```
               IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                         AT CHARLESTON


_____x
                              :
THE CITY OF HUNTINGTON,       :       Civil Action
                              :
             Plaintiff,       :       No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
             Defendants.      :
_____x
                              :
CABELL COUNTY COMMISSION,     :       Civil Action
                              :
             Plaintiff,       :       No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
             Defendants.      :
_____x
```

                     BENCH TRIAL - VOLUME 26
        BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
                   UNITED STATES DISTRICT COURT
                   IN CHARLESTON, WEST VIRGINIA


                          JUNE 14, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301


**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

APPEARANCES (Continued):

For the Defendant,
Cardinal Health:

MS. ASHLEY W. HARDIN
MS. ISIA JASIEWICZ
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

APPEARANCES (Continued):

For the Defendant,
McKesson:

MR. TIMOTHY C. HESTER
MR. PAUL W. SCHMIDT
MS. LAURA M. FLAHIVE WU
MR. ANDREW STANNER
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

MR. JEFFREY M. WAKEFIELD
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:                    Ayme Cochran, RMR, CRR
Court Reporter:                    Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
1        PROCEEDINGS had before The Honorable David A.

2   Faber, Senior Status Judge, United States District

3   Court, Southern District of West Virginia, in

4   Charleston, West Virginia, on June 14, 2021, at 9:00

5   a.m., as follows:

6              THE COURT:  Do you have something?

7              MS. WICHT:  Good morning, Your Honor.  Just a very

8   brief issue.  It doesn't relate to Dr. Keyes, the witness

9   who's on the stand.  It relates to Ms. Keller who's the next

10  witness up.

11       Your Honor, last night we received -- pursuant to the

12  parties' agreement, we received the documents for Ms. Keller

13  and we received the demonstratives as well.

14       We have raised an issue with the plaintiffs that the

15  demonstratives for Ms. Keller contain opinions and analysis

16  that is not in her report.

17       As to certain -- we're in the process of on-going

18  discussions with the plaintiffs.  And as to certain of them,

19  we have resolved the issue.  But there are other

20  demonstratives that contain information that is not in

21  Ms. Keller's report.

22       So, for example, she has a -- what Ms. Keller does,

23  very briefly, is just look at prescribers within Cabell

24  County.  And she has a slide in her demonstratives, for

25  example, where she compares that information to Queens, New
```

1    York, Honolulu, Hawaii, Hartford, Connecticut, nationwide.

2    None of that analysis was in her report, Your Honor.

3         And there's one other -- that's slide 3.  There's one

4    other slide, slide 8, that has similar -- raises similar

5    issues.

6         Our position is these are new analyses, new opinions.

7    They weren't disclosed in her report.  They were first

8    disclosed at 11:00 p.m. last night and she shouldn't be

9    allowed to present them today.

10             THE COURT:  Do you want to respond, Mr. Ackerman?

11             MR. ACKERMAN:  Yes.  I've got a couple of

12   responses, Your Honor.

13        The first one is that we assumed this would come up

14   prior to Ms. Keller taking the stand.  So Ms. Singer who is

15   handling that testimony isn't here.  But, regardless, we

16   think the slides are wholly consistent with her report and I

17   expect that Ms. Singer will be prepared to address that once

18   she gets to court in order to take Ms. Keller's testimony.

19             MS. WICHT:  And that's fine, Your Honor.  I've

20   been communicating with Ms. Singer this morning.  I didn't

21   realize that she wouldn't be in court right at this

22   particular moment.  That's fine.

23        I, I just would say that, then, I don't want to hear

24   any complaints of sandbagging and now the witness is coming

25   to the stand and you're trying to change what we're allowed

```
1    to do with her because we certainly raised it, you know,

2    this morning and, and -- before court and in court this

3    morning.

4              THE COURT:  Well, I'm going to put this off until

5    Ms. Singer is here.  I received some good advice from one of

6    my mentors years ago when I started practicing law.  He said

7    don't deal with all your problems today.  You would be

8    surprised how many of them just go away.

9              MS. WICHT:  Good advice, Your Honor.  Thank you.

10             THE COURT:  All right.  Do we have a witness?

11        Is Mr. Hester ready to cross examine?

12             MR. HESTER:  Yes, Your Honor.  Thank you.

13             THE COURT:  Good morning, Dr. Keyes.

14             THE WITNESS:  Good morning.

15             THE COURT:  You can resume the witness stand and,

16    of course, you're still under oath.

17        KATHERINE KEYES, PLAINTIFFS' WITNESS, RESUMED THE

18    WITNESS STAND

19                        CROSS EXAMINATION

20    BY MR. HESTER:

21    Q.   Good morning, Dr. Keyes.

22    A.   Good morning.

23    Q.   Dr. Keyes, you testified last week that there's a

24    causal connection between exposure to opioids and

25    opioid-related harm; correct?
```

1    **A.**   Yes.

2    **Q.**   And you testified that in your view, exposure is

3    synonymous with supply; is that right?

4    **A.**   I, I think there's multiple levels of exposure.  And

5    one level of exposure can be the supply of prescription

6    opioids to a particular area.  But individuals also are

7    exposed to opioids when they personally are using them.

8    **Q.**   And you remember Mr. Farrell asked you the question

9    where he said, "Let's try to find another word that helps me

10   understand.  Is supply another word for exposure?"  And you

11   said, "Yes."

12        Do you remember that?

13   **A.**   Yes.  In that particular context, I think it was

14   synonymous.  But as a general matter, I wouldn't use those

15   two words synonymously in all cases.

16   **Q.**   So to be clear, when you talk about exposure or supply,

17   you're talking about opioids that are out in the community

18   and are being used or abused by individuals; correct?

19   **A.**   I'm sorry.  Can you repeat the question?

20   **Q.**   Yes.  So when you talk about exposure and supply,

21   you're talking about opioids that are out in the community

22   and are being used or abused by individuals; correct?

23   That's the, that's the supply and the exposure you're

24   focusing on; correct?

25   **A.**   Yes.

1    **Q.**   And with respect to prescription opioids in particular,

2    that means the pills have either been dispensed by a

3    pharmacy pursuant to a prescription or illegally trafficked

4    or manufactured by criminals.  It's one or the other.

5    Correct?

6    **A.**   The opioids that are in communities either arrived

7    there through an illegal route or a legal route.  So those

8    would be the universe of ways that opioids could get into a

9    community.

10   **Q.**   And the source for the legal route, just to set the

11   table -- I think we're on the same page.  But to set the

12   table, the source for the legal route would be dispensed by

13   a pharmacy pursuant to a prescription written by a doctor;

14   correct?

15   **A.**   I would say in the majority of cases, you know, that

16   that -- that would be true in a lot of, a lot of cases.

17   **Q.**   And, and with respect to illegal opioids like heroin

18   and illicit fentanyl, it means criminal traffickers or

19   criminal actors have trafficked the drugs into the community

20   and then sold them to end-users; correct?

21   **A.**   That would be true for prescription opioids as well in

22   many cases.

23   **Q.**   Right.

24   **A.**   So any, any way that the illegal route gets into the

25   community, what -- regardless of what the opioid is, it

1    would be through a trafficking mechanism.

2    **Q.**    Right.  So your point is there may also be legal

3    prescriptions that were issued at some point legally, but

4    they've then been trafficked into a local area by drug

5    traffickers; right?

6    **A.**    That can occur.

7    **Q.**    And, so, when you -- oh, when you opined last week that

8    exposure to opioids causes harm, you mean that the ingestion

9    of opioids into a person's body can cause harm; right?

10   **A.**    There are other types of harms that are outlined in my

11   report that can occur to communities when rates of opioid

12   use are high; for example, to children and families.

13   **Q.**    But those are ripple effects that begin with somebody

14   ingesting opioids into their body; correct?

15   **A.**    Yes.

16   **Q.**    Now, you testified on Friday that it's very difficult

17   to acquire opioid use disorder if you've never been exposed

18   to opioids, almost a truism, right, if nobody -- if somebody

19   has never used an opioid, they're unlikely to develop opioid

20   use exposure; correct?

21   **A.**    It would be impossible.  It's a, it's a necessary cause

22   of opioid use disorder.

23   **Q.**    So, Dr. Keyes, I believe last week in your testimony

24   you spoke about an over-supply of opioids; correct?

25   **A.**    Yes.

1   **Q.**   And you also mentioned that in your report.  You talked

2   about this idea that in your view, there was an over-supply

3   of opioids in Cabell/Huntington; correct?

4   **A.**   Yes.

5   **Q.**   And you recognize, I take it, that there are legitimate

6   medical needs for opioids; correct?

7   **A.**   You know, as a, as a general matter, I think the

8   legitimacy of opioids for any particular condition is one

9   that has been controversial for a lot of different

10  conditions.

11  **Q.**   But you understand that opioids are a legitimate

12  medicine that are used for legitimate purposes to treat

13  pain; correct?

14  **A.**   It would really depend on what the purpose is.  There

15  are many applications of opioids that have been argued were

16  inappropriate.

17  **Q.**   So you're not aware of any legitimate uses for opioids

18  to treat pain?

19  **A.**   Certainly, opioids relieve pain, and certainly there

20  are circumstances in which an opioid would be an appropriate

21  medication, particularly for end-of-life pain, for example,

22  and some acute conditions for which opioids are prescribed

23  for a short-term.  But for a large majority of purposes for

24  which opioids are prescribed, there's literature that has

25  been developed calling into question their efficacy.

1     **Q.**   Well, do you believe that when used as prescribed under

2     medical supervision, opioid analgesics are effective and

3     used as standard practice in managing pain?

4     **A.**   I believe you're quoting the American Journal of Public

5     Health article that I published in 2013.  Right?

6     **Q.**   You have a good memory.

7     **A.**   Thank you very much.  You know, I think that that

8     sentence in that paper, the paper wasn't about the efficacy

9     of opioids.  And certainly in 2013 a lot of us had a broader

10    view of opioids I guess I would say.

11         But the two citations I think that are, are made to

12    that sentence, if you go to those citations, I think it

13    provides a broader context for that particular sentence.

14    **Q.**   Let me show you that document then.

15    **A.**   Sure.

16              MR. HESTER:  Your Honor, may I approach?

17              THE COURT:  Yes.

18    BY MR. HESTER:

19    **Q.**   You probably remember this one.

20         Dr. Keyes, I've handed you a document marked as

21    Defendants' West Virginia Exhibit 2516.  And the title is

22    "Understanding the Rural-Urban Differences in Non-Medical

23    Prescription Opioid Use and Abuse in the United States."

24         Do you see that?

25    **A.**   Yes, I do.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   And this is an article you wrote; correct?

2    **A.**   I was the first author, yes.

3    **Q.**   So there were several authors, but you were one of the

4    authors of this paper?

5    **A.**   I was.

6    **Q.**   And let me ask you to look at Page 3, and I'm using the

7    small numbers in the left-hand corner.  And I think we're

8    together on this, but I just wanted to make sure the record

9    is clear.

10        So there's -- under the heading "Self-medicating for

11   Pain," there's a statement that says, "When used as

12   prescribed under medical supervision, opioid analgesics are

13   effective and used as standard practice in managing acute

14   and chronic pain."

15        Do you see that?

16   **A.**   I do.

17   **Q.**   And that was a true statement at the time you wrote it;

18   correct?

19   **A.**   Well, I think I would just provide a little more

20   context to that statement.  I think -- if I were to write it

21   today, I certainly -- and I think most epidemiologists would

22   not have such a blanket statement about opioid prescribing

23   certainly in 2013.  I think many of us were affected by some

24   of the same inappropriate marketing and misleading

25   advertising and statements by industry that many doctors

1   were as well.

2       But I think if you actually go to the two references

3   that I've cited there, what the underlying references

4   suggest is that for a lot of purposes for which opioids were

5   prescribed, although prescribing increased, there was very

6   little evidence for efficacy.

7       So I think that that sentence is inartfully worded I

8   would say.  And if I were to write it again today, I would

9   certainly provide a lot more context that would be

10   consistent with the actual science that is cited in those

11   underlying citations.

12           MR. HESTER:  Your Honor, I would move to strike

13   the answer as not responsive.  I asked Dr. Keyes whether it

14   was accurate at the time she wrote it, and she's now

15   answered a different question.

16           THE COURT:  Well, I'll grant the motion to strike.

17       You need to answer the precise question, Dr. Keyes.

18           MR. FARRELL:  Judge, I'd like to at least --

19           THE COURT:  Mr. Farrell.

20           MR. FARRELL:  Yes, sir.  I'd like to say that I

21   oppose his motion to strike and note it for the record,

22   please.

23           THE COURT:  Well, she can explain her answer

24   and -- but I believe she went a little beyond that.  So your

25   objection is noted, Mr. Farrell.

1           MR. FARRELL:  Thank you.

2    BY MR. HESTER:

3    **Q.**   So, Dr. Keyes, I just wanted to clarify that at the

4    time you wrote this, you believed this to be a true

5    statement; correct?

6    **A.**   At the time that I wrote that, I, I -- yes, I believed

7    it to be -- I believed it to be a statement that was based

8    in the literature.

9    **Q.**   And you have not undertaken to determine the supply of

10   opioids that are needed to meet medical needs in West

11   Virginia, have you?

12   **A.**   I believe that that type of information is in my

13   report.

14          MR. HESTER:  Let me pull up, please, Dr. Keyes'

15   deposition from this case at pages -- at Page 126, lines 6

16   to 10.

17   BY MR. HESTER:

18   **Q.**   Dr. Keyes, first let me ask you, do you remember

19   being deposed in this litigation?

20          MR. FARRELL:  Objection, Your Honor.  I'm not

21   quite sure that impeachment has been established at this

22   point in time.

23          THE COURT:  Well, we don't know yet.

24          MR. FARRELL:  So before we put up transcripts of

25   other proceedings, I think the foundation has not yet been

```
 1    laid to bring up her prior testimony.

 2              MR. HESTER:  Your Honor, I asked her a question

 3    and, and now I have a deposition excerpt that I believe the

 4    response is the same question that she answered during her

 5    deposition.

 6              THE COURT:  Mr. Ackerman.

 7              MR. ACKERMAN:  Yeah, but the problem is that

 8    counsel hasn't established that yet.  He asked a question

 9    and then went straight to the deposition which is not the

10    proper method of establishing --

11              THE COURT:  Well, you got an answer from her,

12    didn't you, Mr. Hester?

13              MR. HESTER:  I did get an answer.

14              THE COURT:  Overruled.  Go ahead.

15    BY MR. HESTER:

16    Q.  So, Dr. Keyes, you recall being deposed in this

17    litigation; correct?

18    A.  I do.

19    Q.  And you and I had the pleasure of going through that

20    deposition; correct?

21    A.  Yes.

22    Q.  And, so, let me ask you to look at Page 126, line 6.

23        And, so, my question to you was, "So you've not untaken

24    any evaluation of how many pills are needed in

25    Cabell/Huntington?"  That was my question.
```

1          And your answer was, "I -- no, I have not taken -- I've

2     not undertaken that."

3          Do you see that?

4               MR. ACKERMAN:  Your Honor, I want to voice an

5     objection because the question on this deposition is

6     different than the question that was asked of the witness.

7     And that's exactly why we need to establish foundation

8     before we bring up other testimony.

9               THE COURT:  Well, I think it's close enough and

10    I'll overrule the objection.

11         Go ahead, Mr. Hester.

12    BY MR. HESTER:

13    **Q.**   And your answer was, "I have not taken -- I have

14    not undertaken that."  Do you see that?

15    **A.**   I do.

16    **Q.**   And was that a correct statement when you gave it?

17    **A.**   No, I, I have not -- myself have not undertaken any

18    statistical evaluation.  I have reviewed the literature

19    which is what is in the report.

20    **Q.**   But my question to you in that deposition was you have

21    not undertaken any evaluation of how many pills are needed

22    in Cabell County.  And your answer was, "No, I have not

23    undertaken that."

24         Is that correct when you said it?

25    **A.**   That's what the deposition says.  I think my

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    interpretation of the question was whether I had undertaken

2    a statistical evaluation.

3    **Q.**   Well, Dr. Keyes, I'm asking was your testimony accurate

4    when you gave it in your deposition?

5    **A.**   Yes.  I have not undertaken a statistical evaluation,

6    although I have reviewed the literature.  So I just want to,

7    I guess, clarify my interpretation of the question.

8    **Q.**   And you have not undertaken any analysis of the pain

9    needs specifically in Cabell/Huntington, have you?

10   **A.**   No, I have not.

11   **Q.**   So you don't know the level of supply needed to meet

12   the pain needs of Cabell/Huntington; correct?

13   **A.**   I would say that the, the consensus of the literature

14   that I cite in the report is that in terms of the opioid

15   needs in the community, the pre-opioid epidemic levels were

16   the levels that should be considered as, as meeting the pain

17   needs of the community.

18           MR. HESTER:  Your Honor, I move to strike as

19   nonresponsive.

20           THE COURT:  I grant the motion to strike.  Go

21   ahead.

22   BY MR. HESTER:

23   **Q.**   So, Dr. Keyes, you do not know the level of supply

24   of prescription opioids needed to meet the pain needs of

25   Cabell/Huntington; correct?

1    **A.**    The -- I, I do know.  I have an opinion about that.

2    **Q.**    Well, you've not undertaken any analysis for the pain

3    needs in Cabell/Huntington; correct?  You just said that.

4    **A.**    Correct.

5    **Q.**    And, so, you don't know the level of supply of need to

6    meet those pain needs because you don't know the level of

7    pain needs in the community; correct?

8    **A.**    Again, I could point to literature to inform the answer

9    to that question.

10   **Q.**    But you haven't undertaken that analysis of pain needs

11   in Cabell/Huntington; correct?

12   **A.**    That's right.

13   **Q.**    Now, Dr. Keyes, you prepared a 54-page, single-spaced

14   report in this case; right?

15   **A.**    I, I trust that that's correct.

16   **Q.**    I think that's the right count.  In small font too I

17   would add; correct?

18   **A.**    I suppose it was small.

19   **Q.**    You did not evaluate any specific distributors in your

20   report; correct?

21   **A.**    The information that is included in the report includes

22   aggregated data across distributors, although I did not

23   evaluate any specific company by name.

24   **Q.**    And your report does not mention McKesson, Cardinal, or

25   ABDC at all, does it?

1    **A.**   It does not.

2    **Q.**   And you did not review any documents relating to the

3    distributors' individual activities, did you?

4    **A.**   I, I don't believe -- I'm just trying to remember what

5    is included in the ARCOS data.  I'm not sure -- I do believe

6    there's some information on specific distributors, although

7    the information in my report is in the aggregate.

8    **Q.**   Dr. Keyes, I was asking about documents.  You did not

9    review any documents relating to the distributors'

10   individual activities, did you?

11   **A.**   I believe I reviewed some documents about market share

12   generally.

13          MR. HESTER:  May we bring up Dr. Keyes'

14   deposition, please, from this case, Page 301.

15   BY MR. HESTER:

16   **Q.**   And, Dr. Keys, again, you recall being deposed in

17   this case; correct?

18   **A.**   I do.

19   **Q.**   Let me ask you to look at Page 301, line 1.

20          My question to you was, "But you've not reviewed

21   specific documents relating -- related to their individual

22   activities?"

23          Do you see that question?

24          MR. FARRELL:  Objection, Your Honor.  So, again,

25   his first question is materially different than the question

```
1    on the screen.  So I would object to the first question as

2    being vague.  And I would object to the use of the

3    transcript as being improper impeachment.

4              THE COURT:  Overruled.

5         Go ahead, Mr. Hester.

6    BY MR. HESTER:

7    Q.   So my question was, "But you've not reviewed

8    specific documents related to their individual

9    activities?"

10        Do you see that question?

11   A.   I do.

12   Q.   And your answer was, "Generally, no."  Was that your

13   answer?

14   A.   That's what's written.

15   Q.   Well, and is that what you answered, Dr. Keyes?

16   A.   That's what I answered in the deposition.

17   Q.   And was that answer true and correct when you gave it?

18   A.   Yes.  As I've said, as I'm thinking it over, you know,

19   I did see some documents related to market share.  So I

20   think the "generally, no" statement leaves some room for,

21   yes, I have seen some documents related to market share.

22   Q.   You did not assess any individual distributor's

23   contribution to opioid supply relative to other

24   distributors; correct?

25   A.   I have not.
```

1   **Q.**   And as part of your methodology, you did not evaluate

2   how many opioids that McKesson, Cardinal, or ABDC

3   individually had shipped into Huntington and Cabell County;

4   correct?

5   **A.**   That's correct.

6   **Q.**   Your report, in fact, does not make any mention as to

7   how many opioids McKesson, Cardinal, or ABDC individually

8   shipped into Huntington or Cabell County; correct?

9   **A.**   That's right.  It's the total number of shipments.

10   **Q.**   And you don't know the respective market shares of

11   McKesson, ABDC, and Cardinal vis-à-vis their distributions

12   into Cabell and Huntington; correct?

13   **A.**   As I mentioned, I have reviewed documents related to

14   that, although that's not my area and it is not in my

15   report.

16   **Q.**   And you don't know what their respective market shares

17   are for their distribution of opioids into Cabell and

18   Huntington County; correct?

19   **A.**   Not off the top of my head.

20   **Q.**   I'm sorry, Cabell County and Huntington.  Sorry.  You

21   don't --

22   **A.**   Not sitting here today.

23   **Q.**   And you don't have any knowledge in relation to the

24   operations of McKesson, Cardinal, or ABDC in Cabell County

25   and Huntington; correct?

1    **A.**   Can you clarify what you mean by knowledge?

2    **Q.**   Do you have any knowledge in relation to the operations

3    specifically of McKesson, ABDC, or Cardinal in Cabell County

4    and Huntington?

5              MR. ACKERMAN:  Objection, vague.

6              THE COURT:  Overruled.

7              THE WITNESS:  I'm, I'm generally familiar with the

8    activities of distributors, but I have not reviewed any

9    specific material related to operations in Cabell and

10   Huntington that have -- that were in my report or that

11   informed the opinions that I've given in the report.

12   BY MR. HESTER:

13   **Q.**   So you didn't discuss those factors in your report;

14   correct?

15   **A.**   That's -- well, I'm sorry.  Can you -- the question is

16   the --

17   **Q.**   Do you have any knowledge in relation to the operations

18   of McKesson, Cardinal, or ABDC specifically in Cabell County

19   and Huntington?

20   **A.**   In the report I discussed general distribution

21   operations, but not with regard to any company specifically.

22   **Q.**   And, so, your answer is "no;" correct?

23   **A.**   Correct.

24   **Q.**   You did not review the content of any distributor

25   Suspicious Order Monitoring Program for purposes of your

1    report in this case; correct?

2    **A.**    That's correct.

3    **Q.**    You did not review any of the orders that were made by

4    pharmacies in Huntington or Cabell County for prescription

5    opioids; correct?

6    **A.**    No, I did not review any specific orders.

7    **Q.**    And you're not offering an opinion on how many opioids

8    McKesson, Cardinal, or ABDC shipped to any specific pharmacy

9    in Huntington or Cabell County; correct?

10   **A.**    Not a specific pharmacy, no.

11   **Q.**    And you cannot identify a single prescription opioid

12   that was distributed by the defendants in Cabell County or

13   Huntington that in your opinion should have been

14   investigated and not shipped?  That's not something you've

15   done; correct?

16   **A.**    That's not in, in the lens of epidemiology.  We

17   typically don't look at individual prescriptions.

18   **Q.**    And you're not aware of any occasion where McKesson,

19   ABDC, or Cardinal shipped opioids that exceeded their

20   permissible quotas set by the DEA; correct?

21   **A.**    I have not looked at specific quota levels and

22   shipments that have exceeded them.

23   **Q.**    You're not aware of any evidence that McKesson,

24   Cardinal, or ABDC shipped pills into Huntington or Cabell

25   County that exceeded the levels doctors had prescribed;

1    correct?

2    **A.**    I, I have not reviewed evidence related to specific

3    shipments.

4    **Q.**    And, so, you're not aware of any evidence that they

5    shipped pills into Huntington or Cabell County that exceeded

6    the levels prescribed by doctors; correct?

7    **A.**    Right.  That is not something in my report.

8    **Q.**    You've published, I believe you said last week, 306

9    peer-reviewed articles; is that correct?

10   **A.**    Yes.

11   **Q.**    And about 35 to 40 of those relate specifically to

12   opioid use and opioid harms; is that correct?

13   **A.**    Yes.

14   **Q.**    And some of them address the causes of the opioid

15   crisis; right?

16   **A.**    That's right.

17   **Q.**    None of your articles that you've written on the opioid

18   crisis or opioid harms refer to McKesson as a cause of the

19   opioid crisis; correct?

20   **A.**    It refers to over-supply and distribution more

21   generally.

22   **Q.**    Can you answer --

23   **A.**    I have not named McKesson in any of those articles.

24   **Q.**    So none of your articles refer to McKesson as a cause

25   of the opioid crisis; correct?

1    **A.**   In the sense that McKesson is a distributor and the

2    distribution of opioids are identified as a cause, I think

3    it's fair to say that I have identified McKesson.

4          MR. HESTER:  Your Honor, I move to strike as not

5    responsive.

6          THE COURT:  Well, I'll overrule that.  I think

7    that was responsive.

8    BY MR. HESTER:

9    **Q.**   None of your articles refers to distributors

10   collectively as a cause of the opioid crisis; correct?

11   **A.**   No, that's incorrect.  I talk about the over-supply of

12   prescription opioids.

13   **Q.**   I'm talking about distributors collectively.  I'm not

14   talking about over-supply.  My question is none of your

15   articles refers to distributors collectively as a cause of

16   the opioid crisis; correct?

17         MR. ACKERMAN:  Objection, asked and answered.

18         THE COURT:  Overruled.

19         THE WITNESS:  I do talk about distribution of

20   opioids as a cause of the opioid crisis.  And, therefore,

21   the contributors to distribution would be the cause of the

22   distribution.  It doesn't arise magically.

23         MR. HESTER:  Let me ask to pull up the *Frye*

24   transcript from New York, Page 153.

25   BY MR. HESTER:

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   Dr. Keyes, do you remember testifying in a *Frye*

2    hearing in New York?

3    **A.**   I do.

4    **Q.**   I believe you mentioned that last week; correct?

5    **A.**   Yes.

6    **Q.**   And let me show you Page 153 of the transcript, line

7    17.

8         And there was a question asked, "Is there a publication

9    you can point us to where you say that in that publication

10   that distributors as a class caused the opioid crisis?"

11        And your answer was, "Not back then, no."

12        Do you see that?

13             MR. ACKERMAN:  Objection, Your Honor.  This isn't

14   the same question that was asked.  Frankly, if you look at

15   the immediate preceding question on this transcript, it has

16   the exact same answer that the witness just gave.  This is

17   improper impeachment, Your Honor.

18             MR. HESTER:  I object to the speaking objection,

19   Your Honor.  If the objection is improper impeachment, that

20   should be the objection.

21             THE COURT:  Well, I'm going to overrule the

22   objection.

23        You can go ahead, Mr. Hester.

24   BY MR. HESTER:

25   **Q.**   Was that, was that answer that you gave, Dr. Keyes,

1    accurate and true when you gave it?

2    **A.**   This is a different question.

3    **Q.**   I'm asking whether the answer that you gave to the

4    question on the transcript was true and accurate when you

5    gave it.

6    **A.**   Yes.

7    **Q.**   All right.  Dr. Keyes, let's talk about a few of your

8    articles in a little more detail.

9              MR. HESTER:  May I approach, Your Honor?

10             THE COURT:  Yes.

11   BY MR. HESTER:

12   **Q.**   Dr. Keyes, I've handed you a document marked as

13   MC-WV-01806.  And on its face it appears to be an

14   article, "A Critical Review of the Social and Behavioral

15   Contributions to the Overdose Epidemic."

16        Dr. Keyes, I take it you're familiar with this article?

17   **A.**   I am.

18   **Q.**   And you're one of the authors of it; correct?

19   **A.**   Yes.

20   **Q.**   And if you look at Page 12 and, again, working off of

21   the small numbers at the bottom, and this is under the

22   heading for "Author Contributions" there's a statement,

23   "K.M.K. provided feedback on the initial structure of the

24   paper, wrote sections, and critically reviewed and edited

25   multiple versions of the manuscript."

1      Do you see that?

2  **A.**   I do.

3  **Q.**   And I take it K.M.K. is a reference to you?

4  **A.**   Yes.

5  **Q.**   So that's a fair description of what you did in

6  relation to this article?

7  **A.**   Yes.

8  **Q.**   So this article was originally published as a review in

9  advance on November 30, 2020; correct?

10  **A.**   Yes.

11  **Q.**   And then it was published in its final form in the

12  Annual Review of Public Health in April, 2021; is that

13  correct?

14  **A.**   Yes.

15  **Q.**   And, so, it was published after you had been retained

16  as an expert in this case; correct?

17  **A.**   Yes.

18  **Q.**   And it was published after you wrote your expert

19  report; correct?

20  **A.**   The expert report for --

21  **Q.**   For this litigation.

22  **A.**   Yes.

23  **Q.**   And it was published after you sat for your deposition

24  in this case; correct?

25  **A.**   I don't remember the exact timing, but I trust that --

1   **Q.**   I think it was September of last year that we had the

2   pleasure.   Does that sound about right?

3   **A.**   That sounds right.

4   **Q.**   So this paper went through a process of peer-review; is

5   that correct?

6   **A.**   Yes.

7   **Q.**   And what does peer-review mean?   Can you explain just

8   very briefly what peer-review means?

9   **A.**   Sure.   When you submit a journal -- an article to a

10  journal, the editor of the journal will decide whether it

11  merits further consideration.   And if it does, they will

12  invite, you know, other scientists who have expertise in

13  this area to read the paper and say whether it has

14  scientific merit.

15  **Q.**   And, so, there, there are peers that provide input on

16  the article.   And then that peer-review process ensures the

17  legitimacy or the accuracy of the article?   Is that the

18  concept?

19  **A.**   Well, I wouldn't say that it ensures accuracy or

20  legitimacy.   It's really more of, you know, having your

21  peers read the paper and, and provide an assessment to the

22  editor really of whether the paper is, is scientifically

23  meritorious of publication.

24  **Q.**   And is it a fair statement that peer-review is a

25  meaningful step in publishing an article, that that means

1    something about the, the, the article?

2    **A.**    It's certainly a requirement of most journals that an

3    article is, is identified as meritorious by your scientific

4    peers.

5    **Q.**    And if the peers were to say that it was not

6    meritorious or lacked weight or had problems, would that

7    cause the article either to be changed or not published?

8    **A.**    Ultimately, the decision rests with the editor.

9    Certainly, editors listen to the feedback of peer-reviewers.

10   And, so, if your peers -- if the peer-reviewers all said,

11   you know, this article is not scientifically meritorious,

12   then an editor would likely not accept the paper in the

13   journal.

14   **Q.**    So let me ask you to look at Page 3 of this article,

15   please.  And, again, I'm working off of the small numbers at

16   the bottom left.

17        I wanted to focus you under the heading for "Supply

18   Drivers of the Opioid -- of the Overdose Epidemic."  And

19   then there's a subheading for "The Prescription Opioid

20   Supply:  Chronic Pain and Opioid Prescribing."

21        Do you see that?

22   **A.**    I do.

23   **Q.**    And there's a first sentence under that heading that

24   reads, "The supply-side roots of the overdose epidemic in

25   the United States lie at the intersection of two social and

```
 1    behavioral forces that, together, led to the proliferation

 2    of opioid prescribing in the 1990s, especially for

 3    non-cancer acute and chronic pain conditions."

 4          Do you see that?

 5    A.    I do.

 6    Q.    Is that a true statement?

 7    A.    I believe that's an accurate representation of the

 8    literature.

 9    Q.    And it goes on to say, "The first force was a shift in

10    treatment approaches for chronic non-cancer pain, including

11    a campaign by professional pain societies and the U.S. Joint

12    Commission, the nation's largest accrediting body for

13    healthcare organizations, to consider pain as the fifth

14    vital sign and to improve the quality of care for chronic

15    pain."

16          Do you see that?

17    A.    I do.

18    Q.    And that's a true statement; correct?

19    A.    I think that that accurately represents the literature.

20    Q.    Then let me point you to the next paragraph which

21    begins, "The second related force involved the

22    pharmaceutical industry's concerted efforts to advocate for

23    the long-term use of opioids as a safe, non-addictive,

24    effective, and humane alternative to treat non-cancer pain."

25          Do you see that?
```

1    **A.**   I do.

2    **Q.**   And then it goes on a few sentences later to say, "In

3    1996-2002, Purdue Pharma provided funds for educational

4    campaigns supporting the use of opioids to treat chronic

5    non-cancer pain and supported efforts by pain professional

6    societies, the U.S. Joint Commission, and the Federation of

7    State Medical Boards to advocate for the use of opioids to

8    treat pain."

9        Do you see that?

10   **A.**   Yes.

11   **Q.**   And is that a true statement?

12   **A.**   I believe it reflects the literature.

13   **Q.**   Let me point you to Page 4, please.  Just before the

14   heading for the illegal opioid supply, there's a statement,

15   "The expansion of PO supply --" and I take it PO means

16   prescription opioids; right?

17   **A.**   That's right.

18   **Q.**   "The expansion of PO supply increased opioid-related

19   harm through several pathways affecting both individuals who

20   initially used opioids as prescribed but developed impaired

21   control over use and individuals who used non-medically and

22   obtained opioid prescriptions through family, friends, or an

23   illicit diversion source."

24       Do you see that?

25   **A.**   I do.

1    **Q.**   And that's a true statement; correct?

2    **A.**   It reflects the literature, yes.

3    **Q.**   And, so, in this sentence, there's a reference to using

4    opioids non-medically.  And that means opioids not being

5    used pursuant to a doctor's correction [sic]; correct?  I'm

6    sorry.  Doctor's direction; correct?

7    **A.**   Yes.

8    **Q.**   And, for instance, using opioids without a prescription

9    is a form of non-medical use; correct?

10   **A.**   That's right.

11   **Q.**   Stealing opioids from somebody's medicine cabinet and

12   then ingesting them is a form of non-medical use; correct?

13   **A.**   It is.

14   **Q.**   Buying opioids from a drug trafficker and ingesting

15   them is a form of non-medical use; correct?

16   **A.**   Yes.

17   **Q.**   Also, taking pills more frequently or for a longer

18   period of time than prescribed is also a form of non-medical

19   use; correct?

20   **A.**   That's right.

21   **Q.**   The reference here to -- in this sentence we're looking

22   at just before the next paragraph where it says that opioids

23   were obtained through family or friends, is that -- I take

24   it the reference there means someone had a legitimate

25   prescription and then gave or sold them to family or

```
1    friends; correct?

2    A.   Not necessarily.  I mean, a lot of people can obtain

3    prescription opioids through non-medical sources and give

4    them to family or friends or sell them to family or friends

5    as well.

6    Q.   Well, I wanted to ask about the idea that individuals

7    who used non-medically obtained opioid prescriptions through

8    family or friends.  And, so, is the point there that the

9    family or friends may have had a legitimate prescription and

10   then gave those pills or sold them to someone else who used

11   it non-medically?

12   A.   That could happen.  Certainly, one source of opioids is

13   a family or friend who received a prescription for opioids

14   and didn't finish the bottle or, you know -- but, also, the

15   family or friend could have themselves obtained the

16   prescription opioids non-medically.

17        So the literature that forms the basis of that

18   statement usually asks people, "Where do you obtain your

19   opioids?"  And people say family or friends, but they don't

20   specify where the family or friend got the medication.

21   Q.   So your point is there might be one set of

22   circumstances where a family member had a prescription but

23   didn't use all the opioids and then either gave or sold them

24   to somebody else.  That's one scenario; correct?

25   A.   That is one scenario.
```

1    **Q.**   And another scenario might be that a family member him

2    or herself had obtained opioids illegitimately and then

3    handed them over to somebody else; correct?

4    **A.**   Yes.  And I think a third scenario is that people

5    obtain opioids from a medical source where the prescriber is

6    not prescribing for a legitimate medical need for example.

7    **Q.**   So there's a reference in that same sentence we were

8    just looking at to individuals who used non-medically and

9    obtained opioid prescriptions from an illicit diversion

10   source.  Do you see that?

11   **A.**   Yes.

12   **Q.**   And does the reference to an illicit diversion source

13   mean some sort of drug trafficker or someone who's selling

14   the opioids?

15   **A.**   That's one possibility for an illicit diversion source.

16   **Q.**   But this is diversion after the prescriptions have --

17   I'm sorry.  Let me strike that and start over.  This is not

18   diversion in the closed system for controlled substances;

19   correct?

20   **A.**   The definition of diversion that I used, just to -- if

21   I could answer your question with a little bit of context, I

22   hope that's okay.

23        The definition of diversion that I use in the report is

24   any opioids that are used by someone who they were not

25   prescribed for.  So an illicit diversion source would

1    include any use of opioids by someone who they were not

2    prescribed for which would include opioids that arrived

3    through the closed system.

4    **Q.**   But it could -- but the point would be when you're

5    talking here about an illicit diversion source, you're

6    talking about an illicit diversion source after the pills

7    are outside of a pharmacy; correct?

8    **A.**   Again, I, I don't know how -- exactly how to answer

9    that because the diversion definition is the use of an

10   opioid by someone for whom it is not prescribed.

11        So an illicit diversion source would be any source that

12   got a prescription to someone for whom it is not prescribed.

13   And that would include a number of different mechanisms,

14   including a bottle that left the pharmacy and got into the

15   hands of someone it wasn't prescribed for.  But it would

16   also include a lot of other potential diversion mechanisms.

17   **Q.**   A very common one that you've seen and you discuss in

18   your report is the scenario where the pills are prescribed

19   to somebody.  They're -- it's a legitimate prescription.

20   But then they later end up into illicit channels.  Correct?

21   That's a very common pattern you've seen?

22   **A.**   There is a common pattern whereby people have unused

23   medication from an opioid prescription.  I would say that is

24   common.  But there are other mechanisms as well.

25   **Q.**   Let me ask you to look at Page 2, please.

1          In the middle of the second paragraph there's a

2     statement, "Heroin use and related harms increased in the

3     mid 2000s surpassing prescription opioids as a cause of

4     opioid-related overdoses in 2015."

5          Do you see that?

6     **A.**   I do.

7     **Q.**   And that's a true statement; correct?

8     **A.**   Yes, based on the CDC data.

9     **Q.**   And then let me ask you to look at Page 4 again.

10         There's -- about three sentences in under illegal

11    opioid supply, in that paragraph there's a sentence that

12    reads, "While state restrictions on prescription opioids may

13    have increased the risks of transition to heroin use among

14    people with a dependence on prescription opioids, shifts in

15    the heroin market also likely played an important role."

16         Do you see that?

17    **A.**   I do.

18    **Q.**   And that's a true statement; correct?

19    **A.**   Yes, based on the literature.

20    **Q.**   In that same paragraph it says, it says, "In the mid

21    1990s the U.S. supply of South American heroin increased

22    substantially while the fraction of the market controlled by

23    the Asian heroin decreased dramatically."

24         Do you see that?

25    **A.**   I do.

1    **Q.**   And that's a true statement; correct?

2    **A.**   That's my understanding of the literature.

3    **Q.**   And then it goes on to say, "Mexican black tar heroin

4    dominated the West Coast market while Colombian heroin

5    dominated the East Coast."

6          Do you see that?

7    **A.**   I do.

8    **Q.**   And that's a true statement; correct?

9    **A.**   Again, that's my understanding of the literature.

10   **Q.**   And the reference to Colombian heroin there, that's to

11   a white powder heroin; correct?

12   **A.**   Yes.

13   **Q.**   And then it goes on to say, "Abundant supply, low

14   price, and high purity of the Colombian heroin reduced the

15   price per gram of pure heroin."

16         Do you see that?

17   **A.**   I do.

18   **Q.**   And that's a true statement; correct?

19   **A.**   Based on my read of the literature.

20   **Q.**   And then it goes on to say, "In 2013 the illegal opioid

21   market shifted again with the introduction of fentanyl,

22   often mixed with heroin or sold as counterfeit oxycodone and

23   benzodiazepines."

24         Do you see that?

25   **A.**   I do.

```
1    Q.   And that's a true statement; correct?

2    A.   That's my understanding of the literature.

3    Q.   It goes on to say that, "Fentanyl is cheaper to

4    produce.  The wholesale price is one-tenth of heroin's price

5    by weight, and is 30 to 40 times stronger than heroin, so

6    that a comparable dose would be 1/300 to 1/400 of the

7    wholesale price of heroin."

8         Do you see that?

9    A.   Yes.

10   Q.   And that's a true statement; correct?

11   A.   Based on my read of the literature.

12   Q.   There's a reference here to counterfeit oxycodone.  Do

13   you see that?

14   A.   Oh, yes.

15   Q.   And that reference means fentanyl being sold as a

16   counterfeit prescription opioid perhaps mixed with some

17   filler; correct?

18   A.   Can you say that question again?

19   Q.   Yeah, sorry.  I didn't ask that very well.  When it

20   refers to counterfeit oxycodone, that's referring to a

21   counterfeit prescription pill; correct?

22   A.   Yes.

23   Q.   And the counterfeiting is done by the drug dealer; is

24   that correct?

25   A.   My -- that's my understanding.  They are manufactured
```

1    outside of the pharmaceutical company.

2    **Q.**   And the counterfeit pill typically includes some

3    fentanyl; is that correct?

4    **A.**   It could.  That's what that sentence is saying.

5    **Q.**   And, and presumably it wouldn't be a full-size pill all

6    of fentanyl.  It would have some filler or something else as

7    part of the counterfeit?

8    **A.**   It's possible.

9    **Q.**   If it were a full-size pill with fentanyl, it would

10   kill somebody almost immediately; correct?

11   **A.**   It would depend on the amount of fentanyl and the

12   tolerance of the individual taking it.

13   **Q.**   If you look back at Page 2 again, again in that top

14   section under "National Trends," there's a statement that

15   says, "Overdoses involving synthetic opioids other than

16   methadone became the predominant opioid cause of death."

17        Do you see that?

18   **A.**   Yes.

19   **Q.**   And that's a true statement; correct?

20   **A.**   Yes, that is what the data show.

21   **Q.**   And synthetic opioids there as it's used is referring

22   primarily to illicit fentanyl; correct?

23   **A.**   In terms of what's causing the increase in overdoses?

24   **Q.**   Yes.

25   **A.**   Yes, that is what the consensus is.

1   **Q.**   It could also be referring to carfentanil; correct?

2   **A.**   Yes.

3   **Q.**   And you're aware that both illicit fentanyl and

4   carfentanil are much more potent than heroin; correct?

5   **A.**   Yes.

6   **Q.**   In that -- in the next paragraph it says, "Overdose

7   deaths involving stimulants such as cocaine and

8   methamphetamine began to increase rapidly in 2015 due in

9   large part to adulteration of those substances with

10   synthetic opioids."

11        Do you see that?

12   **A.**   I do.

13   **Q.**   And that's a true statement; correct?

14   **A.**   That's what the literature shows.

15   **Q.**   And when it says "adulteration" there, that's referring

16   to something that's being done by the drug dealer to cut the

17   heroin or to create a counterfeit tablet; correct?

18   **A.**   Yes.

19   **Q.**   And, so, when that occurs -- when, when the heroin is

20   being cut or a pill is being counterfeited, the drug dealers

21   are, are in effect cheating the user by adulterating the

22   heroin with fentanyl; correct?

23   **A.**   They're -- I'm sorry.  They're cheating the user?

24   **Q.**   Cheating the user because they're not giving the

25   user -- if the user thinks he or she is buying heroin and

1    they get heroin adulterated with fentanyl, that's not what

2    the user expects; right?

3    **A.**    It would really depend on the, on the particular user

4    and the drug market.  There are some drug users who prefer

5    fentanyl.

6    **Q.**    You're aware that many drug users who are taking heroin

7    are unaware that the heroin has been adulterated with

8    fentanyl; correct?

9    **A.**    There are many users who are unaware.  But there are

10   users who, who prefer the potency of a strong opioid.

11   **Q.**    But for the users who are unaware that heroin is being

12   cut with fentanyl, they may experience an overdose without

13   knowing the risk they were taking because they weren't aware

14   that the heroin had been cut with fentanyl; correct?

15   **A.**    If -- I mean, that's -- it's sort of tautological.  If

16   the user is unaware, then the user would not know that there

17   is fentanyl by definition of being unaware.  And what I'm

18   saying is that many users are aware.

19   **Q.**    But the user who is unaware would also, therefore, not

20   know the risk that he or she is taking by ingesting heroin

21   that's been adulterated with fentanyl; correct?

22   **A.**    I would say any user who's not aware of the potency of

23   the drugs that they're taking is taking a risk.

24          MR. FARRELL:  Excuse me, Mr. Hester.  I got lost

25   there.  Can you tell me the page number?

```
 1                  MR. HESTER:  Sorry, Paul.  It was Page 2.

 2                  MR. FARRELL:  I'm sorry.  I missed it.

 3     BY MR. HESTER:

 4     Q.   All right, Dr. Keyes, you can put that one aside

 5     for now.  We'll look at another one.

 6                  MR. HESTER:  May I approach, Your Honor?

 7                  THE COURT:  Yes.

 8     BY MR. HESTER:

 9     Q.   Dr. Keyes, we've handed you what's been marked as

10     Defendants' West Virginia Exhibit 2518.  On its face it

11     has a heading "Prescription Opioid Use Disorder and

12     Heroin Use Among Youth Non-Medical Prescription Opioid

13     Users from 2002 to 2014."

14          Do you see that?

15     A.   I do.

16     Q.   And I take it this is an article that -- for which you

17     were one of the co-authors; correct?

18     A.   Yes.

19     Q.   And it was published in February of 2017?

20     A.   Yes.

21     Q.   And in this article you set forth causes of the

22     increasing trend in prescription opioid use disorder that

23     had been observed in young adults at that time; is that

24     correct?

25     A.   This article -- there's no abstract that is produced
```

1      with this.  I'm not sure if that can be provided as well.

2      But this article examined changes in prevalence of heroin

3      use among non-medical prescription opioid users.  I don't

4      believe it assessed risk factors or provided a causal

5      analysis.

6   **Q.**   Let me look with you at Page 7 of the article.  Again,

7      we're using the small numbers on the left.

8          There's a -- this is a paragraph that begins, "Although

9      our study does not assess underlying causes, the increasing

10     trend in prescription opioid use disorder observed in young

11     adults might be at least partially explained by historical

12     factors described elsewhere in the literature."

13         Do you see that?

14  **A.**   I do.

15  **Q.**   And, so, what -- when you're referring to the

16     literature there -- I think I've learned over time this is

17     one of the things epidemiologists do is they study

18     literature and draw conclusions from it; correct?

19  **A.**   Yes.

20  **Q.**   And that's what you're doing here.  You're summarizing

21     a body of literature by referring back to it; correct?

22  **A.**   I don't think this summarizes the totality of the

23     literature.  I think this points to a number of underlying

24     potential explanations, but it doesn't assess or review the

25     literature for the validity of those explanations.

1   **Q.**   But it did pull out propositions that had been found in

2   the literature I take it; correct?

3   **A.**   Right.  This is typically what's done in kind of

4   discussion sections as we look to the body of literature and

5   we say, okay, what are the potential explanations for the

6   trends that we're seeing and what research program would we

7   need to initiate in order to provide the kind of causal

8   analysis on those factors that I think you're suggesting.

9   **Q.**   So when you refer here to the historical factors

10  described elsewhere in the literature, you're referring to

11  other papers that had previously identified these various

12  factors that are discussed as ones that might be

13  contributing to prescription opioid use disorder; correct?

14  **A.**   Yes.

15  **Q.**   And, so, the first factor that's listed is a shift in

16  medical practice of prescribing opioids from end-of-life

17  pain and cancer to chronic non-cancer pain, particularly in

18  non-adults [sic].  Do you see that?

19  **A.**   In young adults I think.

20  **Q.**   I'm sorry, young adults.

21  **A.**   Young adults.

22  **Q.**   So do you see that statement?

23  **A.**   I do.

24  **Q.**   And this is a factor that you believe contributed to

25  increases in opioid use disorder in West Virginia?

1   **A.**   Yes.

2   **Q.**   And next -- the next factor that's referred to is an

3   increased rate of opioid prescription by physicians due to a

4   higher sensitivity to patient's pain.  Do you see that?

5   **A.**   I do.

6   **Q.**   And that's a factor that you believe contributed to

7   increases in opioid use disorder in West Virginia; correct?

8   **A.**   Yes.

9   **Q.**   Next is the -- a reference to the endorsement of pain

10  as a fifth vital sign by the Joint Commission with a

11  controverted pain metric.  Do you see that?

12  **A.**   I do.

13  **Q.**   And that's a factor that you believe contributed to

14  opioid use disorder in West Virginia; correct?

15  **A.**   Yes.

16  **Q.**   And then further down it states, "State lobbying by

17  pain advocates for prescription opioid use."  Do you see

18  that?

19  **A.**   I do.  You skipped one.  I don't know if you want to go

20  over that one.

21  **Q.**   I don't think so, but -- I think that's the next one I

22  wanted to ask you about.  And that's a factor that you

23  believe -- the reference I wanted to point you to is state

24  lobbying by pain advocates for prescription opioid use.  Do

25  you see that?

```
 1    A.    I do.

 2    Q.    And that's a factor that you believe contributed to

 3    increases in opioid use disorder in West Virginia; correct?

 4    A.    Yes.

 5    Q.    The next one I wanted to ask you about is physician

 6    sensitivity to pain exploitation by opioid users.  Do you

 7    see that?

 8    A.    Yes.

 9    Q.    And that's referring to doctor sensitivity to patients

10    who overstate their medical need for opioids in order to

11    obtain a medication; correct?

12    A.    That is possible.

13    Q.    And that's a factor that you believe contributed to

14    increases in opioid use disorder in West Virginia; correct?

15    A.    Yes.

16    Q.    The next reference is doctor shopping by patients.  Do

17    you see that?

18    A.    I do.

19    Q.    And that's a factor that you believe contributed to

20    increases in opioid use disorder in West Virginia?

21    A.    Yes.

22    Q.    The next is overprescribing which leaves excess

23    medications available for misuse or redistribution via

24    non-medical sanctioned venues.  Do you see that?

25    A.    Yes.
```

1   **Q.**   And that's a factor that you believe contributed to

2   increases in opioid use disorder in West Virginia; correct?

3   **A.**   That's right.

4   **Q.**   You don't mention the conduct of wholesale distributors

5   like the defendants anywhere in this article; correct?

6   **A.**   I believe that would be included in the one that you

7   skipped.

8   **Q.**   Which one are you referring to?

9   **A.**   Increased distribution of opioids by the pharmaceutical

10  industry in creation of an opioid-rich environment.

11  **Q.**   And the pharmaceutical industry had secured approval

12  for various opioids; correct?

13  **A.**   They had.

14  **Q.**   And the pharmaceutical industry had secured approval

15  from the FDA to sell opioids based on representations about

16  the risks and benefits of those opioids; correct?

17  **A.**   The opioids were approved by the FDA, yes.

18  **Q.**   And the pharmaceutical industry that had developed

19  those for manufacturers who applied for approval from the

20  FDA for those drugs; correct?

21  **A.**   I'm sorry.  Can you say that sentence again?  I didn't

22  understand the question.

23  **Q.**   Yes.  The, the pharmaceutical manufacturers were the

24  ones who applied to the FDA for approval for drugs based on

25  representations about the risks and benefits of those drugs;

1   correct?

2   **A.**   The manufacturers applied to the FDA, yes.

3   **Q.**   Let's go to another article that you also wrote.  I'm

4   sorry.  We already have this one.  I've already given you

5   this one, Dr. Keyes.  It's the one I've handed you

6   previously, Defendant's Exhibit 2516, "Understanding the

7   Rural-Urban Differences in Non-Medical Prescription Opioid

8   Use and Abuse in the United States."

9        And I think we talked about this.  You wrote this

10  article, correct, along with others?

11  **A.**   I was a co-author, yes.

12  **Q.**   And this article specifically discusses West Virginia;

13  correct?

14  **A.**   Yes.

15  **Q.**   And this is the article that you -- let me back up.

16  You mentioned in your testimony last week that Mr. Farrell

17  first contacted you after reading an article you had

18  written.  This is the article; correct?

19  **A.**   That is what he told me.

20  **Q.**   I'd like to direct your attention to Page 3 of the

21  article, again using the small numbers on the left.

22       Actually, we've already discussed -- well, I'm going to

23  go to another place in this page.

24       The bottom of the left-hand column, "States with large

25  rural populations such as West Virginia are among the

```
 1    highest prescribers of opioid analgesics."
 2         Do you see that?
 3    A.   I do.
 4    Q.   And that's a true statement; correct?
 5    A.   Yes.
 6    Q.   And beginning on Page 3, you identify a number of
 7    factors that may explain the high rate of opioid prescribing
 8    places like West Virginia; correct?
 9    A.   Well, the article is really about explaining
10    urban-rural differences, not just overall prescribing
11    levels.
12    Q.   But let me point you to the paragraph I'm thinking of.
13    In the middle column there's a second paragraph that begins
14    "rural populations."  That's the paragraph I wanted to ask
15    you about.
16    A.   Okay.
17    Q.   And that's a paragraph where you're talking about some
18    of the factors that may lead to higher levels of opioid
19    prescribing in rural populations; correct?
20    A.   Yes.
21    Q.   And, so, one point you make in that paragraph is rural
22    populations are on average older and, thus, there may be
23    more chronic pain for which management with opioid
24    analgesics is indicated.
25         Do you see that?
```

1    **A.**   I do.

2    **Q.**   And that's a true statement; correct?

3    **A.**   Yes, within the context of all the other factors that

4    I'm talking about in the article.  But that is one factor

5    that could lead to increases in prescribing.

6    **Q.**   In rural areas?

7    **A.**   In rural areas.

8    **Q.**   Then it goes on to say, "Chronic pain and injury are

9    more common in rural than in urban areas."

10        Do you see that?

11   **A.**   I do.

12   **Q.**   And that's a true statement; correct?

13   **A.**   That was my read of the literature when I was writing

14   this article.

15   **Q.**   And you based this article that you wrote in 2014 on

16   the literature you had reviewed; correct?

17   **A.**   Yes, at that point.

18   **Q.**   And then there's another statement, "Prescription

19   narcotics are often prescribed to maintain a steady work

20   flow in mines and other heavy labor occupations."

21        Do you see that?

22   **A.**   That was -- the first part of the sentence specifically

23   referred to Kentucky.  But, yes, that's what the sentence

24   says.

25   **Q.**   But it's referring to rural areas such as Appalachian

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    Kentucky; right?

2    **A.**    Yes.

3    **Q.**    And, and I take it that that same observation would

4    apply to rural areas in Appalachian West Virginia; correct?

5    **A.**    The specific, you know -- Jennifer Havens, who is a

6    co-author of the article, that's her particular area of

7    interest is Appalachian Kentucky.  And, so, I haven't

8    reviewed the literature on whether that generalizes to

9    Appalachian West Virginia.

10   **Q.**    So you don't know whether observations about the nature

11   of pain needs in Appalachian Kentucky would be comparable to

12   needs in Appalachian West Virginia?  You don't know?

13   **A.**    I haven't reviewed that literature, so I wouldn't want

14   to offer an opinion on that.

15   **Q.**    Okay.  So, so here it's talking about Appalachian

16   Kentucky.  By the way, you understand that in Appalachian

17   West Virginia there is a -- there's a heavy work flow in

18   mines and other heavy labor occupations; correct?

19   **A.**    I'm generally familiar with the labor industries that

20   are in West Virginia.

21   **Q.**    And you understand there's a lot of heavy physical

22   labor expected of the people of West Virginia; correct?

23   **A.**    I would say in those particular industries, they are

24   physically laborious.

25   **Q.**    And, for instance, mining is an important industry in

1    West Virginia; correct?

2    **A.**   I would not offer an opinion on the importance of any

3    one industry.  I'm an epidemiologist, so I review the data

4    on what the occupations are.

5    **Q.**   Do you have an understanding, though, that, that there

6    is a need for prescription opioids -- well, maybe -- let me

7    back up.  Let me ask it a different way.

8         Do you have an understanding that prescription opioids

9    are often prescribed to maintain a steady work flow in mines

10   and other heavy labor occupations?  Do you understand that?

11   **A.**   I'm sorry.  Say that question again.

12   **Q.**   Sure.  I want to put aside the Appalachian Kentucky

13   point.

14   **A.**   Okay.

15   **Q.**   I understand what you've said about that.

16        We do agree with each other that West Virginia's also

17   in Appalachia; correct?

18   **A.**   Yes.

19   **Q.**   And I wanted to ask you about the cause that reads in

20   this article that you wrote, "Prescription narcotics are

21   often prescribed to maintain a steady work flow in mines and

22   other heavy labor occupations."

23        Do you see that?

24   **A.**   I do.

25   **Q.**   Is that a true statement?

1    **A.**   I, I have not reviewed that literature in a lot of

2    detail.  I would just refer to the underlying article that

3    is cited there for more context, which I haven't reviewed as

4    of late.  So I don't want to offer an opinion about the

5    culture of -- the workplace culture in West Virginia.

6    **Q.**   Well, I take it the intention when you wrote the

7    article was to be accurate and to frame, frame accurately

8    what you had determined from the literature at the time you

9    wrote the article; correct?

10   **A.**   Of course.

11   **Q.**   There's also a next sentence that reads -- no, sorry.

12   I think I asked you already about chronic pain and injury

13   are more common in rural than in urban areas; correct?

14   That's a true statement?

15   **A.**   That was based on, on the literature that I reviewed,

16   yes.

17   **Q.**   So, so based on these considerations that are listed in

18   this paragraph, you would expect to see higher levels of

19   opioid prescribing in West Virginia than in many other

20   states; correct?

21   **A.**   Yes.

22   **Q.**   And it's also true that these same factors could lead

23   to different levels of prescribing within an individual

24   state; correct?

25   **A.**   I'm sorry.  Can you say that again?

**Q.**   There could be different parts of a state that might have attributes that would be more or less likely to effect prescribing levels within a state; correct?

**A.**   Well, it would really depend on people's understandings of the risks and benefits.  Just because there is opioid prescribing does not necessarily indicate that it's appropriate opioid prescribing.

And, so, there is increases in opioid prescribing when you have, for example, older populations.  But that doesn't necessarily mean that that opioid prescribing was appropriate.

**Q.**   I -- maybe I, maybe I didn't ask the right question.

**A.**   Okay.

**Q.**   In this paragraph that we've just been going through, you talk about different factors that might lead to higher levels of prescribing in a rural population; correct?

**A.**   Yes.

**Q.**   And one factor is that rural populations are on average older and, therefore, there may be more chronic pain for which management by opioid analgesics is indicated.  That's one of the factors you identify in this paragraph; right?

**A.**   Yes.

**Q.**   And, so, within a particular state, my point is there could be parts of a state that have on average an older population than other parts of the state; correct?

1    **A.**    That's right.

2    **Q.**    And, so, if you had within a state variations in the

3    population so that one part of the state had an older

4    population, following from this factor you identified there

5    might be higher levels of opioid prescribing anticipated;

6    correct?

7    **A.**    It's certainly possible.

8    **Q.**    And the same thing could be true for a part of a state

9    that had a heavy -- heavier manual labor component than

10   other parts of the state.  That might also lead to a higher

11   level of opioid prescribing in one part of the state than

12   another.  Correct?

13   **A.**    It's possible, yes.

14   **Q.**    So within a state, there could be variations in terms

15   of pain needs based on the nature of the population and the

16   nature of the work?

17   **A.**    No, that's not the testimony.  I was not speaking of

18   pain needs.  I was talking about opioid prescribing.

19   **Q.**    Within a state there could be -- I, I was asking you

20   about pain needs.  I believe your, your article here is

21   talking about pain needs based on attributes of the

22   population; correct?

23   **A.**    There's two factors.  One is pain needs and one is

24   opioid prescribing.  Those are not synonymous.

25   **Q.**    Well, I'm asking about pain needs.  You understand that

```
1    a relatively older population might have higher pain needs;

2    correct?

3    A.   Yes.

4    Q.   And a relatively more obese population might have

5    higher pain needs; correct?

6    A.   It's possible.

7    Q.   And a, and a population that has a relatively heavier

8    manual labor component to its work might have higher pain

9    needs; correct?

10   A.   That's possible.

11   Q.   And, so, within a given state, there might be

12   differences because the population is different for

13   different parts of the state or the work is different for

14   different parts of the state; correct?

15   A.   That's correct.

16   Q.   Let me ask you to look at Page 2 of the article,

17   please.

18        On the -- at the bottom of the middle paragraph there's

19   a sentence that reads, "Increased medical use of

20   prescription opioids has resulted in increased access to

21   opioids for non-medical use, either through the non-medical

22   use of legitimately acquired prescriptions or through formal

23   or informal distribution networks."

24        Do you see that?

25   A.   I do.
```

1    **Q.**    And that's a true statement; correct?

2    **A.**    That is, that is based in the literature, yes.

3    **Q.**    And, so, the reference here to formal or informal

4    distribution networks, that's a reference to family and

5    friends or drug dealers; correct?

6    **A.**    I would say -- or any kind of social network.  I mean,

7    I think we talk in this article about kind of the social

8    networks and differences across urban and rural populations

9    that would interact with opioid supply.  So family, friends,

10   people selling drugs, I would say all of those would be

11   included in the informal network.

12   **Q.**    And what would be included in the formal network that

13   you're referring to here?  Is that referring to drug

14   dealers?

15   **A.**    That would include drug dealers, yes.

16   **Q.**    Let me ask you at the top of that next column, to the

17   right-hand column, first sentence, --

18   **A.**    I'm sorry.  Can I actually qualify that previous

19   statement?  Because further on in the article, or in the

20   paragraph I also provide -- I use pill mills and high-volume

21   prescribers and clinics as another example of formal

22   distribution networks.

23   **Q.**    Okay.  That's over on the next column; right?

24   **A.**    Yes.  I'm sorry.  I should have noted that earlier.

25   **Q.**    So that the -- you're saying that your reference to a

1  formal distribution network could include a drug dealer or a

2  pill mill?  Is that what you're saying?

3  **A.**   That's right.

4  **Q.**   There's a statement at the top of the right-hand

5  column, "Studies indicate that the large majority of adults

6  who use opioids non-medically obtain them from friends and

7  relatives or from street-level dealers."

8      Do you see that?

9  **A.**   I'm sorry.  What page?

10 **Q.**   It's at the very top of the right-hand column, the

11 first sentence.

12 **A.**   Of Page 2?

13 **Q.**   Yes, sorry, yes.  Do you see that?

14 **A.**   Oh, I do.

15 **Q.**   That's a true statement; correct?

16 **A.**   Yes.  Many people obtain opioids through friends and

17 relatives and street-level dealers.

18 **Q.**   And this is occurring after the pills have either been

19 dispensed by a pharmacy or illegally trafficked by dealers;

20 correct?

21 **A.**   Again, I think I, I mentioned this before.  The data

22 that these are based on and that -- I think the Inciardi

23 study is the one that I would particularly point to relies

24 on people just reporting where they obtain their opioids.

25 And, so, where the family and friends obtain the opioids is

1    not covered in the article.

2    Q.   But these would be family and friends who have somehow

3    obtained the opioids after they had been dispensed out of a

4    pharmacy; correct?

5    A.   That's what I'm saying is I don't think that that's

6    covered in the article.

7    Q.   And you don't have any knowledge of that one way or the

8    other?

9    A.   I'm relying on the literature.  So I'm trying to report

10   faithfully what the literature says.  And usually they ask

11   people where they obtain opioids.  And if they say family or

12   friends, they don't go to the family or friends and see at

13   what point it arrived in the community.

14   Q.   There's a statement, the next sentence, "A substantial

15   proportion of overdose deaths and emergency department

16   visits occurs among individuals who have never received a

17   prescription."

18        Do you see that?

19   A.   Yes.

20   Q.   And that's a true statement; correct?

21   A.   Yes, that's what the literature indicates.

22   Q.   So it's an accurate reflection of what the literature

23   was telling you?

24   A.   Yes.

25   Q.   You testified last week about a study done by

1    Christopher Ruhm showing the economic conditions are less

2    than 10 percent responsible for the opioid crisis; correct?

3    **A.**    That's right.

4    **Q.**    And Christopher Ruhm did an econometrics study where he

5    was looking at economic factors that may interrelate with

6    prescription opioid abuse; correct?

7    **A.**    I believe it was prescription opioid distribution.

8    **Q.**    Are you aware that Ruhm only considered the impact of

9    economic conditions and not any of these other factors that

10   you've discussed in this paper that we're looking at right

11   now?

12   **A.**    I, I believe that the Ruhm article also discusses other

13   factors, including the illicit drug supply.

14   **Q.**    But you're aware that the way Ruhm measured factors, he

15   was trying to explain what might lead to opioid use

16   variation in different parts of the country; correct?

17   **A.**    I'm sorry.  Say that again.

18   **Q.**    Ruhm was trying to explain factors that might lead to

19   variations in opioid use in different parts of the country;

20   correct?

21   **A.**    If you have the article, I'd like to see it.

22   **Q.**    I do.

23          MR. HESTER:  May I approach, Your Honor?

24   BY MR. HESTER:

25   **Q.**    Here it is.

1   **A.**   So I'm looking at the key --

2   **Q.**   Let me --

3   **A.**   I didn't catch the question.

4   **Q.**   Let me just set the table first.

5        Dr. Keyes, I've handed you a document marked as

6   Defendants' West Virginia Exhibit 2344 headed on the first

7   page, "Deaths of Despair or Drug Problems?"  Christopher

8   Ruhm.

9        Is this the Ruhm paper that you were referring to in

10  your testimony last week?

11  **A.**   Yes.

12  **Q.**   And, and the Ruhm paper was undertaking to evaluate

13  factors that might cause increased drug overdose deaths;

14  correct?  And I, I can point you -- it's not a trick

15  question.  It's a thick paper.  But I can point you to -- if

16  you look at Page 7 using the small numbers on the left.

17  **A.**   Okay.

18  **Q.**   And in the middle of the paragraph Ruhm has a

19  reference, "Third, in the preferred specifications changes

20  in economic conditions explain less than one-tenth of the

21  observed increase in drug deaths."

22        Do you see that?

23  **A.**   Yes.

24  **Q.**   And that's my point is that Ruhm was trying to look at

25  changes in economic conditions that might explain drug

1    deaths; is that correct?

2    **A.**    That's one finding of the article.  There are four.

3    But that is one finding of the article.

4    **Q.**    And he based his equations -- there's equations all

5    through this article; correct?

6    **A.**    There are.

7    **Q.**    And he based his analysis on measurements of economic

8    conditions; correct?

9    **A.**    In addition to the factors that he controlled for,

10   which were the ones that you mentioned in the previous

11   article.

12        He controlled for age, morality.  He had a nine-level

13   variable controlling for population density, race, college

14   education, gender, Hispanic ethnicity; a seven-category

15   variable for age which would account for your -- what you

16   mentioned earlier about the age differences across

17   populations if one county had more older folks than another

18   county.

19   **Q.**    But --

20   **A.**    He also looked at the proportion of households headed

21   by females.  Sorry.  Do you want me to keep reading?

22   **Q.**    No.  I was just going to say -- to take a simple,

23   concrete example, Ruhm did not measure, for instance,

24   differences in the nature of the manual labor in different

25   parts of the country?

1    **A.**    I believe there are labor codes in the paper.  I know

2    Ruhm has done quite a few papers on labor markets.  So I

3    haven't read this article in detail --

4    **Q.**    Okay.

5    **A.**    -- before here, but I -- Ruhm has done pretty extensive

6    evaluations of labor markets in rural counties and how that

7    contributes to drug overdose.

8    **Q.**    Did you know -- I'm correct, am I, that Ruhm did not

9    have measurements of pain needs in different parts of the

10   country in his, in his equations; correct?

11   **A.**    Well, I would say that there are proxies for that based

12   on what you mentioned before such as age and underlying

13   medical conditions that would be indicated by these

14   different demographic and other clinical categories that

15   were included in the control variables.

16   **Q.**    But not, for instance, nature of the work?

17   **A.**    Again, I think that to the extent that labor codes were

18   included in this analysis, that would be accounted for.

19            THE COURT:  We're going to need to take a break

20   when you get to a stopping place.

21            MR. HESTER:  All right, Your Honor.  This is a

22   good place for me.

23            THE COURT:  Is this a good place?

24            MR. HESTER:  Yes.  Thank you.

25            THE COURT:  Okay.  Let's be in recess for about 10

```
 1    minutes.

 2           (Recess taken at 10:24 a.m.)

 3              THE COURT:  All right, Mr. Hester.

 4              MR. HESTER:  Thank you, Your Honor.

 5              BY MR. HESTER:

 6    Q.   Dr. Keyes, I wanted to be clear on one point, that you

 7    have not identified any sources of diversion in relation to

 8    shipments between distributors and pharmacies; is that

 9    correct?

10    A.   I have not covered that in my report.

11    Q.   And you've not identified any such diversion between

12    the time that a distributor has the pills and the time it

13    delivers to a pharmacy, correct?

14    A.   I'm aware that that occurs.  I mean, there are thefts

15    that occur on -- that that happens, so that would be a

16    source of diversion.

17    Q.   But you've not identified any such sources, correct?

18    A.   Other than that it occurs and it's included in my

19    definition of diversion.

20    Q.   Could we pull up the deposition from this litigation,

21    please, Page 113?  Page 113, Line 13.  Dr. Keyes, I started

22    off the question and said, "Right, but I wanted -- just to

23    be clear", and I think so we're talking the same language

24    here and then I asked you this question.  "I want to be

25    clear that you're not identifying any sources of diversion
```

1    in relation to shipments between distributors and

2    pharmacies.  You haven't identified any such evidence?"  And

3    your answer was, "Right."  Was that correct when you -- was

4    that a correct answer when you gave it?

5    **A.**    I don't think so.  I mean, I know in the Inciardi

6    article, in the introduction, it does specifically talk

7    about theft.  You know, so I think if I were answering the

8    question today, which I am, I would point to -- there have a

9    couple sources in the Inciardi 2008 introduction about --

10   about that type of diversion.  So, I think that I would -- I

11   would qualify that answer today.

12   **Q.**    My question is, when you gave that answer, were you

13   under oath?

14   **A.**    Yes.

15   **Q.**    And when you gave that answer, did you mean to be

16   answering correctly and truthfully?

17   **A.**    I meant to be answering correctly and truthfully.

18   **Q.**    And that's the answer you gave when I asked you,

19   "You're not identifying any sources of diversion in relation

20   to shipments between distributors and pharmacies?  You

21   haven't identified any such evidence?"  And your answer was,

22   "Right."  Is that correct?

23   **A.**    That was my answer.

24   **Q.**    And that was meant to be truthful when you gave it,

25   correct?

1    **A.**    I hadn't remembered the Inciardi article and the

2    references that were in that introduction.

3    **Q.**    Dr. Keyes, was that meant to be truthful when you gave

4    the answer?

5    **A.**    It was meant to be truthful.

6    **Q.**    Let me ask you, Dr. Keyes, a couple of preliminary

7    points around doctor prescribing activity.  Doctors decide

8    on the dosage strength to include in a given prescription,

9    correct?

10   **A.**    Can you say the question again?

11   **Q.**    Sure.  Doctors decide on the dosage strength to include

12   in a particular prescription, correct?

13   **A.**    Yes.

14   **Q.**    And also, doctors decide how many pills to include in a

15   given prescription for opioids, correct?

16   **A.**    That's right.

17   **Q.**    In other words, a doctor makes the judgment whether to

18   include a 10-day supply, a 30-day supply, or some other

19   duration for the prescription of the opioid, correct?

20   **A.**    A doctor makes the decision about that, yes.

21   **Q.**    And your view is that the overwhelming majority of

22   doctors prescribe opioids to their patients in good faith,

23   correct?

24   **A.**    I don't know what proportion prescribe in good faith

25   but I would -- my opinion would be that it would be a

1    majority who make prescriptions based on the information

2    that they have.

3    **Q.**   Well, let me ask it again just to be clear.  Your view

4    is that the overwhelming majority of doctors prescribe

5    opioids to their patients in good faith, correct?

6    **A.**   Yes.  I -- I think that that is true.  They base it on

7    the decision -- the information that they have.

8    **Q.**   And starting in the late 1990s up through around 2010,

9    doctors increased their prescribing of opioids, correct?

10   **A.**   Yes.

11   **Q.**   And you wrote in your report at Page 23, if you want to

12   look at it, but I'll quote it to you.  I think it will sound

13   familiar to you.  "Pervasive over-prescribing resulted in

14   unused prescription opioid medicines diverted for monetary

15   value, bartered or for no cost among family and individuals

16   in a shared social network."  Do you want me to point you to

17   that passage?

18   **A.**   Yes, if you don't mind.  I'm on Page 23.

19   **Q.**   Yes.  So, it's at Page 23 of your report.  Let me see

20   if I can find it.  It's in the middle of the page, Dr.

21   Keyes.  There's a -- there's a bolded sentence.

22   **A.**   I -- yes.  It's at the top of my Page 23.  Maybe we

23   have different versions.

24   **Q.**   Oh, yes.  Yes.  You're right.  Absolutely.  At the top,

25   the sentence that -- and there's a sentence that's bolded

1    and it says, "Pervasive over-prescribing resulted in unused

2    prescribed opioid medications diverted for monetary value,

3    bartered, or for no cost among family and individuals in a

4    shared social network."  Do you see that?

5    **A.**    I do.

6    **Q.**    And that's a true statement, correct?

7    **A.**    That's my read of the literature.

8    **Q.**    And the reference there to diverted for money, barter,

9    or no cost, that's diversion after the pills have either

10   been prescribed or illegally trafficked into the community,

11   correct?

12   **A.**    With regard to over-prescribing, that is specifically

13   focused on prescribing behavior.  There's another section,

14   oversupply.

15   **Q.**    So, your point is that there was a pervasive

16   over-prescribing that led to unused pills and then they went

17   from the people who were prescribed those pills to others,

18   either through barter, through money, or through giving them

19   away, correct?

20   **A.**    That's one source of the oversupply.

21   **Q.**    And you also state in just a few sentences down in this

22   same paragraph of your report that, "Available estimates

23   indicate that 90 percent of patients prescribed opioids

24   after surgery have unused medication, most of which is not

25   disposed of or stored safely."  Do you see that?

1    **A.**    I do.

2    **Q.**    And that's a true statement, correct?

3    **A.**    Yes.

4    **Q.**    And that's based on your --

5    **A.**    In the literature that I read.

6    **Q.**    Yeah.  And so, when you -- when you say in the

7    literature you've read, you're purporting to give an

8    accurate summary of the literature when you state this?

9    **A.**    I'm purporting to, yes.

10   **Q.**    And that's your best effort?

11   **A.**    Yes.  I always update, you know, my opinions and

12   information with new -- new information as I'm gathering it.

13   So, I just want to be clear that I'm basing my statement on

14   the literature as I've read it.

15   **Q.**    But when you wrote your report you meant to be

16   accurately reflecting the literature as you know it at the

17   time?

18   **A.**    I certainly did.

19   **Q.**    And the point you're making here in this sentence about

20   available estimates indicate that 90 percent of patients are

21   prescribed opioids have unused medication after surgery, the

22   point you're making there is that even though there might be

23   an underlying legitimate need for the prescription opioid,

24   the doctor prescribes too many pills to meet the need,

25   correct?

1    **A.**    It's not referring to the legitimacy of the need.  It

2    is referring to the -- the -- that there were too many pills

3    prescribed but I'm not -- that these studies did not

4    ascertain the legitimacy of the prescription itself, only

5    that there were unused medications.  So, it could also be

6    that the prescription wasn't needed and that there were

7    unused medications.

8    **Q.**    You're aware that many times prescription opioids are

9    prescribed for people after surgery to deal with acute pain,

10   correct?

11   **A.**    It depends on the type of surgery.  The amount of

12   prescription opioids that are prescribed depends on what

13   surgery we're talking about.  There's many different kinds

14   of surgery.

15   **Q.**    My question was narrower and probably simpler than

16   that, which is you are aware that prescription opioids are

17   often prescribed for treatment of acute pain after surgery,

18   correct?

19   **A.**    Again, I think that that's too broad of a statement.

20   **Q.**    You're not aware of that?

21   **A.**    I am aware that opioids can be prescribed after some

22   surgeries.

23   **Q.**    And so, the point is, there may be a surgery where

24   prescription opioids are prescribed to deal with the pain

25   after surgery, but in your review of the literature, you

1    determine that in 90 percent of those cases there were

2    unused medicines left after the person used them for

3    treating pain?

4    **A.**    That's right.

5    **Q.**    And that's a judgment being made by the doctor about

6    how many pills to include in that prescription for the

7    surgery, treatment of the pain following surgery, correct?

8    **A.**    That's right.

9    **Q.**    And so, this could happen quite often, correct, that

10   there might a circumstance where a prescription is written

11   and a doctor writes too many pills for that given

12   prescription, correct?

13   **A.**    Yes.

14   **Q.**    And the physician, in the good faith exercise of

15   judgment, decides to prescribe an opioid to meet a

16   particular need for a particular kind of pain, correct?

17   **A.**    Can you state the question again?

18   **Q.**    Yes.  So, you could have a circumstance, I take it

19   there's many circumstances where a doctor could make a

20   legitimate good faith decision to prescribe opioids to deal

21   with a particular kind of pain, correct?

22   **A.**    As I've said before, the doctor is making a

23   determination based on their understanding of the risks and

24   benefits of a particular opioid prescribing, which itself

25   has changed over time.  You know, certainly, the

1    recommendations for prescribing have changed quite a lot

2    over the last ten years.  And so, I'm not arguing that there

3    are not doctors that are acting in, quote-unquote, "good

4    faith" to write, quote-unquote "legitimate prescriptions",

5    but that that -- these studies are not purporting to report

6    on the efficacy or legitimacy of a particular prescription.

7    That's a separate evidence base.

8    **Q.**    But going back to what we established a few minutes

9    ago, your view is that the overwhelming majority of doctors

10   prescribe opioids in good faith, correct?

11   **A.**    Yes.  I think many doctors are doing their best.

12   **Q.**    The overwhelming majority, correct?

13   **A.**    Certainly, yes, the majority.

14   **Q.**    The overwhelming majority, correct?

15   **A.**    Yes.

16   **Q.**    And then the doctor acting in good faith to prescribe

17   the opioid may provide for more pills in that prescription

18   than are needed to meet the need for which the pills are

19   being prescribed, correct?

20   **A.**    That can happen, yes.

21   **Q.**    And in that case, even though the doctor has decided

22   that the medical need is legitimate, the doctor has

23   prescribed more pills than are needed to meet the need,

24   correct?

25   **A.**    The doctor has made a determination of a medical need

1    and has prescribed too many pills in that circumstance that

2    you're -- this hypothetical that you're offering.

3    **Q.**   And so, at Page 23 of your report, again, the same

4    page, the same paragraph, actually, you state that, among

5    non-medical opioid users interviewed about where they obtain

6    their opioids, 50.5 percent report from a friend or

7    relative.

8         Do you see that?  It's almost exactly in the middle of

9    that paragraph.  It's the sentence that begins data from the

10   National Survey on Drug Use and Health.

11   **A.**   Yes.  50.5 percent receive -- in that survey received

12   prescription opioids from a friend or family.

13   **Q.**   So, let's just be clear on what that is.  It's a survey

14   from the National -- from the organization called NSDUH,

15   which is the National Survey on Drug Use and Health,

16   correct?

17   **A.**   That's the -- the name of the survey is NSDUH.

18   **Q.**   And that's a government survey that's run --

19   **A.**   Yes.

20   **Q.**   -- periodically?

21   **A.**   Annually.

22   **Q.**   And in that survey the report is that 50.5 percent of

23   non-medical users of opioids stated that they obtained the

24   opioids from a friend or a relative, correct?

25   **A.**   Among the respondents in that survey, yes.

1    **Q.**   And your analysis in the report of this passage was

2    that quite a bit of that was the result of unused

3    medications after a particular prescription, correct?

4    **A.**   My analysis included unused prescriptions.  The

5    previous sentence uses that statistic in citing evidence for

6    the proposition that the expansion of opioid sales and

7    distribution served as a catalyst for the overall

8    availability and one consequence would be unused medication.

9    **Q.**   So, you would have unused medication that would be a

10   ready source of diversion to others from family and friends,

11   correct?

12   **A.**   That's one pathway, yes.

13   **Q.**   You also state just a -- I think in the next sentence

14   that the NSDUH data showed -- oh, sorry.  Let me go down two

15   sentences further.  There's another sentence that reads,

16   "Data from the NSDUH show that 57 percent of non-medical

17   opioid users in 2007 obtained opioid -- opioids from family

18   or relative for free with another 9 percent reporting that a

19   friend or a relative for purchase was also a source of the

20   opioids."

21       Do you see that?

22   **A.**   I do.

23   **Q.**   So, and that's a true statement, correct?

24   **A.**   That is.  Well, sorry.  It's like -- it's based on my

25   review of the literature or I guess my reading of those

1    statistics from the NSDUH.

2    **Q.**    Right.  So, you're accurately reporting what NSDUH

3    reported, correct?

4    **A.**    Yes.

5    **Q.**    And the point is, so that would add up to 66 percent of

6    non-medical users obtaining pills from friends or family in

7    2007, correct?

8    **A.**    Not exactly.  That -- the survey -- it was not a

9    mutually exclusive category.  People could report all of the

10   sources they obtained opioids from, including a doctor,

11   friends and family, a drug dealer; and then friends and

12   family for free, friends and family for money.

13        So, it's not -- can't add them up.  You know, there's

14   going to be overlap.  Some people got them for free from

15   family or friends and then, later on, they bought them from

16   a friend.  You know, so --

17   **Q.**    I see.  I see what you're saying.  So, but the point

18   is, the survey reflected, again, that more than half of the

19   people who were non-medical users, in other words, people

20   who are using opioids without a prescription, more than half

21   reported they had obtained the opioids from a friend or

22   relative for free, correct?

23   **A.**    That's true, but that's not the -- that might not be

24   the only source.  But that is a source.  It's a -- it's a

25   very common source for opioids.

1    Q.    So, fair enough.  So, somebody who is a non-medical

2    opioid user might get some for free from family, but then

3    might also go out on the street and buy some more, correct?

4    A.    Well, I think more germane to the discussion, most

5    non-medical users also obtain opioids medically.  So,

6    there's a large overlap between those two.  They're not

7    distinct.  You don't have one group of legitimate opioid

8    users and one group of non-medical users.  There is a lot of

9    overlap between those two groups.

10   Q.    But you would have -- you could have a circumstance

11   where somebody is a non-medical user, they might have a

12   prescription for some, but then they obtain other pills from

13   family or friends for free, correct?

14   A.    That's right.

15   Q.    Or you could have a circumstance where somebody has a

16   prescription for opioids, but they also go out and buy

17   opioids on the street, correct?

18   A.    That is a -- that is a scenario that occurs.

19   Q.    And they're non-medical users, so they -- by

20   definition, they are using opioids for some non-medical

21   purpose, correct?

22   A.    That's right.

23   Q.    And your view is that the high volume of opioid

24   prescriptions that doctors were writing became the

25   foundation for the overall expansion of the opioid supply,

1    correct?

2    **A.**   Can you say that sentence again?

3    **Q.**   Yes.  Your view is that the high volume of opioid

4    prescriptions that doctors were writing became the

5    foundation for the overall expansion of the opioid supply,

6    correct?

7    **A.**   That is a major source of the foundation, yes.

8    **Q.**   And, in your view, it is -- it was a principal

9    foundation of the expansion of the supply of opioids,

10   correct, the prescribing by doctors?

11   **A.**   I think it's a major foundation of the increases in

12   prescribing and, you know, what we saw subsequently with the

13   heroin epidemic.

14   **Q.**   And your view is that the high volume of opioid

15   prescriptions also became the foundation for the overall

16   expansion and opioid-related harm, correct?

17   **A.**   The high volume of prescribing was a foundational

18   source of the epidemic that followed, including our current

19   fentanyl epidemic.

20   **Q.**   And it was the foundation for the overall expansion and

21   opioid-related harm, correct?

22   **A.**   Yes.  It was a principal source.  I would say there's

23   other sources.  You know, it's a -- in these epidemics where

24   you have a lot of different underlying and interacting

25   factors, certainly, the pervasive over-prescribing was one

```
1    of the foundational ones.

2    Q.   And one of the foundational ones in particular for the

3    expansion of opioid-related harm was the level of

4    prescribing by doctors, correct?

5    A.   The level of prescribing by doctors certainly

6    contributed to the availability of opioids in the community.

7    So, I would say that that is a true statement, but it is not

8    exclusive of other sources of prescription opioids, as I've

9    outlined and we've discussed.

10   Q.   But let me -- let me be clear on it.  Just let me ask

11   it one more time.  You agree that the high volume of opioid

12   prescriptions became the foundation for the overall

13   expansion in the opioid supply and opioid-related harm,

14   correct?

15   A.   Yes.  I believe I've written that before, but in

16   context, I would just say it's a foundation.

17   Q.   Yes.  So, your answer is yes to my question?

18   A.   Yes.

19   Q.   And then, your view is that the opioid crisis would not

20   have occurred if prescribing opioids had not become standard

21   practice in managing acute and chronic pain, correct?

22   A.   That's right.

23   Q.   Distributors did not ship more pills than doctors

24   prescribed, correct?

25   A.   I haven't evaluated the distributor shipments, so I
```

1   wouldn't want to comment on them.  I don't have an opinion

2   on that.

3   **Q.**   You're aware, I take it, that no matter how many

4   opioids a distributor ships to a given pharmacy, if there's

5   not a prescription from a doctor, those opioids stay on the

6   pharmacy shelf and never reach the community, correct?

7   **A.**   My understanding generally is that that's how it's

8   supposed to work.  I don't know exactly how it worked in

9   every circumstance here.

10  **Q.**   Well, let me ask it again just to make clear.  No

11  matter how many opioids a distributor ships to a given

12  pharmacy, if there's not a prescription from a doctor, those

13  opioids are supposed to stay in the pharmacy and not go out

14  to the public, correct?

15  **A.**   They certainly are supposed to.

16  **Q.**   And so, you -- the answer is yes?

17  **A.**   Yes.

18  **Q.**   You published an article in 2013 that said, "The data

19  are robust in demonstrating that rates of overdoses are

20  proportional to the rates of prescribing", correct?

21  **A.**   Which article is this?

22  **Q.**   I'm not sure if I have that article right handy.  Do

23  you remember publishing such an article that said that, "The

24  data are robust in demonstrating that rates of overdoses are

25  proportional to the rates of prescribing"?

1   **A.**   I certainly agree with the statement.  I would just

2   prefer to see the article if I'm going to be quoted to make

3   sure I'm --

4   **Q.**   Okay.  So, you agree with this statement that rates of

5   overdoses are proportional to the rates of prescribing of

6   opioids?

7   **A.**   Yes.

8   **Q.**   Dr. Keyes, I think we've talked about this before, but

9   you do understand that drug trafficking organizations and

10  drug dealers illegally supply prescription opioids in

11  Huntington and Cabell County, correct?

12  **A.**   You said illegally?

13  **Q.**   Yes.

14  **A.**   Yes.

15  **Q.**   And those illegal acts expand the total supply of

16  prescription opioids in Cabell County and Huntington,

17  correct?

18  **A.**   Say -- say the question again.

19  **Q.**   Yes.  Those illegal acts of drug trafficking into

20  Cabell County and Huntington expand the total supply of

21  prescription opioids in the community, correct?

22  **A.**   Yeah.  There's literature on this in my report.  I

23  mean, certainly, it's a minority.  The analyses that have

24  been done suggest that it's a minority of all of the

25  opioid-related harm in the Cabell-Huntington community.

1    But, certainly, there is illegal trafficking that occurs and

2    that does contribute to harm.

3    **Q.**    And the illegal trafficking also expands to the total

4    supply of prescription opioids, correct?

5    **A.**    To -- yes.  There's a -- I would say it's minority of

6    the total supply, certainly, but it certainly does

7    contribute to it.

8    **Q.**    Contribute to the supply of opioids, correct?

9    **A.**    It contributes to the supply of opioids, yes.

10   **Q.**    And so, drug trafficking also contributed to the

11   opioid-related harms that you identify, correct?

12   **A.**    Yes.

13   **Q.**    And we talked before about the fact that drug dealers

14   make and sell counterfeit opioid pills, correct?

15   **A.**    They can.

16   **Q.**    And that includes counterfeit opioid pills that are

17   adulterated with fentanyl, correct?

18   **A.**    That -- that has occurred, yes.

19   **Q.**    And people have overdosed and died from those

20   counterfeit opioid pills, correct?

21   **A.**    The multiple cause of death filed in the CDC doesn't

22   differentiate illicit from licit prescription opioids.  So,

23   I'm certainly -- it's certainly likely that someone has

24   overdosed from a prescription opioid, but the data that I

25   rely on in the report does not distinguish those two.

1    **Q.**   Well, let me ask it again to be clear.  You're aware

2    that people have overdosed and died from counterfeit opioid

3    pills, correct?

4    **A.**   I'm sure it has occurred, but I have not reviewed data

5    on specific counterfeit opioid overdoses.

6              MR. HESTER:  Could we cull up the deposition,

7    please, from this case, Page 324?

8              BY MR. HESTER:

9    **Q.**   Dr. Keyes, let me point you to Line 3.  My question

10   was, "And are you aware that people have overdosed and died

11   from pills like that?"  And if you need me to go back and

12   show you the context, I can, but this is discussing

13   counterfeit pills.  That was my question.

14        Do you see that?

15   **A.**   Yes.

16   **Q.**   And your answer was, "Yes, I have.  I'm aware that that

17   occurs."

18        Do you see that?

19   **A.**   I do.

20   **Q.**   And was your answer correct when you gave it?

21   **A.**   Yes.  That's -- I think it's consistent with what I've

22   just reported.

23   **Q.**   And so, these counterfeit pills also expanded the

24   supply of opioids in Huntington and Cabell County, correct?

25   **A.**   Yes.  I think it's a minority contribution to the

1    supply, a small minority.

2    **Q.**   But you don't know the percentage of prescription

3    opioids in Huntington and Cabell County that -- that were

4    counterfeit, do you?

5    **A.**   Well, we can estimate it somewhat from the data, which

6    I have tried to do in the report and which I believe is

7    reflected in that testimony, as well, that based on what we

8    know about what people report in terms of where they obtain

9    opioids, I would say it's maybe 10 percent, I think

10   somewhere around there.

11   **Q.**   Would be counterfeit opioids?

12   **A.**   Well, would be illicit opioids.

13   **Q.**   Which would include counterfeits?

14   **A.**   Which would include counterfeit.

15   **Q.**   But that could also include counterfeits that are laced

16   with fentanyl and might be more lethal than a conventional

17   prescription opioid, correct?

18   **A.**   Well, the lethality of the opioid is really determined

19   by the dose.  So, the probability of an overdose is

20   dependent on the dose of the opioids that you take.  And so,

21   a conventional opioid and an opioid laced with fentanyl, for

22   example, if they had a different dose, then that would

23   change the overdose risk.

24   **Q.**   Do you have any understanding whether a counterfeit

25   pill laced with fentanyl is more or less risky than a

1    conventional prescription opioid pill?

2    **A.**    Well, I think that's comparing apples and oranges.  So,

3    if we're comparing two doses, you know, a conventional

4    prescription opioid pill compared to a counterfeit pill that

5    has opioid -- has fentanyl in it, if the fentanyl pill has a

6    larger dose, which it probably does if it has fentanyl, then

7    it would be riskier.  But I don't think you could compare

8    the pills directly unless you're comparing -- unless they

9    have equivalent doses.

10   **Q.**    Let me flip to a slightly different topic and it builds

11   on something you said a few minutes ago.  You're aware that

12   there are different dosages for opioid medications, correct?

13   **A.**    Yes.

14   **Q.**    And so, there may be different judgments made by a

15   doctor in prescribing opioids about what dose to use for a

16   particular patient, correct?

17   **A.**    Yes.  A doctor would make -- two doctors might make a

18   different decision about the dosage.

19   **Q.**    And the doctors are the ones who make the judgment

20   about what dose should be prescribed for a particular

21   patient and a particular need, correct?

22   **A.**    Yes, based on the information that's been given to

23   them.

24   **Q.**    And opioid medications can also be prescribed for

25   different durations, correct?

1    **A.**    That's right.

2    **Q.**    For instance, a prescription to treat acute pain with

3    opioids might be for a different duration than a

4    prescription to treat some longer-term pain, correct?

5    **A.**    I wouldn't make a blanket statement because there's

6    been plenty of acute conditions that people have gotten

7    quite a long duration of opioid pills for.  So, it would

8    really depend on the condition, the doctor, and what

9    condition we're comparing it to.

10   **Q.**    But the doctor will make the judgment both about the

11   dose and the duration for a particular prescription or for a

12   particular regimen of treatment, correct?

13   **A.**    A doctor would make the decision based on the

14   information available to him or her.

15   **Q.**    And you are aware that opioids are used to treat

16   different kinds of pain beyond chronic pain, correct?

17   **A.**    Am I -- say that -- that question again, please.

18   **Q.**    You are aware that opioids are used to treat different

19   kinds of pain beyond chronic pain?

20   **A.**    I'm aware that they are used.

21   **Q.**    To treat different kinds of pain beyond chronic pain?

22   **A.**    Yes.

23   **Q.**    And not every patient treated with opioids uses them

24   chronically or for a long time, correct?

25   **A.**    That's right.

1    **Q.**   And so, some patients might use prescription opioids

2    only for a few days or for quite a short period of time,

3    correct?

4    **A.**   It's certainly possible that there's -- well, the

5    literature shows that there are people who use for a short

6    duration and people who use for a long duration.  So, yes,

7    there are people who use opioids for a short duration.

8    **Q.**   You testified on Friday about an article by Edlund and

9    colleagues that provides information on the incidence of OUD

10   based on different levels of dose and duration, right?

11   **A.**   Yes.

12   **Q.**   And when you talk about incidence of OUD, that means

13   new OUD; in other words, how many people develop OUD after

14   they receive an opioid prescription.  That's -- that's what

15   you mean by incidence, right?

16   **A.**   OUD is typically episodic.  And so, I believe in the

17   Edlund article they were looking at new episodes of Opioid

18   Use Disorder.

19   **Q.**   So, in other words, it would be Opioid Use Disorder

20   that arises in some percentage of people after they're

21   exposed to prescription opioids?

22   **A.**   That's right.

23   **Q.**   So, let's take a look at that Edlund study, please.

24            MR. HESTER:  May I approach, Your Honor?

25            BY MR. HESTER:

1    **Q.**   Dr. Keyes, we've handed you what's been marked as

2    DEF-WV-2307.  On the first page it's headed The Role of

3    Opioid Prescription in Incident Opioid Abuse and Dependence

4    Among Individuals With Chronic Non-Cancer Pain.

5          Do you see that?

6    **A.**   And the second part is The Role of Opioid Prescription.

7    **Q.**   Right.  And this is the Edlund article that you were

8    referring to in your testimony last week, correct?

9    **A.**   Correct.

10   **Q.**   And you consider this article to be accurate, correct?

11   **A.**   Based on my reading of it, I have judged it to be of --

12   scientifically meritorious, I would say.

13   **Q.**   And you testified last week that it's relied on by

14   epidemiologists in your field when performing research on

15   opioid use and Opioid Use Disorder, correct?

16   **A.**   Yes.

17   **Q.**   And you also testified that this article is respected

18   and not subject to any underlying questions of veracity,

19   correct?

20   **A.**   Not that I'm aware of.

21          MR. HESTER:  Your Honor, I would move this

22   document into evidence.

23          THE COURT:  Any objection?

24          MR. FARRELL:  Judge, I'm not quite sure it's

25   proper to admit medical literature into the record as

```
 1    evidence.  I'm not necessarily opposed to it, but you'll
 2    recall that the defendants objected to me even showing you
 3    the medical literature, let alone entering it into the
 4    record.  So, I'm a little befuddled as to the purpose of and
 5    the propriety of entering medical literature into the record
 6    at this stage.
 7              MR. HESTER:  Well, Your Honor, the witness
 8    testified last week that this is a respected article, that
 9    there are no issues of underlying veracity or accuracy to
10    her understanding with this article, that it's relied on by
11    epidemiologists in the field.  It was highlighted in the
12    testimony presented on Friday to the Court.
13         It seems to us that, given the witness's testimony, it
14    satisfies the residual hearsay exception because we've --
15    the record now demonstrates sufficient indicia of
16    trustworthiness as to this document.
17         We also think it would be helpful to the Court because
18    it has been highlighted and discussed at some length and it
19    feels, to us, helpful in the sense of the Court being able
20    to rely on the document and to -- and to have it available
21    in the record.
22              THE COURT:  Mr. Farrell?
23              MR. FARRELL:  Well, Judge, you're the trier of
24    fact.  And so, I think that the purpose of the hearsay rules
25    is in general to keep out of the record items that are not
```

1    reliable or trustworthy and I am fully confident that Your

2    Honor has the ability to apply appropriate weight but,

3    again, this is not a non-traditional procedural aspect of

4    the case.

5        Of course, I'm accustomed to jury trials and not bench

6    trials.  So, I'll leave it to Your Honor's discretion

7    whether you think it will assist you and, if it does, I have

8    a host of other medical journals that I would like to

9    supplement when it's my turn to re-direct.

10           MR. HESTER:  Well, Your Honor, I'm not -- I'm not

11   purporting to offer some sort of deal to Mr. Farrell.  It

12   just seemed to me that the witness gave quite a bit of

13   specific testimony on this specific document that makes it

14   different from the norm of any piece out of the literature

15   because she specifically spoke to the reliability and

16   veracity of this particular document.

17           THE COURT:  Well, I don't think you've got this

18   within Rule 807, Mr. Hester, so if there's an objection to

19   it, Mr. Farrell, I'll sustain the objection.

20       Is there an objection to it?

21           MR. FARRELL:  Yes.  Yes.

22           THE COURT:  Well, I'm not going to admit it but,

23   Mr. Hester, it's fair game for you to question her about it.

24           MR. HESTER:  Thank you, Your Honor.  I'll do it

25   that way.  That's totally fine.

```
1              THE COURT:  Okay.

2              BY MR. HESTER:

3    Q.   Dr. Keyes, I know you're familiar with this, but I

4    think we need to put in some pieces into the record just to

5    clarify the nature of this study.  So, the study focused on

6    adults 18 and over with a new chronic non-cancer pain

7    episode and no opioid use or OUD in the prior six months; is

8    that correct?

9    A.   That's right.

10   Q.   And the sample included 568,640 individuals in total,

11   correct?

12   A.   Yes.

13   Q.   And that's a relatively large sample size for a study

14   like this, correct?

15   A.   For a study like this that is based on medical records,

16   I would say it's fairly standard, but it is, you know, a

17   large sample size.

18   Q.   And the study was -- I can point you to Page 4, but you

19   may know this one out of your head.  This study was designed

20   to measure the incidence of OUD following exposure to

21   different levels of prescribed opioids, correct?

22   A.   Yes.

23   Q.   And it reports levels of incidence OUD; in other words,

24   new OUD for both acute and chronic pain treatment, correct?

25   A.   Yes.
```

1    **Q.**   And here, when the article refers to acute, it refers

2    to the length of the opioid therapy, correct?

3    **A.**   That's right.

4    **Q.**   So, it's not -- when it uses the term "acute", it's not

5    referring to the type of pain, but the duration of the

6    treatment, correct?

7    **A.**   Yes.

8    **Q.**   And it defined acute as treatment for less than 90 days

9    with prescription opioids, correct?

10   **A.**   It was inclusive of 90 days.  So, 90 days or less.

11   **Q.**   Got it.  We're with you.  We're with each other.  So,

12   90 days or less would be defined in this study as acute

13   treatment, correct?

14   **A.**   That's right.

15   **Q.**   And so, chronic treatment was -- 90 days or more was

16   considered chronic in this study, correct?

17   **A.**   More than 90.

18   **Q.**   So, more than --

19   **A.**   So, 91 or more.

20   **Q.**   Thank you.  Thank you.  So -- so, let's look at the

21   results and we can see the results at Page 3 of the document

22   discussing the results and the first full paragraph in the

23   right-hand column.  Let me confirm, Dr. Keyes, that for

24   acute or short-term pain treatment; in other words, 90 days

25   or less, the rates of new OUD were .12 percent for patients

1    who were treated with a low dose, correct?

2    **A.**    I'm sorry.  Which page are you on?  I just want to make

3    sure that I --

4    **Q.**    I was looking at Page 3.

5    **A.**    I'm sorry.  I was looking at Page 4.

6    **Q.**    In the right-hand column and the third sentence.  This

7    refers to the unadjusted rates of post-index OUD diagnosis.

8    Do you see that?

9    **A.**    Yes.

10   **Q.**    And so, when we talk about post-index OUD diagnosis

11   that's referring to the -- to the percentage of people who

12   were treated with a given dose duration of prescription

13   opioids and it's referring to the percentage of people who

14   developed OUD, correct?

15   **A.**    That's right.

16   **Q.**    And so, the results reflect that there was a -- an

17   incidence of .12 percent for patients who were treated with

18   a low dose for less than 90 days, correct?

19   **A.**    That's right.

20   **Q.**    And .12 percent, as well, for patients treated with a

21   medium dose for 90 days or less, correct?

22   **A.**    .12, yes.

23   **Q.**    And the same is true for patients treated with a high

24   dose for 90 days or less, that the incidence level of OUD

25   was .12 percent, right?

**A.**    That's right.

**Q.**    And so, turning that around, that -- that means that over 99.8 percent of patients who were treated with prescription opioids, no matter what the dose, did not develop OUD if they were treated for less than 90 days, correct?

**A.**    That's right.

**Q.**    Now, let's look at the other side of the coin, chronic or longer term treatment.  So, more than 90 days.  And the rates of OUD there were .7 percent for patients who were treated with a low dose for more than 90 days, correct?

**A.**    That's right.

**Q.**    And the rate of OUD was 1.2 percent for patients who were treated with medium dose for more than 90 days, correct?

**A.**    Yes.

**Q.**    And the OUD level was higher for patients with a high dose treated more than 90 days, 6.08 percent, correct?

**A.**    I see 6.1 percent, but maybe that's rounding.

**Q.**    It may well be rounding, but okay.  I pulled that out of one of the tables.

**A.**    Okay.

**Q.**    But 6.1 percent is stated here.  So, just so we're on the same page, so it found a level of OUD incidence for people treated more than 90 days as a high dose and that

1    came out to 6.1 percent, correct?

2    **A.**    That's right.

3    **Q.**    And when you talked last week about the 122 times, you

4    were using this number of the 6.08 percent, correct?

5    **A.**    That's right.

6    **Q.**    You weren't referring to these other numbers, the

7    numbers, for instance, for acute -- acute treatment of less

8    than 90 days of .12 percent?  That's not what you were

9    referring to, correct?

10   **A.**    The 122 times is comparing the high dose chronic group

11   to non-prescribed opioid group, but the other groups also

12   had an increase in the risk, including the group that you

13   mentioned first, the acute low dose group.  They were more

14   than three times as likely to develop Opioid Use Disorder.

15   **Q.**    So, but focusing on the percentages here, the study did

16   find a percentage of .12 percent of OUD when opioids were

17   used for less than 90 days at all dosage levels?

18   **A.**    Right, which the authors mention in the discussion

19   translates to, you know, 98 million people are prescribed

20   opioids in the United States.  So, that translates to a

21   major population impact.

22            THE COURT:  Your Honor, I move to strike as

23   non-responsive.

24            THE COURT:  Just a minute.  Overruled.  Go ahead.

25            BY MR. HESTER:

1    **Q.**   So, but -- but let me -- let me just be clear, Dr.

2    Keyes, on what the findings were.   So, the study found that

3    the incidence level of OUD when opioids were used for less

4    than 90 days at any dosage level was .12 percent, correct?

5    **A.**   That's right.

6    **Q.**   And the study also found that when opioids were used

7    for more than 90 days with a low or medium dose the

8    incidence of OUD was between .7 percent and 1.2 percent,

9    correct?

10   **A.**   That's right.

11   **Q.**   So, then meaning when opioids were used for more than

12   90 days at a low or medium dosage, 98.8 percent of the

13   patients did not develop OUD, correct?

14   **A.**   That's right.

15   **Q.**   And these findings from this study apply to West

16   Virginia, correct?

17   **A.**   I think that -- I generally think that they would

18   generalize beyond the study sample.

19   **Q.**   And so, you agree that the findings of this study, this

20   Edlund study that we're looking at, apply to West Virginia,

21   correct?

22   **A.**   Yes.

23   **Q.**   And the -- let me point you to Page 6 of the document,

24   please.   At the top of the page, the Edlund -- Edlund and

25   the other authors state, "Actual frequencies of OUDs were

1    relatively low; that is, under 1 percent for four of the six

2    categories of opioid use."

3        Do you see that?

4    **A.**  Well, that's not the whole sentence.  The sentence

5    starts, "Although risks were high."  It could be argued that

6    actual frequencies of OUDs were low.

7    **Q.**  Well, okay.  If you're going to -- if you're going to

8    add to my question, you need to put in the parenthetical,

9    too.

10    **A.**  I'm sorry.  I'll read the whole thing.  "Although risks

11    as measured by ORs", which means odds ratios, "it could be

12    argued that actual frequencies of OUDs were relatively low;

13    that is, under 1 percent for four of the six categories of

14    opioid use."

15    **Q.**  Yes.  So -- so, we both are -- we see that sentence and

16    now I wanted to ask you a follow-up on the sentence, which

17    is it accurate to state that the frequency of OUD was under

18    1 percent for four of the six categories of opioid use,

19    correct?

20    **A.**  That's right.

21    **Q.**  And so, when we talk about the categories of opioid

22    use, there's six categories we're talking about?  There's

23    three that could be more than 90 days and three that would

24    be 90 days or less, correct?

25    **A.**  That's right.

1    **Q.**    And the three in each bucket would be low, medium,

2    high, less than 90 days, low medium high 90, days or more,

3    or 91 days or more, correct?

4    **A.**    That's right.

5    **Q.**    So, that's what they mean by the four of the six

6    categories, correct?

7    **A.**    Yes.

8    **Q.**    Then it goes on in the next paragraph.  There's a first

9    sentence that says, "Our findings have important clinical

10   implications, as they suggest that the risk of an incident

11   OUD is relatively small for an acute trial of opioids."

12        Do you see that?

13   **A.**    I do.

14   **Q.**    And, again, there they're referring to an acute trial,

15   meaning that any dosing level for less than 90 days, the

16   Edlund article characterized the risk of an incident OUD as

17   relatively small, correct?

18   **A.**    That's what that sentence says.  I believe it's more

19   contextualized in the -- in the following sentences.

20   **Q.**    But the -- but Edlund did state in this article that

21   the risk of an incident OUD is relatively small for an acute

22   trial of opioids?

23   **A.**    That sentence says that.

24   **Q.**    And acute trial, again, meaning less than 90 days of

25   use?

1    **A.**    That's right.

2    **Q.**    Let me also ask you to look a few sentences further

3    down.  It says, "Our data suggests that it is almost

4    meaningless to talk of a single rate of OUDs."

5         Do you see that?

6    **A.**    That -- that's how the sentence begins, yes.

7    **Q.**    Right.  I just wanted to ask you about that clause.

8    And the point being made there is you can't talk about a

9    single rate of OUD associated with prescription opioids

10   because you need to know both the duration of treatment and

11   also the level of dosing, correct?

12   **A.**    My interpretation of that sentence would be that OUD

13   risk does vary with dose and duration.  I mean, certainly,

14   there are many public health studies that have assessed

15   overall OUD prevalence.  And so, my interpretation of that

16   would be that the author is reporting that OUD risk varies

17   by dose and duration.  So, there's not one particular number

18   of like this is how many OUD cases you're going to get.

19   But, certainly, in public health we report the prevalence of

20   OUD without always reporting dose and duration because it

21   really depends on the public health activity that you're

22   doing.

23   **Q.**    But the point being made in this Edlund study is if

24   you're really going to be able to assess risks of OUD

25   associated with treatment with prescription opioids, you

1    need to know the dose and duration?

2    **A.**    No.   I don't think that that's how my interpretation of

3    that sentence would be.   My interpretation would be that

4    Edlund and colleagues are saying that dose and duration are

5    major factors in determining the risk of OUD.

6    **Q.**    Let me ask you, you're aware that the majority of

7    opioid prescriptions are for short-term therapy of less than

8    90 days, correct?

9    **A.**    In what year?

10   **Q.**    Let me ask you generally without reference to any

11   particular year.   You're aware that the majority of opioid

12   prescriptions are for short-term therapy of less than

13   90 days?

14   **A.**    It certainly would depend on the opioid therapy that

15   we're specifying.   I haven't seen data on every opioid

16   therapy.

17   **Q.**    So, you don't know one way or the other what level of

18   prescriptions are for short-term treatment as compared to

19   longer term?

20   **A.**    Because you haven't specified the product that we're

21   talking about, I can't report on the average duration of

22   every opioid product.

23   **Q.**    Do you have any understanding that there's a large

24   fraction of opioid prescriptions that are written for

25   short-term treatment of less than 90 days?

1    **A.**    Yes, which is why this OUD number is so concerning.

2    **Q.**    The -- I was asking about less than 90 days.

3    **A.**    Right.

4    **Q.**    And the point is that you're aware that there is a

5    substantial fraction of prescriptions that are written for

6    less than 90 days of treatment, correct?

7    **A.**    Yes, which is -- yes.  That's the problem with having

8    .12 percent incidence.

9    **Q.**    The -- the -- and this is true even for patients with

10   chronic non-cancer pain?  They're often prescribed opioids

11   for shorter durations, correct?

12   **A.**    I don't know that.

13   **Q.**    Let me ask you to look back at Edlund again.  Again,

14   sticking on Page 6.  He begins on the left-hand column, the

15   final paragraph.  The first sentence says, "Although our

16   study was designed to study incidence of OUDs, it also

17   provides descriptive data on incident opioid use for chronic

18   pain."  Do you see that?

19   **A.**    Yes.

20   **Q.**    And then it goes on in the next sentence to say, "At

21   35 percent, incident opioid use was not uncommon" -- I'm

22   sorry.  I messed that up.  "At 35 percent", comma, "incident

23   opioid use was not uncommon among individuals with new onset

24   of a CNCP episode."

25        Do you see that?

1    **A.**    I do.

2    **Q.**    And the reference to CNCP is chronic non-cancer pain,

3    correct?

4    **A.**    Yes.

5    **Q.**    And this study is focusing on the treatment of people

6    with chronic non-cancer pain, correct?

7    **A.**    Right.

8    **Q.**    And so, it indicates here that only 35 percent of the

9    population, 35 percent of the sample they studied, only

10   35 percent received an opioid prescription, correct?

11   **A.**    35 percent of people on the sample were prescribed an

12   opioid for chronic non-cancer pain; that's the question,

13   right?

14   **Q.**    Yes, exactly.

15   **A.**    Okay.

16   **Q.**    That's -- that's what I meant to be asking you.  In

17   other words, he was looking at a sample of people with

18   chronic non-cancer pain and he's reporting that only

19   35 percent of the sample received an opioid prescription,

20   correct?

21   **A.**    I certainly wouldn't use the word only.  That's a huge

22   number.

23   **Q.**    I'm -- okay.

24   **A.**    The word only isn't in the sentence.  That's --

25   **Q.**    I'll take out only.

1    **A.**    Thank you.

2    **Q.**    He -- he's looking at a sample of people with chronic

3    non-cancer pain and 35 percent of the sample received an

4    opioid prescription, correct?

5    **A.**    Yes.

6    **Q.**    And so, another way to put that is 65 percent of this

7    group that had chronic non-cancer pain was not prescribed an

8    opioid?

9    **A.**    That's right.

10   **Q.**    And then, he states in the next sentence, "However,

11   among the 35 percent who received opioids, only 5 percent

12   proceeded to chronic use."

13        Do you see that?

14   **A.**    I do.

15   **Q.**    And then he says, "And only 3 percent of these

16   proceeded to chronic use of high daily doses."

17        Do you see that?

18   **A.**    I do.

19   **Q.**    So, he does a little math for us in his parentheticals.

20   He says, "Among the 35 percent who received opioids, the 5

21   percent who proceeded to chronic use represented 1.7 percent

22   of the sample", correct?

23   **A.**    That's right.

24   **Q.**    So, he's saying there that only 1.7 percent of the

25   overall sample was prescribed opioids for more than 90 days,

1    correct?

2    **A.**    Again, the only is not the word I would use.

3    **Q.**    He's got only in the sentence.

4    **A.**    Not for the 1.7 percent.

5    **Q.**    He's got only before 5 -- okay, we won't play.  I'll

6    take out the word only.  I won't inject any value judgment.

7    I'm just trying to clarify the word.

8         He's saying that 1.7 percent of the sample received an

9    opioid prescription for more than 90 days, correct?

10   **A.**    That's right.

11   **Q.**    And he's saying within that group the 1.7 percent that

12   received a prescription for more than 90 days for opioids, 3

13   percent of those people representing 0.1 percent of the

14   overall sample proceeded to chronic use at a high dose,

15   correct?

16   **A.**    That's right.

17   **Q.**    And he -- he then goes on in the next sentence to say,

18   "This is a steep selection process for patients achieving

19   chronic high dose therapy."

20        Do you see that?

21   **A.**    Yes.

22   **Q.**    And then he says, "Further, this selection process may

23   be even steeper now than when our study was conducted, due

24   to growing physician concerns regarding addiction."

25        Do you see that?

1    **A.**   I do.

2    **Q.**   And do you consider that to be a true statement?

3    **A.**   I do believe that physicians are more concerned about

4    addiction now than they were in the 1990s and 2000s.

5    **Q.**   And more so than they were at the time this article was

6    written in 2014?

7    **A.**   Well, I think at the time the article was written in

8    2014 -- I mean, I'm agreeing with the author's statement

9    that there is a growing concern about addiction in 2014.

10   **Q.**   And that's a growing concern within the medical

11   community as it gathered more data and information?

12   **A.**   I think the medical and general public was increasingly

13   concerned about addiction.

14   **Q.**   Let me ask you to look at another article, please.

15          MR. HESTER:  Your Honor, may I approach?

16          THE COURT:  Yes, you may.

17          BY MR. HESTER:

18   **Q.**   Dr. Keyes, we've handed you a document marked DEF-WV

19   Exhibit 2524 headed Opioid Abuse and Chronic Pain

20   Misconceptions and Mitigation Strategies.  Dr. Keyes, do you

21   have that document in front of you?

22   **A.**   I do.

23   **Q.**   And this is a 2016 paper written by Nora Volkow and

24   others published in the New England Journal of Medicine; is

25   that correct?

```
 1    A.    Yes.

 2    Q.    And you rely on this article in forming your opinions

 3    in this case, correct?

 4    A.    I do.

 5    Q.    And Nora Volkow is the Director of the National

 6    Institute on Drug Abuse, correct?

 7    A.    Yes.

 8    Q.    And let me point you to Page 1 of the document under

 9    the heading for Source of the Opioid Epidemic.  There's a

10    third sentence that reads, "In 2014 alone, U. S. retail

11    pharmacies dispensed 245 million prescriptions for opioid

12    pain relievers."

13          Do you see that?

14    A.    Yes.

15    Q.    Does that accord with your understanding?

16    A.    It does.

17    Q.    And then, it goes on to say, "Of these prescriptions,

18    65 percent were for short-term therapy of less than three

19    weeks."

20          Do you see that?

21    A.    Yes.  That's exactly why the Edlund article should be

22    so concerning.

23              MR. HESTER:  Your Honor, I move to strike as

24    non-responsive.

25              THE WITNESS:  I can explain.
```

```
 1              THE COURT:  Well, answer --
 2         Mr. Farrell?
 3              MR. FARRELL:  Yeah.  I think she should be
 4    permitted to explain.  She gave the -- she answered the
 5    question yes and then offered an explanation.
 6              MR. HESTER:  I don't think -- Your Honor, she's
 7    not explaining the question I asked her.
 8              THE COURT:  Right.  The answer was non-responsive.
 9    I'll strike it.
10              BY MR. HESTER:
11    Q.   Dr. Keyes, I just wanted to ask about this sentence
12    that says, "Of these prescriptions, 65 percent were for
13    short-term therapy of less than three weeks."
14         Do you see that?
15    A.   I do.
16    Q.   And does that accord with your understanding that, in
17    this time frame of 2014, 65 percent of the opioid
18    prescriptions written in the country were for a duration of
19    less than three weeks?
20    A.   Yes, that is my understanding.
21    Q.   Also on the same page, it goes on to say that, "Chronic
22    pain not caused by cancer is among the most prevalent and
23    debilitating medical conditions, but also among the most
24    controversial and complex to manage."
25         Do you see that?
```

1    **A.**    I don't.  I'm sorry.  It's on the first page?

2    **Q.**    It's actually the first sentence of the whole article.

3    **A.**    Oh.

4    **Q.**    Didn't mean to trick you there.  So, yeah, just so --

5    the article begins that way.

6         Do you see that?

7    **A.**    Yes.

8    **Q.**    That's a true statement, correct?

9    **A.**    I think that -- I don't know -- I have not reviewed the

10   literature on what the most prevalent and debilitating

11   medical conditions would be.  I actually might -- I might

12   have my own views on that.

13        Certainly, I would agree that chronic pain not caused

14   by cancer is prevalent and is a challenge to clinically

15   manage.  I don't know that I would agree that it is the most

16   prevalent.

17   **Q.**    Do you agree that chronic pain not caused by cancer is

18   a debilitating medical condition?

19   **A.**    I agree that chronic pain not caused by cancer is a

20   debilitating medical condition.

21   **Q.**    And do you see -- do you see further down on this same

22   first page, toward the bottom of the page, there's a

23   statement that says, "The major source of diverted opioids

24   is physician prescriptions?"

25        Do you see that?

1    **A.**    Oh, I'm sorry.  We're in a different section?  Okay.

2    **Q.**    Yeah, sorry.  It's the last full paragraph on the page.

3    States, "The major source of diverted opioids is physician

4    prescriptions."

5         Do you see that?

6    **A.**    I'm just trying to find it.

7    **Q.**    It --

8    **A.**    Yes.  I see that.

9    **Q.**    And that's a true statement, correct?

10   **A.**    I mean, if I -- I would say a major source of diverted

11   opioids is physician prescriptions.  I think there are other

12   major sources, but physician prescriptions is certainly a

13   major source of diverted opioids.

14   **Q.**    Let me ask you to look at Page 4, please.  There's --

15   over on the left-hand side, first full sentence on the page,

16   there's a reference -- well, I guess I should actually begin

17   by pointing you to the prior page, Page 3, and there's a

18   sentence on the right-hand side.  "The repeated

19   administration of any opioid almost inevitably results in

20   the development of tolerance and physical dependence."

21        Do you see that?

22   **A.**    Yes.

23   **Q.**    And then it goes on to say over on Page 4, "These

24   short-term results of repeated opioid administration revolve

25   -- resolve rapidly after discontinuation of the opioid."

1        Do you see that?

2    **A.**    Yes.  They're referring to the intracellular signaling

3    cascades.

4    **Q.**    And that accords with your understanding, correct?

5    **A.**    I'm sorry.  What -- I don't understand the question.

6    Whether intracellular signaling cascades resolve?

7    **Q.**    When Dr. Volkow here says, "These short-term results of

8    repeated opioid administration resolve rapidly after

9    discontinuation of the opioid," that's a true statement,

10   correct?

11   **A.**    There's a sentence in between the two that we haven't

12   discussed that I think is important for contextualizing the

13   short-term results of -- when she says "these short-term

14   results", she's referring to the predictable phenomenon

15   reflect contra-adaptations in opioid receptors and their

16   intracellular signaling cascades.  So, that's what's

17   referred to as "these short-term results".

18   **Q.**    And it accords with your understanding that those

19   results resolve rapidly after discontinuation of the opioid?

20   **A.**    The intracellular signaling cascades, yes.

21   **Q.**    Then, over on the right-hand side on Page 4, the last

22   full paragraph on the right-hand side says, "Unlike

23   tolerance and physical dependence, addiction is not a

24   predictable result of opioid prescribing."

25       Do you see that?

**A.**   I see that.

**Q.**   And then it goes on to say, "Addiction occurs in only a small percentage of persons who are exposed to opioids."

Do you see that?

**A.**   I do.

**Q.**   And did you -- that's your understanding of what Dr. Volkow -- how Dr. Volkow has characterized addiction risks here?

**A.**   I -- I agree that a small percentage of people who use opioids develop Opioid Use Disorder and I think that's what she's saying.  I think you have to contextualize that with the amount of opioid prescribing as we do in public health.

**Q.**   But so, you would agree with the statement she makes here?

**A.**   Yes.  There's numerous studies in the report that demonstrate the same statement.

**Q.**   Let me ask you to look over on the next page, Page 5, please.  And in the first full column on the left side there's a sentence that begins, "However, we do know that the risk of opioid addiction varies substantially among persons, that genetic vulnerability accounts for at least 35 to 40 percent of the risk associated with addiction."

Do you see that?

**A.**   I do.

**Q.**   And does that accord with your understanding that

```
 1    genetic vulnerability accounts for at least 35 to 40 percent
 2    of the risk associated with addiction?
 3    A.   Yes.
 4    Q.   Okay.  Dr. Keyes, we can put that one down for a
 5    minute.
 6         I want to turn back to discuss your testimony and the
 7    estimates on the number of deaths caused by prescription
 8    opioids in Huntington and Cabell County.  So, just to set
 9    the table here, you're not a Medical Examiner, correct?
10    A.   Correct.
11    Q.   And to estimate deaths attributable to prescription
12    opioids, you relied on data compiled by the CDC from death
13    certificates, correct?
14    A.   That's right.
15    Q.   And the CDC data is based on death certificates
16    prepared by authorities in each jurisdiction where the
17    deaths occurred, correct?
18    A.   Yes.
19    Q.   You did not look yourself at the underlying death
20    certificates, right?
21    A.   That's right.
22    Q.   But you are aware that there are circumstances where
23    more than one drug will be listed in a death certificate,
24    correct?
25    A.   Yes.
```

1  **Q.**   And, in fact, in Huntington-Cabell, there are many

2  polydrug overdoses, meaning overdoses where multiple drugs

3  are found in somebody's body at the time of death, right?

4  **A.**   That's right.

5  **Q.**   And so, for purposes of your calculations, if

6  prescription opioids were one of the drugs listed in the CDC

7  data, you directly contribute that death to prescription

8  opioids even if there were other drugs also identified as

9  contributing to the death, correct?

10  **A.**   That is the reliable methodology of my field.

11  **Q.**   But let me make sure I understand what you did.  I

12  didn't ask whether it was reliable.  I asked what you did.

13  **A.**   Okay.

14  **Q.**   And what you did was if a prescription opioid was one

15  of the drugs listed in the CDC data as contributing to

16  death, you directly attributed that death to prescription

17  opioids even if there were also other drugs also listed as

18  contributing to the death, correct?

19  **A.**   Of course, yes, I did.

20  **Q.**   So, if you have a death certificate that lists both

21  prescription opioids and heroin, the death certificate would

22  be coded in the CDC data as involving both prescription

23  opioids and heroin and you attribute that death directly to

24  prescription opioids?

25  **A.**   Yes.  And I can explain the reasoning why, if that

1    would be --

2    **Q.**   I'll drill into that more later, but for now, I'm just

3    trying to set the table on what you did.

4    **A.**   Okay.

5    **Q.**   And, in fact, there could be circumstances where four

6    or five drugs would be listed on the death certificate as

7    contributing to the death and if one of them is a

8    prescription opioid, you would attribute that death directly

9    to prescription opioids?

10   **A.**   Absolutely.

11   **Q.**   So, to be clear, some portion of the deaths that you

12   categorize as directly attributable to prescription opioids

13   were coded by the Medical Examiner as also involving heroin

14   or illicit fentanyl?

15   **A.**   Yes.

16   **Q.**   And you don't actually know how many, correct?

17   **A.**   In Cabell County or in West Virginia?

18   **Q.**   In Cabell County?

19   **A.**   You're asking if I know how many deaths had fentanyl --

20   had prescription opioids without one of these other codes?

21   **Q.**   No.  I was going at it the other way.  So, if you had a

22   death certificate that listed prescription opioids, and

23   heroin, and fentanyl, all three were listed as contributing

24   to the death, I'm asking, you don't know how many of those

25   there were?

1    **A.**    I think we do know that in the CDC data.  I could -- we

2    -- we know it for -- I guess at the county level there might

3    not be sufficient numbers to estimate that directly.

4    **Q.**    So, I mean, just to be clear on the methodology, you

5    could have a circumstance where there might be multiple

6    drugs listed, along with prescription opioids, that you

7    attribute that death directly to prescription opioids and

8    you don't know how many of those deaths there were that

9    might list multiple drugs alongside the prescription

10   opioids?

11   **A.**    I think we do know how many list multiple drugs.

12   **Q.**    For purposes of your death estimates in

13   Cabell-Huntington?

14   **A.**    Oh, I -- is that knowledge knowable?  Yes.  But was it

15   relied upon for my methodology?  No.

16   **Q.**    Okay.  So, just to make sure --

17   **A.**    I apologize.  I was not --

18   **Q.**    No.  Just so we're communicating here.  So -- so, for

19   purposes of your analysis in Cabell-Huntington, when you

20   were attributing deaths to prescription opioids, you didn't

21   undertake to analyze how many of the deaths that you

22   directly attributed to prescription opioids also listed

23   other drugs as contributing to the death?

24   **A.**    That was not part of the methodology.

25   **Q.**    And so, you didn't do that?

1   **A.**   I didn't -- it's not part of the methodology.  I may

2   have done it -- I might have looked at that in developing

3   the methodology, but it's not part of the final number that

4   I derived.

5   **Q.**   And so, we couldn't go back and figure that out from

6   the work you did?

7   **A.**   No.

8   **Q.**   And so, some portions of the death that you categorized

9   as directly attributable to prescription opioids also were

10  coded by the Medical Examiner as involving cocaine, for

11  instance?

12  **A.**   Yes.

13  **Q.**   You don't know how many were coded that way?

14  **A.**   Off the top of my head, sitting here today, I don't,

15  but I don't believe that information is obtainable.

16  **Q.**   But it wasn't part of your methodology?

17  **A.**   No.

18  **Q.**   And you also attribute a certain number of illicit

19  opioid deaths indirectly to prescription opioids, correct?

20  **A.**   That's right.

21  **Q.**   So, where you have a death where the soul cause is

22  listed as fentanyl on the death certificate, you indirectly

23  attribute a percentage of those deaths to prescription

24  opioids?

25  **A.**   That's right.

1   **Q.**   And this is based on your assumption of a gateway that

2   you discussed last week, correct?

3   **A.**   Yes.

4   **Q.**   So, I'm going to come back to that later, but I just

5   wanted to put a pin in it that that's the basis by which you

6   do this indirect attribution, correct?

7   **A.**   Yes he.

8   **Q.**   The NSDUH data, the government data, was your basis for

9   estimating deaths indirectly attributable to prescription

10   opioids, correct?

11   **A.**   That's right.

12   **Q.**   And the NSDUH data is limited to people who misused --

13   misused prescription opioids prior to heroin use, correct?

14   **A.**   That's right.

15   **Q.**   And so, with respect to the NSDUH data on prescription

16   opioid misuse, you don't know what percentage of those

17   people actually had a prescription for opioids, right?

18   **A.**   Certainly, that is estimate-able [sic], and that's the

19   methodology I outline in the report, that there is this

20   quite large overlap.  Most non-medical users also have a

21   prescription at some point in their lives.

22   **Q.**   But you -- you don't know what percentage that is?

23   That wasn't something you developed as part of your

24   methodology, correct?

25   **A.**   For the indirect attribution percentage, I used the

1    proportion of heroin users who started with non-medical

2    opioid use.

3    **Q.**   And so, to be clear, the deaths that you're attributing

4    indirectly to prescription opioids did not have a

5    prescription opioid coded in the CDC data, correct?

6    **A.**   The people I am indirectly attributing to prescription

7    opioids did not have a prescription opioid as a contributing

8    cause at the time of death.

9    **Q.**   So -- so, the death certificate coded by the CDC

10   doesn't have prescription opioid listed as a contributing

11   cause of death in the ones that you indirectly attribute to

12   prescription opioids?

13   **A.**   That's right.

14   **Q.**   And when the death certificate does not list

15   prescription opioids as a contributing cause of death, the

16   Medical Examiner concluded that prescription opioids were

17   not a source of the death, correct?

18   **A.**   A proximal cause of the death.  It did not contribute

19   to the death as it occurred.

20   **Q.**   So, when we have this indirect attribution, those all

21   involve death certificates where the Medical Examiner coded

22   the death as caused only by either heroin or illicit

23   fentanyl, correct?

24   **A.**   Right.  And I can provide a little bit of context for

25   that, if that would be helpful.

122

1    **Q.**   I -- for right now, I'm just trying to set the stage on

2    what you did.  And I've got that correctly, right?

3    **A.**   That's correct.  That's the methodology.

4    **Q.**   And you've not examined the drug use histories of any

5    of the individuals whose opioid overdose deaths you count as

6    indirectly attributable to prescription opioids to determine

7    whether they ever used prescription opioids, correct?

8    **A.**   It's an estimate based on the literature, so I did not

9    look at any particular death and their drug use history.

10   **Q.**   So, let's take a step back and talk about how you

11   developed your report.  You served your expert report on

12   August 3, 2020, correct?

13   **A.**   Yes.

14   **Q.**   You then served an errata three weeks later on

15   August 24, correct?

16   **A.**   That's right.

17   **Q.**   You were then deposed on September 15, correct?

18   **A.**   Yes.

19   **Q.**   And then you served a second errata a week after your

20   deposition on September 23, correct?

21   **A.**   That's right.

22   **Q.**   And between your report and the two errata, your

23   calculations on these death numbers changed, correct?

24   **A.**   Yes.

25   **Q.**   In your original report you estimated the number of

1    deaths directly and indirectly attributable to prescription

2    opioids using the methodology we just reviewed, you did a

3    direct attribution and an indirect attribution, correct?

4    **A.**   Yes.

5    **Q.**   And, in your original report, you reported that of the

6    105 opioid overdose deaths in Cabell-Huntington in 2018, 104

7    were directly attributable to prescription opioids, right?

8    **A.**   Is the figure that's in the report in front of me based

9    on the original or the revised?  I just want to make sure

10   that I'm giving you --

11   **Q.**   I think what we have handed you is your original

12   report.

13   **A.**   And do you have the revised that I can compare it to?

14   **Q.**   Yes.  We can try to come up with those.  It may take us

15   just a minute, please.

16   **A.**   Sure.

17   **Q.**   Let me ask you before we -- before we get you the

18   documents, do you remember that you had to change the number

19   from what you had in your original report?  You had to

20   revise it downward?

21   **A.**   Well, there was two -- one, I had a typo and that was

22   -- I corrected it.  And then, secondly, I also revised the

23   estimation.  Could I have both?

24          MR. HESTER:  May I approach, Your Honor?

25          THE COURT:  You may.

1              MR. HESTER:  I think if it's okay by counsel, this

2    was just to refresh Dr. Keyes' recollection.  I wasn't

3    planning to introduce this as an exhibit.

4              THE COURT:  You're refreshing her recollection on

5    the errata?

6              MR. HESTER:  Yes.

7              BY MR. HESTER:

8    **Q.**   Dr. Keyes, as I understand it, it would help you to

9    have the errata to refresh your recollection on the sequence

10   of events?

11   **A.**   Yes.

12             THE COURT:  You don't remember independently the

13   sequence of events?

14             THE WITNESS:  I -- I remember this -- I just -- he

15   asked, well, the number was 105.  And then, it was 104.  And

16   then you arrived at -- I just don't remember the exact

17   numbers, but I remember the sequence of events.

18             BY MR. HESTER:

19   **Q.**   So, Dr. Keyes, let me hand you two errata.  And the

20   first errata that was submitted on August 24 and the second

21   errata from September 23, those will help refresh your

22   memory on the sequence?

23   **A.**   They will.  I'm sorry.

24             MR. HESTER:  Your Honor, may I approach?

25             MR. ACKERMAN:  Your Honor, may we get copies,

1   please?

2           MR. HESTER:  Sure.  Sorry.

3           BY MR. HESTER:

4   **Q.**   So, Dr. Keyes, I think the first question I had for you

5   was in your original report you reported that of the 105

6   opioid overdose deaths in Cabell-Huntington in 2018, 104

7   were directly attributable to prescription opioids; is that

8   right?

9   **A.**   That's right.

10  **Q.**   And then that was an error?  I think you've said that

11  was a mistake?

12  **A.**   Well, not exactly.  I can explain, if that's helpful.

13  **Q.**   Well, you had counted every single death involving

14  fentanyl as a prescription opioid death?

15  **A.**   So, that was the CDC's guidance.  We followed the CDC's

16  guidance on categorizing prescription opioids.  And then, I

17  decided that I was -- that that wasn't the best guidance to

18  use because the T40.4 deaths, which are the synthetic opioid

19  deaths, would include illicit fentanyl.

20       And so, I thought, well, I don't want to include that

21  as a prescription opioid because a lot of it might be

22  illicit.  And so, that's why I made that revision.  It went

23  from what the CDC recommends in terms of categorizing

24  prescription opioids to what I felt was a more accurate

25  reflection, which would be not including all of those as

1    prescription opioids because every fentanyl death is not a

2    prescription fentanyl death, to -- just to provide the

3    context there.

4    **Q.**   So, you concluded that the first numbers weren't

5    correct, right?

6    **A.**   Well, the first numbers are what the CDC recommends

7    that we do and I decided that that wasn't the best label.

8    To call those all prescription opioid deaths was probably

9    not the best way to estimate the direct attribution of

10   prescription opioids.

11   **Q.**   Well, let's just make sure we got the context.  You

12   started with 104 deaths that you directly attributed to

13   prescription opioids, correct?

14   **A.**   That's right.

15   **Q.**   Then you dropped the number that you directly

16   attributed to prescription down to 32, correct?

17   **A.**   That's right.

18   **Q.**   And then you dropped the number again to 20 and --

19   **A.**   Yes, and I can explain.  Okay, sorry.

20   **Q.**   Dropped the number --

21   **A.**   I'm excited about methods.  I've got to --

22   **Q.**   You dropped the -- you dropped the number again to 20

23   deaths attributable to prescription opioids in your second

24   errata, correct?

25   **A.**   That's right.

1    **Q.**    So, we went from 104 deaths directly attributable to

2    prescription opioids and in the original report down to 32

3    down to 20 deaths directly attributable to prescription

4    opioids, correct?

5    **A.**    That's right.

6    **Q.**    And let me ask you to look in particular at your second

7    errata.  And this comes up with a number of -- as we've

8    discussed, 20 deaths that you attribute directly to

9    prescription opioids, right?

10   **A.**    That's right.

11   **Q.**    And that's based on the methodology that we discussed a

12   few minutes ago, correct?

13   **A.**    If I could just qualify one part of what you're saying

14   that I'm realizing is a little bit inaccurate, is that

15   you're just talking about the 2018 deaths and that's where

16   the fentanyl issue becomes really apparent.  Everything

17   before 2015, there really aren't any changes.  It was just

18   when fentanyl happened that we had to change the methodology

19   to reflect the epidemiological situation.

20         So, not all of the numbers decreased in terms of the

21   direct attribution to prescription opioids, especially those

22   pre-2015 numbers.  There really weren't any changes.

23   **Q.**    Fair enough.  So, I'm focusing -- I am focusing

24   principally on 2018 because 2018 is the number that

25   ultimately gets supplied to Dr. Alexander for purposes of

1    his abatement report, correct?

2    **A.**    I don't know what --

3    **Q.**    You don't know what's happened with the numbers you've

4    estimated?

5    **A.**    I know that various other experts have relied upon

6    them, but I haven't -- I have tried to stay out of that.

7    **Q.**    Okay.  So, but in any event, I am -- it is fair I'm

8    focusing on 2018.  And so, I want it to just be clear in the

9    record that it went from 2018 you started at 104 deaths

10   directly attributable to prescription opioids.  You then

11   dropped the number to 32 deaths directly attributable to

12   prescription opioids.  And then you dropped the number again

13   to 20 deaths directly attributable to prescription opioids

14   in 2018, correct?

15   **A.**    That's right.

16   **Q.**    And then you attribute 45 other deaths indirectly to

17   prescription opioids, correct?

18   **A.**    Yes.  The number went up.  If we're talking about the

19   trajectory of indirectly and directly attributable.  Because

20   the number of directly attributable went down, the number

21   indirectly attributable went up.  There's kind of a -- a

22   correspondence between those two.

23   **Q.**    So, again, just focusing on the 2018 numbers here, the

24   -- just so we have it for the record and it's clear, the --

25   you've indirectly attributed 45 overdose deaths to

1    prescription opioids based on the indirect attribution

2    methodology we discussed a few minutes ago, correct?

3    **A.**   That's right.

4    **Q.**   And the total number of deaths that you've analyzed is

5    105, correct?  Those are the deaths for opioid overdoses in

6    2018, correct?

7    **A.**   That's right.

8    **Q.**   So, this means, applying your methodology, that you

9    attribute directly approximately 20 percent of the

10   opioid-involved deaths in 2018 to prescription opioids,

11   correct?

12   **A.**   You're saying it would be whatever 20 plus 45 divided

13   by 105?

14   **Q.**   Well, no.  I was really focusing on the 21st, just so

15   the record is clear.

16   **A.**   Oh.

17   **Q.**   So, there's 105 opioid-related overdose deaths in 2018

18   in Huntington-Cabell that you've analyzed, right?

19   **A.**   That's right.

20   **Q.**   And of those 105, there are 20 that you directly

21   attribute to prescription opioids, correct?

22   **A.**   That's correct.

23   **Q.**   And that's based on the direct attribution methodology

24   we discussed a few minutes ago, correct?

25   **A.**   Uh-huh, yes.

**Q.**   And so then, in addition to those 20, there's another
45 deaths that you attribute indirectly to prescription
opioids?

**A.**   Yes.

**Q.**   Based on the methodology we discussed a few minutes
ago; is that right?

**A.**   That's right.

**Q.**   And so, from the 105 total deaths, total opioid-related
overdose deaths in 2018, we're left with, I believe, it's 40
deaths that you don't attribute either directly or
indirectly to prescription opioids, correct?

**A.**   Just about, yeah.

**Q.**   So, that means you have a -- you have a 40 percent or
so of the 105 total opioid-related overdose deaths you don't
attribute to prescription opioids, correct?

**A.**   That's right.

**Q.**   Either directly or indirectly, correct?

**A.**   Yes.

**Q.**   Did you say yes?  I'm sorry.

**A.**   Yes.

        THE COURT:  We need to pull the plug here, Mr.
Hester, when you get to a convenient stopping place.

        MR. HESTER:  All right.  This is -- this is as
good a time as any, Your Honor.

        THE COURT:  All right.  We'll come back at 2:00

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1   and you can get up and walk around or do whatever you want

 2   to do for two hours, Dr. Keyes.

 3              THE WITNESS:  Thank you.

 4         (Recess taken)

 5              THE COURT:  Is Dr. Keyes in the courtroom?

 6         Okay, Mr. Hester, you may continue, sir.

 7              MR. HESTER:  Thank you, Your Honor.

 8              BY MR. HESTER:

 9   Q.   Good afternoon Dr. Keyes.

10   A.   Good afternoon.

11   Q.   Earlier today, you made a reference to pill mills; do

12   you recall that?

13   A.   Yes.

14   Q.   And I wanted to ask you in your report that you

15   submitted, your expert report that you submitted in the MDL

16   litigation, you stated that, quote, "Pill mills do not

17   explain in any significant way the expansion of opioid

18   prescribing and opioid-related harm in the U. S."

19         Do you recall saying that in your MDL report?

20   A.   I do.

21   Q.   And that's a true statement, correct?

22   A.   Yes.

23   Q.   Let me turn now to your estimate of the OUD population

24   in Huntington and Cabell County.  And I'm going to do a

25   little bit on the board here.
```

1    And your view, Dr. Keyes, is that there is no

2    systematic way to count the OUD population, correct?

3    **A.**    That's right.

4    **Q.**    And so, because you can't actually count the OUD

5    population, you developed an estimate for it, correct?

6    **A.**    Yes.

7    **Q.**    And to estimate it, you divided the number of overdose

8    -- overdose deaths due to drugs in Cabell-Huntington in 2018

9    by a mortality rate; is that right?

10   **A.**    By two mortality rates.

11   **Q.**    Right.  So, I will get into that.

12   **A.**    Okay.

13   **Q.**    And maybe we'll start with the simpler point first.

14       You -- you refer to a methodology that you described as

15   a multiplier method, right?

16   **A.**    Yes.

17   **Q.**    And if I can write this formula over here, I will ask

18   you, Dr. Keyes, so we're talking the same language, I hope.

19   So, the basic principle of the multiplier method is that if

20   you know the number of deaths due to drug overdose and you

21   know the mortality rate associated with a population of drug

22   users, you can back into the OUD number; is that right?

23   **A.**    That's the basic idea.

24   **Q.**    So, another way to put that based on the formula I put

25   up there, you could also multiply OUD, the OUD population,

1    by a mortality rate and that would give you a number of

2    deaths, right?

3    **A.**    That's right.

4    **Q.**    But, of course, in this case, we don't know the OUD

5    population, so you observe the number of deaths and then you

6    come up with a mortality rate and that's the way you

7    estimate OUD population, correct?

8    **A.**    Well, not exactly because, as I discussed on Friday,

9    there were a number of adjustments that you need to make up

10   epidemiologically based on the current state of the

11   epidemic.

12   **Q.**    So, but in the simple model -- and I'm going to get

13   into the adjustments.

14   **A.**    Okay.

15   **Q.**    But in the simple model, if you know the number of

16   deaths and you know a mortality rate, you can back into an

17   OUD population, correct?

18   **A.**    That's right.

19   **Q.**    So, you need to know two numbers.  You need to know a

20   death number, which is due to drug overdoses, correct?

21   **A.**    The number I used was deaths due to drug overdose.

22   **Q.**    And then the other number would be the mortality rate

23   associated with the population of people who have OUD,

24   correct?  Those are the two things you're trying to get to?

25   **A.**    Generally, although there's not one mortality rate

1    because of -- I know we're going to get into it.  I just

2    want to make sure that, for the record, it's stated the way

3    that I did it, which is that I used two mortality rates.

4    **Q.**    Right.  So, let's talk about the numbers you used but,

5    first, I wanted to be clear that because you're estimating

6    an OUD population, the accuracy of the death number and the

7    accuracy of the mortality number is extremely important to

8    coming up with an accurate OUD number, right?

9    **A.**    Yes.

10   **Q.**    And if either -- if you're off on the deaths or if

11   you're off on the mortality rate, you may be off on your OUD

12   estimate, correct?

13   **A.**    Not exactly.  The bioses would need to be working in

14   different directions in order for the OUD to be

15   mis-estimated.  So, you could mis-estimate one, but as long

16   as you're mis-estimating the other in a similar direction,

17   then your OUD estimate may still be unbiased.

18   **Q.**    Well, maybe I can take it more concretely in this case.

19   You came up with a specific number of deaths, so you know

20   that number that you have come up with, right, based on the

21   CDC data?

22   **A.**    Yes.

23   **Q.**    So, in the circumstance where you have a fixed number

24   for deaths, the question is, is your mortality rate

25   accurate, right?  That's going to be the driver of the

```
 1    accuracy, the OUD number, right?
 2    A.   Well, again, I mean, it would depend on if there's any
 3    -- if there's any mis-classification of death, for example,
 4    as long as that mis-classification is consistent in the
 5    mortality at rate that you've estimated, then your OUD rate
 6    would be unbiased.
 7         So, I wouldn't agree with that as a blanket statement,
 8    although there could be situations in which one or the other
 9    estimate would -- would lead to a biased estimate of OUD.
10    Q.   In this case, you came up with a number of 115 for
11    deaths; is that right?
12    A.   Do you know what page that's on?
13    Q.   42 of your report, I think.
14    A.   Okay.  115, yes.
15    Q.   Right.  So, let's drill into that 115 just a little
16    bit.  Before lunch, we were talking about the fact that you
17    had looked at -- you had come up with a number of 105
18    opioid-related overdoses, correct?
19    A.   That's right.
20    Q.   For this calculation, to do your OUD estimate, you used
21    the number 115, correct?
22    A.   Correct.
23    Q.   So, you added ten more drug overdose deaths that were
24    not due to opioids, correct?
25    A.   Well, I don't think that those two should be equated in
```

1    any way because this method relies on the all drug overdose

2    death number, not the opioid overdose death number.  So, I

3    didn't add them.  There happened to be 115 all drug overdose

4    deaths, of which 105 were opioid-related.

5    **Q.**   Okay.  So -- so, maybe I'll just put it the other way

6    around.  In this 115, there are overdoses for non-opioid

7    drugs, correct?

8    **A.**   That's right.  That's what the method required.

9    **Q.**   And so --

10   **A.**   And I -- I can explain that, if you'd like.

11   **Q.**   Well, let me walk through it and I think we'll get to

12   the right place.  So, the 115 is going to include both

13   opioid-related deaths, but also drug overdose deaths due to,

14   for instance, methamphetamine or cocaine, correct?

15   **A.**   Exactly.

16   **Q.**   And so, it's going to include deaths caused by

17   methamphetamine, for instance, even if there was no opioid

18   involved at all?

19   **A.**   And that's because the metaanalysis that it relies on

20   required that the OUD mortality rate be applied to the all

21   drug overdose category.

22   **Q.**   But I just want to make sure that the method is clear.

23   You estimated or you came up with a count of 105 deaths that

24   are opioid-related, correct?

25   **A.**   Right.

1    **Q.**   And of those 105 that are opioid-related, we discussed

2    before lunch that there were 20 directly attributed to

3    prescription opioids under the method we discussed earlier,

4    correct?

5    **A.**   Yes.

6    **Q.**   And there are 45 that you attribute indirectly to

7    prescription opioids under the methodology we discussed

8    before, correct?

9    **A.**   That's a different estimation process from this number

10   but, yes, in a different section of the report when I

11   estimate the attribution, that's what was --

12   **Q.**   So, when we look at the 115, the number that you used

13   for this OUD calculation, it means that 50 of the 115 deaths

14   are not attributed by you either directly or indirectly to

15   prescription opioids, correct?

16   **A.**   I haven't done that calculation.  That was for -- I

17   haven't -- I haven't estimated out of the 115 the number

18   that would be indirectly attributable to prescription

19   opioids.  Certainly, additional -- if you added the

20   additional overdose deaths, there would be a different

21   calculation for how many of them are indirectly attributable

22   to prescription opioids.  So, it wouldn't be 50.

23   **Q.**   Well, you have a number of 105.  Are you saying there's

24   some different number that you haven't calculated for the

25   number of deaths attributable to --

1   **A.**   No.  I'm saying that if I were to calculate the number

2   of deaths that were attributable -- directly and indirectly

3   attributable to prescription opioids based on the 115, it

4   would be a different number than the number that I based

5   directly and indirectly attributable to prescription opioids

6   based on the 105.

7   **Q.**   Do you have any reason to think that within this 115

8   death count that you used that there's more prescription

9   opioid deaths attributable than there was in the 105 we

10  discussed earlier when you went through the opioid-related

11  deaths?

12  **A.**   Indirectly attributable, yes.

13  **Q.**   Indirectly?  So, you would say that there are some that

14  you would view as indirectly attributable in this 115, but

15  you haven't done that calculation?

16  **A.**   I haven't -- yeah.  I'm saying that hypothetically I

17  would have to do a different analysis to answer your

18  question, which I have not done, because these are all drug

19  overdose deaths including, you know, everything.

20  **Q.**   Right.  So, this 115 includes drug overdose deaths that

21  don't involve opioids at all?

22  **A.**   Correct.

23  **Q.**   So then, for the mortality rate, you relied on an

24  analysis that was published in 2019 in a journal called JAMA

25  Psychiatry, right?

```
 1    A.   That's right.

 2    Q.   So, let's take a look at that study.

 3               MR. HESTER:  May I approach, Your Honor?

 4               THE COURT:  Yes.

 5               THE WITNESS:  Did you also print out the

 6    supplemental material because it's Figure 7-20 of the

 7    supplemental material that I relied on for the death rate.

 8    And so, that's a very important part of this discussion.

 9               MR. HESTER:  Let's try to see if we can straighten

10    it out.

11               THE WITNESS:  Okay.

12               MR. HESTER:  I'll do my best.

13               BY MR. HESTER:

14    Q.   So, Dr. Keyes, we've handed you a document marked

15    DEF-WV Exhibit 2495.  It has the title All-Cause and

16    Cause-Specific Mortality Among People Using Extramedical

17    Opioids, a Systematic Review and Metaanalysis.

18         Do you see that?

19    A.   I do.

20    Q.   And is this the paper that you relied on for the

21    mortality rate that you used to do the OUD estimate?

22    A.   There were two mortality rates.  One of them anchor --

23    well, both anchored in this paper, but one was -- I relied

24    on other information, as well.

25    Q.   Right.  So -- so in -- let's just be clear on this.
```

1    This is what you call the Larney study, right?

2    **A.**    That's right.

3    **Q.**    And it's called a metaanalysis because it analyzes the

4    results from other studies, right?

5    **A.**    A metaanalysis takes a lot of studies and comes up with

6    a summary of all of those studies.

7    **Q.**    And so, the Larney metaanalysis, if you look -- if you

8    look over at Page 4 of this paper under drug-related deaths,

9    there's a statement, "Across the three definitions for which

10   data were extracted, the pooled CMR was 0.52 per 100 per

11   person-years."

12        Do you see that?

13   **A.**    I do.

14   **Q.**    And that's one of the mortality rates that you used to

15   calculate OUD?

16   **A.**    That's correct.

17   **Q.**    So, let's put that on the board so we don't lose track

18   of it.  So, I've written Larney = .0052.  That's a correct

19   transition from the numbers in the report, right?

20   **A.**    That's right.

21   **Q.**    And so, the goal of this Larney study was to estimate

22   the mortality rate in people who engage in non-medical

23   opioid use; is that right?

24   **A.**    Yes.

25   **Q.**    And so, the rate that you used, this rate I've put up

```
 1    of .0052, the rate that you used for your calculation is the
 2    rate at which people using extra-medical opioids suffer
 3    drug-related overdose deaths, not just opioid overdoses?
 4    A.   Sorry.  I -- there is one correction I need to make to
 5    your statement.
 6    Q.   Okay.
 7    A.   Which is that if you look at Figure 7-20 in the
 8    supplemental materials, I went through each of the different
 9    -- I think it's 56 different cohorts that informed that
10    death rate calculation to ensure that the majority of people
11    had OUD and not extra-medical opioid use.
12    Q.   Well, okay, but --
13    A.   And you -- you had said extra-medical opioid use, but
14    it's really OUD.
15    Q.   Well, okay.  Maybe -- maybe I can clean that up.  So,
16    the Larney study includes people who did not have OUD,
17    correct?  It includes mortality rates for people who did not
18    have OUD, correct?
19    A.   I don't know what you mean.
20    Q.   Let me point you to Page 2 of the document under the
21    heading for Inclusion and Exclusion Criteria.
22         Do you see that, right-hand column?
23    A.   Sorry.  Hold on.
24    Q.   Page 2.
25    A.   Yes.
```

1    **Q.**   Are you with me there?  And there's -- there's a third

2    sentence that says, "Cohorts did not need to be opioid

3    dependent or have Opioid Use Disorder to be included."

4        Do you see that?

5    **A.**   I see that.

6    **Q.**   And so, just -- I think your point is you looked at

7    this?

8    **A.**   Right.

9    **Q.**   I wanted to make sure I understand the Larney design

10   included studies of people who had overdoses who did not

11   have OUD, correct?

12   **A.**   I suppose it's possible, but in the studies that I used

13   for my metaanalysis estimate for my OUD calculation, I made

14   sure to go through the studies to make sure that I wasn't --

15   that I was appropriately capturing my target population.

16   **Q.**   Well, you didn't change the Larney number.  You used

17   the Larney number as written in the paper, correct?

18   **A.**   Right, which if you go to Figure 7-20 and you look at

19   those cohort studies, I think you'll see that they include

20   people who are in treatment for opioid dependence.

21        MR. HESTER:  Your Honor, the witness is raising a

22   new point that was not disclosed in her expert report.  I do

23   not believe this point has ever been made to us previously.

24   I mean, I can press on because I think I can get through

25   this, but I -- just for the record -- I believe this is not

1    something that Dr. Keyes stated in her report.

2              THE COURT:  Well --

3              MR. HESTER:  I'll -- I'll press on, Your Honor.

4    I'm not asking you to do anything.

5              THE COURT:  Mr. Farrell, do you want to say

6    something?

7              MR. FARRELL:  Well, the fact that this wasn't

8    asked before doesn't make it untrue.

9              THE COURT:  Yes.  It was in response to one of

10   your questions, Mr. Hester.  So, you can go ahead.

11             MR. HESTER:  Well, I would only say, Your Honor,

12   the expert, in my view, has an obligation to disclose her

13   methodology.  This is complicated.

14             THE COURT:  Well, that's true.

15             MR. HESTER:  And it's going to get a little more

16   so as we work through it.  And so, the fact that this is a

17   new piece of the methodology that wasn't disclosed, I must

18   say, is a little bit of a curve ball for us.

19             THE WITNESS:  I'm sorry.  It's not a new piece.  I

20   -- I -- I can contextualize it further, but it's not a new

21   piece of methodology.  It's all in the report.

22             MR. HESTER:  I'll press on.  I just wanted to

23   preserve my point.

24             BY MR. HESTER:

25   Q.   So, Dr. Keyes, you recognized that the Larney study was

```
1    not enough or was not the only thing you could use for the

2    mortality rate, correct, because you recognized that there

3    is a fentanyl adjustment you needed to make, correct?

4    A.   Yes.

5    Q.   And so, let's just put that formula up on the board for

6    just a minute.  So, you actually broke the mortality rate in

7    half -- or into two parts, not in half, but you broke it

8    into two parts.

9         So, you did OUD as a function of 115, which was your

10   death number, divided by a prescription opioid mortality

11   rate based on Larney?

12   A.   Well, it's not a prescription opioid mortality rate.

13   Q.   Okay.  Or mortality -- what would be more accurate?

14   A.   It would be --

15   Q.   Larney?

16   A.   Right.  It would be the mortality rate for -- I suppose

17   I would -- I would characterize it as the OUD overdose

18   mortality rate for an -- aggregated across non-fentanyl

19   opioids.  That's probably hard to write out.

20   Q.   Do you have a clever way for me to abbreviate that?

21   A.   Non-fentanyl.

22   Q.   Okay.

23   A.   Non-fentanyl.

24   Q.   What if I put "NF"?

25   A.   Sure.
```

**Q.**   So, you broke it into two mortality rates, one

associated with non-fentanyl, and the other associated with

fentanyl?

**A.**   That's right.

**Q.**   Right?  And then you made a determination that there

was a percentage breakdown in the deaths in 2018, correct?

**A.**   Well, if I could just describe the methodology in a

little more detail.  I took the two overdose death rates and

then I weighted them by the proportion of deaths by year for

which T40.4 or synthetic opioids were a contributing cause.

And so, in 2018, I'm sure you have the number with you.

It's probably 80-something percent, right?

**Q.**   84 percent.

**A.**   Right.

**Q.**   Does that sound right?

**A.**   That sounds about right.  And so, in previous years it

was lower, and then it increased over the course of the OUD

yearly estimation that I did.

**Q.**   So, let's put that up on the board just so we don't

lose that.  So, you had an 84 percent.  Those were the

deaths that you construed as attributable to synthetic

opioids, correct, that percentage?

**A.**   84 percent of overdose deaths in 2018 were coded with a

T40.4 code, which is the synthetic opioid code.

**Q.**   So, you concluded that, as you're looking at this 115

1    number, you would view 84 percent of those deaths as due to

2    synthetic opioids?

3    **A.**    Yes.  They had synthetic opioids as a contributing

4    cause.

5    **Q.**   Well, and you viewed that as the contributing cause for

6    84 percent of the deaths, correct?

7    **A.**    A contributing cause.  There might have been other

8    drugs listed on the death certificate.

9    **Q.**   But not prescription opioids, correct?

10   **A.**    Prescription opioids could have been listed on the

11   death certificate.

12   **Q.**   Well, but you weren't attributing these to prescription

13   opioids.

14   **A.**    That was a different analysis.  So, in this analysis,

15   I'm weighting the death rate, the OUD death rate for

16   fentanyl, by the proportion of deaths that had a fentanyl --

17   had T40.4 as an underlying cause.

18        They could have T40.1, T40.2, T40.-infinity, but they

19   at least had T40.4.

20   **Q.**   So, I'm with you.  So -- so, you're saying that you

21   viewed, from among this 115 deaths, 84 percent of them

22   you've had synthetic opioids listed as a cause?

23   **A.**    That's right.

24   **Q.**   So, that left 16 percent for non-fentanyl; is that

25   right?

1          THE COURT:  Is synthetic opioid equivalent to

2    fentanyl or is there a difference?  I'm a little bit

3    confused here.

4          THE WITNESS:  There's a -- I can answer or --

5          MR. HESTER:  Yes, please.

6          BY MR. HESTER:

7    **Q.**   So, Dr. Keyes, synthetic opioids, that phraseology is

8    typically applied to illicit fentanyl, correct?

9    **A.**   It's applied to any fully synthetic opioid.  Fentanyl

10   would be one of which there's prescription varieties and

11   illicit varieties, but there's many other kinds of synthetic

12   opioids, as well.

13   **Q.**   But, Dr. Keyes, just to be clear, the opioids that

14   you're focusing on here, these are -- these are illicit

15   fentanyl deaths, correct?

16   **A.**   Well, that's another discussion that we should probably

17   have about the proportion of those that are prescription

18   fentanyl versus illicit, which I also provided an estimate

19   of.  I'm sure we'll -- we'll get there.

20   **Q.**   Sorry.  You understood that the vast majority of this

21   84 percent of fentanyl deaths were illicit fentanyl,

22   correct?

23   **A.**   Yes.

24   **Q.**   And you attributed, in fact, three deaths out of 115 to

25   prescription fentanyl, correct?

1   **A.**   That's right.

2   **Q.**   So, if I do the math, and I'm not fast enough to do it

3   in my head, but it would be 84 percent times 115 would be

4   the fentanyl deaths.  And then we would subtract 3 from that

5   to figure out how many you viewed as prescription fentanyl,

6   correct?

7   **A.**   That seems reasonable.

8   **Q.**   And putting it the other way around, therefore, if we

9   wanted to figure out how many were illicit fentanyl, it

10   would be 84 percent times the 115.  And then, you would

11   subtract 3 from that for the prescription fentanyl deaths,

12   correct?

13   **A.**   That's right.

14   **Q.**   So, if we -- and as we discussed before, for the

15   non-fentanyl, you used Larney as your multiplier number,

16   correct?

17   **A.**   Yes.

18   **Q.**   And so that the math doesn't even get more complicated,

19   I'm going to ask you to help me.  I've even got a calculator

20   here, Dr. Keyes.

21          MR. HESTER:  Can I approach, Your Honor?

22          THE COURT:  Yes.

23          BY MR. HESTER:

24   **Q.**   And so, Dr. Keyes, we know that we're applying the

25   Larney number .0052 to the 16 percent that are non-fentanyl,

1    correct?

2    **A.**    That's -- well, it's -- I think that's one way to

3    phrase it.   It weights the denominator.

4    **Q.**    Right.

5    **A.**    By the -- it's .0052 times 16 percent.

6    **Q.**    And maybe just to put it up here in the corner, I don't

7    want to do too much with it, but the point is, that you're

8    making is, it's .84 times your fentanyl mortality rate

9    plus .16 times the non-fentanyl?

10   **A.**    Yes.   That sounds about right.

11   **Q.**    That's what -- that's what we need to come up with here

12   to do the proper weighting because we've got a non-fentanyl

13   mortality rate and a fentanyl and we need to weight them,

14   correct?

15   **A.**    That's right.

16   **Q.**    And sorry this is a little messy.   But I think, if you

17   can help me with this, Dr. Keyes, we know -- we know the

18   Larney number.   We know the .0052.   And we know that -- the

19   16 percent.   So, we can come up with what the NF number is,

20   correct?   If you multiply -- if you multiply .1 --

21   **A.**    Yes.   We could come up with the NF number, yeah.

22   **Q.**    Come up with that number --

23   **A.**    Yes, because that would --

24   **Q.**    You check -- check me.   I think the weighted number is

25   .000832.

1   **A.**   That's what I get, as well.

2   **Q.**   Okay.  So, we're going to do a little more math here.

3   Or maybe this is Algebra.  So, its OUD is going to be 115

4   divided by .00832.  That's the number you came up with,

5   right?

6   **A.**   Yes.

7   **Q.**   Oh, I'm sorry.  I'm sorry, Dr. Keyes.  I think I

8   dropped a digit.  It should be .000832, right?

9   **A.**   I already cleared it on my calculator, but --

10  **Q.**   Can you do that again?

11  **A.**   Sure.  .0052 times -- 000832.

12  **Q.**   Okay.  And that -- so, that .000832, that represents

13  the weighted mortality rate for the non-fentanyl overdoses,

14  correct?

15  **A.**   Yes.

16  **Q.**   And then you needed a different mortality rate for the

17  fentanyl overdoses, correct?

18  **A.**   That's right.

19  **Q.**   And so, I'm just going to keep an "F" here for now and

20  we'll run through how you did that.  Because the fentanyl

21  adjustment was what you needed to do, you couldn't use just

22  the straight Larney number; you had to adjust the Larney

23  number?

24  **A.**   That's what I decided to do, yes.

25  **Q.**   And for that purpose, you took the CDC data on overdose

1    deaths between 2011 and 2015; is that right?

2    **A.**    That's right.

3    **Q.**    And do you -- do you have handy in your report the CDC

4    overdose data or would it help you if I provided you with

5    those?

6    **A.**    There's one specific article that I thought had a nice

7    figure.  I'm sure you have it.  I think --

8    **Q.**    Is that the Hedegaard article?

9    **A.**    Sounds right, but if you have the overdose death rate

10   from those years, we could --

11   **Q.**    Yes.  We can -- I think we can do that most

12   effectively.

13            MR. HESTER:  May I approach, Your Honor?

14            BY MR. HESTER:

15   **Q.**    Dr. Keyes, we've handed you two documents.  They're

16   marked sequentially.  And let me explain them just a little

17   bit and then I'll ask you to confirm that this looks right

18   to you.

19        There's DEF-WV 2586 headed Drug Overdose Deaths in the

20   United States, 1999-2018 written by Holly Hedegaard and

21   others.

22        Then there's DEF-WV 2587, which I can represent to you

23   is the appendix that goes along with the article --

24   **A.**    Excuse me.  Those articles are not referenced in the

25   report on that page.

1    **Q.**   Yeah.  I --

2    **A.**   It's the Dowell article.

3    **Q.**   I will -- are -- let me ask you if these -- so, Dr.

4    Keyes, are you familiar with these data briefs that are

5    published by the CDC?

6    **A.**   I am.

7    **Q.**   And I wanted to -- I think we can get to the same place

8    with this article.

9    **A.**   I don't think so because I believe the Dowell article

10   -- these are for all drug overdose deaths and the Dowell

11   article, I believe, is opioid overdose deaths.

12   **Q.**   Okay.  Well, let me try that.

13   **A.**   Okay.

14           MR. HESTER:  May I approach, Your Honor?

15           THE WITNESS:  Thank you.

16           MR. HESTER:  Sure.

17           BY MR. HESTER:

18   **Q.**   So, Dr. Keyes, are you able to -- well, maybe let me

19   set the table just a little bit more.  You looked at CDC

20   mortality data to come up with your fentanyl adjustment; is

21   that right?

22   **A.**   I did.

23   **Q.**   And are you saying that the Dowell document is where

24   you found the CDC data?

25   **A.**   Yes.  The figure that is in Dowell for illicit opioid

1    overdose deaths from 1999 to 2015.

2    **Q.**   So, you're looking -- maybe I should back up.  I'm

3    sorry.  I didn't set the record properly.

4         We've handed you DEF-WV Exhibit 2497 headed Underlying

5    Factors in Drug Overdose Deaths and, Dr. Keyes, this is the

6    document you were referring to just a minute ago, the Dowell

7    article?

8    **A.**   Yes.

9    **Q.**   And you were looking at the -- at the CDC -- at the CDC

10   data shown on Page 4 of this document?

11   **A.**   Yes.

12   **Q.**   And can you tell me which of the charts you used for

13   the CDC data?

14   **A.**   If you look at the illicit opioid overdose death, which

15   is the top figure on Page 4.

16   **Q.**   Yes.

17   **A.**   And you compare the overdose death rate in 2011, which

18   is approximately two, and the overdose death rate in 2015,

19   which is approximately six per 100,000.

20   **Q.**   And when you say "approximately", did you have the

21   exact data?

22   **A.**   Yes.  I looked at the underlying data that comprised

23   this figure, but you can see it pretty clearly goes from 2

24   to 6.

25   **Q.**   And so, you used for this purpose the opioid-related

1   overdose deaths?

2   **A.**   Illicit opioid overdose deaths.

3   **Q.**   And the point you were making in making the fentanyl

4   adjustment was that the mortality rate you had from Larney

5   didn't actually capture the fentanyl phenomenon after 2011,

6   right, that there had been this increase in fentanyl deaths

7   and you needed to account for that in the mortality rate?

8   **A.**   I was concerned that the mortality rate in Larney, as

9   applied to today's epidemic, was too conservative because we

10  know that people who use fentanyl have a higher risk of

11  overdose given the relationship between dose and duration

12  and overdose death.

13  **Q.**   So, and what you did then for 2011, you took a baseline

14  level of synthetic overdose deaths and then you looked at

15  the change between 2011 and 2015; is that what you did?

16  **A.**   Yes.  It's called an interrupted time series method.

17  **Q.**   So, let me point you back now to DEF-WV Exhibit 2587.

18  And if you look at the last page of this document, it shows

19  -- in the right-hand column it shows synthetic opioids other

20  than Methadone.  It shows deaths per 100,000 for synthetic

21  opioids other than Methadone.

22       Do you see that?

23  **A.**   I'm sorry.  I -- so, this is --

24  **Q.**   Defendant's exhibit 2587.

25  **A.**   2587.

1   **Q.**   It's the -- the appendix?

2   **A.**   Page 4?

3   **Q.**   Yes.

4   **A.**   Age-adjusted drug overdose death rates involving

5   stimulants, by type of stimulant?

6   **Q.**   No.  I'm on the -- I'm on the Page 4 -- I'm sorry --

7   Page 3.  Age-adjusted drug overdose death rates involving

8   opioids, by type of opioid.

9        Do you see that?

10  **A.**   I do.

11  **Q.**   Are these the same data that you used?

12  **A.**   No.

13  **Q.**   They show -- they show deaths per 100,000 in the

14  right-hand column.  Would that be deaths per 100,000 for

15  synthetic opioids; namely, fentanyl?

16  **A.**   This data table has age-adjusted drug overdose death

17  rates involving opioid separated out by the type of opioid.

18  **Q.**   Right.

19  **A.**   I didn't rely on this to come up with the estimate that

20  I used in the OUD estimate.  I used this estimation of

21  illicit opioid overdose deaths.  And I can tell you why.

22  It's an important point.

23  **Q.**   Why don't you explain why you did illicit overdose?

24  **A.**   Because the estimate that we're trying to get to is the

25  probability that you die of an overdose given that you've

1    used an opioid that contains fentanyl.  So, you wouldn't

2    want to use for that just the synthetic -- the total

3    synthetic opioid death rate because what you want is the

4    probability of a death given that you've used an opioid that

5    contains fentanyl.  So, those would be two different

6    numbers.

7        And the illicit opioid overdose death rate is a closer

8    approximation of the probability that you die given that

9    you're using an opioid than the total number of T40.4 deaths

10   per 100,000.  That would not be the right -- that would not

11   be the right quantity for the probability of death given

12   that you've used an opioid.

13        Because that's what Larney is estimating, right?

14   Larney is taking the total OUD population and estimating the

15   probability of death.  And so, I need the total OUD

16   population and the probability of death if there's a

17   fentanyl in the opioid; not what the synthetic opioid

18   overdose death rate is, but the probability of death given

19   that you've used an opioid.

20        And that's why it's, in my opinion, more appropriate to

21   use the illicit opioid overdose death rate than just this

22   simple T40.4 synthetic opioid death rate.

23   Q.   So -- so here, if we go back to the Dowell paper and

24   the Dowell paper shows roughly -- that in 2011 the illicit

25   opioid overdose deaths are roughly two -- is that what you

1    say?

2    **A.**   About two per hundred thousand.

3    **Q.**   You don't know it exactly?

4    **A.**   Not off the top of my head.

5    **Q.**   Do you have a way to find it?

6    **A.**   With a computer, I can.

7    **Q.**   What is the way you would find it?

8    **A.**   You could -- I mean, they use the CDC data.  So, you

9    could look up the CDC data.

10   **Q.**   So, the Dowell data -- the Dowell paper is based on the

11   CDC data?

12   **A.**   This -- this estimate is.  They also have prescription

13   opioid sales and other -- the paper includes data other than

14   the CDC WONDER data, but I -- this estimate is based on CDC

15   WONDER data.

16   **Q.**   And then -- and then you -- you ran that out to 2015,

17   correct?

18   **A.**   Yes.

19   **Q.**   You ran out the increase in illicit opioid overdose

20   deaths from 2011 to 2015, correct?

21   **A.**   That's right.

22   **Q.**   And so -- and, again, you don't know the precise number

23   for 2015, correct?  You're looking at this chart.  You don't

24   know the precise --

25   **A.**   Right now, I'm looking at the chart, yeah.  I don't --

```
1    I don't have that information stored in my working memory.

2    Q.   And this Dowell paper is the only source you've cited

3    for the data to make this adjustment?

4    A.   I cited the underlying CDC data that I verified the

5    numbers in Dowell with.

6    Q.   And we could find in your work papers the precise

7    numbers?

8    A.   I'm sure you could.  I'm sure it's in the spreadsheets

9    that I sent.

10           MR. HESTER:  So, may I have a moment to consult,

11   Your Honor?

12           THE COURT:  Yes.

13      (Pause)

14           BY MR. HESTER:

15   Q.   Dr. Keyes, I just want to run through the numbers that

16   you worked up to make sure we've got it all correct.  So,

17   your approach, the approach you followed, was you multiplied

18   the Larney rate times 3, correct?

19   A.   That's right.

20   Q.   And that was based on your eyeballing that the Dowell

21   data showed about 3?

22   A.   It's based on the Dowell data, which is based on the

23   CDC data.

24   Q.   Now, in your report, you use the word "approximately".

25   You said it was "approximately a change of 3."  Was it
```

```
1    exactly a change of 3 or approximately?

2    A.   I would have to go and look at the -- the numbers

3    again.

4    Q.   What's the reason that you used the word

5    "approximately" in your report?

6    A.   I think I was just trying to provide a general overview

7    of my method.

8    Q.   So, let me ask you just to confirm the numbers.  So,

9    your approach was to multiply Larney times 3 for the

10   fentanyl adjustment, right?

11   A.   That's right.

12   Q.   And I think -- can you do the math for me, Dr. Keyes,

13   just to confirm?  If we multiply Larney times 3, and then we

14   -- it would have to be Larney times 3 x .84.

15   A.   Can I have a pen and scrap paper?

16   Q.   Yes.  Do you need some paper, too?

17   A.   Yes, please.

18   Q.   Okay.

19   A.   So, we have 3 x 0.0052 and then we're multiplying

20   that by .84, right?

21   Q.   Yes.

22   A.   Okay.  I get 0.013104.

23   Q.   And then you're able to recreate the number, the final

24   OUD number that you came up with from that, correct?

25   A.   I -- do you want me to --
```

**Q.**   Yes.  Could you do the final math?  So, in other words,
let's just be clear for the record.  You multiplied Larney
times 3, so it's .0052 x .84.  That becomes your fentanyl
mortality rate, right?  Correct?  And it's a weighted
fentanyl mortality rate?

**A.**   That's correct.

**Q.**   And then you add that together with the non-fentanyl
mortality rate?

**A.**   That's right.

**Q.**   And is -- are you able to recreate the exact number
that you came up with for your OUD estimate?

**A.**   I am doing it right now.  You've given me a calculator
and pen and math to do.  This is like the best day.

**Q.**   What could be better than this?

**A.**   Okay.  Yes.  I've recreated the number.

**Q.**   And the number is?

**A.**   8252.

**Q.**   And that's -- that's the way you calculated the OUD
population for Huntington-Cabell, right?

**A.**   That's right.

**Q.**   Now, I asked you before about your point, your use of
the word "approximately".  If -- if the approximation is not
exactly 3, but if the number -- if the multiplier here were
larger than 3 -- so, for instance, if the multiplier were a
larger number and I'm going to -- I'm going to do an example

1    just to work it through with you, okay?

2         And I'm just putting up here, just so we don't get

3    confused, 2015 unrounded.  You ran this out to 2015.  So,

4    you were looking at the change -- when you came up with your

5    three-times multiplier, you were looking at the change

6    between 2011 and 2015, correct?

7    **A.**   Yes.  I don't -- sorry.  I'm not understanding what

8    "unrounded" means there.

9    **Q.**   Well, I'll explain that.

10   **A.**   Okay.

11   **Q.**   I know that's my word and not yours.

12   **A.**   Okay.

13   **Q.**   So, let the record be clear that's my word I wrote out

14   just to help me and we can change it to something else.

15   **A.**   Okay.

16   **Q.**   But you used the word "approximately" and I just want

17   to ask you to work through a number with me and it's really

18   to assume something.  It's not to say that it's right, but

19   it's to assume.

20        And I want you to assume that the approximate number is

21   actually rounded and that the real number is 3.875.  And if

22   you assumed that, Dr. Keyes, if you assume that the real

23   number --

24             MR. HESTER:  May I consult with my colleague for a

25   minute?

```
 1              THE COURT:  Yes.

 2        (Pause)

 3              BY MR. HESTER:

 4   Q.   I'm going to actually change my assumption, Dr. Keyes.

 5   I want you to assume with me that the proper number is 3.27

 6   times Larney.  I want you to assume that.  Can you run the

 7   math for me on what that would be?

 8   A.   Sure.  Looks like about 8,051, if I'm doing my math

 9   right.

10   Q.   I'm not sure that you are, Dr. Keyes.

11   A.   Oh, no.  I can try it again.  Okay.

12   Q.   So, you multiply --

13   A.   So 0.0052 x 3.27, right?

14   Q.   Yeah.  I mean .0327.

15   A.   .0327?  We're multiplying --

16   Q.   Oh, sorry.  You're right.

17   A.   Okay.

18   Q.   Sorry.  So, it would be 3.27 x this .0052?

19   A.   So, that's .017004 --

20              COURT REPORTER:  I'm sorry.  Can you repeat that

21   number one more time?

22              THE WITNESS:  Yes.  .017004.

23              COURT REPORTER:  Thank you.

24              THE WITNESS:  And we're multiplying that number

25   then times .84, correct?
```

```
1              BY MR. HESTER:

2    Q.   Yes, to create your fentanyl adjustment.

3    A.   Yeah.  So then, I get 0.01428336.

4    Q.   .01428?

5    A.   Yes.

6    Q.   Yes.

7    A.   Is that right.

8    Q.   Yes.  And so, that adds up to .01511 that you divide

9    into 115; is that right?

10   A.   Well, let's just see.  Then we've got 0052 x .16, which

11   is 0.000832.

12   Q.   You've already got that one, yeah.

13   A.   Right.  Sorry.  I'm just -- and then we're adding.  So,

14   our denominator is 0.01511536; is that correct?

15   Q.   Right.  And you divide that into 115, correct?

16   A.   Okay, got it.  7608.

17   Q.   Now, let me ask you to make another assumption with me.

18   You ran -- you ran your numbers out to 2015 for making this

19   fentanyl adjustment, right?  You looked at the period

20   between 2011 and 2015 and that was the period that you

21   looked at.

22        If you ran the fentanyl numbers out to 2018; in other

23   words, if you looked at the change in synthetic overdose

24   deaths over the whole -- over the period up to 2018, it

25   would also have it -- it would change the OUD numbers,
```

1    correct?

2    **A.**    That wouldn't be the right methodology to use.

3    **Q.**    I didn't ask you that.

4    **A.**    Okay.

5    **Q.**    I asked you if you did it, if you ran the --

6    **A.**    I did not do that.

7    **Q.**    And so, let me -- let me try to do that one.  So, in

8    other words, you're measuring OUD numbers for 2018, correct?

9    **A.**    That's right.

10   **Q.**    You're trying to come up with an OUD population that

11   applies to 2018?

12   **A.**    Yes.

13   **Q.**    And so, if you looked at the change in synthetic

14   overdose deaths from 2011 to 2018 --

15   **A.**    But I'm sorry.  I don't understand why you would do

16   that.

17   **Q.**    Well, I'm asking the "if".  I'm asking you to assume

18   with me.  I want to understand the sensitivity of the

19   numbers.  The --

20             MR. FARRELL:  Objection, Your Honor.  The witness

21   has testified this is not proper methodology.  So, as long

22   as the record is clear that she's using some methodology

23   proposed by Mr. Hester, but this is not a methodology that

24   she has adopted or is endorsing.

25             THE COURT:  Well, you're using this to question

1    the methodology she did use, aren't you?

2          MR. HESTER:  That's what I'm trying to do, Your

3    Honor.  It's an assumption to test the methodology.

4          THE COURT:  Mr. Farrell.

5          MR. FARRELL:  I believe the witness just testified

6    that she would not use this for this purpose and attempted

7    to explain.

8          THE COURT:  Well, I think it's proper cross

9    examination and I'll allow it.  Go ahead.

10          MR. FARRELL:  Can I also ask for a foundation to

11    where 3.27 comes from rather than just theoretical or

12    fictional?

13          MR. HESTER:  Well, Your Honor, I don't think I'm

14    obliged to, but I think I will be able to set the foundation

15    for it.  I -- I can do that, but I -- I would like to work

16    through the numbers first.

17          THE COURT:  Go ahead.

18          BY MR. HESTER:

19    Q.   If we -- if we looked at the period from 2011 to 2018

20    to derive your fentanyl adjustment and, during that period,

21    I want you to assume with me that the change reflected in

22    the CDC data is 6.36 --

23    A.   Is that using the same definition that Dowell used --

24    Q.   Yes.

25    A.   -- in this, the illicit opioid overdose deaths?

1    **Q.**   Yes.  Now -- yes.  And I'm going to set the foundation

2    with you, but I want you first to assume -- you know --

3    first of all, you know that fentanyl deaths have continued

4    to rise after 2015.

5    **A.**   Yes.  That's why we have the weighting procedure.

6    **Q.**   Right.  And so, what we see from 2011 to 2015 is some

7    increase in fentanyl deaths.

8    **A.**   The start of the increase, which is very important for

9    the methodology.

10   **Q.**   Well, okay.

11   **A.**   Okay.

12   **Q.**   And, in fact, the death rates increase, continue to

13   increase into 2018, correct?

14   **A.**   The death rate did, but the probability of death given

15   use did not.

16   **Q.**   Well, if there's more fentanyl being mixed into the

17   heroin supply and being mixed into the drug supply from 2018

18   as compared to 2017, or 2016, or 2015, that increases the

19   likelihood of death from fentanyl, correct?

20   **A.**   No.  That's the key to the methodology that I think I

21   would like to explain.

22   **Q.**   Well, let me -- let me keep going on this.

23           MR. FARRELL:  Objection, Your Honor.  Can she

24   explain?

25           MR. HESTER:  So, no.  I don't think she's

1   answering my question.

2           MR. FARRELL:  I'm sorry, Judge?

3           THE COURT:  I'm going to let him continue and

4   finish and we'll see where we go.  And she can be

5   re-directed on this, if you want to.

6           BY MR. HESTER:

7   **Q.**   So, let me assume -- let me ask you to assume that if

8   you looked at the period 2011 to 2018 the change in the

9   numbers is not 3 times, but the change is 6.36.

10  **A.**   But that's not what that number represents.

11  **Q.**   I'm asking you to assume it, Dr. Keyes.

12  **A.**   Right, but your -- it's based on assumptions that are

13  not what that number is representing.

14  **Q.**   Dr. Keyes, you measured this approximately three times

15  by looking at this Dowell chart and seeing that there had

16  been a change in overdose deaths during the period from 2011

17  to 2015, right?

18  **A.**   During the start of the increase of the fentanyl

19  period, which is why it is an appropriate methodology for

20  the parameter I'm trying to estimate, but going to 2018

21  would not be appropriate.

22  **Q.**   I'm not asking you whether it's appropriate right now.

23  **A.**   Okay.

24  **Q.**   I'm asking you to test the assumption.  And the way you

25  did this, just going back to Dowell, Exhibit 2497, is you

1    looked at the change between 2011 and 2015 in illicit opioid

2    overdose deaths, right?

3    **A.**   Yes.  It's a procedure called an interrupted time

4    series analysis.

5    **Q.**   And you looked at the change between 2011 and 2015 to

6    figure out your three times adjustment?

7    **A.**   That's right.

8    **Q.**   If you looked at the change between 2011 and 2018,

9    there would be a larger change in illicit opioid deaths,

10   correct?

11   **A.**   There would be a larger change, but it would not be a

12   correct change to use for that number.  This is -- that's

13   why I didn't do it.  I did this in 2018.  I could have used

14   the 2018 numbers.

15   **Q.**   Well, it would have shown your OUD number, right?

16   **A.**   It would not have been an appropriate methodology to

17   use.  It shrinks the OUD number anyway because I weight it

18   based on the proportion of cases that are T40.4.

19        So, if I used a bigger number for the multiplier, then

20   I wouldn't have weighted for the proportion of deaths that

21   are T40.4.  The proper methodology that shrinks the OUD

22   number is to use the interruption of the time series given

23   the introduction of fentanyl and then weight that

24   probability by the probability of deaths that are T40.4.

25   **Q.**   But you looked over a four-year period to figure that

```
1    out, to figure out your three-times multiplier?  You looked
2    over a four -- year period?
3    A.   That's right.
4    Q.   I'm just asking you to work with me.  Instead of
5    looking over a four-year period, I want you to look over a
6    seven-year period.
7    A.   Okay.
8    Q.   And if you look over a seven-year period and if you
9    assume that the change is 6.36 --
10   A.   Okay.
11   Q.   I want you to do that math for me.
12   A.   However, I just have to say, if you do that, then you
13   shouldn't use the weights that I also provided.  We should
14   just do 6.36 x 0.0052 and divide the 115 by that.  It would
15   not be appropriate to do both of those things.
16   Q.   This weighting that you used, this weighting that you
17   used, the 84 percent weighting for fentanyl was based on the
18   breakdown of deaths during 2018, correct?
19   A.   That's right.
20   Q.   Okay.  Let's go back.  I want you to assume that the
21   proper multiplier is 6.36 x Larney.  Are you able to do that
22   math for me?
23   A.   0.0052 x 6.36 is 0.033072.
24   Q.   And then, what is the -- say that again, Dr. Keyes.
25   A.   0.033072.
```

```
1    Q.   And then what is the OUD number that you estimate?

2    A.   Should -- do you want me to include the weighting or

3    not include the weighting?

4    Q.   Yes.  I'm asking you to use the --

5    A.   So, we're double weighting for --

6    Q.   I'm asking you to use the same weighting you used based

7    on the 2018 deaths and I'm just asking you to use that and

8    is it -- can you tell me what the OUD number would be?

9    A.   I get 3,391.9.

10   Q.   3,391; is that correct?  That's what you calculated?

11   A.   That's the calculation.

12   Q.   Now, let me ask you to look back at the Dowell paper,

13   please.  No, I'm sorry, not the Dowell paper.  I want you to

14   look back at DEF exhibit WV 2587 and I want you to look at

15   the data table for figure 3, which is on Page 3 of this

16   document.  Do you have that?

17   A.   I do.

18   Q.   And so, your point is that one should look at all

19   illicit opioid overdose deaths to figure out the CDC data?

20   In other words, we shouldn't just look at the synthetic

21   opioid number?  We should also look at other illicit

22   opioids, correct?

23   A.   Well, not exactly.  The point is that the perimeter

24   that we're trying to estimate is the probability of death

25   given OUD and that the interruption of the time series
```

1    between 2011 and 2015 for illicit opioid deaths provides the

2    best approximation of that.

3    **Q.**   So -- so, in your -- if you look back at the Dowell

4    paper, that's the one you said you used, correct?

5    **A.**   That's right.

6    **Q.**   And the Dowell paper has this line in the graph for

7    illicit opioid overdose deaths, correct?

8    **A.**   Correct.

9    **Q.**   And so, I'm trying to get to the precise data instead

10   of looking at this graph.  And so, for that purpose, I want

11   to point you to DEF Exhibit 2587, Page 3.

12   **A.**   This does not have the data that underlie that graph.

13   These are separated by each T code separately, but this

14   combines several T codes.  So, we can't -- we can't compare

15   them directly.  We can't get the exact number from Figure 3.

16   **Q.**   I'm going to ask you to work with me again.  If I look

17   at this exhibit, the data table for Figure 3, there's a --

18   there's a column for deaths per 100,000 for heroin, right?

19   **A.**   Yes.

20   **Q.**   And there's a column for synthetic opioid deaths other

21   than methadone, correct?

22   **A.**   Yes.

23   **Q.**   And so, if we add those two together, that's a measure

24   of illicit opioid deaths, right?

25   **A.**   No.  You can't add them together because they're not

1    mutually exclusive.  As we previously talked about, there

2    can be multiple T codes listed on a death certificate.

3    **Q.**   So, you could have circumstances where you have

4    multiple -- multiple causes of death listed in these death

5    certificates in there, so you can't add them together; is

6    that what you're saying?

7    **A.**   That's what I'm saying.

8    **Q.**   If you -- whether you agree with these specific numbers

9    or not, Dr. Keyes, the broader point here is that if the

10   mortality rate is too low, if the estimated mortality rate

11   is too low, your estimated OUD population is going to be too

12   high, correct?

13   **A.**   That's right.

14   **Q.**   And so, for instance, if your fentanyl adjustment is

15   too low, if this is lower than it should be, you're going to

16   be overestimating the OUD population?

17   **A.**   This is why we do corroboration analyses and talk to

18   people in the county to try to corroborate.

19   **Q.**   But can you answer my question first?  If your fentanyl

20   adjustment is too low, then you're going to be

21   overestimating the OUD population, correct?

22   **A.**   It's possible.

23   **Q.**   Well, that's what would happen if your fentanyl

24   adjustment is too low.

25   **A.**   The OUD estimate is a function of the underlying

1    denominator data.  So, if the denominator changes, the OUD

2    estimate will change.

3        And so, if you use a different multiplier for fentanyl,

4    if your multiplier goes up, then the OUD population would go

5    down.

6    **Q.**   But, in particular, if the fentanyl adjustment that

7    you've picked is lower than it should be, lower than what

8    the reality is, then you're going to overestimate the OUD

9    population under this formula?

10   **A.**   Yes.

11   **Q.**   That was fun.  So, let's put that aside for a minute,

12   Dr. Keyes.

13   **A.**   I'm happy to bring out the calculator anytime you have

14   another mathematical question.

15           MR. ACKERMAN:  Mr. Hester -- or can we save

16   whatever's on that screen?

17           MR. HESTER:  Yes.  Yes.

18           MR. ACKERMAN:  I just want to make sure we get it.

19           MR. HESTER:  I want to make sure I press the right

20   buttons to save it.

21           MR. ACKERMAN:  Before it disappears, exactly.

22           MR. HESTER:  Confirm, right?

23           BY MR. HESTER:

24   **Q.**   So, Dr. Keyes, putting aside this discussion that we've

25   just been having about the fentanyl adjustment and the

1    Larney data, I want to go back to your OUD estimate and, as

2    we discussed, the number that you estimate is 8,252 people

3    with OUD in Huntington-Cabell, correct?

4    **A.**    That's right.

5    **Q.**    And that's reflected, for instance, in your August 24

6    errata that I've given you, correct, at Figure 14?

7    **A.**    Yes.

8    **Q.**    So -- so, you have a total number of 8,252 individuals

9    with OUD that you estimate for Cabell-Huntington, correct?

10    **A.**    That's right.

11    **Q.**    And of that number, you allocate 5,800 of those OUD

12    cases directly to prescription opioids; you directly

13    attribute them, correct?

14    **A.**    I do.

15    **Q.**    And that applies your attribution methodology that we

16    discussed earlier?

17    **A.**    That's right.

18    **Q.**    And so, that means approximately 70 percent of the OUD

19    cases in your analysis are directly attributable to

20    prescription opioids?

21    **A.**    I haven't done that math, but I trust that you have.

22    **Q.**    I have.  It's 5,800 divided by 8,252.  It comes out to

23    about 70.82 percent.  Sound about right?

24    **A.**    That sounds about right.

25    **Q.**    And then, you also estimate that 1,309 of the OUD cases

1    are indirectly attributable to prescription opioids,

2    correct?

3    **A.**    That's right.

4    **Q.**    So, that's approximately 16 percent of the OUD cases

5    that are indirectly attributable to prescription opioids and

6    that would be 1,309 divide by 8,252?

7    **A.**    Yes.

8    **Q.**    And, again, when you do this indirect attribution,

9    you're doing that based on the methodology we discussed

10   earlier today, correct?

11   **A.**    Correct.

12   **Q.**    And so, if you add up those OUD cases, the ones that

13   you directly attribute to prescription opioids and the ones

14   you indirectly attribute, the total is 7,109 OUD cases,

15   correct?

16   **A.**    Yes.

17   **Q.**    And that's 5,800 added to 1,309, correct?

18   **A.**    Yes.

19   **Q.**    So, out of the 8,252 OUD cases -- or OUD people or --

20   I'm sorry.  Maybe I'll back up.

21       Out of that total number that you've estimated of 8,252

22   people with OUD, you attribute 7,109 to prescription opioids

23   either directly or indirectly, correct?

24   **A.**    That's right.

25   **Q.**    That means 1,143 OUD cases are not attributable to

1    prescription opioids in your methodology either directly or

2    indirectly, correct?

3    **A.**   Correct.

4    **Q.**   And that represents just about 14 percent of all the

5    OUD cases in Cabell-Huntington that you've estimated,

6    correct?

7    **A.**   That's right.

8    **Q.**   Dr. Keyes, I'd like to switch gears a bit to discuss

9    trends relating to prescription opioids.  At Page 15 of your

10   report, and I think you have it there, you state that the

11   opioid prescribing rate in Cabell-Huntington -- no, in

12   Cabell County, sorry, was 186.6 prescriptions per 100

13   persons in 2011; is that right?  Do you see it there on Page

14   15?

15   **A.**   186.6 prescriptions per 100 persons from 2006 to 2011.

16   So, yes.

17   **Q.**   Right.  So, I've got that right?  The number you came

18   up with for 2011 for the prescribing rate in Cabell County

19   was 186.6 prescriptions per 100 persons?

20   **A.**   That's right.

21   **Q.**   And then, on the same page, you state that the opioid

22   prescribing rate declined at 92.1 prescriptions per 100

23   persons by 2018, correct?

24   **A.**   That was the most recent year-end data available then.

25   There's since been 2019 data that has been released.

1    Q.   And I'm really focusing on these numbers in your

2    report.  You're showing more than a 50 percent decrease in

3    the level of prescriptions in Cabell County, prescription

4    opioids in Cabell County from 2011 to 2018, correct?

5    A.   That's from the highest point to the lowest point, but

6    it's not from the pre-opioid epidemic point.

7    Q.   Let me ask again.

8    A.   Sorry.

9    Q.   Between 2011 and 2018, you're showing more than a 50

10   percent decrease in the level of prescribing of prescription

11   opioids in Cabell County, correct?

12   A.   Yes.

13   Q.   And you're also aware that there's been a decline in

14   MME per person of prescription opioids in West Virginia

15   statewide, correct?

16   A.   Yes.

17   Q.   And in your report you state that the MME per person in

18   West Virginia decreased 2.4 percent from 2010 to 2015,

19   correct?  That's at Page 15.

20   A.   Yes.  The decrease was slower than the U. S. average,

21   but it was 2.4 percent.

22   Q.   So, the 2.4 percent decrease in the MME per person in

23   West Virginia from 2010 to 2015?

24   A.   Yes.

25   Q.   And then, from 2016 to 2017, the MME per person in West

1    Virginia decreased by 15.1 percent, correct?

2    **A.**    That's right.

3    **Q.**    You previously testified, Dr. Keyes, that the

4    non-medical use of prescription opioids means using them in

5    a way other than is prescribed by a doctor, correct?

6    **A.**    Yes.

7    **Q.**    And the non-medical use of prescription opioids is

8    declining in West Virginia, correct?

9    **A.**    I believe it is.

10   **Q.**    And in 2015 to 2016, I can point you to your report at

11   Page 40.  In 2015 to 2016, 1.2 percent of

12   non-institutionalized West Virginians used opioids

13   non-medically in the prior month?

14   **A.**    Well, I have to qualify that.  That's based on the

15   National Household Survey of Drug Use and Health Data and

16   there's now -- that's an underestimate, we know, of

17   non-medical use and, in fact, there are some papers that

18   have recently come out suggesting that, nationally, we're

19   seeing increases in OUD; whereas, NSDUH is showing slight

20   declines.  So, I would say that the NSDUH data shows that

21   the prevalence of non-medical use is slightly declining, but

22   we know that to be an underestimate.

23   **Q.**    Well, let me ask you, your report states that available

24   evidence indicates that non-medical pain reliever use,

25   primarily opioids, is declining among non-institutionalized

1    mostly household populations in West Virginia overall from

2    1.2 percent of those in West Virginia in the sampling framed

3    reporting past month use which --

4    **A.**   Right, but that section also qualifies --

5                COURT REPORTER:  I'm sorry.  Can you -- you were

6    overlapping.  I'm sorry.  Do you want to finish your

7    question so I can --

8                BY MR. HESTER:

9    **Q.**   Yeah.  I hadn't finished.  Sorry.  So, there was

10   decline, you state in your report, a decline in non-medical

11   pain reliever use among non-institutionalized mostly

12   household populations from 1.2 percent of those in West

13   Virginia in the sampling frame reporting past month use in

14   2015 to 2016 to .90 percent in 2017 to 2018, correct?

15   **A.**   Yes.

16   **Q.**   And your report also says that by 2017 to 2018, that

17   percentage had declined by 25 percent to 0.9 percent,

18   correct?

19   **A.**   Can you -- which page of the report?

20   **Q.**   Sorry.  Page 40.  So, I'm really just --

21   **A.**   So, I say that the non-medical use of prescription --

22               COURT REPORTER:  I'm sorry.  Can you slow down for

23   me, please?

24               THE WITNESS:  I'm sorry.

25        It says non-medical use of prescription pain relievers

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

180

```
1    has been relatively stable in recent years from 2.86 to 2.89
2    in 2016-2017 and 2017-2018 respectively.  And reports of
3    heroin use in the past year among adolescents in West
4    Virginia from .7 to .9 percent in 2016-2017 and 2017-2018.
5    Q.   I think you're focusing on a section dealing with
6    adolescents.  I wanted to point you to the statement up
7    above in your report.
8    A.   Oh, I see.  So, we're focusing just on adults?
9    Q.   Yes.  So -- so, the prior paragraph in your report at
10   Page 40 is talking about adult non-medical use of pain
11   relievers; primarily opioids, correct?
12   A.   Yes.
13   Q.   And it states that the non-medical use of non-pain --
14   non -- sorry.  Let me start over.
15        It states that the non-medical use of pain relievers;
16   primarily opioids, is declining among non-institutionalized
17   mostly household populations in West Virginia overall from
18   1.2 percent of those in West Virginia in 2015-16 to .9
19   percent in 20170-2018.
20        Do you see that?
21   A.   I see that.
22   Q.   And that's a correct statement of the data?
23   A.   Well, not exactly because, as the next sentence
24   documents, Drug Use Disorder is increasing.  So --
25   Q.   I wanted to -- did you correctly state the data that I
```

1    read?

2    **A.**    That sentence is -- you read the sentence correctly,

3    but it goes with the next sentence about Opioid Use

4    Disorder, which is what we're focused on.

5    **Q.**    And the Opioid Use Disorder that you're describing in

6    the next sentence would include -- would include heroin and

7    fentanyl use, correct?

8    **A.**    That's right.

9    **Q.**    Let me ask you to look at another document, please.

10              MR. HESTER:  May I approach, Your Honor?

11              THE COURT:  Yes.

12              BY MR. HESTER:

13   **Q.**    Dr. Keyes, we've handed you a document marked as

14   MC-WV 01864, which are the NSDUH 2017 state tables.  Do you

15   have that in front of you?

16   **A.**    I do.

17   **Q.**    And this report contains statewide data from the

18   National Survey on Drug Use and Health, correct?

19   **A.**    That's right.

20   **Q.**    And you considered this report in forming your opinions

21   in this case?

22   **A.**    I did consider it.

23              MR. HESTER:  And let me ask Your Honor to move

24   this into evidence as a public record.

25              THE COURT:  Any objection?

1          MR. FARRELL:  Your Honor, I'm not quite sure what

2     the foundation of it is for other than the representation of

3     Mr. Hester --

4          MR. HESTER:  Well, I believe Dr. Keyes said she

5     relied on it.

6          THE COURT:  Well, if it's a public record --

7          MR. FARRELL:  I'm not sure what it is.

8          BY MR. HESTER:

9     **Q.**   Dr. Keyes, you're familiar with the National Survey on

10    Drug Use and Health, correct?

11    **A.**   I am.

12    **Q.**   And you reviewed data from NSDUH in your work, correct?

13    **A.**   I did.

14    **Q.**   And, in fact, you considered this report in your

15    materials?  It's Reference 589 of your report, if you want

16    to look at it.

17    **A.**   I considered many materials.

18    **Q.**   This is one you would consider?

19    **A.**   And this is -- this is one of hundreds.

20         MR. HESTER:  Should I proceed, Your Honor, or do

21    you -- should I wait?

22         THE COURT:  Well, have you laid the basis for it

23    under 803(8), Mr. Hester?

24         MR. HESTER:  I -- I believe I've laid the basis,

25    Your Honor, that she's familiar with it.  This is a document

```
1    she relied on.  She's familiar with this data for purposes

2    of her work and I believe it's a public record published by

3    the U. S. Government.

4              THE COURT:  Do you object to it, Mr. Farrell?

5              MR. FARRELL:  Yes, Your Honor.  Reliance by an

6    expert is not a basis alone for admission.

7              THE COURT:  Well, I think that's right and I don't

8    think you've hit all the points you need to hit to get it in

9    under 803(8), Mr. Hester, so I'm going to sustain the

10   objection at this point and let you go ahead with your

11   questions.

12             MR. HESTER:  All right.  Thank you, Your Honor.

13             BY MR. HESTER:

14   Q.   Dr. Keyes, if you look at Page 42 of this document,

15   Table 21 has data on Pain Reliever Use Disorder in the past

16   year by age group and state, correct?

17   A.   That's right.

18   Q.   And in West Virginia it shows the percentage of adults

19   over the age of 18 with Opioid Use Disorder in 2015 and 2016

20   was 0.91 percent, correct?

21   A.   This is on the next page, right, 43?

22   Q.   Yes.  I think so, yes.

23   A.   And, I'm sorry, what column are you referring to?

24   Q.   It shows -- I was looking at the column over on the

25   right-hand side for people 18 and over in 2015 to 2016.  It
```

1    shows a percentage of people with OUD in West Virginia

2    of .91 percent; is that correct?

3    **A.**   No.   This is a household sample.   So, it excludes

4    anyone who is at high risk for Opioid Use Disorder.   So, in

5    a low risk population, the prevalence as estimated by NSDUH

6    is .091.

7    **Q.**   So, you're saying it doesn't include people who are

8    incarcerated or homeless?

9    **A.**   For example.

10   **Q.**   But it does include people who live in households?

11   **A.**   It includes a sample of people.

12   **Q.**   And let me ask you then to look at the NSDUH Report

13   from 2019.

14   **A.**   Well, before we move on, we should note that the

15   decrease between 2015 to 2016 and 2016 to 2016 [sic] was not

16   statistically significant.   So, I don't think it would be

17   accurate to say that it decreased.

18   **Q.**   I haven't finished yet.   So, I have one more I wanted

19   to show you.

20          MR. HESTER:  Your Honor, may I approach?

21          THE COURT:  Yes.

22   **Q.**   Dr. Keyes, I've handed you Exhibit MC-WV 1866, which is

23   the NSDUH 2019 state data tables.

24          Do you see that?

25   **A.**   Yes.

1    **Q.**    And do you recognize this is a newer version of that

2    same report that NSDUH puts out annually?

3    **A.**    I do.

4    **Q.**    And the point you were making previously that NSDUH is

5    not comprehensive doesn't necessarily mean that comparisons

6    between years are not valid, correct?

7    **A.**    Unfortunately, in the case of the NSDUH, it does, and I

8    believe across these years there was a change in the way

9    they asked the questions about prescription pain reliever

10   use.  And so, they have explicitly stated on their website

11   that you cannot compare years.

12   **Q.**    So -- so, you -- you believe you can't compare years

13   between NSDUH data?

14   **A.**    Well, not all years, and it really depends on the

15   measure that you're looking at it depends on what year

16   you're trying to compare to what year.  So, you just have to

17   be careful with the data because they change the questions

18   sometimes and they make those comparisons.  Sometimes, you

19   can't compare them.

20   **Q.**    What year did they change the data?

21   **A.**    I don't -- off the top of my head -- I would have to go

22   to the NSDUH and website and look.  I assume that it's

23   stated on there.

24   **Q.**    Let me just ask you just one quick question on this and

25   then we'll move along.  If you look at Page 44 of this

1    document, it states that the percentage of West Virginians

2    over the age of 18 with Opioid Use Disorder was .63 percent.

3         Do you see that?

4    **A.**   Page 44?

5    **Q.**   Yes.

6    **A.**   That's Alcohol Use Disorder.

7    **Q.**   Let me take you over to --

8    **A.**   Or 43?

9    **Q.**   43.  Sorry.  Do you see the number for the column for

10   2018-2019?  People 18 and over, the percentage with Opioid

11   Use Disorder listed as .63 percent?

12   **A.**   The proportion of people in the NSDUH sample, yes.

13   **Q.**   So, as between these two years, if you look at these

14   two documents together, and taking account of your point,

15   I'm just asking you the question, if you looked at these two

16   data sources together, it would show a decline in Opioid Use

17   Disorder of -- from .91 percent in 2015-2016 to .63 percent

18   in 2018-2019?

19   **A.**   No.  Unfortunately, you can't draw that conclusion from

20   these reports.  What those reports show is -- the first

21   report shows no statistically significant decrease and the

22   second report shows no statistically significant decrease.

23   The P value is .178.

24        And you can't compare between the two reports.  Even if

25   the methodology didn't change, they're not doing a

1    statistical test across those years.

2         So, as an epidemiologist, my conclusion would be you've

3    got two reports that both show there's been no change.

4    **Q.**   Well, but it can't be quite right, Dr. Keyes, because

5    the P value here is only between two years.  It's between

6    2018-2019 and 2017-2018, right?  That's the way they measure

7    the P value?

8    **A.**   Right, but there's no P value for 2015 to 2019.

9    **Q.**   It hasn't been provided?

10   **A.**   Right.  You've got two non-significant P values.

11   **Q.**   Your --

12   **A.**   So, the only conclusion that you can draw here is

13   you've got two reports of four years and, in the first two

14   years, there's no change and, in the second two years,

15   there's no changes.

16   **Q.**   But let me just make clear one point.  The P values

17   that are reflected, for instance, in this document we're

18   looking at right now, which is Exhibit 1866, and we're at

19   Page -- I guess 43 of this document, those -- the P values

20   shown there is comparison between the two years of data that

21   are shown.  It's between 2017-2018 and 2018-2019, right?

22   **A.**   That's right.

23   **Q.**   It doesn't provide a P value for the data between 2015

24   and 2018?

25   **A.**   Which is why it would be inappropriate to conclude that

1    there would be a change over time documented here.

2    **Q.**   The P value could be computed, correct, for that longer

3    period?

4    **A.**   You'd have to look and see whether that would be

5    appropriate based on the NSDUH data if there had been a

6    change in measurement.

7    **Q.**   If there hasn't been a change in measurement, you could

8    look at the P value between a longer period of time that's

9    just not provided here, correct?

10   **A.**   Yeah.  One could do that.  And, theoretically, one can

11   look at changes over a longer period of time.

12   **Q.**   Next, I'd like to talk a little bit more about --

13            THE COURT:  It may be time for a break, Mr.

14   Hester.

15            MR. HESTER:  Yes.  That's a good time, Your Honor,

16   a very good time.

17            THE COURT:  Okay.  Let's take about ten minutes.

18       (Recess taken)

19       (Proceedings resumed at 3:42 p.m. as follows:)

20            THE COURT:  Okay.

21            MR. HESTER:  Thank you, Your Honor.  May I

22   approach?

23            THE COURT:  Yes.

24   BY MR. HESTER:

25   **Q.**   Dr. Keyes, I've handed you a document marked

```
 1    Defendants' West Virginia 2647.  It's entitled

 2    "Associations of Non-Medical Pain Reliever Use and

 3    Initiation of Heroin Use in the United States."

 4         Dr. Keyes, have you seen this document before?

 5    A.   Yes.

 6    Q.   And I take it this is a document you rely on in your

 7    report; correct?

 8    A.   It is.

 9    Q.   And under the heading of Author Affiliation it says

10    that Pradip K. Muhuri and Joseph C. Gfroerer are with the

11    Substance Abuse and Mental Health Services Administration,

12    U.S. Department of Health and Human Services, Rockville,

13    Maryland.

14         Is that your understanding as to the author

15    affiliations?

16    A.   I don't see here their affiliations.

17    Q.   If you'd look at Page 16.

18    A.   Oh.

19    Q.   I'm sorry.  I should have pointed you to this page, Dr.

20    Keyes.

21    A.   I see.

22    Q.   So it states that Pradip Muhuri and Joseph Gfroerer are

23    with the Substance Abuse and Mental Health Services

24    Administration of the Department of Health and Human

25    Services.  Do you see that?
```

**A.**    I do.

**Q.**    Is that consistent with your understanding?

**A.**    I don't know them and I, I -- but I have no reason to believe otherwise.  I believe -- I'm sure -- I would assume -- I have no reason to know that what is stated here is not the case.

**Q.**    And as the title of this article suggests, the article looked at the relationship between non-medical opioid use and heroin initiation; is that right?

**A.**    Yes.  They measured non-medical -- the, the NSDUH data that we've been talking about only measures non-medical data.

**Q.**    So this paper was looking at the association between non-medical use of prescription opioids and heroin use; correct?

**A.**    That's right.

**Q.**    It wasn't looking at the relationship between medical use of prescription opioids and heroin use?

**A.**    Well, that's, that's -- it actually is because of the overlap in those two groups.  We know that most non-medical users also obtain prescriptions medically.

**Q.**    Yes.  But, but the point here is that somebody might obtain some prescription opioids medically, but they are viewed as non-medical users for purposes of this study; correct?

**A.**   They at least used opioids once non-medically as far as I think that we could say based on what is assessed in the study.  But most non-medical users have also used medically.

**Q.**   Let's be clear on the terminology here.  When, when you speak about a non-medical user, they might have had a prescription or they might have a prescription, but the focus of a study like this is on people who are using prescription opioids non-medically; correct?

**A.**   They are at least using non-medically.  They may also be using medically.  And, in fact, because those two populations overlap, we can -- they're not only using non-medically I guess is what I'm saying.

**Q.**   They might be using some opioids medically, but they're also using opioids, prescription opioids non-medically; correct?

**A.**   That's right.

**Q.**   And they're not included in the survey unless they are engaged in at least some non-medical use of prescription opioids; correct?

**A.**   Exactly.

**Q.**   And, so, -- and it's reflected in the title of the document.  They're looking at the relationship or the association between non-medical use of prescription opioids and heroin use; correct?

**A.**   That's right.

1    Q.   If you look at -- if you look at Page 1 of this

2    document in the abstract in the left-hand column, there's

3    a -- there's two statements.

4        One statement is, "Four out of five recent heroin

5    initiates previously used non-medical prescription --"

6        Actually, I should back up to make it clear we're on

7    the same language.

8        Do you see the references throughout this paper to

9    NMPR?

10   A.   Yes.

11   Q.   And that means non-medical prescription pain relief,

12   reliever use; correct?

13   A.   That's right.

14   Q.   And, so, that's what they're talking about here when

15   they say NMPR; right?

16   A.   That's right.

17   Q.   So it states in the, in the abstract, "Four out of five

18   recent heroin initiates previously used NMPR."

19       Do you see that?

20   A.   I do.

21   Q.   And is that the statistic that you cited in your prior

22   testimony?

23   A.   There are many studies that show a similar estimate.

24   This is one of them.

25   Q.   And then it goes on to say, "However, the vast majority

 1     of NMPR users have not progressed to heroin use."

 2          Do you see that?

 3     **A.**   I do.

 4     **Q.**   And does that accord with your understanding that the

 5     vast majority of people who use prescription opioids

 6     non-medically do not progress to heroin use?

 7     **A.**   Yes.

 8     **Q.**   And then it goes on to say only 3.6 percent of

 9     non-medical prescription users had initiated heroin use

10     within a five-year period following their first non-medical

11     prescription opioid use.  Do you see that?

12     **A.**   I see that's what is written.

13     **Q.**   And, and does that accord with your understanding?

14     **A.**   I mean, 3.6 percent initiating heroin use is a -- quite

15     a large transition probability.  So I guess I would only --

16     I would take issue with the word "only."  3.6 percent is a

17     lot of heroin.

18     **Q.**   I don't think that answered my question.  My question

19     was:  Does it accord with your understanding that only

20     3.6 percent of people who are using prescription opioids

21     non-medically initiated heroin use within the five-year

22     period following their first non-medical use of prescription

23     opioids?

24     **A.**   I believe that's what this study found if that's the

25     question.

1   **Q.**   And, so, that means that putting it the other way

2   around, 96.4 percent of the non-medical prescription pain

3   reliever users did not use heroin within five years of their

4   first initiation of non-medical use of prescription opioids?

5   **A.**   That's right.

6   **Q.**   So I'm going to start a new board.

7        We have this one saved; correct?

8        So, Dr. Keyes, I've written on the board here

9   "gateway."  And the first thing I wanted to do was put up

10  the number that we just discussed which was that

11  96.4 percent of non-medical users do not transition within

12  five years of first non-medical use.  I want to just put

13  that up as a reference so we don't lose it.

14  **A.**   In the household sample if you would add that, please.

15  **Q.**   And that, that 96.4 percent, as we just discussed,

16  reflects the finding of this Muhuri article; correct?

17  **A.**   That's right.

18  **Q.**   And you make the same observation in your own report at

19  Pages 47 to 48 of your report if you want to look at your

20  report.  You state that the absolute risk of transitioning

21  to heroin, given prescription opioid use, is relatively

22  small.  Do you see that?

23  **A.**   What page?

24  **Q.**   47 to 48 of your report.

25  **A.**   I say a small but significant proportion of individuals

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    who use prescription opioids progress to heroin use.

2    **Q.**   I was looking for the one -- I guess it's actually at

3    the top of, top of Page 48.

4         You say, "The absolute risk of transitioning into

5    heroin, given prescription opioid use, is relatively small."

6         Do you see that?

7    **A.**   Well, could we read the whole sentence just for

8    context?

9    **Q.**   No.  I wanted to focus on that clause first.  And I

10   wanted to focus on the fact that you state, "The absolute

11   risk of transitioning to heroin, given prescription opioid

12   use, is relatively small."

13        Do you see that?

14   **A.**   I think out of context it's not really interpretable

15   because you have to look at the whole sentence which

16   includes the risk ratio estimate and the public health

17   burden.  So out of context, one clause is not really

18   interpretable.

19   **Q.**   Well, I wanted to ask you the basis for your statement,

20   "The absolute risk of transitioning to heroin, given

21   prescription opioid use, is relatively small."

22        What's the basis for that statement?

23   **A.**   I think the studies that I cite in the report are the

24   basis.

25   **Q.**   And Muhuri would be one of those that you rely on for

1    that purpose?

2    **A.**    Muhuri is one of several studies.

3    **Q.**    Let me put that on the board.  I wrote "absolute risk

4    of transition small" to reflect that statement from your

5    report, Dr. Keyes.

6    **A.**    The first part of the sentence is that the number of

7    individuals who use prescription opioids is approximately

8    seven times larger than the number who use heroin.  So

9    that's probably an important point on that too.  The point

10   is that while the absolute risk is small, the population

11   prevalence is large.

12   **Q.**    In other words, your point is prescription opioids are

13   widely used as medicines in this country; correct?

14   **A.**    That's right.

15   **Q.**    And, in fact, the data we looked at previously today

16   reflected that almost a third of adults in 2014 received a

17   prescription for opioids; correct?

18   **A.**    I believe you said 245 million.

19   **Q.**    Actually, I may be low.  So that could be more than --

20   it could be over 60 or 70 percent of the population of the

21   country; right?

22   **A.**    That's right.

23   **Q.**    So, in other words, the point is there's a large volume

24   of prescription opioids being prescribed by doctors in their

25   judgment of medical needs; correct?

**A.**    There's a large supply of opioids.  That's certainly
the case.

**Q.**    Well, and that's being prescribed by doctors who are
prescribing them to patients; correct?

**A.**    Some of them are being prescribed by doctors, correct.

**Q.**    Well, most of them are being prescribed by doctors;
correct?

**A.**    Yes, most of them are being prescribed by doctors.

**Q.**    And so, and so your point is it's a large volume of
opioids because a large percentage of the country is being
treated with opioids?

**A.**    Right.  So if there's a small risk -- it's sort of like
smoking and lung cancer which I think I cite in the, in the
report.

       The prevalence of lung cancer is much lower than the
prevalence of heroin use.  And there's a lot of smokers in
the U.S.  So most smokers don't develop lung cancer.  And,
in fact, many more people use prescription opioids and
transition to heroin use than smoking and get lung cancer.
So you can't really look at the absolute risk in a vacuum.
You have to look at the prevalence as well.

**Q.**    But the, but the point is if you have an extremely
large percentage of our country that is using prescription
opioids for medical purposes, there could be some percentage
of people who develop OUD as a consequence; correct?

1    **A.**    Right.  So if you take the 245 million number, for

2    example -- and I think you said that 65 percent are of short

3    duration?

4    **Q.**    Yes.

5    **A.**    I mean, we could work that through.  That, that would

6    be 160 million people on short duration.  And with an event

7    rate of .12, that's 200,000 people a year developing OUD

8    from short duration opioids.

9    **Q.**    Or put it the other side, put it the other way around.

10   It also suggests the fact that 245 million people receive

11   prescriptions in a given year for opioids reflects a broad

12   scale judgment by doctors about prescribing opioids to treat

13   pain; correct?

14   **A.**    There is a lot of opioid prescribing in the U.S.  And,

15   therefore, small risk translates to big population changes.

16   And, so, yes, there is a vast over-supply of prescription

17   opioids in the U.S.  And the majority of those people will

18   not have a problem related to opioids.

19        But when you have 200,000 people a year -- and that's

20   just the 160 million who are prescribed for less than three

21   weeks.  We've got 85 million, based on what you cited

22   earlier, that are prescribed for chronic conditions where

23   the event rate is much higher.  And that doesn't include

24   non-medical use.

25   **Q.**    But I'm asking, I'm asking the point the other way

1    around.  I'm, I'm trying to confirm that when you see a very

2    large volume of opioids being prescribed, it reflects a

3    widespread judgment by the medical community about the

4    appropriateness of those prescriptions.

5    **A.**    I don't think it necessarily reflects a judgment about

6    the appropriateness.  I think it reflects a, a decision

7    based on the information at hand, of which the information

8    can change.

9    **Q.**    Well, you, you testified previously that the decisions

10   made by doctors are overwhelmingly in good faith.  The

11   prescribing decisions on -- related to opioids are

12   overwhelmingly in good faith.  Correct?

13   **A.**    They're in good faith based on the information that's

14   available.

15   **Q.**    And so, and so when the doctors are acting in good

16   faith to prescribe that volume of pills, it reflects a

17   widespread judgment by doctors about the appropriateness of

18   that prescribing behavior; correct?

19   **A.**    I don't know that I would conflate those two

20   statements.

21   **Q.**    So let's talk a little bit about how someone actually

22   transitions from prescription opioid use to heroin use.

23        First of all, all of the studies that you've cited in

24   your report in support of your opinion regarding the

25   connection between prescription opioids and heroin are

```
1    measuring an association between the misuse of prescription

2    opioids and heroin use; correct?

3    A.   The studies that I cite in the report include medical

4    use followed by transition to heroin.

5    Q.   That's not, that's not what I asked you.  I asked you

6    the question:  All of the studies you've cited in support of

7    your opinion regarding the connection between prescription

8    opioids and heroin all measure an association between misuse

9    of prescription opioids and heroin use; correct?

10   A.   Incorrect.

11   Q.   Let me ask you to look at your report, please, Page 37.

12   I'm trying to make sure I've got the right quote for you,

13   Dr. Keyes.

14            MR. HESTER:  May I consult just a minute, Your

15   Honor, with my colleague?  I'm sorry.

16        (Pause)

17   BY MR. HESTER:

18   Q.   Dr. Keyes, I'm trying to find a statement -- a page

19   in your report.  I'm going to read you a quote and see

20   if this is accurate.

21   A.   Do you have a page number?

22   Q.   I'm trying to find it.

23        Let me read this to you, Dr. Keyes.  I have this in my

24   notes.  I'm going to find the page for you, so I will find

25   this page reference.  But let me read this and see if this
```

```
1    sounds correct to you.

2         "I reviewed 16 studies that found that individuals who

3    use prescription opioids non-medically have higher rates of

4    injecting and snorting heroin than individuals who do not

5    use prescription opioids even after controlling for health

6    and mental health as well as demographics."

7         Is that correct?

8    A.   Well, I think in the context in that paragraph, I also

9    talk about the studies of medical users.  Many of the

10   individuals in those studies were medical users.

11   Q.   Well, we've gone through this before.  Somebody could

12   be a medical user but they're engaged in non-medical use of

13   opioids; correct?

14   A.   That could be the case.

15   Q.   So it's Page 46.  And it states in the first paragraph

16   under the heading I -- second paragraph there's a reference

17   to the fact that you reviewed 16 studies that found that

18   individuals who use prescription opioids non-medically.

19        All of the studies that you were looking at were

20   non-medical?

21   A.   No, that's not correct.  There were many individuals in

22   those 16 studies who used opioids medically.

23   Q.   But all of the studies were looking at non-medical use

24   of opioids?

25   A.   Not necessarily.  The studies varied in terms of the,
```

1    the populations that were examined.  And, so, there are many

2    examples in these studies of individuals who used medically.

3    **Q.**   That's not the question I'm asking, Dr. Keyes.  The

4    question I'm asking is that all of the 16 studies that you

5    relied on for your analysis of gateway were based on people

6    who were using opioids non-medically.  Whether they were

7    also people who held a prescription or not, they were all

8    non-medical users.  They were all studying non-medical

9    users.

10   **A.**   That's not the case.  I think if you go and look at the

11   studies, there are several in which there's information

12   about medical users.

13   **Q.**   So where it states, "I reviewed 16 studies that found

14   individuals who used prescription opioids non-medically."

15   16 studies looked at individuals who used opioids

16   non-medically.  That was the study set you looked at;

17   correct?

18   **A.**   If you look at the populations that comprised the

19   studies, there were individuals who were using opioids

20   non-medically, many people for whom, you know, their first

21   prescription was based on back pain, et cetera.  Some of

22   them went on to use non-medically.  Some of them went on to

23   use heroin.

24       Maybe that sentence is inartfully worded, but they were

25   certainly using opioids non-medically in that they use

```
 1    heroin.  But not all of them were non-medical prescription

 2    opioid users.

 3    Q.   Dr. Keyes, your testimony is that you relied on studies

 4    that did not involve non-medical use of opioids?

 5    A.   Well, they were all heroin users.  So in that sense --

 6              MR. FARRELL:  Objection, Your Honor, asked and

 7    answered.  And if he wants to ask about a particular

 8    provision in the report, I would ask that he simply show it

 9    to the witness.

10              THE COURT:  Yeah.  I'll sustain the objection.  We

11    need to get through this, Mr. Hester.

12    BY MR. HESTER:

13    Q.   If you look back at the Muhuri paper that I showed

14    you earlier, Exhibit 2647, that's one involving

15    non-medical pain reliever use; correct?

16    A.   Again, the, the patient populations or those groups

17    overlap, so it's not only non-medical use, although they

18    measured non-medical use.

19    Q.   You're not aware of any studies that have found that

20    people who use prescription opioids only medically have

21    higher rates of heroin use; correct?

22    A.   I do.  I am aware of one.  It was published after this

23    report.

24    Q.   Which one are you referring to?

25    A.   McCabe 2020.
```

1   **Q.**   Let me ask you to look, please, at your deposition

2   testimony out of New York.

3   **A.**   What was the date of the deposition?

4   **Q.**   Page -- and McCabe is not disclosed in your report?

5   **A.**   It was published after the report and after the

6   deposition.  But I have knowledge of it and you asked me if

7   I know of any study.

8   **Q.**   At the time you wrote your report, there were none that

9   had found that people who use prescription opioids only

10   medically have higher rates of heroin use; correct?

11   **A.**   At the time the report was published, there had not

12   been a study of that.  And now there has been.

13   **Q.**   So the studies that you were looking at involve a

14   transition from prescription opioids to heroin starting with

15   non-medical use?

16   **A.**   I'm sorry.  Say that again.

17   **Q.**   The studies you were relying on involved a transition

18   from prescription opioids to heroin that started with a

19   misuse of prescription opioids?

20   **A.**   That's not necessarily the case.  As I said before,

21   there's a lot of -- a lot of these studies involve people

22   who started using opioids medically.

23   **Q.**   And then transitioned to non-medical use; correct?

24   **A.**   They transitioned to heroin use which is a non-medical

25   use of an opioid.

1  **Q.**   Let me ask you in relation to your gateway theory, you

2  understand that criminals are responsible for manufacturing

3  illegal opioids like heroin; correct?

4  **A.**   I have to correct you.  It's not a gateway theory.

5  It's not a theory.  There's data.  So it's a gateway effect.

6  **Q.**   But you've testified to -- I will ask you more

7  questions about that.

8  **A.**   Okay.

9  **Q.**   So in relation to your view that there's a transition

10  from prescription opioids to heroin, I wanted to ask you

11  about the heroin side of that equation.  That involves

12  criminal conduct by drug dealers; correct?

13  **A.**   Yes.

14  **Q.**   And, so, criminals are responsible for trafficking the

15  illegal drugs that somebody transitions to; correct?

16  **A.**   As far as I know.

17  **Q.**   And then in order for the heroin to cause any harm, the

18  end-user actually needs to use it; correct?  Needs to use

19  the heroin in order for there to be harm?

20  **A.**   Yes.

21  **Q.**   So, so for someone to use an illegal opioid like

22  heroin, there would be at least three crimes committed;

23  right?

24  **A.**   I, I'm not a legal scholar, so I don't know all the

25  crimes that are committed when someone uses heroin.

```
 1    Q.   But a transition to, to heroin from a prescription

 2    opioid would involve criminal conduct in relation to heroin;

 3    correct?

 4              MR. FARRELL:  Objection, Your Honor, outside the

 5    scope of her expertise, calls for a legal conclusion,

 6    validation.

 7              THE COURT:  Overruled.  I think this is proper

 8    cross.

 9              THE WITNESS:  Can you restate the question?

10    BY MR. HESTER:

11    Q.   The -- for someone to transition from prescription

12    opioids to heroin, there would have to be illegal acts

13    involving the, the manufacture, sale, and use of the

14    heroin; correct?

15    A.   I would imagine, yes.

16    Q.   I've written on the board, Dr. Keyes, "depends on

17    criminal conduct."

18         So let's talk a little bit more, Dr. Keyes, about your

19    definition of causation.

20         First, I want to make sure we're all on the same page

21    about terminology.

22         When you use the term "cause," you're using that term

23    as it's used by epidemiologists; correct?

24    A.   That's right.

25    Q.   An epidemiologists considers something a cause if it's
```

1    a factor that contributes, at least in part, to the

2    development of an illness, at least in some individuals;

3    correct?

4    **A.**   Yes, something without which the outcome would not have

5    occurred when and how it did is the common definition we use

6    in our classes.

7    **Q.**   So under the epidemiologist definition of cause that

8    you're applying, the cause need not be temporally proximate

9    to the outcome; correct?

10   **A.**   That's right.

11   **Q.**   And it's true that a cause can occur early in life and

12   an intervening cause can occur later in life and those could

13   still be causes for an epidemiologist; correct?

14   **A.**   Yes.

15   **Q.**   And there can also be multiple causes for a single

16   event; correct?

17   **A.**   Yes.

18   **Q.**   Causes, as you use the term, can be distant in time;

19   correct?

20   **A.**   Can be?

21   **Q.**   Distant in time?

22   **A.**   Yes.

23   **Q.**   And causes can come before or after one another in a

24   sequence of causes; correct?

25   **A.**   Yes.

**Q.**   So a cause does not need to be the closest or the most recent cause to be considered a cause by an epidemiologist; correct?

**A.**   That's right.

**Q.**   A cause does not need to be the primary or most important cause to be considered a cause by an epidemiologist; correct?

**A.**   I don't know what you mean by primary or most important.

**Q.**   In other words, there could be multiple causes that might have different weights and they might all be viewed as causes by an epidemiologist; correct?

**A.**   I don't know what you mean by different weights.

**Q.**   Something does not need to be the direct cause to be considered a cause by an epidemiologist, does it?

**A.**   Again, this is not terminology that I'm familiar with. And, so, I'm not sure what's the direct cause.

**Q.**   So, so you don't evaluate the question of direct causes in your work as an epidemiologist?

**A.**   I guess if you could provide the definition of "direct."  I mean, we have a definition of "cause" and "causation" that we use when we evaluate the literature.

**Q.**   Let me see if I can get at it another way.

       I take it, first, you do recognize that there's an important difference between association and causation;

1    correct?

2    **A.**    Causation is a subset of association.  They're not

3    different.

4    **Q.**    So there could be two events or two things that are --

5    have an association with each other that -- where there's

6    not causation; correct?

7    **A.**    Yes.

8    **Q.**    And you could also have some event that happens

9    temporally prior to another event, and the first event is

10    not necessarily the cause of the second; correct?

11    **A.**    Yes.

12    **Q.**    So an association means that there's a relationship

13    between two or more variables; correct?

14    **A.**    Yes, one -- the outcome occurs with greater frequency

15    in the exposed and the unexposed, for example.

16    **Q.**    And that doesn't necessarily mean that one variable in

17    the association causes the other?

18    **A.**    It doesn't necessarily mean that.

19    **Q.**    And, so, in assessing whether an association is causal,

20    you have to account also for other potential causes;

21    correct?

22    **A.**    That would be a consideration of alternative

23    perspectives in the criteria that I've evaluated.

24    **Q.**    You're familiar with the concept of multifactorial

25    diseases; correct?

1    **A.**    I am.

2    **Q.**    And that's when a single cause does not produce the

3    disease but, rather, the disease is the result of a

4    combination of many causes?

5    **A.**    More than one.

6    **Q.**    And is it the case that most diseases are

7    multifactorial?

8    **A.**    I'm not sure if I would say most, but many diseases are

9    multifactorial.

10   **Q.**    And OUD is a multifactorial disease; correct?

11   **A.**    Well, there's one necessary cause, and then there are

12   other potential causes as well.

13   **Q.**    So when you refer to OUD as, as a multifactorial

14   disease, that means that there's no single cause; there's,

15   there's multiple causes?

16   **A.**    There's one necessary cause, and then there are other

17   contributing causes.

18   **Q.**    And when you say one necessary cause, you're meaning

19   there has to be some exposure at some time to an opioid or

20   else you would never develop an OUD?

21   **A.**    That's right.

22   **Q.**    But, otherwise, there could be other multiple causes

23   that also contribute to the development of OUD in an

24   individual?

25   **A.**    Yes.

**Q.**   And it's also true, isn't it, that if you don't know
about the other causes of a disease, you may make incorrect
causal inferences based on measures of association from
epidemiological studies?

**A.**   No, I wouldn't say that that is true across the board.
It really depends on the research question that you're
looking at.  We in epidemiology call it black box
epidemiology, for example.

     If you do an experiment, you might not know every
single contributing cause of the outcome.  But as long as
the exposure is randomly assigned or that you can control
for enough factors that, you know, net of those controls,
you can make inference.  You don't need to know every single
contributing cause.  That's the whole kind of basis for
epidemiology that we can infer causation from group
comparison.

**Q.**   But there are circumstances where if you haven't fully
identified other causes, you can make incorrect causal
inferences; correct?

**A.**   It would really depend on the specific situation.  I
can't answer that in the abstract.

**Q.**   Now, Dr. Keyes, there was a heroin problem in the
United States well before there was an opioid crisis;
correct?

**A.**   There has been heroin prevalent in the United States at

1    various levels at various times for as long as we've been

2    measuring drugs.

3    Q.   And, and you recall previously we've discussed your

4    allocation of overdose deaths to prescription opioids the

5    way you had done your indirect and direct allocations;

6    right?

7    A.   Yes.

8    Q.   And you attributed 53.4 percent of the illicit opioid

9    deaths indirectly to prescription opioids in your

10   methodology; correct?

11   A.   I don't think it was illicit opioids deaths.  It was

12   all overdose deaths.

13   Q.   The -- am I right that you -- your development of

14   deaths that you attributed indirectly due to prescription

15   opioids was based on a figure of 53.4 percent of those

16   deaths being attributed to prescription opioids?

17   A.   Yes, opioid overdose deaths that were not directly

18   attributable to prescriptions.

19   Q.   So for that group, the opioid overdose deaths that were

20   not directly attributed to prescription opioids in your

21   methodology, you used a 53.4 percent figure for that

22   attribution?

23   A.   I did.

24   Q.   And you took that attribution figure, that

25   53.4 percent, from NSDUH data on the number of heroin users

1    who reported having used prescription drugs before or at the

2    same time as their first use of heroin; is that correct?

3    **A.**    That's right.

4    **Q.**    And you believe that figure was reliable for the use in

5    allocating illegal opioid deaths as a result of your

6    analysis?

7    **A.**    I do.

8    **Q.**    Let me ask you to look at another document, please.

9              MR. HESTER:  May I approach, Your Honor?

10             THE COURT:  Yes.

11   BY MR. HESTER:

12   **Q.**    Dr. Keyes, we've handed you a document marked as

13   Defendant's West Virginia Exhibit 2579.  It's an article

14   written by Theodore Cicero and others, "Increased Use of

15   Heroin as an Initiating Opioid of Abuse:  Further

16   Considerations and Policy Implications."

17             Do you see this document?

18   **A.**    I do.

19   **Q.**    And you've seen this document before I take it?

20   **A.**    I have seen it before.

21   **Q.**    And who --

22   **A.**    I don't know that this is on my reference list, but I'm

23   familiar with the paper.

24   **Q.**    Yes.  I think, I think this is not listed on your

25   reference materials, but you do rely on other materials by

1    Theodore Cicero in your report; correct?

2    **A.**    Yes.  I, I know the paper.  I don't think it's on my

3    reference list or on my materials considered list.  I just

4    want to make that clear.

5    **Q.**    What I wanted to ask you about is this statement

6    from -- in this Cicero paper, Page 2.  And it's in the

7    right-hand column under the heading "Heroin as an Initiating

8    Opioid."

9         There's a statement that says, "Heroin use as a first

10   opioid grew sharply from 8.7 percent of the sample in 2005

11   to almost 31.6 percent in 2015."

12        Do you see that?

13   **A.**    I do.

14   **Q.**    And does that accord with your understanding that

15   heroin use as a first opioid has grown sharply over time and

16   is now roughly around 30 percent?

17   **A.**    Well, this is a different population than the one that

18   I used for my calculation.  So this is a population of

19   people who were, who were -- I'm not so familiar with the

20   methods as I didn't rely on it.  But this is part of the

21   SKIP program, the Survey of Key Informant Patients.  I don't

22   know what the sample size is.  5,885 people who -- I don't

23   know where they -- adults entering their substance abuse

24   treatment program with a primary diagnosis of opioid use

25   disorder.

1   **Q.**   And so, so just to be clear on this, so this Cicero

2   study is looking at a population of people who are entering

3   treatment for opioid use disorder?

4   **A.**   That's what it, it seems to be.

5   **Q.**   And you're familiar with this paper?

6   **A.**   I'm generally familiar with the paper.

7   **Q.**   And, and my question was fairly narrow focusing on this

8   one sentence.  Are you aware that there's been an increase

9   in heroin as a first opioid being used by people who are

10  reporting opioid use disorder?

11  **A.**   This study shows that there has been an increase in

12  heroin use as the first opioid.

13  **Q.**   And you're not aware of any contrary data in West

14  Virginia, are you?

15  **A.**   Well, I guess I am in that if you look at the, at the

16  NSDUH data, for example, and other data sources they would

17  show different percentages.  I haven't tried to adjudicate

18  between other sources at this point since I didn't rely on

19  the study.

20  **Q.**   Well, this, this study reflects heroin use as the first

21  opioid rising to over 30 percent by 2015; correct?

22  **A.**   This study has heroin use as the first opioid -- yes,

23  to 31.6 percent in 2015.

24  **Q.**   And it's reflecting that that has been increasing;

25  correct?

1    **A.**    In this sample, that percentage increased.

2    **Q.**    And does that accord with your general understanding

3    that there has been, there has been an increase in opioid --

4    in heroin with the opioid first initiation?

5    **A.**    I have not undertaken that analysis.

6    **Q.**    The Cicero paper reflects this analysis here; correct?

7    **A.**    Well, the Cicero paper still shows that over 60 percent

8    of people started with prescription opioids, which is what's

9    in my report.  So the 2015 data in Cicero is consistent with

10   my report that 60 percent started with prescription opioids.

11   **Q.**    Well, but your report talks about 80 percent starting

12   with prescription opioids.

13   **A.**    The NSDUH number is slightly smaller.  So it's within

14   the range of the prevalences that I report.  This is, this

15   is very consistent with what other studies have shown.

16   **Q.**    But the Cicero data does reflect an increase in the

17   percentage of people using heroin as the first opioid;

18   correct?

19   **A.**    In a -- in the small treatment-seeking sample which

20   does not generalize noise.  There are other literature to

21   corroborate it.  This sample showed an increase, although

22   prescription opioids remain much more prevalent.

23   **Q.**    And if you take the Cicero number, it's, it's lower

24   than the 80 percent number that you cited in your report as

25   reflecting prescription opioids as the opioid of first use;

```
 1   correct?

 2   A.   Well, it is within the range of what I report in the

 3   report on the proportion of people who began using

 4   prescription opioids before heroin.

 5   Q.   And just to be clear, the NSDUH data, you reflect

 6   nearly half of people reporting that prescription opioids

 7   were the opioid of first use; correct?

 8   A.   Yes.

 9   Q.   Not 80 percent?

10   A.   Yes.  And I go into detail in the report on the

11   differences between that number and why I used it versus

12   other numbers that are closer to what Cicero reports of

13   60 percent starting with prescription opioids.

14   Q.   You don't know whether the percentage of heroin users

15   who started with heroin as their first opioid has increased

16   since 2015, do you?

17   A.   No.

18   Q.   You published 306 peer-review articles I believe you

19   said, Dr. Keyes; is that right?

20   A.   Yes.

21   Q.   And between 35 and 40 of those articles relate

22   specifically to opioid use and related harms; correct?

23   A.   That's right.

24   Q.   And you've never published an article stating that

25   prescription opioid use causes later heroin use; correct?
```

1    **A.**    I believe my scientific writings would be consistent

2    with the gateway effect.  There's really no debate in the

3    literature on that.

4         So my articles that have been on prescription opioid

5    use and other related harms due to opioid use, including I

6    think the paper that we talked about earlier today in the

7    Annual Review of Public Health, certainly would reflect that

8    opinion.

9    **Q.**    You've never, you've never published an article

10   saying -- stating that prescription opioid use causes later

11   heroin use?

12   **A.**    I don't know that that sentence has ever appeared, but

13   it's certainly in the papers, all the, those opinions that

14   reflect the scientific consensus that is in the articles

15   that I've written on opioid use.

16   **Q.**    No, but I'm really asking a very narrow question which

17   is have you stated the conclusion that prescription opioid

18   use causes later heroin use?  And you have not; correct?

19              MR. ACKERMAN:  Objection, asked and answered.

20              THE COURT:  Overruled.

21              THE WITNESS:  I don't believe that sentence -- I

22   don't know if that sentence has ever appeared in those 35 to

23   40 articles, but it's possible those combination of words

24   have not.

25   BY MR. HESTER:

1    Q.   And there's, there's no other article that has

2    stated that conclusion, no public article published by

3    anyone else stating that prescription opioid use causes

4    later heroin use; correct?

5    A.   I would have to disagree with that.  I mean, I think

6    the information I've cited in this report consistently

7    shows, including from Nora Volkow and others, that

8    prescription opioids and heroin are pharmacologically

9    similar; that there's a high rate of transition between the

10   two, or higher than people who don't use prescription

11   opioids.  And all of that information is consistent in those

12   scientific articles.

13        You know, scientists in general, and especially

14   epidemiologists, we talk about the data and the evidence.

15   That's what we do in our articles.  So I think that that's

16   really clear in the literature.

17   Q.   Dr. Keyes, the reports that you're referring to are

18   ones that state an association between prescription opioid

19   use and misuse and later heroin use; correct?

20   A.   I would have to disagree.

21   Q.   Those are the reports you're referring to?

22   A.   I disagree.  I think that the -- what's written in the

23   article, if you look at the Public Health Association report

24   of all the schools of public health, there is consistent

25   language and literature that would, would indicate that

1    there is a scientific consensus that this is a causal

2    relationship.

3    **Q.**   And you state -- and you're asserting that that is

4    found in the 16 studies that you've relied on in your

5    report?

6    **A.**   I'm sorry.  That what is found?

7    **Q.**   Do you, do you assert that the 16 studies you've relied

8    on in your report find causation, find that prescription

9    opioid misuse causes later heroin use?

10   **A.**   That's not what my testimony was.  My testimony is that

11   there is sufficient consensus across the materials that I

12   relied on that this is a causal relationship.

13        I independently undertook my own analysis of those 16

14   studies and others and compared it to the frameworks that we

15   use in public health for making decisions about causation.

16        So I think what we talked about on Friday was that any

17   one study is not sufficient to go from association to

18   causation.  But then when you look at the body of

19   literature, that's what, that's what epidemiologists do.

20   And that's what I and others have done that are cited in

21   this report.

22   **Q.**   But let me stay very narrowly focused on the 16 studies

23   you relied on.  And those 16 studies, none of those studies,

24   none of those studies goes beyond finding an association to

25   finding causation between prescription opioid use and later

```
 1    heroin use?

 2            MR. ACKERMAN:  Objection, asked and answered and

 3    misstates prior testimony.

 4            THE COURT:  I think it has been, Mr. Hester.

 5            MR. HESTER:  Let me ask to pull up the New York

 6    Frye transcript, please, Page 166.

 7    BY MR. HESTER:

 8    Q.   So this is the -- let me go back to the first page.

 9    So this is the testimony you gave in the Frye hearing in

10    September, 2020.  Is that right, Dr. Keyes?

11    A.   Yes.

12    Q.   Let me ask you to look at the question and answer at

13    Page 166, lines 3 to 7.

14         There's a question that was asked you, "Going back to

15    that distinction we drew between causation and association,

16    am I accurate that none of those studies make the step of

17    going beyond association to causation?"  That was the

18    question.

19         And your answer was, "No one study alone, no."

20         Was that your answer?

21    A.   That's what I just said.

22            MR. FARRELL:  Objection, Your Honor.

23            THE COURT:  Yes.

24            MR. FARRELL:  This isn't impeachment.  This is

25    validation of what she testified to.
```

```
 1              THE COURT:  Well, I know.
 2         I've got the point, Mr. Hester.  You're going to have
 3    to move along.
 4              MR. HESTER:  All right, Your Honor, I'll move it
 5    on.
 6    BY MR. HESTER:
 7    Q.   On Friday, Dr. Keyes, you testified about a study
 8    that Banerjee and colleagues had prepared relating to
 9    Veterans Administration data; right?
10    A.   Yes.
11    Q.   And you testified that Banerjee is a protective --
12    sorry.  You testified that Banerjee is a perspective study
13    that follows groups of prescription opioid users and
14    non-users to determine the risk of heroin initiation; right?
15    A.   Yes.  I assume there's a copy of the study that I can
16    look at.
17    Q.   Yes.  I can get that for you.
18              MR. HESTER:  May I approach, Your Honor?
19    BY MR. HESTER:
20    Q.   Dr. Keyes, we've handed you what's been marked as
21    Defendants' West Virginia Exhibit 2436, "Non-Medical Use
22    of Prescription Opioids is Associated with Heroin
23    Initiation Among U.S. Veterans."
24         Do you see that?
25    A.   I do.
```

1    **Q.**   And is this the Banerjee article that you were

2    discussing?

3    **A.**   It is.

4    **Q.**   And it's headed again -- it's focusing on non-medical

5    use of prescription opioids; correct?

6    **A.**   Well, again, not exactly.  I mean, it's asking about

7    non-medical -- the, the questions that they asked queried

8    non-medical use, but there is quite a bit of overlap,

9    especially in the veteran population, between medical and

10   non-medical use.

11   **Q.**   And do you understand -- if you look at Page --

12              MR. FARRELL:  Excuse me, Mr. Hester.

13              MR. HESTER:  Yes.

14              MR. FARRELL:  Is this the -- is this the same

15   article that we talked about yesterday?

16              MR. HESTER:  Uh-huh.

17   BY MR. HESTER:

18   **Q.**   Am I right, Dr. Keyes -- I understood this was the

19   Banerjee article you had discussed in your testimony on

20   Friday.

21   **A.**   Look at the Results section because these authors do

22   publish a lot.  Yes, I believe it is.

23              MR. FARRELL:  I'm sorry.  The format threw me off.

24   I'm sorry.  My apologies.

25   BY MR. HESTER:

1    Q.   And do you see at the top of Page 3 of this

2    article, Dr. Keyes, it refers to people who engage in

3    non-medical use of prescription opioids may be at higher

4    risk for transition to heroin use?  Do you see that,

5    first line?

6    A.   Yes.  It says, "Persons who engage in non-medical use

7    of prescription opioids may be at higher risk for

8    transitioning to heroin use in part because heroin has

9    become more accessible and less expensive than prescription

10   opioids in many U.S. settings."

11   Q.   Does that accord with your understanding?

12   A.   Yes.

13   Q.   And, so, this is talking about persons who are engaged

14   in non-medical use of prescription opioids; right?

15   A.   Well, not non-medical only.  So it leads to non-medical

16   use.

17   Q.   But they have to be engaged in some non-medical use to

18   be part of this analysis; correct?

19   A.   To be a part of the exposed group.  There's also an

20   unexposed group who did not use prescription opioids.

21   Q.   And, so, this -- the study population that they were

22   looking at, if you look at Page 2, was a group of HIV

23   infected and uninfected veterans; is that right?

24   A.   Yes.

25   Q.   And approximately 45 percent of the participants in

 1    this study were HIV infected; right?

 2    **A.**    That's right.

 3    **Q.**    And the authors go on to -- if you look at Page 8, the

 4    authors state -- if you look at the bottom paragraph -- that

 5    the study enrolled individuals who are likely at higher risk

 6    for heroin initiation than the general veteran population.

 7          Do you see that?

 8    **A.**    Yes.

 9    **Q.**    And does that accord with your understanding?

10    **A.**    Yes.  That's why we use a broad range of studies to

11    draw conclusions from in the literature.

12    **Q.**    And it also goes on at Page 9, the last sentence, next

13    to the last sentence of the article.  It says -- states that

14    the demographics of a veteran population are substantially

15    different from young college students.

16          Do you see that?

17    **A.**    Yes.

18    **Q.**    And does that also accord with your understanding?

19    **A.**    That college students are a different demographic than

20    middle-aged veterans?

21    **Q.**    The veterans being studied in this report.

22    **A.**    Yes.

23    **Q.**    And then if you look at Page 4 of this document, the

24    study -- the survey that was being measured was looking at

25    persons who used prescription opioids non-medically either

1    prior to or concurrent with initiation of heroin use; is

2    that right?

3    **A.**   I'm sorry.  What sentence are you --

4    **Q.**   If you look at -- if you look in the middle of the

5    page, the end of the paragraph under "Measures," they refer

6    to new onset, NMUPO, was considered to occur prior to or

7    concurrently with heroin initiation.

8        Do you see that?

9    **A.**   Yes.

10   **Q.**   And, so, do you understand that this study was looking

11   at persons who had either engaged in non-medical

12   prescription opioid use before or concurrently with use of

13   heroin?

14   **A.**   Well, it just -- I think the word "concurrently"

15   they're using here is in the same year.

16   **Q.**   Right.  So there could be heroin use and non-medical

17   use of prescription opioids in the same year and those would

18   be defined as concurrent use under the study; right?

19   **A.**   That's right.

20   **Q.**   So the authors' findings are not limited to people

21   whose non-medical prescription opioid use preceded heroin

22   initiation; correct?

23   **A.**   By and large, the vast majority of the people in the

24   study who are in the risk group, they're looking at -- if I

25   could explain survival analysis for a moment.

1          The way survival analysis works, which is on Figure 2,

2     which is that you're measuring time from exposure to

3     outcome.

4          So the people who had prescription opioid use and

5     heroin use in the same year, their time to outcome is going

6     to be very, very short.  So in Figure 2 they're going to be

7     part of that first bar of the time series graph.

8          And you can look at the time series graph and see the

9     blue line and the red line.  And the red line is incident

10    NMUPO prior to or concurrent to heroin initiation, and then

11    the amount of time that has passed to their heroin

12    initiation.

13         So by far, what this study shows is that the people who

14    are using in the same year are not contributing to that five

15    times risk number that is in Table 2, I think it is, that I

16    spoke about on Friday.

17    **Q.**   But --

18    **A.**   Because, because of the way time series works, you

19    measure that -- the, the hazard of initiation is measured as

20    a factor of time.

21    **Q.**   But the sample that this study is looking at includes

22    people who would initiate both heroin and non-medical use;

23    correct?

24    **A.**   They didn't exclude those people, but the five times

25    risk number is not going to incorporate.  They're largely

```
 1    uninformative.  If you're trying to -- if you can kind of
 2    consider whether -- you know, you want to know what the risk
 3    of heroin initiation is after you use prescription opioids.
 4    So people who used in the same year are not contributing a
 5    lot to that person time.
 6    Q.   Let me ask you about another document you discussed in
 7    your examination on Friday.  You discussed a report that was
 8    put out by the Association of Schools and Programs of Public
 9    Health; correct?
10    A.   Yes.
11    Q.   And you described that report as a consensus statement
12    of the schools; is that right?
13    A.   Yes.
14    Q.   Let me ask you to look at that paper for a minute,
15    please.
16              MR. HESTER:  May I approach, Your Honor?
17              THE COURT:  Yes.
18    BY MR. HESTER:
19    Q.   Dr. Keyes, we've handed you what's been marked as
20    Plaintiffs' Exhibit 43124.  It's entitled "Bringing
21    Science to Bear on Opioids."
22         Do you see that?
23    A.   Yes.
24    Q.   And this is the report you were talking about in your
25    examination on Friday; is that right?
```

1    **A.**    That's right.

2    **Q.**    And this is not an epidemiological study; correct?

3    **A.**    It's a review of the literature which I would consider

4    to be an epidemiological study.

5    **Q.**    It's a report of a task force of this Association of

6    Schools and Programs of Public Health; correct?

7    **A.**    Yes.  But contained in it is reviews of the literature.

8    **Q.**    But it's a task force report.  It doesn't purport to be

9    a consensus statement of all the schools in this

10   association; correct?

11   **A.**    I believe on Page 3 that's what it says.

12   **Q.**    But this is a task force report that was then

13   circulated by the Association of Schools and Programs?

14   **A.**    You know, the ASPPH Board of Directors has reviewed and

15   endorsed the report.

16   **Q.**    But it was prepared by a task force, not by a group of

17   schools; correct?

18            MR. ACKERMAN:  Your Honor, asked and answered,

19   objection.

20            THE COURT:  Sustained.

21   BY MR. HESTER:

22   **Q.**    The -- let me ask you to look at the authors of the

23   report, please.  If you look at the task force

24   members --

25   **A.**    What page is that?

1   **Q.**   It is Page 39 using the small numbers in the bottom

2   right.  Do you see these are the members of the task force?

3   **A.**   Yes.

4   **Q.**   And is it your understanding that these are the folks

5   who prepared the report?

6   **A.**   Let's see.  Not exactly.  On Page 3 it says, "After

7   much deliberation and extensive review of the scientific

8   literature, consultation with other experts, and the

9   practical experience of task force members."

10  **Q.**   So --

11  **A.**   So I would say that these are some of the people that

12  were centrally involved in the development of this document

13  certainly, but that it's not exclusively this group.

14  **Q.**   Right.  Okay.  So these -- the listing here on Page 39

15  that we're looking at would reflect people who were

16  centrally involved in the task force report?

17  **A.**   That would be my assumption.

18  **Q.**   And do you know that Judith Feinberg listed here is an

19  expert witness in this case?

20  **A.**   I'm not familiar with all of the other experts in the

21  case.

22  **Q.**   Do you know that she is an expert witness in this case?

23  **A.**   I heard her name this week when I was -- but I haven't

24  read her report.

25  **Q.**   Do you know that Andrew Kolodny is an expert witness in

```
 1    this case, another person listed in this membership of the
 2    task force?
 3    A.    No.
 4    Q.    You don't know if he's an expert in this case?
 5    A.    I didn't know that.  I know he has a lot of expertise
 6    in opioid policy.
 7    Q.    Do you know he's an expert witness in other opioid
 8    litigation?
 9    A.    I, I, I've heard his name referenced.  I mean, he's an
10    expert on opioid use.  It seems reasonable that he would
11    be --
12    Q.    I was really asking about whether he's testifying as an
13    expert in this litigation.
14    A.    I've heard his name in other litigation.
15    Q.    Do you know -- do you see Caleb Banta-Green who's also
16    listed as one of the members of this task force?
17    A.    Do I know him?
18    Q.    Do you see his name listed there?
19    A.    Yes.
20    Q.    And do you know that he's at the University of
21    Washington and is an employee of the State of Washington?
22    A.    That's what it says.
23    Q.    And do you know that Washington State is suing these
24    defendants?
25    A.    My understanding was that many states are suing.
```

1   **Q.**   But Washington State, do you know that?

2   **A.**   I'm not aware of every lawsuit.

3   **Q.**   Do you see Brendan Saloner is also listed here in this

4   task force membership?

5   **A.**   I see that.

6   **Q.**   And if you look, if you look a few pages back at Page

7   47, there's a disclosure of conflict of interest issues.

8   And the last bullet on the page is, "Dr. Brendan Saloner

9   reported that he has a nondisclosure agreement with Monument

10  Analytics, a litigation consulting research firm run by a

11  colleague (Caleb Alexander)."

12      Do you see that?

13  **A.**   Page 47?

14  **Q.**   Yes.

15  **A.**   Yes, I see that.

16  **Q.**   And do you see that description of Dr. Saloner?

17  **A.**   I see that description of Dr. Saloner.

18  **Q.**   And are you aware -- it reflects here that he's a

19  colleague of Caleb Alexander.  Do you see that?

20  **A.**   Yes.

21  **Q.**   And are you aware that Dr. Alexander is an expert

22  witness in this case?

23  **A.**   I am.

24  **Q.**   Let's turn back to the Muhuri study if we could.  And I

25  wanted to go back, wanted to go back to your statement about

```
 1    the 80 percent number, the 80 percent number being people

 2    engaged in non-medical use of prescription opioids prior to

 3    heroin transition.  Do you recall that?

 4    A.   I do.

 5    Q.   And Muhuri is one of the papers you cite for that

 6    proposition; right?

 7    A.   It is one, yes.

 8    Q.   So let's look, if you could, at Page 11 of this

 9    document, please.  And Table 3 here reports that percentage

10    of people who started using heroin based on different

11    factors that they present; correct?

12    A.   Yes.

13    Q.   And the last six rows on Page 11 give us data on the

14    percentage of heroin users with and without prior

15    non-medical pain reliever use; correct?

16    A.   That's right.

17    Q.   And, so, if we look over at the right-hand side we can

18    see this number of 79.5 percent; correct?

19    A.   Yes.

20    Q.   And that's the number that you cite prior --

21    non-medical prescription use prior to heroin initiation; is

22    that right?

23    A.   That's right.

24    Q.   And do you see also it states, if you look a little bit

25    further down, that it also indicates that -- how many of
```

1    these same individuals have prior illicit drug use before

2    their use of non-medical prescription opioids; correct?

3    **A.**    Yes.

4    **Q.**    And it reflects that 79.5 percent of persons engaged in

5    non-medical prescription use had prior use of illicit drugs;

6    correct?

7    **A.**    Yes.

8    **Q.**    So that's the same percentage as the percentage that

9    goes on to heroin; correct?

10   **A.**    That's right.

11   **Q.**    And if you look --

12   **A.**    Well, it's not the percentage that goes on to heroin.

13   It's the percentage of heroin users who use non-medically

14   first.

15   **Q.**    So the percentage -- 79.5 is the percentage of people

16   who engaged in non-medical use and then subsequently were

17   using heroin based on the Muhuri study; correct?

18   **A.**    It's the proportion of heroin users who started opioid

19   use with prescription opioids.

20   **Q.**    And, and this study also reflects that that same

21   proportion, that same 79.5 percent, had also used other

22   illegal substances before their use of non-medical

23   prescription opioids; right?

24   **A.**    That's right.

25   **Q.**    And if you look over on the next page, it defines the

```
 1    illicit drugs that are referred to there.  And it says, if

 2    you look at Footnote 2, illicit drugs include marijuana,

 3    hashish, cocaine, including crack, hallucinogens, and

 4    inhalants.  Do you see that?

 5    A.   I do.

 6    Q.   So according to this Table 3, every single heroin user

 7    that had prior non-medical pain relieving use also had prior

 8    illicit drug use; correct?

 9    A.   That's right.

10    Q.   So prescription opioids were not the only drug of abuse

11    for any of the individuals who used prescription opioids

12    non-medically and then subsequently used heroin; correct?

13    A.   Well, we only know from this not what their drugs of

14    abuse are, but that they had prior use of marijuana and

15    other drugs.

16    Q.   So they had other -- they had abused other drugs before

17    their non-medical use of prescription opioids; correct?

18    A.   I don't know that we know that they were before the

19    non-medical use of prescription opioids, but they did have

20    prior other illegal drug use like marijuana.

21    Q.   And according to Table 3, nearly all of the heroin

22    users who did not have prior non-medical pain reliever use

23    had prior illicit drug use; is that correct?

24    A.   Yes.  Among those who -- with no prior non-medical pain

25    reliever use, 19.4 percent of the 20.5 percent had also used
```

```
 1    another illegal drug.

 2    Q.   So if we add those two together, in this study

 3    98.9 percent of the heroin users previously used illegal

 4    drugs like marijuana, hashish, cocaine, crack,

 5    hallucinogens, and inhalants; is that right?

 6    A.   That's right.

 7    Q.   So I'm going to put another entry on the board here.

 8    What I've written there is "other substance abuse" to

 9    reflect this finding of Muhuri.

10    A.   Well, substance abuse is a DSM category.  What this

11    study reflects is that they had other substance use.

12    Q.   Other substance use of illegal drugs?

13    A.   Other substance use of an illegal drug.

14    Q.   So if I change that to "other substance use of illegal

15    drugs" is that more accurate?

16    A.   Yes.

17    Q.   And as a more general proposition, it's true, Dr.

18    Keyes, that a majority of heroin users started using

19    marijuana or cocaine or other illegal drugs before they

20    turned to heroin; correct?

21    A.   Among heroin users, the most common first substance use

22    is tobacco and alcohol.  And there is then a progression to

23    other drugs as well.  But the, the timing of those vis-à-vis

24    prescription opioid use is quite variable.

25    Q.   But --
```

1    **A.**    Most people who use heroin have used alcohol and

2    tobacco.  And then there are other drugs that are used as

3    well.  But the timing of those is, is variable across

4    studies.

5    **Q.**    But it's fair to say that a majority of heroin users

6    started using marijuana or cocaine or other illegal drugs

7    before turning to heroin; correct?

8    **A.**    Yes, that is correct.  It's the timing vis-à-vis

9    prescription opioids that is, I think, more relevant.

10   **Q.**    But you could have a circumstance where persons who

11   used heroin began by abusing another drug like cocaine or

12   marijuana and then used prescription opioids, then used --

13   **A.**    In this circumstance, because of the pharmacological

14   similarity between prescription opioid use and heroin use,

15   it's a much tighter connection in terms of that transition

16   because oftentimes people who don't have access to

17   prescription opioids, that becomes a catalyst for that

18   transition as drugs become less accessible and more

19   expensive.

20   **Q.**    I take it, though, that you could have -- and you have

21   observed this sequence of events where persons who use

22   heroin began their abuse of illegal drugs with something

23   like cocaine or marijuana or methamphetamine.  Then they may

24   have used prescription opioids, misused prescription

25   opioids, then later used heroin.  Correct?  That's a

1    sequence you've seen?

2    **A.**    I only reviewed the aggregate data.  And by far, the

3    biggest risk factor is prescription opioid use.  Certainly,

4    I'm sure there is a person in the world who used cocaine

5    before heroin.

6    **Q.**    Well, I was really asking another question which was

7    you're aware that many of the persons who used heroin after

8    misusing prescription opioids also had previously abused

9    other drugs?

10   **A.**    I think what these data show is that there's previous

11   use of other drugs.

12   **Q.**    And when you say other drugs, you're meaning marijuana,

13   cocaine, methamphetamine, et cetera; correct?

14   **A.**    There is co-occurring use of other drugs.  And alcohol

15   and tobacco, I think, would be appropriate to add to that

16   list as well.  But the closest connection in the transition

17   to heroin is the exposure to prescription opioids.

18   **Q.**    It's also true -- I think you said this before -- that

19   a majority of heroin users have used alcohol before they

20   started using heroin?

21   **A.**    Used alcohol.

22   **Q.**    How about abused?

23   **A.**    I haven't done a recent search of the literature for

24   that.  But certainly in terms of alcohol use, the vast

25   majority of people who have used heroin have used alcohol.

1          MR. HESTER:  Let me pull up the New York *Frye*

2    transcript, please, Page 188, lines 3 to 10.

3    BY MR. HESTER:

4    **Q.**   Dr. Keyes, I take it you recall testifying in this

5    *Frye* hearing in New York?

6    **A.**   Yes.

7    **Q.**   And the question was, "Do you know what percentage of

8    people who have used heroin abused alcohol before using

9    heroin?"

10        And you said, "Abused alcohol?  Do you mean have

11   alcohol use disorder?"

12        And the question was, "Or abused it in some way, used

13   it excessively in some way."

14        And your answer was, "It's a majority."

15        Do you see that?

16   **A.**   Yes.

17   **Q.**   And was your answer correct when you gave it?

18   **A.**   And that's what I just said.  They used alcohol, not

19   alcohol use disorder, which is the distinction I was trying

20   to make.  So that's consistent.

21   **Q.**   But the question was abused it in some way or used it

22   excessively.  And that's --

23   **A.**   Used excessively is very different than having an

24   alcohol use disorder.

25   **Q.**   Your own research has shown that past-year drug use,

1    other than non-medical use of prescription opioids and

2    alcohol use disorder, are the strongest factors associated

3    with non-medical use --

4    **A.**   I'm sorry.  Can you say the question again?

5    **Q.**   Yes, sorry.  Your own research has shown that past-year

6    drug use, other than non-medical use of prescription opioids

7    and alcohol use disorder, are the strongest factors

8    associated with non-medical use of prescription opioids.

9    Correct?

10   **A.**   You said past -- I'm sorry.  I don't think the question

11   quite -- unless I'm misunderstanding and it's the end of the

12   day, but I think you just said using drugs other than

13   prescription opioids is the strongest risk factor for using

14   prescription opioids other than -- it's a little bit

15   tautological the way that it's phrased.

16   **Q.**   Fair enough.  Let me see if I can ask it again.

17        Is it correct, Dr. Keyes, that past-year drug use is

18   the strongest factor associated with non-medical use of

19   prescription opioids?

20   **A.**   Strongest compared to what?

21   **Q.**   Strongest risk factor for incidence of non-medical use

22   of prescription opioids.

23   **A.**   Exposure to opioids is the strongest risk factor.

24   There's a study that is potentially being taken out of

25   context.  I'm sure we can look at it.

```
 1              MR. HESTER:  Let me pull up the New York Frye

 2    hearing, please, 188, lines 3 to 8.

 3    BY MR. HESTER:

 4    Q.   The question was asked, Dr. Keyes, "Am I right that

 5    your own research has shown that past-year drug use --"

 6    A.   That's not what's shown on here.

 7    Q.   Sorry.

 8              MR. HESTER:  188, lines 3 to 8, please.  No.

 9    Sorry.  Lines 13 to 18.  Apologies.

10    BY MR. HESTER:

11    Q.   Okay.  Am I right that -- the question was,

12    Dr. Keyes, "Am I right that your own research has shown

13    that past-year drug use, other than non-medical use of

14    prescription opioids and alcohol use disorder, are the

15    strongest factors associated with non-medical use of

16    prescription opioids?"

17         And your answer was, "Yes."

18         Correct?

19    A.   Yes.

20    Q.   And was that answer accurate when you gave it?

21    A.   Yes, in the context of the other questions that had

22    positioned what those other factors we were comparing that

23    to was.  We can't compare it to the universe of all risk

24    factors.

25    Q.   That's a generally accepted view in the epidemiological
```

1    community as you expressed here on the screen; correct?

2    **A.**    Again, you have to start with a list of the risk -- if

3    you're going to say this is the strongest risk factor, you

4    have to start with the list of risk factors you're

5    assessing.

6        The strongest risk factor for non-medical prescription

7    opioid use is exposure to opioids.  If you're talking about

8    a different list of risk factors, drug use is certainly

9    correlated with non-medical use of prescription opioids, of

10   course.  But you have -- to say what the strongest is, you

11   need some ranking.

12             MR. HESTER:  Your Honor, I'm ready to go to

13   another document but --

14             THE COURT:  Well, let's quit until in the morning,

15   Mr. Hester.  I hope you can wrap this up pretty soon.

16             MR. HESTER:  I will, Your Honor.

17             THE COURT:  I've given you the whole day today and

18   we need to get this case moving.

19             MR. HESTER:  Yes, Your Honor.  And maybe if I

20   can -- I understand, first of all, what the Court is saying.

21   I will undertake to do that.  If I can just give a bit of

22   perspective that we feel this is a very important piece

23   of --

24             THE COURT:  Well, I understand that.

25             MR. HESTER:  -- testimony and we felt we needed to

```
 1    explain some of the methodologies.  But I, I don't mean to

 2    burn the Court's time and I'm not trying to.  We'll be as

 3    efficient as we can be.

 4             THE COURT:  Okay.  Mr. Majestro has appeared in

 5    the courtroom and --

 6             MR. MAJESTRO:  Your Honor, I just wanted to

 7    inquire of the defendants.  I don't want to beat a dead

 8    horse, but we inquired Friday and we were told a little bit

 9    after lunch to finish this cross-examination, verified that

10    over the weekend.

11        We've got a witness in from California who we thought

12    we were going to put in tomorrow.  We've had a witness who

13    we were ready to put on this afternoon.  We're starting to

14    stack them up.

15        I mean, it basically -- we agree this is an important

16    witness, but basically three-to-one cross-examination and

17    direct appears to us to be a bit on the excessive side.

18             THE COURT:  Well, I'm getting very concerned about

19    us not getting things done here.  And I realize this is an

20    extremely important witness and these are important points,

21    but at some point we've got to get this story told.

22             MR. MAJESTRO:  Your Honor, may I inquire of

23    Mr. Hester how much time he has -- thinks he has left and

24    whether any of the other defendants are going to be

25    cross-examining so we can plan our witnesses?
```

1         MR. HESTER:  Well, Your Honor, first of all, I'm

2    not sure that there was a representation made on Friday that

3    we were going to finish in X amount of time.

4         THE COURT:  Well, are there -- will there be other

5    cross-examinations of this witness?

6         MS. MCCLURE:  I am not cross-examining this

7    witness, Your Honor.

8         THE COURT:  How about you, Ms. Hardin?

9         MS. HARDIN:  There is a possibility that I would

10   have about a handful of questions, but I would like to have

11   the opportunity to consult with Mr. Hester before making any

12   final determinations about that.

13        THE COURT:  Okay.  Well, let's -- I understand

14   everybody's concerns and I don't have a ready answer for any

15   of this at 5:00 on Monday afternoon.  So we'll reconvene at

16   9:00 in the morning and see where we are then.

17        MR. HESTER:  And, Your Honor, I will undertake

18   overnight to look hard and make sure I'm tight in the

19   morning.

20        THE COURT:  Thank you.

21        MR. MAJESTRO:  If you could get us some estimate

22   as soon as you feel you're in a position to do so, that

23   would be helpful for planning purposes.  We appreciate it.

24        THE COURT:  Okay.  We'll see everybody at 9:00.

25        (Trial recessed at 5:04 p.m.)



```
 1       CERTIFICATION:

 2              I, Ayme A. Cochran, Official Court

 3    Reporter, and I, Lisa A. Cook, Official Court Reporter,

 4    certify that the foregoing is a correct transcript from

 5    the record of proceedings in the matter of The City of

 6    Huntington, et al., Plaintiffs vs. AmerisourceBergen

 7    Drug Corporation, et al., Defendants, Civil Action No.

 8    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

 9    reported on June 14, 2021.

10

11            S\Ayme A. Cochran           s\Lisa A. Cook

12               Reporter                    Reporter

13         _

14

15         June 14, 2021

16            Date

17

18

19

20

21

22

23

24

25
```

## 0

**0.000832** [1] - 163:11
**0.0052** [4] - 159:19, 162:13, 169:14, 169:23
**0.013104** [1] - 159:22
**0.01428336** [1] - 163:3
**0.01511536** [1] - 163:14
**0.033072** [2] - 169:23, 169:25
**0.1** [1] - 107:13
**0.52** [1] - 140:10
**0.9** [1] - 179:17
**0.91** [1] - 183:20
**000832** [4] - 149:25, 150:8, 150:11, 150:12
**0052** [9] - 140:18, 141:1, 148:25, 149:5, 149:18, 150:11, 160:3, 162:18, 163:10
**00832** [1] - 150:4
**00907** [2] - 2:5, 2:14
**01428** [1] - 163:4
**01511** [1] - 163:8
**017004** [2] - 162:19, 162:22
**01864** [1] - 181:14
**0327** [2] - 162:14, 162:15
**091** [1] - 184:6

## 1

**1** [7] - 22:19, 100:1, 100:13, 100:18, 109:8, 149:20, 192:1
**1,143** [1] - 175:25
**1,309** [3] - 174:25, 175:6, 175:17
**1.2** [6] - 97:13, 99:8, 178:11, 179:2, 179:12, 180:18
**1.7** [5] - 106:21, 106:24, 107:4, 107:8, 107:11
**1/300** [1] - 42:6
**1/400** [1] - 42:6
**10** [5] - 17:16, 64:2, 67:25, 87:9, 239:2
**10-day** [1] - 70:18
**100** [5] - 140:10, 176:12, 176:15, 176:19, 176:22
**100,000** [6] - 153:19, 154:20, 155:13, 155:14, 156:10,

171:18
**1001** [2] - 4:6, 4:9
**1022** [1] - 3:5
**104** [6] - 123:6, 124:15, 125:6, 126:12, 127:1, 128:9
**105** [16] - 123:6, 124:15, 125:5, 129:5, 129:13, 129:17, 129:20, 130:8, 130:14, 135:17, 136:4, 136:23, 137:1, 137:23, 138:6, 138:9
**10:24** [1] - 68:2
**11** [2] - 233:8, 233:13
**113** [2] - 68:21
**115** [24] - 135:10, 135:14, 135:15, 135:21, 136:3, 136:6, 136:12, 137:12, 137:13, 137:17, 138:3, 138:7, 138:14, 138:20, 144:9, 145:25, 146:21, 147:24, 148:3, 148:10, 150:3, 163:9, 163:15, 169:14
**11:00** [1] - 8:8
**12** [11] - 30:20, 95:25, 96:17, 96:20, 96:22, 96:25, 98:8, 98:16, 99:4, 104:8, 198:7
**122** [2] - 98:3, 98:10
**126** [3] - 3:5, 17:15, 18:22
**13** [2] - 68:21, 241:9
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**14** [6] - 1:19, 7:4, 174:6, 176:4, 246:9, 246:15
**15** [4] - 122:17, 176:9, 176:14, 177:19
**15.1** [1] - 178:1
**153** [2] - 28:24, 29:6
**15910** [1] - 3:18
**16** [19] - 146:24, 148:25, 149:5, 149:9, 149:19, 163:10, 175:4, 189:17, 201:2, 201:17, 201:22, 202:4, 202:13, 202:15, 220:4, 220:7, 220:13, 220:22, 220:23
**160** [2] - 198:6, 198:20

**1600** [1] - 3:17
**166** [2] - 221:6, 221:13
**17** [1] - 29:7
**1717** [2] - 6:6, 6:13
**178** [1] - 186:23
**18** [6] - 94:6, 183:19, 183:25, 186:2, 186:10, 241:9
**186.6** [3] - 176:12, 176:15, 176:19
**1866** [2] - 184:22, 187:18
**188** [3] - 239:2, 241:2, 241:8
**19.4** [1] - 235:25
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1990s** [4] - 34:2, 40:21, 71:8, 108:4
**1996-2002** [1] - 35:3
**1999** [1] - 153:1
**1999-2018** [1] - 151:20

## 2

**2** [14] - 39:25, 43:13, 46:1, 60:16, 62:12, 141:20, 141:24, 153:23, 214:6, 224:22, 227:1, 227:6, 227:15, 235:2
**2.4** [3] - 177:18, 177:21, 177:22
**2.86** [1] - 180:1
**2.89** [1] - 180:1
**20** [10] - 126:18, 126:22, 127:3, 127:8, 128:13, 129:9, 129:12, 129:20, 130:1, 137:2
**20.5** [1] - 235:25
**200,000** [2] - 198:7, 198:19
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:17, 4:19, 5:5
**2000s** [2] - 40:3, 108:4
**2002** [1] - 46:13
**2005** [1] - 214:10
**2006** [1] - 176:15
**2007** [2] - 78:17, 79:7
**2008** [1] - 69:9
**2010** [3] - 71:8, 177:18, 177:23
**2011** [23] - 151:1, 153:17, 154:5, 154:13, 154:15, 156:24, 157:20, 161:6, 163:20,

164:14, 165:19, 166:6, 167:8, 167:16, 168:1, 168:5, 168:8, 171:1, 176:13, 176:15, 176:18, 177:4, 177:9
**2013** [5] - 14:5, 14:9, 15:23, 41:20, 83:18
**2014** [8] - 46:13, 54:15, 108:6, 108:8, 108:9, 109:10, 110:17, 196:16
**2015** [37] - 40:4, 44:8, 127:17, 151:1, 153:1, 153:18, 154:15, 157:16, 157:20, 157:23, 161:3, 161:6, 163:18, 163:20, 166:4, 166:6, 166:18, 167:17, 168:1, 168:5, 171:1, 177:18, 177:23, 178:10, 178:11, 179:14, 183:19, 183:25, 184:15, 187:8, 187:23, 214:11, 215:21, 215:23, 216:9, 217:16
**2015-16** [1] - 180:18
**2015-2016** [1] - 186:17
**2016** [11] - 108:23, 166:18, 177:25, 178:10, 178:11, 179:14, 183:19, 183:25, 184:15
**2016-2017** [2] - 180:2, 180:4
**2017** [6] - 46:19, 166:18, 177:25, 179:14, 179:16, 181:14
**2017-2018** [4] - 180:2, 180:4, 187:6, 187:21
**20170-2018** [1] - 180:19
**2018** [38] - 123:6, 125:6, 127:15, 127:24, 128:8, 128:9, 128:14, 128:23, 129:6, 129:10, 129:17, 130:9, 132:8, 145:6, 145:11, 145:23, 163:22, 163:24, 164:8, 164:11, 164:14, 165:19, 166:13, 166:17, 167:8, 167:20,

168:8, 168:13, 168:14, 169:18, 170:7, 176:23, 177:4, 177:9, 179:14, 179:16, 187:24
**2018-2019** [4] - 186:10, 186:18, 187:6, 187:21
**2019** [5] - 138:24, 176:25, 184:13, 184:23, 187:8
**202** [2] - 2:4, 2:13
**2020** [4] - 31:9, 122:12, 203:25, 221:10
**2021** [5] - 1:19, 7:4, 31:12, 246:9, 246:15
**21** [1] - 183:15
**21st** [1] - 129:14
**2216** [1] - 3:7
**23** [7] - 71:11, 71:18, 71:19, 71:22, 77:3, 122:20, 124:21
**2344** [1] - 65:6
**24** [3] - 122:15, 124:20, 174:5
**2436** [1] - 222:21
**245** [4] - 109:11, 196:18, 198:1, 198:10
**2495** [1] - 139:15
**2497** [2] - 153:4, 167:25
**25** [2] - 5:5, 179:17
**2516** [2] - 14:21, 52:6
**2518** [1] - 46:10
**2524** [1] - 108:19
**25301** [3] - 2:8, 3:13, 4:22
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**2579** [1] - 213:13
**2586** [1] - 151:19
**2587** [6] - 151:22, 154:17, 154:24, 154:25, 170:14, 171:11
**26** [1] - 1:16
**2647** [2] - 189:1, 203:14
**28** [3] - 3:15, 4:3, 4:12
**29464** [3] - 3:15, 4:4, 4:12
**2:00** [1] - 130:25

## 3

**3** [42] - 8:3, 15:6,

33:14, 52:20, 53:6,
86:9, 95:21, 96:4,
106:15, 107:12,
112:17, 122:12,
148:4, 148:11,
155:7, 158:18,
158:21, 158:25,
159:1, 159:9,
159:13, 159:14,
159:19, 160:3,
160:23, 160:24,
167:9, 170:15,
171:11, 171:15,
171:17, 221:13,
224:1, 229:11,
230:6, 233:9, 235:6,
235:21, 239:2,
241:2, 241:8
**3,391** [1] - 170:10
**3,391.9** [1] - 170:9
**3.27** [4] - 162:5,
162:13, 162:18,
165:11
**3.6** [4] - 193:8, 193:14,
193:16, 193:20
**3.875** [1] - 161:21
**30** [4] - 31:9, 42:5,
214:16, 215:21
**30-day** [1] - 70:18
**301** [2] - 22:14, 22:19
**306** [2] - 27:8, 217:18
**31.6** [2] - 214:11,
215:23
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**32** [3] - 126:16, 127:2,
128:11
**324** [1] - 86:7
**32502** [1] - 2:11
**35** [15] - 27:11, 104:21,
104:22, 105:8,
105:9, 105:10,
105:11, 105:19,
106:3, 106:11,
106:20, 114:21,
115:1, 217:21,
218:22
**37** [1] - 200:11
**3843** [1] - 5:14
**39** [2] - 230:1, 230:14
**3:17-cv-01362** [2] -
1:5, 246:8
**3:17-cv-01665** [2] -
1:11, 246:8
**3:42** [1] - 188:19

**4**

**4** [13] - 35:13, 40:9,
94:18, 96:5, 112:14,

112:23, 113:21,
140:8, 153:10,
153:15, 155:2,
155:6, 225:23
**40** [11] - 27:11, 42:5,
114:22, 115:1,
130:9, 130:13,
178:11, 179:20,
180:10, 217:21,
218:23
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**42** [2] - 135:13, 183:14
**43** [4] - 183:21, 186:8,
186:9, 187:19
**43124** [1] - 228:20
**44** [2] - 185:25, 186:4
**45** [6] - 128:16,
128:25, 129:12,
130:2, 137:6, 224:25
**46** [1] - 201:15
**47** [4] - 194:19,
194:24, 232:7,
232:13
**48** [3] - 194:19,
194:24, 195:3

**5**

**5** [4] - 106:11, 106:20,
107:5, 114:17
**5,800** [3] - 174:11,
174:22, 175:17
**5,885** [1] - 214:22
**50** [4] - 137:13,
137:22, 177:2, 177:9
**50.5** [3] - 77:6, 77:11,
77:22
**53.4** [4] - 212:8,
212:15, 212:21,
212:25
**54-page** [1] - 21:13
**553** [1] - 6:3
**56** [2] - 3:4, 141:9
**568,640** [1] - 94:10
**56th** [1] - 3:5
**57** [1] - 78:16
**589** [1] - 182:15
**5:00** [1] - 244:15
**5:04** [1] - 244:25

**6**

**6** [5] - 17:15, 18:22,
99:23, 104:14,
153:24
**6.08** [2] - 97:18, 98:4
**6.1** [3] - 97:19, 97:23,
98:1
**6.36** [6] - 165:22,

167:9, 169:9,
169:14, 169:21,
169:23
**60** [4] - 196:20, 216:7,
216:10, 217:13
**600** [1] - 2:10
**63** [3] - 186:2, 186:11,
186:17
**65** [5] - 106:6, 109:18,
110:12, 110:17,
198:2
**66** [1] - 79:5
**6th** [1] - 3:5

**7**

**7** [6] - 47:6, 65:16,
97:10, 99:8, 180:4,
221:13
**7,109** [2] - 175:14,
175:22
**7-20** [3] - 139:6, 141:7,
142:18
**70** [2] - 174:18, 196:20
**70.82** [1] - 174:23
**70130** [1] - 3:8
**707** [1] - 4:21
**716** [1] - 3:12
**725** [2] - 4:16, 4:18
**7608** [1] - 163:16
**79.5** [4] - 233:18,
234:4, 234:15,
234:21

**8**

**8** [4] - 8:4, 225:3,
241:2, 241:8
**8,051** [1] - 162:8
**8,252** [6] - 174:2,
174:8, 174:22,
175:6, 175:19,
175:21
**8.7** [1] - 214:10
**80** [3] - 216:11,
216:24, 217:9, 233:1
**80-something** [1] -
145:12
**801** [1] - 3:10
**803(8** [2] - 182:23,
183:9
**807** [1] - 93:18
**8252** [1] - 160:17
**84** [15] - 145:13,
145:20, 145:23,
146:1, 146:6,
146:21, 147:21,
148:3, 148:10,
149:8, 159:14,
159:20, 160:3,

162:25, 169:17
**85** [1] - 198:21
**850** [1] - 5:12

**9**

**9** [4] - 78:18, 180:4,
180:18, 225:12
**90** [39] - 72:23, 73:20,
75:1, 95:8, 95:10,
95:12, 95:15, 95:17,
95:24, 96:18, 96:21,
96:24, 97:5, 97:9,
97:11, 97:14, 97:18,
97:25, 98:8, 98:17,
99:4, 99:7, 99:12,
100:23, 100:24,
101:2, 101:15,
101:24, 103:8,
103:13, 103:25,
104:2, 104:6,
106:25, 107:9,
107:12, 179:14
**901** [1] - 4:21
**91** [4] - 95:19, 101:3,
184:2, 186:17
**91436** [1] - 3:18
**92.1** [1] - 176:22
**96.4** [3] - 194:2,
194:11, 194:15
**98** [1] - 98:19
**98.8** [1] - 99:12
**98.9** [1] - 236:3
**99.8** [1] - 97:3
**9:00** [3] - 7:4, 244:16,
244:24
**9th** [1] - 4:6

**A**

**a.m** [2] - 7:5, 68:2
**abatement** [1] - 128:1
**abbreviate** [1] -
144:20
**ABDC** [10] - 21:25,
24:2, 24:7, 24:11,
24:24, 25:3, 25:18,
26:8, 26:19, 26:24
**ability** [1] - 93:2
**able** [8] - 92:19,
102:24, 120:18,
152:18, 159:23,
160:10, 165:14,
169:21
**absolute** [7] - 194:20,
195:4, 195:10,
195:20, 196:3,
196:10, 197:20
**absolutely** [2] - 71:24,
117:10

**abstract** [4] - 46:25,
192:2, 192:17,
211:21
**Abundant** [1] - 41:13
**Abuse** [8] - 14:23,
52:8, 91:3, 108:19,
109:6, 189:11,
189:23, 213:15
**abuse** [7] - 64:6,
214:23, 235:10,
235:14, 236:8,
236:10, 237:22
**abused** [6] - 10:18,
10:22, 235:16,
238:8, 238:22,
239:8, 239:12,
239:21
**Abused** [1] - 239:10
**abusing** [1] - 237:11
**accept** [1] - 33:12
**accepted** [1] - 241:25
**access** [2] - 60:20,
237:16
**accessible** [2] - 224:9,
237:18
**accord** [11] - 109:15,
110:16, 114:25,
193:4, 193:13,
193:19, 214:14,
216:2, 224:11,
225:9, 225:18
**according** [2] - 235:6,
235:21
**accords** [2] - 113:4,
113:18
**account** [4] - 66:15,
154:7, 186:14,
209:20
**accounted** [1] - 67:18
**accounts** [2] - 114:21,
115:1
**accrediting** [1] - 34:12
**accuracy** [6] - 32:17,
32:19, 92:9, 134:6,
134:7, 135:1
**accurate** [19] - 16:14,
20:3, 30:1, 30:4,
34:7, 57:7, 63:22,
73:8, 91:10, 100:17,
125:24, 134:8,
134:25, 144:13,
184:17, 200:20,
221:16, 236:15,
241:20
**accurately** [4] - 34:19,
57:7, 73:16, 79:2
**accustomed** [1] - 93:5
**achieving** [1] - 107:18
**ACKERMAN** [14] - 4:5,
8:11, 18:7, 19:4,

25:5, 28:17, 29:13, 124:25, 173:15, 173:18, 173:21, 218:19, 221:2, 229:18
**Ackerman** [2] - 8:10, 18:6
**acquire** [1] - 12:17
**acquired** [1] - 60:22
**acting** [3] - 76:3, 76:16, 199:15
**Action** [4] - 1:4, 1:10, 246:7, 246:8
**activities** [5] - 22:3, 22:10, 22:22, 23:9, 25:8
**activity** [2] - 70:7, 102:21
**actors** [1] - 11:19
**acts** [3] - 84:15, 84:19, 206:12
**Actual** [1] - 99:25
**actual** [3] - 16:10, 100:6, 100:12
**acute** [21] - 13:22, 15:13, 34:3, 74:9, 74:17, 82:21, 89:2, 89:6, 94:24, 95:1, 95:4, 95:8, 95:12, 95:24, 98:7, 98:13, 101:11, 101:14, 101:21, 101:24
**adaptations** [1] - 113:15
**add** [13] - 21:17, 79:5, 79:13, 100:8, 136:3, 160:7, 171:23, 171:25, 172:5, 175:12, 194:14, 236:2, 238:15
**added** [3] - 135:23, 137:19, 175:17
**addiction** [9] - 107:24, 108:4, 108:9, 108:13, 113:23, 114:7, 114:20, 114:22, 115:2
**Addiction** [1] - 114:2
**addictive** [1] - 34:23
**adding** [1] - 163:13
**addition** [2] - 66:9, 130:1
**additional** [2] - 137:19, 137:20
**address** [2] - 8:17, 27:14
**adds** [1] - 163:8
**adjudicate** [1] - 215:17
**adjust** [1] - 150:22

**adjusted** [3] - 155:4, 155:7, 155:16
**adjustment** [15] - 144:3, 150:21, 152:20, 154:4, 158:3, 159:10, 163:2, 163:19, 165:20, 168:6, 172:14, 172:20, 172:24, 173:6, 173:25
**adjustments** [2] - 133:9, 133:13
**administration** [3] - 112:19, 112:24, 113:8
**Administration** [3] - 189:11, 189:24, 222:9
**admission** [1] - 183:6
**admit** [2] - 91:25, 93:22
**adolescents** [2] - 180:3, 180:6
**adopted** [1] - 164:24
**adult** [1] - 180:10
**adulterated** [4] - 45:1, 45:7, 45:21, 85:17
**adulterating** [1] - 44:21
**adulteration** [2] - 44:9, 44:15
**adults** [12] - 46:23, 47:11, 48:18, 48:19, 48:20, 48:21, 62:5, 94:6, 180:8, 183:18, 196:16, 214:23
**advance** [1] - 31:9
**advertising** [1] - 15:25
**advice** [2] - 9:5, 9:9
**advocate** [2] - 34:22, 35:7
**advocates** [2] - 49:17, 49:24
**affected** [1] - 15:23
**affecting** [1] - 35:19
**Affiliation** [1] - 189:9
**affiliations** [2] - 189:15, 189:16
**afternoon** [4] - 131:9, 131:10, 243:13, 244:15
**age** [10] - 66:12, 66:15, 66:16, 67:12, 155:4, 155:7, 155:16, 183:16, 183:19, 186:2
**age-adjusted** [3] - 155:4, 155:7, 155:16
**aged** [1] - 225:20

**aggregate** [2] - 22:7, 238:2
**aggregated** [2] - 21:22, 144:18
**ago** [8] - 9:6, 76:9, 88:11, 127:12, 129:2, 129:24, 130:6, 153:6
**agree** [14] - 56:16, 82:11, 84:1, 84:4, 99:19, 111:13, 111:15, 111:17, 111:19, 114:9, 114:13, 135:7, 172:8, 243:15
**agreeing** [1] - 108:8
**agreement** [2] - 7:12, 232:9
**ahead** [10] - 18:14, 19:11, 20:21, 23:5, 29:23, 98:24, 143:10, 165:9, 165:17, 183:10
**al** [4] - 1:7, 1:13, 246:6, 246:7
**Alcohol** [1] - 186:6
**alcohol** [16] - 236:22, 237:1, 238:14, 238:19, 238:21, 238:24, 238:25, 239:8, 239:10, 239:11, 239:18, 239:19, 239:24, 240:2, 240:7, 241:14
**Alexander** [3] - 127:25, 232:19, 232:21
**Alexander)** [1] - 232:11
**Algebra** [1] - 150:3
**All-Cause** [1] - 139:15
**allocate** [1] - 174:11
**allocating** [1] - 213:5
**allocation** [1] - 212:4
**allocations** [1] - 212:5
**allow** [1] - 165:9
**allowed** [2] - 8:9, 8:25
**almost** [7] - 12:18, 43:10, 77:8, 102:3, 112:19, 196:16, 214:11
**alone** [4] - 92:3, 109:10, 183:6, 221:19
**alongside** [1] - 118:9
**alternative** [2] - 34:24, 209:22
**American** [2] - 14:4, 40:21
**AmerisourceBergen**

[2] - 6:2, 246:6
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**amount** [5] - 43:11, 74:11, 114:12, 227:11, 244:3
**analgesics** [5] - 14:2, 15:12, 53:1, 53:24, 58:20
**analyses** [3] - 8:6, 84:23, 172:17
**analysis** [26] - 7:15, 8:2, 20:8, 21:2, 21:10, 47:5, 48:8, 66:7, 67:18, 78:1, 78:4, 118:19, 138:17, 138:24, 146:14, 168:4, 174:19, 202:5, 213:6, 216:5, 216:6, 220:13, 224:18, 226:25, 227:1
**Analytics** [1] - 232:10
**analyze** [1] - 118:21
**analyzed** [2] - 129:4, 129:18
**analyzes** [1] - 140:3
**anchor** [1] - 139:22
**anchored** [1] - 139:23
**ANDREW** [1] - 5:10
**Andrew** [1] - 230:25
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**Annual** [2] - 31:12, 218:7
**annually** [2] - 77:21, 185:2
**answer** [47] - 16:13, 16:17, 16:23, 18:11, 18:13, 19:1, 19:13, 19:22, 21:8, 23:12, 23:13, 23:17, 25:22, 27:22, 29:11, 29:16, 29:25, 30:3, 38:21, 39:8, 69:3, 69:4, 69:11, 69:12, 69:15, 69:18, 69:21, 69:23, 70:4, 82:17, 83:16, 86:16, 86:20, 110:1, 110:8, 138:17, 147:4, 172:19, 211:21, 221:12, 221:19, 221:20, 239:14, 239:17, 241:17, 241:20, 244:14
**answered** [11] - 16:15, 18:4, 23:15, 23:16, 28:17, 110:4, 193:18, 203:7,

218:19, 221:2, 229:18
**answering** [4] - 69:7, 69:16, 69:17, 167:1
**ANTHONY** [1] - 2:6
**anticipated** [1] - 59:5
**anytime** [1] - 173:13
**anyway** [1] - 168:17
**apologies** [1] - 223:24
**Apologies** [1] - 241:9
**apologize** [1] - 118:17
**Appalachia** [1] - 56:17
**Appalachian** [9] - 54:25, 55:4, 55:7, 55:9, 55:11, 55:12, 55:15, 55:16, 56:12
**apparent** [1] - 127:16
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appeared** [3] - 218:12, 218:22, 243:4
**appendix** [2] - 151:23, 155:1
**apples** [1] - 88:2
**applications** [1] - 13:15
**applied** [7] - 51:19, 51:24, 52:2, 136:20, 147:8, 147:9, 154:9
**applies** [2] - 164:11, 174:15
**apply** [4] - 55:4, 93:2, 99:15, 99:20
**applying** [3] - 129:8, 148:24, 207:8
**appreciate** [1] - 244:23
**approach** [21] - 14:16, 30:9, 46:6, 64:23, 90:24, 108:15, 123:24, 124:24, 139:3, 148:21, 151:13, 152:14, 158:17, 159:9, 181:10, 184:20, 188:22, 213:9, 222:18, 228:16
**approaches** [1] - 34:10
**appropriate** [12] - 13:20, 58:7, 58:11, 93:2, 156:20, 167:19, 167:21, 167:22, 168:16, 169:15, 188:5, 238:15
**appropriately** [1] - 142:15
**appropriateness** [3] -

199:4, 199:6, 199:17
**approval** [4] - 51:11, 51:14, 51:19, 51:24
**approved** [1] - 51:17
**approximate** [1] - 161:20
**approximately"** [2] - 158:24, 160:22
**approximation** [3] - 156:8, 160:22, 171:2
**April** [1] - 31:12
**Arch** [2] - 6:6, 6:13
**ARCOS** [1] - 22:5
**area** [5] - 10:6, 12:4, 24:14, 32:13, 55:6
**areas** [6] - 54:6, 54:7, 54:9, 54:25, 55:4, 57:13
**argued** [3] - 13:15, 100:5, 100:12
**arguing** [1] - 76:2
**arise** [1] - 28:22
**arises** [1] - 90:20
**arrived** [4] - 11:6, 39:2, 63:13, 124:16
**article** [96] - 14:5, 15:1, 30:14, 30:16, 31:6, 31:8, 32:9, 32:16, 32:17, 32:25, 33:1, 33:3, 33:7, 33:11, 33:14, 46:16, 46:21, 46:25, 47:2, 47:6, 51:5, 52:3, 52:10, 52:12, 52:15, 52:17, 52:18, 52:21, 53:9, 54:4, 54:14, 54:15, 55:6, 56:20, 57:2, 57:7, 57:9, 59:20, 60:16, 61:7, 61:19, 63:1, 63:6, 64:12, 64:21, 66:2, 66:3, 66:5, 66:11, 67:3, 69:6, 70:1, 83:18, 83:21, 83:22, 83:23, 84:2, 90:8, 90:17, 91:7, 91:10, 91:17, 92:8, 92:10, 95:1, 101:16, 101:20, 108:5, 108:7, 108:14, 109:2, 109:21, 111:2, 111:5, 151:6, 151:8, 151:23, 152:2, 152:8, 152:9, 152:11, 153:7, 190:7, 194:16, 213:13, 217:24, 218:9, 219:1, 219:2, 219:23, 223:1, 223:15, 223:19,

224:2, 225:13
**articles** [15] - 27:9, 27:17, 27:23, 27:24, 28:9, 28:15, 30:8, 151:24, 217:18, 217:21, 218:4, 218:14, 218:23, 219:12, 219:15
**ascertain** [1] - 74:4
**ASHLEY** [1] - 5:3
**Asian** [1] - 40:23
**aside** [4] - 46:4, 56:12, 173:11, 173:24
**aspect** [1] - 93:3
**ASPPH** [1] - 229:14
**assert** [1] - 220:7
**asserting** [1] - 220:3
**assess** [4] - 23:22, 47:9, 47:24, 102:24
**assessed** [3] - 47:4, 102:14, 191:2
**assessing** [2] - 209:19, 242:5
**assessment** [1] - 32:21
**assigned** [1] - 211:11
**assist** [1] - 93:7
**associated** [12] - 102:9, 102:25, 114:22, 115:2, 132:21, 133:23, 145:2, 240:2, 240:8, 240:18, 241:15
**Associated** [1] - 222:22
**association** [17] - 190:13, 191:23, 200:1, 200:8, 208:25, 209:2, 209:5, 209:12, 209:17, 209:19, 211:3, 219:18, 220:17, 220:24, 221:15, 221:17, 229:10
**Association** [4] - 219:23, 228:8, 229:5, 229:13
**Associations** [1] - 189:2
**assume** [17] - 161:18, 161:19, 161:20, 161:22, 162:5, 162:6, 164:17, 165:21, 166:2, 167:7, 167:11, 169:9, 169:20, 185:22, 190:5, 222:15
**assumed** [2] - 8:13,

161:22
**assumption** [6] - 120:1, 162:4, 163:17, 165:3, 167:24, 230:17
**assumptions** [1] - 167:12
**AT** [1] - 1:2
**attempted** [1] - 165:6
**attention** [1] - 52:20
**attributable** [32] - 115:11, 117:12, 119:9, 120:9, 122:6, 123:1, 123:7, 125:7, 126:23, 127:1, 127:3, 128:10, 128:11, 128:13, 128:19, 128:20, 128:21, 137:18, 137:21, 137:25, 138:2, 138:3, 138:5, 138:9, 138:12, 138:14, 145:21, 174:19, 175:1, 175:5, 175:25, 212:18
**attribute** [18] - 116:23, 117:8, 118:7, 119:18, 119:23, 121:11, 127:8, 128:16, 129:9, 129:21, 130:2, 130:10, 130:15, 137:6, 174:13, 175:13, 175:14, 175:22
**attributed** [12] - 116:16, 118:22, 126:12, 126:16, 128:25, 137:2, 137:14, 147:24, 212:8, 212:14, 212:16, 212:20
**attributes** [2] - 58:2, 59:21
**attributing** [4] - 118:20, 121:3, 121:6, 146:12
**attribution** [14] - 120:6, 120:25, 121:20, 123:3, 126:9, 127:21, 129:1, 129:23, 137:11, 174:15, 175:8, 212:22, 212:24
**August** [4] - 122:12, 122:15, 124:20, 174:5
**author** [5] - 15:2,

52:11, 55:6, 102:16, 189:14
**Author** [2] - 30:22, 189:9
**author's** [1] - 108:8
**authorities** [1] - 115:16
**authors** [10] - 15:3, 15:4, 30:18, 46:17, 98:18, 99:25, 223:21, 225:3, 225:4, 229:22
**authors'** [1] - 226:20
**availability** [2] - 78:8, 82:6
**available** [7] - 50:23, 73:20, 89:14, 92:20, 176:24, 178:23, 199:14
**Available** [1] - 72:22
**average** [5] - 53:22, 58:18, 58:24, 103:21, 177:20
**Avin** [1] - 3:7
**aware** [38] - 13:17, 26:18, 26:23, 27:4, 44:3, 45:6, 45:13, 45:18, 45:22, 64:8, 64:14, 68:14, 74:8, 74:16, 74:20, 74:21, 83:3, 86:1, 86:10, 86:16, 88:11, 89:15, 89:18, 89:20, 91:20, 103:6, 103:11, 104:4, 115:22, 177:13, 203:19, 203:22, 215:8, 215:13, 232:2, 232:18, 232:21, 238:7
**Ayme** [2] - 6:17, 246:2

## B

**ball** [1] - 143:18
**Banerjee** [5] - 222:8, 222:11, 222:12, 223:1, 223:19
**Banta** [1] - 231:15
**Banta-Green** [1] - 231:15
**bar** [1] - 227:7
**Baron** [1] - 3:17
**barter** [2] - 72:8, 72:18
**bartered** [2] - 71:15, 72:3
**base** [2] - 71:6, 76:7
**Based** [2] - 41:19, 42:11
**based** [62] - 17:7,

40:8, 40:19, 51:15, 51:24, 54:15, 57:15, 57:17, 59:15, 59:21, 61:2, 62:22, 66:4, 66:7, 67:11, 71:1, 73:4, 75:23, 78:24, 87:7, 88:22, 89:13, 90:10, 91:11, 94:15, 115:15, 120:1, 122:8, 123:8, 127:11, 129:1, 129:23, 130:5, 132:24, 133:10, 134:20, 138:3, 138:4, 138:6, 144:11, 157:10, 157:14, 158:20, 158:22, 167:12, 168:18, 169:17, 170:6, 175:9, 178:14, 188:5, 191:2, 198:21, 199:7, 199:13, 202:5, 202:21, 211:3, 212:15, 233:10, 234:17
**baseline** [1] - 154:13
**basic** [2] - 132:19, 132:23
**basing** [1] - 73:13
**basis** [10] - 37:17, 120:5, 120:8, 182:22, 182:24, 183:6, 195:19, 195:22, 195:24, 211:14
**Baylen** [1] - 2:11
**Bear** [1] - 228:21
**beat** [1] - 243:7
**became** [5] - 43:16, 80:24, 81:4, 81:15, 82:12
**become** [3] - 82:20, 224:9, 237:18
**becomes** [3] - 127:16, 160:3, 237:17
**BEFORE** [1] - 1:17
**befuddled** [1] - 92:4
**began** [4] - 44:8, 217:3, 237:11, 237:22
**begin** [2] - 12:13, 112:16
**beginning** [1] - 53:6
**begins** [8] - 34:21, 47:8, 53:13, 77:9, 102:6, 104:14, 111:5, 114:19
**behavior** [2] - 72:13, 199:18

**Behavioral** [1] - 30:14
**behavioral** [1] - 34:1
**BENCH** [1] - 1:16
**bench** [1] - 93:5
**benefits** [4] - 51:16, 51:25, 58:5, 75:24
**benzodiazepines** [1] - 41:23
**best** [8] - 73:10, 76:11, 125:17, 126:7, 126:9, 139:12, 160:13, 171:2
**better** [1] - 160:14
**between** [51] - 9:24, 68:8, 68:11, 69:1, 69:20, 80:6, 80:9, 99:8, 113:11, 122:22, 128:22, 151:1, 154:11, 154:15, 161:6, 163:20, 168:1, 168:5, 168:8, 171:1, 177:9, 184:15, 185:6, 185:13, 186:13, 186:24, 187:5, 187:20, 187:21, 187:23, 188:8, 190:8, 190:13, 190:17, 191:23, 199:25, 200:1, 200:7, 200:8, 208:25, 209:13, 215:18, 217:11, 217:21, 219:9, 219:18, 220:25, 221:15, 223:9, 237:14
**beyond** [7] - 16:24, 89:16, 89:19, 89:21, 99:18, 220:24, 221:17
**biased** [1] - 135:9
**big** [1] - 198:15
**bigger** [1] - 168:19
**biggest** [1] - 238:3
**bioses** [1] - 134:13
**bit** [21] - 38:21, 78:2, 93:12, 121:24, 127:14, 131:25, 135:16, 143:18, 147:2, 151:17, 152:19, 176:8, 188:12, 199:21, 206:18, 223:8, 233:24, 240:14, 242:21, 243:8, 243:17
**black** [2] - 41:3, 211:7
**blanket** [3] - 15:22, 89:5, 135:7

**blue** [1] - 227:9
**Blvd** [3] - 3:15, 4:3, 4:12
**board** [10] - 131:25, 140:17, 144:5, 145:19, 194:6, 194:8, 196:3, 206:16, 211:5, 236:7
**Board** [1] - 229:14
**Boards** [1] - 35:7
**body** [7] - 12:9, 12:14, 34:12, 47:21, 48:4, 116:3, 220:18
**bolded** [2] - 71:21, 71:25
**Bonasso** [1] - 5:14
**bottle** [2] - 37:14, 39:14
**bottom** [7] - 30:21, 33:16, 52:24, 60:18, 111:22, 225:4, 230:1
**bought** [1] - 79:15
**Boulevard** [1] - 3:18
**box** [1] - 211:7
**Box** [2] - 5:14, 6:8
**break** [2] - 67:19, 188:13
**breakdown** [2] - 145:6, 169:18
**Brendan** [2] - 232:3, 232:8
**Bridgeside** [3] - 3:15, 4:3, 4:12
**brief** [1] - 7:8
**briefly** [2] - 7:23, 32:8
**briefs** [1] - 152:4
**bring** [4] - 18:1, 19:8, 22:13, 173:13
**Bringing** [1] - 228:20
**broad** [3] - 74:19, 198:11, 225:10
**broader** [3] - 14:9, 14:13, 172:9
**broke** [3] - 144:6, 144:7, 145:1
**bucket** [1] - 101:1
**Budd** [1] - 3:17
**builds** [1] - 88:10
**bullet** [1] - 232:8
**burden** [1] - 195:17
**Burling** [1] - 5:11
**burn** [1] - 243:2
**buttons** [1] - 173:20
**buy** [2] - 80:3, 80:16
**buying** [1] - 44:25
**Buying** [1] - 36:14
**BY** [58] - 9:20, 14:18, 17:2, 17:17, 18:15, 19:12, 20:22, 22:15, 23:6, 25:12, 28:8,

28:25, 29:24, 30:11, 46:3, 46:8, 64:24, 86:8, 90:25, 94:2, 98:25, 108:17, 110:10, 124:7, 124:18, 125:3, 131:8, 143:24, 147:6, 148:23, 151:14, 152:17, 158:14, 162:3, 163:1, 165:18, 167:6, 173:23, 179:8, 181:12, 182:8, 183:13, 188:24, 200:17, 203:12, 206:10, 213:11, 218:25, 221:7, 222:6, 222:19, 223:17, 223:25, 228:18, 229:21, 239:3, 241:3, 241:10

**C**

**CA** [1] - 3:18
**CABELL** [1] - 1:10
**Cabell** [44] - 3:2, 7:23, 19:22, 24:3, 24:8, 24:12, 24:17, 24:20, 24:24, 25:3, 25:9, 25:18, 26:4, 26:9, 26:12, 26:24, 27:5, 84:11, 84:16, 84:20, 84:25, 86:24, 87:3, 115:8, 116:1, 117:17, 117:18, 118:13, 118:19, 123:6, 125:6, 129:18, 131:24, 132:8, 160:19, 174:3, 174:9, 176:5, 176:11, 176:12, 176:18, 177:3, 177:4, 177:11
**cabell** [1] - 2:2
**Cabell-Huntington** [9] - 84:25, 118:13, 118:19, 123:6, 125:6, 132:8, 174:9, 176:5, 176:11
**Cabell/Huntington** [7] - 13:3, 18:25, 20:9, 20:12, 20:25, 21:3, 21:11
**cabinet** [1] - 36:11
**calculate** [2] - 138:1, 140:15
**calculated** [3] - 137:24, 160:18,

170:10
**calculation** [10] - 135:20, 137:13, 137:16, 137:21, 138:15, 141:1, 141:10, 142:13, 170:11, 214:18
**calculations** [2] - 116:5, 122:23
**calculator** [4] - 148:19, 150:9, 160:12, 173:13
**Caleb** [3] - 231:15, 232:11, 232:19
**California** [1] - 243:11
**CALLAS** [1] - 6:7
**campaign** [1] - 34:11
**campaigns** [1] - 35:4
**CAMPBELL** [1] - 6:14
**Cancer** [1] - 91:4
**cancer** [22] - 34:3, 34:10, 34:24, 35:5, 48:17, 94:6, 104:10, 105:2, 105:6, 105:12, 105:18, 106:3, 106:7, 110:22, 111:14, 111:17, 111:19, 197:13, 197:15, 197:17, 197:19
**cannot** [2] - 26:11, 185:11
**Capitol** [1] - 2:7
**capture** [1] - 154:5
**capturing** [1] - 142:15
**Cardinal** [12] - 4:14, 5:2, 21:24, 24:2, 24:7, 24:11, 24:24, 25:3, 25:18, 26:8, 26:19, 26:24
**care** [1] - 34:14
**careful** [1] - 185:17
**Carey** [1] - 4:20
**carfentanil** [2] - 44:1, 44:4
**cascades** [4] - 113:3, 113:6, 113:16, 113:20
**case** [29] - 17:15, 21:14, 22:14, 22:17, 26:1, 31:16, 31:24, 76:21, 86:7, 93:4, 109:3, 133:4, 134:18, 135:10, 181:21, 185:7, 190:6, 197:2, 201:14, 202:10, 204:20, 210:6, 230:19, 230:21, 230:22, 231:1,

231:4, 232:22, 242:18
**cases** [16] - 10:15, 11:15, 11:16, 11:22, 75:1, 102:18, 168:18, 174:12, 174:19, 174:25, 175:4, 175:12, 175:14, 175:19, 175:25, 176:5
**catalyst** [2] - 78:7, 237:17
**catch** [1] - 65:3
**categories** [7] - 67:14, 100:2, 100:13, 100:18, 100:21, 100:22, 101:6
**categorize** [1] - 117:12
**categorized** [1] - 119:8
**categorizing** [2] - 125:16, 125:23
**category** [4] - 66:14, 79:9, 136:21, 236:10
**causal** [8] - 9:24, 47:4, 48:7, 209:19, 211:3, 211:18, 220:1, 220:12
**causation** [11] - 206:19, 208:22, 208:25, 209:6, 211:15, 220:8, 220:15, 220:18, 220:25, 221:15, 221:17
**Causation** [1] - 209:2
**Cause-Specific** [1] - 139:16
**caused** [8] - 29:10, 110:22, 111:13, 111:17, 111:19, 115:7, 121:22, 136:16
**causes** [26] - 12:8, 27:14, 46:21, 47:9, 172:4, 207:13, 207:15, 207:23, 207:24, 208:10, 208:12, 208:18, 209:17, 209:20, 210:4, 210:12, 210:15, 210:17, 210:22, 211:2, 211:18, 217:25, 218:10, 218:18, 219:3, 220:9
**Causes** [1] - 207:18
**causing** [1] - 43:23
**CDC** [30] - 40:8, 85:21,

115:12, 115:15, 116:6, 116:15, 116:22, 118:1, 121:5, 121:9, 125:23, 126:6, 134:21, 150:25, 151:3, 152:5, 152:19, 152:24, 153:9, 153:13, 157:8, 157:9, 157:11, 157:14, 158:4, 158:23, 165:22, 170:19

**CDC's** [2] - 125:15

**Center** [2] - 3:12, 5:11

**centrally** [2] - 230:12, 230:16

**certain** [3] - 7:17, 7:18, 119:18

**certainly** [37] - 9:1, 13:19, 14:9, 15:21, 15:23, 16:9, 33:2, 59:7, 73:18, 75:25, 76:13, 81:25, 82:5, 83:15, 84:1, 84:23, 85:1, 85:6, 85:23, 90:4, 102:13, 102:19, 103:14, 105:21, 111:13, 112:12, 120:18, 137:19, 197:1, 202:25, 218:7, 218:13, 230:13, 238:24, 242:8

**Certainly** [4] - 13:19, 33:9, 37:12, 238:3

**certificate** [11] - 115:23, 116:20, 116:21, 117:6, 117:22, 119:22, 121:9, 121:14, 146:8, 146:11, 172:2

**certificates** [5] - 115:13, 115:15, 115:20, 121:21, 172:5

**CERTIFICATION** [1] - 246:1

**certify** [1] - 246:4

**cetera** [2] - 202:21, 238:13

**challenge** [1] - 111:14

**change** [38] - 8:25, 87:23, 123:18, 127:18, 142:16, 154:15, 158:25, 159:1, 161:4, 161:5, 161:14, 162:4, 163:23, 163:25, 164:13, 165:21,

167:8, 167:9, 167:16, 168:1, 168:5, 168:8, 168:9, 168:11, 168:12, 169:9, 173:2, 185:8, 185:17, 185:20, 186:25, 187:3, 187:14, 188:1, 188:6, 188:7, 199:8, 236:14

**changed** [4] - 33:7, 75:25, 76:1, 122:23

**changes** [9] - 47:2, 65:19, 65:25, 127:17, 127:22, 173:1, 187:15, 188:11, 198:15

**channels** [1] - 39:20

**characterize** [1] - 144:17

**characterized** [2] - 101:16, 114:7

**CHARLES** [1] - 3:11

**Charleston** [6] - 2:8, 3:13, 4:22, 5:15, 6:9, 7:4

**CHARLESTON** [1] - 1:2, 1:18

**chart** [3] - 157:23, 157:25, 167:15

**charts** [1] - 153:12

**Chase** [1] - 4:21

**cheaper** [1] - 42:3

**cheating** [2] - 44:21, 44:23

**Cheating** [1] - 44:24

**check** [2] - 149:24

**Chesterbrook** [1] - 6:15

**children** [1] - 12:12

**Christopher** [3] - 64:1, 64:4, 65:7

**Chronic** [5] - 33:20, 54:8, 91:4, 108:19, 110:21

**chronic** [36] - 15:14, 34:3, 34:10, 34:14, 35:4, 48:17, 53:23, 57:12, 58:19, 82:21, 89:16, 89:19, 89:21, 94:6, 94:24, 95:15, 95:16, 97:8, 98:10, 104:10, 104:17, 105:2, 105:6, 105:12, 105:18, 106:2, 106:7, 106:12, 106:16, 106:21, 107:14, 107:19, 111:13, 111:17, 111:19,

198:22

**chronically** [1] - 89:24

**Cicero** [10] - 213:14, 214:1, 214:6, 215:1, 216:6, 216:7, 216:9, 216:16, 216:23, 217:12

**circulated** [1] - 229:13

**circumstance** [10] - 75:10, 75:18, 77:1, 80:10, 80:15, 83:9, 118:5, 134:23, 237:10, 237:13

**circumstances** [7] - 13:20, 37:22, 75:19, 115:22, 117:5, 172:3, 211:17

**citations** [3] - 14:11, 14:12, 16:11

**cite** [6] - 20:14, 195:23, 197:13, 200:3, 233:5, 233:20

**cited** [12] - 16:3, 16:10, 57:3, 158:2, 158:4, 192:21, 198:21, 199:23, 200:6, 216:24, 219:6, 220:20

**citing** [1] - 78:5

**City** [3] - 4:1, 5:11, 246:5

**CITY** [1] - 1:4

**Civil** [3] - 1:4, 246:7, 246:8

**civil** [1] - 1:10

**clarify** [5] - 17:3, 20:7, 25:1, 94:5, 107:7

**class** [1] - 29:10

**classes** [1] - 207:6

**classification** [2] - 135:3, 135:4

**clause** [3] - 102:7, 195:9, 195:17

**clean** [1] - 141:15

**clear** [32] - 10:16, 15:9, 68:6, 68:23, 68:25, 71:3, 73:13, 77:13, 82:10, 83:10, 86:1, 99:1, 117:11, 118:4, 121:3, 128:8, 128:24, 129:15, 134:5, 136:22, 139:25, 147:13, 160:2, 161:13, 164:22, 187:16, 191:4, 192:6, 214:4, 215:1, 217:5, 219:16

**cleared** [1] - 150:9

**clearly** [1] - 153:23

**clever** [1] - 144:20

**clinical** [2] - 67:14, 101:9

**clinically** [1] - 111:14

**clinics** [1] - 61:21

**close** [1] - 19:9

**closed** [2] - 38:18, 39:3

**closer** [2] - 156:7, 217:12

**closest** [2] - 208:1, 238:16

**CMR** [1] - 140:10

**CNCP** [2] - 104:24, 105:2

**co** [4] - 46:17, 52:11, 55:6, 238:14

**co-author** [2] - 52:11, 55:6

**co-authors** [1] - 46:17

**co-occurring** [1] - 238:14

**Coast** [2] - 41:4, 41:5

**cocaine** [11] - 44:7, 119:10, 136:14, 235:3, 236:4, 236:19, 237:6, 237:11, 237:23, 238:4, 238:13

**Cochran** [3] - 6:17, 246:2, 246:11

**code** [3] - 145:24, 171:13

**coded** [8] - 116:22, 117:13, 119:10, 119:13, 121:5, 121:9, 121:21, 145:23

**codes** [5] - 67:1, 67:17, 117:20, 171:14, 172:2

**cohort** [1] - 142:19

**cohorts** [1] - 141:9

**Cohorts** [1] - 142:2

**coin** [1] - 97:8

**colleague** [4] - 161:24, 200:15, 232:11, 232:19

**colleagues** [3] - 90:9, 103:4, 222:8

**collectively** [3] - 28:10, 28:13, 28:15

**college** [3] - 66:13, 225:15, 225:19

**Colombian** [3] - 41:4, 41:10, 41:14

**column** [21] - 52:24, 53:13, 61:16, 61:17, 61:23, 62:5, 62:10, 95:23, 96:6, 104:14, 114:18, 141:22,

154:19, 155:14, 171:18, 171:20, 183:23, 183:24, 186:9, 192:2, 214:7

**combination** [2] - 210:4, 218:23

**combines** [1] - 171:14

**coming** [2] - 8:24, 134:8

**comma** [1] - 104:22

**comment** [1] - 83:1

**COMMISSION** [1] - 1:10

**Commission** [5] - 2:2, 3:2, 34:12, 35:6, 49:10

**committed** [2] - 205:22, 205:25

**common** [9] - 39:17, 39:21, 39:22, 39:24, 54:9, 57:13, 79:25, 207:5, 236:21

**communicating** [2] - 8:20, 118:18

**communities** [2] - 11:6, 12:11

**community** [17] - 10:17, 10:21, 11:9, 11:19, 11:25, 20:15, 20:17, 21:7, 63:13, 72:10, 82:6, 83:6, 84:21, 84:25, 108:11, 199:3, 242:1

**company** [3] - 21:23, 25:21, 43:1

**comparable** [2] - 42:6, 55:11

**compare** [10] - 88:7, 123:13, 153:17, 171:14, 185:11, 185:12, 185:16, 185:19, 186:24, 241:23

**compared** [5] - 88:4, 103:18, 166:18, 220:14, 240:20

**compares** [1] - 7:25

**comparing** [6] - 88:2, 88:3, 88:8, 89:9, 98:10, 241:22

**comparison** [2] - 187:20, 211:16

**comparisons** [2] - 185:5, 185:18

**compiled** [1] - 115:12

**complaints** [1] - 8:24

**complex** [1] - 110:24

**complicated** [2] - 143:13, 148:18

**component** [2] - 59:9,

60:8
**comprehensive** [1] - 185:5
**comprised** [2] - 153:22, 202:18
**computed** [1] - 188:2
**computer** [2] - 6:19, 157:6
**concept** [2] - 32:18, 209:24
**concern** [2] - 108:9, 108:10
**concerned** [4] - 108:3, 108:13, 154:8, 243:18
**concerning** [2] - 104:1, 109:22
**concerns** [2] - 107:24, 244:14
**concerted** [1] - 34:22
**conclude** [1] - 187:25
**concluded** [3] - 121:16, 126:4, 145:25
**conclusion** [6] - 186:19, 187:2, 187:12, 206:5, 218:17, 219:2
**conclusions** [2] - 47:18, 225:11
**concrete** [1] - 66:23
**concretely** [1] - 134:18
**concurrent** [3] - 226:1, 226:18, 227:10
**concurrently** [3] - 226:7, 226:12, 226:14
**condition** [5] - 13:8, 89:8, 89:9, 111:18, 111:20
**conditions** [13] - 13:10, 13:22, 34:3, 64:1, 64:9, 65:20, 65:25, 66:8, 67:13, 89:6, 110:23, 111:11, 198:22
**conduct** [4] - 51:4, 205:12, 206:2, 206:17
**conducted** [1] - 107:23
**confident** [1] - 93:1
**confirm** [6] - 95:23, 151:17, 159:8, 159:13, 173:22, 199:1
**conflate** [1] - 199:19
**conflict** [1] - 232:7

**confused** [2] - 147:3, 161:3
**Connecticut** [1] - 8:1
**connection** [5] - 9:24, 199:25, 200:7, 237:15, 238:16
**Connolly** [2] - 4:16, 5:4
**CONROY** [1] - 3:3
**consensus** [7] - 20:13, 43:25, 218:14, 220:1, 220:11, 228:11, 229:9
**consequence** [2] - 78:8, 197:25
**conservative** [1] - 154:9
**consider** [7] - 34:13, 91:10, 108:2, 181:22, 182:18, 228:2, 229:3
**consideration** [2] - 32:11, 209:22
**Considerations** [1] - 213:16
**considerations** [1] - 57:17
**considered** [11] - 20:16, 64:8, 95:16, 181:20, 182:14, 182:17, 208:2, 208:6, 208:15, 214:3, 226:6
**considers** [1] - 206:25
**consistent** [11] - 8:16, 16:10, 86:21, 135:4, 190:2, 216:9, 216:15, 218:1, 219:11, 219:24, 239:20
**consistently** [1] - 219:6
**construed** [1] - 145:21
**consult** [4] - 158:10, 161:24, 200:14, 244:11
**consultation** [1] - 230:8
**consulting** [1] - 232:10
**contacted** [1] - 52:17
**contain** [2] - 7:15, 7:20
**contained** [1] - 229:7
**contains** [3] - 156:1, 156:5, 181:17
**content** [1] - 25:24
**context** [18] - 10:13, 14:13, 15:20, 16:9,

38:21, 54:3, 57:3, 82:16, 86:12, 121:24, 126:3, 126:11, 195:8, 195:14, 195:17, 201:8, 240:25, 241:21
**contextualize** [2] - 114:11, 143:20
**contextualized** [1] - 101:19
**contextualizing** [1] - 113:12
**continue** [3] - 131:6, 166:12, 167:3
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continued** [1] - 166:3
**contra** [1] - 113:15
**contra-adaptations** [1] - 113:15
**contrary** [1] - 215:13
**contribute** [6] - 85:2, 85:7, 85:8, 116:7, 121:18, 210:23
**contributed** [9] - 48:24, 49:6, 49:13, 50:2, 50:13, 50:19, 51:1, 82:6, 85:10
**contributes** [3] - 67:7, 85:9, 207:1
**contributing** [19] - 48:13, 116:9, 116:15, 116:18, 117:7, 117:23, 118:23, 121:7, 121:10, 121:15, 145:10, 146:3, 146:5, 146:7, 210:17, 211:10, 211:14, 227:14, 228:4
**contribution** [2] - 23:23, 86:25
**Contributions** [2] - 30:15, 30:22
**contributors** [1] - 28:21
**control** [3] - 35:21, 67:15, 211:11
**controlled** [4] - 38:18, 40:22, 66:9, 66:12
**controlling** [2] - 66:13, 201:5
**controls** [1] - 211:12
**controversial** [2] - 13:9, 110:24
**controverted** [1] - 49:11
**convenient** [1] -

130:22
**conventional** [4] - 87:16, 87:21, 88:1, 88:3
**Cook** [3] - 6:18, 246:3, 246:11
**copies** [1] - 124:25
**copy** [1] - 222:15
**corner** [2] - 15:7, 149:6
**Corporation** [2] - 6:2, 246:7
**cORPORATION** [2] - 1:7, 1:13
**Correct** [9] - 11:5, 21:4, 25:23, 39:20, 59:12, 199:12, 237:25, 240:9, 241:18
**correct** [537] - 9:25, 10:18, 10:22, 10:24, 11:14, 11:20, 12:14, 12:20, 12:24, 13:3, 13:6, 13:13, 15:1, 15:18, 17:5, 18:17, 18:20, 19:16, 19:24, 20:12, 20:25, 21:3, 21:7, 21:11, 21:15, 21:17, 21:20, 22:17, 23:17, 23:24, 24:4, 24:5, 24:8, 24:12, 24:18, 24:25, 25:14, 25:22, 26:1, 26:2, 26:5, 26:9, 26:15, 26:20, 27:1, 27:6, 27:9, 27:12, 27:19, 27:25, 28:10, 28:16, 29:4, 30:18, 31:9, 31:13, 31:16, 31:19, 31:24, 32:5, 34:18, 36:1, 36:5, 36:6, 36:9, 36:12, 36:15, 36:19, 37:1, 37:24, 38:3, 38:19, 39:7, 40:7, 40:18, 41:1, 41:8, 41:11, 41:18, 42:1, 42:10, 42:17, 42:21, 42:24, 43:3, 43:10, 43:19, 43:22, 44:1, 44:4, 44:13, 44:17, 44:22, 45:8, 45:14, 45:21, 46:17, 46:24, 47:18, 47:21, 48:2, 48:13, 49:7, 49:14, 50:3, 50:11, 50:14, 51:2, 51:5, 51:12, 51:16, 51:20, 52:1, 52:10, 52:13, 52:18, 53:4, 53:8, 53:19, 54:2, 54:12,

54:16, 55:4, 55:18, 55:22, 56:1, 56:17, 57:9, 57:13, 57:20, 57:24, 58:3, 58:16, 58:25, 59:6, 59:22, 60:2, 60:5, 60:9, 60:14, 60:15, 61:1, 61:5, 62:15, 62:20, 63:4, 63:20, 64:2, 64:6, 64:16, 64:20, 65:14, 66:1, 66:5, 66:8, 67:8, 67:10, 68:9, 68:13, 68:17, 69:3, 69:4, 69:22, 69:25, 70:9, 70:12, 70:15, 70:19, 70:23, 71:5, 71:9, 72:6, 72:11, 72:19, 73:2, 73:25, 74:10, 74:18, 75:7, 75:9, 75:12, 75:16, 75:21, 76:10, 76:12, 76:14, 76:19, 76:24, 77:16, 77:24, 78:3, 78:11, 78:23, 79:3, 79:7, 79:22, 80:3, 80:13, 80:17, 80:21, 81:1, 81:6, 81:10, 81:16, 81:21, 82:4, 82:14, 82:21, 82:24, 83:6, 83:14, 83:20, 84:11, 84:17, 84:21, 85:4, 85:8, 85:11, 85:14, 85:17, 85:20, 86:3, 86:20, 86:24, 87:17, 88:12, 88:16, 88:21, 88:25, 89:4, 89:12, 89:16, 89:24, 90:3, 91:8, 91:9, 91:10, 91:15, 91:19, 94:8, 94:11, 94:14, 94:21, 94:24, 95:2, 95:6, 95:9, 95:13, 95:16, 96:1, 96:14, 96:18, 96:21, 97:6, 97:11, 97:15, 97:18, 98:1, 98:4, 98:9, 99:4, 99:9, 99:13, 99:16, 99:21, 100:19, 100:24, 101:3, 101:6, 101:17, 102:11, 103:8, 104:6, 104:11, 105:3, 105:6, 105:10, 105:20, 106:4, 106:22, 107:1, 107:9, 107:15, 108:25, 109:3, 109:6, 111:8, 112:9, 113:4, 113:10, 115:9, 115:10,

115:13, 115:17, 115:24, 116:9, 116:18, 117:16, 119:19, 120:2, 120:6, 120:10, 120:13, 120:24, 121:5, 121:17, 121:23, 122:3, 122:7, 122:12, 122:15, 122:17, 122:20, 122:23, 123:3, 126:5, 126:13, 126:16, 126:24, 127:4, 127:12, 128:1, 128:14, 128:17, 129:2, 129:5, 129:6, 129:11, 129:21, 129:22, 129:24, 130:11, 130:15, 130:17, 131:21, 132:2, 132:5, 133:7, 133:17, 133:20, 133:24, 134:12, 135:18, 135:21, 135:22, 135:24, 136:7, 136:14, 136:24, 137:4, 137:8, 137:15, 138:22, 140:16, 140:18, 141:17, 141:18, 142:11, 142:17, 144:2, 144:3, 145:6, 145:22, 146:6, 146:9, 147:8, 147:15, 147:22, 147:25, 148:6, 148:12, 148:16, 149:1, 149:14, 149:20, 150:14, 150:17, 157:17, 157:20, 157:23, 158:16, 158:18, 159:24, 160:4, 160:6, 161:6, 162:25, 163:14, 163:15, 164:1, 164:8, 166:13, 166:19, 168:10, 168:12, 169:18, 170:10, 170:22, 171:4, 171:7, 171:8, 171:21, 172:12, 172:21, 174:3, 174:6, 174:9, 174:13, 175:2, 175:10, 175:11, 175:15, 175:17, 175:23, 176:2, 176:3, 176:6,

176:23, 177:4, 177:11, 177:15, 177:19, 178:1, 178:5, 178:8, 179:14, 179:18, 180:11, 180:22, 181:7, 181:18, 182:10, 182:12, 183:16, 183:20, 184:2, 185:6, 188:2, 188:9, 189:7, 190:15, 190:25, 191:8, 191:15, 191:19, 191:24, 192:12, 194:7, 194:16, 196:13, 196:17, 196:25, 197:4, 197:5, 197:7, 197:25, 198:13, 199:18, 200:2, 200:9, 201:1, 201:7, 201:13, 201:21, 202:17, 203:15, 203:21, 204:10, 204:23, 205:3, 205:4, 205:12, 205:15, 205:18, 206:3, 206:14, 206:23, 207:3, 207:9, 207:13, 207:16, 207:19, 207:24, 208:3, 208:7, 208:12, 209:1, 209:6, 209:10, 209:13, 209:21, 209:25, 210:10, 211:19, 211:24, 212:10, 213:2, 214:1, 215:21, 215:25, 216:6, 216:18, 217:1, 217:7, 217:22, 217:25, 218:18, 219:4, 219:19, 223:5, 224:18, 226:22, 227:23, 228:9, 229:2, 229:6, 229:10, 229:17, 233:11, 233:15, 233:18, 234:2, 234:6, 234:9, 234:17, 235:8, 235:12, 235:17, 235:23, 236:20, 237:7, 237:8, 238:13, 239:17, 240:17, 242:1, 246:4
**corrected** [1] - 123:22
**correction** [2] - 36:5, 141:4

**correctly** [5] - 69:16, 69:17, 122:2, 180:25, 181:2
**correlated** [1] - 242:9
**correspondence** [1] - 128:22
**corroborate** [2] - 172:18, 216:21
**corroboration** [1] - 172:17
**cost** [3] - 71:15, 72:3, 72:9
**counsel** [2] - 18:8, 124:1
**count** [6] - 21:16, 122:5, 132:2, 132:4, 136:23, 138:8
**counted** [1] - 125:13
**counterfeit** [20] - 41:22, 42:12, 42:16, 42:20, 42:21, 43:2, 43:7, 44:17, 85:14, 85:16, 85:20, 86:2, 86:5, 86:13, 86:23, 87:4, 87:11, 87:14, 87:24, 88:4
**counterfeited** [1] - 44:20
**counterfeiting** [1] - 42:23
**counterfeits** [2] - 87:13, 87:15
**counties** [1] - 67:6
**country** [9] - 64:16, 64:19, 66:25, 67:10, 110:18, 196:13, 196:21, 197:10, 197:23
**COUNTY** [1] - 1:10
**county** [4] - 66:17, 66:18, 118:2, 172:18
**County** [30] - 2:2, 3:2, 7:24, 19:22, 24:3, 24:8, 24:18, 24:20, 24:24, 25:3, 25:18, 26:4, 26:9, 26:12, 26:25, 27:5, 84:11, 84:16, 84:20, 86:24, 87:3, 115:8, 117:17, 117:18, 131:24, 176:12, 176:18, 177:3, 177:4, 177:11
**couple** [3] - 8:11, 69:9, 70:6
**course** [7] - 9:16, 57:10, 93:5, 116:19, 133:4, 145:17, 242:10
**court** [4] - 8:18, 8:21, 9:2

**Court** [9] - 6:17, 6:18, 7:3, 92:12, 92:17, 92:19, 242:20, 246:2, 246:3
**COURT** [93] - 1:1, 1:17, 7:6, 8:10, 9:4, 9:10, 9:13, 9:15, 14:17, 16:16, 16:19, 16:23, 17:23, 18:6, 18:11, 18:14, 19:9, 20:20, 23:4, 25:6, 28:6, 28:18, 29:21, 30:10, 46:7, 67:19, 67:23, 67:25, 68:3, 91:23, 92:22, 93:17, 93:22, 94:1, 98:22, 98:24, 108:16, 110:1, 110:8, 123:25, 124:4, 124:12, 130:21, 130:25, 131:5, 139:4, 143:2, 143:5, 143:9, 143:14, 147:1, 148:22, 158:12, 162:1, 162:20, 162:23, 164:25, 165:4, 165:8, 165:17, 167:3, 179:5, 179:22, 181:11, 181:25, 182:6, 182:22, 183:4, 183:7, 184:21, 188:13, 188:17, 188:20, 188:23, 203:10, 206:7, 213:10, 218:20, 221:4, 221:23, 222:1, 228:17, 229:20, 242:14, 242:17, 242:24, 243:4, 243:18, 244:4, 244:8, 244:13, 244:20, 244:24
**Court's** [1] - 243:2
**courtroom** [2] - 131:5, 243:5
**covered** [3] - 63:1, 63:6, 68:10
**Covington** [1] - 5:11
**crack** [2] - 235:3, 236:4
**create** [2] - 44:17, 163:2
**creation** [1] - 51:10
**crimes** [2] - 205:22, 205:25
**criminal** [5] - 11:18, 11:19, 205:12,

206:2, 206:17
**criminals** [3] - 11:4, 205:2, 205:14
**crisis** [11] - 27:15, 27:18, 27:19, 27:25, 28:10, 28:16, 28:20, 29:10, 64:2, 82:19, 211:23
**Criteria** [1] - 141:21
**criteria** [1] - 209:23
**Critical** [1] - 30:14
**critically** [1] - 30:24
**cross** [8] - 9:11, 165:8, 206:8, 243:9, 243:16, 243:25, 244:5, 244:6
**CROSS** [1] - 9:19
**cross-examination** [2] - 243:9, 243:16
**cross-examinations** [1] - 244:5
**cross-examining** [2] - 243:25, 244:6
**CRR** [2] - 6:17, 6:18
**cull** [1] - 86:6
**culture** [2] - 57:5
**current** [2] - 81:18, 133:10
**curve** [1] - 143:18
**cut** [4] - 44:16, 44:20, 45:12, 45:14

## D

**daily** [1] - 106:16
**data** [94] - 21:22, 22:5, 40:8, 43:20, 56:3, 62:21, 77:9, 78:14, 83:18, 83:24, 85:24, 86:4, 87:5, 102:3, 103:15, 104:17, 108:11, 115:12, 115:15, 116:7, 116:15, 116:22, 118:1, 120:8, 120:12, 120:15, 121:5, 134:21, 140:10, 150:25, 151:4, 152:4, 152:20, 152:24, 153:10, 153:13, 153:21, 153:22, 155:11, 155:16, 157:8, 157:9, 157:10, 157:11, 157:13, 157:14, 157:15, 158:3, 158:4, 158:21, 158:22, 158:23, 165:22, 170:15,

170:19, 171:9,
171:12, 171:17,
173:1, 174:1,
176:24, 176:25,
178:20, 180:22,
180:25, 181:17,
182:12, 183:1,
183:15, 184:23,
185:13, 185:17,
185:20, 186:16,
187:20, 187:23,
188:5, 190:10,
190:12, 196:15,
205:5, 212:25,
215:13, 215:16,
216:9, 216:16,
217:5, 219:14,
222:9, 233:13,
238:2, 238:10
**Data** [2] - 78:16,
178:15
**Date** [1] - 246:16
**date** [1] - 204:3
**David** [1] - 7:1
**DAVID** [2] - 1:17, 4:5
**days** [36] - 90:2, 95:8,
95:10, 95:12, 95:15,
95:24, 96:18, 96:21,
96:24, 97:5, 97:9,
97:11, 97:14, 97:18,
97:25, 98:8, 98:17,
99:4, 99:7, 99:12,
100:23, 100:24,
101:2, 101:3,
101:15, 101:24,
103:8, 103:13,
103:25, 104:2,
104:6, 106:25,
107:9, 107:12
**DC** [6] - 4:7, 4:10,
4:17, 4:19, 5:5, 5:12
**De** [2] - 2:4, 2:14
**DEA** [1] - 26:20
**dead** [1] - 243:7
**deal** [5] - 9:7, 74:9,
74:24, 75:20, 93:11
**dealer** [4] - 42:23,
44:16, 62:1, 79:11
**dealers** [10] - 44:20,
61:5, 61:14, 61:15,
62:7, 62:17, 62:19,
84:10, 85:13, 205:12
**dealing** [1] - 180:5
**death** [82] - 43:16,
85:21, 115:12,
115:15, 115:19,
115:23, 116:3,
116:7, 116:9,
116:16, 116:18,
116:20, 116:21,

116:23, 117:6,
117:7, 117:8,
117:22, 117:24,
118:7, 118:12,
118:23, 119:8,
119:21, 119:22,
121:8, 121:9,
121:11, 121:14,
121:15, 121:17,
121:18, 121:19,
121:21, 121:22,
122:9, 122:23,
125:13, 125:14,
126:1, 126:2,
133:20, 134:6,
135:3, 136:2, 138:8,
139:7, 141:10,
144:10, 145:8,
146:8, 146:11,
146:15, 151:9,
153:14, 153:17,
153:18, 154:12,
155:4, 155:7,
155:16, 156:3,
156:4, 156:7,
156:11, 156:15,
156:16, 156:18,
156:21, 156:22,
166:12, 166:14,
166:19, 170:24,
172:2, 172:4
**Deaths** [3] - 65:7,
151:19, 153:5
**deaths** [125] - 44:7,
63:15, 65:13, 65:21,
66:1, 115:7, 115:11,
115:17, 117:11,
117:19, 118:8,
118:20, 118:21,
119:19, 119:23,
120:9, 121:3, 122:5,
123:1, 123:6, 125:6,
125:18, 125:19,
126:8, 126:12,
126:23, 127:1,
127:3, 127:8,
127:15, 128:9,
128:11, 128:13,
128:16, 128:25,
129:4, 129:5,
129:10, 129:17,
130:2, 130:8, 130:9,
130:10, 130:14,
132:8, 132:20,
133:2, 133:5,
133:16, 133:21,
134:10, 134:19,
134:24, 135:11,
135:23, 136:4,
136:13, 136:16,
136:23, 137:13,

137:20, 137:25,
138:2, 138:9,
138:11, 138:19,
138:20, 140:8,
141:3, 145:6, 145:9,
145:21, 145:23,
146:1, 146:6,
146:16, 146:21,
147:15, 147:21,
147:24, 148:4,
148:11, 151:1,
152:10, 152:11,
153:1, 154:1, 154:2,
154:6, 154:14,
154:20, 155:13,
155:14, 155:21,
156:9, 156:25,
157:20, 163:24,
164:14, 165:25,
166:3, 166:7,
167:16, 168:2,
168:9, 168:20,
168:24, 169:18,
170:7, 170:19,
171:1, 171:7,
171:18, 171:20,
171:24, 212:4,
212:9, 212:11,
212:12, 212:14,
212:16, 212:17,
212:19, 213:5
**debate** [1] - 218:2
**debilitating** [4] -
110:23, 111:10,
111:18, 111:20
**decide** [4] - 32:10,
70:7, 70:11, 70:14
**decided** [4] - 76:21,
125:17, 126:7,
150:24
**decides** [1] - 75:15
**decision** [7] - 33:8,
70:20, 71:7, 75:20,
88:18, 89:13, 199:6
**decisions** [3] - 199:9,
199:11, 220:15
**decline** [4] - 177:13,
179:10, 186:16
**declined** [2] - 176:22,
179:17
**declines** [1] - 178:20
**declining** [4] - 178:8,
178:21, 178:25,
180:16
**decrease** [7] - 177:2,
177:10, 177:20,
177:22, 184:15,
186:21, 186:22
**decreased** [5] - 40:23,
127:20, 177:18,

178:1, 184:17
**DEF** [8] - 108:18,
139:15, 151:19,
151:22, 153:4,
154:17, 170:14,
171:11
**DEF-WV** [6] - 108:18,
139:15, 151:19,
151:22, 153:4,
154:17
**DEF-WV-2307** [1] -
91:2
**Defendant** [4] - 4:13,
5:2, 5:7, 6:2
**defendant's** [1] -
154:24
**Defendant's** [2] - 52:6,
213:13
**Defendants** [3] - 1:8,
1:14, 246:7
**defendants** [6] -
26:12, 51:5, 92:2,
231:24, 243:7,
243:24
**Defendants'** [5] -
14:21, 46:10, 65:6,
189:1, 222:21
**defined** [2] - 95:8,
95:12, 226:18
**defines** [1] - 234:25
**definition** [12] - 38:20,
38:23, 39:9, 45:17,
68:19, 80:20,
165:23, 206:19,
207:5, 207:7,
208:20, 208:21
**definitions** [1] - 140:9
**deliberation** [1] -
230:7
**delivers** [1] - 68:13
**demographic** [2] -
67:14, 225:19
**demographics** [2] -
201:6, 225:14
**demonstrate** [1] -
114:16
**demonstrates** [1] -
92:15
**demonstrating** [2] -
83:19, 83:24
**demonstratives** [4] -
7:13, 7:15, 7:20,
7:24
**denominator** [4] -
149:3, 163:14, 173:1
**density** [1] - 66:13
**Department** [2] -
189:12, 189:24
**department** [1] - 63:15
**dependence** [4] -

40:14, 112:20,
113:23, 142:20
**Dependence** [1] - 91:3
**dependent** [2] - 87:20,
142:3
**deposed** [4] - 17:19,
18:16, 22:16, 122:17
**deposition** [18] -
17:15, 18:3, 18:5,
18:9, 18:20, 19:5,
19:20, 19:25, 20:4,
22:14, 23:16, 31:23,
68:20, 86:6, 122:20,
204:1, 204:3, 204:6
**derive** [1] - 165:20
**derived** [1] - 119:4
**describe** [1] - 145:7
**described** [4] - 47:12,
48:10, 132:14,
228:11
**describing** [1] - 181:5
**description** [3] - 31:5,
232:16, 232:17
**descriptive** [1] -
104:17
**design** [1] - 142:9
**designed** [2] - 94:19,
104:16
**Despair** [1] - 65:7
**detail** [5] - 30:8, 57:2,
67:3, 145:8, 217:10
**determination** [3] -
75:23, 76:25, 145:5
**determinations** [1] -
244:12
**determine** [4] - 17:9,
75:1, 122:6, 222:14
**determined** [2] - 57:8,
87:18
**determining** [1] -
103:5
**develop** [9] - 12:19,
90:13, 97:5, 98:14,
99:13, 114:10,
197:17, 197:25,
210:20
**developed** [7] - 13:25,
35:20, 51:18, 96:14,
120:23, 122:11,
132:5
**developing** [2] -
119:2, 198:7
**development** [5] -
112:20, 207:2,
210:23, 212:13,
230:12
**diagnosis** [3] - 96:7,
96:10, 214:24
**die** [2] - 155:25, 156:8
**died** [3] - 85:19, 86:2,

86:10
**difference** [2] - 147:2, 208:25
**differences** [6] - 53:10, 60:12, 61:8, 66:16, 66:24, 217:11
**Differences** [2] - 14:22, 52:7
**different** [59] - 13:9, 16:15, 19:6, 22:25, 30:2, 39:13, 56:7, 57:23, 58:1, 58:15, 60:12, 60:13, 60:14, 64:16, 64:19, 66:24, 67:9, 67:14, 71:23, 74:13, 81:24, 87:22, 88:10, 88:12, 88:14, 88:18, 88:25, 89:3, 89:16, 89:18, 89:21, 90:10, 93:14, 94:21, 112:1, 134:14, 137:9, 137:10, 137:20, 137:24, 138:4, 138:17, 141:8, 141:9, 146:14, 150:16, 156:5, 173:3, 208:11, 208:13, 209:3, 214:17, 215:17, 225:15, 225:19, 233:10, 239:23, 242:8
**differentiate** [1] - 85:22
**difficult** [1] - 12:16
**digit** [1] - 150:8
**direct** [12] - 52:20, 93:9, 123:3, 126:9, 127:21, 129:23, 208:14, 208:17, 208:18, 208:21, 212:5, 243:17
**directed** [1] - 167:5
**direction** [2] - 36:6, 134:16
**directions** [1] - 134:14
**directly** [40] - 88:8, 116:7, 116:16, 116:23, 117:8, 117:12, 118:3, 118:7, 118:22, 119:9, 123:1, 123:7, 125:7, 126:12, 126:15, 127:1, 127:3, 127:8, 128:10, 128:11, 128:13, 128:19, 128:20, 129:9, 129:20, 130:10, 130:17, 137:2,

137:14, 138:2, 138:5, 171:15, 174:12, 174:19, 175:13, 175:23, 176:1, 212:17, 212:20
**Director** [1] - 109:5
**Directors** [1] - 229:14
**disagree** [3] - 219:5, 219:20, 219:22
**disappears** [1] - 173:21
**disclose** [1] - 143:12
**disclosed** [5] - 8:7, 8:8, 142:22, 143:17, 204:4
**disclosure** [1] - 232:7
**discontinuation** [3] - 112:25, 113:9, 113:19
**discretion** [1] - 93:6
**discuss** [4] - 25:13, 39:17, 115:6, 176:8
**discussed** [28] - 25:20, 48:12, 52:22, 64:10, 82:9, 92:18, 113:12, 120:2, 127:8, 127:11, 129:2, 129:24, 130:5, 133:8, 137:1, 137:3, 137:7, 138:10, 148:14, 174:2, 174:16, 175:9, 194:10, 194:15, 212:3, 223:19, 228:6, 228:7
**discusses** [2] - 52:12, 64:12
**discussing** [3] - 86:12, 95:22, 223:2
**discussion** [6] - 48:4, 80:4, 98:18, 139:8, 147:16, 173:24
**discussions** [1] - 7:18
**disease** [5] - 210:3, 210:10, 210:14, 211:2
**diseases** [3] - 209:25, 210:6, 210:8
**disorder** [2] - 12:17, 12:22, 46:22, 47:10, 48:13, 48:25, 49:7, 49:14, 50:3, 50:14, 50:20, 51:2, 214:25, 215:3, 215:10, 239:11, 239:19, 239:24, 240:2, 240:7, 241:14
**Disorder** [17] - 46:11, 90:18, 90:19, 91:15,

98:14, 114:10, 142:3, 180:24, 181:4, 181:5, 183:15, 183:19, 184:4, 186:2, 186:6, 186:11, 186:17
**dispensed** [5] - 11:2, 11:12, 62:19, 63:3, 109:11
**disposed** [1] - 72:25
**distant** [1] - 207:18
**Distant** [1] - 207:21
**distinct** [1] - 80:7
**distinction** [2] - 221:15, 239:19
**distinguish** [1] - 85:25
**distributed** [1] - 26:12
**distribution** [14] - 24:17, 25:20, 27:20, 28:2, 28:19, 28:21, 28:22, 51:9, 60:23, 61:4, 61:22, 62:1, 64:7, 78:7
**distributions** [1] - 24:11
**distributor** [6] - 25:24, 28:1, 68:12, 82:25, 83:4, 83:11
**distributor's** [1] - 23:22
**distributors** [14] - 21:19, 21:22, 22:6, 23:24, 25:8, 28:9, 28:13, 28:15, 29:10, 51:4, 68:8, 69:1, 69:20, 82:23
**distributors'** [2] - 22:3, 22:9
**District** [2] - 7:2, 7:3
**DISTRICT** [3] - 1:1, 1:1, 1:17
**diversion** [23] - 35:23, 38:9, 38:12, 38:15, 38:16, 38:18, 38:20, 38:23, 38:25, 39:5, 39:6, 39:9, 39:11, 39:16, 68:7, 68:11, 68:16, 68:19, 68:25, 69:10, 69:19, 72:9, 78:10
**diverted** [7] - 71:14, 72:2, 72:8, 111:23, 112:3, 112:10, 112:13
**divide** [4] - 163:8, 163:15, 169:14, 175:6
**divided** [5] - 129:12, 132:7, 144:10, 150:4, 174:22

**doctor** [24] - 11:13, 50:9, 50:16, 70:7, 70:17, 70:20, 73:24, 75:5, 75:11, 75:19, 75:22, 76:16, 76:21, 76:22, 76:25, 79:10, 83:5, 83:12, 88:15, 88:17, 89:8, 89:10, 89:13, 178:5
**doctor's** [1] - 36:5
**Doctor's** [1] - 36:6
**doctors** [29] - 15:25, 26:25, 27:6, 70:7, 70:11, 70:14, 70:22, 71:4, 71:9, 76:3, 76:9, 76:11, 80:24, 81:4, 81:10, 82:4, 82:5, 82:23, 88:17, 88:19, 196:24, 197:3, 197:5, 197:6, 197:8, 198:12, 199:10, 199:15, 199:17
**document** [42] - 14:14, 14:20, 30:12, 65:5, 91:22, 92:16, 92:20, 93:13, 93:16, 95:21, 99:23, 108:18, 108:21, 109:8, 139:14, 141:20, 152:23, 153:6, 153:10, 154:18, 170:16, 181:9, 181:13, 182:25, 183:14, 186:1, 187:17, 187:19, 188:25, 189:6, 191:22, 192:2, 213:8, 213:12, 213:17, 213:19, 225:23, 228:6, 230:12, 233:9, 242:13
**documented** [1] - 188:1
**documents** [14] - 7:12, 22:2, 22:8, 22:9, 22:11, 22:21, 23:8, 23:19, 23:21, 24:13, 123:18, 151:15, 180:24, 186:14
**dominated** [2] - 41:4, 41:5
**done** [17] - 26:15, 42:23, 44:16, 48:3, 63:25, 67:2, 67:5, 84:24, 119:2, 137:16, 138:15,

138:18, 174:21, 212:5, 220:20, 238:23, 243:19
**dosage** [6] - 70:8, 70:11, 88:18, 98:17, 99:4, 99:12
**dosages** [1] - 88:12
**dose** [30] - 42:6, 87:19, 87:20, 87:22, 88:6, 88:15, 88:20, 89:11, 90:10, 96:1, 96:12, 96:18, 96:21, 96:24, 97:4, 97:11, 97:14, 97:18, 97:25, 98:10, 98:13, 99:7, 102:13, 102:17, 102:20, 103:1, 103:4, 107:14, 107:19, 154:11
**doses** [3] - 88:3, 88:9, 106:16
**dosing** [2] - 101:15, 102:11
**double** [1] - 170:5
**Douglas** [1] - 4:20
**Dowell** [21] - 152:2, 152:9, 152:10, 152:23, 152:25, 153:6, 156:23, 156:24, 157:10, 158:2, 158:5, 158:20, 158:22, 165:23, 167:15, 167:25, 170:12, 170:13, 171:3, 171:6
**down** [13] - 49:16, 72:21, 78:14, 102:3, 111:21, 115:4, 126:16, 127:2, 127:3, 128:20, 173:5, 179:22, 233:25
**downward** [1] - 123:20
**Dr** [119] - 7:8, 9:13, 9:21, 9:23, 12:23, 14:20, 16:13, 16:17, 17:3, 17:14, 17:18, 18:16, 20:3, 20:23, 21:13, 22:8, 22:13, 22:16, 23:15, 29:1, 29:25, 30:7, 30:12, 30:16, 46:4, 46:9, 52:5, 65:5, 68:6, 68:21, 70:3, 70:6, 71:20, 84:8, 86:9, 91:1, 94:3, 95:23, 99:1, 108:18, 108:20, 110:11, 113:7, 114:6, 114:7,

115:4, 124:2, 124:8, 124:19, 125:4, 127:25, 131:2, 131:5, 131:9, 132:1, 132:18, 139:14, 143:1, 143:25, 147:7, 147:13, 148:20, 148:24, 149:17, 150:7, 151:15, 152:3, 152:18, 153:5, 158:15, 159:12, 161:22, 162:4, 162:10, 167:11, 167:14, 169:24, 172:9, 173:12, 173:24, 176:8, 178:3, 181:13, 182:4, 182:9, 183:14, 184:22, 187:4, 188:25, 189:4, 189:19, 194:8, 196:5, 200:13, 200:18, 200:23, 202:3, 203:3, 206:16, 206:18, 211:22, 213:12, 217:19, 219:17, 221:10, 222:7, 222:20, 223:18, 224:2, 228:19, 232:8, 232:16, 232:17, 232:21, 236:17, 239:4, 240:17, 241:4, 241:12
**dramatically** [1] - 40:23
**draw** [4] - 47:18, 186:19, 187:12, 225:11
**drew** [1] - 221:15
**drill** [2] - 117:2, 135:15
**Drive** [1] - 6:15
**driver** [1] - 134:25
**Drivers** [1] - 33:18
**dropped** [8] - 126:15, 126:18, 126:20, 126:22, 128:11, 128:12, 150:8
**drug** [60] - 12:4, 36:14, 38:13, 42:23, 44:16, 44:20, 45:4, 45:6, 61:5, 61:13, 61:15, 62:1, 64:13, 65:13, 65:21, 65:25, 67:7, 79:11, 84:9, 84:10, 84:19, 85:10, 85:13, 115:23, 122:4,

122:9, 132:20, 132:21, 133:20, 133:21, 135:23, 136:1, 136:3, 136:13, 136:21, 138:18, 138:20, 140:8, 141:3, 152:10, 155:4, 155:7, 155:16, 166:17, 205:12, 234:1, 235:8, 235:10, 235:20, 235:23, 236:1, 236:13, 237:11, 239:25, 240:6, 240:17, 241:5, 241:13, 242:8
**DRUG** [2] - 1:7, 1:13
**Drug** [12] - 6:2, 65:7, 77:10, 77:15, 109:6, 151:19, 153:5, 178:15, 180:24, 181:18, 182:10, 246:7
**drug-related** [2] - 140:8, 141:3
**drugs** [42] - 11:19, 45:23, 51:20, 51:24, 51:25, 61:10, 116:2, 116:6, 116:8, 116:15, 116:17, 117:6, 118:6, 118:9, 118:11, 118:23, 132:8, 136:7, 146:8, 205:15, 212:2, 213:1, 234:5, 235:1, 235:2, 235:13, 235:15, 235:16, 236:4, 236:12, 236:15, 236:19, 236:23, 237:2, 237:6, 237:18, 237:22, 238:9, 238:11, 238:12, 238:14, 240:12
**DSM** [1] - 236:10
**due** [12] - 44:8, 49:3, 107:23, 132:8, 132:20, 133:20, 133:21, 135:24, 136:13, 146:1, 212:14, 218:5
**duration** [22] - 70:19, 89:3, 89:7, 89:11, 90:6, 90:7, 90:10, 95:5, 96:12, 102:10, 102:13, 102:17, 102:20, 103:1, 103:4, 103:21, 110:18, 154:11,

198:3, 198:6, 198:8
**durations** [2] - 88:25, 104:11
**during** [5] - 18:4, 165:20, 167:16, 167:18, 169:18

# E

**early** [1] - 207:11
**East** [4] - 3:5, 3:12, 4:21, 41:5
**econometrics** [1] - 64:4
**economic** [6] - 64:1, 64:5, 64:9, 65:20, 65:25, 66:7
**edited** [1] - 30:24
**editor** [4] - 32:10, 32:22, 33:8, 33:12
**editors** [1] - 33:9
**Edlund** [13] - 90:8, 90:17, 90:23, 91:7, 99:20, 99:24, 101:16, 101:20, 102:23, 103:4, 104:13, 109:21
**education** [1] - 66:14
**educational** [1] - 35:3
**effect** [4] - 44:21, 58:2, 205:5, 218:2
**effective** [3] - 14:2, 15:13, 34:24
**effectively** [1] - 151:12
**effects** [1] - 12:13
**efficacy** [4] - 13:25, 14:8, 16:6, 76:6
**efficient** [1] - 24:3
**effort** [1] - 73:10
**efforts** [2] - 34:22, 35:5
**Eighth** [1] - 3:10
**either** [17] - 11:2, 11:6, 33:7, 37:23, 60:21, 62:18, 72:9, 72:18, 121:22, 130:10, 130:17, 134:10, 137:14, 175:23, 176:1, 225:25, 226:11
**ELIZABETH** [1] - 6:14
**elsewhere** [2] - 47:12, 48:10
**emergency** [1] - 63:15
**employee** [1] - 231:21
**Encino** [1] - 3:18
**end** [8] - 11:20, 13:21, 39:20, 48:16, 176:24, 205:18, 226:5, 240:11

**end-of-life** [2] - 13:21, 48:16
**end-user** [1] - 205:18
**end-users** [1] - 11:20
**endorsed** [1] - 229:15
**endorsement** [1] - 49:9
**endorsing** [1] - 164:24
**engage** [3] - 140:22, 224:2, 224:6
**engaged** [8] - 191:18, 201:12, 224:13, 224:17, 226:1, 233:2, 234:4, 234:16
**England** [1] - 108:24
**enrolled** [1] - 225:5
**ensure** [1] - 141:10
**ensures** [2] - 32:16, 32:19
**entering** [4] - 92:3, 92:5, 214:23, 215:2
**entitled** [2] - 189:1, 228:20
**entry** [1] - 236:7
**ENU** [1] - 4:15
**environment** [1] - 51:10
**epidemic** [8] - 20:15, 33:24, 81:13, 81:18, 81:19, 133:11, 154:9, 177:6
**Epidemic** [3] - 30:15, 33:18, 109:9
**epidemics** [1] - 81:23
**epidemiological** [5] - 127:19, 211:4, 229:2, 229:4, 241:25
**epidemiologically** [1] - 133:10
**epidemiologist** [9] - 56:3, 187:2, 207:7, 207:13, 208:2, 208:7, 208:12, 208:15, 208:19
**epidemiologists** [8] - 15:21, 47:17, 91:14, 92:11, 206:23, 206:25, 219:14, 220:19
**epidemiology** [4] - 26:16, 211:7, 211:8, 211:15
**episode** [2] - 94:7, 104:24
**episodes** [1] - 90:17
**episodic** [1] - 90:16
**equated** [1] - 135:25
**equation** [1] - 205:11
**equations** [3] - 66:4, 67:10

**equivalent** [2] - 88:9, 147:1
**errata** [11] - 122:14, 122:19, 122:22, 124:5, 124:9, 124:19, 124:20, 124:21, 126:24, 127:7, 174:6
**error** [1] - 125:10
**especially** [4] - 34:2, 127:21, 219:13, 223:9
**establish** [1] - 19:7
**established** [3] - 17:21, 18:8, 76:8
**establishing** [1] - 18:10
**estimate** [39] - 87:5, 115:11, 118:3, 120:18, 122:8, 126:9, 131:23, 132:5, 132:7, 133:7, 134:12, 134:15, 134:17, 135:9, 135:20, 137:11, 139:21, 140:21, 142:13, 147:18, 155:19, 155:20, 155:24, 157:12, 157:14, 160:11, 167:20, 170:1, 170:24, 172:25, 173:2, 174:1, 174:2, 174:9, 174:25, 192:23, 195:16, 244:21
**estimate-able** [1] - 120:18
**estimated** [11] - 122:25, 128:4, 134:15, 135:5, 136:23, 137:17, 172:10, 172:11, 175:21, 176:5, 184:5
**estimates** [4] - 72:22, 73:20, 115:7, 118:12
**estimating** [5] - 120:9, 134:5, 134:16, 156:13, 156:14
**estimation** [4] - 123:23, 137:9, 145:18, 155:20
**et** [6] - 1:7, 1:13, 202:21, 238:13, 246:6, 246:7
**ethnicity** [1] - 66:14
**evaluate** [6] - 21:19, 21:23, 24:1, 65:12, 208:18, 208:22
**evaluated** [2] - 82:25,

209:23
**evaluation** [5] - 18:24, 19:18, 19:21, 20:2, 20:5
**evaluations** [1] - 67:6
**event** [7] - 128:7, 198:6, 198:23, 207:16, 209:8, 209:9
**events** [5] - 124:10, 124:13, 124:17, 209:4, 237:21
**evidence** [13] - 16:6, 26:23, 27:2, 27:4, 69:2, 69:21, 76:7, 78:5, 91:22, 92:1, 178:24, 181:24, 219:14
**exact** [6] - 29:16, 31:25, 124:16, 153:21, 160:10, 171:15
**Exactly** [1] - 191:20
**exactly** [19] - 19:7, 39:8, 77:8, 79:8, 83:8, 105:14, 109:21, 125:12, 133:8, 134:13, 136:15, 157:3, 159:1, 160:23, 170:23, 173:21, 180:23, 223:6, 230:6
**examination** [5] - 165:9, 228:7, 228:25, 243:9, 243:16
**EXAMINATION** [1] - 9:19
**examinations** [1] - 244:5
**examine** [1] - 9:11
**examined** [3] - 47:2, 122:4, 202:1
**Examiner** [5] - 115:9, 117:13, 119:10, 121:16, 121:21
**examining** [2] - 243:25, 244:6
**example** [16] - 7:2, 7:25, 12:12, 13:21, 38:6, 58:9, 61:21, 66:23, 87:22, 135:3, 160:25, 184:9, 198:2, 209:15, 211:8, 215:16
**examples** [1] - 202:2
**exceeded** [4] - 26:19, 26:22, 26:25, 27:5
**exception** [1] - 92:14
**excerpt** [1] - 18:3
**excess** [1] - 50:22

**excessive** [1] - 243:17
**excessively** [3] - 239:13, 239:22, 239:23
**excited** [1] - 126:21
**exclude** [1] - 227:24
**excludes** [1] - 184:3
**Exclusion** [1] - 141:21
**exclusive** [3] - 79:9, 82:8, 172:1
**exclusively** [1] - 230:13
**excuse** [1] - 151:24
**Excuse** [2] - 45:24, 223:12
**exercise** [1] - 75:14
**Exhibit** [16] - 14:21, 46:10, 52:6, 65:6, 108:19, 139:15, 153:4, 154:17, 167:25, 171:11, 184:22, 187:18, 203:14, 213:13, 222:21, 228:20
**exhibit** [4] - 124:3, 154:24, 170:14, 171:17
**expand** [2] - 84:15, 84:20
**expanded** [1] - 86:23
**expands** [1] - 85:3
**expansion** [11] - 35:15, 35:18, 78:6, 80:25, 81:5, 81:9, 81:16, 81:20, 82:3, 82:13, 131:17
**expect** [2] - 8:17, 57:18
**expected** [1] - 55:22
**expects** [1] - 45:2
**expensive** [2] - 224:9, 237:19
**experience** [2] - 45:12, 230:9
**experiment** [1] - 211:9
**expert** [16] - 31:16, 31:18, 31:20, 122:11, 131:15, 142:22, 143:12, 183:6, 230:19, 230:22, 230:25, 231:4, 231:7, 231:10, 231:13, 232:21
**expertise** [3] - 32:12, 206:5, 231:5
**experts** [3] - 128:5, 230:8, 230:20
**explain** [22] - 16:23, 32:7, 53:7, 64:15,

64:18, 65:20, 65:25, 109:25, 110:4, 116:25, 125:12, 126:19, 131:17, 136:10, 151:16, 155:23, 161:9, 165:7, 166:21, 166:24, 226:25, 243:1
**explained** [1] - 47:11
**explaining** [2] - 53:9, 110:7
**explanation** [1] - 110:5
**explanations** [3] - 47:24, 47:25, 48:5
**explicitly** [1] - 185:10
**exploitation** [1] - 50:6
**exposed** [6] - 10:7, 12:17, 90:21, 114:3, 209:15, 224:19
**Exposure** [1] - 240:23
**exposure** [16] - 9:24, 10:2, 10:4, 10:5, 10:10, 10:16, 10:20, 10:23, 12:8, 12:20, 94:20, 210:19, 211:11, 227:2, 238:17, 242:7
**expressed** [1] - 242:1
**extensive** [2] - 67:5, 230:7
**extent** [1] - 67:17
**extra** [3] - 141:2, 141:11, 141:13
**extra-medical** [3] - 141:2, 141:11, 141:13
**extracted** [1] - 140:10
**Extramedical** [1] - 139:16
**extremely** [3] - 134:7, 197:22, 243:20
**eyeballing** [1] - 158:20

**F**

**Faber** [1] - 7:2
**FABER** [1] - 1:17
**face** [2] - 30:13, 46:10
**fact** [18] - 24:6, 85:13, 92:24, 116:1, 117:5, 135:16, 143:7, 143:16, 147:24, 166:12, 178:17, 182:14, 191:10, 195:10, 196:15, 197:18, 198:10, 201:17
**factor** [22] - 48:15,

48:24, 49:2, 49:6, 49:13, 49:22, 50:2, 50:13, 50:19, 51:1, 54:4, 58:18, 59:4, 207:1, 227:20, 238:3, 240:13, 240:18, 240:21, 240:23, 242:3, 242:6
**Factors** [1] - 153:5
**factors** [31] - 25:13, 47:4, 47:12, 48:8, 48:9, 48:12, 53:7, 53:18, 54:3, 57:22, 58:15, 58:21, 59:23, 64:5, 64:9, 64:13, 64:14, 64:18, 65:13, 66:9, 81:25, 103:5, 211:12, 233:11, 240:2, 240:7, 241:15, 241:22, 241:24, 242:4, 242:8
**Fair** [1] - 240:16
**fair** [8] - 28:3, 31:5, 32:24, 80:1, 93:23, 127:23, 128:7, 237:5
**fairly** [2] - 94:16, 215:7
**faith** [12] - 70:22, 70:24, 71:5, 75:14, 75:20, 76:4, 76:10, 76:16, 199:10, 199:12, 199:13, 199:16
**faithfully** [1] - 63:10
**familiar** [16] - 25:7, 30:16, 55:19, 71:13, 94:3, 152:4, 182:9, 182:25, 183:1, 208:16, 209:24, 213:23, 214:19, 215:5, 215:6, 230:20
**families** [1] - 12:12
**family** [31] - 35:22, 36:23, 36:25, 37:4, 37:8, 37:9, 37:13, 37:15, 37:19, 37:20, 37:22, 38:1, 61:4, 61:9, 62:25, 63:2, 63:11, 63:12, 71:15, 72:3, 77:12, 78:10, 78:17, 79:6, 79:11, 79:12, 79:15, 80:2, 80:13
**far** [4] - 191:1, 205:16, 227:13, 238:2
**FARRELL** [29] - 2:3, 16:18, 16:20, 17:1, 17:20, 17:24, 22:24, 45:24, 46:2, 91:24, 92:23, 93:21, 110:3, 143:7, 164:20,

165:5, 165:10, 166:23, 167:2, 182:1, 182:7, 183:5, 203:6, 206:4, 221:22, 221:24, 223:12, 223:14, 223:23
**Farrell** [13] - 2:4, 2:13, 10:8, 16:19, 16:25, 52:16, 92:22, 93:11, 93:19, 110:2, 143:5, 165:4, 183:4
**fast** [1] - 148:2
**FCRR** [1] - 6:18
**FDA** [5] - 51:15, 51:17, 51:20, 51:24, 52:2
**February** [1] - 46:19
**Federation** [1] - 35:6
**feedback** [2] - 30:23, 33:9
**Feinberg** [1] - 230:18
**felt** [2] - 125:24, 242:25
**females** [1] - 66:21
**Fentanyl** [1] - 42:3
**fentanyl** [97] - 11:18, 41:21, 42:15, 43:3, 43:6, 43:9, 43:11, 43:22, 44:3, 44:22, 45:1, 45:5, 45:8, 45:12, 45:14, 45:17, 45:21, 81:19, 85:17, 87:16, 87:21, 87:25, 88:5, 88:6, 117:14, 117:19, 117:23, 119:22, 121:23, 125:14, 125:19, 126:1, 126:2, 127:16, 127:18, 144:3, 144:18, 144:21, 144:23, 145:2, 145:3, 146:16, 146:24, 147:2, 147:8, 147:9, 147:15, 147:18, 147:21, 147:25, 148:4, 148:5, 148:9, 148:11, 148:15, 148:25, 149:8, 149:9, 149:12, 149:13, 150:13, 150:17, 150:20, 152:20, 154:3, 154:5, 154:6, 154:10, 155:15, 156:1, 156:5, 156:17, 159:10, 160:3, 160:5, 160:7, 163:2, 163:19, 163:22, 165:20,

166:3, 166:7, 166:16, 166:19, 167:18, 168:23, 169:17, 172:14, 172:19, 172:23, 173:3, 173:6, 173:25, 181:7
**few** [13] - 30:7, 35:2, 67:2, 72:21, 76:8, 88:11, 90:2, 102:2, 127:12, 129:2, 129:24, 130:5, 232:6
**fictional** [1] - 165:12
**field** [3] - 91:14, 92:11, 116:10
**fifth** [2] - 34:13, 49:10
**figure** [17] - 119:5, 123:8, 148:5, 148:9, 151:7, 152:25, 153:15, 153:23, 168:6, 168:25, 169:1, 170:15, 170:19, 212:15, 212:21, 212:24, 213:4
**Figure** [8] - 139:6, 141:7, 142:18, 171:15, 171:17, 174:6, 227:1, 227:6
**filed** [1] - 85:21
**filler** [2] - 42:17, 43:6
**final** [6] - 31:11, 104:15, 119:3, 159:23, 160:1, 244:12
**findings** [5] - 99:2, 99:15, 99:19, 101:9, 226:20
**fine** [3] - 8:19, 8:22, 93:25
**finish** [5] - 37:14, 167:4, 179:6, 243:9, 244:3
**finished** [2] - 179:9, 184:18
**firm** [1] - 232:10
**Firm** [2] - 3:4, 3:7
**First** [2] - 199:23, 206:20
**first** [67] - 8:7, 8:13, 15:2, 17:18, 22:25, 23:1, 33:23, 34:9, 48:15, 52:17, 54:22, 61:17, 62:11, 65:4, 65:6, 91:2, 95:22, 98:13, 101:8, 104:15, 111:1, 111:2, 111:22, 112:15, 114:18, 124:20, 125:4,

126:4, 126:6, 132:13, 134:5, 165:16, 166:2, 166:3, 172:19, 186:20, 187:13, 193:10, 193:22, 194:4, 194:9, 194:12, 195:9, 196:6, 201:15, 202:20, 208:24, 209:9, 213:2, 214:9, 214:15, 215:9, 215:12, 215:20, 215:22, 216:4, 216:17, 216:25, 217:7, 217:15, 221:8, 224:5, 227:7, 234:14, 236:21, 242:20, 244:1
**five** [9] - 117:6, 192:4, 192:17, 193:10, 193:21, 194:3, 194:12, 227:14, 227:24
**five-year** [2] - 193:10, 193:21
**fixed** [1] - 134:23
**FL** [1] - 2:11
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flip** [1] - 88:10
**Floor** [1] - 3:5
**flow** [4] - 54:20, 55:17, 56:9, 56:21
**focus** [4] - 33:17, 191:7, 195:9, 195:10
**focused** [4] - 72:13, 94:5, 181:4, 220:22
**focusing** [14] - 10:24, 98:15, 105:5, 127:23, 128:8, 128:23, 129:14, 147:14, 177:1, 180:5, 180:8, 215:7, 223:4
**folks** [2] - 66:17, 230:4
**follow** [1] - 100:16
**follow-up** [1] - 100:16
**followed** [4] - 81:18, 125:15, 158:17, 200:4
**following** [6] - 59:4, 75:7, 94:20, 101:19, 193:10, 193:22
**follows** [3] - 7:5, 188:19, 222:13
**font** [1] - 21:16
**Footnote** [1] - 235:2
**FOR** [1] - 1:1
**force** [13] - 34:9,

34:21, 229:5, 229:8, 229:12, 229:16, 229:23, 230:2, 230:9, 230:16, 231:2, 231:16, 232:4
**forces** [1] - 34:1
**foregoing** [1] - 246:4
**form** [5] - 31:11, 36:9, 36:12, 36:15, 36:18
**formal** [5] - 60:22, 61:3, 61:12, 61:21, 62:1
**format** [1] - 223:23
**forming** [2] - 109:2, 181:20
**forms** [1] - 37:17
**formula** [4] - 132:17, 132:24, 144:5, 173:9
**forth** [1] - 46:21
**foundation** [15] - 17:25, 19:7, 80:25, 81:5, 81:7, 81:9, 81:11, 81:15, 81:20, 82:12, 82:16, 165:10, 165:14, 166:1, 182:2
**foundational** [3] - 81:17, 82:1, 82:2
**four** [10] - 66:2, 100:1, 100:13, 100:18, 101:5, 117:5, 168:25, 169:2, 169:5, 187:13
**Four** [2] - 192:4, 192:17
**four-year** [2] - 168:25, 169:5
**fraction** [3] - 40:22, 103:24, 104:5
**frame** [4] - 57:7, 110:17, 179:13
**framed** [1] - 179:2
**frameworks** [1] - 220:14
**Frankly** [1] - 29:14
**free** [6] - 78:18, 79:12, 79:14, 79:22, 80:2, 80:13
**frequencies** [3] - 99:25, 100:6, 100:12
**frequency** [2] - 100:17, 209:14
**frequently** [1] - 36:17
**Friday** [12] - 12:16, 90:8, 92:12, 133:8, 220:16, 222:7, 223:20, 227:16, 228:7, 228:25, 243:8, 244:2
**friend** [9] - 37:13,

37:15, 37:20, 77:6, 77:12, 77:24, 78:19, 79:16, 79:21
**friends** [23] - 35:22, 36:23, 37:1, 37:4, 37:8, 37:9, 37:19, 61:5, 61:9, 62:6, 62:16, 62:25, 63:2, 63:12, 78:10, 79:6, 79:11, 79:12, 79:15, 80:13
**front** [3] - 108:21, 123:8, 181:15
**Frye** [7] - 28:23, 29:1, 221:6, 221:9, 239:1, 239:5, 241:1
**full** [7] - 43:5, 43:9, 95:22, 112:2, 112:15, 113:22, 114:18
**full-size** [2] - 43:5, 43:9
**FULLER** [1] - 2:12
**Fuller** [2] - 2:4, 2:13
**fully** [3] - 93:1, 147:9, 211:17
**fun** [1] - 173:11
**function** [2] - 144:9, 172:25
**funds** [1] - 35:3

## G

**game** [1] - 93:23
**gateway** [7] - 120:1, 194:9, 202:5, 205:1, 205:4, 205:5, 218:2
**gathered** [1] - 108:11
**gathering** [1] - 73:12
**gears** [1] - 176:8
**gender** [1] - 66:14
**general** [10] - 10:14, 13:7, 25:20, 92:25, 108:12, 159:6, 216:2, 219:13, 225:6, 236:17
**generalize** [2] - 99:18, 216:20
**generalizes** [1] - 55:8
**Generally** [1] - 23:12
**generally** [11] - 22:12, 23:20, 25:7, 27:21, 55:19, 83:7, 99:17, 103:10, 133:25, 215:6, 241:25
**genetic** [2] - 114:21, 115:1
**germane** [1] - 80:4
**Gfroerer** [2] - 189:10, 189:22

**given** [28] - 25:11, 52:4, 60:11, 70:8, 70:15, 75:11, 83:4, 83:11, 88:22, 92:13, 96:12, 154:11, 155:25, 156:4, 156:8, 156:11, 156:18, 160:12, 166:14, 168:22, 170:25, 174:6, 194:21, 195:5, 195:11, 195:20, 198:11, 242:17
**goal** [1] - 140:21
**Government** [1] - 183:3
**government** [2] - 77:18, 120:8
**gram** [1] - 41:15
**grant** [2] - 16:16, 20:20
**graph** [5] - 171:6, 171:10, 171:12, 227:7, 227:8
**greater** [1] - 209:14
**Green** [1] - 231:15
**GRETCHEN** [1] - 6:7
**grew** [1] - 214:10
**group** [17] - 80:7, 80:8, 98:10, 98:11, 98:12, 98:13, 106:7, 107:11, 183:16, 211:15, 212:19, 224:19, 224:20, 224:22, 226:24, 229:16, 230:13
**groups** [5] - 80:9, 98:11, 190:20, 203:16, 222:13
**growing** [3] - 107:24, 108:9, 108:10
**grown** [1] - 214:15
**guess** [11] - 14:10, 20:7, 78:25, 112:16, 118:2, 187:19, 191:12, 193:15, 195:2, 208:20, 215:15
**guidance** [3] - 125:15, 125:16, 125:17

## H

**half** [5] - 79:18, 79:20, 144:7, 217:6
**hallucinogens** [2] - 235:3, 236:5
**hand** [21] - 15:7, 52:24, 61:17, 62:4, 62:10, 95:23, 96:6,

104:14, 112:15, 112:18, 113:21, 113:22, 124:19, 141:22, 154:19, 155:14, 183:25, 192:2, 199:7, 214:7, 233:17
**handed** [18] - 14:20, 30:12, 38:3, 46:9, 52:5, 65:5, 91:1, 108:18, 123:11, 139:14, 151:15, 153:4, 181:13, 184:22, 188:25, 213:12, 222:20, 228:19
**handful** [1] - 244:10
**handling** [1] - 8:15
**hands** [1] - 39:15
**handy** [2] - 83:22, 151:3
**happy** - 173:13
**hard** [2] - 144:19, 244:18
**HARDIN** [2] - 5:3, 244:9
**Hardin** [1] - 244:8
**harm** [13] - 9:25, 12:8, 12:9, 35:19, 81:16, 81:21, 82:3, 82:13, 84:25, 85:2, 131:18, 205:17, 205:19
**harms** [7] - 12:10, 27:12, 27:18, 40:2, 85:11, 217:22, 218:5
**Hartford** [1] - 8:1
**hashish** [2] - 235:3, 236:4
**Havens** [1] - 55:5
**Hawaii** [1] - 8:1
**Hawkins** [1] - 3:7
**hazard** [1] - 227:19
**head** [6] - 24:19, 94:19, 119:14, 148:3, 157:4, 185:21
**headed** [7] - 65:6, 66:20, 91:2, 108:19, 151:19, 153:4, 223:4
**heading** [11] - 15:10, 30:22, 33:17, 33:23, 35:14, 46:11, 109:9, 141:21, 189:9, 201:16, 214:7
**Health** [17] - 4:14, 5:2, 14:5, 31:12, 77:10, 77:15, 178:15, 181:18, 182:10, 189:11, 189:12, 189:23, 189:24, 218:7, 219:23,

228:9, 229:6
**health** [9] - 102:14, 102:19, 102:21, 114:12, 195:16, 201:5, 201:6, 219:24, 220:15
**healthcare** [1] - 34:13
**hear** [1] - 8:23
**heard** [3] - 230:23, 231:9, 231:14
**hearing** [4] - 29:2, 221:9, 239:5, 241:2
**hearsay** [2] - 92:14, 92:24
**heavier** [2] - 59:9, 60:7
**heavy** [7] - 54:20, 55:17, 55:18, 55:21, 56:10, 56:22, 59:9
**Hedegaard** [2] - 151:8, 151:20
**held** [1] - 202:7
**help** [6] - 124:8, 124:21, 148:19, 149:17, 151:4, 161:14
**helpful** [5] - 92:17, 92:19, 121:25, 125:12, 244:23
**helps** [1] - 10:9
**heroin** [153] - 11:17, 40:13, 40:15, 40:21, 40:23, 41:3, 41:4, 41:10, 41:11, 41:14, 41:15, 41:22, 42:5, 42:7, 44:4, 44:17, 44:19, 44:22, 44:25, 45:1, 45:6, 45:7, 45:11, 45:14, 45:20, 47:2, 81:13, 116:21, 116:23, 117:13, 117:23, 120:13, 121:1, 121:22, 166:17, 171:18, 180:3, 181:6, 190:9, 190:14, 190:18, 191:24, 192:4, 192:18, 193:1, 193:6, 193:9, 193:14, 193:17, 193:21, 194:3, 194:21, 195:1, 195:5, 195:11, 195:20, 196:8, 197:16, 197:19, 199:22, 199:25, 200:2, 200:4, 200:8, 200:9, 201:4, 202:23, 203:1, 203:5, 203:21, 204:10, 204:14,

204:18, 204:24, 205:3, 205:10, 205:11, 205:17, 205:19, 205:22, 205:25, 206:1, 206:2, 206:12, 206:14, 211:22, 211:25, 212:25, 213:2, 214:15, 215:9, 215:12, 215:20, 215:22, 216:4, 216:17, 217:4, 217:14, 217:15, 217:25, 218:11, 218:18, 219:4, 219:8, 219:19, 220:9, 221:1, 222:14, 224:4, 224:8, 225:6, 226:1, 226:7, 226:13, 226:16, 226:21, 227:5, 227:10, 227:11, 227:22, 228:3, 233:3, 233:10, 233:14, 233:21, 234:9, 234:12, 234:13, 234:17, 234:18, 235:6, 235:12, 235:21, 236:3, 236:18, 236:20, 236:21, 237:1, 237:5, 237:7, 237:11, 237:14, 237:22, 237:25, 238:5, 238:7, 238:17, 238:19, 238:20, 238:25, 239:8, 239:9
**Heroin** [7] - 40:2, 46:12, 189:3, 213:15, 214:7, 214:9, 222:22
**heroin's** [1] - 42:4
**herself** [1] - 38:2
**Hester** [25] - 9:11, 18:12, 19:11, 23:5, 29:23, 45:24, 68:3, 93:18, 93:23, 130:22, 131:6, 143:10, 164:23, 173:15, 182:3, 182:23, 183:9, 188:14, 203:11, 221:4, 222:2, 223:12, 242:15, 243:23, 244:11
**HESTER** [142] - 5:9, 9:12, 9:20, 14:16, 14:18, 16:12, 17:2,

17:14, 17:17, 18:2, 18:13, 18:15, 19:12, 20:18, 20:22, 22:13, 22:15, 23:6, 25:12, 28:4, 28:8, 28:23, 28:25, 29:18, 29:24, 30:9, 30:11, 46:1, 46:3, 46:6, 46:8, 64:23, 64:24, 67:21, 67:24, 68:4, 68:5, 86:6, 86:8, 90:24, 90:25, 91:21, 92:7, 93:10, 93:24, 94:2, 98:25, 108:15, 108:17, 109:23, 110:6, 110:10, 123:24, 124:1, 124:6, 124:7, 124:18, 124:24, 125:2, 125:3, 130:23, 131:7, 131:8, 139:3, 139:9, 139:12, 139:13, 142:21, 143:3, 143:11, 143:15, 143:22, 143:24, 147:5, 147:6, 148:21, 148:23, 151:13, 151:14, 152:14, 152:16, 152:17, 158:10, 158:14, 161:24, 162:3, 163:1, 165:2, 165:13, 165:18, 166:25, 167:6, 173:17, 173:19, 173:22, 173:23, 179:8, 181:10, 181:12, 181:23, 182:4, 182:8, 182:20, 182:24, 183:12, 183:13, 184:20, 188:15, 188:21, 188:24, 200:14, 200:17, 203:12, 206:10, 213:9, 213:11, 218:25, 221:5, 221:7, 222:4, 222:6, 222:18, 222:19, 223:13, 223:16, 223:17, 223:25, 228:16, 228:18, 229:21, 239:1, 239:3, 241:1, 241:3, 241:8, 241:10, 242:12, 242:16, 242:19, 242:25, 244:1, 244:17
**high** [22] - 12:12, 41:14, 53:7, 61:20,

80:23, 81:3, 81:14, 81:17, 82:11, 96:23, 97:17, 97:25, 98:10, 100:5, 101:2, 106:16, 107:14, 107:19, 172:12, 184:4, 219:9
**high-volume** [1] - 61:20
**higher** [19] - 49:4, 53:18, 57:18, 58:15, 59:5, 59:10, 60:1, 60:5, 60:8, 97:17, 154:10, 198:23, 201:3, 203:21, 204:10, 219:10, 224:3, 224:7, 225:5
**highest** [2] - 53:1, 177:5
**highlighted** [2] - 92:11, 92:18
**Hispanic** [1] - 66:14
**historical** [2] - 47:11, 48:9
**histories** [1] - 122:4
**history** [1] - 122:9
**hit** [2] - 183:8
**HIV** [2] - 224:22, 225:1
**hold** [1] - 141:23
**Holly** [1] - 151:20
**homeless** [1] - 184:8
**Honolulu** [1] - 8:1
**Honor** [77] - 7:7, 7:11, 8:2, 8:12, 8:19, 9:9, 9:12, 14:16, 16:12, 17:20, 18:2, 19:4, 20:18, 22:24, 28:4, 29:13, 29:17, 29:19, 30:9, 46:6, 64:23, 67:21, 68:4, 90:24, 91:21, 92:7, 93:2, 93:10, 93:24, 98:22, 108:15, 109:23, 110:6, 123:24, 124:24, 124:25, 130:24, 131:7, 139:3, 142:21, 143:3, 143:11, 148:21, 151:13, 152:14, 158:11, 164:20, 165:3, 165:13, 166:23, 181:10, 181:23, 182:1, 182:20, 182:25, 183:5, 183:12, 184:20, 188:15, 188:21, 200:15, 203:6, 206:4, 213:9, 221:22, 222:4,

222:18, 228:16,
229:18, 242:12,
242:16, 242:19,
243:6, 243:22,
244:1, 244:7, 244:17
**Honor's** [1] - 93:6
**HONORABLE** [1] -
1:17
**Honorable** [1] - 7:1
**hope** [3] - 38:22,
132:18, 242:15
**horse** [1] - 243:8
**host** [1] - 93:8
**hours** [1] - 131:2
**Household** [1] -
178:15
**household** [5] - 179:1,
179:12, 180:17,
184:3, 194:14
**households** [2] -
66:20, 184:10
**huge** [1] - 105:21
**Human** [2] - 189:12,
189:24
**humane** [1] - 34:24
**hundred** [1] - 157:2
**hundreds** [1] - 182:19
**Huntington** [37] -
3:10, 4:1, 24:3, 24:8,
24:12, 24:18, 24:20,
24:25, 25:4, 25:10,
25:19, 26:4, 26:9,
26:13, 26:24, 27:5,
84:11, 84:16, 84:20,
84:25, 86:24, 87:3,
115:8, 116:1,
118:13, 118:19,
123:6, 125:6,
129:18, 131:24,
132:8, 160:19,
174:3, 174:9, 176:5,
176:11, 246:6
**HUNTINGTON** [1] -
1:4
**Huntington-Cabell** [4]
- 116:1, 129:18,
160:19, 174:3
**hypothetical** [1] - 77:2
**hypothetically** [1] -
138:16

## I

**idea** [3] - 13:2, 37:6,
132:23
**identified** [12] - 28:2,
28:3, 33:3, 48:11,
59:4, 68:7, 68:11,
68:17, 69:2, 69:21,
116:8, 211:18

**identify** [4] - 26:11,
53:6, 58:21, 85:11
**identifying** [2] - 68:25,
69:19
**if"** [1] - 164:17
**illegal** [25] - 11:7,
11:17, 11:24, 35:14,
40:10, 41:20, 84:15,
84:19, 85:1, 85:3,
205:3, 205:15,
205:21, 206:12,
213:5, 234:22,
235:20, 236:1,
236:3, 236:12,
236:13, 236:14,
236:19, 237:6,
237:22
**illegally** [1] - 11:3,
62:19, 72:10, 84:10,
84:12
**illegitimately** [1] -
38:2
**illicit** [51] - 11:18,
35:23, 38:9, 38:12,
38:15, 38:25, 39:5,
39:6, 39:11, 39:20,
43:22, 44:3, 64:13,
85:22, 87:12,
117:14, 119:18,
121:22, 125:19,
125:22, 147:8,
147:11, 147:14,
147:18, 147:21,
148:9, 152:25,
153:14, 154:2,
155:21, 155:23,
156:7, 156:21,
156:24, 157:19,
165:25, 168:1,
168:9, 170:19,
170:21, 171:1,
171:7, 171:24,
212:8, 212:11,
234:1, 234:5, 235:1,
235:2, 235:8, 235:23
**illness** [1] - 207:2
**imagine** [1] - 206:15
**immediate** [1] - 29:15
**immediately** [1] -
43:10
**impact** [2] - 64:8,
98:21
**impaired** [1] - 35:20
**impeachment** [5] -
17:21, 23:3, 29:17,
29:19, 221:24
**implications** [1] -
101:10
**Implications** [1] -
213:16

**importance** [1] - 56:2
**important** [16] - 40:15,
55:25, 101:9,
113:12, 134:7,
139:8, 155:22,
166:8, 196:9, 208:6,
208:9, 208:25,
242:22, 243:15,
243:20
**impossible** [1] - 12:21
**improper** [3] - 23:3,
29:17, 29:19
**improve** [1] - 34:14
**IN** [2] - 1:1, 1:18
**inaccurate** [1] -
127:14
**inappropriate** [3] -
13:16, 15:24, 187:25
**inartfully** [1] - 16:7,
202:24
**incarcerated** [1] -
184:8
**Inciardi** [4] - 62:22,
69:5, 69:9, 70:1
**incidence** [13] - 90:9,
90:12, 90:15, 94:20,
94:23, 96:17, 96:24,
97:24, 99:3, 99:8,
104:8, 104:16,
240:21
**Incident** [1] - 91:3
**incident** [7] - 101:10,
101:16, 101:21,
104:17, 104:21,
104:22, 227:9
**include** [28] - 39:1,
39:2, 39:13, 39:16,
61:15, 62:1, 70:8,
70:11, 70:14, 70:18,
75:6, 87:13, 87:14,
87:15, 125:19,
125:20, 136:12,
136:16, 142:19,
170:2, 170:3, 181:6,
184:7, 184:10,
198:23, 200:3, 235:2
**included** [13] - 21:21,
22:5, 51:6, 61:11,
61:12, 67:15, 67:18,
68:18, 78:4, 94:10,
142:3, 142:10,
191:17
**includes** [10] - 21:21,
43:2, 85:16, 138:20,
141:16, 141:17,
157:13, 184:11,
195:16, 227:21
**including** [11] - 34:10,
39:14, 64:13, 79:10,
81:18, 98:12,

125:25, 138:19,
218:5, 219:7, 235:3
**Inclusion** [1] - 141:21
**inclusive** [1] - 95:10
**incorporate** [1] -
227:25
**incorrect** [3] - 28:11,
211:2, 211:18
**Incorrect** [1] - 200:10
**increase** [16] - 43:23,
44:8, 65:21, 98:12,
154:6, 157:19,
166:7, 166:8,
166:12, 166:13,
167:18, 215:8,
215:11, 216:3,
216:16, 216:21
**Increased** [3] - 51:9,
60:19, 213:14
**increased** [12] - 16:5,
35:18, 40:2, 40:13,
40:21, 49:3, 60:20,
65:13, 71:9, 145:17,
216:1, 217:15
**increases** [11] - 48:25,
49:7, 50:3, 50:14,
50:20, 51:2, 54:5,
58:8, 81:11, 166:18,
178:19
**increasing** [4] - 46:22,
47:9, 180:24, 215:24
**increasingly** [1] -
108:12
**independently** [2] -
124:12, 220:13
**index** [2] - 96:7, 96:10
**indicate** [5] - 58:6,
62:5, 72:23, 73:20,
219:25
**indicated** [3] - 53:24,
58:20, 67:13
**indicates** [4] - 63:21,
105:8, 178:24,
233:25
**indicia** [1] - 92:15
**indirect** [7] - 120:6,
120:25, 121:20,
123:3, 129:1, 175:8,
212:5
**indirectly** [31] -
119:19, 119:22,
120:9, 121:4, 121:6,
121:11, 122:6,
123:1, 128:16,
128:19, 128:21,
128:25, 130:2,
130:11, 130:17,
137:6, 137:14,
137:18, 137:21,
138:2, 138:5,

138:12, 138:13,
138:14, 175:1,
175:5, 175:14,
175:23, 176:2,
212:9, 212:14
**individual** [9] - 22:3,
22:10, 22:21, 23:8,
23:22, 26:17, 43:12,
57:23, 210:24
**individually** [2] - 24:3,
24:7
**individuals** [29] - 10:6,
10:18, 10:22, 35:19,
35:21, 37:6, 38:8,
63:16, 71:15, 72:3,
94:10, 104:23,
122:5, 174:8,
194:25, 196:7,
201:2, 201:4,
201:10, 201:18,
201:21, 202:2,
202:14, 202:15,
202:19, 207:2,
225:5, 234:1, 235:11
**Individuals** [1] - 91:4
**industries** [2] - 55:19,
55:23
**industry** [7] - 15:25,
51:10, 51:11, 51:14,
51:18, 55:25, 56:3
**industry's** [1] - 34:22
**inevitably** [1] - 112:19
**infected** [2] - 224:23,
225:1
**infer** [1] - 211:15
**inference** [1] - 211:13
**inferences** [2] - 211:3,
211:19
**inform** [1] - 21:8
**informal** [3] - 60:23,
61:3, 61:11
**Informant** [1] - 214:21
**information** [23] -
7:20, 7:25, 17:12,
21:21, 22:6, 22:7,
71:1, 71:7, 73:12,
88:22, 89:14, 90:9,
108:11, 119:15,
139:24, 158:1,
199:7, 199:13,
202:11, 219:6,
219:11
**informed** [2] - 25:11,
141:9
**ingesting** [4] - 12:14,
36:12, 36:14, 45:20
**ingestion** [1] - 12:8
**inhalants** [2] - 235:4,
236:5
**initial** [1] - 30:23

initiate [2] - 48:7, 227:22
initiated [2] - 193:9, 193:21
initiates [2] - 192:5, 192:18
Initiating [2] - 213:15, 214:7
initiating [1] - 193:14
Initiation [2] - 189:3, 222:23
initiation [13] - 190:9, 194:4, 216:4, 222:14, 225:6, 226:1, 226:7, 226:22, 227:10, 227:12, 227:19, 228:3, 233:21
inject [1] - 107:6
injecting [1] - 201:4
injury [2] - 54:8, 57:12
input [1] - 32:15
inquire [2] - 243:7, 243:22
inquired [1] - 243:8
instance [13] - 36:8, 55:25, 66:23, 67:16, 89:2, 98:7, 119:11, 136:14, 136:17, 160:24, 172:14, 174:5, 187:17
instead [2] - 169:4, 171:9
Institute [1] - 109:6
institutionalized [4] - 178:12, 178:25, 179:11, 180:16
intention [1] - 57:6
interact [1] - 61:9
interacting [1] - 81:24
interest [2] - 55:7, 232:7
interpretable [2] - 195:14, 195:18
interpretation [6] - 20:1, 20:7, 102:12, 102:15, 103:2, 103:3
interrelate [1] - 64:5
interrupted [2] - 154:16, 168:3
interruption [2] - 168:22, 170:25
intersection [1] - 33:25
intervening [1] - 207:12
interviewed [1] - 77:5
intracellular [4] - 113:2, 113:6, 113:16, 113:20

introduce [1] - 124:3
introduction [5] - 41:21, 69:6, 69:9, 70:2, 168:23
investigated [1] - 26:14
invite [1] - 32:12
involve [6] - 121:21, 138:21, 203:4, 204:13, 204:21, 206:2
involved [6] - 34:21, 129:10, 136:18, 204:17, 230:12, 230:16
involves [1] - 205:11
involving [11] - 43:15, 44:7, 116:22, 117:13, 119:10, 125:13, 155:4, 155:7, 155:17, 203:14, 206:13
Irpino [1] - 3:7
ISIA [1] - 5:4
issue [5] - 7:8, 7:14, 7:19, 127:16, 193:16
issued [1] - 12:3
issues [3] - 8:5, 92:9, 232:7
items [1] - 92:25
itself [2] - 74:4, 75:24

**J**

Jackson [1] - 6:8
JAMA [1] - 138:24
JASIEWICZ [1] - 5:4
JEFFREY [1] - 5:13
Jennifer [1] - 55:5
JENNIFER [1] - 4:15
Joint [3] - 34:11, 35:6, 49:10
Joseph [2] - 189:10, 189:22
JOSEPH [1] - 6:4
Journal [2] - 14:4, 108:24
journal [5] - 32:9, 32:10, 33:13, 138:24
journals [2] - 33:2, 93:8
JR [2] - 2:3, 2:12
Juan [2] - 2:5, 2:14
Judge [4] - 7:2, 16:18, 92:23, 167:2
JUDGE [1] - 1:17
judge [1] - 91:24
judged [1] - 91:11
judgment [1] - 70:17, 75:5, 75:15, 88:19,

89:10, 107:6, 196:25, 198:12, 199:3, 199:5, 199:17
judgments [1] - 88:14
Judith [1] - 230:18
June [3] - 7:4, 246:9, 246:15
JUNE [1] - 1:19
jurisdiction [1] - 115:16
jury [1] - 93:5

**K**

K.M.K [2] - 30:23, 31:3
KATHERINE [1] - 9:17
KEARSE [1] - 4:2
keep [4] - 66:21, 92:25, 150:19, 166:22
Keller [5] - 7:9, 7:12, 7:15, 7:22, 8:14
Keller's [2] - 7:21, 8:18
Kelly [1] - 6:8
Kentucky [6] - 54:23, 55:1, 55:7, 55:11, 55:16, 56:12
Kessler [1] - 4:20
key [2] - 65:1, 166:20
Key [1] - 214:21
KEYES [1] - 9:17
Keyes [107] - 7:8, 9:13, 9:21, 9:23, 12:23, 14:20, 16:13, 16:17, 17:3, 17:18, 18:16, 20:3, 20:23, 21:13, 22:8, 23:15, 29:1, 29:25, 30:7, 30:12, 30:16, 46:4, 46:9, 52:5, 65:5, 68:6, 68:21, 70:3, 70:6, 71:21, 84:8, 86:9, 91:1, 94:3, 95:23, 99:2, 108:18, 108:20, 110:11, 115:4, 124:8, 124:19, 125:4, 131:2, 131:5, 131:9, 132:1, 132:18, 139:14, 143:1, 143:25, 147:7, 147:13, 148:20, 148:24, 149:17, 150:7, 151:15, 152:4, 152:18, 153:5, 158:15, 159:12, 161:22, 162:4, 162:10, 167:11, 167:14,

169:24, 172:9, 173:12, 173:24, 176:8, 178:3, 181:13, 182:4, 182:9, 183:14, 184:22, 187:4, 188:25, 189:4, 189:20, 194:8, 196:5, 200:13, 200:18, 200:23, 202:3, 203:3, 206:16, 206:18, 211:22, 213:12, 217:19, 219:17, 221:10, 222:7, 222:20, 223:18, 224:2, 228:19, 236:18, 239:4, 240:17, 241:4, 241:12
Keyes' [3] - 17:14, 22:13, 124:2
Keys [1] - 22:16
kill [1] - 43:10
kind [9] - 48:3, 48:7, 61:6, 61:7, 75:16, 75:21, 128:21, 211:14, 228:1
kinds [5] - 74:13, 89:16, 89:19, 89:21, 147:11
knowable [1] - 118:14
knowing [1] - 45:13
knowledge [7] - 24:23, 25:1, 25:2, 25:17, 63:7, 118:14, 204:6
Kolodny [1] - 230:25
KOUBA [1] - 3:14

**L**

LA [1] - 3:8
label [1] - 126:7
labor [13] - 54:20, 55:18, 55:19, 55:22, 56:10, 56:22, 59:9, 60:8, 66:24, 67:1, 67:2, 67:6, 67:17
laborious [1] - 55:24
laced [3] - 87:15, 87:21, 87:25
lacked [1] - 33:6
laid [3] - 18:1, 182:22, 182:24
language [4] - 68:23, 132:18, 192:7, 219:25
Lanier [1] - 3:4
large [18] - 13:23,

44:9, 52:24, 62:5, 80:6, 94:13, 94:17, 103:23, 120:20, 193:15, 196:11, 196:23, 197:1, 197:9, 197:10, 197:23, 199:2, 226:23
largely [1] - 227:25
larger [6] - 88:6, 160:24, 160:25, 168:9, 168:11, 196:8
largest [1] - 34:12
Larney [28] - 140:1, 140:7, 140:18, 140:21, 141:16, 142:9, 142:16, 142:17, 143:25, 144:11, 144:15, 148:15, 148:25, 149:18, 150:22, 154:4, 154:8, 156:13, 156:14, 158:18, 159:9, 159:13, 159:14, 160:2, 162:6, 169:21, 174:1
last [24] - 7:11, 8:8, 9:23, 12:7, 12:23, 27:8, 29:4, 32:1, 52:16, 63:25, 65:10, 76:2, 91:8, 91:13, 92:8, 98:3, 112:2, 113:21, 120:2, 154:18, 225:12, 225:13, 232:8, 233:13
late [2] - 57:4, 71:8
LAURA [1] - 5:10
Law [3] - 3:4, 3:7, 3:12
law [1] - 9:6
lawsuit [1] - 232:2
lead [8] - 53:18, 54:5, 57:22, 58:15, 59:10, 64:15, 64:18, 135:9
leads [1] - 224:15
learned [1] - 47:16
least [11] - 16:18, 47:11, 114:21, 115:1, 146:19, 191:1, 191:9, 191:18, 205:22, 207:1, 207:2
leave [1] - 93:6
leaves [2] - 23:20, 50:22
led [2] - 34:1, 72:16
Lee [1] - 3:12
left [15] - 15:7, 33:16, 39:14, 47:7, 52:21,

52:24, 65:16, 75:2, 104:14, 112:15, 114:18, 130:9, 146:24, 192:2, 243:23

**left-hand** [5] - 15:7, 52:24, 104:14, 112:15, 192:2

**legal** [6] - 11:7, 11:10, 11:12, 12:2, 205:24, 206:5

**legally** [1] - 12:3

**legitimacy** [6] - 13:8, 32:17, 32:20, 74:1, 74:4, 76:6

**legitimate** [13] - 13:5, 13:11, 13:12, 13:17, 36:24, 37:9, 38:6, 39:19, 73:23, 75:20, 76:4, 76:22, 80:7

**legitimately** [1] - 60:22

**length** [2] - 92:18, 95:2

**lens** [1] - 26:16

**Leon** [2] - 2:4, 2:14

**less** [30] - 58:2, 64:1, 65:20, 87:25, 95:8, 95:10, 95:12, 95:25, 96:18, 96:21, 96:24, 97:5, 98:7, 98:17, 99:3, 100:24, 101:2, 101:15, 101:24, 103:7, 103:12, 103:25, 104:2, 104:6, 109:18, 110:13, 110:19, 198:20, 224:9, 237:18

**lethal** [1] - 87:16

**lethality** [1] - 87:18

**level** [23] - 10:5, 20:11, 20:23, 21:5, 21:6, 59:11, 62:7, 62:17, 66:12, 82:3, 82:5, 96:24, 97:17, 97:24, 99:3, 99:4, 101:15, 102:11, 103:17, 118:2, 154:14, 177:3, 177:10

**levels** [18] - 10:4, 20:15, 20:16, 26:21, 26:25, 27:6, 53:11, 53:18, 57:18, 57:23, 58:3, 58:16, 59:5, 90:10, 94:21, 94:23, 98:17, 212:1

**Levin** [1] - 2:10

**LEYIMU** [1] - 4:11

**licit** [1] - 85:22

**lie** [1] - 33:25

**life** [4] - 13:21, 48:16, 207:11, 207:12

**likelihood** [1] - 166:19

**likely** [6] - 33:12, 40:15, 58:2, 85:23, 98:14, 225:5

**limited** [2] - 120:12, 226:20

**LINDA** [1] - 4:8

**Line** [2] - 68:21, 86:9

**line** [8] - 18:22, 22:19, 29:6, 171:6, 224:5, 227:9

**lines** [5] - 17:15, 221:13, 239:2, 241:2, 241:8

**Lines** [1] - 241:9

**Lisa** [2] - 6:18, 246:3

**list** [10] - 118:9, 118:11, 121:14, 213:22, 214:3, 238:16, 242:2, 242:4, 242:8

**listed** [25] - 48:15, 57:17, 115:23, 116:6, 116:15, 116:17, 117:6, 117:22, 117:23, 118:6, 118:22, 119:22, 121:10, 146:8, 146:10, 146:22, 172:2, 172:4, 186:11, 213:24, 230:18, 231:1, 231:16, 231:18, 232:3

**listen** [1] - 33:9

**listing** [1] - 230:14

**lists** [1] - 116:20

**literature** [66] - 13:24, 17:8, 19:18, 20:6, 20:13, 21:8, 34:8, 34:19, 35:12, 36:2, 37:17, 40:19, 41:2, 41:9, 41:19, 42:2, 42:11, 44:14, 47:12, 47:16, 47:18, 47:21, 47:23, 47:25, 48:2, 48:4, 48:10, 54:13, 54:16, 55:8, 55:13, 57:1, 57:8, 57:15, 61:2, 63:9, 63:10, 63:21, 63:22, 72:7, 73:5, 73:7, 73:8, 73:14, 73:16, 74:25, 78:25, 84:22, 90:5, 91:25, 92:3, 92:5, 93:14, 111:10, 122:8, 208:22,

216:20, 218:3, 219:16, 219:25, 220:19, 225:11, 229:3, 229:7, 230:8, 238:23

**litigation** [9] - 17:19, 18:17, 31:21, 68:20, 131:16, 231:8, 231:13, 231:14, 232:10

**live** [1] - 184:10

**lives** [1] - 120:21

**LLC** [1] - 2:4

**lobbying** [2] - 49:16, 49:24

**local** [1] - 12:4

**Logan** [2] - 6:5, 6:12

**long-term** [1] - 34:23

**longer-term** [1] - 89:4

**look** [98] - 7:23, 15:6, 18:22, 22:19, 26:17, 29:14, 30:20, 33:14, 39:25, 40:9, 43:13, 46:5, 47:6, 48:4, 60:16, 65:16, 65:24, 71:12, 90:23, 95:20, 97:8, 102:2, 104:13, 108:14, 112:14, 114:17, 115:19, 122:9, 127:6, 137:12, 139:2, 140:7, 140:8, 141:7, 142:18, 153:14, 154:18, 157:9, 159:2, 169:5, 169:8, 170:12, 170:14, 170:18, 170:20, 170:21, 171:3, 171:16, 181:9, 182:16, 183:14, 184:12, 185:22, 185:25, 186:13, 188:4, 188:8, 188:11, 189:17, 192:1, 194:19, 195:15, 197:20, 197:21, 200:11, 202:10, 202:18, 203:13, 204:1, 213:8, 215:15, 219:23, 220:18, 221:12, 222:16, 223:11, 224:22, 225:3, 225:4, 225:23, 226:4, 227:8, 228:14, 229:22, 229:23, 232:6, 233:8, 233:17, 233:24, 234:11, 234:25,

235:2, 240:25, 244:18

**Look** [1] - 223:21

**looked** [24] - 26:21, 66:20, 119:2, 135:17, 142:6, 152:19, 153:22, 154:14, 163:19, 163:21, 163:23, 164:13, 165:19, 167:8, 168:1, 168:5, 168:8, 168:25, 169:1, 186:15, 190:8, 196:15, 202:15, 202:16

**looking** [39] - 36:21, 38:8, 64:5, 64:10, 65:1, 90:17, 96:4, 96:5, 99:20, 105:17, 106:2, 145:25, 153:2, 153:9, 157:23, 157:25, 161:4, 161:5, 167:15, 169:5, 171:10, 183:24, 185:15, 187:18, 190:13, 190:17, 191:22, 195:2, 201:19, 201:23, 204:13, 211:7, 215:2, 224:22, 225:24, 226:10, 226:24, 227:21, 230:15

**looks** [2] - 151:17, 162:8

**lose** [3] - 140:17, 145:20, 194:13

**lost** [1] - 45:24

**low** [19] - 41:13, 96:1, 96:18, 97:11, 98:13, 99:7, 99:12, 100:1, 100:6, 100:12, 101:1, 101:2, 172:10, 172:11, 172:15, 172:20, 172:24, 184:5, 196:19

**lower** [6] - 145:17, 172:15, 173:7, 197:15, 216:23

**lowest** [1] - 177:5

**lunch** [3] - 135:16, 137:2, 243:9

**lung** [4] - 197:13, 197:15, 197:17, 197:19

**M**

**Magazine** [1] - 3:7

**magically** [1] - 28:22

**MAHADY** [1] - 6:4

**MAINIGI** [1] - 4:15

**maintain** [3] - 54:19, 56:9, 56:21

**MAJESTRO** [4] - 2:6, 243:6, 243:22, 244:21

**Majestro** [2] - 2:6, 243:4

**major** [9] - 81:7, 81:11, 98:21, 103:5, 111:23, 112:3, 112:10, 112:12, 112:13

**majority** [23] - 11:15, 13:23, 62:5, 70:21, 71:1, 71:4, 76:9, 76:12, 76:13, 76:14, 103:6, 103:11, 141:10, 147:20, 192:25, 193:5, 198:17, 226:23, 236:18, 237:5, 238:19, 238:25, 239:14

**manage** [2] - 110:24, 111:15

**management** [2] - 53:23, 58:20

**managing** [3] - 14:3, 15:13, 82:21

**manual** [3] - 59:9, 60:8, 66:24

**manufacture** [1] - 206:13

**manufactured** [2] - 11:4, 42:25

**manufacturers** [3] - 51:19, 51:23, 52:2

**manufacturing** [1] - 205:2

**manuscript** [1] - 30:25

**marijuana** [9] - 235:2, 235:14, 235:20, 236:4, 236:19, 237:6, 237:12, 237:23, 238:12

**MARK** [1] - 3:16

**marked** [13] - 14:20, 30:12, 46:9, 65:5, 91:1, 108:18, 139:14, 151:16, 181:13, 188:25, 213:12, 222:20, 228:19

**market** [10] - 22:11,

23:19, 23:21, 24:10, 24:16, 40:15, 40:22, 41:4, 41:21, 45:4
**marketing** [1] - 15:24
**markets** [2] - 67:2, 67:6
**Maryland** [1] - 189:13
**material** [3] - 25:9, 139:6, 139:7
**materially** [1] - 22:25
**materials** [7] - 141:8, 182:15, 182:17, 213:25, 214:3, 220:11
**math** [12] - 106:19, 148:2, 148:18, 150:2, 159:12, 160:1, 160:13, 162:7, 162:8, 169:11, 169:22, 174:21
**mathematical** [1] - 173:14
**matter** [6] - 10:14, 13:7, 83:3, 83:11, 97:4, 246:5
**MC** [2] - 181:14, 184:22
**MC-WV** [2] - 181:14, 184:22
**MC-WV-01806** [1] - 30:13
**McCabe** [2] - 203:25, 204:4
**MCCLURE** [2] - 6:3, 244:6
**MCGINNESS** [1] - 4:2
**McKesson** [16] - 5:8, 21:24, 24:2, 24:7, 24:11, 24:24, 25:3, 25:18, 26:8, 26:18, 26:23, 27:18, 27:23, 27:24, 28:1, 28:3
**MDL** [2] - 131:15, 131:19
**mean** [38] - 12:8, 25:1, 32:7, 37:2, 38:13, 45:15, 58:10, 61:6, 68:14, 69:5, 69:15, 84:23, 90:15, 101:5, 102:13, 108:8, 111:4, 112:10, 118:4, 135:2, 141:19, 142:24, 157:8, 162:14, 185:5, 193:14, 198:5, 208:8, 208:13, 208:21, 209:16, 209:18, 219:5, 223:6, 231:9,

239:10, 243:1, 243:15
**meaning** [6] - 99:11, 101:15, 101:24, 116:2, 210:18, 238:12
**meaningful** [1] - 32:25
**meaningless** [1] - 102:4
**means** [22] - 11:2, 11:18, 32:8, 32:25, 35:15, 36:4, 36:24, 42:15, 90:12, 97:2, 100:11, 129:8, 130:13, 137:13, 161:8, 174:18, 175:25, 178:4, 192:11, 194:1, 209:12, 210:14
**meant** [6] - 69:17, 69:24, 70:3, 70:5, 73:15, 105:16
**measure** [7] - 66:23, 94:20, 171:23, 185:15, 187:6, 200:8, 227:19
**measured** [7] - 64:14, 100:11, 167:14, 190:10, 203:18, 225:24, 227:19
**measurement** [2] - 188:6, 188:7
**measurements** [2] - 66:7, 67:9
**measures** [2] - 190:11, 211:3
**Measures** [1] - 226:5
**measuring** [4] - 164:8, 200:1, 212:2, 227:2
**mechanical** [1] - 6:19
**mechanism** [1] - 12:1
**mechanisms** [3] - 39:13, 39:16, 39:24
**medical** [139] - 13:6, 14:2, 15:12, 17:10, 36:9, 36:12, 36:15, 36:18, 37:3, 38:5, 38:6, 47:3, 48:16, 50:10, 50:24, 60:19, 60:21, 67:13, 76:22, 76:25, 77:5, 77:23, 78:16, 79:6, 79:19, 80:1, 80:5, 80:8, 80:11, 80:19, 80:20, 91:25, 92:3, 92:5, 93:8, 94:15, 108:10, 108:12, 110:23, 111:11, 111:18, 111:20, 120:20, 121:1, 140:22,

141:2, 141:11, 141:13, 178:4, 178:7, 178:17, 178:21, 178:24, 179:10, 179:21, 179:25, 180:10, 180:13, 180:15, 190:8, 190:10, 190:11, 190:14, 190:17, 190:20, 190:24, 191:3, 191:5, 191:18, 191:23, 192:5, 192:11, 193:9, 193:10, 193:22, 194:2, 194:4, 194:11, 194:12, 196:25, 197:24, 198:24, 199:3, 200:3, 201:9, 201:10, 201:12, 201:20, 201:23, 202:8, 202:12, 203:1, 203:4, 203:15, 203:17, 203:18, 204:15, 204:23, 204:24, 223:4, 223:7, 223:8, 223:9, 223:10, 224:3, 224:6, 224:14, 224:15, 224:17, 226:11, 226:16, 226:21, 227:22, 233:2, 233:15, 233:21, 234:2, 234:5, 234:16, 234:22, 235:7, 235:17, 235:19, 235:22, 235:24, 240:1, 240:3, 240:6, 240:8, 240:18, 240:21, 241:13, 241:15, 242:6, 242:9
**Medical** [11] - 14:22, 35:7, 46:12, 52:7, 115:9, 117:13, 119:10, 121:16, 121:21, 189:2, 222:21
**medically** [37] - 35:21, 36:4, 37:7, 37:11, 37:16, 38:8, 62:6, 80:5, 178:13, 190:21, 190:23, 191:1, 191:3, 191:8, 191:9, 191:10, 191:12, 191:13, 191:14, 193:6, 193:21, 201:3, 201:18, 201:22,

202:2, 202:6, 202:14, 202:16, 202:20, 202:22, 202:25, 203:20, 204:10, 204:22, 225:25, 234:13, 235:12
**medicating** [1] - 15:10
**medication** [8] - 13:21, 37:20, 39:23, 50:11, 72:24, 73:21, 78:8, 78:9
**medications** [7] - 50:23, 72:2, 74:5, 74:7, 78:3, 88:12, 88:24
**Medicine** [1] - 108:24
**medicine** [2] - 13:12, 36:11
**medicines** [3] - 71:14, 75:2, 196:13
**medium** [6] - 96:21, 97:14, 99:7, 99:12, 101:1, 101:2
**meet** [8] - 17:10, 20:11, 20:24, 21:6, 73:24, 75:15, 76:18, 76:23
**meeting** [1] - 20:16
**member** [2] - 37:22, 38:1
**members** [4] - 229:24, 230:2, 230:9, 231:16
**membership** [2] - 231:1, 232:4
**memory** [3] - 14:6, 124:22, 158:1
**mental** [1] - 201:6
**Mental** [2] - 189:11, 189:23
**mention** [4] - 21:24, 24:6, 51:4, 98:18
**mentioned** [9] - 13:1, 24:13, 29:4, 52:16, 62:21, 66:10, 66:16, 67:12, 98:13
**mentors** [1] - 9:6
**merit** [1] - 32:14
**meritorious** [5] - 32:23, 33:3, 33:6, 33:11, 91:12
**merits** [1] - 32:11
**messed** [1] - 104:22
**messy** [1] - 149:16
**metaanalysis** [5] - 136:19, 140:3, 140:5, 140:7, 142:13
**Metaanalysis** [1] - 139:17
**Methadone** [2] -

154:20, 154:21
**methadone** [2] - 43:16, 171:21
**methamphetamine** [5] - 44:8, 136:14, 136:17, 237:23, 238:13
**method** [9] - 18:10, 132:15, 132:19, 136:1, 136:8, 136:22, 137:3, 154:16, 159:7
**methodologies** [1] - 243:1
**methodology** [41] - 24:1, 116:10, 118:4, 118:15, 118:24, 119:1, 119:3, 119:16, 120:19, 120:24, 122:3, 123:2, 127:11, 127:18, 129:2, 129:8, 129:23, 130:5, 132:14, 137:7, 143:13, 143:17, 143:21, 145:7, 164:2, 164:21, 164:22, 164:23, 165:1, 165:3, 166:9, 166:20, 167:19, 168:16, 168:21, 174:15, 175:9, 176:1, 186:25, 212:10, 212:21
**methods** [2] - 126:21, 214:20
**metric** [1] - 49:11
**Mexican** [1] - 41:3
**MICHAEL** [2] - 2:12, 3:9
**mid** [2] - 40:3, 40:20
**middle** [8] - 40:1, 53:13, 60:18, 65:18, 71:20, 77:8, 225:20, 226:4
**middle-aged** [1] - 225:20
**might** [41] - 37:21, 38:1, 47:11, 48:12, 58:1, 58:15, 59:5, 59:10, 60:1, 60:4, 60:8, 60:11, 64:15, 64:18, 65:13, 65:25, 73:22, 75:10, 79:23, 80:2, 80:3, 80:11, 87:16, 88:17, 89:3, 90:1, 111:11, 118:2, 118:5, 118:9, 119:2, 125:21, 146:7,

190:22, 191:5, 191:6, 191:13, 208:11, 211:9
**MILDRED** [1] - 3:3
**mill** [1] - 62:2
**million** [8] - 98:19, 109:11, 196:18, 198:1, 198:6, 198:10, 198:20, 198:21
**mills** [3] - 61:20, 131:11, 131:16
**mind** [1] - 71:18
**mines** [4] - 54:20, 55:18, 56:9, 56:21
**mining** [1] - 55:25
**minority** [5] - 84:23, 84:24, 85:5, 86:25, 87:1
**minute** [9] - 98:24, 115:5, 123:15, 144:6, 153:6, 161:25, 173:11, 200:14, 228:14
**minutes** [8] - 68:1, 76:8, 88:11, 127:12, 129:2, 129:24, 130:5, 188:17
**mis** [5] - 134:15, 134:16, 135:3, 135:4
**mis-classification** [2] - 135:3, 135:4
**mis-estimate** [1] - 134:15
**mis-estimated** [1] - 134:15
**mis-estimating** [1] - 134:16
**Misconceptions** [1] - 108:20
**misleading** [1] - 15:24
**missed** [1] - 46:2
**misstates** [1] - 221:3
**mistake** [1] - 125:11
**misunderstanding** [1] - 240:11
**misuse** [7] - 50:23, 120:16, 200:1, 200:8, 204:19, 219:19, 220:9
**misused** [3] - 120:12, 120:13, 237:24
**misusing** [1] - 238:8
**Mitchell** [1] - 2:10
**Mitigation** [1] - 108:20
**mixed** [4] - 41:22, 42:16, 166:16, 166:17
**MME** [4] - 177:14, 177:17, 177:22,

177:25
**model** [2] - 133:12, 133:15
**moment** [3] - 8:22, 158:10, 226:25
**Monday** [1] - 244:15
**monetary** [2] - 71:14, 72:2
**money** [3] - 72:8, 72:18, 79:12
**Monitoring** [1] - 25:25
**month** [3] - 178:13, 179:3, 179:13
**months** [1] - 94:7
**Monument** [1] - 232:9
**morality** [1] - 66:12
**morning** [11] - 7:7, 8:20, 9:2, 9:3, 9:13, 9:14, 9:21, 9:22, 242:14, 244:16, 244:19
**Morris** [1] - 6:15
**mortality** [41] - 132:9, 132:10, 132:21, 133:1, 133:6, 133:16, 133:22, 133:25, 134:3, 134:7, 134:11, 134:24, 135:5, 136:20, 138:23, 139:21, 139:22, 140:14, 140:22, 141:17, 144:2, 144:6, 144:10, 144:12, 144:13, 144:16, 144:18, 145:1, 149:8, 149:13, 150:13, 150:16, 152:20, 154:4, 154:7, 154:8, 160:4, 160:5, 160:8, 172:10
**Mortality** [1] - 139:16
**Most** [1] - 237:1
**most** [22] - 15:21, 33:2, 72:24, 80:4, 110:22, 110:23, 111:10, 111:15, 120:20, 151:11, 176:24, 190:20, 191:3, 197:6, 197:8, 197:17, 208:1, 208:5, 208:8, 210:6, 210:8, 236:21
**mostly** [3] - 179:1, 179:11, 180:17
**motion** [3] - 16:16, 16:21, 20:20
**Motley** [5] - 3:14, 4:3, 4:5, 4:8, 4:11

**MOUGEY** [1] - 2:9
**move** [11] - 16:12, 20:18, 28:4, 91:21, 98:22, 109:23, 181:23, 184:14, 185:25, 222:3, 222:4
**moving** [1] - 242:18
**MR** [198] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:16, 4:5, 4:20, 5:9, 5:10, 5:13, 6:4, 8:11, 9:12, 9:20, 14:16, 14:18, 16:12, 16:18, 16:20, 17:1, 17:2, 17:14, 17:17, 17:20, 17:24, 18:2, 18:7, 18:13, 18:15, 19:4, 19:12, 20:18, 20:22, 22:13, 22:15, 22:24, 23:6, 25:5, 25:12, 28:4, 28:8, 28:17, 28:23, 28:25, 29:13, 29:18, 29:24, 30:9, 30:11, 45:24, 46:1, 46:2, 46:3, 46:6, 46:8, 64:23, 64:24, 67:21, 67:24, 68:4, 68:5, 86:6, 86:8, 90:24, 90:25, 91:21, 91:24, 92:7, 92:23, 93:10, 93:21, 93:24, 94:2, 98:25, 108:15, 108:17, 109:23, 110:3, 110:6, 110:10, 123:24, 124:1, 124:6, 124:7, 124:18, 124:24, 124:25, 125:2, 125:3, 130:23, 131:7, 131:8, 139:3, 139:9, 139:12, 139:13, 142:21, 143:3, 143:7, 143:11, 143:15, 143:22, 143:24, 147:5, 147:6, 148:21, 148:23, 151:13, 151:14, 152:14, 152:16, 152:17, 158:10, 158:14, 161:24, 162:3, 163:1, 164:20, 165:2, 165:5, 165:10, 165:13, 165:18, 166:23, 166:25, 167:2, 167:6, 173:15, 173:17, 173:18, 173:19, 173:21, 173:22, 173:23, 179:8,

181:10, 181:12, 181:23, 182:1, 182:4, 182:7, 182:8, 182:20, 182:24, 183:5, 183:12, 183:13, 184:20, 188:15, 188:21, 188:24, 200:14, 200:17, 203:6, 203:12, 206:4, 206:10, 213:9, 213:11, 218:19, 218:25, 221:2, 221:5, 221:7, 221:22, 221:24, 222:4, 222:6, 222:18, 222:19, 223:12, 223:13, 223:14, 223:16, 223:17, 223:23, 223:25, 228:16, 228:18, 229:18, 229:21, 229:1, 239:1, 239:3, 241:1, 241:3, 241:8, 241:10, 242:12, 242:16, 242:19, 242:25, 243:6, 243:22, 244:1, 244:17, 244:21
**MS** [20] - 3:3, 3:6, 3:14, 4:2, 4:8, 4:11, 4:15, 4:15, 4:18, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 7:7, 8:19, 9:9, 244:6, 244:9
**Mt** [3] - 3:15, 4:4, 4:12
**Muhuri** [10] - 189:10, 189:22, 194:16, 195:25, 196:2, 203:13, 232:24, 233:5, 234:17, 236:9
**multifactorial** [5] - 209:24, 210:7, 210:9, 210:10, 210:13
**multiple** [14] - 10:4, 30:25, 85:21, 116:2, 118:5, 118:9, 118:11, 172:2, 172:4, 207:15, 208:10, 210:15, 210:22
**multiplied** [2] - 158:17, 160:2
**multiplier** [11] - 132:15, 132:19, 148:15, 160:23, 160:24, 161:5, 168:19, 169:1,

169:21, 173:3, 173:4
**multiply** [6] - 132:25, 149:20, 159:9, 159:13, 162:12
**multiplying** [3] - 159:19, 162:15, 162:24
**must** [1] - 143:17
**mutually** [2] - 79:9, 172:1

## N

**name** [6] - 21:23, 77:17, 230:23, 231:9, 231:14, 231:18
**named** [1] - 27:23
**namely** [1] - 155:15
**narcotics** [2] - 54:19, 56:20
**narrow** [2] - 215:7, 218:16
**narrower** [1] - 74:15
**narrowly** [1] - 220:22
**nation's** [1] - 34:12
**National** [8] - 43:14, 77:10, 77:14, 77:15, 109:5, 178:15, 181:18, 182:9
**nationally** [1] - 178:18
**nationwide** [1] - 8:1
**nature** [6] - 55:10, 59:15, 59:16, 66:24, 67:16, 94:5
**nearly** [2] - 217:6, 235:21
**necessarily** [11] - 37:2, 58:6, 58:10, 92:1, 185:5, 199:5, 201:25, 204:20, 209:10, 209:16, 209:18
**necessary** [4] - 12:21, 210:11, 210:16, 210:18
**need** [42] - 16:17, 19:7, 21:5, 38:6, 48:7, 50:10, 56:6, 67:19, 73:23, 73:24, 74:1, 75:16, 76:18, 76:22, 76:23, 76:25, 86:11, 88:21, 94:4, 100:8, 102:10, 103:1, 130:21, 133:9, 133:19, 134:13, 141:4, 142:2, 149:11, 149:13, 156:15, 159:16, 183:8,

203:11, 207:8, 208:1, 208:5, 208:14, 211:13, 242:11, 242:18
**needed** [13] - 17:10, 18:24, 19:21, 20:11, 20:24, 74:6, 76:18, 76:23, 144:3, 150:16, 150:21, 154:7, 242:25
**needs** [25] - 13:6, 17:10, 20:9, 20:12, 20:15, 20:17, 20:24, 21:3, 21:6, 21:7, 21:10, 55:11, 55:12, 59:15, 59:18, 59:20, 59:21, 59:23, 59:25, 60:1, 60:5, 60:9, 67:9, 196:25, 205:18
**Needs** [1] - 205:18
**net** [1] - 211:12
**network** [6] - 61:6, 61:11, 61:12, 62:1, 71:16, 72:4
**networks** [4] - 60:23, 61:4, 61:8, 61:22
**never** [8] - 12:17, 12:19, 63:16, 83:6, 210:20, 217:24, 218:9
**New** [11] - 3:5, 3:8, 7:25, 28:24, 29:2, 108:24, 204:2, 221:5, 239:1, 239:5, 241:1
**new** [16] - 8:6, 73:12, 90:13, 90:17, 94:6, 94:24, 95:25, 104:23, 142:22, 143:17, 143:19, 143:20, 194:6, 226:6
**newer** [1] - 185:1
**next** [27] - 7:9, 34:20, 36:22, 44:6, 49:2, 49:21, 50:5, 50:16, 50:22, 57:11, 61:16, 61:23, 63:14, 78:13, 101:8, 104:20, 106:10, 107:17, 114:17, 180:23, 181:3, 181:6, 183:21, 188:12, 225:12, 234:25
**Next** [1] - 49:9
**NF** [3] - 144:24, 149:19, 149:21
**nice** [1] - 151:6
**NICHOLAS** [1] - 6:11
**night** [2] - 7:11, 8:8
**nine** [1] - 66:12

**nine-level** [1] - 66:12
**Ninth** [1] - 4:9
**NMPR** [4] - 192:9, 192:15, 192:18, 193:1
**NMUPO** [2] - 226:6, 227:10
**nobody** [1] - 12:18
**noise** [1] - 216:20
**Non** [6] - 14:22, 46:12, 52:7, 91:4, 189:2, 222:21
**non** [169] - 34:3, 34:10, 34:23, 34:24, 35:5, 35:21, 36:4, 36:9, 36:12, 36:15, 36:18, 37:3, 37:7, 37:11, 37:16, 38:8, 47:3, 48:17, 48:18, 50:24, 60:21, 62:6, 77:5, 77:23, 78:16, 79:6, 79:19, 80:1, 80:5, 80:8, 80:11, 80:19, 80:20, 93:3, 94:6, 98:11, 98:23, 104:10, 105:2, 105:6, 105:12, 105:18, 106:3, 106:7, 109:24, 110:8, 120:20, 121:1, 136:6, 140:22, 144:18, 144:21, 144:23, 145:2, 146:24, 148:15, 148:25, 149:9, 149:12, 150:13, 160:7, 178:4, 178:7, 178:12, 178:13, 178:17, 178:21, 178:24, 178:25, 179:10, 179:11, 179:21, 179:25, 180:10, 180:13, 180:14, 180:15, 180:16, 187:10, 190:8, 190:10, 190:11, 190:14, 190:20, 190:24, 191:1, 191:3, 191:5, 191:8, 191:9, 191:12, 191:14, 191:18, 191:23, 192:5, 192:11, 193:6, 193:9, 193:10, 193:21, 193:22, 194:2, 194:4, 194:11, 194:12, 198:24, 201:3, 201:12,

201:18, 201:20, 201:23, 202:6, 202:8, 202:14, 202:16, 202:20, 202:22, 202:25, 203:1, 203:4, 203:15, 203:17, 203:18, 204:15, 204:23, 204:24, 222:14, 223:4, 223:7, 223:8, 223:10, 224:3, 224:6, 224:14, 224:15, 224:17, 225:25, 226:11, 226:16, 226:21, 227:22, 233:2, 233:15, 233:21, 234:2, 234:5, 234:13, 234:16, 234:22, 235:7, 235:12, 235:17, 235:19, 235:22, 235:24, 240:1, 240:3, 240:6, 240:8, 240:18, 240:21, 241:13, 241:15, 242:6, 242:9
**non-addictive** [1] - 34:23
**non-adults** [1] - 48:18
**Non-Cancer** [1] - 91:4
**non-cancer** [13] - 34:3, 34:10, 34:24, 35:5, 48:17, 94:6, 104:10, 105:2, 105:6, 105:12, 105:18, 106:3, 106:7
**non-fentanyl** [11] - 144:18, 144:21, 144:23, 145:2, 146:24, 148:15, 148:25, 149:9, 149:12, 150:13, 160:7
**non-institutionalized** [4] - 178:12, 178:25, 179:11, 180:16
**non-medical** [103] - 36:9, 36:12, 36:15, 36:18, 37:3, 47:3, 50:24, 60:21, 77:5, 77:23, 78:16, 79:6, 79:19, 80:1, 80:5, 80:8, 80:11, 80:19, 80:20, 120:20, 121:1, 140:22, 178:4, 178:7, 178:17, 178:21, 178:24, 179:10,

179:21, 179:25, 180:10, 180:13, 180:15, 190:8, 190:10, 190:11, 190:14, 190:20, 190:24, 191:3, 191:5, 191:18, 191:23, 192:5, 192:11, 193:9, 193:10, 193:22, 194:2, 194:4, 194:11, 194:12, 198:24, 201:12, 201:20, 201:23, 202:8, 203:1, 203:4, 203:15, 203:17, 203:18, 204:15, 204:23, 204:24, 223:4, 223:7, 223:8, 223:10, 224:3, 224:6, 224:14, 224:15, 224:17, 226:11, 226:16, 226:21, 227:22, 233:2, 233:15, 233:21, 234:2, 234:5, 234:16, 235:7, 235:17, 235:19, 235:22, 235:24, 240:1, 240:3, 240:6, 240:8, 240:18, 240:21, 241:15, 242:6, 242:9
**Non-Medical** [5] - 14:22, 46:12, 52:7, 189:2, 222:21
**non-medically** [26] - 35:21, 36:4, 37:7, 37:11, 37:16, 38:8, 62:6, 178:13, 191:1, 191:8, 191:9, 191:12, 191:14, 193:6, 193:21, 201:3, 201:18, 202:6, 202:14, 202:16, 202:20, 202:22, 202:25, 225:25, 234:13, 235:12
**non-opioid** [1] - 136:6
**non-pain** [1] - 180:13
**non-prescribed** [1] - 98:11
**non-responsive** [3] - 98:23, 109:24, 110:8
**non-significant** [1] - 187:10
**non-traditional** [1] - 93:3

**non-users** [1] - 222:14
**nondisclosure** [1] - 232:9
**none** [6] - 27:24, 28:14, 204:8, 220:23, 220:24, 221:16
**None** [3] - 8:2, 27:17, 28:9
**nonresponsive** [1] - 20:19
**Nora** [3] - 108:23, 109:5, 219:7
**norm** [1] - 93:14
**note** [2] - 16:21, 184:14
**noted** [2] - 16:25, 61:24
**notes** [1] - 200:24
**November** [1] - 31:9
**NSDUH** [28] - 77:14, 77:17, 78:14, 78:16, 79:1, 79:2, 120:8, 120:12, 120:15, 178:19, 178:20, 181:14, 182:12, 184:5, 184:12, 184:23, 185:2, 185:4, 185:7, 185:13, 185:22, 186:12, 188:5, 190:10, 212:25, 215:16, 216:13, 217:5
**number** [122] - 24:9, 39:13, 45:25, 47:23, 53:6, 98:4, 102:17, 104:1, 105:22, 115:7, 119:3, 119:18, 122:25, 123:18, 124:15, 126:15, 126:18, 126:20, 126:22, 127:7, 127:24, 128:11, 128:12, 128:18, 128:20, 129:4, 132:7, 132:20, 132:22, 133:1, 133:5, 133:9, 133:20, 133:21, 133:22, 134:6, 134:7, 134:8, 134:19, 134:20, 134:23, 135:1, 135:10, 135:17, 135:21, 136:2, 137:9, 137:12, 137:17, 137:23, 137:24, 137:25, 138:1, 138:4,

142:16, 142:17, 144:10, 145:11, 146:1, 148:15, 148:25, 149:18, 149:19, 149:21, 149:22, 149:24, 150:4, 150:22, 150:23, 156:9, 157:22, 159:23, 159:24, 160:10, 160:15, 160:16, 160:23, 160:25, 161:17, 161:20, 161:21, 161:23, 162:5, 162:21, 162:24, 167:10, 167:13, 168:12, 168:15, 168:17, 168:19, 168:22, 170:1, 170:8, 170:21, 171:15, 174:2, 174:8, 174:11, 175:21, 176:17, 186:9, 194:10, 196:6, 196:8, 198:1, 200:21, 212:25, 216:13, 216:23, 216:24, 217:11, 227:15, 227:25, 233:1, 233:18, 233:20

**numbers** [38] - 15:7, 30:21, 33:15, 47:7, 52:21, 65:16, 98:6, 98:7, 118:3, 122:23, 124:17, 126:4, 126:6, 127:20, 127:22, 128:3, 128:23, 133:19, 134:4, 140:19, 156:6, 158:5, 158:7, 158:15, 159:2, 159:8, 163:18, 163:22, 163:25, 164:8, 164:19, 165:16, 167:9, 168:14, 172:8, 177:1, 217:12, 230:1
**numerous** [1] - 114:15
**NW** [6] - 4:6, 4:9, 4:16, 4:18, 5:5, 5:12
**NY** [1] - 3:5

# O

**oath** [2] - 9:16, 69:13
**obese** [1] - 60:4
**object** [4] - 23:1, 23:2, 29:18, 183:4
**objected** [1] - 92:2

**objection** [17] - 16:25, 19:5, 19:10, 29:18, 29:19, 29:20, 29:22, 91:23, 93:18, 93:19, 93:20, 164:20, 166:23, 181:25, 183:10, 203:10, 229:19
**Objection** [10] - 17:20, 22:24, 25:5, 28:17, 29:13, 203:6, 206:4, 218:19, 221:2, 221:22
**obligation** [1] - 143:12
**obliged** [1] - 165:14
**observation** [2] - 55:3, 194:18
**observations** [1] - 55:10
**observe** [1] - 133:5
**observed** [4] - 46:23, 47:10, 65:21, 237:21
**obtain** [15] - 37:2, 37:18, 38:5, 50:11, 62:6, 62:16, 62:24, 62:25, 63:11, 77:5, 80:5, 80:12, 87:8, 190:21, 190:23
**obtainable** [1] - 119:15
**obtained** [11] - 35:22, 36:23, 37:7, 37:15, 38:2, 38:9, 63:3, 77:23, 78:17, 79:10, 79:21
**obtaining** [1] - 79:6
**occasion** [1] - 26:18
**occupations** [5] - 54:20, 55:18, 56:4, 56:10, 56:22
**occur** [6] - 12:6, 12:11, 68:15, 207:11, 207:12, 226:6
**occurred** [6] - 82:20, 85:18, 86:4, 115:17, 121:19, 207:5
**occurring** [2] - 62:18, 238:14
**occurs** [9] - 44:19, 63:16, 68:14, 68:18, 80:18, 85:1, 86:17, 114:2, 209:14
**odds** [1] - 100:11
**OF** [2] - 1:1, 1:4
**offer** [4] - 55:14, 56:2, 57:4, 93:11
**offered** [1] - 110:5
**offering** [2] - 26:7, 77:2

**Official** [2] - 246:2, 246:3
**often** [7] - 41:22, 54:19, 56:9, 56:21, 74:17, 75:9, 104:10
**oftentimes** [1] - 237:16
**older** [7] - 53:22, 58:9, 58:19, 58:24, 59:3, 60:1, 66:17
**on-going** [1] - 7:17
**once** [2] - 8:17, 191:1
**One** [3] - 5:11, 59:23, 192:4
**one** [113] - 8:3, 8:13, 9:5, 10:5, 11:4, 13:8, 14:19, 15:3, 30:18, 37:12, 37:21, 37:24, 37:25, 38:15, 39:17, 42:4, 46:4, 46:5, 46:17, 47:17, 49:19, 49:20, 49:21, 50:5, 51:6, 51:8, 52:4, 52:5, 53:21, 54:4, 56:3, 58:18, 58:21, 59:3, 59:11, 59:23, 62:23, 63:7, 65:20, 66:2, 66:3, 66:17, 68:6, 72:20, 78:8, 78:12, 80:7, 80:8, 81:25, 82:2, 82:11, 94:19, 97:21, 102:17, 103:17, 115:4, 115:23, 116:6, 116:14, 117:7, 117:20, 123:21, 127:13, 133:25, 134:15, 135:8, 139:22, 139:23, 140:14, 141:4, 143:9, 145:1, 147:10, 149:2, 151:6, 162:21, 163:12, 164:7, 170:18, 171:4, 182:18, 182:19, 184:18, 185:24, 187:16, 188:10, 192:24, 194:7, 195:2, 195:17, 195:25, 196:2, 203:14, 203:22, 203:24, 207:23, 209:14, 209:16, 210:5, 210:11, 210:16, 210:18, 214:17, 215:8, 220:17, 221:19, 231:16, 233:5, 233:7, 243:16

**one-tenth** [2] - 42:4, 65:20
**ones** [10] - 48:12, 51:24, 66:10, 82:1, 82:2, 88:19, 121:11, 175:12, 175:13, 219:18
**onset** [2] - 104:23, 226:6
**operations** [5] - 24:24, 25:2, 25:9, 25:17, 25:21
**opined** [1] - 12:7
**opinion** [12] - 21:1, 26:7, 26:13, 55:14, 56:2, 57:4, 70:25, 83:1, 156:20, 199:24, 200:7, 218:8
**opinions** [7] - 7:15, 8:6, 25:11, 73:11, 109:2, 181:20, 218:13
**Opioid** [27] - 14:23, 33:18, 33:19, 33:20, 46:11, 46:12, 52:7, 90:17, 90:19, 91:3, 91:6, 91:15, 98:14, 108:19, 109:9, 114:10, 142:3, 181:3, 181:5, 183:19, 184:4, 186:2, 186:10, 186:16, 213:15, 214:8
**opioid** [289] - 9:25, 11:25, 12:11, 12:17, 12:19, 12:22, 13:20, 14:2, 15:12, 15:22, 20:14, 20:15, 23:23, 26:11, 27:12, 27:14, 27:17, 27:18, 27:19, 27:25, 28:10, 28:16, 28:20, 29:10, 34:2, 35:14, 35:18, 35:22, 37:7, 38:9, 39:10, 39:23, 40:4, 40:11, 41:20, 42:16, 43:16, 45:10, 46:22, 47:3, 47:10, 48:13, 48:25, 49:3, 49:7, 49:14, 49:17, 49:24, 50:3, 50:6, 50:14, 50:20, 51:2, 51:10, 53:1, 53:7, 53:18, 53:23, 57:19, 58:5, 58:7, 58:8, 58:10, 58:20, 59:5, 59:11, 59:18, 59:24, 61:9, 64:2, 64:6, 64:7, 64:15, 64:19, 70:19, 71:14,

72:2, 73:23, 75:15, 75:24, 76:17, 77:5, 78:6, 78:17, 80:2, 80:7, 80:23, 80:25, 81:3, 81:5, 81:14, 81:16, 81:21, 82:3, 82:11, 82:13, 82:19, 84:25, 85:11, 85:14, 85:16, 85:20, 85:24, 86:2, 86:5, 87:17, 87:18, 87:21, 88:1, 88:4, 88:5, 88:12, 88:24, 89:7, 90:14, 91:15, 94:7, 95:2, 98:11, 100:2, 100:14, 100:18, 100:21, 103:7, 103:11, 103:14, 103:15, 103:22, 103:24, 104:17, 104:21, 104:23, 105:10, 105:12, 105:19, 106:4, 106:8, 107:9, 109:11, 110:17, 112:19, 112:24, 112:25, 113:8, 113:9, 113:15, 113:19, 113:24, 114:12, 114:20, 116:14, 117:8, 119:19, 120:16, 121:2, 121:5, 121:7, 121:10, 122:5, 123:6, 125:6, 125:14, 125:18, 125:21, 126:8, 129:5, 129:10, 129:17, 130:8, 130:14, 131:17, 131:18, 135:18, 136:2, 136:4, 136:6, 136:13, 136:17, 136:24, 137:1, 138:9, 138:10, 140:23, 141:3, 141:11, 141:13, 142:2, 142:20, 144:10, 144:12, 145:24, 147:1, 147:9, 152:11, 152:25, 153:14, 153:25, 154:2, 155:8, 155:17, 155:21, 156:1, 156:3, 156:4, 156:7, 156:9, 156:12, 156:17, 156:19, 156:21, 156:22, 156:25, 157:13, 157:19, 165:25,

168:1, 168:9,
170:19, 170:21,
171:1, 171:7,
171:20, 171:24,
176:11, 176:21,
177:6, 190:8,
193:11, 194:21,
195:5, 195:11,
195:21, 198:14,
199:22, 203:2,
204:25, 205:21,
206:2, 210:19,
211:23, 212:8,
212:17, 212:19,
213:5, 214:10,
214:15, 214:24,
215:3, 215:9,
215:10, 215:12,
215:21, 215:22,
216:3, 216:4,
216:17, 216:25,
217:7, 217:15,
217:22, 217:25,
218:4, 218:5,
218:10, 218:15,
218:17, 219:3,
219:18, 220:9,
220:25, 222:13,
226:12, 226:21,
227:4, 231:6, 231:7,
231:10, 234:18,
236:24, 237:14,
238:3, 242:7
**opioid-involved** [1] -
129:10
**opioid-related** [20] -
9:25, 35:18, 40:4,
81:16, 81:21, 82:3,
82:13, 84:25, 85:11,
129:17, 130:8,
130:14, 131:18,
135:18, 136:4,
136:13, 136:24,
137:1, 138:10,
153:25
**opioid-rich** [1] - 51:10
**Opioids** [3] - 139:17,
222:22, 228:21
**opioids** [370] - 9:24,
10:6, 10:7, 10:17,
10:21, 11:1, 11:6,
11:8, 11:17, 11:21,
12:8, 12:9, 12:14,
12:18, 12:24, 13:3,
13:6, 13:8, 13:11,
13:15, 13:17, 13:19,
13:22, 13:24, 14:9,
14:10, 16:4, 17:10,
20:24, 24:2, 24:7,
24:17, 26:5, 26:7,

26:19, 28:2, 28:12,
28:20, 34:23, 35:4,
35:7, 35:16, 35:20,
36:4, 36:8, 36:11,
36:14, 36:22, 37:3,
37:12, 37:13, 37:16,
37:19, 37:23, 38:2,
38:5, 38:14, 38:24,
39:1, 39:2, 40:3,
40:12, 40:14, 43:15,
43:21, 44:10, 48:16,
50:10, 51:9, 51:12,
51:15, 51:16, 51:17,
56:6, 56:8, 60:20,
60:21, 62:6, 62:16,
62:24, 62:25, 63:3,
63:11, 70:15, 70:22,
71:5, 71:9, 72:23,
73:21, 74:8, 74:12,
74:16, 74:21, 74:24,
75:20, 76:10, 77:6,
77:12, 77:23, 77:24,
78:17, 78:20, 79:10,
79:20, 79:21, 79:25,
80:5, 80:16, 80:17,
80:20, 81:9, 82:6,
82:8, 82:20, 83:4,
83:5, 83:11, 83:13,
84:6, 84:10, 84:16,
84:21, 85:4, 85:8,
85:9, 85:22, 86:24,
87:3, 87:9, 87:11,
87:12, 87:20, 88:15,
89:3, 89:15, 89:18,
89:23, 90:1, 90:7,
90:21, 94:21, 95:9,
96:13, 97:4, 98:16,
98:20, 99:3, 99:6,
99:11, 101:11,
101:22, 102:9,
102:25, 104:10,
106:11, 106:20,
106:25, 107:12,
111:23, 112:3,
112:11, 112:13,
114:3, 114:10,
115:8, 115:12,
116:6, 116:8,
116:17, 116:21,
116:23, 116:24,
117:9, 117:12,
117:20, 117:22,
118:6, 118:7,
118:10, 118:20,
118:22, 119:9,
119:19, 119:24,
120:10, 120:13,
120:17, 121:4,
121:7, 121:12,
121:15, 121:16,
122:6, 122:7, 123:2,

123:7, 125:7,
125:16, 125:24,
126:1, 126:10,
126:13, 126:23,
127:2, 127:4, 127:9,
127:21, 128:10,
128:12, 128:13,
128:17, 129:1,
129:10, 129:21,
130:3, 130:11,
130:15, 135:24,
137:3, 137:7,
137:15, 137:19,
137:22, 138:3,
138:5, 138:21,
141:2, 144:19,
145:10, 145:22,
146:2, 146:3, 146:9,
146:10, 146:13,
146:22, 147:7,
147:12, 147:13,
154:19, 154:21,
155:8, 155:15,
170:22, 174:12,
174:20, 175:1,
175:5, 175:13,
175:22, 176:1,
176:9, 177:4,
177:11, 177:14,
178:4, 178:7,
178:12, 178:25,
180:11, 180:16,
190:14, 190:18,
190:23, 191:1,
191:8, 191:13,
191:14, 191:19,
191:23, 193:5,
193:20, 193:23,
194:4, 195:1, 196:7,
196:12, 196:17,
196:24, 197:1,
197:10, 197:11,
197:18, 197:24,
198:8, 198:11,
198:12, 198:17,
198:18, 199:2,
199:11, 199:25,
200:2, 200:8, 200:9,
201:3, 201:5,
201:13, 201:18,
201:22, 201:24,
202:6, 202:14,
202:15, 202:19,
202:25, 203:4,
203:20, 204:9,
204:14, 204:18,
204:19, 204:22,
205:3, 205:10,
206:12, 212:4,
212:9, 212:11,
212:15, 212:16,

212:20, 216:8,
216:10, 216:12,
216:22, 216:25,
217:4, 217:6,
217:13, 219:8,
219:11, 223:5,
224:3, 224:7,
224:10, 224:14,
224:20, 225:25,
226:17, 228:3,
233:2, 234:2,
234:19, 234:23,
235:10, 235:11,
235:17, 235:19,
237:9, 237:12,
237:17, 237:24,
237:25, 238:8,
238:17, 240:1,
240:6, 240:8,
240:13, 240:14,
240:19, 240:22,
240:23, 241:14,
241:16, 242:7, 242:9
**opportunity** [1] -
244:11
**oppose** [1] - 16:21
**opposed** [1] - 92:1
**oranges** [1] - 88:2
**Order** [1] - 25:25
**order** [6] - 8:18, 48:7,
50:10, 134:14,
205:17, 205:19
**orders** [2] - 26:3, 26:6
**organization** [1] -
77:14
**organizations** [2] -
34:13, 84:9
**original** [7] - 122:25,
123:5, 123:9,
123:11, 123:19,
125:5, 127:2
**originally** [1] - 31:8
**Orleans** [1] - 3:8
**ORs** [1] - 100:11
**otherwise** [2] - 190:4,
210:22
**OUD** [114] - 90:9,
90:12, 90:13, 90:16,
94:7, 94:20, 94:23,
94:24, 95:25, 96:7,
96:10, 96:14, 96:24,
97:5, 97:10, 97:13,
97:17, 97:24, 98:16,
99:3, 99:8, 99:13,
100:17, 101:11,
101:16, 101:21,
102:9, 102:12,
102:15, 102:16,
102:18, 102:20,
102:24, 103:5,

104:1, 131:23,
132:2, 132:4,
132:22, 132:25,
133:4, 133:7,
133:17, 133:23,
134:6, 134:8,
134:11, 134:14,
134:17, 135:1,
135:5, 135:9,
135:20, 136:20,
137:13, 139:21,
140:15, 141:11,
141:14, 141:16,
141:18, 142:11,
142:13, 144:9,
144:17, 145:17,
146:15, 150:3,
155:20, 156:14,
156:15, 159:24,
160:11, 160:18,
163:25, 164:8,
164:10, 168:15,
168:17, 168:21,
170:1, 170:8,
170:25, 172:11,
172:16, 172:21,
172:25, 173:1,
173:4, 173:8, 174:1,
174:3, 174:9,
174:11, 174:18,
174:25, 175:4,
175:12, 175:14,
175:19, 175:22,
175:25, 176:5,
178:19, 184:1,
197:25, 198:7,
210:10, 210:13,
210:20, 210:23
**OUDs** [5] - 99:25,
100:6, 100:12,
102:4, 104:16
**outcome** [6] - 207:4,
207:9, 209:14,
211:10, 227:3, 227:5
**outline** [1] - 120:19
**outlined** [2] - 12:10,
82:9
**outside** [3] - 39:7,
43:1, 206:4
**over-prescribing** [5] -
71:13, 72:1, 72:12,
72:16, 81:25
**over-supply** [6] -
12:24, 13:2, 27:20,
28:11, 28:14, 198:16
**overall** [12] - 53:10,
78:7, 80:25, 81:5,
81:15, 81:20, 82:12,
102:15, 106:25,
107:14, 179:1,

180:17
**Overdose** [5] - 30:15, 33:18, 44:6, 151:19, 153:5
**overdose** [67] - 33:24, 45:12, 63:15, 65:13, 67:7, 87:19, 87:23, 122:5, 123:6, 125:6, 128:25, 129:17, 130:9, 130:14, 132:7, 132:8, 132:20, 133:21, 135:23, 136:1, 136:2, 136:3, 136:13, 136:21, 137:20, 138:19, 138:20, 141:3, 144:17, 145:8, 145:23, 150:25, 151:4, 151:9, 152:10, 152:11, 153:1, 153:14, 153:17, 153:18, 154:1, 154:2, 154:11, 154:12, 154:14, 155:4, 155:7, 155:16, 155:21, 155:23, 155:25, 156:7, 156:18, 156:21, 156:25, 157:19, 163:23, 164:14, 165:25, 167:16, 168:2, 170:19, 171:7, 212:4, 212:12, 212:17, 212:19
**overdosed** [4] - 85:19, 85:24, 86:2, 86:10
**overdoses** [16] - 40:4, 43:23, 83:19, 83:24, 84:5, 86:5, 116:2, 129:5, 133:20, 135:18, 136:6, 141:3, 142:10, 150:13, 150:17
**Overdoses** [1] - 43:15
**overestimate** [1] - 173:8
**overestimating** [2] - 172:16, 172:21
**overlap** [8] - 79:14, 80:6, 80:9, 120:20, 190:20, 191:11, 203:17, 223:8
**overlapping** [1] - 179:6
**overnight** [1] - 244:18
**overprescribing** [1] - 50:22

**overrule** [3] - 19:10, 28:6, 29:21
**overruled** [1] - 98:24
**Overruled** [6] - 18:14, 23:4, 25:6, 28:18, 206:7, 218:20
**overstate** [1] - 50:10
**oversupply** [2] - 72:14, 72:20
**overview** [1] - 159:6
**overwhelming** [5] - 70:21, 71:4, 76:9, 76:12, 76:14
**overwhelmingly** [2] - 199:10, 199:12
**own** [7] - 111:12, 194:18, 220:13, 239:25, 240:5, 241:5, 241:12
**oxycodone** [3] - 41:22, 42:12, 42:20

**P**

**P-1200** [1] - 2:7
**p.m** [3] - 8:8, 188:19, 244:25
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**page** [38] - 11:11, 45:25, 52:23, 62:9, 65:7, 71:20, 77:4, 91:2, 96:2, 97:24, 99:24, 110:21, 111:1, 111:22, 112:2, 112:15, 112:17, 114:17, 135:12, 141:24, 151:25, 154:18, 176:21, 179:19, 183:21, 189:19, 194:23, 200:18, 200:21, 200:24, 200:25, 206:20, 221:8, 226:5, 229:25, 232:8, 234:25
**Page** [83] - 15:6, 17:15, 18:22, 22:14, 22:19, 28:24, 29:6, 30:20, 33:14, 35:13, 39:25, 40:9, 43:13, 46:1, 47:6, 52:20, 53:6, 60:16, 62:12, 65:16, 68:21, 71:11, 71:18, 71:19, 71:22, 77:3, 86:7, 94:18, 95:21, 96:4, 96:5, 99:23, 104:14, 109:8, 112:14,

112:17, 112:23, 113:21, 114:17, 140:8, 141:20, 153:10, 153:15, 155:2, 155:6, 155:7, 170:15, 171:11, 176:9, 176:13, 177:19, 178:11, 179:20, 180:10, 183:14, 185:25, 186:4, 187:19, 189:17, 192:1, 195:3, 200:11, 201:15, 204:4, 214:6, 221:6, 221:13, 223:11, 224:1, 224:22, 225:3, 225:12, 225:23, 229:11, 230:1, 230:6, 230:14, 232:6, 232:13, 233:8, 233:13, 239:2
**Pages** [1] - 194:19
**pages** [2] - 17:15, 232:6
**pain** [95] - 13:13, 13:18, 13:19, 13:21, 14:3, 15:14, 20:8, 20:12, 20:16, 20:24, 21:2, 21:6, 21:7, 21:10, 34:3, 34:10, 34:11, 34:13, 34:15, 34:24, 35:5, 35:8, 48:17, 49:4, 49:9, 49:11, 49:17, 49:24, 50:6, 53:23, 54:8, 55:11, 57:12, 58:19, 59:15, 59:18, 59:20, 59:21, 59:23, 59:25, 60:1, 60:5, 60:8, 67:9, 74:9, 74:17, 74:24, 75:3, 75:7, 75:16, 75:21, 82:21, 89:2, 89:4, 89:16, 89:19, 89:21, 94:6, 94:24, 95:5, 95:24, 104:10, 104:18, 105:2, 105:6, 105:12, 105:18, 106:3, 106:7, 109:12, 110:22, 111:13, 111:17, 111:19, 178:24, 179:11, 179:25, 180:10, 180:13, 180:15, 185:9, 192:11, 194:2, 198:13, 202:21, 203:15, 233:15, 235:7, 235:22,

235:24
**Pain** [6] - 15:11, 33:20, 91:4, 108:19, 183:15, 189:2
**Papantonio** [1] - 2:10
**paper** [42] - 14:8, 15:4, 30:24, 32:4, 32:13, 32:21, 32:22, 33:12, 64:10, 65:9, 65:12, 65:15, 67:1, 108:23, 139:20, 139:23, 140:8, 142:17, 156:23, 156:24, 157:10, 157:13, 158:2, 159:15, 159:16, 170:12, 170:13, 171:4, 171:6, 190:13, 192:8, 203:13, 213:23, 214:2, 214:6, 215:5, 215:6, 216:6, 216:7, 218:6, 228:14
**papers** [6] - 48:11, 67:2, 158:6, 178:17, 218:13, 233:5
**paragraph** [32] - 34:20, 36:22, 40:1, 40:11, 40:20, 44:6, 47:8, 53:12, 53:13, 53:14, 53:17, 53:21, 57:18, 58:14, 58:21, 60:18, 61:20, 65:18, 72:22, 77:4, 77:9, 95:22, 101:8, 104:15, 112:2, 113:22, 180:9, 201:8, 201:15, 201:16, 225:4, 226:5
**parameter** [1] - 167:20
**parenthetical** [1] - 100:8
**parentheticals** [1] - 106:19
**part** [22] - 24:1, 43:7, 44:9, 54:22, 59:3, 59:8, 59:11, 91:6, 118:24, 119:1, 119:3, 119:16, 120:23, 127:13, 139:8, 196:6, 207:1, 214:20, 224:8, 224:18, 224:19, 227:7
**partially** [1] - 47:11
**participants** [1] - 224:25
**particular** [30] - 8:22, 10:6, 10:13, 11:1, 13:8, 14:13, 45:3,

55:6, 55:23, 58:23, 70:12, 75:16, 75:21, 75:24, 76:6, 78:3, 82:2, 88:16, 88:20, 88:21, 89:11, 89:12, 93:16, 102:17, 103:11, 122:9, 127:6, 173:6, 203:7
**particularly** [3] - 13:21, 48:17, 62:23
**parties'** [1] - 7:12
**parts** [12] - 58:1, 58:24, 58:25, 59:10, 60:13, 60:14, 64:16, 64:19, 66:25, 67:9, 144:7, 144:8
**passage** [2] - 71:17, 78:1
**passed** [1] - 227:11
**past** [10] - 179:3, 179:13, 180:3, 183:15, 239:25, 240:5, 240:10, 240:17, 241:5, 241:13
**past-year** [5] - 239:25, 240:5, 240:17, 241:5, 241:13
**pathway** [1] - 78:12
**pathways** [1] - 35:19
**patient** [4] - 88:16, 88:21, 89:23, 203:16
**patient's** [1] - 49:4
**Patients** [1] - 214:21
**patients** [19] - 50:9, 50:16, 70:22, 71:5, 72:23, 73:20, 90:1, 95:25, 96:17, 96:20, 96:23, 97:3, 97:10, 97:13, 97:17, 99:13, 104:9, 107:18, 197:4
**pattern** [2] - 39:21, 39:22
**PAUL** [2] - 2:3, 5:9
**Paul** [1] - 46:1
**Pause** [3] - 158:13, 162:2, 200:16
**PEARL** [1] - 3:6
**peer** [9] - 27:9, 32:4, 32:7, 32:8, 32:16, 32:24, 33:9, 33:10, 217:18
**peer-review** [6] - 32:4, 32:7, 32:8, 32:16, 32:24, 217:18
**peer-reviewed** [1] - 27:9
**peer-reviewers** [2] - 33:9, 33:10
**peers** [5] - 32:15,

32:21, 33:4, 33:5,
33:10
**pen** [2] - 159:15,
160:13
**Pensacola** [1] - 2:11
**people** [102] - 37:2,
37:18, 37:19, 38:4,
39:22, 40:14, 55:22,
61:10, 62:16, 62:24,
63:11, 72:17, 74:9,
79:9, 79:14, 79:19,
85:19, 86:2, 86:10,
87:8, 89:6, 90:5,
90:6, 90:7, 90:13,
90:20, 96:11, 96:13,
97:25, 98:19, 105:5,
105:11, 105:17,
106:2, 107:13,
114:9, 120:12,
120:17, 121:6,
133:23, 140:22,
141:2, 141:10,
141:16, 141:17,
142:10, 142:20,
154:10, 172:18,
174:2, 175:19,
175:22, 183:25,
184:1, 184:7,
184:10, 184:11,
186:10, 186:12,
191:7, 193:5,
193:20, 197:18,
197:25, 198:6,
198:7, 198:10,
198:17, 198:19,
202:5, 202:7,
202:20, 203:20,
204:9, 204:21,
214:19, 214:22,
215:2, 215:9, 216:8,
216:17, 217:3,
217:6, 219:10,
224:2, 226:20,
226:23, 227:4,
227:13, 227:22,
227:24, 228:4,
230:11, 230:15,
233:1, 233:10,
234:15, 237:1,
237:16, 238:25,
239:8
**People** [1] - 139:16
**people's** [1] - 58:4
**per** [18] - 41:15,
140:10, 153:19,
154:20, 155:13,
155:14, 156:10,
157:2, 171:18,
176:12, 176:15,
176:19, 176:22,

177:14, 177:17,
177:22, 177:25
**percent** [134] - 64:2,
72:23, 73:20, 75:1,
77:6, 77:11, 77:22,
78:16, 78:18, 79:5,
87:9, 95:25, 96:17,
96:20, 96:25, 97:3,
97:10, 97:13, 97:18,
97:19, 97:23, 98:1,
98:4, 98:8, 98:16,
99:4, 99:8, 99:12,
100:1, 100:13,
100:18, 104:8,
104:21, 104:22,
105:8, 105:9,
105:10, 105:11,
105:19, 106:3,
106:6, 106:11,
106:15, 106:20,
106:21, 106:24,
107:4, 107:8,
107:11, 107:13,
109:18, 110:12,
110:17, 114:22,
115:1, 129:9,
130:13, 145:12,
145:13, 145:20,
145:23, 146:1,
146:6, 146:21,
146:24, 147:21,
148:3, 148:10,
148:25, 149:5,
149:19, 169:17,
174:18, 174:23,
175:4, 176:4, 177:2,
177:10, 177:18,
177:21, 177:22,
178:1, 178:11,
179:2, 179:12,
179:14, 179:17,
180:4, 180:18,
180:19, 183:20,
184:2, 186:2,
186:11, 186:17,
193:8, 193:14,
193:16, 193:20,
194:2, 194:11,
194:15, 196:20,
198:2, 212:8,
212:15, 212:21,
212:25, 214:10,
214:11, 214:16,
215:21, 215:23,
216:7, 216:10,
216:11, 216:24,
217:9, 217:13,
224:25, 233:1,
233:18, 234:4,
234:21, 235:25,
236:3

**percentage** [33] -
87:2, 90:20, 96:11,
96:13, 98:16, 114:3,
114:9, 119:23,
120:16, 120:22,
120:25, 145:6,
145:22, 179:17,
183:18, 184:1,
186:1, 186:10,
197:10, 197:23,
197:24, 216:1,
216:17, 217:14,
233:9, 233:14,
234:8, 234:12,
234:13, 234:15,
239:7
**percentages** [2] -
98:15, 215:17
**performing** [1] - 91:14
**perhaps** [1] - 42:16
**perimeter** [1] - 170:23
**period** [20] - 36:18,
90:2, 163:19,
163:20, 163:24,
165:19, 165:20,
167:8, 167:16,
167:19, 168:25,
169:2, 169:5, 169:6,
169:8, 188:3, 188:8,
188:11, 193:10,
193:22
**periodically** [1] -
77:20
**permissible** [1] -
26:20
**permitted** [1] - 110:4
**person** [9] - 75:2,
140:11, 177:14,
177:17, 177:22,
177:25, 228:5,
231:1, 238:4
**person's** [1] - 12:9
**person-years** [1] -
140:11
**personally** [1] - 10:7
**Persons** [1] - 224:6
**persons** [13] - 114:3,
114:21, 176:13,
176:15, 176:19,
176:23, 224:13,
225:25, 226:11,
234:4, 237:10,
237:21, 238:7
**perspective** [2] -
222:12, 242:22
**perspectives** [1] -
209:23
**pervasive** [3] - 71:13,
72:15, 81:25
**Pervasive** [1] - 72:1

**PETER** [1] - 2:9
**Pharma** [1] - 35:3
**pharmaceutical** [7] -
34:22, 43:1, 51:9,
51:11, 51:14, 51:18,
51:23
**pharmacies** [5] - 26:4,
68:8, 69:2, 69:20,
109:11
**pharmacological** [1] -
237:13
**pharmacologically** [1]
- 219:8
**pharmacy** [13] - 11:3,
11:13, 26:8, 26:10,
39:7, 39:14, 62:19,
63:4, 68:13, 83:4,
83:6, 83:12, 83:13
**phenomenon** [2] -
113:14, 154:5
**Philadelphia** [2] - 6:6,
6:13
**phrase** [1] - 149:3
**phrased** [1] - 240:15
**phraseology** [1] -
147:7
**physical** [3] - 55:21,
112:20, 113:23
**physically** [1] - 55:24
**physician** [7] - 50:5,
75:14, 107:24,
111:24, 112:3,
112:11, 112:12
**physicians** [2] - 49:3,
108:3
**picked** [1] - 173:7
**piece** [5] - 93:14,
143:17, 143:19,
143:21, 242:22
**pieces** [1] - 94:4
**PIFKO** [3] - 3:16
**pill** [13] - 42:21, 43:2,
43:5, 43:9, 44:20,
61:20, 62:2, 87:25,
88:1, 88:4, 88:5,
131:11
**Pill** [1] - 131:16
**pills** [36] - 11:2, 18:24,
19:21, 26:24, 27:5,
36:17, 37:10, 39:6,
39:18, 62:18, 68:12,
70:14, 72:9, 72:16,
72:17, 73:24, 74:2,
75:6, 75:11, 76:17,
76:18, 76:23, 77:1,
79:6, 80:12, 82:23,
85:14, 85:16, 85:20,
86:3, 86:11, 86:13,
86:23, 88:8, 89:7,
199:16

**pin** [1] - 120:5
**place** [7] - 52:23,
67:20, 67:22, 67:23,
130:22, 136:12,
152:7
**places** [1] - 53:8
**Plaintiff** [5] - 1:5, 1:11,
2:2, 3:2, 4:1
**Plaintiffs** [1] - 246:6
**plaintiffs** [2] - 7:14,
7:18
**PLAINTIFFS'** [1] -
9:17
**Plaintiffs'** [1] - 228:20
**plan** [1] - 243:25
**planning** [2] - 124:3,
244:23
**play** [1] - 107:5
**played** [1] - 40:15
**Pleasant** [3] - 3:15,
4:4, 4:12
**pleasure** [2] - 18:19,
32:2
**plenty** [1] - 89:6
**plug** [1] - 130:21
**plus** [2] - 129:12,
149:9
**PO** [3] - 35:15, 35:18
**point** [73] - 12:2, 12:3,
17:22, 21:8, 29:9,
34:20, 35:13, 37:8,
37:21, 39:4, 49:23,
53:12, 53:21, 54:17,
56:13, 58:23, 62:23,
63:13, 65:14, 65:15,
65:24, 68:6, 69:8,
71:16, 72:15, 73:19,
73:22, 74:23, 79:5,
79:17, 86:9, 94:18,
99:23, 102:8,
102:23, 104:4,
109:8, 120:21,
132:13, 141:20,
142:6, 142:22,
142:23, 143:23,
149:7, 154:3,
154:17, 155:22,
160:21, 170:18,
170:23, 171:11,
172:9, 177:5, 177:6,
178:10, 180:6,
183:10, 185:4,
186:14, 187:16,
190:22, 196:9,
196:12, 196:23,
197:9, 197:22,
198:25, 215:18,
222:2, 243:21
**pointed** [1] - 189:19
**pointing** [1] - 112:17

**points** [4] - 47:23, 70:7, 183:8, 243:20
**policy** [1] - 231:6
**Policy** [1] - 213:16
**polydrug** [1] - 116:2
**Ponc** [1] - 2:4
**Ponce** [1] - 2:14
**pooled** [1] - 140:10
**population** [44] - 58:16, 58:25, 59:3, 59:4, 59:15, 59:22, 60:1, 60:4, 60:7, 60:12, 66:13, 98:21, 105:9, 131:23, 132:2, 132:5, 132:21, 132:25, 133:5, 133:7, 133:17, 133:23, 134:6, 142:15, 156:14, 156:16, 160:19, 164:10, 172:11, 172:16, 172:21, 173:4, 173:9, 184:5, 196:10, 196:20, 198:15, 214:17, 214:18, 215:2, 223:9, 224:21, 225:6, 225:14
**populations** [15] - 52:25, 53:14, 53:19, 53:22, 58:9, 58:18, 61:8, 66:17, 179:1, 179:12, 180:17, 191:11, 202:1, 202:18, 203:16
**portion** [1] - 117:11
**portions** [1] - 119:8
**position** [2] - 8:6, 244:22
**positioned** [1] - 241:22
**possibility** [2] - 38:15, 244:9
**possible** [10] - 43:8, 50:12, 59:7, 59:13, 60:6, 60:10, 90:4, 142:12, 172:22, 218:23
**post** [2] - 96:7, 96:10
**post-index** [2] - 96:7, 96:10
**potency** [2] - 45:10, 45:22
**potent** [1] - 44:4
**potential** [5] - 39:16, 47:24, 48:5, 209:20, 210:12
**potentially** [1] - 240:24

**powder** [1] - 41:11
**Powell** [1] - 2:6
**PR** [2] - 2:5, 2:14
**practical** [1] - 230:9
**practice** [4] - 14:3, 15:13, 48:16, 82:21
**practicing** [1] - 9:6
**Pradip** [2] - 189:10, 189:22
**pre** [2] - 20:15, 177:6
**pre-2015** [1] - 127:22
**pre-opioid** [2] - 20:15, 177:6
**preceded** [1] - 226:21
**preceding** [1] - 29:15
**precise** [5] - 16:17, 157:22, 157:24, 158:6, 171:9
**predictable** [2] - 113:14, 113:24
**predominant** [1] - 43:16
**prefer** [3] - 45:4, 45:10, 84:2
**preferred** [1] - 65:19
**preliminary** [1] - 70:6
**prepared** [6] - 8:17, 21:13, 115:16, 222:8, 229:16, 230:5
**prescribe** [8] - 70:22, 70:24, 71:4, 75:15, 75:20, 76:10, 76:16, 199:16
**prescribed** [51] - 13:22, 13:24, 14:1, 15:12, 16:5, 26:25, 27:6, 35:20, 36:18, 38:25, 39:2, 39:10, 39:12, 39:15, 39:18, 54:19, 56:9, 56:21, 72:2, 72:10, 72:17, 72:23, 73:21, 74:3, 74:9, 74:12, 74:17, 74:21, 74:24, 76:19, 76:23, 77:1, 82:24, 88:20, 88:24, 94:21, 98:11, 98:19, 104:10, 105:11, 106:7, 106:25, 178:5, 196:24, 197:3, 197:5, 197:6, 197:8, 198:20, 198:22, 199:2
**prescriber** [1] - 38:5
**prescribers** [3] - 7:23, 53:1, 61:21
**prescribes** [1] - 73:24
**Prescribing** [1] - 33:20
**prescribing** [53] -

15:22, 16:5, 34:2, 38:6, 48:16, 53:7, 53:10, 53:19, 54:5, 57:19, 57:23, 58:3, 58:6, 58:7, 58:8, 58:10, 58:16, 59:5, 59:11, 59:18, 59:24, 70:7, 71:9, 71:13, 72:1, 72:12, 72:13, 72:16, 75:24, 76:1, 81:10, 81:12, 81:17, 81:25, 82:4, 82:5, 82:20, 83:20, 83:25, 84:5, 88:15, 113:24, 114:12, 131:18, 176:11, 176:18, 176:22, 177:10, 197:4, 198:12, 198:14, 199:11, 199:18
**prescription** [307] - 10:5, 11:1, 11:3, 11:13, 11:21, 20:24, 26:4, 26:11, 28:12, 35:16, 36:8, 36:25, 37:3, 37:9, 37:13, 37:16, 37:22, 39:12, 39:19, 39:23, 40:3, 40:12, 40:14, 42:16, 42:21, 46:22, 47:3, 47:10, 48:13, 49:3, 49:17, 49:24, 56:6, 56:8, 60:20, 63:17, 64:6, 64:7, 70:8, 70:12, 70:15, 70:19, 71:14, 73:23, 74:4, 74:6, 74:8, 74:12, 74:16, 74:24, 75:6, 75:10, 75:12, 76:6, 76:17, 77:12, 78:3, 79:20, 80:12, 80:16, 82:8, 83:5, 83:12, 84:10, 84:16, 84:21, 85:4, 85:22, 85:24, 87:2, 87:17, 88:1, 88:4, 89:2, 89:4, 89:11, 90:1, 90:14, 90:21, 95:9, 96:12, 97:4, 102:9, 102:25, 105:10, 105:19, 106:4, 107:9, 107:12, 115:7, 115:11, 116:6, 116:7, 116:14, 116:16, 116:21, 116:22, 116:24, 117:8, 117:9, 117:12, 117:20, 117:22, 118:6, 118:7, 118:9, 118:20, 118:22,

119:9, 119:19, 119:23, 120:9, 120:13, 120:15, 120:17, 120:21, 121:4, 121:5, 121:6, 121:7, 121:10, 121:12, 121:15, 121:16, 122:6, 122:7, 123:1, 123:7, 125:7, 125:14, 125:16, 125:21, 125:24, 126:1, 126:2, 126:8, 126:10, 126:13, 126:16, 126:23, 127:2, 127:3, 127:9, 127:21, 128:10, 128:12, 128:13, 128:17, 129:1, 129:10, 129:21, 130:2, 130:11, 130:15, 137:3, 137:7, 137:15, 137:18, 137:22, 138:3, 138:5, 138:8, 144:10, 144:12, 146:9, 146:10, 146:12, 147:10, 147:17, 147:25, 148:5, 148:11, 157:12, 174:12, 174:20, 175:1, 175:5, 175:13, 175:22, 176:1, 176:9, 177:3, 177:10, 177:14, 178:4, 178:7, 179:21, 179:25, 185:9, 190:14, 190:18, 190:23, 191:6, 191:8, 191:14, 191:18, 191:23, 192:5, 192:11, 193:5, 193:9, 193:11, 193:20, 193:22, 194:2, 194:4, 194:21, 195:1, 195:5, 195:11, 195:21, 196:7, 196:12, 196:17, 196:24, 197:18, 197:23, 198:16, 199:22, 199:25, 200:1, 200:7, 200:9, 201:3, 201:5, 201:18, 202:7, 202:14, 202:21, 203:1, 203:20, 204:9, 204:14, 204:18, 204:19,

205:10, 206:1, 206:11, 212:4, 212:9, 212:14, 212:16, 212:20, 213:1, 216:8, 216:10, 216:12, 216:22, 216:25, 217:4, 217:6, 217:13, 217:25, 218:4, 218:10, 218:17, 219:3, 219:8, 219:10, 219:18, 220:8, 220:25, 222:13, 223:5, 224:3, 224:7, 224:9, 224:14, 224:20, 225:25, 226:12, 226:17, 226:21, 227:4, 228:3, 233:2, 233:21, 234:2, 234:5, 234:19, 234:23, 235:10, 235:11, 235:17, 235:19, 236:24, 237:9, 237:12, 237:14, 237:17, 237:24, 238:3, 238:8, 238:17, 240:1, 240:6, 240:8, 240:13, 240:14, 240:19, 240:22, 241:14, 241:16, 242:6, 242:9
**Prescription** [10] - 14:23, 33:19, 46:11, 46:12, 52:7, 54:18, 56:20, 91:3, 91:6, 222:22
**prescriptions** [36] - 12:3, 26:17, 35:22, 37:7, 38:9, 38:16, 60:22, 71:1, 76:4, 78:4, 80:24, 81:4, 81:15, 82:12, 103:7, 103:12, 103:18, 103:24, 104:5, 109:11, 109:17, 110:12, 110:18, 111:24, 112:4, 112:11, 112:12, 176:12, 176:15, 176:19, 176:22, 177:3, 190:21, 198:11, 199:4, 212:18
**present** [2] - 8:9, 233:11
**presented** [1] - 92:12
**preserve** [1] - 143:23

**press** [4] - 142:24, 143:3, 143:22, 173:19
**presumably** [1] - 43:5
**pretty** [3] - 67:5, 153:23, 242:15
**prevalence** [9] - 47:2, 102:15, 102:19, 178:21, 184:5, 196:11, 197:15, 197:16, 197:21
**prevalences** [1] - 216:14
**prevalent** [6] - 110:22, 111:10, 111:14, 111:16, 211:25, 216:22
**previous** [5] - 61:18, 66:10, 78:5, 145:16, 238:10
**previously** [13] - 48:11, 52:6, 142:23, 172:1, 178:3, 185:4, 192:5, 192:18, 196:15, 199:9, 212:3, 236:3, 238:8
**price** [5] - 41:14, 41:15, 42:4, 42:7
**primarily** [4] - 43:22, 178:25, 180:11, 180:16
**primary** [3] - 208:5, 208:8, 214:24
**principal** [2] - 81:8, 81:22
**principally** [1] - 127:24
**principle** [1] - 132:19
**print** [1] - 139:5
**probability** [13] - 87:19, 155:25, 156:4, 156:8, 156:11, 156:15, 156:16, 156:18, 166:14, 168:24, 170:24, 193:15
**problem** [4] - 18:7, 104:7, 198:18, 211:22
**Problems** [1] - 65:7
**problems** [2] - 9:7, 33:6
**procedural** [1] - 93:3
**procedure** [2] - 166:5, 168:3
**proceed** [1] - 182:20
**proceeded** [4] - 106:12, 106:16, 106:21, 107:14
**Proceedings** [2] -

6:19, 188:19
**proceedings** [2] - 17:25, 246:5
**PROCEEDINGS** [1] - 7:1
**process** [6] - 7:17, 32:4, 32:16, 107:18, 107:22, 137:9
**Proctor** [1] - 2:10
**produce** [2] - 42:4, 210:2
**produced** [2] - 6:19, 46:25
**product** [2] - 103:20, 103:22
**professional** [2] - 34:11, 35:5
**Program** [1] - 25:25
**program** [3] - 48:6, 214:21, 214:24
**Programs** [3] - 228:8, 229:6, 229:13
**progress** [2] - 193:6, 195:1
**progressed** [1] - 193:1
**progression** [1] - 236:22
**proliferation** [1] - 34:1
**proper** [9] - 18:10, 91:25, 149:12, 162:5, 164:21, 165:8, 168:21, 169:21, 206:7
**properly** [1] - 153:3
**proportion** [14] - 63:15, 66:20, 70:24, 121:1, 145:9, 146:16, 147:17, 168:18, 168:20, 186:12, 194:25, 217:3, 234:18, 234:21
**proportional** [3] - 83:20, 83:25, 84:5
**proposed** [1] - 164:23
**proposition** [3] - 78:6, 233:6, 236:17
**propositions** [1] - 48:1
**propriety** [1] - 92:5
**protective** [1] - 222:11
**provide** [12] - 15:19, 16:9, 32:15, 32:21, 48:7, 61:20, 76:17, 121:24, 126:2, 159:6, 187:23, 208:20
**provided** [9] - 30:23, 35:3, 47:1, 47:4, 147:18, 151:4,

169:13, 187:9, 188:9
**provides** [4] - 14:13, 90:9, 104:17, 171:1
**provision** [1] - 203:8
**proxies** [1] - 67:11
**proximal** [1] - 121:18
**proximate** [1] - 207:8
**Psychiatry** [1] - 138:25
**public** [13] - 83:14, 102:14, 102:19, 102:21, 108:12, 114:12, 181:24, 182:6, 183:2, 195:16, 219:2, 219:24, 220:15
**Public** [6] - 14:4, 31:12, 218:7, 219:23, 228:8, 229:6
**publication** [3] - 29:8, 29:9, 32:23
**publish** [1] - 223:22
**published** [21] - 14:5, 27:8, 31:8, 31:11, 31:15, 31:18, 31:23, 33:7, 46:19, 83:18, 108:24, 138:24, 152:5, 183:2, 203:22, 204:5, 204:11, 217:18, 217:24, 218:9, 219:2
**publishing** [2] - 32:25, 83:23
**pull** [8] - 17:14, 28:23, 48:1, 68:20, 130:21, 221:5, 239:1, 241:1
**pulled** [1] - 97:20
**purchase** [1] - 78:19
**Purdue** [1] - 35:3
**pure** [1] - 41:15
**purity** [1] - 41:14
**purport** [1] - 229:8
**purporting** [4] - 73:7, 73:9, 76:5, 93:11
**purpose** [9] - 13:14, 80:21, 92:4, 92:24, 150:25, 153:25, 165:6, 171:10, 196:1
**purposes** [12] - 13:12, 13:23, 16:4, 25:25, 116:5, 118:12, 118:19, 127:25, 183:1, 190:24, 197:24, 244:23
**pursuant** [4] - 7:11, 11:3, 11:13, 36:5
**put** [28] - 9:4, 17:24, 46:4, 56:12, 94:4, 100:8, 106:6, 115:4, 120:5, 132:24,

136:5, 140:17, 140:25, 144:5, 144:24, 145:19, 149:6, 173:11, 194:9, 194:12, 196:3, 198:9, 228:8, 236:7, 243:12, 243:13
**puts** [1] - 185:2
**putting** [4] - 148:8, 161:2, 173:24, 194:1

**Q**

**qualifies** [1] - 179:4
**qualify** [4] - 61:18, 69:11, 127:13, 178:14
**quality** [1] - 34:14
**quantity** [1] - 156:11
**Queens** [1] - 7:25
**queried** [1] - 223:7
**questions** [9] - 91:18, 143:10, 183:11, 185:9, 185:17, 205:7, 223:7, 241:21, 244:10
**quick** [1] - 185:24
**quit** [1] - 242:14
**quite** [16] - 17:21, 67:2, 75:9, 76:1, 78:2, 89:7, 90:2, 91:24, 93:12, 120:20, 182:1, 187:4, 193:14, 223:8, 236:24, 240:11
**quota** [1] - 26:21
**quotas** [1] - 26:20
**quote** [6] - 71:12, 76:3, 76:4, 131:16, 200:12, 200:19
**quote-unquote** [2] - 76:3, 76:4
**quoted** [1] - 84:2
**quoting** [1] - 14:4

**R**

**race** [1] - 66:13
**Rafferty** [1] - 2:10
**raised** [2] - 7:14, 9:1
**raises** [1] - 8:4
**raising** [1] - 142:21
**ran** [7] - 157:16, 157:19, 161:3, 163:18, 163:22, 164:5
**randomly** [1] - 211:11
**range** [3] - 216:14,

217:2, 225:10
**ranking** [1] - 242:11
**rapidly** [4] - 44:8, 112:25, 113:8, 113:19
**rate** [62] - 49:3, 53:7, 97:13, 102:4, 102:9, 132:9, 132:21, 133:1, 133:6, 133:16, 133:22, 133:25, 134:11, 134:24, 135:5, 136:20, 138:23, 139:7, 139:21, 140:22, 140:25, 141:1, 141:2, 141:10, 144:2, 144:6, 144:11, 144:12, 144:16, 144:18, 146:15, 149:8, 149:13, 150:13, 150:16, 151:9, 153:17, 153:18, 154:4, 154:7, 154:8, 156:3, 156:7, 156:18, 156:21, 156:22, 158:18, 160:4, 160:5, 160:8, 166:14, 172:10, 176:11, 176:18, 176:22, 198:7, 198:23, 219:9
**rates** [24] - 12:11, 83:19, 83:20, 83:24, 83:25, 84:4, 84:5, 95:25, 96:7, 97:10, 132:10, 134:3, 139:22, 140:14, 141:17, 145:1, 145:8, 154:4, 155:7, 155:17, 166:12, 201:3, 203:21, 204:10
**rather** [2] - 165:11, 210:3
**ratio** [1] - 195:16
**ratios** [1] - 100:11
**re** [2] - 93:9, 167:5
**re-direct** [1] - 93:9
**re-directed** [1] - 167:5
**reach** [1] - 83:6
**read** [18] - 32:13, 32:21, 41:19, 42:11, 54:13, 67:3, 72:7, 73:5, 73:7, 73:14, 100:10, 181:1, 181:2, 195:7, 200:19, 200:23, 200:25, 230:24

**reading** [4] - 52:17, 66:21, 78:25, 91:11
**reads** [7] - 33:24, 40:12, 56:19, 57:11, 60:19, 78:15, 109:10
**ready** [5] - 9:11, 78:10, 242:12, 243:13, 244:14
**real** [2] - 161:21, 161:22
**reality** [1] - 173:8
**realize** [2] - 8:21, 243:19
**realizing** [1] - 127:14
**really** [29] - 13:14, 32:20, 32:22, 45:3, 53:9, 58:4, 87:18, 89:8, 102:21, 102:24, 127:16, 127:17, 127:22, 129:14, 141:14, 161:17, 177:1, 179:20, 185:14, 195:14, 195:17, 197:20, 211:6, 211:20, 218:2, 218:16, 219:16, 231:12, 238:6
**reason** [4] - 138:7, 159:4, 190:3, 190:5
**reasonable** [2] - 148:7, 231:10
**reasoning** [1] - 116:25
**receive** [3] - 77:11, 90:14, 198:10
**received** [15] - 7:11, 7:12, 7:13, 9:5, 37:13, 63:16, 77:11, 105:10, 105:19, 106:3, 106:11, 106:20, 107:8, 107:12, 196:16
**recent** [6] - 176:24, 180:1, 192:4, 192:18, 208:2, 238:23
**recently** [1] - 178:18
**receptors** [1] - 113:15
**recess** [1] - 67:25
**Recess** [3] - 68:2, 131:4, 188:18
**recessed** [1] - 244:25
**recognize** [3] - 13:5, 185:1, 208:24
**recognized** [2] - 143:25, 144:2
**recollection** [3] - 124:2, 124:4, 124:9
**recommendations** [1] - 76:1

**recommends** [2] - 125:23, 126:6
**reconvene** [1] - 244:15
**record** [22] - 15:8, 16:21, 91:25, 92:4, 92:5, 92:15, 92:21, 92:25, 94:4, 128:9, 128:24, 129:15, 134:2, 142:25, 153:3, 160:2, 161:13, 164:22, 181:24, 182:6, 183:2, 246:5
**recorded** [1] - 6:19
**records** [1] - 94:15
**recreate** [2] - 159:23, 160:10
**recreated** [1] - 160:15
**red** [2] - 227:9
**redistribution** [1] - 50:23
**reduced** [1] - 41:14
**Reed** [2] - 6:4, 6:11
**refer** [7] - 27:18, 27:24, 48:9, 57:2, 132:14, 210:13, 226:5
**Reference** [1] - 182:15
**reference** [27] - 31:3, 36:3, 36:21, 36:24, 38:7, 38:12, 41:10, 42:12, 42:15, 49:9, 49:23, 50:16, 61:3, 61:4, 61:25, 65:19, 72:8, 103:10, 105:2, 112:16, 131:11, 194:13, 200:25, 201:16, 213:22, 213:25, 214:3
**referenced** [2] - 151:24, 231:9
**references** [4] - 16:2, 16:3, 70:2, 192:8
**referred** [4] - 49:2, 54:23, 113:17, 235:1
**referring** [29] - 42:20, 43:21, 44:1, 44:15, 47:15, 47:21, 48:10, 50:9, 51:8, 54:25, 61:13, 65:9, 74:1, 74:2, 91:8, 95:5, 96:11, 96:13, 98:6, 98:9, 101:14, 113:2, 113:14, 153:6, 183:23, 203:24, 219:17, 219:21
**refers** [8] - 27:20, 28:9, 28:15, 42:20, 95:1, 96:7, 224:2

**reflect** [10] - 96:16, 113:15, 127:19, 196:4, 216:16, 217:5, 218:7, 218:14, 230:15, 236:9
**reflected** [7] - 79:18, 87:7, 165:21, 174:5, 187:17, 191:21, 196:16
**reflecting** [3] - 73:16, 215:24, 216:25
**reflection** [2] - 63:22, 125:25
**reflects** [14] - 35:12, 36:2, 194:16, 198:11, 199:2, 199:5, 199:6, 199:16, 215:20, 216:6, 232:18, 234:4, 234:20, 236:11
**refresh** [3] - 124:2, 124:9, 124:21
**refreshing** [1] - 124:4
**regard** [2] - 25:21, 72:12
**regarding** [3] - 107:24, 199:24, 200:7
**regardless** [2] - 8:15, 11:25
**regimen** [1] - 89:12
**relate** [3] - 7:8, 27:11, 217:21
**related** [35] - 9:25, 22:21, 23:8, 23:19, 23:21, 24:13, 25:9, 27:2, 34:21, 35:18, 40:2, 40:4, 81:16, 81:21, 82:3, 82:13, 84:25, 85:11, 129:17, 130:8, 130:14, 131:18, 135:18, 136:4, 136:13, 136:24, 137:1, 138:10, 140:8, 141:3, 153:25, 198:18, 199:11, 217:22, 218:5
**relates** [1] - 7:9
**relating** [5] - 22:2, 22:9, 22:21, 176:9, 222:8
**relation** [10] - 24:23, 25:2, 25:17, 31:6, 68:7, 69:1, 69:19, 205:1, 205:9, 206:2
**relationship** [7] -

154:11, 190:8, 190:17, 191:22, 209:12, 220:2, 220:12
**relative** [6] - 23:23, 77:7, 77:24, 78:18, 78:19, 79:22
**relatively** [14] - 60:1, 60:4, 60:7, 94:13, 100:1, 100:12, 101:11, 101:17, 101:21, 180:1, 194:21, 195:5, 195:12, 195:21
**relatives** [2] - 62:7, 62:17
**released** [1] - 176:25
**relevant** [1] - 237:9
**reliability** [1] - 93:15
**reliable** [4] - 93:1, 116:10, 116:12, 213:4
**reliance** [1] - 183:5
**relied** [17] - 91:13, 92:10, 115:12, 118:15, 128:5, 138:23, 139:7, 139:20, 139:23, 182:5, 183:1, 202:5, 203:3, 220:4, 220:7, 220:12, 220:23
**relief** [1] - 192:11
**relies** [3] - 62:23, 136:1, 136:19
**relieve** [1] - 13:19
**reliever** [9] - 178:24, 179:11, 185:9, 192:12, 194:3, 203:15, 233:15, 235:22, 235:25
**Reliever** [2] - 183:15, 189:2
**relievers** [4] - 109:12, 179:25, 180:11, 180:15
**relieving** [1] - 235:7
**rely** [9] - 85:25, 92:20, 109:2, 155:19, 189:6, 195:25, 213:25, 214:20, 215:18
**relying** [2] - 63:9, 204:17
**remain** [1] - 216:22
**remember** [13] - 10:8, 10:12, 14:19, 17:18, 22:4, 29:1, 31:25, 83:23, 123:18, 124:12, 124:14, 124:16, 124:17

**remembered** [1] - 70:1
**repeat** [2] - 10:19, 162:20
**repeated** [3] - 112:18, 112:24, 113:8
**Report** [1] - 184:12
**report** [132] - 7:16, 7:21, 8:2, 8:7, 8:16, 12:11, 13:1, 17:13, 19:19, 20:14, 21:14, 21:20, 21:21, 21:24, 22:7, 24:6, 24:15, 25:10, 25:11, 25:13, 25:20, 26:1, 27:7, 31:19, 31:20, 38:23, 39:18, 63:9, 68:10, 71:11, 71:19, 72:22, 73:15, 76:5, 77:3, 77:6, 77:22, 78:1, 79:9, 84:22, 85:25, 87:6, 87:8, 102:19, 103:21, 114:15, 120:19, 122:11, 122:22, 122:25, 123:5, 123:8, 123:12, 123:19, 125:5, 127:2, 128:1, 131:14, 131:15, 131:19, 135:13, 137:10, 140:19, 142:22, 143:1, 143:21, 151:3, 151:25, 158:24, 159:5, 176:10, 177:2, 177:17, 178:10, 178:23, 179:10, 179:16, 179:19, 180:7, 180:9, 181:17, 181:20, 182:14, 182:15, 185:2, 186:21, 186:22, 189:7, 194:18, 194:19, 194:20, 194:24, 195:23, 196:5, 197:14, 199:24, 200:3, 200:11, 200:19, 203:8, 203:23, 204:4, 204:5, 204:8, 204:11, 214:1, 216:9, 216:10, 216:11, 216:14, 216:24, 217:2, 217:3, 217:10, 219:6, 219:23, 220:5, 220:8, 220:21, 225:21, 228:7, 228:11, 228:24, 229:5,

229:8, 229:12, 229:15, 229:23, 230:5, 230:16, 230:24
**reported** [8] - 79:3, 79:21, 86:22, 123:5, 125:5, 213:1, 232:9, 246:9
**REPORTER** [4] - 162:20, 162:23, 179:5, 179:22
**Reporter** [6] - 6:17, 6:18, 246:3, 246:12
**reporting** [10] - 62:24, 78:18, 79:2, 102:16, 102:20, 105:18, 179:3, 179:13, 215:10, 217:6
**reports** [11] - 94:23, 180:2, 186:20, 186:24, 187:3, 187:13, 217:12, 219:17, 219:21, 233:9
**represent** [1] - 151:22
**representation** [3] - 34:7, 182:2, 244:2
**representations** [2] - 51:15, 51:25
**represented** [1] - 106:21
**representing** [2] - 107:13, 167:13
**represents** [4] - 34:19, 150:12, 167:10, 176:4
**required** [2] - 136:8, 136:20
**requirement** [1] - 33:2
**research** [8] - 48:6, 91:14, 211:6, 232:10, 239:25, 240:5, 241:5, 241:12
**residual** [1] - 92:14
**resolve** [4] - 112:25, 113:6, 113:8, 113:19
**resolved** [1] - 7:19
**respect** [3] - 11:1, 11:17, 120:15
**respected** [2] - 91:17, 92:8
**respective** [2] - 24:10, 24:16
**respectively** [1] - 180:2
**respond** [1] - 8:10
**respondents** [1] - 77:25
**response** [2] - 18:4, 143:9

responses [1] - 8:12
**responsible** [3] - 64:2, 205:2, 205:14
**responsive** [6] - 16:13, 28:5, 28:7, 98:23, 109:24, 110:8
**restate** [1] - 206:9
**restrictions** [1] - 40:12
**rests** [1] - 33:8
**result** [4] - 78:2, 113:24, 210:3, 213:5
**resulted** [3] - 60:20, 71:13, 72:1
**Results** [1] - 223:21
**results** [11] - 95:21, 95:22, 96:16, 112:19, 112:24, 113:7, 113:13, 113:14, 113:19, 140:4
**results"** [1] - 113:17
**resume** [1] - 9:15
**resumed** [1] - 188:19
**RESUMED** [1] - 9:17
**retail** [1] - 109:10
**retained** [1] - 31:15
**review** [18] - 22:2, 22:9, 25:24, 26:3, 26:6, 31:8, 32:4, 32:7, 32:8, 32:16, 32:24, 47:24, 56:3, 74:25, 78:25, 217:18, 229:3, 230:7
**Review** [2] - 30:14, 31:12, 139:17, 218:7
**reviewed** [25] - 19:18, 20:6, 22:11, 22:20, 23:7, 24:13, 25:8, 27:2, 27:9, 30:24, 54:16, 55:8, 55:13, 57:1, 57:3, 57:15, 86:4, 111:9, 123:2, 182:12, 201:2, 201:17, 202:13, 229:14, 238:2
**reviewers** [2] - 33:9, 33:10
**reviews** [1] - 229:7
**revise** [1] - 123:20
**revised** [3] - 123:9, 123:13, 123:22
**revision** [1] - 125:22
**revolve** [1] - 112:24
**Rice** [5] - 3:14, 4:3, 4:5, 4:8, 4:11
**rich** [1] - 51:10
**right-hand** [14] - 61:17, 62:4, 62:10, 95:23, 96:6, 112:18, 113:21, 113:22,

141:22, 154:19, 155:14, 183:25, 214:7, 233:17
**ripple** [1] - 12:13
**rise** [1] - 166:4
**rising** [1] - 215:21
**risk** [46] - 45:13, 45:20, 45:23, 47:4, 87:23, 98:12, 101:10, 101:16, 101:21, 102:13, 102:16, 103:5, 114:20, 114:22, 115:2, 154:10, 184:4, 184:5, 194:20, 195:4, 195:11, 195:16, 195:20, 196:3, 196:10, 197:12, 197:20, 198:15, 222:14, 224:4, 224:7, 225:5, 226:24, 227:15, 227:25, 228:2, 238:3, 240:13, 240:21, 240:23, 241:23, 242:2, 242:3, 242:4, 242:6, 242:8
**riskier** [1] - 88:7
**risks** [9] - 40:13, 51:16, 51:25, 58:5, 75:23, 100:5, 100:10, 102:24, 114:7
**risky** [1] - 87:25
**RMR** [2] - 6:17, 6:18
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**robust** [2] - 83:19, 83:24
**Rockville** [1] - 189:12
**role** [1] - 40:15
**Role** [2] - 91:2, 91:6
**room** [1] - 23:20
**roots** [1] - 33:24
**roughly** [3] - 156:24, 156:25, 214:16
**rounded** [1] - 161:21
**rounding** [2] - 97:19, 97:20
**route** [5] - 11:7, 11:10, 11:12, 11:24
**rows** [1] - 233:13
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**Ruby** [1] - 4:20
**RUBY** [1] - 4:20
**Ruhm** [15] - 64:1,

64:4, 64:8, 64:12, 64:14, 64:18, 65:8, 65:9, 65:12, 65:18, 65:24, 66:23, 67:2, 67:5, 67:8
**Rule** [1] - 93:18
**rules** [1] - 92:24
**run** [5] - 77:18, 150:20, 158:15, 162:6, 232:10
**rural** [15] - 52:25, 53:10, 53:14, 53:19, 53:21, 54:6, 54:7, 54:9, 54:25, 55:4, 57:13, 58:16, 58:18, 61:8, 67:6
**Rural** [4] - 14:22, 52:7
**Rural-Urban** [2] - 14:22, 52:7

---

## S

**s\Ayme** [1] - 246:11
**s\Lisa** [1] - 246:11
**safe** [1] - 34:23
**safely** [1] - 72:25
**sale** [1] - 206:13
**sales** [2] - 78:6, 157:13
**SALGADO** [1] - 4:18
**Saloner** [4] - 232:3, 232:8, 232:16, 232:17
**sample** [24] - 94:10, 94:13, 94:17, 99:18, 105:9, 105:11, 105:17, 105:19, 106:2, 106:3, 106:22, 106:25, 107:8, 107:14, 184:3, 184:11, 186:12, 194:14, 214:10, 214:22, 216:1, 216:19, 216:21, 227:21
**sampling** [2] - 179:2, 179:13
**San** [2] - 2:5, 2:14
**sanctioned** [1] - 50:24
**sandbagging** [1] - 8:24
**sat** [1] - 31:23
**satisfies** [1] - 92:14
**save** [2] - 173:15, 173:20
**saved** [1] - 194:7
**saw** [1] - 81:12
**SC** [3] - 3:15, 4:4, 4:12
**scale** [1] - 198:12
**scenario** [6] - 37:24,

37:25, 38:1, 38:4, 39:18, 80:18
**SCHMIDT** [1] - 5:9
**scholar** [1] - 205:24
**schools** [4] - 219:24, 228:12, 229:9, 229:17
**Schools** [3] - 228:8, 229:6, 229:13
**science** [1] - 16:10
**Science** [1] - 228:21
**scientific** [7] - 32:14, 33:3, 218:1, 218:14, 219:12, 220:1, 230:7
**scientifically** [3] - 32:22, 33:11, 91:12
**scientists** [2] - 32:12, 219:13
**scope** [1] - 206:5
**scrap** [1] - 159:15
**screen** [3] - 23:1, 173:16, 242:1
**search** [1] - 238:23
**second** [12] - 34:21, 40:1, 53:13, 91:6, 122:19, 124:20, 126:23, 127:6, 186:22, 187:14, 201:16, 209:10
**secondly** [1] - 123:22
**section** [7] - 43:14, 72:13, 112:1, 137:10, 179:4, 180:5, 223:21
**sections** [2] - 30:24, 48:4
**secured** [2] - 51:11, 51:14
**see** [154] - 14:24, 15:15, 19:3, 19:14, 22:23, 23:10, 23:19, 29:12, 31:1, 33:21, 34:4, 34:16, 34:25, 35:9, 35:24, 38:10, 40:5, 40:16, 40:24, 41:6, 41:16, 41:24, 42:8, 42:13, 43:17, 44:11, 46:14, 47:13, 48:18, 48:22, 49:4, 49:11, 49:17, 49:25, 50:7, 50:17, 50:24, 53:2, 53:25, 54:10, 54:21, 56:23, 57:18, 60:24, 62:8, 62:13, 63:12, 63:18, 64:21, 65:22, 71:19, 72:4, 72:25, 77:8, 78:21, 79:17, 84:2, 86:14, 86:18, 91:5, 95:21, 96:8, 97:19, 100:3,

100:15, 101:12, 102:5, 104:18, 104:25, 106:13, 106:17, 107:20, 107:25, 109:13, 109:20, 110:14, 110:25, 111:6, 111:21, 111:25, 112:5, 112:8, 112:21, 113:1, 113:25, 114:1, 114:4, 114:23, 139:9, 139:18, 140:12, 141:22, 142:4, 142:5, 142:19, 153:23, 154:22, 155:9, 163:10, 166:6, 167:4, 176:13, 180:8, 180:20, 180:21, 184:24, 186:3, 186:9, 188:4, 189:16, 189:21, 189:25, 192:8, 192:19, 193:2, 193:11, 193:12, 194:22, 195:6, 195:13, 199:1, 200:19, 200:25, 208:23, 213:17, 214:12, 222:24, 224:1, 224:4, 225:7, 225:16, 226:8, 227:8, 228:22, 230:2, 230:6, 231:15, 231:18, 232:3, 232:5, 232:12, 232:15, 232:16, 232:17, 232:19, 233:18, 233:24, 235:4, 239:15, 240:16, 244:16, 244:24

**seeing** [3] - 48:6, 167:15, 178:19

**seeking** [1] - 216:19

**selection** [2] - 107:18, 107:22

**Self** [1] - 15:10

**Self-medicating** [1] - 15:10

**sell** [3] - 37:4, 51:15, 85:14

**selling** [2] - 38:13, 61:10

**Senior** [1] - 7:2

**SENIOR** [1] - 1:17

**Sensabaugh** [1] - 5:14

**sense** [3] - 28:1, 92:19, 203:5

**sensitivity** [4] - 49:4, 50:6, 50:9, 164:18

**sent** [1] - 158:9

**sentence** [68] - 14:8, 14:12, 14:13, 16:7, 33:23, 36:3, 36:21, 38:7, 40:11, 43:4, 51:21, 54:22, 54:23, 57:11, 60:19, 61:17, 62:11, 63:14, 71:21, 71:25, 73:19, 77:9, 78:5, 78:13, 78:15, 81:2, 96:6, 100:4, 100:15, 100:16, 101:9, 101:18, 101:23, 102:6, 102:12, 103:3, 104:15, 104:20, 105:24, 106:10, 107:3, 107:17, 109:10, 110:11, 111:2, 112:15, 112:18, 113:11, 114:19, 142:2, 180:23, 181:2, 181:3, 181:6, 195:7, 195:15, 196:6, 202:24, 215:8, 218:12, 218:21, 218:22, 225:12, 225:13, 226:3

**sentences** [6] - 35:2, 40:10, 72:21, 78:15, 101:19, 102:2

**separate** [1] - 76:7

**separated** [2] - 155:17, 171:13

**separately** [1] - 171:13

**September** [5] - 32:1, 122:17, 122:20, 124:21, 221:10

**sequence** [7] - 124:9, 124:13, 124:17, 124:22, 207:24, 237:21, 238:1

**sequentially** [1] - 151:16

**series** [7] - 154:16, 168:4, 168:22, 170:25, 227:7, 227:8, 227:18

**served** [4] - 78:7, 122:11, 122:14, 122:19

**Services** [4] - 189:11, 189:12, 189:23, 189:25

**set** [14] - 11:10, 11:11, 26:20, 37:21, 46:21,

65:4, 115:8, 117:3, 122:1, 152:19, 153:3, 165:14, 166:1, 202:16

**settings** [1] - 224:10

**seven** [4] - 66:14, 169:6, 169:8, 196:8

**seven-category** [1] - 66:14

**seven-year** [2] - 169:6, 169:8

**several** [5] - 15:3, 35:19, 171:14, 196:2, 202:11

**SHANNON** [1] - 6:3

**share** [3] - 22:11, 23:19, 23:21

**shared** [2] - 71:16, 72:4

**shares** [2] - 24:10, 24:16

**sharply** [2] - 214:10, 214:15

**shelf** [1] - 83:6

**shift** [2] - 34:9, 48:15

**shifted** [1] - 41:21

**shifts** [1] - 40:14

**ship** [1] - 82:23

**shipments** [7] - 24:9, 26:22, 27:3, 68:8, 69:1, 69:20, 82:25

**shipped** [7] - 24:3, 24:8, 26:8, 26:14, 26:19, 26:24, 27:5

**ships** [2] - 83:4, 83:11

**shopping** [1] - 50:16

**short** [20] - 13:23, 90:2, 90:5, 90:7, 95:24, 103:7, 103:12, 103:18, 103:25, 109:18, 110:13, 112:24, 113:7, 113:13, 113:17, 198:2, 198:6, 198:8, 227:6

**short-term** [13] - 13:23, 95:24, 103:7, 103:12, 103:18, 103:25, 109:18, 110:13, 112:24, 113:7, 113:13, 113:17

**shorter** [1] - 104:11

**show** [15] - 14:14, 29:6, 43:20, 78:16, 86:12, 155:13, 184:19, 186:16, 186:20, 187:3, 192:23, 203:8, 215:17, 238:10

**showed** [4] - 78:14, 158:21, 203:13, 216:21

**showing** [5] - 64:1, 92:2, 177:2, 177:9, 178:19

**shown** [10] - 153:10, 168:15, 187:20, 187:21, 216:15, 239:25, 240:5, 241:5, 241:6, 241:12

**shows** [16] - 44:14, 90:5, 154:18, 154:19, 154:20, 156:24, 178:20, 183:18, 183:24, 184:1, 186:21, 186:22, 215:11, 216:7, 219:7, 227:13

**shrinks** [2] - 168:17, 168:21

**sic** [3] - 36:5, 120:18, 184:15

**sic]** [1] - 48:18

**side** [12] - 33:24, 97:8, 112:15, 112:18, 113:21, 113:22, 114:18, 183:25, 198:9, 205:11, 233:17, 243:17

**sign** [2] - 34:14, 49:10

**signaling** [4] - 113:2, 113:6, 113:16, 113:20

**significant** [6] - 131:17, 184:16, 186:21, 186:22, 187:10, 194:25

**similar** [5] - 8:4, 134:16, 192:23, 219:9

**similarity** [1] - 237:14

**simple** [4] - 66:22, 133:12, 133:15, 156:22

**simpler** [2] - 74:15, 132:13

**simply** [1] - 203:8

**Singer** [4] - 8:14, 8:17, 8:20, 9:5

**SINGER** [1] - 4:8

**single** [11] - 21:13, 26:11, 102:4, 102:9, 125:13, 207:15, 210:2, 210:14, 211:10, 211:13, 235:6

**single-spaced** [1] - 21:13

**sitting** [2] - 24:22,

119:14

**situation** [2] - 127:19, 211:20

**situations** [1] - 135:8

**six** [8] - 94:7, 100:1, 100:13, 100:18, 100:22, 101:5, 153:19, 233:13

**size** [5] - 43:5, 43:9, 94:13, 94:17, 214:22

**SKIP** [1] - 214:21

**skipped** [2] - 49:19, 51:7

**slide** [4] - 7:24, 8:3, 8:4

**slides** [1] - 8:16

**slight** [1] - 178:19

**slightly** [3] - 88:10, 178:21, 216:13

**slow** [1] - 179:22

**slower** [1] - 177:20

**small** [25] - 15:7, 21:16, 21:18, 30:21, 33:15, 47:7, 52:21, 65:16, 87:1, 101:11, 101:17, 101:21, 114:3, 114:9, 194:22, 194:25, 195:5, 195:12, 195:21, 196:4, 196:10, 197:12, 198:15, 216:19, 230:1

**smaller** [1] - 216:13

**Smith** [2] - 6:4, 6:11

**smokers** [2] - 197:16, 197:17

**smoking** [2] - 197:13, 197:19

**snorting** [1] - 201:4

**Social** [1] - 30:14

**social** [5] - 33:25, 61:6, 61:7, 71:16, 72:4

**societies** [2] - 34:11, 35:6

**sold** [6] - 11:20, 36:25, 37:10, 37:23, 41:22, 42:15

**someone** [13] - 36:24, 37:10, 38:13, 38:24, 39:1, 39:10, 39:12, 39:15, 85:23, 199:21, 205:21, 205:25, 206:11

**sometimes** [2] - 185:18

**somewhat** [1] - 87:5

**somewhere** [1] - 87:10

**soon** [2] - 242:15, 244:22

**Sorry** [5] - 24:20, 46:1, 66:21, 241:7, 241:9

**sorry** [74] - 10:19, 24:20, 25:15, 36:6, 38:17, 42:19, 44:23, 46:2, 48:20, 51:21, 52:4, 56:11, 57:11, 57:25, 61:18, 61:24, 62:9, 62:13, 64:17, 78:14, 78:24, 96:2, 96:5, 100:10, 104:22, 111:1, 112:1, 112:2, 113:5, 124:23, 125:2, 126:19, 130:19, 141:4, 141:23, 143:19, 147:20, 149:16, 150:7, 153:3, 154:23, 155:6, 161:7, 162:16, 162:18, 162:20, 163:13, 164:15, 167:2, 170:13, 175:20, 176:12, 177:8, 179:5, 179:6, 179:9, 179:20, 179:22, 179:24, 180:14, 183:23, 186:9, 189:19, 200:15, 204:16, 220:6, 222:12, 223:23, 223:24, 226:3, 240:4, 240:5, 240:10

**sort** [4] - 38:13, 45:15, 93:11, 197:12

**soul** [1] - 119:21

**sound** [4] - 32:2, 71:12, 145:15, 174:23

**sounds** [6] - 32:3, 145:16, 149:10, 151:9, 174:24, 201:1

**Source** [1] - 109:9

**source** [29] - 11:10, 11:12, 35:23, 37:12, 38:5, 38:10, 38:12, 38:15, 38:25, 39:5, 39:6, 39:11, 68:16, 72:20, 78:10, 78:19, 79:24, 79:25, 81:7, 81:18, 81:22, 111:23, 112:3, 112:10, 112:13, 121:17, 158:2

**sources** [13] - 37:3, 68:7, 68:17, 68:25, 69:9, 69:19, 79:10,

81:23, 82:8, 112:12, 186:16, 215:16, 215:18

**South** [2] - 2:11, 40:21

**SOUTHERN** [1] - 1:1

**Southern** [1] - 7:3

**spaced** [1] - 21:13

**speaking** [2] - 29:18, 59:17

**Specific** [1] - 139:16

**specific** [19] - 21:19, 21:23, 22:6, 22:21, 23:8, 25:9, 26:6, 26:8, 26:10, 26:21, 27:2, 55:5, 86:5, 93:13, 134:19, 151:6, 172:8, 211:20

**specifically** [11] - 20:9, 25:3, 25:18, 25:21, 27:11, 52:12, 54:22, 69:6, 72:12, 93:15, 217:22

**specifications** [1] - 65:19

**specified** [1] - 103:20

**specify** [1] - 37:20

**specifying** [1] - 103:15

**spreadsheets** [1] - 158:8

**Square** [2] - 6:5, 6:12

**stable** [1] - 180:1

**stack** [1] - 243:14

**stage** [2] - 92:6, 122:1

**STAND** [1] - 9:18

**stand** [4] - 7:9, 8:14, 8:25, 9:15

**standard** [4] - 14:3, 15:13, 82:20, 94:16

**STANNER** [1] - 5:10

**start** [8] - 38:17, 132:13, 166:8, 167:18, 180:14, 194:6, 242:2, 242:4

**started** [15] - 9:6, 68:21, 121:1, 126:12, 128:9, 204:18, 204:22, 216:8, 216:10, 217:15, 233:10, 234:18, 236:18, 237:6, 238:20

**starting** [5] - 71:8, 204:14, 216:11, 217:13, 243:13

**starts** [1] - 100:5

**state** [40] - 40:12, 49:23, 57:24, 58:1, 58:3, 58:23, 58:24, 58:25, 59:2, 59:3,

59:8, 59:10, 59:11, 59:14, 59:19, 60:11, 60:13, 60:14, 72:21, 73:8, 75:17, 77:4, 78:13, 99:25, 100:17, 101:20, 133:10, 176:10, 176:21, 177:17, 179:10, 180:25, 181:14, 183:16, 184:23, 194:20, 195:10, 219:18, 220:3, 225:4

**State** [5] - 35:7, 49:16, 231:21, 231:23, 232:1

**statement** [73] - 15:11, 15:17, 15:20, 15:22, 17:5, 17:7, 19:16, 23:20, 30:22, 32:24, 34:6, 34:18, 35:11, 35:14, 36:1, 37:18, 40:2, 40:7, 40:18, 41:1, 41:8, 41:18, 42:1, 42:10, 43:14, 43:19, 44:13, 48:22, 53:4, 54:2, 54:12, 54:18, 56:25, 57:14, 61:1, 61:19, 62:4, 62:15, 63:14, 63:20, 72:6, 73:2, 73:13, 74:19, 78:23, 82:7, 84:1, 84:4, 89:5, 108:2, 108:8, 111:8, 111:23, 112:9, 113:9, 114:13, 114:16, 131:21, 135:7, 140:9, 141:5, 180:6, 180:22, 192:4, 195:19, 195:22, 196:4, 200:18, 214:5, 214:9, 228:11, 229:9, 232:25

**statements** [3] - 15:25, 192:3, 199:20

**states** [15] - 49:16, 57:20, 106:10, 112:3, 178:23, 180:13, 180:15, 186:1, 189:22, 192:17, 201:15, 202:13, 225:13, 231:25, 233:24

**STATES** [2] - 1:1, 1:17

**States** [10] - 7:2, 14:23, 33:25, 52:8, 52:24, 98:20, 151:20, 189:3, 211:23, 211:25

**statewide** [2] - 177:15, 181:17

**stating** [3] - 217:24, 218:10, 219:3

**statistic** [2] - 78:5, 192:21

**statistical** [4] - 19:18, 20:2, 20:5, 187:1

**statistically** [3] - 184:16, 186:21, 186:22

**statistics** [1] - 79:1

**Status** [1] - 7:2

**STATUS** [1] - 1:17

**stay** [4] - 83:5, 83:13, 128:6, 220:22

**steady** [3] - 54:19, 56:9, 56:21

**Stealing** [1] - 36:11

**steep** [1] - 107:18

**steeper** [1] - 107:23

**stenography** [1] - 6:19

**step** [3] - 32:25, 122:10, 221:16

**STEVEN** [1] - 4:20

**sticking** [1] - 104:14

**still** [4] - 9:16, 134:17, 207:13, 216:7

**stimulant** [1] - 155:5

**stimulants** [2] - 44:7, 155:5

**stopping** [2] - 67:20, 130:22

**stored** [2] - 72:25, 158:1

**story** [1] - 243:21

**straight** [2] - 18:9, 150:22

**straighten** [1] - 139:9

**Strategies** [1] - 108:20

**Street** [15] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:16, 4:18, 4:21, 5:5, 5:12, 6:6, 6:13

**street** [4] - 62:7, 62:17, 80:3, 80:17

**street-level** [2] - 62:7, 62:17

**strength** [2] - 70:8, 70:11

**strike** [10] - 16:12, 16:16, 16:21, 20:18, 20:20, 28:4, 38:17, 98:22, 109:23, 110:9

**strong** [1] - 45:10

**stronger** [1] - 42:5

**strongest** [9] - 240:2, 240:7, 240:13, 240:18, 240:23,

241:15, 242:3, 242:6, 242:10

**Strongest** [2] - 240:20, 240:21

**structure** [1] - 30:23

**students** [2] - 225:15, 225:19

**studied** [2] - 105:9, 225:21

**Studies** [1] - 62:5

**studies** [48] - 74:3, 76:5, 102:14, 114:15, 140:4, 140:5, 140:6, 142:10, 142:12, 142:14, 142:19, 192:23, 195:23, 196:2, 199:23, 200:3, 200:6, 201:2, 201:9, 201:10, 201:17, 201:19, 201:22, 201:23, 201:25, 202:2, 202:4, 202:11, 202:13, 202:15, 203:3, 203:13, 203:19, 204:13, 204:17, 204:21, 211:4, 216:15, 220:4, 220:7, 220:14, 220:22, 220:23, 220:24, 221:16, 225:10, 237:4

**study** [65] - 47:9, 47:17, 62:23, 63:25, 64:4, 90:23, 94:5, 94:13, 94:15, 94:18, 94:19, 95:12, 95:16, 98:15, 99:2, 99:6, 99:15, 99:18, 99:19, 99:20, 102:23, 104:16, 105:5, 107:23, 139:2, 140:1, 140:21, 141:16, 143:25, 190:24, 191:3, 191:7, 193:24, 202:16, 204:7, 204:12, 215:2, 215:11, 215:19, 215:20, 215:22, 220:17, 221:19, 222:7, 222:12, 222:15, 224:21, 225:1, 225:5, 225:24, 226:10, 226:18, 226:24, 227:13, 227:21, 229:2, 229:4,

232:24, 234:17,
234:20, 236:2,
236:11, 240:24
**studying** [1] - 202:8
**subheading** [1] -
33:19
**subject** [1] - 91:18
**submit** [1] - 32:9
**submitted** [3] -
124:20, 131:15
**subsequently** [3] -
81:12, 234:16,
235:12
**subset** [1] - 209:2
**Substance** [2] -
189:11, 189:23
**substance** [8] -
214:23, 236:8,
236:10, 236:11,
236:12, 236:13,
236:14, 236:21
**substances** [3] -
38:18, 44:9, 234:22
**substantial** [2] -
63:14, 104:5
**substantially** [3] -
40:22, 114:20,
225:14
**subtract** [2] - 148:4,
148:11
**suffer** [1] - 141:2
**sufficient** [4] - 92:15,
118:3, 220:11,
220:17
**suggest** [3] - 16:4,
84:24, 101:10
**suggesting** [2] - 48:8,
178:18
**suggests** [3] - 102:3,
190:7, 198:10
**suing** [2] - 231:23,
231:25
**Suite** [9] - 2:4, 2:7,
2:10, 2:13, 3:17, 4:6,
4:9, 6:5, 6:12
**summarizes** [1] -
47:22
**summarizing** [1] -
47:20
**summary** [2] - 73:8,
140:6
**supervision** [2] - 14:2,
15:12
**supplement** [1] - 93:9
**supplemental** [3] -
139:6, 139:7, 141:8
**supplied** [1] - 127:25
**supply** [44] - 10:3,
10:5, 10:10, 10:16,
10:20, 10:23, 12:24,

13:2, 17:9, 20:11,
20:23, 21:5, 23:23,
27:20, 28:11, 28:14,
33:24, 35:14, 35:15,
35:18, 40:11, 40:21,
41:13, 61:9, 64:13,
70:18, 80:25, 81:5,
81:9, 82:13, 84:10,
84:15, 84:20, 85:4,
85:6, 85:8, 85:9,
86:24, 87:1, 166:17,
197:1, 198:16
**Supply** [2] - 33:17,
33:20
**supply-side** [1] -
33:24
**support** [2] - 199:24,
200:6
**supported** [1] - 35:5
**supporting** [1] - 35:4
**suppose** [3] - 21:18,
142:12, 144:16
**supposed** [3] - 83:8,
83:13, 83:15
**surgeries** [1] - 74:22
**surgery** [11] - 72:24,
73:21, 74:9, 74:11,
74:13, 74:14, 74:17,
74:23, 74:25, 75:7
**surpassing** [1] - 40:3
**surprised** [1] - 9:8
**Survey** [6] - 77:10,
77:15, 178:15,
181:18, 182:9,
214:21
**survey** [10] - 77:11,
77:13, 77:17, 77:18,
77:22, 77:25, 79:8,
79:18, 191:17,
225:24
**survival** [2] - 226:25,
227:1
**Suspicious** [1] - 25:25
**sustain** [2] - 93:19,
183:9, 203:10
**Sustained** [1] - 229:20
**SUZANNE** [1] - 4:18
**switch** [1] - 176:8
**synonymous** [3] -
10:3, 10:14, 59:24
**synonymously** [1] -
10:15
**synthetic** [26] - 43:15,
43:21, 44:10,
125:18, 145:10,
145:21, 145:24,
146:2, 146:3,
146:22, 147:1,
147:7, 147:9,
147:11, 154:14,

154:19, 154:20,
155:15, 156:2,
156:3, 156:17,
156:22, 163:23,
164:13, 170:20,
171:20
**system** [2] - 38:18,
39:3
**Systematic** [1] -
139:17
**systematic** [1] - 132:2

# T

**T40.-infinity** [1] -
146:18
**T40.1** [1] - 146:18
**T40.2** [1] - 146:18
**T40.4** [10] - 125:18,
145:10, 145:24,
146:17, 146:19,
156:9, 156:22,
168:18, 168:21,
168:24
**Table** [5] - 183:15,
227:15, 233:9,
235:6, 235:21
**table** [9] - 11:11,
11:12, 65:4, 115:9,
117:3, 152:19,
155:16, 170:15,
171:17
**tables** [3] - 97:21,
181:14, 184:23
**tablet** [1] - 44:17
**talks** [1] - 216:11
**tar** [1] - 41:3
**target** [1] - 142:15
**task** [11] - 229:5,
229:8, 229:12,
229:16, 229:23,
230:2, 230:9,
230:16, 231:2,
231:16, 232:4
**tautological** [2] -
45:15, 240:15
**TEMITOPE** [1] - 4:11
**temporally** [2] - 207:8,
209:9
**ten** [3] - 76:2, 135:23,
188:17
**Tenth** [1] - 5:12
**tenth** [2] - 42:4, 65:20
**term** [21] - 13:23,
34:23, 89:4, 95:4,
95:24, 97:9, 103:7,
103:12, 103:18,
103:19, 103:25,
109:18, 110:13,
112:24, 113:7,

113:13, 113:17,
206:22, 207:18
**terminology** [3] -
191:4, 206:21,
208:16
**terms** [9] - 20:14,
43:23, 59:14, 87:8,
125:23, 127:20,
201:25, 237:15,
238:24
**test** [3] - 165:3,
167:24, 187:1
**testified** [17] - 9:23,
10:2, 12:16, 63:25,
90:8, 91:13, 91:17,
92:8, 164:21, 165:5,
178:3, 199:9, 205:6,
221:25, 222:7,
222:11, 222:12
**testifying** [3] - 29:1,
231:12, 239:4
**testimony** [24] - 8:15,
8:18, 12:23, 18:1,
19:8, 20:3, 52:16,
59:17, 65:10, 87:7,
91:8, 92:12, 92:13,
93:13, 115:6,
192:22, 203:3,
204:2, 220:10,
221:3, 221:9,
223:19, 242:25
**THE** [108] - 1:1, 1:1,
1:4, 1:17, 7:6, 8:10,
9:4, 9:10, 9:13, 9:14,
9:15, 9:17, 14:17,
16:16, 16:19, 16:23,
17:23, 18:6, 18:11,
18:14, 19:9, 20:20,
23:4, 25:6, 25:7,
26:6, 26:18, 28:19,
29:21, 30:10, 46:7,
67:19, 67:23, 67:25,
68:3, 91:23, 92:22,
93:17, 93:22, 94:1,
98:22, 98:24,
108:16, 109:25,
110:1, 110:8,
123:25, 124:4,
124:12, 124:14,
130:21, 130:25,
131:3, 131:5, 139:4,
139:5, 139:11,
143:2, 143:5, 143:9,
143:14, 143:19,
147:1, 147:4,
148:22, 152:15,
158:12, 162:1,
162:22, 162:24,
164:25, 165:4,
165:8, 165:17,

167:3, 179:24,
181:11, 181:25,
182:6, 182:22,
183:4, 183:7,
184:21, 188:13,
188:17, 188:20,
188:23, 203:10,
206:7, 206:9,
213:10, 218:20,
218:21, 221:4,
221:23, 222:1,
228:17, 229:20,
242:14, 242:17,
242:24, 243:4,
243:18, 244:4,
244:8, 244:13,
244:20, 244:24
**theft** [1] - 69:7
**thefts** [1] - 68:14
**themselves** [1] - 37:15
**Theodore** [2] - 213:14,
214:1
**theoretical** [1] -
165:11
**theoretically** [1] -
188:10
**theory** [3] - 205:1,
205:4, 205:5
**therapy** [4] - 95:2,
103:7, 103:12,
103:14, 103:16,
107:19, 109:18,
110:13
**therefore** [5] - 28:20,
45:19, 58:19, 148:8,
198:15
**they've** [1] - 12:4
**thick** [1] - 65:15
**thinking** [2] - 23:18,
53:12
**thinks** [1] - 44:25,
243:23
**third** [5] - 38:4, 96:6,
109:10, 142:1,
196:16
**Third** [1] - 65:19
**Thomas** [1] - 2:10
**thousand** [1] - 157:2
**Three** [1] - 6:5
**three** [20] - 6:12,
40:10, 98:14,
100:23, 101:1,
109:18, 110:13,
110:19, 117:23,
122:14, 140:9,
147:24, 161:5,
167:14, 168:6,
169:1, 198:20,
205:22, 243:16
**three-times** [2] -

161:5, 169:1
**three-to-one** [1] - 243:16
**threw** [1] - 223:23
**throughout** [1] - 192:8
**tight** [1] - 244:18
**tighter** [1] - 237:15
**timing** [4] - 31:25, 236:23, 237:3, 237:8
**TIMOTHY** [1] - 5:9
**title** [4] - 14:21, 139:15, 190:7, 191:21
**tobacco** [3] - 236:22, 237:2, 238:15
**today** [13] - 8:9, 9:7, 15:21, 16:8, 24:22, 69:8, 69:11, 119:14, 131:11, 175:10, 196:15, 218:6, 242:17
**today's** [1] - 154:9
**together** [9] - 15:8, 34:1, 160:7, 171:23, 171:25, 172:5, 186:14, 186:16, 236:2
**tolerance** [3] - 43:12, 112:20, 113:23
**tomorrow** [1] - 243:12
**took** [4] - 145:8, 150:25, 154:13, 212:24
**top** [15] - 24:19, 43:13, 61:16, 62:4, 62:10, 71:22, 71:24, 99:24, 119:14, 153:15, 157:4, 185:21, 195:3, 224:1
**topic** [1] - 88:10
**total** [17] - 24:9, 84:15, 84:20, 85:3, 85:6, 94:10, 129:4, 130:8, 130:14, 156:2, 156:9, 156:14, 156:15, 174:8, 175:14, 175:21
**totality** [1] - 47:22
**totally** [1] - 93:25
**toward** [1] - 111:22
**Tower** [2] - 3:4, 4:21
**track** [1] - 140:17
**traditional** [1] - 93:3
**trafficked** [5] - 11:3, 11:19, 12:4, 62:19, 72:10
**trafficker** [2] - 36:14, 38:13
**traffickers** [2] - 11:18, 12:5

**trafficking** [7] - 12:1, 84:9, 84:19, 85:1, 85:3, 85:10, 205:14
**trajectory** [1] - 128:19
**transcript** [9] - 6:19, 23:3, 28:24, 29:6, 29:15, 30:4, 221:6, 239:2, 246:4
**transcripts** [1] - 17:24
**transition** [18] - 40:13, 140:19, 193:15, 194:11, 196:4, 197:19, 200:4, 204:14, 204:17, 205:9, 206:1, 206:11, 219:9, 224:4, 233:3, 237:15, 237:18, 238:16
**transitioned** [2] - 204:23, 204:24
**transitioning** [5] - 194:20, 195:4, 195:11, 195:20, 224:8
**transitions** [2] - 199:22, 205:15
**translates** [3] - 98:19, 98:20, 198:15
**treat** [11] - 13:12, 13:18, 34:24, 35:4, 35:8, 89:2, 89:4, 89:15, 89:18, 89:21, 198:12
**treated** [13] - 89:23, 96:1, 96:12, 96:17, 96:20, 96:23, 97:3, 97:5, 97:11, 97:14, 97:18, 97:25, 197:11
**treating** [1] - 75:3
**treatment** [22] - 34:10, 74:17, 75:7, 89:12, 94:24, 95:6, 95:8, 95:13, 95:15, 95:24, 97:9, 98:7, 102:10, 102:25, 103:18, 103:25, 104:6, 105:5, 142:20, 214:24, 215:3, 216:19
**treatment-seeking** [1] - 216:19
**trend** [2] - 46:22, 47:10
**Trends** [1] - 43:14
**trends** [2] - 48:6, 176:9
**Trial** [1] - 244:25
**TRIAL** [1] - 1:16
**trial** [4] - 101:11,

101:14, 101:22, 101:24
**trials** [2] - 93:5, 93:6
**trick** [2] - 65:14, 111:4
**tried** [3] - 87:6, 128:6, 215:17
**trier** [1] - 92:23
**true** [49] - 11:16, 11:21, 15:17, 17:4, 23:17, 30:1, 30:4, 34:6, 34:18, 35:11, 36:1, 40:7, 40:18, 41:1, 41:8, 41:18, 42:1, 42:10, 43:19, 44:13, 53:4, 54:2, 54:12, 56:25, 57:14, 57:22, 59:8, 61:1, 62:15, 63:20, 71:6, 72:6, 73:2, 78:23, 79:23, 82:7, 96:23, 104:9, 108:2, 111:8, 112:9, 113:9, 131:21, 143:14, 207:11, 211:1, 211:5, 236:17, 238:18
**truism** [1] - 12:18
**trust** [3] - 21:15, 31:25, 174:21
**trustworthiness** [1] - 92:16
**trustworthy** [1] - 93:1
**truthful** [3] - 69:24, 70:3, 70:5
**truthfully** [2] - 69:16, 69:17
**try** [7] - 10:9, 123:14, 139:9, 152:12, 162:11, 164:7, 172:18
**trying** [26] - 8:25, 22:4, 63:9, 64:15, 64:18, 65:24, 107:7, 112:6, 117:3, 122:1, 133:24, 155:24, 159:6, 164:10, 165:2, 167:20, 170:24, 171:9, 185:16, 199:1, 200:12, 200:18, 200:22, 228:1, 239:19, 243:2
**turn** [4] - 93:9, 115:6, 131:23, 232:24
**turned** [1] - 236:20
**turning** [2] - 97:2, 237:7
**Twelfth** [3] - 4:16, 4:18, 5:5
**two** [53] - 10:15,

14:11, 16:2, 33:25, 59:23, 78:14, 80:6, 80:9, 85:25, 88:3, 88:17, 113:11, 122:22, 123:21, 124:19, 128:22, 131:2, 132:10, 133:19, 133:24, 134:3, 135:25, 139:22, 144:7, 144:8, 145:1, 145:8, 151:15, 153:18, 156:5, 156:25, 157:2, 171:23, 186:13, 186:14, 186:15, 186:24, 187:3, 187:5, 187:10, 187:13, 187:14, 187:20, 190:20, 191:10, 192:3, 199:19, 209:4, 209:13, 219:10, 236:2
**type** [7] - 17:12, 69:10, 74:11, 95:5, 155:5, 155:8, 155:17
**types** [1] - 12:10
**typically** [5] - 26:17, 43:2, 48:3, 90:16, 147:8
**typo** [1] - 123:21

## U

**U.S** [9] - 34:11, 35:6, 40:21, 189:12, 197:17, 198:14, 198:17, 222:23, 224:10
**ultimately** [1] - 127:25
**Ultimately** [1] - 33:8
**unadjusted** [1] - 96:7
**unaware** [4] - 45:7, 45:9, 45:11, 45:16, 45:17, 45:19
**unbiased** [2] - 134:17, 135:6
**uncommon** [2] - 104:21, 104:23
**under** [27] - 9:16, 14:1, 15:10, 15:12, 30:21, 33:17, 33:23, 40:10, 43:14, 69:13, 100:1, 100:13, 100:17, 109:8, 137:3, 137:7, 140:8, 141:20, 173:9, 182:23, 183:9, 189:9, 201:16, 207:7, 214:7, 226:5, 226:18

**underestimate** [2] - 178:16, 178:22
**underlie** [1] - 171:12
**underlying** [15] - 16:3, 16:11, 47:9, 47:23, 57:2, 67:12, 73:23, 81:24, 91:18, 92:9, 115:19, 146:17, 153:22, 158:4, 172:25
**Underlying** [1] - 153:4
**understandings** [1] - 58:4
**understood** [2] - 147:20, 223:18
**undertake** [3] - 118:21, 242:21, 244:17
**undertaken** [12] - 17:9, 19:2, 19:14, 19:17, 19:21, 19:23, 20:1, 20:5, 20:8, 21:2, 21:10, 216:5
**undertaking** [1] - 65:12
**undertook** [1] - 220:13
**unexposed** [2] - 209:15, 224:20
**unfortunately** [2] - 185:7, 186:19
**uninfected** [1] - 224:23
**uninformative** [1] - 228:1
**United** [9] - 7:2, 14:23, 33:25, 52:8, 98:20, 151:20, 189:3, 211:23, 211:25
**UNITED** [2] - 1:1, 1:17
**universe** [2] - 11:8, 241:23
**University** [1] - 231:20
**unless** [4] - 88:8, 191:17, 240:11
**Unlike** [1] - 113:22
**unlikely** [1] - 12:19
**unquote** [2] - 76:3, 76:4
**unrounded** [2] - 161:3, 161:8
**untaken** [1] - 18:23
**untrue** [1] - 143:8
**unused** [13] - 39:22, 71:14, 72:1, 72:16, 72:24, 73:21, 74:5, 74:7, 75:2, 78:2, 78:4, 78:8, 78:9
**up** [68] - 7:10, 8:13, 17:14, 17:24, 18:1,

19:8, 22:13, 28:23, 39:20, 52:15, 56:7, 68:20, 71:8, 79:5, 79:13, 86:6, 100:16, 104:22, 123:14, 127:7, 128:18, 128:21, 131:1, 132:25, 133:6, 133:9, 134:8, 134:19, 134:20, 135:10, 135:17, 136:23, 140:5, 140:25, 141:15, 144:5, 145:19, 149:6, 149:11, 149:19, 149:21, 149:22, 150:4, 152:20, 153:2, 155:19, 157:9, 158:16, 159:24, 160:11, 161:2, 161:4, 163:8, 163:24, 164:10, 173:4, 175:12, 175:20, 176:18, 180:6, 192:6, 194:9, 194:13, 221:5, 239:1, 241:1, 242:15, 243:14
**update** [1] - 73:11
**Urban** [2] - 14:22, 52:7
**urban** [4] - 53:10, 54:9, 57:13, 61:8
**urban-rural** [1] - 53:10
**user** [17] - 44:21, 44:23, 44:24, 44:25, 45:2, 45:3, 45:16, 45:19, 45:22, 80:2, 80:11, 191:5, 201:12, 205:18, 235:6
**Users** [1] - 46:13
**users** [48] - 11:20, 45:4, 45:6, 45:9, 45:10, 45:11, 45:18, 47:3, 50:6, 77:5, 77:23, 78:17, 79:6, 79:19, 80:5, 80:8, 80:19, 120:20, 121:1, 132:22, 190:21, 190:24, 191:3, 193:1, 193:9, 194:3, 194:11, 201:9, 201:10, 202:8, 202:9, 202:12, 203:2, 203:5, 212:25, 217:14, 222:13, 222:14, 233:14, 234:13, 234:18,

235:22, 236:3, 236:18, 236:21, 237:5, 238:19
**uses** [5] - 13:17, 78:5, 89:23, 95:4, 205:25

## V

**vacuum** [1] - 197:20
**vague** [2] - 23:2, 25:5
**valid** [1] - 185:6
**validation** [2] - 206:6, 221:25
**validity** [1] - 47:25
**value** [10] - 71:15, 72:2, 107:6, 186:23, 187:5, 187:7, 187:8, 187:23, 188:2, 188:8
**values** [3] - 187:10, 187:16, 187:19
**variable** [5] - 66:13, 66:15, 209:16, 236:24, 237:3
**variables** [2] - 67:15, 209:13
**variation** [1] - 64:16
**variations** [3] - 59:2, 59:14, 64:19
**varied** [1] - 201:25
**varies** [2] - 102:16, 114:20
**varieties** [2] - 147:10, 147:11
**various** [5] - 48:11, 51:12, 128:5, 212:1
**vary** [1] - 102:13
**vast** [6] - 147:20, 192:25, 193:5, 198:16, 226:23, 238:24
**Ventura** [1] - 3:18
**venues** [1] - 50:24
**veracity** [3] - 91:18, 92:9, 93:16
**verified** [2] - 158:4, 243:9
**version** [1] - 185:1
**versions** [2] - 30:25, 71:23
**versus** [2] - 147:18, 217:11
**veteran** [3] - 223:9, 225:6, 225:14
**Veterans** [2] - 222:9, 222:23
**veterans** [3] - 224:23, 225:20, 225:21
**via** [1] - 50:23
**view** [17] - 10:2, 13:2, 14:10, 70:21, 71:3,

76:9, 80:23, 81:3, 81:8, 81:14, 82:19, 132:1, 138:14, 143:12, 146:1, 205:9, 241:25
**viewed** [5] - 146:5, 146:21, 148:5, 190:24, 208:11
**views** [1] - 111:12
**Virginia** [46] - 4:21, 7:3, 7:4, 14:21, 17:11, 46:10, 48:25, 49:7, 49:14, 50:3, 50:14, 50:20, 51:2, 52:12, 52:25, 53:8, 55:4, 55:9, 55:12, 55:17, 55:20, 55:22, 56:1, 57:5, 57:19, 65:6, 99:16, 99:20, 117:17, 177:14, 177:18, 177:23, 178:1, 178:8, 179:1, 179:2, 179:13, 180:4, 180:17, 180:18, 183:18, 184:1, 189:1, 213:13, 215:14, 222:21
**VIRGINIA** [2] - 1:1, 1:18
**Virginia's** [1] - 56:16
**Virginians** [2] - 178:12, 186:1
**vis-à-vis** [3] - 24:11, 236:23, 237:8
**visits** [1] - 63:16
**vital** [2] - 34:14, 49:10
**voice** [1] - 19:4
**Volkow** [6] - 108:23, 109:5, 113:7, 114:7, 219:7
**volume** [10] - 61:20, 80:23, 81:3, 81:14, 81:17, 82:11, 196:23, 197:9, 199:2, 199:16
**VOLUME** [1] - 1:16
**vs** [1] - 246:6
**vulnerability** [2] - 114:21, 115:1

## W

**wait** [1] - 182:21
**WAKEFIELD** [1] - 5:13
**walk** [2] - 131:1, 136:11
**wants** [1] - 203:7
**Washington** [10] - 4:7, 4:10, 4:17, 4:19, 5:5,

5:12, 231:21, 231:23, 232:1
**ways** [1] - 11:8
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**website** [2] - 185:10, 185:22
**week** [15] - 9:23, 12:7, 12:23, 27:8, 29:4, 52:16, 63:25, 65:10, 91:8, 91:13, 92:8, 98:3, 120:2, 122:19, 230:23
**weekend** [1] - 243:10
**weeks** [5] - 109:19, 110:13, 110:19, 122:14, 198:21
**weight** [6] - 33:6, 42:5, 93:2, 149:13, 168:17, 168:23
**weighted** [5] - 145:9, 149:24, 150:13, 160:4, 168:20
**weighting** [10] - 146:15, 149:12, 166:5, 169:16, 169:17, 170:2, 170:3, 170:5, 170:6
**weights** [4] - 149:3, 169:13, 208:11, 208:13
**West** [49] - 7:3, 7:4, 14:21, 17:10, 41:4, 46:10, 48:25, 49:7, 49:14, 50:3, 50:14, 50:20, 51:2, 52:12, 52:25, 53:8, 55:4, 55:9, 55:12, 55:17, 55:20, 55:22, 56:1, 56:16, 57:5, 57:19, 65:6, 99:15, 99:20, 117:17, 177:14, 177:18, 177:23, 177:25, 178:8, 178:12, 179:1, 179:2, 179:12, 180:3, 180:17, 180:18, 183:18, 184:1, 186:1, 189:1, 213:13, 215:13, 222:21
**WEST** [2] - 1:1, 1:18
**whatever's** [1] - 173:16
**whereas** [1] - 178:19
**whereby** [1] - 39:22
**white** [1] - 41:11
**whole** [8] - 100:4, 100:10, 111:2, 163:24, 195:7,

195:15, 211:14, 242:17
**wholesale** [3] - 42:4, 42:7, 51:4
**wholly** [1] - 8:16
**WICHT** [4] - 4:15, 7:7, 8:19, 9:9
**widely** [1] - 196:13
**widespread** [2] - 199:3, 199:17
**Williams** [2] - 4:16, 5:4
**WITNESS** [18] - 9:14, 9:17, 9:18, 25:7, 28:19, 109:25, 124:14, 131:3, 139:5, 139:11, 143:19, 147:4, 152:15, 162:22, 162:24, 179:24, 206:9, 218:21
**witness** [24] - 7:8, 7:10, 8:24, 9:10, 9:15, 19:6, 29:16, 92:7, 93:12, 142:21, 164:20, 165:5, 203:9, 230:19, 230:22, 230:25, 231:7, 232:22, 243:11, 243:12, 243:16, 243:20, 244:5, 244:7
**witness's** [1] - 92:13
**witnesses** [1] - 243:25
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**WONDER** [2] - 157:14, 157:15
**word** [15] - 10:9, 10:10, 105:21, 105:24, 107:2, 107:6, 107:7, 158:24, 159:4, 160:22, 161:11, 161:13, 161:16, 193:16, 226:14
**worded** [2] - 16:7, 202:24
**words** [16] - 10:15, 70:17, 79:19, 90:13, 90:19, 94:23, 95:24, 105:17, 160:1, 163:23, 164:8, 170:20, 196:12, 196:23, 208:10, 218:23
**workplace** [1] - 57:5
**works** [2] - 227:1, 227:18
**world** [1] - 238:4

**wrap** [1] - 242:15
**write** [5] - 15:20, 16:8, 76:4, 132:17, 144:19
**writes** [1] - 75:11
**writing** [3] - 54:13, 80:24, 81:4
**writings** [1] - 218:1
**written** [22] - 11:13, 23:14, 27:17, 52:18, 75:10, 82:15, 103:24, 104:5, 108:6, 108:7, 108:23, 110:18, 140:18, 142:17, 151:20, 193:12, 194:8, 206:16, 213:14, 218:15, 219:22, 236:8
**wrote** [18] - 15:1, 15:17, 16:14, 17:4, 17:6, 30:24, 31:18, 52:3, 52:9, 54:15, 56:20, 57:6, 57:9, 71:11, 73:15, 161:13, 196:3, 204:8
**WU** [1] - 5:10
**WV** [15] - 2:8, 3:10, 3:13, 4:22, 5:15, 6:9, 108:18, 139:15, 151:19, 151:22, 153:4, 154:17, 170:14, 181:14, 184:22

## Y

**year** [30] - 32:1, 103:9, 103:11, 145:9, 168:25, 169:2, 169:5, 169:6, 169:8, 176:24, 180:3, 183:16, 185:15, 185:16, 185:20, 193:10, 193:21, 198:7, 198:11, 198:19, 226:15, 226:17, 227:5, 227:14, 228:4, 239:25, 240:5, 240:17, 241:5, 241:13
**year-end** [1] - 176:24
**yearly** [1] - 145:18
**years** [20] - 9:6, 76:2, 140:11, 145:16, 151:10, 180:1, 185:6, 185:8, 185:11, 185:12, 185:14, 186:13, 187:1, 187:5,

187:13, 187:14, 187:20, 194:3, 194:12
**yesterday** [1] - 223:15
**York** [9] - 3:5, 8:1, 28:24, 29:2, 204:2, 221:5, 239:1, 239:5, 241:1
**young** [5] - 46:23, 47:10, 48:19, 48:20, 225:15
**Young** [1] - 48:21
**yourself** [1] - 115:19
**Youth** [1] - 46:12