IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
              Plaintiff,        :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.       :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
              Plaintiff,        :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.       :
_____x
```

BENCH TRIAL - VOLUME 27
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


JUNE 15, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301


**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:             Ayme Cochran, RMR, CRR
Court Reporter:             Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A.

 2    Faber, Senior Status Judge, United States District

 3    Court, Southern District of West Virginia, in

 4    Charleston, West Virginia, on June 15, 2021, at 9:00

 5    a.m., as follows:

 6               MR. HESTER:  Your Honor, before we get started

 7    today, we wanted to offer a brief perspective on the cross

 8    examination yesterday of Dr. Keyes.

 9          First of all, I hope the Court will be pleased to know

10    that we've dropped many of our points overnight and we're

11    expecting a quite brief examination this morning.

12               THE COURT:  Your cross, Mr. Hester, was like

13    reading *War and Peace*.

14               MR. HESTER:  Well, Your Honor, that's what I

15    wanted to offer this perspective on, because I recognize the

16    Court was feeling that way by the end of the day.

17          We did want to give our general view on the need for

18    that cross examination.  Dr. Keyes' opinions rest on complex

19    methods of both epidemiology and methodology and those were

20    not really laid out on the direct.  It was a relatively

21    brief direct and, of course, the plaintiffs are entitled to

22    proceed that way, but it leaves the defense in a difficult

23    spot.  We need to explain and to drill into the methodology

24    and we need to explore the points from the literature and

25    unavoidably, in our view, it takes time.
```

1          We were also surprised yesterday by responses that

2     required impeachment or devoting time to things that we

3     believed were undisputed.  That also took up a meaningful

4     amount of time.

5               MR. FARRELL:  Judge, I'm going to object to the

6     narrative, especially with Dr. Keyes in the courtroom.  We

7     believe most of the impeachment evidence was, on our

8     objections, sustained.  So --

9               THE COURT:  Well, I'm going to let Mr. Hester

10    finish.

11              MR. HESTER:  I just wanted to finish the point.

12    I'm not going to belabor that any longer.

13         We're going to do our very best to stay focused in

14    these crosses and I wanted to assure the Court of that.

15    We're trying to identify the best ways to streamline the

16    information and to make it manageable, but on these complex

17    subjects, it may be unavoidable that the cross examination

18    is relatively longer if the direct is relatively shorter.

19         And yesterday, I will admit, Your Honor, felt long for

20    all of us.  If it was *War and Peace* for the Court, it felt

21    like I was writing it.

22         And to put it in perspective, it was a two-hour direct

23    examination of Dr. Keyes on Friday and a five and a half

24    hour cross yesterday and, in the aggregate, in the aggregate

25    across this trial so far, the plaintiffs have used nine more

```
 1   hours of trial time and 20 more hours of court time if we

 2   take account of the deposition designations, as well.  So,

 3   we don't wasn't to lose sight of that discrepancy even

 4   though we recognize this was a long cross examination

 5   yesterday and I did want to assure the Court we're going to

 6   do our very best to stay tight, and focused, and manageable

 7   as much as we can in these crosses.

 8           THE COURT:  Well, I appreciate that, Mr. Hester,

 9   and you kind of put me in a box.  My 2:00 a.m. hour-long

10   contemplation last night was about this case being off track

11   and what I can do about it to get it back on track and I'm

12   not sure.  I'm very concerned about the situation and the

13   plaintiffs need to have an opportunity to make their case,

14   but I think we'll go ahead today and see where we go and

15   then take a look at it and anything the parties on both

16   sides can do to use the time more expeditiously will be

17   appreciated by the Court.

18       And keep in mind we don't have a jury over here in the

19   -- and the person you've got to persuade is me.

20       Okay.  Dr. Keyes, you can come back and resume the

21   witness stand.

22       Good morning Dr. Keyes.

23           THE WITNESS:  Good morning.

24           THE COURT:  All right, sir.

25           MR. HESTER:  Your Honor, may I approach?
```

1          THE COURT:  Yes.

2          BY MR. HESTER:

3   **Q.**   Dr. Keyes, good morning.

4   **A.**   Good morning.

5   **Q.**   We've handed you a document that's been marked as

6   DEF-WV Exhibit 2646 entitled Relationship Between

7   Non-Medical Prescription Opioid Use and Heroin Use.  Have

8   you seen this article before, Dr. Keyes?

9   **A.**   Yes.

10  **Q.**   And I take it -- and you relied on this article for

11  purposes of your report, correct?

12  **A.**   We did.

13  **Q.**   And the article is written by Wilson Compton and

14  colleagues, correct?

15  **A.**   That's right.

16  **Q.**   And the lead author listed on the article, Wilson

17  Compton --

18          MR. FARRELL:  Judge, if I may?  Judge, if I may?

19          THE COURT:  Yes.

20          MR. FARRELL:  I would object to walking through

21  this article.  This article, I specifically attempted to

22  address during my direct.  Mr. Hester objected.  The Court

23  sustained it.  If the -- if counsel has questions about the

24  article, he should be able to ask them, but I would object,

25  at this point, of simply showing more medical literature on

```
 1    the screen.
 2            MR. HESTER:  Your Honor, our objection was that
 3    the plaintiffs had not provided us a list of any documents
 4    that would be used with Dr. Keyes in her direct examination.
 5    So, we were not given a fair chance to be ready for that.
 6    That's a different question from cross examining her in
 7    relation to an article that she's relied on in her report.
 8            THE COURT:  Well, I'm going to let you go ahead,
 9    Mr. Hester, and hopefully this will be a sprint and not a
10    distance run.
11            MR. HESTER:  Yes, it is.  It is intended to be a
12    sprint, Your Honor.
13            THE COURT:  All right.
14            BY MR. HESTER:
15    Q.   So, Dr. Keyes, I was asking you the lead author, Wilson
16    Compton, is currently serving as the Deputy Director of the
17    National Institute of Drug Abuse; is that correct?
18    A.   That's right.
19    Q.   And this is a review article, if you look at the first
20    page.  That signifies that he's reviewing the literature; is
21    that correct?
22    A.   That's right.
23    Q.   And it's published in the New England Journal of
24    Medicine; is that correct?
25    A.   That's correct.
```

1    **Q.**    And I believe in your direct examination on Friday you

2    had characterized that as one of the world's premier medical

3    journals; is that correct?

4    **A.**    It is.

5    **Q.**    And you understand that this review article by Dr.

6    Compton looked at fourteen of the sixteen studies that you

7    rely on for your gateway opinion, correct?

8    **A.**    That's right.

9    **Q.**    And let me point you to Page 3 of the article, please.

10   And Dr. Compton states in the paragraph right under heroin

11   use among people who use prescription opioids, it states,

12   "Studies that address the patterns of heroin use in

13   non-medical users of prescription opioids are mostly

14   observational and descriptive, i.e., non-experimental."  Do

15   you see that?

16   **A.**    I do.

17   **Q.**    And you said the same thing in your report about these

18   same studies, correct?  You said that the studies are

19   observational rather than experimental, correct?

20   **A.**    Correct.

21   **Q.**    And if you look at Page 3 of the Compton article, he

22   goes on to say after the sentence that says, "The studies

23   that address the patterns of heroin use in non-medical users

24   of prescription opioids are mostly observational and

25   descriptive", he then goes on to say, "Thus, conclusions

1    about cause and effect are uncertain."  Do you see that?

2    **A.**   I do.

3    **Q.**   And you're aware that that's what Dr. Compton

4    determined after his review of the literature in 2016?

5    **A.**   The next sentence is what you need to read to -- in

6    order to comport it with my opinion.  That sentence taken

7    out of context is not sufficient to -- to present his

8    argument in this paper.

9    **Q.**   So -- so, he points to the -- okay.  So, let's look at

10   the next sentence.  He says there's certain consistent

11   findings of a positive association between non-medical use

12   of prescription opioids and heroin use that he says are

13   highly suggestive and plausible.  Do you see that?

14   **A.**   Given the common pharmacologic principles described

15   above.

16   **Q.**   That's what he says, right?

17   **A.**   That's right.

18   **Q.**   But you're also aware that he concluded that

19   conclusions about cause and effect are uncertain, right?

20   **A.**   I think that -- the sentence says that the conclusion

21   about cause and effect are uncertain due to the descriptive

22   nature of the findings.  What I've done in my report is add

23   additional studies to what Dr. Compton reviewed in his New

24   England Journal article and compared it directly to

25   epidemiological principles about causation that I conclude

1    are consistent with a causal hypothesis.

2    **Q.**   So, but in this published article in the New England

3    Journal of Medicine, Dr. Compton was looking at fourteen of

4    the sixteen studies you had looked at, correct?

5    **A.**   That's right.

6    **Q.**   And he concluded, based on his review of the studies

7    plus others that he also reviewed, that the conclusions

8    about cause and effect are uncertain, correct?

9    **A.**   This sentence says conclusions about cause and effect

10   are uncertain.  I think the positive association and the

11   biological plausibility that are also cited in this

12   paragraph make it clear that the direction of the

13   association points to causality.

14   **Q.**   Right.  So, I think we're on the same page.  He notes

15   an association, but he concludes that the cause and effect

16   is uncertain?

17   **A.**   That sentence says conclusions about cause and effect

18   are uncertain due to descriptive nature, but all of the

19   evidence points towards causation.  So, that would be my

20   read of that paragraph.

21   **Q.**   And when you say "due to the descriptive nature",

22   you're saying due to the prescriptive nature of the studies,

23   that's why he concluded that the cause and effect is

24   uncertain?

25   **A.**   That's right.  We can't randomly assign people to

1    prescription opioids anymore.

2    **Q.**    Let me -- let me ask you to look at Page 5 of the

3    article, please, and immediately above the heading for

4    Effects of Opioid Prescribing Intervention it says, "Taken

5    in total, the available data suggests that non-medical

6    prescription opioid use is neither necessary nor sufficient

7    for the initiation of heroin use and that other factors are

8    contributing to the increase in the rate of heroin use and

9    related mortality."  Do you see that?

10   **A.**    I do.

11   **Q.**    And you agree with that statement, correct?

12   **A.**    Yes.

13   **Q.**    And that's a generally accepted view, correct?

14   **A.**    Yes.  It's like smoking and lung cancer.  Smoking is

15   neither necessary nor sufficient to cause lung cancer; just

16   like prescription opioids are neither necessary nor

17   sufficient to cause heroin use.

18   **Q.**    And he goes on to say that, "other factors are

19   contributing to the increase in the rate of heroin use and

20   related mortality."  You agree with that statement, correct?

21   **A.**    Right.  I would say that's also similar to smoking and

22   lung cancer.

23            MR. HESTER:  Thank you, Dr. Keyes.  Those are all

24   the questions I have, but let me actually -- let me do one

25   thing before I close up.

```
 1          Let me add to the board "Compton - other factors are
 2     contributing."
 3          So those are all the questions I have, Dr. Keyes.
 4          Your Honor, as a matter of housekeeping, as the Court
 5     will recall, there are two boards that we used.  This board
 6     is headed Gateway, which we would like to label as McKesson
 7     Demonstrative Exhibit 7.  Then there was the earlier board
 8     that the Court will recall on the OUD calculations and we
 9     would like to label that as McKesson Demonstrative
10     Exhibit 6.
11               THE COURT:  All right.
12          Mr. Ackerman?
13               MR. ACKERMAN:  I was just going to say no
14     objection to that, Your Honor.
15               MR. HESTER:  Thank you, Your Honor.
16          Thank you, Dr. Keyes.
17               THE COURT:  Ms. Hardin, do you want to question
18     the witness?
19               MS. HARDIN:  Not at this time, Your Honor.  Thank
20     you.
21               THE COURT:  Are we through with the cross?
22               MS. MCCLURE:  Yes.  Thank you, Your Honor.
23               THE COURT:  You may re-direct, Mr. Farrell or Mr.
24     Ackerman, whoever is going to do it.
25               MR. FARRELL:  Good morning, Dr. Keyes.
```

1    Your Honor, may I?

2         THE COURT:  Yes, you may.

3              **REDIRECT EXAMINATION**

4         **MR. FARRELL:**

5    **Q.**   Dr. Keyes, do you recall yesterday that you were read a

6    fragment of a sentence in your report --

7         MR. FARRELL:  Can you pull it up, please?

8         BY MR. FARRELL:

9    **Q.**   You were read a portion.  I believe it was just up on

10   the screen.  "Thus, while the absolute risk of transitioning

11   to heroin given prescription opioid use is relatively small"

12   -- and this was read from Page 48 of your report.  Do you

13   recall that?

14   **A.**   I do.

15   **Q.**   Do you recall in your report that this was what's

16   called a non-essential fragment or phrase in the overall

17   sentence structure from Pages 47 and 48?

18   **A.**   It's a -- it's a fragment of the sentence, yes.

19   **Q.**   Yes.  And you offered to read the rest of the sentence

20   in and were you provided that opportunity?

21   **A.**   I don't believe so.

22   **Q.**   Yes.

23         MR. FARRELL:  Judge, if it's -- with your

24   permission, I would like to reveal the rest of the sentence.

25    If you could bring up the rest of the sentence, please?

```
 1              THE COURT:  Yes, you may.
 2              BY MR. FARRELL:
 3   Q.   And I would like to take a moment and have you just
 4   first read to yourself what this sentence is to make sure
 5   it's an accurate depiction of what your report says.
 6   A.   "The number of individuals who use prescription opioids
 7   is approximately seven times larger than the number of
 8   individuals who use heroin.  Thus, while the absolute risk
 9   of transitioning to heroin given prescription opioid use is
10   relatively small, the vast majority of individuals who use
11   heroin began with prescription opioid use.  And even small
12   increases in progression to heroin use creates a significant
13   public health burden."
14   Q.   Does this accurately capture your opinions that you
15   have expressed in this case?
16   A.   They do.
17   Q.   Now, if we go to the next slide, you were asked also
18   about this article.  Do you recall this article?
19   A.   Yes.
20   Q.   And what is this article?
21   A.   This is an article published in 2017 in the journal
22   Addictive Behaviors.  The first author was Sylvia Martins,
23   who is a faculty member in my department at Columbia and I
24   was a co-author.
25   Q.   And Addictive Behaviors, what kind of journal is that?
```

1    **A.**   It is an addiction journal in my field.

2    **Q.**   And is it a source considered authoritative by

3    epidemiologists?

4    **A.**   Yes.

5    **Q.**   And do epidemiologists rely on this type of literature

6    and this journal specifically when performing your

7    profession?

8    **A.**   Yes.

9    **Q.**   All right.  So, you were asked in great detail about a

10   passage from this article.

11          MR. FARRELL:  Please go to the next slide.  Oh,

12   back up.  There we go.

13          BY MR. FARRELL:

14   **Q.**   You were asked about this particular provision.  Do you

15   recall being asked about this?

16   **A.**   I do.

17   **Q.**   And this entire passage talks about underlying causes.

18   This is a causation piece to the case.  And so, do you

19   recall going through each of the provisions in this passage

20   with defense counsel?

21   **A.**   Yes.

22   **Q.**   And you were asked whether or not each of the

23   provisions in this passage was a substantial factor or an

24   underlying cause to prescription Opioid Use Disorder.  Do

25   you recall that?

1    **A.**   I do.

2    **Q.**   And as you were going through this litany of causes of

3    the opioid epidemic, you got to one provision that was

4    skipped over, wasn't it?

5    **A.**   Yes.

6    **Q.**   And, in fact, you pointed it out to counsel that one of

7    the provisions of this article was skipped over, did you

8    not?

9    **A.**   I did.

10   **Q.**   And you offered to tell the Court which provision it

11   was that was skipped over, did you not?

12   **A.**   Yes.

13   **Q.**   And would you like to now read into the record the

14   provision defense counsel skipped over?

15   **A.**   Sure.

16   **Q.**   Please review it.

17           MS. HARDIN:  Your Honor, before Dr. Keyes answers,

18   I would just like to note an objection to the extreme

19   leading that we're having at this point.  If he would like

20   to ask her questions, he should do so, but the constant

21   leading is getting to be a bit much.

22           THE COURT:  Well, this is re-direct, Mr. Farrell,

23   and you are leading her all around the courtroom.  Try not

24   to do that.

25           MR. FARRELL:  Yes, Your Honor.

```
 1              THE COURT:  I think the objection is well taken.
 2              BY MR. FARRELL:
 3   Q.   What, if any, sentence in this paragraph was omitted by
 4   defense counsel?
 5   A.   The omission was that we stated in the article that a
 6   cause of the -- a cause of prescription Opioid Use Disorder
 7   was an increased distribution of opioids by the
 8   pharmaceutical industry and creation of an opioid-rich
 9   environment and we cite a 2014 study in support of that.
10   Q.   And so, not -- does this -- do you have an opinion
11   whether this factor is true and accurate?
12   A.   Yes.
13   Q.   And what is your opinion?
14   A.   My opinion is that there's substantial consensus in my
15   field in epidemiological literature to support a role for
16   distribution of opioids and the creation of an opioid-rich
17   environment in facilitation of the increase in prescription
18   Opioid Use Disorder and the opioid crisis in the
19   Cabell-Huntington community.
20   Q.   Now, we need to be sure that we use the right legal
21   words that comport with epidemiology.  You said
22   "facilitate".  My question specific is, is do you have an
23   opinion whether an increase distribution of opioids and
24   creation of an opioid-rich environment was a substantial
25   factor giving rise to and fueling the opioid epidemic?
```

1    **A.**   Yes.

2             MS. HARDIN:  Objection, Your Honor, to the legal

3    conclusion.

4             THE COURT:  Well, overruled.  I think -- I think

5    it's her opinion based upon the work she's done and so

6    forth.  I'll overrule the objection.

7             BY MR. FARRELL:

8    **Q.**   Now, you were also asked questions about the

9    Association of Schools and Programs of Public Health; do you

10   recall that?

11   **A.**   Yes.

12   **Q.**   And I'm going to put it up on the -- the actual

13   document, not just the pieces of it.  Do you recognize this

14   document?

15   **A.**   I do.

16   **Q.**   And what is it?

17   **A.**   It is a report and recommendations from a Task Force

18   from the ASPPH about the science and literature on the

19   opioid crisis and potential ways to ameliorate the suffering

20   in the communities.

21   **Q.**   And you cited this article in support of your gateway

22   effect opinion, correct?

23   **A.**   Yes.

24   **Q.**   What's the title of this?

25   **A.**   Bringing Science to Bear on Opioids.

1    Q.   And you mentioned the fact that on Page 3 that it was

2    adopted by the Executive Board.  What does that mean?

3    A.   There is an Executive Board of the ASPPH made up of

4    various experts in fields of public health.

5    Q.   And in the last page here, it says there's 120 members

6    of this institution.  Does -- is the Board made from this

7    list?

8    A.   Excuse me?

9    Q.   Is the Executive Board derived from these member

10   institutions?

11   A.   As far as I know, it is.

12   Q.   And you were also shown the Task Force members; do you

13   recall that testimony?

14   A.   I do.

15   Q.   And a couple of the individuals were pointed out and I

16   wanted to make sure that we gave fair credit to the other

17   members of the Task Force.  You can see the right-hand

18   column?

19   A.   Yes.

20   Q.   So, if we go up on this board over here, this is the

21   Appendix A, I think, the Task Force members.  There we go.

22          MR. FARRELL:  Judge, may I approach?

23          THE COURT:  Yes.

24          BY MR. FARRELL:

25   Q.   It was pointed out that Judith Feinberg from WVU was

1    involved; do you recall that?

2    **A.**    Yes.

3    **Q.**    As well as Andrew Kolodny from Brandeis; do you recall

4    that?

5    **A.**    Yes.

6    **Q.**    All right.  On the right-hand side, can you walk

7    through who else was a member of the Task Force?

8    **A.**    Brandon Marshall, who is at Brown University.  Bill

9    Miller, who was at Ohio State.  Brendan Saloner, who was at

10   Johns Hopkins.  Michael Stein at Boston University.  Stan

11   Vermund at Yale.  And April Young at University of Kentucky.

12               MR. FARRELL:  Judge, at this point, I would ask

13   for P-43124 to be admitted for the record.

14               MS. HARDIN:  Objection.

15               MR. HESTER:  We object, Your Honor.  It's clearly

16   hearsay.

17               MS. HARDIN:  Same objection.

18               MS. MCCLURE:  Join.

19               THE COURT:  How is that one admissible, Mr.

20   Farrell?

21               MR. FARRELL:  Well, it's a report and

22   recommendations from the public health schools in the United

23   States.

24               THE COURT:  Well, that doesn't make it -- I'll

25   sustain the objection.

```
 1              MR. FARRELL:  Yes, Your Honor.

 2              MR. ACKERMAN:  Your Honor, may I have a minute

 3   with Mr. Farrell?

 4              THE COURT:  Yes.

 5        (Pause)

 6              BY MR. FARRELL:

 7   Q.   All right.  I need to do some housecleaning.  My

 8   learned co-counsel told me that I asked you whether or not

 9   that -- whether you have an opinion as to whether or not

10   there was a substantial factor and you used the word

11   "facilitate".  I asked you whether or not you had an opinion

12   whether that holds true for your opinion as to whether or

13   not it's a substantial factor.  You said yes, but you didn't

14   offer what that opinion was.

15              MR. HESTER:  Object as leading, Your Honor.

16              MS. HARDIN:  And I would just renew my objection

17   to the -- which I know Your Honor has sustained, but to the

18   legal conclusion.

19              MR. FARRELL:  So --

20              THE COURT:  Well, I'm going to overrule the

21   objection and let her answer and the question is a bit

22   leading, but at some point, you have to permit a bit of

23   leading to get to the subject area and I think that was

24   appropriate from that standpoint.

25        So, can you answer the question Dr. Keyes?
```

```
 1                    THE WITNESS:  Yes.

 2                    THE COURT:  If so, you may do so.

 3                    THE WITNESS:  My opinion is that it was a

 4      substantial contributing factor.

 5                    MR. FARRELL:  Thank you.

 6                    BY MR. FARRELL:

 7      Q.   To avoid further parsing of words, I have a couple more

 8      follow-up questions and then we'll retire.

 9            Do you find the distribution -- or do you have an

10      opinion whether the distribution of some 80 million

11      prescription opioids by the defendants, AmerisourceBergen,

12      Cardinal Health and McKesson, was a substantial factor

13      giving rise to and fueling the opioid epidemic and its

14      related harms?

15                    THE COURT:  We'll take you first, Ms. Hardin, and

16      then go around the table.

17                    MS. HARDIN:  Number one, I object to the legal

18      conclusion.  But, number two, this witness testified

19      yesterday that she doesn't know how many pills were

20      distributed in Cabell County and the City of Huntington.

21      So, she's not able to give an opinion about that question.

22                    THE COURT:  Mr. Hester?

23                    MR. HESTER:  Same objection, Your Honor.

24                    THE COURT:  Ms. McClure?

25                    MS. MCCLURE:  Same objection.  And, moreover, Your
```

 1    Honor's ruling -- same objection.  Thank you, Your Honor.

 2             MR. HESTER:  I would also add, Your Honor, that

 3    this is included in her expert report.  It is beyond the

 4    scope of her expert report.

 5             THE COURT:  Well, if you ask her to assume the 80

 6    million figure, then she can answer the question based on

 7    the assumption, can't she?

 8             THE WITNESS:  I actually did some calculations

 9    yesterday that I think would be --

10             MS. HARDIN:  Objection.  I think we need to

11    proceed by question and answer format, Your Honor.

12             THE WITNESS:  Sorry.

13             THE COURT:  Well, I think we do, Mr. Farrell, but

14    I'm going to allow the -- well, we'll see what you ask her.

15             MR. FARRELL:  Yes, sir.

16             THE COURT:  But I'll let you go ahead at this

17    point.

18             BY MR. FARRELL:

19    Q.   Dr. Keyes, I want you to assume that the defendants,

20    AmerisourceBergen, Cardinal Health, and McKesson,

21    distributed some 80 million prescription opioids into

22    Huntington-Cabell County, West Virginia.  If that is true,

23    do you have an opinion whether such a volume would be a

24    substantial factor giving rise to and fueling the opioid

25    epidemic and its related harms?

```
 1    A.    I do have an opinion.

 2              THE COURT:  The record will show the objection of

 3    all the defendants to that question.

 4              MS. HARDIN:  Thank you, Your Honor.

 5              THE COURT:  I mean, the earlier objection applies,

 6    but I want to make the record clear as to your objection to

 7    that.

 8         Go ahead.

 9         Can you answer it, Dr. Keyes?

10              THE WITNESS:  Sure.

11              THE COURT:  Please do so.

12              THE WITNESS:  Yeah.  I mean, if I -- if you don't

13    -- I was given a calculator.  So, if we assume there's 80

14    million prescription opioids --

15              BY MR. FARRELL:

16    Q.    Let's just stick with this --

17    A.    Okay.

18    Q.    And make this as clean as we can.

19    A.    Okay.

20    Q.    You said you have an opinion.  What is your opinion?

21    A.    What -- say the question again.

22    Q.    Okay.  Based on the assumption that we established, do

23    you have an opinion whether or not such volume of

24    prescription opioids distributed by the defendants,

25    AmerisourceBergen, Cardinal Health and McKesson, would be a
```

1    substantial factor giving rise to and fueling the opioid

2    epidemic and its related harms?

3    **A.**   Yes.

4    **Q.**   And what is that opinion?

5    **A.**   My opinion is that it is a substantial contributing

6    factor.

7    **Q.**   And --

8              MR. HESTER:  Just to be clear, Your Honor, I think

9    the Court is clear on this, but this is beyond the scope of

10   the opinions she has offered in this case.  It's beyond the

11   scope of her expert report and we want to make that record

12   clear.

13             MS. HARDIN:  She expressly testified yesterday she

14   has a 54-page single-spaced report that never mentions the

15   defendants and she hasn't looked at any conduct specifically

16   by these defendants.  So, this is an entirely improper line

17   of questioning and we ask that it be stricken from the

18   record.

19             MS. MCCLURE:  Join.

20             THE COURT:  Well, she didn't put this in her

21   report?  This wasn't one of the opinions that --

22             MR. FARRELL:  Judge --

23             THE COURT:  This is a new opinion today, right?

24             MR. FARRELL:  No, it's not a new opinion.  What

25   she has testified and disclosed, that she believes that

1    volume, an increase in volume, is related to an increase in

2    diversion and that volume has a relationship to an increase

3    in related harms.

4        The only thing I'm asking her to do is to assume the

5    volume that we have established in the record today.

6            MS. HARDIN:  That's not what he's asking, Your

7    Honor.  He's asking her to assume that the volume is the

8    fault of the distributors and, based on that, she has

9    opinion that these distributors caused increased harms.

10   There is no basis in her report for that.

11       Yesterday, she said your report doesn't mention

12   Cardinal Health.  You didn't review any documents relating

13   to the distributors' individual activities.  You did not

14   assess any individual distributors' contribution to opioid

15   supply relative to other distributors.  And as part of your

16   methodology, you did not consider how many opioids McKesson,

17   Cardinal or ABDC shipped into Cabell County and the City of

18   Huntington.

19       It is improper.  We object.  And we ask it be stricken.

20           MR. HESTER:  I just wanted to offer a

21   clarification of Brother Farrell's representation to the

22   Court.  It's not in her opinions.  This is -- it's not in

23   her expert report.  There is no place in her expert report

24   where this opinion is provided.

25           THE COURT:  Ms. McClure?

```
 1              MS. MCCLURE:  Join.
 2              THE COURT:  I'm going to sustain the objection,
 3    Mr. Farrell.
 4              MR. FARRELL:  Okay.
 5              BY MR. FARRELL:
 6    Q.   So, let me circle back and make it broader.  Do you
 7    have an opinion whether the volume of prescription opioids
 8    sold into a community has a causal relationship with opioid
 9    use, misuse and its related harms?
10    A.   Yes.
11              MS. HARDIN:  Objection.  Same objection, Your
12    Honor.
13              THE COURT:  Okay.  Go ahead.  I'll let her answer.
14              MR. FARRELL:
15    Q.   What is your opinion?
16    A.   My opinion is that there is a causal relationship
17    between volume and harm.
18    Q.   And one of those harms includes -- do you have an
19    opinion whether one of those harms includes the transition
20    to and use of heroin?
21    A.   I do.
22    Q.   What is that opinion?
23    A.   That an increase in the volume of prescription opioids
24    causally leads to an increase in heroin use.
25    Q.   And do you have an opinion whether or not volume is a
```

```
 1   substantial factor in diversion into the illicit market?
 2             MS. HARDIN:  Objection.  Legal conclusion.
 3             THE COURT:  Overruled.
 4             THE WITNESS:  Yes.
 5             BY MR. FARRELL:
 6   Q.   And what is that opinion?
 7   A.   My opinion is that it is a substantial contributing
 8   factor.
 9   Q.   And are your opinions supported by the reliance
10   materials cited in your report?
11   A.   Yes.
12   Q.   And are your opinions supported by the medical
13   literature cited in your report?
14   A.   Yes.
15   Q.   And are your opinions supported by core principles of
16   accepted methodology in the field of epidemiology?
17   A.   Yes.
18   Q.   And do you hold your opinions to a reasonable degree of
19   epidemiological certainty?
20   A.   I do.
21   Q.   One final question.  You were asked yesterday about
22   your OUD estimation.  Do you recall that line of testimony?
23   A.   I do.
24   Q.   And you volunteered that you actually corroborated your
25   estimate.  Do you recall that?
```

1  **A.**   Yes.

2  **Q.**   And, in fact, did you corroborate your OUD estimation

3  from actual data from Marshall Health produced in this

4  litigation?

5          MR. HESTER:  Your Honor sustained an objection

6  previously to this inquiry into the corroboration that the

7  witness received from an expert whose opinion was stricken

8  by the Court and I think this is going into that same line

9  of inquiry.

10          MS. MCCLURE:  Join that.  And this is going to

11  someone who is offered as a non-retained expert and Your

12  Honor excluded that.  And, moreover, we have been prevented

13  from obtaining the documentation at issue.

14          MS. HARDIN:  Same objection.

15          THE COURT:  Sustained.

16          MR. FARRELL:  With knowing that you're going to

17  sustain the objection, can I make a proffer for the record

18  to make sure it's accurate?

19          THE COURT:  Yeah.  Absolutely.  Go ahead.

20          MR. FARRELL:  First, we believe that the

21  defendants opened the door when they challenged the veracity

22  of the OUD estimate.

23      Number two is that the -- this is not expert witness

24  testimony that she's relying upon.  This is a fact witness

25  from Marshall University who has testified in this case in

1    the deposition record and submitted a factual affidavit that

2    identifies that from Marshall Health they actually

3    identified the number of people diagnosed with OUD.

4        And her testimony would be, if allowed and accepted by

5    the Court, that she relied upon the factual testimony

6    developed in the record to simply corroborate her --

7            THE COURT:  Well, she didn't say that, did she?

8            MR. FARRELL:  Yes, Your Honor.  Every time I've

9    attempted to get near it, they object.  So, let me, if I

10   may, just finish the proffer.

11       So then, what happened is, is after the testimony from

12   Mr. Davies, he also had components of his testimony from the

13   deposition that we were concerned that he was a lay witness

14   offering expert witness opinion.  And so, we disclosed it

15   under the rules and by virtue of that disclosure, it created

16   this entire secondary mess of late disclosures.  Your Honor

17   then made rulings about the expert witness opinions that

18   were subject.

19       What we're suggesting here is that Mr. Davies, in

20   addition to whatever expert opinions he may have offered in

21   his deposition, he also laid out facts derived from the

22   Marshall Health data.  So, with that, we would make a

23   proffer of what the corroboration would have been, but

24   acknowledge and recognize the Court has sustained the

25   objection.

```
 1              THE COURT:  Okay.

 2        Mr. Ackerman?

 3              MR. ACKERMAN:  May I have a moment with Mr.

 4  Farrell, please?

 5              THE COURT:  You may.

 6        (Pause)

 7              MR. FARRELL:  And so, with that, Mr. Ackerman

 8  would like to make one additional proffer to this particular

 9  point.

10              THE COURT:  Okay, Mr. Ackerman.

11              MR. FARRELL:  And then I have no further

12  questions.  Thank you.

13              MR. ACKERMAN:  One more for the record, Your

14  Honor.  This reliance on Dr. Davies is specifically

15  mentioned in the errata that was used to refresh Dr. Keyes'

16  recollection yesterday.  Rule -- Federal Rule of Evidence

17  612(b) says that we, as the adverse party, are entitled to

18  question Dr. Davies about that document and to submit it

19  into evidence.  And so, that is, with Your Honor's

20  permission, what we would like to do at this point.

21              MR. HESTER:  Your Honor --

22              THE COURT:  Yes, Mr. Hester?

23              MR. HESTER:  If I can just make an important

24  point.  After that errata was provided, we requested the

25  underlying data to support the factual statements or the
```

1    opinion statements asserted by Dr. Davies and we were

2    refused access to the underlying data.

3        There's no way to test that data because the plaintiffs

4    would not provide it to us.  They took the position that

5    Marshall University is a third party.  We weren't entitled

6    to obtain the information.  Therefore, we had no way to test

7    what Dr. Davies was asserting and that was -- is a serious

8    hearsay problem that we were unable to resolve because the

9    plaintiffs would not provide us the underlying data.

10               MR. FARRELL:  Judge, I --

11               MS. MCCLURE:  Your Honor --

12               MR. HESTER:  And I would also add --

13               THE COURT:  Well, wait a minute.

14               MR. HESTER:  Sorry.

15               THE CORT:  Let's get all the responses here and

16    then you can proceed.

17               MR. HESTER:  And I would simply add the point that

18    the Court specifically struck the opinion testimony of Dr.

19    Davies about an OUD number in Cabell-Huntington as a

20    sanction on the plaintiffs for late disclosure.  And so, now

21    this is an effort by the back door to bring that back.

22               THE COURT:  Okay.  Ms. McClure?

23               MS. MCCLURE:  Your Honor, as briefly as possible.

24    One, there's been no testimony at all from Mr. Davies in

25    this court.  So, to the extent that they suggested there was

1    or would be, that's false.  He is not on the list.

2        Second of all, OUD calculations are not a matter of

3    fact testimony.  That is what you've just heard.  OUD

4    calculations are a matter of expert testimony, which is why

5    Your Honor prevented Mr. Davies, given the late disclosure,

6    the absence, total absence of a report from offering those

7    -- those opinions here today in this court in this trial.

8        And then, thirdly, underscoring the point that the

9    underlying source material supporting Mr. Davies'

10   calculations supposedly has never been produced or disclosed

11   to the defendants in this case.

12       MR. FARRELL:  So, to make the record perfectly

13   clear, Marshall University is represented by its own

14   counsel.  This is a discovery dispute between the defendants

15   and Marshall University, which was addressed by your special

16   master.  The plaintiffs have not withheld anything.  So --

17       THE COURT:  Well, to cut this short, this whole

18   argument relates to a proffer that you made in response to

19   me sustaining an objection.  So, I'm going to cut this off

20   and we'll move on from here.

21       MR. FARRELL:  Thank you, Your Honor.

22       MS. HARDIN:  Your Honor, I have some brief

23   re-cross.

24                    **RECROSS EXAMINATION**

25           **BY MS. HARDIN:**

1   **Q.**   Good morning, Dr. Keyes.

2   **A.**   Good morning.

3   **Q.**   I'm Ashley Hardin.  I represent Cardinal Health.  How

4   are you?

5   **A.**   I'm well.

6   **Q.**   With both Mr. Hester yesterday and Mr. Farrell this

7   morning, you discussed an article that you co-authored in

8   2017, the Martins article; do you recall that?

9   **A.**   I do.

10  **Q.**   And it's titled Prescription Opioid Use Disorder and

11  Heroin Use Among Youth, Non-Medical Prescription Opioid

12  Users From 2002 to 2014?  Does that sound right?  Do you

13  have it in front of you?

14  **A.**   Let me -- I assume it was given to me yesterday, but

15  there's a big stack here.

16  **Q.**   Well, the number, for the record, is Defense

17  Exhibit 2518.

18  **A.**   I apologize.  Okay.  It was at the bottom.

19  **Q.**   And Mr. Farrell had asked you this morning about a

20  particular factor in a list of factors and you noted one of

21  those factors is that an increased distribution of opioids

22  by the pharmaceutical industry and creation of an

23  opioid-rich environment is one of the factors discussed in

24  the literature; is that correct?

25  **A.**   That's right.

1   **Q.**   And the single citation for that factor is the Rintoul

2   and Dobbin article from 2014; is that correct?

3   **A.**   In this sentence.  Well, there's -- there's many

4   citations in the paragraph, some of which support multiple

5   different clauses in the paragraph.  There's no periods in

6   the paragraph.  So, all of the citations are -- would go

7   across those clauses.

8   **Q.**   Each factor has a parenthetical citation and the single

9   parenthetical citation after the one about distribution of

10  opioids is the Rintoul Dobbin article; is that correct?

11  **A.**   Sorry.  No, not exactly, because all of the -- all of

12  the articles that are cited in this paragraph together

13  support multiple statements.

14  **Q.**   Well, I'm asking you just about what is actually and

15  physically written on the page, Dr. Keyes, and there's only

16  written on the page one single parenthetical after the

17  distribution.

18          MR. ACKERMAN:  Objection.  Asked and answered.

19          BY MS. HARDIN:

20  **Q.**   It's a simple question about what's written on the

21  page, Dr. Keyes.

22          THE COURT:  I'm sorry.  We're all talking at once.

23  Ask your question again.

24          BY MS. HARDIN:

25  **Q.**   There's one single citation written on the page after

1    that distribution article?

2    **A.**    That's not correct.  There's no periods here.  There

3    are semicolons.  And a semicolon indicates not the end of a

4    thought.  And so, we can go into reference, if you want, but

5    the references throughout that paragraph are intended to

6    reference multiple clauses separated by semicolons.

7    **Q.**    Let's look at the Rintoul and Dobbin article from 2014.

8            MS. HARDIN:  Your Honor, may I approach?

9            THE COURT:  Yes.

10           BY MS. HARDIN:

11   **Q.**    And it's short, but I'll give you a minute to look it

12   over, Dr. Keyes.

13           Does this appear, Dr. Keyes, to be that Rintoul and

14   Dobbin article from 2014 that's cited in your 2017 paper?

15   **A.**    Yes.

16   **Q.**    And it looks like --

17           MR. ACKERMAN:  Your Honor, if I may?

18           THE COURT:  Yes.

19           MR. ACKERMAN:  Counsel, is this document on an

20   exhibit list?  I don't see that it has an exhibit number.

21           MS. HARDIN:  This is cross examination and

22   impeachment material, Mr. Ackerman.

23           MR. ACKERMAN:  Your Honor, the stipulation that

24   the parties have agreed to in this case at -- which is at

25   Docket 1029 specifically states, "The parties may use on

1    cross examination exhibits" -- hold on.  Let me read it so

2    that I have the emphasis in the right spot.

3        "The parties must include on their exhibit lists all

4    exhibit lists they intend to use on cross examination."

5    Then there's a parenthetical, "other than for purposes of

6    impeachment or rebuttal.  However, the parties may use on

7    cross examination exhibits that were not previously

8    identified on an exhibit list, but only if they disclose

9    those previously unlisted exhibits that they reasonably and

10   in good faith believe may be used to cross examine a witness

11   by 7:00 p.m. on the day prior to their expected use at

12   trial."

13       This document was never listed on an exhibit list and

14   was not disclosed to us by 7:00 p.m. the day before, or at

15   any point prior to using it to this witness.  We have an

16   objection to use of this document with the witness as it

17   contravenes the parties' stipulation.

18           MS. HARDIN:  I don't believe it does contravene

19   what he just read about impeachment and rebuttal.  But more

20   than that, Your Honor, Mr. Farrell, on re-direct this

21   morning, asked her specifically about this factor and asked

22   her a series of questions about her opinions that relate to

23   this and this is, we think, fair game on cross examination

24   to dig into the basis of her opinions.

25           THE COURT:  Well, I agree, and I'm going to let

1    you go ahead.

2            MR. ACKERMAN:  To be clear, Your Honor, I just

3    want to make my record for the -- make my record.

4            THE COURT:  Yes.

5            MR. ACKERMAN:  This is not impeachment because

6    these are not Dr. Keyes' words and documents that are to be

7    used on cross examination were to have been disclosed

8    pursuant to the parties' stipulation.

9            THE COURT:  Well, if I understand what happened

10   here, I think the door has been opened to this and I think

11   it's proper cross and I will let you go ahead, Ms. Hardin.

12           MS. HARDIN:  Thank you, Your Honor.

13           BY MS. HARDIN:

14   **Q.**   So, Dr. Keyes, it appears that Rintoul and Dobbin are

15   based in Australia; is that correct?

16   **A.**   Yes.

17   **Q.**   And it appears that what they are doing is commenting

18   about an article that appears in the 2014 Addiction Journal;

19   is that correct?

20   **A.**   This is a commentary that includes review of the

21   literature.  That's common in our field.

22   **Q.**   And let's look at what -- some of the things that

23   Rintoul and Dobbin say in this article.  They say -- this is

24   on the second column, third full paragraph down.  It says,

25   "It's now well established that the inappropriate and

1    intense marketing of OxyContin in the United States

2    contributed to increased consumption"; is that correct?

3    **A.**   That's what is written.

4    **Q.**   And it says that -- down now in the last paragraph, it

5    says, "Widespread prescribing provides more opportunities

6    for diversion, non-medical use and unintentional poisoning,

7    including among children."  Is that correct?

8    **A.**   On the -- this is on the second page?

9    **Q.**   It's at the bottom of the full -- of the last full

10   paragraph on the page.

11   **A.**   On the first page?

12   **Q.**   Yes, ma'am.  My first page anyway, I think.

13   **A.**   Yes.  That sentence is written.

14   **Q.**   This article does not mention McKesson Corporation,

15   correct?

16   **A.**   I would have to read the article in more detail to know

17   whether McKesson --

18   **Q.**   Sitting here right now, you don't know if this article

19   addresses McKesson Corporation?

20   **A.**   That's right.

21   **Q.**   And it does not address Cardinal Health; is that

22   correct?

23   **A.**   I haven't taken the time to read the article in full.

24   **Q.**   Sitting here today, you can't answer the question?

25   **A.**   That's right.

1    **Q.**   And you don't know if this article addresses
2    AmerisourceBergen Corporation or AmerisourceBergen Drug
3    Company?
4    **A.**   That's right.
5    **Q.**   And, in fact, Dr. Keyes, if you take a look, this
6    article is quite short.  This article doesn't mention
7    wholesale distributors at all, does it?
8    **A.**   Well, it certainly mentions distribution.
9    **Q.**   Nowhere in this article, Dr. Keyes, do these authors
10   tie distribution to wholesale distributors?
11   **A.**   There's discussion of distribution and I would imagine
12   that distribution is done by distributors.
13   **Q.**   Well, we just looked at what the article says, didn't
14   we, Dr. Keyes?  It talks about marketing of OxyContin.
15   **A.**   That was one sentence.
16   **Q.**   Which is made by Purdue Corporation, correct, Purdue
17   Pharma?
18   **A.**   Yes.
19   **Q.**   And it talked about widespread prescribing, correct?
20   **A.**   Well, those are two sentences in an article that has
21   many sentences.  And so, we'd have to look at the rest of
22   the sentences to know how distributors are discussed in the
23   article, right.
24   **Q.**   None of the sentences mention wholesale distributors;
25   isn't that correct?

1    **A.**    They mention distribution rather than distributors.

2    **Q.**    Nowhere does the article mention wholesale distributors

3    and their Suspicious Order Monitoring Programs; is that

4    correct?

5    **A.**    I haven't reviewed the article for Suspicious Order

6    Monitoring Program mentions.

7    **Q.**    And nowhere does the article say that any distributor

8    failed in its regulatory obligations to the DEA, does it?

9    **A.**    Considering that we only reviewed two sentences, we

10   would have to review the rest of the article to know whether

11   that statement is factual.

12   **Q.**    Well, it's short, Dr. Keyes, so take a moment and tell

13   me if you think somewhere in the article it mentions either

14   of the things I just asked you about.

15   **A.**    There is discussion in the article about volume of

16   opioids and opioid-related harms and that would contribute

17   to my opinion about distribution.  I don't see any mention

18   of Suspicious Order Monitoring Programs in particular.

19   **Q.**    And no mention of wholesale distributors?

20   **A.**    The words wholesale --

21   **Q.**    I'm asking a very specific question, Dr. Keyes.  Does

22   the article mention wholesale distributors?

23   **A.**    Well, the article does mention that there has been

24   regulatory failure to protect public health with regard to

25   the previous statement about suspicious order monitoring.

1    So, I would say that's probably related.

2            MS. HARDIN:  Your Honor, I would ask that the

3    witness give a yes or no answer to what is a yes or no

4    question.

5            THE WITNESS:  Yes.  I don't see the words

6    wholesale distributor in the article.

7            BY MS. HARDIN:

8    **Q.**   And you don't see the word McKesson?

9    **A.**   I have not seen the word McKesson.

10   **Q.**   Or Cardinal Health?

11   **A.**   Correct.

12   **Q.**   Or AmerisourceBergen?

13   **A.**   I don't see it.

14           MS. HARDIN:  Thank you.  No further questions, Dr.

15   Keyes.

16           MR. FARRELL:  Briefly.

17           MR. HESTER:  Your Honor, is there -- is there a

18   procedure for re-re-direct?  I -- I had understood that

19   re-cross was the end of the sequence.

20           THE COURT:  Well, it has to be within the scope of

21   what she testified to.

22           MR. FARRELL:  Yes, Your Honor.

23           THE COURT:  So, it's got to be real short.

24           MR. FARRELL:  Oh, Yes, Your Honor.

25           THE COURT:  Go ahead.

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | **RE-DIRECT EXAMINATION**                                            |
| 2  | **MR. FARRELL:**                                                     |
| 3  | **Q.**   That article you were asked about, do you have it in        |
| 4  | front of you?                                                         |
| 5  | **A.**   Yes.                                                        |
| 6  | **Q.**   And the citation to -- the citation here to Rintoul and     |
| 7  | Dobbin?                                                               |
| 8  | **A.**   Yes.                                                        |
| 9  | **Q.**   In the references, do you see how many Rintoul and          |
| 10 | Dobbin references there are?                                          |
| 11 | **A.**   I do.                                                       |
| 12 | MS. HARDIN:  Objection, Your Honor.  The article                     |
| 13 | says -- cites a 2014 article and I believe what Mr. Farrell          |
| 14 | just had on the screen is from 2011.  So, clearly, those             |
| 15 | articles are not within the scope of what I asked her about.         |
| 16 | So, this is outside of the scope.                                     |
| 17 | THE COURT:  Yeah.  Where are you going, Mr.                          |
| 18 | Farrell?                                                              |
| 19 | MR. FARRELL:  She asked whether or not the authors                   |
| 20 | had ever found a connection in supply.                                |
| 21 | MS. HARDIN:  That is absolutely not true, Your                       |
| 22 | Honor.                                                                |
| 23 | THE COURT:  No, she did not ask -- she did not ask                   |
| 24 | that question.                                                        |
| 25 | MR. FARRELL:  She specifically asked whether or                      |

```
 1    not these two authors or there was anywhere in there.  I'm

 2    holding --

 3              THE COURT:  Well, I will sustain the objection.  I

 4    don't -- my recollection is not always precise, but I don't

 5    remember that being -- being asked and I'm going to sustain

 6    the objection.

 7              MR. FARRELL:  Yes, Your Honor.  Thank you.

 8              THE COURT:  Can we excuse Dr. Keyes?

 9              MS. HARDIN:  Yes, sir.

10              MR. HESTER:  Yes, Your Honor.  Thank you.

11              THE COURT:  Dr. Keyes, thank you very much for the

12    time you spent with us.  And I hope you have a safe trip

13    home.  And you're free to go.

14              THE WITNESS:  Thank you very much.

15              THE COURT:  You can call your next witness, Mr.

16    Farrell.

17              MR. FARRELL:  Judge, if you'll indulge us, we're

18    making a quick shift here.

19              THE COURT:  Sure.

20         Welcome back, Ms. Singer.

21              MS. SINGER:  Thank you, Your Honor.  I worry that

22    you fear that I only bring three-day witnesses.  I promise,

23    not the case.

24         Plaintiffs call Lacey Keller, Your Honor.

25              THE COURT:  Ms. Keller, come up here and the clerk
```

```
 1   will given you the oath.
 2              COURTROOM DEPUTY CLERK:  Ma'am.
 3              THE WITNESS:  Sorry.  My first time.
 4              COURTROOM DEPUTY CLERK:  Please state your name.
 5              THE WITNESS:  Lacey Keller.
 6              COURTROOM DEPUTY CLERK:  Thank you.  Please raise
 7   your right hand.
 8              LACEY KELLER, PLAINTIFF WITNESS, SWORN
 9              COURTROOM DEPUTY CLERK:  Thank you.  Please take a
10   seat.
11              THE COURT:  Good morning.
12              THE WITNESS:  Good morning.
13              MS. SINGER:  I can take those.  You'll have your
14   own set.
15              THE WITNESS:  Thank you.
16                        DIRECT EXAMINATION
17              BY MS. SINGER:
18   Q.   All right.  Ms. Keller, can you introduce yourself to
19   the Court, please?
20   A.   Good morning, Your Honor.  My name is Lacey Keller.
21   Q.   And you might want to pull the microphone closer to
22   you.
23   A.   Can do.
24   Q.   Very good.  Ms. Keller, where are you currently
25   employed?
```

1    **A.**    NK Analytics.

2    **Q.**    And did you prepare a set of slides to assist in your

3    testimony today?

4    **A.**    I did.

5    **Q.**    And does one of those slides include information

6    regarding your professional and educational background?

7    **A.**    It does.

8    **Q.**    And would those slides assist you in your testimony?

9    **A.**    Greatly.

10           MS. SINGER:  Your Honor, may I publish?

11           THE COURT:  Yes.

12           BY MS. SINGER:

13   **Q.**   All right.  Looking at Demonstrative -- Plaintiffs

14   Demonstrative 236, the first slide, Ms. Keller, can you

15   describe your educational background?

16   **A.**   Yes, I can.  I received an undergraduate degree from

17   Washburn University in Topeka, Kansas in Business, a Masters

18   degree from the new school in Economics, and I also have

19   some postgraduate study from the General Assembly and Data

20   Science.

21   **Q.**   And what is your professional focus?

22   **A.**   Data mining and analytics for investigations and --

23   yeah, that's a pretty good summary.

24   **Q.**   Is there another slide that describes your professional

25   focus?

1    **A.**   It does.

2    **Q.**   And would that slide assist your testimony?

3    **A.**   It would.

4          MS. SINGER:  May we turn to the next slide,

5    please?

6          BY MS. SINGER:

7    **Q.**   And, Ms. Keller, can you describe your area of

8    expertise, please?

9    **A.**   Yes.  I extract, process, clean, merge and analyze

10   public and confidential data.  I also identify trends and

11   outliers that have furthered investigations or prosecution.

12   **Q.**   Now, do you -- what do you call this area of expertise?

13   **A.**   Data mining, analytics, data analytics.  All of those

14   are synonymous.

15   **Q.**   And is data analytics, to use that term, a relatively

16   new field?

17   **A.**   Data analytics has been around for decades.  It's just

18   the tools have changed drastically.  Years ago, we might

19   have done analytics via paper.  Now, we use machine

20   learning, big computer, super computers to do such things.

21   **Q.**   Now, have you held positions in the field of data

22   analytics?

23   **A.**   I have.

24   **Q.**   What positions have you held?

25   **A.**   I have -- currently, I'm the co-owner of MK Analytics,

```
 1    which is a data and analytics company.  Prior to that, I was
 2    the Managing Director of Data Mining and Analytics at
 3    Griffin Strategies.  And prior to that, I was the Director
 4    of Research and Analytics at the New York State Office of
 5    the Attorney General.
 6  Q.    And can you explain to the Court what you did at the
 7    New York Attorney General's Office?
 8  A.    I actually founded the department.  When I started, it
 9    was just me and one other person and I had been brought on
10    to make leads out of big data and -- for the office, so
11    investigatory leads.  And so, I was able to hire a number of
12    people to help in that endeavor.
13  Q.    And what specifically did you do at the Attorney
14    General's Office with respect to data analytics?
15  A.    We used data and analytical tools to not only identify
16    outliers for prosecution, but also identify -- use data in
17    the course of ongoing investigations.
18  Q.    And can you provide an example or two briefly of the
19    kind of investigations that you worked in at the Attorney
20    General's Office?
21  A.    One that comes to mind and is somewhat, I think, easy
22    for most people to understand is the Airbnb investigation.
23    So, when I started at the AG's Office, Airbnb was a newly
24    fangled, a newly created company.  And so, it was only
25    available in New York City and San Francisco.  Now, even in
```

1    my Hometown of 300 people there's an Airbnb on Main Street,

2    but at the time we needed to figure out what this company

3    was doing and the impact it had on New York City.

4         So, I took their reservation data that they produced

5    pursuant to court order and analyzed it looking for trends

6    and patterns and outliers.

7    **Q.**   And can you describe briefly another investigation in

8    which you were involved at the Attorney General's Office?

9    **A.**   Another one was the foreign currency investigation.

10   The traders of these currencies were posting on on-line chat

11   rooms which were on a proprietary software where they were

12   stating they were making trades about a particular currency,

13   but those trades actually -- well, some of which those

14   trades were not actually occurring.

15        And so, our job was to determine not -- using the text

16   messages and comparing them to the actual trades at the end

17   of the day to see which ones actually occurred.

18        So, using -- a person could do this looking at the chat

19   logs, manually going through the end of the day's trades and

20   saying, okay, those -- that currency didn't even exchange

21   hands.  That didn't -- that didn't happen.

22        But we created a computer program to do programatically

23   for us.

24   **Q.**   What was the result of that investigation?

25   **A.**   A guilty plea and over a million dollars settlement.

1    **Q.**   And while you were at the New York Attorney General's

2    Office, did you do any work relating to opioids?

3    **A.**   I did.

4    **Q.**   And what was that work?

5    **A.**   My work was predominantly focused on the office's

6    response using naloxone.  So, I used data to determine where

7    opioids -- what the state of affairs for opioids and

8    opioid-related deaths were, was occurring in New York State.

9    So, there was public data available on deaths,

10   hospitalizations, and I saw that those were rising in the

11   state.  And so, we implemented a program to equip law

12   enforcement with lifesaving naloxone and I was the manager

13   of that multi-million dollar program.

14   **Q.**   Now, in your various professional capacities, have you

15   regularly processed, mined and analyzed data?

16   **A.**   Yes.

17   **Q.**   And have you been a public speaker within your field?

18   **A.**   Yes, numerous times.

19   **Q.**   And can you give examples of the kinds of professional

20   talks that you've given?

21   **A.**   I've been an invited speaker at the Association of

22   Certified Fraud Examiners, their global conference, as well

23   as their law enforcement and government conference.  I've

24   also spoken at the National Association of Securities --

25   National Association of Securities Advisors.  There's still

1   one more "A", because it's NASAA with an extra "A", as well

2   as some other invited engagements in New York City.

3   **Q.**   Have you published any articles in your field?

4   **A.**   I have.  For the ACFE, the Association of Certified

5   Fraud Examiners, I'm to publish a paper to go along with my

6   report and then -- or along with my presentation and then

7   I've also published a report in Fraud Magazine.

8   **Q.**   Have you received awards --

9           MR. WICHT:  I'm sorry.  I'm sorry to interrupt,

10  Ms. Singer.  Can I just have clarity?  Is that an article

11  that is forthcoming to be published or an article that has

12  already been published?  I was not clear if she's referring

13  to an article that she's going to publish about this work

14  and, if so, I'm not sure why that would be supportive.

15          MR. ACKERMAN:  I think, Your Honor, the witness

16  just misstated and used the word "report" instead of

17  presentation.

18          MS. WICHT:  And I may have mis-heard her and so

19  that's why I'm just asking for clarification.

20          THE COURT:  Can you clear that up, Ms. Singer?

21          MS. SINGER:  Yes.

22          BY MS. SINGER:

23  **Q.**   So, Ms. Keller, can you describe the articles that you

24  have published in your field?

25  **A.**   The two articles for ACFE are -- they're probably --

```
1    they're not probably publicly available because they're for

2    the association.  So, you would have to be a member to

3    receive those.  Those have been published.

4         The Fraud Magazine one, I believe, is open to anybody

5    who subscribes to that magazine.

6    Q.   Have you received any awards or recognition in your

7    field?

8    A.   I have.

9    Q.   And what are those?

10   A.   Every year that I was at the New York Attorney

11   General's Office, I received the Superior Service Award,

12   which is an award that goes to members of an outstanding

13   case team for every bureau.  And I've received those awards

14   and every member of my team every year of -- of our

15   existence received awards because of the Department's

16   importance in the Office's work.

17        I also received what's known as the -- oh, boy.  Now

18   I'm forgetting the award.  Sorry.  A little nervous.  It's

19   the -- it's the Outstanding Excellence Award for Innovation

20   in Law Enforcement and they give it to any member of the

21   entire office who has done something innovative in the field

22   of law enforcement.

23   Q.   And is that an award from the New York Attorney

24   General's Office?

25   A.   All of those awards are, yes.
```

```
 1    Q.    Okay.  All right.  And have you been involved in work

 2    for other governmental entities related to opioids?

 3    A.    Yes, I have.

 4    Q.    And can you identify some of those government entities?

 5    A.    Yes.  The Washington Attorney General, New York State

 6    -- or, I'm sorry -- yes, New York State, New Hampshire,

 7    Rhode Island, Utah, are some that come to mind right now.

 8    Q.    And those are all Attorneys General?

 9    A.    Yes.

10    Q.    Did you submit reports in connection with those

11    engagements?

12    A.    Yes.

13    Q.    Roughly how many expert reports have you submitted

14    related to opioids?

15    A.    Nearly a dozen.

16    Q.    And have all of those reports also involved the

17    processing and analysis of large datasets?

18    A.    Yes, they have.

19    Q.    Have you testified in any of those cases?

20    A.    Yes, I have.

21    Q.    Have you testified at trial?

22    A.    Yes, I have.

23    Q.    In what case?

24    A.    California.

25    Q.    And were you qualified as an expert in that case?
```

```
 1    A.    Yes, I have.

 2    Q.    And what was the subject of your testimony in the

 3    California opioid litigation?

 4    A.    The IQVIA Xponent data.

 5    Q.    Now, have you ever been disqualified as an expert in

 6    litigation?

 7    A.    No, I have not.

 8              MS. SINGER:  Your Honor, I offer Ms. Keller as an

 9    expert in data analytics.

10              THE COURT:  Any objection?

11              MS. WICHT:  No objection to her being qualified as

12    an expert in data analytics.  I -- to the extent that the

13    slide that was up said anything different than that, we

14    would object to that, but I think what Ms. Singer just said,

15    no objection.

16              MR. MAHADY:  No objection, Your Honor.  Thank you.

17              MR. SCHMIDT:  Same position as Cardinal, Your

18    Honor.

19              THE COURT:  I find that Ms. Keller is an expert in

20    the field of data analysis; is that what you asked me?

21              MS. SINGER:  Data analytics.

22              THE COURT:  That she is an expert in data

23    analytics.

24              MS. SINGER:  Thank you, Your Honor.

25              THE COURT:  And I find that she is an expert in
```

```
 1    that field.
 2              MS. SINGER:  Thank you.
 3              BY MS. SINGER:
 4    Q.    Now, Ms. Keller, what were you asked to do in this
 5    case?
 6    A.    I was asked to identify outlier prescribing activity or
 7    prescribers in Cabell County using prescribing data.
 8    Q.    And did you form -- in doing that expert analysis, did
 9    you form an opinion regarding the data defendants had or
10    could have had about opioid prescribers in Cabell County?
11    A.    Yes, I have.
12    Q.    And we'll come back to the basis for your opinion in a
13    few minutes, but can you explain to the Court what you
14    concluded?
15    A.    I concluded that defendants had, or had in their
16    possession, prescribing data that allowed them to identify
17    outlying -- outlier prescribers based off of their total
18    volume and composition.
19    Q.    Total volume and composition of what?
20              MR. SCHMIDT:  Excuse me.
21         Sorry, Your Honor.  I just -- I think that answer was
22    inaccurate in terms of -- and I don't know if it was just a
23    misstatement on the part of the witness.  As I heard what
24    she said, that we had, or had in our possession, data, I
25    don't think that's the opinion she gave in her report.  And
```

1    so, I would just ask for clarification on that.

2        I think what she's opining is that we could have, in

3    her view, gotten access to this, not that we did have access

4    to it.

5                THE COURT:  Well, Ms. Singer?

6                MS. SINGER:  I think she is expressing the opinion

7    that was in her report and her testimony will lay out, as I

8    promised, the basis for that opinion and what defendants had

9    or had access to.

10               MR. SCHMIDT:  That's not the opinion she just gave

11   and that's the reason I objected to.  I'm not sure if you

12   heard the answer, but she said had or -- I don't think she

13   had access to.  And so, that's my objection, to the extent

14   she's saying we had this data that's outside the scope of

15   her report.  And maybe it's just a clarifying statement from

16   her.

17               THE COURT:  Well, I will let you go ahead, Ms.

18   Singer, and we'll see where we go with this.

19               MS. SINGER:  Okay.  All right.  So -- and we will

20   go on and explain the basis for that opinion, as I promised.

21               BY MS. SINGER:

22   Q.   Now, Ms. Keller, I think you've used the term "outlier"

23   in your testimony today.  Does outlier have an accepted

24   meaning within your field?

25   A.   Yes, it does.

1    **Q.**    And what is that meaning?

2    **A.**    It means something outside of the norm, something well

3    above average, sometimes it's very visually -- you're able

4    to see it visually because the outlier is so extreme.  It

5    also might mean below the average.  It just means outside of

6    -- of the norm.

7    **Q.**    And did you form an opinion as to the volume of

8    prescriptions written by the top 1 percent of prescribers in

9    Cabell Count?

10   **A.**    I did.

11   **Q.**    And what was that opinion?

12   **A.**    The top 1 percent of prescribers around 5 to 9 in a

13   given year prescribed upwards of over 40 percent of dosage

14   units and 60 percent of MMEs in a given year.

15   **Q.**    And did you form an opinion as to the total volume of

16   opioid prescriptions or dosage units that those prescribers

17   prescribed in Cabell County?

18   **A.**    Those prescribers prescribed over 80 million dosage

19   units and 1.6 billion MMEs.

20   **Q.**    Now, were those numbers noteworthy to you?

21   **A.**    I think that they were noteworthy and, in some cases,

22   if you look at a particular year, very -- very noteworthy,

23   to continue the same word.

24        So, for example, in 2010, in that year, seven

25   prescribers prescribed nearly as many dosage units, around

1    40 percent, as the remaining 550 prescribers in the county.

2    **Q.**    Now, how did those numbers and the volume and

3    concentration of prescribing in Cabell County compare -- I'm

4    sorry.  Do you have a -- have you looked at the volume and

5    composition of prescribing nationally, as well as in Cabell

6    County?

7    **A.**    I have.

8    **Q.**    And did you form a conclusion as to how the volume and

9    concentration of prescribing in Cabell County compared with

10   the volume and concentration nationally?

11   **A.**    So, I looked at other counties nationwide that had

12   similar -- a similar number of outlier prescribers.  So, in

13   total, in Cabell County, there were 24.  Nationally, that

14   total was -- counties that had that many prescribers were

15   the Bronx, Queens --

16             MS. WICHT:  Excuse me, Your Honor.  I'm sorry to

17   interrupt the witness.

18             THE COURT:  Yes.

19             MS. WICHT:  Your Honor, Ms. Keller is now

20   testifying to comparisons of Cabell County with specific

21   other county locations in the United States.  Those opinions

22   were not disclosed anywhere in her report.  Her report

23   exclusively talks about Cabell County.  It looks at West

24   Virginia and it looks at national.  It does not cull out any

25   other county anywhere in the country and we object to those

1     new opinions being offered on the stand.

2             MR. SCHMIDT:  And just to add it that, yesterday,

3     we received a set of demonstratives that included these

4     opinions.  We objected to them as outside the scope of the

5     report.  They took them out of the demonstratives, but the

6     witness is now offering opinions that are plainly outside

7     the scope of her opinion that we didn't have the chance to

8     examine her on at deposition.

9             THE COURT:  Mr. Mahady?

10            MR. MAHADY:  And we join, Your Honor.

11            THE COURT:  Are these outside her report?

12            MS. SINGER:  So, Your Honor, all of the data that

13    Ms. Keller testifies to are within her report.  I am happy

14    to lay a foundation for this, but one of defendants' experts

15    offers an opinion about the number of top prescribers in

16    Cabell County compared to that number nationally.  Ms.

17    Keller is responding to that analysis based on her review of

18    that expert's report and her own analysis.  Defendants had

19    every chance to ask Ms. Keller about this in her deposition,

20    but chose not to.

21            MR. SCHMIDT:  Your Honor, one of the natures of

22    data analytics is that she's looked at a lot of data.  The

23    reason we have a report instead of just saying I've looked

24    at a lot of data is so we can look at what she concluded

25    from that data.  Any conclusions about comparing different

1    parts of the country to each other, which is what the answer

2    just did, appear nowhere in her report.  And that's our

3    objection.

4         The reason Rule 26 requires a report is so we can know

5    her opinions.  These opinions about comparing different

6    parts of the country were not in her report.

7              THE COURT:  Ms. Wicht?

8              MS. WICHT:  I would simply join that, Your Honor,

9    and I believe Ms. Singer just confirmed that these are, in

10   fact, new opinions that are being given for the first time

11   on the stand in response to something that she believes the

12   defense expert said.

13             THE COURT:  Mr. Mahady?

14             MR. MAHADY:  Nothing further, Your Honor.

15             THE COURT:  Well, if it's outside the report, I'm

16   going to sustain the objection, Ms. Singer.

17             MS. SINGER:  So, understood, Your Honor.  And

18   again, to be clear, this is an opinion that defendants'

19   expert has offered.  Ms. Keller is prepared to testify based

20   on the data she reviewed and publicly available information.

21   We won't have a chance to have Ms. Keller on the stand again

22   and, to the extent defendants are going to take the position

23   and have taken the position that this was just business as

24   usual standard of care, then I would ask that Ms. Keller be

25   permitted while she is here to answer one or two questions

1    about that comparison.

2              MR. MAHADY:  Your Honor, our experts haven't

3    testified.  If they want to cross examine our experts, they

4    can, but they can't guess as to what --

5              THE COURT:  You're asking me to permit her to

6    rebut something that I haven't heard, aren't you, Ms.

7    Singer?

8              MS. SINGER:  Excuse me, Your Honor.  I am simply

9    asking for her to reflect on analysis she did prompted by

10   the expert report.  It is, again, an analysis based on

11   publicly available information.  I don't wish to belabor the

12   point, Your Honor, and understand where you are.

13             MR. MAHADY:  Your Honor, there's no supplemental

14   report issued, so if they felt so strongly about this --

15             THE COURT:  If it's not in the report, Ms. Singer,

16   I'm going to sustain the objection and you can proceed.

17             MS. SINGER:  We'll move on, Your Honor.  I'll move

18   on.

19             BY MS. SINGER:

20   **Q.**   Now, Ms. Keller, did you prepare a slide that reflects

21   the rankings of certain prescribers in Cabell County?

22   **A.**   I did.

23   **Q.**   And would that slide assist your testimony?

24   **A.**   Yes, it would.

25             MS. SINGER:  Let me see demonstrative number 4.

```
 1              BY MS. SINGER:

 2    Q.   Is this the slide that you prepared, Ms. Keller?

 3    A.   Yes, it is.

 4    Q.   Now, how do the top 1 percent of prescribers in Cabell

 5    County rank nationally?

 6    A.   So, nationally there are 1.782 million prescribers in

 7    the IQVIA database from 1997 through 2017.  Of those, 10,638

 8    of those are in West Virginia.  Of those West Virginia

 9    prescribers, 1,122 were in Cabell County.

10         Among those Cabell County physicians are Dr. Webb, who

11    nationally ranked 278th.  So, he was not only among the top

12    1 percent in Cabell County, but he was among the top

13    .02 percent nationally.  So, even higher than top 1 percent.

14         Next is Dr. Fisher, who was ranked 633rd in the nation.

15    He was among the top .03 percent in the nation.

16         And Dr. Chaney, who was 9,440th in the nation.  Now,

17    that number may sound large, but it's actually among the top

18    .5 percent nationally.

19    Q.   And the top .5 percent of what again, Ms. Keller?

20    A.   Of 1.782 million prescribers nationally.

21    Q.   And that's across jurisdictions of every size

22    population; is that right?

23    A.   Yes.

24              MS. SINGER:  All right.  We can take this slide

25    down, please.
```

```
 1              BY MS. SINGER:
 2   Q.    Now, Ms. Keller, did you form an opinion as to what
 3   defendants could have observed from dispensing data?
 4   A.    Yes, I have.
 5   Q.    And what is that opinion?
 6   A.    That defendants had access to dispensing data in their
 7   possession that would allow them to -- I'm sorry.  I
 8   misspoke.  They had access to or had in their possession
 9   dispensing data that would allow them to identify outlier
10   prescribers, some of which are identified in the IQVIA data
11   based off the total prescriptions and the composition of
12   those prescriptions.
13              MR. SCHMIDT:  And, Your Honor, again, I will make
14   the same objection to the verbiage that the witness
15   corrected herself on, which is we had access to or we had in
16   our possession.  There's no opinion that we had possession
17   of data that would have allowed these kinds of analyses.
18         What the witness has opined, but seems to be saying
19   something different now, is that we could have bought IQVIA
20   data.  If that's her opinion, she should give that opinion
21   instead of suggesting, contrary to her report, that we had
22   access to this information.  That's a very different opinion
23   saying you could have gone out and bought a data source that
24   we'll be able to cross examine her on, as opposed to
25   suggesting that we had it.
```

1          MR. MAHADY:  Same objection, Your Honor.  This is

2     a disputed issue and the foundation has not been laid for

3     this opinion at this point in time.

4          MR. MAJESTRO:  Your Honor, you know, I welcome the

5     comments from my brethren on the other side, but it appears

6     to me that these are more properly the scope of cross

7     examination.  We intended to get this witness on and off

8     relatively quickly, but if we have another day where we're

9     going to have 40 objections to things that would be better

10    suited to cross examination, we're going to have more time

11    issues.

12         MR. MAHADY:  Your Honor, we certainly appreciate

13    Mr. Majestro's desire to get this moving forward.  We do

14    just need proper foundation laid for the testimony that's

15    being elicited from this expert.

16         THE COURT:  Well, I think the thing to do is for

17    me to hear it and then determine what, if any, weight to

18    give to it after I hear it.

19         So, go ahead, Ms. Singer.

20         MS. SINGER:  All right.

21         BY MS. SINGER:

22    **Q.**  And, Ms. Keller, I don't recall if you finished your

23    answer.

24    **A.**  I might have trailed off, but I was stating that

25    defendants, as -- as evidenced by my analysis of the

1    dispensing data, which is an exemplar of the type of

2    dispensing data that is available to them or that they had

3    in their possession, they were able to identify outlier

4    prescribers, some of which were in the IQVIA data, as well,

5    and appeared as outliers in that data based off the total

6    prescriptions and the composition of those prescriptions.

7    **Q.**   And based on your review and analysis in this case, did

8    you form an opinion as to whether defendants were aware of

9    certain prescribers that you identify in your report?

10   **A.**   Yes.  Some of the same --

11          MR. WICHT:  Objection, Your Honor.  I don't -- I'm

12   not sure how she can testify -- excuse me -- to what

13   defendants are aware of or have knowledge of other than, I

14   suppose, reading a document.  So, I'm not sure what the

15   basis is for her to testify what defendants knew.

16          THE COURT:  Well, there's a difference between her

17   testifying as to the data that was available to the

18   defendants and then offering the opinion of what they were

19   aware of.  I'll sustain the objection.  It seems to me that

20   her testimony as to what they were aware of, unless you can

21   lay a better foundation, is purely speculative and I will

22   sustain the objection.

23          MS. SINGER:  So, Your Honor, we will lay a

24   foundation, but Ms. Keller, I think, responded to my

25   question based on her review and analysis in this case.  I'm

1    happy to lay a foundation for that opinion and we'll go

2    ahead and do so.

3              THE COURT:  Well, I'll sustain the objection on

4    the basis of what's before me right now.  Go ahead.

5              BY MS. SINGER:

6    **Q.**   Ms. Keller, let's go ahead and talk about the data and

7    documents that you reviewed in preparing your report.  When

8    you were first tasked with your expert assignment in this

9    case, did you ask to be provided with any materials?

10   **A.**   Yes, I was.

11   **Q.**   And what sort of things did you ask to be provided?

12   **A.**   Of course, the data that I was to be analyzing,

13   documentation about that data to the extent that it exists,

14   documents about prescribers in Cabell County, and any other

15   supporting documentation for the data analysis.

16   **Q.**   And outside of the documents that you were provided

17   with, did you do any additional research?

18   **A.**   I did.

19   **Q.**   And what was that?

20   **A.**   I did some -- one might call it on-line research,

21   public research, looking for information about the

22   prescribers that I identified in my report.

23   **Q.**   And did you have access to the database of documents

24   that were produced in this case?

25   **A.**   Yes, I did.

1    **Q.**    And did you -- did you actively review documents and

2    search on your own through those materials?

3    **A.**    Yes, I did.

4    **Q.**    Now, are you familiar with different types of data

5    related to opioids?

6    **A.**    Yes, I am.

7    **Q.**    And what are those types of data generally?

8    **A.**    There's the ARCOS data, which is the shipment data in

9    the United States maintained by the DEA.  There's IQVIA

10   Xponent data, which is prescription level data.  There's

11   Charge Max, which is a financial-based data that reflects

12   shipment data.  There's also dispensing data, just to name a

13   few.

14   **Q.**    And did you create a slide to explain what is included

15   in the prescribing data available to different entities in

16   the pharmaceutical supply chain?

17   **A.**    Yes, I did.

18   **Q.**    And would that slide assist in your testimony?

19   **A.**    Yes, it would.

20           MS. SINGER:  Your Honor, may I publish that slide?

21           THE COURT:  You may.

22           BY MS. SINGER:

23   **Q.**    All right.  Ms. Keller, can you explain what kind of

24   information is contained within prescribing data?

25   **A.**    So, prescribing data, of course, starts with a

1    prescription, which is on the left.  A prescription's issued

2    by a prescriber, a physician, which has information about

3    the patient, their name, date of birth.  And then there's

4    information about the prescriber, as well, and the drug to

5    be prescribed.

6        So, that then tells this pharmacy -- and I can't quite

7    see over -- it tells the pharmacy the physician name, the

8    prescriber location, the drug dosage and quantity.  So,

9    let's say it's OxyContin 30 milligrams, the patient name and

10   other potential information.

11       That same information then goes to the wholesaler,

12   which tells the prescriber name, the prescriber location,

13   the drug dosage and quantity to be ordered, and then the --

14   I'm sorry -- the drug quantity that was prescribed and the

15   payment method.  So, whether it was cash or paid through

16   insurance.

17          MR. WICHT:  Your Honor, I am sorry.  I will object

18   to that answer to the extent that it suggested that such

19   data automatically or always goes to the wholesaler.  I

20   think the witness's prior testimony was that distributors

21   had or could have had access to various things and I think

22   that that answer was not consistent with the opinions that

23   Ms. Keller has disclosed to the extent it's suggested

24   otherwise.

25          THE COURT:  Well, I think that goes to the weight

```
 1    rather than the admissibility and might be a subject for
 2    cross examination, but I will overrule the objection at this
 3    point.
 4              BY MS. SINGER:
 5    Q.   All right.  And, Ms. Keller, do you also have
 6    experience with the kind of -- I'm sorry.  In forming your
 7    expert opinions, did you also become familiar with different
 8    types of data related specifically to the distribution of
 9    opioids?
10    A.   Yes, I have.
11    Q.   And did you prepare a slide to describe those different
12    datasets?
13    A.   Yes, I have.
14    Q.   And would that slide assist your testimony?
15    A.   It would.
16              MS. SINGER:  Your Honor, may I publish that slide?
17              BY MS. SINGER:
18    Q.   All right.  Ms. Keller, is this the slide that you
19    prepared?
20    A.   Yes, it is.
21    Q.   Okay.  And can you explain the different data types
22    here, ARCOS, prescribing data, Xponent data and dispensing
23    data or, in this case, Drug Emporium data?
24    A.   So, the ARCOS data is, again, shipment level data.  So,
25    that describes -- that tabulates shipments from the
```

1    manufacturer to the distributor and eventually to the point

2    of sale dispenser.  And so, that might be, in this case, a

3    pharmacy.

4         That shows the buyer, the seller, the specific drug

5    product and the quantity ordered.  And so, when I say drug

6    product, I mean like OxyContin 30 milligrams.

7         Then we move on to the prescribing data.  That is

8    filled drug prescriptions and the Xponent data shows that

9    information at the prescriber level for a given month,

10   although it is available weekly, and it shows the total

11   monthly prescriptions' dosage units per prescriber per

12   product.

13        So, in other words, it would show you, if I were a

14   physician, an opioid prescribing physician, the number of

15   pills prescribed by Lacey Keller in the month of July 2017

16   for OxyContin 30 milligrams.

17        And then moving on to the dispensing data, Drug

18   Emporium is an exemplar of the dispensing data that is

19   available.  And so, that shows the prescriptions actually

20   dispensed to patients.  It shows the physician who wrote the

21   prescription, the drug product, the dosage strength, so the

22   number of pills, let's say, in the bottle and the pharmacy

23   where that prescription was filled.

24   Q.   And in preparing your report in this case, you reviewed

25   two categories of data; is that correct?

**A.**     Yes.

**Q.**     And which two were those?

**A.**     I did the prescribing data and I reviewed the
dispensing data.

**Q.**     And why did you look at those datasets in particular?

**A.**     Those datasets were pertinent to understanding the
prescribing activity in the county.  ARCOS data is shipment
data and does have information about prescribers in it in
the occasions that prescribers purchase directly opioids for
a distribution out of their own offices, but that data does
not reflect prescribing trends and so, wouldn't have been
relevant to my analysis.

**Q.**     And does ARCOS data, at least the ARCOS data produced
in this case, cover the same time period as the prescribing
data that you reviewed?

**A.**     It is a more limited time period than the Xponent data.
So, ARCOS covers 2006 to 2014.  The prescribing data covers
1997 through 2017.

**Q.**     Now, in the course --

            MS. SINGER:  And we can take that slide down,
please.

            BY MS. SINGER:

**Q.**     In the course of forming your opinion, did you
determine that defendants had dispensing data in their
possession?

```
 1    A.    Yes.

 2    Q.    And what is the -- and what was your conclusion?

 3    A.    That they did.

 4    Q.    And what is the basis for that conclusion?

 5    A.    Documents.

 6    Q.    Whose documents?

 7    A.    Case defendant documents.

 8    Q.    Okay.  I'd like to show you P-44170, please.

 9          MS. SINGER:  Your Honor, may I approach?

10          BY MS. SINGER:

11    Q.    And, Ms. Keller, have you seen this document before?

12    A.    I have.

13    Q.    And is this a document that you relied on in forming

14    your opinion in this case?

15    A.    It is.

16    Q.    Why did you rely on this document?

17    A.    This document appears to be -- or this document

18    discusses The Medicine Shoppe and prescribers that are top

19    prescribers of that shop.  Included in this file are their

20    licensing information from the Board of Health -- or, I'm

21    sorry -- the Board of -- the West Virginia Board of

22    Medicine.  So, there will be licensure information in there,

23    as well as DEA registrations.

24          But towards the end of this pretty hefty document is

25    what's known as dispensing data.  So, you can see for
```

1    particular drug products the top prescribers of those -- of

2    those products.

3        And so, what I found notable was on Page -- I'm sorry.

4    It's upside down and now it's in a staple.  Page 41 of that

5    document.  It's very hard to see, but it will -- that page

6    number is hard to see -- that Dr. Deleno Webb prescribed 313

7    prescriptions of the 582 for oxycodone in -- for this -- for

8    store number 290.

9        And the next largest prescriber was 119 prescriptions.

10   And prescribers there on after are generally around 1-5

11   prescriptions with a few exceptions.  So, even to the naked

12   eye, Dr. Webb is an identifiable outlier.

13   **Q.**   Now, are there other examples of documents that you

14   relied on in concluding that defendants actually had

15   dispensing data?

16   **A.**   Yes.

17        MS. SINGER:  Can I see P-42532 and 42568, please?

18   May I approach, Your Honor?  May I approach?

19        THE COURT:  Yes.

20        BY MS. SINGER:

21   **Q.**   And, Ms. Keller, while we're finishing circulating

22   those, are these documents that you also relied on in

23   forming your opinion?

24   **A.**   They were.

25   **Q.**   And why did you rely on these documents?

1          MR. SCHMIDT:  Your Honor, we object to questioning

2     on this document.  It's regarding a pharmacy in West

3     Virginia outside of Huntington-Cabell under Your Honor's

4     geographic scope ruling.

5          THE COURT:  Well, this is offered as an example of

6     the type of document she relied upon.  Overruled.  I will

7     let you go ahead.

8          BY MS. SINGER:

9     **Q.**   Go ahead, Ms. Keller.

10    **A.**   I'm sorry.  I've forgotten the question.

11    **Q.**   That's okay.  Why did you rely on these documents?

12    **A.**   These documents are, again, exemplars of the types of

13    dispensing data available.  I reviewed these documents

14    because they have information about the ways in which that

15    -- that dispensing data or prescribing data is broken down.

16         So, you can see, just taking P-42532001, for example,

17    the first page is a breakdown by drug name.  And you'll see

18    that this time period is, I think, over a year's worth of

19    data from 1/1/2013 to 3/27/2014.

20         I'm sorry.  I did the math wrong.  No.  Yeah.  That's

21    over a year's worth of data.

22         As you continue through the tables, you can see that

23    the data is broken out by physician.  So, for each

24    physician, you can see the combinations of products that

25    each physician is prescribing.  Some have very few

1    prescriptions and some have numerous prescriptions.

2    So, it just speaks to the level of detail available in these

3    documents and in that type of data.

4    **Q.**    And which defendant had the data in the documents that

5    you're looking at now?

6    **A.**    This is McKesson.

7    **Q.**    Okay.  All right.  And if you could put those aside, we

8    may come back to them, Ms. Keller.

9           Did you see similar types of dispensing data in the

10   documents of other defendants

11   **A.**    Yes, I did.

12   **Q.**    Including AmerisourceBergen?

13   **A.**    Yes.

14   **Q.**    And in the course of forming your opinion, did you

15   determine whether defendants purchased prescribing data?

16   **A.**    Yes.

17   **Q.**    And what did you conclude?

18   **A.**    That they did.

19   **Q.**    And are there documents that you relied on in forming

20   that opinion?

21   **A.**    Yes.

22           MS. SINGER:  Can I see P-44176, please?

23        May I approach, Your Honor?

24           THE COURT:  Yes.

25           MS. WICHT:  Your Honor, while Ms. Singer is

1    handing this document up, I will object.  Assuming she said

2    44176, this is not a document that was referenced in Ms.

3    Keller's report, nor was it included on her list of

4    documents relied upon.

5        I noticed that she testified at the beginning of her

6    direct examination that she had access to a database and had

7    gone looking on her own for documents.  That doesn't allow

8    her to come into court and testify about any additional

9    document that she may have found.  She made a disclosure

10   with her report of the documents she relied upon and that

11   she cited in her report and this document is not among them.

12            MS. SINGER:  So, Your Honor, if I may, this is the

13   same -- it is a -- it is a different P number for the same

14   document that Ms. Keller used in her report.  She was also

15   specifically questioned on this document during her

16   deposition, but it is the same document that appears on her

17   reliance list.

18            THE COURT:  Well, why does it have a different

19   number on it?

20            MS. SINGER:  Because it's a family issue, Your

21   Honor.  It's where the number fell in the chain.

22            THE COURT:  Ms. Wicht?

23            MS. WICHT:  It's actually not the same.  A portion

24   of the document is the same, but they're two separate

25   documents.  One has an attachment; one doesn't.  They're

```
 1    different documents, Your Honor.  A portion of them is the

 2    same e-mail chain, but they're not the same document.

 3              MS. SINGER:  Again, it's the same communication,

 4    Your Honor, and, again, I would cull out that Ms. Keller was

 5    questioned on the entire e-mail chain of her deposition,

 6    along with the attachment, which we have not sought to

 7    present today.

 8              MR. WICHT:  I don't believe that's correct and I'd

 9    ask to be directed to the citation in her deposition because

10    I don't recall this document being marked as an exhibit at

11    the deposition.

12              THE COURT:  Well, let's go ahead.  You can cross

13    examine her on it, Ms. Wicht, and I will overrule the

14    objection because, if I'm hearing Ms. Singer correctly, at

15    least it was in part --

16              MS. SINGER:  That's correct.

17              THE COURT:  -- within the matters disclosed

18    previously.

19         And it's time for a break.  We'll be in recess until a

20    quarter until eleven.

21         (Recess taken)

22         (Proceedings resumed at 10:45 a.m. as follows:)

23              THE COURT:  Okay, Ms. Singer.

24    BY MS. SINGER:

25    Q.   All right, Ms. Keller, before we recessed I believe
```

1    I had just shown you P-44176.  Is this a document that

2    you relied on in forming your opinions in this case?

3    **A.**    Yes.

4    **Q.**    And why did you rely on this document?

5    **A.**    This document is an email chain discussing the purchase

6    of an IQVIA product called CS Ratings through Cardinal

7    Health and their third party, or their third party counsel,

8    outside counsel.  That's the word.

9    **Q.**    And is CS Ratings -- what is CS Ratings?

10   **A.**    CS Ratings is, for lack of a better word, a

11   dash-boarding tool that allows the end-user of the database

12   to review top-line statistics on overall prescribing,

13   nationwide top physicians, top --

14               THE COURT:  We've got an objection here.

15               MS. WICHT:  Your Honor, I'll object.  I suspect I

16   know what the Court's answer is.  But at her deposition

17   Ms. Keller testified that she has never personally seen the

18   CS Ratings database.  So I object to the foundation for this

19   testimony about what it contains.

20               THE COURT:  Go ahead.

21               MS. SINGER:  Do you want me to respond to the

22   objection, Your Honor?

23               THE COURT:  No.  I'm going to overrule the

24   objection.  Go ahead.

25   BY MS. SINGER:

1    **Q.**   Go ahead, Ms. Keller.  Finish your answer, please.

2    **A.**   So it provides top-line information about top

3    prescribers.  They call them outlets, top outlets.  So that

4    would be a pharmacy; even within a pharmacy, the top

5    prescribers within that pharmacy.  And you can do so based

6    off of specific drug products, controlled substances, and

7    the like.

8    **Q.**   And, Ms. Keller, were there other documents that you

9    relied on that discussed the defendants' awareness of this

10   kind of CS Ratings data or dispensing data?

11   **A.**   Yes, there were.

12          MS. SINGER:  Your Honor, may I approach?

13   BY MS. SINGER:

14   **Q.**   And, Ms. Keller, do you recognize P-13297 as one of

15   the documents that you relied on in your report?

16   **A.**   Yes, it is.

17   **Q.**   And why did you rely on this document?

18   **A.**   This is another email chain discussing the purchases --

19   the purchase of CS Ratings.  In one part of the document

20   Sean Kelley states that IMS has a great product called CS

21   Ratings and it could be established as an HTTP customer

22   facing portal.

23       In the next part of the communication, they discuss a

24   list of bad prescribers that McKesson maintains.

25   **Q.**   And why did you think this document significant?

1    **A.**   It speaks to the fact that McKesson was considering the

2    purchase of this document in reviewing prescribing

3    activities, and specifically two specific pharmacies that

4    they were filling to -- or supplying.

5    **Q.**   Okay.  And I think you said considering purchasing this

6    document.  Did you mean this document or this data?

7    **A.**   This data.  I'm sorry.

8    **Q.**   Now, in the course of forming -- you can put that

9    aside.  In the course of forming your opinions in this

10   matter, did you look at any questionnaires that defendants

11   used to obtain information from their pharmacy customers?

12   **A.**   Yes, I did.

13   **Q.**   And can you generally describe the type of information

14   that those questionnaires sought?

15   **A.**   Generally, they discussed looking at the pharmacy

16   itself, the percentage of controls to non-controls, whether

17   or not the pharmacy is, has -- what percentage of the

18   prescriptions are picked up paying for in cash, the top

19   prescribers in a, in a location.  So usually they'll ask for

20   a list of top prescribers.

21   **Q.**   And did you see pharmacy questionnaires from each of

22   the defendants, or used by each of the defendants?

23   **A.**   Yes.

24        MS. SINGER:  Can I get P-44173, please.

25        May I approach, Your Honor?

1            THE COURT:  Yes.

2    BY MS. SINGER:

3    **Q.**   Ms. Keller, looking at P-44173, is this a document

4    you relied on in forming your opinion?

5    **A.**   Yes.

6    **Q.**   And why did you rely on this document?

7    **A.**   So this document is the questionnaire starting on the

8    file produced natively portion.  And, again, it discusses

9    the percentage of controlled substances the pharmacy

10   receives, the average prescriptions per day, third-party

11   controlled substances, all of these different questions

12   here, who the top suppliers are to the pharmacy, as well as

13   on Page 8 a list of top prescribers to the store.

14        And then an attachment to that is also prescribing --

15   or a usage report which is another version of dispensing

16   data for that pharmacy.

17   **Q.**   And did you note whether this dispensing data also

18   includes the zip codes of patients who are filling

19   prescriptions?

20   **A.**   It does.  I think on one of the very last pages that it

21   notes the, the zip codes of the patients which would be

22   notable if you were comparing how far a patient lived from

23   the pharmacy.

24            MS. WICHT:  Your Honor, just for purposes of the

25   record, I'd like to note our objection to this document on

```
 1   the basis of geographic scope.  This concerns a pharmacy in

 2   the Columbus, Ohio, area approximately three hours away, not

 3   in Cabell County.

 4            THE COURT:  All right.  Overruled.

 5   BY MS. SINGER:

 6   Q.   Okay.  We can put that document aside.  And can you

 7   turn back, Ms. Keller, to P-42568?

 8   A.   Okay.

 9   Q.   And was this another document you relied on with

10   respect to the kinds of questionnaires that defendants used?

11   A.   Yes.

12   Q.   And which defendant --

13            MR. SCHMIDT:  Your Honor, --

14   BY MS. SINGER:

15   Q.   -- used this questionnaire?

16            MR. SCHMIDT:  Sorry, Your Honor.  I was trying to

17   object to the last question.  I didn't get a chance to.

18       May I just maintain on a running basis our geographic

19   scope objection to this argument -- to this document?

20       Thank you, Your Honor.

21            THE COURT:  All right.  You'll have a running

22   objection to the -- on the basis of geographic scope.

23   BY MS. SINGER:

24   Q.   So, Ms. Keller, was this a document you relied on

25   with respect to McKesson's questionnaire?
```

**A.**   Yes, it was.

**Q.**   And why did you -- why did you rely on this document?

**A.**   This document, similarly to the other document, has questions about the percentage of controlled substances, the average prescriptions filled per day, the top -- and also includes dispensing data with it.  I'm looking for top prescribers here too.

**Q.**   Now, in the course, in the course of forming your opinion, did you determine whether defendants used prescribing or dispensing data in setting or reviewing customer thresholds?

**A.**   Yes.

MS. WICHT:  Objection, Your Honor.  This is beyond the scope of Ms. Keller's report.  She didn't offer any opinions about how defendants operated their Suspicious Order Monitoring Systems.  And to the extent that she's going to talk about how thresholds were set, I object.  That's outside the scope of her expert report disclosed in this case.

MR. SCHMIDT:  Same, Your Honor.

MR. MAHADY:  Same objection, Your Honor.

THE COURT:  Just a minute.

(Pause)

THE COURT:  You may respond.

MS. SINGER:  I, I have no intention of asking

 1    Ms. Keller questions about how defendants used their

 2    threshold system or suspicious order monitoring.  This is

 3    just another example to show that defendants were receiving

 4    and using dispensing and prescribing information.

 5        So it relates not to their Suspicious Order Monitoring

 6    System, Your Honor, but to the prescribing and dispensing

 7    data that Ms. Keller's testifying to.

 8            MS. WICHT:  I'll just note, Your Honor, that the

 9    word "threshold" appears nowhere in Ms. Keller's report.

10            THE COURT:  So this wasn't referenced at all in

11    the report?  Is that right?

12            MS. SINGER:  The documents were referenced, Your

13    Honor.  I'm not asking her about documents outside of her

14    report.  I'm simply using this as another example of the way

15    defendants received and used the same data.

16            THE COURT:  Okay.  I'll overrule the objection and

17    let her answer it.

18            THE WITNESS:  Yes.  May I have the question again?

19    BY MS. SINGER:

20    **Q.**  Yes.  In the course of forming your opinion, did

21    you determine whether defendants used prescribing or

22    dispensing data in setting or reviewing thresholds?

23    **A.**  Yes.

24    **Q.**  And did they?

25    **A.**  Yes, they did.

```
 1   Q.   And in the course of forming your opinion, did you

 2   determine whether defendants' policies and procedures

 3   required them in certain circumstances to obtain pharmacies'

 4   dispensing data?

 5           MR. SCHMIDT:  Same objection, Your Honor.  We're

 6   well outside her opinion.  And I just want to point out

 7   what's happening here.

 8       These are kind of cursory opinions with no documentary

 9   support that are being dumped in the record that are

10   literally impossible to cross-examine on and well outside

11   her report.

12           MR. MAHADY:  And, Your Honor, Ms. Singer can

13   correct me, but I do not believe the witness has cited to

14   any AmerisourceBergen policies and procedures in her

15   reliance materials and has offered no opinions on them in

16   her expert report.

17           MS. WICHT:  We would join the objection, Your

18   Honor.  And, likewise, there's no reference to Cardinal

19   Health's standard operating procedures in her report.

20           THE COURT:  Are these outside the scope of her

21   report?

22           MS. SINGER:  They are not, Your Honor.  Again,

23   they all relate to defendants' use of data which they have

24   contested.  And if defendants object to us not showing

25   Ms. Keller's documents, I'm happy to have her look at the
```

1    documents on which she relied.

2         MR. SCHMIDT:  Our objection is they're talking

3    about documents, threshold change reports that she doesn't

4    have on her reliance list, opinions, opinions about how we

5    use our policies and apply our policies that not only did

6    she not opine on, she disclaimed in her deposition.

7         What is being claimed is because she saw documents,

8    suddenly now she can give opinions that she never disclosed.

9    And that's not how the process works.  And in some of these

10   instances, she didn't even see the documents.

11        THE COURT:  Mr. Mahady.

12        MR. MAHADY:  Yes, Your Honor.

13        It's either in the report or it's not.  It's on the

14   reliance list or it's not.  They're not.  So we maintain our

15   objection.

16        THE COURT:  I'll sustain the objection, Ms.

17   Singer.

18        MS. SINGER:  All right.  Your Honor, to be clear

19   for the record, I am not asking Ms. Keller, nor is she

20   testifying, to any opinion regarding these defendants'

21   Suspicious Order Monitoring System.

22        She is being asked a question about -- questions about

23   use of data that defendants have claimed they did not

24   receive.

25        With that said, all of these documents have been within

1    the scope of her report and on her reliance list.  There

2    were two additional documents that are in evidence in this

3    case that I am happy to show this witness which are also

4    consistent with and supportive of her opinion.

5         But I don't think defendants can complain that she is

6    offering opinions unsupported by documents and then object

7    to the use of those documents.

8              MR. SCHMIDT:  Your Honor, the statement that was

9    just made is she wants to be able to show the witness

10   documents she hasn't seen just because they came into

11   evidence.  That's not appropriate.

12        As to last two questions, the first was asking about

13   threshold change requests; no opinions on that, no documents

14   on that.

15        The second was asking about whether our policies

16   require certain things; no opinions on that.  She disclaimed

17   that at her deposition.

18             MS. WICHT:  And I would just add to that, Your

19   Honor, that to the extent that Ms. Singer said she's not

20   offering opinions, well, then, what she's doing is just

21   reading documents for the Court which we would submit is not

22   helpful to the trier of fact.

23             THE COURT:  I'm going to sustain the objection,

24   Ms. Singer.

25             MS. SINGER:  All right.  I think, Your Honor,

```
1    we've already shown what defendants had access to, but I
2    want to be clear that that was the point of this question,
3    not defendants' policies on their Suspicious Order
4    Monitoring System.
5              THE COURT:  Well, I understand that, but I sustain
6    the objection.
7              MS. SINGER:  But I will move on, Your Honor, in
8    your direction.
9    BY MS. SINGER:
10   Q.   Ms. Keller, in the course of forming your opinions,
11   did you have a chance to look at how -- at documents
12   relating to how defendants used dispensing or
13   prescribing data in identifying red flags?
14   A.   Yes.
15             MR. SCHMIDT:  And I believe this is the same
16   objection, Your Honor.  She does identify red flags in her
17   report.  She never applies it.  And the red flag she
18   identifies is simply what Mr. Rafalski gave in his report
19   but did not testify about.
20             THE COURT:  How, how do you get into this?
21             MS. SINGER:  So, Your Honor, again, this is a
22   document on Ms. Keller's reliance list.  It is a document
23   that shows, using these exact words, that defendants were
24   using dispensing data.
25        I am not asking Ms. Keller to apply, to apply red
```

```
 1    flags.  But she's simply using it to show that defendants

 2    were using this data.

 3              THE COURT:  Okay.  Overruled.  You can do that.

 4              MS. SINGER:  Thank you, Your Honor.

 5         May I approach, Your Honor?

 6    BY MS. SINGER:

 7    Q.   Ms. Keller, do you recognize P-12643?

 8    A.   Yes.

 9    Q.   And did you rely on this document in the course of

10    forming your opinions in this case?

11    A.   Yes.

12    Q.   And why did you rely on this document?

13    A.   On Page 7 of the document you can see there's a

14    section --

15              MR. SCHMIDT:  Your Honor, --

16         I apologize for interrupting, Ms. Keller.

17         I believe this is not something that was disclosed as

18    reliance material.  It was not.

19              MS. SINGER:  Your Honor, if I may address that, it

20    was.  Ms. Keller's report clearly discloses in her first

21    line all documents relied on in the New York report.  It's

22    an explicit line in her reliance materials.  This is one of

23    those documents.

24         It is a document that was also identified to defendants

25    with the disclosures for Ms. Keller's testimony on Sunday
```

1    evening.  So it is both disclosed in her reliance list and

2    her disclosure list for her testimony.

3              MR. SCHMIDT:  And I believe we objected to it.

4    It's not on her reliance list.  We have a specific reliance

5    list of documents she reviewed in this case and this does

6    not appear on it.

7              THE COURT:  What about that, not on the reliance

8    list?

9              MS. SINGER:  Your Honor, the very first line in

10   Ms. Keller's reliance list is all documents on her reliance

11   list in her report in the New York Attorney General matter.

12             THE COURT:  All right.  Overruled.  Let's get on

13   with it.

14             THE WITNESS:  So what I relied on here is on Page

15   7, Section 2.  It speaks to dispensing data, so looking for

16   how the dispensing data should be used per McKesson's SOPs.

17        So a customer's script data shows that they fill a high

18   volume of controlled scripts to a low volume of

19   non-controlled scripts;

20        The customer's script data shows a high volume of

21   scripts being filled for one specific base code;

22        The customer's dispensing data reflects that they are

23   purchasing additional quantities of one or more base codes

24   elsewhere;

25        And their cumulative volume exceeds their established

1    threshold.

2        All of these are data points in this Section 2 that I

3    relied upon.

4    **Q.**   And is it your opinion that this document shows that

5    McKesson was using dispensing data?

6    **A.**   Yes.

7    **Q.**   All right.  Let's turn -- I'm sorry.  Were there other

8    documents from defendants that you relied on in forming your

9    opinion on the use of dispensing data?

10   **A.**   Yes.

11        MS. SINGER:  May I approach, Your Honor?

12   BY MS. SINGER:

13   **Q.**   And, Ms. Keller, do you recognize this document?

14   **A.**   Yes.

15        MS. WICHT:  Your Honor, I'm sorry to interrupt.  I

16   will interpose an objection that this document is not

17   referenced anywhere in Ms. Keller's report.  I would -- and

18   we object to her testifying on it.  It wasn't disclosed to

19   us.  It's not on her reliance list and not in her report and

20   she shouldn't be able to offer opinions about it now.

21        I would, I would further note for the record I have

22   been checking the list of reliance materials that we

23   received with Ms. Keller's report and, and I don't see

24   anywhere on it a reference to materials that she considered

25   in her New York report.

 1          So I would respectfully ask for an indication of where

 2     that is or if there's been some supplement that I'm missing

 3     because it's not on the list that I have, Your Honor.

 4          MR. SCHMIDT:  Yeah.  And we'll renew our objection

 5     to the prior document on that basis.  There's a reason why

 6     we have federal requirements.  It's so that we get a

 7     reliance list of what she's actually reviewed.

 8          And what we have that's unfair about this examination

 9     is the witness simply dumping documents in that she hasn't

10     reviewed with no reference to time period, no reference to

11     understanding the context for the documents, and no prior

12     disclosure so we can examine her at the deposition about it.

13          THE COURT:  Mr. Mahady.

14          MR. MAHADY:  We join, Your Honor.

15          MS. SINGER:  So, Your Honor, again this was

16     clearly within Ms. Keller's reliance list in both the New

17     York matter and then, therefore, in this case.  It was on

18     the list of documents disclosed to defendants on Sunday

19     night.

20          Ms. Keller has not simply -- she's not being shown

21     documents she never relied on.  The whole point of these

22     questions, as she's testified, is she did review these

23     documents and defendants had notice of that.

24          MS. WICHT:  Your Honor, this document was on the

25     list that was disclosed to us on Sunday night and we

 1    objected to it on this same basis on that list.

 2         I will point out her list of reliance materials for

 3    this report, Your Honor, includes precisely six Cardinal

 4    Health produced documents, six.  It's not difficult to look

 5    at this document and determine that this Bates number is not

 6    on her reliance list.

 7              MS. SINGER:  Your Honor, I'm happy to show the

 8    Court.  I'm happy to show counsel.  It's on her reliance

 9    list.  I have it right here.

10              THE COURT:  Well, is it on the list or not?

11              MS. SINGER:  It is.

12              THE COURT:  Well --

13              MS. WICHT:  May I ask to see the list and where it

14    is, Your Honor?  I'm sorry to do that.  I'm looking at a

15    list that I printed out yesterday off the back of Ms.

16    Keller's report and it doesn't include this document.

17              MR. SCHMIDT:  Or the last one, Your Honor.

18              THE COURT:  Well, --

19         (Pause)

20              MS. WICHT:  Your Honor, we're being informed that

21    the fact that she listed on her reliance list her expert

22    report in the New York case somehow means that this list,

23    two inches thick, double-spaced list of Bates numbers is

24    incorporated into everything that she relied on here.  It's

25    simply not fair notice, Your Honor.  We object to the

1    disclosure, to the adequacy of the disclosure and to

2    questioning on the documents.

3           MR. MAHADY:  Your Honor, by comparison, her CT2

4    reliance materials for this case, this Federal Court case is

5    this.

6           THE COURT:  It's not on there.

7           MR. MAHADY:  No.

8           MR. SCHMIDT:  The report is mentioned.  And part

9    of the problem we're struggling with here, Your Honor, is

10   the Court's heard that Ms. Keller has given testimony across

11   a range of defendants across at least seven different cases

12   I think was what I heard, but I might be getting the number

13   off.

14       And the idea that we have to parse through opinions

15   she's given in other cases that she has not given here to

16   try to figure out a long list of documents, a several-inch

17   thick of documents that might be used here, even though

18   there's no opinions on those documents in her report, that's

19   not what the rules are about or what they require.

20          THE COURT:  Well, did you give them a list for

21   this case and this witness?

22          MS. SINGER:  We did and it included --

23          THE COURT:  This isn't on it; right?

24          MS. SINGER:  So, Your Honor, it also included her

25   expert materials in the New York matter in particular

```
 1    because -- I want to be very clear, Your Honor, to correct

 2    the record on this point.

 3        Ms. Keller's opinions are those she offers in the

 4    report.  These documents are not being offered to expand her

 5    opinions.  Her opinions are settled and they remain what

 6    they always were, which is that this data was available to

 7    and in the possession of defendants.

 8        That said, Ms. Keller specifically referenced her New

 9    York report because an expert comes to this case with the

10    knowledge they've gained from reviewing all of the

11    documents.  That's why it was expressly referenced.

12        But, again, I think Ms. Keller has important testimony

13    to offer to the Court.  I want to make sure we get to it and

14    I don't want to bog the Court's time or this testimony down

15    in these objections because I think the point remains the

16    same, which is a series of documents that show the

17    defendants had this information.

18            MS. WICHT:  Very briefly --

19            MR. MAJESTRO:  Your Honor, I just want to add that

20    the idea that these documents were not disclosed to all is

21    untrue.  These documents were -- these specific documents

22    were disclosed Sunday night with respect to what Ms. Keller

23    would be testifying about today.

24            MS. WICHT:  And we objected to them at that time.

25            MR. MAJESTRO:  But the point is they were on
```

1    notice they would be used today.

2              MS. SINGER:  I know, Your Honor, that this is,

3    this is distracting from the testimony and the Court's time.

4        Again, I just want to be clear because of the

5    suggestions here.

6        There are two documents that I have shown to

7    Ms. Keller, one that I just showed, one that I am in the

8    process of showing, with the Court's permission, that are

9    from her reliance list in New York, again expressly

10   referenced here and on her disclosure list.  Every other

11   document is on her specific reliance list for this case.

12       So we are talking about two documents here, again all

13   of which were disclosed to defendants.

14             THE COURT:  But the two you're talking about

15   aren't on her specific reliance list.  Is that right?

16             MS. SINGER:  Only by virtue of their reference in

17   New York.  And, again, --

18             THE COURT:  Well, I'm going to sustain the

19   objection.  I'm getting flooded with paper up here.  I think

20   you can ask her what her opinions are and have her generally

21   describe what she relied upon rather than taking her through

22   document by document.  And, so, to that extent, the

23   objection is sustained.

24             MR. SCHMIDT:  And we move to strike the testimony

25   in the McKesson document.  This was the objection we made.

 1    The representation was that this was disclosed and we now

 2    know it wasn't disclosed except for New York.

 3              MS. SINGER:  Your Honor, again, I believe

 4    defendants had fair notice of this document.

 5              THE COURT:  Well, okay.  I'm not going to strike

 6    the testimony because I think she has a right to give her

 7    opinion and say what she relies on.  But the objection to

 8    these documents is sustained.  I think everybody understands

 9    my ruling.

10         Go ahead.

11              MS. SINGER:  With apologies, may I approach, Your

12    Honor?

13    BY MS. SINGER:

14    **Q.**   Ms. Keller, I'm showing you the last in this series

15    of documents.  Do you recognize P-44172?

16    **A.**   Yes.

17    **Q.**   And is this a document you relied on in your report?

18    **A.**   Yes.

19    **Q.**   And which defendant does this document pertain to?

20    **A.**   Cardinal Health.

21    **Q.**   And why did you rely on this document?

22    **A.**   Just give me one moment so I can find my place.

23    **Q.**   You might look at 6.2.2.

24    **A.**   So on Page 5 of the document, Section 6.2.2, it

25    required the investigator gathers the information provided

1    by the customer, including but not limited to the pharmacy's

2    controlled substance dispensing, and ask questions about

3    those efforts that the customer has in place to ensure

4    controlled substance prescriptions are being filled for

5    legitimate medical purposes, including questions about

6    understanding and applying corresponding responsibility and

7    due diligence measures.

8        So that section again points to the fact that

9    defendants were using dispensing data.

10   **Q.**   All right.  You can put that document aside,

11   Ms. Keller.

12       Now, based on the documents you reviewed, did you reach

13   a conclusion as to whether defendants were actually aware of

14   many of the top prescribers you identify in your report?

15   **A.**   Yes.

16   **Q.**   And what was your conclusion?

17           MS. WICHT:  Same objection as previously, Your

18   Honor.  To the extent she's purporting to testify about what

19   defendants were aware of, she's only doing so by reading a

20   document I assume, so just to foundation.

21           THE COURT:  Well, Mr. Mahady.

22           MR. MAHADY:  I'm just going to object to

23   foundation because the witness has not been shown any

24   AmerisourceBergen documents so far.

25           THE COURT:  I don't think she can testify without

1   speculating more than is before the Court now on what the

2   defendants were aware of.

3       She can testify as to what information was out there

4   and that it was available and, and the conclusion can be

5   drawn from that possibly that they were aware, but I don't

6   think she can say they were aware because I don't think she

7   knows that.

8           MS. SINGER:  Let me try to rephrase the question,

9   Your Honor, if I may.

10  BY MS. SINGER:

11  **Q.**   Ms. Keller, based on your review of documents from

12  these defendants, did you see references to these top

13  prescribers in their own documents?

14  **A.**   Yes.

15  **Q.**   All right.  Let's turn to the specific data that you

16  analyzed in this case.

17      Ms. Keller, did you prepare a slide describing the data

18  you used in order to assist with your testimony today?

19  **A.**   Yes, I did.

20          MS. SINGER:  And can I publish slide 7, please?

21          THE COURT:  Yes, you may.

22  BY MS. SINGER:

23  **Q.**   Ms. Keller, does this slide provide the details on

24  the dataset that you reviewed in preparing your report?

25  **A.**   Yes.

1   Q.   And can you describe very generally the information

2   that was in the data you reviewed from Drug Emporium?

3          MS. SINGER:  And before you answer, I just want to

4   remind the Court that that Drug Emporium data was admitted

5   at P-42060.

6          THE WITNESS:  So on the left is a column

7   describing the Drug Emporium data.  This is all the

8   prescriptions that were dispensed out of the Barboursville

9   store.  It included more than 650,000 prescription records,

10  so lines in the data.

11         The date range was fill dates from 2012 to 2018.  And

12  it shows all prescriptions from, from specific prescribers.

13  It included the drug product and dosage, the date of the

14  prescription, the total dosage units and, of course, the

15  pharmacy for which it was filled which was the Barboursville

16  store.

17         The IQVIA Xponent data, that column is on the right.

18  That includes 93 percent of all outpatient prescriptions

19  dispensed in the United States.  The remaining -- so that

20  are extrapolated using a proprietary method from Xponent.

21         From -- the data covers prescriptions in 1997 through

22  2017.  It shows all prescriptions by prescriber name,

23  prescriber specialty, the drug product, total dosage units,

24  and other prescriber information such as their address.

25  Q.   Do you know how the Drug Emporium data you reviewed in

1    this case was obtained?

2    **A.**    Yes.

3    **Q.**    And how was that?

4    **A.**    By subpoena.

5    **Q.**    And is it -- is the data that was produced by Drug

6    Emporium similar to the data that you saw in defendants'

7    documents?

8    **A.**    Yes.

9    **Q.**    And did you conduct an analysis of the Drug Emporium

10   and Xponent dataset?

11   **A.**    Yes, I did.

12   **Q.**    Was that a complicated analysis?

13   **A.**    The processing and the data was, was quite easy.  Both

14   datasets were relatively structured, clean, needed very

15   little processing.

16        For example, the Xponent data did come to us in over

17   100 files which needed to be decompressed and put together

18   in a, a form that it could be tabulated.

19   **Q.**    And does the Xponent data you analyzed identify the

20   pharmacy at which prescriptions were filled?

21   **A.**    No, it does not.

22   **Q.**    And did you form an opinion as to how defendants could

23   have used Xponent data in that case?

24   **A.**    So even though the pharmacy information is not in the

25   Xponent data, when -- in reviewing the SOMS documentation, I

1  could see that the defendants were reviewing, let's say, a

2  specific pharmacy and they might see a name.  So the Xponent

3  data -- let's say it was Dr. Webb.  You would be able to

4  identify all prescribing activity for Dr. Webb.

5  **Q.**   Now, in analyzing prescriptions or prescribing data,

6  are you aware of whether experts reasonably rely on Xponent

7  data?

8  **A.**   They do.

9  **Q.**   And how do you know that?

10  **A.**   There are studies that are published in, in

11  peer-reviewed journals that rely upon the data, and

12  defendants' own experts use the data.

13      MR. SCHMIDT:  I'll object to the last part of the

14  answer.

15      First of all, it's not defendants plural.  That's not

16  an accurate statement.

17      Second of all, for a witness to come and give opinions

18  on what some other expert has said when she has not cited

19  that expert in her reliance materials is improper in terms

20  of disclosure.  And then it has the additional problem even

21  if it was said, it would be hearsay.

22      MR. MAJESTRO:  Your Honor, the -- I find it

23  interesting that the defendants are walking away from their

24  own expert's testimony.  But the testimony is not being

25  offered for the truth of the opinion, but the reasonability

```
1    of the reliance of this expert on this dataset which is

2    perfectly permissible.

3              MR. SCHMIDT:  That's literally the truth of the

4    matter.

5              MS. WICHT:  It's improper bolstering of this

6    witness's testimony with another expert who has yet to be

7    called in this case.

8              MR. MAJESTRO:  Well, if these defendants are

9    willing to concede that it's reasonable to rely on the

10   Xponent data, then there's no need for this testimony, but I

11   don't think that's the case.  And, therefore, this is --

12   this evidence that their experts are relying on this same

13   dataset is clearly admissible to show the, to show the

14   foundation for the expert's opinion.

15             MR. SCHMIDT:  We'll stand on what we said.  This

16   is clearly relying on it for the truth of matter, so it's

17   hearsay.  It's also improper bolstering on a topic she did

18   not disclose in any way in her report.

19             THE COURT:  Well, as an expert, she's got a right

20   to rely on inadmissible evidence to a certain extent.  I'll

21   overrule the objection.

22        You can go ahead, Ms. Singer.

23             MR. SCHMIDT:  Your Honor, does that apply to our

24   nondisclosure objection as well?  She does have to disclose

25   what she relies on.
```

1          THE COURT:  Well, what about that, Ms. Singer?

2          MR. MAJESTRO:  She's not relying on the other

3    expert.  What she has testified to is that the other experts

4    rely on this data which supports her belief that it is

5    reasonable and it meets the requirement of Rule 703.

6          THE COURT:  Yeah.  Overruled.

7       Go ahead, Ms. Singer.

8    BY MS. SINGER:

9    **Q.**   All right, Ms. Keller, so I think we were -- where

10   we were was defendant's expert, defendant's singular

11   expert reliance on Xponent data.  Do you know whether

12   the Federal Government uses Xponent data?

13   **A.**   It does.

14   **Q.**   And which agency?

15   **A.**   The FDA and Health and Human Services Agency and the

16   DEA.

17   **Q.**   And how do you know --

18   **A.**   And the -- I'm sorry.  And the CDC.

19   **Q.**   How do you know that the Federal Government uses

20   Xponent data?

21   **A.**   It's -- they have published reports publicly available

22   on their website.

23   **Q.**   And did you prepare a slide describing government

24   studies that rely on Xponent data to assist your testimony

25   today?

1    **A.**   Yes, I did.

2              MS. SINGER:  May I publish that slide, Your Honor?

3              THE COURT:  Yes.

4    BY MS. SINGER:

5    **Q.**   And is this a slide that you prepared, Ms. Keller?

6    **A.**   Yes.

7    **Q.**   And which government reports do you reference here that

8    rely on Xponent data?

9              MS. WICHT:  Your Honor, I'll just note that none

10   of this was disclosed in Ms. Keller's expert report.  Her

11   report doesn't mention the CDC, FDA.  It doesn't mention any

12   particular study.

13             MR. SCHMIDT:  And we join in that.  And it's

14   striking in the record how much is trying to be put through

15   this expert that she did not disclose in her report.

16             MR. MAHADY:  Join as well, Your Honor.

17             THE COURT:  Well, I'm going to let her go ahead

18   and I'll try to sort this out after the fact rather than

19   delay this.  So I will overrule the objection at this point.

20        Go ahead, Ms. Singer.

21             THE WITNESS:  There's a handful of studies listed

22   here:  The CDC's prescribing maps, the CDC's annual

23   surveillance report of drug-related risks and outcomes, the

24   FDA's framework for assessing the impacts of strategies to

25   manage risks of higher dose and higher dosage strength

1    opioid analgesic products are just a few that rely on

2    Xponent.  There are others.

3    BY MS. SINGER:

4    **Q.**   All right.  Let's move on.  Did you offer an

5    opinion with regard to Xponent data in the California

6    opioid trial that you mentioned earlier?

7    **A.**   I did.

8    **Q.**   And what was that opinion?

9              MS. WICHT:  Objection, Your Honor.  I don't see

10   the relevance of her opinion in California.

11             THE COURT:  How is her opinion in another case

12   relevant?

13             MS. SINGER:  I am just using it for the same 703

14   reason to establish that the data has been relied on and

15   deemed reliable in another court.

16             THE COURT:  I don't think you need that.  I'll

17   sustain the objection.

18             MS. SINGER:  Okay.

19   BY MS. SINGER:

20   **Q.**   Based on your training, education, and experience,

21   do you have an opinion as to whether the Drug Emporium

22   and Xponent data we've discussed are reliable sources of

23   information for determining the volume of opioids that a

24   healthcare provider prescribed over a period of time?

25   **A.**   They are reliable.

1   **Q.**   I'm sorry.  Can you --

2   **A.**   They are reliable.

3   **Q.**   Before we go into the particulars, I wanted to ask you

4   about some opinions you're not offering in this case.

5        Is it your opinion that defendants had an obligation to

6   buy prescribing data?

7   **A.**   Correct.  I'm not offering that opinion, only that they

8   could have.

9   **Q.**   And are you offering an opinion as to whether

10  defendants should have required pharmacies to provide

11  dispensing data?

12  **A.**   Correct.  I'm sorry.  Could you -- can you ask the

13  question one more time?

14  **Q.**   Yes.  Do you offer an opinion as to whether defendants

15  should have required pharmacies to provide dispensing data?

16  **A.**   I do not offer the opinion that they could -- they

17  should have, but only that they could have used it.

18  **Q.**   And to be clear, I think as you just said, it's your

19  opinion that these data sources were available to

20  defendants; correct?

21  **A.**   Correct.

22  **Q.**   All right.  In your report did you form an opinion as

23  to whether the available data identified healthcare

24  providers who are outliers?

25  **A.**   Yes.

1   **Q.**   And how did you do that?

2   **A.**   I used their total prescribing activity in the IQVIA

3   Xponent and the drug dispensing data for the -- Drug

4   Emporium data.

5        For the IQVIA Xponent data I looked at the top

6   one percent of prescribers based off the total composition

7   of their prescriptions.

8        So if they were among the highest prescribers, those

9   were the ones in which I analyzed.

10       I also made a few tables of prescribers sorting by

11   MMEs, the total prescribed MMEs to arrive at a few lists of

12   prescribers that were among the highest prescribers in the

13   county.

14   **Q.**   And did you prepare a slide reflecting the other

15   factors, other factors that you used besides volume in

16   identifying outlier prescribers?

17   **A.**   Yes.

18            MS. SINGER:  May I publish that slide, Your Honor?

19            THE COURT:  Yes.

20   BY MS. SINGER:

21   **Q.**   Number 10, please, IQVIA.

22       And, Ms. Keller, does this slide reflect the other

23   factors you assessed in identifying outlier prescribers in

24   Cabell County?

25            THE COURT:  Ms. Wicht.

1          MS. WICHT:  Your Honor, we object.  In

2     Ms. Keller's report what she disclosed is that she relied on

3     the expert report of James Rafalski to identify prescribing

4     practices that are red flags of potential diversion.  Those

5     are the elements that are listed on her slide here.

6          Mr. Rafalski has come and testified in this trial.  He

7     did not testify to these factors or these red flags.  His

8     testimony is concluded.  There will be no more testimony

9     from Mr. Rafalski.

10         She cited only his expert report in reliance on this,

11    and it's not proper for an expert to come and rely on

12    another expert who is not being called to testify in the

13    case or who has not been called to testify in the case on

14    that subject.

15         MR. SCHMIDT:  To underscore the point about

16    nondisclosure, the third bullet point on this slide,

17    prescribing disproportionate volume of opioids relative to

18    other non-controlled drugs, she did not give opinions on

19    that regarding these prescribers.

20         The last bullet point on this slide, high volume or

21    proportion of prescriptions paid with cash, she did not give

22    opinions on that in her report other than simply noting that

23    Mr. Rafalski said those were relevant factors.

24         So there are at least two bullets on there that are not

25    contained in her report other than noting that Mr. Rafalski

```
 1    had said them in terms of actually giving opinions on them.
 2              MR. MAHADY:  We join, Your Honor.  I'll just note
 3    that we seem to be supplementing Mr. Rafalski's trial
 4    testimony with a witness that does not have this expertise.
 5              THE COURT:  Do you want to respond, please?
 6              MR. MAJESTRO:  I'm going to respond on the 703
 7    issue.
 8         The Court's made clear that experts can rely on
 9    materials that are not admitted or even inadmissible as long
10    as they meet the reasonable reliance test of Rule 703.
11         These -- the facts that she was relying on, Mr.
12    Rafalski's report was disclosed to defendants.  They had the
13    opportunity to depose her on that.  And we believe it's
14    perfectly proper regardless of whether or not Mr. Rafalski
15    testified to every one of those points.
16         On the issue of whether or not those were disclosed,
17    I'll defer to Ms. Singer.
18              MS. SINGER:  And I can tell you, Your Honor, on
19    that point these are precisely the factors that Ms. Keller
20    lists in her report as being used and relevant to her
21    analysis of outlier prescribers.
22              THE COURT:  Well, I'm going to overrule the
23    objection and let her answer it.
24              MS. WICHT:  Your Honor, --
25              THE COURT:  Yes.
```

```
 1              MS. WICHT:  -- I'm sorry.  May I just state for

 2    purposes of the record the Fourth Circuit has expressly

 3    held, and I'm quoting, "reports specifically prepared for

 4    purposes of litigation are not by definition of a type

 5    reasonably relied upon by experts in the particular field."

 6         That's United States vs. Tran Trong Cuong.  I'm not

 7    sure I'm pronouncing that last word correctly.  It's 18 F.3d

 8    1132 out of the Fourth Circuit in 1994.

 9              THE COURT:  Well, I'm going to let her go ahead

10    and make a record and I'll read that case that I've never

11    heard of before and decide whether to consider it or not.

12         Go ahead.

13              MS. SINGER:  Go ahead, Ms. Keller.

14              MS. WICHT:  Thank you, Your Honor.

15              THE WITNESS:  Prescribing high volumes of opioids

16    or certain drug types, prescribing disproportionally large

17    volume for specialty or geographic area, prescribing a

18    disproportionate volume of opioids relative to

19    non-controlled drugs, large variances or sharp increases in

20    opioid prescribing, prescribing drugs commonly abused with

21    opioids such as Alprazolam, Carisoprodol, Xanax, or Soma and

22    the high volume or proportion of prescriptions paid with

23    cash.

24    BY MS. SINGER:

25    Q.   All right.  We can take that slide down.
```

1          So, Ms. Keller, based on your review of the data and

2      the documents you reviewed, did you form an opinion as to

3      whether the available data identified certain healthcare

4      providers who could have been identified as outliers based

5      on their prescribing of opioids and the other factors you

6      just listed?

7      **A.**    Yes.

8      **Q.**    And before we turn to them, I also want to be clear

9      about the scope of your opinion.  Are you saying that these

10     healthcare providers were engaged in diversion or unlawful

11     prescribing?

12     **A.**    No.

13     **Q.**    What is your opinion then?

14     **A.**    That they were identifiable in the data, and that's my

15     opinion.

16     **Q.**    And did you identify the top prescribers of opioids in

17     Cabell County from 1997 to 2017?

18     **A.**    Yes, I did.

19     **Q.**    And did you prepare a slide to present this aspect of

20     your testimony?

21     **A.**    Yes, I have.

22              MS. SINGER:  May I publish that slide, please?

23              THE COURT:  Yes.

24     BY MS. SINGER:

25     **Q.**    Slide 10 I believe.

1      Ms. Keller, does this slide identify your findings?

2    **A.**   Yes.

3    **Q.**   And what is it that's reflected on this slide?

4    **A.**   These are the 10 highest opioid prescribers overall for

5    the entire time period of 1997 through 2017 in the IQVIA

6    Xponent data.

7      Among those, we can look at Dr. Deleno Webb.  I'm not

8    quite sure of the proper pronunciation.  But if you could

9    enlarge that, his specialty is in pain medicine.  His total

10   prescriptions were 128,805.  And he prescribed a total of

11   14,431,799 dosage units.

12     Also, he was the top prescriber in terms of dosage

13   units, the third largest prescriber in terms of -- number of

14   prescriptions, and the largest prescriber in the county in

15   terms of MMEs, so the relative strength of the drugs that

16   he, that he prescribed.

17   **Q.**   And were there any other doctors whose prescribing

18   stood out in your review of this data?

19   **A.**   Yes, there are.  We can look at Dr. Fisher who's number

20   2.

21     Dr. Fisher is classified in the IQVIA data as a

22   physical and occupational rehabilitation specialty.  His

23   last year of prescribing, I would like to point out, is 2012

24   even though the dataset goes until 2017 which is notable to

25   point out because he's still the second highest prescriber

1    in terms of total dosage units -- I'm sorry -- in terms of

2    total MMEs, but his prescribing practices are only for a

3    portion of the data period.  And he prescribed 10 million

4    dosage units and 268 million MMEs.

5    **Q.**    And did you identify a number of prescribers in Cabell

6    County in your analysis who prescribed more than 10 million

7    dosage units of opioids over the time period?

8    **A.**    Yes.

9    **Q.**    And which prescribers were those?

10   **A.**    There are several.  I don't know that I can recall all

11   of their names.  But in this chart here we've got David --

12   Philip Fisher, Deleno Webb, David Caraway, and Anita Dawson,

13   I believe, if I am following that properly.

14   **Q.**    Okay.  And, Ms. Keller, in the course of your analysis

15   did you also identify the top one percent of prescribers --

16   **A.**    Yes.

17   **Q.**    -- in Cabell County?

18   **A.**    Yes, I did.

19   **Q.**    And do you have a slide that presents those findings?

20   **A.**    Yes, I do.

21           MS. SINGER:  Your Honor, may we turn to slide 11,

22   please?

23   BY MS. SINGER:

24   **Q.**    All right.  Ms. Keller, does this slide represent

25   the top one percent of prescribers in Cabell County?

1    **A.**   This is a portion of those prescribers.  There's 24

2    total top one percent prescribers, but these are -- they

3    exemplify prescribers in my report.  Again --

4    **Q.**   Go ahead.

5    **A.**   Again, at the top of the list is Dr. Webb.  The same

6    totals are here.  We also have some included national ranks

7    in the data.  So -- sorry.  His national rank for dosage

8    units prescribed is 278 nationwide.  He's seventh largest in

9    the State of West Virginia.

10        And, remember, that's out of 1.7 million prescribers

11   nationwide and about 10,000 prescribers in the State of West

12   Virginia.

13        And as far as MMEs, he's 108th nationwide and first in

14   the state for MMEs.  So that's for the strength of the drugs

15   that he's prescribing.

16   **Q.**   And, so, what does it mean that a doctor has a higher

17   ranking in terms of MMEs than dosage units?  What does that

18   tell you about the doctor's prescribing?

19   **A.**   That they're stronger prescriptions.  So if you are

20   prescribing all hydrocodone products, those rankings -- and

21   if everybody was prescribing hydrocodone products, those

22   rankings would be equal.  But if he was prescribing let's

23   say fentanyl or oxymorphone, drugs that are stronger, then

24   those rankings would differ because the MMEs would be

25   stronger.

1   **Q.**   Okay.  And do you see other prescribers who overlap

2   with the chart you showed a minute ago --

3   **A.**   Yes.

4   **Q.**   -- other than Dr. Webb?  Who else would you call out?

5   **A.**   Dr. Fisher, Anita Dawson, among others.

6   **Q.**   And do both of these charts we just looked at,

7   Ms. Keller, accurately reflect your findings from your

8   analysis of the data sources that you reviewed for your

9   report?

10  **A.**   Yes.

11  **Q.**   And do you notice in your review of the data the

12  difference between the very top prescribers, let's say the

13  number one prescriber in the data, and the tenth prescriber

14  in the top one percent?

15  **A.**   Yes.  Even among this list of prescribers, some -- the

16  prescribers -- so even among the outliers, there are

17  outliers I should say.

18       So with Deleno Webb, he has prescribed 14 million

19  dosage units.  At the bottom of the list is John Tiano, for

20  example, 1.9 million dosage units that he prescribed.

21       So there's a large variance even within the list of top

22  one percent prescribers.

23  **Q.**   Now, did you do a similar analysis of the Drug Emporium

24  data?

25  **A.**   Yes, I did.

1    **Q.**   And did you prepare slides to reflect that analysis?

2    **A.**   Yes, I did.

3              MS. SINGER:  Your Honor, may we publish that

4    slide?

5              THE COURT:  Yes.

6    BY MS. SINGER:

7    **Q.**   All right.  And does this slide 12, Ms. Keller,

8    reflect your analysis of the highest Drug Emporium

9    prescribers by volume?

10   **A.**   It's actually by volume of the proportion of opioid

11   prescriptions based off of the prescriptions themselves.

12        So, again, at the top of the list you'll see Deleno

13   Webb.  86.7 percent of the prescriptions that he wrote, so

14   this includes controls and non-controlled substances that

15   were filled at Drug Emporium for opioids.  70 percent of the

16   dosage units were also for opioids.

17   **Q.**   And is it fair to say that some of the doctors in that

18   Drug Emporium data are different than the doctors that show

19   up when you analyze the IQVIA or Xponent data?

20   **A.**   Yes.

21   **Q.**   And why is that?

22   **A.**   This is for a particular store.  The IQVIA Xponent data

23   is a nationwide survey or -- well, it's a survey but also a

24   census of the dispensing data.  So the IQVIA data

25   encapsulates more locations.  This is one specific location.

1    So there will be some differences.

2    **Q.**   Now, once you identified certain providers who were

3    outliers based on your review of the data, did you consult

4    any publicly available documents or sources about those

5    prescribers?

6    **A.**   Yes, I did.

7    **Q.**   And is it a common practice in data analytics to

8    consult other publicly available materials?

9    **A.**   Yes.

10   **Q.**   What kind of sources did you consult in this case?

11   **A.**   I reviewed their licenses on-line as well as any other

12   potential information that I found through on-line research

13   such as news articles mentioning their disciplinary actions

14   regarding them.

15   **Q.**   Did you conduct that kind of analysis of Dr. Webb?

16   **A.**   I did.

17   **Q.**   And did you form any opinions with respect to Dr. Webb?

18   **A.**   I did.

19   **Q.**   Did you prepare slides to present those opinions?

20   **A.**   I did.

21           MS. SINGER:  Your Honor, may I publish slide 14?

22           THE COURT:  Yes.

23   BY MS. SINGER:

24   **Q.**   I'm sorry, 13.  All right.  Can you describe what

25   you concluded about Deleno Webb, Ms. Keller?

1    **A.**    So according to his license, he's listed as a

2    psychiatrist and a pain medicine specialist.  The West

3    Virginia Workman's Compensation Board banned Dr. Webb in

4    2005 from receiving payment for treating injured workers

5    based on the claims that he was prescribing Oxycontin

6    without conducting physical examinations.  And he was the

7    leading prescriber of Oxycontin in the state.  That all came

8    from the West Virginia Workman's Compensation Board.

9          As far as my analysis, he was the top opioid prescriber

10   in both the Xponent and Drug Emporium data.  He voluntarily

11   surrendered his license in 2017 following an investigation

12   that he commonly treated patients with excessive doses of

13   opioids and benzodiazepines.

14              THE COURT:  Ms. Wicht.

15              MS. WICHT:  Sure.  I think Mr. Mahady stood up

16   first, but I'm happy to start, Your Honor.

17        I object to the -- we object to this testimony.  This

18   is not expert opinion testimony.  It's simply narrative,

19   reading of facts into the record that the Court has

20   prohibited experts from doing in this case.

21              MR. MAHADY:  Your Honor, my objection is similar.

22   I appreciate the desire to move this forward, but the

23   witness is just reading what is being put on the

24   demonstratives.  My understanding is that these were used to

25   aid her testimony, but not be her testimony.

```
 1              MR. SCHMIDT:  We join in that objection, Your

 2    Honor.  The witness literally sat there and read almost word

 3    for word what's on slides.  It's leading through the

 4    documents, through not actual real documents, but

 5    lawyer-prepared demonstratives.

 6              MS. SINGER:  That is inaccurate, Your Honor.

 7    Ms. Keller has consistently testified that these are her

 8    slides that she prepared.  In addition, these reflect her

 9    findings based on the documents that she has testified that

10    she reviewed.

11              THE COURT:  Overruled.  I'll allow it.

12    BY MS. SINGER:

13    Q.   And, Ms. Keller, I do want to show you some of the

14    documents that you've relied on in reaching these

15    conclusions.  I'd like to show P-44192.

16              MS. SINGER:  Your Honor, may I approach?

17              THE COURT:  Yes.

18    BY MS. SINGER:

19    Q.   Ms. Keller, is P-44192 one of the documents you

20    relied on in forming your conclusions about Dr. Webb?

21    A.   Yes.

22    Q.   And what is P-44192 or why did you rely on that

23    document?

24    A.   This is an article within the production that discusses

25    -- or this is a document within the production that
```

1   discusses the article reflecting the West Virginia

2   Compensation Commission's banning of Dr. Webb from receiving

3   payments.

4           MS. WICHT:  Your Honor, I'm sorry to object again,

5   but I object to the use of this document.  This is a

6   document that was produced by Purdue, not by any defendant

7   who's in the courtroom today.

8       All it is is an email forwarding, apparently, I guess

9   what appears to be a news article.  There's no source that I

10  can identify for it.  I understand experts are permitted to

11  rely on hearsay, but we have authenticity.  We have hearsay

12  concerns about this document.  I don't think it's

13  sufficiently reliable.

14          THE COURT:  I'm going to sustain the objection to

15  this one, Ms. Singer.

16          MS. SINGER:  All right.  We'll move on, Your

17  Honor.

18          THE COURT:  By this one I'm referring to 44192.

19          MR. SCHMIDT:  And, Your Honor, we would simply

20  note for the record that the testimony the witness gave from

21  the slide currently before the Court, slide 13, plaintiffs'

22  demonstrative 236, the second bullet appears to be based

23  entirely on -- appears to be based on this document.

24          THE COURT:  Well, there's another document coming

25  down the track here that might solve that problem.

```
 1              MS. SINGER:  I hope so, Your Honor.  And I also do

 2    want to confirm, but I believe that this Purdue document was

 3    subject to an authenticity stipulation with Purdue.  And the

 4    point of using it is to demonstrate the information that

 5    would have been available to defendants.

 6              MR. MAHADY:  Purdue is not in this case.  I don't

 7    know what their authenticity stipulation has in effect here.

 8              MR. ACKERMAN:  Your Honor, we provided -- I know

 9    I'm not allowed to talk, but I'm the one who did it so I

10    have to do it on this one.  I apologize.

11         We provided defendants with the Purdue stipulations

12    before the trial.

13              MS. WICHT:  An internal Purdue document could

14    never provide notice to these defendants, Your Honor.

15              MS. SINGER:  It's a news article.

16              THE COURT:  Well, --

17              MS. SINGER:  Excuse me, Your Honor.

18              THE COURT:  What are we -- I'm not even sure what

19    document is on the plate here.

20              MS. SINGER:  So we have been discussing P-44192

21    which is a news article.

22              THE COURT:  Well, I've already ruled it out.

23              MS. SINGER:  We'll move to the next one, Your

24    Honor.  May I approach with P-42370?

25              THE COURT:  Yes.
```

```
1    BY MS. SINGER:

2    Q.   And, Ms. Keller, do you recognize P-4 -- excuse

3    me -- P-42370?

4    A.   Yes.

5    Q.   And what do you recognize that document to be?

6    A.   This is the Consent Order with the West Virginia Board

7    of Medicine concerning Dr. Webb.

8    Q.   And is this a document that you relied on in forming

9    your opinion?

10   A.   Yes.

11   Q.   And why did you rely on this document?

12   A.   There are a number of findings of fact in this document

13   on Pages 1, 2, and 3 that I found relevant which I don't

14   know that I need to read them out loud, but those three

15   pages I found relevant.

16   Q.   And, in general, what does this document reflect about

17   Dr. Webb's prescribing?

18   A.   For example, on Page 20 that his medical records failed

19   to justify courses of treatment.  I think there's mention of

20   his prescribing practices and the like.

21   Q.   And was this document found in your search of publicly

22   available information?

23   A.   Yes.

24            THE COURT:  The one I have doesn't have a Page 20,

25   Ms. Singer.
```

```
 1              MS. SINGER:  That may be a copying problem, Your

 2     Honor.

 3              THE COURT:  I'm confused.  Mine only goes to Page

 4     11.

 5              MS. SINGER:  Page 11.

 6     BY MS. SINGER:

 7     Q.  Ms. Keller, were you referring to Paragraph 20 or

 8     Page 20?

 9     A.  I am sorry for misspeaking.  Paragraph 20.  I'm sorry,

10     Your Honor.

11              MS. SINGER:  No mystery nine pages, apologies,

12     Your Honor.

13     BY MS. SINGER:

14     Q.  All right.  Now, based on your Xponent -- your

15     analysis of the Xponent data, did you form an opinion as

16     to how the number of opioid prescriptions written by Dr.

17     Webb compared to those of other prescribers in Cabell

18     County?

19     A.  I did.

20     Q.  And based on your review of the Xponent data, how did

21     Dr. Webb's prescribing history change over time?

22     A.  His prescribing history -- he -- his prescriptions

23     increased over time.  And then -- it actually would be much

24     more helpful if I had my report in front of me so I can

25     consult it if that would be allowed.
```

1    **Q.**   Yes.  Or did you prepare a slide that reflected your

2    findings with regard to his prescribing over time?

3    **A.**   That would be very helpful.

4    **Q.**   All right.

5    **A.**   And I did prepare that.

6              MS. SINGER:  Your Honor, may we publish that

7    slide?

8              THE COURT:  Yes.

9    BY MS. SINGER:

10   **Q.**   All right.  Ms. Keller, does slide 14 reflect your

11   findings with respect to the volume of Dr. Webb's

12   prescribing?

13             MR. SCHMIDT:  If we're refreshing recollection,

14   we'd ask that it be handled as refreshing.  It has been for

15   every other witness.  I think this is again leading.

16             THE COURT:  Well, are you refreshing recollection?

17   You're not, are you?

18             MS. SINGER:  No, Your Honor.  This is a slide that

19   Ms. Keller prepared.

20             THE COURT:  Overruled.  Go ahead.

21             THE WITNESS:  Dr. Webb was one of the top five

22   prescribers in Cabell County every year between 1998 and

23   2016.

24        Between 1997 and 2017 he prescribed 10 million dosage

25   units of oxycodone alone.  That made him first in the State

1    of West Virginia in terms of prescribed dosage units of that

2    drug.

3        He prescribed four times the volume of opioids, not

4    just oxycodone.  I think I've missed a tab -- tabbed that

5    in.  It should just be four times the volume of opioids

6    prescribed on average compared to other pain management

7    specialists in the state and nation.

8        By 2011 Webb was prescribing 1.1 million dosage units.

9    To put that in perspective, that's the equivalent of

10   prescribing more than 130 pills for every hour of every day.

11   And that's without sleeping, without eating, doing nothing

12   but prescribing.

13       Over 30 percent of the pills that he prescribed were

14   for oxycodone 30 milligrams.  And 70 percent of the --

15   70.6 percent of the prescription opioid dosage units written

16   by Webb that were filled at the Drug Emporium Barboursville

17   store were for opioids.

18   BY MS. SINGER:

19   Q.   And, Ms. Keller, did you also prepare a slide that

20   demonstrates visually Mr. -- Dr. Webb's prescribing

21   compared to other doctors in his specialty?

22   A.   Yes.

23   Q.   And would that slide assist your testimony?

24   A.   Yes.

25            MS. SINGER:  Your Honor, may we publish those

1    slides?

2    BY MS. SINGER:

3    **Q.**   So, Ms. Keller, turning you to slide 15, is this a

4    slide you prepared?

5    **A.**   It was.

6    **Q.**   And what does this slide demonstrate?

7    **A.**   This is a chart from my report that shows the

8    prescribing history of Dr. Webb shown in green as compared

9    to the other specialty -- other prescribers of his

10   specialty.

11        The state and the nation are there at the bottom.

12   They're in blue and red.  It's somewhat difficult to see,

13   but the next slide you'll see for a different specialty

14   would be easier.

15        So on the left you can see this is the prescribed

16   dosage units.  So in some months it's upwards of 120,000

17   dosage units.  And this is the monthly prescribing.  The

18   totals that I provided to you earlier were the annual

19   prescribing totals.  And I have another slide that I would

20   like --

21   **Q.**   Before we move to that, how does Dr. Webb's prescribing

22   compare to other doctors in his specialty as a psychiatrist?

23   **A.**   It is far greater.  I know I spoke earlier to pain

24   management specialists, but I don't recall exactly what it

25   is for psychiatry, the comparison.  But, I mean, in some

1    months it looks like psychiatry is well under 20,000 dosage

2    units.  It's the next line and it's near the bottom.

3        So it must be several times greater given that his

4    prescribed dosage units in certain months were over -- or

5    approximately 120,000 dosage units in a given month compared

6    to the total there.

7    **Q.**   And was Dr. Webb, based on your analysis, a

8    psychiatrist?

9    **A.**   He lists -- the Board of Medicine lists him with two

10   specialties, psychiatry and pain management.

11   **Q.**   All right.  And you mentioned that you also prepared a

12   slide with respect to his prescribing compared to other pain

13   specialists; is that right?

14   **A.**   I did.

15           MS. SINGER:  May we publish that slide, Your

16   Honor?

17           THE COURT:  Yes.

18   BY MS. SINGER:

19   **Q.**   All right.  And, Ms. Keller, how does Dr. Webb's

20   prescribing compare to other pain management

21   documents -- doctors based on your analysis?

22   **A.**   Again, he's well above -- and I think I, I spoke too

23   early, or four times the average pain management specialist

24   nationwide.

25       Here you can see the pain medicine prescribing in

1    states shown in red; the average pain medicine

2    prescribing -- monthly prescribing nationwide shown in blue.

3         So on the other slide, those were basically zero

4    values.  Here they are higher because this is a more -- a

5    higher prescribing specialty generally in the data.

6         In 2003 -- now, this is monthly data.  But just for

7    refreshing recollection, the, the 2003 -- in 2003 he's

8    nearly -- prescribing nearly one million dosage units.  And

9    in the period of 2010 through 2012, he's prescribing over

10   one million dosage units.

11        And this is the monthly volume here shown.  So you can

12   see that that hovers around 80 to 120,000 dosage units in a

13   given year -- or a given month.  I'm sorry.

14   **Q.**   And based on your analysis of Dr. Webb's prescribing as

15   both a psychiatrist and a pain management doctor, is his

16   prescribing an outlier as you've defined it?

17   **A.**   Yes.

18   **Q.**   Did -- could defendants have presented or observed all

19   of this information about Deleno Webb's prescribing from

20   data and sources available to them?

21   **A.**   Yes.

22   **Q.**   Now, did you form any opinions with respect to other

23   prescribers in Cabell County?

24   **A.**   Yes.

25   **Q.**   And did you prepare slides that summarize your findings

```
 1    about those prescribers?

 2    A.   Yes.

 3    Q.   Would those slides assist your testimony?

 4    A.   Yes.

 5              MS. SINGER:  And, Your Honor, may we publish those

 6    very quickly?

 7              THE COURT:  Yes.

 8    BY MS. SINGER:

 9    Q.   Ms. Keller, who is the -- who is the -- let's go

10    ahead and skip, please, to the next slide.

11         Who is the next prescriber who you profiled?

12    A.   This is Dr. Philip Fisher.  He was a licensed doctor of

13    osteopathic medicine until 2011 when his license was

14    suspended.

15         He was the subject of a number of board actions

16    relating to his prescribing practices.  And those board

17    investigations found that he was -- his prescribing

18    practices were relating to the deaths of at least seven

19    patients.

20         They found that Dr. Fisher continued to prescribe

21    opioids to another physician despite being aware that that

22    other physician was seeking the pain medication from several

23    other practitioners.

24              MS. WICHT:  Your Honor, I'll just renew the

25    objection -- I'm sorry.
```

```
 1                THE COURT:  Go ahead.

 2                MS. WICHT:  I'll just renew the objection to

 3     leading by demonstrative of the witness reading the slides

 4     into the record.

 5                MR. SCHMIDT:  May we just have a running objection

 6     on that basis, Your Honor?

 7                THE COURT:  Yes, you may.

 8                MR. SCHMIDT:  Thank you.

 9                THE COURT:  Go ahead, please.  Overruled.

10     BY MS. SINGER:

11     Q.   Ms. Keller, were there documents that you relied on

12     in reaching your conclusions with respect to Dr. Fisher?

13     A.   Yes.

14                MS. SINGER:  And can we show P-42367, please?

15          Your Honor, may I approach?

16                THE COURT:  Yes.

17     BY MS. SINGER:

18     Q.   Ms. Keller, do you recognize this document?

19     A.   Yes.

20     Q.   And is this a document you relied on in preparing your

21     report and your conclusions with respect to Dr. Fisher?

22     A.   Yes.

23     Q.   And what did you draw from -- what is this document?

24     A.   This is the disciplinary document on -- and Statement

25     of Charges regarding Dr. Fisher by the West Virginia Board
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    of Osteopathy.

2    **Q.**   And what generally was the nature of the, of the

3    conduct in which Dr. Fisher was found to engage?

4    **A.**   Count One was pre-signed prescription forms.  Count Two

5    was improper delegation of duties, so specifically

6    authorizing prescription refills for patients; improper

7    delegation of duties as well for several counts; failure to

8    document the course of treatment for a number of counts.

9    **Q.**   And all of this relates to his prescribing of opioids?

10   **A.**   Yes.

11   **Q.**   Okay.  And, Ms. Keller, from your review of the

12   available data and publicly available sources, were you able

13   to determine what Philip Fisher's specialty was?

14   **A.**   Yes.

15   **Q.**   And did you analyze how his prescribing compared to

16   others in his specialty?

17   **A.**   I did.

18   **Q.**   And did you prepare slides to reflect those

19   conclusions?

20   **A.**   I did.

21          MS. SINGER:  May we publish, Your Honor?

22   BY MS. SINGER:

23   **Q.**   And, Ms. Keller, is this the slide that you

24   prepared?

25   **A.**   Yes.

1   **Q.**   And would you describe Dr. Fisher as an outlier

2   compared to other prescribers in his specialty?

3   **A.**   Yes.

4   **Q.**   And would that information have been evident to

5   defendants based on data available to them?

6   **A.**   Yes.

7   **Q.**   All right.  Let's turn -- is there any other doctor

8   that you profiled in preparing your report?

9   **A.**   Yes.

10   **Q.**   And can you identify that prescriber?

11   **A.**   Dr. Chaney.

12   **Q.**   Excuse me?

13   **A.**   Dr. Chaney.

14   **Q.**   And did you prepare slides with respect to your

15   findings with regard to Dr. Chaney?

16   **A.**   Yes.

17   **Q.**   What kind of doctor is Dr. Chaney?

18   **A.**   Internal medicine specialist.

19   **Q.**   And where did he rank among the top prescribers in

20   Cabell County?

21   **A.**   I can't recall sitting here, but I do have a slide that

22   would assist me.

23   **Q.**   All right.  Can we turn to that slide?  Or just tell

24   us, Ms. Keller, if you recall, was he among the top

25   prescribers without giving a specific number?

1    **A.**    Yes.

2    **Q.**    And in forming your opinions concerning Dr. Chaney, did

3    you rely on information from the public record?

4    **A.**    Yes.

5              MS. SINGER:  And can we show P-43538 and P-43539,

6    please?

7         May I approach, Your Honor?

8              THE COURT:  Yes.

9    BY MS. SINGER:

10   **Q.**    And, Ms. Keller, do you recognize these documents?

11   **A.**    Yes.

12   **Q.**    Are these documents that you relied on in forming your

13   opinion with respect to Dr. Chaney?

14   **A.**    Yes.

15   **Q.**    And what are they?  What are these documents?

16   **A.**    One is a Consent Order with the West Virginia Board of

17   Medicine.  And the other is an order summarizing the

18   suspension of his license to practice medicine and surgery

19   by the West Virginia Board of Medicine.

20   **Q.**    And do those documents relate specifically to his

21   prescribing of opioids?

22   **A.**    Yes.

23   **Q.**    And did you prepare slides that summarize your

24   conclusions with respect to Dr. Chaney?

25   **A.**    Yes.

```
 1              MS. SINGER:  May I publish those, Your Honor?
 2              THE COURT:  Yes.
 3   BY MS. SINGER:
 4   Q.   And, Ms. Keller, what did you find in assessing
 5   Dr. Chaney's prescribing?
 6   A.   He was a leading prescriber of opioids in his specialty
 7   from 2012 through 2015.  He was among the top prescribers of
 8   opioids in Cabell County across all specialties from 2012 to
 9   2015.  And he was prescribing 25 times more than the average
10   general practitioner by 2015.
11   Q.   And did you prepare a slide that compared Dr. Chaney's
12   volume to others within his specialty?
13   A.   Yes.
14              MS. SINGER:  Your Honor, may we publish that
15   slide?
16              THE COURT:  Yes.
17   BY MS. SINGER:
18   Q.   And, Ms. Keller, does that reflect your analysis of
19   Dr. Chaney's prescribing of opioids compared to other,
20   other family and general practitioners?
21   A.   Yes.
22   Q.   And would you characterize Dr. Chaney as an outlier
23   based on your assessment of his prescribing?
24   A.   Yes.
25   Q.   Now, you've -- you can take that one down.  You've
```

```
1    described three doctors today, all of whom were subject to

2    professional discipline for their prescribing of opioids; is

3    that right?

4    A.   Yes.

5    Q.   Were there others in the top one percent of Cabell

6    County prescribers who were disciplined for their

7    prescribing of opioids?

8    A.   Yes, there were.

9    Q.   Can you identify any of those doctors?

10   A.   One that comes to mind is Dr. Anita Dawson.

11   Q.   Were there other doctors in the top one percent of

12   Cabell County prescribers who weren't disciplined for their

13   prescribing of opioids?

14   A.   Yes, there were.

15   Q.   And did you identify all of those doctors in your

16   report as well?

17   A.   I identified some in my report, one of which would be

18   Dr. Dawn MacFarland.  She was not disciplined but was among

19   the top one percent of prescribers.

20   Q.   And had the distributors investigated the opioid

21   prescribing of the top one percent of doctors, could they

22   have identified those who were later subject to discipline

23   based on your analysis?

24         MS. WICHT:  Objection, foundation, calls for

25   speculation.
```

```
 1              MR. MAHADY:  Same objection, Your Honor.

 2              THE COURT:  How does she -- show how she knows

 3      this, Ms. Singer.

 4      BY MS. SINGER:

 5      Q.   Based on your review of the data, Ms. Keller, would

 6      the prescribing of those prescribers who were subject to

 7      discipline stood out as outliers in the data you

 8      reviewed?

 9      A.   Yes.

10              MS. SINGER:  May I consult for one moment, Your

11      Honor?

12              THE COURT:  Yes.  And this might be a good time to

13      break until 2:00 as soon as you finish your conference.

14          (Pause)

15              MS. SINGER:  All right, Your Honor, I have just

16      two last questions to clean up and then I will have

17      concluded my exam.

18              THE COURT:  Are you done after you ask her those

19      questions?

20              MS. SINGER:  I am.

21              THE COURT:  Okay.  Let's go.

22      BY MS. SINGER:

23      Q.   Ms. Keller, first, one cleanup item.  I believe I

24      asked you -- I know I asked you earlier about, about

25      whether you observed that defendants had access to
```

1    prescribing and dispensing data.  Do you remember those

2    questions?

3    **A.**    Yes.

4    **Q.**    And did I ask you whether you're aware that

5    AmerisourceBergen had access to dispensing data from some of

6    its pharmacy customers?

7    **A.**    Yes.

8    **Q.**    And is that -- did you conclude that AmerisourceBergen

9    had dispensing data from some of its customers?

10    **A.**    It did.

11    **Q.**    And do you recall which customer?

12    **A.**    Walgreens.  So AmerisourceBergen would receive

13    prescribing data as well as -- and questionnaire data from

14    its Walgreens customers for all stores and -- on a periodic

15    basis in an Excel format.

16    **Q.**    And you testified a minute ago about Dr. Dawson.

17    **A.**    Yes.

18    **Q.**    Are you aware that Dr. Dawson was disciplined and

19    ultimately convicted for her prescribing of opioids?

20    **A.**    Yes.

21              MS. SINGER:  I have nothing further, Your Honor.

22              THE COURT:  All right.  That concludes your direct

23    exam?

24              MS. SINGER:  It does.

25              THE COURT:  All right, Ms. Keller, we're going to

```
 1    need you back here at 2:00 and we'll be in recess until

 2    then.

 3          (Recess taken at 12:03 p.m.)

 4              THE COURT:  Are you going to go first, Ms. Wicht?

 5              MS. WICHT:  I am, Your Honor.

 6              THE COURT:  You may proceed.

 7              MS. WICHT:  Thank you.
```

**CROSS EXAMINATION**

**BY MS. WICHT:**

```
10    Q.   Good afternoon, Ms. Keller.

11    A.   Good afternoon, Ms. Wicht.

12    Q.   My name is Jennifer Wicht and I represent Cardinal

13    Health.  And it's nice to meet you.  You and I haven't met

14    before.  And I will be going first to ask you some questions

15    this afternoon.

16    A.   Great.

17    Q.   Okay.  Ms. Keller, I assume that you have heard of the

18    Controlled Substances Act, correct?

19    A.   Yes.

20    Q.   But you're not an expert on the Controlled Substances

21    Act, right?

22    A.   Correct.

23    Q.   Or on the regulations that implement it, correct?

24    A.   Correct.

25    Q.   And you're not an expert regarding what reporting DEA
```

1    requires from wholesale distributors, correct?

2    **A.**    Yes.

3    **Q.**    And you're not an expert on what makes an order

4    reportable to DEA as a suspicious order, correct?

5    **A.**    Yes.  In other matters, I've implemented compliance

6    metrics that may -- that were -- defendants own, but I'm not

7    offering that opinion here.

8    **Q.**    Okay.  And you don't -- your expertise is in data

9    analytics, correct?

10   **A.**    Correct.

11   **Q.**    And you're not an expert in the design of Suspicious

12   Order Monitoring Programs, correct?

13   **A.**    Yes.  I cannot -- I am not an expert in designing them,

14   but I have implemented metrics in other matters, but I am

15   not offering that opinion here.

16   **Q.**    And that is you are not an expert in how a Suspicious

17   Order Monitoring System should be designed in order to

18   comply with DEA rules and regulations, right?

19   **A.**    Correct.

20   **Q.**    Likewise, you're not an expert in evaluating the

21   adequacy of any due diligence that was done by distributors,

22   correct?

23   **A.**    Correct.

24   **Q.**    And it's also outside your expertise to offer an

25   opinion on the appropriateness of a distributor's conduct

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    based on the pharmacies to which it distributed or the

2    doctors whose prescriptions those pharmacies filled,

3    correct?

4    **A.**    Correct.

5    **Q.**    You testified today generally about information that

6    you believe the defendants could have discovered if they had

7    IQVIA's Xponent database, correct?

8    **A.**    Yes, as well as the dispensing data.

9    **Q.**    So, I want to start by briefly breaking down what the

10   IQVIA Xponent database is.  Xponent is a database that's

11   compiled, maintained and sold by a company called IQVIA,

12   right?

13   **A.**    Yes.

14   **Q.**    And IQVIA is a healthcare information company that was

15   formerly known by some other names like IMS Health and

16   Quintiles, right?

17   **A.**    Right.

18   **Q.**    And the Xponent database, in particular, contains data

19   on the prescribing history of doctors, right?

20   **A.**    Yes.

21   **Q.**    Now, one of the limitations of the Xponent database is

22   that it does not contain data on the pharmacies that filled

23   the prescriptions written by those doctors, correct?

24   **A.**    The Xponent database does not have that information in

25   it, but I understand that IQVIA does collect that and sell

1   that in other products.

2   **Q.**   But it's not in the Xponent database that you analyzed

3   for this case, correct?

4   **A.**   Correct.

5   **Q.**   And another limitation of the Xponent data is that it's

6   based on a sample of data, not comprehensive data, correct?

7   **A.**   The IQVIA data is actually based off of 93 percent of

8   prescriptions that are written in the country.

9   **Q.**   So, it creates -- it was created -- the Xponent

10   database is created using what IQVIA calls a representative

11   sample of retail mail service and long-term care pharmacies,

12   correct?

13   **A.**   Yes.  They state that and it's currently at 93 percent

14   of those -- those outlets.

15   **Q.**   And that figure was as of 2017, correct?

16   **A.**   Correct.

17   **Q.**   IQVIA included data from 93 percent of retail pharmacy

18   distributions, 72 percent of mail order pharmacy

19   distributions, and 78 percent of long-term care pharmacy

20   distributions, correct?

21   **A.**   Yes.

22   **Q.**   Now, the Xponent database also doesn't include data

23   from hospital pharmacies, clinic pharmacies or Veterans

24   Administration long-term care or mail order pharmacies,

25   correct?

1    **A.**    That is my understanding.

2    **Q.**    And the particular copy of the Xponent database that

3    you worked with in this case had been purchased from IQVIA

4    by a company called Allergan and then produced by Allergan

5    in this litigation, right?

6    **A.**    In the Track 1 litigation, yes.

7    **Q.**    In the MDL litigation?

8    **A.**    Yes.

9    **Q.**    Okay.  And you understand that Allergan is a drug

10   manufacturer, right?

11   **A.**    I do.

12   **Q.**    And Allergan is a defendant in this case, the one that

13   we're all here in court on, but that the plaintiffs agreed

14   to sever and try later, correct?

15   **A.**    I'm not privy to the details of that, but I do

16   understand that there are multiple tracks.

17   **Q.**    Okay.  And you know that Allergan is not a defendant in

18   this particular trial that we're having right now, right?

19   **A.**    Correct.

20   **Q.**    Now, you also understand that IQVIA markets the Xponent

21   data for sale to manufacturers as something that they can

22   use to increase pharmaceutical sales by targeting certain

23   doctors, right?

24   **A.**    Generally, yes, I understand that it is used for sales,

25   as well as the compensation of its sales representatives.

1    **Q.**   And that's something that many manufacturers actually

2    use the data for, right, for identifying prescribers for

3    their sales force to visit and for determining compensation

4    for their sales force, right?

5    **A.**   Yes.

6    **Q.**   And are you aware that before Allergan produced the

7    Xponent data in this litigation it asked IQVIA for

8    permission to produce that data?

9    **A.**   Yes.

10   **Q.**   And have you seen the letter that IQVIA sent back in

11   response?

12   **A.**   Yes.

13   **Q.**   Okay.  I'd like to take a look at that letter.  If you

14   could --

15          MS. WICHT:  It's Slide 1, please.

16          BY MS. WICHT:

17   **Q.**   I'll put it up on the screen for you.  And it's a

18   document, as you can see from the file stamp across the top,

19   that's been filed with the Court in this case.  So, it's a

20   publicly available document on the docket.  Okay --

21          THE COURT:  Just a minute.

22       Mr. Ackerman?

23          MR. ACKERMAN:  If I may, and this goes again to

24   the issue that we discussed this morning.  The parties'

25   stipulation, Docket 1029, says that documents that parties

1    intend to use on cross examination must be listed as an

2    exhibit or disclosed by 7:00 p.m. the evening before.

3    There's no -- this document, as far as I know, is not on the

4    exhibit list and was not disclosed by 7:00 p.m. the evening

5    before.

6              MS. WICHT:  Your Honor, I'm not using it as an

7    exhibit.  I'm not seeking to move it into evidence.  It's a

8    publicly available document that's been filed, actually, on

9    the docket in this case and I'm just using it as a basis to

10   question.

11             MR. ACKERMAN:  The stipulation, Your Honor, is

12   clear.  It says the parties must include on their exhibit

13   lists all exhibits they intend to use on cross examination.

14   Doesn't say exhibits they intend to admit on cross

15   examination.  We're entitled to some notice, even if it's

16   the entirety of their exhibit list.

17             MS. WICHT:  Your Honor, it's a publicly available

18   document.  Ms. Keller testified this morning already about

19   numerous publicly available documents.  I am only using it

20   as a basis to ask her questions to see if she's aware of

21   what it says.

22             MR. ACKERMAN:  The documents we used this morning

23   were all on the exhibit list.  They all had --

24             THE COURT:  I'll sustain the objection, Ms. Wicht.

25             MS. WICHT:  Okay.

```
 1          You can take -- thank you.

 2          But is it appropriate to use it as a basis to question

 3     her, Your Honor?

 4               THE COURT:  How about that, Mr. Ackerman?

 5               MR. ACKERMAN:  I think they can question her, yes,

 6     but they can't show her the document or put it up on the

 7     screen.

 8               MS. WICHT:  Sure.  I'll proceed that way, Your

 9     Honor.  Thank you.

10               BY MS. WICHT:

11     Q.   Okay.  Ms. Keller, you said you've seen the letter that

12     IQVIA sent to Allergan when Allergan produced the data in

13     this litigation, correct?

14     A.   Right.

15     Q.   Okay.  And are you aware that IQVIA said that although

16     there is an inclination to view numerical data as fact, the

17     IQVIA information represents an estimate of measured

18     activity?  Do you recall that language?

19     A.   Yes.

20     Q.   Okay.  And that's consistent with your understanding,

21     as well?  The IQVIA data is estimations, correct?

22     A.   Right.

23     Q.   Okay.  And are you aware that IQVIA said that the IQVIA

24     information reflects projections, estimates, forecasts that

25     are the result of a combination of confidential and
```

```
1    proprietary technologies, statistical methodologies and a
2    significant number of sources?  Is that consistent with your
3    understanding of the Xponent database?
4    A.    I understand that the data is collected and purchased
5    from pharmacies.  IQVIA goes through a number of steps to
6    cleanse and standardize the data, all through a patented
7    process.  IQVIA actually holds two patents for this process.
8    Q.    And IQVIA says that the IQVIA information, although
9    appropriate for its intended purpose of supporting business
10   and marketing analyses in industries such as the
11   pharmaceutical industry, contains data that is susceptible
12   to error or variance and is not intended to be used as
13   direct evidence or to establish any fact.  Are you aware of
14   that about the IQVIA data?
15   A.    I don't remember reading that short of what was just
16   shown on the screen, which I'm supposed to not remember, so
17   --
18   Q.    Fair enough.  I assume, Ms. Keller, that you would have
19   no reason to disagree with how IQVIA describes limitations
20   of its own data; is that correct?
21   A.    I understand that the data is survey data.  Again, it
22   does cover 93 percent, but I do understand that it is survey
23   data.
24   Q.    And if IQVIA says that that data is not intended to be
25   used as direct evidence or to establish any fact, you
```

1    wouldn't have any basis to disagree with that; am I right?

2    **A.**    I think I would -- that's calling for an opinion that I

3    don't think I can offer.  I don't know how to offer what

4    might be considered evidence or -- or what would be

5    considered litigation.  So, I don't feel considerable with

6    making that.

7    **Q.**    Okay.  So, you have no opinion on that issue then?

8    **A.**    Right.

9    **Q.**    Okay.  Fair enough.  Okay.  The Xponent database that

10    you analyzed, Ms. Keller, didn't come from ABDC, or Cardinal

11    Health, or McKesson, correct?

12    **A.**    Correct.

13    **Q.**    And you don't know one way or the other whether any of

14    ABDC, Cardinal Health or McKesson purchased the Xponent

15    database, correct?

16    **A.**    I do have knowledge, yes.

17    **Q.**    You have knowledge -- well, is it your knowledge that

18    neither ABDC, Cardinal Health, nor McKesson actually

19    purchased the Xponent database in the normal course of

20    business?

21    **A.**    I do know that one defendant purchased the IQVIA

22    Xponent data.

23    **Q.**    Which defendant do you believe in this courtroom

24    purchased the IQVIA Xponent data?

25    **A.**    McKesson.

1    **Q.**   And when do you believe that happened?

2            MR. SCHMIDT:  And I don't believe this is

3    disclosed in her report, Your Honor.  In fact, she gave

4    contrary testimony at her deposition.

5            THE COURT:  Well, overruled.  I think it's more

6    subject for cross than --

7            MR. SCHMIDT:  We don't know what to cross on

8    because it's not in the report.

9            BY MS. WICHT:

10   **Q.**   Let me ask you a question again, Ms. Keller.  You don't

11   know one way or the other whether any ABDC, Cardinal Health

12   or McKesson purchased the Xponent database, correct?

13   **A.**   I do know, since filing my report, I have done

14   additional research since I was asked about it in

15   deposition.

16           MR. SCHMIDT:  And that's a new opinion then, Your

17   Honor.  We move to strike the testimony as undisclosed

18   opinion testimony.

19           THE COURT:  Well, how can I consider that?

20           MR. ACKERMAN:  It's not an opinion, Your Honor.

21   She's just testifying as to knowledge she has.  She's not

22   offering any opinion as to it.  It's not her --

23           THE COURT:  I'll overrule the objection.  Go

24   ahead.

25           MR. SCHMIDT:  Your Honor, can I just make a record

1    on this?

2              THE COURT:  Yes, please.

3              MR. SCHMIDT:  We asked her at the deposition, "You

4    don't know if -- as you sit here, is it your belief or

5    understanding that any of the case defendants in the

6    ordinary course of their business had IQVIA Xponent data

7    specifically," and she said, "I don't know one way or the

8    other specifically.  I only know that it was" -- and she

9    goes on to say, "I only know it was available for purchase."

10     There was no errata sheet served for her deposition.

11   There was no supplement.  It's not consistent with Rule 26

12   for the witness to reflect on sworn testimony she gave and

13   come in with a new answer without updating her report or her

14   reliance list.

15             THE COURT:  Well, if she subsequently obtained

16   personal knowledge about this, it seems to me like she can

17   testify about it.

18             MR. SCHMIDT:  There should be some disclosure,

19   Your Honor.  That's our objection.

20             THE COURT:  Well, I understand that.

21             MR. ACKERMAN:  Your Honor, I would just note an

22   objection to the -- I mean, that sounds like we're

23   definitely going to hear about that on cross, but I'm not

24   sure why it was all elicited in an objection.

25             MR. SCHMIDT:  I'm making my record, Your Honor.

```
1          May I ask that counsel identify what document she

2     purportedly is relying on so we can actually attempt to

3     cross examine her?

4               THE COURT:  Do you have that document?

5               MR. ACKERMAN:  I think that they have the witness

6     and can probably ask her.

7               THE COURT:  I'm going to overrule the objection

8     and let her -- let her answer.  And I'm sure it will be

9     pursued on cross.

10              BY MS. WICHT:

11    Q.   So, Ms. Keller --

12              THE COURT:  It seems to me if she has personal

13    knowledge now, she can testify about it, whether it's in her

14    report or not.

15              MR. SCHMIDT:  I don't think that's right if she's

16    purported to find something in our documents that we don't

17    know about that I literally can't cross examine her about in

18    terms of not even giving us the courtesy now in court by

19    identifying the document.  If we had the document now, at

20    least we could prepare for cross on it, instead of trying to

21    fish when the witness might not even know what the document

22    is.

23              THE COURT:  Is there a document?  We don't know

24    that there's a document yet, do we?

25              MR. ACKERMAN:  I'll see if I can find out, Your
```

```
 1    Honor, but standing here right now, I don't know, but I'll

 2    ask my colleagues and we'll try to find out.

 3              MR. MAJESTRO:  And, Your Honor, it seems to me the

 4    simple thing to do is for Ms. Wicht to ask what is the basis

 5    for your answer to the previous question and then we could

 6    all find out if there was a document or not.

 7              THE COURT:  Can you answer that question, ma'am?

 8              THE WITNESS:  Yes, Your Honor.

 9              THE COURT:  What is the basis?

10              THE WITNESS:  There is an internal document, I

11    think a series of purchase order agreements, between IQVIA

12    Xponent and McKesson that I'm recalling.

13              THE COURT:  When did you discover that?

14              THE WITNESS:  A few weeks ago in working on a

15    different matter.

16              MR. SCHMIDT:  So, that's our objection.  She's

17    preparing for another case, to give new opinions in another

18    case, and is now trying to bootstrap that into this case.

19    On that basis, that's an improper disclosure.

20         We don't have the -- we still don't know what these

21    purchase orders are.  We haven't had a chance to find them

22    in our million-document production set or examine her about

23    them.

24              THE COURT:  Well, I'm going to reverse my ruling

25    and sustain the objection.  You can move on, Ms. Wicht.
```

```
 1              MS. WICHT:  Okay.

 2              BY MS. WICHT:

 3   Q.   Okay.  Ms. Keller, the Court has heard about a lot of

 4   data already in this case, so I just want to summarize and

 5   make sure that we're clear on what Xponent data is.  It

 6   contains data on prescribing of opioids by doctors, correct,

 7   among other things, but it's prescribing data, correct?

 8   A.   Correct.

 9   Q.   And it doesn't contain data on which pharmacies fill

10   prescriptions written by any given doctor, correct?

11   A.   Again, IQVIA does collect this information, but it was

12   not in the dataset that I reviewed.

13   Q.   And I'm asking you specifically about the Xponent

14   database that you reviewed and that does not contain data on

15   which pharmacy filled any particular prescription, correct?

16   A.   I believe that's what I just said, but correct.

17   Q.   Ms. Keller, do you know who Joe Rannazzisi is?

18   A.   Yes.

19   Q.   And are you aware that he's the former Head of the

20   DEA's Office of Diversion Control over a ten-year period?

21   A.   I don't know exactly what years he was in charge of the

22   DEA, but I do -- or of Diversion Control, but I do know that

23   he generally held that position.

24   Q.   That that's his role?  Okay.  And are you aware that he

25   testified at this trial last week?
```

 1    **A.**    Yes.

 2    **Q.**    Are you aware that on questioning by plaintiffs Mr.

 3    Rannazzisi testified that DEA provided guidance to

 4    distributors that they were not required to look at what

 5    doctors were doing or to question doctors' prescribing

 6    habits?  Are you aware of that testimony?

 7             MR. ACKERMAN:  Objection, Your Honor.

 8    Mischaracterizes prior testimony.

 9             THE COURT:  Well, I don't remember.  I'll overrule

10    the objection.  You can go ahead.

11             BY MS. WICHT:

12    **Q.**    Are you aware of that testimony that Mr. Rannazzisi

13    gave, Ms. Keller?

14    **A.**    Could you say it back to me one more time?

15    **Q.**    Sure.  Are you aware that Mr. Rannazzisi testified that

16    DEA provided guidance to distributors that they were not

17    required to look at what doctors were doing or to question

18    doctors' prescribing habits?

19             MR. ACKERMAN:  That might be a slightly different

20    question, but it's the same objection, Your Honor, that it

21    mischaracterizes Mr. Rannazzisi's testimony.

22             THE COURT:  Well, I don't remember whether it does

23    or not.  I'm going to overrule your objection and let her go

24    ahead.

25             THE WITNESS:  I do not recall -- or I am not aware

1    of that testimony.

2              BY MR. WICHT:

3    **Q.**   Okay.  And if Mr. Rannazzisi said that, you don't have

4    any basis to disagree with him, correct?

5    **A.**   Again, I'm not aware of the testimony, so I couldn't

6    say one way or the other.

7    **Q.**   But if he said that, if you assume that he said that,

8    then you don't have any expertise to disagree with him on

9    that premise, correct?

10   **A.**   If I take that as an assumption, then that's what

11   you're asking me to believe.  So, yes, I have no way to

12   disagree or agree with that.

13   **Q.**   Okay.  Now, talking about the Xponent data, and I want

14   to be very clear about this.  You said this on direct.  You

15   are not here today offering the opinion that there was a

16   legal requirement for distributors to purchase the Xponent

17   data for use in their Suspicious Order Monitoring Systems,

18   correct?

19   **A.**   Correct.  That it was available for purchase as it was

20   a -- publicly available for purchase, but not that they

21   should have.

22   **Q.**   Okay.  And it would be outside of your expertise to say

23   whether IQVIA Xponent data is necessary to operate a legally

24   compliant Suspicious Order Monitoring System, correct?

25   **A.**   I'm not offering that opinion, no.

**Q.**   And it would be outside of your expertise to offer such an opinion, correct?

**A.**   Correct.

**Q.**   And, in fact, it would be outside your expertise to say even whether IQVIA Xponent data would serve a useful function in a Suspicious Order Monitoring System, correct?

**A.**   Again, yes.  I am not offering an opinion on what is a useful Suspicious Order Monitoring System, but that it would be informative.

**Q.**   You mentioned in your direct testimony a different database called CS Ratings; do you recall that?

**A.**   Yes, I do.

**Q.**   Okay.  And Ms. Singer showed you a document that is P-44176 that was about the CS Ratings database.  Do you recall that?  And I will give you a moment to find the document.

**A.**   Okay.

**Q.**   Now, the CS Ratings database was sold by a company called IMS, which was a predecessor to IQVIA, correct?

**A.**   Correct.

**Q.**   And for your work in this case, you only analyzed Xponent, correct, not any other IQVIA or IMS datasets?

**A.**   Correct.

**Q.**   And you haven't actually ever reviewed -- well, let me rephrase that.  At the time that you prepared your report

1    and gave your opinions in this case, you had never reviewed

2    the CS Ratings database, correct?

3    **A.**   I have had -- at the time of preparing my report, no, I

4    had not reviewed CS Ratings, but I do know that it is based

5    off of a number of datasets maintained by IQVIA, including

6    Xponent.

7    **Q.**   And at the time that you prepared your report, you

8    didn't know in what format the CS Ratings database was

9    presented, correct?

10   **A.**   I don't really recall.  I guess I could have assumed

11   that it would be a dashboard-type product given what it --

12   what statements that I had read in documents, but beyond

13   that, I did not have knowledge of CS Ratings.

14   **Q.**   Okay.  And do you recall being deposed in this case on

15   September 18th, 2020, Ms. Keller?

16   **A.**   Yes.

17   **Q.**   And you were under oath when you provided that

18   deposition testimony, correct?

19   **A.**   Yes.

20   **Q.**   And you gave truthful testimony in that deposition?

21   **A.**   Yes.

22            MS. WICHT:  Could we please pull up Page 76 of Ms.

23   Keller's deposition?  Thank you.

24            BY MS. WICHT:

25   **Q.**   And I'll ask you to start looking at Line 12.  And you

 1    can see the reference is to the CS Ratings database there.

 2    And do you see that starting at Line 15 you were asked --

 3    going down to Line 15.  "You don't know in what format the

 4    data is presented."  And your answer was, "Correct."  Do you

 5    see that?

 6              MR. ACKERMAN:  Objection.  Improper impeachment,

 7    Your Honor.

 8              THE COURT:  How is it improper?

 9              MR. ACKERMAN:  It's not inconsistent with what she

10    just testified to.

11              MR. SCHMIDT:  Your Honor, in the interest of time,

12    can we stick to the rule that we have one objector per

13    party?  I think we're up to three now.

14              MR. ACKERMAN:  We have two parties, Huntington and

15    Cabell.  And I have been objecting and Mr. Majestro has been

16    objecting.

17              MR. SCHMIDT:  Ms. Singer conducted the

18    examination.

19              MR. ACKERMAN:  She is not objecting.

20              THE COURT:  Well --

21              MR. MAJESTRO:  For what it's worth, I would join

22    in Mr. Ackerman's objection.

23              MS. WICHT:  Your Honor, I'm happy to address it,

24    if you would like me to.

25              THE COURT:  Well, is it inconsistent with her

1    present testimony?

2          MS. WICHT:  I believe it is, Your Honor.  She just

3    testified that she could make certain assumptions about the

4    form and format of the CS Ratings database and this was her

5    answer in her deposition, that she has no knowledge of that.

6          THE COURT:  I'm going to allow it.  Go ahead.

7    Let's get on with this.

8          BY MR. WICHT:

9    **Q.**   And, Ms. Keller, you have not mined the CS Ratings

10   database or run any data analytics off of it, correct?

11   **A.**   Correct.

12   **Q.**   Now, this document that you discussed with Ms. Singer

13   this morning, P-44176, that document discusses a CS Ratings

14   pilot agreement by Cardinal Health's outside counsel on

15   behalf of Cardinal, correct?

16   **A.**   Correct.

17   **Q.**   And that pilot agreement was in October of 2012?

18   **A.**   That's the date on the document, yes.

19   **Q.**   And the agreement was for Cardinal Health's counsel to

20   have access to CS Ratings, the CS Ratings database, for

21   30 days, correct?

22   **A.**   Could you point to the 30-day limitation, please?

23   **Q.**   Sure.  I will be happy to.  If you flip to -- it's the

24   third page of the document.

25   **A.**   Uh-huh.

1    **Q.**   The pilot agreement itself.  In Paragraph 2, it says,

2    "Evaluation period/license.  As of the effective date and

3    for a period of 30 days thereafter, the services are

4    provided and licensed."

5    **A.**   I see that.  Thank you.

6    **Q.**   Okay.  Yeah.  So, that's your understanding, correct,

7    that the agreement was for Cardinal Health's outside counsel

8    to have access to that database for 30 days?

9    **A.**   Yes.

10   **Q.**   And you have no knowledge of what, if anything,

11   Cardinal Health or its outside counsel did with that data,

12   correct?

13   **A.**   Correct.

14   **Q.**   And you have no knowledge as to whether or not Cardinal

15   Health found that data to be helpful or unhelpful in

16   connection with its Suspicious Order Monitoring Program,

17   correct?

18   **A.**   Correct.  The data, of course, could be informative,

19   but I -- I don't know how Cardinal found the data to be.

20   **Q.**   Well, you don't even know what's in the CS -- at the

21   time that you offered your opinions in this case, Ms.

22   Keller, you had no knowledge of what was in the CS Ratings

23   database, correct?  You had never personally reviewed it?

24   **A.**   Correct.

25   **Q.**   You testified on direct examination to your opinion

1       that if defendants had possessed the IQVIA Xponent database

2       they could have used it to identify the top one percent of

3       prescribers in Cabell County based on volume, correct?

4       **A.**   Using the IQVIA Xponent data, yes.

5       **Q.**   Yes.  I'm sorry.

6       **A.**   Yes.

7       **Q.**   I switched back.  Okay.  But now, you're not offering

8       an opinion that any prescription written by any of the

9       individual doctors that you identified as being in the top

10      one percent was medically improper or medically unnecessary,

11      correct?

12      **A.**   I know that I do cite to articles that speak to the

13      improperness of that.  So, to the extent that those are in

14      my reliance materials and report, then those are there, but

15      --

16      **Q.**   I'm not asking you for what you read in an article or

17      document, Ms. Keller.  I'm asking for your own opinion.  As

18      an expert testifying in this case, you are not offering an

19      opinion that any prescription written by any individual

20      doctor you identified as being in the top one percent was

21      medically improper or medically unnecessary, correct?

22      **A.**   Correct.

23      **Q.**   And you could not offer any such opinion because that

24      would be outside of your expertise, correct?

25      **A.**   Correct.

1    **Q.**   You've not had any medical training, correct?

2    **A.**   Correct.

3    **Q.**   And you're not an expert in the field of pharmacy

4    practice, correct?

5    **A.**   I'm not quite sure what that terms means.  And, just to

6    be clear, I've offered opinions on suspicious order

7    monitoring, compliance metric implementation and other

8    matters, but beyond that --

9    **Q.**   But not in this case, right?

10   **A.**   Correct.

11   **Q.**   Okay.  So, you're not an expert in the regulations that

12   govern the dispensing of controlled substances by

13   pharmacists, correct?

14   **A.**   Correct.  Again, the same answer as earlier.  I have

15   implemented compliance metrics in other matters, but not

16   this one.

17   **Q.**   And your prior work does not give you the expertise to

18   offer an opinion about the regulations that govern the

19   dispensing of controlled substances by pharmacists, correct?

20   **A.**   Correct.

21   **Q.**   So, you're not here offering an opinion that any

22   prescriptions written by any of the top one percent of

23   prescribers should not have been filled by a pharmacist,

24   correct?

25   **A.**   I'm not offering that opinion, but I do know that I

```
 1   have seen documents that discuss not filling for certain

 2   physicians.

 3   Q.   Ms. Keller, I'm asking you about your opinions in this

 4   case and I'm going to ask you to stick to the opinions when

 5   that's what I'm asking you about.

 6        You're not offering any -- you're not offering the

 7   opinion that pharmacies generally should refuse to fill

 8   prescriptions written by a doctor in the top one percent,

 9   correct?

10   A.   I'm not offering an opinion what a pharmacy should do.

11   I am offering the opinion that a pharmacy did, in fact, know

12   what their top prescribers were and -- and as did defendants

13   through questionnaires of their pharmacies.

14             MS. WICHT:  I move to strike as non-responsive,

15   Your Honor.

16             THE COURT:  Well --

17             MR. ACKERMAN:  We oppose.

18             THE COURT:  She's explaining her answer.

19   Overruled.  The motion to strike is denied.  Go ahead.

20             By MS. WICHT:

21   Q.   So, Ms. Keller, leaving aside what you have seen in

22   your review of documents, I am correct that you, yourself,

23   as an expert in this litigation, are not offering an opinion

24   that pharmacies generally should refuse to fill

25   prescriptions written by a doctor who is in the top one
```

1  percent of prescribers, correct?

2  **A.**   So, leaving aside all of the documents that I've read,

3  do I offer an opinion on what the pharmacy should do?  No,

4  but I do offer the opinion that they could have identified

5  -- that defendants could have identified these physicians

6  based off of prescribing history.

7  **Q.**   Okay.  Come to that.  Now, you're not an expert, Ms.

8  Keller, in the prevailing standard of care for prescribing

9  opioid pain medication, correct?

10  **A.**   Correct.

11  **Q.**   So, you're not an expert who can come and tell the

12  Court what volume of opioids was the right volume that

13  should have been prescribed in Cabell-Huntington at any

14  point in time, correct?

15  **A.**   Correct.  I can tell you what the average volume might

16  be over time.  I can tell you what an outlier volume is.

17  But I don't offer the opinion of what should be the volume.

18  **Q.**   And if you are asked to identify the amount of opioid

19  pain medication that should have been prescribed in Cabell

20  County, that would be outside your area of expertise to

21  answer, correct?

22  **A.**   I could tell you what was prescribed, but not what

23  should be prescribed.

24  **Q.**   So, for the top one percent of doctors that you

25  testified about this morning -- or prescribers, excuse me,

1    that you testified about this morning, you don't know

2    whether those prescribers were prescribing too much opioid

3    medication, too little opioid medication, or just the right

4    amount of opioid medication for the particular patients they

5    were seeing, correct?

6    **A.**   I do know that the Board of Pharmacy found some of them

7    to be excessive prescribers, but I am not offering that

8    opinion.

9    **Q.**   You're not offering an opinion on whether any of those

10   prescribers were prescribing too much opioid medication, too

11   little opioid medication, or just the right amount of opioid

12   medication for the particular patients they were seeing,

13   correct?

14   **A.**   Again, I cite to documents that discuss the prescribing

15   histories, but I am not offering that opinion on my own.

16   **Q.**   Ms. Keller, you used the word "outlier" to describe

17   some of the prescribers that you identified for the Court,

18   correct?

19   **A.**   Correct.

20   **Q.**   And when you used that term "outlier", what you mean is

21   outlier in a statistical sense, not in a medical sense,

22   correct?

23   **A.**   Correct.

24   **Q.**   So, your analysis about the top one percent of Cabell

25   County prescribers is not an analysis of whether those

1    prescribers did anything right or wrong; it's just math,

2    correct?

3    **A.**   The top one percent analysis is a mathematical analysis

4    but, again, there are citations in my report to documents

5    that speak to the appropriateness of the prescribing.

6    **Q.**   But the statistics that you offer based on your expert

7    work in this case, not documents that you read, the

8    statistics that you offer based on your expert analysis of

9    the data, doesn't mean that the prescribers -- doesn't allow

10   you to offer an opinion that the prescribers were doing

11   anything wrong, correct?

12   **A.**   The -- and I think we should use a different term.

13   Statistics implies some sort of estimation.  They are really

14   tabulations.  I'm summing up like you would an Excel

15   spreadsheet.  So, the summations of these prescriptions are

16   just math.

17   **Q.**   And you're not offering any opinion that any of the

18   prescriptions written by that top one percent of doctors

19   were, in fact, diverted, correct?

20   **A.**   Again, I do have documents that say even one of the

21   prescription -- sorry -- one of the physicians was

22   prescribing to another physician who he had known was going

23   to other physicians for -- for those drugs.

24   **Q.**   I'm not asking you, again, about what you read in a

25   document.  You're here as an expert on data mining and

 1    analysis and I'm asking you about, in your expert opinion,

 2    your conclusions from the data mining.  Based on that work,

 3    you're not offering an opinion that any of the prescriptions

 4    written by the top one percent of prescribers were, in fact,

 5    diverted, correct?

 6              MR. ACKERMAN:  Your Honor, I'd object to the

 7    argumentative prelude to the question and I'd also object to

 8    the question as asked and answered.

 9              THE COURT:  Well, she -- she did say she knew of

10    one situation where there was diversion, did she not?

11              MR. ACKERMAN:  That was her prior answer, yes.

12              MS. WICHT:  She said she read that in a document,

13    Your Honor, and I'm trying to ask her a different question.

14    I'm asking her about what she's here doing as an expert, not

15    her reading of documents.

16              THE COURT:  Okay.  Overruled.  Go ahead.

17              MR. ACKERMAN:  Your Honor --

18              BY MR. WICHT:

19    Q.   Okay.  In your role as an expert data analyst in this

20    case, Ms. Keller, you are not offering the opinion that any

21    of the prescription opioid medications reflecting in any of

22    your -- reflected in any of your analyses were, in fact,

23    diverted, correct?

24              MR. ACKERMAN:  Objection again, Your Honor, and to

25    be clear --

1           MR. WICHT:  I am --

2           MR. ACKERMAN:  Let me state the basis for my

3    objection.  What I think counsel is trying to do is to say

4    that her opinions are based on data, but not documents that

5    she reviewed, and that's not the witness's testimony.

6           THE COURT:  That's not what she's saying at all,

7    is it?

8           MS. WICHT:  No, Your Honor.

9           THE COURT:  I'll overrule the objection.  Go

10   ahead, Ms. Wicht.

11          MS. WICHT:  Okay.

12          BY MS. WICHT:

13   **Q.**   Do you need me to ask the question one more time, Ms.

14   Keller?

15   **A.**   I would sure appreciate that.

16   **Q.**   That would be very fair.  Okay.

17          You are not offering the opinion that any of the

18   prescription opioid medications reflected in any of your

19   data analysis were, in fact, diverted, correct?

20   **A.**   I mean, again, the documents -- document review can be

21   considered data.  In one of the cases that I worked for at

22   the Attorney General's Office, we reviewed chat text

23   messages for that foreign currency program.  So, just to

24   claim that a document isn't data or text isn't data is

25   difficult for me to understand.

1    **Q.**   Okay.  I'm going to refer you to your deposition again,

2    Ms. Keller.

3            MS. WICHT:  Could we pull up the transcript,

4    please, and go to Page 168?

5            BY MS. WICHT:

6    **Q.**   Dr. Keller [sic] -- I'm sorry.  Ms. Keller, were you

7    asked the question, "Are you offering the opinion that any

8    of the prescriptions -- prescription opioid medications

9    reflected in any of your analyses were diverted?"  And you

10   gave the answer, "No, I'm not offering that opinion",

11   correct?

12   **A.**   That's what the testimony says there.

13   **Q.**   Thank you.

14        You testified earlier on your direct about a few

15   doctors in Cabell County who were the subject of

16   disciplinary actions, correct?

17   **A.**   Correct.

18   **Q.**   Okay.  And you testified that those doctors were, for

19   at least some point in time, among the top one percent of

20   prescribers, right?

21   **A.**   Yes.

22   **Q.**   Now, you didn't testify here in court about all of the

23   Cabell County doctors who you identified to be in the top

24   one percent, correct?

25   **A.**   I think we briefly mentioned a few others who are on

1   the top ten slides that I presented.

2   **Q.**   Now, in your analysis of the top one percent of

3   prescribers you identified each year between 5-9 doctors as

4   top one percent prescribers each year.   Does that sound

5   about right?

6   **A.**   In my report?

7   **Q.**   Yes, ma'am.

8   **A.**   Yes, ma'am.

9   **Q.**   Okay.   So, your report identifies, by my count,

10   somewhere in the neighborhood of at least 15 different

11   doctors over that time period who were in the top one

12   percent.   Does that sound correct to you?

13   **A.**   No.   It's 24.

14   **Q.**   24 doctors?   Okay.   Thank you, Ms. Keller.

15        So, there were -- according to your analyses, there

16   were 24 different doctors who were, at some point in time,

17   between 1997 and 2017, in that top percent category,

18   correct?

19   **A.**   For dosage units and MMEs in any given year, yes.

20   **Q.**   Okay.   Now, many of the doctors who were in that top

21   one percent that you identified continue to be licensed to

22   practice medicine by the State of West Virginia, correct?

23   **A.**   Yes.

24   **Q.**   And many of those top one percent doctors have no

25   disciplinary records whatsoever, correct?

1    **A.**   Correct.

2    **Q.**   Okay.  I'd like to talk about a few of the doctors who

3    are in that top one percent in Cabell County, but who you

4    didn't testify about today.

5         So, one of the doctors in that top one percent was Dr.

6    Ozturk.  Do you recall that name?

7    **A.**   Yes.

8    **Q.**   Okay.  And you decided not to profile Dr. Ozturk in

9    your testimony to the Court today, correct?

10   **A.**   Yes, but I believe there are some tables that include

11   his total prescribing.

12   **Q.**   Correct.  He's reflected in your tables, but you didn't

13   talk about him today, right?

14   **A.**   Correct.

15   **Q.**   Okay.

16              MS. WICHT:  Can you pull up Slide 5, please?

17              BY MS. WICHT:

18   **Q.**   So, in your testimony today, you did not note the fact

19   that Dr. Ozturk, one of the top one percent doctors, is

20   identified on the Cabell Huntington Hospital's website as a

21   specialist in anesthesiology and pain management, correct?

22   **A.**   I didn't speak to him today, so I wouldn't have been

23   able to provide that information.

24   **Q.**   And you also didn't mention that Dr. Ozturk is with the

25   Pain Management Center at Cabell Huntington Hospital?  If

1    you could turn to Slide 6, please.  Correct?  Oh, and I'm

2    sorry.  Slide 6 is the Cabell Huntington Hospital Pain

3    Management Center.  And then, if you go to Slide 7, please,

4    do you see that Dr. Ozturk is a provider at the Cabell

5    Huntington Hospital Pain Management Center?

6    **A.**   I see that that's on your demonstrative, yes.

7    **Q.**   You didn't mention in your testimony today that Dr.

8    Ozturk directs acute and chronic pain management for

9    patients at Cabell Huntington Hospital's Recovery Center,

10   which is a comprehensive treatment program for patients with

11   opioid addiction, correct?

12   **A.**   Again, I didn't speak about Dr. Ozturk, so I wouldn't

13   have been able to say those words.

14            MS. WICHT:  And may I have Slide 8, please?

15            BY MS. WICHT:

16   **Q.**   You also didn't mention that Dr. Ozturk, one of the top

17   one percent of opioid prescribers in Cabell County at

18   various points in time, and Cabell-Huntington Hospital's

19   Recovery Center were identified by the plaintiffs as being

20   part of Huntington's Road to Recovery From the Opioid

21   Epidemic, correct?

22   **A.**   I've never seen this document.

23   **Q.**   And you didn't observe in your testimony today that Dr.

24   Ozturk has been licensed by the West Virginia Board of

25   Medicine since 1988 and that there are no discipline cases

1    against Dr. Ozturk on record, correct?

2    **A.**    I think, actually, his license may be in one of these

3    due diligence files.  I just want to look at it.

4    **Q.**    And I have it on Slide 9, Ms. Keller.  I'm happy to

5    refer you to it, if you would like to look at it.

6         So, you see Dr. Ozturk has been licensed by the West

7    Virginia Board of Medicine since March 14th, 1988, correct?

8    **A.**    Yes.

9    **Q.**    And he has no discipline -- the West Virginia Board of

10   Medicine records indicate that he has no discipline cases on

11   record, correct?

12   **A.**    That's what that says, yes.

13   **Q.**    Now, another one of the top one percent doctors who you

14   didn't testify about today was Dr. Gerrit Kimmey.  Do you

15   recall his name in your tables?

16   **A.**    Yes.

17   **Q.**    And you decided not to profile Dr. Kimmey in your

18   testimony to the Court, correct?

19   **A.**    Yes.  The -- he was not among the three people that I

20   profiled today.

21   **Q.**    Okay.

22         MS. WICHT:  And if I could have Slide 11, please.

23         BY MS. WICHT:

24   **Q.**    So, you didn't mention in your testimony this morning

25   that Dr. Kimmey is a physician with the Breast Cancer Center

1    at St. Mary's Medical Center in Huntington, correct?

2    **A.**    I did not say those words, no.

3    **Q.**    And you didn't mention --

4                   MS. WICHT:  If I could please have Slide 12.

5                   BY MS. WICHT:

6    **Q.**    You didn't mention that Dr. Kimmey is an oncologist who

7    treats patients suffering from breast cancer, correct?

8    **A.**    Well, I don't know that his specialty isn't listed on

9    one of the tables because I know the tables that I included

10   in today's testimony does include specialty.  So, it is

11   possible that he may be listed as an oncologist there, but

12   to the remainder of the type of patient that he services,

13   no.

14   **Q.**    Okay.  You didn't talk about Dr. Kimmey with the Court

15   this morning, correct?

16   **A.**    Correct.

17   **Q.**    Okay.

18                   MS. WICHT:  And if I could have slide 13, please.

19                   BY MS. WICHT:

20   **Q.**    You also didn't talk about Dr. Kimmey's West Virginia

21   Board of Medicine licensure history and you see that he's

22   been licensed by the West Virginia Board of Medicine since

23   1984, correct?

24   **A.**    Yes.  I see that.

25   **Q.**    And, again, there are no discipline cases on record for

1    Dr. Kimmey, correct?

2    **A.**    Yes.  Now, this -- this one looks different.  Does this

3    have information on the malpractice history?  But the other

4    one didn't seem to have that.  Was that --

5    **Q.**    And, Ms. Keller, you had mentioned -- you didn't

6    mention in your testimony to the Court this morning anything

7    about malpractice history of various doctors, correct?

8    **A.**    In the testimony to the Court this morning, no, but

9    other -- my report does mention it.

10    **Q.**    But it's correct that you don't -- you, yourself, in

11    offering your opinions in this case, don't attach any

12    significance to malpractice actions against doctors,

13    correct?

14    **A.**    I mean, they're included alongside the prescribing

15    histories for information purposes in my report.

16    **Q.**    But in your analysis, you don't attach any significance

17    to those malpractice actions, correct?

18    **A.**    I don't understand how you're using that term, but if

19    it wasn't significant, I wouldn't have written it in my

20    report.

21    **Q.**    May I please -- I'll direct you to your deposition

22    again, Ms. Keller, at Page 169, please.  Do you see,

23    starting at Line 12, you were asked the question, "Are you

24    attaching any significance to the idea that a malpractice

25    case was brought but then dismissed?"  Answer, "No.  We're

```
 1    just noting what we saw in those records."
 2              MR. ACKERMAN:  Objection to --
 3              BY MS. WICHT:
 4    Q.   Were you asked that question and did you provide that
 5    answer?
 6              COURT REPORTER:  I'm sorry --
 7              MR. ACKERMAN:  Objection to the impeachment, Your
 8    Honor.  This is not the question that was asked.
 9              THE COURT:  Well, it's close enough to be proper
10    impeachment, I think, Mr. Ackerman, so I will overrule your
11    objection.
12              BY MS. WICHT:
13    Q.   So, we talked about Dr. Ozturk and Dr. Kimmey.  And
14    those two doctors were in the top ten opioid prescribers in
15    Cabell County between 1997 and 2017, but you elected not to
16    profile them, actually, either in your report or in your
17    testimony to the Court this morning, correct?
18    A.   Do you have a copy of my report so I can refresh my
19    recollection?
20    Q.   Sure.
21              MS. WICHT:  May I approach, Your Honor?
22              THE COURT:  Yes.
23              THE WITNESS:  Thank you.
24              BY MS. WICHT:
25    Q.   And just so the question is in your mind while you're
```

1    looking for it, Ms. Keller, the question was that you did

2    not profile Dr. Ozturk or Dr. Kimmey in your report?

3    **A.**    Again, there are totals for them in Table 8, but a full

4    prescriber profile with the narrative analysis is included

5    for those two prescribers.

6    **Q.**    Thank you.  Since that was used to refresh your

7    recollection, I'll collect it back from you at this point.

8    You can get it again if you need it.  Thank you.

9         Now, this morning, you did testify about a few of the

10   doctors in the top one percent who were the subject of

11   disciplinary actions, correct?

12   **A.**    Correct.

13   **Q.**    And one of those was Dr. Deleno Webb, correct?

14   **A.**    Correct.

15   **Q.**    And I'll apologize.  I don't think I know how to say

16   his name any better than you do, so I'm just going to go

17   with that.

18        Now, you testified that in 2005 the West Virginia

19   Worker's Compensation Commission banned Dr. Webb from

20   receiving payment for treating injured workers, correct?

21   **A.**    Correct.

22   **Q.**    And you also testified, I believe, that in 2017 Dr.

23   Webb surrendered his medical license, correct?

24   **A.**    Correct.

25   **Q.**    And as part of your work, you had looked up Dr. Webb's

1    licensure history on the West Virginia Board of Medicine's

2    website, right?

3    **A.**   Yes, I did.

4    **Q.**   Okay.  So, let's pull that up.  It's Slide 14, please.

5    So, you are aware, Ms. Keller, that according to the West

6    Virginia Board of Medicine records, Dr. Webb was first

7    licensed by the West Virginia Board of Medicine in 1971,

8    correct?

9    **A.**   Yes.

10   **Q.**   And it wasn't until 2017 that he surrendered his

11   license, as you can see there, correct?

12   **A.**   Yes.

13   **Q.**   And the West Virginia Board of Medicine's website lists

14   just one discipline or ward action in that section, and

15   that's the voluntary surrender of his license in 2017,

16   correct?

17   **A.**   Yes.

18   **Q.**   And you haven't identified any reason to believe that

19   the Board of Medicine took any -- excuse me.  Let me start

20   that one again.  In your work, you haven't identified any

21   reason to believe that the Board of Medicine took any action

22   against Dr. Webb after he was banned by the Worker's

23   Compensation Commission in 2005, correct?

24   **A.**   I don't understand the question.  I see that there was

25   the disciplinary action after the 2005.  I don't understand

1    the question.

2    **Q.**   The disciplinary action from the West Virginia Board of

3    Medicine is in 2017, correct?

4    **A.**   Correct.

5    **Q.**   Okay.  And the West Virginia Worker's Compensation

6    Commission was in 2005, correct?

7    **A.**   Correct.

8    **Q.**   And you haven't identified any reason to believe that

9    the Board of Medicine took any action against Dr. Webb after

10   the 2005 Worker's Compensation Commission action, correct?

11   **A.**   Am I not understanding the differences in agencies or

12   -- I don't understand the question.

13   **Q.**   The action in 2005 was by the West Virginia Worker's

14   Compensation Commission, correct?

15   **A.**   Yes.

16   **Q.**   As you understand it?

17   **A.**   Yes.

18   **Q.**   And that Commission took certain action against Dr.

19   Webb and restricted him in certain ways, correct?

20   **A.**   Yes.

21   **Q.**   The West Virginia Board of Medicine, a different

22   agency, took no action against Dr. Webb in 2005, correct?

23   **A.**   I don't know.

24   **Q.**   Well, are -- you examined his West Virginia Board of

25   Medicine licensure information as part of your work, didn't

1    you?

2    **A.**   I did.

3    **Q.**   Okay.  And you see that the West Virginia Board of

4    Medicine took no disciplinary action against Dr. Webb until

5    2017, correct?

6    **A.**   But I have no knowledge of what their investigative

7    protocols or timeline would have been.  I don't know when

8    that investigation started.

9    **Q.**   Well, whenever their investigation started, it's

10   correct that the West Virginia Board of Medicine continued

11   to license Dr. Webb for 12 years after the 2005 Worker's

12   Compensation Commission action, correct?

13   **A.**   2017 minus 2005 is that number, yes.

14   **Q.**   Now, in 2017, the West Virginia Board of Medicine

15   entered into a consent order with Dr. Webb.  You're familiar

16   with that, correct?

17   **A.**   Yes, but I'm going to need to see a document to refresh

18   my memory.

19   **Q.**   Okay, sure.  Are you aware that that consent order did

20   not immediately prevent Dr. Webb from prescribing any more

21   opioids?

22   **A.**   Again, I'd like to see it, if we have it.

23   **Q.**   Sure.  It's P-42370.  Do you have it in front of you?

24          MS. WICHT:  And we can put it up on the screen,

25   please, 42370.

1         BY MS. WICHT:

2    **Q.**   You're familiar with this consent order that was

3    entered by the West Virginia Board of Medicine and Dr. Webb,

4    correct?

5    **A.**   Yes.

6    **Q.**   Okay.  And if you would turn, please, to Page 7 of that

7    consent order, do you see that it says, "Immediately upon

8    his execution of this consent order, Dr. Webb shall begin

9    the winding down of his West Virginia medical practice"?  Do

10   you see that?

11   **A.**   Yes.

12   **Q.**   And are you aware that this consent order gave Dr. Webb

13   a three-month period to wind down his practice?

14   **A.**   Sorry.  I'm just reading the documents here.

15   **Q.**   Sure.

16   **A.**   It looks to approximately be three days [sic].  The

17   consent order is signed 1/9 -- January 12th, 2017, and that

18   he should complete the winding down and closing of his

19   medical practice by Sunday, March 5th, 2017.

20   **Q.**   So, he had three months to wind down his practice,

21   correct?

22   **A.**   Essentially.

23   **Q.**   Okay.  And the -- while he was winding down his

24   practice, Dr. Webb continued to have the ability to

25   prescribe controlled substances to certain of his existing

1   patients under this consent order, didn't he?

2   **A.**   If that's your characterization of .1, the safe and

3   medically appropriate titration of medications for current

4   patients, is that the --

5   **Q.**   Well, I'm referring, Ms. Keller, mostly to Paragraph 2

6   of the order which lays out a variety of things that Dr.

7   Webb is prohibited from doing, but does not prohibit him

8   from prescribing all controlled substances.  Do you see

9   that?

10   **A.**   It says that he shall not start prescribing either

11   benzodiazepines and/or narcotic and/or opiate scheduled

12   controlled substances and lists those medications.  So, I

13   don't fully understand what "start prescribing" means in

14   relation to the document.

15   **Q.**   So, Paragraph 1 -- I'm sorry.  Within Paragraph 2, Sub

16   .1 says he shall not accept new patients, right?

17   **A.**   Shall not accept new patients, yes.

18   **Q.**   And then, Subparagraph 2 says that he shall not

19   re-establish a physician-patient relationship with any

20   former patients, correct?

21   **A.**   Correct.

22   **Q.**   Paragraph 3 says he shall not start prescribing a list

23   of drugs that I won't go through to any current patient,

24   correct?

25   **A.**   That's what it states, but I don't know what it means.

```
 1    I can't really interpret that part.
 2    Q.   And then, Paragraph 4 identifies particular patients or
 3    individuals for whom he cannot prescribe, correct,
 4    controlled substances?
 5    A.   Yes, that he can't prescribe them to Patient 19, 21,
 6    22, any current employees or immediate family members.
 7    Q.   And then, as you noted in the next paragraph, it says
 8    that the winding down of his practice shall include the safe
 9    and medically appropriate titration of medications for
10    current patients, correct?
11    A.   Correct.
12    Q.   So, during the time period -- during the three-month
13    period when he was winding down his practice, Dr. Webb could
14    still practice medicine, but in a more limited way, correct?
15    A.   That calls for an opinion that I'm not prepared to
16    give.  I don't know exactly what this consent order allowed
17    him to do.
18    Q.   Okay.  You have no opinion about that?
19    A.   Right.
20    Q.   Fair enough.  Okay.
21         Now, you testified earlier that certain due diligence
22    documents from Cardinal Health identified Dr. Webb as a
23    prescriber whose prescriptions were being filled by a
24    certain pharmacy in Cabell County.  Do you recall that?
25    A.   Generally, yes, but the details, I'd like to review.
```

1    **Q.**   Okay.  Well, if we come to a question that you're not

2    able to answer, we can do that.

3         Now, you pointed to a particular Cardinal Health

4    document in February of 2012 that showed a particular

5    Cardinal Health pharmacy customer filled prescriptions

6    written by Dr. Webb, correct?

7    **A.**   That document, I would like to see, please.

8    **Q.**   441 -- I'm sorry -- P-44170.

9    **A.**   Okay.

10   **Q.**   And at the pages that you referenced in your testimony

11   this morning, that document reflected that this pharmacy

12   filled prescriptions for Dr. Webb in the time frame of

13   approximately February, 2012, correct?

14   **A.**   I'm sorry.  Let me get there.  I'm sorry.  I lost the

15   other half of it.  Just give me one moment.

16   **Q.**   Sure.

17   **A.**   Yes.

18   **Q.**   Okay.  Now --

19   **A.**   Well, it's for the time period -- I'm sorry to

20   interrupt you.  It's for a longer time period.  It's from

21   November 2011 through February 2012.

22   **Q.**   Okay, fair enough.  But at the time that Dr. Webb was

23   identified in that 2012 Cardinal Health document, you agree

24   that Dr. Webb was still licensed to practice medicine in the

25   State of West Virginia, correct?

1    **A.**    Yes.  He did not lose his license until 2017.

2    **Q.**    And Cardinal Health didn't know in February of 2012

3    that Dr. Webb would have his license revoked five years

4    later in 2017, did it?

5    **A.**    No.  I don't believe that -- I'm not offering the

6    opinion that Cardinal could see into the future.  I do offer

7    the opinion that, at that time, they could have seen the

8    prescribing practices of Dr. Webb, including, for this

9    particular location, prescribing 313 of the 582

10   prescriptions.

11   **Q.**    And am I correct that at any time you saw Dr. Webb

12   identified in any of the defendants' documents, Dr. Webb was

13   still actively licensed to practice medicine by the State of

14   West Virginia, correct?

15   **A.**    I don't know that I can testify on every document for

16   every doctor.  That's a bit of a big memory test for me.

17   **Q.**    Well, I'm asking you if you can recall, as you sit here

18   today, seeing a document that reflects prescriptions being

19   filled by -- that were written by Dr. Webb at a time when he

20   was not actively licensed by the West Virginia Board of

21   Medicine?  Can you recall any such instance?

22   **A.**    I can't remember a specific document, no.

23   **Q.**    Okay.  Now, you've testified that the IQVIA Xponent

24   data could have shown that Dr. Webb was -- could have shown

25   to defendants that Dr. Webb was within the top one percent

1    of prescribers of opioids in Cabell County, correct?

2    **A.**    That the IQVIA Xponent data, yes, as well as the Drug

3    Emporium data would note that.  Well, not that he was among

4    the top one percent, but that he was an outlier prescriber.

5    It used a different -- he was just a top prescriber for

6    opioid prescriptions from the Drug Emporium data.

7    **Q.**    Okay, but I'm going to focus on the IQVIA Xponent data

8    and your top one percent analysis, and it's your testimony

9    that that data could have shown Dr. Webb -- that Dr. Webb

10   was within the top one percent of prescribers within Cabell

11   County, correct?

12   **A.**    The IQVIA Xponent?

13   **Q.**    Yes, ma'am.

14   **A.**    Yes.

15   **Q.**    But you're not testifying -- you're not offering the

16   opinion that the fact that Dr. Webb was in the top one

17   percent in and of itself shows that he did anything wrong,

18   correct?

19   **A.**    It's just a mathematical calculation.

20   **Q.**    Okay.  And you also testified that defendants could

21   have gotten dispensing data from their pharmacy customers

22   and that if defendants had that dispensing data, they could

23   have identified the pharmacies that filled prescriptions for

24   Dr. Webb, correct?

25   **A.**    Yes, that they could have asked for it and, in fact, in

```
 1    some of the exemplars that are sitting in front of me, did

 2    have some of that data.

 3    Q.   But even if we assume that defendants had the one

 4    percent analysis from IQVIA that you testified about and

 5    matched it up with the distribution -- the dispensing data

 6    from the pharmacies, you're not offering the opinion -- any

 7    opinion about what defendants should have done with that

 8    information, correct?

 9    A.   Correct.  It's knowledge that they could have had

10    people that they -- they would have seen by name in the data

11    down to granular level.  You could see what prescription

12    drugs they were prescribing.  Even if you wanted to focus on

13    a specific drug, that information was available.  But I'm

14    not offering an opinion on what they should have done with

15    that information.

16    Q.   Okay.  So, you're just offering the opinion that if

17    defendants had that data, they could have seen those facts,

18    correct?

19    A.   If they had that data, they would have seen those

20    facts.

21    Q.   And just like if distributors had that data, they could

22    have seen that Dr. Ozturk was a top one percent prescriber

23    and that pharmacy customers were filling prescriptions

24    written by Dr. Ozturk, correct?

25    A.   Yes.
```

1   **Q.**   And just as they could have seen those same facts with

2   respect to Dr. Kimmey, correct?

3   **A.**   Correct.

4   **Q.**   Okay.  Now, the pharmacy data, the Cardinal Health

5   pharmacy data we were just talking about, 44170, that's for

6   a pharmacy called Medicine Shoppe in Huntington, correct?

7   **A.**   Correct.

8   **Q.**   And you don't know who the pharmacists are at Medicine

9   Shoppe Pharmacy, do you?

10   **A.**   They might be in the diligence records here.  Let me

11   look.

12   **Q.**   Okay.  Well, let me -- maybe I can short circuit that.

13   Whether you're able to identify their names in the diligence

14   records, you don't know anything about those pharmacists,

15   correct?

16   **A.**   I don't know them personally, no.

17   **Q.**   And you don't know anything about their practices in

18   filling prescriptions for controlled substances, correct?

19   **A.**   Correct.

20   **Q.**   You don't know how they evaluated prescriptions,

21   correct?

22   **A.**   Yes.  I don't know them.

23   **Q.**   Or patients or prescribers, correct?

24   **A.**   Correct.

25   **Q.**   And you don't know anything about the particular

1    patients of Dr. Webb who had their prescriptions filled at

2    Medicine Shoppe, correct?

3    **A.**    Patient information would not be included in the

4    datasets that I reviewed.

5    **Q.**    So, you're not offering any opinion that any Dr. Webb

6    prescription filled at Medicine Shoppe was not medically

7    necessary, correct?

8    **A.**    I'm not offering an opinion on the medical necessity of

9    his prescriptions.

10   **Q.**    I'm going to touch briefly on a couple of other doctors

11   you mentioned this morning, Ms. Keller.  Another one of the

12   doctors who you testified about today was Dr. Gregory

13   Chaney, correct?

14   **A.**    Correct.

15   **Q.**    And you identified Dr. Chaney as being within the top

16   one percent of prescribers, correct?

17   **A.**    Yes.

18   **Q.**    But just like Dr. Webb, you're not saying that the fact

19   that Dr. Chaney was in the top one percent in and of itself

20   shows that he did anything wrong, correct?

21   **A.**    It's a mathematical calculation.

22   **Q.**    Okay.  And you looked at Dr. Chaney's licensure

23   information as part of your work in this case, correct?

24   **A.**    I did.

25   **Q.**    So, you were aware that Dr. Chaney was first licensed

```
 1   by the West Virginia Board of Medicine in 1991; is that
 2   right?  And I have it on Slide 40, if you would like to see
 3   it.
 4   A.   Thank you.
 5   Q.   Thank you.
 6            MS. WICHT:  Slide 40.  I'm sorry.
 7            THE WITNESS:  And you said 1991?  Yes, that's the
 8   first date that I see there.
 9            BY MS. WICHT:
10   Q.   And the West Virginia Board of Medicine lists two
11   actions under the discipline history section both in 2016,
12   correct, when Dr. Chaney's license was suspended and then
13   surrendered?
14   A.   Yes.
15   Q.   So, you agree with me that the West Virginia Board of
16   Medicine licensed Dr. Chaney to practice medicine for about
17   25 years or so, correct?
18   A.   Correct.
19   Q.   And in your report and your testimony today, you did
20   not offer -- I'm sorry.  You did not identify any
21   prescriptions written by Dr. Chaney that were filled for
22   patients and any of Cardinal Health's patients in Cabell
23   County, correct?
24   A.   Sorry.  The question is did I identify any patients in
25   Cabell County?
```

```
 1    Q.   Did you identify any prescriptions written by Dr.

 2    Chaney that were filled for patients at any of Cardinal

 3    Health's pharmacy customers in Cabell County?

 4    A.   I think I testified earlier that IQVIA Xponent data

 5    doesn't have the filling pharmacy information in it.

 6    Q.   And you didn't identify any in your work in this case,

 7    correct?

 8    A.   I'd have to review the Drug Emporium data to be

 9    certain, but I am not recalling any right now.

10    Q.   Okay.  You testified earlier, as well, the third

11    physician who you testified -- or prescriber who you

12    testified about this morning was Dr. Fisher, correct?

13    A.   Yes.

14    Q.   Now, in your report and in your testimony today, you

15    did not identify any instance where any prescription written

16    by Dr. Fisher was filled for a patient at any pharmacy in

17    Cabell County serviced by any defendant in this case,

18    correct?

19    A.   Again, I'd have to consult the Drug Emporium data to

20    refresh my memory, but if someone has my report, I would be

21    happy to do that.

22    Q.   And would -- if you were to look at the profile of Dr.

23    Fisher in your report, would that help to refresh your

24    recollection about whether you identified any Dr. Fisher

25    prescriptions filled of any pharmacy customer of any
```

1    defendant here?

2    **A.**   Yes, please.

3    **Q.**   I think I still have it.

4          MS. WICHT:  Your Honor, may I approach?

5          THE WITNESS:  Thank you.  Sorry.

6          MS. WICHT:  That's okay.

7          THE WITNESS:  Oh, yes.  He would not appear in the

8    Drug Emporium data because he was licensed -- his license

9    was suspended in 2011 and the Emporium data starts in 2012.

10   **Q.**   Okay.  So, am I correct that your -- in the opinions

11   that you've offered, you've not identified any Dr. Fisher

12   prescriptions being filled at a pharmacy in Cabell County

13   that was serviced by any of the defendants in this case,

14   correct?

15   **A.**   It is possible that they were filled.  I don't have

16   that information.  Prescriptions are filled in various

17   locations, but -- so, I couldn't say if they were

18   definitively or not, but --

19   **Q.**   But you haven't identified that occurring in your

20   testimony or your report, correct?

21   **A.**   Correct.

22   **Q.**   Okay.  And another doctor who you mentioned this

23   morning briefly was Dr. -- Dr. Dawson.  Do you recall her?

24   **A.**   Yes.

25   **Q.**   And you testified this morning briefly that Dr. Dawson

```
 1    had had her license revoked and I think you said was later

 2    sentenced to prison, correct?

 3    A.   Yes.

 4    Q.   And, Ms. Keller, again, you did not identify in your

 5    testimony today any prescriptions written by Dr. Dawson

 6    filled at any pharmacy customer serviced by any defendant

 7    here, correct?

 8    A.   It is possible that they were filled, but I have not

 9    identified by name any pharmacy, no.

10    Q.   Ms. Keller, are you familiar with Dr. Rahul Gupta?

11    A.   No.

12    Q.   Are you aware Dr. Gupta was the former Secretary of the

13    West Virginia Board of Medicine?

14    A.   I'm not familiar with him.

15    Q.   Okay.  You don't recall -- he's actually the person who

16    signed the Dr. Webb consent order, but you're not familiar

17    with him?

18    A.   I didn't look at that specific name.  I apologize.

19    Q.   Okay.  Dr. Gupta testified a few weeks ago in this

20    trial and I want to show you his testimony.

21              MS. WICHT:  Could we pull up the transcript from

22    May the 6th, please?  Thank you.

23              BY MS. WICHT:

24    Q.   And it's at Page 143 starting on Line 11.  Dr. Gupta

25    was asked, "If the Board of Medicine were to receive
```

1    information from, let's say, this CSMP Review Committee,

2    here are your top five prescribers.  That is not a basis to

3    initiate an investigation, is it?"  And Dr. Gupta answered,

4    "Correct."  Do you see that testimony?

5    **A.**   That's what those words say, yes.

6    **Q.**   Okay.  But you weren't aware that Dr. Gupta testified

7    that identification of a prescriber as one of the top five

8    prescribers would not be a basis for the Board of Medicine

9    to initiate an investigation of that prescriber?

10   **A.**   Again, I'm not familiar with the investigative

11   practices of the Board of Medicine other than what I've

12   cited in my report.  Just for -- for a point of

13   clarification, what's the CSMP Review Committee?

14   **Q.**   Well, I mean, are you familiar with the West Virginia

15   CSMP?

16   **A.**   Is that -- is it an acronym for Controlled Substance

17   Monitoring Program?

18   **Q.**   Yes, ma'am.

19   **A.**   At a high level, I know that it exists.

20   **Q.**   Okay.  I don't have any questions about it, so I'm

21   going to move along from that.

22   **A.**   Okay.

23   **Q.**   Thank you.  Now, you don't have any basis to disagree

24   with what the former Secretary of the West Virginia Board of

25   Medicine said about how the Board of -- about whether the

1    Board of Medicine would initiate an investigation simply

2    based on a prescriber being among the top five, correct?

3    **A.**   I'm not offering an opinion on what the Board of

4    Medicine's practices are.

5    **Q.**   Okay.  Okay.  I'd like to talk to you now about some of

6    your specific data mining and analysis that you presented in

7    the tables and charts in your report.

8    **A.**   Okay.

9    **Q.**   So, one of the analyses of Xponent data that you

10   performed was to track prescriptions for opioids in Cabell

11   County over time as compared to state and national

12   prescription rates, correct?

13   **A.**   Generally, yes.  It's on a per capita basis, I believe.

14   **Q.**   Yes.  And one of the things that you found in that

15   analysis was that opioid dosage units prescribed in Cabell

16   County trended above state and national averages every year,

17   according to IQVIA data, correct?

18   **A.**   Correct.

19   **Q.**   And you prepared a graph about that, correct?

20   **A.**   Yes.

21          MS. WICHT:  Could I have Slide 17, please?

22          BY MS. WICHT:

23   **Q.**   And this is Figure 2 from your report, Dr. Keller.

24   This is the graph that you prepared, correct?

25   **A.**   Yes, ma'am.

1    **Q.**   And the blue line on the graph shows national opioid

2    prescribing rates?

3    **A.**   Correct.

4    **Q.**   And the red line shows West Virginia opioid prescribing

5    rates, correct?

6    **A.**   Yes.

7    **Q.**   And the green line shows Cabell County opioid

8    prescribing rates, correct?

9    **A.**   Correct.

10   **Q.**   So, your conclusion as reflected in this chart was that

11   Cabell County's opioid prescribing rates were significantly

12   higher than national prescribing rates, correct?

13   **A.**   They are above on a per capita basis the national and

14   the state averages.

15   **Q.**   And the Cabell County prescribing rates were

16   significantly higher than national rates in 1997 all the way

17   back at the beginning of your data, correct?

18   **A.**   Yes.  They were more than double.

19   **Q.**   And they continued to be significantly higher than

20   national rates throughout the entire time period of your

21   analysis, correct?

22   **A.**   Yes.  They were above the state and nation through the

23   remainder of the -- of the time period.

24   **Q.**   You also prepared a graph that showed the number of

25   dosage units and MMEs of opioids prescribed in Cabell County

1    on a monthly basis from 1997 through 2017, correct?

2    **A.**    Yes.  There's a few different charts there.

3    **Q.**    Okay.  And then the one we put the slide up on the

4    screen, the one I'm referring to is Figure 1 in your report.

5    Is that a graph that you prepared?

6    **A.**    Yes, Figure 1.

7    **Q.**    And in this graph the blue line is the number of dosage

8    units of opioids that were prescribed by doctors in Cabell

9    County, correct?

10   **A.**    And in comparison to Figure 2, just for clarification,

11   this is total dosage units instead of per capita.

12   **Q.**    Yes.  So, the blue line is the total dosage units of

13   opioids prescribed by doctors in Cabell County, correct?

14   **A.**    Exactly.

15   **Q.**    And then the red line is the total number of MMEs, of

16   opioids that were prescribed by doctors in Cabell County,

17   correct?

18   **A.**    Correct.  So, the -- and just to help folks with the

19   dual access -- axis chart, the left side measures the dosage

20   units and the right side of the chart measures the total

21   volume of MMEs.

22   **Q.**    So, what this chart shows, Ms. Keller, is that opioid

23   prescriptions in Cabell County increased from 1997 through

24   about 2010, correct?

25   **A.**    Generally, yes.

```
 1    Q.   And you're not offering any opinion on why
 2    prescriptions increased in that time frame, correct?
 3    A.   Correct.
 4    Q.   But you do know that more prescriptions were being
 5    written, correct?
 6    A.   Based on the data, yes.
 7    Q.   And based on the data, you also know that in addition
 8    to the total number of prescriptions increasing, the dosage
 9    units per prescription were also increasing over that time
10    period, too?
11    A.   Yes, they were increasing.
12    Q.   Okay.  And I think you said in your report that dosage
13    units written by the average prescriber, not top one
14    percent, just the average prescriber, increased from fewer
15    than 50 per prescription in 1997 to 70 per prescription in
16    2009; is that right?
17    A.   Correct.
18    Q.   That's what you saw in the data?
19    A.   Yep.  And that's shown in Figure 4.  I don't know if
20    you have it, but it increases to 70 and remains relatively
21    at that level through the remainder of the period.
22    Q.   Okay.  And then, you also know that by about -- by
23    2010, the average prescriber in Cabell County -- again, not
24    a top one percent or an average prescriber -- was writing
25    prescriptions totaling over 26,000 dosage units of opioids
```

1    in a year, correct?

2    **A.**    Where are you -- can you --

3    **Q.**    Sure.  Absolutely.  Would it help to look at your

4    report in order to refresh your recollection on those facts?

5    **A.**    I still have it up here.

6    **Q.**    Okay.  If you turn to Page 8, Paragraph 21 of your

7    report.  That's the very last sentence, I believe, of that

8    paragraph.

9    **A.**    Appreciate that.  By 2010, the average prescriber in

10   Cabell County was writing prescriptions totaling over 26,000

11   dosage units and 450,000 MMEs.

12   **Q.**    Now, you also know in that time period from 1997

13   through 2010 that there were just more doctors writing

14   prescriptions in Cabell County, correct?  And I'm happy to

15   direct you.

16          MS. WICHT:  If we can have Slide 19, please.

17          BY MS. WICHT:

18   **Q.**    I'm happy to direct you to the table in your report

19   that lays that out.  And we're going to -- this is Table 3

20   from your report and I'm just going to highlight that first

21   column which lays out the number of opioid prescribers as a

22   whole number, correct?

23   **A.**    Yes.  This is the total number of opioid prescribers.

24   Now, it may be different than total doctors because not all

25   doctors may prescribe, but this is -- and, again, it's

1    opioid prescribers appearing in the IQVIA Xponent data.

2    **Q.**   Okay.  So, in 1997, according to your table in 1997,

3    there were 392 opioid prescribers in Cabell County, correct?

4    **A.**   Correct.

5    **Q.**   And then, by 2010, there were 556 opioid prescribers in

6    Cabell County, correct?

7    **A.**   Correct.

8    **Q.**   And now, you don't have any reason to believe that

9    those additional prescribers were not appropriately licensed

10   and registered, correct?

11   **A.**   That -- I'm not offering that opinion.

12   **Q.**   Okay.  So, between 1997 and 2010, in your analysis of

13   the data, you saw increasing numbers of opioid prescribers

14   in Cabell County, increasing numbers of opioid prescriptions

15   in Cabell County, and increasing numbers of opioid pills per

16   prescription in Cabell County, correct?

17   **A.**   Correct.

18   **Q.**   More prescribers writing more prescriptions for more

19   pills, correct?

20   **A.**   Generally, yes.

21   **Q.**   Okay.

22          MS. WICHT:  If we could please go back to Slide

23   20, to Figure 1 in your report.

24          BY MS. WICHT:

25   **Q.**   Okay.  So, after increasing from 1997 to 2010, opioid

1    prescriptions in Cabell County generally fell from 2010

2    through 2017, although with a bit of a notch upward there in

3    late 2014 or early 2015, correct?

4    **A.**   Yes.

5    **Q.**   And, again, you don't have -- you're not offering an

6    opinion on why prescriptions decreased in that time period,

7    correct?

8    **A.**   Correct.

9    **Q.**   You just observed in the data that they did, correct?

10   **A.**   Correct.

11   **Q.**   I'd like to show you another chart that's been admitted

12   into evidence in this case.  It's Slide 21, P-44711, Page

13   11.  Now, this is a chart by another plaintiffs' expert, Dr.

14   McCann.  You know Dr. McCann, don't you?

15   **A.**   I know his name.  By name.  I don't know him well.

16   **Q.**   Okay.  And Dr. McCann used publicly available ARCOS

17   data to track the distribution of oxycodone and hydrocodone

18   into the three-digit zip code containing Cabell-Huntington

19   by all distributors from '97 through 2019.

20           MS. WICHT:  And may I approach the screen, Your

21   Honor?

22           THE COURT:  Yes.

23           BY MS. WICHT:

24   **Q.**   And I'll just represent to you, Ms. Keller, that the

25   information about what Dr. McCann was looking at is

1    reflected up here in the corner of this table and then you

2    can see the source down here is the ARCOS Retail Drug

3    Summary Reports.  Do you see that?

4    **A.**   Yes.

5    **Q.**   Now, you didn't analyze yourself ARCOS data in this

6    case, correct, other than maybe to validate the Drug

7    Emporium data, right?

8    **A.**   It's usually -- yeah.  We use it to help -- I wouldn't

9    use validate.  Just even to help fill in gaps for county or

10   -- I think the Drug Emporium data had some DEA numbers in

11   it, so we did some matching to that data that way.  I think

12   I may have also used it cursory to add county to IQVIA data

13   based off of city.

14   **Q.**   Okay.  So, you're generally familiar with ARCOS data,

15   correct?

16   **A.**   Yes, ma'am.

17   **Q.**   And you know that ARCOS data, among other things, shows

18   shipments by distributors to pharmacies, correct?

19   **A.**   Yes.  It shows shipments by distributors to pharmacies,

20   manufacturers to distributors.

21   **Q.**   But ARCOS doesn't show prescription data, correct?

22   **A.**   It doesn't show prescription data, correct, but it --

23   my understanding is it would be a reflection of the

24   prescribing because orders ultimately fill prescriptions

25   that are written.

1    Q.   Okay.  So, if I could have Slide 22, please, because

2    that's what I would like to do, is compare your chart with

3    Dr. McCann's chart.  And you would agree that those two

4    charts have the same shape generally, don't they?

5    A.   They generally increase.

6    Q.   They -- and I'm happy to break it down a little bit for

7    you, if that -- that would be helpful.  They basically both

8    show an upward trend through 2010, correct?

9    A.   Yes.

10   Q.   And they both show a downward trend from 2011 through

11   2017, but with that spike again in 2014-2015, correct?

12   A.   They generally follow that pattern, yes.

13   Q.   Okay.  So, the chart that shows prescriptions and the

14   chart that show distributions generally follow the same

15   pattern, correct?

16   A.   Yes.

17   Q.   Now, you also did an analysis, Ms. Keller, of the

18   states with the highest per capita opioid prescribing,

19   correct?

20   A.   Yes, ma'am.

21   Q.   And I'm happy to show you on Slide 23.  It's your Table

22   2 that has that analysis.  Now, your analysis shows West

23   Virginia as having the third highest number of opioid

24   prescriptions per capita when we look across that entire

25   time period, 1997 to 2017, correct?

1    **A.**   Yes.  It's third highest prescriptions per capita,

2    first highest in dosage units per capita, and fourth highest

3    in MMEs per capita.

4    **Q.**   Okay.  And your analysis -- this analysis was done

5    using Xponent prescription data, correct?

6    **A.**   Yes, ma'am.

7    **Q.**   I'm going to show you another one of Dr. McCann's

8    charts, which is at 44711, Page 6, and it's Slide 24.

9         Now, Dr. McCann used ARCOS data, distribution data, to

10   create a chart of oxycodone and hydrocodone distributions

11   per capita among the states.  Do you see that that's how he

12   has that chart labeled?

13   **A.**   Yes.

14   **Q.**   Okay.  And you see that Dr. McCann's chart shows that

15   West Virginia had among the highest distributions of

16   oxycodone and hydrocodone per capita for most of the time

17   period between 1997 and 2017, correct?  His data goes a

18   little bit -- a little bit more recent than yours, but if

19   you look at the same time period as yours, '97 to 2017, you

20   agree that Dr. McCann's chart would show West Virginia

21   having among the highest distributions of oxycodone and

22   hydrocodone per capita during that time period, correct?

23   **A.**   Yes.

24   **Q.**   So, you would agree that, again, your analysis of

25   opioid prescriptions per capita in West Virginia is

```
 1    consistent with Dr. McCann's analysis of oxycodone and

 2    hydrocodone distributions per capita in West Virginia,

 3    correct?

 4    A.    Insofar as we both say that West Virginia was one of

 5    the higher per capita states, yes.

 6    Q.    And -- okay.  Yeah.  Fair enough.

 7    A.    We do -- I do want to point out my Table 2 includes

 8    additional opioids and so that oxymorphone or codeine, those

 9    molecules would also be included in my analysis.

10    Q.    It does.  And to the extent that there might be slight

11    differences between your ranking of West Virginia and Dr.

12    McCann's ranking of West Virginia, the fact that you looked

13    at additional drugs might explain that, correct?

14    A.    Yes.  And, of course, they're two different datasets.

15    Q.    Okay.  Okay.  I want to look at one more of your

16    analyses, Ms. Keller.

17          MS. WICHT:  Well, let me actually pause and ask

18    the Court what you prefer to do about the break this

19    afternoon?

20          THE COURT:  Press on.  Press on.  Let's get this

21    done.

22          MS. WICHT:  Very good.  I will.  Okay.

23          BY MS. WICHT:

24    Q.    Ms. Keller, you also used Xponent data to determine

25    opioid prescribing per capita in Cabell-Huntington, correct?
```

1    **A.**   Yes.

2    **Q.**   Okay.  And pull up Slide 25, please, which is Table 3

3    of your report.  And this is your chart reflecting opioid,

4    among other things, but opioid prescribing per capita in

5    Cabell County, correct?

6    **A.**   Yes.

7    **Q.**   Okay.  And I want to focus in on the columns and you

8    can see I have a little pre-highlighting in there.  I'm

9    going to focus in on the dosage unit per capita columns,

10   okay?  Now, a dosage unit generally means a pill, right?

11   **A.**   Yes.

12   **Q.**   Okay.  And the -- your dosage units per capita rank

13   column lays out where Cabell County ranks among counties in

14   the nation in terms of opioid pills prescribed per capita,

15   correct?

16   **A.**   Yes.  And just for the Court's knowledge, there's about

17   3,000-some counties in the country.  So, just so we know

18   what the denominator is.

19   **Q.**   Okay.  So, in 1997, Cabell County had the 23rd highest

20   number of opioid pills prescribed on a per capita basis of

21   all the counties in the United States, correct?

22   **A.**   Correct.

23   **Q.**   And Cabell County's ranking as you -- as you did it,

24   peaked in 2008, when it was ranked eighth in the nation in

25   terms of the number of opioid medications prescribed on a

1    per capita basis, correct?

2    **A.**    Their ranking was the lowest.  So, it peaked in 2006 at

3    142 dosage units per capita, but the highest dosage unit per

4    capita value is a few years later.

5    **Q.**    Yes.  And to be clear, my question was just about the

6    ranking.  So, their highest ranking was in 2009, when they

7    were eighth in the nation in terms of the number of opioid

8    pills prescribed per capita, correct?

9    **A.**    Correct.

10    **Q.**    Okay.  Now, I am going to focus on the years between

11    2006 and 2014, which is -- which is what we have highlighted

12    on here, and I want to look at the dosage units per capita.

13    So, using the IQVIA Xponent data, you concluded that doctors

14    prescribed anywhere between 116.5 and 157.9 dosage units of

15    opioid medications per capita in Cabell County in those

16    years, correct?

17    **A.**    Yes.  In those years, that's the range of the dosage

18    units prescribed.  In other years, it's lower, but --

19    **Q.**    Right.  That's focusing just on those -- those years

20    for right now.

21        Okay.  So, I'm going to ask you -- and if the Court

22    will allow me to, I'm going to provide you a calculator and

23    I'm going to just ask you to average those numbers.  So,

24    very, very basic math, I hope, on the stand.

25              MS. WICHT:  May I approach, Your Honor?

```
 1                    THE COURT:  Yes.

 2                    THE WITNESS:  Oh, I think I still have one.

 3                    MS. WICHT:  Oh, you brought your own calculator.

 4                    THE WITNESS:  Well, this, I believe, is leftovers

 5        from Dr. Keyes' examination.

 6                    MS. WICHT:  Excellent.  That might be a more

 7        complicated calculator than we need in order to perform this

 8        average calculation, Ms. Keller.

 9                    BY MS. WICHT:

10        Q.   Okay.  So, I will ask you to take those dosage units

11        per capita numbers and just average them, please.

12             I'm going to really tempt fate and write on the white

13        board, if I can.

14        A.   You couldn't have made it ten years to make it easy?

15        Q.   I know.

16        A.   All right.

17        Q.   Okay.  Are you ready with the number?  I'm going to

18        write some things up here.  Are you ready for me?

19        A.   Okay, we'll see.  I might need to double check it here.

20        There is nothing I love more than doing math on the stand.

21        Q.   Okay.  So, what we're focusing on here is 2006 to 2014

22        in Cabell County, correct?

23        A.   Yes, ma'am.

24        Q.   Okay.  And the data that you analyzed is prescription

25        data from IQVIA, correct?
```

**A.**   Yes, ma'am.

**Q.**   Okay.  This is going to be the moment of truth to see

if I did it correctly.  What did you determine was the

average number of pills per capita prescribed in Cabell

County in those years?

**A.**   Without double checking my work, which I always do,

I've got 141.2.

**Q.**   All right.  Well, I think we're going to count this as

a double check because that's what I got, too.  So, I think

we'll -- we'll count that as a double check.

So, 141.2 pills per person on average prescribed in

Cabell County in those years, correct?

**A.**   Correct.

**Q.**   Okay.  All right.  I'm going to direct you to one more

of Dr. McCann's charts.

MS. WICHT:  If I move away from this to a

document, it will still exist, won't it?

MR. ACKERMAN:  Yes.

MS. WICHT:  Okay, thank you.  And I should press

this button to move away?  The red button?

I'm sorry, Your Honor.  This is my first foray.

THE COURT:  I'm totally incompetent when it comes

to stuff like that.

BY MR. WICHT:

**Q.**   Okay.  I'm going to show you Slide 29, please, which is

1    Dr. McCann's analysis that's been admitted as P-447113.

2        Okay.  So, again, what Dr. McCann did here is that he

3    used ARCOS data.  You can see that -- maybe you can see that

4    source down in the corner, right, Ms. Keller?

5    **A.**   Yes.

6    **Q.**   Okay.  And what he did was calculate all distributions

7    by all distributors for 14 opioid medications into Cabell

8    and Huntington from 2006 through 2014.

9        Now, I'd ask you to look -- come all the way over here

10   in the corner at his Cabell-Huntington analysis and can you

11   see that what Dr. McCann calculated was an average of 142.19

12   dosage units shipped per capita in Cabell County, correct?

13   **A.**   I see that there.

14   **Q.**   Okay.  So, let's just compare that to your analysis.

15   Okay.  So, Dr. McCann looked at distributions from ARCOS and

16   he concluded that the distribution showed 142.19 pills per

17   person, correct?

18   **A.**   Correct.

19   **Q.**   Now, do you have any quarrel, Ms. Keller, with the

20   observation that your per capita prescription analysis and

21   Dr. McCann's per capita distribution analysis come within

22   one pill of each other over this nine-year period?

23   **A.**   That's what the math is, yeah.

24   **Q.**   That's what the math shows.  So, the IQVIA prescription

25   data and the ARCOS distribution data get us to the same

1    place, correct?

2    **A.**    Again, they're two different sides of -- one is

3    shipments and one is prescriptions, but they -- for that

4    time period, we both arrive at about the same number of

5    pills per person.

6    **Q.**    And I think what you were saying, are they two

7    different sides of the same coin, basically?

8    **A.**    I don't know that I'd use same coin, but one is

9    shipments and one is prescriptions.  It's all part of one

10   system.

11          MS. WICHT:  May I take a moment to confer, Your

12   Honor?

13          THE COURT:  Yes.  This might be a good time for a

14   break anyway.

15          MS. WICHT:  Sure.

16          THE COURT:  Okay.

17       (Recess taken)

18       (Proceedings resumed at 3:43 p.m.)

19          THE COURT:  All right, Ms. Wicht, you may

20   proceed.

21          MS. WICHT:  I -- Your Honor, --

22          THE COURT:  And I figure you're almost finished.

23          MS. WICHT:  In fact, I am finished.  I'm only

24   coming up to say that I would like to mark my first foray

25   into the big board, which is now gone, but as CAH Demo 1,

1          please.

2                    THE COURT:  All right.  Mr. Mahady.

3                    MR. MAHADY:  No objection to that.  I'm next.

4                           CROSS EXAMINATION

5          BY MR. MAHADY:

6          Q.   Ms. Keller, good afternoon.  My name is Joe Mahady.

7          I represent AmerisourceBergen along with my colleagues

8          here at the table.  It's nice to meet you.

9          A.   You as well.

10         Q.   Ms. Wicht focused a little bit more on the Xponent

11         data, so I'm going to start with the Drug Emporium data that

12         you analyzed as part of your expert report.

13              So just to be clear, you did review the dispensing data

14         for Drug Emporium as part of your analysis; correct?

15         A.   Correct.

16         Q.   And the time period at issue for that data was 2012 to

17         2018; correct?

18         A.   That was the filling date of the dataset.

19         Q.   Okay.  As it relates to Drug Emporium, you were not

20         offering any opinions prior to 2012; correct?

21         A.   As it relates to that dataset, no, I could not.  It's

22         not available in that data.

23         Q.   Okay.  You've never been to this Drug Emporium

24         location; right?

25         A.   No.

1    **Q.**   And you've never spoken to the pharmacist who actually

2    dispensed the medication at Drug Emporium; correct?

3    **A.**   Correct.

4    **Q.**   And you've never spoken to the doctors that prescribed

5    the prescriptions that appear in the data; correct?

6    **A.**   Correct.

7    **Q.**   You have no information about the patients that

8    actually received the prescriptions that are reflected in

9    the data; correct?

10   **A.**   That information isn't in the dataset.

11   **Q.**   Okay.  And the data that you received from Drug

12   Emporium and analyzed, it was not limited to opioids;

13   correct?

14   **A.**   Correct.

15   **Q.**   It included dispensing records for all prescription

16   medications including non-controlled substances; right?

17   **A.**   Correct.

18   **Q.**   You did not do any analysis of those specific drugs

19   that were distributed by AmerisourceBergen or Cardinal

20   during that time period; correct?

21   **A.**   I did -- there is a table in my report that ranks the

22   total prescriptions from, from that dataset regardless of

23   opioid or non-opioid.

24   **Q.**   Okay.  We'll look at that in one second.  Do you have

25   the demonstrative packet that Ms. Singer used with you this

```
 1   morning?

 2   A.   No, I do not.

 3   Q.   Okay.

 4            MR. MAHADY:  Do you mind if I provide her with a

 5   copy of the demonstrative packet?

 6            MR. ACKERMAN:  What is it?

 7            MR. MAHADY:  It's the demonstratives you had.

 8            MS. SINGER:  No.

 9            MR. MAHADY:  Let's just pull it up.

10       Can you please pull up plaintiffs' demonstrative slide

11   6?  Okay.

12   BY MR. MAHADY:

13   Q.   Ms. Keller, you testified this morning that these

14   were the two datasets that you analyzed; correct?

15   A.   Yes.

16   Q.   And under Drug Emporium it says that it included more

17   than 650 prescription records; right?

18   A.   Yes.

19   Q.   Does that mean 650,000 prescriptions?

20   A.   It means lines of data.  So one prescription could

21   authorize refills for like non-controlled substances.  So

22   specific prescriptions given a unique Rx number would be

23   lower.

24   Q.   Okay.  But there were hundreds of thousands of

25   prescriptions reflected in the data?
```

1    **A.**    Correct.

2    **Q.**    Okay.  I do now want to turn to that table you just

3    referenced which I believe is Table 9 in your expert report.

4                MR. MAHADY:  Can you please pull that up?

5    BY MR. MAHADY:

6    **Q.**    Okay.  I just want to note before we go through

7    this that there is a typo that was discussed at your

8    deposition; correct?  It says IQVIA Xponent.  This is

9    actually based off the Drug Emporium data; right, Ms.

10   Keller?

11   **A.**    Yes, it is.  I apologize.

12   **Q.**    No apologies necessary.  Now, what this table shows are

13   the top 10 prescribers who had their prescriptions filled at

14   Drug Emporium for both controlled and non-controlled

15   substances; correct?

16   **A.**    Correct.

17   **Q.**    Okay.  And you have offered an opinion here today about

18   Timothy Saxe; correct?

19   **A.**    Correct.

20   **Q.**    Matthew Harris?

21   **A.**    Correct.

22   **Q.**    David Patrick?

23   **A.**    Okay.  He's not in the top 10 list from -- that we

24   discussed earlier today, so, no.

25   **Q.**    Okay.  You're not offering an opinion about Cynthia

1    Pinson?

2    **A.**    Correct.

3    **Q.**    Matthew Weimer?

4    **A.**    Correct.

5    **Q.**    Donald Klinestiver?

6    **A.**    Correct.

7    **Q.**    Harry Marcuzzi?

8    **A.**    Correct.

9    **Q.**    Melin Moses?

10   **A.**    Correct.

11   **Q.**    Shawn Coffman?  Correct?

12   **A.**    Shawn Coffman actually appears in Table 8.  So to the

13   extent that he is there, I offer that opinion.

14   **Q.**    Okay.  But you have no specific opinions about his

15   prescribing opioids beyond what may appear in the table;

16   correct?

17   **A.**    Correct.

18   **Q.**    And the same is true for Russell Snyder; correct?

19   **A.**    Correct.

20   **Q.**    You take no issue with those 10 individuals who were

21   the top prescribers as reflected by your analysis; correct?

22   **A.**    To be clear, I don't take issue with any prescriber.  I

23   merely note their presence in the data.

24   **Q.**    Okay.  And you're not aware of any disciplinary records

25   for those individuals?

1    **A.**    I haven't done that analysis, so I couldn't say.

2    **Q.**    Okay.  Let's look at the other chart for Drug Emporium

3    data which, I believe, is Table 12, or slide 12 of the

4    plaintiffs' demonstrative.

5         Okay.  And, Ms. Keller, what this table reflects, as I

6    believe you testified this morning, are the top 10

7    prescribers based off of the highest proportion of opioid

8    prescriptions; correct?

9    **A.**    Correct.

10   **Q.**    Okay.  And I just want to go through these quickly as

11   well.  Deleno Webb.  We will come back to him.

12        David Caraway.  You did not offer any specific opinions

13   about Mr. Caraway this morning; correct?

14   **A.**    But he does appear in my report.

15   **Q.**    But this morning you offered no specific opinions about

16   him; correct?

17   **A.**    Correct.  He also appears in Table 8 that we did

18   discuss this morning.

19   **Q.**    Okay.  Beyond the table, you offer no specific

20   opinions?

21   **A.**    Correct.

22   **Q.**    Same for Hollingsworth?

23   **A.**    Hollingsworth was not in Table 8.

24   **Q.**    Same for Ozturk?

25   **A.**    Ozturk is in the -- he is in Table 8.

1   Q.   Okay.  But you have not featured him here today during

2   your questioning with the plaintiffs; correct?

3   A.   Correct.

4   Q.   Same with Spangler?

5   A.   Correct.

6   Q.   Adams?

7   A.   Yes.

8   Q.   Saxe?

9   A.   Yes.

10   Q.   Steele?

11   A.   Yes.

12   Q.   Houdersheldt?

13   A.   Correct.

14   Q.   And Carico; correct?

15   A.   Carico is in Table 8 and I believe he is also profiled

16   in my report.

17   Q.   Okay.  But this morning you offered no specific

18   opinions about that doctor; correct?

19   A.   Correct.

20   Q.   So the only doctor that appears on the list here that

21   you did testify about this morning is Deleno Webb; correct?

22   A.   Correct.

23   Q.   All right.  Now, we just saw a slide that there were

24   650,000 records in the dispensing data for Drug Emporium.

25   How many of those were opioid prescriptions?  And I'm

1  looking specifically at the column "opioid prescriptions."

2  Opioid prescriptions for Deleno Webb.

3  **A.**   How many of the 650,000 were opioid prescriptions for

4  Deleno Webb?

5  **Q.**   Correct.

6  **A.**   1,782.

7  **Q.**   Okay.  And do you have the calculator up there for you?

8  **A.**   I do.

9  **Q.**   What percentage of 650,000 is 1,782?

10  **A.**   Well, it's not really -- I mean, I'll do the math for

11  you, of course, but you're comparing opioid prescriptions to

12  total prescriptions.  I think it would be -- it would be

13  more appropriate to compare total prescriptions to total

14  prescriptions.

15  **Q.**   We're looking at the -- historically as a whole.  So I

16  do want to know the answer to my question which is what

17  percentage of 650,000, appreciating that represents all the

18  prescriptions filled by the store during that time period,

19  are the 1,782 by Deleno Webb?

20  **A.**   .002 so that would be about two -- .2 percent.

21  **Q.**   .2 percent.  So 99.8 percent of the prescriptions

22  reflected in that data were not for Deleno Webb; correct?

23  **A.**   Correct.

24  **Q.**   And you understand that was an AmerisourceBergen

25  customer; correct?

1    **A.**   I -- I'm not sure that I know for certain either way

2    but --

3    **Q.**   That's fine.  At the end of your questioning this

4    morning with Ms. Singer, I believe you referenced two

5    Walgreens locations that were serviced by AmerisourceBergen;

6    correct?

7    **A.**   Yes.

8    **Q.**   And you said that AmerisourceBergen received

9    information about the dispensing at those two locations;

10   correct?

11   **A.**   I think I was speaking more about Walgreens generally.

12   I've seen the data for all Walgreens locations.  So if there

13   happened to be two in, in Cabell County, then that would be

14   included in those datasets that I was testifying to this

15   morning.

16   **Q.**   Okay.  Do you recall that in your report you identify

17   two Walgreens locations for AmerisourceBergen?

18   **A.**   Thank you.  If I could refresh my memory, I would like

19   to.  Do you have a page number?

20   **Q.**   Sure.  Why don't you take a look at -- and you can pull

21   it up.  It's Page 21 of your report, Paragraph 30.  And I'll

22   ask you some specific questions about Deleno Webb.  Okay.

23       Ms. Keller, do you recognize this language from your

24   report?

25   **A.**   Yes.

1    Q.   Okay.  You say, "According to internal

2    AmerisourceBergen documents from April, 2013 and September,

3    2015, Webb was a leading prescriber at a Walgreens store on

4    6414 U.S. 60 East in Barboursville, West Virginia."

5         Did I read that correctly?

6    A.   Yes.

7    Q.   Okay.  Does that kind of refresh your recollection that

8    you did identify some Walgreens stores for

9    AmerisourceBergen?

10   A.   Thank you for reminding me.

11   Q.   No problem.  Okay.  And you cite Footnote 28 in your

12   report.

13        MR. MAHADY:  If you can pull that up, Ritchie.

14   BY MR. MAHADY:

15   Q.   Okay.  So what I want to do is hand you those two

16   documents and just ask you a few questions about those

17   documents.

18   A.   Okay.

19   Q.   '13, '15.

20   A.   Okay.

21   Q.   We'll start with '13.

22   A.   Okay.

23   Q.   I'll put this right here.

24   A.   Okay.

25   Q.   Ms. Keller, I want to start with the document that is

```
 1    labeled P-441608.  This is an excerpt from a larger

 2    spreadsheet.  I'll represent to you that it's been filtered

 3    down to this specific Walgreens in this jurisdiction.

 4         I want to begin with the page that has the Walgreens --

 5    well, before I do that, let me back up.

 6         Ms. Keller, do you see on the lower right-hand corner

 7    that there is a Bates number, which is -- at this point, I'm

 8    sure you're familiar with what Bates numbers are.

 9    ABDC-MDL-00282553.  Do you see that?

10    A.   Yep.

11    Q.   And that's what you cite in your report to say that

12    Deleno Webb is a leading prescriber at this Walgreens

13    location in 2013; correct?

14    A.   Correct.

15    Q.   Okay.  And if we look at the first page of this which

16    has the Walgreens logo, it says, "Data contained in this

17    spreadsheet is based on prescriptions sold for the period

18    1/1/2013 to 4/1/2013.  Did I read that correctly?

19    A.   Correct.

20    Q.   So this contains data for a three-month period for the

21    first quarter in 2013; right?

22    A.   Yes.

23    Q.   Okay.  If we turn to the next page, this is really what

24    we're going to look at in a second.  You'll see that there's

25    two locations here.  There's the 6414 60 East and that's
```

1    Store Number 11977.  Do you see that, Ms. Keller?

2    **A.**    Yes.

3    **Q.**    Okay.  And to move this along, there is another

4    location and that's 11980.  Do you see that?

5    **A.**    Yes.

6    **Q.**    Okay.  We'll come back to that one.  Let's stick with

7    11977.  If you turn to the next page, okay, and as you'll

8    see here on the top line is Deleno Webb; correct?

9    **A.**    Yes.

10   **Q.**    Okay.  And if we look at Column D, Scripts, for the

11   quarter, for that three-month period, how many scripts were

12   filled for Deleno Webb?

13   **A.**    73.

14   **Q.**    Okay.  And if we look to the Column E, it's supposed to

15   be a percentage, but I don't believe it's calculated that

16   way.  But as you just did, if you calculate that figure to a

17   percentage, what percentage of the prescriptions for all

18   products filled at that store were for Deleno Webb in this

19   three-month time period?

20   **A.**    The Column E says .00506, but I've never been able to

21   replicate that math.  So I'm not sure if it's the 160

22   prescriptions per day times 30.  I've always wondered what

23   that is.

24   **Q.**    Let's do it.  So -- this is going to be dangerous, but

25   we'll try it.

1      All right.  Ms. Keller, if we can do -- if you can

2   calculate for me 160, which is the store average Rx daily

3   for controlled and non-controlled, times 90, which is the

4   90-day period for this quarterly report.  And when you have

5   a figure, can you tell me what that is?

6   **A.**   Are you going to take my word for it?

7   **Q.**   I'll take your word for it.  Don't be shy.  I've got a

8   problem with it.  Mine's wrong.  What figure do you have?

9   **A.**   I have 144,000, so 14,400.  Did I do that right?

10  **Q.**   150 times 90.  Try it one more time.

11  **A.**   14,400.

12  **Q.**   So 14,400?

13  **A.**   Thank you.  Gees.

14  **Q.**   Okay.  Now, if you were to take the 73 figure and

15  divide it by 14,000, what do you get?

16  **A.**   .00506.

17  **Q.**   Okay.  And that matches the percentage to overall

18  volume as reflected in the chart; correct?

19  **A.**   Yes.

20  **Q.**   All right.  You solved it.  Now, if you were to convert

21  .00506 to a percentage, you'd multiply that by 100; correct?

22  **A.**   Correct.

23  **Q.**   Can you do that for me, please?

24  **A.**   It would be .506.  You just move the decimal points

25  over two digits.

1    Q.    All right.  And that's half of one percent; correct?

2    A.    That's what that math is.  But Deleno Webb is the

3    largest prescriber for the store.

4    Q.    Fair.  And just because someone's the largest

5    prescriber for a store, it doesn't mean that that store is

6    filling a lot of prescriptions for that doctor as reflected

7    by this example; correct?

8    A.    Well, he is the largest, so I mean a lot compared to

9    other physicians, yes.

10   Q.    Okay.  Now, for this time period, Deleno Webb,

11   prescriptions at this Walgreens location represented less

12   than one percent of the prescriptions that were being filled

13   by that store; correct?

14   A.    Yes.

15   Q.    Okay.  Now, let's take a look at the 2015 one, and it's

16   a little bit easier.  Okay.

17            MR. MAHADY:  Ritchie, could you pull up the 2015

18   one when you get a chance?  Okay.

19   BY MR. MAHADY:

20   Q.    And here they've converted it to a percentage.  If

21   you don't trust my math, we can do it.  But in 2015 for

22   this three-month period, what percentage of the

23   prescriptions were for Deleno Webb?

24   A.    .46.  But, again, he is the largest prescriber in the

25   store.

1   **Q.**   Okay.  But, again, 99.5 percent of the prescriptions

2   were filled for someone other than Deleno Webb; correct?

3   **A.**   That is the correct math, but Dr. Webb is nearly double

4   the next largest prescriber.

5   **Q.**   Okay.  This is in 2015; correct?

6   **A.**   Yes.

7   **Q.**   Okay.  And I believe, based off of your answers to Ms.

8   Wicht's questioning, AmerisourceBergen would not have known

9   about the disciplinary actions that were to come later on

10   when this chart was prepared; correct?

11  **A.**   Are you asking me if they would know into the future?

12  No.

13  **Q.**   Okay.  Thank you.  Okay.

14  **A.**   But -- I'm sorry, just one more thing.  At that point

15  in time, they would have known about the, the Workman's

16  Compensation Board notice of 2005.

17          MR. MAHADY:  Your Honor, I respectfully would ask

18  to strike that answer based off the fact that the document

19  that was used to support that, our objection to that was

20  sustained.

21          MR. ACKERMAN:  I would object, Your Honor, and

22  note that counsel to the previous cross-examination

23  specifically referenced the disciplinary action in 2005.

24          MR. MAHADY:  I raised my objection for

25  AmerisourceBergen.

```
 1              MR. ACKERMAN:  Can't control what other defendants
 2    put into evidence, Your Honor.
 3              THE COURT:  Well, I think she's explaining her
 4    answer.  I'll overrule your objection, or deny the motion to
 5    strike, whatever it was.
 6              MR. MAHADY:  Okay.
 7    BY MR. MAHADY:
 8    Q.   I want to talk about one of the other doctors you
 9    referenced this morning and that's Gregory Chaney.
10              MR. MAHADY:  And if we can pull up Paragraph 40 of
11    the report.
12    BY MR. MAHADY:
13    Q.   Okay.  And here, Ms. Keller, you identify for
14    Mr. Chaney two Walgreens locations; correct?
15    A.   Yes.
16    Q.   You don't identify any other AmerisourceBergen customer
17    in Track 2; correct?
18    A.   Correct.
19    Q.   Okay.  And if we can go back to the 2013 spreadsheet,
20    I'll represent to you that these are the same two
21    spreadsheets that are cited here.
22    A.   Oh, no.
23              MR. ACKERMAN:  I want to see what he's doing.
24              MR. MAHADY:  Nothing good.
25         Can you pull up the 2013 Walgreens spreadsheet please?
```

1    BY MR. MAHADY:

2    **Q.**   Okay.  Now, I'm not going to go through the math

3    again.  I think we already determined that Deleno Webb

4    was .5 percent; correct?

5    **A.**   Yes.

6    **Q.**   And if you apply the same math, what is this with Dr.

7    Chaney?

8    **A.**   On this document, Dr. Chaney is .4 percent for Store

9    Number 1197 which would place him to be the second largest

10   prescriber next to Deleno Webb.

11   **Q.**   Okay.  So 99.6 percent of the prescriptions that were

12   dispensed at drug -- I'm sorry -- Walgreens for that

13   three-month period were for someone other than Dr. Chaney;

14   correct?

15   **A.**   That math is correct.  One other thing I'd like to

16   point out, though, is Dr. Chaney shows up for two separate

17   stores.  He also shows up for Store 11980 as a top

18   prescriber.

19   **Q.**   Sure.  And what percentage of the prescriptions did

20   Store 11980 fill for Dr. Chaney in this three-month time

21   period?

22   **A.**   .1 percent.

23   **Q.**   Okay.  So 99.9 percent of the prescriptions that

24   Walgreens filled during that time period were for someone

25   other than Dr. Chaney; correct?

1    **A.**    Correct.

2    **Q.**    Okay.  Now, this morning you testified that there were

3    subsequent enforcement actions or disciplinary actions

4    involving Dr. Chaney; correct?

5    **A.**    Correct.

6    **Q.**    All right.  The complaint -- let's just look at the

7    document.  Do you have the few documents -- I believe they

8    were handed to you.  If not, we can -- one was 43538,

9    P-43538.  Another was 43539.  Let me know if you have it,

10   Ms. Keller.  If not --

11   **A.**    I do.  I've just got a mess here.  I never work with

12   paper so -- here we go.  Always digital.

13   **Q.**    Okay.  Are you ready?

14   **A.**    Yes.

15   **Q.**    I want to start with 43539.  I just want to look at

16   Paragraph 3.

17          In Paragraph 3 it states on January 11, 2016, the Board

18   took summary disciplinary action to suspend Dr. Chaney's

19   license; correct?

20   **A.**    Correct.

21   **Q.**    Prior to that date, Dr. Chaney was licensed to

22   prescribe opioids in the State of West Virginia; correct?

23   **A.**    Yes.

24   **Q.**    And that was based off of a license that was given to

25   him by the Board of Medicine?

```
 1    A.    Correct.

 2    Q.    AmerisourceBergen does not give Dr. Chaney a license to

 3    prescribe opioids; correct?

 4    A.    Not to my knowledge, no.

 5    Q.    Neither did McKesson; correct?

 6    A.    Correct.

 7    Q.    Neither did Cardinal?

 8    A.    Correct.

 9    Q.    The State of West Virginia; right?

10    A.    I believe so, yes.

11    Q.    Okay.  And the State of West Virginia was the only one

12    that could take away that license; correct?

13    A.    Correct.

14    Q.    All right.  Now, --

15    A.    Well, I'm actually -- I don't want to say fully because

16    I don't know if anybody else could possibly take away that

17    license.  I don't want to speak to any other regulatory

18    matters.  So I'd actually be more confident saying I'm not

19    sure.

20    Q.    Okay.  But not these three defendants; right?

21    A.    Correct.

22    Q.    I want to go back and look at the other document which

23    you have which is 43538.  I think you referenced it this

24    morning.

25          If we can turn to Page 3 and I want to start with
```

```
 1    Paragraph 6.  It says, "On or about January 6, 2015 --" so
 2    we're going back in time one year from when they actually
 3    suspended his license.  It says, "The board received a
 4    complaint questionnaire asserting allegations that
 5    Dr. Chaney improperly prescribed medications, including
 6    narcotics, to a patient who subsequently died."
 7         Did I read that correctly?
 8    A.   Correct.
 9    Q.   Okay.  And that's January 6th, 2015; right?
10    A.   Correct.
11    Q.   And that complaint went to the Board of Medicine;
12    correct?
13    A.   The Board says they received a complaint, yes.
14    Q.   Not AmerisourceBergen; correct?
15    A.   Correct.
16    Q.   Not Cardinal?
17    A.   Correct.
18    Q.   Not McKesson?
19    A.   Correct.
20    Q.   All right.  If you can go to the next paragraph.  Okay.
21         "The Complaint Committee is conducting a confidential
22    investigation into the allegations of the complaint
23    questionnaire and related matters which are developing as
24    the investigation proceeds.  This is an on-going,
25    confidential matter."
```

1          Did I read that correctly?

2     **A.**    Yes.

3     **Q.**    Okay.  So during this 2015 time period when he

4     continues to prescribe opioids, the fact that there's a

5     complaint with the Board of Medicine is a confidential

6     matter, at least as described in this document; correct?

7     **A.**    Yes.

8     **Q.**    Okay.  Next paragraph:  "Associated with its

9     investigation the Complaint Committee requested that

10    Dr. Chaney appear at the committee's September 13th, 2015

11    meeting."

12         Did I read that correctly?

13    **A.**    Yes.

14    **Q.**    Okay.  So they received the complaint in January of

15    2015 and they want him to show up at the September, 2015

16    meeting.

17         Did I read that correctly?

18    **A.**    Yes.

19    **Q.**    And during this time period, based off of your

20    analysis, he continues to prescribe opioids; correct?

21    **A.**    Yes.  He appears to continue prescribing during that

22    time.

23    **Q.**    Okay.

24              MR. MAHADY:  Paragraph 17, please, Ritchie.

25    BY MR. MAHADY:

1    **Q.**   And this really goes back to the point I was just

2    making about the confidential nature of the

3    investigations.

4         It says, "In order to protect the privacy of Dr. Chaney

5    and to ensure impartiality, the Board should -- should the

6    matter come before it in the future for adjudication the

7    committee's request to the full board refers to Dr. Chaney

8    only as Physician A.  At all times prior to the board's vote

9    on this matter, and throughout the board's September 14,

10   2015, meeting, Dr. Chaney was identified only by a

11   pseudonym.  Dr. Chaney's identity was known only to the

12   members of the Complaint Committee."

13        Right?

14   **A.**   That's what that says, yes.

15   **Q.**   Okay.  And September, 2015, that's the same month that

16   we just looked at in the Walgreens data; correct?

17   **A.**   Sorry.  September, 2015?

18   **Q.**   Yeah.

19   **A.**   I've lost the dates, but I remember it being from --

20   here we are.

21   **Q.**   I think it's in your report.

22   **A.**   Yeah.  But, yes.

23   **Q.**   Okay, September, 2015.  So we're talking about the same

24   month; right?

25   **A.**   Yes.

1    **Q.**   Okay.  And, so, what AmerisourceBergen knew about

2    Dr. Chaney at this time, based off of this document, was

3    that .1 percent of the prescriptions being filled at the

4    Walgreens store were for Dr. Chaney; correct?

5    **A.**   They knew that and also that he was a top prescriber in

6    another store in the area.  And in that other store he was

7    nearly twice as high as the next highest prescriber in those

8    stores.

9    **Q.**   .4 percent?

10   **A.**   .4 percent, but twice as high as the next largest

11   prescriber.

12   **Q.**   Less than one percent?

13   **A.**   Again, .1 percent is -- I'm sorry -- .4 percent is less

14   than one percent but he is the second largest prescriber of

15   that other store.

16   **Q.**   Okay.  So that's what AmerisourceBergen knew.  But what

17   the Board of Medicine knew was that -- at least some people

18   knew that this investigation was going on into Dr. Chaney at

19   this time; right?

20   **A.**   Yes.  AmerisourceBergen had knowledge that Chaney was a

21   high prescriber in two stores.  But it appears based off of

22   this document that they did not have knowledge of the

23   investigation.

24   **Q.**   Okay.  Almost done here.

25              MR. MAHADY:  Let's go to slide 23 of the

```
1    plaintiffs' demonstrative.

2    BY MR. MAHADY:

3    Q.   Okay.  The third bullet which I believe you

4    testified to this morning was that Dr. Chaney was

5    prescribing 25 times more than the average general

6    practitioner by 2015; right?

7    A.   Correct.

8    Q.   And in your expert report you had a breakdown by year

9    of his prescribing; correct?

10   A.   Yes.

11           MR. MAHADY:  And, Ritchie, can you please pull up

12   Table 25 which is the breakdown by year for Dr. Chaney?

13   BY MR. MAHADY:

14   Q.   Okay.  January 6, 2015, the State Board of Medicine

15   received a complaint; right?

16   A.   Yes.

17   Q.   They didn't revoke or suspend his license to prescribe

18   opioids until January of 2016; correct?

19   A.   Correct.

20   Q.   So for that entire year during the investigation, he

21   was able to continue to prescribe opioids; right?

22   A.   Yes.

23   Q.   Okay.  And if we look at your table in 2015, Dr. Chaney

24   prescribed the most amount of pills ever while this

25   investigation was pending before the Board of Medicine;
```

```
 1    right?

 2    A.    That, that -- in that year he prescribed the most pills

 3    ever in his IQVIA prescribing history.  And that was the

 4    same year as the AmerisourceBergen document where he's the

 5    largest prescriber among two different stores, yes.

 6    Q.    Okay.  But he was dispensing less than one percent of

 7    the prescriptions filled by that store?

 8    A.    Yes.  Mathematically, yes, but he's also among the

 9    largest prescribers there.

10    Q.    Okay.  I just want to circle back to the Drug Emporium

11    data.  I have one final series of questions and then I'm

12    going to hand it over to counsel for McKesson.

13              MR. MAHADY:  If we can pull up Drug Emporium

14    table, slide 12 in the plaintiffs' demonstrative.

15    BY MR. MAHADY:

16    Q.    We talked about outliers this morning; right?  Or

17    you testified about outliers?

18    A.    Yes, sir.

19    Q.    Okay.  Who was ranked number one for total

20    prescriptions for Drug Emporium based off your analysis?

21    A.    For total prescriptions?  Not just opioid

22    prescriptions?

23    Q.    Yes.

24    A.    That would be Timothy Saxe.

25    Q.    And who was ranked number one for opioid prescriptions?
```

1   **A.**   Timothy Saxe as far as total volume of opioid

2   prescriptions.

3   **Q.**   And who was ranked number one for opioid dosage units?

4   **A.**   Timothy Saxe for total volume of opioid dosage units.

5   **Q.**   Okay.

6   **A.**   Now, for the composition that -- which is what Table 10

7   shows, that's Dr. Webb.

8   **Q.**   Okay.  But Timothy Saxe, based off of your analysis,

9   had 5,727 prescriptions filled at Drug Emporium during that

10   time period; right?

11   **A.**   Correct.

12   **Q.**   Almost four times -- more than four times what Deleno

13   Webb had; correct?

14   **A.**   Yes.

15   **Q.**   All right.  Timothy Saxe is still licensed by the Board

16   of Medicine today; correct?

17   **A.**   I don't know.

18   **Q.**   Did you look at his license?

19   **A.**   I did not.

20   **Q.**   Okay.

21          MR. MAHADY:  Can you pull up his license real

22   quick?  Okay.  Can you pull up Saxe, please?

23          MR. ACKERMAN:  Your Honor, we would have an

24   objection to the use of this document that is not listed on

25   the exhibit list or disclosed by 7:00 p.m. the evening

```
 1   before.

 2   BY MR. MAHADY:

 3   Q.   You're not aware of any disciplinary record

 4   relating to Timothy Saxe; correct?

 5   A.   I don't know.  I haven't looked.

 6           THE COURT:  I'll overrule the objection to get

 7   this overwith.

 8           MR. MAHADY:  Thank you, Your Honor.

 9   BY MR. MAHADY:

10   Q.   Medical doctor, license expiration date 6/30/2023;

11   correct?

12   A.   That's his license for -- yes, his medical doctor's

13   license expires 2023.

14   Q.   Okay.  Disciplinary board action history?

15   A.   I do think his dispensing license has expired, but I

16   don't know --

17   Q.   That only relates to a doctor who wants to give out

18   free drugs; correct?  It has nothing to do with prescribing?

19   A.   That -- I don't have a deep understanding of what it

20   is, so I don't want to say what they can do under that

21   license.

22   Q.   Okay.  And Dr. Saxe, he has no disciplinary cases on

23   record; correct?

24   A.   Correct.

25   Q.   Okay.
```

```
 1                   MR. MAHADY:  I need to check with counsel.
 2           (Pause)
 3                   MR. MAHADY:  Ms. Keller, I have no further
 4      questions.  Thank you for your time today.
 5                   THE WITNESS:  Thank you.
 6                   MR. SCHMIDT:  May I proceed, Your Honor?
 7                   THE COURT:  Mr. Schmidt.
 8                            CROSS EXAMINATION
 9      BY MR. SCHMIDT:
10      Q.   Dr. Keller, I'm Paul Schmidt.  I represent
11      McKesson.  We met briefly by the elevator, but it's good
12      to get to meet you more formally.  I'm going to do my
13      darndest to get you out of here today.
14           You talked about two McKesson documents from pharmacies
15      called Family Discount.  Do you recall that?
16      A.   Yes.
17      Q.   Do you know that Family Discount, those two pharmacies,
18      are in Logan County?
19      A.   Yes.
20      Q.   Do you know how far Logan County is from Cabell County?
21      A.   Generally, yes, but don't make me remember right now.
22      Q.   I won't make you remember.  You know it's not in Cabell
23      County or Huntington; correct?
24      A.   Correct.
25      Q.   All right.  You talked about one other document if you
```

1    want to find it, P-13297.  And to help you out, this is a

2    document where -- in McKesson's document you found one that

3    referred to the CS Ratings data.  Do you remember talking

4    about that document?

5    **A.**    Yes.

6    **Q.**    And the person who wrote that document was named Sean

7    Kelley.  Do you recall that?

8    **A.**    Generally, yes.

9    **Q.**    My question for you is do you know anything about Sean

10   Kelley's role at McKesson beyond what's shown on that

11   document?

12            MR. SCHMIDT:  May I approach, Your Honor?

13            THE COURT:  You may.

14   BY MR. SCHMIDT:

15   **Q.**    Okay.

16   **A.**    Thank you.  He's a Senior Manager of Analytic Services

17   for McKesson based off the email.

18   **Q.**    Right.  And that was my question.  Do you know anything

19   about his role beyond what it says in this document?

20   **A.**    No.

21   **Q.**    Do you know if he or she -- do you know if it's he or

22   she?

23   **A.**    No.

24   **Q.**    Do you know if this person has any role in McKesson's

25   Controlled Substance Monitoring Program?

1    **A.**    No.

2    **Q.**    Do you know if they refer to emails on this chain that

3    you showed that you didn't review?  And I don't mean on the

4    document itself.  But are there later emails on this same

5    subject that you didn't review?  Do you know?

6    **A.**    I wouldn't know.

7    **Q.**    Did you make an effort to review all emails on the

8    subject?

9    **A.**    Yes.

10   **Q.**    And do you know if you did?

11   **A.**    I mean, I know what I know.  And I don't know what

12   comes after this.  So if there are documents, I'd be happy

13   to take a look at them.

14   **Q.**    And you were asked some questions by Ms. Wicht for

15   Cardinal about CS Ratings data.  I'm not going to replow

16   that ground.  But it's true that you have not analyzed the

17   CS Ratings database discussed in this document; correct?

18   **A.**    I have not utilized the data.

19   **Q.**    All right.  Let's put up demonstrative 236, Page 5,

20   please.  These are the slides you showed.  And I just want

21   to ask you a few quick questions about them if I could.

22           MR. SCHMIDT:   Demonstrative 236, slide 5, please.

23   BY MR. SCHMIDT:

24   **Q.**    While he's pulling that up, did you get a copy of

25   the slides?

**A.**   No, I did not.

**Q.**   Okay.  Just bear with us while we put this up, please.
I'll go through this very quickly.  Slide 5, please.

First of all, you talked about ARCOS.  You don't know
if distributors have access to data in ARCOS other than the
data that they individually report; correct?

**A.**   I know distributors have a lot of data available to
them.  I'm not, I'm not able to -- I'm not sure what
other -- if they would have access to the full ARCOS data.

**Q.**   You don't know if they have access to another
distributor's shipment data; correct?

**A.**   I do not know.

**Q.**   In terms of Drug Emporium, the third item here, you
didn't undertake an inquiry into whether all defendants had
access to Drug Emporium data; correct?

**A.**   It was my understanding that the Drug Emporium data
is -- was produced pursuant to a subpoena.  And it is an
exemplar of the type of dispensing data available to them.

MR. SCHMIDT:  Could we cull up the September 18th,
2020, deposition, Page 105, lines 6 to 15?

BY MR. SCHMIDT:

**Q.**   Do you see starting on line 10 there's a little
preamble?  Starting at line 10 you were asked the
question, "You did not undertake an inquiry at all with
the aim of determining whether or not any case

```
1     defendants had the Drug Emporium data; correct?"
2           There's an objection.  And then you answer, "No."
3           Do you see that question and that answer?
4     A.    I don't read that there.  What was the question that
5     you just asked me because that doesn't --
6     Q.    Did you undertake an inquiry at all with the aim of
7     determining whether the defendants all had access to the
8     Drug Emporium data?
9     A.    No.  It's an exemplar.
10    Q.    Okay.  And --
11          MR. ACKERMAN:  I'm sorry.  Could you repeat the
12    page number?
13          MR. SCHMIDT:  It's Page 105.
14    BY MR. SCHMIDT:
15    Q.    Are you aware that McKesson did not distribute to
16    Drug Emporium?
17    A.    I'm actually not aware of the distributors to Drug
18    Emporium, so I don't know.
19    Q.    Did you see any evidence that McKesson had access to
20    that data?
21    A.    Again, it's an exemplar of the type of dispensing data
22    that defendants had access to.
23    Q.    Can you answer my question now, Ms. Keller?
24    A.    Will you repeat it for me, please?
25    Q.    Of course.  Did you see any evidence that McKesson had
```

1    access to Drug Emporium data?

2    **A.**   No.  It is an exemplar of the data that was available.

3    **Q.**   You did not investigate whether there is anyone or

4    anything that possesses dispensing data for all of the

5    registered pharmacies in the Cabell County area without

6    resort to a subpoena; correct?

7    **A.**   You speak very quickly.

8    **Q.**   I'm sorry.  I'm trying to get you out of here.  Let me

9    try it again.

10          Did you investigate whether there is anyone or anything

11   that possesses dispensing data for all of the registered

12   pharmacies in the Cabell County area without resort to a

13   subpoena?

14   **A.**   The IQVIA data would be a dataset that would provide

15   information about all pharmacies, or prescriptions filled at

16   pharmacies.

17          MR. SCHMIDT:  Can you cull up the September 18th,

18   2020, 65, please, lines 11 to 18.  It should be

19   September 18th, 2020, at lines -- at Page 65.

20          Is this the September 18th, 2020, deposition?  I think

21   I've got the wrong page.  I'll move on.

22   BY MR. SCHMIDT:

23   **Q.**   Just as to the, as to the IQVIA data, that's

24   limited.  That's 93 percent.  Correct?

25   **A.**   It's a sample of 93 percent and the rest is

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    extrapolated, yes.

2    **Q.**   And it doesn't cover pharmacy dispensing data; correct?

3    **A.**   I mean, it's -- in some instances you could consider a

4    version of it because it is based off of dispensations which

5    would be filled prescriptions.  So it is filled prescription

6    data that -- for 93 percent of the country's pharmacies.

7    **Q.**   It doesn't identify the pharmacies; correct?

8    **A.**   That is correct.

9    **Q.**   Okay.  You cite some documents reflecting distributors

10   gathering information on their pharmacy customers; correct?

11   **A.**   Yes.

12   **Q.**   You didn't identify any documents where distributors

13   have direct interactions with the prescribers you discussed;

14   correct?

15   **A.**   I don't think so, no.

16   **Q.**   And you know distributors can't access individual

17   prescriptions due to privacy laws?  Are you aware of that?

18   **A.**   I am aware of the privacy laws.  I'm just trying to

19   remember at what granulary I've seen the data because in

20   some instances, the data is quite granular and I don't know

21   if it's at the prescription level or if it's rolled up

22   somewhat.  So that's the reason for my delay.

23   **Q.**   If I tell you that the Court has heard evidence that

24   when it comes to individual prescriptions, distributors

25   can't access that data unless you do it -- privacy laws.  Do

```
1    you have any contrary understanding?

2    A.    I understand that -- I understand that through the

3    course of -- that there is some data called switch data that

4    is collected at the terminal.  But I'm not clear on what

5    information is collected as part of that, if there's

6    identifiable information there.

7    Q.    So can you answer my question?

8    A.    I don't know.

9    Q.    Okay.  And you don't know -- do you know that they

10   can't review any medical records for patients?

11   A.    That would be something beyond my expertise.

12   Q.    In your report when you talk about -- when you talked

13   about pharmacies that filled prescriptions from the top

14   one percent of doctors, including some of the ones you have

15   identified -- do you recall what I'm asking about?

16   A.    Yes.

17   Q.    You don't identify a volume of prescriptions from those

18   prescribers that should lead the distributor to take action

19   against those pharmacies, do you?

20   A.    There, there are physicians that would have been

21   identifiable in the data.

22   Q.    Can you answer my question now, Ms. Keller?

23   A.    Your questions are very long.  I wish I had the

24   real-time here because it would be easier.

25   Q.    Can you identify specific actions that distributors
```

1    should take based on a specific level of filling of

2    prescriptions from the one percent at their pharmacy

3    customers?

4    **A.**    I don't offer an opinion on what distributors should do

5    with that data.

6    **Q.**    There's no specific cutoff to identify that if they

7    take this many prescriptions from a doctor in the top

8    one percent, that that many prescriptions are filled at one

9    of their pharmacies, they should take specific action;

10   correct?

11   **A.**    Again, I don't offer an opinion on what distributors

12   should do, but just offer the opinion on what they could see

13   from the data.

14   **Q.**    Do you understand that pharmacies have a corresponding

15   responsibility when it comes to prescriptions that are

16   brought in to them?

17   **A.**    Corresponding responsibility for what?

18   **Q.**    To that of a doctor when it comes to filling the

19   prescription.

20   **A.**    No.

21   **Q.**    Are you aware of any pharmacies that purchase IQVIA

22   data to meet their corresponding responsibilities?

23   **A.**    The pharmacies are the source of the IQVIA data.

24   **Q.**    Are you aware of any that purchase it regarding

25   prescribers to meet their corresponding responsibility?

**A.**   Pharmacies in selling their data to IQVIA do receive credits.  I'm not sure what they use those credits for.

**Q.**   Do you know of any regulator that has told pharmacies or distributors to purchase IQVIA data of the type you describe, IQVIA Xponent data, to meet their obligations?

**A.**   That's not part of my expertise.

**Q.**   So you don't know of any such regulator from your work?

**A.**   I don't know.

**Q.**   You have heard about prescription drug monitoring programs; correct?

**A.**   Yes.

**Q.**   PDMPs?

**A.**   Yes, sir.

**Q.**   And you do understand that a PDMP is a database of every prescription written by doctors in a particular jurisdiction; right?

**A.**   For the time period that exists.

**Q.**   And that gives more prescription data than IQVIA, correct, because IQVIA is 93 percent.  Correct?

**A.**   Depending on the jurisdiction.  It might give more.  It might give the same.  I don't know what the geographical breakdown of the IQVIA data is.

**Q.**   If I tell you that the West Virginia PDMP has 100 percent of the prescriptions, do you know of any contrary information?

**A.**   No.

**Q.**   And then you also know that the PDMP includes information absent from IQVIA like the name of the dispensing pharmacy; correct?

**A.**   Yes.

**Q.**   Are you aware of any analyses that you ran regarding IQVIA data that the State of West Virginia did not run from its more complete PDMP data?

**A.**   I have no knowledge of what reports the State of West Virginia ran.

**Q.**   All right.  I want to ask you a few more questions about some of the individual doctors you featured if that's okay.

Let's start with Dr. Webb.  And before I get to Dr. Webb, am I right that I did understand correctly that as part of your work, you went to the West Virginia Board of Medicine and Board of Osteopathic Medicine websites and you looked at disciplinary history and other documents regarding some of these doctors?

**A.**   For the top one percent of prescribers I went to their website to find their licensure information, yes.

**Q.**   And you also downloaded information on doctors who have been disciplined and suspended; correct?

**A.**   Correct.  That was part of the top one percent.

**Q.**   I'd like to show you something from that website.

1          MR. SCHMIDT:  May I approach, Your Honor?

2          THE COURT:  Yes.

3    BY MR. SCHMIDT:

4    **Q.**   I've given you a document from the website titled

5    "West Virginia Board of Medicine," MC-WV-2221.  Do you

6    see that?

7    **A.**   Yes.

8    **Q.**   If you look in the upper left corner, it says

9    "Mission."  And it says, "The West Virginia Board of

10   Medicine is the state agency charged with protecting the

11   health and safety of the public through licensure,

12   regulation, and oversight of medical doctors," and others.

13         Do you see that?

14   **A.**   Yes.

15   **Q.**   And do you have that understanding that that's the

16   function of the licensing role that you investigated, to

17   protect the health and safety of the public?

18   **A.**   I have not recalled their mission statement before.

19   **Q.**   Okay.  Do you take issue with that being the purpose of

20   why they grant a license?

21   **A.**   If that's their purpose, then I don't take any issue

22   with that, no.

23   **Q.**   Are you aware that -- if you look further down under

24   "Core Values," there's a heading that says "Public

25   Protection.  We follow the law and achieve complete

1    compliance to the rules, policies, and procedures that have

2    been established to safeguard the public and to regulate

3    fairly the healthcare professionals we serve."

4         Do you have that general understanding that's what a

5    Board of Medicine and a Board of Osteopathic Medicine does?

6    Follow the rules to try to safeguard the public and regulate

7    fairly healthcare professionals?

8    **A.**   I don't have a wide understanding of Boards of Medicine

9    so --

10   **Q.**   Okay.

11   **A.**   -- I'd have to take your word for it.

12   **Q.**   Last question on this.  Don't take my word for it.

13   Take your word for it.

14        Last question.  If you go to the right column, do you

15   see where it says "Fees"?

16   **A.**   I'm there.  Sorry.

17   **Q.**   And if we look there, there's a two-year renewal period

18   for the licensings.  Do you see that?

19   **A.**   Yes.

20   **Q.**   Do you have the understanding that both the Board of

21   Medicine and the Board of Osteopathic Medicine require

22   two-year renewals for doctors in West Virginia?

23   **A.**   My understanding would be based solely to this

24   document.

25            MR. SCHMIDT:  We'll move this into evidence as a

```
 1    public record, 803(8), Your Honor.

 2              THE COURT:  Any objection?

 3              MR. ACKERMAN:  No objection.

 4              THE COURT:  This is 2221, Mr. Schmidt?

 5              MR. SCHMIDT:  2221, yes, Your Honor.

 6              THE COURT:  It's admitted.

 7              MR. SCHMIDT:  May I approach, Your Honor?

 8    BY MR. SCHMIDT:

 9    Q.   Just to complete the record on this, do you see --

10    look at what I've passed out as MC-WV-2224.  The title

11    is -- it's a legislative rule for the West Virginia

12    Board of Osteopathic Medicine.  And if you look under

13    24-5-2, Section 2.2, it refers to biennial, every

14    two-year renewal of license, just like we saw with the

15    Board of Medicine.  Do you see that?

16    A.   I'm sorry.  Which line again?

17    Q.   Just up on the screen there.

18    A.   Oh, thank you.  I do see that.

19    Q.   All right.  I want to ask you -- with that as a

20    foundation, let me turn to first Dr. Webb.  You said you

21    looked at his medical license on the West Virginia Board of

22    Medicine website.  Do you remember that?

23    A.   Yes.

24    Q.   And you saw, I take it, that he had been licensed from

25    1971 through 2017.
```

1      And I'm going to erase this if that's okay.

2      Do you recall seeing that?

3  **A.**   Yes.

4  **Q.**   I've just written 1971 to 2017.  Just doing the math,

5  that's 46 years; right?

6  **A.**   Oh, gosh.  Yes.

7  **Q.**   This will be the most complicated math we do today.

8  **A.**   I know.  I get nervous when you guys make me do math on

9  the stand.  Okay.

10  **Q.**   46 years?

11  **A.**   Yes.

12  **Q.**   And if we take into account that two-year license

13  renewal, that's 22, at least, different renewals; correct?

14  **A.**   Correct.

15  **Q.**   Now, you had mentioned -- did you study how often DEA

16  renewal occurs?

17  **A.**   No.

18  **Q.**   The Court's heard evidence about DEA renewals every

19  three years.  Do you have any contrary information?

20  **A.**   I have no knowledge.

21  **Q.**   I'm not going to make you do the math on how many that

22  is.

23  **A.**   I appreciate it.

24  **Q.**   You mentioned that he was banned from getting

25  reimbursement through the Worker's Compensation program in

1    2005.  Do you remember that?

2    **A.**   Yes, I do.

3    **Q.**   And I'll just put a marker for 2005.  Do you understand

4    that the Worker's Compensation Commission at that time was

5    part of the State of West Virginia?

6    **A.**   Yes.

7    **Q.**   And you saw no action and no disclosure of that fact in

8    the licensing information for Dr. Webb; correct?

9    **A.**   The article that I cite was a public news article.

10   **Q.**   Did you see any disclosure of that 2005 action by the

11   State of West Virginia in the licensing information for Dr.

12   Webb?

13   **A.**   No, just, just on the internet.

14   **Q.**   Did you see any evidence of that article appearing in

15   any of the defendants' files?

16   **A.**   In the case defendants in this matter, no.

17   **Q.**   And just doing the math, that would be at least five

18   renewals during this time period; right?

19   **A.**   Yes.

20   **Q.**   I'll just write the number 5.  In your review of

21   documents -- let's take 5008 [sic] when he would have been

22   renewed once.  Did you see any guidance materials for the

23   State of West Virginia, the DEA, anyone that told

24   distributors in 5008 [sic] let's say they knew about this

25   Worker's Comp issue -- I'm sorry -- 2008.  Let's say they

1    knew about this Worker's Comp issue, but they also knew he

2    had been renewed.

3        Did you see any guidance materials that said if his

4    prescriptions are filled at one of their pharmacies, they

5    need to do something about that pharmacy?

6    **A.**   I did not see those records, no.  It was just a public

7    news article.

8    **Q.**   You talked about a reference to a McKesson document in

9    2016 where one of the customers outside Huntington/Cabell

10   learned that the pharmacy had stopped new prescriptions for

11   Dr. Webb.

12       Did you see any materials from that time period where

13   by this time he's had three or four renewals that directed

14   distributors as to what they should do if their customers

15   were filling prescriptions from Dr. Webb or someone like

16   that?  Did you see any such documents?

17   **A.**   Just the public news article at that time.

18   **Q.**   No guidance from West Virginia or the DEA saying let's

19   say you saw this news article but we've continued to renew

20   him.  Here's how you should act regarding pharmacies filling

21   his prescriptions?

22   **A.**   I don't recall seeing any guidance.  Do you have the

23   document about the stop filling prescriptions?  Could I see

24   it?  The document you just referenced about the -- your

25   customer that was stopped, stopping filling prescriptions?

1    Q.   No.  I'm going to move on because I want to get you out

2    of here.  My question was just referencing that time period.

3    A.   Okay.

4    Q.   You saw no such documents from that time period;

5    correct.

6    A.   No, just the public news article.

7    Q.   Okay.  Last thing on Dr. Webb.  Do you have P-42370 in

8    front of you?

9         And we can go ahead and put it up on the screen,

10   please.

11        This is the consent order that you talked about from

12   Dr. Webb.  Do you see that?

13   A.   Yes.

14   Q.   And if we look at Paragraph 2, there's a reference to

15   information they received that started the complaint process

16   in 2014; right?

17   A.   Yes.

18   Q.   You're aware that when a complaint like this is filed,

19   it's confidential.  It's kept confidential.  We saw that in

20   the other documents; right?

21   A.   Yes.  In the other documents, that's what it states.

22   Q.   Do you know -- we've heard testimony in court that that

23   was the actual rule; that these were kept confidential until

24   an opinion was issued.

25   A.   I understand that.

1    **Q.**   And there's no reference to the complaint on the

2    licensing information; correct?  It just reports the

3    outcome; right?

4    **A.**   Yes.  Sometimes there's findings of facts in between

5    the license being suspended and consent orders in between.

6    **Q.**   Not for Dr. Webb; right?

7    **A.**   Correct.

8    **Q.**   Now, at this point, at the date of this complaint, you

9    understand that what the State Board of Medicine is doing is

10   they're investigating him to see if he's been prescribing

11   improperly; correct?

12   **A.**   That's what the allegation is, yes.

13   **Q.**   And they've got to go through a process where they

14   investigate, get information, and then make a judgment about

15   whether he's prescribing improperly; correct?

16   **A.**   I don't know what their process is.

17   **Q.**   Do you know that that's the purpose of these

18   procedures, to figure out whether he's prescribing

19   improperly?

20   **A.**   Based off my reading of the documents, it appears that

21   there is an investigation.

22   **Q.**   Let's go to Paragraph 4.  To do that, to figure out

23   whether he's prescribing improperly, they tried to get

24   medical records for 24 individuals -- do you see that -- for

25   whom he had prescribed?  Do you see that?

1    **A.**   Yes.

2    **Q.**   That's information distributors can't get.  We talked

3    about that earlier; right?

4    **A.**   They, they cannot receive the medical records for a

5    patient, no.  But they do have knowledge through dispensing

6    data of overall prescribing for that, for that physician.

7    **Q.**   The Board of Medicine has that, but they don't have the

8    medical records; correct?

9    **A.**   The actual medical records and information, that would

10   be likely protected by HIPAA, yes.

11   **Q.**   Let's go to Paragraph 20 which you referred us to in

12   the course of your direct examination.

13        Based on reviewing those medical records, they're able

14   to make a finding that the medical record fails to justify

15   the course of treatment.  Do you see that?

16   **A.**   I see that.

17   **Q.**   And that's language you had for us on direct as

18   supporting this eradication of his ability to practice;

19   correct?

20   **A.**   Yes.

21   **Q.**   And that's not information that a distributor can use.

22   They can't go look at medical records to conclude whether

23   the medical record fails to justify the course of treatment;

24   correct?

25   **A.**   They wouldn't be able to see medical records, at least

1    to my knowledge right now, but would be able to identify Dr.

2    Webb's prescribing trends overall.

3    **Q.**    Two more.  Dr. Fisher.  Do you remember talking about

4    Dr. Fisher?

5    **A.**    Yes.

6    **Q.**    Do you know he was licensed from 1995 to 2011?

7        And if it would help, let's cull up MC-WV-2219.

8        Do you see the reference --

9    **A.**    Yes.

10   **Q.**    -- to '95 to 2011?

11   **A.**    Yes.

12   **Q.**    That's 16 years; right?

13   **A.**    Yes.

14   **Q.**    And that would mean at least seven renewals of Dr.

15   Webb -- Dr. Fisher's license; correct?

16   **A.**    I don't know if both osteopathic medicine and other

17   physicians are regulated in the same way.

18   **Q.**    We looked at a document for osteopathic medicine.  Do

19   you remember that, the regulation?

20   **A.**    I'm sorry.  I didn't realize this one was osteopathic.

21   Yes.

22   **Q.**    Okay.  Let's look at P-42367, the Statement of Charges

23   for Dr. Fisher.  And if we look at the cover, it says they

24   received two complaints; right?

25   **A.**    Yes.

1    **Q.**   And those are confidential; correct?

2    **A.**   Yes.

3    **Q.**   And then let's look at how they decided to act.  You

4    talked earlier about not getting medical records, not

5    getting individual prescriptions.

6        If we go to Page 2, Paragraph 6, do you see that one of

7    the findings -- you can just read this to yourself -- is

8    that he's not filling out the actual hard copy prescriptions

9    correctly?

10   **A.**   Okay.  I read that.

11   **Q.**   And then if we go to Page 11, Paragraph 46, we see

12   another finding that he hasn't kept his records properly.

13   Do you see that?

14   **A.**   Yes.

15   **Q.**   That's information a distributor can't access; can't go

16   and look at his records and see if they're good enough or

17   not.  Right?

18   **A.**   I mean, I don't know what you might do in the course of

19   a diligence investigation, so I wouldn't be able to know.

20   **Q.**   Well, let's take a look at it.  Patient A's medical

21   records, but they don't tell us in the report because it's

22   confidential.  That's protected as to distributors; correct?

23        MR. ACKERMAN:  Objection, calls for a legal

24   conclusion and asked and answered with respect to the second

25   question that was asked.

```
 1                    THE COURT:  Overruled.

 2                    THE WITNESS:  I wouldn't know.

 3    BY MR. SCHMIDT:

 4    Q.   Okay.  Let's look at another document on this

 5    point.  Are you aware that often times these

 6    investigations to determine whether doctors are

 7    prescribing in the regular course of medicine are acting

 8    improperly take years?

 9    A.   I don't know how long an investigation takes.

10    Q.   Well, you remember the questions from Mr. Mahady

11    showing it took a full year for that doctor?

12    A.   Full years -- not years, but it does take some time.

13    In my experience in previous investigations, investigations

14    can take time.

15    Q.   And for Dr. Webb we saw it took three years, right, or

16    two and a half years?

17    A.   Can you refresh --

18    Q.   Of course.

19    A.   -- my memory?

20    Q.   P-42270, P-42370.  June, 2014; correct?

21    A.   Yes.

22    Q.   And then Page 9, results of the complaint, if we just

23    look at the date, January, 2017, two and a half years later;

24    correct?

25    A.   Yes, that's a few years later, yes.
```

```
 1    Q.   Okay.  Let's go back to Dr. Fisher and look at the

 2    course of his investigation.

 3              MR. SCHMIDT:  Can we cull up P-42368?

 4         May I approach, Your Honor?

 5              THE COURT:  Yes.

 6    BY MR. SCHMIDT:

 7    Q.   And do you see that these are board meeting minutes

 8    from June of 2011 from the West Virginia Board of

 9    Osteopathy?  Do you see that?

10    A.   Yes.

11    Q.   Let's go to Page 2.  Do you see the discussion of

12    Philip Fisher, D.O., who we've been talking about?

13    A.   Yes.

14    Q.   Do you see that they have five complaints currently

15    pending at this point in time?

16    A.   Yes.

17    Q.   And then in the third sentence they say there's been

18    difficulty scheduling a hearing with dates agreeable to all

19    parties to consider those five complaints.  Do you see that?

20    A.   Yes.

21    Q.   And then can you read us the last sentence to tell us

22    what the board decided to do with Dr. Fisher while they were

23    considering whether to discipline him?

24    A.   "The board will proceed with license renewal."

25    Q.   And that's something that no distributor in this case
```

1    has anything to do with.  The board decided even though

2    we've got five complaints regarding him and we can't get on

3    his calendar to schedule a hearing, we're going to renew his

4    license.  Distributors have nothing to do with that.

5    Correct?

6    **A.**    Not to my knowledge, no.

7    **Q.**    Last one.  I asked you earlier about downloading

8    information on doctors who have been disciplined; correct?

9    **A.**    Yes.

10          MR. SCHMIDT:  May I approach, Your Honor?

11   BY MR. SCHMIDT:

12   **Q.**    Ms. Keller, I've handed you what I've marked as

13   MC-WV-2262.  It's regarding a Dr. Polavarapu.  Do you

14   see that in the Consent Order?

15   **A.**    Yes.

16   **Q.**    Here's what I want to direct your attention to in this

17   document.  If you go to Page 3 of the document, do you see

18   that there is a heading called "Order"?

19   **A.**    Yes.

20   **Q.**    And then under that heading, Paragraph 3, it says,

21   "Within the next three months, Dr. Polavarapu shall read the

22   book --"

23          MR. ACKERMAN:  Objection.

24   BY MR. SCHMIDT:

25   **Q.**    -- "Responsible Opioid Prescribing, A Physician's

1   Guide, authored by Scott Fishman, M.D., which book has

2   been sent free of charge to all West Virginia licensed

3   physicians in 2008 and shall by May 1, 2009, submit a

4   report on what she has learned from her reading of the

5   book."

6              MR. ACKERMAN:  Objection, Your Honor.  This is

7   well outside the scope of anything this expert opined on.

8              THE COURT:  Well, overruled.  We're to the end

9   here.

10  BY MR. SCHMIDT:

11  **Q.**   Do you see where it says that?

12  **A.**   I read that, yes.

13  **Q.**   Have you read that book which, among other things, that

14  she was directed to write a book report on which, among

15  other things, says patients should not be denied opioid

16  medication except in light of clear evidence that such

17  medications are harmful to the patient?  Have you read that

18  book?  It's marked into evidence as MC-WV-2111.

19             MR. ACKERMAN:  Objection to the reference to

20  writing a book report.  Withdraw the objection.  Withdraw

21  the objection.

22  BY MR. SCHMIDT:

23  **Q.**   Have you read the book that she had to write a book

24  report on when she went to the Board of Medicine?

25  **A.**   I have not read that book.

1    **Q.**   Let's just go to your report, Page 11, Figure 1.  This

2    is something you were asked about with Ms. Wicht.  And

3    remember talking about the prescribing levels over time and

4    how they peaked around 2010?

5    **A.**   Yes.

6    **Q.**   We know from that document the book was sent to all

7    doctors in 2008, and then she had to write a book report in

8    2009; right?

9    **A.**   The time line, yes, is correct.

10   **Q.**   When you were analyzing either the top prescribers or

11   overall prescribing, did you do any analysis of the guidance

12   that they were getting from their Boards of Medicine or

13   Boards of Osteopathic Medicine about prescribing more

14   opioids?

15   **A.**   No, I'm not offering that opinion, nor have I done that

16   analysis.

17              MR. SCHMIDT:  That's all I have of Ms. Keller.

18              THE COURT:  Ms. Singer, are you going to have any

19   redirect?

20              MS. SINGER:  I'm going to have a very brief

21   redirect, Your Honor, less than five minutes, maybe even

22   shorter than that.

23              THE COURT:  Okay, less than five minutes.

24                     REDIRECT EXAMINATION

25   BY MS. SINGER:

1    **Q.**   Ms. Keller, Cardinal's counsel asked you about an

2    IMS pilot program that Cardinal was enrolled in.  Do you

3    recall that --

4    **A.**   Yes.

5    **Q.**   -- testimony?  And if you need to look at the document,

6    go ahead.  Do you recall the year of that pilot?

7    **A.**   Do you have the document?  I have it here.  2012.

8    **Q.**   Okay.  And that is the -- that is the rolled-up data of

9    IQVIA that allows you to identify Dr. Webb, Dr. Fisher, and

10   Dr. Dawson; correct?

11          MS. WICHT:  Objection, mischaracterizes the

12   document on the testimony.  It's an entirely different

13   database and one that this witness testified she never

14   looked at.

15          MS. SINGER:  Your Honor, Ms. Keller has testified

16   that that was a roll-up of the same data that was

17   available --

18          THE COURT:  Okay.  I'll let her answer.  Let's get

19   this done.

20          THE WITNESS:  Yes, I understand that the CS

21   Ratings relies on IQVIA Xponent.

22   BY MS. SINGER:

23   **Q.**   And that was data that Cardinal had in 2012;

24   correct?

25   **A.**   Yes.

1    **Q.**   And then -- you can put that document aside.

2    AmerisourceBergen's counsel showed you data from Walgreens

3    about Dr. Webb's prescribing; is that correct?

4    **A.**   Yes.

5    **Q.**   And asked you about the percent of total prescriptions;

6    is that right?

7    **A.**   Yes.

8    **Q.**   And do you recall when looking back at that spreadsheet

9    whether that was the percentage of opioid prescriptions or

10   all prescriptions for Dr. Webb?

11   **A.**   It doesn't say either way, so I assume it to be all

12   prescriptions.

13   **Q.**   And let's turn to P-42559, please.

14            MS. SINGER:  Your Honor, may I approach?

15            THE COURT:  Yes.

16   BY MS. SINGER:

17   **Q.**   Ms. Keller, do you recognize the document that's

18   P-42559?

19   **A.**   Yes.

20   **Q.**   And did you rely on that document in forming your

21   opinions in this matter?

22   **A.**   Yes.

23   **Q.**   And turning to Page 3 of this document --

24            MR. SCHMIDT:  Your Honor, at this point I'll

25   object just on geographic scope.  It's outside of

```
 1   Huntington/Cabell.
 2           THE COURT:  All right.  Overruled.  Go ahead.
 3           MR. SCHMIDT:  May I preserve a running objection
 4   on that?
 5           THE COURT:  Pardon me?
 6           MR. SCHMIDT:  May I preserve a running objection
 7   on that?
 8           THE COURT:  Oh, yes, absolutely.  I'm sorry.  I
 9   just didn't hear you, Mr. Schmidt.
10           MR. SCHMIDT:  Thank you, Your Honor.
11           THE COURT:  It's late in the day.
12   BY MS. SINGER:
13   Q.   Ms. Keller, does this document, turning to Page 3,
14   indicate that McKesson was aware of Dr. Webb in 2014?
15   A.   Yes.  The document is dated October 21st, 2014, and
16   speaks of Dr. Webb on Page 3.
17   Q.   And let's turn to the top of Page 3, the sentence that
18   begins "Riggins."
19   A.   Yes.
20   Q.   Can you read out loud that sentence, please?
21   A.   "Riggins indicated --" there's actually several
22   statements.
23        "Riggins indicated that when Hart's Pharmacy hits their
24   limit of controlled substances purchased for the month he
25   sends customers elsewhere.  Riggins spoke of a pain clinic
```

1    in Huntington that is operated by Dr. Deleno Webb.  Riggins

2    indicated that Dr. Webb is a psychiatrist that is operating

3    a pain clinic.  Riggins stated that Dr. Webb does pill

4    counts on his patients and Dr. Webb has discharged patients

5    for various reasons.  Riggins stated that Dr. Webb only

6    prescribes enough CII medications to cover patient until

7    their next appointment.  Riggins indicated that 90 percent

8    of the patients from Dr. Webb's office that fill their

9    prescriptions at Hart's Pharmacy receive roxicodone."

10   **Q.**   Okay.  You can -- why don't you go ahead and read --

11   I'm sorry -- the next sentence.

12   **A.**   "Riggins indicated that Dr. Webb commonly prescribes

13   Diazapam and Zanaflex as well.  Riggins stated that a few of

14   Dr. Webb's patients are on the trinity cocktail."

15   **Q.**   Okay.  And skip down, if you would, Ms. Keller, to the

16   last sentence of that paragraph, "A search of internet

17   websites."

18   **A.**   "A search of internet websites showed derogatory

19   information about Dr. Webb including past claims against the

20   prescriber, the suspension of Dr. Webb's medical license in

21   Ohio and Dr. Webb's termination by the West Virginia

22   Worker's Compensation Commission in 2005."

23   **Q.**   All right.  And if you would, Ms. Keller, turn to the

24   last page, please, of this document under "Conclusion and

25   Recommendation."

1    **A.**   "It is recommended that Hart's Pharmacy remain at their

2    current threshold levels."

3    **Q.**   Okay.  Last question, Ms. Keller.  You were shown by

4    both McKesson's and Cardinal's counsel the, the chart that

5    shows an increase in prescribing in Cabell County from your

6    report.  Do you recall that testimony?

7    **A.**   Yes.

8    **Q.**   And does that increase in prescribing include the

9    prescribing of Dr. Webb, Dr. Fisher, Dr. Chaney, and

10   Dr. Dawson?

11   **A.**   Yes.

12          MS. SINGER:  I have nothing further, Your Honor.

13          THE COURT:  May Ms. Keller be excused?

14          MR. SCHMIDT:  I have just a little bit on this

15   document unless anyone else wants to go first.

16                      RECROSS EXAMINATION

17   BY MR. SCHMIDT:

18   **Q.**   Before we leave this document, do you understand

19   this to be a proactive site visit for this pharmacy?

20   **A.**   That's what the document says, but I don't know how it

21   originated.

22   **Q.**   Okay.  You don't know what that means, a proactive site

23   visit?

24   **A.**   No.

25   **Q.**   All right.

```
 1              MR. SCHMIDT:  Let's put it up on the screen,
 2      42559.
 3      BY MR. SCHMIDT:
 4      Q.   First of all, do you know where this pharmacy is
 5      located?
 6      A.   No.
 7      Q.   Do you know that it's located outside of
 8      Huntington/Cabell?
 9      A.   I don't know where it's located.
10              MR. SCHMIDT:  Can we cull up 42559, P-42559?
11      BY MR. SCHMIDT:
12      Q.   Do you see on the second page that they conduct
13      diligence on the pharmacy that a customer --
14          That's the wrong one.  It's 42559, Page 2, please.
15          Do you see that they conduct diligence on their
16      customer, the pharmacy in this document?
17      A.   I see that there is information about the customer.  I
18      don't know -- I don't have the expertise to call it a
19      diligence report.
20      Q.   Do you have the expertise to interpret this document?
21      A.   I can read from it, yes.
22      Q.   Let's read from it then.
23          Do you see that they review the State of West Virginia,
24      Virginia, Board of Pharmacy website regarding the pharmacy
25      and the pharmacist in the first paragraph on Page 2?
```

1    **A.**    Yes.

2    **Q.**    Do you see that they do a search of internet websites

3    for their customer, the pharmacy, and they find no

4    derogatory information on the pharmacy or the staff?

5    **A.**    Yes.

6    **Q.**    And below that do you remember being asked about the

7    corresponding responsibilities of the pharmacist earlier?

8    **A.**    Yes, but I couldn't answer that question.

9    **Q.**    Do you see that they talk about what their customer

10   does to meet their corresponding responsibilities?

11   **A.**    They use the term "corresponding liability."  I don't

12   know if that's the same as corresponding responsibility.

13   **Q.**    Do you see that they give detail on what the pharmacy

14   does?

15   **A.**    I see -- in that same section of corresponding

16   liability, I see words there.  I don't know what that means

17   for their --

18   **Q.**    And if you look at Page --

19   **A.**    -- regulatory requirement.

20   **Q.**    If you look at Page 3, do you see that they conducted

21   an on-site review?

22   **A.**    I see that there's information there, yes.

23   **Q.**    Okay.  That's all I have.  Thank you, Ms. Keller.

24            MR. MAHADY:  No further questions.  Thank you for

25   your time, Ms. Keller.

1              MS. WICHT:  Nothing further.  Thank you, Your

2     Honor.

3              THE COURT:  Ms. Keller, you're free to go.  Thank

4     you very much and I wish you well and you're excused.

5              THE WITNESS:  Thank you so much, Your Honor.

6              THE COURT:  And I'll see everybody at 9:00 in the

7     morning.

8          (Trial recessed at 5:02 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1        CERTIFICATION:

2                  I, Ayme A. Cochran, Official Court

3    Reporter, and I, Lisa A. Cook, Official Court Reporter,

4    certify that the foregoing is a correct transcript from

5    the record of proceedings in the matter of The City of

6    Huntington, et al., Plaintiffs vs. AmerisourceBergen

7    Drug Corporation, et al., Defendants, Civil Action No.

8    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9    reported on June 15, 2021.

10

11             S\Ayme A. Cochran          s\Lisa A. Cook

12                Reporter                   Reporter

13        _

14

15             June 15, 2021

16                Date

17

18

19

20

21

22

23

24

25
```

'

**'13** [2] - 225:19, 225:21
**'15** [1] - 225:19
**'95** [1] - 263:10
**'97** [2] - 205:19, 208:19

## 0

**002** [1] - 223:20
**00506** [3] - 227:20, 228:16, 228:21
**00907** [2] - 2:5, 2:14
**02** [1] - 66:13
**03** [1] - 66:15

## 1

**1** [20] - 61:8, 61:12, 66:4, 66:12, 66:13, 127:13, 147:6, 148:15, 186:2, 186:15, 186:16, 201:4, 201:6, 204:23, 215:25, 232:22, 238:3, 238:13, 268:3, 269:1
**1,122** [1] - 66:9
**1,782** [3] - 223:6, 223:9, 223:19
**1-5** [1] - 77:10
**1.1** [1] - 130:8
**1.6** [1] - 61:19
**1.7** [1] - 119:10
**1.782** [2] - 66:6, 66:20
**1.9** [1] - 120:20
**1/1/2013** [2] - 78:19, 226:18
**1/9** [1] - 185:17
**10** [13] - 112:21, 116:25, 117:4, 118:3, 118:6, 129:24, 219:13, 219:23, 220:20, 221:6, 241:6, 246:22, 246:23
**10,000** [1] - 119:11
**10,638** [1] - 66:7
**100** [3] - 105:17, 228:21, 252:23
**1001** [2] - 4:6, 4:9
**1022** [1] - 3:5
**1029** [2] - 40:25, 148:25
**105** [2] - 246:20, 247:13
**108th** [1] - 119:13
**10:45** [1] - 81:22

**11** [10] - 118:21, 128:4, 128:5, 177:22, 197:24, 205:13, 233:17, 248:18, 264:11, 269:1
**1132** [1] - 115:8
**116.5** [1] - 211:14
**119** [1] - 77:9
**1197** [1] - 232:9
**11977** [2] - 227:1, 227:7
**11980** [3] - 227:4, 232:17, 232:20
**12** [8] - 121:7, 161:25, 178:4, 179:23, 184:11, 221:3, 240:14
**120** [1] - 23:5
**120,000** [3] - 131:16, 132:5, 133:12
**126** [1] - 3:5
**128,805** [1] - 117:10
**12:03** [1] - 143:3
**12th** [1] - 185:17
**13** [3] - 122:24, 125:21, 178:18
**130** [1] - 130:10
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**13th** [1] - 236:10
**14** [6] - 120:18, 122:21, 129:10, 182:4, 214:7, 237:9
**14,000** [1] - 228:15
**14,400** [3] - 228:9, 228:11, 228:12
**14,431,799** [1] - 117:11
**141.2** [2] - 213:7, 213:11
**142** [1] - 211:3
**142.19** [2] - 214:11, 214:16
**143** [1] - 197:24
**144,000** [1] - 228:9
**14th** [1] - 177:7
**15** [9] - 1:19, 7:4, 131:3, 162:2, 162:3, 174:10, 246:20, 278:9, 278:15
**150** [1] - 228:10
**157.9** [1] - 211:14
**15910** [1] - 3:18
**16** [1] - 263:12
**160** [2] - 227:21, 228:2
**1600** [1] - 3:17
**168** [1] - 173:4
**169** [1] - 179:22
**17** [2] - 199:21, 236:24
**1717** [2] - 6:6, 6:13

**18** [2] - 115:7, 248:18
**18th** [5] - 161:15, 246:19, 248:17, 248:19, 248:20
**19** [2] - 187:5, 203:16
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1971** [3] - 182:7, 256:25, 257:4
**1984** [1] - 178:23
**1988** [2] - 176:25, 177:7
**1991** [2] - 194:1, 194:7
**1994** [1] - 115:8
**1995** [1] - 263:6
**1997** [20] - 66:7, 75:18, 104:21, 116:17, 117:5, 129:24, 174:17, 180:15, 200:16, 201:1, 201:23, 202:15, 203:12, 204:2, 204:12, 204:25, 207:25, 208:17, 210:19
**1998** [1] - 129:22

## 2

**2** [20] - 94:15, 95:2, 117:20, 127:13, 164:1, 186:5, 186:15, 186:18, 199:23, 201:10, 207:22, 209:7, 223:20, 223:21, 231:17, 260:14, 264:6, 266:11, 275:14, 275:25
**2.2** [1] - 256:13
**20** [8] - 9:1, 127:18, 127:24, 128:7, 128:8, 128:9, 204:23, 262:11
**20,000** [1] - 132:1
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:17, 4:19, 5:5
**2002** [1] - 38:12
**2003** [3] - 133:6, 133:7
**2005** [16] - 123:4, 181:18, 182:23, 182:25, 183:6, 183:10, 183:13, 183:22, 184:11, 184:13, 230:16, 230:23, 258:1, 258:3, 258:10, 273:22

**2006** [5] - 75:17, 211:2, 211:11, 212:21, 214:8
**2008** [4] - 210:24, 258:25, 268:3, 269:7
**2009** [4] - 202:16, 211:6, 268:3, 269:8
**2010** [12] - 61:24, 133:9, 201:24, 202:23, 203:9, 203:13, 204:5, 204:12, 204:25, 205:1, 207:8, 269:4
**2011** [9] - 47:14, 130:8, 134:13, 188:21, 196:9, 207:10, 263:6, 263:10, 266:8
**2012** [16] - 104:11, 117:23, 133:9, 139:7, 139:8, 163:17, 188:4, 188:13, 188:21, 188:23, 189:2, 196:9, 216:16, 216:20, 270:7, 270:23
**2013** [5] - 225:2, 226:13, 226:21, 231:19, 231:25
**2014** [16] - 21:9, 38:12, 39:2, 40:7, 40:14, 42:18, 47:13, 75:17, 205:3, 211:11, 212:21, 214:8, 260:16, 265:20, 272:14, 272:15
**2014-2015** [1] - 207:11
**2015** [22] - 139:7, 139:9, 139:10, 205:3, 225:3, 229:15, 229:17, 229:21, 230:5, 235:1, 235:9, 236:3, 236:10, 236:15, 237:10, 237:15, 237:17, 237:23, 239:6, 239:14, 239:23
**2016** [6] - 13:4, 129:23, 194:11, 233:17, 239:18, 259:9
**2017** [35] - 18:21, 38:8, 40:14, 66:7, 74:15, 75:18, 104:22, 116:17, 117:5, 117:24, 123:11, 129:24, 146:15, 174:17, 180:15,

181:22, 182:10, 182:15, 183:3, 184:5, 184:13, 184:14, 185:17, 185:19, 189:1, 189:4, 201:5, 205:2, 207:11, 207:25, 208:17, 208:19, 256:25, 257:4, 265:23
**2018** [2] - 104:11, 216:17
**2019** [1] - 205:19
**202** [2] - 2:4, 2:13
**2020** [5] - 161:15, 246:20, 248:18, 248:19, 248:20
**2021** [4] - 1:19, 7:4, 278:9, 278:15
**2023** [1] - 242:13
**21** [4] - 187:5, 203:6, 205:12, 224:21
**21st** [1] - 272:15
**22** [3] - 187:6, 207:1, 257:13
**2216** [1] - 3:7
**2221** [2] - 256:4, 256:5
**23** [2] - 207:21, 238:25
**236** [4] - 50:14, 125:22, 245:19, 245:22
**23rd** [1] - 210:19
**24** [7] - 62:13, 119:1, 174:13, 174:14, 174:16, 208:8, 261:24
**24-5-2** [1] - 256:13
**25** [6] - 5:5, 139:9, 194:17, 210:2, 239:5, 239:12
**2518** [1] - 38:17
**25301** [3] - 2:8, 3:13, 4:22
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26** [2] - 64:4, 154:11
**26,000** [2] - 202:25, 203:10
**2646** [1] - 10:6
**268** [1] - 118:4
**27** [1] - 1:16
**278** [1] - 119:8
**278th** [1] - 66:11
**28** [4] - 3:15, 4:3, 4:12, 225:11
**29** [1] - 213:25
**290** [1] - 77:8
**29464** [3] - 3:15, 4:4, 4:12

**2:00** [3] - 9:9, 141:13, 143:1

## 3

**3** [17] - 12:9, 12:21, 23:1, 127:13, 186:22, 203:19, 210:2, 233:16, 233:17, 234:25, 267:17, 267:20, 271:23, 272:13, 272:16, 272:17, 276:20
**3,000-some** [1] - 210:17
**3/27/2014** [1] - 78:19
**30** [10] - 72:9, 74:6, 74:16, 130:13, 130:14, 163:21, 164:3, 164:8, 224:21, 227:22
**30-day** [1] - 163:22
**300** [1] - 53:1
**3100** [2] - 6:5, 6:12
**313** [2] - 77:6, 189:9
**316** [1] - 2:11
**32502** [1] - 2:11
**3843** [1] - 5:14
**392** [1] - 204:3
**3:17-cv-01362** [2] - 1:5, 278:8
**3:17-cv-01665** [2] - 1:11, 278:8
**3:43** [1] - 215:18

## 4

**4** [8] - 65:25, 187:2, 202:19, 232:8, 238:9, 238:10, 238:13, 261:22
**4/1/2013** [1] - 226:18
**40** [6] - 61:13, 62:1, 68:9, 194:2, 194:6, 231:10
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**41** [1] - 77:4
**42370** [1] - 184:25
**42559** [3] - 275:2, 275:10, 275:14
**42568** [1] - 77:17
**43538** [2] - 233:8, 234:23
**43539** [2] - 233:9, 233:15
**441** [1] - 188:8
**44170** [1] - 192:5
**44176** [1] - 80:2

**44192** [1] - 125:18
**44711** [1] - 208:8
**450,000** [1] - 203:11
**46** [4] - 229:24, 257:5, 257:10, 264:11
**47** [1] - 17:17
**48** [2] - 17:12, 17:17

## 5

**5** [11] - 15:2, 61:12, 66:18, 66:19, 101:24, 175:16, 232:4, 245:19, 245:22, 246:3, 258:20
**5,727** [1] - 241:9
**5-9** [1] - 174:3
**50** [1] - 202:15
**5008** [2] - 258:21, 258:24
**506** [1] - 228:24
**54-page** [1] - 29:14
**550** [1] - 62:1
**553** [1] - 6:8
**556** [1] - 204:5
**56** [1] - 3:4
**56th** [1] - 3:5
**582** [2] - 77:7, 189:9
**5:02** [1] - 277:8
**5th** [1] - 185:19

## 6

**6** [10] - 16:10, 176:1, 176:2, 208:8, 218:11, 235:1, 239:14, 246:20, 264:6
**6.2.2** [2] - 101:23, 101:24
**6/30/2023** [1] - 242:10
**60** [3] - 61:14, 225:4, 226:25
**600** [1] - 2:10
**612(b** [1] - 35:17
**633rd** [1] - 66:14
**6414** [2] - 225:4, 226:25
**65** [2] - 248:18, 248:19
**650** [1] - 218:17
**650,000** [6] - 104:9, 218:19, 222:24, 223:3, 223:9, 223:17
**6th** [3] - 3:5, 197:22, 235:9

## 7

**7** [6] - 16:7, 93:13,

94:15, 103:20, 176:3, 185:6
**70** [4] - 121:15, 130:14, 202:15, 202:20
**70.6** [1] - 130:15
**70130** [1] - 3:8
**703** [4] - 108:5, 110:13, 114:6, 114:10
**707** [1] - 4:21
**716** [1] - 3:12
**72** [1] - 146:18
**725** [2] - 4:16, 4:18
**73** [2] - 227:13, 228:14
**76** [1] - 161:22
**78** [1] - 146:19
**7:00** [5] - 41:11, 41:14, 149:2, 149:4, 241:25

## 8

**8** [9] - 85:13, 176:14, 181:3, 203:6, 220:12, 221:17, 221:23, 221:25, 222:15
**80** [6] - 26:10, 27:5, 27:21, 28:13, 61:18, 133:12
**801** [1] - 3:10
**803(8** [1] - 256:1
**850** [1] - 5:12
**86.7** [1] - 121:13

## 9

**9** [4] - 61:12, 177:4, 219:3, 265:22
**9,440th** [1] - 66:16
**90** [3] - 228:3, 228:10, 273:7
**90-day** [1] - 228:4
**901** [1] - 4:21
**91436** [1] - 3:18
**93** [9] - 104:18, 146:7, 146:13, 146:17, 151:22, 248:24, 248:25, 249:6, 252:19
**99.5** [1] - 230:1
**99.6** [1] - 232:11
**99.8** [1] - 223:21
**99.9** [1] - 232:23
**9:00** [2] - 7:4, 277:6
**9th** [1] - 4:6

## A

**A's** [1] - 264:20

**a.m** [3] - 7:5, 9:9, 81:22
**ABDC** [5] - 30:17, 152:10, 152:14, 152:18, 153:11
**ABDC-MDL-00282553** [1] - 226:9
**ability** [2] - 185:24, 262:18
**able** [21] - 10:24, 26:21, 52:11, 61:3, 67:24, 69:3, 91:9, 95:20, 106:3, 136:12, 175:23, 176:13, 188:2, 192:13, 227:20, 239:21, 246:8, 262:13, 262:25, 263:1, 264:19
**absence** [2] - 37:6
**absent** [1] - 253:3
**absolute** [2] - 17:10, 18:8
**absolutely** [4] - 33:19, 47:21, 203:3, 272:8
**Abuse** [1] - 11:17
**abused** [1] - 115:20
**accept** [2] - 186:16, 186:17
**accepted** [4] - 15:13, 32:16, 34:4, 60:23
**access** [29] - 36:2, 60:3, 60:9, 60:13, 67:6, 67:8, 67:15, 67:22, 70:23, 72:21, 80:6, 92:1, 141:25, 142:5, 163:20, 164:8, 201:19, 246:5, 246:9, 246:10, 246:15, 247:7, 247:19, 247:22, 248:1, 249:16, 249:25, 264:15
**According** [1] - 225:1
**according** [5] - 123:1, 174:15, 182:5, 199:17, 204:2
**account** [2] - 9:2, 257:12
**accurate** [4] - 18:5, 21:11, 33:18, 106:16
**accurately** [2] - 18:14, 120:7
**ACFE** [2] - 55:4, 55:25
**achieve** [1] - 254:25
**Ackerman** [9] - 16:12, 16:24, 35:2, 35:7, 35:10, 40:22, 148:22, 150:4,

180:10
**ACKERMAN** [47] - 4:5, 16:13, 25:2, 35:3, 35:13, 39:18, 40:17, 40:19, 40:23, 42:2, 42:5, 55:15, 126:8, 148:23, 149:11, 149:22, 150:5, 153:20, 154:21, 155:5, 155:25, 158:7, 158:19, 162:6, 162:9, 162:14, 162:19, 167:17, 171:6, 171:11, 171:17, 171:24, 172:2, 180:2, 180:7, 213:18, 218:6, 230:21, 231:1, 231:23, 241:23, 247:11, 256:3, 264:23, 267:23, 268:6, 268:19
**Ackerman's** [1] - 162:22
**acknowledge** [1] - 34:24
**acronym** [1] - 198:16
**act** [2] - 259:20, 264:3
**Act** [2] - 143:18, 143:21
**acting** [1] - 265:7
**Action** [4] - 1:4, 1:10, 278:7, 278:8
**action** [18] - 182:14, 182:21, 182:25, 183:2, 183:9, 183:10, 183:13, 183:18, 183:22, 184:4, 184:12, 230:23, 233:18, 242:14, 250:18, 251:9, 258:7, 258:10
**actions** [11] - 122:13, 134:15, 173:16, 179:12, 179:17, 181:11, 194:11, 230:9, 233:3, 250:25
**actively** [3] - 71:1, 189:13, 189:20
**activities** [2] - 30:13, 84:3
**activity** [5] - 59:6, 75:7, 106:4, 112:2, 150:18
**actual** [7] - 22:12, 33:3, 53:16, 124:4, 260:23, 262:9, 262:8
**acute** [1] - 176:8
**Adams** [1] - 222:6

**add** [9] - 13:22, 16:1, 27:2, 36:12, 36:17, 63:2, 91:18, 99:19, 206:12
**addiction** [2] - 19:1, 176:11
**Addiction** [1] - 42:18
**Addictive** [2] - 18:22, 18:25
**addition** [3] - 34:20, 124:8, 202:7
**additional** [11] - 13:23, 35:8, 70:17, 80:8, 91:2, 94:23, 106:20, 153:14, 204:9, 209:8, 209:13
**address** [7] - 10:22, 12:12, 12:23, 43:21, 93:19, 104:24, 162:23
**addressed** [1] - 37:15
**addresses** [2] - 43:19, 44:1
**adequacy** [2] - 98:1, 144:21
**adjudication** [1] - 237:6
**Administration** [1] - 146:24
**admissibility** [1] - 73:1
**admissible** [2] - 24:19, 107:13
**admit** [2] - 8:19, 149:14
**admitted** [6] - 24:13, 104:4, 114:9, 205:11, 214:1, 256:6
**adopted** [1] - 23:2
**adverse** [1] - 35:17
**Advisors** [1] - 54:25
**affairs** [1] - 54:7
**affidavit** [1] - 34:1
**afternoon** [5] - 143:10, 143:11, 143:15, 209:19, 216:6
**AG's** [1] - 52:23
**agencies** [1] - 183:11
**agency** [3] - 108:14, 183:22, 254:10
**Agency** [1] - 108:15
**aggregate** [2] - 8:24
**ago** [5] - 51:18, 120:2, 142:16, 156:14, 197:19
**agree** [9] - 15:11, 15:20, 41:25, 159:12, 188:23, 194:15, 207:3,

208:20, 208:24
**agreeable** [1] - 266:18
**agreed** [2] - 40:24, 147:13
**agreement** [5] - 163:14, 163:17, 163:19, 164:1, 164:7
**agreements** [1] - 156:11
**ahead** [44] - 9:14, 11:8, 27:16, 28:8, 31:13, 33:19, 42:1, 42:11, 46:25, 60:17, 68:19, 70:2, 70:4, 70:6, 78:7, 78:9, 81:12, 82:20, 82:24, 83:1, 101:10, 107:22, 108:7, 109:17, 109:20, 115:9, 115:12, 115:13, 119:4, 129:20, 134:10, 135:1, 135:9, 153:24, 158:10, 158:24, 163:6, 167:19, 171:16, 172:10, 260:9, 270:6, 272:2, 273:10
**aid** [1] - 123:25
**aim** [2] - 246:25, 247:6
**Airbnb** [3] - 52:22, 52:23, 53:1
**al** [4] - 1:7, 1:13, 278:6, 278:7
**allegation** [1] - 261:12
**allegations** [2] - 235:4, 235:22
**Allergan** [8] - 147:4, 147:9, 147:12, 147:17, 148:6, 150:12
**allow** [8] - 27:14, 67:7, 67:9, 80:7, 124:11, 163:6, 170:9, 211:22
**allowed** [6] - 34:4, 59:16, 67:17, 126:9, 128:25, 187:16
**allows** [2] - 82:11, 270:9
**Almost** [2] - 238:24, 241:12
**almost** [2] - 124:2, 215:22
**alone** [1] - 129:25
**alongside** [1] - 179:14
**Alprazolam** [1] - 115:21
**ameliorate** [1] - 22:19
**AmerisourceBergen** [31] - 6:2, 26:11,

27:20, 28:25, 44:2, 46:12, 79:12, 89:14, 102:24, 142:5, 142:8, 142:12, 216:7, 217:19, 223:24, 224:5, 224:8, 224:17, 225:2, 225:9, 230:8, 230:25, 231:16, 234:2, 235:14, 238:1, 238:16, 238:20, 240:4, 278:6
**AMERISOURCEBERGEN** [2] - 1:7, 1:13
**AmerisourceBergen's** [1] - 271:2
**amount** [5] - 8:4, 168:18, 169:4, 169:11, 239:24
**analgesic** [1] - 110:1
**analyses** [8] - 67:17, 151:10, 171:22, 173:9, 174:15, 199:9, 209:16, 253:6
**analysis** [67] - 57:17, 58:20, 59:8, 63:17, 63:18, 65:9, 65:10, 68:25, 69:7, 69:25, 70:15, 75:12, 105:9, 105:12, 114:21, 118:6, 118:14, 120:8, 120:23, 121:1, 121:8, 122:15, 123:9, 128:15, 132:7, 132:21, 133:14, 139:18, 140:23, 169:24, 169:25, 170:3, 170:8, 171:1, 172:19, 174:2, 179:16, 181:4, 190:8, 191:4, 199:6, 199:15, 200:21, 204:12, 207:17, 207:22, 208:4, 208:24, 209:1, 209:9, 214:1, 214:10, 214:14, 214:20, 214:21, 216:14, 217:18, 220:21, 221:1, 236:20, 240:20, 241:8, 269:11, 269:16
**analyst** [1] - 171:19
**Analytic** [1] - 244:16
**analytical** [5] - 50:1, 51:25, 52:2, 52:4
**analytics** [17] - 50:22,

51:13, 51:15, 51:17, 51:19, 51:22, 52:1, 52:14, 58:9, 58:12, 58:21, 58:23, 63:22, 122:7, 144:9, 163:10
**analyze** [4] - 51:9, 121:19, 136:15, 206:5
**analyzed** [13] - 53:5, 54:15, 103:16, 105:19, 112:9, 146:2, 152:10, 160:21, 212:24, 216:12, 217:12, 218:14, 245:16
**analyzing** [3] - 70:12, 106:5, 269:10
**ANDREW** [1] - 5:10
**Andrew** [1] - 24:3
**anesthesiology** [1] - 175:21
**Anita** [3] - 118:12, 120:5, 140:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**annual** [2] - 109:22, 131:18
**answer** [45] - 25:21, 25:25, 27:6, 27:11, 28:9, 31:13, 43:24, 46:3, 59:21, 60:12, 64:1, 64:25, 68:23, 72:18, 72:22, 82:16, 83:1, 88:17, 104:3, 106:14, 114:23, 154:13, 155:8, 156:5, 156:7, 162:4, 163:5, 166:14, 167:18, 168:21, 171:11, 173:10, 179:25, 180:5, 188:2, 223:16, 230:18, 231:4, 247:2, 247:3, 247:23, 250:7, 250:22, 270:18, 276:8
**answered** [4] - 39:18, 171:8, 198:3, 264:24
**answers** [2] - 20:17, 230:7
**ANTHONY** [1] - 2:6
**anyway** [2] - 43:12, 215:14
**apologies** [1] - 101:11, 128:11, 219:12
**apologize** [6] - 38:18, 93:16, 126:10, 181:15, 197:18,

219:11
**appear** [8] - 40:13, 64:2, 94:6, 196:7, 217:5, 220:15, 221:14, 236:10
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appeared** [1] - 69:5
**appearing** [2] - 204:1, 258:14
**Appendix** [1] - 23:21
**applies** [2] - 28:5, 92:17
**apply** [5] - 90:5, 92:25, 107:23, 232:6
**applying** [1] - 102:6
**appointment** [1] - 273:7
**appreciate** [6] - 9:8, 68:12, 123:22, 172:15, 203:9, 257:23
**appreciated** [1] - 9:17
**appreciating** [1] - 223:17
**approach** [26] - 9:25, 23:22, 40:8, 76:9, 77:18, 79:23, 83:12, 84:25, 93:5, 95:11, 101:11, 124:16, 126:24, 135:15, 138:7, 180:21, 196:4, 205:20, 211:25, 244:12, 254:1, 256:7, 266:4, 267:10, 271:14
**appropriate** [7] - 25:24, 91:11, 150:2, 151:9, 186:3, 187:9, 223:13
**appropriately** [1] - 204:9
**appropriateness** [2] - 144:25, 170:5
**April** [2] - 24:11, 225:2
**Arch** [2] - 6:6, 6:13
**ARCOS** [20] - 71:8, 73:22, 73:24, 75:7, 75:13, 75:17, 205:16, 206:2, 206:5, 206:14, 206:17, 206:21, 208:9, 214:3, 214:15, 214:25, 246:4, 246:5, 246:9
**area** [9] - 25:23, 51:7, 51:12, 86:2, 115:17, 168:20, 238:6, 248:5, 248:12

**argument** [3] - 13:8, 37:18, 86:19
**argumentative** [1] - 171:7
**arrive** [2] - 112:11, 215:4
**article** [71] - 10:8, 10:10, 10:13, 10:16, 10:21, 10:24, 11:7, 11:19, 12:5, 12:9, 12:21, 13:24, 14:2, 15:3, 18:18, 18:20, 18:21, 19:10, 20:7, 21:5, 22:21, 38:7, 38:8, 39:2, 39:10, 40:1, 40:7, 40:14, 42:18, 42:23, 43:14, 43:16, 43:18, 43:23, 44:1, 44:6, 44:9, 44:13, 44:20, 44:23, 45:2, 45:5, 45:7, 45:10, 45:13, 45:15, 45:22, 45:23, 46:6, 47:3, 47:12, 47:13, 55:10, 55:11, 55:13, 124:24, 125:1, 125:9, 126:15, 126:21, 165:16, 258:9, 258:14, 259:7, 259:17, 259:19, 260:6
**articles** [7] - 39:12, 47:15, 55:3, 55:23, 55:25, 122:13, 165:12
**ASHLEY** [1] - 5:3
**Ashley** [1] - 38:3
**aside** [7] - 79:7, 84:9, 86:6, 102:10, 167:21, 168:2, 271:1
**aspect** [1] - 116:19
**ASPPH** [2] - 22:18, 23:3
**Assembly** [1] - 50:19
**asserted** [1] - 36:1
**asserting** [2] - 36:7, 235:4
**assess** [1] - 30:14
**assessed** [1] - 112:23
**assessing** [2] - 109:24, 139:4
**assessment** [1] - 139:23
**assign** [1] - 14:25
**assignment** [1] - 70:8
**assist** [11] - 50:2, 50:8, 51:2, 65:23, 71:18, 73:14, 103:18, 108:24, 130:23, 134:3,

137:22
**Associated** [1] - 236:8
**Association** [5] - 22:9, 54:21, 54:24, 54:25, 55:4
**association** [5] - 13:11, 14:10, 14:13, 14:15, 56:2
**assume** [12] - 27:5, 27:19, 28:13, 30:4, 30:7, 38:14, 102:20, 143:17, 151:18, 159:7, 191:3, 271:11
**assumed** [1] - 161:10
**assuming** [1] - 80:1
**assumption** [3] - 27:7, 28:22, 159:10
**assumptions** [1] - 163:3
**assure** [2] - 8:14, 9:5
**AT** [1] - 1:2
**attach** [2] - 179:11, 179:16
**attaching** [1] - 179:24
**attachment** [3] - 80:25, 81:6, 85:14
**attempt** [1] - 155:2
**attempted** [2] - 10:21, 34:9
**attention** [1] - 267:16
**Attorney** [11] - 52:5, 52:7, 52:13, 52:19, 53:8, 54:1, 56:10, 56:23, 57:5, 94:11, 172:22
**Attorneys** [1] - 57:8
**Australia** [1] - 42:15
**authenticity** [3] - 125:11, 126:3, 126:7
**author** [4] - 10:16, 11:15, 18:22, 18:24
**authored** [2] - 38:7, 268:1
**authoritative** [1] - 19:2
**authorize** [1] - 218:21
**authorizing** [1] - 136:6
**authors** [3] - 44:9, 47:19, 48:1
**automatically** [1] - 72:19
**available** [41] - 15:5, 52:25, 54:9, 56:1, 64:20, 65:11, 69:2, 69:17, 71:15, 74:10, 74:19, 78:13, 79:2, 99:6, 103:4, 108:21, 111:19, 111:23, 116:3, 122:4, 122:8, 126:5, 127:22, 133:20, 136:12,

137:5, 148:20, 149:8, 149:17, 149:19, 154:9, 159:19, 159:20, 191:13, 205:16, 216:22, 246:7, 246:18, 248:2, 270:17
**average** [22] - 61:3, 61:5, 85:10, 87:5, 130:6, 132:23, 133:1, 139:9, 168:15, 202:13, 202:14, 202:23, 202:24, 203:9, 211:23, 212:8, 212:11, 213:4, 213:11, 214:11, 228:2, 239:5
**averages** [2] - 199:16, 200:14
**Avin** [1] - 3:7
**avoid** [1] - 26:7
**Award** [2] - 56:11, 56:19
**award** [3] - 56:12, 56:18, 56:23
**awards** [5] - 55:8, 56:6, 56:13, 56:15, 56:25
**aware** [47] - 13:3, 13:18, 69:8, 69:13, 69:19, 69:20, 102:13, 102:19, 103:2, 103:5, 103:6, 106:6, 134:21, 142:4, 142:18, 148:6, 149:20, 150:15, 150:23, 151:13, 157:19, 157:24, 158:2, 158:6, 158:12, 158:15, 158:25, 159:5, 182:5, 184:19, 185:12, 193:25, 197:12, 198:6, 220:24, 242:3, 247:15, 247:17, 249:18, 251:21, 251:24, 253:6, 254:23, 260:18, 265:5, 272:14
**awareness** [1] - 83:9
**axis** [1] - 201:19
**Ayme** [2] - 6:17, 278:2

**B**

**background** [2] -

50:6, 50:15
**bad** [1] - 83:24
**banned** [4] - 123:3, 181:19, 182:22, 257:24
**banning** [1] - 125:2
**Barboursville** [4] - 104:8, 104:15, 130:16, 225:4
**Baron** [1] - 3:17
**base** [2] - 94:21, 94:23
**Based** [4] - 110:20, 141:5, 261:20, 262:13
**based** [64] - 14:6, 22:5, 27:6, 28:22, 30:8, 42:15, 59:17, 63:17, 64:19, 65:10, 67:11, 69:5, 69:7, 69:25, 71:11, 83:5, 102:12, 103:11, 112:6, 116:1, 116:4, 121:11, 122:3, 123:5, 124:9, 125:22, 125:23, 128:14, 128:20, 132:7, 132:21, 133:14, 137:5, 139:23, 140:23, 145:1, 146:6, 146:7, 161:4, 165:3, 168:6, 170:6, 170:8, 171:2, 172:4, 199:2, 202:6, 202:7, 206:13, 219:9, 221:7, 226:17, 230:7, 230:18, 233:24, 236:19, 238:2, 238:21, 240:20, 241:8, 244:17, 249:4, 251:1, 255:23
**basic** [1] - 211:24
**basis** [32] - 30:10, 41:24, 59:12, 60:8, 60:20, 69:15, 70:4, 76:4, 86:1, 86:18, 86:22, 96:5, 97:1, 135:6, 142:15, 149:9, 149:20, 150:2, 152:1, 156:4, 156:9, 156:19, 159:4, 172:2, 198:2, 198:8, 198:23, 199:13, 200:13, 201:1, 210:20, 211:1
**Bates** [4] - 97:5, 97:23, 226:7, 226:8
**Baylen** [1] - 2:11
**Bear** [1] - 22:25
**bear** [1] - 246:2

**become** [1] - 73:7
**BEFORE** [1] - 1:17
**began** [1] - 18:11
**begin** [2] - 185:8, 226:4
**beginning** [2] - 80:5, 200:17
**begins** [1] - 272:18
**behalf** [1] - 163:15
**Behaviors** [2] - 18:22, 18:25
**belabor** [2] - 8:12, 65:11
**belief** [2] - 108:4, 154:4
**believes** [2] - 29:25, 64:11
**below** [2] - 61:5, 276:6
**BENCH** [1] - 1:16
**benzodiazepines** [2] - 123:13, 186:11
**best** [3] - 8:13, 8:15, 9:6
**better** [4] - 68:9, 69:21, 82:10, 181:16
**between** [17] - 13:11, 31:17, 37:14, 69:16, 120:12, 129:22, 156:11, 174:3, 174:17, 180:15, 204:12, 208:17, 209:11, 211:10, 211:14, 261:4, 261:5
**Between** [2] - 10:6, 129:24
**beyond** [10] - 27:3, 29:9, 29:10, 87:13, 161:12, 166:8, 220:15, 244:10, 244:19, 250:11
**Beyond** [2] - 221:19
**biennial** [1] - 256:13
**big** [5] - 38:15, 51:20, 52:10, 189:16, 215:25
**bill** [1] - 24:8
**billion** [1] - 61:19
**biological** [1] - 14:11
**birth** [1] - 72:3
**bit** [11] - 20:21, 25:21, 25:22, 189:16, 205:2, 207:6, 208:18, 216:10, 229:16, 274:14
**blue** [5] - 131:12, 133:2, 200:1, 201:7, 201:12
**Blvd** [3] - 3:15, 4:3, 4:12
**board** [15] - 16:1, 16:5,

16:7, 23:20, 134:15, 134:16, 212:13, 215:25, 235:3, 237:7, 242:14, 266:7, 266:22, 266:24, 267:1
**Board** [73] - 23:2, 23:3, 23:6, 23:9, 76:20, 76:21, 123:3, 123:8, 127:6, 132:9, 135:25, 138:16, 138:19, 169:6, 176:24, 177:7, 177:9, 178:21, 178:22, 182:1, 182:6, 182:7, 182:13, 182:19, 182:21, 183:2, 183:9, 183:21, 183:24, 184:3, 184:10, 184:14, 185:3, 189:20, 194:1, 194:10, 194:15, 197:13, 197:25, 198:8, 198:11, 198:24, 198:25, 199:1, 199:3, 230:16, 233:17, 233:25, 235:11, 235:13, 236:5, 237:5, 238:17, 239:14, 239:25, 241:15, 253:16, 253:17, 254:5, 254:9, 255:5, 255:20, 255:21, 256:12, 256:15, 256:21, 261:9, 262:7, 266:8, 268:24, 275:24
**board's** [2] - 237:8, 237:9
**boarding** [1] - 82:11
**Boards** [3] - 255:8, 269:12, 269:13
**boards** [1] - 16:5
**bog** [1] - 99:14
**bolstering** [2] - 107:5, 107:17
**Bonasso** [1] - 5:14
**book** [12] - 267:22, 268:1, 268:5, 268:13, 268:14, 268:18, 268:20, 268:23, 268:25, 269:6, 269:7
**bootstrap** [1] - 156:18
**Boston** [1] - 24:10
**bottle** [1] - 74:22
**bottom** [5] - 38:18,

43:9, 120:19, 131:11, 132:2
**bought** [2] - 67:19, 67:23
**Boulevard** [1] - 3:18
**box** [1] - 9:9
**Box** [2] - 5:14, 6:8
**boy** [1] - 56:17
**Brandeis** [1] - 24:3
**Brandon** [1] - 24:8
**break** [5] - 81:19, 141:13, 207:6, 209:18, 215:14
**breakdown** [4] - 78:17, 239:8, 239:12, 252:22
**breaking** [1] - 145:9
**Breast** [1] - 177:25
**breast** [1] - 178:7
**Brendan** [1] - 24:9
**brethren** [1] - 68:5
**Bridgeside** [3] - 3:15, 4:3, 4:12
**brief** [5] - 7:7, 7:11, 7:21, 37:22, 269:20
**briefly** [11] - 36:23, 46:16, 52:18, 53:7, 99:18, 145:9, 173:25, 193:10, 196:23, 196:25, 243:11
**bring** [3] - 17:25, 36:21, 48:22
**Bringing** [1] - 22:25
**broader** [1] - 31:6
**broken** [2] - 78:15, 78:23
**Bronx** [1] - 62:15
**Brother** [1] - 30:21
**brought** [4] - 52:9, 179:25, 212:3, 251:16
**Brown** [1] - 24:8
**Budd** [1] - 3:17
**bullet** [4] - 113:16, 113:20, 125:22, 239:3
**bullets** [1] - 113:24
**burden** [1] - 18:13
**bureau** [1] - 56:13
**Burling** [1] - 5:11
**Business** [1] - 50:17
**business** [4] - 64:23, 151:9, 152:20, 154:6
**button** [2] - 213:20
**buy** [1] - 111:6
**buyer** [1] - 74:4
**BY** [143] - 10:2, 17:8, 18:2, 19:13, 21:2, 22:7, 23:24, 25:6,

26:6, 27:18, 28:15, 31:5, 32:5, 37:25, 39:19, 39:24, 40:10, 42:13, 46:7, 49:17, 50:12, 51:6, 55:22, 59:3, 60:21, 65:19, 66:1, 67:1, 68:21, 70:5, 71:22, 73:4, 73:17, 75:22, 76:10, 78:8, 81:24, 82:25, 83:13, 85:2, 86:5, 86:14, 86:23, 88:19, 92:9, 93:6, 95:12, 101:13, 103:10, 103:22, 108:8, 109:4, 110:3, 110:19, 112:20, 115:24, 116:24, 118:23, 121:6, 122:23, 124:12, 124:18, 127:1, 128:6, 128:13, 129:9, 130:18, 131:2, 132:18, 134:8, 135:10, 135:17, 136:22, 138:9, 139:3, 139:17, 141:4, 141:22, 148:16, 150:10, 153:9, 155:10, 157:2, 158:11, 159:2, 161:24, 163:8, 171:18, 172:12, 173:5, 175:17, 176:15, 177:23, 178:5, 178:19, 180:3, 180:12, 180:24, 185:1, 194:9, 197:23, 199:22, 203:17, 204:24, 205:23, 209:23, 212:9, 213:24, 216:5, 218:12, 219:5, 225:14, 229:19, 231:7, 231:12, 232:1, 236:25, 239:2, 239:13, 240:15, 242:2, 242:9, 243:9, 244:14, 245:23, 246:21, 247:14, 248:22, 254:3, 256:8, 265:3, 266:6, 267:11, 267:24, 268:10, 268:22, 269:25, 270:22, 271:16, 272:12, 274:17, 275:3, 275:11

# C

**CA** [1] - 3:18
**Cabell** [99] - 3:2, 21:19, 26:20, 27:22, 30:17, 36:19, 59:7, 59:10, 61:9, 61:17, 62:3, 62:5, 62:9, 62:13, 62:20, 62:23, 63:16, 65:21, 66:4, 66:9, 66:10, 66:12, 70:14, 78:3, 86:3, 112:24, 116:17, 118:5, 118:17, 118:25, 128:17, 129:22, 133:23, 137:20, 139:8, 140:5, 140:12, 162:15, 165:3, 168:13, 168:19, 169:24, 173:15, 173:23, 175:3, 175:20, 175:25, 176:2, 176:4, 176:9, 176:17, 176:18, 180:15, 187:24, 190:1, 190:10, 194:22, 194:25, 195:3, 195:17, 196:12, 199:10, 199:15, 200:7, 200:11, 200:15, 200:25, 201:8, 201:13, 201:16, 201:23, 202:23, 203:10, 203:14, 204:3, 204:6, 204:14, 204:15, 204:16, 205:1, 205:18, 209:25, 210:5, 210:13, 210:19, 210:23, 211:15, 212:22, 213:4, 213:12, 214:7, 214:10, 214:12, 224:13, 243:20, 243:22, 248:5, 248:12, 274:5
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington** [7] - 21:19, 36:19, 168:13, 176:18, 205:18, 209:25, 214:10
**CAH** [1] - 215:25
**calculate** [2] - 214:6, 227:16, 228:2
**calculated** [2] - 214:11, 227:15

**calculation** [3] - 190:19, 193:21, 212:8
**calculations** [5] - 16:8, 27:8, 37:2, 37:4, 37:10
**calculator** [5] - 28:13, 211:22, 212:3, 212:7, 223:7
**calendar** [1] - 267:3
**California** [4] - 57:24, 58:3, 110:5, 110:10
**CALLAS** [1] - 6:7
**CAMPBELL** [1] - 6:14
**cancer** [4] - 15:14, 15:15, 15:22, 178:7
**Cancer** [1] - 177:25
**cannot** [3] - 144:13, 187:3, 262:4
**capacities** [1] - 54:14
**capita** [31] - 199:13, 200:13, 201:11, 207:18, 207:24, 208:1, 208:2, 208:3, 208:11, 208:16, 208:22, 208:25, 209:2, 209:5, 209:25, 210:4, 210:9, 210:12, 210:14, 210:20, 211:1, 211:3, 211:4, 211:8, 211:12, 211:15, 212:11, 213:4, 214:12, 214:20, 214:21
**Capitol** [1] - 2:7
**capture** [1] - 18:14
**Caraway** [3] - 118:12, 221:12, 221:13
**Cardinal** [42] - 4:14, 5:2, 26:12, 27:20, 28:25, 30:12, 30:17, 38:3, 43:21, 46:10, 58:17, 82:6, 89:18, 97:3, 101:20, 143:12, 152:10, 152:14, 152:18, 153:11, 163:14, 163:15, 163:19, 164:7, 164:11, 164:14, 164:19, 187:22, 188:3, 188:5, 188:23, 189:2, 189:6, 192:4, 194:22, 195:2, 217:19, 234:7, 235:16, 245:15, 270:2, 270:23
**Cardinal's** [2] - 270:1, 274:4

**care** [5] - 64:24, 146:11, 146:19, 146:24, 168:8
**Carey** [1] - 4:20
**Carico** [2] - 222:14, 222:15
**Carisoprodol** [1] - 115:21
**case** [78] - 9:10, 9:13, 18:15, 19:18, 29:10, 33:25, 37:11, 40:24, 48:23, 56:13, 57:23, 57:25, 59:5, 69:7, 69:25, 70:9, 70:24, 73:23, 74:2, 74:24, 75:14, 76:7, 76:14, 82:2, 87:19, 91:3, 93:10, 94:5, 96:17, 97:22, 98:4, 98:21, 99:9, 100:11, 103:16, 105:1, 105:23, 107:7, 107:11, 110:11, 111:4, 113:13, 115:10, 122:10, 123:20, 126:6, 146:3, 147:3, 147:12, 148:19, 149:9, 154:5, 156:17, 156:18, 157:4, 160:21, 161:1, 161:14, 164:21, 165:18, 166:9, 167:4, 170:7, 171:20, 179:11, 179:25, 193:23, 195:6, 195:17, 196:13, 205:12, 206:6, 246:25, 258:16, 266:25
**cases** [9] - 57:19, 61:21, 98:11, 98:15, 172:21, 176:25, 177:10, 178:25, 242:22
**cash** [4] - 72:15, 84:18, 113:21, 115:23
**categories** [1] - 74:25
**category** [1] - 174:17
**causal** [3] - 14:1, 31:8, 31:16
**causality** [1] - 14:13
**causally** [1] - 31:24
**causation** [3] - 13:25, 14:19, 19:18
**caused** [1] - 30:9
**causes** [2] - 19:17, 20:2
**CDC** [2] - 108:18,

109:11
**CDC's** [2] - 109:22
**census** [1] - 121:24
**Center** [9] - 3:12, 5:11, 175:25, 176:3, 176:5, 176:9, 176:19, 177:25, 178:1
**certain** [20] - 13:10, 65:21, 69:9, 89:3, 91:16, 107:20, 115:16, 116:3, 122:2, 132:4, 147:22, 163:3, 167:1, 183:18, 183:19, 185:25, 187:21, 187:24, 195:9, 224:1
**certainly** [2] - 44:8, 68:12
**certainty** [1] - 32:19
**CERTIFICATION** [1] - 278:1
**Certified** [2] - 54:22, 55:4
**certify** [1] - 278:4
**chain** [7] - 71:16, 80:21, 81:2, 81:5, 82:5, 83:18, 245:2
**challenged** [1] - 33:21
**chance** [8] - 11:5, 63:7, 63:19, 64:21, 86:17, 92:11, 156:21, 229:18
**Chaney** [40] - 66:16, 137:11, 137:13, 137:15, 137:17, 138:2, 138:13, 138:24, 139:22, 193:13, 193:15, 193:19, 193:25, 194:16, 194:21, 195:2, 231:9, 231:14, 232:7, 232:8, 232:13, 232:16, 232:20, 232:25, 233:4, 233:21, 234:2, 235:5, 236:10, 237:4, 237:7, 237:10, 238:2, 238:4, 238:18, 238:20, 239:4, 239:12, 239:23, 274:9
**Chaney's** [7] - 139:5, 139:11, 139:19, 193:22, 194:12, 233:18, 237:11
**change** [3] - 90:3,

91:13, 128:21
**changed** [1] - 51:18
**characterization** [1] - 186:2
**characterize** [1] - 139:22
**characterized** [1] - 12:2
**charge** [2] - 157:21, 268:2
**Charge** [1] - 71:11
**charged** [1] - 254:10
**Charges** [2] - 135:25, 263:22
**CHARLES** [1] - 3:11
**Charleston** [6] - 2:8, 3:13, 4:22, 5:15, 6:9, 7:4
**CHARLESTON** [2] - 1:2, 1:18
**chart** [22] - 118:11, 120:2, 131:7, 200:10, 201:19, 201:20, 201:22, 205:11, 205:13, 207:2, 207:3, 207:13, 207:14, 208:10, 208:12, 208:14, 208:20, 210:3, 221:2, 228:18, 230:10, 274:4
**charts** [6] - 120:6, 199:7, 201:2, 207:4, 208:8, 213:15
**Chase** [1] - 4:21
**chat** [3] - 53:10, 53:18, 172:22
**check** [4] - 212:19, 213:9, 213:10, 243:1
**checking** [2] - 95:22, 213:6
**Chesterbrook** [1] - 6:15
**children** [1] - 43:7
**chose** [1] - 63:20
**chronic** [1] - 176:8
**CII** [1] - 273:6
**circle** [2] - 31:6, 240:10
**Circuit** [2] - 115:2, 115:8
**circuit** [1] - 192:12
**circulating** [1] - 77:21
**circumstances** [1] - 89:3
**citation** [7] - 39:1, 39:8, 39:9, 39:25, 47:6, 81:9
**citations** [3] - 39:4,

39:6, 170:4
**cite** [7] - 21:9, 165:12, 169:14, 225:11, 226:11, 249:9, 258:9
**cited** [12] - 14:11, 22:21, 32:10, 32:13, 39:12, 40:14, 80:11, 89:13, 106:18, 113:10, 198:12, 231:21
**cites** [1] - 47:13
**City** [8] - 4:1, 5:11, 26:20, 30:17, 52:25, 53:3, 55:2, 278:5
**city** [1] - 206:13
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 278:7, 278:8
**civil** [1] - 1:10
**claim** [1] - 172:24
**claimed** [2] - 90:7, 90:23
**claims** [2] - 123:5, 273:19
**clarification** [5] - 30:21, 55:19, 60:1, 198:13, 201:10
**clarifying** [1] - 60:15
**clarity** [1] - 55:10
**classified** [1] - 117:21
**clauses** [3] - 39:5, 39:7, 40:6
**clean** [4] - 28:18, 51:9, 105:14, 141:16
**cleanse** [1] - 151:6
**cleanup** [1] - 141:23
**clear** [27] - 14:12, 28:6, 29:8, 29:9, 29:12, 37:13, 42:2, 55:12, 55:20, 64:18, 90:18, 92:2, 99:1, 100:4, 111:18, 114:8, 116:8, 149:12, 157:5, 159:14, 166:6, 171:25, 211:5, 216:13, 220:22, 250:4, 268:16
**clearly** [6] - 24:15, 47:14, 93:20, 96:16, 107:13, 107:16
**clerk** [1] - 48:25
**CLERK** [4] - 49:2, 49:4, 49:6, 49:9
**clinic** [3] - 146:23, 272:25, 273:3
**close** [2] - 15:25, 180:9
**closer** [1] - 49:21
**closing** [1] - 185:18

39:6, 170:4
**co** [4] - 18:24, 25:8, 38:7, 51:25
**co-author** [1] - 18:24
**co-authored** [1] - 38:7
**co-counsel** [1] - 25:8
**co-owner** [1] - 51:25
**Cochran** [3] - 6:17, 278:2, 278:11
**cocktail** [1] - 273:14
**code** [2] - 94:21, 205:18
**codeine** [1] - 209:8
**codes** [3] - 85:18, 85:21, 94:23
**Coffman** [2] - 220:11, 220:12
**coin** [2] - 215:7, 215:8
**colleagues** [3] - 10:14, 156:2, 216:7
**collect** [3] - 145:25, 157:11, 181:7
**collected** [3] - 151:4, 250:4, 250:5
**Columbia** [1] - 18:23
**Columbus** [1] - 86:2
**Column** [3] - 227:10, 227:14, 227:20
**column** [3] - 23:18, 42:24, 104:6, 104:17, 203:21, 210:13, 223:1, 255:14
**columns** [2] - 210:7, 210:9
**combination** [1] - 150:25
**combinations** [1] - 78:24
**coming** [2] - 125:24, 215:24
**commentary** [1] - 42:20
**commenting** [1] - 42:17
**comments** [1] - 68:5
**COMMISSION** [1] - 1:10
**Commission** [11] - 2:2, 3:2, 181:19, 182:23, 183:6, 183:10, 183:14, 183:18, 184:12, 258:4, 273:22
**Commission's** [1] - 125:2
**Committee** [5] - 198:1, 198:13, 235:21, 236:9, 237:12
**committee's** [2] -

236:10, 237:7
**common** [3] - 13:14, 42:21, 122:7
**commonly** [3] - 115:20, 123:12, 273:12
**communication** [2] - 81:3, 83:23
**communities** [1] - 22:20
**community** [2] - 21:19, 31:8
**Comp** [2] - 258:25, 259:1
**company** [7] - 52:1, 52:24, 53:2, 145:11, 145:14, 147:4, 160:18
**Company** [1] - 44:3
**compare** [6] - 62:3, 131:22, 132:20, 207:2, 214:14, 223:13
**compared** [15] - 13:24, 62:9, 63:16, 128:17, 130:6, 130:21, 131:8, 132:5, 132:12, 136:15, 137:2, 139:11, 139:19, 199:11, 229:8
**comparing** [5] - 53:16, 63:25, 64:5, 85:22, 223:11
**comparison** [4] - 65:1, 98:3, 131:25, 201:10
**comparisons** [1] - 62:20
**Compensation** [13] - 123:3, 123:8, 125:2, 181:19, 182:23, 183:5, 183:10, 183:14, 184:12, 230:16, 257:25, 258:4, 273:22
**compensation** [2] - 147:25, 148:3
**compiled** [1] - 145:11
**complain** [1] - 91:5
**complaint** [13] - 233:6, 235:4, 235:11, 235:13, 235:22, 236:5, 236:14, 239:15, 260:15, 260:18, 261:1, 261:8, 265:22
**Complaint** [3] - 235:21, 236:9, 237:12
**complaints** [4] -

263:24, 266:14, 266:19, 267:2
**complete** [4] - 185:18, 253:8, 254:25, 256:9
**complex** [2] - 7:18, 8:16
**compliance** [4] - 144:5, 166:7, 166:15, 255:1
**compliant** [1] - 159:24
**complicated** [3] - 105:12, 212:7, 257:7
**comply** [1] - 144:18
**components** [1] - 34:12
**comport** [2] - 13:6, 21:21
**composition** [7] - 59:18, 59:19, 62:5, 67:11, 69:6, 112:6, 241:6
**comprehensive** [2] - 146:6, 176:10
**Compton** [10] - 10:13, 10:17, 11:16, 12:6, 12:10, 12:21, 13:3, 13:23, 14:3, 16:1
**computer** [3] - 6:19, 51:20, 53:22
**computers** [1] - 51:20
**concede** [1] - 107:9
**concentration** [3] - 62:3, 62:9, 62:10
**concerned** [2] - 9:12, 34:13
**concerning** [2] - 127:7, 138:2
**concerns** [2] - 86:1, 125:12
**conclude** [4] - 13:25, 79:17, 142:8, 262:22
**concluded** [11] - 13:18, 14:6, 14:23, 59:14, 59:15, 63:24, 113:8, 122:25, 141:17, 211:13, 214:16
**concludes** [2] - 14:15, 142:22
**concluding** [1] - 77:14
**conclusion** [13] - 13:20, 22:3, 25:18, 26:18, 32:2, 62:8, 76:2, 76:4, 102:13, 102:16, 103:4, 200:10, 264:24
**Conclusion** [1] - 273:24
**conclusions** [13] - 12:25, 13:19, 14:7,

14:9, 14:17, 63:25, 124:15, 124:20, 135:12, 135:21, 136:19, 138:24, 171:2
**conduct** [7] - 29:15, 105:9, 122:15, 136:3, 144:25, 275:12, 275:15
**conducted** [2] - 162:17, 276:20
**conducting** [2] - 123:6, 235:21
**confer** [1] - 215:11
**conference** [3] - 54:22, 54:23, 141:13
**confident** [1] - 234:18
**confidential** [11] - 51:10, 150:25, 235:21, 235:25, 236:5, 237:2, 260:19, 260:23, 264:1, 264:22
**confirm** [1] - 126:2
**confirmed** [1] - 64:9
**confused** [1] - 128:3
**connection** [3] - 47:20, 57:10, 164:16
**Connolly** [2] - 4:16, 5:4
**CONROY** [1] - 3:3
**consensus** [1] - 21:14
**consent** [12] - 184:15, 184:19, 185:2, 185:7, 185:8, 185:12, 185:17, 186:1, 187:16, 197:16, 260:11, 261:5
**Consent** [3] - 127:6, 138:16, 267:14
**consider** [5] - 30:16, 115:11, 153:19, 249:3, 266:19
**considerable** [1] - 152:5
**considered** [5] - 19:2, 95:24, 152:4, 152:5, 172:21
**considering** [4] - 45:9, 84:1, 84:5, 266:23
**consistent** [8] - 13:10, 14:1, 72:22, 91:4, 150:20, 151:2, 154:11, 209:1
**consistently** [1] - 124:7
**constant** [1] - 20:20
**consult** [6] - 122:3, 122:8, 122:10,

128:25, 141:10, 195:19
**consumption** [1] - 43:2
**contain** [3] - 145:22, 157:9, 157:14
**contained** [3] - 71:24, 113:25, 226:16
**containing** [1] - 205:18
**contains** [5] - 82:19, 145:18, 151:11, 157:6, 226:20
**contemplation** [1] - 9:10
**contested** [1] - 89:24
**context** [2] - 13:7, 96:11
**continue** [5] - 61:23, 78:22, 174:21, 236:21, 239:21
**continued** [5] - 134:20, 184:10, 185:24, 200:19, 259:19
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continues** [2] - 236:4, 236:20
**contrary** [5] - 67:21, 153:4, 250:1, 252:24, 257:19
**contravene** [1] - 41:18
**contravenes** [1] - 41:17
**contribute** [1] - 45:16
**contributed** [1] - 43:2
**contributing** [6] - 15:8, 15:19, 16:2, 26:4, 29:5, 32:7
**contribution** [1] - 30:14
**Control** [2] - 157:20, 157:22
**control** [1] - 231:1
**controlled** [25] - 83:6, 85:9, 85:11, 87:4, 94:18, 94:19, 102:2, 102:4, 113:18, 115:19, 121:14, 166:12, 166:19, 185:25, 186:8, 186:12, 187:4, 192:18, 217:16, 218:21, 219:14, 228:3, 272:24
**Controlled** [4] - 143:18, 143:20, 198:16, 244:25
**controls** [3] - 84:16,

121:14
**convert** [1] - 228:20
**converted** [1] - 229:20
**convicted** [1] - 142:19
**Cook** [3] - 6:18, 278:3, 278:11
**copy** [5] - 147:2, 180:18, 218:5, 245:24, 264:8
**copying** [1] - 128:1
**Core** [1] - 254:24
**core** [1] - 32:15
**corner** [5] - 206:1, 214:4, 214:10, 226:6, 254:8
**Corporation** [6] - 6:2, 43:14, 43:19, 44:2, 44:16, 278:7
**cORPORATION** [2] - 1:7, 1:13
**Correct** [60] - 111:7, 111:12, 111:21, 162:4, 198:4, 216:15, 217:3, 217:6, 217:14, 217:17, 219:1, 219:16, 219:19, 219:21, 220:2, 220:4, 220:6, 220:8, 220:10, 220:11, 220:17, 220:19, 221:9, 221:17, 221:21, 222:3, 222:5, 222:13, 222:19, 222:22, 223:5, 223:23, 226:14, 226:19, 228:22, 231:18, 233:1, 233:5, 233:20, 234:1, 234:6, 234:8, 234:13, 234:21, 235:8, 235:10, 235:15, 235:17, 235:19, 239:7, 239:19, 241:11, 242:24, 243:24, 248:24, 252:19, 253:24, 257:14, 261:7, 267:5
**correct** [417] - 10:11, 10:14, 11:17, 11:21, 11:24, 11:25, 12:3, 12:7, 12:18, 12:19, 12:20, 14:4, 14:8, 15:11, 15:13, 15:20, 22:22, 38:24, 39:2, 39:10, 40:2, 42:15, 42:19, 43:2, 43:7, 43:15, 43:22, 44:16,

44:19, 44:25, 45:4, 46:11, 74:25, 81:8, 81:16, 89:13, 99:1, 111:20, 143:18, 143:22, 143:23, 143:24, 144:1, 144:4, 144:9, 144:10, 144:12, 144:19, 144:22, 144:23, 145:3, 145:4, 145:7, 145:23, 146:3, 146:4, 146:6, 146:12, 146:15, 146:16, 146:20, 146:25, 147:14, 147:19, 150:13, 150:21, 151:20, 152:11, 152:12, 152:15, 153:12, 157:6, 157:7, 157:8, 157:10, 157:15, 157:16, 159:4, 159:9, 159:18, 159:19, 159:24, 160:2, 160:3, 160:6, 160:19, 160:20, 160:22, 160:23, 161:2, 161:9, 161:18, 163:10, 163:11, 163:15, 163:16, 163:21, 164:6, 164:12, 164:13, 164:17, 164:18, 164:23, 164:24, 165:3, 165:11, 165:21, 165:22, 165:24, 165:25, 166:1, 166:2, 166:4, 166:10, 166:13, 166:14, 166:19, 166:20, 166:24, 167:9, 167:22, 168:1, 168:9, 168:10, 168:14, 168:15, 168:21, 169:5, 169:13, 169:18, 169:19, 169:22, 169:23, 170:2, 170:11, 170:19, 171:5, 171:23, 172:19, 173:11, 173:16, 173:17, 173:24, 174:12, 174:18, 174:22, 174:25, 175:1, 175:9, 175:12, 175:14, 175:21, 176:1, 176:11, 176:21,

177:1, 177:7, 177:11, 177:18, 178:1, 178:7, 178:15, 178:16, 178:23, 179:1, 179:7, 179:10, 179:13, 179:17, 180:17, 181:11, 181:12, 181:13, 181:14, 181:20, 181:21, 181:23, 181:24, 182:8, 182:11, 182:16, 182:23, 183:3, 183:4, 183:6, 183:7, 183:10, 183:14, 183:19, 183:22, 184:5, 184:10, 184:12, 184:16, 185:4, 185:21, 186:20, 186:21, 186:24, 187:3, 187:10, 187:11, 187:14, 188:6, 188:13, 188:25, 189:11, 189:14, 190:1, 190:11, 190:18, 190:24, 191:8, 191:9, 191:18, 191:24, 192:2, 192:3, 192:6, 192:7, 192:15, 192:18, 192:19, 192:21, 192:23, 192:24, 193:2, 193:7, 193:13, 193:14, 193:16, 193:20, 193:23, 194:12, 194:17, 194:18, 194:23, 195:7, 195:12, 195:18, 196:10, 196:14, 196:20, 196:21, 197:2, 197:7, 199:2, 199:12, 199:17, 199:18, 199:19, 199:24, 200:3, 200:5, 200:8, 200:9, 200:12, 200:17, 200:21, 201:1, 201:9, 201:13, 201:17, 201:18, 201:24, 202:2, 202:3, 202:5, 202:17, 203:1, 203:14, 203:22, 204:3, 204:4, 204:6, 204:7, 204:10, 204:16, 204:17, 204:19, 205:3,

205:7, 205:8, 205:9, 205:10, 206:6, 206:15, 206:18, 206:21, 206:22, 207:8, 207:11, 207:15, 207:19, 207:25, 208:5, 208:17, 208:22, 209:3, 209:13, 209:25, 210:5, 210:15, 210:21, 210:22, 211:1, 211:8, 211:9, 211:16, 212:22, 212:25, 213:12, 213:13, 214:12, 214:17, 214:18, 215:1, 216:14, 216:17, 216:20, 217:2, 217:5, 217:9, 217:13, 217:20, 218:14, 219:8, 219:15, 219:18, 220:16, 220:18, 220:21, 221:8, 221:13, 221:16, 222:2, 222:14, 222:18, 222:21, 223:22, 223:25, 224:6, 224:10, 226:13, 227:8, 228:18, 228:21, 229:1, 229:7, 229:13, 230:2, 230:3, 230:5, 230:10, 231:14, 231:17, 232:4, 232:14, 232:15, 232:25, 233:4, 233:19, 233:22, 234:3, 234:5, 234:12, 235:12, 235:14, 236:6, 236:20, 237:16, 238:4, 239:9, 239:18, 241:13, 241:16, 242:4, 242:11, 242:18, 242:23, 243:23, 245:17, 246:6, 246:11, 246:15, 247:1, 248:6, 249:2, 249:7, 249:8, 249:10, 249:14, 251:10, 252:10, 252:19, 253:4, 253:23, 257:13, 258:8, 260:5, 261:2, 261:11, 261:15, 262:8, 262:19, 262:24, 263:15,

264:1, 264:22, 265:20, 265:24, 267:8, 269:9, 270:10, 270:24, 271:3, 278:4
**corrected** [1] - 67:15
**correctly** [11] - 81:14, 115:7, 213:3, 225:5, 226:18, 235:7, 236:1, 236:12, 236:17, 253:15, 264:9
**corresponding** [9] - 102:6, 251:14, 251:22, 251:25, 276:7, 276:10, 276:11, 276:12, 276:15
**Corresponding** [1] - 251:17
**corroborate** [2] - 33:2, 34:6
**corroborated** [1] - 32:24
**corroboration** [2] - 33:6, 34:23
**CORT** [1] - 36:15
**counsel** [23] - 10:23, 19:20, 20:6, 20:14, 21:4, 25:8, 37:14, 40:19, 82:7, 82:8, 97:8, 155:1, 163:14, 163:19, 164:7, 164:11, 172:3, 230:22, 240:12, 243:1, 270:1, 271:2, 274:4
**Count** [3] - 61:9, 136:4
**count** [3] - 174:9, 213:8, 213:10
**counties** [5] - 62:11, 62:14, 210:13, 210:17, 210:21
**country** [5] - 62:25, 64:1, 64:6, 146:8, 210:17
**country's** [1] - 249:6
**counts** [3] - 136:7, 136:8, 273:4
**COUNTY** [1] - 1:10
**county** [8] - 62:1, 62:21, 62:25, 75:7, 112:13, 117:14, 206:9, 206:12
**County** [84] - 2:2, 3:2, 26:20, 27:22, 30:17, 59:7, 59:10, 61:17, 62:3, 62:6, 62:9, 62:13, 62:20, 62:23, 63:16, 65:21, 66:5,

66:9, 66:10, 66:12, 70:14, 86:3, 112:24, 116:17, 118:6, 118:17, 118:25, 128:18, 129:22, 133:23, 137:20, 139:8, 140:6, 140:12, 165:3, 168:20, 169:25, 173:15, 173:23, 175:3, 176:17, 180:15, 187:24, 190:1, 190:11, 194:23, 194:25, 195:3, 195:17, 196:12, 199:11, 199:16, 200:7, 200:15, 200:25, 201:9, 201:13, 201:16, 201:23, 202:23, 203:10, 203:14, 204:3, 204:6, 204:14, 204:15, 204:16, 205:1, 210:5, 210:13, 210:19, 211:15, 212:22, 213:5, 213:12, 214:12, 224:13, 243:18, 243:20, 243:23, 248:5, 248:12, 274:5
**County's** [2] - 200:11, 210:23
**couple** [3] - 23:15, 26:7, 193:10
**course** [32] - 7:21, 52:17, 70:12, 71:25, 75:19, 75:23, 79:14, 84:8, 84:9, 87:8, 88:20, 89:1, 92:10, 93:9, 104:14, 118:14, 136:8, 152:19, 154:6, 164:18, 209:14, 223:11, 247:25, 250:3, 262:12, 262:15, 262:23, 264:18, 265:7, 265:18, 266:2
**courses** [1] - 127:19
**Court** [45] - 6:17, 6:18, 7:3, 7:9, 7:16, 8:14, 8:20, 9:5, 9:17, 10:22, 16:4, 16:8, 20:10, 29:9, 30:22, 33:8, 34:5, 34:24, 36:18, 49:19, 52:6, 59:13, 91:21, 97:8, 98:4, 99:13, 103:1,

104:4, 123:19,
125:21, 148:19,
157:3, 168:12,
169:17, 175:9,
177:18, 178:14,
179:6, 179:8,
180:17, 209:18,
211:21, 249:23,
278:2, 278:3
**COURT** [240] - 1:1,
1:17, 7:12, 8:9, 9:8,
9:24, 10:1, 10:19,
11:8, 11:13, 16:11,
16:17, 16:21, 16:23,
17:2, 18:1, 20:22,
21:1, 22:4, 23:23,
24:19, 24:24, 25:4,
25:20, 26:2, 26:15,
26:22, 26:24, 27:5,
27:13, 27:16, 28:2,
28:5, 28:11, 29:20,
29:23, 30:25, 31:2,
31:13, 32:3, 33:15,
33:19, 34:7, 35:1,
35:5, 35:10, 35:22,
36:13, 36:22, 37:17,
39:22, 40:9, 40:18,
41:25, 42:4, 42:9,
46:20, 46:23, 46:25,
47:17, 47:23, 48:3,
48:8, 48:11, 48:15,
48:19, 48:25, 49:11,
50:11, 55:20, 58:10,
58:19, 58:22, 58:25,
60:5, 60:17, 62:18,
63:9, 63:11, 64:7,
64:13, 64:15, 65:5,
65:15, 68:16, 69:16,
70:3, 71:21, 72:25,
77:19, 78:5, 79:24,
80:18, 80:22, 81:12,
81:17, 81:23, 82:14,
82:20, 82:23, 85:1,
86:4, 86:21, 87:22,
87:24, 88:10, 88:16,
89:20, 90:11, 90:16,
91:23, 92:5, 92:20,
93:3, 94:7, 94:12,
96:13, 97:10, 97:12,
97:18, 98:6, 98:20,
98:23, 100:14,
100:18, 101:5,
102:21, 102:25,
103:21, 107:19,
108:1, 108:6, 109:3,
109:17, 110:11,
110:16, 112:19,
112:25, 114:5,
114:22, 114:25,
115:9, 116:23,
121:5, 122:22,

123:14, 124:11,
124:17, 125:14,
125:18, 125:24,
126:16, 126:18,
126:22, 126:25,
127:24, 128:3,
129:8, 129:16,
129:20, 132:17,
134:7, 135:1, 135:7,
135:9, 135:16,
138:8, 139:2,
139:16, 141:2,
141:12, 141:18,
141:21, 142:22,
142:25, 143:4,
143:6, 148:21,
149:24, 150:4,
153:5, 153:19,
153:23, 154:2,
154:15, 154:20,
155:4, 155:7,
155:12, 155:23,
156:7, 156:9,
156:13, 156:24,
158:9, 158:22,
162:8, 162:20,
162:25, 163:6,
167:16, 167:18,
171:9, 171:16,
172:6, 172:9, 180:6,
180:9, 180:22,
205:22, 209:20,
212:1, 213:22,
215:13, 215:16,
215:19, 215:22,
216:2, 231:3, 242:6,
243:7, 244:13,
254:2, 256:2, 256:4,
256:6, 265:1, 266:5,
268:8, 269:18,
269:23, 270:18,
271:15, 272:2,
272:5, 272:8,
272:11, 274:13,
277:3, 277:6
**court** [10] - 9:1, 36:25,
37:7, 53:5, 80:8,
110:15, 147:13,
155:18, 173:22,
260:22
**Court's** [8] - 82:16,
98:10, 99:14, 100:3,
100:8, 114:8,
210:16, 257:18
**courtesy** [1] - 155:18
**courtroom** [4] - 8:6,
20:23, 125:7, 152:23
**COURTROOM** [4] -
49:2, 49:4, 49:6,
49:9

**cover** [5] - 75:14,
151:22, 249:2,
263:23, 273:6
**covers** [3] - 75:17,
104:21
**Covington** [1] - 5:11
**create** [2] - 71:14,
208:10
**created** [5] - 34:15,
52:24, 53:22, 146:9,
146:10
**creates** [2] - 18:12,
146:9
**creation** [4] - 21:8,
21:16, 21:24, 38:22
**credit** [1] - 23:16
**credits** [2] - 252:2
**crisis** [2] - 21:18,
22:19
**cross** [36] - 7:7, 7:12,
7:18, 8:17, 8:24, 9:4,
11:6, 16:21, 37:23,
40:21, 41:1, 41:4,
41:7, 41:10, 41:23,
42:7, 42:11, 46:19,
65:3, 67:24, 68:6,
68:10, 73:2, 81:12,
89:10, 149:1,
149:13, 149:14,
153:6, 153:7,
154:23, 155:3,
155:9, 155:17,
155:20, 230:22
**CROSS** [3] - 143:8,
216:4, 243:8
**cross-examination** [1]
- 230:22
**cross-examine** [1] -
89:10
**crosses** [2] - 8:14, 9:7
**CRR** [2] - 6:17, 6:18
**CS** [27] - 82:6, 82:9,
82:10, 82:18, 83:10,
83:19, 83:20,
160:11, 160:14,
160:18, 161:2,
161:4, 161:8,
161:13, 162:1,
163:4, 163:9,
163:13, 163:20,
164:20, 164:22,
244:3, 245:15,
245:17, 270:20
**CSMP** [3] - 198:1,
198:13, 198:15
**CT2** [1] - 98:3
**cull** [7] - 62:24, 81:4,
246:19, 248:17,
263:7, 266:3, 275:10
**cumulative** [1] - 94:25

**Cuong** [1] - 115:6
**currencies** [1] - 53:10
**currency** [4] - 53:9,
53:12, 53:20, 172:23
**current** [5] - 186:3,
186:23, 187:6,
187:10, 274:2
**cursory** [2] - 89:8,
206:12
**customer** [16] - 83:21,
87:11, 102:1, 102:3,
142:11, 188:5,
195:25, 197:6,
223:25, 231:16,
259:25, 275:13,
275:16, 275:17,
276:3, 276:9
**customer's** [3] -
94:17, 94:20, 94:22
**customers** [12] -
84:11, 142:6, 142:9,
142:14, 190:21,
191:23, 195:3,
249:10, 251:3,
259:9, 259:14,
272:25
**cut** [2] - 37:17, 37:19
**cutoff** [1] - 251:6
**Cynthia** [1] - 219:25

# D

**D.O** [1] - 266:12
**daily** [1] - 228:2
**dangerous** [1] -
227:24
**darndest** [1] - 243:13
**dash** [1] - 82:11
**dash-boarding** [1] -
82:11
**dashboard** [1] -
161:11
**dashboard-type** [1] -
161:11
**Data** [3] - 50:19, 52:2,
226:16
**data** [376] - 15:5, 33:3,
34:22, 35:25, 36:2,
36:3, 36:9, 50:22,
51:10, 51:13, 51:15,
51:17, 51:21, 52:1,
52:10, 52:14, 52:15,
52:16, 53:4, 54:6,
54:9, 54:15, 58:4,
58:9, 58:12, 58:20,
58:21, 58:22, 59:7,
59:9, 59:16, 59:24,
60:14, 63:12, 63:22,
63:24, 63:25, 64:20,
67:3, 67:6, 67:9,

67:10, 67:17, 67:20,
67:23, 69:1, 69:2,
69:4, 69:5, 69:17,
70:6, 70:12, 70:13,
70:15, 71:4, 71:7,
71:8, 71:10, 71:11,
71:12, 71:15, 71:24,
71:25, 72:19, 73:8,
73:21, 73:22, 73:23,
73:24, 74:7, 74:8,
74:17, 74:18, 74:25,
75:3, 75:4, 75:7,
75:8, 75:10, 75:13,
75:15, 75:16, 75:17,
75:24, 76:25, 77:15,
78:13, 78:15, 78:19,
78:21, 78:23, 79:3,
79:4, 79:9, 79:15,
83:10, 84:6, 84:7,
85:16, 85:17, 87:6,
87:10, 88:7, 88:15,
88:22, 89:4, 89:23,
90:23, 92:13, 92:24,
93:2, 94:15, 94:16,
94:17, 94:20, 94:22,
95:2, 95:5, 95:9,
99:6, 102:9, 103:15,
103:17, 104:2,
104:4, 104:7,
104:10, 104:17,
104:21, 104:25,
105:5, 105:6,
105:13, 105:16,
105:19, 105:23,
105:25, 106:3,
106:5, 106:7,
106:11, 106:12,
107:10, 108:4,
108:11, 108:12,
108:20, 108:24,
109:8, 110:5,
110:14, 110:22,
111:6, 111:11,
111:15, 111:19,
111:23, 112:3,
112:4, 112:5, 116:1,
116:3, 116:14,
117:6, 117:18,
117:21, 118:3,
119:7, 120:8,
120:11, 120:13,
120:24, 121:18,
121:19, 121:22,
121:24, 122:3,
122:7, 123:10,
128:15, 128:20,
133:5, 133:6,
133:20, 136:12,
137:5, 141:5, 141:7,
142:1, 142:5, 142:9,
142:13, 142:6, 144:8,

145:8, 145:18, 145:22, 146:5, 146:6, 146:7, 146:17, 146:22, 147:21, 148:2, 148:7, 148:8, 150:12, 150:16, 150:21, 151:4, 151:6, 151:11, 151:14, 151:20, 151:21, 151:23, 151:24, 152:22, 152:24, 154:6, 157:4, 157:5, 157:6, 157:7, 157:9, 157:14, 159:13, 159:17, 159:23, 160:5, 162:4, 163:10, 164:11, 164:15, 164:18, 164:19, 165:4, 170:9, 170:25, 171:2, 171:19, 172:4, 172:19, 172:21, 172:24, 189:24, 190:2, 190:3, 190:6, 190:7, 190:9, 190:21, 190:22, 191:2, 191:5, 191:10, 191:17, 191:19, 191:21, 192:4, 192:5, 195:4, 195:8, 195:19, 196:8, 196:9, 199:6, 199:9, 199:17, 200:17, 202:6, 202:7, 202:18, 204:1, 204:13, 205:9, 205:17, 206:5, 206:7, 206:10, 206:11, 206:12, 206:14, 206:17, 206:21, 206:22, 208:5, 208:9, 208:17, 209:24, 211:13, 212:24, 212:25, 214:3, 214:25, 216:11, 216:13, 216:16, 216:22, 217:5, 217:9, 217:11, 218:20, 218:25, 219:9, 220:23, 221:3, 222:24, 223:22, 224:12, 226:20, 237:16, 240:11, 244:3, 245:15, 245:18, 246:5, 246:6, 246:7, 246:9, 246:11,

246:15, 246:16, 246:18, 247:1, 247:8, 247:20, 247:21, 248:1, 248:2, 248:4, 248:11, 248:14, 248:23, 249:2, 249:6, 249:19, 249:20, 249:25, 250:3, 250:21, 251:5, 251:13, 251:22, 251:23, 252:1, 252:4, 252:5, 252:18, 252:22, 253:7, 253:8, 262:6, 270:8, 270:16, 270:23, 271:2
**database** [36] - 66:7, 70:23, 80:6, 82:11, 82:18, 145:7, 145:10, 145:18, 145:21, 145:24, 146:2, 146:10, 146:22, 147:2, 151:3, 152:9, 152:15, 152:19, 153:12, 157:14, 160:11, 160:14, 160:18, 161:2, 161:8, 162:1, 163:4, 163:10, 163:20, 164:8, 164:23, 165:1, 245:17, 252:14, 270:13
**dataset** [11] - 103:24, 105:10, 107:1, 107:13, 117:24, 157:12, 216:18, 216:21, 217:10, 217:22, 248:14
**datasets** [11] - 57:17, 73:12, 75:5, 75:6, 105:14, 160:22, 161:5, 193:4, 209:14, 218:14, 224:14
**Date** [1] - 278:16
**date** [11] - 72:3, 104:11, 104:13, 163:18, 164:2, 194:8, 216:18, 233:21, 242:10, 261:8, 265:23
**dated** [1] - 272:15
**dates** [3] - 104:11, 237:19, 266:18
**DAVID** [2] - 1:17, 4:5
**David** [5] - 7:1, 118:11, 118:12, 219:22, 221:12

**Davies** [9] - 34:12, 34:19, 35:14, 35:18, 36:1, 36:7, 36:19, 36:24, 37:5
**Davies'** [1] - 37:9
**Dawn** [1] - 140:18
**Dawson** [10] - 118:12, 120:5, 140:10, 142:16, 142:18, 196:23, 196:25, 197:5, 270:10, 274:10
**day's** [1] - 53:19
**days** [4] - 163:21, 164:3, 164:8, 185:16
**DC** [6] - 4:7, 4:10, 4:17, 4:19, 5:5, 5:12
**De** [2] - 2:4, 2:14
**DEA** [15] - 45:8, 71:9, 76:23, 108:16, 143:25, 144:4, 144:18, 157:22, 158:3, 158:16, 206:10, 257:15, 257:18, 258:23, 259:18
**DEA's** [1] - 157:20
**deaths** [3] - 54:8, 54:9, 134:18
**decades** [1] - 51:17
**decide** [1] - 115:11
**decided** [5] - 175:8, 177:17, 264:3, 266:22, 267:1
**decimal** [1] - 228:24
**decompressed** [1] - 105:17
**decreased** [1] - 205:6
**deemed** [1] - 110:15
**deep** [1] - 242:19
**DEF** [1] - 10:6
**DEF-WV** [1] - 10:6
**Defendant** [4] - 4:13, 5:2, 5:7, 6:2
**defendant** [12] - 76:7, 79:4, 86:12, 101:19, 125:6, 147:12, 147:17, 152:21, 152:23, 195:17, 196:1, 197:6
**defendant's** [2] - 108:10
**defendants** [92] - 26:11, 27:19, 28:3, 28:24, 29:15, 29:16, 33:21, 37:11, 37:14, 59:9, 59:15, 60:8, 63:18, 64:22, 67:3, 67:6, 68:25, 69:8, 69:13, 69:15, 69:18,

75:24, 77:14, 79:10, 79:15, 84:10, 84:22, 86:10, 87:9, 87:15, 88:1, 88:3, 88:15, 88:21, 89:24, 90:23, 91:5, 92:1, 92:12, 92:23, 93:1, 93:24, 95:8, 96:18, 96:23, 98:11, 99:7, 99:17, 100:13, 101:4, 102:9, 102:13, 102:19, 103:2, 103:12, 105:22, 106:1, 106:15, 106:23, 107:8, 111:5, 111:10, 111:14, 111:20, 114:12, 126:5, 126:11, 126:14, 133:18, 137:5, 141:25, 144:6, 145:6, 154:5, 165:1, 167:12, 168:5, 189:25, 190:20, 190:22, 191:3, 191:7, 191:17, 196:13, 231:1, 234:20, 246:14, 247:1, 247:7, 247:22, 258:16
**Defendants** [3] - 1:8, 1:14, 278:7
**defendants'** [11] - 63:14, 64:18, 83:9, 89:2, 89:23, 90:20, 92:3, 105:6, 106:12, 189:12, 258:15
**defense** [5] - 7:22, 19:20, 20:14, 21:4, 64:12
**Defense** [1] - 38:16
**defer** [1] - 114:17
**defined** [1] - 133:16
**definitely** [1] - 154:23
**definition** [1] - 115:4
**definitively** [1] - 196:18
**degree** [3] - 32:18, 50:16, 50:18
**delay** [2] - 109:19, 249:22
**delegation** [2] - 136:5, 136:7
**Deleno** [27] - 77:6, 117:7, 118:12, 120:18, 121:12, 122:25, 133:19, 181:13, 221:11, 222:21, 223:2, 223:4, 223:19,

223:22, 224:22, 226:12, 227:8, 227:12, 227:18, 229:2, 229:10, 229:23, 230:2, 232:3, 232:10, 241:12, 273:1
**Demo** [1] - 215:25
**demonstrate** [2] - 126:4, 131:6
**demonstrates** [1] - 130:20
**demonstrative** [11] - 65:25, 125:22, 135:3, 176:6, 217:25, 218:5, 218:10, 221:4, 239:1, 240:14, 245:19
**Demonstrative** [5] - 16:7, 16:9, 50:13, 50:14, 245:22
**demonstratives** [5] - 63:3, 63:5, 123:24, 124:5, 218:7
**denied** [2] - 167:19, 268:15
**denominator** [1] - 210:18
**deny** [1] - 231:4
**department** [2] - 18:23, 52:8
**Department's** [1] - 56:15
**depiction** [1] - 18:5
**depose** [1] - 114:13
**deposed** [1] - 161:14
**deposition** [27] - 9:2, 34:1, 34:13, 34:21, 63:8, 63:19, 80:16, 81:5, 81:9, 81:11, 82:16, 90:6, 91:17, 96:12, 153:4, 153:15, 154:3, 154:10, 161:18, 161:20, 161:23, 163:5, 173:1, 179:21, 219:8, 246:20, 248:20
**DEPUTY** [4] - 49:2, 49:4, 49:6, 49:9
**Deputy** [1] - 11:16
**derived** [2] - 23:9, 34:21
**derogatory** [2] - 273:18, 276:4
**describe** [12] - 50:15, 51:7, 53:7, 55:23, 73:11, 84:13, 100:21, 104:1,

122:24, 137:1,
169:16, 252:5
**described** [3] - 13:14,
140:1, 236:6
**describes** [3] - 50:24,
73:25, 151:19
**describing** [3] -
103:17, 104:7,
108:23
**descriptive** [5] -
12:14, 12:25, 13:21,
14:18, 14:21
**design** [1] - 144:11
**designations** [1] - 9:2
**designed** [1] - 144:17
**designing** [1] - 144:13
**desire** [2] - 68:13,
123:22
**despite** [1] - 134:21
**detail** [4] - 19:9, 43:16,
79:2, 276:13
**details** [3] - 103:23,
147:15, 187:25
**determine** [13] -
53:15, 54:6, 68:17,
75:24, 79:15, 87:9,
88:21, 89:2, 97:5,
136:13, 209:24,
213:3, 265:6
**determined** [2] - 13:4,
232:3
**determining** [4] -
110:23, 148:3,
246:25, 247:7
**developed** [1] - 34:6
**developing** [1] -
235:23
**devoting** [1] - 8:2
**diagnosed** [1] - 34:3
**Diazapam** [1] - 273:13
**died** [1] - 235:6
**differ** [1] - 119:24
**difference** [2] - 69:16,
120:12
**differences** [3] -
122:1, 183:11,
209:11
**different** [37] - 11:6,
39:5, 58:13, 63:25,
64:5, 67:19, 67:22,
71:4, 71:15, 73:7,
73:11, 73:21, 80:13,
80:18, 81:1, 85:11,
98:11, 121:18,
131:13, 156:15,
158:19, 160:10,
170:12, 171:13,
174:10, 174:16,
179:2, 183:21,
190:5, 201:2,

203:24, 209:14,
215:2, 215:7, 240:5,
257:13, 270:12
**difficult** [4] - 7:22,
97:4, 131:12, 172:25
**difficulty** [1] - 266:18
**dig** [1] - 41:24
**digit** [1] - 205:18
**digital** [1] - 233:12
**digits** [1] - 228:25
**diligence** [10] - 102:7,
144:21, 177:3,
187:21, 192:10,
192:13, 264:19,
275:13, 275:15,
275:19
**DIRECT** [2] - 47:1,
49:16
**direct** [27] - 7:20, 7:21,
8:18, 8:22, 10:22,
11:4, 12:1, 16:23,
20:22, 41:20, 46:18,
80:6, 142:22,
151:13, 151:25,
159:14, 160:10,
164:25, 173:14,
179:21, 203:15,
203:18, 213:14,
249:13, 262:12,
262:17, 267:16
**directed** [3] - 81:9,
259:13, 268:14
**direction** [2] - 14:12,
92:8
**directly** [2] - 13:24,
75:9
**Director** [3] - 11:16,
52:2, 52:3
**directs** [1] - 176:8
**disagree** [6] - 151:19,
152:1, 159:4, 159:8,
159:12, 198:23
**discharged** [1] - 273:4
**Disciplinary** [1] -
242:14
**disciplinary** [16] -
122:13, 135:24,
173:16, 174:25,
181:11, 182:25,
183:2, 184:4,
220:24, 230:9,
230:23, 233:3,
233:18, 242:3,
242:22, 253:18
**discipline** [10] - 140:2,
140:22, 141:7,
176:25, 177:9,
177:10, 178:25,
182:14, 194:11,
266:23

**disciplined** [6] -
140:6, 140:12,
140:18, 142:18,
253:23, 267:8
**disclaimed** [2] - 90:6,
91:16
**disclose** [4] - 41:8,
107:18, 107:24,
109:15
**disclosed** [28] - 29:25,
34:14, 37:10, 41:14,
42:7, 62:22, 72:23,
81:17, 87:18, 90:8,
93:17, 94:1, 95:18,
96:18, 96:25, 99:20,
99:22, 100:13,
101:1, 101:2,
109:10, 113:2,
114:12, 114:16,
149:2, 149:4, 153:3,
241:25
**discloses** [1] - 93:20
**disclosure** [14] -
34:15, 36:20, 37:5,
80:9, 94:2, 96:12,
98:1, 100:10,
106:20, 154:18,
156:19, 258:7,
258:10
**disclosures** [2] -
34:16, 93:25
**Discount** [2] - 243:15,
243:17
**discover** [1] - 156:13
**discovered** [1] - 145:6
**discovery** [1] - 37:14
**discrepancy** [1] - 9:3
**discuss** [4] - 83:23,
167:1, 169:14,
221:18
**discussed** [12] - 38:7,
38:23, 44:22, 83:9,
84:15, 110:22,
148:24, 163:12,
219:7, 219:24,
245:17, 249:13
**discusses** [5] - 76:18,
85:8, 124:24, 125:1,
163:13
**discussing** [3] - 82:5,
83:18, 126:20
**discussion** [3] -
44:11, 45:15, 266:11
**dismissed** [1] -
179:25
**Disorder** [4] - 19:24,
21:6, 21:18, 38:10
**dispensations** [1] -
249:4
**dispensed** [5] - 74:20,

104:8, 104:19,
217:2, 232:12
**dispenser** [1] - 74:2
**dispensing** [60] -
67:3, 67:6, 67:9,
69:1, 69:2, 71:12,
73:22, 74:17, 74:18,
75:4, 75:24, 76:25,
77:15, 78:13, 78:15,
79:9, 83:10, 85:15,
85:17, 87:6, 87:10,
88:4, 88:6, 88:22,
89:4, 92:12, 92:24,
94:15, 94:16, 94:22,
95:5, 95:9, 102:2,
102:9, 111:11,
111:15, 112:3,
121:24, 142:1,
142:5, 142:9, 145:8,
166:12, 166:19,
190:21, 190:22,
191:5, 216:13,
217:15, 222:24,
224:9, 240:6,
242:15, 246:18,
247:21, 248:4,
248:11, 249:2,
253:4, 262:5
**disproportionally** [1] -
115:16
**disproportionate** [2] -
113:17, 115:18
**dispute** [1] - 37:14
**disputed** [1] - 68:2
**disqualified** [1] - 58:5
**distance** [1] - 11:10
**distracting** [1] - 100:3
**distribute** [1] - 247:15
**distributed** [5] -
26:20, 27:21, 28:24,
145:1, 217:19
**distribution** [23] -
21:7, 21:16, 21:23,
26:9, 26:10, 38:21,
39:9, 39:17, 40:1,
44:8, 44:10, 44:11,
44:12, 45:1, 45:17,
73:8, 75:10, 191:5,
205:17, 208:9,
214:16, 214:21,
214:25
**distributions** [10] -
146:18, 146:19,
146:20, 207:14,
208:10, 208:15,
208:21, 209:2,
214:6, 214:15
**distributor** [7] - 45:7,
46:6, 74:1, 250:18,
262:21, 264:15,

266:25
**distributor's** [2] -
144:25, 246:11
**distributors** [40] -
30:8, 30:9, 30:15,
44:7, 44:10, 44:12,
44:22, 44:24, 45:1,
45:2, 45:19, 45:22,
72:20, 140:20,
144:1, 144:21,
158:4, 158:16,
159:16, 191:21,
205:19, 206:18,
206:19, 206:20,
214:7, 246:5, 246:7,
247:17, 249:9,
249:12, 249:16,
249:24, 250:25,
251:4, 251:11,
252:4, 258:24,
259:14, 262:2,
264:22
**Distributors** [1] -
267:4
**distributors'** [2] -
30:13, 30:14
**District** [2] - 7:2, 7:3
**DISTRICT** [3] - 1:1,
1:1, 1:17
**Diversion** [2] - 157:20,
157:22
**diversion** [6] - 30:2,
32:1, 43:6, 113:4,
116:10, 171:10
**diverted** [5] - 170:19,
171:5, 171:23,
172:19, 173:9
**divide** [1] - 228:15
**Dobbin** [8] - 39:2,
39:10, 40:7, 40:14,
42:14, 42:23, 47:7,
47:10
**docket** [2] - 148:20,
149:9
**Docket** [2] - 40:25,
148:25
**doctor** [19] - 119:16,
133:15, 134:12,
137:7, 137:17,
157:10, 165:20,
167:8, 167:25,
189:16, 196:22,
222:18, 222:20,
229:6, 242:10,
242:17, 251:7,
251:18, 265:11
**doctor's** [2] - 119:18,
242:12
**doctors** [59] - 117:17,
121:17, 121:18,

130:21, 131:22,
132:21, 140:1,
140:9, 140:11,
140:15, 140:21,
145:2, 145:19,
145:23, 147:23,
157:6, 158:5,
158:17, 165:9,
168:24, 170:18,
173:15, 173:18,
173:23, 174:3,
174:11, 174:14,
174:16, 174:20,
174:24, 175:2,
175:5, 175:19,
177:13, 179:7,
179:12, 180:14,
181:10, 193:10,
193:12, 201:8,
201:13, 201:16,
203:13, 203:24,
203:25, 211:13,
217:4, 231:8,
250:14, 252:15,
253:12, 253:19,
253:22, 254:12,
255:22, 265:6,
267:8, 269:7
**doctors'** [2] - 158:5,
158:18
**document** [174] - 10:5,
22:13, 22:14, 35:18,
40:19, 41:13, 41:16,
69:14, 76:11, 76:13,
76:16, 76:17, 76:24,
77:5, 78:2, 78:6,
80:1, 80:2, 80:9,
80:11, 80:14, 80:15,
80:16, 80:24, 81:2,
81:10, 82:1, 82:4,
82:5, 83:17, 83:19,
83:25, 84:2, 84:6,
85:3, 85:6, 85:7,
85:25, 86:6, 86:9,
86:19, 86:24, 87:2,
87:3, 92:22, 93:9,
93:12, 93:13, 93:24,
95:4, 95:13, 95:16,
96:5, 96:24, 97:5,
97:16, 100:11,
100:22, 100:25,
101:4, 101:17,
101:19, 101:21,
101:24, 102:10,
102:20, 124:23,
124:25, 125:5,
125:6, 125:12,
125:23, 125:24,
126:2, 126:13,
126:19, 127:5,
127:8, 127:11,

127:12, 127:16,
127:21, 135:18,
135:20, 135:23,
135:24, 136:8,
148:18, 148:20,
149:3, 149:8,
149:18, 150:6,
155:1, 155:4,
155:19, 155:21,
155:23, 155:24,
156:6, 156:10,
156:22, 160:13,
160:16, 163:12,
163:13, 163:18,
163:24, 165:17,
170:25, 171:12,
172:20, 172:24,
176:22, 184:17,
186:14, 188:4,
188:7, 188:11,
188:23, 189:15,
189:18, 189:22,
213:17, 225:25,
230:18, 232:8,
233:7, 234:22,
236:6, 238:2,
238:22, 240:4,
241:24, 243:25,
244:2, 244:4, 244:6,
244:11, 244:19,
245:4, 245:17,
254:4, 255:24,
259:8, 259:23,
259:24, 263:18,
265:4, 267:17,
269:6, 270:5, 270:7,
270:12, 271:1,
271:17, 271:20,
271:23, 272:13,
272:15, 273:24,
274:15, 274:18,
274:20, 275:16,
275:20
**documentary** [1] -
89:8
**documentation** [4] -
33:13, 70:13, 70:15,
105:25
**documents** [119] -
11:3, 30:12, 42:6,
70:7, 70:14, 70:16,
70:23, 71:1, 76:5,
76:6, 76:7, 77:13,
77:22, 77:25, 78:11,
78:12, 78:13, 79:3,
79:4, 79:10, 79:19,
80:4, 80:7, 80:10,
80:25, 81:1, 83:8,
83:15, 88:12, 88:13,
89:25, 90:1, 90:3,
90:7, 90:10, 90:25,

91:2, 91:6, 91:7,
91:10, 91:13, 91:21,
92:11, 93:21, 93:23,
94:5, 94:10, 95:8,
96:9, 96:11, 96:18,
96:21, 96:23, 97:4,
98:2, 98:16, 98:17,
98:18, 99:4, 99:11,
99:16, 99:20, 99:21,
100:6, 100:12,
101:8, 101:15,
102:12, 102:24,
103:11, 103:13,
105:7, 116:2, 122:4,
124:4, 124:9,
124:14, 124:19,
132:21, 135:11,
138:10, 138:12,
138:15, 138:20,
148:25, 149:19,
149:22, 155:16,
161:12, 167:1,
167:22, 168:2,
169:14, 170:4,
170:7, 170:20,
171:15, 172:4,
172:20, 185:14,
187:22, 189:12,
225:2, 225:16,
225:17, 233:7,
243:14, 245:12,
249:9, 249:12,
253:18, 258:21,
259:16, 260:4,
260:20, 260:21,
261:20
**dollar** [1] - 54:13
**dollars** [1] - 53:25
**Donald** [1] - 220:5
**done** [16] - 13:22,
22:5, 44:12, 51:19,
56:21, 141:18,
144:21, 153:13,
191:7, 191:14,
208:4, 209:21,
221:1, 238:24,
269:15, 270:19
**door** [3] - 33:21,
36:21, 42:10
**dosage** [58] - 61:13,
61:16, 61:18, 61:25,
72:8, 72:13, 74:11,
74:21, 104:13,
104:14, 104:23,
109:25, 117:11,
117:12, 118:1,
118:4, 118:7, 119:7,
119:17, 120:19,
120:20, 121:16,
129:24, 130:1,

130:8, 130:15,
131:16, 131:17,
132:1, 132:4, 132:5,
133:8, 133:10,
133:12, 174:19,
199:15, 200:25,
201:7, 201:11,
201:12, 201:19,
202:8, 202:12,
202:25, 203:11,
208:2, 210:9,
210:10, 210:12,
211:3, 211:12,
211:14, 211:17,
212:10, 214:12,
241:3, 241:4
**dose** [1] - 109:25
**doses** [1] - 123:12
**double** [7] - 97:23,
200:18, 212:19,
213:6, 213:9,
213:10, 230:3
**double-spaced** [1] -
97:23
**Douglas** [1] - 4:20
**down** [26] - 42:24,
43:4, 66:25, 75:20,
77:4, 78:15, 99:14,
115:25, 125:25,
139:25, 145:9,
162:3, 185:9,
185:13, 185:18,
185:20, 185:23,
187:8, 187:13,
191:11, 206:2,
207:6, 214:4, 226:3,
254:23, 273:15
**downloaded** [1] -
253:22
**downloading** [1] -
267:7
**downward** [1] -
207:10
**dozen** [1] - 57:15
**Dr** [274] - 7:8, 7:18,
8:6, 8:23, 9:20, 9:22,
10:3, 10:8, 11:4,
11:15, 12:5, 12:10,
13:3, 13:23, 14:3,
15:23, 16:3, 16:16,
16:25, 17:5, 20:17,
25:25, 27:19, 28:9,
35:14, 35:15, 35:18,
36:1, 36:7, 36:18,
38:1, 39:15, 39:21,
40:12, 40:13, 42:6,
42:14, 44:5, 44:9,
44:14, 45:12, 45:21,
46:14, 48:8, 48:11,
66:10, 66:14, 66:16,

77:6, 77:12, 106:3,
106:4, 117:7,
117:19, 117:21,
119:5, 120:4, 120:5,
122:15, 122:17,
123:3, 124:20,
125:2, 127:7,
127:17, 128:16,
128:21, 129:11,
129:21, 130:20,
131:8, 131:21,
132:7, 132:19,
133:14, 134:12,
134:20, 135:12,
135:21, 135:25,
136:3, 137:1,
137:11, 137:13,
137:15, 137:17,
138:2, 138:13,
138:24, 139:5,
139:11, 139:19,
139:22, 140:10,
140:18, 142:16,
142:18, 173:6,
175:5, 175:8,
175:19, 175:24,
176:4, 176:7,
176:12, 176:16,
176:23, 177:1,
177:6, 177:14,
177:17, 177:25,
178:6, 178:14,
178:20, 179:1,
180:13, 181:2,
181:13, 181:19,
181:22, 181:25,
182:6, 182:22,
183:9, 183:18,
183:22, 184:4,
184:11, 184:15,
184:20, 185:3,
185:8, 185:12,
185:24, 186:6,
187:13, 187:22,
188:6, 188:12,
188:22, 188:24,
189:3, 189:8,
189:11, 189:12,
189:19, 189:24,
189:25, 190:9,
190:16, 190:24,
191:22, 191:24,
192:2, 193:1, 193:5,
193:12, 193:15,
193:18, 193:19,
193:22, 193:25,
194:12, 194:16,
194:21, 195:1,
195:12, 195:16,
195:22, 195:24,
196:11, 196:23,

196:25, 197:5,
197:10, 197:12,
197:16, 197:19,
197:24, 198:3,
198:6, 199:23,
205:13, 205:14,
205:16, 205:25,
207:3, 208:7, 208:9,
208:14, 208:20,
209:1, 209:11,
212:5, 213:15,
214:1, 214:2,
214:11, 214:15,
214:21, 230:3,
232:6, 232:8,
232:13, 232:16,
232:20, 232:25,
233:4, 233:18,
233:21, 234:2,
235:5, 236:10,
237:4, 237:7,
237:10, 237:11,
238:2, 238:4,
238:18, 239:4,
239:12, 239:23,
241:7, 242:22,
243:10, 253:14,
256:20, 258:8,
258:11, 259:11,
259:15, 260:7,
260:12, 261:6,
263:1, 263:3, 263:4,
263:14, 263:15,
263:23, 265:15,
266:1, 266:22,
267:13, 267:21,
270:9, 270:10,
271:3, 271:10,
272:14, 272:16,
273:1, 273:2, 273:3,
273:4, 273:5, 273:8,
273:12, 273:14,
273:19, 273:20,
273:21, 274:9,
274:10
**drastically** [1] - 51:18
**draw** [1] - 135:23
**drawn** [1] - 103:5
**drill** [1] - 7:23
**Drive** [1] - 6:15
**dropped** [1] - 7:10
**Drug** [51] - 6:2, 11:17,
44:2, 73:23, 74:17,
104:2, 104:4, 104:7,
104:25, 105:5,
105:9, 110:21,
112:3, 120:23,
121:8, 121:15,
121:18, 123:10,
130:16, 190:2,

190:6, 195:8,
195:19, 196:8,
206:2, 206:6,
206:10, 216:11,
216:14, 216:19,
216:23, 217:2,
217:11, 218:16,
219:9, 219:14,
221:2, 222:24,
240:10, 240:13,
240:20, 241:9,
246:13, 246:15,
246:16, 247:1,
247:8, 247:16,
247:17, 248:1, 278:7
**DRUG** [2] - 1:7, 1:13
**drug** [21] - 72:4, 72:8,
72:13, 72:14, 74:4,
74:5, 74:8, 74:21,
77:1, 78:17, 83:6,
104:13, 104:23,
109:23, 112:3,
115:16, 130:2,
147:9, 191:13,
232:12, 252:9
**drug-related** [1] -
109:23
**drugs** [12] - 113:18,
115:19, 115:20,
117:15, 119:14,
119:23, 170:23,
186:23, 191:12,
209:13, 217:18,
242:18
**dual** [1] - 201:19
**due** [9] - 13:21, 14:18,
14:21, 14:22, 102:7,
144:21, 177:3,
187:21, 249:17
**dumped** [1] - 89:9
**dumping** [1] - 96:9
**during** [15] - 10:22,
80:15, 187:12,
208:22, 217:20,
222:1, 223:18,
232:24, 236:3,
236:19, 236:21,
239:20, 241:9,
258:18
**duties** [2] - 136:5,
136:7

**E**

**e-mail** [2] - 81:2, 81:5
**early** [2] - 132:23,
205:3
**easier** [3] - 131:14,
229:16, 250:24
**East** [5] - 3:5, 3:12,

4:21, 225:4, 226:25
**easy** [3] - 52:21,
105:13, 212:14
**eating** [1] - 130:11
**Economics** [1] - 50:18
**education** [1] - 110:20
**educational** [2] - 50:6,
50:15
**effect** [10] - 13:1,
13:19, 13:21, 14:8,
14:9, 14:15, 14:17,
14:23, 22:22, 126:7
**effective** [1] - 164:2
**Effects** [1] - 15:4
**effort** [2] - 36:21,
245:7
**efforts** [1] - 102:3
**eighth** [2] - 210:24,
211:7
**Eighth** [1] - 3:10
**either** [7] - 45:13,
90:13, 180:16,
186:10, 224:1,
269:10, 271:11
**elected** [1] - 180:15
**elements** [1] - 113:5
**elevator** [1] - 243:11
**eleven** [1] - 81:20
**elicited** [2] - 68:15,
154:24
**ELIZABETH** [1] - 6:14
**elsewhere** [2] - 94:24,
272:25
**email** [4] - 82:5, 83:18,
125:8, 244:17
**emails** [3] - 245:2,
245:4, 245:7
**emphasis** [1] - 41:2
**employed** [1] - 49:25
**employees** [1] - 187:6
**Emporium** [47] -
73:23, 74:18, 104:2,
104:4, 104:7,
104:25, 105:6,
105:9, 110:21,
112:4, 120:23,
121:8, 121:15,
121:18, 123:10,
130:16, 190:3,
190:6, 195:8,
195:19, 196:8,
196:9, 206:7,
206:10, 216:11,
216:14, 216:19,
216:23, 217:2,
217:12, 218:16,
219:9, 219:14,
221:2, 222:24,
240:10, 240:13,
240:20, 241:9,

246:13, 246:15,
246:16, 247:1,
247:8, 247:16,
247:18, 248:1
**encapsulates** [1] -
121:25
**Encino** [1] - 3:18
**end** [9] - 7:16, 40:3,
46:19, 53:16, 53:19,
76:24, 82:11, 224:3,
268:8
**end-user** [1] - 82:11
**endeavor** [1] - 52:12
**enforcement** [4] -
54:12, 54:23, 56:22,
233:3
**Enforcement** [1] -
56:20
**engage** [1] - 136:3
**engaged** [1] - 116:10
**engagements** [2] -
55:2, 57:11
**England** [3] - 11:23,
13:24, 14:2
**enlarge** [1] - 117:9
**enrolled** [1] - 270:2
**ensure** [2] - 102:3,
237:5
**entered** [2] - 184:15,
185:3
**entire** [8] - 19:17,
34:16, 56:21, 81:5,
117:5, 200:20,
207:24, 239:20
**entirely** [3] - 29:16,
125:23, 270:12
**entirety** [1] - 149:16
**entities** [3] - 57:2,
57:4, 71:15
**entitled** [5] - 7:21,
10:6, 35:17, 36:5,
149:15
**ENU** [1] - 4:15
**environment** [4] -
21:9, 21:17, 21:24,
38:23
**Epidemic** [1] - 176:21
**epidemic** [5] - 20:3,
21:25, 26:13, 27:25,
29:2
**epidemiological** [3] -
13:25, 21:15, 32:19
**epidemiologists** [2] -
19:3, 19:5
**epidemiology** [3] -
7:19, 21:21, 32:16
**equal** [1] - 119:22
**equip** [1] - 54:11
**equivalent** [1] - 130:9
**eradication** [1] -

262:18
**erase** [1] - 257:1
**errata** [3] - 35:15,
35:24, 154:10
**error** [1] - 151:12
**especially** [1] - 8:6
**essential** [1] - 17:16
**essentially** [1] -
185:22
**establish** [4] - 110:14,
151:13, 151:25,
186:19
**established** [6] -
28:22, 30:5, 42:25,
83:21, 94:25, 255:2
**estimate** [3] - 32:25,
33:22, 150:17
**estimates** [1] - 150:24
**estimation** [3] - 32:22,
33:2, 170:13
**estimations** [1] -
150:21
**et** [4] - 1:7, 1:13,
278:6, 278:7
**evaluated** [1] - 192:20
**evaluating** [1] -
144:20
**Evaluation** [1] - 164:2
**evening** [4] - 94:1,
149:2, 149:4, 241:25
**eventually** [1] - 74:1
**Evidence** [1] - 35:16
**evidence** [21] - 8:7,
14:19, 35:19, 91:2,
91:11, 107:12,
107:20, 149:7,
151:13, 151:25,
152:4, 205:12,
231:2, 247:19,
247:25, 249:23,
255:25, 257:18,
258:14, 268:16,
268:18
**evidenced** [1] - 68:25
**evident** [1] - 137:4
**exact** [1] - 92:23
**exactly** [5] - 39:11,
131:24, 157:21,
187:16, 201:14
**exam** [2] - 141:17,
142:23
**examination** [27] - 7:8,
7:11, 7:18, 8:17,
8:23, 9:4, 11:4, 12:1,
40:21, 41:1, 41:4,
41:7, 41:23, 42:7,
68:7, 68:10, 73:2,
80:6, 96:8, 149:1,
149:13, 149:15,
162:18, 164:25,

212:5, 230:22,
262:12
**EXAMINATION** [9] -
17:3, 37:24, 47:1,
49:16, 143:8, 216:4,
243:8, 269:24,
274:16
**examinations** [1] -
123:6
**examine** [10] - 41:10,
63:8, 65:3, 67:24,
81:13, 89:10, 96:12,
155:3, 155:17,
156:22
**examined** [1] - 183:24
**Examiners** [2] - 54:22,
55:5
**examining** [1] - 11:6
**example** [10] - 52:18,
61:24, 78:5, 78:16,
88:3, 88:14, 105:16,
120:20, 127:18,
229:7
**examples** [2] - 54:19,
77:13
**exceeds** [1] - 94:25
**Excel** [2] - 142:15,
170:14
**Excellence** [1] - 56:19
**excellent** [1] - 212:6
**except** [2] - 101:2,
268:16
**exceptions** [1] - 77:11
**excerpt** [1] - 226:1
**excessive** [2] -
123:12, 169:7
**exchange** [1] - 53:20
**excluded** [1] - 33:12
**exclusively** [1] - 62:23
**Excuse** [2] - 126:17,
137:12
**excuse** [9] - 23:8,
48:8, 59:20, 62:16,
65:8, 69:12, 127:2,
168:25, 182:19
**excused** [2] - 274:13,
277:4
**execution** [1] - 185:8
**Executive** [3] - 23:2,
23:3, 23:9
**exemplar** [6] - 69:1,
74:18, 246:18,
247:9, 247:21, 248:2
**exemplars** [2] - 78:12,
191:1
**exemplify** [1] - 119:3
**exhibit** [14] - 40:20,
41:3, 41:4, 41:8,
41:13, 81:10, 149:2,
149:4, 149:7,

149:12, 149:16,
149:23, 241:25
**Exhibit** [4] - 10:6,
16:7, 16:10, 38:17
**exhibits** [5] - 41:1,
41:7, 41:9, 149:13,
149:14
**exist** [1] - 213:17
**existence** [1] - 56:15
**existing** [1] - 185:25
**exists** [3] - 70:13,
198:19, 252:17
**expand** [1] - 99:4
**expected** [1] - 41:11
**expecting** [1] - 7:11
**expeditiously** [1] -
9:16
**experience** [3] - 73:6,
110:20, 265:13
**experimental** [2] -
118:19, 12:19
**expert** [71] - 27:3,
27:4, 29:11, 30:23,
33:7, 33:11, 33:23,
34:14, 34:17, 34:20,
37:4, 57:13, 57:25,
58:5, 58:9, 58:12,
58:19, 58:22, 58:25,
59:8, 64:12, 64:19,
65:10, 68:15, 70:8,
73:7, 87:18, 89:16,
97:21, 98:25, 99:9,
106:18, 106:19,
107:1, 107:6,
107:19, 108:3,
108:10, 108:11,
109:10, 109:15,
113:3, 113:10,
113:11, 113:12,
123:18, 143:20,
143:25, 144:3,
144:11, 144:13,
144:16, 144:20,
165:18, 166:3,
166:11, 167:23,
168:7, 168:11,
170:6, 170:8,
170:25, 171:1,
171:14, 171:19,
205:13, 216:12,
219:3, 239:8, 268:7
**expert's** [3] - 63:18,
106:24, 107:14
**expertise** [16] - 51:8,
51:12, 114:4, 144:8,
144:24, 159:8,
159:22, 160:1,
160:4, 165:24,
166:17, 168:20,
250:11, 252:6,

275:18, 275:20
**experts** [12] - 23:4,
63:14, 65:2, 65:3,
106:6, 106:12,
107:12, 108:3,
114:8, 115:5,
123:20, 125:10
**expiration** [1] - 242:10
**expired** [1] - 242:15
**expires** [1] - 242:13
**explain** [8] - 7:23,
52:6, 59:13, 60:20,
71:14, 71:23, 73:21,
209:13
**explaining** [2] -
167:18, 231:3
**explicit** [1] - 93:22
**explore** [1] - 7:24
**expressed** [1] - 18:15
**expressing** [1] - 60:6
**expressly** [4] - 29:13,
99:11, 100:9, 115:2
**extent** [15] - 36:25,
58:12, 60:13, 64:22,
70:13, 72:18, 72:23,
87:16, 91:19,
100:22, 102:18,
107:20, 165:13,
209:10, 220:13
**extra** [1] - 55:1
**extract** [1] - 51:9
**extrapolated** [2] -
104:20, 249:1
**extreme** [2] - 20:18,
61:4
**eye** [1] - 77:12

# F

**F.3d** [1] - 115:7
**FABER** [1] - 1:17
**Faber** [1] - 7:2
**facilitate"** [2] - 21:22,
25:11
**facilitation** [1] - 21:17
**facing** [1] - 83:22
**fact** [32] - 20:6, 23:1,
33:2, 33:24, 37:3,
44:5, 64:10, 84:1,
91:22, 97:21, 102:8,
109:18, 127:12,
150:16, 151:13,
151:25, 153:3,
160:4, 167:11,
170:19, 171:4,
171:22, 172:19,
175:18, 190:16,
190:25, 193:18,
209:12, 215:23,
230:18, 236:4, 258:7

**factor** [16] - 19:23,
21:11, 21:25, 25:10,
25:13, 26:4, 26:12,
27:24, 29:1, 29:6,
32:1, 32:8, 38:20,
39:1, 39:8, 41:21
**factors** [13] - 15:7,
15:18, 16:1, 38:20,
38:21, 38:23,
112:15, 112:23,
113:7, 113:23,
114:19, 116:5
**facts** [8] - 34:21,
114:11, 123:19,
191:17, 191:20,
192:1, 203:4, 261:4
**factual** [4] - 34:1,
34:5, 35:25, 45:11
**faculty** [1] - 18:23
**failed** [2] - 45:8,
127:18
**fails** [2] - 262:14,
262:23
**failure** [2] - 45:24,
136:7
**fair** [12] - 11:5, 23:16,
41:23, 97:25, 101:4,
121:17, 151:18,
152:9, 172:16,
187:20, 188:22,
209:6
**Fair** [1] - 229:4
**fairly** [2] - 255:3, 255:7
**faith** [1] - 41:10
**false** [1] - 37:1
**familiar** [11] - 71:4,
73:7, 184:15, 185:2,
197:10, 197:14,
197:16, 198:10,
198:14, 206:14,
226:8
**Family** [2] - 243:15,
243:17
**family** [1] - 80:20,
139:20, 187:6
**fangled** [1] - 52:24
**far** [10] - 8:25, 23:11,
85:22, 102:24,
119:13, 123:9,
131:23, 149:3,
241:1, 243:20
**FARRELL** [49] - 2:3,
8:5, 10:18, 10:20,
16:25, 17:4, 17:7,
17:8, 17:23, 18:2,
19:11, 19:13, 20:25,
21:2, 22:7, 23:22,
23:24, 24:12, 24:21,
25:1, 25:6, 25:19,
26:5, 26:6, 27:15,

27:18, 28:15, 29:22,
29:24, 31:4, 31:5,
31:14, 32:5, 33:16,
33:20, 34:8, 35:7,
35:11, 36:10, 37:12,
37:21, 46:16, 46:22,
46:24, 47:2, 47:19,
47:25, 48:7, 48:17
**Farrell** [15] - 2:4, 2:13,
16:23, 20:22, 24:20,
25:3, 27:13, 31:3,
35:4, 38:6, 38:19,
41:20, 47:13, 47:18,
48:16
**Farrell's** [1] - 30:21
**fate** [1] - 212:12
**fault** [1] - 30:8
**FCRR** [1] - 6:18
**FDA** [2] - 108:15,
109:11
**FDA's** [1] - 109:24
**fear** [1] - 48:22
**featured** [2] - 222:1,
253:12
**February** [4] - 188:4,
188:13, 188:21,
189:2
**federal** [1] - 96:6
**Federal** [4] - 35:16,
98:4, 108:12, 108:19
**Fees** [1] - 255:15
**Feinberg** [1] - 23:25
**fell** [2] - 80:21, 205:1
**felt** [3] - 8:19, 8:20,
65:14
**fentanyl** [1] - 119:23
**few** [21] - 59:13, 71:13,
77:11, 78:25, 110:1,
112:10, 112:11,
156:14, 173:14,
173:25, 175:2,
181:9, 197:19,
201:2, 211:4,
225:16, 233:7,
245:21, 253:11,
265:25, 273:13
**fewer** [1] - 202:14
**field** [16] - 19:1, 21:15,
32:16, 42:21, 51:16,
51:21, 54:17, 55:3,
55:24, 56:7, 56:21,
58:20, 59:1, 60:24,
115:5, 166:3
**fields** [1] - 23:4
**Figure** [7] - 199:23,
201:4, 201:6,
201:10, 202:19,
204:23, 269:1
**figure** [11] - 27:6, 53:2,
98:16, 146:15,

215:22, 227:16,
228:5, 228:8,
228:14, 261:18,
261:22
**file** [3] - 76:19, 85:8,
148:18
**filed** [3] - 148:19,
149:8, 260:18
**files** [3] - 105:17,
177:3, 258:15
**filing** [1] - 153:13
**fill** [9] - 94:17, 104:11,
157:9, 167:7,
167:24, 206:9,
206:24, 232:20,
273:8
**filled** [45] - 74:8,
74:23, 87:5, 94:21,
102:4, 104:15,
105:20, 121:15,
130:16, 145:2,
145:22, 157:15,
166:23, 187:23,
188:5, 188:12,
189:19, 190:23,
193:1, 193:6,
194:21, 195:2,
195:16, 195:25,
196:12, 196:15,
196:16, 197:6,
197:8, 219:13,
223:18, 227:12,
227:18, 229:12,
230:2, 232:24,
238:3, 240:7, 241:9,
248:15, 249:5,
250:13, 251:8, 259:4
**filling** [15] - 84:4,
85:18, 167:1,
191:23, 192:18,
195:5, 216:18,
229:6, 251:1,
251:18, 259:15,
259:20, 259:23,
259:25, 264:8
**filtered** [1] - 226:2
**final** [2] - 32:21,
240:11
**financial** [1] - 71:11
**financial-based** [1] -
71:11
**findings** [13] - 13:11,
13:22, 117:1,
118:19, 120:7,
124:9, 127:12,
129:2, 129:11,
133:25, 137:15,
261:4, 264:7
**fine** [1] - 224:3
**finish** [4] - 8:10, 8:11,

34:10, 141:13
**Finish** [1] - 83:1
**finished** [3] - 68:22,
215:22, 215:23
**finishing** [1] - 77:21
**Firm** [2] - 3:4, 3:7
**First** [3] - 106:15,
246:4, 275:4
**first** [34] - 7:9, 11:19,
18:4, 18:22, 26:15,
33:20, 43:11, 43:12,
49:3, 50:14, 64:10,
70:8, 78:17, 91:12,
93:20, 94:9, 119:13,
123:16, 129:25,
141:23, 143:4,
143:14, 182:6,
193:25, 194:8,
203:20, 208:2,
213:21, 215:24,
226:15, 226:21,
256:20, 274:15,
275:25
**fish** [1] - 155:21
**Fisher** [25] - 66:14,
117:19, 117:21,
118:12, 120:5,
134:12, 134:20,
135:12, 135:21,
135:25, 136:3,
137:1, 195:12,
195:16, 195:23,
195:24, 196:11,
263:3, 263:4,
263:23, 266:1,
266:12, 266:22,
270:9, 274:9
**Fisher's** [2] - 136:13,
263:15
**Fishman** [1] - 268:1
**five** [12] - 8:23,
129:21, 189:3,
198:2, 198:7, 199:2,
258:17, 266:14,
266:19, 267:2,
269:21, 269:23
**FL** [1] - 2:11
**flag** [1] - 92:17
**flags** [5] - 92:13,
92:16, 93:1, 113:4,
113:7
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flip** [1] - 163:23
**flooded** [1] - 100:19
**Floor** [1] - 3:5
**focus** [7] - 50:21,
50:25, 190:7,
191:12, 210:7,
210:9, 211:10

**focused** [4] - 8:13,
9:6, 54:5, 216:10
**focusing** [2] - 211:19,
212:21
**folks** [1] - 201:18
**follow** [4] - 26:8,
207:12, 207:14,
254:25
**Follow** [1] - 255:6
**follow-up** [1] - 26:8
**following** [2] - 118:13,
123:11
**follows** [2] - 7:5, 81:22
**Footnote** [1] - 225:11
**FOR** [1] - 1:1
**foray** [2] - 213:21,
215:24
**force** [2] - 148:3,
148:4
**Force** [5] - 22:17,
23:12, 23:17, 23:21,
24:7
**forecasts** [1] - 150:24
**foregoing** [1] - 278:4
**foreign** [2] - 53:9,
172:23
**forgetting** [1] - 56:18
**forgotten** [1] - 78:10
**form** [15] - 59:8, 59:9,
61:7, 61:15, 62:8,
67:2, 69:8, 105:18,
105:22, 111:22,
116:2, 122:17,
128:15, 133:22,
163:4
**formally** [1] - 243:12
**format** [5] - 27:11,
142:15, 161:8,
162:3, 163:4
**former** [4] - 157:19,
186:20, 197:12,
198:24
**formerly** [1] - 145:15
**forming** [21] - 73:6,
75:23, 76:13, 77:23,
79:14, 79:19, 82:2,
84:8, 84:9, 85:4,
87:8, 88:20, 89:1,
92:10, 93:10, 95:8,
124:20, 127:8,
138:2, 138:12,
271:20
**forms** [1] - 136:4
**forth** [1] - 22:6
**forthcoming** [1] -
55:11
**forward** [2] - 68:13,
123:22
**forwarding** [1] - 125:8
**foundation** [12] -

63:14, 68:2, 68:14,
69:21, 69:24, 70:1,
82:18, 102:20,
102:23, 107:14,
140:24, 256:20
**founded** [1] - 52:8
**four** [6] - 130:3, 130:5,
132:23, 241:12,
259:13
**fourteen** [2] - 12:6,
14:3
**fourth** [1] - 208:2
**Fourth** [2] - 115:2,
115:8
**fragment** [3] - 17:6,
17:16, 17:18
**frame** [2] - 188:12,
202:2
**framework** [1] -
109:24
**Francisco** [1] - 52:25
**Fraud** [4] - 54:22,
55:5, 55:7, 56:4
**free** [4] - 48:13,
242:18, 268:2, 277:3
**Friday** [2] - 8:23, 12:1
**front** [6] - 38:13, 47:4,
128:24, 184:23,
191:1, 260:8
**fueling** [4] - 21:25,
26:13, 27:24, 29:1
**full** [8] - 42:24, 43:9,
43:23, 181:3, 237:7,
246:9, 265:11
**Full** [1] - 265:12
**Fuller** [2] - 2:4, 2:13
**FULLER** [1] - 2:12
**fully** [2] - 186:13,
234:15
**function** [2] - 160:6,
254:16
**furthered** [1] - 51:11
**future** [3] - 189:6,
230:11, 237:6

## G

**gained** [1] - 99:10
**game** [1] - 41:23
**gaps** [1] - 206:9
**gateway** [2] - 12:7,
22:21
**Gateway** [1] - 16:6
**gathering** [1] - 249:10
**gathers** [1] - 101:25
**Gees** [1] - 228:13
**General** [5] - 50:19,
52:5, 57:5, 57:8,
94:11
**general** [6] - 7:17,

127:16, 139:10,
139:20, 239:5, 255:4
**General's** [8] - 52:7,
52:14, 52:20, 53:8,
54:1, 56:11, 56:24,
172:22
**Generally** [3] - 84:15,
243:21, 244:8
**generally** [25] - 15:13,
71:7, 77:10, 84:13,
100:20, 104:1,
133:5, 136:2, 145:5,
147:24, 157:23,
167:7, 167:24,
187:25, 199:13,
201:25, 204:20,
205:1, 206:14,
207:4, 207:5,
207:12, 207:14,
210:10, 224:11
**geographic** [6] - 78:4,
86:1, 86:18, 86:22,
115:17, 271:25
**geographical** [1] -
252:21
**Gerrit** [1] - 177:14
**given** [26] - 11:5,
13:14, 17:11, 18:9,
28:13, 37:5, 38:14,
49:1, 54:20, 61:13,
61:14, 64:10, 74:9,
98:10, 98:15, 132:3,
132:5, 133:13,
157:10, 161:11,
174:19, 218:22,
233:24, 254:4
**global** [1] - 54:22
**gosh** [1] - 257:6
**govern** [2] - 166:12,
166:18
**Government** [2] -
108:12, 108:19
**government** [4] -
54:23, 57:4, 108:23,
109:7
**governmental** [1] -
57:2
**grant** [1] - 254:20
**granular** [2] - 191:11,
249:20
**granulary** [1] - 249:19
**graph** [6] - 199:19,
199:24, 200:1,
200:24, 201:5, 201:7
**great** [3] - 19:9, 83:20,
143:16
**greater** [2] - 131:23,
132:3
**greatly** [1] - 50:9
**green** [2] - 131:8,

200:7
**Gregory** [2] - 193:12, 231:9
**GRETCHEN** [1] - 6:7
**Griffin** [1] - 52:3
**ground** [1] - 245:16
**guess** [2] - 65:4, 125:8, 161:10
**guidance** [7] - 158:3, 158:16, 258:22, 259:3, 259:18, 259:22, 269:11
**Guide** [1] - 268:1
**guilty** [1] - 53:25
**Gupta** [6] - 197:10, 197:12, 197:19, 197:24, 198:3, 198:6
**guys** [1] - 257:8

### H

**habits** [2] - 158:6, 158:18
**half** [5] - 8:23, 188:15, 229:1, 265:16, 265:23
**Hampshire** [1] - 57:6
**hand** [6] - 23:17, 24:6, 49:7, 225:15, 226:6, 240:12
**handed** [3] - 10:5, 233:8, 267:12
**handful** [1] - 109:21
**handing** [1] - 80:1
**handled** [1] - 129:14
**hands** [1] - 53:21
**happy** [16] - 63:13, 70:1, 89:25, 91:3, 97:7, 97:8, 123:16, 162:23, 163:23, 177:4, 195:21, 203:14, 203:18, 207:6, 207:21, 245:12
**hard** [3] - 77:5, 77:6, 264:8
**HARDIN** [31] - 5:3, 16:19, 20:17, 22:2, 24:14, 24:17, 25:16, 26:17, 27:10, 28:4, 29:13, 30:6, 31:11, 32:2, 33:14, 37:22, 37:25, 39:19, 39:24, 40:8, 40:10, 40:21, 41:18, 42:12, 42:13, 46:2, 46:7, 46:14, 47:12, 47:21, 48:9
**Hardin** [3] - 16:17, 38:3, 42:11
**hardin** [1] - 26:15

**harm** [1] - 31:17
**harmful** [1] - 268:17
**harms** [9] - 26:14, 27:25, 29:2, 30:3, 30:9, 31:9, 31:18, 31:19, 45:16
**Harris** [1] - 219:20
**Harry** [1] - 220:7
**Hart's** [3] - 272:23, 273:9, 274:1
**Hawkins** [1] - 3:7
**Head** [1] - 157:19
**headed** [1] - 16:6
**heading** [4] - 15:3, 254:24, 267:18, 267:20
**Health** [32] - 4:14, 5:2, 22:9, 26:12, 27:20, 28:25, 30:12, 33:3, 34:2, 34:22, 38:3, 43:21, 46:10, 76:20, 82:7, 97:4, 101:20, 108:15, 143:13, 145:15, 152:11, 152:14, 152:18, 153:11, 164:11, 164:15, 187:22, 188:3, 188:5, 188:23, 189:2, 192:4
**health** [6] - 18:13, 23:4, 24:22, 45:24, 254:11, 254:17
**Health's** [6] - 89:19, 163:14, 163:19, 164:7, 194:22, 195:3
**healthcare** [7] - 110:24, 111:23, 116:3, 116:10, 145:14, 255:3, 255:7
**hear** [4] - 68:17, 68:18, 154:23, 272:9
**heard** [14] - 37:3, 55:18, 59:23, 60:12, 65:6, 98:10, 98:12, 115:11, 143:17, 157:3, 249:23, 252:9, 257:18, 260:22
**hearing** [3] - 81:14, 266:18, 267:3
**hearsay** [4] - 24:16, 36:8, 106:21, 107:17, 125:11
**hefty** [1] - 76:24
**held** [4] - 51:21, 51:24, 115:3, 157:23
**help** [8] - 52:12, 195:23, 201:18, 203:3, 206:8, 206:9, 244:1, 263:7

**helpful** [5] - 91:22, 128:24, 129:3, 164:15, 207:7
**heroin** [15] - 12:10, 12:12, 12:23, 13:12, 15:7, 15:8, 15:17, 15:19, 17:11, 18:8, 18:9, 18:11, 18:12, 31:20, 31:24
**Heroin** [2] - 10:7, 38:11
**herself** [1] - 67:15
**Hester** [8] - 7:12, 8:9, 9:8, 10:22, 11:9, 26:22, 35:22, 38:6
**HESTER** [25] - 5:9, 7:6, 7:14, 8:11, 9:25, 10:2, 11:2, 11:11, 11:14, 15:23, 16:15, 24:15, 25:15, 26:23, 27:2, 29:8, 30:20, 33:5, 35:21, 35:23, 36:12, 36:14, 36:17, 46:17, 48:10
**high** [9] - 94:17, 94:20, 113:20, 115:15, 115:22, 198:19, 238:7, 238:10, 238:21
**higher** [10] - 66:13, 109:25, 119:16, 133:4, 133:5, 200:12, 200:16, 200:19, 209:5
**highest** [17] - 112:8, 112:12, 117:4, 117:25, 121:8, 207:18, 207:23, 208:1, 208:2, 208:15, 208:21, 210:19, 211:3, 211:6, 221:7, 238:7
**highlight** [1] - 203:20
**highlighted** [1] - 211:11
**highlighting** [1] - 210:8
**highly** [1] - 13:13
**HIPAA** [1] - 262:10
**hire** [1] - 52:11
**historically** [1] - 223:15
**histories** [2] - 169:15, 179:15
**history** [13] - 128:21, 128:22, 131:8, 145:19, 168:6, 178:21, 179:3, 179:7, 182:1, 194:11, 240:3,

242:14, 253:18
**hits** [1] - 272:23
**hold** [2] - 32:18, 41:1
**holding** [1] - 48:2
**holds** [2] - 25:12, 151:7
**Hollingsworth** [2] - 221:22, 221:23
**home** [1] - 48:13
**Hometown** [1] - 53:1
**Honor** [52] - 7:6, 7:14, 8:19, 9:25, 11:2, 11:12, 16:4, 16:14, 16:15, 16:19, 16:22, 17:1, 20:17, 20:25, 22:2, 24:15, 25:1, 25:2, 25:15, 25:17, 26:23, 27:1, 27:2, 27:11, 28:4, 29:8, 30:7, 31:12, 33:5, 33:12, 34:8, 34:16, 35:14, 35:21, 36:11, 36:23, 37:5, 37:21, 37:22, 40:8, 40:17, 40:23, 41:20, 42:2, 42:12, 46:2, 46:17, 46:22, 46:24, 47:12, 47:22, 48:7, 48:10, 48:21, 48:24, 49:20, 50:10, 55:15, 58:8, 58:16, 58:18, 58:24, 59:21, 62:16, 62:19, 63:10, 63:12, 63:21, 64:8, 64:14, 64:17, 65:2, 65:8, 65:12, 65:13, 65:17, 67:13, 68:1, 68:4, 68:12, 69:11, 69:23, 71:20, 72:17, 73:16, 76:9, 77:18, 78:1, 79:23, 79:25, 80:12, 80:21, 81:1, 81:4, 82:15, 82:22, 83:12, 84:25, 85:24, 86:13, 86:16, 86:20, 87:13, 87:20, 87:21, 88:6, 88:8, 88:13, 89:5, 89:12, 89:18, 89:22, 90:12, 90:18, 91:8, 91:19, 91:25, 92:7, 92:16, 92:21, 93:4, 93:5, 93:15, 93:19, 94:9, 95:11, 95:15, 96:3, 96:14, 96:15, 96:24, 97:3, 97:7, 97:14, 97:17, 97:20, 97:25, 98:3, 98:9, 98:24, 99:1, 99:19, 100:2, 101:3, 101:12, 102:18,

103:9, 106:22, 107:23, 109:2, 109:9, 109:16, 110:9, 112:18, 113:1, 114:2, 114:18, 114:24, 115:14, 118:21, 121:3, 122:21, 123:16, 123:21, 124:2, 124:6, 124:16, 125:4, 125:17, 125:19, 126:1, 126:8, 126:14, 126:17, 126:24, 128:2, 128:10, 128:12, 129:6, 129:18, 130:25, 132:16, 134:5, 134:24, 135:6, 135:15, 136:21, 138:7, 139:1, 139:14, 141:1, 141:11, 141:15, 142:21, 143:5, 149:6, 149:11, 149:17, 150:3, 150:9, 153:3, 153:17, 153:20, 153:25, 154:19, 154:21, 154:25, 156:1, 156:3, 156:8, 158:7, 158:20, 162:7, 162:11, 162:23, 163:2, 167:15, 171:6, 171:13, 171:17, 171:24, 172:8, 180:8, 180:21, 196:4, 205:21, 211:25, 213:21, 215:12, 215:21, 230:17, 230:21, 231:2, 241:23, 242:8, 243:6, 244:12, 254:1, 256:1, 256:5, 256:7, 266:4, 267:10, 268:6, 269:21, 270:15, 271:14, 271:24, 272:10, 274:12, 277:2, 277:5
**Honor's** [3] - 27:1, 35:19, 78:3
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**hope** [4] - 7:9, 48:12, 126:1, 211:24
**hopefully** [1] - 11:9
**Hopkins** [1] - 24:10

**Hospital** [3] - 175:25, 176:2, 176:5
**hospital** [1] - 146:23
**Hospital's** [3] - 175:20, 176:9, 176:18
**hospitalizations** [1] - 54:10
**Houdersheldt** [1] - 222:12
**hour** [4] - 8:22, 8:24, 9:9, 130:10
**hour-long** [1] - 9:9
**hours** [3] - 9:1, 86:2
**housecleaning** [1] - 25:7
**housekeeping** [1] - 16:4
**hovers** [1] - 133:12
**HTTP** [1] - 83:21
**Human** [1] - 108:15
**hundreds** [1] - 218:24
**Huntington** [25] - 3:10, 4:1, 21:19, 26:20, 27:22, 30:18, 36:19, 78:3, 162:14, 168:13, 175:20, 175:25, 176:2, 176:5, 176:9, 176:18, 178:1, 192:6, 205:18, 209:25, 214:8, 214:10, 243:23, 273:1, 278:6
**HUNTINGTON** [1] - 1:4
**Huntington's** [1] - 176:20
**Huntington-Cabell** [1] - 27:22, 78:3
**Huntington/Cabell** [3] - 259:9, 272:1, 275:8
**hydrocodone** [7] - 119:20, 119:21, 205:17, 208:10, 208:16, 208:22, 209:2
**hypothesis** [1] - 14:1

## I

**i.e** [1] - 12:14
**idea** [3] - 98:14, 99:20, 179:24
**identifiable** [4] - 77:12, 116:14, 250:6, 250:21
**identification** [1] - 198:7
**identified** [35] - 34:3,

41:8, 67:10, 70:22, 93:24, 111:23, 116:3, 116:4, 122:2, 140:17, 140:22, 165:9, 165:20, 168:4, 168:5, 169:17, 173:23, 174:3, 174:21, 175:20, 176:19, 182:18, 182:20, 183:8, 187:22, 188:23, 189:12, 190:23, 193:15, 195:24, 196:11, 196:19, 197:9, 237:10, 250:15
**identifies** [4] - 34:2, 92:18, 174:9, 187:2
**identify** [44] - 8:15, 51:10, 52:15, 52:16, 57:4, 59:6, 59:16, 67:9, 69:3, 69:9, 92:16, 102:14, 105:19, 106:4, 113:3, 116:16, 117:1, 118:5, 118:15, 125:10, 137:10, 140:9, 140:15, 155:1, 165:2, 168:18, 192:13, 194:20, 194:24, 195:1, 195:6, 195:15, 197:4, 224:16, 225:8, 231:13, 231:16, 249:7, 249:12, 250:17, 250:25, 251:6, 263:1, 270:9
**identifying** [5] - 92:13, 112:16, 112:23, 148:2, 155:19
**identity** [1] - 237:11
**illicit** [1] - 32:1
**imagine** [1] - 44:11
**immediate** [1] - 187:6
**Immediately** [1] - 185:7
**immediately** [2] - 15:3, 184:20
**impact** [1] - 53:3
**impacts** [1] - 109:24
**impartiality** [1] - 237:5
**impeachment** [9] - 8:2, 8:7, 40:22, 41:6, 41:19, 42:5, 162:6, 180:7, 180:10
**implement** [1] - 143:23
**implementation** [1] -

166:7
**implemented** [4] - 54:11, 144:5, 144:14, 166:15
**implies** [1] - 170:13
**importance** [1] - 56:16
**important** [2] - 35:23, 99:12
**impossible** [1] - 89:10
**improper** [12] - 29:16, 30:19, 106:19, 107:5, 107:17, 136:5, 136:6, 156:19, 162:6, 162:8, 165:10, 165:21
**improperly** [6] - 235:5, 261:11, 261:15, 261:19, 261:23, 265:8
**improperness** [1] - 165:13
**IMS** [5] - 83:20, 145:15, 160:19, 160:22, 270:2
**IN** [2] - 1:1, 1:18
**inaccurate** [2] - 59:22, 124:6
**inadmissible** [2] - 107:20, 114:9
**inappropriate** [1] - 42:25
**inch** [1] - 98:16
**inches** [1] - 97:23
**inclination** [1] - 150:16
**include** [9] - 41:3, 50:5, 97:16, 146:22, 149:12, 175:10, 178:10, 187:8, 274:8
**included** [19] - 27:3, 63:3, 71:14, 76:19, 80:3, 98:22, 98:24, 104:9, 104:13, 119:6, 146:17, 178:9, 179:14, 181:4, 193:3, 209:9, 217:15, 218:16, 224:14
**includes** [10] - 31:18, 31:19, 42:20, 85:18, 87:6, 97:3, 104:18, 121:14, 209:7, 253:2
**including** [10] - 43:7, 79:12, 102:1, 102:5, 161:5, 189:8, 217:16, 235:5, 250:14, 273:19
**incompetent** [1] - 213:22

**inconsistent** [2] - 162:9, 162:25
**incorporated** [1] - 97:24
**increase** [13] - 15:8, 15:19, 21:17, 21:23, 30:1, 30:2, 31:23, 31:24, 147:22, 207:5, 274:5, 274:8
**increased** [8] - 21:7, 30:9, 38:21, 43:2, 128:23, 201:23, 202:2, 202:14
**increases** [3] - 18:12, 115:19, 202:20
**increasing** [7] - 202:8, 202:9, 202:11, 204:13, 204:14, 204:15, 204:25
**indicate** [2] - 177:10, 272:14
**indicated** [5] - 272:21, 272:23, 273:2, 273:7, 273:12
**indicates** [1] - 40:3
**indication** [1] - 96:1
**individual** [8] - 30:13, 30:14, 165:9, 165:19, 249:16, 249:24, 253:12, 264:5
**individually** [1] - 246:6
**individuals** [8] - 18:6, 18:8, 18:10, 23:15, 187:3, 220:20, 220:25, 261:24
**indulge** [1] - 48:17
**industries** [1] - 151:10
**industry** [3] - 21:8, 38:22, 151:11
**information** [80] - 8:16, 36:6, 50:5, 64:20, 65:11, 67:22, 70:21, 71:24, 72:2, 72:4, 72:10, 72:11, 74:9, 75:8, 76:20, 76:22, 78:14, 83:2, 84:11, 84:13, 88:4, 99:17, 101:25, 103:3, 104:1, 104:24, 105:24, 110:23, 122:12, 126:4, 127:22, 133:19, 137:4, 138:3, 145:5, 145:14, 145:24, 150:17, 150:24, 151:8, 157:11, 175:23, 179:3,

179:15, 183:25, 191:8, 191:13, 191:15, 193:3, 193:23, 195:5, 196:16, 198:1, 205:25, 217:7, 217:10, 224:9, 248:15, 249:10, 250:5, 250:6, 252:25, 253:3, 253:21, 253:22, 257:19, 258:8, 258:11, 260:15, 261:2, 261:14, 262:2, 262:9, 262:21, 264:15, 267:8, 273:19, 275:17, 276:4, 276:22
**informative** [2] - 160:9, 164:18
**informed** [1] - 97:20
**initiate** [3] - 198:3, 198:9, 199:1
**initiation** [1] - 15:7
**injured** [2] - 123:4, 181:20
**Innovation** [1] - 56:19
**innovative** [1] - 56:21
**inquiry** [5] - 33:6, 33:9, 246:14, 246:24, 247:6
**insofar** [1] - 209:4
**instance** [2] - 189:21, 195:15
**instances** [3] - 90:10, 249:3, 249:20
**instead** [5] - 55:16, 63:23, 67:21, 155:20, 201:11
**Institute** [1] - 11:17
**institution** [1] - 23:6
**institutions** [1] - 23:10
**insurance** [1] - 72:16
**intend** [4] - 41:4, 149:1, 149:13, 149:14
**intended** [6] - 11:11, 40:5, 68:7, 151:9, 151:12, 151:24
**intense** [1] - 43:1
**intention** [1] - 87:25
**interactions** [1] - 249:13
**interest** [1] - 162:11
**interesting** [1] - 106:23
**internal** [3] - 126:13, 156:10, 225:1
**Internal** [1] - 137:18

**internet** [4] - 258:13, 273:16, 273:18, 276:2
**interpose** [1] - 95:16
**interpret** [2] - 187:1, 275:20
**interrupt** [4] - 55:9, 62:17, 95:15, 188:20
**interrupting** [1] - 93:16
**Intervention** [1] - 15:4
**introduce** [1] - 49:18
**investigate** [2] - 248:3, 248:10, 261:14
**investigated** [2] - 140:20, 254:16
**investigating** [1] - 261:10
**investigation** [21] - 52:22, 53:7, 53:9, 53:24, 123:11, 184:8, 184:9, 198:3, 198:9, 199:1, 235:22, 235:24, 236:9, 238:18, 238:23, 239:20, 239:25, 261:21, 264:19, 265:9, 266:2
**investigations** [9] - 50:22, 51:11, 52:17, 52:19, 134:17, 237:3, 265:6, 265:13
**investigative** [2] - 184:6, 198:10
**investigator** [1] - 101:25
**investigatory** [1] - 52:11
**invited** [2] - 54:21, 55:2
**involved** [4] - 24:1, 53:8, 57:1, 57:16
**involving** [1] - 233:4
**IQVIA** [80] - 58:4, 66:7, 67:10, 67:19, 69:4, 71:9, 82:6, 104:17, 112:2, 112:5, 112:21, 117:5, 117:21, 121:19, 121:22, 121:24, 145:10, 145:11, 145:14, 145:25, 146:7, 146:10, 146:17, 147:3, 147:20, 148:7, 148:10, 150:12, 150:15, 150:17, 150:21, 150:23, 151:5, 151:7, 151:8,

151:14, 151:19, 151:24, 152:21, 152:24, 154:6, 156:11, 157:11, 159:23, 160:5, 160:19, 160:22, 161:5, 165:1, 165:4, 189:23, 190:2, 190:7, 190:12, 191:4, 195:4, 199:17, 204:1, 206:12, 211:13, 212:25, 214:24, 219:8, 240:3, 248:14, 248:23, 251:21, 251:23, 252:1, 252:4, 252:5, 252:18, 252:19, 252:22, 253:3, 253:7, 270:9, 270:21
**IQVIA's** [1] - 145:7
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**Island** [1] - 57:7
**issue** [14] - 33:13, 68:2, 80:20, 114:7, 114:16, 148:24, 152:7, 216:16, 220:20, 220:22, 254:19, 254:21, 258:25, 259:1
**issued** [3] - 65:14, 72:1, 260:24
**issues** [1] - 68:11
**item** [2] - 141:23, 246:13
**itself** [5] - 84:16, 164:1, 190:17, 193:19, 245:4

**J**

**Jackson** [1] - 6:8
**James** [1] - 113:3
**January** [8] - 185:17, 233:17, 235:1, 235:9, 236:14, 239:14, 239:18, 265:23
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**Jennifer** [1] - 143:12
**JENNIFER** [1] - 4:15
**job** [1] - 53:15
**Joe** [2] - 157:17, 216:6
**John** [1] - 120:19
**Johns** [1] - 24:10
**Join** [1] - 109:16
**join** [12] - 24:18, 29:19, 31:1, 33:10,

63:10, 64:8, 89:17, 96:14, 109:13, 114:2, 124:1, 162:21
**JOSEPH** [1] - 6:4
**journal** [4] - 18:21, 18:25, 19:1, 19:6
**Journal** [4] - 11:23, 13:24, 14:3, 42:18
**journals** [2] - 12:3, 106:11
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**Judge** [1] - 7:2
**JUDGE** [1] - 1:17
**judge** [9] - 8:5, 10:18, 17:23, 23:22, 24:12, 29:22, 36:10, 48:17
**judgment** [1] - 261:14
**Judith** [1] - 23:25
**July** [1] - 74:15
**June** [5] - 7:4, 265:20, 266:8, 278:9, 278:15
**JUNE** [1] - 1:19
**jurisdiction** [3] - 226:3, 252:16, 252:20
**jurisdictions** [1] - 66:21
**jury** [1] - 9:18
**justify** [3] - 127:19, 262:14, 262:23

**K**

**Kansas** [1] - 50:17
**KEARSE** [1] - 4:2
**keep** [1] - 9:18
**Keller** [169] - 48:24, 48:25, 49:5, 49:18, 49:20, 49:24, 50:14, 51:7, 55:23, 58:8, 58:19, 59:4, 60:22, 62:19, 63:13, 63:17, 63:19, 64:19, 64:21, 64:24, 65:20, 66:2, 66:19, 67:2, 68:22, 69:24, 70:6, 71:23, 72:23, 73:5, 73:18, 74:15, 76:11, 77:21, 78:9, 79:8, 80:14, 81:4, 81:25, 82:17, 83:1, 83:8, 83:14, 85:3, 86:7, 86:24, 88:1, 90:19, 92:10, 92:25, 93:7, 93:16, 95:13, 96:20, 98:10, 99:8, 99:12, 99:22, 100:7, 101:14, 102:11, 103:11, 103:17, 103:23,

108:9, 109:5, 112:22, 114:19, 115:13, 116:1, 117:1, 118:14, 118:24, 120:7, 121:7, 122:25, 124:7, 124:13, 124:19, 127:2, 128:7, 129:10, 129:19, 130:19, 131:3, 132:19, 134:9, 135:11, 135:18, 136:11, 136:23, 137:24, 138:10, 139:4, 139:18, 141:5, 141:23, 142:25, 143:10, 143:17, 149:18, 150:11, 151:18, 152:10, 153:10, 155:11, 157:3, 157:17, 158:13, 161:15, 163:9, 164:22, 165:17, 167:3, 167:21, 168:8, 169:16, 171:20, 172:14, 173:2, 173:6, 174:14, 177:4, 179:5, 179:22, 181:1, 182:5, 186:5, 193:11, 197:4, 197:10, 199:23, 201:22, 205:24, 207:17, 209:16, 209:24, 212:8, 214:4, 214:19, 216:6, 218:13, 219:10, 221:5, 224:23, 225:25, 226:6, 227:1, 228:1, 231:13, 233:10, 243:3, 243:10, 247:23, 250:22, 267:12, 269:17, 270:1, 270:15, 271:17, 272:13, 273:15, 273:23, 274:3, 274:13, 276:23, 276:25, 277:3
**KELLER** [1] - 49:8
**Keller's** [17] - 80:3, 87:14, 88:7, 88:9, 89:25, 92:22, 93:20, 93:25, 94:10, 95:17, 95:23, 96:16, 97:16, 99:3, 109:10, 113:2, 161:23
**Kelley** [2] - 83:20,

244:7
**Kelley's** [1] - 244:10
**Kelly** [1] - 6:8
**Kentucky** [1] - 24:11
**kept** [3] - 260:19, 260:23, 264:12
**Kessler** [1] - 4:20
**Keyes** [32] - 7:8, 8:6, 8:23, 9:20, 9:22, 10:3, 10:8, 11:4, 11:15, 15:23, 16:3, 16:16, 16:25, 17:5, 20:17, 25:25, 27:19, 28:9, 38:1, 39:15, 39:21, 40:12, 40:13, 42:14, 44:5, 44:9, 44:14, 45:12, 45:21, 46:15, 48:8, 48:11
**Keyes'** [4] - 7:18, 35:15, 42:6, 212:5
**Kimmey** [9] - 177:14, 177:17, 177:25, 178:6, 178:14, 179:1, 180:13, 181:2, 192:2
**Kimmey's** [1] - 178:20
**kind** [11] - 9:9, 18:25, 52:19, 71:23, 73:6, 83:10, 89:8, 122:10, 122:15, 137:17, 225:7
**kinds** [3] - 54:19, 67:17, 86:10
**Klinestiver** [1] - 220:5
**knowing** [1] - 33:16
**knowledge** [24] - 69:13, 99:10, 152:16, 152:17, 153:21, 154:16, 155:13, 161:13, 163:5, 164:10, 164:14, 164:22, 184:6, 191:9, 210:16, 234:4, 238:20, 238:22, 253:9, 257:20, 262:5, 263:1, 267:6
**known** [7] - 56:17, 76:25, 145:15, 170:22, 230:8, 230:15, 237:11
**knows** [2] - 103:7, 141:2
**Kolodny** [1] - 24:3
**KOUBA** [1] - 3:14

**L**

**LA** [1] - 3:8
**label** [2] - 16:6, 16:9

**labeled** [2] - 208:12, 226:1
**Lacey** [4] - 48:24, 49:5, 49:20, 74:15
**LACEY** [1] - 49:8
**lack** [1] - 82:10
**laid** [4] - 7:20, 34:21, 68:2, 68:14
**language** [3] - 150:18, 224:23, 262:17
**Lanier** [1] - 3:4
**large** [5] - 57:17, 66:17, 115:16, 115:19, 120:21
**larger** [2] - 18:7, 226:1
**largest** [14] - 77:9, 117:13, 117:14, 119:8, 229:3, 229:4, 229:8, 229:24, 230:4, 232:9, 238:10, 238:14, 240:5, 240:9
**Last** [5] - 255:12, 255:14, 260:7, 267:7, 274:3
**last** [19] - 9:10, 23:5, 43:4, 43:9, 85:20, 86:17, 91:12, 97:17, 101:14, 106:13, 113:20, 115:7, 117:23, 141:16, 157:25, 203:7, 266:21, 273:16, 273:24
**late** [5] - 34:16, 36:20, 37:5, 205:3, 272:11
**LAURA** [1] - 5:10
**Law** [4] - 3:4, 3:7, 3:12, 56:20
**law** [4] - 54:11, 54:23, 56:22, 254:25
**laws** [3] - 249:17, 249:18, 249:25
**lawyer** [1] - 124:5
**lawyer-prepared** [1] - 124:5
**lay** [6] - 34:13, 60:7, 63:14, 69:21, 69:23, 70:1
**lays** [4] - 186:6, 203:19, 203:21, 210:13
**lead** [3] - 10:16, 11:15, 250:18
**leading** [13] - 20:19, 20:21, 20:23, 25:15, 25:22, 25:23, 123:7, 124:3, 129:15, 135:3, 139:6, 225:3, 226:12

**leads** [3] - 31:24, 52:10, 52:11
**learned** [3] - 25:8, 259:10, 268:4
**learning** [1] - 51:20
**least** [14] - 75:13, 81:15, 98:11, 113:24, 134:18, 155:20, 173:19, 174:10, 236:6, 238:17, 257:13, 258:17, 262:25, 263:14
**leave** [1] - 274:18
**leaves** [1] - 7:22
**leaving** [2] - 167:21, 168:2
**Lee** [1] - 3:12
**left** [5] - 72:1, 104:6, 131:15, 201:19, 254:8
**leftovers** [1] - 212:4
**legal** [7] - 21:20, 22:2, 25:18, 26:17, 32:2, 159:16, 264:23
**legally** [1] - 159:23
**legislative** [1] - 256:11
**legitimate** [1] - 102:5
**Leon** [2] - 2:4, 2:14
**Less** [1] - 238:12
**less** [5] - 229:11, 238:13, 240:6, 269:21, 269:23
**letter** [3] - 148:10, 148:13, 150:11
**level** [9] - 71:10, 73:24, 74:9, 79:2, 191:11, 198:19, 202:21, 249:21, 251:1
**levels** [2] - 269:2, 274:2
**Levin** [1] - 2:10
**LEYIMU** [1] - 4:11
**liability** [2] - 276:11, 276:16
**license** [37] - 123:1, 123:11, 134:13, 138:18, 177:2, 181:23, 182:11, 182:15, 184:11, 189:1, 189:3, 194:12, 196:8, 197:1, 233:19, 233:24, 234:2, 234:12, 234:17, 235:3, 239:17, 241:18, 241:21, 242:10, 242:12, 242:13, 242:15,

242:21, 254:20, 256:14, 256:21, 257:12, 261:5, 263:15, 266:24, 267:4, 273:20
**licensed** [19] - 134:12, 164:4, 174:21, 176:24, 177:6, 178:22, 182:7, 188:24, 189:13, 189:20, 193:25, 194:16, 196:8, 204:9, 233:21, 241:15, 256:24, 263:6, 268:2
**licenses** [1] - 122:11
**licensing** [5] - 76:20, 254:16, 258:8, 258:11, 261:2
**licensings** [1] - 255:18
**licensure** [7] - 76:22, 178:21, 182:1, 183:25, 193:22, 253:21, 254:11
**lifesaving** [1] - 54:12
**light** [1] - 268:16
**likely** [1] - 262:10
**likewise** [2] - 89:18, 144:20
**limit** [1] - 272:24
**limitation** [2] - 146:5, 163:22
**limitations** [2] - 145:21, 151:19
**limited** [5] - 75:16, 102:1, 187:14, 217:12, 248:24
**LINDA** [1] - 4:8
**line** [24] - 29:16, 32:22, 33:8, 53:10, 70:20, 82:12, 83:2, 93:21, 93:22, 94:9, 122:11, 122:12, 132:2, 200:1, 200:4, 200:7, 201:7, 201:12, 201:15, 227:8, 246:22, 246:23, 256:16, 269:9
**Line** [5] - 161:25, 162:2, 162:3, 179:23, 197:24
**lines** [5] - 104:10, 218:20, 246:20, 248:18, 248:19
**Lisa** [2] - 6:18, 278:3
**list** [59] - 11:3, 23:7, 37:1, 38:20, 40:20, 41:8, 41:13, 80:3,

80:17, 83:24, 84:20, 85:13, 90:4, 90:14, 91:1, 92:22, 94:1, 94:2, 94:4, 94:5, 94:8, 94:10, 94:11, 95:19, 95:22, 96:3, 96:7, 96:16, 96:18, 96:25, 97:1, 97:2, 97:6, 97:9, 97:10, 97:13, 97:15, 97:21, 97:22, 97:23, 98:16, 98:20, 100:9, 100:10, 100:11, 100:15, 119:5, 120:15, 120:19, 120:21, 121:12, 149:4, 149:16, 149:23, 154:14, 186:22, 219:23, 222:20, 241:25
**listed** [11] - 10:16, 41:13, 97:21, 109:21, 113:5, 116:6, 123:1, 149:1, 178:8, 178:11, 241:24
**lists** [10] - 41:3, 41:4, 112:11, 114:20, 132:9, 149:13, 182:13, 186:12, 194:10
**litany** [1] - 20:2
**literally** [4] - 89:10, 107:3, 124:2, 155:17
**literature** [10] - 7:24, 10:25, 11:20, 13:4, 19:5, 21:15, 22:18, 32:13, 38:24, 42:21
**litigation** [11] - 33:4, 58:3, 58:6, 115:4, 147:5, 147:6, 147:7, 148:7, 150:13, 152:5, 167:23
**lived** [1] - 85:22
**LLC** [1] - 2:4
**located** [3] - 275:5, 275:7, 275:9
**location** [9] - 72:8, 72:12, 84:19, 121:25, 189:9, 216:24, 226:13, 227:4, 229:11
**locations** [9] - 62:21, 121:25, 196:17, 224:5, 224:9, 224:12, 224:17, 226:25, 231:14
**Logan** [4] - 6:5, 6:12, 243:18, 243:20
**logo** [1] - 226:16

**logs** [1] - 53:19
**long-term** [3] - 146:11, 146:19, 146:24
**look** [66] - 9:15, 11:19, 12:21, 13:9, 15:2, 40:7, 40:11, 42:22, 44:5, 44:21, 61:22, 63:24, 75:5, 84:10, 89:25, 92:11, 97:4, 101:23, 117:7, 117:19, 148:13, 158:4, 158:17, 177:3, 177:5, 192:11, 195:22, 197:18, 203:3, 207:24, 208:19, 209:15, 211:12, 214:9, 217:24, 221:2, 224:20, 226:15, 226:24, 227:10, 227:14, 229:15, 233:6, 233:15, 234:22, 239:23, 241:18, 245:13, 254:8, 254:23, 255:17, 256:10, 256:12, 260:14, 262:22, 263:22, 263:23, 264:3, 264:16, 264:20, 265:4, 265:23, 266:1, 270:5, 276:18, 276:20
**looked** [20] - 12:6, 14:4, 29:15, 44:13, 62:4, 62:11, 63:22, 63:23, 112:5, 120:6, 181:25, 193:22, 209:12, 214:15, 237:16, 242:5, 253:18, 256:21, 263:18, 270:14
**looking** [18] - 14:3, 50:13, 53:5, 53:18, 70:21, 79:5, 80:7, 84:15, 85:3, 87:6, 94:15, 97:14, 161:25, 181:1, 205:25, 223:1, 223:15, 271:8
**looks** [6] - 40:16, 62:23, 62:24, 132:1, 179:2, 185:16
**lose** [2] - 9:3, 189:1
**lost** [2] - 188:14, 237:19
**loud** [2] - 127:14, 272:20

**love** [1] - 212:20
**low** [1] - 94:18
**lower** [3] - 211:18, 218:23, 226:6
**lowest** [1] - 211:2
**lung** [3] - 15:14, 15:15, 15:22

# M

**M.D** [1] - 268:1
**ma'am** [13] - 43:12, 49:2, 156:7, 174:7, 174:8, 190:13, 198:18, 199:25, 206:16, 207:20, 208:6, 212:23, 213:1
**MacFarland** [1] - 140:18
**machine** [1] - 51:19
**magazine** [1] - 56:5
**Magazine** [3] - 3:7, 55:7, 56:4
**Mahady** [9] - 63:9, 64:13, 90:11, 96:13, 102:21, 123:15, 216:2, 216:6, 265:10
**MAHADY** [55] - 6:4, 58:16, 63:10, 64:14, 65:2, 65:13, 68:1, 68:12, 87:21, 89:12, 90:12, 96:14, 98:3, 98:7, 102:22, 109:16, 114:2, 123:21, 126:6, 141:1, 216:3, 216:5, 218:4, 218:7, 218:9, 218:12, 219:4, 219:5, 225:13, 225:14, 229:17, 229:19, 230:17, 230:24, 231:6, 231:7, 231:10, 231:12, 231:24, 232:1, 236:24, 236:25, 238:25, 239:2, 239:11, 239:13, 240:13, 240:15, 241:21, 242:2, 242:8, 242:9, 243:1, 243:3, 276:24
**mail** [5] - 81:2, 81:5, 146:11, 146:18, 146:24
**Main** [1] - 53:1
**MAINIGI** [1] - 4:15
**maintain** [2] - 86:18, 90:14
**maintained** [3] - 71:9, 145:11, 161:5

**maintains** [1] - 83:24
**MAJESTRO** [10] - 2:6, 68:4, 99:19, 99:25, 106:22, 107:8, 108:2, 114:6, 156:3, 162:21
**Majestro** [2] - 2:6, 162:15
**Majestro's** [1] - 68:13
**majority** [1] - 18:10
**malpractice** [5] - 179:3, 179:7, 179:12, 179:17, 179:24
**manage** [1] - 109:25
**manageable** [2] - 8:16, 9:6
**management** [8] - 130:6, 131:24, 132:10, 132:20, 132:23, 133:15, 175:21, 176:8
**Management** [3] - 175:25, 176:3, 176:5
**manager** [1] - 54:12
**Manager** [1] - 244:16
**Managing** [1] - 52:2
**manually** [1] - 53:19
**manufacturer** [2] - 74:1, 147:10
**manufacturers** [3] - 147:21, 148:1, 206:20
**maps** [1] - 109:22
**March** [2] - 177:7, 185:19
**Marcuzzi** [1] - 220:7
**MARK** [1] - 3:16
**mark** [1] - 215:24
**marked** [4] - 10:5, 81:10, 267:12, 268:18
**marker** [1] - 258:3
**market** [1] - 32:1
**marketing** [3] - 43:1, 44:14, 151:10
**markets** [1] - 147:20
**Marshall** [8] - 24:8, 33:3, 33:25, 34:2, 34:22, 36:5, 37:13, 37:15
**Martins** [2] - 18:22, 38:8
**Mary's** [1] - 178:1
**master** [1] - 37:16
**Masters** [1] - 50:17
**matched** [1] - 191:5
**matches** [1] - 228:17
**matching** [1] - 206:11
**material** [1] - 37:9,

40:22, 93:18
**materials** [17] - 32:10, 70:9, 71:2, 89:15, 93:22, 95:22, 95:24, 97:2, 98:4, 98:25, 106:19, 114:9, 122:8, 165:14, 258:22, 259:3, 259:12
**math** [20] - 78:20, 170:1, 170:16, 211:24, 212:20, 214:23, 214:24, 223:10, 227:21, 229:2, 229:21, 230:3, 232:2, 232:6, 232:15, 257:4, 257:7, 257:8, 257:21, 258:17
**mathematical** [3] - 170:3, 190:19, 193:21
**Mathematically** [1] - 240:8
**matter** [17] - 16:4, 37:2, 37:4, 84:10, 94:11, 96:17, 98:25, 107:4, 107:16, 156:15, 235:25, 236:6, 237:6, 237:9, 258:16, 271:21, 278:5
**matters** [7] - 81:17, 144:5, 144:14, 166:8, 166:15, 234:18, 235:23
**Matthew** [2] - 219:20, 220:3
**Max** [1] - 71:11
**MC-WV-2111** [1] - 268:18
**MC-WV-2219** [1] - 263:7
**MC-WV-2221** [1] - 254:5
**MC-WV-2224** [1] - 256:10
**MC-WV-2262** [1] - 267:13
**McCann** [8] - 205:14, 205:16, 205:25, 208:9, 214:2, 214:11, 214:15
**McCann's** [9] - 207:3, 208:7, 208:14, 208:20, 209:1, 209:12, 213:15, 214:1, 214:21
**MCCLURE** [9] - 6:3, 16:22, 24:18, 26:25,

29:19, 31:1, 33:10, 36:11, 36:23
**McClure** [3] - 26:24, 30:25, 36:22
**MCGINNESS** [1] - 4:2
**McKesson** [35] - 5:8, 16:6, 16:9, 26:12, 27:20, 28:25, 30:16, 43:14, 43:17, 43:19, 46:8, 46:9, 79:6, 83:24, 84:1, 95:5, 100:25, 152:11, 152:14, 152:18, 152:25, 153:12, 156:12, 234:5, 235:18, 240:12, 243:11, 243:14, 244:10, 244:17, 247:15, 247:19, 247:25, 259:8, 272:14
**McKesson's** [5] - 86:25, 94:16, 244:2, 244:24, 274:4
**MDL** [1] - 147:7
**mean** [23] - 23:2, 28:5, 28:12, 61:5, 74:6, 84:6, 119:16, 131:25, 154:22, 169:20, 170:9, 172:20, 179:14, 198:14, 218:19, 223:10, 229:5, 229:8, 245:3, 245:11, 249:3, 263:14, 264:18
**meaning** [2] - 60:24, 61:1
**meaningful** [1] - 8:3
**means** [10] - 61:2, 61:5, 97:22, 166:5, 186:13, 186:25, 210:10, 218:20, 274:22, 276:16
**measured** [1] - 150:17
**measures** [3] - 102:7, 201:19, 201:20
**mechanical** [1] - 6:19
**Medical** [4] - 10:7, 38:11, 178:1, 242:10
**medical** [32] - 10:25, 12:2, 12:13, 12:23, 13:11, 15:5, 32:12, 43:6, 102:5, 127:18, 166:1, 169:21, 181:23, 185:9, 185:19, 193:8, 242:12, 250:10, 254:12, 256:21, 261:24, 262:4,

262:8, 262:9, 262:13, 262:14, 262:22, 262:23, 262:25, 264:4, 264:20, 273:20
**medically** [7] - 165:10, 165:21, 186:3, 187:9, 193:6
**medication** [11] - 134:22, 168:9, 168:19, 169:3, 169:4, 169:10, 169:11, 169:12, 217:2, 268:16
**medications** [13] - 171:21, 172:18, 173:8, 186:3, 186:12, 187:9, 210:25, 211:15, 214:7, 217:16, 235:5, 268:17, 273:6
**medicine** [15] - 117:9, 123:2, 132:25, 133:1, 134:13, 137:18, 138:18, 174:22, 187:14, 188:24, 189:13, 194:16, 263:16, 263:18, 265:7
**Medicine** [63] - 11:24, 14:3, 76:18, 76:22, 127:7, 132:9, 138:17, 138:19, 176:25, 177:7, 177:10, 178:21, 178:22, 182:6, 182:7, 182:19, 182:21, 183:3, 183:9, 183:21, 183:25, 184:4, 184:10, 184:14, 185:3, 189:21, 192:6, 192:8, 193:2, 193:6, 194:1, 194:10, 194:16, 197:13, 197:25, 198:8, 198:11, 198:25, 199:1, 233:25, 235:11, 236:5, 238:17, 239:14, 239:25, 241:16, 253:17, 254:5, 254:10, 255:5, 255:8, 255:21, 256:12, 256:15, 256:22, 261:9, 262:7, 268:24, 269:12, 269:13
**Medicine's** [3] - 182:1,

182:13, 199:4
**meet** [8] - 114:10, 143:13, 216:8, 243:12, 251:22, 251:25, 252:5, 276:10
**meeting** [4] - 236:11, 236:16, 237:10, 266:7
**meets** [1] - 108:5
**Melin** [1] - 220:9
**member** [6] - 18:23, 23:9, 24:7, 56:2, 56:14, 56:20
**members** [7] - 23:5, 23:12, 23:17, 23:21, 56:12, 187:6, 237:12
**memory** [5] - 184:18, 189:16, 195:20, 224:18, 265:19
**mention** [21] - 30:11, 43:14, 44:6, 44:24, 45:1, 45:2, 45:17, 45:19, 45:22, 45:23, 109:11, 127:19, 175:24, 176:7, 176:16, 177:24, 178:3, 178:6, 179:6, 179:9
**mentioned** [12] - 23:1, 35:15, 98:8, 110:6, 132:11, 160:10, 173:25, 179:5, 193:11, 196:22, 257:15, 257:24
**mentioning** [1] - 122:13
**mentions** [4] - 29:14, 44:8, 45:6, 45:13
**merely** [1] - 220:23
**merge** [1] - 51:9
**mess** [2] - 34:16, 233:11
**messages** [2] - 53:16, 172:23
**met** [2] - 143:13, 243:11
**method** [2] - 72:15, 104:20
**methodologies** [1] - 151:1
**methodology** [4] - 7:19, 7:23, 30:16, 32:16
**methods** [1] - 7:19
**metric** [1] - 166:7
**metrics** [3] - 144:6, 144:14, 166:15
**Michael** [1] - 24:10
**MICHAEL** [2] - 2:12,

3:9
**microphone** [1] - 49:21
**might** [26] - 49:21, 51:18, 61:5, 68:24, 70:20, 73:1, 74:2, 98:12, 98:17, 101:23, 106:2, 125:25, 141:12, 152:4, 155:21, 158:19, 168:15, 192:10, 209:10, 209:13, 212:6, 212:19, 215:13, 252:20, 252:21, 264:18
**MILDRED** [1] - 3:3
**Miller** [1] - 24:9
**milligrams** [4] - 72:9, 74:6, 74:16, 130:14
**million** [20] - 26:10, 27:6, 27:21, 28:14, 53:25, 54:13, 61:18, 66:6, 66:20, 118:3, 118:4, 118:6, 119:10, 120:18, 120:20, 129:24, 130:8, 133:8, 133:10, 156:22
**million-document** [1] - 156:22
**mind** [6] - 9:18, 52:21, 57:7, 140:10, 180:25, 218:4
**Mine** [1] - 128:3
**Mine's** [1] - 228:8
**mined** [2] - 54:15, 163:9
**mining** [5] - 50:22, 51:13, 170:25, 171:2, 199:6
**Mining** [1] - 52:2
**minus** [1] - 184:13
**minute** [7] - 25:2, 36:13, 40:11, 87:22, 120:2, 142:16, 148:21
**minutes** [4] - 59:13, 266:7, 269:21, 269:23
**mis** [1] - 55:18
**mis-heard** [1] - 55:18
**mischaracterizes** [3] - 158:8, 158:21, 270:11
**missed** [1] - 130:4
**missing** [1] - 96:2
**Mission** [1] - 254:9
**mission** [1] - 254:18
**misspeaking** [1] -

128:9
**misspoke** [1] - 67:8
**misstated** [1] - 55:16
**misstatement** [1] - 59:23
**misuse** [1] - 31:9
**Mitchell** [1] - 2:10
**MK** [1] - 51:25
**MMEs** [17] - 61:14, 61:19, 112:11, 117:15, 118:2, 118:4, 119:13, 119:14, 119:17, 119:24, 174:19, 200:25, 201:15, 201:21, 203:11, 208:3
**molecules** [1] - 209:9
**moment** [9] - 18:3, 35:3, 45:12, 101:22, 141:10, 160:15, 188:15, 213:2, 215:11
**Monitoring** [16] - 45:3, 45:6, 45:18, 87:16, 88:5, 90:21, 92:4, 144:12, 144:17, 159:17, 159:24, 160:6, 160:8, 164:16, 198:17, 244:25
**monitoring** [4] - 45:25, 88:2, 166:7, 252:9
**month** [15] - 74:9, 74:15, 132:5, 133:13, 185:13, 187:12, 226:20, 227:11, 227:19, 229:22, 232:13, 232:20, 237:15, 237:24, 272:24
**monthly** [6] - 74:11, 131:17, 133:2, 133:6, 133:11, 201:1
**months** [5] - 131:16, 132:1, 132:4, 185:20, 267:21
**moreover** [2] - 26:25, 33:12
**morning** [47] - 7:11, 9:22, 9:23, 10:3, 10:4, 16:25, 38:1, 38:2, 38:7, 38:19, 41:21, 49:11, 49:12, 49:20, 148:24, 149:18, 149:22, 163:13, 168:25, 169:1, 177:24, 178:15, 179:6,

179:8, 180:17, 181:9, 188:11, 193:11, 195:12, 196:23, 196:25, 218:1, 218:13, 221:6, 221:13, 221:15, 221:18, 222:17, 222:21, 224:4, 224:15, 231:9, 233:2, 234:24, 239:4, 240:16, 277:7
**Morris** [1] - 6:15
**mortality** [2] - 15:9, 15:20
**Moses** [1] - 220:9
**most** [6] - 8:7, 52:22, 208:16, 239:24, 240:2, 257:7
**mostly** [3] - 12:13, 12:24, 186:5
**motion** [2] - 167:19, 231:4
**Motley** [5] - 3:14, 4:3, 4:5, 4:8, 4:11
**MOUGEY** [1] - 2:9
**move** [23] - 37:20, 65:17, 74:7, 92:7, 100:24, 110:4, 123:22, 125:16, 126:23, 131:21, 149:7, 153:17, 156:25, 167:14, 198:21, 213:16, 213:20, 227:3, 228:24, 248:21, 255:25, 260:1
**moving** [2] - 68:13, 74:17
**MR** [282] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:16, 4:5, 4:20, 5:9, 5:10, 5:13, 6:4, 7:6, 7:14, 8:5, 8:11, 9:25, 10:2, 10:18, 10:20, 11:2, 11:11, 11:14, 15:23, 16:13, 16:15, 16:25, 17:4, 17:7, 17:8, 17:23, 18:2, 19:11, 19:13, 20:25, 21:2, 22:7, 23:22, 23:24, 24:12, 24:15, 24:21, 25:1, 25:2, 25:6, 25:15, 25:19, 26:5, 26:6, 26:23, 27:2, 27:15, 27:18, 28:15, 29:8, 29:22, 29:24, 30:20, 31:4, 31:5, 31:14, 32:5, 33:5, 33:16, 33:20,

34:8, 35:3, 35:7, 35:11, 35:13, 35:21, 35:23, 36:10, 36:12, 36:14, 36:17, 37:12, 37:21, 39:18, 40:17, 40:19, 40:23, 42:2, 42:5, 46:16, 46:17, 46:22, 46:24, 47:2, 47:19, 47:25, 48:7, 48:10, 48:17, 55:9, 55:15, 58:16, 58:17, 59:20, 60:10, 63:2, 63:10, 63:21, 64:14, 65:2, 65:13, 67:13, 68:1, 68:4, 68:12, 69:11, 72:17, 78:1, 81:8, 86:13, 86:16, 87:20, 87:21, 89:5, 89:12, 90:2, 90:12, 91:8, 92:15, 93:15, 94:3, 96:4, 96:14, 97:17, 98:3, 98:7, 98:8, 99:19, 99:25, 100:24, 102:22, 106:13, 106:22, 107:3, 107:8, 107:15, 107:23, 108:2, 109:13, 109:16, 113:15, 114:2, 114:6, 123:21, 124:1, 125:19, 126:6, 126:8, 129:13, 135:5, 135:8, 141:1, 148:23, 149:11, 149:22, 150:5, 153:2, 153:7, 153:16, 153:20, 153:25, 154:3, 154:18, 154:21, 154:25, 155:5, 155:15, 155:25, 156:3, 156:16, 158:7, 158:19, 159:2, 162:6, 162:9, 162:11, 162:14, 162:17, 162:19, 162:21, 163:8, 167:17, 171:6, 171:11, 171:17, 171:18, 171:24, 172:1, 172:2, 180:2, 180:7, 213:18, 213:24, 216:3, 216:5, 218:4, 218:6, 218:7, 218:9, 218:12, 219:4, 219:5, 225:13, 225:14, 229:17, 229:19, 230:17, 230:21, 230:24,

231:1, 231:6, 231:7, 231:10, 231:12, 231:23, 231:24, 232:1, 236:24, 236:25, 238:25, 239:2, 239:11, 239:13, 240:13, 240:15, 241:21, 241:23, 242:2, 242:8, 242:9, 243:1, 243:3, 243:6, 243:9, 244:12, 244:14, 245:22, 245:23, 246:19, 246:21, 247:11, 247:13, 247:14, 248:17, 248:22, 254:1, 254:3, 255:25, 256:3, 256:5, 256:7, 256:8, 264:23, 265:3, 266:3, 266:6, 267:10, 267:11, 267:23, 267:24, 268:6, 268:10, 268:19, 268:22, 269:17, 271:24, 272:3, 272:6, 272:10, 274:14, 274:17, 275:1, 275:3, 275:10, 275:11, 276:24

**MS** [318] - 3:3, 3:6, 3:14, 4:2, 4:8, 4:11, 4:15, 4:15, 4:18, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 16:19, 16:22, 20:17, 22:2, 24:14, 24:17, 24:18, 25:16, 26:17, 26:25, 27:10, 28:4, 29:13, 29:19, 30:6, 31:1, 31:11, 32:2, 33:10, 33:14, 36:11, 36:23, 37:22, 37:25, 39:19, 39:24, 40:8, 40:10, 40:21, 41:18, 42:12, 42:13, 46:2, 46:7, 46:14, 47:12, 47:21, 48:9, 48:21, 49:13, 49:17, 50:10, 50:12, 51:4, 51:6, 55:18, 55:21, 55:22, 58:8, 58:11, 58:21, 58:24, 59:2, 59:3, 60:6, 60:19, 60:21, 62:16, 62:19, 63:12, 64:8, 64:17, 65:8, 65:17, 65:19, 65:25, 66:1, 66:24, 67:1, 68:20, 68:21, 69:23, 70:5, 71:20, 71:22, 73:4, 73:16,

73:17, 75:20, 75:22, 76:9, 76:10, 77:17, 77:20, 78:8, 79:22, 79:25, 80:12, 80:20, 80:23, 81:3, 81:16, 81:24, 82:15, 82:21, 82:25, 83:12, 83:13, 84:24, 85:2, 85:24, 86:5, 86:14, 86:23, 87:13, 87:25, 88:8, 88:12, 88:19, 89:17, 89:22, 90:18, 91:18, 91:25, 92:7, 92:9, 92:21, 93:4, 93:6, 93:19, 94:9, 95:11, 95:12, 95:15, 96:15, 96:24, 97:7, 97:11, 97:13, 97:20, 98:22, 98:24, 99:18, 99:24, 100:2, 100:16, 101:3, 101:11, 101:13, 102:17, 103:8, 103:10, 103:20, 103:22, 104:3, 107:5, 108:8, 109:2, 109:4, 109:9, 110:3, 110:9, 110:13, 110:18, 110:19, 112:18, 112:20, 113:1, 114:18, 114:24, 115:1, 115:13, 115:14, 115:24, 116:22, 116:24, 118:21, 118:23, 121:3, 121:6, 122:21, 122:23, 123:15, 124:6, 124:12, 124:16, 124:18, 125:4, 125:16, 126:1, 126:13, 126:15, 126:17, 126:20, 126:23, 127:1, 128:1, 128:5, 128:6, 128:11, 128:13, 129:6, 129:9, 129:18, 130:18, 130:25, 131:2, 132:15, 132:18, 134:5, 134:8, 134:24, 135:2, 135:10, 135:14, 135:17, 136:21, 136:22, 138:5, 138:9, 139:1, 139:3, 139:14, 139:17, 140:24, 141:4, 141:10, 141:15, 141:20, 141:22, 142:21, 142:24,

143:5, 143:7, 143:9, 148:15, 148:16, 149:6, 149:17, 149:25, 150:8, 150:10, 153:9, 155:10, 157:1, 157:2, 158:11, 161:22, 161:24, 162:23, 163:2, 167:14, 167:20, 171:12, 172:8, 172:11, 172:12, 173:3, 173:5, 175:16, 175:17, 176:14, 176:15, 177:22, 177:23, 178:4, 178:5, 178:18, 178:19, 180:3, 180:12, 180:21, 180:24, 184:24, 185:1, 194:6, 194:9, 196:4, 196:6, 197:21, 197:23, 199:21, 199:22, 203:16, 203:17, 204:22, 204:24, 205:20, 205:23, 209:17, 209:22, 209:23, 211:25, 212:3, 212:6, 212:9, 213:16, 213:19, 215:11, 215:15, 215:21, 215:23, 218:8, 269:20, 269:25, 270:11, 270:15, 270:22, 271:14, 271:16, 272:12, 274:12, 277:1

**Mt** [3] - 3:15, 4:4, 4:12

**multi** [1] - 54:13

**multi-million** [1] - 54:13

**multiple** [4] - 39:4, 39:13, 40:6, 147:16

**multiply** [1] - 228:21

**must** [4] - 41:3, 132:3, 149:1, 149:12

**mystery** [1] - 128:11

---

**N**

**naked** [1] - 77:11

**naloxone** [2] - 54:6, 54:12

**name** [21] - 49:4, 49:20, 71:12, 72:3, 72:7, 72:9, 72:12, 78:17, 104:22,

106:2, 143:12, 175:6, 177:15, 181:16, 191:10, 197:9, 197:18, 205:15, 216:6, 253:3

**named** [1] - 244:6

**names** [3] - 118:11, 145:15, 192:13

**narcotic** [1] - 186:11

**narcotics** [1] - 235:6

**narrative** [3] - 8:6, 123:18, 181:4

**NASAA** [1] - 55:1

**nation** [9] - 66:14, 66:15, 66:16, 130:7, 131:11, 200:22, 210:14, 210:24, 211:7

**National** [3] - 11:17, 54:24, 54:25

**national** [10] - 62:24, 119:6, 119:7, 199:11, 199:16, 200:1, 200:12, 200:13, 200:16, 200:20

**nationally** [10] - 62:5, 62:10, 62:13, 63:16, 66:5, 66:6, 66:11, 66:13, 66:18, 66:20

**nationwide** [8] - 62:11, 82:13, 119:8, 119:11, 119:13, 121:23, 132:24, 133:2

**natively** [1] - 85:8

**nature** [6] - 13:22, 14:18, 14:21, 14:22, 136:2, 237:2

**natures** [1] - 63:21

**near** [2] - 34:9, 132:2

**nearly** [6] - 57:15, 61:25, 133:8, 230:3, 238:7

**necessary** [6] - 15:6, 15:15, 15:16, 159:23, 193:7, 219:12

**necessity** [1] - 193:8

**need** [21] - 7:17, 7:23, 7:24, 9:13, 13:5, 21:20, 25:7, 27:10, 68:14, 107:10, 110:16, 127:14, 143:1, 172:13, 181:8, 184:17, 212:7, 212:19, 243:1, 259:5, 270:5

**needed** [3] - 53:2, 105:14, 105:17

**neighborhood** [1] - 174:10

**nervous** [2] - 56:18, 257:8

**never** [18] - 29:14, 37:10, 41:13, 82:17, 90:8, 92:17, 96:21, 115:10, 126:14, 161:1, 164:23, 176:22, 216:23, 217:1, 217:4, 227:20, 233:11, 270:13

**New** [27] - 3:5, 3:8, 11:23, 13:23, 14:2, 52:4, 52:7, 52:25, 53:3, 54:1, 54:8, 55:2, 56:10, 56:23, 57:5, 57:6, 93:21, 94:11, 95:25, 96:16, 97:22, 98:25, 99:8, 100:9, 100:17, 101:2

**new** [12] - 29:23, 29:24, 50:18, 51:16, 63:1, 64:10, 153:16, 154:13, 156:17, 186:16, 186:17, 259:10

**newly** [2] - 52:23, 52:24

**news** [9] - 122:13, 125:9, 126:15, 126:21, 258:9, 259:7, 259:17, 259:19, 260:6

**next** [26] - 13:5, 13:10, 18:17, 19:11, 48:15, 51:4, 66:14, 77:9, 83:23, 126:23, 131:13, 132:2, 134:10, 134:11, 187:7, 216:3, 226:23, 227:7, 230:4, 232:10, 235:20, 238:7, 238:10, 267:21, 273:7, 273:11

**Next** [1] - 236:8

**nice** [2] - 143:13, 216:8

**NICHOLAS** [1] - 6:11

**night** [4] - 9:10, 96:19, 96:25, 99:22

**nine** [3] - 8:25, 128:11, 214:22

**nine-year** [1] - 214:22

**Ninth** [1] - 4:9

**NK** [1] - 50:1

**Non** [2] - 10:7, 38:11

**non** [19] - 12:13,

12:14, 12:23, 13:11, 15:5, 17:16, 33:11, 43:6, 84:16, 94:19, 113:18, 115:19, 121:14, 167:14, 217:16, 217:23, 218:21, 219:14, 228:3

**non-controlled** [8] - 94:19, 113:18, 115:19, 121:14, 217:16, 218:21, 219:14, 228:3

**non-controls** [1] - 84:16

**non-essential** [1] - 17:16

**non-experimental** [1] - 12:14

**Non-Medical** [2] - 10:7, 38:11

**non-medical** [5] - 12:13, 12:23, 13:11, 15:5, 43:6

**non-opioid** [1] - 217:23

**non-responsive** [1] - 167:14

**non-retained** [1] - 33:11

**nondisclosure** [2] - 107:24, 113:16

**none** [2] - 44:24, 109:9

**norm** [2] - 61:2, 61:6

**normal** [1] - 152:19

**notable** [3] - 77:3, 85:22, 117:24

**notch** [1] - 205:2

**note** [14] - 20:18, 85:17, 85:25, 88:8, 95:21, 109:9, 114:2, 125:20, 154:21, 175:18, 190:3, 219:6, 220:23, 230:22

**noted** [2] - 38:20, 187:7

**notes** [2] - 14:14, 85:21

**noteworthy** [3] - 61:20, 61:21, 61:22

**nothing** [7] - 64:14, 130:11, 142:21, 212:20, 242:18, 267:4, 274:12

**Nothing** [2] - 231:24, 277:1

**notice** [8] - 96:23, 97:25, 100:1, 101:4,

120:11, 126:14, 149:15, 230:16

**noticed** [1] - 80:5

**noting** [3] - 113:22, 113:25, 180:1

**November** [1] - 188:21

**nowhere** [5] - 44:9, 45:2, 45:7, 64:2, 88:9

**Number** [3] - 112:21, 227:1, 232:9

**number** [59] - 18:6, 18:7, 26:17, 26:18, 33:23, 34:3, 36:19, 38:16, 40:20, 52:11, 62:12, 63:15, 63:16, 65:25, 66:17, 74:14, 74:22, 77:6, 77:8, 80:13, 80:19, 80:21, 97:5, 98:12, 117:13, 117:19, 118:5, 120:13, 127:12, 128:16, 134:15, 136:8, 137:25, 151:2, 151:5, 161:5, 184:13, 200:24, 201:7, 201:15, 202:8, 203:21, 203:22, 203:23, 207:23, 210:20, 210:25, 211:7, 212:17, 213:4, 215:4, 218:22, 224:19, 226:7, 240:19, 240:25, 241:3, 247:12, 258:20

**numbers** [10] - 61:20, 62:2, 97:23, 204:13, 204:14, 204:15, 206:10, 211:23, 212:11, 226:8

**numerical** [1] - 150:16

**numerous** [3] - 54:18, 79:1, 149:19

**NW** [6] - 4:6, 4:9, 4:16, 4:18, 5:5, 5:12

**NY** [1] - 3:5

## O

**oath** [2] - 49:1, 161:17

**object** [32] - 8:5, 10:20, 10:24, 24:15, 25:15, 26:17, 30:19, 34:9, 58:14, 62:25, 72:17, 78:1, 80:1, 82:15, 82:18, 86:17, 87:17, 89:24, 91:6, 95:18, 97:25,

102:22, 106:13, 113:1, 123:17, 125:4, 125:5, 171:6, 171:7, 230:21, 271:25

**objected** [6] - 10:22, 60:11, 63:4, 94:3, 97:1, 99:24

**objecting** [3] - 162:15, 162:16, 162:19

**Objection** [8] - 87:13, 110:9, 140:24, 264:23, 267:23, 268:6, 268:19, 270:11

**objection** [116] - 11:2, 16:14, 20:18, 21:1, 22:2, 22:6, 24:14, 24:17, 24:25, 25:16, 25:21, 26:23, 26:25, 27:1, 27:10, 28:2, 28:5, 28:6, 31:2, 31:11, 32:2, 33:5, 33:14, 33:17, 34:25, 37:19, 39:18, 41:16, 47:12, 48:3, 48:6, 58:10, 58:11, 58:15, 58:16, 60:13, 64:3, 64:16, 65:16, 67:14, 68:1, 69:11, 69:19, 69:22, 70:3, 73:2, 81:14, 82:14, 82:22, 82:24, 85:25, 86:19, 86:22, 87:21, 88:16, 89:5, 89:17, 90:2, 90:15, 90:16, 91:23, 92:6, 92:16, 95:16, 96:4, 100:19, 100:23, 100:25, 101:7, 102:17, 107:21, 107:24, 109:19, 110:17, 114:23, 123:21, 124:1, 125:14, 134:25, 135:2, 135:5, 141:1, 149:24, 153:23, 154:19, 154:22, 154:24, 155:7, 156:16, 156:25, 158:7, 158:10, 158:20, 158:23, 162:6, 162:22, 171:24, 172:3, 172:9, 180:2, 180:7, 180:11, 216:3, 230:19, 230:24, 231:4, 241:24, 242:6, 247:2, 256:2, 256:3, 268:20, 268:21, 272:3, 272:6

**objections** [3] - 8:8, 68:9, 99:15

**objector** [1] - 162:12

**obligation** [1] - 111:5

**obligations** [2] - 45:8, 252:5

**observation** [1] - 214:20

**observational** [3] - 12:14, 12:19, 12:24

**observe** [1] - 176:23

**observed** [4] - 67:3, 133:18, 141:25, 205:9

**obtain** [3] - 36:6, 84:11, 89:3

**obtained** [2] - 105:1, 154:15

**obtaining** [1] - 33:13

**occasions** [1] - 75:9

**occupational** [1] - 117:22

**occurred** [1] - 53:17

**occurring** [3] - 53:14, 54:8, 196:19

**occurs** [1] - 257:16

**October** [2] - 163:17, 272:15

**OF** [2] - 1:1, 1:4

**offer** [31] - 7:7, 7:15, 25:14, 30:20, 58:8, 87:14, 95:20, 99:13, 110:4, 111:14, 111:16, 144:24, 152:3, 160:1, 165:23, 166:18, 168:3, 168:4, 168:17, 170:6, 170:8, 170:10, 189:6, 194:20, 220:13, 221:12, 221:19, 251:4, 251:11, 251:12

**offered** [17] - 17:19, 20:10, 29:10, 33:11, 34:20, 63:1, 64:19, 78:5, 89:15, 99:4, 106:25, 164:21, 166:6, 196:11, 219:17, 221:15, 222:17

**offering** [48] - 34:14, 37:6, 63:6, 69:18, 91:6, 91:20, 111:4, 111:7, 111:9, 144:7, 144:15, 153:22, 159:15, 159:25, 160:7, 165:7, 165:18, 166:21, 166:25, 167:6,

**offers** [2] - 63:15, 99:3

**Office** [11] - 52:4, 52:7, 52:14, 52:20, 52:23, 53:8, 54:2, 56:11, 56:24, 157:20, 172:22

**office** [3] - 52:10, 56:21, 273:8

**office's** [1] - 54:5

**Office's** [1] - 56:16

**offices** [1] - 75:10

**Official** [2] - 278:2, 278:3

**often** [2] - 257:15, 265:5

**Ohio** [3] - 24:9, 86:2, 273:21

**omission** [1] - 21:5

**omitted** [1] - 21:3

**on-going** [1] - 235:24

**on-line** [4] - 53:10, 70:20, 122:11, 122:12

**on-site** [1] - 276:21

**once** [3] - 39:22, 122:2, 258:22

**oncologist** [2] - 178:6, 178:11

**one** [183] - 12:2, 15:24, 20:3, 20:6, 24:19, 26:17, 29:21, 31:18, 31:19, 32:21, 35:8, 35:13, 36:24, 38:20, 38:23, 39:9, 39:16, 39:25, 44:15, 50:5, 52:9, 52:21, 53:9, 55:1, 56:4, 63:14, 63:21, 64:25, 70:20, 80:25, 83:14, 83:19, 85:20, 93:22, 94:21, 94:23, 97:17, 100:7, 101:22, 111:13, 112:6, 114:15, 118:15, 118:25, 119:2, 120:13, 120:14, 120:22, 121:25, 124:19,

167:10, 167:11, 167:23, 169:7, 169:9, 169:15, 170:17, 171:3, 171:20, 172:17, 173:7, 173:10, 179:11, 189:5, 190:15, 191:6, 191:14, 191:16, 193:5, 193:8, 199:3, 202:1, 204:11, 205:5, 216:20, 219:25, 269:15

125:15, 125:18, 126:9, 126:10, 126:23, 127:24, 129:21, 133:8, 133:10, 139:25, 140:5, 140:11, 140:17, 140:19, 140:21, 141:10, 141:23, 145:21, 147:12, 152:13, 152:21, 153:11, 154:7, 158:14, 159:6, 162:12, 165:2, 165:10, 165:20, 166:16, 166:22, 167:8, 167:25, 168:24, 169:24, 170:3, 170:18, 170:20, 170:21, 171:4, 171:10, 172:13, 172:21, 173:19, 173:24, 174:2, 174:4, 174:11, 174:21, 174:24, 175:3, 175:5, 175:19, 176:16, 176:17, 177:2, 177:13, 178:9, 179:2, 179:4, 181:10, 181:13, 182:14, 182:20, 188:15, 189:25, 190:4, 190:8, 190:10, 190:16, 191:3, 191:22, 193:11, 193:16, 193:19, 198:7, 199:9, 199:14, 201:3, 201:4, 202:13, 202:24, 208:7, 209:4, 209:15, 212:2, 213:14, 214:22, 215:2, 215:3, 215:8, 215:9, 217:24, 218:20, 227:6, 228:10, 229:1, 229:12, 229:15, 229:18, 230:14, 231:8, 233:8, 234:11, 235:2, 238:12, 238:14, 240:6, 240:11, 240:19, 240:25, 241:3, 243:25, 244:2, 250:14, 251:2, 251:8, 253:20, 253:24, 259:4, 259:9, 263:20, 264:6,

267:7, 270:13, 275:14
**One** [5] - 5:11, 136:4, 138:16, 140:10, 232:15
**ones** [3] - 53:17, 112:9, 250:14
**ongoing** [1] - 52:17
**open** [1] - 56:4
**opened** [2] - 33:21, 42:10
**operate** [1] - 159:23
**operated** [2] - 87:15, 273:1
**operating** [2] - 89:19, 273:2
**opiate** [1] - 186:11
**opine** [1] - 90:6
**opined** [2] - 67:18, 268:7
**opining** [1] - 60:2
**opinion** [162] - 12:7, 13:6, 21:10, 21:13, 21:14, 21:23, 22:5, 22:22, 25:9, 25:11, 25:12, 25:14, 26:3, 26:10, 26:21, 27:23, 28:1, 28:20, 28:23, 29:4, 29:5, 29:23, 29:24, 30:9, 30:24, 31:7, 31:15, 31:16, 31:19, 31:22, 31:25, 32:6, 32:7, 33:7, 34:14, 36:1, 36:18, 45:17, 59:9, 59:12, 59:25, 60:6, 60:8, 60:10, 60:20, 61:7, 61:11, 61:15, 63:7, 63:15, 64:18, 67:2, 67:5, 67:16, 67:20, 67:22, 68:3, 69:8, 69:18, 70:1, 75:23, 76:14, 77:23, 79:14, 79:20, 85:4, 87:9, 88:20, 89:1, 89:6, 90:20, 91:4, 95:4, 95:9, 101:7, 105:22, 106:25, 107:14, 110:5, 110:8, 110:10, 110:11, 110:21, 111:5, 111:7, 111:9, 111:14, 111:16, 111:19, 111:22, 116:2, 116:9, 116:13, 116:15, 123:18, 127:9, 128:15, 138:13, 144:7, 144:15, 144:25, 152:2,

152:7, 153:16, 153:18, 153:20, 153:22, 159:15, 159:25, 160:2, 160:7, 164:25, 165:8, 165:17, 165:19, 165:23, 166:18, 166:21, 166:25, 167:7, 167:10, 167:11, 167:23, 168:3, 168:4, 168:17, 169:8, 169:9, 169:15, 170:10, 170:17, 171:1, 171:3, 171:20, 172:17, 173:7, 173:10, 187:15, 187:18, 189:6, 189:7, 190:16, 191:6, 191:7, 191:14, 191:16, 193:5, 193:8, 199:3, 202:1, 204:11, 205:6, 219:17, 219:25, 220:13, 251:4, 251:11, 251:12, 260:24, 269:15
**opinions** [69] - 7:18, 18:14, 29:10, 29:21, 30:22, 32:9, 32:12, 32:15, 32:18, 34:17, 34:20, 37:7, 41:22, 41:24, 62:21, 63:1, 63:4, 63:6, 64:5, 64:10, 72:22, 73:7, 82:2, 84:9, 87:15, 89:8, 89:15, 90:4, 90:8, 91:6, 91:13, 91:16, 91:20, 92:10, 93:10, 95:20, 98:14, 98:18, 99:3, 99:5, 100:20, 106:17, 111:4, 113:18, 113:22, 114:1, 122:17, 122:19, 133:22, 138:2, 156:17, 161:1, 164:21, 166:6, 167:3, 167:4, 172:4, 179:11, 196:10, 216:20, 220:14, 221:12, 221:15, 221:20, 222:18, 271:21
**opioid** [88] - 15:6, 17:11, 18:9, 18:11, 20:3, 21:8, 21:16, 21:18, 21:24, 21:25, 22:19, 26:13, 27:24,

29:1, 30:14, 31:8, 38:23, 45:16, 54:8, 58:3, 59:10, 61:16, 74:14, 110:1, 110:6, 115:20, 117:4, 121:10, 123:9, 128:16, 130:15, 140:20, 168:9, 168:18, 169:2, 169:3, 169:4, 169:10, 169:11, 171:21, 172:18, 173:8, 176:11, 176:17, 180:14, 190:6, 199:15, 200:1, 200:4, 200:7, 200:11, 201:22, 203:21, 203:23, 204:1, 204:3, 204:5, 204:13, 204:14, 204:15, 204:25, 207:18, 207:23, 208:25, 209:25, 210:3, 210:4, 210:14, 210:20, 210:25, 211:7, 211:15, 214:7, 217:23, 221:7, 222:25, 223:1, 223:3, 223:11, 240:21, 240:25, 241:1, 241:3, 241:4, 268:15, 271:9
**Opioid** [10] - 10:7, 15:4, 19:24, 21:6, 21:18, 38:10, 38:11, 176:20, 223:2, 267:25
**opioid-related** [2] - 45:16, 54:8
**opioid-rich** [4] - 21:8, 21:16, 21:24, 38:23
**opioids** [72] - 12:11, 12:13, 12:24, 13:12, 15:1, 15:16, 18:6, 21:7, 21:16, 21:23, 26:11, 27:21, 28:14, 28:24, 30:16, 31:7, 31:23, 38:21, 39:10, 45:16, 54:2, 54:7, 57:2, 57:14, 71:5, 73:9, 75:9, 110:23, 113:17, 115:15, 115:18, 115:21, 116:5, 116:16, 118:7, 121:15, 121:16, 123:13, 130:3, 130:5, 130:17, 134:21, 136:9, 138:21, 139:6, 139:8,

139:19, 140:2, 140:7, 140:13, 142:19, 157:6, 168:12, 184:21, 190:1, 199:10, 200:25, 201:8, 201:13, 201:16, 202:25, 209:8, 217:12, 220:15, 233:22, 234:3, 236:4, 236:20, 239:18, 239:21, 269:14
**Opioids** [1] - 22:25
**opportunities** [1] - 43:5
**opportunity** [3] - 9:13, 17:20, 114:13
**oppose** [1] - 167:17
**opposed** [1] - 67:24
**order** [28] - 13:6, 45:25, 53:5, 88:2, 103:18, 138:17, 144:3, 144:4, 144:17, 146:18, 146:24, 156:11, 166:6, 184:15, 184:19, 185:2, 185:7, 185:8, 185:12, 185:17, 186:1, 186:6, 187:16, 197:16, 203:4, 212:7, 237:4, 260:11
**Order** [18] - 45:3, 45:5, 45:18, 87:16, 88:5, 90:21, 92:3, 127:6, 138:16, 144:12, 144:17, 159:17, 159:24, 160:6, 160:8, 164:16, 267:14, 267:18
**ordered** [2] - 72:13, 74:5
**orders** [3] - 156:21, 206:24, 261:5
**ordinary** [1] - 154:6
**originated** [1] - 274:21
**Orleans** [1] - 3:8
**osteopathic** [4] - 134:13, 263:16, 263:18, 263:20
**Osteopathic** [5] - 253:17, 255:5, 255:21, 256:12, 269:13
**Osteopathy** [2] - 136:1, 266:9
**otherwise** [1] - 72:24
**OUD** [8] - 16:8, 32:22,

33:2, 33:22, 34:3, 36:19, 37:2, 37:3
**outcome** [1] - 261:3
**outcomes** [1] - 109:23
**outlets** [3] - 83:3, 146:14
**outlier** [20] - 59:6, 59:17, 60:22, 60:23, 61:4, 62:12, 67:9, 69:3, 77:12, 112:16, 112:23, 114:21, 133:16, 137:1, 139:22, 168:16, 169:16, 169:20, 169:21, 190:4
**outliers** [12] - 51:11, 52:16, 53:6, 69:5, 111:24, 116:4, 120:16, 120:17, 122:3, 141:7, 240:16, 240:17
**outlying** [1] - 59:17
**outpatient** [1] - 104:18
**outside** [29] - 47:16, 60:14, 61:2, 61:5, 63:4, 63:6, 63:11, 64:15, 70:16, 78:3, 82:8, 87:18, 88:13, 89:6, 89:10, 89:20, 144:24, 159:22, 160:1, 160:4, 163:14, 164:7, 164:11, 165:24, 168:20, 259:9, 268:7, 271:25, 275:7
**outstanding** [1] - 56:12
**Outstanding** [1] - 56:19
**overall** [7] - 17:16, 82:12, 117:4, 228:17, 262:6, 263:2, 269:11
**overlap** [1] - 120:1
**overnight** [1] - 7:10
**overrule** [17] - 22:6, 25:20, 73:2, 81:13, 82:23, 88:16, 107:21, 109:19, 114:22, 153:23, 155:7, 158:9, 158:23, 172:9, 180:10, 231:4, 242:6
**Overruled** [9] - 86:4, 93:3, 94:12, 108:6, 124:11, 129:20, 135:9, 265:1, 272:2
**overruled** [7] - 22:4, 32:3, 78:6, 153:5, 167:19, 171:16,

268:8
**oversight** [1] - 254:12
**overwith** [1] - 242:7
**own** [14] - 37:13, 49:14, 63:18, 71:2, 75:10, 80:7, 103:13, 106:12, 106:24, 144:6, 151:20, 165:17, 169:15, 212:3
**owner** [1] - 51:25
**oxycodone** [9] - 77:7, 129:25, 130:4, 130:14, 205:17, 208:10, 208:16, 208:21, 209:1
**Oxycontin** [7] - 43:1, 44:14, 72:9, 74:6, 74:16, 123:5, 123:7
**oxymorphone** [2] - 119:23, 209:8
**Ozturk** [17] - 175:6, 175:8, 175:19, 175:24, 176:4, 176:8, 176:12, 176:16, 176:24, 177:1, 177:6, 180:13, 181:2, 191:22, 191:24, 221:24, 221:25

**P**

**P-1200** [1] - 2:7
**P-12643** [1] - 93:7
**P-13297** [2] - 83:14, 244:1
**P-4** [1] - 127:2
**P-42060** [1] - 104:5
**P-42270** [1] - 265:20
**P-42367** [2] - 135:14, 263:22
**P-42368** [1] - 266:3
**P-42370** [5] - 126:24, 127:3, 184:23, 260:7, 265:20
**P-42532** [1] - 77:17
**P-42532001** [1] - 78:16
**P-42559** [3] - 271:13, 271:18, 275:10
**P-42568** [1] - 86:7
**P-43124** [1] - 24:13
**P-43538** [2] - 138:5, 233:9
**P-43539** [1] - 138:5
**P-441608** [1] - 226:1
**P-44170** [2] - 76:8, 188:8
**P-44172** [1] - 101:15
**P-44173** [2] - 84:24,

85:3
**P-44176** [4] - 79:22, 82:1, 160:14, 163:13
**P-44192** [4] - 124:15, 124:19, 124:22, 126:20
**P-44711** [1] - 205:12
**P-447113** [1] - 214:1
**p.m** [8] - 41:11, 41:14, 143:3, 149:2, 149:4, 215:18, 241:25, 277:8
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**packet** [2] - 217:25, 218:5
**Page** [44] - 12:9, 12:21, 15:2, 17:12, 23:1, 77:3, 77:4, 85:13, 93:13, 94:14, 101:24, 127:18, 127:24, 128:3, 128:5, 128:8, 161:22, 173:4, 179:22, 185:6, 197:24, 203:6, 205:12, 208:8, 224:21, 234:25, 245:19, 246:20, 247:13, 248:19, 264:6, 264:11, 265:22, 266:11, 267:17, 269:1, 271:23, 272:13, 272:16, 272:17, 275:14, 275:25, 276:18, 276:20
**page** [23] - 11:20, 14:14, 23:5, 39:15, 39:16, 39:21, 39:25, 43:8, 43:10, 43:11, 43:12, 77:5, 78:17, 163:24, 224:19, 226:4, 226:15, 226:23, 227:7, 247:12, 248:21, 273:24, 275:12
**Pages** [2] - 17:17, 127:13
**pages** [4] - 85:20, 127:15, 128:11, 188:10
**paid** [3] - 72:15, 113:21, 115:22
**pain** [18] - 17:9, 123:2, 130:6, 131:23, 132:10, 132:12, 132:20, 132:23, 132:25, 133:1, 133:15,

134:22, 168:9, 168:19, 175:21, 176:8, 272:25, 273:3
**Pain** [3] - 175:25, 176:2, 176:5
**Papantonio** [1] - 2:10
**paper** [6] - 13:8, 40:14, 51:19, 55:5, 100:19, 233:12
**Paragraph** [20] - 128:7, 128:9, 164:1, 186:5, 186:15, 187:2, 203:6, 224:21, 231:10, 233:16, 233:17, 235:1, 236:24, 260:14, 261:22, 262:11, 264:6, 264:11, 267:20
**paragraph** [19] - 12:10, 14:12, 14:20, 21:3, 39:4, 39:5, 39:6, 39:12, 40:5, 42:24, 43:4, 43:10, 186:22, 187:7, 203:8, 235:20, 236:8, 273:16, 275:25
**Pardon** [1] - 272:5
**parenthetical** [4] - 39:8, 39:9, 39:16, 41:5
**parse** [1] - 98:14
**parsing** [1] - 26:7
**part** [20] - 30:15, 59:23, 81:15, 83:19, 83:23, 98:8, 106:13, 176:20, 181:25, 183:25, 187:1, 193:23, 215:9, 216:12, 216:14, 250:5, 252:6, 253:16, 253:24, 258:5
**particular** [24] - 19:14, 35:8, 38:20, 45:18, 53:12, 61:22, 75:5, 77:1, 98:25, 109:12, 115:5, 121:22, 145:18, 147:2, 147:18, 157:15, 169:4, 169:12, 187:2, 188:3, 188:4, 189:9, 192:25, 252:15
**particulars** [1] - 111:3
**parties** [9] - 9:15, 40:24, 40:25, 41:3, 41:6, 148:25, 149:12, 162:14,

266:19
**parties'** [3] - 41:17, 42:8, 148:24
**parts** [2] - 64:1, 64:6
**party** [6] - 35:17, 36:5, 82:7, 85:10, 162:13
**passage** [4] - 19:10, 19:17, 19:19, 19:23
**passed** [1] - 256:10
**past** [1] - 273:19
**patented** [1] - 151:6
**patents** [1] - 151:7
**Patient** [2] - 187:5, 264:20
**patient** [12] - 72:3, 72:9, 85:22, 178:12, 186:19, 186:23, 193:3, 195:16, 235:6, 262:5, 268:17, 273:6
**patients** [31] - 74:20, 85:18, 85:21, 123:12, 134:19, 136:6, 169:4, 169:12, 176:9, 176:10, 178:7, 186:1, 186:4, 186:16, 186:17, 186:20, 187:2, 187:10, 192:23, 193:1, 194:22, 194:24, 195:2, 217:7, 250:10, 268:15, 273:4, 273:8, 273:14
**Patrick** [1] - 219:22
**pattern** [2] - 207:12, 207:15
**patterns** [3] - 12:12, 12:23, 53:6
**PAUL** [2] - 2:3, 5:9
**Paul** [1] - 243:10
**Pause** [6] - 25:5, 35:6, 87:23, 97:19, 141:14, 243:2
**pause** [1] - 209:17
**paying** [1] - 84:18
**payment** [3] - 72:15, 123:4, 181:20
**payments** [1] - 125:3
**PDMP** [4] - 252:14, 252:23, 253:2, 253:8
**PDMPs** [1] - 252:12
**Peace** [2] - 7:13, 8:20
**peaked** [3] - 210:24, 211:2, 269:4
**PEARL** [1] - 3:6
**peer** [1] - 106:11
**peer-reviewed** [1] - 106:11

**pending** [2] - 239:25, 266:15
**Pensacola** [1] - 2:11
**people** [9] - 12:11, 14:25, 34:3, 52:12, 52:22, 53:1, 177:19, 191:10, 238:17
**per** [45] - 74:11, 85:10, 87:5, 94:16, 162:12, 199:13, 200:13, 201:11, 202:9, 202:15, 204:15, 207:18, 207:24, 208:1, 208:2, 208:3, 208:11, 208:16, 208:22, 208:25, 209:2, 209:5, 209:25, 210:4, 210:9, 210:12, 210:14, 210:20, 211:1, 211:3, 211:8, 211:12, 211:15, 212:11, 213:4, 213:11, 214:12, 214:16, 214:20, 214:21, 215:5, 227:22
**percent** [101] - 61:8, 61:12, 61:13, 61:14, 62:1, 66:4, 66:12, 66:13, 66:15, 66:18, 66:19, 104:18, 112:6, 118:15, 118:25, 119:2, 120:14, 120:22, 121:13, 121:15, 130:13, 130:14, 130:15, 140:5, 140:11, 140:19, 140:21, 146:7, 146:13, 146:17, 146:18, 146:19, 151:22, 165:2, 165:10, 165:20, 166:22, 167:8, 168:1, 168:24, 169:24, 170:3, 170:18, 171:4, 173:19, 173:24, 174:2, 174:4, 174:12, 174:17, 174:21, 174:24, 175:3, 175:5, 175:19, 176:17, 177:13, 181:10, 189:25, 190:4, 190:8, 190:10, 190:17, 191:4, 191:22, 193:16, 193:19, 202:14,

202:24, 223:20, 223:21, 229:1, 229:12, 230:1, 232:4, 232:8, 232:11, 232:22, 232:23, 238:3, 238:9, 238:10, 238:12, 238:13, 238:14, 240:6, 248:24, 248:25, 249:6, 250:14, 251:2, 251:8, 252:19, 252:24, 253:20, 253:24, 271:5, 273:7
**percentage** [15] - 84:16, 84:17, 85:9, 87:4, 223:9, 223:17, 227:15, 227:17, 228:17, 228:21, 229:20, 229:22, 232:19, 271:9
**perfectly** [3] - 37:12, 107:2, 114:14
**perform** [1] - 212:7
**performed** [1] - 199:10
**performing** [1] - 19:6
**period** [51] - 75:14, 75:16, 78:18, 96:10, 110:24, 117:5, 118:3, 118:7, 133:9, 157:20, 164:3, 174:11, 185:13, 187:12, 187:13, 188:19, 188:20, 200:20, 200:23, 202:10, 202:21, 203:12, 205:6, 207:25, 208:17, 208:19, 208:22, 214:22, 215:4, 216:16, 217:20, 223:18, 226:17, 226:20, 227:11, 227:19, 228:4, 229:10, 229:22, 232:13, 232:21, 232:24, 236:3, 236:19, 241:10, 252:17, 255:17, 258:18, 259:12, 260:2, 260:4
**period/license** [1] - 164:2
**periodic** [1] - 142:14
**periods** [2] - 39:5, 40:2
**permissible** [1] - 107:2

**permission** [4] - 17:24, 35:20, 100:8, 148:8
**permit** [2] - 25:22, 65:5
**permitted** [2] - 64:25, 125:10
**person** [9] - 9:19, 52:9, 53:18, 197:15, 213:11, 214:17, 215:5, 244:6, 244:24
**personal** [2] - 154:16, 155:12
**personally** [3] - 82:17, 164:23, 192:16
**perspective** [4] - 7:7, 7:15, 8:22, 130:9
**persuade** [1] - 9:19
**pertain** [1] - 101:19
**pertinent** [1] - 75:6
**PETER** [3] - 2:9
**Pharma** [1] - 44:17
**pharmaceutical** [5] - 21:8, 38:22, 71:16, 147:22, 151:11
**pharmacies** [36] - 84:3, 111:10, 111:15, 145:1, 145:2, 145:22, 146:11, 146:23, 146:24, 151:5, 157:9, 167:7, 167:13, 167:24, 190:23, 191:6, 206:18, 206:19, 243:14, 243:17, 248:5, 248:12, 248:15, 248:16, 249:6, 249:7, 250:13, 250:19, 251:9, 251:14, 251:21, 251:23, 252:3, 259:4, 259:20
**Pharmacies** [1] - 252:1
**pharmacies'** [1] - 89:3
**pharmacist** [4] - 166:23, 217:1, 275:25, 276:7
**pharmacists** [4] - 166:13, 166:19, 192:8, 192:14
**pharmacologic** [1] - 13:14
**Pharmacy** [6] - 169:6, 192:9, 272:23, 273:9, 274:1, 275:24
**pharmacy** [59] - 72:6, 72:7, 74:3, 74:22, 78:2, 83:4, 83:5,

84:11, 84:15, 84:17, 84:21, 85:9, 85:12, 85:16, 85:23, 86:1, 104:15, 105:20, 105:24, 106:2, 142:6, 146:17, 146:18, 146:19, 157:15, 166:3, 167:10, 167:11, 168:3, 187:24, 188:5, 188:11, 190:21, 191:23, 192:4, 192:5, 192:6, 195:3, 195:5, 195:16, 195:25, 196:12, 197:6, 197:9, 249:2, 249:10, 251:2, 253:4, 259:5, 259:10, 274:19, 275:4, 275:13, 275:16, 275:24, 276:3, 276:4, 276:13
**pharmacy's** [1] - 102:1
**Philadelphia** [2] - 6:6, 6:13
**Philip** [4] - 118:12, 134:12, 136:13, 266:12
**phrase** [1] - 17:16
**physical** [2] - 117:22, 123:6
**physically** [1] - 39:15
**Physician** [1] - 237:8
**physician** [15] - 72:2, 72:7, 74:14, 74:20, 78:23, 78:24, 78:25, 134:21, 134:22, 170:22, 177:25, 186:19, 195:11, 262:6
**Physician's** [1] - 267:25
**physician-patient** [1] - 186:19
**physicians** [10] - 66:10, 82:13, 167:2, 168:5, 170:21, 170:23, 229:9, 250:20, 263:17, 268:3
**picked** [1] - 84:18
**piece** [1] - 19:18
**pieces** [1] - 22:13
**PIFKO** [1] - 3:16
**pill** [3] - 210:10, 214:22, 273:3
**pills** [16] - 26:19, 74:15, 74:22,

130:10, 130:13, 204:15, 204:19, 210:14, 210:20, 211:8, 213:4, 213:11, 214:16, 215:5, 239:24, 240:2
**pilot** [5] - 163:14, 163:17, 164:1, 270:2, 270:6
**Pinson** [1] - 220:1
**place** [5] - 30:23, 101:22, 102:3, 215:1, 232:9
**plainly** [1] - 63:6
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**PLAINTIFF** [1] - 49:8
**plaintiffs** [13] - 7:21, 8:25, 9:13, 11:3, 36:3, 36:9, 36:20, 37:16, 48:24, 147:13, 158:2, 176:19, 222:2
**Plaintiffs** [2] - 50:13, 278:6
**plaintiffs'** [6] - 125:21, 205:13, 218:10, 221:4, 239:1, 240:14
**plate** [1] - 126:19
**plausibility** [1] - 14:11
**plausible** [1] - 13:13
**plea** [1] - 53:25
**Pleasant** [3] - 3:15, 4:4, 4:12
**pleased** [1] - 7:9
**plural** [1] - 106:15
**plus** [1] - 14:7
**point** [47] - 8:11, 10:25, 12:9, 20:19, 24:12, 25:22, 27:17, 35:9, 35:20, 35:24, 36:17, 37:8, 41:15, 65:12, 68:3, 73:3, 74:1, 89:6, 92:2, 96:21, 97:2, 99:2, 99:15, 99:25, 109:19, 113:15, 113:16, 113:20, 114:19, 117:23, 117:25, 126:4, 163:22, 168:14, 173:19, 174:16, 181:7, 198:12, 209:7, 226:7, 230:14, 232:16, 237:1, 261:8, 265:5, 266:15, 271:24
**pointed** [1] - 20:6, 23:15, 23:25, 188:3
**points** [10] - 7:10,

7:24, 13:9, 14:13, 14:19, 95:2, 102:8, 114:15, 176:18, 228:24
**poisoning** [1] - 43:6
**Polavarapu** [2] - 267:13, 267:21
**policies** [7] - 89:2, 89:14, 90:5, 91:15, 92:3, 255:1
**Ponc** [1] - 2:4
**Ponce** [1] - 2:14
**population** [1] - 66:22
**portal** [1] - 83:22
**portion** [6] - 17:9, 80:23, 81:1, 85:8, 118:3, 119:1
**position** [5] - 36:4, 58:17, 64:22, 64:23, 157:23
**positions** [2] - 51:21, 51:24
**positive** [2] - 13:11, 14:10
**possessed** [1] - 165:1
**possesses** [2] - 248:4, 248:11
**possession** [9] - 59:16, 59:24, 67:7, 67:8, 67:16, 69:3, 75:25, 99:7
**possible** [4] - 36:23, 178:11, 196:15, 197:8
**possibly** [2] - 103:5, 234:16
**postgraduate** [1] - 50:19
**posting** [1] - 53:10
**potential** [4] - 22:19, 72:10, 113:4, 122:12
**Powell** [1] - 2:6
**PR** [2] - 2:5, 2:14
**practice** [16] - 122:7, 138:18, 166:4, 174:22, 185:9, 185:13, 185:19, 185:20, 185:24, 187:8, 187:13, 187:14, 188:24, 189:13, 194:16, 262:18
**practices** [9] - 113:4, 118:2, 127:20, 134:16, 134:18, 189:8, 192:17, 198:11, 199:4
**practitioner** [2] - 139:10, 239:6
**practitioners** [2] -

134:23, 139:20
**pre** [2] - 136:4, 210:8
**pre-highlighting** [1] - 210:8
**pre-signed** [1] - 136:4
**preamble** [1] - 246:23
**precise** [1] - 48:4
**precisely** [2] - 97:3, 114:19
**predecessor** [1] - 160:19
**predominantly** [1] - 54:5
**prefer** [1] - 209:18
**prelude** [1] - 171:7
**premier** [1] - 12:2
**premise** [1] - 159:9
**prepare** [18] - 50:2, 65:20, 73:11, 103:17, 108:23, 112:14, 116:19, 121:1, 122:19, 129:1, 129:5, 130:19, 133:25, 136:18, 137:14, 138:23, 139:11, 155:20
**prepared** [9] - 64:19, 66:2, 73:19, 109:5, 115:3, 124:5, 124:8, 129:19, 131:4, 132:11, 136:24, 160:25, 161:7, 187:15, 199:19, 199:24, 200:24, 201:5, 230:10
**preparing** [7] - 70:7, 74:24, 103:24, 135:20, 137:8, 156:17, 161:3
**prescribe** [11] - 134:20, 185:25, 187:3, 187:5, 203:25, 233:22, 234:3, 236:4, 236:20, 239:17, 239:21
**prescribed** [46] - 61:13, 61:17, 61:18, 61:25, 72:5, 72:14, 74:15, 77:6, 110:24, 112:11, 117:10, 117:16, 118:3, 118:6, 119:8, 120:18, 120:20, 129:24, 130:1, 130:3, 130:6, 130:13, 131:15, 132:4, 168:13, 168:19, 168:22,

168:23, 199:15, 200:25, 201:8, 201:13, 201:16, 210:14, 210:20, 210:25, 211:8, 211:14, 211:18, 213:4, 213:11, 217:4, 235:5, 239:24, 240:2, 261:25
**prescriber** [52] - 72:2, 72:4, 72:8, 72:12, 74:9, 74:11, 77:9, 104:22, 104:23, 104:24, 117:12, 117:13, 117:14, 117:25, 120:13, 123:7, 123:9, 134:11, 137:10, 139:6, 181:4, 187:23, 190:4, 190:5, 191:22, 195:11, 198:7, 198:9, 199:2, 202:13, 202:14, 202:23, 202:24, 203:9, 220:22, 225:3, 226:12, 229:3, 229:5, 229:24, 230:4, 232:10, 232:18, 238:5, 238:7, 238:11, 238:14, 238:21, 240:5, 273:20
**prescribers** [122] - 59:7, 59:10, 59:17, 61:8, 61:12, 61:16, 61:18, 61:25, 62:1, 62:12, 62:14, 63:15, 65:21, 66:4, 66:6, 66:9, 66:20, 67:10, 69:4, 69:9, 70:14, 70:22, 75:8, 75:9, 76:18, 76:19, 77:1, 77:10, 83:3, 83:5, 83:24, 84:19, 84:20, 85:13, 87:7, 102:14, 103:13, 104:12, 112:6, 112:8, 112:10, 112:12, 112:16, 112:23, 113:19, 114:21, 116:16, 117:4, 118:5, 118:9, 118:15, 118:25, 119:1, 119:2, 119:3, 119:10, 119:11, 120:1, 120:12, 120:15, 120:16, 120:22, 121:9,

122:5, 128:17, 129:22, 131:9, 133:23, 134:1, 137:2, 137:19, 137:25, 139:7, 140:6, 140:12, 140:19, 141:6, 148:2, 165:3, 166:23, 167:12, 168:1, 168:25, 169:2, 169:7, 169:10, 169:17, 169:25, 170:1, 170:9, 170:10, 171:4, 173:20, 174:3, 174:4, 176:17, 180:14, 181:5, 190:1, 190:10, 192:23, 193:16, 198:2, 198:8, 203:21, 203:23, 204:1, 204:3, 204:5, 204:9, 204:13, 204:18, 219:13, 220:21, 221:7, 240:9, 249:13, 250:18, 251:25, 253:20, 269:10
**prescribes** [2] - 273:6, 273:12
**Prescribing** [3] - 15:4, 115:15, 267:25
**prescribing** [146] - 43:5, 44:19, 59:6, 59:7, 59:16, 62:3, 62:5, 62:9, 71:15, 71:24, 71:25, 73:22, 74:7, 74:14, 75:3, 75:7, 75:11, 75:14, 75:17, 78:15, 78:25, 79:15, 82:12, 84:2, 85:14, 87:10, 88:4, 88:6, 88:21, 92:13, 106:4, 106:5, 109:22, 111:6, 112:2, 113:3, 113:17, 115:16, 115:17, 115:20, 116:5, 116:11, 117:17, 117:23, 118:2, 119:15, 119:18, 119:20, 119:21, 119:22, 123:5, 127:17, 127:20, 128:21, 128:22, 129:2, 129:12, 130:8, 130:10, 130:12, 130:20, 131:8, 131:17, 131:19,

131:21, 132:12, 132:20, 132:25, 133:2, 133:5, 133:8, 133:9, 133:14, 133:16, 133:19, 134:16, 134:17, 136:9, 136:15, 138:21, 139:5, 139:9, 139:19, 139:23, 140:2, 140:7, 140:13, 140:21, 141:6, 142:1, 142:13, 142:19, 145:19, 157:6, 157:7, 158:5, 158:18, 168:6, 168:8, 169:2, 169:10, 169:14, 170:5, 170:22, 175:11, 179:14, 184:20, 186:8, 186:10, 186:13, 186:22, 189:8, 189:9, 191:12, 200:2, 200:4, 200:8, 200:11, 200:12, 200:15, 206:24, 207:18, 209:25, 210:4, 220:15, 236:21, 239:5, 239:9, 240:3, 242:18, 261:10, 261:15, 261:18, 261:23, 262:6, 263:2, 265:7, 269:3, 269:11, 269:13, 271:3, 274:5, 274:8, 274:9
**Prescription** [3] - 10:7, 38:10, 38:11
**prescription** [59] - 12:11, 12:13, 12:24, 13:12, 15:1, 15:6, 15:16, 17:11, 18:6, 18:9, 18:11, 19:24, 21:6, 21:17, 26:11, 27:21, 28:14, 28:24, 31:7, 31:23, 71:10, 72:1, 74:21, 74:23, 104:9, 104:14, 130:15, 136:4, 136:6, 157:15, 165:8, 165:19, 170:21, 171:21, 172:18, 173:8, 191:11, 193:6, 195:15, 199:12, 202:9, 202:15, 204:16, 206:21, 206:22, 208:5, 212:24, 214:20,

214:24, 217:15, 218:17, 218:20, 249:5, 249:21, 251:19, 252:9, 252:15, 252:18
**prescription's** [1] - 72:1
**prescriptions** [145] - 61:8, 61:16, 67:11, 67:12, 69:6, 74:8, 74:19, 77:7, 77:9, 77:11, 79:1, 84:18, 85:10, 85:19, 87:5, 102:4, 104:8, 104:12, 104:18, 104:21, 104:22, 105:20, 106:5, 112:7, 113:21, 115:22, 117:10, 117:14, 119:19, 121:11, 121:13, 128:16, 128:22, 145:2, 145:23, 146:8, 157:10, 166:22, 167:8, 167:25, 170:15, 170:18, 171:3, 173:8, 187:23, 188:5, 188:12, 189:10, 189:18, 190:6, 190:23, 191:23, 192:18, 192:20, 193:1, 193:9, 194:21, 195:1, 195:25, 196:12, 196:16, 197:5, 199:10, 201:23, 202:2, 202:4, 202:8, 202:25, 203:10, 203:14, 204:14, 204:18, 205:1, 205:6, 206:24, 207:13, 207:24, 208:1, 208:25, 215:3, 215:9, 217:5, 217:8, 217:22, 218:19, 218:22, 218:25, 219:13, 221:8, 222:25, 223:1, 223:2, 223:3, 223:11, 223:12, 223:13, 223:14, 223:18, 223:21, 226:17, 227:17, 227:22, 229:6, 229:11, 229:12, 229:23, 230:1, 232:11, 232:19, 232:23, 238:3, 240:7, 240:20,

240:21, 240:22, 240:25, 241:2, 241:9, 248:15, 249:5, 249:17, 249:24, 250:13, 250:17, 251:2, 251:7, 251:8, 251:15, 252:24, 259:4, 259:10, 259:15, 259:21, 259:23, 259:25, 264:5, 264:8, 271:5, 271:9, 271:10, 271:12, 273:9
**prescriptions'** [1] - 74:11
**prescriptive** [1] - 14:22
**presence** [1] - 220:23
**present** [5] - 13:7, 81:7, 116:19, 122:19, 163:1
**presentation** [2] - 55:6, 55:17
**presented** [5] - 133:18, 161:9, 162:4, 174:1, 199:6
**presents** [1] - 118:19
**preserve** [2] - 272:3, 272:6
**press** [3] - 209:20, 213:19
**pretty** [2] - 50:23, 76:24
**prevailing** [1] - 168:8
**prevent** [1] - 184:20
**prevented** [2] - 33:12, 37:5
**previous** [4] - 45:25, 156:5, 230:22, 265:13
**previously** [5] - 33:6, 41:7, 41:9, 81:18, 102:17
**principles** [3] - 13:14, 13:25, 32:15
**printed** [1] - 97:15
**prison** [1] - 197:2
**privacy** [4] - 237:4, 249:17, 249:18, 249:25
**privy** [1] - 147:15
**proactive** [2] - 274:19, 274:22
**problem** [7] - 36:8, 98:9, 106:20, 125:25, 128:1, 225:11, 228:8
**procedure** [1] - 46:18
**procedures** [5] - 89:2,

89:14, 89:19, 255:1, 261:18
**proceed** [9] - 7:22, 27:11, 36:16, 65:16, 143:6, 150:8, 215:20, 243:6, 266:24
**proceedings** [1] - 278:5
**Proceedings** [3] - 6:19, 81:22, 215:18
**PROCEEDINGS** [1] - 7:1
**proceeds** [1] - 235:24
**process** [8] - 51:9, 90:9, 100:8, 151:7, 260:15, 261:13, 261:16
**processed** [1] - 54:15
**processing** [3] - 57:17, 105:13, 105:15
**Proctor** [1] - 2:10
**produce** [1] - 148:8
**produced** [14] - 6:19, 33:3, 37:10, 53:4, 70:24, 75:13, 85:8, 97:4, 105:5, 125:6, 147:4, 148:6, 150:12, 246:17
**product** [9] - 74:5, 74:6, 74:12, 74:21, 82:6, 83:20, 104:13, 104:23, 161:11
**production** [3] - 124:24, 124:25, 156:22
**products** [9] - 77:1, 77:2, 78:24, 83:6, 110:1, 119:20, 119:21, 146:1, 227:18
**profession** [1] - 19:7
**professional** [6] - 50:6, 50:21, 50:24, 54:14, 54:19, 140:2
**professionals** [2] - 255:3, 255:7
**proffer** [5] - 33:17, 34:10, 34:23, 35:8, 37:18
**profile** [6] - 175:8, 177:17, 180:16, 181:2, 181:4, 195:22
**profiled** [4] - 134:11, 137:8, 177:20, 222:15
**program** [7] - 53:22, 54:11, 54:13, 172:23, 176:10,

257:25, 270:2
**Program** [4] - 45:6, 164:16, 198:17, 244:25
**programatically** [1] - 53:22
**programs** [1] - 252:10
**Programs** [4] - 22:9, 45:3, 45:18, 144:12
**progression** [1] - 18:12
**prohibit** [1] - 186:7
**prohibited** [2] - 123:20, 186:7
**projections** [1] - 150:24
**promise** [1] - 48:22
**promised** [2] - 60:8, 60:20
**prompted** [1] - 65:9
**pronouncing** [1] - 115:7
**pronunciation** [1] - 117:8
**proper** [6] - 42:11, 68:14, 113:11, 114:14, 117:8, 180:9
**properly** [3] - 68:6, 118:13, 264:12
**proportion** [4] - 113:21, 115:22, 121:10, 221:7
**proprietary** [3] - 53:11, 104:20, 151:1
**prosecution** [2] - 51:11, 52:16
**protect** [3] - 45:24, 237:4, 254:17
**protected** [2] - 262:10, 264:22
**protecting** [1] - 254:10
**Protection** [1] - 254:25
**protocols** [1] - 184:7
**provide** [12] - 36:4, 36:9, 52:18, 103:23, 111:10, 111:15, 126:14, 175:23, 180:4, 211:22, 218:4, 248:14
**provided** [15] - 11:3, 17:20, 30:24, 35:24, 70:9, 70:11, 70:16, 101:25, 126:8, 126:11, 131:18, 158:3, 158:16, 161:17, 164:4
**provider** [2] - 110:24, 176:4

**providers** [4] - 111:24, 116:4, 116:10, 122:2
**provides** [2] - 43:5, 83:2
**provision** [4] - 19:14, 20:3, 20:10, 20:14
**provisions** [3] - 19:19, 19:23, 20:7
**pseudonym** [1] - 237:11
**psychiatrist** [5] - 123:2, 131:22, 132:8, 133:15, 273:2
**psychiatry** [3] - 131:25, 132:1, 132:10
**public** [18] - 18:13, 23:4, 24:22, 45:24, 51:10, 54:9, 54:17, 70:21, 138:3, 254:11, 254:17, 255:2, 255:6, 256:1, 258:9, 259:6, 259:17, 260:6
**Public** [2] - 22:9, 254:24
**publicly** [14] - 56:1, 64:20, 65:11, 108:21, 122:4, 122:8, 127:21, 136:12, 148:20, 149:8, 149:17, 149:19, 159:20, 205:16
**publish** [18] - 50:10, 55:5, 55:13, 71:20, 73:16, 103:20, 109:2, 112:18, 116:22, 121:3, 122:21, 129:6, 130:25, 132:15, 134:5, 136:21, 139:1, 139:14
**published** [11] - 11:23, 14:2, 18:21, 55:3, 55:7, 55:11, 55:12, 55:24, 56:3, 106:10, 108:21
**pull** [20] - 17:7, 49:21, 161:22, 173:3, 175:16, 182:4, 197:21, 210:2, 218:9, 218:10, 219:4, 224:20, 225:13, 229:17, 231:10, 231:25, 239:11, 240:13, 241:21, 241:22
**pulling** [1] - 245:24
**purchase** [13] - 75:9,

82:5, 83:19, 84:2,
154:9, 156:11,
156:21, 159:16,
159:19, 159:20,
251:21, 251:24,
252:4
**purchased** [9] - 79:15,
147:3, 151:4,
152:14, 152:19,
152:21, 152:24,
153:12, 272:24
**purchases** [1] - 83:18
**purchasing** [2] - 84:5,
94:23
**Purdue** [8] - 44:16,
125:6, 126:2, 126:3,
126:6, 126:11,
126:13
**purely** [1] - 69:21
**purported** [1] - 155:16
**purportedly** [1] -
155:2
**purporting** [1] -
102:18
**purpose** [4] - 151:9,
254:19, 254:21,
261:17
**purposes** [7] - 10:11,
41:5, 85:24, 102:5,
115:2, 115:4, 179:15
**pursuant** [3] - 42:8,
53:5, 246:17
**pursued** [1] - 155:9
**put** [24] - 8:22, 9:9,
22:12, 29:20, 79:7,
84:8, 86:6, 102:10,
105:17, 109:14,
123:23, 130:9,
148:17, 150:6,
184:24, 201:3,
225:23, 231:2,
245:19, 246:2,
258:3, 260:9, 271:1,
275:1

## Q

**qualified** [2] - 57:25,
58:11
**quantities** [1] - 94:23
**quantity** [4] - 72:8,
72:13, 72:14, 74:5
**quarrel** [1] - 214:19
**quarter** [3] - 81:20,
226:21, 227:11
**quarterly** [1] - 228:4
**Queens** [1] - 62:15
**questioned** [2] -
80:15, 81:5
**questioning** [7] -

29:17, 78:1, 98:2,
158:2, 222:2, 224:3,
230:8
**questionnaire** [6] -
85:7, 86:15, 86:25,
142:13, 235:4,
235:23
**questionnaires** [5] -
84:10, 84:14, 84:21,
86:10, 167:13
**questions** [34] - 10:23,
15:24, 16:3, 20:20,
22:8, 26:8, 35:12,
41:22, 46:14, 64:25,
85:11, 87:4, 88:1,
90:22, 91:12, 96:22,
102:2, 102:5,
141:16, 141:19,
142:2, 143:14,
149:20, 198:20,
224:22, 225:16,
240:11, 243:4,
245:14, 245:21,
250:23, 253:11,
265:10, 276:24
**quick** [3] - 48:18,
241:22, 245:21
**quickly** [1] - 68:8,
134:6, 221:10,
246:3, 248:7
**Quintiles** [1] - 145:16
**quite** [7] - 7:11, 44:6,
72:6, 105:13, 117:8,
166:5, 249:20
**quoting** [1] - 115:3

## R

**Rafalski** [7] - 92:18,
113:3, 113:6, 113:9,
113:23, 113:25,
114:14
**Rafalski's** [2] - 114:3,
114:12
**Rafferty** [1] - 2:10
**Rahul** [1] - 197:10
**raise** [1] - 49:6
**raised** [1] - 230:24
**ran** [2] - 253:6, 253:10
**randomly** [1] - 14:25
**range** [3] - 98:11,
104:11, 211:17
**rank** [4] - 66:5, 119:7,
137:19, 210:12
**ranked** [6] - 66:11,
66:14, 210:24,
240:19, 240:25,
241:3
**ranking** [7] - 119:17,
209:11, 209:12,

210:23, 211:2, 211:6
**rankings** [4] - 65:21,
119:20, 119:22,
119:24
**ranks** [3] - 119:6,
210:13, 217:21
**Rannazzisi** [5] -
157:17, 158:3,
158:12, 158:15,
159:3
**Rannazzisi's** [1] -
158:21
**rate** [2] - 15:8, 15:19
**rates** [9] - 199:12,
200:2, 200:5, 200:8,
200:11, 200:12,
200:15, 200:16,
200:20
**rather** [5] - 12:19,
45:1, 73:1, 100:21,
109:18
**Ratings** [26] - 82:6,
82:9, 82:10, 82:18,
83:10, 83:19, 83:21,
160:11, 160:14,
160:18, 161:2,
161:4, 161:8,
161:13, 162:1,
163:4, 163:9,
163:13, 163:20,
164:22, 244:3,
245:15, 245:17,
270:21
**RE** [1] - 47:1
**re** [8] - 16:23, 20:22,
37:23, 41:20, 46:18,
46:19, 186:19
**re-cross** [2] - 37:23,
46:19
**RE-DIRECT** [1] - 47:1
**re-direct** [3] - 16:23,
20:22, 41:20
**re-establish** [1] -
186:19
**re-re-direct** [1] - 46:18
**reach** [1] - 102:12
**reaching** [2] - 124:14,
135:12
**read** [41] - 13:5, 14:20,
17:5, 17:9, 17:12,
17:19, 18:4, 20:13,
41:1, 41:19, 43:16,
43:23, 115:10,
124:2, 127:14,
161:12, 165:16,
168:2, 170:7,
170:24, 171:12,
225:5, 226:18,
235:7, 236:1,
236:12, 236:17,

247:4, 264:7,
264:10, 266:21,
267:21, 268:12,
268:13, 268:17,
268:23, 268:25,
272:20, 273:10,
275:21, 275:22
**reading** [12] - 7:13,
69:14, 91:21,
102:19, 123:19,
123:23, 135:3,
151:15, 171:15,
185:14, 261:20,
268:4
**ready** [4] - 11:5,
212:17, 212:18,
233:13
**real** [4] - 46:23, 124:4,
241:21, 250:24
**real-time** [1] - 250:24
**realize** [1] - 263:20
**really** [8] - 7:20,
161:10, 170:13,
187:1, 212:12,
223:10, 226:23,
237:1
**reason** [11] - 60:11,
63:23, 64:4, 96:5,
110:14, 151:19,
182:18, 182:21,
183:8, 204:8, 249:22
**reasonability** [1] -
106:25
**reasonable** [4] -
32:18, 107:9, 108:5,
114:10
**reasonably** [3] - 41:9,
106:6, 115:5
**reasons** [1] - 273:5
**rebut** [1] - 65:6
**rebuttal** [2] - 41:6,
41:19
**recalled** [1] - 254:18
**recalling** [2] - 156:12,
195:9
**receive** [7] - 56:3,
90:24, 142:12,
197:25, 252:1,
262:4, 273:9
**received** [20] - 33:7,
50:16, 55:8, 56:6,
56:11, 56:13, 56:15,
56:17, 63:3, 88:15,
95:23, 217:8,
217:11, 224:8,
235:3, 235:13,
236:14, 239:15,
260:15, 263:24
**receives** [1] - 85:10
**receiving** [4] - 88:3,

123:4, 125:2, 181:20
**recent** [1] - 208:18
**recess** [3] - 81:19,
143:1, 215:17
**Recess** [2] - 81:21,
143:3
**recessed** [2] - 81:25,
277:8
**recognition** [1] - 56:6
**recognize** [14] - 7:15,
9:4, 22:13, 34:24,
83:14, 93:7, 95:13,
101:15, 127:2,
127:5, 135:18,
138:10, 224:23,
271:17
**recollection** [10] -
35:16, 48:4, 129:13,
129:16, 133:7,
180:19, 181:7,
195:24, 203:4, 225:7
**Recommendation** [1]
- 273:25
**recommendations** [2]
- 22:17, 24:22
**recommended** [1] -
274:1
**record** [39] - 20:13,
24:13, 28:2, 28:6,
29:11, 29:18, 30:5,
33:17, 34:1, 34:6,
35:13, 37:12, 38:16,
42:3, 85:25, 89:9,
90:19, 95:21, 99:2,
109:14, 115:2,
115:10, 123:19,
125:20, 135:4,
138:3, 153:25,
154:25, 177:1,
177:11, 178:25,
242:3, 242:23,
256:1, 256:9,
262:14, 262:23,
278:5
**recorded** [1] - 6:19
**records** [25] - 104:9,
127:18, 174:25,
177:10, 180:1,
182:6, 192:10,
192:14, 217:15,
218:17, 220:24,
222:24, 250:10,
259:6, 261:24,
262:4, 262:8, 262:9,
262:13, 262:22,
262:25, 264:4,
264:12, 264:16,
264:21
**Recovery** [3] - 176:9,
176:19, 176:20

**RECROSS** [2] - 37:24, 274:16
**red** [11] - 92:13, 92:16, 92:17, 92:25, 113:4, 113:7, 131:12, 133:1, 200:4, 201:15, 213:20
**REDIRECT** [2] - 17:3, 269:24
**redirect** [2] - 269:19, 269:21
**Reed** [2] - 6:4, 6:11
**refer** [3] - 173:1, 177:5, 245:2
**reference** [14] - 40:4, 40:6, 89:18, 95:24, 96:10, 100:16, 109:7, 162:1, 259:8, 260:14, 261:1, 263:8, 268:19
**referenced** [14] - 80:2, 88:10, 88:12, 95:17, 99:8, 99:11, 100:10, 188:10, 219:3, 224:4, 230:23, 231:9, 234:23, 259:24
**references** [4] - 40:5, 47:9, 47:10, 103:12
**referencing** [1] - 260:2
**referred** [2] - 244:3, 262:11
**referring** [5] - 55:12, 125:18, 128:7, 186:5, 201:4
**refers** [2] - 237:7, 256:13
**refills** [2] - 136:6, 218:21
**reflect** [12] - 65:9, 75:11, 112:22, 120:7, 121:1, 121:8, 124:8, 127:16, 129:10, 136:18, 139:18, 154:12
**reflected** [15] - 117:3, 129:1, 171:22, 172:18, 173:9, 175:12, 188:11, 200:10, 206:1, 217:8, 218:25, 220:21, 223:22, 228:18, 229:6
**reflecting** [5] - 112:14, 125:1, 171:21, 210:3, 249:9
**reflection** [1] - 206:23
**reflects** [6] - 65:20, 71:11, 94:22, 150:24, 189:18,

221:5
**refresh** [10] - 35:15, 180:18, 181:6, 184:17, 195:20, 195:23, 203:4, 224:18, 225:7, 265:17
**refreshing** [4] - 129:13, 129:14, 129:16, 133:7
**refuse** [2] - 167:7, 167:24
**refused** [1] - 36:2
**regard** [4] - 45:24, 110:5, 129:2, 137:15
**regarding** [15] - 50:6, 59:9, 78:2, 90:20, 113:19, 122:14, 135:25, 143:25, 251:24, 253:6, 253:18, 259:20, 267:2, 267:13, 275:24
**regardless** [2] - 114:14, 217:22
**registered** [3] - 204:10, 248:5, 248:11
**registrations** [1] - 76:23
**regular** [1] - 265:7
**regularly** [1] - 54:15
**regulate** [2] - 255:2, 255:6
**regulated** [1] - 263:17
**regulation** [2] - 254:12, 263:19
**regulations** [4] - 143:23, 144:18, 166:11, 166:18
**regulator** [2] - 252:3, 252:7
**regulatory** [4] - 45:8, 45:24, 234:17, 276:19
**rehabilitation** [1] - 117:22
**reimbursement** [1] - 257:25
**relate** [3] - 41:22, 89:23, 138:20
**related** [17] - 15:9, 15:20, 26:14, 27:25, 29:2, 30:1, 30:3, 31:9, 45:16, 46:1, 54:8, 57:2, 57:14, 71:5, 73:8, 109:23, 235:23
**relates** [6] - 37:18, 88:5, 136:9, 216:19,

216:21, 242:17
**relating** [6] - 30:12, 54:2, 92:12, 134:16, 134:18, 242:4
**relation** [2] - 11:7, 186:14
**Relationship** [1] - 10:6
**relationship** [4] - 30:2, 31:8, 31:16, 186:19
**relative** [4] - 30:15, 113:17, 115:18, 117:15
**relatively** [9] - 7:20, 8:18, 17:11, 18:10, 51:15, 68:8, 105:14, 202:20
**relevance** [1] - 110:10
**relevant** [6] - 75:12, 110:12, 113:23, 114:20, 127:13, 127:15
**reliable** [5] - 110:15, 110:22, 110:25, 111:2, 125:13
**reliance** [35] - 32:9, 35:14, 80:17, 89:15, 90:4, 90:14, 91:1, 92:22, 93:18, 93:22, 94:1, 94:4, 94:7, 94:10, 95:19, 95:22, 96:7, 96:16, 97:2, 97:6, 97:8, 97:21, 98:4, 100:9, 100:11, 100:15, 106:19, 107:1, 108:11, 113:10, 114:10, 154:14, 165:14
**relied** [34] - 10:10, 11:7, 34:5, 76:13, 77:14, 77:22, 78:6, 79:19, 80:4, 80:10, 82:2, 83:9, 83:15, 85:4, 86:9, 86:24, 90:1, 93:21, 94:14, 95:3, 95:8, 96:21, 97:24, 100:21, 101:17, 110:14, 113:2, 115:5, 124:14, 124:20, 127:8, 135:11, 135:20, 138:12
**relies** [3] - 101:7, 107:25, 270:21
**rely** [27] - 12:7, 19:5, 76:16, 77:25, 78:11, 82:4, 83:17, 85:6, 87:2, 93:9, 93:12, 101:21, 106:6, 106:11, 107:9,

107:20, 108:4, 108:24, 109:8, 110:1, 113:11, 114:8, 124:22, 125:11, 127:11, 138:3, 271:20
**relying** [6] - 33:24, 107:12, 107:16, 108:2, 114:11, 155:2
**remain** [2] - 99:5, 274:1
**remainder** [3] - 178:12, 200:23, 202:21
**remaining** [2] - 62:1, 104:19
**remains** [2] - 99:15, 202:20
**remember** [20] - 48:5, 119:10, 142:1, 151:15, 151:16, 158:9, 158:22, 189:22, 237:19, 243:21, 243:22, 244:3, 249:19, 256:22, 258:1, 263:3, 263:19, 265:10, 269:3, 276:6
**remind** [1] - 104:4
**reminding** [1] - 225:10
**renew** [6] - 25:16, 96:4, 134:24, 135:2, 259:19, 267:3
**renewal** [5] - 255:17, 256:14, 257:13, 257:16, 266:24
**renewals** [6] - 255:22, 257:13, 257:18, 258:18, 259:13, 263:14
**renewed** [2] - 258:22, 259:2
**repeat** [2] - 247:11, 247:24
**rephrase** [2] - 103:8, 160:25
**replicate** [1] - 227:21
**replow** [1] - 245:15
**report** [163] - 10:11, 11:7, 12:17, 13:22, 17:6, 17:12, 17:15, 18:5, 22:17, 24:21, 27:3, 27:4, 29:11, 29:14, 29:21, 30:10, 30:11, 30:23, 32:10, 32:13, 37:6, 55:6, 55:7, 55:16, 59:25, 60:7, 60:15, 62:22, 63:5, 63:11, 63:13, 63:18, 63:23, 64:2,

64:4, 64:6, 64:15, 65:10, 65:14, 65:15, 67:21, 69:9, 70:7, 70:22, 74:24, 80:3, 80:10, 80:11, 80:14, 83:15, 85:15, 87:14, 87:18, 88:9, 88:11, 88:14, 89:11, 89:16, 89:19, 89:21, 90:13, 91:1, 92:17, 92:18, 93:20, 93:21, 94:11, 95:17, 95:19, 95:23, 95:25, 97:3, 97:16, 97:22, 98:8, 98:18, 99:4, 99:9, 101:17, 102:14, 103:24, 107:18, 109:10, 109:11, 109:15, 109:23, 111:22, 113:2, 113:3, 113:10, 113:22, 113:25, 114:12, 114:20, 119:3, 120:9, 128:24, 131:7, 135:21, 137:8, 140:16, 140:17, 153:3, 153:8, 153:13, 154:13, 155:14, 160:25, 161:3, 161:7, 165:14, 170:4, 174:6, 174:9, 179:9, 179:15, 179:20, 180:16, 180:18, 181:2, 194:19, 195:14, 195:20, 195:23, 196:20, 198:12, 199:7, 199:23, 201:4, 202:12, 203:4, 203:7, 203:18, 203:20, 204:23, 210:3, 216:12, 217:21, 219:3, 221:14, 222:16, 224:16, 224:21, 224:24, 225:12, 226:11, 228:4, 231:11, 237:21, 239:8, 246:6, 250:12, 264:21, 268:4, 268:14, 268:20, 268:24, 269:1, 269:7, 274:6, 275:19
**reportable** [1] - 144:4
**reported** [1] - 278:9
**REPORTER** [1] - 180:6
**Reporter** [6] - 6:17, 6:18, 278:3, 278:12

**reporting** [1] - 143:25
**Reports** [1] - 206:3
**reports** [9] - 57:10, 57:13, 57:16, 90:3, 108:21, 109:7, 115:3, 253:9, 261:2
**represent** [8] - 38:3, 118:24, 143:12, 205:24, 216:7, 226:2, 231:20, 243:10
**representation** [2] - 30:21, 101:1
**representative** [1] - 146:10
**representatives** [1] - 147:25
**represented** [2] - 37:13, 229:11
**represents** [2] - 150:17, 223:17
**request** [1] - 237:7
**requested** [2] - 35:24, 236:9
**requests** [1] - 91:13
**require** [3] - 91:16, 98:19, 255:21
**required** [7] - 8:2, 89:3, 101:25, 111:10, 111:15, 158:4, 158:17
**requirement** [3] - 108:5, 159:16, 276:19
**requirements** [1] - 96:6
**requires** [2] - 64:4, 144:1
**research** [5] - 70:17, 70:20, 70:21, 122:12, 153:14
**Research** [1] - 52:4
**reservation** [1] - 53:4
**resolve** [1] - 36:8
**resort** [2] - 248:6, 248:12
**respect** [15] - 52:14, 86:10, 86:25, 99:22, 122:17, 129:11, 132:12, 133:22, 135:12, 135:21, 137:14, 138:13, 138:24, 192:2, 264:24
**respectfully** [2] - 96:1, 230:17
**respond** [4] - 82:21, 87:24, 114:5, 116:4
**responded** [1] - 69:24
**responding** [1] -

63:17
**response** [4] - 37:18, 54:6, 64:11, 148:11
**responses** [2] - 8:1, 36:15
**responsibilities** [3] - 251:22, 276:7, 276:10
**responsibility** [5] - 102:6, 251:15, 251:17, 251:25, 276:12
**Responsible** [1] - 267:25
**responsive** [1] - 167:14
**rest** [7] - 7:18, 17:19, 17:24, 17:25, 44:21, 45:10, 248:25
**restricted** [1] - 183:19
**result** [2] - 53:24, 150:25
**results** [1] - 265:22
**resume** [1] - 9:20
**resumed** [2] - 81:22, 215:18
**Retail** [1] - 206:2
**retail** [2] - 146:11, 146:17
**retained** [1] - 33:11
**retire** [1] - 26:8
**reveal** [1] - 17:24
**reverse** [1] - 156:24
**Review** [2] - 198:1, 198:13
**review** [34] - 11:19, 12:5, 13:4, 14:6, 20:16, 30:12, 42:20, 45:10, 63:17, 69:7, 69:25, 71:1, 82:12, 96:22, 103:11, 116:1, 117:18, 120:11, 122:3, 128:20, 136:11, 141:5, 167:22, 172:20, 187:25, 195:8, 216:13, 245:3, 245:5, 245:7, 250:10, 258:20, 275:23, 276:21
**reviewed** [32] - 13:23, 14:7, 45:5, 45:9, 64:20, 70:7, 74:24, 75:3, 75:15, 78:13, 94:5, 96:7, 96:10, 102:12, 103:24, 104:2, 104:25, 106:11, 116:2, 120:8, 122:11, 124:10, 141:8,

157:12, 157:14, 160:24, 161:1, 161:4, 164:23, 172:5, 172:22, 193:4
**reviewing** [8] - 11:20, 84:2, 87:10, 88:22, 99:10, 105:25, 106:1, 262:13
**revoke** [1] - 239:17
**revoked** [2] - 189:3, 197:1
**Rhode** [1] - 57:7
**Rice** [5] - 3:14, 4:3, 4:5, 4:8, 4:11
**rich** [4] - 21:8, 21:16, 21:24, 38:23
**Riggins** [10] - 272:18, 272:21, 272:23, 272:25, 273:1, 273:3, 273:5, 273:7, 273:12, 273:13
**right-hand** [3] - 23:17, 24:6, 226:6
**Rintoul** [8] - 39:1, 39:10, 40:7, 40:13, 42:14, 42:23, 47:6, 47:9
**rise** [4] - 21:25, 26:13, 27:24, 29:1
**rising** [1] - 54:10
**risk** [2] - 17:10, 18:8
**risks** [2] - 109:23, 109:25
**Ritchie** [4] - 225:13, 229:17, 236:24, 239:11
**RMR** [2] - 6:17, 6:18
**Road** [1] - 176:20
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**role** [7] - 21:15, 157:24, 171:19, 244:10, 244:19, 244:24, 254:16
**roll** [1] - 270:16
**roll-up** [1] - 270:16
**rolled** [2] - 249:21, 270:8
**rolled-up** [1] - 270:8
**rooms** [1] - 53:11
**roughly** [1] - 57:13
**roxicodone** [1] - 273:9
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**RUBY** [1] - 4:20
**Ruby** [1] - 4:20
**rule** [4] - 35:16, 162:12, 256:11, 260:23

**Rule** [5] - 35:16, 64:4, 108:5, 114:10, 154:11
**ruled** [1] - 126:22
**rules** [5] - 34:15, 98:19, 144:18, 255:1, 255:6
**ruling** [4] - 27:1, 78:4, 101:9, 156:24
**rulings** [1] - 34:17
**run** [3] - 11:10, 163:10, 253:7
**running** [5] - 86:18, 86:21, 135:5, 272:3, 272:6
**Russell** [1] - 220:18
**Rx** [2] - 218:22, 228:2

## S

**s\Ayme** [1] - 278:11
**s\Lisa** [1] - 278:11
**safe** [3] - 48:12, 186:2, 187:8
**safeguard** [2] - 255:2, 255:6
**safety** [2] - 254:11, 254:17
**sale** [2] - 74:2, 147:21
**sales** [5] - 147:22, 147:24, 147:25, 148:3, 148:4
**SALGADO** [1] - 4:18
**Saloner** [1] - 24:9
**sample** [3] - 146:6, 146:11, 248:25
**San** [3] - 2:5, 2:14, 52:25
**sanction** [1] - 36:20
**sat** [1] - 124:2
**saw** [5] - 54:10, 90:7, 105:6, 180:1, 189:11, 202:18, 204:13, 222:23, 256:14, 256:24, 258:7, 259:19, 260:4, 260:19, 265:15
**Saxe** [10] - 219:18, 222:8, 240:24, 241:1, 241:4, 241:8, 241:15, 241:22, 242:4, 242:22
**SC** [3] - 3:15, 4:4, 4:12
**schedule** [1] - 267:3
**scheduled** [1] - 186:11
**scheduling** [1] - 266:18
**SCHMIDT** [80] - 5:9,

58:17, 59:20, 60:10, 63:2, 63:21, 67:13, 78:1, 86:13, 86:16, 87:20, 89:5, 90:2, 91:8, 92:15, 93:15, 94:3, 96:4, 97:17, 98:8, 100:24, 106:13, 107:3, 107:15, 107:23, 109:13, 113:15, 124:1, 125:19, 129:13, 135:5, 135:8, 153:2, 153:7, 153:16, 153:25, 154:3, 154:18, 154:25, 155:15, 156:16, 162:11, 162:17, 243:6, 243:9, 244:12, 244:14, 245:22, 245:23, 246:19, 246:21, 247:13, 247:14, 248:17, 248:22, 254:1, 254:3, 255:25, 256:5, 256:7, 256:8, 265:3, 266:3, 266:6, 267:10, 267:11, 267:24, 268:10, 268:22, 269:17, 271:24, 272:3, 272:6, 272:10, 274:14, 274:17, 275:1, 275:3, 275:10, 275:11
**Schmidt** [4] - 243:7, 243:10, 256:4, 272:9
**school** [1] - 50:18
**Schools** [1] - 22:9
**schools** [1] - 24:22
**science** [1] - 22:18
**Science** [2] - 22:25, 50:20
**scope** [21] - 27:4, 29:9, 29:11, 46:20, 47:15, 47:16, 60:14, 63:4, 63:7, 68:6, 78:4, 86:1, 86:19, 86:22, 87:14, 87:18, 89:20, 91:1, 116:9, 268:7, 271:25
**Scott** [1] - 268:1
**screen** [12] - 11:1, 17:10, 47:14, 148:17, 150:7, 151:16, 184:24, 201:4, 205:20, 256:17, 260:9, 275:1
**script** [2] - 94:17, 94:20

**Scripts** [1] - 227:10
**scripts** [4] - 94:18,
94:19, 94:21, 227:11
**Sean** [3] - 83:20,
244:6, 244:9
**search** [5] - 71:2,
127:21, 273:16,
273:18, 276:2
**seat** [1] - 49:10
**Second** [1] - 106:17
**second** [12] - 37:2,
42:24, 43:8, 91:15,
117:25, 125:22,
217:24, 226:24,
232:9, 238:14,
264:24, 275:12
**secondary** [1] - 34:16
**Secretary** [2] - 197:12,
198:24
**section** [5] - 93:14,
102:8, 182:14,
194:11, 276:15
**Section** [4] - 94:15,
95:2, 101:24, 256:13
**Securities** [2] - 54:24,
54:25
**see** [141] - 9:14, 12:15,
13:1, 13:13, 15:9,
23:17, 27:14, 40:20,
45:17, 46:5, 46:8,
46:13, 47:9, 53:17,
60:18, 61:4, 65:25,
72:7, 76:25, 77:5,
77:6, 77:17, 78:16,
78:17, 78:22, 78:24,
79:9, 79:22, 84:21,
90:10, 93:13, 95:23,
97:13, 103:12,
106:1, 106:2, 110:9,
120:1, 121:12,
131:12, 131:13,
131:15, 132:25,
133:12, 148:18,
149:20, 155:25,
162:1, 162:2, 162:5,
164:5, 176:4, 176:6,
177:6, 178:21,
178:24, 179:22,
182:11, 182:24,
184:3, 184:17,
184:22, 185:7,
185:10, 186:8,
188:7, 189:6,
191:11, 194:2,
194:8, 198:4, 206:2,
206:3, 208:11,
208:14, 210:8,
212:19, 213:2,
214:3, 214:11,
214:13, 226:6,

226:9, 226:24,
227:1, 227:4, 227:8,
231:23, 246:22,
247:3, 247:19,
247:25, 251:12,
254:6, 254:13,
255:15, 255:18,
256:9, 256:15,
256:18, 258:10,
258:14, 258:22,
259:3, 259:6,
259:12, 259:16,
259:23, 260:12,
261:10, 261:24,
261:25, 262:15,
262:16, 262:25,
263:8, 264:6,
264:11, 264:13,
264:16, 266:7,
266:9, 266:11,
266:14, 266:19,
267:14, 267:17,
268:11, 275:12,
275:15, 275:17,
275:23, 276:2,
276:9, 276:13,
276:15, 276:16,
276:20, 276:22,
277:6
**seeing** [5] - 169:5,
169:12, 189:18,
257:2, 259:22
**seeking** [2] - 134:22,
149:7
**seem** [2] - 114:3,
179:4
**sell** [1] - 145:25
**seller** [1] - 74:4
**selling** [1] - 252:1
**semicolon** [1] - 40:3
**semicolons** [2] - 40:3,
40:6
**sends** [1] - 272:25
**Senior** [2] - 7:2,
244:16
**SENIOR** [1] - 1:17
**Sensabaugh** [1] - 5:14
**sense** [2] - 169:21
**sent** [4] - 148:10,
150:12, 268:2, 269:6
**sentence** [25] - 12:22,
13:5, 13:6, 13:10,
13:20, 14:9, 14:17,
17:6, 17:17, 17:18,
17:19, 17:24, 17:25,
18:4, 21:3, 39:3,
43:13, 44:15, 203:7,
266:17, 266:21,
272:17, 272:20,
273:11, 273:16

**sentenced** [1] - 197:2
**sentences** [5] - 44:20,
44:21, 44:22, 44:24,
45:9
**separate** [2] - 80:24,
232:16
**separated** [1] - 40:6
**September** [12] -
161:15, 225:2,
236:10, 236:15,
237:9, 237:15,
237:17, 237:23,
246:19, 248:17,
248:19, 248:20
**sequence** [1] - 46:19
**series** [5] - 41:22,
99:16, 101:14,
156:11, 240:11
**serious** [1] - 36:7
**serve** [2] - 160:5,
255:3
**served** [1] - 154:10
**service** [1] - 146:11
**Service** [1] - 56:11
**serviced** [4] - 195:17,
196:13, 197:6, 224:5
**Services** [2] - 108:15,
244:16
**services** [2] - 164:3,
178:12
**serving** [1] - 11:16
**set** [5] - 49:14, 50:2,
63:3, 87:17, 156:22
**setting** [2] - 87:10,
88:22
**settled** [1] - 99:5
**settlement** [1] - 53:25
**seven** [5] - 18:7,
61:24, 98:11,
134:18, 263:14
**seventh** [1] - 119:8
**sever** [1] - 147:14
**several** [6] - 98:16,
118:10, 132:3,
134:22, 136:7,
272:21
**several-inch** [1] -
98:16
**shall** [9] - 185:8,
186:10, 186:16,
186:17, 186:18,
186:22, 187:8,
267:21, 268:3
**SHANNON** [1] - 6:3
**shape** [1] - 207:4
**sharp** [1] - 115:19
**Shawn** [2] - 220:11,
220:12
**sheet** [1] - 154:10
**shift** [1] - 48:18

**shipment** [5] - 71:8,
71:12, 73:24, 75:7,
246:11
**shipments** [5] - 73:25,
206:18, 206:19,
215:3, 215:9
**shipped** [2] - 30:17,
214:12
**shop** [1] - 76:19
**Shoppe** [5] - 76:18,
192:6, 192:9, 193:2,
193:6
**short** [7] - 37:17,
40:11, 44:6, 45:12,
46:23, 151:15,
192:12
**shorter** [2] - 8:18,
269:22
**show** [32] - 28:2,
74:13, 76:8, 88:3,
91:3, 91:9, 93:1,
97:7, 97:8, 99:16,
107:13, 121:18,
124:13, 124:15,
135:14, 138:5,
141:2, 150:6,
197:20, 205:11,
206:21, 206:22,
207:8, 207:10,
207:14, 207:21,
208:7, 208:20,
213:25, 236:15,
253:25
**showed** [10] - 100:7,
120:2, 160:13,
188:4, 200:24,
214:16, 245:3,
245:20, 271:2,
273:18
**showing** [5] - 10:25,
89:24, 100:8,
101:14, 265:11
**shown** [17] - 23:12,
82:1, 92:1, 96:20,
100:6, 102:23,
131:8, 133:1, 133:2,
133:11, 151:16,
189:24, 190:9,
202:19, 244:10,
274:3
**shows** [29] - 74:4,
74:8, 74:10, 74:19,
74:20, 92:23, 94:17,
94:20, 95:4, 104:12,
104:22, 131:7,
190:17, 193:20,
200:1, 200:4, 200:7,
201:22, 206:17,
206:19, 207:13,
207:22, 208:14,

214:24, 219:12,
232:16, 232:17,
241:7, 274:5
**shy** [1] - 228:7
**sic** [3] - 173:6, 258:21,
258:24
**sic]** [1] - 185:16
**side** [4] - 24:6, 68:5,
201:19, 201:20
**sides** [3] - 9:16, 215:2,
215:7
**sight** [1] - 9:3
**signed** [3] - 136:4,
185:17, 197:16
**significance** [3] -
179:12, 179:16,
179:24
**significant** [4] - 18:12,
83:25, 151:2, 179:19
**significantly** [3] -
200:11, 200:16,
200:19
**signifies** [1] - 11:20
**similar** [7] - 15:21,
62:12, 79:9, 105:6,
120:23, 123:21
**similarly** [1] - 87:3
**simple** [2] - 39:20,
156:4
**simply** [15] - 10:25,
34:6, 36:17, 64:8,
65:8, 88:14, 92:18,
93:1, 96:9, 96:20,
97:25, 113:22,
123:18, 125:19,
199:1
**SINGER** [161] - 4:8,
48:21, 49:13, 49:17,
50:10, 50:12, 51:4,
51:6, 55:21, 55:22,
58:8, 58:21, 58:24,
59:2, 59:3, 60:6,
60:19, 60:21, 63:12,
64:17, 65:8, 65:17,
65:19, 65:25, 66:1,
66:24, 67:1, 68:20,
68:21, 69:23, 70:5,
71:20, 71:22, 73:4,
73:16, 73:17, 75:20,
75:22, 76:9, 76:10,
77:17, 77:20, 78:8,
79:22, 80:12, 80:20,
81:3, 81:16, 81:24,
82:21, 82:25, 83:12,
83:13, 84:24, 85:2,
86:5, 86:14, 86:23,
87:25, 88:12, 88:19,
89:22, 90:18, 91:25,
92:7, 92:9, 92:21,
93:4, 93:6, 93:19,

94:9, 95:11, 95:12, 96:15, 97:7, 97:11, 98:22, 98:24, 100:2, 100:16, 101:3, 101:11, 101:13, 103:8, 103:10, 103:20, 103:22, 104:3, 108:8, 109:2, 109:4, 110:3, 110:13, 110:18, 110:19, 112:18, 112:20, 114:18, 115:13, 115:24, 116:22, 116:24, 118:21, 118:23, 121:3, 121:6, 122:21, 122:23, 124:6, 124:12, 124:16, 124:18, 125:16, 126:1, 126:15, 126:17, 126:20, 126:23, 127:1, 128:1, 128:5, 128:6, 128:11, 128:13, 129:6, 129:9, 129:18, 130:18, 130:25, 131:2, 132:15, 132:18, 134:5, 134:8, 135:10, 135:14, 135:17, 136:21, 136:22, 138:5, 138:9, 139:1, 139:3, 139:14, 139:17, 141:4, 141:10, 141:15, 141:20, 141:22, 142:21, 142:24, 218:8, 269:20, 269:25, 270:15, 270:22, 271:14, 271:16, 272:12, 274:12
**singer** [13] - 48:20, 55:10, 58:14, 60:5, 60:18, 64:16, 65:7, 65:15, 79:25, 81:14, 160:13, 162:17, 163:12
**Singer** [19] - 55:20, 64:9, 68:19, 81:23, 89:12, 90:17, 91:19, 91:24, 107:22, 108:1, 108:7, 109:20, 114:17, 125:15, 127:25, 141:3, 217:25, 224:4, 269:18
**single** [5] - 29:14, 39:1, 39:8, 39:16, 39:25

**single-spaced** [1] - 29:14
**singular** [1] - 108:10
**sit** [2] - 154:4, 189:17
**site** [3] - 274:19, 274:22, 276:21
**sitting** [4] - 43:18, 43:24, 137:21, 191:1
**situation** [2] - 9:12, 171:10
**six** [2] - 97:3, 97:4
**sixteen** [2] - 12:6, 14:4
**size** [1] - 66:21
**skip** [2] - 134:10, 273:15
**skipped** [4] - 20:4, 20:7, 20:11, 20:14
**sleeping** [1] - 130:11
**Slide** [21] - 116:25, 148:15, 175:16, 176:1, 176:3, 176:14, 177:4, 177:22, 178:4, 182:4, 194:2, 199:21, 203:16, 204:22, 205:12, 207:1, 207:21, 208:8, 210:2, 213:25, 246:3
**slide** [74] - 18:17, 19:11, 50:14, 50:24, 51:2, 51:4, 58:13, 65:20, 65:23, 66:2, 66:24, 71:14, 71:18, 71:20, 73:11, 73:14, 73:16, 73:18, 75:20, 103:17, 103:20, 103:23, 108:23, 109:2, 109:5, 112:14, 112:18, 112:22, 113:5, 113:16, 113:20, 115:25, 116:19, 116:22, 117:1, 117:3, 118:19, 118:21, 118:24, 121:4, 121:7, 122:21, 125:21, 129:1, 129:7, 129:10, 129:18, 130:19, 130:23, 131:3, 131:4, 131:6, 131:13, 131:19, 132:12, 132:15, 133:3, 134:10, 136:23, 137:21, 137:23, 139:11, 139:15, 176:2, 178:18, 194:6, 201:3, 218:10,

221:3, 222:23, 238:25, 240:14, 245:22
**slides** [17] - 50:2, 50:5, 50:8, 121:1, 122:19, 124:3, 124:8, 131:1, 133:25, 134:3, 135:3, 136:18, 137:14, 138:23, 174:1, 245:20, 245:25
**slight** [1] - 209:10
**slightly** [1] - 158:19
**small** [3] - 17:11, 18:10, 18:11
**Smith** [2] - 6:4, 6:11
**smoking** [3] - 15:14, 15:21
**Snyder** [1] - 220:18
**software** [1] - 53:11
**sold** [4] - 31:8, 145:11, 160:18, 226:17
**solely** [1] - 255:23
**solve** [1] - 125:25
**solved** [1] - 228:20
**Soma** [1] - 115:21
**someone** [4] - 33:11, 195:20, 230:2, 232:13, 232:24, 259:15
**sometimes** [1] - 61:3
**Sometimes** [1] - 261:4
**somewhat** [3] - 52:21, 131:12, 249:22
**somewhere** [2] - 45:13, 174:10
**SOMS** [1] - 105:25
**soon** [1] - 141:13
**SOPs** [1] - 94:16
**Sorry** [3] - 86:16, 237:17, 255:16
**sorry** [62] - 27:12, 36:14, 39:11, 39:22, 49:3, 55:9, 56:18, 57:6, 59:21, 62:4, 62:16, 67:7, 72:14, 72:17, 73:6, 76:21, 77:3, 78:10, 78:20, 84:7, 95:7, 95:15, 97:14, 108:18, 111:1, 111:12, 115:1, 118:1, 119:7, 122:24, 125:4, 128:9, 133:13, 134:25, 165:5, 170:21, 173:6, 176:2, 180:6, 185:14, 186:15, 188:8, 188:14,

188:19, 194:6, 194:20, 194:24, 196:5, 213:21, 230:14, 232:12, 238:13, 247:11, 248:8, 256:16, 258:25, 263:20, 272:8, 273:11
**sort** [3] - 70:11, 109:18, 170:13
**sorting** [1] - 112:10
**sought** [2] - 81:6, 84:14
**sound** [4] - 38:12, 66:17, 174:4, 174:12
**sounds** [1] - 154:22
**source** [7] - 19:2, 37:9, 67:23, 125:9, 206:2, 214:4, 251:23
**sources** [8] - 110:22, 111:19, 120:8, 122:4, 122:10, 133:20, 136:12, 151:2
**South** [1] - 2:11
**Southern** [1] - 7:3
**SOUTHERN** [1] - 1:1
**spaced** [2] - 29:14, 97:23
**Spangler** [1] - 222:4
**speaker** [2] - 54:17, 54:21
**speaking** [1] - 224:11
**speaks** [4] - 79:2, 84:1, 94:15, 272:16
**special** [1] - 37:15
**specialist** [4] - 123:2, 132:23, 137:18, 175:21
**specialists** [3] - 130:7, 131:24, 132:13
**specialties** [2] - 132:10, 139:8
**specialty** [17] - 104:23, 115:17, 117:9, 117:22, 130:21, 131:9, 131:10, 131:13, 131:22, 133:5, 136:13, 136:16, 137:2, 139:6, 139:12, 178:8, 178:10
**specific** [33] - 21:22, 45:21, 62:20, 74:4, 83:6, 84:3, 94:4, 94:21, 99:21, 100:11, 100:15, 103:15, 104:12, 106:2, 121:25,

137:25, 189:22, 191:13, 197:18, 199:6, 217:18, 218:22, 220:14, 221:12, 221:15, 221:19, 222:17, 224:22, 226:3, 250:25, 251:1, 251:6, 251:9
**specifically** [21] - 10:21, 19:6, 29:15, 35:14, 36:18, 40:25, 41:21, 47:25, 52:13, 73:8, 80:15, 84:3, 99:8, 115:3, 136:5, 138:20, 154:7, 154:8, 157:13, 223:1, 230:23
**speculating** [1] - 103:1
**speculation** [1] - 140:25
**speculative** [1] - 69:21
**spent** [1] - 48:12
**spike** [1] - 207:11
**spoken** [3] - 54:24, 217:1, 217:4
**spot** [2] - 7:23, 41:2
**spreadsheet** [6] - 170:15, 226:2, 226:17, 231:19, 231:25, 271:8
**spreadsheets** [1] - 231:21
**sprint** [2] - 11:9, 11:12
**Square** [2] - 6:5, 6:12
**St** [1] - 178:1
**stack** [1] - 38:15
**staff** [1] - 276:4
**stamp** [1] - 148:18
**Stan** [1] - 24:10
**stand** [8] - 9:21, 63:1, 64:11, 64:21, 107:15, 211:24, 212:20, 257:9
**standard** [3] - 64:24, 89:19, 168:8
**standardize** [1] - 151:6
**standing** [1] - 156:1
**standpoint** [1] - 25:24
**STANNER** [1] - 5:10
**staple** [1] - 77:4
**start** [13] - 123:16, 145:9, 161:25, 182:19, 186:10, 186:13, 186:22, 216:11, 225:21, 225:25, 233:15, 234:25, 253:14

**started** [6] - 7:6, 52:8, 52:23, 184:8, 184:9, 260:15
**starting** [5] - 85:7, 162:2, 179:23, 197:24, 246:22
**Starting** [1] - 246:23
**starts** [2] - 71:25, 196:9
**state** [15] - 49:4, 54:7, 54:11, 115:1, 119:14, 123:7, 130:7, 131:11, 146:13, 172:2, 199:11, 199:16, 200:14, 200:22, 254:10
**State** [22] - 24:9, 52:4, 54:8, 57:5, 57:6, 119:9, 119:11, 129:25, 174:22, 188:25, 189:13, 233:22, 234:9, 234:11, 239:14, 253:7, 253:9, 258:5, 258:11, 258:23, 261:9, 275:23
**statement** [8] - 15:11, 15:20, 45:11, 45:25, 60:15, 91:8, 106:16, 254:18
**Statement** [2] - 135:24, 263:22
**statements** [5] - 35:25, 36:1, 39:13, 161:12, 272:22
**states** [11] - 12:10, 12:11, 40:25, 83:20, 133:1, 186:25, 207:18, 208:11, 209:5, 233:17, 260:21
**STATES** [2] - 1:1, 1:17
**States** [8] - 7:2, 24:23, 43:1, 62:21, 71:9, 104:19, 115:6, 210:21
**stating** [2] - 53:12, 68:24
**statistical** [2] - 151:1, 169:21
**statistics** [4] - 82:12, 170:6, 170:8, 170:13
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**stay** [2] - 8:13, 9:6
**Steele** [1] - 222:10
**Stein** [1] - 24:10
**stenography** [1] - 6:19
**steps** [1] - 151:5

**STEVEN** [1] - 4:20
**stick** [4] - 28:16, 162:12, 167:4, 227:6
**still** [11] - 54:25, 117:25, 156:20, 187:14, 188:24, 189:13, 196:3, 203:5, 212:2, 213:17, 241:15
**stipulation** [7] - 40:23, 41:17, 42:8, 126:3, 126:7, 148:25, 149:11
**stipulations** [1] - 126:11
**stood** [3] - 117:18, 123:15, 141:7
**stop** [1] - 259:23
**stopped** [2] - 259:10, 259:25
**stopping** [1] - 259:25
**store** [20] - 77:8, 85:13, 104:9, 104:16, 121:22, 130:17, 223:18, 225:3, 227:18, 228:2, 229:3, 229:5, 229:13, 229:25, 238:4, 238:6, 238:15, 240:7
**Store** [4] - 227:1, 232:8, 232:17, 232:20
**stores** [6] - 142:14, 225:8, 232:17, 238:8, 238:21, 240:5
**Strategies** [1] - 52:3
**strategies** [1] - 109:24
**streamline** [1] - 8:15
**Street** [16] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:16, 4:18, 4:21, 5:5, 5:12, 6:6, 6:13, 53:1
**strength** [4] - 74:21, 109:25, 117:15, 119:14
**stricken** [3] - 29:17, 30:19, 33:7
**strike** [7] - 100:24, 101:5, 153:17, 167:14, 167:19, 230:18, 231:5
**striking** [1] - 109:14
**stronger** [3] - 119:19, 119:23, 119:25
**strongly** [1] - 65:14
**struck** [1] - 36:18
**structure** [1] - 17:17
**structured** [1] -

105:14
**struggling** [1] - 98:9
**studies** [11] - 12:6, 12:18, 12:22, 13:23, 14:4, 14:6, 14:22, 106:10, 108:24, 109:21
**Studies** [1] - 12:12
**study** [4] - 21:9, 50:19, 109:12, 257:15
**stuff** [1] - 213:23
**Sub** [1] - 186:15
**subject** [15] - 25:23, 34:18, 58:2, 73:1, 113:14, 126:3, 134:15, 140:1, 140:22, 141:6, 153:6, 173:15, 181:10, 245:5, 245:8
**subjects** [1] - 8:17
**submit** [4] - 35:18, 57:10, 91:21, 268:3
**submitted** [2] - 34:1, 57:13
**Subparagraph** [1] - 186:18
**subpoena** [4] - 105:4, 246:17, 248:6, 248:13
**subscribes** [1] - 56:5
**subsequent** [1] - 233:3
**subsequently** [2] - 154:15, 235:6
**Substance** [2] - 198:16, 244:25
**substance** [2] - 102:2, 102:4
**Substances** [2] - 143:18, 143:20
**substances** [16] - 83:6, 85:9, 85:11, 87:4, 121:14, 166:12, 166:19, 185:25, 186:8, 186:12, 187:4, 192:18, 217:16, 218:21, 219:15, 272:24
**substantial** [12] - 19:23, 21:14, 21:24, 25:10, 25:13, 26:4, 26:12, 27:24, 29:1, 29:5, 32:1, 32:7
**suddenly** [1] - 90:8
**suffering** [2] - 22:19, 178:7
**sufficient** [4] - 13:7, 15:6, 15:15, 15:17
**sufficiently** [1] -

125:13
**suggested** [3] - 36:25, 72:18, 72:23
**suggesting** [3] - 34:19, 67:21, 67:25
**suggestions** [1] - 100:5
**suggestive** [1] - 13:13
**suggests** [1] - 15:5
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 3:17, 4:6, 4:9, 6:5, 6:12
**suited** [1] - 68:10
**summarize** [1] - 133:25, 138:23, 157:4
**summarizing** [1] - 138:17
**Summary** [1] - 206:3
**summary** [2] - 50:23, 233:18
**summations** [1] - 170:15
**summing** [1] - 170:14
**Sunday** [5] - 93:25, 96:18, 96:25, 99:22, 185:19
**super** [1] - 51:20
**Superior** [1] - 56:11
**supplement** [2] - 96:2, 154:11
**supplemental** [1] - 65:13
**supplementing** [1] - 114:3
**suppliers** [1] - 85:12
**supply** [3] - 30:15, 47:20, 71:16
**supplying** [1] - 84:4
**support** [8] - 21:9, 21:15, 22:21, 35:25, 39:4, 39:13, 89:9, 230:19
**supported** [3] - 32:9, 32:12, 32:15
**supporting** [4] - 37:9, 70:15, 151:9, 262:18
**supportive** [2] - 55:14, 91:4
**supports** [1] - 108:4
**suppose** [1] - 69:14
**supposed** [2] - 151:16, 227:14
**supposedly** [1] - 37:10
**surgery** [1] - 138:18
**surprised** [1] - 8:1
**surrender** [1] - 182:15
**surrendered** [4] - 123:11, 181:23,

182:10, 194:13
**surveillance** [1] - 109:23
**survey** [4] - 121:23, 151:21, 151:22
**susceptible** [1] - 151:11
**suspect** [1] - 82:15
**suspend** [2] - 233:18, 239:17
**suspended** [6] - 134:14, 194:12, 196:9, 235:3, 253:23, 261:5
**suspension** [2] - 138:18, 273:20
**Suspicious** [14] - 45:3, 45:5, 45:18, 87:15, 88:5, 90:21, 92:3, 144:11, 144:16, 159:17, 159:24, 160:6, 160:8, 164:16
**suspicious** [4] - 45:25, 88:2, 144:4, 166:6
**sustain** [18] - 24:25, 31:2, 33:17, 48:3, 48:5, 64:16, 65:16, 69:19, 69:22, 70:3, 90:16, 91:23, 92:5, 100:18, 110:17, 125:14, 149:24, 156:25
**sustained** [9] - 8:8, 10:23, 25:17, 33:5, 33:15, 34:24, 100:23, 101:8, 230:20
**sustaining** [1] - 37:19
**SUZANNE** [1] - 4:18
**switch** [1] - 250:3
**switched** [1] - 165:7
**SWORN** [1] - 49:8
**sworn** [1] - 154:12
**Sylvia** [1] - 18:22
**synonymous** [1] - 51:14
**system** [2] - 88:2, 215:10
**System** [7] - 88:6, 90:21, 92:4, 144:17, 159:24, 160:6, 160:8
**Systems** [2] - 87:16, 159:17

---

**T**

---

**tab** [1] - 130:4
**tabbed** [1] - 130:4

**Table** [14] - 181:3, 203:19, 207:21, 209:7, 210:2, 219:3, 220:12, 221:3, 221:17, 221:23, 221:25, 222:15, 239:12, 241:6

**table** [13] - 26:16, 203:18, 204:2, 206:1, 216:8, 217:21, 219:2, 219:12, 220:15, 221:5, 221:19, 239:23, 240:14

**tables** [8] - 78:22, 112:10, 175:10, 175:12, 177:15, 178:9, 199:7

**tabulated** [1] - 105:18

**tabulates** [1] - 73:25

**tabulations** [1] - 170:14

**talks** [4] - 19:17, 44:14, 54:20, 62:23

**targeting** [1] - 147:22

**Task** [5] - 22:17, 23:12, 23:17, 23:21, 24:7

**tasked** [1] - 70:8

**team** [2] - 56:13, 56:14

**technologies** [1] - 151:1

**TEMITOPE** [1] - 4:11

**tempt** [1] - 212:12

**ten** [4] - 157:20, 174:1, 180:14, 212:14

**ten-year** [1] - 157:20

**Tenth** [1] - 5:12

**tenth** [1] - 120:13

**term** [9] - 51:15, 60:22, 146:11, 146:19, 146:24, 169:20, 170:12, 179:18, 276:11

**terminal** [1] - 250:4

**termination** [1] - 273:21

**terms** [16] - 59:22, 106:19, 114:1, 117:12, 117:13, 117:15, 118:1, 119:17, 130:1, 155:18, 166:5, 210:14, 210:25, 211:7, 246:13

**test** [4] - 36:3, 36:6, 114:10, 189:16

**testified** [50] - 26:18, 29:13, 29:25, 33:25, 46:21, 57:19, 57:21,
65:3, 80:5, 82:17, 96:22, 108:3, 113:6, 114:15, 124:7, 124:9, 142:16, 145:5, 149:18, 157:25, 158:3, 158:15, 162:10, 163:3, 164:25, 168:25, 169:1, 173:14, 173:18, 181:18, 181:22, 187:21, 189:23, 190:20, 191:4, 193:12, 195:4, 195:10, 195:11, 195:12, 196:25, 197:19, 198:6, 218:13, 221:6, 233:2, 239:4, 240:17, 270:13, 270:15

**testifies** [1] - 63:13

**testify** [19] - 64:19, 69:12, 69:15, 80:8, 92:19, 102:18, 102:25, 103:3, 113:7, 113:12, 113:13, 154:17, 155:13, 173:22, 175:4, 177:14, 181:9, 189:15, 222:21

**testifying** [10] - 62:20, 69:17, 88:7, 90:20, 95:18, 99:23, 153:21, 165:18, 190:15, 224:14

**testimony** [87] - 23:13, 32:22, 33:24, 34:4, 34:5, 34:11, 34:12, 36:18, 36:24, 37:3, 37:4, 50:3, 50:8, 51:2, 58:2, 60:7, 60:23, 65:23, 68:14, 69:20, 71:18, 72:20, 73:14, 82:19, 93:25, 94:2, 98:10, 99:12, 99:14, 100:3, 100:24, 101:6, 103:18, 106:24, 107:6, 107:10, 108:24, 113:8, 114:4, 116:20, 123:17, 123:18, 123:25, 125:20, 130:23, 134:3, 153:4, 153:17, 153:18, 154:12, 158:6, 158:8, 158:12, 158:21, 159:1, 159:5,
160:10, 161:18, 161:20, 163:1, 172:5, 173:12, 175:9, 175:18, 176:7, 176:23, 177:18, 177:24, 178:10, 179:6, 179:8, 180:17, 188:10, 190:8, 194:19, 195:14, 196:20, 197:5, 197:20, 198:4, 260:22, 270:5, 270:12, 274:6

**text** [3] - 53:15, 172:22, 172:24

**THE** [276] - 1:1, 1:1, 1:4, 1:17, 7:12, 8:9, 9:8, 9:23, 9:24, 10:1, 10:19, 11:8, 11:13, 16:11, 16:17, 16:21, 16:23, 17:2, 18:1, 20:22, 21:1, 22:4, 23:23, 24:19, 24:24, 25:4, 25:20, 26:1, 26:2, 26:3, 26:15, 26:22, 26:24, 27:5, 27:8, 27:12, 27:13, 27:16, 28:2, 28:5, 28:10, 28:11, 28:12, 29:20, 29:23, 30:25, 31:2, 31:13, 32:3, 32:4, 33:15, 33:19, 34:7, 35:1, 35:5, 35:10, 35:22, 36:13, 36:15, 36:22, 37:17, 39:22, 40:9, 40:18, 41:25, 42:4, 42:9, 46:5, 46:20, 46:23, 46:25, 47:17, 47:23, 48:3, 48:8, 48:11, 48:14, 48:15, 48:19, 48:25, 49:3, 49:5, 49:11, 49:12, 49:15, 50:11, 55:20, 58:10, 58:19, 58:22, 58:25, 60:5, 60:17, 62:18, 63:9, 63:11, 64:7, 64:13, 64:15, 65:5, 65:15, 68:16, 69:16, 70:3, 71:21, 72:25, 77:19, 78:5, 79:24, 80:18, 80:22, 81:12, 81:17, 81:23, 82:14, 82:20, 82:23, 85:1, 86:4, 86:21, 87:22, 87:24, 88:10, 88:16, 88:18, 89:20, 90:11, 90:16, 91:23, 92:5, 92:20, 93:3, 94:7, 94:12, 94:14, 96:13,
97:10, 97:12, 97:18, 98:6, 98:20, 98:23, 100:14, 100:18, 101:5, 102:21, 102:25, 103:21, 104:6, 107:19, 108:1, 108:6, 109:3, 109:17, 109:21, 110:11, 110:16, 112:19, 112:25, 114:5, 114:22, 114:25, 115:9, 115:15, 116:23, 121:5, 122:22, 123:14, 124:11, 124:17, 125:14, 125:18, 125:24, 126:16, 126:18, 126:22, 126:25, 127:24, 128:3, 129:8, 129:16, 129:20, 129:21, 132:17, 134:7, 135:1, 135:7, 135:9, 135:16, 138:8, 139:2, 139:16, 141:2, 141:12, 141:18, 141:21, 142:22, 142:25, 143:4, 143:6, 148:21, 149:24, 150:4, 153:5, 153:19, 153:23, 154:2, 154:15, 154:20, 155:4, 155:7, 155:12, 155:23, 156:7, 156:8, 156:9, 156:10, 156:13, 156:14, 156:24, 158:9, 158:22, 158:25, 162:8, 162:20, 162:25, 163:6, 167:16, 167:18, 171:9, 171:16, 172:6, 172:9, 180:9, 180:22, 180:23, 194:7, 196:5, 196:7, 205:22, 209:20, 212:1, 212:2, 212:4, 213:22, 215:13, 215:16, 215:19, 215:22, 216:2, 231:3, 242:6, 243:5, 243:7, 244:13, 254:2, 256:2, 256:4, 256:6, 265:1, 265:2, 266:5, 268:8, 269:18, 269:23, 270:18, 270:20,
271:15, 272:2, 272:5, 272:8, 272:11, 274:13, 277:3, 277:5, 277:6

**themselves** [1] - 121:11

**thereafter** [1] - 164:3

**therefore** [3] - 36:6, 96:17, 107:11

**they've** [3] - 99:10, 229:20, 261:13

**thick** [2] - 97:23, 98:17

**third** [14] - 36:5, 42:24, 82:7, 85:10, 113:16, 117:13, 163:24, 195:10, 207:23, 208:1, 239:3, 246:13, 266:17

**third-party** [1] - 85:10

**thirdly** [1] - 37:8

**Thomas** [1] - 2:10

**thousands** [1] - 218:24

**Three** [1] - 6:5

**three** [23] - 6:12, 48:22, 86:2, 127:14, 140:1, 162:13, 177:19, 185:13, 185:16, 185:20, 187:12, 205:18, 226:20, 227:11, 227:19, 229:22, 232:13, 232:20, 234:20, 257:19, 259:13, 265:15, 267:21

**three-day** [1] - 48:22

**three-digit** [1] - 205:18

**three-month** [8] - 185:13, 187:12, 226:20, 227:11, 227:19, 229:22, 232:13, 232:20

**threshold** [6] - 88:2, 88:9, 90:3, 91:13, 95:1, 274:2

**thresholds** [3] - 87:11, 87:17, 88:22

**throughout** [3] - 40:5, 200:20, 237:9

**Tiano** [1] - 120:19

**tie** [1] - 44:10

**tight** [1] - 9:6

**timeline** [1] - 184:7

**Timothy** [7] - 219:18, 240:24, 241:1, 241:4, 241:8, 241:15, 242:4

**TIMOTHY** [1] - 5:9

**title** [2] - 22:24, 256:10
**titled** [2] - 38:10, 254:4
**titration** [2] - 186:3, 187:9
**today** [38] - 7:7, 9:14, 29:23, 30:5, 37:7, 43:24, 50:3, 60:23, 81:7, 99:23, 100:1, 103:18, 108:25, 125:7, 140:1, 145:5, 159:15, 175:4, 175:9, 175:13, 175:18, 175:22, 176:7, 176:23, 177:14, 177:20, 189:18, 193:12, 194:19, 195:14, 197:5, 219:17, 219:24, 222:1, 241:16, 243:4, 243:13, 257:7
**today's** [1] - 178:10
**together** [2] - 39:12, 105:17
**took** [13] - 8:3, 36:4, 53:4, 63:5, 182:19, 182:21, 183:9, 183:18, 183:22, 184:4, 233:18, 265:11, 265:15
**tool** [1] - 82:11
**tools** [2] - 51:18, 52:15
**top** [103] - 61:8, 61:12, 63:15, 66:4, 66:11, 66:12, 66:13, 66:15, 66:17, 66:19, 76:18, 77:1, 82:12, 82:13, 83:2, 83:3, 83:4, 84:18, 84:20, 85:12, 85:13, 87:5, 87:6, 102:14, 103:12, 112:5, 116:16, 117:12, 118:15, 118:25, 119:2, 119:5, 120:12, 120:14, 120:21, 121:12, 123:9, 129:21, 137:19, 137:24, 139:7, 140:5, 140:11, 140:19, 140:21, 148:18, 165:2, 165:9, 165:20, 166:22, 167:8, 167:12, 167:25, 168:24, 169:24, 170:3, 170:18, 171:4, 173:19,

173:23, 174:1, 174:2, 174:4, 174:11, 174:17, 174:20, 174:24, 175:3, 175:5, 175:19, 176:16, 177:13, 180:14, 181:10, 189:25, 190:4, 190:5, 190:8, 190:10, 190:16, 191:22, 193:15, 193:19, 198:2, 198:7, 199:2, 202:13, 202:24, 219:13, 219:23, 220:21, 221:6, 227:8, 232:17, 238:5, 250:13, 251:7, 253:20, 253:24, 269:10, 272:17
**top-line** [2] - 82:12, 83:2
**Topeka** [1] - 50:17
**topic** [1] - 107:17
**total** [38] - 15:5, 37:6, 59:17, 59:19, 61:15, 62:13, 62:14, 67:11, 69:5, 74:10, 104:14, 104:23, 112:2, 112:6, 112:11, 117:9, 117:10, 118:1, 118:2, 119:2, 132:6, 175:11, 201:11, 201:12, 201:15, 201:20, 202:8, 203:23, 203:24, 217:22, 223:12, 223:13, 240:19, 240:21, 241:1, 241:4, 271:5
**totaling** [2] - 202:25, 203:10
**totally** [1] - 213:22
**totals** [4] - 119:6, 131:18, 131:19, 181:3
**touch** [1] - 193:10
**towards** [2] - 14:19, 76:24
**Tower** [2] - 3:4, 4:21
**track** [5] - 9:10, 9:11, 125:25, 199:10, 205:17
**Track** [2] - 147:6, 231:17
**tracks** [1] - 147:16
**traders** [1] - 53:10
**trades** [5] - 53:12, 53:13, 53:14, 53:16,

53:19
**trailed** [1] - 68:24
**training** [2] - 110:20, 166:1
**Tran** [1] - 115:6
**transcript** [4] - 6:19, 173:3, 197:21, 278:4
**transition** [1] - 31:19
**transitioning** [2] - 17:10, 18:9
**treated** [1] - 123:12
**treating** [2] - 123:4, 181:20
**treatment** [5] - 127:19, 136:8, 176:10, 262:15, 262:23
**treats** [1] - 178:7
**trend** [2] - 207:8, 207:10
**trended** [1] - 199:16
**trends** [4] - 51:10, 53:5, 75:11, 263:2
**trial** [12] - 8:25, 9:1, 37:7, 41:12, 57:21, 110:6, 113:6, 114:3, 126:12, 147:18, 157:25, 197:20
**TRIAL** [1] - 1:16
**Trial** [1] - 277:8
**tried** [2] - 261:23
**trier** [1] - 91:22
**trinity** [1] - 273:14
**trip** [1] - 48:12
**Trong** [1] - 115:6
**true** [6] - 21:11, 25:12, 27:22, 47:21, 220:18, 245:16
**trust** [1] - 229:21
**truth** [4] - 106:25, 107:3, 107:16, 213:2
**truthful** [1] - 161:20
**try** [9] - 20:23, 98:16, 103:8, 109:18, 147:14, 156:2, 227:25, 248:9, 255:6
**Try** [1] - 228:10
**trying** [9] - 8:15, 86:16, 109:14, 155:20, 156:18, 171:13, 172:3, 248:8, 249:18
**turn** [19] - 51:4, 86:7, 95:7, 103:15, 116:8, 118:21, 137:7, 137:23, 176:1, 185:6, 203:6, 219:2, 226:23, 227:7, 234:25, 256:20, 271:13, 272:17, 273:23

**turning** [3] - 131:3, 271:23, 272:13
**Twelfth** [3] - 4:16, 4:18, 5:5
**twice** [2] - 238:7, 238:10
**Two** [2] - 136:4, 263:3
**two** [55] - 8:22, 16:5, 26:18, 33:23, 44:20, 45:9, 48:1, 52:18, 55:25, 64:25, 74:25, 75:2, 80:24, 84:3, 91:2, 91:12, 97:23, 100:6, 100:12, 100:14, 113:24, 132:9, 141:16, 151:7, 162:14, 180:14, 181:5, 194:10, 207:3, 209:14, 215:2, 215:6, 218:14, 223:20, 224:4, 224:9, 224:13, 224:17, 225:15, 226:25, 228:25, 231:14, 231:20, 232:16, 238:21, 240:5, 243:14, 243:17, 255:17, 255:22, 256:14, 257:12, 263:24, 265:16, 265:23
**two-hour** [1] - 8:22
**two-year** [4] - 255:17, 255:22, 256:14, 257:12
**type** [11] - 19:5, 69:1, 78:6, 79:3, 84:13, 115:4, 161:11, 178:12, 246:18, 247:21, 252:4
**types** [7] - 71:4, 71:7, 73:8, 73:21, 78:12, 79:9, 115:16
**typo** [1] - 219:7

# U

**U.S** [1] - 225:4
**ultimately** [2] - 142:19, 206:24
**unable** [1] - 36:8
**unavoidable** [1] - 8:17
**unavoidably** [1] - 7:25
**uncertain** [8] - 13:1, 13:19, 13:21, 14:8, 14:10, 14:16, 14:18, 14:24
**under** [13] - 12:10, 34:15, 78:3, 132:1,

161:17, 186:1, 194:11, 218:16, 242:20, 254:23, 256:12, 267:20, 273:24
**undergraduate** [1] - 50:16
**underlying** [6] - 19:17, 19:24, 35:25, 36:2, 36:9, 37:9
**underscore** [1] - 113:15
**underscoring** [1] - 37:8
**understood** [2] - 46:18, 64:17
**undertake** [3] - 246:14, 246:24, 247:6
**undisclosed** [1] - 153:17
**undisputed** [1] - 8:3
**unfair** [1] - 96:8
**unhelpful** [1] - 164:15
**unintentional** [1] - 43:6
**unique** [1] - 218:22
**unit** [3] - 210:9, 210:10, 211:3
**United** [8] - 7:2, 24:22, 43:1, 62:21, 71:9, 104:19, 115:6, 210:21
**UNITED** [2] - 1:1, 1:17
**units** [50] - 61:14, 61:16, 61:19, 61:25, 74:11, 104:14, 104:23, 117:11, 117:13, 118:1, 118:4, 118:7, 119:8, 119:17, 120:19, 120:20, 121:16, 129:25, 130:1, 130:8, 130:15, 131:16, 131:17, 132:2, 132:4, 132:5, 133:8, 133:10, 133:12, 174:19, 199:15, 200:25, 201:8, 201:11, 201:12, 201:20, 202:9, 202:13, 202:25, 203:11, 208:2, 210:12, 211:3, 211:12, 211:14, 211:18, 212:10, 214:12, 241:3, 241:4
**University** [8] - 24:8, 24:10, 24:11, 33:25,

36:5, 37:13, 37:15, 50:17
**unlawful** [1] - 116:10
**unless** [3] - 69:20, 249:25, 274:15
**unlisted** [1] - 41:9
**unnecessary** [2] - 165:10, 165:21
**unsupported** [1] - 91:6
**untrue** [1] - 99:21
**up** [68] - 8:3, 15:25, 17:7, 17:9, 17:25, 19:12, 22:12, 23:3, 23:20, 26:8, 48:25, 55:20, 58:13, 80:1, 84:18, 100:19, 121:19, 123:15, 141:16, 148:17, 150:6, 161:22, 162:13, 170:14, 173:3, 175:16, 181:25, 182:4, 184:24, 191:5, 197:21, 201:3, 203:5, 206:1, 210:2, 212:18, 215:24, 218:9, 218:10, 219:4, 223:7, 224:21, 225:13, 226:5, 229:17, 231:10, 231:25, 232:16, 232:17, 236:15, 239:11, 240:13, 241:21, 241:22, 245:19, 245:24, 246:2, 246:19, 248:17, 249:21, 256:17, 260:9, 263:7, 266:3, 270:8, 270:16, 275:1, 275:10
**updating** [1] - 154:13
**upper** [1] - 254:8
**upside** [1] - 77:4
**upward** [2] - 205:2, 207:8
**upwards** [2] - 61:13, 131:16
**usage** [1] - 85:15
**useful** [2] - 160:5, 160:8
**user** [1] - 82:11
**users** [2] - 12:13, 12:23
**Users** [1] - 38:12
**uses** [2] - 108:12, 108:19
**usual** [1] - 64:24
**Utah** [1] - 57:7

**utilized** [1] - 245:18

## V

**validate** [2] - 206:6, 206:9
**value** [1] - 211:4
**Values** [1] - 254:24
**values** [1] - 133:4
**variance** [2] - 120:21, 151:12
**variances** [1] - 115:19
**variety** [1] - 186:6
**various** [7] - 23:4, 54:14, 72:21, 176:18, 179:7, 196:16, 273:5
**vast** [1] - 18:10
**Ventura** [1] - 3:18
**veracity** [1] - 33:21
**verbiage** [1] - 67:14
**Vermund** [1] - 24:11
**version** [2] - 85:15, 249:4
**Veterans** [1] - 146:23
**via** [1] - 51:19
**view** [5] - 7:17, 7:25, 15:13, 60:3, 150:16
**Virginia** [80] - 4:21, 7:3, 7:4, 27:22, 62:24, 66:8, 76:21, 78:3, 119:9, 119:12, 123:3, 123:8, 125:1, 127:6, 130:1, 135:25, 138:16, 138:19, 174:22, 176:24, 177:7, 177:9, 178:20, 178:22, 181:18, 182:1, 182:6, 182:7, 182:13, 183:2, 183:5, 183:13, 183:21, 183:24, 184:3, 184:10, 184:14, 185:3, 185:9, 188:25, 189:14, 189:20, 194:1, 194:10, 194:15, 197:13, 198:14, 198:24, 200:4, 207:23, 208:15, 208:20, 208:25, 209:2, 209:4, 209:11, 209:12, 225:4, 233:22, 234:9, 234:11, 252:23, 253:7, 253:10, 253:16, 254:5, 254:9, 255:22,

256:11, 256:21, 258:5, 258:11, 258:23, 259:18, 266:8, 268:2, 273:21, 275:23, 275:24
**VIRGINIA** [2] - 1:1, 1:18
**virtue** [2] - 34:15, 100:16
**visit** [3] - 148:3, 274:19, 274:23
**visually** [3] - 61:3, 61:4, 130:20
**VOLUME** [1] - 1:16
**volume** [49] - 27:23, 28:23, 30:1, 30:2, 30:5, 30:7, 31:7, 31:17, 31:23, 31:25, 45:15, 59:18, 59:19, 61:7, 61:15, 62:2, 62:4, 62:8, 62:10, 94:18, 94:20, 94:25, 110:23, 112:15, 113:17, 113:20, 115:17, 115:18, 115:22, 121:9, 121:10, 129:11, 130:3, 130:5, 133:11, 139:12, 165:3, 168:12, 168:15, 168:16, 168:17, 201:21, 228:18, 241:1, 241:4, 250:17
**volumes** [1] - 115:15
**voluntarily** [1] - 123:10
**voluntary** [1] - 182:15
**volunteered** [1] - 32:24
**vote** [1] - 237:8
**vs** [2] - 115:6, 278:6

## W

**wait** [1] - 36:13
**WAKEFIELD** [1] - 5:13
**Walgreens** [20] - 142:12, 142:14, 224:5, 224:11, 224:12, 224:17, 225:3, 225:8, 226:3, 226:4, 226:12, 226:16, 229:11, 231:14, 231:25, 232:12, 232:24, 237:16, 238:4, 271:2
**walk** [1] - 24:6
**walking** [2] - 10:20,

106:23
**wants** [3] - 91:9, 242:17, 274:15
**War** [2] - 7:13, 8:20
**ward** [1] - 182:14
**Washburn** [1] - 50:17
**Washington** [7] - 4:7, 4:10, 4:17, 4:19, 5:5, 5:12, 57:5
**ways** [4] - 8:15, 22:19, 78:14, 183:19
**webb** [1] - 189:12
**WEBB** [1] - 3:11
**Webb** [107] - 3:12, 66:10, 77:6, 77:12, 106:3, 106:4, 117:7, 118:12, 119:5, 120:4, 120:18, 121:13, 122:15, 122:17, 122:25, 123:3, 124:20, 125:2, 127:7, 128:17, 129:21, 130:8, 130:16, 131:8, 132:7, 181:13, 181:19, 181:23, 182:6, 182:22, 183:9, 183:19, 183:22, 184:4, 184:11, 184:15, 184:20, 185:3, 185:8, 185:12, 185:24, 186:7, 187:13, 187:22, 188:6, 188:12, 188:22, 188:24, 189:3, 189:8, 189:11, 189:19, 189:24, 189:25, 190:9, 190:16, 190:24, 193:1, 193:5, 193:18, 197:16, 221:11, 222:21, 223:2, 223:4, 223:19, 223:22, 224:22, 225:3, 226:12, 227:8, 227:12, 227:18, 229:2, 229:10, 229:23, 230:2, 230:3, 232:3, 232:10, 241:7, 241:13, 253:14, 253:15, 256:20, 258:8, 258:12, 259:11, 259:15, 260:7, 260:12, 261:6, 263:15, 265:15, 270:9,

271:10, 272:14, 272:16, 273:1, 273:2, 273:3, 273:4, 273:5, 273:12, 273:19, 274:9
**Webb's** [15] - 127:17, 128:21, 129:11, 130:20, 131:21, 132:19, 133:14, 133:19, 181:25, 263:2, 271:3, 273:8, 273:14, 273:20, 273:21
**website** [9] - 108:22, 175:20, 182:2, 182:13, 253:21, 253:25, 254:4, 256:22, 275:24
**websites** [4] - 253:17, 273:17, 273:18, 276:2
**week** [1] - 157:25
**weekly** [1] - 74:10
**weeks** [2] - 156:14, 197:19
**weight** [2] - 68:17, 72:25
**Weimer** [1] - 220:3
**welcome** [2] - 48:20, 68:4
**West** [78] - 7:3, 7:4, 27:22, 62:23, 66:8, 76:21, 78:2, 119:9, 119:11, 123:2, 123:8, 125:1, 127:6, 130:1, 135:25, 138:16, 138:19, 174:22, 176:24, 177:6, 177:9, 178:20, 178:22, 181:18, 182:1, 182:5, 182:7, 182:13, 183:2, 183:5, 183:13, 183:21, 183:24, 184:3, 184:10, 184:14, 185:3, 185:9, 188:25, 189:14, 189:20, 194:1, 194:10, 194:15, 197:13, 198:14, 198:24, 200:4, 207:22, 208:15, 208:20, 208:25, 209:2, 209:4, 209:11, 209:12, 225:4, 233:22, 234:9, 234:11, 252:23, 253:7, 253:9,

253:16, 254:5, 254:9, 255:22, 256:11, 256:21, 258:5, 258:11, 258:23, 259:18, 266:8, 268:2, 273:21, 275:23
**WEST** [2] - 1:1, 1:18
**whatsoever** [1] - 174:25
**white** [1] - 212:12
**whole** [4] - 37:17, 96:21, 203:22, 223:15
**wholesale** [9] - 44:7, 44:10, 44:24, 45:2, 45:19, 45:20, 45:22, 46:6, 144:1
**wholesaler** [2] - 72:11, 72:19
**WICHT** [115] - 4:15, 55:9, 55:18, 58:11, 62:16, 62:19, 64:8, 69:11, 72:17, 79:25, 80:23, 81:8, 82:15, 85:24, 87:13, 88:8, 89:17, 91:18, 95:15, 96:24, 97:13, 97:20, 99:18, 99:24, 102:17, 107:5, 109:9, 110:9, 113:1, 114:24, 115:1, 115:14, 123:15, 125:4, 126:13, 134:24, 135:2, 140:24, 143:5, 143:7, 143:9, 148:15, 148:16, 149:6, 149:17, 149:25, 150:8, 150:10, 153:9, 155:10, 157:1, 157:2, 158:11, 159:2, 161:22, 161:24, 162:23, 163:2, 163:8, 167:14, 167:20, 171:12, 171:18, 172:1, 172:8, 172:11, 172:12, 173:3, 173:5, 175:16, 175:17, 176:14, 176:15, 177:22, 177:23, 178:4, 178:5, 178:18, 178:19, 180:3, 180:12, 180:21, 180:24, 184:24, 185:1, 194:6, 194:9, 196:4,

196:6, 197:21, 197:23, 199:21, 199:22, 203:16, 203:17, 204:22, 204:24, 205:20, 205:23, 209:17, 209:22, 209:23, 211:25, 212:3, 212:6, 212:9, 213:16, 213:19, 213:24, 215:11, 215:15, 215:21, 215:23, 270:11, 277:1
**Wicht** [16] - 64:7, 80:22, 81:13, 112:25, 123:14, 143:4, 143:11, 143:12, 149:24, 156:4, 156:25, 172:10, 215:19, 216:10, 245:14, 269:2
**Wicht's** [1] - 230:8
**wide** [1] - 255:8
**Widespread** [1] - 43:5
**widespread** [1] - 44:19
**Williams** [2] - 4:16, 5:4
**willing** [1] - 107:9
**Wilson** [3] - 10:13, 10:16, 11:15
**wind** [2] - 185:13, 185:20
**winding** [5] - 185:9, 185:18, 185:23, 187:8, 187:13
**wish** [3] - 65:11, 250:23, 277:4
**Withdraw** [2] - 268:20
**withheld** [1] - 37:16
**witness** [38] - 9:21, 16:18, 26:18, 33:7, 33:23, 33:24, 34:13, 34:14, 34:17, 41:10, 41:15, 41:16, 46:3, 48:15, 55:15, 59:23, 62:17, 63:6, 67:14, 67:18, 68:7, 89:13, 91:3, 91:9, 96:9, 98:21, 102:23, 106:17, 114:4, 123:23, 124:2, 125:20, 129:15, 135:3, 154:12, 155:5, 155:21, 270:13
**WITNESS** [35] - 9:23, 26:1, 26:3, 27:8,

27:12, 28:10, 28:12, 32:4, 46:5, 48:14, 49:3, 49:5, 49:8, 49:12, 49:15, 88:18, 94:14, 104:6, 109:21, 115:15, 129:21, 156:8, 156:10, 156:14, 158:25, 180:23, 194:7, 196:5, 196:7, 212:2, 212:4, 243:5, 265:2, 270:20, 277:5
**witness's** [3] - 72:20, 107:6, 172:5
**witnesses** [1] - 48:22
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**wondered** [1] - 227:22
**word** [17] - 25:10, 46:8, 46:9, 55:16, 61:23, 82:8, 82:10, 88:9, 115:7, 124:2, 124:3, 169:16, 228:6, 228:7, 255:11, 255:12, 255:13
**words** [11] - 21:21, 26:7, 42:6, 45:20, 46:5, 74:13, 92:23, 176:13, 178:2, 198:5, 276:16
**Worker's** [11] - 181:19, 182:22, 183:5, 183:10, 183:13, 184:11, 257:25, 258:4, 258:25, 259:1, 273:22
**workers** [2] - 123:4, 181:20
**Workman's** [3] - 123:3, 123:8, 230:15
**works** [1] - 90:9
**world's** [1] - 12:2
**worry** [1] - 48:21
**worth** [3] - 78:18, 78:21, 162:21
**write** [6] - 212:12, 212:18, 258:20, 268:14, 268:23, 269:7
**writing** [6] - 8:21, 202:24, 203:10, 203:13, 204:18, 268:20
**written** [33] - 10:13, 39:15, 39:16, 39:20, 39:25, 43:3, 43:13, 61:8, 128:16, 130:15, 145:23,

146:8, 157:10, 165:8, 165:19, 166:22, 167:8, 167:25, 170:18, 171:4, 179:19, 188:6, 189:19, 191:24, 194:21, 195:1, 195:15, 197:5, 202:5, 202:13, 206:25, 252:15, 257:4
**wrote** [3] - 74:20, 121:13, 244:6
**WU** [1] - 5:10
**WV** [7] - 2:8, 3:10, 3:13, 4:22, 5:15, 6:9, 10:6
**WVU** [1] - 23:25

## X

**Xanax** [1] - 115:21
**Xponent** [78] - 58:4, 71:10, 73:22, 74:8, 75:16, 104:17, 104:20, 105:10, 105:16, 105:19, 105:23, 105:25, 106:2, 106:6, 107:10, 108:11, 108:12, 108:20, 108:24, 109:8, 110:2, 110:5, 110:22, 112:3, 112:5, 117:6, 121:19, 121:22, 123:10, 128:14, 128:15, 128:20, 145:7, 145:10, 145:18, 145:21, 145:24, 146:2, 146:5, 146:9, 146:22, 147:2, 147:20, 148:7, 151:3, 152:9, 152:14, 152:19, 152:22, 152:24, 153:12, 154:6, 156:12, 157:5, 157:13, 159:13, 159:16, 159:23, 160:5, 160:22, 161:6, 165:1, 165:4, 189:23, 190:2, 190:7, 190:12, 195:4, 199:9, 204:1, 208:5, 209:24, 211:13, 216:10, 219:8, 252:5, 270:21

## Y

**Yale** [1] - 24:11
**year** [28] - 56:10, 56:14, 61:13, 61:14, 61:22, 61:24, 117:23, 129:22, 133:13, 157:20, 174:3, 174:4, 174:19, 199:16, 203:1, 214:22, 235:2, 239:8, 239:12, 239:20, 240:2, 240:4, 255:17, 255:22, 256:14, 257:12, 265:11, 270:6
**year's** [2] - 78:18, 78:21
**years** [25] - 51:18, 157:21, 184:11, 189:3, 194:17, 211:4, 211:10, 211:16, 211:17, 211:18, 211:19, 212:14, 213:5, 213:12, 257:5, 257:10, 257:19, 263:12, 265:8, 265:12, 265:15, 265:16, 265:23, 265:25
**yesterday** [16] - 7:8, 8:1, 8:19, 8:24, 9:5, 17:5, 26:19, 27:9, 29:13, 30:11, 32:21, 35:16, 38:6, 38:14, 63:2, 97:15
**York** [22] - 3:5, 52:4, 52:7, 52:25, 53:3, 54:1, 54:8, 55:2, 56:10, 56:23, 57:5, 57:6, 93:21, 94:11, 95:25, 96:17, 97:22, 98:25, 99:9, 100:9, 100:17, 101:2
**Young** [1] - 24:11
**yourself** [6] - 18:4, 49:18, 167:22, 179:10, 206:5, 264:7
**Youth** [1] - 38:11

## Z

**Zanaflex** [1] - 273:13
**zero** [1] - 133:3
**zip** [3] - 85:18, 85:21, 205:18