IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
            Plaintiff,          :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
            Defendants.  :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
            Plaintiff,          :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
            Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 28
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


JUNE 16, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:            Ayme Cochran, RMR, CRR
Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A.

 2    Faber, Senior Status Judge, United States District

 3    Court, Southern District of West Virginia, in

 4    Charleston, West Virginia, on June 16, 2021, at 9:00

 5    a.m., as follows:

 6              THE COURT:  Good morning.

 7              MS. SINGER:  Good morning, Your Honor.

 8              THE COURT:  Good morning, Ms. Singer.

 9              MS. SINGER:  Unless there is any other business,

10    plaintiffs are ready to call Dr. Nancy Young.

11              THE COURT:  All right.

12          Dr. Young, if you will stand right there, the clerk

13    will give you the oath.

14              THE WITNESS:  All right.

15              COURTROOM DEPUTY CLERK:  Please state your name.

16              THE WITNESS:  Nancy Katherine Young.

17              COURTROOM DEPUTY CLERK:  Thank you.  Please raise

18    your right hand.

19              DR. NANCY YOUNG, PLAINTIFF WITNESS, SWORN

20              COURTROOM DEPUTY CLERK:  Thank you.  Please take a

21    seat.

22              THE WITNESS:  Good morning, Your Honor.

23              THE COURT:  Good morning.

24                        DIRECT EXAMINATION

25              BY MS. SINGER:
```

1    **Q.**   Good morning, Dr. Young.  Can you please state your

2    full name for the record?

3    **A.**   Dr. Nancy Katherine Young.

4    **Q.**   And, Dr. Young, did you prepare slides to assist with

5    your testimony today?

6    **A.**   Yes, I did.

7    **Q.**   And do those slides address your educational background

8    and your professional career?

9    **A.**   Yes, they do.

10   **Q.**   And would they assist in your testimony today?

11   **A.**   Yes, they would.

12          MS. SINGER:  Your Honor, may we publish those

13   slides, please?

14          THE COURT:  Yes, you may.

15          BY MS. SINGER:

16   **Q.**   All right.  Dr. Young, does the first slide describe

17   your educational background?  Can you see that?

18   **A.**   Yes, I can.  Thank you.

19   **Q.**   Okay.  And can you take the Court, please, through your

20   educational background?

21   **A.**   As stated, 1987 Bachelor's of Art in Sociology, Masters

22   Social Work Degree in 1989.  I went straight through to the

23   Ph.D. program with a conservation in Social Policy.  One of

24   the awards during my education was I was a fellow with the

25   National Institute on Drug Abuse, which was something I

```
 1   applied for and was successful in that application.
 2   Q.    And what is your current occupation?
 3   A.    I'm an Executive Director of Children and Family
 4   Futures which is a non-profit organization based in Southern
 5   California.
 6   Q.    And what does -- what does your work or Children and
 7   Family Futures work entail?
 8   A.    We work exclusively on the public policy issues
 9   affecting children of parents with Substance Use Disorders.
10   We work in the policy arena.  So, we develop knowledge and
11   we provide technical assistance.  So, we disseminate that
12   knowledge to states, communities, tribes in child welfare,
13   substance use treatment and courts.
14   Q.    And what does technical assistance to these states,
15   tribes and communities involve, Dr. Young?
16   A.    Well, as I've said, it's about developing knowledge,
17   understanding what works, understanding from communities
18   what they've tried and what was successful, and then
19   disseminating that information to others that are trying to
20   tackle these challenges for families.
21   Q.    And did you prepare a slide that demonstrates the
22   technical assistance programs that you provide?
23   A.    Yes, I did.
24   Q.    And would that slide assist your testimony?
25   A.    Yes, it would.
```

```
 1              MS. SINGER:  Your Honor, may we publish Slide 6,

 2     please?

 3              THE COURT:  Yes, you may.

 4              BY MS. SINGER:

 5     Q.   And, Dr. Young, does this slide describe the technical

 6     assistance programs that you're currently involved in?

 7     A.   Those are the major programs we're currently involved

 8     in.  The ones with asterisks are things that are on the

 9     ground in West Virginia.  In particular, the regional

10     partnership grant, you may have heard of.  There's one in

11     Cabell County.  That is the -- the grantee is Prestera.  So,

12     all of these are technical assistance in various communities

13     around the country.

14          Right now, we're working in about 18 states in the

15     program of in-depth technical assistance on infants with

16     prenatal substance exposure.  These are states that have

17     asked us to help them solve these issues and improve their

18     practice and policies.

19          There are about 40 or so regional partnership grants.

20     Those are funded by the Children's Bureau trying to bring

21     systems together because families need services from more

22     than one system, but the Family Treatment Court Technical

23     Assistance Program, is funded by the Department of Justice.

24          We're responsible for helping family treatment courts,

25     or sometimes they're called family drug courts, all across
```

1    the country and there are about 50 grantees right now that

2    we provide services to and the State of West Virginia, the

3    Supreme Court, is one of the cites that we have staff

4    assigned to.

5    **Q.**    And in the course of the technical assistance work you

6    do, have you had a chance to observe the impact of Substance

7    Use Disorder on child welfare agencies and the strategies

8    that have been implemented to address Substance Abuse

9    Disorder?

10   **A.**    Yes, definitely.  We were -- we began -- I began this

11   work in 1993.  Children and Family Futures was originated in

12   1996.  So, we've been monitoring these trends and looking at

13   programs and providing this assistance to communities for

14   25 years in November.  It's our anniversary.

15   **Q.**    Now, do all of the programs that you described, Dr.

16   Young, relate to children, families and pregnant women with

17   Substance Abuse Disorders?

18   **A.**    Yes, they do.  Yes, they do.  The children of veterans

19   work is a new area.  You know, when persons are separated

20   from the military, they have services and treatment that's

21   available during the time that they're in active duty, but

22   once they're separated from the military, the children that

23   also have impacts from their parents' deployment and other

24   conditions that they've been through also need help.  So,

25   we're excited about that opportunity.

1    **Q.**   And with whom does Children and Family Futures work in

2    the different state programs in which it's involved?

3    **A.**   We help these jurisdictions understand what's working

4    and what their challenges are.  It sounds like it would be

5    so simple.  Okay, substance use treatment?  You go work with

6    the child welfare agency.  You go work with the attorney and

7    judges and things will just be fine.

8        But what we find is that the rigid funding streams, the

9    way in which outcomes are measured across the systems, the

10   way in which staff development happens, they often don't

11   work together.

12       So, over these years, we have developed -- we call them

13   TA tools, or technical assistance tools, and it helps these

14   jurisdictions assess what's working and what their

15   challenges are and what they need to put in place for a plan

16   to improve those services.

17       More recently, we've been working a lot, since about

18   2010, with the healthcare providers directly because of the

19   increase in infants that have been placed in protective

20   custody.

21   **Q.**   And, Dr. Young, to your knowledge, are there any other

22   organizations that provide similar services or support to

23   child welfare programs across the country?

24   **A.**   No.  We really are the -- the game.  We really have the

25   expertise.  We have almost 70 employees located all over the

1    country.  We have staff offices in Ohio and in Kentucky.

2    So, we are the -- the go-to that the government goes to for

3    any of these kinds of initiatives.

4    **Q.**   And, Dr. Young, did you prepare a slide that lays out

5    the speeches and presentations that you've given on your

6    work?

7    **A.**   Yes, I did.

8    **Q.**   And would that slide assist your testimony this

9    morning?

10   **A.**   Yes, it would.

11          MS. SINGER:  Your Honor, may we publish that

12   slide?

13          THE COURT:  Yes.

14          MS. SINGER:  Slide 3, please.

15          BY MS. SINGER:

16   **Q.**   And, Dr. Young, does this slide provide the

17   presentations and testimony in which you've been involved on

18   child welfare issues?

19   **A.**   Only a small number of them and very recent ones.  The

20   most recent I presented with the Department of Health and

21   Human Services and the Department of Justice at the American

22   Bar Association Conference For Children on the -- and the

23   Law.  The Legal Aspects of NAS and Confidentiality I

24   presented to the Assistant Secretary for Health for the

25   Department of Health and Human Services in March.  It was a

1    convening that they're trying to get a handle on how do you

2    establish clinical criteria for Neonatal Abstinence Syndrome

3    or withdrawal and they asked me to present information.

4         That's a sampling of the times that I've testified at

5    Congress and the Senate and a few of the publications that

6    are specific to this topic area, the Family Treatment Court

7    Best Practice Standards were, again, funded by the

8    Department of Justice and SAMHSA, the Substance Abuse and

9    Mental Health Service Administration and Children's Bureau

10   funded this monograph on A Collaborative Approach for

11   Pregnant and Parenting Women with Opioid Use Disorders.

12   **Q.**   And, Dr. Young, you mentioned that this was a sample of

13   your publications and speeches.  Roughly how many other

14   articles and publications have you authored?

15   **A.**   In the scientific literature, probably 10-15, but that

16   hasn't really been my career.  My career has been more of

17   what they call the gray material, things that the government

18   publishes.

19        We've been the contractor to the Children's Bureau who

20   funds child welfare and they jointly fund the National

21   Center on Substance Abuse and Child Welfare.  We've been

22   that contractor since 2002.  So, 19 years.

23        During that time, I'd say, reports, we've done well

24   over 50 reports to the federal government similar to this

25   consensus document that SAMHSA published.

1    Q.   And are all of those publications related to child

2    welfare, pregnant women, children and family services?

3    A.   Yes.

4    Q.   And has any of your work related to the impact of the

5    opioids in particular?

6    A.   Yes.  In fact, it was about 2010 or so that our project

7    officer from SAMHSA tasked us with really getting a handle

8    on what was going on with opioids.  They had, you know, the

9    emerging data, 2010, about the impact in the child welfare

10   system and asked us to do first this monograph, as well as

11   really understand what the impact was.  So, we've been at

12   that for about a decade of really understanding the impacts

13   of opioids on children and families.  And various

14   initiatives that we've -- some that we've talked about

15   already today have been specifically about families affected

16   by opioids.

17   Q.   And in how many different states have you worked on

18   matters directly related to opioids?

19   A.   In my career, since 1996 or so, I've actually been to

20   every state.  I've either given a speech, or facilitated a

21   work group.  But, right now, I think I ran through some of

22   the numbers of states that we're working in right now.

23   Q.   And, Dr. Young, has your professional work involved

24   assessing and supporting programs that effectively serve

25   mothers, children and families affected by Substance Abuse

1    Disorders?

2    **A.**    Yes, absolutely.  That's what the developing knowledge

3    is about, understanding the research literature, as well as

4    really talking to people in communities about what they're

5    trying, what they're being successful at, but also

6    evaluating the research to -- and their program evaluations

7    to understand what works.

8    **Q.**    And have you also had professional experience in

9    determining the costs of those various programs and

10   services?

11   **A.**    Yes.  It's always a specific that people want to know

12   is what's the bang for the buck and so we try and understand

13   what the costs of those services are across all of the

14   aspects of what it takes to innovate, and to implement, and

15   to sustain these kinds of programs and have these programs

16   go through these various stages to be able to really stand

17   them up and have them be something that families can count

18   on.

19   **Q.**    And in the course of your work related to the costs of

20   these programs and services, have you had a chance to

21   examine or become familiar with federal grant and federal

22   funding programs?

23   **A.**    Oh, yes.  We've published about all of the funding

24   streams that come into states from the federal government

25   across substance use prevention and treatment, child welfare

```
 1    services, and their various funding streams in Children's
 2    Bureau that provides services to provide funding to states
 3    so that they can provide services in communities, as well as
 4    trying to get a handle on some of those court budgets, which
 5    are sometimes the more difficult, if you will.
 6    Q.   And, Dr. Young, did you write an expert report in this
 7    case?
 8    A.   Yes, I did.
 9    Q.   And what was the subject of your report?
10    A.   I was asked specifically to look at the evidence base
11    of what works for families with Opioid Use Disorders and to
12    describe those kinds of programs and to provide information
13    about that evidence base, as well as to understand what the
14    costs of those programs are.
15    Q.   And are you being paid personally for your work in this
16    case?
17    A.   No.  Children and Family Futures is being paid for my
18    time.
19    Q.   And is this your first time being called to testify?
20    A.   Yes, it is.
21    Q.   All right.
22              MS. SINGER:  Your Honor, based on this record, I
23    proffer Dr. Young to the Court as an expert on the impact of
24    opioids on children and families and remedies to address
25    their impact.
```

```
1              THE COURT:  Is there any objection?

2              MS. CALLAS:  No objection, Your Honor.

3              MS. WU:  No objection.

4              MS. HARDIN:  No objection.

5              THE COURT:  The Court finds that Dr. Young is an

6    expert on the impact of opioids on children and families and

7    remedies to address their impact.

8              MS. SINGER:  Thank you, Your Honor.

9              BY MS. SINGER:

10   Q.   Now, Dr. Young, you mentioned that you have been with

11   Children and Family Futures since 1996; is that right?

12   A.   Well, we incorporated in 1996.  We started doing

13   consulting work a bit before that but, yes, more than

14   25 years.

15   Q.   And has your work changed over that time?

16   A.   It really has.  You know, the federal government passed

17   a law in 1997 called the Adoption and Safe Families Act and

18   the intent -- they call it ASFA because there has to be an

19   acronym.

20        So, the ASFA law was to reduce the number of children

21   that are in out-of-home care through two primary mechanisms.

22   One, stop taking kids into care, allow them to stay with

23   kin, allow them to get prevention services before they have

24   to be removed and, importantly, get the backlog of adoptions

25   solved.
```

1          And so, during that time, from about 1997 -- about 1999

2     was the high point of the number of kids that were in

3     out-of-home care.  And during the next decade, really until

4     2012, so longer than that, those efforts were making

5     progress.

6          So, during that time that we would think of as the

7     methamphetamine era, you know, this really was getting

8     started as cocaine was the thing that was most problematic

9     in our communities and then the methamphetamine era.  And

10     those numbers of kids in care were consistently coming down.

11          As I mentioned, in 2010, our project officer asked us

12     to start being aware of and start developing information and

13     looking at the literature and understanding about opioids

14     and, in fact, in 2012 is the first time that we started to

15     see that trend line completely reverse, that more kids were

16     coming into care, in some ways overwhelming the front end of

17     the Child Protective Service system, and fewer kids were

18     able to get out of foster care and into adoptive homes.

19     So, after that long period of we're doing pretty well and

20     doing some things that were helping families, and then that

21     shifted.

22     **Q.**   And is there anything different about how children

23     impacted by opioids are entering the child welfare system?

24     **A.**   Several.  One is an ongoing increase in infants.  So,

25     yes, infants are, you know, obviously very vulnerable, but

1    we now in the country remove about 50,000 infants a year and

2    place them in protective custody.  And that percentage of

3    the overall placements in care has gone up over the last

4    decade so that now, it's almost 20 percent of who is placed

5    in out-of-home care are infants, which have many

6    implications for the child welfare system for many, many

7    years.  So, there's that issue.

8         The second -- so, a younger population --

9              THE COURT:  Let me interrupt you.  Are all of the

10   50,000 related to substance abuse?

11             THE WITNESS:  About 80 percent are related to

12   substance abuse of those 50,000, but I will go -- if you

13   want, I'll explain those data because they're not collected

14   consistently around the country.

15        In -- in West Virginia, their data says about 80

16   percent of the infants that are placed in care are -- are

17   related to parents with substance use challenges, yes.  So,

18   that's one thing.

19        The second is that the placements became more

20   difficult, the intergenerational component of Opioid Use

21   Disorders.  So, even in -- if you will, even in

22   methamphetamine, there were kin that were able to kind of

23   step up.  And I know that happens in Cabell County.  I know

24   that happens in West Virginia, in particular.

25        In fact, the driver that picked me up from the airplane

1       is parenting his 11-year-old grandson because of his child's

2       opioid problem.  So, I know that that has been a really

3       important way that kids are being -- being parented.  About

4       half of the kids in West Virginia are being parented by a

5       kinship placement.

6           But in 2016, the data switched from kids that were in

7       foster care, so they went to a stranger, compared to

8       grandparents.  So, that was a huge change for grandparents

9       to be stepping in to parent children.  So, that was a big

10      issue.  And along with that was the not being able to find

11      foster homes.

12          Another big change was overdoses.  You know, child

13      welfare and workers had not really dealt with orphans,

14      literally orphans, since the industrial revolution.  But

15      more parents were dying and they had to find who was going

16      to raise this child that was left behind.  So, the parent

17      death and the implications of that for child welfare

18      workers, I mean, they had grief and loss and trauma

19      themselves.  And so, you see this huge turnover of child

20      welfare workers.  So, that -- that was certainly a different

21      thing.

22          And then, obviously, the young people that developed

23      their own substance use.  In the child welfare population,

24      there's like a -- two distributions by age.  One is very

25      young kids, so under five, and the other is adolescents.

1    And so, adolescents who were developing their own substance

2    use and the trauma that they had experienced growing up in

3    families that were challenged by substance use, by Opioid

4    Use Disorders, that is a different piece that we didn't

5    really see before.

6    **Q.**    Now, Dr. Young, in your expert opinion, has the opioid

7    epidemic impacted children, families and pregnant women in

8    Huntington and Cabell County?

9    **A.**    Yes, absolutely.

10   **Q.**    And in your expert opinion, do children, families and

11   pregnant women in Huntington and Cabell County require

12   targeted services to address those impacts?

13   **A.**    Yes.  I mean, we've talked about that already a little

14   bit, about the trauma that kids experience and the services

15   that they need.  We know that traumatic experiences for

16   children, you know, produce a higher likelihood that they'll

17   develop their own Substance Use Disorder.

18        Separation from parents when you're placed in

19   out-of-home care, that is a big issue for kids and they

20   suffer that trauma because even -- even when you think, oh,

21   they want to live with someone else, kids want to live with

22   their parents.  Kids want to be with their parents.

23        There's a whole kind of body of work about helping kids

24   who are in foster care and adopted to really understand, you

25   know, the -- they internalize why wasn't I good enough for

1    my parent to stop using drugs?  Why didn't they stop for me?

2    And they need a lot of specialized services for them to be

3    able to get past that so that they can have a life that's

4    not defined by their parents' opioid use.

5    **Q.**   And, Dr. Young, does your report lay out the kind of

6    services that these children and their families require to

7    get past this epidemic?

8    **A.**   Yes, it does.

9    **Q.**   And in preparing your report what sources of

10   information or experience did you rely on?

11   **A.**   Well, first, my professional knowledge.  I've been at

12   this for a long time, so I've -- I've, as I've said, been to

13   every state.  I know a lot of what has been tried.  I've

14   classified the kinds of programs.

15       We are the provider, the knowledge base, about family

16   treatment courts, about parent mentor programs, all of the

17   ways in which jurisdictions have to understand their

18   challenges of screening and assessment and quick entry into

19   treatment.  So, my knowledge base is pretty extensive.

20       But then to look at the evidence base in the scientific

21   literature, what works, what is supported by research, what

22   kinds of interventions specifically this sort of population

23   -- this population needs.  And there are a couple of big

24   themes to that.

25       One is, again, back to intergenerational.  You have to

1    treat a family as a whole family.  You can't say, you know,

2    parents, go over here.  You get treatment and then come back

3    and, you know, live with your child because this child has

4    been through trauma, as I mentioned, but they've been

5    through that separation.  Sometimes, they've been really

6    parentified, that they took care of that child.  So, there's

7    some specific what we refer to broadly as family

8    strengthening programs, intergenerational programs that

9    address the needs of the parents, as well as the need of the

10   child; but, importantly, how that family functions together

11   again.

12   **Q.**   And, Dr. Young, in addition to drawing on your own

13   professional experience in the literature, did you review

14   data in preparing your report?

15   **A.**   Yes.  Not only just the incidence data in the Child

16   Maltreatment Report which reports on all the kids that are

17   reported for abuse or neglect and those that are found to be

18   victims of abuse and neglect, but there have been some key

19   studies that have been done by the -- by Health and Human

20   Services.

21        The Assistant Secretary For Planning and Evaluation did

22   a series, a multi-method study to look at the -- in

23   particular, overdose deaths and the relationship to children

24   entering care, as well as they did qualitative interviews

25   with 188 social workers and 20 of them were in Cabell

1    County, eight supervisors and 12 social workers, and they

2    asked what was your experience?  What's happening?

3        So that's one of the data sources that I relied on, as

4    well as a host of federal datasets that are put into reports

5    that we could look at in terms of understanding the

6    incidents, the prevalence and cost.

7    **Q.**   And, Dr. Young, did you prepare a slide that summarizes

8    the sources you consulted in forming your opinion?

9    **A.**   Yes, I did.

10   **Q.**   And would that slide assist your testimony?

11   **A.**   Yes, because I'm sure there are things I forgot from

12   that little "what did I rely on".  That would help.

13          MS. SINGER:  And, Your Honor, may I publish that

14   slide briefly?

15       Slide 8, please.

16          BY MS. SINGER:

17   **Q.**   And, Dr. Young, you don't need to describe all of them,

18   but can you just indicate whether this slide accurately

19   describes or represents the sources you consulted in

20   developing your report?

21   **A.**   Yes, it does.  Can I point out another one that seems

22   important?

23   **Q.**   Of course.

24   **A.**   The American Academy of Pediatrics has done a couple of

25   reviews of the literature about outcomes for children who

1    were prenatally exposed to opioids.  And so, that is an

2    important piece.

3    **Q.**   And are the sources that you've discussed and the

4    sources represented on this slide the type on which experts

5    in your field typically rely or reasonably rely?

6    **A.**   Yes.

7    **Q.**   And after the research, and based on your experience,

8    how did you identify the specific services that you -- that

9    you opine are needed in Huntington and Cabell County?

10   **A.**   Well, an approach that I have always taken to these

11   issues of children of parents with substance use is to

12   really understand across the developmental spectrum.  And

13   so, what does that mean in terms of which population are we

14   talking about and which programs are appropriate for that

15   particular population.

16   **Q.**   Okay.  So, let's -- let's start with populations.  Did

17   you offer an opinion as to the specific groups in Cabell

18   County and Huntington that require interventions?

19   **A.**   Yes, I did.

20   **Q.**   And did you prepare a slide that describes those

21   populations?

22   **A.**   Yes, I did.

23           MS. SINGER:  And, Your Honor, may we publish Slide

24   7, please?

25           THE COURT:  Yes.

1           BY MS. SINGER:

2     **Q.**   And, Dr. Young, does this represent each of the

3     populations you identified requiring interventions?

4     **A.**   Yes.  As I mentioned, you know, looking across the

5     developmental -- excuse me -- spectrum, so that means you

6     start with pregnancy.  You start with pregnant women,

7     ensuring that they have the best environment for their

8     developing baby.  And then, looking at those that are

9     affected by prenatal opioid exposure, that's a larger group

10    than those that actually get diagnosed with Neonatal

11    Abstinence Syndrome or Neonatal Opioid Withdrawal Syndrome.

12          And then there's a larger population of sometimes the

13    older kids that they may or may not have been prenatally

14    exposed, but they ended up at the attention of the child

15    welfare system.  So, somebody called and said this child is

16    at risk and they need -- and CPS needed to go out and

17    investigate.  So, children who are parents -- children of

18    parents with Opioid Use Disorders that are in the child

19    welfare system.

20          And we've spent a little time already talking about the

21    special needs of adolescents and young adults.

22    **Q.**   And does the column on the left of your slide describe

23    the methodology that you described a few moments ago?

24    **A.**   Yes.  Looking specifically, again, for interventions

25    that work, what proportion of kids in that population need

1    intervention, what does the literature say about how

2    frequent or what the duration is for each of those services.

3    And then, again, the costs that were assigned to those kinds

4    of interventions from the literature.

5    **Q.**   And, Dr. Young, did you determine that proportion or

6    number of individuals who would require interventions in

7    each of these groups and the costs of those interventions?

8    **A.**   Yes, I did.

9    **Q.**   And how did you arrive at those numbers?

10   **A.**   Again, looking at the literature, budget numbers for

11   what the federal government funds, looking at the cost of

12   individual particular programs that are known in child

13   welfare practice, and substance use treatment to be

14   effective programs.

15   **Q.**   And did you also look at various datasets?

16   **A.**   Yes, I did.

17   **Q.**   And can you recall the name of any of those datasets?

18   **A.**   Well, as I said, child maltreatment for -- for the

19   numbers of kids, that is a report that comes out from

20   Children's Bureau.  All of the states now participate in

21   what's called the National Child Abuse and Neglect Dataset,

22   Data System, NDCANDS.  And NDCANDS records the number of

23   kids who got a report that they might be at risk, the number

24   of children that are investigated by child welfare workers

25   in the states and communities, the number that those

1       allegations are substantiated, those that are able to stay

2       at home because they don't have significant risk factors,

3       and those that are placed in out-of-home care.  So, child

4       maltreatment is all of the states but, in particular, West

5       Virginia's numbers about that front end of the system of

6       investigations and safety assessments.

7       **Q.**   And I know this was on your methodology -- your sources

8       slide, but did you also look at TEDS and CDC WONDER data?

9       **A.**   Yes, I did.  TEDS stands for the Treatment Episode

10      Dataset.  And they put an "A" at the end of it not too long

11      ago to indicate that those are the admissions data.  So,

12      when somebody goes to a publicly funded treatment center in

13      West Virginia, they have certain data that must be collected

14      and those data go into a dataset at the Substance Abuse and

15      Mental Health Services Administration and those datasets are

16      available to -- really to the public, but to researchers.

17      You'd want to kind of know what you were doing with those

18      datasets, but they are available to look at and look by

19      state.

20      **Q.**   And, Dr. Young, do the services and costs laid out in

21      your report as necessary interventions reflect your opinion

22      to a reasonable degree of professional and scientific

23      certainty as to what's required to address children and

24      families in Cabell County and the costs of those

25      interventions?

1    **A.**   What's required and what works.

2    **Q.**   Now, did you visit Cabell County in developing your

3    report?

4    **A.**   No.  Most of my report was during COVID, so I relied on

5    interviews with my staff who are assigned to sites here that

6    are in monthly contact with program directors and people

7    that are implementing programs in Cabell.

8         I also have had lots of interactions over the years

9    with people from West Virginia and from Huntington with some

10   of their grants that they have received.

11        For awhile, I was on the Advisory Committee to the

12   Department of Justice for what's called the COSSAP grants

13   and so, interacted with folks from Huntington, but had lots

14   of contact with, again, people that were talking to the

15   professionals in Cabell.

16        And I actually, you know, sort of didn't think that it

17   was necessary for what I was asked to do.  I wasn't asked to

18   assess the existing programs in Cabell County.  I wasn't

19   asked to make a determination of are those working.  I was

20   asked to look at the literature and say what does the

21   literature say are evidence based programs for this

22   population.

23   **Q.**   And did you interact with any other experts in

24   developing your report?

25   **A.**   Yes.  I did have conversations with Dr. Alexander, who

1    is working on some of the aspects related to the case and,

2    again, the staff that I work with, but I have contact with

3    professionals that are working in this area all the time.

4    Probably, you know, several times a week.

5    **Q.**   And in your report, you sometimes refer to opioids and

6    other Substance Abuse Disorders.  Why do you say "and other

7    Substance Abuse Disorders" instead of "opioids only"?

8    **A.**   Well, I can probably retire when we fix that data.  But

9    right now, in the child welfare system, it's not fixed.  So,

10   we really can't separate out except for in very -- well, we

11   really can't separate out opioids from other substances.

12   The federal government doesn't collect that data that way

13   and so -- and they're not data that the states are required

14   to collect to differentiate which substance, but what we

15   know is that the experience of social workers and what they

16   have reported in these various studies is that opioids are

17   different than what they've ever dealt with before and we

18   ran through some of those ways in which it's different.

19   **Q.**   And do you have a -- based on your professional

20   experience and your review of the literature, do you have

21   knowledge as to what portion of Substance Abuse Disorders in

22   the child welfare system are related to opioids?

23   **A.**   Well, I can --

24           MS. WU:  Objection, Your Honor.  Vague.  Could we

25   get a geography for that opinion, please?

```
 1              THE COURT:  Well, sustained.  Can you clear that
 2   up, Ms. Singer?
 3              MS. SINGER:  Sure, Your Honor.
 4              BY MS. SINGER:
 5   Q.   Dr. Young, I won't endeavor to repeat the question
 6   fully, but do you have a sense in West Virginia, or Cabell
 7   County, in particular, what portion of Substance Abuse
 8   Disorders in the child welfare system or children and
 9   families relate to opioids?
10              THE COURT:  Ms. Wu?
11              MS. WU:  Thank you, Your Honor.  We object on the
12   scope of the disclosed opinions for this expert.  She has
13   not offered an opinion as to the proportion of individuals
14   suffering from those conditions stated by Ms. Singer and,
15   therefore, this question calls for an opinion beyond the
16   scope of the disclosed expert report.
17              THE COURT:  Ms. Singer?
18              MS. SINGER:  Your Honor, Dr. Young intends to
19   testify and has testified about the incidents of
20   opioid-related services required in Cabell and Huntington
21   and this is part of her estimate as to what's required.
22              MS. WU:  Again, Your Honor, it's simply not in the
23   report which was prepared for this case and, again, if Ms.
24   Singer can point me to something specific, I'd be happy to
25   consider it, but based on the question, it does call for an
```

1    opinion outside the bounds of this expert's report.

2           THE COURT:  I'm going to let her answer.

3    Overruled.

4           THE WITNESS:  Could you re-state the question,

5    please?

6           MS. SINGER:  I can try.

7           BY MS. SINGER:

8    **Q.**   Do you have a -- based on your professional experience

9    and your review of data and literature in this case, do you

10   have an estimate as to the proportion of children in the

11   child welfare system in West Virginia and Cabell County who

12   are there related to opioids?

13   **A.**   So, DHHR reports that of children who are removed, 80

14   percent are affected by parents' substance use.  What the

15   report for that ASPE study said is that social workers said

16   it's overwhelmingly opioids.  And that's what we saw in the

17   overall data that changed that -- that path of decreasing

18   numbers in care.  So, yes, the majority are children that

19   are affected by opioids.

20       The other way in which we can know that is a couple of

21   data items that infants with -- that are diagnosed with

22   Abstinence Syndrome, those are -- you know, the American

23   Academy of Pediatrics says it is opioids that are driving

24   the increase in those diagnostic codes.  So, that's not me

25   saying that or making an opinion.  That is the American

1    Academy of Pediatrics that says that.

2    **Q.**   And, Dr. Young, briefly, while we are discussing

3    sources, did you use any local data from Cabell County or

4    Huntington in your report?

5    **A.**   Could I check my report on that?

6    **Q.**   Yes, of course.

7            MS. SINGER:  May I approach, Your Honor?

8            THE COURT:  Yes.

9            THE WITNESS:  Thank you.

10           MS. SINGER:  Of course.

11           THE WITNESS:  Well, one thing that absolutely does

12   come to mind is the TEDS data.  Those are data, again, of

13   treatment admissions.  And let's see.  On what page would

14   that be?

15           BY MS. SINGER:

16   **Q.**   And, Dr. Young, I don't think we need to find a page

17   number.

18   **A.**   It's -- the treatment admission data says that over a

19   time period that there were 612 pregnant women that were

20   admitted to treatment with Opioid Use Disorder, meaning

21   opioids, not heroin.

22       The other data that's important are data from the

23   WONDER, you know, from the whole epidemiology data system in

24   which they asked pregnant women what -- you know, substances

25   that you're using during pregnancy and almost 7 percent --

1    and I think I mentioned that already -- about 7 percent of

2    women admitted that they were using prescription opioids

3    during pregnancy.

4    **Q.**   And, Dr. Young, changing gears slightly, shifting

5    gears, who runs the child welfare system in West Virginia?

6    **A.**   The State runs the child welfare system, DHHR.

7    **Q.**   And why do you recommend interventions for the county

8    and city to implement them?

9    **A.**   Because that is who implements.  You have to have local

10   workers.  You have to have people that live in the community

11   to be able to implement those programs, you know, and have,

12   you know, people from the state office that are going out

13   into communities and understanding the needs and

14   implementing programs and making sure that they can be

15   sustained over time.  It's the community that makes sure

16   that the parenting programs and the children's mental health

17   programs, those are operated at the local level.

18   **Q.**   And to what extent are any of these services funded by

19   federal, state and private grants for funding sources?

20   **A.**   A lot of them are pass-throughs from the federal

21   government, meaning that the federal government provides

22   funds that then are passed through to the regional offices

23   for DHHR and implemented in that way, but the issue is

24   making sure that when a parent reaches out for help, the

25   help is there.  We have evidence about the time to treatment

1    entry.  The shorter the time to treatment entry, the better

2    the reunification outcomes.

3        For children, having a wait list to get into children's

4    mental health or developmental services, that is the norm.

5    And so, that's -- that's really the gap, is making sure that

6    the services are available when the family is ready.

7    **Q.**   And is the grant funding that is available or will be

8    available sufficient to meet the needs of children, families

9    and pregnant women in Cabell County and Huntington?

10   **A.**   No.  I mean, the capacity is -- is not there and even

11   though the grant writers in Cabell and Huntington are

12   extremely good and they have had lots of grants come in; for

13   example, the regional partnership grants, they run for

14   another two or three years.  And so, at the end of that two

15   years that they have been providing wrap-around services for

16   parents in the child welfare system, in two years, that

17   grant money goes away.

18       So, all of those grants -- it's a lot of

19   administration.  There's a lot of time that's taken to

20   secure grants, to administer the grants, to report on the

21   grants.  All of that -- and they all have their own thing

22   that they're needed to respond to.

23       So, if it's a grant at a Children's Bureau, they have

24   outcome measures that you have to send in.  If it's a grant

25   out of the Department of Justice, they have a completely

1   different system that they have to send in.  So, there's a

2   lot of administrative work that goes on to operate the

3   federal grants.

4       They're really meant to be innovations and -- and for

5   communities to really be able to sustain those, they have to

6   take those innovations, evaluate them, determine what works

7   in their community, and then figure out how they're going to

8   pay for them.

9   Q.  And, Dr. Young, just to tie up this issue, do the grant

10  programs that currently exist have the breadth, and the

11  length, and the scale that's required to fund the

12  interventions that you've determined are necessary here?

13          MS. WU:  Objection, Your Honor.

14          THE COURT:  Just a minute.

15          MS. WU:  Foundation.  This witness hasn't reviewed

16  the existing programs and has limited her opinions to

17  exclude analysis of current programs in Huntington and

18  Cabell.

19          THE COURT:  Overruled.  Go ahead.

20          THE WITNESS:  I'm sorry.  I get distracted with

21  those, so could you ask me again?

22          BY MS. SINGER:

23  Q.  Absolutely.  Do -- in your professional opinion, do the

24  existing grant programs, the programs that -- the grant

25  funding that is and will be available have sufficient

1    breadth, and length, and scale to meet the need that you

2    describe in your report?

3    **A.**   Well, scale is something we work on a lot.  And so, we

4    understand that those grant programs -- again, they're

5    innovations.  They're trying to stand up something to test.

6    Does it work there?  That's why the federal government

7    provides grants.

8              THE COURT:  Ms. Singer, you do need to lay a

9    little better foundation for how she -- on the background

10   for this opinion.

11             MS. SINGER:  Of course, Your Honor.

12             THE COURT:  I think, to that extent, the objection

13   might be well taken.

14        Go ahead, please.

15             MS. SINGER:  Sure.

16             BY MS. SINGER:

17   **Q.**   And, Dr. Young, in preparing your report did you

18   conduct an inventory, if not an assessment, to determine

19   what programs currently exist?

20   **A.**   There is an inventory that's part of my report.

21             THE COURT:  Just a minute, Dr. Young.

22             MS. WU:  Objection, Your Honor, foundation.  The

23   witness has previously testified in her deposition that the

24   material that Ms. Singer is referencing was provided by

25   attorneys and not the result of the review of the witness.

1          THE COURT:  Well, I'm going to overrule the

2     objection.  That might be a proper subject for cross

3     examination, but I'm not going to cut her off on that

4     ground.

5          So, go ahead, Ms. Singer.

6          THE WITNESS:  The other part is the grants that

7     are funded, I do list out all of the grants that are

8     specific to substance abuse, child welfare and the courts.

9          There are a lot of grants that have been obtained in

10    Cabell County that are not specific to this population.  So,

11    as I said, the Children's Bureau has their requirements,

12    Department of Justice has their requirements, and what we're

13    trying to do is make sure that those programs can be

14    sustained over time so that, again, when Grandma says my --

15    my son -- grandson that I'm taking care of needs mental

16    health services, that those services are available.

17         So, there are programs that are there, but I also

18    understand the nature of grant programs and that that

19    doesn't sustain that for when that infant that's being born

20    right now needs intervention before that child goes to

21    school at five.  We have to have interventions in those

22    preschool years and they have to be available then because a

23    child's development clock just doesn't stop for us.  It just

24    keeps going.  And you've got to meet the need at the time

25    when that intervention is going to happen.

1    **Q.**   And, Dr. Young, let's turn then to some of the specific

2    programs you lay out in your report.  Let's start with

3    children affected by parental opioid use who have had

4    interactions with the child welfare system.  So now, is it

5    your expert opinion that addressing the needs of children in

6    the child welfare system due to parental opioid use is a

7    required part of an abatement plan?

8    **A.**   Absolutely.  We've talked about that a little bit

9    already.  The trauma for children that they've experienced,

10   you know, we've -- all across the country to California, I

11   knew what was going on in West Virginia before I was ever

12   asked to look at what was going on in Huntington and Cabell

13   because of the awareness of what kids were going through

14   whose parents were addicted to opioids and what they meant

15   for them.

16       So, that population of making sure that their ability

17   to be reunited.  To address their trauma, to address the

18   family's functioning, again, they have to be family-centered

19   programs and those are -- they're hard to do for those

20   reasons that I specified about.  The funding comes

21   different.  The training comes different.  Everything comes

22   down from the federal government and the state in these

23   packages that are -- you know, we refer to them as silos.

24       And so, kids need more than one thing.  Parents need

25   more than one thing.  So, the ability for a community to put

1    those together in a way that puts a family back together so

2    that they can function means that they have to be

3    intergenerational programming.

4    **Q.**   And, Dr. Young, I think you talked about the trauma

5    that children with parental opioid use -- opioid use have

6    experienced.  Can you very briefly describe what kinds of

7    things you're talking about?

8    **A.**   The kinds of programs, so --

9    **Q.**   And just to -- I want to make sure you've heard the

10   question.  The kinds of trauma that they've experienced?

11   **A.**   I'm sorry.  Are you asking the kind of trauma

12   experience or the kinds of programs for trauma?

13   **Q.**   The trauma experience to which the programs are

14   responding?

15   **A.**   So, we mentioned that separation for -- for kids.

16   We've had kids that, as you know, have experienced their

17   parents overdose.  They've watched their parent be taken off

18   in handcuffs.  All of those are very traumatic experiences.

19        We also know that kids who are placed in foster care,

20   while we want that to be a good experience for kids, they

21   are much more likely to develop their own Substance Use

22   Disorder than kids who have not experienced foster care.

23        So, the idea that we're going to get ahead of this and

24   make sure that kids that are currently experiencing that

25   have what they need so that Cabell County is not influenced

1    by this into the next generation, we only have a window.

2    **Q.**   And, Dr. Young, did you prepare a slide that summarizes

3    your conclusions regarding children involved in the child

4    welfare system affected by Substance Abuse Disorders?

5    **A.**   Yes, I did.

6    **Q.**   And would that slide assist your testimony?

7    **A.**   Clearly.

8            MS. SINGER:  Your Honor, may we publish Slide 10,

9    please?

10           THE COURT:  Yes.

11           THE WITNESS:  And I'll work it succinct.  I can

12   talk a lot.

13           BY MS. SINGER:

14   **Q.**   Dr. Young, there's a lot to say, but can you tell us

15   what you found with respect to the number of children

16   involved in the children -- child welfare system in West

17   Virginia?

18   **A.**   Yeah.  These -- these are data, again, from child

19   maltreatment, that report that is, you know, completed by

20   the -- West Virginia and sent to the federal government.

21   The number of kids that are being removed in that ten-year

22   period.  You know, they were -- it's doubled.

23       So, social workers, their case load, everything that

24   they do to try and help families, that doubled during that

25   time period.  And DHHR says that about 80 percent of the

1    cases in West Virginia in which a child -- that there's a

2    petition filed to take custody of that child, 80 percent

3    have a parent with a substance use problem.

4    **Q.**   And in forming your opinions, Dr. Young, did you review

5    literature regarding the impact of overdose deaths on foster

6    care rates?

7    **A.**   Yes, I did.  This is a very important piece for all of

8    us.

9    **Q.**   And what was that literature?  Just the name of the

10   study you relied on?

11   **A.**   The Assistant Secretary of Planning and Evaluation at

12   the Department of Health and Human Services did a

13   multi-method study looking at overdose deaths and foster

14   care entries and other indicators of the child welfare

15   system.

16   **Q.**   And did you prepare a slide that summarized that

17   research?

18   **A.**   Yes, I did.

19   **Q.**   And would that slide assist you?

20   **A.**   Yes, it would.

21          MS. SINGER:  Your Honor, may we publish Slide 11,

22   please?

23          BY MS. SINGER:

24   **Q.**   And, Dr. Young, can you describe what this slide

25   indicates?

1    **A.**    So, in counties across the country, when the overdose

2    death rate was higher than the national median, for every

3    ten percent above the national median of the overdose deaths

4    you see the corresponding relationship with the foster care

5    system.  So, reports of maltreatment.  So, again, hotline

6    calls were up 2.2 percent.  The substantiated cases, so

7    after the CPS worker has done their investigation and the

8    judge decides were those allegations substantiated, those

9    were up.  And then, importantly, the foster care entries

10   were up when overdose deaths were up.

11   **Q.**   And did you examine in the course of preparing your

12   report and in your professional experience how the overdose

13   and foster care entry rates in West Virginia compare to

14   other jurisdictions?

15   **A.**    Yes.

16   **Q.**   And did you prepare a slide that summarized that

17   research?

18   **A.**    Yes, I did.

19   **Q.**   And would that slide assist you?

20   **A.**    Yes, it would.

21            MS. SINGER:  Your Honor, may we publish Slide 12,

22   please?

23            BY MS. SINGER:

24   **Q.**   And what does the map shown in Slide 12 depict, Dr.

25   Young?

1   **A.**   So, every place that is red is a county in which the

2   overdose deaths and the foster care entries were both above

3   the national median.  And we popped out West Virginia there,

4   which is troubling to say the least, that Cabell County, its

5   surrounding counties, all but the counties, a few in the

6   northeast, have this condition that, in 2016, overdose

7   deaths and foster care entries were higher than the median.

8   **Q.**   And based on the data you examined, do you know whether

9   Cabell County has been able to find foster care placements

10  for children removed from their homes or find enough foster

11  care placements?

12  **A.**   No.  Those are reported frequently by DHHR about what,

13  you know, challenges they have and we know from my staff,

14  who are working in Cabell County and the staff that are

15  working with the Supreme Court for West Virginia and

16  standing up family treatment courts, that that is a very big

17  gap in trying to find homes for kids.

18       So, as I was talking about sort of this -- two ways in

19  which the number of kids go up, more kids come in and kids

20  can't get home.  So, both of those things are happening in

21  Cabell County.

22  **Q.**   And you described the negative outcomes and the trauma

23  for children in foster care.  What kind of long-term or

24  shorter-term impacts does parental substance abuse and

25  dislocation have on children?

1   **A.**   These are studies that the American Academy of

2   Pediatrics have reviewed a few different times and they look

3   at all the ways that child development is assessed.  So,

4   fine motor, gross motor, intellectual capability, social

5   emotional kinds of factors, all of those things that are

6   related to child development.  So, there are some studies

7   that they have done that summarize that.  Of importance is

8   the educational outcomes.  And there are data on that.

9   **Q.**   Okay.  And what kind of services, again, at a general

10  level are required for these kids?

11  **A.**   So, immediately, and -- is for infants that are

12  identified with prenatal opioid exposure, making sure that

13  those developmental assessments in all of these different

14  areas of development for a child.  There are tools that help

15  developmental psychologists understand.

16      If that infant, for example, went through withdrawal

17  and had tremors, did that carry over to neurodevelopmental

18  effects that affect their fine motor skills?  Did it carry

19  over to the way that their sensory integration can happen?

20  Did it carry over to their executive functioning so that

21  they can reason and make decisions?  All of those things are

22  looked at in -- in ways in which understanding the impact of

23  that exposure.

24  **Q.**   And, Dr. Young, I want to make sure that you're focused

25  in your response on children in the child welfare system and

1    not only children who were exposed prenatally.  So, is your

2    response addressed to kids long-term in the child welfare

3    system?

4    **A.**    Well, kids long-term in the child welfare system,

5    number one, are very expensive kids, I have to say,

6    particularly if they came in as infants because the State is

7    responsible for their well-being even after adoption.  So,

8    looking at that population and the kinds of services that

9    they need and making sure that they are timely and

10   appropriate for that child's developmental stage is

11   critical.

12   **Q.**    And to the interventions that you describe in your

13   report and you've testified to today, are they effective

14   with these kids?  Do they produce good outcomes?

15   **A.**    Yes, they are.  There's a wealth of information about

16   the developmental outcomes for children with prenatal

17   substance exposure, opioid exposure that get those kinds of

18   developmental services.  The federal government funds those

19   kinds of services for young children 0 to 3 and then a

20   different program for kids who are 3 to 5, but they are

21   often waitlisted -- not often -- generally waitlisted.

22   **Q.**    And let's turn from children in the child welfare

23   system adolescents and young adults.  Is it your expert

24   opinion that addressing the needs of adolescents and young

25   adults with Substance Abuse Disorders themselves or parents

1    with Substance Abuse Disorders is a required part of an

2    abatement plan in Cabell and Huntington?

3    **A.**    Yes, it is.

4    **Q.**    And do the other interventions you've described in your

5    report and your testimony also apply to adolescents?

6    **A.**    Right.  So, adolescents typically get some, you know,

7    substance use prevention kind of programming either through

8    the schools or, you know, kind of broad-based kinds of

9    substance abuse prevention programming.

10          However, these kids need something that is a lot more

11   than that.  So, the prevention world talks about, you know,

12   sort of broad based prevention, education, that sort of

13   strategy, but for kids who are children of a parent with an

14   Opioid Use Disorder, they need specialized programming that

15   helps them, again, solve some of their own challenges, their

16   social emotional challenges, as well as if they were a child

17   that had neurodevelopmental effects of prenatal exposure

18   that we're -- we're rectifying those issues.

19   **Q.**    And, Dr. Young, did you prepare a slide that summarized

20   your assessment of the needs and programs for adolescents

21   and young adults?

22   **A.**    Yes, I did.

23   **Q.**    And would that slide assist you?

24   **A.**    Yes, it would.

25                MS. SINGER:  Your Honor, may we?

```
 1          I believe this is Slide 13, please.

 2               BY MS. SINGER:

 3     Q.   And, Dr. Young, I think you've covered everything in

 4     this slide.

 5     A.   But the one thing that I didn't cover is the high risk

 6     of adolescents.  So, we know that the adolescent -- that,

 7     you know, our brains aren't fully matured with executive

 8     functioning to now about 26.  My kids are a little older.  I

 9     think that's happened.

10          But for adolescents, some of that risky behavior that

11     is part of normal adolescent behavior is part of that

12     completely not developed executive functioning, but if you

13     start using substances during that time period, you are

14     really creating a problem with impulse control and all of

15     the other implications of setting that adolescent brain on

16     that path.

17     Q.   And given the challenges of the adolescent brain, which

18     many of us will also note from experience, is there evidence

19     supporting the efficacy of the programs that you've laid out

20     in your testimony and your report?

21     A.   Yes.  And, again, making sure that those are family

22     centered programs because adolescents need to have a

23     relationship with their birth parents whenever it's safe and

24     appropriate to do so for them to develop appropriately.

25     Q.   Okay.  All right.  Let's turn to, I think, the third
```

1   population that you described, which is pregnant women with

2   Opioid Use Disorder.  Is it your expert opinion that

3   addressing the needs of pregnant women with Opioid Use

4   Disorder is a required part of an abatement plan in Cabell

5   and Huntington?

6   **A.**   Yes, it is.

7   **Q.**   And did you form an opinion as to the types of services

8   that would be effective?

9   **A.**   Yes, I did.

10   **Q.**   And, just generally and briefly, what are those

11   services?

12   **A.**   So, pregnant women not only need medications if they

13   have an opioid use problem during pregnancy, but they need a

14   lot of careful monitoring in prenatal care, as well as the

15   social and emotional support.  Women that develop a

16   Substance Use Disorder, estimates are 80-plus.  80-plus

17   percent of them have had various traumatic experiences in

18   their own right.  So, they need trauma-informed services,

19   trauma-specific services, social emotional support.

20        There are data about what happens when pregnant women

21   stop using medications during treatment.  The risk of

22   overdose is highest for that population.  So, the American

23   College of Obstetrics and Gynecologists, as well as the

24   American Society of Addiction Medicine, have put out

25   guidelines about making sure that pregnant women have access

1    to medication assisted treatment during pregnancy, and that

2    they have the education that they need about what their

3    infant may experience in withdrawal, and that they have the

4    support that they need in order to make sure that they can

5    parent.

6    **Q.**   And, Dr. Young, did you also prepare a slide that

7    summarized your research and opinions with respect to the

8    services for pregnant women?

9    **A.**   Yes, I did.

10   **Q.**   And would that slide assist you?

11   **A.**   Yes, it would.

12           MS. SINGER:  Your Honor, may we publish Slide 14,

13   please?

14           THE COURT:  Yes.

15           BY MS. SINGER:

16   **Q.**   And, Dr. Young, again, I think you've covered much of

17   this and I think you've referenced the number of women with

18   OUD who seek treatment.

19   **A.**   Correct.

20   **Q.**   Now, do you believe the number here, 151 women -- let

21   me actually back up.  Is this the number in West Virginia or

22   Cabell County?

23   **A.**   Those are West Virginia data and they're not women who

24   sought treatment.  They actually got into treatment.  And

25   that's a very big difference between those that are trying

1    to get in and those that actually got in.

2    **Q.**    And that number of 151 women in treatment with Heroin

3    Use Disorders and 612 with Opioid Use Disorders, do you

4    believe that accurately represents the relevant population?

5    **A.**    No.  It couldn't because, again, they're women that

6    were successful at finding treatment and getting admitted

7    into treatment, but the WONDER data, one of those datasets

8    in the -- from the CDC, has asked women -- and I mentioned

9    this already.  6.6 percent of women use prescription drugs

10   during pregnancy.  We know that -- that they need to be

11   monitored during pregnancy and make sure that protection for

12   their infant is put in place.

13        I don't want to go too long, but I do want to mention

14   the Plan of Safe Care because it's so important.  This is

15   legislation that Congress changed originally in 2003, but in

16   2016 in response to the opioid problem among pregnant women

17   and the escalating NAS rates in the country.  They

18   instructed all states that receive the Child Abuse

19   Prevention and Treatment Act grant money that they were to

20   assure that before an infant goes home from the hospital

21   that there is a Plan of Safe Care for that infant.

22        So, what's been exciting that we've seen in the

23   subsequent years are opioid treatment programs, substance

24   abuse treatment programs that are working with pregnant

25   women to make sure they have a plan in place before they go

1    to deliver at the hospital so that they know that they can

2    call DHHR, Children's Services, and say this is what I've

3    been doing.  This is my plan.  This is, you know, who is

4    going to be home.

5        Hopefully, they have a Nana that can help them, a

6    grandma at home that they can help with that newborn.  So,

7    those Plans of Safe Care are critically important for

8    pregnant women.

9        The other part is that we know now that OBs talk about

10   the fourth trimester because the overdose death rate risks

11   or the overdose death risk is so high after delivery,

12   particularly as all of the things that happen after delivery

13   anyway, but if you are a new mom and you have an Opioid Use

14   Disorder and you're trying to keep in treatment and to keep

15   things going on, that there are data now about the overdose

16   deaths just after this postpartum period.

17   **Q.**   All right.  And, Dr. Young, in forming your opinion,

18   did you review evidence that interventions with pregnant

19   women with Opioid or Substance Use Disorders are effective?

20   **A.**   Yes, I did.

21   **Q.**   And what did you conclude?

22   **A.**   There are effective programs that medication assisted

23   treatment during prenatal care is highly effective to make

24   sure that there's a good birth outcome, that infants are

25   protected.

1        We know from a long time of program outcomes for women

2    that they're allowed to stay with their infants.  So, again,

3    that two-generation program in residential care is highly

4    effective to ensure that the infant has an opportunity to

5    bond with their birth mother and that that's good for birth

6    moms and it's good for the infant.

7    **Q.**   And you did talk about the importance of services after

8    birth, but what evidence did you review on how long those

9    services need to last and why?

10   **A.**   Well, the literature supports, for some of those

11   reasons that I talked about, that the stability really needs

12   to be there.  The range is 12 to 24 months that that support

13   needs to make sure that she's -- and that that infant is

14   safe, that the infant is getting the developmental services

15   that they need.

16       I sort of can't emphasize enough that that critical

17   time period of infant, toddler-hood, preschool, that's --

18   that's our moment to change the trajectory for that child's

19   life.  If we miss that, if we wait until there's a special

20   education referral when that child is in third, fourth

21   grade, we've missed the opportunity to give that child the

22   life that has normal development and has the areas of their

23   life that have been compromised that they can get the

24   services that they need to be able to put that together.

25   **Q.**   And, Dr. Young, talking about that early window of

1    time, let's turn to children who are prenatally exposed to

2    opioids.  Is it your expert opinion that addressing the

3    needs of children with prenatal opioid exposure or Neonatal

4    Abstinence Syndrome are part of an abatement plan required

5    for Cabell and Huntington?

6    **A.**    Absolutely.

7    **Q.**    And does that include children who aren't diagnosed

8    with neonatal abstinence?

9    **A.**    Yes, emphatically.

10   **Q.**    Okay.  And did you prepare a slide on this issue?

11   **A.**    Yes, I did.

12   **Q.**    And would that slide assist you?

13   **A.**    Yes, it would.

14          MS. CALLAS:  Your Honor, before that slide is

15   published, I'd like to lodge an objection on what I

16   anticipate will be not disclosed testimony by this witness;

17   that is, she testified in deposition to data going up to

18   2013 in connection with NAS babies.  She was specifically

19   asked about this.

20       The slide, I believe, is going to project out much

21   further.  So, I would like to launch, again, an objection as

22   to these undisclosed opinions by a witness.

23          THE COURT:  Ms. Hardin?

24          MS. HARDIN:  Your Honor, I would just note for the

25   record that under Rule 37(c)(1), undisclosed material may

 1    not be testified to by the witness unless it is

 2    substantially justified or harmless.  It's not discretionary

 3    on the part of the plaintiffs' counsel to elicit testimony

 4    that was not part of the report.

 5              THE COURT:  Are you going outside the report here,

 6    Ms. Singer?

 7              MS. SINGER:  Your Honor, it's not my intention to

 8    go outside of the report.  I will indicate that there has

 9    been a study introduced in evidence in this case relating to

10    neonatal abstinence that Dr. Young is aware of.  It's

11    already been the subject of testimony.  It's certainly not

12    our intention to re-tread any ground that has been tread in

13    this case.

14              MS. WU:  Your Honor, I believe that Ms. Singer is

15    referencing an article published by Dr. Loudin, another

16    expert disclosed in this case.  It's clearly improper for

17    Ms. Singer and the plaintiffs to try to use Dr. Young to

18    introduce evidence that they had or may still introduce

19    through another expert.  That's improper.

20              MS. SINGER:  Your Honor, it's not improper.  And

21    let me also just add the reliance material that has been

22    disclosed to defendants in this -- with Dr. Young's expert

23    report and was covered within her deposition included a

24    press release from the Department of Health and Human

25    Services.  It's dated -- I don't know the date.  I'm sorry.

1    April 2018.

2         Again, this is in the reliance materials of Dr. Young's

3    report and the headline of that press release is DHHR

4    Releases Neonatal Abstinence Syndrome Data for 2017.  It is

5    part of her reliance materials and a perfectly appropriate

6    subject for Dr. Young's testimony today.

7              THE COURT:  Well, I'm going to let her testify

8    subject to the objections.  I think the thing to do is take

9    the testimony and then, since this is a bench trial, I'll

10   decide to what extent, if any, I will consider it.  But I

11   think the fair thing to do is to let you make the record,

12   Ms. Singer, and you may go ahead and do it.

13             MS. SINGER:  Thank you, Your Honor.

14             BY MS. SINGER:

15   **Q.**   All right.  Dr. Young, I think we were midpoint of our

16   -- of your testimony on Neonatal Abstinence Syndrome.

17             MS. SINGER:  Why don't we go ahead and, with the

18   Court's permission, publish Slide 15.

19             BY MS. SINGER:

20   **Q.**   Now, does this slide reflect your opinion as to the

21   need and intervention for children exposed to opioids

22   prenatally?

23   **A.**   These are the specific data of the rate of NAS.  Those

24   are diagnostic codes from that earlier time period and then

25   the more recent data that are available for West Virginia of

1    50.6 NAS diagnoses per 1,000 births.

2    **Q.**   And, by the way, is that 2017 data of 50.6 Neonatal

3    Abstinence Syndrome births the data that was described in

4    the press release that you relied on in your report?

5    **A.**   I believe that's correct, but that's coming from my

6    memory.  If you would like for me to look at the press

7    release to confirm that, but I'm fairly certain that that's

8    correct.

9    **Q.**   Okay.  Okay.  And in the interest of moving along, can

10   you also explain, are there developmental effects or other

11   negative outcomes for infants who are exposed to opioids

12   prenatally, but not diagnosed with NAS?

13   **A.**   Yes.  This is more recent information that's coming

14   from the pediatricians around the country and including the

15   pediatricians at -- in Huntington that sometimes infants

16   don't materialize or don't develop enough symptoms, if you

17   will, of withdrawal.  Right?

18        There's a little window that babies are still in in the

19   hospital.  And so, they may not get that diagnostic code

20   during those two or three days that they're being monitored.

21   So, they go home.

22        They might actually come back to the hospital with

23   withdrawal symptoms, but they didn't get a diagnostic code

24   during that little window.  But what we understand now is

25   that it's not necessarily predictive about how that infant

1    is going to do.

2         So, there may be knowledge that the infant was exposed

3    to opioids prenatally, but they didn't manifest withdrawal

4    symptoms that were severe enough to get a diagnostic code,

5    but they were exposed, and it's -- it's clear now from

6    pediatricians from the American Academy of Pediatrics who

7    says their opinion is all children with opioid exposure need

8    those interventions for the things that I've already

9    discussed about the timing.  You can't wait.

10   **Q.**   And do the interventions that these children need and

11   these babies need extend even after they leave the hospital?

12   **A.**   Yes.  That is a critical period for those things that

13   we talked about, neurodevelopment, the kinds of things that

14   you would see when neurodevelopment has been compromised, as

15   well as the support that their birth parents need that, the

16   extended family need, in order to help them go through those

17   developmental tasks.

18        So, the first task of an infant is to be able to eat,

19   to be able to sleep, and to be consoled.  So, there's this

20   understanding that that task of a newborn to eat, sleep and

21   be consoled has to be supported in a way best by the birth

22   mom, but -- but in a way that that infant can get through

23   those initial tasks so that they can go on to the next stage

24   of development of focusing their eyes, and being able to sit

25   up eventually, crawl.  All of those things have to go in

```
 1   order.  And this eat, sleep, console is really important in

 2   that newborn period.

 3   Q.    And do the services that these infants and young

 4   children require, does that include early intervention and

 5   special education services?

 6   A.    Yes, it does.

 7   Q.    And are those services fully covered by federal funds

 8   and programs?

 9   A.    They're not fully funded by federal funds.  There's

10   state and federal funds that go into those, but I think I

11   mentioned already that there are typically wait lists to get

12   into those developmental services.

13         West Virginia should be congratulated that you changed

14   your eligibility criteria not that long ago so that infants

15   that got the NAS diagnosis are eligible for early

16   intervention, that 0 to 3 intervention.

17         But for that larger population that didn't get the

18   diagnostic code at birth, there's certainly a gap there in

19   what kinds of interventions they need.

20         There are also, frankly, big gaps in having enough

21   developmental pediatricians, developmental psychologists.

22   The people that work with these infants to make sure that

23   they can do all the things that they need to do in those

24   developmental stages of focus, and smile, and react, and,

25   engage, and bond, and attach, there are interventions that
```

```
 1    they put in place to make sure that that's happening for the

 2    infant.

 3    Q.    And, Dr. Young, are you familiar with evidence

 4    regarding longer term impacts beyond this initial

 5    developmental stage to children exposed to opioids

 6    prenatally?

 7    A.    Yes, I am.

 8    Q.    And, again, briefly, what are -- what is that evidence

 9    of those outcomes?

10    A.    Well, I mentioned the reviews that -- you know,

11    researchers have been looking at this for quite sometime and

12    there have been a couple of reviews that have been done that

13    looked at the immediate and the long-term outcomes for these

14    children.

15    Q.    And what are those outcomes?

16    A.    Well, specifically, the -- could I look at my report?

17    Q.    Of course.

18    A.    So I don't do that off the top of my head?

19    Q.    Okay.

20    A.    So, there is a summary that was published in 2013.  Did

21    -- and they show that there are -- there is the strong

22    effect of withdrawal, but longer term that behavior and

23    language, some of those longer term outcomes have been found

24    in studies when they're looking at what are the longer term

25    implications.
```

1        So, in my report there's a summary of 52 published

2    articles about the outcomes for children exposed to opioids

3    in the prenatal period.  There's variation by those various

4    studies.  But they measure with more distress in infancy,

5    that they were significantly lower on Bayley scores, you

6    know, all those different areas of development I've been

7    talking about.  So, Bayley is an assessment named for the

8    guy who invented it that's a developmental screening test

9    and they have, by the time they were two, significantly

10   lower Bayley scores.

11       And then those -- that -- they looked at compared to a

12   non-exposed group several areas of developmental delays,

13   lower IQ, neuropsychiatric hospitalizations.  The biggest

14   one is poor educational testing scores, lower attention

15   scores, requiring special education services.

16   **Q.**   And last two questions.  On the body of your report,

17   Dr. Young, do those educational outcomes and test scores and

18   things like that get better or worse over time for these

19   kids?

20   **A.**   We know from a major study that was done tracking

21   infants with NAS that those educational outcomes get worse

22   over time.

23   **Q.**   And are there intervention programs that the evidence

24   show work for these kids?

25   **A.**   Yes.  I talked about them already a bit, about what

1    those programs are.  I think I have some listed.

2    **Q.**   Does that include the Vanderbilt University study, for

3    instance?

4    **A.**   Yes.  So, making sure that all of those kinds of things

5    that, again, developmental pediatricians, developmental

6    psychologists do to make sure that the neurodevelopment,

7    which is the key thing about their long-term ability to

8    process language, to have executive functioning and, later

9    in life, all of those things need to be tended to.

10   **Q.**   And, Dr. Young, to wrap up, in your professional

11   opinion, can the programs you lay out address the impact of

12   opioids on children, and families, and pregnant women in

13   Cabell and Huntington?

14   **A.**   Yes, they can.

15   **Q.**   And do you hold these opinions you've described

16   throughout your testimony to a reasonable degree of

17   professional certainty?

18   **A.**   Yes, I do.

19   **Q.**   And, Dr. Young, just to wrap up, why are these

20   interventions needed?

21   **A.**   Again, the intergenerational aspect of what happens for

22   these kids.  You know, luck of the draw on who you were born

23   to.  And what does that mean for our responsibility for

24   these kids?

25        Child welfare workers, they step up and they say I'm

```
 1    going to try and protect these children and make sure that

 2    they have a way that they can develop.  And, you know, it's

 3    my view that we all have a responsibility for these kids to

 4    make sure that they have the life chances that others have

 5    and, if there are ways that we can remediate those

 6    challenges for kids, then it's incumbent on us to do it.

 7                MS. SINGER:  Your Honor, may I have one moment

 8    before I wrap up?

 9                THE COURT:  Yes.

10        (Pause)

11                MS. SINGER:  I have nothing further.  Thank you,

12    Dr. Young.

13                THE COURT:  Ms. Singer, you have very ingeniously

14    ended right when it's time to take a break.

15          So, we will be in recess for ten minutes.

16          You may step down, of course, Dr. Young.

17                THE WITNESS:  Thank you, sir.

18          (Recess taken)

19          (Proceedings resumed at 10:42 a.m. as follows:)

20                THE COURT:  Ms. Callas, are you going first?

21                MS. CALLAS:  Yes, Your Honor.  Thank you.

22                          CROSS EXAMINATION

23    BY MS. CALLAS:

24    Q.   Good morning, Dr. Young.

25    A.   Good morning.
```

1    **Q.**   My name is Gretchen Callas and I represent

2    AmerisourceBergen Drug Corporation.  I'm here to ask you

3    some questions today.

4        You did prepare a report in this litigation; is that

5    correct?

6    **A.**   Yes, I did.

7    **Q.**   And it was dated in August of last year; is that right?

8    **A.**   That's correct.

9    **Q.**   Okay.  And it contained a summary of your opinions and

10   your work in this case; is that correct?

11   **A.**   That's correct.

12   **Q.**   And you were retained by the City of Huntington and

13   Cabell County specifically; is that right?

14   **A.**   That's correct.

15   **Q.**   And you were looking at those two communities?

16   **A.**   I'm sorry.  I don't actually know that answer, the

17   technical part of that, because I worked with Motley Rice.

18   So I'm not sure -- they retained Motley Rice, and Motley

19   Rice asked me to do their report.

20   **Q.**   Okay.  Thank you for that clarification.

21       You did understand, though, that your work in this

22   litigation was specific to two communities, the County of

23   Cabell County, West Virginia, and the City of Huntington

24   that's for the most part in that county; is that correct?

25   **A.**   Yes, I do understand that.

1    **Q.**   Okay.  You have identified five populations of people

2    in those communities that you believe need services; is that

3    right?

4    **A.**   Those are not the only populations or special needs in

5    those communities, but I was asked to look at the impact on

6    children and their families, and specifically in the child

7    welfare system.

8    **Q.**   But you've identified five populations or groups of

9    people; correct?

10   **A.**   Yes, that's correct.

11   **Q.**   You've also identified costs that might relate to the

12   provision of these services that you recommend; is that

13   correct?

14   **A.**   Based on the literature, yes, that's correct.

15   **Q.**   So some of your populations of people, those people you

16   believe need services in this community, have been affected

17   by opioid use disorder; is that right?

18   **A.**   Yes, that's correct.

19   **Q.**   And there are groups that are contained in your

20   populations that are affected by a broader category known as

21   substance use disorder; is that correct?

22   **A.**   Yes, opioids and substance use, correct.

23   **Q.**   But there is a broader category known as substance use

24   disorder that relates to substances other than opioids; is

25   that right?

1    **A.**   Yes, that's correct.  Substance use disorders are the

2    broader term that encompass opioids and other substances,

3    that's correct.

4    **Q.**   And those other substances could involve what we've

5    described as a multitude of other substances; is that not

6    correct?

7    **A.**   Well, I don't know a multitude.  That's a really big

8    number.  But there are patterns of multiple substances that

9    people use.  That is correct.

10   **Q.**   And, and some of those that you're aware of in the

11   community at issue here includes alcohol; is that correct?

12   **A.**   Yes.  Alcohol has been an issue in communities actually

13   since Noah, but, yes.

14   **Q.**   And, in fact, in West Virginia when we talk about child

15   welfare services, the only substance that we actually track

16   in West Virginia is alcohol; isn't that correct?

17   **A.**   In child welfare?

18   **Q.**   Yes, ma'am.

19   **A.**   No.  There are two variables that are tracked that

20   are -- that classify alcohol use by parent and drug use by

21   parent.  So both of those are tracked.

22   **Q.**   Okay.  Drug use can relate to any number of drugs; is

23   that right?

24   **A.**   That's correct.  That's why we have to rely on other

25   data sources.

1    **Q.**   So when we're talking, again, about a specific

2    substance, it is only alcohol that is tracked in West

3    Virginia as it relates to substance use disorder; correct?

4    **A.**   No, that is not correct.  There's two variables in the

5    datasets.  One is alcohol.  There's actually four variables.

6    One is alcohol by parent.  One is drug use by parent.  The

7    other is alcohol use by child or drug use by child.

8    **Q.**   Other than alcohol, what is the specific substance that

9    is tracked by West Virginia in the child welfare services?

10   **A.**   Other drugs.

11   **Q.**   When you have looked at children, you are recommending

12   programs for children who have parents who are using

13   substances other than opioids; correct?

14   **A.**   Opioids and other substances, correct.

15   **Q.**   Substances other than opioids?

16   **A.**   I think you're saying it repeatedly, but I'm trying to

17   say back it's opioids and other substances.  And the

18   datasets don't break those out differently.

19   **Q.**   You've testified that you have looked at the programs

20   in Cabell and Huntington Hospital -- city.  Sorry.  Cabell

21   and Huntington; is that correct?

22   **A.**   I -- could you tell me -- ask me or tell me what you

23   mean by looked at?

24   **Q.**   Well, you evaluated.

25   **A.**   No, I haven't evaluated the programs.  That would take

```
1    a research design and to look at, you know, their

2    effectiveness.  It's a research study to evaluate a program.

3    Q.   Were you provided a list of programs that currently

4    exist in Cabell County and the City of Huntington?

5    A.   Yes.  In addition to the programs that I was already

6    aware of, I was provided a list of other programs.

7    Q.   And who provided that list to you?

8    A.   I believe Motley Rice.

9    Q.   And you looked at that list; is that correct?

10   A.   Yes.

11   Q.   And why don't we pull up that list.

12        That is a document you relied on in your report;

13   correct?

14   A.   Yes.  I was aware of that document and knew of those

15   programs, yes.

16   Q.   And it's, it's identified in the report as Attachment 1

17   but it's been marked as Plaintiffs' Exhibit 42246.

18            MS. CALLAS:  Would you hand that document out.

19        May I approach the witness, Your Honor?

20            THE WITNESS:  Thank you.

21   BY MS. CALLAS:

22   Q.   You're welcome.

23   A.   It's an age test, size of the font.

24   Q.   Yeah.  Do we have larger copies or -- well, what we'll

25   do is try to enlarge a few aspects of this document on the
```

```
 1   screen so we can talk about them.
 2   A.   Okay.
 3   Q.   But you recognize this document that I've placed in
 4   front of you as P-42246 for purposes of the trial?
 5   A.   Yes, I do recognize this document.
 6   Q.   All right.  Now, it's your understanding this was
 7   created by the law firm of Motley Rice?
 8   A.   I, I don't know that for certain.  I -- it was given to
 9   me via the attorneys at Motley Rice.
10   Q.   Needless to say, you did not prepare this document; is
11   that right, Dr. Young?
12   A.   No.  I reviewed it and looked at, you know, what the
13   listing is of the programs, but I did not compile it
14   specifically.
15   Q.   You did not add any information to this or supplement
16   this document in any way?
17   A.   I don't recall specifically that point if I made any
18   clarifiers or changed any language in it.  I don't recall
19   specifically.  I don't believe so.
20   Q.   Let's look at -- one of the categories here would be
21   treatment for pregnant women; correct?
22   A.   Yes.
23   Q.   And that is one of your populations of interest in your
24   proposal; correct?
25   A.   In my report, yes, that's correct.
```

1    **Q.**   There is on the far left-hand side an NAS medical

2    treatment category.  I don't know if you can see that.  NAS

3    medical treatment would relate to treatment of infants who

4    have been diagnosed with NAS; is that correct?

5    **A.**   Yes.  I -- it's not just the infant, but it is the

6    mother and the infant in their high risk pregnancy unit.

7    **Q.**   Okay.  So this is a program, M-A-R-C, MARC; is that

8    correct?

9    **A.**   That's correct.

10   **Q.**   And you are aware that this program is operating in

11   Cabell County as we speak?

12   **A.**   Yes, I am aware that that is operating.

13   **Q.**   And beyond the description that is in this document, do

14   you know anything else about this program?

15   **A.**   I have read other things about it, not that I can pull

16   up off the top of my head.  But I do understand the model,

17   and that that is something that is needed for pregnant

18   women.

19   **Q.**   Well, and it is something that currently is being

20   provided to pregnant women in the City of Huntington and

21   Cabell County; correct?

22   **A.**   Right.  We, we talked a little bit about scale.  And,

23   so, we don't know to what extent that is being provided, but

24   we know that the program exists, yes.

25   **Q.**   Okay.  Well, I believe your testimony was that you do

```
 1    have opinions as to capacity and scale of these programs in

 2    Cabell County; --

 3    A.    I have --

 4    Q.    -- correct?

 5    A.    -- yes, impressions of what the scale is.  I've

 6    reviewed documents about the numbers of people that can be

 7    accommodated in various programs.

 8    Q.    And, and, so, this is a program that is in existence in

 9    Cabell County today.  It provides services to women who are

10    pregnant.  Correct?

11    A.    That's correct.

12    Q.    And it includes therapy, individual counseling

13    services, weekly meetings.  Is that your understanding of

14    this program?

15    A.    Yes, it is.

16    Q.    And how many women are served in Cabell County today

17    with this program?

18    A.    I believe that Dr. -- I forget the name -- Werthammer

19    testified or -- to the effect that there were 250 infants

20    that are being followed.  So I would make the assumption

21    that they first were identified through the MARC program and

22    then followed afterwards after the baby is born.

23    Q.    Well, let me ask you about that testimony you've just

24    given.  When did Dr. Werthammer testify to this number

25    you've just offered?
```

1  **A.**   Oh, I'm sorry.  I might have confused what that

2  document was.  It may have been an article that I read,

3  sorry.

4  **Q.**   Well, I understood from your deposition that you had

5  not reviewed any testimony of any witness in this case; is

6  that correct?

7  **A.**   I'm sure if I said that at the time of my deposition,

8  that was correct.  But there's been quite a bit of time

9  since then to understand, you know, other articles that have

10  come out and et cetera.  Go ahead.

11  **Q.**   So I can clarify your testimony, I understood you to

12  say that Dr. Werthammer testified.

13  **A.**   And I was mistaken.

14  **Q.**   Is it correct, Dr. Young, that you have not reviewed

15  the testimony of the obstetrician who runs the MARC program

16  in Cabell County?

17  **A.**   Could you tell me his name?

18  **Q.**   His name is Dr. Chaffin.

19  **A.**   I have not reviewed that deposition.  I don't recall

20  specifically, but I don't believe that I have.

21  **Q.**   Okay.  So just so we're clear, the number of women,

22  pregnant women, one of your populations, treated with this

23  program in Cabell County today, do you know the number?

24  **A.**   No, I do not.

25  **Q.**   And can you tell me, are there women on a wait list to

1   be admitted or receive service from this program?

2   **A.**   If this program is funded by the Substance Abuse

3   Prevention and Treatment block grant, then they are not

4   allowed to have a wait list.  They must have interim

5   services in a short period of time because they are a

6   priority population of the Federal Government to make sure

7   that pregnant women get treatment.

8   **Q.**   So then it is your testimony, Dr. Young, that there

9   should not be any women in Cabell County on a wait list to

10   receive the counseling, weekly group meetings, obstetrician

11   care, those services; correct?

12   **A.**   I need to clarify that the requirement is that they be

13   provided interim services.  So I don't know if there is a

14   wait list for the full comprehensive program or if they are

15   provided interim services until they have a slot for them to

16   be able to be in treatment.

17   **Q.**   Okay.  And what you've said is that this issue of

18   interim service would be dependent upon the funding for this

19   MARC program; correct?

20   **A.**   The requirement to have interim services is dependent

21   on the Substance Abuse Prevention and Treatment block grant.

22   But best practice would be that they immediately had access

23   to treatment, that's correct.

24   **Q.**   We would need to know how this program is funded;

25   correct?

1    **A.**   To know if there's interim services?

2    **Q.**   Yes.

3    **A.**   I think that we may need to know that.

4    **Q.**   And do we know that?

5    **A.**   I can make some assumptions, but I do not know

6    specifically.  If it's at a hospital, I would imagine

7    Medicaid is one of the payers because pregnant women are

8    also a priority population of HRSA, the funder for Medicaid,

9    NCMS, funder of Medicaid.

10   **Q.**   But as you sit here today offering opinions in this

11   court, you do not know the source of funding for the MARC

12   program in Cabell County; correct?

13   **A.**   No.  That was beyond the scope of what I was asked to

14   do.

15   **Q.**   And you do not know the number of women served by this

16   program today?

17   **A.**   No.  That was not what I was asked to do.

18   **Q.**   And do you know how many women, or how long this

19   program has been in place and how many women it's served in

20   the community over time?

21   **A.**   Not off the top of my head.

22   **Q.**   There is another program on this document.  It is the

23   Children's Society --

24          MS. CALLAS:  Ritchie, if you can find that.

25   BY MS. CALLAS:

1    **Q.**    Children's Home Society of West Virginia.  Are you

2    familiar with that program, Dr. Young?

3    **A.**    I'm familiar with Children's Home Society, that program

4    model.

5    **Q.**    And can you tell the Court what your understanding of

6    that program model is?

7    **A.**    They typically would be providing services to children

8    and their families.

9    **Q.**    And is there a specific focus on adopted children?

10   **A.**    Sometimes.  Some of the Children's Home Society has an

11   adoption focus.  Other times it's children that need

12   services while they are in permanency programs which --

13   foster care programs trying to find permanent homes.

14   **Q.**    Again, do you know as you sit here today how many

15   children or families in Cabell County receive the services

16   described here from this organization?

17   **A.**    No.  That was beyond the scope of what I was asked to

18   do.

19   **Q.**    And this is actually a nonprofit or not-for-profit; is

20   that correct?

21   **A.**    I don't know specifically in West Virginia, but

22   typically Children's Home Society programs have been around

23   for decades.  And, yes, they are nonprofit organizations.

24   **Q.**    So this is not the State of West Virginia providing

25   these services; correct?

1    **A.**    No.   It is the State of West Virginia providing those

2    services because they fund Children's Home Society to

3    provide those services for families that are in the child

4    welfare system.

5    **Q.**    So this organization you say is receiving funding from

6    the state?

7    **A.**    They would be receiving Title 4(e) funding from the

8    state if these children are in foster care.   And they would

9    be receiving Title 4(b) if the children are in-home

10   children.

11   **Q.**    What if the children are adopted?

12   **A.**    That's 4(e), adoption assistance.   Let me back up.

13   Adoption assistance goes to the adoptive family.   There may

14   be a funding source out of Title 4(e) that they're funding

15   specifically to Children's Home Society for those permanency

16   services.   But it -- adoption assistance out of Title 4(e)

17   goes to the adoptive family so that they can care for

18   adopted children.

19   **Q.**    The Children's Home Society of West Virginia with a

20   location in Huntington indicates on this document provided

21   to you by the plaintiffs that they provide in-home treatment

22   services including clinical evaluation, treatment planning,

23   supportive individual counseling.   Is that right?

24   **A.**    Yes.   And that would indicate to me that they're funded

25   by Title 4(b) which is a capped grant to the state, whereas

```
 1    Title 4(e) is entitlement that is based on the number of
 2    children that need the service.
 3    Q.   But, in any event, these services are being provided to
 4    families in Cabell County; correct?
 5    A.   Yes.  They're on the list that those services are
 6    available.
 7    Q.   And you do not know how many families in Cabell County
 8    are currently receiving these services; right?
 9    A.   I do not know that.  It's beyond the scope of what I
10    was asked to do.
11    Q.   There are a number -- we'll wrap up with this
12    Plaintiffs' 42246 momentarily.  But there are a number of
13    educational programs identified, including programs offered
14    through the school system in Cabell County; correct?
15    A.   Yes, there are programs offered by the Department of
16    Education.
17    Q.   And you mentioned the West Virginia Birth-to-Three.
18    There's also Kids Clinic, the Cabell County School Special
19    Education Program, and Head Start.  Are those some of the
20    programs on this document?
21    A.   Yes, they are.
22    Q.   And in West Virginia there is a right to special
23    education and it's set out in a Policy 2419.  Does that
24    sound right?
25    A.   Every state has special education legislation that
```

```
 1    entitles children to a free and appropriate educational

 2    placement, yes.

 3    Q.   Now, is West Virginia's specific?  That is, it would be

 4    a unique Policy 2419?

 5    A.   I'm not familiar specifically with the state

 6    legislation 2419.  I'm sure it complies with the federal

 7    requirements of the individual educational plans that are

 8    required by the Department of Education.

 9    Q.   Now, I heard you testify earlier that children begin

10    schooling at age five.  And that's kindergarten; correct?

11    A.   Unless they need early intervention, in which case

12    special education is available to them between the ages of

13    three and five.

14    Q.   Now, you are aware that in West Virginia we're one of

15    the few states that offers free full-day, five-day,

16    kindergarten and Pre-K.  Is that correct?

17    A.   I am aware that that is available.  So that would be a

18    universal program for all children.  Children that have

19    special needs would fit into the special education budget.

20    Q.   And children who are three years old, do they have

21    education opportunities in West Virginia?  Do you know?

22    A.   If you're telling me that they have starting at three

23    for all children, then that's kids that need special

24    education?

25    Q.   I was asking you.
```

1    **A.**    Okay.   I'm not familiar specifically to know the

2    eligibility criteria of three-year-olds for education.

3    **Q.**    Okay.   There is a testing system that occurs for a

4    child to be included in special education; is that correct?

5    **A.**    Yes, that is.

6    **Q.**    And the idea is that special education does not cost a

7    parent anything; correct?

8    **A.**    Having raised two children with special education needs

9    that started in pre-school, I can tell you that there are

10   expenses that parents use that -- or they have in order to

11   meet their needs.

12        The education system must provide the services that

13   they are able to participate in their home school when

14   appropriate, and that it is a free and appropriate setting.

15   **Q.**    And some of the services that can be provided through

16   the school system include transportation, psychological

17   counseling, social work, therapy; is that correct?

18   **A.**    If there is a budget for your child to qualify to get

19   those services, then you can access those.   But I can tell

20   you it is a fierce competition among parents that have

21   special needs children to get those services.

22   **Q.**    And is that based on your experience in California?

23   **A.**    It's based on my knowledge of what special education

24   services are like across the country.   It's one of the areas

25   of the federal budget that is not fully funded.

1    **Q.**   Do you know how many children in Cabell County have a

2    need for special education but have not qualified?

3    **A.**   I'm not sure how you would know that they have a need

4    if they haven't qualified.

5    **Q.**   So is your opinion, then, that the children in Cabell

6    County who have a need have qualified for special education

7    in Cabell County?  Correct?

8    **A.**    That would be the process, that there was an assessment

9    to determine that they had a need for special education

10   services, which means that they are qualified for special

11   education services, which does not mean that they have

12   access to those special education services or that they are

13   appropriate for the type of intensity or length that is

14   needed.

15   **Q.**    Well, is it true that special education begins in West

16   Virginia as early as age three and continues even into

17   adulthood for certain people?  Correct?

18   **A.**    Yes, that's correct.  That's federal law.

19   **Q.**    So that would be a duration that is the life of that

20   person?

21   **A.**    No.  A child has to requalify each year.  So in those

22   kinds of situations that a child is extremely involved and

23   has, you know, obvious disabilities, that still has to be

24   renewed each year to ensure that they are still qualified

25   for that.

1          But the issue with kids with prenatal exposure is that

2     they're sometimes invisible -- or they are invisible

3     disabilities.  You have to really understand what is going

4     on for that particular child to know what kinds of services

5     they need; speech and language, sensory integration, motor

6     skills, attention strategies, those kinds of services.

7     **Q.**   And all of these services are provided to children who

8     have qualified after a careful evaluation by the

9     professionals at the Cabell County schools; correct?

10    **A.**   It's not my experience that they're available to

11    adoptive parents or foster parents at the intensity that

12    these kids need.

13    **Q.**   And what assessment have you made of what is available

14    in Cabell County for adoptive parents or foster parents?

15    **A.**   I wasn't asked to look specifically at what is in

16    Cabell County.  I was asked to report on what is needed for

17    children and families.

18    **Q.**   Now, let's finish up with this exhibit, Plaintiffs'

19    42246.  I count approximately 30 programs.  Is that a fair

20    estimate of the number of programs that this exhibit

21    identifies?

22    **A.**   I think that's about what's on this exhibit.

23    **Q.**   And is it fair to say, Dr. Young, that you have not

24    talked to the local people who are operating these 30

25    programs in Cabell County?

1    **A.**    Individually for all 30 programs, no, I have not.

2    **Q.**    And you have not examined for these 30 programs in

3    Cabell County how many people in Cabell County and the City

4    of Huntington are served currently by these programs?

5    **A.**    I have not evaluated that.  That was beyond the scope

6    of what I was asked to do.

7    **Q.**    And you do not know how many people in Cabell County

8    would like to use these programs or services but are denied

9    access for some reason or another?

10    **A.**    I don't know that second part of your statement about

11    denied access.  I don't know.  We have some estimates about

12    how many children require special education services that

13    have been prenatally exposed and those that are in the

14    foster care system about those kinds of services that are

15    needed.

16        But it was not -- it's beyond the scope of my report to

17    look at what is in Cabell County and the match, if you will,

18    between those services and what is in Cabell County.  I

19    believe there are other experts that are doing that.

20            MS. CALLAS:  I will move the admission of

21    Plaintiffs' 42246.

22            THE COURT:  Is there any objection to that?

23            MR. ACKERMAN:  No objection.

24            THE COURT:  It's admitted.  42246 is admitted.

25    BY MS. CALLAS:

1    **Q.**   So this list of 30 some programs --

2          MS. CALLAS:  And we can take that down, Ritchie.

3    Thank you.

4    BY MS. CALLAS:

5    **Q.**   -- is not exhaustive.  That is, there are other

6    programs that exist in Cabell County today that are not

7    included in that document; is that right?

8    **A.**   Yes.  We talked about that.  There are grant programs.

9    There are other funding sources to pay for specific

10   programs.

11   **Q.**   And one example would be the West Virginia Family

12   Treatment Court.  You mentioned that in your report.  Is

13   that right, Dr. Young?

14   **A.**   Correct.

15   **Q.**   And that is something that you would recommend as a

16   service to families who are dealing with substance use

17   disorder; is that right?

18   **A.**   Those that are in the child welfare system, correct.

19   **Q.**   So all families in Cabell County who are in the child

20   welfare system in your opinion should have access to the

21   services provided by a Family Treatment Court; correct?

22   **A.**   Correct.  Family Treatment Courts have a range of

23   intensity.  Sometimes parents don't need to have the

24   supervision or the frequent contact with the judge that

25   other parents need.

1          But there is a continuum of parents that benefit from

2     more frequent contact, more supervision, more access to make

3     sure that the services that they need are in place.  The

4     judge plays a very important convening role in counties to

5     make sure that those services are available to the families

6     that are in the child welfare system.

7     **Q.**   So if I understand your testimony, there is not a one

8     size that fits all for a family in Family Treatment Court;

9     is that right?

10    **A.**   Hopefully not.

11    **Q.**   But it's true that your cost estimate as identified in

12    your report does have an average cost per family; is that

13    right?

14    **A.**   That's right, an average cost per family.  So some

15    families might move faster through the phases.  So there's

16    typically a phase approach that as the parent is more stable

17    and child welfare is allowing home visits or overnights,

18    that typically the parent steps down in the frequency of

19    contact with the judge, frequency of supervision by the case

20    manager.  So there is a range of intensity in Family

21    Treatment Courts.

22    **Q.**   Your cost estimate, though, is based upon California

23    estimates for Family Treatment Court; is that right?

24    **A.**   I would need to look at my report for the data source

25    for that.  But there are several studies that are cited

1    about what the costs are for Family Treatment Courts.

2    **Q.**   Now, Family Treatment Court exists in West Virginia; is

3    that right?

4    **A.**   They're new.  This is a new initiative out of the

5    Supreme Court to stand up Family Treatment Courts in several

6    counties.

7    **Q.**   And do you know the cost of those courts operating in

8    West Virginia?

9    **A.**   No, I don't know.  Those were an initiative that came

10   about from the McKesson settlement funds that went to the

11   state.  And that was one of the priorities that child

12   welfare and the courts had to put these Family Treatment

13   Courts in place for this population.

14   **Q.**   But we've had Family Treatment Courts operating in West

15   Virginia for a few years.  Do you know the cost of those

16   courts in West Virginia?

17   **A.**   Again, that was beyond the scope of what I was asked to

18   do.  I was asked to look at the literature and to determine

19   what programs are effective and what their cost is.

20   **Q.**   So the treatment courts are not included in the

21   document provided by the lawyers for the City of Huntington.

22   There are other programs that exist in Cabell and Huntington

23   that are not included.

24        You reviewed this document, the City of Solutions; is

25   that correct, Dr. Young?

1    **A.**   Yes, I did.

2    **Q.**   And that is a document you reviewed.  It's been

3    admitted into evidence as 2653.  You reviewed that document

4    after you prepared your report in this case; is that right?

5    **A.**   That's correct.

6    **Q.**   The document identifies a number of programs, many of

7    which are not in the Attachment 1 to your report, the

8    document we've now admitted into evidence.

9         I'd like to draw your attention to one in particular.

10   And I'm happy to hand you this Defendants' 2653.

11   **A.**   Thank you.

12            MR. ACKERMAN:  Do you have a copy for us?

13            MS. CALLAS:  Oh, of course.  You don't have one?

14   BY MS. CALLAS:

15   **Q.**   Dr. Young, if I could direct your attention to Page

16   48 of the City of Solutions, Defendants' Exhibit 2653.

17   Again, this is a program that was not included in your

18   reliance material or the Attachment 1 we've now looked

19   at and it's called CORE.  Do you see that program?

20   **A.**   Yes, I do.

21   **Q.**   Okay.  And would you agree with me -- if you look over

22   the description of this program which is being offered in

23   Huntington and Cabell County, that it is a program that does

24   offer specialized peer recovery coaches for additional wrap

25   around recovery support, and has a target sub population of

1    pregnant and parenting women.  Do you see that?

2    **A.**   On 48 CORE is talking about vocational services.  Am I

3    missing the paragraph you're looking at?

4    **Q.**   It might actually be -- I'm looking at the page before

5    that.  I apologize.

6    **A.**   So peer recovery --

7    **Q.**   Yes.  And I think that's actually an error in my, in

8    my, what I'm looking at here.  If you look at Page 49 --

9    **A.**   47 is where peer recovery is located.

10   **Q.**   It's also discussed on Page 49 in connection with CORE.

11   And it says -- the middle paragraph, the last two sentences,

12   "CORE hubs offer wrap around job entry and training services

13   and life skills training, as well as specialized peer

14   recovery coaches for additional wrap around recovery

15   support."

16        Do you see that?

17   **A.**   I can see it here, but I don't know where you're

18   reading on the paper.  Yes.

19   **Q.**   Okay.  Peer recovery coaching is something you would

20   agree is a service that's needed for certain individuals in

21   Cabell and Huntington; is that right?

22   **A.**   Yes, I do, particularly those in the child welfare

23   system.

24   **Q.**   And these are populations of interest to you in your

25   report; correct?

1    **A.**   Yes, that's correct.

2    **Q.**   So, again, this is a program that is currently

3    operating in Cabell and Huntington.  Do you know how many

4    people in that community are taking advantage of this

5    program?

6    **A.**   No, I don't.

7    **Q.**   Or in the populations you're interested in, families in

8    the child welfare services?

9    **A.**   Again, I wasn't asked to match existing services with

10   the literature of what works.  I was asked to provide what

11   works and the cost of those types of services.

12   **Q.**   Let's switch gears.  We've talked about programs that

13   are currently in existence and how they may be utilized by

14   the people in the community.  I'd like to talk a little bit

15   about cost and funding.

16       So, you testified about a need for long-term funding

17   for the programs you're recommending; CORE as an example.

18   You do not know how CORE gets its funding, do you?

19   **A.**   Not specifically.  I know how recovery coaching is paid

20   for in a variety of ways.

21   **Q.**   And as it relates to any of the programs we've

22   discussed in these two exhibits, you do not know the actual

23   cost per participant to operate a program like CORE; is that

24   right?

25   **A.**   I'd have to look in my report to see what we put for

1   the cost of peer mentor programs.  So I'm hesitant to say.

2   I do not know.  I do -- I was not asked to look at the

3   specific budgets of these various grants and ways in which

4   programs have been initiated in Cabell County.

5   **Q.**   So to the extent you've offered costs for programs that

6   you recommend, you are not referencing or relying on what is

7   actually being done in Cabell County to estimate the cost?

8   **A.**   No, for a few reasons.  Are you interested in those

9   reasons?

10  **Q.**   I, I would like you to answer my question which I think

11  you did with the word "no."

12  **A.**   No.  It was beyond the scope of what I was asked to do.

13  **Q.**   Back to funding.  Do you know currently whether any of

14  the programs we've just looked at have a funding deficit;

15  that is, they do not currently have the funding needed to

16  operate?

17  **A.**   My understanding across the nation, because of COVID,

18  that --

19  **Q.**   Dr. Young, I'm going to interrupt you --

20  **A.**   Okay.

21  **Q.**   -- because you've inserted the nation and I have asked

22  a more specific question obviously.  It relates to Cabell

23  County.  Are you aware of any particular program in Cabell

24  County that today has a funding deficit?

25  **A.**   Not specifically because that was beyond the scope of

1    what I was asked to do.

2    **Q.**   And, and you have talked a bit about federal funding.

3    And the Federal Government does fund a number of the

4    programs that you would recommend for the populations of

5    people in Cabell County of interest to you; is that right?

6    **A.**   There is federal funding for most of these programs,

7    that's correct.

8    **Q.**   And isn't it true that over the last year the Federal

9    Government has instituted a number of very significant

10   federal funding programs specifically identified for

11   substance use disorder and opioid use disorder?

12   **A.**   That is true.  And I think it's really important that

13   we recognize that the Federal Government funding is not

14   free.  That is paid for by the taxpayers of West Virginia

15   and the United States.

16   **Q.**   And some of these large programs, just in the last six

17   months, would include President Biden's American Rescue Plan

18   which had $3 billion earmarked for substance abuse

19   prevention; is that right?

20   **A.**   Yes, in reaction to the increase in overdose deaths

21   during COVID.

22   **Q.**   And in December of 2020 we also saw substance use

23   disorder included in the COVID Relief Bill; is that right?

24   **A.**   Yes.  We've never had these kinds of funds put into

25   substance abuse treatment in the entirety of my career.  And

```
1    this is Congress recognizing the opioid problem in

2    communities and really shoring up the treatment system that

3    is remarkable that there are federal funds being put into

4    communities to address the opioid and substance use problem.

5    Q.   Now, are you aware, Dr. Young, regarding any issues

6    with West Virginia's ability to deploy the federal funding

7    it receives for opioid use disorder?

8    A.   I am aware of challenges to use the funding that has

9    come into Cabell County and West Virginia.  That's not

10   completely unusual in just West Virginia, but it is an

11   issue.

12   Q.   And, in fact, West Virginia has had money for two years

13   to spend -- it's the STR.  I don't know if that's known as a

14   Star grant.

15   A.   No.

16   Q.   STR?

17   A.   Uh-huh.

18   Q.   And they were unable to spend that money; is that

19   correct?

20   A.   That is the situation because the workers are not

21   available, the trained staff.  So while Congress is

22   recognizing that there needs to be additional funds, there's

23   always a lag of being able to get federal dollars and being

24   able to initiate the program having enough staff to be hired

25   to, to run those programs and to deliver those services.
```

1    So we're in a little bit of a catch-up phase right now

2    in this specific era of additional funds for substance use

3    treatment.

4    **Q.**    So, in fact, West Virginia has a surplus of funds it's

5    been unable to spend related to opioid use disorder; is that

6    right?

7    **A.**    I don't know that specifically for the budget for West

8    Virginia, but I know that from nationally and in most states

9    there are more dollars that have come in than -- it's the

10   reason why Congress gave the states most recently in the

11   American Recovery Act a few years to spend those dollars.

12       Typically they're one-year dollars, so you spend it in

13   this one year or, you know, you don't get to roll that over.

14       So in this particular case, the most recent funding was

15   allowed for a couple of years.  Again, that time period

16   means that at the end of that, there won't be those kinds of

17   funds unless there's another crisis that Congress says we

18   need to shore up more treatment than what they've done now.

19   **Q.**    And West Virginia's inability to spend the federal

20   funding for opioid use disorder was the subject of an Office

21   of Inspector General investigation.  Are you aware of that,

22   Dr. Young?

23   **A.**    I'm not aware of that specifically in West Virginia.

24   But, as I said, it is a challenge that states are

25   confronting all over the country right now.

1    **Q.**   Let me show you that document.

2              MS. CALLAS:  May I approach, Your Honor?

3              THE COURT:  Yes.

4    BY MS. CALLAS:

5    **Q.**   Dr. Young, I've handed you what's been marked as

6    Defendants' West Virginia 3237.  And this is a document

7    you would recognize as the Office of Inspector General

8    for the U.S. Department of Health and Human Services, a

9    report related to targeted response to the opioid

10   crisis.  Do you see that?

11   **A.**   Yes, I do.

12   **Q.**   And I would just direct your attention to the first

13   page which is right inside the report.  And I'll direct your

14   attention to the block that says "How OIG Did This Review."

15   Do you see that in the gray section there?

16   **A.**   Yes.

17   **Q.**   And it just describes what the grant's purpose was and

18   the progress made by the states in deploying this grant

19   money, specifically addressed that expanding access to OUD

20   prevention, -- do you see that?

21   **A.**   Yes, I do.

22   **Q.**   -- evidence-based treatment, and recovery support

23   services.  Do you see that?

24   **A.**   I actually don't see prevention.  I -- oh, yes, up

25   above OUD prevention, evidence-based treatment, yes.

1    **Q.**   And these are all programs and services that would fall

2    within the types of programs and services you're

3    recommending for Cabell County; correct?

4    **A.**   Many of them, yes.  They're specific to substance use

5    treatment.  They're not specific to child welfare practice.

6    So child welfare, the courts who are also involved with

7    children and families would not have access to those

8    dollars.

9    **Q.**   Okay.  And I'll direct your attention, if you'll turn

10   several pages to the report, Page 7, you'll see a chart at

11   the bottom that indicates how 14 states have spent less than

12   half of their respective grant awards at the end of the

13   two-year period.  So this grant was a two-year grant; is

14   that correct?

15   **A.**   That's correct.

16   **Q.**   And I think you can see in the document itself that the

17   grant period actually started in 2017 and ran into 2019; is

18   that right?

19   **A.**   I believe that's correct.

20   **Q.**   Okay.  And you'll see that West Virginia is at the top

21   of this list having spent only 34 percent, or approximately

22   a third, of the federal money allocated to it for the

23   purposes described; OUD prevention, evidence-based

24   treatment, and recovery support services.  Is that right?

25   **A.**   That is what this report states, that West Virginia was

1    able to spend a third of those dollars in those two years.

2    **Q.**   You testified on direct related to the administrative

3    costs that can be associated with running a grant funded

4    program.  Do you remember that testimony?

5    **A.**   Yes, I do.

6    **Q.**   Okay.  And if you'll look at this document on Page 18,

7    there is a chart that shows how the states have spent their

8    money.  You see West Virginia third from the bottom.  So

9    18 percent of the money had been spent on prevention.

10   70 percent had been spent on treatment.  8.9 percent had

11   been spent on recovery support.  And only 1.9 percent had

12   been spent on administration.  Do you see that?

13   **A.**   I do.  And you need to recognize this is not a grant

14   program.  This -- these are monies that were passed through

15   to the Substance Abuse Prevention and Treatment -- it is

16   called a grant, the SAPT block grant that goes to the state

17   substance abuse agency.

18       And, so, those mechanisms are in place.  It's not like

19   Cabell County's, you know, court applied for a grant from

20   the Department of Justice.  Those are different kinds of

21   grants that have different administrative requirements.

22   **Q.**   It is fair to say, though, that West Virginia is using

23   most of its federal money for the purposes intended,

24   treatment prevention and recovery support; correct?

25       MR. ACKERMAN:  Objection to form.  I'm sorry.

1    Objection to foundation as to the "purposes intended" part

2    of that question, Your Honor.

3              MS. CALLAS:  We went over that.

4              THE COURT:  Well, it's reflected in the report,

5    Mr. Ackerman.  Overruled.

6    BY MS. CALLAS:

7    **Q.**   Would you like me to try to repeat that question?

8    **A.**   Yes, please.

9    **Q.**   This document would suggest that West Virginia is

10   spending this STR grant money primarily for prevention

11   treatment, recovery support, and not administrative costs;

12   correct?

13   **A.**   Correct, for the reasons that I said about their

14   administrative structure that's set up for the, the

15   Substance Abuse Prevention and Treatment block grant.

16   **Q.**   Now, Dr. Young, you have provided in your report the

17   cost of NAS treatment for babies and also maternal treatment

18   for mothers that are pregnant with substance use disorder;

19   is that correct?

20   **A.**   That's correct.

21   **Q.**   And you would agree that Medicaid, which is --

22        We can take this down.

23        -- that Medicaid, which is a federally funded program,

24   pays for the majority of these treatment costs; is that

25   right?

1    **A.**    Yes.  The federal taxpayers pay for those programs.

2    **Q.**    And in West Virginia in particular, 86 percent of

3    babies born to NAS mothers are covered by Medicaid; is that

4    correct?

5    **A.**    I haven't seen that specific number.  In the nation

6    about half of births are covered by Medicaid.  So I'm not

7    surprised that it would be 86 percent that are paid by the

8    taxpayers.

9    **Q.**    And if that's what the West Virginia DHHR reports, that

10   86 percent of NAS babies are born to mothers covered by

11   Medicaid, you'd have no reason to disagree with that number;

12   right?

13   **A.**    No, because we know that mothers on Medicaid were more

14   likely to get prescriptions for opioids than mothers not on

15   Medicaid.  So I'm not surprised.

16   **Q.**    And you would agree that medical care and treatment for

17   NAS babies and the mothers are funded by Medicaid, then; is

18   that correct?

19   **A.**    I'm agreeing that those services are paid for by the

20   American taxpayers.

21   **Q.**    And medical care and treatment for the mother would

22   include rehabilitation services for substance use disorder;

23   correct?

24   **A.**    Well, Medicaid has a limited benefit package.  And

25   while after the Affordable Care Act it's more expansive and

 1    West Virginia expanded access to Medicaid that there are

 2    services that are provided in the healthcare arena through

 3    Medicaid for that population and in the postpartum period

 4    for that population as a requirement of accepting Medicaid.

 5    **Q.**   So, again, Medicaid does cover for pregnant women their

 6    substance use rehabilitation services; correct?

 7    **A.**   I don't know the benefit package in West Virginia.  It

 8    is typically the healthcare cost that's covered by Medicaid

 9    because it covers medical care.  It doesn't cover social

10    support.  It doesn't cover the other kinds of things that

11    women would need, pregnant women would need.

12    **Q.**   Well, are you aware that West Virginia applied for the

13    1115 waiver and now has an expanded substance use disorder

14    coverage for Medicaid recipients including peer recovery

15    support?

16    **A.**   Yes, I am familiar with the 1115 waiver.

17    **Q.**   But were you aware that West Virginia had applied for

18    and was granted that waiver in 2018?

19    **A.**   No, not specifically the year of that.

20    **Q.**   And you would agree that that waiver expands the

21    substance use disorder treatment options for individuals

22    covered by Medicaid in West Virginia; correct?

23    **A.**   Yes.  I would agree that that expansion means that more

24    West Virginians are eligible and that the package of

25    services that are included in the waiver for healthcare and

1    those kinds of peer navigators that are covered now under

2    Medicaid that that is available because of the funds that

3    are paid into the Federal Government.

4    **Q.**    Now, for people who do not qualify for Medicaid, West

5    Virginia offers, primarily for children 19 and under, a

6    supplemental medical policy.  Are you aware of that?

7    **A.**    Most states have that, yes.

8    **Q.**    Do you know what it's called in West Virginia?

9    **A.**    No, I don't.

10   **Q.**    Do you know that that program known as the West

11   Virginia Children's Health Insurance Program, CHIP for

12   short, offers a variety of medical and therapy coverage

13   options to children?

14   **A.**    Yes.  CHIP is the name of the federal program, yes.

15   And for that eligible population, when they meet medical

16   necessity for those services, it's another stipulation for

17   CHIP and for Medicaid that you have to meet medical

18   necessity to receive those services.

19   **Q.**    And have you evaluated how many children in Cabell

20   County either qualify for Medicaid or qualify for CHIP

21   supplemental?

22   **A.**    No.  It was beyond the scope of what I was asked to do.

23   **Q.**    You had a few calculations in your report, Dr. Young,

24   I'd like to ask you about specifically.  One of them relates

25   to adoptive families.  You had an annual cost for adopted

1    children.

2         Can you tell me how you derived that number?  It was

3    not identified in the report, the source.

4    **A.**   Can I look?

5    **Q.**   Of course.

6    **A.**   Can you refer me to the page that you're talking about?

7    **Q.**   Absolutely.  It is Page 21.

8    **A.**   I don't see where that ties back to the description

9    below the 10,302.  I can tell you what those costs are

10   typically made up of.

11   **Q.**   Well, I'm more interested because you're offering a

12   dollar number --

13   **A.**   Uh-huh.

14   **Q.**   -- that's going to be utilized presumably by

15   Mr. Barrett, Dr. Barrett, where did that $10,000 number come

16   from?  What is your source or basis for the dollar amount?

17   **A.**   I can tell you that it is typically the Child Welfare

18   Outcomes Report that talked about those kinds of incidence

19   dollars.  And, I'm sorry, I don't recall off the top of my

20   head and I don't see it tied back to this.

21   **Q.**   It is not West Virginia specific; correct?

22   **A.**   These numbers are -- when they're adoption assistance,

23   that is, as I mentioned, Title 4(e), adoption assistance.

24   So those are federal budget dollars about what the

25   allocations are.

1    **Q.**   So is it your testimony that that $10,000, if it were

2    needed, is provided by the Federal Government?

3    **A.**   A portion of that is reimbursed to the state based on

4    if the child was eligible for Medicaid at the time that the

5    child was placed and other criteria about were there

6    reasonable efforts made to keep the child with the parent.

7    There are some provisions in the child welfare law that the

8    Court has to make determinations about to say that that

9    child is 4(e) eligible.

10        So if that child was made eligible for that

11   reimbursement, that eligibility continues until the child no

12   longer has a, an adoption assistance available to them.

13        So there are a lot of caveats about which kids actually

14   get reimbursed.  The rest of those funds that would go to

15   adoption assistance would be paid for by the state.

16   **Q.**   And as it relates to any specific group of children in

17   Cabell County, you've not provided to the Court the

18   percentage West Virginia would contribute to that cost or

19   how many children in West Virginia, Cabell County

20   specifically have that cost being reimbursed?

21   **A.**   The state share of 4(e) is the same share for child

22   welfare as it is for Medicaid.  And I believe -- I would

23   want to be able to verify that, but I believe the Medicaid

24   match rate in West Virginia is about 37 percent.

25        So the state taxpayers pay that portion while the

1    Federal Government reimburses the state for the costs that

2    they've put out for adoption assistance.

3    **Q.**   But, again, you don't know how many children in Cabell

4    County this would apply to; correct?

5    **A.**   That was beyond the scope of what I was asked to do.

6    **Q.**   That's all the questions I have for you.  Thank you,

7    Dr. Young.

8              THE COURT:  Ms. Wu, are you next?

9              MS. WU:  Yes, I am.  Your Honor, I'll go ahead and

10   start.  I see that we have some technical switching.

11             THE COURT:  If you need a minute to get ready, you

12   may do so.

13             MS. WU:  May we pause one moment?  That might be

14   more efficient.  Thank you, Judge.

15        (Pause)

16             MS. WU:  May I proceed, Your Honor?

17             THE COURT:  Yes.

18                         CROSS EXAMINATION

19   BY MS. WU:

20   **Q.**   Good morning, Dr. Young.  My name is Laura Wu and I

21   represent McKesson.  We haven't met before.  Thank you

22   for being here today.

23        I have a brief set of questions and I'll ask you to

24   bear with me as we focus on some of the mechanical aspects

25   of your population and cost estimates in this case.  I'm

1       going to do that to situate those estimates in the context

2       of the abatement program of the plaintiffs in this case.

3           Dr. Young, you mentioned that you talked with Dr. Caleb

4       Alexander; correct?

5       **A.**    Correct.

6       **Q.**    You're aware that the population and cost estimates

7       that you've provided and discussed with the Court this

8       morning feed into the abatement program that Dr. Alexander

9       will present to the Court in this case; correct?

10      **A.**    Yes, I am.

11      **Q.**    And for that reason, I'm going to focus just on those

12      aspects of the opinions that you're offering to the Court to

13      situate those opinions for the Court.

14          So, Mr. Reynolds, could we put up the demonstrative

15      that we have?

16      BY MS. WU:

17      **Q.**    Earlier today, Dr. Young, you identified five

18      populations that you discussed with Ms. Singer.  Do you

19      recall that?

20      **A.**    Yes, I do.

21      **Q.**    We're going to put up on the board, just to make sure

22      we get them right, those five populations:

23          Pregnant women with OUD; children affected by prenatal

24      opioid exposure; infants born with NOWS or NAS; children

25      affected by parental opioid and other substance use involved

```
 1    with child welfare services; and adolescents and young
 2    adults.
 3         Do you see those up on the board, Doctor?
 4    A.   I do see those.
 5    Q.   And those are the five populations that you identified
 6    in your testimony earlier this morning; correct?
 7    A.   That's correct.
 8    Q.   Now, I'd like to look at these populations that you
 9    estimated for purposes of your opinions in this case in
10    relationship to Huntington/Cabell.  So I'm going to go ahead
11    and write "Huntington/Cabell" up on the board.
12         (Pause)
13         Thank you for your patience while I got that to work.
14         So I've written on the board "Specific to HC" for
15    Huntington/Cabell, Dr. Young.  Do you see that?
16    A.   Yes, I do.
17    Q.   So for population one, pregnant women with OUD, you
18    provided an estimate for the State of West Virginia as a
19    whole; correct?
20    A.   Could I look at my report?
21    Q.   Certainly.  And I can try to help you with that.  Do
22    you have a copy of your report in front of you?
23    A.   I do.
24    Q.   And if you turn to Page 8, in the table it says 2004 to
25    2017 West Virginia Treatment Admission.  Do you see that,
```

1    Doctor?

2    **A.**    Yes, I do.

3    **Q.**    And, so, your population estimate for pregnant women

4    with OUD is for the State of West Virginia as a whole;

5    correct?

6    **A.**    No.  As I stated in my testimony, these are women that

7    were able to be admitted to treatment during that time

8    period who were -- who said that they were pregnant at

9    admission.  It's not a needs population.  This is who got

10    in.

11    **Q.**    Okay.  So that's a great clarification, Doctor.  So

12    your population estimate for pregnant women with OUD is

13    based on treatment admissions data for the State of West

14    Virginia as a whole; correct?

15    **A.**    This does not make a specific of how many women.  I

16    believe Dr. Alexander does that calculation.  We were

17    showing simply the proportion that were admitted for opioid

18    use disorder versus those who said heroin at admission.  And

19    then the proportion is that all women with opioid use

20    disorder need these specialized services during pregnancy.

21    **Q.**    And the data that you've presented is for the State of

22    West Virginia; correct?

23    **A.**    These are treatment admissions in West Virginia,

24    correct.

25    **Q.**    And that, that population estimate is not specific to

1   Huntington or Cabell County; correct?

2   **A.**   No, no.  What would be the parallel to that would be

3   the data that we mentioned that 7 percent of pregnant women

4   use prescription drugs during pregnancy.

5   **Q.**   And, so, I've put an X on the board because your

6   population estimate for pregnant women with OUD is for the

7   State of West Virginia and not specific to

8   Huntington/Cabell?

9   **A.**   This is not an estimate of pregnant women with OUD.

10   That's in this.  That is based --

11   **Q.**   I'm sorry, for admission.

12   **A.**   Those are treatment admissions of women who got into

13   treatment in West Virginia.  It is not who needed treatment.

14   **Q.**   Correct.  And, Doctor, you've testified about that

15   admission data population.  Do you know what proportion of

16   individuals with OUD seek treatment?

17   **A.**   No, I don't.

18   **Q.**   Doctor, the Court has already heard testimony that

19   Cabell-Huntington Hospital in particular cares for patients

20   for more than 29 counties throughout West Virginia, Eastern

21   Kentucky, and Southern Ohio.  Are you aware of that

22   treatment population which seeks services in Cabell County?

23   **A.**   I have seen that in things I've read, that there's a

24   wide catchment.

25   **Q.**   To estimate the number of pregnant women with OUD in

1    Huntington and Cabell County specifically, you would need to

2    subtract the number of pregnant women who live in Kentucky

3    who receive services in the Cabell County area; correct?

4            MR. ACKERMAN:  Objection, foundation, Your Honor.

5    The witness already testified she wasn't seeking to

6    establish a population count.

7            THE COURT:  Well, this is cross-examination.  I

8    think it's a legitimate question.  Go ahead.  Overruled.

9            THE WITNESS:  I, I don't know that to be accurate

10   because the expenses for those women are being absorbed by

11   Huntington Hospital where they are being treated.  So the

12   fact that they live out of county, that doesn't mean that

13   Cabell County and Huntington Hospital are not absorbing

14   those costs.

15   BY MS. WU:

16   **Q.**   Thank you, Doctor.  And just for purposes of my

17   question, I want to focus on what it would take to come

18   up with a population estimate, setting aside for now the

19   issue of cost.

20        So in the case that we wanted to identify the

21   population of pregnant women with OUD in Huntington and

22   Cabell County, it is the case that we would need to take out

23   of that dataset individuals who received treatment in the

24   county who reside in Kentucky, for example; correct?

25   **A.**   That's what I'm not agreeing to because those -- that

```
 1    catchment area is where women are coming to get their

 2    services in Cabell County.

 3         And, so, Cabell County doesn't have a way to say, oh,

 4    hey, Kentucky, send us back our money.  They're using the

 5    services that are in Cabell County.  And it's not dependent

 6    on what county they live in if they're delivering those

 7    services and delivering those babies in Cabell County.

 8    Q.   Is it your testimony, Doctor, that the population

 9    estimate for Cabell County could sweep in individuals from

10    Kentucky and Ohio who receive treatment in Cabell County?

11    A.   I don't know those specifics about what that proportion

12    looks like.  I just know that if the service is being

13    delivered in Cabell County, just like if you were on

14    vacation and you ended up in Cabell County to have your

15    baby, you would be having those expenses in Cabell County.

16    It didn't matter where you lived.

17    Q.   And the population estimates that you provide in this

18    case don't take account of those specific treatment areas as

19    they relate to the Cabell and Huntington region; correct?

20              MR. ACKERMAN:  Objection, misstates prior

21    testimony, population estimate.

22              THE COURT:  Overruled.  Go ahead.

23              THE WITNESS:  As I've said a few times, that that

24    was not what I was asked to do, to look at that specific,

25    but to provide the estimate of what programs are needed and
```

```
 1    what the cost of those programs are.  I believe there are

 2    other experts that are looking at those specific numbers of

 3    how many.

 4    BY MS. WU:

 5    Q.   So that type of population estimate for Cabell

 6    County is not part of your opinions that you're offering

 7    in this case?

 8    A.   They're not in my report.

 9    Q.   Now, I'd like to turn to the second population,

10    population 2, which is children affected by prenatal opioid

11    exposure.

12         Doctor, you provide estimates for the United States and

13    for West Virginia in your report for this case; correct?

14    A.   That is correct.

15    Q.   And you do not provide an estimate specific to the City

16    of Huntington or Cabell County; correct?

17    A.   That is correct.  That would be somebody else's expert

18    report again.

19    Q.   Thank you, Doctor.  So I've put an X on the board to

20    indicate that your population estimate for population number

21    2 is not specific to Huntington and Cabell County.

22         Now, you might have guessed.  Now we're going to go to

23    your third population which is infants born with NOWS or

24    NAS, Doctor.

25         Do you see that up on the board?
```

1    **A.**    I do.   I will call your attention to the tables that I

2    have provided have not been population estimates.   So we can

3    establish that I've not given population estimates of how

4    many people in Cabell County need that service or that have

5    received that service.   I was asked to give what proportion

6    of that population need the service and what kind of service

7    that is.

8    **Q.**    Thank you, Doctor.   And I appreciate the clarification

9    and disciplining my language.   That's helpful.

10        Sticking with population 3, again, in your report --

11    and if you want to look at it, it's your Table 3 -- you have

12    not provided an estimate of the population which is specific

13    to Huntington/Cabell County.   Again, you've provided data

14    for the United States as a whole and for the State of West

15    Virginia; correct, Doctor?

16    **A.**    On the proportion of the population that need those

17    services, that's correct.

18    **Q.**    So, Doctor, I've put another X on the board because

19    population number 3 reflecting your opinions for this case

20    is not specific to Huntington and Cabell County?

21    **A.**    That's correct because another expert is providing that

22    information, as you know.

23    **Q.**    Thank you, Doctor.   So now we'll march through to

24    population number 4, which is children affected by parental

25    opioid and other substance use involved with child welfare

 1   services.  Do you see that, Doctor?

 2   **A.**   Yes.

 3   **Q.**   And, once again, your estimate is not specific to

 4   Huntington and Cabell.  Instead, it's a West Virginia

 5   estimate.  Correct?

 6   **A.**   I let my mind wander a moment.  So -- and I was looking

 7   for that table.

 8        I am not providing numbers specific to Cabell or

 9   Huntington.  I am providing what proportion of the

10   population needs services and what kinds of services they

11   need.

12   **Q.**   And, Doctor, with regard to population number 4, the

13   population that you discussed is West Virginia as a whole;

14   correct?  Would you like a page reference, Doctor?

15   **A.**   No.  I'm just -- I'm, you know, trying to not be

16   confused as to why you're asking the question because I'm

17   not giving you a number.  I didn't report on a number and it

18   was beyond the scope of what I was asked to do.

19   **Q.**   And the population that you discussed for population

20   number 4 is for the State of West Virginia as a whole.  It's

21   not specific to Huntington or Cabell County.  Correct?

22   **A.**   Perhaps you could tell me where I mention --

23   **Q.**   Sure.

24   **A.**   -- West Virginia as a whole.  On the at-home population

25   I do give the numbers in West Virginia to have an idea of

1    the proportion of children that need these kinds of

2    services.  That's correct.

3    **Q.**   That's right.  So the data that you've used in

4    relationship to your population number 4 is for the State of

5    West Virginia as a whole and not specific to Huntington or

6    Cabell County; correct, Doctor?

7    **A.**   The numbers of persons are not specific to Cabell and

8    Huntington.

9    **Q.**   Thank you, Doctor.

10   **A.**   The proportion of children who need services are

11   provided.

12   **Q.**   Doctor, I've put an X up on the board because your

13   population, again, relates to West Virginia as a whole;

14   correct?

15   **A.**   Yes.

16   **Q.**   Okay.  Now, last one, population number 5, which is

17   adolescents and young adults; correct?

18   **A.**   Correct.

19   **Q.**   And you've provided no estimate or proportion for the

20   population that falls into category number 5; correct?

21   **A.**   I believe that's correct.  All adolescents or children

22   of parents with opioid use disorder require those services.

23   **Q.**   And you haven't used any data that allows you to come

24   up with any type of estimate or proportion for your

25   population number 5; correct?

1    **A.**   No.  All adolescents who are children of parents with

2    opioid use disorder require those services, as similarly

3    with all children who are affected by their parents' opioid

4    use disorder need those services.  So --

5    **Q.**  And, so, you haven't presented any data or opinion to

6    quantify the number of individuals or the proportion of

7    individuals that fall into your population number 5;

8    correct?

9    **A.**   The proportion is all children who meet that criteria

10   need intervention.

11   **Q.**   And there's no quantification of the number which is

12   specific to Huntington or Cabell County; correct, Doctor?

13   **A.**   That was beyond the scope of what I was asked to do,

14   yes.

15   **Q.**   Thank you.

16            THE COURT:  Is this a good place to stop, Ms. Wu?

17            MS. WU:  Certainly, Your Honor.

18            THE COURT:  All right.  We'll be in recess until

19   2:00.  I've got another matter to deal with over the lunch

20   break.  So I'm going to have to ask you to clear out.  I

21   know it's a nuisance, but there's no way around it.

22       Dr. Young, you can step down during the break and I'll

23   see you back here at 2:00.

24            THE WITNESS:  Thank you so much, sir.

25            MS. SINGER:  Your Honor, before we adjourn I know

1   that Dr. Young has a commitment at 3:00.  I don't know how

2   much longer defendants plan to be, but I know that she would

3   likely appreciate some guidance as to whether she'll be able

4   to be there on time.

5          THE COURT:  Well, we have one more --

6          MS. HARDIN:  I don't plan to ask any questions at

7   this time, Your Honor, depending on how things progress, but

8   I wouldn't expect to have questions.

9          THE COURT:  Okay.  Looks like we might make it, --

10         THE WITNESS:  Okay.

11         THE COURT:  -- Ms. Young.  If I didn't have

12  another matter over the lunch break, I'd move it up, but I

13  can't do it.

14         THE WITNESS:  I understand.

15      (Recess taken at 12:03 p.m.)

16         THE COURT:  Dr. Young, you may resume the witness

17  stand, if you're in the courtroom.

18         MS. SINGER:  She's coming, Your Honor.

19         THE WITNESS:  My apologies.

20         THE COURT:  Okay.

21         MS. WU:  May I proceed, Your Honor?

22         THE COURT:  Yes, you may.

23         BY MS. WU:

24  **Q.**   Dr. Young, welcome back.

25  **A.**   Thank you.

1    Q.   Before the break, we were talking about a five -- the

2    five populations that identified for your testimony today.

3    I just want to take a step back.

4        Doctor, you were retained by the plaintiffs in this

5    case to offer abatement strategies related to children and

6    their parents affected by opioids, correct?

7    A.   Children and families, yes.

8    Q.   And by abatement, you mean, in your words, quote,

9    "restore the community to health", end quote, correct?

10   A.   Yes.  I believe that's what you're taking from my

11   report.

12   Q.   Okay, thank you.  So, now I would like to return to the

13   five populations that we were talking about before the lunch

14   break.  Doctor, the first categories, pregnant women with

15   OUD, correct?

16   A.   Yes, it is.

17   Q.   Women can develop OUD from heroin or illegal fentanyl

18   without having ever used a prescription opioid, correct?

19   A.   That isn't my experience, but I suppose it could

20   happen.

21   Q.   And, in fact, your first category, pregnant women with

22   OUD, is not specific prescription opioids, correct?

23   A.   No, not specific to prescription dependence.

24   Q.   Okay.  And so, I'm going to write specific to

25   prescription or Rx opioids on the board.  And put an "x" for

1    your first category of pregnant women with OUD.

2        So, Dr. Young, in order to hopefully move this along

3    for all of our sakes, I'll ask you a more general question.

4    None of your five populations are specific to prescription

5    opioids, correct?

6    **A.**   Well, my experience is that particularly women don't

7    start as their first substance as being heroin or fentanyl.

8            MS. WU:  Your Honor, I'd move to strike the

9    response there, which is not answering my question.

10           THE COURT:  Yeah.  You have to answer the precise

11   question, Dr. Young.

12           THE WITNESS:  Okay.

13           MS. WU:  Again, I understand you need to get out

14   of here this afternoon.

15           THE COURT:  Mr. Ackerman?

16           MR. ACKERMAN:  I'm sorry.  For the record, we'd

17   oppose that, Your Honor.

18           THE COURT:  All right.  Well, I granted the motion

19   to strike.

20       You can go ahead, Ms. Wu.

21           MS. WU:  Thank you, Your Honor.

22           BY MS. WU:

23   **Q.**   Dr. Young, do you need the question again?

24   **A.**   It's -- I don't think I need the question again, but

25   it's not a simple yes/no answer because prescription opioids

1    are embedded in those populations.

2    **Q.**   Looking at the five populations that you've identified

3    in terms of the estimates presented in your report, none of

4    them are limited to prescription opioids, correct?

5    **A.**   Correct.  And none of them are limited to prescription

6    opioids.

7    **Q.**   Okay.  So, we can move through these quickly putting

8    x's up for all five of the populations.

9         Doctor, in your report, which you've discussed earlier,

10   you report certain numbers of individuals in connection with

11   each of the five populations that you discussed today,

12   correct?

13   **A.**   Correct.

14   **Q.**   And all of the numbers that you cite in your report are

15   from several years ago, correct?

16   **A.**   Yes.  What was in the literature at the time, that's

17   correct.

18   **Q.**   And, for instance, you discussed a slide with Ms.

19   Singer earlier today with the number of pregnant women

20   admitted for treatment in the State of West Virginia who

21   reported use of heroin or opioids in 2017, correct?

22   **A.**   That's correct.

23   **Q.**   You did not provide that number for the year 2020,

24   correct?

25   **A.**   The TEDS data are not available in that data set for

1    2020, correct.

2    **Q.**   So, you don't provide any current estimates for your

3    five populations, correct?

4    **A.**   As current as the literature has available.

5    **Q.**   You don't provide any estimates for 2021, correct?

6    **A.**   The data are not available for 2021.

7    **Q.**   Okay.  So, I'm going to write current estimates on the

8    board and put an "x" for all five populations.  Dr. Young,

9    you also have not provided any opinion or forecast as to the

10   populations at any point in the future, correct?

11   **A.**   No.  That would be beyond the scope of my report.

12   **Q.**   So, Doctor, now we've talked about your five

13   populations in brief and I'd like to turn to your cost

14   estimates, which you've discussed earlier with Ms. Singer,

15   okay?

16        Now, Doctor, you have a background in social work,

17   correct?

18   **A.**   Social policy, correct.

19   **Q.**   You are not an expert in healthcare economics, correct?

20   **A.**   I am not.

21   **Q.**   And with regard to the cost estimates that you provide

22   in this case, the expertise that you believe you bring is to

23   summarize the literature on what costs are associated with

24   various kinds of interventions that you've observed across

25   the country, correct?

```
1    A.    And that are substantiated in the literature as being
2    evidence based programs, correct.
3    Q.    Okay.  You haven't, yourself, conducted an assessment
4    of the needs of the community which is specific to the City
5    of Huntington or Cabell County, correct?
6    A.    That is beyond the scope of what I was asked to do,
7    correct.
8    Q.    And because you've not done that type of comprehensive
9    review of needs in the community, you're not opining as to
10   the adequacy or sufficiency of those programs, correct?
11   A.    I was not asked to evaluate the programs to their
12   effectiveness or their efficiencies.
13   Q.    Okay.  So, I'm going to write evaluate programs and,
14   again, put an "x" for all five categories.
15   A.    With the caveat that the programs are evaluated, but
16   they're not evaluated in Cabell County, correct.
17   Q.    That's not work that you've done for purposes of this
18   case, correct?
19   A.    Correct.
20   Q.    Now, Doctor, in forming your opinions about the cost of
21   various interventions discussed in your report you did not
22   review any documents showing the actual program costs for
23   those programs already available to individuals in
24   Huntington or Cabell County, correct?
25   A.    Only the Start Program was specific for Cabell County.
```

1    **Q.**   In forming your opinions expressed in your report, you

2    did not evaluate programs in Huntington and Cabell from a

3    cost perspective, correct?

4    **A.**   The Start Program does have the program costs for that

5    program in Cabell County.

6    **Q.**   And, other than the Start Program, that's a fair

7    clarification, you did not evaluate the costs of other

8    programs available in Cabell County which serve the five

9    populations that you identified in your report?

10   **A.**   I don't recall if I included the cost of the regional

11   partnership grants, of what the award was in that program

12   and the numbers to be served, but that would be another one

13   that would have been specific to Cabell County.

14   **Q.**   Well, let me try to simplify my question.  You didn't

15   consider any cost data specific to Cabell County or the City

16   of Huntington in terms of their expenditures for programs

17   that serve the five populations you've identified, correct?

18   **A.**   Correct.  Those are other experts.

19   **Q.**   Okay.  And which other experts are you referring to

20   when you say "other experts"?

21   **A.**   I'm not sure.  I don't have access to all that

22   information.  I know what I was asked to do.

23   **Q.**   Okay.  Do you know if there is another expert who has,

24   in fact, evaluated the costs of programs serving these

25   populations?

1   **A.**   I do not know.

2   **Q.**   You don't know?  Okay.  So, you have not done that

3   work, so I'm going to write evaluate HC costs,

4   Huntington-Cabell costs.  I will put an "x" for all five

5   categories.

6       Doctor, with Ms. Callas a short while ago, you looked

7   at Attachment 1 to your report which identifies some of the

8   programs which are available to individuals in Cabell

9   County, correct?

10  **A.**   That's correct.

11  **Q.**   And for the programs identified in your Attachment 1,

12  you did not consider whether any of them are run by Cabell

13  County or the City of Huntington, correct?

14  **A.**   That's correct.

15  **Q.**   And you did not evaluate who funds those programs,

16  correct?  That wasn't a part of your opinion in this case?

17  **A.**   I didn't evaluate the programs.  I'm knowledgeable of

18  the funding sources, but I did not evaluate the programs.

19  **Q.**   You didn't evaluate the funders of those programs

20  specific to Huntington and Cabell County, correct?

21  **A.**   Most of them, I know their funding source, so I don't

22  know how you're defining "evaluate".  There was not a cost

23  estimate that was done that was specific to Cabell and

24  Huntington.

25  **Q.**   Okay.  In terms of your specific opinions in this case?

1    That's the clarification you're making?

2    **A.**   Correct.  That is -- was beyond the scope of what I was

3    asked to do.

4    **Q.**   Okay.  So, I'm writing evaluate HC funder.  I'm putting

5    "x" across the board.

6    **A.**   Correct.  This is -- my report is not an evaluation.

7    So, all of those that say evaluate is correct.

8    **Q.**   Okay.  Thank you, Dr. Young.

9        So now, I would like to just switch gears and look at

10   another cost component from your report.

11           MS. WU:  Could we look at DEF-WV 00753?

12       And, actually, before we do that, Your Honor, at this

13   time, could we mark the demonstrative as McKesson

14   Demonstrative 8 for the record?

15           THE COURT:  All right.

16           MS. WU:  Thank you, Your Honor.

17       Your Honor, may I approach?

18           THE COURT:  Yes.

19           BY MS. WU:

20   **Q.**   Dr. Young, do you have in front of you a document which

21   is marked as DEF-WV 00753?

22   **A.**   I do.

23   **Q.**   This is a letter to Congressman Frank Pallone of the

24   Committee on Energy and Commerce.  Do you see that, Doctor?

25   **A.**   Yes, I do.

```
 1   Q.   And it's dated October 18th, 2019, correct?
 2   A.   Yes, it is.
 3   Q.   You see it's written on letterhead of the State of West
 4   Virginia, Department of Health and Human Services, correct?
 5   A.   Yes, it is.
 6   Q.   Now, if we can turn to Page 13 of the document.  And
 7   I'm using the small numbers in the left-hand corner of the
 8   document.  Are you with me, Doctor?
 9   A.   Page 13 of 13?
10   Q.   Yes.
11   A.   Yes.
12   Q.   You see that it's signed by Christina Mullins, the
13   Commissioner of DHHR's Bureau of Behavioral Health?  Do you
14   see that?
15   A.   Yes, I do.
16   Q.   Okay.  So, now I would like to turn back to Page 1.
17   Thank you for your cooperation, Doctor.  And it reads, "The
18   West Virginia Department of Health and Human Resources
19   Cabinet Secretary Bill J. Crouch has asked me to respond to
20   the United States Congress, House of Representatives,
21   Committee on Energy and Commerce's September 18th, 2019
22   request for information regarding West Virginia's response
23   to the opioid crisis."
24        Do you see that?
25   A.   Yes, I do see that.
```

```
 1                MS. WU:  Your Honor, I --

 2          I'm sorry, Doctor.

 3          I'd move to admit DEF-WV 00753 into evidence as a

 4     public record.

 5                MR. ACKERMAN:  Objection, foundation and hearsay.

 6                THE COURT:  Well, how do you get this in, Ms. Wu?

 7                MS. WU:  Well, Your Honor, it is a public record

 8     and it's self-authenticating under Rule 902.

 9                THE COURT:  How do you get around the hearsay in

10     it?

11                MS. WU:  Because it's a public record, Your Honor.

12     It qualifies as a document which sets forth the activities

13     of the Department of Health and Human Resources in the State

14     of West Virginia.

15                MR. ACKERMAN:  With respect to that, Your Honor, I

16     don't believe the foundation has been laid.  All that has

17     been laid is that the witness can read words off a page on a

18     document.

19                THE COURT:  Well, I'm not going to admit it, Ms.

20     Wu, without a better foundation.  You haven't laid the basis

21     for it.  You haven't checked all the blocks under 803(8) for

22     a public record.

23                MS. WU:  Thank you, Your Honor.  I'll proceed and

24     question the witness and see where we land.

25                THE COURT:  Okay.
```

```
 1              BY MS. WU:

 2    Q.    Dr. Young, if we can look back at the document and

 3    staying on Page 1, in the very last paragraph, it reads,

 4    "Since 2016, West Virginia has received significant federal

 5    funds to address the opioid crisis in a manner that is

 6    making a difference.  Positive impacts have been felt across

 7    the state as West Virginia has increased prevention

 8    services, treatment options and recovery access."

 9         Do you see that, Doctor?

10    A.    Yes.

11    Q.    You don't have any basis to disagree with that

12    statement, correct?

13    A.    With that statement, no, I don't.

14    Q.    And then, staying in that paragraph, it continues,

15    "Quite simply, the federal funds at the heart of this

16    request have allowed West Virginia the ability to address

17    the opioid crisis in a holistic manner."

18         Do you see that, Doctor?

19    A.    Yes, I do.

20    Q.    You don't have any basis to disagree with that

21    statement, correct?

22    A.    Only the events of the last year of the pandemic, which

23    has created a different situation.

24              MR. ACKERMAN:  Your Honor, at this point, I would

25    lodge a scope objection to this questioning.  This is a
```

```
1    witness who was designated as an expert on Children and

2    Family Services and we're now going into questioning about

3    the State of West Virginia's efforts at large to address the

4    opioid epidemic.  I think this is outside the scope of her

5    expertise.  Certainly outside the scope of her expert

6    report.

7              THE COURT:  Well, it relates to other sources of

8    funding for these programs, doesn't it, Ms. Wu?

9              MS. WU:  Yes, Your Honor.  Dr. Young provides

10   specific cost estimates which builds the scaffold to very

11   large abatement figures which will be set forward by other

12   experts in this case.  We believe looking at available

13   programs and the funding available for those programs is

14   directly relevant to the reliability and relevance of Dr.

15   Young's opinions.

16             MR. ACKERMAN:  Our request, Your Honor, is that we

17   cut to the chase then and let's just get to the numbers

18   instead of going through the material at the beginning that

19   has nothing to do with specific programs.

20             THE COURT:  Well, I think this is well within the

21   scope of the direct and I will allow it.

22        Go ahead, Ms. Wu.

23             MS. WU:  Thank you, Your Honor.

24             BY MS. WU:

25   Q.  Dr. Young, could you please turn to Page 3 of the
```

1    document?  Again, I'm using the small numbers in the

2    left-hand corner.

3    **A.**   Yes.

4    **Q.**   And if we turn to the fourth paragraph in the middle,

5    it reads, "All the services provided are being coordinated

6    at the state level to avoid duplication and to assure the

7    most needed services are provided in the areas with the

8    highest need."

9         Do you see that, Doctor?

10   **A.**   Not exactly, but --

11   **Q.**   Oh, I'm sorry.

12   **A.**   Oh, in the last paragraph before the bullets?

13   **Q.**   Yes, that's correct.  It's also on the screen to your

14   right, if that's useful, Doctor.

15   **A.**   Yes, I see that.

16   **Q.**   Doctor, you don't have any basis to disagree that the

17   State of West Virginia coordinates these types of services

18   to avoid duplication and assure that needed services are

19   provided, correct?

20   **A.**   I don't have a basis to disagree with that.

21   **Q.**   Now, I would like to ask you to turn with me to Page 8

22   of the document and the first full paragraph reads, "In many

23   ways, West Virginia's treatment system has been completely

24   overhauled in response to the opioid crisis and much of the

25   positive work to date has occurred with or been made

```
1    possible as a direct result of the federal funds awarded
2    since 2016."
3        Do you see that, Doctor?
4    A.   I do see that.
5    Q.   You don't have any basis to disagree with that
6    statement, correct?
7    A.   No, I don't have a basis to disagree with that.  I
8    would note that it's not commenting on need or capacity.
9    It's commenting on what has come in.
10   Q.   And, Doctor, you haven't provided an opinion as to the
11   needs in the community in Huntington and Cabell, correct?
12   A.   Correct.  That was beyond the scope of what I was asked
13   to do.
14   Q.   And you mentioned capacity.  You also haven't provided
15   any opinion as to the capacity of the services currently
16   available in Huntington or Cabell County, correct?
17   A.   Not to the capacity of any of the programs that we know
18   are operating, that's correct.
19   Q.   You offer no opinion as to whether or not they're at
20   capacity or have available capacity, correct?
21   A.   That's correct.
22   Q.   So, if we look back to the document, we're still on
23   Page 8.  If we can go to the second paragraph, it reads,
24   "West Virginia has increased evidence-based treatment
25   options.  Through drug settlement funding West Virginia has
```

 1    added over 200 new treatment beds, with an additional 350

 2    still under development.  In response to the SUD Waiver",

 3    that you mentioned earlier, "another 133 beds have been made

 4    available for residential treatment.

 5         Do you see that, Doctor?

 6    **A.**   Yes, I do see that.

 7    **Q.**   And, again, you don't have any basis to disagree with

 8    those statements?

 9    **A.**   I don't have any basis to disagree with those

10    statements.

11    **Q.**   Doctor, based on what we just looked at, the letter

12    identified as DEF-WV 753 sets out the activities of the West

13    Virginia Department of Health and Human Services, correct?

14    **A.**   Yes, it does, with federal funds.

15    **Q.**   And based on what we reviewed, Christina Mullins was

16    responding to a request from a Congressional Committee to

17    report information, correct?

18    **A.**   That's correct.

19    **Q.**   In fact, she's responding to specific questions about

20    what the Department was doing consistent with its duties to

21    the State of West Virginia, correct?

22    **A.**   Yes.  In 2019, before the pandemic and overdoses

23    increased again, yes, that's correct.

24    **Q.**   Thank you.

25              MS. WU:  Your Honor, I would once again move for

```
 1    admission of DEF-WV 753 as a public record.
 2              MR. ACKERMAN:  Same objection, Your Honor.  The
 3    witness is merely stating what's on a page.  Has no personal
 4    knowledge.
 5              THE COURT:  I agree.  I'm not going to admit it,
 6    Ms. Wu.
 7              MS. WU:  Thank you, Your Honor.
 8         Thank you, Dr. Young.  I have no further questions at
 9    this time.
10              THE WITNESS:  Thank you.
11              THE COURT:  Does Cardinal want to question?
12              MR. ACKERMAN:  Your Honor, if I may?
13              THE COURT:  Yes.
14              MR. ACKERMAN:  I'd like -- give me a minute.  I
15    want to confer with counsel for a minute.
16         (Pause)
17              THE COURT:  Are you done?
18              MR. ACKERMAN:  So, I don't have anything to say,
19    Your Honor.  I don't know whether Ms. Singer has any
20    questions.  I was going to stand up and say something and I
21    am now no longer going to say anything.
22              THE COURT:  Okay.  Thank you, Mr. Ackerman.
23              MR. MAJESTRO:  You should thank me, Your Honor,
24    for that.
25         (Laughter)
```

```
 1                    THE COURT:  Ms. Hardin?

 2                    MS. HARDIN:  I have no questions, Your Honor.

 3                    THE COURT:  You have no questions?  Well, we got

 4      you out of here, Dr. Young, before 3:00.

 5                    THE WITNESS:  Yes.  Thank you very much, Your

 6      Honor.  I appreciate it.

 7                    THE COURT:  You're free to go.  Thank you for

 8      being with us.

 9                    THE WITNESS:  Thank you for your service.

10                    THE COURT:  All right.  You're excused.

11                    THE WITNESS:  Do I leave these here?

12                    THE COURT:  Yeah.  We'll get them.

13         Can you pick them up?  Yeah.

14                    THE WITNESS:  Thank you.

15                    THE COURT:  Yes?

16                    MR. FARRELL:  Judge, it's my honor to introduce

17      our next questioner.  It's Robert Fitzsimmons, Bob

18      Fitzsimmons, from Wheeling, West Virginia who will bring the

19      next witness.

20                    MR. FITZSIMMONS:  Judge, at this time, we would

21      call Dr. Kevin Yingling to the witness stand.

22                    THE COURT:  All right.

23                    COURTROOM DEPUTY CLERK:  Sir, would you please

24      state your name?

25                    THE WITNESS:  My name is Kevin Yingling.
```

```
 1              COURTROOM DEPUTY CLERK:  Thank you.  Please raise
 2    your right hand.
 3              DR. KEVIN YINGLING, PLAINTIFF WITNESS, SWORN
 4              COURTROOM DEPUTY CLERK:  Thank you.  Please take a
 5    seat.
 6              MR. FITZSIMMONS:  Yingling is spelled
 7    Y-i-n-g-l-i-n-g.
 8              COURT REPORTER:  Thank you.
 9              THE COURT:  All right, sir.  You may proceed.
10              MR. FITZSIMMONS:  Thank you, Judge.  Thank you,
11    Your Honor.
12                        DIRECT EXAMINATION
13              BY MR. FITZSIMMONS:
14    Q.   Doctor, would you please tell us your full name and
15    where you presently reside?
16    A.   My name is Kevin Wesley Yingling and I reside in Cabell
17    County.  3963 Scout Camp Road, Ona, West Virginia.
18    Q.   Are you a lifelong resident of Cabell County?
19    A.   Most of my life, since I was ten years old, has been in
20    Cabell County.
21    Q.   Could you please tell Your Honor the positions that you
22    presently hold?  I think you have two board positions.
23    Could you tell us what those are presently?
24    A.   Counselor, specifically board positions or any other
25    positions?
```

1   **Q.**   Well, we're going to get into some other positions

2   after that.

3   **A.**   Okay, sure.

4   **Q.**   And I was going to just kind of proceed.  But go ahead

5   and just tell us --

6   **A.**   Currently, I'm Chairman of the Board for the Cabell

7   County Health Department.  I am the Chairman of the Board of

8   other community organizations, such as the Tri-State Medical

9   Missions.  Other organizations, I'm a member of the board.

10  **Q.**   Are you still on the board at the Cabell Huntington

11  Hospital?

12  **A.**   I am not curtly on the board at Cabell Huntington

13  Hospital.  I completed my term of service for that

14  institution about a year and a half ago.

15  **Q.**   Okay.  And how long had you been on the Cabell

16  Huntington Hospital Board of Directors?

17  **A.**   I believe I joined that organization as a board member

18  in 2014-15 and I've been on the board until 2019-20.

19  **Q.**   All right.  So Your Honor has that date, so you retired

20  from a board member of the hospital around 2019

21  approximately?

22  **A.**   Correct.

23  **Q.**   Okay.  All right.

24  **A.**   It was the end of -- to be exact, it was the end of

25  '19, the beginning of 2020.

1    Q.   All right.  And do you hold any positions with the

2    Marshall University School of Medicine?

3    A.   I've held multiple positions with Marshall University

4    School of Medicine, now known as Marshall Health.  I was the

5    Chairman of the Department of Internal Medicine for ten

6    years.  I was the dean for the School of Pharmacy from its

7    inception through 2017 for seven years.  Those are the two

8    leadership positions I've had there.

9    Q.   Okay.  So, the dean position, you were actually the

10   founding dean of the School of Pharmacy at Marshall

11   University in 2010 approximately?

12   A.   Correct.  I was asked to serve in 2010 and served

13   through the graduating class of 2016, completed in 2017.

14   Q.   2016 was the first graduating class that we had at

15   Marshall University School of Pharmacy; is that right?

16   A.   That's correct.

17   Q.   You've also been a teaching professor at Marshall

18   University School of Medicine?

19   A.   I'm been a professor in the School of Medicine since

20   1990 to present.  I've been a faculty member now, adjunct

21   faculty member of School of Pharmacy, since inception.

22   Q.   Have you also served as President of the Medical and

23   Dental Board at the hospital in Cabell County?

24   A.   I've served in both hospitals in Huntington.  St.

25   Mary's Medical Center, I was elected the President of

1    Medical and Dental Staff and served on the Board for St.

2    Mary's Medical Center 2003-2005 and I was elected as

3    President of the Medical and Dental Staff at Cabell

4    Huntington Hospital 2007-2008.  Severed on both Boards.

5    **Q.**   So, you kind of have several mixed professions, I

6    think, within your education.  First, you went to pharmacy

7    school.  You went to West Virginia University and received a

8    Bachelor of Science degree in Pharmacy; is that right?

9    **A.**   Correct.  So, I'm a graduate of pharmacy school of West

10   Virginia University, the only pharmacy school at that time.

11   **Q.**   Okay.  All right.  And we're going to learn a little

12   bit more about your pharmacy education and that, but could

13   you tell us how you got interested in pharmacy?  Did you

14   have a family member or --

15   **A.**   Sure.  I grew up in Barboursville, West Virginia, a

16   small little community just outside of Huntington, and my

17   first interest in healthcare was to work in a little

18   community pharmacy called Pliver's Pharmacy (phonetic) and

19   that's where I fell in love with the idea that I can make

20   the difference in other people's lives through healthcare

21   and I decided, at that point, probably about what we would

22   now call middle school, junior high school, high school,

23   that that's the career track that I would take.

24   **Q.**   And were you considered what I'd call a pharmacy tech

25   basically at that time, somebody that loads the shelves and

1    takes from the distributor, from the truck and helps wheel

2    it in, and makes sure that everything gets put on the

3    shelves?

4    **A.**   Sure.  Exactly.  I smile only because we weren't

5    defined as a pharmacy tech.  You know, now there's a

6    certification to be a pharmacy tech.  But then, I was a

7    pharmacy technician and did exactly that.

8    **Q.**   All right.  And then you went to pharmacy school for

9    about four years and graduated around 1985; is that right?

10   **A.**   Graduated from pharmacy school before I went to medical

11   school.  That was 1981.

12   **Q.**   1981?  All right.  And then, after that, you decided

13   you wanted to look into the medical field a little bit more

14   and you went to medical school; is that correct?

15   **A.**   Yes, sir.  I went to medical school in 1985 through --

16   I started in 1981 to 1985.

17   **Q.**   And did you attend school at the University of

18   Cincinnati?

19   **A.**   I attended medical school at Marshall University.

20   **Q.**   Marshall?  I'm sorry.  At Marshall.

21   **A.**   I did my residency training at the University of

22   Cincinnati.

23   **Q.**   Okay.  And did you pick a specific area of medicine

24   that you did your residency training?  And I think, also,

25   you did a fellowship, did you not?

1    **A.**   So, my area of training was internal medicine and I did

2    two additional years at the University of Cincinnati.  One

3    is what we call Chief Medical Resident year and the other

4    was a research year, and that research year was a research

5    fellowship.

6    **Q.**   So, and during that period of time, did you keep your

7    pharmacy license, also, during that period of time?

8    **A.**   I kept my pharmacy license early on initially to

9    actually make enough money to get through medical school.

10   And then, after that, I kept my pharmacy license because, as

11   I returned to Marshall University in my academic practice

12   there, I then became a consultant pharmacist and I used my

13   degree and my training as a consultant pharmacist for the

14   School of Medicine.

15   **Q.**   All right.  Something called a consultant -- consultant

16   pharmacist, do you know what that is?

17   **A.**   Well, it's a special designation by the Board of

18   Pharmacy.  It can be used for a variety of activities.  Some

19   people use the consultant pharmacy activity to, for

20   instance, oversee nursing homes and the administration of

21   medications and medication therapy in a nursing home.  And

22   there's other administrative roles that a consultant

23   pharmacist has.

24        In this case, the reason that I kept my license as a

25   consultant pharmacist is because it is necessary for an

1   institutional DEA, a designation, for the institution to

2   have a consultant pharmacist who watches over that

3   designation.  That designation allows each resident

4   physician who is a member of that particular academic

5   institution to be able to prescribe controlled substances

6   under that DEA license.

7        So, each new incoming resident would be provided a

8   special three-digit suffix that fits to the institutional

9   DEA.  I have a personal DEA number.  The institution has a

10   DEA number.  The consultant pharmacist is the person who

11   oversees the administration of the DEA, institutional DEA.

12   **Q.**   All right.  You also have an academic appointment, I

13   think, over in England; is that correct?

14   **A.**   I did.  I've been to England twice.  I was there as a

15   senior resident when I was at the University of Cincinnati

16   at Cambridge University and I was back for a year-long

17   sabbatical at the University of Southampton.  Both of those

18   were around clinical pharmacology.

19   **Q.**   And you also -- we hear all the time board

20   certification.  Are you board certified in internal

21   medicine?

22   **A.**   I am board certified.

23   **Q.**   And that means that you have taken a verbal test and a

24   written test and been accepted by your peers as having met a

25   certain quality of care within internal medicine; is that

1    correct?

2    **A.**    That is correct.

3    **Q.**    All right.  You've maintained that license as a doctor

4    in West Virginia as a practicing doctor since you graduated

5    from medical school?

6    **A.**    That's correct.

7    **Q.**    And, also, your pharmacy license, you still have that

8    and you practice that?

9    **A.**    That's correct.  I think I -- just for clarification, I

10   may have released my license in the past year, you know,

11   longer than --

12   **Q.**    Didn't pay the dues?  Didn't have to -- didn't have to

13   up your dues?

14   **A.**    Yeah.  I didn't -- I didn't have to work overtime in

15   pharmacies to make some money.

16   **Q.**    All right.  So, you got appointed to the Board of

17   Health in 2010; is that -- is that approximately the year --

18   **A.**    That's correct.

19   **Q.**    -- we're talking about?  And the Board of Health, is

20   that comprised of individuals within Cabell County?

21   **A.**    Yes.  It has six board members.  Three are appointed by

22   the City Council and three are appointed by the County

23   Commission.  And I believe I was appointed by the County

24   Commission.

25   **Q.**    And are you the only medical professional on that

1    six-person board for the Board of Health in Cabell County?

2    **A.**    I'm the only physician member of the board.

3    **Q.**    You're on a Board of Health for the Health Department;

4    is that -- is that a --

5    **A.**    Correct.  So, the Board of Health is the governance and

6    fiduciary -- has the governance and fiduciary

7    responsibilities for the Cabell-Huntington Health

8    Department.

9    **Q.**    And when did you become the chairman of that particular

10   board?

11   **A.**    I'm in the second year of that term.  So, two years.

12   2019.

13   **Q.**    Do you know what a community needs assessment is?

14   **A.**    Yes.  A community needs assessment is an activity done

15   by the Health Department.  Our Health Department

16   particularly has chosen to do that every single year.  It is

17   my understanding there is a statutory or governmental

18   requirement that it's done every five years.

19        The community needs assessment is a survey and a

20   coalition of all important data about the county that's used

21   by the board and by the Medical Director of the Board of

22   Health to make decisions about how we would allocate

23   resources, which areas of disease, which parts of public

24   health deserve attention in the next calendar year.

25   **Q.**    And are you familiar with the general rules and

1     practices of the Health Department and the Board of Health

2     within Cabell County?

3     **A.**   Yes.

4     **Q.**   All right.  Do you know whether the community needs

5     assessment, is that something that's required by law to be

6     done by health departments and Boards of Health?

7     **A.**   It is my understanding it is required by law.

8     **Q.**   All right.  And how is that basically performed?  Do

9     you have an individual in your department that goes out in

10    the community and gathers information concerning health data

11    and stuff, if you know?

12    **A.**   So, there's a specifically designated person within the

13    hierarchy of the Board of Health who has that responsibility

14    and she then seeks input from all the agencies that help to

15    fulfill that needs assessment and that covers a broad area

16    and then she collates that.  It's reviewed by the board.

17    It's also used by other organizations.  So, contributing

18    organizations for putting in, if you will, the data into

19    that dataset are also institutions that need that

20    information because they're utilizing it for their own

21    purposes.

22    **Q.**   And do you understand that findings, legal findings,

23    are supposed to be reported then by the board as a result of

24    the collection of this data?

25    **A.**   Well, I know the findings are reported, absolutely, and

1    I know that other agencies use them and find them to be

2    important.  That's why they participate.

3    Q.   And so the judge and everyone here understands really

4    what we're talking about, this person goes out into the

5    community and collects information that relates to

6    potentially health items in our community so we can

7    basically assess how -- what type of health we have in a

8    community, what type of problems, if any?

9    A.   Correct.  So, just as a quick example, that's where we

10   gather information about the percentage of people who smoke

11   in Cabell County, the percentage of people who are vaping in

12   Cabell County.  What's the incidence of teen vaping in

13   Cabell County?  What's the death rate for chronic

14   obstructive pulmonary disease in Cabell County?  What's --

15   you know, I can -- I can list a long list of information

16   that comes out of that.

17   Q.   All factual information?

18   A.   All factual statistics.

19   Q.   Single parents, no parents, adopted children, things

20   like that in the community, this is what this needs

21   assessment has done; is that right?

22   A.   Correct.

23   Q.   All right.  And do you know legally -- and I think you

24   checked, actually, legally, how often does the Cabell County

25   Health Department have to perform one of these needs

1    assessments within the community?

2    **A.**    So, maybe just a nuance there.  I don't -- I can't say

3    specifically to the statutory requirement.  I can say what I

4    understand and how we practice.

5    **Q.**    All right.  Let me ask you -- let me strike it.  What's

6    your understanding as to how often it's to be performed?

7    **A.**    Right.  My understanding is that the Health Department

8    does not have to do it every year, but we do it every year.

9    My understanding is that it's a five-year requirement.  My

10   understanding is that, in my other hats as the member of the

11   board at the hospital, we do a different assessment

12   utilizing that data every three years.

13   **Q.**    Right.  Okay.  And I'm going to get into that also here

14   in just a second.  So, the information that is done, as you

15   understand it, with the Health Department is done yearly?

16   **A.**    Yes.

17   **Q.**    All right.  Even though it's required every five years?

18   **A.**    Correct.

19   **Q.**    All right.  And could you tell the judge what are --

20   what are you guys looking for?  What are you trying to

21   actually find?  What are you -- what are you looking for?

22   Problems in health or what in the community?

23   **A.**    Judge Faber, our efforts in this matter are we want to

24   actually track what's happening in our county.  We actually

25   want to know what the disease incidence is, whether things

1    are trending up or down, and how we're going to allocate

2    resources to those needs.

3         These are very granular.  This is what's happening in

4    our county to our citizens, who we feel we represent in

5    terms of their public health.

6         They're big -- they're big items.  They're like

7    diabetes, hypertension, chronic obstructive pulmonary

8    disease, coronary artery disease, Opioid Use Disorder,

9    overdose deaths, those types of data.

10        We believe we have a responsibility to utilize that

11   data, to define under the direction of the Medical Director

12   of the Health Department how we allocate resources for the

13   next year to address those needs.  We take that

14   responsibility very seriously.

15   **Q.**   And, Doctor, after the first one or two years after

16   having seen this, was there any predominant issue that

17   occupied the focus of the Health Department and the health

18   board that you run?

19   **A.**   Well, I came onto the board in 2010 and I can say that

20   in my first year on the board we did not have any real

21   discussion about Opioid Use Disorder, about an opioid

22   crisis, about those -- those things had not arisen to the

23   attention of the board at that time.

24        What soon became very evident was the incidence of

25   infectious disease consequences in our community.  And so,

1    very quickly, those conversations at the board level and the

2    focus of the community needs assessment began to bring those

3    things to our attention.

4        So, it would be infectious disease consequences, the

5    related harms from the addiction problem in our community.

6    **Q.**   And I want to talk specifically about related harms,

7    not just the addiction itself.  Was there a period of time

8    when you believed that these -- the needs assessment, the

9    community needs assessment, demonstrate that the majority of

10   the focus was on opioid epidemic at that time?

11   **A.**   Well, you know what?  I'll be honest.  I haven't -- I

12   haven't gone back and catalogued each individual year.  I

13   can say from my personal experience on the board.

14   **Q.**   From your personal experience is what we want you to

15   testify to.

16   **A.**   That this started as not necessarily on the radar

17   screen to becoming the predominant issue on the radar screen

18   for the Board of Health and, in that transition over those

19   years, became how would we address the infectious disease

20   problems?  How would we address the overdose rates in Cabell

21   County?  How would we start programs that would be able to

22   address that?  You know, I can pick off many items.

23       I don't want to belabor this but, for instance, how do

24   we know that we should have a Naloxone Distribution Program

25   based out of the Cabell County Health Department is because

```
 1    we began to see those things coming up in the needs
 2    assessment.
 3         How do we know that we needed a syringe exchange
 4    program?  Because we saw the infectious disease problems,
 5    the consequences of Hepatitis C, Hepatitis B, HIV in our
 6    community and we needed to address that.  So, year over
 7    year, time after time, it -- it substituted the priorities
 8    that were previously the priorities of the Health
 9    Department.
10         For instance, when I joined the board, the priority of
11    the Health Department was tobacco, and tobacco smoking, and
12    the consequences of tobacco smoking.  And in the incidence
13    of chronic obstructive pulmonary disease and how many people
14    --
15              COURT REPORTER:  I'm sorry.  You have to slow down
16    for me.
17              MR. FITZSIMMONS:  Slow down for us.
18              THE WITNESS:  Oh, I'm sorry.
19              COURT REPORTER:  Thank you.
20              THE WITNESS:  I get excited.
21              MR. FITZSIMMONS:  Slow down, okay, a little bit.
22              THE WITNESS:  I'll go back.
23              BY MR. FITZSIMMONS:
24    Q.   I think you were talking about the tobacco and you
25    comparing about --
```

```
 1    A.   Tobacco and its relationship to chronic obstructive
 2    pulmonary disease.
 3    Q.   Okay.
 4    A.   And those were the kinds of things that were most
 5    prominent in the board's mind at that time.
 6    Q.   All right.  And I'm not supposed to lead, but I'm
 7    trying to push you along a little bit to also --
 8    A.   Sure.
 9    Q.   For time's sake here today a little bit.
10         So, once you got on the board, after a couple years, is
11    it fair to say that opioid and opioid-related harms kind of
12    consumed the interest of the board?
13    A.   It absolutely consumed the attention of the board.
14    Q.   Right.  And let me ask you, around the middle of that
15    term you had, around '14-'15, 2014-'15, around that time, we
16    have an increase -- did we have an increase in the
17    infectious-type diseases like the Hep B?  Hepatitis B,
18    Hepatitis C, HIV at that time, if you know?
19              MR. RUBY:  Your Honor, I -- with all due respect
20    to my friend, Mr. Fitzsimmons, I will object to the leading.
21    I don't --
22              MR. FITZSIMMONS:  Okay, I'm sorry.
23              MR. RUBY:  I don't know that it's necessary in the
24    interest of time to recite particular medical conditions and
25    ask the witness to agree to them.
```

```
1           THE COURT:  Well, Mr. Fitzsimmons was getting

2    through preliminary matters, which is okay, but you can --

3    this may be the point where you need to stop leading him.

4           MR. FITZSIMMONS:  Yeah.  I've got to stop it at

5    this point?  Okay.  All right, Judge.  I'll --

6           THE COURT:  Ms. Wu?

7           MS. WU:  Your Honor, we'd also lodge a foundation

8    objection.  We don't believe that this witness has yet

9    established a basis to offer testimony on the prevalence

10   rates of particular diseases in the community.

11          THE COURT:  Well, I think he has.  I'll overrule

12   that objection.

13      Go ahead, Mr. Fitzsimmons.

14          BY MR. FITZSIMMONS:

15   Q.   Are you ready?

16      Doctor, did you observe from these community needs

17   assessment any type of spike in conditions for Hepatitis B,

18   C, or HIV from your tenure there and the --

19   A.   We absolutely -- we absolutely saw those and just to go

20   along with my understanding of what I presented to the

21   judge, not only did we see that, we then had to take action

22   on that.  So, we began to create designated cites across our

23   community in which we would provide Hepatitis B vaccine as

24   an example.  We began to test more prevalently for -- or

25   more exactly for HIV infection in our community.  And, when
```

```
 1    identified, we had to have resources to apply to those

 2    situations in order to take care of those patients in an HIV

 3    situation.

 4         And as -- as many in the room may remember, there was

 5    an HIV cluster outbreak in Cabell County.  How did we know

 6    that?  We began to see that --

 7              COURT REPORTER:  Sir, you're going to have to slow

 8    down.  I'm sorry.

 9              THE WITNESS:  Oh, I'm sorry.

10              COURT REPORTER:  Can you finish the answer?  I'm

11    sorry.

12              THE WITNESS:  Sure.

13         So, we will remember that there was an HIV cluster

14    outbreak in Cabell County and it was the responsibility of

15    the board to identify how we would address that within our

16    community.  Again, just staying in the framework of where we

17    are.  That's what happens at the Cabell County Health

18    Department.  That's what happens at the board level.  That's

19    my response.

20              BY MR. FITZSIMMONS:

21    Q.  And in these assessments, you report the needs of the

22    community?  You actually report that -- I think you said

23    earlier you actually share that document and those findings

24    with the hospital, also; is that correct?

25    A.  Well, it is published and then those partners who also
```

1    need that information utilize it in the ways that they find

2    effective.

3    **Q.**   All right.  And the cause for those diseases, as to the

4    needs assessment, was it determined as to why that they

5    seemed to increase as to the Hepatitis B, C and the HIV?

6    **A.**   My personal view and knowledge is that came directly

7    related to intravenous drug use.

8    **Q.**   All right.  And I --

9    **A.**   Or I should say intravenous drug abuse.

10   **Q.**   And I apologize.  I forgot to mention another

11   background aspect of your practice.  You have a full-time --

12   you have a medical practice, also, where you practice

13   internal medicine as a primary care doctor in Cabell County,

14   West Virginia; is that right?

15   **A.**   Yes, sir.  So, the duration of my time at the School of

16   Medicine has been to have a private practice, which I saw

17   this week and will see tomorrow morning.  And I also teach

18   medical students and residents on a continuous basis over

19   the last 31 years.

20   **Q.**   You're teaching the doctors and those residents to be

21   certain types of doctors in internal medicine; is that

22   right?

23   **A.**   Correct.

24   **Q.**   And yesterday, we tried to get you on yesterday

25   afternoon.  We were trying to squeeze you in, but it didn't

1    work yesterday.  You were -- where were you yesterday?

2    **A.**    Tuesday afternoons, I work at an organization -- I

3    volunteer at an organization called PROACT.  PROACT is the

4    Huntington hub, Cabell County hub, for all patients looking

5    to be in long-term recovery for addiction.  I am a provider

6    there and provide medication assisted therapy, along with

7    the therapists and the other components of a broad spectrum

8    of services.  Those are Tuesday afternoons in my practice.

9              THE COURT:  Does your practice concentrate on

10   internal practice, Dr. Yingling?

11             THE WITNESS:  My primary practice is internal

12   medicine.  I'm a physician for adults.  That practice, I

13   received a special waiver in order to do that through the

14   DEA, and that's my commitment to that population.

15             THE COURT:  Thank you.

16             BY MR. FITZSIMMONS:

17   **Q.**    And you still have that personal practice and you're

18   still practicing in --

19   **A.**    I still have that personal practice, yes, sir.

20   **Q.**    All right.  Doctor, let me ask you, we talked about the

21   community needs assessment.  Does the hospital have a

22   comparable-type survey or investigation that they do from

23   your knowledge, personal knowledge, as being a board member?

24   **A.**    As a board member, my personal knowledge is that every

25   three years, the Boards of Directors for the hospital, they

1   create a report called the Community Health Needs

2   Assessment, affectionately in our county known as the CHNA

3   and the CHAH (phonetic).

4       The CHNA is the Board of Directors at the hospital, the

5   Community Health Needs Assessment.  Every three years we

6   evaluate what are the needs of our community, health needs

7   of our community, and we then allocate resources to address

8   that.

9       So, for instance, when there was an epidemic of obesity

10  identified in Cabell County, you would see in those reports

11  that we had identified that as an important healthcare

12  problem of our community and we, the hospital, would put

13  resources forth in order to address that challenge.

14  **Q.**   So, and I'm not so sure I appreciated what the board --

15  the Health Department did until I met you here recently, but

16  recently we had this epidemic with COVID.  So, would both

17  boards with these community needs assessments, would that

18  have been a predominant-type issue that you guys look at and

19  try to protect the public, all of us, so at that we don't

20  have public harm?

21  **A.**   Absolutely.  So, it -- we would actually say that it

22  overtook the previous priority.  The previous crisis was the

23  crisis of COVID.  And so, the attention of the Board of

24  Health for the Cabell County Health Department.

25      And its resources were totally attuned to how do we

```
 1    test individuals?  How do we track them?  How do we track

 2    them in the community?  How do we get them into health care

 3    at the right time?  How -- now, do we vaccinate them?  How

 4    do we set up large vaccination sites?

 5                COURT REPORTER:  Sir, I'm sorry.

 6                MR. FITZSIMMONS:  You've got to slow down, Doctor.

 7                THE WITNESS:  That's my fault.

 8                COURT REPORTER:  Thank you.

 9                THE WITNESS:  How do we set up track COVID

10    infections?  How do we intervene for those patients?  Now,

11    how do we vaccinate them both at a local site, as well as

12    within communities?

13         And the same thing with the board at the hospital.  All

14    of the attention of the board for the last, you know,

15    18 months has been on how do we address this within the

16    hospital?  How do we complete the supply chains?  How do we

17    get the right protective equipment to our employees?  When

18    do we vaccinate our employees?  All of those things are part

19    and parcel of what boards do.

20                BY MR. FITZSIMMONS:

21    Q.   And this is what you know from your personal

22    observation of being a member of both of these two boards

23    basically?

24    A.   Correct.

25    Q.   Correct?  Doctor, have -- through those needs
```

1    assessments being done both by the hospital and by the

2    Health Department, have you found any contradictions, major

3    contradictions?  Are they -- have you determined that

4    they're pretty much the same during the last decade, the

5    last ten years you've been on both of these boards?

6    **A.**   I'm not quite sure I understood the -- which part is

7    the same or --

8    **Q.**   Yeah.

9    **A.**   -- not the same?

10   **Q.**   It wasn't a very good question.  I'm sorry.  I just --

11   are the assessments -- when you look at it in the Health

12   Department and then you go over to the hospital that year

13   and look at it, have there been any -- any things that raise

14   your eyebrow and say we're really off on one of these or the

15   other or maybe --

16   **A.**   No.  I've not noticed any discordance between the

17   organizations and I've not noticed any real discordance in

18   any of the disease processes.

19   **Q.**   And since we're here involving the opioid epidemic, is

20   it true that both of these have made findings from the

21   surveys, the Community Needs Assessments, both that there

22   has been an opioid epidemic here in Cabell County for the

23   last ten years since you've been on these boards?

24   **A.**   Absolutely.

25   **Q.**   All right.  Let me talk about the related harms.  Have

1    there also been from that, from a factual standpoint, a

2    relationship between all other public harms, other

3    conditions, not just the opioid addiction, such as carditis

4    with the heart - I think it's an infection around the heart;

5    is that correct?

6    **A.**   It is.

7    **Q.**   Heart valves; is that correct?

8    **A.**   Yes.

9    **Q.**   Abscesses and infections throughout the entire body?

10           MR. RUBY:  Objection.  Your Honor, objection to

11   leading.  Mr. Fitzsimmons is just stating conditions and

12   asking the witness to agree to them.

13           THE COURT:  You're continuing to lead him a little

14   too much, Mr. Fitzsimmons.

15           MR. FITZSIMMONS:  Am I?  Okay, Judge.  All right.

16   I'll back off a little bit.

17       (Cross-talk)

18           THE COURT:  Do the best you can.

19           MR. FITZSIMMONS:  Okay.  All right.

20           BY MR. FITZSIMMONS:

21   **Q.**   Why don't you tell everybody here, what are the

22   conditions that are related?  Because I know I missed about

23   a half-dozen of them, but could you tell us all the

24   conditions that are related based on the community surveys

25   that were done, the community needs surveys as to what

1    people need to address?

2    **A.**    Based on my experience on both boards and as a

3    practicing physician in Cabell County, these are the list of

4    both what we, as physicians, would call morbidities and

5    mortalities, what I am now going to call the related harms

6    of the opioid crisis in our county.

7          They are infections, Hepatitis B, Hepatitis C, HIV, to

8    list a few.  They are the outcomes of pregnant mothers and

9    their offspring who were affected by their addiction.  That

10   required us to address both the pregnant mother situation

11   and the child's situation after they were born.

12         It includes the infectious disease complications seen

13   at a hospital, the overflow of patients in the emergency

14   room who have overdosed and need to be attended to in the

15   emergency room.  Includes the hospitalization of those

16   patients who have complications, such as endocarditis,

17   abscesses, spinal cord abscesses, and other related harms

18   within that population that are hospitalized.

19         It includes the longer term care of these individuals.

20   I'll just make a quick point.  That is, endocarditis is not

21   a disease in which it is identified, treated and easily

22   remedied.  It is a disease in which it is identified,

23   there's a decision about whether a heart valve would need to

24   be replaced.  It may or not be replaced.  You have weeks of

25   antibiotic therapy and much of that care is uncompensated.

```
1    Just as one example of the various harms that have occurred

2    in our community.

3        I will move on to the mortality of the opioid epidemic.

4    The incredible strain on our support systems in Cabell

5    County.  Of course, I cannot walk past the incredible

6    sadness that occurs when your brother, your sister, your

7    father, your mother, your partner has died from an overdose.

8    And the economic outcome of that.  I have a hard time even

9    putting myself -- to put my mind to what the cost of that

10   is.

11       But in addition to that, you have displaced families.

12   I can only go back -- Judge, I can only go back to what I

13   related to yesterday in my practice at PROACT.  So, as I

14   walk down my list of 25 patients, I see all that in that

15   list of 25 patients.

16       I see small children who have nobody to take care of

17   them.  I see family -- a person telling me I wasn't able to

18   come get my medicine last week because I was in court trying

19   to figure out how I would obtain the privileges to see my

20   child.  Or my child was going to be placed in foster care

21   and how disruptive that was to me.  I mean, and I can go on.

22       The related harms of addiction have cut at the very

23   core and the fabric of our community.  They have jeopardized

24   many, many things in our community.  And I -- I don't know,

25   for the sake of time or, if you'd like, I can continue.
```

1  **Q.**   Just -- just tell us, as to the related harms, I think

2  you've listed medically, are there other parts other than

3  the victim of the addiction, the addict, himself or herself,

4  that is affected?  Does -- does this also measure the impact

5  on the families after a death when one of these people

6  addicted to drugs dies or overdoses?  Does it also identify

7  those types of related harms, Doctor?

8         MS. WU:  Your Honor, I don't want to interrupt the

9  testimony.  I would simply remind Your Honor Dr. Yingling

10  was disclosed by the plaintiffs as an expert witness on a

11  number of issues, including harms to the community.  His

12  proposed expert opinions were excluded and, therefore, to

13  the extent that the question calls for answers that require

14  an opinion outside of Dr. Yingling's personal experience as

15  a physician in the community, we don't believe that those

16  pieces of testimony are proper in this setting.

17         THE COURT:  Go ahead, Mr. Fitzsimmons.

18         MR. FITZSIMMONS:  Yes, Judge.  Specifically, Rule

19  701, which is being addressed, as to a lay witness opinion,

20  I'm well aware of this Court's ruling and have been careful

21  to make sure that every statement made is an observation of

22  personal knowledge and I didn't step over -- didn't attempt

23  to qualify him and I have not done that.  And I'm very

24  cognizant of that and respectful, Judge.  I know what you --

25  I wouldn't do that.

1           THE COURT:  All right.

2       Mr. Ruby?

3           MR. RUBY:  And, Your Honor, on that point and to

4    Ms. Wu's point, we haven't objected to the testimony about

5    the doctor's medical experience, but as Mr. Fitzsimmons

6    attempts to move more broadly to the larger impacts on the

7    community, I think we have to keep a close eye on the

8    personal knowledge requirement and this witness's

9    foundation.

10          THE COURT:  Well, I haven't heard anything yet

11   that appears to be not based on his personal knowledge and

12   experience and I'm going to overrule the objection.  I think

13   you're still within the -- within the realm of his opinions

14   based upon his personal knowledge and experience and not

15   into the realm of an expert opinion.  So, at this point, the

16   objection is overruled.

17       And you can go ahead, Mr. Fitzsimmons.

18          MR. FITZSIMMONS:  Thank you, Judge.

19          BY MR. FITZSIMMONS:

20   Q.   Doctor, do you recall the question about the impact on

21   the family as a result of the addictions for other family

22   members?

23   A.   Well, I can speak to my personal experience, just as I

24   mentioned to the judge that, in my Tuesday afternoon

25   practice at PROACT, I clearly see the outcome and the harm

1    to families.  I -- you know, I -- just to make it as

2    personal as possible, as I'm talking to an individual on the

3    phone who I'm trying to keep in long-term recovery through

4    medication assisted therapy, I can hear the children crying

5    in the background.  I can hear --

6         You know, again, we have that interaction of why can

7    you not move forward to get a job?  How can I help you do

8    that?  What other services do you need?  And I clearly hear

9    all those dynamics, those dynamics of my child is in foster

10   care.  I may never see my child again.

11        Those dynamics of my spouse is in jail.  How will I

12   handle this?  Those dynamics of my mother and father have

13   done as much as they can for me.  How can I expect them to

14   do more?

15        All I can say is, I see it firsthand.  I also see it,

16   the outcome of those kind of challenges, within the

17   healthcare system.  How does the community begin to respond

18   to those things?  I can give very -- a very clear example.

19   I'll just select one.

20        Project Hope.  Project Hope was created out of the

21   Marshall Health organization.  It's a safe haven for

22   pregnant mothers after they've delivered their children.  It

23   allows the mother to stay with her children while she gets

24   into long-term recovery at this facility called Project

25   Hope.

1        18 beds.  18 families.  Moving them from addiction

2    through pregnancy, deliver their child, child has NAS,

3    Neonatal Abstinence Syndrome, and then has to be cared for,

4    if you will, put into a new culture.  Can't go back into the

5    environment they've been in before.

6        That's my personal experience of how I see the trials

7    and tribulations, the related harms of addiction in my

8    community.

9    **Q.**   Doctor, you know Lyn O'Connell?

10   **A.**   I do, yes, Dr. O'Connell.

11   **Q.**   She came and she testified to these other

12   organizations.  Is it fair to say that there are multiple --

13   when I say multiple, more than 10, 15 organizations now that

14   have sprung up, all of which are to address the opioid

15   epidemic and these public harms that we've identified here?

16   **A.**   Yeah.  Mr. Fitzsimmons, in my -- in my -- in my wait to

17   testify today, 50 miles from my home and here in a very

18   august excellent institution of jurisprudence, I began to

19   reflect upon my experience for the last ten years, starting

20   in 2009.

21       I think it's important for this whole body of

22   individuals, every person here, I think it's important for

23   them to understand.  Our community was in a crisis.

24       Our community every day, every year, had to figure out

25   what we were going to do.  Responsible people such, perhaps,

1    as myself had to come up with responsible ways in order to

2    address this problem.

3        Probably this group has heard of the City of Solutions.

4    Probably this group has heard of the Pathway.  The Road to

5    Recovery.  Perhaps this -- you know, we can call it a road,

6    a pathway.  We can call it anything you want to call it.

7    But populated along that road is significant numbers of new

8    programs and new organizations.

9        Our community, by its bootstraps, with or without

10   money, with or without a grant set up a program that said

11   we've got to address the problem with children.  We've got

12   to address the problem with moms.  We've got to address the

13   problem with infections.  We've got to address the problem

14   with overdoses.

15       I'll pause for a second.  I'm waiting for my colleague

16   to catch up.

17   **Q.**   Go ahead.  Is the structure in place in Cabell County

18   presently to build upon that or is this the final?  What

19   you've done, is that -- has it addressed all the problems we

20   have?

21   **A.**   No.  We've addressed the problems that we can see.  We

22   haven't even yet understood what the problems we don't see

23   and can't really yet understand in the next five years, the

24   next ten years.

25       Mr. Fitzsimmons, this is a generational problem.  This

1    is not a problem that started ten years ago and will end.

2    And it has no sunset clause.

3    **Q.**   And, Doctor, let me just ask you --

4                THE COURT:  Mr. Ruby?

5                MR. RUBY:  Your Honor, I will object that the

6    opinion that was just stated as to a generational problem

7    was one of the specific expert opinions that was disclosed

8    by plaintiffs for this witness and then excluded by the

9    Court at Docket 1234 because --

10               THE COURT:  Well, it's still based on his personal

11   observations.

12               MR. FITZSIMMONS:  It's his personal observations

13   from these assessments, yes, Your Honor.

14               THE COURT:  Yeah.  I'll overrule the objection.  I

15   don't think he's gone beyond where he can go without

16   offering an expert opinion that's not based on his -- well,

17   it's not an expert opinion in my view.  Go ahead.

18   Overruled.

19               BY MR. FITZSIMMONS:

20   **Q.**   Doctor, to save time so I can get off here maybe in

21   three minutes, I just moved it down a minute so the judge

22   can consider taking the afternoon break at that point.  I

23   just -- I just have one or two more areas.

24          The Resiliency Plan, you're aware of that?

25   **A.**   I am, yes.

```
1    Q.   Okay.  And when that occurred -- and the two things --
2    are you an economist or are you holding yourself out to be
3    good with numbers or anything like that on -- if I said
4    let's go build a building and make an addiction recovery, do
5    you have any expertise whatsoever in doing things like that?
6    A.   I have no expertise on that and my wife balances the
7    checkbook.
8    Q.   Okay.  So, I don't know that that's good sometimes, but
9    --
10   A.   It's trust.  It's all about trust.
11   Q.   So, but anyway, the Resiliency Plan, there's been
12   several numbers mentioned here in testimony, I'll represent
13   to you, different numbers at different times and things like
14   that.
15        You were on that -- you were asked to be on -- you're
16   asked to be on every committee, every group that relates to
17   medicine or health conditions --
18   A.   Yes, sir.
19   Q.   -- pretty much in Cabell County; is that true?
20   A.   Yes, sir.
21   Q.   All right.  So, do you remember actually also giving
22   some lectures and speaking concerning the opioid epidemic at
23   various places?
24   A.   I can only -- I can only remember one time that I spoke
25   in public.  I only have recollection of one time I spoke in
```

1    public.  There could have been times I was on a panel or --

2    and other people were speaking.  You know, if you can

3    exclude that, I think only one time did I purposefully stand

4    up in front of people to talk about it.

5    **Q.**   Tell us how it goes at these big meetings with all the

6    people, the representatives, when they come up with numbers

7    that, hey, we need 80 zillion dollars to do this or 15

8    trillion zillion to do this.  How does that happen and,

9    specifically, if you recall the Resiliency Plan, how do

10   those different numbers get into those things?

11   **A.**   Can I answer?  Thanks.

12   **Q.**   Yes.  Whatever the judge says, these people don't have

13   anything to do with what you're doing.  Whatever the judge

14   says, testify.

15   **A.**   Judge Faber, my -- my response to this particular

16   question is founded in a practice that I witnessed many,

17   many times and I actually use this practice as I teach

18   medical students.  So, I want to give you an example and

19   then go back to answer the question.

20        So, as I address medical schools on the wards of the

21   hospital, there's three answers they can give.  They can

22   give "I don't know."  They can do a swag.  Or they can say,

23   "I got it and I'm telling you the answer."

24        Now, in a hall of jurisprudence, you don't do swags

25   because I'm going to tell you what a swag is.  Swag is

1    scientific wild guess, okay?  And I want them to tell me

2    what their scientific wild guess because I want to know the

3    frame of reference as to where they are and how I can help

4    to teach them and allow them to be a better physician or a

5    better pharmacist.

6         In my experience around this matter, the Resiliency

7    Plan, I do recall a group of community members, and a large

8    group of community members, and that large group of

9    community members had a voice and represented their own

10   individual organizations.  And in that process of trying to

11   figure out how do we evaluate, assess what are the long-term

12   needs of that Resiliency Plan with every person giving their

13   own swag, their own scientific wild guess at what they think

14   their program needs.

15        Now, I can name those programs, but at the end of the

16   day, that group had to consolidate itself to something that

17   seemed like a reasonable scientific guess based upon the

18   science of the people that were in that room at that time.

19   That's where I think the number came from.

20   **Q.**  Did you all then agree that the final draft, the one

21   that counts, the last one, the final, took all the numbers

22   out, if you recall?

23   **A.**  Did we -- did we all collectively agree to that?

24   **Q.**  Well, that's what final product showed; is that right?

25   **A.**  Yeah.  The final product was the compiling of all the

```
 1    needs of our community and the plan to move us to a new

 2    place.

 3    Q.   Right.

 4    A.   The actual number, I don't remember how the number got

 5    in, got out.  That's not -- that was not under my review.

 6    Q.   The other thing with the Resiliency Plan and all that,

 7    Doctor, there's been some suggestion of somehow tying that

 8    into this lawsuit and also, Mr. Farrell who is present right

 9    here behind me, you know Mr. Farrell and his family, do you?

10    A.   I do.  I do know Mr. Farrell and the family.

11    Q.   And I know he's there in the front.  You can say.  You

12    have to tell the truth.  You were sworn under oath.  Is the

13    Farrell family one of the most reputable families and one of

14    the leaders in that community?

15              MR. RUBY:  Your Honor, objection.  I don't know

16    why the witness is being asked to vouch for counsel.

17              THE COURT:  Yeah.  How is that relevant?

18              MR. FITZSIMMONS:  Well, there were some

19    suggestions that Mr. Farrell kind of put this together,

20    Judge, and I -- as long as we can all understand he was just

21    doing his community thing, I have no further questions.

22              MR. RUBY:  Your Honor, we'd object to the

23    testimony from counsel.

24              THE COURT:  Yeah.  I'll sustain the objection to

25    that, Mr. Fitzsimmons, and you can move on.
```

```
 1              MR. FITZSIMMONS:  I'll withdraw.  Just -- may I

 2    take one second?

 3              THE COURT:  Yes.  Yes.

 4         (Pause)

 5              MR. FITZSIMMONS:  Good news is, Judge, they told

 6    me to sit down, so I have no further questions.

 7              THE COURT:  All right.

 8         Well, it's a little early for the break.  Do you want

 9    to start cross?  Are you going to go first, Ms. Wu?

10              MS. WU:  Yes, Your Honor.

11              THE COURT:  All right.

12              THE WITNESS:  I'm sorry.  Could you state your

13    name?  I didn't hear who you are.

14              MS. WU:  Certainly.  Dr. Yingling, my name is

15    Laura Wu and I represent McKesson in this lawsuit.  We

16    haven't met before.  Thank you for being here today.

17    A.    Thank you.  Nice to meet you.

18              MS. WU:  Okay.  Well, maybe we'll get done before

19    the break, but I'm not sure, Your Honor.

20                        CROSS EXAMINATION

21              BY MS. WU:

22    Q.    Dr. Yingling, we haven't met before, but I'm going to

23    -- I have the benefit of your deposition in this case.  So,

24    hopefully, that will expedite this process for us and for

25    the Court.
```

```
 1          Doctor, it is your understanding that the use of opioid
 2     prescriptions in Cabell County at this time is within the
 3     bounds of medically accepted practice, correct?
 4     A.   Could you read that question again?
 5     Q.   Certainly.  Trying to use your words.  It is your
 6     understanding, Doctor, that the use of opioid prescriptions
 7     in Cabell County at this time is within the bounds of
 8     medically accepted practice, correct?
 9     A.   Correct, with the exception of within the scope of my
10     view.  In other words, I can't attest to something outside
11     of the scope of my view.  I'm attesting to within the scope
12     of my view.  I believe it reaches that standard.
13     Q.   Thank you, Doctor.  I'm going to use some more exacting
14     words here.  Again, I'm trying to be true to your personal
15     opinions and not getting to anything else.
16     A.   So, are you reading from my deposition?
17     Q.   In some cases, I will be and, in other cases, I won't.
18     I'm just, you know, trying to --
19     A.   Would it be fair then to -- would it be fair to explain
20     the deposition part that you're reading from?
21     Q.   Well, I'm just asking some narrow questions trying to
22     get through it quickly and that's why I'm using specific
23     words, which you're picking up on.
24          So, Doctor, it's your appreciation that a higher
25     percentage of overdose deaths are related to synthetic
```

```
1    opioids, such as fentanyl and carfentanil, rather than

2    prescription opioids, correct?

3    A.   At a select time in the journey of the addiction crisis

4    in Cabell County, I would say that's true.

5    Q.   And that's true today, correct?

6    A.   So, read it again and I'll apply it to today.

7    Q.   Sure.  As of today, it is your appreciation that a

8    higher percentage of overdose deaths are related to

9    synthetic opioids, such as elicit fentanyl and carfentanil,

10   rather than prescription opioids?

11   A.   A higher percentage, yes.

12   Q.   Doctor, you spoke a short while ago about your

13   background and you're both a doctor and a pharmacist,

14   correct?

15   A.   Ms. Wu, I am.

16   Q.   And you understand that no opioid pill is supposed to

17   enter the community without being prescribed by a doctor and

18   dispensed by a pharmacist, correct?

19   A.   So, you're asking -- say it again.  You're asking that

20   I know?

21   Q.   Based on your knowledge and experience, you have an

22   understanding that no opioid prescription medication is

23   supposed to enter the community without first being

24   prescribed by a physician or other qualified prescriber and

25   dispensed by a pharmacist, correct?
```

```
 1    A.    Also underline supposed to.  I agree.

 2    Q.    Doctor, you have no knowledge of any prescription

 3    opioid pills that entered the Huntington or Cabell community

 4    without a prescription from a doctor?  You don't have any

 5    specific knowledge of that, correct?

 6    A.    I do not have -- underline specific.  I do not have a

 7    specific knowledge.

 8    Q.    Now, Doctor, you worked in the past as a pharmacist,

 9    including when you were in medical school?

10    A.    Yes.

11    Q.    And you worked both at retail pharmacies and hospital

12    pharmacies, as you described earlier?

13    A.    I did.

14    Q.    More recently, you've taught students the practice of

15    pharmacy as the founding dean at Marshall University School

16    of Pharmacy, correct?

17    A.    I did.

18    Q.    And that included teaching students about their

19    responsibilities pertaining to controlled substances,

20    correct?

21    A.    I did.

22    Q.    There's a -- doctor, and a shared responsibility

23    between the prescribing physician, the pharmacist and the

24    patient to adhere to what the medication is prescribed for,

25    correct?
```

1  **A.**    There is.

2  **Q.**    In fact, you understand that pharmacists have a

3  corresponding responsibility to prevent diversion of

4  controlled substances, correct?

5  **A.**    I think that's almost from the law.

6  **Q.**    You also understand that pharmacists must exercise

7  sound professional judgment before dispensing a controlled

8  substance to determine that the prescription is legitimate,

9  correct?

10  **A.**    I do.

11  **Q.**    Doctor, you understand that pharmaceutical

12  distributors, such as the defendants in this case, play a

13  role, which is to buy prescription opioids from

14  manufacturers, correct?

15  **A.**    Correct.

16  **Q.**    And the pharmaceutical distributors, such as the

17  defendants in this case, then ship those prescription

18  medications to DEA registered state licensed pharmacies and

19  hospitals, correct?

20  **A.**    They do.  Or they better, yes.

21  **Q.**    Okay.  Doctor, you're not aware of distributors ever

22  shipping prescription opioids to anyone in Cabell County

23  other than a DEA registered state licensed pharmacy or

24  hospital, correct?

25  **A.**    I am not aware of that.

1    **Q.**   Okay.  And you've held privileges to practice at

2    various hospitals in the Cabell County community, correct?

3    **A.**   I'm sorry.  I missed that first part.

4    **Q.**   I'm sorry.  Let me -- you've held privileges to

5    practice at various hospitals --

6    **A.**   Oh, yes.

7    **Q.**   -- in the Cabell County community, correct?

8    **A.**   Yes, ma'am.

9    **Q.**   And that's included, at certain points in time,

10   privileges to practice medicine at the VA Medical Center,

11   correct?

12   **A.**   Correct.

13   **Q.**   You continue to hold privileges at Cabell Huntington

14   Hospital, correct?

15   **A.**   I do.

16   **Q.**   When you order a medication for a patient in the

17   hospital, it's important that that medication is available

18   for your patient, correct?

19   **A.**   It is, yes.

20   **Q.**   Now, I'd like to show you a document.

21           MS. WU:  Could I get DEF-WV 2662?

22       Your Honor, may I approach?

23           THE COURT:  Yes.

24           THE WITNESS:  Thank you.

25           BY MS. WU:

1    **Q.**   Doctor, you have in front of you a document which we've

2    identified for purposes of trial as DEF-WV 2662.  Do you

3    have that?

4    **A.**   I do.

5    **Q.**   And this is a PowerPoint titled Odyssey in Medicine:

6    Pain Crisis to Addiction Crisis.  Do you see that?

7    **A.**   I do see that.

8    **Q.**   This is a presentation that you delivered in 2015?

9    **A.**   Be really hard to deny that one, counselor.

10   **Q.**   Well, I like to make it easy on both of us, Doctor.

11   So, if we turn to Page 2, and there's a slide titled

12   Objectives.  Do you see that?

13   **A.**   Sure.

14   **Q.**   One of the objectives, the first bullet, is to more

15   completely understand the journey, 1990s to 2015, from pain

16   management crisis to unexpected consequences.  Correct?

17   **A.**   Correct.

18   **Q.**   Okay.  Now, I would like to ask you to turn further

19   into your presentation to Slide 11.  Now, Doctor, this Slide

20   11 is titled "Another Odyssey Pain Management", correct?

21   **A.**   It does.

22   **Q.**   And the first bullet reads, "From 1911 to 1990s, use of

23   narcotics limited to acute pain and cancer pain management,"

24   correct?

25   **A.**   That's correct.

1    **Q.**    Narcotics, as used in your slide, would include

2    prescription opioid medication, correct?

3    **A.**    Correct.  I'm speaking of scheduled narcotics, yes.

4    **Q.**    Up until the 1990s, prescription opioids were primarily

5    used for acute pain and cancer pain, correct?

6    **A.**    That's my opinion, yes.

7    **Q.**    You completed your medical residency in about 1990; is

8    that right?

9    **A.**    Correct.

10    **Q.**    And after your residency, you started practicing

11    internal medicine here in West Virginia, correct?

12    **A.**    I did.

13    **Q.**    As a practicing internal medicine physician in West

14    Virginia in the early 1990s up until around 1998-1999, you

15    came to believe that pain was undertreated, correct?

16    **A.**    Well, I would -- the only thing I take issue with is

17    defining it in that 1990-1998 time frame.  I would say that

18    all physicians, including mine -- my opinion is that all

19    physicians, including myself, towards the end of the 1990s

20    were alerted to the need to address pain more specifically.

21    And allow me to explain.

22        So, pain is a very subjective thing.  The judge could

23    tell me he's having pain and I would look at him and say I

24    don't think he's in pain.  And I, as a physician, would have

25    a responsibility of how I would respond to that pain.

1       So, it's my personal opinion I -- it is my personal

2   knowledge that there was an attempt to move from a

3   subjective evaluation of pain to an objective evaluation of

4   pain, to objectify it, to allow us to measure it better, to

5   allow us to address it because there was a measurement.

6       And so, now, if the judge were having pain, he would

7   tell me a certain measurement of his pain and then I would

8   have a responsibility to respond to that.

9       To the degree that it was moving from a subjective

10  assessment to an objective assessment and because we were

11  now quantifying it, I think that allows me to say that we

12  were beginning to understand how we would properly treat

13  pain and that our under-appreciation could be linked to this

14  term -- what was the term I used?  What was the term you

15  used?  Under --

16  **Q.**   Undertreated?

17  **A.**   Undertreated.  Now, I'll make a -- well, I'll come

18  back.  I'm sure you'll allow me the opportunity to come

19  back.

20  **Q.**   Sure.  So, and I appreciate the explanation.  So, just

21  to make sure I have it right, it was during the late 1990s

22  that, based on your medical experience and the information

23  you received, you came to believe that pain was

24  undertreated?

25  **A.**   Right.  And, at the same time, there were attempts by

1    other organizations in this country on the same matter to

2    objectify how pain was being assessed.  And that's when we

3    get to, which I'm sure you'll bring up, but I'll just say

4    ahead of time, that's how we get to considering pain as a

5    fifth vital sign, was to try to objectify from the

6    subjective to the objective.

7    **Q.**   Thank you, Doctor.  So, in this period in the late

8    1990s that you've identified in response to your belief or

9    understanding that pain was undertreated, you increased the

10   rate at which you wrote prescriptions for pain medications,

11   correct?

12   **A.**   Well, let me -- let me be very clear in my answer

13   because your question is kind of not specific.  Pain

14   medications, in my view includes, Tylenol, non-steroidal

15   antiinflammatory drugs, non-narcotics.  I don't find any

16   direct relationship between objectifying pain and treating

17   pain to mean that I used narcotics or scheduled controlled

18   substances to treat that pain.

19        So, as long as we're clear in the definition, then I

20   would say yes, there was a responsibility by physicians to

21   become more attentive.  Not just more compassionate, but

22   more attentive to how we manage that, yes.

23   **Q.**   Doctor, other physicians in your community also

24   increased the rate of prescribing pain medication, correct?

25   **A.**   I don't know what the other physicians did.  I mean, I

1    -- I -- are you asking me to -- in the scope of my practice

2    do I think that they did that?

3    **Q.**   Did other physicians in the community increase their

4    rate of prescribing, do you know?

5    **A.**   Oh, I would think that their rate of prescribing, yes,

6    if I take a broad understanding, hospitalized, outpatient,

7    sure.  Yes, I agree to that.

8    **Q.**   And as you referenced a few moments ago, around that

9    same time in the late 1990s, organizations started

10   challenging doctors to meet their duties to address the

11   undertreatment of pain, correct?

12   **A.**   I agree.

13   **Q.**   Now, if we can continue with your PowerPoint

14   presentation, let's turn to Page 15, please.

15   **A.**   I'm sorry.  Make sure.  15?

16   **Q.**   Yes.

17   **A.**   Yes, sure.

18   **Q.**   Thank you, Doctor.  Now, I would like to call your

19   attention to the first bullet.  It reads, "In 1995, the

20   American Pain Society designated pain as the fifth vital

21   sign."

22        Do you see that, Doctor?

23   **A.**   I do.

24   **Q.**   The designation of pain as the fifth vital sign as

25   referenced in your slide put pain in the same category as

1    blood pressure, pulse, body temperature in terms of medical

2    treatment, correct?

3    **A.**   It did.

4    **Q.**   And now, if we turn down to the third bullet, it reads,

5    "In 2001" -- or "2001 pain management standards by JCAHO

6    effective pain management from admission to discharge."

7         Do you see that?

8    **A.**   I do.

9    **Q.**   This references that doctors were reminded to ask their

10   patients about pain and to treat that pain, correct?

11   **A.**   Yes.  I'm only smiling, Counselor, because JCAHO does

12   not really remind people.  I mean, they're a regulatory

13   agency, so remind just seems not quite appropriate, but

14   thank you.

15   **Q.**   Perhaps remind was too gentle.  Let me see if I can --

16   I can -- I can respond to that.

17        JCAHO mandated that doctors ask their patients about

18   pain and treat that pain, correct?

19   **A.**   That sounds like the JCAHO I know, yeah.

20   **Q.**   Okay.

21   **A.**   Counselor, could I -- I just feel an apprehension.  So,

22   I'm not quite sure what I can do with that apprehension, but

23   I would just ask.

24        Judge Faber, do you understand what this presentation

25   was about and what it was for and -- or is it necessary that

```
 1   you understand what it was about and what it's for because,

 2   obviously, we're going through it with pretty careful detail

 3   and I just have a feeling that it would be helpful to you.

 4            THE COURT:  Well, you need to answer her

 5   questions.

 6            THE WITNESS:  Oh, okay.  Got you.  Sorry.

 7       I'm not allowed to ask questions?  You know, I missed

 8   that rule in medical school.  Go ahead.

 9            MS. WU:  Thank you, Doctor.

10            BY MS. WU:

11   Q.   So, the pain rating scale, which I think you referenced

12   actually, a few moments ago allowed patients or encouraged

13   patients to indicate the level of their pain, correct?

14   A.   Yes.

15            MR. WU:  And, Mr. Reynolds, could we put up --

16   this is I believe --

17            THE COURT:  You can explain your answers, if you

18   feel the need to.

19            THE WITNESS:  Okay.

20            THE COURT:  I don't want you to misunderstand what

21   I say.

22            THE WITNESS:  Thank you.  Thank you.

23            BY MS. WU:

24   Q.   Doctor, we've put up a demonstrative.  This is an

25   example of a common pain rating scale, correct?
```

1    **A.**    I think I've seen that before.

2    **Q.**    And it goes from 0-10 or graphically from -- I think

3    you called it the frowny face to the smiley face, correct?

4    **A.**    I don't know.  I didn't say that today, but okay.

5    **Q.**    What this pain scale does is it allows patients to be

6    asked to choose the face that best depicts their pain level,

7    correct?

8    **A.**    I think that's fair.

9    **Q.**    It's your understanding that making pain the fifth

10   vital sign, as you referenced earlier, in introducing this

11   type of pain scale led to an increase in prescribing for

12   pain medications, correct?

13   **A.**    That relationship?  I recognize this as a way to

14   objectify pain.  The response by other physicians to that, I

15   can tell you how I responded to it, but I'm not so sure I --

16   **Q.**    Doctor, you agree that the addition of pain as the

17   fifth vital sign and the smiley face/happy face diagram

18   shown to patients had the effect of increasing net

19   prescribing of pain medications, correct?

20   **A.**    I think you could do that, yes.

21   **Q.**    So, I'd like to turn back to your presentation,

22   DEF-WV 2662, and look at one more page.  It's Page 24 of the

23   presentation.  Doctor, are you on Page 24?

24   **A.**    One minute, please.

25   **Q.**    Oh, I'm sorry.

1    **A.**    I'm on Page 24.

2    **Q.**    Okay.  And Page 24 says, "FDA announces results of

3    investigation of illegal promotion of OxyContin-2007."

4         Do you see that?

5    **A.**    I do.

6    **Q.**    According to your presentation, this Slide 24, Purdue

7    had falsely claimed that OxyContin was, quote, "less

8    addictive than morphine" and that OxyContin could be, quote,

9    "abruptly withdrawn without side effects or tolerance,"

10   correct?

11   **A.**    Repeat that question, Counselor.  I'm not -- I got lost

12   there when you were saying that I said something, but go

13   ahead.

14   **Q.**    Certainly.  So, according to your presentation, Purdue

15   had falsely claimed that OxyContin was less addictive than

16   morphine, correct?

17   **A.**    I want to make it -- I want to make it clear.  I did

18   not adopt any of the items that are stated here.  If you ask

19   me for my opinion, I will render my opinion or my

20   understanding.

21        I think it is now important, Judge Faber, to understand

22   exactly what this presentation is about.  This presentation

23   was I was invited to be a speaker at an alumni event.  So,

24   it's my 30th graduation from medical school and we have the

25   graduates of the entire group attending a weekend.  I'm sure

```
 1    they do it in law school.  We do it in medical school.  And

 2    I was asked to speak at that.

 3         I chose to coincide the odyssey of our medical school

 4    with the odyssey of where our community was with regards to

 5    the addiction crisis and, in doing so, I presented pictures

 6    of the medical school, like where it started.  It started in

 7    an old hospital, a community-based medical school, and I

 8    showed pictures along the way as to where it got to.  I

 9    showed what an investment in a community-based medical

10    school would end up like.

11         At the same time, I was showing simply as a picture of

12    the odyssey.  I wasn't adopting anything.  I wasn't stating

13    anything.  I felt that I was just reflecting what -- if I

14    was reflecting a picture of our -- of a building in our

15    medical school, I was reflecting something that was in the

16    public domain of what other people had said.  That was not

17    what I said.  It was simply walk with me in this odyssey to

18    go from this point to this point, which I thought was

19    relevant to our classmates who wanted to know what's

20    happening in your community, in the community of your

21    medical school right now.

22         So, in that way, I'm -- I'm being very cautious,

23    Counselor, as to what you're actually trying to say that I

24    said because I didn't say it.  And --

25    Q.   Okay.  Thank you, Dr. Yingling.  Hopefully, I can
```

```
 1    simplify this.  So, if we're looking at Page --
 2  A.    I know.  I'm on the same page.
 3  Q.    Okay.  And let's look at Bullet 2.  This bullet relates
 4    to Purdue, correct?
 5  A.    I think it does, yes, since it's OxyContin.
 6  Q.    And it reads, "Plan to maximize revenues and display
 7    false claims.  Some claims included less addictive than
 8    morphine, lower doses always abruptly withdrawn without side
 9    effects or tolerance."
10        Have I read that accurately?
11  A.    You have read it accurately.
12  Q.    Okay.  Now, according to this Bullet 2, Purdue's
13    misrepresentations were to prescribers, correct?
14  A.    From the source that I took this from, I'm assuming
15    that's what they're trying to imply.
16  Q.    Okay.  And then --
17            THE COURT:  When you get to a stopping point, we
18    probably ought to take a break, Ms. Wu.
19            MS. WU:  Certainly, Your Honor.
20            THE COURT:  Let's be in recess for about ten
21    minutes.
22        You can step down, Dr. Yingling.
23            THE WITNESS:  Thank you.
24            THE COURT:  I'll see you back in ten minutes.
25        (Recess taken)
```

```
 1            (Proceedings resumed at 3:42 p.m. as follows:)

 2            THE COURT:  Before you resume, Ms. Wu, I've

 3    been asked to make clear what the schedule as it now

 4    stands is.

 5        I understand Dr. Gilligan who is the defendants'

 6    witness is available on July 2nd.  That's Friday.  And so

 7    we'll start the defendants' case on that day, and then not

 8    come back until July the 7th which I believe is a Wednesday.

 9            Is that consistent with what I've told everybody

10    before?

11            MR. SCHMIDT:  I think so, Your Honor.  And as to

12    Dr. Gilligan, what we've agreed to with the plaintiffs is

13    he'll go on and off in a single day because he's got

14    vacation after that.  And I think as a condition of doing

15    that, we've agreed to wrap him up by noon so that plaintiffs

16    have time to cross.

17            MR. FARRELL:  I'm sorry.  You said you would be

18    done by noon?

19            MR. SCHMIDT:  By the noon break, yes.

20            MR. FARRELL:  Then we definitely will be done.

21            THE COURT:  Okay.  Well, all right.

22        You may proceed, Ms. Wu.

23            MS. WU:  Thank you, Your Honor.

24    BY MS. WU:

25    Q.  Dr. Yingling, welcome back.  Do you still have in
```

1    front of you your PowerPoint presentation, Defendants'

2    West Virginia 2662?

3    **A.**    I do.

4    **Q.**    Okay.  I'd like to just pick up where we left off back

5    on slide 24.  Do you have that, Doctor?

6    **A.**    I do.

7    **Q.**    Okay.  So I'm just going to read through it.

8        The first bullet related to Purdue reads, "Company

9    misrepresented to prescribers."  Correct?

10   **A.**    It does.

11   **Q.**    Then the second bullet which we read but we'll go in

12   order says, "Plan to maximize revenues and display false

13   claims.  Some claims included less addictive than morphine,

14   lower doses always abruptly withdrawn without side effects

15   or tolerance."  Correct?

16   **A.**    It does say that.

17   **Q.**    And then the third bullet, "Payment 634 million to

18   resolve charges of long-term illegal scheme."

19       Do you see that, Doctor?

20   **A.**    It does.

21   **Q.**    You prepared this presentation that we've been

22   reviewing; correct?

23   **A.**    I prepared the presentation.

24   **Q.**    And you didn't include anything in your presentation

25   that you knew to be false; correct?

1  **A.**   Correct.

2  **Q.**   Doctor, distributors do not interact with doctors as it

3  relates to the care and treatment of individual patients;

4  correct?

5  **A.**   They do not.

6  **Q.**   And a distributor has never influenced your own

7  prescribing behavior; correct?

8  **A.**   They have not.

9  **Q.**   Now, I'd like to turn to another slide, slide 26 in

10  your presentation.

11  **A.**   Yes.

12  **Q.**   Slide 26 shows the number of prescriptions in the

13  United States for oxycodone and hydrocodone for the period

14  199- -- 1991 through 2013.  Do you see that?

15  **A.**   I do.

16  **Q.**   And according to your presentation, in 1991 there were

17  76 million prescriptions for oxycodone and hydrocodone;

18  correct?

19  **A.**   Sorry.  I was trying to get those real numbers.  Say

20  the numbers again.

21  **Q.**   Sure.  In 1991 there were only 76 million prescriptions

22  for oxycodone and hydrocodone; correct?

23  **A.**   So I see this as a national reference base in the

24  public domain.  And in 1991 that number was 76 --

25  **Q.**   Correct.

**A.**   -- million.

**Q.**   Okay.  And then if we go to 2011, you'll see that by 2011 there were 219 million prescriptions for those same drugs; correct?

**A.**   I agree that's what it represents.

**Q.**   Okay.  Thank you, Doctor.

         Doctor, the PowerPoint slides that we've been talking about were made around the time you gave the presentation back in 2015; correct?

**A.**   Correct.

**Q.**   And you gave that presentation in connection with your professional work, correct, as a physician?

**A.**   No.  It wasn't with my professional work.  I was asked to present at an alumni event.  I don't consider that my professional work.

**Q.**   Were you presenting to your medical school classmates?

**A.**   I was presenting to the medical school classmates, yes.

**Q.**   Okay.  So you were presenting to a community of physicians; correct?

**A.**   I was presenting to a community of physicians, yes.

**Q.**   Okay.  Doctor, in your testimony earlier this afternoon you mentioned the Cabell County Community Needs Assessment. Do you recall that?

**A.**   I do.

**Q.**   A version of the Needs Assessment for 2015 was produced

```
1    in this case.  Are you familiar with that document?

2    A.   I am not familiar with that document.

3    Q.   Okay.  Are you aware that that 2015 Needs Assessment

4    doesn't mention the opioid -- the word "opioid" a single

5    time?

6    A.   I'm not aware of what it says.  I'd have to read it.

7              MR. FITZSIMMONS:  Judge, can I see the document

8    that she's referencing?

9              MS. WU:  I'm questioning about the document and

10   it's clear that --

11             MR. FITZSIMMONS:  I'd like to see the document

12   she's referencing, Judge.  I think I have a right to see

13   that.

14             MS. WU:  Your Honor, I'm not going to introduce it

15   since the witness has just said he doesn't know about the

16   document.

17             THE COURT:  Well, Mr. Fitzsimmons has a right to

18   see what you're talking about, doesn't he?

19             MS. WU:  Certainly.  I'm happy to hand it out.

20             MR. ACKERMAN:  Do I have as much of a right as Mr.

21   Fitzsimmons does?

22             MS. WU:  Your Honor, I'm not going to -- I'm not

23   going to question the witness about the document since he's

24   said he didn't know about it, so --

25             THE WITNESS:  Counsel, I'm not so sure that
```

 1   characterizes what I said.  I said I haven't read it.  You

 2   asked me something specific.  I said I haven't read it.

 3   It's not that I don't know about it.  I've already testified

 4   in my opinion that every year that document is compiled.

 5   You asked me if I know about it.  I know about it.  I

 6   haven't read it.

 7   BY MS. WU:

 8   **Q.**   Okay.  You -- so I'll just clarify the record.

 9        Dr. Yingling, you testified earlier about a number of

10   Cabell County health community assessments; correct?

11   **A.**   Correct.

12   **Q.**   Are you familiar with one of those assessments which

13   was issued for the year 2015?

14            THE COURT:  Mr. Fitzsimmons, you're on your feet.

15            MR. FITZSIMMONS:  Yeah, Judge.  I'm waiting

16   because I was going to move to strike the previous statement

17   because you, I thought, agreed to withdraw the question.  If

18   that's not the case, then I'll --

19            MS. WU:  The witness attempted to clarify his

20   testimony.  I was just trying to help him with some

21   questions.

22            MR. FITZSIMMONS:  Judge, I move to strike the

23   previous statement because he indicated he didn't know,

24   didn't recall it at this point.

25            THE COURT:  Well, he explained his answer.  I

```
1    don't think I need to strike it.  I think he explained his

2    knowledge of the existence of the document but not his

3    familiarity with it.

4         Is that right, Dr. Yingling?

5              THE WITNESS:  That's correct.

6              THE COURT:  Okay.  You can go ahead, Ms. Wu.

7    BY MS. WU:

8    Q.   Doctor, are you familiar with the contents of the

9    2015 assessment?

10   A.   Unless I have an opportunity to read it, I don't recall

11   the contents of that document.

12   Q.   That's fine.  You don't have knowledge of it as you sit

13   here today?

14   A.   I don't have knowledge of the exact content of that

15   document.

16   Q.   Okay.  And, so, you don't know one way or another

17   whether it discusses opioids; correct?

18   A.   I have no recollection, --

19   Q.   Okay.

20   A.   -- no specific recollection.

21   Q.   Fair enough, Doctor.

22        Now I'd like to switch gears a little bit to talk about

23   some of the programs that you've dealt with as part of your

24   work in the Cabell County Health Department.

25        You spent some time talking with plaintiffs' counsel
```

1    about your role as Chairperson of the Board of Health;

2    correct?

3    **A.**   Correct.

4    **Q.**   And the Board of Health is the government -- governance

5    body for the Cabell/Huntington Health Department; correct?

6    **A.**   That's my understanding, yes.

7    **Q.**   The Board of Health has oversight over the

8    Cabell/Huntington Health Department's budget; correct?

9    **A.**   Yes, it does.

10    **Q.**   The board reviews the Cabell/Huntington Health

11    Department's finances every month; correct?

12    **A.**   It reviews finances every month.

13    **Q.**   You personally have served on the Board of Health for

14    nearly 10 years; correct?

15    **A.**   Correct.

16    **Q.**   At your deposition you were not able to identify any

17    opioid-related programs administered by the Health

18    Department that receives funding from the City of Huntington

19    or Cabell County; correct?

20    **A.**   I asked at that time that the specific question on that

21    matter be deferred to the Medical Director of the Cabell

22    County Health Department, Dr. Kilkenny.  Dr. Kilkenny and

23    Mr. Hazelett, who's the administrator, would have the

24    details that I was asked in my deposition.

25    **Q.**   Those weren't details that you had at that time?

```
 1    A.   I did not have those details at that time.

 2    Q.   Okay.  And you don't have those details as you sit here

 3    today; correct?

 4    A.   I do not.

 5    Q.   Now, you also are affiliated with Marshall University;

 6    correct?

 7    A.   I am.

 8    Q.   And Marshall University administers numerous

 9    opioid-related programs; correct?

10    A.   It does.

11    Q.   You have personally been involved in Marshall's efforts

12    to stand up programs to address the opioid crisis in

13    Huntington/Cabell County; correct?

14    A.   I have.

15         MS. WU:  Now, I'd like to get a copy of

16    Defendants' West Virginia 824.

17         Your Honor, may I approach?

18         THE COURT:  Yes.

19    BY MS. WU:

20    Q.   Dr. Yingling, you have in front of you Defendants'

21    West Virginia 824.  Are you familiar with this document?

22    A.   I am familiar with this document.

23    Q.   This is the Road to Recovery I believe that you

24    referenced in your testimony earlier today?

25    A.   Yes, I said roadmap, pathway, yes.
```

1    **Q.**    And this document sets forth some of the efforts made

2    by Marshall to address the opioid crisis; correct?

3    **A.**    Well, I believe that Marshall is part of the programs

4    that are represented on that roadmap, yes.

5    **Q.**    And this document was prepared and kept in the course

6    of Marshall's regularly conducted business activity;

7    correct?

8    **A.**    You'll have to say that question again.

9    **Q.**    Sure.  This document was prepared in the course of

10   Marshall University's regular business activities?

11   **A.**    It would not be my understanding that this was created

12   or, or cataloged by Marshall University specifically, no.

13   **Q.**    You don't know if Marshall University created this

14   document?  You don't know that?

15   **A.**    I'm quite sure that Marshall University did not create

16   this document.  I'm, I'm quite sure it was a group, a broad

17   group of stakeholders that sat and defined how this map

18   would look and how it would be constructed, of which

19   Marshall University is only a single part of.

20   **Q.**    I understand.  So you're saying that Marshall

21   University participated in the creation of this document?

22   **A.**    I'll agree to "participated," yes.

23   **Q.**    Fair enough.  Marshall University itself is not

24   affiliated with the City of Huntington; correct?

25   **A.**    No.

1   **Q.**   And Marshall University is not affiliated with Cabell

2   County; correct?

3   **A.**   No.  Counsel, the question seems just a little abstract

4   to me, so I'm not quite sure how to answer it.  It feels --

5   I feel like I'm in jeopardy when I answer.  But I can't

6   understand how the university is part of the county or part

7   of the city.  So to that extent of my knowledge, no.

8   **Q.**   To your knowledge, Doctor, Marshall University does not

9   receive any funding from the City of Huntington; correct?

10   **A.**   I have no understanding of that.

11   **Q.**   And to your knowledge, Marshall University does not

12   receive funding from Cabell County; correct?

13   **A.**   I have no understanding of that.

14   **Q.**   I have no further questions at this time.  Thank you,

15   Doctor.

16                THE COURT:  Ms. Callas, --

17                MS. CALLAS:  Yes.  Thank you.

18                THE COURT:  -- you're next.

19                          CROSS EXAMINATION

20   BY MS. CALLAS:

21   **Q.**   Hello, Dr. Yingling.

22   **A.**   Hello.

23   **Q.**   How are you today?

24   **A.**   I'm good.  Tell me who you are and who you represent.

25   **Q.**   I am Gretchen Callas.  I represent AmerisourceBergen

1    Drug Corporation.

2    **A.**    Thank you.

3    **Q.**    I just have a few questions for you.

4         I'd like to focus specifically on Huntington and Cabell

5    County and the healthcare systems in that area.

6    **A.**    Okay.

7    **Q.**    You spoke about being on the board of Cabell/Huntington

8    Hospital; is that right?

9    **A.**    I have.

10   **Q.**    Now, did I understand that you've also served on the

11   board at St. Mary's Medical Center?

12   **A.**    I have.

13   **Q.**    Okay.  These are two large hospitals sitting in the

14   City of Huntington; is that correct?

15   **A.**    They were two large hospitals.  Now they are unified in

16   one dynamic healthcare system, yes.

17   **Q.**    So the two hospitals merged in 2018 or was it --

18   **A.**    It took a long time.  I would probably say '18, '19.

19   **Q.**    Okay.  Let's -- so view them as two separate

20   facilities; correct?

21   **A.**    Correct.

22   **Q.**    Do you know how many beds are at St. Mary's Medical

23   Center?

24   **A.**    Roughly 400.

25   **Q.**    And how many beds are at Cabell/Huntington?

1   **A.**   Roughly 300.  You know, we can pick and choose about

2   accredited beds and utilized beds, but those are two round

3   numbers.

4   **Q.**   In the State of West Virginia would you agree that

5   these two facilities are two of the largest, in fact, the

6   top five, in the top five hospitals in the State of West

7   Virginia?

8   **A.**   They are.

9   **Q.**   And my understanding of Huntington is that these two

10   hospitals are in fairly close proximity.  Would you agree

11   with that?

12   **A.**   Yes.  I mean, within a few miles, yes.

13   **Q.**   But they both sit inside of the City of Huntington?

14   **A.**   They do.

15   **Q.**   Now, I understand that Cabell/Huntington Hospital has

16   the only burn unit in the State of West Virginia.  Is that

17   true?

18   **A.**   That is true.

19   **Q.**   And Cabell/Huntington Hospital also has a comprehensive

20   cancer center, the Edwards --

21   **A.**   It does, the Edwards Comprehensive Cancer Center.

22   **Q.**   Now, St. Mary's is a Level II trauma center; correct?

23   **A.**   It is.

24   **Q.**   And they deal with people who experience a traumatic

25   event and need medical care?

```
1    A.    Yes.

2    Q.    Orthopedic surgery.  Is orthopedic surgery performed at

3    both facilities?

4    A.    Both hospitals.

5    Q.    We also have Marshall Health?

6    A.    We do.

7    Q.    And Marshall Health has its own facilities scattered

8    about the Cabell County region; is that right?

9    A.    We do.

10   Q.    And are there between 30 and 40 individual clinics that

11   are staffed by the Marshal Health --

12   A.    I don't know if we've gotten that big.  I would like to

13   think the footprint was that big, but maybe that's a bit of

14   an exaggeration, but let's just say there are many, many.

15   I'll agree to many.

16   Q.    Okay.  So outside of the two large hospitals, we have a

17   number of other health clinics around Cabell County?

18   A.    Yes, ma'am.

19   Q.    Okay.  The final area I want to address is this group

20   HIMG.  And I think they now have joined the --

21   A.    They have.  They joined the party.  Yes, they have.

22   Q.    And that's a recent acquisition by St. Mary's Medical

23   Center; correct?

24   A.    It is.

25   Q.    All right.  Do you know how many physicians, again
```

```
1    separate from these other entities, that we have at HIMG?
2    A.   I'm sure I'm not going to be fair.  They would object.
3    But let's easily say 30, maybe 40.  If you have a number
4    bigger than that, I'll accept that number.  But they have,
5    you know, many.
6    Q.   Could it be as high as 77?
7    A.   Well, I think, I think the distinction I would make,
8    not that it's important here, is the difference between a
9    provider and a physician.
10        I think they have providers that are in the 70s and
11   physicians that are in the 40s.  But we love them and they
12   are very good.
13   Q.   Okay.  Excellent.  Some of these providers at HIMG,
14   again a separate facility in the Huntington area?
15   A.   Uh-huh.
16   Q.   Is it in the City of Huntington?
17   A.   I think it's in the City of Barboursville.
18   Q.   Okay.  But it's in Cabell County?
19   A.   It is in Cabell County.
20   Q.   So we have about -- we'll say 40 physicians.  And a
21   number of them are specialists; is that right?
22   A.   They are, yes.
23   Q.   Some of them may practice in pain management or have
24   a --
25   A.   I, I'd have to not be able to answer that because I
```

```
 1    don't know that specifically someone is in the specific
 2    practice of pain management at HIMG.  I do not have
 3    knowledge of that.
 4    Q.   What about Cabell/Huntington Hospital?  You do know
 5    they have a pain management center?
 6    A.   Absolutely they do.
 7    Q.   And at times St. Mary's Medical Center has had pain
 8    management --
 9    A.   Absolutely they do.
10    Q.   Would you agree that the geographic pool of those
11    people that come into Huntington for medical care expand
12    over many counties and even other states outside of West
13    Virginia?
14    A.   I've made that argument many times.
15    Q.   I think you have.  And you've even identified the
16    number of counties.  Do you know -- have a number you would
17    share with us today?
18    A.   Counsel, you get to primary, secondary, and tertiary
19    markets and it's probably not something that I'm real
20    familiar with.  But, yes, we have a primary market, a
21    secondary market, a tertiary market.  And we consider
22    Huntington to be a hub of healthcare.
23    Q.   Is it fair to say up to two-thirds of the patients seen
24    at the hospital come from outside of Cabell County?
25    A.   I don't know that specifically.
```

1           MS. CALLAS:  That's all the questions I have.

2           THE WITNESS:  Thank you.

3           THE COURT:  Mr. Ruby.

4           MR. RUBY:  Yes, Your Honor.

5           THE WITNESS:  I'm sorry.  Introduce yourself.  I

6    missed that.

7                        CROSS EXAMINATION

8    BY MR. RUBY:

9    **Q.**   Good afternoon, Dr. Yingling.  I'm Steve Ruby.  I'm

10   here representing Cardinal Health.  How are you?

11   **A.**   Very good, thanks.

12   **Q.**   Good to see you.

13        I want to ask you just a few questions, Doctor, about

14   the balance between opioid regulation and the needs of

15   patients.

16        You were a member of a state board called the Coalition

17   for Responsible Chronic Pain Management; correct?

18   **A.**   I was.

19   **Q.**   And the Coalition for Responsible Chronic Pain

20   Management was essentially a blue ribbon panel of doctors

21   and healthcare providers that was set up in State Code; is

22   that right?

23   **A.**   I'm probably going to parse on the blue ribbon part,

24   but it was a selection of physicians across -- as I

25   recognized, it was a selection of physicians across the

1    state to address that issue.  I think it was called by the

2    legis- -- the House.

3    Q.    And that included -- that Coalition included a number

4    of highly qualified physicians and other healthcare

5    providers?

6    A.    It did.

7    Q.    All of them had, in some capacity or another,

8    experience in the treatment of pain; is that right?

9    A.    They did.

10   Q.    The Chair of the Coalition was Dr. Jeffrey Coben; is

11   that right?

12   A.    That's right.

13   Q.    And Dr. Coben is the Dean of the Public Health School

14   at WVU?

15   A.    He is.

16   Q.    And another member of the Coalition was Dr. Richard

17   Vaglienti; is that right?

18   A.    That's right.

19   Q.    And Dr. Vaglienti is a Professor and the Director of

20   Chronic Pain Medicine at WVU; is that right?

21   A.    He is.  Obviously, we're not parsing on the title but,

22   yes, that's what I understand.

23   Q.    And the purpose of the Coalition, generally speaking,

24   was to study the way that the state was regulating

25   prescription opioids and see if it was striking the right

```
 1   balance; is that right?
 2   A.   I believe that's a fair statement.
 3   Q.   Let's look at a report that the commission put out in
 4   2019.
 5           MR. RUBY:  Approach, Your Honor?
 6           THE COURT:  Yes.
 7           MR. RUBY:  Just a moment, Your Honor.
 8       (Pause)
 9           MR. RUBY:  Judge, we have the wrong exhibit
10   printed.  Rather than take a break, if it's acceptable to
11   counsel, I'm going to ask to put it on the screen and show
12   it to the witness that way.  And then we'll substitute a
13   printed document.
14           THE COURT:  That's fine with me if there's no
15   objection to it.
16           MR. FITZSIMMONS:  I'm fine.  That's good with us.
17           MR. RUBY:  Thank you, Mr. Fitzsimmons.
18       Mr. Huynh, could we get Defendants' West Virginia 602
19   on the screen, please?
20   BY MR. RUBY:
21   Q.   Dr. Yingling, this is the Coalition on Chronic Pain
22   Management's 2019 report to the legislature; is that
23   right?
24   A.   It appears to be, yes.
25   Q.   And your name is listed here under the, the heading
```

1    "Membership" as a member of the, the Coalition; is that

2    correct?

3    **A.**   It is, one of the few times I wasn't last on the list.

4    **Q.**   It's, it's not alphabetical.

5    **A.**   Right.

6              THE COURT:  Just a minute.

7         Mr. Fitzsimmons.

8              MR. FITZSIMMONS:  Your Honor, could Mr. Ruby tell

9    us the exhibit number?

10             MR. RUBY:  This is Defendants' West Virginia 602.

11             MR. FITZSIMMONS:  Thank you.

12   BY MR. RUBY:

13   **Q.**   Dr. Coben is listed here as the Chair of the

14   Coalition; is that right?

15   **A.**   It is.

16   **Q.**   And, again, he's the Public Health Dean at Morgantown?

17   **A.**   He is.

18   **Q.**   And Dr. Vaglienti is here as well; is that right?

19   **A.**   Correct.

20   **Q.**   And he is over Chronic Pain Management at WVU?

21   **A.**   Yes.

22   **Q.**   Do you see the section here underneath the membership

23   list that says "Creation of the Coalition"?

24   **A.**   Could we roll it up a little higher?

25   **Q.**   Sure can.  We can blow it up for you.

1      It says here, "The Coalition for Responsible Chronic

2    Pain Management was created by act of the legislature during

3    the 2017 regular session of the West Virginia legislature

4    with the passage of Senate Bill 339."

5      Did I read that correctly?

6    **A.**   That's correct.

7    **Q.**   And that's consistent with your understanding that the

8    legislature created this, this body?

9    **A.**   It is.

10   **Q.**   If you look a little bit further down on Page 1,

11   Doctor, there's another section that says "Overview of the

12   Legislation."  Do you see that?

13   **A.**   I do.

14   **Q.**   I won't read this entire passage to you.  But if you

15   see there at the beginning it says, "The bill created the

16   Coalition for Responsible Chronic Pain Management, an

17   alliance of specialists," and then it talks about some of

18   the purposes of the Coalition.

19      It says that it reviewed a process by which West

20   Virginia regulates pain clinics and pain management

21   pharmaceuticals.  Do you see that?

22   **A.**   I do.

23   **Q.**   And that, in fact, was one of the purposes of the

24   Coalition?

25   **A.**   It, it was.

1    **Q.**   And then it goes on to say, "The Coalition shall review

2    the state's chronic pain management regulations and attempt

3    to strike a balance between regulation, patient needs, and

4    clinical judgment of physicians."

5         Do you see that?

6    **A.**   I do.

7    **Q.**   That also -- striking that balance, as you testified

8    earlier, was also one of the purposes of this Coalition; is

9    that right?

10   **A.**   It was.

11   **Q.**   And then part of -- if you look further down at the

12   last sentence, or the next to last sentence of this section,

13   it outlines another purpose of the Coalition.  It says, "All

14   recommendations are to be reported back to the Joint

15   Committee on Health."

16        Do you see that?

17   **A.**   I do see that.

18   **Q.**   And the Joint Committee on Health refers to the Joint

19   Committee on Health of the state legislature?

20   **A.**   It does.

21   **Q.**   Another of the purposes of the Coalition for

22   Responsible Chronic Pain Management was to make

23   recommendations to the legislature; is that right?

24   **A.**   It was.

25   **Q.**   Then if you go to --

1    **A.**   The most important part of that paragraph, though, is

2    it expired on December 31st, 2020.  So I know I won't have

3    to serve, yes.

4    **Q.**   It's now sunset; right?

5    **A.**   It did.

6         MR. RUBY:  Mr. Huynh, if we could go to Page 4 of

7    the document.

8    BY MR. RUBY:

9    **Q.**   And about two-thirds of the way down, Dr. Yingling,

10   there's a section -- and I want Mr. Huynh to blow it

11   up -- that begins, "The Coalition finds and recommends

12   the following to the West Virginia legislature."

13        Do you see that?

14   **A.**   I do.

15   **Q.**   And, so, it's correct that in this report, this 2019

16   report, the Coalition for Responsible Chronic Pain

17   Management did, in fact, make findings and recommendations

18   and communicate those to the state legislature; is that

19   right?

20   **A.**   It did.

21   **Q.**   And this report that you see here was the vehicle by

22   which that was done; correct?

23   **A.**   That's correct.

24        MR. RUBY:  Your Honor, I'd move to admit

25   Defendant's West Virginia 602.  It's a public record.

1           THE COURT:  Were you given a duty to -- was the

2     Coalition given a mandate to make this report per the

3     legislature's direction to you?

4           THE WITNESS:  I understood serving on the

5     committee that if you were at the end of the day when it's

6     sunset, there would be a recommendation to the legislature,

7     yes.

8           THE COURT:  Any objection to it, Mr. Fitzsimmons?

9           MR. FITZSIMMONS:  I don't believe he said it was a

10    legal duty, so I would object on that basis, Judge.

11          MR. RUBY:  Judge, just to -- I think we laid that

12    foundation already, but I can take the witness back, if we

13    could go back to Page 1 of the document.

14          THE COURT:  Well, yeah, I think you've already got

15    it, but there's no harm in asking him more questions, a

16    couple questions about it.  Go ahead.

17    BY MR. RUBY:

18    **Q.**   And let's, let's --

19          MR. RUBY:  Actually, if we could shrink that, Mr.

20    Huynh, and get the whole page on there.  Let's, in fact, go

21    to the next page of the document if we could.  There's an

22    overview.

23        Judge, we have the paper now if I could approach?

24          THE COURT:  All right.  Yes.

25          MR. RUBY:  Judge, --

```
 1    BY MR. RUBY:

 2    Q.   Well, Dr. Yingling, do you see -- you have the

 3    document in front of you now, Defendants' West Virginia

 4    602 which is a paper copy of the report that we've been

 5    discussing.

 6         Do you see on Page 2 of that document as part of the

 7    list of duties that the commission had -- and I'm looking

 8    specifically at item number 3 where it says "to provide

 9    guidance to the legislature on potential statutory solutions

10    relative to regulation of chronic pain medications."

11    A.   I do.

12    Q.   And you understood that to be part of the statutory

13    duties that were imposed on the Coalition; correct?

14    A.   I did.

15    Q.   And if you look down further at Number 6 on this list,

16    do you see that item?

17    A.   I do.

18    Q.   And that says, "Offer any additional guidance to the

19    legislature which the Coalition sees is within its scope

20    which would further enhance the provider/patient

21    relationship in the effective treatment and management of

22    chronic pain."

23         Do you see that?

24    A.   I do.

25    Q.   And you also understood that to be one of the duties
```

1    that that statute imposed on the Coalition?

2    **A.**   I did.

3          THE COURT:  I'm ready to admit it, Mr. Ruby.

4          MR. RUBY:  All right, Your Honor.  I'll quit while

5    I'm ahead.

6          MR. FITZSIMMONS:  No objection.

7          THE COURT:  All right.  00602 is admitted.

8          MR. RUBY:  Thank you, Your Honor.

9    BY MR. RUBY:

10   **Q.**   Dr. Yingling, we will go back -- actually, remain

11   here on Page 2.

12         THE COURT:  Just for the record, the document I've

13   just admitted was admitted under 803(8) of the Federal Rules

14   of Evidence.

15         MR. RUBY:  Thank you, Your Honor.  Mr. Ackerman's

16   favorite rule.

17         THE COURT:  So far.

18   BY MR. RUBY:

19   **Q.**   Dr. Yingling, in furtherance of the, the duties

20   that the legislature had imposed upon the Coalition, the

21   members of the Coalition conducted a number of meetings

22   over the course of its existence; is that right?

23   **A.**   It did.

24   **Q.**   And in the course of those meetings, the Coalition

25   heard from other experts in the field of pain management

1    beyond those who were on the Coalition itself; correct?

2    **A.**    Yeah.  I don't have a specific recollection of other

3    people presenting, but they certainly could have.

4    **Q.**    Do you see the section of the report here at the bottom

5    of Page 2 that's headed "Coalition Meetings"?

6    **A.**    I do.

7    **Q.**    And just below that, there's a subsection with the

8    heading "Friday, June 14th, 2019."  Correct?

9    **A.**    It does.

10   **Q.**    I'm going to ask you to turn the page and look at the

11   first paragraph of the description of that meeting, so at

12   the top of Page 3 where it begins, "The CDC guidelines."  Do

13   you see that?

14   **A.**    I do.

15   **Q.**    And that says, "The CDC guidelines --"

16        And I'll read the whole sentence and then ask you a few

17   questions about it.

18        "-- were released in March, 2016 and combined with the

19   SB 273 has led to chronic pain patients experiencing an

20   increased difficulty obtaining medical treatment for their

21   chronic pain."

22        Did I read that correctly?

23   **A.**    Yes.

24   **Q.**    The CDC guidelines, that refers to guidelines that the

25   Centers for Disease Control had released in 2016 to, to

1    effectively tighten or attempt to tighten opioid prescribing

2    in the U.S; is that correct?

3    **A.**   It did, yes.

4    **Q.**   And SB 273 refers to Senate Bill 273 which was West

5    Virginia's Opioid Reduction Act; is that right?

6    **A.**   I, I don't know the title of that bill.

7    **Q.**   Are you familiar with SB 273?

8    **A.**   I'm familiar with that terminology, not the title of

9    the bill.

10   **Q.**   SB 273 put restrictions on the prescribing of opioid

11   pain medication in West Virginia; correct?

12   **A.**   Some of them were guidances.  Some of them were

13   restrictions.

14   **Q.**   One of the things that it did, in fact, was limit

15   opioid prescriptions to 30 days in duration; correct?

16   **A.**   It did.

17   **Q.**   With the possibility of two, thirty-day refills before

18   a patient had to come back to the office for a visit?

19   **A.**   It did.

20   **Q.**   And, and a patient who was going to be on a longer term

21   regimen of opioids would have to sign under SB 273 a

22   contract with, with their physician essentially not to

23   doctor shop and not to pharmacy shop; is that right?

24   **A.**   That's correct.

25   **Q.**   And that was the first time -- SB 273 in 2018 was the

1    first time that West Virginia had ever placed legal limits

2    on the prescribing of opioids; correct?

3    **A.**    That -- that's a very specific question, counselor, so

4    my mind is trying to understand during my course of practice

5    were there any other times in which that had occurred.  It's

6    reasonable to say that that's my recollection.

7              MR. RUBY:  And, Your Honor, I'll just note for the

8    record and the benefit of the Court that the Opioid

9    Reduction Act, that's SB 273, is codified at West Virginia

10   Code Section 16-54-1 through -9.  And the specific

11   limitations that the doctor just testified to regarding

12   prescribing limits are at Section (4)(g), (h) and (j).

13   BY MR. RUBY:

14   **Q.**    Doctor, so we'll go back to the highlighted

15   statement now that we've gotten that background.

16        What's reported here, then, to the legislature in the

17   2019 Coalition report is that the CDC guidelines combined

18   with the SB 273 restrictions had led to chronic pain

19   patients experiencing an increased difficulty obtaining

20   medical treatment for their chronic pain.  Is that right?

21   **A.**    Counsel, restate the question or reframe the question.

22   I don't think I understood the first part of it because I

23   thought you were saying that was a recommendation of the, of

24   the Coalition.  And that statement is not a recommendation

25   of the Coalition.

1   **Q.**   No, no, we'll look at the recommendation in just a

2   minute.

3   **A.**   Oh, okay.

4   **Q.**   My question is that what's being reported to the

5   legislature here in the 2019 Coalition report is, is

6   information from this June 14th, 2019, meeting to the effect

7   that the CDC guidelines, combined with SB 273, had led to

8   chronic pain patients experiencing an increased difficulty

9   in obtaining medical treatment.

10  **A.**   Right.  We're reflecting the concerns of patients in

11  that statement.

12  **Q.**   We will, in fact, Doctor, turn to the findings and

13  recommendations right now.  If you'll return to Page 4, the

14  last page of this -- sorry --

15  **A.**   Yes.

16  **Q.**   -- the last page of the document, next to the last page

17  of the document.

18       MR. RUBY:  Mr. Huynh, if we could go back.  I'm

19  sorry.  Go to 4, please.

20  BY MR. RUBY:

21  **Q.**   There's the language that we looked at a moment

22  ago.  "The Coalition finds and recommends the following

23  to the West Virginia legislature."

24       Do you see that?

25  **A.**   I do.

1   Q.   And I want to focus specifically, Doctor, on the fourth

2   recommendation, the fourth finding, the fourth bullet point

3   down.

4       And in that item what the Coalition told the

5   legislature was that, "SB 273 has inadvertently and

6   inappropriately interfered with the patient/practitioner

7   relationship unnecessarily regulating the evidence-based

8   practice of medicine and in some cases even dissuade

9   physicians to deliver safe, legal, and necessary medical

10  care to patients suffering from pain."

11      Do you see that?

12  A.   That's what it says.

13  Q.   Did I read that correctly?

14  A.   You did.

15  Q.   Now, SB 273, again that's the, the act that we were

16  discussing just a moment ago that imposed restrictions on

17  the prescribing of opioids in West Virginia; correct?

18  A.   It did.

19  Q.   Including the thirty-day prescription limit?

20  A.   Uh-huh.

21  Q.   And you and the other healthcare professionals on the

22  Coalition, you made a finding that's reflected in this

23  report that there were doctors whom SB 273 had dissuaded

24  from delivering necessary medical care to patients who were

25  in pain; correct?

```
 1    A.    Say that again.

 2    Q.    You and the other healthcare professionals on the

 3    Coalition -- what's reflected here is that you had made a

 4    finding that there were doctors whom the Opioid Reduction

 5    Act had dissuaded from delivering necessary medical care to

 6    patients who were in pain.

 7    A.    It was one of the reasons that dissuaded them, yes.

 8    Q.    Now turn to the next sentence which begins "in

 9    addition."  Do you see that?

10    A.    Sorry, I missed that.

11    Q.    Page -- the bottom of -- right there, the bottom of --

12    A.    Page 4.

13    Q.    The bullet point.

14    A.    Okay, got it.

15    Q.    And that says, "In addition, in some cases pharmacists

16    have been dissuaded --"

17          And if we could flip the page, Mr. Huynh.

18          "-- dissuaded to dispense safe, legal, and necessary

19    medication to patients as part of proper medication therapy

20    management."

21          Do you see that?

22    A.    It would be my opinion it's one of them, yes.  It would

23    be my knowledge that it's one of them.

24    Q.    And I did read that statement correctly, Doctor?

25    A.    Yes, you did.
```

1    Q.   I think you may have been anticipating the question

2    that I was going to ask which is that this reflects that you

3    and the other healthcare professionals on the Coalition had

4    made a finding that there were pharmacists whom the Opioid

5    Reduction Act, Senate Bill 573, had dissuaded from

6    dispensing necessary medication to patients who were in

7    pain; correct?

8    A.   Correct, one of the reasons.

9    Q.   You agree that there are patients for whom prescription

10   opioids are necessary medical care; is that right?

11   A.   State it again.

12   Q.   You agree that there are patients for whom prescription

13   opioid medication is necessary medical care?

14   A.   Yes.

15   Q.   That's part of what's reflected in the Coalition's

16   findings here; correct?

17   A.   Sure.

18   Q.   I want to go back to the first page of the report.

19        And, again, in the overview paragraph, we touched on

20   this just a moment ago, the sentence about balance.

21        It says that one of the Coalition's jobs is to attempt

22   to strike a balance between regulation, patient needs, and

23   clinical judgment of physicians.

24        You agree that that balance is important; correct?

25   A.   I agree.

**Q.**   And that includes the ability of physicians to exercise their clinical judgment in deciding how to treat patients who are suffering from pain.  That's important; right?

**A.**   I agree.

**Q.**   And part of what this report reflects is that that balance is difficult to strike; correct?

**A.**   There are struggles, yes.

**Q.**   And, in particular, that limits on the prescribing of opioid pain medications here in West Virginia have had in some cases the unintended consequence of depriving patients of necessary medical care; correct?

**A.**   Counsel, my answer needs to be framed in, in the consideration of the population of patients, the population of citizens we're talking about here.

        Yes, we are trying to strike a balance for a small population of individuals in our state who have chronic pain.  That's what our attempt was.

        So I don't want to be found generalizing outside of this very specific population.  For that specific population, my answer is "yes."

**Q.**   And part of what this report reflects, and the findings that are included in here reflect, is that doctors and healthcare professionals, including the folks on this Coalition, with decades of experience in pain management are still sorting out the right way to strike that balance; is

```
1    that right?
2    A.    For a select population with chronic pain, yes, sir.
3              MR. RUBY:  That's all I have, Your Honor.
4              THE COURT:  Is there any redirect, Mr.
5    Fitzsimmons?
6              MR. FITZSIMMONS:  Yes, Your Honor, just a brief
7    redirect.  May I proceed, Judge?
8                          REDIRECT EXAMINATION
9    BY MR. FITZSIMMONS:
10   Q.    Doctor, you were shown an exhibit by McKesson's
11   attorneys here, Defendants' West Virginia WV 03685.  Do
12   you recall having been shown that document?
13             THE COURT:  Just a minute.
14             MS. WU:  Your Honor, the witness said that he
15   wasn't familiar with the contents of the document.  And,
16   therefore, I didn't provide it to the witness to question
17   him about the document.  I, therefore, object to the
18   questioning of the witness --
19             THE COURT:  I don't know where he's going.  It
20   might, it might be the basis for a -- good faith basis for
21   him to ask questions.  Let's see where we go and you can
22   object again.  But at this point, I'm overruling the
23   objection.
24        Go ahead, Mr. Fitzsimmons.
25             MR. FITZSIMMONS:  Thank you, Judge.
```

```
 1    BY MR. FITZSIMMONS:

 2    Q.   Do you --

 3    A.   Counsel, I don't have that document.

 4    Q.   Is there any --

 5         MR. FITZSIMMONS:  I don't know how to do this,

 6    Judge.  I'm totally IT illiterate.  I don't know how the

 7    exhibits are being shown.

 8         (Pause)

 9         MR. FITZSIMMONS:  Would you publish that

10    particular exhibit, Judge?

11         MS. WU:  Your Honor, we object to publishing the

12    document which is not in evidence about which this witness

13    has said he has no knowledge.

14         MR. ACKERMAN:  In fairness, Your Honor, defendants

15    have spent the entire day publishing documents that weren't

16    in evidence.

17         MS. WU:  Your Honor, that was cross-examination.

18    Here this is being used to lead the witness through

19    testimony there's no foundation to offer.

20         MR. ACKERMAN:  I think Mr. Fitzsimmons is trying

21    to lay that foundation right now.

22         THE COURT:  Well, I'm going to let him go ahead,

23    Ms. Wu.  I don't know where he's going with it.

24      I think you're on questionable ground here, Mr.

25    Fitzsimmons, but I'm going to let you try anyway.
```

1          MR. FITZSIMMONS:  Thank you, Judge.

2     BY MR. FITZSIMMONS:

3     **Q.**   Doctor, do you recall being asked the question

4     whether that document -- whether the Cabell County

5     Community Health Assessment contained the word

6     "opioids," any mention of it?  Do you recall that?

7     **A.**   That was the question I was asked, yes.

8     **Q.**   And the Community Health Association updates typically

9     generally include data relating to addiction, drug

10    dependence, drug overdose, blood-borne disease which in some

11    fashion may relate directly to opioids?

12    **A.**   In the last few years, yes, it has.

13    **Q.**   All right.  In reference to that question, let me ask

14    you --

15          MR. FITZSIMMONS:  Gina, could you turn to Page

16    45412?  Oh, Page 8 -- I'm sorry -- the top bullet point on

17    that page.

18    BY MR. FITZSIMMONS:

19    **Q.**   Is heroin an opioid?

20    **A.**   Is heroin an opioid?  Heroin is an opiate.

21    **Q.**   Opiate?  All right.  So when -- the question as to

22    opioids, would that be included within the generic --

23    **A.**   Yes.

24    **Q.**   -- part of the opioids?

25    **A.**   Yes, the general public and most lump the two together.

1  **Q.**   All right.  So on Page 8 of that particular exhibit,

2  once again 45412, defense has referenced, in the first

3  bullet point does that specifically include the word

4  "heroin" which is an opiate within the classification of

5  opioid as to that question that's been asked that it

6  doesn't -- the representation that it didn't appear in there

7  at all?

8  **A.**   Yes.  It says "significant increase in heroin use."

9  **Q.**   And that specifically would address that question when

10  it was represented that it wasn't mentioned -- opioids

11  weren't mentioned at all?

12  **A.**   It would completely address that.

13  **Q.**   All right.  And, again on Page 53 --

14  **A.**   Counsel, could I --

15       THE COURT:  Excuse me.  Ms. Wu.

16       MS. WU:  Your Honor, objection, leading.  Again,

17  this document about which the witness has no foundation is

18  being led through testimony using the document about which

19  he has no knowledge.

20       THE COURT:  Well, you can use it to ask him the

21  question, Mr. Fitzsimmons, but I have a problem with him

22  showing -- exhibiting the document when he said he doesn't,

23  he hasn't seen it or anything.  You can use it as a basis to

24  ask him questions about his knowledge and so forth, but I

25  don't think it should be displayed.

```
 1    BY MR. FITZSIMMONS:

 2    Q.   Doctor, once again --

 3              THE COURT:  So I'll sustain the objection.

 4    BY MR. FITZSIMMONS:

 5    Q.   Once again, that question where the word -- it is

 6    represented that the word "opiate," "opioid" did not

 7    appear whatsoever in this document, wherever reference

 8    in that document with the word "heroin" that would be a

 9    type of opioid, would it not?

10    A.   Yes, that's fair.  And to clarify my response, as a

11    member of the Board of Health, each of these documents is

12    presented to the board for review.

13         I believe I was being asked did I have specific

14    recollection of specific content in the 2015 document.

15    That's what I was saying I did not have an understanding of.

16         I do not think I was representing, and I think I made a

17    clear representation, that the board members saw the

18    document, understood the content of the document in

19    real-time at the board meeting, and they were used by

20    stakeholders in the community.

21    Q.   So if the word "heroin" appears in there three times,

22    not once, three times, you would agree that that document

23    clearly has "opioid" or at least the generic classification

24    of "opioid" within it; is that right?

25    A.   I absolutely agree with the statement and I believe it
```

 1    supports my previous statement.

 2    **Q.**    All right.  And one last question, Doctor.  Based upon

 3    your experience and all your -- I don't want to say

 4    expertise.  Based upon your experience, your personal

 5    experience and your observation being in multiple areas that

 6    you have and you've described to Your Honor here, does the

 7    Cabell/Huntington County community have a healthcare

 8    infrastructure with -- which if properly funded would make a

 9    substantial difference in combating the opioid epidemic

10    today?

11    **A.**    I believe our community, of which I'm only one

12    representative, has proven itself to be resilient, to be

13    responsible in addressing this opioid crisis and its related

14    harms in our community.

15         Without question, without question our community has

16    been through two significant crises.  One was the airplane

17    crash in 2070 [sic] which ripped our community part.  We

18    proved ourself to be a resilient, responsible community to

19    address that and to come from that.

20         And I believe our community has, as exampled by the

21    Huntington Road to Recovery, exampled itself to be

22    responsible for addressing the crisis within our community

23    and responsible with the infrastructure to address the

24    unknown and the known related harms of this crisis going to

25    the future.

```
 1              MR. FITZSIMMONS:  I have no further questions,

 2    Judge.  Thank you so much.

 3         Thank you, Doctor.

 4              THE COURT:  Is there any recross?

 5              MS. WU:  No further questions, Your Honor.

 6              MR. RUBY:  No, Your Honor.

 7              THE COURT:  Dr. Yingling, thank you, sir, very

 8    much for being with us.  You're free to go --

 9              THE WITNESS:  Thank you.

10              THE COURT:  -- with the Court's appreciation.

11    Thank you, sir, very much.

12              MR. FARRELL:  Judge, so where we're at at 4:30 for

13    scheduling purposes, we have two expert witnesses and then

14    we have former Chief of Police, Skip Holbrook, to testify.

15    Chief Holbrook arrives tomorrow at 2:00 p.m.  And, so, we

16    anticipate that he would be called Friday morning.

17         We can either begin with Dr. Thomas McGuire who is an

18    economist, a health economist, today.  He's here prepared to

19    go.  I anticipate my direct is approximately an hour.

20         The second expert is Dr. Judith Feinberg from WVU.  I

21    anticipate her direct is approximately an hour.

22         So we would hope that by close of business tomorrow,

23    both of them would be able to be finished.  And then Friday

24    morning we would call Chief Holbrook and finish definitely

25    by the noon hour.  That would bring us up to our break.
```

```
 1          When we return from the break, we have three witnesses

 2    for three days.

 3          The first witness would be Dr. Caleb Alexander who will

 4    present the abatement plan.

 5          The second witness will be our economist who will put a

 6    value on the abatement plan.

 7          And then we will close with Mayor Steve Williams.

 8          So we think we've squeezed things down to fit into the

 9    parameters.

10          That being said, we can either take the next 25 minutes

11    and start with Dr. McGuire or we can start fresh tomorrow

12    morning at 9:00 a.m.

13          THE COURT:  Well, if you think you can get him

14    done tomorrow, I think the thing to do would be put it off

15    and start tomorrow.  I hate to give up 25 minutes.  On the

16    other hand, interrupting it might not --

17          What do you want to do?  Do you want to start him or

18    not?

19          MR. FARRELL:  I feel comfortable that -- with the

20    additional time that you've allowed, I feel comfortable

21    we'll put our case in.

22          The only question I have is that if tomorrow morning if

23    we get done quickly with cross and direct with the two

24    experts, the only question is whether or not we can squeeze

25    in Chief Holbrook Thursday evening and then call it a, call
```

1    it an early day.

2              THE COURT:  Well, I'm going to adjourn until 9:00

3    in the morning and we'll start fresh with your first witness

4    then.

5              MR. FARRELL:  Thank you, Judge.

6              THE COURT:  I'll see everybody then.

7         (Trial recessed at 4:35 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1      CERTIFICATION:

2              I, Ayme A. Cochran, Official Court

3      Reporter, and I, Lisa A. Cook, Official Court Reporter,

4      certify that the foregoing is a correct transcript from

5      the record of proceedings in the matter of The City of

6      Huntington, et al., Plaintiffs vs. AmerisourceBergen

7      Drug Corporation, et al., Defendants, Civil Action No.

8      3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9      reported on June 16, 2021.

10

11              S\Ayme A. Cochran              s\Lisa A. Cook

12                Reporter                       Reporter

13          _

14

15              June 16, 2021

16                Date

17

18

19

20

21

22

23

24

25
```

**$**

**$10,000** [2] - 101:15, 102:1

**'**

**'14-'15** [1] - 148:15
**'18** [1] - 197:18
**'19** [2] - 134:25, 197:18

**0**

**0** [2] - 47:19, 60:16
**0-10** [1] - 182:2
**00602** [1] - 211:7
**00753** [3] - 123:11, 123:21, 125:3
**00907** [2] - 2:5, 2:14
**03685** [1] - 220:11

**1**

**1** [9] - 69:16, 87:7, 87:18, 122:7, 122:11, 124:16, 126:3, 206:10, 209:13
**1,000** [1] - 58:1
**1.9** [1] - 96:11
**10** [3] - 42:8, 162:13, 193:14
**10,302** [1] - 101:9
**10-15** [1] - 14:15
**1001** [2] - 4:6, 4:9
**1022** [1] - 3:5
**10:42** [1] - 64:19
**11** [3] - 43:21, 175:19, 175:20
**11-year-old** [1] - 21:1
**1115** [2] - 99:13, 99:16
**12** [4] - 25:1, 44:21, 44:24, 54:12
**1234** [1] - 164:9
**126** [1] - 3:5
**12:03** [1] - 115:15
**13** [4] - 49:1, 124:6, 124:9
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**133** [1] - 130:3
**14** [2] - 51:12, 95:11
**14th** [2] - 212:8, 215:6
**15** [5] - 57:18, 162:13, 166:7, 179:14, 179:15
**151** [2] - 51:20, 52:2
**15910** [1] - 3:15
**16** [4] - 1:19, 7:4,

229:9, 229:15
**16-54-1** [1] - 214:10
**1600** [1] - 3:15
**1717** [2] - 6:6, 6:13
**18** [6] - 10:14, 96:6, 96:9, 154:15, 162:1
**188** [1] - 24:25
**18th** [2] - 124:1, 124:21
**19** [2] - 14:22, 100:5
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1911** [1] - 175:22
**1981** [3] - 137:11, 137:12, 137:16
**1985** [3] - 137:9, 137:15, 137:16
**1987** [1] - 8:21
**1989** [1] - 8:22
**199** [1] - 188:14
**1990** [2] - 135:20, 176:7
**1990-1998** [1] - 176:17
**1990s** [8] - 175:15, 175:22, 176:4, 176:14, 176:19, 177:21, 178:8, 179:9
**1991** [4] - 188:14, 188:16, 188:21, 188:24
**1993** [1] - 11:11
**1995** [1] - 179:19
**1996** [4] - 11:12, 15:19, 18:11, 18:12
**1997** [2] - 18:17, 19:1
**1998-1999** [1] - 176:14
**1999** [1] - 19:1

**2**

**2** [8] - 110:10, 110:21, 175:11, 185:3, 185:12, 210:6, 211:11, 212:5
**2.2** [1] - 44:6
**20** [2] - 20:4, 24:25
**200** [1] - 130:1
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21, 5:5
**2001** [2] - 180:5
**2002** [1] - 14:22
**2003** [1] - 52:15
**2003-2005** [1] - 136:2
**2004** [1] - 105:24
**2007-2008** [1] - 136:4
**2009** [1] - 162:20
**2010** [2] - 12:18, 15:6, 15:9, 19:11, 135:11,

135:12, 140:17, 145:19
**2011** [2] - 189:2, 189:3
**2012** [2] - 19:4, 19:14
**2013** [3] - 55:18, 61:20, 188:14
**2014-'15** [1] - 148:15
**2014-15** [1] - 134:18
**2015** [8] - 175:8, 175:15, 189:9, 189:25, 190:3, 191:13, 192:9, 224:14
**2016** [9] - 21:6, 45:6, 52:16, 126:4, 129:2, 135:13, 135:14, 212:18, 212:25
**2017** [8] - 57:4, 58:2, 95:17, 105:25, 118:21, 135:7, 135:13, 206:3
**2018** [4] - 57:1, 99:18, 197:17, 213:25
**2019** [13] - 95:17, 124:1, 124:21, 130:22, 134:20, 141:12, 204:4, 204:22, 208:15, 212:8, 214:17, 215:5, 215:6
**2019-20** [1] - 134:18
**202** [2] - 2:4, 2:13
**2020** [5] - 91:22, 118:23, 119:1, 134:25, 208:2
**2021** [6] - 1:19, 7:4, 119:5, 119:6, 229:9, 229:15
**2070** [1] - 225:17
**21** [1] - 101:7
**219** [1] - 189:3
**2216** [1] - 3:7
**24** [7] - 54:12, 182:22, 182:23, 183:1, 183:2, 183:6, 187:5
**2419** [3] - 78:23, 79:4, 79:6
**25** [7] - 5:5, 11:14, 18:14, 158:14, 158:15, 227:10, 227:15
**250** [1] - 72:19
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26** [3] - 49:8, 188:9, 188:12
**2653** [3] - 87:3, 87:10,

87:16
**2662** [4] - 174:21, 175:2, 182:22, 187:2
**273** [13] - 212:19, 213:4, 213:7, 213:10, 213:21, 213:25, 214:9, 214:18, 215:7, 216:5, 216:15, 216:23
**28** [4] - 1:16, 4:3, 4:12, 4:14
**29** [1] - 107:20
**29464** [3] - 4:4, 4:12, 4:15
**2:00** [3] - 114:19, 114:23, 226:15
**2nd** [1] - 186:6

**3**

**3** [11] - 13:14, 47:19, 47:20, 60:16, 91:18, 111:10, 111:11, 111:19, 127:25, 210:8, 212:12
**30** [8] - 82:19, 82:24, 83:1, 83:2, 84:1, 199:10, 200:3, 213:15
**300** [1] - 198:1
**30th** [1] - 183:24
**31** [1] - 151:19
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**31st** [1] - 208:2
**3237** [1] - 94:6
**32502** [1] - 2:11
**339** [1] - 206:4
**34** [1] - 95:21
**350** [1] - 130:1
**37** [1] - 102:24
**37(c)(1** [1] - 55:25
**3843** [1] - 5:14
**3963** [1] - 133:17
**3:00** [2] - 115:1, 132:4
**3:17-cv-01362** [2] - 1:5, 229:8
**3:17-cv-01665** [2] - 1:11, 229:8
**3:42** [1] - 186:1

**4**

**4** [8] - 111:24, 112:12, 112:20, 113:4, 208:6, 215:13, 215:19, 217:12
**4(b** [2] - 77:9, 77:25
**4(e** [8] - 77:7, 77:12,

77:14, 77:16, 78:1, 101:23, 102:9, 102:21
**4)(g** [1] - 214:12
**40** [4] - 10:19, 199:10, 200:3, 200:20
**400** [1] - 197:24
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**40s** [1] - 200:11
**42246** [5] - 69:17, 78:12, 82:19, 83:21, 83:24
**45412** [2] - 222:16, 223:2
**47** [1] - 88:9
**48** [2] - 87:16, 88:2
**49** [2] - 88:8, 88:10
**4:30** [1] - 226:12
**4:35** [1] - 228:7

**5**

**5** [5] - 47:20, 113:16, 113:20, 113:25, 114:7
**50** [3] - 11:1, 14:24, 162:17
**50,000** [3] - 20:1, 20:10, 20:12
**50.6** [2] - 58:1, 58:2
**52** [1] - 62:1
**53** [1] - 223:13
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**573** [1] - 218:5

**6**

**6** [2] - 10:1, 210:15
**6.6** [1] - 52:9
**600** [1] - 2:10
**602** [4] - 204:18, 205:10, 208:25, 210:4
**612** [2] - 34:19, 52:3
**634** [1] - 187:17
**6th** [1] - 3:5

**7**

**7** [5] - 26:24, 34:25, 35:1, 95:10, 107:3
**70** [2] - 12:25, 96:10
**701** [1] - 159:19
**70130** [1] - 3:8
**707** [1] - 4:24
**70s** [1] - 200:10
**716** [1] - 3:12

**725** [2] - 4:19, 4:21
**753** [2] - 130:12, 131:1
**76** [3] - 188:17, 188:21, 188:24
**77** [1] - 200:6
**7th** [1] - 186:8

## 8

**8** [7] - 25:15, 105:24, 123:14, 128:21, 129:23, 222:16, 223:1
**8.9** [1] - 96:10
**80** [6] - 20:11, 20:15, 33:13, 42:25, 43:2, 166:7
**80-plus** [2] - 50:16
**801** [1] - 3:10
**803(8** [2] - 125:21, 211:13
**824** [2] - 194:16, 194:21
**850** [1] - 5:12
**86** [3] - 98:2, 98:7, 98:10

## 9

**9** [1] - 214:10
**901** [1] - 4:23
**902** [1] - 125:8
**91436** [1] - 3:16
**9:00** [3] - 7:4, 227:12, 228:2
**9th** [1] - 4:6

## A

**a.m** [3] - 7:5, 64:19, 227:12
**abatement** [11] - 40:7, 48:2, 50:4, 55:4, 104:2, 104:8, 116:5, 116:8, 127:11, 227:4, 227:6
**ability** [6] - 40:16, 40:25, 63:7, 92:6, 126:16, 219:1
**able** [27] - 16:16, 19:18, 20:22, 21:10, 23:3, 29:1, 35:11, 37:5, 45:9, 54:24, 59:18, 59:19, 59:24, 74:16, 80:13, 92:23, 92:24, 96:1, 102:23, 106:7, 115:3, 139:5, 146:21, 158:17, 193:16, 200:25, 226:23

**abruptly** [3] - 183:9, 185:8, 187:14
**abscesses** [2] - 156:9, 157:17
**Absolutely** [3] - 101:7, 201:6, 201:9
**absolutely** [13] - 16:2, 22:9, 34:11, 37:23, 40:8, 55:6, 142:25, 148:13, 149:19, 153:21, 155:24, 224:25
**absorbed** [1] - 108:10
**absorbing** [1] - 108:13
**Abstinence** [8] - 14:2, 27:11, 33:22, 55:4, 57:4, 57:16, 58:3, 162:3
**abstinence** [2] - 55:8, 56:10
**abstract** [1] - 196:3
**abuse** [12] - 20:10, 20:12, 24:17, 24:18, 39:8, 45:24, 48:9, 52:24, 91:18, 91:25, 96:17, 151:9
**Abuse** [20] - 8:25, 11:8, 11:17, 14:8, 14:21, 15:25, 28:21, 29:14, 31:6, 31:7, 31:21, 32:7, 42:4, 47:25, 48:1, 52:18, 74:2, 74:21, 96:15, 97:15
**academic** [3] - 138:11, 139:4, 139:12
**Academy** [5] - 25:24, 33:23, 34:1, 46:1, 59:6
**accept** [1] - 200:4
**acceptable** [1] - 204:10
**accepted** [2] - 139:24, 170:3, 170:8
**accepting** [1] - 99:4
**access** [13] - 50:25, 74:22, 80:19, 81:12, 83:9, 83:11, 84:20, 85:2, 94:19, 95:7, 99:1, 121:21, 126:8
**accommodated** [1] - 72:7
**according** [4] - 183:6, 183:14, 185:12, 188:16
**account** [1] - 109:18
**accredited** [1] - 198:2
**accurate** [1] - 108:9
**accurately** [4] - 25:18, 52:4, 185:10, 185:11

**Ackerman** [3] - 97:5, 117:15, 131:22
**ACKERMAN** [18] - 4:5, 83:23, 87:12, 96:25, 108:4, 109:20, 117:16, 125:5, 125:15, 126:24, 127:16, 131:2, 131:12, 131:14, 131:18, 190:20, 221:14, 221:20
**Ackerman's** [1] - 211:15
**acquisition** [1] - 199:22
**acronym** [1] - 18:19
**act** [2] - 206:2, 216:15
**Act** [8] - 18:17, 52:19, 93:11, 98:25, 213:5, 214:9, 217:5, 218:5
**Action** [4] - 1:4, 1:10, 229:7, 229:8
**action** [1] - 149:21
**active** [1] - 11:21
**activities** [4] - 125:12, 130:12, 138:18, 195:10
**activity** [3] - 138:19, 141:14, 195:6
**actual** [3] - 89:22, 120:22, 168:4
**acute** [2] - 175:23, 176:5
**add** [2] - 56:21, 70:15
**added** [1] - 130:1
**addict** [1] - 159:3
**addicted** [2] - 40:14, 159:6
**addiction** [13] - 146:5, 146:7, 152:5, 156:3, 157:9, 158:22, 159:3, 162:1, 162:7, 165:4, 171:3, 184:5, 222:9
**Addiction** [2] - 50:24, 175:6
**addictions** [1] - 160:21
**addictive** [4] - 183:8, 183:15, 185:7, 187:13
**addition** [6] - 24:12, 69:5, 158:11, 182:16, 217:9, 217:15
**additional** [8] - 87:24, 88:14, 92:22, 93:2, 130:1, 138:2, 210:18, 227:20
**address** [43] - 8:7,

11:8, 17:24, 18:7, 22:12, 24:9, 29:23, 40:17, 63:11, 92:4, 126:5, 126:16, 127:3, 145:13, 146:19, 146:20, 146:22, 147:6, 150:15, 153:7, 153:13, 154:15, 157:1, 157:10, 162:14, 163:2, 163:11, 163:12, 163:13, 166:20, 176:20, 177:5, 179:10, 194:12, 195:2, 199:19, 203:1, 223:9, 223:12, 225:19, 225:22, 225:23
**addressed** [5] - 47:2, 94:19, 159:19, 163:19, 163:21
**addressing** [6] - 40:5, 47:24, 50:3, 55:2, 225:13, 225:22
**adequacy** [1] - 120:10
**adhere** [1] - 172:24
**adjourn** [2] - 114:25, 228:2
**adjunct** [1] - 135:20
**administer** [1] - 36:20
**administered** [1] - 193:17
**administers** [1] - 194:8
**administration** [4] - 36:19, 96:12, 138:20, 139:11
**Administration** [2] - 14:9, 29:15
**administrative** [6] - 37:2, 96:2, 96:21, 97:11, 97:14, 138:22
**administrator** [1] - 193:23
**admission** [8] - 34:18, 83:20, 106:9, 106:18, 107:11, 107:15, 131:1, 180:6
**Admission** [1] - 105:25
**admissions** [5] - 29:11, 34:13, 106:13, 106:23, 107:12
**admit** [5] - 125:3, 125:19, 131:5, 208:24, 211:3
**admitted** [14] - 34:20, 35:2, 52:6, 74:1,

83:24, 87:3, 87:8, 106:7, 106:17, 118:20, 211:7, 211:13
**adolescent** [4] - 49:6, 49:11, 49:15, 49:17
**adolescents** [15] - 21:25, 22:1, 27:21, 47:23, 47:24, 48:5, 48:6, 48:20, 49:6, 49:10, 49:22, 105:1, 113:17, 113:21, 114:1
**adopt** [1] - 183:18
**adopted** [6] - 22:24, 76:9, 77:11, 77:18, 100:25, 143:19
**adopting** [1] - 184:12
**Adoption** [2] - 18:17, 77:13
**adoption** [9] - 47:7, 76:11, 77:12, 77:16, 101:22, 101:23, 102:12, 102:15, 103:2
**adoptions** [1] - 18:24
**adoptive** [6] - 19:18, 77:13, 77:17, 82:11, 82:14, 100:25
**adulthood** [1] - 81:17
**adults** [7] - 27:21, 47:23, 47:25, 48:21, 105:2, 113:17, 152:12
**advantage** [1] - 89:4
**Advisory** [1] - 30:11
**affect** [1] - 46:18
**affected** [17] - 15:15, 15:25, 27:9, 33:14, 33:19, 40:3, 42:4, 66:16, 66:20, 104:23, 104:25, 110:10, 111:24, 114:3, 116:6, 157:9, 159:4
**affecting** [1] - 9:9
**affectionately** [1] - 153:2
**affiliated** [3] - 194:5, 195:24, 196:1
**Affordable** [1] - 98:25
**afternoon** [6] - 117:14, 151:25, 160:24, 164:22, 189:21, 202:9
**afternoons** [2] - 152:2, 152:8
**afterwards** [1] - 72:22
**age** [4] - 21:24, 69:23, 79:10, 81:16

**agencies** [3] - 11:7, 142:14, 143:1
**agency** [3] - 12:6, 96:17, 180:13
**ages** [1] - 79:12
**ago** [13] - 27:23, 29:11, 60:14, 118:15, 122:6, 134:14, 164:1, 171:12, 179:8, 181:12, 215:22, 216:16, 218:20
**agree** [28] - 87:21, 88:20, 97:21, 98:16, 99:20, 99:23, 131:5, 148:25, 156:12, 167:20, 167:23, 172:1, 179:7, 179:12, 182:16, 189:5, 195:22, 198:4, 198:10, 199:15, 201:10, 218:9, 218:12, 218:24, 218:25, 219:4, 224:22, 224:25
**agreed** [3] - 186:12, 186:15, 191:17
**agreeing** [2] - 98:19, 108:25
**ahead** [27] - 37:19, 38:14, 39:5, 41:23, 57:12, 57:17, 73:10, 103:9, 105:10, 108:8, 109:22, 117:20, 127:22, 134:4, 149:13, 159:17, 160:17, 163:17, 164:17, 178:4, 181:8, 183:13, 192:6, 209:16, 211:5, 220:24, 221:22
**airplane** [2] - 20:25, 225:16
**al** [4] - 1:7, 1:13, 229:6, 229:7
**alcohol** [8] - 67:11, 67:16, 67:20, 68:2, 68:5, 68:6, 68:7, 68:8
**Alcohol** [1] - 67:12
**alerted** [1] - 176:20
**Alexander** [5] - 30:25, 104:4, 104:8, 106:16, 227:3
**allegations** [2] - 29:1, 44:8
**alliance** [1] - 206:17
**allocate** [4] - 141:22,

145:1, 145:12, 153:7
**allocated** [1] - 95:22
**allocations** [1] - 101:25
**allow** [8] - 18:22, 18:23, 127:21, 167:4, 176:21, 177:4, 177:5, 177:18
**allowed** [7] - 54:2, 74:4, 93:15, 126:16, 181:7, 181:12, 227:20
**allowing** [1] - 85:17
**allows** [5] - 113:23, 139:3, 161:23, 177:11, 182:5
**almost** [4] - 12:25, 20:4, 34:25, 173:5
**alphabetical** [1] - 205:4
**alumni** [2] - 183:23, 189:14
**American** [12] - 13:21, 25:24, 33:22, 33:25, 46:1, 50:22, 50:24, 59:6, 91:17, 93:11, 98:20, 179:20
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**AmerisourceBergen** [4] - 6:2, 65:2, 196:25, 229:6
**amount** [1] - 101:16
**analysis** [1] - 37:17
**ANDREW** [1] - 5:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 4:11
**anniversary** [1] - 11:14
**announces** [1] - 183:2
**annual** [1] - 100:25
**answer** [17] - 33:2, 65:16, 90:10, 117:10, 117:25, 150:10, 166:11, 166:19, 166:23, 178:12, 181:4, 191:25, 196:4, 196:5, 200:25, 219:12, 219:20
**answering** [1] - 117:9
**answers** [3] - 159:13, 166:21, 181:17
**ANTHONY** [1] - 2:6
**antibiotic** [1] - 157:25
**anticipate** [4] - 55:16, 226:16, 226:19, 226:21
**anticipating** [1] - 218:1

**antiinflammatory** [1] - 178:15
**anyway** [3] - 53:13, 165:11, 221:25
**apologies** [1] - 115:19
**apologize** [2] - 88:5, 151:10
**appear** [2] - 223:6, 224:7
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**application** [1] - 9:1
**applied** [4] - 9:1, 96:19, 99:12, 99:17
**apply** [4] - 48:5, 103:4, 150:1, 171:6
**appointed** [4] - 140:16, 140:21, 140:22, 140:23
**appointment** [1] - 139:12
**appreciate** [4] - 111:8, 115:3, 132:6, 177:20
**appreciated** [1] - 153:14
**appreciation** [4] - 170:24, 171:7, 177:13, 226:10
**apprehension** [2] - 180:21, 180:22
**approach** [9] - 26:10, 34:7, 69:19, 85:16, 94:2, 123:17, 174:22, 194:17, 209:23
**Approach** [2] - 14:10, 204:5
**appropriate** [9] - 26:14, 47:10, 49:24, 57:5, 79:1, 80:14, 81:13, 180:13
**appropriately** [1] - 49:24
**April** [1] - 57:1
**Arch** [2] - 6:6, 6:13
**area** [11] - 11:19, 14:6, 31:3, 108:3, 109:1, 137:23, 138:1, 142:15, 197:5, 199:19, 200:14
**areas** [10] - 46:14, 54:22, 62:6, 62:12, 80:24, 109:18, 128:7, 141:23, 164:23, 225:5
**arena** [2] - 9:10, 99:2
**argument** [1] - 201:14
**arisen** [1] - 145:22
**arrive** [1] - 28:9

**arrives** [1] - 226:15
**Art** [1] - 8:21
**artery** [1] - 145:8
**article** [2] - 56:15, 73:2
**articles** [3] - 14:14, 62:2, 73:9
**ASFA** [2] - 18:18, 18:20
**ASHLEY** [1] - 5:3
**aside** [1] - 108:18
**ASPE** [1] - 33:15
**aspect** [2] - 63:21, 151:11
**Aspects** [1] - 13:23
**aspects** [5] - 16:14, 31:1, 69:25, 103:24, 104:12
**assess** [4] - 12:14, 30:18, 143:7, 167:11
**assessed** [2] - 46:3, 178:2
**assessing** [1] - 15:24
**assessment** [24] - 23:18, 38:18, 48:20, 62:7, 81:8, 82:13, 120:3, 141:13, 141:14, 141:19, 142:5, 142:15, 143:21, 144:11, 146:2, 146:8, 146:9, 147:2, 149:17, 151:4, 152:21, 177:10, 192:9
**Assessment** [6] - 153:2, 153:5, 189:22, 189:25, 190:3, 222:5
**assessments** [10] - 29:6, 46:13, 144:1, 150:21, 153:17, 155:1, 155:11, 164:13, 191:10, 191:12
**Assessments** [1] - 155:21
**assigned** [3] - 11:4, 28:3, 30:5
**assist** [11] - 8:4, 8:10, 9:24, 13:8, 25:10, 42:6, 43:19, 44:19, 48:23, 51:10, 55:12
**assistance** [17] - 9:11, 9:14, 9:22, 10:6, 10:12, 10:15, 11:5, 11:13, 12:13, 77:12, 77:13, 77:16, 101:22, 101:23, 102:12, 102:15, 103:2

**Assistance** [1] - 10:23
**Assistant** [3] - 13:24, 24:21, 43:11
**assisted** [4] - 51:1, 53:22, 152:6, 161:4
**associated** [2] - 96:3, 119:23
**Association** [2] - 13:22, 222:8
**assuming** [1] - 185:14
**assumption** [1] - 72:20
**assumptions** [1] - 75:5
**assure** [3] - 52:20, 128:6, 128:18
**asterisks** [1] - 10:8
**AT** [1] - 1:2
**at-home** [1] - 112:24
**attach** [1] - 60:25
**Attachment** [5] - 69:16, 87:7, 87:18, 122:7, 122:11
**attempt** [6] - 159:22, 177:2, 207:2, 213:1, 218:21, 219:17
**attempted** [1] - 191:19
**attempts** [2] - 160:6, 177:25
**attend** [1] - 137:17
**attended** [2] - 137:19, 157:14
**attending** [1] - 183:25
**attention** [16] - 27:14, 62:14, 82:6, 87:9, 87:15, 94:12, 94:14, 95:9, 111:1, 141:24, 145:23, 146:3, 148:13, 153:23, 154:14, 179:19
**attentive** [2] - 178:21, 178:22
**attest** [1] - 170:10
**attesting** [1] - 170:11
**attorney** [1] - 12:6
**attorneys** [3] - 38:25, 70:9, 220:11
**attuned** [1] - 153:25
**August** [1] - 65:7
**august** [1] - 162:18
**authenticating** [1] - 125:8
**authored** [1] - 14:14
**available** [32] - 11:21, 29:16, 29:18, 36:6, 36:7, 36:8, 37:25, 39:16, 39:22, 57:25, 78:6, 79:12, 79:17, 82:10, 82:13, 85:5, 92:21, 100:2,

102:12, 118:25,
119:4, 119:6,
120:23, 121:8,
122:8, 127:12,
127:13, 129:16,
129:20, 130:4,
174:17, 186:6
**average** [2] - 85:12,
85:14
**Avin** [1] - 3:7
**avoid** [2] - 128:6,
128:18
**award** [1] - 121:11
**awarded** [1] - 129:1
**awards** [2] - 8:24,
95:12
**aware** [25] - 19:12,
56:10, 67:10, 69:6,
69:14, 71:10, 71:12,
79:14, 79:17, 90:23,
92:5, 92:8, 93:21,
93:23, 99:12, 99:17,
100:6, 104:6,
107:21, 159:20,
164:24, 173:21,
173:25, 190:3, 190:6
**awareness** [1] - 40:13
**awhile** [1] - 30:11
**Ayme** [2] - 6:17, 229:2

# B

**babies** [8] - 55:18,
58:18, 59:11, 97:17,
98:3, 98:10, 98:17,
109:7
**baby** [3] - 27:8, 72:22,
109:15
**Bachelor** [1] - 136:8
**Bachelor's** [1] - 8:21
**background** [9] - 8:7,
8:17, 8:20, 38:9,
119:16, 151:11,
161:5, 171:13,
214:15
**backlog** [1] - 18:24
**balance** [10] - 202:14,
204:1, 207:3, 207:7,
218:20, 218:22,
218:24, 219:6,
219:15, 219:25
**balances** [1] - 165:6
**bang** [1] - 16:12
**Bar** [1] - 13:22
**Barboursville** [2] -
136:15, 200:17
**Baron** [1] - 3:14
**Barrett** [2] - 101:15
**base** [6] - 17:10,
17:13, 23:15, 23:19,

23:20, 188:23
**Based** [3] - 66:14,
225:2, 225:4
**based** [37] - 9:4,
17:22, 26:7, 30:21,
31:19, 32:25, 33:8,
45:8, 48:8, 48:12,
78:1, 80:22, 80:23,
85:22, 94:22, 94:25,
95:23, 102:3,
106:13, 107:10,
120:2, 129:24,
130:11, 130:15,
146:25, 156:24,
157:2, 160:11,
160:14, 164:10,
164:16, 167:17,
171:21, 177:22,
184:7, 184:9, 216:7
**basis** [16] - 101:16,
125:20, 126:11,
126:20, 128:16,
128:20, 129:5,
129:7, 130:7, 130:9,
149:9, 151:18,
209:10, 220:20,
223:23
**Baylen** [1] - 2:11
**Bayley** [3] - 62:5, 62:7,
62:10
**bear** [1] - 103:24
**became** [4] - 20:19,
138:12, 145:24,
146:19
**become** [3] - 16:21,
141:9, 178:21
**becoming** [1] - 146:17
**beds** [7] - 130:1,
130:3, 162:1,
197:22, 197:25,
198:2
**BEFORE** [1] - 1:17
**began** [8] - 11:10,
146:2, 147:1,
149:22, 149:24,
150:6, 162:18
**begin** [3] - 79:9,
161:17, 226:17
**beginning** [4] -
127:18, 134:25,
177:12, 206:15
**begins** [4] - 81:15,
208:11, 212:12,
217:8
**behavior** [4] - 49:10,
49:11, 61:22, 188:7
**Behavioral** [1] -
124:13
**behind** [2] - 21:16,
168:9

**belabor** [1] - 146:23
**belief** [1] - 178:8
**below** [2] - 101:9,
212:7
**bench** [1] - 57:9
**BENCH** [1] - 1:16
**benefit** [5] - 85:1,
98:24, 99:7, 169:23,
214:8
**Best** [1] - 14:7
**best** [5] - 27:7, 59:21,
74:22, 156:18, 182:6
**better** [8] - 36:1, 38:9,
62:18, 125:20,
167:4, 167:5,
173:20, 177:4
**between** [12] - 51:25,
79:12, 83:18,
155:16, 156:2,
172:23, 178:16,
199:10, 200:8,
202:14, 207:3,
218:22
**beyond** [21] - 32:15,
61:4, 71:13, 75:13,
76:17, 78:9, 83:5,
83:16, 86:17, 90:12,
90:25, 100:22,
103:5, 112:18,
114:13, 119:11,
120:6, 123:2,
129:12, 164:15,
212:1
**Biden's** [1] - 91:17
**big** [13] - 21:9, 21:12,
22:19, 23:23, 45:16,
51:25, 60:20, 67:7,
145:6, 146:5,
199:12, 199:13
**bigger** [1] - 200:4
**biggest** [1] - 62:13
**bill** [3] - 206:15, 213:6,
213:9
**Bill** [5] - 91:23,
124:19, 206:4,
213:4, 218:5
**billion** [1] - 91:18
**Birth** [1] - 78:17
**birth** [8] - 49:23,
53:24, 54:5, 54:8,
59:15, 59:21, 60:18
**Birth-to-Three** [1] -
78:17
**births** [3] - 58:1, 58:3,
98:6
**bit** [18] - 18:13, 22:14,
40:8, 62:25, 71:22,
73:8, 89:14, 91:2,
93:1, 136:12,
137:13, 147:21,

148:7, 148:9,
156:16, 192:22,
199:13, 206:10
**block** [5] - 74:3, 74:21,
94:14, 96:16, 97:15
**blocks** [1] - 125:21
**blood** [2] - 180:1,
222:10
**blood-borne** [1] -
222:10
**blow** [2] - 205:25,
208:10
**blue** [2] - 202:20,
202:23
**Blvd** [3] - 4:3, 4:12,
4:14
**Board** [22] - 134:6,
134:7, 134:16,
135:23, 136:1,
138:17, 140:16,
140:19, 141:1,
141:3, 141:5,
141:21, 142:1,
142:13, 146:18,
153:4, 153:23,
193:1, 193:4, 193:7,
193:13, 224:11
**board** [55] - 104:21,
105:3, 105:11,
105:14, 107:5,
110:19, 110:25,
111:18, 113:12,
116:25, 119:8,
123:5, 133:22,
133:24, 134:9,
134:10, 134:12,
134:17, 134:18,
134:20, 139:19,
139:20, 139:22,
140:21, 141:1,
141:2, 141:10,
141:21, 142:16,
142:23, 144:11,
145:18, 145:19,
145:20, 145:23,
146:1, 146:13,
147:10, 148:10,
148:12, 148:13,
150:15, 150:18,
152:23, 152:24,
153:14, 154:13,
154:14, 193:10,
197:7, 197:11,
202:16, 224:12,
224:17, 224:19
**board's** [1] - 148:5
**boards** [6] - 153:17,
154:19, 154:22,
155:5, 155:23, 157:2
**Boards** [3] - 136:4,

142:6, 152:25
**Bob** [1] - 132:17
**body** [7] - 22:23,
62:16, 156:9,
162:21, 180:1,
193:5, 206:8
**Bonasso** [1] - 5:14
**bond** [2] - 54:5, 60:25
**bootstraps** [1] - 163:9
**born** [8] - 39:19,
63:22, 72:22, 98:3,
98:10, 104:24,
110:23, 157:11
**borne** [1] - 222:10
**bottom** [5] - 95:11,
96:8, 212:4, 217:11
**Boulevard** [1] - 3:15
**bounds** [3] - 33:1,
170:3, 170:7
**Box** [2] - 5:14, 6:8
**brain** [2] - 49:15,
49:17
**brains** [1] - 49:7
**breadth** [2] - 37:10,
38:1
**break** [15] - 64:14,
68:18, 114:20,
114:22, 115:12,
116:1, 116:14,
164:22, 169:8,
169:19, 185:18,
186:19, 204:10,
226:25, 227:1
**Bridgeside** [3] - 4:3,
4:12, 4:14
**brief** [3] - 103:23,
119:13, 220:6
**briefly** [5] - 25:14,
34:2, 41:6, 50:10,
61:8
**bring** [6] - 10:20,
119:22, 132:18,
146:2, 178:3, 226:25
**broad** [6] - 48:8,
48:12, 142:15,
152:7, 179:6, 195:16
**broad-based** [1] -
48:8
**broader** [3] - 66:20,
66:23, 67:2
**broadly** [2] - 24:7,
160:6
**brother** [1] - 158:6
**buck** [1] - 16:12
**Budd** [1] - 3:14
**budget** [7] - 28:10,
79:19, 80:18, 80:25,
93:7, 101:24, 193:8
**budgets** [2] - 17:4,
90:3

**build** [2] - 163:18, 165:4
**building** [2] - 165:4, 184:14
**builds** [1] - 127:10
**Bullet** [2] - 185:3, 185:12
**bullet** [12] - 175:14, 175:22, 179:19, 180:4, 185:3, 187:8, 187:11, 187:17, 216:2, 217:13, 222:16, 223:3
**bullets** [1] - 128:12
**Bureau** [8] - 10:20, 14:9, 14:19, 17:2, 28:20, 36:23, 39:11, 124:13
**Burling** [1] - 5:11
**burn** [1] - 198:16
**business** [4] - 7:9, 195:6, 195:10, 226:22
**buy** [1] - 173:13
**BY** [70] - 7:25, 8:15, 10:4, 13:15, 18:9, 25:16, 27:1, 32:4, 33:7, 34:15, 37:22, 38:16, 42:13, 43:23, 44:23, 49:2, 51:15, 57:14, 57:19, 64:23, 69:21, 75:25, 83:25, 84:4, 87:14, 94:4, 97:6, 103:19, 104:16, 108:15, 110:4, 115:23, 117:22, 123:19, 126:1, 127:24, 133:13, 147:23, 149:14, 150:20, 152:16, 154:20, 156:20, 160:19, 164:19, 169:21, 174:25, 181:10, 181:23, 186:24, 191:7, 192:7, 194:19, 196:20, 202:8, 204:20, 205:12, 208:8, 209:17, 210:1, 211:9, 211:18, 214:13, 215:20, 220:9, 221:1, 222:2, 222:18, 224:1, 224:4

---

**C**

---

**CA** [1] - 3:16
**CABELL** [1] - 1:10
**Cabell** [179] - 3:2,

10:11, 20:23, 22:8, 22:11, 24:25, 26:9, 26:17, 29:24, 30:2, 30:7, 30:15, 30:18, 32:6, 32:20, 33:11, 34:3, 36:9, 36:11, 37:18, 39:10, 40:12, 41:25, 45:4, 45:9, 45:14, 45:21, 48:2, 50:4, 51:22, 55:5, 63:13, 65:13, 65:23, 68:20, 69:4, 71:11, 71:21, 72:2, 72:9, 72:16, 73:16, 73:23, 74:9, 75:12, 76:15, 78:4, 78:7, 78:14, 78:18, 81:1, 81:5, 81:7, 82:9, 82:14, 82:16, 82:25, 83:3, 83:7, 83:17, 83:18, 84:6, 84:19, 86:22, 87:23, 88:21, 89:3, 90:4, 90:7, 90:22, 90:23, 91:5, 92:9, 95:3, 96:19, 100:19, 102:17, 102:19, 103:3, 107:1, 107:19, 107:22, 108:1, 108:3, 108:13, 108:22, 109:2, 109:3, 109:5, 109:7, 109:9, 109:10, 109:13, 109:14, 109:15, 109:19, 110:5, 110:16, 110:21, 111:4, 111:20, 112:4, 112:8, 112:21, 113:6, 113:7, 114:12, 120:5, 120:16, 120:24, 120:25, 121:2, 121:5, 121:8, 121:13, 121:15, 122:4, 122:8, 122:12, 122:20, 122:23, 129:11, 129:16, 133:16, 133:18, 133:20, 134:6, 134:10, 134:12, 134:15, 135:23, 136:3, 140:20, 141:1, 141:7, 142:2, 143:11, 143:12, 143:13, 143:14, 143:24, 146:20, 146:25, 150:5, 150:14, 150:17, 151:13, 152:4, 153:10, 153:24,

155:22, 157:3, 158:4, 163:17, 165:19, 170:2, 170:7, 171:4, 172:3, 173:22, 174:2, 174:7, 174:13, 189:22, 191:10, 192:24, 193:19, 193:21, 196:1, 196:12, 197:4, 199:8, 199:17, 200:18, 200:19, 201:24, 222:4
**cabell** [1] - 2:2
**Cabell-Huntington** [2] - 107:19, 141:7
**Cabell/Huntington** [9] - 193:5, 193:8, 193:10, 197:7, 197:25, 198:15, 198:19, 201:4, 225:7
**Cabinet** [1] - 124:19
**calculation** [1] - 106:16
**calculations** [1] - 100:23
**Caleb** [2] - 104:3, 227:3
**calendar** [1] - 141:24
**California** [4] - 9:5, 40:10, 80:22, 85:22
**Callas** [5] - 64:20, 65:1, 122:6, 196:16, 196:25
**CALLAS** [22] - 6:7, 18:2, 55:14, 64:21, 64:23, 69:18, 69:21, 75:24, 75:25, 83:20, 83:25, 84:2, 84:4, 87:13, 87:14, 94:2, 94:4, 97:3, 97:6, 196:17, 196:20, 202:1
**Cambridge** [1] - 139:16
**Camp** [1] - 133:17
**CAMPBELL** [1] - 6:14
**cancer** [3] - 175:23, 176:5, 198:20
**Cancer** [1] - 198:21
**cannot** [1] - 158:5
**capability** [1] - 46:4
**capacity** [9] - 36:10, 72:1, 129:8, 129:14, 129:15, 129:17, 129:20, 203:7
**Capitol** [1] - 2:7
**capped** [1] - 77:25
**Cardinal** [4] - 4:16, 5:2, 131:11, 202:10

**carditis** [1] - 156:3
**Care** [4] - 52:14, 52:21, 53:7, 98:25
**care** [58] - 18:21, 18:22, 19:3, 19:10, 19:16, 19:18, 20:3, 20:5, 20:16, 21:7, 22:19, 22:24, 24:6, 24:24, 29:3, 33:18, 39:15, 41:19, 41:22, 43:6, 43:14, 44:4, 44:9, 44:13, 45:2, 45:7, 45:9, 45:11, 45:23, 50:14, 53:23, 54:3, 74:11, 76:13, 77:8, 77:17, 83:14, 98:16, 98:21, 99:9, 139:25, 150:2, 151:13, 154:2, 157:19, 157:25, 158:16, 158:20, 161:10, 188:3, 198:25, 201:11, 216:10, 216:24, 217:5, 218:10, 218:13, 219:11
**cared** [1] - 162:3
**career** [6] - 8:8, 14:16, 15:19, 91:25, 136:23
**careful** [4] - 50:14, 82:8, 159:20, 181:2
**cares** [1] - 107:19
**Carey** [1] - 4:23
**carfentanil** [2] - 171:1, 171:9
**carry** [3] - 46:17, 46:18, 46:20
**case** [39] - 17:7, 17:16, 31:1, 32:23, 33:9, 42:23, 56:9, 56:13, 56:16, 65:10, 73:5, 79:11, 85:19, 87:4, 93:14, 103:25, 104:2, 104:9, 105:9, 108:20, 108:22, 109:18, 110:7, 110:13, 111:19, 116:5, 119:22, 120:18, 122:16, 122:25, 127:12, 138:24, 169:23, 173:12, 173:17, 186:7, 190:1, 191:18, 227:21
**cases** [7] - 43:1, 44:6, 170:17, 216:8, 217:15, 219:10
**cataloged** [1] - 195:12
**catalogued** [1] - 146:12

**catch** [2] - 93:1, 163:16
**catch-up** [1] - 93:1
**catchment** [2] - 107:24, 109:1
**categories** [4] - 70:20, 116:14, 120:14, 122:5
**category** [7] - 66:20, 66:23, 71:2, 113:20, 116:21, 117:1, 179:25
**cautious** [1] - 184:22
**caveat** [1] - 120:15
**caveats** [1] - 102:13
**CDC** [7] - 29:8, 52:8, 212:12, 212:15, 212:24, 214:17, 215:7
**Center** [11] - 3:12, 5:11, 14:21, 135:25, 136:2, 174:10, 197:11, 197:23, 198:21, 199:23, 201:7
**center** [4] - 29:12, 198:20, 198:22, 201:5
**centered** [2] - 40:18, 49:22
**Centers** [1] - 212:25
**certain** [10] - 29:13, 58:7, 70:8, 81:17, 88:20, 118:10, 139:25, 151:21, 174:9, 177:7
**certainly** [9] - 21:20, 56:11, 60:18, 127:5, 169:14, 170:5, 183:14, 185:19, 212:3
**Certainly** [3] - 105:21, 114:17, 190:19
**certainty** [2] - 29:23, 63:17
**certification** [2] - 137:6, 139:20
**CERTIFICATION** [1] - 229:1
**certified** [2] - 139:20, 139:22
**certify** [1] - 229:4
**cetera** [1] - 73:10
**Chaffin** [1] - 73:18
**CHAH** [1] - 153:3
**chains** [1] - 154:16
**Chair** [2] - 203:10, 205:13
**Chairman** [3] - 134:6, 134:7, 135:5

**chairman** [1] - 141:9
**Chairperson** [1] - 193:1
**challenge** [2] - 93:24, 153:13
**challenged** [1] - 22:3
**challenges** [12] - 9:20, 12:4, 12:15, 20:17, 23:18, 45:13, 48:15, 48:16, 49:17, 64:6, 92:8, 161:16
**challenging** [1] - 179:10
**chance** [2] - 11:6, 16:20
**chances** [1] - 64:4
**change** [3] - 21:8, 21:12, 54:18
**changed** [5] - 18:15, 33:17, 52:15, 60:13, 70:18
**changing** [1] - 35:4
**characterizes** [1] - 191:1
**charges** [1] - 187:18
**CHARLES** [1] - 3:11
**Charleston** [6] - 2:8, 3:13, 4:24, 5:15, 6:9, 7:4
**CHARLESTON** [2] - 1:2, 1:18
**chart** [2] - 95:10, 96:7
**chase** [1] - 127:17
**Chase** [1] - 4:23
**check** [1] - 34:5
**checkbook** [1] - 165:7
**checked** [2] - 125:21, 143:24
**Chesterbrook** [1] - 6:15
**Chief** [5] - 138:3, 226:14, 226:15, 226:24, 227:25
**Child** [6] - 14:21, 19:17, 24:15, 28:21, 52:18, 101:17
**child** [92] - 9:12, 11:7, 12:6, 12:23, 13:18, 14:20, 15:1, 15:9, 16:25, 19:23, 20:6, 21:12, 21:16, 21:17, 21:19, 21:23, 24:3, 24:6, 24:10, 27:14, 27:15, 27:18, 28:12, 28:18, 28:24, 29:3, 31:9, 31:22, 32:8, 33:11, 35:5, 35:6, 36:16, 39:8, 39:20, 40:4, 40:6, 42:3, 42:16, 42:18, 43:1,

43:2, 43:14, 46:3, 46:6, 46:14, 46:25, 47:2, 47:4, 47:22, 48:16, 54:20, 54:21, 63:25, 66:6, 67:14, 67:17, 68:7, 68:9, 77:3, 80:4, 80:18, 81:21, 81:22, 82:4, 84:18, 84:19, 85:6, 85:17, 86:11, 88:22, 89:8, 95:5, 95:6, 102:4, 102:5, 102:6, 102:7, 102:9, 102:10, 102:11, 102:21, 105:1, 111:25, 158:20, 161:9, 161:10, 162:2
**child's** [5] - 21:1, 39:23, 47:10, 54:18, 157:11
**Children** [9] - 9:3, 9:6, 11:11, 12:1, 13:22, 17:17, 18:11, 79:18, 127:1
**children** [108] - 9:9, 11:16, 11:18, 11:22, 15:2, 15:13, 15:25, 17:24, 18:6, 18:20, 19:22, 21:9, 22:7, 22:10, 22:16, 23:6, 24:23, 25:25, 26:11, 27:17, 28:24, 29:23, 32:8, 33:10, 33:13, 33:18, 36:3, 36:8, 40:3, 40:5, 40:9, 41:5, 42:3, 42:15, 42:16, 45:10, 45:23, 45:25, 46:25, 47:1, 47:16, 47:19, 47:22, 48:13, 55:1, 55:3, 55:7, 57:21, 59:7, 59:10, 60:4, 61:5, 61:14, 62:2, 63:12, 64:1, 66:6, 68:11, 68:12, 76:7, 76:9, 76:11, 76:15, 77:8, 77:9, 77:10, 77:11, 77:18, 78:2, 79:1, 79:9, 79:18, 79:20, 79:23, 80:8, 80:21, 81:1, 81:5, 82:7, 82:17, 83:12, 95:7, 100:5, 100:13, 100:19, 101:1, 102:16, 102:19, 103:3, 104:23, 104:24, 110:10, 111:24, 113:1, 113:10, 113:21, 114:1, 114:3, 114:9, 116:5, 116:7,

143:19, 158:16, 161:4, 161:22, 161:23, 163:11
**children's** [2] - 35:16, 36:3
**Children's** [17] - 10:20, 14:9, 14:19, 17:1, 28:20, 36:23, 39:11, 53:2, 75:23, 76:1, 76:3, 76:10, 76:22, 77:2, 77:15, 77:19, 100:11
**CHIP** [4] - 100:11, 100:14, 100:17, 100:20
**CHNA** [2] - 153:2, 153:4
**choose** [2] - 182:6, 198:1
**chose** [1] - 184:3
**chosen** [1] - 141:16
**Christina** [2] - 124:12, 130:15
**chronic** [14] - 143:13, 145:7, 147:13, 148:1, 207:2, 210:10, 210:22, 212:19, 212:21, 214:18, 214:20, 215:8, 219:16, 220:2
**Chronic** [9] - 202:17, 202:19, 203:20, 204:21, 205:20, 206:1, 206:16, 207:22, 208:16
**Cincinnati** [4] - 137:18, 137:22, 138:2, 139:15
**cite** [1] - 118:14
**cited** [1] - 85:25
**cites** [2] - 11:3, 149:22
**citizens** [2] - 145:4, 219:14
**City** [24] - 4:1, 5:11, 65:12, 65:23, 69:4, 71:20, 83:3, 86:21, 86:24, 87:16, 110:15, 120:4, 121:15, 122:13, 140:22, 163:3, 193:18, 195:24, 196:9, 197:14, 198:13, 200:16, 200:17, 229:5
**CITY** [1] - 1:4
**city** [1] - 35:8, 68:20, 196:7
**Civil** [3] - 1:4, 229:7, 229:8
**civil** [1] - 1:10

**claimed** [2] - 183:7, 183:15
**claims** [4] - 185:7, 187:13
**clarification** [6] - 65:20, 106:11, 111:8, 121:7, 123:1, 140:9
**clarifiers** [1] - 70:18
**clarify** [5] - 73:11, 74:12, 191:8, 191:19, 224:10
**class** [2] - 135:13, 135:14
**classification** [2] - 223:4, 224:23
**classified** [1] - 23:14
**classify** [1] - 67:20
**classmates** [3] - 184:19, 189:16, 189:17
**clause** [1] - 164:2
**clear** [11] - 32:1, 59:5, 73:21, 114:20, 161:18, 178:12, 178:19, 183:17, 186:3, 190:10, 224:17
**clearly** [5] - 42:7, 56:16, 160:25, 161:8, 224:23
**clerk** [1] - 7:12
**CLERK** [6] - 7:15, 7:17, 7:20, 132:23, 133:1, 133:4
**Clinic** [1] - 78:18
**clinical** [6] - 14:2, 77:22, 139:18, 207:4, 218:23, 219:2
**clinics** [3] - 199:10, 199:17, 206:20
**clock** [1] - 39:23
**close** [4] - 160:7, 198:10, 226:22, 227:7
**cluster** [2] - 150:5, 150:13
**coaches** [2] - 87:24, 88:14
**coaching** [2] - 88:19, 89:19
**coalition** [1] - 141:20
**Coalition** [39] - 202:16, 202:19, 203:3, 203:10, 203:16, 203:23, 204:21, 205:1, 205:14, 205:23, 206:1, 206:16, 206:18, 206:24,

207:1, 207:8, 207:13, 207:21, 208:11, 208:16, 209:2, 210:13, 210:19, 211:1, 211:20, 211:21, 211:24, 212:1, 212:5, 214:17, 214:24, 214:25, 215:5, 215:22, 216:4, 216:22, 217:3, 218:3, 219:24
**Coalition's** [2] - 218:15, 218:21
**Coben** [3] - 203:10, 203:13, 205:13
**cocaine** [1] - 19:8
**Cochran** [3] - 6:17, 229:2, 229:11
**code** [4] - 58:19, 58:23, 59:4, 60:18
**Code** [2] - 202:21, 214:10
**codes** [2] - 33:24, 57:24
**codified** [1] - 214:9
**cognizant** [1] - 159:24
**coincide** [1] - 184:3
**Collaborative** [1] - 14:10
**collates** [1] - 142:16
**colleague** [1] - 163:15
**collect** [2] - 31:12, 31:14
**collected** [2] - 20:13, 29:13
**collection** [1] - 142:24
**collectively** [1] - 167:23
**collects** [1] - 143:5
**College** [1] - 50:23
**column** [1] - 27:22
**combating** [1] - 225:9
**combined** [3] - 212:18, 214:17, 215:7
**comfortable** [2] - 227:19, 227:20
**coming** [7] - 19:10, 19:16, 58:5, 58:13, 109:1, 115:18, 147:1
**commenting** [2] - 129:8, 129:9
**Commerce** [1] - 123:24
**Commerce's** [1] - 124:21
**COMMISSION** [1] - 1:10
**commission** [2] -

204:3, 210:7
**Commission** [4] - 2:2,
3:2, 140:23, 140:24
**Commissioner** [1] -
124:13
**commitment** [2] -
115:1, 152:14
**Committee** [7] -
30:11, 123:24,
124:21, 130:16,
207:15, 207:18,
207:19
**committee** [2] -
165:16, 209:5
**common** [1] - 181:25
**communicate** [1] -
208:18
**communities** [19] -
9:12, 9:15, 9:17,
10:12, 11:13, 16:4,
17:3, 19:9, 28:25,
35:13, 37:5, 65:15,
65:22, 66:2, 66:5,
67:12, 92:2, 92:4,
154:12
**Community** [6] -
153:1, 153:5,
155:21, 189:22,
222:5, 222:8
**community** [87] -
35:10, 35:15, 37:7,
40:25, 66:16, 67:11,
75:20, 89:4, 89:14,
116:9, 120:4, 120:9,
129:11, 134:8,
136:16, 136:18,
141:13, 141:14,
141:19, 142:4,
142:10, 143:5,
143:6, 143:8,
143:20, 144:1,
144:22, 145:25,
146:2, 146:5, 146:9,
147:6, 149:10,
149:16, 149:23,
149:25, 150:16,
150:22, 152:21,
153:6, 153:7,
153:12, 153:17,
154:2, 156:24,
156:25, 158:2,
158:23, 158:24,
159:11, 159:15,
160:7, 161:17,
162:8, 162:23,
162:24, 163:9,
167:7, 167:8, 167:9,
168:1, 168:14,
168:21, 171:17,
171:23, 172:3,

174:2, 174:7,
178:23, 179:3,
184:4, 184:7, 184:9,
184:20, 189:18,
189:20, 191:10,
224:20, 225:7,
225:11, 225:14,
225:15, 225:17,
225:18, 225:20,
225:22
**community-based** [2]
- 184:7, 184:9
**Company** [1] - 187:8
**comparable** [1] -
152:22
**comparable-type** [1] -
152:22
**compare** [1] - 44:13
**compared** [2] - 21:7,
62:11
**comparing** [1] -
147:25
**compassionate** [1] -
178:21
**competition** [1] -
80:20
**compile** [1] - 70:13
**compiled** [1] - 191:4
**compiling** [1] - 167:25
**complete** [1] - 154:16
**completed** [4] - 42:19,
134:13, 135:13,
176:7
**completely** [7] -
19:15, 36:25, 49:12,
92:10, 128:23,
175:15, 223:12
**complications** [2] -
157:12, 157:16
**complies** [1] - 79:6
**component** [2] -
20:20, 123:10
**components** [1] -
152:7
**comprehensive** [3] -
74:14, 120:8, 198:19
**Comprehensive** [1] -
198:21
**comprised** [1] -
140:20
**compromised** [2] -
54:23, 59:14
**computer** [1] - 6:19
**concentrate** [1] -
152:9
**concerning** [2] -
142:10, 165:22
**concerns** [1] - 215:10
**conclude** [1] - 53:21
**conclusions** [1] - 42:3

**condition** [2] - 45:6,
186:14
**conditions** [9] - 11:24,
32:14, 148:24,
149:17, 156:3,
156:11, 156:22,
156:24, 165:17
**conduct** [1] - 38:18
**conducted** [3] - 120:3,
195:6, 211:21
**confer** [1] - 131:15
**Conference** [1] -
13:22
**Confidentiality** [1] -
13:23
**confirm** [1] - 58:7
**confronting** [1] -
93:25
**confused** [2] - 73:1,
112:16
**congratulated** [1] -
60:13
**Congress** [7] - 14:5,
52:15, 92:1, 92:21,
93:10, 93:17, 124:20
**Congressional** [1] -
130:16
**Congressman** [1] -
123:23
**connection** [4] -
55:18, 88:10,
118:10, 189:11
**Connolly** [2] - 4:18,
5:4
**CONROY** [1] - 3:3
**consensus** [1] - 14:25
**consequence** [1] -
219:10
**consequences** [5] -
145:25, 146:4,
147:5, 147:12,
175:16
**conservation** [1] -
8:23
**consider** [7] - 32:25,
57:10, 121:15,
122:12, 164:22,
189:14, 201:21
**consideration** [1] -
219:13
**considered** [1] -
136:24
**considering** [1] -
178:4
**consistent** [3] -
130:20, 186:9, 206:7
**consistently** [2] -
19:10, 20:14
**console** [1] - 60:1
**consoled** [2] - 59:19,

59:21
**consolidate** [1] -
167:16
**constructed** [1] -
195:18
**consultant** [9] -
138:12, 138:13,
138:15, 138:19,
138:22, 138:25,
139:2, 139:10
**consulted** [2] - 25:8,
25:19
**consulting** [1] - 18:13
**consumed** [2] -
148:12, 148:13
**contact** [6] - 30:6,
30:14, 31:2, 84:24,
85:2, 85:19
**contained** [3] - 65:9,
66:19, 222:5
**content** [3] - 192:14,
224:14, 224:18
**contents** [3] - 192:8,
192:11, 220:15
**context** [1] - 104:1
**continue** [3] - 158:25,
174:13, 179:13
**Continued** [5] - 3:1,
5:1, 5:6, 6:1, 6:10
**continues** [3] - 81:16,
102:11, 126:14
**continuing** [1] -
156:13
**continuous** [1] -
151:18
**continuum** [1] - 85:1
**contract** [1] - 213:22
**contractor** [2] - 14:19,
14:22
**contradictions** [2] -
155:2, 155:3
**contribute** [1] -
102:18
**contributing** [1] -
142:17
**control** [1] - 49:14
**Control** [1] - 212:25
**controlled** [5] - 139:5,
172:19, 173:4,
173:7, 178:17
**convening** [2] - 14:1,
85:4
**conversations** [2] -
30:25, 146:1
**Cook** [3] - 6:18, 229:3,
229:11
**cooperation** [1] -
124:17
**coordinated** [1] -
128:5

**coordinates** [1] -
128:17
**copies** [1] - 69:24
**copy** [4] - 87:12,
105:22, 194:15,
210:4
**cord** [1] - 157:17
**CORE** [7] - 87:19,
88:2, 88:10, 88:12,
89:17, 89:18, 89:23
**core** [1] - 158:23
**corner** [2] - 124:7,
128:2
**coronary** [1] - 145:8
**cORPORATION** [2] -
1:7, 1:13
**Corporation** [4] - 6:2,
65:2, 197:1, 229:7
**Correct** [24] - 51:19,
72:10, 81:7, 81:17,
84:14, 84:22, 97:13,
104:5, 107:14,
112:5, 112:21,
113:18, 187:9,
187:15, 188:1,
188:25, 189:10,
191:11, 193:3,
193:15, 197:21,
205:19, 212:8, 218:8
**correct** [297] - 58:5,
58:8, 65:5, 65:8,
65:10, 65:11, 65:14,
65:24, 66:9, 66:10,
66:13, 66:14, 66:18,
66:21, 66:22, 67:1,
67:3, 67:6, 67:9,
67:11, 67:16, 67:24,
68:3, 68:4, 68:13,
68:14, 68:21, 69:9,
69:13, 70:21, 70:24,
70:25, 71:4, 71:8,
71:9, 71:21, 72:4,
72:11, 73:6, 73:8,
73:14, 74:11, 74:19,
74:23, 74:25, 75:12,
76:20, 76:25, 78:4,
78:14, 79:10, 79:16,
80:4, 80:7, 80:17,
81:18, 82:9, 84:18,
84:21, 86:25, 87:5,
88:25, 89:1, 91:7,
92:19, 95:3, 95:14,
95:15, 95:19, 96:24,
97:12, 97:19, 97:20,
98:4, 98:18, 98:23,
99:6, 99:22, 101:21,
103:4, 104:4, 104:9,
105:6, 105:7,
105:19, 106:5,
106:14, 106:22,

106:24, 107:1, 108:3, 108:24, 109:19, 110:13, 110:14, 110:16, 110:17, 111:15, 111:17, 111:21, 112:14, 113:2, 113:6, 113:14, 113:17, 113:20, 113:21, 113:25, 114:8, 114:12, 116:6, 116:9, 116:15, 116:18, 116:22, 117:5, 118:4, 118:5, 118:12, 118:13, 118:15, 118:17, 118:21, 118:22, 118:24, 119:1, 119:3, 119:5, 119:10, 119:17, 119:18, 119:19, 119:25, 120:2, 120:5, 120:7, 120:10, 120:16, 120:18, 120:19, 120:24, 121:3, 121:17, 121:18, 122:9, 122:10, 122:13, 122:14, 122:16, 122:20, 123:2, 123:6, 123:7, 124:1, 124:4, 126:12, 126:21, 128:13, 128:19, 129:6, 129:11, 129:12, 129:16, 129:18, 129:20, 129:21, 130:13, 130:17, 130:18, 130:21, 130:23, 134:22, 135:12, 135:16, 136:9, 137:14, 139:13, 140:1, 140:2, 140:6, 140:9, 140:18, 141:5, 143:9, 143:22, 144:18, 150:24, 151:23, 154:24, 154:25, 156:5, 156:7, 170:3, 170:8, 170:9, 171:2, 171:5, 171:14, 171:18, 171:25, 172:5, 172:16, 172:20, 172:25, 173:4, 173:9, 173:14, 173:15, 173:19, 173:24, 174:2, 174:7, 174:11, 174:12,

174:14, 174:18, 175:16, 175:17, 175:20, 175:24, 175:25, 176:2, 176:3, 176:5, 176:9, 176:11, 176:15, 178:11, 178:24, 179:11, 180:2, 180:10, 180:18, 181:13, 181:25, 182:3, 182:7, 182:12, 182:19, 183:10, 183:16, 185:4, 185:13, 187:22, 187:25, 188:4, 188:7, 188:18, 188:22, 189:4, 189:9, 189:12, 189:19, 191:10, 192:5, 192:17, 193:2, 193:5, 193:8, 193:11, 193:14, 193:19, 194:3, 194:6, 194:9, 194:13, 195:2, 195:7, 195:24, 196:2, 196:9, 196:12, 197:14, 197:20, 198:22, 199:23, 202:17, 205:2, 206:6, 208:15, 208:22, 208:23, 210:13, 212:1, 213:2, 213:11, 213:15, 213:24, 214:2, 216:17, 216:25, 218:7, 218:16, 218:24, 219:6, 219:11, 229:4
**correctly** [4] - 206:5, 212:22, 216:13, 217:24
**corresponding** [2] - 44:4, 173:3
**COSSAP** [1] - 30:12
**cost** [34] - 25:6, 28:11, 80:6, 85:11, 85:12, 85:14, 85:22, 86:7, 86:15, 86:19, 89:11, 89:15, 89:23, 90:1, 90:7, 97:17, 99:8, 100:25, 102:18, 102:20, 103:25, 104:6, 108:19, 110:1, 119:13, 119:21, 120:20, 121:3, 121:10, 121:15, 122:22, 123:10, 127:10,

158:9
**costs** [24] - 16:9, 16:13, 16:19, 17:14, 28:3, 28:7, 29:20, 29:24, 66:11, 86:1, 90:5, 96:3, 97:11, 97:24, 101:9, 103:1, 108:14, 119:23, 120:22, 121:4, 121:7, 121:24, 122:3, 122:4
**Council** [1] - 140:22
**counsel** [6] - 56:3, 131:15, 168:16, 168:23, 192:25, 204:11
**Counsel** [7] - 190:25, 196:3, 201:18, 214:21, 219:12, 221:3, 223:14
**counseling** [4] - 72:12, 74:10, 77:23, 80:17
**counselor** [4] - 133:24, 175:9, 180:21, 214:3
**Counselor** [3] - 180:11, 183:11, 184:23
**count** [3] - 16:17, 82:19, 108:6
**counties** [8] - 44:1, 45:5, 85:4, 86:6, 107:20, 201:12, 201:16
**country** [14] - 10:13, 11:1, 12:23, 13:1, 20:1, 20:14, 40:10, 44:1, 52:17, 58:14, 80:24, 93:25, 119:25, 178:1
**counts** [1] - 167:21
**COUNTY** [1] - 1:10
**county** [12] - 35:7, 45:1, 65:24, 108:12, 108:24, 109:6, 141:20, 144:24, 145:4, 153:2, 157:6, 196:6
**County** [154] - 2:2, 3:2, 10:11, 20:23, 22:8, 22:11, 25:1, 26:9, 26:18, 29:24, 30:2, 30:18, 32:7, 33:11, 34:3, 36:9, 39:10, 41:25, 45:4, 45:9, 45:14, 45:21, 51:22, 65:13, 65:22, 65:23, 69:4, 71:11, 71:21, 72:2, 72:9, 72:16,

73:16, 73:23, 74:9, 75:12, 76:15, 78:4, 78:7, 78:14, 78:18, 81:1, 81:6, 81:7, 82:9, 82:14, 82:16, 82:25, 83:3, 83:7, 83:17, 83:18, 84:6, 84:19, 87:23, 90:4, 90:7, 90:23, 90:24, 91:5, 92:9, 95:3, 100:20, 102:17, 102:19, 103:4, 107:1, 107:22, 108:1, 108:3, 108:13, 108:22, 109:2, 109:3, 109:5, 109:7, 109:9, 109:10, 109:13, 109:14, 109:15, 110:6, 110:16, 110:21, 111:4, 111:13, 111:20, 112:21, 113:6, 114:12, 120:5, 120:16, 120:24, 120:25, 121:5, 121:8, 121:13, 121:15, 122:9, 122:13, 122:20, 129:16, 133:17, 133:18, 133:20, 134:7, 135:23, 140:20, 140:22, 140:23, 141:1, 142:2, 143:11, 143:12, 143:13, 143:14, 143:24, 146:21, 146:25, 150:5, 150:14, 150:17, 151:13, 152:4, 153:10, 153:24, 155:22, 157:3, 158:5, 163:17, 165:19, 170:2, 170:7, 171:4, 173:22, 174:2, 174:7, 189:22, 191:10, 192:24, 193:19, 193:22, 194:13, 196:2, 196:12, 197:5, 199:8, 199:17, 200:18, 200:19, 201:24, 222:4, 225:7
**County's** [1] - 96:19
**couple** [7] - 23:23, 25:24, 33:20, 61:12, 93:15, 148:10, 209:16
**course** [17] - 11:5, 16:19, 25:23, 34:6,

34:10, 38:11, 44:11, 61:17, 64:16, 87:13, 101:5, 158:5, 195:5, 195:9, 211:22, 211:24, 214:4
**court** [4] - 17:4, 75:11, 96:19, 158:18
**COURT** [139] - 1:1, 1:17, 7:6, 7:8, 7:11, 7:23, 8:14, 10:3, 13:13, 18:1, 18:5, 20:9, 26:25, 32:1, 32:10, 32:17, 33:2, 34:8, 37:14, 37:19, 38:8, 38:12, 38:21, 39:1, 42:10, 51:14, 55:23, 56:5, 57:7, 64:9, 64:13, 64:20, 83:22, 83:24, 94:3, 97:4, 103:8, 103:11, 103:17, 108:7, 109:22, 114:16, 114:18, 115:5, 115:9, 115:11, 115:16, 115:20, 115:22, 117:10, 117:15, 117:18, 123:15, 123:18, 125:6, 125:9, 125:19, 125:25, 127:7, 127:20, 131:5, 131:11, 131:13, 131:17, 131:22, 132:1, 132:3, 132:7, 132:10, 132:12, 132:15, 132:22, 133:8, 133:9, 147:15, 147:19, 149:1, 149:6, 149:11, 150:7, 150:10, 152:9, 152:15, 154:5, 154:8, 156:13, 156:18, 159:17, 160:1, 160:10, 164:4, 164:10, 164:14, 168:17, 168:24, 169:3, 169:7, 169:11, 174:23, 181:4, 181:17, 181:20, 185:17, 185:20, 185:24, 186:2, 186:21, 190:17, 191:14, 191:25, 192:6, 194:18, 196:16, 196:18, 202:3, 204:6, 204:14, 205:6, 209:1, 209:8,

209:14, 209:24,
211:3, 211:7,
211:12, 211:17,
220:4, 220:13,
220:19, 221:22,
223:15, 223:20,
224:3, 226:4, 226:7,
226:10, 227:13,
228:2, 228:6
**Court** [29] - 6:17, 6:18,
7:3, 8:19, 10:22,
11:3, 14:6, 17:23,
18:5, 45:15, 76:5,
84:12, 84:21, 85:8,
85:23, 86:2, 86:5,
102:8, 102:17,
104:7, 104:9,
104:12, 104:13,
107:18, 164:9,
169:25, 214:8,
229:2, 229:3
**Court's** [3] - 57:18,
159:20, 226:10
**courtroom** [1] -
115:17
**COURTROOM** [6] -
7:15, 7:17, 7:20,
132:23, 133:1, 133:4
**Courts** [6] - 84:22,
85:21, 86:1, 86:5,
86:13, 86:14
**courts** [11] - 9:13,
10:24, 10:25, 23:16,
39:8, 45:16, 86:7,
86:12, 86:16, 86:20,
95:6
**cover** [4] - 49:5, 99:5,
99:9, 99:10
**coverage** [2] - 99:14,
100:12
**covered** [10] - 49:3,
51:16, 56:23, 60:7,
98:3, 98:6, 98:10,
99:8, 99:22, 100:1
**covers** [2] - 99:9,
142:15
**COVID** [7] - 30:4,
90:17, 91:21, 91:23,
153:16, 153:23,
154:9
**Covington** [1] - 5:11
**CPS** [2] - 27:16, 44:7
**crash** [1] - 225:17
**crawl** [1] - 59:25
**create** [3] - 149:22,
153:1, 195:15
**created** [8] - 70:7,
126:23, 161:20,
195:11, 195:13,
206:2, 206:8, 206:15

**creating** [1] - 49:14
**creation** [1] - 195:21
**Creation** [1] - 205:23
**crises** [1] - 225:16
**crisis** [19] - 93:17,
94:10, 124:23,
126:5, 126:17,
128:24, 145:22,
153:22, 153:23,
157:6, 162:23,
171:3, 175:16,
184:5, 194:12,
195:2, 225:13,
225:22, 225:24
**Crisis** [2] - 175:6
**criteria** [5] - 14:2,
60:14, 80:2, 102:5,
114:9
**critical** [3] - 47:11,
54:16, 59:12
**critically** [1] - 53:7
**cross** [6] - 39:2,
108:7, 169:9,
186:16, 221:17,
227:23
**Cross** [1] - 156:17
**CROSS** [5] - 64:22,
103:18, 169:20,
196:19, 202:7
**cross-examination** [2]
- 108:7, 221:17
**Cross-talk** [1] - 156:17
**Crouch** [1] - 124:19
**CRR** [2] - 6:17, 6:18
**crying** [1] - 161:4
**culture** [1] - 162:4
**current** [5] - 9:2,
37:17, 119:2, 119:4,
119:7
**curtly** [1] - 134:12
**custody** [3] - 12:20,
20:2, 43:2
**cut** [3] - 39:3, 127:17,
158:22

# D

**Data** [2] - 28:22, 57:4
**data** [58] - 15:9, 20:13,
20:15, 21:6, 24:14,
24:15, 25:3, 29:8,
29:11, 29:13, 29:14,
31:8, 31:12, 31:13,
33:9, 33:17, 33:21,
34:3, 34:12, 34:18,
34:22, 34:23, 42:18,
45:8, 46:8, 50:20,
51:23, 52:7, 53:15,
55:17, 57:23, 57:25,
58:2, 58:3, 67:25,

85:24, 106:13,
106:21, 107:3,
107:15, 111:13,
113:3, 113:23,
114:5, 118:25,
119:6, 121:15,
141:20, 142:10,
142:18, 142:24,
144:12, 145:9,
145:11, 222:9
**dataset** [3] - 29:14,
108:23, 142:19
**Dataset** [2] - 28:21,
29:10
**datasets** [8] - 25:4,
28:15, 28:17, 29:15,
29:18, 52:7, 68:5,
68:18
**date** [3] - 56:25,
128:25, 134:19
**Date** [1] - 229:16
**dated** [3] - 56:25,
65:7, 124:1
**David** [1] - 7:1
**DAVID** [2] - 1:17, 4:5
**days** [3] - 58:20,
213:15, 227:2
**DC** [6] - 4:7, 4:10,
4:19, 4:21, 5:5, 5:12
**De** [2] - 2:4, 2:14
**DEA** [10] - 139:1,
139:6, 139:9,
139:10, 139:11,
152:14, 173:18,
173:23
**deal** [2] - 114:19,
198:24
**dealing** [1] - 84:16
**dealt** [3] - 21:13,
31:17, 192:23
**dean** [4] - 135:6,
135:9, 135:10,
172:15
**Dean** [2] - 203:13,
205:16
**death** [6] - 21:17,
44:2, 53:10, 53:11,
143:13, 159:5
**deaths** [12] - 24:23,
43:5, 43:13, 44:3,
44:10, 45:2, 45:7,
53:16, 91:20, 145:9,
170:25, 171:8
**decade** [4] - 15:12,
19:3, 20:4, 155:4
**decades** [2] - 76:23,
219:24
**December** [2] - 91:22,
208:2
**decide** [1] - 57:10

**decided** [2] - 136:21,
137:12
**decides** [1] - 44:8
**deciding** [1] - 219:2
**decision** [1] - 157:23
**decisions** [2] - 46:21,
141:22
**decreasing** [1] - 33:17
**DEF** [8] - 123:11,
123:21, 125:3,
130:12, 131:1,
174:21, 175:2,
182:22
**DEF-WV** [8] - 123:11,
123:21, 125:3,
130:12, 131:1,
174:21, 175:2,
182:22
**Defendant** [4] - 4:16,
5:2, 5:7, 6:2
**Defendant's** [1] -
208:25
**Defendants** [3] - 1:8,
1:14, 229:7
**defendants** [5] -
56:22, 115:2,
173:12, 173:17,
221:14
**defendants'** [2] -
186:5, 186:7
**Defendants'** [10] -
87:10, 87:16, 94:6,
187:1, 194:16,
194:20, 204:18,
205:10, 210:3,
220:11
**defense** [1] - 223:2
**deferred** [1] - 193:21
**deficit** [2] - 90:14,
90:24
**define** [1] - 145:11
**defined** [3] - 23:4,
137:5, 195:17
**defining** [2] - 122:22,
176:17
**definitely** [3] - 11:10,
186:20, 226:24
**definition** [1] - 178:19
**Degree** [1] - 8:22
**degree** [5] - 29:22,
63:16, 136:8,
138:13, 177:9
**delays** [1] - 62:12
**deliver** [4] - 53:1,
92:25, 162:2, 216:9
**delivered** [3] - 109:13,
161:22, 175:8
**delivering** [4] - 109:6,
109:7, 216:24, 217:5
**delivery** [2] - 53:11,

53:12
**demonstrate** [1] -
146:9
**demonstrates** [1] -
9:21
**Demonstrative** [1] -
123:14
**demonstrative** [3] -
104:14, 123:13,
181:24
**denied** [2] - 83:8,
83:11
**Dental** [3] - 135:23,
136:1, 136:3
**deny** [1] - 175:9
**department** [1] - 142:9
**Department** [43] -
10:23, 13:20, 13:21,
13:25, 14:8, 30:12,
36:25, 39:12, 43:12,
56:24, 78:15, 79:8,
94:8, 96:20, 124:4,
124:18, 125:13,
130:13, 130:20,
134:7, 135:5, 141:3,
141:8, 141:15,
142:1, 143:25,
144:7, 144:15,
145:12, 145:17,
146:25, 147:9,
147:11, 150:18,
153:15, 153:24,
155:2, 155:12,
192:24, 193:5,
193:18, 193:22
**Department's** [2] -
193:8, 193:11
**departments** [1] -
142:6
**dependence** [2] -
116:23, 222:10
**dependent** [3] - 74:18,
74:20, 109:5
**depict** [1] - 44:24
**depicts** [1] - 182:6
**deploy** [1] - 92:6
**deploying** [1] - 94:18
**deployment** [1] -
11:23
**deposition** [11] -
38:23, 55:17, 56:23,
73:4, 73:7, 73:19,
169:23, 170:16,
170:20, 193:16,
193:24
**depriving** [1] - 219:10
**depth** [1] - 10:15
**DEPUTY** [6] - 7:15,
7:17, 7:20, 132:23,
133:1, 133:4

derived [1] - 101:2
describe [9] - 8:16,
  10:5, 17:12, 25:17,
  27:22, 38:2, 41:6,
  43:24, 47:12
described [12] - 11:15,
  27:23, 45:22, 48:4,
  50:1, 58:3, 63:15,
  67:5, 76:16, 95:23,
  172:12, 225:6
describes [3] - 25:19,
  26:20, 94:17
description [4] -
  71:13, 87:22, 101:8,
  212:11
deserve [1] - 141:24
design [1] - 69:1
designated [4] -
  127:1, 142:12,
  149:22, 179:20
designation [5] -
  138:17, 139:1,
  139:3, 179:24
detail [1] - 181:2
details [4] - 193:24,
  193:25, 194:1, 194:2
determination [1] -
  30:19
determinations [1] -
  102:8
determine [6] - 28:5,
  37:6, 38:18, 81:9,
  86:18, 173:8
determined [3] -
  37:12, 151:4, 155:3
determining [1] - 16:9
develop [8] - 9:10,
  22:17, 41:21, 49:24,
  50:15, 58:16, 64:2,
  116:17
developed [3] - 12:12,
  21:22, 49:12
developing [8] - 9:16,
  16:2, 19:12, 22:1,
  25:20, 27:8, 30:2,
  30:24
development [9] -
  12:10, 39:23, 46:3,
  46:6, 46:14, 54:22,
  59:24, 62:6, 130:2
developmental [20] -
  26:12, 27:5, 36:4,
  46:13, 46:15, 47:10,
  47:16, 47:18, 54:14,
  58:10, 59:17, 60:12,
  60:21, 60:24, 61:5,
  62:8, 62:12, 63:5
DHHR [8] - 33:13,
  35:6, 35:23, 42:25,
  45:12, 53:2, 57:3,

98:9
DHHR's [1] - 124:13
diabetes [1] - 145:7
diagnosed [5] - 27:10,
  33:21, 55:7, 58:12,
  71:4
diagnoses [1] - 58:1
diagnosis [1] - 60:15
diagnostic [6] - 33:24,
  57:24, 58:19, 58:23,
  59:4, 60:18
diagram [1] - 182:17
died [1] - 158:7
dies [1] - 159:6
difference [5] - 51:25,
  126:6, 136:20,
  200:8, 225:9
different [21] - 12:2,
  15:17, 19:22, 21:20,
  22:4, 31:17, 31:18,
  37:1, 40:21, 46:2,
  46:13, 47:20, 62:6,
  96:20, 96:21,
  126:23, 144:11,
  165:13, 166:10
differentiate [1] -
  31:14
differently [1] - 68:18
difficult [3] - 17:5,
  20:20, 219:6
difficulty [3] - 212:20,
  214:19, 215:8
digit [1] - 139:8
DIRECT [1] - 7:24,
  133:12
direct [11] - 87:15,
  94:12, 94:13, 95:9,
  96:2, 127:21, 129:1,
  178:16, 226:19,
  226:21, 227:23
direction [2] - 145:11,
  209:3
directly [5] - 12:18,
  15:18, 127:14,
  151:6, 222:11
Director [5] - 9:3,
  141:21, 145:11,
  193:21, 203:19
Directors [3] - 134:16,
  152:25, 153:4
directors [1] - 30:6
disabilities [2] -
  81:23, 82:3
disagree [9] - 98:11,
  126:11, 126:20,
  128:16, 128:20,
  129:5, 129:7, 130:7,
  130:9
discharge [1] - 180:6
disciplining [1] -

111:9
disclosed [7] - 32:12,
  32:16, 55:16, 56:16,
  56:22, 159:10, 164:7
discordance [2] -
  155:16, 155:17
discretionary [1] -
  56:2
discussed [13] - 26:3,
  59:9, 88:10, 89:22,
  104:7, 104:18,
  112:13, 112:19,
  118:9, 118:11,
  118:18, 119:14,
  120:21
discusses [1] - 192:17
discussing [3] - 34:2,
  210:5, 216:16
discussion [1] -
  145:21
Disease [1] - 212:25
disease [16] - 141:23,
  143:14, 144:25,
  145:8, 145:25,
  146:4, 146:19,
  147:4, 147:13,
  148:2, 155:18,
  157:12, 157:21,
  157:22, 222:10
diseases [3] - 148:17,
  149:10, 151:3
dislocation [1] - 45:25
disorder [20] - 66:17,
  66:21, 66:24, 68:3,
  84:17, 91:11, 91:23,
  92:7, 93:5, 93:20,
  97:18, 98:22, 99:13,
  99:21, 106:18,
  106:20, 113:22,
  114:2, 114:4
Disorder [12] - 11:7,
  11:9, 22:17, 34:20,
  41:22, 48:14, 50:2,
  50:4, 50:16, 53:14,
  145:8, 145:21
Disorders [18] - 9:9,
  11:17, 14:11, 16:1,
  17:11, 20:21, 22:4,
  27:18, 31:6, 31:7,
  31:21, 32:8, 42:4,
  47:25, 48:1, 52:3,
  53:19
disorders [1] - 67:1
dispense [1] - 217:18
dispensed [2] -
  171:18, 171:25
dispensing [2] -
  173:7, 218:6
displaced [1] - 158:11
display [2] - 185:6,

187:12
displayed [1] - 223:25
disruptive [1] - 158:21
disseminate [1] - 9:11
disseminating [1] -
  9:19
dissuade [1] - 216:8
dissuaded [6] -
  216:23, 217:5,
  217:7, 217:16,
  217:18, 218:5
distinction [1] - 200:7
distracted [1] - 37:20
distress [1] - 62:4
Distribution [1] -
  146:24
distributions [1] -
  21:24
distributor [2] - 137:1,
  188:6
distributors [4] -
  173:12, 173:16,
  173:21, 188:2
DISTRICT [3] - 1:1,
  1:1, 1:17
District [2] - 7:2, 7:3
diversion [1] - 173:3
Docket [1] - 164:9
Doctor [94] - 105:3,
  106:1, 106:11,
  107:14, 107:18,
  108:16, 109:8,
  110:12, 110:19,
  110:24, 111:8,
  111:15, 111:18,
  111:23, 112:1,
  112:12, 112:14,
  113:6, 113:9,
  113:12, 114:12,
  116:4, 116:14,
  118:9, 119:12,
  119:16, 120:20,
  122:6, 123:24,
  124:8, 124:17,
  125:2, 126:9,
  126:18, 128:9,
  128:14, 128:16,
  129:3, 129:10,
  130:5, 130:11,
  133:14, 145:15,
  149:16, 150:20,
  154:6, 154:25,
  159:7, 160:20,
  162:9, 164:3,
  164:20, 168:7,
  170:1, 170:6,
  170:13, 170:24,
  171:12, 172:2,
  172:8, 173:11,
  173:21, 175:1,

175:10, 175:19,
  178:7, 178:23,
  179:18, 179:22,
  181:9, 181:24,
  182:16, 182:23,
  187:5, 187:19,
  188:2, 189:6, 189:7,
  189:21, 192:8,
  192:21, 196:8,
  196:15, 202:13,
  206:11, 214:14,
  215:12, 216:1,
  217:24, 220:10,
  222:3, 224:2, 225:2,
  226:3
doctor [9] - 140:3,
  140:4, 151:13,
  171:13, 171:17,
  172:4, 172:22,
  213:23, 214:11
doctor's [1] - 160:5
doctors [10] - 151:20,
  151:21, 179:10,
  180:9, 180:17,
  188:2, 202:20,
  216:23, 217:4,
  219:22
document [81] -
  14:25, 69:12, 69:14,
  69:18, 69:25, 70:3,
  70:5, 70:10, 70:16,
  71:13, 73:2, 75:22,
  77:20, 78:20, 84:7,
  86:21, 86:24, 87:2,
  87:3, 87:6, 87:8,
  94:1, 94:6, 95:16,
  96:6, 97:9, 123:20,
  124:6, 124:8,
  125:12, 125:18,
  126:2, 128:1,
  128:22, 129:22,
  150:23, 174:20,
  175:1, 190:1, 190:2,
  190:7, 190:9,
  190:11, 190:16,
  190:23, 191:4,
  192:2, 192:11,
  192:15, 194:21,
  194:22, 195:1,
  195:5, 195:9,
  195:14, 195:16,
  195:21, 204:13,
  208:7, 209:13,
  209:21, 210:3,
  210:6, 211:12,
  215:16, 215:17,
  220:12, 220:15,
  220:17, 221:3,
  221:12, 222:4,
  223:17, 223:18,
  223:22, 224:7,

224:8, 224:14, 224:18, 224:22

**documents** [4] - 72:6, 120:22, 221:15, 224:11

**dollar** [2] - 101:12, 101:16

**dollars** [9] - 92:23, 93:9, 93:11, 93:12, 95:8, 96:1, 101:19, 101:24, 166:7

**domain** [2] - 184:16, 188:24

**done** [31] - 14:23, 24:19, 25:24, 44:7, 46:7, 61:12, 62:20, 90:7, 93:18, 120:8, 120:17, 122:2, 122:23, 131:17, 141:14, 141:18, 142:6, 143:21, 144:14, 144:15, 155:1, 156:25, 159:23, 161:13, 163:19, 169:18, 186:18, 186:20, 208:22, 227:14, 227:23

**doses** [2] - 185:8, 187:14

**doubled** [2] - 42:22, 42:24

**Douglas** [1] - 4:23

**down** [24] - 19:10, 40:22, 64:16, 84:2, 85:18, 97:22, 114:22, 145:1, 147:15, 147:17, 147:21, 150:8, 154:6, 158:14, 164:21, 169:6, 180:4, 185:22, 206:10, 207:11, 208:9, 210:15, 216:3, 227:8

**dozen** [1] - 156:23

**Dr** [141] - 7:10, 7:12, 8:1, 8:3, 8:4, 8:16, 9:15, 10:5, 11:15, 12:21, 13:4, 13:16, 14:12, 15:23, 17:6, 17:23, 18:5, 18:10, 22:6, 23:5, 24:12, 25:7, 25:17, 27:2, 28:5, 29:20, 30:25, 32:5, 32:18, 34:2, 34:16, 35:4, 37:9, 38:17, 38:21, 40:1, 41:4, 42:2, 42:14, 43:4, 43:24, 44:24,

46:24, 48:19, 49:3, 51:6, 51:16, 53:17, 54:25, 56:10, 56:15, 56:17, 56:22, 57:2, 57:6, 57:15, 61:3, 62:17, 63:10, 63:19, 64:12, 64:16, 64:24, 70:11, 72:18, 72:24, 73:12, 73:14, 73:18, 74:8, 76:2, 82:23, 84:13, 86:25, 87:15, 90:19, 92:5, 93:22, 94:5, 97:16, 100:23, 101:15, 103:7, 103:20, 104:3, 104:8, 104:17, 105:15, 106:16, 114:22, 115:1, 115:16, 115:24, 117:2, 117:11, 117:23, 119:8, 123:8, 123:20, 126:2, 127:9, 127:14, 127:25, 131:8, 132:4, 132:21, 152:10, 159:9, 159:14, 162:10, 169:14, 169:22, 184:25, 185:22, 186:5, 186:12, 186:25, 191:9, 192:4, 193:22, 194:20, 196:21, 202:9, 203:10, 203:13, 203:16, 203:19, 204:21, 205:13, 205:18, 208:9, 210:2, 211:10, 211:19, 226:7, 226:17, 226:20, 227:3, 227:11

**DR** [2] - 7:19, 133:3

**draft** [1] - 167:20

**draw** [2] - 63:22, 87:9

**drawing** [1] - 24:12

**Drive** [1] - 6:15

**driver** [1] - 20:25

**driving** [1] - 33:23

**Drug** [6] - 6:2, 8:25, 65:2, 67:22, 197:1, 229:7

**drug** [9] - 10:25, 67:20, 68:6, 68:7, 129:25, 151:7, 151:9, 222:9, 222:10

**DRUG** [2] - 1:7, 1:13

**drugs** [8] - 23:1, 52:9, 67:22, 68:10, 107:4, 159:6, 178:15, 189:4

**due** - 40:6, 148:19

**dues** [2] - 140:12, 140:13

**duplication** [2] - 128:6, 128:18

**duration** [4] - 28:2, 81:19, 151:15, 213:15

**during** [30] - 8:24, 11:21, 14:23, 19:1, 19:3, 19:6, 30:4, 34:25, 35:3, 42:24, 49:13, 50:13, 50:21, 51:1, 52:10, 52:11, 53:23, 58:20, 58:24, 91:21, 106:7, 106:20, 107:4, 114:22, 138:6, 138:7, 155:4, 177:21, 206:2, 214:4

**duties** [6] - 130:20, 179:10, 210:7, 210:13, 210:25, 211:19

**duty** [3] - 11:21, 209:1, 209:10

**dying** [1] - 21:15

**dynamic** [1] - 197:16

**dynamics** [4] - 161:9, 161:11, 161:12

## E

**early** [9] - 54:25, 60:4, 60:15, 79:11, 81:16, 138:8, 169:8, 176:14, 228:1

**earmarked** [1] - 91:18

**easily** [2] - 157:21, 200:3

**East** [3] - 3:5, 3:12, 4:24

**Eastern** [1] - 107:20

**easy** [1] - 175:10

**eat** [3] - 59:18, 59:20, 60:1

**economic** [1] - 158:8

**economics** [1] - 119:19

**economist** [4] - 165:2, 226:18, 227:5

**Education** [3] - 78:16, 78:19, 79:8

**education** [27] - 8:24, 48:12, 51:2, 54:20, 60:5, 62:15, 78:23, 78:25, 79:12, 79:19, 79:21, 79:24, 80:2, 80:4, 80:6, 80:8, 80:12, 80:23, 81:2,

81:6, 81:9, 81:11, 81:12, 81:15, 83:12, 136:6, 136:12

**educational** [10] - 8:7, 8:17, 8:20, 46:8, 62:14, 62:17, 62:21, 78:13, 79:1, 79:7

**Edwards** [2] - 198:20, 198:21

**effect** [4] - 61:22, 72:19, 182:18, 215:6

**effective** [11] - 28:14, 47:13, 50:8, 53:19, 53:22, 53:23, 54:4, 86:19, 151:2, 180:6, 210:21

**effectively** [2] - 15:24, 213:1

**effectiveness** [2] - 69:2, 120:12

**effects** [6] - 46:18, 48:17, 58:10, 183:9, 185:9, 187:14

**efficacy** [1] - 49:19

**efficiencies** [1] - 120:12

**efficient** [1] - 103:14

**efforts** [6] - 19:4, 102:6, 127:3, 144:23, 194:11, 195:1

**eight** [1] - 25:1

**Eighth** [1] - 3:10

**either** [5] - 15:20, 48:7, 100:20, 226:17, 227:10

**elected** [2] - 135:25, 136:2

**elicit** [2] - 56:3, 171:9

**eligibility** [3] - 60:14, 80:2, 102:11

**eligible** [6] - 60:15, 99:24, 100:15, 102:4, 102:9, 102:10

**ELIZABETH** [1] - 6:14

**embedded** [1] - 118:1

**emergency** [2] - 157:13, 157:15

**emerging** [1] - 15:9

**emotional** [4] - 46:5, 48:16, 50:15, 50:19

**emphasize** [1] - 54:16

**emphatically** [1] - 55:9

**employees** [3] - 12:25, 154:17, 154:18

**Encino** [1] - 3:16

**encompass** [1] - 67:2

**encouraged** [1] - 181:12

**end** [14] - 19:16, 29:5, 29:10, 36:14, 93:16, 95:12, 116:9, 134:24, 164:1, 167:15, 176:19, 184:10, 209:5

**endeavor** [1] - 32:5

**ended** [3] - 27:14, 64:14, 109:14

**endocarditis** [2] - 157:16, 157:20

**Energy** [2] - 123:24, 124:21

**engage** [1] - 60:25

**England** [2] - 139:13, 139:14

**enhance** [1] - 210:20

**enlarge** [1] - 69:25

**ensure** [2] - 54:4, 81:24

**ensuring** [1] - 27:7

**entail** [1] - 9:7

**enter** [2] - 171:17, 171:23

**entered** [1] - 172:3

**entering** [2] - 19:23, 24:24

**entire** [4] - 156:9, 183:25, 206:14, 221:15

**entirety** [1] - 91:25

**entities** [1] - 200:1

**entitlement** [1] - 78:1

**entitles** [1] - 79:1

**entries** [4] - 43:14, 44:9, 45:2, 45:7

**entry** [5] - 23:18, 36:1, 44:13, 88:12

**ENU** [1] - 4:17

**environment** [2] - 27:7, 162:5

**epidemic** [12] - 22:7, 23:7, 127:4, 146:10, 153:9, 153:16, 155:19, 155:22, 158:3, 162:15, 165:22, 225:9

**epidemiology** [1] - 34:23

**Episode** [1] - 29:9

**equipment** [1] - 154:17

**era** [3] - 19:7, 19:9, 93:2

**error** [1] - 88:7

**escalating** [1] - 52:17

**essentially** [2] - 202:20, 213:22

**establish** [3] - 14:2, 108:6, 111:3

**established** [1] - 149:9
**estimate** [26] - 32:21, 33:10, 82:20, 85:11, 85:22, 90:7, 105:18, 106:3, 106:12, 106:25, 107:6, 107:9, 107:25, 108:18, 109:9, 109:21, 109:25, 110:5, 110:15, 110:20, 111:12, 112:3, 112:5, 113:19, 113:24, 122:23
**estimated** [1] - 105:9
**estimates** [17] - 50:16, 83:11, 85:23, 103:25, 104:1, 104:6, 109:17, 110:12, 111:2, 111:3, 118:3, 119:2, 119:5, 119:7, 119:14, 119:21, 127:10
**et** [5] - 1:7, 1:13, 73:10, 229:6, 229:7
**evaluate** [15] - 37:6, 69:2, 120:11, 120:13, 121:2, 121:7, 122:3, 122:15, 122:17, 122:18, 122:19, 123:4, 123:7, 153:6, 167:11
**evaluate"** [1] - 122:22
**evaluated** [7] - 68:24, 68:25, 83:5, 100:19, 120:15, 120:16, 121:24
**evaluating** [1] - 16:6
**evaluation** [5] - 77:22, 82:8, 123:6, 177:3
**Evaluation** [2] - 24:21, 43:11
**evaluations** [1] - 16:6
**evening** [1] - 227:25
**event** [4] - 78:3, 183:23, 189:14, 198:25
**events** [1] - 126:22
**eventually** [1] - 59:25
**Evidence** [1] - 211:14
**evidence** [24] - 17:10, 17:13, 23:20, 30:21, 35:25, 49:18, 53:18, 54:8, 56:9, 56:18, 61:3, 61:8, 62:23, 87:3, 87:8, 94:22, 94:25, 95:23, 120:2,

125:3, 129:24, 216:7, 221:12, 221:16
**evidence-based** [5] - 94:22, 94:25, 95:23, 129:24, 216:7
**evident** [1] - 145:24
**exact** [2] - 134:24, 192:14
**exacting** [1] - 170:13
**exactly** [5] - 128:10, 137:4, 137:7, 149:25, 183:22
**exaggeration** [1] - 199:14
**EXAMINATION** [8] - 7:24, 64:22, 103:18, 133:12, 169:20, 196:19, 202:7, 220:8
**examination** [3] - 39:3, 108:7, 221:17
**examine** [2] - 16:21, 44:11
**examined** [2] - 45:8, 83:2
**example** [11] - 36:13, 46:16, 84:11, 89:17, 108:24, 143:9, 149:24, 158:1, 161:18, 166:18, 181:25
**exampled** [2] - 225:20, 225:21
**Excellent** [1] - 200:13
**excellent** [1] - 162:18
**except** [1] - 31:10
**exception** [1] - 170:9
**exchange** [1] - 147:3
**excited** [2] - 11:25, 147:20
**exciting** [1] - 52:22
**exclude** [2] - 37:17, 166:3
**excluded** [2] - 159:12, 164:8
**exclusively** [1] - 9:8
**excuse** [1] - 27:5
**Excuse** [1] - 223:15
**excused** [1] - 132:10
**executive** [4] - 46:20, 49:7, 49:12, 63:8
**Executive** [1] - 9:3
**exercise** [2] - 173:6, 219:1
**exhaustive** [1] - 84:5
**Exhibit** [2] - 69:17, 87:16
**exhibit** [8] - 82:18, 82:20, 82:22, 204:9, 205:9, 220:10,

221:10, 223:1
**exhibiting** [1] - 223:22
**exhibits** [2] - 89:22, 221:7
**exist** [5] - 37:10, 38:19, 69:4, 84:6, 86:22
**existence** [4] - 72:8, 89:13, 192:2, 211:22
**existing** [4] - 30:18, 37:16, 37:24, 89:9
**exists** [2] - 71:24, 86:2
**expand** [1] - 201:11
**expanded** [2] - 99:1, 99:13
**expanding** [1] - 94:19
**expands** [1] - 99:20
**expansion** [1] - 99:23
**expansive** [1] - 98:25
**expect** [2] - 115:8, 161:13
**expedite** [1] - 169:24
**expenditures** [1] - 121:16
**expenses** [3] - 80:10, 108:10, 109:15
**expensive** [1] - 47:5
**experience** [48] - 16:8, 22:14, 23:10, 24:13, 25:2, 26:7, 31:15, 31:20, 33:8, 41:12, 41:13, 41:20, 44:12, 49:18, 51:3, 80:22, 82:10, 116:19, 117:6, 146:13, 146:14, 157:2, 159:14, 160:5, 160:12, 160:14, 160:23, 162:6, 162:19, 167:6, 171:21, 177:22, 198:24, 203:8, 219:24, 225:3, 225:4, 225:5
**experienced** [6] - 22:2, 40:9, 41:6, 41:10, 41:16, 41:22
**experiences** [3] - 22:15, 41:18, 50:17
**experiencing** [4] - 41:24, 212:19, 214:19, 215:8
**expert** [28] - 17:6, 17:23, 18:6, 22:6, 22:10, 32:12, 32:16, 40:5, 47:23, 50:2, 55:2, 56:16, 56:19, 56:22, 110:17, 111:21, 119:19, 121:23, 127:1,

127:5, 159:10, 159:12, 160:15, 164:7, 164:16, 164:17, 226:13, 226:20
**expert's** [1] - 33:1
**expertise** [6] - 12:25, 119:22, 127:5, 165:5, 165:6, 225:4
**experts** [10] - 26:4, 30:23, 83:19, 110:2, 121:18, 121:19, 121:20, 127:12, 211:25, 227:24
**expired** [1] - 208:2
**explain** [5] - 20:13, 58:10, 170:19, 176:21, 181:17
**explained** [2] - 191:25, 192:1
**explanation** [1] - 177:20
**exposed** [12] - 26:1, 27:14, 47:1, 55:1, 57:21, 58:11, 59:2, 59:5, 61:5, 62:2, 62:12, 83:13
**exposure** [12] - 10:16, 27:9, 46:12, 46:23, 47:17, 48:17, 55:3, 59:7, 82:1, 104:24, 110:11
**expressed** [1] - 121:1
**extend** [1] - 59:11
**extended** [1] - 59:16
**extensive** [1] - 23:19
**extent** [7] - 35:18, 38:12, 57:10, 71:23, 90:5, 159:13, 196:7
**extremely** [2] - 36:12, 81:22
**eye** [1] - 160:7
**eyebrow** [1] - 155:14
**eyes** [1] - 59:24

**F**

**Faber** [5] - 7:2, 144:23, 166:15, 180:24, 183:21
**FABER** [1] - 1:17
**fabric** [1] - 158:23
**face** [4] - 182:3, 182:6, 182:17
**face/happy** [1] - 182:17
**facilitated** [1] - 15:20
**facilities** [4] - 197:20, 198:5, 199:3, 199:7
**facility** [2] - 161:24,

200:14
**fact** [17] - 15:6, 19:14, 20:25, 67:14, 92:12, 93:4, 108:12, 116:21, 121:24, 130:19, 173:2, 198:5, 206:23, 208:17, 209:20, 213:14, 215:12
**factors** [2] - 29:2, 46:5
**factual** [3] - 143:17, 143:18, 156:1
**faculty** [2] - 135:20, 135:21
**Fair** [2] - 192:21, 195:23
**fair** [14] - 57:11, 82:19, 82:23, 96:22, 121:6, 148:11, 162:12, 170:19, 182:8, 200:2, 201:23, 204:2, 224:10
**fairly** [2] - 58:7, 198:10
**fairness** [1] - 221:14
**faith** [1] - 220:20
**fall** [2] - 95:1, 114:7
**falls** [1] - 113:20
**false** [3] - 185:7, 187:12, 187:25
**falsely** [2] - 183:7, 183:15
**familiar** [18] - 16:21, 61:3, 76:2, 76:3, 79:5, 80:1, 99:16, 141:25, 190:1, 190:2, 191:12, 192:8, 194:21, 194:22, 201:20, 213:7, 213:8, 220:15
**familiarity** [1] - 192:3
**Families** [1] - 18:17
**families** [40] - 9:20, 10:21, 11:16, 15:13, 15:15, 15:25, 16:17, 17:11, 17:24, 18:6, 19:20, 22:3, 22:7, 22:10, 23:6, 29:24, 32:9, 36:8, 42:24, 63:12, 66:6, 76:8, 76:15, 77:3, 78:4, 78:7, 82:17, 84:16, 84:19, 85:5, 85:15, 89:7, 95:7, 100:25, 116:7, 158:11, 159:5, 161:1, 162:1, 168:13
**Family** [20] - 9:3, 9:7, 10:22, 11:11, 12:1, 14:6, 17:17, 18:11, 84:11, 84:21, 84:22,

85:8, 85:20, 85:23,
86:1, 86:2, 86:5,
86:12, 86:14, 127:2
**family** [26] - 10:24,
10:25, 15:2, 23:15,
24:1, 24:7, 24:10,
36:6, 40:18, 41:1,
45:16, 49:21, 59:16,
77:13, 77:17, 85:8,
85:12, 85:14,
136:14, 158:17,
160:21, 168:9,
168:10, 168:13
**family's** [1] - 40:18
**family-centered** [1] -
40:18
**far** [2] - 71:1, 211:17
**FARRELL** [7] - 2:3,
132:16, 186:17,
186:20, 226:12,
227:19, 228:5
**Farrell** [7] - 2:4, 2:13,
168:8, 168:9,
168:10, 168:13,
168:19
**fashion** [1] - 222:11
**faster** [1] - 85:15
**father** [2] - 158:7,
161:12
**fault** [1] - 154:7
**favorite** [1] - 211:16
**FCRR** [1] - 6:18
**FDA** [1] - 183:2
**federal** [38] - 14:24,
16:21, 16:24, 18:16,
25:4, 28:11, 31:12,
35:19, 35:20, 35:21,
37:3, 38:6, 40:22,
42:20, 47:18, 60:7,
60:9, 60:10, 79:6,
80:25, 81:18, 91:2,
91:6, 91:10, 92:3,
92:6, 92:23, 93:19,
95:22, 96:23, 98:1,
100:14, 101:24,
126:4, 126:15,
129:1, 130:14
**Federal** [8] - 74:6,
91:3, 91:8, 91:13,
100:3, 102:2, 103:1,
211:13
**federally** [1] - 97:23
**feed** [1] - 104:8
**feet** [1] - 191:14
**Feinberg** [1] - 226:20
**fell** [1] - 136:19
**fellow** [1] - 8:24
**fellowship** [2] -
137:25, 138:5
**felt** [2] - 126:6, 184:13

**fentanyl** [4] - 116:17,
117:7, 171:1, 171:9
**few** [20] - 14:5, 27:23,
45:5, 46:2, 69:25,
79:15, 86:15, 90:8,
93:11, 100:23,
109:23, 157:8,
179:8, 181:12,
197:3, 198:12,
202:13, 205:3,
212:16, 222:12
**fewer** [1] - 19:17
**fiduciary** [2] - 141:6
**field** [3] - 26:5, 137:13,
211:25
**fierce** [1] - 80:20
**fifth** [5] - 178:5,
179:20, 179:24,
182:9, 182:17
**figure** [4] - 37:7,
158:19, 162:24,
167:11
**figures** [1] - 127:11
**filed** [1] - 43:2
**final** [6] - 163:18,
167:20, 167:21,
167:24, 167:25,
199:19
**finances** [2] - 193:11,
193:12
**findings** [9] - 142:22,
142:25, 150:23,
155:20, 208:17,
215:12, 218:16,
219:21
**fine** [6] - 12:7, 46:4,
46:18, 192:12,
204:14, 204:16
**finish** [3] - 82:18,
150:10, 226:24
**finished** [1] - 226:23
**Firm** [2] - 3:4, 3:7
**firm** [1] - 70:7
**first** [34] - 8:16, 15:10,
17:19, 19:14, 23:11,
59:18, 64:20, 72:21,
94:12, 116:14,
116:21, 117:1,
117:7, 128:22,
135:14, 136:6,
136:17, 145:15,
145:20, 169:9,
171:23, 174:3,
175:14, 175:22,
179:19, 187:8,
212:11, 213:25,
214:1, 214:22,
218:18, 223:2,
227:3, 228:3
**firsthand** [1] - 161:15

**fit** [2] - 79:19, 227:8
**fits** [2] - 85:8, 139:8
**FITZSIMMONS** [47] -
132:20, 133:6,
133:10, 133:13,
147:17, 147:21,
147:23, 148:22,
149:4, 149:14,
150:20, 152:16,
154:6, 154:20,
156:15, 156:19,
156:20, 159:18,
160:18, 160:19,
164:12, 164:19,
168:18, 169:1,
169:5, 190:7,
190:11, 191:15,
191:22, 204:16,
205:8, 205:11,
209:9, 211:6, 220:6,
220:9, 220:25,
221:1, 221:5, 221:9,
222:1, 222:2,
222:15, 222:18,
224:1, 224:4, 226:1
**Fitzsimmons** [24] -
132:17, 132:18,
148:20, 149:1,
149:13, 156:11,
156:14, 159:17,
160:5, 160:17,
162:16, 163:25,
168:25, 190:17,
190:21, 191:14,
204:17, 205:7,
209:8, 220:5,
220:24, 221:20,
221:25, 223:17
**five** [30] - 21:25,
39:21, 66:1, 66:8,
79:10, 79:13, 79:15,
104:17, 104:22,
105:5, 116:1, 116:2,
116:13, 117:4,
118:2, 118:8,
118:11, 119:3,
119:8, 119:12,
120:14, 121:8,
121:17, 122:4,
141:18, 144:9,
144:17, 163:23,
198:6
**five-day** [1] - 79:15
**five-year** [1] - 144:9
**fix** [1] - 31:8
**fixed** [1] - 31:9
**FL** [1] - 2:11
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flip** [1] - 217:17

**Floor** [1] - 3:5
**focus** [11] - 60:24,
76:9, 76:11, 103:24,
104:11, 108:17,
145:17, 146:2,
146:10, 197:4, 216:1
**focused** [1] - 46:24
**focusing** [1] - 59:24
**folks** [2] - 30:13,
219:23
**followed** [2] - 72:20,
72:22
**following** [2] - 208:12,
215:22
**follows** [3] - 7:5,
64:19, 186:1
**font** [1] - 69:23
**footprint** [1] - 199:13
**FOR** [1] - 1:1
**forecast** [1] - 119:9
**foregoing** [1] - 229:4
**forget** [1] - 72:18
**forgot** [2] - 25:11,
151:10
**form** [2] - 50:7, 96:25
**former** [1] - 226:14
**forming** [5] - 25:8,
43:4, 53:17, 120:20,
121:1
**forth** [4] - 125:12,
153:13, 195:1,
223:24
**forward** [2] - 127:11,
161:7
**foster** [23] - 19:18,
21:7, 21:11, 22:24,
41:19, 41:22, 43:5,
43:13, 44:4, 44:9,
44:13, 45:2, 45:7,
45:9, 45:10, 45:23,
76:13, 77:8, 82:11,
82:14, 83:14,
158:20, 161:9
**foundation** [14] -
37:15, 38:9, 38:22,
97:1, 108:4, 125:5,
125:16, 125:20,
149:7, 160:9,
209:12, 221:19,
221:21, 223:17
**founded** [1] - 166:16
**founding** [2] - 135:10,
172:15
**four** [2] - 68:5, 137:9
**fourth** [6] - 53:10,
54:20, 128:4, 216:1,
216:2
**frame** [2] - 167:3,
176:17
**framed** [1] - 219:12

**framework** [1] -
150:16
**Frank** [1] - 123:23
**frankly** [1] - 60:20
**free** [6] - 79:1, 79:15,
80:14, 91:14, 132:7,
226:8
**frequency** [2] - 85:18,
85:19
**frequent** [3] - 28:2,
84:24, 85:2
**frequently** [1] - 45:12
**fresh** [2] - 227:11,
228:3
**Friday** [4] - 186:6,
212:8, 226:16,
226:23
**friend** [1] - 148:20
**front** [11] - 19:16,
29:5, 70:4, 105:22,
123:20, 166:4,
168:11, 175:1,
187:1, 194:20, 210:3
**frowny** [1] - 182:3
**fulfill** [1] - 142:15
**full** [6] - 8:2, 74:14,
79:15, 128:22,
133:14, 151:11
**full-day** [1] - 79:15
**full-time** [1] - 151:11
**Fuller** [2] - 2:4, 2:13
**FULLER** [1] - 2:12
**fully** [5] - 32:6, 49:7,
60:7, 60:9, 80:25
**function** [1] - 41:2
**functioning** [5] -
40:18, 46:20, 49:8,
49:12, 63:8
**functions** [1] - 24:10
**fund** [4] - 14:20,
37:11, 77:2, 91:3
**funded** [16] - 10:20,
10:23, 14:7, 14:10,
29:12, 35:18, 39:7,
60:9, 74:2, 74:24,
77:24, 80:25, 96:3,
97:23, 98:17, 225:8
**funder** [3] - 75:8, 75:9,
123:4
**funders** [1] - 122:19
**funding** [39] - 12:8,
16:22, 16:23, 17:1,
17:2, 35:19, 36:7,
37:25, 40:20, 74:18,
75:11, 77:5, 77:7,
77:14, 84:9, 89:15,
89:16, 89:18, 90:13,
90:14, 90:15, 90:24,
91:2, 91:6, 91:10,
91:13, 92:6, 92:8,

93:14, 93:20,
122:18, 122:21,
127:8, 127:13,
129:25, 193:18,
196:9, 196:12
**funds** [21] - 14:20,
28:11, 35:22, 47:18,
60:7, 60:9, 60:10,
86:10, 91:24, 92:3,
92:22, 93:2, 93:4,
93:17, 100:2,
102:14, 122:15,
126:5, 126:15,
129:1, 130:14
**furtherance** [1] -
211:19
**future** [2] - 119:10,
225:25
**Futures** [6] - 9:4, 9:7,
11:11, 12:1, 17:17,
18:11

## G

**game** [1] - 12:24
**gap** [3] - 36:5, 45:17,
60:18
**gaps** [1] - 60:20
**gather** [1] - 143:10
**gathers** [1] - 142:10
**gears** [5] - 35:4, 35:5,
89:12, 123:9, 192:22
**General** [2] - 93:21,
94:7
**general** [4] - 46:9,
117:3, 141:25,
222:25
**generalizing** [1] -
219:18
**generally** [4] - 47:21,
50:10, 203:23, 222:9
**generation** [2] - 42:1,
54:3
**generational** [2] -
163:25, 164:6
**generic** [2] - 222:22,
224:23
**gentle** [1] - 180:15
**geographic** [1] -
201:10
**geography** [1] - 31:25
**Gilligan** [2] - 186:5,
186:12
**Gina** [1] - 222:15
**given** [8] - 13:5, 15:20,
49:17, 70:8, 72:24,
111:3, 209:1, 209:2
**go-to** [1] - 13:2
**governance** [3] -
141:5, 141:6, 193:4

**Government** [7] -
74:6, 91:3, 91:9,
91:13, 100:3, 102:2,
103:1
**government** [14] -
13:2, 14:17, 14:24,
16:24, 18:16, 28:11,
31:12, 35:21, 38:6,
40:22, 42:20, 47:18,
193:4
**governmental** [1] -
141:17
**grade** [1] - 54:21
**graduate** [1] - 136:9
**graduated** [3] - 137:9,
137:10, 140:4
**graduates** [1] - 183:25
**graduating** [2] -
135:13, 135:14
**graduation** [1] -
183:24
**grandma** [1] - 53:6
**Grandma** [1] - 39:14
**grandparents** [2] -
21:8
**grandson** [2] - 21:1,
39:15
**grant** [31] - 10:10,
16:21, 36:7, 36:11,
36:17, 36:23, 36:24,
37:9, 37:24, 38:4,
39:18, 52:19, 74:3,
74:21, 77:25, 84:8,
92:14, 94:18, 95:12,
95:13, 95:17, 96:3,
96:13, 96:16, 96:19,
97:10, 97:15, 163:10
**grant's** [1] - 94:17
**granted** [2] - 99:18,
117:18
**grantee** [1] - 10:11
**grantees** [1] - 11:1
**grants** [18] - 10:19,
30:10, 30:12, 35:19,
36:12, 36:13, 36:18,
36:20, 36:21, 37:3,
38:7, 39:6, 39:7,
39:9, 90:3, 96:21,
121:11
**granular** [1] - 145:3
**graphically** [1] - 182:2
**gray** [2] - 14:17, 94:15
**great** [1] - 106:11
**GRETCHEN** [1] - 6:7
**Gretchen** [2] - 65:1,
196:25
**grew** [1] - 136:15
**grief** [1] - 21:18
**gross** [1] - 46:4
**ground** [4] - 10:9,

39:4, 56:12, 221:24
**group** [16] - 15:21,
27:9, 62:12, 74:10,
102:16, 163:3,
163:4, 165:16,
167:7, 167:8,
167:16, 183:25,
195:16, 195:17,
199:19
**groups** [4] - 26:17,
28:7, 66:8, 66:19
**growing** [1] - 22:2
**guess** [4] - 167:1,
167:2, 167:13,
167:17
**guessed** [1] - 110:22
**guidance** [3] - 115:3,
210:9, 210:18
**guidances** [1] -
213:12
**guidelines** [7] - 50:25,
212:12, 212:15,
212:24, 214:17,
215:7
**guy** [1] - 62:8
**guys** [2] - 144:20,
153:18
**Gynecologists** [1] -
50:23

## H

**half** [5] - 21:4, 95:12,
98:6, 134:14, 156:23
**half-dozen** [1] -
156:23
**hall** [1] - 166:24
**hand** [9] - 7:18, 69:18,
71:1, 87:10, 124:7,
128:2, 133:2,
190:19, 227:16
**handcuffs** [1] - 41:18
**handed** [1] - 94:5
**handle** [4] - 14:1,
15:7, 17:4, 161:12
**happy** [3] - 32:24,
87:10, 190:19
**hard** [3] - 40:19,
158:8, 175:9
**HARDIN** [5] - 5:3,
18:4, 55:24, 115:6,
132:2
**Hardin** [2] - 55:23,
132:1
**harm** [3] - 153:20,
160:25, 209:15
**harmless** [1] - 56:2
**harms** [16] - 146:5,
146:6, 148:11,
155:25, 156:2,

157:5, 157:17,
158:1, 158:22,
159:1, 159:7,
159:11, 162:7,
162:15, 225:14,
225:24
**hate** [1] - 227:15
**hats** [1] - 144:10
**haven** [1] - 161:21
**Hawkins** [1] - 3:7
**Hazelett** [1] - 193:23
**HC** [3] - 105:14, 122:3,
123:4
**head** [4] - 61:18,
71:16, 75:21, 101:20
**Head** [1] - 78:19
**headed** [1] - 212:5
**heading** [2] - 204:25,
212:8
**headline** [1] - 57:3
**Health** [73] - 4:16, 5:2,
13:20, 13:24, 13:25,
14:9, 24:19, 29:15,
43:12, 56:24, 94:8,
100:11, 124:4,
124:13, 124:18,
125:13, 130:13,
134:7, 135:4,
140:17, 140:19,
141:1, 141:3, 141:5,
141:7, 141:15,
141:22, 142:1,
142:6, 142:13,
143:25, 144:7,
144:15, 145:12,
145:17, 146:18,
146:25, 147:8,
147:11, 150:17,
153:1, 153:5,
153:15, 153:24,
155:2, 155:11,
161:21, 192:24,
193:1, 193:4, 193:5,
193:7, 193:8,
193:10, 193:13,
193:17, 193:22,
199:5, 199:7,
199:11, 202:10,
203:13, 205:16,
207:15, 207:18,
207:19, 222:5,
222:8, 224:11
**health** [18] - 35:16,
36:4, 39:16, 116:9,
141:24, 142:6,
142:10, 143:6,
143:7, 144:22,
145:5, 145:17,
153:6, 154:2,
165:17, 191:10,

199:17, 226:18
**healthcare** [19] -
12:18, 99:2, 99:8,
99:25, 119:19,
136:17, 136:20,
153:11, 161:17,
197:5, 197:16,
201:22, 202:21,
203:4, 216:21,
217:2, 218:3,
219:23, 225:7
**hear** [5] - 139:19,
161:4, 161:5, 161:8,
169:13
**heard** [8] - 10:10,
41:9, 79:9, 107:18,
160:10, 163:3,
163:4, 211:25
**hearsay** [2] - 125:5,
125:9
**heart** [5] - 126:15,
156:4, 156:7, 157:23
**held** [3] - 135:3, 174:1,
174:4
**Hello** [2] - 196:21,
196:22
**help** [16] - 10:17,
11:24, 12:3, 25:12,
35:24, 35:25, 42:24,
46:14, 53:5, 53:6,
59:16, 105:21,
142:14, 161:7,
167:3, 191:20
**helpful** [2] - 111:9,
181:3
**helping** [3] - 10:24,
19:20, 22:23
**helps** [2] - 12:13,
48:15, 137:1
**Hep** [1] - 148:17
**Hepatitis** [9] - 147:5,
148:17, 148:18,
149:17, 149:23,
151:5, 157:7
**Heroin** [2] - 52:2,
222:20
**heroin** [11] - 34:21,
106:18, 116:17,
117:7, 118:21,
222:19, 222:20,
223:4, 223:8, 224:8,
224:21
**herself** [1] - 159:3
**hesitant** [1] - 90:1
**HESTER** [1] - 5:9
**hierarchy** [1] - 142:13
**high** [7] - 19:2, 49:5,
53:11, 71:6, 136:22,
200:6
**higher** [7] - 22:16,

44:2, 45:7, 170:24,
171:8, 171:11,
205:24
**highest** [2] - 50:22,
128:8
**highlighted** [1] -
214:14
**highly** [3] - 53:23,
54:3, 203:4
**HIMG** [4] - 199:20,
200:1, 200:13, 201:2
**himself** [1] - 159:3
**hired** [1] - 92:24
**HIV** [9] - 147:5,
148:18, 149:18,
149:25, 150:2,
150:5, 150:13,
151:5, 157:7
**Holbrook** [4] - 226:14,
226:15, 226:24,
227:25
**hold** [4] - 63:15,
133:22, 135:1,
174:13
**holding** [1] - 165:2
**holistic** [1] - 126:17
**Home** [7] - 76:1, 76:3,
76:10, 76:22, 77:2,
77:15, 77:19
**home** [18] - 18:21,
19:3, 20:5, 22:19,
29:2, 29:3, 45:20,
52:20, 53:4, 53:6,
58:21, 77:9, 77:21,
80:13, 85:17,
112:24, 138:21,
162:17
**homes** [6] - 19:18,
21:11, 45:10, 45:17,
76:13, 138:20
**honest** [1] - 146:11
**honor** [1] - 132:16
**Honor** [107] - 7:7,
7:22, 8:12, 10:1,
13:11, 17:22, 18:2,
18:8, 25:13, 26:23,
31:24, 32:3, 32:11,
32:18, 32:22, 34:7,
37:13, 38:11, 38:22,
42:8, 43:21, 44:21,
48:25, 51:12, 55:14,
55:24, 56:7, 56:14,
56:20, 57:13, 64:7,
64:21, 69:19, 94:2,
97:2, 103:9, 103:16,
108:4, 114:17,
114:25, 115:7,
115:18, 115:21,
117:8, 117:17,
117:21, 123:12,

123:16, 123:17,
125:1, 125:7,
125:11, 125:15,
125:23, 126:24,
127:9, 127:16,
127:23, 130:25,
131:2, 131:7,
131:12, 131:19,
131:23, 132:2,
132:6, 133:11,
133:21, 134:19,
148:19, 149:7,
156:10, 159:8,
159:9, 160:3, 164:5,
164:13, 168:15,
168:22, 169:10,
169:19, 174:22,
185:19, 186:11,
186:23, 190:14,
190:22, 194:17,
202:4, 204:5, 204:7,
205:8, 208:24,
211:4, 211:8,
211:15, 214:7,
220:3, 220:6,
220:14, 221:11,
221:14, 221:17,
223:16, 225:6,
226:5, 226:6
**HONORABLE** [1] -
1:17
**Honorable** [1] - 7:1
**hood** [1] - 54:17
**hope** [1] - 226:12
**Hope** [3] - 161:20,
161:25
**Hopefully** [1] - 85:10
**hopefully** [4] - 53:5,
117:2, 169:24,
184:25
**Hospital** [13] - 68:20,
107:19, 108:11,
108:13, 134:11,
134:13, 134:16,
136:4, 174:14,
197:8, 198:15,
198:19, 201:4
**hospital** [25] - 52:20,
53:1, 58:19, 58:22,
59:11, 75:6, 134:20,
135:23, 144:11,
150:24, 152:21,
152:25, 153:4,
153:12, 154:13,
154:16, 155:1,
155:12, 157:13,
166:21, 172:11,
173:24, 174:17,
184:7, 201:24
**hospitalization** [1] -

157:15
**hospitalizations** [1] -
62:13
**hospitalized** [2] -
157:18, 179:6
**hospitals** [11] -
135:24, 173:19,
174:2, 174:5,
197:13, 197:15,
197:17, 198:6,
198:10, 199:4,
199:16
**host** [1] - 25:4
**hotline** [1] - 44:5
**hour** [3] - 226:19,
226:21, 226:25
**House** [2] - 124:20,
203:2
**HRSA** [1] - 75:8
**hub** [3] - 152:4,
201:22
**hubs** [1] - 88:12
**huge** [2] - 21:8, 21:19
**Human** [10] - 13:21,
13:25, 24:19, 43:12,
56:24, 94:8, 124:4,
124:18, 125:13,
130:13
**HUNTINGTON** [1] -
1:4
**Huntington** [81] -
3:10, 4:1, 22:8,
22:11, 26:9, 26:18,
30:9, 30:13, 32:20,
34:4, 36:9, 36:11,
37:17, 40:12, 48:2,
50:5, 55:5, 58:15,
63:13, 65:12, 65:23,
68:20, 68:21, 69:4,
71:20, 77:20, 83:4,
86:21, 86:22, 87:23,
88:21, 89:3, 107:1,
107:19, 108:1,
108:11, 108:13,
108:21, 109:19,
110:16, 110:21,
111:20, 112:4,
112:9, 112:21,
113:5, 113:8,
114:12, 120:5,
120:24, 121:2,
121:16, 122:4,
122:13, 122:20,
122:24, 129:11,
129:16, 134:10,
134:12, 134:16,
135:24, 136:4,
136:16, 141:7,
152:4, 172:3,
174:13, 193:18,

195:24, 196:9,
197:4, 197:14,
198:9, 198:13,
200:14, 200:16,
201:11, 201:22,
225:21, 229:6
**Huntington-Cabell**
[1] - 122:4
**Huntington/Cabell** [6]
- 105:10, 105:11,
105:15, 107:8,
111:13, 194:13
**Huynh** [6] - 204:18,
208:6, 208:10,
209:20, 215:18,
217:17
**hydrocodone** [3] -
188:13, 188:17,
188:22
**hypertension** [1] -
145:7

**I**

**idea** [4] - 41:23, 80:6,
112:25, 136:19
**identified** [28] - 27:3,
46:12, 66:1, 66:8,
66:11, 69:16, 72:21,
78:13, 85:11, 91:10,
101:3, 104:17,
105:5, 116:2, 118:2,
121:9, 121:17,
122:11, 130:12,
150:1, 153:10,
153:11, 157:21,
157:22, 162:15,
175:2, 178:8, 201:15
**identifies** [3] - 82:21,
87:6, 122:7
**identify** [5] - 26:8,
108:20, 150:15,
159:6, 193:16
**II** [1] - 198:22
**illegal** [3] - 116:17,
183:3, 187:18
**illiterate** [1] - 221:6
**imagine** [1] - 75:6
**immediate** [1] - 61:13
**immediately** [2] -
46:11, 74:22
**impact** [14] - 11:6,
15:4, 15:9, 15:11,
17:23, 17:25, 18:6,
18:7, 43:5, 46:22,
63:11, 66:5, 159:4,
160:20
**impacted** [2] - 19:23,
22:7
**impacts** [7] - 11:23,

15:12, 22:12, 45:24,
61:4, 126:6, 160:6
**implement** [3] - 16:14,
35:8, 35:11
**implemented** [2] -
11:8, 35:23
**implementing** [2] -
30:7, 35:14
**implements** [1] - 35:9
**implications** [4] -
20:6, 21:17, 49:15,
61:25
**imply** [1] - 185:15
**importance** [2] - 46:7,
54:7
**important** [21] - 21:3,
25:22, 26:2, 34:22,
43:7, 52:14, 53:7,
60:1, 85:4, 91:12,
141:20, 143:2,
153:11, 162:21,
162:22, 174:17,
183:21, 200:8,
208:1, 218:24, 219:3
**importantly** [3] -
18:24, 24:10, 44:9
**imposed** [4] - 210:13,
211:1, 211:20,
216:16
**impressions** [1] - 72:5
**improper** [3] - 56:16,
56:19, 56:20
**improve** [2] - 10:17,
12:16
**impulse** [1] - 49:14
**IN** [2] - 1:1, 1:18
**in-depth** [1] - 10:15
**in-home** [2] - 77:9,
77:21
**inability** [1] - 93:19
**inadvertently** [1] -
216:5
**inappropriately** [1] -
216:6
**inception** [2] - 135:7,
135:21
**incidence** [6] - 24:15,
101:18, 103:12,
144:25, 145:24,
147:12
**incidents** [2] - 25:6,
32:19
**include** [10] - 55:7,
60:4, 63:2, 80:16,
91:17, 98:22, 176:1,
187:24, 222:9, 223:3
**included** [17] - 56:23,
80:4, 84:7, 86:20,
86:23, 87:17, 91:23,
99:25, 121:10,

172:18, 174:9,
185:7, 187:13,
203:3, 219:22,
222:22
**includes** [7] - 67:11,
72:12, 157:12,
157:15, 157:19,
178:14, 219:1
**Including** [1] - 216:19
**including** [9] - 58:14,
77:22, 78:13, 99:14,
159:11, 172:9,
176:18, 176:19,
219:23
**incoming** [1] - 139:7
**incorporated** [1] -
18:12
**increase** [10] - 12:19,
19:24, 33:24, 91:20,
148:16, 151:5,
179:3, 182:11, 223:8
**increased** [8] - 126:7,
129:24, 130:23,
178:9, 178:24,
212:20, 214:19,
215:8
**increasing** [1] -
182:18
**incredible** [2] - 158:4,
158:5
**incumbent** [1] - 64:6
**indicate** [6] - 25:18,
29:11, 56:8, 77:24,
110:20, 181:13
**indicated** [1] - 191:23
**indicates** [3] - 43:25,
77:20, 95:11
**indicators** [1] - 43:14
**individual** [10] - 28:12,
72:12, 77:23, 79:7,
142:9, 146:12,
161:2, 167:10,
188:3, 199:10
**Individually** [1] - 83:1
**individuals** [17] - 28:6,
32:13, 88:20, 99:21,
107:16, 108:23,
109:9, 114:6, 114:7,
118:10, 120:23,
122:8, 140:20,
154:1, 157:19,
162:22, 219:16
**industrial** [1] - 21:14
**infancy** [1] - 62:4
**infant** [18] - 39:19,
46:16, 51:3, 52:12,
52:20, 52:21, 54:4,
54:6, 54:13, 54:14,
54:17, 58:25, 59:2,
59:18, 59:22, 61:2,

71:5, 71:6
**infants** [22] - 10:15,
12:19, 19:24, 19:25,
20:1, 20:5, 20:16,
33:21, 46:11, 47:6,
53:24, 54:2, 58:11,
58:15, 60:3, 60:14,
60:22, 62:21, 71:3,
72:19, 104:24,
110:23
**infection** [2] - 149:25,
156:4
**infections** [4] -
154:10, 156:9,
157:7, 163:13
**infectious** [6] -
145:25, 146:4,
146:19, 147:4,
148:17, 157:12
**infectious-type** [1] -
148:17
**influenced** [2] - 41:25,
188:6
**information** [22] -
9:19, 14:3, 17:12,
19:12, 23:10, 47:15,
58:13, 70:15,
111:22, 121:22,
124:22, 130:17,
142:10, 142:20,
143:5, 143:10,
143:15, 143:17,
144:14, 151:1,
177:22, 215:6
**informed** [1] - 50:18
**infrastructure** [2] -
225:8, 225:23
**ingeniously** [1] -
64:13
**initial** [2] - 59:23, 61:4
**initiate** [1] - 92:24
**initiated** [1] - 90:4
**initiative** [2] - 86:4,
86:9
**initiatives** [2] - 13:3,
15:14
**innovate** [1] - 16:14
**innovations** [3] - 37:4,
37:6, 38:5
**input** [1] - 142:14
**inserted** [1] - 90:21
**inside** [2] - 94:13,
198:13
**Inspector** [2] - 93:21,
94:7
**instance** [6] - 63:3,
118:18, 138:20,
146:23, 147:10,
153:9
**Instead** [1] - 112:4

**instead** [2] - 31:7,
127:18
**Institute** [1] - 8:25
**instituted** [1] - 91:9
**institution** [5] -
134:14, 139:1,
139:5, 139:9, 162:18
**institutional** [3] -
139:1, 139:8, 139:11
**institutions** [1] -
142:19
**instructed** [1] - 52:18
**Insurance** [1] - 100:11
**integration** [2] -
46:19, 82:5
**intellectual** [1] - 46:4
**intended** [2] - 96:23,
97:1
**intends** [1] - 32:18
**intensity** [4] - 81:13,
82:11, 84:23, 85:20
**intent** [1] - 18:18
**intention** [2] - 56:7,
56:12
**interact** [2] - 30:23,
188:2
**interacted** [1] - 30:13
**interaction** [1] - 161:6
**interactions** [2] - 30:8,
40:4
**interest** [7] - 58:9,
70:23, 88:24, 91:5,
136:17, 148:12,
148:24
**interested** [4] - 89:7,
90:8, 101:11, 136:13
**interfered** [1] - 216:6
**intergenerational** [5] -
20:20, 23:25, 24:8,
41:3, 63:21
**interim** [6] - 74:4,
74:13, 74:15, 74:18,
74:20, 75:1
**Internal** [1] - 135:5
**internal** [9] - 138:1,
139:20, 139:25,
151:13, 151:21,
152:10, 152:11,
176:11, 176:13
**internalize** [1] - 22:25
**interrupt** [3] - 20:9,
90:19, 159:8
**interrupting** [1] -
227:16
**intervene** [1] - 154:10
**intervention** [10] -
28:1, 39:20, 39:25,
57:21, 60:4, 60:16,
62:23, 79:11, 114:10
**interventions** [22] -

23:22, 26:18, 27:3,
27:24, 28:4, 28:6,
28:7, 29:21, 29:25,
35:7, 37:12, 39:21,
47:12, 48:4, 53:18,
59:8, 59:10, 60:19,
60:25, 63:20,
119:24, 120:21
**interviews** [2] - 24:24,
30:5
**intravenous** [2] -
151:7, 151:9
**introduce** [4] - 56:18,
132:16, 190:14
**Introduce** [1] - 202:5
**introduced** [1] - 56:9
**introducing** [1] -
182:10
**invented** [1] - 62:8
**inventory** [2] - 38:18,
38:20
**investigate** [1] - 27:17
**investigated** [1] -
28:24
**investigation** [4] -
44:7, 93:21, 152:22,
183:3
**investigations** [1] -
29:6
**investment** [1] - 184:9
**invisible** [2] - 82:2
**invited** [1] - 183:23
**involve** [2] - 9:15, 67:4
**involved** [12] - 10:6,
10:7, 12:2, 13:17,
15:23, 42:3, 42:16,
81:22, 95:6, 104:25,
111:25, 194:11
**involving** [1] - 155:19
**IQ** [1] - 62:13
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**issue** [17] - 20:7,
21:10, 22:19, 35:23,
37:9, 55:10, 67:11,
67:12, 74:17, 82:1,
92:11, 108:19,
145:16, 146:17,
153:18, 176:16,
203:1
**issued** [1] - 191:13
**issues** [7] - 9:8, 10:17,
13:18, 26:11, 48:18,
92:5, 159:11
**IT** [1] - 221:6
**item** [3] - 210:8,
210:16, 216:4
**items** [5] - 33:21,
143:6, 145:6,
146:22, 183:18

**itself** [7] - 95:16,
146:7, 167:16,
195:23, 212:1,
225:12, 225:21

**J**

**j)** [1] - 214:12
**Jackson** [1] - 6:8
**jail** [1] - 161:11
**JASIEWICZ** [1] - 5:4
**JCAHO** [4] - 180:5,
180:11, 180:17,
180:19
**Jeffrey** [1] - 203:10
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:18
**jeopardized** [1] -
158:23
**jeopardy** [1] - 196:5
**job** [2] - 88:12, 161:7
**jobs** [1] - 218:21
**joined** [4] - 134:17,
147:10, 199:20,
199:21
**Joint** [3] - 207:14,
207:18
**jointly** [1] - 14:20
**JOSEPH** [1] - 6:4
**journey** [2] - 171:3,
175:15
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**judge** [15] - 44:8,
84:24, 85:4, 85:19,
132:16, 132:20,
143:3, 144:19,
149:21, 160:24,
164:21, 166:12,
166:13, 176:22,
177:6
**JUDGE** [1] - 1:17
**Judge** [32] - 7:2,
103:14, 133:10,
144:23, 149:5,
156:15, 158:12,
159:18, 159:24,
160:18, 166:15,
168:20, 169:5,
180:24, 183:21,
190:7, 190:12,
191:15, 191:22,
204:9, 209:10,
209:11, 209:23,
209:25, 220:7,
220:25, 221:6,
221:10, 222:1,
226:2, 226:12, 228:5
**judges** [1] - 12:7
**judgment** [4] - 173:7,

207:4, 218:23, 219:2
**Judith** [1] - 226:20
**July** [2] - 186:6, 186:8
**June** [5] - 7:4, 212:8, 215:6, 229:9, 229:15
**JUNE** [1] - 1:19
**junior** [1] - 136:22
**jurisdictions** [4] - 12:3, 12:14, 23:17, 44:14
**jurisprudence** [2] - 162:18, 166:24
**Justice** [7] - 10:23, 13:21, 14:8, 30:12, 36:25, 39:12, 96:20
**justified** [1] - 56:2

### K

**Katherine** [2] - 7:16, 8:3
**KEARSE** [1] - 4:2
**keep** [6] - 53:14, 102:6, 138:6, 160:7, 161:3
**keeps** [1] - 39:24
**Kelly** [1] - 6:8
**Kentucky** [6] - 13:1, 107:21, 108:2, 108:24, 109:4, 109:10
**kept** [4] - 138:8, 138:10, 138:24, 195:5
**Kessler** [1] - 4:23
**Kevin** [3] - 132:21, 132:25, 133:16
**KEVIN** [1] - 133:3
**key** [2] - 24:18, 63:7
**kids** [51] - 18:22, 19:2, 19:10, 19:15, 19:17, 21:3, 21:4, 21:6, 21:25, 22:14, 22:19, 22:21, 22:22, 22:23, 24:16, 27:13, 27:25, 28:19, 28:23, 40:13, 40:24, 41:15, 41:16, 41:19, 41:20, 41:22, 41:24, 42:21, 45:17, 45:19, 46:10, 47:2, 47:4, 47:5, 47:14, 47:20, 48:10, 48:13, 49:8, 62:19, 62:24, 63:22, 63:24, 64:3, 64:6, 79:23, 82:1, 82:12, 102:13
**Kids** [1] - 78:18
**Kilkenny** [2] - 193:22
**kin** [2] - 18:23, 20:22
**kind** [16] - 20:22,

22:23, 23:5, 29:17, 41:11, 45:23, 46:9, 48:7, 48:8, 111:6, 134:4, 136:5, 148:11, 161:16, 168:19, 178:13
**kindergarten** [2] - 79:10, 79:16
**kinds** [32] - 13:3, 16:15, 17:12, 23:14, 23:22, 28:3, 41:6, 41:8, 41:10, 41:12, 46:5, 47:8, 47:17, 47:19, 48:8, 59:13, 60:19, 63:4, 81:22, 82:4, 82:6, 83:14, 91:24, 93:16, 96:20, 99:10, 100:1, 101:18, 112:10, 113:1, 119:24, 148:4
**kinship** [1] - 21:5
**knowledge** [36] - 9:10, 9:12, 9:16, 12:21, 16:2, 23:11, 23:15, 23:19, 31:21, 59:2, 80:23, 131:4, 151:6, 152:23, 152:24, 159:22, 160:8, 160:11, 160:14, 171:21, 172:2, 172:5, 172:7, 177:2, 192:2, 192:12, 192:14, 196:7, 196:8, 196:11, 201:3, 217:23, 221:13, 223:19, 223:24
**knowledgeable** [1] - 122:17
**known** [8] - 28:12, 66:20, 66:23, 92:13, 100:10, 135:4, 153:2, 225:24
**KOUBA** [1] - 4:11

### L

**LA** [1] - 3:8
**lag** [1] - 92:23
**laid** [6] - 29:20, 49:19, 125:16, 125:17, 125:20, 209:11
**land** [1] - 125:24
**language** [6] - 61:23, 63:8, 70:18, 82:5, 111:9, 215:21
**Lanier** [1] - 3:4
**large** [9] - 91:16, 127:3, 127:11, 154:4, 167:7, 167:8,

197:13, 197:15, 199:16
**larger** [5] - 27:9, 27:12, 60:17, 69:24, 160:6
**largest** [1] - 198:5
**last** [27] - 20:3, 54:9, 62:16, 65:7, 88:11, 91:8, 91:16, 113:16, 126:3, 126:22, 128:12, 151:19, 154:14, 155:4, 155:5, 155:23, 158:18, 162:19, 167:21, 205:3, 207:12, 215:14, 215:16, 222:12, 225:2
**late** [3] - 177:21, 178:7, 179:9
**Laughter** [1] - 131:25
**launch** [1] - 55:21
**Laura** [2] - 103:20, 169:15
**LAURA** [1] - 5:10
**Law** [4] - 3:4, 3:7, 3:12, 13:23
**law** [9] - 18:17, 18:20, 70:7, 81:18, 102:7, 142:5, 142:7, 173:5, 184:1
**lawsuit** [2] - 168:8, 169:15
**lawyers** [1] - 86:21
**lay** [6] - 23:5, 38:8, 40:2, 63:11, 159:19, 221:21
**lays** [1] - 13:4
**lead** [3] - 148:6, 156:13, 221:18
**leaders** [1] - 168:14
**leadership** [1] - 135:8
**leading** [4] - 148:20, 149:3, 156:11, 223:16
**learn** [1] - 136:11
**least** [2] - 45:4, 224:23
**leave** [2] - 59:11, 132:11
**lectures** [1] - 165:22
**led** [5] - 182:11, 212:19, 214:18, 215:7, 223:18
**Lee** [1] - 3:12
**left** [6] - 21:16, 27:22, 71:1, 124:7, 128:2, 187:4
**left-hand** [3] - 71:1, 124:7, 128:2
**Legal** [1] - 13:23

**legal** [5] - 142:22, 209:10, 214:1, 216:9, 217:18
**legally** [2] - 143:23, 143:24
**legis** [1] - 203:2
**legislation** [3] - 52:15, 78:25, 79:6
**Legislation** [1] - 206:12
**legislature** [16] - 204:22, 206:2, 206:3, 206:8, 207:19, 207:23, 208:12, 208:18, 209:6, 210:9, 210:19, 211:20, 214:16, 215:5, 215:23, 216:5
**legislature's** [1] - 209:3
**legitimate** [1] - 108:8, 173:8
**length** [3] - 37:11, 38:1, 81:13
**Leon** [2] - 2:4, 2:14
**less** [5] - 95:11, 183:7, 183:15, 185:7, 187:13
**letter** [2] - 123:23, 130:11
**letterhead** [1] - 124:3
**level** [7] - 35:17, 46:10, 128:6, 146:1, 150:18, 181:13, 182:6
**Level** [1] - 198:22
**Levin** [1] - 2:10
**LEYIMU** [1] - 4:13
**license** [8] - 138:7, 138:8, 138:10, 138:24, 139:6, 140:3, 140:7, 140:10
**licensed** [2] - 173:18, 173:23
**life** [9] - 23:3, 54:19, 54:22, 54:23, 63:9, 64:4, 81:19, 88:13, 133:19
**lifelong** [1] - 133:18
**likelihood** [1] - 22:16
**likely** [3] - 41:21, 98:14, 115:3
**limit** [2] - 213:14, 216:19
**limitations** [1] - 214:11
**limited** [5] - 37:16, 98:24, 118:4, 118:5, 175:23

**limits** [3] - 214:1, 214:12, 219:8
**LINDA** [1] - 4:8
**line** [1] - 19:15
**linked** [1] - 177:13
**Lisa** [2] - 6:18, 229:3
**list** [24] - 36:3, 39:7, 69:3, 69:6, 69:7, 69:9, 69:11, 73:25, 74:4, 74:9, 74:14, 78:5, 84:1, 95:21, 143:15, 157:3, 157:8, 158:14, 158:15, 205:3, 205:23, 210:7, 210:15
**listed** [4] - 63:1, 159:2, 204:25, 205:13
**listing** [1] - 70:13
**lists** [1] - 60:11
**literally** [1] - 21:14
**literature** [23] - 14:15, 16:3, 19:13, 23:21, 24:13, 25:25, 28:1, 28:4, 28:10, 30:20, 30:21, 31:20, 33:9, 43:5, 43:9, 54:10, 66:14, 86:18, 89:10, 118:16, 119:4, 119:23, 120:1
**litigation** [2] - 65:4, 65:22
**live** [7] - 22:21, 24:3, 35:10, 102:2, 108:12, 109:6
**lived** [1] - 109:16
**lives** [1] - 136:20
**LLC** [1] - 2:4
**load** [1] - 42:23
**loads** [1] - 136:25
**local** [5] - 34:3, 35:9, 35:17, 82:24, 154:11
**located** [2] - 12:25, 88:9
**location** [1] - 77:20
**lodge** [3] - 55:15, 126:25, 149:7
**Logan** [2] - 6:5, 6:12
**long-term** [11] - 45:23, 47:2, 47:4, 61:13, 63:7, 89:16, 152:5, 161:3, 161:24, 167:14, 167:11, 187:18
**look** [48] - 17:10, 23:20, 24:22, 25:5, 28:15, 29:8, 29:18, 30:20, 40:12, 46:2, 58:6, 61:16, 66:5, 69:1, 70:20, 82:15, 83:17, 85:24, 86:18,

87:21, 88:8, 89:25, 90:2, 96:6, 101:4, 105:8, 105:20, 109:24, 111:11, 123:9, 123:11, 126:2, 129:22, 137:13, 153:18, 155:11, 155:13, 176:23, 182:22, 185:3, 195:18, 204:3, 206:10, 207:11, 210:15, 212:10, 215:1
**looked** [13] - 46:22, 61:13, 62:11, 68:11, 68:19, 68:23, 69:9, 70:12, 87:18, 90:14, 122:6, 130:11, 215:21
**looking** [24] - 11:12, 19:13, 27:4, 27:8, 27:24, 28:10, 28:11, 43:13, 47:8, 61:11, 61:24, 65:15, 88:3, 88:4, 88:8, 110:2, 112:6, 118:2, 127:12, 144:20, 144:21, 152:4, 185:1, 210:7
**looks** [1] - 109:12
**Looks** [1] - 115:9
**loss** [1] - 21:18
**lost** [1] - 183:11
**Loudin** [1] - 56:15
**love** [2] - 136:19, 200:11
**lower** [6] - 62:5, 62:10, 62:13, 62:14, 185:8, 187:14
**luck** [1] - 63:22
**lump** [1] - 222:25
**lunch** [3] - 114:19, 115:12, 116:13
**Lyn** [1] - 162:9

## M

**ma'am** [3] - 67:18, 174:8, 199:18
**Magazine** [1] - 3:7
**MAHADY** [1] - 6:4
**MAINIGI** [1] - 4:17
**maintained** [1] - 140:3
**MAJESTRO** [2] - 2:6, 131:23
**Majestro** [1] - 2:6
**major** [3] - 10:7, 62:20, 155:2
**majority** [3] - 33:18, 97:24, 146:9

**Maltreatment** [1] - 24:16
**maltreatment** [4] - 28:18, 29:4, 42:19, 44:5
**manage** [1] - 178:22
**management** [14] - 175:16, 175:23, 180:5, 180:6, 200:23, 201:2, 201:5, 201:8, 206:20, 207:2, 210:21, 211:25, 217:20, 219:24
**Management** [8] - 175:20, 202:17, 202:20, 205:20, 206:2, 206:16, 207:22, 208:17
**Management's** [1] - 204:22
**manager** [1] - 85:20
**mandate** [1] - 209:2
**mandated** [1] - 180:17
**manifest** [1] - 59:3
**manner** [2] - 126:5, 126:17
**manufacturers** [1] - 173:14
**map** [2] - 44:24, 195:17
**MARC** [6] - 71:7, 72:21, 73:15, 74:19, 75:11
**March** [2] - 13:25, 212:18
**march** [1] - 111:23
**mark** [1] - 123:13
**MARK** [1] - 3:14
**marked** [3] - 69:17, 94:5, 123:21
**market** [3] - 201:20, 201:21
**markets** [1] - 201:19
**Marshal** [1] - 199:11
**Marshall** [28] - 135:2, 135:3, 135:4, 135:10, 135:15, 135:17, 137:19, 137:20, 138:11, 161:21, 172:15, 194:5, 194:8, 195:2, 195:3, 195:10, 195:12, 195:13, 195:15, 195:19, 195:20, 195:23, 196:1, 196:8, 196:11, 199:5, 199:7
**Marshall's** [2] - 194:11, 195:6

**Mary's** [7] - 135:25, 136:2, 197:11, 197:22, 198:22, 199:22, 201:7
**Masters** [1] - 8:21
**match** [3] - 83:17, 89:9, 102:24
**material** [6] - 14:17, 38:24, 55:25, 56:21, 87:18, 127:18
**materialize** [1] - 58:16
**materials** [2] - 57:2, 57:5
**maternal** [1] - 97:17
**matter** [8] - 109:16, 114:19, 115:12, 144:23, 167:6, 178:1, 193:21, 229:5
**matters** [2] - 15:18, 149:2
**matured** [1] - 49:7
**maximize** [2] - 185:6, 187:12
**Mayor** [1] - 227:7
**MCCLURE** [1] - 6:3
**MCGINNESS** [1] - 4:2
**McGuire** [2] - 226:17, 227:11
**McKesson** [5] - 5:8, 86:10, 103:21, 123:13, 169:15
**McKesson's** [1] - 220:10
**mean** [14] - 21:18, 22:13, 26:13, 36:10, 63:23, 68:23, 81:11, 108:12, 116:8, 158:21, 178:17, 178:25, 180:12, 198:12
**meaning** [2] - 34:20, 35:21
**means** [6] - 27:5, 41:2, 81:10, 93:16, 99:23, 139:23
**meant** [2] - 37:4, 40:14
**measure** [3] - 62:4, 159:4, 177:4
**measured** [1] - 12:9
**measurement** [2] - 177:5, 177:7
**measures** [1] - 36:24
**mechanical** [2] - 6:19, 103:24
**mechanisms** [2] - 18:21, 96:18
**median** [4] - 44:2, 44:3, 45:3, 45:7
**Medicaid** [26] - 75:7,

75:8, 75:9, 97:21, 97:23, 98:3, 98:6, 98:11, 98:13, 98:15, 98:17, 98:24, 99:1, 99:3, 99:4, 99:5, 99:8, 99:14, 99:22, 100:2, 100:4, 100:17, 100:20, 102:4, 102:22, 102:23
**Medical** [15] - 134:8, 135:22, 135:25, 136:1, 136:2, 136:3, 138:3, 141:21, 145:11, 174:10, 193:21, 197:11, 197:22, 199:22, 201:7
**medical** [49] - 71:1, 71:3, 98:16, 98:21, 99:9, 100:6, 100:12, 100:15, 100:17, 137:10, 137:13, 137:14, 137:15, 137:19, 138:9, 140:5, 140:25, 148:24, 151:12, 151:18, 160:5, 166:18, 166:20, 172:9, 176:7, 177:22, 180:1, 181:8, 183:24, 184:1, 184:3, 184:6, 184:7, 184:9, 184:15, 184:21, 189:16, 189:17, 198:25, 201:11, 212:20, 214:20, 215:9, 216:9, 216:24, 217:5, 218:10, 218:13, 219:11
**medically** [3] - 159:2, 170:3, 170:8
**medication** [16] - 51:1, 53:22, 138:21, 152:6, 161:4, 171:22, 172:24, 174:16, 174:17, 176:2, 178:24, 213:11, 217:19, 218:6, 218:13
**medications** [10] - 50:12, 50:21, 138:21, 173:18, 178:10, 178:14, 182:12, 182:19, 210:10, 219:9
**medicine** [13] - 137:23, 138:1,

139:21, 139:25, 151:13, 151:21, 152:12, 158:18, 165:17, 174:10, 176:11, 176:13, 216:8
**Medicine** [10] - 50:24, 135:2, 135:4, 135:5, 135:18, 135:19, 138:14, 151:16, 175:5, 203:20
**meet** [9] - 36:8, 38:1, 39:24, 80:11, 100:15, 100:17, 114:9, 169:17, 179:10
**meeting** [3] - 212:11, 215:6, 224:19
**meetings** [5] - 72:13, 74:10, 166:5, 211:21, 211:24
**Meetings** [1] - 212:5
**member** [16] - 134:9, 134:17, 134:20, 135:20, 135:21, 136:14, 139:4, 141:2, 144:10, 152:23, 152:24, 154:22, 202:16, 203:16, 205:1, 224:11
**members** [7] - 140:21, 160:22, 167:7, 167:8, 167:9, 211:21, 224:17
**Membership** [1] - 205:1
**membership** [1] - 205:22
**memory** [1] - 58:6
**mental** [3] - 35:16, 36:4, 39:15
**Mental** [2] - 14:9, 29:15
**mention** [5] - 52:13, 112:22, 151:10, 190:4, 222:6
**mentioned** [22] - 14:12, 18:10, 19:11, 24:4, 27:4, 35:1, 41:15, 52:8, 60:11, 61:10, 78:17, 84:12, 101:23, 104:3, 107:3, 129:14, 130:3, 160:24, 165:12, 189:22, 223:10, 223:11
**mentor** [2] - 23:16, 90:1
**merely** [1] - 131:3

**merged** [1] - 197:17
**met** [5] - 103:21, 139:24, 153:15, 169:16, 169:22
**methamphetamine** [3] - 19:7, 19:9, 20:22
**method** [2] - 24:22, 43:13
**methodology** [2] - 27:23, 29:7
**MICHAEL** [2] - 2:12, 3:9
**middle** [4] - 88:11, 128:4, 136:22, 148:14
**midpoint** [1] - 57:15
**might** [14] - 28:23, 38:13, 39:2, 58:22, 66:11, 73:1, 85:15, 88:4, 103:13, 110:22, 115:9, 220:20, 227:16
**MILDRED** [1] - 3:3
**miles** [2] - 162:17, 198:12
**military** [2] - 11:20, 11:22
**million** [5] - 187:17, 188:17, 188:21, 189:1, 189:3
**mind** [5] - 34:12, 112:6, 148:5, 158:9, 214:4
**mine** [1] - 176:18
**minute** [10] - 37:14, 38:21, 103:11, 131:14, 131:15, 164:21, 182:24, 205:6, 215:2, 220:13
**minutes** [6] - 64:15, 164:21, 185:21, 185:24, 227:10, 227:15
**misrepresentations** [1] - 185:13
**misrepresented** [1] - 187:9
**miss** [1] - 54:19
**missed** [6] - 54:21, 156:22, 174:3, 181:7, 202:6, 217:10
**missing** [1] - 88:3
**Missions** [1] - 134:9
**misstates** [1] - 109:20
**mistaken** [1] - 73:13
**misunderstand** [1] - 181:20
**Mitchell** [1] - 2:10
**mixed** [1] - 136:5
**model** [3] - 71:16,

76:4, 76:6
**mom** [2] - 53:13, 59:22
**moment** [8] - 54:18, 64:7, 103:13, 112:6, 204:7, 215:21, 216:16, 218:20
**momentarily** [1] - 78:12
**moments** [3] - 27:23, 179:8, 181:12
**moms** [2] - 54:6, 163:12
**money** [14] - 36:17, 52:19, 92:12, 92:18, 94:19, 95:22, 96:8, 96:9, 96:23, 97:10, 109:4, 138:9, 140:15, 163:10
**monies** [1] - 96:14
**monitored** [2] - 52:11, 58:20
**monitoring** [2] - 11:12, 50:14
**monograph** [2] - 14:10, 15:10
**month** [2] - 193:11, 193:12
**monthly** [1] - 30:6
**months** [3] - 54:12, 91:17, 154:15
**morbidities** [1] - 157:4
**Morgantown** [1] - 205:16
**morning** [18] - 7:6, 7:7, 7:8, 7:22, 7:23, 8:1, 13:9, 64:24, 64:25, 103:20, 104:8, 105:6, 151:17, 226:16, 226:24, 227:12, 227:22, 228:3
**morphine** [4] - 183:8, 183:16, 185:8, 187:13
**Morris** [1] - 6:15
**mortalities** [1] - 157:5
**mortality** [1] - 158:3
**Most** [1] - 100:7
**most** [16] - 13:20, 19:8, 30:4, 65:24, 91:6, 93:8, 93:10, 93:14, 96:23, 122:21, 128:7, 133:19, 148:4, 168:13, 208:1, 222:25
**mother** [7] - 54:5, 71:6, 98:21, 157:10, 158:7, 161:12,

161:23
**mothers** [9] - 15:25, 97:18, 98:3, 98:10, 98:13, 98:14, 98:17, 157:8, 161:22
**motion** [1] - 117:18
**Motley** [11] - 4:3, 4:5, 4:8, 4:11, 4:14, 65:17, 65:18, 69:8, 70:7, 70:9
**motor** [4] - 46:4, 46:18, 82:5
**MOUGEY** [1] - 2:9
**move** [17] - 83:20, 85:15, 115:12, 117:2, 117:8, 118:7, 125:3, 130:25, 158:3, 160:6, 161:7, 168:1, 168:25, 177:2, 191:16, 191:22, 208:24
**moved** [1] - 164:21
**moving** [3] - 58:9, 162:1, 177:9
**MR** [121] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:14, 4:5, 4:22, 5:9, 5:10, 5:13, 6:4, 83:23, 87:12, 96:25, 108:4, 109:20, 117:16, 125:5, 125:15, 126:24, 127:16, 131:2, 131:12, 131:14, 131:18, 131:23, 132:16, 132:20, 133:6, 133:10, 133:13, 147:17, 147:23, 148:19, 148:22, 148:23, 149:4, 149:14, 150:20, 152:16, 154:6, 154:20, 156:10, 156:15, 156:19, 156:20, 159:18, 160:3, 160:18, 160:19, 164:5, 164:12, 164:19, 168:15, 168:18, 168:22, 169:1, 169:5, 181:15, 186:11, 186:17, 186:19, 186:20, 190:7, 190:11, 190:20, 191:15, 191:22, 202:4, 202:8, 204:5, 204:7, 204:9, 204:16, 204:17, 204:20, 205:8,

205:10, 205:11, 205:12, 208:6, 208:8, 208:24, 209:9, 209:11, 209:17, 209:19, 209:25, 210:1, 211:4, 211:6, 211:8, 211:9, 211:15, 211:18, 214:7, 214:13, 215:18, 215:20, 220:3, 220:6, 220:9, 220:25, 221:1, 221:5, 221:9, 221:14, 221:20, 222:1, 222:2, 222:15, 222:18, 224:1, 224:4, 226:1, 226:6, 226:12, 227:19, 228:5
**MS** [152] - 3:3, 3:6, 4:2, 4:8, 4:11, 4:13, 4:17, 4:18, 4:20, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 7:7, 7:9, 7:25, 8:12, 8:15, 10:1, 10:4, 13:11, 13:14, 13:15, 17:22, 18:2, 18:3, 18:4, 18:8, 18:9, 25:13, 25:16, 26:23, 27:1, 31:24, 32:3, 32:4, 32:11, 32:18, 32:22, 33:6, 33:7, 34:7, 34:10, 34:15, 37:13, 37:15, 37:22, 38:11, 38:15, 38:16, 38:22, 42:8, 42:13, 43:21, 43:23, 44:21, 44:23, 48:25, 49:2, 51:12, 51:15, 55:14, 55:24, 56:7, 56:14, 56:20, 57:13, 57:14, 57:17, 57:19, 64:7, 64:11, 64:21, 64:23, 69:18, 69:21, 75:24, 75:25, 83:20, 83:25, 84:2, 84:4, 87:13, 87:14, 94:2, 94:4, 97:3, 97:6, 103:9, 103:13, 103:16, 103:19, 104:16, 108:15, 110:4, 114:17, 114:25, 115:6, 115:18, 115:21, 115:23, 117:8, 117:13, 117:21, 117:22, 123:11, 123:16, 123:19, 125:1, 125:7, 125:11, 125:23, 126:1,

127:9, 127:23, 127:24, 130:25, 131:7, 132:2, 149:7, 159:8, 169:10, 169:14, 169:18, 169:21, 174:21, 174:25, 181:9, 181:10, 181:23, 185:19, 186:23, 186:24, 190:9, 190:14, 190:19, 190:22, 191:7, 191:19, 192:7, 194:15, 194:19, 196:17, 196:20, 202:1, 220:14, 221:11, 221:17, 223:16, 226:5
**Mt** [3] - 4:4, 4:12, 4:15
**Mullins** [2] - 124:12, 130:15
**multi** [2] - 24:22, 43:13
**multi-method** [2] - 24:22, 43:13
**multiple** [5] - 67:8, 135:3, 162:12, 162:13, 225:5
**multitude** [2] - 67:5, 67:7
**must** [4] - 29:13, 74:4, 80:12, 173:6

**N**

**Naloxone** [1] - 146:24
**name** [18] - 7:15, 8:2, 28:17, 43:9, 65:1, 72:18, 73:17, 73:18, 100:14, 103:20, 132:24, 132:25, 133:14, 133:16, 167:15, 169:13, 169:14, 204:25
**named** [1] - 62:7
**Nana** [1] - 53:5
**Nancy** [3] - 7:10, 7:16, 8:3
**NANCY** [1] - 7:19
**narcotics** [5] - 175:23, 176:1, 176:3, 178:15, 178:17
**narrow** [1] - 170:21
**NAS** [18] - 13:23, 52:17, 55:18, 57:23, 58:1, 58:12, 60:15, 62:21, 71:1, 71:2, 71:4, 97:17, 98:3, 98:10, 98:17, 104:24, 110:24,

162:2
**nation** [3] - 90:17, 90:21, 98:5
**national** [4] - 44:2, 44:3, 45:3, 188:23
**National** [3] - 8:25, 14:20, 28:21
**nationally** [1] - 93:8
**nature** [1] - 39:18
**navigators** [1] - 100:1
**NCMS** [1] - 75:9
**NDCANDS** [2] - 28:22
**nearly** [1] - 193:14
**necessarily** [2] - 58:25, 146:16
**necessary** [14] - 29:21, 30:17, 37:12, 138:25, 148:23, 180:25, 216:9, 216:24, 217:5, 217:18, 218:6, 218:10, 218:13, 219:11
**necessity** [2] - 100:16, 100:18
**need** [92] - 10:21, 11:24, 12:15, 22:15, 23:2, 24:9, 25:17, 27:16, 27:25, 34:16, 38:1, 38:8, 39:24, 40:24, 41:25, 47:9, 48:10, 48:14, 49:22, 50:12, 50:13, 50:18, 51:2, 51:4, 52:10, 54:9, 54:15, 54:24, 57:21, 59:7, 59:10, 59:11, 59:15, 59:16, 60:19, 60:23, 63:9, 66:2, 66:16, 74:12, 74:24, 75:3, 76:11, 78:2, 79:11, 79:23, 81:2, 81:3, 81:6, 81:9, 82:5, 82:12, 84:23, 84:25, 85:3, 85:24, 89:16, 93:18, 96:13, 99:11, 103:11, 106:20, 108:1, 108:22, 111:4, 111:6, 111:16, 112:11, 113:1, 113:10, 114:4, 114:10, 117:13, 117:23, 117:24, 128:8, 129:8, 142:19, 149:3, 151:1, 157:1, 157:14, 157:23, 161:8, 166:7, 176:20, 181:4, 181:18, 192:1,

198:25
**needed** [17] - 26:9, 27:16, 36:22, 63:20, 71:17, 81:14, 82:16, 83:15, 88:20, 90:15, 102:2, 107:13, 109:25, 128:7, 128:18, 147:3, 147:6
**Needless** [1] - 70:10
**Needs** [6] - 153:1, 153:5, 155:21, 189:22, 189:25, 190:3
**needs** [54] - 23:23, 24:9, 27:21, 35:13, 36:8, 39:15, 39:20, 40:5, 47:24, 48:20, 50:3, 54:11, 54:13, 55:3, 66:4, 79:19, 80:8, 80:11, 80:21, 92:22, 106:9, 112:10, 120:4, 120:9, 129:11, 141:13, 141:14, 141:19, 142:4, 142:15, 143:20, 143:25, 145:2, 145:13, 146:2, 146:8, 146:9, 147:1, 149:16, 150:21, 151:4, 152:21, 153:6, 153:17, 154:25, 156:25, 167:12, 167:14, 168:1, 202:14, 207:3, 218:22, 219:12
**negative** [2] - 45:22, 58:11
**neglect** [2] - 24:17, 24:18
**Neglect** [1] - 28:21
**Neonatal** [8] - 14:2, 27:10, 27:11, 55:3, 57:4, 57:16, 58:2, 162:3
**neonatal** [2] - 55:8, 56:10
**net** [1] - 182:18
**neurodevelopment** [3] - 59:13, 59:14, 63:6
**neurodevelopmental** [2] - 46:17, 48:17
**neuropsychiatric** [1] - 62:13
**never** [3] - 91:24, 161:10, 188:6
**New** [2] - 3:5, 3:8
**new** [10] - 11:19,

53:13, 86:4, 130:1, 139:7, 162:4, 163:7, 163:8, 168:1
**newborn** [3] - 53:6, 59:20, 60:2
**news** [1] - 169:5
**next** [16] - 19:3, 42:1, 59:23, 103:8, 132:17, 132:19, 141:24, 145:13, 163:23, 163:24, 196:18, 207:12, 209:21, 215:16, 217:8, 227:10
**nice** [1] - 169:17
**NICHOLAS** [1] - 6:11
**Ninth** [1] - 4:9
**Noah** [1] - 67:13
**nobody** [1] - 158:16
**non** [4] - 9:4, 62:12, 178:14, 178:15
**non-exposed** [1] - 62:12
**non-narcotics** [1] - 178:15
**non-profit** [1] - 9:4
**non-steroidal** [1] - 178:14
**none** [3] - 117:4, 118:3, 118:5
**nonprofit** [2] - 76:19, 76:23
**noon** [4] - 186:15, 186:18, 186:19, 226:25
**norm** [1] - 36:4
**normal** [2] - 49:11, 54:22
**northeast** [1] - 45:6
**not-for-profit** [1] - 76:19
**note** [4] - 49:18, 55:24, 129:8, 214:7
**nothing** [2] - 64:11, 127:19
**noticed** [2] - 155:16, 155:17
**November** [1] - 11:14
**NOWS** [2] - 104:24, 110:23
**nuance** [1] - 144:2
**nuisance** [1] - 114:21
**number** [71] - 13:19, 18:20, 19:2, 28:6, 28:22, 28:23, 28:25, 34:17, 42:15, 42:21, 45:19, 47:5, 51:17, 51:20, 51:21, 52:2, 67:8, 67:22, 72:24, 73:21, 73:23, 75:15,

78:1, 78:11, 78:12, 82:20, 87:6, 91:3, 91:9, 98:5, 98:11, 101:2, 101:12, 101:15, 107:25, 108:2, 110:20, 111:19, 111:24, 112:12, 112:17, 112:20, 113:4, 113:16, 113:20, 113:25, 114:6, 114:7, 114:11, 118:19, 118:23, 139:9, 139:10, 159:11, 167:19, 168:4, 188:12, 188:24, 191:9, 199:17, 200:3, 200:4, 200:21, 201:16, 203:3, 205:9, 210:8, 211:21
**Number** [1] - 210:15
**numbers** [29] - 15:22, 19:10, 28:9, 28:10, 28:19, 29:5, 33:18, 72:6, 101:22, 110:2, 112:8, 112:25, 113:7, 118:10, 118:14, 121:12, 124:7, 127:17, 128:1, 163:7, 165:3, 165:12, 165:13, 166:6, 166:10, 167:21, 188:19, 188:20, 198:3
**numerous** [1] - 194:8
**nursing** [2] - 138:20, 138:21
**NW** [6] - 4:6, 4:9, 4:19, 4:21, 5:5, 5:12
**NY** [1] - 3:5

**O**

**O'Connell** [2] - 162:9, 162:10
**oath** [2] - 7:13, 168:12
**obesity** [1] - 153:9
**object** [9] - 32:11, 148:20, 164:5, 168:22, 200:2, 209:10, 220:17, 220:22, 221:11
**objected** [1] - 160:4
**objectify** [4] - 177:4, 178:2, 178:5, 182:14
**objectifying** [1] - 178:16
**objection** [31] - 18:1, 18:2, 18:3, 18:4,

31:24, 37:13, 38:12, 38:22, 39:2, 55:15, 55:21, 83:22, 83:23, 125:5, 126:25, 131:2, 149:8, 149:12, 156:10, 160:12, 160:16, 164:14, 168:15, 168:24, 204:15, 209:8, 211:6, 220:23, 223:16, 224:3
**Objection** [4] - 96:25, 97:1, 108:4, 109:20
**objections** [1] - 57:8
**objective** [3] - 177:3, 177:10, 178:6
**Objectives** [1] - 175:12
**objectives** [1] - 175:14
**OBs** [1] - 53:9
**observation** [3] - 154:22, 159:21, 225:5
**observations** [2] - 164:11, 164:12
**observe** [2] - 11:6, 149:16
**observed** [1] - 119:24
**obstetrician** [2] - 73:15, 74:10
**Obstetrics** [1] - 50:23
**obstructive** [4] - 143:14, 145:7, 147:13, 148:1
**obtain** [1] - 158:19
**obtained** [1] - 39:9
**obtaining** [3] - 212:20, 214:19, 215:9
**obvious** [1] - 81:23
**obviously** [4] - 19:25, 21:22, 90:22, 181:2
**Obviously** [1] - 203:21
**occupation** [1] - 9:2
**occupied** [1] - 145:17
**occurred** [4] - 128:25, 158:1, 165:1, 214:5
**occurs** [2] - 80:3, 158:6
**October** [1] - 124:1
**odyssey** [4] - 184:3, 184:4, 184:12, 184:17
**Odyssey** [2] - 175:5, 175:20
**OF** [2] - 1:1, 1:4
**offer** [7] - 26:17, 87:24, 88:12, 116:5, 129:19, 149:9, 221:19

**Offer** [1] - 210:18
**offered** [6] - 32:13, 72:25, 78:13, 78:15, 87:22, 90:5
**offering** [5] - 75:10, 101:11, 104:12, 110:6, 164:16
**offers** [3] - 79:15, 100:5, 100:12
**office** [2] - 35:12, 213:18
**Office** [2] - 93:20, 94:7
**officer** [2] - 15:7, 19:11
**offices** [2] - 13:1, 35:22
**Official** [2] - 229:2, 229:3
**offspring** [1] - 157:9
**often** [5] - 12:10, 47:21, 143:24, 144:6
**Ohio** [3] - 13:1, 107:21, 109:10
**OIG** [1] - 94:14
**old** [3] - 79:20, 133:19, 184:7
**older** [2] - 27:13, 49:8
**olds** [1] - 80:2
**on"** [1] - 25:12
**Ona** [1] - 133:17
**once** [7] - 11:22, 112:3, 130:25, 148:10, 223:2, 224:2, 224:22
**Once** [1] - 224:5
**One** [7] - 5:11, 68:5, 68:6, 100:24, 213:14, 225:16
**one** [72] - 8:23, 10:10, 10:22, 11:3, 18:22, 19:24, 20:18, 21:24, 23:25, 25:3, 25:21, 34:11, 40:24, 40:25, 47:5, 49:5, 52:7, 62:14, 64:7, 70:20, 70:23, 73:22, 75:7, 79:14, 80:24, 84:11, 85:7, 86:11, 87:9, 87:13, 93:12, 93:13, 103:13, 105:17, 113:16, 115:5, 121:12, 138:2, 143:25, 145:15, 155:14, 158:1, 159:5, 161:19, 164:7, 164:23, 165:24, 165:25, 166:3, 167:20, 167:21, 168:13, 169:2, 175:9,

175:14, 182:22, 182:24, 191:12, 192:16, 197:16, 205:3, 206:23, 207:8, 210:25, 217:7, 217:22, 217:23, 218:8, 218:21, 225:2, 225:11
**one-year** [1] - 93:12
**ones** [2] - 10:8, 13:19
**ongoing** [1] - 19:24
**operate** [2] - 37:2, 89:23, 90:16
**operated** [1] - 35:17
**operating** [7] - 71:10, 71:12, 82:24, 86:7, 86:14, 89:3, 129:18
**opiate** [3] - 222:20, 223:4, 224:6
**Opiate** [1] - 222:21
**opine** [1] - 26:9
**opining** [1] - 120:9
**opinion** [42] - 22:6, 22:10, 25:8, 26:17, 29:21, 31:25, 32:13, 32:15, 33:1, 33:25, 37:23, 38:10, 40:5, 47:24, 50:2, 50:7, 53:17, 55:2, 57:20, 59:7, 63:11, 81:5, 84:20, 114:5, 119:9, 122:16, 129:10, 129:15, 129:19, 159:14, 159:19, 160:15, 164:6, 164:16, 164:17, 176:6, 176:18, 177:1, 183:19, 191:4, 217:22
**opinions** [22] - 32:12, 37:16, 43:4, 51:7, 55:22, 63:15, 65:9, 72:1, 75:10, 104:12, 104:13, 105:9, 110:6, 111:19, 120:20, 121:1, 122:25, 127:15, 159:12, 160:13, 164:7, 170:15
**opioid** [77] - 21:2, 22:6, 23:4, 27:9, 32:20, 40:3, 40:6, 41:5, 46:12, 47:17, 50:13, 52:16, 52:23, 55:3, 59:7, 66:17, 91:11, 92:1, 92:4, 92:7, 93:5, 93:20, 94:9, 104:24, 104:25, 106:17,

106:19, 110:10, 111:25, 113:22, 114:2, 114:3, 116:18, 124:23, 126:5, 126:17, 127:4, 128:24, 145:21, 146:10, 148:11, 155:19, 155:22, 156:3, 157:6, 158:3, 162:14, 165:22, 170:1, 170:6, 171:16, 171:22, 172:3, 176:2, 190:4, 193:17, 194:9, 194:12, 195:2, 202:14, 213:1, 213:10, 213:15, 218:13, 219:9, 222:19, 222:20, 223:5, 224:6, 224:9, 224:23, 224:24, 225:9, 225:13
**Opioid** [19] - 14:11, 17:11, 20:20, 22:3, 27:11, 27:18, 34:20, 48:14, 50:2, 50:3, 52:3, 53:13, 53:19, 145:8, 145:21, 213:5, 214:8, 217:4, 218:4
**opioid-related** [4] - 32:20, 148:11, 193:17, 194:9
**Opioids** [1] - 68:14
**opioids** [63] - 15:5, 15:8, 15:13, 15:16, 15:18, 17:24, 18:6, 19:13, 19:23, 26:1, 31:5, 31:7, 31:11, 31:16, 31:22, 32:9, 33:12, 33:16, 33:19, 33:23, 34:21, 35:2, 40:14, 55:2, 57:21, 58:11, 59:3, 61:5, 62:2, 63:12, 66:22, 66:24, 67:2, 68:13, 68:15, 68:17, 98:14, 116:6, 116:22, 116:25, 117:5, 117:25, 118:4, 118:6, 118:21, 171:1, 171:2, 171:9, 171:10, 173:13, 173:22, 176:4, 192:17, 203:25, 213:21, 214:2, 216:17, 218:10, 222:6, 222:11, 222:22, 222:24, 223:10

**opportunities** [1] - 79:21
**opportunity** [5] - 11:25, 54:4, 54:21, 177:18, 192:10
**oppose** [1] - 117:17
**options** [4] - 99:21, 100:13, 126:8, 129:25
**order** [11] - 51:4, 59:16, 60:1, 80:10, 117:2, 150:2, 152:13, 153:13, 163:1, 174:16, 187:12
**organization** [7] - 9:4, 76:16, 77:5, 134:17, 152:2, 152:3, 161:21
**organizations** [13] - 12:22, 76:23, 134:8, 134:9, 142:17, 142:18, 155:17, 162:12, 162:13, 163:8, 167:10, 178:1, 179:9
**originally** [1] - 52:15
**originated** [1] - 11:11
**Orleans** [1] - 3:8
**orphans** [2] - 21:13, 21:14
**Orthopedic** [1] - 199:2
**orthopedic** [1] - 199:2
**OUD** [17] - 51:18, 94:19, 94:25, 95:23, 104:23, 105:17, 106:4, 106:12, 107:6, 107:9, 107:16, 107:25, 108:21, 116:15, 116:17, 116:22, 117:1
**ought** [1] - 185:18
**ourself** [1] - 225:18
**out-of-home** [5] - 18:21, 19:3, 20:5, 22:19, 29:3
**outbreak** [2] - 150:5, 150:14
**outcome** [5] - 36:24, 53:24, 158:8, 160:25, 161:16
**Outcomes** [1] - 101:18
**outcomes** [17] - 12:9, 25:25, 36:2, 45:22, 46:8, 47:14, 47:16, 54:1, 58:11, 61:9, 61:13, 61:15, 61:23, 62:2, 62:17, 62:21, 157:8

**outlines** [1] - 207:13
**outpatient** [1] - 179:6
**outside** [12] - 33:1, 56:5, 56:8, 127:4, 127:5, 136:16, 159:14, 170:10, 199:16, 201:12, 201:24, 219:18
**overall** [2] - 20:3, 33:17
**overdose** [21] - 24:23, 41:17, 43:5, 43:13, 44:1, 44:3, 44:10, 44:12, 45:2, 45:6, 50:22, 53:10, 53:11, 53:15, 91:20, 145:9, 146:20, 158:7, 170:25, 171:8, 222:10
**overdosed** [1] - 157:14
**overdoses** [4] - 21:12, 130:22, 159:6, 163:14
**overflow** [1] - 157:13
**overhauled** [1] - 128:24
**overnights** [1] - 85:17
**overrule** [4] - 39:1, 149:11, 160:12, 164:14
**overruled** [4] - 33:3, 37:19, 160:16, 164:18
**Overruled** [3] - 97:5, 108:8, 109:22
**overruling** [1] - 220:22
**oversee** [1] - 138:20
**oversees** [1] - 139:11
**oversight** [1] - 193:7
**overtime** [1] - 140:14
**overtook** [1] - 153:22
**Overview** [1] - 206:11
**overview** [2] - 209:22, 218:19
**overwhelming** [1] - 19:16
**overwhelmingly** [1] - 33:16
**own** [14] - 21:23, 22:1, 22:17, 24:12, 36:21, 41:21, 48:15, 50:18, 142:20, 167:9, 167:13, 188:6, 199:7
**oxycodone** [3] - 188:13, 188:17, 188:22
**OxyContin** [4] - 183:7, 183:8, 183:15, 185:5
**OxyContin-2007** [1] -

183:3

# P

**P-1200** [1] - 2:7
**P-42246** [1] - 70:4
**p.m** [4] - 115:15, 186:1, 226:15, 228:7
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**package** [1] - 98:24, 99:7, 99:24
**packages** [1] - 40:23
**page** [19] - 34:13, 34:16, 88:4, 94:13, 101:6, 112:14, 125:17, 131:3, 182:22, 185:2, 209:20, 209:21, 212:10, 215:14, 215:16, 217:17, 218:18, 222:17
**Page** [35] - 87:15, 88:8, 88:10, 95:10, 96:6, 101:7, 105:24, 124:6, 124:9, 124:16, 126:3, 127:25, 128:21, 129:23, 175:11, 179:14, 182:22, 182:23, 183:1, 183:2, 185:1, 206:10, 208:6, 209:13, 210:6, 211:11, 212:5, 212:12, 215:13, 217:11, 217:12, 222:15, 222:16, 223:1, 223:13
**pages** [1] - 95:10
**paid** [8] - 17:15, 17:17, 89:19, 91:14, 98:7, 98:19, 100:3, 102:15
**Pain** [12] - 175:6, 175:20, 179:20, 202:17, 202:19, 203:20, 204:21, 205:20, 206:2, 206:16, 207:22, 208:16
**pain** [73] - 175:15, 175:23, 176:5, 176:15, 176:20, 176:22, 176:23, 176:24, 176:25, 177:3, 177:4, 177:6, 177:7, 177:13, 177:23, 178:2, 178:4, 178:9, 178:10, 178:13,

178:16, 178:17, 178:18, 178:24, 179:11, 179:20, 179:24, 179:25, 180:5, 180:6, 180:10, 180:18, 181:11, 181:13, 181:25, 182:5, 182:6, 182:9, 182:11, 182:12, 182:14, 182:16, 182:19, 200:23, 201:2, 201:5, 201:7, 203:8, 206:20, 207:2, 210:10, 210:22, 211:25, 212:19, 212:21, 213:11, 214:18, 214:20, 215:8, 216:10, 216:25, 217:6, 218:7, 219:3, 219:9, 219:17, 219:24, 220:2
**Pallone** [1] - 123:23
**pandemic** [2] - 126:22, 130:22
**panel** [2] - 166:1, 202:20
**Papantonio** [1] - 2:10
**paper** [3] - 88:18, 209:23, 210:4
**paragraph** [11] - 88:3, 88:11, 126:3, 126:14, 128:4, 128:12, 128:22, 129:23, 208:1, 212:11, 218:19
**parallel** [1] - 107:2
**parameters** [1] - 227:9
**parcel** [1] - 154:19
**parent** [17] - 21:9, 21:16, 23:1, 23:16, 35:24, 41:17, 43:3, 48:13, 51:5, 67:20, 67:21, 68:6, 80:7, 85:16, 85:18, 102:6
**parental** [6] - 40:3, 40:6, 41:5, 45:24, 104:25, 111:24
**parented** [2] - 21:3, 21:4
**parentified** [1] - 24:6
**Parenting** [1] - 14:11
**parenting** [3] - 21:1, 35:16, 88:1
**parents** [33] - 9:9, 20:17, 21:15, 22:18, 22:22, 24:2, 24:9, 26:11, 27:17, 27:18, 36:16, 40:14, 40:24,

41:17, 47:25, 49:23, 59:15, 68:12, 80:10, 80:20, 82:11, 82:14, 84:23, 84:25, 85:1, 113:22, 114:1, 116:6, 143:19
**parents'** [4] - 11:23, 23:4, 33:14, 114:3
**parse** [1] - 202:23
**parsing** [1] - 203:21
**part** [40] - 32:21, 38:20, 39:6, 40:7, 48:1, 49:11, 50:4, 53:9, 55:4, 56:3, 56:4, 57:5, 65:17, 65:24, 83:10, 97:1, 110:6, 122:16, 154:18, 155:6, 170:20, 174:3, 192:23, 195:3, 195:19, 196:6, 202:23, 207:11, 208:1, 210:6, 210:12, 214:22, 217:19, 218:15, 219:5, 219:21, 222:24, 225:17
**participant** [1] - 89:23
**participate** [3] - 28:20, 80:13, 143:2
**participated** [2] - 195:21, 195:22
**particular** [22] - 10:9, 15:5, 20:24, 24:23, 26:15, 28:12, 29:4, 32:7, 82:4, 87:9, 90:23, 93:14, 98:2, 107:19, 139:4, 141:9, 148:24, 149:10, 166:15, 219:8, 221:10, 223:1
**particularly** [5] - 47:6, 53:12, 88:22, 117:6, 141:16
**partner** [1] - 158:7
**partners** [1] - 150:25
**partnership** [4] - 10:10, 10:19, 36:13, 121:11
**parts** [2] - 141:23, 159:2
**party** [1] - 199:21
**pass** [1] - 35:20
**pass-throughs** [1] - 35:20
**passage** [2] - 206:4, 206:14
**passed** [3] - 18:16, 35:22, 96:14
**past** [5] - 23:3, 23:7,

140:10, 158:5, 172:8
**path** [2] - 33:17, 49:16
**Pathway** [1] - 163:4
**pathway** [2] - 163:6, 194:25
**patience** [1] - 105:13
**patient** [7] - 172:24, 174:16, 174:18, 207:3, 213:18, 213:20, 218:22
**patient/practitioner** [1] - 216:6
**patients** [31] - 107:19, 150:2, 152:4, 154:10, 157:13, 157:16, 158:14, 158:15, 180:10, 180:17, 181:12, 181:13, 182:5, 182:18, 188:3, 201:23, 202:15, 212:19, 214:19, 215:8, 215:10, 216:10, 216:24, 217:6, 217:19, 218:6, 218:9, 218:12, 219:2, 219:10, 219:13
**patterns** [1] - 67:8
**PAUL** [2] - 2:3, 5:9
**Pause** [7] - 64:10, 103:15, 105:12, 131:16, 169:4, 204:8, 221:8
**pause** [2] - 103:13, 163:15
**pay** [5] - 37:8, 84:9, 98:1, 102:25, 140:12
**payers** [1] - 75:7
**Payment** [1] - 187:17
**pays** [1] - 97:24
**PEARL** [1] - 3:6
**pediatricians** [5] - 58:14, 58:15, 59:6, 60:21, 63:5
**Pediatrics** [5] - 25:24, 33:23, 34:1, 46:2, 59:6
**peer** [7] - 87:24, 88:6, 88:9, 88:13, 90:1, 99:14, 100:1
**Peer** [1] - 88:19
**peers** [1] - 139:24
**Pensacola** [1] - 2:11
**people** [41] - 16:4, 16:11, 21:22, 30:6, 30:9, 30:14, 35:10, 35:12, 60:22, 66:1, 66:9, 66:15, 67:9, 72:6, 81:17, 82:24,

83:3, 83:7, 89:4, 89:14, 91:5, 100:4, 111:4, 138:19, 143:10, 143:11, 147:13, 157:1, 159:5, 162:25, 166:2, 166:4, 166:6, 166:12, 167:18, 180:12, 184:16, 198:24, 201:11, 212:3
**people's** [1] - 136:20
**per** [5] - 58:1, 85:12, 85:14, 89:23, 209:2
**percent** [22] - 20:4, 20:11, 20:16, 33:14, 34:25, 35:1, 42:25, 43:2, 44:3, 44:6, 50:17, 52:9, 95:21, 96:9, 96:10, 96:11, 98:2, 98:7, 98:10, 102:24, 107:3
**percentage** [7] - 20:2, 102:18, 143:10, 143:11, 170:25, 171:8, 171:11
**perfectly** [1] - 57:5
**perform** [1] - 143:25
**performed** [3] - 142:8, 144:6, 199:2
**perhaps** [3] - 162:25, 163:5, 180:15
**Perhaps** [1] - 112:22
**period** [22] - 19:19, 34:19, 42:22, 42:25, 49:13, 53:16, 54:17, 57:24, 59:12, 60:2, 62:3, 74:5, 93:15, 95:13, 95:17, 99:3, 106:8, 138:6, 138:7, 146:7, 178:7, 188:13
**permanency** [2] - 76:12, 77:15
**permanent** [1] - 76:13
**permission** [1] - 57:18
**person** [8] - 81:20, 139:10, 141:1, 142:12, 143:4, 158:17, 162:22, 167:12
**personal** [24] - 131:3, 139:9, 146:13, 146:14, 151:6, 152:17, 152:19, 152:23, 152:24, 154:21, 159:14, 159:22, 160:8, 160:11, 160:14, 160:23, 161:2, 162:6, 164:10,

164:12, 170:14,
177:1, 225:4
**personally** [3] - 17:15,
193:13, 194:11
**persons** [2] - 11:19,
113:7
**perspective** [1] -
121:3
**pertaining** [1] - 172:19
**PETER** [1] - 2:9
**petition** [1] - 43:2
**Ph.D** [1] - 8:23
**pharmaceutical** [2] -
173:11, 173:16
**pharmaceuticals** [1] -
206:21
**pharmacies** [4] -
140:15, 172:11,
172:12, 173:18
**pharmacist** [13] -
138:12, 138:13,
138:16, 138:23,
138:25, 139:2,
139:10, 167:5,
171:13, 171:18,
171:25, 172:8,
172:23
**pharmacists** [4] -
173:2, 173:6,
217:15, 218:4
**pharmacology** [1] -
139:18
**Pharmacy** [8] - 135:6,
135:10, 135:15,
135:21, 136:8,
136:18, 138:18,
172:16
**pharmacy** [20] - 136:6,
136:9, 136:10,
136:12, 136:13,
136:18, 136:24,
137:5, 137:6, 137:7,
137:8, 137:10,
138:7, 138:8,
138:10, 138:19,
140:7, 172:15,
173:23, 213:23
**phase** [2] - 85:16, 93:1
**phases** [1] - 85:15
**Philadelphia** [2] - 6:6,
6:13
**phone** [1] - 161:3
**phonetic** [1] - 136:18
**phonetic)** [1] - 153:3
**physician** [1] - 139:4,
141:2, 152:12,
157:3, 159:15,
167:4, 171:24,
172:23, 176:13,
176:24, 189:12,

200:9, 213:22
**physicians** [20] -
157:4, 176:18,
176:19, 178:20,
178:23, 178:25,
179:3, 182:14,
189:19, 189:20,
199:25, 200:11,
200:20, 202:24,
202:25, 203:4,
207:4, 216:9,
218:23, 219:1
**pick** [5] - 132:13,
137:23, 146:22,
187:4, 198:1
**picked** [1] - 20:25
**picking** [1] - 170:23
**picture** [2] - 184:11,
184:14
**pictures** [2] - 184:5,
184:8
**piece** [3] - 22:4, 26:2,
43:7
**pieces** [1] - 159:16
**PIFKO** [1] - 3:14
**pill** [1] - 171:16
**pills** [1] - 172:3
**place** [3] - 12:15,
20:2, 45:1, 52:12,
52:25, 61:1, 75:19,
85:3, 86:13, 96:18,
114:16, 163:17,
168:2
**placed** [10] - 12:19,
20:4, 20:16, 22:18,
29:3, 41:19, 70:3,
102:5, 158:20, 214:1
**placement** [2] - 21:5,
79:2
**placements** [4] - 20:3,
20:19, 45:9, 45:11
**places** [1] - 165:23
**PLAINTIFF** [2] - 7:19,
133:3
**Plaintiff** [5] - 1:5, 1:11,
2:2, 3:2, 4:1
**plaintiffs** [9] - 7:10,
56:17, 77:21, 104:2,
116:4, 159:10,
164:8, 186:12,
186:15
**Plaintiffs** [1] - 229:6
**Plaintiffs'** [4] - 69:17,
78:12, 82:18, 83:21
**plaintiffs'** [2] - 56:3,
192:25
**plan** [12] - 12:15, 40:7,
48:2, 50:4, 52:25,
53:3, 55:4, 115:2,
115:6, 168:1, 227:4,

227:6
**Plan** [11] - 52:14,
52:21, 91:17,
164:24, 165:11,
166:9, 167:7,
167:12, 168:6,
185:6, 187:12
**planning** [1] - 77:22
**Planning** [2] - 24:21,
43:11
**Plans** [1] - 53:7
**plans** [1] - 79:7
**play** [1] - 173:12
**plays** [1] - 85:4
**Pleasant** [3] - 4:4,
4:12, 4:15
**Pliver's** [1] - 136:18
**point** [23] - 19:2,
25:21, 32:24, 70:17,
119:10, 126:24,
136:21, 149:3,
149:5, 157:20,
160:3, 160:4,
160:15, 164:22,
184:18, 185:17,
191:24, 216:2,
217:13, 220:22,
222:16, 223:3
**points** [1] - 174:9
**Police** [1] - 226:14
**policies** [1] - 10:18
**Policy** [3] - 8:23,
78:23, 79:4
**policy** [4] - 9:8, 9:10,
100:6, 119:18
**Ponc** [1] - 2:4
**Ponce** [1] - 2:14
**pool** [1] - 201:10
**poor** [1] - 62:14
**popped** [1] - 45:3
**populated** [1] - 163:7
**population** [73] - 20:8,
21:23, 23:22, 23:23,
26:13, 26:15, 27:12,
27:25, 30:22, 39:10,
40:16, 47:8, 50:1,
50:22, 52:4, 60:17,
74:6, 75:8, 86:13,
87:25, 99:3, 99:4,
100:15, 103:25,
104:6, 105:17,
106:3, 106:9,
106:12, 106:25,
107:6, 107:15,
107:22, 108:6,
108:18, 108:21,
108:9, 109:17,
109:21, 110:5,
110:9, 110:10,
110:20, 110:23,

111:2, 111:3, 111:6,
111:10, 111:12,
111:16, 111:19,
111:24, 112:10,
112:12, 112:13,
112:19, 112:24,
113:4, 113:13,
113:16, 113:20,
113:25, 114:7,
152:14, 157:18,
219:13, 219:16,
219:19, 219:20,
220:2
**populations** [31] -
26:16, 26:21, 27:3,
66:1, 66:4, 66:8,
66:15, 66:20, 70:23,
73:22, 88:24, 89:7,
91:4, 104:18,
104:22, 105:5,
105:8, 116:2,
116:13, 117:4,
118:1, 118:2, 118:8,
118:11, 119:3,
119:8, 119:10,
119:13, 121:9,
121:17, 121:25
**portion** [4] - 31:21,
32:7, 102:3, 102:25
**position** [1] - 135:9
**positions** [8] - 133:21,
133:22, 133:24,
133:25, 134:1,
135:1, 135:3, 135:8
**positive** [2] - 126:6,
128:25
**possibility** [1] -
213:17
**possible** [2] - 129:1,
161:2
**postpartum** [2] -
53:16, 99:3
**potential** [1] - 210:9
**potentially** [1] - 143:6
**Powell** [1] - 2:6
**PowerPoint** [4] -
175:5, 179:13,
187:1, 189:7
**PR** [2] - 2:5, 2:14
**Practice** [1] - 14:7
**practice** [33] - 10:18,
28:13, 74:22, 95:5,
138:11, 140:8,
144:4, 151:11,
151:12, 151:16,
152:8, 152:9,
152:10, 152:11,
152:12, 152:17,
152:19, 158:13,
160:25, 166:16,

166:17, 170:3,
170:8, 172:14,
174:1, 174:5,
174:10, 179:1,
200:23, 201:2,
214:4, 216:8
**practices** [1] - 142:1
**practicing** [5] - 140:4,
152:18, 157:3,
176:10, 176:13
**Pre** [1] - 79:16
**pre** [1] - 80:9
**Pre-K** [1] - 79:16
**pre-school** [1] - 80:9
**precise** [1] - 117:10
**predictive** [1] - 58:25
**predominant** [3] -
145:16, 146:17,
153:18
**predominant-type** [1]
- 153:18
**pregnancy** [11] - 27:6,
34:25, 35:3, 50:13,
51:1, 52:10, 52:11,
71:6, 106:20, 107:4,
162:2
**pregnant** [47] - 11:16,
15:2, 22:7, 22:11,
27:6, 34:19, 34:24,
36:9, 50:1, 50:3,
50:12, 50:20, 50:25,
51:8, 52:16, 52:24,
53:8, 53:18, 63:12,
70:21, 71:17, 71:20,
72:10, 73:22, 74:7,
75:7, 88:1, 97:18,
99:5, 99:11, 105:17,
106:3, 106:8,
106:12, 107:3,
107:6, 107:9,
107:25, 108:2,
108:21, 116:14,
116:21, 117:1,
118:19, 157:8,
157:10, 161:22
**Pregnant** [2] - 14:11,
104:23
**preliminary** [1] - 149:2
**prenatal** [12] - 10:16,
27:9, 46:12, 47:16,
48:17, 50:14, 53:23,
55:3, 62:3, 82:1,
104:23, 110:10
**prenatally** [9] - 26:1,
27:13, 47:1, 55:1,
57:22, 58:12, 59:3,
61:6, 83:13
**prepare** [13] - 8:4,
9:21, 13:4, 25:7,
26:20, 42:2, 43:16,

44:16, 48:19, 51:6,
55:10, 65:4, 70:10
**prepared** [7] - 32:23,
87:4, 187:21,
187:23, 195:5,
195:9, 226:18
**preparing** [4] - 23:9,
24:14, 38:17, 44:11
**preschool** [2] - 39:22,
54:17
**prescribe** [1] - 139:5
**prescribed** [3] -
171:17, 171:24,
172:24
**prescriber** [1] - 171:24
**prescribers** [2] -
185:13, 187:9
**prescribing** [13] -
172:23, 178:24,
179:4, 179:5,
182:11, 182:19,
188:7, 213:1,
213:10, 214:2,
214:12, 216:17,
219:8
**prescription** [26] -
35:2, 52:9, 107:4,
116:18, 116:22,
116:23, 116:25,
117:4, 117:25,
118:4, 118:5, 171:2,
171:10, 171:22,
172:2, 172:4, 173:8,
173:13, 173:17,
173:22, 176:2,
176:4, 203:25,
216:19, 218:9,
218:12
**prescriptions** [9] -
98:14, 170:2, 170:6,
178:10, 188:12,
188:17, 188:21,
189:3, 213:15
**present** [6] - 14:3,
104:9, 135:20,
168:8, 189:14, 227:4
**presentation** [18] -
175:8, 175:19,
179:14, 180:24,
182:21, 182:23,
183:6, 183:14,
183:22, 187:1,
187:21, 187:23,
187:24, 188:10,
188:16, 189:8,
189:11
**presentations** [2] -
13:5, 13:17
**presented** [8] - 13:20,
13:24, 106:21,

114:5, 118:3,
149:20, 184:5,
224:12
**presenting** [5] -
189:16, 189:17,
189:18, 189:20,
212:3
**presently** [4] - 133:15,
133:22, 133:23,
163:18
**President** [4] - 91:17,
135:22, 135:25,
136:3
**press** [4] - 56:24,
57:3, 58:4, 58:6
**pressure** [1] - 180:1
**Prestera** [1] - 10:11
**presumably** [1] -
101:14
**pretty** [5] - 19:19,
23:19, 155:4,
165:19, 181:2
**prevalence** [2] - 25:6,
149:9
**prevalently** [1] -
149:24
**prevent** [1] - 173:3
**prevention** [15] -
16:25, 18:23, 48:7,
48:9, 48:11, 48:12,
91:19, 94:20, 94:24,
94:25, 95:23, 96:9,
96:24, 97:10, 126:7
**Prevention** [5] - 52:19,
74:3, 74:21, 96:15,
97:15
**previous** [5] - 153:22,
191:16, 191:23,
225:1
**previously** [2] - 38:23,
147:8
**primarily** [3] - 97:10,
100:5, 176:4
**primary** [5] - 18:21,
151:13, 152:11,
201:18, 201:20
**printed** [2] - 204:10,
204:13
**priorities** [3] - 86:11,
147:7, 147:8
**priority** [4] - 74:6,
75:8, 147:10, 153:22
**private** [2] - 35:19,
151:16
**privileges** [5] -
158:19, 174:1,
174:4, 174:10,
174:13
**PROACT** [4] - 152:3,
158:13, 160:25

**problem** [18] - 21:2,
43:3, 49:14, 50:13,
52:16, 92:1, 92:4,
146:5, 153:12,
163:2, 163:11,
163:12, 163:13,
163:25, 164:1,
164:6, 223:21
**problematic** [1] - 19:8
**problems** [7] - 143:8,
144:22, 146:20,
147:4, 163:19,
163:21, 163:22
**proceed** [7] - 103:16,
115:21, 125:23,
133:9, 134:4,
186:22, 220:7
**Proceedings** [3] -
6:19, 64:19, 186:1
**proceedings** [1] -
229:5
**PROCEEDINGS** [1] -
7:1
**process** [5] - 63:8,
81:8, 167:10,
169:24, 206:19
**processes** [1] -
155:18
**Proctor** [1] - 2:10
**produce** [2] - 22:16,
47:14
**produced** [2] - 6:19,
189:25
**product** [2] - 167:24,
167:25
**professional** [17] -
8:8, 15:23, 16:8,
23:11, 24:13, 29:22,
31:19, 33:8, 37:23,
44:12, 63:10, 63:17,
140:25, 173:7,
189:12, 189:13,
189:15
**professionals** [7] -
30:15, 31:3, 82:9,
216:21, 217:2,
218:3, 219:23
**professions** [1] -
136:5
**professor** [2] - 135:17,
135:19
**Professor** [1] - 203:19
**proffer** [1] - 17:23
**profit** [2] - 9:4, 76:19
**Program** [7] - 10:23,
78:19, 100:11,
120:25, 121:4,
121:6, 146:24
**program** [54] - 8:23,
10:15, 16:6, 30:6,

47:20, 54:1, 54:3,
69:2, 71:7, 71:10,
71:14, 71:24, 72:8,
72:14, 72:17, 72:21,
73:15, 73:23, 74:1,
74:2, 74:14, 74:19,
74:24, 75:12, 75:16,
75:19, 75:22, 76:2,
76:3, 76:6, 79:18,
87:17, 87:19, 87:22,
87:23, 89:2, 89:5,
89:23, 90:23, 92:24,
96:4, 96:14, 97:23,
100:10, 100:14,
104:2, 104:8,
120:22, 121:4,
121:5, 121:11,
147:4, 163:10,
167:14
**programming** [4] -
41:3, 48:7, 48:9,
48:14
**programs** [131] - 9:22,
10:6, 10:7, 11:13,
11:15, 12:2, 12:23,
15:24, 16:9, 16:15,
16:20, 16:22, 17:12,
17:14, 23:14, 23:16,
24:8, 26:14, 28:12,
28:14, 30:7, 30:18,
30:21, 35:11, 35:14,
35:16, 35:17, 37:10,
37:16, 37:17, 37:24,
38:4, 38:19, 39:13,
39:17, 39:18, 40:2,
40:19, 41:8, 41:12,
41:13, 48:20, 49:19,
49:22, 52:23, 52:24,
53:22, 60:8, 62:23,
63:1, 63:11, 68:12,
68:19, 68:25, 69:3,
69:5, 69:6, 69:15,
70:13, 72:1, 72:7,
76:12, 76:13, 76:22,
78:13, 78:15, 78:20,
82:19, 82:20, 82:25,
83:1, 83:2, 83:4,
83:8, 84:1, 84:6,
84:8, 84:10, 86:19,
86:22, 87:6, 89:12,
89:17, 89:21, 90:1,
90:4, 90:5, 90:14,
91:4, 91:6, 91:10,
91:16, 92:25, 95:1,
95:2, 98:1, 109:25,
110:1, 120:2,
120:10, 120:11,
120:13, 120:15,
120:23, 121:2,
121:8, 121:16,
121:24, 122:8,

122:11, 122:15,
122:17, 122:18,
122:19, 127:8,
127:13, 127:19,
129:17, 146:21,
163:8, 167:15,
192:23, 193:17,
194:9, 194:12, 195:3
**progress** [3] - 19:5,
94:18, 115:7
**project** [3] - 15:6,
19:11, 55:20
**Project** [3] - 161:20,
161:24
**prominent** [1] - 148:5
**promotion** [1] - 183:3
**proper** [3] - 39:2,
159:16, 217:19
**properly** [2] - 177:12,
225:8
**proportion** [17] -
27:25, 28:5, 32:13,
33:10, 106:17,
106:19, 107:15,
109:11, 111:5,
111:16, 112:9,
113:1, 113:10,
113:19, 113:24,
114:6, 114:9
**proposal** [1] - 70:24
**proposed** [1] - 159:12
**protect** [2] - 64:1,
153:19
**protected** [1] - 53:25
**protection** [1] - 52:11
**protective** [3] - 12:19,
20:2, 154:17
**Protective** [1] - 19:17
**proved** [1] - 225:18
**proven** [1] - 225:12
**provide** [24] - 9:11,
9:22, 11:2, 12:22,
13:16, 17:2, 17:3,
17:12, 77:3, 77:21,
80:12, 89:10,
109:17, 109:25,
110:12, 110:15,
118:23, 119:2,
119:5, 119:21,
149:23, 152:6,
210:8, 220:16
**provided** [32] - 38:24,
69:3, 69:6, 69:7,
71:20, 71:23, 74:13,
74:15, 77:20, 78:3,
80:15, 82:7, 84:21,
86:21, 97:16, 99:2,
102:2, 102:17,
104:7, 105:18,
111:2, 111:12,

111:13, 113:11, 113:19, 119:9, 128:5, 128:7, 128:19, 129:10, 129:14, 139:7
**provider** [3] - 23:15, 152:5, 200:9
**provider/patient** [1] - 210:20
**providers** [5] - 12:18, 200:10, 200:13, 202:21, 203:5
**provides** [5] - 17:2, 35:21, 38:7, 72:9, 127:9
**providing** [8] - 11:13, 36:15, 76:7, 76:24, 77:1, 111:21, 112:8, 112:9
**provision** [1] - 66:12
**provisions** [1] - 102:7
**proximity** [1] - 198:10
**psychological** [1] - 80:16
**psychologists** [3] - 46:15, 60:21, 63:6
**Public** [2] - 203:13, 205:16
**public** [19] - 9:8, 29:16, 125:4, 125:7, 125:11, 125:22, 131:1, 141:23, 145:5, 153:19, 153:20, 156:2, 162:15, 165:25, 166:1, 184:16, 188:24, 208:25, 222:25
**publications** [4] - 14:5, 14:13, 14:14, 15:1
**publicly** [1] - 29:12
**publish** [11] - 8:12, 10:1, 13:11, 25:13, 26:23, 42:8, 43:21, 44:21, 51:12, 57:18, 221:9
**published** [7] - 14:25, 16:23, 55:15, 56:15, 61:20, 62:1, 150:25
**publishes** [1] - 14:18
**publishing** [2] - 221:11, 221:15
**pull** [2] - 69:11, 71:15
**pulmonary** [4] - 143:14, 145:7, 147:13, 148:2
**pulse** [1] - 180:1
**Purdue** [4] - 183:6, 183:14, 185:4, 187:8

**Purdue's** [1] - 185:12
**purpose** [3] - 94:17, 203:23, 207:13
**purposefully** [1] - 166:3
**purposes** [14] - 70:4, 95:23, 96:23, 97:1, 105:9, 108:16, 120:17, 142:21, 175:2, 206:18, 206:23, 207:8, 207:21, 226:13
**push** [1] - 148:7
**put** [37] - 12:15, 25:4, 29:10, 40:25, 50:24, 52:12, 54:24, 61:1, 86:12, 89:25, 91:24, 92:3, 103:2, 104:14, 104:21, 107:5, 110:19, 111:18, 113:12, 116:25, 119:8, 120:14, 122:4, 137:2, 153:12, 158:9, 162:4, 168:19, 179:25, 181:15, 181:24, 204:3, 204:11, 213:10, 227:5, 227:14, 227:21
**puts** [1] - 41:1
**putting** [4] - 118:7, 123:4, 142:18, 158:9

## Q

**qualified** [8] - 81:2, 81:4, 81:6, 81:10, 81:24, 82:8, 171:24, 203:4
**qualifies** [1] - 125:12
**qualify** [5] - 80:18, 100:4, 100:20, 159:23
**qualitative** [1] - 24:24
**quality** [1] - 139:25
**quantification** [1] - 114:11
**quantify** [1] - 114:6
**quantifying** [1] - 177:11
**questionable** [1] - 221:24
**questioner** [1] - 132:17
**questioning** [4] - 126:25, 127:2, 190:9, 220:18
**questions** [28] - 62:16, 65:3, 103:6, 103:23,

115:6, 115:8, 130:19, 131:8, 131:20, 132:2, 132:3, 168:21, 169:6, 170:21, 181:5, 181:7, 191:21, 196:14, 197:3, 202:1, 202:13, 209:15, 209:16, 212:17, 220:21, 223:24, 226:1, 226:5
**quick** [3] - 23:18, 143:9, 157:20
**quickly** [4] - 118:7, 146:1, 170:22, 227:23
**quit** [1] - 211:4
**quite** [8] - 61:11, 73:8, 155:6, 180:13, 180:22, 195:15, 195:16, 196:4
**Quite** [1] - 126:15
**quote** [4] - 116:8, 116:9, 183:7, 183:8

## R

**radar** [2] - 146:16, 146:17
**Rafferty** [1] - 2:10
**raise** [4] - 7:17, 21:16, 133:1, 155:13
**raised** [1] - 80:8
**ran** [3] - 15:21, 31:18, 95:17
**range** [3] - 54:12, 84:22, 85:20
**rate** [9] - 44:2, 53:10, 57:23, 102:24, 143:13, 178:10, 178:24, 179:4, 179:5
**rates** [5] - 43:6, 44:13, 52:17, 146:20, 149:10
**Rather** [1] - 204:10
**rather** [2] - 171:1, 171:10
**rating** [2] - 181:11, 181:25
**re** [2] - 33:4, 56:12
**re-state** [1] - 33:4
**re-tread** [1] - 56:12
**reaches** [2] - 35:24, 170:12
**react** [1] - 60:24
**reaction** [1] - 91:20
**read** [21] - 71:15, 73:2, 107:23, 125:17, 170:4, 171:6,

185:10, 185:11, 187:7, 187:11, 190:6, 191:1, 191:2, 191:6, 192:10, 206:5, 206:14, 212:16, 212:22, 216:13, 217:24
**reading** [3] - 88:18, 170:16, 170:20
**reads** [10] - 124:17, 126:3, 128:5, 128:22, 129:23, 175:22, 179:19, 180:4, 185:6, 187:8
**ready** [5] - 7:10, 36:6, 103:11, 149:15, 211:3
**real** [5] - 145:20, 155:17, 188:19, 201:19, 224:19
**real-time** [1] - 224:19
**really** [35] - 12:24, 14:16, 15:7, 15:11, 15:12, 16:4, 16:16, 18:16, 19:3, 19:7, 21:2, 21:13, 22:5, 22:24, 24:5, 26:12, 29:16, 31:10, 31:11, 36:5, 37:4, 37:5, 49:14, 54:11, 60:1, 67:7, 82:3, 91:12, 92:2, 143:3, 155:14, 163:23, 175:9, 180:12
**realm** [2] - 160:13, 160:15
**reason** [6] - 46:21, 83:9, 93:10, 98:11, 104:11, 138:24
**reasonable** [5] - 29:22, 63:16, 102:6, 167:17, 214:6
**reasonably** [1] - 26:5
**reasons** [7] - 40:20, 54:11, 90:8, 90:9, 97:13, 217:7, 218:8
**receive** [9] - 52:18, 74:1, 74:10, 76:15, 100:18, 108:3, 109:10, 196:9, 196:12
**received** [7] - 30:10, 108:23, 111:5, 126:4, 136:7, 152:13, 177:23
**receives** [2] - 92:7, 193:18
**receiving** [4] - 77:5, 77:7, 77:9, 78:8
**recent** [6] - 13:19,

13:20, 57:25, 58:13, 93:14, 199:22
**recently** [5] - 12:17, 93:10, 153:15, 153:16, 172:14
**recess** [3] - 64:15, 114:18, 185:20
**Recess** [3] - 64:18, 115:15, 185:25
**recessed** [1] - 228:7
**recipients** [1] - 99:14
**recite** [1] - 148:24
**recognize** [6] - 70:3, 70:5, 91:13, 94:7, 96:13, 182:13
**recognized** [1] - 202:25
**recognizing** [2] - 92:1, 92:22
**recollection** [6] - 165:25, 192:18, 192:20, 212:2, 214:6, 224:14
**recommend** [5] - 35:7, 66:12, 84:15, 90:6, 91:4
**recommendation** [5] - 209:6, 214:23, 214:24, 215:1, 216:2
**recommendations** [4] - 207:14, 207:23, 208:17, 215:13
**recommending** [3] - 68:11, 89:17, 95:3
**recommends** [2] - 208:11, 215:22
**record** [16] - 8:2, 17:22, 55:25, 57:11, 117:16, 123:14, 125:4, 125:7, 125:11, 125:22, 131:1, 191:8, 208:25, 211:12, 214:8, 229:5
**recorded** [1] - 6:19
**records** [1] - 28:22
**Recovery** [4] - 93:11, 163:5, 194:23, 225:21
**recovery** [19] - 87:24, 87:25, 88:6, 88:9, 88:14, 88:19, 89:19, 94:22, 95:24, 96:11, 96:24, 97:11, 99:14, 126:8, 152:5, 161:3, 161:24, 165:4
**recross** [1] - 226:4
**rectifying** [1] - 48:18
**red** [1] - 45:1
**redirect** [2] - 220:4,

220:7
**REDIRECT** [1] - 220:8
**reduce** [1] - 18:20
**Reduction** [4] - 213:5,
214:9, 217:4, 218:5
**Reed** [2] - 6:4, 6:11
**refer** [4] - 24:7, 31:5,
40:23, 101:6
**reference** [5] - 112:14,
167:3, 188:23,
222:13, 224:7
**referenced** [7] - 51:17,
179:8, 179:25,
181:11, 182:10,
194:24, 223:2
**references** [1] - 180:9
**referencing** [5] -
38:24, 56:15, 90:6,
190:8, 190:12
**referral** [1] - 54:20
**referring** [1] - 121:19
**refers** [3] - 207:18,
212:24, 213:4
**refills** [1] - 213:17
**reflect** [4] - 29:21,
57:20, 162:19,
219:22
**reflected** [4] - 97:4,
216:22, 217:3,
218:15
**reflecting** [5] - 111:19,
184:13, 184:14,
184:15, 215:10
**reflects** [3] - 218:2,
219:5, 219:21
**reframe** [1] - 214:21
**regard** [2] - 112:12,
119:21
**regarding** [6] - 42:3,
43:5, 61:4, 92:5,
124:22, 214:11
**regards** [1] - 184:4
**regimen** [1] - 213:21
**region** [2] - 109:19,
199:8
**regional** [5] - 10:9,
10:19, 35:22, 36:13,
121:10
**registered** [2] -
173:18, 173:23
**regular** [2] - 195:10,
206:3
**regularly** [1] - 195:6
**regulates** [1] - 206:20
**regulating** [2] -
203:24, 216:7
**regulation** [4] -
202:14, 207:3,
210:10, 218:22
**regulations** [1] - 207:2

**regulatory** [1] - 180:12
**rehabilitation** [2] -
98:22, 99:6
**reimbursed** [3] -
102:3, 102:14,
102:20
**reimbursement** [1] -
102:11
**reimburses** [1] - 103:1
**relate** [7] - 11:16,
32:9, 66:11, 67:22,
71:3, 109:19, 222:11
**related** [37] - 15:1,
15:4, 15:18, 16:19,
20:10, 20:11, 20:17,
31:1, 31:22, 32:20,
33:12, 46:6, 93:5,
94:9, 96:2, 116:5,
146:5, 146:6,
148:11, 151:7,
155:25, 156:22,
156:24, 157:5,
157:17, 158:13,
158:22, 159:1,
159:7, 162:7,
170:25, 171:8,
187:8, 193:17,
194:9, 225:13,
225:24
**relates** [12] - 66:24,
68:3, 89:21, 90:22,
100:24, 102:16,
113:13, 127:7,
143:5, 165:16,
185:3, 188:3
**relating** [2] - 56:9,
222:9
**relationship** [11] -
24:23, 44:4, 49:23,
105:10, 113:4,
148:1, 156:2,
178:16, 182:13,
210:21, 216:7
**relative** [1] - 210:10
**release** [4] - 56:24,
57:3, 58:4, 58:7
**released** [3] - 140:10,
212:18, 212:25
**Releases** [1] - 57:4
**relevance** [1] - 127:14
**relevant** [4] - 52:4,
127:14, 168:17,
184:19
**reliability** [1] - 127:14
**reliance** [4] - 56:21,
57:2, 57:5, 87:18
**relied** [5] - 25:3, 30:4,
43:10, 58:4, 69:12
**Relief** [1] - 91:23
**rely** [5] - 23:10, 25:12,

26:5, 67:24
**relying** [1] - 90:6
**remain** [1] - 211:10
**remarkable** [1] - 92:3
**remediate** [1] - 64:5
**remedied** [1] - 157:22
**remedies** [2] - 17:24,
18:7
**remember** [6] - 96:4,
150:4, 150:13,
165:21, 165:24,
168:4
**remind** [3] - 159:9,
180:12, 180:13,
180:15
**reminded** [1] - 180:9
**remove** [1] - 20:1
**removed** [4] - 18:24,
33:13, 42:21, 45:10
**render** [1] - 183:19
**renewed** [1] - 81:24
**repeat** [3] - 32:5, 97:7,
183:11
**repeatedly** [1] - 68:16
**replaced** [2] - 157:24
**report** [98] - 17:6,
17:9, 23:5, 23:9,
24:14, 25:20, 28:19,
28:23, 29:21, 30:3,
30:4, 30:24, 31:5,
32:16, 32:23, 33:1,
33:15, 34:4, 34:5,
36:20, 38:2, 38:17,
38:20, 40:2, 42:19,
44:12, 47:13, 48:5,
49:20, 56:4, 56:5,
56:8, 56:23, 57:3,
58:4, 61:16, 62:1,
62:16, 65:4, 65:19,
69:12, 69:16, 70:25,
82:16, 83:16, 84:12,
85:12, 85:24, 87:4,
87:7, 88:25, 89:25,
94:9, 94:13, 95:10,
95:25, 97:4, 97:16,
100:23, 101:3,
105:20, 105:22,
110:8, 110:13,
110:18, 111:10,
112:17, 116:11,
118:3, 118:9,
118:10, 118:14,
119:11, 120:21,
121:1, 121:9, 122:7,
123:6, 123:10,
127:6, 130:17,
150:21, 150:22,
153:1, 204:3,
204:22, 208:15,
208:16, 208:21,

209:2, 210:4, 212:4,
214:17, 215:5,
216:23, 218:18,
219:5, 219:21
**Report** [2] - 24:16,
101:18
**reported** [10] - 24:17,
31:16, 45:12,
118:21, 142:23,
142:25, 207:14,
214:16, 215:4, 229:9
**Reporter** [6] - 6:17,
6:18, 229:3, 229:12
**REPORTER** [7] -
133:8, 147:15,
147:19, 150:7,
150:10, 154:5, 154:8
**reports** [8] - 14:23,
14:24, 24:16, 25:4,
33:13, 44:5, 98:9,
153:10
**represent** [8] - 27:2,
65:1, 103:21, 145:4,
165:12, 169:15,
196:24, 196:25
**representation** [2] -
223:6, 224:17
**representative** [1] -
225:12
**Representatives** [1] -
124:20
**representatives** [1] -
166:6
**represented** [5] - 26:4,
167:9, 195:4,
223:10, 224:6
**representing** [2] -
202:10, 224:16
**represents** [3] - 25:19,
52:4, 189:5
**reputable** [1] - 168:13
**requalify** [1] - 81:21
**request** [4] - 124:22,
126:16, 127:16,
130:16
**require** [9] - 22:11,
23:6, 26:18, 28:6,
60:4, 83:12, 113:22,
114:2, 159:13
**required** [16] - 29:23,
30:1, 31:13, 32:20,
32:21, 37:11, 40:7,
46:10, 48:1, 50:4,
55:4, 79:8, 142:5,
142:7, 144:17,
157:10
**requirement** [7] -
74:12, 74:20, 99:4,
141:18, 144:3,
144:9, 160:8

**requirements** [4] -
39:11, 39:12, 79:7,
96:21
**requiring** [2] - 27:3,
62:15
**Rescue** [1] - 91:17
**research** [12] - 16:3,
16:6, 23:21, 26:7,
43:17, 44:17, 51:7,
69:1, 69:2, 138:4
**researchers** [2] -
29:16, 61:11
**reside** [3] - 108:24,
133:15, 133:16
**residency** [4] -
137:21, 137:24,
176:7, 176:10
**resident** [4] - 133:18,
139:3, 139:7, 139:15
**Resident** [1] - 138:3
**residential** [2] - 54:3,
130:4
**residents** [2] - 151:18,
151:20
**Resiliency** [6] -
164:24, 165:11,
166:9, 167:6,
167:12, 168:6
**resilient** [2] - 225:12,
225:18
**resolve** [1] - 187:18
**Resources** [2] -
124:18, 125:13
**resources** [2] -
141:23, 145:2,
145:12, 150:1,
153:7, 153:13,
153:25
**respect** [4] - 42:15,
51:7, 125:15, 148:19
**respectful** [1] - 159:24
**respective** [1] - 95:12
**respond** [6] - 36:22,
124:19, 161:17,
176:25, 177:8,
180:16
**responded** [1] -
182:15
**responding** [3] -
41:14, 130:16,
130:19
**response** [13] - 46:25,
47:2, 52:16, 94:9,
117:9, 124:22,
128:24, 130:2,
150:19, 166:15,
178:8, 182:14,
224:10
**responsibilities** [2] -
141:7, 172:19

**responsibility** [11] - 63:23, 64:3, 142:13, 145:10, 145:14, 150:14, 172:22, 173:3, 176:25, 177:8, 178:20
**responsible** [8] - 10:24, 47:7, 162:25, 163:1, 225:13, 225:18, 225:22, 225:23
**Responsible** [6] - 202:17, 202:19, 206:1, 206:16, 207:22, 208:16
**rest** [1] - 102:14
**restate** [1] - 214:21
**restore** [1] - 116:9
**restrictions** [4] - 213:10, 213:13, 214:18, 216:16
**result** [4] - 38:25, 129:1, 142:23, 160:21
**results** [1] - 183:2
**resume** [2] - 115:16, 186:2
**resumed** [2] - 64:19, 186:1
**retail** [1] - 172:11
**retained** [3] - 65:12, 65:18, 116:4
**retire** [1] - 31:8
**retired** [1] - 134:19
**return** [3] - 116:12, 215:13, 227:1
**returned** [1] - 138:11
**reunification** [1] - 36:2
**reunited** [1] - 40:17
**revenues** [2] - 185:6, 187:12
**reverse** [1] - 19:15
**review** [12] - 24:13, 31:20, 33:9, 38:25, 43:4, 53:18, 54:8, 120:9, 120:22, 168:5, 207:1, 224:12
**Review** [1] - 94:14
**reviewed** [13] - 37:15, 46:2, 70:12, 72:6, 73:5, 73:14, 73:19, 86:24, 87:2, 87:3, 130:15, 142:16, 206:19
**reviewing** [1] - 187:22
**reviews** [5] - 25:25, 61:10, 61:12, 193:10, 193:12
**revolution** [1] - 21:14

**Reynolds** [2] - 104:14, 181:15
**ribbon** [2] - 202:20, 202:23
**Rice** [11] - 4:3, 4:5, 4:8, 4:11, 4:14, 65:17, 65:18, 65:19, 69:8, 70:7, 70:9
**Richard** [1] - 203:16
**rigid** [1] - 12:8
**ripped** [1] - 225:17
**risk** [7] - 27:16, 28:23, 29:2, 49:5, 50:21, 53:11, 71:6
**risks** [1] - 53:10
**risky** [1] - 49:10
**Ritchie** [2] - 75:24, 84:2
**RMR** [2] - 6:17, 6:18
**road** [2] - 163:5, 163:7
**Road** [4] - 133:17, 163:4, 194:23, 225:21
**roadmap** [2] - 194:25, 195:4
**ROBERT** [1] - 6:11
**Robert** [1] - 132:17
**ROBERTSON** [1] - 3:6
**role** [3] - 85:4, 173:13, 193:1
**roles** [1] - 138:22
**roll** [2] - 93:13, 205:24
**room** [4] - 150:4, 157:14, 157:15, 167:18
**Roughly** [2] - 197:24, 198:1
**roughly** [1] - 14:13
**round** [1] - 198:2
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**RUBY** [36] - 4:22, 148:19, 148:23, 156:10, 160:3, 164:5, 168:15, 168:22, 202:4, 202:8, 204:5, 204:7, 204:9, 204:17, 204:20, 205:10, 205:12, 208:6, 208:8, 208:24, 209:11, 209:17, 209:19, 209:25, 210:1, 211:4, 211:8, 211:9, 211:15, 211:18, 214:7, 214:13, 215:18, 215:20, 220:3, 226:6
**Ruby** [7] - 4:23, 160:2,

164:4, 202:3, 202:9, 205:8, 211:3
**Rule** [3] - 55:25, 125:8, 159:18
**rule** [2] - 181:8, 211:16
**rules** [1] - 141:25
**Rules** [1] - 211:13
**ruling** [1] - 159:20
**run** [4] - 36:13, 92:25, 122:12, 145:18
**running** [1] - 96:3
**runs** [3] - 35:5, 35:6, 73:15
**Rx** [1] - 116:25

## S

**s\Ayme** [1] - 229:11
**s\Lisa** [1] - 229:11
**sabbatical** [1] - 139:17
**sadness** [1] - 158:6
**Safe** [4] - 18:17, 52:14, 52:21, 53:7
**safe** [5] - 49:23, 54:14, 161:21, 216:9, 217:18
**safety** [1] - 29:6
**sake** [2] - 148:9, 158:25
**sakes** [1] - 117:3
**SALGADO** [1] - 4:20
**SAMHSA** [3] - 14:8, 14:25, 15:7
**sample** [1] - 14:12
**sampling** [1] - 14:4
**San** [2] - 2:5, 2:14
**SAPT** [1] - 96:16
**sat** [1] - 195:17
**save** [1] - 164:20
**saw** [6] - 33:16, 91:22, 147:4, 149:19, 151:16, 224:17
**SB** [12] - 212:19, 213:4, 213:7, 213:10, 213:21, 213:25, 214:9, 214:18, 215:7, 216:5, 216:15, 216:23
**SC** [3] - 4:4, 4:12, 4:15
**scaffold** [1] - 127:10
**scale** [10] - 37:11, 38:1, 38:3, 71:22, 72:1, 72:5, 181:11, 181:25, 182:5, 182:11
**scattered** [1] - 199:7
**schedule** [1] - 186:3

**scheduled** [2] - 176:3, 178:17
**scheduling** [1] - 226:13
**scheme** [1] - 187:18
**SCHMIDT** [3] - 5:9, 186:11, 186:19
**school** [33] - 39:21, 78:14, 80:9, 80:13, 80:16, 136:7, 136:9, 136:10, 136:22, 137:8, 137:10, 137:11, 137:14, 137:15, 137:17, 137:19, 138:9, 140:5, 172:9, 181:8, 183:24, 184:1, 184:3, 184:6, 184:7, 184:10, 184:15, 184:21, 189:16, 189:17
**School** [13] - 78:18, 135:2, 135:4, 135:6, 135:10, 135:15, 135:18, 135:19, 135:21, 138:14, 151:15, 172:15, 203:13
**schooling** [1] - 79:10
**schools** [3] - 48:8, 82:9, 166:20
**science** [1] - 167:18
**Science** [1] - 136:8
**scientific** [7] - 14:15, 23:20, 29:22, 167:1, 167:2, 167:13, 167:17
**scope** [27] - 32:12, 32:16, 75:13, 76:17, 78:9, 83:5, 83:16, 86:17, 90:12, 90:25, 100:22, 103:5, 112:18, 114:13, 119:11, 120:6, 123:2, 126:25, 127:4, 127:5, 127:21, 129:12, 170:9, 170:11, 179:1, 210:19
**scores** [5] - 62:5, 62:10, 62:14, 62:15, 62:17
**Scout** [1] - 133:17
**screen** [6] - 70:1, 128:13, 146:17, 204:11, 204:19
**screening** [2] - 23:18, 62:8
**seat** [2] - 7:21, 133:5
**second** [12] - 20:8,

20:19, 83:10, 110:9, 129:23, 141:11, 144:14, 163:15, 169:2, 187:11, 226:20, 227:5
**secondary** [2] - 201:18, 201:21
**Secretary** [4] - 13:24, 24:21, 43:11, 124:19
**Section** [2] - 214:10, 214:12
**section** [6] - 94:15, 205:22, 206:11, 207:12, 208:10, 212:4
**secure** [1] - 36:20
**see** [103] - 8:17, 19:15, 21:19, 22:5, 34:13, 44:4, 59:14, 71:2, 87:19, 88:1, 88:16, 88:17, 89:25, 94:10, 94:15, 94:20, 94:23, 94:24, 95:10, 95:16, 95:20, 96:8, 96:12, 101:8, 101:20, 103:10, 105:3, 105:4, 105:15, 105:25, 110:25, 112:1, 114:23, 123:24, 124:3, 124:12, 124:14, 124:24, 124:25, 125:24, 126:9, 126:18, 128:9, 128:15, 129:3, 129:4, 130:5, 130:6, 147:1, 149:21, 150:6, 151:17, 153:10, 158:14, 158:16, 158:17, 158:19, 160:25, 161:10, 161:15, 162:6, 163:21, 163:22, 175:6, 175:7, 175:12, 179:22, 180:7, 180:15, 183:4, 185:24, 187:19, 188:14, 188:23, 189:2, 190:7, 190:11, 190:12, 190:18, 202:12, 203:25, 205:22, 206:12, 206:15, 206:21, 207:5, 207:16, 207:17, 208:13, 208:21, 210:2, 210:6, 210:16, 210:23, 212:4, 212:13,

215:24, 216:11, 217:9, 217:21, 220:21, 228:6

**seek** [2] - 51:18, 107:16

**seeking** [1] - 108:5

**seeks** [2] - 107:22, 142:14

**sees** [1] - 210:19

**select** [3] - 161:19, 171:3, 220:2

**selection** [2] - 202:24, 202:25

**self** [1] - 125:8

**self-authenticating** [1] - 125:8

**Senate** [4] - 14:5, 206:4, 213:4, 218:5

**send** [3] - 36:24, 37:1, 109:4

**senior** [1] - 139:15

**Senior** [1] - 7:2

**SENIOR** [1] - 1:17

**Sensabaugh** [1] - 5:14

**sense** [1] - 32:6

**sensory** [2] - 46:19, 82:5

**sent** [1] - 42:20

**sentence** [5] - 207:12, 212:16, 217:8, 218:20

**sentences** [1] - 88:11

**separate** [5] - 31:10, 31:11, 197:19, 200:1, 200:14

**separated** [2] - 11:19, 11:22

**separation** [3] - 22:18, 24:5, 41:15

**September** [1] - 124:21

**series** [1] - 24:22

**seriously** [1] - 145:14

**serve** [5] - 15:24, 121:8, 121:17, 135:12, 208:3

**served** [11] - 72:16, 75:15, 75:19, 83:4, 121:12, 135:12, 135:22, 135:24, 136:1, 193:13, 197:10

**service** [12] - 74:1, 74:18, 78:2, 84:16, 88:20, 109:12, 111:4, 111:5, 111:6, 132:9, 134:13

**Service** [2] - 14:9, 19:17

**services** [128] - 10:21,

11:2, 11:20, 12:16, 12:22, 15:2, 16:10, 16:13, 16:20, 17:1, 17:2, 17:3, 18:23, 22:12, 22:14, 23:2, 23:6, 26:8, 28:2, 29:20, 32:20, 35:18, 36:4, 36:6, 36:15, 39:16, 46:9, 47:8, 47:18, 47:19, 50:7, 50:11, 50:18, 50:19, 51:8, 54:7, 54:9, 54:14, 54:24, 60:3, 60:5, 60:7, 60:12, 62:15, 66:2, 66:12, 66:16, 67:15, 68:9, 72:9, 72:13, 74:5, 74:11, 74:13, 74:15, 74:20, 75:1, 76:7, 76:12, 76:15, 76:25, 77:2, 77:3, 77:16, 77:22, 78:3, 78:5, 78:8, 80:12, 80:15, 80:19, 80:21, 80:24, 81:10, 81:11, 81:12, 82:4, 82:6, 82:7, 83:8, 83:12, 83:14, 83:18, 84:21, 85:3, 85:5, 88:2, 88:12, 89:8, 89:9, 89:11, 92:25, 94:23, 95:1, 95:2, 95:24, 98:19, 98:22, 99:2, 99:6, 99:25, 100:16, 100:18, 105:1, 106:20, 107:22, 108:3, 109:2, 109:5, 109:7, 111:17, 112:1, 112:10, 113:2, 113:10, 113:22, 114:2, 114:4, 126:8, 128:5, 128:7, 128:17, 128:18, 129:15, 152:8, 161:8

**Services** [11] - 13:21, 13:25, 24:20, 29:15, 43:12, 53:2, 56:25, 94:8, 124:4, 127:2, 130:13

**serving** [2] - 121:24, 209:4

**session** [1] - 206:3

**set** [9] - 78:23, 97:14, 103:23, 118:25, 127:11, 154:4, 154:9, 163:10, 202:21

**sets** [3] - 125:12, 130:12, 195:1

**setting** [4] - 49:15, 80:14, 108:18, 159:16

**settlement** [2] - 86:10, 129:25

**seven** [1] - 135:7

**several** [9] - 19:24, 31:4, 62:12, 85:25, 86:5, 95:10, 118:15, 136:5, 165:12

**severe** [1] - 59:4

**severed** [1] - 136:4

**shall** [1] - 207:1

**SHANNON** [1] - 6:3

**share** [4] - 102:21, 150:23, 201:17

**shared** [1] - 172:22

**shelves** [1] - 136:25, 137:3

**shifted** [1] - 19:21

**shifting** [1] - 35:4

**ship** [1] - 173:17

**shipping** [1] - 173:22

**shop** [2] - 213:23

**shore** [1] - 93:18

**shoring** [1] - 92:2

**short** [4] - 74:5, 100:12, 122:6, 171:12

**shorter** [2] - 36:1, 45:24

**shorter-term** [1] - 45:24

**show** [5] - 61:21, 62:24, 94:1, 174:20, 204:11

**showed** [3] - 167:24, 184:8, 184:9

**showing** [4] - 106:17, 120:22, 184:11, 223:22

**shown** [5] - 44:24, 182:18, 220:10, 220:12, 221:7

**shows** [2] - 96:7, 188:12

**shrink** [1] - 209:19

**sic** [1] - 225:17

**side** [4] - 71:1, 183:9, 185:8, 187:14

**sign** [6] - 178:5, 179:21, 179:24, 182:10, 182:17, 213:21

**signed** [1] - 124:12

**significant** [6] - 29:2, 91:9, 126:4, 163:7, 223:8, 225:16

**significantly** [1] - 62:5, 62:9

**silos** [1] - 40:23

**similar** [2] - 12:22, 14:24

**similarly** [1] - 114:2

**simple** [2] - 12:5, 117:25

**simplify** [1] - 121:14, 185:1

**simply** [6] - 32:22, 106:17, 126:15, 159:9, 184:11, 184:17

**Singer** [2] - 38:8, 104:18

**SINGER** [50] - 4:8, 7:7, 7:9, 7:25, 8:12, 8:15, 10:1, 10:4, 13:11, 13:14, 13:15, 17:22, 18:8, 18:9, 25:13, 25:16, 26:23, 27:1, 32:3, 32:4, 32:18, 33:6, 33:7, 34:7, 34:10, 34:15, 37:22, 38:11, 38:15, 38:16, 42:8, 42:13, 43:21, 43:23, 44:21, 44:23, 48:25, 49:2, 51:12, 51:15, 56:7, 56:20, 57:13, 57:14, 57:17, 57:19, 64:7, 64:11, 114:25, 115:18

**singer** [15] - 7:8, 32:2, 32:14, 32:17, 32:24, 38:24, 39:5, 56:6, 56:14, 56:17, 57:12, 64:13, 118:19, 119:14, 131:19

**single** [5] - 141:16, 143:19, 186:13, 190:4, 195:19

**sister** [1] - 158:6

**sit** [7] - 59:24, 75:10, 76:14, 169:6, 192:12, 194:2, 198:13

**site** [1] - 154:11

**sites** [2] - 30:5, 154:4

**sitting** [1] - 197:13

**situate** [2] - 104:1, 104:13

**situation** [5] - 92:20, 126:23, 150:3, 157:10, 157:11

**situations** [2] - 81:22, 150:2

**six** [3] - 91:16, 140:21, 141:1

**six-person** [1] - 141:1

**size** [2] - 69:23, 85:8

**skills** [3] - 46:18, 82:6,

88:13

**Skip** [1] - 226:14

**sleep** [3] - 59:19, 59:20, 60:1

**Slide** [15] - 10:1, 13:14, 15:14, 25:15, 26:23, 42:8, 43:21, 44:21, 44:24, 49:1, 51:12, 57:18, 175:19, 183:6, 188:12

**slide** [40] - 8:16, 9:21, 9:24, 10:5, 13:4, 13:8, 13:12, 13:16, 25:7, 25:10, 25:14, 25:18, 26:4, 26:20, 27:22, 29:8, 42:2, 42:6, 43:16, 43:19, 43:24, 44:16, 44:19, 48:19, 48:23, 49:4, 51:6, 51:10, 55:10, 55:12, 55:14, 55:20, 57:20, 118:18, 175:11, 176:1, 179:25, 187:5, 188:9

**slides** [4] - 8:4, 8:7, 8:13, 189:7

**slightly** [1] - 35:4

**slot** [1] - 74:15

**slow** [4] - 147:15, 147:21, 150:7, 154:6

**Slow** [1] - 147:17

**small** [6] - 13:19, 124:7, 128:1, 136:16, 158:16, 219:15

**smile** [2] - 60:24, 137:4

**smiley** [2] - 182:3, 182:17

**smiling** [1] - 180:11

**Smith** [2] - 6:4, 6:11

**smoke** [1] - 143:10

**smoking** [2] - 147:11, 147:12

**social** [13] - 24:25, 25:1, 31:15, 33:15, 42:23, 46:4, 48:16, 50:15, 50:19, 80:17, 99:9, 119:16, 119:18

**Social** [2] - 8:22, 8:23

**Society** [10] - 50:24, 75:23, 76:1, 76:3, 76:10, 76:22, 77:2, 77:15, 77:19, 179:20

**Sociology** [1] - 8:21

**solutions** [1] - 210:9

**Solutions** [3] - 86:24, 87:16, 163:3

**solve** [2] - 10:17, 48:15

**solved** [1] - 18:25
**someone** [2] - 22:21, 201:1
**sometime** [1] - 61:11
**Sometimes** [2] - 76:10, 84:23
**sometimes** [8] - 10:25, 17:5, 24:5, 27:12, 31:5, 58:15, 82:2, 165:8
**son** [1] - 39:15
**soon** [1] - 145:24
**sorry** [32] - 37:20, 41:11, 56:25, 65:16, 73:1, 73:3, 96:25, 101:19, 107:11, 117:16, 125:2, 128:11, 137:20, 147:15, 147:18, 148:22, 150:8, 150:9, 150:11, 154:5, 155:10, 169:12, 174:3, 174:4, 179:15, 181:6, 182:25, 186:17, 202:5, 215:14, 215:19, 222:16
**Sorry** [3] - 68:20, 188:19, 217:10
**sort** [6] - 23:22, 30:16, 45:18, 48:12, 54:16
**sorting** [1] - 219:25
**sought** [1] - 51:24
**sound** [2] - 78:24, 173:7
**sounds** [2] - 12:4, 180:19
**source** [7] - 75:11, 77:14, 85:24, 101:3, 101:16, 122:21, 185:14
**sources** [13] - 23:9, 25:3, 25:8, 25:19, 26:3, 26:4, 29:7, 34:3, 35:19, 67:25, 84:9, 122:18, 127:7
**South** [1] - 2:11
**Southampton** [1] - 139:17
**SOUTHERN** [1] - 1:1
**Southern** [3] - 7:3, 9:4, 107:21
**speaker** [1] - 183:23
**speaking** [4] - 165:22, 166:2, 176:3, 203:23
**Special** [1] - 78:18
**special** [26] - 27:21, 54:19, 60:5, 62:15, 66:4, 78:22, 78:25,

79:12, 79:19, 79:23, 80:4, 80:6, 80:8, 80:21, 80:23, 81:2, 81:6, 81:9, 81:10, 81:12, 81:15, 83:12, 138:17, 139:8, 152:13
**specialists** [2] - 200:21, 206:17
**specialized** [5] - 23:2, 48:14, 87:24, 88:13, 106:20
**specific** [73] - 14:6, 16:11, 24:7, 26:8, 26:17, 32:24, 39:8, 39:10, 40:1, 50:19, 57:23, 65:22, 68:1, 68:8, 76:9, 79:3, 84:9, 90:3, 90:22, 93:2, 95:4, 95:5, 98:5, 101:21, 102:16, 106:15, 106:25, 107:7, 109:18, 109:24, 110:2, 110:15, 110:21, 111:12, 111:20, 112:3, 112:8, 112:21, 113:5, 113:7, 114:12, 116:22, 116:23, 116:24, 117:4, 120:4, 120:25, 121:13, 121:15, 122:20, 122:23, 122:25, 127:10, 127:19, 130:19, 137:23, 164:7, 170:22, 172:5, 172:6, 172:7, 178:13, 191:2, 192:20, 193:20, 201:1, 212:2, 214:3, 214:10, 219:19, 224:13, 224:14
**Specific** [1] - 105:14
**specifically** [43] - 15:15, 17:10, 23:22, 27:24, 55:18, 61:16, 65:13, 66:6, 70:14, 70:17, 70:19, 73:20, 75:6, 76:21, 77:15, 79:5, 80:1, 82:15, 89:19, 90:25, 91:10, 93:7, 93:23, 94:19, 99:19, 100:24, 102:20, 108:1, 133:24, 142:12, 144:3, 146:6, 159:18, 166:9, 176:20, 195:12,

197:4, 201:1, 201:25, 210:8, 216:1, 223:3, 223:9
**specifics** [1] - 109:11
**specified** [1] - 40:20
**spectrum** [3] - 26:12, 27:5, 152:7
**speech** [2] - 15:20, 82:5
**speeches** [2] - 13:5, 14:13
**spelled** [1] - 133:6
**spend** [7] - 92:13, 92:18, 93:5, 93:11, 93:12, 93:19, 96:1
**spending** [1] - 97:10
**spent** [10] - 27:20, 95:11, 95:21, 96:7, 96:9, 96:10, 96:11, 96:12, 192:25, 221:15
**spike** [1] - 149:17
**spinal** [1] - 157:17
**spouse** [1] - 161:11
**sprung** [1] - 162:14
**Square** [2] - 6:5, 6:12
**squeeze** [2] - 151:25, 227:24
**squeezed** [1] - 227:8
**St** [7] - 135:24, 136:1, 197:11, 197:22, 198:22, 199:22, 201:7
**stability** [1] - 54:11
**stable** [1] - 85:16
**Staff** [2] - 136:1, 136:3
**staff** [9] - 11:3, 12:10, 13:1, 30:5, 31:2, 45:13, 45:14, 92:21, 92:24
**staffed** [1] - 199:11
**stage** [3] - 47:10, 59:23, 61:5
**stages** [2] - 16:16, 60:24
**stakeholders** [2] - 195:17, 224:20
**stand** [9] - 7:12, 16:16, 38:5, 86:5, 115:17, 131:20, 132:21, 166:3, 194:12
**standard** [1] - 170:12
**Standards** [1] - 14:7
**standards** [1] - 180:5
**standing** [1] - 45:16
**standpoint** [1] - 156:1
**stands** [2] - 29:9, 186:4
**STANNER** [1] - 5:10

**Star** [1] - 92:14
**start** [17] - 19:12, 26:16, 27:6, 40:2, 49:13, 103:10, 117:7, 146:21, 169:9, 186:7, 227:11, 227:15, 227:17, 228:3
**Start** [4] - 78:19, 120:25, 121:4, 121:6
**started** [12] - 18:12, 19:8, 19:14, 80:9, 95:17, 137:16, 146:16, 164:1, 176:10, 179:9, 184:6
**starting** [2] - 79:22, 162:19
**state** [35] - 7:15, 8:1, 12:2, 15:20, 23:13, 29:19, 33:4, 35:12, 35:19, 40:22, 60:10, 77:6, 77:8, 77:25, 78:25, 79:5, 86:11, 96:16, 102:3, 102:15, 102:21, 102:25, 103:1, 126:7, 128:6, 132:24, 169:12, 173:18, 173:23, 202:16, 203:1, 203:24, 207:19, 208:18, 219:16
**State** [25] - 11:2, 35:6, 47:6, 76:24, 77:1, 105:18, 106:4, 106:13, 106:21, 107:7, 111:14, 112:20, 113:4, 118:20, 124:3, 125:13, 127:3, 128:17, 130:21, 134:8, 198:4, 198:6, 198:16, 202:21, 218:11
**state's** [1] - 207:2
**statement** [15] - 83:10, 126:12, 126:13, 126:21, 129:6, 159:21, 191:16, 191:23, 204:2, 214:15, 214:24, 215:11, 217:24, 224:25, 225:1
**statements** [2] - 130:8, 130:10
**STATES** [2] - 1:1, 1:17
**states** [23] - 9:12, 9:14, 10:14, 10:16, 15:17, 15:22, 16:24, 17:2, 28:20, 28:25,

29:4, 31:13, 52:18, 79:15, 93:8, 93:10, 93:24, 94:18, 95:11, 95:25, 96:7, 100:7, 201:12
**States** [6] - 7:2, 91:15, 110:12, 111:14, 124:20, 188:13
**stating** [3] - 131:3, 156:11, 184:12
**statistics** [1] - 143:18
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**statute** [1] - 211:1
**statutory** [4] - 141:17, 144:3, 210:9, 210:12
**stay** [4] - 18:22, 29:1, 54:2, 161:23
**staying** [3] - 126:3, 126:14, 150:16
**stenography** [1] - 6:19
**step** [7] - 20:23, 63:25, 64:16, 114:22, 116:3, 159:22, 185:22
**stepping** [1] - 21:9
**steps** [1] - 85:18
**steroidal** [1] - 178:14
**Steve** [2] - 202:9, 227:7
**STEVEN** [1] - 4:22
**Sticking** [1] - 111:10
**still** [15] - 56:18, 58:18, 81:23, 81:24, 129:22, 130:2, 134:10, 140:7, 152:17, 152:18, 152:19, 160:13, 164:10, 186:25, 219:25
**stipulation** [1] - 100:16
**stop** [8] - 18:22, 23:1, 39:23, 50:21, 114:16, 149:3, 149:4
**stopping** [1] - 185:17
**STR** [3] - 92:13, 92:16, 97:10
**straight** [1] - 8:22
**strain** [1] - 158:4
**stranger** [1] - 21:7
**strategies** [3] - 11:7, 82:6, 116:5
**strategy** [1] - 48:13
**streams** [3] - 12:8, 16:24, 17:1
**Street** [15] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:19, 4:21, 4:24, 5:5, 5:12, 6:6,

6:13
**strengthening** [1] - 24:8
**strike** [11] - 117:8, 117:19, 144:5, 191:16, 191:22, 192:1, 207:3, 218:22, 219:6, 219:15, 219:25
**striking** [2] - 203:25, 207:7
**strong** [1] - 61:21
**structure** [2] - 97:14, 163:17
**struggles** [1] - 219:7
**students** [4] - 151:18, 166:18, 172:14, 172:18
**studies** [7] - 24:19, 31:16, 46:1, 46:6, 61:24, 62:4, 85:25
**study** [9] - 24:22, 33:15, 43:10, 43:13, 56:9, 62:20, 63:2, 69:2, 203:24
**stuff** [1] - 142:11
**sub** [1] - 87:25
**subject** [6] - 17:9, 39:2, 56:11, 57:6, 57:8, 93:20
**subjective** [4] - 176:22, 177:3, 177:9, 178:6
**subsection** [1] - 212:7
**subsequent** [1] - 52:23
**Substance** [24] - 9:9, 11:6, 11:8, 11:17, 14:8, 14:21, 15:25, 22:17, 29:14, 31:6, 31:7, 31:21, 32:7, 41:21, 42:4, 47:25, 48:1, 50:16, 53:19, 67:1, 74:2, 74:21, 96:15, 97:15
**substance** [46] - 9:13, 10:16, 12:5, 16:25, 20:10, 20:12, 20:17, 21:23, 22:1, 22:3, 26:11, 28:13, 31:14, 33:14, 39:8, 43:3, 45:24, 47:17, 48:7, 48:9, 52:23, 66:21, 66:22, 66:23, 67:15, 68:2, 68:3, 68:8, 84:16, 91:11, 91:18, 91:22, 91:25, 92:4, 93:2, 95:4, 96:17, 97:18, 98:22, 99:6, 99:13, 99:21,

104:25, 111:25, 117:7, 173:8
**substances** [15] - 31:11, 34:24, 49:13, 66:24, 67:2, 67:4, 67:5, 67:8, 68:13, 68:14, 68:17, 139:5, 172:19, 173:4, 178:18
**Substances** [1] - 68:15
**substantial** [1] - 225:9
**substantially** [1] - 56:2
**substantiated** [4] - 29:1, 44:6, 44:8, 120:1
**substitute** [1] - 204:12
**substituted** [1] - 147:7
**subtract** [1] - 108:2
**successful** [4] - 9:1, 9:18, 16:5, 52:6
**succinct** [1] - 42:11
**SUD** [1] - 130:2
**suffer** [1] - 22:20
**suffering** [3] - 32:14, 216:10, 219:3
**sufficiency** [1] - 120:10
**sufficient** [2] - 36:8, 37:25
**suffix** [1] - 139:8
**suggest** [1] - 97:9
**suggestion** [1] - 168:7
**suggestions** [1] - 168:19
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 3:15, 4:6, 4:9, 6:5, 6:12
**summarize** [2] - 46:7, 119:23
**summarized** [4] - 43:16, 44:16, 48:19, 51:7
**summarizes** [2] - 25:7, 42:2
**summary** [3] - 61:20, 62:1, 65:9
**sunset** [3] - 164:2, 208:4, 209:6
**supervision** [3] - 84:24, 85:2, 85:19
**supervisors** [1] - 25:1
**supplement** [1] - 70:15
**supplemental** [2] - 100:6, 100:21
**supply** [1] - 154:16
**support** [16] - 12:22, 50:15, 50:19, 51:4,

54:12, 59:15, 87:25, 88:15, 94:22, 95:24, 96:11, 96:24, 97:11, 99:10, 99:15, 158:4
**supported** [2] - 23:21, 59:21
**supporting** [2] - 15:24, 49:19
**supportive** [1] - 77:23
**supports** [2] - 54:10, 225:1
**suppose** [1] - 116:19
**supposed** [5] - 142:23, 148:6, 171:16, 171:23, 172:1
**Supreme** [3] - 11:3, 45:15, 86:5
**surgery** [2] - 199:2
**surplus** [1] - 93:4
**surprised** [2] - 98:7, 98:15
**surrounding** [1] - 45:5
**survey** [2] - 141:19, 152:22
**surveys** [3] - 155:21, 156:24, 156:25
**sustain** [5] - 16:15, 37:5, 39:19, 168:24, 224:3
**sustained** [3] - 32:1, 35:15, 39:14
**SUZANNE** [1] - 4:20
**swag** [4] - 166:22, 166:25, 167:13
**swags** [1] - 166:24
**sweep** [1] - 109:9
**switch** [3] - 89:12, 123:9, 192:22
**switched** [1] - 21:6
**switching** [1] - 103:10
**sworn** [1] - 168:12
**SWORN** [2] - 7:19, 133:3
**symptoms** [3] - 58:16, 58:23, 59:4
**Syndrome** [9] - 14:2, 27:11, 33:22, 55:4, 57:4, 57:16, 58:3, 162:3
**synthetic** [2] - 170:25, 171:9
**syringe** [1] - 147:3
**System** [1] - 28:22
**system** [42] - 10:22, 15:10, 19:17, 19:23, 20:6, 27:15, 27:19, 29:5, 31:9, 31:22, 32:8, 33:11, 34:23, 35:5, 35:6, 36:16,

37:1, 40:4, 40:6, 42:4, 42:16, 43:15, 44:5, 46:25, 47:3, 47:4, 47:23, 66:7, 77:4, 78:14, 80:3, 80:12, 80:16, 83:14, 84:18, 84:20, 85:6, 88:23, 92:2, 128:23, 161:17, 197:16
**systems** [4] - 10:21, 12:9, 158:4, 197:5

---

**T**

**TA** [1] - 12:13
**Table** [1] - 111:11
**table** [2] - 105:24, 112:7
**tables** [1] - 111:1
**tackle** [1] - 9:20
**talks** [2] - 48:11, 206:17
**target** [1] - 87:25
**targeted** [2] - 22:12, 94:9
**task** [2] - 59:18, 59:20
**tasked** [1] - 15:7
**tasks** [2] - 59:17, 59:23
**taught** [1] - 172:14
**taxpayers** [5] - 91:14, 98:1, 98:8, 98:20, 102:25
**teach** [3] - 151:17, 166:17, 167:4
**teaching** [3] - 135:17, 151:20, 172:18
**tech** [3] - 136:24, 137:5, 137:6
**Technical** [1] - 10:22
**technical** [10] - 9:11, 9:14, 9:22, 10:5, 10:12, 10:15, 11:5, 12:13, 65:17, 103:10
**technician** [1] - 137:7
**TEDS** [4] - 29:8, 29:9, 34:12, 118:25
**teen** [1] - 143:12
**TEMITOPE** [1] - 4:13
**temperature** [1] - 180:1
**ten** [12] - 42:21, 44:3, 64:15, 133:19, 135:5, 155:5, 155:23, 162:19, 163:24, 164:1, 185:20, 185:24
**ten-year** [1] - 42:21
**tended** [1] - 63:9
**Tenth** [1] - 5:12

**tenure** [1] - 149:18
**term** [25] - 45:23, 45:24, 47:2, 47:4, 61:4, 61:13, 61:22, 61:23, 61:24, 63:7, 67:2, 89:16, 134:13, 141:11, 148:15, 152:5, 157:19, 161:3, 161:24, 167:11, 177:14, 187:18, 213:20
**terminology** [1] - 213:8
**terms** [7] - 25:5, 26:13, 118:3, 121:16, 122:25, 145:5, 180:1
**tertiary** [2] - 201:18, 201:21
**test** [8] - 38:5, 62:8, 62:17, 69:23, 139:23, 139:24, 149:24, 154:1
**testified** [18] - 14:4, 32:19, 38:23, 47:13, 55:17, 56:1, 68:19, 72:19, 73:12, 89:16, 96:2, 107:14, 108:5, 162:11, 191:3, 191:9, 207:7, 214:11
**testify** [5] - 17:19, 32:19, 57:7, 72:24, 79:9, 146:15, 162:17, 166:14, 226:14
**testimony** [42] - 8:5, 8:10, 9:24, 13:8, 13:17, 25:10, 42:6, 48:5, 49:20, 55:16, 56:3, 56:11, 57:6, 57:9, 57:16, 63:16, 71:25, 72:23, 73:5, 73:11, 73:15, 74:8, 85:7, 96:4, 102:1, 105:6, 106:6, 107:18, 109:8, 109:21, 116:2, 149:9, 159:9, 159:16, 160:4, 165:12, 168:23, 189:21, 191:20, 194:24, 221:19, 223:18
**testing** [2] - 62:14, 80:3
**THE** [179] - 1:1, 1:1, 1:4, 1:17, 7:6, 7:8, 7:11, 7:14, 7:16, 7:22, 7:23, 8:14, 10:3, 13:13, 18:1,

18:5, 20:9, 20:11,
26:25, 32:1, 32:10,
32:17, 33:2, 33:4,
34:8, 34:9, 34:11,
37:14, 37:19, 37:20,
38:8, 38:12, 38:21,
39:1, 39:6, 42:10,
42:11, 51:14, 55:23,
56:5, 57:7, 64:9,
64:13, 64:17, 64:20,
69:20, 83:22, 83:24,
94:3, 97:4, 103:8,
103:11, 103:17,
108:7, 108:9,
109:22, 109:23,
114:16, 114:18,
114:24, 115:5,
115:9, 115:10,
115:11, 115:14,
115:16, 115:19,
115:20, 115:22,
117:10, 117:12,
117:15, 117:18,
123:15, 123:18,
125:6, 125:9,
125:19, 125:25,
127:7, 127:20,
131:5, 131:10,
131:11, 131:13,
131:17, 131:22,
132:1, 132:3, 132:5,
132:7, 132:9,
132:10, 132:11,
132:12, 132:14,
132:15, 132:22,
132:25, 133:9,
147:18, 147:20,
147:22, 149:1,
149:6, 149:11,
150:9, 150:12,
152:9, 152:11,
152:15, 154:7,
154:9, 156:13,
156:18, 159:17,
160:1, 160:10,
164:4, 164:10,
164:14, 168:17,
168:24, 169:3,
169:7, 169:11,
169:12, 174:23,
174:24, 181:4,
181:6, 181:17,
181:19, 181:20,
181:22, 185:17,
185:20, 185:23,
185:24, 186:2,
186:21, 190:17,
190:25, 191:14,
191:25, 192:5,
192:6, 194:18,
196:16, 196:18,

202:2, 202:3, 202:5,
204:6, 204:14,
205:6, 209:1, 209:4,
209:8, 209:14,
209:24, 211:3,
211:7, 211:12,
211:17, 220:4,
220:13, 220:19,
221:22, 223:15,
223:20, 224:3,
226:4, 226:7, 226:9,
226:10, 227:13,
228:2, 228:6
**themes** [1] - 23:24
**themselves** [2] -
21:19, 47:25
**therapists** [1] - 152:7
**therapy** [8] - 72:12,
80:17, 100:12,
138:21, 152:6,
157:25, 161:4,
217:19
**therefore** [4] - 32:15,
159:12, 220:16,
220:17
**they've** [12] - 9:18,
11:24, 24:4, 24:5,
31:17, 40:9, 41:10,
41:17, 93:18, 103:2,
161:22, 162:5
**third** [8] - 49:25,
54:20, 95:22, 96:1,
96:8, 110:23, 180:4,
187:17
**thirds** [2] - 201:23,
208:9
**thirty** [2] - 213:17,
216:19
**thirty-day** [2] - 213:17,
216:19
**Thomas** [2] - 2:10,
226:17
**Three** [2] - 6:5, 78:17
**three** [20] - 6:12,
36:14, 58:20, 79:13,
79:20, 79:22, 80:2,
81:16, 139:8,
140:21, 140:22,
144:12, 152:25,
153:5, 164:21,
166:21, 224:21,
224:22, 227:1, 227:2
**three-digit** [1] - 139:8
**three-year-olds** [1] -
80:2
**throughout** [3] -
63:16, 107:20, 156:9
**throughs** [1] - 35:20
**Thursday** [1] - 227:25
**tie** [1] - 37:9

**tied** [1] - 101:20
**ties** [1] - 101:8
**tighten** [2] - 213:1
**time's** [1] - 148:9
**timely** [1] - 47:9
**timing** [1] - 59:9
**TIMOTHY** [1] - 5:9
**Title** [7] - 77:7, 77:9,
77:14, 77:16, 77:25,
78:1, 101:23
**title** [3] - 203:21,
213:6, 213:8
**titled** [3] - 175:5,
175:11, 175:20
**tobacco** [5] - 147:11,
147:12, 147:24,
148:1
**today** [33] - 8:5, 8:10,
15:15, 47:13, 57:6,
65:3, 72:9, 72:16,
73:23, 75:10, 75:16,
76:14, 84:6, 90:24,
103:22, 104:17,
116:2, 118:11,
118:19, 148:9,
162:17, 169:16,
171:5, 171:6, 171:7,
182:4, 192:13,
194:3, 194:24,
196:23, 201:17,
225:10, 226:18
**toddler** [1] - 54:17
**toddler-hood** [1] -
54:17
**together** [8] - 10:21,
12:11, 24:10, 41:1,
54:24, 168:19,
222:25
**tolerance** [3] - 183:9,
185:9, 187:15
**tomorrow** [7] -
151:17, 226:15,
226:22, 227:11,
227:14, 227:15,
227:22
**took** [4] - 24:6,
167:21, 185:14,
197:18
**tools** [3] - 12:13,
46:14
**top** [9] - 61:18, 71:16,
75:21, 95:20,
101:19, 198:6,
212:12, 222:16
**topic** [1] - 14:6
**totally** [2] - 153:25,
221:6
**touched** [1] - 218:19
**towards** [1] - 176:19
**Tower** [2] - 3:4, 4:23

**track** [6] - 67:15,
136:23, 144:24,
154:1, 154:9
**tracked** [4] - 67:19,
67:21, 68:2, 68:9
**tracking** [1] - 62:20
**trained** [1] - 92:21
**training** [7] - 40:21,
88:12, 88:13,
137:21, 137:24,
138:1, 138:13
**trajectory** [1] - 54:18
**transcript** [2] - 6:19,
229:4
**transition** [1] - 146:18
**transportation** [1] -
80:16
**trauma** [16] - 21:18,
22:2, 22:14, 22:20,
24:4, 40:9, 40:17,
41:4, 41:10, 41:11,
41:12, 41:13, 45:22,
50:18, 50:19, 198:22
**trauma-informed** [1] -
50:18
**trauma-specific** [1] -
50:19
**traumatic** [4] - 22:15,
41:18, 50:17, 198:24
**tread** [2] - 56:12
**treat** [6] - 24:1,
177:12, 178:18,
180:10, 180:18,
219:2
**treated** [3] - 73:22,
108:11, 157:21
**treating** [1] - 178:16
**Treatment** [20] -
10:22, 14:6, 29:9,
52:19, 74:3, 74:21,
84:12, 84:21, 84:22,
85:8, 85:21, 85:23,
86:1, 86:2, 86:5,
86:12, 86:14, 96:15,
97:15, 105:25
**treatment** [79] - 9:13,
10:24, 11:20, 12:5,
16:25, 23:16, 23:19,
24:2, 28:13, 29:12,
34:13, 34:18, 34:20,
35:25, 36:1, 45:16,
50:21, 51:1, 51:18,
51:24, 52:2, 52:6,
52:7, 52:23, 52:24,
53:14, 53:23, 70:21,
71:2, 71:3, 74:7,
74:16, 74:23, 77:21,
77:22, 86:20, 91:25,
92:2, 93:3, 93:18,
94:22, 94:25, 95:5,

95:24, 96:10, 96:24,
97:11, 97:17, 97:24,
98:16, 98:21, 99:21,
106:7, 106:13,
106:23, 107:12,
107:13, 107:16,
107:22, 108:23,
109:10, 109:18,
118:20, 126:8,
128:23, 129:24,
130:1, 130:4, 180:2,
188:3, 203:8,
210:21, 212:20,
214:20, 215:9
**tremors** [1] - 46:17
**trend** [1] - 19:15
**trending** [1] - 145:1
**trends** [1] - 11:12
**Tri** [1] - 134:8
**Tri-State** [1] - 134:8
**trial** [2] - 57:9, 70:4,
175:2
**TRIAL** [1] - 1:16
**Trial** [1] - 228:7
**trials** [1] - 162:6
**tribes** [2] - 9:12, 9:15
**tribulations** [1] -
162:7
**tried** [3] - 9:18, 23:13,
151:24
**trillion** [1] - 166:8
**trimester** [1] - 53:10
**troubling** [1] - 45:4
**truck** [1] - 137:1
**true** [11] - 81:15,
85:11, 91:8, 91:12,
155:20, 165:19,
170:14, 171:4,
171:5, 198:17,
198:18
**trust** [2] - 165:10
**truth** [1] - 168:12
**try** [12] - 16:12, 33:6,
42:24, 56:17, 64:1,
69:25, 97:7, 105:21,
121:14, 153:19,
178:5, 221:25
**trying** [30] - 9:19,
10:20, 14:1, 16:5,
17:4, 38:5, 39:13,
45:17, 51:25, 53:14,
68:16, 76:13,
112:15, 144:20,
148:7, 151:25,
158:18, 161:3,
167:10, 170:5,
170:14, 170:18,
170:21, 184:23,
185:15, 188:19,
191:20, 214:4,

219:15, 221:20
**Tuesday** [3] - 152:2, 152:8, 160:24
**turn** [23] - 40:1, 47:22, 49:25, 55:1, 95:9, 105:24, 110:9, 119:13, 124:6, 124:16, 127:25, 128:4, 128:21, 175:11, 175:18, 179:14, 180:4, 182:21, 188:9, 212:10, 215:12, 217:8, 222:15
**turnover** [1] - 21:19
**Twelfth** [3] - 4:19, 4:21, 5:5
**twice** [1] - 139:14
**two** [45] - 18:21, 21:24, 36:14, 36:16, 45:18, 54:3, 58:20, 62:9, 62:16, 65:15, 65:22, 67:19, 68:4, 80:8, 88:11, 89:22, 92:12, 95:13, 96:1, 133:22, 135:7, 138:2, 141:11, 145:15, 154:22, 164:23, 165:1, 197:13, 197:15, 197:17, 197:19, 198:2, 198:5, 198:9, 199:16, 201:23, 208:9, 213:17, 222:25, 225:16, 226:13, 227:23
**two-generation** [1] - 54:3
**two-thirds** [2] - 201:23, 208:9
**two-year** [2] - 95:13
**tying** [1] - 168:7
**Tylenol** [1] - 178:14
**type** [13] - 26:4, 81:13, 110:5, 113:24, 120:8, 143:7, 143:8, 148:17, 149:17, 152:22, 153:18, 182:11, 224:9
**types** [7] - 50:7, 89:11, 95:2, 128:17, 145:9, 151:21, 159:7
**Typically** [1] - 93:12
**typically** [11] - 26:5, 48:6, 60:11, 76:7, 76:22, 85:16, 85:18, 99:8, 101:10, 101:17, 222:8

## U

**U.S** [2] - 94:8, 213:2
**unable** [2] - 92:18, 93:5
**uncompensated** [1] - 157:25
**under** [16] - 21:25, 55:25, 100:1, 100:5, 125:8, 125:21, 130:2, 139:6, 145:11, 168:5, 168:12, 177:13, 177:15, 204:25, 211:13, 213:21
**under-appreciation** [1] - 177:13
**underline** [2] - 172:1, 172:6
**underneath** [1] - 205:22
**understood** [9] - 73:4, 73:11, 155:6, 163:22, 209:4, 210:12, 210:25, 214:22, 224:18
**undertreated** [5] - 176:15, 177:16, 177:17, 177:24, 178:9
**undertreatment** [1] - 179:11
**undisclosed** [2] - 55:22, 55:25
**unexpected** [1] - 175:16
**unified** [1] - 197:15
**unintended** [1] - 219:10
**unique** [1] - 79:4
**unit** [2] - 71:6, 198:16
**United** [6] - 7:2, 91:15, 110:12, 111:14, 124:20, 188:13
**UNITED** [2] - 1:1, 1:17
**universal** [1] - 79:18
**university** [1] - 196:6
**University** [28] - 63:2, 135:2, 135:3, 135:11, 135:15, 135:18, 136:7, 136:10, 137:17, 137:19, 137:21, 138:2, 138:11, 139:15, 139:16, 139:17, 172:15, 194:5, 194:8, 195:12, 195:13, 195:15, 195:19, 195:21, 195:23,

196:1, 196:8, 196:11
**University's** [1] - 195:10
**unknown** [1] - 225:24
**Unless** [2] - 79:11, 192:10
**unless** [3] - 7:9, 56:1, 93:17
**unnecessarily** [1] - 216:7
**unusual** [1] - 92:10
**up** [76] - 16:17, 20:3, 20:23, 20:25, 22:2, 27:14, 32:2, 37:9, 38:5, 44:6, 44:9, 44:10, 45:16, 45:19, 51:21, 55:17, 59:25, 63:10, 63:19, 63:25, 64:8, 69:11, 71:16, 77:12, 78:11, 82:18, 86:5, 92:2, 93:1, 93:18, 94:24, 97:14, 101:10, 104:14, 104:21, 105:3, 105:11, 108:18, 109:14, 110:25, 113:12, 113:24, 115:12, 118:8, 131:20, 132:13, 136:15, 140:13, 145:1, 147:1, 154:4, 154:9, 162:14, 163:1, 163:10, 163:16, 166:4, 166:6, 170:23, 176:4, 176:14, 178:3, 181:15, 181:24, 184:10, 186:15, 187:4, 194:12, 201:23, 202:21, 205:24, 205:25, 208:11, 226:25, 227:15
**updates** [1] - 222:8
**useful** [1] - 128:14
**utilize** [2] - 145:10, 151:1
**utilized** [3] - 89:13, 101:14, 198:2
**utilizing** [2] - 142:20, 144:12

## V

**VA** [1] - 174:10
**vacation** [2] - 109:14, 186:14
**vaccinate** [3] - 154:3, 154:11, 154:18
**vaccination** [1] -

154:4
**vaccine** [1] - 149:23
**Vaglienti** [2] - 203:17, 203:19, 205:18
**vague** [1] - 31:24
**value** [1] - 227:6
**valve** [1] - 157:23
**valves** [1] - 156:7
**Vanderbilt** [1] - 63:2
**vaping** [2] - 143:11, 143:12
**variables** [3] - 67:19, 68:4, 68:5
**variation** [1] - 62:3
**variety** [3] - 89:20, 100:12, 138:18
**various** [17] - 10:12, 15:13, 16:9, 16:16, 17:1, 28:15, 31:16, 50:17, 62:3, 72:7, 90:3, 119:24, 120:21, 158:1, 165:23, 174:2, 174:5
**vehicle** [1] - 208:21
**Ventura** [1] - 3:15
**verbal** [1] - 139:23
**verify** [1] - 102:23
**version** [1] - 189:25
**versus** [1] - 106:18
**veterans** [1] - 11:18
**via** [1] - 70:9
**victim** [1] - 159:3
**victims** [1] - 24:18
**view** [8] - 64:3, 151:6, 164:17, 170:10, 170:11, 170:12, 178:14, 197:19
**Virginia** [131] - 4:24, 7:3, 7:4, 10:9, 11:2, 20:15, 20:24, 21:4, 29:13, 30:9, 32:6, 33:11, 35:5, 40:11, 42:17, 42:20, 43:1, 44:13, 45:3, 45:15, 51:21, 51:23, 57:25, 60:13, 65:23, 67:14, 67:16, 68:3, 68:9, 76:1, 76:21, 76:24, 77:1, 77:19, 78:17, 78:22, 79:14, 79:21, 81:16, 84:11, 86:2, 86:8, 86:15, 86:16, 91:14, 92:9, 92:10, 92:12, 93:4, 93:8, 93:23, 94:6, 95:20, 95:25, 96:8, 96:22, 97:9, 98:2, 98:9, 99:1, 99:7, 99:12, 99:17, 99:22, 100:5, 100:8, 100:11,

154:4
**vaccine** [1] - 149:23
101:21, 102:18, 102:19, 102:24, 105:18, 105:25, 106:4, 106:14, 106:22, 106:23, 107:7, 107:13, 107:20, 110:13, 111:15, 112:4, 112:13, 112:20, 112:24, 112:25, 113:5, 113:13, 118:20, 124:4, 124:18, 125:14, 126:4, 126:7, 126:16, 128:17, 129:24, 129:25, 130:13, 130:21, 132:18, 133:17, 136:7, 136:10, 136:15, 140:4, 151:14, 176:11, 176:14, 187:2, 194:16, 194:21, 198:4, 198:7, 198:16, 201:13, 204:18, 205:10, 206:3, 206:20, 208:12, 208:25, 210:3, 213:11, 214:1, 214:9, 215:23, 216:17, 219:9, 220:11
**VIRGINIA** [2] - 1:1, 1:18
**Virginia's** [8] - 29:5, 79:3, 92:6, 93:19, 124:22, 127:3, 128:23, 213:5
**Virginians** [1] - 99:24
**visit** [2] - 30:2, 213:18
**visits** [1] - 85:17
**vital** [5] - 178:5, 179:20, 179:24, 182:10, 182:17
**vocational** [1] - 88:2
**voice** [1] - 167:9
**VOLUME** [1] - 1:16
**volunteer** [1] - 152:3
**vouch** [1] - 168:16
**vs** [1] - 229:6
**vulnerable** [1] - 19:25

## W

**wait** [9] - 36:3, 54:19, 59:9, 60:11, 73:25, 74:4, 74:9, 74:14, 162:16
**waiting** [2] - 163:15, 191:15

**waitlisted** [2] - 47:21
**waiver** [6] - 99:13, 99:16, 99:18, 99:20, 99:25, 152:13
**Waiver** [1] - 130:2
**WAKEFIELD** [1] - 5:13
**walk** [3] - 158:5, 158:14, 184:17
**wander** [1] - 112:6
**wards** [1] - 166:20
**Washington** [6] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12
**watched** [1] - 41:17
**watches** [1] - 139:2
**ways** [12] - 19:16, 23:17, 31:18, 45:18, 46:3, 46:22, 64:5, 89:20, 90:3, 128:23, 151:1, 163:1
**wealth** [1] - 47:15
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**Wednesday** [1] - 186:8
**week** [3] - 31:4, 151:17, 158:18
**weekend** [1] - 183:25
**weekly** [2] - 72:13, 74:10
**weeks** [1] - 157:24
**welcome** [3] - 69:22, 115:24, 186:25
**Welfare** [2] - 14:21, 101:17
**welfare** [55] - 9:12, 11:7, 12:6, 12:23, 13:18, 14:20, 15:2, 15:9, 16:25, 19:23, 20:6, 21:13, 21:17, 21:20, 21:23, 27:15, 27:19, 28:13, 28:24, 31:9, 31:22, 32:8, 33:11, 35:5, 35:6, 36:16, 39:8, 40:4, 40:6, 42:4, 42:16, 43:14, 46:25, 47:2, 47:4, 47:22, 63:25, 66:7, 67:15, 67:17, 68:9, 77:4, 84:18, 84:20, 85:6, 85:17, 86:12, 88:22, 89:8, 95:5, 95:6, 102:7, 102:22, 105:1, 111:25
**well-being** [1] - 47:7
**Werthammer** [3] - 72:18, 72:24, 73:12
**Wesley** [1] - 133:16
**West** [139] - 7:3, 7:4,

10:9, 11:2, 20:15, 20:24, 21:4, 29:4, 29:13, 30:9, 32:6, 33:11, 35:5, 40:11, 42:16, 42:20, 43:1, 44:13, 45:3, 45:15, 51:21, 51:23, 57:25, 60:13, 65:23, 67:14, 67:16, 68:2, 68:9, 76:1, 76:21, 76:24, 77:1, 77:19, 78:17, 78:22, 79:3, 79:14, 79:21, 81:15, 84:11, 86:2, 86:8, 86:14, 86:16, 91:14, 92:6, 92:9, 92:10, 92:12, 93:4, 93:7, 93:19, 93:23, 94:6, 95:20, 95:25, 96:8, 96:22, 97:9, 98:2, 98:9, 99:1, 99:7, 99:12, 99:17, 99:22, 99:24, 100:4, 100:8, 100:10, 101:21, 102:18, 102:19, 102:24, 105:18, 105:25, 106:4, 106:13, 106:22, 106:23, 107:7, 107:13, 107:20, 110:13, 111:14, 112:4, 112:13, 112:20, 112:24, 112:25, 113:5, 113:13, 118:20, 124:3, 124:18, 124:22, 125:14, 126:4, 126:7, 126:16, 127:3, 128:17, 128:23, 129:24, 129:25, 130:12, 130:21, 132:18, 133:17, 136:7, 136:9, 136:15, 140:4, 151:14, 176:11, 176:13, 187:2, 194:16, 194:21, 198:4, 198:6, 198:16, 201:12, 204:18, 205:10, 206:3, 206:19, 208:12, 208:25, 210:3, 213:4, 213:11, 214:1, 214:9, 215:23, 216:17, 219:9, 220:11
**WEST** [2] - 1:1, 1:18
**whatsoever** [2] - 165:5, 224:7

**wheel** [1] - 137:1
**Wheeling** [1] - 132:18
**whereas** [1] - 77:25
**whole** [15] - 22:23, 24:1, 34:23, 105:19, 106:4, 106:14, 111:14, 112:13, 112:20, 112:24, 113:5, 113:13, 162:21, 209:20, 212:16
**WICHT** [1] - 4:18
**wide** [1] - 107:24
**wife** [1] - 165:6
**wild** [3] - 167:1, 167:2, 167:13
**Williams** [3] - 4:18, 5:4, 227:7
**window** [4] - 42:1, 54:25, 58:18, 58:24
**withdraw** [2] - 169:1, 191:17
**Withdrawal** [1] - 27:11
**withdrawal** [7] - 14:3, 46:16, 51:3, 58:17, 58:23, 59:3, 61:22
**withdrawn** [3] - 183:9, 185:8, 187:14
**WITNESS** [47] - 7:14, 7:16, 7:19, 7:22, 20:11, 33:4, 34:9, 34:11, 37:20, 39:6, 42:11, 64:17, 69:20, 108:9, 109:23, 114:24, 115:10, 115:14, 115:19, 117:12, 131:10, 132:5, 132:9, 132:11, 132:14, 132:25, 133:3, 147:18, 147:20, 147:22, 150:9, 150:12, 152:11, 154:7, 154:9, 169:12, 174:24, 181:6, 181:19, 181:22, 185:23, 190:25, 192:5, 202:2, 202:5, 209:4, 226:9
**witness** [38] - 37:15, 38:23, 38:25, 55:16, 55:22, 56:1, 69:19, 73:5, 108:5, 115:16, 125:17, 125:24, 127:1, 131:3, 132:19, 132:21, 148:25, 149:8, 156:12, 159:10, 159:19, 164:8,

168:16, 186:6, 190:15, 190:23, 191:19, 204:12, 209:12, 220:14, 220:16, 220:18, 221:12, 221:18, 223:17, 227:3, 227:5, 228:3
**witness's** [1] - 160:8
**witnessed** [1] - 166:16
**witnesses** [2] - 226:13, 227:1
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**women** [69] - 11:16, 15:2, 22:7, 22:11, 27:6, 34:19, 34:24, 35:2, 36:9, 50:1, 50:3, 50:12, 50:15, 51:17, 51:20, 51:23, 52:2, 52:5, 52:8, 52:9, 52:16, 52:25, 53:8, 53:19, 54:1, 63:12, 70:21, 71:18, 71:20, 72:9, 72:16, 73:21, 73:22, 73:25, 74:7, 74:9, 75:7, 75:15, 75:18, 75:19, 88:1, 99:5, 99:11, 104:23, 105:17, 106:3, 106:6, 106:12, 106:15, 106:19, 107:3, 107:6, 107:9, 107:12, 107:25, 108:2, 108:10, 108:21, 109:1, 116:14, 116:17, 116:21, 117:1, 117:6, 118:19
**Women** [1] - 14:11
**WONDER** [3] - 29:8, 34:23, 52:7
**word** [8] - 90:11, 190:4, 222:5, 223:3, 224:5, 224:6, 224:8, 224:21
**words** [6] - 116:8, 125:17, 170:5, 170:10, 170:14, 170:23
**worker** [1] - 44:7
**workers** [12] - 21:13, 21:18, 21:20, 24:25, 25:1, 28:24, 31:15, 33:15, 35:10, 42:23, 63:25, 92:20
**works** [8] - 9:17, 16:7, 17:11, 23:21, 30:1,

37:6, 89:10, 89:11
**world** [1] - 48:11
**worse** [2] - 62:18, 62:21
**wrap** [9] - 36:15, 63:10, 63:19, 64:8, 78:11, 87:24, 88:12, 88:14, 186:15
**wrap-around** [1] - 36:15
**write** [6] - 17:6, 105:11, 116:24, 119:7, 120:13, 122:3
**writers** [1] - 36:11
**writing** [1] - 123:4
**written** [3] - 105:14, 124:3, 139:24
**wrote** [1] - 178:10
**wu** [1] - 32:10
**WU** [65] - 5:10, 18:3, 31:24, 32:11, 32:22, 37:13, 37:15, 38:22, 56:14, 103:9, 103:13, 103:16, 103:19, 104:16, 108:15, 110:4, 114:17, 115:21, 115:23, 117:8, 117:13, 117:21, 117:22, 123:11, 123:16, 123:19, 125:1, 125:7, 125:11, 125:23, 126:1, 127:9, 127:23, 127:24, 130:25, 131:7, 149:7, 159:8, 169:10, 169:14, 169:18, 169:21, 174:21, 174:25, 181:9, 181:10, 181:15, 181:23, 185:19, 186:23, 186:24, 190:9, 190:14, 190:19, 190:22, 191:7, 191:19, 192:7, 194:15, 194:19, 220:14, 221:11, 221:17, 223:16, 226:5
**Wu** [19] - 103:8, 103:20, 114:16, 117:20, 125:6, 125:20, 127:8, 127:22, 131:6, 149:6, 169:9, 169:15, 171:15, 185:18, 186:2, 186:22, 192:6,

221:23, 223:15
**Wu's** [1] - 160:4
**WV** [15] - 2:8, 3:10,
3:13, 4:24, 5:15, 6:9,
123:11, 123:21,
125:3, 130:12,
131:1, 174:21,
175:2, 182:22,
220:11
**WVU** [4] - 203:14,
203:20, 205:20,
226:20

## X

**x's** [1] - 118:8

## Y

**Y-i-n-g-l-i-n-g** [1] -
133:7
**year** [36] - 20:1, 42:21,
65:7, 80:2, 81:21,
81:24, 91:8, 93:12,
93:13, 95:13, 99:19,
118:23, 126:22,
134:14, 138:3,
138:4, 139:16,
140:10, 140:17,
141:11, 141:16,
141:24, 144:8,
144:9, 145:13,
145:20, 146:12,
147:6, 147:7,
155:12, 162:24,
191:4, 191:13
**year-long** [1] - 139:16
**yearly** [1] - 144:15
**years** [41] - 11:14,
12:12, 14:22, 18:14,
20:7, 30:8, 36:14,
36:15, 36:16, 39:22,
52:23, 79:20, 86:15,
92:12, 93:11, 93:15,
96:1, 118:15,
133:19, 135:6,
135:7, 137:9, 138:2,
141:11, 141:18,
144:12, 144:17,
145:15, 146:19,
148:10, 151:19,
152:25, 153:5,
155:5, 155:23,
162:19, 163:23,
163:24, 164:1,
193:14, 222:12
**yes/no** [1] - 117:25
**yesterday** [5] -
151:24, 152:1,
158:13
**Yingling** [22] - 132:21,

132:25, 133:6,
133:16, 152:10,
159:9, 169:14,
169:22, 184:25,
185:22, 186:25,
191:9, 192:4,
194:20, 196:21,
202:9, 204:21,
208:9, 210:2,
211:10, 211:19,
226:7
**YINGLING** [1] - 133:3
**Yingling's** [1] - 159:14
**York** [1] - 3:5
**Young** [60] - 7:10,
7:12, 7:16, 8:1, 8:3,
8:16, 9:15, 11:16,
17:23, 18:5, 18:10,
22:6, 32:5, 32:18,
38:21, 42:14, 43:4,
44:25, 56:10, 56:17,
57:15, 62:17, 64:12,
64:16, 64:24, 70:11,
73:14, 74:8, 76:2,
82:23, 84:13, 86:25,
87:15, 90:19, 92:5,
93:22, 94:5, 97:16,
100:23, 103:7,
103:20, 104:3,
104:17, 105:15,
114:22, 115:1,
115:11, 115:16,
115:24, 117:2,
117:11, 117:23,
119:8, 123:8,
123:20, 126:2,
127:9, 127:25,
131:8, 132:4
**young** [44] - 8:4, 10:5,
12:21, 13:4, 13:16,
14:12, 15:23, 17:6,
21:22, 21:25, 23:5,
24:12, 25:7, 25:17,
27:2, 27:21, 28:5,
29:20, 34:2, 34:16,
35:4, 37:9, 38:17,
40:1, 41:4, 42:2,
43:24, 46:24, 47:19,
47:23, 47:24, 48:19,
48:21, 49:3, 51:6,
51:16, 53:17, 54:25,
60:3, 61:3, 63:10,
63:19, 105:1, 113:17
**YOUNG** [1] - 7:19
**Young's** [4] - 56:22,
57:2, 57:6, 127:15
**younger** [1] - 20:8
**yourself** [3] - 120:3,
165:2, 202:5

## Z

**zillion** [2] - 166:7,
166:8