IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____x
                                :
THE CITY OF HUNTINGTON,         :     Civil Action
                                :
            Plaintiff,          :     No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
            Defendants.  :
_____x
                                :
CABELL COUNTY COMMISSION,       :     Civil Action
                                :
            Plaintiff,          :     No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
            Defendants.  :
_____x


BENCH TRIAL - VOLUME 29
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


JUNE 17, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301


**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087

Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A.

 2   Faber, Senior Status Judge, United States District

 3   Court, Southern District of West Virginia, in

 4   Charleston, West Virginia, on June 17, 2021, at 9:00

 5   a.m., as follows:

 6              THE COURT:  Mr. Farrell, are you ready to go?

 7              MR. FARRELL:  Yes, I am, Your Honor.  Thank you.

 8   The plaintiffs call Dr. Thomas McGuire.  M-c-G-u-i-r-e.

 9              THE COURT:  Mr. McGuire, if you will come up here,

10   the clerk will give you the oath.

11              COURTROOM DEPUTY CLERK:  Please state your name.

12              THE WITNESS:  Thomas McGuire.

13              COURTROOM DEPUTY CLERK:  And please raise your

14   right hand.

15          DR. THOMAS MCGUIRE, PLAINTIFF WITNESS, SWORN

16              COURTROOM DEPUTY CLERK:  Thank you.  Please be

17   seated.

18              THE COURT:  Good morning, sir.

19                       DIRECT EXAMINATION

20          MR. FARRELL:

21   Q.   Good morning.  Would you please state your full name

22   for the record?

23   A.   Thomas McGuire.

24   Q.   And, Dr. McGuire, what is your profession?

25   A.   I'm a health economist.
```

1    **Q.**    And where do you practice health economics?

2    **A.**    I work in the Department of Healthcare Policy at

3    Harvard Medical School.

4    **Q.**    Would you mind taking your microphone and kind of

5    tilting it up a little bit?

6    **A.**    Like this?  How is that?

7    **Q.**    Okay.  So, you are a health economist.  Would you

8    please tell the Court, what is a health economist?

9    **A.**    Well, a health economist is a PhD in economics and they

10   specialize in the economics of the healthcare industry, the

11   pharmaceutical industry, hospitals, doctors, health

12   insurance companies.

13   **Q.**    And so, what is your actual academic position at

14   Harvard?

15   **A.**    It's -- the title is Professor of Health Economics.

16   **Q.**    And so, what does -- what do your job responsibilities

17   include?

18   **A.**    They include teaching and research.  I teach a course

19   in the spring for graduate health economic students and then

20   I conduct research.

21   **Q.**    Okay.  So, let's back up a little bit now and talk

22   about your educational background.  Where did you go to

23   school and what degrees did you earn?

24   **A.**    My college education was Princeton, Economics, 1971.

25   My PhD was Yale, 1976, also in Economics.

1    **Q.**    And after your doctoral degree, did you do any

2    postdoctoral research?

3    **A.**    I -- I did.  I was a postdoctoral National Institute of

4    Mental Health Research fellow at Yale between -- in the

5    academic year '80-'81.

6    **Q.**    Okay.  After your educational accomplishments, what did

7    you do next?

8    **A.**    Then I went to work.  My first job was at Boston

9    University in the Department of Economics.  I worked there

10   for 25 years.  I worked in health economics that entire

11   time.  And then, in 2001, I moved to the Department of

12   Healthcare Policy at Harvard Medical School, where I guess

13   I've been now for 20 years.

14   **Q.**    Are you a member of any organizations?

15   **A.**    I'm a member of the National Academy of Medicine, which

16   used to be called the Institute of Medicine, and then

17   several professional organizations.

18   **Q.**    All right.  So, let's talk about what's formerly known

19   as the Institute of Medicine.  What is that?

20   **A.**    It's a national body that is, I would say, honorary

21   membership.  If a scientist, or practitioner, administrator

22   has had a distinguished career they would be nominated for

23   the Institute of Medicine.  They would be elected by the

24   members.  And then, part of the duties of an Institute of

25   Medicine member is to research at the request of Congress

1    and sometimes other parties and to do it for no pay.

2    **Q.**    So, and I asked you this question in a simpler way, I'm

3    sure, but health economists, do you all have your own

4    professional organization?

5    **A.**    We do.  There is an International Health Economics

6    Association and then there's an American Society of Health

7    Economists.  I'm a member of both of those.

8    **Q.**    All right.  And I promised not to embarrass you, but

9    I'm going to point out, is there any recent award that you

10   received from your organization that you're particularly

11   appreciative of?

12   **A.**    Yes, there is.

13   **Q.**    And what is that?

14   **A.**    This was 2018.  It was from the American Society of

15   Health Economics and it was a Lifetime Achievement Award.

16   **Q.**    Now, and in addition, is your -- do health economists

17   have a particular journal that publishes papers?

18   **A.**    Yes.  There's the Journal of Health Economics, which is

19   generally regarded as the most prestigious journal in health

20   economics.  There are others that also publish health

21   economics papers.

22   **Q.**    And do you have any affiliation or have you worked with

23   this journal in the past?

24   **A.**    I was an editor of the journal for ten years beginning,

25   I don't know, 2002 or something.

1    **Q.**   All right.  And without belaboring the point, you are

2    published?

3    **A.**   Yes.

4    **Q.**   And approximately how many papers and textbooks or

5    texts have you published?

6    **A.**   I would say authored or edited maybe ten or so books

7    and 250 papers, something like that.

8    **Q.**   Now, you said that you conduct research and over your

9    ex -- distinguished career -- not extinguished career.

10   **A.**   Be careful.

11   **Q.**   Strike that from the record.

12        (Laughter)

13            BY MR. FARRELL:

14   **Q.**   Over your distinguished career, can you tell the judge

15   a little bit about some of the notable sources of funding

16   you have received for your research?

17   **A.**   Okay.  I would say the primary source of funding has

18   been the National Institute of Health and that's comprised

19   of separate agencies such as the National Institute of

20   Mental Health, that helped pay for my post-doc, that I've

21   led a number of research proposals through that agency.  The

22   National Institute of Alcohol and Alcohol Abuse, the

23   National Institute of Aging, and the National Institute of

24   Drug Abuse, all a part of National Institute of Health, and

25   then there's also been private foundations.

1    Q.   Very good.

2         MR. FARRELL:  Judge, at this point, I would ask

3    the Court to acknowledge and recognize Dr. McGuire as an

4    expert health economist and allow him to testify

5    accordingly.

6         THE COURT:  Any objection?

7         MS. HARDIN:  I have no objection to his

8    qualifications, Your Honor.

9         MR. SCHMIDT:  Your Honor, we don't objectify to

10   his qualification.  We did have a *Daubert* motion regarding,

11   among other things, between his testimony and what this case

12   is about and we would just preserve that.

13        THE COURT:  Well, I understand that and that's

14   pending, but I will recognize Dr. McGuire as obviously an

15   expert in the field of health economics.

16        MR. FARRELL:  Thank you.

17        BY MR. FARRELL:

18   Q.   Dr. McGuire, you prepared a report that was disclosed

19   in this case, correct?

20   A.   I did, yes.

21   Q.   And for your testimony today, have you helped prepare

22   slides for a demonstrative to assist you in your testimony

23   with the Court?

24   A.   I have.

25   Q.   And would it be helpful for you to see those slides up

1    on the screen as we move forward?

2    **A.**    Yes, it would.

3         MR. FARRELL:  Judge, at this point, I would like

4    to publish the front page of the demonstrative and I also

5    have disclosed it and have copies to circulate.

6         THE COURT:  You may do so.

7         MR. FARRELL:  Judge, with your permission?

8         THE COURT:  Yes.

9         BY MR. FARRELL:

10   **Q.**    So, Dr. McGuire, I've asked this of most of the experts

11   that come into the courtroom.  Let's just start with the big

12   picture.  Will you please tell the judge what is it you

13   understand to be your role in this case and why, based on

14   your understanding, have we asked you to come and testify?

15   **A.**    Okay.  I understand my role to be putting an economic

16   valuation on some of the harms that have been identified by

17   previous witnesses due to prescription opioids.

18   **Q.**    So, let's talk about first what this is not.  You are

19   not putting a value on what, in the legal world, we call a

20   damages claim, correct?

21   **A.**    Oh, I don't -- no, I'm not doing that.

22   **Q.**    What it is that we've asked you to do is to take the

23   related harms that have been proffered for the Court and

24   perform an economic analysis to place a value on it.  Do you

25   understand that?

**A.**   That's correct.  I do understand, yes, that's what I --
that's what I'm doing.

**Q.**   All right.  So, there's two particular related harms
that I would like for you to address today.  Can we go to
the next slide, please?  And these are deaths and morbidity.
Can you walk through with the Court the valuation method and
the source of your count and what that means?

**A.**   Okay.  So, there's two here.  Let me start with deaths.
Professor Keyes testified regarding the number of deaths in
the Cabell-Huntington area that were due to prescription
opioids and those are numbers like 120, 150 per year.

     And what I did with those numbers is associate a value
to each of those deaths using standard economic methodology.
So, that would be -- it's going to be a number in the
millions.

     And then, so for each death valued in the millions,
it's a product.  How many people died?  What is the
valuation of that person's life?  And that would then be the
total of costs imposed on a community by the prescription
opioids in the form of death.

**Q.**   What about morbidity?

**A.**   And death is the biggest, which makes a lot of sense.
So, that's where most of the weight comes in.

     Morbidity follows a similar methodology.  It begins
with Professor Keyes' count of the number of individuals in

1    Cabell-Huntington with OUD in any particular year and that's

2    also in the number of hundreds per year.  That's what her

3    testimony was.

4         And then, as an economist, I start with those counts

5    and put a dollar value on each of those individuals per

6    year.

7         Now, if I could mention one more step about what is

8    being done here, you see on the slide, it says excess

9    healthcare costs.  So, what I'll be testifying about, Judge,

10   is one aspect of the costs associated with OUD, which is the

11   excess healthcare costs and, obviously, there are many other

12   -- many other probably more serious ones, loss of function,

13   loss of parenting.  None of those do I put an economic value

14   on.  The numbers you'll see are only the excess healthcare

15   costs of OUD.

16   **Q.**   Now, the next slide that you prepared is entitled

17   Conservative Approach and would you please explain to the

18   judge why you felt the need to discuss your approach and why

19   it's conservative?

20   **A.**   Well, I think it's important for the Court to

21   understand that there's a methodology when it comes to

22   economics.  It values things, but it has limitations.  And,

23   in this realm, there are some important limitations

24   regarding things that are not counted.  So, the value of a

25   life is only from the perspective of the victim and I think

1    it's obvious the community and the family also are harmed if

2    a family member dies.

3        And then morbidity, I got ahead of myself a little bit

4    on this.  I am only counting excess healthcare costs;

5    whereas, there's many, many adverse consequences of someone

6    who is sick with OUD.

7    **Q.**   All right.  So, the first thing I would like to do is I

8    would like to take a moment and talk about the methodology,

9    which is so important in the field of health economics.

10                MR. FARRELL:  Can we go to the next slide?

11                MS. HARDIN:  Your Honor --

12                THE COURT:  Yes?

13                MS. HARDIN:  We have an objection to this slide

14    being shown.  If Dr. McGuire would like to testify about his

15    methodology and he would like to utilize these two articles,

16    we don't have an objection to that, but we have an objection

17    that these articles themselves are -- that the cost analysis

18    that's being shown on the screen is irrelevant to this case.

19    So, we would ask that the slide be taken down and Dr.

20    McGuire testify about his methodology.

21                THE COURT:  Mr. Farrell, do you want to respond to

22    that?

23                MR. FARRELL:  Yes.  This is the methodology and

24    the source.  This is evidence of the methodology that health

25    economists use across the country with regard to the opioid

```
 1    epidemic that he will be using and applying to

 2    Huntington-Cabell County, West Virginia.

 3              THE COURT:  Well, I'm sorry.  Ms. Hardin?

 4              MS. HARDIN:  I don't disagree that he can testify

 5    about the methodology, but what the estimate is, which is

 6    the third column of that slide, is not relevant to this

 7    analysis.

 8              THE COURT:  What about that, Mr. Farrell?

 9              MR. FARRELL:  Well, we're trying to establish that

10    the Council of Economic Advisors took A plus B equals C for

11    the nation and we're going to ask him to take A plus B and

12    ask him to calculate C for Huntington-Cabell County.

13              THE COURT:  Mr. Ackerman?

14              MR. ACKERMAN:  I would add to what Mr. Farrell

15    said just to say that to the extent the witness has already

16    testified that he is calculating harms caused by the opioid

17    epidemic, other calculations of harms are relevant to that

18    analysis.  I don't understand the argument that it's not

19    relevant.

20              MS. HARDIN:  It's not relevant because those

21    analyses cover the entire United States and at least one of

22    them covers all drugs, including illegal drugs.  So, that's

23    how it's not relevant to this case, which is only about

24    Cabell County and the City of Huntington.

25              THE COURT:  Well, that might be true, but -- and
```

1    I'll -- after the cross examination, I'll give it such

2    weight as I think it deserves, but I think it's going to be

3    helpful to the Court to have Dr. McGuire explain his entire

4    process here and I think the slide is helpful to that extent

5    and I'll overrule the objection.

6        You go ahead, Mr. Farrell.

7            MR. FARRELL:  Thank you.

8            BY MR. FARRELL:

9    **Q.**   So, Doctor McGuire, you identified two separate studies

10   or two separate items and, in general, can you describe what

11   the Council of Economic Advisors 2017 document titled The

12   Underestimated Cost of the Opioid Crisis, can you explain to

13   the Court what that is?

14   **A.**   Yes.  The Council of Economic Advisors, to begin, is an

15   Executive Office of the President and one of the first

16   things President Trump did in his administration was to call

17   attention to the opioid crisis and he did that through some

18   legislation and he did it through commissioning his report

19   from the -- what's shorthand called the CEA.

20       And he asked the CEA to look at the harms that were

21   being caused to the country due to the opioid crisis and, as

22   the slide indicates, this is all opioids, not just

23   prescription opioids.  That's important for my testimony

24   today because the methodology that was conducted by the CEA

25   for valuing deaths and for valuing morbidity is exactly the

1    methodology that I'm applying to the Cabell-Huntington

2    community.  And I put it in quotes there so I would remember

3    that.

4         So, it's using conventional economic estimates for

5    valuing life routinely used by U. S. federal agencies.  So,

6    they didn't just take this out of the blue.  They relied on

7    guidance from other federal agencies and looked at practices

8    by the Department of Transportation, the Department of

9    Environmental Protection, and I think other federal agencies

10   and said this is how we do it at the federal level for

11   regulatory purposes.  This is how we, the CEA, are going to

12   value lives lost to the opioid crisis.  And that's the

13   methodology I apply in my report.

14             THE COURT:  And the $504 billion figures is for

15   the entire country?

16             THE WITNESS:  That's for the entire country for

17   prescription and nonprescription opioids and it's just for

18   one year.

19             BY MR. FARRELL:

20   **Q.**   And so, you've also referenced a second study,

21   Florence, from the CDC.  What's the purpose of Florence, et

22   al., CDC 2016 titled The Economic Burden of Prescription

23   Overdose Abuse and Dependence in the U. S., 2013?  Why are

24   you referencing this report?

25   **A.**   Well, this report is probably the best known, second to

1    the CEA, of studies that look at the national impact of the

2    opioid crisis.  And this study, as mentioned on the slide,

3    is only concerned with prescription opioids, as we're

4    concerned with here today.

5        They had a -- they took a comprehensive approach to

6    quantifying harm in a number of different areas, as I did in

7    my report and, importantly for my report, these are the --

8    this is an analysis that conducts the excess cost

9    quantification in a way that was adopted by the CEA that's

10   essentially used in a number of other papers that are

11   published on the same topic and that I used in my report.

12   **Q.**   Now, does the CEA report that is referenced in the

13   slide, does it actually walk through and identify the

14   methodology for both of your estimates here today?

15   **A.**   Well, it certainly does with respect to mortality and

16   then it incorporates the Florence estimate.  So, CEA says

17   we're going to use Florence for morbidity which is, in

18   effect, and it's not walking through, but it's at least

19   referencing the Florence approach.

20   **Q.**   And I have a copy of the actual CEA report.  It's

21   P-41886.

22            MR. FARRELL:  Judge, may I approach?

23            THE COURT:  Yes.

24            MR. FARRELL:  Am I a copy short?

25            COURTROOM DEPUTY CLERK:  Yes.

```
 1              BY MR. FARRELL:
 2    Q.   So, Dr. McGuire, do you recognize this document?
 3    A.   Yes, I do.
 4    Q.   And what is this document?
 5    A.   This is the CEA report.
 6              MR. FARRELL:  All right.  Can we bring up the
 7    exhibit, please?
 8              BY MR. FARRELL:
 9    Q.   And the first thing I'd like you to do is you note the
10    seal of the President of the United States on Page 1?
11    A.   Yes.
12    Q.   And if we can flip to the very back page.
13              MR. FARRELL:  And can you blow up that section
14    down there?
15              BY MR. FARRELL:
16    Q.   This is from the report and you'll see that it
17    references the White House website, correct?
18    A.   Yes.
19    Q.   And does the statement on the back of the page about
20    the Council of Economic Advisors, is it consistent with your
21    testimony that this is a report commissioned by the
22    President of the United States and published under the
23    authority of his office?
24    A.   Yes, it is.
25    Q.   And is this document the methodology upon which you
```

1    relied in providing your testimony today?

2    **A.**   Yes, it is.

3    **Q.**   And the methodology referenced in this report, is it

4    widely accepted by health economists and relied upon for

5    purposes of your profession?

6    **A.**   Yes, it is.

7              MR. FARRELL:  Judge, at this time, we'd ask for

8    the admission of the exhibit.

9              THE COURT:  Ms. Hardin?

10             MS. HARDIN:  Objection, Your Honor.  I don't

11    believe that Mr. Farrell has laid the foundation for all of

12    the elements of 803(8).  So, we object that it's a public

13    record if that's what he was attempting to establish there.

14         We also object on relevance and geographic scope

15    arguments for the reasons I already said.  This is an

16    estimate for the entire United States that is not in any

17    way, shape or form limited to Cabell County and the City of

18    Huntington.

19         And to the extent that it is just reliance material,

20    Dr. McGuire may certainly testify about it, but there's no

21    need for the basis of his methodology to be admitted in this

22    case as actual evidence.

23             MR. SCHMIDT:  Join.

24             THE COURT:  Mr. Farrell, have you checked all the

25    blocks under 803(8)?

1              MR. FARRELL:  I have, Your Honor.

2              THE COURT:  The office's activities -- duties to

3    report -- obviously, this is pursuant to a charge of the

4    government.  I'm going to overrule the objection and admit

5    it under 803(8).

6              MR. FARRELL:  Thank you, Your Honor.

7              BY MR. FARRELL:

8    **Q.**   Dr. McGuire, before we move on to the next

9    calculations, I'm going to rely upon your expertise in

10   health economics to tell the judge, based on the CEA report,

11   based upon your experience and background, and based on

12   generally accepted methodology within the field of health

13   economics, how did you come about to value a life for

14   purposes of your opinions today?

15   **A.**   I'm not sure I understand the question.  I'm sorry.

16   **Q.**   Well, I tried to use a bunch of legal stuff at the

17   front end to get to the basis at the back.  What is the VSL

18   and how did you come about to calculate the value of each

19   statistical life that is referenced in your report?

20   **A.**   Okay.  Now I understand.  The methodology that's used

21   in the CEA report and that I applied in my report refers to

22   a value of a statistical life.  VSL is the shorthand for

23   that.  And it's that economic concept that is the

24   quantification of the cost of a death.

25   **Q.**   Okay.  So, what is it that you -- what is the value of

```
1    life that you use?  What is the factor that you've used in
2    your report that you've relied upon to generate the results?
3    A.   The dollar factor begins with the recommendation of the
4    CEA.  That's also consistent with the recommendation of a
5    number of other federal agencies.
6         THE COURT:  Let me interrupt and make clear my
7    basis for my ruling on admitting this.  Rule 803(8) allows a
8    public record to be admitted if it sets out the office's
9    activities and this is certainly activities of the Council
10   of Economic Advisors, a public -- obviously, a public
11   entity, a matter observed under legal duty to report, and
12   this is a legal duty to report because the last page, as Mr.
13   Farrell pointed out, shows a charge to the Council of
14   Economic Advisors to offer the President objective economic
15   advice in the formulation of domestic and international
16   economic policy and this report is completed pursuant to
17   that directive and -- which is certainly a legally
18   authorized investigation under 803(8)(a)(3).
19        So, I think it does come within that exception to the
20   hearsay rule.  I just wanted to make my ruling clear.
21        MS. HARDIN:  And we would just maintain our
22   relevance objection, Your Honor.
23        MR. FARRELL:  Thank you.
24        THE COURT:  All right.  Your objections are shown
25   on the record and you may proceed.
```

1           BY MR. FARRELL:

2    **Q.**   So, from -- let's start with this.  Did the Council of

3    Economic Advisors make a learned recommendation of the value

4    to place on a statistical life lost to the opioid epidemic?

5    **A.**   Yes, they did.

6    **Q.**   And what was that value?

7    **A.**   The -- there was actually several values they used, but

8    the central value, I would say, was $9.3 million dollars per

9    person and I think that was in 2014 dollars.

10   **Q.**   Did you conduct your own analysis or use your own

11   expertise to validate the accuracy and appropriateness of

12   that value?

13   **A.**   Yes.

14   **Q.**   Okay.  And so, what -- I guess what I'm asking is, is

15   where did the CEA get that number and the process, your

16   methodology by which it got the number, do you approve it

17   and validate it?

18   **A.**   I would say yes.  This -- they chose that number based

19   on the practices of other federal agencies who were

20   conducting similar analyses and based on the recommendations

21   of an agency called the Assistant Secretary for Planning

22   Evaluation of HHS, which doesn't sound important, but it

23   actually is very important.

24   **Q.**   So, are you prepared to testify that the CEA report of

25   November 2017 uses sound methodology relied upon and used by

1    health economists in the United States?

2    **A.**   Yes.

3            MR. FARRELL:  Let's, if we could, go to the next

4    slide, which is Demo Exhibit 5.

5        Your Honor, may I approach?

6            THE COURT:  Yes.

7            MR. FARRELL:  I don't know how to make that go

8    away.

9            BY MR. FARRELL:

10   **Q.**   So, the slide that we're showing now which is Demo 245,

11   Page 5, does this page accurately reflect your calculations

12   of the value of statistical lives lost to the opioid

13   epidemic arising out of Huntington-Cabell County, West

14   Virginia?

15   **A.**   I would qualify that to say yes, but these are due to

16   prescription opioids.

17   **Q.**   Very good.

18   **A.**   In Cabell County.

19   **Q.**   And how do you know that?

20   **A.**   I know that because the first row total deaths

21   attributed to prescription opioids were provided to me by

22   Professor Keyes.

23   **Q.**   Very good.

24   **A.**   That's what -- excuse me.  That's what her task was.

25   That's what she did.  And then, my role was to supply the

```
 1    second line, the value of statistical life, which is

 2    adjusted for time and adjusted for relative income in Cabell

 3    compared to the nation.

 4    Q.   What methodology did you use to adjust the VSL over

 5    time?

 6    A.   There's two things you need to adjust for.  One is over

 7    time because there's changes in consumer prices that would

 8    affect the valuation.  And then the second form of

 9    adjustment is the income in Cabell compared to the average

10    income in the United States.

11         The VSL is kind of rooted in a willingness to pay and

12    willingness to pay is affected by income.  And so, in a --

13    the methodology, it implies that for a lower average income

14    area, the VSL would be taken down roughly in proportion to

15    the lower income.

16    Q.   And the adjustments that you made, did you use

17    methodology routinely used by health economists when

18    performing this function?

19    A.   Yes.  Those are the methodologies I used.

20    Q.   And then, I think for propriety, we probably need to

21    read into the record the VSL values for each year from 2006

22    forward.  Could you do so, please?

23    A.   Okay.  2006, $4.6 million.  2007, $3.9 million.  2008,

24    $4.2 million.  2009, $4.8 million.  2010, $5.2 million.

25    2011, $5.7 million.  2012, $5.4 million.  2013,
```

1    $6.3 million.  2014, $5.1 million.  2015, $6.3 million.

2    2016, $6.4 million.  2017, $5.2 million.  2018,

3    $6.5 million.

4    **Q.**    And in the first row you have calculated the total

5    number of deaths relying upon the testimony of

6    epidemiologist Dr. Kerry Keyes.  Will you please tell the

7    Court what the total number is?

8    **A.**    The total number spanning 2006 to 2018 is 497.

9    **Q.**    And then, based upon the multiplication of the total

10   deaths per year by the VSL that you've identified per year,

11   were you able to calculate annual valuations and then

12   compile it into a total?

13   **A.**    Yes, I was.

14   **Q.**    And so, based upon your analysis, what is the total

15   value of the statistical lives lost in Huntington Cabell

16   County, West Virginia related to prescription opioids?

17   **A.**    Over that time period is $2.775.7 million dollars.  So,

18   that's -- a simpler way to say it would be $2.8 billion

19   dollars.

20   **Q.**    So, $2.8 billion dollars in lost life arising out of

21   Huntington-Cabell County, West Virginia?

22   **A.**    Yes.

23   **Q.**    Now, in addition to the morality, did you also perform

24   the same analysis using the same methodology to look at

25   morbidity?

1    **A.**    A very similar methodology, yes.

2            MR. FARRELL:  Can we bring up Slide 6, please?

3    And, again, this is from 2006 to 2018 and the count or the

4    numbers that for OUD cases due to prescription opioids,

5    where did you get that data?

6    **A.**    That's an epidemiologic element of data.  How many

7    people have disease in an area at a certain time period.

8    And these numbers were derived by the epidemiologist,

9    Katherine Keyes.

10   **Q.**    And so, where did you get the excess healthcare costs

11   per OUD case?

12           THE COURT:  Let me interrupt you for a minute.

13       Dr. McGuire, this is probably a very dumb question, but

14   you need to tell me what the difference is between deaths

15   and morbidity.

16           THE WITNESS:  Okay.  Deaths are people who die.

17           THE COURT:  Okay.  I've got that.

18           THE WITNESS:  You can probably anticipate that.

19   And then morbidity is people who are sick.

20           THE COURT:  Okay.

21           THE WITNESS:  So, it's mortality and morbidity.

22   Mortality is died; morbidity is sick.

23           THE COURT:  Okay.

24           THE WITNESS:  So, these people are all around, but

25   they're having problems.

1          THE COURT:  Okay.

2          BY MR. FARRELL:

3     Q.   And so, how did you calculate the excess healthcare

4     costs for the sick people in Huntington-Cabell County

5     arising out of the opioid epidemic?

6     A.   Okay.  First of all, it should be expected that people

7     with OUD are going to cost more in terms of healthcare

8     directly for their illness, for other illnesses that are

9     related, such as Hep C and HIV, and they're more expensive

10    to treat for pretty much anything.  So, there is going to be

11    additional healthcare costs for people with that condition.

12         This has been studied by a number of cases.  I Count 11

13    that are in my -- in one of my tables.  Papers that all use

14    the same methodology, which is to compare people with OUD to

15    similar people without OUD, and look at the difference in

16    their healthcare cost.  That's the basis of the methodology.

17    And I relied on those papers and took estimates from those

18    papers that I thought were most relevant and applied them to

19    Cabell-Huntington.

20    Q.   So, to be clear, the number of people -- OUD means

21    Opioid Use Disorder, correct?

22    A.   Yes.

23    Q.   And you rely upon the estimates from Dr. Kerry Keyes to

24    calculate the number of people with OUD in Huntington-Cabell

25    County, correct?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **A.**    That's right.  That's the first row.

2    **Q.**    And then what you did was you used a variety of factors

3    in your methodology that are relied upon within the field of

4    health economics to calculate the total excess health costs

5    for those individuals, correct?

6    **A.**    Yes.  It's very a straightforward and well used

7    methodology.

8    **Q.**    And so, what was the total that you reached for the

9    total excess healthcare costs for individuals in

10   Huntington-Cabell County that are suffering from Opioid Use

11   Disorder?

12   **A.**    This is the lower right-hand number.  It's $494 million

13   dollars over the period of 2006 to 2018.

14             MR. FARRELL:  Now, could we go to the final slide,

15   please?

16             BY MR. FARRELL:

17   **Q.**    The final slide is Demo 245, Page 7, and it is a -- it

18   is a summary slide of your two opinions in this case.  Does

19   this slide fairly and accurately depict your opinions in

20   this case measuring the harms to Cabell-Huntington community

21   in economic terms between 2006 and 2018?

22   **A.**    Yes, it does.

23   **Q.**    And does the total come to a harm approximately

24   $3.2 billion dollars of related harms of death and excess

25   healthcare costs?

```
 1    A.    Yes, it does.

 2    Q.    And do you hold these opinions to a reasonable degree

 3    of health economic certainty?

 4    A.    I do.

 5    Q.    And the methodology that you used, is it a methodology

 6    that is commonly used in your field, including by the

 7    Council of Economic Advisors appointed by the President of

 8    the United States?

 9    A.    It is.

10          MR. FARRELL:  Judge, if I could have a moment?

11          THE COURT:  Yes.

12      (Pause)

13          MR. FARRELL:  Judge, we have no further questions.

14          THE COURT:  All right.  You may cross examine, Ms.

15    Hardin.

16                      CROSS EXAMINATION

17               BY MS. HARDIN:

18    Q.    Good morning, Dr. McGuire.

19    A.    Good morning.

20    Q.    I'm Ashley Hardin.  I represent Cardinal Health.  How

21    are you this morning?

22    A.    Fine so far.  Thanks.

23    Q.    Dr. McGuire, you told the Court that what you have done

24    is put an economic value on harms identified by previous

25    witnesses in this trial; is that correct?
```

1    **A.**   By Professor Keyes.

2    **Q.**   Only Dr. Keyes?

3    **A.**   Well, what I testified about this morning was deaths

4    that were identified by Professor Keyes and people with

5    disease that were also identified by Professor Keyes.

6    **Q.**   And you did not discuss this morning with Mr. Farrell

7    any benefits to the prescription opioids that were sold and

8    distributed in Cabell County or the City of Huntington; is

9    that correct?

10   **A.**   That's correct.

11   **Q.**   But you understand that there have been witnesses in

12   this trial who have testified that there are benefits to

13   prescription opioids; is that correct?

14   **A.**   I'm not directly familiar, but I'll take your word for

15   it.

16   **Q.**   You're familiar with Dr. Corey Waller?

17   **A.**   Yes.

18   **Q.**   And you know that he is a paid expert for the

19   plaintiffs in this case?

20   **A.**   Yes.

21   **Q.**   And you know that Dr. Waller testified in this trial?

22   **A.**   I do know that.

23   **Q.**   And, as a matter of fact, he was the very first witness

24   who came and testified?

25   **A.**   Okay.

1    **Q.**   Are you aware of that?

2    **A.**   I wasn't sure, but okay.

3    **Q.**   Did you watch Dr. Waller's testimony?

4    **A.**   No.

5    **Q.**   Have you read the transcript of his testimony?

6    **A.**   I skimmed it.  I didn't -- I wouldn't say I read it,

7    read it.

8    **Q.**   So, are you aware that he testified that prescription

9    opioid medications have legitimate medical uses?

10   **A.**   I may have seen it in the transcript.  That wouldn't

11   shock me.

12   **Q.**   Are you aware that Dr. Waller testified that he,

13   himself, has prescribed opioids thousands of times over the

14   course of his career?

15   **A.**   I don't remember seeing that in the transcript.

16   **Q.**   Are you aware that Dr. Waller testified that

17   prescription opioids can be effective in treating acute

18   traumatic pain?

19   **A.**   I didn't see that in the transcript, but I'm -- his

20   report may have contained that.  I -- but I didn't see it in

21   the transcript, if that's what you're asking.

22   **Q.**   And are you aware that Dr. Waller testified that

23   prescription opioids can be effective in palliative care

24   settings?

25   **A.**   I didn't see that in the transcript.

1    **Q.**   If that was the testimony of Dr. Waller, do you have

2    any basis to disagree with it?

3    **A.**   No.  He's a clinician.  I'm not.

4    **Q.**   And are you aware that he testified that if someone

5    were to net out the costs and the benefits associated with

6    prescription opioids that that person would need to take

7    into account those benefits in treating acute traumatic pain

8    and palliative care?

9    **A.**   I'm not sure I understand the question.  Sorry.

10   **Q.**   I was asking you if you are aware of testimony by Dr.

11   Waller that if a person were to engage in a netting of the

12   costs and benefits of prescription opioids that that

13   analysis would have to take into account the benefits of

14   treating acute traumatic pain and palliative care?

15   **A.**   Okay.  So, am I aware of the testimony?  The answer is

16   no.

17   **Q.**   And you understand that the FDA approved prescription

18   opioids as safe and effective when used as prescribed?

19   **A.**   Right, yes.

20   **Q.**   So, you understand that the FDA has determined that

21   there are benefits for some populations to prescription

22   opioids?

23   **A.**   They -- this is something that I -- of course, it is

24   not an economic question, but that's my general

25   understanding of the role of the FDA.

1    Q.   And if physicians and other prescribers in Cabell

2    County and the City of Huntington determined for their

3    patients that the benefits of prescription opioids

4    outweighed the risks, you're not in a position to

5    second-guess that determination?

6    A.   I'm an economist.  I'm not in a position to

7    second-guess clinical decisions.

8    Q.   And as far as you know, Cabell County and City of

9    Huntington doctors prescribed opioids in amounts they did in

10   the belief that the benefits would outweigh the risks for

11   their patients; is that correct?

12   A.   I have no understanding of that.

13   Q.   Did you know that Joseph Rannazzisi, who is the former

14   Head of the Office of Diversion Control for the DEA,

15   testified in this trial?

16   A.   I think I did know that he testified, yes.

17   Q.   Have you had occasion to either watch or read the

18   transcript of his testimony?

19   A.   No.

20   Q.   So, did you know that he testified that when he was the

21   Head of the Office of Diversion Control that he repeatedly

22   stated, including to Congress, that the overwhelming

23   majority of prescribing in America was conducted

24   responsibly?

25   A.   I didn't read his testimony.

1    **Q.**   But if that were his testimony, you have no basis to

2    disagree with it?

3    **A.**   That's correct.

4    **Q.**   And did you know that he also testified that the DEA

5    raised the quotas for prescription opioids every year to

6    make sure that legitimate patients and palliative care,

7    Hospice and end-of-life care could get their necessary

8    medications?

9    **A.**   I didn't read his testimony.

10   **Q.**   But if that was his testimony, you have no basis to

11   disagree with it; is that correct?

12   **A.**   That's correct.

13   **Q.**   Okay.  Dr. McGuire, I would like to talk now about the

14   cost side, the harm side, which is what you testified about

15   this morning; is that correct?

16   **A.**   Yes.

17   **Q.**   And what you did, as I understood it, was you assigned

18   an economic value to deaths and excess healthcare costs due

19   to prescription opioids sold and distributed in Cabell

20   County and City of Huntington from 2006 to 2018; is that

21   correct?

22   **A.**   That's fair.

23   **Q.**   And you noted that the Council on Economic Advisors had

24   done a similar type of analysis; is that correct?

25   **A.**   Well, as you pointed out, there were some differences.

1    **Q.**   And the purpose of the CEA, which I think, as you said,

2    is the appropriate abbreviation for the Council of Economic

3    Advisors, they state in the paper that Mr. Farrell handed to

4    you that their purpose was to provide policy makers with the

5    economic analysis needed to review and assess potential

6    policy options; is that correct?  Is that your

7    understanding?

8    **A.**   That sounds -- that sounds what I would expect this to

9    say.  I haven't -- I would have to confirm if you want me to

10   do that.

11   **Q.**   It's on Page 9.  And that was P-41886.  First sentence

12   under Heading 3, Future CEA Analysis.

13   **A.**   Okay, I see.

14   **Q.**   So, you agree that the CEA said that its purpose was to

15   provide policy makers with the economic analysis needed to

16   review and assess potential policy options; is that correct?

17   **A.**   I see that, yes.

18   **Q.**   And that's a very different purpose than what we have

19   here in this lawsuit; isn't that right?

20   **A.**   I'm not sure what your purpose here is in the lawsuit,

21   but the economic methodology is what I paid attention to and

22   what I apply.

23   **Q.**   Well, you understand that the purpose of this lawsuit

24   is not to make policy, correct?

25   **A.**   I'm not sure I should speculate on that, but I -- I

1   hope this lawsuit will have an effect on the way we handle

2   the problem of Opioid Use Disorder.  That's policy, in my

3   view.

4   **Q.**   But you're not sure sitting here today exactly what the

5   purpose of this lawsuit is then; is that correct?

6   **A.**   Well, I know what the allegations are.  I think

7   different parties have different purposes.  But from the

8   standpoint of a health economist and a health policy

9   economist, I think it's important and significant that these

10   issues are being called attention to, that some of the harms

11   are identified and, ideally, this leads to some improvement

12   in the way we deal with a very significant public health

13   problem.

14   **Q.**   And the way that you assigned the economic value, at

15   least to the death portion of what you testified about, was

16   this method, the VSL, the value of a statistical life; is

17   that correct?

18   **A.**   That's correct.

19   **Q.**   And in layman's terms, what that really means is the

20   value that a person is willing to pay in order to avoid the

21   risks, is that --

22   **A.**   No.  I wouldn't go on that.

23   **Q.**   It is the value -- it is the willingness of a person to

24   exchange money for a reduced mortality risk; isn't that what

25   the VSL is?

1   **A.**   No.  I wouldn't go with that either.

2   **Q.**   Like that's what the CEA says that it is.  Would you

3   disagree that that's how the VSL works?

4   **A.**   Well, that's not how the VSL works and if you show me

5   the discussion of the CSA, I'm happy to comment on it.

6   **Q.**   If you don't agree with my characterization, I think we

7   can move on, Dr. McGuire.  The value that you placed on the

8   deaths and the excess healthcare costs from 2006 to 2018 is

9   roughly about $3.2 billion, you said; is that correct?

10  **A.**   I'm sorry.  The deaths alone?

11  **Q.**   No, the deaths combined with the excess morbidity?

12  **A.**   Yes.  Yes, that's correct.

13  **Q.**   And those are economic costs, correct?

14  **A.**   Yes.  I would call them economic costs.

15  **Q.**   And it is not your opinion that Cabell County or the

16  City of Huntington have spent $3.2 billion dollars due to

17  the sales and distribution of prescription opioids between

18  2006 and 2018, correct?

19  **A.**   That's correct.

20  **Q.**   And then when it comes to opioid-related expenses,

21  out-of-pocket money by the county and the city governments,

22  you didn't do any analysis, correct?

23  **A.**   That wasn't my purpose.

24  **Q.**   So, you don't know what their out-of-pocket expenses

25  were, if any, between 2006 to 2018 as a result of the sale

```
 1   and distribution of prescription opioids?

 2   A.    That's correct.  I didn't study that.

 3   Q.    And you're not offering an opinion about any amounts

 4   that the City of Huntington and Cabell County actually spent

 5   due to the sales and distribution of opioids by the three

 6   defendants in this case, correct?

 7   A.    That's correct.

 8   Q.    And you are not offering opinions about the amount of

 9   money that Cabell and Huntington may have to spend in the

10   future as a result of the distribution of prescription

11   opioids from 2006 to 2018?

12   A.    That's correct.  My analysis is backward looking, not

13   forward looking.

14   Q.    And I think you told Mr. Farrell that you did not

15   calculate damages to the City of Huntington or Cabell County

16   as a result of the actionable conduct, if any, by these

17   three defendants?

18   A.    Well, I -- I know damages has special meanings in

19   places like this and so, I didn't think of what I was doing

20   as damages.  It is harm in an economic sense, but I don't

21   know that it's damages in a legal sense.

22   Q.    And you are not offering an opinion about how much it

23   would cost to fund a remediation plan to address addiction

24   or other opioid-related harms in Cabell County and the City

25   of Huntington in the future?
```

1    **A.**    That's correct.

2    **Q.**    And when you calculated the value of the harms, you

3    looked at the total sales of prescription opioids in Cabell

4    County and City of Huntington from 2006 to 2018, correct?

5    **A.**    That's correct.

6    **Q.**    And doing your analysis, you didn't exclude any sales

7    from your calculation, correct?

8    **A.**    Well, to be clear, this would have played into

9    Professor Keyes' component, not McGuire's component.  My

10   valuations were taken from the standards used in federal

11   agencies or in economic research.  So, the count of people

12   who died and had disease, that's where there might have been

13   some allocation among different distributors, but it didn't

14   play into my work.

15   **Q.**    So, you didn't exclude the value of any harms based on

16   the sales and distribution of prescription opioids to

17   hospitals?

18   **A.**    Well, again, this -- this kind of counting was

19   something that I drew upon from Professor Keyes.  My role

20   was valuation.  I'm not sure if that's getting to your

21   question, but --

22   **Q.**    Professor Keyes -- you took from Professor Keyes the

23   amount of people that, according to her, died as a result of

24   prescription opioids from 2006 to 2018?

25   **A.**    In total, yes.

1   **Q.**   And you took from -- the input from Professor Keyes on

2   the total number of people who, according to her, have

3   Opioid Use Disorder from 2006 to 2018?

4   **A.**   That's right, in total.

5   **Q.**   But I'm asking you about the calculation that you did

6   when you calculated the value of the economic harm based on

7   those numbers?

8   **A.**   All right.

9   **Q.**   So, when you did your analysis you did it based on

10  total sales and distribution of prescription opioids in the

11  City of Huntington and Cabell County from 2006 to 2018?

12  **A.**   Well, that's where I think we're a bit across purposes.

13  The valuation that I derive per life was starting with 9.3

14  million 2014 national average.  I can start with that no

15  matter what it's being applied to and that's my

16  contribution.

17       And my contribution on the morbidity side was also

18  pretty straightforward.  It's a dollar number per something

19  and I think your question is really about the per -- is

20  about the -- how many people you would count in the

21  category, not about the valuation of those people, unless I

22  am misunderstanding you.  I'm sorry.

23  **Q.**   Well, let's see if we can try to get on the same page.

24  I am asking you about the analysis that you performed.  You

25  took some numbers from Dr. Keyes.  I understand that you did

1    that.

2    **A.**    Right.

3    **Q.**    But then you calculated the harms based on the total

4    sales and distribution of prescription opioids into Cabell

5    County and the City of Huntington between the years 2006 and

6    2018.  That's the calculation that you did, correct?

7    **A.**    I heard exactly the same question.  My contribution was

8    the valuation of Professor Keyes' counts in both of those

9    cases.  I'm sorry if I'm missing the point of your question.

10           MS. HARDIN:  Mr. Huynh, can we pull up the

11   deposition transcript of Dr. McGuire?  Page 47, please.

12           BY MS. HARDIN:

13   **Q.**    Dr. McGuire, do you recall being deposed in this matter

14   on September 9th, 2020?

15   **A.**    I do.

16   **Q.**    And you were under oath when you gave that testimony?

17   **A.**    Yes.

18   **Q.**    And the testimony that you gave was truthful?

19   **A.**    Yes.

20   **Q.**    Okay.  So, look at Lines -- this is Page 47, Lines 1

21   through 6.  "And so, in quantifying the harms resulting from

22   the sale or distribution of prescription opioids, you didn't

23   exclude any prescription opioid sales or distributions

24   during that time period, 2006 to 2018, correct?"  And your

25   answer was "Didn't exclude."

```
 1              THE COURT:  I'm sorry.  Go ahead, Ms. Hardin, and
 2       then I'll take his objection.
 3              MR. FARRELL:  Judge, I'm going to object on the
 4       grounds of this is not proper impeachment.  This is a
 5       separate and distinct component of the testimony from Dr.
 6       McGuire that's related to opinions in his report that are
 7       not offered in this case.  This is the net balancing
 8       assessment and I don't believe that Dr. McGuire testified on
 9       direct that he used sales whatsoever as a component of his
10       calculations of the related harms on death and morbidity.
11              THE COURT:  Well, I think it's arguably
12       inconsistent and it's a matter you can clear up on re-direct
13       if you want to, Mr. Farrell.  I'm going to overrule the
14       objection and let her go ahead.
15              BY MS. HARDIN:
16       Q.   Dr. McGuire, when you testified about the amount of the
17       harms this morning, you did not calculate the amount of
18       economic harms attributable to just the sales and
19       distribution of prescription opioids by these three
20       defendants; isn't that correct?
21       A.   I didn't exclude anything.  I can put it that way, if
22       you like, and had I excluded something, it would have been
23       through excluding some of Professor Keyes' counts, but I did
24       not exclude any of the counts of Professor Keyes'.
25       Q.   You have no basis to think that the numbers that came
```

1    from Dr. Keyes are just the deaths and excess morbidity that

2    she says are caused by these three defendants; isn't that

3    correct?

4    **A.**   I don't know that she says that.  But what was the

5    question to me?

6    **Q.**   You said you did not exclude any -- you didn't

7    partition it in any way, I think is what -- I know that's

8    not the exact phrasing you used, but I think that's the

9    point of what you're saying, correct?

10   **A.**   Yes.

11   **Q.**   That you're only using the numbers that you got from

12   Dr. Keyes?

13   **A.**   Yes.

14   **Q.**   Right.  And when you did your calculation, you didn't

15   make any attempt to only calculate harms based on the sales

16   and distribution of prescription opioids, if any, by these

17   three defendants?

18   **A.**   That's correct.  I did not do that analysis.

19   **Q.**   And you did not, in calculating the harms, attempt to

20   only calculate the economic harms associated, if any, with

21   the sales and distribution of prescription opioids by

22   AmerisourceBergen?

23   **A.**   That's correct.

24   **Q.**   And you didn't do that calculation only for the opioid

25   -- the prescription opioids sold by McKesson?

1    **A.**   That's correct.

2    **Q.**   Nor did you do that with respect to the prescription

3    opioids sold and distributed by Cardinal Health?

4    **A.**   That's correct.

5    **Q.**   And you understand that these three defendants are not

6    the only wholesale distributors that supplied opioids to

7    Cabell County and the City of Huntington from 2006 to '18,

8    correct?

9    **A.**   It wouldn't surprise me if there were others.

10   **Q.**   Did you listen or have occasion to read the trial

11   testimony of Dr. Craig McCann?

12   **A.**   No.

13   **Q.**   Do you understand that he's another one of the

14   plaintiffs' experts?

15   **A.**   I know that, yes.

16   **Q.**   Are you aware that he testified that there were 36

17   wholesale distributors who distributed prescription opioids

18   to Cabell County and City of Huntington?

19   **A.**   I didn't read his testimony.

20   **Q.**   And you would have no reason to disagree with that if

21   that were his testimony?

22   **A.**   That's correct.

23   **Q.**   And you are aware that other distributors, other than

24   these three, supplied opioids -- or distributed opioids to

25   pharmacies in Cabell and Huntington?

1    **A.**    Well, I'm not really aware, but I am -- it doesn't

2    surprise me if it were the case.

3    **Q.**    And you understand that the defendants in this case are

4    wholesale distributors; is that correct?

5    **A.**    Yes.

6    **Q.**    And you understand that they are registered by the Drug

7    Enforcement Administration to distribute prescription

8    opioids?

9    **A.**    Yes.

10   **Q.**    But in calculating the harms that you testified about

11   this morning, you did not make any attempt to only calculate

12   the harms that were attributable to defendants, unlawful

13   distributions, if any, as opposed to their lawful

14   distributions?

15   **A.**    I think we can get to the point here more quickly,

16   that's correct.

17   **Q.**    And you didn't calculate the harms based only on the

18   allegedly suspicious orders, if any, that the defendants

19   shipped into Cabell County and Huntington?

20   **A.**    That's correct.

21   **Q.**    And you did not, in performing your calculation,

22   determine an appropriate level of distribution of

23   prescription opioids into Cabell and Huntington and then

24   calculate the harms only with regard to those that were

25   shipped above that appropriate level; is that correct?

1    **A.**   That's correct.

2    **Q.**   Now, you also understand that wholesale distributors

3    are not the only entities that sold and distributed

4    prescription opioids in Cabell County and City of Huntington

5    from 2006 to '18, correct?

6    **A.**   I have a general understanding of that, yes.

7    **Q.**   You understand that there are illegal sales of

8    prescription opioids that take place and that did take

9    place?

10   **A.**   Yes.

11   **Q.**   From entities like drug cartels, or street gangs, or

12   the like?

13   **A.**   Yes.

14   **Q.**   And you did not, when you were calculating the harms,

15   try to isolate and only calculate the costs that would be

16   attributable to the sales and distributions by those illegal

17   actors in Cabell and Huntington?

18   **A.**   That's also correct.

19   **Q.**   So, your analysis is based on the totality of the

20   prescription opioids in Cabell -- sold and distributed in

21   Cabell County and the City of Huntington?

22   **A.**   That's fair.

23   **Q.**   So, if the Court wants to know the total economic costs

24   associated using a VSL method of all the sales and

25   distribution of prescription opioids from 2006 to 2018, your

1    number is the one you gave on the stand this morning,

2    correct?

3    **A.**   That sounds right.

4    **Q.**   But if the Court wants to know the economic costs

5    attributable to just these three defendants' actionable

6    conduct, if any, you don't have that number, correct?

7    **A.**   I don't have that number.

8    **Q.**   And you wouldn't know how to come up with that number,

9    would you?

10   **A.**   Well, I could give it some thought, but I don't have

11   that number right now.

12          MS. HARDIN:  Can we pull up the deposition

13   transcript, Page 59, 8 through 19, please?

14          BY MS. HARDIN:

15   **Q.**   Dr. McGuire, this is the same September 9th, 2020

16   deposition that you gave.  And the question was, "Then, did

17   you differentiate at all between the economic harms or costs

18   that were imposed by the unlawful sale and distribution of

19   prescription opioids versus the lawful sale and distribution

20   of prescription opioids," and you said, "I think this

21   partition has been talked -- been asked about previously.

22   Again, I did not partition on this basis.  I don't -- I

23   wouldn't know how to do it."

24          Was that your answer?

25   **A.**   That was my answer.

1   **Q.**   And you testified truthfully?

2   **A.**   I did.

3   **Q.**   And such a calculation would be beyond your expertise,

4   correct?

5   **A.**   Well, I could give it some thought, but I -- I'm not

6   claiming it's my expertise.

7   **Q.**   I think the next sentence of your answer from that

8   September 9th deposition was, "It's not within my

9   expertise," correct?

10  **A.**   That's what the sentence says, yes.

11  **Q.**   And it was truthful at the time you gave it, correct?

12  **A.**   It was truthful, yes.

13          MS. HARDIN:  No further questions, Dr. McGuire.

14          THE COURT:  Any other defendant want to cross Dr.

15  McGuire?

16      Mr. Schmidt?

17          MR. SCHMIDT:  May I proceed, Your Honor?

18          THE COURT:  Yes, you may.

19                    **CROSS EXAMINATION**

20          **BY MR. SCHMIDT:**

21  **Q.**   Good morning, Dr. McGuire.  My name is Paul Schmidt.  I

22  represent McKesson.  I'm going to try to be exceedingly

23  brief.

24  **A.**   Thank you.

25  **Q.**   I'll ask for your help.

1      You've talked about relying on Dr. Keyes; do you recall

2  that?

3  **A.**   Yes.

4  **Q.**   I'd like to show you some testimony from Dr. Keyes, but

5  I'm going to need just a minute for that.  I didn't realize

6  I was jumping in without our tech person being here, so if

7  you could give me just a minute and bear with me, we can do

8  that.

9           MR. SCHMIDT:  And I apologize, Your Honor.  I

10  didn't realize my setup wasn't ready.

11           THE COURT:  That's all right.  We're all prisoners

12  of technology anymore, Doctor.

13           THE WITNESS:  Getting worse and worse.

14           MR. SCHMIDT:  I'm nothing without my tech, at

15  least for this question.  You'll see we each have our own

16  tech people, so they switch in between and we ask them to do

17  superhuman work under the circumstances going back and forth

18  and they -- they do it.

19      Mr. Reynolds, could we pull up the June 14th, 2021

20  trial testimony from Dr. Keyes, 76, Lines 8 through 15, when

21  you're all connected up?  June 14th, 76, 8 through 15.

22           BY MR. SCHMIDT:

23  **Q.**   And I just want to show you, Dr. McGuire, one bit of

24  her testimony and then ask you a question about it, if I

25  may, before moving on to a different subject.

1           MR. SCHMIDT:  Thank you for bearing with me, Your

2     Honor.  So, it's June 14th, 76, Lines 8 through 15, please.

3           THE COURT:  There we go.

4           BY MR. SCHMIDT:

5     **Q.**   Okay.  And I just want to read this testimony together

6     and then ask you a question about it.  Dr. Keyes is asked,

7     "Going back to what we established a few minutes ago, your

8     view is that the overwhelming majority of doctors prescribe

9     opioids in good faith, correct?"  Answer, "Yes.  I think

10    many doctors are doing their best."

11          Question, "The overwhelming majority, correct?"

12    Answer, "Certainly, yes, the majority."

13          Question, "The overwhelming majority, correct?"

14    Answer, "Yes."

15          Do you see that testimony?

16    **A.**   I do, yes.

17    **Q.**   Did you know that was Dr. Keyes' view including, I

18    believe in this instance, as stated in this instance in one

19    of her publications?

20    **A.**   I wasn't aware of that.

21    **Q.**   Did you undertake any quantification either -- well,

22    let me ask it in two parts.  Did you undertake any

23    quantification of the benefits that this overwhelming

24    majority of doctors thought they were providing by

25    prescribing opioids in good faith?

1    **A.**   Well, I did undertake a quantification of the labor

2    market effects of prescription opioids which this would have

3    played into.

4    **Q.**   Okay.  How much in terms of treating pain, in terms of

5    actual benefit to human beings, did you calculate?

6    **A.**   Well, working is a benefit to human beings.

7    **Q.**   Other than -- other than working, did you calculate any

8    benefits?

9    **A.**   I did not calculate the benefits of pain reduction.

10          MR. SCHMIDT:  And let's stay with that quote,

11   please, Mr. Reynolds.

12          BY MR. SCHMIDT:

13   **Q.**   Did you calculate how many of the costs that you

14   identified are attributable to this overwhelming majority of

15   doctors who Dr. Keyes tells us are prescribing in good

16   faith?  Did you allocate your costs in that way?

17   **A.**   I didn't allocate my costs by defendant or by form of

18   use.

19   **Q.**   Do you know whether it's true or not that the -- I'm

20   picking up on this phrase that she's using, the overwhelming

21   majority.  Do you know whether it's true or not that the

22   overwhelming majority of your costs would be from doctors

23   who prescribe opioids in good faith?  Do you know that one

24   way or the other?

25   **A.**   I don't know that.

1   **Q.**   There have been published estimates of the costs that

2   pain and untreated pain impose on society, correct?

3   **A.**   Yes.

4   **Q.**   Are you familiar with some of those publications?

5   **A.**   Yes.

6   **Q.**   Do you know sitting here right now what they estimate

7   in terms of the costs of untreated pain?

8   **A.**   I can't tell you the numbers.

9   **Q.**   You talked a couple of times during your direct

10   examination about being a fellow of the Institute of

11   Medicine; do you recall that?

12   **A.**   Yes.

13   **Q.**   Are you aware that the Institute of Medicine has

14   published estimates or an estimate of costs of untreated

15   pain?

16   **A.**   I'm aware, yes.

17   **Q.**   Let's take a look at that, please.

18         MR. SCHMIDT:  And may I approach, Your Honor?

19         THE COURT:  Yes.

20         BY MR. SCHMIDT:

21   **Q.**   Dr. McGuire, before you came, we have had a witness

22   where we had a very voluminous document.  This is a very

23   voluminous document, but because we literally ended up with

24   a wall of documents on the judge's table, I've started

25   excerpting.  So, I'm going to give you excerpts of that

1    study and if you need to see more, let me know.

2    **A.**   I know the IOM reports are massive.

3    **Q.**   Yes.  Trying to adapt over the course of our trial.

4    I've given you what I've marked as DEF-WV 3688.  And why

5    don't we go to the second page.  And if we look at the

6    second page, about halfway down, do you see the name

7    Institute of Medicine?

8    **A.**   Yes.  Okay, I see.

9    **Q.**   And the title of the publication -- and I don't know if

10   you saw.  You've got a screen to your right.  We're going to

11   put things up there, if it helps you find something in the

12   document.

13   **A.**   Okay.

14   **Q.**   As we look at it.

15   **A.**   Okay.

16   **Q.**   Do you see the title of this Institute of Medicine

17   publication is Relieving Pain in America?

18   **A.**   I see that.

19   **Q.**   And if you go to the next page of the excerpt, Page 3,

20   if you look down near the bottom at the suggested citation

21   just in the last line it's from 2011.  Do you see that date?

22   **A.**   I can read that, yes.

23   **Q.**   Okay.  And then let's go to Page 20 of this excerpt and

24   it has a heading summary.  Do you see that?

25   **A.**   Yes.

1   **Q.**   And I'd like to just look at the first two sentences of

2   that summary.  First sentence, "Acute and chronic pain

3   affects large numbers of Americans with approximately 100

4   million U. S. adults burdened by chronic pain alone."  Do

5   you see that?

6   **A.**   Yes.

7   **Q.**   Do you take any issue with those statistics, sir?

8   **A.**   No.

9   **Q.**   The next sentence says, "The annual national economic

10  cost associated with chronic pain is estimated to be $560 to

11  $630 [sic] billion."  Do you take any issue with those

12  calculations given in this 2011 report?

13  **A.**   No.

14  **Q.**   And, in fact, are you aware that these calculations

15  sponsored by the IOM were ultimately published in a study

16  that you cite in your report?

17  **A.**   Yeah.  I do -- I remember this study.

18  **Q.**   Do you accept this data as valid?

19  **A.**   Yes, I do.

20  **Q.**   Okay.  I want to turn to a different topic, please, and

21  I want to ask you very briefly a few questions about this

22  report from the Council of Economic Advisors.  Do you still

23  have that in front of you?  It's P-41886 and I'm also going

24  to put it up on the screen, if I could.

25  **A.**   Okay.

1    **Q.**   Do you still have that in front of you, sir?

2    **A.**   I've got it.

3    **Q.**   Go to the second page of the document and I'm going to

4    be using these little numbers down here, which are different

5    than the actual original numbers.  So, I'm going to refer to

6    Page 2 in the bottom right corner, if that's okay.  Let's

7    highlight under Heading 1 the opioid crisis and previous

8    cost estimates.  Do you see that?

9    **A.**   Yes.

10   **Q.**   And the study -- and in this report that you told us

11   about they say, "Opioids are largely effective for their

12   main prescribed uses of reducing acute pain and as

13   anesthesia during surgery."

14        Did I read that correctly?

15   **A.**   You did.

16   **Q.**   So, I just want to break that down for a moment, if I

17   may.  First of all, they talk about opioids being largely

18   effective for reducing acute pain.  Do you see that?

19   **A.**   I see that.

20   **Q.**   You don't take any issue in your work with that

21   proposition, do you?

22   **A.**   This is -- these are clinical statements that I am not

23   challenging.

24   **Q.**   Second question, they say they're largely effective for

25   anesthesia during surgery.  Do you see that?

1   **A.**   I see that.

2   **Q.**   You don't take any issue with that for the same

3   reasoning, correct?

4   **A.**   Same reasoning, yes.

5   **Q.**   And third point and final point on this language.  They

6   say that those uses, reducing acute pain and anesthesia

7   during surgery, are their main prescribed uses.  Do you see

8   that?

9   **A.**   I see that.

10   **Q.**   Do you take any issue with that fact, that the main

11   prescribed uses for prescription opioids are reducing acute

12   pain and anesthesia during surgery?

13   **A.**   No.  I don't have any reason to question this.

14   **Q.**   Let's go to Page 3, please, of the document.  Do you

15   see that they show opioid over -- I'm sorry.  Let me start

16   again.  Do you see that they show opioid involved overdose

17   deaths up to 2015 and they're increasing?

18   **A.**   I see that.

19   **Q.**   Do you have an understanding that the reason for the

20   later increase is heroin and fentanyl, illegal fentanyl?

21   **A.**   That would be -- you know, the direct indication on the

22   death certificate would be heroin and fentanyl.  It would be

23   more frequently heroin.  Heroin and fentanyl during that

24   time period.

25   **Q.**   And then they go on, if we go on to the next page, Page

```
 1    4, to talk about the methodology.  Could we go to Page 4,

 2    please?  Going a little out of sequence.  They talk about

 3    the methodology they use and that you said you used.  If we

 4    look under the heading of the third line, we see that

 5    acronym, VSL.  Do you see that?

 6    A.    There it is, yes.

 7    Q.    And I just want to read you a couple of statements from

 8    this and see if you agree or disagree with it.  Go to the

 9    next paragraph, the bottom paragraph on this page.  They

10    say, "Although VSL is widely used to value of the risk of

11    fatalities" -- first of all, do you agree with that?

12    A.    Yes.

13    Q.    "There is not a consensus on what value the VSL should

14    take in various settings."  Do you agree with that?

15    A.    I agree with that.

16    Q.    Let's go to Page 4, please.  Under the -- I'm sorry.

17    Page 5, please.  In the last paragraph, the first sentence

18    states, "Some argue, however, that VSL estimates are prone

19    to being overstated."  Do you see that?

20    A.    I do, but I'm -- I'd like to look at the paragraph --

21    oh, here it is.  Just give me one second.

22    Q.    Yeah.  It's Page 5 on the bottom right.

23    A.    Yes, I see it.

24    Q.    Do you agree with that statement?

25    A.    Yes.
```

1    **Q.**   And then they go on to say a few lines down right after

2    the highlighting here, "Another concern, evident in the

3    literature on wage differentials and occupational risks, is

4    that failing to control for confounding factors will bias

5    VSL estimates upwards."  Do you see that?

6    **A.**   I see that, yes.

7    **Q.**   Do you agree with that concern?

8    **A.**   These are concerns, yes.

9    **Q.**   Okay.  Let's go to Page 9, please, of this study or

10   this report and they have a Table 3.  And if we could cull

11   out Table 3, I want to just ask you about what this shows.

12   Am I correct that Table 3 reports four different studies?

13   **A.**   Yes.  Yes.

14   **Q.**   Just like in the deposition, I've got to ask you to

15   give a verbal answer.  Thank you for doing that.

16        The last one is the present study, the Council of

17   Economic Advisors, correct?

18   **A.**   Yes.

19   **Q.**   Above that is the Florence study you talked briefly

20   about, correct?

21   **A.**   Yes.

22   **Q.**   And above that are two studies by Birnbaum.  Do you see

23   that?

24   **A.**   Yes.

25   **Q.**   And for each of them, they have the year, some criteria

1    about them.  I want to skip over to the second to last

2    column.  Do you see that?

3    **A.**   I see that.

4    **Q.**   And we see the 504 billion from the Council of Economic

5    Advisors report.  Do you see that?

6    **A.**   I see that.

7    **Q.**   And it's $79.9 billion from Florence, correct?

8    **A.**   Yes.

9    **Q.**   And all the way down to $11.5 billion from the Birnbaum

10   study, correct?

11   **A.**   Yes.

12   **Q.**   On the next page of the report, on Page 10 --

13   **A.**   Excuses me, Counsel.  Could I -- the main difference is

14   the methodology.

15   **Q.**   Yes.  And that's what I'm getting to.

16   **A.**   You're going to -- I'll have a chance to talk about

17   that?

18   **Q.**   I'm going to ask you about that and then, if Mr.

19   Farrell wants to ask you more questions about that, he can.

20        Right where I was going was this top paragraph here.

21   Do you see that top paragraph?

22   **A.**   Yes.

23   **Q.**   And they say there are several reasons why the CEA

24   estimate is much larger than those found in the prior

25   literature.  Do you see that?

**A.**    Yes.

**Q.**    And they say, "First, and most importantly, we fully account for the value of lives lost based on conventional methods used routinely by federal agencies in cost benefit analysis for health related interventions."

     Do you see that?

**A.**    I'm glad you're reading that one, yes.

**Q.**    Yes.  And that's what I think you were just alluding to, right?

**A.**    That's the one I really agree with.

**Q.**    And that's the VSL, correct?

**A.**    That's the VSL.  That's the numbers that show up in my report.

**Q.**    They identify a second point, the crisis has worsened, especially in terms of overdose deaths which have doubled in the past ten years, right?

**A.**    Yes.

**Q.**    And you understand that goes to the heroin and fentanyl problem we talked about, right?

**A.**    Well, and that the direct attribution is to fentanyl and heroin, yes.

**Q.**    And then they say, "Third, while previous studies have focused exclusively on prescription opioids, we consider illicit opioids, including heroin, as well."

     Do you see that?

1   **A.**    Yes.  Yes.

2   **Q.**    All right.  And just to be clear -- I want to make sure

3   the record is clear on this point.  In your work you

4   consider illicit opioids, including heroin, as well,

5   correct?

6   **A.**    Well, this was, again, the province of the

7   epidemiologist and what Professor Keyes did in this case was

8   to derive estimates of the share of deaths in which the

9   death certificate indicated fentanyl and heroin and that

10   were due to prescription opioids.  So, I used it in my

11   report, but the analysis was done by Professor Keyes.

12   **Q.**    Right.  And just to be sure we're on the same page for

13   both your death estimates and your morbidity estimates, you

14   understand that Dr. Keyes took cases involving heroin and

15   fentanyl and made a judgment based on her gateway theory as

16   to how much of those were attributable to prescription

17   opioids and you included those numbers in your calculations,

18   correct?

19   **A.**    That's correct.

20   **Q.**    Thank you.  And so, just to round out this document,

21   please -- and, actually, one point on this just so we're

22   absolutely clear.  Could we show Demonstrative 245, Page 5?

23   It's the slide set that you were shown by Mr. Farrell.  I

24   just want to make sure we have it clear for the record.

25   Demonstrative 245, please.  And if it's easier to put it up

1    on the ELMO, I can switch to the ELMO.

2         There we go.  Could we go to Page 5, please?

3         Just so we have it for the record, these numbers

4    include deaths due to heroin and fentanyl where Dr. Keyes

5    has performed an attribution of prescription opioids,

6    correct?

7    **A.**   That shows up in the first row of that table, yes.

8    **Q.**   And then if we go to the next page, this includes

9    healthcare costs involving people who have used heroin and

10   fentanyl where Dr. Keyes attributes it to prescription

11   opioids, correct?

12   **A.**   That's also correct, yes.

13   **Q.**   And just so I'm clear on this table, you did not --

14   when you -- when you came up with this number, this $494

15   million number or -- yeah, $494 million, you did not apply

16   any offsets for healthcare costs covered by, for example,

17   the federal government or the state government, correct?

18   **A.**   I'm not sure what you mean.

19   **Q.**   I mean that includes costs covered by the federal

20   government and the state government, that amount, correct?

21   **A.**   Those amounts are caused by third-party payers.

22   Medicare is a government program.  Medicaid is a government

23   program.  And commercial is mostly private.  Uninsured,

24   those are borne by, you know, sometimes local government,

25   sometimes the providers themselves.

1   **Q.**   Do you know of any specific amount covered by

2   Huntington?

3   **A.**   That wasn't my task.

4   **Q.**   So, no?

5   **A.**   So, no, I don't know.

6   **Q.**   Do you know any specific amount covered by Cabell

7   County?

8   **A.**   Same answer.

9   **Q.**   No?

10  **A.**   No.

11  **Q.**   All right.  So, let's just finish up with the Council

12  of Economic Advisors study, if we can go back to P-41886.  I

13  want to just go back to that table, if I could, on Page 9.

14  Could we go to Page 9, the table at the bottom right there?

15  We talked a few moments ago about how the CEA study was

16  different from the prior three studies.  Do you remember

17  those three or four studies?

18  **A.**   Yes, I do.

19  **Q.**   And they actually explain the differences and

20  similarities across the top, correct, in the columns?

21  **A.**   In the -- yes.  Yes.

22  **Q.**   For example, the point you raised, fatal costs, they

23  say -- they do value of statistical life where others do

24  earnings, correct?

25  **A.**   Yes.  That's what I wanted to be sure and talk about.

```
 1    Q.   We'll give you that chance.

 2    A.   Okay.

 3    Q.   That may be opioids included, correct, and they say

 4    prescription and illicit for CEA; prescription only for the

 5    other three studies, correct?

 6    A.   That's correct.

 7    Q.   And then here's the point I wanted to just close on.

 8    They give us in the far right column multipliers.  Do you

 9    see that?

10    A.   I see that.

11    Q.   And so we understand how this works, these are

12    multipliers determining how much bigger than the prior

13    studies the CEA study is, correct?

14    A.   I see that.

15    Q.   And so, it's one for the CEA study because it's

16    literally one times the amount, right?

17    A.   Yes.

18    Q.   And for the earlier studies, the CEA study ranges from

19    being 6.3 times higher to 4.8 times higher, correct?

20    A.   You are reading that correctly, yes.

21    Q.   Okay.  And one of those differences, not the only

22    difference, but one of those between the studies that

23    accounts for that spread, one of the differences is

24    including illicit opioids, correct?

25    A.   That's correct.
```

1   **Q.**   Last set of questions, Doctor.  If we could go back to

2   your slide set, please.

3   **A.**   I'm sorry.  I was promised the ability to talk about

4   that earlier methodology.

5   **Q.**   I thought we had, but I will let Mr. Farrell give you

6   further opportunity if there's further you want to say.

7   **A.**   I do.

8   **Q.**   I think, and I will speak for some people in the room,

9   that we heard a lot on it, but if Mr. Farrell wants to ask

10  more on it, he can.

11         MR. SCHMIDT:  Could we show Demonstrative 245,

12  please?

13         THE WITNESS:  If you can put up the table that we

14  were just looking at, that would be helpful.

15         MR. SCHMIDT:  I'm going to finish up with

16  something else, sir.

17         THE WITNESS:  Oh, all right.

18         BY MR. SCHMIDT:

19  **Q.**   Could we go to Page 2, please?  Do you recall talking

20  about -- this is your core methodology, how you calculated

21  deaths, how you calculated morbidity.  Do you see that?

22  **A.**   Yes.

23  **Q.**   And what you did as the source of your count was for

24  deaths you looked at calculations performed by Dr. Keyes,

25  correct?

**A.**   Yes.

**Q.**   And for morbidity you looked to calculations performed by Dr. Keyes?

**A.**   Yes.

**Q.**   And what that means is if her numbers change at all that changes all of your numbers, correct?

**A.**   Yes.

**Q.**   And, in fact, that's already happened, correct?

**A.**   Yes.

**Q.**   Let's just take a look at it so that we all know what we're talking about.  I'm going to show you two errata sheets you served in this case.  Do you recall serving two errata sheets to your numbers in this case based on changes that Dr. Keyes made?

**A.**   I do.

          MR. SCHMIDT:  May I approach, Your Honor?

          THE COURT:  Yes.

          MR. SCHMIDT:  And so we have it for the record --
did I short you one copy?

          COURTROOM DEPUTY CLERK:  Yes.

          BY MR. SCHMIDT:

**Q.**   So we have it for the record, I've given you two documents that I understand you prepared.  The first is landscape presentation and it says, "Errata sheet for the 8/03/2020 expert report of Dr. McGuire."  Do you see that?

1    **A.**   I do.

2    **Q.**   And my understanding is this is one you served and it

3    doesn't have a date, at least that I see, but you served it

4    August 24, 2020, correct?

5    **A.**   That seems correct, yes.

6    **Q.**   And then the second one does have a date.  It's letter

7    oriented.  It's September 23rd, 2020, correct?

8    **A.**   Yes.

9    **Q.**   All right.  Let's look at the first one.  Actually,

10   could we put them side by side just so -- I just want to

11   illustrate this point about using Dr. Keyes' work.

12         So, on the left we have the August 24th, 2020 and,

13   hopefully, in a moment on the right we'll have the

14   September 23rd, 2020.

15         And what we see is on the left, the top row, you're

16   making changes to your numbers.  Do you see that?

17   **A.**   Yes, I have it here.

18   **Q.**   And you explain that by input change in Dr. Keyes'

19   report.  Do you see that?

20   **A.**   Yes.

21   **Q.**   And do you know why she had to make that change?

22   **A.**   Just generally, I think.  And it might have been across

23   both of these, but I think there was a -- some kind of input

24   error or early version of a count that was used

25   inadvertently.  I'm not a hundred percent sure.  She would,

1    of course, be the one to ask about that, not me.

2    **Q.**   Do you know what the nature of the input error was, why

3    it occurred?

4    **A.**   I don't know the details, no.

5    **Q.**   And then, if we look at the second one, there is,

6    again, another change.  Do you see that?

7    **A.**   Yes.

8    **Q.**   The second one being the one from September 23rd, 22020

9    and, again, this time the change is because of Dr. Keyes

10   again adjusting her numbers.  Do you see that?

11   **A.**   Yes.

12   **Q.**   And do you know why she adjusted her numbers that

13   second time?

14   **A.**   Well, I just have a general understanding that I stated

15   in response to your previous question.

16   **Q.**   You couldn't specifically articulate what the error was

17   the second time around and why she had to fix it?

18   **A.**   Well, this details the actual change, but I'm not sure

19   about the cause.

20   **Q.**   Okay.  So, let's just stick with the August 1.  If I go

21   down the August 1 and just look in the right column where it

22   says that the reason for the change is because of Dr. Keyes,

23   I see 1, 2 -- 19 different changes you had to make to your

24   numbers because of this first change that Dr. Keyes made; is

25   that correct?

1    **A.**    That sounds okay, yeah.

2    **Q.**    And then, if we look to the second one from

3    September 23rd, 2020, I'm not going to count them up, but it

4    goes Page 1, Page 2, Page 3, Page 4 -- through Page 4 of

5    changes that you had to make to your report because of

6    changes Dr. Keyes made?

7    **A.**    Yes.

8    **Q.**    And just so I ask, you did -- let's take the OUD

9    numbers.  That was one of the changes she made twice,

10   correct?

11   **A.**    Yes.

12   **Q.**    You didn't independently research the number of OUD

13   cases?  You relied on Dr. Keyes for that, correct?

14   **A.**    I relied on Dr. Keyes for her estimates, yes.

15   **Q.**    And when you looked at her original numbers, the ones

16   that she changed twice, and she said that for 2018, for

17   example, a hundred percent of her deaths due to opioids were

18   due to prescription opioids, it didn't occur to you that

19   that seemed wrong or odd, correct?

20   **A.**    It didn't strike me.

21   **Q.**    And there's no criticisms you can recall having given

22   her of her numbers, correct?

23   **A.**    That's correct.

24   **Q.**    Despite these two corrections, right?

25   **A.**    That's correct.

```
1              MR. SCHMIDT:  Thank you, Dr. McGuire.  That's all
2     I have.
3              THE COURT:  Let's take about ten minutes and then
4     we'll come back and finish with Dr. McGuire.
5         And you may step down during the break.
6              MR. SCHMIDT:  And, Your Honor, thank you to the
7     Court.  I didn't realize I went a little long.  Thank you
8     for letting me go a little long just to finish.
9              THE COURT:  Thank you.
10        (Recess taken)
11        (Proceedings resumed at 10:42 a.m. as follows:)
12             THE COURT:  Are we through with the cross?
13        Ms. Callas?
14             MS. CALLAS:  No cross, Your Honor.  Thank you.
15             THE COURT:  You stood up.  I thought you were
16    ready to go.
17        All right, Mr. Farrell.
18                        REDIRECT EXAMINATION
19    BY MR. FARRELL:
20    Q.   Dr. McGuire, let's start with the errata.  Within
21    your field of economics, is it uncommon for calculations
22    to change or to be adjusted over time?
23    A.   No.  I've made some mistakes myself sitting here.
24    Q.   And, in fact, the errata changes that you made in this
25    case lowered your numbers, did they not?
```

1  **A.**   Yes, they did.

2  **Q.**   And I'm probably going to butcher this, but the

3  Institute of Medicine's Defense WV 03688 on chronic pain,

4  Relieving Pain in America, I'm going to try not to -- I'm

5  going to try to figure this out.  This article was about the

6  economic cost of pain in America; correct?

7  **A.**   It was.

8  **Q.**   On your labor workforce; correct?

9  **A.**   You know, I don't remember what the valuation was of

10  pain.  I don't remember.

11  **Q.**   That's fair.  I'm not trying to make that point.  This

12  isn't a report about the economic benefits of opioids;

13  correct?

14  **A.**   Exactly.

15  **Q.**   This is an economic report on the impact of pain on the

16  labor force.  Have you, in fact, done an economic analysis

17  of opioids in the workforce?

18  **A.**   I have reviewed the studies that have investigated the

19  role of prescription opioids.

20            THE COURT:  Ms. Hardin.

21            MS. HARDIN:  Objection.  I think it's beyond the

22  scope.  I think the first questions that I asked the doctor

23  made clear that he didn't testify this morning about

24  benefits at all.

25            THE COURT:  Well, it is beyond the scope, isn't

1    it, Mr. Farrell?

2            MR. FARRELL:  But there was a small crack in the

3    door.

4            THE COURT:  I'm going to sustain the objection.

5    The crack wasn't big enough.

6    BY MR. FARRELL:

7    Q.    And then before I let you explain what you want to

8    explain, I do want to bring up in the CEA report -- and

9    I hope this is consistent with what you're about to

10   explain.

11        You were asked about the first sentence, "Opioids are

12   largely effective for their main prescribed uses of reducing

13   acute pain and as anesthesia during surgery."

14        Will you read the second sentence into the record?

15   A.    It says, "A side effect of these beneficial treatment

16   effects is that they also have high potential for abuse

17   which can lead users to substitute to more lethal opioids

18   without accepted medical uses such as heroin or illicitly

19   produced fentanyl."

20   Q.    And this is the findings of the Council for Economic

21   Advisers to President Trump; correct?

22   A.    That's correct.

23           MR. SCHMIDT:  Objection, Your Honor.  It's one

24   thing for him to read it.  He didn't give an opinion on this

25   topic and it's outside of his expertise.

1          THE COURT:  Well, overruled.

2      Go ahead, Mr. Farrell.  Let's get through it.  Let's

3  go.

4  BY MR. FARRELL:

5  **Q.**   And then methodology wise I'm going to reference on

6  Page 3 do you see where I've put the purple star?

7  **A.**   Yes.

8  **Q.**   And the CEA report itself says that it's applying

9  conventional methods.  Do you agree the CEA's assessment

10  used conventional methods?

11  **A.**   I do, yes.

12  **Q.**   And then a final question is -- you asked for the

13  opportunity to explain Table 3.  And I'm not going to

14  pretend I know why.  I'm just going to say you wanted to

15  have something to say about Table 3.  Explain what you

16  found.

17  **A.**   Well, counsel made the point looking at Table 3 that

18  the estimates by the CEA were larger than the estimates in

19  these other studies.  And he pointed out one important

20  difference, which was the scope.  The CEA was concerned with

21  all opioids, and the other three studies were concerned with

22  prescription opioids.

23      But there was one other difference that you see in this

24  table, that the fatal costs were valued according to a

25  different methodology.  And it says here "earnings."  Now, I

1    just wanted to explain to the Court what that was.

2         Earnings as a valuation is a measure of the future

3    earnings that an individual would lose if they die.  Okay?

4    So what about 65-year-olds?  What is the value of a life of

5    a 65-year-old according to the earnings methodology?  It's

6    zero.  I would be zero.  Maybe other people in the courtroom

7    would be zero.  Women are penalized because they earn over a

8    lifetime, for many reasons, lower wages than men.  So the

9    value of a life of a woman is less than the value of the

10   life of a man.

11        So I totally agree with the CEA that the conventional

12   and more comprehensive methodology that is employed by

13   federal agencies at the recommendation of the Federal

14   Government is the right way to go in this case.

15             MR. FARRELL:  Thank you.  No further questions.

16             THE COURT:  Any recross, Ms. Hardin?

17             MS. HARDIN:  No, Your Honor.  But when the witness

18   is excused, I would like to address the Court.

19             MR. SCHMIDT:  No more, Your Honor.

20             THE COURT:  All right.

21        Dr. McGuire, I can excuse you now.  I enjoyed your

22   testimony and I'm going to do my best not to hold against

23   you the fact that you went to Yale.

24             THE WITNESS:  I know why you're saying that.

25   Thank you, Your Honor.

```
 1              THE COURT:  And you're free to go.  Thank you,
 2    sir.
 3              THE WITNESS:  Thank you.
 4              MS. HARDIN:  Your Honor, now that Dr. McGuire's
 5    testimony is complete, the defendants would renew their
 6    Daubert challenge.  I think that the testimony has confirmed
 7    that his expertise that he has offered on the stand today
 8    has no fit or relevance to this case.
 9         He has done what seems to be an academic exercise of
10    multiplying his calculation of a value of a life by certain
11    estimates given by Dr. Keyes that has absolutely nothing to
12    do with the defendants' conduct.  He's not calculating the
13    amount of harm that result from any sales and distribution
14    by the defendants not even on a wholesale basis, much less
15    calculating the harms that result from any actionable or
16    unreasonable conduct on the part of the defendants.
17              THE COURT:  So your Daubert attack is not on his
18    qualifications.  It's on the relevance of what he said were
19    the issues in this case if I understand you correctly.
20              MS. HARDIN:  Right.  I don't challenge the fact
21    that he seems to be a quite accomplished health economist.
22    But he had nothing to say that was relevant to this case
23    this morning, Your Honor.
24         The Daubert -- when we made the Daubert challenge to
25    him back during the, the pre-trial period, the
```

1    representations were made by the plaintiffs that his

2    weighing analysis -- because what he purported to do in his

3    report was to net the cost and benefits.

4         Now, he didn't assign any value to those benefits and,

5    so, we had a challenge to that.  But what -- the

6    representation that was made is that that weighing of the

7    cost and benefits --

8              THE COURT:  He didn't weigh the cost and benefits,

9    did he?

10             MS. HARDIN:  He did not today and we disputed that

11   that's what he was doing even before he came to the stand.

12   But I think he made it quite clear that's not what he was

13   doing.

14        And, so, if the representation made that this is

15   somehow relevant to the weighing and costs and benefits for

16   a public nuisance, which we would itself object is relevant.

17   But even so, taking the plaintiffs at their word about what

18   he was going to do is not what he did.

19        He didn't say anything about the defendants.  He can't

20   say anything about the defendants.  He said it would be

21   beyond his expertise to say anything about the defendants.

22        So what we're left with is some numbers that he

23   multiplied in an academic exercise in an effort to get some

24   extraordinarily large numbers in front of the Court that

25   have nothing to do with the defendants' conduct.

```
1          So we would ask that his testimony be stricken from the
2     record, Your Honor.
3               THE COURT:  Shouldn't that -- well, let me hear
4     from Mr. Schmidt.
5               MR. SCHMIDT:  I would just join to the point to
6     underscore the fact that this is a case about prospective
7     relief, not retrospective relief.  He only touched on
8     retrospective relief.
9          I believe Mr. Farrell elicited he's not addressing
10    prospective relief.  There's statement after statement from
11    the plaintiffs:
12         Docket 125, Page 1, note 1.  Plaintiffs waive past
13    damages for economic losses sustained by the Cabell County
14    Commission and City of Huntington.
15         Docket 225.  Plaintiffs have waived all claims for
16    damages, including punitive damages.
17         Plaintiffs' public nuisance claims seeking only the
18    equitable remedy of abatement are not tort actions.  That's
19    Page 5 of Docket 225, and again and again.
20         Docket 813 at 2.  Plaintiffs' public nuisance claim
21    seeking abatement as an equitable remedy are not tort
22    actions for compensatory damages.
23         So in addition to Ms. Hardin's point that his past
24    numbers don't relate to the facts of this case in terms of
25    the defendants, he also doesn't address what the claim is
```

1    actually about, which is future relief.

2           THE COURT:  Well, since he's qualified and the

3    issue is relevance, doesn't this go to what weight, if any,

4    I should give his testimony rather than just kicking it out

5    all together?

6           MS. HARDIN:  I don't believe so, Your Honor.  I

7    mean, one of the, the foundations of the *Daubert* analysis is

8    a gatekeeping analysis.  It is not just let it in and

9    consider it once it's in.  It's:  Is it proper expert

10   testimony in the first place?

11      And, again, not challenging his qualifications, which

12   seem completely legitimate, but he had nothing relevant to

13   say here.  And as part of Your Honor's gatekeeping function,

14   we submit that he should not have been allowed to testify in

15   the first place.

16      We understood Your Honor wanted to see and hear the

17   testimony.  And now that that's happened, we think that

18   you're in a position to say that he didn't meet the *Daubert*

19   standard in this case and you would not only give it what

20   weight you find, but strike it all together.  I'm sorry.

21   Please.

22          THE COURT:  I remember reading in one of those

23   cases that in a bench trial, you should be very liberal

24   because you're keeping the gate for yourself.

25      Do you have anything to say about that?

1              MS. HARDIN:  I certainly appreciate that, Your

2    Honor, and I think that's what we've done here.  I

3    understand you didn't want to cut the testimony off before

4    you were able to hear it which would be very prejudicial in

5    a jury trial.

6         You are in the position to be able to take the

7    testimony and listen to it.  And I think that's the benefit

8    of the bench trial.  But we've done that exercise now.  He's

9    come, he's testified, and we think it should be disregarded.

10             MR. SCHMIDT:  Just to add to that, the view we've

11   taken on gatekeeping that I think is consistent with what

12   Your Honor just said is if we had a jury, in many cases

13   there would be a *Daubert* hearing on some of these experts

14   and Your Honor would execute the gatekeeping function in the

15   context of a *Daubert* hearing.

16        Here in a bench trial, it's kind of combined because

17   Your Honor can serve that function as you hear the

18   witnesses.  But that underlying purpose that Ms. Hardin was

19   referring to of *Daubert* to keep unreliable or non-fit expert

20   testimony out of the record, I think that still applies in a

21   bench setting.

22             THE COURT:  Well, let me hear from the other side

23   here, Mr. Farrell.

24             MR. FARRELL:  Judge, we disagree.

25        So aside from the academic thing --

```
 1              THE COURT:  The academic thing is not a problem.

 2    What about the relevance?

 3              MR. FARRELL:  So we are tasked with establishing

 4    to this Court that there is an unreasonable interference

 5    with a right common to the general public, unreasonable.

 6         So what we are attempting to do is we are attempting to

 7    not only demonstrate the unreasonableness by virtue of

 8    fatalities and morbidities, but we're attempting to put

 9    before the Court some objective measure of how unreasonable

10    it is, how much of an unreasonable interference it is.

11         If we were to come here and say that the economic

12    impact on the community was $10, you might say, "Paul,

13    that's not an unreasonable interference with the community."

14         But what we've done is using standard methodology, we

15    are putting a -- we are objectively defining this

16    interference in dollars, which I believe are significant.

17         We're not asking this as a component of damages.  We

18    didn't even go so far as to put into the record a balancing

19    to establish the ultimate question --

20              THE COURT:  Is Dr. McGuire's testimony part of the

21    basis for your ultimate evidence on damages -- not damages

22    but abatement costs?

23              MR. FARRELL:  No.  His evidence is to whether or

24    not the interference was reasonable or unreasonable.  He is,

25    he is taking what Dr. Keyes has identified as the related
```

1    harms of the opioid epidemic and he has put an economic

2    value on it for the finder of fact to apply appropriate

3    weight in making a determination as to whether or not the

4    interference was unreasonable.

5            THE COURT:  And you're saying the numbers -- his

6    bottom line numbers are a factor on the reasonableness of

7    the interference?

8            MR. FARRELL:  Well, if Kerry Keyes defines related

9    harms from the opioid epidemic and Dr. McGuire says those

10   related harms have an economic cost of $3.2 billion in a

11   community of 100,000 people, I would think that that would

12   be, that would be a factor that a trier of fact could weigh

13   when making a determination as to whether or not the

14   interference is reasonable in the existence of a public

15   nuisance.

16           THE COURT:  Okay.  Ms. Hardin.

17           MS. HARDIN:  If what the purpose of Dr. McGuire

18   was was to weigh in on our liability, then I think it's

19   crystal clear that he has nothing to say about that.

20       He did not calculate the harms attributable to our

21   conduct, our sales, our reasonable conduct, our unlawful

22   conduct.  Had absolutely nothing to do with that.

23       And Dr. Keyes, we established, had nothing to say about

24   the distributors or their conduct.  And, so, you can't add

25   Dr. Keyes to Dr. McGuire and get anything that is relevant

1     to this case.  He is a health economist.  And in some cases,

2     he might have relevant things to say, but it wasn't this

3     case, Your Honor.

4          MR. SCHMIDT:  And just to add to that, Your Honor,

5     Ms. Hardin made the point, which she very ably established

6     on cross, that he didn't do any kind of allocation that

7     would support the proper basis which is reasonable versus

8     unreasonable.

9          In addition to that, he didn't weigh the benefit in his

10    testimony, so it's just cost.  Of course, there would have

11    to be weighing of benefit.  And he didn't evaluate it in any

12    way in terms of the plaintiff here.  The only costs he

13    acknowledged he knew where they were from were costs to the

14    Federal Government, who's not a plaintiff here, and the

15    state, who's not a plaintiff here.  He couldn't allocate any

16    to the plaintiff here.

17         MR. ACKERMAN:  Just briefly, Your Honor, I think

18    with respect to the relevance, Mr. McGuire -- Dr. McGuire's

19    testimony establishes the existence of a public nuisance,

20    which is one of the things we have to establish.

21         And with respect to all that you have heard from the

22    defendants' counsel, that all goes to the weight of the

23    testimony and not to its ultimate admissibility.

24         THE COURT:  How does his testimony in and of

25    itself establish the existence of a public nuisance?

1          MR. ACKERMAN:  It, it -- exactly in the way that

2     Mr. Farrell described, because it establishes a

3     quantification of the harm that resulted from opioids in the

4     community.  Whether or not defendants claim they are

5     responsible for that harm is a separate question.

6          THE COURT:  Last shot here, Mr. Farrell.

7          MR. FARRELL:  This is not an extraordinary leap

8     for us to be able to sustain to enter into evidence on

9     relevance.

10        You know, this would be no different if it were a fire

11    or if it were the Exxon Valdez or the BP oil spill.  There

12    is an impact on the community.

13        How do we define that impact?  Well, we've defined it

14    through the abuse, addiction, morbidity, mortality.  And

15    this is a -- and Your Honor has probably seen in the

16    newspaper repeated reports from the Pew Foundation and the

17    Kaiser Foundation --

18        THE COURT:  If there's no impact, there's no

19    nuisance; right?

20        MR. FARRELL:  Correct.

21        MS. HARDIN:  Your Honor, the legal definition of a

22    nuisance is an unreasonable interference.  It focuses on the

23    conduct of the defendant.

24        This testimony had nothing to do with the conduct of

25    the defendants.  We're not here to estimate the costs of the

```
 1    opioid epidemic.  We're here to determine if these
 2    defendants did something unreasonable that interfered with a
 3    right common to the public.  And Dr. McGuire's testimony has
 4    absolutely nothing to do with any of that.
 5              THE COURT:  Okay.  I'm not going to rule on this
 6    right now.  I'll give it some thought and rule on it at some
 7    appropriate time.  But I realize this is a significant issue
 8    and -- well, I'll leave it at that.
 9         Do you want to call your next witness, Mr. Farrell?
10              MR. FARRELL:  Be my pleasure.  Ann Kearse is
11    taking the lead.
12              MR. ACKERMAN:  We need a minute to shuffle the
13    deck, Your Honor.
14              THE COURT:  I'm sorry?
15              MR. ACKERMAN:  We just need a minute to shuffle
16    the deck.
17              MS. KEARSE:  Good morning, Your Honor.
18              MS. WICHT:  Good morning, Your Honor.
19         While we're calling the witness in and getting
20    organized, I just wanted to take the opportunity to
21    introduce the Court to my colleague who will be handling
22    this witness since you have not heard from her yet today.
23         This is Isia Jasiewicz.
24              MS. JASIEWICZ:  Good morning, Your Honor.
25              THE COURT:  Good morning.  Welcome yet another
```

```
 1    lawyer.

 2              MS. JASIEWICZ:  Thank you.

 3              THE COURT:  I was just getting all the names

 4    straight.  I think your name has appeared before in the

 5    papers.

 6              MS. JASIEWICZ:  Yes, it has.

 7              MS. KEARSE:  Your Honor, the plaintiffs call

 8    Dr. Judith Feinberg.

 9              THE COURT:  Dr. Feinberg, if you'll stand right

10    there, the clerk will give you your oath.

11              THE CLERK:  Please state your name.

12              THE WITNESS:  Judith Feinberg.

13              THE CLERK:  Please raise your right hand.

14    JUDITH FEINBERG, PLAINTIFFS' WITNESS, SWORN

15              THE CLERK:  Thank you.  Please be seated.

16              THE COURT:  Good morning, Dr. Feinberg.

17              THE WITNESS:  Good morning.

18                        DIRECT EXAMINATION

19    BY MS. KEARSE:

20    Q.   Dr. Feinberg, can you please introduce yourself to

21    the Court?

22    A.   Pardon me?

23    Q.   Can you please introduce yourself to the Court?  State

24    your name for the record.

25    A.   Oh, Judith Feinberg.
```

1    **Q.**   And, Dr. Feinberg, what is your occupation?

2    **A.**   I'm a physician.  I'm specifically an internist with

3    special training in infectious diseases.

4    **Q.**   And, Dr. Feinberg, do you currently hold any academic

5    positions?

6    **A.**   I do.  I have several at the -- at West Virginia

7    University School of Medicine.  I'm a Professor of

8    Behavioral Medicine and Psychiatry.  I'm also a Professor of

9    Medicine in the section of infectious diseases.  And I'm the

10   Doctor E.B. Flink Vice Chair of Medicine for Research.

11   **Q.**   Doctor, did you help create some slides today that will

12   aid in your testimony and provide information to the Court

13   today?

14   **A.**   Yes.

15            MS. KEARSE:  Your Honor, may I approach?

16            THE COURT:  Yes.

17            MS. JASIEWICZ:  Your Honor, I would like to state

18   an objection just for the record.

19       We received a copy of the slide deck to be used with

20   Dr. Feinberg around midnight last night for the first time.

21   And since we've been sitting here since the mid-morning

22   break, we received a new version that Mr. Ackerman sent at

23   10:42 a.m.

24       Mr. Ackerman represented in his email that there have

25   not been substantive changes to the deck, but he did not

1    specify what is different about this deck.

2         Just on a quick look, it appears like there are some

3    slides that were removed.  And, so, as a result, the slide

4    numbers are different.

5         I just wanted to note that since we have not had an

6    opportunity to review the deck to see whether there were, in

7    fact, any changes that we would characterize as substantive.

8              MS. KEARSE:  Yes, Your Honor.  I believe there was

9    a typo and some name things on that too that the doctor

10   wanted to make sure was accurate.

11             THE COURT:  Okay.  I'm going to let you go ahead.

12   Your objection will be noted for the record.

13             MS. JASIEWICZ:  Thank you, Your Honor.

14             MS. KEARSE:  May we please go ahead and put up 001

15   and then 002?

16   BY MS. KEARSE:

17   Q.   I think, Dr. Feinberg, you just went over where you

18   are.  I'd like to -- go over with the Court a little bit

19   of your educational background.

20             MS. KEARSE:  If we can go to slide 2, Gina.

21   BY MS. KEARSE:

22   Q.   Can you go over with the Court just your education

23   and what you studied and walk us through the various --

24   A.   Sure, sure.  I got my Bachelor's Degree at the

25   University of Chicago.  My major was Russian civilization

1    which was really a focus on Russian history and Russian

2    literature.

3        And then I undertook graduate training at the

4    University of Chicago.  Again, my topic of study was Russian

5    history.

6        I completed all the course work and my language exam

7    for a Ph.D., but I did not write a dissertation.  So I don't

8    have, I don't have a Ph.D.

9        Then a number of years later I had to go back to

10   college to do all the pre-medical course work that would be

11   required for applying to medical school.  So I spent two

12   years at the University of California at Berkeley taking

13   physics and chemistry, organic chemistry, calculus, all the

14   things I hadn't taken in college.

15       And then I did go to medical school in Chicago at Rush

16   Medical College.

17       And following that, I was trained in -- did my

18   internship and residency in general internal medicine at

19   Rush-Presbyterian-St. Luke's Medical Center also in Chicago.

20       And following that, I did a fellowship in infectious

21   diseases at UCLA.

22   **Q.**  Doctor, you currently have -- you currently have a

23   medical license?

24   **A.**  Pardon me?

25   **Q.**  Are you currently licensed to practice medicine?

1    **A.**    Yes, I am, in both Ohio and West Virginia.

2    **Q.**    And do you also have hospital privileges in both Ohio

3    and West Virginia?

4    **A.**    Yes, I do.

5              MS. KEARSE:  Gina, number 4.

6    BY MS. KEARSE:

7    **Q.**    Doctor, do you hold board certifications?

8    **A.**    Yes.

9    **Q.**    And --

10   **A.**    Those are --

11   **Q.**    Can you tell the Court what board certifications do you

12   hold?

13   **A.**    So the National Board of Medical Examiners is a

14   three-part exam that you take during medical school.  Two of

15   them were at the end of the second year, one at the end of

16   the fourth year.  And the third you take at the end of your

17   internship year.  That's to test basic medical knowledge

18   across the various fields of medicine.

19          And then following my internal medicine training, I

20   passed the boards for the American Board of Internal

21   Medicine.

22          And then after my infectious disease training, I passed

23   the subspecialty board in infectious diseases.

24   **Q.**    Doctor, how long have you been seeing or evaluating

25   patients with infectious diseases?

1    **A.**    Well, let's see.  If you start with -- I mean, I

2    started seeing patients with infectious diseases, of course,

3    as a medical student and certainly during training.  So I

4    don't know exactly -- the start of my third year of medical

5    school would have been July, 1977.

6        And then, you know, of course, after board

7    certification in infectious diseases, that's really what I

8    did full-time.

9    **Q.**    That was 40 years or so?

10   **A.**    About 40 years.  I earned all this gray hair.

11   **Q.**    Doctor, I'd like to spend a little time going over some

12   of your research and experience before we get to some of

13   your opinions today.

14       MS. KEARSE:  Gina, can you go to 03, please?

15       THE WITNESS:  So I think I -- what you see on this

16   slide are the major positions that I've held since

17   completing all of my training.

18       So after fellowship, I had a research position at

19   Schering Corporation involving the development of a new

20   antibiotic, and then later involving the development of

21   interferon, alpha interferon for infectious diseases.

22       I was recruited from Schering by the National Institute

23   of Allergy and Infectious Diseases because one of the

24   projects I was working on at Schering was the potential use

25   of alpha interferon as a treatment for AIDS.  And I did that

1    work with collaborators at NIH with Cliff Lane who's now I

2    think the second in command to Dr. Fauci at NIAID.

3         And, so, they got to know me and I got to know them.

4    And when they decided that they really needed to have a

5    dedicated part of the institute for HIV and AIDS, they

6    recruited me.  I believe I was employee number five or six.

7         I went to NIH in the fall of 1986 and spent four years

8    there really developing the research structure that exists

9    across the country in major medical schools to do clinical

10   studies of medications in HIV, AIDS.

11        So this isn't lab work.  This is work directly with

12   patients to treat the, the HIV itself, to treat the

13   infections and cancers that constitute AIDS; in other words,

14   the complications of HIV disease, and then also to explore

15   the prevention of some of these infections.  I was involved

16   in some very famous studies and they're in my CV.

17   **Q.**   Can you highlight just a couple of those for the Court

18   if we're talking about a time period?

19   **A.**   Can I --

20   **Q.**   Can you just highlight a couple of those for the Court?

21   **A.**   Oh, well, one of the things that I developed but then

22   handed over to another medical officer, so I'm not on the

23   publication, is the prevention of HIV in mother to child

24   transmission which is a famous study called 076 that showed

25   that we could decrease the transmission of HIV to a newborn

1    by two-thirds.

2        And I was involved in seminal, many seminal studies to

3    treat pneumocystis pneumonia, which is the most common

4    manifestation of AIDS, cytomegalovirus retinitis that causes

5    blindness in people with AIDS, a number of other infections,

6    toxoplasmosis, histoplasmosis.  These are all quite serious

7    and sometimes fatal infections in people with AIDS.

8        I was also involved in the additional studies of HIV

9    medicines in children.  So the first two drugs, AZT and DDI,

10   that were used in adults, and then I was responsible for

11   designing those studies and getting them conducted in

12   children.

13   **Q.**   Okay.  And if we can continue with some of your

14   continued research and experience at Johns Hopkins?

15   **A.**   I was recruited from NIH to join the Division of

16   Infectious Diseases at Johns Hopkins.  And, so, I did very

17   much on the investigator side in the field as I had -- it

18   was the flip side of what I had been doing as a medical

19   officer at NIAID, you know, moving the, the research agenda

20   forward.

21       And during this time, I served as Vice Chair and then

22   Chair of -- there were two big committees in this structure.

23   The structure is called the AIDS Clinical Trials Group.  And

24   there are two big committees, one for the treatment of HIV

25   and one for the treatment of, prevention of opportunistic

1    diseases that complicate HIV and AIDS.

2         And, so, I was Chair and Vice Chair of the

3    Opportunistic Infections Committee during that time.  And --

4    **Q.**   Were you recruited again to somewhere else?

5    **A.**   I was recruited then to the University of Cincinnati to

6    run their HIV program.  And that was a wonderful opportunity

7    to be in charge of a program.

8         So I went to Cincinnati, but they loaned me back to NIH

9    for a little over a year, year and a half.  And that's the

10   part that says Office of AIDS Research.

11        Congress passed a law that established the Office of

12   AIDS Research.  So I was one of the initial five subject

13   matter experts that reported to the Director of the Office

14   of AIDS Research.  His name was William Paul.  He's a

15   well-known immunologist.

16        So I did that sort of in transition from Hopkins from

17   Baltimore to Cincinnati.  And each institution -- what's the

18   word for it -- interagency agreement.  Each institution

19   signed an agreement to loan me back to NIH even though I

20   really was a faculty member during that time.

21   **Q.**   And it looks like you made it to West Virginia.  Were

22   you recruited to WVU?

23   **A.**   I was.  I retired from the University of Cincinnati in

24   December of 2015.  I was two weeks shy of 70.  And the folks

25   at WVU had been talking to me, and I was convinced that this

1    was the place to come because I had already started in

2    Cincinnati working on the infectious and medical

3    complications of opioid use disorder.

4         And at the time I was being recruited, then Governor

5    Tomblin said heroin is West Virginia's number one problem.

6    So I thought, well, I've got to come here then because I

7    really was at that point really focused on opioid use

8    disorder and its associated infections.

9         I kind of moved over a ten-year period from like 2005

10   to 2015, had moved from the HIV field into the addiction

11   field.

12   **Q.**   And we'll get into more detail into that.  I want to

13   quickly go through some of your other qualifications as

14   well.

15             MS. KEARSE:  Gina, 05.

16   BY MS. KEARSE:

17   **Q.**   Doctor, are you also a member of professional

18   organizations in your field?

19   **A.**   Yes.  I'm a member of a lot of organizations, and I'm a

20   fellow, which is kind of an advanced status from -- for the

21   American College of Physicians, which is the internist

22   organization, and for the Infectious Diseases Society of

23   America which I think is self-explanatory.

24   **Q.**   Right.  And do you serve on any boards or prior boards

25   or -- the American Academy of HIV Medicine or HIV Medicine

1    Association?  Are those two recent organizations?

2    **A.**    So there are two professional organizations for people

3    who are involved in HIV and AIDS.  One is the American

4    Academy of HIV Medicine.  It's slightly different focuses.

5         So the academy focus is really on supporting

6    clinicians, especially educationally.  We wrote a wonderful

7    two-volume textbook about HIV for which I was one of the

8    editors.  So I was the Chair of that, the board, the

9    national board for that organization.  I think it was 2000

10   to 2002.

11        And I am currently the past Chair -- it's a four-year

12   process to go from Vice Chair to past Chair -- for the HIV

13   Medicine Association.  And that organization is much more

14   focused on policy.  We spend a lot of time talking to --

15   testifying in Congress, talking to our elected

16   representatives about the funding and the, you know, the

17   funding for care, the funding for research.  So it has, it

18   has sort of a different focus, and I'm in my last year of

19   service for that.

20             MS. KEARSE:  Gina, 007.

21   BY MS. KEARSE:

22   **Q.**   Doctor, we may have highlighted some of these

23   already, various committees that you're involved in.

24   And just to highlight one or two of these for the Court

25   in your active role for both, you know, either

1    local/regionally or nationally?

2    **A.**    Right.  So this is just a very -- a small snippet of

3    the list because I think the list on my CV is like two or

4    three pages, so an awful lot of committees both locally and

5    nationally and internationally.

6        We just talked about at the national level the two

7    organizations here in the United States.  I've also been

8    part of the National Academy of Sciences investigation into

9    opioids and infectious diseases.

10       And I am the -- actually the founder of the West

11   Virginia Hepatitis Academic Mentoring Partnership.  It is an

12   effort to broaden the axis of people with chronic hepatitis

13   C.  We can cure hep C now in like eight to 12 weeks.  So

14   it's broadened the axis of people across West Virginia to

15   this, you know, amazing therapy because West Virginia

16   Medicaid does not permit anybody other than a specialist to

17   prescribe these medications unless you do it under the

18   guidance of a specialist.

19       Well, this is not a state that has a lot of

20   specialists.  We have one hepatologist in the whole state.

21   There's probably not 20 ID docs here.  So, you know, we

22   developed this training, and we started in March of last

23   year.  Actually, the first training was held in person in

24   Bluefield.  And then the pandemic came and all the training

25   since has been on-line.

1    But we have now provided consultation for 245 people

2    with chronic hep C across the state.  And we have so far

3    cured 97 percent of them which is -- I can't tell you how

4    good that makes me fee.  But that is a cure rate that

5    specialists achieve.

6    So I've spent a lot of time in the last couple of years

7    getting this up and off the ground.  That's kind of the most

8    major thing I've done here locally.

9    **Q.**   Okay, great.  And we'll talk in some more detail as

10   well.  Have you published in peer-reviewed literature?

11   **A.**   Oh, sure, yes.

12   **Q.**   I don't have slides for all of these, so I'll just ask

13   you about how many articles have you published in the

14   peer-reviewed literature?

15   **A.**   I think the current number is about 150.

16   **Q.**   And are there some key journals or ones that in your

17   field that you can just list a couple of them for the Court

18   of where your articles appear?

19   **A.**   Sure.  So some of these articles are in the *New England*

20   *Journal of Medicine*.  Some are in the *Annals of Internal*

21   *Medicine*.  So some of them are in general medical journals.

22   Others are in specialty journals like the *Journal of*

23   *Infectious Diseases*, *Clinical Infectious Diseases*, *AIDS*, and

24   a number of, a number of other journals that have, you know,

25   a more specialized audience.

1    **Q.**   And, Doctor, do your peer-reviewed publications concern

2    harms associated with opioid use disorder?

3    **A.**   Yes, some of them do.

4    **Q.**   And deal with the opioid epidemic in West Virginia?

5    **A.**   Yes.

6    **Q.**   And harms associated with injection opioid drug use?

7    **A.**   Yes, both overdose and the infectious complications.

8    **Q.**   And would they include concerns over HIV?

9    **A.**   Pardon me?

10   **Q.**   Would they include concerns over HIV?

11   **A.**   The most -- yeah, the most recent paper that was

12   published in *The Lancet* a couple of months ago addresses the

13   issue of HIV and its connection to the opioid epidemic here

14   in the United States.  And, you know, the hardest hit area,

15   of course, is --

16   **Q.**   How about hepatitis?

17              THE COURT:  Just a minute.  Ms. Wu.

18              MS. WU:  Your Honor, I hate to interrupt, but the

19   witness is now testifying as to an article published in 2021

20   which was not disclosed in connection with her opinions in

21   this case.  And, therefore, we ask that she not be allowed

22   to testify concerning that article.

23              MS. KEARSE:  This is just basically foundation.

24   We're not going into the article.

25              THE COURT:  You're referring to it as part of her

1    qualifications?

2              MS. KEARSE:  Yes, Your Honor.

3              THE COURT:  Overruled.  You can go ahead.

4    BY MS. KEARSE:

5    **Q.**   Doctor, have you published also about endocarditis?

6    **A.**   Pardon me?

7    **Q.**   Have you also published about endocarditis?

8    **A.**   Yes, I have, also as a complication of injection opioid

9    use.

10   **Q.**   And, Doctor, you served on editorial positions on

11   various journals?

12   **A.**   I have.  I have had a number -- served on a number of

13   editorial boards.

14   **Q.**   And in your role as -- at WVU, do you also -- are you

15   involved in teaching?

16   **A.**   Yes.  I teach at a number of different levels.  I

17   teach -- I actually have mentored some college students who

18   are interested in opioid use disorder and research.  So they

19   would spend the summer with me.

20       I teach medical students.  Again, this is pretty much

21   focused on the ones who are interested in infections and

22   interested in -- and/or opioid use disorder.

23       I give specific talks, lectures to the trainees in

24   behavioral medicine and psychiatry.  I give specific

25   lectures to the -- we have an addiction medicine fellowship

1    in our department and I give specific lectures to the

2    individuals spending a year with us to get additional

3    certification as addiction treaters.  These are people who

4    are already trained in like internal medicine or family

5    medicine and now they're acquiring another level of

6    expertise.

7    **Q.**   Dr. Feinberg, have you received grants as they relate

8    to opioid use disorders and their associated risks for

9    contracting infectious diseases?

10   **A.**   I think all of my current funding is related in one way

11   or another to opioid use disorder.  Sometimes it's related

12   to the safety of using certain drugs.  So I have a grant

13   from NIH to evaluate the use of fentanyl test strips so

14   people can check to see if there's fentanyl in their drugs.

15        But most of the funding -- and I -- and there's a

16   state -- a grant that's federal money through the state to

17   expand treatment for opioid use disorder for people who come

18   to emergency rooms asking for that kind of help.  But most

19   of the grants are focused on the infectious complications.

20   **Q.**   And does your work involve working with communities in

21   aid of prevention of infectious diseases resulting from

22   injection opioid use?

23   **A.**   Yes.  My work here in West Virginia has really focused

24   in sort of two geographic areas.  One is Monongalia County,

25   of course where WVU is.  But the majority of the work that I

1    have done and continue to do is in the southern coalfields;

2    so, you know, the bottom third of the state and these are

3    counties that border Kentucky and Virginia.

4         That's why we hold -- held the first hepatitis

5    mentoring partnership training in Bluefield because it's

6    those counties, Mercer, McDowell, Mingo, Wyoming, Raleigh,

7    Logan, Boone that have the highest rates of hepatitis C in

8    the state.  So, you know, we wanted to start where the need

9    was greatest.

10   **Q.**   Before coming to West Virginia, did you also work with

11   various communities when you were working in Ohio?

12   **A.**   I did.  I did because I -- it took nine years, but I

13   eventually founded Ohio's third syringe exchange and -- but

14   its first true syringe services program, so more than just

15   sterile needles for used ones, but, you know, a whole range

16   of other services; testing for HIV and hep C, referrals for

17   substance use disorder care, you know, all the other things

18   that are part of a more complex program.

19        Overdose education and naloxone distribution, I had a

20   grant from the Ohio Department of Health to do that.  And

21   that involved a great deal of work with local communities in

22   metropolitan Cincinnati.

23             MS. KEARSE:  Gina, 06.

24   BY MS. KEARSE:

25   **Q.**   I want to ask you one more follow-up and then I'm

1    going to ask the Court's permission to have you testify

2    today.

3        So quickly on 06 I just want to highlight the grants.

4    Are these some of the grants that you're working on that are

5    specific to your field and specific to West Virginia?

6    **A.**   Yes.  Sorry.

7    **Q.**   Some of the grants, just two examples of grants for

8    your work in rural West Virginia?

9    **A.**   Right.  These are two of the -- I think I have

10   something like six current active federally funded grants.

11   And I think I mentioned -- let me put my eyeglasses on.

12   **Q.**   And, Doctor, I think it should be on the screen right

13   next to you if that helps.  Right next to you there's a

14   screen as well.

15   **A.**   Actually, I don't see that page here.  So just to make

16   it easy, I think that the Rural West Virginia Responds to

17   Injection Opioid Epidemics, that's the grant that is now

18   completed and we're analyzing the data, so it hasn't been

19   published.  But that is the grant that we had from NIDA to

20   work in these southern coalfield counties.

21       Expanding Overdose Aftercare and Peer Recovery

22   Services, this is federal money through the state that --

23   it's actually CDC money that comes to the state to, as I

24   mentioned, to engage people who come to the emergency room

25   asking for treatment to begin Suboxone, Buprenorphine

1    treatment in the emergency department and then refer them --

2    give them three days' worth of medication and then refer

3    them, link them to a community provider.  After all,

4    emergency departments can't be chronically engaged in

5    managing people with opioid use disorder.

6        So that's two of the -- as I said, I think there's

7    currently six grants.

8            MS. KEARSE:  Your Honor, plaintiffs tender

9    Dr. Feinberg as an expert in the prevention and treatment of

10   infectious diseases associated with opioid use disorder and

11   injection of opioid drug use.

12           THE COURT:  Any objection?

13           MS. JASIEWICZ:  No objection, Your Honor.

14           THE COURT:  The Court finds Dr. Feinberg to be an

15   expert in the prevention and treatment of infectious

16   diseases associated with opioid use disorder and injection

17   opioid drug use.

18           MS. KEARSE:  Thank you, Your Honor.

19           THE COURT:  That was an easy call to make, Doctor.

20           THE WITNESS:  Thank you, sir.

21   BY MS. KEARSE:

22   Q.   I'd like to talk a little bit about what you were

23   asked to do in this case and some of the methodology

24   and, and --

25       Doctor, are you familiar with the literature concerning

1  the use of pre- -- let me -- strike that.  You've testified

2  just a little while ago that you've contributed greatly to

3  the literature; is that correct?

4  **A.**   Yes.

5  **Q.**   And can you tell the Court the types of documents and

6  literature that you reviewed in order to offer your

7  testimony today?

8  **A.**   Okay.  So I, I re-read a number of articles that I was

9  already familiar with.  I read a number of new papers that I

10  had not come across before.  I read a number of reports from

11  the Bureau of Public Health about -- those were primarily

12  focused on HIV in the state and the counties, and on

13  hepatitis B and C in the counties, state and in the

14  counties.

15      I also reviewed specific reports from the Cabell

16  Huntington Health Department.  Let's see.  And, of course, I

17  relied on, you know, almost 40 years of experience as an

18  infectious disease physician working with patients who are

19  struggling with opioid use disorder and the infections

20  associated with injection drug use.

21  **Q.**   And, Doctor, are these, this type of research and

22  techniques widely accepted in your scientific community, in

23  the medical community?

24  **A.**   I hope so.  I believe so.  Modestly, yes, I think the

25  answer is "yes."

1    **Q.**   And are these scientific and medical principles used in

2    forming your opinions widely used in your field?

3    **A.**   Yes.

4    **Q.**   And you used the same type of methodology in your

5    academic research?

6    **A.**   Yes.  I mean, the -- writing this report was like

7    writing a book chapter.  It was the same kind of process you

8    would go through that you do when you write a chapter.

9         You look at all the background.  You look at all the

10   accumulated data that are available, the peer-reviewed

11   literature, but also the public health organizations, and

12   then, you know, you form opinions and come to conclusions

13   based on all of that.

14   **Q.**   And it's the same type of research you would do in

15   relationship to the grants that you get and the work that

16   you do associated with those?

17   **A.**   Yeah.  No, it's not substantively different.

18   **Q.**   Doctor, did I ask you to come here today to explain to

19   the Court the associated harms with the injection of

20   opioids, including HIV, HBV, HCV, and other bacterial

21   infections such as endocarditis?

22   **A.**   Yes.

23   **Q.**   And did you issue a report in this case?

24   **A.**   I did.

25   **Q.**   And if there's some specific data -- you just mentioned

```
 1    it's like a chapter of a book.  If there's specific data

 2    that you'd like to look at, would you please ask me for that

 3    information and I'll ask the Court's permission to show you

 4    that report?  Is that fair?

 5    A.    Yes.

 6    Q.    Doctor, I'd like to start us off in our discussion

 7    today with a quote --

 8              MS. KEARSE:  08, Gina.

 9    BY MS. KEARSE:

10    Q.    -- from your report.  And I'd like you to read this

11    and I think this is going to help us get to where we're

12    going on that too.

13         Can you read this to the Court and let me know if this

14    is kind of where -- gives us a direction of where we're

15    headed?

16    A.    Okay.  So I wrote, "Opioid overdoses are not the only

17    life-threatening consequences of the drug epidemic.  The

18    serious infections associated with drug use and especially

19    injection opioid use have resulted in a series of syndemics,

20    intertwined epidemics, that are part of the complex public

21    health crisis we are currently facing that will be described

22    in detail below."

23    Q.    And "detail below" is now where we're going to go

24    within your report.

25    A.    It was here.  I just didn't turn the right page.
```

1    Sorry.

2    **Q.**    And I believe there's a screen next to you as well.  So

3    there's that if you need that.

4    **A.**    Thank you.

5    **Q.**    I don't know -- sometimes it's easier to see there or

6    on your slide.

7    **A.**    Thank you.

8    **Q.**    So, Doctor, tell us a little bit about why you came to

9    West Virginia or what brought you to West Virginia with that

10   as well, but why the study of infectious diseases?  In

11   general, you've been studying infectious diseases for 40

12   years.

13   **A.**    You know, these -- there are two parts of this.  And

14   actually, you know, if you think about the history of public

15   health, it really started with the control of infections.

16   Right?  There's the famous Typhoid Mary at the pump, the

17   water pump in London.

18        So there are, there are really two aspects to

19   infectious diseases that appeal to me.  One is the

20   individual patient.  You either prevent or treat or cure or

21   prevent death in people by appropriately diagnosing and

22   treating these infections.

23        And unlike most of adult medicine, which is the

24   management of chronic conditions that you don't cure but you

25   just manage, diabetes, high blood pressure, you know,

1    cardiovascular disease, you never, you never get back to

2    baseline in those.  You can actually cure infections, some,

3    many which is gratifying.

4        But it's also, you know, the very nature of an

5    infectious disease means it's frequently contagious.  And,

6    so, there's a whole public health part of infectious

7    diseases that's very important.

8        If you cure hepatitis C in somebody who has hepatitis

9    C, then they can't give it to anybody else even if they are

10   still injecting drugs and, you know, sharing a needle with

11   somebody else.

12       So you have, you know, a major impact not only on the

13   individual, but on the community, you know, I mean, the

14   public health, the community.  And I think that has, of

15   course, tremendous value.  And, of course, it has

16   implications for costs and health insurance and

17   hospitalizations and, you know, everything that goes along

18   with people being pretty sick.

19       But the infections we're talking about, they're not

20   trivial infections.  You know, most of these infections are

21   extremely serious and, in some cases, life-threatening.

22       So you're not going to be able to go into recovery from

23   opioid use disorder if you're not alive and breathing.

24   You've got to -- you have to make it to that point.

25   **Q.**   What I'd like to do, Doctor -- sorry.

1          MS. KEARSE:  09.

2    BY MS. KEARSE:

3    **Q.**   I'd like to start walking through some of these

4    areas that we'll talk about today and, and your work

5    with opioid use disorder and then the infections of

6    concern with that.

7          And I'd like to briefly talk about first viral versus

8    bacterial just, just broadly if you can explain the

9    different types.  And then we're going to go specifically

10   into each one and just highlight for the Court a little bit

11   about it I hope.

12   **A.**   So the vast majority of the infections that people get

13   who are injecting opioids are blood-borne infections.  You

14   are injecting material that isn't sterile and that has been

15   prepared in unsterile equipment and injected, you know, if

16   it's a shared syringe with now an unsterile syringe through

17   skin that is typically not clean.

18         So you've got the opportunity to directly introduce

19   organisms into the blood.  And, of course, then it's easy

20   for them to get anywhere in the body.

21         There are other infections like skin infections that

22   are not so -- not involved in the blood-borne route.  But

23   the infections that cause the greatest morbidity and

24   mortality are the ones that enter the blood.

25         And there's -- as you said, there's kind of two

1    categories.  There's viral infections which includes HIV and

2    hepatitis B and C.  And then there are bacterial infections,

3    the most common and most deadly of which is infective

4    endocarditis, an infection of the heart valves.

5        But there are other serious bacterial infections that

6    get to their target organ through the blood.  So you could

7    have a brain abscess.  You could have a bone infection.  You

8    could have joint infection.  So you're going to have other

9    serious things.

10        And to a much more minor extent, you can also introduce

11    fungal organisms through the skin.  You sometimes see that

12    in a small proportion of endocarditis cases.  But I've

13    really pretty much focused on viruses and bacteria.  That's

14    really what you see.

15    **Q.**   Okay.  So that's -- we'll walk through these so we can

16    maybe give some definition to some of these and, and some

17    preventative measures.

18             MS. KEARSE:  Gina, 10.

19    BY MS. KEARSE:

20    **Q.**   And then I'll move quickly into -- we'll start with

21    the viral infections.

22        So if we can go to the next slide, number 11.

23        Can you tell the Court what is HIV and -- well, back up

24    one thing to explain to the Court.

25        We're focused on infectious diseases as a result of

1    opioid drug use; correct?

2    **A.**    Yes.

3    **Q.**    And is that to say that some of these diseases are also

4    caused by other ways that, that blood is, is, you know,

5    enters into the system from different ways?  Is that fair to

6    say?

7    **A.**    Yes.  Well, I mean, there are -- the viral infections

8    can also be acquired sexually.  And to the extent that

9    people with opioid use disorder engage in transactional sex,

10   which is kind of the medical terminology for prostitution,

11   but exchange of sex for something of value to that person,

12   money, drugs, that is also an avenue of infection.  But

13   really what I'm focused on here is what you get from direct

14   invasion of the blood.

15   **Q.**    And we'll talk about as, as, as you see what, you know,

16   the -- when you see a majority of that coming from drug use

17   as well, when you can distinguish that.

18        So if you could tell the Court just briefly what is HIV

19   and what is the risk of -- that you've seen about getting

20   that, some context and background?

21   **A.**    So HIV is a retrovirus.  It's an RNA virus.  And it's

22   transmitted by exposure to infected body fluids.  And those

23   include, you know, blood where the largest amount of virus

24   can be found, but also sexual fluids like semen and vaginal

25   fluid.  And also it's excreted in breast milk.  So a mother

1    who is nursing a baby can give HIV through breast milk.

2    **Q.**    What are the risks of contracting HIV with --

3    **A.**    Well, specifically for people who inject drugs, every

4    time you inject, there's a 1 in 160 chance of acquiring HIV.

5    And, you know, of course, the more times you inject, you

6    know, that risk accumulates.

7         Injection drug use is really the second most -- let's

8    see how to say that -- the second most contagious way to get

9    HIV.

10        So the most contagious, the thing that is worse most

11   often is, again, in medical terms, unprotected receptive

12   anal intercourse between -- especially between men.  And

13   that's got to do with the nature of the lining of the rectum

14   and the fragility of that tissue to abrasions and tears that

15   when there's virus and semen can enter the body.

16        And then the second most sort of contagious way to get

17   HIV, the second most common way to get HIV is through

18   injection drug use.

19             MS. KEARSE:  Could we go to the next slide,

20   please?

21   BY MS. KEARSE:

22   **Q.**    And can you tell us the number of people with HIV

23   both in the United States, and more specific to West

24   Virginia and Cabell County?

25   **A.**    Well, about -- there are approximately -- it's hard to

1    have an exact number, but we think there's approximately

2    1.2 million people in this country with HIV.  About

3    14 percent of them don't know they have HIV.  That used to

4    be 30 percent and there's been a big effort to diagnose

5    people.

6         After the introduction of syringe exchange in the

7    1990s, the proportion of people who were acquiring HIV

8    through injection drug use steadily dropped over time.

9         And then around -- it's like, let's see, around 2010 or

10   so that flat-lined.  It, it stalled.  The continued decrease

11   among people who inject drugs stalled.  And now it's on the

12   increase.  And now we're up to 9 percent of new HIV

13   infections are in people who inject drugs; 10 percent in men

14   and I think 7 percent in women.

15        And here in West Virginia -- we're going to start by

16   saying something that isn't on the slide.

17        So West Virginia has always been a low incidence,

18   that's new infections incidence; and a low prevalence,

19   that's existing infections.  Low incidence and low

20   prevalence state for HIV.

21        And almost all of the cases of HIV in this state since

22   1982 have been acquired sexually.  And the typical number of

23   new diagnoses made a year, until very recently, was about

24   77, primarily among men who have sex with men.  And,

25   actually, blessedly so, there have not been 5,000 cases of

1   HIV in this state in the 40 years we've had HIV, which is

2   pretty amazing.

3        But the sad thing is we're seeing a reversal of that

4   now.  So we are now seeing so many HIV infections due to

5   injection drug use that that is now the primary way that new

6   HIV infections in West Virginia are acquired which, as you

7   can imagine from what I've told you, is a really dramatic

8   change.

9        So, for example, it says on the slide in Cabell County

10  in 2019 there were 69 new cases.  And 90 percent of those

11  new HIV cases were among people who inject drugs.

12       Data from 2020 are a little trickier and a little

13  harder to confirm because that was our pandemic year.  And,

14  so, the effort of the Bureau for Public Health was very much

15  focused on dealing with the COVID pandemic.  But we do have

16  data from 2020.  It's just, you know, the degree of

17  confirmation is still kind of pandemic.

18  **Q.**   Doctor, how is HIV treated?

19  **A.**   So we do have a vaccine for HIV.  And we can't cure it,

20  but based on the work that we -- that I've described much

21  earlier, we have come a long way to manage it.

22       So this -- when I started in 1982, June of 1982 taking

23  care of people with AIDS, they -- death was the uniform

24  outcome.  You, you maybe could live a year or two, but you

25  would succumb eventually from multiple infectious and

1   sometimes malignant opportunistic diseases.

2       Since 1996 when we developed this new class of drugs

3   called protease inhibitors -- that's kind of like -- that's

4   what Magic Johnson got.  That's the, sort of the famous

5   turning point in the epidemic where people stopped dying.

6   And the medicines have only gotten more refined and better

7   since then; fewer pills fewer times a day, less side

8   effects, less toxicity.

9       And now if you're a 20-year-old man and you diagnose

10  with HIV and you take one pill once a day, it's projected

11  that you'll live to be in your 70s.  That's a far cry from

12  watching men in their 20s and 30s die at -- I went to a lot

13  of funerals who died in their prime of life.

14      So we can really manage this disease.  But on the flip

15  side, it requires determination to swallow that pill every

16  day and you don't get a vacation.  Right?  You have to take

17  that pill for a lifetime.

18      No matter how long your HIV viral load has been

19  undetectable, below the ability of the assay to find it in

20  your blood, no matter how long that's happened, you stop

21  taking the medicine, within days to weeks your viral load

22  goes back to where it was before.

23      So we have not been able to eradicate it.  We're

24  actually trying to work on that now.  There's what we call a

25  cure effort.  Current research is trying to figure out how

```
1    to flush HIV from its hiding places in the body and kind of

2    kill it off and, and sort of get a functional cure that way.

3    But we're not there.  So you do have to take medicine every

4    day for the rest of your life.

5            MS. KEARSE:  Gina, can you go to 013.

6    BY MS. KEARSE:

7    Q.   And I believe you just talked a little bit about

8    this.  We'll focus on Cabell County.  Have you provided

9    the Court -- and really up to 2020 because I know 2021

10   is, is not in yet and I believe just testified 2020 may

11   be a little under-reported.

12           MS. JASIEWICZ:  Your Honor, if I may, we have an

13   objection to the use of this slide which contains data from

14   2020 and 2021.  That was not disclosed in Dr. Feinberg's

15   report.

16       In addition, we only received a copy of this data at

17   7:00 p.m. last night.  We only received a version that had

18   the source citation at the bottom of the page around

19   midnight last night.

20       So we have not had an opportunity to assess this data

21   for concerns about reliability.  And I would just note that

22   we certainly have such concerns considering that the slide

23   itself notes that data are preliminary and subject to

24   change.

25           MS. KEARSE:  And we can focus just on 2019, Your
```

 1    Honor.  This is just additional information that's been

 2    provided.  But if we just focus on 2019 --

 3              THE COURT:  Do you object to that if she cuts it

 4    off at 2019?

 5              MS. JASIEWICZ:  If she just testifies about 2019,

 6    that's fine.  I think we would still have an objection to

 7    the data from 2020 and 2021 being on the screen, but I

 8    understand if you're not able to remove that part.

 9              THE COURT:  Well, I think I'm capable of ignoring

10    the 2020 and 2021 data.

11              MS. JASIEWICZ:  Thank you, Your Honor.

12              MS. KEARSE:  That's fine, Your Honor.

13              THE WITNESS:  I only just obtained this

14    information very recently.  It wasn't available when I wrote

15    my report.  But the trend is clear, so that's fine.

16         And you can see that before 2018, as I said, the

17    average number -- you don't see the state total because it

18    goes on for, you know, 55 counties and takes up three or

19    four pages.

20         But previously, as I said, there was an average number

21    of about 77 new cases a year in the state.  And the average

22    for Cabell County was seven.  And you can see that in 2018

23    that went to 17, a total with 13 of that 17 reporting

24    injection drug use.  And then in 2019 it jumped to 69 with

25    63 percent reporting injection drug use.

1    So that kind of -- I think the percents are something

2    like -- for 2019 are, are approaching like 68 or 70 percent.

3    It's a lot.  And it's -- the majority of the cases in Cabell

4    County.  But as I mentioned before, it is now the majority

5    and has been for several years the majority of all the cases

6    in West Virginia are now associated with injection drug use.

7    BY MS. KEARSE:

8    **Q.**   And, Doctor, have you also looked at Cabell County

9    and -- which includes the City of Huntington in

10   comparison to other counties as well?

11   **A.**   So Cabell has the highest number.  You know, we can

12   certainly say through 2019 has the highest number of new HIV

13   cases total and the highest proportion of new HIV cases in

14   people who inject drugs.

15   **Q.**   And is this what you're referring to?  Explain to the

16   Court what, what I've put on this slide about the outbreaks

17   of HIV and HCV.

18   **A.**   Right.  So let me give you a little background for

19   this.

20      So in the end of 2014, but mostly in 2015 and 2016,

21   there was a big outbreak of HIV in Southwest Indiana in

22   Scott County.  So this provided a big shock to the public

23   health community because this was the first time there was

24   an HIV outbreak in a rural location.  You know, HIV had been

25   primarily really just sort of an urban disease until then.

1       And this caught the CDC rather unawares.  And as a

2   result of this, they did a big investigation into the --

3   looked at the characteristics of Scott County and then tried

4   to look at counties cross the -- the over 3,000 counties

5   across the United States to see if there were other counties

6   that shared these characteristics.

7       And they came up with a list of 220 counties that they

8   considered to be at high risk for hepatitis C and HIV.  They

9   were all rural counties.  And more than half of them were in

10  Central Appalachia.  So by Central Appalachia I mean

11  Southern Ohio, all of West Virginia, Eastern Kentucky, you

12  know, north, Northeastern Tennessee.  So we had more than

13  50 percent.  And that really reflects the, you know, the

14  injection of opioid epidemic in this region.

15      And when they did that, the largest number of those

16  counties were in Kentucky, representing about 25 percent of

17  the 220 of the total.  But 13 percent of them, the second

18  highest proportion, were in West Virginia.  And if you do it

19  by counties, we actually -- it was 51 percent.  28 of West

20  Virginia's 55 counties were on that list.

21      Mingo was number one -- no, I'm wrong.  McDowell was

22  number one.  Mingo was number seven.  Cabell and -- most of

23  these southern coalfield counties were on the list.

24      So then the state looked at that data and said, you

25  know, we can do a more specific look at characteristics that

1    are important in West Virginia.

2         So, you know, Scott County -- there's 92 counties in

3    Indiana.  So Scott County is the poorest.  It's number 92.

4    It has very poor access to healthcare, very few physicians.

5    You know, one in ten, you know, live in poverty.  One in 20

6    haven't graduated from high school.  So, you know, it was

7    really an area that had a lot of -- was not a very healthy

8    area.

9         And, in addition, in West Virginia we looked at another

10   10 characteristics that the Bureau of Public Health felt

11   were really important to West Virginia.  And, so, they did a

12   similar analysis using the Scott County criteria and the

13   West Virginia criteria.  And they came up with this map that

14   you can see now on the screen.

15        And, actually, this -- my order is different from the

16   order up there but --

17   **Q.**   We skipped a couple.

18   **A.**   Cabell County turns out to be in both lists, for both

19   the CDC list and the West Virginia list and, in fact, this

20   tremendous overlap between the CDC evaluation and the West

21   Virginia evaluation.  And the West Virginia evaluation only

22   added two new counties, Greenbrier and Pocahontas.

23   Otherwise, they were concordant.  So even adding in those

24   specific characteristics to West Virginia only added two

25   more counties.

1      And as you can see, this is a typical heat map.  So the

2  darker the color, the more, more intense the problem.  So

3  you can see again that the southern third of the state is at

4  extraordinary risk for HIV and hepatitis C outbreaks.

5      And then I think on the right-hand side of the slide

6  you can see the comparison to the risks for overdose that

7  the Bureau of Public Health did.  And you can see that

8  there's, you know, tremendous concordance between the two.

9      And I think that is just evidence that getting HIV and

10  hepatitis C is highly associated with injection drug use, or

11  you could say opioid use because you can, of course,

12  overdose from opioids when they're not injected.  But then

13  they're highly concorded with opioid use disorder.

14          MS. KEARSE:  Your Honor, I'm getting ready to turn

15  to a different subject matter.

16          THE COURT:  This might be a good time to break.

17  Let me hear --

18          MS. JASIEWICZ:  Yes.  I just wanted to ask that we

19  proceed by question and answer as opposed to just having

20  Dr. Feinberg offer her opinions at length.

21          THE COURT:  Well, --

22          THE WITNESS:  Okay.

23          THE COURT:  I think we're doing fine the way it's

24  going here.

25      Dr. Feinberg, I'm going to ask you to come back at

```
1    2:00.  I apologize for the long delay but I've got another

2    matter that I've got to take care.  So if you'll come back

3    at 2:00, we'll press on with your testimony.

4              THE WITNESS:  Okay.  Thank you very much.

5              THE COURT:  We'll be in recess now.

6              MR. FARRELL:  Judge, before we take a break, I

7    understand that President Biden just signed into law a

8    federal holiday takes effect tomorrow for Juneteenth.  So

9    the Office of Personnel Management just made some comments

10   about federal employees.

11        That being said, I think that we're going to try to

12   talk at lunch about seeing if we can squeeze in Chief

13   Holbrook today.  And I don't know what the Court's --

14             THE COURT:  What's the new holiday?

15             MR. MAJESTRO:  Juneteenth.

16             MR. HESTER:  It commemorates the ending of slavery

17   in Texas, Your Honor.

18             THE COURT:  Well, that's a thing that's worthy of

19   commemorating, but it's a bit surprising to learn about it

20   one day beforehand.

21        All right.  We'll come back at 2:00.

22        (Recess taken at 12:00 p.m.)

23             THE COURT:  Good afternoon, Dr. Feinberg.

24             THE WITNESS:  Good afternoon, Judge.

25             THE COURT:  You may proceed when you're ready, Ms.
```

1    Kearse.

2              MS. KEARSE:  Good afternoon, Judge.

3    Good afternoon, Dr. Feinberg.

4              THE COURT:  Good afternoon.

5              MS. KEARSE:  Gina, can you go ahead and put 15 on?

6              BY MS. KEARSE:

7    **Q.**    Doctor, before the lunch break, we had talked about HIV

8    quite extensively and I want to now talk about HCV, which is

9    Hepatitis C?

10   **A.**    Yes.

11   **Q.**    And if you can tell the Court what HCV is?

12   **A.**    Sure.  So, Hepatitis C is another RNA virus, a

13   Flavivirus in the Flavivirus family and it causes a systemic

14   infection that we call Hepatitis C because the liver is its

15   target of choice, but it's really a systemic infection that,

16   you know, has an impact on multiple body systems.

17             And Hepatitis C is primarily transmitted through

18   contact with the blood of an infected person.  So, before we

19   had a blood test for Hepatitis C, a very common way to get

20   it was through transfusion and, in those days, because we

21   didn't have this organism identified, we called it Non-A,

22   Non-B Hepatitis because it was neither Hep A nor Hep B.

23   **Q.**    Dr. Feinberg, did you put a slide together to assist

24   you in your testimony and to provide the Court information

25   on Hepatitis C?

1    **A.**   I'm sorry.  I didn't hear that clearly.

2    **Q.**   Did you create a slide --

3    **A.**   Yes.

4    **Q.**   -- in order to assist in your testimony and provide to

5    the Court?

6              MS. KEARSE:  Your Honor, may I publish Slide 18?

7              THE WITNESS:  Let me -- so, this repeats some of

8    what I just said.  And then what happens, this is an

9    interesting infection in that the majority of people who get

10   acute Hepatitis C will go on to have chronic Hepatitis C.

11   And it's really chronic Hepatitis C that causes the damage.

12        So, some lucky approximately 20 percent will clear it

13   on their own and without any kind of intervention or

14   treatment, but the other 75-80 percent, we don't really know

15   the exact number, will go on to have chronic disease and the

16   chronicity of the disease is marked in the liver by scarring

17   and scarring is kind of the body's way of responding to lots

18   of insult, right?  You cut your skin, you have a scar.

19        So, you damage the liver.  The liver starts laying down

20   scar tissue.  And the medical term is fibrosis.  And when

21   there is a lot of fibrosis in the liver, then you have

22   Cirrhosis.  Cirrhosis is nothing but a liver that is just

23   balled up with scar.

24        And, you know, at the point of having decompensated

25   Cirrhosis, in other words, having a lot of scar tissue and

1    end stage liver disease, the only way to survive that is to

2    get a liver transplant.  And chronic Hepatitis C at that

3    stage of the game is also marked in some people by the

4    development of cancer, of a hepatocellular carcinoma, is the

5    formal term.

6        So --

7    Q.   And I will ask you to back up.  Is HCV or Hepatitis C,

8    is that caused by intravenous or injection drug use?

9    A.   Right.  So, it's really -- so, as I said, it's contact

10   with blood.  It used to be transfusion.  Now we screen the

11   blood supply.  And the primary way now in the United States

12   and actually most of the developing world, the primary way

13   to get Hepatitis C is from injection drug use, sharing the

14   syringe or the other materials that are used to prepare the

15   drugs.

16   Q.   And can you tell the Court what is the risk of

17   contracting HIV within the first year of using --

18   A.   So, Hepatitis C is way more contagious than HIV and

19   studies have shown that maybe 40 percent of people who

20   inject drugs will acquire Hepatitis C in their first year of

21   injection drug use and eventually the majority of people

22   will have it.

23   Q.   Dr. Feinberg, can you estimate how many people in the

24   United States and then in West Virginia have Hepatitis C or

25   HCV as a result of injection drug use?

1    **A.**    So, it's not easy to have an exact number, although

2    acute Hepatitis C is reportable, and that's because it's not

3    very symptomatic in the acute state and a lot of disease

4    happens.  A lot of infection happens without being reported.

5         But it's estimated that somewhere between 3.5 and

6    5.2 million people have Hepatitis C.  And among people who

7    inject drugs, the prevalence has been estimated as high as

8    90 percent.  So, up to 40 percent in the first year of

9    injection, up to 90 percent with continued years of

10   injection.

11   **Q.**   Now, does the State of West Virginia and Cabell County,

12   in particular, have an HCV or Hepatitis C problem?

13   **A.**    So, we have an enormous problem.  When you look at

14   acute Hepatitis C rates across the United States for the

15   last decade West Virginia has either been number one or

16   number two.  Traditionally, we trade that back and forth

17   with Kentucky which, of course, shares geography and a lot

18   of the same risk factors with West Virginia.

19        This year it happens to be -- or last year, rather,

20   2020 happens to be Indiana, but -- and we're number two

21   again.  So, we have an extraordinarily high rate of acute

22   Hepatitis C.

23        And then if 80 percent or so of people with acute

24   disease go on to the chronic form, which is what damages the

25   liver, then we also have an enormous burden of chronic

1    Hepatitis C that can cause liver damage.

2    **Q.**   And has Cabell County seen a rise over the years of

3    Hepatitis C?

4    **A.**   So, within West Virginia, when you look at it by

5    county, Cabell County has had one of the highest acute Hep C

6    rates inside the state.  So, there are data from Cabell

7    County Health Department, the Cabell-Huntington Health

8    Department.

9          In 2016, the rate in Cabell County was 10.3 per hundred

10   thousand and that was double the rate for the entire state,

11   which was 5.1 per hundred thousand, and that's a pretty high

12   rate for a state.  So, Cabell County has been -- has been

13   subject to an extraordinary Hepatitis C epidemic.

14          MS. KEARSE:  Gina, can you go to Slide 22?

15          BY MS. KEARSE:

16   **Q.**   Dr. Feinberg, you mentioned material from the

17   Cabell-Huntington Health Department.  Is this a graph you

18   put together in your report that actually talks about acute

19   Hepatitis C in Cabell County from 2013 to 2017?

20   **A.**   Yes.  So, this is data from CHHD, Cabell-Huntington

21   Health Department, for that five-year period and it shows

22   the orange or the upper line is the incidence per hundred

23   thousand overall.  And then the red line just below that

24   mirrors the orange line is the incidence of acute Hepatitis

25   C with -- that's been associated with injection drug use.

1    **Q.**   And this is as of 2017.  Do you have additional

2    information as to the rates of Hepatitis C as we move

3    forward into 2018 or 2019?

4    **A.**   Right.  It's actually gone back up again.  So, you

5    know, I can't explain the -- the drop right there for that

6    one year.  It could have been the impact of the syringe

7    services program that started in the Fall of 2015, but I

8    can't say for sure.

9              MS. KEARSE:  Gina, could we have Slide 21?

10             BY MS. KEARSE:

11   **Q.**   And similar to discussing earlier the HIV, has West

12   Virginia and Cabell County, in particular, been

13   disproportionately affected by HCV and Hepatitis C?

14   **A.**   So, a study that the CDC did in West Virginia,

15   Virginia, Kentucky and Tennessee from 2012 to 2016 showed a

16   364 percent or something like that increase in acute

17   Hepatitis C in young people; young, in this case, being

18   defined as 30 or younger, and three quarters of them had

19   admitted to injection drug use.

20             So, Central Appalachia as a region has been

21   extraordinarily affected by Hepatitis C as associated with

22   injection drug use.  And then, here, you see data that --

23   from the CDC that looks at nationally and you can see that

24   West Virginia and Tennessee are the two states that really

25   light up as having really high rates.  So, you know, we have

1    continued as a state to be highly impacted by Hepatitis C.

2    **Q.**    How is HCV treated?

3    **A.**    So, actually, you can cure Hepatitis C now, but it's a

4    very recent development.  Probably dates back only to 2016.

5    So, only people who have completed training in the last

6    several years really know this.

7        You give them a combination of drugs, two or three.

8    They're taken usually once a day for as little as 8 to

9    12 weeks, depending on the drug combination, and you can

10   cure between 95 to 99 percent of people.

11       So, this is really important because, first of all, if

12   you're cured, you can no longer give Hepatitis C to anybody

13   else.  So, it really is important to slowing the epidemic,

14   but you also preserve your liver so you don't go on to have

15   endstage liver disease, or need of a liver transplant, or

16   spend a lot of your life in a hospital.

17       And from a public health perspective, this is really

18   important because one of the things I didn't tell you is

19   that the only reservoir for Hepatitis C is humans.  So, like

20   smallpox, you could actually eliminate Hepatitis C if you

21   could cure enough people.  If you could cure enough people

22   and stop new people from getting Hepatitis C.

23       So, being able to cure this disease is -- you know,

24   really is a medical miracle, as far as I'm concerned,

25   because most of my career, you just saw people get really

1    sick.

2                MS. KEARSE:  Gina, Slide 23.

3                BY MS. KEARSE:

4    **Q.**    And, Doctor, similar to talking with the HIV has there

5    been a comparison to overdoses in West Virginia and Cabell

6    County, in particular -- here the site says 2014 compared to

7    2015 and can you explain this slide to the Court?

8    **A.**    Sure.  So, when we put this slide together I didn't

9    have data concordant with the same years.  I didn't have the

10   same density data for 2015 for -- for overdoses, but I think

11   you get a good feel even though they're a year apart.

12        So, again, these are heat maps.  The darker the color

13   the more intense the problem.  Once again, you'll see in the

14   southern coalfields and Cabell County on the left, you know,

15   dark red and purple.  These are the overdose rates we're

16   looking at.

17        And then interposed on the bottom right is the bottom

18   third of the state for acute Hepatitis C.  And you can see

19   how clearly they are associated.

20        And I think I use this slide in teaching to point out

21   that, you know, this makes it really sort of visually

22   evident that Hepatitis C is associated with injection -- you

23   know, injection of opioid use, because the opioids are

24   opioid overdoses.

25   **Q.**    Doctor, can people get both HIV and HCV?

1    **A.**   They can.  You can be co-infected with HIV and

2    Hepatitis C.  You can be co-infected with HIV and Hepatitis

3    B.  The most common combination, because Hepatitis C is more

4    common in this population, chronic Hepatitis C than chronic

5    B, what happens to an individual that has both viruses is

6    that neither infection does well.  In fact, they both do

7    worse.

8         So, having Hepatitis C on top of HIV worsens your

9    immune dysfunction because Hepatitis C also affects the

10   immune system just like HIV does and having HIV makes the

11   progression to Cirrhosis faster.  So, it is a bad thing.

12        And even in the era when access to curative Hepatitis C

13   drugs was extraordinarily limited because of cost, if you

14   had coinfection, West Virginia Medicaid would approve it

15   because -- because the outcomes are so bad.

16   **Q.**   And so, it increases your morbidity and mortality?

17   **A.**   Right.  It affects morbidity and mortality.  And

18   coinfection of Hepatitis C and HIV is extraordinarily

19   common.  It's most common in people who inject drugs because

20   they're -- you know, that's -- that's the risk for acquiring

21   both infections.

22   **Q.**   Doctor, I'd like to talk about the next viral infection

23   that was on our list and that's Hepatitis B.

24   **A.**   Okay.

25   **Q.**   If you can go to slide 25.  And, Doctor, did you create

1    a couple of slides to assist you in providing testimony

2    before the Court on what Hepatitis B is?

3    **A.**    Right.  So, I think some of those details are on the

4    following slide, but Hepatitis B is a DNA virus, not an RNA

5    virus like HIV and Hep C.  It's in the Hepadnavirus family.

6    It causes liver disease and, in fact, the damage it does to

7    the liver is exactly the same kind of damage that Hepatitis

8    C does which is, you know, it kills off liver cells and then

9    they start scarring.

10        It is spread by contact with the blood of an infected

11   person, as well as by some other routes.  It's -- you can

12   contract it sexually.  Through contaminated food.  Women can

13   certainly give it to their newborns.

14        And just like Hepatitis C, there's been a rise in

15   Hepatitis B.  Studies have shown it in the same central

16   Appalachia region, a study from the CDC.  And, once again,

17   it is highly associated with injection drug use.

18             MS. KEARSE:  And if we can go to the next slide,

19   Gina, Slide 27.

20             BY MS. KEARSE:

21   **Q.**    Can you provide the Court some information about the

22   number of people who contract HBV or Hepatitis B?

23   **A.**    So, there's about a little over 2 million people,

24   2.2 million people in the United States with Hepatitis B.

25   Sadly, our record as a state with Hep B is even worse than

 1    with Hep C because, at least with Hep C, we've sometimes

 2    been number two in the United States.  We have had the

 3    highest rate of Hepatitis B for over a decade, which is not

 4    good.

 5        You can, in fact, prevent Hepatitis B with vaccination.

 6    So now, and since we have good vaccinations regulations

 7    here, primarily the people who get Hepatitis B are those who

 8    were born before 1990 -- late '91-'92 when we started

 9    vaccinating babies at birth and they would get their first

10    shot before they left the hospital.

11        And the incidence of Hep B in this state is 14 times

12    the U. S. average.  And, you know, it's linked to injection

13    drug use.  It progresses to a chronic stage just like Hep C

14    does, but it progresses to a chronic stage in a much smaller

15    percent of cases.

16    **Q.**   And do you specifically have information about Cabell

17    County in regards to --

18    **A.**   So, Cabell County, again, like Hepatitis C among West

19    Virginia counties has a really high rate of acute Hepatitis

20    B.  And I think on that slide it says almost 17 per hundred

21    thousand.  And this is -- and it also has one of the highest

22    -- you know, once you have a high rate of acute Hep B,

23    right, it follows that you'll have a high right of chronic

24    Hep B and, indeed, Cabell County has a significant number of

25    reported cases.  So, in 2016, as it says there, it's --

1    there were 43 such cases.

2    **Q.**    Is that also associated with injection opioid use?

3    **A.**    You know, there aren't data that -- there aren't -- I

4    didn't -- I have not created a slide with a parallel set of

5    data but really Hepatitis B has the same kind of

6    distribution that Hepatitis C does.  So, if I were to create

7    a teaching slide like the one I showed you, it would look

8    very much the same.

9    **Q.**    And how is HBV treated?

10   **A.**    Like HIV, you can't cure it.  You can prevent it with

11   vaccination, but as I said, people who were born before

12   1991-'92 are very vulnerable.  And just like HIV, you just

13   have to take lifelong daily medication and that you measure

14   the viral load.  Just like HIV, you measure the viral load.

15   If you can keep the viral load below the limit of detection

16   of the blood test then people maintain health and they don't

17   progress to Cirrhosis and hepatocellular carcinoma and

18   endstage liver disease and all the other, you know, sequelae

19   of other serious chronic Hepatitis B infection.

20   **Q.**    Do you have information for the Court on how -- what

21   state has been most affected by Hepatitis B?

22   **A.**    What --

23   **Q.**    What state has been most affected by Hepatitis B?

24   **A.**    I think I mentioned that already but, yeah, West

25   Virginia by -- by leaps and bounds.  And I think we have --

1    there should be a slide that has a picture of this, again,

2    data from the CDC.

3        And, as I said, we've sadly been -- had the highest

4    rate for over a decade.  So, Tennessee is in second place

5    here.

6    **Q.**   And for the Court, we're showing a slide that says

7    source CDC on the bottom there, but can you explain to the

8    Court what is this data showing?

9    **A.**   So, this is the same kind of -- you know, the heat map

10   concept.  The darker the color, the worse the problem.  So,

11   here you can see that these states that are in red, yellow

12   and orange, with the exception of Florida, are very much

13   centered in Central Appalachia.  And then you can see the

14   only red state is West Virginia.  And, as we said, we have a

15   rate that is 14 times the rate of the country as a whole.

16            MS. KEARSE:  Gina, can you go to Slide 30?

17            BY MS. KEARSE:

18   **Q.**   And did you also have information from the

19   Cabell-Huntington Health Department that you've utilized in

20   your report and can describe to the Court?

21   **A.**   Right.  So, this -- these data from CHHD, the orange

22   line on the graph is the Cabell County acute Hepatitis B

23   rate from 2012 to 2016.  And the red line is the West

24   Virginia rate.  So, you can see the Cabell County and West

25   Virginia rates kind of track together, but the Cabell County

1    rate is higher than the state is as a whole.

2          And then the sort of Oxblood red line at the bottom is

3    the U. S. rate and you can see there's a very slight

4    increase from 2012 to 2015, but you can see what a

5    significant difference there is between the West Virginia

6    and Cabell County rates and the U. S. as a whole.

7    **Q.**   And you continue to track this type of data, as well?

8    **A.**   Right.  I mean, these are the data that I was given

9    access to from the Cabell-Huntington Health Department.  You

10   know, if there -- my understanding from looking at state

11   data is that this continues, but I don't have newer data

12   than this from the Health Department there itself.

13   **Q.**   And, Doctor, I think we went through the treatment of

14   HBV and Hepatitis C.  I'm going to -- I'm going to move to

15   another topic now, the bacterial infectious disease that we

16   talked about earlier and, specifically, endocarditis.

17         And can you tell the Court -- well, first, did you

18   provide some slides in order to assist your testimony to

19   provide information to the Court on endocarditis?

20   **A.**   So, infective endocarditis or, just for short,

21   endocarditis, is an infection of the lining of the heart or

22   the endocardium.  And it not only lines the heart, but it

23   covers the valves that control the flow of the blood in and

24   out of the heart.  And when these valves get infected, they

25   malfunction, right?  They don't -- there's something bulky

1    on them.  They don't close tightly, so that there's a

2    leakage of blood.

3         And you hear that clinically, the examining doctor, you

4    hear a murmur with your stethoscope and it's either a new

5    murmur or, if they had pre-existing heart disease, it's a

6    worsened murmur.

7         And the most common cause of infective endocarditis is

8    various bacteria.  Typically, skin bacteria, but often mouth

9    bacteria because it's very common for people to lick the

10   needle before they use it so then they get mouth organisms

11   on the needle.

12        And what happens -- and I think I mentioned this

13   before.  You have unsterile drug prepared using unsterile

14   equipment, perhaps with a shared syringe that has other

15   people's germs, and you're injecting this through skin that

16   may not be clean.  And so, you're injecting infectious

17   organisms directly into the bloodstream.

18        And, actually, it's amazing that everybody doesn't have

19   endocarditis all the time because every time you inject,

20   you're putting germs in the blood.  But it actually takes

21   root on valves that we think are sort of already a little

22   bit damaged in some mechanical way.

23   Q.   And I think you have a graphic there that shows.

24   A.   Yeah.  I think that comes -- comes later.  So, the

25   bacteria or, in rare cases, the fungi attached to the valve

1    and multiply there and do damage to the valve.  Sometimes,

2    the valve will actually perforate.  In other words, the

3    infection will eat a hole through the valve.  Sometimes the

4    valve will detach from where it's rooted into the -- into

5    the heart itself.

6         And this is a picture of, you know, a diagram of what

7    the valves look like.  The try cuspid valve is on the

8    right-hand side of the heart.  And when you inject into a

9    vein that blood goes directly to the right side of the

10   heart.  The right side is the low pressure side.  It pumps

11   to the lungs.  That's where the blood cells pick up oxygen.

12   It's pumped to the left side of the heart.

13        The left side of the heart is what sends oxygenated

14   blood to the rest of the body.  So, it has a much higher

15   pressure.

16        And if you have the misfortune of having a hole, or a

17   rupture or, you know, complete separation of the valve on

18   the left side of the heart then you go into acute heart

19   failure and, unlike older people who have chronic heart

20   failure and it's a chronic disease and, you know, you play

21   around with medications to control it, acute heart failure

22   is an emergency.  It's a disaster.  And if you don't have

23   cardiac surgery to replace that valve right away you will

24   die.

25   Q.   Doctor, did you start seeing at some period of time an

1   increase in endocarditis?

2   **A.**    So, we started seeing an increase in endocarditis

3   around 2005.  So, I think, you know, in the time course of

4   the -- within the opioid epidemic, if you don't need cardiac

5   surgery then the typical treatment is six weeks of

6   intravenous antibiotics.  You typically stay in the hospital

7   for that period of time.

8        But if you're in a smaller hospital you usually almost

9   always actually get transferred to a major medical center

10   because there's always this risk of a valve dehiscence, a

11   medical term for separating or rupturing.  And if you don't

12   have access to cardiac surgery, then you're not going to get

13   fixed.

14        And there's only a limited number of hospitals in West

15   Virginia that can handle this that have this capacity.  So,

16   that's Huntington, Charleston and Morgantown.  Those are the

17   three cities that patients get sent to, you know, when they

18   have endocarditis.

19             MS. KEARSE:  Gina, if you go to 33.

20             BY MS. KEARSE:

21   **Q.**    And can you tell us, Dr. Feinberg, about the number of

22   people you've started seeing with endocarditis and the

23   trends that you've seen that would include

24   Cabell-Huntington?

25   **A.**    Right.  Actually, I was in Cincinnati still in 2005 and

```
 1     I was the hospital infection consultant and I -- in a

 2     two-week period, I saw four people with endocarditis.  And

 3     they were all people who injected drugs.  And they all came

 4     from the small towns east of Cincinnati, which is

 5     Appalachian Southern Ohio.

 6          And that's what made me know that we had a heroin

 7     problem.  Cincinnati had never had a heroin problem before.

 8     This was a new thing.

 9          And endocarditis has been an enormous problem across

10     all of West Virginia and it has been, you know, significant

11     in the major population centers.  But there's no active

12     surveillance for endocarditis, not at a state level or not

13     at the CDC level.  So, no one can tell you how many cases of

14     endocarditis there are in a given time period because the

15     data just are not collected.

16          But we just finished doing a study of the four referral

17     hospitals where more than 90 percent of the cases in the

18     state go.  That was 762 cases of endocarditis in a five-year

19     period.  And that's a lot of endocarditis.  And 71 -- that's

20     a six-fold increase over the five years.  I think it was

21     2014 through the end of 2018.  And 71 percent of those cases

22     were associated with injection drug use.

23          So, it's another one of these things where there is

24     injection drug use, HIV, Hep B, Hep C and endocarditis will

25     follow because it's a consequence of -- of drug delivery.
```

1    **Q.**   And you talked about a study in the Charleston area, in

2    Kanawha County?

3    **A.**   Yeah.  There's a -- was a study done by Mark Bates from

4    CAMC.  And they looked at an earlier time period, 2006 to

5    2015, and they looked at just the cases at CAMC which, at

6    that -- from that time period was at 462 cases and that was

7    a significant increase for them.  It was more than a

8    two-fold -- more than a doubling of the cases over that time

9    period.

10       And they also looked at hospital utilization and, of

11   course, people who had drug use associated endocarditis were

12   sicker, younger, and had more expensive hospitalizations

13   because they required surgery more often.

14   **Q.**   And are you aware of endocarditis cases also in Cabell

15   County even though we don't have a specific number?

16   **A.**   Yeah.  It's hard to come by specific data per county

17   because it's not tracked in a surveillance kind of way like

18   the viral diseases are, but St. Mary's and Huntington

19   Hospital are two of those referral hospitals, so the

20   762 cases that we saw statewide, a significant proportion of

21   them, but I can't tell you exactly the number were clearly

22   seen at that -- those two hospitals and also referred from

23   outside Cabell County to those hospitals.

24   **Q.**   Okay.  And, Doctor, can you -- it looks like a slide

25   that's another one of your teaching material slides.  Can

```
 1    you tell the Court a little bit about the epidemiology
 2    that's part of what you teach in your class about the causes
 3    of ineffective endocarditis?
 4    A.   Right.  So, typically, this is like so many things, a
 5    disease of the elderly --
 6              MS. JASIEWICZ:  Excuse me.  I'm sorry.  I have an
 7    objection to the slide which does not appear in Dr.
 8    Feinberg's report and I don't believe that the source of
 9    this -- it says Judith Feinberg teaching materials.  I don't
10    believe there is a specific source on Dr. Feinberg's
11    reliance list that corresponds with this.
12              MS. KEARSE:  This is a demonstrative, Your Honor,
13    one of her teaching materials just to talk about
14    endocarditis and what she's testified to, the intravenous
15    drug use.
16              THE COURT:  What she's testifying to was a subject
17    in her report, wasn't it?
18              MS. KEARSE:  This particular slide was not in her
19    report.
20              THE COURT:  I understand that, but this is
21    illustrating something that was in her report?
22              MS. KEARSE:  Yes, Your Honor.
23              THE COURT:  Overruled.  I'm going to let her go
24    ahead.
25              BY MS. KEARSE:
```

1    **Q.**   I think we just got through the slide anyway.  Anything

2    else --

3    **A.**   Should I go on?

4    **Q.**   Yeah.  I don't know if you were finished with that

5    slide.

6    **A.**   Okay.

7    **Q.**   Were you finished?  So, the --

8             MS. KEARSE:  Well, go back to that Gina.  I think

9    the point of this was is there --

10   **A.**   I think we've gone over this.

11   **Q.**   Okay.

12   **A.**   I mean, about a third of the patients have left-sided

13   disease.  Those are the people who are at risk, who are at

14   serious risk for heart failure and needing cardiac surgery.

15   You know, 20 to 30 people with endocarditis will die.  So

16   it's, even with cardiac surgery, quite a serious problem.

17   **Q.**   And looking from the back -- from the slides before

18   that, is it fair to say a majority of the endocarditis cases

19   are injection drug-related?

20   **A.**   Because it's -- otherwise, how do you get bacteria into

21   your blood?  Well, if you have really bad teeth and you

22   brush your teeth too vigorously, you can introduce bacteria

23   from your mouth into your bloodstream that way.  But the

24   direct injection of bacteria into your bloodstream is -- I

25   don't know how to quite say that.  It's a -- I think it sort

1    of speaks for itself in terms of what the risk is likely to

2    be, as opposed to people who, in some accidental way, get

3    bacteria into their blood.

4    **Q.**    Doctor, I'd like to change course now.  I think we've

5    talked about the primary viral and bacterial diseases, but

6    there's others that we haven't talked about.  Is there just

7    a brief overview of anything that we've left out because I

8    would like to move to prevention or harm reduction, but --

9    **A.**    Say that again.

10   **Q.**    Is there anything we left out that we need to talk

11   about today?  We talked about the major ones, HIV, Hep C --

12   Hep C, Hep B, endocarditis, HIV.  Is there any other viral

13   or bacterial infections that we've seen in West Virginia and

14   Cabell County?

15   **A.**    Right.  So, endocarditis is the most serious and life

16   threatening bacterial infection but really once the bacteria

17   enter the bloodstream they can make a home anywhere they

18   like.  And so, there are other serious infections that are

19   usually not quite so likely to be fatal, but they cause a

20   lot of morbidity.

21       So you could have infection of a bone.  Infection of a

22   joint.  You can have an abscess in a visceral organ like the

23   liver or spleen.  You can have an abscess in the brain.

24   Now, that can be, as you could imagine, really a dangerous

25   event because it takes up a lot of space and, you know,

1    turns a chunk of the brain to pus so people could have some

2    serious neurologic problems from that.

3        And then, you know, the most common infection,

4    bacterial infection that's associated with injection drug

5    use is, of course, skin and soft tissue infections.

6    Cellulites, which is an infection of the skin.  Or an

7    abscess of the injection site.

8        So, and you -- you know, these are not fatal and some

9    -- some people are hospitalized for those things and require

10   like surgical drainage.  Some people are treated on an

11   outpatient basis.

12       But because it's so common, it's actually the most

13   expensive.  If you look at costs to society, it is the most

14   expensive injection drug-related problem.  But it's -- you

15   know, it's rarely that -- it's rarely that serious, you

16   know, unless people ignore it for a long time and then

17   require amputation.  And even amputation is not death.  So,

18   those are the main other things.

19       And then, of course, as a result of transactional sex,

20   trading sex for drugs and money, there's -- this population

21   has a lot of sexually transmitted infections.  And, again,

22   they're treatable, but they're not fatal.  And, you know,

23   they're -- they're manageable.

24   **Q.**   Doctor, did you also in your report provide opinions in

25   regard to preventative measures in regard to the diseases

1  that we've discussed today from injection of drugs and

2  opioids specifically?

3  **A.**   Sure.  Well, I would start by saying a very key thing

4  is harm reduction.  And harm reduction is the public health

5  principle of minimizing harm for -- from behaviors that we

6  do not condone, right?  Nobody thinks that injecting drugs

7  is a good idea.

8       And harm reduction in its broadest sense encompasses

9  the provision of services and resources to people who use

10  drugs and to the communities in which they live to assist

11  them in reducing the harms of drug use.  And the most, I

12  think, well-known aspect of harm reduction is syringe

13  exchange or syringe services programs.

14       I think in the 1990s and early 2000s people primarily

15  -- this was primarily really just syringe exchange or people

16  would call it needle exchange.  You'd bring in a used

17  syringe; they'd give you a sterile one in return.

18       But over time, I think it was realized that this was a

19  great way to reach this population in terms of minimizing

20  other health risks and, you know, offering them access to

21  drug treatment.  And that's really what the term syringe

22  services encompasses.  It's a lot of other things besides

23  just exchange of, you know, used syringes for sterile ones.

24  **Q.**   Did you provide a slide, Dr. Feinberg, that kind of

25  goes over some of the different categories of harm reduction

```
 1    that we can briefly go over?

 2    A.    Yes.

 3             MS. KEARSE:  Gina, Slide 37.

 4             BY MS. KEARSE:

 5    Q.    And, Doctor, you just said something about treatment,

 6    so I -- I want to ask you from a public health perspective,

 7    what are the goals of harm reduction programs for the

 8    community and for the individuals who may be so diseased

 9    with infections?

10    A.    Okay.  So, you know, I think the -- clearly, the

11    primary goal is, first of all, keeping people alive.  Alive

12    and healthy, right, because Opioid Use Disorder is a chronic

13    relapsing brain disease and everything that you get on top

14    of that just makes life that much more difficult to

15    negotiate.

16        So, keeping people alive and healthy is the initial

17    primary goal.  And you do that through the exchange of

18    syringes.  And you do that through education about overdose,

19    what it is, how to recognize it, how to intervene, how to

20    give people rescue breathing.  These are programs that

21    typically distribute naloxone, which is the rescue drug that

22    prevents fatalities from an opioid overdose.

23        And then there's a whole range of other services.  And

24    these are services that are important, I think, for the

25    individual, but also for the community at large.  Syringe
```

1    service programs test people.  You can do these rapid

2    on-site tests for HIV and Hepatitis C.  We don't have one

3    for Hep B.  But for Hepatitis C, you have results in

4    15 minutes.

5          You can refer people that you identify as infected to

6    specific care for those infections.  You can refer them for

7    treatment for Opioid Use Disorder.

8          Lots of people with the Opioid Use Disorder have other

9    problems and -- such as mental health problems or other

10   medical problems.  So, they can be referred for that.  Women

11   can be referred, of course, for birth control and prenatal

12   care.

13         More recently, in the last several years, we've been

14   giving people fentanyl test strips as fentanyl has become a

15   really -- a very big part of the opioid drug supply and has

16   a very high fatality rate because it's so potent and it acts

17   so quickly.  So, we give people fentanyl test strips and we

18   teach them how to test their drug supply for fentanyl.

19         So, it's all of those kinds of things that are valuable

20   to the individual, but also have a larger value to the

21   community.  You know, if somebody has Hepatitis C and you

22   can identify that and get them into care.

23         We just completed a study.  Actually, the results have

24   been submitted to the New England Journal of Medicine where

25   we cured active injectors, active injectors of Hepatitis C

1    and, you know, you -- not only as I -- protect their -- the

2    liver of those individuals, but you protect the ongoing

3    transmission of Hepatitis C in the community.  The same

4    thing would be true for, you know, the other viral

5    infections.

6    **Q.**    And, Doctor, I want to ask you, you touched on these

7    referrals to treatment for Opioid Use Disorder.  Is that a

8    goal of a Harm Reduction Program to have people -- to give

9    people the ability to reach out?

10   **A.**    It's a desirable outcome, I think, but like most

11   serious life decisions, it has to be that person's

12   motivation to do it.  You can't just say, look, let's send

13   you to drug treatment.  It's great, great for you.  If

14   they're not ready, that's just not going to work.  So, I

15   would say that's a desirable outcome.

16        I think the main goal, in addition to keeping people

17   alive and healthy, is to develop trust because what happens,

18   and this is certainly my experience, as well, people will

19   eventually show up because you've treated them with respect,

20   which is hard to come by because drug user is so

21   stigmatized.  You've treated them like they are people

22   deserving of some assistance and they'll come back to you

23   and they'll say I can't do this for another day.  Help me.

24   And then, you know, you make those connections for them.

25        In our syringe services program in Cincinnati, we not

1    only had all the phone numbers and we had Memoranda of

2    Understanding with all the treatment centers in the area,

3    but we would actually -- our staff would actually drive

4    people to those intake appointments.  So, when they trust

5    you, they'll do that.

6    **Q.**    In fact, did you put a slide together on that, on how a

7    Harm Reduction Program can work in having participants

8    actually seek treatment?

9    **A.**    So, I think sometimes syringe services programs sort of

10   get a bad wrap because I think a lot of times the public

11   perception of these programs is that they somehow enable

12   drug use.

13        You know, that's not the case.  Addiction means you

14   have obsessive thoughts and you are driven to behave in a

15   certain way.  It's not choice.  If you don't have clean

16   syringes, you're going to use whatever you find in the

17   street.  And there are multiple, multiple studies since the

18   90s that support the utility of syringe services programs.

19        So, these studies have shown us that people are five

20   times as likely to enter drug treatment.  They're three

21   times as likely to reduce the frequency of injection even if

22   they don't enter treatment.  They've been shown to decrease

23   the transmission of HIV, and Hepatitis C, and Hepatitis B

24   which, as we've talked about, are pretty terrible things to

25   have.

1        They decrease the presence of syringes in the community

2    that pose a risk for children and first responders and, you

3    know, people who -- sanitation workers.  It's

4    extraordinarily cost effective, extraordinarily cost

5    effective.  You could run a syringe services program for a

6    year on less money than one hospitalization for HIV or

7    serious Hep C.

8    **Q.**   Did you put a slide together on that, too, that the

9    costs avoided with a Harm Reduction Program is actually of

10   benefit?

11   **A.**   Right.  So, you know, the estimate of a $450,000.00

12   lifetime cost of treating one person with HIV, actually, the

13   numbers are closer to $500,000 now, but that's a study that

14   was published seven years ago and we are dealing with

15   extraordinary costs for hospitalizations for drug use

16   associated infections.  And, you know, if you can avoid

17   this, it's fantastic.

18       I ran a syringe services program for something like

19   $60,000.00.  It's -- it's -- you know, if you think about

20   not just the human cost of preventing fatal overdoses and

21   preventing the spread of these infections but if you just

22   think in terms of money, you know, then I don't think you

23   can find a better deal.

24   **Q.**   And with the goal of getting them to treatment or

25   medically assisted treatment and other types of programs?

1    **A.**    Yeah.

2            MS. KEARSE:  Gina, Slide 41.

3        And I think we're about to wrap things up.

4            BY MS. KEARSE:

5    **Q.**    So, Dr. Feinberg, do you also have some specific

6    information in the documents that you reviewed about some of

7    the individuals served in Cabell County in regards to their

8    reduction programs and harm reductions?

9    **A.**    Right.  So, this is data from the Cabell-Huntington

10   Health Department.  This was the first -- you know, if you

11   look through 2016, so that syringe service program started

12   in, I think, September of 2015.  So, you're looking at a

13   little more than a year of data.  And, at that point, they

14   had served almost 2,000 individuals with -- clearly, people

15   were coming back because they had almost 8,000 client

16   encounters, so people were coming back again and again.

17       It was a little more men than women.  But a significant

18   portion of people were homeless.  20 percent homeless.  And,

19   of course, you know, lack of insurance was extremely common

20   in a third of these individuals.

21       So, this program was providing both -- meeting

22   individual needs, but providing a real service, a real

23   public health service, to the City of Huntington and the

24   County by, you know, being able to -- you know, being able

25   to meet with people and, you know, help avoid these

1    infections, help avoid these complications.

2    **Q.**    Is it fair to say that Cabell County under the

3    direction of Dr. Kilkenny was pioneering on some of these

4    ways in order to come to people with injection drug

5    addiction?

6    **A.**    This was a -- this was a model program by all -- you

7    know, sort of the public health criteria, by the CDC's

8    criteria, for a syringe service program.  The -- some

9    aspects of the program were altered in April of -- so, it's

10   2018 following the closure of the syringe services program

11   in Charleston in the prior month.

12        And I think there was, you know, tremendous concern

13   that the politics that drove that closure would -- you know,

14   would be a problem in Huntington and Cabell County, too.

15   So, it's still an excellent program.  It has some

16   limitations to it now that it didn't have originally.

17   **Q.**    And people with OUD, are there barriers and stigma

18   still associated that the communities like Cabell County are

19   still working through in order to reach out to more people?

20   **A.**    Yeah.  I mean, I think -- I don't know.  I'm not sure I

21   heard that clearly.  Would you please re-state that?

22   **Q.**    Could you tell the Court what types of things like

23   communities like Cabell County doing in order to deal with

24   stigma or other barriers to treatment?

25   **A.**    So, that's a great question and not easy to answer

1   because, you know, stigma lives in the individual heart and

2   mind of a lot of people and it has been hard to -- it's hard

3   to convince people sometimes otherwise, but there has been a

4   tremendous outreach effort, especially after the HIV

5   outbreak in Cabell County.  There was a real outreach effort

6   to bring people in, bring in new clients who had not been

7   part of it before, screen people for HIV.  The stigma part

8   is just --

9   **Q.**   So, there's still work to be done?

10  **A.**   Still, I think, remains a significant problem not

11  really there but everywhere in the state.  Maybe everywhere

12  in the country.  So -- but, you know, there have -- there

13  have been specific efforts made to enhance the individual

14  and public health aspects of some of those services.

15  **Q.**   And the more we focus on it in a public health aspect,

16  the more people will actually learn about treatment and what

17  people can -- can get better from OUD; is that fair?

18  **A.**   You know what?  It's so hard to hear through this

19  thing.

20  **Q.**   Okay.  All right.  I was going to say, Dr. Feinberg,

21  I'll just move on from that because I want to ask a couple

22  extra more questions with that and finish up here this

23  afternoon.  So, my last question about the stigma and

24  barrier, is there still work being done though to educate

25  communities and members of communities the benefits of

1    treatment for people with Opioid Use Disorder?

2    **A.**    I would say that there are still efforts being made

3    kind of piecemeal.  I think we need a much more significant,

4    concerted, coordinated effort.

5        I think that, you know, Madison Avenue can sell almost

6    anything.  I think we should think about selling people on

7    the idea that Substance Use Disorder and Opioid Use

8    Disorder, in particular, are chronic relapsing brain

9    diseases.  That these are people who need medical care.  You

10   know, and they're not disposable.  These are not people --

11   oh -- we throw to a corner and just say, well, too bad.

12       Now, these are primarily people in their 20s and 30s,

13   right?  The majority of the people who are suffering from

14   these infections related to injection drug use are between

15   the age of 20 and 40.  They're in the prime of life.  They

16   often have families and young children.

17       You know, we need to make a much stronger and better

18   effort to deal with the stigma because it's the stigma that

19   keeps people from getting medical care.  It keeps them from

20   getting Opioid Use Disorder care.  You know, it's just a

21   major barrier.

22       In our own work, in our own research in the southern

23   coalfields, stigma and transportation, lack of access to

24   transportation, were the two biggest obstacles for any kind

25   of care, whether it was infectious diseases or Substance Use

1    Disorder.  You know, people just can't get from A to B to --

2    to access care.

3        And the stigma and -- stops them because, sadly,

4    healthcare providers and healthcare systems are often no

5    less stigmatizing than the general public and people are

6    afraid.  They're afraid of going to see a doctor.  They're

7    afraid of going to an emergency department where they will

8    just be treated very badly.

9        And I've witnessed this.  I've seen this.  I've heard

10   this.  I've heard people say terrible things to people,

11   things that you wouldn't -- you can't imagine that a polite

12   person could conceivably say to another human being.

13   **Q.**   Well, Doctor, it sounds like we've got some work to do

14   and to deal the stigma.  I want to wrap up with a couple of

15   just questions from your work here and what you've provided

16   the Court with, the information today.

17       And, Dr. Feinberg, do you have an opinion as to whether

18   or not there's a public health crisis in Cabell County as it

19   relates to bloodborne diseases resulting from opioid use?

20   **A.**   There's no question in my mind that these two things

21   are related.

22   **Q.**   And, Doctor, does that include the various diseases

23   that we asked today in providing information to the Court?

24   **A.**   Yes.

25           MS. KEARSE:  Your Honor, no further questions.

```
 1              THE COURT:  All right.  You may cross examine.

 2              MS. KEARSE:  Thank you, Doctor.

 3              THE WITNESS:  Thank you.

 4                      CROSS EXAMINATION

 5              BY MS. JASIEWICZ:

 6    Q.   Good afternoon, Dr. Feinberg.

 7    A.   Hi.

 8    Q.   My name is Isia Jasiewicz.  I represent Cardinal

 9    Health.  We have met on Zoom, but it is very nice to finally

10    meet you in person.

11    A.   As I remember, it was hard to hear you on Zoom, too, so

12    I hope we'll do better today.

13    Q.   Yes.  I will try to do better today.

14    A.   I know.  I have new hearing aid batteries and

15    everything, but I think the plexiglass is, I don't know,

16    part of the problem.  It's hard.

17    Q.   Well, I will say, this microphone is certainly better

18    than the cell phone that I was using for audio and Zoom.

19    A.   Great.

20    Q.   So, hopefully, you'll be able to hear me.  If you can't

21    hear me, just ask me to repeat.

22    A.   Okay.

23    Q.   Dr. Feinberg, your opinions in your report are confined

24    to the infectious consequences of injection drug use,

25    correct?
```

1    **A.**    Yes, because that is my expertise.

2    **Q.**    And in your testimony today, you have sometimes been

3    using the term "injection opioid use", but in your report,

4    you use the term "injection drug use", right?

5    **A.**    You know, I don't recall the extent to which I used

6    those terms interchangeably or not, but I had in mind

7    certainly opioid use when I wrote that report.

8    **Q.**    Now, you testified on direct that there is a risk of

9    certain infectious diseases that arises as a consequence of

10   the means of drug delivery, meaning when someone injects

11   drugs that are not sterile, using unsterile equipment,

12   shared needles through unclean skin, correct?

13   **A.**    Correct.

14   **Q.**    And that risk associated with the means of drug

15   delivery is the same regardless of which drug is being

16   injected, correct?

17   **A.**    So, I would say that is probably true, although all of

18   the data we have, and it's a pretty vast amount of data, is

19   in the context of injecting opioids.  I think, if you inject

20   other drugs, you have the same behaviors.  There's probably

21   an association there, as well, but the materials that I

22   reviewed and my own experience, you know, is really very

23   much focused on the use of opioids in that context.

24   **Q.**    And, Dr. Feinberg, you didn't mention any of the

25   defendants who are in the courtroom today in your expert

1    report, did you?

2    **A.**    No, I did not.

3    **Q.**    And, in fact, you don't use the word "distributors"

4    anywhere in your report?

5    **A.**    My expertise was about the connection of injection

6    opioid use and infectious diseases, not about who

7    distributed these drugs.  My -- my expertise is about the

8    end result of that distribution but --

9    **Q.**    Now, when we're talking about injection drug use, when

10    you use that term, you are referring to non-medical use of

11    drugs, correct?

12    **A.**    Typically because it's very limited circumstances in

13    which a prescription would be written to deliver an opioid

14    by injection to -- directly to a patient, right?  We do give

15    opioids by injection in the emergency room and -- or

16    intravenously and in the hospital, but that's not how you

17    would write a prescription.  I certainly have never written

18    a prescription for an opioid to be anything other than

19    swallowed or as a fentanyl patch applied to the skin.

20    **Q.**    So, to be clear when you use the term "injection drug

21    use", you are referring to non-medical use, correct?

22    **A.**    As I just said, yes.  You know, this is not a -- this

23    is not something you do as part of typical medical practice.

24    **Q.**    And when we talk about non-medical drug use, that can

25    mean either use of an illicit drug or non-medical misuse of

1    a legal drug, correct?

2    **A.**    Right.  Right.  You know, a drug can be prescribed to

3    somebody and then the acute pain is gone, but they have

4    become dependent on the drug and they can continue to use

5    it.  So, even if the prescription was written to them, at

6    this point, it's non-medical use.

7    **Q.**    Now, when talking about injection drug use in that

8    first bucket, illicit drugs, that might include heroin, for

9    instance?

10   **A.**    Illicit drugs can be prescription pills that people get

11   on the street or take from their grandmother's medicine

12   cabinet.  It doesn't mean --

13   **Q.**    Yes, but I am asking when you're talking about --

14           MS. KEARSE:  Your Honor, objection.

15           BY MS. JASIEWICZ:  -- injection drug use --

16           MS. KEARSE:  Objection.  I think you just cut her

17   off in her answer.

18       Your Honor, I would ask that she be able to complete

19   her answer.

20           BY MS. JASIEWICZ:

21   **Q.**    I apologize.  I certainly didn't mean to cut you off.

22   I just thought we might be talking past each other because I

23   am asking when you're talking about injection drug use --

24   **A.**    Right.

25   **Q.**    And we've already established that means non-medical

```
 1   use, could be illicit drugs, could also be non-medical use
 2   of legal drugs.  And in that first bucket, illicit drugs,
 3   that includes heroin, for instance, correct?
 4   A.   I think so, if I'm following you correctly, but you can
 5   also break up a prescription pill and inject it.
 6   Q.   Okay.  You anticipated some of my next questions, but
 7   before we get there, non-medical use, meaning injection drug
 8   use, could also include use of illicit fentanyl, correct?
 9   A.   I'm sorry.  Say that again.
10   Q.   Could also include illicit fentanyl, correct?
11   A.   Right.  It can include any opioid that is not
12   prescribed to you and is taken in a way that is not
13   prescribed.  So, if your prescription says by mouth and you
14   inject it, that's not -- that's illicit use.  At least in my
15   mind, that's illicit use.
16   Q.   And injection drug use can also refer to injection of
17   methamphetamine, correct?
18   A.   It can -- it can refer to the injection of anything.
19   Q.   Okay.  Now, moving on to the questions that you
20   anticipated, non-medical use of drugs might also include
21   misuse of legal drugs.  So, for example, a person might have
22   a valid prescription for an opioid that's supposed to be
23   swallowed and, instead, they crush it or they otherwise make
24   it soluble and they inject it, right?
25   A.   Yes.
```

1   **Q.**   But that would be misuse of a prescribed drug, correct?

2   **A.**   Yeah.  That's certainly one way to describe it.

3   **Q.**   And you alluded to this before, but to be clear, there

4   are also prescription drugs that can be injected by medical

5   professionals in an appropriate medical setting, right?

6   **A.**   Correct.

7   **Q.**   But in your experience, no one refers to the medical

8   use of those drugs as injection drug use, correct?

9   **A.**   Correct because that is -- that term has a very

10  specific connotation.  So, I, myself, in the Emergency

11  Department have injected into an intravenous line morphine

12  for people who are having heart attacks, acute myocardial

13  infarctions.  That is appropriate medical care.

14  **Q.**   And you're not aware of any prescription opioids

15  indicated for self-injection, meaning that the appropriate

16  medical use is for someone to inject themselves, as opposed

17  to sitting in a doctor's office and a nurse or a doctor

18  injects them?

19  **A.**   If that exists, I am not aware of it.

20  **Q.**   Dr. Feinberg, you also talk in your report and in your

21  testimony today using the term "persons who inject drugs" or

22  "people who inject drugs" and when you refer to persons who

23  inject drugs, just like with IDU, you're referring to

24  persons who inject drugs for non-medical use, correct?

25  **A.**   Yes.

1    **Q.** So, again, that might be someone who is injecting

2    illicit drugs like heroin or fentanyl or methamphetamines,

3    correct?

4    **A.** Yes.

5    **Q.** And it might also be someone who has a prescription for

6    a drug indicated for oral administration and they wind up

7    crushing it, solu-izing it and injecting it, right?

8    **A.** Correct.

9    **Q.** And that would be misuse or abuse of that drug,

10   correct?

11   **A.** Yes.

12   **Q.** So, when you refer to persons who inject drugs that

13   term also does not include persons who are receiving

14   prescription opioids by injection for medical use as

15   administered by an appropriately licensed healthcare

16   professional, correct?

17   **A.** Correct.

18   **Q.** So, like the term "injection drug use", "persons who

19   inject drugs" or "people who inject drugs" is always used in

20   the context of non-medical usage, correct?

21   **A.** Yes.

22   **Q.** So, am I understanding correctly that none of your

23   opinions that you are offering today concern medical use of

24   prescription drugs as indicated with a valid prescription,

25   correct?

1    **A.**    Correct.

2    **Q.**    Dr. Feinberg, I believe you testified on direct that

3    you have been practicing as an infectious disease doctor for

4    approximately 40 years; is that right?

5    **A.**    Correct.

6    **Q.**    And during those approximately 40 years you observed

7    prescribing practices and attitudes for prescribing opioids

8    change over time, correct?

9    **A.**    I didn't hear that clearly.

10   **Q.**    I'm sorry.  During your 40 years in medical practice

11   you have observed prescribing practices and attitudes for

12   prescribing opioids change over time?

13   **A.**    Yes.

14           MS. KEARSE:  Your Honor, I just have an objection

15   to beyond the scope.

16           MS. JASIEWICZ:  Your Honor, I have just a few very

17   brief questions.

18           THE COURT:  I'm going to allow it.  It's cross

19   examination.  Go ahead.

20           MS. JASIEWICZ:  Thank you, Your Honor.

21           THE COURT:  This is certainly a matter that's been

22   at issue in this case over and over.  So, I'll let you

23   explore it.

24           BY MS. JASIEWICZ:

25   **Q.**    And you observed that the medical community made a

1    tremendous push in the 90s and the early 2000s to treat pain

2    with opioids because there was an emphasis at the time on

3    the undertreatment of pain, correct?

4    **A.**    I'm not sure I would say that that was the medical

5    profession that moved in that direction, but I think -- I

6    would not say that.

7    **Q.**    Well, you are familiar, are you not, with a concept of

8    pain as the fifth vital sign?

9    **A.**    I am.

10   **Q.**    And you observed that concept being promoted by

11   institutions such as JCAHO, which is the Joint Commission on

12   Hospital Accreditation, correct?

13   **A.**    Yes.

14   **Q.**    And, in your experience, once medical bodies said we

15   will say that pain is the fifth vital sign and we will

16   assess pain at every patient encounter, that's the way it

17   was whether individual doctors thought it was a good idea or

18   not, right?

19   **A.**    I think if you were practicing medicine in -- if you

20   didn't -- weren't in your own private practice where you

21   could establish your own policies and norms, but if you were

22   working for a hospital, say, or a large organization that

23   had adopted these new ways of thinking about opioid

24   medications, or narcotics, we used to call them, then I

25   think you would have felt pressure to abide by those new

1     regulations or new recommendations.

2          However, for example, in my clinic, those questions

3     were asked by the medical assistant as the patient came in

4     and took their other four vital signs and asked them if they

5     needed any refills.

6          So, that's what I'm saying.  I don't think this was

7     something that I would say was adopted widely by the medical

8     community.  Certainly, I did not ask every patient whether

9     they had pain or not because people tell you when they have

10    pain.

11    **Q.**   Dr. Feinberg, do you recall giving a deposition in this

12    case on September 2nd, 2020?

13    **A.**   I don't remember all the details, but I know we had

14    one.

15    **Q.**   And you were under oath during that deposition,

16    correct?

17    **A.**   Yes.

18    **Q.**   And you testified truthfully during your deposition,

19    correct?

20    **A.**   And I testified --

21    **Q.**   You testified truthfully during your deposition?

22    **A.**   Yes.  I hope so.

23          MS. JASIEWICZ:  Mr. Huynh, if we could please put

24    up the deposition on Page 111, Line 14.  And it goes on to

25    the next page, also Line 14.

```
1              BY MS. JASIEWICZ:

2    Q.   And the question was, "Would you agree with me that the

3    medical -- would you agree with me that the medical

4    community also made a push to treat pain with opioids?"  And

5    you answered, "I think when JCAHO says" --

6              MS. KEARSE:  Objection.  I'm not sure this is the

7    same question and proper impeachment.  I think --

8              THE COURT:  Well, I think it's close enough and

9    I'm going to allow it.  Go ahead.

10             BY MS. JASIEWICZ:

11   Q.   The answer is, "I think when JCAHO says that in order

12   to remain a certified hospital that you have to do this, I

13   don't think there is an argument with that, frankly.  I am

14   not a hospital -- I'm not a hospital administrator so I

15   don't -- didn't sit in any of these conversations, but I

16   would imagine if you want to retain your status as a

17   certified hospital" --

18             THE COURT:  Well, that's no inconsistent with what

19   she testified to.

20             MS. JASIEWICZ:  I'm sorry.  If we could pull up

21   the rest of the answer on Page 112 and keep going.

22             BY MS. JASIEWICZ:

23   Q.   "So, you do not say to JCAHO, you know, that's

24   ridiculous, we've never done that before, we see no reason

25   to do that now, we're not going to do it, I don't think that
```

1    is a realistic response."

2        And then you go on to say at the end there, which is

3    the question that I asked you today, you said, "I think the

4    fact that once those bodies said we will treat that pain as

5    the fifth vital sign and we will assess pain at every

6    patient encounter, that's the way it was, whether doctors

7    thought it was a good idea or not."  Correct?

8    **A.**   So, I don't think that at all is different from what I

9    just told you today.

10            THE COURT:  I don't either.  I don't think that's

11   inconsistent at all with what she testified.

12            MS. JASIEWICZ:  Okay.  We can move on.

13            THE WITNESS:  Okay.  I'm confused, but --

14            BY MS. JASIEWICZ:

15   **Q.**   Moving on, Dr. Feinberg, do you recall writing a

16   statement of personal opinion about the opioid epidemic in

17   the journal Nature published in September of 2019?

18   **A.**   That what was published in September of 2019.

19   **Q.**   Do you recall writing a statement of personal opinion

20   about the opioid epidemic that was published in Nature in

21   2019?

22   **A.**   Oh, yes, I do.

23   **Q.**   And I'd like to discuss that article which has been

24   marked as DEF-WV 2608 and I would also like to publish it on

25   the screen.

1          MS. JASIEWICZ:  And, Your Honor, I'm not intending

2     to move this into evidence, just to use it as a basis to

3     cross examine Dr. Feinberg.

4          Your Honor, may I approach?

5          THE COURT:  Yes.

6          MS. JASIEWICZ:  And, Mr. Huynh, could we please

7     pull up Slide 1?  It might be a little easier to read.

8          BY MS. JASIEWICZ:

9     **Q.**   So, Dr. Feinberg, if you could turn your attention

10    here, this is the Nature article published in September 2019

11    and the title is Tackle the Epidemic, Not the Opioids.  Is

12    this the article that we have been discussing?

13    **A.**   Yes.

14    **Q.**   And moving on to Slide 2, if you could turn your

15    attention to the top above your picture next to world view,

16    it says, A Personal Take on Events.  Do you see that?

17    **A.**   Yes.  It's an opinion piece.

18    **Q.**   So, this is your opinion based on your experience,

19    personal observations, and research, including in West

20    Virginia, correct?

21    **A.**   Yes.

22    **Q.**   And I'd like to take a look at some of the specific

23    statements in this article together with you.

24    **A.**   Okay.

25    **Q.**   So, first, I'd like to call your attention to the third

1    paragraph which we can put up as Slide 3.  And here you say,

2    "Historically, substance misuse has come in waves, with a

3    new drug supplanting the previous one:  The heroin chic of

4    the 1990s followed the crack babies of the 1980s.  By the

5    time federal programs target a specific drug, the issue is

6    being attacked where it was, not where it is.  Funding

7    should be targeted to substance misuse, not to the drug du

8    jour."

9         Was that your opinion published in Nature?

10   **A.**   Yes, but it's more nuance than ending at that -- at

11   that -- the end of that sentence.

12   **Q.**   Sure.  Well, let's -- let's keep going here.  So --

13             MS. KEARSE:  Your Honor, I don't think -- the

14   doctor was not finished answering her question.

15             THE COURT:  Well, I thought she was.  Were you

16   finished with your answer, Dr. Feinberg?

17             THE WITNESS:  Well, you know, I would like to

18   explain the nuance, but I don't know where you --

19             THE COURT:  Well, you have the right to explain

20   your answer.

21             THE WITNESS:  Okay.  Well, okay.  Let me -- let me

22   try to explain this.

23        At multiple points in this opinion piece I talk about

24   the flood of prescription opioids that set off the current

25   epidemic.  Unlike those prior waves that sort of came and

1    went pretty briefly, we have really seen this problem start

2    in around the turn of the century and here we are 21 years

3    later and we're still in the thick of it.

4         So, this is not -- this has been a pretty persistent

5    problem.  And while there is -- a pretty persistent problem

6    that really started with opioids and is still primarily

7    driven by opioids.

8         So, I'm sure Court has already heard from experts in

9    this area about overdose statistics both in the U. S. and in

10   West Virginia and we luckily have a Medical Examiner here

11   who does an extraordinary job of chasing down not only what

12   drugs are found in a person's body, but what concentration

13   they're found.

14        And I think those data show that even with the advent

15   of some -- or the -- because methamphetamine and cocaine are

16   not new.  They're -- but even with the newfound maybe

17   popularity of stimulant drugs, death due to drugs, overdose,

18   is still overwhelmingly due to opioids.

19        So, yes, we have a problem, but it's a little more

20   complicated, and that's what I was responding to.  Actually,

21   I was in part responding to my frustration because when

22   Congress gives money that comes to the State from SAMHSA,

23   say, the Substance Abuse and Mental Health Administration,

24   which is how most of the money for the drug epidemic comes

25   to us in block grants, when that money says opioid, if you

1   have a patient who is also not only injecting fentanyl, but

2   also injecting methamphetamine, you can't use that money for

3   the methamphetamine part.  It's narrow.

4       And I think that is part of the problem of the

5   government in these kinds of situations, is typically

6   reactive and, you know, by the time the feds gave money for

7   combating the opioid epidemic, we've been in the thick of it

8   for a decade.  So, you know, it's a very reactive system.

9       So, I had some frustration that we were dealing with

10  people who had polysubstance use and, yet, we couldn't

11  address the polysubstance part because it wasn't only

12  opioids, but opioids were and remain the primary problem.

13  They're the primary cause of death and, you know, continued

14  injection of opioids is -- I think I showed you the overdose

15  death rate and the acute Hepatitis C rate are practically

16  overlapped in the southern third of the state.  There is a

17  clear relationship.

18      So, that's what I'm saying about this is rather nuanced

19  and I think if you think of it only in terms of -- if you

20  don't think of it in that way, and I think there's plenty of

21  statements in the rest of the page that address those --

22  address those issues, I think it's not a fair interpretation

23  of what I was trying to say.

24  **Q.**  Well, so let's keep going here and we'll talk about

25  some more of your statements from this article.  So, I would

1   like to jump ahead to the fifth paragraph here and that's on

2   Slide 4 and it starts with, "By the time Congress".  So,

3   this relates to something that you just testified to, Dr.

4   Feinberg.

5        And you wrote here that, "By the time Congress moved

6   to address the opioid epidemic, the pattern of drug use had

7   started to shift.  Once those using multiple drugs combined

8   opioids with alcohol and other drugs, such as antianxiety

9   agents that work on the central nervous system.

10       Where I work in central Appalachia, western Virginia,

11  southern Ohio, eastern Kentucky and northeastern Tennessee,

12  opioids are being rapidly supplanted or exacerbated by

13  cheap, readily available, high potency methamphetamine.

14  When opioids are used, they are being increasingly combined

15  with stimulants such as cocaine which, like methamphetamine,

16  is thought to help counteract the depressant effect of

17  opioids."

18       Did I read that correctly?

19  **A.**   You read that correctly.  I would say that I probably

20  misspoke when I used the word "supplanted".  I think more

21  the reality is exacerbated.  And I think, you know, since I

22  wrote this and it got published in September, which meant I

23  wrote it months and months before that, we have a lot more

24  evidence, especially with the use of fentanyl test strips

25  and the ongoing overdose death rate from polysubstance use

1    that includes fentanyl.

2         The other thing I think we've learned is that fentanyl

3    is so -- so, I think part of it is -- it's a complex issue.

4    Part of it is the drug supply, right?  The drug that is

5    being sold on the street is very often, if not almost always

6    now -- I don't know if the right word is adulterated, but

7    fentanyl is in almost everything.

8         And, in fact, there have been reports of deaths from

9    people who are purely -- this came from Cleveland.  One

10   case, three or four gentlemen died of overdose who were

11   cocaine users and did not know that their drug was

12   contaminated with, or cut with, or adulterated with Fentanyl

13   and since they had no -- what's the word -- they were not

14   accustomed, their bodies -- their metabolism was not

15   accustomed to dealing with opioids, they all died of a

16   fentanyl overdose.

17        So, I think we're learning more and more over time, you

18   know, what is going on.  So, part of it is the drug supply

19   itself.  Part of it is that fentanyl has so much -- is so --

20   to such a great extent ubiquitous now and it's extremely

21   sedating.  It's far more sedating than heroin.

22        And that some people will tell you that they use

23   stimulants.  I've heard mostly about methamphetamine rather

24   than cocaine, but some people will say they use

25   methamphetamine so that they can wake up again and function.

1    So, I've had people with Opioid Use Disorder tell me that,

2    you know, they'll do some methamphetamine so they can get

3    the kids to school.

4         So, it's -- it's -- again, it's a very complex -- it's

5    a very complex situation and that's -- you know, that's what

6    I said at the bottom here where it's counteractive

7    depressant effect, you know, of the opioids.

8         But I really was not trying to say -- I was not trying

9    to say or imply that our opioid use epidemic is completely

10   now a methamphetamine epidemic.  That is not accurate

11   because, as I said before, most people are still dying in

12   2020 and 2021 of opioids, not of methamphetamine.

13   Q.   Thank you, Dr. Feinberg.

14        MS. JASIEWICZ:  I'd move to strike the last

15   portion of that answer as non-responsive to my question

16   which occurred a couple of minutes ago, but I believe my

17   question was just whether I read the paragraph correctly.

18        THE WITNESS:  You read it correctly, but I -- I

19   understood that the judge permitted me to say what I meant.

20        THE COURT:  Yes, and I -- I'm going to deny the

21   motion to strike.  I think it was -- I think it was

22   responsive to your question.

23        Go ahead, please.

24        MS. JASIEWICZ:  Thank you, Your Honor.

25        BY MS. JASIEWICZ:

**Q.**   Moving on to the next paragraph here, starting with
federal grants, if we can move on to Slide 5, it says here,
"Federal grants come tagged for combating opioids and cannot
be repurposed to deal with the rising incidence of
methamphetamine misuse.  The narrow focus on opioids means
we cannot keep up with the drug du jour cycle.  We will just
keep playing Whack-a-Mole."

     Did I read that correctly?

**A.**   You read that correctly.  And I would say exactly what
I said before, that that's what -- that's the context in
which I meant this.

     And, you know, it is frustrating if you are -- if your
personal and professional commitment is to dealing with a
significant health problem and then a regulation tells you
you can't look at it in a -- the broader way that you would
like to, you know, that is -- that's frustrating.

**Q.**   And so going back to Slide 1 for a moment, that is why
you say here that, "Unless addiction turns to what leads to
addiction" -- sorry.  "Unless attention turns to what leads
to addiction and overdose, treatment will always be out of
date," correct?

**A.**   Correct.  So, that's the conclusion from the -- toward
the bottom of this opinion piece and I think what I am
trying to say there is that there is a tendency of our
government to focus narrowly on what maybe appears to be the

1    piece that they can most kind of efficiently and least

2    expensively fix.

3        And, yet, not just West Virginia, but eastern Kentucky,

4    northeastern Tennessee, southern Ohio, southwestern

5    Pennsylvania, we have a vast part of this country, right,

6    more than 50 percent of the 220 counties at risk of an HIV

7    and Hep C outbreak are struggling and nobody asks -- and

8    this was my point.  Nobody asks why are so many people

9    seeking oblivion?

10        And it is still primarily opioids and now the overlay

11   of some methamphetamine and some cocaine, but why are so

12   many people in the position of having developed Opioid Use

13   Disorder, and why don't we look at that?  And that's what

14   I'm trying to say.

15        So, you know, so I have federal money and I -- I look

16   at whether people use fentanyl test strips to get an extra

17   measure of safety so they never use without naloxone on

18   board, but how did they get there?  How did they get to that

19   point?  And that's what I'm trying to point out, that

20   there's a reality underneath all of this and I don't propose

21   to know what it is, but I think it's a significant social

22   question and social problem.

23   Q.   And so, just to wrap up with this article, Dr.

24   Feinberg, if we could jump to Slide 9, and the last

25   paragraph here, and you reference that this is something

1    that you discussed towards the end of this article.

2         You write, "Without an effort to rebuild the social and

3    economic fabric of rural communities, addiction will

4    persist.  That's where the real problem lies and yet there

5    are no serious attempts to address it.  Our current approach

6    to drug misuse means that we will always be playing catchup

7    and leaving vulnerable people behind."

8         Did I read that correctly?

9    **A.**    You read that correctly.  Again, central Appalachia,

10   which is really the belly of the beast here, is a very

11   vulnerable and very disadvantaged part of America.  And

12   maybe there's a connection in some way with these things.

13        But I think that it behooves us to think about why so

14   many people sought those prescriptions and then, when those

15   prescriptions were harder to come by and they were already

16   drug dependent on opioids, you know, why they went on to use

17   street drugs.  It's kind of scary to buy drugs on the

18   street, don't you think?  But they were already dependent.

19   They already had Opioid Use Disorder.

20        So, there's a lot of people with Opioid Use Disorder.

21   And that's really what I was trying to point to.  I think --

22   I think we, as a society, need to think about that.  And how

23   are we going to help these individuals, in addition to

24   getting them into recovery, curing their Hep C, preventing

25   HIV?  You know, how are we going to address how they got

1    there to begin with?

2         And I think when prescription drugs that offer oblivion

3    are readily available, I think that was a way out for a lot

4    of people in our interviews.  That seems to be the -- what a

5    lot of people in these southern counties say.  This was --

6    misuse of prescriptions was a way -- it was a way out.

7              MS. JASIEWICZ:  Thank you, Dr. Feinberg.

8         Your Honor, may I have a moment to confer?

9              THE COURT:  Yes.

10        (Pause)

11             MS. JASIEWICZ:  Thank you, Dr. Feinberg.  I have

12   no further questions.

13             THE WITNESS:  Oh, okay.  Thank you.

14             THE COURT:  We're going to -- do you have some

15   questions?

16             MS. WU:  I have two questions.

17             THE COURT:  Well, let's take a break.  It's 2:30.

18        You can stand up and move around during the break, Dr.

19   Feinberg, if you wish.

20             THE WITNESS:  Sounds good.

21        (Recess taken)

22        (Proceedings resumed at 3:39 p.m. as follows:)

23             THE COURT:  The clerk has informed us that the

24   courthouse will be open tomorrow.

25        So, Ms. Wu, you may cross-examine.

1          MS. WU:  Thank you, Your Honor.

2                    CROSS EXAMINATION

3     BY MS. WU:

4     **Q.**   Doctor Feinberg, my name is Laura Wu and I

5     represent McKesson in this case.  I have just a few

6     questions for you.

7          In your testimony you mentioned your success with a

8     syringe exchange program that you ran in Ohio; correct?

9     **A.**   Yes.

10    **Q.**   And you mentioned that the program had a budget of

11    $60,000 per year; correct?

12    **A.**   That was -- yes, that was essentially what we started

13    with for a foundation grant and a contract from the state.

14    **Q.**   How many individuals were you able to serve each year

15    in that program?

16    **A.**   Wow, let me think about that.  It's been a while.  I

17    think in the first year of operation we served -- we had

18    more than one location.  We had two.  We eventually extended

19    to three.  And I think we served maybe 14- or 1,500 people.

20    That was a long time ago.

21    **Q.**   Thank you, Doctor.  I didn't mean it to be a memory

22    test.  We appreciate your recollection.

23         I just have one other -- two other questions.  You

24    mentioned fentanyl test strips.  Do you recall that?

25    **A.**   Yes.

1    **Q.**   Do you know if fentanyl test strips are offered in

2    Cabell County?

3    **A.**   I, I actually don't know the answer to that.  All of

4    the conversations that I've had with Dr. Kilkenny and all of

5    the material that I read, which pretty much ends in 2017,

6    because there's always a lag and, you know, I reported this

7    a while back, I don't recall that they did.

8         There are a number of syringe service programs in the

9    state that do do this.  It is a relatively more recent

10   adjunct to syringe services.  I honestly don't know the

11   answer to whether Cabell County offers that.  I know they

12   offer a lot of services, but I, I'm not sure about that.

13   **Q.**   Thank you, Doctor.  I have no further questions.  And

14   thank you for being here today.

15   **A.**   Thank you.

16        MS. KEARSE:  Your Honor, I have no further

17   questions.

18        THE COURT:  You have no redirect?

19        MS. KEARSE:  No, Your Honor.

20        THE COURT:  Dr. Feinberg, I can excuse you now.  I

21   want to thank you very much for being here and helping us

22   out and you're free to go.

23        THE WITNESS:  Thank you, Judge.  I appreciate the

24   opportunity very much.  Thank you.

25        THE COURT:  And the clerk just -- the limb the

1    clerk put me out on when I made my last statement has now

2    been sawed off.

3        (Laughter)

4        THE COURT:  And the message now is they don't know

5    whether the President will sign the bill today.  And if he

6    does, they don't know whether it will immediately take

7    effect.  And we're completely in the dark, and apparently

8    the courthouse may be closed tomorrow.

9        In the old days, I could get away with saying we're

10   going to work on Saturday and we're going to go full speed

11   ahead.  I can't do that anymore.  They won't let me do that.

12       So if the courthouse is closed tomorrow, we'll -- I

13   guess we'll be out of commission.  So we'll just have to

14   wait and see.  But I'm going to assume we're going to go

15   ahead tomorrow.

16       MR. FARRELL:  Judge, on behalf of the plaintiffs,

17   we may be able to solve that.  We have one last witness

18   designated for this week who is here, got here early.

19       THE COURT:  Well, let's go.

20       MR. FARRELL:  Yes, sir.

21       THE COURT:  Welcome back.

22       MS. LEYIMU:  Good afternoon, Your Honor.

23       Your Honor, at this time plaintiffs call Skip Holbrook

24   to the stand.

25       Temitoe Leyimu for the plaintiffs.

```
 1              THE CLERK:  Please state your name.

 2              THE WITNESS:  William Howard Holbrook, Jr.

 3              THE CLERK:  Please raise your right hand.

 4   WILLIAM HOWARD HOLBROOK, JR., PLAINTIFFS' WITNESS, SWORN

 5              THE CLERK:  You can be seated.  Thank you.

 6                      DIRECT EXAMINATION

 7   BY MS. LEYIMU:

 8   Q.   Good afternoon, Chief Holbrook.  Would you please

 9   state your full name for the record?

10   A.   William Howard Holbrook, Jr.

11   Q.   And where do you currently live?

12   A.   Columbia, South Carolina.

13   Q.   Where are you originally from?

14   A.   Huntington, West Virginia.

15   Q.   Did you grow up in Huntington?  Did you grow up in

16   Huntington?

17   A.   I did.

18   Q.   Could you tell the Court about what it was like to grow

19   up in Huntington, West Virginia?

20   A.   Wonderful.  I had lovely parents, wonderful friends,

21   just a community of -- blue collar community where people

22   cared about each other.  Neighbors were neighbors.  They

23   were nosy neighbors and they looked out for one another and

24   it was just a wonderful place to grow up.

25   Q.   And how long did you live in Huntington?
```

```
 1    A.    Until I graduated from college.

 2    Q.    And where did you go to college?

 3    A.    Marshall University.

 4    Q.    And did you obtain your degree at Marshall University?

 5    A.    I did.

 6    Q.    What did you get your degree in?

 7    A.    Criminal justice.

 8    Q.    Did you always have an inkling you wanted to be a

 9    police officer?

10    A.    I think I did, yes, ma'am.

11    Q.    And when did you graduate from Marshall University?

12    A.    In 1987.

13    Q.    After graduating from Marshall, did you go on to obtain

14    higher education?

15    A.    I did a few years later, yes, ma'am.

16    Q.    And what did you obtain?

17    A.    A Master's in business administration from Pfeiffer

18    University.

19    Q.    Chief Holbrook, why did you decide to become a police

20    officer?

21    A.    Well, some would say it's the greatest show on earth; a

22    lot of challenges, excitement but, most importantly, an

23    opportunity to serve my fellow man.  And I always felt like

24    I had a heart for service and just -- I think it's the most

25    noblest profession that there has ever been.  And that's
```

1    what drew me to it.

2    **Q.**   So I presume you graduated from the police academy; is

3    that right?

4    **A.**   Yes.

5    **Q.**   And when was that?

6    **A.**   In the summer of 1987.

7    **Q.**   And in the course of your education and training, did

8    you receive any advance training as it relates to drugs?

9    **A.**   I did.

10   **Q.**   Could you tell the Court a little bit about that?

11   **A.**   Well, of course, in, in the Charlotte Police Academy,

12   which is where I started my career, they teach introductory

13   level of drug recognition and drug investigation.

14         And then I advanced rather quickly into narcotics

15   investigations.  I was an investigator and then I went on to

16   the State Police.  And throughout my assignments, I had

17   opportunities to attend trainings and seminars and, of

18   course, in the field training with seasoned officers and

19   investigators.

20         And, so, some was in the field and some would have been

21   technical training in the classroom and, and advanced

22   courses by the Drug Enforcement Administration, the FBI, and

23   ATF specific to narcotics and firearms investigations.

24   **Q.**   And what was your first job in law enforcement?

25   **A.**   I was a patrol officer with the Charlotte Police

```
 1   Department.
 2   Q.   And how long did you work at the Charlotte Police
 3   Department?
 4   A.   Five years.
 5   Q.   Is that Charlotte, North Carolina?
 6   A.   Yes, ma'am.
 7   Q.   And at some point, did you make a decision to come back
 8   to Huntington?
 9   A.   I did.
10   Q.   Could you tell the Court about that?
11   A.   I had been a police officer for about 16 years and had
12   moved a number of times.  And my three children were all
13   born in North Carolina and I -- as I spoke to just a minute
14   ago, just the experience I had growing up and the impact my
15   family and friends had on me, I felt like that was something
16   that was missing with my children.  And I had an opportunity
17   to go back home and present them with the same opportunities
18   that I had and I chose to do that.
19   Q.   And at some point, did you work for the Huntington
20   Police Department?
21   A.   I did.
22   Q.   How did that come about?
23   A.   They needed a Police Chief.  And in 2007 I had the, the
24   honor of being selected to be the Police Chief in
25   Huntington.
```

1    **Q.**   How long did you serve as the Police Chief in

2    Huntington?

3    **A.**   Just, just a few months shy of seven years.

4    **Q.**   During that time, did you serve on any executive

5    boards?

6    **A.**   I did.  I served on the Appalachia HIDTA Executive

7    Board.

8    **Q.**   What is Appalachia HIDTA?

9    **A.**   It's -- it stands for high intensity drug trafficking

10   area and it's, it's a group that is primarily responsible

11   for analysis and funding for drug initiatives and strategic

12   planning for drug operations and drug task forces in

13   multiple states.

14   **Q.**   So as Chief of the police of -- Chief of Police for

15   Huntington Police Department, what was the oversight that

16   you had?

17   **A.**   I was in charge administratively and operationally of

18   everything that happened with the Huntington Police

19   Department.

20   **Q.**   Who did you report to?

21   **A.**   The mayor.

22   **Q.**   And how many mayors did you report to over the span of

23   your seven years?

24   **A.**   Three.

25   **Q.**   After serving for the Huntington Police Department --

1    and we'll come back to that -- did your career take you

2    other places?

3    **A.**   Yes, it did.

4    **Q.**   And did it take you to the place that you are now?

5    **A.**   It did.

6    **Q.**   And where are you currently?

7    **A.**   In 2014 I was selected to be the Police Chief in

8    Columbia, South Carolina.

9    **Q.**   Now, going back to your tenure as Police Chief for

10   Huntington, that was 2007; is that correct?

11   **A.**   Yes.

12   **Q.**   All right.  While you were there, what was the mission

13   of the Huntington Police Department?

14   **A.**   To prevent and investigate crime.

15   **Q.**   Was keeping the public safe a forefront of one of your

16   priorities while Chief?

17   **A.**   Serving the public, enforcing the laws, doing things

18   with integrity, making constitutionally correct decisions,

19   treating people with empathy and respect, that was our

20   mission in keeping our citizens safe.

21   **Q.**   And when you first stepped on the scene as Police Chief

22   in 2007, do you recall what types of drugs were in the area?

23   **A.**   Yes.  When, when I first became Police Chief, we had a

24   number of challenges.  One specific challenge was tackling

25   our drug problem in the city.  We had open-air drug markets

1    and we also had a significant issue with opioids and

2    prescription pills.

3    **Q.**   And, generally speaking, when you talk about drugs in

4    the community, is there associated crime with that?

5    **A.**   There is.

6    **Q.**   Is it fair to say on a high level the Huntington Police

7    Department has various bureaus and sub factions within the

8    department?

9    **A.**   Yes.

10   **Q.**   As Chief, did you oversee all of these departments?

11   **A.**   I did.

12   **Q.**   As Chief, would you hold meetings and collaborate with

13   these various bureaus and departments?

14   **A.**   Yes.

15   **Q.**   As Chief, would you obtain reports to see what types of

16   drugs were in the area and what was going on with crime in

17   the city?

18   **A.**   I would.

19   **Q.**   And at your direction as Chief, what types of reports

20   did you have generated that spoke to the types of drugs and

21   crime in the community?

22   **A.**   We would have incident reports, initial reports when

23   officers respond to scenes of crimes.  We would have reports

24   of interviews.  We would have field, field contacts.  And we

25   would have confidential informant interviews and reports.

1    **Q.**    Were you a part of those processes?

2    **A.**    Yes.

3    **Q.**    And did you task anyone in particular in the department

4    with tracking drugs and crime in the area?

5    **A.**    Well, yes, I did.

6    **Q.**    Okay.  Tell the Court about that.

7    **A.**    We, we would multi-task as an executive staff.  At the

8    time, I had a lieutenant by the name of Hank Dial that did a

9    lot of my analysis in terms of crime statistics and

10   maintaining those statistics and analysis.

11        And then at some point during my tenure, we actually

12   hired an analyst that had, that had training, analytical

13   training.  And that individual's name was Scott Lemley.

14   **Q.**    And, so, Scott Lemley would track and analyze the data

15   as it relates to drugs and crime?

16   **A.**    Yes.

17   **Q.**    And would you rely on that data?

18   **A.**    I would.

19   **Q.**    When you stepped in as Chief, was part of the

20   department's job to interdict and seize drugs and drug

21   activity in the community?

22   **A.**    Yes.

23   **Q.**    And whose job was that?

24   **A.**    Well, I had the ultimate responsibility for

25   establishing the mission of our department, our philosophy

```
 1   and the direction that we would follow.  And then I would, I
 2   would direct subordinate personnel to address the problems
 3   we identified as our emerging threats.
 4   Q.    And did the Huntington Police Department officers, in
 5   fact, work to interdict and seize drugs in the community?
 6   A.    Every day.
 7   Q.    I want you to describe for the Court, Chief Holbrook,
 8   the evolution of what you saw from 2007 when you first
 9   became Chief to 2014 when you left.
10   A.    Well, as I, as I briefly mentioned, when I became
11   Police Chief, it was evident that it was not the same city
12   that I grew up in.  There was, you know, clear evidence of
13   open-air drug markets.  What I mean by that is somebody
14   standing on the street corner flagging cars down, selling,
15   making hand-to-hand drug transactions.
16         But at the same time, what we were also seeing was just
17   an incredible volume of finding people in possession of
18   prescription pills.
19         And when I say they were in possession of prescription
20   pills, not necessarily standing on the corner selling them,
21   but in possession of prescription pills for personal use.
22   Q.    And when you talk about hand-to-hand transactions and
23   drug market, open-air drug markets, was any particular drug
24   associated with that?
25   A.    It, it was a variety of drugs.  Our -- a lot of our
```

1    focus as we tackled the open-air drug market was focused on

2    crack cocaine.

3    **Q.**   And was there an issue with crack cocaine within the

4    City of Huntington at the time?

5    **A.**   That was one of our issues.  And it was an issue

6    because of the violence that was associated with it.

7    **Q.**   And where was it an issue within the city?

8    **A.**   Primarily in the Fairfield neighborhood of Huntington.

9    **Q.**   Okay.  You spoke about pills, and I believe observing

10   pills on individuals.  Could you tell the Court a little bit

11   more about what you were seeing during that time period and

12   when it was?

13   **A.**   It was prescription pills, pain pills, opioids.  And,

14   again, as we would come across individuals through the

15   course of, you know, daily operations, traffic stops, calls

16   for service, investigations, we would encounter people,

17   again, with personal use amounts of pills.

18         And early on in 2007, that was not something that we

19   would find on our, what we would consider our street-level

20   drug traffickers.  We were finding the illicit drugs such as

21   crack cocaine especially.  And that's -- again, that's where

22   our focus was.

23   **Q.**   So from the years 2011 to 2014, what drugs were you

24   primarily seeing in your community?

25   **A.**   It had kind of evolved into probably three drugs and,

```
1    again, at different periods.  A lot was predicated on

2    enforcement action, prevention action, regulatory action.

3    But it was crack cocaine, prescription pills.  And then late

4    in my tenure, it graduated to heroin.

5    Q.   And was there a presence of drug trafficking

6    organizations in the community at that time where opioids

7    were prevalent?

8    A.   Yes.

9    Q.   And as Chief of Police, did you determine what was

10   driving that activity?

11   A.   Yes.

12   Q.   Could you tell the Court what that was?

13   A.   What was driving the activity of the drug trafficking

14   organizations?

15   Q.   Yes.

16   A.   It was -- in my opinion, you know, the prevalence of

17   drugs depends on demand, supply and demand.  And there was

18   an outrageously strong appetite, demand for drugs in

19   Huntington.  And we had an addicted population

20   unfortunately.

21   Q.   And the addicted population, was there any drug that

22   was more prevalent in terms of addiction in the community at

23   that time?

24   A.   As far as addiction, it was, it was clear that it was

25   an opioid addiction that was driving, that was driving that.
```

1    It, it -- oftentimes it was, you know, hand-and-glove with

2    the crack cocaine distribution.

3        But we, we did a pretty good job eradicating the

4    open-air drug market in that, you know, how we had to change

5    some of our strategies on how we would address the opioid

6    epidemic after we had some success with our open-air drug

7    markets.

8    **Q.**   Now, in comparison to the issue that you had with crack

9    cocaine in primarily the Fairfield area, could you explain

10   to the Court how that differed from the opioid issue that

11   you were facing?

12   **A.**   The, the issue in Fairfield was multi-layered.  Again,

13   you had dealers standing on the corner.  You had prostitutes

14   that would be in the area.  You had a lot of dilapidated

15   housing, vacant housing.  You had quality of life issues.

16   You had some convenience stores nearby that catered to that

17   vulnerable population.

18       And there was food stamp fraud, WIC card violations

19   going on where people would trade, you know, their cards,

20   their food stamps for, for money, 50 cents on the dollar if

21   you will.  They would sell single cigarettes, a lot of

22   single malt beverages and drug paraphernalia that would

23   facilitate somebody smoking crack cocaine.

24       It -- and then on top of that, you, you had the

25   robberies that would occur because of the drug transactions,

1   being outside and going on.

2   Q.   And as compared to the opioid epidemic that you've

3   described, how was that different?

4   A.   The opioid epidemic, again, was more widespread in

5   terms of it went from one end of the city to the other and

6   it, it really affected people from all walks of life.

7        It, it didn't matter where you, you know, where you

8   lived, what color your skin was, or how much money you made.

9   People were focused on fueling their, their addiction.  And,

10  again, independent of an open-air drug market, there wasn't

11  traditional drug trafficking trends that were going on at

12  that time.

13  Q.   And when you say there weren't traditional drug

14  trafficking trends, what do you mean by that?

15  A.   What I mean by that is typically you would go to the

16  street corner and buy your illicit drugs, you know, a

17  hand-to-hand or go down an alley and buy it.

18       But in this situation, people were having -- or they

19  were obtaining drugs through various means or -- they were

20  obtaining opioids through various means.  Oftentimes it

21  was -- it would start innocently with somebody visiting a

22  doctor for an ailment.  But we had people obtaining opioids

23  through doctors and pharmacies.

24       And then their -- once the addiction would start, there

25  was an appetite to continue to fuel that and get more pills.

1    And they were -- they would use means that, you know, really

2    were limited to their imagination.

3         Once, once the pills were obtained, you know, through

4    legitimate reasons, you know, they were often diverted.

5    They were traded, sold.  There would be -- or they would be

6    stolen.  There would be break-ins from people seeking drugs

7    from medicine cabinets.

8    **Q.**   And did diversion of prescription opioid pills become

9    prevalent in the Huntington community?

10   **A.**   Very prevalent.

11   **Q.**   And over what years did you see that increase in

12   diversion of prescription pills of opioids?

13   **A.**   During my entire tenure.

14   **Q.**   And during this time, were overdoses increasing?  Were

15   there overdoses?  I'll ask that question first.  During this

16   time, were you experiencing opioid overdoses?

17   **A.**   We were.  And they continued to increase again from,

18   from -- throughout my entire tenure.

19   **Q.**   And in 2007, for instance, when you first stepped on

20   the scene, was heroin a big problem in Huntington?

21   **A.**   No.

22   **Q.**   And by the time you left in 2014, had that changed?

23   **A.**   Dramatically.

24   **Q.**   And while serving as Chief of Police, did you identify

25   any emerging threats in the area in your community?

1    **A.**    Yes.

2    **Q.**    And why did you do that?

3    **A.**    We, we did that in order to make strategic decisions on

4    where we would put resources and, you know, the measures

5    that we would prioritize to protect our community and

6    respond to issues that would affect our, our citizens.

7    **Q.**    And were one of these emerging threats diversion, as

8    you've just described, of prescription opioids?

9    **A.**    Yes.

10   **Q.**    Did Huntington Police Department endeavor to combat

11   diversion of prescription opioids in your community?

12   **A.**    Yes.

13   **Q.**    How did you go about doing that?

14   **A.**    Well, we, we made that one of our focuses just, just

15   like we would address any, any drug of choice, prevalent

16   drug of choice that was being abused.  We did that through

17   education and prevention, enforcement, and treatment.

18        And we really -- our, our most, I guess, influence

19   would be on the education and, and prevention and then

20   enforcement.  And we restructured our drug unit.  We created

21   assets that focused on street level.  And then we had a

22   multi-agency approach to targeting drug trafficking

23   organizations.  And then we also assigned somebody to a

24   tactical, a DEA tactical diversion squad specifically to

25   look at pharmacies and doctors that may be prescribing pain

1    medications irresponsibly.

2    **Q.**    And are you familiar with any pharmacies or doctors

3    that you all investigated for diversion?

4    **A.**    Yes.

5    **Q.**    Could you tell the Court about that?

6            THE COURT:  Mr. Mahady.

7            MR. MAHADY:  Your Honor, good afternoon.

8        I object on foundation grounds for any testimony about

9    specific investigations or police reports that the Chief was

10   not involved in.

11       The Chief testified at his deposition that he was not

12   personally involved in any investigations in Huntington.  As

13   he said, he was the Police Chief.

14       When he was asked if he oversaw investigations,

15   diversion of pills, he said, and I quote, "I wouldn't even

16   say I oversaw diversion of pills.  I was the Police Chief.

17   I, you know, I was, you know, at the 10,000-foot level.  I

18   would be briefed on, you know, investigations, status

19   investigations but, you know, I was not directing

20   investigations."

21       When he was asked if he specifically oversaw any

22   investigations of diversion while he was the Police Chief,

23   he said, "No."

24       We have encountered this issue with an analogous

25   witness.  And that was Chief Zerkle, or Sheriff Zerkle.

1    During Sheriff Zerkle's examination, the plaintiffs sought

2    to elicit a very similar opinion about specific

3    investigations where he lacked personal knowledge.

4              THE COURT:  Who is Sheriff Zerkle and when did he

5    testify?

6              MR. MAHADY:  Sheriff Zerkle testified on May 27th

7    and he was the Sheriff of Cabell County for a period of

8    time.

9              THE COURT:  And what was the proceeding he

10   testified in?

11             MR. MAHADY:  This one, Your Honor, on May 27th.

12   And when the plaintiffs --

13             THE COURT:  Oh, yeah, I remember him now.

14             MR. MAHADY:  He was hard to forget.

15             THE COURT:  Too many witnesses in this case.  It's

16   10 after 4:00.

17             MR. MAHADY:  He was hard to forget, and he also

18   was in uniform.

19        But when the plaintiffs sought to elicit very similar

20   testimony about specific investigations where he lacked

21   personal knowledge, my colleague, Gretchen Callas, objected

22   on grounds of foundation and you sustained that objection.

23        Now, when Chief -- Sheriff Zerkle was being questioned

24   on cross-examination by McKesson, Sheriff Zerkle was shown a

25   document that he was on and asked questions about a specific

 1     investigation where he said he was not personally involved.

 2          The plaintiffs in that case objected and said he didn't

 3     work on that case, and they objected on foundation grounds.

 4     And Your Honor sustained that objection as well.

 5          So to the extent that the plaintiffs are going to ask

 6     him questions about investigations where he was not

 7     personally involved, which he has already testified in his

 8     deposition he wasn't involved in any of them, we object.

 9          We also would object that there's hearsay.  Everything

10     he knows about these investigations is hearsay and we don't

11     think they can overcome that.

12               THE COURT:  Well, what about that?

13               MS. LEYIMU:  Well, first, I believe this is

14     appropriate for cross-examination.  I don't even think I got

15     a chance to ask a question first.  I think you're

16     preemptively objecting that I'm not going to lay the

17     foundation to ask about a specific police report which I

18     don't intend to do.

19          So my question was pretty basic.  It was as Police

20     Chief, and I believe as Police Chief, Chief Holbrook can

21     talk about what he oversaw and what he knew, what he

22     observed during the course of his role of Huntington Police

23     Department.

24               MR. MAHADY:  Your Honor, I believe the last

25     question referenced specific investigations, and that's what

```
 1   prompted the objection.
 2              THE COURT:  How is this different from the box I
 3   got myself in with Sheriff Zerkle?
 4              MS. LEYIMU:  I don't think you put yourself in a
 5   box, Your Honor.  And it was a pretty innocuous question to
 6   be honest.  As a Police Chief, it's no surprise that a Chief
 7   might have knowledge of investigations that his department
 8   is investigating.
 9       So it's pretty broad.  So if he, if he has any
10   knowledge, he can answer that.  If he doesn't have
11   knowledge, we move on.
12              MR. MAHADY:  Your Honor, he does not have personal
13   knowledge of these investigations as he himself testified at
14   his deposition.
15              MS. LEYIMU:  I don't know what "these
16   investigations" are.  It's very vague.
17              THE COURT:  I'm looking for my notes on Mr.
18   Zerkle.
19              MR. MAHADY:  Your Honor, and if it helps, it was
20   May 27th, Sheriff Zerkle -- and the section of the
21   transcript, at least with the plaintiffs' objection, was
22   Page 172 to 175.
23              MR. MAJESTRO:  Your Honor, to the extent this is a
24   hearsay objection, Rule 803(8)(A)(ii) we believe would
25   govern, a matter observed while under a legal duty to
```

 1   report, but not including, in a criminal case, a matter

 2   observed by law enforcement personnel.

 3       So to the extent Mr. -- the witness can testify about

 4   the things that he has learned as Chief that -- and I

 5   believe that was -- Mr. Zerkle was my witness.

 6       We're not asking for specific conversations, those

 7   sorts of things.  I think the best way to proceed would be

 8   to let us do it on a question by question basis, and we can

 9   elicit the foundation for a particular statement.  This

10   preemptive objection Mr. Mahady is making we believe is

11   premature.

12           THE COURT:  Well, I think I'm going to let you go

13   ahead and then I'll, I'll go back and review what I ruled

14   about Zerkle and then decide whether to consider it or not.

15       But I think I'll take the testimony subject to your

16   objection, Mr. Mahady.

17           MR. MAHADY:  Your Honor, if we do reach a point

18   where they're trying to use specific documents, can I renew

19   my objection at that time?

20           THE COURT:  Yes, absolutely.

21           MR. MAHADY:  Thank you.

22           THE COURT:  Go ahead, please.

23   BY MS. LEYIMU:

24   Q.   Well, Chief Holbrook, are you aware of

25   investigations as it relates to the department that

1    you're overseeing?

2    **A.**   Yes.  I would elaborate if I might, Judge.

3            THE COURT:  Yes.  Go ahead.

4            THE WITNESS:  We often refer to an investigator

5    when they're working a case as the case agent, the person

6    that's responsible for reducing that case to writing for

7    presentation ultimately in court possibly.

8        When I -- I did not participate in investigations in

9    that, in that manner.  I am a very involved Police Chief.  I

10   was then and I am now.  The drug unit reported directly to

11   me.  I was intimately involved with knowledge of -- working

12   knowledge of drug cases that were under my purview.

13       And, so, I -- again, I have knowledge of drug cases,

14   maybe not every single one, but I certainly have a lot of

15   working knowledge of drug cases that occurred during my

16   tenure in Huntington.

17   BY MS. LEYIMU:

18   **Q.**   It's an obvious question, but as Chief of Police

19   why is it important for the drug unit to report to you

20   the investigations that they're involved in?

21   **A.**   Well, first of all, I want to make sure everybody is

22   doing the job that they're supposed to be doing and that we

23   have checks and balances to make sure not only that we're

24   doing our job, but we're doing it with integrity and

25   correctly.

1     And, so, it's a layer of oversight that we have.  And

2     then I want to make sure that we are, you know, working in

3     the direction that we, that we've established as our

4     strategy to combat a problem.

5   **Q.**   So, for instance, if you're trying to combat a problem

6     and it's an opioid problem, would you be interested in

7     investigations and what the department is doing to eradicate

8     that problem in the community?

9   **A.**   Yes.  I would want to make sure that we're, we're

10    conducting investigations on opioids.

11  **Q.**   And do those investigations include ones that people on

12    your unit were involved in as it relates to diversion?

13  **A.**   Yes.

14  **Q.**   Does that include diversion doctors were involved in

15    and pharmacies were involved in?

16  **A.**   At times it would start with us, yes.

17  **Q.**   Could you tell the Court about what you recall about

18    investigations that you oversaw as Chief in terms of talking

19    to and communicating with your drug unit in the community?

20  **A.**   Yes.  Often times, especially with diversion, an

21    investigation would start with a call to a tip line, a

22    pharmacy calling, a traffic stop and finding prescription

23    pills in somebody's possession and they not have a

24    legitimate prescription, or they would have one and you

25    would find multiple pharmacies or doctors they had been to.

 1        So you would see some evidence where it looked like

 2     maybe a pharmacist or a doctor potentially was, again,

 3     distributing, prescribing drugs, opioids irresponsibly.  We

 4     would assign that for follow-up.

 5        And they would -- investigators would look into that

 6     matter and decide if it's something that was within their

 7     capacity to work or something that they would pass off to

 8     our federal, state or federal partners.

 9     **Q.**   And do you recall any pharmacies in the area that that

10     was true for?

11     **A.**   Yes.

12     **Q.**   Could you tell the Court?

13     **A.**   In the, in the City of Huntington specifically we had a

14     pharmacy on Fourth Avenue, I believe it's called SafeScript,

15     that, that we initiated an investigation.

16            MR. MAHADY:  Your Honor, I'm going to renew my

17     objection at this time.

18        He testified specifically that he had no personal

19     involvement in any of these investigations.  I will also

20     note now, because I do think it's important, that when he

21     was asked directly, "Did you know of any investigations of

22     pharmacies in Huntington," he referenced a completely

23     different pharmacy and did not mention SafeScript at all.

24        So I don't know how we've gone from his deposition

25     where he identified A-Plus Pharmacy to now identifying

1    SafeScript Pharmacy.  And that's the problem.  He does not

2    have personal knowledge.  And he testified explicitly that

3    he lacks personal knowledge.

4              MS. LEYIMU:  Your Honor, I believe that is right

5    for cross-examination and this is completely improper.

6         And also he -- as we've just laid the foundation for,

7    the Police Chief is clearly aware of investigations that his

8    people on his drug unit are investigating in the community

9    in their efforts to combat the opioid epidemic.

10             MR. MAHADY:  Your Honor, we took his deposition to

11   see if he had this type of knowledge.  We asked him

12   repeatedly, "Do you have this type of knowledge?  Do you

13   have this type of personal involvement?"

14        And he was very clear.  He has a 10,000-foot level of

15   knowledge.  Those are his words, not mine.  He does not have

16   personal knowledge.  He cannot meet the requirements of Rule

17   602.  He disavowed this.  He can't now come into trial

18   months later and testify about investigations he had nothing

19   to do with, that he never disclosed.  We are incredibly

20   prejudiced now.

21             THE COURT:  I'm going to take the testimony and

22   you can cross-examine him on this and then I'll decide

23   whether and to what extent I'm going to consider it.  And I

24   want to go back and review what I did with Sheriff Zerkle.

25   Believe it or not, I do remember now some of his testimony

```
 1    and there's nothing in my notes about me sustaining this
 2    type of an objection.  I'm sure it happened.  You say it did
 3    and I believe you.  But I need to go back and review his
 4    testimony.
 5              MR. MAHADY:  Thank you, Your Honor.
 6              THE COURT:  Go ahead.
 7    BY MS. LEYIMU:
 8    Q.   Chief Holbrook, as a part of your role as Chief,
 9    was it your role to keep abreast of and inform the
10    community regarding emerging threats to the community?
11    A.   I feel like that was my responsibility.
12    Q.   And how did you become aware of what the emerging
13    threats were to the community as Chief?
14    A.   Based on calls for service, reports and interviews,
15    community meetings, all that taken, taken together would
16    identify problems and threats and help us form a roadmap or
17    strategy for attacking it.
18    Q.   And did you issue any reports describing these emerging
19    threats?
20    A.   Yes.
21    Q.   What were those reports?
22    A.   We actually produced what we refer to as Threat
23    Assessments and Strategies.  And then we also did annual
24    reports.
25              MS. LEYIMU:  Your Honor, may I approach?
```

1          THE COURT:  Yes.

2   BY MS. LEYIMU:

3   **Q.**   Chief Holbrook, I have just handed you two reports,

4   the 2012 HPD Threat Assessment and Strategy Summary

5   which is P-41374, and the 2014 Threat Assessment and

6   Strategy which is P-41527.

7          Do you have both of those?

8   **A.**   Yes, I do.

9   **Q.**   All right.  So you recognize these documents?

10  **A.**   I do.

11  **Q.**   What are these documents?

12  **A.**   These are two Threat Assessment and Strategy documents

13  produced at the Huntington Police Department.

14  **Q.**   Okay.  And did you author these documents?

15  **A.**   I did.

16  **Q.**   Both the 2012 and the 2014?

17  **A.**   Yes.

18  **Q.**   And were these Threat Assessments kept in the normal

19  course of business at the Huntington Police Department?

20  **A.**   They were.

21  **Q.**   What was the purpose of these documents?

22  **A.**   Again, to allow us to analyze our problem and make

23  tactical decisions on how we would address and mitigate the

24  problem.

25  **Q.**   Did they set out the activities of the Huntington

```
 1    Police Department?

 2    A.   Yes.

 3    Q.   Did they set out your strategic plans and

 4    investigations?

 5    A.   Yes.

 6    Q.   And were these reports reviewed by police officers in

 7    your department?

 8    A.   They were.

 9    Q.   And were these Threat Assessments utilized and relied

10    upon by the Huntington Police Department --

11    A.   They were.

12    Q.   -- in carrying out their work?

13    A.   Yes, they were.

14    Q.   And did you share these with anyone?

15    A.   We shared them internally and externally.  We shared

16    them with elected officials and our citizens as we attended

17    meetings throughout the city.

18         MS. LEYIMU:  Your Honor, at this time I'd move to

19    admit these two Threat Assessments, P-41374 and P-41527,

20    into evidence.

21         THE COURT:  Were you directed by the mayor or any

22    other authority specifically to make these reports?

23         THE WITNESS:  No, sir.  This is something that I

24    did.

25         MS. WU:  Your Honor, we object on hearsay grounds
```

```
 1      to the admission of both documents which have been

 2      introduced.

 3              MS. LEYIMU:  Your Honor, pursuant to 803(8), I

 4      believe, these are public records that set out the office's

 5      activities.

 6              MS. WU:  Your Honor, these --

 7              MS. LEYIMU:  They're --

 8              MS. WU:  I'm sorry.

 9              THE COURT:  Was he under a legal duty to report?

10              MS. LEYIMU:  As a police officer -- as a police

11      department, yes, Your Honor, I would say, yes, legal

12      authorized duty to report.  These are factual findings from

13      a legal authorized investigation.

14              MR. MAJESTRO:  Your Honor, if I might add,

15      (8)(A)(i), this requires it to be the office's activities.

16      The other, (ii) and (iii) are disjunctive.  It's not -- they

17      don't have to meet all of the requirements.

18              THE COURT:  You're saying they're not -- they're

19      exclusive and not inclusive?  (I), (ii), and (iii)?

20              MR. MAJESTRO:  (I), (ii), and (iii) you only have

21      to meet one of them.

22              MS. WU:  Your Honor, the portion of the rule that

23      Mr. Majestro is referencing relates to activities of a

24      public office.  The documents that are being introduced are

25      Threat Assessments.  They do not summarize the activities of
```

1    the police department.  There are other documents that do

2    that.  Those are the HPD reports that have already been

3    introduced into evidence.

4        And for that reason, we don't believe that these

5    records, the Threat Assessments, meet any hearsay exception.

6            MR. MAJESTRO:  The witness testified the act of

7    conducting the threat assessment is an activity of the

8    department.

9            THE COURT:  Well, I'm going to conditionally admit

10   them at this time and look at the law and decide whether to

11   any extent I'll consider them.  But I'm going to

12   conditionally admit them and let you go ahead at this point.

13           MS. LEYIMU:  Yes, Your Honor.

14   BY MS. LEYIMU:

15   Q.   Chief Holbrook, do these Threat Assessments outline

16   and set forth the goals of the Huntington Police

17   Department?

18   A.   Yes, a strategic goal.

19   Q.   And do they summarize investigations that you were

20   legally authorized to carry out in the Huntington Police

21   Department?

22   A.   I don't know that these documents summarize the

23   investigation.  They, they take the results of

24   investigations and outcomes and it's what allows us to

25   forecast.

1    **Q.**    And does it inform the work that you do?

2    **A.**    Yes.

3    **Q.**    And, again, what is the purpose of putting this

4    together?

5    **A.**    Again, it's a process for us to analyze a problem and

6    develop a strategy to, to attack the problem.

7    **Q.**    And that is part of the role of the Huntington Police

8    Department in the community?

9    **A.**    To prevent and solve crime and address crime disorder

10   in the community.

11   **Q.**    Now, in these Threat Assessments could you advise the

12   Court what were the main take-aways?  Let's start with 2012.

13   Do you recall what you were trying to communicate in these

14   Threat Assessments?

15   **A.**    I think first we established that there was an opioid

16   problem nationally.  And then on the local level, we were

17   also experiencing a similar trend and that, you know, we had

18   an addicted population that was a vulnerable population and,

19   and we had drug trafficking organizations that were taking

20   advantage of that vulnerable population.  And then we had

21   citizens that were addicted that were seeking, you know,

22   seeking more of the opioids through, you know, various means

23   to include, you know, seeking doctors and pharmacists again

24   that would distribute irresponsibly.

25   **Q.**    And what were the emerging threats to the community

 1    that were outlined in the 2012 and 2014 report?

 2    **A.**    What we started seeing in 2012 was we were beginning to

 3    have some success with disrupting some of the flow of opioid

 4    prescription drugs, and we were seeing those that were

 5    addicted turn to heroin.

 6         And as a result of that, the, the pills that those that

 7    were addicted were used to taking, you know, they knew

 8    exactly what that pill would do to their body when they

 9    ingested it.

10         As they turned to heroin, it was really a mixed bag, a

11    trick bag.  Heroin was cut with, you know, different cutting

12    agents or the purity levels were just really all over the

13    place and it was leading to overdoses.  The people survived

14    from overdoses that some, that proved to be fatal.

15    **Q.**    And was it a part of your role as Chief of Police to

16    identify what drugs were most prevalent in the area?

17    **A.**    Yes.

18    **Q.**    Was it part of your job to identify what drugs were a

19    threat to your community's health and public safety?

20    **A.**    Yes.

21    **Q.**    And were you doing that in these Threat Assessments?

22    **A.**    Absolutely.

23    **Q.**    And in 2012, if you'll turn to Page 2, the third

24    paragraph says, "Heroin has also become an emerging threat

25    to our community due to the availability and affordability

1    of the drug."

2         Do you see that?

3    **A.**   Yes.

4    **Q.**   And is that consistent with what was going on in the

5    community in 2012?

6    **A.**   Yes, it was.

7    **Q.**   Okay.  Could you tell the Court a little bit more about

8    that?  Why was that happening?

9    **A.**   The opioid pills were expensive.  And depending on the

10   disruption with, with distribution of the pills, people were

11   turning to a less expensive alternative which was heroin.

12   And, again, that was leading to --

13              THE COURT:  Just a minute, Chief.

14              MS. WU:  Objection.  We object to the testimony on

15   foundation grounds.  The witness is testifying as to the

16   motivations of individuals in the community.

17              THE COURT:  Well, right now it's objectionable.

18         Can you lay a foundation for it?

19              MS. LEYIMU:  Sure.

20   BY MS. LEYIMU:

21   **Q.**   Was it part of your role as Police Chief to

22   understand --

23              MS. LEYIMU:  I think I did lay the foundation

24   because I asked --

25              THE COURT:  Maybe you did.

1    BY MS. LEYIMU:

2    **Q.**    Yeah.   I believe I asked was it part of your role

3    to understand what were the prevalent drugs in the

4    community?

5    **A.**    Yes.

6    **Q.**    Was it part of your role to understand what the drug

7    trends were?

8    **A.**    Yes.

9    **Q.**    Was it part of your role to understand what the

10   trajectory of drug trends were?

11   **A.**    Yes.

12   **Q.**    How did you do that?

13   **A.**    Through analysis, through investigation, through

14   interviews, through seizures.

15   **Q.**    Okay.   And as a result of that, did you form an

16   understanding --

17           THE COURT:   Overruled.   You can answer.

18   BY MS. LEYIMU:

19   **Q.**    And I believe you were talking about transition

20   that people were having in the community that you saw in

21   your investigations through the ways that you have laid

22   out from prescription pills to heroin, is that correct,

23   when we left off?

24   **A.**    Yes.

25   **Q.**    And tell us about -- as a police officer, is it

1    important for you to know about the price of drugs and what

2    they're going for?

3    **A.**    Yes.

4    **Q.**    Explain that to the Court, please.

5    **A.**    Well, illicit drug trafficking is all about supply and

6    demand.  And, you know, we, we do pay particular attention

7    to what, what the going cost is for a particular drug.  That

8    can have consequences with respect to drug trafficking

9    organizations and territory and retaliation.

10            And then with, with respect to the opioids, we, we knew

11    that as prices would go up -- you know, at one time it was

12    about a dollar a milligram -- that folks would not be able

13    to pay that and they would turn to cheaper alternatives.

14    And there was great risk with some of those cheaper

15    alternatives, heroin being one of them.

16    **Q.**    In the 2014 Threat Assessment were you kind of doing

17    the same analysis?

18    **A.**    Yes.

19    **Q.**    Okay.  And the cover letter on the front, was that

20    authored by you?

21    **A.**    It was.

22    **Q.**    Who was that authored to?

23    **A.**    The mayor and City Council.

24    **Q.**    Okay.  On the second line it says, "This report is the

25    most important document I have ever prepared for your

1    review."

2        Do you see that?

3    **A.**   I do.

4    **Q.**   And why were you communicating that to the mayor?

5    **A.**   I've been a police officer for 30 years, and at that

6    time in the mid -- 25 years.  I saw my town being decimated

7    by addiction.

8        And as I saw the addiction explode, I also saw our drug

9    seizures exploding.  The pills continued to -- our pill

10   seizures were going up and the overdoses were going up, but

11   we were also seeing property crime go up.

12       So all the correlations were there and we were on a

13   trajectory that I did not think we could sustain.  And I was

14   trying to be writing an impactful and meaningful document

15   that would reinforce to our elected officials that we --

16   that our number one priority had to be public safety in

17   addressing this threat as a community.

18   **Q.**   You saw this coming?  This threat to the community, you

19   saw this coming?

20   **A.**   I was living it.

21   **Q.**   If you turn to Page 2 on the 2014 report, I'm going to

22   ask you about something quickly.

23       In the box there it says, "A long-standing organization

24   the Neighborhood Institute is comprised of 12 neighborhood

25   organizations that work with the Huntington Police

1    Department to identify and solve problems."

2        Do you see that?

3    **A.**    Yes.

4    **Q.**    Could you tell the Court a little bit about the

5    Neighborhood Institute, what it was and what its purpose

6    served?

7    **A.**    Sure.  Huntington had a number of neighborhood

8    associations, as most cities do.  And the Neighborhood

9    Institute brought the leadership from each one of those

10   neighborhood associations together and allowed us to network

11   and address issues collectively with all the neighborhood

12   associations and, again, hear from them on what their

13   problems were, hear from them on what their expectations

14   were from the police department, and also for us to educate

15   and share information with the neighborhood associations to

16   share with the citizens in their neighborhoods.

17   **Q.**    And would that be an example of community policing?

18   **A.**    Absolutely.

19   **Q.**    And was that helpful in your efforts combating the

20   opioid crisis in the community?

21   **A.**    I think it's probably been the most important thing

22   that we could ever engage is our citizens.

23   **Q.**    On the back end on Page 11 of the 2014 report -- or it

24   might just look like the back.  You have a vision and

25   mission statement.  Do you see that?

1    **A.**    Yes, ma'am.

2    **Q.**    Right above it, the paragraph before says, "Heroin

3    distribution and abuse in Huntington grew significantly in

4    2013."

5        Does that comport and is that consistent with your

6    understanding of what was going on in the community at that

7    time?

8    **A.**    Yes.

9    **Q.**    The next sentence says, "This is a direct result of the

10   predominant prescription drug threat in the Appalachia

11   region."

12       Do you see that?

13   **A.**    Yes.

14   **Q.**    "West Virginia, specifically Huntington, is at the

15   center of this particular threat."

16       Do you see that?

17   **A.**    Yes.

18   **Q.**    And is that consistent with what you experienced, saw,

19   and observed in your role as Police Chief for the City of

20   Huntington?

21   **A.**    Yes.

22   **Q.**    Did the Huntington Police Department develop or engage

23   in any initiatives to combat the opioid epidemic?  You

24   talked about the arrests and the investigations and the

25   interviews and the seizures.  Any other initiatives that you

1    took on to combat the opioid epidemic in the community?

2    **A.**    Well, there was a number of strategies we employed.

3    First of all was taking a collaborative approach to the

4    problem.  What I mean by that is relying on our partnerships

5    with our state and federal partners.

6        We, we participated in -- we worked alongside every one

7    of our federal partners.  They were often times embedded in

8    our police department.  So we had initiatives with each

9    individual task force.  And we also had association and

10   alignment with what we mentioned earlier, Appalachia HIDTA.

11       And that -- again, that's how we established

12   investigative strategies and were able to work specifically

13   on drug trafficking organizations or, or distribution

14   networks involving prescription drugs.

15   **Q.**   And what about prevention efforts?  Were you involved

16   in any prevention efforts to combat the prescription drugs

17   that were posing as a threat to your community?

18   **A.**    I was.

19   **Q.**   Could you tell the Court a little bit about that?

20   **A.**    At the direction of, at the time, the United States

21   Attorney for the Southern District of West Virginia, I

22   participated in a public service announcement.  And we also

23   spent quite a bit of time visiting schools, talking to our

24   young adults.  We promoted our drug take-back program, again

25   trying to educate of the dangers and the severe consequences

1    of the opioid addiction and, again, talked about the

2    importance of prevention.

3    **Q.**   When you left the city in 2014, was the City of

4    Huntington in the midst of an opioid epidemic?

5    **A.**   Yes.

6    **Q.**   And, Chief Holbrook, could you tell this Court over the

7    span of time that you served as Chief of Police in

8    Huntington, your home and service, what has been the impact

9    of the opioid epidemic on the community?

10   **A.**   When I -- when I started today -- it's a, it's a

11   difficult topic for me to really talk about, Judge.  I

12   probably didn't do it service when I said just how wonderful

13   it was growing up in Huntington.

14       You know, yes, I was blessed to have wonderful parents

15   and family and great friends.  Just the quality of life in

16   Huntington was incredible.

17       What I saw happen during my time as a Police Chief was

18   something that it really has affected me just profoundly.

19   There was not one person through some connection -- there

20   was no degree of separation by the time I left Huntington

21   that a friend, family, neighbor had not been touched by this

22   problem, had not lost a loved one, had not, you know,

23   reached financial ruin because of their efforts to address

24   an addiction problem with a loved one.

25       I saw friends that I went to school with and grew up

```
 1    with, I attended funerals for their children.  It was
 2    difficult going to crime scenes.  My, my children, they,
 3    they lost friends.  I've never seen anything in what I
 4    consider to be a distinguished law enforcement career
 5    where -- I don't know everything, but I've had the privilege
 6    of experiencing a lot.
 7         My -- almost my entire career, besides being a Police
 8    Chief, was investigating drug trafficking organizations,
 9    organized crime and violent crime.  I've policed from one
10    end of North Carolina to the next with the State Police.  I
11    worked in a major city in Charlotte.  I've been in Columbia
12    for seven years.
13         And I've never experienced anything like what I saw
14    when I left Huntington.  And, and those challenges remain
15    today.  But it had an everlasting impact on me personally
16    and professionally.
17    Q.   Thank you, Chief Holbrook.  I have no more questions.
18              THE COURT:  You may cross-examine, Mr. Mahady.
19              MR. MAHADY:  Thank you, Your Honor.
20                         CROSS EXAMINATION
21    BY MR. MAHADY:
22    Q.   Chief Holbrook, nice to meet you.  My name is Joe
23    Mahady.
24         Chief Holbrook, you personally didn't investigate
25    anything in Huntington as Police Chief; correct?
```

1    **A.**   I'll explain again.  As I just stated, the majority of

2    my career has been in investigations.  I'm a very hands-on

3    Police Chief.

4         When -- it's subjective in how you're asking me if I

5    investigated.  I was not the case agent on investigations as

6    a Police Chief, but I had oversight and responsibility for

7    everything that went on at the police department.  I was

8    very inquisitive about major investigations and drug

9    investigations and that unit reported to me.  So I had

10   knowledge about investigations.

11   **Q.**   Your knowledge was at the 10,000-foot level; correct?

12   **A.**   I, I used that statement, yes, sir.

13   **Q.**   That's a correct statement, though?

14   **A.**   My knowledge is -- would be, again, not

15   boots-on-the-grounds necessarily conducting the interviews,

16   but maybe with a suspect or making an arrest, but being

17   briefed on the nature of the investigation and the, you

18   know, significant events that may have, or seizures that may

19   have occurred in an investigation.

20   **Q.**   Okay.  Thank you.  But you personally, you were not the

21   individual conducting the investigation; correct?

22   **A.**   I was not the case agent on an investigation, correct.

23   **Q.**   And you personally were not the individual conducting

24   investigations of any doctors or pharmacies in Huntington;

25   correct?

1   **A.**   As I said, I was not a case agent on any investigation.

2   **Q.**   So the answer to my question is "yes"?

3   **A.**   The answer would be "no."

4   **Q.**   You were not personally involved in these

5   investigations; correct?

6   **A.**   That's correct.

7   **Q.**   And you personally did not have direct oversight of any

8   investigation into the diversion of pills; correct?

9   **A.**   I had direct oversight of the folks that worked for me.

10  **Q.**   But you yourself did not directly oversee any specific

11  investigation into the diversion of pills in Huntington;

12  correct?

13  **A.**   Again, I'm going to repeat what I told you initially.

14  I have knowledge of the major investigations that went on at

15  the police department, whether it was major crimes or

16  narcotics investigations.  So if one of those investigations

17  would have been a diversion investigation of significance,

18  then, yes, I would have had knowledge of that investigation.

19  **Q.**   And while I appreciate that you had knowledge, you were

20  not directing the investigations; correct?

21  **A.**   I stated earlier that I, I was not the case agent on

22  any investigation.

23  **Q.**   And you did not direct them in an oversight role

24  either; correct?

25          MS. LEYIMU:  I'm going to object.  This has been

```
 1    asked and answered, Your Honor.

 2              THE COURT:  Sustained.  I believe it has been

 3    asked and answered.

 4    BY MR. MAHADY:

 5    Q.   Do you recall giving a deposition in this case?

 6    A.   Yes, sir.

 7    Q.   Okay.  And was that deposition on -- make sure I have

 8    the right date here -- July 22nd, 2020?

 9    A.   I think so, yes, sir.

10    Q.   Okay.  And did you testify truthfully at that

11    deposition?

12    A.   Yes, sir.

13    Q.   Okay.  I would like to pull up your deposition video,

14    Page 52 starting at line 11.

15              (A video clip was played as follows:)

16         "During your time as Huntington Police Chief, were you

17    involved in any investigations of diversions, diversion of

18    pills?

19    A.   Me personally?

20    Q.   Well, let's start with you personally, yes.

21    A.   I can just tell you me personally, I didn't

22    investigate, you know, anything in Huntington.  I was the

23    Police Chief.

24    Q.   Okay.  So did you oversee investigations of diversion

25    of pills?
```

1      **A.**   I wouldn't say I oversaw diversion of pills.  I was the

2    Police Chief.  I -- you know, I was -- you know, at the

3    10,000-foot level I would be briefed on, you know,

4    investigations, status of investigations, but, you know, I

5    was not directing investigations."

6          (Video clip concluded)

7                THE COURT:  This is perfectly consistent with what

8    he just testified to, Mr. Mahady.  What's the purpose of

9    this?

10               MR. MAHADY:  Your Honor, I think --

11               THE COURT:  How is this impeachment?

12               MR. MAHADY:  Because he's trying to claim here

13   today that he was overseeing with his direct role.  I think

14   in his testimony he was very clear it was not a direct role

15   and that he was at a 10,000-foot level which I do think is

16   inconsistent.  I will move on.  I just want to confer with

17   my co-counsel for one second.

18         (Pause)

19               MR. MAHADY:  I have no further questions, Chief

20   Holbrook.  Thank you.

21               THE COURT:  Ms. Wu.

22         Let me ask where we're going here.  Are we going to be

23   able to finish Chief Holbrook today if we go past 5:00?

24               MS. WU:  I will do my very best.  I don't believe

25   we should hold the witness over what could be a break.

```
 1              THE COURT:  Well, I understand he's not available
 2    tomorrow.  Is that right, Mr. Farrell?
 3              MR. FARRELL:  Preferably he would like to return
 4    to Columbia, South Carolina.  He has business to take care
 5    of.
 6              THE COURT:  Well, we don't even know whether we're
 7    going to be in session here.  We have to switch court
 8    reporters at 5:00, but let's go ahead, Ms. Wu, and see how
 9    far we get.
10              MS. WU:  I'm optimistic we can get the witness off
11    the stand, Your Honor.
12              THE COURT:  Okay.
13                        CROSS EXAMINATION
14    BY MS. WU:
15    Q.   Good afternoon, Chief.
16              MS. WU:  May I proceed, Your Honor?
17              THE COURT:  Yes, please.
18    BY MS. WU:
19    Q.   My name is Laura Wu and I represent McKesson.  I
20    have a few questions for you.  Thank you for being here
21    today.
22    A.   Yes, ma'am.
23    Q.   Chief, during your time as Chief of Police in
24    Huntington, the city was a well-known hub for distribution
25    of illegal drugs; correct?
```

1    **A.**    Yes.

2    **Q.**    Heroin and other illegal drugs were often brought into

3    Huntington from Detroit; correct?

4    **A.**    Yes, at different -- different drugs at different

5    times, yes, ma'am.

6    **Q.**    In fact, Huntington was sometimes referred to as Little

7    Detroit -- sorry.  My microphone wasn't on.

8        In fact, Huntington was sometimes referred to as Little

9    Detroit?

10   **A.**    Yes, I've heard that statement.

11   **Q.**    During your time as Police Chief, the officers who

12   worked for you regularly arrested residents trafficking

13   illegal drugs from Detroit into Huntington; correct?

14   **A.**    Not regularly arrested Huntington residents, no.

15   **Q.**    Let me try that again.  HPD regularly arrested

16   individuals from Detroit who were trafficking drugs into

17   Huntington?

18   **A.**    Yes.

19   **Q.**    Drugs were also trafficked from other cities outside

20   West Virginia including Columbus, Ohio; correct?

21   **A.**    Yes.

22   **Q.**    Now, I'd like to look at just one example of the work

23   of your department.

24        MS. WU:  Could we please have Defendants' West

25   Virginia 1317?

1          Your Honor, may I approach?

2     BY MS. WU:

3     **Q.**   Chief, you have in front of you a document which

4     we've marked for identification as Defendants' West

5     Virginia 1317?

6     **A.**   Yes, ma'am.

7     **Q.**   And this is a set of memoranda related to an operation

8     titled "Operation Dirty Deeds."  Do you see that?

9     **A.**   Yes.

10    **Q.**   The top page of the memo includes a memo from you which

11    is dated December 14th, 2012; correct?

12    **A.**   Yes.

13    **Q.**   And if you would look with me to the first paragraph of

14    your letter it reads, "On October 15th, 2012, R. Booth

15    Goodwin, U.S. Attorney, Southern District of West Virginia,

16    submitted a memorandum commending each of you for your

17    outstanding performance during the Dirty Deeds OCDETF

18    investigation.  This case involved the prosecution of a

19    number of local and out-of-state crack cocaine and oxycodone

20    dealers which resulted in the dismantling of a major DTO and

21    lengthy prison sentences for those involved."

22         Do you see that?

23    **A.**   Yes.

24    **Q.**   Chief, after commendation letters on Page 4 of this

25    document, if you'll turn with me -- and, Chief, I'm using

```
 1    the numbers in the left-hand corner of the document, the

 2    Defendants' West Virginia 1317.00004.  Do you see that?

 3    A.   Yes, ma'am.

 4    Q.   Thank you.  This Page 4 of the document includes a memo

 5    that you sent to then Mayor Kim Wolfe.  Do you see that?

 6    A.   Yes.

 7              MS. WU:  Your Honor, I move to admit Defendants'

 8    West Virginia 1317 into evidence.

 9              THE COURT:  Is there any objection to this?

10              MS. LEYIMU:  No objection.

11              THE COURT:  Any objection?

12              MS. LEYIMU:  No objection, Your Honor.

13              THE COURT:  It's admitted.

14              MS. WU:  Thank you.

15    BY MS. WU:

16    Q.   Chief, if we can continue looking at Page 4 of the

17    document, the first paragraph reads, "Beginning in 2008

18    the members of the HPD Special Investigations Division

19    (Sergeant D. Booth, Corporal Shane Bills, Sean Hinchman,

20    and Paul Hunter) and the FBI Violent Crimes Drug Task

21    Force initiated an investigation of violent criminal

22    activity involving a drug trafficking (DTO) operating in

23    Huntington, West Virginia.  The DTO was being controlled

24    by Charles R. Burke and several of his criminal

25    associates."
```

1        Do you see that?

2   **A.**   Yes.

3   **Q.**   And that was a true statement; correct?

4   **A.**   Yes.

5   **Q.**   Now, if we can look into the second paragraph still on

6   Page 4, the second sentence reads, "According to one

7   cooperating defendant, Burke was responsible for recruiting

8   and bringing to Huntington at least 100 people to distribute

9   crack cocaine and illegally diverted prescriptions."

10        Do you see that?

11  **A.**   Yes.

12  **Q.**   That was a true statement; correct?

13  **A.**   Yes.

14  **Q.**   And, so, the investigation and the results reported in

15  your memos provide just one example of a DTO bringing both

16  prescription pills and crack from outside of West Virginia

17  into the Huntington community; correct?

18  **A.**   Yes.

19  **Q.**   Chief, you never found the origin of the prescription

20  drugs that the criminals identified in this memorandum

21  brought into the community?  You just know they came from

22  Detroit.  Correct?

23  **A.**   Yes.  We had information -- we had knowledge of how

24  they obtained it in Detroit, but not a singular, you know,

25  source of supply if that was your question.

1    **Q.**   Thank you, Chief.  So now I'd like to talk about some

2    of the drug trends that you described during your direct

3    examination.

4        When you became the Chief in 2007, crack cocaine was

5    the most serious drug problem in Huntington; correct?

6    **A.**   It was very prevalent.

7            THE COURT:  Let's take a short break.  I need to

8    relieve the court reporter here.  And then we'll come back.

9            THE WITNESS:  Yes, sir.

10       (Recess taken at 4:55 p.m.)

11           THE COURT:  As of 5:00, the official word is that

12   tomorrow is a holiday and the courthouse will be closed

13   except I've been told by the clerk that if I want to keep it

14   open, I can.

15       We can -- and I understand Chief Holbrook is the last

16   witness on the plate for this week; is that right?

17           MR. FARRELL:  Yes, Your Honor.

18           THE COURT:  And I think we can finish him tonight,

19   so we'll --

20       Chief, you can come up and take a seat.

21           THE WITNESS:  Yes, sir.

22           THE COURT:  So let's press on and we'll finish and

23   go our -- do something else tomorrow.

24           MS. WU:  Thank you, Your Honor.

25           BY MS. WU:

1   **Q.**   Welcome, back, Chief.  I'm going to be brief.  I'm

2   standing between us and a break.

3        So, before the break, we were talking about the early

4   part of your tenure as Chief when crack cocaine was a

5   problem in the City of Huntington; do you recall that?

6   **A.**   Yes, ma'am.

7   **Q.**   At that time when you became chief in 2007, most of

8   HPD's drug investigations involved either cocaine or crack

9   cocaine, correct?

10   **A.**   Yes.

11   **Q.**   And, in fact, you've been quoted as saying that, "Crack

12   cocaine has been the root of all evil that has affected

13   Huntington," correct?

14   **A.**   I did make that statement.

15   **Q.**   Chief, shortly after you became the Chief in 2007, and

16   as you described earlier, Huntington started -- you started

17   to see heroin overdose fatalities, correct?

18   **A.**   Can you repeat that, please?

19   **Q.**   Sure.  Shortly after you became Chief in 2007, you

20   started to see heroin overdose fatalities, correct?

21   **A.**   Yes.  We had a -- we had a brief spell of overdose

22   fatalities.

23   **Q.**   And when you are referring to a brief spell, are you

24   referring to a particular overdose cluster of 14 individuals

25   who overdosed in 2007?

1    **A.**    I am.  Yes, ma'am.

2    **Q.**    Okay.  Chief, you don't know when historically heroin

3    first emerged in the City of Huntington, correct?

4    **A.**    The Winter of 2007 was the first time I had experienced

5    it in my -- in my time there.

6    **Q.**    And you don't know if heroin had been present in the

7    community prior to 2007, correct?

8    **A.**    I saw no evidence of that when I --

9          THE COURT:  Did you see any Mexican heroin on your

10    watch?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  You did?  So, it not only came from

13    Detroit, it came from Mexico, too?

14          THE WITNESS:  Mexico was the point of origin and

15    the only time that we saw the Mexican black tar heroin was

16    this incident that she's referring to.

17          THE COURT:  Just -- just one time, right?

18          THE WITNESS:  Just one time with black tar heroin,

19    yes, sir.

20          BY MS. WU:

21    **Q.**    Chief, prior to your time coming to Huntington, you

22    worked as a patrolman in the Charlotte Police Department in

23    the 1980s, correct?

24    **A.**    Yes.

25    **Q.**    And during your time in that role in the 1980s, you saw

1    heroin being abused in Charlotte, correct?

2    **A.**    I did.

3    **Q.**    And you also worked as a narcotics detective assigned

4    to Charlotte Douglas International Airport in the early

5    1990s, correct?

6    **A.**    I did.

7    **Q.**    And in the early 1990s, in that role, heroin was one of

8    the primary drugs that you seized at the airport, correct?

9    **A.**    No, it was not.

10   **Q.**    Heroin alongside other drugs, such as cocaine and

11   marijuana, was one of the primary drugs that you seized at

12   the airport, correct?

13   **A.**    The primary drugs that we seized when I was working

14   interdiction was cocaine.

15   **Q.**    Were there other prominent drugs that you seized at the

16   airport, including heroin?

17   **A.**    We -- we would occasionally make a heroin seizure but

18   it was -- it was not prevalent.

19   **Q.**    It was prominent?  I'm just trying to use your words.

20   Heroin was prominent when you worked at the airport in the

21   1990s, correct?

22          MS. LEYIMU:  Your Honor, I'm objecting to this

23   line of questioning.  The witness has asked and answered and

24   it's mischaracterizing his testimony.

25          THE COURT:  Well, overruled.  This is cross

1    examination and I'll let you go ahead, Ms. Wu.

2              MS. WU:  Thank you, Judge.

3              BY MS. WU:

4    **Q.**   Chief, was heroin one of the drugs that was prominent

5    in terms of seizures when you worked at the airport in the

6    1990s?

7    **A.**   We would seize heroin.  By and large, the most

8    prevalent drug we would seize was cocaine.

9    **Q.**   Now, in response to the judge's question just a short

10   while ago, you testified that the heroin that came into

11   Huntington in 2007 originated in Mexico, correct?

12   **A.**   Yes.

13   **Q.**   And it wasn't until after the Police Department had

14   taken care of that rash of heroin in 2008 that larger

15   supplies of prescription pills came into the Huntington

16   community, correct?

17             MS. LEYIMU:  Object to the foundation.

18             THE COURT:  Overruled.  Go ahead.

19             THE WITNESS:  I don't -- I would not agree with

20   how you characterized that, no.

21             BY MS. WU:

22   **Q.**   In terms of the sequence of time, in 2007, your

23   department was focused on eradicating black tar heroin which

24   had originated in Mexico and come into Huntington, correct?

25   **A.**    No, ma'am.  Initially, I testified today and in

1    deposition, our focus was on open air drug markets and there

2    was a prevalence of crack cocaine.  But I also stated that

3    we just saw a surge in finding individuals with opioids.

4         Late in 2007, we had 14 overdose fatalities.  And what

5    was unique about that was they all were -- we were finding

6    the packaging was the same and, after we did analysis of

7    what was left over at the scenes that we were finding, we

8    found that it was all connected and it was connected to one

9    source in Mexico.

10   **Q.**   And, Chief, after your department took care of that

11   black tar heroin sometime in 2008, that's when larger

12   supplies of prescription pills came into play and became the

13   drug of choice, correct?

14   **A.**   I don't -- I'm not -- I wouldn't say it the same way

15   you're saying it, I guess, is how I'm answering that.  I'm

16   saying we had the prevalence of pills.  However, our focus

17   in 2007 was on open air drug markets.

18        We had a rash of heroin overdoses that we pivoted to,

19   investigated, dismantled that organization.  And then we --

20   we continued to address our open air market, you know,

21   through 2008.  And as we were doing this, we started seeing

22   our pill seizures continue to grow.

23             MS. WU:  And, Mr. Reynolds, could we pull up the

24   Chief's deposition in this case from July 22nd, 2020?

25             BY MS. WU:

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   Chief, you recall that you were deposed in the context

2    of this litigation, correct?

3    **A.**   Yes.  Yes, ma'am.

4    **Q.**   And could we please go to Page 107, Line 2, please?

5    And the question reads, "What I'm saying is that -- is it

6    your understanding, as described here, that after you kind

7    of took care of the black tar heroin sometime in 2008,

8    that's when the -- that the larger supplies of prescription

9    pills came into play and became the drug of choice," and

10   your answer is, "Yes."

11        Do you see that, Chief?

12   **A.**   I do.

13   **Q.**   And that was your testimony in July 2020, correct?

14   **A.**   Yes.

15   **Q.**   And you testified truthfully at that time?

16   **A.**   Yes.

17   **Q.**   Chief, by 2013, heroin had returned and become the

18   number one threat to the City of Huntington, correct?

19   **A.**   Yes.

20   **Q.**   And when you left Huntington in 2014, heroin was still

21   the greatest drug threat in the city, correct?

22   **A.**   Yes, but to address what you just brought up and what

23   you're saying now, crack cocaine never went away.  You know,

24   we -- so, when we talk about what is most prevalent, heroin

25   and cocaine, there would be different times that there would

1    be more prevalence.  The one -- the one constant throughout

2    this, this time, was the pills.

3    **Q.**   And it was the same criminal drug trafficking

4    organizations which brought all of those drugs into

5    Huntington, correct?

6    **A.**   No, not necessarily.  The pills came in -- they came to

7    be in Huntington in a variety of ways but, most importantly,

8    you referenced the 100 -- you know, the OCDETF case where

9    100 people were recruited to distribute in Huntington and, I

10   mean, I think that is exactly the -- what we're getting at

11   here is we were an addicted community.  Why would you send

12   100 people to sell drugs in a community?

13   **Q.**   Well, Chief, let me ask you some more specific

14   questions so we can talk about that.  So, much like the

15   illegal drugs that you talked about, heroin and crack

16   cocaine, drug trafficking organizations also trafficked

17   prescription opioids into Huntington, correct?

18   **A.**   At some point, they did.

19   **Q.**   And those same drug trafficking organizations also

20   brought counterfeit pills into Huntington, correct?

21   **A.**   We did find counterfeit drugs at some point.

22   **Q.**   And you know that drug trafficking organizations

23   sometimes take heroin or fentanyl and press it into the

24   shape of a prescription pill, correct?

25   **A.**   Yes, I do.

```
 1    Q.   So, it's possible that someone in Huntington thought

 2    that he or she was taking a prescription pill, but was

 3    actually taking heroin or fentanyl, correct?

 4    A.   That would be possible.

 5    Q.   And drug trafficking organizations obtained

 6    prescriptions that they brought into Huntington in the cases

 7    that there were actual prescription pills through illegal

 8    means, correct?

 9    A.   Doctor shopping.

10    Q.   And that's -- that's illegal?  It's a crime?

11    A.   Yes.

12    Q.   So, you've talked about diversion.  So, let's just, for

13    the record, lay it out there.  Diversion is a crime,

14    correct?

15    A.   Yes.

16    Q.   And doctor shopping, as you said, is a form of criminal

17    diversion, correct?

18    A.   Yes.

19    Q.   Forging a prescription is another form of criminal

20    diversion, correct?

21    A.   Yes.

22    Q.   Theft of pills from someone's medicine cabinet is

23    another form of diversion, correct?

24    A.   Correct.

25    Q.   And that's a crime?
```

1    **A.**    Yes.

2    **Q.**    Chief, there's nothing a pharmaceutical distributor can

3    do to prevent pills from being stolen out of a medicine

4    cabinet, correct?

5            MS. LEYIMU:  I'll object on foundation.  Calls for

6    speculation.

7            THE COURT:  Overruled.  You can answer it, if you

8    can.

9            THE WITNESS:  I think indirectly there is.

10           MS. WU:  Mr. Reynolds, would you please pull up

11   the Chief's deposition from July 22nd, 2020?  Could we

12   please go to Page 168?  And to Line 15, please?

13           BY MS. WU:

14   **Q.**    And the question posed to you at your deposition was,

15   "Would you agree that there is nothing that the distributor

16   can do from having pills stolen out of a medicine cabinet

17   once they are -- once they've left the pharmacy?"  And you

18   answered, "Yes, I agree that a distributor would have no

19   control over theft of pills out of somebody's personal

20   residence."  Do you see that, Chief?

21           MR. MAJESTRO:  Objection, Your Honor.  That's a

22   completely different question than the one she just asked.

23           THE COURT:  I don't think it is and it is

24   inconsistent, but it's kind of a so what, you know?  It's

25   not a major point.

```
 1          Go ahead, Ms. Wu.

 2               MS. WU:  Thank you, Chief.  I have no further

 3     questions at this time.

 4               THE COURT:  Does Cardinal want to question?

 5               MS. JASIEWICZ:  No questions, Your Honor.  Thank

 6     you.

 7               THE COURT:  Do you have any re-direct, Mr.

 8     Farrell?

 9               MR. FARRELL:  Very briefly, if I can beg your

10     patience and bring just a moment of levity into this long

11     seven weeks of trial before we take our break.

12               THE COURT:  Well, are we violating the one --

13               MR. FARRELL:  No.

14               THE COURT:  I can't keep straight.

15               MR. FARRELL:  Yes, Your Honor.  It's evenly --

16     that was the City of Huntington.

17               THE COURT:  Yes, Ms. Kearse.

18          Mr. Farrell, you're legal.  Go ahead.

19               MR. FARRELL:  Yes, thank you.
```

<b>REDIRECT EXAMINATION</b>

<b>BY MR. FARRELL:</b>

```
22     Q.   Chief Holbrook, nice to see you again.  Your father was

23     a longtime coach of Huntington East baseball, was he not?

24     A.   Yes, sir.

25     Q.   And do you know who his favorite left fielder was of
```

```
1    all time?
2              MR. MAJESTRO:  Objection, Your Honor.
3         (Laughter)
4              MR. FARRELL:  Seriously, Chief, thank you for
5    coming up from South Carolina.  We appreciate you coming in
6    here and testifying before the Court.
7              THE COURT:  Who was his favorite left fielder?
8              THE WITNESS:  I don't think his last name was
9    Farrell.
10             MR. FARRELL:  No further questions.
11             MR. MAJESTRO:  I can't even get the last objection
12   sustained on my birthday.
13             THE COURT:  Nobody moved to strike that answer.
14        (Laughter)
15             MR. FARRELL:  It's true.
16             THE COURT:  Was that you?
17             MR. FARRELL:  It was me.  I wasn't -- I wasn't his
18   best player, but I was probably one of his favorites.
19             THE COURT:  Okay.  Well, Chief, we're going to let
20   you go.
21             THE WITNESS:  Thank you, Judge.
22             THE COURT:  Thank you very much for being here and
23   I wish you good luck in your -- in your job down in South
24   Carolina.
25             THE WITNESS:  Thank you, sir.
```

```
1              THE COURT:  And you're free to go.

2              THE WITNESS:  Okay.

3              THE COURT:  Mr. Ackerman?

4              MR. ACKERMAN:  Your Honor, I remembered this time

5    before you walked off the bench.  Ms. Christenson has some

6    deposition designations to submit to the Court at this time.

7              THE COURT:  Okay, that's fine.  If there's nothing

8    else to do today, I'll see everybody Monday morning,

9    June 28th, at 9:00 to finish the plaintiffs' case.  And on

10   Friday that week, we'll take your witness, Mr. Schmidt, and

11   then start the defense case and hope everybody enjoys the

12   time off.

13       Excuse me.  Oh, you need to do that on the record.

14             MS. CHRISTENSON:  I do.

15             THE COURT:  I'm sorry.

16             MS. CHRISTENSON:  But I have the list written

17   down.

18             THE COURT:  You go ahead.

19             MS. CHRISTENSON:  The plaintiffs submit Nathan

20   Hartle's fact deposition, Staci Harper-Avilla, Matthew

21   Strait, Eric Trevino, Nathan Elkins, Edward Hazewski and

22   Lisa Mash.  And that would be all.

23             THE COURT:  All right.

24             MS. CHRISTENSON:  That's it.

25             THE COURT:  Is there anything else?
```

```
1              MR. HESTER:  No, Your Honor.  I would just state

2    that the deposition designations are being submitted, of

3    course, with our objections embedded.

4              THE COURT:  I understand, Mr. Hester.

5         All right.  We're adjourned until June 28th at 9:00.

6              SIMULTANEOUS SPEAKERS:  Thank you, Your Honor.

7         (Court recessed at 5:17 p.m.)

8

9

10   CERTIFICATION:

11              I, Ayme A. Cochran, Official Court

12   Reporter, and I, Lisa A. Cook, Official Court Reporter,

13   certify that the foregoing is a correct transcript from

14   the record of proceedings in the matter of The City of

15   Huntington, et al., Plaintiffs vs. AmerisourceBergen

16   Drug Corporation, et al., Defendants, Civil Action No.

17   3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

18   reported on June 17, 2021.

19

20             S\Ayme A. Cochran          s\Lisa A. Cook

21               Reporter                   Reporter

22         _

23

24             June 17, 2021

25               Date
```



## $

**$10** [1] - 83:12
**$450,000.00** [1] - 154:11
**$494** [3] - 31:12, 65:14, 65:15
**$500,000** [1] - 154:13
**$504** [1] - 19:14
**$560** [1] - 57:10
**$60,000** [1] - 183:14
**$60,000.00** [1] - 154:19
**$630** [1] - 57:11

## '

**'18** [2] - 47:7, 49:5
**'80-'81** [1] - 9:5
**'91-'92** [1] - 136:8

## 0

**001** [1] - 90:14
**002** [1] - 90:15
**007** [1] - 98:20
**00907** [2] - 2:5, 2:14
**013** [1] - 119:5
**03** [1] - 93:14
**03688** [1] - 74:3
**05** [1] - 97:15
**06** [2] - 104:23, 105:3
**076** [1] - 94:24
**08** [1] - 109:8
**09** [1] - 112:1

## 1

**1** [12] - 21:10, 44:20, 58:7, 71:20, 71:21, 71:23, 72:4, 80:12, 115:4, 172:7, 179:17
**1,500** [1] - 183:19
**1.2** [1] - 116:2
**10** [5] - 62:12, 113:18, 116:13, 123:10, 202:16
**10,000-foot** [5] - 201:17, 209:14, 226:11, 229:3, 229:15
**10.3** [1] - 130:9
**100** [5] - 57:3, 234:8, 242:8, 242:9, 242:12
**100,000** [1] - 84:11
**1001** [2] - 4:6, 4:9
**1022** [1] - 3:5
**107** [1] - 241:4
**10:42** [2] - 73:11, 89:23

**11** [4] - 30:12, 113:22, 221:23, 228:14
**11.5** [1] - 62:9
**111** [1] - 169:24
**112** [1] - 170:21
**12** [3] - 99:13, 132:9, 220:24
**120** [1] - 14:11
**125** [1] - 80:12
**126** [1] - 3:5
**12:00** [1] - 125:22
**13** [2] - 120:23, 122:17
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**1317** [3] - 231:25, 232:5, 233:8
**1317.00004** [1] - 233:2
**14** [8] - 116:3, 136:11, 138:15, 169:24, 169:25, 183:19, 236:24, 240:4
**14th** [4] - 52:19, 52:21, 53:2, 232:11
**15** [6] - 52:20, 52:21, 53:2, 126:5, 151:4, 244:12
**150** [2] - 14:11, 100:15
**15910** [1] - 3:15
**15th** [1] - 232:14
**16** [1] - 189:11
**160** [1] - 115:4
**1600** [1] - 3:15
**168** [1] - 244:12
**17** [7] - 1:19, 7:4, 120:23, 136:20, 248:18, 248:24
**1717** [2] - 6:6, 6:13
**172** [1] - 204:22
**175** [1] - 204:22
**18** [1] - 127:6
**19** [2] - 50:13, 71:23
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1971** [1] - 8:24
**1976** [1] - 8:25
**1977** [1] - 93:5
**1980s** [3] - 173:4, 237:23, 237:25
**1982** [3] - 116:22, 117:22
**1986** [1] - 94:7
**1987** [2] - 187:12, 188:6
**1990** [1] - 136:8
**1990s** [7] - 116:7, 149:14, 173:4, 238:5, 238:7, 238:21, 239:6
**1991-'92** [1] - 137:12

**1996** [1] - 118:2

## 2

**2** [11] - 58:6, 68:19, 71:23, 72:4, 80:20, 90:20, 135:23, 172:14, 216:23, 220:21, 241:4
**2,000** [1] - 155:14
**2.2** [1] - 135:24
**2.775.7** [1] - 28:17
**2.8** [2] - 28:18, 28:20
**20** [8] - 9:13, 56:23, 99:21, 123:5, 127:12, 146:15, 155:18, 158:15
**20-year-old** [1] - 118:9
**2000** [1] - 98:9
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21, 5:5
**2000s** [2] - 149:14, 168:1
**2001** [1] - 9:11
**2002** [2] - 10:25, 98:10
**2005** [3] - 97:9, 142:3, 142:25
**2006** [21] - 27:21, 27:23, 28:8, 29:3, 31:13, 31:21, 37:20, 40:8, 40:18, 40:25, 41:11, 42:4, 42:24, 43:3, 43:11, 44:5, 44:24, 47:7, 49:5, 49:25, 144:4
**2007** [18] - 27:23, 189:23, 191:10, 191:22, 194:8, 195:18, 199:19, 235:4, 236:7, 236:15, 236:19, 236:25, 237:4, 237:7, 239:11, 239:22, 240:4, 240:17
**2008** [6] - 27:23, 233:17, 239:14, 240:11, 240:21, 241:7
**2009** [1] - 27:24
**2010** [2] - 27:24, 116:9
**2011** [4] - 27:25, 56:21, 57:12, 195:23
**2012** [13] - 27:25, 131:15, 138:23, 139:4, 211:4, 211:16, 215:12, 216:1, 216:2,

216:23, 217:5, 232:11, 232:14
**2013** [5] - 19:23, 27:25, 130:19, 222:4, 241:17
**2014** [18] - 25:9, 28:1, 43:14, 121:20, 133:6, 143:21, 191:7, 194:9, 195:23, 199:22, 211:5, 211:16, 216:1, 219:16, 220:21, 221:23, 224:3, 241:20
**2015** [11] - 28:1, 59:17, 96:24, 97:10, 121:20, 131:7, 133:7, 133:10, 139:4, 144:5, 155:12
**2016** [9] - 19:22, 28:2, 121:20, 130:9, 131:15, 132:4, 136:25, 138:23, 155:11
**2017** [6] - 18:11, 25:25, 28:2, 130:19, 131:1, 184:5
**2018** [24] - 10:14, 28:2, 28:8, 29:3, 31:13, 31:21, 37:20, 40:8, 40:18, 40:25, 41:11, 42:4, 42:24, 44:3, 43:11, 44:6, 44:24, 49:25, 72:16, 120:16, 120:22, 131:3, 143:21, 156:10
**2019** [13] - 117:10, 119:25, 120:2, 120:4, 120:5, 120:24, 121:2, 121:12, 131:3, 171:17, 171:18, 171:21, 172:10
**202** [2] - 2:4, 2:13
**2020** [21] - 44:14, 50:15, 70:4, 70:7, 70:12, 70:14, 72:3, 117:12, 117:16, 119:9, 119:10, 119:14, 120:7, 120:10, 129:20, 169:12, 178:12, 228:8, 240:24, 241:13, 244:11
**2021** [11] - 1:19, 7:4, 52:19, 101:19, 119:9, 119:14, 120:7, 120:10, 178:12, 248:18,

248:24
**20s** [2] - 118:12, 158:12
**21** [2] - 131:9, 174:2
**22** [1] - 130:14
**220** [3] - 122:7, 122:17, 180:6
**22020** [1] - 71:8
**2216** [1] - 3:7
**225** [2] - 80:15, 80:19
**22nd** [3] - 228:8, 240:24, 244:11
**23** [1] - 133:2
**23rd** [4] - 70:7, 70:14, 71:8, 72:3
**24** [1] - 70:4
**245** [6] - 26:10, 31:17, 64:22, 64:25, 68:11, 100:1
**24th** [1] - 70:12
**25** [5] - 5:5, 9:10, 122:16, 134:25, 220:6
**250** [1] - 11:7
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**2608** [1] - 171:24
**27** [1] - 135:19
**27th** [3] - 202:6, 202:11, 204:20
**28** [4] - 4:3, 4:12, 4:14, 122:19
**28th** [2] - 247:9, 248:5
**29** [1] - 1:16
**29464** [3] - 4:4, 4:12, 4:15
**2:00** [3] - 125:1, 125:3, 125:21
**2:30** [1] - 182:17
**2nd** [1] - 169:12

## 3

**3** [12] - 38:12, 56:19, 59:14, 61:10, 61:11, 61:12, 72:4, 76:6, 76:13, 76:15, 76:17, 173:1
**3,000** [1] - 122:4
**3.2** [4] - 31:24, 40:9, 40:16, 84:10
**3.5** [1] - 129:5
**3.9** [1] - 27:23
**30** [5] - 116:4, 131:18, 138:16, 146:15, 220:5
**30s** [2] - 118:12,

158:12
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**32502** [1] - 2:11
**33** [1] - 142:19
**36** [1] - 47:16
**364** [1] - 131:16
**3688** [1] - 56:4
**37** [1] - 150:3
**3843** [1] - 5:14
**3:17-cv-01362** [2] -
    1:5, 248:17
**3:17-cv-01665** [2] -
    1:11, 248:17
**3:39** [1] - 182:22

## 4

**4** [11] - 60:1, 60:16,
    72:4, 92:5, 176:2,
    232:24, 233:4,
    233:16, 234:6
**4.2** [1] - 27:24
**4.6** [1] - 27:23
**4.8** [2] - 27:24, 67:19
**40** [11] - 93:9, 93:10,
    107:17, 110:11,
    117:1, 128:19,
    129:8, 158:15,
    167:4, 167:6, 167:10
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**41** [1] - 155:2
**43** [1] - 137:1
**462** [1] - 144:6
**47** [2] - 44:11, 44:20
**497** [1] - 28:8
**4:00** [1] - 202:16
**4:55** [1] - 235:10

## 5

**5** [8] - 26:4, 26:11,
    60:17, 60:22, 64:22,
    65:2, 80:19, 179:2
**5,000** [1] - 116:25
**5.1** [2] - 28:1, 130:11
**5.2** [3] - 27:24, 28:2,
    129:6
**5.4** [1] - 27:25
**5.7** [1] - 27:25
**50** [3] - 122:13, 180:6,
    197:20
**504** [1] - 62:4
**51** [1] - 122:19
**52** [1] - 220:14
**55** [2] - 120:18, 122:20
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5

**59** [1] - 50:13
**5:00** [3] - 229:23,
    230:8, 235:11
**5:17** [1] - 248:7

## 6

**6** [2] - 29:2, 44:21
**6.3** [3] - 28:1, 67:19
**6.4** [1] - 28:2
**6.5** [1] - 28:3
**600** [1] - 2:10
**602** [1] - 209:17
**63** [1] - 120:25
**65-year-old** [1] - 77:5
**65-year-olds** [1] - 77:4
**68** [1] - 121:2
**69** [2] - 117:10, 120:24
**6th** [1] - 3:5

## 7

**7** [2] - 31:17, 116:14
**70** [2] - 96:24, 121:2
**70130** [1] - 3:8
**707** [1] - 4:24
**70s** [1] - 118:11
**71** [2] - 143:19, 143:21
**716** [1] - 3:12
**725** [2] - 4:19, 4:21
**75-80** [1] - 127:14
**76** [3] - 52:20, 52:21,
    53:2
**762** [1] - 143:18,
    144:20
**77** [2] - 116:24, 120:21
**79.9** [1] - 62:7
**7:00** [1] - 119:17

## 8

**8** [5] - 50:13, 52:20,
    52:21, 53:2, 132:8
**8)(A)(i** [1] - 213:15
**8,000** [1] - 155:15
**8/03/2020** [1] - 69:25
**80** [1] - 129:23
**801** [1] - 3:10
**803(8** [3] - 22:25, 24:7,
    213:3
**803(8)** [2] - 22:12, 23:5
**803(8)(a)(3)** [1] - 24:18
**803(8)(A)(ii** [1] -
    204:24
**813** [1] - 80:20
**850** [1] - 5:12

## 9

**9** [6] - 38:11, 61:9,

66:13, 66:14,
    116:12, 180:24
**9.3** [2] - 25:8, 43:13
**90** [4] - 117:10, 129:8,
    129:9, 143:17
**901** [1] - 4:23
**90s** [2] - 153:18, 168:1
**91436** [1] - 3:16
**92** [2] - 123:2, 123:3
**95** [1] - 132:10
**97** [1] - 100:3
**99** [1] - 132:10
**9:00** [3] - 7:4, 247:9,
    248:5
**9th** [4] - 4:6, 44:14,
    50:15, 51:8

## A

**A-Plus** [1] - 208:25
**a.m** [3] - 7:5, 73:11,
    89:23
**abatement** [2] - 80:18,
    80:21, 83:22
**abbreviation** [1] - 38:2
**abide** [1] - 168:25
**ability** [3] - 68:3,
    118:19, 152:9
**able** [17] - 28:11, 82:4,
    82:6, 86:8, 111:22,
    118:23, 120:8,
    132:23, 155:24,
    160:20, 163:18,
    183:14, 185:17,
    219:12, 223:12,
    229:23
**ably** [1] - 85:5
**abrasions** [1] - 115:14
**abreast** [1] - 210:9
**abscess** [4] - 113:7,
    147:22, 147:23,
    148:7
**Absolutely** [2] -
    216:22, 221:18
**absolutely** [5] - 64:22,
    78:11, 84:22, 87:4,
    205:20
**abuse** [4] - 75:16,
    86:14, 166:9, 222:3
**Abuse** [4] - 11:22,
    11:24, 19:23, 174:23
**abused** [2] - 200:16,
    238:1
**Academic** [1] - 99:11
**academic** [8] - 8:13,
    9:5, 78:9, 79:23,
    82:25, 83:1, 89:4,
    108:5
**Academy** [5] - 9:15,
    97:25, 98:4, 99:8,

188:11
**academy** [2] - 98:5,
    188:2
**accept** [1] - 57:18
**accepted** [4] - 22:4,
    23:12, 75:18, 107:22
**access** [7] - 123:4,
    134:12, 139:9,
    142:12, 149:20,
    158:23, 159:2
**accidental** [1] - 147:2
**accomplished** [1] -
    78:21
**accomplishments** [1]
    - 9:6
**according** [4] - 42:23,
    43:2, 76:24, 77:5
**According** [1] - 234:6
**accordingly** [1] - 12:5
**account** [3] - 35:7,
    35:13, 63:3
**accounts** [1] - 67:23
**Accreditation** [1] -
    168:12
**accumulated** [1] -
    108:10
**accumulates** [1] -
    115:6
**accuracy** [1] - 25:11
**accurate** [2] - 90:10,
    178:10
**accurately** [2] - 26:11,
    31:19
**accustomed** [2] -
    177:14, 177:15
**achieve** [1] - 100:5
**Achievement** [1] -
    10:15
**Ackerman** [4] - 17:13,
    89:22, 89:24, 247:3
**ACKERMAN** [7] - 4:5,
    17:14, 85:17, 86:1,
    87:12, 87:15, 247:4
**acknowledge** [1] -
    12:3
**acknowledged** [1] -
    85:13
**acquire** [1] - 128:20
**acquired** [3] - 114:8,
    116:22, 117:6
**acquiring** [4] - 103:5,
    115:4, 116:7, 134:20
**acronym** [1] - 60:5
**act** [1] - 214:6
**Action** [4] - 1:4, 1:10,
    248:16, 248:17
**action** [3] - 196:2
**actionable** [3] - 41:16,
    50:5, 78:15
**actions** [2] - 80:18,

80:22
**active** [5] - 98:25,
    105:10, 143:11,
    151:25
**activities** [8] - 23:2,
    24:9, 211:25, 213:5,
    213:15, 213:23,
    213:25
**activity** [5] - 193:21,
    196:10, 196:13,
    214:7, 233:22
**actors** [1] - 49:17
**acts** [1] - 151:16
**actual** [7] - 8:13,
    20:20, 22:22, 54:5,
    58:5, 71:18, 243:7
**acute** [27] - 34:17,
    35:7, 35:14, 58:12,
    58:18, 59:6, 59:11,
    75:13, 127:10,
    129:2, 129:3,
    129:14, 129:21,
    129:23, 130:5,
    130:18, 130:24,
    131:16, 133:18,
    136:19, 136:22,
    138:22, 141:18,
    141:21, 163:3,
    165:12, 175:15
**Acute** [1] - 57:2
**acutely** [1] - 56:3
**adapt** [1] - 56:3
**add** [5] - 17:14, 82:10,
    84:24, 85:4, 213:14
**added** [2] - 123:22,
    123:24
**addicted** [7] - 196:19,
    196:21, 215:18,
    215:21, 216:5,
    216:7, 242:11
**addiction** [20] - 41:23,
    86:14, 97:10,
    102:25, 103:3,
    153:13, 156:5,
    179:18, 179:19,
    179:20, 181:3,
    196:22, 196:24,
    196:25, 198:9,
    198:24, 220:7,
    220:8, 224:1, 224:24
**adding** [1] - 123:23
**addition** [8] - 10:16,
    28:23, 80:23, 85:9,
    119:16, 123:9,
    152:16, 181:23
**additional** [5] - 30:11,
    95:8, 103:2, 120:1,
    131:1
**address** [19] - 14:4,
    41:23, 77:18, 80:25,
    175:11, 175:21,

175:22, 176:6,
181:5, 181:25,
194:2, 197:5,
200:15, 211:23,
215:9, 221:11,
224:23, 240:20,
241:22
**addresses** [1] -
101:12
**addressing** [2] - 80:9,
220:17
**adjourned** [1] - 248:5
**adjunct** [1] - 184:10
**adjust** [2] - 27:4, 27:6
**adjusted** [4] - 27:2,
71:12, 73:22
**adjusting** [1] - 71:10
**adjustment** [1] - 27:9
**adjustments** [1] -
27:16
**administered** [1] -
166:15
**administration** [3] -
18:16, 166:6, 187:17
**Administration** [3] -
48:7, 174:23, 188:22
**administratively** [1] -
190:17
**administrator** [2] -
9:21, 170:14
**admissibility** [1] -
85:23
**admission** [2] - 22:8,
213:1
**admit** [5] - 23:4,
212:19, 214:9,
214:12, 233:7
**admitted** [4] - 22:21,
24:8, 131:19, 233:13
**admitting** [1] - 24:7
**adopted** [3] - 20:9,
168:23, 169:7
**adult** [1] - 110:23
**adulterated** [2] -
177:6, 177:12
**adults** [3] - 57:4,
95:10, 223:24
**advance** [1] - 188:8
**advanced** [3] - 97:20,
188:14, 188:21
**advantage** [1] -
215:20
**advent** [1] - 174:14
**adverse** [1] - 16:5
**advice** [1] - 24:15
**advise** [1] - 215:11
**Advisers** [1] - 75:21
**Advisors** [14] - 17:10,
18:11, 18:14, 21:20,
24:10, 24:14, 25:3,

32:7, 37:23, 38:3,
57:22, 61:17, 62:5,
66:12
**affect** [2] - 27:8, 200:6
**affected** [8] - 27:12,
131:13, 131:21,
137:21, 137:23,
198:6, 224:18,
236:12
**affects** [3] - 57:3,
134:9, 134:17
**affiliation** [1] - 10:22
**affordability** [1] -
216:25
**afraid** [3] - 159:6,
159:7
**Aftercare** [1] - 105:21
**afternoon** [11] -
125:23, 125:24,
126:2, 126:3, 126:4,
157:23, 160:6,
185:22, 186:8,
201:7, 230:15
**age** [1] - 158:15
**agencies** [9] - 11:19,
19:5, 19:7, 19:9,
24:5, 25:19, 42:11,
63:4, 77:13
**agency** [1] - 11:21,
25:21, 200:22
**agenda** [1] - 95:19
**agent** [5] - 206:5,
226:5, 226:22,
227:1, 227:21
**agents** [2] - 176:9,
216:12
**Aging** [1] - 11:23
**ago** [9] - 53:7, 66:15,
101:12, 107:2,
154:14, 178:16,
183:20, 189:14,
239:10
**agree** [16] - 38:14,
40:6, 60:8, 60:11,
60:14, 60:15, 60:24,
61:7, 63:10, 76:9,
77:11, 170:2, 170:3,
239:19, 244:15,
244:18
**agreement** [2] - 96:18,
96:19
**ahead** [27] - 16:3,
18:6, 45:1, 45:14,
76:2, 90:11, 90:14,
102:3, 126:5,
145:24, 167:19,
170:9, 176:1,
178:23, 185:11,
185:15, 205:13,
205:22, 206:3,

210:6, 214:12,
230:8, 239:1,
239:18, 245:1,
245:18, 247:18
**aid** [3] - 89:12, 103:21,
160:14
**AIDS** [15] - 93:25,
94:5, 94:10, 94:13,
95:4, 95:5, 95:7,
95:23, 96:1, 96:10,
96:12, 96:14, 98:3,
100:23, 117:23
**ailment** [1] - 198:22
**air** [10] - 191:25,
194:13, 194:23,
195:1, 197:4, 197:6,
198:10, 240:1,
240:17, 240:20
**Airport** [1] - 238:4
**airport** [5] - 238:8,
238:12, 238:16,
238:20, 239:5
**al** [5] - 1:7, 1:13,
19:22, 248:15,
248:16
**alcohol** [1] - 176:8
**Alcohol** [2] - 11:22
**alignment** [1] - 223:10
**alive** [5] - 111:23,
150:11, 150:16,
152:17
**allegations** [1] - 39:6
**allegedly** [1] - 48:18
**Allergy** [1] - 93:23
**alley** [1] - 198:17
**allocate** [3] - 54:16,
54:17, 85:15
**allocation** [2] - 42:13,
85:6
**allow** [4] - 12:4,
167:18, 170:9,
211:22
**allowed** [3] - 81:14,
101:21, 221:10
**allows** [2] - 24:7,
214:24
**alluded** [1] - 165:3
**alluding** [1] - 63:8
**almost** [10] - 107:17,
116:21, 136:20,
142:8, 155:14,
155:15, 158:5,
177:5, 177:7, 225:7
**alone** [2] - 40:10, 57:4
**alongside** [2] - 223:6,
238:10
**alpha** [2] - 93:21,
93:25
**altered** [1] - 156:9
**alternative** [1] -

217:11
**alternatives** [2] -
219:13, 219:15
**amazing** [3] - 99:15,
117:2, 140:18
**America** [6] - 36:23,
56:17, 74:4, 74:6,
97:23, 181:11
**American** [6] - 10:6,
10:14, 92:20, 97:21,
97:25, 98:3
**Americans** [1] - 57:3
**AMERISOURCEBER
GEN** [1] - 1:7, 1:13
**AmerisourceBergen**
[3] - 6:2, 46:22,
248:15
**amount** [11] - 41:8,
42:23, 45:16, 45:17,
65:20, 66:1, 66:6,
67:16, 78:13,
114:23, 161:18
**amounts** [4] - 36:9,
41:3, 65:21, 195:17
**amputation** [2] -
148:17
**anal** [1] - 115:12
**analogous** [1] -
201:24
**analyses** [2] - 17:21,
15:20
**analysis** [32] - 13:24,
16:17, 17:7, 17:18,
20:8, 25:10, 28:14,
28:24, 35:13, 37:24,
38:5, 38:15, 40:22,
41:12, 42:6, 43:9,
43:24, 46:18, 49:19,
63:5, 64:11, 74:16,
79:2, 81:7, 81:8,
123:12, 190:11,
193:9, 193:10,
218:13, 219:17,
240:6
**Analysis** [1] - 38:12
**analyst** [1] - 193:12
**analytical** [1] - 193:12
**analyze** [3] - 193:14,
211:22, 215:5
**analyzing** [1] - 105:18
**ANDREW** [1] - 5:10
**anesthesia** [5] -
58:13, 58:25, 59:6,
59:12, 75:13
**Ann** [1] - 87:10
**Annals** [1] - 100:20
**ANNE** [1] - 4:2
**ANNIE** [1] - 4:11
**announcement** [1] -
223:22

**annual** [3] - 28:11,
57:9, 210:23
**answer** [29] - 35:15,
44:25, 50:24, 50:25,
51:7, 53:9, 53:12,
53:14, 61:15, 66:8,
107:25, 124:19,
156:25, 163:17,
163:19, 170:11,
170:21, 173:16,
173:20, 178:15,
184:3, 184:11,
204:10, 218:17,
227:2, 227:3,
241:10, 244:7,
246:13
**answered** [5] - 170:5,
228:1, 228:3,
238:23, 244:18
**answering** [2] -
173:14, 240:15
**ANTHONY** [1] - 2:6
**antianxiety** [1] - 176:8
**antibiotic** [1] - 93:20
**antibiotics** [1] - 142:6
**anticipate** [1] - 29:18
**anticipated** [2] -
164:6, 164:20
**anyway** [1] - 146:1
**apart** [1] - 133:11
**apologize** [3] - 52:9,
125:1, 163:21
**Appalachia** [11] -
122:10, 131:20,
135:16, 138:13,
176:10, 181:9,
190:6, 190:8,
222:10, 223:10
**Appalachian** [1] -
143:5
**appeal** [1] - 110:19
**appear** [2] - 100:18,
145:7
**APPEARANCES** [6] -
2:1, 3:1, 5:1, 5:6,
6:1, 6:10
**appeared** [1] - 88:4
**appetite** [2] - 196:18,
198:25
**applied** [4] - 23:21,
30:18, 43:15, 162:19
**applies** [1] - 82:20
**apply** [4] - 19:13,
38:22, 65:15, 84:2
**applying** [4] - 17:1,
19:1, 76:8, 91:11
**appointed** [1] - 32:7
**appointments** [1] -
153:4
**appreciate** [5] - 82:1,

183:22, 184:23, 227:19, 246:5
**appreciative** [1] - 10:11
**Approach** [1] - 15:17
**approach** [14] - 15:18, 20:5, 20:19, 20:22, 26:5, 55:18, 69:16, 89:15, 172:4, 181:5, 200:22, 210:25, 223:3, 232:1
**approaching** [1] - 121:2
**appropriate** [9] - 38:2, 48:22, 48:25, 84:2, 87:7, 165:5, 165:13, 165:15, 203:14
**appropriately** [2] - 110:21, 166:15
**appropriateness** [1] - 25:11
**approve** [2] - 25:16, 134:14
**approved** [1] - 35:17
**April** [1] - 156:9
**Arch** [2] - 6:6, 6:13
**area** [18] - 14:10, 27:14, 29:7, 101:14, 123:7, 123:8, 144:1, 153:2, 174:9, 190:10, 191:22, 192:16, 193:4, 197:9, 197:14, 199:25, 208:9, 216:16
**areas** [3] - 20:6, 103:24, 112:4
**arguably** [1] - 45:11
**argue** [1] - 60:18
**argument** [2] - 17:18, 170:13
**arguments** [1] - 22:15
**arises** [1] - 161:9
**arising** [3] - 26:13, 28:20, 30:5
**arrest** [1] - 226:16
**arrested** [3] - 231:12, 231:14, 231:15
**arrests** [1] - 222:24
**article** [11] - 74:5, 101:19, 101:22, 101:24, 171:23, 172:10, 172:12, 172:23, 175:25, 180:23, 181:1
**articles** [6] - 16:15, 16:17, 100:13, 100:18, 100:19, 107:8
**articulate** [1] - 71:16

**Ashley** [1] - 32:20
**ASHLEY** [1] - 5:3
**aside** [1] - 82:25
**aspect** [3] - 15:10, 149:12, 157:15
**aspects** [3] - 110:18, 156:9, 157:14
**assay** [1] - 118:19
**assess** [5] - 38:5, 38:16, 119:20, 168:16, 171:5
**Assessment** [4] - 211:4, 211:5, 211:12, 219:16
**assessment** [3] - 45:8, 76:9, 214:7
**Assessments** [10] - 210:23, 211:18, 212:9, 212:19, 213:25, 214:5, 214:15, 215:11, 215:14, 216:21
**assets** [1] - 200:21
**assign** [2] - 79:4, 208:4
**assigned** [4] - 37:17, 39:14, 200:23, 238:3
**assignments** [1] - 188:16
**assist** [6] - 12:22, 126:23, 127:4, 135:1, 139:18, 149:10
**assistance** [1] - 152:22
**assistant** [1] - 169:3
**Assistant** [1] - 25:21
**assisted** [1] - 154:25
**associate** [1] - 14:12
**associated** [32] - 15:10, 35:5, 46:20, 49:24, 57:10, 97:8, 101:2, 101:6, 103:8, 106:10, 106:16, 107:20, 108:16, 108:19, 109:18, 121:6, 124:10, 130:25, 131:21, 133:19, 133:22, 135:17, 137:2, 143:22, 144:11, 148:4, 154:16, 156:18, 161:14, 192:4, 194:24, 195:6
**associates** [1] - 233:25
**Association** [3] - 10:6, 98:1, 98:13
**association** [2] - 161:21, 223:9

**associations** [4] - 221:8, 221:10, 221:12, 221:15
**assume** [1] - 185:14
**AT** [1] - 1:2
**ATF** [1] - 188:23
**attached** [1] - 140:25
**attack** [2] - 78:17, 215:6
**attacked** [1] - 173:6
**attacking** [1] - 173:6
**attacks** [1] - 165:12
**attempt** [3] - 46:15, 46:19, 48:11
**attempting** [4] - 22:13, 83:6, 83:8
**attempts** [1] - 181:5
**attend** [1] - 188:17
**attended** [2] - 212:16, 225:1
**attention** [8] - 18:17, 38:21, 39:10, 172:9, 172:15, 172:25, 179:19, 219:6
**attitudes** [2] - 167:7, 167:11
**Attorney** [2] - 223:21, 232:15
**attributable** [7] - 45:18, 48:12, 49:16, 50:5, 54:14, 64:16, 84:20
**attributed** [1] - 26:21
**attributes** [1] - 65:10
**attribution** [2] - 63:20, 65:5
**audience** [1] - 100:25
**audio** [1] - 160:18
**August** [4] - 70:4, 70:12, 71:20, 71:21
**author** [1] - 211:14
**authored** [3] - 11:6, 219:20, 219:22
**authority** [2] - 21:23, 212:22
**authorized** [4] - 24:18, 213:12, 213:13, 214:20
**availability** [1] - 216:25
**available** [5] - 108:10, 120:14, 176:13, 182:3, 230:1
**Avenue** [2] - 158:5, 208:14
**avenue** [1] - 114:12
**average** [7] - 27:9, 27:13, 43:14, 120:17, 120:20, 120:21, 136:12

**Avilla** [1] - 247:20
**Avin** [1] - 3:7
**avoid** [4] - 39:20, 154:16, 155:25, 156:1
**avoided** [1] - 154:9
**award** [1] - 10:9
**Award** [1] - 10:15
**aware** [21] - 34:1, 34:8, 34:12, 34:16, 34:22, 35:4, 35:10, 35:15, 47:16, 47:23, 48:1, 53:20, 55:13, 55:16, 57:14, 144:14, 165:14, 165:19, 205:24, 209:7, 210:12
**aways** [1] - 215:12
**awful** [1] - 99:4
**axis** [2] - 99:12, 99:14
**Ayme** [2] - 6:17, 248:11
**AZT** [1] - 95:9

# B

**babies** [2] - 136:9, 173:4
**baby** [1] - 115:1
**Bachelor's** [1] - 90:24
**background** [6] - 8:22, 23:11, 90:19, 108:9, 114:20, 121:18
**backward** [1] - 41:12
**bacteria** [10] - 113:13, 140:8, 140:9, 140:25, 146:20, 146:22, 146:24, 147:3, 147:16
**bacterial** [9] - 108:20, 112:8, 113:2, 113:5, 139:15, 147:5, 147:13, 147:16, 148:4
**bad** [5] - 134:11, 134:15, 146:21, 153:10, 158:11
**badly** [1] - 159:8
**bag** [2] - 216:10, 216:11
**balances** [1] - 206:23
**balancing** [2] - 45:7, 83:18
**balled** [1] - 127:23
**Baltimore** [1] - 96:17
**Baron** [1] - 3:14
**barrier** [2] - 157:24, 158:21
**barriers** [2] - 156:17,

156:24
**baseball** [1] - 245:23
**based** [21] - 13:13, 23:10, 23:11, 25:18, 25:20, 28:9, 28:14, 42:15, 43:6, 43:9, 44:3, 46:15, 48:17, 49:19, 63:3, 64:15, 69:13, 108:13, 117:20, 172:18
**Based** [1] - 210:14
**baseline** [1] - 111:2
**basic** [2] - 92:17, 203:19
**basis** [15] - 22:21, 23:17, 24:7, 30:16, 35:2, 37:1, 37:10, 45:25, 50:22, 78:14, 83:21, 85:7, 148:11, 172:2, 205:8
**Bates** [1] - 144:3
**batteries** [1] - 160:14
**Baylen** [1] - 2:11
**bear** [1] - 52:7
**bearing** [1] - 53:1
**beast** [1] - 181:10
**became** [9] - 191:23, 194:9, 194:10, 235:4, 236:7, 236:15, 236:19, 240:12, 241:9
**become** [7] - 151:14, 163:4, 187:19, 199:8, 210:12, 216:24, 241:17
**BEFORE** [1] - 1:17
**beforehand** [1] - 125:20
**beg** [1] - 245:9
**begin** [3] - 18:14, 105:25, 182:1
**Beginning** [1] - 233:17
**beginning** [2] - 10:24, 216:2
**begins** [2] - 14:24, 24:3
**behalf** [1] - 185:16
**behave** [1] - 153:14
**Behavioral** [1] - 89:8
**behavioral** [1] - 102:24
**behaviors** [2] - 149:5, 161:20
**behind** [1] - 181:7
**behooves** [1] - 181:13
**beings** [2] - 54:5, 54:6
**belaboring** [1] - 11:1
**belief** [1] - 36:10
**belly** [1] - 181:10

**below** [5] - 109:22, 109:23, 118:19, 130:23, 137:15
**BENCH** [1] - 1:16
**bench** [5] - 81:23, 82:8, 82:16, 82:21, 247:5
**beneficial** [1] - 75:15
**benefit** [7] - 54:5, 54:6, 63:4, 82:7, 85:9, 85:11, 154:10
**benefits** [20] - 33:7, 33:12, 35:5, 35:7, 35:12, 35:13, 35:21, 36:3, 36:10, 53:23, 54:8, 54:9, 74:12, 74:24, 79:3, 79:4, 79:7, 79:8, 79:15, 157:25
**Berkeley** [1] - 91:12
**best** [6] - 19:25, 53:10, 77:22, 205:7, 229:24, 246:18
**better** [7] - 118:6, 154:23, 157:17, 158:17, 160:12, 160:13, 160:17
**between** [19] - 9:4, 12:11, 29:14, 31:21, 40:17, 40:25, 44:5, 50:17, 52:16, 67:22, 115:12, 123:20, 124:8, 129:5, 132:10, 139:5, 158:14, 236:2
**beverages** [1] - 197:22
**beyond** [5] - 51:3, 74:21, 74:25, 79:21, 167:15
**bias** [1] - 61:4
**Biden** [1] - 125:7
**big** [10] - 13:11, 75:5, 95:22, 95:24, 116:4, 121:21, 121:22, 122:2, 151:15, 199:20
**bigger** [1] - 67:12
**biggest** [2] - 14:22, 158:24
**bill** [1] - 185:5
**billion** [11] - 19:14, 28:18, 28:20, 31:24, 40:9, 40:16, 57:11, 62:4, 62:7, 62:9, 84:10
**Bills** [1] - 233:19
**Birnbaum** [2] - 61:22, 62:9
**birth** [2] - 136:9,

151:11
**birthday** [1] - 246:12
**bit** [20] - 8:5, 8:21, 11:15, 16:3, 43:12, 52:23, 90:18, 106:22, 110:8, 112:10, 119:7, 125:19, 140:22, 145:1, 188:10, 195:10, 217:7, 221:4, 223:19, 223:23
**black** [5] - 237:15, 237:18, 239:23, 240:11, 241:7
**blessed** [1] - 224:14
**blessedly** [1] - 116:25
**blindness** [1] - 95:5
**block** [1] - 174:25
**blocks** [1] - 22:25
**blood** [24] - 110:25, 112:13, 112:19, 112:22, 112:24, 113:6, 114:4, 114:14, 114:23, 118:20, 126:18, 126:19, 128:10, 128:11, 135:10, 137:16, 139:23, 140:2, 140:20, 141:9, 141:11, 141:14, 146:21, 147:3
**blood-borne** [2] - 112:13, 112:22
**bloodborne** [1] - 159:19
**bloodstream** [4] - 140:17, 146:23, 146:24, 147:17
**blow** [1] - 21:13
**blue** [2] - 19:6, 186:21
**Bluefield** [2] - 99:24, 104:5
**Blvd** [3] - 4:3, 4:12, 4:14
**board** [7] - 92:7, 92:11, 92:23, 93:6, 98:8, 98:9, 180:18
**Board** [3] - 92:13, 92:20, 190:7
**boards** [5] - 92:20, 97:24, 102:13, 190:5
**bodies** [3] - 168:14, 171:4, 177:14
**body** [9] - 9:20, 112:20, 114:22, 115:15, 119:1, 126:16, 141:14, 174:12, 216:8

**body's** [1] - 127:17
**Bonasso** [1] - 5:14
**bone** [2] - 113:7, 147:21
**book** [2] - 108:7, 109:1
**books** [1] - 11:6
**Boone** [1] - 104:7
**Booth** [2] - 232:14, 233:19
**boots** [1] - 226:15
**boots-on-the-grounds** [1] - 226:15
**border** [1] - 104:3
**born** [3] - 136:8, 137:11, 189:13
**borne** [3] - 65:24, 112:13, 112:22
**Boston** [1] - 9:8
**bottom** [14] - 56:20, 58:6, 60:9, 60:22, 66:14, 84:6, 104:2, 119:18, 133:17, 138:7, 139:2, 178:6, 179:23
**Boulevard** [1] - 3:15
**bounds** [1] - 137:25
**box** [3] - 204:2, 204:5, 220:23
**Box** [2] - 5:14, 6:8
**BP** [1] - 86:11
**brain** [5] - 113:7, 147:23, 148:1, 150:13, 158:8
**break** [15] - 58:16, 73:5, 89:22, 124:16, 125:6, 126:7, 164:5, 182:17, 182:18, 199:6, 229:25, 235:7, 236:2, 236:3, 245:11
**break-ins** [1] - 199:6
**breast** [2] - 114:25, 115:1
**breathing** [2] - 111:23, 150:20
**Bridgeside** [3] - 4:3, 4:12, 4:14
**brief** [6] - 51:23, 147:7, 167:17, 236:1, 236:21, 236:23
**briefed** [3] - 201:18, 226:17, 229:3
**briefly** [9] - 57:21, 61:19, 85:17, 112:7, 114:18, 150:1, 174:1, 194:10, 245:9
**bring** [7] - 21:6, 29:2, 75:8, 149:16, 157:6,

245:10
**bringing** [2] - 234:8, 234:15
**broad** [1] - 204:9
**broaden** [1] - 99:12
**broadened** [1] - 99:14
**broader** [1] - 179:15
**broadest** [1] - 149:8
**broadly** [1] - 112:8
**brought** [8] - 110:9, 221:9, 231:2, 234:21, 241:22, 242:4, 242:20, 243:6
**brush** [1] - 146:22
**bucket** [2] - 163:8, 164:2
**Budd** [1] - 3:14
**budget** [1] - 183:10
**bulky** [1] - 139:25
**bunch** [1] - 23:16
**Buprenorphine** [1] - 105:25
**burden** [1] - 129:25
**Burden** [1] - 19:22
**burdened** [1] - 57:4
**Bureau** [4] - 107:11, 117:14, 123:10, 124:7
**bureaus** [2] - 192:7, 192:13
**Burke** [2] - 233:24, 234:7
**Burling** [1] - 5:11
**business** [3] - 187:17, 211:19, 230:4
**butcher** [1] - 74:2
**buy** [3] - 181:17, 198:16, 198:17
**BY** [84] - 11:13, 12:17, 13:9, 18:8, 19:19, 21:1, 21:8, 21:15, 23:7, 25:1, 26:9, 30:2, 31:16, 32:17, 44:12, 45:15, 50:14, 51:20, 52:22, 54:12, 55:20, 68:18, 69:21, 73:19, 75:6, 76:4, 88:19, 90:16, 90:21, 92:6, 97:16, 98:21, 102:4, 104:24, 106:21, 109:9, 112:2, 113:19, 115:21, 119:6, 121:7, 126:6, 130:15, 131:10, 133:3, 135:20, 138:17, 142:20, 145:25, 150:4, 155:4, 160:5, 163:15, 163:20,

167:24, 170:1, 170:10, 170:22, 171:14, 172:8, 178:25, 183:3, 186:7, 205:23, 206:17, 210:7, 211:2, 214:14, 217:20, 218:1, 218:18, 225:21, 228:4, 230:14, 230:18, 232:2, 233:15, 235:25, 237:20, 239:3, 239:21, 240:25, 244:13, 245:21

### C

**CA** [1] - 3:16
**Cabell** [89] - 3:2, 14:10, 15:1, 17:2, 17:12, 17:24, 19:1, 22:17, 26:13, 26:18, 27:2, 27:9, 28:15, 28:21, 30:4, 30:19, 30:24, 31:10, 31:20, 33:8, 36:1, 36:8, 37:19, 40:15, 41:4, 41:9, 41:15, 41:24, 42:3, 43:11, 44:4, 47:7, 47:18, 47:25, 48:19, 48:23, 49:4, 49:17, 49:20, 49:21, 66:6, 80:13, 107:15, 115:24, 117:9, 119:8, 120:22, 121:3, 121:8, 121:11, 122:22, 123:18, 129:11, 130:2, 130:5, 130:6, 130:7, 130:9, 130:12, 130:17, 130:19, 130:20, 131:12, 133:5, 133:14, 136:16, 136:18, 136:24, 138:19, 138:22, 138:24, 138:25, 139:6, 139:9, 142:24, 144:14, 144:23, 147:14, 155:7, 155:9, 156:2, 156:14, 156:18, 156:23, 157:5, 159:18, 184:2, 184:11, 202:7
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington** [12] - 14:10, 15:1, 19:1, 30:19, 31:20,

130:7, 130:17, 130:20, 138:19, 139:9, 142:24, 155:9
**cabinet** [4] - 163:12, 243:22, 244:4, 244:16
**cabinets** [1] - 199:7
**calculate** [19] - 17:12, 23:18, 28:11, 30:3, 30:24, 31:4, 41:15, 45:17, 46:15, 46:20, 48:11, 48:17, 48:24, 49:15, 54:5, 54:7, 54:9, 54:13, 84:20
**calculated** [6] - 28:4, 42:2, 43:6, 44:3, 68:20, 68:21
**calculating** [6] - 17:16, 46:19, 48:10, 49:14, 78:12, 78:15
**calculation** [8] - 42:7, 43:5, 44:6, 46:14, 46:24, 48:21, 51:3, 78:10
**calculations** [10] - 17:17, 23:9, 26:11, 45:10, 57:12, 57:14, 64:17, 68:24, 69:2, 73:21
**calculus** [1] - 91:13
**California** [1] - 91:12
**CALLAS** [2] - 6:7, 73:14
**Callas** [2] - 73:13, 202:21
**CAMC** [2] - 144:4, 144:5
**CAMPBELL** [1] - 6:14
**cancer** [1] - 128:4
**cancers** [1] - 94:13
**cannot** [3] - 179:3, 179:6, 209:16
**capable** [1] - 120:9
**capacity** [2] - 142:15, 208:7
**Capitol** [1] - 2:7
**carcinoma** [2] - 128:4, 137:17
**card** [1] - 197:18
**cardiac** [5] - 141:23, 142:4, 142:12, 146:14, 146:16
**Cardinal** [6] - 4:16, 5:2, 32:20, 47:3, 160:8, 245:4
**cardiovascular** [1] - 111:1
**cards** [1] - 197:19
**care** [22] - 34:23, 35:8, 35:14, 37:6, 37:7,

98:17, 104:17, 117:23, 125:2, 151:6, 151:12, 151:22, 158:9, 158:19, 158:20, 158:25, 159:2, 165:13, 230:4, 239:14, 240:10, 241:7
**cared** [1] - 186:22
**career** [11] - 9:22, 11:9, 11:14, 34:14, 132:25, 188:12, 191:1, 225:4, 225:7, 226:2
**careful** [1] - 11:10
**Carey** [1] - 4:23
**Carolina** [8] - 186:12, 189:5, 189:13, 191:8, 225:10, 230:4, 246:5, 246:24
**carry** [1] - 214:20
**carrying** [1] - 212:12
**cars** [1] - 194:14
**cartels** [1] - 49:11
**case** [53] - 12:11, 12:19, 13:13, 16:18, 17:23, 22:22, 29:11, 31:18, 31:20, 33:19, 41:6, 45:7, 48:2, 48:3, 64:7, 69:12, 69:13, 73:25, 77:14, 78:8, 78:19, 78:22, 80:6, 80:24, 81:19, 85:1, 85:3, 101:21, 106:23, 108:23, 131:17, 153:13, 167:22, 169:12, 177:10, 183:5, 202:15, 203:2, 203:3, 205:1, 206:5, 206:6, 226:5, 226:22, 227:1, 227:21, 228:5, 232:18, 240:24, 242:8, 247:9, 247:11
**cases** [37] - 29:4, 30:12, 44:9, 64:14, 72:13, 81:23, 82:12, 85:1, 111:21, 113:12, 116:21, 116:25, 117:10, 117:11, 120:21, 121:3, 121:5, 121:13, 136:15, 136:25, 137:1, 140:25, 143:13, 143:17, 143:18, 143:21, 144:5, 144:6, 144:8,

144:14, 144:20, 146:18, 206:12, 206:13, 206:15, 243:6
**catchup** [1] - 181:6
**categories** [2] - 113:1, 149:25
**category** [1] - 43:21
**catered** [1] - 197:16
**caught** [1] - 122:1
**caused** [6] - 17:16, 18:21, 46:2, 65:21, 114:4, 128:8
**causes** [5] - 95:4, 126:13, 127:11, 135:6, 145:2
**CDC** [12] - 19:21, 19:22, 105:23, 122:1, 123:19, 123:20, 131:14, 131:23, 135:16, 138:2, 138:7, 143:13
**CDC's** [1] - 156:7
**CEA** [30] - 18:19, 18:20, 18:24, 19:11, 20:1, 20:9, 20:12, 20:16, 20:20, 21:5, 23:10, 23:21, 24:4, 25:15, 25:24, 38:1, 38:12, 38:14, 40:2, 62:23, 66:15, 67:4, 67:13, 67:15, 67:18, 75:8, 76:8, 76:18, 76:20, 77:11
**CEA's** [1] - 76:9
**cell** [1] - 160:18
**cells** [2] - 135:8, 141:11
**cellulites** [1] - 148:6
**Center** [3] - 3:12, 5:11, 91:19
**center** [2] - 142:9, 222:15
**centered** [1] - 138:13
**centers** [2] - 143:11, 153:2
**central** [5] - 25:8, 135:15, 176:9, 176:10, 181:9
**Central** [4] - 122:10, 131:20, 138:13
**cents** [1] - 197:20
**century** [1] - 174:2
**certain** [5] - 29:7, 78:10, 103:12, 153:15, 161:9
**certainly** [18] - 20:15, 22:20, 24:9, 24:17, 82:1, 93:3, 119:22, 121:12, 135:13,

152:18, 160:17, 161:7, 162:17, 163:21, 165:2, 167:21, 169:8, 206:14
**Certainly** [1] - 53:12
**certainty** [1] - 32:3
**certificate** [2] - 59:22, 64:9
**certification** [2] - 93:7, 103:3
**CERTIFICATION** [1] - 248:10
**certifications** [2] - 92:7, 92:11
**certified** [2] - 170:12, 170:17
**certify** [1] - 248:13
**Chair** [9] - 89:10, 95:21, 95:22, 96:2, 98:8, 98:11, 98:12
**challenge** [5] - 78:6, 78:20, 78:24, 79:5, 191:24
**challenges** [3] - 187:22, 191:24, 225:14
**challenging** [2] - 58:23, 81:11
**chance** [4] - 62:16, 67:1, 115:4, 203:15
**change** [15] - 69:5, 70:18, 70:21, 71:6, 71:9, 71:18, 71:22, 71:24, 73:22, 117:8, 119:24, 147:4, 167:8, 167:12, 197:4
**changed** [2] - 72:16, 199:22
**changes** [11] - 27:7, 69:6, 69:13, 70:16, 71:23, 72:5, 72:6, 72:9, 73:24, 89:25, 90:7
**chapter** [3] - 108:7, 108:8, 109:1
**characteristics** [5] - 122:3, 122:6, 122:25, 123:10, 123:24
**characterization** [1] - 40:6
**characterize** [1] - 90:7
**characterized** [1] - 239:20
**charge** [4] - 23:3, 24:13, 96:7, 190:17
**CHARLES** [1] - 3:11
**Charles** [1] - 233:24
**CHARLESTON** [2] -

1:2, 1:18
**Charleston** [9] - 2:8, 3:13, 4:24, 5:15, 6:9, 7:4, 142:16, 144:1, 156:11
**Charlotte** [8] - 188:11, 188:25, 189:2, 189:5, 225:11, 237:22, 238:1, 238:4
**Chase** [1] - 4:23
**chasing** [1] - 174:11
**cheap** [1] - 176:13
**cheaper** [2] - 219:13, 219:14
**check** [1] - 103:14
**checked** [1] - 22:24
**checks** [1] - 206:23
**chemistry** [1] - 91:13
**Chesterbrook** [1] - 6:15
**CHHD** [2] - 130:20, 138:21
**chic** [1] - 173:3
**Chicago** [4] - 90:25, 91:4, 91:15, 91:19
**chief** [2] - 235:20, 236:7, 236:15, 237:2, 237:21, 239:4, 241:1, 241:17, 244:2
**Chief** [89] - 125:12, 186:8, 187:19, 189:23, 189:24, 190:1, 190:14, 191:7, 191:9, 191:16, 191:21, 191:23, 192:10, 192:12, 192:15, 192:19, 193:19, 194:7, 194:9, 194:11, 196:9, 199:24, 201:9, 201:11, 201:13, 201:16, 201:22, 201:25, 202:23, 203:20, 204:6, 205:4, 205:24, 206:9, 206:18, 207:18, 209:7, 210:8, 210:13, 211:3, 214:15, 216:15, 217:13, 217:21, 222:19, 224:6, 224:7, 224:17, 225:8, 225:17, 225:22, 225:24, 225:25, 226:3, 226:6, 228:16, 228:23, 229:2, 229:19,

229:23, 230:15,
230:23, 231:11,
232:3, 232:24,
232:25, 233:16,
234:19, 235:1,
235:4, 235:15,
236:1, 236:4,
236:15, 236:19,
240:10, 241:11,
242:13, 244:20,
245:2, 245:22,
246:4, 246:19
**Chief's** [2] - 240:24,
244:11
**child** [1] - 94:23
**children** [8] - 95:9,
95:12, 154:2,
158:16, 189:12,
189:16, 225:1, 225:2
**choice** [6] - 126:15,
153:15, 200:15,
200:16, 240:13,
241:9
**chose** [2] - 25:18,
189:18
**Christenson** [1] -
247:5
**CHRISTENSON** [4] -
247:14, 247:16,
247:19, 247:24
**chronic** [23] - 57:2,
57:4, 57:10, 74:3,
99:12, 100:2,
110:24, 127:10,
127:11, 127:15,
128:2, 129:24,
129:25, 134:4,
136:13, 136:14,
136:23, 137:19,
141:19, 141:20,
150:12, 158:8
**chronically** [1] - 106:4
**chronicity** [1] - 127:16
**chunk** [1] - 148:1
**cigarettes** [1] - 197:21
**Cincinnati** [10] - 96:5,
96:8, 96:17, 96:23,
97:2, 104:22,
142:25, 143:4,
143:7, 152:25
**circulate** [1] - 13:5
**circumstances** [2] -
52:17, 162:12
**Cirrhosis** [5] - 127:22,
127:25, 134:11,
137:17
**citation** [2] - 56:20,
119:18
**cite** [1] - 57:16
**cities** [3] - 142:17,

221:8, 231:19
**citizens** [6] - 191:20,
200:6, 212:16,
215:21, 221:16,
221:22
**city** [11] - 40:21,
191:25, 192:17,
194:11, 195:7,
198:5, 212:17,
224:3, 225:11,
230:24, 241:21
**City** [32] - 4:1, 5:11,
17:24, 22:17, 33:8,
36:2, 36:8, 37:20,
40:16, 41:4, 41:15,
41:24, 42:4, 43:11,
44:5, 47:7, 47:18,
49:4, 49:21, 80:14,
121:9, 155:23,
195:4, 208:13,
219:23, 222:19,
224:3, 236:5, 237:3,
241:18, 245:16,
248:14
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 248:16,
248:17
**civil** [1] - 1:10
**civilization** [1] - 90:25
**claim** [5] - 13:20,
80:20, 80:25, 86:4,
229:12
**claiming** [1] - 51:6
**claims** [2] - 80:15,
80:17
**class** [2] - 118:2,
145:2
**classroom** [1] -
188:21
**clean** [3] - 112:17,
140:16, 153:15
**clear** [22] - 24:6,
24:20, 30:20, 42:8,
45:12, 64:2, 64:3,
64:22, 64:24, 65:13,
74:23, 79:12, 84:19,
120:15, 127:12,
162:20, 165:3,
175:17, 194:12,
196:24, 209:14,
229:14
**clearly** [8] - 127:1,
133:19, 144:21,
150:10, 155:14,
156:21, 167:9, 209:7
**clerk** [6] - 7:10, 88:10,
182:23, 184:25,
185:1, 235:13
**CLERK** [11] - 7:11,
7:13, 7:16, 20:25,

69:20, 88:11, 88:13,
88:15, 186:1, 186:3,
186:5
**Cleveland** [1] - 177:9
**client** [1] - 155:15
**clients** [1] - 157:6
**Cliff** [1] - 94:1
**clinic** [1] - 169:2
**clinical** [3] - 36:7,
58:22, 94:9
**Clinical** [2] - 95:23,
100:23
**clinically** [1] - 140:3
**clinician** [1] - 35:3
**clinicians** [1] - 98:6
**clip** [2] - 228:15, 229:6
**close** [3] - 67:7, 140:1,
170:8
**closed** [3] - 185:8,
185:12, 235:12
**closer** [1] - 154:13
**closure** [2] - 156:10,
156:13
**cluster** [1] - 236:24
**co** [3] - 134:1, 134:2,
229:17
**co-counsel** [1] -
229:17
**co-infected** [2] -
134:1, 134:2
**coach** [1] - 245:23
**coalfield** [2] - 105:20,
122:23
**coalfields** [3] - 104:1,
133:14, 158:23
**cocaine** [26] - 174:15,
176:15, 177:11,
177:24, 180:11,
195:2, 195:3,
195:21, 196:3,
197:2, 197:9,
197:23, 232:19,
234:9, 235:4, 236:4,
236:8, 236:9,
236:12, 238:10,
238:14, 239:8,
240:2, 241:23,
241:25, 242:16
**Cochran** [3] - 6:17,
248:11, 248:20
**coinfection** [2] -
134:14, 134:18
**collaborate** [1] -
192:12
**collaborative** [1] -
223:3
**collaborators** [1] -
94:1
**collar** [1] - 186:21
**colleague** [2] - 87:21,

202:21
**collected** [1] - 143:15
**collectively** [1] -
221:11
**College** [2] - 91:16,
97:21
**college** [6] - 8:24,
91:10, 91:14,
102:17, 187:1, 187:2
**color** [4] - 124:2,
133:12, 138:10,
198:8
**Columbia** [4] - 186:12,
191:8, 225:11, 230:4
**Columbus** [1] -
231:20
**column** [4] - 17:6,
62:2, 67:8, 71:21
**columns** [1] - 66:20
**combat** [7] - 200:10,
207:4, 207:5, 209:9,
222:23, 223:1,
223:16
**combating** [3] - 175:7,
179:3, 221:19
**combination** [3] -
132:7, 132:9, 134:3
**combined** [4] - 40:11,
82:16, 176:7, 176:14
**coming** [9] - 104:10,
114:16, 155:15,
155:16, 220:18,
220:19, 237:21,
246:5
**command** [1] - 94:2
**commemorates** [1] -
125:16
**commemorating** [1] -
125:19
**commendation** [1] -
232:24
**commending** [1] -
232:16
**comment** [1] - 40:5
**comments** [1] - 125:9
**commercial** [1] -
65:23
**commission** [1] -
185:13
**COMMISSION** [1] -
1:10
**Commission** [4] - 2:2,
3:2, 80:14, 168:11
**commissioned** [1] -
21:21
**commissioning** [1] -
18:18
**commitment** [1] -
179:13
**Committee** [1] - 96:3

**committees** [4] -
95:22, 95:24, 98:23,
99:4
**common** [15] - 83:5,
87:3, 95:3, 113:3,
115:17, 126:19,
134:3, 134:4,
134:19, 140:7,
140:9, 148:3,
148:12, 155:19
**commonly** [1] - 32:6
**communicate** [1] -
215:13
**communicating** [2] -
207:19, 220:4
**communities** [9] -
103:20, 104:11,
104:21, 149:10,
156:18, 156:23,
157:25, 181:3
**community** [65] -
14:19, 16:1, 19:2,
31:20, 83:12, 83:13,
84:11, 86:4, 86:12,
106:3, 107:22,
107:23, 111:13,
111:14, 121:23,
150:8, 150:25,
151:21, 152:3,
154:1, 167:25,
169:8, 170:4,
186:21, 192:4,
192:21, 193:21,
194:5, 195:24,
196:6, 196:22,
199:9, 199:25,
200:5, 200:11,
207:8, 207:19,
209:8, 210:10,
210:13, 210:15,
215:8, 215:10,
215:25, 216:25,
217:5, 217:16,
218:4, 218:20,
220:17, 220:18,
221:17, 221:20,
222:6, 223:1,
223:17, 224:9,
234:17, 234:21,
237:7, 239:16,
242:11, 242:12
**community's** [1] -
216:19
**companies** [1] - 8:12
**compare** [1] - 30:14
**compared** [4] - 27:3,
27:9, 133:6, 198:2
**comparison** [4] -
121:10, 124:6,
133:5, 197:8

**compensatory** [1] - 80:22

**compile** [1] - 28:12

**complete** [3] - 78:5, 141:17, 163:18

**completed** [5] - 24:16, 91:6, 105:18, 132:5, 151:23

**completely** [6] - 81:12, 178:9, 185:7, 208:22, 209:5, 244:22

**completing** [1] - 93:17

**complex** [5] - 104:18, 109:20, 177:3, 178:4, 178:5

**complicate** [1] - 96:1

**complicated** [1] - 174:20

**complication** [1] - 102:8

**complications** [5] - 94:14, 97:3, 101:7, 103:19, 156:1

**component** [5] - 42:9, 45:5, 45:9, 83:17

**comport** [1] - 222:5

**comprehensive** [2] - 20:5, 77:12

**comprised** [2] - 11:18, 220:24

**computer** [1] - 6:19

**conceivably** [1] - 159:12

**concentration** [1] - 174:12

**concept** [4] - 23:23, 138:10, 168:7, 168:10

**concern** [6] - 61:2, 61:7, 101:1, 112:6, 156:12, 166:23

**concerned** [5] - 20:3, 20:4, 76:20, 76:21, 132:24

**concerning** [2] - 101:22, 106:25

**concerns** [5] - 61:8, 101:8, 101:10, 119:21, 119:22

**concerted** [1] - 158:4

**concluded** [1] - 229:6

**conclusion** [1] - 179:22

**conclusions** [1] - 108:12

**concordance** [1] - 124:8

**concordant** [2] - 123:23, 133:9

**concorded** [1] - 124:13

**condition** [1] - 30:11

**conditionally** [2] - 214:9, 214:12

**conditions** [1] - 110:24

**condone** [1] - 149:6

**conduct** [14] - 8:20, 11:8, 25:10, 41:16, 50:6, 78:12, 78:16, 79:25, 84:21, 84:22, 84:24, 86:23, 86:24

**conducted** [3] - 18:24, 36:23, 95:11

**conducting** [6] - 25:20, 207:10, 214:7, 226:15, 226:21, 226:23

**conducts** [1] - 20:8

**confer** [2] - 182:8, 229:16

**confidential** [1] - 192:25

**confined** [1] - 160:23

**confirm** [2] - 38:9, 117:13

**confirmation** [1] - 117:17

**confirmed** [1] - 78:6

**confounding** [1] - 61:4

**confused** [1] - 171:13

**Congress** [6] - 9:25, 36:22, 96:11, 98:15, 174:22, 176:5

**Congress"** [1] - 176:2

**connected** [3] - 52:21, 240:8

**connection** [5] - 101:13, 101:20, 162:5, 181:12, 224:19

**connections** [1] - 152:24

**Connolly** [2] - 4:18, 5:4

**connotation** [1] - 165:10

**CONROY** [1] - 3:3

**consensus** [1] - 60:13

**consequence** [2] - 143:25, 161:9

**consequences** [5] - 16:5, 109:17, 160:24, 219:8, 223:25

**Conservative** [1] - 15:17

**conservative** [1] -

15:19

**consider** [8] - 63:23, 64:4, 81:9, 195:19, 205:14, 209:23, 214:11, 225:4

**considered** [1] - 122:8

**considering** [1] - 119:22

**consistent** [8] - 21:20, 24:4, 75:9, 82:11, 217:4, 222:5, 222:18, 229:7

**constant** [1] - 242:1

**constitute** [1] - 94:13

**constitutionally** [1] - 191:18

**consultant** [1] - 143:1

**consultation** [1] - 100:1

**consumer** [1] - 27:7

**contact** [3] - 126:18, 128:9, 135:10

**contacts** [1] - 192:24

**contagious** [5] - 111:5, 115:8, 115:10, 115:16, 128:18

**contained** [1] - 34:20

**contains** [1] - 119:13

**contaminated** [2] - 135:12, 177:12

**context** [7] - 82:15, 114:20, 161:19, 161:23, 166:20, 179:10, 241:1

**continue** [7] - 95:13, 104:1, 139:7, 163:4, 198:25, 233:16, 240:22

**Continued** [3] - 3:1, 5:1, 5:6, 6:1, 6:10

**continued** [8] - 95:14, 116:10, 129:9, 132:1, 175:13, 199:17, 220:9, 240:20

**continues** [1] - 139:11

**contract** [3] - 135:12, 135:22, 183:13

**contracting** [3] - 103:9, 115:2, 128:17

**contributed** [1] - 107:2

**contribution** [3] - 43:16, 43:17, 44:7

**Control** [2] - 36:14, 36:21

**control** [6] - 61:4, 110:15, 139:23, 141:21, 151:11,

244:19

**controlled** [1] - 233:23

**convenience** [1] - 197:16

**conventional** [5] - 19:4, 63:3, 76:9, 76:10, 77:11

**conversations** [3] - 170:15, 184:4, 205:6

**convince** [1] - 157:3

**convinced** [1] - 96:25

**Cook** [3] - 6:18, 248:12, 248:20

**cooperating** [1] - 234:7

**coordinated** [1] - 158:4

**copies** [1] - 13:5

**copy** [5] - 20:20, 20:24, 69:19, 89:19, 119:16

**core** [1] - 68:20

**Corey** [1] - 33:16

**corner** [7] - 58:6, 158:11, 194:14, 194:20, 197:13, 198:16, 233:1

**Corporal** [1] - 233:19

**Corporation** [3] - 6:2, 93:19, 248:16

**cORPORATION** [2] - 1:7, 1:13

**Correct** [2] - 86:20, 234:22

**correct** [202] - 12:19, 13:20, 14:1, 21:17, 30:21, 30:25, 31:5, 32:25, 33:9, 33:10, 33:13, 36:11, 37:3, 37:11, 37:12, 37:15, 37:21, 37:24, 38:6, 38:16, 38:24, 39:5, 39:17, 39:18, 40:9, 40:12, 40:13, 40:18, 40:19, 40:22, 41:2, 41:6, 41:7, 41:12, 42:1, 42:4, 42:5, 42:7, 44:6, 44:24, 45:20, 46:3, 46:9, 46:18, 46:23, 47:1, 47:4, 47:8, 47:22, 48:4, 48:16, 48:20, 48:25, 49:1, 49:5, 49:18, 50:2, 50:6, 51:4, 51:9, 51:11, 53:9, 53:11, 53:13, 55:2, 59:3, 61:12, 61:17, 61:20, 62:7, 62:10, 63:11, 64:5, 64:18, 64:19, 65:6,

65:11, 65:12, 65:17, 65:20, 66:20, 66:24, 67:3, 67:5, 67:6, 67:13, 67:19, 67:24, 67:25, 68:25, 69:6, 69:8, 70:4, 70:5, 70:7, 71:25, 72:10, 72:13, 72:19, 72:22, 72:23, 72:25, 74:6, 74:8, 74:13, 75:21, 75:22, 107:3, 114:1, 160:25, 161:12, 161:13, 161:16, 162:11, 162:21, 163:1, 164:3, 164:8, 164:10, 164:17, 165:1, 165:6, 165:8, 165:9, 165:24, 166:3, 166:8, 166:10, 166:16, 166:17, 166:20, 166:25, 167:1, 167:5, 167:8, 168:7, 168:3, 168:12, 169:16, 169:19, 171:7, 172:20, 179:21, 179:22, 183:8, 183:11, 191:10, 191:18, 218:22, 225:25, 226:11, 226:13, 226:21, 226:22, 226:25, 227:5, 227:6, 227:8, 227:12, 227:20, 227:24, 230:25, 231:3, 231:13, 231:20, 232:11, 234:3, 234:12, 234:17, 235:5, 236:9, 236:13, 236:17, 236:20, 237:3, 237:7, 237:23, 238:1, 238:5, 238:8, 238:12, 238:21, 239:11, 239:16, 239:24, 240:13, 241:2, 241:13, 241:18, 241:21, 242:5, 242:17, 242:20, 242:24, 243:3, 243:8, 243:14, 243:17, 243:20, 243:23, 243:24, 244:4, 248:13

**corrections** [1] - 72:24

**correctly** [14] - 58:14, 67:20, 78:19, 164:4, 166:22, 176:18, 176:19, 178:17,

178:18, 179:8,
179:9, 181:8, 181:9,
206:25
**correlations** [1] -
220:12
**corresponds** [1] -
145:11
**Cost** [1] - 18:12
**cost** [22] - 16:17, 20:8,
23:24, 30:7, 30:16,
37:14, 41:23, 57:10,
58:8, 63:4, 74:6,
79:3, 79:7, 79:8,
84:10, 85:10,
134:13, 154:4,
154:12, 154:20,
219:7
**costs** [43] - 14:19,
15:9, 15:10, 15:11,
15:15, 16:4, 29:10,
30:4, 30:11, 31:4,
31:9, 31:25, 35:5,
35:12, 37:18, 40:8,
40:13, 40:14, 49:15,
49:23, 50:4, 50:17,
54:13, 54:16, 54:17,
54:22, 55:1, 55:7,
55:14, 65:9, 65:16,
65:19, 66:22, 76:24,
79:15, 83:22, 85:12,
85:13, 86:25,
111:16, 148:13,
154:9, 154:15
**Council** [16] - 17:10,
18:11, 18:14, 21:20,
24:9, 24:13, 25:2,
32:7, 37:23, 38:2,
57:22, 61:16, 62:4,
66:11, 75:20, 219:23
**Counsel** [1] - 62:13
**counsel** [3] - 76:17,
85:22, 229:17
**Count** [1] - 30:12
**count** [8] - 14:7,
14:25, 29:3, 42:11,
43:20, 68:23, 70:24,
72:3
**counted** [1] - 15:24
**counteract** [1] -
176:16
**counteractive** [1] -
178:6
**counterfeit** [2] -
242:20, 242:21
**counties** [23] - 104:3,
104:6, 105:20,
107:12, 107:13,
107:14, 120:18,
121:10, 122:4,
122:5, 122:7, 122:9,

122:16, 122:19,
122:20, 122:23,
123:2, 123:22,
123:25, 136:19,
180:6, 182:5
**counting** [2] - 16:4,
42:18
**country** [9] - 16:25,
18:21, 19:15, 19:16,
94:9, 116:2, 138:15,
157:12, 180:5
**counts** [4] - 15:4,
44:8, 45:23, 45:24
**county** [3] - 40:21,
130:5, 144:16
**COUNTY** [1] - 1:10
**County** [76] - 2:2, 3:2,
17:2, 17:12, 17:24,
22:17, 26:13, 26:18,
28:16, 28:21, 30:4,
30:25, 31:10, 33:8,
36:2, 36:8, 37:20,
40:15, 41:4, 41:15,
41:24, 42:4, 43:11,
44:5, 47:7, 47:18,
48:19, 49:4, 49:21,
66:7, 80:13, 103:24,
115:24, 117:9,
119:8, 120:22,
121:4, 121:8,
121:22, 122:3,
123:2, 123:3,
123:12, 123:18,
129:11, 130:2,
130:5, 130:7, 130:9,
130:12, 130:19,
131:12, 133:6,
133:14, 136:17,
136:18, 136:24,
138:22, 138:24,
138:25, 139:6,
144:2, 144:15,
144:23, 147:14,
155:7, 155:24,
156:2, 156:14,
156:18, 156:23,
157:5, 159:18,
184:2, 184:11, 202:7
**couple** [12] - 55:9,
60:7, 94:17, 94:20,
100:6, 100:17,
101:12, 123:17,
135:1, 157:21,
159:14, 178:16
**course** [33] - 8:18,
34:14, 35:23, 56:3,
71:1, 85:10, 91:6,
91:10, 93:2, 93:6,
101:15, 103:25,
107:16, 111:15,

112:19, 115:5,
124:11, 129:17,
142:3, 144:11,
147:4, 148:5,
148:19, 151:11,
155:19, 188:7,
188:11, 188:18,
195:15, 203:22,
211:19, 248:3
**courses** [1] - 188:22
**court** [3] - 206:7,
230:7, 235:8
**Court** [82] - 6:17, 6:18,
7:3, 8:8, 12:3, 12:23,
13:23, 14:6, 15:20,
18:3, 18:13, 28:7,
32:23, 49:23, 50:4,
73:7, 77:1, 77:18,
79:24, 83:4, 83:9,
87:21, 88:21, 88:23,
89:12, 90:18, 90:22,
92:11, 94:17, 94:20,
98:24, 100:17,
106:14, 107:5,
108:19, 109:13,
112:10, 113:23,
113:24, 114:18,
119:9, 121:16,
126:11, 126:24,
127:5, 128:16,
133:7, 135:2,
135:21, 137:20,
138:6, 138:8,
138:20, 139:17,
139:19, 145:1,
156:22, 159:16,
159:23, 174:8,
186:18, 188:10,
189:10, 193:6,
194:7, 195:10,
196:12, 197:10,
201:5, 207:17,
208:12, 215:12,
217:7, 219:4, 221:4,
223:19, 224:6,
246:6, 247:6, 248:7,
248:11, 248:12
**COURT** [174] - 1:1,
1:17, 7:6, 7:9, 7:18,
12:6, 12:13, 13:6,
13:8, 16:12, 16:21,
17:3, 17:8, 17:13,
17:25, 19:14, 20:23,
22:9, 22:24, 23:2,
24:6, 24:24, 26:6,
29:12, 29:17, 29:20,
29:23, 30:1, 32:11,
32:14, 45:1, 45:11,
51:14, 51:18, 52:11,
53:3, 55:19, 69:17,
73:3, 73:9, 73:12,

73:15, 74:20, 74:25,
75:4, 76:1, 77:16,
77:20, 78:1, 78:17,
79:8, 80:3, 81:2,
81:22, 82:22, 83:1,
83:20, 84:5, 84:16,
85:24, 86:6, 86:18,
87:5, 87:14, 87:25,
88:3, 88:9, 88:16,
89:16, 90:11,
101:17, 101:25,
102:3, 106:12,
106:14, 106:19,
120:3, 120:9,
124:16, 124:21,
124:23, 125:5,
125:14, 125:18,
125:23, 125:25,
126:4, 145:16,
145:20, 145:23,
160:1, 167:18,
167:21, 170:8,
170:18, 171:10,
172:5, 173:15,
173:19, 178:20,
182:9, 182:14,
182:17, 182:23,
184:18, 184:20,
184:25, 185:4,
185:19, 185:21,
201:6, 202:4, 202:9,
202:13, 202:15,
203:12, 204:2,
204:17, 205:12,
205:20, 205:22,
206:3, 209:21,
210:6, 211:1,
212:21, 213:9,
213:18, 214:9,
217:13, 217:17,
217:25, 218:17,
225:18, 228:2,
229:7, 229:11,
229:21, 230:1,
230:6, 230:12,
230:17, 233:9,
233:11, 233:13,
235:7, 235:11,
235:18, 235:22,
237:9, 237:12,
237:17, 238:25,
239:18, 244:7,
244:23, 245:4,
245:7, 245:12,
245:14, 245:17,
246:7, 246:13,
246:16, 246:19,
246:22, 247:1,
247:3, 247:7,
247:15, 247:18,
247:23, 247:25,

248:4
**Court's** [3] - 105:1,
109:3, 125:13
**courthouse** [4] -
182:24, 185:8,
185:12, 235:12
**courtroom** [3] - 13:11,
77:6, 161:25
**COURTROOM** [5] -
7:11, 7:13, 7:16,
20:25, 69:20
**cover** [2] - 17:21,
219:19
**covered** [4] - 65:16,
65:19, 66:1, 66:6
**covers** [2] - 17:22,
139:23
**COVID** [1] - 117:15
**Covington** [1] - 5:11
**Crack** [1] - 236:11
**crack** [19] - 75:2, 75:5,
173:4, 195:2, 195:3,
195:21, 196:3,
197:2, 197:8,
197:23, 232:19,
234:9, 234:16,
235:4, 236:4, 236:8,
240:2, 241:23,
242:15
**Craig** [1] - 47:11
**create** [4] - 89:11,
127:2, 134:25, 137:6
**created** [2] - 137:4,
200:20
**crime** [16] - 191:14,
192:4, 192:16,
192:21, 193:4,
193:9, 193:15,
215:9, 220:11,
225:2, 225:9,
243:10, 243:13,
243:25
**Crimes** [1] - 233:20
**crimes** [2] - 192:23,
227:15
**Criminal** [1] - 187:7
**criminal** [6] - 205:1,
233:21, 233:24,
242:3, 243:16,
243:19
**criminals** [1] - 234:20
**Crisis** [1] - 18:12
**crisis** [9] - 18:17,
18:21, 19:12, 20:2,
58:7, 63:14, 109:21,
159:18, 221:20
**criteria** [5] - 61:25,
123:12, 123:13,
156:7, 156:8
**criticisms** [1] - 72:21

cross [17] - 18:1, 32:14, 51:14, 73:12, 73:14, 85:6, 122:4, 160:1, 167:18, 172:3, 182:25, 202:24, 203:14, 209:5, 209:22, 225:18, 238:25
CROSS [6] - 32:16, 51:19, 160:4, 183:2, 225:20, 230:13
cross-examination [3] - 202:24, 203:14, 209:5
cross-examine [3] - 182:25, 209:22, 225:18
CRR [2] - 6:17, 6:18
crush [1] - 164:23
crushing [1] - 166:7
cry [1] - 118:11
crystal [1] - 84:19
CSA [1] - 40:5
cull [1] - 61:10
curative [1] - 134:12
cure [15] - 99:13, 100:4, 110:20, 110:24, 111:2, 111:8, 117:19, 118:25, 119:2, 132:3, 132:10, 132:21, 132:23, 137:10
cured [3] - 100:3, 132:12, 151:25
curing [1] - 181:24
Current [1] - 118:25
current [5] - 100:15, 103:10, 105:10, 173:24, 181:5
cuspid [1] - 141:7
cut [6] - 82:3, 127:18, 163:16, 163:21, 177:12, 216:11
cuts [1] - 120:3
cutting [1] - 216:11
CV [2] - 94:16, 99:3
cycle [1] - 179:6
cytomegalovirus [1] - 95:4

## D

daily [2] - 137:13, 195:15
damage [6] - 127:11, 127:19, 130:1, 135:6, 135:7, 141:1
damaged [1] - 140:22
damages [13] - 13:20,

41:15, 41:18, 41:20, 41:21, 80:13, 80:16, 80:22, 83:17, 83:21, 129:24
dangerous [1] - 147:24
dangers [1] - 223:25
dark [2] - 133:15, 185:7
darker [3] - 124:2, 133:12, 138:10
data [38] - 29:5, 29:6, 57:18, 105:18, 108:10, 108:25, 109:1, 117:16, 119:13, 119:16, 119:20, 119:23, 120:7, 120:10, 122:24, 130:6, 130:20, 131:22, 133:9, 133:10, 137:3, 137:5, 138:2, 138:8, 138:21, 139:7, 139:8, 139:11, 143:15, 144:16, 155:9, 155:13, 161:18, 174:14, 193:14, 193:17
Data [1] - 117:12
Date [1] - 248:25
date [5] - 56:21, 70:3, 70:6, 179:21, 228:8
dated [1] - 232:11
dates [1] - 132:4
Daubert [10] - 12:10, 78:6, 78:17, 78:24, 81:7, 81:18, 82:13, 82:15, 82:19
DAVID [2] - 1:17, 4:5
David [1] - 7:1
days [3] - 118:21, 126:20, 185:9
days' [1] - 106:2
DC [6] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12
DDI [1] - 95:9
De [2] - 2:4, 2:14
DEA [3] - 36:14, 37:4, 200:24
deadly [1] - 113:3
deal [8] - 39:12, 101:4, 104:21, 154:23, 156:23, 158:18, 159:14, 179:4
dealers [2] - 197:13, 232:20
dealing [5] - 117:15, 154:14, 175:9, 177:15, 179:13

death [17] - 14:16, 14:20, 14:22, 23:24, 31:24, 39:15, 45:10, 59:22, 64:9, 64:13, 110:21, 117:23, 148:17, 174:17, 175:13, 175:15, 176:25
deaths [24] - 14:5, 14:8, 14:9, 14:13, 18:25, 26:20, 28:10, 29:14, 29:16, 33:3, 37:18, 40:8, 40:10, 40:11, 46:1, 59:17, 63:15, 64:8, 65:4, 68:21, 68:24, 72:17, 177:8
decade [4] - 129:15, 136:3, 138:4, 175:8
December [2] - 96:24, 232:11
decide [5] - 187:19, 205:14, 208:6, 209:22, 214:10
decided [1] - 94:4
decimated [1] - 220:6
decision [1] - 189:7
decisions [5] - 36:7, 152:11, 191:18, 200:3, 211:23
deck [6] - 87:13, 87:16, 89:19, 89:25, 90:1, 90:6
decompensated [1] - 127:24
decrease [4] - 94:25, 116:10, 153:22, 154:1
dedicated [1] - 94:5
Deeds [2] - 232:8, 232:17
DEF [2] - 56:4, 171:24
DEF-WV [2] - 56:4, 171:24
Defendant [4] - 4:16, 5:2, 5:7, 6:2
defendant [4] - 51:14, 54:17, 86:23, 234:7
defendants [20] - 41:6, 41:17, 45:20, 46:2, 46:17, 47:5, 48:3, 48:12, 48:18, 78:5, 78:14, 78:16, 79:19, 79:20, 79:21, 80:25, 86:4, 86:25, 87:2, 161:25
Defendants [3] - 1:8, 1:14, 248:16
Defendants' [4] - 231:24, 232:4,

233:2, 233:7
defendants' [4] - 50:5, 78:12, 79:25, 85:22
Defense [1] - 74:3
defense [1] - 247:11
define [1] - 86:13
defined [2] - 86:13, 131:18
defines [1] - 84:8
defining [1] - 83:15
definition [2] - 86:21, 113:16
degree [6] - 9:1, 32:2, 117:16, 187:4, 187:6, 224:20
Degree [1] - 90:24
degrees [1] - 8:23
dehiscence [1] - 142:10
delay [1] - 125:1
deliver [1] - 162:13
delivery [3] - 143:25, 161:10, 161:15
demand [2] - 196:17, 196:18, 219:6
Demo [2] - 26:4, 26:10, 31:17
demonstrate [1] - 83:7
Demonstrative [2] - 64:22, 68:11
demonstrative [4] - 12:22, 13:4, 64:25, 145:12
density [1] - 133:10
deny [1] - 178:20
department [20] - 103:1, 106:1, 159:7, 192:8, 193:3, 193:25, 204:7, 205:25, 207:7, 212:7, 213:11, 214:1, 214:8, 221:14, 223:8, 226:7, 227:15, 231:23, 239:23, 240:10
Department [38] - 8:2, 9:9, 9:11, 19:8, 104:20, 107:16, 130:7, 130:8, 130:17, 130:21, 138:19, 139:9, 139:12, 155:10, 165:11, 189:1, 189:3, 189:20, 190:15, 190:19, 190:25, 191:13, 192:7, 194:4, 200:10, 203:23, 211:13, 211:19,

212:1, 212:10, 214:17, 214:21, 215:8, 221:1, 222:22, 237:22, 239:13
department's [1] - 193:20
departments [3] - 106:4, 192:10, 192:13
Dependence [1] - 19:23
dependent [4] - 163:4, 181:16, 181:18
depict [1] - 31:19
deposed [2] - 44:13, 241:1
deposition [26] - 44:11, 50:12, 50:16, 51:8, 61:14, 169:11, 169:15, 169:18, 169:21, 169:24, 201:11, 203:8, 204:14, 208:24, 209:10, 228:5, 228:7, 228:11, 228:13, 240:1, 240:24, 244:11, 244:14, 247:6, 247:20, 248:2
depressant [2] - 176:16, 178:7
DEPUTY [5] - 7:11, 7:13, 7:16, 20:25, 69:20
derive [2] - 43:13, 64:8
derived [1] - 29:8
describe [4] - 18:10, 138:20, 165:2, 194:7
described [8] - 86:2, 109:21, 117:20, 198:3, 200:8, 235:2, 236:16, 241:6
describing [1] - 210:18
deserves [1] - 18:2
deserving [1] - 152:22
designated [1] - 185:18
designations [2] - 247:6, 248:2
designing [1] - 95:11
desirable [2] - 152:10, 152:15
despite [1] - 72:24
detach [1] - 141:4
detail [4] - 97:12, 100:9, 109:22, 109:23
details [4] - 71:4,

71:18, 135:3, 169:13
**detection** [1] - 137:15
**detective** [1] - 238:3
**determination** [4] -
36:5, 84:3, 84:13,
118:15
**determine** [3] - 48:22,
87:1, 196:9
**determined** [2] -
35:20, 36:2
**determining** [1] -
67:12
**Detroit** [8] - 231:3,
231:7, 231:9,
231:13, 231:16,
234:22, 234:24,
237:13
**develop** [3] - 152:17,
215:6, 222:22
**developed** [4] - 94:21,
99:22, 118:2, 180:12
**developing** [2] - 94:8,
128:12
**development** [4] -
93:19, 93:20, 128:4,
132:4
**diabetes** [1] - 110:25
**diagnose** [2] - 116:4,
118:9
**diagnoses** [1] -
116:23
**diagnosing** [1] -
110:21
**diagram** [1] - 141:6
**Dial** [1] - 193:8
**die** [5] - 29:16, 77:3,
118:12, 141:24,
146:15
**died** [7] - 14:17, 29:22,
42:12, 42:23,
118:13, 177:10,
177:15
**dies** [1] - 16:2
**differed** [1] - 197:10
**difference** [7] - 29:14,
30:15, 62:13, 67:22,
76:20, 76:23, 139:5
**differences** [4] -
37:25, 66:19, 67:21,
67:23
**different** [35] - 20:6,
38:18, 39:7, 42:13,
52:25, 57:20, 58:4,
61:12, 66:16, 71:23,
76:25, 86:10, 90:1,
90:4, 98:4, 98:18,
102:16, 108:17,
112:9, 114:5,
123:15, 124:15,
149:25, 171:8,

196:1, 198:3, 204:2,
208:23, 216:11,
231:4, 241:25,
244:22
**differentials** [1] - 61:3
**differentiate** [1] -
50:17
**difficult** [3] - 150:14,
224:11, 225:2
**dilapidated** [1] -
197:14
**DIRECT** [3] - 7:19,
88:18, 186:6
**direct** [18] - 45:9,
45:12, 55:9, 59:21,
63:20, 114:13,
146:24, 161:8,
167:2, 194:2, 222:9,
227:7, 227:9,
227:23, 229:13,
229:14, 235:2, 245:7
**directed** [1] - 212:21
**directing** [3] - 201:19,
227:20, 229:5
**direction** [7] - 109:14,
156:3, 168:5,
192:19, 194:1,
207:3, 223:20
**directive** [1] - 24:17
**directly** [10] - 30:8,
33:14, 94:11,
112:18, 140:17,
141:9, 162:14,
206:10, 208:21,
227:10
**Director** [1] - 96:13
**Dirty** [2] - 232:8,
232:17
**disadvantaged** [1] -
181:11
**disagree** [8] - 17:4,
35:2, 37:2, 37:11,
40:3, 47:20, 60:8,
82:24
**disaster** [1] - 141:22
**disavowed** [1] -
209:17
**disclosed** [5] - 12:18,
13:5, 101:20,
119:14, 209:19
**discuss** [3] - 15:18,
33:6, 171:23
**discussed** [2] - 149:1,
181:1
**discussing** [2] -
131:11, 172:12
**discussion** [2] - 40:5,
109:6
**disease** [26] - 29:7,
33:5, 42:12, 92:22,

94:14, 107:18,
111:1, 111:5,
118:14, 121:25,
127:15, 127:16,
128:1, 129:3,
129:24, 132:15,
132:23, 135:6,
137:18, 139:15,
140:5, 141:20,
145:5, 146:13,
150:13, 167:3
**diseased** [1] - 150:8
**diseases** [30] - 89:3,
89:9, 91:21, 92:23,
92:25, 93:2, 93:7,
93:21, 96:1, 99:9,
103:9, 103:21,
106:10, 106:16,
110:10, 110:11,
110:19, 111:7,
113:25, 114:3,
118:1, 144:18,
147:5, 148:25,
158:9, 158:25,
159:19, 159:22,
161:9, 162:6
**Diseases** [5] - 93:23,
95:16, 97:22, 100:23
**disjunctive** [1] -
213:16
**dismantled** [1] -
240:19
**dismantling** [1] -
232:20
**Disorder** [17] - 30:21,
31:11, 39:2, 43:3,
150:12, 151:7,
151:8, 152:7, 158:1,
158:7, 158:8,
158:20, 159:1,
178:1, 180:13,
181:19, 181:20
**disorder** [17] - 97:3,
97:8, 101:2, 102:18,
102:22, 103:11,
103:17, 104:17,
106:5, 106:10,
106:16, 107:19,
111:23, 112:5,
114:9, 124:13, 215:9
**disorders** [1] - 103:8
**disposable** [1] -
158:10
**disproportionately** [1]
- 131:13
**disputed** [1] - 79:10
**disregarded** [1] - 82:9
**disrupting** [1] - 216:3
**disruption** [1] -
217:10

**dissertation** [1] - 91:7
**distinct** [1] - 45:5
**distinguish** [1] -
114:17
**distinguished** [4] -
9:22, 11:9, 11:14,
225:4
**distribute** [5] - 48:7,
150:21, 215:24,
234:8, 242:9
**distributed** [8] - 33:8,
37:19, 47:3, 47:17,
47:24, 49:3, 49:20,
162:7
**distributing** [1] -
208:3
**distribution** [24] -
40:17, 41:1, 41:5,
41:10, 42:16, 43:10,
44:4, 44:22, 45:19,
46:16, 46:21, 48:22,
49:25, 50:18, 50:19,
78:13, 104:19,
137:6, 162:8, 197:2,
217:10, 222:3,
223:13, 230:24
**distributions** [4] -
44:23, 48:13, 48:14,
49:16
**distributor** [3] - 244:2,
244:15, 244:18
**distributors** [8] -
42:13, 47:6, 47:17,
47:23, 48:4, 49:2,
84:24, 162:3
**DISTRICT** [3] - 1:1,
1:1, 1:17
**District** [4] - 7:2, 7:3,
223:21, 232:15
**Diversion** [2] - 36:14,
36:21
**diversion** [23] - 199:8,
199:12, 200:7,
200:11, 200:24,
201:3, 201:15,
201:16, 201:22,
207:12, 207:14,
207:20, 227:8,
227:11, 227:17,
228:17, 228:24,
229:1, 243:12,
243:13, 243:17,
243:20, 243:23
**diversions** [1] -
228:17
**diverted** [2] - 199:4,
234:9
**Division** [2] - 95:15,
233:18
**DNA** [1] - 135:4

**doc** [1] - 11:20
**Docket** [4] - 80:12,
80:15, 80:19, 80:20
**docs** [1] - 99:21
**doctor** [11] - 74:22,
90:9, 140:3, 159:6,
165:17, 167:3,
173:14, 198:22,
208:2, 243:9, 243:16
**Doctor** [42] - 18:9,
52:12, 68:1, 89:10,
89:11, 91:22, 92:7,
92:24, 93:11, 97:17,
98:22, 101:1, 102:5,
102:10, 105:12,
106:19, 106:25,
107:21, 108:18,
109:6, 110:8,
111:25, 117:18,
121:8, 126:7, 133:4,
133:25, 134:22,
134:25, 139:13,
141:25, 144:24,
147:4, 148:24,
150:5, 152:6,
159:13, 159:22,
160:2, 183:4,
183:21, 184:13
**doctor's** [1] - 165:17
**doctoral** [1] - 9:1
**doctors** [16] - 8:11,
36:9, 53:8, 53:10,
53:24, 54:15, 54:22,
168:17, 171:6,
198:23, 200:25,
201:2, 207:14,
207:25, 215:23,
226:24
**document** [18] -
18:11, 21:2, 21:4,
21:25, 55:22, 55:23,
56:12, 58:3, 59:14,
64:20, 202:25,
219:25, 220:14,
232:3, 232:25,
233:1, 233:4, 233:17
**documents** [14] -
55:24, 69:23, 107:5,
155:6, 205:18,
211:9, 211:11,
211:12, 211:14,
211:21, 213:1,
213:24, 214:1,
214:22
**dollar** [3] - 15:5, 24:3,
43:18, 197:20,
219:12
**dollars** [9] - 25:8,
25:9, 28:17, 28:19,
28:20, 31:13, 31:24,

40:16, 83:16
**domestic** [1] - 24:15
**done** [15] - 15:8,
32:23, 37:24, 64:11,
74:16, 78:9, 82:2,
82:8, 83:14, 100:8,
104:1, 144:3, 157:9,
157:24, 170:24
**door** [1] - 75:3
**double** [1] - 130:10
**doubled** [1] - 63:15
**doubling** [1] - 144:8
**Douglas** [2] - 4:23,
238:4
**down** [17] - 16:19,
21:14, 27:14, 56:6,
56:20, 58:4, 58:16,
61:1, 62:9, 71:21,
73:5, 127:19,
174:11, 194:14,
198:17, 246:23,
247:17
**Dr** [125] - 7:8, 7:24,
12:3, 12:14, 12:18,
13:10, 16:14, 16:19,
18:3, 21:2, 22:20,
23:8, 28:6, 29:13,
30:23, 32:18, 32:23,
33:2, 33:16, 33:21,
34:3, 34:12, 34:16,
34:22, 35:1, 35:10,
37:13, 40:7, 43:25,
44:11, 44:13, 45:5,
45:8, 45:16, 46:1,
46:12, 47:11, 50:15,
51:13, 51:14, 51:21,
52:1, 52:4, 52:20,
52:23, 53:6, 53:17,
54:15, 55:21, 64:14,
65:4, 65:10, 68:24,
69:3, 69:14, 69:25,
70:11, 70:18, 71:9,
71:22, 71:24, 72:6,
72:13, 72:14, 73:1,
73:4, 73:20, 77:21,
78:4, 78:11, 83:20,
83:25, 84:9, 84:17,
84:23, 84:25, 85:18,
87:3, 88:8, 88:9,
88:16, 88:20, 89:1,
89:4, 89:20, 90:17,
94:2, 103:7, 106:9,
106:14, 119:14,
124:20, 124:25,
125:23, 126:3,
126:23, 128:23,
130:16, 142:21,
145:7, 145:10,
149:24, 155:5,
156:3, 157:20,

159:17, 160:6,
160:23, 161:24,
165:20, 167:2,
169:11, 171:15,
172:3, 172:9,
173:16, 176:3,
178:13, 180:23,
182:7, 182:11,
182:18, 184:4,
184:20
**DR** [1] - 7:15
**drainage** [1] - 148:10
**dramatic** [1] - 117:7
**Dramatically** [1] -
199:23
**drew** [2] - 42:19, 188:1
**drive** [1] - 153:3
**Drive** [1] - 6:15
**driven** [2] - 153:14,
174:7
**driving** [4] - 196:10,
196:13, 196:25
**drop** [1] - 131:5
**dropped** [1] - 116:8
**drove** [1] - 156:13
**drug** [147] - 49:11,
101:6, 106:11,
106:17, 107:20,
109:17, 109:18,
114:1, 114:16,
115:7, 115:18,
116:8, 117:5,
120:24, 120:25,
121:6, 124:10,
128:8, 128:13,
128:21, 128:25,
130:25, 131:19,
131:22, 132:9,
135:17, 136:13,
140:13, 143:22,
143:24, 143:25,
144:11, 145:15,
146:19, 148:4,
148:14, 149:11,
149:21, 150:21,
151:15, 151:18,
152:13, 152:20,
153:12, 153:20,
154:15, 156:4,
158:14, 160:24,
161:4, 161:10,
161:14, 161:15,
162:9, 162:20,
162:24, 162:25,
163:1, 163:2, 163:4,
163:7, 163:15,
163:23, 164:7,
164:16, 165:1,
165:8, 166:6, 166:9,
166:18, 173:3,

173:5, 173:7,
174:24, 176:6,
177:4, 177:11,
177:18, 179:6,
181:6, 181:16,
188:13, 190:9,
190:11, 190:12,
191:25, 193:20,
194:13, 194:15,
194:23, 195:1,
195:20, 196:5,
196:13, 196:21,
197:4, 197:6,
197:22, 197:25,
198:10, 198:11,
198:13, 200:15,
200:16, 200:20,
200:22, 206:10,
206:12, 206:13,
206:15, 206:19,
207:19, 209:8,
215:19, 217:1,
218:6, 218:10,
219:5, 219:7, 219:8,
220:8, 222:10,
223:13, 223:24,
225:8, 226:8,
233:22, 235:2,
235:5, 236:8, 239:8,
240:1, 240:13,
240:17, 241:9,
241:21, 242:3,
242:16, 242:19,
242:22, 243:5
**Drug** [6] - 6:2, 11:24,
48:6, 188:22,
233:20, 248:16
**DRUG** [2] - 1:7, 1:13
**drug-related** [2] -
146:19, 148:14
**Drugs** [1] - 231:19
**drugs** [96] - 17:22,
95:9, 103:12,
103:14, 111:10,
114:12, 115:3,
116:11, 116:13,
117:11, 118:2,
121:14, 128:15,
128:20, 129:7,
132:7, 134:13,
134:19, 143:3,
148:20, 149:1,
149:6, 149:10,
161:11, 161:20,
162:7, 162:11,
163:8, 163:10,
164:1, 164:2,
164:20, 164:21,
165:4, 165:8,
165:21, 165:22,

165:23, 165:24,
166:2, 166:12,
166:19, 166:24,
174:12, 174:17,
176:7, 176:8,
181:17, 182:2,
188:8, 191:22,
192:3, 192:16,
192:20, 193:4,
193:15, 193:20,
194:5, 194:25,
195:20, 195:23,
195:25, 196:17,
196:18, 198:16,
198:19, 199:6,
208:3, 216:4,
216:16, 216:18,
218:3, 219:11,
223:14, 223:16,
230:25, 231:2,
231:4, 231:13,
231:16, 234:20,
238:8, 238:10,
238:11, 238:13,
238:15, 239:4,
242:4, 242:12,
242:15, 242:21
**DTO** [4] - 232:20,
233:22, 233:23,
234:15
**du** [2] - 173:7, 179:6
**due** [16] - 13:17,
14:10, 18:21, 26:15,
29:4, 37:18, 40:16,
41:5, 64:10, 65:4,
72:17, 72:18, 117:4,
174:17, 174:18,
216:25
**dumb** [1] - 29:13
**during** [31] - 44:24,
55:9, 58:13, 58:25,
59:7, 59:12, 59:23,
73:5, 75:13, 78:25,
92:14, 93:3, 95:21,
96:3, 96:20, 167:6,
167:10, 169:15,
169:18, 169:21,
182:18, 193:11,
195:11, 199:14,
203:22, 206:15,
224:17, 230:23,
232:17, 235:2,
237:25
**During** [6] - 190:4,
199:13, 199:15,
202:1, 228:16,
231:11
**duties** [2] - 9:24, 23:2
**duty** [5] - 24:11, 24:12,
204:25, 213:9,

213:12
**dying** [2] - 118:5,
178:11
**dysfunction** [1] -
134:9

---

**E**

---

**E.B** [1] - 89:10
**early** [8] - 70:24,
149:14, 168:1,
185:18, 195:18,
236:3, 238:4, 238:7
**earn** [2] - 8:23, 77:7
**earned** [1] - 93:10
**Earnings** [1] - 77:2
**earnings** [4] - 66:24,
76:25, 77:3, 77:5
**earth** [1] - 187:21
**easier** [3] - 64:25,
110:5, 172:7
**east** [1] - 143:4
**East** [4] - 3:5, 3:12,
4:24, 245:23
**Eastern** [1] - 122:11
**eastern** [2] - 176:11,
180:3
**easy** [5] - 105:16,
106:19, 112:19,
129:1, 156:25
**eat** [1] - 141:3
**Economic** [16] -
17:10, 18:11, 18:14,
19:22, 21:20, 24:10,
24:14, 25:3, 32:7,
37:23, 38:2, 57:22,
61:17, 62:4, 66:12,
75:20
**economic** [38] - 8:19,
13:15, 13:24, 14:13,
15:13, 19:4, 23:23,
24:14, 24:16, 31:21,
32:3, 32:24, 35:24,
37:18, 38:5, 38:15,
38:21, 39:14, 40:13,
40:14, 41:20, 42:11,
43:6, 45:18, 46:20,
49:23, 50:4, 50:17,
57:9, 74:6, 74:12,
74:15, 74:16, 80:13,
83:11, 84:1, 84:10,
181:3
**economics** [13] - 8:1,
8:9, 8:10, 9:10,
10:20, 10:21, 12:15,
15:22, 16:9, 23:10,
23:13, 31:4, 73:21
**Economics** [7] - 8:15,
8:24, 8:25, 9:9, 10:5,
10:15, 10:18

**economist** [11] - 7:25, 8:7, 8:8, 8:9, 12:4, 15:4, 36:6, 39:8, 39:9, 78:21, 85:1
**economists** [6] - 10:3, 10:16, 16:25, 22:4, 26:1, 27:17
**Economists** [1] - 10:7
**edited** [1] - 11:6
**editor** [1] - 10:24
**editorial** [2] - 102:10, 102:13
**editors** [1] - 98:8
**educate** [3] - 157:24, 221:14, 223:25
**education** [8] - 8:24, 90:22, 104:19, 150:18, 187:14, 188:7, 200:17, 200:19
**educational** [3] - 8:22, 9:6, 90:19
**educationally** [1] - 98:6
**Edward** [1] - 247:21
**effect** [7] - 20:18, 39:1, 75:15, 125:8, 176:16, 178:7, 185:7
**effective** [9] - 34:17, 34:23, 35:18, 58:11, 58:18, 58:24, 75:12, 154:4, 154:5
**effects** [3] - 54:2, 75:16, 118:8
**efficiently** [1] - 180:1
**effort** [10] - 79:23, 99:12, 116:4, 117:14, 118:25, 157:4, 157:5, 158:4, 158:18, 181:2
**efforts** [7] - 157:13, 158:2, 209:9, 221:19, 223:15, 223:16, 224:23
**eight** [1] - 99:13
**Eighth** [1] - 3:10
**either** [11] - 36:17, 40:1, 53:21, 98:25, 110:20, 129:15, 140:4, 162:25, 171:10, 227:24, 236:8
**elaborate** [1] - 206:2
**elderly** [1] - 145:5
**elected** [4] - 9:23, 98:15, 212:16, 220:15
**element** [1] - 29:6
**elements** [1] - 22:12
**elicit** [3] - 202:2,

202:19, 205:9
**elicited** [1] - 80:9
**eliminate** [1] - 132:20
**ELIZABETH** [1] - 6:14
**Elkins** [1] - 247:21
**ELMO** [2] - 65:1
**email** [1] - 89:24
**embarrass** [1] - 10:8
**embedded** [2] - 223:7, 248:3
**emerged** [1] - 237:3
**Emergency** [1] - 165:10
**emergency** [7] - 103:18, 105:24, 106:1, 106:4, 141:22, 159:7, 162:15
**emerging** [8] - 194:3, 199:25, 200:7, 210:10, 210:12, 210:18, 215:25, 216:24
**empathy** [1] - 191:19
**emphasis** [1] - 168:2
**employed** [2] - 77:12, 223:2
**employee** [1] - 94:6
**employees** [1] - 125:10
**enable** [1] - 153:11
**Encino** [1] - 3:16
**encompasses** [2] - 149:8, 149:22
**encounter** [3] - 168:16, 171:6, 195:16
**encountered** [1] - 201:24
**encounters** [1] - 155:16
**end** [15] - 23:17, 37:7, 92:15, 92:16, 121:20, 128:1, 143:21, 162:8, 171:2, 173:11, 181:1, 198:5, 221:23, 225:10
**end-of-life** [1] - 37:7
**endeavor** [1] - 200:10
**ended** [1] - 55:23
**ending** [2] - 125:16, 173:10
**endocarditis** [30] - 102:5, 102:7, 108:21, 113:4, 113:12, 139:16, 139:19, 139:20, 139:21, 140:7, 140:19, 142:1,

142:2, 142:18, 142:22, 143:2, 143:9, 143:12, 143:14, 143:18, 143:19, 143:24, 144:11, 144:14, 145:3, 145:14, 146:15, 146:18, 147:12, 147:15
**endocardium** [1] - 139:22
**ends** [1] - 184:5
**endstage** [2] - 132:15, 137:18
**Enforcement** [2] - 48:7, 188:22
**enforcement** [6] - 188:24, 196:2, 200:17, 200:20, 205:2, 225:4
**enforcing** [1] - 191:17
**engage** [5] - 35:11, 105:24, 114:9, 221:22, 222:22
**engaged** [1] - 106:4
**England** [2] - 100:19, 151:24
**enhance** [1] - 157:13
**enjoyed** [1] - 77:21
**enjoys** [1] - 247:11
**enormous** [3] - 129:13, 129:25, 143:9
**enter** [6] - 86:8, 112:24, 115:15, 147:17, 153:20, 153:22
**enters** [1] - 114:5
**entire** [10] - 9:10, 17:21, 18:3, 19:15, 19:16, 22:16, 130:10, 199:13, 199:18, 225:7
**entities** [2] - 49:3, 49:11
**entitled** [1] - 15:16
**entity** [1] - 24:11
**ENU** [1] - 4:17
**Environmental** [1] - 19:9
**epidemic** [32] - 17:1, 17:17, 25:4, 26:13, 30:5, 84:1, 84:9, 87:1, 101:4, 101:13, 109:17, 118:5, 122:14, 130:13, 132:13, 142:4, 171:16, 171:20, 173:25, 174:24, 175:7, 176:6, 178:9,

178:10, 197:6, 198:2, 198:4, 209:9, 222:23, 223:1, 224:4, 224:9
**Epidemic** [1] - 172:11
**epidemics** [1] - 109:20
**Epidemics** [1] - 105:17
**epidemiologic** [1] - 29:6
**epidemiologist** [3] - 28:6, 29:8, 64:7
**epidemiology** [1] - 145:1
**equals** [1] - 17:10
**equipment** [3] - 112:15, 140:14, 161:11
**equitable** [2] - 80:18, 80:21
**era** [1] - 134:12
**eradicate** [2] - 118:23, 207:7
**eradicating** [2] - 197:3, 239:23
**Eric** [1] - 247:21
**errata** [4] - 69:11, 69:13, 73:20, 73:24
**Errata** [1] - 69:24
**error** [3] - 70:24, 71:2, 71:16
**especially** [8] - 63:15, 98:6, 109:18, 115:12, 157:4, 176:24, 195:21, 207:20
**essentially** [2] - 20:10, 183:12
**establish** [6] - 17:9, 22:13, 83:19, 85:20, 85:25, 168:21
**established** [8] - 53:7, 84:23, 85:5, 96:11, 163:25, 207:3, 215:15, 223:11
**establishes** [2] - 85:19, 86:2
**establishing** [2] - 83:3, 193:25
**estimate** [9] - 17:5, 20:16, 22:16, 55:6, 55:14, 62:24, 86:25, 128:23, 154:11
**estimated** [3] - 57:10, 129:5, 129:7
**estimates** [16] - 19:4, 20:14, 30:17, 30:23, 55:1, 55:14, 58:8, 60:18, 61:5, 64:8,

64:13, 72:14, 76:18, 78:11
**et** [5] - 1:7, 1:13, 19:21, 248:15, 248:16
**evaluate** [2] - 85:11, 103:13
**evaluating** [1] - 92:24
**Evaluation** [1] - 25:22
**evaluation** [3] - 123:20, 123:21
**evenly** [1] - 245:15
**event** [1] - 147:25
**Events** [1] - 172:16
**events** [1] - 226:18
**eventually** [5] - 104:13, 117:25, 128:21, 152:19, 183:18
**everlasting** [1] - 225:15
**everywhere** [2] - 157:11
**evidence** [14] - 16:24, 22:22, 83:21, 83:23, 86:8, 124:9, 172:2, 176:24, 194:12, 208:1, 212:20, 214:3, 233:8, 237:8
**evident** [3] - 61:2, 133:22, 194:11
**evil** [1] - 236:12
**evolution** [1] - 194:8
**evolved** [1] - 195:25
**ex** [1] - 11:9
**exacerbated** [2] - 176:12, 176:21
**exact** [4] - 46:8, 116:1, 127:15, 129:1
**exactly** [10] - 18:25, 39:4, 44:7, 86:1, 93:4, 135:7, 144:21, 179:9, 216:8, 242:10
**Exactly** [1] - 74:14
**exam** [2] - 91:6, 92:14
**examination** [9] - 18:1, 55:10, 167:19, 202:1, 202:24, 203:14, 209:5, 235:3, 239:1
**EXAMINATION** [11] - 7:19, 32:16, 51:19, 73:18, 88:18, 160:4, 183:2, 186:6, 225:20, 230:13, 245:20
**examine** [6] - 32:14, 160:1, 172:3, 182:25, 209:22, 225:18

165:19
**expand** [1] - 103:17
**Expanding** [1] - 105:21
**expect** [1] - 38:8
**expectations** [1] - 221:13
**expected** [1] - 30:6
**expenses** [2] - 40:20, 40:24
**expensive** [6] - 30:9, 144:12, 148:13, 148:14, 217:9, 217:11
**expensively** [1] - 180:2
**experience** [10] - 23:11, 93:12, 95:14, 107:17, 152:18, 161:22, 165:7, 168:14, 172:18, 189:14
**experienced** [3] - 222:18, 225:13, 237:4
**experiencing** [3] - 199:16, 215:17, 225:6
**expert** [9] - 12:4, 12:15, 33:18, 69:25, 81:9, 82:19, 106:9, 106:15, 161:25
**expertise** [12] - 23:9, 25:11, 51:3, 51:6, 51:9, 75:25, 78:7, 79:21, 103:6, 161:1, 162:5, 162:7
**experts** [5] - 13:10, 47:14, 82:13, 96:13, 174:8
**Explain** [3] - 76:15, 121:15, 219:4
**explain** [21] - 15:17, 18:3, 18:12, 66:19, 70:18, 75:7, 75:8, 75:10, 76:13, 77:1, 108:18, 112:8, 113:24, 131:5, 133:7, 138:7, 173:18, 173:19, 173:22, 197:9, 226:1
**explanatory** [1] - 97:23
**explicitly** [1] - 209:2
**explode** [1] - 220:8
**exploding** [1] - 220:9
**explore** [2] - 94:14, 167:23
**exposure** [1] - 114:22
**extended** [1] - 183:18

**Examiner** [1] - 174:10
**Examiners** [1] - 92:13
**examining** [1] - 140:3
**example** [9] - 65:16, 66:22, 72:17, 117:9, 164:21, 169:2, 221:17, 231:22, 234:15
**examples** [1] - 105:7
**exceedingly** [1] - 51:22
**excellent** [1] - 156:15
**except** [1] - 235:13
**exception** [3] - 24:19, 138:12, 214:5
**excerpt** [2] - 56:19, 56:23
**excerpting** [1] - 55:25
**excerpts** [1] - 55:25
**excess** [14] - 15:8, 15:11, 15:14, 16:4, 20:8, 29:10, 30:3, 31:4, 31:9, 31:24, 37:18, 40:8, 40:11, 46:1
**exchange** [10] - 39:24, 104:13, 114:11, 116:6, 149:13, 149:15, 149:16, 149:23, 150:17, 183:8
**excitement** [1] - 187:22
**exclude** [7] - 42:6, 42:15, 44:23, 44:25, 45:21, 45:24, 46:6
**excluded** [1] - 45:22
**excluding** [1] - 45:23
**exclusive** [1] - 213:19
**exclusively** [1] - 63:23
**excreted** [1] - 114:25
**excuse** [5] - 26:24, 77:21, 145:6, 184:20, 247:13
**excused** [1] - 77:18
**excuses** [1] - 62:13
**execute** [1] - 82:14
**executive** [2] - 190:4, 193:7
**Executive** [2] - 18:15, 190:6
**exercise** [3] - 78:9, 79:23, 82:8
**Exhibit** [1] - 26:4
**exhibit** [2] - 21:7, 22:8
**existence** [3] - 84:14, 85:19, 85:25
**existing** [2] - 116:19, 140:5
**exists** [2] - 94:8,

**extensively** [1] - 126:8
**extent** [12] - 17:15, 18:4, 22:19, 113:10, 114:8, 161:5, 177:20, 203:5, 204:23, 205:3, 209:23, 214:11
**externally** [1] - 212:15
**extinguished** [1] - 11:9
**extra** [2] - 157:22, 180:16
**extraordinarily** [7] - 79:24, 129:21, 131:21, 134:13, 134:18, 154:4
**extraordinary** [5] - 86:7, 124:4, 130:13, 154:15, 174:11
**extremely** [3] - 111:21, 155:19, 177:20
**Exxon** [1] - 86:11
**eyeglasses** [1] - 105:11

## F

**FABER** [1] - 1:17
**Faber** [1] - 7:2
**fabric** [1] - 181:3
**facilitate** [1] - 197:23
**facing** [2] - 109:21, 197:11
**fact** [25] - 33:23, 57:14, 59:10, 69:8, 73:24, 74:16, 77:23, 78:20, 80:6, 84:2, 84:12, 90:7, 123:19, 134:6, 135:6, 136:5, 153:6, 162:3, 171:4, 177:8, 194:5, 231:6, 231:8, 236:11, 247:20
**factions** [1] - 192:7
**factor** [4] - 24:1, 24:3, 84:6, 84:12
**factors** [3] - 31:2, 61:4, 129:18
**facts** [1] - 80:24
**factual** [1] - 213:12
**faculty** [1] - 96:20
**failing** [1] - 61:4
**failure** [4] - 141:19, 141:20, 141:21, 146:14
**fair** [10] - 37:22, 49:22, 74:11, 109:4, 114:5, 146:18, 156:2, 157:17, 175:22,

192:6
**Fairfield** [3] - 195:8, 197:9, 197:12
**fairly** [1] - 31:19
**faith** [4] - 53:9, 53:25, 54:16, 54:23
**fall** [1] - 94:7
**Fall** [1] - 131:7
**familiar** [7] - 33:14, 33:16, 55:4, 106:25, 107:9, 168:7, 201:2
**families** [1] - 158:16
**family** [8] - 16:1, 16:2, 103:4, 126:13, 135:5, 189:15, 224:15, 224:21
**famous** [4] - 94:16, 94:24, 110:16, 118:4
**fantastic** [1] - 154:17
**far** [10] - 32:22, 36:8, 67:8, 83:18, 100:2, 118:11, 132:24, 177:21, 196:24, 230:9
**FARRELL** [65] - 2:3, 7:7, 7:20, 11:13, 12:2, 12:16, 12:17, 13:3, 13:7, 13:9, 16:10, 16:23, 17:9, 18:7, 18:8, 19:19, 20:22, 20:24, 21:1, 21:6, 21:8, 21:13, 21:15, 22:7, 23:1, 23:6, 23:7, 24:23, 25:1, 26:3, 26:7, 26:9, 29:2, 30:2, 31:14, 31:16, 32:10, 32:13, 45:3, 73:19, 75:2, 75:6, 76:4, 77:15, 82:24, 83:3, 83:23, 84:8, 86:7, 86:20, 87:10, 126:6, 185:16, 185:20, 230:3, 235:17, 245:9, 245:13, 245:15, 245:19, 245:21, 246:4, 246:10, 246:15, 246:17
**Farrell** [30] - 2:4, 2:13, 7:6, 16:21, 17:8, 17:14, 18:6, 22:11, 22:24, 24:13, 33:6, 38:3, 41:14, 45:13, 62:19, 64:23, 68:5, 68:9, 73:17, 75:1, 76:2, 80:9, 82:23, 86:2, 86:6, 87:9, 230:2, 245:8, 245:18, 246:9
**FEINBERG** [1] - 88:14
**Feinberg's** [3] - 119:14, 145:8, 145:10
**fellow** [4] - 9:4, 55:10,

**faster** [1] - 134:11
**fatal** [8] - 66:22, 76:24, 95:7, 147:19, 148:8, 148:22, 154:20, 216:14
**fatalities** [7] - 60:11, 83:8, 150:22, 236:17, 236:20, 236:22, 240:4
**fatality** [1] - 151:16
**father** [1] - 245:22
**Fauci** [1] - 94:2
**favorite** [2] - 245:25, 246:7
**favorites** [1] - 246:18
**FBI** [2] - 188:22, 233:20
**FCRR** [1] - 6:18
**FDA** [3] - 35:17, 35:20, 35:25
**Federal** [3] - 77:13, 85:14, 179:3
**federal** [22] - 19:5, 19:7, 19:9, 19:10, 24:5, 25:19, 42:10, 63:4, 65:17, 65:19, 77:13, 103:16, 105:22, 125:8, 125:10, 173:5, 179:2, 180:15, 208:8, 223:5, 223:7
**federally** [1] - 105:10
**feds** [1] - 175:6
**fee** [1] - 100:4
**Feinberg** [44] - 88:8, 88:9, 88:12, 88:16, 88:20, 88:25, 89:1, 89:4, 89:20, 90:17, 103:7, 106:9, 106:14, 124:20, 124:25, 125:23, 126:3, 126:23, 128:23, 130:16, 142:21, 145:9, 149:24, 155:5, 157:20, 159:17, 160:6, 160:23, 161:24, 165:20, 167:2, 169:11, 171:15, 172:3, 172:9, 173:16, 176:4, 178:13, 180:24, 182:7, 182:11, 182:19, 183:4, 184:20

97:20, 187:23
**fellowship** [3] - 91:20, 93:18, 102:25
**felt** [5] - 15:18, 123:10, 168:25, 187:23, 189:15
**Fentanyl** [1] - 177:12
**fentanyl** [33] - 59:20, 59:22, 59:23, 63:18, 63:20, 64:9, 64:15, 65:4, 65:10, 75:19, 103:13, 103:14, 151:14, 151:17, 151:18, 162:19, 164:8, 164:10, 166:2, 175:1, 176:24, 177:1, 177:2, 177:7, 177:16, 177:19, 180:16, 183:24, 184:1, 242:23, 243:3
**few** [10] - 53:7, 57:21, 61:1, 66:15, 123:4, 167:16, 183:5, 187:15, 190:3, 230:20
**fewer** [2] - 118:7
**fibrosis** [2] - 127:20, 127:21
**field** [17] - 12:15, 16:9, 23:12, 31:3, 32:6, 73:21, 95:17, 97:10, 97:11, 97:18, 100:17, 105:5, 108:2, 188:18, 188:20, 192:24
**fielder** [2] - 245:25, 246:7
**fields** [1] - 92:18
**fifth** [4] - 168:8, 168:15, 171:5, 176:1
**figure** [2] - 74:5, 118:25
**figures** [1] - 19:14
**final** [4] - 31:14, 31:17, 59:5, 76:12
**finally** [1] - 160:9
**financial** [1] - 224:23
**finder** [1] - 84:2
**findings** [2] - 75:20, 213:12
**fine** [6] - 32:22, 120:6, 120:12, 120:15, 124:23, 247:7
**finish** [9] - 66:11, 68:15, 73:4, 73:8, 157:22, 229:23, 235:18, 235:22, 247:9
**finished** [5] - 143:16,

146:4, 146:7, 173:14, 173:16
**fire** [1] - 86:10
**firearms** [1] - 188:23
**Firm** [2] - 3:4, 3:7
**first** [58] - 9:8, 13:18, 16:7, 18:15, 21:9, 26:20, 28:4, 30:6, 31:1, 33:23, 38:11, 57:1, 57:2, 58:17, 60:11, 60:17, 65:7, 69:23, 70:9, 71:24, 74:22, 75:11, 81:10, 81:15, 89:20, 95:9, 99:23, 104:4, 104:14, 112:7, 121:23, 128:17, 128:20, 129:8, 132:11, 136:9, 139:17, 150:11, 154:2, 155:10, 163:8, 164:2, 172:25, 183:17, 188:24, 191:21, 191:23, 194:8, 199:15, 199:19, 203:13, 203:15, 206:21, 215:15, 232:13, 233:17, 237:3, 237:4
**First** [2] - 63:2, 223:3
**fit** [2] - 78:8, 82:19
**Five** [1] - 189:4
**five** [6] - 94:6, 96:12, 130:21, 143:18, 143:20, 153:19
**five-year** [2] - 130:21, 143:18
**fix** [2] - 71:17, 180:2
**fixed** [1] - 142:13
**FL** [1] - 2:11
**flagging** [1] - 194:14
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flat** [1] - 116:10
**flat-lined** [1] - 116:10
**Flavivirus** [2] - 126:13
**Flink** [1] - 89:10
**flip** [3] - 21:12, 95:18, 118:14
**flood** [1] - 173:24
**Floor** [1] - 3:5
**Florence** [7] - 19:21, 20:16, 20:17, 20:19, 61:19, 62:7
**Florida** [1] - 138:12
**flow** [2] - 139:23, 216:3
**fluid** [1] - 114:25
**fluids** [2] - 114:22,

114:24
**flush** [1] - 119:1
**focus** [13] - 91:1, 98:5, 98:18, 119:8, 119:25, 120:2, 157:15, 179:5, 179:25, 195:1, 195:22, 240:1, 240:16
**focused** [16] - 63:23, 97:7, 98:14, 102:21, 103:19, 103:23, 107:12, 113:13, 113:25, 114:13, 117:15, 161:23, 195:1, 198:9, 200:21, 239:23
**focuses** [3] - 86:22, 98:4, 200:14
**fold** [2] - 143:20, 144:8
**folks** [3] - 96:24, 219:12, 227:9
**follow** [4] - 104:25, 143:25, 194:1, 208:4
**follow-up** [2] - 104:25, 208:4
**followed** [1] - 173:4
**following** [6] - 91:17, 91:20, 92:19, 135:4, 156:10, 164:4
**follows** [6] - 7:5, 14:24, 73:11, 136:23, 182:22, 228:15
**food** [3] - 135:12, 197:18, 197:20
**FOR** [1] - 1:1
**force** [2] - 74:16, 223:9
**Force** [1] - 233:21
**forces** [1] - 190:12
**forecast** [1] - 214:25
**forefront** [1] - 191:15
**foregoing** [1] - 248:13
**forget** [2] - 202:14, 202:17
**forging** [1] - 243:19
**form** [11] - 14:20, 22:17, 27:8, 54:17, 108:12, 129:24, 210:16, 218:15, 243:16, 243:19, 243:23
**formal** [1] - 128:5
**former** [1] - 36:13
**formerly** [1] - 9:18
**forming** [1] - 108:2
**formulation** [1] - 24:15

forth [3] - 52:17, 129:16, 214:16
**forward** [5] - 13:1, 27:22, 41:13, 95:20, 131:3
**Foundation** [2] - 86:16, 86:17
**foundation** [14] - 22:11, 101:23, 183:13, 201:8, 202:22, 203:3, 203:17, 205:9, 209:6, 217:15, 217:18, 217:23, 239:17, 244:5
**foundations** [2] - 11:25, 81:7
**founded** [1] - 104:13
**founder** [1] - 99:10
**four** [9] - 61:12, 66:17, 94:7, 98:11, 120:19, 143:2, 143:16, 169:4, 177:10
**four-year** [1] - 98:11
**Fourth** [1] - 208:14
**fourth** [1] - 92:16
**fragility** [1] - 115:14
**frankly** [1] - 170:13
**fraud** [1] - 197:18
**free** [3] - 78:1, 184:22, 247:1
**frequency** [1] - 153:21
**frequently** [2] - 59:23, 111:5
**Friday** [1] - 247:10
**friend** [1] - 224:21
**friends** [5] - 186:20, 189:15, 224:15, 224:25, 225:3
**front** [7] - 13:4, 23:17, 57:23, 58:1, 79:24, 219:19, 232:3
**frustrating** [2] - 179:12, 179:16
**frustration** [2] - 174:21, 175:9
**fuel** [1] - 198:25
**fueling** [1] - 198:9
**full** [4] - 7:21, 93:8, 185:10, 186:9
**full-time** [1] - 93:8
**FULLER** [1] - 2:12
**Fuller** [2] - 2:4, 2:13
**fully** [1] - 63:2
**function** [6] - 15:12, 27:18, 81:13, 82:14, 82:17, 177:25
**functional** [1] - 119:2
**fund** [1] - 41:23
**funded** [1] - 105:10

**funding** [9] - 11:15, 11:17, 98:16, 98:17, 103:10, 103:15, 173:6, 190:11
**funerals** [2] - 118:13, 225:1
**fungal** [1] - 113:11
**fungi** [1] - 140:25
**Future** [1] - 38:12
**future** [4] - 41:10, 41:25, 77:2, 81:1

## G

**game** [1] - 128:3
**gangs** [1] - 49:11
**gate** [1] - 81:24
**gatekeeping** [4] - 81:8, 81:13, 82:11, 82:14
**gateway** [1] - 64:15
**general** [9] - 18:10, 35:24, 49:6, 71:14, 83:5, 91:18, 100:21, 110:11, 159:5
**generally** [4] - 10:19, 23:12, 70:22, 192:3
**generate** [1] - 24:2
**generated** [1] - 192:20
**gentlemen** [1] - 177:10
**geographic** [2] - 22:14, 103:24
**geography** [1] - 129:17
**germs** [2] - 140:15, 140:20
**Gina** [19] - 90:20, 92:5, 93:14, 97:15, 98:20, 104:23, 109:8, 113:18, 119:5, 126:5, 130:14, 131:9, 133:2, 135:19, 138:16, 142:19, 146:8, 150:3, 155:2
**given** [7] - 56:4, 57:12, 69:22, 72:21, 78:11, 139:8, 143:14
**glad** [1] - 63:7
**glove** [1] - 197:1
**goal** [6] - 150:11, 150:17, 152:8, 152:16, 154:24, 214:18
**goals** [2] - 150:7, 214:16
**Goodwin** [1] - 232:15
**govern** [1] - 204:25
**government** [10] -

23:4, 65:17, 65:20, 65:22, 65:24, 175:5, 179:25
**Government** [2] - 77:14, 85:14
**governments** [1] - 40:21
**Governor** [1] - 97:4
**graduate** [3] - 8:19, 91:3, 187:11
**graduated** [4] - 123:6, 187:1, 188:2, 196:4
**graduating** [1] - 187:13
**grandmother's** [1] - 163:11
**grant** [6] - 103:12, 103:16, 104:20, 105:17, 105:19, 183:13
**grants** [12] - 103:7, 103:19, 105:3, 105:4, 105:7, 105:10, 106:7, 108:15, 174:25, 179:2, 179:3
**graph** [2] - 130:17, 138:22
**graphic** [1] - 140:23
**gratifying** [1] - 111:3
**gray** [1] - 93:10
**great** [10] - 100:9, 104:21, 149:19, 152:13, 156:25, 160:19, 177:20, 219:14, 224:15
**greatest** [4] - 104:9, 112:23, 187:21, 241:21
**greatly** [1] - 107:2
**Greenbrier** [1] - 123:22
**Gretchen** [1] - 202:21
**GRETCHEN** [1] - 6:7
**grew** [3] - 194:12, 222:3, 224:25
**ground** [1] - 100:7
**grounds** [7] - 45:4, 201:8, 202:22, 203:3, 212:25, 217:15, 226:15
**group** [1] - 190:10
**Group** [1] - 95:23
**grow** [5] - 186:15, 186:18, 186:24, 240:22
**growing** [2] - 189:14, 224:13
**guess** [7] - 9:12, 25:14, 36:5, 36:7,

185:13, 200:18, 240:15
**guidance** [2] - 19:7, 99:18

## H

**hair** [1] - 93:10
**half** [2] - 96:9, 122:9
**halfway** [1] - 56:6
**hand** [14] - 7:14, 31:12, 88:13, 124:5, 141:8, 186:3, 194:15, 194:22, 197:1, 198:17, 233:1
**hand-and-glove** [1] - 197:1
**hand-to-hand** [3] - 194:15, 194:22, 198:17
**handed** [3] - 38:3, 94:22, 211:3
**handle** [2] - 39:1, 142:15
**handling** [1] - 87:21
**hands** [1] - 226:2
**hands-on** [1] - 226:2
**Hank** [1] - 193:8
**happy** [1] - 40:5
**hard** [10] - 115:25, 144:16, 152:20, 157:2, 157:18, 160:11, 160:16, 202:14, 202:17
**harder** [2] - 117:13, 181:15
**hardest** [1] - 101:14
**Hardin** [12] - 17:3, 22:9, 32:15, 32:20, 45:1, 74:20, 77:16, 82:18, 84:16, 85:5
**HARDIN** [24] - 5:3, 12:7, 16:11, 16:13, 17:4, 17:20, 22:10, 24:21, 32:17, 44:10, 44:12, 45:15, 50:12, 50:14, 51:13, 74:21, 77:17, 78:4, 78:20, 79:10, 81:6, 82:1, 84:17, 86:21
**Hardin's** [1] - 80:23
**Harm** [3] - 152:8, 153:7, 154:9
**harm** [17] - 20:6, 31:23, 37:14, 41:20, 43:6, 78:13, 86:3, 86:5, 147:8, 149:4, 149:5, 149:8, 149:12, 149:25, 150:7, 155:8

**harmed** [1] - 16:1
**harms** [36] - 13:16, 13:23, 14:3, 17:16, 17:17, 18:20, 31:20, 31:24, 32:24, 39:10, 41:24, 42:2, 42:15, 44:3, 44:21, 45:10, 45:17, 45:18, 46:15, 46:19, 46:20, 48:10, 48:12, 48:17, 48:24, 49:14, 50:17, 78:15, 84:1, 84:9, 84:10, 84:20, 101:2, 101:6, 108:19, 149:11
**Harper** [1] - 247:20
**Harper-Avilla** [1] - 247:20
**Hartle's** [1] - 247:20
**Harvard** [3] - 8:3, 8:14, 9:12
**hate** [1] - 101:18
**Hawkins** [1] - 3:7
**Hazewski** [1] - 247:21
**HBV** [4] - 108:20, 135:22, 137:9, 139:14
**HCV** [10] - 108:20, 121:17, 126:8, 126:11, 128:7, 128:25, 129:12, 131:13, 132:2, 133:25
**Head** [2] - 36:14, 36:21
**headed** [1] - 109:15
**Heading** [2] - 38:12, 58:7
**heading** [2] - 56:24, 60:4
**Health** [29] - 4:16, 5:2, 8:15, 9:4, 10:5, 10:6, 10:15, 10:18, 11:18, 11:20, 11:24, 32:20, 47:3, 104:20, 107:11, 107:16, 117:14, 123:10, 124:7, 130:7, 130:17, 130:21, 138:19, 139:9, 139:12, 155:10, 160:9, 174:23
**health** [50] - 7:25, 8:1, 8:7, 8:8, 8:9, 8:11, 8:19, 9:10, 10:3, 10:16, 10:19, 10:20, 12:4, 12:15, 16:9, 16:24, 22:4, 23:10, 23:12, 26:1, 27:17, 31:4, 32:3, 39:8, 39:12, 63:5, 78:21,

85:1, 108:11, 109:21, 110:15, 111:6, 111:14, 111:16, 121:23, 132:17, 137:16, 149:4, 149:20, 150:6, 151:9, 155:23, 156:7, 157:14, 157:15, 159:18, 179:14, 216:19
**Healthcare** [2] - 8:2, 9:12
**healthcare** [20] - 8:10, 15:9, 15:11, 15:14, 16:4, 29:10, 30:3, 30:7, 30:11, 30:16, 31:9, 31:25, 37:18, 40:8, 65:9, 65:16, 123:4, 159:4, 166:15
**healthy** [4] - 123:7, 150:12, 150:16, 152:17
**hear** [16] - 80:3, 81:16, 82:4, 82:17, 82:22, 124:17, 127:1, 140:3, 140:4, 157:18, 160:11, 160:20, 160:21, 167:9, 221:12, 221:13
**heard** [10] - 44:7, 68:9, 85:21, 87:22, 156:21, 159:9, 159:10, 174:8, 177:23, 231:10
**hearing** [3] - 82:13, 82:15, 160:14
**hearsay** [6] - 24:20, 203:9, 203:10, 204:24, 212:25, 214:5
**heart** [18] - 113:4, 139:21, 139:22, 139:24, 140:5, 141:5, 141:8, 141:10, 141:12, 141:13, 141:18, 141:19, 141:21, 146:14, 157:1, 165:12, 187:24
**heat** [3] - 124:1, 133:12, 138:9
**held** [3] - 93:16, 99:23, 104:4
**help** [10] - 51:25, 89:11, 103:18, 109:11, 152:23, 155:25, 156:1, 176:16, 181:23,

210:16
**helped** [2] - 11:20, 12:21
**helpful** [5] - 12:25, 18:3, 18:4, 68:14, 221:19
**helping** [1] - 184:21
**helps** [3] - 56:11, 105:13, 204:19
**Hep** [21] - 30:9, 126:22, 130:5, 135:5, 135:25, 136:1, 136:11, 136:13, 136:22, 136:24, 143:24, 147:11, 147:12, 151:3, 154:7, 180:7, 181:24
**hep** [3] - 99:13, 100:2, 104:16
**Hepadnavirus** [1] - 135:5
**Hepatitis** [75] - 99:11, 126:9, 126:12, 126:14, 126:17, 126:19, 126:22, 126:25, 127:10, 127:11, 128:2, 128:7, 128:13, 128:18, 128:20, 128:24, 129:2, 129:6, 129:12, 129:14, 129:22, 130:1, 130:3, 130:13, 130:19, 130:24, 131:2, 131:13, 131:17, 131:21, 132:1, 132:3, 132:12, 132:19, 132:20, 132:22, 133:18, 133:22, 134:2, 134:3, 134:4, 134:8, 134:9, 134:12, 134:18, 134:23, 135:2, 135:4, 135:7, 135:14, 135:15, 135:22, 135:24, 136:3, 136:5, 136:7, 136:18, 136:19, 137:5, 137:6, 137:19, 137:21, 137:23, 138:22, 139:14, 151:2, 151:3, 151:21, 151:25, 152:3, 153:23, 175:15
**hepatitis** [11] - 99:12, 101:16, 104:4, 104:7, 107:13,

111:8, 113:2, 122:8, 124:4, 124:10
**hepatocellular** [2] - 128:4, 137:17
**hepatologist** [1] - 99:20
**heroin** [55] - 59:20, 59:22, 59:23, 63:18, 63:21, 63:24, 64:4, 64:9, 64:14, 65:4, 65:9, 75:18, 97:5, 143:6, 143:7, 163:8, 164:3, 166:2, 173:3, 177:21, 196:4, 199:20, 216:5, 216:10, 217:11, 218:22, 219:15, 236:17, 236:20, 237:2, 237:6, 237:9, 237:15, 237:18, 238:1, 238:7, 238:10, 238:16, 238:17, 238:20, 239:4, 239:7, 239:10, 239:14, 239:23, 240:11, 240:18, 241:7, 241:17, 241:20, 241:24, 242:15, 242:23, 243:3
**Heroin** [4] - 216:11, 216:24, 222:2, 231:2
**HESTER** [3] - 5:9, 125:16, 248:1
**Hester** [1] - 248:4
**HHS** [1] - 25:22
**hi** [1] - 160:7
**hiding** [1] - 119:1
**HIDTA** [3] - 190:6, 190:8, 223:10
**high** [15] - 75:16, 110:25, 122:8, 123:6, 129:7, 129:21, 130:11, 131:25, 136:19, 136:22, 136:23, 151:16, 176:13, 190:9, 192:6
**higher** [5] - 67:19, 139:1, 141:14, 187:14
**highest** [9] - 104:7, 121:11, 121:12, 121:13, 122:18, 130:5, 136:3, 136:21, 138:3
**highlight** [6] - 58:7, 94:17, 94:20, 98:24, 105:3, 112:10
**highlighted** [1] - 98:22

**highlighting** [1] - 61:2
**highly** [4] - 124:10, 124:13, 132:1, 135:17
**himself** [2] - 34:13, 204:13
**Hinchman** [1] - 233:19
**hired** [1] - 193:12
**histoplasmosis** [1] - 95:6
**Historically** [1] - 173:2
**historically** [1] - 237:2
**history** [3] - 91:1, 91:5, 110:14
**hit** [1] - 101:14
**HIV** [87] - 30:9, 94:5, 94:10, 94:12, 94:14, 94:23, 94:25, 95:8, 95:24, 96:1, 96:6, 97:10, 97:25, 98:3, 98:4, 98:7, 98:12, 101:8, 101:10, 101:13, 104:16, 107:12, 108:20, 113:1, 113:23, 114:18, 114:21, 115:1, 115:2, 115:4, 115:9, 115:17, 115:22, 116:2, 116:3, 116:7, 116:12, 116:20, 116:21, 117:1, 117:4, 117:6, 117:11, 117:18, 117:19, 118:10, 118:18, 119:1, 121:12, 121:13, 121:17, 121:21, 121:24, 122:8, 124:4, 124:9, 126:7, 128:17, 128:18, 131:11, 133:4, 133:25, 134:1, 134:2, 134:8, 134:10, 134:18, 135:5, 137:10, 137:12, 137:14, 143:24, 147:11, 147:12, 151:2, 153:23, 154:6, 154:12, 157:4, 157:7, 180:6, 181:25
**HOLBROOK** [1] - 186:4
**Holbrook** [20] - 125:13, 185:23, 186:2, 186:8, 186:10, 187:19, 194:7, 203:20, 205:24, 210:8,

211:3, 214:15, 224:6, 225:17, 225:22, 225:24, 229:20, 229:23, 235:15, 245:22
**hold** [8] - 32:2, 77:22, 89:4, 92:7, 92:12, 104:4, 192:12, 229:25
**hole** [2] - 141:3, 141:16
**holiday** [3] - 125:8, 125:14, 235:12
**home** [3] - 147:17, 189:17, 224:8
**homeless** [2] - 155:18
**honest** [1] - 204:6
**honestly** [1] - 184:10
**Honor** [113] - 7:7, 12:8, 12:9, 16:11, 22:10, 23:1, 23:6, 24:22, 26:5, 51:17, 52:9, 53:2, 55:18, 69:16, 73:6, 73:14, 75:23, 77:17, 77:19, 77:25, 78:4, 78:23, 80:2, 81:6, 81:16, 82:2, 82:12, 82:14, 82:17, 85:3, 85:4, 85:17, 86:15, 86:21, 87:13, 87:17, 87:18, 87:24, 88:7, 89:15, 89:17, 90:8, 90:13, 101:18, 102:2, 106:8, 106:13, 106:18, 119:12, 120:1, 120:11, 120:12, 124:14, 125:17, 127:6, 145:12, 145:22, 159:25, 163:14, 163:18, 167:14, 167:16, 167:20, 172:1, 172:4, 173:13, 178:24, 182:8, 183:1, 184:16, 184:19, 185:22, 185:23, 201:7, 202:11, 203:4, 203:24, 204:5, 204:12, 204:19, 204:23, 205:17, 208:16, 209:4, 209:10, 210:5, 210:25, 212:18, 212:25, 213:3, 213:6, 213:11, 213:14, 213:22, 214:13, 225:19, 228:1,

229:10, 230:11, 230:16, 232:1, 233:7, 233:12, 235:17, 235:24, 238:22, 244:21, 245:5, 245:15, 246:2, 247:4, 248:1, 248:6
**honor** [1] - 189:24
**Honor's** [1] - 81:13
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**honorary** [1] - 9:20
**hope** [7] - 39:1, 75:9, 107:24, 112:11, 160:12, 169:22, 247:11
**hopefully** [2] - 70:13, 160:20
**Hopkins** [3] - 95:14, 95:16, 96:16
**Hospice** [1] - 37:7
**Hospital** [2] - 144:19, 168:12
**hospital** [13] - 92:2, 132:16, 136:10, 142:6, 142:8, 143:1, 144:10, 162:16, 168:22, 170:12, 170:14, 170:17
**hospitalization** [1] - 154:6
**hospitalizations** [3] - 111:17, 144:12, 154:15
**hospitalized** [1] - 148:9
**hospitals** [7] - 8:11, 42:17, 142:14, 143:17, 144:19, 144:22, 144:23
**House** [1] - 21:17
**housing** [2] - 197:15
**Howard** [2] - 186:2, 186:10
**HOWARD** [1] - 186:4
**HPD** [4] - 211:4, 214:2, 231:15, 233:18
**HPD's** [1] - 236:8
**hub** [1] - 230:24
**human** [4] - 54:5, 54:6, 154:20, 159:12
**humans** [1] - 132:19
**hundred** [2] - 70:25, 72:17, 130:9, 130:11, 130:22, 136:20
**hundreds** [1] - 15:2

**Hunter** [1] - 233:20
**Huntington** [134] - 3:10, 4:1, 14:10, 15:1, 17:2, 17:12, 17:24, 19:1, 22:18, 26:13, 28:15, 28:21, 30:4, 30:19, 30:24, 31:10, 31:20, 33:8, 36:2, 36:9, 37:20, 40:16, 41:4, 41:9, 41:15, 41:25, 42:4, 43:11, 44:5, 47:7, 47:18, 47:25, 48:19, 48:23, 49:4, 49:17, 49:21, 66:2, 80:14, 107:16, 121:9, 130:7, 130:17, 130:20, 138:19, 139:9, 142:16, 142:24, 144:18, 155:9, 155:23, 156:14, 186:14, 186:15, 186:16, 186:19, 186:25, 189:8, 189:19, 189:25, 190:2, 190:15, 190:18, 190:25, 191:10, 191:13, 192:6, 194:4, 195:4, 195:8, 196:19, 199:9, 199:20, 200:10, 201:12, 203:22, 206:16, 208:13, 208:22, 211:13, 211:19, 211:25, 212:10, 214:16, 214:20, 215:7, 220:25, 221:7, 222:3, 222:14, 222:20, 222:22, 224:4, 224:8, 224:13, 224:16, 224:20, 225:14, 225:25, 226:24, 227:11, 228:16, 228:22, 230:24, 231:3, 231:6, 231:8, 231:13, 231:14, 231:17, 233:23, 234:8, 234:17, 235:5, 236:5, 236:13, 236:16, 237:3, 237:21, 239:11, 239:15, 239:24, 241:18, 241:20, 242:5, 242:7, 242:9, 242:17, 242:20, 243:1, 243:6, 245:16, 245:23,

248:15
**HUNTINGTON** [1] - 1:4
**Huntington-Cabell** [7] - 17:2, 17:12, 26:13, 28:21, 30:4, 30:24, 31:10
**Huynh** [3] - 44:10, 169:23, 172:6

**I**

**ID** [1] - 99:21
**idea** [4] - 149:7, 158:7, 168:17, 171:7
**ideally** [1] - 39:11
**identification** [1] - 232:4
**identified** [13] - 13:16, 18:9, 28:10, 32:24, 33:4, 33:5, 39:11, 54:14, 83:25, 126:21, 194:3, 208:25, 234:20
**identify** [9] - 20:13, 63:14, 151:5, 151:22, 199:24, 210:16, 216:16, 216:18, 221:1
**identifying** [1] - 208:25
**IDU** [1] - 165:23
**ignore** [1] - 148:16
**ignoring** [1] - 120:9
**ii** [3] - 213:16, 213:19, 213:20
**iii** [3] - 213:16, 213:19, 213:20
**illegal** [10] - 17:22, 49:7, 49:16, 59:20, 230:25, 231:2, 231:13, 242:15, 243:7, 243:10
**illegally** [1] - 234:9
**illicit** [17] - 63:24, 64:4, 67:4, 67:24, 162:25, 163:8, 163:10, 164:1, 164:2, 164:8, 164:10, 164:14, 164:15, 166:2, 195:20, 198:16, 219:5
**illicitly** [1] - 75:18
**illness** [1] - 30:8
**illnesses** [1] - 30:8
**illustrate** [1] - 70:11
**illustrating** [1] - 145:21
**imagination** [1] -

199:2
**imagine** [4] - 117:7, 147:24, 159:11, 170:16
**immediately** [1] - 185:6
**immune** [2] - 134:9, 134:10
**immunologist** [1] - 96:15
**impact** [12] - 20:1, 74:15, 83:12, 86:12, 86:13, 86:18, 111:12, 126:16, 131:6, 189:14, 224:8, 225:15
**impacted** [1] - 132:1
**impactful** [1] - 220:14
**impeachment** [1] - 45:4, 170:7, 229:11
**implications** [1] - 111:16
**implies** [1] - 27:13
**imply** [1] - 178:9
**importance** [1] - 224:2
**important** [20] - 15:20, 15:23, 16:9, 18:23, 25:22, 25:23, 39:9, 76:19, 111:7, 123:1, 123:11, 132:11, 132:13, 132:18, 150:24, 206:19, 208:20, 219:1, 219:25, 221:21
**importantly** [4] - 20:7, 63:2, 187:22, 242:7
**impose** [1] - 55:2
**imposed** [2] - 14:19, 50:18
**improper** [1] - 209:5
**improvement** [1] - 39:11
**IN** [2] - 1:1, 1:18
**inadvertently** [1] - 70:25
**incidence** [7] - 116:17, 116:18, 116:19, 130:22, 130:24, 136:11, 179:4
**incident** [2] - 192:22, 237:16
**include** [17] - 8:17, 8:18, 65:4, 101:8, 101:10, 114:23, 142:23, 159:22, 163:8, 164:8, 164:10, 164:11, 164:20, 166:13, 207:11, 207:14,

215:23
**included** [2] - 64:17, 67:3
**includes** [8] - 65:8, 65:19, 113:1, 121:9, 164:3, 177:1, 232:10, 233:4
**including** [13] - 17:22, 32:6, 36:22, 53:17, 63:24, 64:4, 67:24, 80:16, 108:20, 172:19, 205:1, 231:20, 238:16
**inclusive** [1] - 213:19
**income** [6] - 27:2, 27:9, 27:10, 27:12, 27:13, 27:15
**inconsistent** [5] - 45:12, 170:18, 171:11, 229:16, 244:24
**incorporates** [1] - 20:16
**increase** [10] - 59:20, 116:12, 131:16, 139:4, 142:1, 142:2, 143:20, 144:7, 199:11, 199:17
**increases** [1] - 134:16
**increasing** [2] - 59:17, 199:14
**increasingly** [1] - 176:14
**incredible** [2] - 194:17, 224:16
**incredibly** [1] - 209:19
**indeed** [1] - 136:24
**independent** [1] - 198:10
**independently** [1] - 72:12
**Indiana** [3] - 121:21, 123:3, 129:20
**indicated** [4] - 64:9, 165:15, 166:6, 166:24
**indicates** [1] - 18:22
**indication** [1] - 59:21
**indirectly** [1] - 244:9
**individual** [13] - 77:3, 110:20, 111:13, 134:5, 150:25, 151:20, 155:22, 157:1, 157:13, 168:17, 223:9, 226:21, 226:23
**individual's** [1] - 193:13
**individuals** [18] - 14:25, 15:5, 31:5,

31:9, 103:2, 150:8, 152:2, 155:7, 155:14, 155:20, 181:23, 183:14, 195:10, 195:14, 217:16, 231:16, 236:24, 240:3
**industry** [2] - 8:10, 8:11
**ineffective** [1] - 145:3
**infarctions** [1] - 165:13
**infected** [7] - 114:22, 126:18, 134:1, 134:2, 135:10, 139:24, 151:5
**infection** [20] - 113:4, 113:7, 113:8, 114:12, 126:14, 126:15, 127:9, 129:4, 134:6, 134:22, 137:19, 139:21, 141:3, 143:1, 147:16, 147:21, 148:3, 148:4, 148:6
**infections** [43] - 94:13, 94:15, 95:5, 95:7, 97:8, 102:21, 107:19, 108:21, 109:18, 110:15, 110:22, 111:2, 111:19, 111:20, 112:5, 112:12, 112:13, 112:21, 112:23, 113:1, 113:2, 113:5, 113:21, 114:7, 116:13, 116:18, 116:19, 117:4, 117:6, 134:21, 147:13, 147:18, 148:5, 148:21, 150:9, 151:6, 152:5, 154:16, 154:21, 156:1, 158:14
**Infections** [1] - 96:3
**Infectious** [5] - 93:23, 95:16, 97:22, 100:23
**infectious** [32] - 89:3, 89:9, 91:20, 92:22, 92:23, 92:25, 93:2, 93:7, 93:21, 97:2, 99:9, 101:7, 103:9, 103:19, 103:21, 106:10, 106:15, 107:18, 110:10, 110:11, 110:19, 111:5, 111:6, 113:25, 117:25,

139:15, 140:16, 158:25, 160:24, 161:9, 162:6, 167:3
**infective** [3] - 113:3, 139:20, 140:7
**influence** [1] - 200:18
**inform** [2] - 210:9, 215:1
**informant** [1] - 192:25
**information** [16] - 89:12, 109:3, 120:1, 120:14, 126:24, 131:2, 135:21, 136:16, 137:20, 138:18, 139:19, 155:6, 159:16, 159:23, 221:15, 234:23
**informed** [1] - 182:23
**ingested** [1] - 216:9
**inhibitors** [1] - 118:3
**initial** [3] - 96:12, 150:16, 192:22
**initiated** [2] - 208:15, 233:21
**initiatives** [4] - 190:11, 222:23, 222:25, 223:8
**inject** [24] - 115:3, 115:4, 115:5, 116:11, 116:13, 117:11, 121:14, 128:20, 129:7, 134:19, 140:19, 141:8, 161:19, 164:5, 164:14, 164:24, 165:16, 165:21, 165:22, 165:23, 165:24, 166:12, 166:19
**injected** [6] - 112:15, 124:12, 143:3, 161:16, 165:4, 165:11
**injecting** [11] - 111:10, 112:13, 112:14, 140:15, 140:16, 149:6, 161:19, 166:1, 166:7, 175:1, 175:2
**Injection** [2] - 105:17, 115:7
**injection** [61] - 101:6, 102:8, 103:22, 106:11, 106:16, 107:20, 108:19, 109:19, 115:18, 116:8, 117:5, 120:24, 120:25, 121:6, 122:14,

124:10, 128:8,
128:13, 128:21,
128:25, 129:9,
129:10, 130:25,
131:19, 131:22,
133:22, 133:23,
135:17, 136:12,
137:2, 143:22,
143:24, 146:19,
146:24, 148:4,
148:7, 148:14,
149:1, 153:21,
156:4, 158:14,
160:24, 161:3,
161:4, 162:5, 162:9,
162:14, 162:15,
162:20, 163:7,
163:15, 163:23,
164:7, 164:16,
164:18, 165:8,
165:15, 166:14,
166:18, 175:14
**injectors** [2] - 151:25
**injects** [2] - 161:10,
165:18
**inkling** [1] - 187:8
**innocently** [1] -
198:21
**innocuous** [1] - 204:5
**input** [4] - 43:1, 70:18,
70:23, 71:2
**inquisitive** [1] - 226:8
**inside** [1] - 130:6
**instance** [6] - 53:18,
163:9, 164:3,
199:19, 207:5
**instead** [1] - 164:23
**Institute** [20] - 9:3,
9:16, 9:19, 9:23,
9:24, 11:18, 11:19,
11:22, 11:23, 11:24,
55:10, 55:13, 56:7,
56:16, 74:3, 93:22,
220:24, 221:5, 221:9
**institute** [1] - 94:5
**institution** [2] - 96:17,
96:18
**institutions** [1] -
168:11
**insult** [1] - 127:18
**insurance** [3] - 8:12,
111:16, 155:19
**intake** [1] - 153:4
**integrity** [2] - 191:18,
206:24
**intend** [1] - 203:18
**intending** [1] - 172:1
**intense** [2] - 124:2,
133:13
**intensity** [1] - 190:9

**interagency** [1] -
96:18
**interchangeably** [1] -
161:6
**intercourse** [1] -
115:12
**interdict** [2] - 193:20,
194:5
**interdiction** [1] -
238:14
**interested** [4] -
102:18, 102:21,
102:22, 207:6
**interesting** [1] - 127:9
**interfered** [1] - 87:2
**interference** [9] - 83:4,
83:10, 83:13, 83:16,
83:24, 84:4, 84:7,
84:14, 86:22
**interferon** [3] - 93:21,
93:25
**internal** [3] - 91:18,
92:19, 103:4
**Internal** [2] - 92:20,
100:20
**internally** [1] - 212:15
**international** [1] -
24:15
**International** [2] -
10:5, 238:4
**internationally** [1] -
99:5
**internist** [2] - 89:2,
97:21
**internship** [2] - 91:18,
92:17
**interposed** [1] -
133:17
**interpretation** [1] -
175:22
**interrupt** [3] - 24:6,
29:12, 101:18
**intertwined** [1] -
109:20
**intervene** [1] - 150:19
**intervention** [1] -
127:13
**interventions** [1] -
63:5
**interviews** [7] - 182:4,
192:24, 192:25,
210:14, 218:14,
222:25, 226:15
**intimately** [1] - 206:11
**intravenous** [4] -
128:8, 142:6,
145:14, 165:11
**intravenously** [1] -
162:16
**introduce** [6] - 87:21,

88:20, 88:23,
112:18, 113:10,
146:22
**introduced** [3] -
213:2, 213:24, 214:3
**introduction** [1] -
116:6
**introductory** [1] -
188:12
**invasion** [1] - 114:14
**investigate** [3] -
191:14, 225:24,
228:22
**investigated** [4] -
74:18, 201:3, 226:5,
240:19
**investigating** [3] -
204:8, 209:8, 225:8
**investigation** [23] -
24:18, 99:8, 122:2,
188:13, 203:1,
207:21, 208:15,
213:13, 214:23,
218:13, 226:17,
226:19, 226:21,
226:22, 227:1,
227:8, 227:11,
227:17, 227:18,
227:22, 232:18,
233:21, 234:14
**Investigations** [1] -
233:18
**investigations** [51] -
188:15, 188:23,
195:16, 201:9,
201:12, 201:14,
201:18, 201:19,
201:20, 201:22,
202:3, 202:20,
203:6, 203:10,
203:25, 204:7,
204:13, 204:16,
205:25, 206:8,
206:20, 207:7,
207:10, 207:11,
207:18, 208:19,
208:21, 209:7,
209:18, 212:4,
214:19, 214:24,
218:21, 222:24,
226:2, 226:5, 226:8,
226:9, 226:10,
226:24, 227:5,
227:14, 227:16,
227:20, 228:17,
228:24, 229:4,
229:5, 236:8
**investigative** [1] -
223:12
**investigator** [3] -

95:17, 188:15, 206:4
**investigators** [2] -
188:19, 208:5
**involve** [1] - 103:20
**involved** [26] - 59:16,
94:15, 95:2, 95:8,
98:3, 98:23, 102:15,
104:21, 112:22,
201:10, 201:12,
203:1, 203:7, 203:8,
206:9, 206:11,
206:20, 207:12,
207:14, 207:15,
223:15, 227:4,
228:17, 232:18,
232:21, 236:8
**involvement** [2] -
208:19, 209:13
**involving** [6] - 64:14,
65:9, 93:19, 93:20,
223:14, 233:22
**IOM** [2] - 56:2, 57:15
**Irpino** [1] - 3:7
**irrelevant** [1] - 16:18
**irresponsibly** [3] -
201:1, 208:3, 215:24
**Isia** [2] - 87:23, 160:8
**ISIA** [1] - 5:4
**isolate** [1] - 49:15
**issue** [21] - 57:7,
57:11, 58:20, 59:2,
59:10, 81:3, 87:7,
101:13, 108:23,
167:22, 173:5,
177:3, 192:1, 195:3,
195:5, 195:7, 197:8,
197:10, 197:12,
201:24, 210:18
**issues** [7] - 39:10,
78:19, 175:22,
195:5, 197:15,
200:6, 221:11
**items** [1] - 18:10
**itself** [9] - 76:8, 79:16,
85:25, 94:12,
119:23, 139:12,
141:5, 147:1, 177:19
**izing** [1] - 166:7

| **J** |
| --- |

**Jackson** [1] - 6:8
**Jasiewicz** [2] - 87:23,
160:8
**JASIEWICZ** [34] - 5:4,
87:24, 88:2, 88:6,
89:17, 90:13,
106:13, 119:12,
120:5, 120:11,
124:18, 145:6,

160:5, 163:15,
163:20, 167:16,
167:20, 167:24,
169:23, 170:1,
170:10, 170:20,
170:22, 171:12,
171:14, 172:1,
172:6, 172:8,
178:14, 178:24,
178:25, 182:7,
182:11, 245:5
**JCAHO** [4] - 168:11,
170:5, 170:11,
170:23
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:18
**job** [11] - 8:16, 9:8,
174:11, 188:24,
193:20, 193:23,
197:3, 206:22,
206:24, 216:18,
246:23
**Joe** [1] - 225:22
**Johns** [2] - 95:14,
95:16
**Johnson** [1] - 118:4
**join** [3] - 22:23, 80:5,
95:15
**Joint** [1] - 168:11
**joint** [2] - 113:8,
147:22
**Joseph** [1] - 36:13
**JOSEPH** [1] - 6:4
**jour** [2] - 173:8, 179:6
**journal** [5] - 10:17,
10:19, 10:23, 10:24,
171:17
**Journal** [4] - 10:18,
100:20, 100:22,
151:24
**journals** [5] - 100:16,
100:21, 100:22,
100:24, 102:11
**JR** [3] - 2:3, 2:12,
186:4
**Jr** [2] - 186:2, 186:10
**Juan** [2] - 2:5, 2:14
**Judge** [12] - 7:2, 15:9,
82:24, 125:6,
125:24, 126:2,
184:23, 185:16,
206:2, 224:11,
239:2, 246:21
**judge** [13] - 11:14,
12:2, 13:3, 13:7,
13:12, 15:18, 20:22,
22:7, 23:10, 32:10,
32:13, 45:3, 178:19
**JUDGE** [1] - 1:17
**judge's** [2] - 55:24,

239:9
**judgment** [1] - 64:15
**Judith** [4] - 88:8,
88:12, 88:25, 145:9
**JUDITH** [1] - 88:14
**July** [5] - 93:5, 228:8,
240:24, 241:13,
244:11
**jump** [2] - 176:1,
180:24
**jumped** [1] - 120:24
**jumping** [1] - 52:6
**June** [9] - 7:4, 52:19,
52:21, 53:2, 117:22,
247:9, 248:5,
248:18, 248:24
**JUNE** [1] - 1:19
**Juneteenth** [2] -
125:8, 125:15
**jury** [2] - 82:5, 82:12
**justice** [1] - 187:7

**K**

**Kaiser** [1] - 86:17
**Kanawha** [1] - 144:2
**Katherine** [1] - 29:9
**KEARSE** [73] - 4:2,
87:17, 88:7, 88:19,
89:15, 90:8, 90:14,
90:16, 90:20, 90:21,
92:5, 92:6, 93:14,
97:15, 97:16, 98:20,
98:21, 101:23,
102:2, 102:4,
104:23, 104:24,
106:8, 106:18,
106:21, 109:8,
109:9, 112:1, 112:2,
113:18, 113:19,
115:19, 115:21,
119:5, 119:6,
119:25, 120:12,
121:7, 124:14,
126:2, 126:5, 126:6,
127:6, 130:14,
130:15, 131:9,
131:10, 133:2,
133:3, 135:18,
135:20, 138:16,
138:17, 142:19,
142:20, 145:12,
145:18, 145:22,
145:25, 146:8,
150:3, 150:4, 155:2,
155:4, 159:25,
160:2, 163:14,
163:16, 167:14,
170:6, 173:13,
184:16, 184:19

**Kearse** [3] - 87:10,
126:1, 245:17
**keep** [10] - 82:19,
137:15, 170:21,
173:12, 175:24,
179:6, 179:7, 210:9,
235:13, 245:14
**keeping** [6] - 81:24,
150:11, 150:16,
152:16, 191:15,
191:20
**keeps** [2] - 158:19
**Kelly** [1] - 6:8
**Kentucky** [7] - 104:3,
122:11, 122:16,
129:17, 131:15,
176:11, 180:3
**kept** [1] - 211:18
**Kerry** [3] - 28:6, 30:23,
84:8
**Kessler** [1] - 4:23
**key** [2] - 100:16, 149:3
**Keyes** [40] - 14:9,
26:22, 28:6, 29:9,
30:23, 33:1, 33:2,
33:4, 33:5, 42:19,
42:22, 43:1, 43:25,
46:1, 46:12, 52:1,
52:4, 52:20, 53:6,
54:15, 64:7, 64:11,
64:14, 65:4, 65:10,
68:24, 69:3, 69:14,
71:9, 71:22, 71:24,
72:6, 72:13, 72:14,
78:11, 83:25, 84:8,
84:23, 84:25
**Keyes'** [8] - 14:25,
42:9, 44:8, 45:23,
45:24, 53:17, 70:11,
70:18
**kicking** [1] - 81:4
**kids** [1] - 178:3
**Kilkenny** [2] - 156:3,
184:4
**kill** [1] - 119:2
**kills** [1] - 135:8
**Kim** [1] - 233:5
**kind** [34] - 8:4, 27:11,
42:18, 70:23, 82:16,
85:6, 97:9, 97:20,
100:7, 103:18,
108:7, 109:14,
112:25, 114:10,
117:17, 118:3,
119:1, 121:1,
127:13, 127:17,
135:7, 137:5, 138:9,
138:25, 144:17,
149:24, 158:3,
158:24, 180:1,

181:17, 195:25,
219:16, 241:6,
244:24
**kinds** [2] - 151:19,
175:5
**knowledge** [24] -
92:17, 202:3,
202:21, 204:7,
204:10, 204:11,
204:13, 206:11,
206:12, 206:13,
206:15, 209:2,
209:3, 209:11,
209:12, 209:15,
209:16, 226:10,
226:11, 226:14,
227:14, 227:18,
227:19, 234:23
**known** [5] - 9:18,
19:25, 96:15,
149:12, 230:24
**knows** [1] - 203:10
**KOUBA** [1] - 4:11

**L**

**LA** [1] - 3:8
**lab** [1] - 94:11
**labor** [3] - 54:1, 74:8,
74:16
**lack** [2] - 155:19,
158:23
**lacked** [2] - 202:3,
202:20
**lacks** [1] - 209:3
**lag** [1] - 184:6
**laid** [3] - 22:11, 209:6,
218:21
**Lancet** [1] - 101:12
**landscape** [1] - 69:24
**Lane** [1] - 94:1
**language** [2] - 59:5,
91:6
**Lanier** [1] - 3:4
**large** [5] - 57:3, 79:24,
150:25, 168:22,
239:7
**largely** [4] - 58:11,
58:17, 58:24, 75:12
**larger** [6] - 62:24,
76:18, 151:20,
239:14, 240:11,
241:8
**largest** [2] - 114:23,
122:15
**last** [25] - 24:12,
56:21, 60:17, 61:16,
62:1, 68:1, 89:20,
98:18, 99:22, 100:6,
119:17, 119:19,

129:15, 129:19,
132:5, 151:13,
157:23, 178:14,
180:24, 185:1,
185:17, 203:24,
235:15, 246:8,
246:11
**Last** [1] - 86:6
**late** [3] - 136:8, 196:3,
240:4
**laughter** [1] - 246:3
**Laughter** [3] - 11:12,
185:3, 246:14
**Laura** [2] - 183:4,
230:19
**LAURA** [1] - 5:10
**law** [6] - 96:11, 125:7,
188:24, 205:2,
214:10, 225:4
**Law** [3] - 3:4, 3:7, 3:12
**lawful** [2] - 48:13,
50:19
**laws** [1] - 191:17
**lawsuit** [5] - 38:19,
38:20, 38:23, 39:1,
39:5
**lawyer** [1] - 88:1
**lay** [4] - 203:16,
217:18, 217:23,
243:13
**layer** [1] - 207:1
**layered** [1] - 197:12
**laying** [1] - 127:19
**layman's** [1] - 39:19
**lead** [2] - 75:17, 87:11
**leadership** [1] - 221:9
**leading** [2] - 216:13,
217:12
**leads** [3] - 39:11,
179:18, 179:19
**leakage** [1] - 140:2
**leap** [1] - 86:7
**leaps** [1] - 137:25
**learn** [2] - 125:19,
157:16
**learned** [3] - 25:3,
177:2, 205:4
**learning** [1] - 177:17
**least** [10] - 17:21,
20:18, 39:15, 52:15,
70:3, 136:1, 164:14,
180:1, 204:21, 234:8
**leave** [1] - 87:8
**leaving** [1] - 181:7
**lectures** [3] - 102:23,
102:25, 103:1
**led** [1] - 11:21
**Lee** [1] - 3:12
**left** [23] - 70:12, 70:15,
79:22, 133:14,

136:10, 141:12,
141:13, 141:18,
146:12, 147:7,
147:10, 194:9,
199:22, 218:23,
224:3, 224:20,
225:14, 233:1,
240:7, 241:20,
244:17, 245:25,
246:7
**left-hand** [1] - 233:1
**left-sided** [1] - 146:12
**legal** [14] - 13:19,
23:16, 24:11, 24:12,
41:21, 86:21, 163:1,
164:2, 164:21,
204:25, 213:9,
213:11, 213:13,
245:18
**legally** [2] - 24:17,
214:20
**legislation** [1] - 18:18
**legitimate** [5] - 34:9,
37:6, 81:12, 199:4,
207:24
**Lemley** [2] - 193:13,
193:14
**length** [1] - 124:20
**lengthy** [1] - 232:21
**Leon** [2] - 2:4, 2:14
**less** [7] - 77:9, 78:14,
118:7, 118:8, 154:6,
159:5, 217:11
**lethal** [1] - 75:17
**letter** [3] - 70:6,
219:19, 232:14
**letters** [1] - 232:24
**letting** [1] - 73:8
**level** [17] - 19:10,
48:22, 48:25, 99:6,
103:5, 143:12,
143:13, 188:13,
192:6, 195:19,
200:21, 201:17,
209:14, 215:16,
226:11, 229:3,
229:15
**levels** [2] - 102:16,
216:12
**Levin** [1] - 2:10
**levity** [1] - 245:10
**Leyimu** [1] - 185:25
**LEYIMU** [29] - 4:13,
185:22, 186:7,
203:13, 204:4,
204:15, 205:23,
206:17, 209:4,
210:7, 210:25,
211:2, 212:18,
213:3, 213:7,

213:10, 214:13, 214:14, 217:19, 217:20, 217:23, 218:1, 218:18, 227:25, 233:10, 233:12, 238:22, 239:17, 244:5
**liability** [1] - 84:18
**liberal** [1] - 81:23
**license** [1] - 91:23
**licensed** [2] - 91:25, 166:15
**lick** [1] - 140:9
**lies** [1] - 181:4
**lieutenant** [1] - 193:8
**life** [30] - 14:18, 15:25, 19:5, 23:13, 23:19, 23:22, 24:1, 25:4, 27:1, 28:20, 37:7, 39:16, 43:13, 66:23, 77:4, 77:9, 77:10, 78:10, 109:17, 111:21, 118:13, 119:4, 132:16, 147:15, 150:14, 152:11, 158:15, 197:15, 198:6, 224:15
**life-threatening** [2] - 109:17, 111:21
**lifelong** [1] - 137:13
**lifetime** [3] - 77:8, 118:17, 154:12
**Lifetime** [1] - 10:15
**light** [1] - 131:25
**likely** [4] - 147:1, 147:19, 153:20, 153:21
**limb** [1] - 184:25
**limit** [1] - 137:15
**limitations** [3] - 15:22, 15:23, 156:16
**limited** [5] - 22:17, 134:13, 142:14, 162:12, 199:2
**LINDA** [1] - 4:8
**Line** [4] - 169:24, 169:25, 241:4, 244:12
**line** [16] - 27:1, 56:21, 60:4, 84:6, 99:25, 130:22, 130:23, 130:24, 138:22, 138:23, 139:2, 165:11, 207:11, 219:24, 228:14, 238:23
**lined** [1] - 116:10
**Lines** [4] - 44:20, 52:20, 53:2

**lines** [2] - 61:1, 139:22
**lining** [2] - 115:13, 139:21
**link** [1] - 106:3
**linked** [1] - 136:12
**Lisa** [3] - 6:18, 247:22, 248:12
**list** [11] - 99:3, 100:17, 122:7, 122:20, 122:23, 123:19, 134:23, 145:11, 247:16
**listen** [2] - 47:10, 82:7
**lists** [1] - 123:18
**literally** [2] - 55:23, 67:16
**literature** [9] - 61:3, 62:25, 91:2, 100:10, 100:14, 106:25, 107:3, 107:6, 108:11
**litigation** [1] - 241:2
**live** [6] - 117:24, 118:11, 123:5, 149:10, 186:11, 186:25
**lived** [1] - 198:8
**liver** [19] - 126:14, 127:16, 127:19, 127:21, 127:22, 128:1, 128:2, 129:25, 130:1, 132:14, 132:15, 135:6, 135:7, 135:8, 137:18, 147:23, 152:2
**lives** [5] - 19:12, 26:12, 28:15, 63:3, 157:1
**living** [1] - 220:20
**LLC** [1] - 2:4
**load** [5] - 118:18, 118:21, 137:14, 137:15
**loan** [1] - 96:19
**loaned** [1] - 96:8
**local** [4] - 65:24, 104:21, 215:16, 232:19
**local/regionally** [1] - 99:1
**locally** [2] - 99:4, 100:8
**location** [2] - 121:24, 183:18
**Logan** [3] - 6:5, 6:12, 104:7
**London** [1] - 110:17
**long-standing** [1] - 220:23
**longtime** [1] - 245:23

**look** [41] - 18:20, 20:1, 28:24, 30:15, 44:20, 55:17, 56:5, 56:14, 56:20, 57:1, 60:4, 60:20, 69:10, 70:9, 71:5, 71:21, 72:2, 90:2, 108:9, 109:2, 122:4, 122:25, 129:13, 130:4, 137:7, 141:7, 148:13, 152:12, 155:11, 172:22, 179:15, 180:13, 180:15, 200:25, 208:5, 214:10, 221:24, 231:22, 232:13, 234:5
**looked** [14] - 19:7, 42:3, 68:24, 69:2, 72:15, 121:8, 122:3, 122:24, 123:9, 144:4, 144:5, 144:10, 186:23, 208:1
**looking** [10] - 41:12, 41:13, 68:14, 76:17, 133:16, 139:10, 146:17, 155:12, 204:17, 233:16
**looks** [3] - 96:21, 131:23, 144:24
**lose** [1] - 77:3
**loss** [2] - 15:12, 15:13
**losses** [1] - 80:13
**lost** [8] - 19:12, 25:4, 26:12, 28:15, 28:20, 63:3, 224:22, 225:3
**loved** [2] - 224:22, 224:24
**lovely** [1] - 186:20
**low** [4] - 116:17, 116:18, 116:19, 141:10
**Low** [1] - 116:19
**lower** [4] - 27:13, 27:15, 31:12, 77:8
**lowered** [1] - 73:25
**luck** [1] - 246:23
**luckily** [1] - 174:10
**lucky** [1] - 127:12
**Luke's** [1] - 91:19
**lunch** [2] - 125:12, 126:7
**lungs** [1] - 141:11

**M**

**M-c-G-u-i-r-e** [1] - 7:8
**ma'am** [12] - 187:10, 187:15, 189:6,

222:1, 230:22, 231:5, 232:6, 233:3, 236:6, 237:1, 239:25, 241:3
**Madison** [1] - 158:5
**Magazine** [1] - 3:7
**Magic** [1] - 118:4
**MAHADY** [20] - 6:4, 201:7, 202:6, 202:11, 202:14, 202:17, 203:24, 204:12, 204:19, 205:17, 205:21, 208:16, 209:10, 210:5, 225:19, 225:21, 228:4, 229:10, 229:12, 229:19
**Mahady** [8] - 201:6, 205:10, 205:16, 225:18, 225:23, 229:8
**main** [8] - 58:12, 59:7, 59:10, 62:13, 75:12, 148:18, 152:16, 215:12
**MAINIGI** [1] - 4:17
**maintain** [2] - 24:21, 137:16
**maintaining** [1] - 193:10
**MAJESTRO** [9] - 2:6, 125:15, 204:23, 213:14, 213:20, 214:6, 244:21, 246:2, 246:11
**Majestro** [2] - 2:6, 213:23
**major** [15] - 90:25, 93:16, 94:9, 100:8, 111:12, 142:9, 143:11, 147:11, 158:21, 225:11, 226:8, 227:14, 227:15, 232:20, 244:25
**majority** [20] - 36:23, 53:8, 53:11, 53:12, 53:13, 53:24, 54:14, 54:21, 54:22, 103:25, 112:12, 114:16, 121:3, 121:4, 121:5, 127:9, 128:21, 146:18, 158:13, 226:1
**makers** [2] - 38:4, 38:15
**malfunction** [1] - 139:25
**malignant** [1] - 118:1

**malt** [1] - 197:22
**man** [3] - 77:10, 118:9, 187:23
**manage** [3] - 110:25, 117:21, 118:14
**manageable** [1] - 148:23
**Management** [1] - 125:9
**management** [1] - 110:24
**managing** [1] - 106:5
**manifestation** [1] - 95:4
**manner** [1] - 206:9
**map** [3] - 123:13, 124:1, 138:9
**maps** [1] - 133:12
**March** [1] - 99:22
**marijuana** [1] - 238:11
**MARK** [1] - 3:14
**Mark** [1] - 144:3
**marked** [5] - 56:4, 127:16, 128:3, 171:24, 232:4
**market** [6] - 54:2, 194:23, 195:1, 197:4, 198:10, 240:20
**markets** [6] - 191:25, 194:13, 194:23, 197:7, 240:1, 240:17
**Marshall** [4] - 187:3, 187:4, 187:11, 187:13
**Mary** [1] - 110:16
**Mary's** [1] - 144:18
**Mash** [1] - 247:22
**massive** [1] - 56:2
**Master's** [1] - 187:17
**material** [5] - 22:19, 112:14, 130:16, 144:25, 184:5
**materials** [4] - 128:14, 145:9, 145:13, 161:21
**matter** [16] - 24:11, 33:23, 43:15, 44:13, 45:12, 96:13, 118:18, 118:20, 124:15, 125:2, 167:21, 198:7, 204:25, 205:1, 208:6, 248:14
**Matthew** [1] - 247:20
**mayor** [4] - 190:21, 212:21, 219:23, 220:4
**Mayor** [1] - 233:5
**mayors** [1] - 190:22

**McCann** [1] - 47:11
**MCCLURE** [1] - 6:3
**McDowell** [2] - 104:6, 122:21
**MCGINNESS** [1] - 4:2
**McGuire** [41] - 7:8, 7:9, 7:12, 7:23, 7:24, 12:3, 12:14, 12:18, 13:10, 16:14, 16:20, 18:3, 18:9, 21:2, 22:20, 23:8, 29:13, 32:18, 32:23, 37:13, 40:7, 44:11, 44:13, 45:6, 45:8, 45:16, 50:15, 51:13, 51:15, 51:21, 52:23, 55:21, 69:25, 73:1, 73:4, 73:20, 77:21, 84:9, 84:17, 84:25, 85:18
**MCGUIRE** [1] - 7:15
**McGuire's** [5] - 42:9, 78:4, 83:20, 85:18, 87:3
**McKesson** [6] - 5:8, 46:25, 51:22, 183:5, 202:24, 230:19
**mean** [20] - 65:18, 65:19, 81:7, 93:1, 108:6, 111:13, 114:7, 122:10, 139:8, 146:12, 156:20, 162:25, 163:12, 163:21, 183:21, 194:13, 198:14, 198:15, 223:4, 242:10
**meaning** [3] - 161:10, 164:7, 165:15
**meaningful** [1] - 220:14
**meanings** [1] - 41:18
**means** [16] - 14:7, 30:20, 39:19, 69:5, 111:5, 153:13, 161:10, 161:14, 163:25, 179:5, 181:6, 198:19, 198:20, 199:1, 215:22, 243:8
**meant** [2] - 176:22, 178:19, 179:11
**measure** [5] - 77:2, 83:9, 137:13, 137:14, 180:17
**measures** [3] - 113:17, 148:25, 200:4
**measuring** [1] - 31:20
**mechanical** [2] - 6:19, 140:22

**Medicaid** [3] - 65:22, 99:16, 134:14
**Medical** [6] - 8:3, 9:12, 91:16, 91:19, 92:13, 174:10
**medical** [54] - 34:9, 75:18, 91:10, 91:11, 91:15, 91:23, 92:14, 92:17, 93:3, 93:4, 94:9, 94:22, 95:18, 97:2, 100:21, 102:20, 107:23, 108:1, 114:10, 115:11, 127:20, 132:24, 142:9, 142:11, 151:10, 158:9, 158:19, 162:10, 162:21, 162:23, 162:24, 162:25, 163:6, 163:25, 164:1, 164:7, 164:20, 165:4, 165:5, 165:7, 165:13, 165:16, 165:24, 166:14, 166:20, 166:23, 167:10, 167:25, 168:4, 168:14, 169:3, 169:7, 170:3
**medically** [1] - 154:25
**Medicare** [1] - 65:22
**medication** [2] - 106:2, 137:13
**medications** [7] - 34:9, 37:8, 94:10, 99:17, 141:21, 168:24, 201:1
**Medicine** [21] - 9:15, 9:16, 9:19, 9:23, 9:25, 55:11, 55:13, 56:7, 56:16, 89:7, 89:8, 89:9, 89:10, 92:21, 97:25, 98:4, 98:13, 100:20, 100:21, 151:24
**medicine** [17] - 91:18, 91:25, 92:18, 92:19, 102:24, 102:25, 103:4, 103:5, 110:23, 118:21, 119:3, 163:11, 168:19, 199:7, 243:22, 244:3, 244:16
**Medicine's** [1] - 74:3
**medicines** [2] - 95:9, 118:6
**meet** [8] - 81:18, 155:25, 160:10, 209:16, 213:17,

213:21, 214:5, 225:22
**meeting** [1] - 155:21
**meetings** [3] - 192:12, 210:15, 212:17
**member** [8] - 9:14, 9:15, 9:25, 10:7, 16:2, 96:20, 97:17, 97:19
**members** [3] - 9:24, 157:25, 233:18
**membership** [1] - 9:21
**memo** [3] - 232:10, 233:4
**Memoranda** [1] - 153:1
**memoranda** [1] - 232:7
**memorandum** [2] - 232:16, 234:20
**memory** [1] - 183:21
**memos** [1] - 234:15
**men** [7] - 77:8, 115:12, 116:13, 116:24, 118:12, 155:17
**mental** [1] - 151:9
**Mental** [3] - 9:4, 11:20, 174:23
**mention** [3] - 15:7, 161:24, 208:23
**mentioned** [13] - 20:2, 105:11, 105:24, 108:25, 121:4, 130:16, 137:24, 140:12, 183:7, 183:10, 183:24, 194:10, 223:10
**mentored** [1] - 102:17
**Mentoring** [1] - 99:11
**mentoring** [1] - 104:5
**Mercer** [1] - 104:6
**message** [1] - 185:4
**met** [1] - 160:9
**metabolism** [1] - 177:14
**methamphetamine** [13] - 164:17, 174:15, 175:2, 175:3, 176:13, 176:15, 177:23, 177:25, 178:2, 178:10, 178:12, 179:5, 180:11
**methamphetamines** [1] - 166:2
**method** [2] - 14:6, 39:16, 49:24
**methodologies** [1] - 27:19
**methodology** [44] -

14:13, 14:24, 15:21, 16:8, 16:15, 16:20, 16:23, 16:24, 17:5, 18:24, 19:1, 19:13, 20:14, 21:25, 22:3, 22:21, 23:12, 23:20, 25:16, 25:25, 27:4, 27:13, 27:17, 28:24, 29:1, 30:14, 30:16, 31:3, 31:7, 32:5, 38:21, 60:1, 60:3, 62:14, 68:4, 68:20, 76:5, 76:25, 77:5, 77:12, 83:14, 106:23, 108:4
**methods** [3] - 63:4, 76:9, 76:10
**metropolitan** [1] - 104:22
**Mexican** [2] - 237:9, 237:15
**Mexico** [5] - 237:13, 237:14, 239:11, 239:24, 240:9
**MICHAEL** [2] - 2:12, 3:9
**microphone** [3] - 8:4, 160:17, 231:7
**mid** [2] - 89:21, 220:6
**mid-morning** [1] - 89:21
**midnight** [2] - 89:20, 119:19
**midst** [1] - 224:4
**might** [17] - 17:25, 42:12, 70:22, 83:12, 85:2, 124:16, 163:8, 163:22, 164:20, 164:21, 166:1, 166:5, 172:7, 204:7, 206:2, 213:14, 221:24
**MILDRED** [1] - 3:3
**milk** [2] - 114:25, 115:1
**milligram** [1] - 219:12
**million** [24] - 25:8, 27:23, 27:24, 27:25, 28:1, 28:2, 28:3, 28:17, 31:12, 43:14, 57:4, 65:15, 116:2, 129:6, 135:23, 135:24
**millions** [2] - 14:15, 14:16
**mind** [5] - 8:4, 157:2, 159:20, 161:6, 164:15
**mine** [1] - 209:15
**Mingo** [3] - 104:6,

122:21, 122:22
**minimizing** [2] - 149:5, 149:19
**minor** [1] - 113:10
**minute** [8] - 29:12, 52:5, 52:7, 87:12, 87:15, 101:17, 189:13, 217:13
**minutes** [4] - 53:7, 73:3, 151:4, 178:16
**miracle** [1] - 132:24
**mirrors** [1] - 130:24
**mischaracterizing** [1] - 238:24
**misfortune** [1] - 141:16
**missing** [2] - 44:9, 189:16
**mission** [4] - 191:12, 191:20, 193:25, 221:25
**misspoke** [1] - 176:20
**mistakes** [1] - 73:23
**misunderstanding** [1] - 43:22
**misuse** [9] - 162:25, 164:21, 165:1, 166:9, 173:2, 173:7, 179:5, 181:6, 182:6
**Mitchell** [1] - 2:10
**mitigate** [1] - 211:23
**mixed** [1] - 216:10
**model** [1] - 156:6
**Modestly** [1] - 107:24
**Mole** [1] - 179:7
**moment** [7] - 16:8, 32:10, 58:16, 70:13, 179:17, 182:8, 245:10
**moments** [1] - 66:15
**Monday** [1] - 247:8
**money** [18] - 39:24, 40:21, 41:9, 103:16, 105:22, 105:23, 114:12, 148:20, 154:6, 154:22, 174:22, 174:24, 174:25, 175:2, 175:6, 180:15, 197:20, 198:8
**Monongalia** [1] - 103:24
**month** [1] - 156:11
**months** [5] - 101:12, 176:23, 190:3, 209:18
**morality** [1] - 28:23
**morbidities** [1] - 83:8
**morbidity** [23] - 14:5, 14:21, 14:24, 16:3,

18:25, 20:17, 28:25, 29:15, 29:19, 29:21, 29:22, 40:11, 43:17, 45:10, 46:1, 64:13, 68:21, 69:2, 86:14, 112:23, 134:16, 134:17, 147:20
**Morgantown** [1] - 142:16
**morning** [22] - 7:18, 7:21, 32:18, 32:19, 32:21, 33:3, 33:6, 37:15, 45:17, 48:11, 50:1, 51:21, 74:23, 78:23, 87:17, 87:18, 87:24, 87:25, 88:16, 88:17, 89:21, 247:8
**morphine** [1] - 165:11
**Morris** [1] - 6:15
**mortality** [8] - 20:15, 29:21, 29:22, 39:24, 86:14, 112:24, 134:16, 134:17
**most** [50] - 10:19, 13:10, 14:23, 30:18, 63:2, 95:3, 100:7, 101:11, 103:15, 103:18, 110:23, 111:20, 113:3, 115:7, 115:8, 115:10, 115:16, 115:17, 122:22, 128:12, 132:25, 134:3, 134:19, 137:21, 137:23, 140:7, 147:15, 148:3, 148:12, 148:13, 149:11, 152:10, 174:24, 178:11, 180:1, 187:22, 187:24, 200:18, 216:16, 219:25, 221:8, 221:21, 235:5, 236:7, 239:7, 241:24, 242:7
**mostly** [3] - 65:23, 121:20, 177:23
**mother** [2] - 94:23, 114:25
**motion** [2] - 12:10, 178:21
**motivation** [1] - 152:12
**motivations** [1] - 217:16
**Motley** [5] - 4:3, 4:5, 4:8, 4:11, 4:14
**MOUGEY** [1] - 2:9
**mouth** [4] - 140:8,

140:10, 146:23, 164:13
**move** [17] - 13:1, 23:8, 40:7, 113:20, 131:2, 139:14, 147:8, 157:21, 171:12, 172:2, 178:14, 179:2, 182:18, 204:11, 212:18, 229:16, 233:7
**moved** [7] - 9:11, 97:9, 97:10, 168:5, 176:5, 189:12, 246:13
**moving** [6] - 52:25, 95:19, 164:19, 171:15, 172:14, 179:1
**MR** [138] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:14, 4:5, 4:22, 5:9, 5:10, 5:13, 6:4, 7:7, 7:20, 11:13, 12:2, 12:9, 12:16, 12:17, 13:3, 13:7, 13:9, 16:10, 16:23, 17:9, 17:14, 18:7, 18:8, 19:19, 20:22, 20:24, 21:1, 21:6, 21:8, 21:13, 21:15, 22:7, 22:23, 23:1, 23:6, 23:7, 24:23, 25:1, 26:3, 26:7, 26:9, 29:2, 30:2, 31:14, 31:16, 32:10, 32:13, 45:3, 51:17, 51:20, 52:9, 52:14, 52:22, 53:1, 53:4, 54:10, 54:12, 55:18, 55:20, 68:11, 68:15, 68:18, 69:16, 69:18, 69:21, 73:1, 73:6, 73:19, 75:2, 75:6, 75:23, 76:4, 77:15, 77:19, 80:5, 82:10, 82:24, 83:3, 83:23, 84:8, 85:4, 85:17, 86:1, 86:7, 86:20, 87:10, 87:12, 87:15, 126:5, 125:15, 125:16, 185:16, 185:20, 201:7, 202:6, 202:11, 202:14, 202:17, 203:24, 204:12, 204:19, 204:23, 205:17, 205:21, 208:16, 209:10, 210:5, 213:14, 213:20, 214:6, 225:19, 225:21, 228:4,

229:10, 229:12, 229:19, 230:3, 235:17, 244:21, 245:9, 245:13, 245:15, 245:19, 245:21, 246:2, 246:4, 246:10, 246:11, 246:15, 246:17, 247:4, 248:1
**MS** [207] - 3:3, 3:6, 4:2, 4:8, 4:11, 4:13, 4:17, 4:18, 4:20, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 12:7, 16:11, 16:13, 17:4, 17:20, 22:10, 24:21, 32:17, 44:10, 44:12, 45:15, 50:12, 50:14, 51:13, 73:14, 74:21, 77:17, 78:4, 78:20, 79:10, 81:6, 82:1, 84:17, 86:21, 87:17, 87:18, 87:24, 88:2, 88:6, 88:7, 88:19, 89:15, 89:17, 90:8, 90:13, 90:14, 90:16, 90:20, 90:21, 92:5, 92:6, 93:14, 97:15, 97:16, 98:20, 98:21, 101:18, 101:23, 102:2, 102:4, 104:23, 104:24, 106:8, 106:13, 106:18, 106:21, 109:8, 109:9, 112:1, 112:2, 113:18, 113:19, 115:19, 115:21, 119:5, 119:6, 119:12, 119:25, 120:5, 120:11, 120:12, 121:7, 124:14, 124:18, 126:2, 126:5, 126:6, 127:6, 130:14, 130:15, 131:9, 131:10, 133:2, 133:3, 135:18, 135:20, 138:16, 138:17, 142:19, 142:20, 145:6, 145:12, 145:18, 145:22, 145:25, 146:8, 150:3, 150:4, 155:2, 155:4, 159:25, 160:2, 160:5, 163:14, 163:15, 163:16, 163:20, 167:14, 167:16, 167:20, 167:24, 169:23, 170:1, 170:6,

170:10, 170:20, 170:22, 171:12, 171:14, 172:1, 172:6, 172:8, 173:13, 178:14, 178:24, 178:25, 182:7, 182:11, 182:16, 183:1, 183:3, 184:16, 184:19, 185:22, 186:7, 203:13, 204:4, 204:15, 205:23, 206:17, 209:4, 210:7, 210:25, 211:2, 212:18, 212:25, 213:3, 213:6, 213:7, 213:8, 213:10, 213:22, 214:13, 214:14, 217:14, 217:19, 217:20, 217:23, 218:1, 218:18, 227:25, 229:24, 230:10, 230:14, 230:16, 230:18, 231:24, 232:2, 233:7, 233:10, 233:12, 233:14, 233:15, 235:24, 235:25, 237:20, 238:22, 239:2, 239:3, 239:17, 239:21, 240:23, 240:25, 244:5, 244:10, 244:13, 245:2, 245:5, 247:14, 247:16, 247:19, 247:24
**Mt** [3] - 4:4, 4:12, 4:15
**multi** [3] - 193:7, 197:12, 200:22
**multi-agency** [1] - 200:22
**multi-layered** [1] - 197:12
**multi-task** [1] - 193:7
**multiple** [8] - 117:25, 126:16, 153:17, 173:23, 176:7, 190:13, 207:25
**multiplication** [1] - 28:9
**multiplied** [1] - 79:23
**multipliers** [2] - 67:8, 67:12
**multiply** [1] - 141:1
**multiplying** [1] - 78:10
**murmur** [3] - 140:4, 140:5, 140:6

**myocardial** [1] - 165:12

---

**N**

---

**naloxone** [3] - 104:19, 150:21, 180:17
**name** [18] - 7:11, 7:21, 51:21, 56:6, 88:4, 88:11, 88:24, 90:9, 96:14, 160:8, 183:4, 186:1, 186:9, 193:8, 193:13, 225:22, 230:19, 246:8
**names** [1] - 88:3
**narcotics** [5] - 168:24, 188:14, 188:23, 227:16, 238:3
**narrow** [2] - 175:3, 179:5
**narrowly** [1] - 179:25
**Nathan** [2] - 247:19, 247:21
**nation** [2] - 17:11, 27:3
**National** [11] - 9:3, 9:15, 11:18, 11:19, 11:22, 11:23, 11:24, 92:13, 93:22, 99:8
**national** [6] - 9:20, 20:1, 43:14, 57:9, 98:9, 99:6
**nationally** [4] - 99:1, 99:5, 131:23, 215:16
**Nature** [4] - 171:17, 171:20, 172:10, 173:9
**nature** [4] - 71:2, 111:4, 115:13, 226:17
**near** [1] - 56:20
**nearby** [1] - 197:16
**necessarily** [3] - 194:20, 226:15, 242:6
**necessary** [1] - 37:7
**need** [22] - 15:18, 22:21, 27:6, 27:20, 29:14, 35:6, 52:5, 56:1, 87:12, 87:15, 104:8, 110:3, 132:15, 142:4, 147:10, 158:3, 158:9, 158:17, 181:22, 210:3, 235:7, 247:13
**needed** [5] - 38:5, 38:15, 94:4, 169:5, 189:23
**needing** [1] - 146:14

**needle** [4] - 111:10, 140:10, 140:11, 149:16
**needles** [2] - 104:15, 161:12
**needs** [1] - 155:22
**negotiate** [1] - 150:15
**neighbor** [1] - 224:21
**neighborhood** [6] - 195:8, 220:24, 221:7, 221:10, 221:11, 221:15
**Neighborhood** [3] - 220:24, 221:5, 221:8
**neighborhoods** [1] - 221:16
**Neighbors** [1] - 186:22
**neighbors** [2] - 186:22, 186:23
**nervous** [1] - 176:9
**net** [3] - 35:5, 45:7, 79:3
**netting** [1] - 35:11
**network** [1] - 221:10
**networks** [1] - 223:14
**neurologic** [1] - 148:2
**never** [11] - 111:1, 143:7, 162:17, 170:24, 180:17, 209:19, 225:3, 225:13, 234:19, 241:23
**New** [4] - 3:5, 3:8, 100:19, 151:24
**new** [25] - 89:22, 93:19, 107:9, 116:12, 116:18, 116:23, 117:5, 117:10, 117:11, 118:2, 120:21, 121:12, 121:13, 123:22, 125:14, 132:22, 140:4, 143:8, 157:6, 160:14, 168:23, 168:25, 169:1, 173:3, 174:16
**newborn** [1] - 94:25
**newborns** [1] - 135:13
**newer** [1] - 139:11
**newfound** [1] - 174:16
**newspaper** [1] - 86:16
**next** [27] - 9:7, 14:5, 15:16, 16:10, 23:8, 26:3, 51:7, 56:19, 57:9, 59:25, 60:9, 62:12, 65:8, 87:9, 105:13, 110:2, 113:22, 115:19,

134:22, 135:18, 164:6, 169:25, 172:15, 179:1, 222:9, 225:10
**NIAID** [2] - 94:2, 95:19
**nice** [3] - 160:9, 225:22, 245:22
**NICHOLAS** [1] - 6:11
**NIDA** [1] - 105:19
**night** [3] - 89:20, 119:17, 119:19
**NIH** [6] - 94:1, 94:7, 95:15, 96:8, 96:19, 103:13
**nine** [1] - 104:12
**Ninth** [1] - 4:9
**noblest** [1] - 187:25
**nobody** [4] - 149:6, 180:7, 180:8, 246:13
**nominated** [1] - 9:22
**non** [13] - 82:19, 162:10, 162:21, 162:24, 162:25, 163:6, 163:25, 164:1, 164:7, 164:20, 165:24, 166:20, 178:15
**Non** [2] - 126:21, 126:22
**Non-A** [1] - 126:21
**Non-B** [1] - 126:22
**non-fit** [1] - 82:19
**non-medical** [11] - 162:10, 162:21, 162:24, 162:25, 163:6, 163:25, 164:1, 164:7, 164:20, 165:24, 166:20
**non-responsive** [1] - 178:15
**none** [2] - 15:13, 166:22
**nonprescription** [1] - 19:17
**normal** [1] - 211:18
**norms** [1] - 168:21
**north** [1] - 122:12
**North** [3] - 189:5, 189:13, 225:10
**northeastern** [2] - 176:11, 180:4
**Northeastern** [1] - 122:12
**nosy** [1] - 186:23
**notable** [1] - 11:15
**note** [5] - 21:9, 80:12, 90:5, 119:21, 208:20
**noted** [2] - 37:23, 90:12

**notes** [3] - 119:23, 204:17, 210:1
**nothing** [16] - 52:14, 78:11, 78:22, 79:25, 81:12, 84:19, 84:22, 84:23, 86:24, 87:4, 127:22, 209:18, 210:1, 244:2, 244:15, 247:7
**November** [1] - 25:25
**nuance** [2] - 173:10, 173:18
**nuanced** [1] - 175:18
**nuisance** [8] - 79:16, 80:17, 80:20, 84:15, 85:19, 85:25, 86:19, 86:22
**number** [75] - 11:21, 14:9, 14:14, 14:25, 15:2, 20:6, 20:10, 24:5, 25:15, 25:16, 25:18, 28:5, 28:7, 28:8, 30:12, 30:20, 30:24, 31:12, 43:2, 43:18, 50:1, 50:6, 50:7, 50:8, 50:11, 65:14, 65:15, 72:12, 91:9, 92:5, 94:6, 95:5, 97:5, 100:15, 100:24, 102:12, 102:16, 107:8, 107:9, 107:10, 113:22, 115:22, 116:1, 116:22, 120:17, 120:20, 121:11, 121:12, 122:15, 122:21, 122:22, 123:3, 127:15, 129:1, 129:15, 129:16, 129:20, 135:22, 136:2, 136:24, 142:14, 142:21, 144:15, 144:21, 184:8, 189:12, 191:24, 220:16, 221:7, 223:2, 232:19, 241:18
**numbers** [36] - 14:11, 14:12, 15:14, 29:4, 29:8, 43:7, 43:25, 45:25, 46:11, 55:8, 57:3, 58:4, 58:5, 63:12, 64:17, 65:3, 69:5, 69:6, 69:13, 70:16, 71:10, 71:12, 71:24, 72:9, 72:15, 72:22, 73:25, 79:22, 79:24, 80:24, 84:5, 84:6, 90:4, 153:1,

154:13, 233:1
**nurse** [1] - 165:17
**nursing** [1] - 115:1
**NW** [6] - 4:6, 4:9, 4:19, 4:21, 5:5, 5:12
**NY** [1] - 3:5

## O

**oath** [4] - 7:10, 44:16, 88:10, 169:15
**object** [13] - 22:12, 22:14, 45:3, 79:16, 120:3, 201:8, 203:8, 203:9, 212:25, 217:14, 227:25, 239:17, 244:5
**objected** [3] - 202:21, 203:2, 203:3
**objectify** [1] - 12:9
**objecting** [2] - 203:16, 238:22
**objection** [40] - 12:6, 12:7, 16:13, 16:16, 18:5, 22:10, 23:4, 24:22, 45:2, 45:14, 75:4, 89:18, 90:12, 106:12, 106:13, 119:13, 120:6, 145:7, 163:14, 163:16, 167:14, 170:6, 202:22, 203:4, 204:1, 204:21, 204:24, 205:10, 205:16, 205:19, 208:17, 210:2, 233:9, 233:10, 233:11, 233:12, 244:21, 246:2, 246:11
**Objection** [3] - 74:21, 75:23, 217:14
**objectionable** [1] - 217:17
**objections** [2] - 24:24, 248:3
**objective** [2] - 24:14, 83:9
**objectively** [1] - 83:15
**oblivion** [2] - 180:9, 182:2
**observations** [1] - 172:19
**observed** [9] - 24:11, 167:6, 167:11, 167:25, 168:10, 203:22, 204:25, 205:2, 222:19
**observing** [1] - 195:9
**obsessive** [1] - 153:14

**obstacles** [1] - 158:24
**obtain** [4] - 187:4, 187:13, 187:16, 192:15
**obtained** [4] - 120:13, 199:3, 234:24, 243:5
**obtaining** [3] - 198:19, 198:20, 198:22
**obvious** [2] - 16:1, 206:18
**obviously** [4] - 12:14, 15:11, 23:3, 24:10
**occasion** [2] - 36:17, 47:10
**occasionally** [1] - 238:17
**occupation** [1] - 89:1
**occupational** [1] - 61:3
**occur** [2] - 72:18, 197:25
**occurred** [4] - 71:3, 178:16, 206:15, 226:19
**OCDETF** [2] - 232:17, 242:8
**October** [1] - 232:14
**odd** [1] - 72:19
**OF** [2] - 1:1, 1:4
**offer** [5] - 24:14, 107:6, 124:20, 182:2, 184:12
**offered** [3] - 45:7, 78:7, 184:1
**offering** [5] - 41:3, 41:8, 41:22, 149:20, 166:23
**offers** [1] - 184:11
**Office** [7] - 18:15, 36:14, 36:21, 96:10, 96:11, 96:13, 125:9
**office** [3] - 21:23, 165:17, 213:24
**office's** [4] - 23:2, 24:8, 213:4, 213:15
**officer** [9] - 94:22, 95:19, 187:9, 187:20, 188:25, 189:11, 213:10, 218:25, 220:5
**officers** [5] - 188:18, 192:23, 194:4, 212:6, 231:11
**Official** [2] - 248:11, 248:12
**official** [1] - 235:11
**officials** [2] - 212:16, 220:15
**offsets** [1] - 65:16
**Often** [1] - 207:20

**often** [10] - 115:11, 140:8, 144:13, 158:16, 159:4, 177:5, 199:4, 206:4, 223:7, 231:2
**Oftentimes** [1] - 198:20
**oftentimes** [1] - 197:1
**Ohio** [10] - 92:1, 92:2, 104:11, 104:20, 122:11, 143:5, 176:11, 180:4, 183:8, 231:20
**Ohio's** [1] - 104:13
**oil** [1] - 86:11
**old** [1] - 185:9
**older** [1] - 141:19
**on-line** [1] - 99:25
**on-site** [1] - 151:2
**once** [14] - 81:9, 118:10, 132:8, 133:13, 135:16, 136:22, 147:16, 168:14, 171:4, 176:7, 198:24, 199:3, 244:17
**Once** [1] - 199:3
**One** [6] - 5:11, 98:3, 103:24, 110:19, 123:5, 191:24
**one** [115] - 15:7, 15:10, 17:21, 18:15, 19:18, 27:6, 30:13, 47:13, 50:1, 52:23, 53:18, 54:23, 60:21, 61:16, 63:7, 63:10, 64:21, 67:15, 67:16, 67:21, 67:22, 67:23, 69:19, 70:2, 70:6, 70:9, 71:1, 71:5, 71:8, 72:2, 72:9, 75:23, 76:19, 76:23, 81:7, 81:22, 85:20, 92:15, 93:23, 94:21, 95:24, 95:25, 96:12, 97:5, 98:7, 98:24, 99:20, 103:10, 104:25, 112:10, 113:24, 118:10, 122:21, 122:22, 123:5, 125:20, 129:15, 130:5, 131:6, 132:18, 136:21, 137:7, 143:13, 143:23, 144:25, 145:13, 149:17, 151:2, 154:6, 154:12, 165:2, 165:7, 169:14, 173:3, 177:9,

183:18, 183:23, 185:17, 186:23, 191:15, 195:5, 198:5, 200:7, 200:14, 202:11, 206:14, 207:24, 213:21, 219:11, 219:15, 220:16, 221:9, 223:6, 224:19, 224:22, 224:24, 225:9, 227:16, 229:17, 231:22, 234:6, 234:15, 237:17, 237:18, 238:7, 238:11, 239:4, 240:8, 241:18, 242:1, 244:22, 245:12, 246:18
**ones** [9] - 15:12, 72:15, 100:16, 102:21, 104:15, 112:24, 147:11, 149:23, 207:11
**ongoing** [2] - 152:2, 176:25
**open** [12] - 182:24, 191:25, 194:13, 194:23, 195:1, 197:4, 197:6, 198:10, 235:14, 240:1, 240:17, 240:20
**open-air** [7] - 191:25, 194:13, 194:23, 195:1, 197:4, 197:6, 198:10
**operating** [1] - 233:22
**Operation** [1] - 232:8
**operation** [2] - 183:17, 232:7
**operationally** [1] - 190:17
**operations** [2] - 190:12, 195:15
**opinion** [14] - 40:15, 41:3, 41:22, 75:24, 159:17, 171:16, 171:19, 172:17, 172:18, 173:9, 173:23, 179:23, 196:16, 202:2
**opinions** [4] - 23:14, 31:18, 31:19, 32:2, 41:8, 45:6, 93:13, 101:20, 108:2, 108:12, 124:20, 148:24, 160:23, 166:23
**opioid** [86] - 16:25,

17:16, 18:17, 18:21, 19:12, 20:2, 25:4, 26:12, 30:5, 34:9, 40:20, 41:24, 44:23, 46:24, 58:7, 59:15, 59:16, 84:1, 84:9, 87:1, 97:3, 97:7, 101:2, 101:4, 101:6, 101:13, 102:8, 102:18, 102:22, 103:8, 103:11, 103:17, 103:22, 106:5, 106:10, 106:11, 106:16, 106:17, 107:19, 109:19, 111:23, 112:5, 114:1, 114:9, 122:14, 124:11, 124:13, 133:23, 133:24, 137:2, 142:4, 150:22, 151:15, 159:19, 161:3, 161:7, 162:6, 162:13, 162:18, 164:11, 164:22, 168:23, 171:16, 171:20, 174:25, 175:7, 176:6, 178:9, 196:25, 197:5, 197:10, 198:2, 198:4, 199:8, 199:16, 207:6, 209:9, 215:15, 216:3, 217:9, 221:20, 222:23, 223:1, 224:1, 224:4, 224:9
**Opioid** [18] - 18:12, 30:21, 31:10, 39:2, 43:3, 105:17, 109:16, 150:12, 151:7, 151:8, 152:7, 158:1, 158:7, 158:20, 178:1, 180:12, 181:19, 181:20
**opioid-related** [2] - 40:20, 41:24
**opioids** [122] - 13:17, 14:11, 14:20, 18:22, 18:23, 19:17, 20:3, 26:16, 26:21, 28:16, 29:4, 33:7, 33:13, 34:13, 34:17, 34:23, 35:6, 35:12, 35:18, 35:22, 36:3, 36:9, 37:5, 37:19, 40:17, 41:1, 41:5, 41:11, 42:3, 42:16, 42:24, 43:10, 44:4, 44:22, 45:19, 46:16, 46:21,

46:25, 47:3, 47:6, 47:17, 47:24, 48:8, 48:23, 49:4, 49:8, 49:20, 49:25, 50:19, 50:20, 53:9, 53:25, 54:2, 54:23, 58:17, 59:11, 63:23, 63:24, 64:4, 64:10, 64:17, 65:5, 65:11, 67:3, 67:24, 72:17, 72:18, 74:12, 74:17, 74:19, 75:17, 76:21, 76:22, 86:3, 99:9, 108:20, 112:13, 124:12, 133:23, 149:2, 161:19, 161:23, 162:15, 165:14, 166:14, 167:7, 167:12, 168:2, 170:4, 173:24, 174:6, 174:7, 174:18, 175:12, 175:14, 176:8, 176:12, 176:14, 176:17, 177:15, 178:7, 178:12, 179:3, 179:5, 180:10, 181:16, 192:1, 195:13, 196:6, 198:20, 198:22, 199:12, 200:8, 200:11, 207:10, 208:3, 215:22, 219:10, 240:3, 242:17
**Opioids** [3] - 58:11, 75:11, 172:11
**opportunistic** [2] - 95:25, 118:1
**Opportunistic** [1] - 96:3
**opportunities** [2] - 188:17, 189:17
**opportunity** [10] - 68:6, 76:13, 87:20, 90:6, 96:6, 112:18, 119:20, 184:24, 187:23, 189:16
**opposed** [4] - 48:13, 124:19, 147:2, 165:16
**optimistic** [1] - 230:10
**options** [2] - 38:6, 38:16
**oral** [1] - 166:6
**orange** [4] - 130:22, 130:24, 138:12, 138:21
**order** [11] - 39:20, 107:6, 123:15,

123:16, 127:4, 139:18, 156:4, 156:19, 156:23, 170:11, 200:3
**orders** [1] - 48:18
**organ** [2] - 113:6, 147:22
**organic** [1] - 91:13
**organism** [1] - 126:21
**organisms** [4] - 112:19, 113:11, 140:10, 140:17
**organization** [8] - 10:4, 10:10, 97:22, 98:9, 98:13, 168:22, 220:23, 240:19
**organizations** [21] - 9:14, 9:17, 97:18, 97:19, 98:1, 98:2, 99:7, 108:11, 196:6, 196:14, 200:23, 215:19, 219:9, 220:25, 223:13, 225:8, 242:4, 242:16, 242:19, 242:22, 243:5
**organized** [2] - 87:20, 225:9
**oriented** [1] - 70:7
**origin** [2] - 234:19, 237:14
**original** [2] - 58:5, 72:15
**originally** [2] - 156:16, 186:13
**originated** [2] - 239:11, 239:24
**Orleans** [1] - 3:8
**otherwise** [3] - 146:20, 157:3, 164:23
**Otherwise** [1] - 123:23
**OUD** [15] - 15:1, 15:10, 15:15, 16:6, 29:4, 29:11, 30:7, 30:14, 30:15, 30:20, 30:24, 72:8, 72:12, 156:17, 157:17
**out-of-pocket** [2] - 40:21, 40:24
**out-of-state** [1] - 232:19
**outbreak** [4] - 121:21, 121:24, 157:5, 180:7
**outbreaks** [2] - 121:16, 124:4
**outcome** [3] - 117:24, 152:10, 152:15
**outcomes** [2] - 134:15, 214:24

**outline** [1] - 214:15
**outlined** [1] - 216:1
**outpatient** [1] - 148:11
**outrageously** [1] - 196:18
**outreach** [2] - 157:4, 157:5
**outside** [5] - 75:25, 144:23, 198:1, 231:19, 234:16
**outstanding** [1] - 232:17
**outweigh** [1] - 36:10
**outweighed** [1] - 36:4
**overall** [1] - 130:23
**overcome** [1] - 203:11
**overdose** [20] - 59:16, 63:15, 101:7, 124:6, 124:12, 133:15, 150:18, 150:22, 174:9, 174:17, 175:14, 176:25, 177:10, 177:16, 179:20, 236:17, 236:20, 236:21, 236:24, 240:4
**Overdose** [3] - 19:23, 104:19, 105:21
**overdosed** [1] - 236:25
**overdoses** [12] - 109:16, 133:5, 133:10, 133:24, 154:20, 199:14, 199:15, 199:16, 216:13, 216:14, 220:10, 240:18
**overlap** [1] - 123:20
**overlapped** [1] - 175:16
**overlay** [1] - 180:10
**overrule** [3] - 18:5, 23:4, 45:13
**overruled** [5] - 76:1, 145:23, 238:25, 239:18, 244:7
**Overruled** [2] - 102:3, 218:17
**oversaw** [6] - 201:14, 201:16, 201:21, 203:21, 207:18, 229:1
**oversee** [3] - 192:10, 227:10, 228:24
**overseeing** [2] - 206:1, 229:13
**oversight** [6] - 190:15, 207:1, 226:6, 227:7, 227:9, 227:23
**overstated** [1] - 60:19

**overview** [1] - 147:7
**overwhelming** [8] - 36:22, 53:8, 53:11, 53:13, 53:23, 54:14, 54:20, 54:22
**overwhelmingly** [1] - 174:18
**own** [10] - 10:3, 25:10, 52:15, 127:13, 158:22, 161:22, 168:20, 168:21
**Oxblood** [1] - 139:2
**oxycodone** [1] - 232:19
**oxygen** [1] - 141:11
**oxygenated** [1] - 141:13

**P**

**P-1200** [1] - 2:7
**P-41374** [2] - 211:5, 212:19
**P-41527** [2] - 211:6, 212:19
**P-41886** [4] - 20:21, 38:11, 57:23, 66:12
**p.m** [5] - 119:17, 125:22, 182:22, 235:10, 248:7
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**packaging** [1] - 240:6
**page** [21] - 13:4, 21:12, 21:19, 24:12, 26:11, 43:23, 56:5, 56:6, 56:19, 58:3, 59:25, 60:9, 62:12, 64:12, 65:8, 105:15, 109:25, 119:18, 169:25, 175:21, 232:10
**Page** [44] - 21:10, 26:11, 31:17, 38:11, 44:11, 44:20, 50:13, 56:19, 56:23, 58:6, 59:14, 59:25, 60:1, 60:16, 60:17, 60:22, 61:9, 62:12, 64:22, 65:2, 66:13, 66:14, 68:19, 72:4, 76:6, 80:12, 80:19, 169:24, 170:21, 204:22, 216:23, 220:21, 221:23, 228:14, 232:24, 233:4, 233:16, 234:6, 241:4, 244:12
**pages** [2] - 99:4, 120:19

**paid** [2] - 33:18, 38:21
**Pain** [2] - 56:17, 74:4
**pain** [34] - 34:18, 35:7, 35:14, 54:4, 54:9, 55:2, 55:7, 55:15, 57:2, 57:4, 57:10, 58:12, 58:18, 59:6, 59:12, 74:3, 74:6, 74:10, 74:15, 75:13, 163:3, 168:1, 168:3, 168:8, 168:15, 168:16, 169:9, 169:10, 170:4, 171:4, 171:5, 195:13, 200:25
**palliative** [4] - 34:23, 35:8, 35:14, 37:6
**pandemic** [4] - 99:24, 117:13, 117:15, 117:17
**Papantonio** [1] - 2:10
**paper** [2] - 38:3, 101:11
**papers** [10] - 10:17, 10:21, 11:4, 11:7, 20:10, 30:13, 30:17, 30:18, 88:5, 107:9
**paragraph** [16] - 60:9, 60:17, 60:20, 62:20, 62:21, 173:1, 176:1, 178:17, 179:1, 180:25, 216:24, 222:2, 232:13, 233:17, 234:5
**parallel** [1] - 137:4
**paraphernalia** [1] - 197:22
**Pardon** [4] - 88:22, 91:24, 101:9, 102:6
**parenting** [1] - 15:13
**parents** [2] - 186:20, 224:14
**part** [41] - 9:24, 11:24, 78:16, 81:13, 83:20, 92:14, 94:5, 96:10, 99:8, 101:25, 104:18, 109:20, 111:6, 120:8, 145:2, 151:15, 157:7, 160:16, 162:23, 174:21, 175:3, 175:4, 175:11, 177:3, 177:4, 177:18, 177:19, 180:5, 181:11, 193:1, 193:19, 210:8, 215:7, 216:15, 216:18, 217:21, 218:2, 218:6, 218:9, 236:4

**participants** [1] - 153:7
**participate** [1] - 206:8
**participated** [2] - 223:6, 223:22
**particular** [15] - 10:17, 14:3, 15:1, 129:12, 131:12, 133:6, 145:18, 158:8, 193:3, 194:23, 205:9, 219:6, 219:7, 222:15, 236:24
**particularly** [1] - 110:10
**parties** [2] - 10:1, 39:7
**partition** [3] - 46:7, 50:21, 50:22
**partners** [2] - 208:8, 223:5, 223:7
**Partnership** [1] - 99:11
**partnership** [1] - 104:5
**partnerships** [1] - 223:4
**parts** [2] - 53:22, 110:13
**party** [1] - 65:21
**pass** [1] - 208:7
**passed** [3] - 92:20, 92:22, 96:11
**past** [8] - 10:23, 63:16, 80:12, 80:23, 98:11, 98:12, 163:22, 229:23
**patch** [1] - 162:19
**patience** [1] - 245:10
**patient** [7] - 110:20, 162:14, 168:16, 169:3, 169:8, 171:6, 175:1
**patients** [9] - 36:3, 36:11, 37:6, 92:25, 93:2, 94:12, 107:18, 142:17, 146:12
**patrol** [1] - 188:25
**patrolman** [1] - 237:22
**pattern** [1] - 176:6
**PAUL** [2] - 2:3, 5:9
**Paul** [4] - 51:21, 83:12, 96:14, 233:20
**Pause** [3] - 32:12, 182:10, 229:18
**pay** [7] - 10:1, 11:20, 27:11, 27:12, 39:20, 219:6, 219:13
**payers** [1] - 65:21
**PEARL** [1] - 3:6
**Peer** [1] - 105:21
**peer** [4] - 100:10, 100:14, 101:1,

108:10
**peer-reviewed** [4] - 100:10, 100:14, 101:1, 108:10
**penalized** [1] - 77:7
**pending** [1] - 12:14
**Pennsylvania** [1] - 180:5
**Pensacola** [1] - 2:11
**People** [1] - 198:9
**people** [165] - 14:17, 29:7, 29:16, 29:19, 29:24, 30:4, 30:6, 30:11, 30:14, 30:15, 30:20, 30:24, 33:4, 42:11, 42:23, 43:2, 43:20, 43:21, 52:16, 65:9, 68:8, 77:6, 84:11, 95:5, 95:7, 98:2, 99:12, 99:14, 100:1, 103:3, 103:14, 103:17, 105:24, 106:5, 110:21, 111:18, 112:12, 114:9, 115:3, 115:22, 116:2, 116:5, 116:7, 116:11, 116:13, 117:11, 117:23, 118:5, 121:14, 127:9, 128:3, 128:19, 128:21, 128:23, 129:6, 129:23, 131:17, 132:5, 132:10, 132:21, 132:22, 132:25, 133:25, 134:19, 135:22, 135:23, 135:24, 136:7, 137:11, 137:16, 140:9, 141:19, 142:22, 143:2, 143:3, 144:11, 146:13, 146:15, 147:2, 148:1, 148:9, 148:10, 148:16, 149:9, 149:14, 149:15, 150:11, 150:16, 150:20, 151:1, 151:5, 151:8, 151:14, 151:17, 152:8, 152:9, 152:16, 152:18, 152:21, 153:4, 153:19, 154:3, 155:14, 155:16, 155:18, 155:25, 156:4, 156:17, 156:19, 157:2,

157:3, 157:6, 157:7, 157:16, 157:17, 158:1, 158:6, 158:9, 158:10, 158:12, 158:13, 158:19, 159:1, 159:5, 159:10, 163:10, 165:12, 165:22, 166:19, 169:9, 175:10, 177:9, 177:22, 177:24, 178:1, 178:11, 180:8, 180:12, 180:16, 181:7, 181:14, 181:20, 182:4, 182:5, 183:19, 186:21, 191:19, 194:17, 195:16, 197:19, 198:6, 198:18, 198:22, 199:6, 207:11, 209:8, 216:13, 217:10, 218:20, 234:8, 242:9, 242:12

**people's** [1] - 140:15

**per** [16] - 14:11, 15:2, 15:5, 25:8, 28:10, 29:11, 43:13, 43:18, 43:19, 130:9, 130:11, 130:22, 136:20, 144:16, 183:11

**percent** [29] - 70:25, 72:17, 100:3, 116:3, 116:4, 116:12, 116:13, 116:14, 117:10, 120:25, 121:2, 122:13, 122:16, 122:17, 122:19, 127:12, 127:14, 128:19, 129:8, 129:9, 129:23, 131:16, 132:10, 136:15, 143:17, 143:21, 155:18, 180:6

**percents** [1] - 121:1

**perception** [1] - 153:11

**perfectly** [1] - 229:7

**perforate** [1] - 141:2

**perform** [2] - 13:24, 28:23

**performance** [1] - 232:17

**performed** [4] - 43:24, 65:5, 68:24, 69:2

**performing** [2] - 27:18, 48:21

**perhaps** [1] - 140:14

**period** [19] - 28:17, 29:7, 31:13, 44:24, 59:24, 78:25, 94:18, 97:9, 130:21, 141:25, 142:7, 143:2, 143:14, 143:19, 144:4, 144:6, 144:9, 195:11, 202:7

**periods** [1] - 196:1

**permission** [3] - 13:7, 105:1, 109:3

**permit** [1] - 99:16

**permitted** [1] - 178:19

**persist** [1] - 181:4

**persistent** [2] - 174:4, 174:5

**person** [16] - 25:9, 35:6, 35:11, 39:20, 39:23, 52:6, 99:23, 114:11, 126:18, 135:11, 154:12, 159:12, 160:10, 164:21, 206:5, 224:19

**person's** [3] - 14:18, 152:11, 174:12

**personal** [15] - 171:16, 171:19, 172:19, 179:13, 194:21, 195:17, 202:3, 202:21, 204:12, 208:18, 209:2, 209:3, 209:13, 209:16, 244:19

**Personal** [1] - 172:16

**personally** [12] - 201:12, 203:1, 203:7, 225:15, 225:24, 226:20, 226:23, 227:4, 227:7, 228:19, 228:20, 228:21

**personnel** [2] - 194:2, 205:2

**Personnel** [1] - 125:9

**persons** [6] - 165:21, 165:22, 165:24, 166:12, 166:13, 166:18

**perspective** [3] - 15:25, 132:17, 150:6

**PETER** [1] - 2:9

**Pew** [1] - 86:16

**Pfeiffer** [1] - 187:17

**Ph.D** [2] - 91:7, 91:8

**pharmaceutical** [2] - 8:11, 244:2

**pharmacies** [9] -

47:25, 198:23, 200:25, 201:2, 207:15, 207:25, 208:9, 208:22, 226:24

**pharmacist** [1] - 208:2

**pharmacists** [1] - 215:23

**pharmacy** [4] - 207:22, 208:14, 208:23, 244:17

**Pharmacy** [2] - 208:25, 209:1

**PhD** [2] - 8:9, 8:25

**Philadelphia** [2] - 6:6, 6:13

**philosophy** [1] - 193:25

**phone** [2] - 153:1, 160:18

**phrase** [1] - 54:20

**phrasing** [1] - 46:8

**physician** [2] - 89:2, 107:18

**physicians** [2] - 36:1, 123:4

**Physicians** [1] - 97:21

**physics** [1] - 91:13

**pick** [1] - 141:11

**picking** [1] - 54:20

**picture** [4] - 13:12, 138:1, 141:6, 172:15

**piece** [4] - 172:17, 173:23, 179:23, 180:1

**piecemeal** [1] - 158:3

**PIFKO** [1] - 3:14

**pill** [9] - 118:10, 118:15, 118:17, 164:5, 216:8, 220:9, 240:22, 242:24, 243:2

**pills** [42] - 118:7, 163:10, 192:2, 194:18, 194:20, 194:21, 195:9, 195:10, 195:13, 195:17, 196:3, 198:25, 199:3, 199:8, 199:12, 201:15, 201:16, 207:23, 216:6, 217:9, 217:10, 218:22, 220:9, 227:8, 227:11, 228:18, 228:25, 229:1, 234:16, 239:15, 240:12, 240:16, 241:9, 242:2, 242:6,

242:20, 243:7, 243:22, 244:3, 244:16, 244:19

**pioneering** [1] - 156:3

**pivoted** [1] - 240:18

**place** [11] - 13:24, 25:4, 49:8, 49:9, 81:10, 81:15, 97:1, 138:4, 186:24, 191:4, 216:13

**placed** [1] - 40:7

**places** [3] - 41:19, 119:1, 191:2

**PLAINTIFF** [1] - 7:15

**plaintiff** [4] - 85:12, 85:14, 85:15, 85:16

**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1

**Plaintiffs** [3] - 80:12, 80:15, 248:15

**plaintiffs** [16] - 7:8, 33:19, 79:1, 79:17, 80:11, 88:7, 106:8, 185:16, 185:23, 185:25, 202:1, 202:12, 202:19, 203:2, 203:5, 247:19

**PLAINTIFFS'** [2] - 88:14, 186:4

**plaintiffs'** [3] - 47:14, 204:21, 247:9

**Plaintiffs'** [2] - 80:17, 80:20

**plan** [1] - 41:23

**Planning** [1] - 25:21

**planning** [1] - 190:12

**plans** [1] - 212:3

**plate** [1] - 235:16

**play** [4] - 42:14, 141:20, 240:12, 241:9

**played** [3] - 42:8, 54:3, 228:15

**player** [1] - 246:18

**playing** [2] - 179:7, 181:6

**Pleasant** [3] - 4:4, 4:12, 4:15

**pleasure** [1] - 87:10

**plenty** [1] - 175:20

**plexiglass** [1] - 160:15

**Plus** [1] - 208:25

**plus** [2] - 17:10, 17:11

**pneumocystis** [1] - 95:3

**pneumonia** [1] - 95:3

**Pocahontas** [1] - 123:22

**pocket** [2] - 40:21, 40:24

**point** [41] - 10:9, 11:1, 12:2, 13:3, 44:9, 46:9, 48:15, 59:5, 63:14, 64:3, 64:21, 66:22, 67:7, 70:11, 74:11, 76:17, 80:5, 80:23, 85:5, 97:7, 111:24, 118:5, 127:24, 133:20, 146:9, 155:13, 163:6, 180:8, 180:19, 181:21, 189:7, 189:19, 193:11, 205:17, 214:12, 237:14, 242:18, 242:21, 244:25

**pointed** [3] - 24:13, 37:25, 76:19

**points** [1] - 173:23

**police** [17] - 187:9, 187:19, 188:2, 189:11, 190:14, 201:9, 203:17, 212:6, 213:10, 214:1, 218:25, 220:5, 221:14, 223:8, 226:7, 227:15

**Police** [59] - 188:11, 188:16, 188:25, 189:2, 189:20, 189:23, 189:24, 190:1, 190:14, 190:15, 190:18, 190:25, 191:7, 191:9, 191:13, 191:21, 191:23, 192:6, 194:4, 194:11, 196:9, 199:24, 200:10, 201:13, 201:16, 201:22, 203:19, 203:20, 203:22, 204:6, 206:9, 206:18, 209:7, 211:13, 211:19, 212:1, 212:10, 214:16, 214:20, 215:7, 216:15, 217:21, 220:25, 222:19, 222:22, 224:7, 224:17, 225:7, 225:10, 225:25, 226:3, 226:6, 228:16, 228:23, 229:2, 230:23, 231:11, 237:22, 239:13

**policed** [1] - 225:9

**policies** [1] - 168:21

policing [1] - 221:17
**Policy** [2] - 8:2, 9:12
**policy** [9] - 24:16, 38:4, 38:6, 38:15, 38:16, 38:24, 39:2, 39:8, 98:14
polite [1] - 159:11
politics [1] - 156:13
polysubstance [3] - 175:10, 175:11, 176:25
Ponc [1] - 2:4
Ponce [1] - 2:14
poor [1] - 123:4
poorest [1] - 123:3
popularity [1] - 174:17
population [10] - 134:4, 143:11, 148:20, 149:19, 196:19, 196:21, 197:17, 215:18, 215:20
populations [1] - 35:21
portion [4] - 39:15, 155:18, 178:15, 213:22
pose [1] - 154:2
posed [1] - 244:14
posing [1] - 223:17
position [7] - 8:13, 36:4, 36:6, 81:18, 82:6, 93:18, 180:12
positions [3] - 89:5, 93:16, 102:10
possession [4] - 194:17, 194:19, 194:21, 207:23
possible [2] - 243:1, 243:4
possibly [1] - 206:7
post [1] - 11:20
post-doc [1] - 11:20
postdoctoral [2] - 9:2, 9:3
potency [1] - 176:13
potent [1] - 151:16
potential [4] - 38:5, 38:16, 75:16, 93:24
potentially [1] - 208:2
poverty [1] - 123:5
Powell [1] - 2:6
PR [2] - 2:5, 2:14
practically [1] - 175:15
practice [5] - 8:1, 91:25, 162:23, 167:10, 168:20
practices [4] - 19:7, 25:19, 167:7, 167:11

practicing [2] - 167:3, 168:19
practitioner [1] - 9:21
pre [4] - 78:25, 91:10, 107:1, 140:5
pre-existing [1] - 140:5
pre-medical [1] - 91:10
pre-trial [1] - 78:25
predicated [1] - 196:1
predominant [1] - 222:10
preemptive [1] - 205:10
preemptively [1] - 203:16
Preferably [1] - 230:3
prejudiced [1] - 209:20
prejudicial [1] - 82:4
preliminary [1] - 119:23
premature [1] - 205:11
prenatal [1] - 151:11
prepare [2] - 12:21, 128:14
prepared [7] - 12:18, 15:16, 25:24, 69:23, 112:15, 140:13, 219:25
Presbyterian [1] - 91:19
prescribe [3] - 53:8, 54:23, 99:17
prescribed [11] - 34:13, 35:18, 36:9, 58:12, 59:7, 59:11, 75:12, 163:2, 164:12, 164:13, 165:1
prescribers [1] - 36:1
prescribing [9] - 36:23, 53:25, 54:15, 167:7, 167:11, 167:12, 200:25, 208:3
Prescription [1] - 19:22
prescription [101] - 13:17, 14:10, 14:19, 18:23, 19:17, 20:3, 26:16, 26:21, 28:16, 29:4, 33:7, 33:13, 34:8, 34:17, 34:23, 35:6, 35:12, 35:17, 35:21, 36:3, 37:5, 37:19, 40:17, 41:1, 41:10, 42:3, 42:16, 42:24, 43:10, 44:4,

44:22, 44:23, 45:19, 46:16, 46:21, 46:25, 47:2, 47:17, 48:7, 48:23, 49:4, 49:8, 49:20, 49:25, 50:19, 50:20, 54:2, 59:11, 63:23, 64:10, 64:16, 65:5, 65:10, 67:4, 72:18, 74:19, 76:22, 162:13, 162:17, 162:18, 163:5, 163:10, 164:5, 164:13, 164:22, 165:4, 165:14, 166:5, 166:14, 166:24, 173:24, 182:2, 192:2, 194:18, 194:19, 194:21, 195:13, 196:3, 199:8, 199:12, 200:8, 200:11, 207:22, 207:24, 216:4, 218:22, 222:10, 223:14, 223:16, 234:16, 234:19, 239:15, 240:12, 241:8, 242:17, 242:24, 243:2, 243:7, 243:19
prescriptions [5] - 181:14, 181:15, 182:6, 234:9, 243:6
presence [2] - 154:1, 196:5
present [3] - 61:16, 189:17, 237:6
presentation [2] - 69:24, 206:7
preserve [2] - 12:12, 132:14
President [9] - 18:15, 18:16, 21:10, 21:22, 24:14, 32:7, 75:21, 125:7, 185:5
press [3] - 125:3, 235:22, 242:23
pressure [4] - 110:25, 141:10, 141:15, 168:25
prestigious [1] - 10:19
presume [1] - 188:2
pretend [1] - 76:14
pretty [17] - 30:10, 43:18, 102:20, 111:18, 113:13, 117:2, 130:11, 153:24, 161:18, 174:1, 174:4, 174:5, 184:5, 197:3,

203:19, 204:5, 204:9
prevalence [7] - 116:18, 116:20, 129:7, 196:16, 240:2, 240:16, 242:1
prevalent [1] - 196:7, 196:22, 199:9, 199:10, 200:15, 216:16, 218:3, 235:6, 238:18, 239:8, 241:24
prevent [7] - 110:20, 110:21, 136:5, 137:10, 191:14, 215:9, 244:3
preventative [2] - 113:17, 148:25
preventing [3] - 154:20, 154:21, 181:24
prevention [13] - 94:15, 94:23, 95:25, 103:21, 106:9, 106:15, 147:8, 196:2, 200:17, 200:19, 223:15, 223:16, 224:2
prevents [1] - 150:22
previous [6] - 13:17, 32:24, 58:7, 63:22, 71:15, 173:3
previously [2] - 50:21, 120:20
price [1] - 219:1
prices [2] - 27:7, 219:11
Primarily [1] - 195:8
primarily [12] - 107:11, 116:24, 121:25, 126:17, 136:7, 149:14, 149:15, 158:12, 174:6, 180:10, 190:10, 195:24, 197:9
primary [12] - 11:17, 117:5, 128:11, 128:12, 147:5, 150:11, 150:17, 175:12, 175:13, 238:8, 238:11, 238:13
prime [2] - 118:13, 158:15
Princeton [1] - 8:24
principle [1] - 149:5
principles [1] - 108:1
priorities [1] - 191:16
prioritize [1] - 200:5
priority [1] - 220:16

prison [1] - 232:21
prisoners [1] - 52:11
private [3] - 11:25, 65:23, 168:20
privilege [1] - 225:5
privileges [1] - 92:2
problem [44] - 39:2, 39:13, 63:19, 83:1, 97:5, 124:2, 129:12, 129:13, 133:13, 138:10, 143:7, 143:9, 146:16, 148:14, 156:14, 157:10, 160:16, 174:1, 174:5, 174:19, 175:4, 175:12, 179:14, 180:22, 181:4, 191:25, 199:20, 207:4, 207:5, 207:6, 207:8, 209:1, 211:22, 211:24, 215:5, 215:6, 215:16, 223:4, 224:22, 224:24, 235:5, 236:5
problems [9] - 29:25, 148:2, 151:9, 151:10, 194:2, 210:16, 221:1, 221:13
proceed [6] - 24:25, 51:17, 124:19, 125:25, 205:7, 230:16
proceeding [1] - 202:9
Proceedings [3] - 6:19, 73:11, 182:22
proceedings [1] - 248:14
PROCEEDINGS [1] - 7:1
process [5] - 18:4, 25:15, 98:12, 108:7, 215:5
processes [1] - 193:1
Proctor [1] - 2:10
produced [4] - 6:19, 75:19, 210:22, 211:13
product [1] - 14:17
profession [4] - 7:24, 22:5, 168:5, 187:25
professional [6] - 9:17, 10:4, 97:17, 98:2, 166:16, 179:13
professionally [1] - 225:16
professionals [1] - 165:5

**Professor** [19] - 8:15, 14:9, 14:25, 26:22, 33:1, 33:4, 33:5, 42:9, 42:19, 42:22, 43:1, 44:8, 45:23, 45:24, 64:7, 64:11, 89:7, 89:8
**proffered** [1] - 13:23
**profoundly** [1] - 224:18
**Program** [3] - 152:8, 153:7, 154:9
**program** [21] - 65:22, 65:23, 96:6, 96:7, 104:14, 104:18, 131:7, 152:25, 154:5, 154:18, 155:11, 155:21, 156:6, 156:8, 156:9, 156:10, 156:15, 183:8, 183:10, 183:15, 223:24
**programs** [11] - 149:13, 150:7, 150:20, 151:1, 153:9, 153:11, 153:18, 154:25, 155:8, 173:5, 184:8
**progress** [1] - 137:17
**progresses** [2] - 136:13, 136:14
**progression** [1] - 134:11
**projected** [1] - 118:10
**projects** [1] - 93:24
**prominent** [4] - 238:15, 238:19, 238:20, 239:4
**promised** [2] - 10:8, 68:3
**promoted** [2] - 168:10, 223:24
**prompted** [1] - 204:1
**prone** [1] - 60:18
**proper** [4] - 45:4, 81:9, 85:7, 170:7
**property** [1] - 220:11
**proportion** [6] - 27:14, 113:12, 116:7, 121:13, 122:18, 144:20
**proposals** [1] - 11:21
**propose** [1] - 180:20
**proposition** [1] - 58:21
**propriety** [1] - 27:20
**prosecution** [1] - 232:18
**prospective** [2] - 80:6, 80:10

**prostitutes** [1] - 197:13
**prostitution** [1] - 114:10
**protease** [1] - 118:3
**protect** [3] - 152:1, 152:2, 200:5
**Protection** [1] - 19:9
**proved** [1] - 216:14
**provide** [11] - 38:4, 38:15, 89:12, 126:24, 127:4, 135:21, 139:18, 139:19, 148:24, 149:24, 234:15
**provided** [6] - 26:21, 100:1, 119:8, 120:2, 121:22, 159:15
**provider** [1] - 106:3
**providers** [2] - 65:25, 159:4
**providing** [6] - 22:1, 53:24, 135:1, 155:21, 155:22, 159:23
**province** [1] - 64:6
**provision** [1] - 149:9
**psychiatry** [1] - 102:24
**Psychiatry** [1] - 89:8
**public** [36] - 22:12, 24:8, 24:10, 39:12, 79:16, 80:17, 80:20, 83:5, 84:14, 85:19, 85:25, 87:3, 108:11, 109:20, 110:14, 111:6, 111:14, 121:22, 132:17, 149:4, 150:6, 153:10, 155:23, 156:7, 157:14, 157:15, 159:5, 159:18, 191:15, 191:17, 213:4, 213:24, 216:19, 220:16, 223:22
**Public** [4] - 107:11, 117:14, 123:10, 124:7
**publication** [3] - 56:9, 56:17, 94:23
**publications** [3] - 53:19, 55:4, 101:1
**publish** [4] - 10:20, 13:4, 127:6, 171:24
**published** [21] - 11:2, 11:5, 20:11, 21:22, 55:1, 55:14, 57:15, 100:10, 100:13, 101:12, 101:19,

102:5, 102:7, 105:19, 154:14, 171:17, 171:18, 171:20, 172:10, 173:9, 176:22
**publishes** [1] - 10:17
**pull** [8] - 44:10, 50:12, 52:19, 170:20, 172:7, 228:13, 240:23, 244:10
**pump** [2] - 110:16, 110:17
**pumped** [1] - 141:12
**pumps** [1] - 141:10
**punitive** [1] - 80:16
**purely** [1] - 177:9
**purity** [1] - 216:12
**purple** [2] - 76:6, 133:15
**purported** [1] - 79:2
**purpose** [15] - 19:21, 38:1, 38:4, 38:14, 38:18, 38:20, 38:23, 39:5, 40:23, 82:18, 84:17, 211:21, 215:3, 221:5, 229:8
**purposes** [5] - 19:11, 22:5, 23:14, 39:7, 43:12
**pursuant** [3] - 23:3, 24:16, 213:3
**purview** [1] - 206:12
**pus** [1] - 148:1
**push** [2] - 168:1, 170:4
**put** [28] - 15:5, 15:13, 19:2, 32:24, 45:21, 56:11, 57:24, 64:25, 68:13, 70:10, 76:6, 83:8, 83:18, 84:1, 90:14, 105:11, 121:16, 126:5, 126:23, 130:18, 133:8, 153:6, 154:8, 169:23, 173:1, 185:1, 200:4, 204:4
**putting** [5] - 13:15, 13:19, 83:15, 140:20, 215:3

**Q**

**qualification** [1] - 12:10
**qualifications** [5] - 12:8, 78:18, 81:11, 97:13, 102:1
**qualified** [1] - 81:2
**qualify** [1] - 26:15
**quality** [2] - 197:15,

224:15
**quantification** [6] - 20:9, 23:24, 53:21, 53:23, 54:1, 86:3
**quantifying** [2] - 20:6, 44:21
**quarters** [1] - 131:18
**questioned** [1] - 202:23
**questioning** [1] - 238:23
**questions** [30] - 32:13, 51:13, 57:21, 62:19, 68:1, 74:22, 77:15, 157:22, 159:15, 159:25, 164:6, 164:19, 167:17, 169:2, 182:12, 182:15, 182:16, 183:6, 183:23, 184:13, 184:17, 202:25, 203:6, 225:17, 229:19, 230:20, 242:14, 245:3, 245:5, 246:10
**quick** [1] - 90:2
**quickly** [7] - 48:15, 97:13, 105:3, 113:20, 151:17, 188:14, 220:22
**quite** [8] - 78:21, 79:12, 95:6, 126:8, 146:16, 146:25, 147:19, 223:23
**quotas** [1] - 37:5
**quote** [3] - 54:10, 109:7, 201:15
**quoted** [1] - 236:11
**quotes** [1] - 19:2

**R**

**Rafferty** [1] - 2:10
**raise** [3] - 7:13, 88:13, 186:3
**raised** [2] - 37:5, 66:22
**Raleigh** [1] - 104:6
**ran** [2] - 154:18, 183:8
**range** [2] - 104:15, 150:23
**ranges** [1] - 67:18
**Rannazzisi** [1] - 36:13
**rapid** [1] - 151:1
**rapidly** [1] - 176:12
**rare** [1] - 140:25
**rarely** [2] - 148:15
**rash** [2] - 239:14, 240:18
**rate** [19] - 100:4,

129:21, 130:9, 130:10, 130:12, 136:3, 136:19, 136:22, 138:4, 138:15, 138:23, 138:24, 139:1, 139:3, 151:16, 175:15, 176:25
**rates** [8] - 104:7, 129:14, 130:6, 131:2, 131:25, 133:15, 138:25, 139:6
**rather** [6] - 81:4, 122:1, 129:19, 175:18, 177:23, 188:14
**re** [4] - 45:12, 107:8, 156:21, 245:7
**re-direct** [2] - 45:12, 245:7
**re-read** [1] - 107:8
**re-state** [1] - 156:21
**reach** [4] - 149:19, 152:9, 156:19, 205:17
**reached** [2] - 31:8, 224:23
**reactive** [2] - 175:6, 175:8
**read** [30] - 27:21, 34:5, 34:6, 34:7, 36:17, 36:25, 37:9, 47:10, 47:19, 53:5, 56:22, 58:14, 60:7, 75:14, 75:24, 107:8, 107:9, 107:10, 109:10, 109:13, 172:7, 176:18, 176:19, 178:17, 178:18, 179:8, 179:9, 181:8, 181:9, 184:5
**readily** [2] - 176:13, 182:3
**reading** [3] - 63:7, 67:20, 81:22
**reads** [4] - 232:14, 233:17, 234:6, 241:5
**ready** [6] - 7:6, 52:10, 73:16, 124:14, 125:25, 152:14
**real** [4] - 155:22, 157:5, 181:4
**realistic** [1] - 171:1
**reality** [2] - 176:21, 180:20
**realize** [4] - 52:5, 52:10, 73:7, 87:7
**realized** [1] - 149:18
**really** [61] - 39:19,

43:19, 48:1, 63:10, 91:1, 93:7, 94:4, 94:8, 96:20, 97:7, 98:5, 103:23, 110:15, 110:18, 113:13, 113:14, 114:13, 115:7, 117:7, 118:14, 119:9, 121:25, 122:13, 123:7, 123:11, 126:15, 127:11, 127:14, 128:9, 131:24, 131:25, 132:6, 132:11, 132:13, 132:17, 132:24, 132:25, 133:21, 136:19, 137:5, 146:21, 147:16, 147:24, 149:15, 149:21, 151:15, 157:11, 161:22, 174:1, 174:6, 178:8, 181:10, 181:21, 198:6, 199:1, 200:18, 216:10, 216:12, 224:11, 224:18

**realm** [1] - 15:23
**reason** [6] - 47:20, 59:13, 59:19, 71:22, 170:24, 214:4
**reasonable** [5] - 32:2, 83:24, 84:14, 84:21, 85:7
**reasonableness** [1] - 84:6
**reasoning** [2] - 59:3, 59:4
**reasons** [4] - 22:15, 62:23, 77:8, 199:4
**rebuild** [1] - 181:2
**receive** [1] - 188:8
**received** [7] - 10:10, 11:16, 89:19, 89:22, 103:7, 119:16, 119:17
**receiving** [1] - 166:13
**recent** [5] - 10:9, 98:1, 101:11, 132:4, 184:9
**recently** [3] - 116:23, 120:14, 151:13
**receptive** [1] - 115:11
**recess** [1] - 125:5
**Recess** [4] - 73:10, 125:22, 182:21, 235:10
**recessed** [1] - 248:7
**recognition** [1] - 188:13

**recognize** [5] - 12:3, 12:14, 21:2, 150:19, 211:9
**recollection** [1] - 183:22
**recommendation** [4] - 24:3, 24:4, 25:3, 77:13
**recommendations** [2] - 25:20, 169:1
**record** [23] - 7:22, 11:11, 22:13, 24:8, 24:25, 27:21, 64:3, 64:24, 65:3, 69:18, 69:22, 75:14, 80:2, 82:20, 83:18, 88:24, 89:18, 90:12, 135:25, 186:9, 243:13, 247:13, 248:14
**recorded** [1] - 6:19
**records** [2] - 213:4, 214:5
**recovery** [2] - 111:22, 181:24
**Recovery** [1] - 105:21
**recross** [1] - 77:16
**recruited** [8] - 93:22, 94:6, 95:15, 96:4, 96:5, 96:22, 97:4, 242:9
**recruiting** [1] - 234:7
**rectum** [1] - 115:13
**red** [6] - 130:23, 133:15, 138:11, 138:14, 138:23, 139:2
**redirect** [1] - 184:18
**REDIRECT** [2] - 73:18, 245:20
**reduce** [1] - 153:21
**reduced** [1] - 39:24
**reducing** [7] - 58:12, 58:18, 59:6, 59:11, 75:12, 149:11, 206:6
**reduction** [6] - 54:9, 147:8, 149:4, 149:8, 149:12, 149:25, 150:7, 155:8
**Reduction** [3] - 152:8, 153:7, 154:9
**reductions** [1] - 155:8
**Reed** [2] - 6:4, 6:11
**refer** [11] - 58:5, 106:1, 106:2, 151:5, 151:6, 164:16, 164:18, 165:22, 166:12, 206:4, 210:22
**reference** [2] - 76:5, 180:25

**referenced** [7] - 19:20, 20:12, 22:3, 23:19, 203:25, 208:22, 242:8
**references** [1] - 21:17
**referencing** [3] - 19:24, 20:19, 213:23
**referral** [2] - 143:16, 144:19
**referrals** [2] - 104:16, 152:7
**referred** [5] - 144:22, 151:10, 151:11, 231:6, 231:8
**referring** [9] - 82:19, 101:25, 121:15, 162:10, 162:21, 165:23, 236:23, 236:24, 237:16
**refers** [2] - 23:21, 165:7
**refills** [1] - 169:5
**refined** [1] - 118:6
**reflect** [1] - 26:11
**reflects** [1] - 122:13
**regard** [4] - 16:25, 48:24, 148:25
**regarded** [1] - 10:19
**regarding** [4] - 12:10, 14:9, 15:24, 210:10
**regardless** [1] - 161:15
**regards** [2] - 136:17, 155:7
**region** [4] - 122:14, 131:20, 135:16, 222:11
**registered** [1] - 48:6
**regularly** [3] - 231:12, 231:14, 231:15
**regulation** [1] - 179:14
**regulations** [2] - 136:6, 169:1
**regulatory** [2] - 19:11, 196:2
**reinforce** [1] - 220:15
**relapsing** [2] - 150:13, 158:8
**relate** [2] - 80:24, 103:7
**related** [20] - 13:23, 14:3, 28:16, 30:9, 31:24, 40:20, 41:24, 45:6, 45:10, 63:5, 83:25, 84:8, 84:10, 103:10, 103:11, 146:19, 148:14, 158:14, 159:21, 232:7
**relates** [7] - 159:19,

176:3, 188:8, 193:15, 205:25, 207:12, 213:23
**relationship** [2] - 108:15, 175:17
**relative** [1] - 27:2
**relatively** [1] - 184:9
**relevance** [8] - 22:14, 24:22, 78:8, 78:18, 81:3, 83:2, 85:18, 86:9
**relevant** [12] - 17:6, 17:17, 17:19, 17:20, 17:23, 30:18, 78:22, 79:15, 79:16, 81:12, 84:25, 85:2
**reliability** [1] - 119:21
**reliance** [2] - 22:19, 145:11
**relied** [11] - 19:6, 22:1, 22:4, 24:2, 25:25, 30:17, 31:3, 72:13, 72:14, 107:17, 212:9
**relief** [5] - 80:7, 80:8, 80:10, 81:1
**relieve** [1] - 235:8
**Relieving** [2] - 56:17, 74:4
**rely** [3] - 23:9, 30:23, 193:17
**relying** [3] - 28:5, 52:1, 223:4
**remain** [3] - 170:12, 175:12, 225:14
**remains** [1] - 157:10
**remediation** [1] - 41:23
**remedy** [2] - 80:18, 80:21
**remember** [11] - 19:2, 34:15, 57:17, 66:16, 74:9, 74:10, 81:22, 160:11, 169:13, 202:13, 209:25
**remembered** [1] - 247:4
**remove** [1] - 120:8
**removed** [1] - 90:3
**renew** [3] - 78:5, 205:18, 208:16
**repeat** [3] - 160:21, 227:13, 236:18
**repeated** [1] - 86:16
**repeatedly** [2] - 36:21, 209:12
**repeats** [1] - 127:7
**replace** [1] - 141:23
**report** [74] - 12:18, 18:18, 19:13, 19:24, 19:25, 20:7, 20:11,

20:12, 20:20, 21:5, 21:16, 21:21, 22:3, 23:3, 23:10, 23:19, 23:21, 24:2, 24:11, 24:12, 24:16, 25:24, 34:20, 45:6, 57:12, 57:16, 57:22, 58:10, 61:10, 62:5, 62:12, 63:13, 64:11, 69:25, 70:19, 72:5, 74:12, 74:15, 75:8, 76:8, 79:3, 108:6, 108:23, 109:4, 109:10, 109:24, 119:15, 120:15, 130:18, 138:20, 145:8, 145:17, 145:19, 145:21, 148:24, 160:23, 161:3, 161:7, 162:1, 162:4, 165:20, 190:20, 190:22, 203:17, 205:1, 206:19, 213:9, 213:12, 216:1, 219:24, 220:21, 221:23
**reportable** [1] - 129:2
**reported** [9] - 96:13, 119:11, 129:4, 136:25, 184:6, 206:10, 226:9, 234:14, 248:18
**reporter** [1] - 235:8
**Reporter** [6] - 6:17, 6:18, 248:12, 248:21
**reporters** [1] - 230:8
**reporting** [2] - 120:23, 120:25
**reports** [21] - 56:2, 61:12, 86:16, 107:10, 107:15, 177:8, 192:15, 192:19, 192:22, 192:23, 192:25, 201:9, 210:14, 210:18, 210:21, 210:24, 211:3, 212:6, 212:22, 214:2
**represent** [5] - 32:20, 51:22, 160:8, 183:5, 230:19
**representation** [2] - 79:6, 79:14
**representations** [1] - 79:1
**representatives** [1] - 98:16
**represented** [1] - 89:24
**representing** [1] -

122:16
**repurposed** [1] - 179:4
**request** [1] - 9:25
**require** [2] - 148:9, 148:17
**required** [2] - 91:11, 144:13
**requirements** [2] - 209:16, 213:17
**requires** [2] - 118:15, 213:15
**rescue** [2] - 150:20, 150:21
**research** [22] - 8:18, 8:20, 9:2, 9:25, 11:8, 11:16, 11:21, 42:11, 72:12, 93:12, 93:18, 94:8, 95:14, 95:19, 98:17, 102:18, 107:21, 108:5, 108:14, 118:25, 158:22, 172:19
**Research** [5] - 9:4, 89:10, 96:10, 96:12, 96:14
**reservoir** [1] - 132:19
**residence** [1] - 244:20
**residency** [1] - 91:18
**residents** [2] - 231:12, 231:14
**resources** [2] - 149:9, 200:4
**respect** [8] - 20:15, 47:2, 85:18, 85:21, 152:19, 191:19, 219:8, 219:10
**respond** [3] - 16:21, 192:23, 200:6
**responders** [1] - 154:2
**responding** [3] - 127:17, 174:20, 174:21
**Responds** [1] - 105:16
**response** [3] - 71:15, 171:1, 239:9
**responsibilities** [1] - 8:16
**responsibility** [3] - 193:24, 210:11, 226:6
**responsible** [5] - 86:5, 95:10, 190:10, 206:6, 234:7
**responsibly** [1] - 36:24
**responsive** [2] - 178:15, 178:22
**rest** [4] - 119:4, 141:14, 170:21,

175:21
**restructured** [1] - 200:20
**result** [15] - 40:25, 41:10, 41:16, 42:23, 78:13, 78:15, 90:3, 113:25, 122:2, 128:25, 148:19, 162:8, 216:6, 218:15, 222:9
**resulted** [3] - 86:3, 109:19, 232:20
**resulting** [3] - 44:21, 103:21, 159:19
**results** [5] - 24:2, 151:3, 151:23, 214:23, 234:14
**resumed** [2] - 73:11, 182:22
**retain** [1] - 170:16
**retaliation** [1] - 219:9
**retinitis** [1] - 95:4
**retired** [1] - 96:23
**retrospective** [2] - 80:7, 80:8
**retrovirus** [1] - 114:21
**return** [2] - 149:17, 230:3
**returned** [1] - 241:17
**reversal** [1] - 117:3
**review** [7] - 38:5, 38:16, 90:6, 205:13, 209:24, 210:3, 220:1
**reviewed** [10] - 74:18, 100:10, 100:14, 101:1, 107:6, 107:15, 108:10, 155:6, 161:22, 212:6
**Reynolds** [4] - 52:19, 54:11, 240:23, 244:10
**Rice** [5] - 4:3, 4:5, 4:8, 4:11, 4:14
**ridiculous** [1] - 170:24
**right-hand** [3] - 31:12, 124:5, 141:8
**rise** [2] - 130:2, 135:14
**rising** [1] - 179:4
**risk** [18] - 39:24, 60:10, 114:19, 115:6, 122:8, 124:4, 128:16, 129:18, 134:20, 142:10, 146:13, 146:14, 147:1, 154:2, 161:8, 161:14, 180:6, 219:14
**risks** [8] - 36:4, 36:10, 39:21, 61:3, 103:8, 115:2, 124:6, 149:20

**RMR** [2] - 6:17, 6:18
**RNA** [3] - 114:21, 126:12, 135:4
**roadmap** [1] - 210:16
**robberies** [1] - 197:25
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**role** [23] - 13:13, 13:15, 26:25, 35:25, 42:19, 74:19, 98:25, 102:14, 203:22, 210:8, 210:9, 215:7, 216:15, 217:21, 218:2, 218:6, 218:9, 222:19, 227:23, 229:13, 229:14, 237:25, 238:7
**room** [3] - 68:8, 105:24, 162:15
**rooms** [1] - 103:18
**root** [2] - 140:21, 236:12
**rooted** [2] - 27:11, 141:4
**roughly** [2] - 27:14, 40:9
**round** [1] - 64:20
**route** [1] - 112:22
**routes** [1] - 135:11
**routinely** [3] - 19:5, 27:17, 63:4
**row** [5] - 26:20, 28:4, 31:1, 65:7, 70:15
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**Ruby** [1] - 4:23
**RUBY** [1] - 4:22
**ruin** [1] - 224:23
**Rule** [3] - 24:7, 204:24, 209:16
**rule** [4] - 24:20, 87:5, 87:6, 213:22
**ruled** [1] - 205:13
**ruling** [2] - 24:7, 24:20
**run** [2] - 96:6, 154:5
**rupture** [1] - 141:17
**rupturing** [1] - 142:11
**rural** [4] - 105:8, 121:24, 122:9, 181:3
**Rural** [1] - 105:16
**Rush** [2] - 91:15, 91:19
**Rush-Presbyterian-St** [1] - 91:19
**Russian** [4] - 90:25, 91:1, 91:4

**S**

**s\Ayme** [1] - 248:20
**s\Lisa** [1] - 248:20
**sad** [1] - 117:3
**sadly** [3] - 135:25, 138:3, 159:3
**safe** [3] - 35:18, 191:15, 191:20
**SafeScript** [3] - 208:14, 208:23, 209:1
**safety** [4] - 103:12, 180:17, 216:19, 220:16
**sale** [4] - 40:25, 44:22, 50:18, 50:19
**sales** [17] - 40:17, 41:5, 42:3, 42:6, 42:16, 43:10, 44:4, 44:23, 45:9, 45:18, 46:15, 46:21, 49:7, 49:16, 49:24, 78:13, 84:21
**SALGADO** [1] - 4:20
**SAMHSA** [1] - 174:22
**San** [2] - 2:5, 2:14
**sanitation** [1] - 154:3
**Saturday** [1] - 185:10
**saw** [19] - 56:10, 132:25, 143:2, 144:20, 194:8, 218:20, 220:6, 220:8, 220:18, 220:19, 222:18, 224:17, 224:25, 225:13, 237:8, 237:15, 237:25, 240:3
**sawed** [1] - 185:2
**SC** [3] - 4:4, 4:12, 4:15
**scar** [1] - 127:18, 127:20, 127:23, 127:25
**scarring** [3] - 127:16, 127:17, 135:9
**scary** [1] - 181:17
**scene** [2] - 191:21, 199:20
**scenes** [3] - 192:23, 225:2, 240:7
**Schering** [3] - 93:19, 93:22, 93:24
**Schmidt** [4] - 51:16, 51:21, 80:4, 247:10
**SCHMIDT** [27] - 5:9, 12:9, 22:23, 51:17, 51:20, 52:9, 52:14, 52:22, 53:1, 53:4, 54:10, 54:12, 55:18,

55:20, 68:11, 68:15, 68:18, 69:16, 69:18, 69:21, 73:1, 73:6, 75:23, 77:19, 80:5, 82:10, 85:4
**School** [3] - 8:3, 9:12, 89:7
**school** [8] - 8:23, 91:11, 91:15, 92:14, 93:5, 123:6, 178:3, 224:25
**schools** [2] - 94:9, 223:23
**Sciences** [1] - 99:8
**scientific** [2] - 107:22, 108:1
**scientist** [1] - 9:21
**scope** [5] - 22:14, 74:22, 74:25, 76:20, 167:15
**Scott** [7] - 121:22, 122:3, 123:2, 123:3, 123:12, 193:13, 193:14
**screen** [12] - 13:1, 16:18, 56:10, 57:24, 105:12, 105:14, 110:2, 120:7, 123:14, 128:10, 157:7, 171:25
**seal** [1] - 21:10
**Sean** [1] - 233:19
**seasoned** [1] - 188:18
**seat** [1] - 235:20
**seated** [3] - 7:17, 88:15, 186:5
**second** [32] - 19:20, 19:25, 27:1, 27:8, 36:5, 36:7, 56:5, 56:6, 58:3, 58:24, 60:21, 62:1, 63:14, 70:6, 71:5, 71:8, 71:13, 71:17, 72:2, 75:14, 92:15, 94:2, 115:7, 115:8, 115:16, 115:17, 122:17, 138:4, 219:24, 229:17, 234:5, 234:6
**second-guess** [2] - 36:5, 36:7
**Secretary** [1] - 25:21
**section** [3] - 21:13, 89:9, 204:20
**sedating** [2] - 177:21
**see** [121] - 12:25, 15:8, 15:14, 21:16, 34:19, 34:20, 34:25, 38:13, 38:17, 43:23, 52:15, 53:15, 56:1, 56:6,

56:8, 56:16, 56:18, 56:21, 56:24, 57:5, 58:8, 58:18, 58:19, 58:25, 59:1, 59:7, 59:9, 59:15, 59:16, 59:18, 60:4, 60:5, 60:8, 60:19, 60:23, 61:5, 61:6, 61:22, 62:2, 62:3, 62:4, 62:5, 62:6, 62:21, 62:25, 63:6, 63:25, 67:9, 67:10, 67:14, 68:21, 69:25, 70:3, 70:15, 70:16, 70:19, 71:6, 71:10, 71:23, 76:6, 76:23, 81:16, 90:6, 93:1, 93:15, 103:14, 105:15, 107:16, 110:5, 113:11, 113:14, 114:15, 114:16, 115:8, 116:9, 120:16, 120:17, 120:22, 122:5, 123:14, 124:1, 124:3, 124:6, 124:7, 131:22, 131:23, 133:13, 133:18, 138:11, 138:13, 138:24, 139:3, 139:4, 159:6, 170:24, 172:16, 185:14, 192:15, 199:11, 208:1, 209:11, 217:2, 220:2, 221:2, 221:25, 222:12, 222:16, 230:8, 232:8, 232:22, 233:2, 233:5, 234:1, 234:10, 236:17, 236:20, 237:9, 241:11, 244:20, 245:22, 247:8

**seeing** [16] - 34:15, 92:24, 93:2, 117:3, 117:4, 125:12, 141:25, 142:2, 142:22, 194:16, 195:11, 195:24, 216:2, 216:4, 220:11, 240:21

**seek** [1] - 153:8

**seeking** [7] - 80:17, 80:21, 180:9, 199:6, 215:21, 215:22, 215:23

**seem** [1] - 81:12

**seize** [4] - 193:20, 194:5, 239:7, 239:8

**seized** [4] - 238:8, 238:11, 238:13, 238:15

**seizure** [1] - 238:17

**seizures** [7] - 218:14, 220:9, 220:10, 222:25, 226:18, 239:5, 240:22

**selected** [2] - 189:24, 191:7

**self** [2] - 97:23, 165:15

**self-explanatory** [1] - 97:23

**self-injection** [1] - 165:15

**sell** [3] - 158:5, 197:21, 242:12

**selling** [3] - 158:6, 194:14, 194:20

**semen** [2] - 114:24, 115:15

**seminal** [2] - 95:2

**seminars** [1] - 188:17

**send** [2] - 152:12, 242:11

**sends** [1] - 141:13

**Senior** [1] - 7:2

**SENIOR** [1] - 1:17

**Sensabaugh** [1] - 5:14

**sense** [4] - 14:22, 41:20, 41:21, 149:8

**sent** [3] - 89:22, 142:17, 233:5

**sentence** [1] - 38:11, 51:7, 51:10, 57:2, 57:9, 60:17, 75:11, 75:14, 173:11, 222:9, 234:6

**sentences** [2] - 57:1, 232:21

**separate** [5] - 11:19, 18:9, 18:10, 45:5, 86:5

**separating** [1] - 142:11

**separation** [2] - 141:17, 224:20

**September** [13] - 44:14, 50:15, 51:8, 70:7, 70:14, 71:8, 72:3, 155:12, 169:12, 171:17, 171:18, 172:10, 176:22

**sequelae** [1] - 137:18

**sequence** [2] - 60:2, 239:22

**Sergeant** [1] - 233:19

**series** [1] - 109:19

**serious** [17] - 15:12,

95:6, 109:18, 111:21, 113:5, 113:9, 137:19, 146:14, 146:16, 147:15, 147:18, 148:2, 148:15, 152:11, 154:7, 181:5, 235:5

**seriously** [1] - 246:4

**serve** [6] - 82:17, 97:24, 183:14, 187:23, 190:1, 190:4

**served** [13] - 69:12, 70:2, 70:3, 95:21, 102:10, 102:12, 155:7, 155:14, 183:17, 183:19, 190:6, 221:6, 224:7

**service** [13] - 98:19, 151:1, 155:11, 155:22, 155:23, 156:8, 184:8, 187:24, 195:16, 210:14, 223:22, 224:8, 224:12

**services** [17] - 104:14, 104:16, 131:7, 149:9, 149:13, 149:22, 150:23, 150:24, 152:25, 153:9, 153:18, 154:5, 154:18, 156:10, 157:14, 184:10, 184:12

**Services** [1] - 105:22

**Serving** [1] - 191:17

**serving** [3] - 69:12, 190:25, 199:24

**session** [1] - 230:7

**set** [10] - 64:23, 68:1, 68:2, 137:4, 173:24, 211:25, 212:3, 213:4, 214:16, 232:7

**sets** [1] - 24:8

**setting** [2] - 82:21, 165:5

**settings** [2] - 34:24, 60:14

**setup** [1] - 52:10

**seven** [7] - 120:22, 122:22, 154:14, 190:3, 190:23, 225:12, 245:11

**several** [8] - 9:17, 25:7, 62:23, 89:6, 121:5, 132:6, 151:13, 233:24

**severe** [1] - 223:25

**sex** [5] - 114:9, 114:11, 116:24,

148:19, 148:20

**sexual** [1] - 114:24

**sexually** [4] - 114:8, 116:22, 135:12, 148:21

**Shane** [1] - 233:19

**SHANNON** [1] - 6:3

**shape** [2] - 22:17, 242:24

**share** [4] - 64:8, 212:14, 221:15, 221:16

**shared** [2] - 112:16, 122:6, 140:14, 161:12, 212:15

**shares** [1] - 129:17

**sharing** [2] - 111:10, 128:13

**sheet** [1] - 69:24

**sheets** [2] - 69:12, 69:13

**Sheriff** [10] - 201:25, 202:1, 202:4, 202:6, 202:7, 202:23, 202:24, 204:3, 204:20, 209:24

**shift** [1] - 176:7

**shipped** [2] - 48:19, 48:25

**shock** [2] - 34:11, 121:22

**shopping** [2] - 243:9, 243:16

**short** [5] - 20:24, 69:19, 139:20, 235:7, 239:9

**shorthand** [2] - 18:19, 23:22

**shortly** [2] - 236:15, 236:19

**shot** [2] - 86:6, 136:10

**show** [13] - 40:4, 52:4, 52:23, 59:15, 59:16, 63:12, 64:22, 68:11, 69:11, 109:3, 152:19, 174:14, 187:21

**showed** [4] - 94:24, 131:15, 137:7, 175:14

**showing** [3] - 26:10, 138:6, 138:8

**shown** [9] - 16:14, 16:18, 24:24, 64:23, 128:19, 135:15, 153:19, 153:22, 202:24

**shows** [5] - 24:13, 61:11, 65:7, 130:21, 140:23

**shuffle** [2] - 87:12, 87:15

**shy** [2] - 96:24, 190:3

**sic** [1] - 57:11

**sick** [6] - 16:6, 29:19, 29:22, 30:4, 111:18, 133:1

**sicker** [1] - 144:12

**side** [19] - 37:14, 43:17, 70:10, 75:15, 82:22, 95:17, 95:18, 118:7, 118:15, 124:5, 141:8, 141:9, 141:10, 141:12, 141:13, 141:18

**sided** [1] - 146:12

**sign** [4] - 168:8, 168:15, 171:5, 185:5

**signed** [2] - 96:19, 125:7

**significance** [1] - 227:17

**significant** [16] - 39:9, 39:12, 83:16, 87:7, 136:24, 139:5, 143:10, 144:7, 144:20, 155:17, 157:10, 158:3, 179:14, 180:21, 192:1, 226:18

**significantly** [1] - 222:3

**signs** [1] - 169:4

**similar** [11] - 14:24, 25:20, 29:1, 30:15, 37:24, 123:12, 131:11, 133:4, 202:2, 202:19, 215:17

**similarities** [1] - 66:20

**simpler** [1] - 10:2, 28:18

**SIMULTANEOUS** [1] - 248:6

**SINGER** [1] - 4:8

**single** [3] - 197:21, 197:22, 206:14

**singular** [1] - 234:24

**sit** [1] - 170:15

**site** [3] - 133:6, 148:7, 151:2

**sitting** [5] - 39:4, 55:6, 73:23, 89:21, 165:17

**situation** [2] - 178:5, 198:18

**situations** [1] - 175:5

**six** [5] - 94:6, 105:10, 106:7, 142:5, 143:20

**six-fold** [1] - 143:20

**skimmed** [1] - 34:6

**skin** [11] - 112:17,
112:21, 113:11,
127:18, 140:8,
140:15, 148:5,
148:6, 161:12,
162:19, 198:8
**Skip** [1] - 185:23
**skip** [1] - 62:1
**skipped** [1] - 123:17
**slavery** [1] - 125:16
**Slide** [16] - 29:2,
127:6, 130:14,
131:9, 133:2,
135:19, 138:16,
150:3, 155:2, 172:7,
172:14, 173:1,
176:2, 179:2,
179:17, 180:24
**slide** [53] - 14:5, 15:8,
15:16, 16:10, 16:13,
16:19, 17:6, 18:4,
18:22, 20:2, 20:13,
26:4, 26:10, 31:14,
31:17, 31:18, 31:19,
64:23, 68:2, 89:19,
90:3, 90:20, 93:16,
110:6, 113:22,
115:19, 116:16,
117:9, 119:13,
119:22, 121:16,
124:5, 126:23,
127:2, 133:7, 133:8,
133:20, 134:25,
135:4, 135:18,
136:20, 137:4,
137:7, 138:1, 138:6,
144:24, 145:7,
145:18, 146:1,
146:5, 149:24,
153:6, 154:8
**slides** [9] - 12:22,
12:25, 89:11, 90:3,
100:12, 135:1,
139:18, 144:25,
146:17
**slight** [1] - 139:3
**slightly** [1] - 98:4
**slowing** [1] - 132:13
**small** [4] - 75:2, 99:2,
113:12, 143:4
**smaller** [2] - 136:14,
142:8
**smallpox** [1] - 132:20
**Smith** [2] - 6:4, 6:11
**smoking** [1] - 197:23
**snippet** [1] - 99:2
**social** [3] - 180:21,
180:22, 181:2
**Society** [3] - 10:6,
10:14, 97:22

**society** [3] - 55:2,
148:13, 181:22
**soft** [1] - 148:5
**sold** [8] - 33:7, 37:19,
46:25, 47:3, 49:3,
49:20, 177:5, 199:5
**solu** [1] - 166:7
**solu-izing** [1] - 166:7
**soluble** [1] - 164:24
**solve** [3] - 185:17,
215:9, 221:1
**someone** [7] - 16:5,
35:4, 161:10,
165:16, 166:1,
166:5, 243:1
**sometime** [2] -
240:11, 241:7
**sometimes** [16] - 10:1,
65:24, 65:25, 95:7,
110:5, 113:11,
118:1, 136:1, 141:1,
141:3, 153:9, 157:3,
161:2, 231:6, 231:8,
242:23
**Sometimes** [1] -
103:11
**somewhere** [2] - 96:4,
129:5
**Sorry** [2] - 105:6,
110:1
**sorry** [22] - 17:3,
23:15, 35:9, 40:10,
43:22, 44:9, 45:1,
59:15, 60:16, 68:3,
81:20, 87:14,
111:25, 127:1,
145:6, 164:9,
167:10, 170:20,
179:19, 213:8,
231:7, 247:15
**sort** [14] - 96:16,
98:18, 103:24,
115:16, 118:4,
119:2, 121:25,
133:21, 139:2,
140:21, 146:25,
153:9, 156:7, 173:25
**sorts** [1] - 205:7
**sought** [3] - 181:14,
202:1, 202:19
**sound** [2] - 25:22,
25:25
**sounds** [6] - 38:8,
50:3, 72:1, 159:13,
182:20
**source** [10] - 11:17,
14:7, 16:24, 68:23,
119:18, 138:7,
145:8, 145:10,
234:25, 240:9

**sources** [1] - 11:15
**South** [6] - 2:11,
186:12, 191:8,
230:4, 246:5, 246:23
**Southern** [5] - 7:3,
122:11, 143:5,
223:21, 232:15
**southern** [10] - 104:1,
105:20, 122:23,
124:3, 133:14,
158:22, 175:16,
176:11, 180:4, 182:5
**SOUTHERN** [1] - 1:1
**Southwest** [1] -
121:21
**southwestern** [1] -
180:4
**space** [1] - 147:25
**span** [2] - 190:22,
224:7
**spanning** [1] - 28:8
**SPEAKERS** [1] -
248:6
**speaking** [1] - 192:3
**speaks** [1] - 147:1
**Special** [1] - 233:18
**special** [2] - 41:18,
89:3
**specialist** [2] - 99:16,
99:18
**specialists** [2] - 99:20,
100:5
**specialize** [1] - 8:10
**specialized** [1] -
100:25
**specialty** [1] - 100:22
**specific** [34] - 66:1,
66:6, 102:23,
102:24, 103:1,
105:5, 107:15,
108:25, 109:1,
115:23, 122:25,
123:24, 144:15,
144:16, 145:10,
151:6, 155:5,
157:13, 165:10,
172:22, 173:5,
188:23, 191:24,
201:9, 202:2,
202:20, 202:25,
203:17, 203:25,
205:6, 205:18,
227:10, 242:13
**specifically** [14] -
71:16, 89:2, 112:9,
115:3, 136:16,
139:16, 149:2,
200:24, 201:21,
208:13, 208:18,
212:22, 222:14,

223:12
**specify** [1] - 90:1
**speculate** [1] - 38:25
**speculation** [1] -
244:6
**speed** [1] - 185:10
**spell** [2] - 236:21,
236:23
**spend** [5] - 41:9,
93:11, 98:14,
102:19, 132:16
**spending** [1] - 103:2
**spent** [6] - 40:16,
41:4, 91:11, 94:7,
100:6, 223:23
**spill** [1] - 86:11
**spleen** [1] - 147:23
**sponsored** [1] - 57:15
**spread** [3] - 67:23,
135:10, 154:21
**spring** [1] - 8:19
**squad** [1] - 200:24
**Square** [2] - 6:5, 6:12
**squeeze** [1] - 125:12
**St** [2] - 91:19, 144:18
**Staci** [1] - 247:20
**staff** [2] - 153:3, 193:7
**stage** [4] - 128:1,
128:3, 136:13,
136:14
**stalled** [2] - 116:10,
116:11
**stamp** [1] - 197:18
**stamps** [1] - 197:20
**stand** [7] - 50:1, 78:7,
79:11, 88:9, 182:18,
185:24, 230:11
**standard** [3] - 14:13,
81:19, 83:14
**standards** [1] - 42:10
**standing** [5] - 194:14,
194:20, 197:13,
220:23, 236:2
**standpoint** [1] - 39:8
**stands** [1] - 190:9
**STANNER** [1] - 5:10
**star** [1] - 76:6
**start** [25] - 13:11, 14:8,
15:4, 25:2, 43:14,
59:15, 73:20, 93:1,
93:4, 104:8, 109:6,
112:3, 113:20,
116:15, 135:9,
141:25, 149:3,
174:1, 198:21,
198:24, 207:16,
207:21, 215:12,
228:20, 247:11
**started** [21] - 55:24,
93:2, 97:1, 99:22,

110:15, 117:22,
131:7, 136:8, 142:2,
142:22, 155:11,
174:6, 176:7,
183:12, 188:12,
216:2, 224:10,
236:16, 236:20,
240:21
**starting** [3] - 43:13,
179:1, 228:14
**starts** [2] - 127:19,
176:2
**State** [5] - 88:23,
129:11, 174:22,
188:16, 225:10
**state** [52] - 7:11, 7:21,
38:3, 65:17, 65:20,
85:15, 88:11, 89:17,
99:19, 99:20, 100:2,
103:16, 104:2,
104:8, 105:22,
105:23, 107:12,
107:13, 116:20,
116:21, 117:1,
120:17, 120:21,
122:24, 124:3,
129:3, 130:6,
130:10, 130:12,
132:1, 133:18,
135:25, 136:11,
137:21, 137:23,
138:14, 139:1,
139:10, 143:12,
143:18, 156:21,
157:11, 175:16,
183:13, 184:9,
186:1, 186:9, 208:8,
223:5, 232:19, 248:1
**statement** [15] - 21:19,
60:24, 80:10,
171:16, 171:19,
185:1, 205:9,
221:25, 226:12,
226:13, 231:10,
234:3, 234:12,
236:14
**statements** [5] -
58:22, 60:7, 172:23,
175:21, 175:25
**States** [18] - 7:2,
17:21, 21:10, 21:22,
22:16, 26:1, 27:10,
32:8, 99:7, 101:14,
115:23, 122:5,
128:11, 128:24,
129:14, 135:24,
136:2, 223:20
**states** [4] - 60:18,
131:24, 138:11,
190:13

**STATES** [2] - 1:1, 1:17
**statewide** [1] - 144:20
**statistical** [8] - 23:19, 23:22, 25:4, 26:12, 27:1, 28:15, 39:16, 66:23
**statistics** [4] - 57:7, 174:9, 193:9, 193:10
**Status** [1] - 7:2
**status** [4] - 97:20, 170:16, 201:18, 229:4
**STATUS** [1] - 1:17
**stay** [2] - 54:10, 142:6
**steadily** [1] - 116:8
**stenography** [1] - 6:19
**step** [2] - 15:7, 73:5
**stepped** [3] - 191:21, 193:19, 199:19
**sterile** [5] - 104:15, 112:14, 149:17, 149:23, 161:11
**stethoscope** [1] - 140:4
**STEVEN** [1] - 4:22
**stick** [1] - 71:20
**stigma** [10] - 156:17, 156:24, 157:1, 157:7, 157:23, 158:18, 158:23, 159:3, 159:14
**stigmatized** [1] - 152:21
**stigmatizing** [1] - 159:5
**still** [21] - 57:22, 58:1, 82:20, 111:10, 117:17, 120:6, 142:25, 156:15, 156:18, 156:19, 157:9, 157:10, 157:24, 158:2, 174:3, 174:6, 174:18, 178:11, 180:10, 234:5, 241:20
**stimulant** [1] - 174:10
**stimulants** [2] - 176:15, 177:23
**stolen** [3] - 199:6, 244:3, 244:16
**stood** [1] - 73:15
**stop** [3] - 118:20, 132:22, 207:22
**stopped** [1] - 118:5
**stops** [2] - 159:3, 195:15
**stores** [1] - 197:16
**straight** [2] - 88:4, 245:14

**straightforward** [2] - 31:6, 43:18
**Strait** [1] - 247:21
**strategic** [4] - 190:11, 200:3, 212:3, 214:18
**Strategies** [1] - 210:23
**strategies** [3] - 197:5, 223:2, 223:12
**strategy** [3] - 207:4, 210:17, 215:6
**Strategy** [3] - 211:4, 211:6, 211:12
**street** [10] - 49:11, 153:17, 163:11, 177:5, 181:17, 181:18, 194:14, 195:19, 198:16, 200:21
**Street** [15] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:19, 4:21, 4:24, 5:5, 5:12, 6:6, 6:13
**street-level** [1] - 195:19
**stricken** [1] - 80:1
**strike** [7] - 11:11, 72:20, 81:20, 107:1, 178:14, 178:21, 246:13
**strips** [7] - 103:13, 151:14, 151:17, 176:24, 180:16, 183:24, 184:1
**strong** [1] - 196:18
**stronger** [1] - 158:17
**structure** [3] - 94:8, 95:22, 95:23
**struggling** [2] - 107:19, 180:7
**student** [1] - 93:3
**students** [3] - 8:19, 102:17, 102:20
**studied** [2] - 30:12, 90:23
**studies** [23] - 18:9, 20:1, 61:12, 61:22, 63:22, 66:16, 66:17, 67:5, 67:13, 67:18, 67:22, 74:18, 76:19, 76:21, 94:10, 94:16, 95:2, 95:8, 95:11, 128:19, 135:15, 153:17, 153:19
**study** [26] - 19:20, 20:2, 41:2, 56:1, 57:15, 57:17, 58:10, 61:9, 61:16, 61:19, 62:10, 66:12, 66:15, 67:13, 67:15, 67:18,

91:4, 94:24, 110:10, 131:14, 135:16, 143:16, 144:1, 144:3, 151:23, 154:13
**studying** [1] - 110:11
**stuff** [1] - 23:16
**sub** [1] - 192:7
**subject** [7] - 52:25, 96:12, 119:23, 124:15, 130:13, 145:16, 205:15
**subjective** [1] - 226:4
**submit** [3] - 81:14, 247:6, 247:19
**submitted** [3] - 151:24, 232:16, 248:2
**subordinate** [1] - 194:2
**Suboxone** [1] - 105:25
**subspecialty** [1] - 92:23
**Substance** [3] - 158:7, 158:25, 174:23
**substance** [3] - 104:17, 173:2, 173:7
**substantive** [2] - 89:25, 90:7
**substantively** [1] - 108:17
**substitute** [1] - 75:17
**success** [3] - 183:7, 197:6, 216:3
**succumb** [1] - 117:25
**suffering** [2] - 31:10, 158:13
**suggested** [1] - 56:20
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 3:15, 4:6, 4:9, 6:5, 6:12
**summarize** [3] - 213:25, 214:19, 214:22
**summary** [3] - 31:18, 56:24, 57:2
**Summary** [1] - 211:4
**summer** [2] - 102:19, 188:6
**superhuman** [1] - 52:17
**supplanted** [1] - 176:12
**supplanted"** [1] - 176:20
**supplanting** [1] - 173:3
**supplied** [2] - 47:6, 47:24
**supplies** [3] - 239:15,

240:12, 241:8
**supply** [9] - 26:25, 128:11, 151:15, 151:18, 177:4, 177:18, 196:17, 219:5, 234:25
**support** [2] - 85:7, 153:18
**supporting** [1] - 98:5
**supposed** [2] - 164:22, 206:22
**surge** [1] - 240:3
**surgery** [11] - 58:13, 58:25, 59:7, 59:12, 75:13, 141:23, 142:5, 142:12, 144:13, 146:14, 146:16
**surgical** [1] - 148:10
**surprise** [3] - 47:9, 48:2, 204:6
**surprising** [1] - 125:19
**surveillance** [2] - 143:12, 144:17
**survive** [1] - 128:1
**survived** [1] - 216:13
**suspect** [1] - 226:16
**suspicious** [1] - 48:18
**sustain** [3] - 75:4, 86:8, 220:13
**sustained** [4] - 80:13, 202:22, 203:4, 246:12
**Sustained** [1] - 228:2
**sustaining** [1] - 210:1
**SUZANNE** [1] - 4:20
**swallow** [1] - 118:15
**swallowed** [2] - 162:19, 164:23
**switch** [3] - 52:16, 65:1, 230:7
**SWORN** [3] - 7:15, 88:14, 186:4
**symptomatic** [1] - 129:3
**syndemics** [1] - 109:19
**syringe** [25] - 104:13, 104:14, 112:16, 116:6, 128:14, 131:6, 140:14, 149:12, 149:13, 149:15, 149:17, 149:21, 150:25, 152:25, 153:9, 153:18, 154:5, 154:18, 155:11, 156:8, 156:10, 183:8, 184:8, 184:10

**syringes** [4] - 149:23, 150:18, 153:16, 154:1
**system** [4] - 114:5, 134:10, 175:8, 176:9
**systemic** [2] - 126:13, 126:15
**systems** [2] - 126:16, 159:4

**T**

**Table** [6] - 61:10, 61:11, 61:12, 76:13, 76:15, 76:17
**table** [7] - 55:24, 65:7, 65:13, 66:13, 66:14, 68:13, 76:24
**tables** [1] - 30:13
**Tackle** [1] - 172:11
**tackled** [1] - 195:1
**tackling** [1] - 191:24
**tactical** [3] - 200:24, 211:23
**tagged** [1] - 179:3
**take-aways** [1] - 215:12
**take-back** [1] - 223:24
**talks** [2] - 102:23, 130:18
**tar** [5] - 237:15, 237:18, 239:23, 240:11, 241:7
**target** [3] - 113:6, 126:15, 173:5
**targeted** [1] - 173:7
**targeting** [1] - 200:22
**task** [6] - 26:24, 66:3, 190:12, 193:3, 193:7, 223:9
**Task** [1] - 233:20
**tasked** [1] - 83:3
**teach** [7] - 8:18, 102:16, 102:17, 102:20, 145:2, 151:18, 188:12
**teaching** [7] - 8:18, 102:15, 133:20, 137:7, 144:25, 145:9, 145:13
**tears** [1] - 115:14
**tech** [3] - 52:6, 52:14, 52:16
**technical** [1] - 188:21
**techniques** [1] - 107:22
**technology** [1] - 52:12
**teeth** [2] - 146:21, 146:22
**Temitoe** [1] - 185:25

**TEMITOPE** [1] - 4:13
**ten** [6] - 10:24, 11:6, 63:16, 73:3, 97:9, 123:5
**ten-year** [1] - 97:9
**tendency** [1] - 179:24
**tender** [1] - 106:8
**Tennessee** [6] - 122:12, 131:15, 131:24, 138:4, 176:11, 180:4
**Tenth** [1] - 5:12
**tenure** [7] - 191:9, 193:11, 196:4, 199:13, 199:18, 206:16, 236:4
**term** [12] - 127:20, 128:5, 142:11, 149:21, 161:3, 161:4, 162:10, 162:20, 165:9, 165:21, 166:13, 166:18
**terminology** [1] - 114:10
**terms** [21] - 30:7, 31:21, 39:19, 54:4, 55:7, 63:15, 80:24, 85:12, 115:11, 147:1, 149:19, 154:22, 161:6, 175:19, 193:9, 196:22, 198:5, 207:18, 239:5, 239:22
**terrible** [2] - 153:24, 159:10
**territory** [1] - 219:9
**test** [13] - 92:17, 103:13, 126:19, 137:16, 151:1, 151:14, 151:17, 151:18, 176:24, 180:16, 183:22, 183:24, 184:1
**testified** [46] - 14:9, 17:16, 33:3, 33:12, 33:21, 33:24, 34:8, 34:12, 34:16, 34:22, 35:4, 36:15, 36:16, 36:20, 37:4, 37:14, 39:15, 45:8, 45:16, 47:16, 48:10, 51:1, 82:9, 107:1, 119:10, 145:14, 161:8, 167:2, 169:18, 169:20, 169:21, 170:19, 171:11, 176:3, 201:11, 202:6, 202:10,

203:7, 204:13, 208:18, 209:2, 214:6, 229:8, 239:10, 239:25, 241:15
**testifies** [1] - 120:5
**testify** [15] - 12:4, 13:14, 16:14, 16:20, 17:4, 22:20, 25:24, 74:23, 81:14, 101:22, 105:1, 202:5, 205:3, 209:18, 228:10
**testifying** [6] - 15:9, 98:15, 101:19, 145:16, 217:15, 246:6
**testimony** [66] - 12:11, 12:21, 12:22, 15:3, 18:23, 21:21, 22:1, 28:5, 34:3, 34:5, 35:1, 35:10, 35:15, 36:18, 36:25, 37:1, 37:9, 37:10, 44:16, 44:18, 45:5, 47:11, 47:19, 47:21, 52:4, 52:20, 52:24, 53:5, 53:15, 77:22, 78:5, 78:6, 80:1, 81:4, 81:10, 81:17, 82:3, 82:7, 82:20, 83:20, 85:10, 85:19, 85:23, 85:24, 86:24, 87:3, 89:12, 107:7, 125:3, 126:24, 127:4, 135:1, 139:18, 161:2, 165:21, 183:7, 201:8, 202:20, 205:15, 209:21, 209:25, 210:4, 217:14, 229:14, 238:24, 241:13
**testing** [1] - 104:16
**tests** [1] - 151:2
**Texas** [1] - 125:17
**textbook** [1] - 98:7
**textbooks** [1] - 11:4
**texts** [1] - 11:5
**THE** [224] - 1:1, 1:1, 1:4, 1:17, 7:6, 7:9, 7:12, 7:18, 12:6, 12:13, 13:6, 13:8, 16:12, 16:21, 17:3, 17:8, 17:13, 17:25, 19:14, 19:16, 20:23, 22:9, 22:24, 23:2, 24:6, 24:24, 26:6, 29:12, 29:16, 29:17, 29:18, 29:20, 29:21,

29:23, 29:24, 30:1, 32:11, 32:14, 45:1, 45:11, 51:14, 51:18, 52:11, 52:13, 53:3, 55:19, 68:13, 68:17, 69:17, 73:3, 73:9, 73:12, 73:15, 74:20, 74:25, 75:4, 76:1, 77:16, 77:20, 77:24, 78:1, 78:3, 78:17, 79:8, 80:3, 81:2, 81:22, 82:22, 83:1, 83:20, 84:5, 84:16, 85:24, 86:6, 86:18, 87:5, 87:14, 87:25, 88:3, 88:9, 88:11, 88:12, 88:13, 88:15, 88:16, 88:17, 89:16, 90:11, 93:15, 101:17, 101:25, 102:3, 106:12, 106:14, 106:19, 106:20, 120:3, 120:9, 120:13, 124:16, 124:21, 124:22, 124:23, 125:4, 125:5, 125:14, 125:18, 125:23, 125:24, 125:25, 126:4, 127:7, 145:16, 145:20, 145:23, 160:1, 160:3, 167:18, 167:21, 170:8, 170:18, 171:10, 171:13, 172:5, 173:15, 173:17, 173:19, 173:21, 178:18, 178:20, 182:9, 182:13, 182:14, 182:17, 182:20, 182:23, 184:18, 184:20, 184:23, 184:25, 185:4, 185:19, 185:21, 186:1, 186:2, 186:3, 186:5, 201:6, 202:4, 202:9, 202:13, 202:15, 203:12, 204:2, 204:17, 205:12, 205:20, 205:22, 206:3, 206:4, 209:21, 210:6, 211:1, 212:21, 212:23, 213:9, 213:18, 214:9, 217:13, 217:17, 217:25, 218:17, 225:18, 228:2, 229:7,

229:11, 229:21, 230:1, 230:6, 230:12, 230:17, 233:9, 233:11, 233:13, 235:7, 235:9, 235:11, 235:18, 235:21, 235:22, 237:9, 237:11, 237:12, 237:14, 237:17, 237:18, 238:25, 239:18, 239:19, 244:7, 244:9, 244:23, 245:4, 245:7, 245:12, 245:14, 245:17, 246:7, 246:8, 246:13, 246:16, 246:19, 246:21, 246:22, 246:25, 247:1, 247:2, 247:3, 247:7, 247:15, 247:18, 247:23, 247:25, 248:4
**theft** [2] - 243:22, 244:19
**themselves** [3] - 16:17, 65:25, 165:16
**theory** [1] - 64:15
**therapy** [1] - 99:15
**therefore** [1] - 101:21
**they've** [2] - 153:22, 244:17
**thick** [2] - 174:3, 175:7
**thinking** [1] - 168:23
**thinks** [1] - 149:6
**Third** [1] - 63:22
**third** [15] - 17:6, 59:5, 60:4, 65:21, 92:16, 93:4, 104:2, 104:13, 124:3, 133:18, 146:12, 155:20, 172:25, 175:16, 216:23
**third-party** [1] - 65:21
**thirds** [1] - 95:1
**THOMAS** [1] - 7:15
**Thomas** [4] - 2:10, 7:8, 7:12, 7:23
**thoughts** [1] - 153:14
**thousand** [4] - 130:10, 130:11, 130:23, 136:21
**thousands** [1] - 34:13
**Threat** [14] - 210:22, 211:4, 211:5, 211:12, 211:18, 212:9, 212:19, 213:25, 214:5, 214:15, 215:11,

215:14, 216:21, 219:16
**threat** [10] - 214:7, 216:19, 216:24, 220:17, 220:18, 222:10, 222:15, 223:17, 241:18, 241:21
**threatening** [3] - 109:17, 111:21, 147:16
**threats** [8] - 194:3, 199:25, 200:7, 210:10, 210:13, 210:16, 210:19, 215:25
**Three** [2] - 6:5, 190:24
**three** [25] - 6:12, 41:5, 41:17, 45:19, 46:2, 46:17, 47:5, 47:24, 50:5, 66:16, 66:17, 67:5, 76:21, 92:14, 99:4, 106:2, 120:18, 131:18, 132:7, 142:17, 153:20, 177:10, 183:19, 189:12, 195:25
**three-part** [1] - 92:14
**throughout** [4] - 188:16, 199:18, 212:17, 242:1
**throw** [1] - 158:11
**tightly** [1] - 140:1
**tilting** [1] - 8:5
**TIMOTHY** [1] - 5:9
**tip** [1] - 207:21
**tissue** [4] - 115:14, 127:20, 127:25, 148:5
**title** [4] - 8:15, 56:9, 56:16, 172:11
**titled** [3] - 18:11, 19:22, 232:8
**today** [41] - 12:21, 14:4, 18:24, 20:4, 20:14, 22:1, 23:14, 39:4, 78:7, 79:10, 87:22, 89:11, 89:13, 93:13, 105:2, 107:7, 108:18, 109:7, 112:4, 125:13, 147:11, 149:1, 159:16, 159:23, 160:12, 160:13, 161:2, 161:25, 165:21, 166:23, 171:3, 171:9, 184:14, 185:5, 224:10, 225:15, 229:13, 229:23,

230:21, 239:25, 247:8
**together** [13] - 53:5, 81:5, 81:20, 126:23, 130:18, 133:8, 138:25, 153:6, 154:8, 172:23, 210:15, 215:4, 221:10
**Tomblin** [1] - 97:5
**tomorrow** [8] - 125:8, 182:24, 185:8, 185:12, 185:15, 230:2, 235:12, 235:23
**tonight** [1] - 235:18
**took** [13] - 17:10, 20:5, 30:17, 42:22, 43:1, 43:25, 64:14, 104:12, 169:4, 209:10, 223:1, 240:10, 241:7
**top** [9] - 62:20, 62:21, 66:20, 70:15, 134:8, 150:13, 172:15, 197:24, 232:10
**topic** [6] - 20:11, 57:20, 75:25, 91:4, 139:15, 224:11
**tort** [2] - 80:18, 80:21
**total** [23] - 14:19, 26:20, 28:4, 28:7, 28:8, 28:9, 28:12, 28:14, 31:4, 31:8, 31:9, 31:23, 42:3, 42:25, 43:2, 43:4, 43:10, 44:3, 49:23, 120:17, 120:23, 121:13, 122:17
**totality** [1] - 49:19
**totally** [1] - 77:11
**touched** [3] - 80:7, 152:6, 224:21
**toward** [1] - 179:22
**towards** [1] - 181:1
**Tower** [2] - 3:4, 4:23
**town** [1] - 220:6
**towns** [1] - 143:4
**toxicity** [1] - 118:8
**toxoplasmosis** [1] - 95:6
**track** [3] - 138:25, 139:7, 193:14
**tracked** [1] - 144:17
**tracking** [1] - 193:4
**trade** [2] - 129:16, 197:19
**traded** [1] - 199:5
**trading** [1] - 148:20
**traditional** [2] -

198:11, 198:13
**traditionally** [1] - 129:16
**traffic** [2] - 195:15, 207:22
**trafficked** [2] - 231:19, 242:16
**traffickers** [1] - 195:20
**trafficking** [19] - 190:9, 196:5, 196:13, 198:11, 198:14, 200:22, 215:19, 219:5, 219:8, 223:13, 225:8, 231:12, 231:16, 233:22, 242:3, 242:16, 242:19, 242:22, 243:5
**trained** [2] - 91:17, 103:4
**trainees** [1] - 102:23
**training** [17] - 89:3, 91:3, 92:19, 92:22, 93:3, 93:17, 99:22, 99:23, 99:24, 104:5, 132:5, 188:7, 188:8, 188:18, 188:21, 193:12, 193:13
**trainings** [1] - 188:17
**trajectory** [2] - 218:10, 220:13
**transactional** [2] - 114:9, 148:19
**transactions** [3] - 194:15, 194:22, 197:25
**transcript** [12] - 6:19, 34:5, 34:10, 34:15, 34:19, 34:21, 34:25, 36:18, 44:11, 50:13, 204:21, 248:13
**transferred** [1] - 142:9
**transfusion** [2] - 126:20, 128:10
**transition** [2] - 96:16, 218:19
**transmission** [4] - 94:24, 94:25, 152:3, 153:23
**transmitted** [3] - 114:22, 126:17, 148:21
**transplant** [2] - 128:2, 132:15
**transportation** [2] - 158:23, 158:24
**Transportation** [1] - 19:8
**traumatic** [3] - 34:18,

35:7, 35:14
**treat** [8] - 30:10, 94:12, 95:3, 110:20, 168:1, 170:4, 171:4
**treatable** [1] - 148:22
**treated** [7] - 117:18, 132:2, 137:9, 148:10, 152:19, 152:21, 159:8
**treaters** [1] - 103:3
**treating** [7] - 34:17, 35:7, 35:14, 54:4, 110:22, 154:12, 191:19
**treatment** [28] - 75:15, 93:25, 95:24, 95:25, 103:17, 105:25, 106:1, 106:9, 106:15, 127:14, 139:13, 142:5, 149:21, 150:5, 151:7, 152:7, 152:13, 153:2, 153:8, 153:20, 153:22, 154:24, 154:25, 156:24, 157:16, 158:1, 179:20, 200:17
**tremendous** [6] - 111:15, 123:20, 124:8, 156:12, 157:4, 168:1
**trend** [2] - 120:15, 215:17
**trends** [6] - 142:23, 198:11, 198:14, 218:7, 218:10, 235:2
**Trevino** [1] - 247:21
**trial** [14] - 32:25, 33:12, 33:21, 36:15, 47:10, 52:20, 56:3, 78:25, 81:23, 82:5, 82:8, 82:16, 209:17, 245:11
**TRIAL** [1] - 1:16
**Trials** [1] - 95:23
**trick** [1] - 216:11
**trickier** [1] - 117:12
**tried** [2] - 23:16, 122:3
**trier** [1] - 84:12
**trivial** [1] - 111:20
**true** [10] - 17:25, 54:19, 54:21, 104:14, 152:4, 161:17, 208:10, 234:3, 234:12, 246:15
**Trump** [2] - 18:16, 75:21
**trust** [1] - 152:17,

153:4
**truthful** [3] - 44:18, 51:11, 51:12
**truthfully** [5] - 51:1, 169:18, 169:21, 228:10, 241:15
**try** [10] - 43:23, 49:15, 51:22, 74:4, 74:5, 125:11, 141:7, 160:13, 173:22, 231:15
**trying** [19] - 17:9, 56:3, 74:11, 118:24, 118:25, 175:23, 178:8, 179:24, 180:14, 180:19, 181:21, 205:18, 207:5, 215:13, 220:14, 223:25, 229:12, 238:19
**turn** [11] - 57:20, 109:25, 124:14, 172:9, 172:14, 174:2, 216:5, 216:23, 219:13, 220:21, 232:25
**turned** [1] - 216:10
**turning** [2] - 118:5, 217:11
**turns** [4] - 123:18, 148:1, 179:18, 179:19
**Twelfth** [3] - 4:19, 4:21, 5:5
**twice** [2] - 72:9, 72:16
**two** [54] - 14:3, 14:8, 16:15, 18:9, 18:10, 27:6, 31:18, 53:22, 57:1, 61:22, 69:11, 69:12, 69:22, 72:24, 91:11, 95:1, 95:9, 95:22, 95:24, 96:24, 98:1, 98:2, 98:7, 98:24, 99:3, 99:6, 103:24, 105:7, 105:9, 106:6, 110:13, 110:18, 112:25, 117:24, 123:22, 123:24, 124:8, 129:16, 129:20, 131:24, 132:7, 136:2, 143:2, 144:8, 144:19, 144:22, 158:24, 159:20, 182:16, 183:18, 183:23, 211:3, 211:12, 212:19
**Two** [1] - 92:14
**two-fold** [1] - 144:8

**two-thirds** [1] - 95:1
**two-volume** [1] - 98:7
**two-week** [1] - 143:2
**type** [9] - 37:24, 107:21, 108:4, 108:14, 139:7, 209:11, 209:12, 209:13, 210:2
**types** [8] - 107:5, 112:9, 154:25, 156:22, 191:22, 192:15, 192:19, 192:20
**Typhoid** [1] - 110:16
**typical** [4] - 116:22, 124:1, 142:5, 162:23
**typically** [8] - 112:17, 140:8, 142:6, 145:4, 150:21, 162:12, 175:5, 198:15
**typo** [1] - 90:9

## U

**U.S** [1] - 232:15
**ubiquitous** [1] - 177:20
**UCLA** [1] - 91:21
**ultimate** [4] - 83:19, 83:21, 85:23, 193:24
**ultimately** [2] - 57:15, 206:7
**unawares** [1] - 122:1
**unclean** [1] - 161:12
**uncommon** [1] - 73:21
**under** [18] - 21:22, 22:25, 23:5, 24:11, 24:18, 38:12, 44:16, 52:17, 58:7, 60:4, 60:16, 99:17, 119:11, 156:2, 169:15, 204:25, 206:12, 213:9
**under-reported** [1] - 119:11
**Underestimated** [1] - 18:12
**underlying** [1] - 82:18
**underneath** [1] - 180:20
**underscore** [1] - 80:6
**understood** [3] - 37:17, 81:16, 178:19
**undertake** [3] - 53:21, 53:22, 54:1
**undertook** [1] - 91:3
**undertreatment** [1] - 168:3
**undetectable** [1] - 118:19

**unfortunately** [1] - 196:20
**uniform** [2] - 117:23, 202:18
**uninsured** [1] - 65:23
**unique** [1] - 240:5
**unit** [7] - 200:20, 206:10, 206:19, 207:12, 207:19, 209:8, 226:9
**UNITED** [2] - 1:1, 1:17
**United** [18] - 7:2, 17:21, 21:10, 21:22, 22:16, 26:1, 27:10, 32:8, 99:7, 101:14, 115:23, 122:5, 128:11, 128:24, 129:14, 135:24, 136:2, 223:20
**University** [11] - 9:9, 89:7, 90:25, 91:4, 91:12, 96:5, 96:23, 187:3, 187:4, 187:11, 187:18
**unlawful** [3] - 48:12, 50:18, 84:21
**Unless** [1] - 179:18
**unless** [4] - 43:21, 99:17, 148:16, 179:19
**unlike** [3] - 110:23, 141:19, 173:25
**unprotected** [1] - 115:11
**unreasonable** [11] - 78:16, 83:4, 83:5, 83:9, 83:10, 83:13, 83:24, 84:4, 85:8, 86:22, 87:2
**unreasonableness** [1] - 83:7
**unreliable** [1] - 82:19
**unsterile** [5] - 112:15, 112:16, 140:13, 161:11
**untreated** [3] - 55:2, 55:7, 55:14
**up** [79] - 7:9, 8:5, 8:21, 12:25, 21:6, 21:13, 29:2, 44:10, 45:12, 50:8, 50:12, 52:19, 52:21, 54:20, 55:23, 56:11, 57:24, 59:17, 63:12, 64:25, 65:7, 65:14, 66:11, 68:13, 68:15, 72:3, 73:15, 75:8, 90:14, 100:7, 104:25, 113:23, 116:12, 119:9, 120:18, 122:7,

123:13, 123:16, 127:23, 128:7, 129:8, 129:9, 131:4, 131:25, 141:11, 147:25, 152:19, 155:3, 157:22, 159:14, 164:5, 166:6, 169:24, 170:20, 172:7, 173:1, 177:25, 179:6, 180:23, 182:18, 186:15, 186:19, 186:24, 189:14, 194:12, 208:4, 219:11, 220:10, 220:11, 224:13, 224:25, 228:13, 235:20, 240:23, 241:22, 244:10, 246:5
**upper** [1] - 130:22
**upwards** [1] - 61:5
**urban** [1] - 121:25
**usage** [1] - 166:20
**user** [1] - 152:20
**users** [2] - 75:17, 177:11
**uses** [8] - 25:25, 34:9, 58:12, 59:6, 59:7, 59:11, 75:12, 75:18
**utility** [1] - 153:18
**utilization** [1] - 144:10
**utilize** [1] - 16:15
**utilized** [2] - 138:19, 212:9

## V

**vacant** [1] - 197:15
**vacation** [1] - 118:16
**vaccinating** [1] - 136:9
**vaccination** [2] - 136:5, 137:11
**vaccinations** [1] - 136:6
**vaccine** [1] - 117:19
**vaginal** [1] - 114:24
**vague** [1] - 204:16
**Valdez** [1] - 86:11
**valid** [3] - 57:18, 164:22, 166:24
**validate** [2] - 25:11, 25:17
**valuable** [1] - 151:19
**valuation** [10] - 13:16, 14:6, 14:18, 27:8, 42:20, 43:13, 43:21, 44:8, 74:9, 77:2
**valuations** [2] - 28:11,

42:10
**value** [41] - 13:19, 13:24, 14:12, 15:5, 15:13, 15:24, 19:12, 23:13, 23:18, 23:22, 23:25, 25:3, 25:6, 25:8, 25:12, 26:12, 27:1, 28:15, 32:24, 37:18, 39:14, 39:16, 39:20, 39:23, 40:7, 42:2, 42:15, 43:6, 60:10, 60:13, 63:3, 66:23, 77:4, 77:9, 78:10, 79:4, 84:2, 111:15, 114:11, 151:20
**valued** [2] - 14:16, 76:24
**values** [3] - 15:22, 25:7, 27:21
**valuing** [3] - 18:25, 19:5
**valve** [9] - 140:25, 141:1, 141:2, 141:3, 141:4, 141:7, 141:17, 141:23, 142:10
**valves** [6] - 113:4, 139:23, 139:24, 140:21, 141:7
**variety** [3] - 31:2, 194:25, 242:7
**various** [13] - 60:14, 90:23, 92:18, 98:23, 102:11, 104:11, 140:8, 159:22, 192:7, 192:13, 198:19, 198:20, 215:22
**vast** [2] - 112:12, 161:18, 180:5
**vein** [1] - 141:9
**Ventura** [1] - 3:15
**verbal** [1] - 61:15
**version** [3] - 70:24, 89:22, 119:17
**versus** [3] - 50:19, 85:7, 112:7
**Vice** [4] - 89:10, 95:21, 96:2, 98:12
**victim** [1] - 15:25
**video** [2] - 228:13, 228:15
**Video** [1] - 229:6
**view** [5] - 39:3, 53:8, 53:17, 82:10, 172:15
**vigorously** [1] - 146:22
**violating** [1] - 245:12
**violations** [1] - 197:18

**violence** [1] - 195:6
**violent** [2] - 225:9, 233:21
**Violent** [1] - 233:20
**viral** [14] - 112:7, 113:1, 113:21, 114:7, 118:18, 118:21, 134:22, 137:14, 137:15, 144:18, 147:5, 147:12, 152:4
**Virginia** [74] - 4:24, 7:3, 7:4, 17:2, 26:14, 28:16, 28:21, 89:6, 92:1, 92:3, 96:21, 99:11, 99:14, 99:15, 101:4, 103:23, 104:3, 104:10, 105:5, 105:8, 105:16, 110:9, 115:24, 116:15, 116:17, 117:6, 121:6, 122:11, 122:18, 123:1, 123:9, 123:11, 123:13, 123:19, 123:21, 123:24, 128:24, 129:11, 129:15, 129:18, 130:4, 131:12, 131:14, 131:15, 131:24, 133:5, 134:14, 136:19, 137:25, 138:14, 138:24, 138:25, 139:5, 142:15, 143:10, 147:13, 172:20, 174:10, 176:10, 180:3, 186:14, 186:19, 222:14, 223:21, 231:20, 231:25, 232:5, 232:15, 232:2, 233:8, 233:23, 234:16
**VIRGINIA** [2] - 1:1, 1:18
**Virginia's** [2] - 97:5, 122:20
**virtue** [1] - 83:7
**virus** [6] - 114:21, 114:23, 115:15, 126:12, 135:4, 135:5
**viruses** [2] - 113:13, 134:5
**visceral** [1] - 147:22
**vision** [1] - 221:24
**visiting** [2] - 198:21, 223:23
**visually** [1] - 133:21

**vital** [4] - 168:8, 168:15, 169:4, 171:5
**VOLUME** [1] - 1:16
**volume** [2] - 98:7, 194:17
**voluminous** [2] - 55:22, 55:23
**vs** [1] - 248:15
**VSL** [19] - 23:17, 23:22, 27:4, 27:11, 27:14, 27:21, 28:10, 39:16, 39:25, 40:3, 40:4, 49:24, 60:5, 60:10, 60:13, 60:18, 61:5, 63:11, 63:12
**vulnerable** [6] - 137:12, 181:7, 181:11, 197:17, 215:18, 215:20

## W

**wage** [1] - 61:3
**wages** [1] - 77:8
**wait** [1] - 185:14
**waive** [1] - 80:12
**waived** [1] - 80:15
**wake** [1] - 177:25
**WAKEFIELD** [1] - 5:13
**walk** [4] - 14:6, 20:13, 90:23, 113:15
**walked** [1] - 247:5
**walking** [2] - 20:18, 112:3
**walks** [1] - 198:6
**wall** [1] - 55:24
**Waller** [7] - 33:16, 33:21, 34:12, 34:16, 34:22, 35:1, 35:11
**Waller's** [1] - 34:3
**wants** [4] - 49:23, 50:4, 62:19, 68:9
**Washington** [6] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12
**watch** [3] - 34:3, 36:17, 237:10
**watching** [1] - 118:12
**water** [1] - 110:17
**waves** [2] - 173:2, 173:25
**ways** [6] - 114:4, 114:5, 156:4, 168:23, 218:21, 242:7
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**website** [1] - 21:17
**week** [4] - 143:2, 185:18, 235:16,

247:10
**weeks** [6] - 96:24, 99:13, 118:21, 132:9, 142:5, 245:11
**weigh** [4] - 79:8, 84:12, 84:18, 85:9
**weighing** [4] - 79:2, 79:6, 79:15, 85:11
**weight** [6] - 14:23, 18:2, 81:3, 81:20, 84:3, 85:22
**Welcome** [2] - 87:25, 185:21
**welcome** [1] - 236:1
**well-known** [3] - 96:15, 149:12, 230:24
**West** [72] - 7:3, 7:4, 17:2, 26:13, 28:16, 28:21, 89:6, 92:1, 92:3, 96:21, 97:5, 99:10, 99:14, 99:15, 101:4, 103:23, 104:10, 105:5, 105:8, 105:16, 110:9, 115:23, 116:15, 116:17, 117:6, 121:6, 122:11, 122:18, 122:19, 123:1, 123:9, 123:11, 123:13, 123:19, 123:20, 123:21, 123:24, 128:24, 129:11, 129:15, 129:18, 130:4, 131:11, 131:14, 131:24, 133:5, 134:14, 136:18, 137:24, 138:14, 138:23, 138:24, 139:5, 142:14, 143:10, 147:13, 172:19, 174:10, 180:3, 186:14, 186:19, 222:14, 223:21, 231:20, 231:24, 232:4, 232:15, 233:2, 233:8, 233:23, 234:16
**WEST** [2] - 1:1, 1:18
**western** [1] - 176:10
**Whack** [1] - 179:7
**Whack-a-Mole** [1] - 179:7
**whatsoever** [1] - 45:9
**whereas** [1] - 16:5
**White** [1] - 21:17
**whole** [7] - 99:20,

104:15, 111:6, 138:15, 139:1, 139:6, 150:23
**wholesale** [5] - 47:6, 47:17, 48:4, 49:2, 78:14
**WIC** [1] - 197:18
**WICHT** [2] - 4:18, 87:18
**widely** [5] - 22:4, 60:10, 107:22, 108:2, 169:7
**widespread** [1] - 198:4
**William** [3] - 96:14, 186:2, 186:10
**WILLIAM** [1] - 186:4
**Williams** [2] - 4:18, 5:4
**willing** [1] - 39:20
**willingness** [3] - 27:11, 27:12, 39:23
**wind** [1] - 166:6
**Winter** [1] - 237:4
**wise** [1] - 76:5
**wish** [2] - 182:19, 246:23
**witness** [19] - 17:15, 33:23, 55:21, 77:17, 87:9, 87:19, 87:22, 101:19, 185:17, 201:25, 205:3, 205:5, 214:6, 217:15, 229:25, 230:10, 235:16, 238:23, 247:10
**WITNESS** [45] - 7:12, 7:15, 19:16, 29:16, 29:18, 29:21, 29:24, 52:13, 68:13, 68:17, 77:24, 78:3, 88:12, 88:14, 88:17, 93:15, 106:20, 120:13, 124:22, 125:4, 125:24, 127:7, 160:3, 171:13, 173:17, 173:21, 178:18, 182:13, 182:20, 184:23, 186:2, 186:4, 206:4, 212:23, 235:9, 235:21, 237:11, 237:14, 237:18, 239:19, 244:9, 246:8, 246:21, 246:25, 247:2
**witnessed** [1] - 159:9
**witnesses** [5] - 13:17, 32:25, 33:11, 82:18, 202:15

**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**Wolfe** [1] - 233:5
**woman** [1] - 77:9
**Women** [1] - 77:7
**women** [4] - 116:14, 135:12, 151:10, 155:17
**Wonderful** [1] - 186:20
**wonderful** [6] - 96:6, 98:6, 186:20, 186:24, 224:12, 224:14
**word** [8] - 33:14, 79:17, 96:18, 162:3, 176:20, 177:6, 177:13, 235:11
**words** [5] - 94:13, 127:25, 141:2, 209:15, 238:19
**workers** [1] - 154:3
**workforce** [2] - 74:8, 74:17
**works** [3] - 40:3, 40:4, 67:11
**world** [3] - 13:19, 128:12, 172:15
**worse** [6] - 52:13, 115:10, 134:7, 135:25, 138:10
**worsened** [2] - 63:14, 140:6
**worsens** [1] - 134:8
**worth** [1] - 106:2
**worthy** [1] - 125:18
**Wow** [1] - 183:16
**wrap** [4] - 153:10, 155:3, 159:14, 180:23
**write** [4] - 91:7, 108:8, 162:17, 181:2
**writing** [6] - 108:6, 108:7, 171:15, 171:19, 206:6, 220:14
**written** [4] - 162:13, 162:17, 163:5, 247:16
**wrote** [7] - 98:6, 109:16, 120:14, 161:7, 176:5, 176:22, 176:23
**WU** [31] - 5:10, 101:18, 182:16, 183:1, 183:3, 212:25, 213:6, 213:8, 213:22, 217:14, 229:24, 230:10, 230:14, 230:16,

230:18, 231:24, 232:2, 233:7, 233:14, 233:15, 235:24, 235:25, 237:20, 239:2, 239:3, 239:21, 240:23, 240:25, 244:10, 244:13, 245:2
**Wu** [8] - 101:17, 182:25, 183:4, 229:21, 230:8, 230:19, 239:1, 245:1
**WV** [9] - 2:8, 3:10, 3:13, 4:24, 5:15, 6:9, 56:4, 74:3, 171:24
**WVU** [4] - 96:22, 96:25, 102:14, 103:25
**Wyoming** [1] - 104:6

**Y**

**Yale** [3] - 8:25, 9:4, 77:23
**year** [40] - 9:5, 14:11, 15:1, 15:2, 15:6, 19:18, 27:21, 28:10, 37:5, 61:25, 92:15, 92:16, 92:17, 93:4, 96:9, 97:9, 98:11, 98:18, 99:23, 103:2, 116:23, 117:13, 117:24, 120:21, 128:17, 128:20, 129:8, 129:19, 130:21, 131:6, 133:11, 143:18, 154:6, 155:13, 183:11, 183:14, 183:17
**years** [37] - 9:10, 9:13, 10:24, 44:5, 63:16, 91:9, 91:12, 93:9, 93:10, 94:7, 100:6, 104:12, 107:17, 110:12, 117:1, 121:5, 129:9, 130:2, 132:6, 133:9, 143:20, 151:13, 154:14, 167:4, 167:6, 167:10, 174:2, 187:15, 189:4, 189:11, 190:3, 190:23, 195:23, 199:11, 220:5, 220:6, 225:12
**yellow** [1] - 138:11
**York** [1] - 3:5
**young** [4] - 131:17,

158:16, 223:24
**younger** [2] - 131:18, 144:12
**yourself** [5] - 81:24, 88:20, 88:23, 204:4, 227:10

**Z**

**Zerkle** [12] - 201:25, 202:4, 202:6, 202:23, 202:24, 204:3, 204:18, 204:20, 205:5, 205:14, 209:24
**Zerkle's** [1] - 202:1
**zero** [3] - 77:6, 77:7
**Zoom** [3] - 160:9, 160:11, 160:18