

**U.S. Department of Justice**
**Office of the Inspector General**
**Evaluation and Inspections Division**

# Follow-Up Review of the Drug Enforcement Administration's Efforts to Control the Diversion of Controlled Pharmaceuticals

## July 2006

## I-2006-004

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

# EXECUTIVE DIGEST

## INTRODUCTION

The U.S. Department of Justice's (Department) Drug Enforcement Administration (DEA) is the primary agency for enforcing the provisions of the Controlled Substances Act of 1970 that pertain to the diversion of controlled pharmaceuticals, such as narcotics, stimulants, and depressants, and regulated chemicals, such as ephedrine. The DEA's diversion control program seeks to prevent, detect, and investigate the redirection of controlled pharmaceuticals from legitimate channels, while ensuring an adequate, uninterrupted supply to meet legitimate needs. Controlled pharmaceuticals can be diverted from legitimate channels through theft or fraud during the manufacturing and distribution process, and can be diverted by anyone involved in the process, including medical staff, pharmacy staff, and individuals involved in selling or using pharmaceuticals. Diversion schemes include physicians selling prescriptions, individuals obtaining and using controlled pharmaceuticals without a documented medical need, and drug traffickers illegally selling pharmaceuticals on the Internet without requiring prescriptions.

Diversion of controlled pharmaceuticals has dramatically increased in recent years, and research on drug usage reflects the growth of the problem. According to a 2005 report from the National Center on Addiction and Substance Abuse (CASA), the number of people who admitted abusing controlled prescription drugs increased by 94 percent over a 10-year period, from 7.8 million in 1992 to 15.1 million in 2003.[1] This rate of increase was seven times faster than the increase in the U.S. population for that same period. Further, the 2004 National Survey on Drug Use and Health reported that 2.4 million people used prescription pain relievers non-medically for the first time within 12 months of the survey – the largest number of new users for any type of illicitly used drug.[2]

The increase in the diversion of controlled pharmaceuticals has coincided with the emergence of the Internet as a significant source for

---

[1] *Under the Counter: The Diversion and Abuse of Controlled Prescription Drugs in the U.S.*, National Center on Addiction and Substance Abuse of Columbia University, July 2005. The report uses the term "abuse" to refer to non-medical use of a drug.

[2] The National Survey on Drug Use and Health defines "non-medical use" as the use of prescription-type drugs not prescribed for the respondent by a physician or the use of a drug only for the experience and feeling it causes.

U.S. Department of Justice                                                                 i
Office of the Inspector General
Evaluation and Inspections Division

diverted pharmaceuticals.  Hundreds of Internet pharmacies have been established through which large amounts of pharmaceuticals can be easily purchased with a credit card and without a prescription.  According to one estimate cited in the 2005 CASA report, the number of Internet pharmacies in operation had reached as many as 1,400 at one time.  In addition, an April 2005 study by comScore Networks reported that 17.4 million people visited online pharmacies in the fourth quarter of 2004, an increase of 14 percent from the previous quarter.[3]  Sixty-three percent of these Internet pharmacies did not require a prescription to obtain controlled substances.  Furthermore, the head of the DEA's Miami field division underscored the problem of pharmaceutical sales over the Internet in congressional testimony in 2004, stating, "And perhaps of the greatest concern, the Internet has become a virtual wild west bazaar for 'spam' emails and website advertisements that sell controlled substances with little or no oversight."[4]

The Office of the Inspector General (OIG) conducted this follow-up review to assess the DEA's actions to control pharmaceutical diversion since our previous review in October 2002.[5]  As in our previous review, this review does not examine the DEA diversion control program's regulatory activities, or its efforts to prevent the diversion of regulated chemicals.  In 2002, we found that despite the widespread problem of controlled pharmaceutical diversion and abuse, the DEA had been slow to commit sufficient resources to address the problem.  According to interviews with DEA personnel cited in our 2002 report, DEA special agents spent only 3 percent of their total work hours on diversion investigations.  In addition, we found that because DEA diversion investigators lacked law enforcement authority, the lack of special agent assistance negatively affected the quality and timeliness of diversion investigations.[6]  In addition, we found that the DEA had not resolved the question of the law enforcement authority for

---

[3] ComScore is a global market research provider and consultant for Internet usage, audience measurement, and e-commerce tracking data.

[4] Testimony of Thomas Raffanello, Special Agent in Charge (SAC), Miami Division, DEA, before the U.S. House of Representatives Committee on Government Reform, Subcommittee on Criminal Justice, Drug Policy and Human Resources, February 9, 2004.

[5] See the OIG report entitled *Review of the Drug Enforcement Administration's Control of the Diversion of Controlled Pharmaceuticals,* I-2002-010, October 2002, www.usdoj.gov/oig/reports/DEA/e0210/index.htm.

[6] In the 2002 review, the estimate of 3 percent of special agents' time devoted to diversion investigations was based on information obtained from interviews with DEA officials.  In our 2005 review, we used DEA work hour data to determine how much time special agents spent on diversion investigations.

diversion investigators, provided minimal intelligence support to diversion investigators and did not provide specialized training for special agents in diversion investigations.

We made four recommendations in our 2002 review, and the DEA concurred with them.  We recommended that the DEA:

- increase investigative resources devoted to the controlled pharmaceutical diversion program;
- ensure adequate training for DEA special agents in diversion investigation procedures;
- clarify the roles, responsibilities, and law enforcement authorities of diversion investigators; and
- fully implement the Online Investigations Project (the DEA's Internet investigative tool) and the diversion intelligence group to provide effective intelligence support to the Office of Diversion; also, the DEA should continue to explore additional intelligence capabilities to support the diversion investigator.

In our current review, we examined (1) the actions taken by the DEA to control the diversion of pharmaceuticals since our 2002 review, (2) the current amount of law enforcement and intelligence assistance the DEA provided for its diversion investigations, and (3) the DEA's response to the growing problem of Internet diversion.  To investigate these issues, we interviewed the DEA Administrator and Deputy Administrator, and other personnel at DEA headquarters and in 13 DEA field offices, analyzed data from 7 DEA databases, and reviewed a variety of DEA documents.  We also surveyed the group supervisors of the DEA's 68 domestic diversion groups regarding the organization of their groups, the law enforcement and intelligence support they received, the types of investigations they initiated, and their training.

**RESULTS IN BRIEF**

Since our 2002 review, we found that the DEA has taken important steps to improve its ability to control the diversion of controlled pharmaceuticals, especially pharmaceutical diversion using the Internet. However, several shortcomings in the DEA's diversion control efforts that we identified and reported on in 2002 still exist.

On the positive side, the DEA has added diversion control as a strategic goal in its strategic plan for fiscal years (FY) 2003 – 2008, reorganized its Operations Division to include law enforcement operations for diversion control, and provided additional intelligence resources to

U.S. Department of Justice                                                                                    iii
Office of the Inspector General
Evaluation and Inspections Division

diversion investigators.  Further, it increased the number of criminal diversion investigations initiated from 770 in FY 2002 to 950 in FY 2005 and the number of authorized domestic diversion investigators by 75 positions from 512 in FY 2004 to 587 in FY 2005.  In addition, in FY 2005 the DEA established the first performance measures for its diversion control program.[7]

Moreover, since 2002 the DEA has taken a series of actions to control the increasing use of the Internet to divert pharmaceuticals.  From FY 2002 to FY 2005, the DEA increased the percentage of time that diversion investigators spent investigating Internet diversion cases from 3 percent to 11 percent.  The DEA also developed an operational strategy for Internet investigations that has been used successfully on several large pharmaceutical diversion investigations.

Despite these positive actions, we identified several continuing concerns.  We found that although the need for special agent assistance in diversion investigations had increased significantly since our previous review, the time spent by special agents assisting diversion investigations still constitutes a small share of their total investigative effort.[8]  In addition, we found that the DEA still had not resolved the complicated issue of providing law enforcement authority for its diversion investigators, although it is actively pursuing the matter.  Further, we found that few DEA special agents have received diversion control training beyond the 2-hour module provided during basic agent training. In addition, the support provided by intelligence analysts to diversion groups in the field has continued to be limited, and intelligence analysts still received minimal diversion control training.

With respect to the DEA's Internet efforts, we examined several of the intelligence, technological, and investigative tools that are part of the DEA's operational strategy, including the Online Investigations Project (OIP), telephone and online hotlines, undercover equipment, and training in conducting Internet diversion investigations.  We found that the OIP, under development since 2001, has become a valuable investigative tool even though it cannot automatically identify web sites with the highest volume of suspect pharmaceutical sales as originally intended.  In addition, since 2002 the DEA has established telephone and online hotlines for reporting

---

[7]  The 75 positions include diversion personnel in domestic field divisions, as well as in headquarters and field support.

[8]  Diversion investigators lack law enforcement authority and therefore must depend on DEA special agents or other law enforcement officers to perform tasks such as making arrests and serving search warrants.

U.S. Department of Justice                                                                                    iv
Office of the Inspector General
Evaluation and Inspections Division

suspicious Internet pharmacies.  However, these hotlines have yielded few leads that resulted in diversion investigations.  Further, while the DEA has started to provide undercover equipment to its diversion groups, as of May 2006 most diversion groups still did not have this equipment.  And while over half of the 482 diversion investigators have received training in Internet investigations, most have not received the types of specialized training that diversion investigators said would prove useful for conducting Internet investigations.

We now discuss in more detail the DEA improvements in its pharmaceutical diversion control efforts as well as continuing areas of concern.

## Improvements in the DEA's Diversion Control Program

The DEA has taken important steps to help prevent the diversion of controlled pharmaceuticals since our last review.  For example, the DEA made diversion control a strategic goal in its strategic plan for FY 2003 – 2008.  In addition, DEA leaders have expressed the importance of the agency's diversion control efforts.  For example, the DEA Administrator emphasized the importance of diversion control in a January 2004 cable to all field divisions, stating that "stopping the abuse and diversion of pharmaceutical controlled substances must be a DEA and Department of Justice priority."  The DEA also reorganized its headquarters Operations Division in the fall of 2004 so that all criminal enforcement activities, including those for diversion control, were centralized in one unit, which according to one DEA official gave more visibility and importance to criminal diversion investigations.[9]

In 2002, we recommended that the DEA increase the investigative resources devoted to controlling pharmaceutical diversion.  In response, the DEA added 75 diversion investigator positions in FY 2004, raising the number of authorized diversion investigator positions in the DEA's domestic field divisions by 15 percent.  Further, in FY 2006 the DEA received 41 additional intelligence positions and 23 special agent positions that it intends to dedicate to diversion control.

The DEA also provided diversion investigators with additional intelligence resources, including a new searchable analytical database and a

---

[9]  Previously, responsibility for oversight of enforcement operations was divided between two DEA headquarters offices, with domestic and foreign enforcement for illicit drugs overseen by the Office of Enforcement Operations and diversion control enforcement by the Office of Diversion Control.

U.S. Department of Justice                                                                                      v
Office of the Inspector General
Evaluation and Inspections Division

new unit at DEA headquarters dedicated to supporting investigations that involve Internet-based communications.  Further, the DEA has made the Automation of Reports and Consolidated Orders System (ARCOS) database, which tracks Schedule II controlled substances from point of manufacture to retail locations, more timely and accessible to diversion investigators.[10]

Between FY 2002 and FY 2005 the DEA increased the number of criminal diversion investigations it initiated from 770 to 950, an increase of approximately 23 percent.  The DEA's formal diversion control performance measures, established in FY 2005, showed that the number of drug diversion organizations disrupted increased from 454 to 474 and the number of diversion drug organizations dismantled increased from 474 to 594.[11]

## Diversion of Controlled Pharmaceuticals Using the Internet

Since 2002, diversion of controlled pharmaceuticals using the Internet has increased dramatically, and the DEA has increased the percentage of diversion investigators' time applied to Internet diversion investigations from 3 percent in FY 2002 to 11 percent in FY 2005.  In 2004, the DEA developed an operational strategy for Internet-based diversion investigations that according to the DEA's Deputy Administrator has been used successfully in several large DEA-led operations.[12]  Although no DEA personnel specifically

---

[10]  All controlled substances, which include illicit drugs as well as those prescribed for medical purposes, are assigned to one of five categories or schedules based upon the substance's medicinal value, harmfulness, and potential for abuse or addiction.  Schedule I is reserved for the most dangerous drugs that have no recognized medical use, while Schedule V is used for the least dangerous drugs.  Controlled pharmaceuticals are found in Schedules II through V.

[11]  The DEA formally measures the performance of its diversion control program by the number of diversion drug organizations disrupted (total number of civil fines imposed, administrative hearings conducted, letters of admonition issued, and registrations suspended or restricted) and by the number of diversion drug organizations dismantled (total number of registrations revoked, denied, or surrendered for cause).

[12]  The DEA's Internet strategy contains five elements:  (1) targeting and analysis, which identifies and investigates suspicious Internet pharmacy activity; (2) technology, which develops and implements new resources to collect information about suspicious Internet pharmacy activity; (3) legislation, which attempts to change laws either to make operating illegal online pharmacies more difficult or to make prosecuting operators of illegal online pharmacies easier; (4) demand reduction, which establishes hotlines the public can use to report suspicious online pharmacies, public service announcements, and Internet sites to educate the public about controlled pharmaceutical abuse; and (5) training and education, which develop training courses for DEA personnel, task force officers, and Assistant U.S. Attorneys.

mentioned the Internet strategy to us during our field work, DEA headquarters managers informed us that they had presented the strategy to field managers during 2005 through a PowerPoint presentation. DEA management stated that while field personnel might not have been aware of the term "Internet strategy," many had used the intelligence tools and technology that are a part of it.

We also examined the key intelligence, technological, and investigative tools that are a part of the DEA's Internet strategy. Our review found that the Online Investigations Project (OIP), while considered by the DEA to be implemented and a viable investigative tool, does not operate as originally intended because it cannot automatically identify web sites with the highest volume of suspect pharmaceutical sales.[13] While the OIP is not able to proactively identify the Internet pharmacies receiving the most orders so that investigations can be prioritized, the DEA reported that analysts are using it to efficiently synthesize large amounts of information about web sites that are already under investigation.

According to DEA managers, the OIP scans information that is publicly available on the Internet to find connections between web sites under investigation and pertinent information such as addresses, phone numbers, e-mail addresses, and other web sites. DEA analysts then transfer the OIP's search results to charts that display these connections and provide the charts to field investigators to assist in their investigations.

Further, in our current review we found that most diversion investigators did not have undercover credit cards that would allow them to establish undercover identities that could not be traced to the DEA, a tool often necessary for conducting Internet investigations. DEA managers stated that they were aware of this problem and had conducted a pilot undercover credit card program for diversion investigations in three field divisions during the fall of 2005. DEA managers said that this pilot program was successful and that by June 2006 each DEA field division will have three to five undercover credit cards to be used exclusively for purchasing pharmaceuticals over the Internet.[14]

DEA managers also informed us that the DEA has begun establishing a virtual private network that will link its undercover computers in each

---

[13] The OIP is a computer program that searches the Internet, using key words or phrases to identify web sites possibly involved in the diversion of controlled substances.

[14] As of June 8, 2006, 6 of the DEA's 21 domestic field divisions had at least one undercover credit card for diversion investigations and 12 field divisions were still in the process of obtaining their first card.

U.S. Department of Justice                                                        vii
Office of the Inspector General
Evaluation and Inspections Division

DEA field division to DEA headquarters.  They stated that the virtual private network has already been implemented in the Atlanta, Phoenix, Los Angeles, and Miami field divisions.

Finally, over half of the 482 diversion investigators on board in FY 2005 and assigned to domestic divisions had attended the DEA's 3-day Internet Telecommunications Exploitation training.  However, only 7 percent had attended the DEA training on financial investigations and conspiracy and complex investigations.[15]  Diversion investigators told us that training in these areas was crucial for Internet diversion investigations because Internet operations often are dispersed geographically and because the anonymity of the Internet allows businesses to easily hide their identity and financial transactions.  DEA managers stated that training resources are limited and that providing Internet Telecommunications Exploitation training to diversion investigators is a DEA priority over other training courses.

## Continuing Concerns in the DEA's Diversion Control Program

Despite the positive steps that the DEA has taken to help prevent the diversion of controlled pharmaceuticals since 2002, we identified several continuing concerns about the DEA's diversion control program.  These concerns are related to inadequate special agent support for diversion investigations, slow resolution on the issue of providing law enforcement authority to diversion investigators, additional need for intelligence analyst support, and the need for additional training for special agents and intelligence analysts in pharmaceutical diversion investigations.

<u>Special Agent Support</u>

We found that even though DEA special agent assistance to diversion investigations has increased since 2002, it has remained a small part of special agents' investigative efforts.  To assess the amount of special agent support for diversion investigations since 2002, we considered five sources of evidence:  analysis of work hour data related to special agent time spent on diversion investigations; analysis of work hour data related to special agent time spent on pharmaceutical investigations;[16] interviews of DEA

---

[15]  As of April 2006, 34 percent of special agents and 61 percent of intelligence analysts had attended the Internet Telecommunications Exploitation training.

[16]  In this review, we refer to *diversion* investigations as those initiated by diversion investigators that can involve controlled pharmaceuticals or regulated chemicals, and that can be criminal or regulatory in nature; and *pharmaceutical* investigations as those that Cont'd.

U.S. Department of Justice                                                                                          viii
Office of the Inspector General
Evaluation and Inspections Division

personnel; DEA Pharmaceutical Threat Assessments;[17] and OIG survey responses of diversion group supervisors.

Both work hour data analyses indicated that while the time that special agents spent on diversion control increased after our 2002 review, it still represented a small amount of special agents' investigative time. Between FY 2002 and FY 2005, the DEA increased the number of work years that special agents spent on diversion investigations from 14.8 to 27.4 work years, an increase of 85 percent. Even with this increase, the actual percentage of special agent time spent on diversion investigations increased from 0.6 percent to 1.0 percent of their total investigative time between FY 2002 and FY 2005. That is, DEA special agents collectively spent 1 percent of their total investigative efforts on diversion investigations in FY 2005.

We also found that between FY 2003 and FY 2005 special agents increased the number of work years spent on pharmaceutical investigations from 26.8 to 57.4 work years, an increase of 114 percent. However, this still accounted for only 1.2 percent of the special agents' total investigative time in FY 2003 and 2.2 percent in FY 2005. That is, DEA special agents collectively spent approximately 2 percent of their total investigative efforts on pharmaceutical investigations in FY 2005.

Although the investigative time that special agents spent on diversion investigations constitutes a small part of their total investigative efforts, we found instances of the DEA providing significant special agent support to some diversion investigations. For example, in FY 2005 four large diversion operations accounted for 22 percent of all special agent work hours on criminal diversion pharmaceutical investigations.

The DEA has recognized the importance of providing special agent support to diversion investigators for several years. On August 3, 2001, the DEA's Chief of Operations directed field divisions to assign two special agents to each diversion group in every division office. The DEA's plans were delayed when, after the September 11, 2001, terrorist attacks, many federal law enforcement agents, including DEA agents, were assigned to assist the Federal Bureau of Investigation on various counterterrorism task

---

can be initiated by diversion investigators or special agents, must involve controlled pharmaceuticals only, and are criminal in nature.

[17] In a January 2004 cable, the DEA Administrator directed the Special Agent in Charge of each field division to develop a Pharmaceutical Threat Assessment for the division's region containing information such as statistics about drug prices and use, and obstacles to case investigation and prosecution.

U.S. Department of Justice                                                                                        ix
Office of the Inspector General
Evaluation and Inspections Division

forces.  However, almost 5 years after the Chief of Operations directive, we found that only 6 of the DEA's 27 diversion groups located in field offices had at least 1 special agent position authorized to assist with diversion investigations.[18]

Some DEA diversion personnel told the OIG that the lack of assistance from special agents to perform law enforcement functions,  such as serving warrants and conducting surveillance, caused diversion investigations to be delayed.  Other diversion investigators said that they did not pursue some investigative leads requiring law enforcement support because they assumed that they would not receive special agent assistance.  Three-quarters of the 62 diversion group supervisors who responded to our survey stated that they had to rely on law enforcement support for their diversion investigations from state, local, or other federal law enforcement personnel rather than from DEA special agents.

During our review, we also found instances in which diversion personnel were very satisfied with their working relationships with DEA special agents.  This was the case primarily in field divisions that assigned special agents and diversion investigators to the same group or where the field division had been involved in a major diversion control operation.

Diversion Control Training for Special Agents

Our current review also found that during the past 3 years DEA special agents have received minimal diversion control training.  In 2004, the DEA created a week-long Special Agent Diversion School.  According to the DEA, as of April 2006 a total of 98 special agents had attended the school.[19]  DEA officials stated that they intend eventually to send all special agents who assist with diversion investigations to this school; however, according to DEA officials, no additional sessions of this training will be conducted in FY 2006.  Currently, the only diversion training that all DEA special agents receive is a 2-hour session included in basic agent training that consists of a video produced in 1996 and a general overview of the DEA's diversion control program.[20]

---

[18]  One of the 27 diversion groups did not respond to our survey.

[19]  In addition, DEA officials informed us that 11 special agents have attended a seminar on the development and prosecution of diversion/Internet investigations and that 34 percent (1,699) of all DEA special agents have attended the DEA's three-day Internet Telecommunications Exploitation Program, which includes a module on Internet pharmacy investigations.

[20]  DEA officials told us that they are currently updating this video.

