# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>    Plaintiff<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>    Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>    Defendants. | Civil Action No. 3:17-01665<br>Hon David A. Faber |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION TO TAKE JUDICIAL NOTICE**

Under Federal Rule of Evidence 201, judicial notice is permitted of facts which are matters of public record if not subject to reasonable dispute because they are either: (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to "sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. The rule also provides that a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

1

Courts, including the Fourth Circuit, this court and those throughout the circuit, take judicial notice of relevant facts in various forms. *See, e.g.,* ; *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (noting that the district court "in dismissing the Attorney General … took judicial notice of the Attorney General's Web site"); *Sabika, Inc. v. Goshen Sparkling Jewelry, LLC,* No. CV 1:13-00848, 2013 WL 12180994, at *4 n.3 (S.D.W. Va. July 12, 2013) (taking judicial notice of Defendant's Articles of Organization because they are "certified public records" kept by the West Virginia Secretary of State); *comScore, Inc. v. Integral Ad Sci., Inc.*, 924 F. Supp. 2d 677, 690 n.15, 691 (E.D. Va. 2013) (taking judicial notice of statistical information made available from Administrative Office of United States Courts and the United States Patent and Trademark Office); *Ohio Valley Envtl. Coal., Inc. v. Fola Coal Co.*, CA No. 2:12-3750, 2013 WL 6709957 (S.D. W. Va. Dec. 19, 2013) (taking judicial notice of information found on the website of the West Virginia Secretary of State); *Geddie v. McMillian*, CA No. 9:12-828- JLW-BM, 2012 WL 1566008, at *2 (D.S.C. Apr. 12, 2012), report and recommendation adopted, 2012 WL 1565712 (D.S.C. May 2, 2012) (taking judicial notice of information contained in records posted on a local clerk of court's website).

With the above in mind, and the other jurisprudence set forth herein, Plaintiffs submit that the following materials should be judicially noticed.

## Federal Register Publications

The Federal Register is the official daily publication for Federal government rules, proposed rules, and notices, as well as executive orders and other Presidential documents. The Federal Register Act requires the contents of the Federal Register to be judicially noticed. 4 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of citation, may be cited by volume and page number."). Courts routinely do so.

*See e.g., Golding v. United States,* 219 F.2d 109, 110 (4th Cir. 1955) ("It is clear, however, that the court could take judicial notice of these regulations[,] in the Federal Register."); *Longo v. Seminole Indian Casino-Immokalee*, 813 F.3d 1348, 1349 n.2 (11th Cir. 2016) ("We take judicial notice of documents published in the Federal Register.") (citing 44 U.S.C. § 1507); *Bayview Hunters Point Comm. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 702 n.5 (9th Cir.2004); *Coupe v. Federal Express Corp.*, 121 F.3d 1022, 1026 n.3 (6th Cir. 1997) (noting that because Federal Aviation Administration rule was in the Federal Register "we can and do take judicial notice of it"); *Crimm v. Missouri Pac. R.R. Co.*, 750 F.2d 703, 710 n.3 (8th Cir.1984); *Wei v. Robinson*, 246 F.2d 739, 743 (7th Cir.1957) (Code of Federal Regulations and the Federal Register are required to be judicially noticed). The following Federal Register publications are relevant to the instant matter, and Plaintiffs hereby request the Court to take judicial notice of same.

- ***Novelty Distributors, Inc., Revocation of Registration*, 73 Fed. Reg. 52689 (Drug Enf't Admin. Sept. 10, 2008).[1]**

On September 10, 2008, the DEA published in the Federal Register its revocation of the DEA Certificate of Registration for drug distributor Novelty Distributors, Inc. *See* 73 Fed. Reg. 52689. This publication states, in part, that: "Fundamental to its obligation to maintain effective controls against diversion, a distributor must review every order and identify suspicious transactions. Further, it must do so prior to shipping the products. Indeed, a distributor has an affirmative duty to forgo a transaction if, upon investigation, it is unable to determine that the proposed transaction is for legitimate purposes." *Id*. at 52699. This publication provides notice of the DEA's interpretation and enforcement of CSA requirements regarding, among other things, identifying suspicious orders and actions to take relative to shipping/not shipping.

