IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 32
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

JUNE 30, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301


**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087

Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1              PROCEEDINGS had before The Honorable David A. Faber,
 2     Senior Status Judge, United States District Court, Southern
 3     District of West Virginia, in Charleston, West Virginia, on
 4     June 30, 2021, at 9:00 a.m., as follows:
 5              THE COURT:  Ms. Kearse, you may proceed.
 6              MS. KEARSE:  Good morning, Your Honor.  Plaintiffs
 7     call Mayor Steve Williams to the stand.
 8              THE COURT:  Okay.
 9              THE CLERK:  Please state your name.
10              THE WITNESS:  Steve Williams.
11              THE CLERK:  Thank you.  Please raise your right
12     hand.
13         STEVE WILLIAMS, PLAINTIFFS' WITNESS, SWORN
14              THE CLERK:  Thank you.  Please take a seat.
15              THE COURT:  Good morning, Mayor.
16                      DIRECT EXAMINATION
17     BY MS. KEARSE:
18     Q.   Good morning, Mayor.
19     A.   Good morning.
20     Q.   I've got some water for you right there if you need
21     that.
22     A.   Thank you.
23     Q.   Mayor Williams, will you please introduce yourself to
24     the Court?
25     A.   My name is Steve Williams.  I'm the Mayor of
```

1    Huntington, West Virginia.

2    **Q.**   Mayor, how long have you served as the Mayor of the

3    City of Huntington?

4    **A.**   Eight years and six months today.

5    **Q.**   Can you tell the Court when you were sworn in as Mayor?

6    **A.**   Sworn in on January 1st, 2013.

7    **Q.**   And can you tell the Court how long have you been

8    serving in regard to terms?

9    **A.**   This is -- I'm in the middle of my third term.

10   **Q.**   Mayor Williams, can you provide the Court with a little

11   bit of your background?  And let's start -- where, where

12   were you born and where did you grow up?

13   **A.**   I was born in Bluefield, West Virginia.  I lived in

14   Athens, West Virginia, until I was 16 years old.  My father

15   was a professor and coach at Concord.  And when he quit

16   coaching, he went on to work on his doctorate at VPI.

17           When he completed his doctoral course work, he was

18   offered a job in Huntington at Marshall University.  And we

19   moved to Huntington and have been there ever since.

20   **Q.**   And did your mother also teach in Bluefield?

21   **A.**   Mom was an elementary schoolteacher, taught in the

22   Mercer County Schools and she made her way through there.

23   Then she ended up teaching at Bluefield State College -- or

24   for a while before we moved to Huntington.

25           When we moved to Huntington, as I indicated, dad was at

1    Marshall.  Mom taught in the Cabell County Schools in

2    elementary education.  And I went to Huntington High School,

3    graduated from there.

4         When I was in Mercer County, I lived in Athens, went

5    to -- transferred to Princeton so that I could play sports.

6    Athens was an awfully small school.  And I went to Princeton

7    High School.  And then when we moved to Huntington, I went

8    to Huntington High School, then on to Marshall on a football

9    scholarship after the crash.

10   **Q.**   You played, you played football in high school and you

11   continued that into --

12   **A.**   If there was a ball, I was, I was participating.  I

13   played football, basketball, track, ran base -- played

14   baseball in the summers, baseball and basketball, whatever.

15   Like I said, wherever there was a ball, I was right there.

16   **Q.**   You mentioned that you went to Marshall.  Can you tell

17   the Court, when did you graduate from Marshall and what did

18   you study?

19   **A.**   I studied political science and graduated in 1978.

20   **Q.**   And you graduated cum laude?

21   **A.**   Cum laude, yes.

22   **Q.**   And, Mayor, after Marshall University, did you continue

23   your studies?

24   **A.**   Yes, I got my Master's Degree in public administration

25   up at WVU.

1    **Q.**   And can you tell the Court a little bit about

2    additional education in addition to your Master's that you

3    did over the years?

4    **A.**   Well, I continued developing my, my career.  I guess

5    we'll talk about that a little bit later.  I became a

6    financial advisor and went through all the training and

7    licensing for that.

8         But much later in my life and in my career, after I had

9    moved away, I moved back to Huntington.  And circumstances

10   were such that I became part of a study group called

11   Education for Ministry that the Episcopal church has within

12   its local churches through the University of the South.

13        And the first, the first year of study was the study of

14   the Old Testament.  The second year of study was the study

15   of the New Testament.  The third year was of church history.

16   The fourth year was theological thought.

17        It wasn't truly a seminary course of study.  It was a

18   course of study that had a lot of reading, no tests, no

19   papers.  But the whole idea was to lift up lay ministers

20   within, within the congregation.

21   **Q.**   Were you at that time looking to go into the ministry?

22   **A.**   No.  I contemplated that when I was first starting my

23   career.  And I came to understand that giving sermons wasn't

24   all that what a minister was about, that you had to meet

25   people at their highest and lowest points.  And I thought

1    maybe my calling should be more of a public service realm.

2    **Q.**   Let's talk about your public, your public service.  Can

3    you tell the Court what you did after you received your

4    Master's in administration?  Take us a little bit through

5    your work career before becoming Mayor.

6    **A.**   Well, it's ironic now.  When I first got out of

7    graduate school, I was an intern at the City of Huntington

8    for the City Manager.  It was -- interestingly, it was a man

9    named Dick Barton who grew up in Bluefield and was the City

10   Manager in Huntington.  I worked with him for a couple of

11   years.

12        Then Putnam County started establishing -- or had

13   established a Putnam County Development Authority and

14   Economic Development Organization and I was hired to be

15   their first Director of the Putnam County Development

16   Authority working in Putnam County for a few years.

17        We had had a great level of success and we know how

18   much Putnam County has been growing for the last 40 years

19   anyway.  And we had a great deal of success.  And the folks

20   in Huntington saw what was being done in Putnam and they

21   said, "Well, we should be doing that too."

22        And I was recruited back to Huntington by then the City

23   Manager to be -- to build an economic development program

24   within the city government.  I did that for six or seven

25   months and --

1   **Q.**   Can you give us a time frame for that too, Mayor?

2   **A.**   Oh, that was in 19 -- well, I was in Putnam County from

3   1981 to 1984.  Then in 1984 I went into Putnam -- or went

4   back to Huntington.

5        Six months into -- six to seven months when I was in --

6   back with the City of Huntington, the City Manager took

7   another job as the City Manager elsewhere.  And then I was

8   offered the job to be the acting City Manager, the youngest

9   City Manager in the history of Huntington at the time.  I

10  was only 28 years old.

11       And I became -- they took the acting title away on the

12  very day that Governor Moore was sworn in for his third term

13  interestingly.  And I served as City Manager through the end

14  of 1985.

15       That was when the City of Huntington decided, or

16  members of the community said they wanted -- instead of a

17  city manager form of government, thought it was more

18  important to have a more politically oriented administration

19  and chose to go to a strong mayor form of government.

20       And I left at the end of that, at the end of that year

21  when the new mayor came in.  And at that point, I embarked

22  on a career of finance.

23  **Q.**   And, so, can you tell the Court about after leaving as

24  City Manager what was your career path at that point in

25  time?

1    **A.**    At that point, interestingly, I was -- had been

2    weighing whether to go to law school or not and had been

3    accepted into WVU and was seriously looking at that.  And a

4    couple of things happened simultaneously.

5        Your Honor, I think you're well aware in West Virginia

6    legislators are part-time legislators.  I was approached by

7    some in the community to run for the State House of

8    Delegates at the time.

9        Simultaneously when I left City Hall, I went to work

10   with an investment bank out of Pittsburgh.  And our

11   specialty was underwriting public finance issues, bond

12   issues and things such as that.  I was with them up through

13   1990.

14       Simultaneously I got elected to the House of Delegates,

15   served four terms in the, in the House of Delegates.  But in

16   1990, the tax laws started to change, wasn't able to finance

17   as many projects through bond issues as you were previously.

18   And I switched over into the brokerage business.

19       And then that would have been in '91 or so.  And then I

20   was in that occupation until I ran for Mayor in 2012.  I was

21   in the legislature, as I indicated, for eight years and left

22   the legislature in 1994.

23   **Q.**    And did you continue for a term in the investment

24   banking and actually --

25   **A.**    Well, in the brokerage business at that time.  And then

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    I started developing my business.  I started out as a

2    producer, as a stockbroker, if you will, within the Bank

3    One -- then the Bank One which became the Chase system.

4        And then I started changing jobs throughout the coming

5    years with Bank One.  I was in production from '93 up

6    through '98.  In '98 I changed and started training other

7    brokers how to build their business and started moving up

8    the system.

9        I was working in Cincinnati and Louisville and, and

10   Lexington for a few years.  Then I was asked to move to

11   Chicago to run the Chicago market.  We had, we had a

12   wholesale.  We had a package product company of one group,

13   and I was a wholesaler for that and helped promote the sales

14   of those products through our brokers.

15       But at the same time, simultaneously I was trying to

16   help the brokers be able to learn how to develop their

17   business.  And I was -- I was moved to Chicago to run that

18   market and ran the market for Bank One Securities.

19   **Q.**   And then you came back to West Virginia?

20   **A.**   Then I found my way back to West Virginia.  There was a

21   couple of other positions with -- I left Bank One and was

22   recruited to go to Citizens Bank out of New England which

23   was buying a bank in the midwest and they were looking for

24   somebody to run their investment program in Illinois,

25   Michigan, Indiana, Ohio, and part of Pennsylvania.

1       I found my way back to, to West Virginia and then moved

2   to Huntington Banks and was managing West Virginia, Western

3   Pennsylvania and Eastern Ohio for, for the investment firm

4   with Huntington Banks, and then was doing that up until the

5   point where I decided to run for Mayor.

6   **Q.**   And, Mayor, have you previously run for Mayor?  There's

7   part of that that I probably need to have you talk about a

8   little bit.

9   **A.**   That's something that we really don't like to ponder

10   about.  It was a rough experience.

11       I ran for Mayor in 1993.  I was nominated to run in the

12   general election.  And to this day, I've never looked at the

13   results.  All I know is I lost.  And it's just something

14   that -- but the --

15       As an aside, since we are smiling here, Jean Dean beat

16   me.  And then when I became Mayor, which would have been --

17   let's see.  It was in '93.  Twenty years later I took her

18   out to dinner on June 1st on the night that she beat me just

19   to show that everything is fine.  I got there when --

20   eventually when I was supposed to.

21       The one thing I didn't mention -- excuse me for

22   bouncing all over the place, Your Honor.  Before I was --

23   ran for Mayor, I was on Huntington City Council for 40 years

24   as well.  And that was really -- I had been out of public

25   life from 1994 up to 2008 for 14 years.

1     It's one of those times that I thought, well, I'll -- I

2     feel like I can do something to help the community.  I'll

3     dip my toe in the water and just kind of -- and I've learned

4     something about myself is that I can't dip my toe into

5     anything.  If I go in, I go in head-first.

6     And, so, when I was finishing that term, I came to the

7     conclusion that if I'm going to be this involved, I might as

8     well be running the city, not just being a member of

9     council.  So that's when I decided --

10    **Q.**   What was, what was the term?  Was it a four-year term

11    with City Council?

12    **A.**   Yes, four-year term of 2008 to 2012.  And then in 2012

13    I ran for Mayor and have been elected, as I indicated, three

14    times.  And I'm in the middle of my third term now.

15    **Q.**   So how long have you lived in Huntington now?

16    **A.**   49 -- it will be 49 years in August.

17    **Q.**   And, Mayor, why did you decide to spend most of your

18    life in, in Huntington?

19    **A.**   Well, it's home.  My family is there.  And -- when I

20    first -- when I first moved to Huntington, something very

21    special happened.  I was only 16 years old when I moved.

22    It's a volatile time for a young person.

23    And there was something about the community that

24    reached out and embraced me, embraced my family.  And it's

25    been, it's been that way ever since.  And Huntington is

1    home.

2         I found when I was in Chicago, I felt like I was gone

3    but I never left.  And I guess this is how we are in West

4    Virginia.  We are always connected to, to what's at home.

5    And when I had the opportunity to be able to come home, I

6    didn't have to think twice about it.

7    **Q.**   I want to talk a little bit more about your, your

8    public service.  But are you currently a member of any

9    organizations or community organizations within Huntington?

10   **A.**   In Huntington I'm quite active at Marshall.  I'm a

11   member of the alumni association.  As I indicated, I went to

12   Marshall on a football scholarship.  There was a letterman's

13   club called the M Club.  And I'm a past president of the, of

14   the M Club.

15        I'm active in the community.  We have, as I

16   indicated -- well, we're active in two churches in our city,

17   Fifth Avenue Baptist Church where I've been a member since

18   the, the early '80s.  And my wife is a member of Trinity

19   Episcopal Church.  And she and her family had grown up there

20   and that's where we were married, and our children have been

21   baptized and each of her parents were laid to rest.

22        Interestingly, the two churches are right next to one

23   another and it just seems to be a nice eclectic mix for us

24   in our, in our church life and in our spiritual life.

25        Interestingly, in each church they want to know, well,

```
 1    what are you or who are you.  And I lovingly say that I've

 2    determined that I'm a Bapcopalian (phonetic).

 3    Q.   Mayor, I'd like to spend some time now as, as -- when

 4    you are Mayor and focus on your time in regard to your

 5    service as Mayor of the City of Huntington.

 6         Mayor, did you assist in putting some slides together

 7    that can help with your testimony but also provide the Court

 8    with some background information?

 9    A.   Yes.  There are a few things that kind of show some

10    milestones over the last eight and a half years.

11              MS. KEARSE:  Your Honor, may I approach?

12              THE COURT:  Yes.

13    BY MS. KEARSE:

14    Q.   Looks like you have a lot of things up there.  I

15    apologize.  There's a lot of spreadsheets.  I'm not

16    going to go through spreadsheets with you.

17    A.   So it's okay for me --

18    Q.   Yes, yes.

19    A.   Good.

20    Q.   No spreadsheets.

21              MR. RUBY:  Your Honor, I'll just note -- and I

22    don't know quite what to do with this.  We got this slide

23    deck night before last.  And I think that if, if we had a

24    jury over here, we would certainly object to handing out or

25    displaying pictures of the Mayor going to church or the
```

1    Mayor meeting with important people to sort of bolster him

2    with this kind of imagery in the eyes of the jury.  It

3    looked almost like a campaign ad to me.  We'll just note an

4    objection to it and the Court can do with it as it sees fit.

5              THE COURT:  Well, your objection will be preserved

6    in the record.  I'm going to go ahead and let him go

7    forward.

8              MS. KEARSE:  Thank you, Your Honor.

9              THE COURT:  I don't think I'm going to be unduly

10   influenced, Mr. Ruby.

11             MR. RUBY:  I agree, Your Honor.

12             MS. KEARSE:  For the record, I think these are

13   some milestones that the Mayor wanted to talk about and

14   certainly not a campaign slide deck.

15   BY MS. KEARSE:

16   **Q.**   Mayor, when did you officially start your term as

17   the Mayor of Huntington?

18   **A.**   January 1st, 2013.

19   **Q.**   And have you been recognized for your service as the

20   Mayor of Huntington?

21   **A.**   I don't understand what you mean by recognized.

22   **Q.**   I'm sorry.  Have you been named Mayor of the Year by

23   the West Virginia Municipal League?

24   **A.**   I'm active in the West Virginia Municipal League and I

25   think it was 2016 I was named Mayor of the Year.

1    **Q.**   Okay.  I want to talk a little bit about the structure

2    and the main departments within the City of Huntington.  Can

3    you tell the Court a little bit about how the City of

4    Huntington is, is made up?

5    **A.**   As I indicated, Your Honor, the Mayor now is the CEO of

6    the city.  Each of the departments answer to the Mayor.  We

7    have, naturally, police department, fire department.  We

8    have a public works department.  We have the planning and

9    zoning department.

10        They're unique in that they are also listed in the

11   charter as having special boards, the planning commission

12   according to state law and the board of zoning appeals, but

13   they still answer within the administration.

14        We have -- certainly we have a finance committee.  We

15   also have -- or finance department.  We have -- separate

16   from that, we have some associated boards of which I am a

17   member or chair.  There's a water quality board that runs

18   the storm water utility, as well as the sanitary board and

19   the sewer system.  I'm the chair of that.

20        And we also have a Municipal Development Authority

21   which is responsible for economic development for the, for

22   the city.  We have a board of -- I believe it's 15

23   individuals.  I'm a member of that board.  I'm not the chair

24   of it.

25        By state law, they're independent to be able to do

1    certain things, but we do hold that strong partnership.  And

2    the city does pay for part of the salary for the individuals

3    that are there.

4         I don't think I've missed any.  It's a pretty wide

5    range.  We have a parking authority and such as that.

6    **Q.**   What are your main roles and responsibilities as Mayor,

7    big picture?

8    **A.**   Well, I'm responsible for the, for the fiscal health of

9    the city, running the city and its, and its finances.  Each

10   of the department heads run or respond or report to me, the

11   police chief, the fire chief.  Each of the department heads

12   are tasked with running their department, but the person who

13   has the ultimate responsibility for what happens in any of

14   the departments is the Mayor.

15   **Q.**   And you set out provisions that --

16   **A.**   The Mayor -- well, that -- what I just explained is

17   what the charter expects.  Realistically, what the Mayor --

18   I see that my role is as Mayor is to identify -- to

19   articulate a vision for the city, to build consensus around

20   that vision, and then start building on the vision.

21   **Q.**   Do you regularly collaborate with your department

22   heads?

23   **A.**   Very regularly.  We have normally scheduled meetings

24   and then as often as, as necessary.

25   **Q.**   Mayor, you mentioned that you're in charge of the

1    financial stability and health of the community.  Do you

2    also oversee public health and public safety issues within

3    the community?

4    **A.**    Interestingly, public health involves everything.

5    Public safety is principally towards police and fire, but

6    public health leans into public works.

7        If we're not picking up the garbage, it's certainly not

8    a healthy environment.  We're -- if properties aren't taken

9    care of, it's not a healthy environment.  And then the

10   public safety naturally is providing police protection

11   within the neighborhoods, and for the fire department to

12   protect the property of the citizens and within the

13   community.

14   **Q.**    As part of the financial oversight that you provide to

15   the city, can you -- does that involve a budgeting process?

16   **A.**    Well, every year I'm expected to bring a budget

17   estimate.  The charter states that by February 15th of each

18   year I'm expected to bring a budget message to council and a

19   budget recommendation.

20       The budget has to balance at the end of the year.  If

21   it's not balanced, the Mayor and the members of City Council

22   will be held personally responsible for that under penalty

23   of law.

24       So we begin in earnest in developing our budgets in

25   November to December.  And then in January we're in full,

1    full board.  And I bring by February 15th of each year a

2    message that really describes where we are fiscally, fiscal

3    strength, fiscal condition of the city, but also projecting

4    where are we going to go in the, in the coming year, but

5    also outlying -- outlining a five-year capital plan as well,

6    not just what we're about to do now but where we are going.

7    And that certainly assures that, that we're keeping the

8    future in mind at all times with what we're doing.

9    **Q.**   Mayor, where do the funds come from that you're

10   budgeting?

11   **A.**   We have, we have about 40 -- 30 to 40 different revenue

12   sources.  I never remember the, the exact number.  But the

13   big ones are we have a business and occupation tax, the only

14   business tax that we have.

15        We, we also have a sales tax that the legislature

16   allowed us to enact a few years ago.  That's proven to be

17   quite stable.

18        We also have a series of fees.  The legislature is very

19   restrictive in what cities, municipalities can, can do to

20   raise money or to acquire money to, to provide their

21   services.

22        And what the legislature has permitted is -- and the

23   courts have, I guess, affirmed is the proper way of saying

24   it, is that if there are certain services that require

25   fees -- for instance, we have a municipal service fee that,

1    that charges a per square foot amount -- a per square foot

2    charge on property, on all, all property within the city.

3    That pays for the fire department.

4        We have a user fee that individuals who work within the

5    city pay $5 a week.  Actually, it's called generally user

6    fee.  It's stated within the accounting, probably within the

7    ordinance and on the accounting ledgers as a city service

8    fee.  The $5 a week helps, helps pay.  It doesn't pay it

9    all.  It helps pay for the police department and helps pay

10   for, for paving.

11   **Q.**   Let me ask you this.  You mentioned the deficits and

12   not going into deficit.  Can you tell the Court a little bit

13   about how you prevent yourself from going to a deficit and

14   maybe discuss just briefly about surplus, what that means in

15   the budgeting process?

16   **A.**   Well, the first thing you do, you definitely don't want

17   to find yourself headed to a deficit and you're always

18   looking and projecting forward.

19       With our revenues as we are right now, if we're

20   continuing through the year, is the spending occurring

21   within the department where they're going to stay within

22   their budget?  And if it appears that we are about to

23   overspend our budget, then we have to start making

24   adjustments through the year.

25       Early while I was on City Council and in my early

1    years, it was commonplace in the middle of the year to be

2    reviewing, see where we were, and then issuing an order to

3    scale back, reduce the spending in departments by a certain

4    percentage to be able to balance.

5        A surplus has some interesting parts it comprises.  A

6    surplus would appear at first is just not, not spending

7    everything that's coming in.  But we're also required to

8    have, for instance, a landfill closure account for Workers'

9    Compensation.  We have to have a balance that is set aside

10    that is always -- can be relied upon if revenues aren't able

11    to cover the landfill or to cover for the Workers' Comp

12    claims or other insurance.

13    **Q.**   Health programs?

14    **A.**   Pardon me?

15    **Q.**   Health programs?

16    **A.**   Insurance and such as that.  So oftentimes -- this

17    wasn't -- interestingly, Your Honor, Huntington was known

18    for having a really sad state of financial affairs.  There

19    was a time before I became Mayor people were saying, well,

20    the city is on the verge of bankruptcy.  We had a triple B

21    plus bond rating, not the best in the world.  But it was a

22    rating, nonetheless.

23        What I came to observe is that from an accounting

24    standpoint, if you take those assigned funds, have them

25    listed as part of the, of the cash reserves with the, with

1    rating agencies, that that strengthened the financial

2    picture or outlook or the financial view of the city.

3         So when I became Mayor, we moved some of those over

4    into the area that was known as surplus.  Before I became

5    Mayor, it was not unusual to see the administration spend

6    down to right next to the next penny that they had down to

7    less than $100,000 which would be frightening.

8         When we moved over, at least with -- once again, with

9    the rating agencies and anybody that was seeking to do

10   something with banks, we could see there was some financial

11   strength that was there that otherwise wasn't being shown on

12   the books.

13        But beyond that, it also helped us, but we still had

14   the responsibility of making sure that we're not spending

15   down to the nub.  And what's important is to try to build

16   some level of surplus looking -- if I could give an example,

17   just, just -- this is Wednesday morning.  Right?

18        Monday night we had a council meeting, and we had I

19   think three separate items on the council agenda where I was

20   having to deal with building retaining walls where going

21   up -- if you've been in Huntington, going up 8th Street hill

22   to the, to the museum, part of the hillside where some new

23   houses had been built was starting to cave in.  We're having

24   to build a retaining wall which is costing several hundred

25   thousand dollars.  There's another -- out Norway Avenue

1   there's a road that's slipping, starting to give way.

2       We have, we have those that are occurring.  I think it

3   came to about $2 million that we were having to appropriate

4   just in the one council meeting.

5       If those things happened in the middle of the year, if

6   you don't have that reserve, then you're going to have to go

7   in to cut other departments to be able to, to carry that.

8       When I was on City Council, there was -- with the

9   previous Mayor, inside Cabell-Huntington Hospital, if you

10  were coming in looking at Cabell-Huntington Hospital and

11  over to the right, to the south of Cabell-Huntington

12  Hospital there's -- up on the hillside there are a bunch of

13  houses up on the hillside.  That whole hillside came down in

14  a bunch of rains that we had.

15      The city was having to respond to it and looked to see

16  what could be done with insurance and such.  But they were

17  having to dig into their own -- into our own coffers at that

18  point.  I don't remember the specific details because it's

19  been a number of years.

20      But we were having to move money out of other

21  departments in order to cover because there weren't proper

22  reserves there to be able to help assure that we could

23  respond to the unexpected expenses.

24  Q.   So is it fair to say that in the budgeting process as

25  well sometimes you're having to -- are there some tough

1    decisions you have to make in the budgeting process at

2    times?

3    **A.**    Well, if you're not willing to make the hard decisions,

4    you have no business being in office.

5    **Q.**    And have hard, have hard decisions come in various

6    departments including the police department and the fire

7    department or public works?

8    **A.**    Well, in 20 -- very specifically -- we've had hard

9    decisions in all departments.  I indicated at the very

10   outset there were times in the middle of the year we would

11   find that we would have to reduce budgets just to make sure

12   that we were carrying on, able to make sure that we weren't

13   coming anywhere close to a deficit.

14        But we had a, a perilous situation that developed in 20

15   -- January of 2017.  As we were looking at what needed to be

16   done, there was -- we have a 55-million-dollar budget and we

17   were projected to have a six-million-dollar deficit.

18        And needless to say, we all were in a world of hurt.

19   And, honestly, my general philosophy was that -- two,

20   two-fold.  If the department is overspending their money,

21   they've got to be responsible for fixing it.  They had two

22   departments, and I was going to them to say, "We've got to

23   find a way to be able to fix this."

24        The last thing that we were ever going to do -- and

25   some were saying the first thing to do, but that's just not

1    the way that I seek to do -- I think any of us should be

2    doing business in government.  Some were saying, well, just

3    raise taxes.  Raise some fees.  And that just made

4    absolutely no sense to me.  And I was just saying that -- I

5    didn't even want to say that's a last resort.  We've got to

6    find a way to be able to get there.

7        Very long story short, yes, I had to make the decision

8    to lay some police officers and fire fighters off.  I think

9    it was 24 total that were laid off.

10       What was being proposed to me at first was to lay off

11   40, 50 police officers, 50, 50 fire fighters.  And that was

12   just a death wish and there was no way we were going to do

13   that.  And we just kept pressing.  We've got to find another

14   way to do this.

15       What we had seen for a few years before that is that

16   there were some problems with our public safety pensions

17   that we needed desperately to fix.  We hadn't been able to

18   get those fixed yet.

19       And our healthcare plans.  We had been negotiating an

20   adjustment of our healthcare plan for about a year and a

21   half and couldn't come to an agreement among the employee

22   groups as to how to change it.

23       Well, finally, I saw with, with my legal counsel that I

24   had the, the authority to enter into an agreement with our

25   healthcare to adjust our healthcare plan, but it had to be

1    made by a certain date.

2         I made the decision, made the decision that we would

3    make adjustments on how we calculate pensions.  It raised a

4    lot of angry voices.  They had since found that what we were

5    doing was not taking anything away from anyone, just making

6    sure it was calculated properly.

7         Long story short, we laid off 20 some fire fighters and

8    police officers.  Fortunately, we had hired some fire

9    fighters and police officers who were still probationary.

10   We, we, we removed them from the positions.

11        And at the end of the fiscal year, we didn't have a

12   casual deficit.  We actually had a small surplus.  And,

13   interestingly, by the end of the -- because of the, the

14   savings that we received from our healthcare changes,

15   because of the savings that we were receiving in our pension

16   calculations, we were able to offer every one of those

17   police officers, probationary police officers and fire

18   fighters we were able to offer their job back by December.

19   Now, they all didn't agree to come back.  Many of them found

20   other jobs anyway.

21        But I guess the point is that we had hard decisions to

22   make and we made them and the city is stronger financially

23   fiscally as a result of it.

24   Q.   Mayor, when -- can you give the Court some examples --

25   and we'll get into more detail later.  But if you don't have

1    enough money in the budget to meet community needs, are

2    there other vehicles to obtain funds for various projects or

3    specifically to help you run your departments?

4    **A.**    Well, one of the things -- we always go for grants.

5    One of the things that we did because -- needless to say, we

6    have three unions within the, within the city, Your Honor.

7    We have the AFSCME union, the police union, and the fire

8    fighters union.

9         Because we had to lay off some, some fire fighters, we

10   went and partnered with our fire fighters union to get

11   what's called a safer grant.  A safer grant gives you a

12   grant to be able to hire additional fire fighters and use

13   that grant, but you have to commit that you're going to have

14   them for a certain period of time.  We did that.

15        Oftentimes the grants require matches.  And those,

16   those matches might be up to 20 percent of whatever the

17   grant is.

18        We also became unbelievably aggressive of philanthropic

19   foundation support on, on things that, that we were doing.

20        Last, last check I think, I think when we were having

21   our depositions last year, it was in the 35-million-dollar

22   area.  I think it's now present day over $40 million of

23   grants that we've been able to receive for all departments

24   within --

25   **Q.**    To help run --

1    **A.**    To help us advance our mission.

2    **Q.**    And you also partner with other federal and state

3    organizations, for example, through law enforcement?

4    **A.**    Well, in, in law enforcement we partner with the entire

5    alphabet soup; DEA, ATF, the FBI, U.S. Attorney.  We have a

6    strong partnership there with each of the previous U.S.

7    Attorneys.

8         We don't have -- we don't have that.  I mean, frankly,

9    what I've said time and again is that the citizens of

10   Huntington -- I don't want to appear too righteous about

11   this, but this just makes sense.  Citizens of Huntington pay

12   city taxes, taxes to the county, to the state, and to the

13   federal government.

14        So we should have a layer on all layers, particularly

15   law enforcement, of support.  So we have the city, we have

16   the county, we work with the sheriff, and have partnered

17   with the sheriff on various law enforcement issues, state

18   government, the State Police partner with us, and then the

19   federal marshals.  As I said, the ATF, DEA, Appalachian

20   HIDTA, FBI.

21        And we have various task forces.  And those task forces

22   we review every single year because sometimes they will take

23   some of our police officers and assign them to the Task

24   Force.  Sometimes there will be others from other

25   jurisdictions that will come in to be supporting us in

1    their -- in our mission and the overall mission of the Task

2    Force.  We review that every year.  Sometimes it's more.

3    Sometimes it's less.  It depends upon the agency of what,

4    what their goal is or what their strategy is as to how to

5    move forward.

6         We found there were some times that they were building

7    cases.  And as they were building those cases, we could

8    start to see that it was taking an awful long time and we

9    needed to be able to see right now, there's some action.

10   Right now we would partner with some other federal agencies

11   so that we're not interfering with the federal case that is

12   taking some time to build its -- the federal agency that's

13   taking time to build its case, but we're able to make sure

14   that we're continuing to be aggressive on, on our side in

15   other areas.

16   **Q.**   Mayor, I want to spend a little bit more time on the

17   communication and outreach on that.  So is it fair to say

18   that communication and outreach is an important job of the

19   Mayor in the city?

20   **A.**   Well, as I said, I see that the Mayor's mission is to,

21   to identify a vision, articulate that vision, and build

22   consensus around it.  If you're not -- you've got to let

23   folks know what you're -- the direction that you're wanting

24   to go and then start building consensus as to how we are

25   actually going to go in that direction.  So communication

1    has to be -- certainly has to be the key.

2    **Q.**    And how do you communicate with members of your

3    community?

4    **A.**    Well, the budget message is, is one.  It's -- the way

5    we do it is it's a budget message to council, but it becomes

6    what we call the State of the City Address and points out

7    just where we are certainly making our way into the

8    community.

9         We have -- what was built in the mid 1990s was

10   something that was brilliant.  It's a series of neighborhood

11   associations.  And those neighborhood associations -- the

12   whole idea is to get the neighborhoods to lift them up so

13   that they can take care of their neighborhoods.

14        I really believe strongly government shouldn't be doing

15   everything.  There are those that say -- well, I remember

16   growing up saying there ought to be a law on a cartoon.

17   There ought to be a law.  Not necessarily always.  Sometimes

18   it just takes common sense.

19        And sometimes it takes just the neighborhood reaching

20   out and having pride within its own, in its own area and for

21   the community to take pride in its own area, shouldn't

22   expect the city to do everything.

23        But one thing that we did do that was novel, a lot of

24   mayors in Huntington and I've seen elsewhere will have open

25   houses where individuals will be able to come to the Mayor's

1    office, don't have to have an appointment, just come in and

2    sign up, get in line, and talk to the Mayor.

3         You may have heard, Your Honor, several years ago

4    Huntington was -- received a label as being the most

5    unhealthy city in the nation, most obese, the most unhealthy

6    city in the nation.  That kind of frosted the back sides of

7    a lot of us.

8         It may have had some level of truth in it, but we

9    weren't going to sit around and say, no, we're not going to

10   do -- no, that's not true.  Quit crying about it and do

11   something about it.

12        Well, it hurt me.  Rather than having everybody have to

13   truck down to City Hall on a given evening or afternoon and

14   sit there in the Mayor's office or wherever to wait to sit

15   to see the Mayor, why don't we accomplish a couple of

16   things.  Why don't we just get out into the neighborhoods

17   and start walking, novel, with the neighborhood and let them

18   show us what their concerns are.

19        Today we have nine council districts.  We would arrange

20   it in each council district.  Now we're well over 70, well

21   over 70 walks that we've made.  But what we do is when we go

22   out there, they'll say, "Here's a pothole.  This sidewalk

23   needs to be fixed.  How about that house?  Why are you

24   letting them get by with not mowing their lawn when my lawn

25   is immaculate?  Aren't you going to do something about

1    that?"  Oh, and they'll say, "That's a stash house.  They

2    sell drugs out of that house."

3         When we go out, it's not just me.  I bring my police

4    chief, my fire chief, or if they're not available, their

5    command -- members of their command staff.  I'll bring my

6    public works director.  Sometimes we'll bring housing

7    inspectors.  I'll have -- oh, heavens, it's, it's

8    practically the entire administration with me.  But they're

9    able to eyeball very specifically --

10   **Q.**   And you learn about the various concerns of the

11   citizens?

12   **A.**   Yes.

13   **Q.**   Mayor, do you also frequently communicate with the

14   County Commission and other community cities and --

15   **A.**   Well, one, one of the county commissioners is on our

16   Municipal Development Authority.  His name is -- county

17   commissioner Jim Morgan.  I think he's the president of the

18   commission right now.

19        We serve -- we have an animal shelter and an animal

20   shelter board where the city, Cabell County, and Wayne

21   County have members on it.  The presidents of each of, of

22   the, of the County Commissions are board members on the

23   animal shelter.  We talk to them.

24        But collaborating -- most of it's informal.  One thing

25   that -- I don't want them coming over and telling me how to

1    run my house and I'm sure not going to go over and tell them

2    how to run their house.  But we're always, we're always

3    collaborating with one another, particularly on economic

4    development issues.

5        As I indicated, the police chief and the sheriff are in

6    constant communication and we find ourselves as members of

7    the same task forces.  If we feel that we need some help on

8    something, the sheriff and his deputies will come in.  But

9    also the flip is true.  If they're out in the county, we go

10   and help them as well.

11   **Q.**   Mayor, I want to talk specifically about why we're here

12   today and talk about what you began to observe as you became

13   Mayor and prior to that as well.

14       But can you tell the Court a little bit about as you

15   became Mayor and your conversations or your work with law

16   enforcement and what did you do to understand what was going

17   on in your community?

18   **A.**   I understand you had a chance to meet Chief Holbrook.

19   He was the Chief of Police when I first became Mayor.  Chief

20   Holbrook and I have known each other for a very long time.

21   His -- interestingly, it's the two degrees of separation

22   within West Virginia.  His dad was my football coach in high

23   school.

24       Chief Holbrook, Chief Holbrook and I met regularly and

25   he would provide us with reports and updates as to what was

```
1    going on.  I think -- I believe -- well, I don't want to

2    overstep myself, but I think it may have been brought up in

3    Chief Holbrook's testimony, provided threat assessments as

4    to state of affairs and --

5    Q.   Let me ask you -- I'll back up a second with that.

6    When you became the Mayor, did you have confidence in the

7    law enforcement department that you were about to oversee?

8    A.   Well, the police department's known, widely known.  And

9    the U.S. Attorney came in and made it known to everyone who

10   would listen, Mr. Goodwin, that the Huntington Police

11   Department was considered the top law enforcement agency

12   serving in the Southern District of West Virginia.

13         What we were seeing and what we were observing and what

14   the, the aggressiveness of the police department, the

15   professionalism of the police department was gaining it as

16   a, as being known as -- within the region as one of the top

17   law enforcement agencies.

18         So I had the ultimate confidence in the police

19   department that I truly trusted the judgment and the advice

20   of Chief Holbrook and his command staff.

21   Q.   And did Chief Holbrook make you aware of some growing

22   concerns regarding diversion of prescription drugs as you

23   entered your Mayorship?

24              MS. WU:  Your Honor, objection to hearsay.  The

25   witness is being asked to testify to what he was told by
```

1    Chief Holbrook.

2         THE COURT:  Well, it is hearsay.  I'll sustain the

3    objection.  I'm sure you can get at it another way,

4    Ms. Kearse.

5    BY MS. KEARSE:

6    **Q.**   Mayor, as part of your -- when you arrived as

7    Mayor, what were some of the first actions that you took

8    in order to perform your job on behalf of the City of

9    Huntington and overseeing the various departments of the

10   City of Huntington?

11   **A.**   Well, when -- as I indicated, I met regularly with each

12   of my department heads, clearly with, with the police chief

13   and the fire chief to see what the on-going threats and

14   concerns were.

15       Chief Holbrook -- the leadership team within the

16   command staff of the, of the police department helped me to

17   understand that we had a serious problem of proliferation of

18   opioid prescription pills as, as well as heroin, but they

19   were saying that this was something that was very serious.

20         MR. RUBY:  Your Honor, object to the hearsay.  I

21   don't think that the Mayor, notwithstanding the fact that he

22   certainly has met with these folks, can come in and say they

23   said X, Y, or Z and put that hearsay into the record.  Chief

24   Holbrook has already been here and testified as to his

25   understanding of what was happening in the community.

```
 1              THE COURT:  Well, I think he can say what he did

 2     to find out what was going on in the city and then he can

 3     say what his impressions and his state of mind was without

 4     specifically saying what he was told.  I think that's

 5     permissible and he can do it.

 6              MR. RUBY:  I, I don't dispute that, Your Honor.

 7     It was that last bit -- I don't have the real-time in front

 8     of me, but that last bit where the Mayor testified "they

 9     said" and then there was a phrase after that.  It was the

10     "they said" that I think was hearsay.

11              THE COURT:  That's hearsay and I'll sustain the

12     objection to that specific part.

13         But I can see where you're going with this, Ms. Kearse,

14     and I think he can certainly, as the Mayor of the city,

15     testify as to what his state of mind was with regard to the

16     problems that existed in the city.

17         Do you want to say anything else, Mr. Majestro?

18              MR. MAJESTRO:  Your Honor, that was the exact

19     argument I was going to make.

20     BY MS. KEARSE:

21     Q.   Mayor, in your official capacity and the official

22     capacity of the chief of police and chief of fire and

23     others, did you have meetings and provide official

24     reports to assist you in mayoring [sic] your city?

25     A.   Let me make sure that I say this appropriately.
```

1    **Q.**   I'll couch it as everything in your official capacity

2    and, and --

3    **A.**   Understand.

4    **Q.**   -- and explaining things in others' official capacity.

5    **A.**   I had several meetings, constant meetings with Chief

6    Holbrook and the command staff certainly within my first, my

7    first year.

8         It became apparent to me as a result of, of my

9    inquiries that we had a problem of -- with opioid pills

10   being distributed illegally, a heavy abundance of opioid

11   pills being distributed within the community and had heroin.

12        I understood that it was a growing problem.  But, once

13   again, I'll point out what I was saying before.  I had

14   absolute faith in our police department and the level of

15   partnership that they had with other federal agencies, while

16   they didn't have it under control, I wouldn't want anyone

17   else other than them to be dealing with the issue because in

18   my mind, it was a police issue, a law enforcement, public

19   safety issue, and our police needed to have all the support

20   that we could muster to help them.

21   **Q.**   Mayor, did you go out into the community with law

22   enforcement and fire also to see for yourself what was going

23   on in your community?

24   **A.**   In -- yes.  At one point, Chief Holbrook had left.

25   Chief Holbrook did provide us a threat assessment that

1   really raised the alarm early.  I was, I was in office for

2   about a year, so it was January of 2014.  In 2013 I

3   understood that there was a problem.  I felt that our police

4   department and the strategies they were employing were, were

5   what we needed to be, to be taking this on.

6        After Chief Holbrook left for his new job in Columbia,

7   South Carolina, I was asked to come in and observe a SWAT

8   team.  It was in the -- near 20th Street in Huntington and

9   Ninth Avenue.

10       And what we had been advised is that, from what I

11  understood, that there was, there was going to be a raid the

12  next morning because there had been a really large shipment

13  of heroin had been delivered to this one household, or to

14  this one address.  I think it was 500 grams of heroin.  I

15  might be wrong on that.

16       What I do know is that I had never, ever seen anything

17  like this.  I'd never been on a SWAT raid, never sat nearby

18  when massive arrests were about to go.  And I went with,

19  with the SWAT team as they were preparing before, early in

20  the morning, getting their last-minute instructions, going

21  down, assembling at the top of the hill on 20th Street,

22  driving down to the, to the address.

23       We were in a, obviously, a separate vehicle a safe

24  distance back.  And I saw them come up to the house, form a

25  wedge to be able to go in and knock the door down and be

1    able to get in that house, again expecting there was going

2    to be a huge delivery of heroin that we were going to be

3    able to intercept.

4        I was -- I don't know that I necessarily need to go

5    into this.  I was just scared witless because I saw the

6    danger that our officers were in.  Fortunately, nobody was

7    in there.  But when they went in, I found out that what had

8    been delivered at 11:00 the night before -- again, I think

9    it was 500 grams -- there was only 35 grams left in the

10   house.  Overnight 465 grams had been distributed.

11   **Q.**   Mayor, as a result of, of that and your threat

12   assessments that you received from Chief Holbrook, what did

13   you start doing on behalf of the community?

14   **A.**   Well, my, my sense of urgency just really just went --

15   skyrocketed.  I came face-to-face with -- as I understood --

16   as I understand, each gram has about ten hits of, of heroin

17   that are being used.  Now, if that's the case, that means

18   thousands of hits were being distributed throughout the

19   community.

20       It helped me understand this wasn't -- that we had a

21   serious problem with addiction.  There was a market.  There

22   was a market here and we had to do what we were --

23   everything that we could to try to take that on.

24       But, interestingly, at the same time while that was

25   occurring, what was so perplexing to me is I started

1    having -- and this just doesn't happen.  I started having

2    emails, texts, people stopping me in the street, stopping

3    and saying, "Mayor, you've got to do something.  We don't

4    feel safe in our neighborhood."

5         Now, that just -- I didn't understand that because we

6    had the strongest law enforcement agency in the region and I

7    thought they had -- they said these drug dealers are coming

8    through and they just -- we just -- somebody needs to do

9    something.

10        So I'm hearing that on one side.  Then I go to a raid

11   and I observe the SWAT team and find out that there's, there

12   are hundreds of grams that have been distributed overnight.

13   I knew at that time that this was beyond anything that I

14   really ever, ever imagined.  I thought I had been advised

15   and had an appreciation as to what was being done --

16             MR. RUBY:  Your Honor, --

17             THE COURT:  Just a minute.

18             MR. RUBY:  I'll just object to the hearsay as to

19   the hundreds of grams being distributed overnight.  I don't

20   think the Mayor had any personal knowledge or observation of

21   that.

22        My understanding from his testimony is that someone

23   else told him that they were anticipating a shipment of

24   500 grams, and when the law enforcement actually got to the

25   house there was a much smaller quantity there.  But I don't

1    think the Mayor has any personal knowledge that 400 grams

2    were distributed.

3              THE COURT:  Mr. Majestro.

4              MR. MAJESTRO:  This is classic effect on the

5    listener.  We're not offering it for the truth of the matter

6    asserted.

7              THE COURT:  Well, yeah.  He's talking about --

8    he's describing his state of mind, his impressions.  And I

9    don't think -- I'll overrule the objection.  Go ahead.

10             MR. RUBY:  And just so I understand Mr. Majestro's

11   position, if it's not being offered for the truth of the

12   assertion, we just want that to be clear on the record.

13             THE COURT:  That's what I asked him.  You're not

14   offering it for the truth.  You're offering it to show what

15   the Mayor's state of the mind was, his understanding of what

16   the problem was.  And then I assume you're going to ask him

17   what he did about it.

18             MS. KEARSE:  That was my very next question, Your

19   Honor.  And I'll add that it's, it's also all in his

20   official capacity and information that he's received in his

21   official capacity.

22             THE COURT:  I'll overrule the objection.

23             THE WITNESS:  So as we were, as we were -- as I

24   was absorbing what, the information that I was becoming

25   aware of the state of affairs, that it was much worse than I

1    ever, ever imagined, I was immediately reaching out to the

2    then acting police chief and the command staff, "What are we

3    doing?  We've got to step this, this up."

4         Earlier, Your Honor, I pointed out that I have come to

5    learn that on some federal investigations they would be

6    operating extremely slow, and not that they were doing

7    anything wrong, but they were very carefully and slowly

8    pulling together, pulling together their case.

9         What I started finding in this instance is that there

10   were instances where within the Task Force they were

11   observing drug deals and such, but nothing was being done.

12        In the meantime, our neighborhoods were beginning to

13   crumble.  And we've got to step up.  And I was pressing.

14   We've got to do something and said we can't interfere with

15   the Federal Task Force.  They're our partners.  And I was

16   pressing saying, "Well, we've got to be able to do something

17   so that we can, we can show in our neighborhoods that we're

18   acting."

19        And I couldn't imagine that the, our federal partners

20   were seeking to tie our hands from being able to protect our

21   citizens.  Let's figure a way to, to do something.

22        Well, interestingly, there were several warrants that,

23   that were left unfilled.  And one of the first things that

24   we had -- and I think this was in early August.  It would

25   have been 2014.

BY MS. KEARSE:

**Q.**    That's what I was going to ask you.  Did you reach
out to other folks?

**A.**    This is what we were doing.  We, we had -- one morning
we were having a raid, a round-up of all warrants that were
out there related to drug trafficking within, within the
city.  And we had city police, county sheriffs, State
Police.  We had federal agencies, ATF, and others there.

What we did is we, we gathered at the -- about 7:00 in
the morning at the city arena in the large arena, had one
full side in the, in the bleachers full.  And everybody was
convening there.  And at one point, everybody there went out
and started serving the warrants and started arresting
everyone.  It was to the point that I believe it was
reported that there is a bus that would go --

**Q.**    Let me ask you this.  Is there a time when you started
going from your -- looking from arresting people to changing
how you looked at what was going on in your community?

**A.**    Well, right after that, there was something else that
happened because I was thinking this is, this has got to be
a police, police issue.  We had the raid.  Within --
simultaneously we had developed a program within ourselves,
among ourselves called River to Jail.

The River to Jail initiative in essence was making sure
that we weren't doing anything that interfered with a

1     Federal Task Force investigation.  But I think that the law

2     enforcement term was knock-and-talk, that they would come

3     in.  And we -- in that, in that period we were finding the

4     low-level distributors and sellers and such.  And we had

5     over 200 arrests in a 90-day period.

6          Now, Your Honor, I was feeling pretty good because I

7     thought they're getting the message not to come in, not to

8     come in here.

9          We, we started receiving communication from other --

10    the biggest concern for neighboring counties in West

11    Virginia and in Ohio saying, "Well, are you just going to be

12    pushing them out into our area?"  And I said, "Well, no.  We

13    all need to be joining together and just -- as we're

14    punching them in the nose, then you're there to punch them

15    in the nose."

16         And I was just feeling -- I thought that we were doing

17    something pretty special and pretty big.  But what I came to

18    understand --

19  **Q.**   That's going to go into the next part --

20  **A.**   I'm sorry.

21  **Q.**   That's okay.  There's a lot to say on that.

22         I'd like to move into what you did as you started

23    reaching out to other officers and, and really coming to

24    what you put together as the Court has heard about, some of

25    your policy and organizations and groups that you put

1    together to --

2    **A.**    Well, as this, as this was happening, there was some

3    violent crime that was occurring, shootings that were

4    occurring.  There was a lot of concern being raised within

5    the community.  Somebody needs to be doing something.

6        We thought that we were doing something with the River

7    to Jail.  And then as I indicated, we saw over 200 people

8    being arrested.  But the, the distribution continued.  They

9    just kept coming in and kept selling more stuff, again

10   because there was such a high level of addiction.

11   **Q.**    I'd like to talk about that.  Did you reach out to, to

12   the National Drug Control Policy to --

13   **A.**    Well, actually, as this was occurring, we had a

14   congressman, Nick Rahall, at the time and he reached out to

15   the Director of the -- Mike Botticelli who was the Director

16   of the National Office of Drug Control Policy.

17       He came in -- he came in in the middle of -- in early

18   October to meet with us.  And we took him to show him some

19   recovery facilities, show him where -- we had an assembly of

20   about 25 or 30 people to have a conversation.

21       This picture is part of the tour with -- Mike

22   Botticelli is on the right and Congressman Rahall is on the

23   left.  And we were showing them, in essence, what we were

24   doing and what we were facing.

25       What we, what we started seeing is that as we were

1    dealing with this is that you can start bringing different

2    parties together, but it felt -- it started to feel like

3    this is much more than just a law enforcement issue, that --

4         I came to -- I came face-to-face, Your Honor, with the

5    saying that we all -- I imagine you have heard -- is that

6    you can't arrest your way out of this.  There are other

7    things that have, that have to be done.

8         I was at a loss as to what those other things were.

9    And we were talking with Director Botticelli about it and

10   our interdiction efforts, our law enforcement efforts.  But

11   he was pointing out partnerships within the community.

12        That was what I came to understand, was that

13   partnerships within law enforcement, partnerships within the

14   community had to be, had to be established.

15        And the first area that we started reaching out to in

16   large measure is just the nature of the, of the community

17   and the, and the partnerships that we had created, we

18   reached out to the faith community.

19        There's a group, Your Honor, of pastors for several

20   years, not just with me but with previous mayors, have met

21   with public officials on a regular basis, two meetings a

22   month.  They'll come meet with each of us individually and

23   it's -- they're not coming in to proselytize or anything.

24   It's just there to offer an ear and to pray with us.  It's

25   helpful.

1         And then we get together as a community group talking

2    about issues that we're dealing with and how our faith -- I

3    went to the -- I went to the, to the ministers because what

4    I was hearing when I was going to some of these groups,

5    there was one thing that I kept hearing individuals saying.

6    And, frankly, it kind of aggravated me.  I just felt like

7    they were giving up.

8         People were saying, well, you've got to have

9    prevention, intervention, treatment, law enforcement.  But

10   they would always qualify, but there's no silver bullet.

11   And they would always come back, there's no silver bullet.

12        And it just felt to me like they were saying, well,

13   we've got to do these things, but there's no silver bullet.

14   We're just lost here.

15        And I'm the nature that you've got to name the problem.

16   If you name the problem, you own it.  And I felt like that

17   we had to come out and aggressively state that we have a

18   serious, serious level of addiction in our community and

19   that we have to join together to be able to, to fight this.

20        And what I said -- I was meeting with these pastors and

21   I said what if, what if we -- if you would help us bring all

22   of the churches together on one day in September, and then

23   we would be able to just have a brief prayer in your

24   service.

25        I just -- this gets a little personal for me.  But I,

1    I've found in most difficult times, prayer has been

2    enlightening to me and certainly comforting to me.

3        And I know the nature of our community.  It's a

4    conservative, faith-based community, certainly not everyone,

5    but there's something -- there is a compassion within our

6    community.

7        And I said to the pastors, I said, "What if all we

8    would do is just offer a prayer, just a brief prayer in your

9    service at the same time that would just pray for the

10   delivery of those who are fighting addiction, that they

11   would be delivered out of opiate addiction, protection of

12   our law enforcement officers, and then also a prayer for

13   those who are engaged in a life of crime pedaling this stuff

14   that they be delivered from that."

15       I was asked to -- the pastors thought, you know, this,

16   this might, this might be something that we could be able to

17   communicate with our other fellow clergy members.

18   **Q.**   Did you set a certain time period for that to happen?

19   **A.**   We set it for September 7th -- that was the first

20   Sunday in September in 2014 -- at 11:05 a.m.  The reason was

21   that if you attended a church that started at 11:00, by the

22   time of the procession and everything, 11:05 might be a good

23   time for it, or if you were at -- like one of my churches

24   starts at a quarter till.  By the time you get to the

25   pastoral prayer, it would be an appropriate time.

1          What I ended up learning is that the Jewish community

2     on their Friday did night prayers and Saturday morning

3     prayers, they included that there.  On the Muslim community,

4     on their Friday afternoon prayers invited me to come to be a

5     part of, of that with, with them.

6          All I did was I asked -- I was asked to send an email

7     out and do a quick video that said -- the pastors said,

8     "Mayor, they need to hear your voice and what, the passion

9     behind it."

10         I did a quick -- I had somebody who was able to film

11    it.  I did a very quick video and attached it to the email.

12    And I gave it to five pastors.  That's it.  There was a

13    Pentecostal pastor.  There was a Presbyterian pastor, a

14    Baptist pastor, an Episcopalian pastor, and a

15    non-denominational pastor.

16         And I gave it to them and I asked them at first just if

17    there is something theologically or spiritually offensive

18    about this, let me know.  I don't want to do more harm.

19         They all came back indicating they thought it was

20    something that could be helpful.  They shared it with their

21    fellow clergy.  They shared it within their congregations.

22         The reason September was is that's National Recovery

23    Month and I thought if we do it on September 7th on that one

24    Sunday -- what was amazing -- what we started finding out,

25    we knew that several churches in the Huntington area were

1    going to participate, but the entire churches throughout the

2    region started worked receiving communication from, from

3    pastors, from others, started learning that it had spread

4    around the world; started getting letters from, from Egypt,

5    from South America, Europe.  Some of them I had to find

6    somebody to be able to interpret what was being written.

7         What was so absolutely amazing to me and affirming

8    about this is that of all the languages around the world

9    that people were participating in this, there were three

10   words, there were three words in every language that they

11   were using:  Huntington, West Virginia.

12        And what I came to understand as we moved, as we moved

13   on this is, this is how the community started to embrace

14   that we have to stand, that we have to stand together.

15        As I said, if you name it, you own it.  And, and

16   principally what our message was was that everyone has to

17   have an assignment.  I had individuals calling me, Your

18   Honor, saying, "Well, what can I do?"  Some would say -- and

19   I don't mean any offense of this to anyone who might -- "I'm

20   just a housewife.  What do I do?"  As a housewife, there's

21   many things that you can do.

22        "I'm only a high school student.  What can I do?"  I

23   said, "Well, what's your passion?  What is your passion?  Is

24   it sports?  Is it the arts?  Is it in your church?"

25        But everybody, everybody has to -- everybody has to

1    have an assignment.  And what we started seeing as we were

2    moving forward is that the community started coming together

3    and somehow we needed to make sure that that community was

4    coming together in such a way that it wasn't just, wasn't

5    just a tea party where you're getting together and there was

6    no substance.  We've got to have something that was embraced

7    by the community.

8           MS. KEARSE:  Gina, I think if you can just go

9    quickly to 3 and 4.

10   BY MS. KEARSE:

11   Q.   And these are just two photographs I think.  Was

12   this the September, first Sunday when you got members of

13   your community together in Huntington that eventually --

14   just tell us --

15   A.   Yeah.  This was on September 7th.  And, interestingly,

16   that's my church.  But there is something instructive about,

17   about this picture on the left.

18        Your Honor, if you notice, right behind me there is a

19   blondish, light-haired woman.  And to her right, our left,

20   is an older gentleman.  And immediately to their left, our

21   right, there's another couple that are bowing their heads,

22   one man balding and his wife just to the side.

23        What's instructive about this is that it shows the

24   extent of what we were dealing with.  The couple on the

25   left, their grandson died of an overdose, opioid pills.

1      The couple on the right, same thing with their son died

2  from an overdose of pills.

3      The bald-headed man that you see came in to meet with

4  me.  We've known each other for years.  And he came in with

5  me and he was as angry as you could ever, ever imagine and

6  just -- he needed somebody to yell at.  And he was saying,

7  "Why aren't we doing more?"

8      And I felt myself starting to feel a little defensive.

9  And I -- wait a second.  My responsibility as Mayor is also

10  to listen when people's hearts are hurting.

11      What's amazing is that the grandparents and the parents

12  each have started their own individual ministries within the

13  church and other churches for individuals who have lost a

14  loved one as to how they can come together and be able to

15  provide helpful support.

16      And it's just -- what I was encouraging them and what

17  I've been encouraging so many families that come in, that's,

18  that's I guess the hardest part of this is, is dealing with

19  the family members who have lost someone and they're,

20  they're lost.  They're saying, "What can we, what can we

21  do?"

22      And what I've come to understand is that we've got to

23  find a way to be able to give them a channel to be able to

24  be active in the community.  You heard me say earlier this

25  isn't something that, that city government can do or county

1    government can do.  Government can't answer everything.  The

2    community has to reach out.  The community has to reach out

3    and, and embrace these issues and be able to address them.

4    And that was the -- what we were -- it was a -- well, it's

5    been, as you might imagine --

6    **Q.**   I want to --

7    **A.**   These recent years have been awfully emotional.

8    **Q.**   So I want to go to some of the other things that you

9    did aside from reaching out to the churches and the faith

10   community.  I want to talk about some other partnerships

11   that you also worked with.

12       Gina, if we can --

13           THE COURT:  Ms. Kearse, we need a -- it's break

14   time if you're at a stopping place.

15           MS. KEARSE:  This is perfect, Your Honor.

16           THE COURT:  Okay.  We'll take about 10 minutes.

17       Mayor, you can step down during the break.

18       (Recess taken at 10:27 a.m.)

19           THE COURT:  Mayor, you can resume the witness

20   stand, sir.

21           MS. KEARSE:  I'm just looking for Gina, Your

22   Honor, our technical person.

23           THE COURT:  You can't live without the technology

24   now.

25           MS. KEARSE:  Even if it was just a picture, I was

1    going to go ahead and start, but I figure it's a good way to

2    kind of go in the next direction.

3           BY MS. KEARSE:

4    **Q.**   So, what I would like to do is spend the next little

5    bit of time just talking about now what, as the Mayor of the

6    City of Huntington, did you do in order to deal with some of

7    the issues we have talked about this morning, as well.

8           So, the judge has seen Chief Rader and Scott Lemley, but

9    can you tell the Court, what is this picture, and let's talk

10   about the Mayor's Office of Drug Control Policy.

11   **A.**   This is -- these are the members who I appointed as

12   members of the Mayor's Office of Drug Control Policy.  It

13   came -- everything -- as I have gone into excruciating

14   detail, Your Honor, so many things have been happening at

15   once, recognizing that with the law enforcement efforts of

16   trying to arrest as many arrests as we were -- we were

17   having, we were finding that it didn't seem that anything

18   was slowing down.

19          You might recall, Your Honor, that Director Botticelli

20   had come in to meet with us and the way he interacted with

21   everyone was quite compelling to me and came with a meeting

22   -- to the far right was Jim Johnson, who had been serving as

23   our acting Chief of Police and, for just a few months, our

24   Chief of Police, until I had a permanent Chief in place.

25   He's retired from the police department.  Certainly, well

1    known within the community.

2         I was meeting with him and I said, well, why don't we

3    -- why don't we create our own Office of Drug Control Policy

4    and asked him to serve as the director of it.  He was on the

5    verge of retiring and I encouraged him to stay, lead this

6    effort.

7         We asked Scott Lemley to be a part of it because he was

8    a crime analyst in the Police Department and we -- one thing

9    that we knew was that we needed to have current data.

10        You had a chance to meet Jan Rader, as well.  She was

11   just a Captain at this time.  She is also a registered

12   nurse.  I had observed her personally because she was --

13   when she wasn't on shift as a -- as a fire -- as a member of

14   the Fire Department, she was working in the emergency room

15   at Cabell Huntington Hospital.

16        I had occasion to see her in action because my dad, who

17   has since passed, was brought into the emergency room a few

18   times and I saw how compassionate she was in dealing with

19   him, calming him down, and then also my mother, who was just

20   scared witless as to -- and just to see how -- and it

21   occurred to me and, particularly, was learning that she was

22   dealing with a lot of overdoses within the emergency room,

23   as well, and I thought these -- these three might be able to

24   help.

25        The reason I asked and I wanted to create the Office of

1   Drug Control Policy, I was becoming -- beginning to feel

2   overwhelmed in this regard.  With all the law enforcement

3   efforts that we were having, with the actions that were

4   developing within the community, individuals were starting

5   to call me, oddly enough, not just from within the county,

6   but outside the county, even in Ohio and Kentucky and

7   throughout Southern West Virginia, and they were asking

8   what's next?  What's next?

9        And I remember standing there in my office by myself

10  and I thought, just kind of aimlessly looking at the

11  bookcases, and I thought I don't have enough -- I don't have

12  enough time in a day to do all that has to be done and we've

13  got to go out and start reaching out to others and start

14  bringing folks together.

15       And then I remembered what Director Botticelli was

16  doing and I thought maybe we ought to just do that here in

17  our community.  So, we created the Office of Drug Control

18  Policy and they started in earnest in December and then

19  started going out within the community to meet with others.

20       They pulled together two strategic plans.  2015 was

21  their first effort.  And December and January, December of

22  '14 and in January of '15, as they were going around meeting

23  with so many different groups, what we started finding is

24  that it wasn't that there was a lack of effort to deal with

25  the -- with the level of opiate addiction.  It was just

1    there was -- there was a lot of -- a lot of different groups

2    doing things, but the left hand didn't know what the right

3    hand was doing.

4         And I was encouraging -- because they were asking me,

5    well, what -- what do we want?  What is this supposed to be

6    doing?  And I said, well, get out there and start talking

7    with everybody.  Start building a sense of community among

8    those who are -- who are involved and the answers will start

9    to tell themselves.

10   **Q.**   So, as part of their role, did they -- they eventually

11   went out to the community and --

12   **A.**   Yes.  They went through the community and the first

13   strategic plan in 2015, in essence, saying we've got to

14   focus on prevention, intervention, treatment and law

15   enforcement.  But the only way that we do it is that if

16   everybody who is involved starts linking together.

17        The other report was that in 2017, for two years, as

18   active as we had been, we knew -- I will never, ever -- you

19   will never hear me say mission accomplished because there's

20   still so much more, still so much more to do, but the

21   efforts that we made with the '15 strategic plan, the

22   direction that was being created in the '17, 2017 strategic

23   plan, was laying the framework for the community to be able

24   to come together.

25        Because remember the admonition that I was mentioning

1    earlier, Your Honor, is I kept saying to anybody who would

2    listen, you have to accept an assignment.  It wasn't just

3    the children, or the teachers, or the housewives, or -- it

4    was also the hospitals, the university, the medical centers,

5    the health departments, the businesses in the community.

6    And that's, in essence, what this group pulled together.

7    **Q.**   And, Mayor, if you can tell a little bit about the

8    partnerships.  Let me back up.

9         So, you put these offices together and this is an

10   office run by the City of Huntington and also embracing your

11   community to work with you on this?

12   **A.**   Our goal -- our goal was to reach out as the -- this is

13   not something I took to City Council.  This is not an

14   official agency that was created.  It was very specifically

15   stated the Mayor's Office.  Felt like it had to have the

16   mayor's name on it, not the Williams Office.  The Mayor's

17   Office.

18        And, in essence, what we came to understand is that we

19   had to not say anybody had to do something, but the best way

20   to lead oftentimes is to get people to agree to make those

21   decisions themselves.  And what we started seeing, clergy,

22   education, healthcare, certainly law enforcement, all

23   started swimming in the same direction.

24   **Q.**   And when you testified that part of the role of the

25   Office of -- Mayor's Office of Drug Control Policy was to

1    collaborate and deal with prevention, treatment, recovery.

2    Can you tell the Court, why was that important for the

3    Mayor's Office to be involved in that process and what it

4    did for the community?

5    **A.**    We -- the one -- somebody -- I've had occasion to --

6    for a lot of different groups come in and look at what we

7    are doing.  Somebody needs to take the lead.  It doesn't

8    have to be a mayor, or the Mayor's Office, but somebody

9    needed to.

10        Circumstances were such in Huntington we were uniquely

11   positioned to be able to do that.  It could have been in

12   some other community.  It could have been a leader of a

13   physician community.  It could have been somebody from a

14   neighborhood.  It could have been an education leader.

15   Somebody needs to step forward.

16        But the Office of Drug Control Policy knows that this

17   is something that is born of the city.  We were leading

18   these things and then encouraging folks along -- along the

19   way.

20   **Q.**    And was part of the role of the policy to actually look

21   at, for example, treatment and promoting the fact, one, you

22   need treatment and you need more treatment and you need more

23   -- the ability to -- for the medical community to help with

24   that, as well?

25   **A.**    Yes.  We had to -- what we started seeing is that the

1    Health Department became very active.  They were interested

2    or felt that with some of the issues in the City, that a

3    Harm Reduction Program needed to be put in place, a Syringe

4    Exchange Program.

5         This was not something that the City was doing itself.

6    It was something that the Health Department and its Board

7    was charged to do, but we were very much partners in the

8    introduction and development of that.

9         The university, and one of the advantages that we have

10   in the community is when you have a university sitting right

11   down the street with the intellectual and the research

12   capability to be able to utilize that.  We saw that the

13   university stepped forward and started providing some

14   leadership.

15        Even in the hospitals, the hospitals found themselves

16   even partnering with the faith community.  I think there was

17   a group called Faith United that -- of pastors that came

18   together that were saying we really don't know how to deal

19   with these issues.

20        Your Honor, what -- I had one pastor say, say to me,

21   the only thing I know to do is say, well, I'll pray for you.

22   They needed -- they felt they needed to develop skills to be

23   able to address these issues not just for someone who was

24   fighting Opiate Use Disorder, but for the families that are

25   -- that are being affected.

1        The emergency room at the hospitals, the emergency room

2    started providing us realtime data through this as we were

3    working with Emergency Medical Services.  We knew we had to

4    have realtime data.  The problem was with the Centers for

5    Disease Control, with the information that they provide,

6    it's really frustrating, Your Honor, when they were telling

7    you what has happened two years before.

8        How in the world are you able to effectively respond to

9    a threat within a community when you're dealing with

10    two-year-old data?  My background is in the investment

11    world.  We have the most active, largest economic system in

12    the world.  Yet, publicly traded companies manage to report

13    their earnings on a quarterly basis, but we can't receive

14    realtime health data except every -- every two years.  It

15    says more about how broken the system is and that's kind of

16    off of this subject.

17    **Q.**   What I'd like to focus on is what -- what the Mayor's

18    Office of Drug Control Policy, what did you do with the data

19    and what foundation did you lay for the community in regards

20    to prevention and treatment?

21    **A.**   Well, we -- we -- as I indicated earlier, we started

22    going after grants right and left and it wasn't -- sometimes

23    they were grants that the City would pursue.  Oftentimes,

24    they were grants that the university or the hospitals or

25    from different foundations for the different groups within

1    -- within the community where we would provide -- we would

2    provide the leadership.

3        As I indicated, there are a lot of things that have

4    been pointed out the City is not paying for, for this.

5    Well, that's never been the intention.  The intention was,

6    was to move the community.

7        Your Honor, there's a -- there's a formula that works

8    in my mind that is very simple, is that collaboration leads

9    to partnerships.  You collaborate and you start to create

10   partnerships.  Then you establish a level of trust.

11       The outcome, not the tactic, the outcome ends up being

12   hope.  What we're trying to do is find a small ray of hope

13   within the community, going through all that we are doing in

14   our struggles, in the death, in the chaos, trying to find a

15   small ray of hope.

16       What the -- Mayor's Office of Drug Control Policy

17   helped us lay a foundation so that we would be able to move

18   forward within a community.

19   Q.   Were you able to build a Community Action Network?

20   A.   Yes, and there's -- I've lost the number of how many

21   different organizations there are.

22   Q.   We can go through some of those.

23   A.   Okay.

24   Q.   And so, I'll go quickly.  Were you able to address the

25   issues that you set out to address on addiction within your

1    community, at least to work -- start working towards some of

2    the solutions?

3    **A.**    Well, we were having individuals who were saying that

4    we were the epicenter of the opioid epidemic and that just

5    kind of smacked pretty hard.  And the more we continued to

6    work on what we were doing and identifying different

7    solutions, we could see the attitudes within the community

8    started to shift.  And it was fascinating to see how many

9    individuals considered themselves a full participating

10   partner in addressing the opioid epidemic.

11   **Q.**    And you're able to, it sounds like, establish

12   partnerships within a community, state and federal?

13   **A.**    Well, we had -- we had -- certainly, we had -- well,

14   yes, at the state and the federal level.  It went from City

15   Hall, to county courthouse, to the Governor's Office.

16        And throughout the governor's -- when Governor Justice

17   became Governor, he created his own, with the legislature,

18   the Governor's Office of Drug Control Policy and the

19   gentleman who was in that group, Jim Johnson, Your Honor,

20   who was part of our Mayor's Office of Drug Control Policy,

21   was hired away from the City to be the State Director of

22   Office of -- Office of Drug Control Policy.

23   **Q.**    Mayor, is the -- we -- the previous slide, we had two

24   strategic plans in place and I believe those are in evidence

25   and we can go through those another time, but did they set

1    out findings and the information provided through the data

2    and investigations and community outreach of what needed to

3    be done within the community and help move it forward?

4    **A.**    Well, what they did is they set information in place

5    and brought the community together in a collaborative

6    fashion to where the City of Solutions plan that was, in

7    essence, authored by Marshall University.

8        This was one of the examples, Your Honor, that I --

9    that I believe is when you start to see that what we were

10   doing laying the foundation, the university started to say

11   they were accepting their assignment.  They had research

12   that was available to be able to start identifying and

13   defining how do we continue to address this problem.  And

14   then the Resiliency Plan even rose out of that.

15       What you -- as you look at everything that we have

16   encountered over -- over the years, certainly from the very

17   first times that I started learning about what we were

18   facing in the community, you can see a constant evolution of

19   thought, of deed, and structure as to how we -- how we were

20   doing it.

21       And what's so fascinating, I believe, in our community

22   and, again, we still have so much work to do, but a

23   foundation has been laid where, Your Honor, the way that

24   I've said it is that what has amazed me is that we have had

25   people hiding in plain sight, leaders hiding in plain sight

1    to step forward to take action on things.

2         Lyn O'Connell, who spoke earlier, was one who just

3    became a breath of fresh air because of her intellect and

4    what -- and her passion.  And so many other individuals at

5    the university and the hospitals and throughout the

6    community.  Clergy.

7    **Q.**   So -- so, taking it through, is it fair to say that the

8    Mayor's Office of Drug Control Policy led a lot of the

9    foundation to a lot of the programs that were instituted

10   throughout the community that was -- that's discussed in the

11   City of Solutions?

12   **A.**   The Mayor's Office of Drug Control Policy helped lay

13   the foundation for all -- for all of the -- for all of these

14   things.

15   **Q.**   And in collaboration with various partnerships

16   throughout the community?

17   **A.**   Well, and this was -- that was what the Office of Drug

18   Control Policy did.  There was one point where you had to --

19   the Office of Drug Control Policy brought other groups

20   together so that they were moving forward on their own and

21   they didn't need the impetus of others and we created the

22   opportunity for collaboration throughout the community.

23   **Q.**   And then you mentioned the Resiliency Plan and, just

24   briefly, can you tell the Court, the Court has heard some

25   things about the Resiliency Plan, but is this an ongoing,

moving forward, looking forward type of document?

**A.**   Well, it's -- it's not defining where we've been.  If I've learned anything from COVID, if you want to know, you have to evaluate where you've been in order to know where you're going.  With what we have encountered in the last seven years and have experienced through COVID, even the Resiliency Plan is pointing in the direction of where we go.

The two things that I'm always pressing for is for a program to be replicable.  It doesn't have to be exactly the same way, but if we're doing something that is highly successful here in Huntington, how can it be replicated in another community?

It's very important to me, particularly throughout Appalachia, that there are communities that are able to say look what we can do.  So, it's not just being replicable, but it also has to be sustainable.

The hardest thing in the world is, is that when we have a program that is successful, wondering, well, how are we going to continue to fund -- to fund this?  And that's what the Resiliency Plan is, is to help us determine how are we going to be able to have a sustainable effort on this?

Fortunately, what we have established in Huntington is an unbelievably talented network of individuals and I believe that what -- what we have present there is you start to look at the history over from where we started from

1    scratch establishing what we are able to do.

2         This is a -- well, you're looking at this.  I think

3    there are, what, 15 different groups there.  Every one of

4    those groups -- the City of Huntington is listed.  So, there

5    are 15.  All of those are different groups that we've

6    partnered with through the Mayor's Office of Drug Control

7    Policy.  It's not to say that any of us have done something

8    that nobody else has.  And some of them are broadly stated

9    community groups.

10   **Q.**   And this -- and so, what we're showing, Mayor, this is

11   the Cabell County Commission, the City of Huntington, and

12   the ability to work with various partnerships in order to do

13   what you've done today and to actually move into the future?

14   **A.**   Well, yes.  And this is where community solutions is

15   stated so well.  The last thing in the world that we need is

16   for somebody from Washington to come in and tell us, now,

17   this is what you need to do.

18        I've had meetings with those folks and some of them are

19   fairly high ranking and I think you've come to see that I'll

20   be a little blunt or direct.  And I said if you think you're

21   going to come here and tell us what we need to do, you can

22   stop right now.  What I'm looking for is a partner.  If

23   you're willing to come in here and partner with us -- and

24   it's amazing.  When you're pretty direct with those folks

25   right up front, they seem to fall in accord and respect what

1    we are able to do locally.

2    **Q.**    And just briefly, Mayor.  I mean, this talks about

3    community groups, and local schools, and recovery centers,

4    and universities, and hospitals.  You mentioned Marshall

5    Health.  But this is a collaboration of the -- of Cabell

6    County?

7    **A.**    Yes.

8    **Q.**    And how they're dealing with the opioid epidemic?

9    **A.**    It's amazing, yes.  Local business leaders, where

10   business leaders are taking it upon themselves.  All right.

11   How can they create economic opportunity for those

12   individuals who are coming through recovery and in treatment

13   to be able to have a job to provide some stability within

14   their life.

15        The Marshall School of Medicine, and Marshall Health,

16   and the Mountain Health Network, each of those bring

17   resources, certainly, but what they also bring is capacity,

18   but they also bring capability within their professional

19   structure to be able to address these issues.

20   **Q.**    Mayor, have you also, in addition to what we had the

21   outreach within the community, also been involved in

22   outreach with other organizations in cities and counties to

23   -- to discuss your experiences and, just very briefly, if

24   you could tell the Court some of those organizations?

25   **A.**    Well, I'm quite active in the National League of

1    Cities, which is an accumulation of cities representing over

2    19,000 cities across the nation.  Actually, they reached out

3    to us and asked us early, early on to be part of the

4    National Opioid -- National City/County Opioid Task Force

5    made up of ten representatives from counties, ten

6    representatives from cities.

7          One of the county commissioners from Mercer County was

8    on it.  I don't need to enter his name in the record, but

9    I'm sure, if you're down in Bluefield, you know who he is.

10   He was on it.

11         And we had ten representatives of cities and I was one

12   of three mayors.  The Mayor of Little Rock, the Mayor of

13   Dayton and I were mayors and we came with recommendations.

14   A member of the U. S. Conference of Mayors.

15         And I used to be a Co-Chair of the Committee on

16   Substance Abuse with the Conference of Mayors.  The Co-Chair

17   was the Mayor of Boston and now he's the Secretary of Labor

18   in the Biden Administration.  I'm the Chair of that

19   Department -- of that Committee right now.

20         As a result of those, we've been invited to participate

21   in Task Forces to give us technical support as to how we're

22   able to -- to proceed forward, but it's not just technical

23   support.  Oftentimes, it's everyone in here from their

24   professional knowledge knows that if you come and you're

25   collaborating with professionals elsewhere in your -- in

1    your field, you take to them what your -- expertise you've

2    developed, but you walk away with a heck of a lot more.

3         And, as a result of that, we've been invited to be a

4    part of programs and several universities at NYU, Georgetown

5    University, O'Neill Institute in -- I think it's within

6    their law school.  Indiana University, the School of --

7    **Q.**   So, you continue to reach out and collaborate with --

8    **A.**   Yes.

9    **Q.**   -- with others and --

10   **A.**   Stanford.  And I'm sure I'm missing a couple.

11   **Q.**   Mayor, we've talked a lot throughout this trial about

12   the devastation the City has experienced and the community

13   as a whole in Cabell County, but over the course of your

14   time in Huntington and in your capacity as the mayor, have

15   you observed people who have become successful in overcoming

16   their addiction through treatment and resources offered by

17   the community?

18   **A.**   Yes.  There's one -- so many.  I mean, that's -- that's

19   the encouraging aspect of this when you do see individuals

20   who have been at the lowest point in their life and then

21   when they have been able to go on and develop.

22        There was one man that came in to meet with us at City

23   Council and he showed us a picture of him and here he was,

24   he was in a highly professional suit, well groomed, very

25   articulate, and he showed a picture that looked like Haiti

1    frozen over and he said this was the lowest day of my life.

2    This is when I was arrested because of my involvement with

3    opioids.  And when I look at what he has done and with so

4    many others, it's -- it's affirming that what we are doing

5    is the work of the angels.

6    **Q.**    Mayor, you've dedicated most of your life to public

7    service and, obviously, the City of Huntington and Cabell

8    County.  Has it been rewarding work as you've been mayor

9    even in the face of what you've testified about today?

10   **A.**    It's been the most rewarding experience that I've ever

11   had, but it's also the most heart wrenching.

12        Your Honor, when I -- I became mayor, I never, ever

13   dreamed that this would be something I'd be dealing with.

14   It's not my -- it's not my forte.  That's not my background.

15        But the one thing that I learned in my family is

16   there's some times you're called to lead.  And my parents,

17   with my brother and I, taught us you are expected to lead.

18   Not an opportunity.  You are expected to lead.

19        We saw what was happening here and the beauty of it is,

20   is that when you lead and it's channeled in the proper

21   direction, then individuals start to line up to be

22   supportive.  And we have a loving, caring, compassionate

23   community.  And what I've also learned is that we have a

24   loving, caring, compassionate state and nation.  And that's

25   where that little ray of hope survives for me.

1    Q.   And, Mayor, as we sit here today, does Cabell County

2    and the City of Huntington still need resources and the

3    ability to move forward in order to deal with this opioid

4    epidemic?

5    A.   My biggest fear is, is that what -- what happens if we

6    can't take care of this?  Do we just -- are we in a

7    perpetual cycle of just continuing with this?  You'll notice

8    I said earlier replicable and -- not resilient.  Well, so

9    that we can be able to -- sustainable.  That's absolutely

10   necessary for us to -- somehow to be able to move forward.

11        What is -- what Huntington and Cabell County has done

12   is beyond -- beyond measure, but when we're talking about

13   resources, I'm not looking for a money grab.  All I'm

14   looking for is the capacity to be able to make sure that my

15   community can heal.  And I believe that we are demonstrating

16   that we are in that direction.

17        But the truth is, addiction is highly fragile.  We've

18   experienced an uptick in overdoses through COVID.  We were

19   up 14 percent last year.  Our overdoses are on track of

20   being more than what we had last -- last year.  I think,

21   last year, we had 999 overdoses.  I don't -- this is an --

22   I'm not trying to enter something into the record.  So,

23   please --

24   Q.   Let me ask you this.  Is there an ongoing opioid

25   epidemic in the City of Huntington and Cabell County as we

1   sit here today?

2   **A.**   It's -- we -- we fight it every -- every day.

3   **Q.**   And is there a vision and hope that an abatement plan

4   or strategic plans that can be put in place will bring about

5   some closure to the opioid epidemic within your community?

6   **A.**   We must have the capability of being able to move

7   forward.  We're active in going after grants.  That's a

8   piecemeal that's working in half shares.

9        We need resolution to this.  And the way that we

10  resolve it is having the -- being able to say to these folks

11  in Huntington is that you go, you do what you're capable of

12  doing, and let's set a system where we're able to see that

13  the resources can be afforded to do just that; nothing else,

14  but to do just that.

15  **Q.**   To focus on the opioid epidemic?

16  **A.**   Opioid epidemic, just that.

17          MS. KEARSE:  Mayor, I have no further questions.

18  Thank you very much.

19          THE COURT:  You may cross examine.

20          MR. RUBY:  Thank you, Your Honor.

21                    **CROSS EXAMINATION**

22          **BY MR. RUBY:**

23  **Q.**   Good morning, Mr. Mayor.  How are you?

24  **A.**   Doing well.

25  **Q.**   I was looking over the transcript of the deposition,

```
 1   which is the last time we had a chance to spend some time

 2   together, and noticed that it was exactly a year ago today

 3   that we were able to spend a few hours together in

 4   Huntington.  It seems impossible, but it's true.

 5   A.   Happy anniversary.

 6   Q.   Happy anniversary to you.

 7        Mayor, you've been here for several days of this trial,

 8   correct?

 9   A.   Yes.

10   Q.   And you were here for the opening statements?

11   A.   Yes.

12   Q.   So, you know already that nobody in this room is

13   disputing that there's been an opioid problem in Huntington

14   or Cabell County, right?

15   A.   That's true.

16   Q.   Let's look at what you said about the causes of that

17   problem.  You agree that prescription opioids don't just

18   show up on a pharmacy's doorstep, right?

19   A.   Correct.

20   Q.   You understand that distributors, wholesale

21   distributors, only ship opioid pain medications when

22   pharmacists order them, right?

23   A.   Yes.

24   Q.   So, you understand that the number of doses of opioid

25   pain medications that were shipped to Cabell County and
```

1    Huntington was simply the number of doses that were ordered

2    by pharmacists in Cabell County and Huntington, right?

3    **A.**    Yes.

4    **Q.**    You also understand that the pharmacist who ordered

5    those medications were licensed by the government, right?

6    **A.**    Yes, sir.

7    **Q.**    And the City hasn't sued any pharmacists in this case,

8    has it?

9    **A.**    I haven't looked at the order of our original lawsuit.

10   I'm not sure.  I think there -- you're asking pharmacists,

11   correct?

12   **Q.**    Yes, Mayor.

13   **A.**    No.  I don't believe specific pharmacists.

14   **Q.**    And you understand that when pharmacists in Huntington

15   and Cabell County dispensed prescription pain medication,

16   they were doing it because a patient brought them a

17   prescription from a doctor or some other kind of licensed

18   prescriber, right?

19   **A.**    Yes, sir.

20   **Q.**    And you agree that pharmacists in Cabell County and

21   Huntington were dispensing prescription opioids only to

22   people who had prescriptions, right?

23   **A.**    That the pharmacists were -- yes, that the pharmacists,

24   is that your question again?  I'm sorry.

25   **Q.**    Yes, Mayor.  You would agree that the pharmacists in

1    Cabell County and Huntington --

2    **A.**    Yes.

3    **Q.**    -- were dispensing prescription opioids only to

4    patients who had prescriptions from physicians?

5    **A.**    Yes, sir.

6    **Q.**    So, you understand then that the number of pills that

7    were shipped to Cabell County and Huntington was the number

8    that physicians there prescribed; is that right?

9    **A.**    Yes, sir.

10   **Q.**    And that's the way it should be, right?  You agree that

11   it's up to a physician to decide who has a legitimate need

12   for prescription opioids, correct?

13   **A.**    Yes, but if I could at least speak to this because I

14   understand the direction you are going.  My -- my principal

15   concern is this, is that while prescriptions are being

16   written by physicians, filled by pharmacists, the pharmacy

17   is requesting the shipment of pills from the distributors.

18   Through this system causes me to have a concern.  Now, this

19   is not my area of expertise, but it appears to me that if

20   there is a trend of extremely high levels of prescriptions

21   that are being ordered into the community, I would think

22   that red flags and bells would be going off everywhere and

23   that -- and excuse me for going on with this.  Our concern

24   -- my concern has been how did we get here.

25              MR. RUBY:  Your Honor, the question was whether

```
1    the mayor agrees that it's up to a physician to decide who

2    has a legitimate need for opioids, so I will move to strike

3    that answer as non-responsive.

4           MR. MAJESTRO:  Your Honor, and at this time, I

5    want to object.  He's well beyond what this witness's

6    personal knowledge is of these concepts.

7           MR. RUBY:  Your Honor, the witness has just been

8    on the stand for two hours testifying about the depth of the

9    opioid crisis that exists in Huntington and Cabell County

10   and we're certainly entitled to cross examine about

11   statements he's made as to the cause of that problem.

12          THE COURT:  Well, I'm going to overrule and deny

13   the motion.  I think you made a motion to strike the

14   testimony, didn't you?

15          MR. RUBY:  Yes, Your Honor.

16          THE COURT:  I'm going to deny the motion to

17   strike.  I think the mayor is just explaining his answers

18   and I'll let you go ahead, but you need to answer the

19   specific question, if you can.

20          THE WITNESS:  Yes, sir.  I understand.  I

21   apologize.

22          BY MR. RUBY:

23   Q.   And I do want to get, Mayor, an answer to that question

24   and make sure it's clear on the record.

25        You do agree that it is up to a physician to decide who
```

```
 1    has a legitimate need for prescription opioids, right?
 2    A.   Yes, sir.  I thought I said -- excuse me.  I apologize,
 3    but I thought I had said yes before I went into my
 4    explanation.
 5    Q.   You understand that prescription opioids are approved
 6    by the FDA?
 7    A.   Yes, sir.
 8    Q.   And you understand that they serve the legitimate
 9    purpose of treating people who are in pain, correct?
10    A.   Yes.
11    Q.   And you believe that the vast majority of doctors in
12    Cabell County and Huntington thought they were prescribing
13    opioids appropriately, correct?
14    A.   Yes, sir.  Yes, sir.
15    Q.   Let's talk about some other things, Mayor, that you've
16    said and that the City has said caused the problem that you
17    testified about earlier.  You, of course, are familiar with
18    the complaint in this case, correct?
19    A.   Yes, sir.
20    Q.   I'm going to give it to you because it's lengthy and I
21    don't expect you to have it all in memory.  This is going to
22    be DEF-WV-2631.
23             MR. RUBY:  May I approach, Your Honor?
24         I noticed that the bench had been cleared, Your Honor.
25    I didn't think you'd want to keep it that way for long.
```

```
 1              THE COURT:  Well, I want to have plenty of room
 2    for the next batch of documents.
 3         (Laughter)
 4              BY MR. RUBY:
 5    Q.   Mayor, this is the current version of the complaint in
 6    this case, correct, the third amended complaint?
 7    A.   Yes, sir.
 8    Q.   And you, yourself, made the decision to file this
 9    lawsuit, right?
10    A.   Yes, sir.
11    Q.   It wasn't City Council; it was you, correct?
12    A.   Yes, sir.
13    Q.   And the first defendant that's named on this complaint
14    is Purdue Pharma, LP, correct?
15    A.   Yes, sir.
16    Q.   And then the next two are other Purdue Pharma
17    companies; is that right?
18    A.   And I think family members, yes, sir.
19    Q.   And we'll get to that.  There's Rhodes Pharmaceuticals,
20    which is a subsidiary of Purdue Pharma?
21    A.   Yes.  Excuse me.  I'm not really sure, but I will take
22    your word for it.
23    Q.   And then you mentioned family members.  Here on the
24    complaint you have Richard Sackler, Kathe Sackler, Jonathan
25    Sackler, and a number of other people named Sackler,
```

1    correct?

2    **A.**    Yes, sir.

3    **Q.**    The Sackler family owns Purdue Pharma?

4    **A.**    As I understand.

5    **Q.**    And then there is, after that, a page and a half of

6    pharmaceutical manufacturers, correct, in the defendants'

7    section of this complaint?

8    **A.**    Yes, sir.

9    **Q.**    Now, there's some preliminaries here at the beginning

10   of the complaint, Mayor, but I'm going to ask you to turn

11   past those and go, if you would, to Page 75 and look at

12   Paragraph 313.  And we should also be able to get that on

13   the screen there beside you so that it's a little bit more

14   convenient to see.

15        Do you see there, Mayor, at the bottom of Page 75,

16   Paragraph 313?

17   **A.**    Yes.

18   **Q.**    That paragraph says this drug crisis began with a

19   corporate business plan.  It started with a decision by

20   Purdue and the Sackler defendants (collectively, Purdue

21   entities), to promote opioids deceptively and illegally in

22   order to significantly increase sales and generate billions

23   of dollars in revenue for Purdue's private owners, the

24   Sackler family.

25        Did I read that correctly?

1   **A.**   Yes, sir.

2   **Q.**   And you agree with that statement, correct?

3   **A.**   Yes.

4   **Q.**   There's nothing in there that you disagree with?

5   **A.**   There's nothing I disagree with.

6   **Q.**   And that statement on what started the opioid crisis,

7   that's about Purdue Pharma and the Sackler family, correct?

8   **A.**   Yes.

9   **Q.**   In fact, you believe that Purdue Pharma led to opioid

10  abuse across our entire country, don't you?

11  **A.**   Yes.

12  **Q.**   And Purdue led to opioid abuse specifically in

13  Huntington, West Virginia?

14  **A.**   Yes.

15  **Q.**   And in Cabell County, West Virginia?

16  **A.**   Yes.

17  **Q.**   The Sackler family contributed to opioid abuse in

18  Huntington, West Virginia, correct?

19  **A.**   Yes.

20  **Q.**   And in Cabell County, West Virginia?

21  **A.**   Yes.

22  **Q.**   Let's look at the next paragraph, Paragraph 314.  This

23  says Purdue's strategies were quickly joined by other

24  manufacturers.

25       Do you see that?  And I'm going to stop right there.

1    We'll finish it so you can have a chance to look at the

2    whole thing.

3         But the first part there, Purdue's strategies were

4    quickly joined by other manufacturers, do you agree with

5    that statement?

6    **A.**   Yes.

7    **Q.**   And then the paragraph goes on to name a long list of

8    other pharmaceutical manufacturers, correct?

9    **A.**   Yes.

10   **Q.**   Endo Pharmaceuticals on that list?

11   **A.**   What was that again, sir?

12   **Q.**   Endo Pharmaceuticals?

13   **A.**   Oh, yes.   Yes.

14   **Q.**   And Par, P-a-r, Pharmaceutical is on that list?

15   **A.**   Yes.

16   **Q.**   Johnson & Johnson is on that list?

17   **A.**   Yes.

18   **Q.**   Noramco?

19   **A.**   Yes.

20   **Q.**   Teva Pharmaceuticals?

21   **A.**   Yes.

22   **Q.**   Mallinckrodt?

23   **A.**   Yes.

24   **Q.**   And there are a few others that I'll skip over for the

25   sake of time, but at the end of that list in parentheses it

1    says (collectively the), and then in quotes, "marketing

2    defendants".  Do you see that?

3    **A.**    Yes.

4    **Q.**    And what that means is that where this complaint says

5    marketing defendants, it means the pharmaceutical

6    manufacturers that are in that list, right?

7    **A.**    Yes.

8    **Q.**    So, let's look at what the complaint says about the

9    marketing defendants.  If you turn to the next page, Mayor,

10   Paragraph 319, and we'll take this a bite at a time.  This

11   paragraph starts out the marketing defendants' scheme was

12   resoundingly successful.  Do you see that?

13   **A.**    Yes.

14   **Q.**    You agree with that statement, right?

15   **A.**    Yes.

16   **Q.**    And then it goes on to say chronic opioid therapy --

17   the prescribing of opioids long-term to treat chronic pain

18   -- has become a commonplace, and often first-line,

19   treatment.

20         You agree with that statement, right?

21   **A.**    Yes.

22   **Q.**    And then it says marketing defendants', and that's the

23   list of manufacturers that we just looked at, right?

24   **A.**    Yes.

25   **Q.**    It says marketing defendants' deceptive marketing

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    caused prescribing not only of their opioids, but of opioids

2    as a class, to skyrocket.

3        Did I read that correctly?

4    **A.**   Yes.

5    **Q.**   And you agree with that statement, right?

6    **A.**   Yes.

7    **Q.**   Now, Mayor, we could spend a couple of hours going

8    through everything that your complaint says about the

9    manufacturers, but I'm not going to do that.  I'm going to

10   ask you to look at just a few more statements in this

11   document.

12       If you would, turn to Page 94.  And I'll direct you to

13   Paragraph 376.  Are you there?

14   **A.**   Yes.  At the bottom of the page, correct?

15   **Q.**   Yes, sir.  This paragraph says marketing defendants' --

16   and, again, that's the list of manufacturers that we looked

17   at just a moment ago, right?

18   **A.**   Yes.

19   **Q.**   Marketing -- marketing defendants' deceptive marketing

20   created a cadre of doctors who looked for pain and treated

21   it with opioids, which created an even broader cohort of

22   patients who expected and received opioids.

23       Do you agree with that statement?

24   **A.**   Yes.

25   **Q.**   And it goes on to say this laid the groundwork for

1    today's epidemic of opioid addiction, injury and death.

2         You agree with that statement, correct?

3    **A.**   Yes.

4    **Q.**   If you turn to Page 98, Mayor, Paragraph 384, do you

5    see that?

6    **A.**   Yes.

7    **Q.**   This paragraph says the marketing defendants'

8    misrepresentations generally fall into the following nine

9    categories:  The risk of addiction from chronic opioid

10   therapy is low.  That's number one, correct?

11   **A.**   Yes.

12   **Q.**   And you agree with that statement?

13   **A.**   Yes.

14   **Q.**   And it goes on to say, number 2, signs of addictive

15   behavior are, quote, "pseudoaddiction," requiring more

16   opioids.  You agree with that statement, correct?

17   **A.**   Yes.

18   **Q.**   Number 3, to the extent there is a risk of addiction,

19   it can be easily identified and managed.  You agree with

20   that, correct?

21   **A.**   I agree, once again, the misrepresentation on -- that

22   it was a misrepresentation.

23   **Q.**   And I want to be clear on the record.  You agree that

24   this was one of the misrepresentations --

25   **A.**   Yes.

1    **Q.**    Made by the marketing defendants, correct?

2    **A.**    Yes, sir.

3    **Q.**    And you also agree that another of the

4    misrepresentations that the marketing defendants made is

5    number 4 here, opioid withdrawal can be avoided by tapering,

6    correct?

7    **A.**    Yes.

8    **Q.**    And you agree that another one of those defendants --

9    by the misrepresentations, excuse me, by the marketing

10   defendants was number 5, long-term opioid use improves

11   functioning, correct?

12   **A.**    Correct.

13   **Q.**    And another misrepresentation by the marketing

14   defendants was number 6, that opioid doses can be increased

15   without limit or greater risks, correct?

16   **A.**    Correct.

17   **Q.**    And another misrepresentation by the marketing

18   defendants was here in number 7.  Alternative forms of pain

19   relief pose greater risks than opioids.  You agree with

20   that, correct?

21   **A.**    Yes.

22   **Q.**    And you agree that -- that -- and I'll do 8 and 9

23   together here, that the marketing defendants'

24   misrepresentations also included the misrepresentation that

25   Oxycontin provides 12 hours of pain relief and that new

1    formulations of certain opioids successfully deter abuse.

2    Do you agree with that?

3    **A.**    Yes.

4    **Q.**    All of those are misrepresentations that, according to

5    the City of Huntington and Cabell County, were made by the

6    marketing defendants, correct?

7    **A.**    Yes.

8    **Q.**    And then, Mayor, if you would turn to Paragraph 385,

9    it's the next one down, it says each of these propositions

10   was false.  The marketing defendants knew this, but they

11   nonetheless set out to convince physicians, patients, and

12   the public at large of the truth of each of these

13   propositions in order to expand the market for their

14   opioids.  You agree with that statement, correct, Mayor?

15   **A.**    Yes.

16   **Q.**    Now, let's talk about another organization that the

17   City of Huntington also says caused the opioid problem.

18   You're familiar with the Joint Commission, correct?

19   **A.**    Yes.

20   **Q.**    And that used to be called the Joint Commission on the

21   Accreditation of Healthcare Organizations?

22   **A.**    Yes.

23   **Q.**    We'll call it the Joint Commission today, or JCAHO,

24   which is the way that people pronounce the acronym for the

25   whole longer name; is that all right?

1    **A.**   Yes, sir.

2    **Q.**   The Joint Commission is the organization that accredits

3    virtually every hospital in America; is that right?

4    **A.**   Yes.

5    **Q.**   And it's an enormously influential organization in the

6    medical community, correct?

7    **A.**   Yes.

8    **Q.**   Huntington -- separate and apart from the case that

9    we're in here today, Huntington has also sued the Joint

10   Commission for causing the opioid problem, correct?

11   **A.**   Yes.

12   **Q.**   And you made the decision to file that lawsuit; is that

13   right?

14   **A.**   Yes.

15   **Q.**   I'm going to ask you to take a look, Mr. Mayor, at

16   what's been marked DEF-WV-1102.

17            MR. RUBY:  May I approach, Your Honor?

18            THE COURT:  Yes.

19            BY MR. RUBY:

20   **Q.**   Mayor, the document that I've handed you, DEF-WV-1102,

21   this is a press release that your office issued in November

22   of 2017, correct?

23   **A.**   Yes.

24   **Q.**   It says at the top in the headline, Huntington, three

25   other West Virginia cities, file lawsuit against Joint

```
 1    Commission, correct?
 2    A.   Yes.
 3    Q.   You personally approved the quotes from you that appear
 4    in this press release; is that right?
 5    A.   Yes.
 6              MR. RUBY:  Your Honor, I would move to admit
 7    DEF-WV-1102.
 8              THE COURT:  Any objection?
 9              MS. KEARSE:  I think it's -- well, it's hearsay on
10    -- it's a press release.  Hearsay.
11              MR. RUBY:  Your Honor --
12              THE COURT:  If it's hearsay, how do you get it in?
13              MR. RUBY:  Statement of party opponent offered
14    against the party, 801(d)(2).
15              THE COURT:  Let me look at the rule just to be
16    sure.
17         (Pause)
18              THE COURT:  It's admitted.  1102 is admitted.
19              BY MR. RUBY:
20    Q.   Mayor, we will look at the complaint against the Joint
21    Commission that this press release refers to in just a
22    minute, but I want to first look at how you, yourself,
23    described the lawsuit in this press release.
24         If you would turn, Mayor, to Page 2, and you may have a
25    double-sided copy there, I'm not sure.  Mine is.  And if
```

1    yours is, then it would be on the back of Page 1.  Page 2,

2    the third paragraph down, is a quote from you and it begins

3    this lawsuit is a critical move.  Do you see that?

4    **A.**    Yes.

5    **Q.**    It says this lawsuit is a critical move toward

6    eliminating the source of opioid addiction and holding one

7    of the most culpable parties responsible.  Did I read that

8    correctly?

9    **A.**    Yes, sir.

10   **Q.**    You agree with that statement, right?

11   **A.**    I -- yes.  I agree that it is one of the most culpable

12   parties.  There was a qualifier in there and that was on

13   purpose.

14   **Q.**    Well, let me ask, is there any part of this statement

15   that you disagree with?

16   **A.**    No.  It's -- but it's a qualification.  It's not a --

17   an assertion that it's the most culpable.  It's one of the

18   most culpable.

19   **Q.**    And that refers to the Joint Commission, correct?

20   **A.**    Yes, sir.

21   **Q.**    Let's talk about why suing the Joint Commission in your

22   view was a critical move toward eliminating the source of

23   opioid addiction.  The Joint Commission played a key role in

24   the concept of pain as the fifth vital sign; is that right?

25   **A.**    Yes.

1   **Q.**   And the concept of pain as the fifth vital sign that,

2   in turn, led to increasing prescribing of pain medications,

3   correct?

4   **A.**   Yes.

5   **Q.**   And that's why you said that the lawsuit against the

6   Joint Commission was a critical move toward eliminating the

7   source of opioid addiction, right?

8   **A.**   Yes.

9   **Q.**   Now, let's focus on the second part of the sentence,

10   which is the one that you commented on just a moment ago.

11   It says holding one of the most culpable parties

12   responsible, and you agree that the Joint Commission is one

13   of the most culpable parties responsible for the opioid

14   problem, correct?

15   **A.**   Yes.

16   **Q.**   And the reason that you believe that is because it's

17   the Joint Commission that sets the standards that

18   physicians, and hospitals, and clinics rely on, right?

19   **A.**   Yes.

20   **Q.**   And the Joint Commission helped encourage the

21   prescribing of opioids because it set standards that

22   required hospital patients' pain to be eliminated, right?

23   **A.**   Eliminated, I think, is the keyword, yes.

24   **Q.**   And, in your view, the only way to accomplish that, the

25   only way for hospitals, and physicians, and prescribers

1    working in hospitals to accomplish that, was by prescribing

2    opioids, correct?

3    **A.**   Yes.

4    **Q.**   Turn to the next sentence of what you said here in the

5    press release, Mayor.  It goes on, for too long, JCAHO has

6    operated in concert with opioid producers to establish pain

7    management guidelines that feature the use of opioids

8    virtually without restriction.  You agree with that

9    statement, right?

10   **A.**   Yes.

11   **Q.**   And by opioid producers in that statement, you meant

12   manufacturers, correct?

13   **A.**   Yes.

14   **Q.**   And when you said that JCAHO, an opioid manufacturer,

15   established pain management guidelines that feature the use

16   of opioids virtually without restriction, what you meant was

17   that the fifth vital sign which JCAHO promoted led to the

18   use of opioids virtually without restriction, right?

19   **A.**   Yes, sir.

20   **Q.**   You agree that JCAHO contributed to the opioid abuse

21   problem in Huntington and in every other city across the

22   country, don't you?

23   **A.**   Yes.

24   **Q.**   Now, we'll take a look at the complaint, the JCAHO

25   complaint itself, Mayor.  I'm going to show you what's been

1    marked as DEF-WV-2124.

2        Mayor, is this the City's complaint against the Joint

3    Commission?

4    **A.**    Yes.

5    **Q.**    And you approved this complaint, right?

6    **A.**    Yes, on behalf of the City of Huntington.

7    **Q.**    And it was filed, in fact, by the City of Huntington

8    among some other plaintiffs who are listed there on the

9    front page, correct?

10   **A.**    Yes.

11   **Q.**    It was filed here in the Southern District of West

12   Virginia, correct?

13   **A.**    Yes.

14   **Q.**    And the City sued -- the City of Huntington sued here

15   the Joint Commission which, according to the caption, was

16   formerly known, as you've already discussed, is the Joint

17   Commission on the Accreditation -- I got that wrong.  The

18   Joint Commission on Accreditation of Healthcare

19   Organizations and also sued Joint Commission Resources,

20   Inc., which is an affiliate of the Joint Commission,

21   correct?

22   **A.**    Yes.

23   **Q.**    And -- and -- well, I'll just -- I think we've already

24   established that.

25            MR. RUBY:  Your Honor, I would move to admit this

```
1    document, also, as a statement of a party opponent.
2              THE COURT:  Well, I can take judicial notice of it
3    anyway, can't I?
4              MR. RUBY:  You can, Your Honor.
5              THE COURT:  Any objection?
6              MS. KEARSE:  No, Your Honor.
7              THE COURT:  It's admitted.
8              BY MR. RUBY:
9    Q.   Let's see, Mayor, what this complaint against the Joint
10   Commission says about the causes of the opioid problem in
11   Huntington.  And we will start with the first numbered
12   paragraph, which is on Page 2.  Do you see Paragraph number
13   1 there, Mayor?
14   A.   Yes.
15   Q.   That says, in 2001, Defendant JCAHO, as part of its
16   certification program for healthcare organizations, teamed
17   with Purdue Pharma LP and its affiliates, and in parentheses
18   there it says ("Purdue"), as well as other opioid
19   manufacturers, to issue pain management standards, ("or
20   Standards") and other related documents that grossly
21   misrepresented the addictive qualities of opioids and
22   fostered dangerous pain control practices, the result of
23   which was often the inappropriate provision of opioids with
24   disastrous adverse consequences for individuals, families,
25   and communities.  Did I read that correctly?
```

1    A.    Yes.

2    Q.    And you agree with that statement, correct?

3    A.    Yes.

4    Q.    And there's not a part of that statement that you

5    disagree with, is there?

6    A.    No.

7    Q.    It continues, these dangerous standards, with minor

8    modifications, exist to this day.  Did I read that

9    correctly?

10   A.    Yes, sir.

11   Q.    And you agree with that statement, as well, correct?

12   A.    Yes.

13   Q.    And I'll say the same thing as I said on the last

14   complaint.  We could spend a long time on the City's

15   explanation of how it was the Joint Commission that caused

16   the opioid problem in Huntington, but in the interest of

17   time, we'll move quickly.

18         If you can turn to Paragraph 8 on Page 4, Mayor.  It

19   begins there at the bottom of Page 4 and continues onto the

20   next page.  Do you see that?

21   A.    Yes.

22   Q.    It says, JCAHO's enforcement of its pain management

23   standards and its and JCRs -- that's Joint Commission

24   Resources, correct?

25   A.    Yes.

1    **Q.**    JCR?

2    **A.**    Yes.

3    **Q.**    -- widespread misinformation campaign about the safety

4    of opioids has also led to an over-prescribing of opioids,

5    not only in terms of doses and necessity, but also in terms

6    of quantity.  Did I read that correctly?

7    **A.**    Yes.

8    **Q.**    And you agree with that statement, correct?

9    **A.**    Yes.

10   **Q.**    Now, the Joint Commission accredits in Huntington,

11   Cabell Huntington Hospital, correct?

12   **A.**    Yes.

13   **Q.**    St. Mary's Hospital?

14   **A.**    Yes.

15   **Q.**    Mildred Mitchell Bateman Hospital?

16   **A.**    Yes.

17   **Q.**    And River Park Hospital; is that right?

18   **A.**    Yes.

19   **Q.**    And the complaint here goes on to explain why JCAHO was

20   able to explain the standard -- was able to change, excuse

21   me, the standard of care so drastically.

22        And I'm going to direct you, Mayor, to Page 7,

23   Paragraph 16.  Do you see that, Mayor?

24   **A.**    Yes.

25   **Q.**    It says here in the City's complaint, because of its

1    certification program, JCAHO wields enormous power over

2    healthcare organizations.  Do you agree with that statement?

3    **A.**    Yes.

4    **Q.**    Loss of certification is deemed by most healthcare

5    organizations as disastrous to their continued operation.

6    Do you agree with that?

7    **A.**    Yes.

8    **Q.**    And JCAHO certifies 99% of healthcare organizations in

9    the United States.  Do you agree with that?

10   **A.**    Yes.

11   **Q.**    It goes on, Mayor, and we will, as I said, skip most of

12   the allegations that the City made here, but I want you to

13   look at Page 39, Paragraph 142.  Let me know when you're

14   there.

15   **A.**    142?

16   **Q.**    142.

17   **A.**    Yes, sir.

18   **Q.**    It says, no alternative to this class action exists.

19   Do you see that?

20   **A.**    Yes.

21   **Q.**    That's a true statement, right?

22   **A.**    Yes.

23   **Q.**    And that refers to the class action that's presented

24   here in this complaint against the Joint Commission, right?

25   **A.**    Yes.

**Q.**   It goes on to say, if JCAHO's standards persist, the municipalities and their residents will continue to suffer unabated harm.  True statement, correct?

**A.**   Yes.

**Q.**   Or at least in view of the City, right?

**A.**   Yes.

**Q.**   That is what the City of Huntington told the United States District Court for the Southern District of West Virginia, that the only thing that can abate the opioid problem is for JCAHO to change its pain management standards, correct?

**A.**   Yes.

**Q.**   Now, this case, the City's case against JCAHO, it's still ongoing, correct?

**A.**   Yes.

**Q.**   Last August, the City, I think -- I looked at the docket.  Last August, the City moved for leave to amend its complaint; is that right?

**A.**   Yes.

**Q.**   And that motion is still pending with Judge Copenhaver?

**A.**   Yes.

**Q.**   And in this complaint that the City of Huntington has been pursuing for almost four years about the cause of the opioid problem, there's not a single word about Cardinal Health, is there?

```
 1    A.    No.

 2    Q.    There's not a single word about McKesson Corporation?

 3    A.    Correct.

 4    Q.    There's not a single word about AmerisourceBergen?

 5    A.    Right.

 6    Q.    Let's look at some more evidence, Mayor, of what caused

 7    the problem.  I'm going to ask you to look at what's been

 8    marked DEF-WV-473.

 9              MR. RUBY:  And, Your Honor, as a housekeeping

10    matter, I will note that this document, DEF-WV-473, was

11    previously admitted during the testimony of Dr. Werthammer

12    for the purpose of notice to the City, not for the truth of

13    the matter asserted, and that's the only purpose that I

14    intend to use it for today.

15              THE COURT:  All right.

16              BY MR. RUBY:

17    Q.    Mayor, this is an e-mail chain in which you were a

18    participant, along with a number of other people in the

19    Huntington community, correct?

20    A.    Yes.

21    Q.    And at the top here, there's an e-mail from Kenny

22    Burner, correct?

23    A.    Yes.

24    Q.    Dated February the 5th, 2016?

25    A.    Yes.
```

1    **Q.**   And you were one of the recipients of that e-mail from

2    Mr. Burner?

3    **A.**   Yes.

4    **Q.**   Mr. Burner is the former Head of Appalachia HIDTA in

5    West Virginia, correct?

6    **A.**   Yes.

7    **Q.**   And the subject of this e-mail is How Big Pharma Got

8    People Hooked on Opioids, correct?

9    **A.**   Correct.

10   **Q.**   Now, let's go quickly through some of the other people

11   who are on this e-mail chain.  Dr. Joe Shapiro is the Dean

12   of the Medical School at Marshall; is that right?

13   **A.**   Yes.

14   **Q.**   Dr. Joe Werthammer is a physician in Huntington and the

15   former Chief Medical Office at Marshall Health?

16   **A.**   Yes.

17   **Q.**   Jim Johnson, you talked about earlier in your earlier

18   testimony.  He was the Head of the City's Office of Drug

19   Control Policy and later the State Office of Drug Control

20   Policy?

21   **A.**   Yes.

22   **Q.**   Kevin Yingling is the former Chair of the Board at

23   Cabell Huntington Hospital, correct?

24   **A.**   Yes.

25   **Q.**   And also the Cabell-Huntington Health Department?

1    **A.**    Yes.

2    **Q.**    Michael Kilkenny is the Director of the Health

3    Department?

4    **A.**    Yes.

5    **Q.**    And Tim Hazelett is his number two?

6    **A.**    Yes.

7    **Q.**    I'll direct you, Mayor, to the third e-mail down in the

8    chain, the one that starts on -- or the header for it

9    starts, on February 5th, 2016, at 10:48 a.m., Werthammer,

10   comma, Joseph W.  Do you see that?

11   **A.**    Yes.

12   **Q.**    And that's an e-mail from Dr. Werthammer, correct?

13   **A.**    Yes.

14   **Q.**    And he says there, unfortunately, it was not big pharma

15   who wrote the prescriptions.  It was me and my colleagues,

16   correct?

17   **A.**    Correct.

18   **Q.**    And you had no reason to disagree with that statement,

19   true?

20   **A.**    I had no reason to agree with the statement.

21   **Q.**    And, in fact, you didn't disagree with it on this

22   e-mail chain, did you?

23   **A.**    I didn't even acknowledge it.

24   **Q.**    Now, look at the message above that one, the one from

25   Dr. Shapiro.

**A.**   Yes.

**Q.**   He replies to Dr. Werthammer's e-mail and says, we had some help.  Pain as the fifth vital sign comes to mind.  Do you see that?

**A.**   Yes.

**Q.**   And you have no reason to disagree with that statement either, do you?

**A.**   No.

**Q.**   And you didn't disagree with it in this e-mail chain, did you?

**A.**   I didn't agree with it either.  I just received the e-mail.

**Q.**   And Mr. Burner then replies to that e-mail from Mr. Shapiro, correct?

**A.**   Correct.

**Q.**   And, at that time, Mr. Burner was the Head of the High Intensity Drug Trafficking Area Program for all of West Virginia, right?

**A.**   Yes.

**Q.**   That program is the national coordinating arm of the White House's Office of National Drug Control Policy, right?

**A.**   Yes.

**Q.**   And what Mr. Burner said was, Dr. Shapiro, I couldn't agree with you more, correct?

**A.**   Correct.

1    **Q.**   And you didn't disagree with that statement in this

2    e-mail chain either, did you?

3    **A.**   And I didn't agree with it either.

4    **Q.**   Let's look at yet another document that talks about a

5    cause of the problem that you testified about earlier.  I'm

6    going to show you what's been marked as DEF-WV-1134.

7            MR. RUBY:  Approach, Your Honor?

8            BY MR. RUBY:

9    **Q.**   Mayor, this is an e-mail from you to Bryan Chambers

10   dated January 17th, 2019; is that right?

11   **A.**   Yes.

12   **Q.**   Mr. Chambers is your Communications Director, correct?

13   **A.**   Yes.

14   **Q.**   And the subject here is Opioids Research - The

15   Guardian, correct?

16   **A.**   Yes.

17   **Q.**   I want to start at the bottom of the e-mail chain,

18   which is an e-mail from a Jessica Glenza to Mr. Chambers,

19   also dated January 17th, 2019.  Do you see that?

20   **A.**   Yes.

21   **Q.**   And that says -- well, let's talk for a minute about

22   the subject of it and who Jessica Glenza is.  She is a

23   reporter at The Guardian Newspaper, correct?

24   **A.**   Yes.

25   **Q.**   And she was writing to Mr. Chambers about a study that

1    was about to be released on opioid marketing payments made

2    directly to doctors, right?

3    **A.**    Yes.

4    **Q.**    And if you look at the second paragraph of her e-mail,

5    the one that begins as far as --

6              MR. MAJESTRO:  Your Honor, this appears to be

7    hearsay.  It's an e-mail from a reporter to another City

8    employee.  It's not the statement of anybody from the City.

9              MR. RUBY:  Two -- two points.

10             THE COURT:  It's offered for the truth, isn't it?

11             MR. RUBY:  It's going to be offered for the truth,

12   Your Honor.  Two points.  It will be offered for the truth.

13   What I think will be established on cross examination is

14   that the mayor and the City manifested their adoption of

15   this statement or at least their belief in its truth by

16   issuing a quote that was premised on the truth of the

17   statement and, therefore, it falls within Rule 801(d)(2)(B),

18   which says that a statement is not hearsay if it's offered

19   against an opposing party and is one that the party

20   manifested, that it adopted or believed to be true.

21             MR. MAJESTRO:  He hasn't laid the foundation that

22   the City has adopted this statement.  If the City makes

23   other statements somewhere else that might be similar,

24   that's not manifestation or the adoption of the statement.

25             MR. RUBY:  I was on my way when Mr. Majestro

1    interposed an objection, Your Honor.

2             THE COURT:  Yeah.  I think we've got to see where

3    he goes with this, Mr. Majestro, before I rule on it.

4             BY MR. RUBY:

5    **Q.**   Ms. Glenza, Mayor, was writing to Mr. Chambers

6    regarding a study that was about to be released on opioid

7    marketing payments directly to doctors; is that right?

8    **A.**   Yes.

9    **Q.**   And if you look at the second paragraph of her e-mail,

10   she says, as far as Cabell County specifically, the

11   researcher did some math at my request which was not

12   specifically included in the study.  He found Cabell County

13   had the highest per capita rate of opioid marketing in the

14   29 months his study covered (2013-2015).  Did I read that

15   correctly?

16   **A.**   Yes.

17   **Q.**   And it goes on to say, for every 1,000 people in the

18   county, drug companies spent $49.95 in marketing payment

19   made directly to doctors annually.  The U. S. -- sorry.  The

20   annual U. S. average is $1.57, so you can see the huge

21   difference.

22        Now, that is the information that your office received

23   from this reporter at The Guardian Newspaper, correct?

24   **A.**   Yes.

25   **Q.**   Now, if you look at the e-mail above that from Mr.

 1   Chambers to you, do you see that?

 2   **A.**   Yes.

 3   **Q.**   And this says --

 4          MR. MAJESTRO:  Your Honor, I mean, I think he

 5   needs to -- objection.  I think he needs to lay the

 6   foundation before he reads the statements into the record.

 7   He's reading the statements into the record.  He is not

 8   laying a foundation for how these statements were adopted by

 9   the City.

10          THE COURT:  I think that's right, Mr. Ruby.  You

11   need to do that.

12          MR. RUBY:  And then, Your Honor, I will wait to go

13   through this statement in detail although, parenthetically,

14   I would submit that it's also a proper subject for cross

15   examination as to the mayor's understanding and his views.

16          THE COURT:  And can provide a good faith basis for

17   your question -- for your questioning him about the subject

18   without admitting the document.  So, go ahead.

19          MR. RUBY:  But I would like to see if we can get

20   it admitted, Your Honor.

21          BY MR. RUBY:

22   **Q.**   So, let me ask you, Mayor, and we'll skip the -- I'll

23   skip the statement --

24          MR. RUBY:  Well, you know what, Your Honor?  I

25   take it back.  I -- with respect to the e-mail that I'm

1    about to read, this is a statement from Bryan Chambers, who

2    is the Communications Director from the City of Huntington.

3    That's simply a statement of a party offered against the

4    party.  That's 801(d)(2) that the Court just looked at.  And

5    so, the statement that is offered, the statement that's made

6    here by Bryan Chambers, is simply a non-hearsay statement.

7              THE COURT:  Well, who is Bryan Chambers, Mayor?

8              THE WITNESS:  He's our -- my -- he's the

9    Communications Director for the City of Huntington.

10             THE COURT:  So, he was a representative of the

11   City of Huntington at the time this was --

12             THE WITNESS:  Yes, sir.

13             THE COURT:  I'm going to admit it.  I will

14   overrule the objection and admit it under Rule 801(d)(2).

15             MR. RUBY:  Thank you, Your Honor.

16             BY MR. RUBY:

17   **Q.**   And this statement from Mr. Chambers, Mayor, says,

18   Mayor, Jessica Glenza with The Guardian contacted me awhile

19   ago regarding a new study that will be released tomorrow at

20   11 a.m. regarding marketing dollars spent by drug companies

21   directly on doctors.  The study found that Cabell County had

22   the highest amount spent per capita during the period of the

23   study, and then it says in parentheses, (see below and

24   attached for more details).

25        It goes on to say, I contacted Katie and Erin, our

1    media consultants, because Jessica mentioned the lawsuits on

2    the phone.  Katie sees no problem with you providing a

3    statement for this story.  She proposes the following.

4         And then there's a quote there in bold at the bottom.

5    Do you see that, Mayor?

6    **A.**   Yes.

7    **Q.**   It says, here is more evidence of these companies

8    profiting off of our residents and misleading ours doctors.

9    We are starting to dig out, but this will be a decades-long

10   recovery process.  And you read this e-mail that you

11   received from your Communications Director, Mr. Chambers,

12   correct?

13   **A.**   Yes.

14   **Q.**   And it included a proposed quote that would come from

15   you?

16   **A.**   Yes.

17   **Q.**   About the high level of physician payments in Cabell

18   County; is that right?

19   **A.**   Yes.

20   **Q.**   And that quote was prepared by media consultants who

21   were helping you with this litigation, correct?

22   **A.**   Correct.

23        THE COURT:  Let me interrupt you and make the

24   ruling clearer.  I'm admitting it under Rule 801(d)(2)(B),

25   as one party manifested that it adopted or believed to be

1    true.

2              MR. RUBY:  Thank you, Your Honor.

3              BY MR. RUBY:

4    **Q.**   Now, you reviewed, Mayor, the statement that the media

5    consultants that the City works with were proposing,

6    correct?

7    **A.**   Yes.

8    **Q.**   And you agreed to make that statement about the

9    extremely high level of physician payments for marketing in

10   Cabell County, correct?

11   **A.**   Yes.

12   **Q.**   And you don't have any knowledge of any of the

13   defendants in this case making any payments to any

14   physicians, do you?

15   **A.**   No.

16   **Q.**   Let's turn to yet another piece of the City's

17   explanation about what caused the opioid problem.  In 2018,

18   Mayor -- and I'm going to go ahead and show you a document

19   that has been marked DEF-WV-1287.  Mayor, are you familiar

20   with this document?

21   **A.**   Yes, sir.

22   **Q.**   And this is a letter that you sent to Senator Manchin

23   on December 27th, 2018; is that correct?

24   **A.**   Yes.

25   **Q.**   This is signed by you here on the back on Page 2,

```
 1   correct?

 2   A.   Yes, sir.

 3            MR. RUBY:  Your Honor, move to admit as statement

 4   of a party opponent.

 5            THE COURT:  Any objection?

 6            MS. KEARSE:  No objection, Your Honor.

 7            THE COURT:  It's admitted.

 8            BY MR. RUBY:

 9   Q.   And it says here -- we'll start at the very beginning,

10   Mayor.  Dear Senator Manchin, as the mayor of Huntington,

11   West Virginia, I oversee a city that has been ravaged by the

12   opioid drug crisis.  Do you see that?

13   A.   Yes.

14   Q.   And we won't read the whole thing, but if you go to the

15   bottom of the page there, the last paragraph before the page

16   turns, it says, Senator Manchin, you can help by sponsoring

17   legislation that gives patients and physicians access to

18   non-opioid options for relieving post-surgical pain.  Do you

19   see that?

20   A.   Yes.

21   Q.   That was the statement that you made to Senator Manchin

22   in this letter, correct?

23   A.   Yes.

24   Q.   And it goes on to say, right now, Medicare discourages

25   the use of non-opioid treatments in outpatient units because
```

1    the hospitals would have to bear the costs of them, correct?

2    **A.**    Correct.

3    **Q.**    And then go on past by turning the page, by contrast,

4    the hospitals bear none of the costs when they send patients

5    home with prescriptions for opioids.  Do you see that?

6    **A.**    Yes.

7    **Q.**    And if you look down to the -- there's a sentence a bit

8    later in the paragraph that starts, thus, Medicare provides.

9    Do you see that?

10   **A.**    Where is this?

11   **Q.**    Same paragraph.

12   **A.**    Oh, okay.

13   **Q.**    A couple lines down.  It says, thus --

14   **A.**    Yes, sir.  Yes, sir.

15   **Q.**    Thus, Medicare provides an incentive for hospital

16   outpatient units to prescribe opioids instead of the

17   healthier option of administering non-opioid treatments

18   while the patients are still at the hospitals -- and later

19   pays for the drugs that can cause so much harm.  Do you see

20   that?

21   **A.**    Yes.

22   **Q.**    You agree with all of those statements; is that right?

23   **A.**    Yes.

24   **Q.**    And then you go on to ask for a change.  I'll look at

25   the last or the next to the last paragraph in the -- in the

1    letter.  It says, Senator, I know you care for our fellow

2    West Virginians as much as I do.  I urge you to use your

3    power in Congress to introduce legislation that would

4    mandate CMS to make the above policy changes or to use your

5    influence to persuade CMS to make the changes in lieu of

6    legislation.  We must do anything we can to curb the opioid

7    crisis.  Do you see that?

8    **A.**    Yes.

9    **Q.**    And those were statements that you made to Senator

10   Manchin, correct?

11   **A.**    Yes.

12   **Q.**    Now, the policy changes that you're urging here would

13   have resulted in additional payments to hospitals; is that

14   right?

15   **A.**    If they were going to be administering non-opioid

16   treatments.

17   **Q.**    And that was the purpose of it, right?

18   **A.**    Yes.

19   **Q.**    Was so that hospitals could be paid by Medicare for

20   non-opioid treatment that, according to your letter, are

21   more expensive than the opioid treatments that the hospitals

22   were providing?

23   **A.**    I think, also, the purpose of the letter was that the

24   hospitals only get paid if opioid treatments are being

25   utilized and encouraging to, at least within what is

1    reimbursable, non-opioid payments.  And to that end, yes,

2    the hospitals would be paid, but it's not just to get the

3    hospitals paid, but to be able to encourage them to divert

4    away from opioid -- opioid treatments.

5    **Q.**   And the policy that you just described that you were

6    advocating be changed, that's a policy of Medicaid, right,

7    or the federal government?

8    **A.**   Yes.

9    **Q.**   And what you said to Senator Manchin here in this

10   letter is that Medicaid needed to change that policy in

11   order to curb the opioid crisis, correct?

12   **A.**   Yes.

13   **Q.**   And you agree with that; is that right?

14   **A.**   Yes.

15   **Q.**   Now, I know you've seen this letter before.  You didn't

16   write this letter, did you?

17   **A.**   I wrote some of it, but it was originally crafted by --

18   by an old friend, but also someone -- a lobbyist and he

19   crafted it and we made adjustments, as we had discussed once

20   before in the deposition.

21   **Q.**   And you would agree that the substance of this letter

22   was originally written by a lobbyist, correct?

23   **A.**   Yes.

24   **Q.**   And then the lobbyist sent the letter to you, correct?

25   **A.**   Yes.

```
1    Q.   And you made some adjustments to the form of the letter

2    and signed your name to it, correct?

3    A.   Yes.

4    Q.   And then sent it on to Senator Manchin with your name

5    on it, correct?

6    A.   Yes.

7    Q.   And were you aware at the time that you did that, that

8    the lobbyist who sent you the letter is a lobbyist for at

9    least five hospitals in West Virginia?

10   A.   I wasn't aware of who he was a lobbyist for.  I knew

11   that this was something that he was working on, but I didn't

12   know who he was -- I didn't know who he was -- who his

13   clients were.

14   Q.   You're aware that the State of West Virginia, I think

15   the Ethics Commission, publishes a guide every year as to

16   registered lobbyists in West Virginia, correct?

17   A.   Yes.

18   Q.   And you're aware that in that guide is a list of the

19   clients that each registered lobbyist in the state lobbies

20   for?

21   A.   Yes.

22   Q.   But before you adopted this letter from the lobbyist

23   who sent it to you, you didn't check the list of registered

24   lobbyists to see if he, in fact, lobbied for hospitals,

25   correct?  And you -- I'm sorry.  Go ahead.
```

```
1    A.   No, I didn't check.

2    Q.   And you have no reason to disagree that he does, in

3    fact, represent at least five hospitals in the State of West

4    Virginia, correct?

5    A.   I have no reason to disagree.

6              MR. RUBY:  Your Honor, this might be a good time

7    to break for lunch.

8              THE COURT:  Okay.  I'm going to suggest we come

9    back at 1:30 instead of 2:00.  Is there any objection to

10   that?

11             MR. RUBY:  I think that's a good idea, Your Honor.

12             THE COURT:  Okay.  Mayor Williams, you're excused

13   until 1:30, sir.

14             THE WITNESS:  Thank you.

15             THE COURT:  And we'll see you then.

16             THE WITNESS:  Yes, sir.

17        (Recess taken)

18        (Proceedings resumed at 1:29 p.m. as follows:)

19             THE COURT:  You may resume the witness stand,

20   Mr. Williams.

21             THE WITNESS:  Yes, sir.

22             THE COURT:  All right, Mr. Ruby, you may proceed.

23             MR. RUBY:  Thank you, Your Honor.

24   BY MR. RUBY:

25   Q.   Mayor, I hope you had a good lunch.
```

120

A.    Yes.

Q.    When we left, we were talking about statements that,
that you and the city had made about the causes of the
opioid problem.  I want to look at another one of those
statements.

       In 2018 Huntington applied to participate in something
called the Mayors' Institute on Opioids; correct?

A.    Yes, sir.

Q.    And the Mayors' Institute was a program to provide
technical assistance and resources to cities that were
dealing with opioid problems?

A.    Yes, through the National League of Cities.

Q.    And the National League of Cities is in turn an
organization that provides policy-making assistance for
cities around the country; correct?

A.    Yes.

Q.    You're a member of the Board of Directors of that?

A.    Yes.

Q.    And for this Mayors' Institute on Opioids that the
National League of Cities was running there was a
competitive selection process; right?

A.    Yes.

Q.    Huntington applied to be a part of that institute?

A.    Yes.

Q.    And to receive the resources and technical support that

```
 1   were involved there?

 2   A.   It's really technical support, but I guess you could

 3   call those resources.

 4   Q.   And I don't mean funding.

 5   A.   Yeah.

 6   Q.   I mean resources in terms of the assistance from

 7   the, --

 8   A.   Yes.

 9   Q.   -- from the NLC.

10   A.   Yes.

11   Q.   And ultimately Huntington was selected for that; right?

12   A.   Yes.

13   Q.   I'm going to ask you to take a look at what's been

14   marked Defendants' West Virginia 902.

15             MR. RUBY:  Approach, Your Honor?

16   BY MR. RUBY:

17   Q.   Mayor, the document that I've handed you,

18   Defendants' West Virginia 902, is the case statement

19   that the City of Huntington submitted for its

20   participation in the Mayors' Institute on Opioids;

21   correct?

22   A.   Yes.

23   Q.   And this is based on the city's application or its

24   response to the request or proposal that the National League

25   of Cities put out?
```

1   **A.**   It's to describe the opportunities and challenges and,

2   in essence, laying -- the short answer is "yes."  The longer

3   explanation is to indicate what we were dealing with in

4   relation to the five other cities who were participating.

5   **Q.**   And this was prepared by you and others on the, the

6   team that are listed here at the top of the document; is

7   that right?

8   **A.**   Yes.

9           MR. RUBY:  Your Honor, move to admit Defendants'

10  902, statement of party opponent.

11          THE COURT:  Any objection?

12          MS. KEARSE:  No, Your Honor.

13          THE COURT:  It's admitted.

14  BY MR. RUBY:

15  **Q.**   Mayor, on the fifth page of the document do you see

16  the paragraph that begins at the bottom and carries over

17  to the next page?  It begins, "Of the gaps and

18  priorities."

19  **A.**   Yes, sir.

20  **Q.**   That sentence says, "Of the gaps and priorities listed

21  in the RFP --" and the RFP was the Request for Proposals

22  from the National League of Cities; right?

23  **A.**   Yes.

24  **Q.**   "Of the gaps and priorities listed in the RFP, equity

25  has the biggest impact on health outcomes in Huntington."

```
1              That's a true statement; right?
2       A.     Yes.
3       Q.     And "equity" there essentially means economic
4       opportunity or lack of economic opportunity; correct?
5       A.     Correct.
6       Q.     And then it goes on to say, "Huntington thrived for
7       decades as a coal transport and manufacturing hub with
8       nearly 90,000 people living in the city in 1950.  But as the
9       economy changed and the coal sector modernized, jobs left.
10      Blight, crime, and environmental challenges befell the
11      community."
12             You agree with that statement; right?
13      A.     Yes.
14      Q.     And it goes on to say, "City population dropped --"
15      turn the page there to Page 6.  "City population dropped to
16      under 50,000 and over 30 percent of people in Huntington now
17      live in poverty."
18             That's a true statement; correct?
19      A.     Yes.
20      Q.     It goes on and it's a long paragraph and I won't ask
21      you about every bit of it.  But if you read on, it describes
22      certain areas of the city.  Well, actually, I'll just read
23      the next sentence.
24             "According to U.S. census data, certain neighborhoods
25      have poverty rates above 50 percent.  Residents in these
```

```
 1   areas struggle to meet daily needs and lack the resources to

 2   improve their physical health and mental health outcomes

 3   which can lead to depression and increase risk for drug use

 4   and addiction."

 5        Do you see that?

 6   A.   Yes.

 7   Q.   And you would agree with that statement; correct?

 8   A.   Yes.

 9   Q.   I want to move down, Mayor, there's another sentence

10   about halfway down the paragraph that begins, "In 2008 the

11   Center for Disease Control."  Do you see that?

12   A.   Yes.

13   Q.   And this touches, I think, on something that you

14   mentioned earlier.

15        "In 2008 the Center for Disease Control gave Huntington

16   the poorest health rating of any metro area in the nation.

17   The Associated Press labeled Huntington as America's

18   fattest, most depressed, and most unhealthy city."

19        Do you see that?

20   A.   Yes.

21   Q.   And you agree with that statement?

22   A.   Yes.

23   Q.   And then the -- it goes on to say that nearly half of

24   the adults in the metropolitan area were obese and

25   Huntington led in a half dozen other illness measures
```

1    including heart disease and diabetes.

2        That's also true; correct?

3    **A.**   Yes.

4    **Q.**   And then the next sentence talks about steps that the

5    city has taken to combat obesity and improve health; right?

6    **A.**   Yes.

7    **Q.**   And then the final sentence of the paragraph says this:

8        "However, despite this progress, continuing economic

9    distress due to coal and manufacturing decline has

10   intensified the spread of opioid use in Huntington to

11   unthinkable proportions."

12       Do you agree with that statement?

13   **A.**   Yes, if I could clarify one point.  We didn't add this

14   to it, but at least this is in my mind right now, Your

15   Honor, is that the one thing that has become perfectly clear

16   is that the opioid epidemic is hitting communities that have

17   problems of poverty and unemployment, but it has -- it's

18   also hitting extremely wealthy communities as well.

19       And it has -- it does not discriminate on, on race, on

20   social stature, in, in life, or in income.  I know we didn't

21   place this in here, sir, but it's on my mind and thank you

22   for giving me the chance to at least express it.

23   **Q.**   But you do agree, Mayor, with the statement that you

24   made to the National League of Cities which is that

25   continuing economic distress due to coal and manufacturing

1    decline has intensified the spread of opioid use in

2    Huntington to unthinkable proportions; right?

3    **A.**   Yes, sir.

4    **Q.**   And the defendants in this case didn't cause the

5    decline of the coal industry, did they?

6    **A.**   No.

7    **Q.**   The defendants in this case didn't cause the decline of

8    the manufacturing industry?

9    **A.**   No.

10   **Q.**   The city wrote this document that was submitted to the

11   National League of Cities in 2018; correct?

12   **A.**   Yes.

13   **Q.**   And that was a year after you filed the lawsuit in this

14   case; correct?

15   **A.**   Yes.

16   **Q.**   This document talks about poor physical health as a

17   cause of the opioid problem; correct?

18   **A.**   Yes.

19   **Q.**   And poor mental health; correct?

20   **A.**   Yes.

21   **Q.**   And poverty; correct?

22   **A.**   Yes, sir.

23   **Q.**   And economic decline; correct?

24   **A.**   Yes, sir.

25   **Q.**   And it doesn't say a single word about pharmaceutical

1    distributors, does it?

2    **A.**    No, it doesn't go into that entire area of, of the

3    industry.  It's simply speaking to economic factors within,

4    within the community.  We didn't bother to get into the

5    delivery of pharmaceuticals at all.

6    **Q.**    Let's talk about another cause of the opioid problem in

7    Huntington.  Huntington has a major problem with illegal

8    drug dealers; right?

9    **A.**    Yes.

10    **Q.**    And, specifically, Detroit drug dealers are a

11    significant cause of the opioid problem in Huntington;

12    correct?

13    **A.**    Detroit and other cities, yes.

14    **Q.**    Illegal drug dealers are the source of the heroin

15    that's sold in Huntington; correct?

16    **A.**    Yes.

17    **Q.**    And dealers from Detroit are a particularly serious

18    source of that heroin; right?

19    **A.**    Yes.  As I indicated, other cities have become very

20    pronounced, but Detroit gets most of the blame.

21    **Q.**    And that circumstance, that, that drug dealers from

22    Detroit are, are a cause of the opioid problem, and in

23    particular the heroin problem in the City of Huntington,

24    that's existed for a long time, hasn't it?

25    **A.**    Well, it's existed since I've been Mayor for the last

1   eight years.

2   **Q.**   Mayor, I'm going to ask you to take a look at what's

3   been marked as Defendants' West Virginia 2148.

4        Mayor, this is an article from the Huntington

5   Herald-Dispatch dated May 21st, 2006; is that right?

6   **A.**   Yes.

7   **Q.**   And it actually was written by Bryan Chambers; correct?

8   **A.**   That's what it says, yes.

9   **Q.**   Mr. Chambers -- we talked about this a moment ago.

10  He's now your communications director?

11  **A.**   Yes.

12  **Q.**   But he used to be a recorder for the Herald-Dispatch

13  newspaper; right?

14  **A.**   Yes.

15  **Q.**   And the headline of the article here is "Heroin Making

16  Inroads in Huntington."  Do you see that?

17  **A.**   Yes.

18  **Q.**   And this is, again, from May of 2006; correct?

19  **A.**   Yes.

20  **Q.**   And according to this article that he wrote, heroin, in

21  fact, was on the rise in Huntington as long ago as 2006;

22  right?

23  **A.**   That's what this article is saying, but this is a

24  picture in time.  My recollection is that there was a flare

25  of heroin in the 2006-2008 period -- I don't even think it

1    lasted that long -- where black tar heroin arrived in the

2    city and the police department effectively shut that down.

3    Then we started seeing heroin making a more aggressive move

4    in later years after I was Mayor.

5    **Q.**   So the testimony that you just gave is about black tar

6    heroin; is that right?

7    **A.**   Yes.

8    **Q.**   Let's take a look at what the article is discussing

9    which I think it's a little different from your

10   recollection.

11        The article begins, "Detroit drug dealers who already

12   control most of the crack cocaine market in the Tri-State

13   are now shipping in a steady stream of heroin local

14   authorities say."

15        Do you see that?

16   **A.**   Yes.

17   **Q.**   I'm going to ask you to skip down with reference to the

18   point you made about black tar heroin to the fourth

19   paragraph that begins, "Detroiters are even adding."  Do you

20   see that?

21   **A.**   Yes.

22   **Q.**   It says, "Detroiters are even adding a personal touch

23   with the packaging of heroin which is sold as a powder in

24   one-third to one-half gram hits for $10 to $20, Adams said.

25   It's wrapped in Michigan lottery tickets."

1      So that would indicate that the heroin that's being

2  discussed here is white powder heroin rather than black tar;

3  correct?

4  **A.**   Yes.

5  **Q.**   And this article was from 15 years ago; right?

6  **A.**   Yes.

7  **Q.**   I'm going to ask you to go down to the, the fifth

8  paragraph under the one we just read.  It says, "Sergeant

9  Mike Clark of Cabell County's Drug Enforcement Unit said

10  he's baffled by the reappearance of heroin, especially with

11  most of the supply coming from Detroit crack dealers."

12      And he goes on to say, "Both drugs are extremely

13  dangerous and addictive, but that's where the similarities

14  end he said.  Crack takes you way up but it's a short-lived

15  high.  Heroin takes you way down but lasts longer.  The

16  logical guess is crack dealers see that there's money to be

17  made and want to control both ends of the spectrum."

18      Did I read that correctly?

19  **A.**   Yes.

20  **Q.**   Do you have any reason to disagree with this report

21  that crack dealers as far back as 2006 in Huntington saw

22  there was money to be made in heroin and wanted to control

23  both ends of the spectrum?

24  **A.**   No.  My only observation here is that I believe this is

25  also around the time that the spike in opioid pills was

1    occurring.  And it's an interesting parallel that as the

2    spike in opioid pills is spiking and there was a spike of

3    opioid pill distribution in Huntington and then heroin to be

4    coming on the back side of it.  I don't know if there's

5    anything other than it's an interesting combination

6    occurring at the same time.

7    **Q.**   And just to be clear, it's not your allegation that any

8    of the distributors in this case distributed heroin;

9    correct?

10   **A.**   No.  I'm simply saying the proliferation of opioid

11   pills coming in during that same time frame, it's an

12   interesting juxtaposition.

13   **Q.**   Mayor, I want to change tracks just a bit and talk

14   about the city's budget which you testified about at some

15   length on the direct.

16        The city's budget for the fiscal year that ends today,

17   in fact, included a multi-million-dollar surplus, didn't it?

18   **A.**   Yes.

19   **Q.**   And we talked about that in your deposition last year.

20   In fact, it includes a surplus of about $6 million; right?

21   **A.**   Correct.

22   **Q.**   Which is at $6 million about 10 percent of your total

23   budget, give or take?

24   **A.**   Yes, sir.  It's close.

25   **Q.**   And, in fact, when we talked about it last year, I

```
1    think you anticipated that the surplus was going to be

2    around $6 million.  In fact, it ended up being over

3    $15 million; right?

4    A.   Yes.  In -- yes, if large measure because of COVID

5    where COVID was able to -- COVID or the CARES Act was able

6    to provide us assistance in covering some of the COVID

7    related expenses.

8    Q.   And $15 million is a little less than a quarter of your

9    total budget; right?

10   A.   Correct.

11   Q.   But in last year's budget, the city didn't budget any

12   of that surplus to address the opioid problem, did it?

13   A.   We didn't budget -- correct.  We didn't budget the

14   surplus, but our budget certainly is reflective of

15   everything that we're doing to fight the opioid epidemic.

16   Q.   The city's budget for last year didn't include any

17   spending whatsoever on opioid treatment; correct?

18   A.   We've never -- we've never funded opioid treatment.

19   Q.   The only money that the city directs to opioid

20   treatment is grant money that originally comes from the

21   federal government --

22   A.   Yes.

23   Q.   -- and then passes through the state government and

24   then it's passed on through the city; correct?

25   A.   Yes.
```

1    **Q.**   That's the Federal Community Development Block Grant

2    Program?

3    **A.**   Yes.

4    **Q.**   Now, let's talk about some of the things that the city

5    did spend its money on last year.

6         Every city employee last year got a five percent raise;

7    right?

8    **A.**   Yes.

9    **Q.**   And you got a raise also; correct?

10   **A.**   That was voted upon.  It was not a selection by the

11   council of last year.  That was a statutory provision that

12   was made by the previous council.

13   **Q.**   And you were -- last year, just to explore that a

14   little bit more, you were up for re-election last year;

15   correct?

16   **A.**   Yes.

17   **Q.**   And you won; correct?

18   **A.**   Yes.

19   **Q.**   And when you won, because of the, the raise that had

20   been voted on by City Council, you got a raise from $85,000

21   to almost $115,000?

22   **A.**   Yes.

23   **Q.**   That's about a 35 percent increase?

24   **A.**   I haven't calculated the increase.

25   **Q.**   The city last year also increased the budget for the

1    animal shelter; correct?

2    **A.**    Yes.

3    **Q.**    But there was nothing in the budget for opioid

4    treatment?

5    **A.**    Correct.

6    **Q.**    And the reason that the city doesn't spend its own

7    money for opioid treatment you said is because it can find

8    grant funding for that; right?

9    **A.**    Yes.

10   **Q.**    Let's talk about the budget for the upcoming year.

11   Earlier this year, I think in February, you proposed the

12   city's budget for fiscal 2020; correct?

13   **A.**    Yes.

14   **Q.**    Fiscal 2020 -- no, strike that.  Fiscal 2022.

15   **A.**    '22, yes.

16   **Q.**    Fiscal 2022 begins tomorrow; correct?

17   **A.**    Yes.

18   **Q.**    And that budget shows a 17-million-dollar surplus for

19   fiscal 2022; correct?

20   **A.**    I would have to check that.  My latest figures were

21   showing -- I'm not disputing it.  I'm just -- I don't think

22   it's that much, but I'm not going to argue I guess.

23   **Q.**    Would you agree it's in the neighborhood of

24   $17 million?

25   **A.**    I would agree that it's more than six million.

1    **Q.**   Well, at one point did you, did you know what the, the

2    budget or the surplus was that was included in the fiscal

3    2022 budget?

4    **A.**   We had a projected -- I think we were projecting a

5    10-million-dollar surplus.  And, once again, I could be, I

6    could be corrected on it, but --

7    **Q.**   At one point, you did have that number in mind;

8    correct?

9    **A.**   Yes.

10   **Q.**   And you don't, you don't have it in mind as you sit

11   here on the stand?

12   **A.**   The most recent conversations that I've had with, with

13   my finance office trying to determine, we were sitting right

14   around the six-million-dollar range again, but it could be

15   now the calculations were set on the CARES money that has

16   come in that's used for COVID relief and such as that.  But

17   I'm -- I'm not going to quibble with what.

18   **Q.**   Let's, let's take a look at it.  I'm going to show

19   you --

20            MR. RUBY:  And this has not been marked, Your

21   Honor.  But for purposes of impeachment, I am going to hand

22   the witness the City of Huntington, West Virginia, fiscal

23   year 2022 revenue budget.  We'll mark it if we need to in a

24   minute.

25            MS. KEARSE:  Your Honor, I'm not sure if this is

1    actually impeachment or just refreshing his recollection.

2             MR. RUBY:  Well, I think we'll find that this is a

3    statement that -- or this is a document that the Mayor

4    provided to City Council.  I'll lay that foundation.  And if

5    it's a statement of his or a document that he provided to

6    City Council, then I think it's proper impeachment, Judge.

7             THE COURT:  Well, are you offering it to refresh

8    his recollection?  He said he couldn't remember

9    specifically.

10            MR. RUBY:  I would be happy to go about it that

11   way, Your Honor.  That's fine.

12            THE COURT:  Yeah.

13   BY MR. RUBY:

14   **Q.**   Mayor, let me ask, does the document that's in

15   front of you refresh your recollection as to what the

16   fiscal 2022 proposed budget included as its unassigned

17   fund balance as surplus?

18   **A.**   I'm looking for it.

19   **Q.**   First page.

20   **A.**   Yes.

21   **Q.**   Does that refresh your recollection?

22   **A.**   Yes.

23            MR. RUBY:  Your Honor, may I retrieve the

24   document?

25            THE COURT:  Yes.

```
 1              THE WITNESS:  I understand.
 2    BY MR. RUBY:
 3    Q.   Mayor, now that you've had a chance to look at the
 4    fiscal 2022 proposed revenue budget for the City of
 5    Huntington, does it project a surplus or an unassigned
 6    fund balance of a little over $17 million?
 7    A.   Yes.
 8    Q.   Now, in this budget you include a position to revive in
 9    a form the Mayor's Office of Drug Control Policy that you
10    testified about earlier this morning; right?
11    A.   There's been some discussion about that, but we haven't
12    come to a conclusion as to how.  But at that point, we
13    created the position so that we wouldn't have to come back
14    and do it if we did decide to go into that direction.
15              MR. RUBY:  Mr. Huynh, could we have Slide 5 from
16    the demonstrative deck that was used this morning, please?
17    BY MR. RUBY:
18    Q.   The photo here that you see on the screen, Mayor,
19    that you testified about this morning, this is a
20    photograph of you with the members of the original
21    Mayor's Office of Drug Control Policy; correct?
22    A.   Yes.
23    Q.   There were three people assigned to that office;
24    correct?
25    A.   Yes.
```

1   Q.   One was Jim Johnson who's on the right there; correct?

2   A.   Yes, sir.

3   Q.   And then in the middle Scott Lemley; correct?

4   A.   Yes.

5   Q.   And then Jan Rader, now Chief Rader of the fire

6   department; correct?

7   A.   That's correct.

8   Q.   By -- and this, this office was established around

9   2014; correct?

10  A.   Yes, in December -- November or December of 2014.

11  Q.   And by 2017, each of these people, Mr. Johnson, Mr.

12  Lemley, and Chief Rader had moved on to different positions;

13  correct?

14  A.   Yes.

15  Q.   And they were replaced in their role at the Mayor's

16  Office of Drug Control Policy; correct?

17  A.   Yes.

18  Q.   But in next year's budget with, with the $17 million

19  projected surplus, you have about 100,000 included for a

20  director of a new council on drug control policy and public

21  health; correct?

22  A.   Yes.  And that's also for office supplies and such as

23  that, not salary, but the $100,000 generally.

24  Q.   And you have about $300,000 in the, the 2022 budget,

25  the fiscal 2022 budget for the COMPASS program; right?

1    **A.**    Yes.

2    **Q.**    The COMPASS program is the program for what's been

3    referred to as compassion fatigue by police officers and

4    fire fighters and EMTs and so forth?

5    **A.**    Yes.

6    **Q.**    And that involves a fitness facility and wellness

7    center for first responders?

8            THE COURT:  Mr. Farrell.

9            MR. FARRELL:  Judge, at this time I'd like to

10   place an objection, maybe just a preservation objection.  I

11   believe we filed a motion before trial started on some of

12   this.  I'm not quite sure that it has been ruled upon.

13       But I would like to just for the record proffer that

14   the City of Huntington along with the County Commission

15   waived all of their own claims for economic losses and are

16   bringing this case on behalf of the public as public

17   representatives.

18       So we don't know why the budget of the city or the

19   county has any bearing because what we're attempting to do

20   is not have the city or county pay for it.  We're trying to

21   get the defendants to pay for it.

22       So I just would like to have a continuing objection on

23   the relevance to extra budget discussions of the two, the

24   city and the county in the third amended complaint.

25           THE COURT:  Okay.  You can have a continuing

1    objection.  I'm going to overrule it and let you proceed.

2              MR. ACKERMAN:  Can we just get a copy of the

3    budget that was used to refresh the witness's recollection?

4    I don't think we were provided with a copy.

5         Thank you.

6    BY MR. RUBY:

7    **Q.**   I think the question, Mayor, was the COMPASS

8    program that's, that is budgeted at $300,000 in the

9    upcoming year's budget, that includes a fitness facility

10   and a wellness center for first responders; correct?

11   **A.**   Yes, sir.  It's wellness and -- for physical fitness as

12   well as mental fitness.

13   **Q.**   And in the fiscal 2022 budget with the

14   17-million-dollar projected surplus, there's still nothing,

15   not a penny for opioid treatment; correct?

16   **A.**   Actually, nothing specifically.  There's a line item

17   for opioid treatment.  But there are several grants that we

18   have that I believe I had referenced earlier where there are

19   matches that occur.  And those are coming directly out of

20   our, our budget as well.

21        There's some that are specifically for opioids, some in

22   our efforts within the police department.  I think those

23   come to a couple million dollars.  I'm not here to represent

24   that as fact.

25        But in answer to your question, there are

1    appropriations that we have in our day-to-day operations,

2    and particularly in servicing the grants that we have are

3    appropriations of the city so that we can be eligible for

4    those grants.

5    **Q.**    Are those new since your deposition, Mayor?

6    **A.**    In my deposition I had not even considered that we

7    might have -- what we might have in terms of grant --

8    matching money for grants.  So it was not an intentional

9    omission.  It's something that I thought of later.

10         I've contemplated -- we're being told we're not

11   spending any money.  And then I'm looking at the number of

12   grants that we have.  And we have to be able, not on all but

13   on some have salary matches.  There are some that are

14   non-salary matches.

15         And the best I recall, we were talking for non-opioid

16   and police department, it came to about $4 million of

17   matching money that we were having to use already reflected

18   within the individual budgets.

19   **Q.**    I will -- Mayor, the, the match that you're talking

20   about, the city match that you're talking about, does that

21   come in the form of providing space, physical space?

22   **A.**    No.  What I'm talking about is -- some of it is a flat

23   dollar amount.  If you get, let's just say, $100,000,

24   $20,000, we have to be able to, to cover.

25         Some of it is non-salary.  Some of it is where we're

1    having to match the salary.  It depends upon, depends upon

2    the grant.  And, once again, there's some for opioids and

3    some were within, within the police department.

4        I think, if I'm not mistaken, and I'm just rolling off

5    of memory, the Byrne Justice, JAG grants, Justice, Justice

6    Assistance Grants, as I recall, we had some -- and I'm

7    bringing things up that we have not provided here.  It's

8    just recent research that I've done.

9    **Q.**   So I want to be clear before we turn to the deposition.

10   It's your testimony as you sit here today that the city does

11   spend part of its general fund budget on opioid

12   rehabilitation?

13   **A.**   No, I didn't say rehabilitation.  Our response to the

14   opioid, to the opioid epidemic.

15   **Q.**   Okay.  So let me make sure we've got the record clear.

16   It is the case, is it not, that the city, the city doesn't

17   spend any of its general fund budget on opioid treatment?

18   **A.**   I stated that earlier.  I thought I was hearing you say

19   we had not, we had not spent or budgeted any money for -- to

20   address the opioid addiction.  And my assertion was that not

21   only throughout the general fund budget that we are

22   constantly addressing that.

23       But that aside, we have grants related to addressing

24   the opioid epidemic specifically.  And we also have grants

25   that come to the police department to enable us to be able

1     to respond that -- and those -- I would, I would submit

2     that, yes, indeed, we do appropriate money in the general

3     fund in this endeavor to fight the opioid epidemic.

4     **Q.**   And my question was specific to treatment.  So --

5     **A.**   Okay.  Then, then I have taken us down a rabbit hole we

6     didn't need to go.  I apologize.

7     **Q.**   I want to make sure, just for the benefit of all of us

8     when we go back to look at this later, that we have a clear

9     record.

10         In last year's city budget, there, there was no

11     spending for opioid treatment; correct?

12     **A.**   Correct.

13     **Q.**   And in the fiscal 2022 projected city budget with a

14     17-million-dollar surplus, there's still no spending for

15     opioid treatment; correct?

16     **A.**   Correct.  And, once again, if I could, Judge, the

17     reason that we don't is that --

18             MR. RUBY:  Your Honor --

19             THE COURT:  Let him explain his answer.

20             THE WITNESS:  That's not -- that is not what we

21     do.  We don't have the expertise in that.  We assist

22     entities to get grants, not necessarily anything that we're

23     going to be matching.  But I will not ever expect the city

24     government -- I won't speak for the county, but I never

25     would expect the city government to actually start running

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    treatment programs or funding treatment programs.

2              THE COURT:  Okay.

3    BY MR. RUBY:

4    **Q.**   Mayor, I don't know if you heard Dr. Alexander's

5    testimony yesterday about how the city's facing an

6    existential problem.  But the fact is that the city is

7    in the strongest financial position it's been in in 50

8    years; right?

9    **A.**   Yes.

10   **Q.**   Earlier this year you gave your annual budget message

11   to the City Council; correct?

12   **A.**   Yes.

13   **Q.**   And in that message you said that this is the first

14   City Council in more than 50 years that is not operating

15   from a perspective of scarcity; correct?

16   **A.**   Correct.

17   **Q.**   You said roads are being paved, delapidated buildings

18   are being removed, police and fire pensions are being funded

19   properly, employees are receiving regularly scheduled

20   raises; correct?

21   **A.**   Yes, I said that.  And if I can expand upon that, Your

22   Honor, I clearly will acknowledge -- and I think I've very

23   passionately acknowledged that the greatest existential

24   threat that we're facing in our city is our challenges of

25   the opioid epidemic.

1    However, we have other challenges as well.  And to that

2    end, what I was trying to stress and get people, as I

3    mentioned, to be able to identify that small ray of, ray of

4    hope, the challenge that we have had in addressing the

5    opioid epidemic is not just addressing that, but also trying

6    to lift our economy and getting the city moving in that

7    direction.

8         And that's where I was focusing on, not on a position

9    of scarcity, but we're able to do things that were never

10   able to be done in our public infrastructure.  And that's,

11   that's the very reason why I was making those comments in

12   that framework in the State of the City message.

13   **Q.**   And on top of the 17-million-dollar budget surplus

14   that's projected for fiscal 2022, the city is also going to

15   get about $44 million from the federal COVID Relief Act;

16   correct?

17   **A.**   Actually, it's forty million six hundred eighty-four

18   million dollars (verbatim).

19   **Q.**   And the $40 million, let's just say, that the city is

20   getting in federal relief money, that can be spent on

21   substance misuse treatment; correct?

22   **A.**   Actually, that is the first time I've ever heard of

23   that.  I'm not disputing -- the rules and regulations on the

24   rescue plan seem to be changing on a weekly basis.  What

25   we're focusing on are infrastructure projects, water, and

1    sewer and, and such as that.

2    **Q.**   So you weren't aware -- and I'll cite this for the

3    benefit of the Court -- that 31, Code of Federal

4    Regulations, Section 35.6(b)(1)(xviii) lets you use that

5    $40 million for substance misuse treatment?

6                THE COURT:  Mr. Farrell.

7                MR. FARRELL:  Judge, we would also like to renew

8    or preserve our motion that we filed on the collateral

9    source doctrine.

10        Again, the point is that we don't want the federal

11   government to have to pay for the opioid clean-up.  We want

12   the defendants to pay for the opioid clean-up.  I believe

13   that motion is still pending.

14               THE COURT:  All right.  You've got a pending

15   motion?

16               MR. FARRELL:  I believe we argued under the

17   collateral source rule.

18               MR. RUBY:  Judge, I think that's been denied.

19               MR. HESTER:  The Court denied that motion.

20               THE COURT:  I'm reminded that I denied that

21   motion.

22               MR. FARRELL:  Well then -- so, Judge, what we

23   would like to do is preserve -- we'd like to preserve --

24   renew and preserve that motion.

25               THE COURT:  All right.  The record will so show.

BY MR. RUBY:

**Q.**   And I'll ask the question again, Mayor.  You
weren't aware that 31, Code of Federal Regulations,
Section 35.6(b)(1)(xviii) does let the city use that
$40 million for substance misuse treatment?

**A.**   Yeah.  We weren't, we weren't aware of that.  I was not
aware of that.

**Q.**   And the county is going to get $17 million in federal
COVID relief money on top of the 40 million that the city is
going to get; correct?

**A.**   I know the county is getting some money.  I really
haven't taken the time to familiarize myself with what my
brethren on the other side of the street are getting.

**Q.**   But you know that it's millions of dollars; correct?

**A.**   I know they're receiving some money, but I don't know
how much.

**Q.**   The city has never taken any action to limit the
prescribing of opioids, has it?

**A.**   No, because we never thought that it was something that
was within our legal authority to do that.

**Q.**   In fact, you said you would be against that kind of
interference with the business practices; right?

**A.**   I don't believe that that's the role that a city should
play.

**Q.**   You think that if limits are going to be placed on the,

1   the prescribing of opioids by physicians, that ought to be

2   done by medical licensing bodies; right?

3   **A.**   Yes.

4   **Q.**   The city has never required doctors to report

5   information about opioid prescriptions that they write?

6   **A.**   That's correct.  And I think that is beyond the bounds

7   of our authority or responsibility.

8   **Q.**   It's never limited -- the city has never limited the

9   number of opioids that pharmacies in Huntington could

10  dispense?

11  **A.**   Correct.

12  **Q.**   The city has never required pharmacies to report

13  information about opioids that they dispense?

14  **A.**   I agree, yes.  And, once again, that is not what cities

15  in my -- in my experience, that's not what cities are

16  allowed to do by the state legislature.

17  **Q.**   Now, the city -- I want to focus on the statement that

18  you just made about the limits of the city's authority.  The

19  city does have a Code of Ordinances; correct?

20  **A.**   Yes.

21  **Q.**   And the Code of Ordinances does define city offenses;

22  right?

23  **A.**   Yes.

24  **Q.**   And, in particular, the city Code of Ordinances has a

25  section defining nuisances; right?

1    **A.**    Yes.

2    **Q.**    And, and the nuisances that are defined in the city

3    Code of Ordinances, those define things that the city says

4    people can and can't do; correct?

5    **A.**    Yes.

6    **Q.**    I'm going to ask you to take a look at what's been

7    marked Defendants' West Virginia 2810.

8              MR. RUBY:  Approach, Your Honor?

9              THE COURT:  Yes.

10             MR. FARRELL:  Judge, I think I'm on better ground

11   with this objection.  I believe we've had motions that were

12   filed and you entered an order distinguishing between

13   nuisance by ordinance and nuisance per se.

14        And, so, this line of questioning is trying to

15   establish whether or not the city can adopt an ordinance

16   that makes X or Y a public nuisance.  And as you'll recall

17   from the order, we have West Virginia precedent that says

18   just because the city says it's a public nuisance doesn't

19   make it adjudicated fact.  That's why we have these

20   proceedings here.

21        So this line of questioning is taking the Mayor of the

22   City of Huntington down a legal analysis that would be the

23   subject of a Law Review article.

24             MR. RUBY:  Judge, the question --

25             THE COURT:  This is cross-examination and if I

```
 1    understand where Mr. Ruby is going, he's pointing out that

 2    the city code identifies a list of nuisances and he's asking

 3    why can't you add another one that covers the opioids.

 4         Isn't that where you're going?

 5              MR. RUBY:  You have, you have anticipated me, Your

 6    Honor.

 7              THE COURT:  Go ahead.

 8    BY MR. RUBY:

 9    Q.   Mayor, do you recognize this as Section 1109.01 of

10    the Huntington Code of City Ordinances?

11    A.   Honestly, I can't say that I recognize it because I

12    don't spend much time going through our city ordinances, but

13    I will in a gentlemanly way take your word for it.

14    Q.   Are you aware that the City of Huntington does prohibit

15    a number of nuisances that is defined?

16    A.   Yes, as it's defined here I presume.

17    Q.   And what this code section says is -- it starts out

18    with the title "What Constitutes Nuisances."  And then it

19    says, "In addition to those declared by statute to be such,

20    each of the following specific conditions and things are

21    hereby prohibited and declared nuisances."

22         Do you see that?

23    A.   Yes.

24    Q.   And you agree that the City of Huntington has the

25    authority to define something as a nuisance and to prohibit
```

1    it; right?

2    **A.**    Yes, within the bounds that are set forth by state law.

3    **Q.**    And we'll turn to that in a minute.  But I want to look

4    at a few of the things that the City of Huntington has

5    defined as nuisances.

6         Do you see there in Subsection (a) that the city has

7    defined as a nuisance and has prohibited the deposit or

8    accumulation of foul, decaying or putrescent substances?

9    **A.**    Yes, I see that.  And if you go down through here,

10   these -- honestly, I have no idea when these were put in

11   place.  Some of them appear to be extremely dated and have

12   not been -- might have been an issue in some passing

13   decades, but nonetheless --

14   **Q.**    The city's never passed an ordinance declaring anything

15   about prescription opioids to be a public nuisance; correct?

16   **A.**    Correct.  And given the fact that we have been dealing

17   with this nearly every day certainly in the last seven plus

18   years, if not all eight and a half years that I've been in

19   office, particularly with, with my leadership team and my

20   legal counsel, I would believe that if, if we were given

21   authority to be able to go down that path by the state

22   legislature that we would not have left that stone unturned.

23   **Q.**    Let's talk about that.  The city has, has ordinances on

24   all kinds of things that are also regulated by the state

25   government and federal government; right?

1    **A.**    Yes.  But, once again, the State of West Virginia is

2    extremely tight in what they say cities can and cannot do.

3    We are a creation of the state and they take that very

4    seriously, even to the point that even when we do some

5    things, they'll come back and say -- that are permitted,

6    they'll come back and say you can't do that anymore.

7    **Q.**    The city has an ordinance on gambling; right?

8    **A.**    Yes.

9    **Q.**    And that's Article 513 of the Code of Ordinances.

10   Gambling is also regulated by the state and by the federal

11   government; correct?

12   **A.**    I'm not arguing who is, who is regulating and at what

13   level.  I'm simply saying that the state legislature sets

14   out cities can do these things.  We might be able to do a

15   lot of things that state -- we are able to do several

16   things -- nothing comes to mind -- that, that the states and

17   federal government can do.  But one thing is quite clear.

18   They tell us what we cannot do.  And what I have been led to

19   believe, if something is not explicitly stated, better stay

20   away from it.

21   **Q.**    And the city even has ordinances on drugs; right?

22   **A.**    Not being an attorney and, as I indicated earlier, I

23   presume that we do, but I don't have the familiarity of our

24   code.  That's why I have a legal staff.

25   **Q.**    Well, and I'm not asking for any sort of legal opinion.

1    I'm just asking as the Mayor of City of Huntington and a

2    former city council member, you are aware, aren't you, that

3    the City of Huntington has an ordinance that prohibits

4    synthetic cannabinoids?

5    **A.**    Matter of fact, what happened while I was on City

6    Council, yes.

7    **Q.**    And the City of Huntington has another ordinance that

8    prohibits synthetic cocaine; correct?

9    **A.**    I think that was all in the same ordinance, but it was

10   also accompanied by a state statute, if my recollection is

11   correct.   There was a big debate that was occurring up at

12   the state legislature.   And in my opinion -- my

13   recollection, what the state was doing was then allowing

14   localities to take action as well.

15   **Q.**    And the city -- notwithstanding those ordinances on

16   other kinds of drugs, the city has never enacted an

17   ordinance that says anything about prescription opioids;

18   right?

19   **A.**    Not that I'm aware of.   Again, I have to say that I

20   depend upon my legal staff, legal department to advise us

21   accordingly.

22   **Q.**    The, the first official action, as a matter of fact,

23   that the City Council ever took that was specific to the

24   issue of opioids was a resolution that it passed in April of

25   2020; right?

1    **A.**   I would have to know what the resolution was.

2    **Q.**   I'm going to show you what we've marked --

3    **A.**   Was this, was this the one authorizing the lawsuit?

4    **Q.**   It is.

5    **A.**   Okay.

6    **Q.**   At least in a manner of speaking, although it came

7    three years after the lawsuit.

8        I'm going to show you what's been marked as Defendants'

9    West Virginia 3148.

10       Mayor, this is the resolution that you were just

11   referring to; is that right?

12   **A.**   Yes.

13   **Q.**   And this is a, a resolution, not an ordinance; correct?

14   **A.**   Yes.

15   **Q.**   Meaning that it doesn't have the effect of allowing or

16   prohibiting anything; right?

17   **A.**   Correct.

18   **Q.**   And what this says is that this is a declaration of

19   public nuisance related to the wrongful manufacturing,

20   distribution, and dispensing of prescription pain pills to

21   Huntington residents; is that right?

22   **A.**   That's the title.

23   **Q.**   And if you look at the second page of the document,

24   you'll see that this was approved by the City Council on

25   April the 13th, 2020; is that correct?

**A.**   Yes.

**Q.**   And the reason that this was put before City Council in April of 2020 was because your lawyers told you to; correct?

          MS. KEARSE:  Objection, Your Honor.

          THE COURT:  What's the basis of the objection?

          MS. KEARSE:  I, I think there's a discussion about privilege there.  But I think it was insinuated that he was told something by the lawyers and I'm not sure where he's going with it.  But anything we've discussed, obviously, is privileged, but it's outside the scope --

          THE COURT:  I'll sustain the objection to the question the way you asked it, Mr. Ruby.

          MR. RUBY:  Judge, I'll just note that this was testified to without objection in the witness's deposition.

          THE COURT:  Well, it's objected to now, so I'll sustain it now.

BY MR. RUBY:

**Q.**   This resolution was adopted, Mayor, three weeks after the defendants in this case moved to dismiss in part because the city had no ordinance of general applicability that deemed the opioid problem a public nuisance; correct?

**A.**   I presume so, but I would have to rely upon my legal counsel to tell me why and such on that.  That's where I depend upon my legal counsel.

1    **Q.**   And this, this resolution was adopted in April of 2020

2    in response to that motion to dismiss that was filed in this

3    case; correct?

4    **A.**   I wouldn't know.  I had met with counsel and was

5    advised that --

6              MS. KEARSE:  Objection.

7              THE WITNESS:  Oh, I can't say that.

8              THE COURT:  Sustained.

9    BY MR. RUBY:

10   **Q.**   Now, the resolution from last year wasn't an

11   ordinance, but the city could have adopted an ordinance

12   in place of this resolution that added prescription

13   opioids to the city's public nuisance code; right?

14   **A.**   I don't know if that's the case.  That's something that

15   I just haven't agreed to because I'm not, I'm not certain

16   that we have that authority by state law.

17   **Q.**   This resolution came more than three years after the

18   case was filed; correct?

19   **A.**   Yes.

20   **Q.**   And this case, in turn, was filed five years after the

21   state Attorney General sued Cardinal Health and

22   AmerisourceBergen; right?

23   **A.**   Yes.  Frankly, what the Attorney General did really did

24   not matter to me.  I've got a problem in my city and the

25   Attorney General can do whatever he wants.  We're going to

1    address the issues in our city and that's why I got elected

2    Mayor.

3    **Q.**   But you must have known about the case that the

4    Attorney General filed in 2012; right?

5    **A.**   I didn't know the details.  I was aware that something

6    had been -- that there had been a case.

7    **Q.**   And the city didn't file its own version of that case

8    until after the state got a settlement; correct?

9    **A.**   That I don't know for sure.  I presume, but I'm not

10   familiar with when the state case was settled or when -- if

11   it settled prior to 2017, then I'll agree.  But if it's --

12   if it settled after that, then I'll have to say I'm not

13   sure.

14   **Q.**   And the city didn't file this case until 2017 even

15   though the volume of opioid pain medications that was

16   distributed in Cabell County and Huntington was public

17   information down to the three-digit zip code level as far

18   back as 2003; correct?

19   **A.**   I'll take your word for it that that was the -- that

20   was information that was available to the public.

21          MS. KEARSE:  Your Honor, he doesn't have knowledge

22   of that.

23          THE COURT:  Sustained.

24          MR. RUBY:  Well, Judge, I'd like to ask the

25   question as to whether he did anything to determine that.

1          THE COURT:  He said he didn't remember, and that's

2     the end of that question.  So ask your next one and we'll

3     see where it goes.

4     BY MR. RUBY:

5     **Q.**   And in your work on the opioid problem, Mayor, did

6     you do -- have you done anything to determine whether

7     the, the volume of opioid medications that were shipped

8     to Huntington/Cabell County was publicly available on

9     the DEA's website?

10    **A.**   I became aware through the press that there was some

11    information that was available.  But I haven't -- was not

12    aware that it's anything that I could obtain or was readily

13    made available to -- readily made available to the public.

14    **Q.**   In the City of Huntington, Mayor, there's already a set

15    of programs in place that comprehensively address the opioid

16    crisis; correct?

17    **A.**   We're constantly building upon -- on those programs.

18    We've laid a foundation on them since 2014.  And as I

19    indicated I think earlier in my testimony, we knew there

20    were several programs that were in place.  The left hand

21    didn't know what the right hand was doing.  And what we've

22    been seeking to do is make sure that the community is

23    equipped to be able to step forward in a collaborative

24    fashion.

25    **Q.**   And I'll make my question very specific.  You agree

1    that the set of programs that are in place in Huntington

2    right now comprehensively, and I'll emphasize that word

3    comprehensively, address the opioid problem; correct?

4    **A.**   We, we address -- we are attempting to address the

5    opioid epidemic in every way possible, but I don't think

6    it's comprehensive -- as comprehensive as it needs to be.

7    **Q.**   Do you agree that it's comprehensive?

8    **A.**   Counsel, the reason I'm hesitating on saying, saying

9    "yes" is that does saying comprehensive means that it covers

10   everything?  I don't believe -- I don't want to represent

11   that I think it covers everything and I wouldn't want that

12   to be my testimony today.

13        I'm willing to make my testimony that it is far

14   reaching, but it is certainly not in a, in a comprehensive

15   manner that we can rest assured that we have everything that

16   we need to move forward to address this, this epidemic.

17   **Q.**   All right.  We've talked earlier about the deposition

18   that you gave last year.  You were deposed in this case on

19   June 30th, 202; correct?

20   **A.**   Sure.  Well, then, read what I said and then we'll see

21   if I'm -- I'm not trying to be glib, but read what I said

22   and then we'll see if what I'm saying is diametrically

23   opposed.  I think -- I can't imagine that they're too far

24   apart from one another.  I may have just said "yes" and then

25   didn't continue to qualify my response.

```
1              MR. RUBY:  Mr. Huynh, could we have Page 293 of
2       the transcript?
3       BY MR. RUBY:
4       Q.   I'll direct you to lines 14 through 21, Mayor.
5            It says -- we were talking about a statement that the
6       city had made to the Mayors' Institute which we talked about
7       earlier.
8            And the question was:  "And that says considered to be
9       at the front lines of the epidemic prior to engagement of
10      the Mayors' Institute the City of Huntington already had
11      numerous programs and practices in place to comprehensively
12      address the opioid epidemic.  Do you agree with that
13      statement?"  And you see that your answer was, "Yes."
14           Correct?
15      A.   Yes.
16      Q.   And you were telling the truth when you made that
17      statement; correct?
18      A.   Yes.  And I will agree with that and I'm telling the
19      truth now.
20      Q.   The City of Huntington has been a model for how to
21      address the opioid problem; correct?
22      A.   Yes.  And that model is changing on a monthly basis.
23      Q.   Let's look at the comprehensive set of programs that
24      make Huntington a model.  You're familiar with the City of
25      Solutions guide?
```

1    **A.**    Yes.

2    **Q.**    I'm going to ask you to take a look at that.  And

3    that's been marked as Defense West Virginia 2653.

4          MR. FARRELL:  Judge, I think it's appropriate for

5    me to make an objection on this basis of cumulative.  I

6    think you'll probably recall this is probably the fifth or

7    sixth time you've been handed the same documents that go

8    through the same programs.

9       The county and the city stipulate that all of the

10    programs that are mentioned in the City of Solutions are

11    programs in the City of Huntington and Cabell County.

12          MR. RUBY:  Judge, I don't think Mr. Farrell

13    respectfully knows what questions I'm going to ask yet.

14          THE COURT:  Yeah.  You can go ahead with your

15    question.

16    BY MR. RUBY:

17    **Q.**    Mayor, this is --

18          THE COURT:  Objection is overruled.  Go ahead.

19          MR. RUBY:  Thank you, Your Honor.

20    BY MR. RUBY:

21    **Q.**    Mayor, this document that's been put in front of

22    you is the City of Solutions guide that was put together

23    to explain Huntington's successes in the fight against

24    opioids?

25    **A.**    Yes.

1    **Q.**   This is from 2019; correct?

2    **A.**   Yes.

3    **Q.**   And this is a guide that was created to share with

4    communities around the country and around the world;

5    correct?

6    **A.**   Yes.

7    **Q.**   This was written by Marshall University's Division of

8    Addiction Sciences; is that right?

9    **A.**   Yes.

10   **Q.**   Including Dr. Steve Petrany; correct?

11   **A.**   Yes.

12   **Q.**   And Dr. Lyn O'Connell?

13   **A.**   Yes.

14   **Q.**   Drs. Petrany and O'Connell are knowledgeable about the

15   opioid problem in Huntington, aren't they?

16   **A.**   Yes.

17   **Q.**   And so are their colleagues at the Division of

18   Addiction Sciences?

19   **A.**   Yes.

20   **Q.**   Let's look at what the guide said about the cause of

21   Huntington's opioid problem, if you'd turn to Page 8,

22   History.

23        I think Mr. Huynh's waiting for me to move to admit

24   this, Judge.  This is probably in evidence.

25             MR. HESTER:  Yes, it is.

1          MR. RUBY:  This is already in evidence, Your

2     Honor.  I'm going to ask to publish it.

3          We're on Page 8, Mr. Huynh.

4          THE WITNESS:  Yes, Page 8.  Did you ask me a

5     question or did I --

6     BY MR. RUBY:

7     **Q.**   No.  I was just trying to get the right page on the

8     screen.

9          So do you see the section at the top of Page 8 that

10    begins with "History"?

11    **A.**   History, yes.

12    **Q.**   And the first paragraph there, Mayor, says, "Every

13    region of the United States is currently experiencing the

14    negative impact of the substance use epidemic with certain

15    regions and communities experiencing it at a much higher

16    rate.  The Appalachian region, West Virginia, and the City

17    of Huntington in West Virginia are currently experiencing

18    the highest rate in the country --" and this is the passage

19    that I want to focus your attention on -- "due to a strong

20    combination of environmental and social factors."

21         Did I read that correctly?

22    **A.**   Yes.

23    **Q.**   Now, that's what Marshall's Division of Addiction

24    Sciences said about the cause of Huntington's high substance

25    abuse rate; correct?

```
 1   A.    Yes.

 2   Q.    And you wrote a Forward to this document; correct?

 3   A.    Yes.

 4   Q.    We'll look at that in just a minute.  But what I first

 5   want to turn to is a listing in the Table of Contents of

 6   this document.

 7              MR. RUBY:  If we can go back to the Table of

 8   Contents, Mr. Huynh.

 9              THE WITNESS:  Yes.

10   BY MR. RUBY:

11   Q.    Do you see that, Mayor?

12   A.    Yes.

13   Q.    And under Table of Contents the second bold heading

14   down is a heading that says "What We Have Now."

15         Do you see that?

16   A.    Yes.

17   Q.    And under that is a listing of substance abuse related

18   programs that currently exist in Huntington; correct?

19   A.    It's not comprehensive, but, yes.

20   Q.    And the Court has already heard about many of these

21   before, so we won't rehash that exhaustively.  But let's

22   just talk about these at a high level.  There are more than

23   20 programs on this list; correct?

24   A.    I haven't counted them.

25         (Pause)
```

```
 1          I'm counting 15, but I might be wrong.
 2    Q.    I could be off.  Maybe I was counting the headings.  In
 3    any event, there are a large number of programs on the list;
 4    correct?
 5    A.    Yes.
 6    Q.    There are multiple programs that serve the function of
 7    prevention; correct?
 8    A.    Yes.
 9    Q.    There are multiple programs that are focused on
10    intervention, meaning intervening in the lives of people
11    with substance abuse?
12               THE COURT:  Mr. Farrell.
13               MR. FARRELL:  I'm hoping my objection is now
14    timely that this is cumulative with the third or fourth time
15    we've been through the programs with the actual witnesses
16    that wrote the City of Solutions.
17               THE COURT:  Well, this is cross-examination.  I
18    think, I think the defendants have a right to probe this
19    through this witness.  But you're testing my patience here,
20    Mr. Ruby.
21               MR. RUBY:  Well, I don't mean to do that, Your
22    Honor, and we're not going to go past this list in the Table
23    of Contents.  We're going to discuss the program briefly
24    without going into any detail about any of them.
25    BY MR. RUBY:
```

1    Q.   What I'll ask you, Mayor, and I won't go through

2    all of them, but there's a medically assisted treatment

3    program on here, PROACT; correct?

4    A.   Yes.

5    Q.   And that program is funded almost entirely by

6    government and private health insurance; right?

7    A.   I wasn't aware of that.  I know, I know the partners

8    who are in Marshall, Marshall Health, the Mountain Health

9    network, at one point Valley Health was involved.  I don't

10   think they're involved any longer.  So if it was grants and

11   such as that, I won't dispute that, but I don't have that as

12   personal knowledge.

13   Q.   And the list of programs that's on here you already

14   indicated is not a comprehensive list; correct?

15   A.   Correct.

16   Q.   There are other programs that provide substance abuse

17   treatment for people in Huntington that aren't listed here?

18   A.   Yes.

19   Q.   Valley Health is one of those; right?

20   A.   Yes.

21   Q.   That's a federally qualified health center; correct?

22   A.   Yes.

23   Q.   It's supported by federal money?

24   A.   I presume.

25   Q.   And Prestera is another provider of substance abuse

1     that's not listed here?

2     **A.**     Right.

3     **Q.**     They're one of, if not the largest provider, of

4     substance abuse treatment services in Cabell County;

5     correct?

6     **A.**     Yes.

7     **Q.**     And also of behavioral health services?

8     **A.**     Yes.

9     **Q.**     They see thousands of patients every year?

10    **A.**     Yes.

11    **Q.**     And there are all together 14 medically assisted, or

12    medication assisted treatment providers in Cabell County;

13    correct?

14    **A.**     That I wouldn't know.

15    **Q.**     If Dr. O'Connell had said that in her testimony in this

16    trial, would you have any reason to disagree?

17    **A.**     I would not have any reason to dispute her.  That would

18    be in her expertise.  Certainly it's not something that I'm

19    aware of.

20    **Q.**     And those include Ohio Valley Physicians; correct?

21    **A.**     I would presume.

22    **Q.**     And Valley Health, as we just talked about, also does

23    medication assisted treatment; correct?

24    **A.**     I will take your word for it.  I believe you're right,

25    but it's not something that is my direct immediate

1    recollection or knowledge.

2    **Q.**    And the point that I'm getting to here, and I hope this

3    will address Mr. Farrell's objection, Your Honor, is that

4    none of those programs is funded from the budget of the City

5    of Huntington; correct?

6    **A.**    And they will never be and should never be.

7    **Q.**    None of them are funded from the budget of Cabell

8    County; correct?

9    **A.**    Correct.

10   **Q.**    Many of them receive funding from Medicaid; correct?

11   **A.**    Yes.

12   **Q.**    Many of them receive funding from private insurance;

13   correct?

14   **A.**    Yes.

15   **Q.**    Many of them, or at least some of them receive funding

16   from Marshall University; correct?

17   **A.**    I don't know about that, but I do know this, is that

18   part of the city's responsibility is not just to provide a

19   service, but to provide leadership.  And each of these

20   groups that we've talked to were part of the network and

21   collaboration that we established.  And I don't know -- I

22   know I have never represented that the city should be going

23   into the treatment business.  And I think I made that pretty

24   clear today.

25   **Q.**    And I think we may be able there to find a point on

1    which we can agree, Mayor.  A significant reason that the

2    city doesn't fund the treatment is because it's already

3    funded from those other sources; correct?

4    **A.**    Yes, and we don't do that.  We don't have the

5    professional expertise to provide that service.

6    **Q.**    Let's talk about the city's success and what the

7    outcome has been of the comprehensive set of programs that

8    we've looked at.

9         Overdose deaths in Cabell County peaked in 2017;

10   correct?

11   **A.**    Yes.

12   **Q.**    You're familiar -- you testified earlier this morning

13   about the State Office of Drug Control Policy; correct?

14   **A.**    Yes.

15   **Q.**    And, in fact, the director of your Office of Drug

16   Control Policy went on to be the founding director of the

17   State Office of Drug Control Policy; correct?

18   **A.**    Yes.

19   **Q.**    That was Mr. Johnson?

20   **A.**    Yes, sir.

21   **Q.**    And one of the things that Mr. Johnson and those who

22   have followed him at that office did was to put overdose

23   statistics on-line; correct?

24   **A.**    Yes.

25   **Q.**    Mr. Johnson and his successors created something called

1    a Data Dashboard?

2    **A.**   I believe -- I couldn't remember -- I can't remember

3    what that is called, but I have no reason to doubt what

4    you're saying.

5    **Q.**   It's a website; correct?

6    **A.**   Yes.

7    **Q.**   And it is a vehicle on the web, on the internet where

8    the State Office of Drug Control Policy shows overdose data?

9    **A.**   Yes.

10   **Q.**   I'm going to ask you to take a look, Mayor, at some

11   data from, from that ODCP website.  And I have three

12   exhibits that cover three years.  These are marked

13   MC-WV-2243, 2239, and 2240.

14              MR. RUBY:  Approach, Your Honor?

15              THE COURT:  Yes, you may.

16              MS. KEARSE:  I don't know what the document is,

17   Your Honor.

18              THE COURT:  Ms. Kearse doesn't know what you're

19   dealing with here.  Show counsel the documents.

20              MR. FARRELL:  Judge, I think I would like to make

21   two objections.

22       Number one, if I'm not mistaken, this is data from a

23   dashboard on the internet that has already been referenced

24   from another witness unless this is a new document.  But I

25   think 2240 has already been referenced.

```
 1          MR. RUBY:  Your Honor, I believe that these were
 2  shown to, to one of plaintiffs' expert witnesses the other
 3  day, but certainly the Mayor hasn't seen these and I haven't
 4  had an opportunity to cross-examine him about these.
 5          THE COURT:  Well, if it's been previously
 6  referenced, what is the significance of that?
 7          MR. FARRELL:  Well, the significance is if it's
 8  not been admitted, if it's simply been referenced, then --
 9  and I'll be very forthright with the Judge.  I'm thinking
10  through the next several weeks.
11      Without the foundation of the data from this document,
12  I'm not sure that it's permissible to cross-examine without
13  some type of foundation on the legitimacy of these data
14  conclusions.
15          THE COURT:  Well, where are you going with this,
16  Mr. Ruby?
17      It might be sufficient to give him a basis for his
18  cross-examination, Mr. Farrell.
19          MR. RUBY:  And that's fine, Your Honor.  I'm not
20  going to move to admit these.
21          MR. FARRELL:  No, no, I'm not saying to admit
22  them.  I understand that.  I'm, I'm wondering what
23  foundation is required for him to ask questions about data
24  compiled from an outside source.
25          THE COURT:  Well, we'll see where he goes with it
```

```
 1    because it doesn't take much to provide a basis for

 2    questions during a cross-examination --

 3              MR. FARRELL:  Thank you, Your Honor.

 4              THE COURT:  -- as long as his questions are in

 5    good faith.

 6              MR. FARRELL:  Thank you.

 7              MS. KEARSE:  And, Your Honor, I don't object if

 8    he's familiar with this.  I don't know if he's laid that

 9    foundation as well.

10              MR. RUBY:  Well, Your Honor, I think the witness

11    has already said that he's familiar with the data that the

12    State Office of Drug Control Policy --

13              THE COURT:  Go ahead and ask the questions, Mr.

14    Ruby, and we'll see where it goes.

15    BY MR. RUBY:

16    Q.   And, Mayor, just to recap, you are familiar with

17    the data that the Office of Drug Control Policy

18    publishes on-line; correct?

19    A.   I think a more accurate statement is I'm familiar with

20    the database.

21    Q.   That's fair.  I'm going to ask you to look first,

22    Mayor, at the one that has been marked for identification as

23    MC-WV-02243.

24    A.   Okay.

25    Q.   And do you see that this is a printout of the Data
```

1    Dashboard for fatal overdoses in West Virginia overview?

2    **A.**   Yes.

3              MR. RUBY:  And I'm going to ask, Your Honor, if we

4    could -- and I'll ask this because of the quality of the

5    printout that I have and that the Court has and the witness

6    has is not very good with respect to the section of the data

7    that we're looking for.  So I'd like to put it on the screen

8    and blow that up.  Judge --

9              THE COURT:  I'm puzzled.  Go ahead.  I was

10   reading.  I wasn't listening to you, Mr. Ruby.  Can you

11   re-address me, please?

12             MR. RUBY:  I'm sorry, Your Honor.  I just wanted

13   to know if I could publish because the print quality is not

14   very good.  That may be why you're puzzled.  The quality of

15   this printout is hard to read.  And, so, we'd like to put it

16   on the screen.

17             THE COURT:  Yeah, go ahead.

18             MR. RUBY:  Thank you.

19   BY MR. RUBY:

20   **Q.**   Now, on the -- there's a screen there beside you,

21   Mayor, that also might be easier to read, to the side of

22   you.

23   **A.**   Actually, this hasn't been on at all today so --

24   **Q.**   Oh, sorry.  Do you see that this is a -- this is the

25   State Office of Drug Control Policy listing of fatal

1    overdoses in West Virginia for the year 2017?

2    **A.**    Yes.

3    **Q.**    And if you look at the numbers for Cabell County,

4    Mayor, the, the data here show that there were 182 overdose

5    deaths in Cabell County in 2017 in which the decedent had

6    some opioid in their system.

7         Do you see the row for Cabell County and the column for

8    all opioids?

9    **A.**    Yes.  Is it all right if I write on this?

10   **Q.**    Of course.

11   **A.**    This is 43; correct?

12   **Q.**    This one is 43, yes.  And 162 of those involved

13   fentanyl in the decedent's system; is that correct?

14   **A.**    Yes.

15   **Q.**    And 62 of them involved heroin in the decedent's

16   system; is that correct?

17   **A.**    Yes.

18   **Q.**    And I want to ask you about these because we're going

19   to look at the trends over a period of three years, but I'll

20   just ask you a side question.

21        There's nothing on this, this listing from the ODCP

22   about prescription opioids at all, is there?

23   **A.**    Not that I see.  What I'm noticing -- and I guess --

24        MR. FARRELL:  I'm going to object at this point,

25   Your Honor.  I think that's an unfair question based on the

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    last eight weeks worth of testimony about what an opioid is.

2    To ask this witness that question I don't think is fair.

3            THE COURT:  I'm going to sustain the objection.

4    You're just asking him to read into the record things off

5    the exhibits here, Mr. Ruby, it seems to me, without showing

6    any knowledge on his part.  I mean, I don't -- I'm going to

7    sustain the objection to this.

8    BY MR. RUBY:

9    Q.   Well, let me ask you this, Mr. Mayor.  You're aware

10   that from 2017 to 2019, overdose deaths in Cabell County

11   fell by approximately 50 percent; correct?

12   A.   I'm not sure of the percentage, but I believe -- I do

13   know that they were falling 2017 to '19, correct, yes.

14   Q.   Are you aware -- are you aware that they fell

15   substantially?

16   A.   Yes.

17   Q.   And are you also aware that the number of overdose

18   response calls that the Huntington Fire Department responded

19   to fell by more than 80 percent from 2017 to 2019?

20   A.   Yes.  But I would also point out, and maybe this is

21   where we will go, in 2020 our -- once again, it demonstrates

22   the fragility of addiction.  In 2020 our overdose rates went

23   up.  I haven't been able to see the overdose deaths, but the

24   overdoses, overdose calls increased throughout 2020.  And

25   for six months of this year, they've increased over that.

1    Q.   And we'll talk about that, Mayor.  But let me ask you

2    about the -- again about the period prior to that.

3         In 2018 Huntington saw a double-digit decline in

4    property crime; correct?

5    A.   Yes.

6    Q.   And also a double-digit decline in violent crime;

7    correct?

8    A.   Yes.

9    Q.   And all of that reflects the impact of the

10   comprehensive set of programs that exist in Huntington to

11   address the opioid epidemic; correct?

12   A.   Yes.  We -- yes.

13   Q.   And even last year when the country and the state set

14   overdose records during the COVID pandemic, Cabell County's

15   overdose rate was still well below where it was in 2017;

16   correct?

17   A.   Can I clarify something before I -- I can say "yes

18   but."  It's all a matter of, of perspective.  Forgive me for

19   just using this analogy.

20        I heard on the news last night it's 119 degrees out

21   west.  If it drops down to 95 degrees, it's still hot, but

22   it might be perceived to be a cold snap.

23        The level of -- the highest level that we were having

24   in 2017 and such, I would hope it would be coming down.  But

25   where we found ourselves in '19, it was still way too high,

1   still way too high.  And just -- yes, we would say, yes,

2   they're dropping so that I could try to create some level of

3   hope within, within the community.  But the reality is we

4   still continue to have a miserable, horrible problem.

5   **Q.**   Do you know Bob Hanson, Mayor?

6   **A.**   Yes.

7   **Q.**   He was the CEO of Prestera Center; is that right?

8   **A.**   Yes.

9   **Q.**   And he was the Director of Addiction Services at

10  Marshall?

11  **A.**   Yes.

12  **Q.**   He went on to be the Director -- a Director after

13  Mr. Johnson at the State Office of Drug Control Policy?

14  **A.**   Yes.

15  **Q.**   He's an expert on addiction and substance abuse in West

16  Virginia; correct?

17  **A.**   Yes.

18  **Q.**   And I'm going to show you what he said about the

19  increase in overdoses during COVID.  I'll ask you to look at

20  what's been marked as Defendants' --

21          MR. FARRELL:  Objection, Your Honor, hearsay.

22          MR. RUBY:  Your Honor, I'm not offering it for the

23  truth.  My plan is to cross-examine the witness in

24  accordance with his understanding.

25          MS. KEARSE:  Your Honor, it shows a statement by

```
 1    someone else that's not --

 2                THE COURT:  You're getting pretty far afield here,

 3    Mr. Ruby.  I'm giving wide latitude in cross-examination,

 4    but you're asking him about things that he may not know

 5    about.  I mean, I'm going to sustain the objection to this

 6    line of questioning.

 7         You've made the point that the deaths were decreasing

 8    and the Mayor admitted that and then explained his answer

 9    and I think you need to get on with your next question.

10         We need to break right now.  We'll come back at five

11    till 3:00.

12         (Recess taken at 2:46 p.m.)

13                THE COURT:  Let's move this, Mr. Ruby, and get it

14    done, okay?

15                MR. RUBY:  Your Honor, I've been reminded that the

16    prospect was raised yesterday of an afternoon off.  And so,

17    I have no further questions of this witness.

18                THE COURT:  All right.  Any other cross

19    examination?

20                MR. NICHOLAS:  No, Your Honor.

21                THE COURT:  All right.  Any re-direct?

22                MS. KEARSE:  There's a couple of things I think

23    Mr. Farrell and I will cover very quickly.

24                THE COURT:  You probably made yourself very

25    unpopular with your co-counsel, Mr. Ruby.
```

1          MR. FARRELL:  Except for Mr. Hester.  I think Mr.

2     Hester --

3          MR. HESTER:  Looking good now.

4          (Laughter)

5                    **REDIRECT EXAMINATION**

6          **BY MS. KEARSE:**

7     **Q.**   Just a couple of things, Mayor.  Good afternoon.

8     **A.**   Yes, ma'am.

9     **Q.**   So, quickly, you were shown a couple of complaints that

10    I believe you hired counsel to assist in doing some

11    complaints before this Court; is that correct?

12    **A.**   Yes.

13    **Q.**   And you were shown some excerpts from the complaint,

14    WV-02631, which is a complaint before this Court in this

15    case; do you recall that?

16    **A.**   Yes, ma'am.

17    **Q.**   And I just want to draw your attention to a couple

18    paragraphs.  And let me back up.

19          MS. WU:  Your Honor, we object.  This isn't an

20    opportunity for the plaintiffs to read their own complaint

21    into the record.  We were able to use portions of it as

22    admissions, but it is not an opportunity for the plaintiffs

23    to read their complaint into the record.

24          THE COURT:  Well, what are you going to ask him?

25          MS. KEARSE:  There's just two things, Your Honor,

```
 1    on particular areas they were asking him about.

 2              MS. WU:  We would ask that Ms. Kearse ask

 3    questions rather than reading the complaint, or portions of

 4    it, into the record.

 5              BY MS. KEARSE:

 6    Q.   Let me ask you this, Mayor.  Over the seven and a half

 7    years that you've been mayor and bringing these lawsuits,

 8    have you been looking into the culpability of various

 9    defendants in regard to assisting in a -- paying for a

10    public health nuisance?

11    A.   No.

12              MS. WU:  Your Honor, objection.  Calls for a legal

13    conclusion.

14              BY MS. KEARSE:

15    Q.   You were -- Mayor, you were shown a couple of

16    paragraphs --

17              THE COURT:  Just a minute.

18         Overruled.  Go ahead and ask him.

19              MS. KEARSE:  312.

20              BY MS. KEARSE:

21    Q.   Mayor, you were shown Paragraph 313.

22              MS. KEARSE:  Gina, if you can go up to Section B,

23    and it's under the Section B entitled The Summary of the

24    Origin of the Opioid Epidemic and Opioid Public Nuisance.

25              BY MS. KEARSE:
```

1   **Q.**   Do you recall that?

2   **A.**   Yes.

3   **Q.**   Okay.  And I want to draw your attention to the

4   Paragraph 312 that was above the paragraph about the Sackler

5   family and I want to ask you if you would agree with this

6   statement that's in the complaint.

7        By now, most Americans have been affected, either

8   directly or indirectly, by the opioid disaster.  But few

9   realize that this crisis arose from the opioid

10  manufacturers', distributors', and dispensers' deliberate

11  efforts to evade restrictions.  Manufacturers and

12  distributors alike acted without regard for the lives that

13  would be trammeled in pursuit of profit.  Do you agree with

14  that statement?

15            MS. WU:  Your Honor, we object to the hearsay.

16  This is not an opportunity for the plaintiffs to read their

17  complaint into the record.  Ms. Kearse may ask the witness

18  questions, but she's simply reading the plaintiffs'

19  complaint into the record.

20            THE COURT:  Overruled.  I think it's a proper

21  re-direct based upon the questions that were asked on cross.

22  So, I'll allow it.  Go ahead.

23            MS. KEARSE:  And I had another rule --

24            BY MS. KEARSE:

25  **Q.**   In addition to that section, and specifically to

1    Paragraph 323, and, again, under the section about the

2    origins of the opioid epidemic and opioid public nuisance,

3    would you agree that the -- on 323, can you read that into

4    the record, Mayor?

5    **A.**    323.  Once the marketing defendants, employing the help

6    of distributor defendants, created a mass market for

7    prescription opioids, McKesson Corporation,

8    AmerisourceBergen Drug Corporation, Cardinal Health,

9    Incorporated, H. D. Smith Wholesale Drug Company, CVS, Rite

10   Aid, Walgreens, Kroger, and Wal-Mart, Inc. (together

11   "distributor defendants"), along with the marketing

12   defendants, flooded it.

13   **Q.**   And can you go down to -- we'll just go down to, yet,

14   distributor and marketing defendants.

15   **A.**    Yet, distributor and marketing defendants repeatedly

16   shipped suspicious orders of opioids - often in quantities

17   that they knew or should have known exceed any legitimate

18   market for opioids, even the wider market for chronic pain,

19   and ignored red flags of suspicious orders of these drugs in

20   the plaintiffs' communities, thereby exacerbating the

21   oversupply of such drugs and fueling an illegal secondary

22   market.

23   **Q.**   And do you agree with that statement, Mayor?

24   **A.**    Yes.

25            MS. WU:  Your Honor, objection.  Foundation.  The

```
1    witness has no personal knowledge of this information.

2              THE COURT:  Well, overruled.  On cross

3    examination, portions of the complaint were read into the

4    record and these are other portions that I think are

5    properly responsive to the ones that were read into on

6    cross.

7              MS. WU:  We understand, Your Honor.  However,

8    those are party admissions.  That is not a way to open a

9    door to simply reading in the plaintiffs' allegations in

10   this case.  The evidentiary rules don't allow for that.

11             MS. KEARSE:  And that's the last one I'm going to

12   do just for completeness sake.

13             THE COURT:  I'm going to overrule the objection.

14             MS. KEARSE:  Can you please put it back up?

15             BY MS. KEARSE:

16   Q.  You will agree with me, Mayor, that in that portion

17   that we just read that the marketing defendants, along with

18   the distributors defendants that are particularly named in

19   this courtroom, were part of the -- created a mass market

20   for prescription opioids --

21             MS. WU:  Objection.  Leading, Your Honor.

22             THE COURT:  Sustained.

23             BY MS. KEARSE:

24   Q.  Mayor, you were asked a lot about the budget and I

25   don't want to prolong the budget talks with that, but I
```

1    believe you did indicate that all aspects of your budget

2    have been impacted by the opioid crisis in your city?

3    **A.**    Absolutely.

4    **Q.**    And you continue to deal with budgetary issues in your

5    various departments, including police and fire, on a daily

6    basis that are specifically dealing with the opioid crisis

7    today?

8    **A.**    Yes.  And budgets are still being adversely affected by

9    the opioid -- by our efforts in fighting the opioid

10   epidemic.

11          MS. KEARSE:  Mayor, I'm going to have Mr. Farrell

12   ask some questions, as well.  Thank you.

13          THE WITNESS:  Thank you.

14          THE COURT:  Is there any further cross?

15          MR. FARRELL:  Judge, on behalf of Cabell County

16   Commission, I have a couple of questions.

17          THE COURT:  All right.  You may ask them.

18          MR. FARRELL:  Can we pull up Defendant 2631,

19   please?  That's the third amended complaint, just the front

20   page.

21                    **RE-DIRECT EXAMINATION**

22              **BY MR. FARRELL:**

23   **Q.**    Mayor, you were asked a couple of questions about the

24   third amended complaint and I believe you were asked the

25   question of you didn't sue any pharmacies or pharmacists.

```
 1    You were asked some questions about Purdue Pharma and what I
 2    would like to do is pull up the entire style of the case.
 3              MR. FARRELL:  And, Judge, may I approach the
 4    screen for a moment?
 5              THE COURT:  Yes.
 6              MR. RUBY:  Your Honor, I just want to object to
 7    the misstatement of the record.  The question was to
 8    pharmacists, not pharmacies.  There was not a question asked
 9    as to whether the plaintiffs had sued any pharmacies.
10              THE COURT:  Well, I -- I'm going to cut this off.
11    I understand what's going on here and I can read the
12    complaint, Mr. Farrell.
13              BY MR. FARRELL:
14    Q.  Now, you were also asked about the resolution that was
15    passed by the City of Huntington?
16    A.  Yes.
17    Q.  And one of the points I wanted to make with the
18    complaint was the third amended complaint has the City of
19    Huntington and Cabell County Commission as plaintiffs,
20    plural, in a joint complaint in this case.  You understand
21    that?
22    A.  Yes.
23    Q.  And you understand that both the City and the County
24    waived your governmental economic losses?
25    A.  Yes.  And I recall that when we had these
```

1    conversations, I was insistent.  I don't care about what we

2    spend.  I'm worried about what is coming.

3    **Q.**   And the lawsuit that you're bringing for public

4    nuisance is on behalf of the people who live in the City of

5    Huntington; is that your understanding?

6              MS. WU:  Your Honor, objection.  Leading and

7    misstates the allegations in this case.

8              THE COURT:  Yeah.  It's leading and I will sustain

9    the objection.

10             MR. FARRELL:  All right.

11             BY MR. FARRELL:

12   **Q.**   For whom are you bringing this lawsuit?

13   **A.**   The people of Huntington.

14   **Q.**   And which county do the people of Huntington live in?

15   **A.**   Cabell.

16             MR. RUBY:  Your Honor, that -- we object because

17   that states a legal conclusion.  The County, I believe -- or

18   the City and the County have disclaimed the ability to bring

19   a suit in a parens patriae capacity on behalf of the people.

20   They brought the suit -- the County and the City have both

21   brought the suit in the names of their own governments.

22             THE COURT:  Well, what about that, Mr. Farrell?

23             MR. FARRELL:  I'm not quite sure what he means by

24   it.  We have statutory authority.  This isn't parens

25   patriae, which is common law.  There are two specific

1    statutes from our legislature that allow the City of

2    Huntington, the governmental entity, the municipality, to

3    bring this cause of action on behalf of the people that live

4    within the city limits of Huntington.  There's also a

5    statute bestowed by the West Virginia Legislature to the

6    County Commission to bring this.

7             THE COURT:  Well, I think -- I think these are

8    legal questions that the Court is going to have to deal with

9    and I understand what they are and --

10            MR. FARRELL:  Well, I promise I'll get -- I'll get

11   straight to it.  The questions that were asked -- I'll see

12   if I can shortcut it.

13        Judge, I'd ask for the Court to take judicial notice of

14   Document 1433-18 in this record, which is the declaration by

15   the County Commission for the people that live in the county

16   to bring a public nuisance case against the distributors and

17   I'd ask for the Court to take judicial notice of

18   Document 1433-19 in this record where the City of Huntington

19   is authorized to represent the people that live in the City

20   of Huntington to bring this public nuisance case.

21            MS. WU:  Your Honor, while we've been in court

22   this afternoon, the plaintiffs have filed a motion for

23   judicial notice of a number of documents, including those

24   Mr. Farrell just identified.  We ask that we have a chance

25   to respond to that motion.

```
 1                THE COURT:  All right.  I'll reserve ruling on

 2      that.

 3                MS. WU:  Thank you, Judge.

 4                MR. FARRELL:  One last thing.  Will you please

 5      bring up -- this is the last -- last one, Judge -- Defense

 6      1287.

 7                BY MR. FARRELL:

 8      Q.   Mayor, do you recall you were asked about the Dear

 9      Senator Manchin letter --

10      A.   Yes.

11      Q.   -- in the context of utter causes of the opioid

12      epidemic?  I'd like to bring your attention to the third

13      full paragraph that was not referenced during your cross

14      examination and you see in the very first sentence, can you

15      -- can you tell me who it is that you identified in the very

16      first sentence of the third paragraph?

17      A.   The first sentence?  In the first sentence?

18      Q.   Yes.

19      A.   By one count?

20      Q.   So, let me -- let me make it cleaner.  You were asked

21      by counsel for Cardinal Health about all of the other people

22      that you have attributed as causing the opioid epidemic and

23      in your letter to Senator Manchin, is there anywhere in

24      there that you reference the distributors?

25      A.   Nine pharmaceutical distributors flooded Cabell County
```

```
 1   with 40 million prescription hydrocodone and oxycodone pills

 2   from 2007 to 2012.

 3   Q.    And since filing this lawsuit and since sending this

 4   letter to Senator Manchin, have you come to learn whether or

 5   not the 40 million prescription pills is the entire extent

 6   of prescription pills sold by the defendants?

 7             MS. WU:  Objection.  Leading, Your Honor.

 8             MR. RUBY:  And calls for hearsay, Your Honor.

 9             THE COURT:  What did you say?

10             MR. RUBY:  Also calls for hearsay, Your Honor.

11             THE COURT:  I'll sustain the objection.

12             BY MR. FARRELL:

13   Q.   Are you aware of how many pills the defendants sold to

14   Huntington-Cabell County as we allege in this lawsuit?

15             MR. RUBY:  Objection, Your Honor.  Foundation.

16             THE COURT:  Sustained.

17             MR. FARRELL:  I think I have expired the patience

18   of the Court and I hope I've made my point and, with that,

19   Judge --

20             THE COURT:  Well, this is not the first time, is

21   it, Mr. Farrell?

22       (Laughter)

23             MR. FARRELL:  It is not.  You have been incredibly

24   gracious and patient with all of us.

25             THE COURT:  Well, I don't know about that last
```

1    point.

2        Are we done with Mayor Williams?  Can we mercifully

3    excuse him?

4            MR. RUBY:  We're done, Your Honor.

5            MR. FARRELL:  Yes.

6            THE COURT:  Thank you, sir, very much.  We

7    appreciate it.

8            THE WITNESS:  Thank you, Your Honor.

9            THE COURT:  Appreciate it.  You're excused.

10           MR. FARRELL:  So, Judge, we are going to have

11   cleanup before we formally rest.  We can either do it

12   tomorrow morning before argument or we can take more time

13   this afternoon, but it's in the form of proffers, and I

14   think I have some AmerisourceBergen cleanup with document

15   replacements.  It's just technical stuff that I think is

16   uncontroverted.

17           THE COURT:  How long is it going to take you to do

18   it?

19           MR. FARRELL:  Well, unless somebody kicks me, I've

20   got one right here in my hand that I can do.

21           THE COURT:  Well, is that all of it or just part

22   of it?

23           MR. ACKERMAN:  We have one deposition designation,

24   the one from yesterday that's now complete, but I don't

25   think it's a whole lot.

1          THE COURT:  Let's do it at 9:00 in the morning

2    and, depending on how long you take, we'll start the -- what

3    did I allow, two and a half hours a side?

4          MR. HESTER:  Yes, Your Honor.

5          THE COURT:  Let's do it -- let's do it at 9:00.

6    And then, whatever time you take, we'll start the clock on

7    the two and a half hours for the defendants' motions at that

8    time.

9          MR. FARRELL:  Thank you, Judge.

10         THE COURT:  All right.  Thank you all very much.

11      (Trial recessed at 3:10 p.m.)

12

13

14      CERTIFICATION:

15          I, Ayme A. Cochran, Official Court Reporter,

16   and I, Lisa A. Cook, Official Court Reporter, certify that

17   the foregoing is a correct transcript from the record of

18   proceedings in the matter of The City of Huntington, et al.,

19   Plaintiffs vs. AmerisourceBergen Drug Corporation, et al.,

20   Defendants, Civil Action No. 3:17-cv-01362 and Civil Action

21   No. 3:17-cv-01665, as reported on June 30, 2021.

22

23      S\Ayme A. Cochran              s\Lisa A. Cook

24          Reporter                      Reporter

25      _



1

2        June 30, 2021

3            Date

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1.57** [1] - 109:20
**$10** [1] - 129:24
**$100,000** [3] - 26:7, 138:23, 141:23
**$115,000** [1] - 133:21
**$15** [2] - 132:3, 132:8
**$17** [4] - 134:24, 137:6, 138:18, 147:8
**$20** [1] - 129:24
**$20,000** [1] - 141:24
**$300,000** [2] - 138:24, 140:8
**$40** [4] - 31:22, 145:19, 146:5, 147:5
**$44** [1] - 145:15
**$49.95** [1] - 109:18
**$85,000** [1] - 133:20

## '

**'14** [1] - 60:22
**'15** [2] - 60:22, 61:21
**'17** [1] - 61:22
**'19** [2] - 175:13, 176:25
**'22** [1] - 134:15
**'80s** [1] - 17:18
**'91** [1] - 13:19
**'93** [2] - 14:5, 15:17
**'98** [1] - 14:6

## 0

**00907** [2] - 2:5, 2:14

## 1

**1** [2] - 94:1, 98:13
**1,000** [1] - 109:17
**10** [2] - 57:16, 131:22
**10-million-dollar** [1] - 135:5
**100,000** [1] - 138:19
**1001** [2] - 4:6, 4:9
**1022** [1] - 3:5
**10:27** [1] - 57:18
**10:48** [1] - 105:9
**11** [1] - 111:20
**1102** [1] - 93:18
**1109.01** [1] - 150:9
**119** [1] - 176:20
**11:00** [2] - 43:8, 52:21
**11:05** [2] - 52:20, 52:22
**12** [1] - 90:25
**126** [1] - 3:5
**1287** [1] - 188:6
**1300** [1] - 6:15

**1311** [2] - 2:4, 2:14
**13th** [1] - 154:25
**14** [4] - 15:25, 76:19, 160:4, 167:11
**142** [3] - 101:13, 101:15, 101:16
**1433-18** [1] - 187:14
**1433-19** [1] - 187:18
**15** [5] - 20:22, 71:3, 71:5, 130:5, 165:1
**15910** [1] - 3:15
**15th** [2] - 22:17, 23:1
**16** [3] - 8:14, 16:21, 100:23
**1600** [1] - 3:15
**162** [1] - 174:12
**17-million-dollar** [4] - 134:18, 140:14, 143:14, 145:13
**1717** [2] - 6:6, 6:13
**17th** [2] - 107:10, 107:19
**182** [1] - 174:4
**19** [1] - 12:2
**19,000** [1] - 73:2
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1950** [1] - 123:8
**1978** [1] - 9:19
**1981** [1] - 12:3
**1984** [2] - 12:3
**1985** [1] - 12:14
**1990** [2] - 13:13, 13:16
**1990s** [1] - 34:9
**1993** [1] - 15:11
**1994** [2] - 13:22, 15:25
**1:29** [1] - 119:18
**1:30** [2] - 119:9, 119:13
**1st** [3] - 8:6, 15:18, 19:18

## 2

**2** [6] - 27:3, 89:14, 93:24, 94:1, 98:12, 113:25
**20** [5] - 28:8, 28:14, 30:7, 31:16, 164:23
**200** [2] - 48:5, 49:7
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21, 5:5
**2001** [1] - 98:15
**2003** [1] - 157:18
**2006** [4] - 128:5, 128:18, 128:21, 130:21
**2006-2008** [1] - 128:25

**2007** [1] - 189:2
**2008** [4] - 15:25, 16:12, 124:10, 124:15
**2012** [5] - 13:20, 16:12, 157:4, 189:2
**2013** [3] - 8:6, 19:18, 42:2
**2013-2015)** [1] - 109:14
**2014** [6] - 42:2, 46:25, 52:20, 138:9, 138:10, 158:18
**2015** [2] - 60:20, 61:13
**2016** [3] - 19:25, 103:24, 105:9
**2017** [15] - 28:15, 61:17, 61:22, 92:22, 138:11, 157:11, 157:14, 169:9, 174:1, 174:5, 175:10, 175:13, 175:19, 176:15, 176:24
**2018** [5] - 113:17, 113:23, 120:6, 126:11, 176:3
**2019** [5] - 107:10, 107:19, 162:1, 175:10, 175:19
**202** [3] - 2:4, 2:13, 159:19
**2020** [9] - 134:12, 134:14, 153:25, 154:25, 155:3, 156:1, 175:21, 175:22, 175:24
**2021** [4] - 1:19, 7:4, 191:21, 192:2
**2022** [12] - 134:14, 134:16, 134:19, 135:3, 135:23, 136:16, 137:4, 138:24, 138:25, 140:13, 143:13, 145:14
**20th** [2] - 42:8, 42:21
**21** [1] - 160:4
**2148** [1] - 128:3
**21st** [1] - 128:5
**2216** [1] - 3:7
**2239** [1] - 170:13
**2240** [2] - 170:13, 170:25
**24** [1] - 29:9
**25** [2] - 5:5, 49:20
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15

**25701** [1] - 3:10
**2631** [1] - 184:18
**2653** [1] - 161:3
**27th** [1] - 113:23
**28** [4] - 4:3, 4:12, 4:14, 12:10
**2810** [1] - 149:7
**29** [1] - 109:14
**293** [1] - 160:1
**29464** [3] - 4:4, 4:12, 4:15
**2:00** [1] - 119:9
**2:46** [1] - 178:12

## 3

**3** [2] - 55:9, 89:18
**30** [7] - 1:19, 7:4, 23:11, 49:20, 123:16, 191:21, 192:2
**30th** [1] - 159:19
**31** [2] - 146:3, 147:3
**3100** [2] - 6:5, 6:12
**312** [2] - 180:19, 181:4
**313** [3] - 84:12, 84:16, 180:21
**314** [1] - 85:22
**3148** [1] - 154:9
**316** [1] - 2:11
**319** [1] - 87:10
**32** [1] - 1:16
**323** [3] - 182:1, 182:3, 182:5
**32502** [1] - 2:11
**35** [2] - 43:9, 133:23
**35-million-dollar** [1] - 31:21
**35.6(b)(1)(xviii** [2] - 146:4, 147:4
**376** [1] - 88:13
**384** [1] - 89:4
**3843** [1] - 5:14
**385** [1] - 91:8
**39** [1] - 101:13
**3:00** [1] - 178:11
**3:10** [1] - 191:11
**3:17-cv-01362** [2] - 1:5, 191:20
**3:17-cv-01665** [2] - 1:11, 191:21

## 4

**4** [5] - 55:9, 90:5, 99:18, 99:19, 141:16
**40** [8] - 11:18, 15:23, 23:11, 29:11, 147:9, 189:1, 189:5
**400** [1] - 45:1

**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**43** [2] - 174:11, 174:12
**465** [1] - 43:10
**49** [1] - 16:16

## 5

**5** [4] - 24:5, 24:8, 90:10, 137:15
**50** [7] - 29:11, 123:25, 144:7, 144:14, 175:11
**50,000** [1] - 123:16
**500** [3] - 42:14, 43:9, 44:24
**513** [1] - 152:9
**55-million-dollar** [1] - 28:16
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**5th** [2] - 103:24, 105:9

## 6

**6** [5] - 90:14, 123:15, 131:20, 131:22, 132:2
**600** [1] - 2:10
**62** [1] - 174:15
**6th** [1] - 3:5

## 7

**7** [2] - 90:18, 100:22
**70** [2] - 35:20, 35:21
**70130** [1] - 3:8
**707** [1] - 4:24
**716** [1] - 3:12
**725** [2] - 4:19, 4:21
**75** [2] - 84:11, 84:15
**7:00** [1] - 47:9
**7th** [3] - 52:19, 53:23, 55:15

## 8

**8** [6] - 90:22, 99:18, 162:21, 163:3, 163:4, 163:9
**80** [1] - 175:19
**801** [1] - 3:10
**801(d)(2** [1] - 111:4
**801(d)(2)** [2] - 93:14, 111:14
**801(d)(2)(B** [2] - 108:17, 112:24
**850** [1] - 5:12
**8th** [1] - 26:21

## 9

**9** [1] - 90:22
**90,000** [1] - 123:8
**90-day** [1] - 48:5
**901** [1] - 4:23
**902** [3] - 121:14, 121:18, 122:10
**91436** [1] - 3:16
**94** [1] - 88:12
**95** [1] - 176:21
**98** [1] - 89:4
**99%** [1] - 101:8
**999** [1] - 76:21
**9:00** [3] - 7:4, 191:1, 191:5
**9th** [1] - 4:6

## A

**a.m** [5] - 7:4, 52:20, 57:18, 105:9, 111:20
**abate** [1] - 102:9
**abatement** [1] - 77:3
**ability** [4] - 63:23, 71:12, 76:3, 186:18
**able** [79] - 13:16, 14:16, 17:5, 20:25, 25:4, 25:10, 27:7, 27:22, 28:12, 28:23, 29:6, 29:17, 30:16, 30:18, 31:12, 31:23, 33:9, 33:13, 34:25, 36:9, 42:25, 43:1, 43:3, 46:16, 46:20, 51:19, 51:23, 52:16, 53:10, 54:6, 56:14, 56:23, 57:3, 59:23, 61:23, 63:11, 64:12, 64:23, 65:8, 66:17, 66:19, 66:24, 67:11, 68:12, 70:14, 70:21, 71:1, 72:1, 72:13, 72:19, 73:22, 74:21, 76:9, 76:10, 76:14, 77:6, 77:10, 77:12, 78:3, 84:12, 100:20, 117:3, 132:5, 141:12, 141:24, 142:25, 145:3, 145:9, 145:10, 151:21, 152:14, 152:15, 158:23, 168:25, 175:23, 179:21
**absolute** [1] - 41:14
**absolutely** [4] - 29:4, 54:7, 76:9, 184:3
**absorbing** [1] - 45:24
**abundance** [1] - 41:10

**Abuse** [1] - 73:16
**abuse** [12] - 85:10, 85:12, 85:17, 91:1, 96:20, 163:25, 164:17, 165:11, 166:16, 166:25, 167:4, 177:15
**accept** [1] - 62:2
**accepted** [1] - 13:3
**accepting** [1] - 68:11
**access** [1] - 114:17
**accompanied** [1] - 153:10
**accomplish** [3] - 35:15, 95:24, 96:1
**accomplished** [1] - 61:19
**accord** [1] - 71:25
**accordance** [1] - 177:24
**According** [1] - 123:24
**according** [5] - 20:12, 91:4, 97:15, 116:20, 128:20
**accordingly** [1] - 153:21
**account** [1] - 25:8
**accounting** [3] - 24:6, 24:7, 25:23
**Accreditation** [3] - 91:21, 97:17, 97:18
**accredits** [2] - 92:2, 100:10
**accumulation** [2] - 73:1, 151:8
**accurate** [1] - 172:19
**ACKERMAN** [3] - 4:5, 140:2, 190:23
**acknowledge** [2] - 105:23, 144:22
**acknowledged** [1] - 144:23
**acquire** [1] - 23:20
**acronym** [1] - 91:24
**Act** [2] - 132:5, 145:15
**acted** [1] - 181:12
**acting** [5] - 12:8, 12:11, 46:2, 46:18, 58:23
**Action** [5] - 1:4, 1:10, 66:19, 191:20
**action** [9] - 33:9, 59:16, 69:1, 101:18, 101:23, 147:17, 153:14, 153:22, 187:3
**actions** [2] - 39:7, 60:3
**active** [10] - 17:10,

17:15, 17:16, 19:24, 56:24, 61:18, 64:1, 65:11, 72:25, 77:7
**actual** [1] - 165:15
**ad** [1] - 19:3
**Adams** [1] - 129:24
**add** [3] - 45:19, 125:13, 150:3
**added** [1] - 156:12
**Addiction** [4] - 162:8, 162:18, 163:23, 177:9
**addiction** [19] - 43:21, 49:10, 51:18, 52:10, 52:11, 60:25, 66:25, 74:16, 76:17, 89:1, 89:9, 89:18, 94:6, 94:23, 95:7, 124:4, 142:20, 175:22, 177:15
**addictive** [3] - 89:14, 98:21, 130:13
**adding** [2] - 129:19, 129:22
**addition** [4] - 10:2, 72:20, 150:19, 181:25
**additional** [3] - 10:2, 31:12, 116:13
**address** [21] - 42:14, 42:22, 57:3, 64:23, 66:24, 66:25, 68:13, 72:19, 132:12, 142:20, 157:1, 158:15, 159:3, 159:4, 159:16, 160:12, 160:21, 168:3, 173:11, 176:11
**Address** [1] - 34:6
**addressing** [5] - 67:10, 142:22, 142:23, 145:4, 145:5
**adjudicated** [1] - 149:19
**adjust** [1] - 29:25
**adjustment** [1] - 29:20
**adjustments** [4] - 24:24, 30:3, 117:19, 118:1
**administering** [2] - 115:17, 116:15
**Administration** [1] - 73:18
**administration** [6] - 9:24, 11:4, 12:18, 20:13, 26:5, 36:8
**admissions** [2] - 179:22, 183:8
**admit** [9] - 93:6,

97:25, 111:13, 111:14, 114:3, 122:9, 162:23, 171:20, 171:21
**admitted** [9] - 93:18, 98:7, 103:11, 110:20, 114:7, 122:13, 171:8, 178:8
**admitting** [2] - 110:18, 112:24
**admonition** [1] - 61:25
**adopt** [1] - 149:15
**adopted** [8] - 108:20, 108:22, 110:8, 112:25, 118:22, 155:18, 156:1, 156:11
**adoption** [2] - 108:14, 108:24
**adults** [1] - 124:24
**advance** [1] - 32:1
**advantages** [1] - 64:9
**adverse** [1] - 98:24
**adversely** [1] - 184:8
**advice** [1] - 38:19
**advise** [1] - 153:20
**advised** [3] - 42:10, 44:14, 156:5
**advisor** [1] - 10:6
**advocating** [1] - 117:6
**affairs** [3] - 25:18, 38:4, 45:25
**affected** [4] - 64:25, 181:7, 184:8
**affiliate** [1] - 97:20
**affiliates** [1] - 98:17
**affirmed** [1] - 23:23
**affirming** [2] - 54:7, 75:4
**afforded** [1] - 77:13
**afield** [1] - 178:2
**AFSCME** [1] - 31:7
**afternoon** [6] - 35:13, 53:4, 178:16, 179:7, 187:22, 190:13
**agencies** [6] - 26:1, 26:9, 33:10, 38:17, 41:15, 47:8
**agency** [5] - 33:3, 33:12, 38:11, 44:6, 62:14
**agenda** [1] - 26:19
**aggravated** [1] - 51:6
**aggressive** [3] - 31:18, 33:14, 129:3
**aggressively** [1] - 51:17
**aggressiveness** [1] - 38:14
**ago** [9] - 23:16, 35:3,

78:2, 88:17, 95:10, 111:19, 128:9, 128:21, 130:5
**agree** [64] - 19:11, 30:19, 62:20, 78:17, 79:20, 79:25, 80:10, 81:25, 85:2, 86:4, 87:14, 87:20, 88:5, 88:23, 89:2, 89:12, 89:16, 89:19, 89:21, 89:23, 90:3, 90:8, 90:19, 90:22, 91:2, 91:14, 94:10, 94:11, 95:12, 96:8, 96:20, 99:2, 99:11, 100:8, 101:2, 101:6, 101:9, 105:20, 106:11, 106:24, 107:3, 115:22, 117:13, 117:21, 123:12, 124:7, 124:21, 125:12, 125:23, 134:23, 134:25, 148:14, 150:24, 157:11, 158:25, 159:7, 160:12, 160:18, 169:1, 181:5, 181:13, 182:3, 182:23, 183:16
**agreed** [2] - 113:8, 156:15
**agreement** [2] - 29:21, 29:24
**agrees** [1] - 81:1
**ahead** [15] - 19:6, 45:9, 58:1, 81:18, 110:18, 113:18, 118:25, 150:7, 161:14, 161:18, 172:13, 173:9, 173:17, 180:18, 181:22
**Aid** [1] - 182:10
**aimlessly** [1] - 60:10
**air** [1] - 69:3
**al** [4] - 1:7, 1:13, 191:18, 191:19
**alarm** [1] - 42:1
**Alexander's** [1] - 144:4
**alike** [1] - 181:12
**allegation** [1] - 131:7
**allegations** [3] - 101:12, 183:9, 186:7
**allege** [1] - 189:14
**allow** [4] - 181:22, 183:10, 187:1, 191:3
**allowed** [2] - 23:16, 148:16

allowing [2] - 153:13, 154:15
almost [4] - 19:3, 102:23, 133:21, 166:5
alphabet [1] - 32:5
alternative [2] - 90:18, 101:18
alumni [1] - 17:11
amazed [1] - 68:24
amazing [5] - 53:24, 54:7, 56:11, 71:24, 72:9
amend [1] - 102:17
amended [5] - 83:6, 139:24, 184:19, 184:24, 185:18
America [4] - 54:5, 92:3
America's [1] - 124:17
Americans [2] - 181:7
AmerisourceBergen [6] - 6:2, 103:4, 156:22, 182:8, 190:14, 191:19
AMERISOURCEBER GEN [2] - 1:7, 1:13
amount [3] - 24:1, 111:22, 141:23
analogy [1] - 176:19
analysis [1] - 149:22
analyst [1] - 59:8
ANDREW [1] - 5:10
angels [1] - 75:5
angry [2] - 30:4, 56:5
animal [4] - 36:19, 36:23, 134:1
ANNE [1] - 4:2
ANNIE [1] - 4:11
anniversary [2] - 78:5, 78:6
annual [2] - 109:20, 144:10
annually [1] - 109:19
answer [11] - 20:6, 20:13, 57:1, 81:3, 81:18, 81:23, 122:2, 140:25, 143:19, 160:13, 178:8
answers [2] - 61:8, 81:17
ANTHONY [1] - 2:6
anticipated [2] - 132:1, 150:5
anticipating [1] - 44:23
anyway [3] - 11:19, 30:20, 98:3
apart [2] - 92:8, 159:24

apologize [4] - 18:15, 81:21, 82:2, 143:6
Appalachia [2] - 70:14, 104:4
Appalachian [2] - 32:19, 163:16
apparent [1] - 41:8
appeals [1] - 20:12
appear [4] - 25:6, 32:10, 93:3, 151:11
APPEARANCES [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
applicability [1] - 155:21
application [1] - 121:23
applied [2] - 120:6, 120:23
appointed [1] - 58:11
appointment [1] - 35:1
appreciate [2] - 190:7, 190:9
appreciation [1] - 44:15
Approach [3] - 121:15, 149:8, 170:14
approach [5] - 18:11, 82:23, 92:17, 107:7, 185:3
approached [1] - 13:6
appropriate [4] - 27:3, 52:25, 143:2, 161:4
appropriately [2] - 40:25, 82:13
appropriations [2] - 141:1, 141:3
approved [4] - 82:5, 93:3, 97:5, 154:24
April [4] - 153:24, 154:25, 155:3, 156:1
Arch [2] - 6:6, 6:13
Area [1] - 106:17
area [11] - 26:4, 31:22, 34:20, 34:21, 48:12, 50:15, 53:25, 80:19, 124:16, 124:24, 127:2
areas [4] - 33:15, 123:22, 124:1, 180:1
arena [2] - 47:10
argue [1] - 134:22
argued [1] - 146:16
arguing [1] - 152:12
argument [2] - 40:19, 190:12
arm [1] - 106:20
arose [1] - 181:9

arrange [1] - 35:19
arrest [2] - 50:6, 58:16
arrested [2] - 49:8, 75:2
arresting [2] - 47:13, 47:17
arrests [3] - 42:18, 48:5, 58:16
arrived [2] - 39:6, 129:1
article [8] - 128:4, 128:15, 128:20, 128:23, 129:8, 129:11, 130:5, 149:23
Article [1] - 152:9
articulate [3] - 21:19, 33:21, 74:25
arts [1] - 54:24
ASHLEY [1] - 5:3
aside [4] - 15:15, 25:9, 57:9, 142:23
aspect [1] - 74:19
aspects [1] - 184:1
assembling [1] - 42:21
assembly [1] - 49:19
asserted [2] - 45:6, 103:13
assertion [3] - 45:12, 94:17, 142:20
assessment [1] - 41:25
assessments [2] - 38:3, 43:12
assign [1] - 32:23
assigned [2] - 25:24, 137:23
assignment [4] - 54:17, 55:1, 62:2, 68:11
assist [4] - 18:6, 40:24, 143:21, 179:10
Assistance [1] - 142:6
assistance [4] - 120:10, 120:14, 121:6, 132:6
assisted [4] - 166:2, 167:11, 167:12, 167:23
assisting [1] - 180:9
Associated [1] - 124:17
associated [2] - 20:16
association [1] - 17:11
associations [2] - 34:11
assume [1] - 45:16

assure [1] - 27:22
assured [1] - 159:15
assures [1] - 23:7
AT [1] - 1:2
ATF [3] - 32:5, 32:19, 47:8
Athens [3] - 8:14, 9:4, 9:6
attached [2] - 53:11, 111:24
attempting [2] - 139:19, 159:4
attended [1] - 52:21
attention [4] - 163:19, 179:17, 181:3, 188:12
attitudes [1] - 67:7
attorney [1] - 152:22
Attorney [6] - 32:5, 38:9, 156:21, 156:23, 156:25, 157:4
Attorneys [1] - 32:7
attributed [1] - 188:22
August [4] - 16:16, 46:24, 102:16, 102:17
authored [1] - 68:7
authorities [1] - 129:14
authority [9] - 21:5, 29:24, 147:20, 148:7, 148:18, 150:25, 151:21, 156:16, 186:24
Authority [4] - 11:13, 11:16, 20:20, 36:16
authorized [1] - 187:19
authorizing [1] - 154:3
available [7] - 36:4, 68:12, 157:20, 158:8, 158:11, 158:13
Avenue [3] - 17:17, 26:25, 42:9
average [1] - 109:20
Avin [1] - 3:7
avoided [1] - 90:5
aware [24] - 13:5, 38:21, 45:25, 118:7, 118:10, 118:14, 118:18, 146:2, 147:3, 147:6, 147:7, 150:14, 153:2, 153:19, 157:5, 158:10, 158:12, 166:7, 167:19, 175:9, 175:14, 175:17, 189:13

awful [1] - 33:8
awfully [2] - 9:6, 57:7
awhile [1] - 111:18
Ayme [2] - 6:17, 191:15

## B

background [4] - 8:11, 18:8, 65:10, 75:14
baffled [1] - 130:10
balance [5] - 22:20, 25:4, 25:9, 136:17, 137:6
balanced [1] - 22:21
bald - 56:3
bald-headed [1] - 56:3
balding [1] - 55:22
ball [2] - 9:12, 9:15
bank [2] - 13:10, 14:23
Bank [6] - 14:2, 14:3, 14:5, 14:18, 14:21, 14:22
banking [1] - 13:24
bankruptcy [1] - 25:20
banks [1] - 26:10
Banks [2] - 15:2, 15:4
Bapcopalian [1] - 18:2
Baptist [2] - 17:17, 53:14
baptized [1] - 17:21
Baron [1] - 3:14
Barton [1] - 11:9
base [1] - 9:13
baseball [2] - 9:14
based [4] - 52:4, 121:23, 174:25, 181:21
basis [10] - 50:21, 65:13, 110:16, 145:24, 155:5, 160:22, 161:5, 171:17, 172:1, 184:6
basketball [2] - 9:13, 9:14
batch [1] - 83:2
Bateman [1] - 100:15
Baylen [1] - 2:11
bear [2] - 115:1, 115:4
bearing [1] - 139:19
beat [2] - 15:15, 15:18
beauty [1] - 75:19
became [19] - 10:5, 10:10, 12:11, 14:3, 15:16, 25:19, 26:3, 26:4, 31:18, 37:12, 37:15, 37:19, 38:6, 41:8, 64:1, 67:17, 69:3, 75:12, 158:10

**become** [4] - 74:15, 87:18, 125:15, 127:19
**becomes** [1] - 34:5
**becoming** [3] - 11:5, 45:24, 60:1
**befell** [1] - 123:10
**BEFORE** [1] - 1:17
**began** [2] - 37:12, 84:18
**begin** [1] - 22:24
**beginning** [4] - 46:12, 60:1, 84:9, 114:9
**begins** [10] - 94:2, 99:19, 108:5, 122:16, 122:17, 124:10, 129:11, 129:19, 134:16, 163:10
**behalf** [8] - 39:8, 43:13, 97:6, 139:16, 184:15, 186:4, 186:19, 187:3
**behavior** [1] - 89:15
**behavioral** [1] - 167:7
**behind** [2] - 53:9, 55:18
**belief** [1] - 108:15
**bells** [1] - 80:22
**below** [2] - 111:23, 176:15
**BENCH** [1] - 1:16
**bench** [1] - 82:24
**benefit** [2] - 143:7, 146:3
**beside** [2] - 84:13, 173:20
**best** [3] - 25:21, 62:19, 141:15
**bestowed** [1] - 187:5
**better** [2] - 149:10, 152:19
**between** [1] - 149:12
**beyond** [6] - 26:13, 44:13, 76:12, 81:5, 148:6
**Biden** [1] - 73:18
**Big** [1] - 104:7
**big** [5] - 21:7, 23:13, 48:17, 105:14, 153:11
**biggest** [3] - 48:10, 76:5, 122:25
**billions** [1] - 84:22
**bit** [20] - 8:11, 10:1, 10:5, 11:4, 15:8, 17:7, 20:1, 20:3, 24:12, 33:16, 37:14, 40:7, 40:8, 58:5, 62:7, 84:13, 115:7,

123:21, 131:13, 133:14
**bite** [1] - 87:10
**black** [4] - 129:1, 129:5, 129:18, 130:2
**blame** [1] - 127:20
**bleachers** [1] - 47:11
**Blight** [1] - 123:10
**Block** [1] - 133:1
**blondish** [1] - 55:19
**blow** [1] - 173:8
**Bluefield** [5] - 8:13, 8:20, 8:23, 11:9, 73:9
**blunt** [1] - 71:20
**Blvd** [3] - 4:3, 4:12, 4:14
**board** [8] - 20:12, 20:17, 20:18, 20:22, 20:23, 23:1, 36:20, 36:22
**Board** [3] - 64:6, 104:22, 120:17
**boards** [2] - 20:11, 20:16
**Bob** [1] - 177:5
**bodies** [1] - 148:2
**bold** [2] - 112:4, 164:13
**bolster** [1] - 19:1
**Bonasso** [1] - 5:14
**bond** [3] - 13:11, 13:17, 25:21
**bookcases** [1] - 60:11
**books** [1] - 26:12
**born** [3] - 8:12, 8:13, 63:17
**Boston** [1] - 73:17
**bother** [1] - 127:4
**Botticelli** [5] - 49:15, 49:22, 50:9, 58:19, 60:15
**bottom** [7] - 84:15, 88:14, 99:19, 107:17, 112:4, 114:15, 122:16
**Boulevard** [1] - 3:15
**bouncing** [1] - 15:22
**bounds** [2] - 148:6, 151:2
**bowing** [1] - 55:21
**Box** [2] - 5:14, 6:8
**break** [4] - 57:13, 57:17, 119:7, 178:10
**breath** [1] - 69:3
**brethren** [1] - 147:13
**Bridgeside** [3] - 4:3, 4:12, 4:14
**brief** [2] - 51:23, 52:8
**briefly** [5] - 24:14,

69:24, 72:2, 72:23, 165:23
**brilliant** [1] - 34:10
**bring** [18] - 22:16, 22:18, 23:1, 36:3, 36:5, 36:6, 51:21, 72:16, 72:17, 72:18, 77:4, 186:18, 187:3, 187:6, 187:16, 187:20, 188:5, 188:12
**bringing** [7] - 50:1, 60:14, 139:16, 142:7, 180:7, 186:3, 186:12
**broader** [1] - 88:21
**broadly** [1] - 71:8
**broken** [1] - 65:15
**brokerage** [2] - 13:18, 13:25
**brokers** [3] - 14:7, 14:14, 14:16
**brother** [1] - 75:17
**brought** [7] - 38:2, 59:17, 68:5, 69:19, 79:16, 186:20, 186:21
**Bryan** [5] - 107:9, 111:1, 111:6, 111:7, 128:7
**Budd** [1] - 3:14
**budget** [52] - 22:16, 22:18, 22:19, 22:20, 24:22, 24:23, 28:16, 31:1, 34:4, 34:5, 131:14, 131:16, 131:23, 132:9, 132:11, 132:13, 132:14, 132:16, 133:25, 134:3, 134:10, 134:12, 134:18, 135:2, 135:3, 135:23, 136:16, 137:4, 137:8, 138:18, 138:24, 138:25, 139:18, 139:23, 140:3, 140:9, 140:13, 140:20, 142:11, 142:17, 142:21, 143:10, 143:13, 144:10, 145:13, 168:4, 168:7, 183:24, 183:25, 184:1
**budgetary** [1] - 184:4
**budgeted** [2] - 140:8, 142:19
**budgeting** [5] - 22:15, 23:10, 24:15, 27:24,

28:1
**budgets** [4] - 22:24, 28:11, 141:18, 184:8
**build** [9] - 11:23, 14:7, 21:19, 26:15, 26:24, 33:12, 33:13, 33:21, 66:19
**building** [7] - 21:20, 26:20, 33:6, 33:7, 33:24, 61:7, 158:17
**buildings** [1] - 144:17
**built** [2] - 26:23, 34:9
**bullet** [3] - 51:10, 51:11, 51:13
**bunch** [2] - 27:12, 27:14
**Burling** [1] - 5:11
**Burner** [1] - 103:22
**burner** [5] - 104:2, 104:4, 106:13, 106:16, 106:23
**bus** [1] - 47:15
**business** [14] - 13:18, 13:25, 14:1, 14:7, 14:17, 23:13, 23:14, 28:4, 29:2, 72:9, 72:10, 84:19, 147:22, 168:23
**businesses** [1] - 62:5
**buying** [1] - 14:23
**BY** [56] - 7:17, 18:13, 19:15, 39:5, 40:20, 47:1, 55:10, 58:3, 77:22, 81:22, 83:4, 92:19, 93:19, 98:8, 103:16, 107:8, 109:4, 110:21, 111:16, 113:3, 114:8, 119:24, 121:16, 122:14, 136:13, 137:2, 137:17, 140:6, 144:3, 147:1, 150:8, 155:17, 156:9, 158:4, 160:3, 161:16, 161:20, 163:6, 164:10, 165:25, 172:15, 173:19, 175:8, 179:6, 180:5, 180:14, 180:20, 180:25, 181:24, 183:15, 183:23, 184:22, 185:13, 186:11, 188:7, 189:12
**Byrne** [1] - 142:5

**C**

**CA** [1] - 3:16
**CABELL** [1] - 1:10
**Cabell** [51] - 3:2, 9:1, 27:9, 27:10, 27:11, 36:20, 59:15, 71:11, 72:5, 74:13, 75:7, 76:1, 76:11, 76:25, 78:14, 78:25, 79:2, 79:15, 79:20, 80:1, 80:7, 81:9, 82:12, 85:15, 85:20, 91:5, 100:11, 104:23, 104:25, 109:10, 109:12, 111:21, 112:17, 113:10, 130:9, 157:16, 161:11, 167:4, 167:12, 168:7, 169:9, 174:3, 174:5, 174:7, 175:10, 176:14, 184:15, 185:19, 186:15, 188:25, 189:14
**cabell** [1] - 2:2
**Cabell-Huntington** [4] - 27:9, 27:10, 27:11, 104:25
**cadre** [1] - 88:20
**calculate** [1] - 30:3
**calculated** [2] - 30:6, 133:24
**calculations** [2] - 30:16, 135:15
**CALLAS** [1] - 6:7
**calming** [1] - 59:19
**campaign** [3] - 19:3, 19:14, 100:3
**CAMPBELL** [1] - 6:14
**cannabinoids** [1] - 153:4
**cannot** [2] - 152:2, 152:18
**capability** [3] - 64:12, 72:18, 77:6
**capable** [1] - 77:11
**capacity** [10] - 40:21, 40:22, 41:1, 41:4, 45:20, 45:21, 72:17, 74:14, 76:14, 186:19
**capita** [2] - 109:13, 111:22
**capital** [1] - 23:5
**Capitol** [1] - 2:7
**Captain** [1] - 59:11
**caption** [1] - 97:15
**Cardinal** [6] - 4:16, 5:2, 102:24, 156:21, 182:8, 188:21

**care** [6] - 22:9, 34:13, 76:6, 100:21, 116:1, 186:1
**career** [10] - 10:4, 10:8, 10:23, 11:5, 12:22, 12:24
**carefully** [1] - 46:7
**CARES** [2] - 132:5, 135:15
**Carey** [1] - 4:23
**caring** [2] - 75:22, 75:24
**Carolina** [1] - 42:7
**carries** [1] - 122:16
**carry** [1] - 27:7
**carrying** [1] - 28:12
**cartoon** [1] - 34:16
**case** [36] - 33:11, 33:13, 43:17, 46:8, 79:7, 82:18, 83:6, 92:8, 102:13, 113:13, 121:18, 126:4, 126:7, 126:14, 131:8, 139:16, 142:16, 155:19, 156:3, 156:14, 156:18, 156:20, 157:3, 157:6, 157:7, 157:10, 157:14, 159:18, 179:15, 183:10, 185:2, 185:20, 186:7, 187:16, 187:20
**cases** [2] - 33:7
**cash** [1] - 25:25
**casual** [1] - 30:12
**categories** [1] - 89:9
**caused** [6] - 82:16, 88:1, 91:17, 99:15, 103:6, 113:17
**causes** [5] - 78:16, 80:18, 98:10, 120:3, 188:11
**causing** [2] - 92:10, 188:22
**cave** [1] - 26:23
**census** [1] - 123:24
**Center** [5] - 3:12, 5:11, 124:11, 124:15, 177:7
**center** [3] - 139:7, 140:10, 166:21
**Centers** [1] - 65:4
**centers** [2] - 62:4, 72:3
**CEO** [2] - 20:5, 177:7
**certain** [11] - 21:1, 23:24, 25:3, 30:1, 31:14, 52:18, 91:1,

123:22, 123:24, 156:15, 163:14
**Certainly** [1] - 167:18
**certainly** [22] - 18:24, 19:14, 20:14, 22:7, 23:7, 34:1, 34:7, 39:22, 40:14, 41:6, 52:2, 52:4, 58:25, 62:22, 67:13, 68:16, 72:17, 81:10, 132:14, 151:17, 159:14, 171:3
**certification** [3] - 98:16, 101:1, 101:4
**CERTIFICATION** [1] - 191:14
**certifies** [1] - 101:8
**certify** [1] - 191:16
**chain** [7] - 103:17, 104:11, 105:8, 105:22, 106:9, 107:2, 107:17
**chair** [3] - 20:17, 20:19, 20:23
**Chair** [4] - 73:15, 73:16, 73:18, 104:22
**challenge** [1] - 145:4
**challenges** [4] - 122:1, 123:10, 144:24, 145:1
**Chambers** [6] - 107:9, 111:1, 111:6, 111:7, 128:7, 128:9
**chambers** [7] - 107:12, 107:18, 107:25, 109:5, 110:1, 111:17, 112:11
**chance** [7] - 37:18, 59:10, 78:1, 86:1, 125:22, 137:3, 187:24
**change** [7] - 13:16, 29:22, 100:20, 102:10, 115:24, 117:10, 131:13
**changed** [3] - 14:6, 117:6, 123:9
**changes** [4] - 30:14, 116:4, 116:5, 116:12
**changing** [4] - 14:4, 47:17, 145:24, 160:22
**channel** [1] - 56:23
**channeled** [1] - 75:20
**chaos** [1] - 66:14
**charge** [2] - 21:25, 24:2
**charged** [1] - 64:7
**charges** [1] - 24:1

**CHARLES** [1] - 3:11
**Charleston** [6] - 2:8, 3:13, 4:24, 5:15, 6:9, 7:3
**CHARLESTON** [2] - 1:2, 1:18
**charter** [3] - 20:11, 21:17, 22:17
**Chase** [2] - 4:23, 14:3
**check** [4] - 31:20, 118:23, 119:1, 134:20
**Chesterbrook** [1] - 6:15
**Chicago** [4] - 14:11, 14:17, 17:2
**Chief** [23] - 37:18, 37:19, 37:24, 38:3, 38:20, 38:21, 39:1, 39:15, 39:23, 41:5, 41:24, 41:25, 42:6, 43:12, 58:8, 58:23, 58:24, 104:15, 138:5, 138:12
**chief** [10] - 21:11, 36:4, 37:5, 39:12, 39:13, 40:22, 46:2
**children** [2] - 17:20, 62:3
**chose** [1] - 12:19
**chronic** [4] - 87:16, 87:17, 89:9, 182:18
**church** [9] - 10:11, 10:15, 17:24, 17:25, 18:25, 52:21, 54:24, 55:16, 56:13
**Church** [2] - 17:17, 17:19
**churches** [9] - 10:12, 17:16, 17:22, 51:22, 52:23, 53:25, 54:1, 56:13, 57:9
**Cincinnati** [1] - 14:9
**circumstance** [1] - 127:21
**circumstances** [2] - 10:9, 63:10
**cite** [1] - 146:2
**cities** [17] - 23:19, 36:14, 72:22, 73:1, 73:2, 73:6, 73:11, 92:25, 120:10, 120:15, 122:4, 127:13, 127:19, 148:14, 148:15, 152:2, 152:14
**Cities** [8] - 73:1, 120:12, 120:13, 120:20, 121:25, 122:22, 125:24,

126:11
**citizens** [4] - 22:12, 32:9, 36:11, 46:21
**Citizens** [2] - 14:22, 32:11
**City** [117] - 4:1, 5:11, 8:3, 11:7, 11:8, 11:9, 11:22, 12:6, 12:7, 12:8, 12:9, 12:13, 12:15, 12:24, 13:9, 15:23, 16:11, 18:5, 20:2, 20:3, 22:21, 24:25, 27:8, 34:6, 35:13, 39:8, 39:10, 58:6, 62:10, 62:13, 64:2, 64:5, 65:23, 66:4, 67:14, 67:21, 68:6, 69:11, 71:4, 71:11, 74:12, 74:22, 75:7, 76:2, 76:25, 79:7, 82:16, 83:11, 91:5, 91:17, 97:6, 97:7, 97:14, 101:12, 102:5, 102:7, 102:16, 102:17, 102:22, 103:12, 108:7, 108:8, 108:14, 108:22, 110:9, 111:2, 111:9, 111:11, 113:5, 121:19, 123:14, 123:15, 127:23, 133:20, 135:22, 136:4, 136:6, 137:4, 139:14, 144:11, 144:14, 145:12, 149:22, 150:10, 150:14, 150:24, 151:4, 153:1, 153:3, 153:5, 153:7, 153:23, 154:24, 155:2, 158:14, 160:10, 160:20, 160:24, 161:10, 161:11, 161:22, 163:16, 165:16, 168:4, 185:15, 185:18, 185:23, 186:4, 186:18, 186:20, 187:1, 187:18, 187:19, 191:18
**CITY** [1] - 1:4
**city** [105] - 11:24, 12:17, 16:8, 17:16, 20:6, 20:22, 21:2, 21:9, 21:19, 22:15, 23:3, 24:2, 24:5, 24:7, 25:20, 26:2, 27:15, 30:22, 31:6,

32:12, 32:15, 33:19, 34:22, 35:5, 35:6, 36:20, 40:2, 40:14, 40:16, 40:24, 47:7, 47:10, 56:25, 63:17, 96:21, 114:11, 120:3, 123:8, 123:22, 124:18, 125:5, 126:10, 129:2, 132:11, 132:19, 132:24, 133:4, 133:6, 133:25, 134:6, 139:18, 139:20, 139:24, 141:3, 141:20, 142:10, 142:16, 143:10, 143:13, 143:23, 143:25, 144:6, 144:24, 145:6, 145:14, 145:19, 147:4, 147:9, 147:17, 147:23, 148:4, 148:8, 148:12, 148:17, 148:19, 148:21, 148:24, 149:2, 149:3, 149:15, 149:18, 150:2, 150:12, 151:6, 151:23, 152:7, 152:21, 153:2, 153:15, 153:16, 155:20, 156:11, 156:24, 157:1, 157:7, 157:14, 160:6, 161:9, 168:22, 169:2, 184:2, 187:4
**city's** [11] - 121:23, 131:14, 131:16, 132:16, 134:12, 144:5, 148:18, 151:14, 156:13, 168:18, 169:6
**City's** [6] - 97:2, 99:14, 100:25, 102:13, 104:18, 113:16
**City/County** [1] - 73:4
**Civil** [3] - 1:4, 191:20
**civil** [1] - 1:10
**claims** [2] - 25:12, 139:15
**clarify** [2] - 125:13, 176:17
**Clark** [1] - 130:9
**class** [3] - 88:2, 101:18, 101:23
**classic** [1] - 45:4

clean [2] - 146:11, 146:12
clean-up [2] - 146:11, 146:12
cleaner [1] - 188:20
cleanup [2] - 190:11, 190:14
clear [10] - 45:12, 81:24, 89:23, 125:15, 131:7, 142:9, 142:15, 143:8, 152:17, 168:24
cleared [1] - 82:24
clearer [1] - 112:24
clearly [2] - 39:12, 144:22
clergy [4] - 52:17, 53:21, 62:21, 69:6
CLERK [3] - 7:9, 7:11, 7:14
clients [2] - 118:13, 118:19
clinics [1] - 95:18
clock [1] - 191:6
close [2] - 28:13, 131:24
closure [2] - 25:8, 77:5
club [1] - 17:13
Club [2] - 17:13, 17:14
CMS [2] - 116:4, 116:5
co [1] - 178:25
Co [2] - 73:15, 73:16
Co-Chair [2] - 73:15, 73:16
co-counsel [1] - 178:25
coach [2] - 8:15, 37:22
coaching [1] - 8:16
coal [5] - 123:7, 123:9, 125:9, 125:25, 126:5
cocaine [2] - 129:12, 153:8
Cochran [3] - 6:17, 191:15, 191:23
code [5] - 150:2, 150:17, 152:24, 156:13, 157:17
Code [8] - 146:3, 147:3, 148:19, 148:21, 148:24, 149:3, 150:10, 152:9
coffers [1] - 27:17
cohort [1] - 88:21
cold [1] - 176:22
collaborate [4] - 21:21, 63:1, 66:9, 74:7
collaborating [3] -

36:24, 37:3, 73:25
collaboration [5] - 66:8, 69:15, 69:22, 72:5, 168:21
collaborative [2] - 68:5, 158:23
collateral [2] - 146:8, 146:17
colleagues [2] - 105:15, 162:17
collectively [2] - 84:20, 87:1
College [1] - 8:23
Columbia [1] - 42:6
column [1] - 174:7
combat [1] - 125:5
combination [2] - 131:5, 163:20
comforting [1] - 52:2
coming [19] - 14:4, 23:4, 25:7, 27:10, 28:13, 36:25, 44:7, 48:23, 49:9, 50:23, 55:2, 55:4, 72:12, 130:11, 131:4, 131:11, 140:19, 176:24, 186:2
comma [1] - 105:10
command [6] - 36:5, 38:20, 39:16, 41:6, 46:2
commented [1] - 95:10
comments [1] - 145:11
commission [2] - 20:11, 36:18
COMMISSION [1] - 1:10
Commission [35] - 2:2, 3:2, 36:14, 71:11, 91:18, 91:20, 91:23, 92:2, 92:10, 93:1, 93:21, 94:19, 94:21, 94:23, 95:6, 95:12, 95:17, 95:20, 97:3, 97:15, 97:17, 97:18, 97:19, 97:20, 98:10, 99:15, 99:23, 100:10, 101:24, 118:15, 139:14, 184:16, 185:19, 187:6, 187:15
commissioner [1] - 36:17
commissioners [2] - 36:15, 73:7
Commissions [1] - 36:22
commit [1] - 31:13

committee [1] - 20:14
Committee [2] - 73:15, 73:19
common [2] - 34:18, 186:25
commonplace [2] - 25:1, 87:18
communicate [3] - 34:2, 36:13, 52:17
communication [6] - 33:17, 33:18, 33:25, 37:6, 48:9, 54:2
Communications [4] - 107:12, 111:2, 111:9, 112:11
communications [1] - 128:10
communities [7] - 70:14, 98:25, 125:16, 125:18, 162:4, 163:15, 182:20
community [94] - 12:16, 13:7, 16:2, 16:23, 17:9, 17:15, 22:1, 22:3, 22:13, 31:1, 34:3, 34:8, 34:21, 36:14, 37:17, 39:25, 41:11, 41:21, 41:23, 43:13, 43:19, 47:18, 49:5, 50:11, 50:14, 50:16, 50:18, 51:1, 51:18, 52:3, 52:4, 52:6, 53:1, 53:3, 54:13, 55:2, 55:3, 55:7, 55:13, 56:24, 57:2, 57:10, 59:1, 60:4, 60:17, 60:19, 61:7, 61:11, 61:12, 61:23, 62:5, 62:11, 63:4, 63:12, 63:13, 63:23, 64:10, 64:16, 65:9, 65:19, 66:1, 66:6, 66:13, 66:18, 67:1, 67:7, 67:12, 68:2, 68:3, 68:5, 68:18, 68:21, 69:6, 69:10, 69:16, 69:22, 70:12, 71:9, 71:14, 72:3, 72:21, 74:12, 74:17, 75:23, 76:15, 77:5, 80:21, 92:6, 103:19, 123:11, 127:4, 158:22, 177:3
Community [2] - 66:19, 133:1
Comp [1] - 25:11
companies [5] - 65:12, 83:17,

109:18, 111:20, 112:7
Company [1] - 182:9
company [1] - 14:12
COMPASS [3] - 138:25, 139:2, 140:7
compassion [2] - 52:5, 139:3
compassionate [3] - 59:18, 75:22, 75:24
compelling [1] - 58:21
Compensation [1] - 25:9
competitive [1] - 120:21
compiled [1] - 171:24
complaint [38] - 82:18, 83:5, 83:6, 83:13, 83:24, 84:7, 84:10, 87:4, 87:8, 88:8, 93:20, 96:24, 96:25, 97:2, 97:5, 98:9, 99:14, 100:19, 100:25, 101:24, 102:18, 102:22, 139:24, 179:13, 179:14, 179:20, 179:23, 180:3, 181:6, 181:17, 181:19, 183:3, 184:19, 184:24, 185:12, 185:18, 185:20
complaints [2] - 179:9, 179:11
complete [1] - 190:24
completed [1] - 8:17
completeness [1] - 183:12
comprehensive [10] - 159:6, 159:7, 159:9, 159:14, 160:23, 164:19, 166:14, 169:7, 176:10
comprehensively [4] - 158:15, 159:2, 159:3, 160:11
comprises [1] - 25:5
computer [1] - 6:19
concept [2] - 94:24, 95:1
concepts [1] - 81:6
concern [6] - 48:10, 49:4, 80:15, 80:18, 80:23, 80:24
concerns [4] - 35:18, 36:10, 38:22, 39:14
concert [1] - 96:6
conclusion [4] - 16:7, 137:12, 180:13,

186:17
conclusions [1] - 171:14
Concord [1] - 8:15
condition [1] - 23:3
conditions [1] - 150:20
Conference [2] - 73:14, 73:16
confidence [2] - 38:6, 38:18
congregation [1] - 10:20
congregations [1] - 53:21
Congress [1] - 116:3
congressman [1] - 49:14
Congressman [1] - 49:22
connected [1] - 17:4
Connolly [2] - 4:18, 5:4
CONROY [1] - 3:3
consensus [3] - 21:19, 33:22, 33:24
consequences [1] - 98:24
conservative [1] - 52:4
considered [4] - 38:11, 67:9, 141:6, 160:8
constant [3] - 37:6, 41:5, 68:18
constantly [2] - 142:22, 158:17
Constitutes [1] - 150:18
consultants [3] - 112:1, 112:20, 113:5
contacted [2] - 111:18, 111:25
contemplated [2] - 10:22, 141:10
Contents [4] - 164:5, 164:8, 164:13, 165:23
context [1] - 188:11
continue [9] - 9:22, 13:23, 68:13, 70:19, 74:7, 102:2, 159:25, 177:4, 184:4
Continued [5] - 3:1, 5:1, 5:6, 6:1, 6:10
continued [5] - 9:11, 10:4, 49:8, 67:5, 101:5
continues [2] - 99:7, 99:19

**continuing** [7] - 24:20, 33:14, 76:7, 125:8, 125:25, 139:22, 139:25
**contrast** [1] - 115:3
**contributed** [2] - 85:17, 96:20
**control** [6] - 41:16, 98:22, 129:12, 130:17, 130:22, 138:20
**Control** [36] - 49:12, 49:16, 58:10, 58:12, 59:3, 60:1, 60:17, 62:25, 63:16, 65:5, 65:18, 66:16, 67:18, 67:20, 67:22, 69:8, 69:12, 69:18, 69:19, 71:6, 104:19, 106:21, 124:11, 124:15, 137:9, 137:21, 138:16, 169:13, 169:16, 169:17, 170:8, 172:12, 172:17, 173:25, 177:13
**convenient** [1] - 84:14
**convening** [1] - 47:12
**conversation** [1] - 49:20
**conversations** [3] - 37:15, 135:12, 186:1
**convince** [1] - 91:11
**Cook** [3] - 6:18, 191:16, 191:23
**coordinating** [1] - 106:20
**Copenhaver** [1] - 102:20
**copy** [3] - 93:25, 140:2, 140:4
**corporate** [1] - 84:19
**cORPORATION** [2] - 1:7, 1:13
**Corporation** [5] - 6:2, 103:2, 182:7, 182:8, 191:19
**Correct** [13] - 123:5, 131:21, 132:10, 134:5, 143:12, 143:16, 144:16, 148:11, 151:16, 154:17, 160:14, 166:15, 168:9
**correct** [199] - 78:8, 78:19, 79:11, 80:12, 82:9, 82:13, 82:18, 83:6, 83:11, 83:14, 84:1, 84:6, 85:2, 85:7, 85:18, 86:8,

88:14, 89:2, 89:10, 89:16, 89:20, 90:1, 90:6, 90:11, 90:12, 90:15, 90:16, 90:20, 91:6, 91:14, 91:18, 92:6, 92:10, 92:22, 93:1, 94:19, 95:3, 95:14, 96:2, 96:12, 97:9, 97:12, 97:21, 99:2, 99:11, 99:24, 100:8, 100:11, 102:3, 102:11, 102:14, 103:3, 103:19, 103:22, 104:5, 104:8, 104:9, 104:23, 105:12, 105:16, 105:17, 106:14, 106:15, 106:24, 106:25, 107:12, 107:15, 107:23, 109:23, 112:12, 112:21, 112:22, 113:6, 113:10, 113:23, 114:1, 114:22, 115:1, 115:2, 116:10, 117:11, 117:22, 117:24, 118:2, 118:5, 118:16, 118:25, 119:4, 120:7, 120:15, 121:21, 123:4, 123:18, 124:7, 125:2, 126:11, 126:14, 126:17, 126:19, 126:21, 126:23, 127:12, 127:15, 128:7, 128:18, 130:3, 131:9, 132:13, 132:17, 132:24, 133:9, 133:15, 133:17, 134:1, 134:12, 134:16, 134:19, 135:8, 137:21, 137:24, 138:1, 138:3, 138:6, 138:7, 138:9, 138:13, 138:16, 138:21, 140:10, 140:15, 143:11, 143:15, 144:11, 144:15, 144:20, 145:16, 145:21, 147:10, 147:14, 148:6, 148:19, 149:4, 151:15, 152:11, 153:8, 153:11, 154:13, 154:25, 155:3, 155:22,

156:3, 156:18, 157:8, 157:18, 158:16, 159:3, 159:19, 160:17, 160:21, 162:1, 162:5, 162:10, 163:25, 164:2, 164:18, 164:23, 165:4, 165:7, 166:3, 166:14, 166:21, 167:5, 167:13, 167:20, 167:23, 168:5, 168:8, 168:10, 168:13, 168:16, 169:3, 169:10, 169:13, 169:17, 169:23, 170:5, 172:18, 174:11, 174:13, 174:16, 175:11, 175:13, 176:4, 176:7, 176:11, 176:16, 177:16, 179:11, 191:17
**corrected** [1] - 135:6
**correctly** [9] - 84:25, 88:3, 94:8, 98:25, 99:9, 100:6, 109:15, 130:18, 163:21
**costing** [1] - 26:24
**costs** [2] - 115:1, 115:4
**couch** [1] - 41:1
**Council** [17] - 15:23, 16:11, 22:21, 24:25, 27:8, 62:13, 74:23, 83:11, 133:20, 136:4, 136:6, 144:11, 144:14, 153:6, 153:23, 154:24, 155:2
**council** [12] - 16:9, 22:18, 26:18, 26:19, 27:4, 34:5, 35:19, 35:20, 133:11, 133:12, 138:20, 153:2
**counsel** [9] - 29:23, 151:20, 155:24, 155:25, 156:4, 170:19, 178:25, 179:10, 188:21
**Counsel** [1] - 159:8
**count** [1] - 188:19
**counted** [1] - 164:24
**counties** [3] - 48:10, 72:22, 73:5
**counting** [1] - 165:1, 165:2
**country** [6] - 85:10,

96:22, 120:15, 162:4, 163:18, 176:13
**county** [21] - 32:12, 32:16, 36:15, 36:16, 37:9, 47:7, 56:25, 60:5, 60:6, 67:15, 73:7, 109:18, 139:19, 139:20, 139:24, 143:24, 147:8, 147:11, 161:9, 186:14, 187:15
**COUNTY** [1] - 1:10
**County** [62] - 2:2, 3:2, 8:22, 9:1, 9:4, 11:12, 11:13, 11:15, 11:16, 11:18, 12:2, 36:14, 36:20, 36:21, 36:22, 71:11, 72:6, 73:7, 74:13, 75:8, 76:1, 76:11, 76:25, 78:14, 78:25, 79:2, 79:15, 79:20, 80:1, 80:7, 81:9, 82:12, 85:15, 85:20, 91:5, 109:10, 109:12, 111:21, 112:18, 113:10, 139:14, 157:16, 158:8, 161:11, 167:4, 167:12, 168:8, 169:9, 174:3, 174:5, 174:7, 175:10, 184:15, 185:19, 185:23, 186:17, 186:18, 186:20, 187:6, 187:15, 188:25, 189:14
**County's** [2] - 130:9, 176:14
**couple** [18] - 11:10, 13:4, 14:21, 35:15, 55:21, 55:24, 56:1, 74:10, 88:7, 115:13, 140:23, 178:22, 179:7, 179:9, 179:17, 180:15, 184:16, 184:23
**course** [6] - 8:17, 10:17, 10:18, 74:13, 82:17, 174:10
**court** [1] - 187:21
**COURT** [115] - 1:1, 1:17, 7:5, 7:8, 7:15, 18:12, 19:5, 19:9, 39:2, 40:1, 40:11, 44:17, 45:3, 45:7, 45:13, 45:22, 57:13, 57:16, 57:19, 57:23,

77:19, 81:12, 81:16, 83:1, 92:18, 93:8, 93:12, 93:15, 93:18, 98:2, 98:5, 98:7, 103:15, 108:10, 109:2, 110:10, 110:16, 111:7, 111:10, 111:13, 112:23, 114:5, 114:7, 119:8, 119:12, 119:15, 119:19, 119:22, 122:11, 122:13, 136:7, 136:12, 136:25, 139:8, 139:25, 143:19, 144:2, 146:6, 146:14, 146:20, 146:25, 149:9, 149:25, 150:7, 155:5, 155:11, 155:15, 156:8, 157:23, 158:1, 161:14, 161:18, 165:12, 165:17, 170:15, 170:18, 171:5, 171:15, 171:25, 172:4, 172:13, 173:9, 173:17, 175:3, 178:2, 178:13, 178:18, 178:21, 178:24, 179:24, 180:17, 181:20, 183:2, 183:13, 183:22, 184:14, 184:17, 185:5, 185:10, 186:8, 186:22, 187:7, 188:1, 189:9, 189:11, 189:16, 189:20, 189:25, 190:6, 190:9, 190:17, 190:21, 191:1, 191:5, 191:10
**Court** [37] - 6:17, 6:18, 7:2, 7:24, 8:5, 8:7, 8:10, 9:17, 10:1, 11:3, 12:23, 18:7, 19:4, 20:3, 24:12, 30:24, 37:14, 48:24, 58:9, 63:2, 69:24, 72:24, 102:8, 111:4, 146:3, 146:19, 164:20, 173:5, 179:11, 179:14, 187:8, 187:13, 187:17, 189:18, 191:15, 191:16
**courthouse** [1] - 67:15

**courtroom** [1] - 183:19
**courts** [1] - 23:23
**cover** [6] - 25:11, 27:21, 141:24, 170:12, 178:23
**covered** [1] - 109:14
**covering** [1] - 132:6
**covers** [3] - 150:3, 159:9, 159:11
**COVID** [12] - 70:3, 70:6, 76:18, 132:4, 132:5, 132:6, 135:16, 145:15, 147:9, 176:14, 177:19
**Covington** [1] - 5:11
**crack** [4] - 129:12, 130:11, 130:16, 130:21
**Crack** [1] - 130:14
**crafted** [2] - 117:17, 117:19
**crash** [1] - 9:9
**create** [5] - 59:3, 59:25, 66:9, 72:11, 177:2
**created** [13] - 50:17, 60:17, 61:22, 62:14, 67:17, 69:21, 88:20, 88:21, 137:13, 162:3, 169:25, 182:6, 183:19
**creation** [1] - 152:3
**crime** [6] - 49:3, 52:13, 59:8, 123:10, 176:4, 176:6
**crisis** [10] - 81:9, 84:18, 85:6, 114:12, 116:7, 117:11, 158:16, 181:9, 184:2, 184:6
**critical** [4] - 94:3, 94:5, 94:22, 95:6
**cross** [18] - 77:19, 81:10, 108:13, 110:14, 149:25, 165:17, 171:4, 171:12, 171:18, 172:2, 177:23, 178:3, 178:18, 181:21, 183:2, 183:6, 184:14, 188:13
**CROSS** [1] - 77:21
**cross-examination** [5] - 149:25, 165:17, 171:18, 172:2, 178:3
**cross-examine** [3] - 171:4, 171:12,

177:23
**CRR** [2] - 6:17, 6:18
**crumble** [1] - 46:13
**crying** [1] - 35:10
**culpability** [1] - 180:8
**culpable** [6] - 94:7, 94:11, 94:17, 94:18, 95:11, 95:13
**cum** [1] - 9:20
**Cum** [1] - 9:21
**cumulative** [2] - 161:5, 165:14
**curb** [2] - 116:6, 117:11
**current** [2] - 59:9, 83:5
**cut** [2] - 27:7, 185:10
**CVS** [1] - 182:9
**cycle** [1] - 76:7

## D

**dad** [3] - 8:25, 37:22, 59:16
**daily** [2] - 124:1, 184:5
**danger** [1] - 43:6
**dangerous** [3] - 98:22, 99:7, 130:13
**Dashboard** [2] - 170:1, 173:1
**dashboard** [1] - 170:23
**data** [18] - 59:9, 65:2, 65:4, 65:10, 65:14, 65:18, 68:1, 123:24, 170:8, 170:11, 170:22, 171:11, 171:13, 171:23, 172:11, 172:17, 173:6, 174:4
**Data** [2] - 170:1, 172:25
**database** [1] - 172:20
**date** [1] - 30:1
**Date** [1] - 192:3
**dated** [5] - 103:24, 107:10, 107:19, 128:5, 151:11
**David** [1] - 7:1
**DAVID** [2] - 1:17, 4:5
**day-to-day** [1] - 141:1
**days** [1] - 78:7
**Dayton** [1] - 73:13
**DC** [6] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12
**De** [2] - 2:4, 2:14
**DEA** [2] - 32:5, 32:19
**DEA's** [1] - 158:9
**deal** [9] - 11:19, 26:20, 58:6, 60:24, 63:1, 64:18, 76:3, 184:4,

187:8
**dealers** [10] - 44:7, 127:8, 127:10, 127:14, 127:17, 127:21, 129:11, 130:11, 130:16, 130:21
**dealing** [15] - 41:17, 50:1, 51:2, 55:24, 56:18, 59:18, 59:22, 65:9, 72:8, 75:13, 120:11, 122:3, 151:16, 170:19, 184:6
**deals** [1] - 46:11
**Dean** [2] - 15:15, 104:11
**dear** [1] - 114:10
**Dear** [1] - 188:8
**death** [3] - 29:12, 66:14, 89:1
**deaths** [5] - 169:9, 174:5, 175:10, 175:23, 178:7
**debate** [1] - 153:11
**decades** [3] - 112:9, 123:7, 151:13
**decades-long** [1] - 112:9
**decaying** [1] - 151:8
**decedent** [1] - 174:5
**decedent's** [2] - 174:13, 174:15
**December** [8] - 22:25, 30:18, 60:18, 60:21, 113:23, 138:10
**deceptive** [2] - 87:25, 88:19
**deceptively** [1] - 84:21
**decide** [5] - 16:17, 80:11, 81:1, 81:25, 137:14
**decided** [3] - 12:15, 15:5, 16:9
**decision** [6] - 29:7, 30:2, 83:8, 84:19, 92:12
**decisions** [6] - 28:1, 28:3, 28:5, 28:9, 30:21, 62:21
**deck** [3] - 18:23, 19:14, 137:16
**declaration** [2] - 154:18, 187:14
**declared** [2] - 150:19, 150:21
**declaring** [1] - 151:14
**decline** [7] - 125:9, 126:1, 126:5, 126:7, 126:23, 176:3, 176:6

**decreasing** [1] - 178:7
**dedicated** [1] - 75:6
**deed** [1] - 68:19
**deemed** [2] - 101:4, 155:21
**DEF-WV-1102** [3] - 92:16, 92:20, 93:7
**DEF-WV-1134** [1] - 107:6
**DEF-WV-1287** [1] - 113:19
**DEF-WV-2124** [1] - 97:1
**DEF-WV-2631** [1] - 82:22
**DEF-WV-473** [2] - 103:8, 103:10
**defendant** [1] - 83:13
**Defendant** [6] - 4:16, 5:2, 5:7, 6:2, 98:15, 184:18
**defendants** [29] - 84:20, 87:5, 87:9, 90:1, 90:4, 90:8, 90:10, 90:14, 90:18, 91:6, 91:10, 113:13, 126:4, 126:7, 139:21, 146:12, 155:19, 165:18, 180:9, 182:5, 182:6, 182:11, 182:12, 182:14, 182:15, 183:17, 183:18, 189:6, 189:13
**Defendants** [3] - 1:8, 1:14, 191:20
**defendants"** [1] - 87:2
**Defendants'** [7] - 121:14, 121:18, 122:9, 128:3, 149:7, 154:8, 177:20
**defendants'** [9] - 84:6, 87:11, 87:22, 87:25, 88:15, 88:19, 89:7, 90:23, 191:7
**Defense** [2] - 161:3, 188:5
**defensive** [1] - 56:8
**deficit** [6] - 24:12, 24:13, 24:17, 28:13, 28:17, 30:12
**deficits** [1] - 24:11
**define** [3] - 148:21, 149:3, 150:25
**defined** [5] - 149:2, 150:15, 150:16, 151:5, 151:7
**defining** [3] - 68:13, 70:2, 148:25
**definitely** [1] - 24:16

**Degree** [1] - 9:24
**degrees** [3] - 37:21, 176:20, 176:21
**delapidated** [1] - 144:17
**Delegates** [3] - 13:8, 13:14, 13:15
**deliberate** [1] - 181:10
**delivered** [4] - 42:13, 43:8, 52:11, 52:14
**delivery** [3] - 43:2, 52:10, 127:5
**demonstrates** [1] - 175:21
**demonstrating** [1] - 76:15
**demonstrative** [1] - 137:16
**denied** [3] - 146:18, 146:19, 146:20
**denominational** [1] - 53:15
**deny** [2] - 81:12, 81:16
**Department** [9] - 38:11, 59:8, 59:14, 64:1, 64:6, 73:19, 104:25, 105:3, 175:18
**department** [32] - 20:7, 20:8, 20:9, 20:15, 21:10, 21:11, 21:12, 21:21, 22:11, 24:3, 24:9, 24:21, 28:6, 28:7, 28:20, 38:7, 38:14, 38:15, 38:19, 39:12, 39:16, 41:14, 42:4, 58:25, 129:2, 138:6, 140:22, 141:16, 142:3, 142:25, 153:20
**department's** [1] - 38:8
**departments** [14] - 20:2, 20:6, 21:14, 25:3, 27:7, 27:21, 28:6, 28:9, 28:22, 31:3, 31:23, 39:9, 62:5, 184:5
**deposed** [1] - 159:18
**deposit** [1] - 151:7
**deposition** [9] - 77:25, 117:20, 131:19, 141:5, 141:6, 142:9, 155:14, 159:17, 190:23
**depositions** [1] - 31:21
**depressed** [1] - 124:18

**depression** [1] - 124:3
**depth** [1] - 81:8
**deputies** [1] - 37:8
**describe** [1] - 122:1
**described** [2] - 93:23, 117:5
**describes** [2] - 23:2, 123:21
**describing** [1] - 45:8
**designation** [1] - 190:23
**desperately** [1] - 29:17
**despite** [1] - 125:8
**detail** [4] - 30:25, 58:14, 110:13, 165:24
**details** [2] - 27:18, 157:5
**details)** [1] - 111:24
**deter** [1] - 91:1
**determine** [4] - 70:20, 135:13, 157:25, 158:6
**determined** [1] - 18:2
**Detroit** [7] - 127:10, 127:13, 127:17, 127:20, 127:22, 129:11, 130:11
**Detroiters** [2] - 129:19, 129:22
**devastation** [1] - 74:12
**develop** [3] - 14:16, 64:22, 74:21
**developed** [3] - 28:14, 47:22, 74:2
**developing** [4] - 10:4, 14:1, 22:24, 60:4
**Development** [6] - 11:13, 11:14, 11:15, 20:20, 36:16, 133:1
**development** [4] - 11:23, 20:21, 37:4, 64:8
**diabetes** [1] - 125:1
**diametrically** [1] - 159:22
**Dick** [1] - 11:9
**died** [2] - 55:25, 56:1
**difference** [1] - 109:21
**different** [13] - 23:11, 50:1, 60:23, 61:1, 63:6, 65:25, 66:21, 67:6, 71:3, 71:5, 129:9, 138:12
**difficult** [1] - 52:1
**dig** [2] - 27:17, 112:9
**digit** [3] - 157:17, 176:3, 176:6

**dinner** [1] - 15:18
**dip** [2] - 16:3, 16:4
**DIRECT** [2] - 7:16, 184:21
**direct** [10] - 71:20, 71:24, 88:12, 100:22, 105:7, 131:15, 160:4, 167:25, 178:21, 181:21
**direction** [11] - 33:23, 33:25, 58:2, 61:22, 62:23, 70:7, 75:21, 76:16, 80:14, 137:14, 145:7
**directly** [6] - 108:2, 109:7, 109:19, 111:21, 140:19, 181:8
**Director** [15] - 11:15, 49:15, 50:9, 58:19, 60:15, 67:21, 105:2, 107:12, 111:2, 111:9, 112:11, 177:9, 177:12
**director** [6] - 36:6, 59:4, 128:10, 138:20, 169:15, 169:16
**Directors** [1] - 120:17
**directs** [1] - 132:19
**disagree** [13] - 85:4, 85:5, 94:15, 99:5, 105:18, 105:21, 106:6, 106:9, 107:1, 119:2, 119:5, 130:20, 167:16
**disaster** [1] - 181:8
**disastrous** [2] - 98:24, 101:5
**disclaimed** [1] - 186:18
**discourages** [1] - 114:24
**discriminate** [1] - 125:19
**discuss** [3] - 24:14, 72:23, 165:23
**discussed** [5] - 69:10, 97:16, 117:19, 130:2, 155:9
**discussing** [1] - 129:8
**discussion** [2] - 137:11, 155:6
**discussions** [1] - 139:23
**disease** [1] - 125:1
**Disease** [3] - 65:5, 124:11, 124:15
**dismiss** [2] - 155:19,

156:2
**Disorder** [1] - 64:24
**Dispatch** [2] - 128:5, 128:12
**dispense** [2] - 148:10, 148:13
**dispensed** [1] - 79:15
**dispensers'** [1] - 181:10
**dispensing** [3] - 79:21, 80:3, 154:20
**displaying** [1] - 18:25
**dispute** [3] - 40:6, 166:11, 167:17
**disputing** [3] - 78:13, 134:21, 145:23
**distance** [1] - 42:24
**distinguishing** [1] - 149:12
**distress** [2] - 125:9, 125:25
**distributed** [9] - 41:10, 41:11, 43:10, 43:18, 44:12, 44:19, 45:2, 131:8, 157:16
**distribution** [3] - 49:8, 131:3, 154:20
**distributor** [4] - 182:6, 182:11, 182:14, 182:15
**distributors** [11] - 48:4, 78:20, 78:21, 80:17, 127:1, 131:8, 181:12, 183:18, 187:16, 188:24, 188:25
**distributors'** [1] - 181:10
**DISTRICT** [3] - 1:1, 1:1, 1:17
**district** [1] - 35:20
**District** [6] - 7:2, 7:3, 38:12, 97:11, 102:8
**districts** [1] - 35:19
**diversion** [1] - 38:22
**divert** [1] - 117:3
**Division** [3] - 162:7, 162:17, 163:23
**docket** [1] - 102:17
**doctor** [1] - 79:17
**doctoral** [1] - 8:17
**doctorate** [1] - 8:16
**doctors** [8] - 82:11, 88:20, 108:2, 109:7, 109:19, 111:21, 112:8, 148:4
**doctrine** [1] - 146:9
**document** [26] - 70:1, 88:11, 92:20, 98:1, 103:10, 107:4,

110:18, 113:18, 113:20, 121:17, 122:6, 122:15, 126:10, 126:16, 136:3, 136:5, 136:14, 136:24, 154:23, 161:21, 164:2, 164:6, 170:16, 170:24, 171:11, 190:14
**Document** [2] - 187:14, 187:18
**documents** [5] - 83:2, 98:20, 161:7, 170:19, 187:23
**dollar** [4] - 28:17, 131:17, 135:14, 141:23
**dollars** [6] - 26:25, 84:23, 111:20, 140:23, 145:18, 147:14
**done** [11] - 11:20, 27:16, 28:16, 44:15, 46:11, 50:7, 60:12, 68:3, 71:7, 71:13, 75:3, 76:11, 142:8, 145:10, 148:2, 158:6, 178:14, 190:2, 190:4
**door** [2] - 42:25, 183:9
**doorstep** [1] - 78:18
**doses** [4] - 78:24, 79:1, 90:14, 100:5
**double** [3] - 93:25, 176:3, 176:6
**double-digit** [2] - 176:3, 176:6
**double-sided** [1] - 93:25
**doubt** [1] - 170:3
**Douglas** [1] - 4:23
**down** [34] - 26:6, 26:15, 27:13, 35:13, 42:21, 42:22, 42:25, 57:17, 58:18, 59:19, 64:11, 73:9, 91:9, 94:2, 105:7, 115:7, 115:13, 124:9, 124:10, 129:2, 129:17, 130:7, 130:15, 143:5, 149:22, 151:9, 151:21, 157:17, 164:14, 176:21, 176:24, 182:13
**dozen** [1] - 124:25
**Dr** [11] - 103:11, 104:11, 104:14, 105:12, 105:25,

106:2, 106:23, 144:4, 162:10, 162:12, 167:15
**drastically** [1] - 100:21
**draw** [2] - 179:17, 181:3
**dreamed** [1] - 75:13
**Drive** [1] - 6:15
**driving** [1] - 42:22
**dropped** [2] - 123:14, 123:15
**dropping** [1] - 177:2
**drops** [1] - 176:21
**Drs** [1] - 162:14
**drug** [14] - 44:7, 46:11, 47:6, 84:18, 109:18, 111:20, 114:12, 124:3, 127:8, 127:10, 127:14, 127:21, 129:11, 138:20
**Drug** [39] - 6:2, 49:12, 49:16, 58:10, 58:12, 59:3, 60:1, 60:17, 62:25, 63:16, 65:18, 66:16, 67:18, 67:20, 67:22, 69:8, 69:12, 69:17, 69:19, 71:6, 104:18, 104:19, 106:17, 106:21, 130:9, 137:9, 137:21, 138:16, 169:13, 169:15, 169:17, 170:8, 172:12, 172:17, 173:25, 177:13, 182:8, 182:9, 191:19
**DRUG** [2] - 1:7, 1:13
**drugs** [8] - 36:2, 38:22, 115:19, 130:12, 152:21, 153:16, 182:19, 182:21
**due** [3] - 125:9, 125:25, 163:19
**during** [8] - 57:17, 103:11, 111:22, 131:11, 172:2, 176:14, 177:19, 188:13

---

## E

**e-mail** [22] - 103:17, 103:21, 104:1, 104:7, 104:11, 105:7, 105:12, 105:22, 106:2, 106:9, 106:12,

106:13, 107:2, 107:9, 107:17, 107:18, 108:4, 108:7, 109:9, 109:25, 110:25, 112:10
**ear** [1] - 50:24
**Early** [1] - 24:25
**early** [8] - 17:18, 24:25, 42:1, 42:19, 46:24, 49:17, 73:3
**earnest** [2] - 22:24, 60:18
**earnings** [1] - 65:13
**easier** [1] - 173:21
**easily** [1] - 89:19
**East** [3] - 3:5, 3:12, 4:24
**Eastern** [1] - 15:3
**eclectic** [1] - 17:23
**Economic** [1] - 11:14
**economic** [13] - 11:23, 20:21, 37:3, 65:11, 72:11, 123:3, 123:4, 125:8, 125:25, 126:23, 127:3, 139:15, 185:24
**economy** [2] - 123:9, 145:6
**Education** [1] - 10:11
**education** [4] - 9:2, 10:2, 62:22, 63:14
**effect** [2] - 45:4, 154:15
**effectively** [2] - 65:8, 129:2
**effort** [4] - 59:6, 60:21, 60:24, 70:21
**efforts** [8] - 50:10, 58:15, 60:3, 61:21, 140:22, 181:11, 184:9
**Egypt** [1] - 54:4
**eight** [5] - 13:21, 18:10, 128:1, 151:18, 175:1
**Eight** [1] - 8:4
**Eighth** [1] - 3:10
**eighty** [1] - 145:17
**eighty-four** [1] - 145:17
**either** [6] - 106:7, 106:11, 107:2, 107:3, 181:7, 190:11
**elected** [3] - 13:14, 16:13, 157:1
**election** [2] - 15:12, 133:14
**elementary** [2] - 8:21, 9:2

**eligible** [1] - 141:3
**eliminated** [2] - 95:22, 95:23
**eliminating** [3] - 94:6, 94:22, 95:6
**ELIZABETH** [1] - 6:14
**elsewhere** [3] - 12:7, 34:24, 73:25
**email** [2] - 53:6, 53:11
**emails** [1] - 44:2
**embarked** [1] - 12:21
**embrace** [2] - 54:13, 57:3
**embraced** [3] - 16:24, 55:6
**embracing** [1] - 62:10
**emergency** [5] - 59:14, 59:17, 59:22, 65:1
**Emergency** [1] - 65:3
**emotional** [1] - 57:7
**emphasize** [1] - 159:2
**employee** [3] - 29:21, 108:8, 133:6
**employees** [1] - 144:19
**employing** [2] - 42:4, 182:5
**EMTs** [1] - 139:4
**enable** [1] - 142:25
**enact** [1] - 23:16
**enacted** [1] - 153:16
**Encino** [1] - 3:16
**encountered** [2] - 68:16, 70:5
**encourage** [2] - 95:20, 117:3
**encouraged** [1] - 59:5
**encouraging** [6] - 56:16, 56:17, 61:4, 63:18, 74:19, 116:25
**end** [11] - 12:13, 12:20, 22:20, 30:11, 30:13, 86:25, 117:1, 130:14, 145:2, 158:2
**endeavor** [1] - 143:3
**ended** [3] - 8:23, 53:1, 132:2
**Endo** [2] - 86:10, 86:12
**ends** [4] - 66:11, 130:17, 130:23, 131:16
**enforcement** [23] - 32:3, 32:4, 32:15, 32:17, 37:16, 38:7, 38:11, 38:17, 41:18, 41:22, 44:6, 44:24, 48:2, 50:3, 50:10, 50:13, 51:9, 52:12,

58:15, 60:2, 61:15, 62:22, 99:22
**Enforcement** [1] - 130:9
**engaged** [1] - 52:13
**engagement** [1] - 160:9
**England** [1] - 14:22
**enlightening** [1] - 52:2
**enormous** [1] - 101:1
**enormously** [1] - 92:5
**enter** [3] - 29:24, 73:8, 76:22
**entered** [2] - 38:23, 149:12
**entire** [7] - 32:4, 36:8, 54:1, 85:10, 127:2, 185:2, 189:5
**entirely** [1] - 166:5
**entities** [2] - 84:21, 143:22
**entitled** [2] - 81:10, 180:23
**entity** [1] - 187:2
**ENU** [1] - 4:17
**environment** [2] - 22:8, 22:9
**environmental** [2] - 123:10, 163:20
**epicenter** [1] - 67:4
**Epidemic** [1] - 180:24
**epidemic** [26] - 67:4, 67:10, 72:8, 76:4, 76:25, 77:5, 77:15, 77:16, 89:1, 125:16, 132:15, 142:14, 142:24, 143:3, 144:25, 145:5, 159:5, 159:16, 160:9, 160:12, 163:14, 176:11, 182:2, 184:10, 188:12, 188:22
**Episcopal** [2] - 10:11, 17:19
**Episcopalian** [1] - 53:14
**equipped** [1] - 158:23
**equity** [2] - 122:24, 123:3
**Erin** [1] - 111:25
**especially** [1] - 130:10
**essence** [7] - 47:24, 49:23, 61:13, 62:6, 62:18, 68:7, 122:2
**essentially** [1] - 123:2
**establish** [4] - 66:10, 67:11, 96:6, 149:15
**established** [8] - 11:13, 50:14, 70:22,

96:15, 97:24, 108:13, 138:8, 168:21
**establishing** [2] - 11:12, 71:1
**estimate** [1] - 22:17
**et** [4] - 1:7, 1:13, 191:18, 191:19
**Ethics** [1] - 118:15
**Europe** [1] - 54:5
**evade** [1] - 181:11
**evaluate** [1] - 70:4
**evening** [1] - 35:13
**event** [1] - 165:3
**eventually** [3] - 15:20, 55:13, 61:10
**everywhere** [1] - 80:22
**evidence** [5] - 67:24, 103:6, 112:7, 162:24, 163:1
**evidentiary** [1] - 183:10
**evolution** [1] - 68:18
**exacerbating** [1] - 182:20
**exact** [2] - 23:12, 40:18
**exactly** [2] - 70:9, 78:2
**EXAMINATION** [4] - 7:16, 77:21, 179:5, 184:21
**examination** [10] - 108:13, 110:15, 149:25, 165:17, 171:18, 172:2, 178:3, 178:19, 183:3, 188:14
**examine** [1] - 77:19, 81:10, 171:4, 171:12, 177:23
**example** [3] - 26:16, 32:3, 63:21
**examples** [2] - 30:24, 68:8
**exceed** [1] - 182:17
**except** [2] - 65:14, 179:1
**excerpts** [1] - 179:13
**Exchange** [1] - 64:4
**excruciating** [1] - 58:13
**excuse** [7] - 15:21, 80:23, 82:2, 83:21, 90:9, 100:20, 190:3
**excused** [2] - 119:12, 190:9
**exhaustively** [1] - 164:21
**exhibits** [2] - 170:12,

175:5
**exist** [3] - 99:8, 164:18, 176:10
**existed** [3] - 40:16, 127:24, 127:25
**existential** [2] - 144:6, 144:23
**exists** [2] - 81:9, 101:18
**expand** [2] - 91:13, 144:21
**expect** [4] - 34:22, 82:21, 143:23, 143:25
**expected** [5] - 22:16, 22:18, 75:17, 75:18, 88:22
**expecting** [1] - 43:1
**expects** [1] - 21:17
**expenses** [2] - 27:23, 132:7
**expensive** [1] - 116:21
**experience** [3] - 15:10, 75:10, 148:15
**experienced** [3] - 70:6, 74:12, 76:18
**experiences** [1] - 72:23
**experiencing** [3] - 163:13, 163:15, 163:17
**expert** [2] - 171:2, 177:15
**expertise** [5] - 74:1, 80:19, 143:21, 167:18, 169:5
**expired** [1] - 189:17
**explain** [4] - 100:19, 100:20, 143:19, 161:23
**explained** [2] - 21:16, 178:8
**explaining** [2] - 41:4, 81:17
**explanation** [4] - 82:4, 99:15, 113:17, 122:3
**explicitly** [1] - 152:19
**explore** [1] - 133:13
**express** [1] - 125:22
**extent** [3] - 55:24, 89:18, 189:5
**extra** [1] - 139:23
**extremely** [7] - 46:6, 80:20, 113:9, 125:18, 130:12, 151:11, 152:2
**eyeball** [1] - 36:9
**eyes** [1] - 19:2

# F

**Faber** [1] - 7:1
**FABER** [1] - 1:17
**face** [5] - 43:15, 50:4, 75:9
**face-to-face** [2] - 43:15, 50:4
**facilities** [1] - 49:19
**facility** [2] - 139:6, 140:9
**facing** [4] - 49:24, 68:18, 144:5, 144:24
**fact** [20] - 39:21, 63:21, 85:9, 97:7, 105:21, 118:24, 119:3, 128:21, 131:17, 131:20, 131:25, 132:2, 140:24, 144:6, 147:21, 149:19, 151:16, 153:5, 153:22, 169:15
**factors** [2] - 127:3, 163:20
**fair** [5] - 27:24, 33:17, 69:7, 172:21, 175:2
**fairly** [1] - 71:19
**Faith** [1] - 64:17
**faith** [8] - 41:14, 50:18, 51:2, 52:4, 57:9, 64:16, 110:16, 172:5
**faith-based** [1] - 52:4
**fall** [2] - 71:25, 89:8
**falling** [1] - 175:13
**falls** [1] - 108:17
**false** [1] - 91:10
**familiar** [10] - 82:17, 91:18, 113:19, 157:10, 160:24, 169:12, 172:8, 172:11, 172:16, 172:19
**familiarity** [1] - 152:23
**familiarize** [1] - 147:12
**families** [3] - 56:17, 64:24, 98:24
**family** [12] - 16:19, 16:24, 17:19, 56:19, 75:15, 83:18, 83:23, 84:3, 84:24, 85:7, 85:17, 181:5
**far** [8] - 58:22, 108:5, 109:10, 130:21, 157:17, 159:13, 159:23, 178:2
**FARRELL** [34] - 2:3, 139:9, 146:7,

146:16, 146:22, 149:10, 161:4, 165:13, 170:20, 171:7, 171:21, 172:3, 172:6, 174:24, 177:21, 179:1, 184:15, 184:18, 184:22, 185:3, 185:13, 186:10, 186:11, 186:23, 187:10, 188:4, 188:7, 189:12, 189:17, 189:23, 190:5, 190:10, 190:19, 191:9
**Farrell** [13] - 2:4, 2:13, 139:8, 146:6, 161:12, 165:12, 171:18, 178:23, 184:11, 185:12, 186:22, 187:24, 189:21
**Farrell's** [1] - 168:3
**fascinating** [2] - 67:8, 68:21
**fashion** [2] - 68:6, 158:24
**fatal** [2] - 173:1, 173:25
**father** [1] - 8:14
**fatigue** [1] - 139:3
**fattest** [1] - 124:18
**FBI** [2] - 32:5, 32:20
**FCRR** [1] - 6:18
**FDA** [1] - 82:6
**fear** [1] - 76:5
**feature** [2] - 96:7, 96:15
**February** [5] - 22:17, 23:1, 103:24, 105:9, 134:11
**federal** [22] - 32:2, 32:13, 32:19, 33:10, 33:11, 33:12, 41:15, 46:5, 46:19, 47:8, 67:12, 67:14, 117:7, 132:21, 145:15, 145:20, 146:10, 147:8, 151:25, 152:10, 152:17, 166:23
**Federal** [5] - 46:15, 48:1, 133:1, 146:3, 147:3
**federally** [1] - 166:21
**fee** [4] - 23:25, 24:4, 24:6, 24:8
**fees** [3] - 23:18, 23:25, 29:3

**fell** [3] - 175:11, 175:14, 175:19
**fellow** [3] - 52:17, 53:21, 116:1
**felt** [10] - 17:2, 42:3, 50:2, 51:6, 51:12, 51:16, 56:8, 62:15, 64:2, 64:22
**fentanyl** [1] - 174:13
**few** [12] - 11:16, 14:10, 18:9, 23:16, 29:15, 58:23, 59:17, 78:3, 86:24, 88:10, 151:4, 181:8
**field** [1] - 74:1
**Fifth** [1] - 17:17
**fifth** [7] - 94:24, 95:1, 96:17, 106:3, 122:15, 130:7, 161:6
**fight** [5] - 51:19, 77:2, 132:15, 143:3, 161:23
**fighters** [10] - 29:8, 29:11, 30:7, 30:9, 30:18, 31:8, 31:9, 31:10, 31:12, 139:4
**fighting** [3] - 52:10, 64:24, 184:9
**figure** [2] - 46:21, 58:1
**figures** [1] - 134:20
**file** [5] - 83:8, 92:12, 92:25, 157:7, 157:14
**filed** [11] - 97:7, 97:11, 126:13, 139:11, 146:8, 149:12, 156:2, 156:18, 156:20, 157:4, 187:22
**filing** [1] - 189:3
**filled** [1] - 80:16
**film** [1] - 53:10
**final** [1] - 125:7
**finally** [1] - 29:23
**finance** [6] - 12:22, 13:11, 13:16, 20:14, 20:15, 135:13
**finances** [1] - 21:9
**financial** [8] - 10:6, 22:1, 22:14, 25:18, 26:1, 26:2, 26:10, 144:7
**financially** [1] - 30:22
**findings** [1] - 68:1
**fine** [3] - 15:19, 136:11, 171:19
**finish** [1] - 86:1
**finishing** [1] - 16:6
**fire** [24] - 20:7, 21:11, 22:5, 22:11, 24:3, 28:6, 29:8, 29:11,

30:7, 30:8, 30:17, 31:7, 31:9, 31:10, 31:12, 36:4, 39:13, 40:22, 41:22, 59:13, 138:5, 139:4, 144:18, 184:5
**Fire** [2] - 59:14, 175:18
**Firm** [2] - 3:4, 3:7
**firm** [1] - 15:3
**first** [42] - 10:13, 10:22, 11:6, 11:15, 16:5, 16:20, 24:16, 25:6, 28:25, 29:10, 37:19, 39:7, 41:6, 41:7, 46:23, 50:15, 52:19, 53:16, 55:12, 60:21, 61:12, 68:17, 83:13, 86:3, 87:18, 93:22, 98:11, 139:7, 140:10, 144:13, 145:22, 153:22, 163:12, 164:4, 172:21, 188:14, 188:16, 188:17, 189:20
**First** [1] - 136:19
**first-line** [1] - 87:18
**fiscal** [15] - 21:8, 23:2, 23:3, 30:11, 131:16, 134:12, 134:19, 135:2, 135:22, 136:16, 137:4, 138:25, 140:13, 143:13, 145:14
**Fiscal** [3] - 134:14, 134:16
**fiscally** [2] - 23:2, 30:23
**fit** [1] - 19:4
**fitness** [4] - 139:6, 140:9, 140:11, 140:12
**five** [8] - 23:5, 53:12, 118:9, 119:3, 122:4, 133:6, 156:20, 178:10
**five-year** [1] - 23:5
**fix** [2] - 28:23, 29:17
**fixed** [2] - 29:18, 35:23
**fixing** [1] - 28:21
**FL** [1] - 2:11
**flags** [2] - 80:22, 182:19
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flare** [1] - 128:24
**flat** [1] - 141:22
**flip** [1] - 37:9
**flooded** [2] - 182:12,

188:25
**Floor** [1] - 3:5
**focus** [7] - 18:4, 61:14, 65:17, 77:15, 95:9, 148:17, 163:19
**focused** [1] - 165:9
**focusing** [2] - 145:8, 145:25
**fold** [1] - 28:20
**folks** [9] - 11:19, 33:23, 39:22, 47:3, 60:14, 63:18, 71:18, 71:24, 77:10
**followed** [1] - 169:22
**following** [3] - 89:8, 112:3, 150:20
**follows** [2] - 7:4, 119:18
**foot** [2] - 24:1
**football** [6] - 9:8, 9:10, 9:13, 17:12, 37:22
**FOR** [1] - 1:1
**Force** [6] - 32:24, 33:2, 46:10, 46:15, 48:1, 73:4
**Forces** [1] - 73:21
**forces** [3] - 32:21, 37:7
**foregoing** [1] - 191:17
**Forgive** [1] - 176:18
**form** [7] - 12:17, 12:19, 42:24, 118:1, 137:9, 141:21, 190:13
**formally** [1] - 190:11
**former** [4] - 104:4, 104:15, 104:22, 153:2
**formerly** [1] - 97:16
**forms** [1] - 90:18
**formula** [1] - 66:7
**formulations** [1] - 91:1
**forte** [1] - 75:14
**forth** [2] - 139:4, 151:2
**forthright** [1] - 171:9
**fortunately** [1] - 70:22
**Fortunately** [2] - 30:8, 43:6
**forty** [1] - 145:17
**Forward** [1] - 164:2
**forward** [18] - 19:7, 24:18, 33:5, 55:2, 63:15, 64:13, 66:18, 68:3, 69:1, 69:20, 70:1, 73:22, 76:3, 76:10, 77:7, 158:23, 159:16
**fostered** [1] - 98:22
**foul** [1] - 151:8

**foundation** [18] - 31:19, 65:19, 66:17, 68:10, 68:23, 69:9, 69:13, 108:21, 110:6, 110:8, 136:4, 158:18, 171:11, 171:13, 171:23, 172:9, 182:25, 189:15
**foundations** [1] - 65:25
**founding** [1] - 169:16
**four** [5] - 13:15, 16:10, 16:12, 102:23, 145:17
**four-year** [2] - 16:10, 16:12
**fourth** [3] - 10:16, 129:18, 165:14
**fragile** [1] - 76:17
**fragility** [1] - 175:22
**frame** [2] - 12:1, 131:11
**framework** [2] - 61:23, 145:12
**Frankly** [1] - 156:23
**frankly** [2] - 32:8, 51:6
**frequently** [1] - 36:13
**fresh** [1] - 69:3
**Friday** [2] - 53:2, 53:4
**friend** [1] - 117:18
**frightening** [1] - 26:7
**front** [7] - 40:7, 71:25, 97:9, 136:15, 160:9, 161:21, 184:19
**frosted** [1] - 35:6
**frozen** [1] - 75:1
**frustrating** [1] - 
**fueling** [1] - 182:21
**full** [6] - 22:25, 23:1, 47:11, 67:9, 188:13
**FULLER** [1] - 2:12
**Fuller** [2] - 2:4, 2:13
**function** [1] - 165:6
**functioning** [1] - 90:11
**fund** [9] - 70:19, 136:17, 137:6, 142:11, 142:17, 142:21, 143:3, 169:2
**funded** [2] - 132:18, 144:18, 166:5, 168:4, 168:7, 169:3
**funding** [6] - 121:4, 134:8, 144:1, 168:10, 168:12, 168:15
**funds** [3] - 23:9, 25:24, 31:2
**future** [2] - 23:8, 71:13

# G

**gaining** [1] - 38:15
**Gambling** [1] - 152:10
**gambling** [1] - 152:7
**gaps** [3] - 122:17, 122:20, 122:24
**garbage** [1] - 22:7
**gathered** [1] - 47:9
**general** [7] - 15:12, 28:19, 142:11, 142:17, 142:21, 143:2, 155:20
**General** [4] - 156:21, 156:23, 156:25, 157:4
**generally** [3] - 24:5, 89:8, 138:23
**generate** [1] - 84:22
**gentleman** [2] - 55:20, 67:19
**gentlemanly** [1] - 150:13
**Georgetown** [1] - 74:4
**Gina** [4] - 55:8, 57:12, 57:21, 180:22
**given** [3] - 35:13, 151:16, 151:20
**Glenza** [4] - 107:18, 107:22, 109:5, 111:18
**glib** [1] - 159:21
**goal** [3] - 33:4, 62:12
**Goodwin** [1] - 38:10
**Government** [1] - 57:1
**government** [21] - 11:24, 12:17, 12:19, 29:2, 32:13, 32:18, 34:14, 56:25, 57:1, 79:5, 117:7, 132:21, 132:23, 143:24, 143:25, 146:11, 151:25, 152:11, 152:17, 166:6
**governmental** [2] - 185:24, 187:2
**governments** [1] - 186:21
**Governor** [3] - 12:12, 67:16, 67:17
**Governor's** [2] - 67:15, 67:18
**governor's** [1] - 67:16
**grab** [1] - 76:13
**gracious** [1] - 189:24
**graduate** [2] - 9:17, 11:7
**graduated** [3] - 9:3, 9:19, 9:20
**gram** [2] - 43:16,

129:24
**grams** [8] - 42:14, 43:9, 43:10, 44:12, 44:19, 44:24, 45:1
**grandparents** [1] - 56:11
**grandson** [1] - 55:25
**Grant** [1] - 133:1
**grant** [9] - 31:11, 31:12, 31:13, 31:17, 132:20, 134:8, 141:7, 142:2
**Grants** [1] - 142:6
**grants** [17] - 31:4, 31:15, 31:23, 65:22, 65:23, 65:24, 77:7, 140:17, 141:2, 141:4, 141:8, 141:12, 142:5, 142:23, 142:24, 143:22, 166:10
**great** [2] - 11:17, 11:19
**greater** [2] - 90:15, 90:19
**greatest** [1] - 144:23
**GRETCHEN** [1] - 6:7
**grew** [1] - 11:9
**groomed** [1] - 74:24
**grossly** [1] - 98:20
**ground** [1] - 149:10
**groundwork** [1] - 88:25
**group** [7] - 10:10, 14:12, 50:19, 51:1, 62:6, 64:17, 67:19
**groups** [14] - 29:22, 48:25, 51:4, 60:23, 61:1, 63:6, 65:25, 69:19, 71:3, 71:4, 71:5, 71:9, 72:3, 168:20
**grow** [1] - 8:12
**growing** [4] - 11:18, 34:16, 38:21, 41:12
**grown** [1] - 17:19
**Guardian** [4] - 107:15, 107:23, 109:23, 111:18
**guess** [9] - 10:4, 17:3, 23:23, 30:21, 56:18, 121:2, 130:16, 134:22, 174:23
**guide** [6] - 118:15, 118:18, 160:25, 161:22, 162:3, 162:20
**guidelines** [2] - 96:7, 96:15

# H

**haired** [1] - 55:19
**Haiti** [1] - 74:25
**half** [11] - 18:10, 29:21, 77:8, 84:5, 124:23, 124:25, 129:24, 151:18, 180:6, 191:3, 191:7
**halfway** [1] - 124:10
**Hall** [3] - 13:9, 35:13, 67:15
**hand** [7] - 7:12, 61:2, 61:3, 135:21, 158:20, 158:21, 190:20
**handed** [3] - 92:20, 121:17, 161:7
**handing** [1] - 18:24
**hands** [1] - 46:20
**Hanson** [1] - 177:5
**happy** [3] - 78:5, 78:6, 136:10
**hard** [7] - 28:3, 28:5, 28:8, 30:21, 67:5, 173:15
**hardest** [2] - 56:18, 70:17
**HARDIN** [1] - 5:3
**harm** [3] - 53:18, 102:3, 115:19
**Harm** [1] - 64:3
**Hawkins** [1] - 3:7
**Hazelett** [1] - 105:5
**head** [1] - 16:5
**Head** [3] - 104:4, 104:18, 106:16
**head-first** [1] - 16:5
**headed** [2] - 24:17, 56:3
**header** [1] - 105:8
**heading** [2] - 164:13, 164:14
**headings** [1] - 165:2
**headline** [2] - 92:24, 128:15
**heads** [5] - 21:10, 21:11, 21:22, 39:12, 55:21
**heal** [1] - 76:15
**Health** [21] - 4:16, 5:2, 25:13, 25:15, 64:1, 64:6, 72:5, 72:15, 72:16, 102:25, 104:15, 104:25, 105:2, 156:21, 166:8, 166:9, 166:19, 167:22, 182:8, 188:21
**health** [19] - 21:8,

22:1, 22:2, 22:4, 22:6, 62:5, 65:14, 122:25, 124:2, 124:16, 125:5, 126:16, 126:19, 138:21, 166:6, 166:21, 167:7, 180:10
**healthcare** [10] - 29:19, 29:20, 29:25, 30:14, 62:22, 98:16, 101:2, 101:4, 101:8
**Healthcare** [2] - 91:21, 97:18
**healthier** [1] - 115:17
**healthy** [2] - 22:8, 22:9
**hear** [2] - 53:8, 61:19
**heard** [9] - 35:3, 48:24, 50:5, 56:24, 69:24, 144:4, 145:22, 164:20, 176:20
**hearing** [4] - 44:10, 51:4, 51:5, 142:18
**hearsay** [17] - 38:24, 39:2, 39:20, 39:23, 40:10, 40:11, 44:18, 93:9, 93:10, 93:12, 108:7, 108:18, 111:6, 177:21, 181:15, 189:8, 189:10
**heart** [2] - 75:11, 125:1
**hearts** [1] - 56:10
**heavens** [1] - 36:7
**heavy** [1] - 41:10
**heck** [1] - 74:2
**held** [1] - 22:22
**help** [18] - 14:16, 16:2, 18:7, 27:22, 31:3, 31:25, 32:1, 37:7, 37:10, 41:20, 51:21, 59:24, 63:23, 68:3, 70:20, 106:3, 114:16, 182:5
**helped** [7] - 14:13, 26:13, 39:16, 43:20, 66:17, 69:12, 95:20
**helpful** [3] - 50:25, 53:20, 56:15
**helping** [1] - 112:21
**helps** [4] - 24:8, 24:9
**Herald** [2] - 128:5, 128:12
**Herald-Dispatch** [2] - 128:5, 128:12
**hereby** [1] - 150:21
**heroin** [24] - 39:18, 41:11, 42:13, 42:14,

43:2, 43:16, 127:14, 127:18, 127:23, 128:20, 128:25, 129:1, 129:3, 129:6, 129:13, 129:18, 129:23, 130:1, 130:2, 130:10, 130:22, 131:3, 131:8, 174:15
**Heroin** [2] - 128:15, 130:15
**hesitating** [1] - 159:8
**HESTER** [5] - 5:9, 146:19, 162:25, 179:3, 191:4
**Hester** [2] - 179:1, 179:2
**hiding** [1] - 68:25
**HIDTA** [2] - 32:20, 104:4
**high** [13] - 9:10, 37:22, 49:10, 54:22, 71:19, 80:20, 112:17, 113:9, 130:15, 163:24, 164:22, 176:25, 177:1
**High** [4] - 9:2, 9:7, 9:8, 106:16
**higher** [1] - 163:15
**highest** [5] - 10:25, 109:13, 111:22, 163:18, 176:23
**highly** [3] - 70:10, 74:24, 76:17
**hill** [2] - 26:21, 42:21
**hillside** [4] - 26:22, 27:12, 27:13
**hire** [1] - 31:12
**hired** [4] - 11:14, 30:8, 67:21, 179:10
**history** [3] - 10:15, 12:9, 70:25
**History** [3] - 162:22, 163:10, 163:11
**hits** [3] - 43:16, 43:18, 129:24
**hitting** [2] - 125:16, 125:18
**Holbrook** [14] - 37:18, 37:20, 37:24, 38:20, 38:21, 39:1, 39:15, 39:24, 41:6, 41:24, 41:25, 42:6, 44:16
**Holbrook's** [1] - 38:3
**hold** [1] - 21:1
**holding** [2] - 94:6, 95:11
**hole** [1] - 143:5
**home** [5] - 16:19, 17:1, 17:4, 17:5,

115:5
**Honestly** [1] - 150:11
**honestly** [2] - 28:19, 151:10
**Honor** [115] - 7:6, 13:5, 15:22, 18:11, 18:21, 19:8, 19:11, 20:5, 25:17, 31:6, 35:3, 38:24, 39:20, 40:6, 40:18, 44:16, 45:19, 46:4, 48:6, 50:4, 50:19, 54:18, 55:18, 57:15, 57:22, 58:14, 58:19, 62:1, 64:20, 65:6, 66:7, 67:19, 68:8, 68:23, 75:12, 77:20, 80:25, 81:4, 81:7, 81:15, 82:23, 82:24, 92:17, 93:6, 93:11, 97:25, 98:4, 98:6, 103:9, 107:7, 108:6, 108:12, 109:1, 110:4, 110:12, 110:20, 110:24, 111:15, 113:2, 114:3, 114:6, 119:6, 119:11, 119:23, 121:15, 122:9, 122:12, 125:15, 135:21, 135:25, 136:11, 136:23, 143:18, 144:22, 149:8, 150:6, 154:4, 157:21, 161:19, 163:2, 165:22, 168:3, 170:14, 170:17, 171:1, 171:19, 172:3, 172:7, 172:10, 173:3, 173:12, 174:25, 177:21, 177:22, 177:25, 178:15, 178:20, 179:19, 179:25, 180:12, 181:15, 182:25, 183:7, 183:21, 185:6, 186:6, 186:16, 187:21, 189:7, 189:8, 189:10, 189:15, 190:4, 190:8, 191:4
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**Hooked** [1] - 104:8
**hope** [11] - 66:12, 66:15, 75:25, 77:3, 119:25, 145:4,

168:2, 176:24, 177:3, 189:18
**hoping** [1] - 165:13
**horrible** [1] - 177:4
**hospital** [3] - 92:3, 95:22, 115:15
**Hospital** [9] - 27:9, 27:10, 27:12, 59:15, 100:11, 100:13, 100:15, 100:17, 104:23
**hospitals** [22] - 62:4, 64:15, 65:1, 65:24, 69:5, 72:4, 95:18, 95:25, 96:1, 115:1, 115:4, 115:18, 116:13, 116:19, 116:21, 116:24, 117:2, 117:3, 118:9, 118:24, 119:3
**hot** [1] - 176:21
**hours** [6] - 78:3, 81:8, 88:7, 90:25, 191:3, 191:7
**house** [9] - 35:23, 36:1, 36:2, 37:1, 37:2, 42:24, 43:1, 43:10, 44:25
**House** [3] - 13:7, 13:14, 13:15
**House's** [1] - 106:21
**household** [1] - 42:13
**housekeeping** [1] - 103:9
**houses** [2] - 26:23, 27:13, 34:25
**housewife** [2] - 54:20
**housewives** [1] - 62:3
**housing** [1] - 36:6
**hub** [1] - 123:7
**huge** [2] - 43:2, 109:20
**hundred** [2] - 26:24, 145:17
**hundreds** [2] - 44:12, 44:19
**Huntington** [160] - 3:10, 4:1, 8:1, 8:3, 8:18, 8:19, 8:24, 8:25, 9:2, 9:7, 9:8, 10:9, 11:7, 11:10, 11:20, 11:22, 12:4, 12:6, 12:9, 12:15, 15:2, 15:4, 15:23, 16:15, 16:18, 16:20, 16:25, 17:9, 17:10, 18:5, 19:17, 19:20, 20:2, 20:4, 25:17, 26:21, 27:9, 27:10, 27:11, 32:10, 32:11,

34:24, 35:4, 38:10, 39:9, 39:10, 42:8, 53:25, 54:11, 55:13, 58:6, 59:15, 62:10, 63:10, 70:11, 70:22, 71:4, 71:11, 74:14, 75:7, 76:2, 76:11, 76:25, 77:11, 78:4, 78:13, 79:1, 79:2, 79:14, 79:21, 80:1, 80:7, 81:9, 82:12, 85:13, 85:18, 91:5, 91:17, 92:8, 92:9, 92:24, 96:21, 97:6, 97:7, 97:14, 98:11, 99:16, 100:10, 100:11, 102:7, 102:22, 103:19, 104:14, 104:23, 104:25, 111:2, 111:9, 111:11, 114:10, 120:6, 120:23, 121:11, 121:19, 122:25, 123:6, 123:16, 124:15, 124:17, 124:25, 125:10, 126:2, 127:7, 127:11, 127:15, 127:23, 128:4, 128:16, 128:21, 130:21, 131:3, 135:22, 137:5, 139:14, 148:9, 149:22, 150:10, 150:14, 150:24, 151:4, 153:1, 153:3, 153:7, 154:21, 157:16, 158:14, 159:1, 160:10, 160:20, 160:24, 161:11, 162:15, 163:17, 164:18, 166:17, 168:5, 175:18, 176:3, 176:10, 185:15, 185:19, 186:5, 186:13, 186:14, 187:2, 187:4, 187:18, 187:20, 189:14, 191:18
**HUNTINGTON** [1] - 1:4
**Huntington's** [3] - 161:23, 162:21, 163:24
**Huntington-Cabell** [1] - 189:14
**Huntington/Cabell** [1] - 158:8

**hurt** [2] - 28:18, 35:12
**hurting** [1] - 56:10
**Huynh** [4] - 137:15, 160:1, 163:3, 164:8
**Huynh's** [1] - 162:23
**hydrocodone** [1] - 189:1

**I**

**idea** [4] - 10:19, 34:12, 119:11, 151:10
**identification** [1] - 172:22
**identified** [3] - 89:19, 187:24, 188:15
**identifies** [1] - 150:2
**identify** [3] - 21:18, 33:21, 145:3
**identifying** [2] - 67:6, 68:12
**ignored** [1] - 182:19
**illegal** [2] - 127:7, 182:21
**Illegal** [1] - 127:14
**illegally** [2] - 41:10, 84:21
**Illinois** [1] - 14:24
**illness** [1] - 124:25
**imagery** [1] - 19:2
**imagine** [5] - 46:19, 50:5, 56:5, 57:5, 159:23
**imagined** [2] - 44:14, 46:1
**immaculate** [1] - 35:25
**immediate** [1] - 167:25
**immediately** [2] - 46:1, 55:20
**impact** [3] - 122:25, 163:14, 176:9
**impacted** [1] - 184:2
**impeachment** [3] - 135:21, 136:1, 136:6
**impetus** [1] - 69:21
**important** [6] - 12:18, 19:1, 26:15, 33:18, 63:2, 70:13
**impossible** [1] - 78:4
**impressions** [2] - 40:3, 45:8
**improve** [1] - 124:2, 125:5
**improves** [1] - 90:10
**IN** [2] - 1:1, 1:18
**inappropriate** [1] - 98:23
**Inc** [2] - 97:20, 182:10

**incentive** [1] - 115:15
**include** [3] - 132:16, 137:8, 167:20
**included** [8] - 53:3, 90:24, 109:12, 112:14, 131:17, 135:2, 136:16, 138:19
**includes** [2] - 131:20, 140:9
**including** [4] - 28:6, 125:1, 184:5, 187:23
**Including** [1] - 162:10
**income** [1] - 125:20
**Incorporated** [1] - 182:9
**increase** [5] - 84:22, 124:3, 133:23, 133:24, 177:19
**increasing** [1] - 95:2
**incredibly** [1] - 189:23
**indeed** [1] - 143:2
**independent** [1] - 20:25
**Indiana** [2] - 14:25, 74:6
**indicate** [3] - 122:3, 130:1, 184:1
**indicated** [16] - 8:25, 13:21, 16:13, 17:11, 17:16, 20:5, 28:9, 37:5, 39:11, 49:7, 65:21, 66:3, 127:19, 152:22, 158:19, 166:14
**indicating** [1] - 53:19
**indirectly** [1] - 181:8
**individual** [2] - 56:12, 141:18
**individually** [1] - 50:22
**individuals** [16] - 20:23, 21:2, 24:4, 34:25, 51:5, 54:17, 56:13, 60:4, 67:3, 67:9, 69:4, 70:23, 72:12, 74:19, 75:21, 98:24
**industry** [3] - 126:5, 126:8, 127:3
**influence** [1] - 116:5
**influenced** [1] - 19:10
**influential** [1] - 92:5
**informal** [1] - 36:24
**information** [13] - 18:8, 45:20, 45:24, 65:5, 68:1, 68:4,

109:22, 148:5, 148:13, 157:17, 157:20, 158:11, 183:1
**infrastructure** [2] - 145:10, 145:25
**initiative** [1] - 47:24
**injury** [1] - 89:1
**inquiries** [1] - 41:9
**Inroads** [1] - 128:16
**inside** [1] - 27:9
**insinuated** [1] - 155:7
**insistent** [1] - 186:1
**inspectors** [1] - 36:7
**instance** [3] - 23:25, 25:8, 46:9
**instances** [1] - 46:10
**instead** [3] - 12:16, 115:16, 119:9
**Institute** [7] - 74:5, 120:7, 120:9, 120:19, 121:20, 160:6, 160:10
**institute** [1] - 120:23
**instituted** [1] - 69:9
**instructions** [1] - 42:20
**instructive** [2] - 55:16, 55:23
**insurance** [4] - 25:12, 27:16, 166:6, 168:12
**Insurance** [1] - 25:16
**intellect** [1] - 69:3
**intellectual** [1] - 64:11
**intend** [1] - 103:14
**intensified** [2] - 125:10, 126:1
**Intensity** [1] - 106:17
**intention** [2] - 66:5
**intentional** [1] - 141:8
**interacted** [1] - 58:20
**intercept** [1] - 43:3
**interdiction** [1] - 50:10
**interest** [1] - 99:16
**interested** [1] - 64:1
**interesting** [4] - 25:5, 131:1, 131:5, 131:12
**Interestingly** [3] - 17:22, 17:25, 22:4
**interestingly** [9] - 11:8, 12:13, 13:1, 25:17, 30:13, 37:21, 43:24, 46:22, 55:15
**interfere** [1] - 46:14
**interfered** [1] - 47:25
**interference** [1] - 147:22
**interfering** [1] - 33:11
**intern** [1] - 11:7

**internet** [2] - 170:7, 170:23
**interposed** [1] - 109:1
**interpret** [1] - 54:6
**interrupt** [1] - 112:23
**intervening** [1] - 165:10
**intervention** [3] - 51:9, 61:14, 165:10
**introduce** [2] - 7:23, 116:3
**introduction** [1] - 64:8
**investigation** [1] - 48:1
**investigations** [2] - 46:5, 68:2
**investment** [5] - 13:10, 13:23, 14:24, 15:3, 65:10
**invited** [3] - 53:4, 73:20, 74:3
**involve** [1] - 22:15
**involved** [10] - 16:7, 61:8, 61:16, 63:3, 72:21, 121:1, 166:9, 166:10, 174:12, 174:15
**involvement** [1] - 75:2
**involves** [2] - 22:4, 139:6
**ironic** [1] - 11:6
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**issue** [8] - 41:17, 41:18, 41:19, 47:21, 50:3, 98:19, 151:12, 153:24
**issued** [1] - 92:21
**issues** [16] - 13:11, 13:12, 13:17, 22:2, 32:17, 37:4, 51:2, 57:3, 58:7, 64:2, 64:19, 64:23, 66:25, 72:19, 157:1, 184:4
**issuing** [2] - 25:2, 108:16
**item** [1] - 140:16
**items** [1] - 26:19
**itself** [2] - 64:5, 96:25

## J

**Jackson** [1] - 6:8
**JAG** [1] - 142:5
**Jail** [3] - 47:23, 47:24, 49:7
**Jan** [2] - 59:10, 138:5
**January** [9] - 8:6, 19:18, 22:25, 28:15, 42:2, 60:21, 60:22,

107:10, 107:19
**JASIEWICZ** [1] - 5:4
**JCAHO** [12] - 91:23, 96:5, 96:14, 96:17, 96:20, 96:24, 98:15, 100:19, 101:1, 101:8, 102:10, 102:13
**JCAHO's** [2] - 99:22, 102:1
**JCR** [1] - 100:1
**JCRs** [1] - 99:23
**Jean** [1] - 15:15
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:18
**Jessica** [4] - 107:18, 107:22, 111:18, 112:1
**Jewish** [1] - 53:1
**Jim** [5] - 36:17, 58:22, 67:19, 104:17, 138:1
**job** [8] - 8:18, 12:7, 12:8, 30:18, 33:18, 39:8, 42:6, 72:13
**jobs** [3] - 14:4, 30:20, 123:9
**Joe** [2] - 104:11, 104:14
**Johnson** [11] - 58:22, 67:19, 86:16, 104:17, 138:1, 138:11, 169:19, 169:21, 169:25, 177:13
**join** [1] - 51:19
**joined** [2] - 85:23, 86:4
**joining** [1] - 48:13
**joint** [1] - 185:20
**Joint** [25] - 91:18, 91:20, 91:23, 92:2, 92:9, 92:25, 93:20, 94:19, 94:21, 94:23, 95:6, 95:12, 95:17, 95:20, 97:2, 97:15, 97:16, 97:18, 97:19, 97:20, 98:9, 99:15, 99:23, 100:10, 101:24
**Jonathan** [1] - 83:24
**JOSEPH** [1] - 6:4
**Joseph** [1] - 105:10
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**judge** [3] - 58:8, 184:15, 187:13
**Judge** [24] - 7:2, 102:20, 136:6, 139:9, 143:16, 146:7, 146:18,

146:22, 149:10, 149:24, 155:13, 157:24, 161:4, 161:12, 162:24, 170:20, 171:9, 173:8, 183:3, 188:3, 188:5, 189:19, 190:10, 191:9
**JUDGE** [1] - 1:17
**judgment** [1] - 38:19
**judicial** [4] - 98:2, 187:13, 187:17, 187:23
**JUNE** [1] - 1:19
**June** [5] - 7:4, 15:18, 159:19, 191:21, 192:2
**jurisdictions** [1] - 32:25
**jury** [2] - 18:24, 19:2
**Justice** [2] - 67:16, 142:5
**juxtaposition** [1] - 131:12

## K

**Kathe** [1] - 83:24
**Katie** [2] - 111:25, 112:2
**KEARSE** [47] - 4:2, 7:6, 7:17, 18:11, 18:13, 19:8, 19:12, 19:15, 39:5, 40:20, 45:18, 47:1, 55:8, 55:10, 57:15, 57:21, 57:25, 58:3, 77:17, 93:9, 98:6, 114:6, 122:12, 135:25, 155:4, 155:6, 156:6, 157:21, 170:16, 172:7, 177:25, 178:22, 179:6, 179:25, 180:5, 180:14, 180:19, 180:20, 180:22, 180:25, 181:23, 181:24, 183:11, 183:14, 183:15, 183:23, 184:11
**Kearse** [7] - 7:5, 39:4, 40:13, 57:13, 170:18, 180:2, 181:17
**keep** [1] - 82:25
**keeping** [1] - 23:7
**Kelly** [1] - 6:8
**Kenny** [1] - 103:21
**Kentucky** [1] - 60:6
**kept** [5] - 29:13, 49:9,

51:5, 62:1
**Kessler** [1] - 4:23
**Kevin** [1] - 104:22
**key** [2] - 34:1, 94:23
**keyword** [1] - 95:23
**kicks** [1] - 190:19
**Kilkenny** [1] - 105:2
**kind** [11] - 16:3, 18:9,
19:2, 35:6, 51:6,
58:2, 60:10, 65:15,
67:5, 79:17, 147:21
**kinds** [2] - 151:24,
153:16
**knock** [2] - 42:25, 48:2
**knock-and-talk** [1] -
48:2
**knowledge** [10] -
44:20, 45:1, 73:24,
81:6, 113:12,
157:21, 166:12,
168:1, 175:6, 183:1
**knowledgeable** [1] -
162:14
**known** [12] - 25:17,
26:4, 37:20, 38:8,
38:9, 38:16, 56:4,
59:1, 97:16, 157:3,
182:17
**knows** [3] - 63:16,
73:24, 161:13
**KOUBA** [1] - 4:11
**Kroger** [1] - 182:10

### L

**LA** [1] - 3:8
**label** [1] - 35:4
**labeled** [1] - 124:17
**Labor** [1] - 73:17
**lack** [3] - 60:24, 123:4,
124:1
**laid** [8] - 17:21, 29:9,
30:7, 68:23, 88:25,
108:21, 158:18,
172:8
**landfill** [2] - 25:8,
25:11
**language** [1] - 54:10
**languages** [1] - 54:8
**Lanier** [1] - 3:4
**large** [6] - 42:12,
47:10, 50:16, 91:12,
132:4, 165:3
**largest** [2] - 65:11,
167:3
**last** [46] - 11:18,
18:10, 18:23, 28:24,
29:5, 31:20, 31:21,
40:7, 40:8, 42:20,
70:5, 71:15, 76:19,

76:20, 76:21, 78:1,
99:13, 102:16,
102:17, 114:15,
115:25, 127:25,
131:19, 131:25,
132:11, 132:16,
133:5, 133:6,
133:11, 133:13,
133:14, 133:25,
143:10, 151:17,
156:10, 159:18,
175:1, 176:13,
176:20, 183:11,
188:4, 188:5, 189:25
**Last** [1] - 31:20
**last-minute** [1] - 42:20
**lasted** [1] - 129:1
**lasts** [1] - 130:15
**latest** [1] - 134:20
**latitude** [1] - 178:3
**laude** [2] - 9:20, 9:21
**Laughter** [2] - 83:3,
179:4
**laughter** [1] - 189:22
**LAURA** [1] - 5:10
**law** [32] - 13:2, 20:12,
20:25, 22:23, 32:3,
32:4, 32:15, 32:17,
34:16, 34:17, 37:15,
38:7, 38:11, 38:17,
41:18, 41:21, 44:6,
44:24, 48:1, 50:3,
50:10, 50:13, 51:9,
52:12, 58:15, 60:2,
61:14, 62:22, 74:6,
151:2, 156:16,
186:25
**Law** [4] - 3:4, 3:7,
3:12, 149:23
**lawn** [1] - 35:24
**laws** [1] - 13:16
**lawsuit** [15] - 79:9,
83:9, 92:12, 92:25,
93:23, 94:3, 94:5,
95:5, 126:13, 154:3,
154:7, 186:3,
186:12, 189:3,
189:14
**lawsuits** [2] - 112:1,
180:7
**lawyers** [2] - 155:3,
155:8
**lay** [9] - 10:19, 29:8,
29:10, 31:9, 65:19,
66:17, 69:12, 110:5,
136:4
**layer** [1] - 32:14
**layers** [1] - 32:14
**laying** [4] - 61:23,
68:10, 110:8, 122:2

**lead** [8] - 59:5, 62:20,
63:7, 75:16, 75:17,
75:18, 75:20, 124:3
**leader** [2] - 63:12,
63:14
**leaders** [1] - 68:25,
72:9, 72:10
**leadership** [5] - 39:15,
64:14, 66:2, 151:19,
168:19
**leading** [5] - 63:17,
183:21, 186:6,
186:8, 189:7
**leads** [1] - 66:8
**League** [10] - 19:23,
19:24, 72:25,
120:12, 120:13,
120:20, 121:24,
122:22, 125:24,
126:11
**leans** [1] - 22:6
**learn** [4] - 14:16,
36:10, 46:5, 189:4
**learned** [4] - 16:3,
70:3, 75:15, 75:23
**learning** [4] - 53:1,
54:3, 59:21, 68:17
**least** [12] - 26:8, 67:1,
80:13, 102:5,
108:15, 116:25,
118:9, 119:3,
125:14, 125:22,
154:6, 168:15
**leave** [1] - 102:17
**leaving** [1] - 12:23
**led** [8] - 69:8, 85:9,
85:12, 95:2, 96:17,
100:4, 124:25,
152:18
**ledgers** [1] - 24:7
**Lee** [1] - 3:12
**left** [20] - 12:20, 13:9,
13:21, 14:21, 17:3,
41:24, 42:6, 43:9,
46:23, 49:23, 55:17,
55:19, 55:20, 55:25,
61:2, 65:22, 120:2,
123:9, 151:22,
158:20
**legal** [13] - 29:23,
147:20, 149:22,
151:20, 152:24,
152:25, 153:20,
155:23, 155:25,
180:12, 186:17,
187:8
**legislation** [3] -
114:17, 116:3, 116:6
**legislators** [2] - 13:6
**legislature** [11] -

13:21, 13:22, 23:15,
23:18, 23:22, 67:17,
148:16, 151:22,
152:13, 153:12,
187:1
**Legislature** [1] - 187:5
**legitimacy** [1] - 171:13
**legitimate** [5] - 80:11,
81:2, 82:1, 82:8,
182:17
**Lemley** [4] - 58:8,
59:7, 138:3, 138:12
**length** [1] - 131:15
**lengthy** [1] - 82:20
**Leon** [2] - 2:4, 2:14
**less** [3] - 26:7, 33:3,
132:8
**letter** [16] - 113:22,
114:22, 116:1,
116:20, 116:23,
117:10, 117:15,
117:16, 117:21,
117:24, 118:1,
118:8, 118:22,
188:9, 188:23, 189:4
**letterman's** [1] - 17:12
**letters** [1] - 54:4
**letting** [1] - 35:24
**level** [18] - 11:17,
26:16, 35:8, 41:14,
48:4, 49:10, 51:18,
60:25, 66:10, 67:14,
112:17, 113:9,
152:13, 157:17,
164:22, 176:23,
177:2
**levels** [1] - 80:20
**Levin** [1] - 2:10
**Lexington** [1] - 14:10
**LEYIMU** [1] - 4:13
**licensed** [2] - 79:5,
79:17
**licensing** [2] - 10:7,
148:2
**lieu** [1] - 116:5
**life** [11] - 10:8, 15:25,
16:18, 17:24, 52:13,
72:14, 74:20, 75:1,
75:6, 125:20
**lift** [3] - 10:19, 34:12,
145:6
**light** [1] - 55:19
**light-haired** [1] -
55:19
**limit** [2] - 90:15,
147:17
**limited** [2] - 148:8
**limits** [3] - 147:25,
148:18, 187:4
**LINDA** [1] - 4:8

**line** [9] - 35:2, 75:21,
87:18, 140:16,
149:14, 149:21,
169:23, 172:18,
178:6
**lines** [3] - 115:13,
160:4, 160:9
**linking** [1] - 61:16
**Lisa** [2] - 6:18, 191:16
**list** [16] - 86:7, 86:10,
86:14, 86:16, 86:25,
87:6, 87:23, 88:16,
118:18, 118:23,
150:2, 164:23,
165:3, 165:22,
166:13, 166:14
**listed** [9] - 20:10,
25:25, 71:4, 97:8,
122:6, 122:20,
122:24, 166:17,
167:1
**listen** [3] - 38:10,
56:10, 62:2
**listener** [1] - 45:5
**listening** [1] - 173:10
**listing** [4] - 164:5,
164:17, 173:25,
174:21
**litigation** [1] - 112:21
**live** [7] - 57:23,
123:17, 186:4,
186:14, 187:3,
187:15, 187:19
**lived** [4] - 8:13, 9:4,
16:15, 130:14
**lives** [2] - 165:10,
181:12
**living** [1] - 123:8
**LLC** [1] - 2:4
**lobbied** [1] - 118:24
**lobbies** [1] - 118:19
**lobbyist** [8] - 117:18,
117:22, 117:24,
118:8, 118:10,
118:19, 118:22
**lobbyists** [2] - 118:16,
118:24
**local** [4] - 10:12, 72:3,
72:9, 129:13
**localities** [1] - 153:14
**locally** [1] - 72:1
**Logan** [2] - 6:5, 6:12
**logical** [1] - 130:16
**long-term** [1] - 87:17,
90:10
**look** [46] - 63:6, 63:20,
68:15, 70:15, 70:25,
75:3, 78:16, 84:11,
85:22, 86:1, 87:8,
88:10, 92:15, 93:15,

93:20, 93:22, 96:24, 101:13, 103:6, 103:7, 105:24, 107:4, 108:4, 109:9, 109:25, 115:7, 115:24, 120:4, 121:13, 128:2, 129:8, 135:18, 137:3, 143:8, 149:6, 151:3, 154:23, 160:23, 161:2, 162:20, 164:4, 170:10, 172:21, 174:3, 174:19, 177:19
**looked** [12] - 15:12, 19:3, 27:15, 47:18, 74:25, 79:9, 87:23, 88:16, 88:20, 102:16, 111:4, 169:8
**looking** [21] - 10:21, 13:3, 14:23, 24:18, 26:16, 27:10, 28:15, 47:17, 57:21, 60:10, 70:1, 71:2, 71:22, 76:13, 76:14, 77:25, 136:18, 141:11, 173:7, 179:3, 180:8
**Looks** [1] - 18:14
**loss** [2] - 50:8, 101:4
**losses** [1] - 139:15, 185:24
**lost** [6] - 15:13, 51:14, 56:13, 56:19, 56:20, 66:20
**lottery** [1] - 129:25
**Louisville** [1] - 14:9
**loved** [1] - 56:14
**loving** [2] - 75:22, 75:24
**lovingly** [1] - 18:1
**low** [2] - 48:4, 89:10
**low-level** [1] - 48:4
**lowest** [3] - 10:25, 74:20, 75:1
**LP** [2] - 83:14, 98:17
**lunch** [2] - 119:7, 119:25
**Lyn** [2] - 69:2, 162:12

**M**

**ma'am** [2] - 179:8, 179:16
**Magazine** [1] - 3:7
**MAHADY** [1] - 6:4
**mail** [22] - 103:17, 103:21, 104:1, 104:7, 104:11, 105:7, 105:12,

105:22, 106:2, 106:9, 106:12, 106:13, 107:2, 107:9, 107:17, 107:18, 108:4, 108:7, 109:9, 109:25, 110:25, 112:10
**main** [2] - 20:2, 21:6
**MAINIGI** [1] - 4:17
**MAJESTRO** [7] - 2:6, 40:18, 45:4, 81:4, 108:6, 108:21, 110:4
**Majestro** [5] - 2:6, 40:17, 45:3, 108:25, 109:3
**Majestro's** [1] - 45:10
**major** [1] - 127:7
**majority** [1] - 82:11
**Mallinckrodt** [1] - 86:22
**man** [4] - 11:8, 55:22, 56:3, 74:22
**manage** [1] - 65:12
**managed** [1] - 89:19
**management** [5] - 96:7, 96:15, 98:19, 99:22, 102:10
**manager** [1] - 12:17
**Manager** [9] - 11:8, 11:10, 11:23, 12:6, 12:7, 12:8, 12:9, 12:13, 12:24
**managing** [1] - 15:2
**Manchin** [10] - 113:22, 114:10, 114:16, 114:21, 116:10, 117:9, 118:4, 188:9, 188:23, 189:4
**mandate** [1] - 116:4
**manifestation** [1] - 108:24
**manifested** [3] - 108:14, 108:20, 112:25
**manner** [2] - 154:6, 159:15
**manufacturer** [1] - 96:14
**manufacturers** [11] - 84:6, 85:24, 86:4, 86:8, 87:6, 87:23, 88:9, 88:16, 96:12, 98:19, 181:11
**manufacturers'** [1] - 181:10
**manufacturing** [5] - 123:7, 125:9, 125:25, 126:8, 154:19

**mark** [1] - 135:23
**MARK** [1] - 3:14
**marked** [15] - 92:16, 97:1, 103:8, 107:6, 113:19, 121:14, 128:3, 135:20, 149:7, 154:2, 154:8, 161:3, 170:12, 172:22, 177:20
**market** [12] - 14:11, 14:18, 43:21, 43:22, 91:13, 129:12, 182:6, 182:18, 182:22, 183:19
**marketing** [31] - 87:1, 87:5, 87:9, 87:11, 87:22, 87:25, 88:15, 88:19, 89:7, 90:1, 90:4, 90:9, 90:13, 90:17, 90:23, 91:6, 91:10, 108:1, 109:7, 109:13, 109:18, 111:20, 113:9, 182:5, 182:11, 182:14, 182:15, 183:17
**married** [1] - 17:20
**Marshall** [19] - 8:18, 9:1, 9:8, 9:16, 9:17, 9:22, 17:10, 17:12, 68:7, 72:4, 72:15, 104:12, 104:15, 162:7, 166:8, 168:16, 177:10
**Marshall's** [1] - 163:23
**marshals** [1] - 32:19
**Mart** [1] - 182:10
**Mary's** [1] - 100:13
**mass** [2] - 182:6, 183:19
**massive** [1] - 42:18
**Master's** [3] - 9:24, 10:2, 11:4
**match** [3] - 141:19, 141:20, 142:1
**matches** [5] - 31:15, 31:16, 140:19, 141:13, 141:14
**matching** [3] - 141:8, 141:17, 143:23
**math** [1] - 109:11
**Matter** [1] - 153:5
**matter** [7] - 45:5, 103:10, 103:13, 153:22, 156:24, 176:18, 191:18
**mayor** [30] - 12:19, 12:21, 57:19, 63:8, 67:23, 72:20, 74:11, 74:14, 75:6, 75:8,

75:12, 77:17, 77:23, 78:7, 81:1, 81:17, 83:5, 92:15, 92:20, 97:2, 103:17, 107:9, 108:14, 114:10, 180:7, 180:21, 183:24, 184:11, 184:23, 188:8
**Mayor** [165] - 7:7, 7:15, 7:18, 7:23, 7:25, 8:2, 8:5, 8:10, 9:22, 11:5, 12:1, 13:20, 15:5, 15:6, 15:11, 15:16, 15:23, 16:13, 16:17, 18:3, 18:4, 18:5, 18:6, 18:25, 19:1, 19:13, 19:16, 19:17, 19:20, 19:22, 19:25, 20:5, 20:6, 21:6, 21:14, 21:16, 21:17, 21:18, 21:25, 22:21, 23:9, 25:19, 26:3, 26:5, 27:9, 30:24, 33:16, 33:19, 35:2, 35:15, 36:13, 37:11, 37:13, 37:15, 37:19, 38:6, 39:6, 39:7, 39:21, 40:8, 40:14, 40:21, 41:21, 43:11, 44:3, 44:20, 45:1, 53:8, 56:9, 57:17, 58:5, 62:7, 71:10, 72:2, 73:12, 73:17, 76:1, 79:12, 79:25, 81:23, 82:15, 84:10, 84:15, 87:9, 88:7, 89:4, 91:8, 91:14, 93:20, 93:24, 96:5, 96:25, 98:9, 98:13, 99:18, 100:22, 100:23, 101:11, 103:6, 105:7, 109:5, 110:22, 111:7, 111:17, 111:18, 112:5, 113:4, 113:18, 113:19, 114:10, 119:12, 119:25, 121:17, 122:15, 124:9, 125:23, 127:25, 128:2, 128:4, 129:4, 131:13, 136:3, 136:14, 137:3, 137:18, 140:7, 141:5, 141:19, 144:4, 147:2, 149:21, 150:9, 153:1, 154:10, 155:18, 157:2, 158:5, 158:14, 160:4, 161:17,

161:21, 163:12, 164:11, 166:1, 169:1, 170:10, 171:3, 172:16, 172:22, 173:21, 174:4, 175:9, 176:1, 177:5, 178:8, 179:7, 180:6, 180:15, 182:4, 182:23, 183:16, 190:2
**Mayor's** [20] - 33:20, 34:25, 35:14, 45:15, 58:10, 58:12, 62:15, 62:16, 62:25, 63:3, 63:8, 65:17, 66:16, 67:20, 69:8, 69:12, 71:6, 137:9, 137:21, 138:15
**mayor's** [2] - 62:16, 110:15
**mayoring** [1] - 40:24
**Mayors** [2] - 73:14, 73:16
**mayors** [4] - 34:24, 50:20, 73:12, 73:13
**Mayors'** [6] - 120:7, 120:9, 120:19, 121:20, 160:6, 160:10
**Mayorship** [1] - 38:23
**MC-WV-02243** [1] - 172:23
**MC-WV-2243** [1] - 170:13
**MCCLURE** [1] - 6:3
**MCGINNESS** [1] - 4:2
**McKesson** [3] - 5:8, 103:2, 182:7
**mean** [11] - 19:21, 32:8, 54:19, 72:2, 74:18, 110:4, 121:4, 121:6, 165:21, 175:6, 178:5
**Meaning** [1] - 154:15
**meaning** [1] - 165:10
**means** [7] - 24:14, 43:17, 87:4, 87:5, 123:3, 159:9, 186:23
**meant** [2] - 96:11, 96:16
**meantime** [1] - 46:12
**measure** [3] - 50:16, 76:12, 132:4
**measures** [1] - 124:25
**mechanical** [1] - 6:19
**media** [3] - 112:1, 112:20, 113:4
**Medicaid** [3] - 117:6, 117:10, 168:10
**medical** [4] - 62:4,

63:23, 92:6, 148:2
**Medical** [3] - 65:3, 104:12, 104:15
**medically** [2] - 166:2, 167:11
**Medicare** [4] - 114:24, 115:8, 115:15, 116:19
**medication** [3] - 79:15, 167:12, 167:23
**medications** [6] - 78:21, 78:25, 79:5, 95:2, 157:15, 158:7
**Medicine** [1] - 72:15
**meet** [11] - 10:24, 31:1, 37:18, 49:18, 50:22, 56:3, 58:20, 59:10, 60:19, 74:22, 124:1
**meeting** [7] - 19:1, 26:18, 27:4, 51:20, 58:21, 59:2, 60:22
**meetings** [6] - 21:23, 40:23, 41:5, 50:21, 71:18
**member** [11] - 16:8, 17:8, 17:11, 17:17, 17:18, 20:17, 20:23, 59:13, 73:14, 120:17, 153:2
**members** [15] - 12:16, 22:21, 34:2, 36:5, 36:21, 36:22, 37:6, 52:17, 55:12, 56:19, 58:11, 58:12, 83:18, 83:23, 137:20
**memory** [2] - 82:21, 142:5
**mental** [3] - 124:2, 126:19, 140:12
**mention** [1] - 15:21
**mentioned** [10] - 9:16, 21:25, 24:11, 69:23, 72:4, 83:23, 112:1, 124:14, 145:3, 161:10
**mentioning** [1] - 61:25
**Mercer** [3] - 8:22, 9:4, 73:7
**mercifully** [1] - 190:2
**message** [10] - 22:18, 23:2, 34:4, 34:5, 48:7, 54:16, 105:24, 144:10, 144:13, 145:12
**met** [5] - 37:24, 39:11, 39:22, 50:20, 156:4
**metro** [1] - 124:16
**metropolitan** [1] -

124:24
**MICHAEL** [2] - 2:12, 3:9
**Michael** [1] - 105:2
**Michigan** [2] - 14:25, 129:25
**mid** [1] - 34:9
**middle** [7] - 8:9, 16:14, 25:1, 27:5, 28:10, 49:17, 138:3
**midwest** [1] - 14:23
**might** [20] - 16:7, 31:16, 42:15, 52:16, 52:22, 54:19, 57:5, 58:19, 59:23, 108:23, 119:6, 141:7, 151:12, 152:14, 165:1, 171:17, 173:21, 176:22
**Mike** [3] - 49:15, 49:21, 130:9
**Mildred** [1] - 100:15
**MILDRED** [1] - 3:3
**milestones** [2] - 18:10, 19:13
**million** [26] - 27:3, 28:17, 31:22, 131:17, 131:20, 131:22, 132:2, 132:3, 132:8, 134:24, 134:25, 135:14, 137:6, 138:18, 140:23, 141:16, 145:15, 145:17, 145:18, 145:19, 146:5, 147:5, 147:8, 147:9, 189:1, 189:5
**millions** [1] - 147:14
**mind** [13] - 23:8, 40:3, 40:15, 41:18, 45:8, 45:15, 66:8, 106:3, 125:14, 125:21, 135:7, 135:10, 152:16
**mine** [1] - 93:25
**minister** [1] - 10:24
**ministers** [2] - 10:19, 51:3
**ministries** [1] - 56:12
**ministry** [1] - 10:21
**Ministry** [1] - 10:11
**minor** [1] - 99:7
**minute** [8] - 42:20, 44:17, 93:22, 107:21, 135:24, 151:3, 164:4, 180:17
**minutes** [1] - 57:16
**miserable** [1] - 177:4

**misinformation** [1] - 100:3
**misleading** [1] - 112:8
**misrepresentation** [5] - 89:21, 89:22, 90:13, 90:17, 90:24
**misrepresentations** [6] - 89:8, 89:24, 90:4, 90:9, 90:24, 91:4
**misrepresented** [1] - 98:21
**missed** [1] - 21:4
**missing** [1] - 74:10
**mission** [5] - 32:1, 33:1, 33:20, 61:19
**misstatement** [1] - 185:7
**misstates** [1] - 186:7
**mistaken** [2] - 142:4, 170:22
**misuse** [3] - 145:21, 146:5, 147:5
**Mitchell** [2] - 2:10, 100:15
**mix** [1] - 17:23
**model** [3] - 160:20, 160:22, 160:24
**modernized** [1] - 123:9
**modifications** [1] - 99:8
**Mom** [2] - 8:21, 9:1
**moment** [4] - 88:17, 95:10, 128:9, 185:4
**Monday** [1] - 26:18
**money** [23] - 23:20, 27:20, 28:20, 31:1, 76:13, 130:16, 130:22, 132:19, 132:20, 133:5, 134:7, 135:15, 141:8, 141:11, 141:17, 142:19, 143:2, 145:20, 147:9, 147:11, 147:15, 166:23
**month** [1] - 50:22
**Month** [1] - 53:23
**monthly** [1] - 160:22
**months** [7] - 8:4, 11:25, 12:5, 58:23, 109:14, 175:25
**Moore** [1] - 12:12
**Morgan** [1] - 36:17
**morning** [18] - 7:6, 7:15, 7:18, 7:19, 26:17, 42:12, 42:20, 47:4, 47:10, 53:2, 58:7, 77:23, 137:10,

137:16, 137:19, 169:12, 190:12, 191:1
**Morris** [1] - 6:15
**most** [25] - 16:17, 35:4, 35:5, 36:24, 52:1, 65:11, 75:6, 75:10, 75:11, 94:7, 94:11, 94:17, 94:18, 95:11, 95:13, 101:4, 101:11, 124:18, 127:20, 129:12, 130:11, 135:12, 181:7
**mother** [2] - 8:20, 59:19
**motion** [14] - 81:13, 81:16, 102:20, 139:11, 146:8, 146:13, 146:15, 146:19, 146:21, 146:24, 156:2, 187:22, 187:25
**motions** [2] - 149:11, 191:7
**Motley** [5] - 4:3, 4:5, 4:8, 4:11, 4:14
**MOUGEY** [1] - 2:9
**Mountain** [2] - 72:16, 166:8
**move** [27] - 14:10, 27:20, 33:5, 48:22, 66:6, 66:17, 68:3, 71:13, 76:3, 76:10, 77:6, 81:2, 93:6, 94:3, 94:5, 94:22, 95:6, 97:25, 99:17, 114:3, 122:9, 124:9, 129:3, 159:16, 162:23, 171:20, 178:13
**moved** [17] - 8:19, 8:24, 8:25, 9:7, 10:9, 14:17, 15:1, 16:20, 16:21, 26:3, 26:8, 54:12, 102:17, 138:12, 155:19
**moving** [5] - 14:7, 55:2, 69:20, 70:1, 145:6
**mowing** [1] - 35:24
**MR** [161] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:14, 4:5, 4:22, 5:9, 5:10, 5:13, 6:4, 18:21, 19:11, 39:20, 40:6, 40:18, 44:16, 44:18, 45:4, 45:10, 77:20, 77:22, 80:25, 81:4, 81:7, 81:15,

81:22, 82:23, 83:4, 92:17, 92:19, 93:6, 93:11, 93:13, 93:19, 97:25, 98:4, 98:8, 103:9, 103:16, 107:7, 107:8, 108:6, 108:9, 108:11, 108:21, 108:25, 109:4, 110:4, 110:12, 110:19, 110:21, 110:24, 111:15, 111:16, 113:2, 113:3, 114:3, 114:8, 119:6, 119:11, 119:23, 119:24, 121:15, 121:16, 122:9, 122:14, 135:20, 136:2, 136:10, 136:13, 136:23, 137:2, 137:15, 137:17, 139:9, 140:2, 140:6, 143:18, 144:3, 146:7, 146:16, 146:18, 146:19, 146:22, 147:1, 149:18, 149:24, 150:5, 149:24, 150:5, 150:8, 155:13, 155:17, 156:9, 157:24, 158:4, 160:1, 160:3, 161:4, 161:12, 161:16, 161:19, 161:20, 162:25, 163:1, 163:6, 164:7, 164:10, 165:13, 165:21, 165:25, 170:14, 170:20, 171:1, 171:7, 171:19, 171:21, 172:3, 172:6, 172:10, 172:15, 173:3, 173:12, 173:18, 173:19, 174:24, 175:8, 177:21, 177:22, 178:15, 178:20, 179:1, 179:3, 184:15, 184:18, 184:22, 185:3, 185:6, 185:13, 186:10, 186:11, 186:16, 186:23, 187:10, 188:4, 188:7, 189:8, 189:10, 189:12, 189:15, 189:17, 189:23, 190:4, 190:5, 190:10,

190:19, 190:23, 191:4, 191:9
**MS** [73] - 3:3, 3:6, 4:2, 4:8, 4:11, 4:13, 4:17, 4:18, 4:20, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 7:6, 7:17, 18:11, 18:13, 19:8, 19:12, 19:15, 38:24, 39:5, 40:20, 45:18, 47:1, 55:8, 55:10, 57:15, 57:21, 57:25, 58:3, 77:17, 93:9, 98:6, 114:6, 122:12, 135:25, 155:4, 155:6, 156:6, 157:21, 170:16, 172:7, 177:25, 178:22, 179:6, 179:19, 179:25, 180:2, 180:5, 180:12, 180:14, 180:19, 180:20, 180:22, 180:25, 181:15, 181:23, 181:24, 182:25, 183:7, 183:11, 183:14, 183:15, 183:21, 183:23, 184:11, 186:6, 187:21, 188:3, 189:7
**Mt** [3] - 4:4, 4:12, 4:15
**multi** [1] - 131:17
**multi-million-dollar** [1] - 131:17
**multiple** [2] - 165:6, 165:9
**municipal** [1] - 23:25
**Municipal** [4] - 19:23, 19:24, 20:20, 36:16
**municipalities** [2] - 23:19, 102:2
**municipality** [1] - 187:2
**museum** [1] - 26:22
**Muslim** [1] - 53:3
**must** [3] - 77:6, 116:6, 157:3
**muster** [1] - 41:20

## N

**name** [12] - 7:9, 7:25, 36:16, 51:15, 51:16, 54:15, 62:16, 73:8, 86:7, 91:25, 118:2, 118:4
**named** [6] - 11:9, 19:22, 19:25, 83:13, 83:25, 183:18

**names** [1] - 186:21
**nation** [5] - 35:5, 35:6, 73:2, 75:24, 124:16
**National** [4] - 49:12, 49:16, 53:22, 72:25, 73:4, 106:21, 120:12, 120:13, 120:20, 121:24, 122:22, 125:24, 126:11
**national** [1] - 106:20
**naturally** [2] - 20:7, 22:10
**nature** [3] - 50:16, 51:15, 52:3
**near** [1] - 42:8
**nearby** [1] - 42:17
**nearly** [3] - 123:8, 124:23, 151:17
**necessarily** [3] - 34:17, 43:4, 143:22
**necessary** [2] - 21:24, 76:10
**necessity** [1] - 100:5
**need** [27] - 7:20, 15:7, 37:7, 43:4, 48:13, 53:8, 57:13, 63:22, 69:21, 71:15, 71:17, 71:21, 73:8, 76:2, 77:9, 80:11, 81:2, 81:18, 82:1, 110:11, 135:23, 143:6, 159:16, 178:9, 178:10
**needed** [14] - 28:15, 29:17, 33:9, 41:19, 42:5, 55:3, 56:6, 59:9, 63:9, 64:3, 64:22, 68:2, 117:10
**needless** [2] - 28:18, 31:5
**needs** [10] - 31:1, 35:23, 44:8, 49:5, 63:7, 63:15, 110:5, 124:1, 159:6
**negative** [1] - 163:14
**negotiating** [1] - 29:19
**neighborhood** [7] - 34:10, 34:11, 34:19, 35:17, 44:4, 63:14, 134:23
**neighborhoods** [7] - 22:11, 34:12, 34:13, 35:16, 46:12, 46:17, 123:24
**neighboring** [1] - 48:10
**network** [3] - 70:23, 166:9, 168:20
**Network** [2] - 66:19,

72:16
**never** [25] - 15:12, 17:3, 23:12, 42:16, 42:17, 61:18, 61:19, 66:5, 75:12, 132:18, 143:24, 145:9, 147:17, 147:19, 148:4, 148:8, 148:12, 151:14, 153:16, 168:6, 168:22
**new** [8] - 12:21, 26:22, 42:6, 90:25, 111:19, 138:20, 141:5, 170:24
**New** [4] - 3:5, 3:8, 10:15, 14:22
**news** [1] - 176:20
**newspaper** [1] - 128:13
**Newspaper** [2] - 107:23, 109:23
**next** [25] - 17:22, 26:6, 42:12, 45:18, 48:19, 58:2, 58:4, 60:8, 83:2, 83:16, 85:22, 87:9, 91:9, 96:4, 99:20, 115:25, 122:17, 123:23, 125:4, 138:18, 158:2, 171:10, 178:9
**nice** [1] - 17:23
**NICHOLAS** [2] - 6:11, 178:20
**Nick** [1] - 49:14
**night** [6] - 15:18, 18:23, 26:18, 43:8, 53:2, 176:20
**nine** [3] - 35:19, 89:8, 188:25
**Ninth** [2] - 4:9, 42:9
**NLC** [1] - 121:9
**nobody** [3] - 43:6, 71:8, 78:12
**nominated** [1] - 15:11
**non** [12] - 53:15, 81:3, 111:6, 114:18, 114:25, 115:17, 116:15, 116:20, 117:1, 141:14, 141:15, 141:25
**non-denominational** [1] - 53:15
**non-hearsay** [1] - 111:6
**non-opioid** [7] - 114:18, 114:25, 115:17, 116:15, 116:20, 117:1, 141:15

**non-responsive** [1] - 81:3
**non-salary** [2] - 141:14, 141:25
**None** [1] - 168:7
**none** [2] - 115:4, 168:4
**nonetheless** [3] - 25:22, 91:11, 151:13
**Noramco** [1] - 86:18
**normally** [1] - 21:23
**Norway** [1] - 26:25
**nose** [2] - 48:14, 48:15
**note** [4] - 18:21, 19:3, 103:10, 155:13
**nothing** [9] - 46:11, 77:13, 85:4, 85:5, 134:3, 140:14, 140:16, 152:16, 174:21
**notice** [7] - 55:18, 76:7, 98:2, 103:12, 187:13, 187:17, 187:23
**noticed** [2] - 78:2, 82:24
**noticing** [1] - 174:23
**notwithstanding** [2] - 39:21, 153:15
**novel** [2] - 34:23, 35:17
**November** [3] - 22:25, 92:21, 138:10
**nub** [1] - 26:15
**Nuisance** [1] - 180:24
**nuisance** [15] - 149:13, 149:16, 149:18, 150:25, 151:7, 151:15, 154:19, 155:22, 156:13, 180:10, 182:2, 186:4, 187:16, 187:20
**nuisances** [6] - 148:25, 149:2, 150:2, 150:15, 150:21, 151:5
**Nuisances** [1] - 150:18
**Number** [1] - 170:22
**number** [25] - 23:12, 27:19, 66:20, 78:24, 79:1, 80:6, 80:7, 83:25, 89:10, 89:14, 89:18, 90:5, 90:10, 90:14, 90:18, 98:12, 103:18, 105:5, 135:7, 141:11, 148:9, 150:15, 165:3, 175:17,

187:23
**numbered** [1] - 98:11
**numbers** [1] - 174:3
**numerous** [1] - 160:11
**nurse** [1] - 59:12
**NW** [6] - 4:6, 4:9, 4:19, 4:21, 5:5, 5:12
**NY** [1] - 3:5
**NYU** [1] - 74:4

## O

**O'Connell** [4] - 69:2, 162:12, 162:14, 167:15
**O'Neill** [1] - 74:5
**obese** [2] - 35:5, 124:24
**obesity** [1] - 125:5
**object** [10] - 18:24, 39:20, 44:18, 81:5, 172:7, 174:24, 179:19, 181:15, 185:6, 186:16
**objected** [1] - 155:15
**objection** [39] - 19:4, 19:5, 38:24, 39:3, 40:12, 45:9, 45:22, 93:8, 98:5, 109:1, 110:5, 111:14, 114:5, 114:6, 119:9, 122:11, 139:10, 139:22, 140:1, 149:11, 155:5, 155:11, 155:14, 161:5, 165:13, 168:3, 175:3, 175:7, 178:5, 180:12, 182:25, 183:13, 183:21, 186:6, 186:9, 189:7, 189:11, 189:15
**Objection** [2] - 155:4, 156:6, 161:18, 177:21
**objections** [1] - 170:21
**observation** [2] - 44:20, 130:24
**observe** [4] - 25:23, 37:12, 42:7, 44:11
**observed** [2] - 59:12, 74:15
**observing** [2] - 38:13, 46:11
**obtain** [2] - 31:2, 158:12
**obviously** [3] - 42:23, 75:7, 155:9
**occasion** [2] - 59:16,

63:5
**occupation** [2] - 13:20, 23:13
**occur** [1] - 140:19
**occurred** [1] - 59:21
**occurring** [9] - 24:20, 27:2, 43:25, 49:3, 49:4, 49:13, 131:1, 131:6, 153:11
**October** [1] - 49:18
**ODCP** [2] - 170:11, 174:21
**oddly** [1] - 60:5
**OF** [2] - 1:1, 1:4
**offense** [1] - 54:19
**offenses** [1] - 148:21
**offensive** [1] - 53:17
**offer** [4] - 30:16, 30:18, 50:24, 52:8
**offered** [11] - 8:18, 12:8, 45:11, 74:16, 93:13, 108:10, 108:11, 108:12, 108:18, 111:3, 111:5
**offering** [5] - 45:5, 45:14, 136:7, 177:22
**office** [14] - 28:4, 35:1, 35:14, 42:1, 60:9, 62:10, 92:21, 109:22, 135:13, 137:23, 138:8, 138:22, 151:19, 169:22
**Office** [41] - 49:16, 58:10, 58:12, 59:3, 59:25, 60:17, 62:15, 62:16, 62:17, 62:25, 63:3, 63:8, 63:16, 65:18, 66:16, 67:15, 67:18, 67:20, 67:22, 69:8, 69:12, 69:17, 69:19, 71:6, 104:15, 104:18, 104:19, 106:21, 137:9, 137:21, 138:16, 169:13, 169:15, 169:17, 170:8, 172:12, 172:17, 173:25, 177:13
**officers** [11] - 29:8, 29:11, 30:8, 30:9, 30:17, 32:23, 43:6, 48:23, 52:12, 139:3
**offices** [1] - 62:9
**official** [9] - 40:21, 40:23, 41:1, 41:4, 45:20, 45:21, 62:14, 153:22
**Official** [2] - 191:15, 191:16

**officially** [1] - 19:16
**officials** [1] - 50:21
**often** [4] - 21:24, 87:18, 98:23, 182:16
**oftentimes** [4] - 25:16, 62:20, 65:23, 73:23
**Oftentimes** [1] - 31:15
**Ohio** [5] - 14:25, 15:3, 48:11, 60:6, 167:20
**Old** [1] - 10:14
**old** [5] - 8:14, 12:10, 16:21, 65:10, 117:18
**older** [1] - 55:20
**omission** [1] - 141:9
**on-going** [1] - 39:13
**on-line** [2] - 169:23, 172:18
**once** [12] - 26:8, 41:12, 58:15, 89:21, 117:19, 135:5, 142:2, 143:16, 148:14, 152:1, 175:21, 182:5
**one** [87] - 14:12, 15:21, 16:1, 17:22, 27:4, 30:16, 31:4, 34:4, 34:23, 36:15, 37:3, 38:16, 41:24, 42:13, 42:14, 44:10, 46:23, 47:4, 47:10, 47:12, 51:5, 51:22, 52:23, 53:23, 55:22, 56:14, 59:8, 63:5, 63:21, 64:9, 64:20, 68:8, 69:2, 69:18, 71:3, 73:7, 73:11, 74:18, 74:22, 75:15, 89:10, 89:24, 90:8, 91:9, 94:6, 94:11, 94:17, 95:10, 95:11, 95:12, 104:1, 105:8, 105:24, 108:5, 108:19, 112:25, 120:4, 125:13, 125:15, 129:24, 130:8, 135:1, 135:7, 150:3, 152:17, 154:3, 158:2, 159:24, 166:9, 166:19, 167:3, 169:21, 170:22, 171:2, 172:22, 174:12, 183:11, 185:17, 188:4, 188:5, 188:19, 190:20, 190:23, 190:24
**One** [9] - 5:11, 14:3, 14:5, 14:18, 14:21, 31:5, 36:24, 138:1

**one-half** [1] - 129:24
**one-third** [1] - 129:24
**ones** [2] - 23:13, 183:5
**ongoing** [3] - 69:25, 76:24, 102:14
**open** [2] - 34:24, 183:8
**opening** [1] - 78:10
**operated** [1] - 96:6
**operating** [2] - 46:6, 144:14
**operation** [1] - 101:5
**operations** [1] - 141:1
**opiate** [2] - 52:11, 60:25
**Opiate** [1] - 64:24
**opinion** [2] - 152:25, 153:12
**Opioid** [4] - 73:4, 180:24
**opioid** [119] - 39:18, 41:9, 41:10, 55:25, 67:4, 67:10, 72:8, 76:3, 76:24, 77:5, 77:15, 77:16, 78:13, 78:21, 78:24, 81:9, 85:6, 85:9, 85:12, 85:17, 87:16, 89:1, 89:9, 90:5, 90:10, 90:14, 91:17, 92:10, 94:6, 94:23, 95:7, 95:13, 96:6, 96:11, 96:14, 96:20, 98:10, 98:18, 99:16, 102:9, 102:24, 108:1, 109:6, 109:13, 113:17, 114:12, 114:18, 114:25, 115:17, 116:6, 116:15, 116:20, 116:21, 116:24, 117:1, 117:4, 117:11, 120:4, 120:11, 125:10, 125:16, 126:1, 126:17, 127:6, 127:11, 127:22, 130:25, 131:2, 131:3, 131:10, 132:12, 132:15, 132:17, 132:18, 132:19, 134:3, 134:7, 140:15, 140:17, 141:15, 142:11, 142:14, 142:17, 142:20, 142:24, 143:3, 143:11, 143:15, 144:25, 145:5, 146:11, 146:12,

148:5, 155:21, 157:15, 158:5, 158:7, 158:15, 159:3, 159:5, 160:12, 160:21, 162:15, 162:21, 174:6, 175:1, 176:11, 181:8, 181:9, 182:2, 184:2, 184:6, 184:9, 188:11, 188:22
**Opioids** [5] - 104:8, 107:14, 120:7, 120:19, 121:20
**opioids** [48] - 75:3, 78:17, 79:21, 80:3, 80:12, 81:2, 82:1, 82:5, 82:13, 84:21, 87:17, 88:1, 88:21, 88:22, 89:16, 90:19, 91:1, 91:14, 95:21, 96:2, 96:7, 96:16, 96:18, 98:21, 98:23, 100:4, 115:5, 115:16, 140:21, 142:2, 147:18, 148:1, 148:9, 148:13, 150:3, 151:15, 153:17, 153:24, 156:13, 161:24, 174:8, 174:22, 182:7, 182:16, 182:18, 183:20
**opponent** [4] - 93:13, 98:1, 114:4, 122:10
**opportunities** [1] - 122:1
**opportunity** [10] - 17:5, 69:22, 72:11, 75:18, 123:4, 171:4, 179:20, 179:22, 181:16
**opposed** [1] - 159:23
**opposing** [1] - 108:19
**option** [1] - 115:17
**options** [1] - 114:18
**order** [14] - 25:2, 27:21, 39:8, 58:6, 70:4, 71:12, 76:3, 78:22, 79:9, 84:22, 91:13, 117:11, 149:12, 149:17
**ordered** [3] - 79:1, 79:4, 80:21
**orders** [2] - 182:16, 182:19
**ordinance** [13] - 24:7, 149:13, 149:15, 151:14, 152:7,

153:3, 153:7, 153:9, 153:17, 154:13, 155:20, 156:11
**Ordinances** [6] - 148:19, 148:21, 148:24, 149:3, 150:10, 152:9
**ordinances** [4] - 150:12, 151:23, 152:21, 153:15
**Organization** [1] - 11:14
**organization** [4] - 91:16, 92:2, 92:5, 120:14
**organizations** [11] - 17:9, 32:3, 48:25, 66:21, 72:22, 72:24, 98:16, 101:2, 101:5, 101:8
**Organizations** [2] - 91:21, 97:19
**oriented** [1] - 12:18
**Origin** [1] - 180:24
**original** [2] - 79:9, 137:20
**originally** [3] - 117:17, 117:22, 132:20
**origins** [1] - 182:2
**Orleans** [1] - 3:8
**others'** [1] - 41:4
**otherwise** [1] - 26:11
**ought** [4] - 34:16, 34:17, 60:16, 148:1
**ourselves** [4] - 37:6, 47:22, 47:23, 176:25
**outcome** [3] - 66:11, 169:7
**outcomes** [2] - 122:25, 124:2
**outlining** [1] - 23:5
**outlook** [1] - 26:2
**outlying** [1] - 23:5
**outpatient** [2] - 114:25, 115:16
**outreach** [5] - 33:17, 33:18, 68:2, 72:21, 72:22
**outset** [1] - 28:10
**outside** [3] - 60:6, 155:10, 171:24
**over-prescribing** [1] - 100:4
**overall** [1] - 33:1
**overcoming** [1] - 74:15
**overdose** [12] - 55:25, 56:2, 169:22, 170:8, 174:4, 175:10, 175:17, 175:22,

175:23, 175:24,
176:14, 176:15
**Overdose** [1] - 169:9
**overdoses** [8] - 59:22,
76:18, 76:19, 76:21,
173:1, 174:1,
175:24, 177:19
**Overnight** [1] - 43:10
**overnight** [2] - 44:12,
44:19
**overrule** [6] - 45:9,
45:22, 81:12,
111:14, 140:1,
183:13
**overruled** [4] - 161:18,
180:18, 181:20,
183:2
**oversee** [3] - 22:2,
38:7, 114:11
**overseeing** [1] - 39:9
**oversight** [1] - 22:14
**overspend** [1] - 24:23
**overspending** [1] -
28:20
**overstep** [1] - 38:2
**oversupply** [1] -
182:21
**overview** [1] - 173:1
**overwhelmed** [1] -
60:2
**own** [16] - 27:17,
34:20, 34:21, 51:16,
54:15, 56:12, 59:3,
67:17, 69:20, 134:6,
139:15, 157:7,
179:20, 186:21
**owners** [1] - 84:23
**owns** [1] - 84:23
**oxycodone** [1] - 189:1
**Oxycontin** [1] - 90:25

## P

**P-1200** [1] - 2:7
**p.m** [3] - 119:18,
178:12, 191:11
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**package** [1] - 14:12
**packaging** [1] -
129:23
**page** [15] - 84:5, 87:9,
88:14, 97:9, 99:20,
114:15, 115:3,
122:15, 122:17,
123:15, 136:19,
154:23, 163:7,
184:20
**Page** [19] - 84:11,
84:15, 88:12, 89:4,

93:24, 94:1, 98:12,
99:18, 99:19,
100:22, 101:13,
113:25, 123:15,
160:1, 162:21,
163:3, 163:4, 163:9
**paid** [4] - 116:19,
116:24, 117:2, 117:3
**pain** [23] - 78:21,
78:25, 79:15, 82:9,
87:17, 88:20, 90:18,
90:25, 94:24, 95:1,
95:2, 95:22, 96:6,
96:15, 98:19, 98:22,
99:22, 102:10,
106:3, 114:18,
154:20, 157:15,
182:18
**pandemic** [1] - 176:14
**Papantonio** [1] - 2:10
**papers** [1] - 10:19
**Par** [1] - 86:14
**PAR** [1] - 86:14
**Paragraph** [14] -
84:12, 84:16, 85:22,
87:10, 88:13, 89:4,
91:8, 98:12, 99:18,
100:23, 101:13,
180:21, 181:4, 182:1
**paragraph** [24] -
84:18, 85:22, 86:7,
87:11, 88:15, 89:7,
94:2, 98:12, 108:4,
109:9, 114:15,
115:8, 115:11,
115:25, 122:16,
123:20, 124:10,
125:7, 129:19,
130:8, 163:12,
181:4, 188:13,
188:16
**paragraphs** [2] -
179:18, 180:16
**parallel** [1] - 131:1
**Pardon** [1] - 25:14
**parens** [2] - 186:19,
186:24
**parentheses** [3] -
86:25, 98:17, 111:23
**parenthetically** [1] -
110:13
**parents** [3] - 17:21,
56:11, 75:16
**Park** [1] - 100:17
**parking** [1] - 21:5
**part** [34] - 10:10, 13:6,
14:25, 15:7, 21:2,
22:14, 25:25, 26:22,
39:6, 40:12, 48:19,
49:21, 53:5, 56:18,

59:7, 61:10, 62:24,
63:20, 67:20, 73:3,
74:4, 86:3, 94:14,
95:9, 98:15, 99:4,
120:23, 142:11,
155:20, 168:18,
168:20, 175:6,
183:19, 190:21
**part-time** [1] - 13:6
**participant** [1] -
103:18
**participate** [3] - 54:1,
73:20, 120:6
**participating** [4] -
9:12, 54:9, 67:9,
122:4
**participation** [1] -
121:20
**particular** [3] - 127:23,
148:24, 180:1
**particularly** [8] -
32:14, 37:3, 59:21,
70:13, 127:17,
141:2, 151:19,
183:18
**parties** [5] - 50:2,
94:7, 94:12, 95:11,
95:13
**partner** [7] - 32:2,
32:4, 32:18, 33:10,
67:10, 71:22, 71:23
**partnered** [3] - 31:10,
32:16, 71:6
**partnering** [1] - 64:16
**partners** [4] - 46:15,
46:19, 64:7, 166:7
**partnership** [3] - 21:1,
32:6, 41:15
**partnerships** [1] -
50:11, 50:13, 50:17,
57:10, 62:8, 66:9,
66:10, 67:12, 69:15,
71:12
**parts** [1] - 25:5
**party** [12] - 55:5,
93:13, 93:14, 98:1,
108:19, 111:3,
111:4, 112:25,
114:4, 122:10, 183:8
**passage** [1] - 163:18
**passed** [5] - 59:17,
132:24, 151:14,
153:24, 185:15
**passes** [1] - 132:23
**passing** [1] - 151:12
**passion** [4] - 53:8,
54:23, 69:4
**passionately** [1] -
144:23
**past** [4] - 17:13, 84:11,

115:3, 165:22
**pastor** [8] - 53:13,
53:14, 53:15, 64:20
**pastoral** [1] - 52:25
**pastors** [8] - 50:19,
51:20, 52:7, 52:15,
53:7, 53:12, 54:3,
64:17
**path** [2] - 12:24,
151:21
**patience** [2] - 165:19,
189:17
**patient** [2] - 79:16,
189:24
**patients** [7] - 80:4,
88:22, 91:11,
114:17, 115:4,
115:18, 167:9
**patients'** [1] - 95:22
**patriae** [2] - 186:19,
186:25
**PAUL** [2] - 2:3, 5:9
**Pause** [2] - 93:17,
164:25
**paved** [1] - 144:17
**paving** [1] - 24:10
**pay** [11] - 21:2, 24:5,
24:8, 24:9, 32:11,
139:20, 139:21,
146:11, 146:12
**paying** [2] - 66:4,
180:9
**payment** [1] - 109:18
**payments** [7] - 108:1,
109:7, 112:17,
113:9, 113:13,
116:13, 117:1
**pays** [2] - 24:3, 115:19
**peaked** [1] - 169:9
**PEARL** [1] - 3:6
**pedaling** [1] - 52:13
**penalty** [1] - 22:22
**pending** [2] - 102:20,
146:13, 146:14
**Pennsylvania** [2] -
14:25, 15:3
**penny** [2] - 26:6,
140:15
**Pensacola** [1] - 2:11
**pension** [1] - 30:15
**pensions** [3] - 29:16,
30:3, 144:18
**Pentecostal** [1] -
53:13
**People** [2] - 51:8,
104:8
**people** [34] - 10:25,
19:1, 25:19, 44:2,
47:17, 49:7, 49:20,
54:9, 62:20, 68:25,

74:15, 79:22, 82:9,
83:25, 91:24,
103:18, 104:10,
109:17, 123:8,
123:16, 137:23,
138:11, 145:2,
149:4, 165:10,
166:17, 186:4,
186:13, 186:14,
186:19, 187:3,
187:15, 187:19,
188:21
**people's** [1] - 56:10
**per** [5] - 24:1, 109:13,
111:22, 149:13
**perceived** [1] - 176:22
**percent** [9] - 31:16,
76:19, 123:16,
123:25, 131:22,
133:6, 133:23,
175:11, 175:19
**percentage** [2] - 25:4,
175:12
**perfect** [1] - 57:15
**perfectly** [1] - 125:15
**perform** [1] - 39:8
**perilous** [1] - 28:14
**period** [8] - 31:14,
48:3, 48:5, 52:18,
111:22, 128:25,
174:19, 176:2
**permanent** [1] - 58:24
**permissible** [2] - 40:5,
171:12
**permitted** [1] - 23:22,
152:5
**perpetual** [1] - 76:7
**perplexing** [1] - 43:25
**persist** [1] - 102:1
**person** [3] - 16:22,
21:12, 57:22
**personal** [7] - 44:20,
45:1, 51:25, 81:6,
129:22, 166:12,
183:1
**personally** [3] - 22:22,
59:12, 93:3
**perspective** [2] -
144:15, 176:18
**persuade** [1] - 116:5
**PETER** [1] - 2:9
**Petrany** [2] - 162:10,
162:14
**Pharma** [9] - 83:14,
83:16, 83:20, 84:3,
85:7, 85:9, 98:17,
104:7, 185:1
**pharma** [1] - 105:14
**pharmaceutical** [5] -
84:6, 86:8, 87:5,

126:25, 188:25
**Pharmaceutical** [1] - 86:14
**pharmaceuticals** [1] - 127:5
**Pharmaceuticals** [4] - 83:19, 86:10, 86:12, 86:20
**pharmacies** [5] - 148:9, 148:12, 184:25, 185:8, 185:9
**pharmacist** [1] - 79:4
**pharmacists** [13] - 78:22, 79:2, 79:7, 79:10, 79:13, 79:14, 79:20, 79:23, 79:25, 80:16, 184:25, 185:8
**pharmacy** [1] - 80:16
**pharmacy's** [1] - 78:18
**Philadelphia** [2] - 6:6, 6:13
**philanthropic** [1] - 31:18
**philosophy** [1] - 28:19
**phone** [1] - 112:2
**phonetic** [1] - 18:2
**photo** [1] - 137:18
**photograph** [1] - 137:20
**photographs** [1] - 55:11
**phrase** [1] - 40:9
**physical** [4] - 124:2, 126:16, 140:11, 141:21
**physician** [7] - 63:13, 80:11, 81:1, 81:25, 104:14, 112:17, 113:9
**Physicians** [1] - 167:20
**physicians** [9] - 80:4, 80:8, 80:16, 91:11, 95:18, 95:25, 113:14, 114:17, 148:1
**picking** [1] - 22:7
**picture** [9] - 21:7, 26:2, 49:21, 55:17, 57:25, 58:9, 74:23, 74:25, 128:24
**pictures** [1] - 18:25
**piece** [1] - 113:16
**piecemeal** [1] - 77:8
**PIFKO** [1] - 3:14
**pill** [1] - 131:3
**pills** [15] - 39:18, 41:9, 41:11, 55:25, 56:2, 80:6, 80:17, 130:25,

131:2, 131:11, 154:20, 189:1, 189:5, 189:6, 189:13
**Pittsburgh** [1] - 13:10
**place** [15] - 15:22, 57:14, 58:24, 64:3, 67:24, 68:4, 77:4, 125:21, 139:10, 151:11, 156:12, 158:15, 158:20, 159:1, 160:11
**placed** [1] - 147:25
**plain** [2] - 68:25
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**Plaintiffs** [2] - 7:6, 191:19
**plaintiffs** [7] - 97:8, 179:20, 179:22, 181:16, 185:9, 185:19, 187:22
**plaintiffs'** [4] - 171:2, 181:18, 182:20, 183:9
**PLAINTIFFS'** [1] - 7:13
**Plan** [5] - 68:14, 69:23, 69:25, 70:7, 70:20
**plan** [11] - 23:5, 29:20, 29:25, 61:13, 61:21, 61:23, 68:6, 77:3, 84:19, 145:24, 177:23
**planning** [2] - 20:8, 21:3
**plans** [4] - 29:19, 60:20, 67:24, 77:4
**play** [2] - 9:5, 147:24
**played** [5] - 9:10, 9:13, 94:23
**Pleasant** [3] - 4:4, 4:12, 4:15
**plenty** [1] - 83:1
**plural** [1] - 185:20
**plus** [2] - 25:21, 151:17
**point** [27] - 12:21, 12:24, 13:1, 15:5, 27:18, 30:21, 41:13, 41:24, 47:12, 47:14, 69:18, 74:20, 125:13, 129:18, 135:1, 135:7, 137:12, 146:10, 152:4, 166:9, 168:2, 168:25, 174:24, 175:20, 178:7, 189:18, 190:1
**pointed** [2] - 46:4,

66:4
**pointing** [3] - 50:11, 70:7, 150:1
**points** [5] - 10:25, 34:6, 108:9, 108:12, 185:17
**police** [40] - 20:7, 21:11, 22:5, 22:10, 24:9, 28:6, 29:8, 29:11, 30:8, 30:9, 30:17, 31:7, 32:23, 36:3, 37:5, 38:8, 38:14, 38:15, 38:18, 39:12, 39:16, 40:22, 41:14, 41:18, 41:19, 42:3, 46:2, 47:7, 47:21, 58:25, 129:2, 139:3, 140:22, 141:16, 142:3, 142:25, 144:18, 184:5
**Police** [7] - 32:18, 37:19, 38:10, 48:7, 58:23, 58:24, 59:8
**Policy** [33] - 49:12, 49:16, 58:10, 58:12, 59:3, 60:1, 60:18, 62:25, 63:16, 65:18, 66:16, 67:18, 67:20, 67:22, 69:8, 69:12, 69:18, 69:19, 71:7, 104:19, 104:20, 106:21, 137:9, 137:21, 138:16, 169:13, 169:16, 169:17, 170:8, 172:12, 172:17, 173:25, 177:13
**policy** [9] - 48:25, 63:20, 116:4, 116:12, 117:5, 117:6, 117:10, 120:14, 138:20
**policy-making** [1] - 120:14
**political** [1] - 9:19
**politically** [1] - 12:18
**Ponc** [1] - 2:4
**Ponce** [1] - 2:14
**ponder** [1] - 15:9
**poor** [2] - 126:16, 126:19
**poorest** [1] - 124:16
**population** [2] - 123:14, 123:15
**portion** [1] - 183:16
**portions** [4] - 179:21, 180:3, 183:3, 183:4
**pose** [1] - 90:19
**position** [5] - 45:11,

137:8, 137:13, 144:7, 145:8
**positioned** [1] - 63:11
**positions** [3] - 14:21, 30:10, 138:12
**possible** [1] - 159:5
**post** [1] - 114:18
**post-surgical** [1] - 114:18
**pothole** [1] - 35:22
**poverty** [4] - 123:17, 123:25, 125:17, 126:21
**powder** [1] - 129:23, 130:2
**Powell** [1] - 2:6
**power** [2] - 101:1, 116:3
**PR** [2] - 2:5, 2:14
**practically** [1] - 36:8
**practices** [3] - 98:22, 147:22, 160:11
**pray** [3] - 50:24, 52:9, 64:21
**prayer** [6] - 51:23, 52:1, 52:8, 52:12, 52:25
**prayers** [3] - 53:2, 53:3, 53:4
**precedent** [1] - 149:17
**preliminaries** [1] - 84:9
**premised** [1] - 108:16
**prepared** [2] - 112:20, 122:5
**preparing** [1] - 42:19
**Presbyterian** [1] - 53:13
**prescribe** [1] - 115:16
**prescribed** [1] - 80:8
**prescriber** [1] - 79:18
**prescribers** [1] - 95:25
**prescribing** [9] - 82:12, 87:17, 88:1, 95:2, 95:21, 96:1, 100:4, 147:18, 148:1
**prescription** [20] - 38:22, 39:18, 78:17, 79:15, 79:17, 79:21, 80:3, 80:12, 82:1, 82:5, 151:15, 153:17, 154:20, 156:12, 174:22, 182:7, 183:20, 189:1, 189:5, 189:6
**prescriptions** [7] - 79:22, 80:4, 80:15, 80:20, 105:15, 115:5, 148:5
**present** [2] - 31:22,

70:24
**presented** [1] - 101:23
**preservation** [1] - 139:10
**preserve** [4] - 146:8, 146:23, 146:24
**preserved** [1] - 19:5
**president** [2] - 17:13, 36:17
**presidents** [1] - 36:21
**Press** [1] - 124:17
**press** [7] - 92:21, 93:4, 93:10, 93:21, 93:23, 96:5, 158:10
**pressing** [4] - 29:13, 46:13, 46:16, 70:8
**Prestera** [2] - 166:25, 177:7
**presume** [6] - 150:16, 152:23, 155:23, 157:9, 166:24, 167:21
**pretty** [8] - 21:4, 48:6, 48:17, 67:5, 71:24, 168:23, 178:2
**prevent** [1] - 24:13
**prevention** [5] - 51:9, 61:14, 63:1, 65:20, 165:7
**previous** [5] - 27:9, 32:6, 50:20, 67:23, 133:12
**previously** [4] - 13:17, 15:6, 103:11, 171:5
**pride** [2] - 34:20, 34:21
**Princeton** [2] - 9:5, 9:6
**principal** [1] - 80:14
**principally** [2] - 22:5, 54:16
**print** [1] - 173:13
**printout** [3] - 172:25, 173:5, 173:15
**priorities** [3] - 122:18, 122:20, 122:24
**private** [3] - 84:23, 166:6, 168:12
**privilege** [1] - 155:7
**privileged** [1] - 155:10
**PROACT** [1] - 166:3
**probationary** [2] - 30:9, 30:17
**probe** [1] - 165:18
**problem** [43] - 39:17, 41:9, 41:12, 42:3, 43:21, 45:16, 51:15, 51:16, 65:4, 68:13, 78:13, 78:17, 81:11, 82:16, 91:17, 92:10,

95:14, 96:21, 98:10,
99:16, 102:10,
102:24, 103:7,
107:5, 112:2,
113:17, 120:4,
126:17, 127:6,
127:7, 127:11,
127:22, 127:23,
132:12, 144:6,
155:21, 156:24,
158:5, 159:3,
160:21, 162:15,
162:21, 177:4
**problems** [4] - 29:16,
40:16, 120:11,
125:17
**proceed** [4] - 7:5,
73:22, 119:22, 140:1
**proceedings** [2] -
149:20, 191:18
**Proceedings** [2] -
6:19, 119:18
**PROCEEDINGS** [1] -
7:1
**process** [7] - 22:15,
24:15, 27:24, 28:1,
63:3, 112:10, 120:21
**procession** [1] - 52:22
**Proctor** [1] - 2:10
**produced** [1] - 6:19
**producer** [1] - 14:2
**producers** [2] - 96:6,
96:11
**product** [1] - 14:12
**production** [1] - 14:5
**products** [1] - 14:14
**professional** [4] -
72:18, 73:24, 74:24,
169:5
**professionalism** [1] -
38:15
**professionals** [1] -
73:25
**professor** [1] - 8:15
**proffer** [1] - 139:13
**proffers** [1] - 190:13
**profit** [1] - 181:13
**profiting** [1] - 112:8
**Program** [4] - 64:3,
64:4, 106:17, 133:2
**program** [16] - 11:23,
14:24, 47:22, 70:9,
70:18, 98:16, 101:1,
106:20, 120:9,
138:25, 139:2,
140:8, 165:23,
166:3, 166:5
**programs** [26] - 25:13,
25:15, 69:9, 74:4,
144:1, 158:15,

158:17, 158:20,
159:1, 160:11,
160:23, 161:8,
161:10, 161:11,
164:18, 164:23,
165:3, 165:6, 165:9,
165:15, 166:13,
166:16, 168:4,
169:7, 176:10
**progress** [1] - 125:8
**prohibit** [2] - 150:14,
150:25
**prohibited** [2] -
150:21, 151:7
**prohibiting** [1] -
154:16
**prohibits** [2] - 153:3,
153:8
**project** [1] - 137:5
**projected** [6] - 28:17,
135:4, 138:19,
140:14, 143:13,
145:14
**projecting** [3] - 23:3,
24:18, 135:4
**projects** [3] - 13:17,
31:2, 145:25
**proliferation** [2] -
39:17, 131:10
**prolong** [1] - 183:25
**promise** [1] - 187:10
**promote** [2] - 14:13,
84:21
**promoted** [1] - 96:17
**promoting** [1] - 63:21
**pronounce** [1] - 91:24
**pronounced** [1] -
127:20
**proper** [6] - 23:23,
27:21, 75:20,
110:14, 136:6,
181:20
**properly** [3] - 30:6,
144:19, 183:5
**properties** [1] - 22:8
**property** [4] - 22:12,
24:2, 176:4
**proportions** [2] -
125:11, 126:2
**proposal** [1] - 121:24
**Proposals** [1] - 122:21
**proposed** [5] - 29:10,
112:14, 134:11,
136:16, 137:4
**proposes** [1] - 112:3
**proposing** [1] - 113:5
**propositions** [2] -
91:9, 91:13
**proselytize** [1] - 50:23
**prospect** [1] - 178:16

**protect** [2] - 22:12,
46:20
**protection** [2] - 22:10,
52:11
**proven** [1] - 23:16
**provide** [20] - 8:10,
18:7, 22:14, 23:20,
37:25, 40:23, 41:25,
56:15, 65:5, 66:1,
66:2, 72:13, 110:16,
120:9, 132:6,
166:16, 168:18,
168:19, 169:5, 172:1
**provided** [6] - 38:3,
68:1, 136:4, 136:5,
140:4, 142:7
**provider** [2] - 166:25,
167:3
**providers** [1] - 167:12
**provides** [4] - 90:25,
115:8, 115:15,
120:14
**providing** [6] - 22:10,
64:13, 65:2, 112:2,
116:22, 141:21
**provision** [2] - 98:23,
133:11
**provisions** [1] - 21:15
**pseudoaddiction** [1] -
89:15
**public** [39] - 9:24,
11:1, 11:2, 13:11,
15:24, 17:8, 20:8,
22:2, 22:4, 22:6,
22:10, 28:7, 29:16,
36:6, 41:18, 50:21,
75:6, 91:12, 138:20,
139:16, 145:10,
149:16, 149:18,
151:15, 154:19,
155:21, 156:13,
157:16, 157:20,
158:13, 180:10,
182:2, 186:3,
187:16, 187:20
**Public** [2] - 22:5,
180:24
**publicly** [2] - 65:12,
158:8
**publish** [2] - 163:2,
173:13
**publishes** [2] -
118:15, 172:18
**pull** [2] - 184:18, 185:2
**pulled** [2] - 60:20,
62:6
**pulling** [2] - 46:8
**punch** [1] - 99:3
**punching** [1] - 48:14
**Purdue** [12] - 83:14,

83:16, 83:20, 84:3,
84:20, 85:7, 85:9,
85:12, 98:17, 98:18,
185:1
**Purdue's** [3] - 84:23,
85:23, 86:3
**purpose** [6] - 82:9,
94:13, 103:12,
103:13, 116:17,
116:23
**purposes** [1] - 135:21
**pursue** [1] - 65:23
**pursuing** [1] - 102:23
**pursuit** [1] - 181:13
**pushing** [1] - 48:12
**put** [15] - 39:23, 48:24,
48:25, 62:9, 64:3,
77:4, 121:25,
151:10, 155:2,
161:21, 161:22,
169:22, 173:7,
173:15, 183:14
**Putnam** [8] - 11:12,
11:13, 11:15, 11:16,
11:18, 11:20, 12:2,
12:3
**putrescent** [1] - 151:8
**putting** [1] - 18:6
**puzzled** [2] - 173:9,
173:14

**Q**

**qualification** [1] -
94:16
**qualified** [1] - 166:21
**qualifier** [1] - 94:12
**qualify** [2] - 51:10,
159:25
**qualities** [1] - 98:21
**quality** [4] - 20:17,
173:4, 173:13,
173:14
**quantities** [1] - 182:16
**quantity** [2] - 44:25,
100:6
**quarter** [2] - 52:24,
132:8
**quarterly** [1] - 65:13
**questioning** [4] -
110:17, 149:14,
149:21, 178:6
**questions** [10] - 77:1,
161:13, 171:23,
172:2, 172:4,
172:13, 178:17,
180:3, 181:18,
181:21, 184:12,
184:16, 184:23,
185:1, 187:8, 187:11

**quibble** [1] - 135:17
**quick** [3] - 53:7, 53:10,
53:11
**quickly** [8] - 55:9,
66:24, 85:23, 86:4,
99:17, 104:10,
178:23, 179:9
**quit** [1] - 8:15
**Quit** [1] - 35:10
**quite** [8] - 17:10,
18:22, 23:17, 58:21,
72:25, 139:12,
152:17, 186:23
**quote** [6] - 89:15,
94:2, 108:16, 112:4,
112:14, 112:20
**quotes** [2] - 87:1, 93:3

**R**

**rabbit** [1] - 143:5
**race** [1] - 125:19
**Rader** [5] - 58:8,
59:10, 138:5, 138:12
**Rafferty** [1] - 2:10
**Rahall** [2] - 49:14,
49:22
**raid** [5] - 42:11, 42:17,
44:10, 47:5, 47:21
**rains** [1] - 27:14
**raise** [7] - 7:11, 23:20,
29:3, 133:6, 133:9,
133:19, 133:20
**Raise** [1] - 29:3
**raised** [4] - 30:3, 42:1,
49:4, 178:16
**raises** [1] - 144:20
**ran** [6] - 9:13, 13:20,
14:18, 15:11, 15:23,
16:13
**range** [2] - 21:5,
135:14
**ranking** [1] - 71:19
**rate** [5] - 109:13,
163:16, 163:18,
163:25, 176:15
**rates** [2] - 123:25,
175:22
**Rather** [1] - 35:12
**rather** [2] - 130:2,
180:3
**rating** [5] - 25:21,
25:22, 26:1, 26:9,
124:16
**ravaged** [1] - 114:11
**ray** [5] - 66:12, 66:15,
75:25, 145:3
**re** [4] - 133:14, 173:11,
178:21, 181:21
**RE** [1] - 184:21

re-address [1] - 173:11
RE-DIRECT [1] - 184:21
re-direct [2] - 178:21, 181:21
re-election [1] - 133:14
reach [6] - 47:2, 49:11, 57:2, 62:12, 74:7
reached [4] - 16:24, 49:14, 50:18, 73:2
reaching [7] - 34:19, 46:1, 48:23, 50:15, 57:9, 60:13, 159:14
read [28] - 84:25, 88:3, 94:7, 98:25, 99:8, 100:6, 109:14, 111:1, 112:10, 114:14, 123:21, 123:22, 130:8, 130:18, 159:20, 159:21, 163:21, 173:15, 173:21, 175:4, 179:20, 179:23, 181:16, 182:3, 183:3, 183:5, 183:17, 185:11
readily [2] - 158:12, 158:13
reading [6] - 10:18, 110:7, 173:10, 180:3, 181:18, 183:9
reads [1] - 110:6
real [1] - 40:7
real-time [1] - 40:7
Realistically [1] - 21:17
reality [1] - 177:3
realize [1] - 181:9
really [16] - 15:9, 15:24, 23:2, 25:18, 34:14, 42:1, 42:12, 43:14, 44:14, 48:23, 64:18, 65:6, 83:21, 121:2, 147:11, 156:23
realm [1] - 11:1
realtime [3] - 65:2, 65:4, 65:14
reappearance [1] - 130:10
reason [19] - 52:20, 53:22, 59:25, 95:16, 105:18, 105:20, 106:6, 119:2, 119:5, 130:20, 134:6, 143:17, 145:11, 155:2, 159:8,

167:16, 167:17, 169:1, 170:3
recap [1] - 172:16
receive [6] - 31:23, 65:13, 120:25, 168:10, 168:12, 168:15
received [9] - 11:3, 30:14, 35:4, 43:12, 45:20, 88:22, 106:11, 109:22, 112:11
receiving [5] - 30:15, 48:9, 54:2, 144:19, 147:15
recent [3] - 57:7, 135:12, 142:8
Recess [3] - 57:18, 119:17, 178:12
recessed [1] - 191:11
recipients [1] - 104:1
recognize [2] - 150:9, 150:11
recognized [2] - 19:19, 19:21
recognizing [1] - 58:15
recollection [10] - 128:24, 129:10, 136:1, 136:8, 136:15, 136:21, 140:3, 153:10, 153:13, 168:1
recommendation [1] - 22:19
recommendations [1] - 73:13
record [26] - 19:6, 19:12, 39:23, 45:12, 73:8, 76:22, 81:24, 89:23, 110:6, 110:7, 139:13, 142:15, 143:9, 146:25, 175:4, 179:21, 179:23, 180:4, 181:17, 181:19, 182:4, 183:4, 185:7, 187:14, 187:18, 191:17
recorded [1] - 6:19
recorder [1] - 128:12
records [1] - 176:14
Recovery [1] - 53:22
recovery [5] - 49:19, 63:1, 72:3, 72:12, 112:10
recruited [2] - 11:22, 14:22
red [2] - 80:22, 182:19
REDIRECT [1] - 179:5

reduce [2] - 25:3, 28:11
Reduction [1] - 64:3
Reed [2] - 6:4, 6:11
reference [2] - 129:17, 188:24
referenced [6] - 140:18, 170:23, 170:25, 171:6, 171:8, 188:13
referred [1] - 139:3
referring [1] - 154:11
refers [3] - 93:21, 94:19, 101:23
reflected [1] - 141:17
reflective [1] - 132:14
reflects [1] - 176:9
refresh [4] - 136:7, 136:15, 136:21, 140:3
refreshing [1] - 136:1
regard [6] - 8:8, 18:4, 40:15, 60:2, 180:9, 181:12
regarding [4] - 38:22, 109:6, 111:19, 111:20
regards [1] - 65:19
region [5] - 38:16, 44:6, 54:2, 163:13, 163:16
regions [1] - 163:15
registered [4] - 59:11, 118:16, 118:19, 118:23
regular [1] - 50:21
regularly [5] - 21:21, 21:23, 37:24, 39:11, 144:19
regulated [2] - 151:24, 152:10
regulating [1] - 152:12
regulations [1] - 145:23
Regulations [2] - 146:4, 147:3
rehabilitation [2] - 142:12, 142:13
rehash [1] - 164:21
reimbursable [1] - 117:1
related [6] - 47:6, 98:20, 132:7, 142:23, 154:19, 164:17
relation [1] - 122:4
release [6] - 92:21, 93:4, 93:10, 93:21, 93:23, 96:5
released [3] - 108:1,

109:6, 111:19
relevance [1] - 139:23
relied [1] - 25:10
relief [5] - 90:19, 90:25, 135:16, 145:20, 147:9
Relief [1] - 145:15
relieving [1] - 114:18
rely [2] - 95:18, 155:23
remember [9] - 23:12, 27:18, 34:15, 60:9, 61:25, 136:8, 158:1, 170:2
remembered [1] - 60:15
reminded [2] - 146:20, 178:15
removed [2] - 30:10, 144:18
renew [2] - 146:7, 146:24
repeatedly [1] - 182:15
replaced [1] - 138:15
replacements [1] - 190:15
replicable [3] - 70:9, 70:15, 76:8
replicated [1] - 70:11
replies [2] - 106:2, 106:13
report [6] - 21:10, 61:17, 65:12, 130:20, 148:4, 148:12
reported [2] - 47:15, 191:21
Reporter [6] - 6:17, 6:18, 191:15, 191:16, 191:24
reporter [2] - 107:23, 108:7, 109:23
reports [2] - 37:25, 40:24
represent [4] - 119:3, 140:23, 159:10, 187:19
representative [1] - 111:10
representatives [4] - 73:5, 73:6, 73:11, 139:17
represented [1] - 168:22
representing [1] - 73:1
request [2] - 109:11, 121:24
Request [1] - 122:21
requesting [1] - 80:17

require [2] - 23:24, 31:15
required [5] - 25:7, 95:22, 148:4, 148:12, 171:23
requiring [1] - 89:15
rescue [1] - 145:24
research [3] - 64:11, 68:11, 142:8
Research [1] - 107:14
researcher [1] - 109:11
reserve [2] - 27:6, 188:1
reserves [2] - 25:25, 27:22
Residents [1] - 123:25
residents [3] - 102:2, 112:8, 154:21
Resiliency [5] - 68:14, 69:23, 69:25, 70:7, 70:20
resilient [1] - 76:8
resolution [11] - 77:9, 153:24, 154:1, 154:10, 154:13, 155:18, 156:1, 156:10, 156:12, 156:17, 185:14
resolve [1] - 77:10
resort [1] - 29:5
resoundingly [1] - 87:12
resources [10] - 72:17, 74:16, 76:2, 76:13, 77:13, 120:10, 120:25, 121:3, 121:6, 124:1
Resources [2] - 97:19, 99:24
respect [3] - 71:25, 110:25, 173:6
respectfully [1] - 161:13
respond [6] - 21:10, 27:15, 27:23, 65:8, 143:1, 187:25
responded [1] - 175:18
responders [2] - 139:7, 140:10
response [5] - 121:24, 142:13, 156:2, 159:25, 175:18
responsibilities [1] - 21:6
responsibility [5] - 21:13, 26:14, 56:9, 148:7, 168:18
responsible [7] -

20:21, 21:8, 22:22, 28:21, 94:7, 95:12, 95:13
**responsive** [2] - 81:3, 183:5
**rest** [3] - 17:21, 159:15, 190:11
**restriction** [3] - 96:8, 96:16, 96:18
**restrictions** [1] - 181:11
**restrictive** [1] - 23:19
**result** [6] - 30:23, 41:8, 43:11, 73:20, 74:3, 98:22
**resulted** [1] - 116:13
**results** [1] - 15:13
**resume** [2] - 57:19, 119:19
**resumed** [1] - 119:18
**retaining** [2] - 26:20, 26:24
**retired** [1] - 58:25
**retiring** [1] - 59:5
**retrieve** [1] - 136:23
**revenue** [4] - 23:11, 84:23, 135:23, 137:4
**revenues** [2] - 24:19, 25:10
**review** [2] - 32:22, 33:2
**Review** [1] - 149:23
**reviewed** [1] - 113:4
**reviewing** [1] - 25:2
**revive** [1] - 137:8
**rewarding** [2] - 75:8, 75:10
**RFP** [3] - 122:21, 122:24
**Rhodes** [1] - 83:19
**Rice** [5] - 4:3, 4:5, 4:8, 4:11, 4:14
**Richard** [1] - 83:24
**righteous** [1] - 32:10
**rise** [1] - 128:21
**risk** [3] - 89:9, 89:18, 124:3
**risks** [2] - 90:15, 90:19
**Rite** [1] - 182:9
**River** [4] - 47:23, 47:24, 49:6, 100:17
**RMR** [2] - 6:17, 6:18
**road** [1] - 27:1
**roads** [1] - 144:17
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**Rock** [1] - 73:12
**role** [7] - 21:18, 61:10, 62:24, 63:20, 94:23, 138:15, 147:23

**roles** [1] - 21:6
**rolling** [1] - 142:4
**room** [7] - 59:14, 59:17, 59:22, 65:1, 78:12, 83:1
**rose** [1] - 68:14
**rough** [1] - 15:10
**round** [1] - 47:5
**round-up** [1] - 47:5
**row** [1] - 174:7
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**Ruby** [14] - 4:23, 19:10, 110:10, 119:22, 150:1, 155:12, 165:20, 171:16, 172:14, 173:10, 175:5, 178:3, 178:13, 178:25
**RUBY** [103] - 4:22, 18:21, 19:11, 39:20, 40:6, 44:16, 44:18, 45:10, 77:20, 77:22, 80:25, 81:7, 81:15, 81:22, 82:23, 83:4, 92:17, 92:19, 93:6, 93:11, 93:13, 93:19, 97:25, 98:4, 98:8, 103:9, 103:16, 107:7, 107:8, 108:9, 108:11, 108:25, 109:4, 110:12, 110:19, 110:21, 110:24, 111:15, 111:16, 113:2, 113:3, 114:3, 114:8, 119:6, 119:11, 119:23, 119:24, 121:15, 121:16, 122:9, 122:14, 135:20, 136:2, 136:10, 136:13, 136:23, 137:2, 137:15, 137:17, 140:6, 143:18, 144:3, 146:18, 147:1, 149:8, 149:24, 150:5, 150:8, 155:13, 155:17, 156:9, 157:24, 158:4, 160:1, 160:3, 161:12, 161:16, 161:19, 161:20, 163:1, 163:6, 164:7, 164:10, 165:21, 165:25, 170:14, 171:1, 171:19,

172:10, 172:15, 173:3, 173:12, 173:18, 173:19, 175:8, 177:22, 178:15, 185:6, 186:16, 189:8, 189:10, 189:15, 190:4
**Rule** [3] - 108:17, 111:14, 112:24
**rule** [4] - 93:15, 109:3, 146:17, 181:23
**ruled** [1] - 139:12
**rules** [2] - 145:23, 183:10
**ruling** [2] - 112:24, 188:1
**run** [13] - 13:7, 14:11, 14:17, 14:24, 15:5, 15:6, 15:11, 21:10, 31:3, 31:25, 37:1, 37:2, 62:10
**running** [5] - 16:8, 21:9, 21:12, 120:20, 143:25
**runs** [1] - 20:17

**S**

**s\Ayme** [1] - 191:23
**s\Lisa** [1] - 191:23
**Sackler** [10] - 83:24, 83:25, 84:3, 84:20, 84:24, 85:7, 85:17, 181:4
**sad** [1] - 25:18
**safe** [2] - 42:23, 44:4
**safer** [2] - 31:11
**safety** [6] - 22:2, 22:5, 22:10, 29:16, 41:19, 100:3
**sake** [2] - 86:25, 183:12
**salary** [6] - 21:2, 138:23, 141:13, 141:14, 141:25, 142:1
**sales** [3] - 14:13, 23:15, 84:22
**SALGADO** [1] - 4:20
**San** [2] - 2:5, 2:14
**sanitary** [1] - 20:18
**sat** [1] - 42:17
**Saturday** [1] - 53:2
**savings** [2] - 30:14, 30:15
**saw** [10] - 11:20, 29:23, 42:24, 43:5, 49:7, 59:18, 64:12, 75:19, 130:21, 176:3

**SC** [3] - 4:4, 4:12, 4:15
**scale** [1] - 25:3
**scarcity** [2] - 144:15, 145:9
**scared** [2] - 43:5, 59:20
**scheduled** [2] - 21:23, 144:19
**scheme** [1] - 87:11
**SCHMIDT** [1] - 5:9
**scholarship** [2] - 9:9, 17:12
**School** [6] - 9:2, 9:7, 9:8, 72:15, 74:6, 104:12
**school** [7] - 9:6, 9:10, 11:7, 13:2, 37:23, 54:22, 74:6
**schools** [1] - 72:3
**Schools** [2] - 8:22, 9:1
**schoolteacher** [1] - 8:21
**science** [1] - 9:19
**Sciences** [3] - 162:8, 162:18, 163:24
**scope** [1] - 155:10
**Scott** [3] - 58:8, 59:7, 138:3
**scratch** [1] - 71:1
**screen** [7] - 84:13, 137:18, 163:8, 173:7, 173:16, 173:20, 185:4
**se** [1] - 149:13
**seat** [1] - 7:14
**second** [8] - 10:14, 38:5, 56:9, 95:9, 108:4, 109:9, 154:23, 164:13
**secondary** [1] - 182:21
**Secretary** [1] - 73:17
**Section** [5] - 146:4, 147:4, 150:9, 180:22, 180:23
**section** [7] - 84:7, 148:25, 150:17, 163:9, 173:6, 181:25, 182:1
**sector** [1] - 123:9
**Securities** [1] - 14:18
**see** [82] - 15:17, 21:18, 25:2, 26:5, 26:10, 27:15, 33:8, 33:9, 33:20, 35:15, 39:13, 40:13, 41:22, 56:3, 59:16, 59:20, 67:7, 67:8, 68:9, 68:18, 71:19, 74:19, 77:12, 84:14, 84:15, 85:25,

87:2, 87:12, 89:5, 94:3, 98:9, 98:12, 99:20, 100:23, 101:19, 105:10, 106:4, 107:19, 109:2, 109:20, 110:1, 110:19, 111:23, 112:5, 114:12, 114:19, 115:5, 115:9, 115:19, 116:7, 118:24, 119:15, 122:15, 124:5, 124:11, 124:19, 128:16, 129:15, 129:20, 130:16, 137:18, 150:22, 151:6, 151:9, 154:24, 158:3, 159:20, 159:22, 160:13, 163:9, 164:11, 164:15, 167:9, 171:25, 172:14, 172:25, 173:24, 174:7, 174:23, 175:23, 187:11, 188:14
**seeing** [6] - 38:13, 49:25, 55:1, 62:21, 63:25, 129:3
**seek** [1] - 29:1
**seeking** [3] - 26:9, 46:20, 158:22
**seem** [3] - 58:17, 71:25, 145:24
**sees** [2] - 19:4, 112:2
**selected** [1] - 121:11
**selection** [2] - 120:21, 133:10
**sell** [1] - 36:2
**sellers** [1] - 48:4
**selling** [1] - 49:9
**seminary** [1] - 10:17
**Senator** [11] - 113:22, 114:10, 114:16, 114:21, 116:1, 116:9, 117:9, 118:4, 188:9, 188:23, 189:4
**send** [2] - 53:6, 115:4
**sending** [1] - 189:3
**Senior** [1] - 7:2
**SENIOR** [1] - 1:17
**Sensabaugh** [1] - 5:14
**sense** [5] - 29:4, 32:11, 34:18, 43:14, 61:7
**sent** [5] - 113:22, 117:24, 118:4, 118:8, 118:23
**sentence** [12] - 95:9,

96:4, 115:7, 122:20, 123:23, 124:9, 125:4, 125:7, 188:14, 188:16, 188:17
**separate** [4] - 20:15, 26:19, 42:23, 92:8
**separation** [1] - 37:21
**September** [7] - 51:22, 52:19, 52:20, 53:22, 53:23, 55:12, 55:15
**Sergeant** [1] - 130:8
**series** [2] - 23:18, 34:10
**serious** [6] - 39:17, 39:19, 43:21, 51:18, 127:17
**seriously** [2] - 13:3, 152:4
**sermons** [1] - 10:23
**serve** [4] - 36:19, 59:4, 82:8, 165:6
**served** [3] - 8:2, 12:13, 13:15
**service** [12] - 11:1, 11:2, 17:8, 18:5, 19:19, 23:25, 24:7, 51:24, 52:9, 75:7, 168:19, 169:5
**services** [4] - 23:21, 23:24, 167:4, 167:7
**Services** [2] - 65:3, 177:9
**servicing** [1] - 141:2
**serving** [4] - 8:8, 38:12, 47:13, 58:22
**set** [18] - 21:15, 25:9, 52:18, 52:19, 66:25, 67:25, 68:4, 77:12, 91:11, 95:21, 135:15, 151:2, 158:14, 159:1, 160:23, 169:7, 176:10, 176:13
**sets** [2] - 95:17, 152:13
**settled** [3] - 157:10, 157:11, 157:12
**settlement** [1] - 157:8
**seven** [5] - 11:24, 12:5, 70:6, 151:17, 180:6
**several** [12] - 26:24, 35:3, 41:5, 46:22, 50:19, 53:25, 74:4, 78:7, 140:17, 152:15, 158:20, 171:10
**sewer** [2] - 20:19, 146:1

**SHANNON** [1] - 6:3
**Shapiro** [4] - 104:11, 105:25, 106:14, 106:23
**share** [1] - 162:3
**shared** [2] - 53:20, 53:21
**shares** [1] - 77:8
**shelter** [4] - 36:19, 36:20, 36:23, 134:1
**sheriff** [4] - 32:16, 32:17, 37:5, 37:8
**sheriffs** [1] - 47:7
**shift** [2] - 59:13, 67:8
**ship** [1] - 78:21
**shipment** [3] - 42:12, 44:23, 80:17
**shipped** [4] - 78:25, 80:7, 158:7, 182:16
**shipping** [1] - 129:13
**shootings** [1] - 49:3
**short** [4] - 29:7, 30:7, 122:2, 130:14
**short-lived** [1] - 130:14
**shortcut** [1] - 187:12
**Show** [1] - 170:19
**show** [17] - 15:19, 18:9, 35:18, 45:14, 46:17, 49:18, 49:19, 78:18, 96:25, 107:6, 113:18, 135:18, 146:25, 154:2, 154:8, 174:4, 177:18
**showed** [2] - 74:23, 74:25
**showing** [4] - 49:23, 71:10, 134:21, 175:5
**shown** [6] - 26:11, 171:2, 179:9, 179:13, 180:15, 180:21
**shows** [4] - 55:23, 134:18, 170:8, 177:25
**shut** [1] - 129:2
**sic** [1] - 40:24
**side** [9] - 33:14, 44:10, 47:11, 55:22, 131:4, 147:13, 173:21, 174:20, 191:3
**sided** [1] - 93:25
**sides** [1] - 35:6
**sidewalk** [1] - 35:22
**sight** [2] - 68:25
**sign** [5] - 35:2, 94:24, 95:1, 96:17, 106:3
**signed** [2] - 113:25, 118:2
**significance** [2] -

171:6, 171:7
**significant** [2] - 127:11, 169:1
**significantly** [1] - 84:22
**signs** [1] - 89:14
**silver** [3] - 51:10, 51:11, 51:13
**similar** [1] - 108:23
**similarities** [1] - 130:13
**simple** [1] - 66:8
**simply** [9] - 79:1, 111:3, 111:6, 127:3, 131:10, 152:13, 171:8, 181:18, 183:9
**simultaneously** [3] - 13:4, 14:15, 47:22
**Simultaneously** [2] - 13:9, 13:14
**SINGER** [1] - 4:8
**single** [5] - 32:22, 102:24, 103:2, 103:4, 126:25
**sit** [7] - 35:9, 35:14, 76:1, 77:1, 135:10, 142:10
**sitting** [2] - 64:10, 135:13
**situation** [1] - 28:14
**Six** [1] - 12:5
**six** [8] - 8:4, 11:24, 12:5, 28:17, 134:25, 135:14, 145:17, 175:25
**six-million-dollar** [2] - 28:17, 135:14
**sixth** [1] - 161:7
**skills** [1] - 64:22
**skip** [5] - 86:24, 101:11, 110:22, 110:23, 129:17
**skyrocket** [1] - 88:2
**skyrocketed** [1] - 43:15
**Slide** [1] - 137:15
**slide** [3] - 18:22, 19:14, 67:23
**slides** [1] - 18:6
**slipping** [1] - 27:1
**slow** [1] - 46:6
**slowing** [1] - 58:18
**slowly** [1] - 46:7
**smacked** [1] - 67:5
**small** [5] - 9:6, 30:12, 66:12, 66:15, 145:3
**smaller** [1] - 44:25
**smiling** [1] - 15:15
**Smith** [3] - 6:4, 6:11, 182:9

**snap** [1] - 176:22
**social** [2] - 125:20, 163:20
**sold** [4] - 127:15, 129:23, 189:6, 189:13
**solutions** [3] - 67:2, 67:7, 71:14
**Solutions** [6] - 68:6, 69:11, 160:25, 161:10, 161:22, 165:16
**someone** [5] - 44:22, 56:19, 64:23, 117:18, 178:1
**sometimes** [4] - 27:25, 32:22, 34:19, 65:22
**Sometimes** [5] - 32:24, 33:2, 33:3, 34:17, 36:6
**somewhere** [1] - 108:23
**son** [1] - 56:1
**sorry** [7] - 19:22, 48:20, 79:24, 109:19, 118:25, 173:12, 173:24
**sort** [2] - 19:1, 152:25
**sounds** [1] - 67:11
**soup** [1] - 32:5
**source** [8] - 94:6, 94:22, 95:7, 127:14, 127:18, 146:9, 146:17, 171:24
**sources** [2] - 23:12, 169:3
**South** [4] - 2:11, 10:12, 42:7, 54:5
**south** [1] - 27:11
**SOUTHERN** [1] - 1:1
**Southern** [5] - 7:2, 38:12, 60:7, 97:11, 102:8
**space** [2] - 141:21
**speaking** [2] - 127:3, 154:6
**special** [3] - 16:21, 20:11, 48:17
**specialty** [1] - 13:11
**specific** [9] - 27:18, 40:12, 79:13, 81:19, 143:4, 150:20, 153:23, 158:25, 186:25
**specifically** [16] - 28:8, 31:3, 36:9, 37:11, 40:4, 62:14, 85:12, 109:10, 109:12, 127:10,

136:9, 140:16, 140:21, 142:24, 181:25, 184:6
**spectrum** [2] - 130:17, 130:23
**spend** [15] - 16:17, 18:3, 26:5, 33:16, 58:4, 78:1, 78:3, 88:7, 99:14, 133:5, 134:6, 142:11, 142:17, 150:12, 186:2
**spending** [8] - 24:20, 25:3, 25:6, 26:14, 132:17, 141:11, 143:11, 143:14
**spent** [5] - 109:18, 111:20, 111:22, 142:19, 145:20
**spike** [3] - 130:25, 131:2
**spiking** [1] - 131:2
**spiritual** [1] - 17:24
**spiritually** [1] - 53:17
**sponsoring** [1] - 114:16
**sports** [2] - 9:5, 54:24
**spread** [3] - 54:3, 125:10, 126:1
**spreadsheets** [3] - 18:15, 18:16, 18:20
**Square** [2] - 6:5, 6:12
**square** [2] - 24:1
**St** [1] - 100:13
**stability** [2] - 22:1, 72:13
**stable** [1] - 23:17
**staff** [7] - 36:5, 38:20, 39:16, 41:6, 46:2, 152:24, 153:20
**stand** [7] - 7:7, 54:14, 57:20, 81:8, 119:19, 135:11
**standard** [2] - 100:20, 100:21
**standards** [7] - 95:17, 95:21, 98:19, 99:7, 99:23, 102:1, 102:11
**Standards** [1] - 98:20
**standing** [1] - 60:9
**standpoint** [1] - 25:24
**Stanford** [1] - 74:10
**STANNER** [1] - 5:10
**start** [27] - 8:11, 19:16, 21:20, 24:23, 33:8, 33:24, 35:17, 43:13, 50:1, 58:1, 60:13, 61:6, 61:7, 61:8, 66:9, 67:1, 68:9, 68:12, 70:24, 75:21,

98:11, 107:17, 114:9, 143:25, 191:2, 191:6
**started** [44] - 11:12, 13:16, 14:1, 14:4, 14:6, 14:7, 43:25, 44:1, 46:9, 47:13, 47:16, 48:9, 48:22, 49:25, 50:2, 50:15, 52:21, 53:24, 54:2, 54:3, 54:4, 54:13, 55:1, 55:2, 56:12, 60:18, 60:19, 60:23, 62:21, 62:23, 63:25, 64:13, 65:2, 65:21, 67:8, 68:10, 68:17, 70:25, 84:19, 85:6, 129:3, 139:11
**starting** [6] - 10:22, 26:23, 27:1, 56:8, 60:4, 112:9
**starts** [7] - 52:24, 61:16, 87:11, 105:8, 105:9, 115:8, 150:17
**stash** [1] - 36:1
**state** [35] - 7:9, 20:12, 20:25, 25:18, 32:2, 32:12, 32:17, 38:4, 40:3, 40:15, 45:8, 45:15, 45:25, 51:17, 67:12, 67:14, 75:24, 118:19, 132:23, 148:16, 151:2, 151:21, 151:24, 152:3, 152:10, 152:13, 152:15, 153:10, 153:12, 153:13, 156:16, 156:21, 157:8, 157:10, 176:13
**State** [18] - 8:23, 13:7, 32:18, 34:6, 47:7, 67:21, 104:19, 118:14, 119:3, 129:12, 145:12, 152:1, 169:13, 169:17, 170:8, 172:12, 173:25, 177:13
**statement** [67] - 85:2, 85:6, 86:5, 87:14, 87:20, 88:5, 88:23, 89:2, 89:12, 89:16, 91:14, 93:13, 94:10, 94:14, 96:9, 96:11, 98:1, 99:2, 99:4, 99:11, 100:8, 101:2, 101:21, 102:3, 105:18, 105:20, 106:6, 107:1, 108:8,

108:15, 108:17, 108:18, 108:22, 108:24, 110:13, 110:23, 111:1, 111:3, 111:5, 111:6, 111:17, 112:3, 113:4, 113:8, 114:3, 114:21, 121:18, 122:10, 123:1, 123:12, 123:18, 124:7, 124:21, 125:12, 125:23, 136:3, 136:5, 148:17, 160:5, 160:13, 160:17, 172:19, 177:25, 181:6, 181:14, 182:23
**statements** [11] - 78:10, 81:11, 88:10, 108:23, 110:6, 110:7, 110:8, 115:22, 116:9, 120:2, 120:5
**states** [3] - 22:17, 152:16, 186:17
**States** [4] - 7:2, 101:9, 102:8, 163:13
**STATES** [2] - 1:1, 1:17
**statistics** [1] - 169:23
**stature** [1] - 125:20
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**statute** [3] - 150:19, 153:10, 187:5
**statutes** [1] - 187:1
**statutory** [2] - 133:11, 186:24
**stay** [3] - 24:21, 59:5, 152:19
**steady** [1] - 129:13
**stenography** [1] - 6:19
**step** [6] - 46:3, 46:13, 57:17, 63:15, 69:1, 158:23
**stepped** [1] - 64:13
**steps** [1] - 125:4
**Steve** [4] - 7:7, 7:10, 7:25, 162:10
**STEVE** [1] - 7:13
**STEVEN** [1] - 4:22
**still** [19] - 20:13, 26:13, 30:9, 61:20, 68:22, 76:2, 102:14, 102:20, 115:18, 140:14, 143:14, 146:13, 176:15, 176:21, 176:25, 177:1, 177:4, 184:8
**stipulate** [1] - 161:9

**stockbroker** [1] - 14:2
**stone** [1] - 151:22
**stop** [2] - 71:22, 85:25
**stopping** [3] - 44:2, 57:14
**storm** [1] - 20:18
**story** [3] - 29:7, 30:7, 112:3
**straight** [1] - 187:11
**strategic** [6] - 60:20, 61:13, 61:21, 61:22, 67:24, 77:4
**strategies** [3] - 42:4, 85:23, 86:3
**strategy** [1] - 33:4
**stream** [1] - 129:13
**street** [3] - 44:2, 64:11, 147:13
**Street** [18] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:19, 4:21, 4:24, 5:5, 5:12, 6:6, 6:13, 26:21, 42:8, 42:21
**strength** [2] - 23:3, 26:11
**strengthened** [1] - 26:1
**stress** [1] - 145:2
**strike** [4] - 81:2, 81:13, 81:17, 134:14
**strong** [4] - 12:19, 21:1, 32:6, 163:19
**stronger** [1] - 30:22
**strongest** [2] - 44:6, 144:7
**strongly** [1] - 34:14
**structure** [3] - 20:1, 68:19, 72:19
**struggle** [1] - 124:1
**struggles** [1] - 66:14
**student** [1] - 54:22
**studied** [1] - 9:19
**studies** [1] - 9:23
**study** [15] - 9:18, 10:10, 10:13, 10:14, 10:17, 10:18, 107:25, 109:6, 109:12, 109:14, 111:19, 111:21, 111:23
**stuff** [3] - 49:9, 52:13, 190:15
**style** [1] - 185:2
**subject** [7] - 65:16, 104:7, 107:14, 107:22, 110:14, 110:17, 149:23
**submit** [1] - 110:14, 143:1

**submitted** [2] - 121:19, 126:10
**Subsection** [1] - 151:6
**subsidiary** [1] - 83:20
**Substance** [1] - 73:16
**substance** [3] - 55:6, 117:21, 145:21, 146:5, 147:5, 163:14, 163:24, 164:17, 165:11, 166:16, 166:25, 167:4, 177:15
**substances** [1] - 151:8
**substantially** [1] - 175:15
**success** [3] - 11:17, 11:19, 169:6
**successes** [1] - 161:23
**successful** [4] - 70:11, 70:18, 74:15, 87:12
**successfully** [1] - 91:1
**successors** [1] - 169:25
**sue** [1] - 184:25
**sued** [7] - 79:7, 92:9, 97:14, 97:19, 156:21, 185:9
**suffer** [1] - 102:2
**sufficient** [1] - 171:17
**suggest** [1] - 119:8
**suing** [1] - 94:21
**suit** [4] - 74:24, 186:19, 186:20, 186:21
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 3:15, 4:6, 4:9, 6:5, 6:12
**Summary** [1] - 180:23
**summers** [1] - 9:14
**Sunday** [3] - 52:20, 53:24, 55:12
**supplies** [1] - 138:22
**supply** [1] - 130:11
**support** [8] - 31:19, 32:15, 41:19, 56:15, 73:21, 73:23, 120:25, 121:2
**supported** [1] - 166:23
**supporting** [1] - 32:25
**supportive** [1] - 75:22
**supposed** [2] - 15:20, 61:5
**surgical** [1] - 114:18
**surplus** [20] - 24:14, 25:5, 25:6, 26:4, 26:16, 30:12,

131:17, 131:20, 132:1, 132:12, 132:14, 134:18, 135:2, 135:5, 136:17, 137:5, 138:19, 140:14, 143:14, 145:13
**survives** [1] - 75:25
**suspicious** [2] - 182:16, 182:19
**sustain** [9] - 39:2, 40:11, 155:11, 155:16, 175:3, 175:7, 178:5, 186:8, 189:11
**sustainable** [3] - 70:16, 70:21, 76:9
**sustained** [2] - 183:22, 189:16
**Sustained** [2] - 156:8, 157:23
**SUZANNE** [1] - 4:20
**SWAT** [4] - 42:7, 42:17, 42:19, 44:11
**swimming** [1] - 62:23
**switched** [1] - 13:18
**SWORN** [1] - 7:13
**sworn** [2] - 8:5, 12:12
**Sworn** [1] - 8:6
**synthetic** [2] - 153:4, 153:8
**Syringe** [1] - 64:3
**system** [10] - 14:3, 14:8, 20:19, 65:11, 65:15, 77:12, 80:18, 174:6, 174:13, 174:16

**T**

**Table** [4] - 164:5, 164:7, 164:13, 165:22
**tactic** [1] - 66:11
**talented** [1] - 70:23
**talks** [5] - 72:2, 107:4, 125:4, 126:16, 183:25
**tapering** [1] - 90:5
**tar** [4] - 129:1, 129:5, 129:18, 130:2
**task** [3] - 32:21, 37:7
**Task** [7] - 32:23, 33:1, 46:10, 46:15, 48:1, 73:4, 73:21
**tasked** [1] - 21:12
**taught** [3] - 8:21, 9:1, 75:17
**tax** [4] - 13:16, 23:13, 23:14, 23:15

**taxes** [3] - 29:3, 32:12
**tea** [1] - 55:5
**teach** [1] - 8:20
**teachers** [1] - 62:3
**teaching** [1] - 8:23
**team** [6] - 39:15, 42:8, 42:19, 44:11, 122:6, 151:19
**teamed** [1] - 98:16
**technical** [7] - 57:22, 73:21, 73:22, 120:10, 120:25, 121:2, 190:15
**technology** [1] - 57:23
**TEMITOPE** [1] - 4:13
**ten** [4] - 43:16, 73:5, 73:11
**Tenth** [1] - 5:12
**term** [12] - 8:9, 12:12, 13:23, 16:6, 16:10, 16:12, 16:14, 19:16, 48:2, 87:17, 90:10
**terms** [6] - 8:8, 13:15, 100:5, 121:6, 141:7
**Testament** [2] - 10:14, 10:15
**testified** [11] - 39:24, 40:8, 62:24, 75:9, 82:17, 107:5, 131:14, 137:10, 137:19, 155:14, 169:12
**testify** [2] - 38:25, 40:15
**testifying** [1] - 81:8
**testimony** [14] - 18:7, 38:3, 44:22, 81:14, 103:11, 104:18, 129:5, 142:10, 144:5, 158:19, 159:12, 159:13, 167:15, 175:1
**testing** [1] - 165:19
**tests** [1] - 10:18
**Teva** [1] - 86:20
**texts** [1] - 44:2
**THE** [135] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:8, 7:9, 7:10, 7:11, 7:14, 7:15, 18:12, 19:5, 19:9, 39:2, 40:1, 40:11, 44:17, 45:3, 45:7, 45:13, 45:22, 45:23, 57:13, 57:16, 57:19, 57:23, 77:19, 81:12, 81:16, 81:20, 83:1, 92:18, 93:8, 93:12, 93:15, 93:18, 98:2, 98:5, 98:7, 103:15, 108:10,

109:2, 110:10, 110:16, 111:7, 111:8, 111:10, 111:12, 111:13, 112:23, 114:5, 114:7, 119:8, 119:12, 119:14, 119:15, 119:16, 119:19, 119:21, 119:22, 122:11, 122:13, 136:7, 136:12, 136:25, 137:1, 139:8, 139:25, 143:19, 143:20, 144:2, 146:6, 146:14, 146:20, 146:25, 149:9, 149:25, 150:7, 155:5, 155:11, 155:15, 156:7, 156:8, 157:23, 158:1, 161:14, 161:18, 163:4, 164:9, 165:12, 165:17, 170:15, 170:18, 171:5, 171:15, 171:25, 172:4, 172:13, 173:9, 173:17, 175:3, 178:2, 178:13, 178:18, 178:21, 178:24, 179:24, 180:17, 181:20, 183:2, 183:13, 183:22, 184:13, 184:14, 184:17, 185:5, 185:10, 186:8, 186:22, 187:7, 188:1, 189:9, 189:11, 189:16, 189:20, 189:25, 190:6, 190:8, 190:9, 190:17, 190:21, 191:1, 191:5, 191:10
**themselves** [5] - 61:9, 62:21, 64:15, 67:9, 72:10
**theological** [1] - 10:16
**theologically** [1] - 53:17
**therapy** [2] - 87:16, 89:10
**thereby** [1] - 182:20
**therefore** [1] - 108:17
**they've** [2] - 28:21, 175:25
**thinking** [2] - 47:20, 171:9
**third** [15] - 8:9, 10:15,

12:12, 16:14, 83:6, 94:2, 105:7, 129:24, 139:24, 165:14, 184:19, 184:24, 185:18, 188:12, 188:16
**Thomas** [1] - 2:10
**thousand** [1] - 26:25
**thousands** [2] - 43:18, 167:9
**threat** [5] - 38:3, 41:25, 43:11, 65:9, 144:24
**threats** [1] - 39:13
**Three** [1] - 6:5
**three** [17] - 6:12, 16:13, 26:19, 31:6, 54:9, 54:10, 59:23, 73:12, 92:24, 137:23, 154:7, 155:18, 156:17, 157:17, 170:11, 170:12, 174:19
**three-digit** [1] - 157:17
**thrived** [1] - 123:6
**throughout** [13] - 14:4, 43:18, 54:1, 60:7, 67:16, 69:5, 69:10, 69:16, 69:22, 70:13, 74:11, 142:21, 175:24
**tickets** [1] - 129:25
**tie** [1] - 46:20
**tight** [1] - 152:2
**Tim** [1] - 105:5
**timely** [1] - 165:14
**TIMOTHY** [1] - 5:9
**title** [3] - 12:11, 150:18, 154:22
**today** [16] - 8:4, 37:12, 71:13, 75:9, 76:1, 77:1, 78:2, 91:23, 92:9, 103:14, 131:16, 142:10, 159:12, 168:24, 173:23, 184:7
**Today** [1] - 35:19
**today's** [1] - 89:1
**toe** [2] - 16:3, 16:4
**together** [31] - 18:6, 46:8, 48:13, 48:24, 49:1, 50:2, 51:1, 51:19, 51:22, 54:14, 55:2, 55:4, 55:5, 55:13, 56:14, 60:14, 60:20, 61:16, 61:24, 62:6, 62:9, 64:18, 68:5, 69:20, 78:2, 78:3, 90:23, 161:22,

167:11, 182:10
**tomorrow** [3] - 111:19, 134:16, 190:12
**took** [7] - 12:6, 12:11, 15:17, 39:7, 49:18, 62:13, 153:23
**top** [9] - 38:11, 38:16, 42:21, 92:24, 103:21, 122:6, 145:13, 147:9, 163:9
**total** [3] - 29:9, 131:22, 132:9
**touch** [1] - 129:22
**touches** [1] - 124:13
**tough** [1] - 27:25
**tour** [1] - 49:21
**toward** [3] - 94:5, 94:22, 95:6
**towards** [2] - 22:5, 67:1
**Tower** [2] - 3:4, 4:23
**track** [2] - 9:13, 76:19
**tracks** [1] - 131:13
**traded** [1] - 65:12
**trafficking** [1] - 47:6
**Trafficking** [1] - 106:17
**training** [2] - 10:6, 14:6
**trammeled** [1] - 181:13
**transcript** [4] - 6:19, 77:25, 160:2, 191:17
**transferred** [1] - 9:5
**transport** [1] - 123:7
**treat** [1] - 87:17
**treated** [1] - 88:20
**treating** [1] - 82:9
**treatment** [34] - 51:9, 61:14, 63:1, 63:21, 63:22, 65:20, 72:12, 74:16, 87:19, 116:20, 132:17, 132:18, 132:20, 134:4, 134:7, 140:15, 140:17, 142:17, 143:4, 143:11, 143:15, 144:1, 145:21, 146:5, 147:5, 166:2, 166:17, 167:4, 167:12, 167:23, 168:23, 169:2
**treatments** [6] - 114:25, 115:17, 116:16, 116:21, 116:24, 117:4
**trend** [1] - 80:20
**trends** [1] - 174:19

**Tri** [1] - 129:12
**Tri-State** [1] - 129:12
**trial** [4] - 74:11, 78:7, 139:11, 167:16
**Trial** [1] - 191:11
**TRIAL** [1] - 1:16
**Trinity** [1] - 17:18
**triple** [1] - 25:20
**truck** [1] - 35:13
**true** [12] - 35:10, 37:9, 78:4, 78:15, 101:21, 102:3, 105:19, 108:20, 113:1, 123:1, 123:18, 125:2
**truly** [2] - 10:17, 38:19
**trust** [1] - 66:10
**trusted** [1] - 38:19
**truth** [15] - 35:8, 45:5, 45:11, 45:14, 76:17, 91:12, 103:12, 108:10, 108:11, 108:12, 108:15, 108:16, 160:16, 160:19, 177:23
**try** [3] - 26:15, 43:23, 177:2
**trying** [12] - 14:15, 58:16, 66:12, 66:14, 76:22, 135:13, 139:20, 145:2, 145:5, 149:14, 159:21, 163:7
**turn** [17] - 84:10, 87:9, 88:12, 89:4, 91:8, 93:24, 95:2, 96:4, 99:18, 113:16, 120:13, 123:15, 142:9, 151:3, 156:20, 162:21, 164:5
**turning** [1] - 115:3
**turns** [1] - 114:16
**Twelfth** [3] - 4:19, 4:21, 5:5
**Twenty** [1] - 15:17
**twice** [1] - 17:6
**two** [27] - 17:16, 17:22, 28:19, 28:20, 28:21, 37:21, 50:21, 55:11, 60:20, 61:17, 65:7, 65:10, 65:14, 67:23, 70:8, 81:8, 83:16, 105:5, 108:9, 108:12, 139:23, 170:21, 179:25, 186:25, 191:3, 191:7
**two-fold** [1] - 28:20
**two-year-old** [1] - 65:10
**type** [2] - 70:1, 171:13

## U

178:25

**U.S** [4] - 32:5, 32:6, 38:9, 123:24
**ultimate** [2] - 21:13, 38:18
**ultimately** [1] - 121:11
**unabated** [1] - 102:3
**unassigned** [2] - 136:16, 137:5
**unbelievably** [2] - 31:18, 70:23
**uncontroverted** [1] - 190:16
**under** [11] - 22:22, 41:16, 111:14, 112:24, 123:16, 130:8, 146:16, 164:13, 164:17, 180:23, 182:1
**understood** [4] - 41:12, 42:3, 42:11, 43:15
**underwriting** [1] - 13:11
**unduly** [1] - 19:9
**unemployment** [1] - 125:17
**unexpected** [1] - 27:23
**unfair** [1] - 174:25
**unfilled** [1] - 46:23
**unfortunately** [1] - 105:14
**unhealthy** [3] - 35:5, 124:18
**union** [4] - 31:7, 31:8, 31:10
**unions** [1] - 31:6
**unique** [1] - 20:10
**uniquely** [1] - 63:10
**Unit** [1] - 130:9
**UNITED** [2] - 1:1, 1:17
**United** [5] - 7:2, 64:17, 101:9, 102:7, 163:13
**units** [2] - 114:25, 115:16
**universities** [2] - 72:4, 74:4
**University** [7] - 8:18, 9:22, 10:12, 68:7, 74:5, 74:6, 168:16
**university** [7] - 62:4, 64:9, 64:10, 64:13, 65:24, 68:10, 69:5
**University's** [1] - 162:7
**unless** [2] - 170:24, 190:19
**unpopular** [1] -

**unthinkable** [2] - 125:11, 126:2
**unturned** [1] - 151:22
**unusual** [1] - 26:5
**up** [55] - 8:12, 8:23, 9:25, 10:19, 11:9, 13:12, 14:5, 14:7, 15:4, 15:25, 17:19, 18:14, 20:4, 22:7, 26:21, 27:12, 27:13, 31:16, 34:12, 34:16, 35:2, 38:2, 38:5, 42:24, 46:3, 46:13, 47:5, 51:7, 53:1, 62:8, 66:11, 71:25, 73:5, 75:21, 76:19, 78:18, 80:11, 81:1, 81:25, 130:14, 132:2, 133:14, 142:7, 146:11, 146:12, 153:11, 173:8, 175:23, 179:18, 180:22, 183:14, 184:18, 185:2, 188:5
**upcoming** [2] - 134:10, 140:9
**updates** [1] - 37:25
**uptick** [1] - 76:18
**urge** [1] - 116:2
**urgency** [1] - 43:14
**urging** [1] - 116:12
**user** [2] - 24:4, 24:5
**utility** [1] - 20:18
**utilize** [1] - 64:12
**utilized** [1] - 116:25
**utter** [1] - 188:11

## V

**Valley** [4] - 166:9, 166:19, 167:20, 167:22
**various** [10] - 28:5, 31:2, 32:17, 32:21, 36:10, 39:9, 69:15, 71:12, 180:8, 184:5
**vast** [1] - 82:11
**vehicle** [2] - 42:23, 170:7
**vehicles** [1] - 31:2
**Ventura** [1] - 3:15
**verbatim)** [1] - 145:18
**verge** [2] - 25:20, 59:5
**version** [2] - 83:5, 157:7
**video** [2] - 53:7, 53:11
**view** [4] - 26:2, 94:22, 95:24, 102:5

**views** [1] - 110:15
**violent** [2] - 49:3, 176:6
**Virginia** [48] - 4:24, 7:3, 8:1, 8:13, 8:14, 13:5, 14:19, 14:20, 15:1, 15:2, 17:4, 19:23, 19:24, 37:22, 38:12, 48:11, 54:11, 60:7, 85:13, 85:15, 85:18, 85:20, 92:25, 97:12, 102:9, 104:5, 106:18, 114:11, 118:9, 118:14, 118:16, 119:4, 121:14, 121:18, 128:3, 135:22, 149:7, 149:17, 152:1, 154:9, 161:3, 163:16, 163:17, 173:1, 174:1, 177:16, 187:5
**VIRGINIA** [2] - 1:1, 1:18
**Virginians** [1] - 116:2
**virtually** [4] - 92:3, 96:8, 96:16, 96:18
**vision** [6] - 21:19, 21:20, 33:21, 77:3
**vital** [4] - 94:24, 95:1, 96:17, 106:3
**voice** [1] - 53:8
**voices** [1] - 30:4
**volatile** [1] - 16:22
**VOLUME** [1] - 1:16
**volume** [2] - 157:15, 158:7
**voted** [2] - 133:10, 133:20
**VPI** [1] - 8:16
**vs** [1] - 191:19

## W

**wait** [3] - 35:14, 56:9, 110:12
**waiting** [1] - 162:23
**waived** [2] - 139:15, 185:24
**WAKEFIELD** [1] - 5:13
**Wal** [1] - 182:10
**Wal-Mart** [1] - 182:10
**Walgreens** [1] - 182:10
**walk** [1] - 74:2
**walking** [1] - 35:17
**walks** [1] - 35:21
**wall** [1] - 26:24
**walls** [1] - 26:20
**wants** [1] - 156:25

**warrants** [3] - 46:22, 47:5, 47:13
**Washington** [7] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12, 71:16
**water** [5] - 7:20, 16:3, 20:17, 20:18, 145:25
**Wayne** [1] - 36:20
**wealthy** [1] - 125:18
**web** [1] - 170:7
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**website** [3] - 158:9, 170:5, 170:11
**wedge** [1] - 42:25
**Wednesday** [1] - 26:17
**week** [2] - 24:5, 24:8
**weekly** [1] - 145:24
**weeks** [3] - 155:18, 171:10, 175:1
**weighing** [1] - 13:2
**wellness** [3] - 139:6, 140:10, 140:11
**Werthammer** [4] - 103:11, 104:14, 105:9, 105:12
**Werthammer's** [1] - 106:2
**west** [1] - 176:21
**WEST** [2] - 1:1, 1:18
**West** [48] - 7:3, 8:1, 8:13, 8:14, 13:5, 14:19, 14:20, 15:1, 15:2, 17:3, 19:23, 19:24, 37:22, 38:12, 48:10, 54:11, 60:7, 85:13, 85:15, 85:18, 85:20, 92:25, 97:11, 102:8, 104:5, 106:17, 114:11, 116:2, 118:9, 118:14, 118:16, 119:3, 121:14, 121:18, 128:3, 135:22, 149:7, 149:17, 152:1, 154:9, 161:3, 163:16, 163:17, 173:1, 174:1, 177:15, 187:5
**Western** [1] - 15:2
**whatsoever** [1] - 132:17
**White** [1] - 106:21
**white** [1] - 130:2
**whole** [8] - 10:19, 27:13, 34:12, 74:13, 86:2, 91:25, 114:14, 190:25

**Wholesale** [1] - 182:9
**wholesale** [2] - 14:12, 78:20
**wholesaler** [1] - 14:13
**WICHT** [1] - 4:18
**wide** [2] - 21:4, 178:3
**widely** [1] - 38:8
**wider** [1] - 182:18
**widespread** [1] - 100:3
**wields** [1] - 101:1
**wife** [2] - 17:18, 55:22
**Williams** [11] - 4:18, 5:4, 7:7, 7:10, 7:23, 7:25, 8:10, 62:16, 119:12, 119:20, 190:2
**WILLIAMS** [1] - 7:13
**willing** [3] - 28:3, 71:23, 159:13
**wish** [1] - 29:12
**withdrawal** [1] - 90:5
**witless** [2] - 43:5, 59:20
**witness** [14] - 38:25, 57:19, 81:7, 119:19, 135:22, 165:19, 170:24, 172:10, 173:5, 175:2, 177:23, 178:17, 181:17, 183:1
**WITNESS** [16] - 7:10, 7:13, 45:23, 81:20, 111:8, 111:12, 119:14, 119:16, 119:21, 137:1, 143:20, 156:7, 163:4, 164:9, 184:13, 190:8
**witness's** [3] - 81:5, 140:3, 155:14
**witnesses** [2] - 165:15, 171:2
**WOELFEL** [1] - 3:9
**Woelfel** [1] - 3:9
**woman** [1] - 55:19
**won** [2] - 133:17, 133:19
**wondering** [2] - 70:18, 171:22
**word** [9] - 83:22, 102:24, 103:2, 103:4, 126:25, 150:13, 157:19, 159:2, 167:24
**words** [2] - 54:10
**Workers'** [2] - 25:8, 25:11
**works** [6] - 20:8, 22:6, 28:7, 36:6, 66:7,

113:5
**world** [10] - 25:21,
28:18, 54:4, 54:8,
65:8, 65:11, 65:12,
70:17, 71:15, 162:4
**worried** [1] - 186:2
**worse** [1] - 45:25
**worth** [1] - 175:1
**wrapped** [1] - 129:25
**wrenching** [1] - 75:11
**write** [3] - 117:16,
148:5, 174:9
**writing** [2] - 107:25,
109:5
**written** [5] - 54:6,
80:16, 117:22,
128:7, 162:7
**wrongful** [1] - 154:19
**wrote** [6] - 105:15,
117:17, 126:10,
128:20, 164:2,
165:16
**WU** [13] - 5:10, 38:24,
179:19, 180:2,
180:12, 181:15,
182:25, 183:7,
183:21, 186:6,
187:21, 188:3, 189:7
**WV** [6] - 2:8, 3:10,
3:13, 4:24, 5:15, 6:9
**WV-02631** [1] - 179:14
**WVU** [2] - 9:25, 13:3

# Y

**Year** [2] - 19:22, 19:25
**year** [52] - 10:13,
10:14, 10:15, 10:16,
12:20, 16:10, 16:12,
22:16, 22:18, 22:20,
23:1, 23:4, 23:5,
24:20, 24:24, 25:1,
27:5, 28:10, 29:20,
30:11, 31:21, 32:22,
33:2, 41:7, 42:2,
65:10, 76:19, 76:20,
76:21, 78:2, 118:15,
126:13, 131:16,
131:19, 131:25,
132:16, 133:5,
133:6, 133:11,
133:13, 133:14,
133:25, 134:10,
134:11, 135:23,
144:10, 156:10,
159:18, 167:9,
174:1, 175:25,
176:13
**year's** [4] - 132:11,
138:18, 140:9,

143:10
**years** [43] - 8:4, 8:14,
10:3, 11:11, 11:16,
11:18, 12:10, 13:21,
14:5, 14:10, 15:17,
15:23, 15:25, 16:16,
16:21, 18:10, 23:16,
25:1, 27:19, 29:15,
35:3, 50:20, 56:4,
57:7, 61:17, 65:7,
65:14, 68:16, 70:6,
102:23, 128:1,
129:4, 130:5, 144:8,
144:14, 151:18,
154:7, 156:17,
156:20, 170:12,
174:19, 180:7
**yell** [1] - 56:6
**yesterday** [3] - 144:5,
178:16, 190:24
**Yingling** [1] - 104:22
**York** [1] - 3:5
**young** [1] - 16:22
**youngest** [1] - 12:8
**yourself** [7] - 7:23,
24:13, 24:17, 41:22,
83:8, 93:22, 178:24

# Z

**zip** [1] - 157:17
**zoning** [2] - 20:9,
20:12