IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 33
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


JULY 1, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:                    Ayme Cochran, RMR, CRR
Court Reporter:                    Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1          PROCEEDINGS had before The Honorable David A.

2    Faber, Senior Status Judge, United States District

3    Court, Southern District of West Virginia, in

4    Charleston, West Virginia, on July 1, 2021, at 9:00

5    a.m., as follows:

6               THE COURT:  Happy birthday, Mr. Farrell.  I

7    can't even remember when I was 49.

8         (Laughter)

9               MR. FARRELL:  Thank you, Judge.

10        I have the honor of cleaning up a couple of things

11   before the plaintiff rests.

12        I have a cheat sheet for the court reporter that I'm

13   going to read into the record.

14              COURT REPORTER:  Thank you.

15              MR. FARRELL:  During plaintiffs' questioning of

16   AmerisourceBergen witness Steven Mays, AmerisourceBergen

17   objected to the use of certain spreadsheets that showed

18   threshold amounts, overrides, orders, released or held, and

19   orders reported to the DEA.

20        That's at trial transcript May 18th -- May 18th, 2021,

21   transcript Page 110.

22        Plaintiffs and AmerisourceBergen have since conferred

23   and agreed to the resubmission and admission of three

24   spreadsheets that are as follows:

25        P-44765 was originally produced by AmerisourceBergen

1    bearing Bates stamp ABDCMDL01911481.  This document is a

2    spreadsheet that's been adjusted at AmerisourceBergen's

3    request to include only AmerisourceBergen Cabell County

4    customers.  The content of the spreadsheet shows the order

5    monitoring history of all prescriptions and control items

6    for 2008 through 2012.

7         Next, P-44766 was originally produced by

8    AmerisourceBergen bearing Bates ABDCMDL01911482.  This

9    document is a spreadsheet that has been adjusted at

10   AmerisourceBergen's request to include only

11   AmerisourceBergen's Cabell County customers.  The content of

12   the spreadsheet shows orders reported to the DEA for all

13   prescriptions and control items from 2007 through 2012.

14        Third, P-44767 was originally produced by

15   AmerisourceBergen bearing Bates ABDCMDL01911479.  This

16   document is a spreadsheet that's been adjusted at

17   AmerisourceBergen's request to include only

18   AmerisourceBergen's Cabell County customers.  The content of

19   this spreadsheet shows orders reported to the DEA for all

20   prescription and control items from 2012 to 2018.

21        Finally, to make the record clear, these documents are

22   provided to correct the record and identification of

23   documents during the direct examination of Steven Mays.  The

24   documents are intended to replace previously identified

25   Exhibits P-2819A, as in alpha, and P-16639A, as in alpha.

```
 1          So P-44765 replaces P-2819A referenced at the May 18th,

 2     2021, transcript, Page 110.  And P-44766 and P-44767 replace

 3     P-16639A referenced at the May 18th, 2021, transcript at

 4     Page 109.

 5               THE COURT:  I understand there's no objection to

 6     this by any of the other parties.

 7               MS. MCCLURE:  No objection from ABDC.

 8               MS. MAINIGI:  None from us, Your Honor.

 9               MR. FARRELL:  Then we have one or two other

10     cleanup items.

11               THE COURT:  Okay.

12               MS. CHRISTENSON:  Your Honor, we previously

13     submitted, offered Kim Howenstein's deposition designation.

14     We are submitting it finally.

15               MR. FARRELL:  Judge Faber, on behalf of the

16     plaintiffs, the City of Huntington and the Cabell County

17     Commission, we rest.

18               THE COURT:  Thank you, Mr. Farrell.

19          Who's going first?

20               MR. HESTER:  Your Honor, I have the honors.

21               THE COURT:  All right.  I understand the

22     defendants are all going to orally make a Rule 52(c) motion.

23               MR. HESTER:  Yes, Your Honor.  And I thought it

24     might be helpful to the Court to just lay out a short

25     roadmap of what our plan is for these motions.
```

1          I'm going to begin with an overarching motion addressed

2    to the issue of proximate causation.  My colleagues are then

3    going to argue separate Rule 52 motions that are related to

4    the separate conduct of each of the three defendants.  So

5    there will be three separate arguments on those three

6    separate motions.  I'll then return to argue an overarching

7    motion related to abatement relief.

8          So those will be the five motions that we're planning

9    to argue to the Court.  And our aim is to hold at least 20

10   minutes of our allocated time for rebuttal.  We're going to

11   try to stick to the clock, Your Honor, and that's what we're

12   hoping to achieve is about 20 minutes for rebuttal.

13         At the conclusion of these arguments today and the

14   plaintiffs' responses, we are planning to file briefs in

15   support of these five motions.  And we'll provide copies,

16   courtesy copies to the parties and the Court to that as

17   well.

18         So with that, Your Honor, let me begin.

19         The plaintiffs (verbatim) move under Rule 52 for

20   judgment on partial findings based on plaintiffs' failure to

21   prove proximate causation.

22         The core allegation that the plaintiffs have made in

23   this case is that there is an excessive volume of pills, a

24   flood of pills.  That was the heart of their opening, as the

25   Court will recall, and it's been the heart of their case

1    ever since focusing on the volume.

2         And the evidence is overwhelming and uncontroverted, in

3    our view, that the flood of pills, if there was one, was

4    caused by increased prescribing.  And we have a few slides

5    just to reflect this.

6         Dr. Gupta highlighted that there was a culture of

7    attempting to reduce pain from a scale of whatever to zero

8    for every West Virginian.  He said that was the culture.

9    That was the education.  That was the influence.

10        Dr. Keyes, one of plaintiffs' important

11   epidemiologists, agreed that the high volume of opioid

12   prescriptions became the foundation for the overall

13   expansion in the opioid supply.

14        Mr. Rannazzisi said that the crisis started with

15   prescriptions.  He agreed that that was what started the

16   crisis.

17        And Mr. Rafalski said that there was no other way for

18   the volume to increase; there was no other way for the

19   charts that he was showing to go up unless there had been an

20   increase in prescriptions.

21        The evidence is also overwhelming and uncontroverted,

22   in our view, that this increased prescribing was undertaken

23   in good faith.  And there's extensive testimony in this

24   record that the, that the prescribing by doctors was

25   undertaken in good faith in their best medical judgment as

1    to what was needed to treat pain based on prevailing

2    standards at the time.

3         The evidence is also overwhelming and uncontroverted,

4    in our view, that this increase was driven by a change in

5    the standard of care for the treatment of pain.

6         And we saw that early in the case, first week.  We

7    presented to the Court various policy statements issued by

8    the West Virginia Board of Medicine in 1997, 2005, 2013, all

9    of which encouraged opioid prescribing and called on doctors

10   to be more attentive to treating pain.

11        There was also the Fishman book that the Court has

12   heard about on several occasions that was issued and sent to

13   every doctor and every prescriber in the State of West

14   Virginia in 2008 encouraging the prescribing of opioids and

15   again calling on doctors to be focused and attentive to the

16   treatment of pain.

17        The evidence is also overwhelming and uncontroverted,

18   in our view, that distributors cannot second-guess these

19   prescribing decisions by doctors.  And there were two

20   powerful statements made on this point by the two DEA

21   related experts the plaintiffs offered; Mr. Rafalski who

22   agreed that the DEA does not expect distributors to

23   second-guess legitimate medical judgments of doctors, and

24   Mr. Rannazzisi who agreed that a distributor cannot make the

25   determination whether a controlled substance is medically

```
 1    necessary for a particular patient.

 2         So the plaintiffs stake their entire case on the volume

 3    of pills.  But the increased volume was caused by

 4    doctor-prescribing.  The flood of pills that lies at the

 5    heart of the plaintiffs' case was caused by

 6    doctor-prescribing.

 7         And I think it's reflected very clearly in this

 8    question and answer from, from Dr. Keyes.  The question:

 9         "The opioid crisis would not have occurred if

10    prescribing opioids had not become standard practice in

11    managing acute and chronic pain; correct?"

12         She said, "That's right."

13         We think that's dispositive, Your Honor.  It's a very

14    clear, very clean statement and it reflects the entirety of

15    the evidence in this record.

16         Now, the plaintiffs claim harm from the increased

17    prescribing based on diversion after the pills have been

18    prescribed, have left the pharmacies, and are out in

19    medicine cabinets or otherwise in the community.  That was

20    the clear focus of the harm theory that the plaintiffs

21    presented.

22         And, again, Dr. Keyes presented testimony on this point

23    if we go to the next slide.  Okay.

24         "So when you talk about exposure and supply --" this

25    was the issue that she was identifying and the plaintiffs
```

1    have highlighted throughout the case.  There was a huge

2    increase in volume caused by doctor-prescribing.  That

3    increase in volume was out in the community.  And the

4    evidence is clear and, again, uncontroverted that

5    distributors cannot and do not control this kind of what we

6    could call medicine cabinet diversion.

7        After the pills have been prescribed, they've left the

8    pharmacy, they're out in the community, the distributors no

9    longer have control over them.  And that's very clearly

10   reflected in the next slide, statements again from Mr.

11   Rafalski and Mr. Rannazzisi who acknowledged that

12   distributors cannot control diversion after pills leave the

13   pharmacy, after they're out in the community.

14       And, it's -- of course, it stands to reason.  It's

15   understandable.  Once the pills are in the community because

16   doctors have prescribed them, distributors no longer have

17   control over what happens to them since.  And the

18   plaintiffs' theory of harm is that the pills were out in the

19   community and that's when the harm occurred.  And that is

20   outside the control of distributors.

21       So given this clear, essentially, undisputed and

22   uniform record, there are two cases issued from this

23   district that are dispositive on the issue of proximate

24   causation.

25       The first is the *Employer Teamsters* case and the second

1    is the *City of Charleston* case, the *Employer Teamsters* case

2    written by Judge Chambers who pointed to the vast array of

3    intervening events including the independent medical

4    judgment of doctors that defeated a showing of proximate

5    causation.

6        And I would emphasize, Your Honor, that both of these

7    cases are on pre-trial motions.  Here we've gone through an

8    extensive development of evidence.  We're in the midst of

9    trial.  The record is clear.  But we have these two very

10   clear, very well-reasoned decisions from this district that

11   set out the proper legal step, standard and tell us the

12   answer to the question on proximate causation.

13       *City of Charleston*, the case written -- decision

14   written by Judge Copenhaver again points to the fact -- and

15   it's the first quotation on the right side.  "No injury

16   would occur unless the physician proceeded to unnecessarily

17   prescribe opioid treatments."

18       That's a very important point.  That's essentially the

19   same point we're making here.  No injury would occur under

20   the plaintiffs' own theory unless the doctors prescribe the

21   opioids.

22       And that's the statement that I highlighted a few

23   minutes ago from Dr. Keyes who said but for the prescribing,

24   this would not have happened.

25       That's exactly what Judge Copenhaver addressed in the

1    *City of Charleston* case, again on a pre-trial motion.  And

2    here we are, we've gone through the evidence, we've built

3    the record to show that it was doctor prescribing that led

4    to the harm.

5        These cases establish that there must be a direct

6    relationship between the claimed harm and the alleged

7    wrongful conduct.

8        And, in particular, both of these cases establish that

9    doctors' intervening prescribing decisions defeat proximate

10   causation as a matter of law under West Virginia law.

11            THE COURT:  Were either of those cases appealed,

12   Mr. Hester, to your knowledge?

13            MR. HESTER:  Your Honor, I believe the *City of*

14   *Charleston* case there is a motion to amend the complaint.

15   I'm not aware of an appeal in *Employer Teamsters*.

16            THE COURT:  Thank you.

17            MR. HESTER:  But we submit, Your Honor, that these

18   two decisions issued by this district set out the legal test

19   and provide the legal answer to the question now that we've

20   built the record showing that it was prescribing decisions

21   that drove the volume that the plaintiffs are alleging

22   caused the injury.  It was prescriber decisions, and these

23   two cases say that defeats proximate causation.

24        I would add, Your Honor, that these decisions from this

25   district, this Federal Court, squarely reflect the

1    remoteness requirement of West Virginia law.

2         And I've put up two cases on the slide here.  The

3    *Aikens* case, remoteness is a component of proximate cause.

4    That's under West Virginia law.  And the *Metro* vs. *Smith*

5    case saying that conduct must be a proximate, not a remote,

6    cause of injury.

7         So we have these two cases under West Virginia law,

8    West Virginia State law cases, and then *City of Charleston*

9    and *Employer Teamsters* out of this court apply that West

10   Virginia legal standard and conclude that the intervening

11   prescribing decisions of doctors defeat the showing of

12   proximate causation.

13        So that's my discussion on legal drugs, on prescription

14   opioids, the flood.

15        Let's also talk about illegal drugs.  And, of course,

16   the Court has heard extensively about how illegal drugs have

17   really taken over as the key issue since at least 2013,

18   2014.  Causation is clearly even more remote as to illegal

19   drugs.

20        First, on the plaintiffs' claim, their gateway theory,

21   that increased prescription opioids led to illegal drug use,

22   that's defeated under the same reasoning I've just laid out.

23        Doctors drove the increased prescribing.  The record is

24   uncontroverted on that point.  And if illegal drug use

25   followed from that increased prescribing, that necessarily

1    was caused by the doctor decision-making as well.

2         In other words, if the point of the plaintiffs' theory

3    is illegal drugs came after the prescribing of opioids, that

4    ties back to the doctor decision-making.  *Employer Teamsters*

5    and the *City of Charleston* tell us that those intervening

6    decisions by the doctors defeat proximate causation, even as

7    to lawful prescription opioids clearly defeat proximate

8    causation as to the even more remote point about illegal

9    drugs.

10        But, second, even putting that aside, the claimed harms

11   from illegal drug use are clearly too remote from the

12   description -- from the distribution of prescription

13   opioids.  There are clearly multiple independent steps that

14   occur after distributors deliver prescription opioids to a

15   pharmacy.

16        A pharmacy -- a doctor prescribes.  A pharmacy

17   dispenses.  Once the pills are out in the community, as

18   we've discussed, the pills are then diverted to an illicit

19   use.  Pills are misused.  Follow the plaintiffs' theory

20   through.

21        Then they say, well, that misuse leads to later illegal

22   drug use.  Well, that involves a crime of misuse of the

23   prescription opioids followed by a crime involving drug

24   trafficking followed by a crime involving drug dealing

25   followed by a crime involving drug, drug purchasers, drug

```
 1    users, intravenous drug users and others who illegally

 2    acquire the drugs.

 3         And, again, *City of Charleston* and *Employer Teamsters*

 4    establish that these multiple criminal acts defeat proximate

 5    causation.

 6         And I wanted to highlight in particular the second

 7    quotation on the right-hand side from Judge Copenhaver where

 8    he said, "Defendants' actions are too attenuated and

 9    influenced by too many intervening causes, including the

10    criminal actions of third parties, to stand as the proximate

11    cause of plaintiffs' injuries."

12         That's the exact same point we're making here, Your

13    Honor.  It's the exact same reasoning.  It's the exact same

14    issue.

15         We have multiple steps in the chain.  Even if you

16    assume that the plaintiffs are right, even if you assume

17    that they're right, that there's gateway, it requires

18    multiple intervening criminal acts before you get there.

19    And that defeats proximate causation.

20         Your Honor, that's what I wanted to address to the

21    Court today.  And as I indicated, we will have a brief

22    following up on this argument later today.  Unless the Court

23    has more, I'll pass it on to my colleagues.

24              THE COURT:  All right.  Thank you, Mr. Hester.

25              MR. HESTER:  Thank you, Your Honor.
```

20

1          THE COURT:  Mr. Nicholas, you may proceed.

2          MR. NICHOLAS:  Thank you, Your Honor.  Good

3    morning.

4          On behalf of AmerisourceBergen, we move for judgment on

5    partial findings pursuant to Rule 52.

6          Mr. Hester has just gone through the fact that there

7    was no evidence of proximate causation established against

8    any of the defendants in this case and we strongly agree.

9          I would like to address something separate.  What I'd

10   like to address is the total absence of any proof of

11   wrongful conduct on the part of my client,

12   AmerisourceBergen.

13         We're past the rhetoric stage.  We're past the

14   allegations stage.  I'm going to restrict my comments and my

15   stuff to the evidence that's in the record and the evidence

16   that's not in the record.

17         THE COURT:  Is wrongful conduct under a nuisance

18   theory an essential element?

19         MR. NICHOLAS:  I believe the essential element

20   under a nuisance theory is, is -- yes, I think wrongful

21   conduct has to be established.  And I think that means that

22   unreasonable conduct has to be established.

23         And I want to start with our customers.

24         One of the first things I did in my opening statement

25   was to put up a slide that displayed AmerisourceBergen's

1   customers in the City of Huntington and Cabell County.

2       If there was going to be any suggestion of bad conduct

3   on our part, it would have had to have had something to do

4   with these customers.  They were our only connection in the

5   area.  But they were hardly mentioned.  And, certainly,

6   there was nothing negative.  There wasn't a negative word

7   uttered.

8       Mr. Rafalski, their SOMS expert, their conduct expert,

9   did not say a single word about our customers and, in fact,

10  didn't say anything specific about our programs at all.

11      Mr. Rannazzisi, who was in charge of diversion control

12  for our regulator, the DEA, for the relevant years did not

13  mention a single AmerisourceBergen customer.

14      The only person that the plaintiffs called -- the only

15  expert that they called who said anything at all on the

16  subject of AmerisourceBergen's customers was Lacey Keller,

17  another expert who talked about two AmerisourceBergen

18  customers.  Both were Walgreens stores.

19      And what did we learn?  What did she say?  What was the

20  outcome of her testimony?  It was that only a fraction of

21  one percent of the prescriptions filled at those two

22  Walgreens stores were for licensed doctors who later had --

23  who later had actions brought against them by the Board of

24  Medicine, a fraction of one percent.  And that was it.  That

25  was the sum total of the evidence about our customers, full

1    stock.

2        The plaintiffs, however, also called -- they chose to

3    call four AmerisourceBergen company witnesses as of cross.

4    It was their choice to do that.  They had them on the stand

5    for days you will recall.  And it's a while ago, but they

6    had them on the stand for days.

7        But there was hardly any cross-examination about our

8    customers of those -- of our witnesses.  And there was

9    certainly no negative testimony.

10       In fact, the only person in this entire case who had

11   any first-hand knowledge of our customers in Cabell County,

12   it was only one.  And that was Mike Perry, our sales

13   representative.

14       And to remind the Court, and it has been a while, he is

15   the person who spoke -- he's the person who spoke with a lot

16   of emotion about the City of Huntington.  He's the person

17   who self-described as a Son of Marshall, Son of Marshall

18   University.

19       He described several of the stores on the list I showed

20   you in great detail.  He described the premises.  He knew

21   the pharmacists in charge.  If there was to be any evidence

22   of missed red flags, he was the one to ask.  And the

23   plaintiffs did not ask.

24       Meanwhile, there was positive testimony.  Every one of

25   AmerisourceBergen's customers was licensed by the DEA,

1   licensed by the West Virginia Board of Pharmacy during all

2   of the time that we serviced them.  This was confirmed by,

3   among others, the plaintiffs' expert, Craig McCann.

4       And I don't need to read this.  It's very clear.  We

5   reported -- in addition, we reported suspicious orders for

6   these pharmacies.  And no one disputes that.  No one

7   disputes that.

8       And Mr. Rafalski, the plaintiffs' diversion control

9   expert, confirmed it.  The plaintiffs did not identify a

10  single order that we should have reported as suspicious but

11  did not, not a single order.

12      And, finally, AmerisourceBergen reported every order of

13  prescription opioids that it shipped to customers in Cabell

14  County and the City of Huntington to the DEA.

15          THE COURT:  Well, wasn't there evidence of

16  failures of the specific order -- of suspicious order

17  reporting system that the plaintiffs claim should have been

18  noticed and -- by the defendants and did the -- assuming

19  that's correct, did the defendants have a responsibility to

20  do anything about that, if you understand my question?

21          MR. NICHOLAS:  Well, I, I don't believe there --

22  well, I'm not sure I understand your question.  Ask me

23  again.

24          THE COURT:  Well, it was very inarticulate.

25          MR. NICHOLAS:  No, that's not true.  I'm just

```
1    not --

2              THE COURT:  If I understand it correctly, there

3    was evidence of the failure of the suspicious order

4    reporting system that the plaintiffs claim the defendants

5    should have recognized.

6         If that's true, did the defendants have a

7    responsibility to do anything about that --

8              MR. NICHOLAS:  Okay.

9              THE COURT:  -- rather than just keep shipping

10   pills?

11             MR. NICHOLAS:  Well, I think there was absolute --

12   there was no evidence of a failure -- of failure of any of

13   the -- of our system or any of these systems, certainly

14   ours.

15        And, certainly, such failures -- and, in fact, the

16   evidence is all to the contrary.  And I have -- I move to

17   this in about three minutes in my, in my presentation.

18        But, basically, I think what we're -- what I'm trying

19   to say in a nutshell here is that there's only two ways I

20   can think of to look at the conduct issue in this case.

21        One, was there any evidence of misconduct or bad

22   conduct in Cabell -- that, you know, attributable to us in

23   Cabell or Huntington.  And the answer to that -- and that's

24   why I'm going through, that's why I'm emphasizing the

25   customer -- is "no."
```

1          The other -- so, so I think the plaintiffs are

2     defaulting to, you know, plan B, argument B which is that

3     there was some sort of systemic failure with our system that

4     we should have corrected.  But there's no evidence -- there

5     is no evidence of that.  In fact, the evidence is to the

6     contrary.

7          The DEA -- you know, our regulator -- and, you know,

8     I'm jumping ahead of my own outline here.  Everything that

9     they did, everything that they said speaks to the contrary.

10    And there's just no evidence of a failure.

11         And the only thing the plaintiffs are pointing to

12    really in this case when you boil everything down is volume.

13    That's it.  That's their argument.  There were just too many

14    pills full stock.

15         But Mr. Hester has just addressed that.  You know, he

16    has just addressed the fact that the number of pills is, is

17    purely and 100 percent a function of the number of

18    prescriptions.  And then we roll right back into the

19    argument on proximate causation and the standard of care.

20         But -- so, so I, I don't think that there was any

21    evidence, any credible evidence, any evidence at all,

22    actually, presented of a failure of AmerisourceBergen's

23    system.

24         The irony here, the irony here -- because I do think

25    that the only thing the plaintiffs are really pointing to as

```
1     a failure is volume itself.  The irony is that the evidence

2     as to the number of pills shipped into Cabell and Huntington

3     and, for that matter, anywhere in the country, all came from

4     our own ARCOS reporting to our regulator, the DEA.

5          So the evidence of volume was not new.  It's not on --

6     it's not new.  It isn't uncovered.  It isn't discovered.

7     The DEA has always had it.  These figures were well-known

8     before this trial even started.  That's not what this case

9     is about.  And they were known by the entity that mattered

10    the most, our regulator.

11         And the dispositive undisputed fact about volume is

12    this:  The number of pills distributed matched the number of

13    pills prescribed one to one.  They were mirror images.

14    Witness after witness said this.

15         Mr. McCann:  "And the fact that prescribing in Cabell

16    County peaked in 2009 is entirely consistent with your

17    countless opinions that distribution peaked -- that

18    distributions peaked in 2009; correct?"

19         "Correct.  That's what I say.  They're two sides of the

20    same coin."

21         Lacey Keller:  "Again, they're two different sides

22    of -- one is shipments and one is prescriptions, but they --

23    for that time period, we both arrived at about the same

24    number of pills per person."

25         And to close the loop on this, none of the witnesses
```

```
 1    was prepared to say that AmerisourceBergen should have tried

 2    to second-guess the doctors who prescribed these

 3    medications.

 4         We can go to the next slide.

 5         "You cannot say --" question to their expert:  "You

 6    cannot tell this Court --" I'm sorry.  Let's see.  Yeah.

 7    Sorry.  I got myself mixed up and lost.

 8              THE COURT:  Well, that was my fault, I think,

 9    because I jumped you ahead, --

10              MR. NICHOLAS:  That's all right.

11              THE COURT:  -- ahead of your scorecard there.

12              MR. NICHOLAS:  It's my fault for not being

13    quick-witted enough.  I, I skipped a step here.  And this is

14    the step I skipped.

15         None of the plaintiffs' experts was able to say what

16    the right number of pills should have been.  And this is

17    extremely important.  None of them actually even said that

18    the wrong number of pills had been shipped.  And how could

19    they since they lined up one to one with the prescriptions?

20         Question to Dr. McCann:  "You cannot tell this Court

21    how many prescription opioids should have been distributed

22    to Cabell County or the City of Huntington; correct?"

23         "Correct."

24         "You cannot say whether or not all the charts you

25    showed over the last day and a half show over-supply or
```

1    under-supply; correct?"

2        "Correct."

3        Next slide, Lacey Keller:  "But I don't offer the

4    opinion of what should be the volume."

5        Question:  "And if you're asked to identify the amount

6    of opioid pain medication that should have been prescribed

7    in Cabell County, that would be outside your area of

8    expertise to answer; correct?"

9        "I could tell you what was prescribed but not what

10   should have been prescribed."

11       And no one told us, no one told us what should -- that,

12   that the number -- that the pills that were prescribed were

13   wrong or what else should or shouldn't have been prescribed.

14       And now to close the loop on this, none of the

15   plaintiffs' witnesses was prepared to say that

16   AmerisourceBergen should have tried to second-guess the

17   doctors who prescribed these medications.

18       And this is the testimony from Dr. -- from Mr.

19   Rannazzisi that so states.  He's the person to ask.  This

20   was his answer.  And I believe Mr. Hester already showed

21   this to you.

22       So now I'm going to -- now I'm rounding into an answer

23   to the question you asked me about five minutes ago I think,

24   I hope.

25       So the plaintiffs have failed to show any failures on

1     the part of AmerisourceBergen in Cabell County and in the

2     City of Huntington.  Their fallback was to try to suggest

3     that there were systemic failures at AmerisourceBergen, but

4     there was no evidence of it.  They did not deliver anything

5     to you.

6          In fact, the evidence at trial paints an extremely

7     positive picture of AmerisourceBergen throughout these years

8     in broad strokes, Your Honor, in broad strokes.  From 1998

9     to 2007 ABDC -- AmerisourceBergen operated a program that

10    was approved by the DEA.  Okay.

11         The DEA worked with us on this program for two years

12    leading up to the approval, and the approval was in writing.

13    And we've seen the writing.  Mr. Zimmerman testified about

14    this at length.

15         During this same time period -- during this period

16    between 1998 and 2007, AmerisourceBergen trained DEA's

17    diversion investigators at the -- at AmerisourceBergen's

18    distribution center.  Mr. Zimmerman and Steve -- and Mr.

19    Mays testified about this.

20         You will -- you have heard that in 2007

21    AmerisourceBergen's Orlando, Florida, distribution center

22    was suspended for a few months.  That -- and this I think is

23    the only snippet of evidence that the plaintiffs will try to

24    use to suggest anything wrong with our systems.  This is it.

25         This does not establish civil -- this 2007 action does

1    not establish civil liability in a lawsuit brought by two

2    political subdivisions in West Virginia that we are hearing

3    in 2021, 14 years later.  And I'll pause on this to make

4    just a couple of more points.

5         First, the distribution center in question in Orlando

6    did not ship product or pills into Huntington or Cabell

7    ever.

8         Second, there's no admission of liability.

9         Third, the suspension was short and was partial.

10        Fourth, the suspension was in 2007, 14 years ago.

11        And, fifth, most importantly, this did not even result

12   in a fine.  AmerisourceBergen has never been fined by the

13   DEA.  And that is one way of answering the question that you

14   asked.

15        And what happened afterwards is just as important and

16   just as responsive to your question because

17   AmerisourceBergen as an outgrowth of this 2007, you know,

18   situation created a new program with input from the DEA that

19   the DEA had AmerisourceBergen present at its, at its

20   industry conference.

21        That happened in 2007.  We did it again with the DEA in

22   2009.  And the description of those two presentations is

23   still on the DEA's website to this day.

24        Where is the evidence, where is the evidence that there

25   was any kind of failure, systemic failure, systemic or

```
 1    otherwise or anything wrong with our program when you --
 2    particularly when you juxtapose it with all the positive
 3    feedback, positive reinforcement we were getting from our
 4    regulator, the DEA, during all of these years?  What we were
 5    hearing, in essence, was, "You're -- this is good.  You're
 6    doing great.  We agree.  Let's show the industry."
 7         And since I don't know what time it is, I'm going to,
 8    I'm going to just show you one more slide.  Okay?
 9              THE COURT:  You go ahead.
10              MR. NICHOLAS:  Mr. -- and this is testimony that
11    Mr. Rannazzisi -- that the plaintiffs elicited during the
12    trial.  Plaintiffs elicited this.
13         Question to Mr. Rannazzisi:  "Mr. Rannazzisi, did the
14    DEA bring additional actions against AmerisourceBergen
15    during your tenure as Deputy Assistant Administrator?"
16         This was -- timing wise, the question was anything
17    after, anything after 2007.
18         Answer:  "I don't recall any additional actions against
19    AmerisourceBergen."
20         Question:  "And was the fact that DEA, to your
21    knowledge, did not initiate an enforcement action against
22    AmerisourceBergen a sign that you had found or that the DEA
23    had found AmerisourceBergen's compliance -- a sign that you
24    had found or that DEA had found AmerisourceBergen's
25    compliance with the Controlled Substances Act?"
```

1          Now, he said, "No," but then he went on to say the

2     following:  "The fact that there was no enforcement action

3     doesn't mean they were compliant, doesn't mean they weren't

4     compliant."

5          I'll stop there to say that is not proof.  They have

6     showed you nothing.

7          "We just didn't --" he goes on to say, "We just didn't

8     have -- during our, our investigations, they did not come

9     up," since 2007.

10         Look, Mr. Rannazzisi -- Mr. Rannazzisi was our

11    regulator.  We are one of the -- we are one of the three

12    largest distributors of all healthcare products in the

13    country.  He knows who we are.  He knew where -- he knows --

14    he knew where we lived.  He knew every shipment that we made

15    within two days of our making it.

16         If there was any evidence that we were doing something

17    wrong systemically, if there was any evidence that there was

18    anything wrong with our systems after 2007, this guy would

19    have found it and this guy would have been the first to tell

20    you about it.

21         I appreciate the opportunity to have spoken to Your

22    Honor.  Thank you very much.

23              THE COURT:  Thank you, Mr. Nicholas.

24         We need to switch court reporters.  It's a little

25    early, but this might be the best time to do it.  Our relief

1    pitcher is in the courtroom I see.

2         (Recess taken at 9:42 a.m.)

3              THE COURT:  Good morning, Mr. Heard.

4              MR. HEARD:  Good morning, Your Honor.  When I've

5    had the pleasure of addressing you before, it's been on

6    behalf of all the distributors.  But this morning, as is

7    appropriate, I think, at this stage of the case, I'm here to

8    speak only on behalf of Cardinal Health and to present our

9    motion under Rule 52(c) for judgment.

10        And, Your Honor, this morning, I want to address really

11   three topics, not surprisingly.  First, that the plaintiffs

12   have failed to prove that Cardinal acted unreasonably.

13   After all, they have a public nuisance claim and they need

14   to prove that there was an unreasonable interference with

15   the public right.

16             THE COURT:  Is that a necessary element of a

17   nuisance claim, in your view?

18             MR. HEARD:  It is.  They have to prove we acted

19   unreasonably, an unreasonable interference.  And, Your

20   Honor, in an appendix that we'll supply with our brief,

21   we're going to ask you respectfully to re-visit one element

22   of the standard, but for purpose of this morning, we're

23   going to assume that it's the standard of unreasonableness

24   and we're going to show you the way you cut and slice this

25   by time period, pre-2007, 2007-2010, or 2010 to the current,

1     they have failed to prove that we acted unreasonably.

2          If you look at the components of our Anti-Diversion

3     System about which Mr. Mone testified you'll see that Mr.

4     Rafalski didn't criticize those components.  And then I'm

5     going to come to Your Honor's question, which I think goes

6     to this suggestion that we did not do adequate due diligence

7     of suspicious orders and I think we're going to find that

8     there's not evidence.  There was artful questioning.

9          The second bucket that I want to address is the

10    question of causation.  We adopt everything that Mr. Hester

11    said and he's absolutely right about the proof of proximate

12    causation.  But one might say even more fundamentally

13    there's a failure to prove cause in fact in this case.  By

14    cause in fact I mean there's no proof in this case that had

15    Cardinal Health done more due diligence, had it blocked more

16    orders, had it reported more orders, that it would have

17    affected in any way or diminished by one pill the volume of

18    prescription opioids coming into Cabell-Huntington.

19         That is a fundamental failure of causation and this

20    isn't a question, Your Honor, of weighing the evidence.

21    There is no evidence.  No witness even addressed the

22    question.

23         And, finally, I want to address a series of questions

24    that go to the power of the Court when it is sitting in

25    equity.  These are questions of equity jurisdiction and I'd

1    like to show Your Honor at the end of this time that the

2    federal law is quite clear that when the federal court is

3    sitting in equity it lacks the power to grant equitable

4    relief if there is a remedy at law.  And there is a remedy

5    at law, and plaintiffs acknowledge that there is a remedy at

6    law, for the $2 billion dollars in abatement relief that

7    they seek for medical treatment.

8        Secondly, the federal court sitting in equity lacks the

9    power to grant monetary relief when that monetary relief is

10   not adjunct to some traditional form of equitable relief

11   like an injunction, restitution, disgorgement, et cetera.

12   The plaintiffs have not cited in the four years of this

13   litigation a single case in which a federal court has done

14   what they are asking you to do.  We'll come back to that.

15       And, lastly, a fundamental principle of equitable

16   relief is that the Court narrowly tailors the remedy to the

17   wrong and the abatement plan that was presented on Monday is

18   quite clearly cut from whole cloth.  It's not tailored in

19   any way whatsoever.

20       So, that's where we want to go and let me start with

21   this question of whether they have met their burden of

22   proving that Cardinal acted unreasonably and, ironically,

23   the proof at trial maps on to plaintiffs' opening statement

24   because in plaintiffs' opening statement there was not a

25   single mention of Cardinal's conduct vis-a-vis a single

1    pharmacy customer in Cabell-Huntington, much as was the

2    case, as Mr. Nicholas says, with ABDC.

3         Cardinal has 37 pharmacy customers in

4    Cabell-Huntington.  27 of those were never mentioned in this

5    trial.  Ten of them were mentioned only by Dr. McCann, who

6    had no opinions about them.  He mentioned them only in the

7    form of presenting a data summary sheet.

8         Mr. Rafalski, the one witness who testifies about

9    Cardinal's conduct, mentioned only one pharmacy customer,

10   Medicine Shoppe, and here is the anodyne testimony that Mr.

11   Rafalski gave about Medicine Shoppe at Page 72 and 73 of his

12   direct examination.  And this was in the context of taking

13   an ingredient limit report, one of those reports that was

14   used to report orders in excess of the threshold, and after

15   going through this report to just show the various blanks

16   that are filled in, this was the set of summary questions,

17   and this is all that was said about a pharmacy by name.

18        Question:  So, using this exemplar, The Medicine Shoppe

19   would be a pharmacy, correct?  Answer:  That's correct.  And

20   it made orders from Cardinal Health?  That's correct.

21        Question:  All of those orders got shipped that are on

22   that list?  Answer, that's correct.  Those orders, either on

23   a monthly or quarterly basis, the transactions would be

24   reported to the ARCOS database, correct?  Yes.

25        Question:  And because the orders for that month from

1   this pharmacy exceeded four times the average this pharmacy

2   got included in the excess purchase report sent to the DEA?

3   Answer:  That's a correct statement, Your Honor.

4       That's the only testimony in this case by name about a

5   pharmacy customer.

6       The reason for this, I believe, Your Honor, is, as Mr.

7   Hester and Mr. Nicholas have both said, the plaintiffs told

8   us in their opening statement that the first pillar of their

9   case was volume.  And the syllogism that they seem to have

10  offered the Court is that the volume appeared to be

11  unreasonable, unreasonably large, and Cardinal's conduct was

12  unreasonable.

13      That's not a logical syllogism at all.  It skips over

14  any proof of actual wrongful conduct.  And, as my colleagues

15  have said, what was established, and established in the

16  first week of trial, is that it's not supply that drives

17  demand.  It's demand that drives supply.  And the demand is

18  doctors' prescriptions and doctors' prescriptions went up

19  and up and up over this time period because the standard of

20  care changed.

21      And you've -- you've seen in their slides and so I

22  won't repeat the testimony from Dr. Waller, the very first

23  witness, that that was the general gestalt.

24      Doctor Gupta, that that was the understanding.  That

25  was the culture.  That was the influence.

```
 1          Dr. Werthammer, Dr. Werthammer who testified candidly,
 2     even ruefully, I guess, saying, unfortunately, it was not
 3     big pharma who wrote the prescriptions.  It was me and my
 4     colleagues.
 5          And Mr. Rafalski, who testified, I think inadvertently,
 6     not recognizing what he was saying, he said the overwhelming
 7     majority of physicians who prescribe controlled substances
 8     do so in a legitimate manner.  And here's the important
 9     part.  That will never warrant scrutiny by federal or state
10     law enforcement officials.
11          Mr. Rannazzisi, of course, put a number on that
12     overwhelming majority.  It was 99.5 percent of doctors he
13     told Congress that were prescribing appropriately and it
14     just beggars logic to say that if 99.5 percent of doctors
15     are prescribing appropriately that pharmacies can be faulted
16     for filling those prescriptions or distributors like
17     Cardinal Health can be faulted for filling the orders so
18     that pharmacies can fill those prescriptions.
19          After all, you will remember that Mr. Rannazzisi said I
20     couldn't cut the quota because it was important to fill
21     doctors' prescriptions so patients who needed the drugs
22     would get them.
23          So, plaintiffs say this is all about volume and they
24     say it's all about volume because their claim is that
25     there's more volume, there may be more diversion.  But
```

1    here's the important thing where Cardinal is concerned.

2    There is no evidence in this trial that Cardinal ever

3    distributed a single pill outside the Closed System of

4    Distribution.  It never distributed a pill to a pharmacy

5    that was not licensed.

6        And the 37 pharmacy customers of Cardinal's never

7    dispensed a pill other than to fill a doctor's prescription

8    and there is precious little evidence in this case, Your

9    Honor, that any doctor in Cabell-Huntington prescribed

10   outside the standard of care against the prevailing standard

11   of care.

12       Reference has already been made this morning to Dr.

13   Keller's testimony.  She told the Court that there were more

14   than 500, 500 doctors, in Cabell-Huntington who prescribed

15   opioids.  She rendered an opinion about none of them.  She

16   said that three of them had been disciplined at one time or

17   another by the Board of Medicine, but of those three out of

18   500, there was only one who had patient prescriptions that

19   were filled at a Cardinal pharmacy health customer and that

20   doctor at that pharmacy accounted for 0.2 percent of the

21   pharmacy's prescriptions, two out of every one thousand.

22       So, the only evidence of diversion in this case is the

23   general truism that there is diversion if there are too many

24   pills being prescribed and there are too many sometimes left

25   in the medicine cabinet, medicine cabinet diversion, as Mr.

1   Hester said.

2        But critically for Cardinal's motion, there is no

3   evidence that connects any action of Cardinal with any act

4   of diversion.  And that's because the diversion, as we know,

5   comes after it's left Cardinal's hands, after it's left the

6   pharmacy's hands, after sometimes it's left the patient's

7   hands.

8        So, let's turn to Mr. Rafalski, the one witness who

9   presumably says something about Cardinal's conduct.  We have

10  articulated in a motion why we think the Court should strike

11  this testimony under *Daubert*, but apart from that, his

12  testimony is not credible.  It's entitled to no weight for

13  two big reasons.

14       And the first reason, Your Honor, is this complete

15  willful blindness about the historical conduct in which all

16  of these events occurred.  If we're going to answer the

17  question of whether Cardinal Health or any other distributor

18  acted unreasonably, we have to look at it in a historical

19  context and, as my colleagues have indicated, that is, you

20  heard from Drs. Waller and Gupta and Werthammer and Yingling

21  the standard of care changed.

22       And what I want to underscore is this.  Not just that

23  we have individual doctors who recognize that the standard

24  changed, but that for a period of a decade or so this

25  understanding of prescribing opioids, that it was okay to

1    prescribe them long-term for chronic pain, was a pervasive

2    understanding.  It was the conventional wisdom.  It was, to

3    use a somewhat pejorative term, group think.  And group

4    think has great power.

5        And the evidence that this was group think is that you

6    heard in the first week of trial from the first witness that

7    the West Virginia Board of Medicine sent this booklet,

8    Responsible Opioid Prescribing, to every doctor in West

9    Virginia.  In retrospect, the plaintiffs would highlight

10   this book in their complaint and say this is what caused

11   prescriptions to skyrocket.

12       You heard testimony about the Joint Commission and the

13   fifth pain as a fifth vital sign and, in retrospect, the

14   plaintiffs, the City of Huntington, at least, files a

15   complaint saying that the Joint Commission's endorsement and

16   use of pain as a fifth vital sign is a criteria for hospital

17   accreditation caused prescriptions to skyrocket.

18       And, of course, most saliently, it's the DEA.  The DEA

19   endorses the Federation of State Medical Board guidelines.

20   It reports to Congress that 99.5 percent of doctors are

21   prescribing appropriately.  It raises the quota 39-fold over

22   a 15-year period.

23       I say this not because this is to blame the DEA, not at

24   all.  It is to underscore the historical conduct -- context

25   in which this prescribing takes place, that there is a

1    powerful conventional wisdom at work, so that even the

2    regulators and the quasi regulators like the Joint

3    Commission at state and federal level are all part of this

4    view that the standard of care has changed.

5        And if 99 percent of doctors are prescribing

6    appropriately, how can 90 percent of the orders be

7    suspicious and should have been flagged?  That is a

8    jerry-rigged reverse engineering methodology that Dr.

9    Rafalski has provided and it shows a willful blindness to

10   historical conduct in which prescriptions and distributions

11   were being made.

12       But the second big problem and the reason why Rafalski

13   is entitled to no weight is let's break this down into the

14   time periods.  Pre-2007, all of the distributors, all of

15   them; not just these three, all of them nationwide, are

16   reporting suspicious orders and shipping the drugs.

17   Reporting them and, in Cardinal's case, doing limit reports.

18       You heard through Mr. Rafalski that agents of the DEA

19   testified in federal court in the Eastern District of

20   Michigan before Judge Lawson saying the DEA was aware of

21   this practice and approved it.  And who is seated at counsel

22   table as that testimony was given?  None other than James

23   Rafalski.  So, before 2007, we know that everyone is

24   performing a system that's in accord with DEA understanding

25   expectation and with their approval.

1          Post-2007, what does Cardinal do when the DEA, along

2     with ABDC, sponsors a presentation telling all distributors

3     this is the way you should now model your system?  We know

4     there's no golden rule, no one way it's supposed to be done,

5     but DEA stood up on the stage with ABDC and said to

6     everyone, this is a good system, and Cardinal goes out to

7     modify its system accordingly and you heard from Mr. Mone

8     what Cardinal did.

9          Did you hear any criticism from Mr. Rafalski about, A.,

10    the person that Cardinal chose to lead this modification,

11    mastermind Mone, a pharmacist, a lawyer, a former regulator

12    in the State of Kentucky?  You did not.

13         Our modified system had three major components, know

14    your customer, analytics for setting thresholds,

15    investigations, broadly, broadly stated.

16         Did you hear any criticism from Mr. Rafalski that under

17    our know your customer component that there was any customer

18    that we approved that we should not have approved?  No, you

19    did not.

20         Did you hear any testimony there was a customer that we

21    should have terminated that we did not?  No.  There was no

22    such testimony.

23         The analytics component, the data driven analytics

24    component for setting thresholds, did you hear about a

25    single pharmacy customer that we set the thresholds wrongly

1    or adjusted them wrongly?  You did not.

2         The investigations component, did you hear any

3    criticism of who we hired as investigators?  Mr. Mone talked

4    about former DEA agents, former police, former FDA

5    investigators.  Did you hear any testimony we hired the

6    wrong people?  No.

7         Did you hear any criticism we didn't hire enough

8    people?  No.

9         Did you hear any criticism we didn't train them well

10   enough?  No.

11        All you heard was that there was a claim that we failed

12   to do adequate due diligence of suspicious orders and I

13   would imagine that was where Your Honor's question was

14   coming from and I will submit to you that what you heard was

15   not evidence, but artful questioning, because here's what

16   Mr. Rafalski was asked on direct examination:

17        Were you asked to review the due diligence files?  Have

18   you gone through customer files?  Not have you found that

19   there is affirmative proof that Cardinal Health did not do

20   due diligence, but did you find evidence sufficient to

21   dispel your suspicions.

22        But he walked it all back on cross because, when Mr.

23   Schmidt asked him direct questions, have you looked at those

24   initial orders you flagged, he hadn't looked at them.

25        Did you individually review them to see if they were

1    suspicious?  I did not.

2         Did you review the due diligence files for these

3    flagged orders?  Well, some.

4         Didn't review all of them?  No.  Just some.

5         And then further, when he was impeached with his

6    deposition testimony, can you say anywhere between 0 and

7    100 percent how many Cardinal Health, or McKesson, or ABDC?

8    I don't have a definitive answer.

9         And why not?  It's not something he even tried to

10   evaluate.

11        So, here's what he didn't do.  He didn't review all of

12   Cardinal's due diligence files, only some.

13        He didn't even review the pharmacy orders that were

14   flagged by his methods.  He didn't review his initial ones.

15        He doesn't know how many Cardinal investigated because

16   it's not something he tried to evaluate.

17        That's just dodging testimony, Your Honor, and it has

18   -- should be accorded no weight.  That's a dodging

19   methodology to begin with and his implementation is he

20   doesn't even look to see.

21        And we have to the contrary Mr. Mone's testimony that

22   Cardinal did evaluate every suspicious order; that is, every

23   order that was flagged for being over the threshold, and

24   held the order and did not ship it until they had satisfied

25   it was okay to do so.

1          The only other thing Mr. Rafalski had to say was, well,

2     I didn't see a lot of due diligence files.  Well, you know,

3     we produced records going back to 1996.  These records were

4     20 years old by the time the plaintiffs asked for them.  And

5     the important fact is that DEA has never imposed any record

6     retention requirement for due diligence files and, notably,

7     it does establish such requirements for other files but not

8     these.

9          So, Your Honor, I would suggest there is a complete

10    failure of proof on the plaintiffs' part.  And on the other

11    side, there's Mr. Mone's quite consistent testimony about

12    what they did.  And here's more detail.

13         Cardinal hired a good person to change the system.

14    We've modeled our system after one DEA sponsor.  Mr. Mone

15    testified at length that he briefed the Chief of the Office

16    of Diversion on this.  And when I sa briefed, he didn't just

17    call her on the phone or go to the DEA Office for a

18    half-day's meeting.

19         She came to Dublin, Ohio for a week with investigators

20    while he presented this system.  And then they cooperated

21    with DEA investigators, who went to various of our

22    distribution centers and did a deep dive.  All of that

23    stands in contradiction of Mr. Rafalski's superficial

24    testimony about due diligence.

25         And I should underscore this.  I said at the beginning,

1    there is not a single statement about a Cardinal pharmacy

2    customer.  There's not a single mention in this trial of the

3    Wheeling Distribution Center, the one Cardinal Distribution

4    Center that supplies all these drugs to our customers in

5    this area.  No criticism of the Wheeling Distribution Center

6    by any witness and the fact is no criticism at any time from

7    the DEA or state regulators.

8         So, Your Honor, I submit they've failed to prove their

9    case about reasonableness.

10        Now, let's turn to causation for a second.

11        As I say, we adopt what Mr. Hester has to say about

12   proximate cause.  But there is, in a way, a predicate

13   question about cause and effect.  And there are three

14   questions here that the plaintiffs had to have answered.

15        The first is if Cardinal had done more due diligence,

16   or different due diligence, or better due diligence, would

17   it have then blocked more orders?

18        Secondly, if it had blocked more orders, would that in

19   any way have affected the supply coming into

20   Cabell-Huntington?

21        If Cardinal had reported more orders to the DEA, would

22   the DEA have done something differently?  As I say, there is

23   no witness in the case, not Mr. Rafalski and no one else,

24   even addressed those questions.  There is no evidence

25   whatsoever to prove what plaintiffs must prove, which is

1    that Cardinal's allegedly unreasonable conduct was a cause

2    and fact of the harm.  And all the evidence, Your Honor, is

3    to the contrary and this question and answer captures it.

4        I don't know what I did to make this blip on the screen

5    and I apologize.

6        But did he ever look to see how many doctors were

7    prescribing legitimate?  If we had done a deep dive, a due

8    diligence dive that the law doesn't even require us to make,

9    no, I didn't conduct any research on that.

10       If we had done a deep dive to go, you know, every --

11   every pharmacy, boots on the ground, which we're not

12   required to do, he doesn't have any -- he didn't have any

13   opinion about that.

14       And we know that if we had even done some fly on the

15   wall, fly on the wall of the doctor's office, that that's

16   where we've been, what and we would have known is that

17   99.5 percent of doctors were prescribing appropriately.

18       So, the evidence is to the contrary about whether more

19   due diligence would have caused us to block more orders.

20   Would blocking more orders have led to fewer pills coming

21   into Cabell-Huntington?

22       Well, Judge, there are more than 30 wholesale

23   distributors and the ones who have small pieces of the

24   market are always trying to poach business from Cardinal,

25   and McKesson, and ABDC.

1          And you heard testimony about the A Plus Pharmacy, the

2      pharmacy where the owner was sent to jail.  It wasn't

3      supplied by any of the defendants in this case.  It was

4      supplied by Miami-Luken, who's standing by to supply the

5      pills if Cardinal, or McKesson, or ABDC cuts off a customer.

6      Cutting off a customer wouldn't have changed the supply,

7      only the DEA, as Mr. Rafalski acknowledged, could do that.

8          And, finally, had we reported no orders, would that

9      have made a difference?  Well, you've heard the testimony.

10     The plaintiffs say this case is about the volume of opioids.

11     We reported accurately every transaction to every pharmacy.

12     The DEA had the information about volume.  It knew the total

13     volume going to each pharmacy and every pharmacy in the city

14     and every pharmacy in the county and it saw no reason to

15     take action because it believed that 99.5 percent of doctors

16     were prescribing appropriately.

17         So, not -- the plaintiffs haven't even proven cause in

18     fact and they haven't proven proximate cause.  And I add

19     this slide only to underscore what Mr. Hester says.  There

20     is no reported case in which there have been this many steps

21     standing between our conduct and the plaintiffs' harm and

22     not, not been held to be too indirect and too attenuated to

23     support proximate causation.  And, of course, these steps

24     are punctuated by illegal conduct and professional

25     judgments.  So, we submit, Your Honor, they haven't proved

1    cause any more than they proved that we acted unreasonably.

2         And, finally, Your Honor, when we come to the question

3    of their abatement remedy, it takes quite a number of pages

4    in our brief, you will find it discussed fully there, but

5    I'll -- I'll ameliorate it here.

6         The first major obstacle is that the Court has no power

7    to grant equitable relief when there's an adequate legal

8    remedy at law.  Your Honor knows that we have -- we have

9    complained from the beginning that the plaintiffs' concept

10   of abatement is all wrong and we've swung the hammer at that

11   nail a few times.  I think you'll see in the brief now that

12   we can hit the nail squarely on the head.

13        And beginning with the Supreme Court's decision in

14   *Guaranty Trust v. York* in 1945, an opinion written by

15   Justice Frankfurter, the Court has said that regardless of

16   state law, when the federal court is sitting in equity, it's

17   governed by federal common law and the federal court always

18   must insist on finding there is no adequate remedy at law.

19        And the $2 billion dollars that plaintiffs seek for

20   medical treatment is classic damages.  It is future costs

21   for personal injury.

22        And so, Mr. Barrett, on Tuesday when he testified, was

23   not misspeaking when several times he referred to the

24   abatement plan as a life care plan.  It is a life care plan.

25   It's the same life care plan he does in personal injury

1      cases for damages all the time.

2          The case we're going to ask Your Honor to look at very

3      closely is this case decided in August, 2020 by the Ninth

4      Circuit.  The case relies on the legal principle I've just

5      discussed with you and the facts are uncannily like those

6      here.  And this is the Court's summary in one of the

7      introductory paragraphs of what happened;

8          On the brink of trial, after more than four years of

9      litigation, plaintiff dismissed her damages claim and chose

10     to proceed with only equitable remedies.  Just like here.

11         A singular and strategic purpose drove this maneuver to

12     have a bench trial rather than a jury trial.  Just like

13     here, where the other strategic purpose, of course, was to

14     get out of the MDL as quickly as possible and have a trial.

15         Third, plaintiffs continued to seek $32 million

16     dollars, but as equitable restitution rather than damages.

17     Just like here.  Plaintiffs are still seeking the same

18     amount of money they've always sought.

19         The Court dismissed the claims for restitution, this

20     so-called equitable remedy, because an adequate remedy at

21     law, damages, was available.  Confirmed by the Ninth Circuit

22     the District Court's holding on that ground.

23         And, Your Honor, that's exactly true here for the $2

24     billion.  Plaintiffs have an adequate legal remedy.  They've

25     said so.  They alleged it in their complaint.

1      When we moved to dismiss, they said we have a valid

2  damages claim.  Even in opposing summary judgment on

3  abatement they insisted they had plenary power under the

4  municipal code to get any kind of relief.

5      And, of course, in the broader litigation the damages

6  claims have been sustained time and again.  After all, the

7  State of West Virginia settled with these three defendants

8  for roughly $75 million dollars for its damages claim.

9      The mass litigation panel denied our motion to dismiss

10  because they allege damages.  The MDL court did the same.

11  So, they have an adequate remedy at law and, because of

12  that, they can't collect $2 billion dollars in abatement

13  relief for medical treatment.

14      Now, the second problem they have, Your Honor, is that

15  there is a limitation on the Court's equity jurisdiction in

16  any case where you seek monetary relief that is not adjunct

17  to injunctive relief.  Again, it's a large portion of the

18  brief that you will be receiving.

19      I will say only this, as I said in the beginning, after

20  four years of litigation, the plaintiffs still cannot cite a

21  single federal case in which a Court has done what they are

22  asking you to do.

23      If you're asking for $2.6 billion dollars, I would

24  submit you need more than one case.  It would be nice to

25  have an established line of authority, but they don't even

1    have one case.

2        And we take the 22 cases that they put in their

3    Memorandum of Law when they were seeking a bench trial and

4    the few additional cases in their summary judgment papers

5    and we take those out of the footnotes and we hold them up

6    to the light.  And when you look at those 22 cases, not one

7    of them does what they're asking the Court to do and not

8    even one of them supports doing what they're asking the

9    Court to do.

10       So, I'll end with this, Your Honor.  The problem with

11   the abatement plan, is there any more fundamental principle

12   of equitable relief than that the plaintiff has to show and

13   the Court has to narrowly tailor the remedy to the wrong?

14   Well, this plan that Dr. Alexander talked about on Monday

15   doesn't begin to be narrowly tailored.

16       Just consider this.  You got addicted to opioids before

17   1990, before Purdue even began to market the drugs, before

18   there even was an opioid epidemic, and you're still alive

19   today?  You're in the abatement plan.

20       If you lived all of your life in Las Vegas and got

21   addicted to opioids in Las Vegas, but you moved to West

22   Virginia in 2025, you're in the abatement plan.

23       You haven't even been born as of today and, as a

24   teenager in 15 years you get addicted to opioids, you're in

25   the abatement plan.

1          And if you've never used prescription drugs,

2     prescription opioids, and you get addicted to heroin in

3     2035, you're in Dr. Alexander's abatement plan because he

4     wasn't asked to create a plan that was in any way tailored

5     to the defendants' wrongful conduct or to the period in

6     which wrongful conduct occurred.

7          And if we were to try to break down this plan and

8     provide some analytical structure, we'd see it's not

9     narrowly tailored because the remedies have to do with

10    future addiction.  Our -- our wrongful conduct stopped,

11    according to plaintiffs proof, in 2012.

12         They came into court in 2017, when I first argued

13    before Your Honor, and Mr. Majestro said, as of 2017, the

14    defendants are doing everything right now.

15         But this plan has millions, or tens of millions, or

16    perhaps hundreds of millions for future addiction.  It seeks

17    to hold us responsible for the wrongs of others.

18         There's programs in here to educate doctors, re-educate

19    doctors in proper prescribing.  We don't have any

20    responsibility for communicating with doctors.  We didn't

21    mis-educate doctors.

22         We didn't mislead them.  The complaint says the

23    manufacturers did.  But we're being held under this plan to

24    account for the wrongs of others.

25         And there are remedies that are just so remote from any

1    conduct of Cardinal.  The plan includes distributing testing

2    strips to drug addicts in homeless shelters so they can see

3    if their illegal drugs are adulterated and we're supposed to

4    pay for that.

5        And there are remedies that are related to the root

6    cause of drug abuse, such as they want mental counseling for

7    those in chronic pain because people in chronic pain are at

8    risk of developing drug addiction.  Well, that may be, but

9    chronic pain has long been with us and pre-dates this

10   epidemic.  It will post-date this epidemic.

11       They want us to have programs to eliminate stigma of

12   drug addiction, but stigma preceded the opioid crisis.

13   We've known about stigma since Eugene O'Neill wrote Long

14   Day's Journey into Night in 1941.  So, this program is in no

15   way narrowly tailored.

16       And the rubber meets the road, Your Honor, on this very

17   last point.  There is no evidence that would allow Your

18   Honor to tailor this plan when the plaintiffs haven't done

19   it themselves.  There is no evidence that allows you to

20   disaggregate the components.  There is no way to separate

21   out what might be narrowly tailored from what isn't at all

22   because Dr. Alexander testified he didn't do that analysis.

23   Everything is lumped in, lumped into one pot.

24       So, on behalf of Cardinal, Your Honor, I have to

25   suggest they have not proven we acted unreasonably, haven't

proved causation, either proximate or cause in fact.  And
that abatement plan is entirely contrary to the power of a
federal court sitting in equity jurisdiction.  For all of
these reasons, we ask the Court to grant the motion.  Thank
you.

THE COURT:  Let me ask you this.

MR. HEARD:  Yes.

THE COURT:  And, hopefully, this is not out of
bounds for the scope of this argument, but as you know from
prior arguments, Mr. Heard, I had a serious question whether
the law of negligence was broad enough to even cover this
cause of action.

I ruled on that issue.  Didn't write an opinion about
it.  Am I foreclosed from reconsidering that issue under the
law of the case doctrine as -- in the posture this case is
in now or is that open for me to look at again?

MR. HEARD:  Your Honor, I think it's open for a
couple of reasons.  One is, and as is true of any
evidentiary issues and other legal issues, Your Honor has
waited to have the full context of the evidence in order to
weigh some of these issues.  That's one of the great virtues
of a bench trial, is a lot of these things don't have to be
decided precipitously.  So, yes, I think you can re-visit
it.

And I think you will find in the brief that ABDC is

1    filing that they made a very cogent argument about why the

2    plaintiffs can't recover under a negligence standard and

3    that argument they're making meshes with the argument that

4    we're making, which is under West Virginia law the Supreme

5    Court in *Hendricks v. Stalnaker* set forth a test specific to

6    private nuisance, a three-part test for how you could prove

7    unreasonable conduct, the unreasonableness component.

8        And we believe when Your Honor re-visits negligence you

9    should also re-visit this question under *Hendricks v.*

10   *Stalnaker* of whether plaintiffs can meet that standard

11   because negligence is one of those -- one of those choices.

12       This is certainly not abnormally dangerous activity,

13   the distribution of FDA approved drugs, so that's not

14   possible.

15       The second standard is -- is negligence and ABDC's

16   brief explains why that doesn't apply because there's no

17   private cause of action to enforce the Controlled Substances

18   Act.  And that leaves us with a standard that says they have

19   to prove unreasonable conduct that's also intentional with

20   knowledge that the parties knew that this was going to have

21   an impact on opioid abuse and they can't meet that.

22       So, Your Honor, I think we can -- you could re-visit

23   negligence.  You could re-visit the nuisance standard, as

24   well, unreasonable interference with public right.  Thank

25   you.

```
 1                THE COURT:  Thank you, Mr. Heard.

 2                MR. HESTER:  Your Honor, I wanted to introduce my

 3     partner, Christian Pistilli.  You've not met him before in

 4     this courtroom during trial, but you're actually somewhat

 5     familiar with his work because he's done a lot of the

 6     writing for which we're most grateful on many of the briefs

 7     that have been filed with the Court.  So, I'm glad to be

 8     able to introduce him to you today.

 9                THE COURT:  All right.

10                MR. PISTILLI:  Good to meet you, Your Honor.

11                THE COURT:  We're happy to have you, Mr. Lee

12     [sic].  You're yet another lawyer to introduce into this

13     case.

14                MR. PISTILLI:  It's very good to meet you, Judge.

15                MR. HESTER:  May I, Your Honor?  I think I can

16     solve this.

17                THE COURT:  You're Mr. Pistilli; is that right?

18                MR. PISTILLI:  Yes, Your Honor.

19                THE COURT:  I only called you "Mr. Lee".  I only

20     got the last syllable of that.

21                MR. PISTILLI:  Well, Pistilli is much harder than

22     Lee.

23          (Pause)

24                MR. PISTILLI:  Good morning again, Your Honor.

25                THE COURT:  Good morning.
```

1              MR. PISTILLI:  In openings, plaintiffs' counsel

2      told the Court that it was their burden to prove actionable

3      conduct.  After nearly seven weeks of testimony, it's clear

4      that plaintiffs cannot prove actionable conduct as to

5      McKesson, nor have they shown that McKesson's conduct was a

6      substantial factor in Cabell and Huntington's opioid use

7      problem.  McKesson is, therefore, entitled to judgment under

8      Rule 52(c).

9          Now, plaintiffs' efforts to establish wrongful conduct

10     fall into two buckets.  First, and dominantly, they point to

11     the volume of pills defendants shipped into Cabell and

12     Huntington.

13         In openings, plaintiffs referred to volume as the first

14     pillar of their case.  So, I intend to start this morning

15     with a basic and undisputed proposition that the volume of

16     McKesson's shipments into Cabell and Huntington were, in

17     both relative and absolute terms, really quite small and

18     plaintiffs have absolutely no evidence tying any diversion

19     that occurred in Cabell and Huntington to the --

20             THE COURT:  Well, McKesson got in trouble and paid

21     a big fine on at least one occasion, did it not?

22             MR. PISTILLI:  Yes, Your Honor, and I will address

23     those settlements and the key point as to those.  Well,

24     there are two key points as to those.

25         The first is that the settlements were not about Cabell

 1     and Huntington and the point I was making is that they have

 2     absolutely no evidence of diversion into Cabell and

 3     Huntington.

 4          Then the second very point I will get to is that the

 5     second of those settlements was about reporting.  And for

 6     reasons I'll explain, the reporting issues can't -- couldn't

 7     possibly have led to diversion because, at the time of those

 8     reporting issues, McKesson was blocking all of the orders it

 9     identified as suspicious.

10          So, you know, DEA has rules about reporting.  Those

11     were addressed in the settlement.  But the question here is

12     was any harm caused in Cabell and Huntington.  And as we'll

13     hear plaintiffs' own experts admit, when you block an order,

14     it can't be diverted.  It can't cause harm.

15          So, you know, because plaintiffs can't show that any of

16     McKesson's small volume of shipments into Cabell or

17     Huntington were diverted they couldn't possibly show that

18     McKesson was a substantial factor in Cabell Huntington's

19     harm.

20          Now, second, plaintiffs have suggested that McKesson

21     failed to design and implement an adequate system, which is

22     what I think Your Honor was getting at.  But, first, we'll

23     see that McKesson's systems at all times conformed with

24     DEA's evolving guidance to the wholesale distribution

25     industry when it comes to preventing diversion and, in any

1    event, there's no evidence that those purported deficiencies

2    in the system caused any harm in Cabell and Huntington.

3         And as I just said, Your Honor, absent evidence that

4    McKesson's conduct caused diversion, caused harm in Cabell

5    and Huntington, any abstract deficiencies in McKesson's

6    programs simply are not relevant to this case.

7         Now, Your Honor has asked a couple of times today about

8    the standard, so I just want to say a few words about the

9    legal standard and we've got the next slide on that.

10        So, plaintiffs throughout this case have made various

11   claims about the standard.  We've disagreed about some --

12   some of those.  You know, for instance, it's common ground

13   that unreasonableness is part of the standard, but as Your

14   Honor just referenced, that's something we've briefed and we

15   do think Your Honor is free to re-visit that.

16        And in our briefs, and in ABDC's brief, as Mr. Heard

17   referenced, there's a discussion of what the applicable

18   legal standard is to establish unreasonableness, but for

19   purposes of this motion, we're just going to assume along

20   with plaintiffs that the standard is unreasonableness

21   simpliciter.

22        We actually think they have to prove more.  We think

23   Your Honor can re-visit that.  We think there are serious

24   questions about whether the distribution of a lawful product

25   can possibly give rise to a public nuisance claim.  But at

1    least for now we're going to spot plaintiffs the standard.

2         And so, first, we're going to say that the actionable

3    conduct standard is simply reasonableness without more.  And

4    then, the next thing that plaintiff has said is that they

5    have to prove, and they admit this, that each defendant's

6    conduct was a substantial factor in causing the harm.

7         And so, what I intend to show Your Honor today is that

8    plaintiffs cannot prove that any unreasonable conduct by

9    McKesson was a substantial factor in bringing about the

10   present-day opioid abuse problem in Huntington and Cabell

11   County.  And so, we would respectfully submit that under any

12   standard, including the very standard that plaintiffs

13   themselves have espoused in this case, they haven't shown

14   liability on the part of McKesson.

15        Now, remember, the plaintiffs' core theory here is

16   volume, but the vast, vast majority of McKesson's shipments

17   into Cabell and Huntington were made to the federal

18   government.

19        Specifically, they were made to the Hershel "Woody"

20   Williams VA Hospital in Huntington.  In his testimony, Dr.

21   McCann admitted that this facility alone accounted for over

22   76 percent of McKesson's opioid shipments and both Dr.

23   McCann and Mr. Rafalski testified that they excluded

24   McKesson's VA shipments from all of their analyses other

25   than their total volume numbers because those shipments

1   were, in Mr. Rafalski's words, not applicable to the

2   diversion topic.  So, McKesson's VA shipments are not part

3   of plaintiffs' case.

4        Now, after we exclude the VA shipments, McKesson's

5   market share in Cabell and Huntington is tiny.  Dr. McCann,

6   for instance, confirmed that it was less than 6 percent and

7   that five other distributors shipped a greater amount of

8   prescription opioids into Cabell and Huntington.

9        Dr. McCann also presented various charts to the Court

10  comparing defendants' shipments into Cabell and Huntington

11  with statewide and national averages and he suggested that

12  above average distributions into Cabell and Huntington were

13  somehow probative of wrongdoing.

14       But as to McKesson, Dr. McCann's own chart showed that

15  its shipments were well below average.  We see it there on

16  the screen.  45 percent lower than the West Virginia

17  average.  15 percent lower than the national average.

18  That's according to Dr. McCann.

19       Now, during the course of the trial, Your Honor, the

20  Court has heard evidence about multiple different groups

21  that played a role in bringing about the opioid crisis.

22  Doctors in the medical community, opioid manufacturers,

23  state and federal regulators, people who illegally diverted

24  prescription opioids, criminal drug traffickers, drug

25  dealers and drug users.

1        Even if we accept the assumption, accept plaintiffs'
2   premise that the wholesale distribution industry as a whole
3   was also somehow a factor, given the dominant role of all
4   these other actors and given that McKesson specifically
5   accounted for only 6 percent of the total distributions into
6   Cabell and Huntington, we would submit that plaintiffs have
7   failed to prove McKesson was a substantial factor in Cabell
8   and Huntington's opioid problem.

9        But the Court doesn't need to rest on that basis alone.
10  Consistent with McKesson's very small market share, it's
11  only done business with a very few pharmacies in Cabell and
12  Huntington.  Tim Ashworth, who Your Honor heard from, who
13  was McKesson's regional sales manager, he testified that at
14  any one time McKesson had only around three independent
15  pharmacy customers in Cabell and Huntington.

16       And over the course of nearly seven weeks of testimony
17  plaintiffs ever even only mentioned five McKesson customers
18  in Cabell and Huntington.  As to three of those five, the
19  Fruth pharmacy, the McCloud Pharmacy and The Medicine Shoppe
20  Pharmacy, all plaintiffs did was introduce bear shipment
21  volumes and there was nothing remotely concerning about
22  these volumes.

23       For Medicine Shoppe, to take just one example, Dr.
24  McCann testified that McKesson's volume was essentially
25  zero.  There was somewhat more extensive testimony about two

1    pharmacy customers, Custom Script and Rite Aid, but, again,

2    nothing remotely concerning.

3        As to Custom Script, plaintiffs focused on the fact

4    that its ordering patterns showed a relatively high ratio of

5    controlled substances, which in some cases can be a red

6    flag.

7        But Mr. Ashworth explained that there was a perfectly

8    benign explanation in the case of Custom Script.  Custom

9    Script is not a typical pharmacy.  It's what's known as a

10   compounding pharmacy, which means that it makes specialized

11   medicines that aren't commercially available.

12       Now, Custom Script got most of the supplies that it

13   needed for that compounding business from others.  Pretty

14   much the only thing it bought from McKesson were controlled

15   substances.  Thus, unsurprisingly, most of McKesson's

16   shipments to Custom Script were controlled substances, which

17   would mean the ratio is going to be quite high.

18       What's more, Custom Script was only a McKesson customer

19   from 2010-2013.  Its opioid ordering went up some in 2010

20   because it took on as new client contracts with

21   Cabell-Huntington Hospital's oncology clinic and the Hospice

22   of Huntington.

23       But even then, when it took on these new contracts, it

24   dispensed less than 2,000 dosage units of hydrocodone and

25   oxycodone per month, which Dr. McCann himself testified was,

1    quote, in the bottom half of pharmacies in Cabell and

2    Huntington.  So, there's no evidence of wrongdoing as to

3    Custom Script.

4         Same goes for McKesson's distributions to Rite Aids in

5    Cabell and Huntington.  Mr. Rafalski suggested in conclusory

6    fashion that McKesson's Rite Aid shipments were too high,

7    but he admitted that he didn't review any concrete

8    information relating to the operation of those Rite Aid

9    stores.

10        For instance, he ignored the West Virginia Board of

11   Pharmacy Report shown on the screen there that said Rite Aid

12   was a good pharmacy for which all prescriptions appeared for

13   a legitimate medical use.

14        Notably, Dr. McCann testified that Rite Aid

15   self-distributed two-thirds of its prescription opioids and

16   McKesson distributed only the remaining one third.  Mr.

17   Rafalski admitted that he could not opine as to, quote,

18   whether Rite Aid helped cause the opioid crisis in

19   Huntington and Cabell.

20        If Mr. Rafalski could not opine that Rite Aid itself

21   helped cause the opioid crisis in Huntington-Cabell, then he

22   necessarily could not opine that McKesson's minority

23   shipments to that Rite Aid helped cause the opioid crisis in

24   Huntington and Cabell.

25        So, in short, Your Honor, plaintiffs have failed to

1    prove any actionable conduct on the part of McKesson in

2    Cabell or Huntington and, for this reason alone, judgment is

3    warranted.

4        Now, Your Honor, in addition to that, plaintiffs have

5    failed to prove any actionable conduct on the part -- that

6    any actionable conduct on McKesson's part was a substantial

7    factor which plaintiffs say is part of their burden in

8    causing harm to occur in Cabell and Huntington.

9        Not a single plaintiff witness ever testified that

10   diversion was occurring at any pharmacy customer serviced by

11   McKesson in Cabell or Huntington, let alone that McKesson

12   knew or should have known about that diversion.

13       For example, as you see on the screen, Mr. Rannazzisi

14   testified that he had not reviewed any documents relating to

15   West Virginia and he could not identify any orders in

16   Huntington or Cabell that he believed should have been

17   blocked by McKesson but were not.

18       And perhaps the best illustration of this point is the

19   testimony of Mr. Rafalski.  He admitted that he was, quote,

20   not offering any opinions about whether diversion occurred

21   at pharmacy level in Cabell or Huntington.

22       This concession alone is fatal to plaintiffs' case.

23   Absent concrete evidence of diversion occurring at a

24   pharmacy serviced by McKesson, plaintiffs could not possibly

25   prove that McKesson substantially contributed to the opioid

1    crisis in Cabell or Huntington.  There is simply no record

2    evidence of any such diversion.

3        So, I now want to switch gears and address some of

4    plaintiffs' claims about McKesson's systems.  In the

5    interest of time, I plan to focus on plaintiffs' core

6    criticisms, but I would be happy to address any questions

7    the Court has and, also, just for Your Honor's benefit, the

8    subject is addressed in a little bit more detail in the

9    brief we'll be submitting later today.

10       But, for today, I think the really critical point is

11   that the Court doesn't even need to reach the issue of the

12   advocacy of McKesson's systems.  As I've already explained,

13   plaintiffs have no evidence tying McKesson's distributions

14   to any diversion in the community.

15       Absent such evidence, it doesn't matter whether

16   McKesson's systems were less than perfect as they evolved or

17   whether McKesson made problematic shipments to internet

18   pharmacies 15 years ago in Florida.

19       The question before this Court is whether actionable

20   conduct by McKesson led to diversion and then led to harm in

21   Cabell and Huntington.  Because plaintiffs haven't proven

22   that, the adequacy of McKesson's systems in the abstract are

23   simply not relevant.

24       In any event, the evidence shows that McKesson's

25   systems were at all times in line with DEA's contemporaneous

1    expectations for the wholesale distribution industry.

2         Now, if we could go to the next slide, so this is a

3    typed-up version of the demonstrative that Your Honor saw in

4    connection with the testimony of McKesson's long-time

5    Director of Regulatory Affairs, Michael Oriente, and it

6    shows the evolution of McKesson's systems over time.

7         And it shows that McKesson had one system in place

8    prior to 2008.  The system was replaced by the Controlled

9    Substance Monitoring Program, or CSMP in 2008.  And then,

10   significant further enhancements were made in 2013 and I

11   just want to very briefly walk through each those periods.

12        Now, plaintiffs' main critique of McKesson's system

13   prior to 2008 is that it shipped the suspicious orders it

14   identified, but the undisputed record shows that DEA was

15   fully aware of and approved of that practice.  It wasn't

16   until 20 -- 2007 that DEA, without making any change to its

17   regulations, informed distributors that it expected them to

18   block all orders they identified as suspicious.

19        Mr. Rafalski acknowledged this.  He acknowledged that

20   there was no do not ship requirement before 2007.  Indeed,

21   before 2006, Mr. Rafalski testified that he couldn't

22   identify a single distributor that blocked all orders

23   exceeding a threshold.

24        And, as for Mr. Rannazzisi, he acknowledged that the DC

25   Circuit stated in its *Masters* decision that DEA first

1      articulated, first articulated, the do not ship requirement

2      in its 2007 administrative decision in the *Southwood*

3      *Pharmaceuticals* matter.

4          Now, there's another very important point about this

5      2008 period.  Before 2008, after 2008, and at every time up

6      through today, McKesson has always, always blocked orders

7      that it determined posed a risk of diversion.  For example,

8      Mr. Oriente testified that there was always a manual block

9      for orders that McKesson believed likely to be diverted.

10         We'd submit, Your Honor, that especially under these

11     circumstances, plaintiffs cannot show either that McKesson's

12     pre-2008 system was unreasonable or that any alleged

13     deficiencies in that system were a substantial factor in

14     causing diversion in Cabell or Huntington.

15         Now, I next want to briefly address the 2008 settlement

16     with DEA, which is something Your Honor asked about earlier.

17     That Settlement Agreement does not reference any conduct

18     occurring in West Virginia, nor does it implicate McKesson's

19     Washington Court House Distribution Center, which the

20     testimony shows was the distribution center that served this

21     part of the State of West Virginia.

22         And what's more, that agreement stated, quote, this

23     agreement is neither an admission by McKesson of liability

24     or of any -- or of any allegations made by the DEA in the

25     orders or investigation.

1      And we would say -- we would submit, Your Honor, that

2  as a matter of blackletter law the agreement, therefore, may

3  not be used by plaintiffs to prove liability and we cite a

4  number of cases to that effect in the brief we'll be

5  submitting.

6      Notably, though, plaintiffs themselves have

7  acknowledged this point.  They successfully argued to the

8  Court that settlement agreements were admissible as

9  providing, quote, notice and as evidence that, quote,

10 allegations were made, but not as evidence that the

11 allegations were true.  And so, the 2008 Settlement

12 Agreement provides no factual or legal impediment to

13 granting judgment in favor of McKesson.

14      Now, I want to briefly turn to the 2008-2013 period.

15 As I mentioned a minute ago, DEA provided new sub-regulatory

16 guidance to distributors regarding their programs in 2007.

17 In response to this new guidance, in May of 2008, McKesson

18 introduced its new Controlled Substance Monitoring Program.

19 Under that program, McKesson began blocking all potentially

20 suspicious orders that it received.  And that's just a

21 critical point that I want to underscore.

22      As Mr. Rafalski himself admitted, by 2008, McKesson had

23 a policy in place that involved blocking flagged orders.

24 There is zero record evidence that McKesson shipped a single

25 order it identified as suspicious since 2008.

1          There's also zero record evidence that McKesson's CSMP

2    program was designed in a deficient manner.  Under that

3    program McKesson blocked all orders over a customer-specific

4    threshold that it set.

5          And this is very important.  Neither Mr. Rafalski nor

6    any other witness in the course of nearly seven weeks

7    testified that McKesson set those thresholds too high or

8    inappropriately when the CSMP was put in place.

9          What we've seen is -- and Mr. Rafalski used a different

10   set of thresholds that he invented for litigation under

11   which vastly more orders, up to 90 percent would have been

12   blocked.  But, as Mr. Rafalski admitted, those thresholds

13   entirely ignored the very important changes in the medical

14   community and the increase in the legitimate prescribing

15   that you heard about from Mr. Hester and Mr. Heard already.

16   So, you know, it's hard to improve on Mr. Heard's

17   explanation of the many reasons that Mr. Rafalski in his

18   flagging opinions were simply not credible.

19         So now, as we continue on in this post-2008 period, I

20   want to briefly address the second McKesson settlement.  And

21   here, you know, during this post-2008 period, plaintiffs'

22   principal criticism doesn't relate to the shipping of

23   suspicious orders but, instead, it focuses on reporting.

24         And in the 2017 DEA settlement McKesson did acknowledge

25   that it did not, quote, report to DEA certain orders placed

1    by certain pharmacies which should have been detected by

2    McKesson as suspicious.  But -- and this comes back to a

3    point I made at the very outset, Your Honor.  As Mr.

4    Rannazzisi admitted, there's no language in there about

5    failing to block orders.  And so, for two reasons, this

6    limited admission does not provide any basis for liability.

7         In the first place, there's no record evidence that any

8    of these orders were placed by McKesson's handful of tiny

9    customers in Cabell or Huntington.  And, more fundamentally,

10   this time period, during this entire time period, McKesson

11   was blocking and not shipping all suspicious orders.

12        You see the quotes there on the screen.  What those

13   quotes demonstrate clearly is that an order that is not

14   shipped cannot be diverted and cannot cause any harm.  So,

15   since McKesson wasn't shipping these orders, it couldn't

16   have caused any harm.

17        And then, very briefly, Your Honor, and this truly will

18   be very brief, there is the post-2012 period.  McKesson made

19   substantial improvements to its program in 2013.  It started

20   reporting more orders.  And there is a complete lack of

21   record evidence of any concrete wrongdoing on the part of

22   McKesson after 2013.

23        So, we'd submit that with no evidence in the past eight

24   years calling into question McKesson's conduct, there's no

25   proof that McKesson was a substantial factor in the present

1     day nuisance in Cabell and Huntington County [sic] and, for

2     that reason, McKesson is entitled to judgment under Rule

3     52(c).

4                THE COURT:  Thank you, sir.

5          This might be an appropriate time to take another break

6     and then we'll come back.

7          (Recess taken)

8                MR. HESTER:  Good morning again, Your Honor.

9                THE COURT:  Good morning again, Mr. Hester.

10               MR. HESTER:  I'm batting cleanup.  Or I'm in the

11    fifth spot I guess, actually.

12               THE COURT:  Okay.

13               MR. HESTER:  But one more -- one more motion that

14    we wanted to make to the Court this morning on behalf of all

15    defendants.  We move under Rule 52 for a motion for judgment

16    on partial findings based on plaintiffs' failure to prove

17    their entitlement to the abatement remedy that they're

18    seeking.  And I wanted to address this in four parts because

19    I think there are really four core prongs of the plaintiffs'

20    failure to establish their entitlement to the abatement

21    relief they seek.

22         The first point I wanted to make is that the plaintiffs

23    are seeking damages and not abatement.  That -- that is one

24    of the core flaws in the remedy they have presented to the

25    Court.

```
 1          Like any tort, public nuisance, of course, involves

 2     conduct.  And we've included a quotation from Kermit Lumber

 3     that has the familiar articulation that a public nuisance is

 4     the doing of or failure to do something.  It's a conduct

 5     element.

 6          And abatement does not include compensation or

 7     treatment for downstream harms caused by the nuisance.  And

 8     that's reflected, I think, quite clearly in this quotation

 9     from the West Virginia Code Section we have on the board, as

10     well, that a remedy for -- for a nuisance is limited to the

11     abatement of -- the public nuisance abatement of the

12     conduct.

13          So, compensation for downstream harms related to a

14     nuisance is damages and not abatement and I think it can be

15     illustrated quite clearly with a simple example.

16          Let's assume somebody is dumping pollutants into a

17     lake.  Abatement could clearly include preventing the

18     discharge of further pollutants into the lake and it might

19     include removing the pollutants from the lake.

20          But abatement clearly would not include the

21     compensation for harms for people who drank the water from

22     the lake.  Those are damages.  That's not abatement.

23          And so, if you have a circumstance where somebody is

24     harmed or suffers adverse effects from the public nuisance,

25     that's a damages concept, not an abatement concept.  And
```

1    here, the plaintiffs' remedy is overwhelmingly seeking

2    treatment for the harms of opioid use and the downstream

3    effects that follow from Opioid Use Disorder and other

4    harms.

5         HIV, endocarditis, some of the things that the Court

6    has heard a lot about in this case.  NAS babies.  These are

7    all people and entities, children, drug users who are harmed

8    by the drugs.  These are not abatement concepts.  These are

9    damages concepts.

10             THE COURT:  And the damages remedy would only go

11   to the individual's harm, would it not?

12             MR. HESTER:  I believe that's right, Your Honor.

13             THE COURT:  I mean, look at the tobacco

14   litigation.  The plaintiffs in the tobacco litigation were

15   the people who had lung cancer from smoking cigarettes.

16             MR. HESTER:  That's right.  And that's a -- that's

17   a fair analogy to what we have here.

18         And as the Court will recall from Dr. Alexander's

19   testimony this week, the overwhelming majority of what he is

20   contemplating in his so-called abatement remedy is treatment

21   of people who have OUD, or families adversely affected by

22   OUD, babies adversely affected by OUD, vocational training

23   for people who have OUD.

24         All of these are perfectly fine concepts.  They're

25   just not abatement.  They're damages, whether they're past

1    or future.

2         But that gets to the next point, which is also very

3    important here.  The plaintiffs have waived all claims for

4    damages.  They cannot recover them here and they've stated

5    it very clearly and very consistently in their papers in

6    this case that they've waived their claim for damages and

7    they're only seeking an abatement remedy.  So, they're stuck

8    in a box.  They waive damages, but now they've presented a

9    remedy to this Court that really is a damages remedy.

10        Let's go onto the next point.  Aside from seeking

11   damages rather than abatement, they're also seeking recovery

12   for future addiction and future harms.  And Dr. Alexander

13   acknowledged that his abatement model includes and

14   encompasses people who develop OUD for the first time after

15   2021.

16        And the Court will probably remember some of the cross

17   examination from this week where we were exploring this

18   point that Dr. Alexander, for instance, would include within

19   his abatement remedy a child who is ten years old today, who

20   has never been exposed to an opioid, who develops heroin

21   addiction in five or ten years, that becomes part of the

22   future population.

23        And, indeed, we did a little math with Dr. Alexander

24   and it was obviously not clear in his mind how you would

25   figure out how many people develop OUD in the future as

1    compared to people who have already suffered the harm, but

2    it was also quite clear that it could be a sizable

3    percentage of the -- of the entire remedial plan is

4    extending to people who are harmed in the future.

5         So, that really creates the other side of the same

6    coin, Your Honor.  Either we have people who have been

7    harmed in the past who are seeking a damages remedy that the

8    plaintiffs have waived or we're looking ahead to people who

9    suffer harm in the future, but there is no proof, of course,

10   of what happens in the future on behalf of these three

11   defendants to support a future abatement remedy based on

12   future harm that -- without any evidence at all as to what

13   the defendants will be doing in the future.

14        Indeed, no evidence that the defendants will even be

15   distributing opioids in Cabell-Huntington in the future.

16   Yet, somehow, they would be on the hook for -- for a remedy

17   related to people who suffer future harm or develop

18   addiction in the future.

19        I mean, in effect, what the plaintiffs are doing here

20   is claiming a future nuisance, but the case law is quite

21   clear that if there's a claim of a future nuisance, there's

22   a heightened standard that applies to any such claim.  And

23   that's the *Duff v. Morgantown Energy Associates* case out of

24   the West Virginia Supreme Court that we have here on the

25   board.

1            Plaintiffs bear a heavy burden of proving that harm is

2    reasonably certain to result from the defendants' conduct if

3    they're talking about a future nuisance.  And, of course,

4    there is no evidence in this record of any future activity

5    at all.  Plaintiffs made no effort to prove any future

6    conduct by the defendants and they simply have no basis to

7    seek a remedy that encompasses harm to people who have not

8    yet suffered any harm.  And then, if we look backwards,

9    they've waived a damages claim for people who've already

10   suffered harm.

11           So, those are the two prongs I think are most

12   fundamental to the flaw in this abatement remedy, but there

13   are two more.

14           The next one is that the plaintiffs are seeking a

15   remedy for harms that are completely unrelated to the

16   defendants and Mr. Heard already laid out some of this, but

17   let me just highlight it quickly.

18           Dr. Alexander acknowledged that his remedial plan

19   extends to people who were never exposed to a prescription

20   opioid and he didn't know how many there are who are

21   included within his abatement model.

22           So, for instance, his abatement model would extend to

23   heroin abusers who've never been exposed to a prescription

24   opioid ever and he had no way to separate the people who

25   have been exposed to prescription opioids versus others who

1    never had any exposure to the defendants' products.

2        And it's certainly a basic principle of tort law that a

3    remedy is barred where there's no way to separate it out

4    between people who are exposed to the product that the

5    distributors distribute and people who never had any

6    exposure to it at all.  And that's another core flaw in

7    their abatement remedy.

8        The last flaw that I wanted to highlight is that it

9    would lead to a windfall for the City and the County and a

10   Court sitting in equity should avoid a windfall.  And that's

11   an established equitable principle.  And the plaintiffs'

12   abatement plan would lead to a fundamentally unfair windfall

13   in two respects.

14       The first is that the City and the County do not pay

15   for or run the programs encompassed within this abatement

16   plan.  The evidence demonstrates that the City and the

17   County do not pay for and do not run programs for treating

18   OUD and almost every other part of the programs and concepts

19   included within Dr. Alexander's remedial plan.

20       And the Court may well remember the very clear

21   testimony from Mayor Williams yesterday on this.  You would

22   never expect the city government to actually start running

23   treatment programs or funding them.  Yet, that is the huge

24   dollar amount that's sought, sought by this remedial plan.

25       So, we have clear evidence that the City and the County

1    don't pay for the treatment programs for which relief is

2    sought and, indeed, Medicare, Medicaid, other insurance,

3    pays for most of these OUD treatment costs.

4         Now, there have been references to collateral source

5    doctrines.  That's a damages concept.  The Court is sitting

6    in equity and is being asked here to engage in an equitable

7    remedy and surely it cannot be the case that the Court would

8    be blind to the fact that the City and the County are

9    seeking to recover money for programs they will never run

10   and that they have never paid for and will never pay for.

11   That's the first component of the windfall.

12        The second component of the windfall is that there was

13   no evaluation of the needs of this community.  Fairly

14   shocking, we felt that Dr. Alexander did not even purport to

15   make any effort to assess the current levels of programs and

16   services provided in the community.  He made no assessment

17   as to what's already being done, whether what's already

18   being done is sufficient to meet the OUD needs of this

19   community and the treatment needs of this community.  He

20   made no assessment as to whether only a small amount of

21   additional spending might be needed on top of the programs

22   that are already being engaged in.

23             THE COURT:  So, under your polluted lake theory,

24   if you had two factors polluting the same lake and one of

25   them was beyond the reach of the Court, the one left over

1     would have to pay the whole thing?

2          MR. HESTER:  Well, I mean, that -- that would be

3     one way to think about it.  But the other way to think about

4     it is if you've -- if you have a polluted lake and you've

5     taken out 98 percent of the pollution already and somebody

6     comes along, an expert comes down from Baltimore and says I

7     think it's going to cost this much to take out a hundred

8     percent of the pollution and the expert never figures out

9     that there's only two percent that needs to come out, that's

10    where you've got the problem of the windfall.

11         And that's what we have here because the evidence is

12    quite strong that there's a very powerful set of programs in

13    place in this community and there was quite a bit of

14    admirable testimony from the community leaders about how

15    much they've done.

16         Well, in fact, they may have done everything that is

17    needed and there may -- it may take time.  Dr. Alexander's

18    program takes 15 years to drop the OUD level by 50 percent.

19    It may take some time, but as we heard over and over again

20    from the community leaders, they're doing a lot already.

21         Without any assessment as to whether what's being done

22    is sufficient or meets the needs of this community, how can

23    the Court sitting in equity be asked to impose an enormous

24    dollar remedy?

25         And we submit it would be an extraordinary windfall to

1    award huge dollars for programs that may be completely

2    unnecessary if, indeed, the current programs are either

3    fully sufficient, mostly sufficient, partially sufficient.

4         And Dr. Alexander didn't even purport to look at that

5    question.  He just didn't look at it at all.  He didn't know

6    what the current programs were or whether they were

7    sufficient.

8         And, of course, Mr. Barrett said the same thing.  I

9    asked him just two days ago, you didn't look at the capacity

10   for treatment that already exists in the community?  No.

11   And I'm not so sure that Dr. Alexander looked at capacity

12   either.

13        Well, that's a fairly shocking concept when the Court

14   sitting in equity is being asked to award a remedy that the

15   Court's not been provided with any information as to whether

16   the current programs and current capacity are entirely

17   sufficient or mostly sufficient.

18        So, here we are at the end of a long trial, or midway

19   through a trial, but we hope at the end, the Court is

20   somehow left to figure this all out on its own.  We submit

21   the plaintiffs have failed entirely to provide the Court

22   with a sufficient basis to make a reasoned decision on the

23   appropriate remedy.  They've not given the Court enough.

24        In effect, what they're doing is throwing it up to the

25   Court and saying you figure it out.  And we say -- we submit

1    that's not enough, that a failure to provide a Court with

2    the tools it needs sitting in equity to order the

3    appropriate level of relief means the case should be

4    dismissed on that basis alone.

5         The case law recognizes that a claim should be

6    dismissed where the plaintiff fails to come forward with

7    sufficient evidence to support the claim for relief and we

8    submit that's what they've done.  They've not given the

9    Court enough guidance to order any kind of relief along the

10   lines that they're seeking.

11        But I don't want -- in focusing on this windfall at the

12   end, Your Honor, I don't want to lose sight of first two

13   points which I really think are the most fundamental of all.

14   They're seeking a damages remedy, overwhelmingly a damages

15   remedy, for harms suffered by people exposed to opioids.

16   That was their case.

17        Their case was all about how much harm there is in the

18   community because of opioids.  That's a damages concept.

19   That is not an abatement concept.

20        And then fold into that the fact that they are seeking

21   a remedy for people who suffer harm into the future.  Those

22   two points really doom their abatement remedy even putting

23   aside these points about the windfall.

24        So, for this reason, Your Honor, we submit that we're

25   entitled to judgment that they have failed to establish a

```
 1    basis for the equitable relief they seek.  Of course, the

 2    Court does not need to reach this if it agrees with our

 3    points on proximate causation, and fault, and other issues,

 4    but the remedy is another core flaw in the plaintiffs' case.

 5         Thank you, Your Honor.

 6              THE COURT:  Thank you, Mr. Hester.

 7         And the defendants have reserved some time for

 8    rebuttal.  Is that --

 9              MR. HESTER:  Your Honor, we -- yes.  I mean, I

10    think we've done reasonably well, I hope, in sticking to the

11    clock.

12              THE COURT:  I agree.

13              MR. HESTER:  And so, we had hoped to reserve in

14    the range of 20 or 30 minutes for rebuttal.

15              THE COURT:  All right.  I'm going to -- it's a

16    little early, but I'm going to suggest we adjourn now and

17    come back at 1:00 rather than push the plaintiffs into their

18    argument right now.

19              MR. MAJESTRO:  Your Honor --

20              THE COURT:  Do you agree with that, Mr. Majestro?

21              MR. MAJESTRO:  I would like to give everybody a

22    little bit longer lunch, everybody but me a little bit

23    longer lunch break.  Can we come back at 2:00?  And I don't

24    think we'll take the full two and a half hours.

25              THE COURT:  You want to not come back until 2:00?
```

```
1              MR. MAJESTRO:  Please.

2              THE COURT:  Is that okay with everybody?

3              MR. HESTER:  It's all right by us, Your Honor.

4              THE COURT:  All right.  We'll come back at 2:00.

5    And since you brought that up, I was -- at some point, I was

6    going to tell everybody this.  When we -- when we come back,

7    my plan is to go back to the original schedule and go from

8    9:00 to noon and 2:00 to 5:00 except on Friday and adjourn

9    at noon on Friday.  That gives me time to try to keep up

10   with some of the other things that I've got to do.

11        So, we'll come back at 2:00.

12             MR. MAJESTRO:  Thank you, Your Honor.

13        (Recess taken)

14             MR. MAJESTRO:  May I proceed, Your Honor?

15             THE COURT:  Yes, please.

16             MR. MAJESTRO:  Thank you, Your Honor.  The

17   plaintiffs are proud to present this argument and the

18   summary of the case we put on over the past 30-some days of

19   trial.  We believe that the Rule 52(c) motion should be

20   denied and we're going to give you some of the reasons why

21   today.

22        I'd note at the outset that today we found out that the

23   defendants are going to be filing briefs tonight.  Of

24   course, we would like the opportunity to respond in writing

25   to the briefs and, you know, given the nature, we're sort of
```

1    at a little bit of a disadvantage because, although we had

2    -- had some indication of the general topics they were going

3    to address, the specifics were -- we saw them for the first

4    time today.  So, we will get more specific citations in

5    writing for you in connection with those responses.

6         But I believe --

7              THE COURT:  I want you to have an opportunity to

8    do a good job here and I don't see any reason to rush this.

9    So, do you need some time after you get their brief to

10   respond?

11             MR. MAJESTRO:  Well, we'll -- with Your Honor's

12   permission, when we get those -- I understand we're getting

13   those tonight and we'll take a look at them and have a

14   proposal for you to -- talk to them and have a proposal to

15   you tomorrow morning, if that's okay.

16             THE COURT:  All right.

17             MR. MAJESTRO:  I'd like to start a little bit with

18   the rule here, Your Honor.

19        Gina, could you bring up Slide 1?

20        You know, I've never done a Rule 52(c) motion before,

21   so I went and looked up some of the case law and Judge

22   Chambers had a good quote on what the standard is and what

23   -- and what -- how these -- these decisions should work in

24   the context of a complicated bench trial like this.

25        And what he noted is the party opposing a Rule 52(c)

```
 1    motion need not establish that they have met their ultimate

 2    persuasive burden by --

 3              THE COURT:  That's similar to a Rule 50 motion in

 4    a jury trial, isn't it?

 5              MR. MAJESTRO:  I think so.  There's a -- you have

 6    a little bit -- we would acknowledge you have a little bit

 7    more discretion, but -- but what he said is that all that is

 8    required is the character and quantity of the evidence

 9    presented by plaintiffs is sufficient to defeat a motion for

10    judgment on partial findings.  You don't have to establish

11    the ultimate persuasive burden.

12         Next slide, Gina.

13         Now, there's some procedural problems with -- that are

14    necessary for a Rule 52 motion that we don't think are here

15    just yet in this case.  The prerequisite for a Rule 52(c)

16    motion is that a party has been fully heard on an issue

17    during a non-jury trial.

18         When the Court has not heard all the evidence, a Rule

19    52(a) motion -- that should be -- yes, a Rule 52(a) motion

20    is premature.  Should be 52(c).  I'm sorry.  That's a typo.

21         But what the Advisory Committee noted was a judgment on

22    partial findings is made after the Court has heard all the

23    evidence bearing on a crucial issue of fact.

24         Now, my friends to my left will probably say we've been

25    heard on all of this evidence and Mr. Farrell rested today.
```

1    However, in front of the Court are a number of deposition

2    designations and highlighting -- there are 17 defendants'

3    witnesses that we've submitted testimony from, four from

4    ABDC, seven from Cardinal Health, six from McKesson, four

5    DEA depositions.

6         And with those depositions are included many exhibits

7    and many of those exhibits are un-objected to.  So, this is

8    all evidence and I don't think I'm going too far out on a

9    limb to assume that the Court has not had a chance to review

10   all that evidence.

11             THE COURT:  Well, you're absolutely right.  I have

12   not gotten through all of that, by any means.

13             MR. MAJESTRO:  And, fortunately, Rule 52(c)

14   provides for something like this.

15        Next slide, Gina.

16        The rule explicitly says the Court may, however,

17   decline to render any judgment until the close of the

18   evidence and in the *Sailor v. Hubbell* case the Fourth

19   Circuit noted the Court may do so, and that's decline to

20   render the judgment until the close of the evidence, even if

21   it concluded at the close of evidence that it could not give

22   a verdict in the opposing parties' favor.

23        So, this -- unlike a Rule 50 motion, this is a -- this

24   motion recognizes the flexibility of a bench trial, lets you

25   look at the whole matter in a -- in a way that we can do

1       final briefing, final proposed orders, and have -- and after

2       spending this much time in trial and more trial that, in the

3       end, you'll have a reasoned decision on a reasoned record.

4              I don't -- I mean, I've got some quotes from the --

5       from all the depositions that are in the record, but I think

6       I'll spare you that orally today and we'll put some of that

7       -- that in our briefs.

8              But -- but, in sum, we really think that this is a

9       premature motion and we ought to finish this trial, have you

10      consider this case, important case, on the entire record of

11      the entire trial.

12             So, next, I want to -- where I want to go is where we

13      started.  In the very first complaint Mr. Farrell and I

14      drafted, it had -- it was a rather unique complaint, and Mr.

15      Farrell can take most of the credit for it, but it's set up

16      duty, breach, causation and damages.  And that's going to be

17      the outline of my argument today.

18             And I -- I'll note for the Court, with the Court's

19      permission, in the middle of my argument there's a portion

20      of the defendants' conduct argument that Mr. Farrell wanted

21      to address and since it was his birthday, I couldn't tell

22      him no.

23             So, let's -- let's talk about duty in a nuisance case.

24                   THE COURT:  Let me --

25                   MR. MAJESTRO:  And, you know, that's -- and I am

```
 1    happy to just answer your questions, Your Honor.  I've got
 2    -- I've got prepared things, but it sounds to me like you've
 3    got a question and I'm happy to --
 4              THE COURT:  Well, it might not be fair to hit you
 5    with this.
 6              MR. MAJESTRO:  I'll do my best.
 7              THE COURT:  Since you thought it was -- you
 8    probably thought it was resolved.  But the question I asked
 9    Mr. Heard is a subject that has troubled me in this case and
10    that's whether this is really a nuisance case at all.
11         You know, and I'll give you an example of -- I don't
12    know where this is going to go.  If this is a nuisance case,
13    the same theory can apply to a whole lot of situations.
14         Take Southern West Virginia has the highest level of
15    obesity in the United States with all the attendant social
16    problems that go along with that.  One of the main causes of
17    that is the overconsumption of pork products, you know,
18    sausage, bacon, throw in a can of Spam once in awhile.
19              MR. MAJESTRO:  I'm guilty of that.
20              THE COURT:  Yeah.  So am I.
21         And you could use the very same theory you're using
22    here to sue Smithfield Foods for creating that kind of a
23    nuisance, couldn't you?
24              MR. MAJESTRO:  Well, I think there have been those
25    similar claims and, unlike this claim, they've been
```

```
 1    rejected.  And I'm going to -- that's where I want to start

 2    in answer to your question.

 3         This is -- where we are now, four or five years later

 4    since we first started filing these cases, this is not a

 5    novel cause of action.  So, in denying the motion for

 6    summary judgment, this Court joined every other West

 7    Virginia trial and appellate judge that has ruled on the

 8    existence of this opioid nuisance claim under West Virginia

 9    law.

10              THE COURT:  The Appellate Courts haven't ruled on

11    it, have they?

12              MR. MAJESTRO:  Well, I think we have denials of

13    writs three times and that is -- and I think that there's

14    maybe one case they deny it, one time they deny.  Maybe

15    that's limited.

16         Each time they do that, and this is -- these are

17    denials of whether it states a claim for nuisance.  And so,

18    that -- it was the exact issue that you're concerned about.

19    That was the issue in all three of those cases, in the

20    Attorney General's case, in the case in the northern

21    panhandle, and in the case of the mass litigation panel,

22    which they followed the northern panhandle.

23         There were three writs taken up and each time the

24    Supreme Court denied it.  The last two times it was

25    unanimous.  But we also have three very good trial judges
```

1    and -- well, three courts.  One of the courts is the mass

2    litigation panel that also came to that same conclusion, but

3    they aren't alone in this.

4        We filed, and I believe it's Document 1290, a survey of

5    the nuisance decision, opioid nuisance decisions.  I

6    provided for Your Honor citations and copies of cases of 41

7    decisions rejecting the defendants' argument in this way.

8    Representing 20 -- 20-plus states.

9        So --

10            THE COURT:  And there were at least two or three

11   that went the other way, though, right?

12            MR. MAJESTRO:  I think that is correct, but I --

13   but I -- but I think I've got the numbers on my side and

14   that combined with the number -- the very West Virginia

15   specific decisions makes me feel comfortable in saying you

16   got it right when you denied the motion for summary

17   judgment.

18            THE COURT:  Okay.

19            MR. MAJESTRO:  I mean, it's not -- this claim is

20   not a stretch anymore.  It's the substantial majority --

21   majority rule.

22        In fact, as we sit here today, my friends in New York

23   are trying a case against these same defendants and others

24   on public nuisance and my friends in California are -- and

25   Ann's partners, Ms. Kearse's partners, are trying a case

```
 1    against the manufacturing defendants on a public nuisance

 2    theory.

 3         So -- so, not only are these cases proceeded past

 4    motion stage, there are two other judges who have denied

 5    summary judgment motions and let those cases proceed to

 6    trial.

 7         So, you know, on the legal claim does the opioid

 8    epidemic create a factual circumstance that states a claim

 9    for nuisance, common law nuisance, the vast majority of the

10    courts that have addressed that question have ruled just as

11    you did.

12         So, let's talk a little bit about the specific -- I

13    mean, and I -- if you've got any other questions on that, I

14    --

15              THE COURT:  No, no.  I just -- I was interested in

16    what counsel had to say about that.

17              MR. MAJESTRO:  Okay.  And so, you know, that --

18    that is -- and we'll address that a little -- we'll address

19    the defendants' arguments in the briefs and that -- but that

20    is -- you know, we think we are right down the middle of

21    where the rest of the country is and we think you are, too.

22         So, the nuisance standard that they're willing to

23    accept for purposes of this argument, which we think is the

24    correct standard, is that it -- the conduct just needs to be

25    unreasonable.
```

1      Now, in their briefing they offer three other tests

2   that are required to be -- that they allege we are required

3   to meet.  We don't think we're required to meet those, but

4   we think we meet those, too, that -- that in addition to the

5   unreasonableness standard, if you define unreasonableness as

6   illegal conduct, as I'll explain, we think we have illegal

7   conduct as violations of the CSA.

8      Counsel mentioned intentional conduct, but as Your

9   Honor ruled, intentional conduct doesn't require intent to

10   cause harm.  No *mens rea* is necessary, Your Honor.  Your

11   Honor has already concluded that under West Virginia law.

12   Intent is the intent to act.

13      There is no suggestion on this record that defendants

14   accidentally flooded the -- flooded the market with 81

15   million pills.  It was purposeful.  The act of distributing

16   those pills was something that was purposeful.

17      Finally, we also have negligence and -- and a lot of

18   these arguments overlap, but if the question is what -- was

19   the defendants' conduct negligent under old standard West

20   Virginia case law, *Robertson v. LeMaster,* the touchstone of

21   duty and negligence is foreseeability.

22      And what happened in this case, we will show you, was

23   entirely foreseeable.  In fact, let's start --

24      Gina, I'm going to go ahead.  Go to Slide -- well, no.

25   Skip that.  All right.  We'll keep going.

1          So, under whatever culpability standard the defendants

2     raise or just under the more general standard of is their

3     conduct reasonable, we think we can meet all of those

4     standards.

5          And I want to -- I want to talk a little bit about the

6     CSA.

7          First of all, the United States Supreme Court's

8     decisions, I think, are very instructive.  In *United States*

9     *v. Mohr* the Supreme Court held --

10         And, Gina, go ahead and bring up Slide 8.

11         Congress -- that Congress was particularly concerned

12     with the diversion of drugs from legitimate channels.  It

13     was aware that registrants, who have the greatest access to

14     controlled substances and, therefore, the greatest

15     opportunity for diversion, were responsible for a large part

16     of the illegal drug traffic.

17         Back to 1943, we have Mr. Farrell's favorite case,

18     *Direct Sales*, and this is another -- another thing that

19     distinguishes your pork example from what we're talking

20     about here.  The difference between sugar, cans, and other

21     articles on the one hand, and narcotic drugs on the other,

22     arises from the latter's inherent capacity for harm and from

23     the very fact that they're restricted.  We're not talking

24     about everyday products that don't have an inherent capacity

25     for harm at which the exact problems that happened in this

1      case, if the rules aren't followed, were foreseeable.

2           The language in CSA hasn't changed the entire time of

3      this litigation other than a recent regulatory provision

4      that is -- that -- that is -- from its own terms confirms

5      the existing case law.  The regulations haven't changed.

6           And so, what we have here is a system that was set up

7      to set up responsibilities in the so-called closed system.

8      And the reason the system is closed is for what the Court

9      said in *Direct Sales*, that -- that there is danger --

10     there's a horrible danger from these dangerous products if

11     they're not treated correctly.  So, we use belt and

12     suspenders and put duties on everyone in the chain of

13     distribution.

14          Now, the defendants in this case want to blame the

15     people above them in the chain of distribution, the

16     manufacturers, and the people below them in the chain of

17     distribution, the pharmacies and the doctors, but they're --

18     they are registrants under the CSA.  They make money from

19     the sale of these narcotics and, as Mr. Rannazzisi said, the

20     tradeoff is they have assumed a heightened responsibility

21     with respect to the shipments they made.  It's their duty.

22     It isn't a duty that's delegable to someone else.

23          Mr. Rannazzisi confirmed that DEA relies on registrants

24     to discharge these duties appropriately because the DEA

25     cannot police the entire system itself.  The question here

1    is whether the defendants discharged that duty appropriately

2    and the reason they have that duty is because they are

3    registrants.

4         Now, there are two classic decisions dealing with the

5    duties under the Controlled Substances Act and we've talked

6    a lot about them in the briefs.  *Southwood Pharmaceuticals*,

7    that decision was admitted into evidence at P-23736 and

8    *Southwood* instructed distributors that if they continued to

9    ship orders without resolving suspicions they're not

10   maintaining effective controls against diversion.  That's

11   Mr. Rannazzisi's testimony on -- on Page 152.

12        In short, *Southwood* confirms that distributors must

13   exercise due diligence before filling an order and the

14   *Southwood* decision found that the direct and foreseeable

15   consequence of the manner in which the respondent in that

16   case conducted its due diligence program was the likely

17   diversion of millions of doses of -- dosage units of

18   hydrocodone.

19        The second case is *Masters Pharmaceutical*, which was an

20   early birthday present for Mr. Farrell, was decided four

21   years ago yesterday.  And, in this case, we brought you the

22   lead investigator from the *Masters Pharmaceutical* case, Mr.

23   Rannazzisi, and what was -- what happened in that case, the

24   ultimate holding of the DC Circuit, is -- was that it is not

25   necessary for a distributor of controlled substances to

1    investigate suspicious orders if it reports them to the DEA

2    and declines to fill them, but if the distributor chooses to

3    shoulder the burden of dispelling suspicion in the hopes of

4    shipping any it finds to be non-suspicious and the

5    distributor used something like the SOMS protocol in that

6    case to guide the efforts, then the distributor must

7    actually undertake an investigation.

8         The defendant's own witnesses acknowledged, and we'll

9    cite that testimony for you, acknowledged that -- that duty.

10        Now, we -- we've heard a lot about how the DEA -- what

11   the DEA did and what the DEA didn't do, but what the law

12   requires is independent of what a regulatory agency might

13   say or do.  The defendants haven't tried to show any kind of

14   governmental estoppel.  They have not tried to meet that

15   high burden.  And they couldn't on the facts of this -- of

16   this case.

17        The testimony, for example, from Mr. Rannazzisi and,

18   for example, defendants' own witnesses, Mr. Mays, Mr. Mone,

19   they all testified regarding this 2005 distributor

20   initiative which the DEA met face-to-face with each of the

21   defendants and advised them of shipping to internet

22   pharmacies that should have triggered suspicions.

23        The slide decks for each of these meetings are in

24   evidence.  And the slides specifically noted to the

25   defendants that the duties that the DEA was telling them

```
 1    about to not ship suspicious orders were not limited to

 2    internet pharmacies.

 3         The DEA also specifically advised reporting a

 4    suspicious order to the DEA does not relieve the distributor

 5    of the responsibility to maintain effective controls against

 6    diversion.

 7         Indeed, the -- the presentations explicitly refer to

 8    the Direct Sales case that -- that explain that you're not

 9    -- about the harms of shipping these danger products.

10         Thereafter, Mr. Rannazzisi sent two letters to the

11    distributors reinforcing these obligations.  They're in the

12    record.

13         And the -- and, you know, we hear a lot about, well, we

14    didn't ship any -- any drugs to any pharmacy that was not

15    registered.  That doesn't relieve the defendants of the duty

16    to maintain effective controls against diversions.

17         The Rannazzisi letters confirmed a distributor may not

18    simply rely on the fact that a person placing the suspicious

19    order is a DEA registrant and turn a blind eye to the

20    suspicious circumstances.

21         So, those were in 2006 and 2007.  And, I mean, I can go

22    -- go more -- more on those.

23         We have the Masters, the ALJ decision, and then the

24    Masters -- the other Masters -- the Masters DC Circuit

25    decision.  And then we had the HDMA, the defendants' Trade
```

1    Association compliance guidelines that confirmed the

2    obligation to conduct due diligence into customers prior to

3    shipping controlled substances the obligation to monitor for

4    suspicious orders, the obligation that defendants should not

5    ship potentially suspicious orders until they have conducted

6    adequate investigation to dispel suspicions and the

7    obligation to report suspicious orders to the DEA when

8    discovered.

9         So, that's the administrative record of what the DEA

10   says.  What have the courts done with those?

11        So, we have Judge Polster's opinion, which was the

12   first opioid litigation court to deal with this factual

13   situation.  He upheld *Southwood* and *Masters* and adopted the

14   holdings of those cases.

15        Following that, the remand courts in the Northern

16   District of Illinois in the Chicago case, the Northern

17   District of California in the San Francisco case, and the

18   Eastern District of Oklahoma in the Cherokee case all

19   confirmed Judge Polster's rulings.

20        So, the rule is -- and according to those decisions,

21   the rule is and always has been you don't ship a suspicious

22   order without dispelling the suspicion.

23        Finally, the last sort of administrative argument I

24   want to address is the defendants briefly mentioned quotas.

25   You know, one of the depositions that we've submitted for

1    Your Honor to read is another DEA witness, Staci

2    Harper-Avilla, and she testified in her deposition that the

3    existence of those quotas that we've heard so much about did

4    not excuse the defendants from complying with their

5    obligations to identify, report and stop shipment of

6    suspicious orders.  That's on Page 140 of the deposition.

7        And she also -- further testified the quota set is a

8    national quota.  It is not jurisdiction specific so it

9    doesn't take into account how many pills are sold into a

10   particular jurisdiction.

11       So, we have this national quota that they split up

12   among the defendants and what the DEA is telling them is

13   that is not designed to replace the requirements that you

14   monitor for suspicious orders and not ship when you find

15   them unless you dispel -- dispel that.

16       So, at this point, I -- I want to turn the microphone

17   to my colleague, Mr. Farrell, and he's going to give you an

18   overview of the defendants' breaches of those duties in

19   Cabell County and Huntington.

20       MR. FARRELL:  Thank you, Judge.

21       Without belaboring the point, I think what we've

22   attempted to do is by looking at two cases, we've attempted

23   to replicate the legal structure in *Direct Sales* from 1943

24   with *Masters Pharmaceutical* from June 30th of 2017.

25       And Mr. Majestro said that it was Mr. Rannazzisi who

1    was the lead investigator.  It was actually Mr. Rafalski.

2    We brought in as an expert witness Mr. James Rafalski, who

3    was the lead investigator and built the *Masters*

4    *Pharmaceutical* case.

5          The reason these two cases are important is because

6    much of the same defenses and arguments we've heard in this

7    courtroom were raised in those two cases.  In fact, in the

8    *Direct Sales* case the argument was made that the wholesaler

9    was selling to a retailer that had tax stamps from the

10   federal government and that's where their duty ended.

11         And so, when you read -- and I would ask the Court to

12   -- to read the 1943 United States Supreme Court case with

13   this evidence you've heard in mind because in there what it

14   says is that the salient facts are that *Direct Sales* sold

15   morphine sulfate to Dr. Tate in such quantities so

16   frequently and over so long a period it must have known he

17   could not dispense the amounts received in lawful practice

18   and was, therefore, distributing the drug illegally.

19         What we've attempted to demonstrate to the Court is in

20   a similar vein.  We'll use AmerisourceBergen as an example.

21   We've attempted to identify the frequency, pattern and

22   volume of sales to specific pharmacies.  So, as you'll

23   recall from this chart that I affectionately referred to as

24   The Matrix, the middle column is the month-by-month sales by

25   AmerisourceBergen to pharmacies in Cabell County, West

1    Virginia.

2         Then, what we've provided for the Court as a benchmark

3    for comparison purposes, a county average, a state average,

4    and a national average so that you can look at a particular

5    month and see that 40,000 dosage units of oxycodone were

6    sold in say December of 2009 and compare it to the average

7    pharmacies around the country, in the State of West

8    Virginia, and within Cabell County.

9         We also went to great lengths to establish through the

10   defendants' witnesses that their monitoring program was

11   nationwide and systemic.  And what we mean by that is that

12   its successes are nationwide successes.  Systemic successes.

13   But its failures are systemic failures.

14        And, as evidence of that, we've given examples in the

15   far right-hand column of other pharmacies around the state

16   that makes the argument that their systems were functioning

17   impossible.

18        We did so with reference to just oxycodone.  We did so

19   with reference to hydrocodone.  And we did it for each of

20   the three defendants.  We went into painstaking detail to

21   show the actual transactions to actual pharmacies to

22   demonstrate that this conduct applies to Huntington-Cabell

23   County, West Virginia.

24        So, closing argument, we may spend a lot of time going

25   and comparing and giving you specific examples, but to argue

1    that we failed to identify the specific conduct to specific

2    pharmacies is not consistent with the record.  What we would

3    say is the measurement of whether or not their conduct was

4    reasonable can be determined by looking at the volume of

5    pills they sold either on a local level, regional level,

6    state level, or national level.

7         Now, with regard to your comment about negligence or

8    your comment about the -- which standard we apply,

9    regardless of whatever the standard is, whether it's

10   negligence or unreasonable interference, if you're looking

11   for some baseline of what is normal, we've given it to you.

12   And to be able to look at what is abnormal, I submit, is

13   facially evident in the records that we've produced to you.

14        And, if you don't have any other questions, I'll turn

15   the floor back over to Mr. Majestro.

16             THE COURT:  All right.  Thank you.

17             MR. MAJESTRO:  And I -- I apologize for Mr.

18   Rafalski.  I get the two "R" DEA witnesses mixed up.

19        So, let's -- and let's talk a little bit about Mr.

20   Rafalski's testimony.  You know, we heard a lot about --

21   from the defendants about what he didn't testify to, but

22   they didn't tell you a lot about what he did testify to, and

23   he testified that once a suspicious order is flagged it is

24   the -- it's the duty of the defendants to stop the drugs and

25   to stop the shipment of the drugs.

1      He testified about the thousands of transactions under

2   a number of different suspicious order monitoring tests that

3   one could reasonably apply that would have been flagged and

4   shipment stopped had the defendants had a -- had systems in

5   place that would do that.

6      Now, the important thing about Mr. Rafalski's testimony

7   is he went through the defendants' records and there isn't

8   evidence that -- other than this anecdotal, yeah, we were

9   doing -- we were -- we were doing due diligence, but they

10  didn't produce any evidence of that due diligence through

11  Mr. Rafalski or to anyone else.

12     And they say, well, we weren't required to keep the

13  records.  But, certainly, as something as important as that,

14  if it was done, they could give us some specific examples of

15  places where due diligence was conducted and the orders were

16  stopped on a level.

17     But what we do know is that they -- for a long period

18  of time they had policies in place where they didn't stop

19  the shipments.  And what we do know is, as Mr. Farrell has

20  shown you, two of these specific pharmacies, the volume that

21  went into those -- went into those pharmacies.

22     So, the combination of that evidence, we believe, is

23  sufficient for you to conclude that they were not doing

24  their job under the CSA and, as he testified, as Mr.

25  Rannazzisi testified, as a number of the defendants'

1    witnesses testified, when you don't meet the duties under

2    the CSA and orders that are shipped that are likely to be

3    diverted, you end up that diversion is likely.

4        And Mr. Rafalski testified, were orders the defendants

5    knew or should have known were suspicious likely to be

6    diverted?  Yes.  Does -- and he -- then that is consistent

7    testimony throughout this case.

8            THE COURT:  I'm trying to remember the evidence

9    here.  Once they stopped shipping orders that were

10   determined to be suspicious, were some of those ultimately

11   shipped after they looked into them?

12           MR. MAJESTRO:  And I think it -- it depends on the

13   time period, but what -- what the evidence in this record

14   shows is that very little evidence of any of that due

15   diligence.  And given Mr. Rafalski's testimony about the

16   potentially -- the number of potential suspicious orders --

17       And we don't just have his testimony about that.  Let's

18   take, for example, what Cardinal Health -- when the --

19   during the periods of times when the defendants were just

20   massively reporting after the fact shipments of -- of orders

21   they deemed suspicious to the DEA.

22           THE COURT:  But that stopped early on, didn't it?

23           MR. MAJESTRO:  It wasn't -- well, it depends on

24   what you mean by early on and there's evidence in the record

25   that it continued throughout their -- their changes in

1    policies.  I mean, it was really bad in the beginning and it

2    slowly -- it slowly got better, but there were still

3    problems.  And what the defendants had were limits and --

4    and there's testimony about that those limits were getting

5    raised.

6        And then there's, for example, the testimony regarding

7    -- regarding some of the -- the chain pharmacies, Judge,

8    where they weren't doing -- they were letting the pharmacies

9    themselves do the suspicious order monitoring and the due

10   diligence with -- with respect to what McKesson was doing

11   with Rite Aid, for example.

12       So, there's a lot of -- there's a lot of evidence that

13   they were failing to do that.  The best evidence that they

14   were failing to do that is the number of pills that were

15   being shipped.

16       And, as Mr. Farrell pointed out, the failures -- these

17   programs were all national programs.  There's not any

18   testimony -- and while the DEA enforcement actions happened

19   at various places, not necessarily the distribution centers

20   that were servicing West Virginia, there's no testimony in

21   this case that the defendants' policies were any different

22   here than they were anywhere else.

23       And, finally, at one point, and when these documents

24   are in the record with respect to the defendants, they hired

25   independent consultants even to evaluate their systems who

```
 1    found the same -- the same failures in their systems that

 2    we're alleging.

 3         For example, the ABDC hired FTI Consulting and did an

 4    evaluation of what their -- of what their Suspicious Order

 5    Monitoring System was and came up with the roles and

 6    responsibilities weren't defined.  They had difficulty in

 7    keeping up with demands.  They didn't receive adequate

 8    training.  They weren't sufficiently staffed.  Overwhelmed

 9    by the volume.  Lack of direction.  Limited visibility.

10         And so -- and so, it wasn't just us saying it.  It's

11    not just the DEA saying it.  It's the independent auditors

12    that the defendants hired to look into those systems.

13         So, you know, I think that, you know, that -- excuse

14    me.  I have something stuck in my eye.

15         So, in terms of the breach, I think that we have enough

16    evidence and we'll give you more record citations to the

17    specific -- to the specific -- the specific testimony.

18         The next place I want to go to is causation.  You know

19    what?  I think I'm going to go to abatement first because

20    I've got them in the wrong order.

21         So, the defendants have a -- have a lot of arguments on

22    abatement and I -- and I think that the central problem with

23    the defendants' arguments is they want to treat this case as

24    an individual case brought by a private citizen on behalf of

25    an injured person and that's not what a public nuisance
```

1    claim is.

2         As -- as we've discussed before, a public nuisance

3    claim is brought on behalf of the public for the citizens,

4    not the individuals who are injured.

5         What the testimony in this case showed was the opioid

6    epidemic.  It didn't show -- and the opioid epidemic is made

7    up of a lot of different parts, but it's one epidemic, and

8    what the abatement we are seeking to do in this case is

9    designed to do is to -- is to take care of that epidemic.

10        And there's several concepts, I think, that are

11   important that the Court understand.  One is that --

12             THE COURT:  Isn't there a difference between

13   stopping the epidemic, which is the nuisance, and correcting

14   all the things that have -- problems that have been created

15   because of that?  Aren't we looking at really two different

16   things there?

17             MR. MAJESTRO:  It's two sides of the same coin

18   because what we have -- and I will use the defendants'

19   example.  Pollution, if -- if we have pollution that

20   contaminates water, contaminates land, it's not enough to

21   stop the source of the pollution.  You've got to clean the

22   mess up.  Otherwise, it will continue to cause harm.

23             THE COURT:  You've got to clean the mess up, but

24   you don't have to pay the medical costs of everybody that

25   got sick because of the polluted water, do you?

```
1              MR. MAJESTRO:  Well --

2              THE COURT:  Is that part of the abatement or not?

3              MR. MAJESTRO:  And it is.  And I'll -- and let me

4    -- let me explain why.  So, the medical costs -- the

5    nuisance is caused -- the consequences of the nuisance from

6    addiction are not just limited to the addicted person.

7    That's what distinguishes this case from -- from cigarettes

8    or from someone who might have gotten sick from pollution.

9         Someone who gets sick from pollution doesn't go out and

10   start a life of crime.  They don't -- they don't -- we don't

11   have the societal problems with their children.  We don't

12   have the problems that happened in their neighborhood.  We

13   don't have them using dirty needles and catching --

14             THE COURT:  You can get a communicable disease --

15             MR. MAJESTRO:  Diseases, exactly.

16             THE COURT:  -- from drinking dirty water and then

17   pass it out to other people, couldn't you?

18             MR. MAJESTRO:  Well, and if that were the case and

19   if -- if someone created a pond that was a nuisance that

20   caused -- let's just say that COVID was spread in a pond

21   that was caused by a nuisance and you created this pool of

22   people with an infectious disease that was being spread.

23        And that's exactly what's happening in this case.  You

24   heard the testimony about HIV, about hepatitis -- about

25   hepatitis.  We have actual diseases that are caused by
```

1    people with addiction and that's the -- that's what

2    distinguishes this harm from some of those -- from some of

3    those other harms, that those --

4            THE COURT:  I don't think you answered my

5    question.  And maybe it was inarticulate, but what I was

6    asking is at what point is the abatement of the nuisance

7    sufficient to correct the problem and you're projecting a

8    net that's cast way beyond what I would think would be the

9    normal range of corrective action.

10           MR. MAJESTRO:  Well, I think the answer would be

11   to analogize to -- and -- and pools of infectious people are

12   -- are another classic nuisance.  The analogy would be to

13   stop those with the problem that are spreading the harms to

14   the public.

15       And so, in this case, Dr. Alexander presented an

16   abatement plan that had -- that -- for those 8,000 people

17   that the evidence shows have Opioid Use Disorder in Cabell

18   County.  And so, he presented a plan to stop the harms that

19   are caused by that.  And -- and so -- so, you -- some of

20   that is treatment for those, those people.  Some of that is

21   dealing with the consequences, cleaning up the mess of the

22   consequences, that the people addicted to opioids have

23   caused to the community, the harm that they've had to the

24   public, and -- and we believe that those are reasonably

25   within the realm of what it would take to abate -- abate the

1    problem.

2         So, in terms of the -- and then, Mr. Hester also had

3    some other arguments that I want to -- I want to address at

4    this -- at this point.

5         We hear a lot about -- from the defendants about, well,

6    the 15-year-old who isn't addicted yet, or the person who

7    went straight to -- to heroin never -- never had

8    prescription drugs.  And I -- I think that's a

9    misrepresentation of the abatement plan and what we're

10   proposing.

11        Dr. Alexander testified about what the infrastructure

12   was that's necessary to solve -- to solve this problem.

13   That some other people might be beneficiaries of that we

14   don't think makes it improper to have that program.  And,

15   you know, what -- what -- especially when we're talking

16   about an epidemic that is one -- that is one epidemic.

17        What -- What Dr. Alexander said is this is what's

18   necessary.  And we're not even spending the money to solve

19   the program to a hundred percent.  He's saying this is

20   reasonable -- it's a lot of money.  It's a reasonable

21   program, but you only get to 50 percent.

22        So, the fact that maybe some -- some people who got

23   caught -- were part of -- in the epidemic not as a result of

24   -- maybe not as a result of the defendants' actions

25   shouldn't discount the abatement plan, which the testimony

114

1    is, is necessary to deal with the 8,000 or so people who are

2    in that -- in that group.

3         The next point I want to make about that is --

4              THE COURT:  But somebody who -- who -- suppose

5    that program were put in place.  If somebody goes out and

6    gets hooked on Mexican heroin, they're in the group that the

7    abatement plan affects and that's way beyond the -- the

8    initial problem, isn't it?

9              MR. MAJESTRO:  Well, I -- I have two responses to

10   that, Your Honor.

11        First of all, we set up that program because that's

12   what's necessary to deal with the epidemic that we have that

13   the defendants are a proximate cause of.  That's -- that's

14   -- that's my first response.

15        My second response is that, as Dr. Alexander testified,

16   some of these people -- the reason we have heroin in Cabell

17   and Huntington is not because the heroin dealers thought it

18   was a great idea to come to Cabell and Huntington.  The

19   testimony -- we believe the testimony shows that -- that

20   those kinds of illegal drugs that Mr. Zerkle testified to

21   and that some of the other witnesses testified were rare in

22   Cabell County.

23        So, now we have a heroin -- an opioid epidemic where

24   the existence of these illegal drugs is in part due to the

25   problems caused by the defendants.  So I don't think you can

```
 1   completely divorce the situation from -- from their conduct
 2   because it's the single opioid epidemic that they are a
 3   cause of.
 4        And I think I want to back up and talk a little bit
 5   about West Virginia --
 6             THE COURT:  Your evidence on the gateway theory
 7   was kind of thin, wasn't it, Mr. Majestro?
 8             MR. MAJESTRO:  I think it's anything other than
 9   that and I'll tell you --
10             THE COURT:  Well, tell me what it was and maybe I
11   --
12             MR. MAJESTRO:  And the first -- the first thing
13   I'll say, Your Honor, is that that's the one argument the
14   defendants didn't make today.  They -- their argument is
15   they're not responsible for it.  It's -- it's a proximate
16   cause legal argument.
17        They didn't argue that heroin -- heroin doesn't cause
18   -- or that heroin isn't caused by virtue of the exposure to
19   these prescription opioids.  And when I get to -- and I'll
20   address that more when I get to the causation argument, but
21   I want to finish -- with Your Honor's permission, I want to
22   finish the important thing -- things I want to deal with in
23   terms of splitting out the abatement program.
24        First of all, I think it's clear that on this record at
25   this point that we have a situation where we have joint and
```

1    several liability.  Your Honor struck the notices of

2    non-party fault consistent with what the mass litigation

3    panel did.

4         And -- and I -- I won't spend a lot of time on this

5    oral presentation explaining the four opinions of the

6    Supreme Court, but in the end, the Supreme Court didn't

7    overturn the mass litigation panel's ruling which was

8    identical to Your Honor.  We believe that that ruling is

9    consistent with West Virginia law and consistent with the

10   general West Virginia law that -- common law that joint and

11   several liability is the rule.

12        Old cases, for example, *Mackeigan v Hickman* in 1921

13   noted that a more liberal standard applies to joint and

14   several liability in equity.  The number of cases at -- have

15   held that the kind of claim that we are -- that we are

16   seeking is a proper remedy, remedy in equity.

17        And, you know, one of the -- the argument on

18   apportionment, the problem with the defendants' argument on

19   -- we can't tell how much of it goes to -- how much of it

20   comes from the doctors, or illegal, or other -- other

21   causes.  The problem with that argument is that's not our

22   burden.  That's theirs.

23        So, under West Virginia law, the burden is on the

24   defendants to make the allocation when there is -- when

25   there is an indivisible loss like here.  So, there's no

1    suggestion that we can split up the -- this opioid epidemic

2    into divisible parts and, even if there was, it's their

3    burden to do that under West Virginia law and, when we brief

4    it, I'll cite the cases for you.

5        Once we make a prima fascia showing the defendants can

6    only limit liability if they can show that injuries are

7    capable of apportionment and it's their burden to do that

8    apportionment.  That's *Blankenship v. General Motors,*

9    *Johnson* -- by *Johnson v. General Motors*.

10       In fact, this Court in *Grant Thornton v. FDIC* said

11   unless sufficient evidence permits the fact-finder to

12   determine that damages are divisible, they are indivisible.

13   This Court recognized that, quoting Restatement Third of

14   Torts Section 26.

15       So, we're -- as here, you have concurrent negligence

16   and the defendants must prove that the damage caused by each

17   is clearly separable permitting the distinct assignment of

18   responsibility to each.

19       Now, in the context of public nuisance the Supreme

20   Court of Appeals has recognized that there -- that a

21   nuisance is a condition that by its nature is likely to be

22   indivisible.  In *McMicken* (phonetic), the Court said

23   although brought into existence or maintained by the

24   separate acts of a number of persons, a nuisance considered

25   in all of its aspects and elements may be an entire thing.

1    And that's exactly the situation here with respect to --

2              THE COURT:  Is there any difference between *Grant*

3    *Thornton* when you had defendants operating within a narrow

4    sphere in one specific situation leading to a bank failure?

5              MR. MAJESTRO:  Right.

6              THE COURT:  Accountants, lawyers, bank -- banking

7    experts.  Here, the misconduct is like beads on a chain.  It

8    happens over here and one -- with the manufacturers.  It

9    happens down here with the prescribing doctors.  And isn't

10   that -- it seems to me -- I'm struggling with this concept,

11   but it seems to me that that is a significantly different

12   situation.

13             MR. MAJESTRO:  It's a different situation, but the

14   rule is still the same.  Once you get past the causation

15   burden that the defendant is a substantial factor in causing

16   the indivisible loss, then the burden shifts to the

17   defendants to divide and that's what -- that's what the law

18   says.

19        So, if it's -- and the burden shifts --

20             THE COURT:  Does it matter how remote one mis --

21   act of misconduct is from another one that produces the

22   ultimate result?

23             MR. MAJESTRO:  I'm sorry.  I missed the beginning

24   of what you just said.

25             THE COURT:  No matter how remote one act of

```
 1    misconduct is from the ultimate act that results in the

 2    loss?

 3              MR. MAJESTRO:  And I -- so, I think the answer to

 4    that is we still have to meet the test for remoteness and

 5    the -- we have to get past the causation burden.

 6         And Your Honor has denied the summary judgment motions

 7    with respect to causation and our burden in showing

 8    causation and I'll just -- let's go to causation now.

 9         Pull up Slide 4, Gina.

10         Wehner v. Weinstein, a classic West Virginia case.

11    When multiple wrongdoers each contribute to a combined harm,

12    all that is required to show proximate cause is that the

13    actions of a tort feasor contributes in any degree to the

14    injury.

15         Go to the next, the next slide, Slide 5.

16         And let's talk about Wehner.  Wehner was a case where

17    you had a bunch of defendants that ultimately -- it was a

18    fraternity up in Morgantown where a pizza delivery truck

19    parked.  They parked and blocked a driveway.  And the -- and

20    some members of the fraternity wanted to move their car,

21    wanted to get out their car and were being blocked, so they

22    took the brake off the car, let it roll down High Street,

23    and killed two girls.

24         So, you had fairly disparate acts.  You had somebody

25    blocking a parking lot and then somebody -- somebody taking
```

1    the action of running the car downhill.  In that case, the

2    Supreme Court affirmed the finding of causation.

3        In *Everly v. Columbia Gas* the Court held a plaintiff is

4    not required to show defendants actions' were the sole

5    proximate cause, only that they were a proximate cause.

6            THE COURT:  Those are negligence cases, weren't

7    they?  Isn't there a difference between --

8            MR. MAJESTRO:  Well, if there --

9            THE COURT:  -- this case and a negligence case?

10           MR. MAJESTRO:  There is and that -- and what the

11   case law shows is that in a nuisance case a causation burden

12   is lighter, not heavier.

13           THE COURT:  Okay.

14           MR. MAJESTRO:  And I'm glad you reminded me of

15   that, Your Honor.

16       So, the -- then we get to the issue of intervening

17   cause and remoteness.  And, you know, I think what we --

18   where we look to that is that -- that what the case law says

19   on those concepts is that the touchstone is foreseeability.

20       And so, we go back to *Direct Sales*.  We go back to all

21   of the testimony that says when you distribute opioids in a

22   manner that they're likely to be -- that they're likely to

23   be diverted, the result of that is exactly what we have

24   here.  You get addiction.  You get transition to heroin.

25       You know, I think we had -- the pills to heroin

1    evidence we think is pretty strong and the evidence from Dr.

2    Keyes and the other -- and the other experts on the studies

3    about how much more likely it is to -- that users of heroin

4    started on pills.  So, we have all of that causation

5    evidence.

6         And, again, as to what I -- as to what I noted before,

7    it's strong enough that I don't think the defendants believe

8    that we haven't proven that case because that's not an

9    argument -- an argument they made here today.  Their

10   argument is not that we haven't proven it.  Their argument

11   is that it's too remote.

12        And I think the answer to that is back to the elements

13   of what we're talking about, back to *Direct Sales*, back to

14   the other Supreme Court cases, back to the statutory

15   findings of why the Controlled Substances Act was created,

16   and back to the testimony of all of the experts and all of

17   the defendants, many of the defendants that recognize that

18   when you put this dangerous product into the system that's

19   outside the closed system, what you have is the foreseeable

20   consequences of addiction that leads to these other

21   problems, these other problems.

22        And if you look at what the evidence shows, that the

23   transition from pills to heroin, that the -- it was -- the

24   reason it's so stark is that when the pills started shutting

25   down, that's when the heroin became evident.  The lay

1    witnesses even figured that out.  The experts gave you the

2    scientific studies that proved that that was the case.  And

3    the testimony of numerous witnesses in this case are clear

4    to establish that that was something that was foreseeable.

5         The DEA witnesses testified to that.  The defendants'

6    witnesses testified to that.  The -- Dr. Keyes and the other

7    -- Dr. Waller all the other experts had testified to that.

8         Our very first witness in the case, Dr. Waller,

9    explained how the molecule, the heroin molecule and the

10   opioid molecule is the same, that the effect on the brain

11   and the body and that -- that once you take that away, the

12   opioid high, the opioid addiction away, the poor person who

13   is stuck with that addiction looks for a substitute and the

14   illegal drug dealers were more than happy to provide that.

15        That is not some farfetched theory.  That's science

16   that we believe we established.  And it's not something that

17   surprised anybody.  That is consistent with what all of the

18   medicine is.  It's consistent with the reason we have --

19   have these statutes, these statutes in place.

20        Last thing I want to talk about on causation is this

21   whole thing with the doctors.

22        First point I would make is that -- and pharmacies

23   because we have some bad pharmacies in this case -- is that

24   joint and several liability, apportionment, all of those

25   causation theories apply to that, apply to that argument.

1     We are not arguing the defendants are the only ones

2  responsible.  We are arguing that they are -- that we have

3  produced enough evidence that you can conclude that they're

4  a substantial factor in this indivisible opioid epidemic.

5  So, it doesn't matter that these other parties contributed

6  to it, also.  They are still joint and severally responsible

7  and -- in this indivisible problem.

8     The second point I would make is that we produced

9  testimony that they are not totally divorced from the

10  marketing of these drugs.  We had Dr. Mohr testify about the

11  defendant's participation in the marketing.  So, we believe

12  there's sufficient evidence for Your Honor to conclude that

13  the -- that they are somewhat responsible at least for the

14  marketing itself.

15     The last point, I think, is the most important and that

16  is when you look at the volume we're talking about, 81

17  million -- if I've got -- if my memory is correct, 81

18  million pills, we're talking about different counts, but the

19  volume is very high.

20     And what they tell you is most of the doctors are good.

21  Most of the pharmacies didn't cause these problems.  But if

22  you remember the testimony of Lacey Keller, the bad

23  pharmacies and the bad doctors, even if we're only talking

24  about 1 percent, 1 percent of 81 million pills is 800,000

25  pills.

1          And, as the evidence in this case from the DEA

2     witnesses testified, if you have rogue doctors and rogue

3     pharmacies that we presented evidence of some of those

4     happening in Cabell County, they can do a lot of damage.

5     So, even when you don't have -- have high percentages of bad

6     conduct, low percentages of bad conduct creating addiction

7     in a population with the numbers at the level we are at is

8     sufficient to also be a cause of this epidemic.

9          So, they can't run away from the doctors, the bad

10    doctors and the bad pharmacies.  As a participant in this

11    closed system they had a duty under the Controlled

12    Substances Act to monitor and do their part to prevent

13    diversion.  We've presented a lot of evidence of that

14    failure.  That failure is a cause of the single epidemic in

15    Cabell County and we presented a plan to -- to abate that,

16    abate that problem.

17         And, you know, the last -- last point I want to make

18    is, and this one is -- and I know I said last a couple of

19    times, but I had forgotten about this one when I was talking

20    about abatement and that is let's talk about what this --

21    the City and County are doing.

22         So, they have the advantage of being sued by somebody

23    who actually did their best to solve this problem.  Now, the

24    deaths, the current situation, it's clear from the evidence

25    that was presented, there's still an opioid epidemic in

```
1      Cabell County.  So, whatever they're doing is not enough.
2            The numbers -- and, you know, we had Mr. Barrett's math
3      notwithstanding the amount of money that's being spent
4      currently is a drop in the bucket of what it's going to take
5      to eradicate just 50 percent of the opioid epidemic.
6            So, it's not necessary -- and it's not necessary for
7      Dr. Alexander to look at what they're doing because what
8      they're doing now is not enough and, most importantly,
9      what's being done now is not being done by the defendants
10     and that's the point of the collateral source rule.
11           And so, what they want you to do is they want you to
12     say, well, because the federal government has taken care of
13     this problem, because the state government has taken care of
14     this problem, it's not these -- the City's and County's
15     responsibility to take care of the problem.  That's contrary
16     to the statutes which give them the authority to abate this
17     nuisance that's not being abated.
18           And those other monies and the grants and other
19     good-meaning private people, all of which the evidence shows
20     is insufficient to solve the problem now, there is no -- Dr.
21     Alexander's testimony was that this is what's -- this
22     program is what's necessary to stop the epidemic.  There's
23     no testimony that what is going on now is necessary and
24     sufficient to solve the epidemic.  And so, even if you look
25     at what's there, we still -- there still needs to be much
```

1    more.

2        And, finally, the fact that other people are paying for

3    it and not the people who caused the problem should be what

4    concerns us all.  The defendants want to say, well, the

5    State's paying for it.

6        And the reason we have the collateral source rule --

7    and they say, well, the collateral source rule applies only

8    to damages.  The reason we have the collateral source rule

9    is it is a doctrine founded in equity.  It is not a legal

10   doctrine.  It's an equitable doctrine.  It is an equitable

11   doctrine that deals with how to allocate a windfall.

12       So, defendants are at fault.

13           THE COURT:  Is the argument that it's a legal

14   doctrine because it goes to damages?

15           MR. MAJESTRO:  No.  It's an equitable -- if you

16   look at the case law, Your Honor, it's an equitable doctrine

17   to say we have a windfall.  Who should bear the -- who

18   should bear the -- who should bear the burden of the

19   windfall?  Who should bear the benefit?

20       And what the doctrine says is that it is the -- that

21   the benefit of that goes to the party that's not at fault.

22   The defendants should not be able to claim, well, all of

23   these other people are solving this problem so we don't have

24   to.  And especially in a situation here where -- where

25   there's no showing that it's sufficient.

1        And I think if -- and, you know, in your opinion you

2    cited Judge Polster's decision in the Northern District of

3    Ohio case and I -- and I think the reason I would

4    distinguish that case is *Kenney v. Liston* is not the low and

5    high.  The *Bates* case in Ohio is directly contrary to the

6    direct holding in *Kenney v. Liston*.  The West Virginia

7    Supreme Court rejected that theory and found -- and we're

8    not talking about even a payment to someone else.

9        The facts of *Kenney v. Liston,* what they said, that the

10   discount that your insurance company negotiated with a

11   provider is a collateral source.  It didn't even require a

12   payment.  And they listed every possible collateral source

13   in the rule and said this is a non-exhaustive list.

14       So, when you start with a doctrine founded in equity

15   and a decision as broad as *Kenney v. Liston*, I believe that

16   on these facts the Supreme Court would apply to an abatement

17   action brought by -- brought by cities and counties.

18       So, I think I hit the highlights of the defendants'

19   arguments.  Let me --

20       (Pause)

21          MR. MAJESTRO:  Mr. Farrell wants to conclude.

22       I just want to say that we will look carefully at the

23   defendants' briefs and respond point-by-point with evidence

24   and law to deal with those.

25          THE COURT:  All right.

1        Mr. Farrell?

2            MR. FARRELL:  Thank you for your patience, Judge.

3        You asked some tough and challenging questions that are

4        very important to a resolution of this case and, at the risk

5        of making it more confusing, I'm going to use your analogy.

6            THE COURT:  Okay.

7            MR. FARRELL:  If you'll recall Dreamland,

8        Dreamland is a pool in Portsmouth, Ohio.

9            THE COURT:  I've read Dreamland twice, Mr.

10       Farrell, and I'm old enough to remember when it was going

11       strong, believe it or not.

12           MR. FARRELL:  Yes, sir.

13           THE COURT:  And that was a long time ago.

14           MR. FARRELL:  The author of the book, Sam

15       Quinones, he used Dreamland, the Dreamland pool, as a

16       metaphor for what was happening in the community.

17       So, let's see if we can use the same metaphor to

18       understand with the factory polluting into the pond.  What

19       we are -- are trying to communicate is that a public

20       nuisance is an act or a condition.  So, while the act of

21       polluting a pipe into the pond dumping pollutants, yes, you

22       can stop the dumping of chemicals into our water.

23       In West Virginia, the Kanawha River, we've experienced that.

24       The condition that is left behind are those individuals

25       that are in that pond.  And I understand your question that

1    plaintiffs perhaps are putting too many people in that pond,

2    that if there is a person who has never taken a prescription

3    pill, or is not born yet and, at 12 years old gets addicted

4    to black tar heroin, you're saying, Mr. Farrell, how do you

5    put that person in the pond?

6         Well, that might be fair.  We'll take that for a

7    second.

8         One could argue that just like in the book Dreamland,

9    that we didn't have a whole bunch of Mexican black tar drug

10   dealers in Huntington, West Virginia in the 1990s, but that

11   because of the same storyboard in Dreamland, they ended up

12   here.

13        But I'm not even going to go there because what I'm

14   attempting to do is I'm attempting to identify that if you

15   take a reducio ad absurdum and take the most far-reaching

16   example to use that to judge our abatement plan, you'll

17   always be able to find fault with it.

18        Using the factory dumping into the pond, what we're

19   trying to do is we're trying to clean the water.  So, if we

20   build a treatment plant to treat the water and it happens to

21   screen out not only the chemicals dumped by the defendants,

22   but also other contaminants, well, God bless us, but that

23   doesn't negate the fact that the treatment facility is

24   necessary to begin with to address this condition.

25        So, we acknowledge that there are some logical

1    extremes, but what we firmly believe is that we can define

2    those human souls that are in that pond.

3         And the evidence on the gateway effect is this:  Four

4    out of five heroin users began with prescription opioids.

5    Heroin use has tripled, quadrupled and quintupled in our

6    hometowns.

7              THE COURT:  Is that in the record, the four out of

8    five figure?

9              MR. FARRELL:  Yes, Your Honor.

10             THE COURT:  It is?

11             MR. FARRELL:  And I believe it will be relatively

12   undisputed and that you'll hear from some of the learned

13   experts on the other side, as well.  The medical literature

14   is as strong as it has ever been and, in fact, since the

15   expert witness depositions, there's even more medical

16   literature on it that I know you'll hear about in the coming

17   weeks.

18        But four out of five current heroin users started on

19   prescription opioids.  The reason for that, we explain with

20   Dr. Corey Waller when we drew the molecule on the board,

21   it's the same molecule.

22        What the drug dealers figured out is they could mass

23   produce the same molecule, bring it here, and sell it

24   cheaper.  That's what they figured out.  That's Dreamland.

25        So, the epidemiologists testified from the -- from

1    their studies.  The scientists have given us the basis.  The

2    gateway effect is not a myth.  It's not a myth.  It's not a

3    theory.  We're not calling it the gateway theory.  It is the

4    gateway effect.

5         Now, on top of all of that, what we're trying to do is

6    we're trying to establish that there is a solution.  And if

7    you just take a step back and you ask the common sense

8    question to a hundred Americans, what do you think is going

9    to be the foreseeable result if you deliver 81 million pills

10   of pharmaceutical grade opium into a community of less than

11   a hundred thousand people, what are the common sense

12   sequelae you think are going to happen?

13        The first thing that people are probably going to say

14   is addiction.  The second thing they'll probably say is

15   they're probably going to say overdoses.  The third thing

16   they're probably going to say is wait for the heroin drug

17   dealers.

18        So, all in all, we have to kind of get our minds around

19   what the proper analogy is.  We all learn by experience and

20   analogy.  And so, we are, too, struggling with figuring out

21   the analogy of what to do with this.

22        But what we believe by taking the opposite, I'll take

23   the reducio ad absurdum to Kermit, West Virginia.  How can

24   you take tens of millions of pills into a community of 400

25   people and not expect there to be problems?  So, however we

1    define it, we're going to put our arms around this epidemic

2    and we're looking for a solution.

3         The hard part for this Court, I think, is when we get

4    to the end and we have to make some important -- not we, you

5    have to make some important decisions on whether this is one

6    indivisible injury, or whether it is divisible, on whether

7    or not you're going to allocate for it because I think at

8    the end when we give closing arguments and we draw the

9    timeline of events, I think we're going to agree on what

10   happened.  I don't think the defendants are going to dispute

11   the number of pills they sold.

12        They're going to say these were lawful transactions.

13   We're going to say it was unreasonable.

14        I don't think there's going to be any dispute that

15   there are pharmacies that were not doing their job selling

16   those pills and that there were doctors that were not doing

17   their jobs writing the prescriptions.  I think we're all

18   going to agree that drug dealers were providing licit and

19   illicit prescriptions to everybody in the community.  And I

20   think we're all going to agree that there is a bad opioid

21   epidemic and that something needs to be done about it.

22        The real question is whether or not we've proved under

23   the burden of law that the conduct by the defendants was

24   unreasonable and was it a substantial factor in this public

25   nuisance.

1      If those two factual issues are yes, then the rest of

2  this case has a lot of legal hurdles, a lot of legal

3  decisions you must make.  And we think we're pretty squarely

4  -- squarely within the law.  We think public -- this is the

5  right way to do it.  Rather than bringing 8,000 personal

6  injury cases, we think that we have standing for -- to abate

7  the public health crisis.

8      If this were COVID, ask ourselves -- and I don't -- I

9  don't want to make light of it because it's not -- it's not

10 something to make light of, but if the defendants were

11 directly involved with selling a product that causes COVID,

12 then we start drawing better analogies.

13          THE COURT:  How is this different from tobacco and

14 asbestos litigation where you could arguably apply your

15 nuisance theory to that situation, but those cases were all,

16 like you say, 8,000 personal injury cases, maybe probably

17 more than 8,000 in the asbestos situation.  How is this case

18 different from that?

19          MR. FARRELL:  This case is different because we've

20 taken a different approach for a solution.  If you think

21 about the tobacco cases, there were a whole bunch of

22 individual cases that went to trial and most of them lost,

23 quite frankly.

24     And then the Attorney Generals came around and they

25 actually filed a subrogation claim for the expense they were

1    writing.  They didn't bring a public nuisance case.  The

2    genius of the tobacco litigation was somebody figured out,

3    and it was the AG from Mississippi, that the standing of a

4    state to bring a subrogation case was viable, right?  So,

5    that's kind of like in a different pod.

6        If you look at the asbestos --

7            THE COURT:  But the subrogation argument puts that

8    case closer to this, this one, right?

9            MR. FARRELL:  Well -- well, for purposes of

10   standing, the attorney generals were seeking restitution for

11   their own personal out-of-pocket expenses.  So, if you could

12   board -- this would be no different than if Cabell County

13   could board that we spent X dollars on treatment of opioids,

14   we should be reimbursed.  That's a damage claim, right?

15       Now, on the asbestos side of things what you have is

16   you have individual claims and then the TPPs, the

17   third-party payers, filed cases, the unions, the -- all --

18   they came in and that was millions and millions of

19   individual damage cases.

20       The real kind of crux of this is -- and I don't want to

21   bore you with the background, but it's really lead paint and

22   handguns.  So, the lead paint cases were brought on public

23   nuisance.  It wasn't brought by kids or the parents of kids

24   who ate the lead paint and got lead poisoning.  It was

25   brought out in California by, I think, Los Angeles and said,

1    look, we've got lead paint all over the place and they filed

2    a public nuisance case.

3         Now, across America, the public nuisance cases for the

4    most part did not succeed and that's because a lot of the

5    states argued that at the time the lead paint was being

6    sold, those were -- it was not foreseeable that it was going

7    to cause lead poisoning.

8         The difference here in this case, the reason we filed

9    this suit, is because *Direct Sales*, selling narcotics, has a

10   different foreseeability element.  That's the first hurdle I

11   got over when I started looking at it.

12        The second thing I looked at was the handgun cases.

13   Now, for the most part, the handgun cases struggle, as well,

14   because the transaction between the wholesaler and the

15   retailer, there was no duty.  There was no unlawful act or

16   wrongful act that people could find.  So, those handgun

17   cases failed.

18        So, when I started reading the law and I came across

19   the *Cardinal Health v. Holder* case, I thought, well, there

20   you have unlawful wrongful conduct.  So, the two paradigms

21   here of lead -- lead paint failed for one reason and the

22   handgun cases failed on the other on the most part.

23        We solved both of those here.  We have foreseeability

24   back to the 1970 Controlled Substances Act.  We have -- and

25   even if you don't take the congressional record, we have

1    foreseeability from the DEA and from Congress with the 2001

2    hearing, the Rannazzisi letters.  We have built

3    foreseeability up beyond which can be disputed.

4        What it really comes down to is what standard you're

5    going to require us to meet to show actionable conduct.

6        You'll recall in opening statement I kind of put a

7    circle around that box and punted on it because it's a legal

8    debate.

9        But if you decide what hurdle we have to overcome and

10   we overcome it, I think you are well within the bounds of

11   law to order abatement of the condition and we have

12   attempted to bring in the leading experts in the country on

13   that very thing.

14       We've brought in guys from Johns Hopkins, from Harvard.

15   We brought in Columbia.  We brought in the Head of the DEA.

16   We brought in the guy who did the *Masters* case.

17       We've tried to replicate those administrative actions

18   for you not on a national level.  Not someplace else.  We've

19   tried to replicate what happened here.  And I hope we've

20   done a pretty darn good job of trying to link together these

21   disparate pieces to make it a cogent argument.

22       Thank you.

23          THE COURT:  Thank you, Mr. Farrell.  Thank you.

24       Mr. Hester, you may rebut.

25          MR. HESTER:  Thank you, Your Honor.

```
1              THE COURT:  Just a minute.  We probably need a
2     break here.
3              MR. HESTER:  That's fine, Your Honor.
4         (Recess taken)
5         (Proceedings resumed at 3:33 p.m. as follows:)
6              MR. HESTER:  Thank you, Your Honor.
7              THE COURT:  You may proceed, Mr. Hester.
8              MR. HESTER:  So I'm going to make a few points and
9     observations and then my colleagues as well will have some
10    points they want to make.
11             THE COURT:  All right.
12             MR. HESTER:  Very quickly, on Mr. Majestro's first
13    point about prematurity, the rule contemplates that if a
14    party has been fully heard on an issue that the Court can
15    enter judgment on partial findings.
16        And on the two key issues we raised, causation and the
17    flaws of their abatement model, they have been fully heard.
18    The deposition designations they're talking about do not go
19    to either of those issues.  And the Court did not hear any
20    reference to any evidence presented at the trial that
21    contradicts our points that prescribing behavior is what
22    drove the volume and that, that defeats their proximate
23    causation obligation.
24        And, in particular, it's notable that they failed to
25    make any reference to Employer Teamsters or City of
```

1    *Charleston*, the two cases out of this district that have

2    specifically found that proximate causation is defeated

3    where there's intervening medical judgments that give rise

4    to the alleged harm.

5         And there's no question here that the alleged harm is

6    the effect from the downstream prescribing of opioids and

7    what happens once they're out in the community.

8         And as to that issue, the plaintiffs have offered no

9    answer to the Court.  That defeats proximate causation under

10   the standard of *City of Charleston* and *Employer Teamsters*.

11        It's also important to note -- Mr. Majestro asserted

12   that we had not challenged the gateway theory.  We have.  We

13   made -- I made the argument this morning that the gateway

14   theory is defeated because it depends on a premise that

15   there was an excessive volume of prescription opioid pills

16   and that led to later use of illegal drugs.

17        And we made the point as a matter of law that that is

18   unduly remote.  And it begins with the prescribing decisions

19   of doctors.  And then it involves illegal conduct of various

20   criminal actors.

21        Of course we didn't dispute factual points.  That's not

22   the way that we would anticipate the Court to resolve a Rule

23   52 issue.  But we did make the point that proximate

24   causation cannot be established as to illegal drugs because

25   it depends on the premise that there was an excessive

1    volume, the excessive volume occurred because of doctor

2    prescribing behavior.  Then the second point is that there

3    was subsequent illegal activity that led to the use of the

4    illegal drugs.  That defeats proximate causation.

5        I also wanted to go back to the Court's questions about

6    the nature of the abatement remedy the plaintiffs are

7    seeking here.

8        They are clearly seeking to deal with the downstream

9    harms caused by the use of opioids, opioid use disorder,

10   subsequent effects in the community that come from that.

11       And I think you heard in Mr. Majestro's own language as

12   I was writing it down consequences of the epidemic stopped

13   the harms caused by the epidemic.  Those are damages

14   concepts.

15       Another point the plaintiffs never responded to is that

16   they have waived their damages claim.  That's a fundamental

17   point here that makes this different from a public nuisance

18   case that often has a damages component as well as a future

19   request for injunctive relief.

20       Here the plaintiffs are only seeking an abatement

21   remedy.  Yet, the remedy they've presented to the Court is

22   clearly based on harms to the people who were exposed to the

23   opioids and who were exposed to the adverse effects flowing

24   out of it.

25       They are not seeking to address the defendants'

1    conduct, and that's quite clear.  There was nothing said in

2    the, in the plaintiffs' argument that was responsive to one

3    of the core points we made that they are not dealing with

4    the defendants' conduct.  They are dealing with the harms

5    allegedly caused by the fact that doctors prescribed a high

6    volume of opioids.

7         So, again, in terms of the remedy the plaintiffs seek,

8    the, the fact that they are only seeking 98 percent of the

9    remedy is focused around treatment and is focused around

10   downstream effects flowing out of opioids.  That is the core

11   flaw in their abatement remedy.

12        But it's also quite important to go back -- and I do

13   want to highlight that they have failed to respond to our

14   argument on proximate causation.

15        Foreseeability is not the sole test for proximate

16   causation under West Virginia law.  There is clearly an

17   element of remoteness embedded in West Virginia law on

18   proximate causation.

19        We cited the cases to the Court this morning under West

20   Virginia law, but the *Employer Teamsters* case and the *City

21   of Charleston* case both make the point that remoteness is an

22   element of West Virginia proximate causation law.

23        And I found it quite notable that there was no response

24   to the point that the harms alleged are remote when we take

25   account of the independent decisions of doctors and the

```
 1   failure to answer those two cases out of this district we

 2   submit reflects the weakness of the plaintiffs' position on

 3   proximate causation.

 4        I would also add, Your Honor, that this is not a case

 5   where there is one injury.  It's not a simple case like

 6   Grant Thornton, for instance.  And I know that was a complex

 7   case that this Court worked on.

 8        But this is a, this is a complex multi-faceted

 9   proposition.  It's a social problem of enormous dimension.

10   There is independent activity of each of these defendants.

11   It's not a simple case.

12        It's quite different from the Weiner vs. Weinstein case

13   that the plaintiffs cited which was a single injury flowing

14   out of a sequence of events and it was a concurrent

15   negligence case.  That's different from what we have here.

16        Here we have a very complex set of factors and

17   independent activity of separate defendants and not a single

18   injury.  It's a very different kind of case.

19        So I think a number of the arguments that the

20   plaintiffs made fall apart at the threshold because of that

21   point.

22        I did want to highlight again that, that Mr. Farrell's

23   remarks and holding up of the charts only highlights that

24   their case turns on volume.  And if the case turns on

25   volume, it falls apart on volume as well.
```

1          And the reason it falls apart on volume is because the

2     evidence is uncontroverted, undisputed, and quite extensive.

3     The volume is driven by doctor decision-making.  And the

4     plaintiffs did not dispute that today.

5          And *Employer Teamsters* and the *City of Charleston* tell

6     us that if the theory of the case is that the independent

7     decision-making of doctors led, led to the subsequent harm,

8     that case is too remote under West Virginia law.

9          I would also close up here by talking about the

10    references to the collateral source rule.

11         There is no case, first of all, that says the

12    collateral source rule applies to an equitable abatement.

13    And the Court made that point I think in denying previously

14    the plaintiffs' motion on collateral source.

15         But perhaps even more importantly, it's important to

16    distinguish this case from the paradigm of a collateral

17    source.  Collateral source might apply, for instance, if

18    somebody's hit by a car and then gets insurance and they've

19    suffered an injury.

20         Here there's no showing that the city and the county

21    have suffered the injury.  It's, it's third parties who are

22    engaged in the activity and it's third parties that are

23    receiving -- that are making the payments.  It's very

24    different from a conventional collateral source case.

25         And, so, we don't think that the collateral source rule

1    at all answers the problem that's presented here, which is

2    really that there would be a fundamental windfall to the

3    city and the county if the Court were to engage in the, in

4    the kind of abatement relief that the plaintiffs have sought

5    here.

6          Your Honor, I, I'm sure we will have more to say on

7    this once we see the plaintiffs' brief.  But unless the

8    Court has questions, I can turn it over to my colleagues.

9               THE COURT:  All right.  Thank you, Mr. Hester.

10              MR. HEARD:  Your Honor, I'd like to address just

11   three subjects.  But I'd like to begin with the question you

12   asked me at the end of the argument, which was about

13   revisiting the nuisance claim.  And I'd like to address what

14   Mr. Majestro said about that.

15         First of all, it's quite clear that Your Honor can

16   revisit your ruling.  I had an experience two years ago that

17   I was reminded of during the break in which Judge William

18   Smith in the District of Rhode Island granted summary

19   judgment against me without opinion, and then six months

20   later reversed himself and denied the motion for summary

21   judgment.

22         You can certainly revisit the question.  And if you'd

23   like, we could also, as a matter of formality, refile it.

24         But Your Honor is in a unique position because you are

25   now the only Federal Judge in this opioid litigation who has

heard evidence in one of these cases.  Only one State Court has done that, the Oklahoma court.  So you are really in a unique position now to evaluate the legal arguments in light of having heard the evidence.

And if you do that, then I would remind you that what the plaintiffs are asking you to do is something that no West Virginia Court has done or, rather, the West Virginia Supreme Court has never endorsed.

There is no West Virginia Court, Supreme Court decision in which the Court has recognized a nuisance claim in a products case, a case arising from the misuse or abuse of products.  That would be a new development entirely in West Virginia law.

And that no reported case, West Virginia case, has the Court awarded as a remedy for a nuisance claim remedies for downstream harms to individuals, something like the abatement plan involving addiction and other medical treatment for individuals.  That's never been awarded as relief in a nuisance case in West Virginia.  And, indeed, it's never been awarded as relief in any federal case.

The lead paint cases involved cleaning up the lead paint in the houses.  They quite clearly did not involve any relief for the children who had eaten the lead paint chips. So they're asking you to do something unprecedented and that's worth revisiting.

1        The direct answer to Your Honor's question about the

2   asbestos case or the lead paint cases or a case involving

3   obesity is what's said in the Restatement (Third) of torts

4   in Section 8.  The commentary to that section says there

5   have been cases which have tried to apply nuisance law to

6   products cases like lead paint and asbestos and tobacco and

7   we, the commentators, say that's a misapplication of

8   nuisance law.  That's better addressed under products

9   liability law.

10        And for certain in the several writs that have gone to

11   the West Virginia Supreme Court during this litigation, the

12   Supreme Court has never addressed the merits of nuisance

13   claim, nor indeed have most of the decisions in this

14   litigation provided a thoughtful appraisal that we asked

15   Your Honor to make where the fundamental distinction has to

16   be made.

17        We talked about a public nuisance, and there has to be

18   an interference with a public right.  As you and I discussed

19   at the summary judgment argument, you've got to distinguish

20   between what's an interference with a public right and

21   what's an interference with a private right.

22        And the plaintiffs so broadly define what is an

23   interference with a public right that they leave that

24   private right element entirely out of the Restatement

25   definition.  And if you leave it out, then you can be sure

1     that there will be a flood of cases involving obesity or

2     anything else or it's Katie bar the door.

3          Now, I'd like to say this on the question of whether

4     Cardinal -- and it applies I think to McKesson and ABDC as

5     well -- acted reasonably, whether there's proof that they

6     acted unreasonably.  And I'll just try to paraphrase.  I

7     think it's pretty close to a quote of what Mr. Farrell said.

8          The measure of whether the conduct is reasonable is the

9     volume sold.  The measure of whether the conduct is

10    reasonable or not is the volume sold.  And that just can't

11    be, Your Honor.  That is a fundamental divide between us.

12         They need to prove that we acted unreasonably.  And to

13    prove that we acted unreasonably, they have to consider the

14    historical context.  And they have to understand if the

15    standard of care changed, and that there wasn't anything

16    suspicious about filling pharmacy orders for doctors who

17    were prescribing in good faith pursuant to the prevailing

18    standard of care who were prescribing pursuant to what was

19    essentially the bible for prescribers, the book that was

20    given to every West Virginia doctor by the West Virginia

21    Board of Medicine, not given to them by some, even some

22    professional society, not given to them by Purdue Pharma,

23    given to them by the West Virginia Board of Medicine and

24    said, "Follow this."

25         And plaintiffs simply can't show that we're acting

1    unreasonably when we fill the orders necessary for

2    pharmacies to dispense to patients who come in with a

3    prescription because their doctor in good faith has said,

4    "You need this for the treatment of your pain."

5        What we needed in this case and we didn't get was

6    evidence -- in Cardinal's case -- where the plaintiffs name

7    a single Cardinal customer, one of those 37 pharmacy

8    customers, and provide evidence showing this is what you did

9    wrong vis-à-vis this pharmacy.  You set the thresholds

10   wrong.  You didn't go out and investigate.  If you'd looked

11   and investigated, you would have seen this pharmacy was

12   associated with a pill mill.

13       We know from the example of A-Plus Pharmacy it's

14   possible to come forward with that kind of evidence.  A-Plus

15   Pharmacy, the owner, the pharmacists, they went to jail.

16   They were working hand-in-glove with a pill mill.  But they

17   were supplied by Miami-Luken, not by McKesson, not by ABDC,

18   not by Cardinal Health.

19       Where is that kind of evidence?  Where is that example

20   as to any of the defendants in this case?

21       We didn't surprise them with that argument today.  But

22   they can't come back and give you an example as to any of

23   our customers.

24       The evidence for Cardinal is that we modified our

25   system in 2007-08 after the DEA changed the rules and gave

1    us an example to follow which was ABDC -- the example of

2    ABDC.  We followed it.

3        We set thresholds which weren't criticized by Mr.

4    Rafalski.  We flagged every order Mr. Mone said in excess of

5    the threshold.  We blocked the orders that were flagged.  We

6    evaluated every one of those blocked orders.

7        And there's no criticism of that except to say, well,

8    the volume still continues to be big.  That just doesn't

9    suffice as evidence that we acted unreasonably.

10       And there's certainly no systemic failure here.  If

11   there was some systemic failure with our systems, then they

12   would be able to give you one example of a pharmacy in West

13   Virginia that was like A-Plus Pharmacy.

14           THE COURT:  Blocked orders were sometimes shipped

15   after they were evaluated; is that right?

16           MR. HEARD:  That's correct.  So we set the

17   threshold, no criticism of that.  If it's in excess of the

18   threshold, we block it, evaluate it, and then ship it.

19           THE COURT:  I can't remember the evidence, but the

20   quality of the evaluation would be pretty key there,

21   wouldn't it?

22           MR. HEARD:  That's key.  And, of course, the

23   burden of proof is on the plaintiffs to show that that, that

24   due diligence wasn't done.

25       And as I tried to explain this morning, what we have is

```
 1    Mr. Rafalski on direct examination making a very broad claim
 2    that he had reviewed all of the due diligence files and he
 3    found nothing to dispel his suspicion.
 4         The problem is it doesn't square with what he admitted
 5    on cross-examination which is he only looked at some of the
 6    due diligence files.  And he didn't even look at the due
 7    diligence files for the initial flagged orders, and he
 8    doesn't know of any example of a pharmacy getting diverted.
 9    And he didn't look at any of the orders to see if there was
10    something like A-Plus Pharmacy where the doctors were
11    clearly violating contrary to any standards of care
12    whatsoever.
13         I mean, that's the problem, Your Honor.  You didn't
14    hear a single answer to the argument.  I said that they
15    don't prove cause in fact.  If we had done more due
16    diligence, what would we have found?  Would we have found
17    bad doctors prescribing contrary to the standards of care
18    who were -- who are sending prescriptions to their patients
19    to our pharmacy customers?  That's what they need to prove.
20    No witness even addressed the question.
21         They need to show that if we blocked more orders, it
22    would have affected the volume coming into
23    Cabell/Huntington.  There are 30 other distributors who have
24    stepped in to fulfill the orders for any blocked, any
25    blocked pharmacy.  They don't have any witness to even
```

1     address the question.

2          They fault us for not reporting more suspicious orders,

3     but there's no witness who even addressed the question

4     whether the DEA would have done more.  And we know the DEA

5     would not have done more because the DEA had all the volume

6     data.  It had it on a monthly basis.  And it did nothing and

7     that's not to blame them.  That's, that's to go back to the

8     question of historical context.

9          The DEA didn't do anything when they saw this volume

10    because they believed and recognized at the time that

11    99.5 percent of doctors were prescribing appropriately.  And

12    the appropriate response to these greater number of

13    prescriptions was for them to raise the annual quota

14    nationwide because everybody believed, it was the

15    conventional wisdom, that it was okay to prescribe opioids

16    for the long-term treatment of chronic pain.

17         I submit, Your Honor, there's complete failure to prove

18    that we acted unreasonably.  And it was interesting to note,

19    and confirming what I said this morning, there's not even a

20    claim that Cardinal Health acted unreasonably after 2012,

21    which means for the last nine years distributors, even under

22    their evidence, their view of the evidence have been acting

23    reasonably.

24         So the last thing I would like to just touch on is

25    abatement.

1       I thought it was a -- I think it's a fact, but

2   certainly it's a challenge to the plaintiffs.  I said they

3   have not been able in four years of this litigation to point

4   to a single case in which any Federal Court in the history

5   of the republic has ever done what they want Your Honor to

6   do by way of a remedy.

7       Pointing that out is no surprise.  We've been waiting

8   for four years to see such case.  And they can't cite you to

9   such case because they're asking the Court to grant an

10  equitable remedy where there is an adequate remedy of law.

11      They're asking you to award $2.6 billion that's not

12  adjunct to any injunctive relief or any claim for

13  restitution or any claim for disgorgement.  No Federal Court

14  has ever done that.

15      This stuff about joint and several liability,

16  apportionment, has nothing to do with the abatement remedy.

17  We're not arguing here between the three defendants about

18  joint and several liability.  We're not fighting about

19  liability apportioned between the three of us.

20      We're pointing out that a Federal Court in equity has

21  to tailor the equitable remedy to the wrong.  And they

22  haven't tailored it to the wrong when it's to solve the

23  whole opioid crisis regardless of our wrongful conduct and

24  what we did and when we did it.

25      It's not because they don't believe there are a lot of

1    people at fault.  You'll remember Mr. Rannazzisi's

2    testimony.  Mr. Schmidt, "Do you believe X is at fault and Y

3    is at fault and Z is at fault?"  And he said, "Yes, yes,

4    yes."  Of course, Mr. Rannazzisi didn't accept any fault at

5    all.

6         But the remedy has to be tailored to the wrong of these

7    three defendants.  They haven't done that.

8         And, so, I will say at the end, Your Honor, they're

9    asking you to do what no Federal Court has done.  And

10   they're just asking you to ignore common sense when they say

11   we acted unreasonably.

12        If 99 percent of doctors were prescribing the drugs

13   appropriately, there's no way that 90 percent of the

14   pharmacy orders were suspicious.  That just defies common

15   sense.

16        And if the State of West Virginia sued these three

17   defendants for damages and collected $75 million in *parens*

18   *patriae* capacity on behalf of every resident of the state,

19   it makes no sense for Cabell/Huntington to be claiming that

20   $2.6 billion is a reasonable abatement remedy.  Everything

21   they're saying defies common sense and we think it's

22   appropriate to grant the motion.

23        Thank you.

24             THE COURT:  Thank you, Mr. Heard.

25        Mr. Nicholas.

1           MR. NICHOLAS:  Thank you, Your Honor.

2       I hope to be even briefer than my two colleagues, but I

3   will at the end ask if I can, incredibly enough, introduce a

4   new partner of, partner of mine to speak to you about one

5   tiny point who you have not met before I don't think and

6   it's Ms. Watterson.

7           THE COURT:  I have met Ms. Watterson.

8           MR. NICHOLAS:  Good, excellent.  I'll be really,

9   really short.

10      It was striking I thought today how little of an effort

11  the plaintiffs were able to muster to present any evidence

12  at all to address the question of conduct on the one hand

13  or, or proximate cause, causation on the other.

14      I heard Your Honor's question about the quality of --

15  how the quality of the evaluation and the programs is key,

16  the question you asked just now.

17      There was nothing that the plaintiffs have suggested in

18  this case, no evidence that they pointed to today in

19  argument to suggest anything negative in that regard.

20      But I would remind the Court with regard to

21  AmerisourceBergen, for example, that you heard four of our

22  witnesses testify at length about our program and about the

23  work we've done and the results we've achieved.

24      And, frankly, you know, yes, it's a bench trial and not

25  a jury trial.  But the evaluation of, of witnesses, the

1    quality of the testimony, the credibility of the witnesses

2    is just as much, you know, your province as it is to a jury.

3        And I, I would strongly urge us all to try to think all

4    the way back to those four witnesses, those four

5    AmerisourceBergen witnesses, Mr. Zimmerman, Mr. May, Mr.

6    Mays, and Mr. Perry because they were subjected to a lot of

7    cross-examination and, you know, the evidence came through

8    with flying colors is really -- I mean, just, just to go out

9    and say it.

10       And one last thing on this point and then I am going to

11   turn this over to Ms. Watterson.

12       The other thing is, you know, the issue of

13   reasonableness of conduct of our behavior, what did the DEA

14   think?  Where was the DEA?

15       The DEA has never fined AmerisourceBergen.  We made

16   presentations of our program with Ameri- -- I'm sorry --

17   with the DEA.  We trained DEA personnel.

18       The program that we created in 2007 became a model for

19   the industry that the DEA basically recommended that the

20   other distributors follow.  And they did, as Mr. Heard has

21   just pointed out.

22       What are we supposed -- in terms of our reasonableness,

23   when our regulator has been telling -- has basically been

24   working with us for years, essentially endorsing our program

25   for years, not, not having -- it has taken no action against

```
 1    us since 2007 whatsoever of, on the record, on this record

 2    and, for that matter, didn't do anything prior to it except

 3    for the one instance in, the one shutdown in Orlando,

 4    Florida, in 2007, that has something -- that is worth

 5    looking at when one considers reasonableness here.  There is

 6    simply no evidence of any unreasonable conduct on the part

 7    of my client, none.

 8         So that's kind of what I wanted to say and I will

 9    introduce you to your old friend Ms. Watterson now because

10    there is a point that we want -- last point we want to make.

11         Thank you, Your Honor.

12              THE COURT:  She was on closed-circuit TV when I

13    met her.

14              MS. WATTERSON:  I was, Your Honor.  Nice to see

15    you in person.

16         What I'm going to talk to you about now, Your Honor, is

17    what the West Virginia Supreme Court did recently.  And I

18    didn't think I would be here talking to you about it today

19    in connection with the directed verdict motions which go to

20    whether plaintiffs have met their burden of proof because

21    what was going on in an issue in the writ in front of the

22    West Virginia Supreme Court had to do with the question of

23    non-party fault, apportionment, the 2015 act, which really

24    only comes into play if plaintiff meets their burden on the

25    elements of a public nuisance claim and, most importantly,
```

1    to prove proximate cause.

2         But as Mr. Heard mentioned when he was talking, during

3    plaintiffs' response to the proximate cause argument, they

4    raised issues about the 2015 act and joint and several

5    liability.

6         So let me just say this.  I talked about them mixing --

7    I used the word mixing apples and oranges.  Mr. Heard

8    pointed out that it really didn't have anything to do with

9    the central question before the Court today.

10        I don't want to mix apples and oranges, but I can't

11   leave the room without saying the following.

12        On at least two different occasions, plaintiffs have

13   suggested that the West Virginia Supreme Court's recent

14   decision on the writ challenging the MLP's ruling striking

15   the non-party fault motions, or notices -- and, by the way,

16   I know Your Honor also granted their motion to strike

17   non-party fault and I'm going to talk to you about this at

18   the end of the case.

19        But let me say this.  There is absolutely nothing in

20   the West Virginia Supreme Court's three opinions that

21   foreclose this Court from, at the right time, determining

22   that apportionment of fault to non-parties, again assuming

23   plaintiffs get past their burden and meet their burden,

24   there's nothing in those opinions that foreclose this Court

25   from reconsidering its ruling saying that it wasn't going to

1    look at non-party fault in this case and it wasn't going to

2    apply the 2015 act because, in short, Mr. Majestro said he

3    wasn't going to go through the opinions.  I'm going to go

4    through it in three sentences.

5        The majority opinion, the three Justices, Walker,

6    Hutchison, and Wooton, denied the writ only because they

7    concluded that it was too early in the MLP case to figure

8    out what it is the plaintiffs were actually requesting by

9    way of their remedy, whether it was money or equitable

10   relief.

11       They said nothing at all that suggested that just

12   because it was a public nuisance claim, just because someone

13   labeled their requested relief abatement that it never could

14   be the type of request for relief -- I call it cash money --

15   where the non-party fault statute would apply, the 2015 act

16   would apply.

17       Two of the Justices went so far as to say, given what

18   they understood that the MLP plaintiffs wanted -- and that

19   was Justice Armstead joined by Chief Justice Jenkins --

20   said, you know what, we think on this record that's before

21   us, we think that what plaintiffs want, no matter that they

22   call it abatement, is money.  They want a sizeable transfer

23   of cash from the defendants to the plaintiffs.  And we would

24   include on this record, without awaiting anything, that the

25   2015 act applies.

1          So, Your Honor, when we get there in the case, I want

2     to say that there is nothing in the Supreme Court's opinion

3     that forecloses this Court from concluding that it can

4     consider, assuming again plaintiff met their burden of

5     demonstrating liability on the part of defendants, and as

6     we've argued today, we don't believe that they have or that

7     they can, that non-party fault will come into play.

8          And again, Your Honor, it's not -- it doesn't have

9     anything to do with proximate cause.  But on several

10    occasions, plaintiffs have said something about the Supreme

11    Court opinion and I thought it was important to point this

12    out now.

13         I also want to point out that -- you know, Mr. Hester

14    has argued and I don't want to be in tension with the

15    arguments that he's made on behalf of all of us, that what

16    plaintiffs are seeking by way of abatement are categories of

17    damages that are not recoverable under an abatement theory.

18         And I would say plaintiffs can't have it both ways.

19    They can't be seeking such sizeable amounts of money -- Mr.

20    Barrett called it, what he was doing was doing his reduction

21    to present value so as to arrive at a lump sum.  Lump sum is

22    cash.  Cash is, is money.

23         And when money is involved, as it is here in

24    plaintiffs' request, then the 2015 act applies.  And that's

25    what the legislature intended.

1        But maybe I will talk to you about that more later.

2    But I just wanted to point out that the Supreme Court's

3    recent decision doesn't foreclose you from revisiting your

4    ruling on non-party fault.

5        And, as a matter of fact, Your Honor, I would say it

6    compels the reversal or the reconsideration of your decision

7    because unlike the MLP, we know what plaintiffs want here.

8    They've already put that evidence in front of you, and the

9    act would apply.

10        So thank you for bearing with me at the end of a long

11   day.

12            THE COURT:  Thank you, Ms. Watterson.

13        Yes, sir.

14            MR. PISTILLI:  Just one point related to McKesson

15   and blocking, one legal point, Your Honor.  I promise to be

16   the fastest of the day.

17        You had asked Mr. Heard about the defendants' systems.

18   And I just wanted to make clear that when McKesson's new

19   system was put in place in 2008, we didn't have a pend and

20   ship system.  If an order was blocked, it stayed blocked.

21        And then very quickly, just a related legal point on

22   blocking.

23        You heard about *Direct Sales*.  And I would suggest that

24   plaintiffs are conflating two things.

25        At most, the Supreme Court's *Direct Sales* case stands

1    for the proposition that if a party like a distributor knows

2    or has reason to believe it's extremely likely that a

3    narcotic they ship out is going to be diverted, is going to

4    be used improperly, maybe there's a liability if they

5    nevertheless make that shipment.

6        That's something very different, and that's something

7    that McKesson, I believe -- and there was testimony from Mr.

8    Oriente on this that I showed you this morning and I believe

9    the other defendants as well.

10       At all times, McKesson has been blocking orders that it

11   believed were likely to be diverted.  That's separate from

12   the DEA change in policy that came about in 2007-2008.

13       That involves blocking of a much larger number of

14   orders, the orders that meet the broad regulatory definition

15   of suspicious.

16       Now, if you go and look at those regulations, Your

17   Honor, they don't say anything about blocking.  It's just

18   not in there.

19       And it was clear from the testimony of the DEA

20   officials, including Mr. Rannazzisi and Mr. Rafalski, that

21   this was a new policy announced in 2007 that registrants

22   should block all of those orders.

23       And as you've heard today, we all began doing that in

24   2008.  So I just wanted to make that clear for the record on

25   blocking, Your Honor.  And with that, I'll rest.

```
1              THE COURT:  Thank you, sir.

2         I look forward to reading the briefs on this.

3         We'll take your witness tomorrow, Mr. Hester.

4              MR. HESTER:  Yes.  That would be Dr. Gilligan,

5    Your Honor.

6              THE COURT:  All right.  We'll take Dr. Gilligan as

7    an accommodation of the defendants.  And then we'll come

8    back on Wednesday at 9:00 a.m. and start the defendants'

9    case.

10        And for the time being, at least, I'm going to take

11   advantage of the provision of Rule 52(c) that says the Court

12   may decline to consider any judgment until the close of the

13   evidence.  I'm not sure I'm going to do that, but I want to

14   read the briefs first.

15             MR. HESTER:  Your Honor, we do have copies of the

16   briefs that we'll hand up to the Court and to the parties.

17             THE COURT:  Thank you very much.  All right.

18        When can I expect to hear from the -- see the

19   defendants' [sic] paper?

20        Mr. Majestro?

21             MR. MAJESTRO:  Our response, Your Honor.  I'd like

22   to see it first.  Can we have -- can we give you an answer

23   to that question tomorrow morning?

24             THE COURT:  Yes.

25             MR. MAJESTRO:  I'll consult with my colleagues.
```

1              THE COURT:  I'd rather give you time to do your

2      usual workmanlike product rather than force you to dash it

3      off in a hurry, particularly in view of everything that's

4      come up today.

5              MR. MAJESTRO:  Appreciate it, Your Honor.  And my

6      colleagues who are going to assist me will appreciate it

7      too.

8              THE COURT:  All right.  If there's nothing further

9      to take up, I'll see everybody tomorrow.

10         (Trial recessed at 4:11 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1         CERTIFICATION:

2                   I, Ayme A. Cochran, Official Court

3    Reporter, and I, Lisa A. Cook, Official Court Reporter,

4    certify that the foregoing is a correct transcript from

5    the record of proceedings in the matter of The City of

6    Huntington, et al., Plaintiffs vs. AmerisourceBergen

7    Drug Corporation, et al., Defendants, Civil Action No.

8    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9    reported on July 1, 2021.

10

11            S\Ayme A. Cochran            s\Lisa A. Cook

12              Reporter                     Reporter

13        _

14

15         July 1, 2021

16           Date

17

18

19

20

21

22

23

24

25
```

## $

**$32** [1] - 51:15
**$75** [2] - 52:8, 152:17

## 0

**0** [1] - 45:6
**0.2** [1] - 39:20
**00907** [2] - 2:5, 2:14

## 1

**1** [7] - 1:19, 7:4, 87:19, 123:24, 163:9, 163:15
**100** [1] - 25:17, 45:7
**1001** [2] - 4:6, 4:9
**1022** [1] - 3:5
**109** [1] - 9:4
**110** [2] - 7:21, 9:2
**12** [1] - 129:3
**126** [1] - 3:5
**1290** [1] - 93:4
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**14** [2] - 30:3, 30:10
**140** [1] - 102:6
**15** [4] - 53:24, 63:17, 68:18, 82:18
**15-year** [1] - 41:22
**15-year-old** [1] - 113:6
**152** [1] - 98:11
**15910** [1] - 3:15
**1600** [1] - 3:15
**17** [1] - 89:2
**1717** [2] - 6:6, 6:13
**18th** [4] - 7:20, 9:1, 9:3
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1921** [1] - 116:12
**1941** [1] - 55:14
**1943** [3] - 96:17, 102:23, 103:12
**1945** [1] - 50:14
**1970** [1] - 135:24
**1990** [1] - 53:17
**1990s** [1] - 129:10
**1996** [1] - 46:3
**1997** [1] - 12:8
**1998** [2] - 29:8, 29:16
**1:00** [1] - 85:17

## 2

**2** [4] - 35:6, 50:19, 51:23, 52:12
**2,000** [1] - 65:24
**2.6** [3] - 52:23, 151:11, 152:20

**20** [6] - 10:9, 10:12, 46:4, 69:16, 85:14, 93:8
**20-plus** [1] - 93:8
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21, 5:5
**2001** [1] - 136:1
**2005** [2] - 12:8, 99:19
**2006** [2] - 69:21, 100:21
**2007** [21] - 8:13, 29:9, 29:16, 29:20, 29:25, 30:10, 30:17, 30:21, 31:17, 32:9, 32:18, 42:23, 69:16, 69:20, 70:2, 71:16, 100:21, 154:18, 155:1, 155:4, 160:21
**2007-08** [1] - 147:25
**2007-2008** [1] - 160:12
**2007-2010** [1] - 33:25
**2008** [15] - 8:6, 12:14, 69:8, 69:9, 69:13, 70:5, 70:15, 71:11, 71:17, 71:22, 71:25, 159:19, 160:24
**2008-2013** [1] - 71:14
**2009** [4] - 26:16, 26:18, 30:22, 104:6
**2010** [2] - 33:25, 65:19
**2010-2013** [1] - 65:19
**2012** [5] - 8:6, 8:13, 8:20, 54:11, 150:20
**2013** [5] - 12:8, 17:17, 69:10, 73:19, 73:22
**2014** [1] - 17:18
**2015** [6] - 155:23, 156:4, 157:2, 157:15, 157:25, 158:24
**2017** [4] - 54:12, 54:13, 72:24, 102:24
**2018** [1] - 8:20
**202** [2] - 2:4, 2:13
**2020** [1] - 51:3
**2021** [9] - 1:19, 7:4, 7:20, 9:2, 9:3, 30:3, 77:15, 163:9, 163:15
**2025** [1] - 53:22
**2035** [1] - 54:3
**22** [2] - 53:2, 53:6
**2216** [1] - 3:7
**25** [1] - 5:5
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10

**26** [1] - 117:14
**27** [1] - 36:4
**28** [3] - 4:3, 4:12, 4:14
**29464** [3] - 4:4, 4:12, 4:15
**2:00** [5] - 85:23, 85:25, 86:4, 86:8, 86:11

## 3

**30** [3] - 48:22, 85:14, 149:23
**30-some** [1] - 86:18
**30th** [1] - 102:24
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**32502** [1] - 2:11
**33** [1] - 1:16
**37** [3] - 36:3, 39:6, 147:7
**3843** [1] - 5:14
**39-fold** [1] - 41:21
**3:17-cv-01362** [2] - 1:5, 163:8
**3:17-cv-01665** [2] - 1:11, 163:8
**3:33** [1] - 137:5

## 4

**4** [1] - 119:9
**40,000** [1] - 104:5
**400** [1] - 131:24
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**41** [1] - 93:6
**45** [1] - 63:16
**49** [1] - 7:7
**4:11** [1] - 162:10

## 5

**5** [1] - 119:15
**50** [5] - 82:18, 88:3, 89:23, 113:21, 125:5
**500** [3] - 39:14, 39:18
**52** [6] - 10:3, 10:19, 20:5, 74:15, 88:14, 138:23
**52(a** [2] - 88:19
**52(c** [8] - 9:22, 33:9, 86:19, 87:20, 87:25, 88:15, 89:13, 161:11
**52(c)** [3] - 59:8, 74:3, 88:20
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**5:00** [1] - 86:8

## 6

**6** [2] - 63:6, 64:5
**600** [1] - 2:10
**6th** [1] - 3:5

## 7

**70130** [1] - 3:8
**707** [1] - 4:24
**716** [1] - 3:12
**72** [1] - 36:11
**725** [2] - 4:19, 4:21
**73** [1] - 36:11
**76** [1] - 62:22

## 8

**8** [2] - 96:10, 145:4
**8,000** [5] - 112:16, 114:1, 133:5, 133:16, 133:17
**800,000** [1] - 123:24
**801** [1] - 3:10
**81** [5] - 95:14, 123:16, 123:17, 123:24, 131:9
**850** [1] - 5:12

## 9

**90** [3] - 42:6, 72:11, 152:13
**901** [1] - 4:23
**91436** [1] - 3:16
**98** [2] - 82:5, 140:8
**99** [2] - 42:5, 152:12
**99.5** [6] - 38:12, 38:14, 41:20, 48:17, 49:15, 150:11
**9:00** [3] - 7:4, 86:8, 161:8
**9:42** [1] - 33:2
**9th** [1] - 4:6

## A

**A-Plus** [4] - 147:13, 147:14, 148:13, 149:10
**a.m** [3] - 7:5, 33:2, 161:8
**abate** [6] - 112:25, 124:15, 124:16, 125:16, 133:6
**abated** [1] - 125:17
**abatement** [69] - 10:7, 35:6, 35:17, 50:3, 50:10, 50:24, 52:3, 52:12, 53:11, 53:19,

53:22, 53:25, 54:3, 56:2, 74:17, 74:20, 74:23, 75:6, 75:11, 75:14, 75:17, 75:20, 75:22, 75:25, 76:8, 76:20, 76:25, 77:7, 77:11, 77:13, 77:19, 78:11, 79:12, 79:21, 79:22, 80:7, 80:12, 80:15, 84:19, 84:22, 109:19, 109:22, 110:8, 111:2, 112:6, 112:16, 113:9, 113:25, 114:7, 115:23, 124:20, 127:16, 129:16, 136:11, 137:17, 139:6, 139:20, 140:11, 142:12, 143:4, 144:17, 150:25, 151:16, 152:20, 157:13, 157:22, 158:16, 158:17
**ABDC** [15] - 9:7, 29:9, 36:2, 43:2, 43:5, 45:7, 48:25, 49:5, 56:25, 89:4, 109:3, 146:4, 147:17, 148:1, 148:2
**ABDC's** [2] - 57:15, 61:16
**ABDCMDL01911479** [1] - 8:15
**ABDCMDL01911481** [1] - 8:1
**ABDCMDL01911482** [1] - 8:8
**able** [8] - 27:15, 58:8, 105:12, 126:22, 129:17, 148:12, 151:3, 153:11
**abnormal** [1] - 105:12
**abnormally** [1] - 57:12
**absence** [1] - 20:10
**absent** [3] - 61:3, 67:23, 68:15
**absolute** [2] - 24:11, 59:17
**absolutely** [5] - 34:11, 59:18, 60:2, 89:11, 156:19
**abstract** [2] - 61:5, 68:22
**absurdum** [2] - 129:15, 131:23
**abuse** [4] - 55:6, 57:21, 62:10, 144:11
**abusers** [1] - 79:23
**accept** [4] - 64:1,

94:23, 152:4
**access** [1] - 96:13
**accidentally** [1] - 95:14
**accommodation** [1] - 161:7
**accord** [1] - 42:24
**accorded** [1] - 45:18
**according** [3] - 54:11, 63:18, 101:20
**accordingly** [1] - 43:7
**account** [3] - 54:24, 102:9, 140:25
**accountants** [1] - 118:6
**accounted** [3] - 39:20, 62:21, 64:5
**accreditation** [1] - 41:17
**accurately** [1] - 49:11
**achieve** [1] - 10:12
**achieved** [1] - 153:23
**ACKERMAN** [1] - 4:5
**acknowledge** [4] - 35:5, 72:24, 88:6, 129:25
**acknowledged** [10] - 14:11, 49:7, 69:19, 69:24, 71:7, 77:13, 79:18, 99:8, 99:9
**acquire** [1] - 19:2
**act** [17] - 40:3, 95:12, 95:15, 118:21, 118:25, 119:1, 128:20, 135:15, 135:16, 155:23, 156:4, 157:2, 157:15, 157:25, 158:24, 159:9
**Act** [6] - 31:25, 57:18, 98:5, 121:15, 124:12, 135:24
**acted** [15] - 33:12, 33:18, 34:1, 35:22, 40:18, 50:1, 55:25, 146:5, 146:6, 146:12, 146:13, 148:9, 150:18, 150:20, 152:11
**acting** [2] - 146:25, 150:22
**Action** [4] - 1:4, 1:10, 163:7, 163:8
**action** [12] - 29:25, 31:21, 32:2, 40:3, 49:15, 56:12, 57:17, 92:5, 112:9, 120:1, 127:17, 154:25
**actionable** [8] - 59:2, 59:4, 62:2, 67:1,

67:5, 67:6, 68:19, 136:5
**actions** [9] - 19:8, 19:10, 21:23, 31:14, 31:18, 108:18, 113:24, 119:13, 136:17
**actions'** [1] - 120:4
**activity** [6] - 57:12, 79:4, 139:3, 141:10, 141:17, 142:22
**actors** [2] - 64:4, 138:20
**acts** [4] - 19:4, 19:18, 117:24, 119:24
**actual** [4] - 37:14, 104:21, 111:25
**acute** [1] - 13:11
**ad** [2] - 129:15, 131:23
**add** [3] - 16:24, 49:18, 141:4
**addicted** [8] - 53:16, 53:21, 53:24, 54:2, 111:6, 112:22, 113:6, 129:3
**addiction** [16] - 54:10, 54:16, 55:8, 55:12, 77:12, 77:21, 78:18, 111:6, 112:1, 120:24, 121:20, 122:12, 122:13, 124:6, 131:14, 144:17
**addicts** [1] - 55:2
**addition** [3] - 23:5, 67:4, 95:4
**additional** [4] - 31:14, 31:18, 53:4, 81:21
**address** [25] - 19:20, 20:9, 20:10, 33:10, 34:9, 34:23, 59:22, 68:3, 68:6, 70:15, 72:20, 74:18, 87:3, 90:21, 94:18, 101:24, 113:3, 115:20, 129:24, 139:25, 143:10, 143:13, 150:1, 153:12
**addressed** [13] - 10:1, 15:25, 25:15, 25:16, 34:21, 47:24, 60:11, 68:8, 94:10, 145:8, 145:12, 149:20, 150:3
**addressing** [1] - 33:5
**adequacy** [1] - 68:22
**adequate** [14] - 34:6, 44:12, 50:7, 50:18, 51:20, 51:24, 52:11,

60:21, 101:6, 109:7, 151:10
**adjourn** [2] - 85:16, 86:8
**adjunct** [3] - 35:10, 52:16, 151:12
**adjusted** [4] - 8:2, 8:9, 8:16, 44:1
**administrative** [4] - 70:2, 101:9, 101:23, 136:17
**Administrator** [1] - 31:15
**admirable** [1] - 82:14
**admissible** [1] - 71:8
**admission** [4] - 7:23, 30:8, 70:23, 73:6
**admit** [2] - 60:13, 62:5
**admitted** [9] - 62:21, 66:7, 66:17, 67:19, 71:22, 72:12, 73:4, 98:7, 149:4
**adopt** [2] - 34:10, 47:11
**adopted** [1] - 101:13
**adulterated** [1] - 55:3
**advantage** [2] - 124:22, 161:11
**adverse** [2] - 75:24, 139:23
**adversely** [2] - 76:21, 76:22
**advised** [2] - 99:21, 100:3
**Advisory** [1] - 88:21
**advocacy** [1] - 68:12
**Affairs** [1] - 69:5
**affected** [5] - 34:17, 47:19, 76:21, 76:22, 149:22
**affectionately** [1] - 103:23
**affects** [1] - 114:7
**affirmed** [1] - 120:2
**afterwards** [1] - 30:15
**AG** [1] - 134:3
**agency** [1] - 99:12
**agents** [2] - 42:18, 44:4
**ago** [10] - 15:23, 22:5, 28:23, 30:10, 68:18, 71:15, 83:9, 98:21, 128:13, 143:16
**agree** [7] - 20:8, 31:6, 85:12, 85:20, 132:9, 132:18, 132:20
**agreed** [5] - 7:23, 11:11, 11:15, 12:22, 12:24
**Agreement** [2] -

70:17, 71:12
**agreement** [3] - 70:22, 70:23, 71:2
**agreements** [1] - 71:8
**agrees** [1] - 85:2
**ahead** [7] - 25:8, 27:9, 27:11, 31:9, 78:8, 95:24, 96:10
**Aid** [9] - 65:1, 66:6, 66:8, 66:11, 66:14, 66:18, 66:20, 66:23, 108:11
**Aids** [1] - 66:4
**Aikens** [1] - 17:3
**aim** [1] - 10:9
**al** [4] - 1:7, 1:13, 163:6, 163:7
**Alexander** [14] - 53:14, 55:22, 77:12, 77:18, 77:23, 79:18, 81:14, 83:4, 83:11, 112:15, 113:11, 113:17, 114:15, 125:7
**Alexander's** [5] - 54:3, 76:18, 80:19, 82:17, 125:21
**alive** [1] - 53:18
**ALJ** [1] - 100:23
**allegation** [1] - 10:22
**allegations** [4] - 20:14, 70:24, 71:10, 71:11
**allege** [2] - 52:10, 95:2
**alleged** [6] - 16:6, 51:25, 70:12, 138:4, 138:5, 140:24
**allegedly** [2] - 48:1, 140:5
**alleging** [2] - 16:21, 109:2
**allocate** [2] - 126:11, 132:7
**allocated** [1] - 10:10
**allocation** [1] - 116:24
**allow** [1] - 55:17
**allows** [1] - 55:19
**almost** [1] - 80:18
**alone** [7] - 62:21, 64:9, 67:2, 67:11, 67:22, 84:4, 93:3
**alpha** [1] - 8:25
**ameliorate** [1] - 50:5
**amend** [1] - 16:14
**Ameri** [1] - 154:16
**America** [1] - 135:3
**Americans** [1] - 131:8
**AmerisourceBergen** [33] - 6:2, 7:16, 7:22, 7:25, 8:3, 8:8, 8:15,

20:4, 20:12, 21:13, 21:17, 22:3, 23:12, 27:1, 28:16, 29:1, 29:3, 29:7, 29:9, 29:16, 30:12, 30:17, 30:19, 31:14, 31:19, 31:22, 103:20, 103:25, 153:21, 154:5, 154:15, 163:6
**AMERISOURCEBERGEN** [2] - 1:7, 1:13
**AmerisourceBergen's** [13] - 8:2, 8:10, 8:11, 8:17, 8:18, 20:25, 21:16, 22:25, 25:22, 29:17, 29:21, 31:23, 31:24
**amount** [2] - 28:5, 51:18, 63:7, 80:24, 81:20, 125:3
**amounts** [3] - 7:18, 103:17, 158:19
**analogies** [1] - 133:12
**analogize** [1] - 112:11
**analogy** [6] - 76:17, 112:12, 128:5, 131:19, 131:20, 131:21
**analyses** [1] - 62:24
**analysis** [1] - 55:22
**analytical** [1] - 54:8
**analytics** [3] - 43:14, 43:23
**ANDREW** [1] - 5:10
**anecdotal** [1] - 106:8
**Angeles** [1] - 134:25
**Ann's** [1] - 93:25
**ANNE** [1] - 4:2
**ANNIE** [1] - 4:11
**announced** [1] - 160:21
**annual** [1] - 150:13
**anodyne** [1] - 36:10
**answer** [23] - 13:8, 15:12, 16:19, 24:23, 28:8, 28:20, 28:22, 36:19, 36:22, 37:3, 40:16, 45:8, 48:3, 91:1, 92:2, 112:10, 119:3, 121:12, 138:9, 141:1, 145:1, 149:14, 161:22
**Answer** [1] - 31:18
**answered** [2] - 47:14, 112:4
**answering** [1] - 30:13
**answers** [1] - 143:1
**ANTHONY** [1] - 2:6
**Anti** [1] - 34:2
**Anti-Diversion** [1] -

34:2
**anticipate** [1] - 138:22
**apart** [4] - 40:11, 141:20, 141:25, 142:1
**apologize** [2] - 48:5, 105:17
**appeal** [1] - 16:15
**appealed** [1] - 16:11
**Appeals** [1] - 117:20
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appeared** [2] - 37:10, 66:12
**appellate** [1] - 92:7
**Appellate** [1] - 92:10
**appendix** [1] - 33:20
**apples** [2] - 156:7, 156:10
**applicable** [2] - 61:17, 63:1
**applies** [8] - 78:22, 104:22, 116:13, 126:7, 142:12, 146:4, 157:25, 158:24
**apply** [15] - 17:9, 57:16, 91:13, 105:8, 106:3, 122:25, 127:16, 133:14, 142:17, 145:5, 157:2, 157:15, 157:16, 159:9
**apportioned** [1] - 151:19
**apportionment** [7] - 116:18, 117:7, 117:8, 122:24, 151:16, 155:23, 156:22
**appraisal** [1] - 145:14
**Appreciate** [1] - 162:5
**appreciate** [2] - 32:21, 162:6
**approach** [1] - 133:20
**appropriate** [6] - 33:7, 74:5, 83:23, 84:3, 150:12, 152:22
**appropriately** [10] - 38:13, 38:15, 41:21, 42:6, 48:17, 49:16, 97:24, 98:1, 150:11, 152:13
**approval** [3] - 29:12, 42:25
**approved** [6] - 29:10, 42:21, 43:18, 57:13, 69:15
**Arch** [2] - 6:6, 6:13

**ARCOS** [2] - 26:4, 36:24
**area** [3] - 21:5, 28:7, 47:5
**arguably** [1] - 133:14
**argue** [6] - 10:3, 10:6, 10:9, 104:25, 115:17, 129:8
**argued** [5] - 54:12, 71:7, 135:5, 158:6, 158:14
**arguing** [1] - 123:1, 123:2, 151:17
**argument** [43] - 19:22, 25:2, 25:13, 25:19, 56:9, 57:1, 57:3, 85:18, 86:17, 90:17, 90:19, 90:20, 93:7, 94:23, 101:23, 103:8, 104:16, 104:24, 115:13, 115:14, 115:16, 115:20, 116:17, 116:18, 116:21, 121:9, 121:10, 122:25, 126:13, 134:7, 136:21, 138:13, 140:2, 140:14, 143:12, 145:19, 147:21, 149:14, 153:19, 156:3
**arguments** [14] - 10:5, 10:13, 56:10, 94:19, 95:18, 103:6, 109:21, 109:23, 113:3, 127:19, 132:8, 141:19, 144:3, 158:15
**arises** [1] - 96:22
**arising** [1] - 144:11
**arms** [1] - 132:1
**Armstead** [1] - 157:19
**array** [1] - 15:2
**arrive** [1] - 158:21
**arrived** [1] - 26:23
**artful** [2] - 34:8, 44:15
**articles** [1] - 96:21
**articulated** [3] - 40:10, 70:1
**articulation** [1] - 75:3
**asbestos** [6] - 133:14, 133:17, 134:6, 134:15, 145:2, 145:6
**ASHLEY** [1] - 5:3
**Ashworth** [2] - 64:12, 65:7
**aside** [3] - 18:10, 77:10, 84:23
**aspects** [1] - 117:25

**asserted** [1] - 138:11
**assess** [1] - 81:15
**assessment** [3] - 81:16, 81:20, 82:21
**assignment** [1] - 117:17
**assist** [1] - 162:6
**Assistant** [1] - 31:15
**associated** [1] - 147:12
**Associates** [1] - 78:23
**Association** [1] - 101:1
**assume** [6] - 19:16, 33:23, 61:19, 75:16, 89:9
**assumed** [1] - 97:20
**assuming** [3] - 23:18, 156:22, 158:4
**assumption** [1] - 64:1
**AT** [1] - 1:2
**ate** [1] - 134:24
**attempted** [5] - 102:22, 103:19, 103:21, 136:12
**attempting** [3] - 11:7, 129:14
**attendant** [1] - 91:15
**attentive** [2] - 12:10, 12:15
**attenuated** [2] - 19:8, 49:22
**attorney** [1] - 134:10
**Attorney** [2] - 92:20, 133:24
**attributable** [1] - 24:22
**auditors** [1] - 109:11
**August** [1] - 51:3
**author** [1] - 128:14
**authority** [2] - 52:25, 125:16
**available** [2] - 51:21, 65:11
**average** [9] - 37:1, 63:12, 63:15, 63:17, 104:3, 104:4, 104:6
**averages** [1] - 63:11
**Avila** [1] - 102:2
**Avin** [1] - 3:7
**avoid** [1] - 80:10
**awaiting** [1] - 157:24
**award** [3] - 83:1, 83:14, 151:11
**awarded** [3] - 144:15, 144:18, 144:20
**aware** [4] - 16:15, 42:20, 69:15, 96:13
**awhile** [1] - 91:18
**Ayme** [2] - 6:17, 163:2

## B

**babies** [2] - 76:6, 76:22
**background** [1] - 134:21
**backwards** [1] - 79:8
**bacon** [1] - 91:18
**bad** [12] - 21:2, 24:21, 108:1, 122:23, 123:22, 123:23, 124:5, 124:6, 124:9, 124:10, 132:20, 149:17
**Baltimore** [1] - 82:6
**bank** [2] - 118:4, 118:6
**banking** [1] - 118:6
**bar** [1] - 146:2
**Baron** [1] - 3:14
**barred** [1] - 80:3
**Barrett** [3] - 50:22, 83:8, 158:20
**Barrett's** [1] - 125:2
**based** [6] - 10:20, 12:1, 13:17, 74:16, 78:11, 139:22
**baseline** [1] - 105:11
**basic** [2] - 59:15, 80:2
**basis** [9] - 36:23, 64:9, 73:6, 79:6, 83:22, 84:4, 85:1, 131:1, 150:6
**Bates** [4] - 8:1, 8:8, 8:15, 127:5
**batting** [1] - 74:10
**Baylen** [1] - 2:11
**beads** [1] - 118:7
**bear** [4] - 64:20, 79:1, 126:17, 126:18, 126:19
**bearing** [5] - 8:1, 8:8, 8:15, 88:23, 159:10
**became** [3] - 11:12, 121:25, 154:18
**become** [1] - 13:10
**becomes** [1] - 77:21
**BEFORE** [1] - 1:17
**began** [4] - 53:17, 71:19, 130:4, 160:23
**beggars** [1] - 38:14
**begin** [6] - 10:1, 10:18, 45:19, 53:15, 129:24, 143:11
**beginning** [6] - 46:25, 50:9, 50:13, 52:19, 108:1, 118:23
**begins** [1] - 138:18
**behalf** [11] - 9:15, 20:4, 33:6, 33:8, 55:24, 74:14, 78:10,

**109:24, 110:3, 152:18, 158:15
**behavior** [3] - 137:21, 139:2, 154:13
**behind** [1] - 128:24
**belaboring** [1] - 102:21
**below** [2] - 63:15, 97:16
**belt** [1] - 97:11
**bench** [6] - 51:12, 53:3, 56:22, 87:24, 89:24, 153:24
**BENCH** [1] - 1:16
**benchmark** [1] - 104:2
**beneficiaries** [1] - 113:13
**benefit** [3] - 68:7, 126:19, 126:21
**benign** [1] - 65:8
**best** [6] - 11:25, 32:25, 67:18, 91:6, 108:13, 124:23
**better** [4] - 47:16, 108:2, 133:12, 145:8
**between** [14] - 16:6, 29:16, 45:6, 49:21, 80:4, 96:20, 110:12, 118:2, 120:7, 135:14, 145:20, 146:11, 151:17, 151:19
**beyond** [4] - 81:25, 112:8, 114:7, 136:3
**bible** [1] - 146:19
**big** [5] - 38:3, 40:13, 42:12, 59:21, 148:8
**billion** [7] - 35:6, 50:19, 51:24, 52:12, 52:23, 151:11, 152:20
**birthday** [3] - 7:6, 90:21, 98:20
**bit** [12] - 68:8, 82:13, 85:22, 87:1, 87:17, 88:6, 94:12, 96:5, 105:19, 115:4
**black** [2] - 129:4, 129:9
**blackletter** [1] - 71:2
**blame** [3] - 41:23, 97:14, 150:7
**Blankenship** [1] - 117:8
**blanks** [1] - 36:15
**bless** [1] - 129:22
**blind** [2] - 81:8, 100:19
**blindness** [2] - 40:15, 42:9

**blip** [1] - 48:4
**block** [7] - 48:19, 60:13, 69:18, 70:8, 73:5, 148:18, 160:22
**blocked** [17] - 34:15, 47:17, 47:18, 67:17, 69:22, 70:6, 72:3, 72:12, 119:19, 119:21, 148:5, 148:6, 149:21, 149:24, 149:25, 159:20
**Blocked** [1] - 148:14
**blocking** [12] - 48:20, 60:8, 71:19, 71:23, 73:11, 119:25, 159:15, 159:22, 160:10, 160:13, 160:17, 160:25
**Blvd** [3] - 4:3, 4:12, 4:14
**Board** [9] - 12:8, 21:23, 23:1, 39:17, 41:7, 41:19, 66:10, 146:21, 146:23
**board** [5] - 75:9, 78:25, 130:20, 134:12, 134:13
**body** [1] - 122:11
**boil** [1] - 25:12
**Bonasso** [1] - 5:14
**book** [5] - 12:11, 41:10, 128:14, 129:8, 146:19
**booklet** [1] - 41:7
**boots** [1] - 48:11
**bore** [1] - 134:21
**born** [2] - 53:23, 129:3
**bottom** [1] - 66:1
**bought** [1] - 65:14
**Boulevard** [1] - 3:15
**bounds** [2] - 56:9, 136:10
**box** [2] - 77:8, 136:7
**Box** [2] - 5:14, 6:8
**brain** [1] - 122:10
**brake** [1] - 119:22
**breach** [2] - 90:16, 109:15
**breaches** [1] - 102:18
**break** [6] - 42:13, 54:7, 74:5, 85:23, 137:2, 143:17
**Bridgeside** [3] - 4:3, 4:12, 4:14
**brief** [14] - 19:21, 33:20, 50:4, 50:11, 52:18, 56:25, 57:16, 61:16, 68:9, 71:4, 73:18, 87:9, 117:3,

143:7
**briefed** [3] - 46:15, 46:16, 61:14
**briefer** [1] - 153:2
**briefing** [2] - 90:1, 95:1
**briefly** [6] - 69:11, 70:15, 71:14, 72:20, 73:17, 101:24
**briefs** [12] - 10:14, 58:6, 61:16, 86:23, 86:25, 90:7, 94:19, 98:6, 127:23, 161:2, 161:14, 161:16
**bring** [7] - 31:14, 87:19, 96:10, 130:23, 134:1, 134:4, 136:12
**bringing** [3] - 62:9, 63:21, 133:5
**brink** [1] - 51:8
**broad** [6] - 29:8, 56:11, 127:15, 149:1, 160:14
**broader** [1] - 52:5
**broadly** [3] - 43:15, 145:22
**brought** [17] - 21:23, 30:1, 86:5, 98:21, 103:2, 109:24, 110:3, 117:23, 127:17, 134:22, 134:23, 134:25, 136:14, 136:15, 136:16
**bucket** [2] - 34:9, 125:4
**buckets** [1] - 59:10
**Budd** [1] - 3:14
**build** [1] - 129:20
**built** [4] - 16:2, 16:20, 103:3, 136:2
**bunch** [3] - 119:17, 129:9, 133:21
**burden** [26] - 35:21, 59:2, 67:7, 79:1, 88:2, 88:11, 99:3, 99:15, 116:22, 116:23, 117:3, 117:7, 118:15, 118:16, 118:19, 119:5, 119:7, 120:11, 126:18, 132:23, 148:23, 155:20, 155:24, 156:23, 158:4
**Burling** [1] - 5:11
**business** [3] - 48:24, 64:11, 65:13

# C

**CA** [1] - 3:16
**Cabell** [74] - 3:2, 8:3, 8:11, 8:18, 9:16, 21:1, 22:11, 23:13, 24:22, 24:23, 26:2, 26:15, 27:22, 28:7, 29:1, 30:6, 34:18, 36:1, 36:4, 39:9, 39:14, 47:20, 48:21, 59:6, 59:11, 59:16, 59:19, 59:25, 60:2, 60:12, 60:16, 60:18, 61:2, 61:4, 62:10, 62:17, 63:5, 63:8, 63:10, 63:12, 64:6, 64:7, 64:11, 64:15, 64:18, 65:21, 66:1, 66:5, 66:19, 66:21, 66:24, 67:2, 67:8, 67:11, 67:16, 67:21, 68:1, 68:21, 70:14, 73:9, 74:1, 78:15, 102:19, 103:25, 104:8, 104:22, 112:17, 114:16, 114:18, 114:22, 124:4, 124:15, 125:1, 134:12
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington** [9] - 34:18, 36:1, 36:4, 39:9, 39:14, 47:20, 48:21, 65:21, 78:15
**Cabell/Huntington** [2] - 149:23, 153:19
**cabinet** [3] - 14:6, 39:25
**cabinets** [1] - 13:19
**California** [3] - 93:24, 101:17, 134:25
**CALLAS** [1] - 6:7
**CAMPBELL** [1] - 6:14
**cancer** [1] - 76:15
**candidly** [1] - 38:1
**cannot** [18] - 12:18, 12:24, 14:5, 14:12, 27:5, 27:6, 27:20, 27:24, 52:20, 59:4, 62:8, 70:11, 73:14, 77:4, 81:7, 97:25, 138:24
**cans** [1] - 96:20
**capable** [1] - 117:7
**capacity** [6] - 83:9, 83:11, 83:16, 96:22, 96:24, 152:18
**Capitol** [1] - 2:7

**captures** [1] - 48:3
**car** [5] - 119:20, 119:21, 119:22, 120:1, 142:18
**Cardinal** [39] - 4:16, 5:2, 33:8, 33:12, 34:15, 35:22, 36:3, 36:20, 38:17, 39:1, 39:2, 39:19, 40:3, 40:17, 43:1, 43:6, 43:8, 43:10, 44:19, 45:7, 45:15, 45:22, 46:13, 47:1, 47:3, 47:15, 47:21, 48:24, 49:5, 55:1, 55:24, 89:4, 107:18, 135:19, 146:4, 147:7, 147:18, 147:24, 150:20
**Cardinal's** [11] - 35:25, 36:9, 37:11, 39:6, 40:2, 40:5, 40:9, 42:17, 45:12, 48:1, 147:6
**care** [18] - 12:5, 25:19, 37:20, 39:10, 39:11, 40:21, 42:4, 50:24, 50:25, 110:9, 125:12, 125:13, 125:15, 146:15, 146:18, 149:11, 149:17
**carefully** [1] - 127:22
**Carey** [1] - 4:23
**case** [174] - 10:23, 10:25, 12:6, 13:2, 13:5, 14:1, 14:25, 15:1, 15:13, 16:1, 16:14, 17:3, 17:5, 20:8, 22:10, 24:20, 25:12, 26:8, 33:7, 34:13, 34:14, 35:13, 36:2, 37:4, 37:9, 39:8, 39:22, 42:17, 47:9, 47:23, 49:3, 49:10, 49:20, 51:2, 51:3, 51:4, 52:16, 52:21, 52:24, 53:1, 56:15, 58:13, 59:14, 61:6, 61:10, 62:13, 63:3, 65:8, 67:22, 76:6, 77:6, 78:20, 78:23, 81:7, 84:3, 84:5, 84:16, 84:17, 85:4, 86:18, 87:21, 88:15, 89:18, 90:10, 90:23, 91:9, 91:10, 91:12, 92:14, 92:20, 92:21, 93:23, 93:25, 95:20, 95:22, 96:17,

97:1, 97:5, 97:14, 98:16, 98:19, 98:21, 98:22, 98:23, 99:6, 99:16, 100:8, 101:16, 101:17, 101:18, 103:4, 103:8, 103:12, 107:7, 108:21, 109:23, 109:24, 110:5, 110:8, 111:7, 111:18, 111:23, 112:15, 119:10, 119:16, 120:1, 120:9, 120:11, 120:18, 121:8, 122:2, 122:3, 122:8, 122:23, 124:1, 126:16, 127:3, 127:4, 127:5, 128:4, 133:2, 133:17, 133:19, 134:1, 134:4, 134:8, 135:2, 135:8, 135:19, 136:16, 139:18, 140:20, 140:21, 141:4, 141:5, 141:7, 141:11, 141:12, 141:15, 141:18, 141:24, 142:6, 142:8, 142:11, 142:16, 142:24, 144:11, 144:14, 144:19, 144:20, 145:2, 147:5, 147:6, 147:20, 151:4, 151:8, 151:9, 153:18, 156:18, 157:1, 157:7, 158:1, 159:25, 161:9
**cases** [51] - 14:22, 15:7, 16:5, 16:8, 16:11, 16:23, 17:2, 17:7, 17:8, 51:1, 53:2, 53:4, 53:6, 65:5, 71:4, 92:4, 92:19, 93:6, 94:3, 94:5, 101:14, 102:22, 103:5, 103:7, 116:12, 116:14, 117:4, 120:6, 121:14, 133:6, 133:15, 133:16, 133:21, 133:22, 134:17, 134:19, 134:22, 135:3, 135:12, 135:13, 135:17, 135:22, 138:1, 140:19, 141:1, 144:1, 144:21, 145:2, 145:5, 145:6,

146:1
**Cash** [1] - 158:22
**cash** [3] - 157:14, 157:23, 158:22
**cast** [1] - 112:8
**catching** [1] - 111:13
**categories** [1] - 158:16
**caught** [1] - 113:23
**Causation** [1] - 17:18
**causation** [46] - 10:2, 10:21, 14:24, 15:5, 15:12, 16:10, 16:23, 17:12, 18:6, 18:8, 19:5, 19:19, 20:7, 25:19, 34:10, 34:12, 34:19, 47:10, 49:23, 56:1, 85:3, 90:16, 109:18, 115:20, 118:14, 119:5, 119:7, 119:8, 120:2, 120:11, 121:4, 122:20, 122:25, 137:16, 137:23, 138:2, 138:9, 138:24, 139:4, 140:14, 140:16, 140:18, 140:22, 141:3, 153:13
**caused** [28] - 11:4, 13:3, 13:5, 14:2, 16:22, 18:1, 41:10, 41:17, 48:19, 60:12, 61:2, 61:4, 73:16, 75:7, 111:5, 111:20, 111:21, 111:25, 112:19, 112:23, 114:25, 115:18, 117:16, 126:3, 139:9, 139:13, 140:5
**causes** [4] - 19:9, 91:16, 116:21, 133:11
**causing** [4] - 62:6, 67:8, 70:14, 118:15
**Center** [6] - 3:12, 5:11, 47:3, 47:4, 47:5, 70:19
**center** [4] - 29:18, 29:21, 30:5, 70:20
**centers** [2] - 46:22, 108:19
**central** [2] - 109:22, 156:9
**certain** [5] - 7:17, 72:25, 73:1, 79:2, 145:10
**certainly** [10] - 21:5, 22:9, 24:13, 24:15, 57:12, 80:2, 106:13,

143:22, 148:10, 151:2
**CERTIFICATION** [1] - 163:1
**certify** [1] - 163:4
**cetera** [1] - 35:11
**chain** [6] - 19:15, 97:12, 97:15, 97:16, 108:7, 118:7
**challenge** [1] - 151:2
**challenged** [1] - 138:12
**challenging** [2] - 128:3, 156:14
**Chambers** [2] - 15:2, 87:22
**chance** [1] - 89:9
**change** [4] - 12:4, 46:13, 69:16, 160:12
**changed** [9] - 37:20, 40:21, 40:24, 42:4, 49:6, 97:2, 97:5, 146:15, 147:25
**changes** [2] - 72:13, 107:25
**channels** [1] - 96:12
**character** [1] - 88:8
**charge** [2] - 21:11, 22:21
**CHARLES** [1] - 3:11
**Charleston** [17] - 2:8, 3:13, 4:24, 5:15, 6:9, 7:4, 15:1, 15:13, 16:1, 16:14, 17:8, 18:5, 19:3, 138:1, 138:10, 140:21, 142:5
**CHARLESTON** [2] - 1:2, 1:18
**chart** [2] - 63:14, 103:23
**charts** [4] - 11:19, 27:24, 63:9, 141:23
**Chase** [1] - 4:23
**cheaper** [1] - 130:24
**cheat** [1] - 7:12
**chemicals** [2] - 128:22, 129:21
**Cherokee** [1] - 101:18
**Chesterbrook** [1] - 6:15
**Chicago** [1] - 101:16
**Chief** [2] - 46:15, 157:19
**child** [1] - 77:19
**children** [3] - 76:7, 111:11, 144:23
**chips** [1] - 144:23
**choice** [1] - 22:4
**choices** [1] - 57:11

**chooses** [1] - 99:2
**chose** [3] - 22:2, 43:10, 51:9
**CHRISTENSON** [1] - 9:12
**Christian** [1] - 58:3
**chronic** [6] - 13:11, 41:1, 55:7, 55:9, 150:16
**cigarettes** [2] - 76:15, 111:7
**circle** [1] - 136:7
**Circuit** [6] - 51:4, 51:21, 69:25, 89:19, 98:24, 100:24
**circuit** [1] - 155:12
**circumstance** [2] - 75:23, 94:8
**circumstances** [2] - 70:11, 100:20
**citations** [3] - 87:4, 93:6, 109:16
**cite** [5] - 52:20, 71:3, 99:9, 117:4, 151:8
**cited** [4] - 35:12, 127:2, 140:19, 141:13
**cities** [1] - 127:17
**citizen** [1] - 109:24
**citizens** [1] - 110:3
**City** [27] - 4:1, 5:11, 9:16, 15:1, 15:13, 16:1, 16:13, 17:8, 18:5, 19:3, 21:1, 22:16, 23:14, 27:22, 29:2, 41:14, 80:9, 80:14, 80:16, 80:25, 81:8, 124:21, 137:25, 138:10, 140:20, 142:5, 163:5
**city** [4] - 49:13, 80:22, 142:20, 143:3
**CITY** [1] - 1:4
**City's** [1] - 125:14
**Civil** [3] - 1:4, 163:7, 163:8
**civil** [3] - 1:10, 29:25, 30:1
**claim** [41] - 13:16, 17:20, 23:17, 24:4, 33:13, 33:17, 38:24, 44:11, 51:9, 52:2, 52:8, 61:25, 77:6, 78:21, 78:22, 79:9, 84:5, 84:7, 91:25, 92:8, 92:17, 93:19, 94:7, 94:8, 110:1, 110:3, 116:15, 126:22, 133:25, 134:14, 139:16,

143:13, 144:10, 144:15, 145:13, 149:1, 150:20, 151:12, 151:13, 155:25, 157:12
**claimed** [2] - 16:6, 18:10
**claiming** [2] - 78:20, 152:19
**claims** [7] - 51:19, 52:6, 61:11, 68:4, 77:3, 91:25, 134:16
**classic** [4] - 50:20, 98:4, 112:12, 119:10
**clean** [4] - 13:14, 110:21, 110:23, 129:19
**cleaning** [3] - 7:10, 112:21, 144:21
**cleanup** [2] - 9:10, 74:10
**clear** [23] - 8:21, 13:14, 13:20, 14:4, 14:21, 15:9, 15:10, 23:4, 35:2, 59:3, 77:24, 78:2, 78:21, 80:20, 80:25, 115:24, 122:3, 124:24, 140:1, 143:15, 159:18, 160:19, 160:24
**clearly** [19] - 13:7, 14:9, 17:18, 18:7, 18:11, 18:13, 35:18, 73:13, 75:8, 75:15, 75:17, 75:20, 77:5, 117:17, 139:8, 139:22, 140:16, 144:22, 149:11
**client** [3] - 20:11, 65:20, 155:7
**clinic** [1] - 65:21
**clock** [2] - 10:11, 85:11
**close** [8] - 26:25, 28:14, 89:17, 89:20, 89:21, 142:9, 146:7, 161:12
**closed** [5] - 97:7, 97:8, 121:19, 124:11, 155:12
**Closed** [1] - 39:3
**closed-circuit** [1] - 155:12
**closely** [1] - 51:3
**closer** [1] - 134:8
**closing** [2] - 104:24, 132:8
**cloth** [1] - 35:18
**Cochran** [3] - 6:17,

163:2, 163:11
**Code** [1] - 75:9
**code** [1] - 52:4
**cogent** [2] - 57:1, 136:21
**coin** [3] - 26:20, 78:6, 110:17
**Collateral** [1] - 142:17
**collateral** [13] - 81:4, 125:10, 126:6, 126:7, 126:8, 127:11, 127:12, 142:10, 142:12, 142:14, 142:16, 142:24, 142:25
**colleague** [1] - 102:17
**colleagues** [10] - 10:2, 19:23, 37:14, 38:4, 40:19, 137:9, 143:8, 153:2, 161:25, 162:6
**collect** [1] - 52:12
**collected** [2] - 152:17
**colors** [1] - 154:8
**Columbia** [2] - 120:3, 136:15
**column** [2] - 103:24, 104:15
**combination** [1] - 106:22
**combined** [2] - 93:14, 119:11
**comfortable** [1] - 93:15
**coming** [6] - 34:18, 44:14, 47:19, 48:20, 130:16, 149:22
**comment** [2] - 105:7, 105:8
**commentary** [1] - 145:4
**commentators** [1] - 145:7
**comments** [1] - 20:14
**commercially** [1] - 65:11
**COMMISSION** [1] - 1:10
**Commission** [5] - 2:2, 3:2, 9:17, 41:12, 42:3
**Commission's** [1] - 41:15
**Committee** [1] - 88:21
**common** [9] - 50:17, 61:12, 94:9, 116:10, 131:7, 131:11, 152:10, 152:14, 152:21
**communicable** [1] - 111:14

communicate [1] - 128:19

communicating [1] - 54:20

community [27] - 13:19, 14:3, 14:8, 14:13, 14:15, 14:19, 18:17, 63:22, 68:14, 72:14, 81:13, 81:16, 81:19, 82:13, 82:14, 82:20, 82:22, 83:10, 84:18, 112:23, 128:16, 131:10, 131:24, 132:19, 138:7, 139:10

company [2] - 22:3, 127:10

compare [1] - 104:6

compared [1] - 78:1

comparing [2] - 63:10, 104:25

comparison [1] - 104:3

compels [1] - 159:6

compensation [3] - 75:6, 75:13, 75:21

complained [1] - 50:9

complaint [7] - 16:14, 41:10, 41:15, 51:25, 54:22, 90:13, 90:14

complete [4] - 40:14, 46:9, 73:20, 150:17

completely [3] - 79:15, 83:1, 115:1

complex [3] - 141:6, 141:8, 141:16

compliance [3] - 31:23, 31:25, 101:1

compliant [2] - 32:3, 32:4

complicated [1] - 87:24

complying [1] - 102:4

component [9] - 17:3, 43:17, 43:23, 43:24, 44:2, 57:7, 81:11, 81:12, 139:18

components [4] - 34:2, 34:4, 43:13, 55:20

compounding [2] - 65:10, 65:13

computer [1] - 6:19

concept [8] - 50:9, 75:25, 81:5, 83:13, 84:18, 84:19, 118:10

concepts [7] - 76:8, 76:9, 76:24, 80:18, 110:10, 120:19, 139:14

concerned [3] - 39:1, 92:18, 96:11

concerning [2] - 64:21, 65:2

concerns [1] - 126:4

concession [1] - 67:22

conclude [5] - 17:10, 106:23, 123:3, 123:12, 127:21

concluded [3] - 89:21, 95:11, 157:7

concluding [1] - 158:3

conclusion [2] - 10:13, 93:2

conclusory [1] - 66:5

concrete [3] - 66:7, 67:23, 73:21

concurrent [2] - 117:15, 141:14

condition [5] - 117:21, 128:20, 128:24, 129:24, 136:11

conduct [75] - 10:4, 16:7, 17:5, 20:11, 20:17, 20:21, 20:22, 21:2, 21:8, 24:20, 24:22, 35:25, 36:9, 37:11, 37:14, 40:9, 40:15, 41:24, 42:10, 48:1, 48:9, 49:21, 49:24, 54:5, 54:6, 54:10, 55:1, 57:7, 57:19, 59:3, 59:4, 59:5, 59:9, 61:4, 62:3, 62:6, 62:8, 67:1, 67:5, 67:6, 68:20, 70:17, 73:24, 75:2, 75:4, 75:12, 79:2, 79:6, 90:20, 94:24, 95:6, 95:7, 95:8, 95:9, 95:19, 96:3, 101:2, 104:22, 105:1, 105:3, 115:1, 124:6, 132:23, 135:20, 136:5, 138:19, 140:1, 140:4, 146:8, 146:9, 151:23, 153:12, 154:13, 155:6

conducted [3] - 98:16, 101:5, 106:15

conference [1] - 30:20

conferred [1] - 7:22

confirmed [8] - 23:2, 23:9, 51:21, 63:6, 97:23, 100:17, 101:1, 101:19

confirming [1] - 150:19

confirms [1] - 97:4, 98:12

conflating [1] - 159:24

conformed [1] - 60:23

confusing [1] - 128:5

congress [1] - 96:11

Congress [4] - 38:13, 41:20, 96:11, 136:1

congressional [1] - 135:25

connection [4] - 21:4, 69:4, 87:5, 155:19

connects [1] - 40:3

Connolly [2] - 4:18, 5:4

CONROY [1] - 3:3

consequence [1] - 98:15

consequences [5] - 111:5, 112:21, 112:22, 121:20, 139:12

consider [3] - 53:16, 90:10, 146:13, 158:4, 161:12

considered [1] - 117:24

considers [1] - 155:5

consistent [10] - 26:16, 46:11, 64:10, 105:2, 107:6, 116:2, 116:9, 122:17, 122:18

consistently [1] - 77:5

consult [1] - 161:25

consultants [1] - 108:25

Consulting [1] - 109:3

contaminants [1] - 129:22

contaminates [1] - 110:20

contemplates [1] - 137:13

contemplating [1] - 76:20

contemporaneous [1] - 68:25

content [3] - 8:4, 8:11, 8:18

context [8] - 36:12, 40:19, 41:24, 56:20, 87:24, 117:19, 146:14, 150:8

continue [2] - 72:19, 110:22

Continued [5] - 3:1, 5:1, 5:6, 6:1, 6:10

continued [3] - 51:15, 98:8, 107:25

continues [1] - 148:8

contracts [2] - 65:20, 65:23

contradiction [1] - 46:23

contradicts [1] - 137:21

contrary [11] - 24:16, 25:6, 25:9, 45:21, 48:3, 48:18, 56:2, 125:15, 127:5, 149:11, 149:17

contribute [1] - 119:11

contributed [2] - 67:25, 123:5

contributes [1] - 119:13

control [10] - 8:5, 8:13, 8:20, 14:5, 14:9, 14:12, 14:17, 14:20, 21:11, 23:8

Controlled [8] - 31:25, 57:17, 69:8, 71:18, 98:5, 121:15, 124:11, 135:24

controlled [8] - 12:25, 38:7, 65:5, 65:14, 65:16, 96:14, 98:25, 101:3

controls [3] - 98:10, 100:5, 100:16

conventional [4] - 41:2, 42:1, 142:24, 150:15

Cook [3] - 6:18, 163:3, 163:11

cooperated [1] - 46:20

Copenhaver [3] - 15:14, 15:25, 19:7

copies [4] - 10:15, 10:16, 93:6, 161:15

core [9] - 10:22, 62:15, 68:5, 74:19, 74:24, 80:6, 85:4, 140:3, 140:10

Corey [1] - 130:20

Corporation [2] - 6:2, 163:7

cORPORATION [2] - 1:7, 1:13

correct [19] - 8:22, 13:11, 23:19, 26:18, 27:22, 28:1, 28:8, 36:19, 36:20, 36:22, 36:24, 37:3, 93:12, 94:24, 112:7, 123:17, 148:16, 163:4

Correct [3] - 26:19,

27:23, 28:2

corrected [1] - 25:4

correcting [1] - 110:13

corrective [1] - 112:9

correctly [2] - 24:2, 97:11

cost [1] - 82:7

costs [4] - 50:20, 81:3, 110:24, 111:4

counsel [4] - 42:21, 59:1, 94:16, 95:8

counseling [1] - 55:6

counties [1] - 127:17

countless [1] - 26:17

country [5] - 26:3, 32:13, 94:21, 104:7, 136:12

counts [1] - 123:18

COUNTY [1] - 1:10

county [4] - 49:14, 104:3, 142:20, 143:3

County [31] - 2:2, 3:2, 8:3, 8:11, 8:18, 9:16, 21:1, 22:11, 23:14, 26:16, 27:22, 28:7, 29:1, 62:11, 74:1, 80:9, 80:14, 80:17, 80:25, 81:8, 102:19, 103:25, 104:8, 104:23, 112:18, 114:22, 124:4, 124:15, 124:21, 125:1, 134:12

County's [1] - 125:14

couple [5] - 7:10, 30:4, 56:18, 61:7, 124:18

course [19] - 14:14, 17:15, 38:11, 41:18, 49:23, 51:13, 52:5, 63:19, 64:16, 72:6, 75:1, 78:9, 79:3, 83:8, 85:1, 86:24, 138:21, 148:22, 152:4

COURT [103] - 1:1, 1:17, 7:6, 7:14, 9:5, 9:11, 9:18, 9:21, 16:11, 16:16, 19:24, 20:1, 20:17, 23:15, 23:24, 24:2, 24:9, 27:8, 27:11, 31:9, 32:23, 33:3, 33:16, 56:6, 56:8, 58:1, 58:9, 58:11, 58:17, 58:19, 58:25, 59:20, 74:4, 74:9, 74:12, 76:10, 76:13, 81:23, 85:6, 85:12, 85:15, 85:20, 85:25, 86:2,

86:4, 86:15, 87:7,
87:16, 88:3, 89:11,
90:24, 91:4, 91:7,
91:20, 92:10, 93:10,
93:18, 94:15,
105:16, 107:8,
107:22, 110:12,
110:23, 111:2,
111:14, 111:16,
112:4, 114:4, 115:6,
115:10, 118:2,
118:6, 118:20,
118:25, 120:6,
120:9, 120:13,
126:13, 127:25,
128:6, 128:9,
128:13, 130:7,
130:10, 133:13,
134:7, 136:23,
137:1, 137:7,
137:11, 143:9,
148:14, 148:19,
152:24, 153:7,
155:12, 159:12,
161:1, 161:6,
161:17, 161:24,
162:1, 162:8
**Court** [125] - 6:17,
6:18, 7:3, 9:24, 10:9,
10:16, 10:25, 12:7,
12:11, 16:25, 17:16,
19:21, 19:22, 22:14,
27:6, 27:20, 34:24,
35:16, 37:10, 39:13,
40:10, 50:6, 50:15,
51:19, 52:21, 53:7,
53:9, 53:13, 56:4,
57:5, 58:7, 59:2,
63:9, 63:20, 64:9,
68:7, 68:11, 68:19,
70:19, 71:8, 74:14,
74:25, 76:5, 76:18,
77:9, 77:16, 78:24,
80:10, 80:20, 81:5,
81:7, 81:25, 82:23,
83:13, 83:19, 83:21,
83:23, 83:25, 84:1,
84:9, 85:2, 88:18,
88:22, 89:1, 89:9,
89:16, 89:19, 90:18,
92:6, 92:24, 96:9,
97:8, 103:11,
103:12, 103:19,
104:2, 110:11,
116:6, 117:10,
117:13, 117:20,
117:22, 120:2,
120:3, 121:14,
127:7, 127:16,
132:3, 137:14,
137:19, 138:9,

138:22, 139:21,
140:19, 141:7,
142:13, 143:3,
143:8, 144:1, 144:7,
144:8, 144:9,
144:10, 144:15,
145:11, 145:12,
151:4, 151:9,
151:13, 151:20,
152:9, 153:20,
155:17, 155:22,
156:9, 156:21,
156:24, 158:3,
158:11, 161:11,
161:16, 163:2, 163:3
**court** [14] - 7:12, 17:9,
32:24, 35:2, 35:8,
35:13, 42:19, 50:16,
50:17, 52:10, 54:12,
56:3, 101:12, 144:2
**Court's** [13] - 50:13,
51:6, 51:22, 52:15,
83:15, 90:18, 96:7,
139:5, 156:13,
156:20, 158:2,
159:2, 159:25
**courtesy** [1] - 10:16
**courtroom** [3] - 33:1,
58:4, 103:7
**Courts** [1] - 92:10
**courts** [5] - 93:1,
94:10, 101:10,
101:15
**cover** [1] - 56:11
**COVID** [3] - 111:20,
133:8, 133:11
**Covington** [1] - 5:11
**Craig** [1] - 23:3
**create** [2] - 54:4, 94:8
**created** [6] - 30:18,
110:14, 111:19,
111:21, 121:15,
154:18
**creates** [1] - 78:5
**creating** [2] - 91:22,
124:6
**credibility** [1] - 154:1
**credible** [3] - 25:21,
40:12, 72:18
**credit** [1] - 90:15
**crime** [5] - 18:22,
18:23, 18:24, 18:25,
111:10
**criminal** [5] - 19:4,
19:10, 19:18, 63:24,
138:20
**crisis** [11] - 11:14,
11:16, 13:9, 55:12,
63:21, 66:18, 66:21,
66:23, 68:1, 133:7,

151:23
**criteria** [1] - 41:16
**critical** [2] - 68:10,
71:21
**critically** [1] - 40:2
**criticism** [10] - 43:9,
43:16, 44:3, 44:7,
44:9, 47:5, 47:6,
72:22, 148:7, 148:17
**criticisms** [1] - 68:6
**criticize** [1] - 34:4
**criticized** [1] - 148:3
**critique** [1] - 69:12
**cross** [6] - 22:3, 22:7,
44:22, 77:16, 149:5,
154:7
**cross-examination** [3]
- 22:7, 149:5, 154:7
**CRR** [2] - 6:17, 6:18
**crucial** [1] - 88:23
**crux** [1] - 134:20
**CSA** [6] - 95:7, 96:6,
97:2, 97:18, 106:24,
107:2
**CSMP** [3] - 69:9, 72:1,
72:8
**culpability** [1] - 96:1
**culture** [3] - 11:6,
11:8, 37:25
**current** [8] - 33:25,
81:15, 83:2, 83:6,
83:16, 124:24,
130:18
**Custom** [8] - 65:1,
65:3, 65:8, 65:12,
65:16, 65:18, 66:3
**customer** [19] - 21:13,
24:25, 36:1, 36:9,
37:5, 39:19, 43:14,
43:17, 43:20, 43:25,
44:18, 47:2, 49:5,
49:6, 65:18, 67:10,
72:3, 147:7
**customer-specific** [1]
- 72:3
**customers** [25] - 8:4,
8:11, 8:18, 20:23,
21:1, 21:4, 21:9,
21:16, 21:18, 21:25,
22:8, 22:11, 22:25,
23:13, 36:3, 39:6,
47:4, 64:15, 64:17,
65:1, 73:9, 101:2,
147:8, 147:23,
149:19
**cut** [3] - 33:24, 35:18,
38:20
**cuts** [1] - 49:5
**cutting** [1] - 49:6

# D

**damage** [4] - 117:16,
124:4, 134:14,
134:19
**damages** [36] - 50:20,
51:1, 51:9, 51:16,
51:21, 52:2, 52:5,
52:8, 52:10, 74:23,
75:14, 75:22, 75:25,
76:9, 76:10, 76:25,
77:4, 77:6, 77:8,
77:9, 77:11, 78:7,
79:9, 81:5, 84:14,
84:18, 90:16,
117:12, 126:8,
126:14, 139:13,
139:16, 139:18,
152:17, 158:17
**danger** [3] - 97:9,
97:10, 100:9
**dangerous** [3] - 57:12,
97:10, 121:18
**darn** [1] - 136:20
**dash** [1] - 162:2
**data** [3] - 36:7, 43:23,
150:6
**database** [1] - 36:24
**Date** [1] - 163:16
**date** [1] - 55:10
**dates** [1] - 55:9
**Daubert** [1] - 40:11
**DAVID** [2] - 1:17, 4:5
**David** [1] - 7:1
**Day's** [1] - 55:14
**day's** [1] - 46:18
**days** [5] - 22:5, 22:6,
32:15, 83:9, 86:18
**DC** [9] - 4:7, 4:10,
4:19, 4:21, 5:5, 5:12,
69:24, 98:24, 100:24
**De** [2] - 2:4, 2:14
**DEA** [87] - 7:19, 8:12,
8:19, 12:20, 12:22,
21:12, 22:25, 23:14,
25:7, 26:4, 26:7,
29:10, 29:11, 30:13,
30:18, 30:19, 30:21,
31:4, 31:14, 31:20,
31:22, 31:24, 37:2,
41:18, 41:23, 42:18,
42:20, 42:24, 43:1,
43:5, 44:4, 46:5,
46:14, 46:17, 46:21,
47:7, 47:21, 47:22,
49:7, 49:12, 60:10,
69:14, 69:16, 69:25,
70:16, 70:24, 71:15,
72:24, 72:25, 89:5,
97:23, 97:24, 99:1,

99:10, 99:11, 99:20,
99:25, 100:3, 100:4,
100:19, 101:7,
101:9, 102:1,
102:12, 105:18,
107:21, 108:18,
109:11, 122:5,
124:1, 136:1,
136:15, 147:25,
150:4, 150:5, 150:9,
154:13, 154:14,
154:15, 154:17,
154:19, 160:12,
160:19
**DEA's** [4] - 29:16,
30:23, 60:24, 68:25
**deal** [6] - 101:12,
114:1, 114:12,
115:22, 127:24,
139:8
**dealers** [7] - 63:25,
114:17, 122:14,
129:10, 130:22,
131:17, 132:18
**dealing** [5] - 18:24,
98:4, 112:21, 140:3,
140:4
**deals** [1] - 126:11
**deaths** [1] - 124:24
**debate** [1] - 136:8
**decade** [1] - 40:24
**December** [1] - 104:6
**decide** [1] - 136:9
**decided** [3] - 51:3,
56:23, 98:20
**decision** [21] - 15:13,
18:1, 18:4, 50:13,
69:25, 70:2, 83:22,
90:3, 93:5, 98:7,
98:14, 100:23,
100:25, 127:2,
127:15, 142:3,
142:7, 144:9,
156:14, 159:3, 159:6
**decision-making** [4] -
18:1, 18:4, 142:3,
142:7
**decisions** [21] - 12:19,
15:10, 16:9, 16:18,
16:20, 16:22, 16:24,
17:11, 18:6, 87:23,
93:5, 93:7, 93:15,
96:8, 98:4, 101:20,
132:5, 133:3,
138:18, 140:25,
145:13
**decks** [1] - 99:23
**decline** [3] - 89:17,
89:19, 161:12
**declines** [1] - 99:2

**deemed** [1] - 107:21
**deep** [3] - 46:22, 48:7, 48:10
**defaulting** [1] - 25:2
**defeat** [6] - 16:9, 17:11, 18:6, 18:7, 19:4, 88:9
**defeated** [4] - 15:4, 17:22, 138:2, 138:14
**defeats** [5] - 16:23, 19:19, 137:22, 138:9, 139:4
**defendant** [1] - 118:15
**Defendant** [4] - 4:16, 5:2, 5:7, 6:2
**defendant's** [3] - 62:5, 99:8, 123:11
**Defendants** [3] - 1:8, 1:14, 163:7
**defendants** [76] - 9:22, 10:4, 20:8, 23:18, 23:19, 24:4, 24:6, 49:3, 52:7, 54:14, 59:11, 74:15, 78:11, 78:13, 78:14, 79:6, 79:16, 85:7, 86:23, 93:23, 94:1, 95:13, 96:1, 97:14, 98:1, 99:13, 99:21, 99:25, 100:15, 101:4, 101:24, 102:4, 102:12, 104:20, 105:21, 105:24, 106:4, 107:4, 107:19, 108:3, 108:24, 109:12, 109:21, 113:5, 114:13, 114:25, 115:14, 116:24, 117:5, 117:16, 118:3, 118:17, 119:17, 120:4, 121:7, 121:17, 123:1, 125:9, 126:4, 126:12, 126:22, 129:21, 132:10, 132:23, 133:10, 141:10, 141:17, 147:20, 151:17, 152:7, 152:17, 157:23, 158:5, 160:9, 161:7
**defendants'** [28] - 54:5, 63:10, 79:2, 80:1, 89:2, 90:20, 93:7, 94:19, 95:19, 99:18, 100:25, 102:18, 104:10, 106:7, 106:25,

108:21, 109:23, 110:18, 113:24, 116:18, 122:5, 127:18, 127:23, 139:25, 140:4, 159:17, 161:8, 161:19
**Defendants'** [1] - 19:8
**defenses** [1] - 103:6
**deficiencies** [3] - 61:1, 61:5, 70:13
**deficient** [1] - 72:2
**defies** [2] - 152:14, 152:21
**define** [4] - 95:5, 130:1, 132:1, 145:22
**defined** [1] - 109:6
**definition** [2] - 145:25, 160:14
**definitive** [1] - 45:8
**degree** [1] - 119:13
**delegable** [1] - 97:22
**deliver** [3] - 18:14, 29:4, 131:9
**delivery** [1] - 119:18
**demand** [3] - 37:17
**demands** [1] - 109:7
**demonstrate** [3] - 73:13, 103:19, 104:22
**demonstrates** [1] - 80:16
**demonstrating** [1] - 158:5
**demonstrative** [1] - 69:3
**denials** [2] - 92:12, 92:17
**denied** [8] - 52:9, 86:20, 92:24, 93:16, 94:4, 119:6, 143:20, 157:6
**deny** [2] - 92:14
**denying** [2] - 92:5, 142:13
**deposition** [6] - 9:13, 45:6, 89:1, 102:2, 102:6, 137:18
**depositions** [5] - 89:5, 89:6, 90:5, 101:25, 130:15
**Deputy** [1] - 31:15
**described** [3] - 22:17, 22:19, 22:20
**description** [2] - 18:12, 30:22
**design** [1] - 60:21
**designation** [1] - 9:13
**designations** [2] - 89:2, 137:18

**designed** [3] - 72:2, 102:13, 110:9
**detail** [4] - 22:20, 46:12, 68:8, 104:20
**detected** [1] - 73:1
**determination** [1] - 12:25
**determine** [1] - 117:12
**determined** [3] - 70:7, 105:4, 107:10
**determining** [1] - 156:21
**develop** [3] - 77:14, 77:25, 78:17
**developing** [1] - 55:8
**development** [2] - 15:8, 144:12
**develops** [1] - 77:20
**difference** [6] - 49:9, 96:20, 110:12, 118:2, 120:7, 135:8
**different** [25] - 26:21, 47:16, 63:20, 72:9, 106:2, 108:21, 110:7, 110:15, 118:11, 118:13, 123:18, 133:13, 133:18, 133:19, 133:20, 134:5, 134:12, 135:10, 139:17, 141:12, 141:15, 141:18, 142:24, 156:12, 160:6
**differently** [1] - 47:22
**difficulty** [1] - 109:6
**diligence** [28] - 34:6, 34:15, 44:12, 44:17, 44:20, 45:2, 45:12, 46:2, 46:6, 46:24, 47:15, 47:16, 48:8, 48:19, 98:13, 98:16, 101:2, 106:9, 106:10, 106:15, 107:15, 108:10, 148:24, 149:2, 149:6, 149:7, 149:16
**dimension** [1] - 141:9
**diminished** [1] - 34:17
**Direct** [11] - 96:18, 97:9, 100:8, 102:23, 103:8, 103:14, 120:20, 121:13, 135:9, 159:23, 159:25
**direct** [9] - 8:23, 16:5, 36:12, 44:16, 44:23, 98:14, 127:6, 145:1, 149:1
**directed** [1] - 155:19

**direction** [1] - 109:9
**directly** [2] - 127:5, 133:11
**Director** [1] - 69:5
**dirty** [2] - 111:13, 111:16
**disadvantage** [1] - 87:1
**disaggregate** [1] - 55:20
**disagreed** [1] - 61:11
**discharge** [2] - 75:18, 97:24
**discharged** [1] - 98:1
**disciplined** [1] - 39:16
**discount** [2] - 113:25, 127:10
**discovered** [2] - 26:6, 101:8
**discretion** [1] - 88:7
**discussed** [5] - 18:18, 50:4, 51:5, 110:2, 145:18
**discussion** [2] - 17:13, 61:17
**disease** [2] - 111:14, 111:22
**Diseases** [1] - 111:15
**diseases** [1] - 111:25
**disgorgement** [2] - 35:11, 151:13
**dismiss** [2] - 52:1, 52:9
**dismissed** [4] - 51:9, 51:19, 84:4, 84:6
**disorder** [1] - 139:9
**Disorder** [2] - 76:3, 112:17
**disparate** [2] - 119:24, 136:21
**dispel** [5] - 44:21, 101:6, 102:15, 149:3
**dispelling** [2] - 99:3, 101:22
**dispense** [2] - 103:17, 147:2
**dispensed** [2] - 39:7, 65:24
**dispenses** [1] - 18:17
**displayed** [1] - 20:25
**dispositive** [3] - 13:13, 14:23, 26:11
**dispute** [4] - 132:10, 132:14, 138:21, 142:4
**disputed** [1] - 136:3
**disputes** [2] - 23:6, 23:7
**distinct** [1] - 117:17
**distinction** [1] -

145:15
**distinguish** [3] - 127:4, 142:16, 145:19
**distinguishes** [3] - 96:19, 111:7, 112:2
**distribute** [2] - 80:5, 120:21
**distributed** [6] - 26:12, 27:21, 39:3, 39:4, 66:15, 66:16
**distributing** [4] - 55:1, 78:15, 95:15, 103:18
**Distribution** [5] - 39:4, 47:3, 47:5, 70:19
**distribution** [16] - 18:12, 26:17, 29:18, 29:21, 30:5, 46:22, 57:13, 60:24, 61:24, 64:2, 69:1, 70:20, 97:13, 97:15, 97:17, 108:19
**distributions** [6] - 26:18, 42:10, 63:12, 64:5, 66:4, 68:13
**distributor** [11] - 12:24, 40:17, 69:22, 98:25, 99:2, 99:5, 99:6, 99:19, 100:4, 100:17, 160:1
**distributors** [24] - 12:18, 12:22, 14:5, 14:8, 14:12, 14:16, 14:20, 18:14, 32:12, 33:6, 38:16, 42:14, 43:2, 48:23, 63:7, 69:17, 71:16, 80:5, 98:8, 98:12, 100:11, 149:23, 150:21, 154:20
**District** [9] - 7:2, 7:3, 42:19, 51:22, 101:16, 101:17, 101:18, 127:2, 143:18
**DISTRICT** [3] - 1:1, 1:1, 1:17
**district** [6] - 14:23, 15:10, 16:18, 16:25, 138:1, 141:1
**dive** [4] - 46:22, 48:7, 48:8, 48:10
**diversion** [34] - 13:17, 14:6, 14:12, 21:11, 23:8, 29:17, 38:25, 39:22, 39:23, 39:25, 40:4, 59:18, 60:2, 60:7, 60:25, 61:4, 63:2, 67:10, 67:12, 67:20, 67:23, 68:2,

68:14, 68:20, 70:7, 70:14, 96:12, 96:15, 98:10, 98:17, 100:6, 107:3, 124:13
**Diversion** [2] - 34:2, 46:16
**diversions** [1] - 100:16
**diverted** [12] - 18:18, 60:14, 60:17, 63:23, 70:9, 73:14, 107:3, 107:6, 120:23, 149:8, 160:3, 160:11
**divide** [2] - 118:17, 146:11
**divisible** [3] - 117:2, 117:12, 132:6
**divorce** [1] - 115:1
**divorced** [1] - 123:9
**doctor** [16] - 12:13, 13:4, 13:6, 14:2, 16:3, 18:1, 18:4, 18:16, 37:24, 39:9, 39:20, 41:8, 139:1, 142:3, 146:20, 147:3
**doctor's** [2] - 39:7, 48:15
**doctor-prescribing** [3] - 13:4, 13:6, 14:2
**Doctors** [1] - 17:23
**doctors** [46] - 11:24, 12:9, 12:15, 12:19, 12:23, 14:16, 15:4, 15:20, 17:11, 18:6, 21:22, 27:2, 28:17, 38:12, 38:14, 39:14, 40:23, 41:20, 42:5, 48:6, 48:17, 49:15, 54:18, 54:19, 54:20, 54:21, 63:22, 97:17, 116:20, 118:9, 122:21, 123:20, 123:23, 124:2, 124:9, 124:10, 132:16, 138:19, 140:5, 140:25, 142:7, 146:16, 149:10, 149:17, 150:11, 152:12
**doctors'** [4] - 16:9, 37:18, 38:21
**doctrine** [9] - 56:15, 126:9, 126:10, 126:11, 126:14, 126:16, 126:20, 127:14
**doctrines** [1] - 81:5
**Document** [1] - 93:4
**document** [3] - 8:1, 8:9, 8:16

**documents** [5] - 8:21, 8:23, 8:24, 67:14, 108:23
**dodging** [2] - 45:17, 45:18
**dollar** [2] - 80:24, 82:24
**dollars** [8] - 35:6, 50:19, 51:16, 52:8, 52:12, 52:23, 83:1, 134:13
**dominant** [1] - 64:3
**dominantly** [1] - 59:10
**done** [37] - 34:15, 35:13, 43:4, 47:15, 47:22, 48:7, 48:10, 48:14, 52:21, 55:18, 58:5, 64:11, 81:17, 81:18, 82:15, 82:16, 82:21, 84:8, 85:10, 87:20, 101:10, 106:14, 125:9, 132:21, 136:20, 144:2, 144:7, 148:24, 149:15, 150:4, 150:5, 151:5, 151:14, 152:7, 152:9, 153:23
**doom** [1] - 84:22
**door** [1] - 146:2
**dosage** [3] - 65:24, 98:17, 104:5
**doses** [1] - 98:17
**Douglas** [1] - 4:23
**down** [10] - 25:12, 42:13, 54:7, 82:6, 94:20, 118:9, 119:22, 121:25, 136:4, 139:12
**downhill** [1] - 120:1
**downstream** [7] - 75:7, 75:13, 76:2, 138:6, 139:8, 140:10, 144:16
**Dr** [50] - 11:6, 11:10, 13:8, 13:22, 15:23, 27:20, 28:18, 36:5, 37:22, 38:1, 39:12, 42:8, 53:14, 54:3, 55:22, 62:20, 62:22, 63:5, 63:9, 63:14, 63:18, 64:23, 65:25, 66:14, 76:18, 77:12, 77:18, 77:23, 79:18, 80:19, 81:14, 82:17, 83:4, 83:11, 103:15, 112:15, 113:11, 113:17, 114:15, 121:1, 122:6, 122:7, 122:8, 123:10,

125:7, 125:20, 130:20, 161:4, 161:6
**drafted** [1] - 90:14
**drank** [1] - 75:21
**draw** [1] - 132:8
**drawing** [1] - 133:12
**Dreamland** [8] - 128:7, 128:8, 128:9, 128:15, 129:8, 129:11, 130:24
**drew** [1] - 130:20
**drinking** [1] - 111:16
**Drive** [1] - 6:15
**driven** [3] - 12:4, 43:23, 142:3
**drives** [2] - 37:16, 37:17
**driveway** [1] - 119:19
**drop** [2] - 82:18, 125:4
**drove** [4] - 16:21, 17:23, 51:11, 137:22
**Drs** [1] - 40:20
**Drug** [2] - 6:2, 163:7
**drug** [25] - 17:21, 17:24, 18:11, 18:22, 18:23, 18:24, 18:25, 19:1, 55:2, 55:6, 55:8, 55:12, 63:24, 63:25, 76:7, 96:16, 103:18, 122:14, 129:9, 130:22, 131:16, 132:18
**DRUG** [2] - 1:7, 1:13
**drugs** [28] - 17:13, 17:15, 17:16, 17:19, 18:3, 18:9, 19:2, 38:21, 42:16, 47:4, 53:17, 54:1, 55:3, 57:13, 76:8, 96:12, 96:21, 100:14, 105:24, 105:25, 113:8, 114:20, 114:24, 123:10, 138:16, 138:24, 139:4, 152:12
**Dublin** [1] - 46:19
**due** [29] - 34:6, 34:15, 44:12, 44:17, 44:20, 45:2, 45:12, 46:2, 46:6, 46:24, 47:15, 47:16, 48:7, 48:19, 98:13, 98:16, 101:2, 106:9, 106:10, 106:15, 107:14, 108:9, 114:24, 148:24, 149:2, 149:6, 149:15
**Duff** [1] - 78:23
**dumped** [1] - 129:21
**dumping** [4] - 75:16,

128:21, 128:22, 129:18
**during** [16] - 8:23, 23:1, 29:15, 31:4, 31:11, 31:15, 32:8, 58:4, 63:19, 72:21, 73:10, 88:17, 107:19, 143:17, 145:11, 156:2
**During** [2] - 7:15, 29:15
**duties** [6] - 97:12, 97:24, 98:5, 99:25, 102:18, 107:1
**duty** [13] - 90:16, 90:23, 95:21, 97:21, 97:22, 98:1, 98:2, 99:9, 100:15, 103:10, 105:24, 124:11, 135:15

## E

**early** [7] - 12:6, 32:25, 85:16, 98:20, 107:22, 107:24, 157:7
**East** [3] - 3:5, 3:12, 4:24
**Eastern** [2] - 42:19, 101:18
**eaten** [1] - 144:23
**educate** [3] - 54:18, 54:21
**education** [1] - 11:9
**effect** [9] - 47:13, 71:4, 78:19, 83:24, 122:10, 130:3, 131:2, 131:4, 138:6
**effective** [3] - 98:10, 100:5, 100:16
**effects** [5] - 75:24, 76:3, 139:10, 139:23, 140:10
**effort** [3] - 79:5, 81:15, 153:10
**efforts** [2] - 59:9, 99:6
**eight** [1] - 73:23
**Eighth** [1] - 3:10
**either** [9] - 16:11, 36:22, 56:1, 70:11, 78:6, 83:2, 83:12, 105:5, 137:19
**element** [9] - 20:18, 20:19, 33:16, 33:21, 75:5, 135:10, 140:17, 140:22, 145:24
**elements** [3] - 117:25, 121:12, 155:25

**elicited** [2] - 31:11, 31:12
**eliminate** [1] - 55:11
**ELIZABETH** [1] - 6:14
**embedded** [1] - 140:17
**emotion** [1] - 22:16
**emphasize** [1] - 15:6
**emphasizing** [1] - 24:24
**Employer** [10] - 14:25, 15:1, 16:15, 17:9, 18:4, 19:3, 137:25, 138:10, 140:20, 142:5
**Encino** [1] - 3:16
**encompassed** [1] - 80:15
**encompasses** [2] - 77:14, 79:7
**encouraged** [1] - 12:9
**encouraging** [1] - 12:14
**end** [15] - 35:1, 53:10, 83:18, 83:19, 84:12, 90:3, 107:3, 116:6, 132:4, 132:8, 143:12, 152:8, 153:3, 156:18, 159:10
**ended** [2] - 103:10, 129:11
**endocarditis** [1] - 76:5
**endorsed** [1] - 144:8
**endorsement** [1] - 41:15
**endorses** [1] - 41:19
**endorsing** [1] - 154:24
**Energy** [1] - 78:23
**enforce** [1] - 57:17
**enforcement** [4] - 31:21, 32:2, 38:10, 108:18
**engage** [2] - 81:6, 143:3
**engaged** [2] - 81:22, 142:22
**engineering** [1] - 42:8
**enhancements** [1] - 69:10
**enormous** [2] - 82:23, 141:9
**enter** [1] - 137:15
**entire** [9] - 13:2, 22:10, 73:10, 78:3, 90:10, 90:11, 97:2, 97:25, 117:25
**entirely** [8] - 26:16, 56:2, 72:13, 83:16, 83:21, 95:23,

144:12, 145:24
**entirety** [1] - 13:14
**entities** [1] - 76:7
**entitled** [5] - 40:12, 42:13, 59:7, 74:2, 84:25
**entitlement** [2] - 74:17, 74:20
**entity** [1] - 26:9
**ENU** [1] - 4:17
**epidemic** [27] - 53:18, 55:10, 94:8, 110:6, 110:7, 110:9, 110:13, 113:16, 113:23, 114:12, 114:23, 115:2, 117:1, 123:4, 124:8, 124:14, 124:25, 125:5, 125:22, 125:24, 132:1, 132:21, 139:12, 139:13
**epidemiologists** [2] - 11:11, 130:25
**equitable** [19] - 35:3, 35:10, 35:15, 50:7, 51:10, 51:16, 51:20, 53:12, 80:11, 81:6, 85:1, 126:10, 126:15, 126:16, 142:12, 151:10, 151:21, 157:9
**equity** [17] - 34:25, 35:3, 35:8, 50:16, 52:15, 56:3, 80:10, 81:6, 82:23, 83:14, 84:2, 116:14, 116:16, 126:9, 127:14, 151:20
**eradicate** [1] - 125:5
**especially** [3] - 70:10, 113:15, 126:24
**espoused** [1] - 62:13
**essence** [1] - 31:5
**essential** [2] - 20:18, 20:19
**essentially** [5] - 14:21, 15:18, 64:24, 146:19, 154:24
**establish** [15] - 16:5, 16:8, 19:4, 29:25, 30:1, 46:7, 59:9, 61:18, 74:20, 84:25, 88:1, 88:10, 104:9, 122:4, 131:6
**established** [9] - 20:7, 20:21, 20:22, 37:15, 52:25, 80:11, 122:16, 138:24
**estoppel** [1] - 99:14

**et** [5] - 1:7, 1:13, 35:11, 163:6, 163:7
**Eugene** [1] - 55:13
**evaluate** [6] - 45:10, 45:16, 45:22, 108:25, 144:3, 148:18
**evaluated** [2] - 148:6, 148:15
**evaluation** [5] - 81:13, 109:4, 148:20, 153:15, 153:25
**event** [2] - 61:1, 68:24
**events** [4] - 15:3, 40:16, 132:9, 141:14
**Everly** [1] - 120:3
**everyday** [1] - 96:24
**evidence** [133] - 11:2, 11:21, 12:3, 12:17, 13:15, 14:4, 15:8, 16:2, 20:7, 20:15, 21:25, 22:21, 23:15, 24:3, 24:12, 24:16, 24:21, 25:4, 25:5, 25:10, 25:21, 26:1, 26:5, 29:4, 29:6, 29:23, 30:24, 32:16, 32:17, 34:8, 34:20, 34:21, 39:2, 39:8, 39:22, 40:3, 41:5, 44:15, 44:20, 47:24, 48:2, 48:18, 55:17, 55:19, 56:20, 59:18, 60:2, 61:1, 61:3, 63:20, 66:2, 67:23, 68:2, 68:13, 68:15, 68:24, 71:9, 71:10, 71:24, 72:1, 73:7, 73:21, 73:23, 78:12, 78:14, 79:4, 80:16, 80:25, 82:11, 84:7, 88:8, 88:18, 88:23, 88:25, 89:8, 89:10, 89:18, 89:20, 89:21, 98:7, 99:24, 103:13, 104:14, 106:8, 106:10, 106:22, 107:8, 107:13, 107:14, 107:24, 108:12, 108:13, 109:16, 112:17, 115:6, 117:11, 121:1, 121:5, 121:22, 123:3, 123:12, 124:1, 124:3, 124:13, 124:24, 125:19, 127:23, 130:3, 137:20, 142:2, 144:1, 144:4, 147:6,

147:8, 147:14, 147:19, 147:24, 148:9, 148:19, 150:22, 153:11, 153:18, 154:7, 155:6, 159:8, 161:13
**evident** [2] - 105:13, 121:25
**evidentiary** [1] - 56:19
**evolution** [1] - 69:6
**evolved** [1] - 68:16
**evolving** [1] - 60:24
**exact** [5] - 19:12, 19:13, 92:18, 96:25
**exactly** [6] - 15:25, 51:23, 111:15, 111:23, 118:1, 120:23
**examination** [8] - 8:23, 22:7, 36:12, 44:16, 77:17, 149:1, 149:5, 154:7
**example** [24] - 64:23, 67:13, 70:7, 75:15, 91:11, 96:19, 99:17, 99:18, 103:20, 107:18, 108:6, 108:11, 109:3, 110:19, 116:12, 129:16, 147:13, 147:19, 147:22, 148:1, 148:12, 149:8, 153:21
**examples** [3] - 104:14, 104:25, 106:14
**exceeded** [1] - 37:1
**exceeding** [1] - 69:23
**excellent** [1] - 153:8
**except** [3] - 86:8, 148:7, 155:2
**excess** [4] - 36:14, 37:2, 148:4, 148:17
**excessive** [4] - 10:23, 138:15, 138:25, 139:1
**exclude** [1] - 63:4
**excluded** [1] - 62:23
**excuse** [2] - 102:4, 109:13
**exemplar** [1] - 36:18
**exercise** [1] - 98:13
**exhaustive** [1] - 127:13
**Exhibits** [1] - 8:25
**exhibits** [2] - 89:6, 89:7
**existence** [4] - 92:8, 102:3, 114:24, 117:23
**existing** [1] - 97:5

**exists** [1] - 83:10
**expansion** [1] - 11:13
**expect** [4] - 12:22, 80:22, 131:25, 161:18
**expectation** [1] - 42:25
**expectations** [1] - 69:1
**expected** [1] - 69:17
**expense** [1] - 133:25
**expenses** [1] - 134:11
**experience** [2] - 131:19, 143:16
**experienced** [1] - 128:23
**expert** [11] - 21:8, 21:15, 21:17, 23:3, 23:9, 27:5, 82:6, 82:8, 103:2, 130:15
**expertise** [1] - 28:8
**experts** [10] - 12:21, 27:15, 60:13, 118:7, 121:2, 121:16, 122:1, 122:7, 130:13, 136:12
**explain** [6] - 60:6, 95:6, 100:8, 111:4, 130:19, 148:25
**explained** [3] - 65:7, 68:12, 122:9
**explaining** [1] - 116:5
**explains** [1] - 57:16
**explanation** [2] - 65:8, 72:17
**explicitly** [2] - 89:16, 100:7
**exploring** [1] - 77:17
**exposed** [8] - 77:20, 79:19, 79:23, 79:25, 80:4, 84:15, 139:22, 139:23
**exposure** [4] - 13:24, 80:1, 80:6, 115:18
**extend** [1] - 79:22
**extending** [1] - 78:4
**extends** [1] - 79:19
**extensive** [4] - 11:23, 15:8, 64:25, 142:2
**extensively** [1] - 17:16
**extraordinary** [1] - 82:25
**extremely** [3] - 27:17, 29:6, 160:2
**extremes** [1] - 130:1
**eye** [2] - 100:19, 109:14

## F

**FABER** [1] - 1:17
**Faber** [2] - 7:2, 9:15
**face** [2] - 99:20
**face-to-face** [1] - 99:20
**faceted** [1] - 141:8
**facially** [1] - 105:13
**facility** [2] - 62:21, 129:23
**fact** [41] - 15:14, 20:6, 21:9, 22:10, 24:15, 25:5, 25:16, 26:11, 26:15, 29:6, 31:20, 32:2, 34:13, 34:14, 46:5, 47:6, 48:2, 49:18, 56:1, 65:3, 81:8, 82:16, 84:20, 88:23, 93:22, 95:23, 96:23, 100:18, 103:7, 107:20, 113:22, 117:10, 117:11, 126:2, 129:23, 130:14, 140:5, 140:8, 149:15, 151:1, 159:5
**fact-finder** [1] - 117:11
**factor** [12] - 59:6, 60:18, 62:6, 62:9, 64:3, 64:7, 67:7, 70:13, 73:25, 118:15, 123:4, 132:24
**factors** [2] - 81:24, 141:16
**factory** [2] - 128:18, 129:18
**facts** [5] - 51:5, 99:15, 103:14, 127:9, 127:16
**factual** [5] - 71:12, 94:8, 101:12, 133:1, 138:21
**failed** [17] - 28:25, 33:12, 34:1, 44:11, 47:8, 60:21, 64:7, 66:25, 67:5, 83:21, 84:25, 105:1, 135:17, 135:21, 135:22, 137:24, 140:13
**failing** [3] - 73:5, 108:13, 108:14
**fails** [1] - 84:6
**failure** [24] - 10:20, 24:3, 24:12, 25:3, 25:10, 25:22, 26:1, 30:25, 34:13, 34:19, 46:10, 74:16, 74:20,

75:4, 84:1, 118:4, 124:14, 141:1, 148:10, 148:11, 150:17
**failures** [8] - 23:16, 24:15, 28:25, 29:3, 104:13, 108:16, 109:1
**fair** [3] - 76:17, 91:4, 129:6
**fairly** [3] - 81:13, 83:13, 119:24
**faith** [4] - 11:23, 11:25, 146:17, 147:3
**fall** [2] - 59:10, 141:20
**fallback** [1] - 29:2
**falls** [2] - 141:25, 142:1
**familiar** [2] - 58:5, 75:3
**families** [1] - 76:21
**far** [4] - 89:8, 104:15, 129:15, 157:17
**far-reaching** [1] - 129:15
**farfetched** [1] - 122:15
**FARRELL** [14] - 2:3, 7:9, 7:15, 9:9, 9:15, 102:20, 128:2, 128:7, 128:12, 128:14, 130:9, 130:11, 133:19, 134:9
**Farrell** [18] - 2:4, 2:13, 7:6, 9:18, 88:25, 90:13, 90:15, 90:20, 98:20, 102:17, 106:19, 108:16, 127:21, 128:1, 128:10, 129:4, 136:23, 146:7
**Farrell's** [2] - 96:17, 141:22
**fascia** [1] - 117:5
**fashion** [1] - 66:6
**fastest** [1] - 159:16
**fatal** [1] - 67:22
**fault** [21] - 27:8, 27:12, 85:3, 116:2, 126:12, 126:21, 129:17, 150:2, 152:1, 152:2, 152:3, 152:4, 155:23, 156:15, 156:17, 156:22, 157:1, 157:15, 158:7, 159:4
**faulted** [2] - 38:15, 38:17
**favor** [2] - 71:13, 89:22

**favorite** [1] - 96:17
**FCRR** [1] - 6:18
**FDA** [2] - 44:4, 57:13
**FDIC** [1] - 117:10
**feasor** [1] - 119:13
**federal** [17] - 35:2, 35:8, 35:13, 38:9, 42:3, 42:19, 50:16, 50:17, 52:21, 56:3, 62:17, 63:23, 103:10, 125:12, 144:20
**Federal** [6] - 16:25, 143:25, 151:4, 151:13, 151:20, 152:9
**Federation** [1] - 41:19
**feedback** [1] - 31:3
**felt** [1] - 81:14
**few** [8] - 11:4, 15:22, 29:22, 50:11, 53:4, 61:8, 64:11, 137:8
**fewer** [1] - 48:20
**fifth** [5] - 30:11, 41:13, 41:16, 74:11
**fighting** [1] - 151:18
**figure** [5] - 77:25, 83:20, 83:25, 130:8, 157:7
**figured** [4] - 122:1, 130:22, 130:24, 134:2
**figures** [2] - 26:7, 82:8
**figuring** [1] - 131:20
**file** [1] - 10:14
**filed** [6] - 58:7, 93:4, 133:25, 134:17, 135:1, 135:8
**files** [11] - 41:14, 44:17, 44:18, 45:2, 45:12, 46:2, 46:6, 46:7, 149:2, 149:6, 149:7
**filing** [3] - 57:1, 86:23, 92:4
**fill** [5] - 38:18, 38:20, 39:7, 99:2, 147:1
**filled** [3] - 21:21, 36:16, 39:19
**filling** [4] - 38:16, 38:17, 98:13, 146:16
**final** [2] - 90:1
**Finally** [1] - 8:21
**finally** [9] - 9:14, 23:12, 34:23, 49:8, 50:2, 95:17, 101:23, 108:23, 126:2
**finder** [1] - 117:11
**findings** [7] - 10:20, 20:5, 74:16, 88:10,

88:22, 121:15, 137:15
**fine** [4] - 30:12, 59:21, 76:24, 137:3
**fined** [2] - 30:12, 154:15
**finish** [3] - 90:9, 115:21, 115:22
**Firm** [2] - 3:4, 3:7
**firmly** [1] - 130:1
**First** [3] - 17:20, 30:5, 143:15
**first** [49] - 9:19, 12:6, 14:25, 15:15, 20:24, 22:11, 32:19, 33:11, 37:8, 37:16, 37:22, 40:14, 41:6, 47:15, 50:6, 54:12, 59:10, 59:13, 59:25, 60:22, 62:2, 69:25, 70:1, 73:7, 74:22, 77:14, 80:14, 81:11, 84:12, 87:3, 90:13, 92:4, 96:7, 101:12, 109:19, 114:11, 114:14, 115:12, 115:24, 122:8, 122:22, 131:13, 135:10, 137:12, 142:11, 161:14, 161:22
**first-hand** [1] - 22:11
**Fishman** [1] - 12:11
**five** [11] - 10:8, 10:15, 28:23, 63:7, 64:17, 64:18, 77:21, 92:3, 130:4, 130:8, 130:18
**FL** [1] - 2:11
**flag** [1] - 65:6
**flagged** [11] - 42:7, 44:24, 45:3, 45:14, 45:23, 71:23, 105:23, 106:3, 148:4, 148:5, 149:7
**flagging** [1] - 72:18
**flags** [1] - 22:22
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 2:10
**flaw** [5] - 79:12, 80:6, 80:8, 85:4, 140:11
**flaws** [2] - 74:24, 137:17
**flexibility** [1] - 89:24
**flood** [5] - 10:24, 11:3, 13:4, 17:14, 146:1
**flooded** [2] - 95:14
**Floor** [1] - 3:5
**floor** [1] - 105:15
**Florida** [3] - 29:21, 68:18, 155:4

**flowing** [3] - 139:23, 140:10, 141:13
**fly** [2] - 48:14, 48:15
**flying** [1] - 154:8
**focus** [2] - 13:20, 68:5
**focused** [4] - 12:15, 65:3, 140:9
**focuses** [1] - 72:23
**focusing** [2] - 11:1, 84:11
**fold** [1] - 84:20
**Follow** [2] - 18:19, 146:24
**follow** [3] - 76:3, 148:1, 154:20
**followed** [7] - 17:25, 18:23, 18:24, 18:25, 92:22, 97:1, 148:2
**following** [4] - 19:22, 32:2, 101:15, 156:11
**follows** [3] - 7:5, 7:24, 137:5
**Foods** [1] - 91:22
**footnotes** [1] - 53:5
**FOR** [1] - 1:1
**force** [1] - 162:2
**foreclose** [3] - 156:21, 156:24, 159:3
**foreclosed** [1] - 56:14
**forecloses** [1] - 158:3
**foregoing** [1] - 163:4
**Foreseeability** [1] - 140:15
**foreseeability** [6] - 95:21, 120:19, 135:10, 135:23, 136:1, 136:3
**foreseeable** [7] - 95:23, 97:1, 98:14, 121:19, 122:4, 131:9, 135:6
**forgotten** [1] - 124:19
**form** [2] - 35:10, 36:7
**formality** [1] - 143:23
**former** [4] - 43:11, 44:4
**forth** [1] - 57:5
**fortunately** [1] - 89:13
**forward** [3] - 84:6, 147:14, 161:2
**foundation** [1] - 11:12
**founded** [2] - 126:9, 127:14
**four** [20] - 22:3, 35:12, 37:1, 51:8, 52:20, 74:18, 74:19, 89:3, 89:4, 92:3, 98:20, 116:5, 130:3, 130:7, 130:18, 151:3, 151:8, 153:21, 154:4

**Fourth** [2] - 30:10, 89:18
**fraction** [2] - 21:20, 21:24
**Francisco** [1] - 101:17
**Frankfurter** [1] - 50:15
**frankly** [2] - 133:23, 153:24
**fraternity** [2] - 119:18, 119:20
**free** [1] - 61:15
**frequency** [1] - 103:21
**frequently** [1] - 103:16
**Friday** [2] - 86:8, 86:9
**friend** [1] - 155:9
**friends** [3] - 88:24, 93:22, 93:24
**front** [3] - 89:1, 155:21, 159:8
**Fruth** [1] - 64:19
**FTI** [1] - 109:3
**fulfill** [1] - 149:24
**full** [4] - 21:25, 25:14, 56:20, 85:24
**FULLER** [1] - 2:12
**Fuller** [2] - 2:4, 2:13
**fully** [6] - 50:4, 69:15, 83:3, 88:16, 137:14, 137:17
**function** [1] - 25:17
**functioning** [1] - 104:16
**fundamental** [9] - 34:19, 35:15, 53:11, 79:12, 84:13, 139:16, 143:2, 145:15, 146:11
**fundamentally** [1] - 34:12, 73:9, 80:12
**funding** [1] - 80:23
**future** [24] - 50:20, 54:10, 54:16, 77:1, 77:12, 77:22, 77:25, 78:4, 78:9, 78:10, 78:11, 78:12, 78:13, 78:15, 78:17, 78:18, 78:20, 78:21, 79:3, 79:4, 79:5, 84:21, 139:18

## G

**Gas** [1] - 120:3
**gateway** [9] - 17:20, 19:17, 115:6, 130:3, 131:2, 131:3, 131:4, 138:12, 138:13
**gears** [1] - 68:3
**general** [5] - 37:23, 39:23, 87:2, 96:2,

116:10
**General** [2] - 117:8, 117:9
**General's** [1] - 92:20
**Generals** [1] - 133:24
**generals** [1] - 134:10
**genius** [1] - 134:2
**gestalt** [1] - 37:23
**Gilligan** [2] - 161:4, 161:6
**Gina** [6] - 87:19, 88:12, 89:15, 95:24, 96:10, 119:9
**girls** [1] - 119:23
**given** [16] - 14:21, 42:22, 64:3, 64:4, 83:23, 84:8, 86:25, 104:14, 105:11, 107:15, 131:1, 146:20, 146:21, 146:22, 146:23, 157:17
**glad** [2] - 58:7, 120:14
**glove** [1] - 147:16
**God** [1] - 129:22
**golden** [1] - 43:4
**good-meaning** [1] - 125:19
**governed** [1] - 50:17
**government** [5] - 62:18, 80:22, 103:10, 125:12, 125:13
**governmental** [1] - 99:14
**grade** [1] - 131:10
**Grant** [3] - 117:10, 118:2, 141:6
**grant** [6] - 35:3, 35:9, 50:7, 56:4, 151:9, 152:22
**granted** [2] - 143:18, 156:16
**granting** [1] - 71:13
**grants** [1] - 125:18
**grateful** [1] - 58:6
**great** [6] - 22:20, 31:6, 41:4, 56:21, 104:9, 114:18
**greater** [2] - 63:7, 150:12
**greatest** [2] - 96:13, 96:14
**GRETCHEN** [1] - 6:7
**ground** [3] - 48:11, 51:22, 61:12
**group** [5] - 41:3, 41:5, 114:2, 114:6
**groups** [1] - 63:20
**Guaranty** [1] - 50:14

**guess** [6] - 12:18, 12:23, 27:2, 28:16, 38:2, 74:11
**guidance** [4] - 60:24, 71:16, 71:17, 84:9
**guide** [1] - 99:6
**guidelines** [2] - 41:19, 101:1
**guilty** [1] - 91:19
**Gupta** [3] - 11:6, 37:24, 40:20
**guy** [3] - 32:18, 32:19, 136:16
**guys** [1] - 136:14

## H

**half** [4] - 27:25, 46:18, 66:1, 85:24
**half-day's** [1] - 46:18
**hammer** [1] - 50:10
**hand** [7] - 19:7, 22:11, 96:21, 104:15, 147:16, 153:12, 161:16
**hand-in-glove** [1] - 147:16
**handful** [1] - 73:8
**handgun** [4] - 135:12, 135:13, 135:16, 135:22
**handguns** [1] - 134:22
**hands** [3] - 40:5, 40:6, 40:7
**Happy** [1] - 7:6
**happy** [5] - 58:11, 68:6, 91:1, 91:3, 122:14
**hard** [2] - 72:16, 132:3
**harder** [1] - 58:21
**HARDIN** [1] - 5:3
**hardly** [2] - 21:5, 22:7
**harm** [39] - 13:16, 13:20, 14:18, 14:19, 16:4, 16:6, 48:2, 49:21, 60:12, 60:14, 60:19, 61:2, 61:4, 62:6, 67:8, 68:20, 73:14, 73:16, 76:11, 78:1, 78:9, 78:12, 78:17, 79:1, 79:7, 79:8, 79:10, 84:17, 84:21, 95:10, 96:22, 96:25, 110:22, 112:2, 112:23, 119:11, 138:4, 138:5, 142:7
**harmed** [4] - 75:24, 76:7, 78:4, 78:7
**harms** [19] - 18:10,

75:7, 75:13, 75:21, 76:2, 76:4, 77:12, 79:15, 84:15, 100:9, 112:3, 112:13, 112:18, 139:9, 139:13, 139:22, 140:4, 140:24, 144:16
**Harper** [1] - 102:2
**Harper-Avilla** [1] - 102:2
**Harvard** [1] - 136:14
**Hawkins** [1] - 3:7
**HDMA** [1] - 100:25
**head** [1] - 50:12
**Head** [1] - 136:15
**health** [2] - 39:19, 133:7
**Health** [14] - 4:16, 5:2, 33:8, 34:15, 36:20, 38:17, 40:17, 44:19, 45:7, 89:4, 107:18, 135:19, 147:18, 150:20
**healthcare** [1] - 32:12
**hear** [16] - 43:9, 43:16, 43:20, 43:24, 44:2, 44:5, 44:7, 44:9, 60:13, 100:13, 113:5, 130:12, 130:16, 137:19, 149:14, 161:18
**heard** [36] - 12:12, 17:16, 29:20, 40:20, 41:6, 41:12, 42:18, 43:7, 44:11, 44:14, 49:1, 49:9, 63:20, 64:12, 72:15, 76:6, 82:19, 88:16, 88:18, 88:22, 88:25, 99:10, 102:3, 103:6, 103:13, 105:20, 111:24, 137:14, 137:17, 139:11, 144:1, 144:4, 153:14, 153:21, 159:23, 160:23
**Heard** [12] - 33:3, 56:10, 58:1, 61:16, 72:15, 79:16, 91:9, 152:24, 154:20, 156:2, 156:7, 159:17
**HEARD** [7] - 33:4, 33:18, 56:7, 56:17, 143:10, 148:16, 148:22
**Heard's** [1] - 72:16
**hearing** [3] - 30:2, 31:5, 136:2
**heart** [3] - 10:24,

10:25, 13:5
**heavier** [1] - 120:12
**heavy** [1] - 79:1
**heightened** [2] - 78:22, 97:20
**held** [7] - 7:18, 45:24, 49:22, 54:23, 96:9, 116:15, 120:3
**helped** [3] - 66:18, 66:21, 66:23
**helpful** [1] - 9:24
**Hendricks** [2] - 57:5, 57:9
**hepatitis** [2] - 111:24, 111:25
**heroin** [22] - 54:2, 77:20, 79:23, 113:7, 114:6, 114:16, 114:17, 114:23, 115:17, 115:18, 120:24, 120:25, 121:3, 121:23, 121:25, 122:9, 129:4, 130:4, 130:5, 130:18, 131:16
**Hershel** [1] - 62:19
**Hester** [19] - 16:12, 19:24, 20:6, 25:15, 28:20, 34:10, 37:7, 40:1, 47:11, 49:19, 72:15, 74:9, 85:6, 113:2, 136:24, 137:7, 143:9, 158:13, 161:3
**HESTER** [24] - 5:9, 9:20, 9:23, 16:13, 16:17, 19:25, 58:2, 58:15, 74:8, 74:10, 74:13, 76:12, 76:16, 82:2, 85:9, 85:13, 86:3, 136:25, 137:3, 137:6, 137:8, 137:12, 161:4, 161:15
**Hickman** [1] - 116:12
**high** [11] - 11:11, 65:4, 65:17, 66:6, 72:7, 99:15, 122:12, 123:19, 124:5, 127:5, 140:5
**High** [1] - 119:22
**highest** [1] - 91:14
**highlight** [6] - 19:6, 41:9, 79:17, 80:8, 140:13, 141:22
**highlighted** [3] - 11:6, 14:1, 15:22
**highlighting** [1] - 89:2
**highlights** [2] - 127:18, 141:23

**himself** [3] - 65:25, 71:22, 143:20
**hire** [1] - 44:7
**hired** [6] - 44:3, 44:5, 46:13, 108:24, 109:3, 109:12
**historical** [6] - 40:15, 40:18, 41:24, 42:10, 146:14, 150:8
**history** [2] - 8:5, 151:4
**hit** [4] - 50:12, 91:4, 127:18, 142:18
**HIV** [2] - 76:5, 111:24
**hold** [3] - 10:9, 53:5, 54:17
**Holder** [1] - 135:19
**holding** [4] - 51:22, 98:24, 127:6, 141:23
**holdings** [1] - 101:14
**homeless** [1] - 55:2
**hometowns** [1] - 130:6
**Honor** [125] - 9:8, 9:12, 9:20, 9:23, 10:11, 10:18, 13:13, 15:6, 16:13, 16:17, 16:24, 19:13, 19:20, 19:25, 20:2, 29:8, 32:22, 33:4, 33:10, 33:20, 34:20, 35:1, 37:3, 37:6, 39:9, 40:14, 45:17, 46:9, 47:8, 48:2, 49:25, 50:2, 50:8, 51:2, 51:23, 52:14, 53:10, 54:13, 55:16, 55:18, 55:24, 56:17, 56:19, 57:8, 57:22, 58:2, 58:10, 58:15, 58:18, 58:24, 59:22, 60:22, 61:3, 61:7, 61:14, 61:15, 61:23, 62:7, 63:19, 64:12, 66:25, 67:4, 69:3, 70:10, 70:16, 71:1, 73:3, 73:17, 74:8, 76:12, 78:6, 84:12, 84:24, 85:5, 85:9, 85:19, 86:3, 86:12, 86:14, 86:16, 87:18, 91:1, 93:6, 95:9, 95:10, 95:11, 102:1, 114:10, 115:13, 116:1, 116:8, 119:6, 120:15, 123:12, 126:16, 130:9, 136:25, 137:3, 137:6, 141:4, 143:6, 143:10, 143:15, 143:24, 145:15,

146:11, 149:13, 150:17, 151:5, 152:8, 153:1, 155:11, 155:14, 155:16, 156:16, 158:1, 158:8, 159:5, 159:15, 160:17, 160:25, 161:5, 161:15, 161:21, 162:5

**honor** [1] - 7:10

**Honor's** [7] - 34:5, 44:13, 68:7, 87:11, 115:21, 145:1, 153:14

**HONORABLE** [1] - 1:17

**Honorable** [1] - 7:1

**honors** [1] - 9:20

**hook** [1] - 78:16

**hooked** [1] - 114:6

**hope** [5] - 28:24, 83:19, 85:10, 136:19, 153:2

**hoped** [1] - 85:13

**hopefully** [1] - 56:8

**hopes** [1] - 99:3

**hoping** [1] - 10:12

**Hopkins** [1] - 136:14

**horrible** [1] - 97:10

**Hospice** [1] - 65:21

**hospital** [1] - 41:16

**Hospital** [1] - 62:20

**Hospital's** [1] - 65:21

**hours** [1] - 85:24

**House** [1] - 70:19

**houses** [1] - 144:22

**Howenstein's** [1] - 9:13

**Hubbell** [1] - 89:18

**huge** [3] - 14:1, 80:23, 83:1

**human** [1] - 130:2

**hundred** [4] - 82:7, 113:19, 131:8, 131:11

**hundreds** [1] - 54:16

**Huntington** [63] - 3:10, 4:1, 9:16, 21:1, 22:16, 23:14, 24:23, 26:2, 27:22, 29:2, 30:6, 34:18, 36:1, 36:4, 39:9, 39:14, 41:14, 47:20, 48:21, 59:12, 59:16, 59:19, 60:1, 60:3, 60:12, 60:17, 61:2, 61:5, 62:10, 62:17, 62:20, 63:5, 63:8, 63:10, 63:12, 64:6, 64:12,

64:15, 64:18, 65:21, 65:22, 66:2, 66:5, 66:19, 66:21, 66:24, 67:2, 67:8, 67:11, 67:16, 67:21, 68:1, 68:21, 70:14, 73:9, 74:1, 78:15, 102:19, 104:22, 114:17, 114:18, 129:10, 163:6

**HUNTINGTON** [1] - 1:4

**Huntington's** [3] - 59:6, 60:18, 64:8

**Huntington-Cabell** [2] - 66:21, 104:22

**hurdle** [2] - 135:10, 136:9

**hurdles** [1] - 133:2

**hurry** [1] - 162:3

**Hutchison** [1] - 157:6

**hydrocodone** [3] - 65:24, 98:18, 104:19

---

# I

**idea** [1] - 114:18

**identical** [1] - 116:8

**identification** [1] - 8:22

**identified** [5] - 8:24, 60:9, 69:14, 69:18, 71:25

**identify** [8] - 23:9, 28:5, 67:15, 69:22, 102:5, 103:21, 105:1, 129:14

**identifying** [1] - 13:25

**ignore** [1] - 152:10

**ignored** [2] - 66:10, 72:13

**illegal** [23] - 17:15, 17:16, 17:18, 17:21, 17:24, 18:3, 18:8, 18:11, 18:21, 49:24, 55:3, 95:6, 96:16, 114:20, 114:24, 116:20, 122:14, 138:16, 138:19, 138:24, 139:3, 139:4

**illegally** [3] - 19:1, 63:23, 103:18

**illicit** [2] - 18:18, 132:19

**Illinois** [1] - 101:16

**illustrated** [1] - 75:15

**illustration** [1] - 67:18

**images** [1] - 26:13

**imagine** [1] - 44:13

**impact** [1] - 57:21

**impeached** [1] - 45:5

**impediment** [1] - 71:12

**implement** [1] - 60:21

**implementation** [1] - 45:19

**implicate** [1] - 70:18

**important** [26] - 11:10, 15:18, 27:17, 30:15, 38:8, 38:20, 39:1, 46:5, 70:4, 72:5, 72:13, 77:3, 90:10, 103:5, 106:6, 106:13, 110:11, 115:22, 123:15, 128:4, 132:4, 132:5, 138:11, 140:12, 142:15, 158:11

**importantly** [4] - 30:11, 125:8, 142:15, 155:25

**impose** [1] - 82:23

**imposed** [1] - 46:5

**impossible** [1] - 104:17

**improper** [1] - 113:14

**improperly** [1] - 160:4

**improve** [1] - 72:16

**improvements** [1] - 73:19

**IN** [2] - 1:1, 1:18

**inadvertently** [1] - 38:5

**inappropriately** [1] - 72:8

**inarticulate** [2] - 23:24, 112:5

**include** [9] - 8:3, 8:10, 8:17, 75:6, 75:17, 75:19, 75:20, 77:18, 157:24

**included** [5] - 37:2, 75:2, 79:21, 80:19, 89:6

**includes** [2] - 55:1, 77:13

**including** [4] - 15:3, 19:9, 62:12, 160:20

**increase** [6] - 11:18, 11:20, 12:4, 14:2, 14:3, 72:14

**increased** [7] - 11:4, 11:22, 13:3, 13:16, 17:21, 17:23, 17:25

**incredibly** [1] - 153:3

**indeed** [8] - 69:20, 77:23, 78:14, 81:2, 83:2, 100:7, 144:19, 145:13

**independent** [10] -

15:3, 18:13, 64:14, 99:12, 108:25, 109:11, 140:25, 141:10, 141:17, 142:6

**indicated** [2] - 19:21, 40:19

**indication** [1] - 87:2

**indirect** [1] - 49:22

**individual** [5] - 40:23, 109:24, 133:22, 134:16, 134:19

**individual's** [1] - 76:11

**individually** [1] - 44:25

**individuals** [4] - 110:4, 128:24, 144:16, 144:18

**indivisible** [7] - 116:25, 117:12, 117:22, 118:16, 123:4, 123:7, 132:6

**industry** [6] - 30:20, 31:6, 60:25, 64:2, 69:1, 154:19

**infectious** [2] - 111:22, 112:11

**influence** [2] - 11:9, 37:25

**influenced** [1] - 19:9

**information** [3] - 49:12, 66:8, 83:15

**informed** [1] - 69:17

**infrastructure** [1] - 113:11

**ingredient** [1] - 36:13

**inherent** [2] - 96:22, 96:24

**initial** [4] - 44:24, 45:14, 114:8, 149:7

**initiate** [1] - 31:21

**initiative** [1] - 99:20

**injunction** [1] - 35:11

**injunctive** [3] - 52:17, 139:19, 151:12

**injured** [2] - 109:25, 110:4

**injuries** [2] - 19:11, 117:6

**injury** [15] - 15:15, 15:19, 16:22, 17:6, 50:21, 50:25, 119:14, 132:6, 133:6, 133:16, 141:5, 141:13, 141:18, 142:19, 142:21

**input** [1] - 30:18

**insist** [1] - 50:18

**insisted** [1] - 52:3

**instance** [8] - 61:12, 63:6, 66:10, 77:18, 79:22, 141:6, 142:17, 155:3

**instead** [1] - 72:23

**instructed** [1] - 98:8

**instructive** [1] - 96:8

**insufficient** [1] - 125:20

**insurance** [3] - 81:2, 127:10, 142:18

**intend** [1] - 59:14, 62:7

**intended** [2] - 8:24, 158:25

**intent** [3] - 95:9, 95:12

**intentional** [3] - 57:19, 95:8, 95:9

**interest** [1] - 68:5

**interested** [1] - 94:15

**interesting** [1] - 150:18

**interference** [8] - 33:14, 33:19, 57:24, 105:10, 145:18, 145:20, 145:21, 145:23

**internet** [3] - 68:17, 99:21, 100:2

**intervening** [8] - 15:3, 16:9, 17:10, 18:5, 19:9, 19:18, 120:16, 138:3

**intravenous** [1] - 19:1

**introduce** [6] - 58:2, 58:8, 58:12, 64:20, 153:3, 155:9

**introduced** [1] - 71:18

**introductory** [1] - 51:7

**invented** [1] - 72:10

**investigate** [2] - 99:1, 147:10

**investigated** [2] - 45:15, 147:11

**investigation** [3] - 70:25, 99:7, 101:6

**investigations** [3] - 32:8, 43:15, 44:2

**investigator** [3] - 98:22, 103:1, 103:3

**investigators** [5] - 29:17, 44:3, 44:5, 46:19, 46:21

**involve** [1] - 144:22

**involved** [4] - 71:23, 133:11, 144:21, 158:23

**involves** [4] - 18:22, 75:1, 138:19, 160:13

**involving** [6] - 18:23, 18:24, 18:25, 144:17, 145:2, 146:1
**ironically** [1] - 35:22
**irony** [3] - 25:24, 26:1
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**Island** [1] - 143:18
**issue** [19] - 10:2, 13:25, 14:23, 17:17, 19:14, 24:20, 56:13, 56:14, 68:11, 88:16, 88:23, 92:18, 92:19, 120:16, 137:14, 138:8, 138:23, 154:12, 155:21
**issued** [4] - 12:7, 12:12, 14:22, 16:18
**issues** [10] - 56:19, 56:21, 60:6, 60:8, 85:3, 133:1, 137:16, 137:19, 156:4
**items** [4] - 8:5, 8:13, 8:20, 9:10
**itself** [4] - 26:1, 66:20, 97:25, 123:14

**J**

**Jackson** [1] - 6:8
**jail** [2] - 49:2, 147:15
**James** [2] - 42:22, 103:2
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**Jenkins** [1] - 157:19
**JENNIFER** [1] - 4:18
**jerry** [1] - 42:8
**jerry-rigged** [1] - 42:8
**job** [4] - 87:8, 106:24, 132:15, 136:20
**jobs** [1] - 132:17
**Johns** [1] - 136:14
**Johnson** [2] - 117:9
**joined** [2] - 92:6, 157:19
**joint** [8] - 115:25, 116:10, 116:13, 122:24, 123:6, 151:15, 151:18, 156:4
**Joint** [3] - 41:12, 41:15, 42:2
**JOSEPH** [1] - 6:4
**Journey** [1] - 55:14
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**judge** [2] - 92:7, 129:16
**JUDGE** [1] - 1:17

**Judge** [19] - 7:2, 7:9, 9:15, 15:2, 15:14, 15:25, 19:7, 42:20, 48:22, 58:14, 87:21, 101:11, 101:19, 102:20, 108:7, 127:2, 128:2, 143:17, 143:25
**judges** [2] - 92:25, 94:4
**judgment** [26] - 10:20, 11:25, 15:4, 20:4, 33:9, 52:2, 53:4, 59:7, 67:2, 71:13, 74:2, 74:15, 84:25, 88:10, 88:21, 89:17, 89:20, 92:6, 93:17, 94:5, 119:6, 137:15, 143:19, 143:21, 145:19, 161:12
**judgments** [3] - 12:23, 49:25, 138:3
**July** [3] - 7:4, 163:9, 163:15
**JULY** [1] - 1:19
**jumped** [1] - 27:9
**jumping** [1] - 25:8
**June** [1] - 102:24
**jurisdiction** [5] - 34:25, 52:15, 56:3, 102:8, 102:10
**jury** [5] - 51:12, 88:4, 88:17, 153:25, 154:2
**Justice** [3] - 50:15, 157:19
**Justices** [2] - 157:5, 157:17
**juxtapose** [1] - 31:2

**K**

**Kanawha** [1] - 128:23
**Katie** [1] - 146:2
**KEARSE** [1] - 4:2
**Kearse's** [1] - 93:25
**keep** [4] - 24:9, 86:9, 95:25, 106:12
**keeping** [1] - 109:7
**Keller** [4] - 21:16, 26:21, 28:3, 123:22
**Keller's** [1] - 39:13
**Kelly** [1] - 6:8
**Kenney** [4] - 127:4, 127:6, 127:9, 127:15
**Kentucky** [1] - 43:12
**Kermit** [2] - 75:2, 131:23
**Kessler** [1] - 4:23
**key** [7] - 17:17, 59:23, 59:24, 137:16,

148:20, 148:22, 153:15
**Keyes** [6] - 11:10, 13:8, 13:22, 15:23, 121:2, 122:6
**kids** [2] - 134:23
**killed** [1] - 119:23
**Kim** [1] - 9:13
**kind** [17] - 14:5, 30:25, 52:4, 84:9, 91:22, 99:13, 115:7, 116:15, 131:18, 134:5, 134:20, 136:6, 141:18, 143:4, 147:14, 147:19, 155:8
**kinds** [1] - 114:20
**knowledge** [4] - 16:12, 22:11, 31:21, 57:20
**known** [8] - 26:7, 26:9, 48:16, 55:13, 65:9, 67:12, 103:16, 107:5
**knows** [4] - 32:13, 50:8, 160:1
**KOUBA** [1] - 4:11

**L**

**LA** [1] - 3:8
**labeled** [1] - 157:13
**Lacey** [4] - 21:16, 26:21, 28:3, 123:22
**lack** [2] - 73:20, 109:9
**lacks** [2] - 35:3, 35:8
**laid** [2] - 17:22, 79:16
**lake** [7] - 75:17, 75:18, 75:19, 75:22, 81:23, 81:24, 82:4
**land** [1] - 110:20
**language** [3] - 73:4, 97:2, 139:11
**Lanier** [1] - 3:4
**large** [3] - 37:11, 52:17, 96:15
**larger** [1] - 160:13
**largest** [1] - 32:12
**Las** [2] - 53:20, 53:21
**last** [19] - 27:25, 55:17, 58:20, 80:8, 92:24, 101:23, 122:20, 123:15, 124:17, 124:18, 150:21, 150:24, 154:10, 155:10
**lastly** [1] - 35:15
**latter's** [1] - 96:22
**Laughter** [1] - 7:8
**LAURA** [1] - 5:10
**law** [57] - 16:10, 17:1,

17:4, 17:7, 17:8, 35:2, 35:4, 35:5, 35:6, 38:10, 48:8, 50:8, 50:16, 50:17, 50:18, 51:21, 52:11, 56:11, 56:15, 57:4, 71:2, 78:20, 80:2, 84:5, 87:21, 92:9, 94:9, 95:11, 95:20, 97:5, 99:11, 116:9, 116:10, 116:23, 117:3, 118:17, 120:11, 120:18, 126:16, 127:24, 132:23, 133:4, 135:18, 136:11, 138:17, 140:16, 140:17, 140:20, 140:22, 142:8, 144:13, 145:5, 145:8, 145:9, 151:10
**Law** [4] - 3:4, 3:7, 3:12, 53:3
**lawful** [4] - 18:7, 61:24, 103:17, 132:12
**Lawson** [1] - 42:20
**lawsuit** [1] - 30:1
**lawyer** [2] - 43:11, 58:12
**lawyers** [1] - 118:6
**lay** [2] - 9:24, 121:25
**lead** [20] - 43:10, 80:9, 80:12, 98:22, 103:1, 103:3, 134:21, 134:22, 134:24, 135:1, 135:5, 135:7, 135:21, 144:21, 144:23, 145:2, 145:6
**leaders** [2] - 82:14, 82:20
**leading** [3] - 29:12, 118:4, 136:12
**leads** [2] - 18:21, 121:20
**learn** [2] - 21:19, 131:19
**learned** [1] - 130:12
**least** [9] - 10:9, 17:17, 41:14, 59:21, 62:1, 93:10, 123:13, 156:12, 161:10
**leave** [4] - 14:12, 145:23, 145:25, 156:11
**leaves** [1] - 57:18
**led** [10] - 16:3, 17:21, 48:20, 60:7, 68:20, 138:16, 139:3, 142:7
**Lee** [3] - 3:12, 58:11,

58:22
**Lee"** [1] - 58:19
**left** [10] - 13:18, 14:7, 39:24, 40:5, 40:6, 81:25, 83:20, 88:24, 128:24
**legal** [23] - 15:11, 16:18, 16:19, 17:10, 17:13, 50:7, 51:4, 51:24, 56:19, 61:9, 61:18, 71:12, 94:7, 102:23, 115:16, 126:9, 126:13, 133:2, 136:7, 144:3, 159:15, 159:21
**legislature** [1] - 158:25
**legitimate** [6] - 12:23, 38:8, 48:7, 66:13, 72:14, 96:12
**LeMaster** [1] - 95:20
**length** [3] - 29:14, 46:15, 153:22
**lengths** [1] - 104:9
**Leon** [2] - 2:4, 2:14
**less** [4] - 63:6, 65:24, 68:16, 131:10
**letters** [3] - 100:10, 100:17, 136:2
**letting** [1] - 108:8
**level** [12] - 42:3, 67:21, 82:18, 84:3, 91:14, 105:5, 105:6, 106:16, 124:7, 136:18
**levels** [1] - 81:15
**Levin** [1] - 2:10
**LEYIMU** [1] - 4:13
**liability** [18] - 30:1, 30:8, 62:14, 70:23, 71:3, 73:6, 116:1, 116:11, 116:14, 117:6, 122:24, 145:9, 151:15, 151:18, 151:19, 156:5, 158:5, 160:4
**liberal** [1] - 116:13
**licensed** [4] - 21:22, 22:25, 23:1, 39:5
**licit** [1] - 132:18
**lies** [1] - 13:4
**life** [5] - 50:24, 50:25, 53:20, 111:10
**light** [4] - 53:6, 133:9, 133:10, 144:3
**lighter** [1] - 120:12
**likely** [11] - 70:9, 98:16, 107:2, 107:3, 107:5, 117:21, 120:22, 121:3,

160:2, 160:11
**limb** [1] - 89:9
**limit** [3] - 36:13, 42:17, 117:6
**limitation** [1] - 52:15
**Limited** [1] - 109:9
**limited** [5] - 73:6, 75:10, 92:15, 100:1, 111:6
**limits** [2] - 108:3, 108:4
**LINDA** [1] - 4:8
**line** [2] - 52:25, 68:25
**lined** [1] - 27:19
**lines** [1] - 84:10
**link** [1] - 136:20
**Lisa** [2] - 6:18, 163:3
**list** [3] - 22:19, 36:22, 127:13
**listed** [1] - 127:12
**Liston** [4] - 127:4, 127:6, 127:9, 127:15
**literature** [2] - 130:13, 130:16
**litigation** [20] - 35:13, 51:9, 52:5, 52:9, 52:20, 72:10, 76:14, 92:21, 93:2, 97:3, 101:12, 116:2, 116:7, 133:14, 134:2, 143:25, 145:11, 145:14, 151:3
**lived** [2] - 32:14, 53:20
**LLC** [1] - 2:4
**local** [1] - 105:5
**Logan** [2] - 6:5, 6:12
**logic** [1] - 38:14
**logical** [2] - 37:13, 129:25
**long-term** [2] - 41:1, 150:16
**long-time** [1] - 69:4
**look** [32] - 24:20, 34:2, 40:18, 45:20, 48:6, 51:2, 53:6, 56:16, 76:13, 79:8, 83:4, 83:5, 83:9, 87:13, 89:25, 104:4, 105:12, 109:12, 120:18, 121:22, 123:16, 125:7, 125:24, 126:16, 127:22, 134:6, 135:1, 149:6, 149:9, 157:1, 160:16, 161:2
**Look** [1] - 32:10
**looked** [8] - 44:23, 44:24, 83:11, 87:21, 107:11, 135:12,

147:10, 149:5
**looking** [8] - 78:8, 102:22, 105:4, 105:10, 110:15, 132:2, 135:11, 155:5
**looks** [1] - 122:13
**loop** [2] - 26:25, 28:14
**Los** [1] - 134:25
**lose** [1] - 84:12
**loss** [3] - 116:25, 118:16, 119:2
**lost** [2] - 27:7, 133:22
**low** [2] - 124:6, 127:4
**lower** [2] - 63:16, 63:17
**Luken** [2] - 49:4, 147:17
**Lumber** [1] - 75:2
**Lump** [1] - 158:21
**lumped** [2] - 55:23
**lunch** [2] - 85:22, 85:23
**lung** [1] - 76:15

# M

**Mackeigan** [1] - 116:12
**Magazine** [1] - 3:7
**MAHADY** [1] - 6:4
**main** [2] - 69:12, 91:16
**MAINIGI** [2] - 4:17, 9:8
**maintain** [2] - 100:5, 100:16
**maintained** [1] - 117:23
**maintaining** [1] - 98:10
**MAJESTRO** [43] - 2:6, 85:19, 85:21, 86:1, 86:12, 86:14, 86:16, 87:11, 87:17, 88:5, 89:13, 90:25, 91:6, 91:19, 91:24, 92:12, 93:12, 93:19, 94:17, 105:17, 107:12, 107:23, 110:17, 111:1, 111:3, 111:15, 111:18, 112:10, 114:9, 115:8, 115:12, 118:5, 118:13, 118:23, 119:3, 120:8, 120:10, 120:14, 126:15, 127:21, 161:21, 161:25, 162:5
**Majestro** [10] - 2:6, 54:13, 85:20,

102:25, 105:15, 115:7, 138:11, 143:14, 157:2, 161:20
**Majestro's** [2] - 137:12, 139:11
**major** [2] - 43:13, 50:6
**majority** [8] - 38:7, 38:12, 62:16, 76:19, 93:20, 93:21, 94:9, 157:5
**manager** [1] - 64:13
**managing** [1] - 13:11
**maneuver** [1] - 51:11
**manner** [4] - 38:8, 72:2, 98:15, 120:22
**manual** [1] - 70:8
**manufacturers** [4] - 54:23, 63:22, 97:16, 118:8
**manufacturing** [1] - 94:1
**maps** [1] - 35:23
**MARK** [1] - 3:14
**market** [5] - 48:24, 53:17, 63:5, 64:10, 95:14
**marketing** [3] - 123:10, 123:11, 123:14
**Marshall** [2] - 22:17
**mass** [6] - 52:9, 92:21, 93:1, 116:2, 116:7, 130:22
**massively** [1] - 107:20
**mastermind** [1] - 43:11
**Masters** [1] - 69:25, 98:19, 98:22, 100:23, 100:24, 101:13, 102:24, 103:3, 136:16
**matched** [1] - 26:12
**math** [2] - 77:23, 125:2
**Matrix** [1] - 103:24
**matter** [15] - 16:10, 26:3, 68:15, 70:3, 71:2, 89:25, 118:20, 118:25, 123:5, 138:17, 143:23, 155:2, 157:21, 159:5, 163:5
**mattered** [1] - 26:9
**Mayor** [1] - 80:21
**Mays** [5] - 7:16, 8:23, 29:19, 99:18, 154:6
**McCann** [12] - 23:3, 26:15, 27:20, 36:5, 62:21, 62:23, 63:5,

63:9, 63:18, 64:24, 65:25, 66:14
**McCann's** [1] - 63:14
**McCloud** [1] - 64:19
**MCCLURE** [2] - 6:3, 9:7
**MCGINNESS** [1] - 4:2
**McKesson** [55] - 5:8, 45:7, 48:25, 49:5, 59:5, 59:7, 59:20, 60:8, 60:18, 60:20, 62:9, 62:14, 63:14, 64:4, 64:7, 64:14, 64:17, 65:14, 65:18, 66:16, 67:1, 67:11, 67:17, 67:24, 67:25, 68:17, 68:20, 69:7, 70:6, 70:9, 70:23, 71:13, 71:17, 71:19, 71:22, 71:24, 72:3, 72:7, 72:20, 72:24, 73:2, 73:10, 73:15, 73:18, 73:22, 73:25, 74:2, 89:4, 108:10, 146:4, 147:17, 159:14, 160:7, 160:10
**McKesson's** [34] - 59:5, 59:16, 60:16, 60:23, 61:4, 61:5, 62:16, 62:22, 62:24, 63:2, 63:4, 64:10, 64:13, 64:24, 65:15, 66:4, 66:6, 66:22, 67:6, 68:4, 68:12, 68:13, 68:16, 68:22, 68:24, 69:4, 69:6, 69:12, 70:11, 70:18, 72:1, 73:8, 73:24, 159:18
**McMicken** [1] - 117:22
**MDL** [2] - 51:14, 52:10
**mean** [17] - 32:3, 34:14, 65:17, 76:13, 78:19, 82:2, 85:9, 90:4, 93:19, 94:13, 100:21, 104:11, 107:24, 108:1, 149:13, 154:8
**meaning** [1] - 125:19
**means** [5] - 20:21, 65:10, 84:3, 89:12, 150:21
**Meanwhile** [1] - 22:24
**measure** [2] - 146:8, 146:9
**measurement** [1] - 105:3
**mechanical** [1] - 6:19
**Medicaid** [1] - 81:2

**Medical** [1] - 41:19
**medical** [15] - 11:25, 12:23, 15:3, 35:7, 50:20, 52:13, 63:22, 66:13, 72:13, 110:24, 111:4, 130:13, 130:15, 138:3, 144:17
**medically** [1] - 12:25
**Medicare** [1] - 81:2
**medication** [1] - 28:6
**medications** [2] - 27:3, 28:17
**Medicine** [11] - 12:8, 21:24, 36:10, 36:11, 36:18, 39:17, 41:7, 64:19, 64:23, 146:21, 146:23
**medicine** [5] - 13:19, 14:6, 39:25, 122:18
**medicines** [1] - 65:11
**meet** [15] - 57:10, 57:21, 58:10, 58:14, 81:18, 95:3, 95:4, 96:3, 99:14, 107:1, 119:4, 136:5, 156:23, 160:14
**meeting** [1] - 46:18
**meetings** [1] - 99:23
**meets** [3] - 55:16, 82:22, 155:24
**members** [1] - 119:20
**Memorandum** [1] - 53:3
**memory** [1] - 123:17
**mens** [1] - 95:10
**mental** [1] - 55:6
**mention** [3] - 21:13, 35:25, 47:2
**mentioned** [10] - 21:5, 36:4, 36:5, 36:6, 36:9, 64:17, 71:15, 95:8, 101:24, 156:2
**merits** [1] - 145:12
**meshes** [1] - 57:3
**mess** [3] - 110:22, 110:23, 112:21
**met** [9] - 35:21, 58:3, 88:1, 99:20, 153:5, 153:7, 155:13, 155:20, 158:4
**metaphor** [2] - 128:16, 128:17
**methodology** [2] - 42:8, 45:19
**methods** [1] - 45:14
**Metro** [1] - 17:4
**Mexican** [2] - 114:6, 129:9
**Miami** [2] - 49:4,

147:17
**Miami-Luken** [2] - 49:4, 147:17
**MICHAEL** [2] - 2:12, 3:9
**Michael** [1] - 69:5
**Michigan** [1] - 42:20
**microphone** [1] - 102:16
**middle** [3] - 90:19, 94:20, 103:24
**midst** [1] - 15:8
**midway** [1] - 83:18
**might** [13] - 9:24, 32:25, 34:12, 55:21, 74:5, 75:18, 81:21, 91:4, 99:12, 111:8, 113:13, 129:6, 142:17
**Mike** [1] - 22:12
**MILDRED** [1] - 3:3
**mill** [2] - 147:12, 147:16
**million** [8] - 51:15, 52:8, 95:15, 123:17, 123:18, 123:24, 131:9, 152:17
**millions** [7] - 54:15, 54:16, 98:17, 131:24, 134:18
**mind** [2] - 77:24, 103:13
**minds** [1] - 131:18
**mine** [1] - 153:4
**minority** [1] - 66:22
**minute** [2] - 71:15, 137:1
**minutes** [6] - 10:10, 10:12, 15:23, 24:17, 28:23, 85:14
**mirror** [1] - 26:13
**mis** [2] - 54:21, 118:20
**mis-educate** [1] - 54:21
**misapplication** [1] - 145:7
**misconduct** [4] - 24:21, 118:7, 118:21, 119:1
**mislead** [1] - 54:22
**misrepresentation** [1] - 113:9
**missed** [2] - 22:22, 118:23
**Mississippi** [1] - 134:3
**misspeaking** [1] - 50:23
**misuse** [3] - 18:21, 18:22, 144:11
**misused** [1] - 18:19

Mitchell [1] - 2:10
**mix** [1] - 156:10
**mixed** [2] - 27:7, 105:18
**mixing** [2] - 156:6, 156:7
**MLP** [3] - 157:7, 157:18, 159:7
**MLP's** [1] - 156:14
**model** [6] - 43:3, 77:13, 79:21, 79:22, 137:17, 154:18
**modeled** [1] - 46:14
**modification** [1] - 43:10
**modified** [2] - 43:13, 147:24
**modify** [1] - 43:7
**Mohr** [2] - 96:9, 123:10
**molecule** [6] - 122:9, 122:10, 130:20, 130:21, 130:23
**Monday** [2] - 35:17, 53:14
**Mone** [7] - 34:3, 43:7, 43:11, 44:3, 46:14, 99:18, 148:4
**Mone's** [2] - 45:21, 46:11
**monetary** [1] - 35:9, 52:16
**money** [12] - 51:18, 81:9, 97:18, 113:18, 113:20, 125:3, 157:9, 157:14, 157:22, 158:19, 158:22, 158:23
**monies** [1] - 125:18
**monitor** [3] - 101:3, 102:14, 124:12
**Monitoring** [3] - 69:9, 71:18, 109:5
**monitoring** [4] - 8:5, 104:10, 106:2, 108:9
**month** [5] - 36:25, 65:25, 103:24, 104:5
**month-by-month** [1] - 103:24
**monthly** [2] - 36:23, 150:6
**months** [2] - 29:22, 143:19
**Morgantown** [2] - 78:23, 119:18
**morning** [20] - 20:3, 33:3, 33:4, 33:6, 33:10, 33:22, 39:12, 58:24, 58:25, 59:14, 74:8, 74:9, 74:14,

87:15, 138:13, 140:19, 148:25, 150:19, 160:8, 161:23
**morphine** [1] - 103:15
**Morris** [1] - 6:15
**most** [22] - 26:10, 30:11, 41:18, 58:6, 65:12, 65:15, 79:11, 81:3, 84:13, 90:15, 123:15, 123:20, 123:21, 125:8, 129:15, 133:22, 135:4, 135:13, 135:22, 145:13, 155:25, 159:25
**mostly** [2] - 83:3, 83:17
**motion** [32] - 9:22, 10:1, 10:7, 16:1, 16:14, 33:9, 40:2, 40:10, 52:9, 56:4, 61:19, 74:13, 74:15, 86:19, 87:20, 88:1, 88:3, 88:9, 88:14, 88:16, 88:19, 89:23, 89:24, 90:9, 92:5, 93:16, 94:4, 142:14, 143:20, 152:22, 156:16
**motions** [10] - 9:25, 10:3, 10:6, 10:8, 10:15, 15:7, 94:5, 119:6, 155:19, 156:15
**Motley** [5] - 4:3, 4:5, 4:8, 4:11, 4:14
**Motors** [2] - 117:8, 117:9
**MOUGEY** [1] - 2:9
**move** [5] - 10:19, 20:4, 24:16, 74:15, 119:20
**moved** [2] - 52:1, 53:21
**MR** [117] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:14, 4:5, 4:22, 5:9, 5:10, 5:13, 6:4, 7:9, 7:15, 9:9, 9:15, 9:20, 9:23, 16:13, 16:17, 19:25, 20:2, 20:19, 23:21, 23:25, 24:8, 24:11, 27:10, 27:12, 31:10, 33:4, 33:18, 56:7, 56:17, 58:2, 58:10, 58:14, 58:15, 58:18, 58:21, 58:24, 59:1, 59:22, 74:8, 74:10, 74:13, 76:12, 76:16, 82:2, 85:9,

85:13, 85:19, 85:21, 86:1, 86:3, 86:12, 86:14, 86:16, 87:11, 87:17, 88:5, 89:13, 90:25, 91:6, 91:19, 91:24, 92:12, 93:12, 93:19, 94:17, 102:20, 105:17, 107:12, 107:23, 110:17, 111:1, 111:3, 111:15, 111:18, 112:10, 114:9, 115:8, 115:12, 118:5, 118:13, 118:23, 119:3, 120:8, 120:10, 120:14, 126:15, 127:21, 128:2, 128:7, 128:12, 128:14, 130:9, 130:11, 133:19, 134:9, 136:25, 137:3, 137:6, 137:8, 137:12, 143:10, 148:16, 148:22, 153:1, 153:8, 159:14, 161:4, 161:15, 161:21, 161:25, 162:5
**MS** [19] - 3:3, 3:6, 4:2, 4:8, 4:11, 4:13, 4:17, 4:18, 4:20, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 9:7, 9:8, 9:12, 155:14
**Mt** [3] - 4:4, 4:12, 4:15
**multi** [1] - 141:8
**multi-faceted** [1] - 141:8
**multiple** [6] - 18:13, 19:4, 19:15, 19:18, 63:20, 119:11
**municipal** [1] - 52:4
**must** [9] - 16:5, 17:5, 47:25, 50:18, 98:12, 99:6, 103:16, 117:16, 133:3
**muster** [1] - 153:11
**myth** [2] - 131:2

## N

**nail** [2] - 50:11, 50:12
**name** [3] - 36:17, 37:4, 147:6
**narcotic** [2] - 96:21, 160:3
**narcotics** [2] - 97:19, 135:9

**narrow** [1] - 118:3
**narrowly** [6] - 35:16, 53:13, 53:15, 54:9, 55:15, 55:21
**NAS** [1] - 76:6
**national** [8] - 63:11, 63:17, 102:8, 102:11, 104:4, 105:6, 108:17, 136:18
**nationwide** [4] - 42:15, 104:11, 104:12, 150:14
**nature** [3] - 86:25, 117:21, 139:6
**nearly** [3] - 59:3, 64:16, 72:6
**necessarily** [3] - 17:25, 66:22, 108:19
**necessary** [15] - 13:1, 33:16, 88:14, 95:10, 98:25, 113:12, 113:18, 114:1, 114:12, 125:6, 125:22, 125:23, 129:24, 147:1
**need** [14] - 23:4, 32:24, 33:13, 52:24, 64:9, 68:11, 85:2, 87:9, 88:1, 137:1, 146:12, 147:4, 149:19, 149:21
**needed** [6] - 12:1, 38:21, 65:13, 81:21, 82:17, 147:5
**needles** [1] - 111:13
**needs** [9] - 81:13, 81:18, 81:19, 82:9, 82:22, 84:2, 94:24, 125:25, 132:21
**negate** [1] - 129:23
**negative** [4] - 21:6, 22:9, 153:19
**negligence** [14] - 56:11, 57:2, 57:8, 57:11, 57:15, 57:23, 95:17, 95:21, 105:7, 105:10, 117:15, 120:6, 120:9, 141:15
**negligent** [1] - 95:19
**negotiated** [1] - 127:10
**neighborhood** [1] - 111:12
**net** [1] - 112:8
**never** [28] - 30:12, 36:4, 38:9, 39:4, 39:6, 46:5, 54:1, 77:20, 79:19, 79:23, 80:1, 80:5, 80:22,

81:9, 81:10, 82:8,
87:20, 113:7, 129:2,
139:15, 144:8,
144:18, 144:20,
145:12, 154:15,
157:13
**nevertheless** [1] -
160:5
**New** [3] - 3:5, 3:8,
93:22
**new** [12] - 26:5, 26:6,
30:18, 65:20, 65:23,
71:15, 71:17, 71:18,
144:12, 153:4,
159:18, 160:21
**Next** [2] - 8:7, 28:3
**next** [17] - 13:23,
14:10, 27:4, 61:9,
62:4, 69:2, 70:15,
77:2, 77:10, 79:14,
88:12, 89:15, 90:12,
109:18, 114:3,
119:15
**nice** [1] - 52:24
**Nice** [1] - 155:14
**Nicholas** [5] - 20:1,
32:23, 36:2, 37:7,
152:25
**NICHOLAS** [12] - 6:11,
20:2, 20:19, 23:21,
23:25, 24:8, 24:11,
27:10, 27:12, 31:10,
153:1, 153:8
**Night** [1] - 55:14
**nine** [1] - 150:21
**Ninth** [3] - 4:9, 51:3,
51:21
**non** [12] - 88:17, 99:4,
116:2, 127:13,
155:23, 156:15,
156:17, 156:22,
157:1, 157:15,
158:7, 159:4
**non-exhaustive** [1] -
127:13
**non-jury** [1] - 88:17
**non-parties** [1] -
156:22
**non-party** [8] - 116:2,
155:23, 156:15,
156:17, 157:1,
157:15, 158:7, 159:4
**non-suspicious** [1] -
99:4
**None** [3] - 9:8, 27:15,
27:17
**none** [5] - 26:25,
28:14, 39:15, 42:22,
155:7
**noon** [2] - 86:8, 86:9

**normal** [2] - 105:11,
112:9
**northern** [2] - 92:20,
92:22
**Northern** [3] - 101:15,
101:16, 127:2
**notable** [2] - 137:24,
140:23
**notably** [3] - 46:6,
66:14, 71:6
**note** [4] - 86:22,
90:18, 138:11,
150:18
**noted** [6] - 87:25,
88:21, 89:19, 99:24,
116:13, 121:6
**nothing** [14] - 21:6,
32:6, 64:21, 65:2,
140:1, 149:3, 150:6,
151:16, 153:17,
156:19, 156:24,
157:11, 158:2, 162:8
**notice** [1] - 71:9
**noticed** [1] - 23:18
**notices** [2] - 116:1,
156:15
**notwithstanding** [1] -
125:3
**novel** [1] - 92:5
**nuisance** [63] - 20:17,
20:20, 33:13, 33:17,
57:6, 57:23, 61:25,
74:1, 75:1, 75:3,
75:7, 75:10, 75:11,
75:14, 75:24, 78:20,
78:21, 79:3, 90:23,
91:10, 91:12, 91:23,
92:8, 92:17, 93:5,
93:24, 94:1, 94:9,
94:22, 109:25,
110:2, 110:13,
111:5, 111:19,
111:21, 112:6,
112:12, 117:19,
117:21, 117:24,
120:11, 125:17,
128:20, 132:25,
133:15, 134:1,
134:23, 135:2,
135:3, 139:17,
143:13, 144:10,
144:15, 144:19,
145:5, 145:8,
145:12, 145:17,
155:12, 155:12
**number** [24] - 25:16,
25:17, 26:2, 26:12,
26:24, 27:16, 27:18,
28:12, 38:11, 50:3,
71:4, 89:1, 93:14,

106:2, 106:25,
107:16, 108:14,
116:14, 117:24,
132:11, 141:19,
150:12, 160:13
**numbers** [4] - 62:25,
93:13, 124:7, 125:2
**numerous** [1] - 122:3
**nutshell** [1] - 24:19
**NW** [6] - 4:6, 4:9, 4:19,
4:21, 5:5, 5:12
**NY** [1] - 3:5

## O

**O'Neill** [1] - 55:13
**obesity** [3] - 91:15,
145:3, 146:1
**objected** [2] - 7:17,
89:7
**objection** [2] - 9:5, 9:7
**obligation** [5] - 101:2,
101:3, 101:4, 101:7,
137:23
**obligations** [2] -
100:11, 102:5
**observations** [1] -
137:9
**obstacle** [1] - 50:6
**obviously** [1] - 77:24
**occasion** [1] - 59:21
**occasions** [3] - 12:12,
156:12, 158:10
**occur** [4] - 15:16,
15:19, 18:14, 67:8
**occurred** [7] - 13:9,
14:19, 40:16, 54:6,
59:19, 67:20, 139:1
**occurring** [3] - 67:10,
67:23, 70:18
**OF** [2] - 1:1, 1:4
**offer** [2] - 28:3, 95:1
**offered** [4] - 9:13,
12:21, 37:10, 138:8
**offering** [1] - 67:20
**Office** [2] - 46:15,
46:17
**office** [1] - 48:15
**Official** [2] - 163:2,
163:3
**officials** [2] - 38:10,
160:20
**often** [1] - 139:18
**Ohio** [4] - 46:19,
127:3, 127:5, 128:8
**Oklahoma** [2] -
101:18, 144:2
**old** [7] - 46:4, 77:19,
95:19, 116:12,
128:10, 129:3, 155:9

**once** [8] - 91:18,
105:23, 107:9,
117:5, 118:14,
122:11, 138:7, 143:7
**Once** [2] - 14:15,
18:17
**oncology** [1] - 65:21
**one** [97] - 9:9, 11:3,
11:10, 21:21, 21:24,
22:12, 22:22, 22:24,
23:6, 26:13, 26:22,
27:19, 28:11, 30:13,
31:8, 32:11, 33:21,
34:12, 34:17, 36:8,
36:9, 36:13, 39:16,
39:18, 39:21, 40:8,
43:4, 46:14, 47:3,
47:23, 51:6, 52:24,
53:1, 53:6, 53:8,
55:23, 56:18, 56:21,
57:11, 59:21, 64:14,
64:23, 66:16, 69:7,
74:13, 74:23, 79:14,
81:24, 81:25, 82:3,
91:16, 92:14, 93:1,
96:21, 101:25,
106:3, 108:23,
110:7, 113:16,
115:13, 116:17,
118:4, 118:8,
118:20, 118:21,
118:25, 124:18,
124:19, 129:8,
132:5, 134:8,
135:21, 140:2,
141:5, 144:1, 147:7,
148:6, 148:12,
153:4, 153:12,
154:10, 155:3,
155:5, 159:14,
159:15
**One** [4] - 5:11, 20:24,
24:21, 110:11
**ones** [3] - 45:14,
48:23, 123:1
**open** [2] - 56:16,
56:17
**opening** [6] - 10:24,
20:24, 35:23, 35:24,
37:8, 136:6
**openings** [2] - 59:1,
59:13
**operated** [1] - 29:9
**operating** [1] - 118:3
**operation** [1] - 66:8
**opine** [3] - 66:17,
66:20, 66:22
**opinion** [11] - 28:4,
39:15, 48:13, 50:14,
56:13, 101:11,

127:1, 143:19,
157:5, 158:2, 158:11
**opinions** [8] - 26:17,
36:6, 67:20, 72:18,
116:5, 156:20,
156:24, 157:3
**Opioid** [3] - 41:8, 76:3,
112:17
**opioid** [44] - 11:11,
11:13, 12:9, 13:9,
15:17, 28:6, 53:18,
55:12, 57:21, 59:6,
62:10, 62:22, 63:21,
63:22, 64:8, 65:19,
66:18, 66:21, 66:23,
67:25, 76:2, 77:20,
79:20, 79:24, 92:8,
93:5, 94:7, 101:12,
110:5, 110:6,
114:23, 115:2,
117:1, 122:10,
122:12, 123:4,
124:25, 125:5,
132:20, 138:15,
139:9, 143:25,
151:23
**opioids** [39] - 12:14,
13:10, 15:21, 17:14,
17:21, 18:3, 18:7,
18:13, 18:14, 18:23,
23:13, 27:21, 34:18,
39:15, 40:25, 49:10,
53:16, 53:21, 53:24,
54:2, 63:8, 63:24,
66:15, 78:15, 79:25,
84:15, 84:18,
112:22, 115:19,
120:21, 130:4,
130:19, 134:13,
138:6, 139:9,
139:23, 140:6,
140:10, 150:15
**opium** [1] - 131:10
**opportunity** [4] -
32:21, 86:24, 87:7,
96:15
**opposing** [3] - 52:2,
87:25, 89:22
**opposite** [1] - 131:22
**oral** [1] - 116:5
**orally** [2] - 9:22, 90:6
**oranges** [2] - 156:7,
156:10
**Order** [1] - 109:4
**order** [27] - 8:4, 23:10,
23:11, 23:12, 23:16,
24:3, 45:22, 45:23,
45:24, 56:20, 60:13,
71:25, 73:13, 84:2,
84:9, 98:13, 100:4,

100:19, 101:22, 105:23, 106:2, 108:9, 109:20, 136:11, 148:4, 159:20
**ordering** [2] - 65:4, 65:19
**orders** [75] - 7:18, 7:19, 8:12, 8:19, 23:5, 34:7, 34:16, 36:14, 36:20, 36:21, 36:22, 36:25, 38:17, 42:6, 42:16, 44:12, 44:24, 45:3, 45:13, 47:17, 47:18, 47:21, 48:19, 48:20, 49:8, 60:8, 67:15, 69:13, 69:18, 69:22, 70:6, 70:9, 70:25, 71:20, 71:23, 72:3, 72:11, 72:23, 72:25, 73:5, 73:8, 73:11, 73:15, 73:20, 90:1, 98:9, 99:1, 100:1, 101:4, 101:5, 101:7, 102:6, 102:14, 106:15, 107:2, 107:4, 107:9, 107:16, 107:20, 146:16, 147:1, 148:5, 148:6, 148:14, 149:7, 149:9, 149:21, 149:24, 150:2, 152:14, 160:10, 160:14, 160:22
**Oriente** [3] - 69:5, 70:8, 160:8
**original** [1] - 86:7
**originally** [3] - 7:25, 8:7, 8:14
**Orlando** [3] - 29:21, 30:5, 155:3
**Orleans** [1] - 3:8
**otherwise** [3] - 13:19, 31:1, 110:22
**OUD** [10] - 76:21, 76:22, 76:23, 77:14, 77:25, 80:18, 81:3, 81:18, 82:18
**ought** [1] - 90:9
**ourselves** [1] - 133:8
**out-of-pocket** [1] - 134:11
**outcome** [1] - 21:20
**outgrowth** [1] - 30:17
**outline** [2] - 25:8, 90:17
**outset** [2] - 73:3, 86:22
**outside** [5] - 14:20,

28:7, 39:3, 39:10, 121:19
**over-supply** [1] - 27:25
**overall** [1] - 11:12
**overarching** [2] - 10:1, 10:6
**overcome** [2] - 136:9, 136:10
**overconsumption** [1] - 91:17
**overdoses** [1] - 131:15
**overlap** [1] - 95:18
**overrides** [1] - 7:18
**overturn** [1] - 116:7
**overview** [1] - 102:18
**overwhelmed** [1] - 109:8
**overwhelming** [7] - 11:2, 11:21, 12:3, 12:17, 38:6, 38:12, 76:19
**overwhelmingly** [2] - 76:1, 84:14
**own** [11] - 15:20, 25:8, 26:4, 60:13, 63:14, 83:20, 97:4, 99:8, 99:18, 134:11, 139:11
**owner** [2] - 49:2, 147:15
**oxycodone** [3] - 65:25, 104:5, 104:18

**P**

**P-1200** [1] - 2:7
**P-16639A** [2] - 8:25, 9:3
**P-23736** [1] - 98:7
**P-2819A** [2] - 8:25, 9:1
**P-44765** [2] - 7:25, 9:1
**P-44766** [2] - 8:7, 9:2
**P-44767** [2] - 8:14, 9:2
**p.m** [2] - 137:5, 162:10
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**Page** [6] - 7:21, 9:2, 9:4, 36:11, 98:11, 102:6
**pages** [1] - 50:3
**paid** [2] - 59:20, 81:10
**pain** [15] - 11:7, 12:1, 12:5, 12:10, 12:16, 13:11, 28:6, 41:1, 41:13, 41:16, 55:7, 55:9, 147:4, 150:16
**painstaking** [1] - 104:20

**paint** [11] - 134:21, 134:22, 134:24, 135:1, 135:5, 135:21, 144:21, 144:22, 144:23, 145:2, 145:6
**paints** [1] - 29:6
**panel** [4] - 52:9, 92:21, 93:2, 116:3
**panel's** [1] - 116:7
**panhandle** [2] - 92:21, 92:22
**Papantonio** [1] - 2:10
**paper** [1] - 161:19
**papers** [2] - 53:4, 77:5
**paradigm** [1] - 142:16
**paradigms** [1] - 135:20
**paragraphs** [1] - 51:7
**paraphrase** [1] - 146:6
**parens** [1] - 152:17
**parents** [1] - 134:23
**parked** [2] - 119:19
**parking** [1] - 119:25
**part** [29] - 20:11, 21:3, 29:1, 38:9, 42:3, 46:10, 57:6, 61:13, 62:14, 63:2, 67:1, 67:5, 67:6, 67:7, 70:21, 73:21, 77:21, 80:18, 96:15, 111:2, 113:23, 114:24, 124:12, 132:3, 135:4, 135:13, 135:22, 155:6, 158:5
**partial** [7] - 10:20, 20:5, 30:9, 74:16, 88:10, 88:22, 137:15
**partially** [1] - 83:3
**participant** [1] - 124:10
**participation** [1] - 123:11
**particular** [6] - 13:1, 16:8, 19:6, 102:10, 104:4, 137:24
**particularly** [3] - 31:2, 96:11, 162:3
**parties** [9] - 9:6, 10:16, 19:10, 57:20, 123:5, 142:21, 142:22, 156:22, 161:16
**parties'** [1] - 89:22
**partner** [3] - 58:3, 153:4
**partners** [2] - 93:25
**parts** [3] - 74:18, 110:7, 117:2
**party** [14] - 87:25,

88:16, 116:2, 126:21, 134:17, 137:14, 155:23, 156:15, 156:17, 157:1, 157:15, 158:7, 159:4, 160:1
**pass** [2] - 19:23, 111:17
**past** [10] - 20:13, 73:23, 76:25, 78:7, 86:18, 94:3, 118:14, 119:5, 156:23
**patience** [1] - 128:2
**patient** [2] - 13:1, 39:18
**patient's** [1] - 40:6
**patients** [3] - 38:21, 147:2, 149:18
**patriae** [1] - 152:18
**pattern** [1] - 103:21
**patterns** [1] - 65:4
**PAUL** [2] - 2:3, 5:9
**Pause** [2] - 58:23, 127:20
**pause** [1] - 30:3
**pay** [7] - 55:4, 80:14, 80:17, 81:1, 81:10, 82:1, 110:24
**payers** [1] - 134:17
**paying** [2] - 126:2, 126:5
**payment** [2] - 127:8, 127:12
**payments** [1] - 142:23
**pays** [1] - 81:3
**peaked** [3] - 26:16, 26:17, 26:18
**PEARL** [1] - 3:6
**pejorative** [1] - 41:3
**pend** [1] - 159:19
**Pensacola** [1] - 2:11
**people** [48] - 44:6, 44:8, 55:7, 63:23, 75:21, 76:7, 76:15, 76:21, 76:23, 77:14, 77:25, 78:1, 78:4, 78:6, 78:8, 78:17, 79:7, 79:9, 79:19, 79:24, 80:4, 80:5, 84:15, 84:21, 97:15, 97:16, 111:17, 111:22, 112:1, 112:11, 112:16, 112:20, 112:22, 113:13, 113:22, 114:1, 114:16, 125:19, 126:2, 126:3, 126:23, 129:1, 131:11, 131:13, 131:25,

135:16, 139:22, 152:1
**per** [2] - 26:24, 65:25
**percent** [31] - 21:21, 21:24, 25:17, 38:12, 38:14, 39:20, 41:20, 42:5, 42:6, 45:7, 48:17, 49:15, 62:22, 63:6, 63:16, 63:17, 64:5, 72:11, 82:5, 82:8, 82:9, 82:18, 113:19, 113:21, 123:24, 125:5, 140:8, 150:11, 152:12, 152:13
**percentage** [1] - 78:3
**percentages** [2] - 124:5, 124:6
**perfect** [1] - 68:16
**perfectly** [2] - 65:7, 76:24
**performing** [1] - 42:24
**perhaps** [4] - 54:16, 67:18, 129:1, 142:15
**period** [18] - 26:23, 29:15, 33:25, 37:19, 40:24, 41:22, 54:5, 70:5, 71:14, 72:19, 72:21, 73:10, 73:18, 103:16, 106:17, 107:13
**periods** [3] - 42:14, 69:11, 107:19
**permission** [3] - 87:12, 90:19, 115:21
**permits** [1] - 117:11
**permitting** [1] - 117:17
**Perry** [2] - 22:12, 154:6
**person** [17] - 21:14, 22:10, 22:15, 22:16, 26:24, 28:19, 43:10, 46:13, 100:18, 109:25, 111:6, 113:6, 122:12, 129:2, 129:5, 155:15
**personal** [5] - 50:21, 50:25, 133:5, 133:16, 134:11
**personnel** [1] - 154:17
**persons** [1] - 117:24
**persuasive** [2] - 88:2, 88:11
**pervasive** [1] - 41:1
**PETER** [1] - 2:9
**Pharma** [1] - 146:22
**pharma** [1] - 38:3
**Pharmaceutical** [4] - 98:19, 98:22,

102:24, 103:4
**pharmaceutical** [1] -
131:10
**Pharmaceuticals** [2] -
70:3, 98:6
**pharmacies** [29] -
13:18, 23:6, 38:15,
38:18, 64:11, 66:1,
68:18, 73:1, 97:17,
99:22, 100:2,
103:22, 103:25,
104:7, 104:15,
104:21, 105:2,
106:20, 106:21,
108:7, 108:8,
122:22, 122:23,
123:21, 123:23,
124:3, 124:10,
132:15, 147:2
**pharmacist** [1] - 43:11
**pharmacists** [2] -
22:21, 147:15
**pharmacy** [45] - 14:8,
14:13, 18:15, 18:16,
36:1, 36:3, 36:9,
36:17, 36:19, 37:1,
37:5, 39:4, 39:6,
39:19, 39:20, 43:25,
45:13, 47:1, 48:11,
49:2, 49:11, 49:13,
49:14, 64:15, 64:19,
65:1, 65:9, 65:10,
66:12, 67:10, 67:21,
67:24, 100:14,
146:16, 147:7,
147:9, 147:11,
148:12, 149:8,
149:19, 149:25,
152:14
**Pharmacy** [9] - 23:1,
49:1, 64:19, 64:20,
66:11, 147:13,
147:15, 148:13,
149:10
**pharmacy's** [2] -
39:21, 40:6
**Philadelphia** [2] - 6:6,
6:13
**phone** [1] - 46:17
**phonetic** [1] - 117:22
**physician** [1] - 15:16
**physicians** [1] - 38:7
**picture** [1] - 29:7
**pieces** [2] - 48:23,
136:21
**PIFKO** [1] - 3:14
**pill** [7] - 34:17, 39:3,
39:4, 39:7, 129:3,
147:12, 147:16
**pillar** [2] - 37:8, 59:14

**Pills** [1] - 18:19
**pills** [44] - 10:23,
10:24, 11:3, 13:3,
13:4, 13:17, 14:7,
14:12, 14:15, 14:18,
18:17, 18:18, 24:10,
25:14, 25:16, 26:2,
26:12, 26:13, 26:24,
27:16, 27:18, 28:12,
30:6, 39:24, 48:20,
49:5, 59:11, 95:15,
95:16, 102:9, 105:5,
108:14, 120:25,
121:4, 121:23,
121:24, 123:18,
123:24, 123:25,
131:9, 131:24,
132:11, 132:16,
138:15
**pipe** [1] - 128:21
**Pistilli** [3] - 58:3,
58:17, 58:21
**PISTILLI** [8] - 58:10,
58:14, 58:18, 58:21,
58:24, 59:1, 59:22,
159:14
**pitcher** [1] - 33:1
**pizza** [1] - 119:18
**place** [13] - 41:25,
69:7, 71:23, 72:8,
73:7, 82:13, 106:5,
106:18, 109:18,
114:5, 122:19,
135:1, 159:19
**placed** [2] - 72:25,
73:8
**places** [2] - 106:15,
108:19
**placing** [1] - 100:18
**Plaintiff** [5] - 1:5, 1:11,
2:2, 3:2, 4:1
**plaintiff** [9] - 7:11,
51:9, 53:12, 62:4,
67:9, 84:6, 120:3,
155:24, 158:4
**plaintiffs** [108] - 9:16,
10:19, 10:22, 12:21,
13:2, 13:16, 13:20,
13:25, 16:21, 19:16,
21:14, 22:2, 22:23,
23:9, 23:17, 24:4,
25:1, 25:11, 25:25,
28:25, 29:23, 31:11,
33:11, 35:5, 35:12,
37:7, 38:23, 41:9,
41:14, 46:4, 47:14,
47:25, 49:10, 49:17,
50:19, 51:15, 51:17,
51:24, 52:20, 54:11,
55:18, 57:2, 57:10,

59:4, 59:13, 59:18,
60:15, 60:20, 61:10,
61:20, 62:1, 62:8,
62:12, 64:6, 64:17,
64:20, 65:3, 66:25,
67:4, 67:7, 67:24,
68:13, 68:21, 70:11,
71:3, 71:6, 74:22,
76:14, 77:3, 78:8,
78:19, 79:1, 79:5,
79:14, 83:21, 85:17,
86:17, 88:9, 129:1,
138:8, 139:6,
139:15, 139:20,
140:7, 141:13,
141:20, 142:4,
143:4, 144:6,
145:22, 146:25,
147:6, 148:23,
151:2, 153:11,
153:17, 155:20,
156:12, 156:23,
157:8, 157:18,
157:21, 157:23,
158:10, 158:16,
158:18, 159:7,
159:24
**Plaintiffs** [3] - 7:22,
31:12, 163:6
**plaintiffs'** [42] - 7:15,
10:14, 10:20, 11:10,
13:5, 14:18, 15:20,
17:20, 18:2, 18:19,
19:11, 23:3, 23:8,
27:15, 28:15, 35:23,
35:24, 46:10, 49:21,
50:9, 59:1, 59:9,
60:13, 62:15, 63:3,
64:1, 67:22, 68:4,
68:5, 69:12, 72:21,
74:16, 74:19, 76:1,
80:11, 85:4, 140:2,
141:2, 142:14,
143:7, 156:3, 158:24
**plan** [36] - 9:25, 25:2,
35:17, 50:24, 50:25,
53:11, 53:14, 53:19,
53:22, 53:25, 54:3,
54:4, 54:7, 54:15,
54:23, 55:1, 55:18,
56:2, 68:5, 78:3,
79:18, 80:12, 80:16,
80:19, 80:24, 86:7,
112:16, 112:18,
113:9, 113:25,
114:7, 124:15,
129:16, 144:17
**planning** [2] - 10:8,
10:14
**plant** [1] - 129:20

**play** [2] - 155:24,
158:7
**played** [1] - 63:21
**Pleasant** [3] - 4:4,
4:12, 4:15
**pleasure** [1] - 33:5
**plenary** [1] - 52:3
**Plus** [5] - 49:1,
147:13, 147:14,
148:13, 149:10
**poach** [1] - 48:24
**pocket** [1] - 134:11
**pod** [1] - 134:5
**point** [59] - 12:20,
13:22, 15:18, 15:19,
17:24, 18:2, 18:8,
19:12, 55:17, 59:10,
59:23, 60:1, 60:4,
67:18, 68:10, 70:4,
71:7, 71:21, 73:3,
74:22, 77:2, 77:10,
77:18, 86:5, 102:16,
102:21, 108:23,
112:6, 113:4, 114:3,
115:25, 122:22,
123:8, 123:15,
124:17, 125:10,
127:23, 137:13,
138:17, 138:23,
139:2, 139:15,
139:17, 140:21,
140:24, 141:21,
142:13, 151:3,
153:5, 154:10,
155:10, 158:11,
158:13, 159:2,
159:14, 159:15,
159:21
**point-by-point** [1] -
127:23
**pointed** [5] - 15:2,
108:16, 153:18,
154:21, 156:8
**Pointing** [1] - 151:7
**pointing** [3] - 25:11,
25:25, 151:20
**points** [12] - 15:14,
30:4, 59:24, 84:13,
84:22, 84:23, 85:3,
137:8, 137:10,
137:21, 138:21,
140:3
**poisoning** [2] -
134:24, 135:7
**police** [2] - 44:4, 97:25
**policies** [3] - 106:18,
108:1, 108:21
**policy** [4] - 12:7,
71:23, 160:12,
160:21

**political** [1] - 30:2
**pollutants** [4] - 75:16,
75:18, 75:19, 128:21
**polluted** [3] - 81:23,
82:4, 110:25
**polluting** [3] - 81:24,
128:18, 128:21
**pollution** [7] - 82:5,
82:8, 110:19,
110:21, 111:8, 111:9
**Polster's** [3] - 101:11,
101:19, 127:2
**Ponc** [1] - 2:4
**Ponce** [1] - 2:14
**pond** [9] - 111:19,
111:20, 128:18,
128:21, 128:25,
129:1, 129:5,
129:18, 130:2
**pool** [3] - 111:21,
128:8, 128:15
**pools** [1] - 112:11
**poor** [1] - 122:12
**population** [2] - 77:22,
124:7
**pork** [2] - 91:17, 96:19
**portion** [2] - 52:17,
90:19
**Portsmouth** [1] -
128:8
**posed** [1] - 70:7
**position** [3] - 141:2,
143:24, 144:3
**positive** [4] - 22:24,
29:7, 31:2, 31:3
**possible** [4] - 51:14,
57:14, 127:12,
147:14
**possibly** [4] - 60:7,
60:17, 61:25, 67:24
**post** [1] - 55:10
**post-2007** [1] - 43:1
**post-2008** [2] - 72:19,
72:21
**post-2012** [1] - 73:18
**post-date** [1] - 55:10
**posture** [1] - 56:15
**pot** [1] - 55:23
**potential** [1] - 107:16
**potentially** [3] - 71:19,
101:5, 107:16
**Powell** [1] - 2:6
**power** [7] - 34:24,
35:3, 35:9, 41:4,
50:6, 52:3, 56:2
**powerful** [3] - 12:20,
42:1, 82:12
**PR** [2] - 2:5, 2:14
**practice** [4] - 13:10,
42:21, 69:15, 103:17

**pre** [3] - 15:7, 16:1, 55:9
**pre-2007** [2] - 33:25, 42:14
**pre-2008** [1] - 70:12
**pre-dates** [1] - 55:9
**pre-trial** [2] - 15:7, 16:1
**preceded** [1] - 55:12
**precious** [1] - 39:8
**precipitously** [1] - 56:23
**predicate** [1] - 47:12
**premature** [2] - 88:20, 90:9
**prematurity** [1] - 137:13
**premise** [2] - 64:2, 138:14, 138:25
**premises** [1] - 22:20
**prepared** [3] - 27:1, 28:15, 91:2
**prerequisite** [1] - 88:15
**prescribe** [5] - 15:17, 15:20, 38:7, 41:1, 150:15
**prescribed** [15] - 13:18, 14:7, 14:16, 26:13, 27:2, 28:6, 28:9, 28:10, 28:12, 28:13, 28:17, 39:9, 39:14, 39:24, 140:5
**prescriber** [2] - 12:13, 16:22
**prescribers** [1] - 146:19
**prescribes** [1] - 18:16
**prescribing** [41] - 11:4, 11:22, 11:24, 12:9, 12:14, 12:19, 13:4, 13:6, 13:10, 13:17, 14:2, 15:23, 16:3, 16:9, 16:20, 17:11, 17:23, 17:25, 18:3, 26:15, 38:13, 38:15, 40:25, 41:21, 41:25, 42:5, 48:7, 48:17, 49:16, 54:19, 72:14, 118:9, 137:21, 138:6, 138:18, 139:2, 146:17, 146:18, 149:17, 150:11, 152:12
**Prescribing** [1] - 41:8
**prescription** [26] - 8:20, 17:13, 17:21, 18:7, 18:12, 18:14, 18:23, 23:13, 27:21,

34:18, 39:7, 54:1, 54:2, 63:8, 63:24, 66:15, 79:19, 79:23, 79:25, 113:8, 115:19, 129:2, 130:4, 130:19, 138:15, 147:3
**prescriptions** [25] - 8:5, 8:13, 11:12, 11:15, 11:20, 21:21, 25:18, 26:22, 27:19, 37:18, 38:3, 38:16, 38:18, 38:21, 39:18, 39:21, 41:11, 41:17, 42:10, 66:12, 132:17, 132:19, 149:18, 150:13
**present** [8] - 30:19, 33:8, 62:10, 73:25, 86:17, 98:20, 153:11, 158:21
**present-day** [1] - 62:10
**presentation** [3] - 24:17, 43:2, 116:5
**presentations** [3] - 30:22, 100:7, 154:16
**presented** [19] - 12:7, 13:21, 13:22, 25:22, 35:17, 46:20, 63:9, 74:24, 77:8, 88:9, 112:15, 112:18, 124:3, 124:13, 124:15, 124:25, 137:20, 139:21, 143:1
**presenting** [1] - 36:7
**presumably** [1] - 40:9
**pretty** [6] - 65:13, 121:1, 133:3, 136:20, 146:7, 148:20
**prevailing** [3] - 12:1, 39:10, 146:17
**prevent** [1] - 124:12
**preventing** [2] - 60:25, 75:17
**previously** [3] - 8:24, 9:12, 142:13
**prima** [1] - 117:5
**principal** [1] - 72:22
**principle** [5] - 35:15, 51:4, 53:11, 80:2, 80:11
**private** [6] - 57:6, 57:17, 109:24, 125:19, 145:21, 145:24
**probative** [1] - 63:13
**problem** [28] - 42:12,

52:14, 53:10, 59:7, 62:10, 64:8, 82:10, 109:22, 112:7, 112:13, 113:1, 113:12, 114:8, 116:18, 116:21, 123:7, 124:16, 124:23, 125:13, 125:14, 125:15, 125:20, 126:3, 126:23, 141:9, 143:1, 149:4, 149:13
**problematic** [1] - 68:17
**problems** [12] - 88:13, 91:16, 96:25, 108:3, 110:14, 111:11, 111:12, 114:25, 121:21, 123:21, 131:25
**procedural** [1] - 88:13
**proceed** [5] - 20:1, 51:10, 86:14, 94:5, 137:7
**proceeded** [2] - 15:16, 94:3
**Proceedings** [2] - 6:19, 137:5
**proceedings** [1] - 163:5
**PROCEEDINGS** [1] - 7:1
**Proctor** [1] - 2:10
**produce** [2] - 106:10, 130:23
**produced** [8] - 6:19, 7:25, 8:7, 8:14, 46:3, 105:13, 123:3, 123:8
**produces** [1] - 118:21
**product** [6] - 30:6, 61:24, 80:4, 121:18, 133:11, 162:2
**products** [10] - 32:12, 80:1, 91:17, 96:24, 97:10, 100:9, 144:11, 144:12, 145:6, 145:8
**professional** [2] - 49:24, 146:22
**Program** [2] - 69:9, 71:18
**program** [23] - 29:9, 29:11, 30:18, 31:1, 55:14, 71:19, 72:2, 72:3, 73:19, 82:18, 98:16, 104:10, 113:14, 113:19, 113:21, 114:5, 114:11, 115:23, 125:22, 153:22,

154:16, 154:18, 154:24
**programs** [21] - 21:10, 54:18, 55:11, 61:6, 71:16, 80:15, 80:17, 80:18, 80:23, 81:1, 81:9, 81:15, 81:21, 82:12, 83:1, 83:2, 83:6, 83:16, 108:17, 153:15
**projecting** [1] - 112:7
**promise** [1] - 159:15
**prongs** [2] - 74:19, 79:11
**proof** [14] - 20:10, 32:5, 34:11, 34:14, 35:23, 37:14, 44:19, 46:10, 54:11, 73:25, 78:9, 146:5, 148:23, 155:20
**proper** [4] - 15:11, 54:19, 116:16, 131:19
**proposal** [2] - 87:14
**proposed** [1] - 90:1
**proposing** [1] - 113:10
**proposition** [3] - 59:15, 141:9, 160:1
**protocol** [1] - 99:5
**proud** [1] - 86:17
**prove** [30] - 10:21, 33:12, 33:14, 33:18, 34:1, 34:13, 47:8, 47:25, 57:6, 57:19, 59:2, 59:4, 61:22, 62:5, 62:8, 64:7, 67:1, 67:5, 67:25, 71:3, 74:16, 79:5, 117:16, 146:12, 146:13, 149:15, 149:19, 150:17, 156:1
**proved** [5] - 49:25, 50:1, 56:1, 122:2, 132:22
**proven** [6] - 49:17, 49:18, 55:25, 68:21, 121:8, 121:10
**provide** [8] - 10:15, 16:19, 54:8, 73:6, 83:21, 84:1, 122:14, 147:8
**provided** [8] - 8:22, 42:9, 71:15, 81:16, 83:15, 93:6, 104:2, 145:14
**provider** [1] - 127:11
**provides** [2] - 71:12, 89:14

**providing** [2] - 71:9, 132:18
**province** [1] - 154:2
**proving** [2] - 35:22, 79:1
**provision** [2] - 97:3, 161:11
**proximate** [42] - 10:2, 10:21, 14:23, 15:4, 15:12, 16:9, 16:23, 17:3, 17:5, 17:12, 18:6, 18:7, 19:4, 19:10, 19:19, 20:7, 25:19, 34:11, 47:12, 49:18, 49:23, 56:1, 85:3, 114:13, 115:15, 119:12, 120:5, 137:22, 138:2, 138:9, 138:23, 139:4, 140:14, 140:15, 140:18, 140:22, 141:3, 153:13, 156:1, 156:3, 158:9
**public** [31] - 33:13, 33:15, 57:24, 61:25, 75:1, 75:3, 75:11, 75:24, 93:24, 94:1, 109:25, 110:2, 110:3, 112:14, 112:24, 117:19, 128:19, 132:24, 133:4, 133:7, 134:1, 134:22, 135:2, 135:3, 139:17, 145:17, 145:18, 145:20, 145:23, 155:25, 157:12
**pull** [1] - 119:9
**punctuated** [1] - 49:24
**punted** [1] - 136:7
**purchase** [1] - 37:2
**purchasers** [1] - 18:25
**Purdue** [2] - 53:17, 146:22
**purely** [1] - 25:17
**purport** [2] - 81:14, 83:4
**purported** [1] - 61:1
**purpose** [3] - 33:22, 51:11, 51:13
**purposeful** [2] - 95:15, 95:16
**purposes** [4] - 61:19, 94:23, 104:3, 134:9
**pursuant** [3] - 20:5, 146:17, 146:18
**push** [1] - 85:17
**put** [15] - 17:2, 20:25, 38:11, 53:2, 72:8,

86:18, 90:6, 97:12, 114:5, 121:18, 129:5, 132:1, 136:6, 159:8, 159:19
**puts** [1] - 134:7
**putting** [3] - 18:10, 84:22, 129:1

## Q

**quadrupled** [1] - 130:5
**quality** [4] - 148:20, 153:14, 153:15, 154:1
**quantities** [1] - 103:15
**quantity** [1] - 88:8
**quarterly** [1] - 36:23
**quasi** [1] - 42:2
**questioning** [3] - 7:15, 34:8, 44:15
**questions** [14] - 34:23, 34:25, 36:16, 44:23, 47:14, 47:24, 61:24, 68:6, 91:1, 94:13, 105:14, 128:3, 139:5, 143:8
**quick** [1] - 27:13
**quick-witted** [1] - 27:13
**quickly** [4] - 51:14, 79:17, 137:12, 159:21
**Quinones** [1] - 128:15
**quintupled** [1] - 130:5
**quite** [20] - 35:2, 35:18, 46:11, 50:3, 59:17, 65:17, 75:8, 75:15, 78:2, 78:20, 82:12, 82:13, 133:23, 140:1, 140:12, 140:23, 141:12, 142:2, 143:15, 144:22
**quota** [6] - 38:20, 41:21, 102:7, 102:8, 102:11, 150:13
**quotas** [2] - 101:24, 102:3
**quotation** [4] - 15:15, 19:7, 75:2, 75:8
**quote** [9] - 66:1, 66:17, 67:19, 70:22, 71:9, 72:25, 87:22, 146:7
**quotes** [3] - 73:12, 73:13, 90:4
**quoting** [1] - 117:13

## R

**Rafalski** [40] - 11:17, 12:21, 14:11, 21:8, 23:8, 34:4, 36:8, 36:11, 38:5, 40:8, 42:9, 42:12, 42:18, 42:23, 43:9, 43:16, 44:16, 46:1, 47:23, 49:7, 62:23, 66:5, 66:17, 66:20, 67:19, 69:19, 69:21, 71:22, 72:5, 72:9, 72:12, 72:17, 103:1, 103:2, 105:18, 106:11, 107:4, 148:4, 149:1, 160:20
**Rafalski's** [5] - 46:23, 63:1, 105:20, 106:6, 107:15
**Rafferty** [1] - 2:10
**raise** [2] - 96:2, 150:13
**raised** [4] - 103:7, 108:5, 137:16, 156:4
**raises** [1] - 41:21
**range** [2] - 85:14, 112:9
**Rannazzisi** [26] - 11:14, 12:24, 14:11, 21:11, 28:19, 31:11, 31:13, 32:10, 38:11, 38:19, 67:13, 69:24, 73:4, 97:19, 97:23, 98:23, 99:17, 100:10, 100:17, 102:25, 106:25, 136:2, 152:4, 160:20
**Rannazzisi's** [2] - 98:11, 152:1
**rare** [1] - 114:21
**rather** [10] - 24:9, 51:12, 51:16, 77:11, 85:17, 90:14, 133:5, 144:7, 162:1, 162:2
**ratio** [2] - 65:4, 65:17
**re** [9] - 33:21, 54:18, 56:23, 57:8, 57:9, 57:22, 57:23, 61:15, 61:23
**re-educate** [1] - 54:18
**re-visit** [7] - 33:21, 56:23, 57:9, 57:22, 57:23, 61:15, 61:23
**re-visits** [1] - 57:8
**rea** [1] - 95:10
**reach** [3] - 68:11, 81:25, 85:2
**reaching** [1] - 129:15
**read** [7] - 7:13, 23:4, 102:1, 103:11, 103:12, 128:9, 161:14
**reading** [2] - 135:18, 161:2
**real** [2] - 132:22, 134:20
**really** [24] - 17:17, 25:12, 25:25, 33:10, 59:17, 68:10, 74:19, 77:9, 78:5, 84:13, 84:22, 90:8, 91:10, 108:1, 110:15, 134:21, 136:4, 143:2, 144:2, 153:8, 153:9, 154:8, 155:23, 156:8
**realm** [1] - 112:25
**reason** [23] - 14:14, 37:6, 40:14, 42:12, 49:14, 67:2, 74:2, 84:24, 87:8, 97:8, 98:2, 103:5, 114:16, 121:24, 122:18, 126:6, 126:8, 127:3, 130:19, 135:8, 135:21, 142:1, 160:2
**reasonable** [7] - 96:3, 105:4, 113:20, 146:8, 146:10, 152:20
**reasonableness** [5] - 47:9, 62:3, 154:13, 154:22, 155:5
**reasonably** [6] - 79:2, 85:10, 106:3, 112:24, 146:5, 150:23
**reasoned** [4] - 15:10, 83:22, 90:3
**reasoning** [2] - 17:22, 19:13
**reasons** [7] - 40:13, 56:4, 56:18, 60:6, 72:17, 73:5, 86:20
**rebut** [1] - 136:24
**rebuttal** [4] - 10:10, 10:12, 85:8, 85:14
**receive** [1] - 109:7
**received** [2] - 71:20, 103:17
**receiving** [2] - 52:18, 142:23
**recent** [3] - 97:3, 156:13, 159:3
**recently** [1] - 155:17
**Recess** [4] - 33:2, 74:7, 86:13, 137:4
**recessed** [1] - 162:10
**recognize** [2] - 40:23, 121:17

**recognized** [5] - 24:5, 117:13, 117:20, 144:10, 150:10
**recognizes** [2] - 84:5, 89:24
**recognizing** [1] - 38:6
**recommended** [1] - 154:19
**reconsideration** [1] - 159:6
**reconsidering** [2] - 56:14, 156:25
**record** [40] - 7:13, 8:21, 8:22, 11:24, 13:15, 14:22, 15:9, 16:3, 16:20, 17:23, 20:15, 20:16, 46:5, 68:1, 69:14, 71:24, 72:1, 73:7, 73:21, 79:4, 90:3, 90:5, 90:10, 95:13, 100:12, 101:9, 105:2, 107:13, 107:24, 108:24, 109:16, 115:24, 130:7, 135:25, 155:1, 157:20, 157:24, 160:24, 163:5
**recorded** [1] - 6:19
**records** [5] - 46:3, 105:13, 106:7, 106:13
**recover** [3] - 57:2, 77:4, 81:9
**recoverable** [1] - 158:17
**recovery** [1] - 77:11
**red** [2] - 22:22, 65:5
**reduce** [1] - 11:7
**reducio** [2] - 129:15, 131:23
**reduction** [1] - 158:20
**Reed** [2] - 6:4, 6:11
**refer** [1] - 100:7
**reference** [6] - 39:12, 70:17, 104:18, 104:19, 137:20, 137:25
**referenced** [4] - 9:1, 9:3, 61:14, 61:17
**references** [2] - 81:4, 142:10
**referred** [3] - 50:23, 59:13, 103:23
**refile** [1] - 143:23
**reflect** [2] - 11:5, 16:25
**reflected** [3] - 13:7, 14:10, 75:8

**reflects** [2] - 13:14, 141:2
**regard** [1] - 105:7, 153:19, 153:20
**regarding** [4] - 71:16, 99:19, 106:6, 108:7
**regardless** [3] - 50:15, 105:9, 151:23
**regional** [2] - 64:13, 105:5
**registered** [1] - 100:15
**registrant** [1] - 100:19
**registrants** [5] - 96:13, 97:18, 97:23, 98:3, 160:21
**regulations** [3] - 69:17, 97:5, 160:16
**regulator** [21] - 21:12, 25:7, 26:4, 26:10, 31:4, 32:11, 43:11, 154:23
**regulators** [4] - 42:2, 47:7, 63:23
**regulatory** [4] - 71:15, 97:3, 99:12, 160:14
**Regulatory** [1] - 69:5
**reimbursed** [1] - 134:14
**reinforcement** [1] - 31:3
**reinforcing** [1] - 100:11
**rejected** [2] - 92:1, 127:7
**rejecting** [1] - 93:7
**relate** [1] - 72:22
**related** [8] - 10:3, 10:7, 12:21, 55:5, 75:13, 78:17, 159:14, 159:21
**relating** [2] - 66:8, 67:14
**relationship** [1] - 16:6
**relative** [1] - 59:17
**relatively** [2] - 65:4, 130:11
**released** [1] - 7:18
**relevant** [3] - 21:12, 61:6, 68:23
**relief** [29] - 10:7, 32:25, 35:4, 35:6, 35:9, 35:10, 35:16, 50:7, 52:4, 52:13, 52:16, 52:17, 53:12, 74:21, 81:1, 84:3, 84:7, 84:9, 85:1, 139:19, 143:4, 144:19, 144:20, 144:23, 151:12, 157:10, 157:13,

157:14
**relies** [2] - 51:4, 97:23
**relieve** [1] - 100:4, 100:15
**rely** [1] - 100:18
**remaining** [1] - 66:16
**remand** [1] - 101:15
**remarks** [1] - 141:23
**remedial** [4] - 78:3, 79:18, 80:19, 80:24
**remedies** [5] - 51:10, 54:9, 54:25, 55:5, 144:15
**remedy** [56] - 35:4, 35:5, 35:16, 50:3, 50:8, 50:18, 51:20, 51:24, 52:11, 53:13, 74:17, 74:24, 75:10, 76:1, 76:10, 76:20, 77:7, 77:9, 77:19, 78:7, 78:11, 78:16, 79:7, 79:12, 79:15, 80:3, 80:7, 81:7, 82:24, 83:14, 83:23, 84:14, 84:15, 84:21, 84:22, 85:4, 116:16, 139:6, 139:21, 140:7, 140:9, 140:11, 144:15, 151:6, 151:10, 151:16, 151:21, 152:6, 152:20, 157:9
**remember** [10] - 7:7, 38:19, 62:15, 77:16, 80:20, 107:8, 123:22, 128:10, 148:19, 152:1
**remind** [3] - 22:14, 144:5, 153:20
**reminded** [2] - 120:14, 143:17
**remote** [11] - 17:5, 17:18, 18:8, 18:11, 54:25, 118:20, 118:25, 121:11, 138:18, 140:24, 142:8
**remotely** [2] - 64:21, 65:2
**remoteness** [6] - 17:1, 17:3, 119:4, 120:17, 140:17, 140:21
**removing** [1] - 75:19
**render** [2] - 89:17, 89:20
**rendered** [1] - 39:15
**repeat** [1] - 37:22
**replace** [3] - 8:24, 9:2, 102:13
**replaced** [1] - 69:8

**replaces** [1] - 9:1
**replicate** [3] - 102:23, 136:17, 136:19
**Report** [1] - 66:11
**report** [7] - 36:13, 36:14, 36:15, 37:2, 72:25, 101:7, 102:5
**reported** [15] - 7:19, 8:12, 8:19, 23:5, 23:10, 23:12, 34:16, 36:24, 47:21, 49:8, 49:11, 49:20, 144:14, 163:9
**Reporter** [6] - 6:17, 6:18, 163:3, 163:12
**reporter** [1] - 7:12
**REPORTER** [1] - 7:14
**reporters** [1] - 32:24
**reporting** [14] - 23:17, 24:4, 26:4, 42:16, 42:17, 60:5, 60:6, 60:8, 60:10, 72:23, 73:20, 100:3, 107:20, 150:2
**reports** [4] - 36:13, 41:20, 42:17, 99:1
**representative** [1] - 22:13
**representing** [1] - 93:8
**republic** [1] - 151:5
**request** [6] - 8:3, 8:10, 8:17, 139:19, 157:14, 158:24
**requested** [1] - 157:13
**requesting** [1] - 157:8
**require** [4] - 48:8, 95:9, 127:11, 136:5
**required** [8] - 48:12, 88:8, 95:2, 95:3, 106:12, 119:12, 120:4
**requirement** [4] - 17:1, 46:6, 69:20, 70:1
**requirements** [2] - 46:7, 102:13
**requires** [2] - 19:17, 99:12
**research** [1] - 48:9
**reserve** [1] - 85:13
**reserved** [1] - 85:7
**resident** [1] - 152:18
**resolution** [1] - 128:4
**resolve** [1] - 138:22
**resolved** [1] - 91:8
**resolving** [1] - 98:9
**respect** [5] - 97:21, 108:10, 108:24, 118:1, 119:7

**respectfully** [2] - 33:21, 62:11
**respects** [1] - 80:13
**respond** [4] - 86:24, 87:10, 127:23, 140:13
**responded** [1] - 139:15
**respondent** [1] - 98:15
**response** [7] - 71:17, 114:14, 114:15, 140:23, 150:12, 156:3, 161:21
**responses** [3] - 10:14, 87:5, 114:9
**responsibilities** [2] - 97:7, 109:6
**responsibility** [7] - 23:19, 24:7, 54:20, 97:20, 100:5, 117:18, 125:15
**responsible** [6] - 54:17, 96:15, 115:15, 123:2, 123:6, 123:13
**Responsible** [1] - 41:8
**responsive** [2] - 30:16, 140:2
**rest** [5] - 9:17, 64:9, 94:21, 133:1, 160:25
**Restatement** [3] - 117:13, 145:3, 145:24
**rested** [1] - 88:25
**restitution** [5] - 35:11, 51:16, 51:19, 134:10, 151:13
**restrict** [1] - 20:14
**restricted** [1] - 96:23
**rests** [1] - 7:11
**resubmission** [1] - 7:23
**result** [7] - 30:11, 79:2, 113:23, 113:24, 118:22, 120:23, 131:9
**results** [2] - 119:1, 153:23
**resumed** [1] - 137:5
**retailer** [2] - 103:9, 135:15
**retention** [1] - 46:6
**retrospect** [2] - 41:9, 41:13
**return** [1] - 10:6
**reversal** [1] - 159:6
**reverse** [1] - 42:8
**reversed** [1] - 143:20
**review** [9] - 44:17,

44:25, 45:2, 45:4, 45:11, 45:13, 45:14, 66:7, 89:9
**reviewed** [2] - 67:14, 149:2
**revisit** [2] - 143:16, 143:22
**revisiting** [3] - 143:13, 144:25, 159:3
**rhetoric** [1] - 20:13
**Rhode** [1] - 143:18
**Rice** [5] - 4:3, 4:5, 4:8, 4:11, 4:14
**rigged** [1] - 42:8
**right-hand** [2] - 19:7, 104:15
**rise** [2] - 61:25, 138:3
**risk** [3] - 55:8, 70:7, 128:4
**Rite** [10] - 65:1, 66:4, 66:6, 66:8, 66:11, 66:14, 66:18, 66:20, 66:23, 108:11
**River** [1] - 128:23
**RMR** [2] - 6:17, 6:18
**road** [1] - 55:16
**roadmap** [1] - 9:25
**ROBERT** [1] - 6:11
**Robertson** [1] - 95:20
**ROBERTSON** [1] - 3:6
**rogue** [2] - 124:2
**role** [2] - 63:21, 64:3
**roles** [1] - 109:5
**roll** [2] - 25:18, 119:22
**room** [1] - 156:11
**root** [1] - 55:5
**roughly** [1] - 52:8
**rounding** [1] - 28:22
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**rubber** [1] - 55:16
**RUBY** [1] - 4:22
**Ruby** [1] - 4:23
**ruefully** [1] - 38:2
**rule** [17] - 43:4, 87:18, 89:16, 93:21, 101:20, 101:21, 116:11, 118:14, 125:10, 126:6, 126:7, 126:8, 127:13, 137:13, 142:10, 142:12, 142:25
**Rule** [20] - 9:22, 10:3, 10:19, 20:5, 33:9, 59:8, 74:2, 74:15, 86:19, 87:20, 87:25, 88:3, 88:14, 88:15, 88:18, 88:19, 89:13,

89:23, 138:22, 161:11
**ruled** [5] - 56:13, 92:7, 92:10, 94:10, 95:9
**rules** [3] - 60:10, 97:1, 147:25
**ruling** [6] - 116:7, 116:8, 143:16, 156:14, 156:25, 159:4
**rulings** [1] - 101:19
**run** [4] - 80:15, 80:17, 81:9, 124:9
**running** [2] - 80:22, 120:1
**rush** [1] - 87:8

---

## S

**s\Ayme** [1] - 163:11
**s\Lisa** [1] - 163:11
**sa** [1] - 46:16
**Sailor** [1] - 89:18
**sale** [1] - 97:19
**sales** [4] - 22:12, 64:13, 103:22, 103:24
**Sales** [11] - 96:18, 97:9, 100:8, 102:23, 103:8, 103:14, 120:20, 121:13, 135:9, 159:23, 159:25
**SALGADO** [1] - 4:20
**salient** [1] - 103:14
**saliently** [1] - 41:18
**Sam** [1] - 128:14
**San** [3] - 2:5, 2:14, 101:17
**satisfied** [1] - 45:24
**sausage** [1] - 91:18
**saw** [5] - 12:6, 49:14, 69:3, 87:3, 150:9
**SC** [3] - 4:4, 4:12, 4:15
**scale** [1] - 11:7
**schedule** [1] - 86:7
**Schmidt** [2] - 44:23, 152:2
**SCHMIDT** [1] - 5:9
**science** [1] - 122:15
**scientific** [1] - 122:2
**scientists** [1] - 131:1
**scope** [1] - 56:9
**scorecard** [1] - 27:11
**screen** [6] - 48:4, 63:16, 66:11, 67:13, 73:12, 129:21
**Script** [8] - 65:1, 65:3, 65:8, 65:9, 65:12, 65:16, 65:18, 66:3

**scrutiny** [1] - 38:9
**seated** [1] - 42:21
**Second** [1] - 30:8
**second** [24] - 12:18, 12:23, 14:25, 18:10, 19:6, 27:2, 28:16, 34:9, 42:12, 47:10, 52:14, 57:15, 60:4, 60:5, 60:20, 72:20, 81:12, 98:19, 114:15, 123:8, 129:7, 131:14, 135:12, 139:2
**second-guess** [4] - 12:18, 12:23, 27:2, 28:16
**secondly** [2] - 35:8, 47:18
**section** [1] - 145:4
**Section** [3] - 75:9, 117:14, 145:4
**see** [24] - 27:6, 33:1, 34:3, 44:25, 45:20, 46:2, 48:6, 50:11, 54:8, 55:2, 60:23, 63:15, 67:13, 73:12, 87:8, 104:5, 128:17, 143:7, 149:9, 151:8, 155:14, 161:18, 161:22, 162:9
**seek** [8] - 35:7, 50:19, 51:15, 52:16, 74:21, 79:7, 85:1, 140:7
**seeking** [24] - 51:17, 53:3, 74:18, 74:23, 76:1, 77:7, 77:10, 77:11, 78:7, 79:14, 81:9, 84:10, 84:14, 84:20, 110:8, 116:16, 134:10, 139:7, 139:8, 139:20, 139:25, 140:8, 158:16, 158:19
**seeks** [1] - 54:16
**seem** [1] - 37:9
**self** [2] - 22:17, 66:15
**self-described** [1] - 22:17
**self-distributed** [1] - 66:15
**sell** [1] - 130:23
**selling** [4] - 103:9, 132:15, 133:11, 135:9
**sending** [1] - 149:18
**Senior** [1] - 7:2
**SENIOR** [1] - 1:17
**Sensabaugh** [1] - 5:14
**sense** [6] - 131:7,

131:11, 152:10, 152:15, 152:19, 152:21
**sent** [5] - 12:12, 37:2, 41:7, 49:2, 100:10
**sentences** [1] - 157:4
**separable** [1] - 117:17
**separate** [11] - 10:3, 10:4, 10:5, 10:6, 20:9, 55:20, 79:24, 80:3, 117:24, 141:17, 160:11
**sequelae** [1] - 131:12
**sequence** [1] - 141:14
**series** [1] - 34:23
**serious** [2] - 56:10, 61:23
**served** [1] - 70:20
**serviced** [3] - 23:2, 67:10, 67:24
**services** [1] - 81:16
**servicing** [1] - 108:20
**set** [18] - 15:11, 16:18, 36:16, 43:25, 57:5, 72:4, 72:7, 72:10, 82:12, 90:15, 97:6, 97:7, 102:7, 114:11, 141:16, 147:9, 148:3, 148:16
**setting** [2] - 43:14, 43:24
**settled** [1] - 52:7
**Settlement** [2] - 70:17, 71:11
**settlement** [5] - 60:11, 70:15, 71:8, 72:20, 72:24
**settlements** [3] - 59:23, 59:25, 60:5
**seven** [4] - 59:3, 64:16, 72:6, 89:4
**several** [3] - 12:12, 22:19, 50:23, 110:10, 116:1, 116:11, 116:14, 122:24, 145:10, 151:15, 151:18, 156:4, 158:9
**severally** [1] - 123:6
**SHANNON** [1] - 6:3
**share** [2] - 63:5, 64:10
**sheet** [2] - 7:12, 36:7
**shelters** [1] - 55:2
**shifts** [2] - 118:16, 118:19
**ship** [13] - 30:6, 45:24, 69:20, 70:1, 98:9, 100:1, 100:14, 101:5, 101:21, 102:14, 148:18,

159:20, 160:3
**shipment** [6] - 32:14, 64:20, 102:5, 105:25, 106:4, 160:5
**shipments** [18] - 26:22, 59:16, 60:16, 62:16, 62:22, 62:24, 62:25, 63:2, 63:4, 63:10, 63:15, 65:16, 66:6, 66:23, 68:17, 97:21, 106:19, 107:20
**shipped** [13] - 23:13, 26:2, 27:18, 36:21, 59:11, 63:7, 69:13, 71:24, 73:14, 107:2, 107:11, 108:15, 148:14
**shipping** [10] - 24:9, 42:16, 72:22, 73:11, 73:15, 99:4, 99:21, 100:9, 101:3, 107:9
**shocking** [2] - 81:14, 83:13
**Shoppe** [5] - 36:10, 36:11, 36:18, 64:19, 64:23
**short** [6] - 9:24, 30:9, 66:25, 98:12, 153:9, 157:2
**shoulder** [1] - 99:3
**show** [24] - 16:3, 27:25, 28:25, 31:6, 31:8, 33:24, 35:1, 36:15, 53:12, 60:15, 60:17, 62:7, 70:11, 95:22, 99:13, 104:21, 110:6, 117:6, 119:12, 120:4, 136:5, 146:25, 148:23, 149:21
**showed** [9] - 7:17, 22:19, 27:25, 28:20, 32:6, 63:14, 65:4, 110:5, 160:8
**showing** [9] - 11:19, 15:4, 16:20, 17:11, 117:5, 119:7, 126:25, 142:20, 147:8
**shown** [4] - 59:5, 62:13, 66:11, 106:20
**shows** [5] - 8:4, 8:12, 8:19, 42:9, 68:24, 69:6, 69:7, 69:14, 70:20, 107:14, 112:17, 114:19, 120:11, 121:22, 125:19

**shutdown** [1] - 155:3
**shutting** [1] - 121:24
**sic** [2] - 74:1, 161:19
**sic]** [1] - 58:12
**sick** [3] - 110:25, 111:8, 111:9
**side** [7] - 15:15, 19:7, 46:11, 78:5, 93:13, 130:13, 134:15
**sides** [3] - 26:19, 26:21, 110:17
**sight** [1] - 84:12
**sign** [4] - 31:22, 31:23, 41:13, 41:16
**significant** [1] - 69:10
**significantly** [1] - 118:11
**similar** [3] - 88:3, 91:25, 103:20
**simple** [3] - 75:15, 141:5, 141:11
**simpliciter** [1] - 61:21
**simply** [9] - 61:6, 62:3, 68:1, 68:23, 72:18, 79:6, 100:18, 146:25, 155:6
**SINGER** [1] - 4:8
**single** [22] - 21:9, 21:13, 23:10, 23:11, 35:13, 35:25, 39:3, 43:25, 47:1, 47:2, 52:21, 67:9, 69:22, 71:24, 115:2, 124:14, 141:13, 141:17, 147:7, 149:14, 151:4
**singular** [1] - 51:11
**sit** [1] - 93:22
**sitting** [10] - 34:24, 35:3, 35:8, 50:16, 56:3, 80:10, 81:5, 82:23, 83:14, 84:2
**situation** [12] - 30:18, 101:13, 115:1, 115:25, 118:1, 118:4, 118:12, 118:13, 124:24, 126:24, 133:15, 133:17
**situations** [1] - 91:13
**six** [2] - 89:4, 143:19
**sizable** [1] - 78:2
**sizeable** [2] - 157:22, 158:19
**skip** [1] - 95:25
**skipped** [2] - 27:13, 27:14
**skips** [1] - 37:13
**skyrocket** [2] - 41:11, 41:17

**slice** [1] - 33:24
**Slide** [5] - 87:19, 95:24, 96:10, 119:9, 119:15
**slide** [14] - 13:23, 14:10, 17:2, 20:25, 27:4, 28:3, 31:8, 49:19, 61:9, 69:2, 88:12, 89:15, 99:23, 119:15
**slides** [3] - 11:4, 37:21, 99:24
**slowly** [2] - 108:2
**small** [5] - 48:23, 59:17, 60:16, 64:10, 81:20
**Smith** [4] - 6:4, 6:11, 17:4, 143:18
**Smithfield** [1] - 91:22
**smoking** [1] - 76:15
**snippet** [1] - 29:23
**so-called** [5] - 51:20, 76:20, 97:7
**social** [2] - 91:15, 141:9
**societal** [1] - 111:11
**society** [1] - 146:22
**sold** [8] - 102:9, 103:14, 104:6, 105:5, 132:11, 135:6, 146:9, 146:10
**sole** [2] - 120:4, 140:15
**solution** [3] - 131:6, 132:2, 133:20
**solve** [8] - 58:16, 113:12, 113:18, 124:23, 125:20, 125:24, 151:22
**solved** [1] - 135:23
**solving** [1] - 126:23
**someone** [6] - 97:22, 111:8, 111:9, 111:19, 127:8, 157:12
**someplace** [1] - 136:18
**sometimes** [3] - 39:24, 40:6, 148:14
**somewhat** [4] - 41:3, 58:4, 64:25, 123:13
**SOMS** [2] - 21:8, 99:5
**Son** [2] - 22:17
**sorry** [4] - 27:6, 88:20, 118:23, 154:16
**Sorry** [1] - 27:7
**sort** [3] - 25:3, 86:25, 101:23
**sought** [5] - 51:18, 80:24, 81:2, 143:4

**souls** [1] - 130:2
**sounds** [1] - 91:2
**source** [15] - 81:4, 110:21, 125:10, 126:6, 126:7, 126:8, 127:11, 127:12, 142:10, 142:12, 142:14, 142:17, 142:24, 142:25
**South** [1] - 2:11
**Southern** [2] - 7:3, 91:14
**SOUTHERN** [1] - 1:1
**Southwood** [6] - 70:2, 98:6, 98:8, 98:12, 98:14, 101:13
**Spam** [1] - 91:18
**spare** [1] - 90:6
**speaks** [1] - 25:9
**specialized** [1] - 65:10
**specific** [18] - 21:10, 23:16, 57:5, 72:3, 87:4, 93:15, 94:12, 102:8, 103:22, 104:25, 105:1, 106:14, 106:20, 109:17, 118:4
**specifically** [5] - 62:19, 64:4, 99:24, 100:3, 138:2
**specifics** [1] - 87:3
**spend** [2] - 104:24, 116:4
**spending** [3] - 81:21, 90:2, 113:18
**spent** [2] - 125:3, 134:13
**sphere** [1] - 118:4
**split** [2] - 102:11, 117:1
**splitting** [1] - 115:23
**spoken** [1] - 32:21
**sponsor** [1] - 46:14
**sponsors** [1] - 43:2
**spot** [2] - 62:1, 74:11
**spread** [2] - 111:20, 111:22
**spreading** [1] - 112:13
**spreadsheet** [6] - 8:2, 8:4, 8:9, 8:12, 8:16, 8:19
**spreadsheets** [2] - 7:17, 7:24
**Square** [2] - 6:5, 6:12
**square** [1] - 149:4
**squarely** [4] - 16:25, 50:12, 133:3, 133:4
**Staci** [1] - 102:1
**staffed** [1] - 109:8
**stage** [5] - 20:13,

20:14, 33:7, 43:5, 94:4
**stake** [1] - 13:2
**Stalnaker** [2] - 57:5, 57:10
**stamp** [1] - 8:1
**stamps** [1] - 103:9
**stand** [3] - 19:10, 22:4, 22:6
**standard** [43] - 12:5, 13:10, 15:11, 17:10, 25:19, 33:22, 33:23, 37:19, 39:10, 40:21, 40:23, 42:4, 57:2, 57:10, 57:15, 57:18, 57:23, 61:8, 61:9, 61:11, 61:13, 61:18, 61:20, 62:1, 62:3, 62:12, 78:22, 87:22, 94:22, 94:24, 95:5, 95:19, 96:1, 96:2, 105:8, 105:9, 116:13, 136:4, 138:10, 146:15, 146:18
**standards** [4] - 12:2, 96:4, 149:11, 149:17
**standing** [5] - 49:4, 49:21, 133:6, 134:3, 134:10
**stands** [3] - 14:14, 46:23, 159:25
**STANNER** [1] - 5:10
**stark** [1] - 121:24
**start** [11] - 20:23, 35:20, 59:14, 80:22, 87:17, 92:1, 95:23, 111:10, 127:14, 133:12, 161:8
**started** [11] - 11:14, 11:15, 26:8, 73:19, 90:13, 92:4, 121:4, 121:24, 130:18, 135:11, 135:18
**state** [11] - 38:9, 42:3, 47:7, 50:16, 63:23, 104:3, 104:15, 105:6, 125:13, 134:4, 152:18
**State** [9] - 12:13, 17:8, 41:19, 43:12, 52:7, 70:21, 104:7, 144:1, 152:16
**State's** [1] - 126:5
**statement** [9] - 13:14, 15:22, 20:24, 35:23, 35:24, 37:3, 37:8, 47:1, 136:6
**statements** [3] - 12:7, 12:20, 14:10

**states** [5] - 28:19, 92:17, 93:8, 94:8, 135:5
**STATES** [2] - 1:1, 1:17
**States** [5] - 7:2, 91:15, 96:7, 96:8, 103:12
**statewide** [1] - 63:11
**Status** [1] - 7:2
**STATUS** [1] - 1:17
**statute** [1] - 157:15
**statutes** [3] - 122:19, 125:16
**statutory** [1] - 121:14
**stayed** [1] - 159:20
**stenography** [1] - 6:19
**step** [4] - 15:11, 27:13, 27:14, 131:7
**stepped** [1] - 149:24
**steps** [4] - 18:13, 19:15, 49:20, 49:23
**Steve** [1] - 29:18
**Steven** [2] - 7:16, 8:23
**STEVEN** [1] - 4:22
**stick** [1] - 10:11
**sticking** [1] - 85:10
**stigma** [3] - 55:11, 55:12, 55:13
**still** [12] - 30:23, 51:17, 52:20, 53:18, 108:2, 118:14, 119:4, 123:6, 124:25, 125:25, 148:8
**stock** [2] - 22:1, 25:14
**stood** [1] - 43:5
**stop** [10] - 32:5, 102:5, 105:24, 105:25, 106:18, 110:21, 112:13, 112:18, 125:22, 128:22
**stopped** [6] - 54:10, 106:4, 106:16, 107:9, 107:22, 139:12
**stopping** [1] - 110:13
**stores** [4] - 21:18, 21:22, 22:19, 66:9
**storyboard** [1] - 129:11
**straight** [1] - 113:7
**strategic** [2] - 51:11, 51:13
**Street** [16] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:19, 4:21, 4:24, 5:5, 5:12, 6:6, 6:13, 119:22
**stretch** [1] - 93:20
**strike** [2] - 40:10, 156:16

**striking** [2] - 153:10, 156:14
**strips** [1] - 55:2
**strokes** [2] - 29:8
**strong** [5] - 82:12, 121:1, 121:7, 128:11, 130:14
**strongly** [2] - 20:8, 154:3
**struck** [1] - 116:1
**structure** [2] - 54:8, 102:23
**struggle** [1] - 135:13
**struggling** [2] - 118:10, 131:20
**stuck** [3] - 77:7, 109:14, 122:13
**studies** [3] - 121:2, 122:2, 131:1
**stuff** [2] - 20:15, 151:15
**sub** [1] - 71:15
**sub-regulatory** [1] - 71:15
**subdivisions** [1] - 30:2
**subject** [3] - 21:16, 68:8, 91:9
**subjected** [1] - 154:6
**subjects** [1] - 143:11
**submit** [18] - 16:17, 44:14, 47:8, 49:25, 52:24, 62:11, 64:6, 70:10, 71:1, 73:23, 82:25, 83:20, 83:25, 84:8, 84:24, 105:12, 141:2, 150:17
**submitted** [3] - 9:13, 89:3, 101:25
**submitting** [3] - 9:14, 68:9, 71:5
**subrogation** [3] - 133:25, 134:4, 134:7
**subsequent** [3] - 139:3, 139:10, 142:7
**Substance** [2] - 69:9, 71:18
**substance** [1] - 12:25
**substances** [7] - 38:7, 65:5, 65:15, 65:16, 96:14, 98:25, 101:3
**Substances** [6] - 31:25, 57:17, 98:5, 121:15, 124:12, 135:24
**substantial** [13] - 59:6, 60:18, 62:6, 62:9, 64:7, 67:6, 70:13, 73:19, 73:25, 93:20, 118:15, 123:4,

132:24
**substantially** [1] - 67:25
**substitute** [1] - 122:13
**succeed** [1] - 135:4
**successes** [3] - 104:12
**successfully** [1] - 71:7
**sue** [1] - 91:22
**sued** [2] - 124:22, 152:16
**suffer** [3] - 78:9, 78:17, 84:21
**suffered** [6] - 78:1, 79:8, 79:10, 84:15, 142:19, 142:21
**suffers** [1] - 75:24
**suffice** [1] - 148:9
**sufficient** [19] - 44:20, 81:18, 82:22, 83:3, 83:7, 83:17, 83:22, 84:7, 88:9, 106:23, 112:7, 117:11, 123:12, 124:8, 125:24, 126:25
**sufficiently** [1] - 109:8
**sugar** [1] - 96:20
**suggest** [7] - 29:2, 29:24, 46:9, 55:25, 85:16, 153:19, 159:23
**suggested** [6] - 60:20, 63:11, 66:5, 153:17, 156:13, 157:11
**suggestion** [4] - 21:2, 34:6, 95:13, 117:1
**suit** [1] - 135:9
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 3:15, 4:6, 4:9, 6:5, 6:12
**sulfate** [1] - 103:15
**sum** [4] - 21:25, 90:8, 158:21
**summary** [13] - 36:7, 36:16, 51:6, 52:2, 53:4, 86:18, 92:6, 93:16, 94:5, 119:6, 143:18, 143:20, 145:19
**superficial** [1] - 46:23
**supplied** [3] - 49:3, 49:4, 147:17
**supplies** [2] - 47:4, 65:12
**supply** [10] - 11:13, 13:24, 27:25, 28:1, 33:20, 37:16, 37:17, 47:19, 49:4, 49:6
**support** [4] - 10:15, 49:23, 78:11, 84:7

**supports** [1] - 53:8
**suppose** [1] - 114:4
**supposed** [3] - 43:4, 55:3, 154:22
**Supreme** [26] - 50:13, 57:4, 78:24, 92:24, 96:7, 96:9, 103:12, 116:6, 117:19, 120:2, 121:14, 127:7, 127:16, 144:8, 144:9, 145:11, 145:12, 155:17, 155:22, 156:13, 156:20, 158:2, 158:10, 159:2, 159:25
**surely** [1] - 81:7
**surprise** [2] - 147:21, 151:7
**surprised** [1] - 122:17
**surprisingly** [1] - 33:11
**survey** [1] - 93:4
**suspended** [1] - 29:22
**suspenders** [1] - 97:12
**suspension** [2] - 30:9, 30:10
**suspicion** [3] - 99:3, 101:22, 149:3
**suspicions** [4] - 44:21, 98:9, 99:22, 101:6
**Suspicious** [1] - 109:4
**suspicious** [41] - 23:5, 23:10, 23:16, 24:3, 34:7, 42:7, 42:16, 44:12, 45:1, 45:22, 60:9, 69:13, 69:18, 71:20, 71:25, 72:23, 73:2, 73:11, 99:1, 99:4, 100:1, 100:4, 100:18, 100:20, 101:4, 101:5, 101:7, 101:21, 102:6, 102:14, 105:23, 106:2, 107:5, 107:10, 107:16, 107:21, 108:9, 146:16, 150:2, 152:14, 160:15
**sustained** [1] - 52:6
**SUZANNE** [1] - 4:20
**switch** [2] - 32:24, 68:3
**swung** [1] - 50:10
**syllable** [1] - 58:20
**syllogism** [2] - 37:9, 37:13
**system** [30] - 23:17,
24:4, 24:13, 25:3, 25:23, 42:24, 43:3, 43:6, 43:7, 43:13, 46:13, 46:14, 46:20, 60:21, 61:2, 69:7, 69:8, 69:12, 70:12, 70:13, 97:6, 97:7, 97:8, 97:25, 121:18, 121:19, 124:11, 147:25, 159:19, 159:20
**System** [3] - 34:3, 39:3, 109:5
**systemic** [9] - 25:3, 29:3, 30:25, 104:11, 104:12, 104:13, 148:10, 148:11
**systemically** [1] - 32:17
**systems** [17] - 24:13, 29:24, 32:18, 60:23, 68:4, 68:12, 68:16, 68:22, 68:25, 69:6, 104:16, 106:4, 108:25, 109:1, 109:12, 148:11, 159:17

**T**

**table** [1] - 42:22
**tailor** [3] - 53:13, 55:18, 151:21
**tailored** [8] - 35:18, 53:15, 54:4, 54:9, 55:15, 55:21, 151:22, 152:6
**tailors** [1] - 35:16
**tar** [2] - 129:4, 129:9
**Tate** [1] - 103:15
**tax** [1] - 103:9
**Teamsters** [10] - 14:25, 15:1, 16:15, 17:9, 18:4, 19:3, 137:25, 138:10, 140:20, 142:5
**teenager** [1] - 53:24
**TEMITOPE** [1] - 4:13
**ten** [3] - 36:5, 77:19, 77:21
**tens** [2] - 54:15, 131:24
**tension** [1] - 158:14
**Tenth** [1] - 5:12
**tenure** [1] - 31:15
**term** [3] - 41:1, 41:3, 150:16
**terminated** [1] - 43:21
**terms** [7] - 59:17, 97:4, 109:15, 113:2,
115:23, 140:7, 154:22
**test** [5] - 16:18, 57:5, 57:6, 119:4, 140:15
**testified** [37] - 29:13, 29:19, 34:3, 38:1, 38:5, 42:19, 46:15, 50:22, 55:22, 62:23, 64:13, 64:24, 65:25, 66:14, 67:9, 67:14, 69:21, 70:8, 72:7, 99:19, 102:2, 102:7, 105:23, 106:1, 106:24, 106:25, 107:1, 107:4, 113:11, 114:5, 114:20, 114:21, 122:5, 122:6, 122:7, 124:2, 130:25
**testifies** [1] - 36:8
**testify** [4] - 105:21, 105:22, 123:10, 153:22
**testimony** [65] - 11:23, 13:22, 21:20, 22:9, 22:24, 28:18, 31:10, 36:10, 37:4, 37:22, 39:13, 40:11, 40:12, 41:12, 42:22, 43:20, 43:22, 44:5, 45:6, 45:17, 45:21, 46:11, 46:24, 49:1, 49:9, 59:3, 62:20, 64:16, 64:25, 67:19, 69:4, 70:20, 76:19, 80:21, 82:14, 89:3, 98:11, 99:9, 99:17, 105:20, 106:6, 107:7, 107:15, 107:17, 108:4, 108:6, 108:18, 108:20, 109:17, 110:5, 111:24, 113:25, 114:19, 120:21, 121:16, 122:3, 123:9, 123:22, 125:21, 125:23, 152:2, 154:1, 160:7, 160:19
**testing** [1] - 55:1
**tests** [2] - 95:1, 106:2
**THE** [104] - 1:1, 1:1, 1:4, 1:17, 7:6, 9:5, 9:11, 9:18, 9:21, 16:11, 16:16, 19:24, 20:1, 20:17, 23:15, 23:24, 24:2, 24:9, 27:8, 27:11, 31:9, 32:23, 33:3, 33:16, 56:6, 56:8, 58:1,
58:9, 58:11, 58:17, 58:19, 58:25, 59:20, 74:4, 74:9, 74:12, 76:10, 76:13, 81:23, 85:6, 85:12, 85:15, 85:20, 85:25, 86:2, 86:4, 86:15, 87:7, 87:16, 88:3, 89:11, 90:24, 91:4, 91:7, 91:20, 92:10, 93:10, 93:18, 94:15, 105:16, 107:8, 107:22, 110:12, 110:23, 111:2, 111:14, 111:16, 112:4, 114:4, 115:6, 115:10, 118:2, 118:6, 118:20, 118:25, 120:6, 120:9, 120:13, 126:13, 127:25, 128:6, 128:9, 128:13, 130:7, 130:10, 133:13, 134:7, 136:23, 137:1, 137:7, 137:11, 143:9, 148:14, 148:19, 152:24, 153:7, 155:12, 159:12, 161:1, 161:6, 161:17, 161:24, 162:1, 162:8
**theirs** [1] - 116:22
**themselves** [4] - 55:19, 62:13, 71:6, 108:9
**theories** [1] - 122:25
**theory** [23] - 13:20, 14:18, 15:20, 17:20, 18:2, 18:19, 20:18, 20:20, 62:15, 81:23, 91:13, 91:21, 94:2, 115:6, 122:15, 127:7, 131:3, 133:15, 138:12, 138:14, 142:6, 158:17
**thereafter** [1] - 100:10
**therefore** [4] - 59:7, 71:2, 96:14, 103:18
**they've** [16] - 14:7, 47:8, 51:18, 51:24, 77:4, 77:6, 77:8, 79:9, 82:15, 83:23, 84:8, 91:25, 112:23, 139:21, 142:18
**They've** [1] - 159:8
**thin** [1] - 115:7
**third** [7] - 19:10,
51:15, 66:16, 131:15, 134:17, 142:21, 142:22
**Third** [4] - 8:14, 30:9, 117:13, 145:3
**third-party** [1] - 134:17
**thirds** [1] - 66:15
**Thomas** [1] - 2:10
**Thornton** [3] - 117:10, 118:3, 141:6
**thoughtful** [1] - 145:14
**thousand** [2] - 39:21, 131:11
**thousands** [1] - 106:1
**Three** [1] - 6:5
**three** [34] - 6:12, 7:23, 10:4, 10:5, 24:17, 32:11, 33:11, 39:16, 39:17, 42:15, 43:13, 47:13, 52:7, 57:6, 64:14, 64:18, 78:10, 92:13, 92:19, 92:23, 92:25, 93:1, 93:10, 95:1, 104:20, 143:11, 151:17, 151:19, 152:7, 152:16, 156:20, 157:4, 157:5
**three-part** [1] - 57:6
**threshold** [9] - 7:18, 36:14, 45:23, 69:23, 72:4, 141:20, 148:5, 148:17, 148:18
**thresholds** [8] - 43:14, 43:24, 43:25, 72:7, 72:10, 72:12, 147:9, 148:3
**throughout** [5] - 14:1, 29:7, 61:10, 107:7, 107:25
**throw** [1] - 91:18
**throwing** [1] - 83:24
**ties** [1] - 18:4
**Tim** [1] - 64:12
**timeline** [1] - 132:9
**timing** [1] - 31:16
**TIMOTHY** [1] - 5:9
**tiny** [3] - 63:5, 73:8, 153:5
**tobacco** [6] - 76:13, 76:14, 133:13, 133:21, 134:2, 145:6
**today** [30] - 10:13, 19:21, 19:22, 53:19, 53:23, 58:8, 61:7, 62:7, 68:9, 68:10, 70:6, 77:19, 86:21, 86:22, 87:4, 88:25,

90:6, 90:17, 93:22, 115:14, 121:9, 142:4, 147:21, 153:10, 153:18, 155:18, 156:9, 158:6, 160:23, 162:4
**together** [1] - 136:20
**tomorrow** [4] - 87:15, 161:3, 161:23, 162:9
**tonight** [2] - 86:23, 87:13
**took** [3] - 65:20, 65:23, 119:22
**tools** [1] - 84:2
**top** [2] - 81:21, 131:5
**topic** [1] - 63:2
**topics** [2] - 33:11, 87:2
**tort** [3] - 75:1, 80:2, 119:13
**torts** [1] - 145:3
**Torts** [1] - 117:14
**total** [5] - 20:10, 21:25, 49:12, 62:25, 64:5
**totally** [1] - 123:9
**touch** [1] - 150:24
**touchstone** [2] - 95:20, 120:19
**tough** [1] - 128:3
**Tower** [2] - 3:4, 4:23
**TPPs** [1] - 134:16
**Trade** [1] - 100:25
**tradeoff** [1] - 97:20
**traditional** [1] - 35:10
**traffic** [1] - 96:16
**traffickers** [1] - 63:24
**trafficking** [1] - 18:24
**train** [1] - 44:9
**trained** [2] - 29:16, 154:17
**training** [2] - 76:22, 109:8
**transaction** [2] - 49:11, 135:14
**transactions** [4] - 36:23, 104:21, 106:1, 132:12
**transcript** [6] - 6:19, 7:20, 7:21, 9:2, 9:3, 163:4
**transfer** [1] - 157:22
**transition** [2] - 120:24, 121:23
**treat** [3] - 12:1, 109:23, 129:20
**treated** [1] - 97:11
**treating** [2] - 12:10, 80:17
**treatment** [21] - 12:5,

12:16, 35:7, 50:20, 52:13, 75:7, 76:2, 76:20, 80:23, 81:1, 81:3, 81:19, 83:10, 112:20, 129:20, 129:23, 134:13, 140:9, 144:18, 147:4, 150:16
**treatments** [1] - 15:17
**trial** [39] - 7:20, 15:7, 15:9, 16:1, 26:8, 29:6, 31:12, 35:23, 36:5, 37:16, 39:2, 41:6, 47:2, 51:8, 51:12, 51:14, 53:3, 56:22, 58:4, 63:19, 83:18, 83:19, 86:19, 87:24, 88:4, 88:17, 89:24, 90:2, 90:9, 90:11, 92:7, 92:25, 94:6, 133:22, 137:20, 153:24, 153:25
**Trial** [1] - 162:10
**TRIAL** [1] - 1:16
**tried** [10] - 27:1, 28:16, 45:9, 45:16, 99:13, 99:14, 136:17, 136:19, 145:5, 148:25
**triggered** [1] - 99:22
**tripled** [1] - 130:5
**trouble** [1] - 59:20
**troubled** [1] - 91:9
**truck** [1] - 119:18
**true** [5] - 23:25, 24:6, 51:23, 56:18, 71:11
**truism** [1] - 39:23
**truly** [1] - 73:17
**Trust** [1] - 50:14
**try** [7] - 10:11, 29:2, 29:23, 54:7, 86:9, 146:6, 154:3
**trying** [11] - 24:18, 48:24, 93:23, 93:25, 107:8, 128:19, 129:19, 131:5, 131:6, 136:20
**Tuesday** [1] - 50:22
**turn** [8] - 40:8, 47:10, 71:14, 100:19, 102:16, 105:14, 143:8, 154:11
**turns** [2] - 141:24
**TV** [1] - 155:12
**Twelfth** [3] - 4:19, 4:21, 5:5
**twice** [1] - 128:9
**two** [57] - 9:9, 12:19, 12:20, 14:22, 15:9,

16:18, 16:23, 17:2, 17:7, 21:17, 21:21, 24:19, 26:19, 26:21, 29:11, 30:1, 30:22, 32:15, 39:21, 40:13, 59:10, 59:24, 64:25, 66:15, 73:5, 79:11, 79:13, 80:13, 81:24, 82:9, 83:9, 84:12, 84:22, 85:24, 92:24, 93:10, 94:4, 98:4, 100:10, 102:22, 103:5, 103:7, 105:18, 106:20, 110:15, 110:17, 114:9, 119:23, 133:1, 135:20, 137:16, 138:1, 141:1, 143:16, 153:2, 156:12, 159:24
**Two** [1] - 157:17
**two-thirds** [1] - 66:15
**tying** [2] - 59:18, 68:13
**type** [1] - 157:14
**typed** [1] - 69:3
**typed-up** [1] - 69:3
**typical** [1] - 65:9
**typo** [1] - 88:20

# U

**ultimate** [5] - 88:1, 88:11, 98:24, 118:22, 119:1
**ultimately** [2] - 107:10, 119:17
**un-objected** [1] - 89:7
**unanimous** [1] - 92:25
**uncannily** [1] - 51:5
**uncontroverted** [7] - 11:2, 11:21, 12:3, 12:17, 14:4, 17:24, 142:2
**uncovered** [1] - 26:6
**under** [48] - 10:19, 15:19, 16:10, 17:4, 17:7, 17:22, 20:17, 20:20, 28:1, 33:9, 40:11, 43:16, 52:3, 54:23, 56:14, 57:2, 57:4, 57:9, 59:7, 62:11, 70:10, 71:19, 72:2, 72:10, 74:2, 74:15, 81:23, 92:8, 95:11, 95:19, 96:1, 96:2, 97:18, 98:5, 106:1, 106:24, 107:1, 116:23, 117:3, 124:11,

132:22, 138:9, 140:16, 140:19, 142:8, 145:8, 150:21, 158:17
**under-supply** [1] - 28:1
**underscore** [5] - 40:22, 41:24, 46:25, 49:19, 71:21
**understandable** [1] - 14:15
**understood** [1] - 157:18
**undertake** [1] - 99:7
**undertaken** [2] - 11:22, 11:25
**undisputed** [6] - 14:21, 26:11, 59:15, 69:14, 130:12, 142:2
**unduly** [1] - 138:18
**unfair** [1] - 80:12
**unfortunately** [1] - 38:2
**uniform** [1] - 14:22
**unions** [1] - 134:17
**unique** [3] - 90:14, 143:24, 144:3
**United** [5] - 7:2, 91:15, 96:7, 96:8, 103:12
**UNITED** [2] - 1:1, 1:17
**units** [3] - 65:24, 98:17, 104:5
**University** [1] - 22:18
**unlawful** [2] - 135:15, 135:20
**Unless** [1] - 19:22
**unless** [6] - 11:19, 15:16, 15:20, 102:15, 117:11, 143:7
**unlike** [3] - 89:23, 91:25, 159:7
**unnecessarily** [1] - 15:16
**unnecessary** [1] - 83:2
**unprecedented** [1] - 144:24
**unreasonable** [16] - 20:22, 33:14, 33:19, 37:11, 37:12, 48:1, 57:7, 57:19, 57:24, 62:8, 70:12, 94:25, 105:10, 132:13, 132:24, 155:6
**unreasonableness** [7] - 33:23, 57:7, 61:13, 61:18, 61:20, 95:5
**unreasonably** [16] - 33:12, 33:19, 34:1,

35:22, 37:11, 40:18, 50:1, 55:25, 146:6, 146:12, 146:13, 147:1, 148:9, 150:18, 150:20, 152:11
**unrelated** [1] - 79:15
**unsurprisingly** [1] - 65:15
**up** [50] - 7:10, 11:19, 17:2, 19:22, 20:25, 27:7, 27:19, 29:12, 32:9, 37:18, 37:19, 43:5, 53:5, 65:19, 69:3, 70:5, 72:11, 83:24, 86:5, 86:9, 87:19, 87:21, 90:15, 92:23, 96:10, 97:6, 97:7, 102:11, 105:18, 107:3, 109:5, 109:7, 110:7, 110:22, 110:23, 112:21, 114:11, 115:4, 117:1, 119:9, 119:18, 129:11, 136:3, 141:23, 142:9, 144:21, 161:16, 162:4, 162:9
**upheld** [1] - 101:13
**urge** [1] - 154:3
**users** [7] - 19:1, 63:25, 76:7, 121:3, 130:4, 130:18
**usual** [1] - 162:2
**uttered** [1] - 21:7

# V

**VA** [4] - 62:20, 62:24, 63:2, 63:4
**valid** [1] - 52:1
**value** [1] - 158:21
**various** [7] - 12:7, 36:15, 46:21, 61:10, 63:9, 108:19, 138:19
**vast** [4] - 15:2, 62:16, 94:9
**vastly** [1] - 72:11
**Vegas** [2] - 53:20, 53:21
**vein** [1] - 103:20
**Ventura** [1] - 3:15
**verbatim** [1] - 10:19
**verdict** [2] - 89:22, 155:19
**version** [1] - 69:3
**versus** [1] - 79:25
**viable** [1] - 134:4
**view** [8] - 11:3, 11:22, 12:4, 12:18, 33:17,

42:4, 150:22, 162:3
**violating** [1] - 149:11
**violations** [1] - 95:7
**Virginia** [66] - 4:24, 7:3, 7:4, 12:8, 12:14, 16:10, 17:1, 17:4, 17:7, 17:8, 17:10, 23:1, 30:2, 41:7, 41:9, 52:7, 53:22, 57:4, 63:16, 66:10, 67:15, 70:18, 70:21, 75:9, 78:24, 91:14, 92:7, 92:8, 93:14, 95:11, 95:20, 104:1, 104:8, 104:23, 108:20, 115:5, 116:9, 116:10, 116:23, 117:3, 119:10, 127:6, 128:23, 129:10, 131:23, 140:16, 140:17, 140:20, 140:22, 142:8, 144:7, 144:9, 144:13, 144:14, 144:19, 145:11, 146:20, 146:23, 148:13, 152:16, 155:17, 155:22, 156:13, 156:20
**VIRGINIA** [2] - 1:1, 1:18
**Virginian** [1] - 11:8
**virtue** [1] - 115:18
**virtues** [1] - 56:21
**vis** [2] - 35:25
**vis-a-vis** [1] - 35:25
**vis-à-vis** [1] - 147:9
**visibility** [1] - 109:9
**visit** [7] - 33:21, 56:23, 57:9, 57:22, 57:23, 61:15, 61:23
**visits** [1] - 57:8
**vital** [2] - 41:13, 41:16
**vocational** [1] - 76:22
**VOLUME** [1] - 1:16
**volume** [52] - 10:23, 11:1, 11:11, 11:18, 13:2, 13:3, 14:2, 14:3, 16:21, 25:12, 26:1, 26:5, 26:11, 28:4, 34:17, 37:9, 37:10, 38:23, 38:24, 38:25, 49:10, 49:12, 49:13, 59:11, 59:13, 59:15, 60:16, 62:16, 62:25, 64:24, 103:22, 105:4, 106:20, 109:9, 123:16, 123:19,

137:22, 138:15, 139:1, 140:6, 141:24, 141:25, 142:1, 142:3, 146:9, 146:10, 148:8, 149:22, 150:5, 150:9
**volumes** [2] - 64:21, 64:22
**vs** [3] - 17:4, 141:12, 163:6

## W

**wait** [1] - 131:16
**waited** [1] - 56:20
**waiting** [1] - 151:7
**waive** [1] - 77:8
**waived** [5] - 77:3, 77:6, 78:8, 79:9, 139:16
**WAKEFIELD** [1] - 5:13
**Walgreens** [2] - 21:18, 21:22
**walk** [1] - 69:11
**walked** [1] - 44:22
**Walker** [1] - 157:5
**wall** [2] - 48:15
**Waller** [5] - 37:22, 40:20, 122:7, 122:8, 130:20
**wants** [1] - 127:21
**warrant** [1] - 38:9
**warranted** [1] - 67:3
**Washington** [7] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12, 70:19
**water** [7] - 75:21, 110:20, 110:25, 111:16, 128:22, 129:19, 129:20
**Watterson** [5] - 153:6, 153:7, 154:11, 155:9, 159:12
**WATTERSON** [1] - 155:14
**ways** [2] - 24:19, 158:18
**weakness** [1] - 141:2
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**website** [1] - 30:23
**Wednesday** [1] - 161:8
**week** [6] - 12:6, 37:16, 41:6, 46:19, 76:19, 77:17
**weeks** [4] - 59:3, 64:16, 72:6, 130:17
**Wehner** [3] - 119:10, 119:16

**weigh** [1] - 56:21
**weighing** [1] - 34:20
**weight** [3] - 40:12, 42:13, 45:18
**Weiner** [1] - 141:12
**Weinstein** [2] - 119:10, 141:12
**well-known** [1] - 26:7
**well-reasoned** [1] - 15:10
**Werthammer** [3] - 38:1, 40:20
**West** [66] - 7:3, 7:4, 11:8, 12:8, 12:13, 16:10, 17:1, 17:4, 17:7, 17:8, 17:9, 23:1, 30:2, 41:7, 41:8, 52:7, 53:21, 57:4, 63:16, 66:10, 67:15, 70:18, 70:21, 75:9, 78:24, 91:14, 92:6, 92:8, 93:14, 95:11, 95:19, 103:25, 104:7, 104:23, 108:20, 115:5, 116:9, 116:10, 116:23, 117:3, 119:10, 127:6, 128:23, 129:10, 131:23, 140:16, 140:17, 140:19, 140:22, 142:8, 144:7, 144:9, 144:12, 144:14, 144:19, 145:11, 146:20, 146:23, 148:12, 152:16, 155:17, 155:22, 156:13, 156:20
**WEST** [2] - 1:1, 1:18
**whatsoever** [4] - 35:19, 47:25, 149:12, 155:1
**Wheeling** [2] - 47:3, 47:5
**who've** [2] - 79:9, 79:23
**whole** [9] - 35:18, 64:2, 82:1, 89:25, 91:13, 122:21, 129:9, 133:21, 151:23
**wholesale** [4] - 48:22, 60:24, 64:2, 69:1
**wholesaler** [2] - 103:8, 135:14
**WICHT** [1] - 4:18
**willful** [2] - 40:15, 42:9
**William** [1] - 143:17
**Williams** [4] - 4:18,

5:4, 62:20, 80:21
**willing** [1] - 94:22
**windfall** [13] - 80:9, 80:10, 80:12, 81:11, 81:12, 82:10, 82:25, 84:11, 84:23, 126:11, 126:17, 126:19, 143:2
**wisdom** [3] - 41:2, 42:1, 150:15
**wise** [1] - 31:16
**Witness** [1] - 26:14
**witness** [79] - 7:16, 26:14, 34:21, 36:8, 37:23, 40:8, 41:6, 47:6, 47:23, 67:9, 72:6, 102:1, 103:2, 122:8, 130:15, 149:20, 149:25, 150:3, 161:3
**witnesses** [21] - 22:3, 22:8, 26:25, 28:15, 89:3, 99:8, 99:18, 104:10, 105:18, 107:1, 114:21, 122:1, 122:3, 122:5, 122:6, 124:2, 153:22, 153:25, 154:1, 154:4, 154:5
**witted** [1] - 27:13
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**Woody** [1] - 62:19
**Wooton** [1] - 157:6
**word** [3] - 21:6, 21:9, 156:7
**words** [3] - 18:2, 61:8, 63:1
**workmanlike** [1] - 162:2
**worth** [2] - 144:25, 155:4
**writ** [3] - 155:21, 156:14, 157:6
**write** [1] - 56:13
**writing** [8] - 29:12, 29:13, 58:6, 86:24, 87:5, 132:17, 134:1, 139:12
**writs** [3] - 92:13, 92:23, 145:10
**written** [4] - 15:2, 15:13, 15:14, 50:14
**wrongdoers** [1] - 119:11
**wrongdoing** [3] - 63:13, 66:2, 73:21
**wrongful** [12] - 16:7, 20:11, 20:17, 20:20, 37:14, 54:5, 54:6,

54:10, 59:9, 135:16, 135:20, 151:23
**wrongly** [2] - 43:25, 44:1
**wrongs** [2] - 54:17, 54:24
**wrote** [2] - 38:3, 55:13
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10, 3:13, 4:24, 5:15, 6:9

## Y

**years** [25] - 21:12, 29:7, 29:11, 30:3, 30:10, 31:4, 35:12, 46:4, 51:8, 52:20, 53:24, 68:18, 73:24, 77:19, 77:21, 82:18, 92:3, 98:21, 129:3, 143:16, 150:21, 151:3, 151:8, 154:24, 154:25
**yesterday** [2] - 80:21, 98:21
**Yingling** [1] - 40:20
**York** [3] - 3:5, 50:14, 93:22

## Z

**Zerkle** [1] - 114:20
**zero** [4] - 11:7, 64:25, 71:24, 72:1
**Zimmerman** [3] - 29:13, 29:18, 154:5