# TAB 1

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                      AT CHARLESTON

_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
              Plaintiff,        :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.       :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
              Plaintiff,        :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.       :
_____x


               BENCH TRIAL - VOLUME I
   BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
              UNITED STATES DISTRICT COURT
              IN CHARLESTON, WEST VIRGINIA


                      MAY 3, 2021
```

1        Despite its complexity, the law of parsimony or Occam's
2   philosophical razor suggests the simplest explanation is
3   usually the right one, Judge.  We intend to prove the simple
4   truth that the distributor defendants sold a mountain of
5   opium pills into our community fueling the modern opioid
6   epidemic.  The headlines, Judge -- technical difficulty.
7        THE COURT:  First technical glitch of the trial.
8      (Laughter)
9        THE COURT:  There will be many more, I'm sure.
10       MR. FARRELL:  I don't know where I need to point
11  it.  Well, I'm glad I got it out of the way with the very
12  first one.
13     Gina, do you just want to bring the laptop to me?
14       UNIDENTIFIED SPEAKER:  No.  It's --
15       MR. FARRELL:  There we go.  The Pulitzer Prize,
16  Judge, in the headlines, "780 million pills, 1,728 deaths."
17  I've circled these two things because this simple, elegant,
18  blunt truth provides the framework for our case, conduct and
19  consequences.
20     May it please the Court.  We have the great honor of
21  representing the peoples of Huntington-Cabell County, West
22  Virginia in this first trial against the distributors of
23  prescription opioids, AmerisourceBergen, Cardinal Health and
24  McKesson, collectively referred to as "The Big Three".
25     This is a bench trial wherein you serve as both the

1   judge and the jury.  As the judge, you will determine which
2   laws apply.  As the jury, you are the finder of fact.  You
3   are the audience.
4       I have told my clients you are a student of history, so
5   perhaps this analogy is apt.  Patrick Henry and John
6   Marshall were contemporaries.  They were both lawyers.  One
7   was known for his power of persuasion, evoking fiery
8   emotion; the other, methodical and convincing.  We believe
9   our aim in these proceedings is to follow the path of the
10  latter, to be methodical and convincing.
11      I believe that we will show you facts upon which you
12  will record in the permanent record as the historian.  We
13  will present direct evidence from primary sources, as well
14  as firsthand accounts of what happened here, and seek the
15  truth in this forum.  To that noble aim, I take this
16  opportunity to outline our case in chief.
17          THE COURT:  Just a minute.  I hate to interrupt
18  you, but second technical glitch.  I'm not getting realtime
19  up here.  Oh, it's over here.  Sorry.
20      Sorry, Mr. Farrell.  Go ahead, please.
21          MR. FARRELL:  It's our intentions during this
22  opening statement to provide an outline of the evidence we
23  intend to present in our case in chief, which will fulfill
24  the elements of proof from public nuisance.
25      To that end, there are four pillars to our case.  The

1    four pillars are volume.  We will introduce in painstaking
2    detail the volume of pills that were sold by The Big Three
3    into Huntington-Cabell County.
4         The second pillar are what we call black flags.  We
5    have an enormous amount of documents and deposition
6    testimony that we have culled into what we believe to be
7    essential facts which will provide notice and foreseeability
8    of the conduct that we will label and walk through with you
9    called black flags.
10        The third pillar is the morphinan molecule.  We're
11   going to have science.  In fact, the very first witness you
12   will hear from is Dr. Corey Waller and he's going to walk
13   through why this morphine molecule is so potent, why it is
14   driving the fourth pillar, which is the epidemic.
15        We intend to outline the four horsemen of the opioid
16   epidemic, addiction, abuse, morbidity and mortality.  These
17   four pillars are divided into the theme of our case, conduct
18   and consequences.  I'm going to spend the first half of
19   opening, as well as we will spend the first half of the
20   trial, focused on conduct.  My colleague, Anne Kearse, will
21   spend the second half of opening, and we will spend the
22   second half of trial, going through the consequences.
23        So, backing up, before we even start on this journey,
24   we need to remember the lesson from Eric Eyre's newspaper
25   articles.  We need transparency.  We've demanded

1   transparency from our clients and ourselves and we've
2   demanded transparency from the defendants.
3        Through transparency, we can get visibility into the
4   volume and into the conduct.  Through transparency, once we
5   establish conduct and consequences, we're going to ask you
6   for accountability.  From start to finish.  From Alpha to
7   Omega, transparency will lead us to accountability and in
8   between the two are going to be twelve weeks of evidence.
