# TAB 2A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
              Plaintiff,        :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.       :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
              Plaintiff,        :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.       :
_____x


BENCH TRIAL - VOLUME 30
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


JUNE 28, 2021

1    BY MS. SINGER:

2    **Q.**   All right.  This is Demonstrative 270.

3         Turning to Slide 2, Dr. Alexander, can you tell us

4    about your educational background?

5    **A.**   Sure.  I attended university, college for two years at

6    Oberlin College in Ohio, and then completed my training at

7    the University of Pennsylvania.

8         I attended medical school at Case Western Reserve

9    University in Cleveland, and subsequently completed a

10   Master's of Science at the University of Chicago.

11   **Q.**   All right.  And in addition to your employment as a

12   Professor of Epidemiology and Medicine at Johns Hopkins, do

13   you have other affiliations or employment?

14   **A.**   Yes, I do.

15   **Q.**   And what are those?

16   **A.**   Well, I mentioned my role as a Professor of

17   Epidemiology and Medicine at Johns Hopkins.  I'm also the

18   founding co-director of the Johns Hopkins Center for Drug

19   Safety and Effectiveness.  And I'm Principal Investigator of

20   the Johns Hopkins Center of Excellence in Regulatory Science

21   and Innovation.

22        I noted that I'm a practicing general internist.  And I

23   also am owner and co-founder of a consultancy that's

24   separate and distinct from my role at Johns Hopkins,

25   Monument Analytics.

1    **Q.**   Dr. Alexander, are you a published author as well as a

2    Professor and other affiliations?

3    **A.**   Yes, I am.

4    **Q.**   And did you prepare a slide -- I'm sorry.  Before we

5    get to your publications, did you prepare a slide that

6    summarizes your licenses, affiliations, and publications?

7    **A.**   Yes, I did.

8              MS. SINGER:  Your Honor, may we publish the next

9    slide, please?

10   BY MS. SINGER:

11   **Q.**   And, Dr. Alexander, can you describe to the Court

12   your licenses and other affiliations?

13   **A.**   Of course.  I am boarded by the American Board of

14   Internal Medicine, and also have a DEA controlled substance

15   license.

16        I'm a former Chair and current member of the Food and

17   Drug Administration's Peripheral and Central Nervous System

18   Committee, and a former member of OptumRx's National

19   Pharmacy and Therapeutics Committee.

20   **Q.**   And I prematurely asked you if you were a published

21   author.  Have you -- can you describe your, your

22   publications generally, the number, et cetera?

23   **A.**   Of course.  I've authored or co-authored more than 325

24   scientific articles, editorials, and book chapters.  I'm the

25   current or former editor or deputy editor of nine journals.

1    And about 50 of my peer-reviewed publications have focused

2    on the opioid epidemic.

3    **Q.**   Now, are there certain publications related to opioids

4    that you thought would be especially relevant to highlight

5    for the Court?

6    **A.**   Yes, there are.

7    **Q.**   And did you prepare a slide to summarize those?

8    **A.**   Yes, I did.

9          MS. SINGER:  Your Honor, may we publish?

10   BY MS. SINGER:

11   **Q.**   And, Dr. Alexander, does this represent that list

12   of selected publications?

13   **A.**   Yes, it does.

14   **Q.**   And could you briefly walk the Court through those

15   articles?

16   **A.**   The first article was published -- the first article

17   entitled "The Opioid Epidemic:  From Evidence to Impact --"

18   I should correct myself.  This was not a peer-reviewed

19   article but, rather, a report that was published and

20   produced by a large number of faculty and other scientists

21   in 2017 and focused on providing comprehensive

22   evidence-based solutions that could be implemented to

23   address the opioid epidemic.

24       The second is a peer-reviewed article entitled "The

25   Prescription Opioid and Heroin Crisis:  A Public Health

1    they're insufficient to abate the opioid epidemic.

2    **Q.**   Now, Dr. Alexander, I think the slide may preview it.

3    But can you describe the categories of intervention that are

4    included in the abatement plan?

5    **A.**   Yes.  In general, the sorts of recommendations that

6    I've suggested fall into one of four categories:

7    Prevention, treatment, recovery, and special populations.

8    **Q.**   All right.  And is that described on the slide that's

9    now appearing on the screen, Number 11, Dr. Alexander?

10   **A.**   Yes, it is.

11   **Q.**   So let's start on the plan itself by focusing on I

12   think the first circle which is -- I'm sorry -- the first

13   circle which is the green prevention circle.  Can you

14   describe generally the kinds of programs that fit within

15   this bucket?

16   **A.**   Yes.  Prevention focuses on preventing further cases of

17   opioid addiction, as well as helping to ensure that those

18   that have active addiction that aren't yet in treatment

19   don't die before they get access to treatment.

20   **Q.**   Now, did you prepare a slide that describes the

21   subcategories of interventions within the prevention

22   category?

23   **A.**   Yes, I did.

24   **Q.**   And would that slide assist your testimony?

25   **A.**   Yes.

1          MS. SINGER:  Your Honor, may we publish the next

2     Slide 12, please?

3     BY MS. SINGER:

4     **Q.**   And, Dr. Alexander, can you describe briefly the

5     kinds of interventions that fall in each of these

6     categories that you have determined are necessary in

7     Cabell and Huntington?

8     **A.**   Health professional education refers to special

9     programming for healthcare providers, not just about the

10    over-supply of opioids and about the appropriate treatment

11    of pain, but also about the appropriate identification and

12    management of people with opioid addiction.

13          Patient and public education is focused on ensuring

14    that patients and the general public understand the

15    evidence, understand the science, that they know that

16    opioids have serious and not uncommon risks, that they know

17    that the evidence for opioids for chronic pain is, is

18    limited.  And, so, those educational initiatives are

19    important.

20          Safe storage and disposal is important because we know

21    that as the volume of opioids in a community increases, as

22    the supply in the community increases, so too does the risk

23    of unsafe storage or failure for drug disposal.  So those

24    initiatives are important.

25          Community prevention and resiliency is important

1    because this community's fabric has been, has been torn, has

2    been damaged, has been harmed by the opioid epidemic.  And,

3    so, community prevention and resiliency programs give the

4    community a central gathering space, a space for educational

5    programming.

6         Harm reduction is important because not everybody is

7    immediately ready to enter into treatment.  And the

8    principles of harm reduction are posited on the idea of

9    meeting people where they were at -- where they are at and

10   ensuring that they, that they have available methods to

11   minimize the risk of overdose.

12        And surveillance, evaluation, and leadership is

13   important because there has to be a mission control to this

14   plan.  Surveillance and evaluation allow for iterative

15   refinement and fine-tuning of the plan over time as the

16   epidemic continues to evolve.

17        And leadership is important because the governance of

18   this overall plan will be vital.  And I think that the

19   community has what it takes.

20   **Q.**   And, Dr. Alexander, can we focus for a minute on the

21   first category, the health professional education.

22        Can you describe the kinds of interventions and the

23   doctors with whom -- to whom that education is directed?

24   **A.**   Yes.  Health professional education can take a number

25   of forms, but one of the most important is targeted outreach

1    to specific prescribers.

2        So in my plan I suggest identifying prescribers that

3    account for the highest volume of opioid prescribing and to

4    conduct academic -- what's called academic detailing;

5    essentially outreach to these prescribers to provide

6    unbiased, non-commercially influenced sources of information

7    about the optimal management of pain, as well as the

8    identification and treatment of opioid addiction.

9    **Q.**   And are there certain types of doctors or practices

10   that in addition to the general education would be provided

11   to particular prescribers?

12   **A.**   Yes.  I do think general educational programming is

13   important, again that's not influenced and biased by

14   commercial sources and that provides clinicians with the

15   information they need to provide evidence-based care.

16       But I also suggest identifying a subset of doctors that

17   may account for a disproportionate volume of opioids on the

18   market and to target them with specific messaging.

19   **Q.**   And, Dr. Alexander, have you conducted any research

20   specific to high-volume prescribers that informed this

21   recommendation?

22   **A.**   Yes, I have.

23   **Q.**   And what generally were your findings?

24   **A.**   Well, my work and that of many other parties suggest

25   that opioid prescribing is skewed or concentrated so that

1    **A.**   The treatment category includes services and programs

2    to provide direct treatment for people that have opioid

3    addiction, as well as to treat some of the collateral or

4    downstream harms that have occurred because of addiction

5    such as HIV and Hepatitis C.

