# TAB 2B

```
            IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                     AT CHARLESTON

_____x
                              :
THE CITY OF HUNTINGTON,       :     Civil Action
                              :
           Plaintiff,         :     No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
           Defendants.        :
_____x
                              :
CABELL COUNTY COMMISSION,     :     Civil Action
                              :
           Plaintiff,         :     No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
           Defendants.        :
_____x


             BENCH TRIAL - VOLUME 31
  BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
           UNITED STATES DISTRICT COURT
            IN CHARLESTON, WEST VIRGINIA


                   JUNE 29, 2021
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    MS. SINGER: So, I made a promise. I'm going to
2 try to keep it, Your Honor.
3    THE COURT: Good.

#### REDIRECT EXAMINATION

**BY MS. SINGER:**

Q. Dr. Alexander, you were asked questions yesterday on cross examination about whether the abatement plan contemplates services for people who had not used opioids or not used opioids before 2021. Do you recall those questions?

A. Yes, I do.

Q. Now, you were asked some hypothetical questions and I want to ask you a non-hypothetical question. Is it reasonable to assume that individuals will continue to develop addiction as a result of the epidemic that exists right now in Cabell County and the City of Huntington?

A. Yes, it is.

Q. And in your expert opinion will individuals who are not current or past opioid users still be harmed by the opioid epidemic that exists in this community?

A. Yes, they will.

Q. And can you explain the basis for that opinion?

A. Sure. Well, the opioid epidemic, I mean, I discussed yesterday one example of this, which is the intergenerational perpetuation of addiction. So, there are

1   individuals currently that are being harmed because they are
2   living in families where addiction is rampant and their
3   likelihood of developing subsequent addiction is much higher
4   than it otherwise would be.
5   　　　A second salient example, I think, are individuals that
6   are currently taking long-term prescription opioids.  They
7   may not currently have diagnostic -- they may not currently
8   have addiction, but they're at much greater risk of
9   addiction than an individual that's not currently taking
10  long-term prescription opioids and they may well be on
11  long-term prescription opioids as part and parcel of the
12  current epidemic.
13  　　　So, I think these are two of several examples of how
14  there's a very real prospect and every reason to believe
15  that there will be people in the future that will develop
16  addiction or other -- have other adverse consequences from
17  the epidemic who are not necessarily currently addicted.
18  **Q.**   And, Dr. Alexander, would that extend to children in
19  the child welfare system today or children born with
20  Neonatal Abstinence Syndrome, as well?  Will they
21  potentially bear greater risks in the future?
22  **A.**   Yes, they will.
23  **Q.**   And, Dr. Alexander, does a plan to abate the opioid
24  epidemic in Cabell-Huntington have to include interventions
25  to address the impacts that today's epidemic may have in the

1  future?
2  **A.** Yes, it does.
3  **Q.** All right. You were also asked questions yesterday
4  about various services currently being offered in the State
5  of West Virginia or Cabell and Huntington; do you recall
6  those questions?
7  **A.** Yes, I do.
8  **Q.** And does the Board of Medicine Medical Education
9  Program required for a provider's periodic licensing fully
10 address the overuse of opioids in Cabell County and the City
11 of Huntington?
12 **A.** No, it does not.
13 **Q.** And how about does -- let me ask differently. Does
14 that CME take the place of the other interventions laid out
15 in the abatement plan's prevention category aimed at helping
16 healthcare professionals identify patients with Opioid Use
17 Disorder or high volume prescribers?
18 **A.** No, it does not. And, indeed, I believe yesterday we
19 discussed in every category of my abatement plan one
20 example, for example, of some activity that's current that
21 speaks to that category and that says nothing as to the
22 comprehensiveness, sustainability, or impact of those select
23 interventions that might have been identified in a
24 particular category.
25 **Q.** Moving on to the next topic, Dr. Alexander, you were