Enforcement Authority for Diversion Investigators

In 2002, we found that the DEA had failed to resolve the question of whether diversion investigators should receive law enforcement authority, and we recommended that the DEA clarify diversion investigator's roles, responsibilities, and law enforcement authority. We found that since our 2002 review the DEA has taken actions to reclassify the diversion investigator position to one with law enforcement authority, but that conversion has not yet been accomplished.

In January 2003, the DEA submitted an initial proposal to the Department to reclassify its diversion investigators from a non-law enforcement job series to a criminal investigative job series with law enforcement authority. DEA officials informed us that throughout 2004 and 2005 they pursued this effort by meeting regularly with Department officials who had to review and approve the proposal. In September 2005, the DEA submitted a final proposal to reclassify diversion investigators to a new position that would give them law enforcement authority and allow them to conduct criminal investigations. However, as of June 1, 2006, the Department, the Office of Personnel Management, and the Office of Management and Budget have yet to approve the request.

In addition to obtaining approval, reclassifying DEA diversion investigators to law enforcement officers will also require an increase in the Diversion Control Fee Account.[21] Even if the DEA's conversion proposal is approved and funded, DEA officials estimate that it will take an additional 18 months to recruit, hire, and train new personnel and 9 months to reclassify, train, and assign eligible current diversion investigators. Therefore, despite the DEA's efforts, diversion investigators are not likely to receive law enforcement authority anytime soon. We believe that until the DEA receives approval and fully implements this initiative, it needs to ensure that its diversion investigators receive sufficient special agent support.

Intelligence Analyst Assistance

Since our 2002 review, the DEA has increased the amount of intelligence resources (such as searchable analytical databases) available to diversion investigators. However, we found that the assistance that

---

[21] The Diversion Control Fee Account (DCFA) is administered by the DEA to recover the full costs of operating the various aspects of the DEA's diversion control program. The DCFA is funded by registration fees paid by all manufacturers, distributors, dispensers, importers, and exporters of controlled substances and List I chemicals.

U.S. Department of Justice                                                                                        xi
Office of the Inspector General
Evaluation and Inspections Division

intelligence analysts provide field investigators for diversion investigations has remained limited.

In 2002, we recommended that the DEA provide effective intelligence support to the diversion control program. We learned in both our previous and current reviews that assistance from intelligence analysts is particularly important in diversion control cases because of the increasingly complex nature of diversion investigations, especially diversion using the Internet. The DEA concurred with our recommendation, and over the past several years the amount of time intelligence analysts spent assisting diversion investigations increased by 143 percent, from 2.5 work years in FY 2002 to 6.0 work years in FY 2005. The amount of time that intelligence analysts spent assisting criminal pharmaceutical investigations increased from 3.4 work years in FY 2003 to 11.4 work years in FY 2005. Yet, despite this increase, overall intelligence analysts spent 1.7 percent of their total criminal investigative time on diversion investigations in FY 2003 and 5.3 percent in FY 2005.

Similar to special agent time spent on diversion cases, we found that the DEA provided significant intelligence support for several major diversion investigations. For example, in FY 2005 four large diversion operations accounted for 44 percent of all intelligence analyst work hours on criminal pharmaceutical investigations.

None of the 62 diversion groups that responded to our survey said they had a field intelligence analyst assigned to them, even though we found instances in which intelligence analysts were assigned to special agent enforcement groups investigating illicit drugs. As a result, diversion investigators told us they had to develop their own intelligence by gathering information from databases and other sources. Further, 55 percent of the survey respondents reported that the lack of intelligence support sometimes or often delayed investigations.

We spoke to DEA managers about diversion investigators' perceived lack of intelligence support. They explained that previously, intelligence analysts were often assigned to, and provided support to, specific enforcement groups, which gave the enforcement groups direct access to intelligence support, whereas diversion groups, on the other hand, had indirect access. However, recently DEA field divisions have begun to provide intelligence support based on the priority of the investigation, regardless of whether the investigation involves illegal drugs or controlled pharmaceuticals.

Finally, we found that intelligence analysts received minimal training focusing on the diversion of pharmaceuticals. Currently, the only training that intelligence analysts receive in diversion control is a 2-hour module

U.S. Department of Justice                                                                                          xii
Office of the Inspector General
Evaluation and Inspections Division

included in their basic training, which represents only 0.5 percent of the training hours for intelligence analysts.

## CONCLUSION AND RECOMMENDATIONS

Since our last review, the DEA has taken important steps to improve its ability to control the diversion of controlled pharmaceuticals, including efforts to control diversion using the Internet. However, several shortcomings in the DEA's diversion control program that we identified and reported in 2002 still exist today. On the positive side, the DEA has added diversion control as a strategic goal in its FY 2003 – 2008 strategic plan, reorganized its Operations Division to include law enforcement operations for diversion control, provided additional intelligence resources to investigators, and increased its authorized domestic diversion investigator positions by 15 percent from FY 2002 to FY 2005. The DEA also increased the number of criminal diversion investigations initiated by 23 percent since issuance of our 2002 report and established the first performance measures for the diversion control program in FY 2005. Finally, the DEA has increased the percentage of time diversion investigators spend investigating diversion using the Internet and developed an operational strategy for Internet investigations.

Overall, we found that the DEA had increased the amount of special agents' time devoted to diversion control since our last review. Nonetheless, this still represents a very small percentage of special agent time, and the need for special agent assistance in diversion cases has increased. In addition, while 34 percent (1,699) of all DEA special agents have attended Internet training applicable to Internet diversion investigations, only 98 of 5,013 special agents have attended the DEA's week-long course specifically addressing diversion. We also found that the DEA has not ensured that diversion investigators have the necessary tools and training to conduct successful investigations involving diversion using the Internet. Finally, with the growing threat of diversion using the Internet and the overall growth of pharmaceutical diversion in general, the need for intelligence analyst support for diversion control has increased. However, similar to what we found in our previous review, intelligence analyst assistance remains limited in the field and training for intelligence analysts is minimal.

We are making six recommendations to help the DEA improve its ability to address the growing problem of diversion of controlled pharmaceuticals.

U.S. Department of Justice                                                                                      xiii
Office of the Inspector General
Evaluation and Inspections Division

We recommend that the DEA:

1. Provide diversion investigators with adequate special agent support until the conversion of the DEA diversion investigator position to one with law enforcement authority is fully implemented.

2. Ensure that DEA special agents who frequently assist with diversion investigations attend the week-long diversion training school.

3. Provide training to intelligence analysts on topics that would effectively support diversion investigations.

4. Update the diversion control training video used in the special agent and intelligence analyst training academies to include current issues such as diversion using the Internet.

5. Ensure that diversion investigators receive training in skills necessary for conducting Internet investigations, such as financial investigations.

6. Fully implement the program to provide undercover credit cards to diversion investigators.

U.S. Department of Justice                                                                    xiv
Office of the Inspector General
Evaluation and Inspections Division

# TABLE OF CONTENTS

**EXECUTIVE DIGEST** ..............................................................................i

**BACKGROUND** ................................................................................ 1

**PURPOSE, SCOPE, AND METHODOLOGY** .............................................. 12

**RESULTS OF THE REVIEW** ................................................................ 16

    Improvements in the DEA's Pharmaceutical Diversion Control
    Program .......................................................................................... 16
    Diversion of Controlled Pharmaceuticals Using the Internet ............. 20
    Continuing Concerns in the DEA's Diversion Control Program ......... 27

**CONCLUSION AND RECOMMENDATIONS** ........................................... 40

**APPENDIX I: GROUP SUPERVISOR QUESTIONNAIRE** ......................... 42

**APPENDIX II:  SCOPE OF THE OIG REVIEW REGARDING CONTROLLED
SUBSTANCES AND COMMODITIES** ..................................................... 53

**APPENDIX III:  DEA'S RESPONSE TO DRAFT REPORT** ....................... 56

**APPENDIX IV:  OIG'S ANALYSIS OF DEA'S RESPONSE** ...................... 66

# BACKGROUND

## Introduction

On October 27, 1970, the Congress passed the Comprehensive Drug Abuse Prevention and Control Act (P.L. 91-513, 21 U.S.C. § 801 et seq.). According to the Drug Enforcement Administration (DEA), Title II of this Act, the Controlled Substances Act, is a "consolidation of numerous laws regulating the manufacture and distribution of narcotics, stimulants, depressants, hallucinogens, anabolic steroids, and chemicals used in the illicit production of controlled substances" and is "the legal foundation of the government's fight against drugs and other substances."[22]  The Act also regulates all legal and illegal substances that are recognized as having potential for abuse or addiction.

The DEA is charged with enforcing the Controlled Substances Act, including the regulation of controlled pharmaceuticals and regulated chemicals.  Specifically, the DEA's diversion control program oversees and regulates the legal manufacture and distribution of controlled pharmaceuticals, which include narcotics such as codeine and methadone, stimulants such as amphetamine, and depressants such as diazepam; and regulated chemicals, which include pseudo ephedrine and ephedrine.

The Controlled Substances Act requires registration with the DEA by all businesses that import, export, manufacture, or distribute controlled substances; all health care practitioners entitled to dispense, administer, or prescribe controlled pharmaceuticals; and all pharmacies entitled to fill prescriptions.  Registrants must comply with a series of regulatory requirements relating to security, record keeping and accountability, and adherence to published standards.  The DEA can deny, suspend, or revoke a registration for several reasons, including professional license sanctions (by state authorities), prior federal or state convictions, or a registrant's incompatibility with the public interest.

## Controlled Pharmaceutical Diversion

Controlled pharmaceuticals are used legitimately by a large share of the American public and are found in legitimate places such as doctors' offices and pharmacies.  However, they can be diverted intentionally or unintentionally by doctors, pharmacists, dentists, nurses, veterinarians, and individual users.  Diversion cases may involve physicians who sell prescriptions to drug dealers or abusers, pharmacists who falsify records to

---

[22] DEA overview on the Controlled Substances Act, www.usdoj.gov/dea/agency/csa.htm.

obtain and then sell pharmaceuticals, employees who steal from physician or pharmacy inventories, individuals who forge prescriptions, individuals who commit armed robbery of pharmacies and drug distributors, "doctor shoppers" who routinely visit multiple doctors complaining of the same ailment to obtain multiple prescriptions for controlled substances, and individuals who establish Internet pharmacies that sell controlled pharmaceuticals without requiring prescriptions.

The abuse of controlled pharmaceuticals can be as dangerous as the abuse of illicit drugs. Both can result in addiction, overdoses, and deaths. Moreover, the emergence of illicit Internet pharmacies has increased the availability of controlled pharmaceuticals by facilitating an easy purchase with a credit card and without a prescription.

**Scope of Diversion**

In recent years, the amount of controlled pharmaceuticals diverted from legal channels has increased significantly.  Statistics from the National Drug Intelligence Center show that between calendar years 2000 and 2003, thefts of pharmaceuticals increased by 15.7 percent.[23]  According to a July 2005 report from the National Center on Addiction and Substance Abuse of Columbia University (CASA), the number of people who admitted abusing controlled prescription drugs increased by 94 percent, from 7.8 million in 1992 to 15.1 million in 2003.[24]  This rate of increase was seven times faster than the increase in the U.S. population for that same period.  Additionally, the 2004 National Survey on Drug Use and Health reported that 2.4 million people used prescription pain relievers non-medically for the first time within the past 12 months.[25]  This number was the largest number of new users for any type of illicitly used drug during that same time period.

The abuse of controlled pharmaceuticals rivals the abuse of illicit drugs.  For example, the CASA report stated that more people reported abusing prescription drugs (15.1 million) in 2003 than abusing illicit drugs,

---

[23] *National Drug Threat Assessment 2005*, National Drug Intelligence Center, February 2005.

[24] *Under the Counter: The Diversion and Abuse of Controlled Prescription Drugs in the U.S.*, National Center on Addiction and Substance Abuse of Columbia University, July 2005.  The report uses the term "abuse" to refer to non-medical use of a drug.

[25] The National Survey on Drug Use and Health defines non-medical use as the use of prescription-type drugs not prescribed for the respondent by a physician or the use of a drug only for the experience and feeling it causes.  The CASA report uses the term abuse to refer to non-medical use of a drug.

such as cocaine, hallucinogens, inhalants, and heroin (12.3 million).  From 2002 to 2003, the number of people in the U.S. population who reported using heroin at least once in their lifetime remained constant, while the number who reported using Oxycodone non-medically increased by 1.9 million users.  A 2005 DEA report on prescription drug diversion stated that "twenty-two million Americans suffer from substance dependence or abuse, with the non-medical use of prescription drugs ranking second only to marijuana as the most prevalent category of drug abuse."[26]

In 2005, Congress emphasized its concern regarding the diversion of controlled pharmaceuticals.  The House Report on the Justice Department's fiscal year (FY) 2005 appropriations stated that while more than 6 million Americans abused prescription drugs, the "DEA has demonstrated a lack of effort to address this problem."  The report also stated that the DEA was expected to work "to ensure a coordinated government-wide approach to address prescription drug diversion . . . [and that the] Department of Justice is directed to submit quarterly reports describing its efforts to address prescription drug diversion."[27]  The House Report on the Justice Department's FY 2006 appropriations repeated the concerns from the previous year.  The final appropriation for FY 2006 included an additional $8.8 million and 41 positions for the DEA to improve intelligence support and $4.7 million and 23 positions for additional agents to assist diversion control.[28]

One specific area in which diversion recently has increased dramatically is through the use of the Internet.  According to one estimate cited in the CASA report, the number of Internet pharmacies in operation at any one time has reached as high as 1,400.[29]  Additionally, a study by comScore Networks reported that 17.4 million people visited an online pharmacy in the fourth quarter of 2004, an increase of 14 percent from the previous quarter.[30]  Sixty-three percent of these sites did not require a prescription to obtain controlled substances.

---

[26] DEA, *Prescription Drug Diversion*, June 2005.

[27] H.R. Rep. No. 108-576 (July 1, 2004).

[28] H.R. Rep. No. 109-118 (June 10, 2005).

[29] Each of these pharmacies may have been represented by multiple web sites.

[30] ComScore is a global market research provider and consultant for Internet usage, audience measurement, and e-commerce tracking data.  The study is at www.comscore.com/press/release.asp?press=571.

Three recent high-profile DEA-led Internet investigations indicate the scope of the problem of pharmaceutical diversion using the Internet.  In April 2005, Operation Cyber Chase targeted an organization suspected of illegally distributed approximately 2.5 million dosage units of controlled pharmaceuticals per month over the Internet.  Operation Cyber Chase was an international operation involving two DEA field divisions and one DEA foreign office, and resulted in the arrest of 26 people in four countries.  It also resulted in the seizure of 10 million dosage units of controlled pharmaceuticals, 231 pounds of an animal tranquilizer (ketamine), and $8.5 million.

In September 2005, Operation CybeRx dismantled an organization that was averaging more than $50,000 a day in profits from an illegal Internet-based enterprise.  The Special Agent in Charge (SAC) of the Dallas Field Division dedicated the entire staff of the Fort Worth field office to Operation CybeRx for 7½ months.  The operation resulted in 19 arrests, suspension orders against 20 pharmacies and physicians, and the seizure of $16.8 million in cash and property.

In December 2005, Operation Gear Grinder targeted eight major steroid manufacturing companies whose combined illicit Internet sales of steroids smuggled from Mexico totaled $56 million a year.  These companies were the source of 82 percent of all steroids seized in the Unites States and analyzed by DEA laboratories.  Operation Gear Grinder took place over 21 months and resulted in 9 arrests.

**Impact of Diversion**

The DEA Administrator noted the consequences of non-medical pharmaceutical use in a 2004 cable to DEA employees, stating that "the diversion and abuse of legal controlled substances poses a significant threat to the health and safety of Americans."  In 2005 congressional testimony, the DEA's Acting Deputy Assistant Administrator, Office of Diversion Control, also stated that:

> The non-medical use of prescription drugs has become an increasingly widespread and serious problem in the United States.  A new generation of high dose, extended release, opioid pain medications have taken the existing threat to a new level. The abuse and diversion statistics are alarming. . . .  These powerful drugs provide strong incentives for diversion through new means, such as "rogue" Internet pharmacies, as well as

older methods, like prescriptions for profit.  Recent drug use surveys have highlighted the gravity of this problem.[31]

**The DEA's Diversion Control Program**

The DEA's diversion control program has two main functions:

- **Regulatory** – Oversight of all registrants that provide controlled pharmaceutical products to the public to ensure that they are complying with the requirements of the Controlled Substances Act.

- **Enforcement** – Responsibility for identifying, investigating, and penalizing (administratively, civilly, or criminally) those persons responsible for diversion, whether through willfully negligent or criminal acts.

The DEA's diversion control activities are directed and supported from DEA headquarters but are conducted primarily through the DEA's field divisions and offices.  The DEA headquarters Office of Diversion Control coordinates regulatory activities, the Pharmaceutical Investigations Section in the Office of Enforcement Operations manages the enforcement functions, and the Special Operations Division provides assistance with Internet investigations (Chart 1).

---

[31]  Statement of Joseph Rannazzisi, Acting Deputy Assistant Administrator, Office of Diversion Control, DEA, before the House Committee on Government Reform, Subcommittee on Regulatory Affairs, *Status of the Efforts of the FDA and DEA in regulating Schedule II Prescription Painkillers, Specifically OxyContin® and Other Opioid Analgesics*, September 13, 2005.

**Chart 1:  Subset of the Overall DEA Organization Chart**



Source:  The DEA

Diversion Control Program Structure in DEA Headquarters

Office of Diversion Control.  The Office of Diversion Control is located within the DEA's Operations Division.  Until the fall of 2004, the Office of Diversion Control was the primary headquarters element responsible for both the regulatory and enforcement functions of diversion control.  In the fall of 2004, the DEA relocated the enforcement functions of diversion control to the Office of Enforcement Operations and certain Internet investigative assistance to the Special Operations Division.  Currently, the Office of Diversion Control provides policy direction, program guidance, and support to DEA diversion control staff in the field.  It also coordinates all regulatory activities, such as working with registrants, potential registrants, and members of the community to help prevent the diversion of controlled pharmaceuticals.

In addition, the Office of Diversion Control manages two systems that allow the public to report suspicious Internet pharmacies.  The first is the Unlawful Medical Internet Reporting Effort (UMPIRE) accessed from the DEA's web site, and the second is the 1-877-RxAbuse telephone hotline.  A report received through the web site or hotline is forwarded to the DEA field division located in the area where the complaint originated.

The E-Commerce Section of the Office of Diversion Control maintains two databases that are used at headquarters and in the field and serve as analytical tools for diversion investigators.  The Automation of Reports and

Consolidated Orders System (ARCOS) database contains information from the pharmaceutical industry such as the path of Schedule II controlled substances from point of manufacture to retail locations where they are sold to consumers.[32]  The E-Commerce Section provides quarterly and yearly ARCOS reports to the field showing the most-ordered Schedule II controlled pharmaceuticals and regulated chemicals in certain geographic areas.  The second database is an analytical search tool developed by the DEA and private industry.  Implementation of this database began in 2004, and currently all DEA field divisions have access.

Office of Enforcement Operations.  The Office of Enforcement Operations' Pharmaceutical Investigations Section (OEP) in DEA headquarters oversees diversion investigations.  As described in a cable from DEA headquarters to DEA staff worldwide in the fall of 2004, "OEP is responsible for all domestic and international, criminal and/or complaint investigations of pharmaceutical controlled substances. . . .  OEP will provide operational support to domestic field divisions' . . . investigations and other domestic projects having a pharmaceutical nexus."  Diversion investigators in the unit who serve as staff coordinators monitor several field divisions and serve as the divisions' contact for funding requests, receive and monitor reports of investigations from the field, and coordinate multi-jurisdictional investigations.

Special Operations Division.  The Special Operations Division, through its Pharmaceutical and Chemical Internet Coordination unit established in the fall of 2004, supports the field by coordinating Internet investigations, providing administrative support, and providing a liaison between the field and certain intelligence resources located at headquarters.  The Special Operations Division ensures that all investigators who are considering investigating a particular web site are aware of other DEA investigative activities associated with the site.

The Special Operations Division also responds to requests from the field for intelligence information pertaining to specific web sites as part of the DEA's Online Investigations Project (OIP).[33]  In July 2003, in a memorandum to the Office of the Inspector General (OIG), the DEA stated

---

[32] All controlled substances, which include illicit drugs as well as those prescribed for medical purposes, are assigned to one of five categories or schedules based upon the substance's medicinal value, harmfulness, and potential for abuse or addiction.  Schedule I is reserved for the most dangerous drugs that have no recognized medical use, while Schedule V is used for the least dangerous drugs.  Controlled pharmaceuticals are found in Schedules II through V.

[33] The OIP is a computer program that searches the Internet, using key words or phrases to identify web sites possibly involved in the diversion of controlled substances.

that the OIP was intended to be a "state of the art data mining and warehousing system capable of rapidly detecting public domain web sites offering the illicit sale of controlled substances" that would "identify pharmacies and other businesses conducting illegal transactions via the web."

### Diversion Control Program Structure in the Field

The DEA domestic field structure consists of 21 field division offices, each headed by a SAC, and 234 sub-offices located throughout the United States.  Sixty-three of these offices and sub-offices have a diversion control group of investigators led by a supervisor.  As of June 2005, 482 of 535 diversion investigators were assigned to DEA domestic field divisions; the remaining positions were in headquarters and in foreign field offices.