---

[1] Ex. 1. Available at: https://www.federalregister.gov/documents/2008/09/10/E8-21035/novelty-distributors-inc-revocation-of-registration

- *Interim Final Rule with Requests for Comments - Implementation of the Ryan Haight Online Pharmacy Consumer Protection Act of 2008*, **74 Fed. Reg. 15596 (Dep't of Just. Apr. 6, 2009).**[2]

On April 6, 2009, the U.S. Department of Justice ("DOJ") published in the Federal Register an interim final rule titled *Implementation of the Ryan Haight Online Pharmacy Consumer Protection Act of 2008*. *See* 74 Fed. Reg. 15596. "The Ryan Haight Online Pharmacy Consumer Protection Act, which was enacted on October 15, 2008, amended the Controlled Substances Act and Controlled Substances Import and Export Act by adding several new provisions to prevent the illegal distribution and dispensing of controlled substances by means of the Internet." *Id*. "This document serves three purposes: (1) To explain the new legislation; (2) to announce the amendments to the DEA regulations that implement the new legislation; and (3) to request comments on the amendments to the regulations, which are being issued as an interim rule as contemplated in the legislation." *Id*. Among other things, this publication states that "[t]he unlawful use of pharmaceutical controlled substances has reached alarming levels in the United States in recent years, causing a substantial detrimental effect on the public health and safety[,]" and "[w]ith specific regard to pain relievers, 5.2 million respondents reported abusing these drugs, which is an 18 percent increase from 2004[,]" and "[a]mong persons aged 12 and older who reported using illicit drugs for the first time in 2007, abuse of pain relievers was the most common category of first-time illicit drug use." *Id*. at 15597 (citations omitted).

- *Notice of Proposed Rulemaking - Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products From Schedule III to Schedule II*, **79 Fed. Reg. 11037 (Dep't of Just. Feb. 27, 2014).**[3]

---

[2] Ex. 2. Available at: https://www.federalregister.gov/documents/2009/04/06/E9-7698/implementation-of-the-ryan-haight-online-pharmacy-consumer-protection-act-of-2008

[3] Ex. 3. Available at: https://www.federalregister.gov/documents/2014/02/27/2014-04333/schedules-of-controlled-substances-rescheduling-of-hydrocodone-combination-products-from-schedule

On February 27, 2014, the DOJ published in the Federal Register a proposed rule titled *Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products From Schedule III to Schedule II*. *See* 79 Fed. Reg. 11037.  The publication states that the DEA "proposes to reschedule hydrocodone combination products from [the less regulated] schedule III to [the more regulated] schedule II of the Controlled Substances Act." *Id*.  Schedule II drugs include the opioids oxycodone, oxymorphone, fentanyl, methadone, and tapentadol.  Among other things, this publication states that the Department of Health and Human Services analyzed hydrocodone combination products ("HCPs") and found "that individuals are taking HCPs in amounts sufficient to create a hazard to their health or to the safety of other individuals or to the community; that there is significant diversion of HCPs; and that individuals are taking HCPs on their own initiative rather than on the basis of medical advice from a practitioner licensed by law to administer such drugs." *Id*. at 11040.

- *Final Rule - Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products From Schedule III to Schedule II*, **79 Fed. Reg. 49661 (Dep't of Just. Aug. 22, 2014).**[4]

On August 22, 2014, the DOJ published in the Federal Register the *Final Rule - Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products From Schedule III to Schedule II*.  *See* 79 Fed. Reg. 49661.  "With the issuance of this final rule, the Administrator of the Drug Enforcement Administration reschedules hydrocodone combination products from schedule III to schedule II of the Controlled Substances Act." *Id*.  This publication also includes the comments and objections received following the February 27, 2014 proposed rulemaking relative to same.  *Id*. at 49663.  "Based on consideration of all comments, the scientific and medical

---

[4] Ex. 4.  Available at: https://www.federalregister.gov/documents/2014/08/22/2014-19922/schedules-of-controlled-substances-rescheduling-of-hydrocodone-combination-products-from-schedule

evaluation and accompanying recommendation of the HHS, and based on the DEA's consideration of its own eight-factor analysis, the DEA finds that these facts and all other relevant data constitute substantial evidence of potential for abuse of HCPs. As such, the DEA is rescheduling HCPs as a schedule II controlled substance under the CSA." *Id*. at 49680. The effective date of Final Rule was set at October 6, 2014 because "[a]fter careful consideration of the risk to the U.S. public health and safety related to the diversion and abuse of HCPs, the DEA believes the 45-day effective date is reasonable." *Id*. at 49676.