9        The key to this case is transparency and visibility
10  because, if you can't see the depth of what happened in our
11  community, we can't find the truth, and that will be the
12  process by which we will go through.
13       Introductions.  I'd like to take a few minutes and talk
14  about and introduce our clients and introduce the
15  distributor defendants.
16       Huntington-Cabell County, West Virginia is in the
17  southwest corner of our state and it sits in the confluence
18  of the Big Sandy and the Ohio River.  Huntington is the seat
19  of Cabell County.  It's the Tri-State area.  You cross the
20  Big Sandy, you find Kentucky.  You cross the Ohio, you find
21  the State of Ohio.
22       Our county has about a hundred thousand people, which
23  is nice because, when we do math for the next three weeks, a
24  hundred thousand is easily divisible.  About half of which
25  reside within city limits.

1     and then they ship it.  The morphine molecule gives us this
2     simple, elegant algorithm for us to be able to communicate
3     to you what we think the actionable conduct in this case is.
4          Now, how do we take this story and piece it together in
5     a point where we have a sequence of events that matches all
6     of the data from all of these documents?  What I've
7     attempted to do is I've attempted to take a timeline, a
8     timeline that has a sequence of events.
9          So, over a period of time, we have three defendants who
10    are independently acting at times, at other times working in
11    concert, but in a sequence of events will go back and forth.
12         How do we show the sequence of events in the context of
13    the volume of pills?  That's my goal, Judge.  My goal is to
14    be able to take a sequence of events and to show you the
15    timing of the event and the context of the volume of pills
16    that were sold into Huntington, West Virginia.
17         The first aspect, you'll remember the four pillars.
18    The first pillar, volume.  The second pillar, black flags
19    that come from the documents and depositions.
20         So, we're going to talk about pillar one, volume.  The
21    volume comes from ARCOS, A-R-C-O-S.  Now, the ARCOS
22    database, this is probably not true, but I envision a huge
23    computer in the basement of the DEA in Virginia.  Every
24    transaction that happens between a distributor and a
25    pharmacy is entered in a portal and recorded in a database.

1     You'll hear testimony from the DEA, as well as
2     references to the DEA's testimony in Congress, that this
3     data historically was not used on a pro-active basis.  And
4     what I mean by this is that just like the stock market has
5     billions of transactions that happen every day, the fact
6     that the transaction goes through doesn't mean it's a
7     clearinghouse.
8     You don't get a free pass safe harbor because your
9     transaction went through.  The SCC can look backwards in
10    time and recreate what happened.  So, the DEA has testified
11    that they used the ARCOS data to look backwards in time to
12    build on investigations, but not until recently were they
13    using it on a pro-active basis to look for trends.
14    This is a data chart from the national ARCOS data.
15    See, the ARCOS data is confidential.  Before Eric Eyre got
16    access to it, it had never been in the public domain.  The
17    only thing that had ever been in the public domain was the
18    DEA would publish summaries.  And those summaries, you could
19    look at national trends.
20    This is a summary from the DEA that shows from '97 to
21    2019 the volume by weight of what was sold by all
22    distributors in the country of hydrocodone and oxycodone,
23    the oxycodone being in blue; the hydrocodone in orange.
24    This data, you can also break out by state.  We're able
25    to take the state data published by the -- by the DEA, the

1   summaries, and be able to see the volume by weight of the
2   pills, the active ingredient weight of the pills, into West
3   Virginia during the same time frame. Again, this is all
4   sellers, all distributors into the United States and into
5   West Virginia. And, of course, the scale is different, but
6   the pattern is the same.
7      What we're able to do is we're able to take some of
8   this ARCOS data and make measurements. This is the
9   oxycodone and hydrocodone shipments to retail and chain
10  pharmacies. No hospitals, no VAs, no nursing homes. This
11  is pharmacy dispensing. The ARCOS data tells us that West
12  Virginia was getting more doses per capita than any other
13  state in the country.
14     Now, you may say, well, what if these pills are just
15  the small ones, the little 5 milligrams versus the
16  30 milligrams? Well, we can also measure it by weight.
17  This is the weight, the active ingredient of the drug. By
18  weight, West Virginia has the highest weight per capita in
19  the United States.
20     You can compare states to states. This is West
21  Virginia, for Cardinal Health, sold 130 million. To the
22  State of Illinois, they sold only 80 million.
23  AmerisourceBergen, 66 million in West Virginia, 60 million
24  in Illinois. McKesson, 116 million to West Virginia. 78
25  million to Illinois.