6    **Q.**   And did you prepare a slide that summarizes the

7    elements of the treatment program laid out in your expert

8    report?

9    **A.**   Yes, I did.

10    **Q.**   And would that slide assist your testimony?

11    **A.**   It would.

12          MS. SINGER:  Your Honor, may we publish the next

13    slide?

14          THE COURT:  Yes, you may.

15          BY MS. SINGER:

16    **Q.**   Dr. Alexander, is this the slide you prepared to lay

17    out the elements of the treatment plan?

18    **A.**   Yes, it is.

19    **Q.**   And can you briefly describe each of those

20    subcategories of intervention?

21    **A.**   Yes.  Well, connecting individuals to care is important

22    because there are gaps in care and you need to reach people

23    at the point when they're most ready to enter treatment and

24    to make it easy for them to do so.  So, connecting

25    individuals to care includes programs or services such as

1     Quick Response Teams or bridge programs that may bridge

2     people from Emergency Departments to treatment settings.

3          Treatment for Opioid Use Disorder, I think, speaks for

4     itself and there's an enormous need.  And this is a highly

5     treatable condition.

6          Managing complication of Opioid Use Disorder is

7     important for the reasons that we've discussed.

8          Workforce Expansion and Resiliency is important

9     because, as I already noted, it's not just about being sure

10    that we can maintain Lily's Place, or Project Hope, or the

11    PROACT program at the current levels.  We need to hire up

12    and scale up and that will require workforce expansion.

13         And taking care of the people that are working in these

14    settings.  I think that the Court has heard, and it

15    certainly was abundantly clear to me speaking with experts

16    on the ground, the toll that the epidemic has taken on first

17    responders and others who are working and we need to help

18    the helpers.

19         The last point is about naloxone distribution and

20    training and this is vital because we know that naloxone is

21    highly successful in reversing overdoses and giving people a

22    second shot.

23    Q.   And, Dr. Alexander, why do you include treatment in the

24    abatement plan?

25    A.   Well, treatment works.  I mean, if -- and, you know,

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    treatment -- we have highly safe and effective medicines to

 2    treat opioid addiction.  With treatment, we can save many

 3    lives and help people return to happy, successful,

 4    productive lives in society.  Without treatment, hundreds

 5    and thousands over the years will die.

 6         So, treatment isn't just the right thing to do.  It's

 7    also -- makes good economic sense.  We know that there's a

 8    positive return on investment when we invest in the

 9    treatment infrastructure.  So, there are many reasons to --

10    to treat Opioid Use Disorder.

11         We can also disrupt the cycle, the intergenerational

12    cycle of addiction, if we get people into treatment and

13    we'll disrupt and prevent the intergenerational perpetuation

14    of addiction going forward.

15    Q.   And can you explain what you mean by the

16    intergenerational transmission of addiction?

17    A.   Yes.  And I recognize that that is a bit of a mouthful.

18    And what I mean is that people that -- families that have

19    addiction -- often, addiction is not just in one generation

20    of the family.  Parents may have addiction.  There are many,

21    many settings and cases and abundant evidence that having a

22    parent, a household member with Substance Use Disorder, is a

23    significant risk factor for a child to develop Substance Use

24    Disorder.

25         So, that's -- when I say intergenerational perpetuation
```

1    of addiction, what I mean is that this gets passed down not

2    invariably, but not uncommonly from grandparent to parent to

3    child and so on.

4    Q.   Now, I think you talked about the efficacy of addiction

5    treatment.  Do many individuals in treatment relapse or drop

6    out?

7    A.   Well, there is relapse from treatment, but there's

8    relapse among individuals with major depression.  People

9    with cancer relapse.  People with diabetes may be well

10   controlled at one point and their condition may be less well

11   controlled at another.  So, relapse is an important feature

12   of Opioid Use Disorder and it's why I suggest the programs

13   that I do, so that we can help to minimize relapse.  But

14   relapse isn't a unique feature of this disease alone.

15   Q.   Now, did you prepare a slide to summarize the evidence

16   regarding the efficacy of treatment for Opioid Use Disorder?

17   A.   Yes, I did.

18   Q.   And would that slide help you in testifying today?

19   A.   Yes, it would.

20        MR. SINGER:  Your Honor, may we publish?

21        BY MS. SINGER:

22   Q.   And, Dr. Alexander, this slide, Treatment Saves Lives,

23   is that the slide you prepared to summarize the evidence

24   regarding the efficacy of Opioid Use Disorder treatment?

25   A.   Yes.  It contains what I think is a pivotal and

1    well-done study that summarizes information from many, many

2    other sources.

3    **Q.**   And what does that study convey?

4    **A.**   Well, I think the graph on the right in the slide says

5    it all.  It conveys that the likelihood of death among

6    individuals with opioid addiction is significantly, many

7    fold higher, if you're not in treatment than if you are in

8    treatment.  And the risk is somewhere in the middle among

9    individuals who have discontinued treatment.  So, I think

10   that it shows the significant benefit of treatment in

11   reducing the likelihood of people dying.

12   **Q.**   And what is the difference in the death rate for people

13   in treatment versus those who aren't in treatment or never

14   receive treatment?

15   **A.**   So, while in treatment, the death rate in this study

16   was less than one in a hundred person-years.  And among

17   those who had never received treatment, the death rate was

18   about five in a hundred person-years.  Whereas, among those

19   who had received treatment, the death rate fewer than two

20   per 100 person-years.

21   **Q.**   And from a public health perspective, is that a

22   meaningful difference?

23   **A.**   Massive.  Massive.  I mean, this -- this type of

24   effect, if only we had this type of effect in looking at

25   many other medicines that are approved by the US FDA that

1    further slide that talks about the evidence for other

2    aspects of your treatment plan?

3    **A.**   Yes, I did.

4    **Q.**   And would that slide assist your testimony?

5    **A.**   Yes, it would.

6          MS. SINGER:  Your Honor, may we publish?

7          BY MS. SINGER:

8    **Q.**   Dr. Alexander, is this the slide you prepared laying

9    out some of the evidence for other aspects of the treatment

10   program?

11   **A.**   Yes, it is.

12   **Q.**   And can you describe what that evidence consists of?

13   **A.**   Well, these are just, again, illustrative examples, but

14   emergency department, bridge programs that I referred to

15   that transition people from emergency department straight

16   into treatment can double the chance that an individual with

17   Opioid Use Disorder will receive treatment.  Quick Response

18   Teams, which I've noted previously.  One in three

19   individuals contacted by Cabell's Quick Response Team after

20   an overdose began treatment.  And naloxone, as well.  A

21   systemic review of naloxone take-home programs showed it was

22   successful in reversing overdose in 96 percent of cases.

23   **Q.**   Now, in terms of naloxone, can you describe what is

24   needed in terms of making naloxone more available in Cabell

25   and Huntington?

1    **A.**    Well, I suggest a number of different means to better

2    distribute naloxone within the community ranging from

3    ensuring that first responders continue to have it and that

4    it's well stocked in emergency departments to providing it

5    to family and loved ones of individuals that are at high

6    risk of overdose, to using public lock boxes similar to

7    defibrillators.

8        You know, if someone has a heart attack in a mall, or

9    an airport, a movie theater, there is a defibrillator there

10   and it should be no different in a community that's been as

11   devastated and where overdose is as common as Cabell County.

12   It should be no different with respect to the public

13   availability of naloxone.

14   **Q.**    All right.  Dr. Alexander, let's move from here to the

15   third category of interventions in your abatement plan,

16   recovery.  What's included generally within the recovery

17   area of your plan?

18   **A.**    Well, recovery includes a whole host of programs and

19   services that aren't focused on -- directly on treating

20   individuals with active addiction, but nevertheless will

21   allow for those individuals to flourish and for the

22   community as a whole to regain its former livelihood and

23   standing that Cabell County and the City of Huntington

24   historically have had.

25   **Q.**    And did you prepare a slide that summarized some of the

1    specific interventions that are included in the abatement

2    plan?

3    **A.**   Yes, I did.

4    **Q.**   And would that slide assist your testimony?

5    **A.**   Yes, it would.

6              MS. SINGER:  Your Honor, may we publish?

7              BY MS. SINGER:

8    **Q.**   And, Dr. Alexander, can you describe the subcategories

9    of intervention that make up the recovery plan?

10   **A.**   Public safety includes a number of different programs

11   and services for law enforcement, such as the development of

12   an overdose response -- I'm sorry.  Such as the development

13   of an overdose team or squad which would be able to

14   investigate overdoses and track down the originating

15   sources, for example, of opioids in the community.

16        Criminal justice system includes ensuring that

17   individuals within the penal system have access to treatment

18   and, as well, supporting programs, for example, to divert

19   individuals from the criminal justice system into the

20   treatment system.

21        Vocational training and job placement is very important

22   in a place like Huntington and Cabell County because of the

23   degree to which the economy has been decimated and the

24   degree to which individuals with opioid addiction who are in

25   treatment and in recovery are a great source of workforce

1    that can help the economy to recover.

2         Reengineering the workplace is important because this

3    is not only valuable to help make the workplace more

4    accommodating with individuals with addiction, but also, to

5    help employers to better manage the workplace and to help

6    local businesses to thrive.

7         And mental health counseling and grief support,

8    unfortunately, is needed because of the ways -- the mental

9    health impacts of the epidemic.  If you consider, you know,

10   children that have been orphaned or simply living with

11   somebody with Substance Use Disorder, or adults that have

12   lost loved ones, there is a lot of -- there is a lot of

13   impact from the epidemic that requires mental health

14   counseling and, in some cases, grief support.

15   **Q.**   Now, to provide just one example, Dr. Alexander, of the

16   programs that you lay out, can you walk us through what drug

17   court in Cabell County does and why you include it?

18   **A.**   Well, historically, many individuals that are

19   non-violent; in some cases, first time offenders,

20   non-felonies, with addiction have ended up in the criminal

21   justice system.

22        Addiction treatment for these individuals offers them

23   an opportunity to get back on their feet and to re-enter the

24   workforce and to have meaningful jobs and return to their

25   families and the like.

1        So, law enforcement assisted diversion -- I'm sorry.

2   So, drug courts are a separate track within the criminal

3   justice system that allows for individuals that may be

4   non-violent, may be first time offenders, to get treatment

5   instead of ending up incarcerated.

6        And there are terms and provisions to the participation

7   and such and, I believe in Cabell County and the City of

8   Huntington, there's also been a separate track, the WEAR

9   program for women who are commercial sex workers, many have

10  a history of trauma, violence.  And here, too, this is a

11  separate track within the drug court system that allows for

12  them to get treatment for their underlying disease.

13  **Q.**   And, Dr. Alexander, is there a need, based on your

14  research, and analysis, and report, to expand the services

15  that drug court is able to offer?

16  **A.**   I believe that there is.

17  **Q.**   Now, can you explain, and you've touched on this

18  briefly, why job training is part of the abatement plan?

19  **A.**   It's part of the plan in this community because this

20  community, the local economy has been hurt, was challenged

21  before the epidemic, and the epidemic has taken an

22  additional toll.

23       Many individuals with opioid addiction, when they enter

24  treatment want and are looking for gainful employment, and

25  job vocational training and job placement allows for them to