Diversion investigators, special agents, and intelligence analysts are the three types of employees in DEA field offices that have primary roles in diversion investigations.  The role of each is described below.

Diversion investigators.  Diversion investigators conduct regulatory tasks, educate the public, coordinate with the pharmaceutical industry, work with state and local officials engaged in diversion control, and investigate pharmaceutical diversion.

Diversion investigators' regulatory tasks include conducting onsite pre-registration investigations of all applicants proposing to manufacture, distribute, import, or export controlled substances, or to operate a narcotic treatment program as required by the Controlled Substances Act.  The Act also requires that the DEA conduct cyclic investigations of all pharmaceutical manufacturers, distributors, importers, exporters, and narcotic treatment programs.[34]

In addition, diversion investigators perform tasks to prevent and deter the diversion of pharmaceuticals.  They engage in demand reduction activities, such as giving presentations to community organizations and institutions about the dangers of non-medical pharmaceutical use, training industry in how to comply with pertinent regulations of the Controlled Substance Act, assisting businesses seeking to register with the DEA, reviewing pharmaceutical labels, reviewing pharmaceutical companies' drug promotion and risk management plans, and establishing quotas for controlled substances.  Diversion investigators also provide diversion control training to state and local officials and collaborate with states on their

---

[34]  Currently, these cyclic investigations take place every 5 years.

Prescription Drug Monitoring Programs.[35]  The DEA Diversion Investigators Manual directs diversion investigators to spend 45 percent of their time on these and other regulatory activities.

Diversion investigators also investigate and take action against diverters of controlled pharmaceuticals.  Diversion investigators initiate investigations through the detection of violations or irregularities uncovered during pre-registration or cyclic investigations, from complaints received from members of the public or registrants, or from leads received through intelligence sources.  Targets of diversion investigations can be doctors, pharmacists, drug organizations, or individuals.  The DEA Diversion Investigators Manual directs diversion investigators to spend 55 percent of their time on enforcement activities.

Diversion investigators are not criminal investigators and cannot perform law enforcement functions such as serving warrants, conducting surveillance, managing confidential informants, and working undercover.  Diversion investigators rely on special agents or other law enforcement personnel when tasks requiring law enforcement authority are necessary.

Special agents.  Special agents either are assigned permanently to assist diversion groups or are assigned temporarily to assist diversion groups on specific investigations or tasks when requested.  Special agents assist diversion investigators by performing investigative tasks that require law enforcement authority such as surveillance, registering and working with confidential informants, serving search warrants, and making arrests.

Tactical Diversion Squads.  In 1996, the DEA created Tactical Diversion Squads.  The squads are composed of diversion investigators, special agents, and state and local law enforcement personnel who work on retail-level diversion cases, such as investigations of prescription forgers and doctor shoppers.  Tactical Diversion Squads currently are located in the following five DEA field divisions:  Denver, St. Louis, Houston, New Orleans, and Boston.

Intelligence analysts.  Intelligence analysts also assist diversion investigations.  The primary functions of intelligence analysts are to collect, collate, research, and analyze all available information on a particular operation, investigation, organization, drug-related issue, program, or

---

[35] Prescription Drug Monitoring Programs are systems in which controlled pharmaceutical prescription data are submitted to a centralized database administered by an authorized state agency.  These programs are designed to help prevent and detect the diversion and abuse of controlled pharmaceutical substances, particularly at the retail level where no other automated information collection system exists.

---

project.  They assist diversion investigators by analyzing data collected through wiretaps or prescription records, preparing background profiles on investigative targets, and performing database checks.  Intelligence analysts provide three primary types of support: [36]

- **Investigative** – Assistance for ongoing cases, including telephone toll analysis, financial analysis, and debriefings of confidential informants;
- **Tactical** – Information such as identification of "traffickers, conveyances, methods of operation, and the movement of drugs" that allows immediate enforcement action to take place, such as arrests and seizures; and
- **Strategic** – Complex predictive and descriptive research and analysis regarding drug trafficking trends and issues.

## Previous OIG Report on Pharmaceutical Diversion

The 2002 OIG review of the DEA's pharmaceutical diversion control program concluded that the DEA's enforcement efforts had not adequately addressed the problem of controlled pharmaceutical diversion.[37] Specifically, we found that despite the widespread problem of controlled pharmaceutical diversion and abuse, the DEA had been slow to commit sufficient resources to address the problem.  According to the DEA, special agents spent only 3 percent of their total work hours on diversion investigations, and the lack of special agent assistance negatively affected the quality and timeliness of diversion investigations (since diversion investigators lack law enforcement authority).[38]  In addition, the DEA had failed to resolve the question of the law enforcement authority for diversion investigators, provided minimal intelligence support to diversion investigators, and did not provide specialized training for special agents in diversion investigations.

In the 2002 review, we made four recommendations, and the DEA concurred with all four.  First, we recommended that the DEA increase investigative resources devoted to the controlled pharmaceutical diversion

---

[36] Intelligence Program Policy Order 00-200, Responsibilities of Intelligence Analysts, November 1999.

[37] See the OIG report entitled *Review of the Drug Enforcement Administration's Control of the Diversion of Controlled Pharmaceuticals,* I-2002-010, October 2002, www.usdoj.gov/oig/reports/DEA/e0210/index.htm.

[38] This 3 percent figure was based on information from interviews with DEA officials.  In the current review, we used DEA work hour data to determine how much time special agents spent on diversion investigations.

program.  Subsequently, the DEA obtained approval in its FY 2004 budget for 75 additional diversion investigator positions.[39]  Second, we recommended that the DEA ensure adequate training for special agents in diversion investigation procedures.  In response, the DEA implemented a week-long course on diversion investigation operations for special agents who assist with diversion investigations.

The third recommendation was for the DEA to clarify the roles, responsibilities, and law enforcement authorities of diversion investigators. On September 6, 2005, the DEA approved the reclassification of diversion investigator positions to positions with law enforcement authority and is now awaiting approval by the Department, the Office of Personnel Management, and the Office of Management and Budget for the reclassification.  Finally, we recommended that the DEA fully implement the Online Investigations Project and the diversion intelligence group to provide effective intelligence support to the Office of Diversion, and that the DEA continue to explore additional intelligence capabilities to support the diversion investigators.  The DEA has stated that the Online Investigations Project is now fully implemented and that "although the OIP does not perform in the manner originally intended (a push button system without any user interaction), it has developed into a viable investigative tool that is assisting field personnel in Internet investigations."[40]  The DEA also received 40 additional field and headquarters intelligence analyst positions and one intelligence support position located in the Special Operations Division in its FY 2006 appropriation.

---

[39]  The remaining positions are DEA special agent positions.

[40]  The DEA's December 20, 2005, response to the OIG's 2002 review.

# PURPOSE, SCOPE, AND METHODOLOGY

**Purpose**

The OIG conducted this review as a follow-up to our October 2002 review, which assessed the DEA's actions to control pharmaceutical diversion. This current review examined the changes to the DEA's efforts to manage the diversion of controlled pharmaceuticals in response to the recommendations made in the previous report. Specifically, this review assessed:

- the DEA's actions in pharmaceutical diversion control since our 2002 review,
- the amount of law enforcement and intelligence assistance the DEA provided for diversion investigations, and
- the DEA's response to the growing problem of Internet diversion.

**Scope**

Our review examined the DEA's enforcement efforts to control pharmaceutical diversion since our October 2002 report through FY 2005. We limited our data analyses to the DEA's domestic field divisions and offices, except in our analysis of diversion using the Internet where we considered all diversion work hours because Internet diversion crosses national boundaries. We did not assess the diversion control program's regulatory function and did not examine its enforcement efforts against the diversion of regulated chemicals.[41]

**Methodology**

To examine the DEA's pharmaceutical diversion control program, we reviewed federal laws, DEA policies and procedures, documentation related to the DEA's pharmaceutical diversion control efforts. To obtain information on pharmaceutical abuse trends, we analyzed drug use studies from the National Survey on Drug Abuse and Heath, Monitoring the Future, the Drug Abuse Warning Network, a July 2005 report by the National Center on Addiction and Substance Abuse of Columbia University, and other sources.

---

[41] The DEA's regulated chemical control responsibilities originated with passage of the Chemical Diversion and Trafficking Act (CDTA) in 1988. The CDTA and subsequent amendments in 1993 have placed 34 chemicals "under control," including ephedrine, pseudo ephedrine, and red phosphorous. The CDTA also ["regulates"] equipment used in the production of controlled substances, such as machines that form tablets.

<u>Field work</u>.  We interviewed DEA headquarters staff, including the DEA Administrator and Deputy Administrator; the Chief of Operations; the Chief of Intelligence; the Deputy Assistant Administrator, Office of Diversion Control; the Special Agent in Charge of training; the Special Agent in Charge of the Special Operations Division; personnel within the Office of Diversion Control, the Special Operations Division, and the Pharmaceutical Investigations Section within the Operations Division; personnel within the Office of Special Intelligence and the El Paso Intelligence Center within the Intelligence Division; personnel within the Office of Resource Management within the Financial Management Division; and personnel within the Human Resources Division and on the Executive Policy and Strategic Planning Staff.

We also conducted site visits to eight DEA field offices:  Washington, D.C.; Baltimore, Maryland; New York City and Long Island, New York; Miami and Ft. Lauderdale, Florida; and Denver and Colorado Springs, Colorado.  We selected the Miami Field Division because it was recommended by the DEA during the entrance conference for this review and by numerous interviewees as being very active in Internet diversion investigations, the New York Field Division because it had recently split diversion regulatory and enforcement functions into two separate groups where the diversion enforcement group was composed of special agents and diversion investigators, and the Denver Field Division because it had a Tactical Diversion Squad and was recommended to us in an interview as actively working with the Special Operations Division.

During this review we interviewed special agents in charge, associate and assistant special agents in charge, special agents, diversion program managers, diversion group supervisors, diversion investigators, group assistants, intelligence group supervisors, intelligence analysts, Assistant United States Attorneys, and state and local law enforcement officers who collaborated with the DEA in diversion investigations.

We also attended presentations on the history of the structure and threat of diversion, DEA's online pharmacy trafficking strategy, intelligence support for Internet investigations, intelligence technology supporting Internet pharmacy investigations, Internet public awareness, Internet training, Operation CybeRx, Operation Cyber Chase, Operation Baywatch, Operation Cookie Dough, and Operation Gear Grinder.

<u>Survey</u>.  To obtain a broad perspective on the DEA diversion control program, we conducted an e-mail survey of the 63 diversion groups and 5 Tactical Diversion Squads within DEA field offices, as defined in the DEA's

table of organization.[42]  Out of these 68 surveys sent, we received 62 responses for a response rate of 91 percent.  The survey topics included law enforcement and intelligence assistance for diversion investigations, the DEA's efforts to address the emerging threat of Internet diversion, and diversion training for special agents and intelligence analysts.  The questionnaire is included in Appendix I.

Data.  To assess the DEA's efforts and effectiveness at controlling pharmaceutical diversion, we obtained and analyzed data from seven sources:  the Controlled Substances Act System, the Quarterly Report Database, the Case Status Subsystem database, personnel data, the 1-877-RxAbuse hotline, the Unlawful Medical Internet Reporting Effort, and the Work Hours Reporting System.  In addition, we reviewed information about specific training the DEA offered to its employees as well as a variety of other documents.

Work Hour Data. In this report, we include two analyses of special agent and intelligence analyst work hour data to measure different aspects of the DEA's diversion control efforts.  To differentiate between the two types of work hour data included in this review, we refer to *diversion* investigations as those initiated by diversion investigators that can involve controlled pharmaceuticals or regulated chemicals and that can be criminal or regulatory in nature; and *pharmaceutical* investigations as those that can be initiated by diversion investigators or special agents, must involve controlled pharmaceuticals only, and are criminal in nature.  Table 1 below describes the difference between diversion investigations and pharmaceutical investigations.

---

[42]  We did not send surveys to DEA offices defined on the DEA's table of organization as having "diversion staff" rather than a "diversion group" or "Tactical Diversion Squad."

**Table 1: Types of Work Hour Analysis Included in Review**

| Type of Investigation | Initiator of investigation | Substances involved in investigation | Nature of investigation | Source of data |
|---|---|---|---|---|
| **Diversion** | Diversion investigators | Diverted controlled pharmaceuticals or regulated chemicals | Criminal or non-criminal | "2000 series" data* |
| **Pharmaceutical** | Diversion investigators or special agents | Diverted controlled pharmaceuticals | Criminal | G-DEP data** |

* Every DEA investigation has a unique case number consisting of eight digits that specify the (1) field division where it was initiated, (2) the fiscal year when it was initiated, and (3) who initiated it.  Cases initiated by diversion investigators are denoted as "2000 series" cases.
** The G-DEP code is a five-character code the DEA assigns to all criminal investigations indicating (1) the type of investigative target, (2) whether other agencies are involved in the investigation, (3) the principal controlled substance or commodity involved in the investigation, and (4) the geographic scope of the criminal activity under investigation.
Source: OIG Analysis

While most investigations into the diversion of controlled pharmaceuticals are initiated by diversion investigators, special agents may initiate pharmaceutical investigations if they work in field offices where there are no diversion investigators, if they obtain pharmaceutical diversion information from a confidential informant, or if they discover a pharmaceutical diversion link to an existing illicit drug investigation.  (See Appendix II for the complete explanation of the methodology we used for our work hour analyses, and for a comparison of "2000 series" and G-DEP data.)

# RESULTS OF THE REVIEW

## Improvements in the DEA's Pharmaceutical Diversion Control Program

**Since our 2002 review, the DEA has taken important steps to improve its ability to control the diversion of controlled pharmaceuticals.  The DEA added diversion control as a strategic goal in its strategic plan for FY 2003 – 2008, reorganized its Operations Division to include law enforcement for diversion control, provided additional intelligence resources to diversion investigators, and increased the number of domestic diversion investigators by 15 percent.  Further, the DEA increased the number of criminal diversion investigations initiated by 23 percent since issuance of our 2002 report, and established performance measures for the diversion control program for the first time in FY 2005.**

**The DEA made diversion control one of its strategic goals.**

In 2003, the DEA made reducing the diversion of controlled pharmaceuticals one of the agency's four strategic goals in its strategic plan for FY 2003 – 2008.  Strategic Goal Four is to "reduce the diversion of licit drugs" to "prevent, detect, and eliminate the diversion of [controlled pharmaceuticals] into the illicit drug market."  Additionally, the DEA Administrator reinforced the importance of diversion control in a January 2004 cable sent to all field divisions, stating that "stopping the abuse and diversion of pharmaceutical controlled substances must be a DEA and Department of Justice priority."

**The DEA increased resources for diversion control.**

In FY 2004, the DEA increased the investigative resources devoted to the diversion control program by adding 75 diversion investigator positions. This addition increased the number of authorized diversion investigator positions in the DEA's domestic field divisions by 15 percent in FY 2005. The 75 positions were allocated among the DEA headquarters and field divisions.  In the FY 2006 budget, the DEA received 40 additional intelligence analyst positions, one intelligence support position located in the Special Operations Division, and 23 special agent positions that will be dedicated to diversion control.

**The DEA reorganized its Operations Division.**

In the fall of 2004, the DEA reorganized its Operations Division so that all criminal enforcement activities, including those for diversion control, were centralized into one unit.[43]  By doing so, law enforcement operations for diversion control were consolidated with those for illicit drugs. According to one DEA manager, this integration of law enforcement operations put more emphasis on criminal diversion investigations and allowed the DEA to devote additional enforcement resources to addressing the diversion of controlled substances.  One DEA official in the Office of Diversion Control said that the reorganization "energized and revitalized diversion investigations."

**The DEA provided additional intelligence resources.**

Since our 2002 report, the DEA has provided additional intelligence resources to assist investigators with pharmaceutical diversion investigations, including Internet investigations.  For example, the DEA made the ARCOS database more timely and accessible to diversion investigators.  Sixty-three percent of the diversion group supervisors who responded to our survey reported that they found ARCOS very useful, and 53 percent reported that they used it in all or most of their investigations.

In 2004, the DEA also provided investigators with a new search tool in the form of an analytical database used to develop investigations. Sixty percent of our survey respondents reported that they found the new analytical database very useful, and 61 percent reported that they used it in all or most of their investigations.  The DEA's Director of E-Commerce told us that without the new analytical database, compiling prescription transaction histories would be manual and tedious and that histories now can be compiled much more quickly.  The DEA plans to create pre-defined criteria to produce automatic reports and investigative leads from the new database that can be pursued by field investigators.

In June 2002, the DEA established a new intelligence unit at DEA headquarters to support investigations that involve Internet-based communications.  According to DEA managers, most of this unit's time is spent supporting Internet pharmacy investigations.  This unit helps investigators analyze data obtained through pen registers and other

---

[43]  Previously, enforcement operations were divided, with domestic and foreign enforcement for illicit drugs managed by the Office of Enforcement Operations and diversion control enforcement managed by the Office of Diversion Control.

electronic documents and transactions; and coordinates analytical support with Special Operations Division personnel.[44]

**The DEA undertook more criminal diversion investigations and established formal performance measures.**

One indication that the DEA is responding to the growing problem of diversion is the increase in the number of criminal diversion investigations it has initiated since 2002.  In FY 2005, the DEA initiated 950 investigations, which is 23 percent more criminal diversion investigations than the 770 initiated in FY 2002.  This increase in criminal diversion investigations coincided with a decrease in non-criminal diversion investigations.  In FY 2002, the DEA initiated 1,440 non-criminal diversion investigations; in FY 2005, it initiated 1,353 of these investigations.[45]  In FY 2005, criminal diversion investigations represented approximately 6 percent of the DEA's overall criminal investigations for illicit and licit drugs.

Furthermore, in the FY 2005 budget submission the DEA established its first formal performance measures to quantify the accomplishments of its diversion control program:

1. The number of diversion drug organizations disrupted, measured by the total number of civil fines imposed, administrative hearings conducted, number of letters of admonition issued, and the number of registrations suspended or restricted;[46] and

2. The number of diversion drug organizations dismantled, measured by the total number of registrations revoked, denied, or surrendered for cause.

The DEA's performance measures showed that from FY 2002 to FY 2005 the number of diversion drug organizations disrupted increased from 454 to 474 and the number of diversion drug organizations dismantled increased from 474 to 594 (see Table 2).

---

[44] A pen register is an electronic device that records all numbers dialed from a particular telephone line.  Pen registers can also be used to track Internet communications.

[45] Non-criminal investigations include regulatory investigations (pre-registration and cyclic investigations of registrants, which decreased from 793 to 632 between FY 2002 and FY 2005) and other investigations involving administrative or civil violations (which increased from 647 to 721 between FY 2002 and FY 2005).

[46] Organization includes Controlled Substance Act registrants, applicants, and organizations.

**Table 2:  Number of Diversion Drug Organizations
Disrupted or Dismantled**

|  | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Disruptions** | 454 | 435 | 461 | 474 |
| **Dismantlements** | 474 | 521 | 582 | 594 |

Source:  The DEA's Case Status Subsystem database

## Diversion of Controlled Pharmaceuticals Using the Internet

**Since 2002, diversion of controlled pharmaceuticals using the Internet has increased dramatically, and the DEA has increased the percentage of diversion investigators' time applied to Internet investigations from 3 percent to 11 percent.  The DEA has also developed an operational Internet strategy for performing Internet investigations.  We examined several of the intelligence, technological, and investigative tools that are part of the DEA's Internet strategy:  the Online Investigations Project (OIP), hotlines for reporting suspicious Internet activity, undercover equipment, and training for diversion investigators on conducting Internet investigations.  We found that while the DEA considers its Online Investigations Project to be fully implemented and a valuable tool, it does not automatically identify web sites with the highest volume of suspect pharmaceutical sales as originally intended.  In addition, we found that most diversion groups still did not have undercover equipment necessary to conduct Internet investigations.  Further, while 54 percent of diversion investigators had received training in Internet investigations, most had not received specialized training that would prove useful for conducting successful Internet investigations.**

As diversion using the Internet has become a greater concern, the DEA has increased the number of pharmaceutical-related Internet investigations from 10 in FY 2002 to 74 in FY 2005, and increased the percentage of diversion investigators' time applied to Internet diversion during the same period from 3 percent to 11 percent.  In addition, the DEA developed an operational Internet strategy that guides investigators in conducting investigations of online trafficking of controlled pharmaceuticals.  As part of our review, we examined several of the intelligence, technological, and investigative tools that are part of this strategy

**The DEA developed an operational Internet strategy.**

We found that since our previous review, the DEA developed in 2004 an operational Internet strategy.  During our original field work, no DEA personnel mentioned this strategy.  However, after the exit conference DEA management provided us with a copy of a PowerPoint presentation entitled "On-line Pharmacy Trafficking Strategy."  DEA managers told us they disseminated the strategy to field division special agents in charge, diversion

program managers, and diversion group supervisors at conferences during 2005.

In interviews we conducted after our exit conference, one of the three diversion program managers and all four field division special agents in charge said they were aware of the DEA's Internet strategy and described specific ways in which they had applied elements of it to their investigations. The two other diversion program managers mentioned elements of the strategy, but were not aware of the strategy itself. DEA headquarters managers said that field personnel may not have been aware of the strategy, even though many of these personnel had used tools such as the OIP that are a part of the strategy.