- ***Notice of Proposed Rulemaking - Suspicious Orders of Controlled Substances*, 85 Fed. Reg. 69282 (Dep't of Just. Nov. 2, 2020).[5]**

On November 2, 2020, the DOJ published in the Federal Register a proposed rule titled *Suspicious Orders of Controlled Substances*. *See* 85 Fed. Reg. 69282. The publication states that the DEA "is proposing to revise its regulations relating to suspicious orders of controlled substances, in order to implement the Preventing Drug Diversion Act of 2018 (PDDA) and to clarify the procedures a registrant must follow for orders received under suspicious circumstances (ORUSCs)." *Id*. This publication in the Federal Register states that "identifying and reporting suspicious orders of controlled substances (and refusing to distribute based on such orders), has always been, and remains, the responsibility of the DEA registrant." *Id*. at 69283.

Aside from the background relevance outlined above, "publication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." *Camp v. U.S. BLM*, 183 F.3d 1141, 1145 (9th Cir.1999). *See also, United States v. Southern Union Co.*, 630 F.3d 17, 31 (1st Cir. 2010) ("[T]hose who manage companies in highly regulated industries are not unsophisticated . . . It is part of [a company's]

---

[5] Ex. 5. Available at: https://www.federalregister.gov/documents/2020/11/02/2020-21302/suspicious-orders-of-controlled-substances

6

business to keep abreast of government regulation."); *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.") (citations omitted).  As such, judicial notice of the above Federal Register publications is also warranted to show that Defendants, who are interested and affected distributors, had at least constructive notice of the matters set forth therein.

### Census Data

Courts take judicial notice of census data and related information published online by the Census Bureau and other governmental agencies. *Philips v. Pitt Cnty Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("we may properly take judicial notice of matters of public record") (noting it was proper to take judicial notice of "'publicly available [statistics] on the official redistricting website of the Virginia Division of Legislative Services'") (quoting *Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004)); *Wilson v. Ill. Cent. R.R.*, No. 09 C 7392, 2012 WL 135446, at *3 (N.D. Ill. Jan. 12, 2012) (taking judicial notice of demographic information published online by the Census Bureau, such as "the racial breakdown for the Memphis metropolitan area population"); *see J&J Sports Prods., Inc. v. Cal City Post No. 476*, No. 1:10-cv-00762 AWI JLT, 2011 WL 2946178, at *8 n.5 (E.D. Cal. July 21, 2011) (taking judicial notice of city populations obtained from "the Internet website for the United States Census Bureau"); *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 721 (N.D. Tex. 2009) (taking "judicial notice of [a] Census Bureau's February 2009 publication" located on the website www.census.gov).  The following court government publications of census data are relevant to the instant matter, and Plaintiffs hereby request the Court to take judicial notice of same.

- **U.S. Census Bureau** *Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2019.*[6]

In December 2019, the U.S. Census Bureau ("Bureau") released its table of population statistics of each U.S. State and Puerto Rico for each of the prior ten years (2010 – 2019). *Id*. The Bureau currently maintains this publication on its website. *Id*. Moreover, various evidentiary matters (including the opinions of numerous experts) involve population statistics and state-to-state comparisons. Although Plaintiffs believe that the population statistics have been sufficiently proven, this request is being made and this information is being provided out of an abundance of caution and/or for use or reference by the Court.

- **U.S. Census Bureau** *West Virginia: 2010 Census of Population and Housing Unit Counts.*[7]

In September 2012, the Bureau issued the *West Virginia: 2010 Census of Population and Housing Unit Counts*, providing population of West Virginia as well as the populations for each county, city, and town in West Virginia as of 2010. *Id*. This publication also includes population statistics of West Virginia as well as each county, city, and town in West Virginia for the years 1990 and 2000. *Id*. at 6, 10-22, 24-35. The Bureau currently maintains this publication on its website. *Id*. Further, various evidentiary matters (including the opinions of numerous experts) involve population statistics for Cabell County, the City of Huntington, and other West Virginia municipalities. Although Plaintiffs believe that the population statistics have been sufficiently proven, this request is being made and this information is being provided out of an abundance of caution and/or for use or reference by the Court.