```
 1    get back on their feet.  It allows for them to start drawing
 2    an income to put food on the table, to help support a
 3    family, and it is an important component of successful
 4    recovery.
 5    Q.   Now, is there evidence to support the efficacy of the
 6    recovery programs that you've described and lay out in your
 7    report and model?
 8    A.   Yes, there's extensive evidence.
 9    Q.   And did you prepare a slide that summarizes some of
10    that evidence?
11    A.   Yes, I did.
12              MS. SINGER:  And, Your Honor, may we publish that
13    slide?
14              THE COURT:  Yes, you may.
15              BY MS. SINGER:
16    Q.   Dr. Alexander, is this slide, Evidence For Recovery
17    Programs, a slide that pulls out some of the evidence
18    supporting the recovery programs you lay out?
19    A.   Yes, it is.
20    Q.   And can you describe what that evidence is?
21    A.   Well, these are illustrative examples, but the slide
22    depicts that 82 percent of Cabell County drug court
23    graduates did not re-offend within 12 months.  And also,
24    that in Huntington, LEAD programs, or law enforcement
25    assisted diversion successfully transitioned more than half
```

1    of individuals to treatment.

2    **Q.**   And are those good outcomes from a public health

3    perspective?

4    **A.**   I think they're very positive.

5    **Q.**   All right.  Let's turn then, Dr. Alexander, to the

6    fourth category of interventions in the abatement plan,

7    special populations.  Can you describe, again, at a high

8    level what types of programs or services are included within

9    the special population category?

10   **A.**   Well, this includes programs and services whether

11   direct treatment -- whether the direct provision of

12   treatment or what are sometimes called wrap-around services,

13   things such as vocational training, or psychological

14   counseling, or the like for special populations, pregnant

15   women, women that have newborns, individuals who, upon

16   re-entry after a period of incarceration, children and

17   families that have been hurt by the epidemic.

18   **Q.**   Now, and did you prepare a slide, as with the other

19   categories of the plan, that summarize the specific

20   subcategories of programs within that plan?

21   **A.**   Yes, I did.

22   **Q.**   And would that assist your testimony?

23   **A.**   Yes, it would.

24            MS. SINGER:  Your Honor, thank you.

25            BY MS. SINGER:

1    **Q.**   And, Dr. Alexander, can you describe the abatement plan

2    addressing special populations?

3    **A.**   Yes.   Well, I've mentioned pregnant women, and new

4    mothers, and infants already.

5         And, Your Honor, I was also able in my brief break to

6    check and I believe that the 17-plus-or-minus percent of

7    cord blood samples does represent of all women coming in for

8    birth.   I believe that all women are treated -- all women

9    are screened for Substance Use Disorder and, if they test

10   positive, then the cords, the umbilical cords, are in turn

11   tested.

12        And so --

13             MR. HESTER:   Your Honor, may we object?   I mean,

14   the witness is doing research during -- during a break and

15   reporting back to the Court on a question.   We don't think

16   that's appropriate.

17             MR. NICHOLAS:   I agree.

18             THE COURT:   Sustain the objection, Ms. Singer.

19             MS. SINGER:   I think Dr. Alexander was trying to

20   be helpful to the Court, Your Honor.

21             THE COURT:   I think he was, too, and it's my job

22   to apply the rules even when it means not being real nice,

23   so --

24             MS. SINGER:   Understood.

25             BY MS. SINGER:

1    **Q.**   All right.   Dr. Alexander, why don't you continue down.

2    I think you were at the first bullet, pregnant women, new

3    mothers, and infants?

4    **A.**   Of course.   So, these programs and services include

5    screening women and ensuring that pregnant women have access

6    to treatment after birth, supporting both the mother and

7    infant, ensuring that infants with Neonatal Abstinence

8    Syndrome have access to the specialized services that they

9    need to have the best shot possible.

10        There are many adolescents and young adults, far too

11   many, that show up in emergency departments that are not in

12   school when they should be, and so on.   And so, my abatement

13   plan includes many specialized programs to address the needs

14   of adolescents and young adults that may have non-medical

15   opioid use or may simply be living in a household that's

16   been impacted by the epidemic.

17        Families and children, as well, vitally important that

18   the abatement plan addresses.   The child welfare system has

19   been heavily taxed because of the toll that the epidemic has

20   played in Cabell County and the City of Huntington.

21        And so, this includes services both to support children

22   that may be living in households where there's a lot of

23   chaos because of the ongoing addiction, as well as children,

24   for example, that may have a history of Neonatal Abstinence

25   Syndrome in the past and their families.

1          I've mentioned housing and housing insecurity, as well,

2     and this is also vitally important.  It's very hard for

3     someone with addiction to get up on their feet if they -- if

4     they are homeless, if they don't have a secure place to

5     live, if they don't have a roof over their head, and I think

6     that sometimes this can be taken for granted.

7          And, lastly, opioid misuse.  There are many, many

8     individuals that may not have formal addiction that are

9     using these products non-medically.  They're at elevated

10    risk of addiction and elevated risk of overdose.  And so,

11    this is another special population of interest.

12    **Q.**   Now, Dr. Alexander, did you prepare a slide that speaks

13    specifically to the impact of the opioid epidemic on

14    children in West Virginia?

15    **A.**   Yes, I did.

16    **Q.**   And would that slide assist you in testifying today?

17    **A.**   Yes, it would.

18              MS. SINGER:  Thank you, Your Honor.

19              BY MS. SINGER:

20    **Q.**   And, Dr. Alexander, this slide, Impact on Children in

21    West Virginia, does this summarize some of the facts that

22    you relied upon in reaching your opinion on the

23    interventions for special populations?

24    **A.**   Yes, it does, and I think the statistics are

25    staggering.  You know, 2017, 54 of every one thousand

1    children in West Virginia were affected by the opioid

2    epidemic.  I mean, look at that compared with nationally, 28

3    out of a thousand children.

4        In West Virginia, over half of these children are

5    residing in a household without a parent.  I'm sorry.  In

6    West Virginia, over half of these children resided in a

7    household with a parent that had opioid addiction.

8        Nearly one in five lost a parent due to death or

9    incarceration.  One in five were removed from their home for

10   foster or kinship care.

11       Of the 22,000 total children affected, it's estimated

12   that 1,500 either developed opioid addiction as an

13   adolescent or accidentally ingested opioids as a child.

14       And this last statistic is one that's based on my

15   discussion with local experts.  Up to half of children in

16   Cabell public schools are being raised by someone other than

17   a parent.  I think that these statistics suggest the gravity

18   of the epidemic on children.

19   **Q.**   And, Dr. Alexander, are these kinds of statistics

20   different than what you have observed nationally or in other

21   jurisdictions?

22   **A.**   They're strikingly different.  Again, in just about

23   every metric it's hard to find a place in the United States

24   that's been impacted as heavily as Cabell County and the

25   City of Huntington.

1    **Q.**   All right.  So, in terms of programs for children, Dr.

2    Alexander, can you speak in greater detail about the kinds

3    of interventions that are needed for teens and adolescents,

4    to just pull out one example?

5    **A.**   Sure.  Well, my discussion with experts from the local

6    school system underscored just how challenged the school

7    system is in managing individuals, adolescents and teens,

8    that may be living in households.  They may not be living

9    with their parents.  They may be living in households that

10   are -- have a high degree of dysfunction and where there's

11   active addiction.

12        So, the sorts of programs and services include

13   increasing the volume of social workers and other

14   specialized experts within the school system so that there's

15   a stable and consistent workforce that's able to intervene

16   with these children to advocate on their behalf and, as

17   well, to screen them for their own risk of opioid

18   non-medical use or addiction.  And then, to help ensure that

19   they have access to the same high quality treatment that

20   everybody should have access to in the community.

21   **Q.**   Now, Dr. Alexander, as with the other programs that you

22   lay out, is there evidence that this -- these interventions

23   for women, newborns, teens, adolescents, having secured all

24   of the other categories, are effective?

25   **A.**   Yes.  Again, I suppose you might call it one of the

1    silver linings of the epidemic, but -- a bit large

2    nationally -- but there has been an immense body of evidence

3    developed evaluating different abatement remedies and

4    there's not exactly the same amount of evidence for one

5    remedy versus another, but the interventions that I propose

6    in my abatement plan are well supported by the scientific

7    and public health evidence.

8    **Q.**   And specifically, with respect to special populations,

9    did you prepare a slide that laid out or summarized the

10   efficacy of those interventions?

11   **A.**   Yes, I did.

12   **Q.**   And would that slide assist you?

13   **A.**   Yes, it would.

14            MS. SINGER:  Your Honor, may we publish?

15            BY MS. SINGER:

16   **Q.**   And, Dr. Alexander, does this slide pull out a couple

17   of examples of the evidence that these kinds of

18   interventions work?

19   **A.**   Yes.  This slide just depicts or, you know, provides

20   illustrative examples again, but one focused on maintaining

21   family relationships and the importance of that and

22   improving the health and socio emotional outcomes for women