> ### Three Recent High-Profile DEA-Led Internet Investigations
>
> - **Operation Cyber Chase.** In April 2005, Operation Cyber Chase targeted an organization that illegally distributed approximately 2.5 million dosage units of controlled pharmaceuticals per month over the Internet. Operation Cyber Chase was an international operation involving two DEA field divisions and one foreign office, and resulted in the arrest of 26 people in four countries and the seizure of 10 million dosage units of pharmaceutical controlled substances, 231 pounds of an animal tranquilizer (Ketamine), and $8.5 million.
>
> - **Operation CYBERx.** In September 2005, Operation CYBERx dismantled an organization that was averaging more than $50,000 a day in profits from their illegal Internet-based enterprise. The operation resulted in 19 arrests, immediate suspension orders against 20 pharmacies and physicians, and the seizure of $16.8 million in cash and property.
>
> - **Operation Gear Grinder.** In December 2005, Operation Gear Grinder targeted eight major steroids manufacturing companies whose combined illicit Internet sales of steroids smuggled from Mexico totaled $56 million a year and resulted in 9 arrests. These companies were the source of 82 percent of all steroids seized in the Unites States and analyzed by DEA laboratories.

Further, they explained that the strategy is not finalized but rather is considered a "work in progress" so that it can be frequently revised to reflect changes in diversion using the Internet. According to these DEA managers, the strategy was used in several recent Internet operations that disrupted major Internet pharmaceutical traffickers.

The DEA's Internet strategy contains five elements:

- Targeting and Analysis – Identify trends and investigate suspicious Internet pharmacy activity;

- Technology – Develop and implement new resources to collect information about suspicious Internet pharmacy activity;

- Legislation – Attempt to change laws either to make operating illegal online pharmacies more difficult or to make prosecuting operators of illegal online pharmacies easier;

- Demand Reduction – Establish hotlines the public can use to report suspicious online pharmacies, issue public service announcements, and create Internet sites to educate the public about controlled pharmaceutical abuse; and

- Training and Education – Establish training courses for DEA personnel; other federal, state, and local law enforcement officers; and Assistant U.S. Attorneys.

In her April 6, 2006, testimony to the United States House of Representatives Committee on Appropriations, Subcommittee on Science, the Departments of State, Justice, and Commerce, and Related Agencies, the DEA Administrator said that "The strategy calls for DEA to coordinate its Internet investigations with federal, state, and local agencies, and provide training for investigators, prosecutors, the pharmaceutical industry, and DEA registrants."

**The DEA has implemented intelligence, technological, and investigative tools for Internet diversion investigations.**

We examined several of the DEA's intelligence, technological, and investigative tools that are part of its Internet strategy:  the Online Investigations Project, hotlines for reporting suspicious Internet activity, undercover equipment, and training for diversion investigators on conducting Internet investigations.  Below is a discussion of what we found.

**The Online Investigations Project (OIP).**  In our 2002 review, we recommended, and the DEA concurred, that the DEA fully implement the OIP, which it had begun to develop in 2001.  Originally, the DEA told us that the OIP would allow diversion investigators to "focus their efforts on potential diverters rather than spending valuable time surfing the Web for leads."[47]  The DEA planned the OIP to function proactively by searching the Internet using criteria commonly found in web sites that illegally distribute controlled substances to identify those web sites that had the highest volume of controlled pharmaceutical orders and that were accessed the greatest number of times so that the DEA could identify and prioritize them for investigation.

---

[47]  The DEA's July 1, 2003, response to the OIG's 2002 review.

In December 2005, the DEA notified the OIG that it considered the OIP to be operational, but stated that the OIP has limited practical application as a proactive targeting tool and can only access for retrieval that which is publicly available on the Internet.  Therefore, the OIP is ineffective identifying sites with the highest volume of controlled pharmaceutical orders and those sites most frequently accessed.  In January 2006, DEA managers reported that the OIP was functioning as "a viable investigative tool that is assisting field personnel in Internet investigations."[48]  While the OIP is not able to proactively identify the Internet pharmacies receiving the most orders so that investigations can be prioritized, DEA officials told us that analysts are using it to efficiently synthesize large amounts of information about web sites that are already under investigation.  According to DEA managers, the OIP scans information that is publicly available on the Internet to find connections between web sites under investigation and pertinent information such as addresses, phone numbers, e-mail addresses, and other web sites.  DEA analysts then transfer the OIP's search results to charts that display these connections and provide the charts to field investigators to assist in their investigations.

According to the DEA, the OIP is capable of efficiently scanning large amounts of data.  For example, between July 2005 and May 2006, the DEA stated that it used the OIP to scan 4 million web pages from 42,694 sites in 7,300 hours.  The DEA estimated that this task would have taken 60,000 analytical staff hours without the OIP.[49]

**Hotlines.**  In June 2004, the DEA established the Unlawful Medical Internet Reporting Effort (UMPIRE), which is linked to the DEA's web site and allows the public to report suspicious Internet pharmacies.  In January 2005, the DEA created the 1-877-RxAbuse telephone hotline for the public to anonymously report the illegal sale and abuse of prescription drugs.  Reports received through the web site and telephone hotline are forwarded to the DEA field divisions where the complaints originated, and then either addressed by the DEA or disseminated to local law enforcement agencies.

Of survey respondents who had received leads from the telephone hotline, 20 percent had initiated investigations based on those leads.  No respondents who had received leads through the web-based system had

---

[48]  The DEA's February 8, 2006, informal comments on this review.

[49]  This is a rough estimate based on the number of hours it would likely take an analyst to perform an analysis minus the number of hours it would take the OIP to produce the same analysis.  This time savings was then multiplied by the number of analyses that the OIP has produced since July 2005.

initiated investigations based on those leads.  The DEA personnel we interviewed stated that the leads typically involved lower-level diversion, such as "doctor shoppers," rather than the higher-level diversion conspiracies that diversion group members said they preferred to investigate.

**Undercover equipment.**  Our review also found that most diversion investigators did not have undercover equipment – such as undercover credit cards and computers – needed for certain types of Internet investigations.  Based on survey responses, 84 percent of the diversion groups had undercover computers that allowed investigators to conduct business on the Internet without being traced to the DEA.  However, survey respondents and interviewees reported that it was not very useful to have an undercover computer without an undercover credit card that they could use to establish Internet service provider accounts, obtain Post Office boxes, and place orders for pharmaceuticals.  Of the survey respondents who suggested that additional resources were needed for conducting Internet investigations, 51 percent mentioned the need for an undercover credit card.  Moreover, in some of the 2004 Pharmaceutical Threat Assessments, DEA personnel stated that problems with establishing undercover identities were impeding diversion investigations:

- "There are possible [Internet] leads but the diversion group is not yet able to explore them properly due to the need for investigators to obtain undercover identities."

- "[The Internet] has shown that to conduct a proper investigation of an Internet company the process of obtaining undercover documents must be streamlined . . . ."

- "There are numerous potential Internet cases . . . that cannot be pursued due to the lack of undercover driver's licenses and undercover credit cards."

DEA headquarters' managers stated that they were aware that the scarcity of undercover credit cards was a hindrance in the field.  In response, during the fall of 2005 the DEA administered a pilot undercover credit card program in three field divisions.  The DEA also provided documentation that on March 10, 2006, it had begun implementing a program to issue undercover credit cards to three to five diversion investigators or special agents selected by the Diversion Program Manager in each field division.  These credit cards were intended exclusively for purchasing pharmaceuticals over the Internet.  The DEA managers expected

all diversion investigators to have access to undercover credit cards and to receive training in their appropriate use by June 2006.[50]

In addition, DEA managers informed us that the DEA had begun establishing a virtual private network to link the undercover computers in each DEA field division to DEA headquarters so that investigative information and analysis can be passed between headquarters and the field securely.  DEA managers stated that thus far the virtual private network had been implemented in the Atlanta, Phoenix, Los Angeles, and Miami field divisions.

**Internet diversion training for diversion investigators.**  The DEA has established several training courses pertinent to investigations of diversion using the Internet.  We found that over half of the 482 diversion investigators had attended the DEA's Internet Telecommunications Exploitation Program training.  However, few diversion investigators have attended additional specialized courses that would be useful for conducting Internet investigations, as shown in Table 3.

**Table 3:  Training for Diversion Investigators in Internet Investigations**

| Training course | Number of diversion investigators who attended, FY 2002 – FY 2005 | Percentage of FY 2005 on-board diversion investigators |
|---|---|---|
| **Internet Telecommunications Exploitation Program** | 263 | 54.6 |
| **Diversion Internet*** | 89 | 18.5 |
| **Asset Forfeiture Training** | 50 | 10.4 |
| **Conspiracy and Complex Investigations Training** | 33 | 6.8 |
| **Financial Investigations Seminar and Techniques** | 32 | 6.6 |
| **FinCEN Training**** | 7 | 1.5 |

* This training was discontinued after FY 2004.
** Training in accessing the Financial Crimes Enforcement Network database.

Source:  The DEA's Office of Training

In addition, we found that 5 percent of diversion investigators had attended the Internet Pharmacy and Controlled Substance Pharmaceutical Diversion Prosecution Seminar sponsored by the National Advocacy Center.[51]

---

[50]  As of June 8, 2006, 6 of the DEA's 21 domestic field divisions had at least one undercover credit card for diversion investigations and 12 field divisions were still in the process of obtaining their first card.

According to survey respondents and interviewees, knowledge and training in financial analysis and conspiracy investigations are particularly important for conducting Internet investigations because Internet operations are often geographically dispersed.  The pharmacy, drug supplier, web site server, web site programmer, and physicians involved could be in different states or even in different countries.  In addition, the anonymity of the Internet, in which businesses can easily hide their identity and financial transactions, makes diversion investigations more complicated.
In interviews with the OIG, diversion investigators stated that their lack of training impeded their ability to conduct these difficult and technically challenging investigations.

One diversion program manager that we interviewed stated that additional and ongoing training in Internet investigations was needed for diversion investigators.  In survey responses, diversion investigators echoed this statement:

- "More in-depth Internet classes should be conducted.  The 3-day classes are not adequate."

- "Hands-on long-term training on the use of the Internet to make undercover buys [is needed]."

- "Diversion Investigators need ongoing technical training related to the Internet. . . . As the internet becomes more sophisticated, the frequency and level of training needs to be increased."

We asked DEA officials about the low numbers of diversion investigators who attended Internet-related training courses other than the Internet Telecommunications Exploitation Program training.  They stated that the DEA's training resources are limited and that providing Internet Telecommunications Exploitation training to diversion investigators is a DEA priority.

---

[51] The National Advocacy Center is a joint venture of the National District Attorneys Association and the Department that provides prosecution-related training.

## Continuing Concerns in the DEA's Diversion Control Program

**Despite the positive steps the DEA has taken to improve its ability to control the diversion of controlled pharmaceuticals, we identified several continuing concerns about the DEA's diversion control program. We found that although the need for special agent assistance in diversion investigations had increased since our 2002 review, the work hours spent by special agents on diversion control still constituted a small share of their total investigative time. In addition, few special agents had received specific diversion control training beyond the 2-hour module provided during basic agent training. Moreover, diversion investigators still lack law enforcement authority, despite the DEA's efforts to reclassify their positions. Further, the support provided by intelligence analysts to diversion groups in the field continued to be limited, and intelligence analysts received minimal training in diversion control.**

**Special agent assistance for pharmaceutical diversion control investigations still represents a small share of their total investigative time even though the need for their support has increased.**

Similar to our 2002 review, we found that special agent assistance for pharmaceutical and diversion investigations was still a small share of their total investigative time. The assistance of special agents is crucial because diversion investigators do not have the law enforcement authority to conduct surveillance, work with confidential informants, serve search warrants, or make arrests.

To examine the issue of special agent support for diversion control, we considered five sources: analysis of work hour data based on special agent assistance to diversion investigations ("2000 series" data); analysis of work hour data based on special agent investigative time spent on pharmaceutical investigations (G-DEP data); interviews of DEA personnel; DEA Pharmaceutical Threat Assessments; and survey responses of diversion group supervisors.

**Work hour data analyses.** Both work hour data analyses indicated that while the time special agents spent on diversion control increased since our 2002 review, it still represented a small amount of special agents' total investigative time. Between FY 2002 and FY 2005, the amount of time special agents spent on diversion investigations, measured by the hours they charged to investigations initiated by diversion investigators, increased from 14.8 work years to 27.4 work years. Even with this 85 percent

increase, the actual percentage of special agent time spent on diversion investigations increased from only 0.6 percent to 1.0 percent of their total investigative time between FY 2002 and FY 2005 (Table 4).

**Table 4:  Special Agent Work Years Spent
Assisting Diversion Investigations**

| Number of Special Agent Work Years | FY 2002 | FY 2005 |
|---|---|---|
| Spent on diversion investigations | 14.8 | 27.4 |
| Spent on diversion *and* illicit drug investigations | 2,376.8 | 2,722.6 |
| Percentage spent on diversion investigations | 0.6 | 1.0 |

Note:  The investigative work years do not include time spent on other types of activities such as administrative duties or training.

Source:  The DEA's Work Hour Reporting database reporting 2000 series data

Using data from the DEA's G-DEP system as a measure of time spent on pharmaceutical investigations, we found that between FY 2003 and FY 2005 special agents increased the time they spent on pharmaceutical investigations from 26.8 work years to 57.4 work years, an increase of 114 percent.  However, this still accounted for only 1.2 percent of special agent investigative time in FY 2003 and 2.2 percent in FY 2005 (see Table 5).

**Table 5:  Special Agent Work Years Spent
on Pharmaceutical Investigations**

| Number of Special Agent Work Years | FY 2003 | FY 2005 |
|---|---|---|
| Spent on pharmaceutical  investigations | 26.8 | 57.4 |
| Total spent on pharmaceutical *and* illicit drug investigations | 2,376.8 | 2,722.6 |
| Percentage spent on pharmaceutical investigations | 1.2 | 2.2 |

Note:  The investigative work years do not include time spent on other types of activities such as administrative duties or training.

Source:  The DEA's Work Hour Reporting database based on G-DEP data

**Diversion investigators' need for special agent support.**  While special agents can initiate pharmaceutical investigations, most pharmaceutical investigations are still initiated by diversion investigators who do not have law enforcement authority.  Therefore, special agent assistance in these cases is crucial.  The DEA has recognized the importance of adequate special agent support for several years.  For example, on August 3, 2001, the DEA's Chief of Operations issued a directive stating:  "To ensure that the diversion investigators have consistent access to special agent personnel, each diversion group in every division office will have two (2) special agents assigned full time to support their activities."  The DEA's plans were delayed when, after the September 11,

2001, terrorist attacks, many federal law enforcement agents, including DEA agents, were assigned to assist the Federal Bureau of Investigation on counter-terrorism task forces.  However, almost 5 years later, we found that of the DEA's 27 diversion groups located in field offices, only 1 reported having 2 full-time special agent positions authorized to assist with diversion investigations, 5 reported having 1 agent, and 20 reported having no agents assigned.[52]

The DEA reiterated the need for special agent assistance in a September 6, 2005, memorandum to the Department, which stated that:

> Because the [diversion] workforce lacks the enforcement status required to engage in *all* requisite investigative activities, DIs must obtain the support of DEA Special Agents or state /local police officers to perform the enforcement functions needed to develop evidence of criminal violations identified during compliance investigations.  Such a requirement often results in delays and/or errors in the investigation due to the unavailability (or limited availability) of law enforcement personnel and/or the latter's insufficient knowledge of the registrant community's processes and practices.[53]

During our field work, one SAC explained that the criminal aspects of a diversion investigation may not be fully developed because of the lack of special agent assistance.  Diversion investigators we spoke with reinforced this point.  They stated that developing criminal diversion investigations often requires undercover surveillance or use of a confidential informant and that they might not pursue the criminal aspects of the investigation because they could not rely on receiving special agent assistance.

In addition, 58 percent of survey respondents stated that the lack of available law enforcement support from special agents sometimes or often caused delays in diversion investigations.  Diversion group supervisors and investigators also explained that they had to work around the schedules of the special agents, causing the diversion investigation to be delayed.

Seventy-six percent of the respondents to our survey stated that they most often relied on state, local, or other federal agencies, rather than DEA special agents, to provide law enforcement assistance in their pharmaceutical diversion cases.  Several interviewees and survey

---

[52]  One of the 27 diversion groups did not respond to our survey.

[53]  Memorandum from the DEA Administrator to the Assistant Attorney General for Administration, "Request for Establishment of a New Series," September 6, 2006.

respondents also said that while they appreciated the assistance they received from DEA special agents, such assistance often did not fully support their investigations.  For example, survey respondents stated:

- "When we request assistance [from DEA special agents] for short term projects we receive excellent support, such as for the execution of a search warrant.  Long term investigations, such as undercover buys, are more difficult since there are extensive demands on the [DEA] enforcement group that provide us with support.  We have found it more useful to get assistance for long term investigations from our state counterparts.  These state counterparts are tasked with doing the same type of complaint or criminal investigations as diversion investigators but have full arrest powers."

- "I normally receive assistance from state/local agencies or other federal agencies. . . .  When we are ready to make arrests I then get special agents from the DEA involved.  With the requirements for various assignments it is difficult for a DEA special agent to spend time with diversion investigators."

- "Agents are responsible for their own priorities.  They assist on such things as search warrants, arrest warrants when needed, and some undercover buys.  However, they are not available for long term needs such as surveillance."

According to diversion investigators we interviewed, when the diversion groups received assistance from DEA special agents it was typically for specific law enforcement tasks such as executing arrest warrants or making undercover buys, rather than as ongoing partners in the diversion investigation.  Fifty-three percent of the survey respondents said that they were "somewhat satisfied" and seven percent were "not at all satisfied" with law enforcement assistance from DEA special agents.

**Situations in which diversion personnel were satisfied with special agent support.**  In contrast, we found instances where diversion personnel were satisfied with their working relationships with special agents and enthusiastic about the accomplishments of these partnerships.  This was primarily the case in DEA field divisions where special agents and diversion investigators were assigned to the same group or where the field division had been involved in a major diversion operation.  Diversion investigators assigned to these groups described the working relationship with the special agents as "tremendous," "excellent," "a breath of fresh air," "outstanding," and "instrumental."  The diversion investigators assigned to the groups also said they gained criminal investigative knowledge from the special agents.  Table 6 describes the groups of diversion investigators and special agents.

**Table 6:  Partnerships between Special Agents and Diversion Investigators**

| Location | Description of Partnership |
|---|---|
| Baltimore, Detroit, El Paso, Miami, Phoenix, San Antonio, San Diego | One or two special agents assigned to a diversion group |
| Boston, Houston, New Orleans, St. Louis* | Tactical Diversion Squads that include special agents, diversion investigators, and law enforcement officers from other agencies |
| New York City | Tactical Diversion Group of special agents and diversion investigators |
| Seattle | Two diversion investigators assigned to an enforcement group |

\* At the time of our field work, the Denver Tactical Diversion Squad did not have a special agent assigned.

Source:  OIG Diversion Group Supervisor Survey and interviews with DEA personnel

During our review, the DEA provided four examples of complex diversion operations to which SACs dedicated significant personnel over a long period of time.[54]  For example, the SAC of the Dallas Field Division informed us that he dedicated the entire staff of the Fort Worth field office to an investigation of an Internet pharmacy that took over seven months to complete.  In fact, we found that these four large operations accounted for 22 percent of time that special agents spent on pharmaceutical investigations in FY 2005. (See Chart 2).

**Chart 2:  Share of Special Agent Criminal Investigative Hours by Type of Investigation, FY 2005**



Source:  The DEA's Work Hour Reporting database

---

[54]  The four DEA operations are Operations Cyber Chase, CYBERx, Gear Grinder, and Cookie Dough.

**Few special agents have received training in diversion control.**

Similar to what we found in our 2002 review, few special agents have received specific diversion control training, although the growing number of criminal diversion investigations has since increased the need for special agent involvement in diversion cases.[55]  Diversion investigators that we interviewed during our current review stated that the inexperience and unfamiliarity of DEA special agents sometimes impeded or delayed investigations.  This problem was also highlighted in the DEA's Pharmaceutical Threat Assessments.  Among the comments in the assessments were:

- "DEA enforcement groups . . . either do not know or do not understand what is required to successfully prosecute the types of cases that the diversion investigators investigate on a daily basis."

- "Agents don't often comprehend or want to comprehend how the diversion investigations are done because they don't reflect the types of cases that they normally do."

In our 2002 review, we recommended that the DEA train special agents in diversion investigation procedures.  The DEA concurred with this recommendation and noted that each special agent received a 2-hour module on diversion control during basic agent training.  Yet, this module, which represented only 0.2 percent of the basic training hours for special agents, included a 30-minute video produced in 1996 that did not cover current diversion control issues, including using the Internet to divert pharmaceuticals.  DEA officials informed us that they currently are updating the video.

In responding to our 2002 recommendation, the DEA also stated that it planned to initiate additional training for special agents assigned to diversion investigations.  The first week-long Special Agent Diversion School took place in FY 2004.  However, as of April 2006, the DEA had convened five classes and reported that 98 of its 5,013 special agents had attended the training.  DEA officials stated that the DEA eventually intends to send all special agents who assist with diversion investigations to this school, but due to limited training funds and training facility space, no additional classes were planned for FY 2006.

---

[55]  As discussed previously, between FY 2002 and FY 2005, the DEA increased the number of criminal diversion investigations it initiated from 770 to 950, an increase of approximately 23 percent.