---

[6] Ex. 6. Available at: https://www.census.gov/data/tables/time-series/demo/popest/2010s-state-total.html#par_textimage_1574439295

[7] Ex. 7. Available at: https://www.census.gov/prod/cen2010/cph-2-50.pdf

**Executive and Government Agency Publications and Press Releases**

"This court and numerous others routinely take judicial notice of information contained on state and federal government websites." *United States v. Garcia*, 855 F.3d 615, 621-22 (4th Cir. 2017) (citing *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004); *Garling v. U.S. Envtl. Prot. Agency*, 849 F.3d 1289, 1297 n.4 (10th Cir. 2017); *Swindol v. Aurora Flight Sci. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015)). "[I]t is well-established that executive and agency determinations are subject to judicial notice." *Fornalik v. Perryman*, 223 F.3d 523, 529 (7th Cir. 2000). *See also*, *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 959 (9th Cir. 2013) (taking judicial notice of several California Division of Labor Standards Enforcement opinion letters); *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 545 F. Supp. 2d 845, 847 (E.D. Ark. 2008), aff'd, 559 F.3d 772 (8th Cir. 2009) (taking judicial notice of U.S. Securities and Exchange Commission releases and publications); *Louis v. McCormick & Schmick Rest. Corp.*, 460 F. Supp. 2d 1153, 1155 n.4 (C.D. Cal. 2006) (taking judicial notice of opinion letters issued by federal and state regulatory agencies); *United States v. Holmes*, 414 F. Supp. 831, 839 (D. Md. 1976) (taking judicial notice of a Presidential Proclamation). The following declarations, releases and publications are relevant to the instant matter, and Plaintiffs hereby request the Court to take judicial notice of same.

- **January 2001 U.S. Department of Justice, Information Bulletin Warning: *Oxycontin Diversion and Abuse*.[8]**

In January 2001, the U.S. Department of Justice issued a warning bulletin titled "Oxycontin Diversion and Abuse". *Id*. This bulletin notifies the public of various issues with Oxycontin, including that "Diversion and abuse of the prescription pain reliever OxyContin is a major problem, particularly in the eastern United States. The Drug Enforcement Administration (DEA)

---

[8] Ex. 8.  Available at: https://www.justice.gov/archive/ndic/pubs/651/overview.htm#Top

reports that, in the United States, oxycodone products, including OxyContin, are frequently abused pharmaceuticals. The pharmacological effects of OxyContin make it a suitable substitute for heroin; therefore, it is attractive to the same abuser population." *Id*. This publication is still maintained on the U.S. Department of Justice website. *Id*.

- **April 18, 2011 DEA Press Release:** *Michigan Based Pharmaceutical Wholesaler Harvard Drug Group To Pay U.S. $8,000,000 In Settlement.*[9]

On April 18, 2011, the DEA issued a press release titled "Michigan Based Pharmaceutical Wholesaler Harvard Drug Group To Pay U.S. $8,000,000 In Settlement". *Id*. at 1. This press release notifies the public that the settlement "resolves allegations that Harvard violated the Controlled Substances [Act] (CSA)", and that "Harvard is alleged to have violated the CSA by failing to have in place an effective system designed to identify suspicious orders of controlled substances, and to report suspicious orders of those substances to the DEA." *Id*. The press release also states that "[t]he CSA requires distributors of pharmaceuticals, such as Harvard, to have in place systems that reliably identify suspicious orders - for example, those of unusual size, those that are unusually frequent, or those that substantially deviate from a normal pattern - of controlled substances. In this case, a DEA investigation revealed that between March, 2009 and May, 2010, Harvard had received over 1,000 suspicious orders for Schedule II narcotics - primarily oxycodone - that should have triggered further investigation by the company and reporting to the DEA." *Id*. The DEA still maintains this publication on its website. *Id*.