23   and children.

24        And the second from the West Virginia Perinatal

25   Partnership is focused on early -- on pregnant women or

1    cross examination exhibits that were not previously

2    identified on an exhibit list, but only if they disclose

3    those previously unlisted exhibits that they reasonably and

4    in good faith believe may be used to cross examine a witness

5    by 7:00 p.m. on the day prior to their expected use at

6    trial.

7         The problem we have, Your Honor, and, quite frankly, if

8    this were one or two exhibits, this probably wouldn't be an

9    issue.  We received a set of 50 exhibits last night.  They

10   were voluminous.  There was no way for us to review them

11   having received them at 10:45 p.m.

12        The other point I would make with respect to the

13   demonstrative, there is no provision in this stipulation

14   relating to demonstratives.  We have been providing

15   defendants copies of our demonstratives the night before

16   when they are ready but, frankly, we have been waiting to

17   get their objections to exhibits because their objections to

18   exhibits sometimes affect what goes in a demonstrative and

19   that's exactly what happened last night.

20        MR. HESTER:  Your Honor, we received the

21   Plaintiffs' exhibit list that -- of documents they plan to

22   use with Dr. Alexander at, I believe, 7:00 last night.  And

23   so, by 10:30, we supplemented our exhibit list to include

24   exhibits that were responsive to what had been disclosed to

25   us.

1     The plaintiffs' exhibit list included a number of

2     documents that were not on Dr. Alexander's reliance list.

3     They were new materials.  And we have undertaken to provide

4     these exhibits as quickly as we can.  It was three and a

5     half hours after we had the disclosure from the plaintiffs.

6               THE COURT:  Well, let's go forward and see where

7     we get.

8               MR. ACKERMAN:  Okay.  We will be objecting to use

9     of those documents if they are -- if they come up.

10              THE COURT:  Well, I will take a look when it comes

11    up.

12        Mr. Nicholas?

13                         **CROSS EXAMINATION**

14              **BY MR. NICHOLAS:**

15    **Q.**   Good afternoon, Dr. Alexander.  How are you?

16    **A.**   Fine, thank you.

17    **Q.**   Good.  I hope you're enjoying all of this legal

18    argument back and forth.  I don't have very many questions,

19    but I have a few.

20        And I want to shift over to sort of a new topic, which

21    is the -- the people that are covered, the population that's

22    covered by your proposed abatement plan, and my first

23    question is simply this:  Is it correct that the abatement

24    plan that you set forth would provide services and treatment

25    to individuals who never took prescription opioids?

120

1    **A.**    Yes, it is.

2    **Q.**    And do you agree -- I think -- well, I think you will,

3    but do you agree that there are individuals in Cabell County

4    and in the City of Huntington who have OUD who have, in

5    fact, never used a prescription opioid?

6    **A.**    Yes, I do.

7    **Q.**    And there are people in Cabell County and in the City

8    of Huntington with HIV who have never used a prescription

9    opioid; isn't that correct?

10   **A.**    Well, yes, it is, but my estimates of needs for people

11   with HIV are only limited to those that I estimate have HIV

12   as a result of the opioid epidemic.

13   **Q.**    Fair enough.  Would you have the same answer for me

14   with regard to infectious endocarditis and Hepatitis C?

15   **A.**    Yes, I would.

16   **Q.**    Okay.  Playing this out just a little bit further, if

17   someone never touched a prescription opioid and in the

18   future started using heroin, or fentanyl, or illegal

19   fentanyl, or carfentanil and developed Opioid Use Disorder

20   as a result of that use, treatment for their Opioid Use

21   Disorder would be covered under your plan, correct?

22   **A.**    Yes.  My plan is to abate the opioid epidemic in the

23   community and I don't think that that can be done without --

24   I think there's one epidemic, not two; an opioid epidemic,

25   not a prescription epidemic and a fentanyl and heroin

1    epidemic.

2    **Q.**   I understand.  So, your plan would address people whose

3    Opioid Use Disorder was caused by use of -- would be --

4    would relate back, in your view, to the use of prescription

5    opioids and it would also cover people who simply started on

6    illegal heroin, fentanyl, carfentanil and continued on in

7    that vein, correct?

8    **A.**   Yes.  That latter population representing a small

9    proportion of the entire group of people that use opioids in

10   the community.

11   **Q.**   And your plan for services and treatment would also

12   include folks who simply misused opioids, correct, misused

13   prescription opioids?

14   **A.**   Well, non-medical use of prescription opioids is an

15   important dimension of the opioid epidemic.  So, the plan

16   would address that.

17   **Q.**   Understood.  And, Dr. Alexander, you are not offering

18   any opinions here today that are specific to any of the

19   three distributor defendants; is that correct?

20   **A.**   Yes, that's correct.

21   **Q.**   And your proposed abatement plan does not recommend any

22   changes to the distributors' business practices in any way;

23   is that correct?

24   **A.**   Well, my abatement plan addresses one of the key

25   drivers of the epidemic, which is the oversupply of

1    prescription opioids, and you don't get prescription opioids

2    that don't come through the hands of a distributor.  You

3    have a manufacturer here and a patient here and every single

4    one of those 40 million prescriptions that I believe entered

5    Cabell County and the City of Huntington passed through the

6    hands of a distributor.

7    **Q.**   And every one of those however many prescriptions you

8    just referenced passed through the hands of a licensed

9    physician, correct?

10   **A.**   Well, I would guess that the vast majority did,

11   although there is -- there's the potential for diversion

12   from pharmacies and the like, also.

13   **Q.**   Okay.  But your -- but would you agree with me that the

14   supply of opioids is caused -- that the cause of the supply

15   of opioids is the number of prescriptions that are written?

16   **A.**   Well, the oversupply of opioids in Cabell County and

17   the City of Huntington is a function of many factors.

18   **Q.**   All I'm asking you is whether, taking however many

19   factors you want into account, they all trace back to the

20   fact that a licensed physician wrote a prescription?

21   **A.**   Again, I believe that there is some diversion of --

22   there's evidence that there's diversion of opioids upstream

23   from prescribers, but there's no question that because of a

24   false assurance that prescribers have had both regarding the

25   safety of opioids, as well as their effectiveness for

1    **Q.**   Okay.  So, I wanted to make sure that the record is

2    clear on what these categories cover.

3              MR. HESTER:  And could we pull that up?

4              BY MR. HESTER:

5    **Q.**   I think everybody probably has it.  You have it, Dr.

6    Alexander.  I hope the Court has it, too, the category

7    listing, but let's just wait a minute.

8              MR. HESTER:  Sorry, Your Honor.

9              THE COURT:  That's all right.

10             MR. HESTER:  This will make it a little easier, I

11   think, for everybody to follow.

12             BY MR. HESTER:

13   **Q.**   So, let's go to the first page, please.  We need to go

14   back a few tabs.  So -- so, Dr. Alexander, so we have this

15   up on the screen so we can all work through this together.

16   So, this -- this front page here is listing all of the

17   categories of your abatement plan, correct?

18   **A.**   Yes.

19   **Q.**   And so, you reviewed some of them this morning in your

20   direct examination and I won't spend a lot of time on those,

21   but I do want to make sure we've got a clear record on what

22   all of them entail.

23       So, the first one under Category 1, which is entitled

24   Prevention-Reducing Opioid Oversupply and Improving Safe

25   Opioid Use, do you see that?

1    **A.**    Yes, I do.

2    **Q.**    And the first item there is Category 1-A, Health

3    Professional Education.  Do you see that?

4    **A.**    Yes.

5    **Q.**    And that's what you discussed this morning, the

6    education of doctors and other prescribers about risks and

7    benefits associated with opioids; is that correct?

8    **A.**    Well, as well as how to identify and treat Opioid Use

9    Disorder.

10   **Q.**    Well, the Health Professional Education is focusing

11   particularly on educating doctors and other prescribers,

12   correct?

13   **A.**    It's focused on educating healthcare providers, but not

14   just about the oversupply of opioids, but also about the

15   identification and treatment of people that have Opioid Use

16   Disorder.

17   **Q.**    Right.  Fair enough.  So, but the point is, the focus

18   of this category is on better education to doctors and other

19   prescribers?

20   **A.**    Yes, healthcare providers that could include nurses

21   and, you know, EMS technicians, and other healthcare

22   providers.

23   **Q.**    And you're aware that the West Virginia State Board of

24   Medicine engages in continuing medical education, correct?

25   **A.**    Yes, I am.

1    **Q.**   And you're aware that one of the continuing medical

2    education programs they provide relates to opioid

3    prescribing and risks and benefits, correct?

4    **A.**   Yes.  I believe that to be the case.

5    **Q.**   The next item is Category 1-B, Patient and Public

6    Education.  Do you see that?

7    **A.**   Yes.

8    **Q.**   And that entails a mass media campaign to educate the

9    public about opioid risks and benefits; is that correct?

10   **A.**   Correct.

11   **Q.**   And would include a mass media campaign that would use

12   platforms such as TV, radio, billboards, print and social

13   media; is that correct?

14   **A.**   Yeah.  I mean, some combination of those, yeah.

15   **Q.**   And you're aware that a mass media campaign on opioids

16   has already been implemented across the State of West

17   Virginia, correct?

18   **A.**   I'm aware that there's been some -- some effort to

19   conduct what are sometimes called social marketing campaigns

20   in this state, yes.