Separately, the DEA has provided training on Internet investigations for special agents conducting investigations involving diversion using the Internet. As of April 2006, 34 percent (1,699) of special agents had attended the DEA's 3-day Internet Telecommunications Exploitation Program, which includes a 1-day module that highlighted Operation Cyber Chase. Also, during 2004 and 2005, 11 special agents attended the Internet Pharmacy and Controlled Substance Pharmaceutical Diversion Prosecution Seminar, a seminar sponsored by the National Advocacy Center.

**Diversion investigators still lack law enforcement authority.**

We recommended in our 2002 review that the DEA clarify diversion investigator's roles, responsibilities, and law enforcement authority. The DEA concurred with this recommendation and in response has taken steps to reclassify the diversion investigator position to one with law enforcement authority. Table 7 summarizes the DEA's reports to the OIG about its efforts since September 2002.

**Table 7:  Timeline of the DEA's Actions to Reclassify the Diversion Investigator Position to One with Law Enforcement Authority Since 2002 OIG Review**

| Date | Action |
|------|--------|
| 9/26/02 | The DEA concurs with OIG recommendation to make a decision regarding the roles, responsibilities, and law enforcement authorities of diversion investigators and reports that DEA management is reviewing a decision paper to be discussed at a 10/16/02 SAC advisory meeting. |
| 1/15/03 | The DEA forwards a decision paper seeking to reclassify the diversion investigator position to one with law enforcement authority to the Deputy Attorney General, whose approval would initiate a 10-year conversion process.  Various Department components must also review the paper. |
| 7/25/03 | The Department requests additional information and clarification from the DEA. |
| 10/29/03 | The DEA provides the Department with the additional information requested. |
| 4/8/04 | The DEA reports that it is waiting for a decision from the Department. |
| 9/27/04 | The DEA reports that the Department requested additional information concerning demographics of the current diversion investigator workforce and that it is conducting a survey of diversion investigators to collect the necessary information. |
| 7/29/05 | The DEA reports that it plans to request a new law enforcement job series for diversion investigators. |
| 9/6/05 | The DEA provides the Department with a proposal to reclassify the diversion investigator position to one with law enforcement authority through a new law enforcement job series different from the special agent series. |
| 12/20/05 | The DEA reports that it is optimistic that the Department will support the request to reclassify the diversion investigator position to one with law enforcement authority through a new job series, but that a final decision has not been reached. |

Source:  DEA responses to the OIG's 2002 review

The DEA's current proposal, submitted to the Department's Justice Management Division in September 2005, is to create a new job series for diversion investigators who would focus on criminal diversion investigations.  The new diversion investigator position would be a "hybrid position" with full law enforcement investigative authority while also requiring the full knowledge and skills of the diversion investigator.  The position would have both regulatory duties and investigative responsibilities. All diversion investigators hired once the plan was implemented would be hired under this new job series.  Current diversion investigators would be reclassified to the new position if they meet certain requirements, including standards concerning age and physical capabilities.  A recent DEA survey found that 88 of the 340 current diversion investigators (26 percent) who responded met the eligibility requirements.  According to the DEA, the "roles and responsibilities of current diversion investigators who do not reclassify

[to the new law enforcement position] will be minimally affected" because they will devote their time to regulatory work.[56]

As of May 2006, the DEA's proposal was awaiting approval from the Department, after which it must be approved by the Office of Personnel Management and the Office of Management and Budget.  If approved, the DEA will need to take a series of steps to implement it.  First, the conversion will require an increase in the registration fees used to fund the Diversion Control Fee Account.[57]  Second, the DEA will need to reclassify, train, and assign current eligible diversion investigators, a process the DEA estimates will take 9 months.  Third, given that only about one fourth of the current diversion investigators may be eligible for conversion, the DEA will need to recruit, hire, and train a substantial number of people for the new position, a process the DEA estimates will take 18 months.

Therefore, despite the DEA's efforts, diversion investigators are not likely to receive law enforcement authority anytime soon.  We believe that until the DEA receives approval and fully implements this initiative, it needs to ensure that its diversion investigators receive sufficient special agent support.

**Intelligence analyst assistance in the field is limited.**

Similar to what we found in our previous review, intelligence analyst assistance in the field was limited.  Work hour data analyses based on "2000 series" cases and G-DEP identifiers indicated that the time that intelligence analysts spent on diversion control had increased since our 2002 review.  However, it still represented a small proportion of intelligence analysts' total investigative time.

In our 2002 review, we recommended that the DEA provide effective intelligence support to the Office of Diversion Control, and that the DEA continue to explore additional intelligence capabilities to support the diversion investigators.  The DEA concurred with the recommendation.

Since our 2002 report, the number of work years that intelligence analysts spend on diversion investigations, measured by the hours they charged to investigations diversion investigators initiated, has increased 143

---

[56]  The DEA's December 20, 2005, response to the OIG's 2002 review.

[57]  The Diversion Control Fee Account is administered by the DEA to recover the full costs of operating the various aspects of its diversion control program.  The account is funded by registration fees paid by manufacturers, distributors, dispensers, importers and exporters of controlled substances and List I chemicals as required by the Controlled Substances Act.

percent, from 2.5 work years in FY 2002 to 6.0 work years in FY 2005. Nevertheless, the 6.0 work years still represent less than 3 percent of all intelligence analyst investigative work years (Table 8).

**Table 8:  Intelligence Analyst Work Years Spent Assisting Diversion Investigations**

| Number of intelligence analyst work years | FY 2002 | FY 2005 |
|---|---|---|
| Spent on diversion investigations | 2.5 | 6.0 |
| Spent on diversion *and* illicit drug investigations | 181.0 | 214.6 |
| Percentage spent on diversion investigations | 1.4 | 2.8 |

Note:  The total work years for intelligence analysts do not include time spent on other types of activities such as administrative duties or training.

Source:  The DEA's Work Hour Reporting Database based on 2000 series data

Using data from the DEA's G-DEP system as a measure of all time spent on pharmaceutical cases, we found that between FY 2003 and FY 2005 intelligence analysts increased the number of work years spent on pharmaceutical investigations from 3.4 work years to 11.4 work years, an increase of 235 percent.  This accounted for 1.7 percent of intelligence analyst investigative time in FY 2003 and 5.3 percent in FY 2005 (see Table 9).

**Table 9:  Intelligence Analyst Work Years Spent Assisting Pharmaceutical Investigations**

| Number of intelligence analyst work years | FY 2003 | FY 2005 |
|---|---|---|
| Spent on pharmaceutical investigations | 3.4 | 11.4 |
| Spent on pharmaceutical *and* illicit drug investigations | 181.0 | 214.6 |
| Percentage spent on pharmaceutical investigations | 1.7 | 5.3 |

Note:  The total work years for intelligence analysts do not include time spent on other types of activities such as administrative duties or training.

Source: The DEA's Work Hour Reporting database based on G-DEP data

Three-quarters of the respondents to our survey stated that the need for intelligence support had increased since 2002.  According to interviewees, the diversion control program's increased need for intelligence assistance was largely because of the growth of diversion using the Internet.  Forty-five percent of the respondents said they were "somewhat satisfied" with intelligence support and 27 percent said they were "not at all satisfied" with intelligence support.  Approximately one-third said that intelligence analysts in the field never provided sufficient support.

According to our survey results, 71 percent of group supervisors received intelligence support regarding specific cases; however, only 32 percent received intelligence regarding general trends in diversion and 23 percent received intelligence regarding specific targets to consider for investigation. Receiving intelligence on trends in pharmaceutical diversion and specific potential investigative targets would allow diversion investigators to focus their efforts on the most significant threats.

Eleven survey respondents as well as interviewees in each field division that we visited stated that the most effective way to provide intelligence support was to assign an intelligence analyst to their diversion groups, as they commonly have been assigned to enforcement groups working on illicit drug investigations. Assignment to a specific diversion group would allow intelligence analysts to remain up-to-date and knowledgeable about current investigations and would create a more effective, long-term working partnership between investigator and analyst. Otherwise, diversion investigators who request assistance have to familiarize the intelligence analyst with the entire investigation.

Fifty-five percent of survey respondents said that the lack of permanent support from field intelligence analysts "sometimes" or "often" delayed investigations. Of the 62 diversion group supervisors who responded to our survey, none had an intelligence analyst permanently assigned to their group. Instead, 81 percent stated that they had to request intelligence analyst assistance on a case-specific basis, 3 percent said they received intelligence support through a diversion task force (such as a Tactical Diversion Squad), and 16 percent said they received no intelligence support at all from the field. Because they did not have an intelligence analyst assigned to their group, diversion investigators relied on ad hoc, request-specific intelligence support. If diversion investigators had a particular need for intelligence during the course of an investigation, they requested assistance for only that specific task, such as a database check or analysis of prescription records or financial transactions.

Respondents' comments to our survey highlight the limited field intelligence analyst assistance and diversion investigators' perception that their investigations are a lower priority compared to illicit drug investigations:

- "We have requested assistance and have received some very limited help. Diversion investigations are not as important as special agent investigations. When something better comes along, our support leaves."
- "In the eleven years I have served as a Diversion Group Supervisor, we have received minimal assistance on only ONE case and that was

over four years ago.  We receive absolutely no assistance from intelligence analysts . . . .  It has been made perfectly clear to my investigators that the analyst in our office is here to assist the special agents and that leaves no time for our cases."

- "When I ask for support from Intel for case assistance, I have to make the request through the assistant SAC.  If they are working on Agent cases, the Agents get priority.  Since Agents almost always have cases that Intel is assisting them on, Diversion often doesn't get assistance. We are low man on the totem pole."

Intelligence analysts that we interviewed who stated that diversion investigators did not know what intelligence assistance they could obtain reflected diversion investigators' limited experience with receiving field intelligence support.  These intelligence analysts stated that sometimes diversion personnel asked for intelligence products at the wrong point of an investigation or asked intelligence analysts to perform data entry or prepare visual aids for meetings, indications that diversion investigators were unfamiliar with the role of intelligence analysts in investigations.

When we spoke to DEA managers about the perceived lack of field intelligence support to diversion investigations, they explained that historically, intelligence analysts were often assigned to, and provided support to, specific enforcement groups.  This gave the enforcement groups direct access to intelligence support, while diversion groups had indirect access.  However, recently DEA field divisions have begun to provide intelligence support based on the priority of the investigation, regardless of whether the investigation involves illegal drugs or controlled pharmaceuticals.

As with special agent support for pharmaceutical diversion investigations, we found evidence that the DEA provided significant intelligence support for certain major diversion investigations.  In FY 2005, four large diversion operations accounted for 44 percent of all intelligence analyst work hours on criminal pharmaceutical investigations (Operations CyberRx, Cyber Chase, Gear Grinder, and Cookie Dough).  (See Chart 3.)

**Chart 3:  Share of Intelligence Analysts Criminal Investigative Hours by Type of Investigation, FY 2005**



Source: The DEA's Work Hour Reporting database

**Intelligence analysts receive minimal diversion training.**

We found that intelligence analysts received only minimal training in diversion control, such as training on the laws pertaining to diversion, methods of diversion, and commonly diverted substances.  Similar to what we found with special agent training in diversion control, the only training that intelligence analysts receive in diversion is a 2-hour module included in their basic training that represents only 0.5 percent of the training hours for intelligence analysts.

The need for training in diversion control for intelligence analysts is particularly important because, as previously mentioned, intelligence analysts have historically not been assigned to specific diversion groups.  For example, a special agent in charge told us that intelligence analysts must become familiar with diversion control through appropriate training.  In addition, an intelligence group supervisor whom we interviewed stated that intelligence analysts sometimes considered diversion control investigations to be a "foreign entity" compared with illicit drug investigations.  Another diversion group supervisor said that intelligence analysts may be accustomed to analyzing thousands of telephone calls in an illicit drug investigation, but are not as accustomed to analyzing millions of prescriptions from an Internet pharmacy for a diversion control investigation.  This group supervisor stated that some diversion cases are more difficult for intelligence analysts than illicit drug investigations.

# CONCLUSION AND RECOMMENDATIONS

Since our 2002 review, the DEA has taken steps to improve its ability to control the diversion of controlled pharmaceuticals, especially pharmaceutical diversion using the Internet.  However, there are still some areas in need of further improvement in the DEA's diversion control efforts that we identified and reported in 2002.

Since 2002, the DEA has added diversion control as a strategic goal in its strategic plan for FY 2003 – 2008, reorganized its Operations Division to include law enforcement operations for diversion control, provided additional intelligence resources to investigators, and increased its authorized domestic diversion investigator positions by 15 percent from FY 2002 to FY 2005.  Further, the DEA increased the number of criminal diversion investigations initiated by 23 percent since issuance of our 2002 report and established the first performance measures for the diversion control program in FY 2005.

Since our previous review, diversion using the Internet has become a growing threat.  The DEA has increased the percentage of diversion investigator time applied to Internet diversion investigations and developed an operational Internet strategy for guiding investigators in conducting Internet investigations.  However, it has not ensured that diversion investigators have the necessary tools, such as undercover credit cards, and training to conduct successful investigations of diversion using the Internet.

We also found that the DEA had increased the amount of time that special agents devoted to diversion control since our last review.  Nonetheless, this still represents a very small percentage of DEA special agents' overall efforts at a time when the need for special agent assistance in diversion cases has increased.  In addition, while 34 percent of special agents have attended a 3-day training course that is applicable to Internet-related investigations, only 98 special agents have attended the DEA's week-long course specifically concerning diversion.  Also, we found that the complicated issue of providing law enforcement authority for DEA diversion investigators has not been resolved, although the DEA has been actively pursuing the matter.

Finally, with the growing threat of diversion using the Internet and the overall growth of diversion in general, the need for intelligence analysts has increased.  While we found that the DEA has implemented certain new intelligence resources pertinent to diversion investigations, similar to what we found in our previous review, intelligence analyst assistance remains

limited in the field.  Further, training for intelligence analysts on diversion issues is minimal.

To make more progress in reducing the illegal diversion of controlled pharmaceuticals, the DEA must address these conditions by ensuring that criminal diversion investigations receive adequate assistance from special agents and intelligence analysts who have been trained in the intricacies of this type of investigation.  Further, because diversion using the Internet is a growing threat, the DEA must also ensure that investigators have the necessary tools and training to conduct successful Internet investigations.

We are therefore making six recommendations to help the DEA improve its ability to address the growing problem of diversion of controlled pharmaceuticals.

We recommend that the DEA:

1. Provide diversion investigators with adequate special agent support until the conversion of the DEA diversion investigator position to one with law enforcement authority is fully implemented.

2. Ensure that DEA special agents who frequently assist with diversion investigations attend the week-long diversion training school.

3. Provide training to intelligence analysts on topics that effectively support diversion investigations.

4. Update the diversion control training video used in basic special agent and intelligence analyst training to include current diversion issues such as diversion using the Internet.

5. Ensure that diversion investigators receive training in skills necessary for conducting Internet investigations, such as financial investigations.

6. Fully implementation of the program to provide undercover credit cards to diversion investigators.

## APPENDIX I: GROUP SUPERVISOR QUESTIONNAIRE



# Department of Justice
# Office of the Inspector General
# Evaluation & Inspections Division

**DEA Diversion Control Program Questionnaire**

**INTRODUCTION**

The Department of Justice Office of the Inspector General is conducting a review of the Drug Enforcement Administration's (DEA) diversion control program.  Specifically, we are examining the DEA's enforcement efforts regarding controlled pharmaceutical diversion. We completed our last review in this area in October 2002.

As part of the review, we are conducting this survey of diversion investigator, special agent, or other Group Supervisors involved in diversion control to obtain information regarding DEA's diversion control operations.  Your input is very important to us.  For tracking purposes, it is important that you include your name on the survey, but your identity will remain confidential and will not be used in any survey results. All responses will be reported in the aggregate only.

**DIRECTIONS:**  This survey should be completed by every Group Supervisor directly responsible for coordinating and supervising either:
- a DEA diversion group,
- a DEA enforcement group that focuses on diversion, or
- a Tactical Diversion Squad or other task force devoted to diversion control.
Unless otherwise noted, please answer the survey questions as they relate to **current operations for your group only**.

We prefer that you answer this questionnaire electronically.  To do so, please click your cursor in the indicated shaded area and type your response.  After you have completed the questionnaire, please save the document and e-mail it as an attachment to the following address: xxx@usdoj.gov.  If necessary, you may print out the questionnaire, fill it out manually, and fax it to (xxx) xxx-xxx.

We estimate that it will take you less than one hour to complete this questionnaire.  **Please return the completed questionnaire by *September 9, 2005*.**

Thank you for your assistance.

**NOTE:** For this survey, **"diversion investigations"** refers only to criminal/civil/complaint investigations, not scheduled or cyclic investigations.

## A. BACKGROUND INFORMATION

| | |
|---|---|
| Name | |
| Position (e.g., diversion investigator, special agent) | |
| DEA Field Division (e.g., Phoenix Field Division) | |
| DEA Office  (e.g., Tucson, AZ, District Office) | |
| Phone Number | |
| Address | |
| | |

## B. ORGANIZATION OF YOUR GROUP

1. **How many of each of the following authorized positions is assigned to your group (including yourself)?** *(Enter a number in each row.  If your group has no positions for a particular position, enter "0".)*

| | |
|---|---|
| | Diversion investigators |
| | Special agents |
| | Intelligence analysts |
| | Task force officers |
| | Other (*Describe:*) |

2. **How many, if any, vacant positions do you currently have for each of the following in your group?**
*(Enter a number in each row.  If your group has no vacancies for a particular position, enter "0".)*

| | |
|---|---|
| | Diversion investigators |
| | Special agents |
| | Intelligence analysts |
| | Task force officers |
| | Other (*Describe:*) |

3. **Approximately what percentage of time does your group spend on the following?**
*(Enter a percentage in each row.  The column total should equal 100%.)*

| | |
|---|---|
| | Complaint/criminal/civil investigations |
| | Cyclic/scheduled investigations |
| | Pre-registrant investigations |
| | All other activities |
| **100%** | **TOTAL** |

**C. LAW ENFORCEMENT SUPPORT FOR DIVERSION INVESTIGATIONS**

4.  **Which of the following best describes the involvement of DEA special agents in your group's diversion investigations?** *(Check one box.)*

| | |
|---|---|
| ☐ | One or more special agents is permanently assigned to work with my group. |
| ☐ | I request the assignment of special agents who are part of a DEA enforcement group to assist with diversion investigations on a case-specific basis. |
| ☐ | I request the assignment of special agents who are part of a task force devoted to diversion investigations (i.e., Tactical Diversion Squad or Diversion Response Team) to assist my group on a case-specific basis.  This task force is led by DEA or another law enforcement group. |
| ☐ | DEA special agents are not involved in my group's diversion investigations. *(Please explain why:)* |

5.  **Which of the following best describes the availability of law enforcement support that you receive from DEA special agents?** *(Check one box.)*

| | |
|---|---|
| ☐ | The availability of DEA special agent support allows diversion investigations to continue without delay. |
| ☐ | The availability of DEA special agent support sometimes causes delays in diversion investigations. |
| ☐ | The availability of DEA special agent support often delays diversion investigations. |

6.  **Which of the following best describes the amount of law enforcement support that your group receives from DEA special agents?** *(Check one box.)*

| | |
|---|---|
| ☐ | DEA special agents always provide a sufficient amount of law enforcement support for diversion investigations. |
| ☐ | DEA special agents usually provide a sufficient amount of law enforcement support for diversion investigations. |
| ☐ | DEA special agents never provide a sufficient amount of law enforcement support for diversion investigations. *(Please explain why:)* |

7.  **How satisfied are you with the law enforcement support that your group receives from DEA special agents?** *(Check one box.)*

| | |
|---|---|
| ☐ | Very satisfied |
| ☐ | Somewhat satisfied |
| ☐ | Not at all satisfied |

   **7a. If you answered "Not at all satisfied" to Q7, explain why:**

8. **Which of the following best describes the involvement of local/state/other federal law enforcement personnel that assist in your group's diversion investigations?** *(Check one box.)*

| | |
|---|---|
| ☐ | Other law enforcement personnel are part of a task force (led by DEA or other law enforcement group) devoted to diversion investigations. |
| ☐ | Other law enforcement personnel are part of a task force (led by DEA or other law enforcement group) not dedicated to diversion investigations, but the personnel assist with my group's diversion investigations when necessary. |
| ☐ | Other law enforcement personnel are not part of any task force but we work with them informally on a case-specific basis. |
| ☐ | We have no local/state/other federal law enforcement involvement in our diversion investigations. |

9. **What type of law enforcement personnel do you work with most often to support your group's diversion investigations?** *(Check one box.)*

| | |
|---|---|
| ☐ | DEA special agents |
| ☐ | Other federal law enforcement personnel |
| ☐ | State/local law enforcement personnel |
| ☐ | Other (*Describe:*) |

10. **In 2005, approximately how many of the controlled pharmaceutical diversion investigations conducted by your group required some type of law enforcement support?** *(Check one box.)*

| | |
|---|---|
| ☐ | All investigations |
| ☐ | Most investigations |
| ☐ | Some investigations |
| ☐ | No investigations |