---

[9] Ex. 9. Available at: https://www.dea.gov/press-releases/2011/04/18/michigan-based-pharmaceutical-wholesaler-harvard-drug-group-pay-us

- **June 10, 2011 DEA Press Release:** *Cincinnati Pharmaceutical Supplier's DEA License Suspended.*[10]

On June 10, 2011, the DEA issued a press release titled "Cincinnati Pharmaceutical Supplier's DEA License Suspended". *Id*. at 1. This press release notifies the public that the DEA "announced today the immediate suspension of the federal controlled substance Registration of Keysource Medical, a wholesale supplier of pharmaceuticals." *Id*. The press release also states that "[p]harmaceutical companies have a responsibility to ensure that the drugs they sell don't end up in the hands of drug traffickers or businesses that are conducting their business illegally, [and that] "[p]rescription drug abuse in Florida, southern Ohio and northern Kentucky has risen to epidemic proportions, and Keysource Medical, should have known based on the large, frequent quantities, that their customers were diverting oxycodone into arenas that were not legitimate." *Id*. The DEA still maintains this publication on its website. *Id*.

- **February 20, 2013 Centers for Disease Control and Prevention Press Release:** *Opioids drive continued increase in overdose deaths.*[11]

On February 20, 2013, the Centers for Disease Control and Prevention ("CDC") issued a press release titled "Opioids drive continued increase in overdose deaths". This press release notifies the public of various issues and statistics involving opioids, including that "[i]n 2010, nearly 60 percent of the drug overdose deaths (22,134) involved pharmaceutical drugs. Opioid analgesics, such as oxycodone, hydrocodone, and methadone, were involved in about 3 of every 4 pharmaceutical overdose deaths (16,651), confirming the predominant role opioid analgesics play in drug overdose deaths." *Id*. The CDC currently maintains this publication on its website. *Id*.

---

[10] Ex. 10. Available at: https://www.dea.gov/press-releases/2011/06/10/cincinnati-pharmaceutical-suppliers-dea-license-suspended

[11] Ex. 11. Available at: https://www.cdc.gov/media/releases/2013/p0220_drug_overdose_deaths.html

- **October 26, 2017 U.S. Dept. of Health and Human Services Opioid Public Health Emergency Declaration.**[12]

On October 26, 2017, the United States Department of Health and Human Services Department ("DHH") acting under section 319 of the Public Health Service Act declared that as "a result of the consequences of the opioid crisis affecting our Nation . . . a public health emergency exists nationwide." *Id*. DHH currently maintains this declaration on its website. *Id*.

### Government Reports

Courts may take judicial notice of records and reports of administrative bodies. *City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155, 171–72 (4th Cir. 2002) (taking judicial notice of a fishery management plan prepared by a federal agency). *See also Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012). *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008) (judicial notice taken of a Department of Energy report, reasoning that "[j]udicial notice is appropriate for records and reports of administrative bodies"); *Youdon v. Bd. of Immigration Appeals*, No. 06-2525-ag (NAC), 2006 WL 3219278, at *2-3 (2d Cir. Nov. 6, 2006) (judicial notice taken of State Department Report on Human Rights Practices for China). The following government reports and publications are relevant to the instant matter, and Plaintiffs hereby request the Court to take judicial notice of same.

- **October 1998 Report to the U.S. Attorney General [Janet Reno] by DOJ DEA Office of Diversion Control Suspicious Orders Task Force ("Reno Report").**[13]

The Suspicious Orders Task Force was formed by charter on September 3, 1997, and it implemented the mandate contained in Section 504 of the Comprehensive Methamphetamine

---

[12] Ex. 12. Available at:
https://www.phe.gov/emergency/news/healthactions/phe/Pages/opioids.aspx

[13] Ex. 13. As the PDF version of this exhibit contains additional cover pages, the references herein to page numbers of the Reno Report are all to the PDF page numbers.