21   **Q.**   And, in particular, you're aware that the CDC conducted

22   a mass media campaign specifically implemented in the State

23   of West Virginia related to the risks and benefits of

24   opioids?

25   **A.**   I'm not aware of the details of that.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1          MR. HESTER:  Could I pull up Dr. Alexander's

2     deposition from September 18, 2020?

3          BY MR. HESTER:

4     **Q.**   Dr. Alexander, do you remember being deposed in this

5     case in September of last year?

6     **A.**   Yes, I do.

7     **Q.**   And you testified under oath; is that correct?

8          MR. FARRELL:  Objection, Your Honor.  This appears

9     to be improper refreshing of his recollection.  He testified

10    -- his answer was I don't recall.  Perhaps if he could be

11    refreshed before being impeached would be the proper

12    procedure.

13         THE COURT:  When did he say he didn't recall?  I

14    don't understand.

15         MR. FARRELL:  Maybe I mis-heard him when the

16    question was asked whether or not he testified.  His answer

17    was I don't recall.

18         MR. HESTER:  I thought he said he wasn't aware of

19    it.

20         THE COURT:  Overruled.  Go ahead.

21         BY MR. HESTER:

22    **Q.**   Let me show you, Dr. Alexander, Page 318, Lines 13 to

23    17, please.  And the question was asked, and are you aware

24    that, in 2017, the CDC conducted a mass media

25    campaign -- campaign itself, and it was specifically

1    implemented in the State of West Virginia?  And your answer

2    was, yes, I am.  Do you see that?

3    **A.**    Yes, I do.

4    **Q.**    And was that a true and accurate statement when you

5    made it in your testimony?

6    **A.**    Yes.  I have no reason to believe otherwise.

7    **Q.**    Let me ask you to turn now to Category 1.  See if we

8    can go back to that summary of categories.  Category 1-C is

9    Safe Storage and Drug Disposal.  Do you see that?

10   **A.**    Yes, I do.

11   **Q.**    And that entails collection sites for unused pills,

12   such as take-back boxes and safe storage practices; is that

13   correct?

14   **A.**    Yes.

15   **Q.**    And you're aware that there are multiple pill

16   collection sites in Huntington and Cabell County already,

17   correct?

18   **A.**    Yes.  I mean, I think in each of these domains there

19   may be some element of something that's been done, but --

20   and I'd be happy to discuss in more detail any of them, but

21   the presence of some intervention to address some aspect or

22   some dimension of one of these problems is a far cry from

23   the abatement plan that I've proposed.

24            MR. HESTER:  Your Honor, I would move to strike as

25   not responsive.

1          MR. ACKERMAN:  And we would oppose, Your Honor.

2          MR. HESTER:  Overruled.

3          BY MR. HESTER:

4     Q.   But you are aware that there are multiple pill

5     collection sites in Huntington and Cabell County, correct?

6     A.   Yes, I am.

7     Q.   The next item is Category 1-D, which is Community

8     Prevention and Resiliency.  Do you see that?

9     A.   Yes.

10    Q.   And that entails coalition building and focuses on

11    promoting community resiliency, correct?

12    A.   Yes.

13    Q.   And you're aware that this is already an ongoing

14    activity in the community to promote resiliency, correct?

15    A.   I'm not aware of the details of the programs, but I

16    would also point to my earlier response in addressing that

17    question.

18    Q.   But you are aware that there are resiliency efforts and

19    community building efforts already underway in Cabell and

20    Huntington, correct?

21    A.   There -- I am aware and, absolutely, my conversations

22    with experts made it more than clear from the experts on the

23    ground that they have worked very hard to try to maintain

24    the fabric of the community.

25    Q.   Let me ask you to point -- to look at the next item,

1   please, Category 1-E, which is harm reduction, and this

2   entails syringe services programs to provide clean needles

3   for IV drug users, correct?

4   **A.**   Well, among other things.  It also includes naloxone.

5   Naloxone may be featured separately, but harm reduction

6   programs often also include naloxone, as well as fentanyl

7   testing to allow for people to know if their opioids that

8   they may be using contain fentanyl.

9   **Q.**   Right.  Naloxone is culled out separately in your plan,

10  correct?

11  **A.**   Yes, it is.

12  **Q.**   Let me -- I just want to focus on this one, though,

13  harm reduction.  One piece of the harm reduction category

14  that you are calling for is syringe services programs that

15  would provide clean needles for IV drug users; is that

16  correct?

17  **A.**   Well, these programs do far more than just give people

18  needles.  I mean, they offer people access to care.  They

19  screen for sexually transmitted infections.  They offer

20  people access to mental health counseling services and the

21  like.  But, yes, one of their many services is to provide

22  needle exchange.

23  **Q.**   And another is fentanyl testing for IV drug users; is

24  that correct?

25  **A.**   Yes.

1    **Q.**   And that would allow IV drug users to test for fentanyl

2    and heroin or other drugs that they're injecting, correct?

3    **A.**   Well, yes, it would be to allow for them -- it may not

4    be that they're injecting.  It could be counterfeit pills,

5    as well, that have hurt and killed lots of people.  And so,

6    fentanyl testing allows for them to identify products that

7    are contaminated with fentanyl.

8    **Q.**   So, it would be people who are using illicit drugs

9    testing for whether they have fentanyl, correct?

10   **A.**   Yes.

11   **Q.**   Let me ask you to look at Category 1-F, Surveillance,

12   Evaluation and Leadership.  Do you see that one?

13   **A.**   Yes, I do.

14   **Q.**   And this entails the collection of data on the opioid

15   epidemic; is that right?

16   **A.**   Among many other things, yes.

17   **Q.**   And that's already being done in Cabell and Huntington,

18   correct?

19   **A.**   Again, I would be happy and, at some point, would

20   request to be able to speak in a little bit more full

21   fashion, you know, to provide a more -- a single more

22   comprehensive response to these queries but, yes, some

23   element to evaluation and leadership is currently being

24   provided in Cabell County and the City of Huntington.

25   **Q.**   And so, for instance, the Division of Addiction

1    Sciences is playing a role in that, correct?

2    **A.**   At Marshall University?

3    **Q.**   Yes.

4    **A.**   Yes, I believe so.

5    **Q.**   And Scott Lemley is also involved in those efforts,

6    correct?

7    **A.**   I would want to refresh my memory regarding the

8    particular names of individuals.

9    **Q.**   You are aware that the community has established an

10   excellent foundation for data collection and surveillance,

11   correct?

12   **A.**   Well, I -- I think that there is a strong foundation,

13   but I think there's a lot more work that remains to be done.

14   **Q.**   Well, let me ask you the question again.  Has the

15   community established an excellent foundation for data

16   collection and surveillance?

17   **A.**   Again, my response would be that the community has a

18   strong foundation and a lot more work needs to be done.

19   **Q.**   Let me ask you to look at Category 2, please.  We'll

20   keep moving through this.  This is under your heading for

21   Treatment Supporting Individuals Affected By the Epidemic;

22   is that right?

23   **A.**   Yes.

24   **Q.**   And your first item, Category 2-A, is connecting

25   individuals to care.  Do you see that?

1    **A.**    Yes.

2    **Q.**    And this entails programs to assist people with OUD in

3    getting care and treatment, correct?

4    **A.**    Yes.  And accessing care, yes.

5    **Q.**    And so, that would include things like help lines that

6    would provide treatment options, transportation for them to

7    get to treatment, and other -- and other services to connect

8    people who have OUD to care, correct?

9    **A.**    Yes.  And -- and maintain their engagement in care.  I

10   talked about relapse earlier today.  And so, you know,

11   things like peer recovery coaches and other supports that

12   help people to maintain sobriety are important components of

13   this.

14   **Q.**    And it would be intended for people who have OUD who

15   would need those connections to care, correct?

16   **A.**    Yeah, although there's no reason that it couldn't also

17   be used by people that were suicidal and thinking about

18   ending their lives because of the trauma that they have

19   experienced with family members that may have active

20   addiction.  There's no reason it couldn't be used by people

21   that are using opioids non-medically but don't fulfill

22   formal diagnostic criteria for opioid addiction.  So, I

23   guess I view the population that could benefit from this as

24   larger than just the people with outright addiction.

25   **Q.**    But you have -- in terms of your modeling, you've

1    modeled this around the OUD population, correct?

2    **A.**    Yes, I believe that's true.

3    **Q.**    Let me ask about the next one, Category 2-B, Treating

4    Opioid Use Disorder.  This -- I think, you've discussed this

5    before.  Just to confirm, this entails the range of

6    treatment options for people with OUD, correct?

7    **A.**    Yes.

8    **Q.**    And then, Category 2-C, Managing the Complications

9    Attributable to the Epidemic, this relates to complications

10   relating to IV drug use among people with OUD, correct?

11   **A.**    Yes.

12   **Q.**    And then the next one, Category 2-D, Workforce

13   Expansion and Resiliency, this entails expanding the

14   workforce of healthcare professionals needed to treat people

15   with OUD or chronic pain, correct?

16   **A.**    Yes.  So -- or their family members or otherwise to

17   address the epidemic.  I mean, again, if you think about the

18   need for social workers in the school system, they're not

19   there necessarily to treat teenagers that have Opioid Use

20   Disorder, although there may be such teenagers, but the

21   workforce expansion is needed beyond the healthcare

22   workforce to treat people with opioid addiction.  My point

23   is that this is a much bigger problem than just a problem of

24   addiction alone.

25   **Q.**    But this category, which is then modeled by Dr. -- or