11. **Since 2002, would you say that the need for law enforcement support in diversion investigations for your group has increased, stayed the same, or decreased?** *(Check one box.)*

| | |
|---|---|
| ☐ | Increased |
| ☐ | Stayed the same |
| ☐ | Decreased |

**D. INTELLIGENCE SUPPORT FOR DIVERSION INVESTIGATIONS**

The following section asks about your familiarity and use of the following:

o   **ARCOS** – DEA's Automation of Reports and Consolidated Orders System
o   ███████ – database provided by ChoicePoint
o   **AutoTrack** – database provided by ChoicePoint
o   **Lexis/Nexis**
o   **FinCEN** – Financial Crimes Enforcement Network
o   **1-877-RX-ABUSE** – toll-free number allowing public to report suspicious Internet pharmacies
o   **UMPIRE** – Unlawful Internet Pharmaceutical Sales Reporting system used to report suspicious Internet pharmacies on-line through DEA's website

12. **How familiar is your group with the information contained in the following?**
    *(Check one box in each row.)*

|  | Very familiar | Somewhat familiar | Not familiar |
|---|---|---|---|
| ARCOS | ☐ | ☐ | ☐ |
| ███████ | ☐ | ☐ | ☐ |
| AutoTrack | ☐ | ☐ | ☐ |
| Lexis/Nexis | ☐ | ☐ | ☐ |
| FinCEN | ☐ | ☐ | ☐ |

13. **Which of the following does your group have access to in your field office?** *(Check all that apply.)*

|  |  |
|---|---|
| ☐ | ARCOS |
| ☐ | ███████ |
| ☐ | AutoTrack |
| ☐ | Lexis/Nexis |
| ☐ | FinCEN |

14. **How useful is the information contained in the following for your group's diversion investigations?**
    *(Check one box in each row.)*

|  | Very useful | Somewhat useful | Not useful | Never used |
|---|---|---|---|---|
| ARCOS | ☐ | ☐ | ☐ | ☐ |
| ███████ | ☐ | ☐ | ☐ | ☐ |
| AutoTrack | ☐ | ☐ | ☐ | ☐ |
| Lexis/Nexis | ☐ | ☐ | ☐ | ☐ |
| FinCEN | ☐ | ☐ | ☐ | ☐ |

15. **In 2005, in how many diversion investigations did your group use the following?**
    *(Check one box in each row.)*

| | All investigations | Most investigations | Some investigations | No investigations |
|---|---|---|---|---|
| ARCOS | ☐ | ☐ | ☐ | ☐ |
| ██████████ | ☐ | ☐ | ☐ | ☐ |
| AutoTrack | ☐ | ☐ | ☐ | ☐ |
| Lexis/Nexis | ☐ | ☐ | ☐ | ☐ |
| FinCEN | ☐ | ☐ | ☐ | ☐ |

16. **Has the E-Commerce Section (which includes E-Commerce Operations, E-Commerce Operational Support Unit and the Targeting and Analysis Unit) in the Office of Diversion Control in headquarters ever contacted your group with any proactive tips or leads developed through** ██████████ **or ARCOS?** *(Check one box in each row.)*

| | Yes | No |
|---|---|---|
| ██████████ | ☐ | ☐ |
| ARCOS | ☐ | ☐ |

17. **Has your group ever received any tips or leads from the 1-877-RX-ABUSE hotline or UMPIRE to investigate?**
*(Check one box in each row.)*

| | Yes | No |
|---|---|---|
| 1-877-RX-ABUSE hotline | ☐ | ☐ |
| UMPIRE | ☐ | ☐ |

18. **Have tips or leads received from any of the following sources initiated a diversion investigation for your group?** *(Check one box in each row.)*

| | Yes | No | Have not received tips or leads from source |
|---|---|---|---|
| ██████████ | ☐ | ☐ | ☐ |
| ARCOS | ☐ | ☐ | ☐ |
| 1-877-RX-ABUSE hotline | ☐ | ☐ | ☐ |
| UMPIRE | ☐ | ☐ | ☐ |

19. **Which of the following best describes the involvement of DEA intelligence analysts in the field with diversion investigations for your group?** *(Check one box.)*

| | |
|---|---|
| ☐ | One or more intelligence analysts is permanently assigned to work with my group. |
| ☐ | I have to request the assignment of intelligence analysts to assist with diversion investigations on a case-specific basis. |
| ☐ | I have to request the assignment of intelligence analysts who are part of a task force devoted to diversion investigations (i.e., Tactical Diversion Squad or Diversion Response Team). This task force is led by DEA or another law enforcement group. |
| ☐ | My group does not receive any intelligence analyst support from the field. *(Please explain why:)* |

20. **Which of the following best describes the availability of intelligence support that your group receives from DEA intelligence analysts in the field?** *(Check one box.)*

| ☐ | The availability of DEA intelligence support allows diversion investigations to continue without delay. |
|---|---|
| ☐ | The availability of DEA intelligence support sometimes causes delays in diversion investigations. |
| ☐ | The availability of DEA intelligence support often delays diversion investigations. |

21. **Which of the following best describes the amount of intelligence support that your group receives from DEA intelligence analysts in the field?** *(Check one box.)*

| ☐ | DEA intelligence analysts always provide a sufficient amount of intelligence support for diversion investigations. |
|---|---|
| ☐ | DEA intelligence analysts usually provide a sufficient amount of intelligence support for diversion investigations. |
| ☐ | DEA intelligence analysts never provide a sufficient amount of intelligence support for diversion investigations. <br> *(Please explain why:)* |

22. **Which of the following statements represent the types of DEA intelligence that your group receives from DEA headquarters or from the field?** *(Check all that apply.)*

| ☐ | My group receives intelligence for specific investigations when we request it. |
|---|---|
| ☐ | My group receives intelligence regarding specific diversion targets to consider for investigation. |
| ☐ | My group receives strategic intelligence regarding general trends in diversion. |
| ☐ | My group receives another type of intelligence. *(Describe:)* |

23. **For what types of diversion investigations would you be most likely to request intelligence support?** *(Check all that apply.)*

| ☐ | For priority target investigations (CPOT, RPOT) |
|---|---|
| ☐ | For OCDETF investigations |
| ☐ | For HIDTA investigations |
| ☐ | For investigations involving complex financial transactions |
| ☐ | For investigations involving toll analysis |
| ☐ | For investigations involving the Internet |
| ☐ | Other *(Describe:)* |

24. **How satisfied are you with the intelligence support that your group has received from the intelligence group in your office?** *(Check one box.)*

| ☐ | Very satisfied |
|---|---|
| ☐ | Somewhat satisfied |
| ☐ | Not at all satisfied |

24a. **If you answered "Not at all satisfied" to Q24, explain why:**

25. **In 2005, approximately how many of the controlled pharmaceutical investigations conducted by your group required some type of intelligence support?** *(Check one box.)*

| | |
|---|---|
| ☐ | All investigations |
| ☐ | Most investigations |
| ☐ | Some investigations |
| ☐ | No investigations |

26. **Since 2002, would you say that the need for intelligence support in diversion investigations for your group has increased, stayed the same, or decreased?** *(Check one box.)*

| | |
|---|---|
| ☐ | Increased |
| ☐ | Stayed the same |
| ☐ | Decreased |

27. **Describe any additional intelligence resources (e.g., access to investigative leads, intelligence analysts, or databases) necessary for your group to conduct diversion investigations:** *(Describe:)*

**E. DIVERSION INVESTIGATIONS**

The following section asks about your interaction with the Special Operations Division (SOD) in headquarters and your familiarity with its Webcrawler program/Online Investigations Project.  The Webcrawler program/Online Investigations Project allows SOD to provide data, such as IP address and registration information, regarding specific websites or email addresses.

28. **In 2005, how many of the following diversion investigations has your group initiated?**
    *(Enter a number in each row.)*

| | |
|---|---|
| | Investigations of controlled pharmaceutical diversion involving the Internet (i.e., suspicious Internet pharmacies or email addresses) |
| | Investigations of controlled pharmaceutical diversion **not** involving the Internet. |

29. **Since 2002, would you say that the number of the following diversion investigations that your group has conducted has increased, stayed the same, or decreased?** *(Check one box in each row.)*

| | Increased | Stayed the same | Decreased | Have not conducted any |
|---|---|---|---|---|
| Investigations of controlled pharmaceutical diversion involving the Internet (i.e., suspicious Internet pharmacies or email addresses) | ☐ | ☐ | ☐ | ☐ |
| Investigations of controlled pharmaceutical diversion **not** involving the Internet. | ☐ | ☐ | ☐ | ☐ |

30. **Do you contact the Special Operations Division prior to initiating an Internet investigation?**
    *(Check one box.)*

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

49

| ☐ | Yes |
| ☐ | No |
| ☐ | Unsure |
| ☐ | Have not initiated any Internet investigations |

31. **Has the Special Operations Division ever provided your group with information gathered through the Webcrawler?** *(Check one box.)*

| ☐ | Yes |
| ☐ | No |
| ☐ | Unsure |
| ☐ | Have not initiated any Internet investigations |

   31a. **If you answered "Yes" to Q31, how satisfied were you with the Webcrawler information that was provided?** *(Check one box.)*

| ☐ | Very satisfied |
| ☐ | Somewhat satisfied |
| ☐ | Not at all satisfied |

32. **Which of the following types of undercover equipment does your group have for conducting Internet investigations?** *(Check all that apply.)*

| ☐ | Computer |
| ☐ | Credit card |
| ☐ | Internet Service Provider account (such as AOL) |
| ☐ | Internet connection (i.e., DSL, cable modem, or dial-up connection) |
| ☐ | Post Office box |

33. **Which of the following types of undercover equipment has your group used for conducting Internet investigations?** *(Check all that apply.)*

| ☐ | Computer |
| ☐ | Credit card |
| ☐ | Internet Service Provider account (such as AOL) |
| ☐ | Internet connection (i.e., DSL, cable modem, or dial-up connection) |
| ☐ | Post Office box |

   33b. **If you have not used any of the undercover equipment in Q33, please explain why:**
   *(Describe:)*

34. **Describe any additional resources that are necessary for your group to conduct the following investigations.** *(Describe in each row.)*

| Investigations of controlled pharmaceutical diversion involving the Internet (i.e., suspicious Internet | |

| | |
|---|---|
| pharmacies or email addresses) | |
| Investigations of controlled pharmaceutical diversion **not** involving the Internet. | |

35. **In 2005, how many cases involving controlled pharmaceutical diversion from your group have been presented and accepted by the U.S. Attorneys' Office?** *(Enter a number in each row.)*

| | | |
|---|---|---|
| | Number of cases presented to the U.S. Attorneys' Office | |
| | Number of cases accepted by the U.S. Attorneys' Office | |

**F. TRAINING**

36. **Other than the Basic Diversion Investigator Training Course received by all diversion investigators, which of the following additional training courses have been taken by diversion investigators in your group?** *(Check all that apply)*

| | |
|---|---|
| ☐ | Asset forfeiture training |
| ☐ | Financial investigation seminar |
| ☐ | Conspiracy and complex investigation training |
| ☐ | GATEWAY training |
| ☐ | Internet telecommunications exploitation school (offered by SOD) |
| ☐ | Other (*Describe:*) |

37. **How adequate is the training that the diversion investigators in your group have received?**
*(Check one box.)*

| | |
|---|---|
| ☐ | Very adequate |
| ☐ | Mostly adequate |
| ☐ | Not adequate |

37a. **If you answered "Not adequate" to Q37, what additional training would be useful for diversion investigators in your group?** *(Describe:)*

38. **Have the diversion investigators in your group received any specific training regarding how to prepare cases for the U.S. Attorneys' Office?** *(Check one box.)*

| | |
|---|---|
| ☐ | Yes |
| ☐ | No |
| ☐ | Unsure |

38a. **If you answered "No" to Q38, please describe any additional resources that the diversion investigators in your group have access to for assistance in preparing cases for the U.S. Attorneys' Office?** *(Describe:)*

## G. CONCLUSION

39. **In your opinion, how true are each of the following statements?** *(Check one box in each row.)*

| | Very true | Somewhat true | Not true at all | Don't know |
|---|---|---|---|---|
| The problem of diversion has grown in my DEA office's geographic area since 2002. | ☐ | ☐ | ☐ | ☐ |
| The availability of controlled pharmaceuticals available over the Internet has increased substantially since 2002. | ☐ | ☐ | ☐ | ☐ |
| In general, the nature of the problem has changed from lower-level diversion (i.e., doctor shoppers) to higher-level diversion (i.e., organized drug rings selling large quantities of controlled pharmaceuticals) since 2002. | ☐ | ☐ | ☐ | ☐ |
| The DEA's efforts to control the diversion of pharmaceuticals have improved since 2002. | ☐ | ☐ | ☐ | ☐ |

## APPENDIX II:  SCOPE OF THE OIG REVIEW REGARDING CONTROLLED SUBSTANCES AND COMMODITIES

To reach the best estimate of time devoted by the DEA to pharmaceutical cases, we present two special agent and intelligence analyst work hour analyses based on two different data sets.  The first analysis is based on "2000 series data" and is a measure of the time that that special agents and intelligence analysts spent assisting diversion investigations.  The second analysis is based on G-DEP data and is a measure of all time spent on pharmaceutical investigations by special agents and intelligence analysts.

Diversion investigations.  Every DEA investigation has a unique case number consisting of eight digits that specify the (1) field division where it was initiated, (2) the fiscal year when it was initiated, and (3) who initiated it.  Cases initiated by diversion investigators are denoted as "2000 series" cases.

Pharmaceutical investigations.  The G-DEP code is a five-character code the DEA assigns to all criminal investigations indicating (1) the type of investigative target, (2) whether other agencies are involved in the investigation, (3) the principal controlled substance or commodity involved in the investigation, and (4) the geographic scope of the criminal activity under investigation.  There are 51 principal controlled substances captured by the G-DEP code.  According to the DEA, 29 of a possible 51 substances related to the diversion of controlled pharmaceuticals; however, we concluded that only 15 were within the scope of this review.

The 15 substances classified with a G-DEP identifier and included in our review are:

- Methylphenidate
- Fentanyl (and its generics)
- Ketamine (and its analogues)
- Opioid Treatment Pharmaceuticals
- Hydromorphone (Dilaudid)
- Schedule II Pharmaceutical Narcotic
- Schedule II Pharmaceutical Non-Narcotic
- Schedule III Narcotic
- Benzodiazepine
- All Other  Pharmaceutical Controlled Substances
- Oxycodone

- Hydrocodone
- Palladone
- Steroid (pharmaceutical)
- Pharmaceutical Cocaine

The remaining 14 of the 29 substances not included in our review (for reasons stated) are:

- Methaqualone – This is a schedule I drug not being legally manufactured or imported.
- GHB/GBL/BD (and other GHB analogues) – This is an active ingredient for one Schedule II pharmaceutical, but not a pharmaceutical.
- Unspecified Analogues – This is an ingredient in controlled pharmaceuticals, but not a pharmaceutical controlled substance.
- Amphetamine/Stimulant Related Chemical – This is a listed chemical, and thus, outside of our scope.
- Pseudo ephedrine – This is a listed chemical, and thus, outside of our scope.
- Ephedrine – This is a listed chemical, and thus, outside of our scope.
- Hallucinogen-Related Chemical – This is a listed chemical, and thus, outside of our scope.
- Iodine/Red Phosphorus – This is a listed chemical, and thus, outside of our scope.
- Depressant-Related Chemical – This refers to chemicals, and is thus, outside of our scope.
- Chemical Equipment (non-drug-specific) – Chemical equipment is not a controlled substance.
- Depressant (clandestine) – Clandestinely produced substances are not diverted drugs.
- Other Stimulant (clandestine) – Clandestinely produced substances are not diverted drugs.
- Steroid (clandestine) – Clandestinely produced substances are not diverted drugs.
- No Specific Drug – This code is used for controlled pharmaceuticals as well as illicit drugs.

<u>Comparison of "2000" series and G-DEP Work Hour Data.</u>  The DEA informed us that there is no perfect way to capture the entire universe of all pharmaceutical investigations.  However, both of the methods we present – using "2000 series" case data and using G-DEP code data for the 15

principal controlled substances within the scope of our review – have advantages and disadvantages, as described in Table 1.

**Table 1.  Comparison of "2000 Series" and G-DEP Work Hour Data**

|  | **"2000 Series" Data** | **G-DEP Data** |
|---|---|---|
| Basis for data | Based on an investigation's case number.  The "2000 Series" data represents investigations initiated by diversion investigators. | Based on the G-DEP substance identifier of investigation.  We concluded that there were 15 principal controlled substances captured by the G-DEP code that were within the scope of our review. |
| Time period of data | Data is available for the entire review period, FY 2002 – FY 2003. | Data is only available for FY 2003 – FY 2005.* |
| Substances included in analysis | All cases initiated by diversion investigators are captured, regardless of the controlled substance involved. | The identifier allows for analysis of specific substances.  *Diversion* cases on substances not selected are not captured. |
| Disadvantages of data set | Pharmaceutical investigations initiated by special agents are not captured.<br><br>Chemical diversion investigations outside the scope of our review are captured. | Deciding which of the 51 substance identifiers to include is subjective.<br><br>Time spent on non-criminal diversion investigations is not captured because only criminal cases are assigned G-DEP codes.<br><br>The identifier for the substance only indicates the lead drug and is sometimes changed during the investigation. |

* Because the DEA restructured the list of principal controlled substances or commodities in 2002, FY 2002 data based on the G-DEP code is not comparable to more recent data, and our analysis of G-DEP data covers only FY 2003 through FY 2005.

# APPENDIX III:  DEA'S RESPONSE TO DRAFT REPORT



**U. S. Department of Justice**
Drug Enforcement Administration

Executive Policy and Strategic Planning Staff
Office of the Deputy Administrator

*www.dea.gov*                                              June 28, 2006

TO:        Paul A. Price
                Assistant Inspector General
                Evaluation and Inspections Division
                Office of the Inspector General

FROM:     Douglas N. Blates, Chief
                Executive Policy and Strategic Planning Staff
                Office of the Deputy Administrator

SUBJECT:  DEA's Response to the OIG's Draft *Follow-Up Review of the Drug Enforcement Administration's Efforts to Control the Diversion of Controlled Pharmaceuticals,* June 2006

      The Drug Enforcement Administration (DEA) appreciates the Office of the Inspector General (OIG) for extending this review in order to consider additional briefings and information on the Diversion Control Program.

      As your review correctly reflects, DEA has made significant progress since the OIG's 2002 review.  DEA designated the diversion of controlled pharmaceuticals as a top agency priority and communicated this priority throughout DEA and to all U.S. Attorneys nationwide.  DEA also formulated a comprehensive Internet strategy to attack the trafficking and diversion of controlled pharmaceutical substances over the Internet.  The strategy, which has evolved in step with trafficker operations and the changing threat environment, has guided the execution of major international operations in the last two years and has led to the arrest of some of the nation's top pharmaceutical traffickers and the closure of significant and dangerous illegal Internet pharmacies.  Other milestones and accomplishments of the Diversion Control Program include:

- Diversion Control was made a Strategic Goal in the FY 2003—FY 2008 DEA Strategic Plan

- In January 2004, the DEA Administrator announced to DEA offices worldwide the importance and priority of diversion investigations

- DEA Headquarters was reorganized in 2004 to centralize diversion investigations into one section and to place diversion investigations on par with other DEA criminal investigations

Paul A. Price, Assistant Inspector General                                                              Page 2

- A pharmaceutical Internet coordination unit was established at the Special Operations Division in the Fall of 2004

- DEA established Financial Investigation Groups to target financial crimes and assets associated with drug trafficking that includes diversion investigations

- DEA established strong partnerships to educate the pharmaceutical industry on the spread of pharmaceutical abuse and to clamp down on on-line Internet trafficking

- DEA assisted with the development of the OCDETF Fusion Center that is accessible to diversion investigators and used for coordinating complex Organized Crime Drug Enforcement Task Force investigations

- DEA trained more than half of its diversion investigators via the Internet Telecommunications Exploitation school

- DEA established a diversion school for special agents and to date has trained approximately 98 special agents

- From FY 2003 to FY 2005, DEA increased special agent work hours devoted to pharmaceutical investigations by 114 per cent; increased intelligence analyst work hours by 235 percent; and increased the total number of work-hours expended on Internet diversion investigations by more than 71 per cent

- DEA increased the number of diversion investigations by 23 per cent, from 770 in FY 2002 to 950 in FY 2005

- From FY 2002 to FY 2005, DEA increased the number of organizational disruptions from 454 to 474 and organizational dismantlements from 474 to 594

- DEA increased seized assets related to Internet diversion investigations from $1.8 million in FY 2002 to more than $32.4 million in FY 2005

- DEA requested and received authority to increase the number of diversion investigators by 75 between FY 2004 and FY 2005

Despite these accomplishments, the OIG report makes a number of conclusions with which DEA disagrees. Following are DEA's views as to its progress and its responses to each of the OIG's recommendations.

**Work Hours Analysis**

Much of the report centers on special agent and intelligence analyst assistance to diversion investigations as measured by work hours/years. OIG's analysis is overly restrictive and excludes

Paul A. Price, Assistant Inspector General                                    Page 3

key data. Specifically, it excludes the work hours expended under 14 G-DEP identifiers, one of which is pseudoephedrine. DEA believes that for consistency, this review should reflect work hours expended under all relevant G-DEP identifiers just as in the 2002 review. While OIG's rationale may make sense when looking at only "diversion" cases, it is not applicable when looking at "pharmaceutical" cases (e.g., most would consider ephedrine and pseudoephedrine to be pharmaceuticals). Further, the dynamics of the global drug trade concerning controlled pharmaceutical substances have evolved so profoundly since the 2002 review that to exclude these 14 G-DEP identifiers renders conclusions that are not fully representative of the pharmaceutical drug threat and DEA's activities.