Control Act (MCA) of 1996.[14]  *Id*.  "The charter required the establishment of a task force to prepare recommendations concerning additional guidelines to be used by the chemical industry in complying with 21 D-S.C. 830 (b)(l)(A). This statute requires that certain regulated transactions which are commonly referred to as suspicious orders must be reported to the Drug Enforcement Administration (DEA) in order to prevent the diversion of listed chemicals used in the production of illicit substances."  *Id*.  As part of its mandated responsibilities, the task force researched and "developed proposals for identifying indicators of suspicious orders in the various segments of industry [including wholesale distributors]."  *Id*.  These indicators of suspicious orders are outlined in the October 1998 report to the Attorney General, along with "recommendations, advice, and proposals for the establishment of such guidelines that will adequately define suspicious orders of listed chemicals."  *Id*. at 83.  Moreover, detailed findings and recommendations were made relative to wholesale distributors.  *Id*. at 24-26.

- **October 2002 DOJ Office of the Inspector General** *Review of the Drug Enforcement Administration's Efforts to Control the Diversion of Controlled Pharmaceuticals*, **Report Number I-2002-010.**[15]

The Office of the Inspector General (OIG) conducted this research and report ["2002 OIG Report"] to assess the DEA's "efforts to investigate cases of controlled pharmaceutical diversion."[16]  The work that went into this report was extensive.[17]  The 2002 OIG Report provides

---

[14] "The Task Force was comprised of 21 industry, Federal, state and local law enforcement, and regulatory officials. It met on four occasions in meetings open to the public and conducted under the rules established by the Federal Advisory Committee Act (5 U.S.C. App. 2) in Washington, D.C.; San Diego, California; St. Louis, Missouri; and San Antonio, Texas." *Id.* at p. 5.

[15] Ex. 14.  Available at: https://oig.justice.gov/reports/DEA/e0210/final.pdf

[16] *Id*. at 1.  "The OIG . . . audits and inspects DOJ programs. The Inspector General, who is appointed by the President subject to Senate confirmation, reports to the Attorney General and Congress."  *See* https://oig.justice.gov/about.

[17] *Id*. at 7-8 (the field work lasted approximately one year, from August 2001 to July 2002, and included review of DEA-related laws, policies, procedures and documents; conducting in-person

13

factual information regarding diversion of controlled pharmaceuticals, as well as the scope and impact of the diversion. *Id*. at 7, 9-11. This report also provides factual background and analysis of the DEA's Diversion Control Program organization, staffing, responsibilities, and funding. *Id*. at 5-8. Additionally, the 2002 OIG Report provides "four recommendations to improve the DEA's ability to investigate the diversion of controlled pharmaceuticals". *Id*. at 1, 10-25.

- **July 2006 DOJ Office of the Inspector General** *Follow-Up Review of the Drug Enforcement Administration's Efforts to Control the Diversion of Controlled Pharmaceuticals*, **Report Number I-2006-004.**[18]

The OIG "conducted this follow-up review ["2006 OIG Report"] to assess the DEA's actions to control pharmaceutical diversion since [the above-referenced prior report] in October 2002." *Id*. at 3. The research and efforts which went into this report were thorough and wide-ranging.[19] The 2006 OIG Report provides factual information regarding diversion of controlled pharmaceuticals, as well as the scope and impact of the diversion. *Id*. at 17-21. This report also provides an updated factual background and analysis of the DEA's Diversion Control Program organization, staffing, and structure (since the 2002 OIG Report). *Id*. at 21-26. Additionally, the 2006 OIG Report provides "six recommendations to help the DEA improve its ability to address the growing problem of diversion of controlled pharmaceuticals." *Id*. at 14-15, 56-57.

---

interviews of high-ranking DEA officers, supervisors and field agents, as well as Department of Health and Human Services officials from the NIDA and the Substance Abuse and Mental Health Services Administration; conducting telephone surveys of other individuals and site visits of various field offices; and analyzing data).