```
 1    used by Dr. Barrett to develop costs, this category is

 2    focusing on expanding the workforce of healthcare

 3    professionals, correct?

 4    A.    That's correct.

 5    Q.    And it would be healthcare professionals to treat

 6    people with OUD or other afflictions, correct?

 7    A.    Well, I -- it would be helpful.  I mean, there are many

 8    pages, as you know, and thousands of cells and inputs to

 9    these -- to this model.  So, it would be helpful for me to

10    review this if you would like a definitive answer on which

11    specific occupations are in or out of this category.

12    Q.    But the general -- the general category covered by this

13    -- I'm sorry -- the general group of people covered by this,

14    this is to expand healthcare professionals in the workforce,

15    correct?

16    A.    It's to sure up the community workforce, the number of

17    workers in the community that are recruited, and maintained,

18    and taken care of, so that they can help to address the

19    opioid epidemic.  And I think that the majority, if not

20    entirety of these, are in the healthcare space.

21    Q.    Let me ask you to look at Category 2-E, Distributing

22    Naloxone and Providing Training.  This is one you discussed

23    before, correct?  It relates to the distribution of naloxone

24    in the community, correct?

25    A.    Yes, that's right.
```

1    **Q.**   And you're aware that the community has already been

2    involved in extensive efforts to distribute naloxone in the

3    community, correct?

4    **A.**   I'm aware and I've reviewed those programs carefully

5    and I just want to reiterate briefly that the fact that

6    there may be a -- some element of activity in one of these

7    categories doesn't at all speak to whether or not that level

8    of activity is adequate, adequate now, or adequate for the

9    future.

10   **Q.**   Do you agree, Dr. Alexander, that there has been an

11   extensive use of naloxone in the community?

12   **A.**   I believe there has and I believe it's saved many

13   lives.

14   **Q.**   Let me ask you to look at Category 3, please, which is

15   Recovery-Enhancing Public Safety and Reintegration.  Do you

16   see that one?

17   **A.**   Yes, I do.

18   **Q.**   And under the first one, 3-A, public safety, that

19   focuses on enhancing police capabilities to address drug

20   crime, correct?

21   **A.**   Yes.  That's a topic that -- it was made very clear to

22   me in speaking with individuals on the ground that that was

23   important to them.

24   **Q.**   So, but it is -- just to be clear on what the category

25   covers, it's expansion of police capabilities, correct?

1    **A.**   Yes.

2    **Q.**   Let me ask you to look at Category 3-B, the Criminal

3    Justice System.   That entails enhancing the Cabell drug

4    court and other programs in the justice system; is that

5    correct?

6    **A.**   Yes, including the -- increasing the availability of

7    treatment for addiction within the criminal justice system

8    because a large proportion of individuals with OUD or a

9    significant proportion cycle in and out of the criminal

10   justice system in a given year.

11   **Q.**   So, an example of that would be the LEAD program, for

12   instance, correct?

13   **A.**   Yes, or people that are incarcerated and don't have

14   access to FDA approved safe and effective treatment for

15   addiction.

16   **Q.**   Let me ask you to look at Category 3-C, Vocational

17   Training and Job Placement.   Do you see that one?

18   **A.**   Yes, I do.

19   **Q.**   And that entails creating employment opportunities for

20   people with OUD, correct?

21   **A.**   Yes, and supporting employers and the local economy

22   simultaneously.

23   **Q.**   And then, Category 3-D, Reengineering the Workplace,

24   that entails encouraging workplace opportunities for people

25   with OUD or who are in recovery, correct?

 1   **A.**   Yes.  Again, my conversations with experts on the

 2   ground underscore the importance of those sorts of

 3   initiatives.

 4   **Q.**   Let me ask you to look at Category 3-E, Mental Health

 5   Counseling and Grief Support.  That entails expanding mental

 6   health services and grief support for individuals with OUD,

 7   families who have lost people to overdoses, and children

 8   affected by the epidemic, correct?

 9   **A.**   Yes, it does.

10   **Q.**   Category 4 is our last one, Addressing Needs of Special

11   Populations, and I believe you talked about this a little

12   bit.  At a high level, these are special populations that

13   are adversely affected by opioid use and misuse and by OUD,

14   correct?

15   **A.**   Yes.

16   **Q.**   So, the first one, Category 4-A, Pregnant Women, New

17   Mothers, and Infants, do you see that one?

18   **A.**   Uh-huh.

19   **Q.**   And that focuses on pregnant women with OUD and babies

20   born with NAS, correct?

21   **A.**   Yes.

22   **Q.**   Category 4-B, Adolescents and Young Adults, that

23   addresses the impact of opioid use, addiction and overdoses

24   on children and adolescents, correct?

25   **A.**   Yes, including the ripple effects throughout families

1    and the intergenerational effects that I spoke to briefly

2    earlier.

3    **Q.**    And then you have one which may be related,

4    Category 4-C, Families and Children.  That entails programs

5    to support orphans or other children that are adversely

6    affected by OUD and overdoses, correct?

7    **A.**    Well, and their families and loved ones.

8    **Q.**    And you're aware that the State of West Virginia runs

9    foster care and adoption services, correct?

10   **A.**    I don't recall with certainty, but that sounds right to

11   me.

12   **Q.**    Let me ask you to look at Category 4-D, Homeless and

13   Housing Insecure.  Do you see that one?

14   **A.**    Yes.

15   **Q.**    And that focuses on individuals with OUD who are

16   homeless or housing insecure, correct?

17   **A.**    Yes, and it's vitally important.  I was shocked at the

18   rate of homelessness and housing insecurity among

19   individuals with, in this instance, intravenous opioid use

20   in the community.  The numbers were quite surprising to me

21   and very high.

22   **Q.**    And then, Category 4-E, Individuals With Opioid Misuse,

23   do you see that one?

24   **A.**    Yes.

25   **Q.**    And I believe you talked about this before, but that

1    focuses on individuals who misuse opioids, including heroin,

2    or fentanyl, or prescription opioids who do not yet have

3    OUD, correct?

4    **A.**   Yes.  I mean, I think most of what I've discussed in my

5    expert report and would focus on is individuals with

6    non-medical prescription opioid use, but -- but there may be

7    individuals that use heroin or illicit fentanyl but don't

8    fulfill formal diagnostic criteria for addiction.

9    **Q.**   Dr. -- I'm sorry -- Mr. Barrett is going to take these

10   categories and develop a total cost number, correct?

11   **A.**   I don't know the details of what Mr. Barrett will do,

12   but that's my general understanding.

13   **Q.**   You've never talked to Mr. Barrett about what he does

14   with what you've developed?

15   **A.**   I have had -- I believe I've had a conversation or two

16   with him and my understanding is that he's to develop a

17   total cost estimate based on what I've proposed, but I don't

18   -- I don't know the details of his methodology or approach.

19   **Q.**   Let me ask you to turn to a new topic, please.  I'd