**Investigative Work Hours for Pharmaceutical Investigations by Job Series, FY 2003 – 2005**

|                  | FY2003    |        | FY2004    |        | FY2005    |        |
|------------------|-----------|--------|-----------|--------|-----------|--------|
| Special Agent    | 280,419.5 | 40.2%  | 299,940.3 | 38.5%  | 418,395.5 | 42.0%  |
| Task Force Ofc   | 173,841.6 | 24.9%  | 182,995.8 | 23.5%  | 202,728.2 | 20.3%  |
| Diversion Invest | 216,968.7 | 31.1%  | 264,512.7 | 34.0%  | 334,985.7 | 33.6%  |
| Intel. Analyst   | 25,602.9  | 3.7%   | 31,435.7  | 4.0%   | 40,516.5  | 4.1%   |
| TOTAL            | 696,832.7 | 100.0% | 778,884.5 | 100.0% | 996,625.9 | 100.0% |

In addition, the OIG's analysis excluded the work hours of state and local task force officers assigned to DEA task forces. Since the 1970s, these task force officers have been an extension of the DEA agent work force, and are federally deputized with equal responsibilities and authorities as DEA agents. Most important, their activities and investigations are directed by DEA priorities. Therefore, DEA maintains that the investigative work hours that these task force officers spent on criminal diversion investigations should be combined with those of DEA special agents.

When calculating all criminal pharmaceutical diversion investigations and 2000-series diversion investigations, as well as the work hours of task force officers, and investigative hours involving the additional 14 G-DEP identifiers, DEA found that:

- Total work hours for all DEA job series (SA, TFO, DI, IA) rose 43 per cent from 696,832 hours in 2003 to 996,625 hours in FY 2005
- SA work years increased from 107 in FY 2003 to 161 in FY 2005 (as opposed to the OIG's analysis that ranges from 14.8 in 2002 to 57.4 work years in 2005)
- Combined SA/TFO work years increased 37 per cent from 174 in FY 2003 to 238 in FY 2005
- In FY 2005, special agents spent approximately 5.4 per cent of their total investigative time on criminal pharmaceutical cases

The draft report states that while DEA has increased the amount of its intelligence resources to diversion investigators, intelligence analyst assistance to diversion investigations has remained limited (p. xii). However, DEA analysis shows that intelligence analyst work hours on diversion investigations increased 58 per cent from 25,603 hours in 2003 to 40,517 hours in 2005. Also, the

U.S. Department of Justice                                                    58
Office of the Inspector General
Evaluation and Inspections Division

Paul A. Price, Assistant Inspector General                                   Page 4

OIG survey shows that:

- 67 per cent of the 60 respondents report that intelligence analysts always or usually provide a sufficient amount of intelligence support for diversion investigations (question 21)
- 72 per cent of the 61 respondents were very satisfied or somewhat satisfied with the intelligence support received (question 24)
- 75 per cent of the 62 respondents reported receiving intelligence for specific investigations when requested (question 22)

DEA is continuing to expand its intelligence support to diversion investigations and is in the process of allocating 41 new intelligence analysts to support the Diversion Control Program.

**Sustaining Worldwide Commitments with Resource Constraints**

Controlling pharmaceutical diversion continues to be a priority for DEA. While maintaining pharmaceutical diversion as a top priority, DEA must also continue its work uninterrupted around the world—in Mexico, Colombia, Afghanistan and in 59 other countries—and across America to fight cocaine, heroin, methamphetamine, MDMA, and marijuana trafficking organizations.

Following September 11, 2001, many agencies were overhauled and reorganized, and their priorities reordered. DEA underwent the most sweeping realignment in its 33-year history to attack drug-related terrorism and other threats in a post-9/11 environment. DEA has designated diversion control as a top priority through this change and without commensurate resource enhancements to address the growth of this threat.

The fact that DEA is constrained by ongoing budget shortfalls that limit the manpower support the agency is able to provide for the Diversion Control Program was overlooked by OIG. For example, DEA absorbed $108.8 million in base funding offsets and unfunded mandates between FY 2003 and FY 2006. That amount is equal to the pay and benefits of 749 special agents. Still, despite these constraints, DEA has made a significant investment in combating the diversion and abuse of controlled pharmaceuticals, and with substantive results as previously outlined.

**DEA Response to OIG Recommendations**

1. **Provide diversion investigators with adequate special agent support until the conversion of the DEA diversion investigator position to one with law enforcement authority is fully implemented.**

This recommendation is unnecessary and its objective—"to provide *adequate* special agent support"—is ambiguous. DEA indeed has provided "adequate" special agent support to diversion investigations without the benefit of additional resources and while maintaining its other worldwide enforcement obligations. DEA has realigned its priorities and resources all in an effort to focus DEA, especially its special agents, on diversion investigations. The complete body of DEA's efforts—its investigations, operations, intelligence support, work hours, organizational arrests,

Paul A. Price, Assistant Inspector General                                    Page 5

disruptions, and dismantlements—is evidence that DEA indeed has provided adequate, even substantial and effective, special agent support to diversion investigations. Results of the OIG's questionnaire support this conclusion. A full 82 per cent of the 61 respondents said they believe special agents "always" or "usually" provide sufficient support to diversion investigations (question 6); and 94 per cent said they were "very satisfied" or "somewhat satisfied" with special agent support (question 7). In addition, only one respondent reported not having special agents involved in his or her diversion group's investigations (question 4).

Another concern is the OIG reports' misrepresentation of the August 2001 directive by DEA's Chief of Operations. DEA's Chief of Operations issued this memorandum instructing Special Agents in Charge to place two special agents in each diversion group in each Division office. This instruction, thought originally to be the permanent solution to diversion investigators' lack of law enforcement authority, was overtaken by a 2003 decision to instead convert diversion investigators to a series with law enforcement authority. Once the conversion (involving a new "hybrid" position) is complete, DEA will be in a position to provide increased investigative assistance to diversion investigators and carry out more diversion investigations. DEA has requested and has received authorization for additional enhancements in special agent positions in the diversion program. In the interim, DEA will enhance special agent/task force officer support to diversion investigations that require law enforcement assistance and cannot be performed independently by diversion investigators.

Within 30 days after the issuance of the final OIG report, the DEA Deputy Administrator will issue a memorandum and worldwide teletype restating that diversion and trafficking of controlled pharmaceuticals, to include Internet trafficking, remain a top DEA priority and that Special Agents in Charge are to enhance special agent assistance to criminal diversion investigations. Additionally, 23 special agents are being allocated to support diversion groups and the diversion program.

**2.      Ensure that DEA special agents who frequently assist with diversion investigations attend the week-long diversion training school.**

Concur. DEA's Office of Training will continue to identify and offer training to all special agents and task force officers who are assigned to DEA's Tactical Diversion Squads, or who assist with diversion investigations. The one-week training course will provide students with an in-depth understanding of diversion investigations, focusing on the Controlled Substances Act as it pertains to regulated pharmaceuticals, methods of diversion, pharmacology, addiction, and the investigative techniques used in diversion investigations. Dependent upon funding, special agents and task force officers will be identified and trained during FY 2007.

Paul A. Price, Assistant Inspector General                                              Page 6

**3.     Provide training to intelligence analysts on topics that would effectively support diversion investigations.**

Concur.  DEA's Office of Training will develop a training course for intelligence analysts to ensure their full and effective analytic support to diversion investigations.  The Office of Training will conduct an assessment to determine the precise analytic needs of diversion investigators and investigations.  The assessment will determine the necessary tasks, standards, analytic skills, knowledge, and abilities that intelligence analysts must possess to support diversion investigations effectively.  The assessment will then be used as a baseline to design a course and curriculum for analyst training.  Dependent upon funding, the Office of Training will develop the curriculum by October 1, 2006 and commence training in FY 2007.

**4.     Update the diversion control training video used in the special agent and intelligence analyst training academies to include current issues such as diversion using the Internet.**

Concur.  DEA's Office of Training is currently in the process of developing a new training video specifically for pharmaceutical diversion.  The video, being developed especially for special agents and intelligence analysts, as well as for diversion investigators, will contain the latest information on diversion threats, trends, methods, and techniques.  It will also contain specific training material on Internet-based drug trafficking, technical investigative techniques, methodologies, resources, and financial investigations.  The Office of Training anticipates completing the new training video by September 30, 2006.

**5.     Ensure that diversion investigators receive training in skills necessary for conducting Internet investigations, such as financial investigations.**

Concur.  The Special Operations Division (SOD) has developed the Internet Telecommunications Exploitation training curriculum for diversion investigators, special agents, and intelligence analysts.  To date, over 50 per cent of all diversion investigators have attended this training.  Dependent upon funding, DEA will increase the number of diversion investigators who attend this school in FY 2007.  In addition, DEA's Office of Training offers courses in financial investigations, asset forfeiture, complex conspiracy, and FinCEN/Gateway training.  DEA will increase the number of diversion investigators in these courses as well.  Further, the Office of Training will conduct a needs assessment to determine the necessary job tasks/standards as well as the knowledge, skills, and abilities needed for diversion investigators to effectively conduct Internet investigations.  As needed, DEA will modify existing courses or develop new ones to meet the needs of diversion investigators.  The Office of Training expects to complete its needs assessment by November 2006.

**6.     Fully implement the program to provide undercover credit cards to diversion investigators.**

Concur.  DEA has made effective progress toward fully implementing an undercover credit card program for the Diversion Control Program.  To date, DEA has approved the program, tested it,

Paul A. Price, Assistant Inspector General                                              Page 7

and issued guidelines.  Seven of DEA's 21 Field Divisions have already received and are using the undercover credit cards.  The remaining divisions are in various stages of processing and having banks issue the undercover cards.  DEA anticipates completing the program's full implementation by December of 2006.


    In summary, DEA has made solid strides in dealing with the ever-changing threat of pharmaceutical diversion, trafficking, and abuse.  DEA continues to identify, target, disrupt, and dismantle individuals, practitioners, and those criminal drug organizations that traffic controlled pharmaceuticals and constitute the greatest threat to the American public.  The major cases cited in the draft review (Operations Cyber Chase, CybeRx, and Gear Grinder) clearly reflect the growing complexity of these cases and the resources needed to execute them, as well as DEA's commitment to combating pharmaceutical diversion.

    Finally, DEA appreciates the OIG's cooperation and the level of commitment it has invested in this review, as well as for its willingness to extend it in recent weeks to consider additional information not previously captured by the OIG review team.


Attachments
    - Action Plan
    - Specific Editorial Comments

Paul A. Price, Assistant Inspector General                                    Page 8

## SPECIFIC EDITORIAL COMMENTS

- On page viii, first paragraph, please insert the Phoenix Field Division and review to read: "…implemented in the Atlanta, Phoenix, Los Angeles, and Miami Field Divisions."  Again, please make the same change on page 25, first full paragraph.

- On pages 7 and 8, please revise to read "The Special Operations Division also responds to requests from the field for intelligence information pertaining to specific web sites as part of its DEA's Online Investigations Project (OIP)."

- Organization chart on Page 6 -- should be caveated that this is a subset of the overall DEA organization chart.  For example, they only mention two offices under the Intelligence Division (NS and EPIC) and there are more offices than the two mentioned

- On Page 31, there is mention of the Houston SAC closing the Ft. Worth office for CyberRX. Please revise to show the Dallas SAC dedicated the entire Ft. Worth office for CybeRx.

- Pages V, 11, and 16 say, "In the FY 2006 budget, the DEA received 41 additional intelligence analyst positions and 23 special agent positions that will be dedicated to diversion control."  DEA received 40 intelligence analysts; the other position is a support position at Special Operations Division.

- At the first use of the term "organization" when referring to disruption and dismantlement, please insert a footnote that reads:
  "Includes CSA registrants, applicants, and organizations."

# DEA ACTION PLAN
## OIG REVIEW OF THE DEA DIVERSION CONTROL PROGRAM
### June 2006

| Recommendation | Action Plan | Projected Completion Date |
|---|---|---|
| 1. Provide diversion investigators with adequate special agent support until the conversion of the DEA diversion investigator position to one with law enforcement authority is fully implemented. | Twenty-three special agent positions are in the process of being allocated to the diversion groups and the Diversion Control Program. The DEA Deputy Administrator will issue a memorandum and worldwide teletype restating that the diversion and trafficking of controlled pharmaceuticals remains a top DEA priority and that Special Agents in Charge are to enhance special agent assistance to criminal diversion investigations. | Within 30 days after the issuance of the final OIG report. |
| 2. Ensure that DEA special agents who frequently assist with diversion investigations attend the week-long diversion training school. | DEA's Office of Training will continue to identify and offer training to all special agents and task force officers who are assigned to DEA's Tactical Diversion Squads, or who assist with diversion investigations, dependent upon funding. The one-week training course will provide students with an in-depth understanding of diversion investigations, focusing on the Controlled Substances Act as it pertains to regulated pharmaceuticals, methods of diversion, pharmacology, addiction and the investigative techniques used in diversion investigations. | Additional special agents and task force officers will be identified and trained during FY 2007. |
| 3. Provide training to intelligence analysts on topics that would effectively support diversion investigations. | DEA's Office of Training will develop a training course for intelligence analysts to ensure their full and effective analytic support to diversion investigations. The Office of Training will conduct an assessment to determine the precise analytic needs of diversion investigators and investigations. The assessment will determine the necessary tasks, standards, analytic skills, knowledge, and abilities that intelligence analysts must possess to support diversion investigations effectively. The assessment will then be used as a baseline to design a course and curriculum for analyst training. | Dependent on funding, the Office of Training will develop, the curriculum by October 1, 2006 and commence training in FY 2007. |
| 4. Update the diversion control training video used in the special agent and intelligence analyst training academies to include current issues such as diversion using the Internet. | DEA's Office of Training is currently in the process of developing a new training video specifically for pharmaceutical diversion. The video, being developed especially for special agents and intelligence analysts, as well as for diversion investigators, will contain the latest information on diversion threats, trends, methods, and techniques. It will also contain specific training material on Internet-based drug trafficking, technical investigative techniques, methodologies, resources, and financial investigations. | The Office of Training anticipates completing the new training video by September 30, 2006. |
| 5. Ensure that diversion investigators receive training in skills necessary for conducting Internet investigations, such as financial investigations. | Dependent on funding, DEA will increase the number of diversion investigators who attend SOD's Internet Telecommunication Exploitation training in FY 2007. In addition, DEA's Office of Training offers courses in financial investigations, asset forfeiture, complex conspiracy, and FinCEN/Gateway training. DEA will increase the number of diversion investigators in these courses as well. The Office of Training will conduct a needs assessment to determine the necessary job tasks/standards as well as the knowledge, skills, and abilities needed for | The Office of Training expects to complete its needs assessment by November 2006. |

| 6. | Fully implement the program to provide undercover credit cards to diversion investigators. | diversion investigators to effectively conduct Internet investigations. As needed, DEA will modify existing courses or develop new ones to meet the needs of diversion investigators. | |
|---|---|---|---|
| | | DEA has made effective progress toward fully implementing an undercover credit card program for the Diversion Control Program. To date, DEA has approved the program, tested it, and issued guidelines. Seven of DEA's 21 Field Divisions have already received and are using the undercover credit cards. The remaining divisions are in various stages of processing and having banks issue the undercover cards. DEA anticipates completing the program's full implementation by December of 2006. | DEA anticipates completing the program's full implementation by December of 2006. |

# APPENDIX IV:  OIG'S ANALYSIS OF DEA'S RESPONSE

On June 9, 2006, the Office of the Inspector General (OIG) sent a copy of the draft report to the Drug Enforcement Administration (DEA) with a request for written comments.  The DEA responded to us in a memorandum dated June 28, 2006.

**DEA Response**

In its response, the DEA disagreed with several of the OIG's conclusions concerning the amount of assistance special agents and intelligence analysts provide to DEA diversion investigations.  Specifically, the DEA expressed concern with the OIG's exclusion of certain G-DEP substance identifiers from the analysis of pharmaceutical diversion investigation work hours.[58]  According to the DEA, this exclusion led to OIG conclusions that were "not fully representative of the pharmaceutical drug threat and DEA's activities."  Also, the DEA disagreed with the OIG conclusion that intelligence analyst assistance to diversion investigations has remained limited.  According to the DEA, intelligence analysts' work hours spent on diversion investigations increased 58 percent from 2003 to 2005.  The DEA also stated that 67 percent of the 60 respondents to an OIG survey reported that intelligence analysts "always or usually provided" a sufficient amount of intelligence support for diversion investigations.  The DEA also stated that the OIG overlooked "ongoing budget shortfalls" that limit the manpower support the DEA is able to provide for the diversion control program.

Although the DEA disagreed with several of the report's conclusions, it concurred with five of the six OIG recommendations.  However, the DEA did not state concurrence or nonconcurrence with the recommendation to "Provide diversion investigators with adequate special agent support until the conversion of the DEA diversion investigator position to one with law enforcement authority is fully implemented," because, in the DEA's opinion, the recommendation was "unnecessary."  Nonetheless, the DEA presented an action plan for addressing that recommendation as well as for the five with which it concurred.  The DEA also offered several minor technical corrections to the report that we incorporated in the final version of the report, as appropriate.

---

[58]  G-DEP is the DEA's case identification system that indicates, among other things, the primary substance involved in an investigation.  There are 51 G-DEP substance identifiers.

### OIG Analysis of the DEA Response

While we believe that the actions undertaken and planned by the DEA to improve its ability to address the growing problem of the diversion of controlled pharmaceuticals are responsive to our recommendations, we address the DEA's specific comments on our conclusions below.

### The OIG's exclusion of 14 G-DEP identifiers from the analysis of pharmaceutical diversion work hours

The DEA stated that the OIG's work hour data analysis based on the G-DEP substance identifiers "is overly restrictive and excludes key data." Specifically, the DEA stated that excluding the work hours charged to investigations denoted by 14 additional G-DEP substance identifiers "renders conclusions that are not fully representative of the pharmaceutical drug threat and DEA's activities." According to the DEA, "for consistency, this review should reflect work hours expended under all relevant G-DEP identifiers just as in the 2002 review." The substances denoted by the 14 additional G-DEP identifiers are methaqualone, GHB/GBL/BD, unspecified analogues, amphetamine/stimulant related chemical, pseudoephedrine, ephedrine, hallucinogen related chemical, iodine/red phosphorous, depressant related chemical, chemical equipment (non-drug specific), depressant (clandestine), other stimulant (clandestine), steroid (clandestine), and "No Specific Drug."

OIG Analysis.  The DEA's assessment of our G-DEP work hour analysis is incorrect.  In its calculations, the DEA inappropriately included work hours for investigations that did not involve pharmaceuticals.  In addition, the DEA incorrectly characterized the work hour analysis contained in our 2002 report. In Appendix II of this report, we list the 29 G-DEP substance identifiers that the DEA stated were related to the diversion of pharmaceuticals and our rationale for excluding 14 of these identifiers that we deemed not to be within the scope of this review.  The 14 excluded G-DEP substance identifiers fall into the following five categories.

First, we excluded 7 of the 14 G-DEP substance identifiers because they are chemicals, not controlled pharmaceuticals.  As noted in the scope statement of this report (page 12), "Our review examined the DEA's enforcement efforts to control pharmaceutical diversion since our October 2002 report through FY 2005. . . . We did not assess the diversion control program's regulatory function and did not examine its enforcement efforts against the diversion of regulated chemicals."  In addition, because this review is a follow-up review to one conducted in 2002, the scope of this review was guided by the scope of the previous review, which also excluded

chemicals and was entitled *Review of the Drug Enforcement Administration's Control of the Diversion of Controlled Pharmaceuticals* (I-2002-010).

Second, we excluded 3 of the remaining 7 G-DEP substance identifiers because they are clandestinely produced substances and therefore cannot be "diverted" in the way we define that term in this report since they were never in the legal distribution chain.

Third, we excluded 2 of the remaining 4 G-DEP substance identifiers because they are ingredients used to make pharmaceuticals and not controlled pharmaceuticals themselves. Ingredients do not represent "diverted pharmaceuticals" because they must be combined with other ingredients in order to become controlled pharmaceuticals.

Fourth, we excluded 1 of the remaining 2 G-DEP substance identifiers because it refers to a Schedule I drug. Schedule I drugs have no legal medical use and therefore are rarely diverted pharmaceuticals.[59] Therefore, the vast majority of work hours spent on this Schedule 1 drug reflects illicit production.

Finally, we excluded hours charged to investigations in which the G-DEP identifier was listed as "No Specific Drug" because we found that most of the hours in this category did not relate to pharmaceuticals. Although we explored the possibility with the DEA of extracting the "No Specific Drug" investigations that pertained specifically to controlled pharmaceuticals and including data about those cases in our analysis, the DEA informed us that this would not be possible without an extensive manual case file review. Further, when DEA personnel conducted a manual review of a small subjective sample of "No Specific Drug" investigations, they found that most of the investigations reviewed did not pertain to controlled pharmaceuticals.