[18] Ex. 15. Available at: https://oig.justice.gov/reports/DEA/e0604/final.pdf

[19] The work included review of DEA-related laws, policies, procedures and documents; conducting field work, site visits, surveys and interviews; attending presentations; and analyzing data from 7 sources: "the Controlled Substances Act System, the Quarterly Report Database, the Case Status Subsystem database, personnel data, the 1-877-RxAbuse hotline, the Unlawful Medical Internet Reporting Effort, and the Work Hours Reporting System". *Id*. at 28-31

- **September 2013 U.S. Department of Health and Human Services Report:** *Addressing Prescription Drug Abuse in the United States - Current Activities and Future Opportunities.*[20]

In September 2013, the U.S. Department of Health and Human Services ("HHS") issued a report titled "Addressing Prescription Drug Abuse in the United States - Current Activities and Future Opportunities".[21]  "This report was prepared in response to a congressional directive (Section 1122 of the Food and Drug Administration Safety and Innovation Act of 2012) to [HHS] to improve the understanding of current prescription drug abuse activities and produce a report which provides a review of current initiatives and identifies opportunities to ensure the safe use of prescription drugs with the potential for abuse and the treatment of prescription drug dependence." *Id*. at 3.  HHS's work on this report was extensive.  *Id*. at 6-7.  Substantively, this report includes facts about prescription drug abuse, and the public health consequences, including factors and economic burden related to same.  *Id*. at 8-18. The report also outlines HHS's work in connection with prescription drug abuse activities, including surveillance, prevention, education, clinical practice tools, regulatory and oversight activities, drug abuse treatment, and overdose prevention. *Id*. at 18-36.  Further, the report makes various findings and recommendations regarding drug abuse.  *Id*. at 36.

---

[20] Ex. 16.  Available at:
https://www.cdc.gov/drugoverdose/pdf/hhs_prescription_drug_abuse_report_09.2013.pdf

[21] *Id*. at 6. (As this exhibit/report consists of preliminary cover pages which were intentionally not numbered, all page citations are to the PDF page number and not the internal report page number).

- **May 2014 DOJ Office of the Inspector General Report:** *The Drug Enforcement Administration's Adjudication of Registrant Actions*, Report Number I-2014-003.[22]

The OIG conducted this work ("2014 OIG Report") to analyze and oversee "the DEA's process for issuing final decisions on registrant actions". *Id*. at 1. The OIG's research and work on this report was significant, occurring over a period of four months (May 2013 through August 2013).[23] The 2014 OIG Report provides factual background regarding the types of registrants required to register with the DEA, the process by which the DEA adjudicates registrant actions, the number of cases adjudicated by the DEA between 2008 and 2012, and the federal laws and regulations and DEA policy governing the process. *Id*. at 1-7. This report sets forth the results of the OIG's findings regarding the DEA's process for issuing final decisions on registrant actions, the timeliness of the process, and the impact of any delays on registrants, the public, and on the DEA itself. *Id*. at 8-34. Additionally, the 2014 OIG Report provides three recommendations to improve the DEA's ability to effectively and efficiently adjudicate all registrant actions in a timely manner. *Id*. at 35-36.

### Legislative Actions

The Court is entitled to take judicial notice of the legislative action. *See Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226–27, 79 S.Ct. 274, 3 L.Ed.2d 257 (1959). In fact, "[t]he court may take judicial notice of the legislative history of the laws at issue" *N.C. State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 333 n.6 (M.D. N.C. 2016), rev'd on other grounds, 831 F.3d 204 (4th Cir. 2016); *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir.

---

[22] Ex. 17. Available at: https://oig.justice.gov/reports/2014/e1403.pdf (note: as the 2014 OIG Report did not number the cover page and as the introduction pages to the report have Roman numerals, all citations herein reference the actual page numbers marked in the report itself).

[23] *Id*. at 36-38 (describing scope and methodology of the OIG review including interviews, field work, document analysis, data analysis, case file review, etc.).

1995), judgment vacated on other grounds, 517 U.S. 1206 (1996), readopted, 101 F.3d 325 (4th Cir. 1996), cert. denied, 520 U.S. 1204 (1997) (finding district court's consideration of legislative history of ordinance, including city council transcripts, appropriate). *See also*, *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice."); *Ramos v. Capital One, N.A.*, No. 17-CV-00435-BLF, 2017 WL 3232488, at *3 (N.D. Cal. July 27, 2017) (taking judicial notice of senate committee hearing notes); The following legislative resolutions are relevant to the instant matter, and Plaintiffs hereby request the Court to take judicial notice of same.