20   like to talk about the OUD population that you've discussed

21   previously.  Just to confirm, you start with an estimate of

22   the OUD population in Cabell and Huntington from 2018; is

23   that correct?

24   **A.**   Yes.

25   **Q.**   And that -- that number, that 2018 OUD estimate, was

1    developed by Dr. Katherine Keyes; is that right?

2    **A.**    Yes, that's correct.

3    **Q.**    And so, in other words, when Dr. Keyes provides that

4    OUD estimate for 2018, those are people who have OUD as of

5    2018, correct?

6    **A.**    I believe that's the case.

7    **Q.**    Is so, in other words, it would include people who use

8    opioids such as heroin, or fentanyl, or misused prescription

9    opioids and then developed OUD at sometime in the past, 2018

10    or previously, correct?

11    **A.**    Well, I believe it's an estimate of individuals with

12    active Opioid Use Disorder in the community as of 2018.

13    **Q.**    So, maybe I'm just misstating almost a truism.  I think

14    you used the word tautology before, but the truism that you

15    -- these are people who had used opioids in the past and had

16    developed OUD and active OUD as of 2018, correct?

17    **A.**    Yes.

18    **Q.**    And then -- so, your starting population is, therefore,

19    based on the assumptions that Dr. Keyes applied in

20    developing her OUD population of 8,252 people, correct?

21    **A.**    Well, it's not just -- it's not as if she just handed

22    off a number to me.  I mean, I -- at the time that she was

23    developing her estimates, I reviewed them and I reviewed her

24    methodology and my team independently considered a number of

25    alternative approaches.  And I triangulated those with her.

1   And I had confidence at the time that her approach was

2   methodologically sound.

3   **Q.**   Is there anyplace in your report where you say you

4   triangulated and tested what Dr. Keyes did in developing her

5   OUD numbers?  Is that stated anywhere in your report?

6   **A.**   I don't recall the details of what I've stated in my

7   report, but I -- I don't recall that specific statement, no.

8   **Q.**   It's not stated in your report, is it?

9               MR. ACKERMAN:  Objection, asked and answered.

10              MR. HESTER:  I don't think so.

11              THE COURT:  Overruled.

12       Can you answer the question?

13              THE WITNESS:  It would be helpful to review my

14   report.  I mean, my report is, I don't know, 40, 60, 80

15   pages.  I don't know sitting here whether or not -- to what

16   degree I spoke to the -- to my having vetted Dr. Keyes'

17   estimate.

18              MR. HESTER:  Let me give you your report.

19              MR. FARRELL:  Judge, to hopefully save some time

20   with the review, can I make an objection on relevance?  I

21   fail to see why it's relevant whether or not an answer

22   elicited on cross examination is contained within his expert

23   witness report.

24              MR. HESTER:  Well, Your Honor, I think it's a

25   quite important point because the witness had never

1     previously said that he had undertaken any check of what Dr.

2     Keyes did.  He had previously, as I understood it, testified

3     that he was relying on what Dr. Keyes gave him.

4                THE COURT:  And you're going to refresh him with

5     it?

6                MR. HESTER:  Yes.  I thought I would refresh him.

7         May I approach, Your Honor?

8                THE COURT:  Yes.  If you saw your report, do you

9     think you would remember?

10               THE WITNESS:  Well, I would want to review it and

11    I'm sensitive to your time, Your Honor, and everybody

12    else's.  I think the key thing to say here is that -- that I

13    did speak with Dr. Keyes, that at the time that she was

14    developing her estimates, I agreed with her approach and

15    that -- and that I -- but I didn't do an -- you know, and

16    that I and my team considered a number of different ways of

17    estimating the population in the county and, ultimately, I

18    used the approach that Dr. Keyes pursued.

19               MR. HESTER:  I think that solves my problem, Your

20    Honor.

21               THE COURT:  I think it does, too.

22               BY MR. HESTER:

23    Q.   But you did rely to start on the number that Dr. Keyes

24    gave you, correct?

25    A.   Well, yes.  I used it in my report, so in that sense,

1    yes, I did.  I did use her estimate in my report.

2    **Q.**   And so, if the estimate provided by Dr. Keyes of the

3    starting OUD population is too high, then the population

4    numbers in your redress model would also be too high,

5    correct?

6    **A.**   Yes.  And if those numbers are too low, then the

7    population numbers would be too low.  I mean, there is a

8    possibility of either, but the point is that I and my team

9    carefully reviewed different methods of estimating the

10   population and the county and ultimately -- and that

11   included reviewing with Dr. Keyes her approach and,

12   ultimately, I'm confident that the approach that was used

13   was a valid approach that reflects the practices of

14   epidemiology.

15   **Q.**   But it -- but let me just confirm my point though.  If

16   the number from Dr. Keyes is too high, then the OUD numbers

17   on which you rely in the redress model are also too high,

18   correct?

19            MR. ACKERMAN:  Objection.  Asked and answered.

20            THE COURT:  Overruled.

21            THE WITNESS:  If they're too high, then the

22   numbers I relied upon are too high.  And if they're too low,

23   then the numbers that I relied upon are too low.

24            BY MR. HESTER:

25   **Q.**   And under your model, the starting OUD population from

1    Dr. Keyes does not remain constant over the 15 years,

2    correct?

3    **A.**    That's correct.

4    **Q.**    And some people leave the OUD population, perhaps from

5    overdose, perhaps from some completely unrelated cause of

6    death, perhaps they move away from Cabell Huntington,

7    correct?  But it's not going to be a static population over

8    time, correct?

9    **A.**    Yes.  It's a dynamic population.

10   **Q.**    And you also assume that there are new people who

11   develop OUD over the 15-year period covered by your redress

12   model in addition to your starting population, correct?

13   **A.**    Yes.

14   **Q.**    And just to be clear on the -- on the numbers, Dr.

15   Keyes gave a number of 8,225 people.  The first year in your

16   redress model is 7,882.  That's the start of the scaling

17   down of the OUD population, correct?

18   **A.**    Correct.

19   **Q.**    But you're assuming that new people will develop OUD

20   during the 15-year period and that starting population in

21   your redress model of 7,882 does not stay static, correct?

22   **A.**    Well, the individual people are not necessarily the

23   same people.  I mean, there are people, just like if you

24   looked at all smokers today and took everybody with lung

25   cancer, there's a group that has lung cancer now and there's

1    a group that's going to develop lung cancer in three or

2    five years.

3         So, if I was addressing the lung cancer problem, I

4    would want to design policies that account for the fact that

5    some people will develop lung cancer in the future.

6         The analogy here is, as one example, there are

7    individuals on chronic high dose prescription opioids now

8    that may not yet have developed opioid addiction, but will