The decision about whether to include hours in the "No Specific Drug" category was critical to reaching the most accurate analysis possible because, of the 29 G-DEP substance identifiers that the DEA said were related to the diversion of pharmaceuticals, the "No Specific Drug" category contained the most hours. In fact, this category accounted for 30 percent of the combined work hours for the 29 G-DEP substance identifiers and 72 percent of the work hours for the 14 G-DEP substance identifiers that we excluded from this review.

---

[59] Small amounts of Schedule 1 drugs may be legitimately produced by manufacturers for research purposes.

To further test the reasonableness of our decision to exclude "No Specific Drug" investigations, we checked the number of work hours diversion investigators charged to this category. We posited that if many "No Specific Drug" investigations were related to diversion, then diversion investigators would have charged a substantial number of hours to this category. We therefore examined the percentage of time that diversion investigators charged to the "No Specific Drug" category out of the total time they charged to the 29 G-DEP substance identifiers that the DEA said were related to the diversion of controlled pharmaceuticals. We found that diversion investigators charged only 0.26 percent of their work hours to the "No Specific Drug" category, while special agents charged 49 percent, task force officers 43 percent, and intelligence analysts 37 percent.

We also examined whether diversion investigator work hours made up a significant share of total hours spent on "No Specific Drug" investigations. We found that in FY 2005, a total of 289,197.5 hours were charged to "No Specific Drug" investigations. Of those hours, only 922 (0.32 percent) were diversion investigator hours, while 203,898 (70.5 percent) were special agent hours, 66,791.5 (23.1 percent) were task force officer hours, and 17,586 (6.1 percent) were intelligence analyst hours. These analyses confirmed that diversion investigators had limited involvement in investigations denoted by the "No Specific Drug" G-DEP substance identifier. Therefore, we concluded from our analysis that including the hours spent on "No Specific Drug" investigations, as the DEA suggested, would improperly inflate the amount of time that the DEA spent investigating the diversion of controlled pharmaceuticals.

In its response, the DEA also stated that "this review should reflect work hours expended under all relevant G-DEP identifiers, just as in the 2002 review." In fact, the OIG's 2002 review did not examine work hours by G-DEP identifier because the DEA told the OIG at the time that it was not possible to provide data on the number of work hours that special agents spent on diversion investigations. Therefore, we used DEA officials' estimate that special agents spent 1 to 3 percent of their time on diversion investigations. In the 2002 report, we also gave the DEA the maximum credit for special agent assistance by using the highest estimate and calculated the total number of work years spent by special agents on controlled pharmaceutical cases by computing 3 percent of all special agent time spent on criminal investigations. That methodology was required because the DEA could not specifically isolate the work hours spent by special agents on investigations involving controlled pharmaceuticals.

Since 2002, the DEA has improved its work hour reporting system and can now better differentiate and report the work hours spent by special agents investigating controlled pharmaceuticals, using more specific G-DEP

substance identifiers. This improvement allowed the OIG to produce a more accurate analysis of the percentage of special agent time spent on pharmaceutical investigations. Given the fact that the DEA has refined its work hour reporting system so that it can identify work hours for specific substances by job series, we used this information in calculating the work hour data.

In sum, we concluded that using all of the 29 G-DEP substance identifiers, as suggested by the DEA, would not accurately assess special agent time spent on pharmaceutical investigations. Thus, we made no changes to the work hour analysis in the report.

**The OIG's exclusion of task force officer work hours from the analysis of pharmaceutical diversion work hours**

The DEA response noted that the OIG's analysis excluded the work hours of state and local officers working on pharmaceutical investigations as a part of DEA task forces. The DEA stated:

> Since the 1970s, these task force officers have been an extension of the DEA agent workforce, and are federally deputized with equal responsibilities and authorities as DEA agents. Most important their activities and investigations are directed by DEA priorities. Therefore, DEA maintains that the investigative work hours that these task force officers spend on criminal diversion investigations should be combined with those of DEA special agents.

OIG Analysis. The OIG recognizes the importance of task force officers to the success of the DEA's mission. During interviews and in responses to our survey, diversion personnel often noted the excellent partnerships they had with officers from state, local, and federal agencies. Although task force officers often play an important role in the DEA's diversion control investigations, the fact that local jurisdictions responded to the increasing diversion of pharmaceuticals by increasing their support of DEA task forces is not a satisfactory substitute for the DEA providing adequate support through its own special agents. The OIG's review focused on DEA resources allocated to control the diversion of pharmaceuticals.

In addition, because this was a follow-up review, we focused on the current status of the issues we identified in our 2002 review. In that review, the work hour data analysis focused exclusively on DEA special agents and the assistance of task force officers was mentioned only in the context of diversion investigators relying on state, local, and federal agents because of the lack of DEA special agent assistance.

**The OIG's statement that intelligence analyst assistance to diversion investigations has remained limited**

The DEA response stated that while the OIG report states that intelligence analyst support has remained limited, its own analysis "shows that intelligence analyst work hours on diversion investigations increased 58 percent from 25,603 hours in 2003 to 40,517 hours in 2005." The DEA also presented its own analysis of the OIG's diversion group supervisor survey. Finally, the DEA noted that it is "continuing to expand its intelligence support to diversion investigations and is in the process of allocating 41 new intelligence analysts to support the Diversion Control Program."[60]

OIG Analysis. The DEA made two arguments to support its contention that our conclusion concerning limited intelligence analyst support to diversion investigations was not accurate. First, the DEA's statement that intelligence analyst work hours on diversion investigations increased 58 percent is based on the work hours expended on all 29 G-DEP substance identifiers that the DEA stated are related to pharmaceutical investigations, including the "No Specific Drug" category. As we discussed previously, it is inaccurate to include these substances, particularly the "No Specific Drug" category. The "No Specific Drug" category contains 37 percent of all the intelligence analyst work hours that the DEA stated were related to pharmaceutical investigations. Once these hours are excluded, the increase in work hours is shown to be much more modest, as we describe in the report on page 36.

Further, that modest increase appears to be mostly attributable to a few specific operations rather than an across-the-board increase. We found that in FY 2005, 44 percent of intelligence analyst time was charged to four specific operations (page 38). While this indicates that some pharmaceutical investigations are receiving significant amounts of intelligence support, it does not establish that intelligence analyst assistance is generally and consistently available to diversion investigators. Moreover, our data analysis, interviews, and survey responses showed that overall intelligence analyst support in the field is limited.

Second, the DEA presented its own analysis of the results of our diversion group supervisor survey that obscures important information, and we do not agree with the DEA's characterization of the survey data. For example, the DEA stated that 67 percent of the respondents reported that

---

[60] In its FY 2006 appropriations (H.R. Rep. No. 109-118, June 10, 2005), the DEA was appropriated funds for 41 positions to improve intelligence analysis supporting diversion investigations. The DEA was allocated 40 of these positions for intelligence analysts and 1 as a support position.

intelligence analysts *always* or *usually* provide a sufficient amount of intelligence support for diversion investigations.  However, the survey results showed that more than double the number of respondents reported that DEA intelligence analysts *never* provide sufficient support than said DEA intelligence analysts *always* provide sufficient support.  In fact, one-third of respondents stated that they never receive sufficient intelligence support.  The actual survey question and results are shown below.

| Number of respondents | Percentage of respondents | **Which of the following best describes the amount of intelligence support that your group receives from DEA intelligence analysts in the field?** |
|---|---|---|
| 9 | 14.5 | DEA intelligence analysts *always* provide a sufficient amount of intelligence support for diversion investigations. |
| 32 | 51.6 | DEA intelligence analysts *usually* provide a sufficient amount of intelligence support for diversion investigations. |
| 20 | 32.3 | DEA intelligence analysts *never* provide a sufficient amount of intelligence support for diversion investigations. |

Similarly, the DEA stated that 72 percent of survey respondents were *very satisfied* or *somewhat satisfied* with the intelligence support received, as shown in the table below.  The survey results showed that 27 percent of respondents were *not at all satisfied* with the intelligence that their group received from intelligence analysts.  Further, in our opinion, having an additional 45 percent of diversion group supervisors report that they are only *somewhat satisfied* leaves considerable room for the DEA to improve intelligence analyst support to diversion investigations. The survey question and its results are shown below.

| Number of respondents | Percentage of respondents | **How satisfied are you with the intelligence support that your group has received from the intelligence group in your office?** |
|---|---|---|
| 17 | 27.4 | Very satisfied |
| 28 | 45.2 | Somewhat satisfied |
| 17 | 27.4 | Not at all satisfied |

Moreover, although omitted from the DEA's response to our report, 17.7 percent of respondents to our survey reported that the availability of intelligence support *often* causes delays in investigations, and 37.1 percent reported that the availability of intelligence support *sometimes* causes delays in investigations.  This further reinforces our conclusion that the DEA's limited support of pharmaceutical investigations is negatively affecting these investigations.  The survey question and its results are shown below.

| Number of respondents | Percentage of respondents | **Which of the following best describes the availability of intelligence support that your group receives from DEA intelligence analysts in the field?** |
|---|---|---|
| 23 | 37.1 | The availability of DEA intelligence support allows diversion investigations to continue without delay. |
| 23 | 37.1 | The availability of DEA intelligence support *sometimes* causes delays in diversion investigations. |
| 11 | 17.7 | The availability of DEA intelligence support *often* delays diversion investigations. |

The DEA also stated that "75 percent of respondents reported receiving intelligence for specific investigations when requested." This misrepresents the data in our survey. The question that the DEA refers to was intended to capture the type of intelligence support provided, not the frequency. The question asks what type of intelligence assistance the respondent received – not whether they received assistance when they needed it. The responses to this question indicate that it is far more common for diversion investigators to receive intelligence support when they specifically request it than for them to receive proactive intelligence support on specific potential targets of investigation or trends in diversion. We found that only 22.6 percent of respondents received intelligence on specific investigative targets, and 32.3 percent received intelligence on trends in diversion, as shown in the table below. The survey question and its results are shown below.

| Number of respondents | Percentage of respondents | **Which of the following statements represent the types of DEA intelligence that your group receives from DEA headquarters or from the field?** |
|---|---|---|
| 44 | 71 | My group receives intelligence for specific investigations when we request it. |
| 14 | 22.6 | My group receives intelligence regarding specific diversion targets to consider for investigation. |
| 20 | 32.3 | My group receives strategic intelligence regarding general trends in diversion. |

Moreover, while the DEA and the OIG interpreted the survey results differently, we also used other evidence from site visit interviews, DEA threat assessments, and work hour data to conclude that intelligence analyst assistance remains limited, as it was at the time of our 2002 review.

Finally, the DEA stated that it is continuing to expand its intelligence support to diversion investigators and is in the process of allocating 40 new intelligence analysts to support the diversion control program. While we agree that such a measure will be helpful, the OIG could not assess the full

impact of these positions on intelligence support because, as of the end of our field work, the DEA had not yet begun to fill the positions.

**The OIG overlooked DEA budget shortfalls that limit support for the diversion control program**

The DEA's response also stated that the OIG overlooked "ongoing budget shortfalls" that limit the manpower support the DEA is able to provide for the diversion control program.  The OIG recognizes that the DEA, like other Department components, is faced with budget constraints that require prioritization of limited resources.  In conducting our evaluations, the OIG attempts to assess whether the agency's response is in proportion to the scope of the problem and identifies areas where the response could be improved.

Yet, we believe the dramatic growth in pharmaceutical diversion requires the DEA to consider rebalancing its priorities.  As we state in our report on page 2, the abuse of controlled pharmaceuticals can be as dangerous as the abuse of illicit drugs.  Both can result in addiction, overdoses, and deaths.  Two recent reports show the continuing increase in the diversion of controlled pharmaceuticals.  According to a report released by the National Center on Addiction and Substance Abuse at Columbia University (CASA) in June 2006, "The extensive availability of controlled prescription drugs online poses a silent menace to our nation's health and a challenge for law enforcement."  The CASA report also documents the increase in web sites selling controlled pharmaceuticals without requiring prescriptions between 2004 and 2005 and again between 2005 and 2006.  In addition, a May 2006 study by the Partnership for a Drug Free America reported that nearly one in five (19 percent or 4.5 million) teens has used prescription pain relievers or stimulants non-medically and that the widespread availability and easy access of these substances has driven their popularity among teens.  Additionally, the CASA report states, "Today more adults and teens report abusing these drugs [controlled pharmaceuticals] than the number abusing all illicit drugs combined except marijuana."

The DEA's efforts are critical to controlling the diversion of pharmaceuticals, and undertaking criminal investigations of diverters is critical to the effectiveness of these efforts.  The recommendations in our report are intended to help the DEA improve its ability to address the growing problem of controlled pharmaceutical diversion, given the limited resources available to it.

The following section addresses the DEA's responses to the specific recommendations in the report.

## RECOMMENDATIONS

**Recommendation 1:**  Provide diversion investigators with adequate special agent support until the conversion of the DEA diversion investigator position to one with law enforcement authority is fully implemented.

Summary of DEA Response.  The DEA did not state concurrence or nonconcurrence with this recommendation.  The DEA asserted that "this recommendation is unnecessary and its objective – 'to provide adequate special agent support' is ambiguous."  Further, the DEA stated that it has "provided 'adequate' special agent support to diversion investigations."  The DEA also wrote, "Another concern is the OIG reports' [sic] misrepresentation of the August 2001 directive by DEA's Chief of Operations.  DEA's Chief of Operations issued this memorandum instructing Special Agents in Charge to place two special agents in each diversion group in each Division office."  According to the DEA, this instruction "was overtaken by a 2003 decision to instead convert diversion investigators to a series with law enforcement authority."

Although the DEA neither concurred nor nonconcurred with this recommendation, the DEA reported that it is planning to allocate 23 additional special agents to support diversion groups and the diversion control program.  In addition, the DEA response said that within 30 days after the issuance of this report, the DEA Administrator will issue a memorandum and worldwide teletype restating that diversion and trafficking of controlled pharmaceuticals, including Internet trafficking, remain a top DEA priority and that Special Agents in Charge are to enhance special agent assistance to criminal diversion investigations.

OIG Analysis.  Recommendation 1 is resolved – open.  The actions planned by the DEA are responsive to the recommendation.  Please provide a copy of the teletype, a description of how the 23 additional special agents will be deployed to support diversion groups, and a description of how Special Agents in Charge have enhanced assistance to criminal diversion investigations in each field division by October 31, 2006.

However, although we accept the DEA's planned actions to address this recommendation, we disagree with several of the statements included in the DEA's response.  We address each of these statements below.

The DEA stated that it has "provided adequate special agent support to diversion investigations."  However, as this report shows, we believe the DEA should do more to ensure that diversion investigators have adequate special agent support.  Diversion investigators still do not have law enforcement authority and continue to rely on special agent support to

conduct critical tasks in criminal diversion investigations.  In 2002, DEA personnel estimated that special agents spent at most 3 percent of their time assisting with diversion investigations. Although diversion of pharmaceuticals has increased dramatically since that time, in our current review the percentage of special agent time dedicated to pharmaceutical diversion investigations was at most 2.2 percent.  Further, we were told during field interviews that diversion investigators' lack of law enforcement authority, coupled with inconsistent levels of special agent support, impeded diversion investigators' criminal pharmaceutical investigations. Moreover, our review of the DEA's 2004 Pharmaceutical Threat Assessments and our survey results supported the field interviews.  And although the DEA has proposed converting the diversion investigator position to one with law enforcement authority, this proposed conversion has not yet occurred.

We also disagree with the DEA's statement that the OIG misrepresented an August 2001 directive by DEA's Chief of Operations.  In the memorandum in question, the DEA's Chief of Operations instructed Special Agents in Charge to place two special agents in each diversion group in each Division office to better support diversion investigations.  According to the DEA, this instruction was overtaken by a 2003 decision to instead convert diversion investigators to a job series with law enforcement authority.  However, the DEA presented no documentation showing that the directive had been overtaken or rescinded.  In fact, the DEA reaffirmed the 2001 Chief of Operations' directive by using it as evidence in a DEA 2003 memorandum to the Department requesting conversion of the diversion investigator position.[61]  In addition, this explanation that the memorandum was overtaken by the 2003 decision to convert diversion investigators contradicts the DEA's previous written statements to us, in February 2006, in which it said that the terrorist attacks of September 11, 2001, had prevented the DEA from implementing the 2001 Chief of Operations' directive.

In conclusion, although the DEA states that it believes this recommendation to be "unnecessary," several sources of evidence (such as site visit interviews, analysis of survey responses, review of the DEA 2004 Pharmaceutical Threat Assessments, and special agent work hour data) showed that for many diversion investigators, inadequate special agent support, coupled with their own lack of law enforcement authority, remains a serious concern.  In our report (beginning on page 16), we note many positive steps that the DEA has taken to improve its pharmaceutical

---

[61]  The 2003 memorandum briefly outlined the history of the diversion investigator position and stated that the 2001 directive reaffirmed previously described constraints on the diversion investigator position in order to clarify the duties and responsibilities to the diversion investigator workforce.

diversion control program.  However, contrary to the DEA's claim that this recommendation is unnecessary, it is needed to ensure that the DEA consistently, sufficiently, and timely supports diversion investigations.

**Recommendation 2:**  Ensure that DEA special agents who frequently assist with diversion investigations attend the week-long diversion training school.

<u>Summary of DEA Response</u>.  The DEA concurred with the recommendation and will continue to identify and offer training to all special agents and task force officers who are assigned to Tactical Diversion Squads or who assist with diversion investigations.  The DEA stated that, dependent upon funding, special agents and task force officers will be identified and will attend the 1-week diversion course during FY 2007.

<u>OIG Analysis</u>.  Recommendation 2 is resolved – open.  The actions planned by the DEA are responsive to the recommendation.

Please provide your target number and timeline for the special agents and task force officers who are assigned to Tactical Diversion Squads or who assist with diversion investigations to attend the 1-week course.  Please explain how special agents and task force officers will be identified and prioritized for this training, and submit the number of special agents by field office that are expected to attend the course during FY 2007.  In addition, please indicate whether any of the agents currently assigned full time to diversion groups, Tactical Diversion Squads, or other diversion task forces are not expected to attend the 1-week course during FY 2007.  Please provide an alternative plan to address this recommendation by October 31, 2006, if the DEA anticipates funding or other constraints will prevent special agents and task force officers assigned to Tactical Diversion Squads or assisting with diversion investigations from attending the 1-week course during FY 2007.

**Recommendation 3:**  Provide training to intelligence analysts on topics that would effectively support diversion investigations.

<u>Summary of DEA Response</u>.  The DEA concurred with the recommendation and said it will conduct an assessment to determine the precise analytic needs of diversion investigators and investigations, which will then be used as a baseline to design a course and curriculum for intelligence analyst training.

<u>OIG Analysis</u>.  Recommendation 3 is resolved – open.  The actions planned by the DEA are responsive to the recommendation.  However, the DEA noted that development of the curriculum and commencement of the

training are dependent on funding.  If the curriculum is developed and the training commences, please provide us with a report on the findings of the assessment, a copy of the new curriculum, and the schedule of intelligence analyst diversion courses planned for FY 2007 by October 31, 2006.  If funding or other constraints prevent the DEA from developing the curriculum and conducting courses in FY 2007, please provide an alternative plan to address this recommendation by October 31, 2006.

**Recommendation 4:**  Update the diversion control training video used in the special agent and intelligence analyst training academies to include current issues such as diversion using the Internet.

Summary of DEA Response.  The DEA concurred with the recommendation and said it is currently in the process of developing a new training video specifically for pharmaceutical diversion, which it expects to complete by September 30, 2006.

OIG Analysis.  Recommendation 4 is resolved – open.  The action planned by the DEA is responsive to the recommendation.  Please provide a copy of the new video by October 31, 2006.

**Recommendation 5:**  Ensure that diversion investigators receive training in skills necessary for conducting Internet investigations, such as financial investigations.

Summary of DEA Response.  The DEA concurred with the recommendation and said it will conduct a needs assessment to determine the knowledge, skills, and abilities necessary for diversion investigators to effectively conduct Internet investigations by November 2006; increase the number of diversion investigators who attend the DEA Special Operations Division's Internet Telecommunications Exploitation Training (ITEP) school in FY 2007; increase the number of diversion investigators who attend the DEA's financial investigations, asset forfeiture, complex conspiracy, and FinCEN/Gateway courses; and modify existing courses or develop new ones to meet the needs of diversion investigators.

OIG Analysis.  Recommendation 5 is resolved – open.  The actions planned by the DEA are responsive to our recommendation.  However, the DEA noted that increasing the number of diversion investigators attending the ITEP course is dependent on funding.  Please provide us with the status of the needs assessment, an FY 2007 schedule showing the planned number of sessions of each course listed in your response as relevant to Internet diversion investigations, and the number of diversion investigators expected to attend each course during FY 2007 by October 31, 2006.  If funding or other constraints prevent the DEA from taking these actions,

please provide an alternative plan to address this recommendation by October 31, 2006.

**Recommendation 6:**  Fully implement the program to provide undercover credit cards to diversion investigators.

Summary of DEA Response.  The DEA concurred with the recommendation and said it has approved the program, tested it, and issued guidelines.  The DEA reported that 7 of its 21 field divisions have received the undercover credit cards and that the remaining divisions are in various stages of processing and having banks issue the undercover cards.  The DEA anticipates that the program will be completely implemented by December 2006.

OIG Analysis.  Recommendation 6 is resolved – open.  The actions planned by the DEA are responsive to the recommendation.  Please provide a status report on the implementation by October 31, 2006.