- **January 26, 2017 Cabell County Resolution Declaring Distribution of Pain Medications a Public Nuisance.[24]**

On January 26, 2017, the Cabell Commission passed a resolution officially recognizing that the conditions in Cabell County constituted a public nuisance and authorized the hiring of counsel to pursue all available civil remedies and abate the "public nuisance to the people of Cabell County." *Id*. at pp. 1-2.  The resolution also set forth: "In addition to all other powers and duties now conferred by law upon county commissions, the Cabell County Commission is 'authorized to enact ordinances, issue orders and take other appropriate and necessary actions for the elimination of hazards to public health and safety and to abate or cause to be abated anything which the Commission determines to be a public nuisance.'" *Id*. (citing W.Va. Code§ 7-1-3kk [2002]). This resolution provides relevant background about opioid distribution into Cabell County, the impact of same, Cabell County's official recognition of these matters, the resulting actions taken by Cabell County, and the bases for same.

---

[24] Ex. 18.

- **April 13, 2020 City of Huntington Resolution and Declaration of Public Nuisance.[25]**

On April 13, 2020, the Council of the City of Huntington passed a resolution officially detailing, among other things that in recognition of the extreme hazard to the public safety of its residents and the public nuisance created by the wrongful distribution of prescription pain medications, in 2017, the City of Huntington retained outside counsel in order to hold accountable those entities responsible for the crisis through this public nuisance lawsuit against these Defendants.  *Id*. at pp. 1-2.  This resolution also set forth that "there exists a severe public nuisance, causing opioid abuse, addiction, morbidity, and mortality in the City of Huntington."  *Id*. at p. 1.  This resolution provides relevant background about opioid distribution into the City of Huntington, the impact of same, the City of Huntington's official recognition of these matters, the resulting actions taken by the City of Huntington, and the bases for same.

## CONCLUSION

Pursuant to Fed. R. of Evid. 201, Plaintiffs hereby move for the Court to take judicial notice of the information outlined above and/or attached, for purposes of the trial of this matter.  The information is generally known within the trial court's territorial jurisdiction and/or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

---

[25] Ex. 19.

Dated: June 30, 2021

                                                    Respectfully Submitted,

| THE CITY OF HUNTINGTON | CABELL COUNTY COMMISSION |
|---|---|
| /s/ *Anne McGinness Kearse* | /s/ *Paul T. Farrell, Jr.* |
| Anne McGinness Kearse (WVSB No. 12547) | Paul T. Farrell, Jr., Esq. (WVSB No. 7443) |
| **MOTLEY RICE LLC** | **FARRELL & FULLER LLC** |
| 28 Bridgeside Blvd. | 1311 Ponce de Leon Ave., Suite 202 |
| Mount Pleasant, SC 29464 | San Juan, Puerto Rico 00907 |
| Tel:  843-216-9000 | Cell: 304.654.8281 |
| Fax:  843-216-9450 | Email: paul@farrell.law |
| Email: akearse@motleyrice.com | |
| | |
| Linda Singer | /s/ *Anthony J. Majestro* |
| David I. Ackerman | Anthony J. Majestro (WVSB No. 5165) |
| **MOTLEY RICE LLC** | **POWELL & MAJESTRO, PLLC** |
| 401 9th Street NW, Suite 1001 | 405 Capitol Street, Suite P-1200 |
| Washington, DC 20004 | Charleston, WV 25301 |
| Tel:  202-232-5504 | 304-346-2889 / 304-346-2895 (f) |
| Fax:  202-386-9622 | amajestro@powellmajestro.com |
| lsinger@motleyrice.com | |
| dackerman@motleyrice.com | Michael A. Woelfel (WVSB No. 4106) |
| | **WOELFEL AND WOELFEL, LLP** |
| Charles R. "Rusty" Webb (WVSB No. 4782) | 801 Eighth Street |
| **The Webb Law Centre, PLLC** | Huntington, West Virginia 25701 |
| 716 Lee Street, East | Tel. 304.522.6249 |
| Charleston, West Virginia 25301 | Fax. 304.522.9282 |
| Telephone: (304) 344-9322 | mikewoelfel3@gmail.com |
| Facsimile: (304) 344-1157 | |
| rusty@rustywebb.com | |

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on this 30th day of June, 2021, the foregoing "**Plaintiffs' Motion to Take Judicial Notice**" was served using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

                                                                            /s/ *Anthony J. Majestro*