9    by 2024.  So, my plan accounts for that.

10   **Q.**   And let's just make this concrete.

11        MR. HESTER:  If we could put up Tab 2-B of the --

12   of Dr. Alexander's redress model.  It's the model itself,

13   Chris.

14        BY MR. HESTER:

15   **Q.**   And if you can go to Tab 2-B, Dr. Alexander, this is

16   not meant to be an eye test, but here's this -- this top

17   line is the OUD population over time, correct?

18   **A.**   Yes.

19   **Q.**   And so, your point is that there's some people in that

20   OUD population who come in and out and you're going to have

21   new people coming into that top line population, correct?

22   **A.**   Yes.

23   **Q.**   And that might include -- just as an example, that

24   could include a child who is ten years old as of 2021 and

25   has never used opioids begins abusing heroin in 2027 as a

1    teenager and develops OUD.  That -- that child would be

2    included in your OUD numbers, correct?

3    **A.**    It would, as would someone who is living a happy,

4    healthy life in recovery now in treatment from prescription

5    Opioid Use Disorder who relapses.  So, there are any number

6    of scenarios that might land someone in need of treatment in

7    2024.

8    **Q.**    So -- so, maybe to go to the generality of the point,

9    you can have people who newly develop OUD in the future for

10   all sorts of reasons and who join the population, you could

11   also have people who drop out of the population, and the top

12   line that we're showing there in the model is the net of

13   those two, correct?

14   **A.**    It is.  There's one opioid epidemic.  I mean, there's a

15   lot of dynamics of different directions that people may

16   develop harms and experience harms and, you know, move

17   towards recovery and then backslide, but it's one opioid

18   epidemic.  And so, my plan addresses that.

19   **Q.**    Now, I'm trying to just nail down the methodology and

20   the methodology is when we look at this top line, when we

21   look at the OUD population in your redress model, what we're

22   looking at is a net of people who go out of the OUD

23   population and new people who come in, correct?

24   **A.**    Yes.

25   **Q.**    And in other settings you have looked at or projected

1   the population of individuals who would newly be joining the

2   OUD population, but you were not asked to do so here,

3   correct?

4   **A.**   Yes, that's correct.

5   **Q.**   So, you've not estimated how many people would develop

6   OUD each year during the period covered by your model,

7   correct?

8   **A.**   Right.  I've not -- I've not estimated the proportions

9   that are developing opioid addiction anew in each subsequent

10  year.

11  **Q.**   So, let's again go back and if I could look at 2035.

12  If we look at this number for 2035 of an OUD population of

13  4,143, we don't know how many people in that population

14  newly developed OUD during the 15 years, as compared to

15  having OUD as of 2018?  We don't know that, correct?

16  **A.**   Well, it's a number that could be derived, but I,

17  sitting here today, could not provide you with such a

18  number.

19  **Q.**   And you were not asked to do that in this case,

20  correct?

21  **A.**   Correct.

22  **Q.**   So, there's no way to separate out the group that has

23  newly developed OUD after 2021, as compared to the group

24  that had OUD as of 2021?  That hasn't been done in this

25  case?

1     A.   It hasn't because I focused on abating the overall

2     opioid epidemic and, for that purpose, such a separation or

3     sort of distinction of one population versus another is --

4     is, in some sense, immaterial.  It's not necessary from a

5     public health and public policy perspective.

6     Q.   I'm not trying to be very cosmic.  I'm being pretty

7     narrow on the methodology.  And in terms of the methodology,

8     you have not separated out in any of these years the people

9     who have newly developed OUD during the 15-year period as

10    contrasted with the people who had OUD at the start of the

11    15 years?  You have not done that, correct?

12    A.   Yes, correct.

13    Q.   So, we've been looking quite a bit at this -- at this

14    line for the treatment population, but other aspects of your

15    plan also assume that people will use opioids and develop

16    OUD in the future, correct?

17    A.   Can you be more specific, please?

18    Q.   Sure.  Let me try.  So, one of the categories in your

19    plan is 4-A, for pregnant women, new mothers and infants.

20    And so, that is covering infants who develop NAS during

21    gestation, correct?

22    A.   Well, it's covering pregnant mothers and the infants.

23    Q.   Right.

24    A.   But the children would -- yes, the children would be --

25    the neonates would be infants that are born impacted by

1    Neonatal Abstinence Syndrome.

2    **Q.**   So, that could well include a baby who was born to a

3    mother who didn't have OUD as of 2018 or 2021, but begins

4    using opioids at some later time, delivers a baby, and that

5    baby has NAS, correct?

6    **A.**   Yes, it could.  I mean, I think that mother and that

7    baby are just as entitled to services and treatment as any

8    other.  And so, what I've focused on is developing a plan

9    that would allow for them to be treated such that, in

10   15 years, we could have the amount of harms occurring in the

11   community.

12   **Q.**   But I'm not debating the merits.  I'm just trying to

13   understand the method.  And the method includes mothers who

14   develop OUD later, after 2021, and who give birth to a baby

15   after 2021 and the mother and that baby are both treated

16   within this plan even though the mother did not have OUD as

17   of 2021, correct?

18   **A.**   Yes.

19   **Q.**   And you don't know what percentage of the NAS babies or

20   the mothers encompassed within that part of your plan are --

21   will be born to mothers who have OUD as of 2021 as compared

22   to mothers who develop OUD later?  You just haven't -- you

23   haven't done that analysis, correct?

24   **A.**   Well, I don't know if I've done the analysis, but I've

25   not done it and submitted it as part of my report for this

1    case.

2    **Q.**   Your plan also provides for early intervention, special

3    education and psychosocial treatment for children going

4    forward after they're born with NAS, correct?

5    **A.**   Yes.

6    **Q.**   And, again, so that could include a child born to a

7    mother who does not have OUD today, but develops it at some

8    later time from using opioids, correct?

9    **A.**   Yes.   I mean, you know, my -- my discussions with

10   experts on the ground and my review of the materials

11   suggests that there is no shortage of people that are

12   currently in need of services within the community, but

13   you're correct that I didn't net out or try to disaggregate

14   rather, you know, looking forward nine years from now, what

15   proportion of people nine years from now have opioid

16   addiction that developed after, you know, June, 2021.

17   **Q.**   So, let's go -- let's go back to the treatment section

18   of your report, Tab 2-B, and you discussed on your direct

19   examination that you're starting with a population of 7,882.

20   That's the OUD population, correct?

21   **A.**   Yes.

22   **Q.**   And then, you're assuming -- and you discussed this

23   this morning.   You're assuming that 40 percent of them

24   receive treatment for OUD in that first year, correct?

25   **A.**   Yes.