# TAB 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.   :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.   :
_____x
```

BENCH TRIAL - VOLUME 31
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

JUNE 29, 2021

1    **A.**    The next row is the actual amount of anticipated annual

2    rent for 1,000 square feet of office space in the Huntington

3    area.

4    **Q.**    And did you calculate that number?

5    **A.**    I did.

6    **Q.**    What was your source for that?

7    **A.**    I conducted a review and survey of the market rates for

8    office space rental in the Huntington area.

9    **Q.**    And then the next row has a growth rate; correct?

10   **A.**    Yes, it does.

11   **Q.**    And how did you calculate -- what's the growth rate and

12   how did you calculate it?

13   **A.**    The growth rate for this particular item is

14   2.97 percent per year.  That is based upon data presented in

15   Appendix D to my report -- and that's D as in Delta -- which

16   is the calculation of the 30-year annual average rate of

17   change in the rent of shelter index that's provided by the

18   U.S. Bureau of Labor Statistics.

19   **Q.**    Would this be an example of using different inflation

20   rates for different goods and services?

21   **A.**    Yes, it is.

22   **Q.**    And then the last row is total estimated costs.  That's

23   easy enough math.  Even I can do it.  But can you explain it

24   very quickly?

25   **A.**    Yes.  Again, it is very simple and straightforward.

1    It's simply the number of terms, 1, times the annual rent

2    cost which is $15,033.

3    **Q.**   How do you know how much square feet would be needed

4    for this space?

5    **A.**   I looked at various office buildings and presentation

6    areas to determine how much space would be approximately

7    needed for a meeting of 50 people but could also house three

8    independent office spaces.  And from what I could review,

9    1,000 square feet seemed to be sufficient for that.

10   **Q.**   And the -- where did you get the 50 people and the

11   three office spaces?

12   **A.**   Oh, excuse me.  50 people in three offices comes from

13   Dr. Alexander's redress model.

14   **Q.**   Let's look at another example.

15         MR. MAJESTRO:  Can you pull up Demo 9?

16   BY MR. MAJESTRO:

17   **Q.**   Can you identify Demo Slide 9?

18   **A.**   Yes, I can.  This is a representation of the specific

19   calculations for the category in item 3B3, traditional

20   housing for newly released falling under criminal justice.

21   **Q.**   How did you calculate the cost of housing for this

22   population?

23   **A.**   In the City of Huntington we could not find any

24   specific data relating to the transitional cost of

25   individuals who were being released from incarceration and

1    being reintroduced to society.

2          So there was an article which was published which I

3    have in a footnote.  The footnote here is Footnote 6, the

4    Spellman article published in 2010 that's entitled "Costs

5    associated with first-time homelessness for families and

6    individuals."

7          That particular article provided a national average for

8    what transitional housing costs were for seven different

9    cities spread across the United States.

10         I utilized that information as a proxy for

11   understanding how transitional housing costs differ from

12   just regular housing costs, which that article also

13   provided.

14         So there's a supplement, an addition to the regular

15   housing costs that are made for transitional housing.

16   **Q.**   And why is that?

17   **A.**   Transitional housing has services built into it that

18   regular housing for individuals who have not been

19   incarcerated would not have.

20         So because of those special services that Dr. Alexander

21   has recommended with the recommendation of transitional

22   housing, we can expect those costs to be greater than simply

23   the fair market rent values in that particular area.

24   **Q.**   And, so, how did you relate the Spellman article that

25   had surveys of I think you said seven areas on a nationwide

1    basis to Cabell/Huntington costs?

2    **A.**    We were able to obtain data for the fair market rent

3    values in Huntington from a document that the City of

4    Huntington submitted to the U.S. Department of Housing and

5    Urban Development.

6         In that particular document, from 2015 to 2019 it was

7    identified that the fair market rent value in Huntington was

8    a specific amount.  And then I simply did a ratio

9    calculation comparing that with the fair market rent values

10   from the Spellman article.

11        That ratio provided me an adjustment factor to move the

12   transitional housing costs from the Spellman article from

13   the seven-city national average to a Huntington specific.

14   **Q.**    And, so, is that -- are those the numbers, then, that

15   would be on the row that's listed as cost per person for the

16   transitional housing?

17   **A.**    Yes, it would.

18   **Q.**    And then you also adjusted those for inflation;

19   correct?

20   **A.**    Yes, I did.

21   **Q.**    And what inflation rate did you use for that?

22   **A.**    Similar to the office space, I used the same index here

23   which was the rent of shelter index increasing into the

24   future at a rate of 2.97 percent.

25   **Q.**    And then what -- the total estimated cost, how was that

```
1    A.    That's right.  If you took the individual tabs from

2    each one of these specific items, added them all up, they

3    would equal $144 million.

4    Q.    Okay.  And then let's just go through the years.

5          What's the -- what was the total for 2022?

6    A.    $149 million.

7    Q.    2023?

8    A.    $153 million.

9    Q.    2024?

10   A.    $159 million.

11   Q.    2025?

12   A.    $164 million.

13   Q.    2026?

14   A.    $159 million.

15   Q.    2027?

16   A.    $160 million.

17   Q.    2028?

18   A.    $166 million.

19   Q.    2029?

20   A.    $170 million.

21   Q.    2030?

22   A.    $174 million.

23   Q.    2031?

24   A.    $178 million.

25   Q.    2032?
```

1    **A.**   $183 million.

2    **Q.**   2033?

3    **A.**   $188 million.

4    **Q.**   2034?

5    **A.**   $192 million.

6    **Q.**   And 2035?

7    **A.**   $197 million.

8    **Q.**   And can you tell me what the total is of all of those

9    numbers for the 15-year period?

10   **A.**   $2.5 billion.

11   **Q.**   Why don't you read the whole number out for this one?

12   **A.**   $2,544,446,548.

13   **Q.**   And, so, these numbers that you've just testified to,

14   do you hold an opinion to a reasonable degree of

15   professional certainty in the field of forensic economics

16   that they are the total cost for Dr. Alexander's redress

17   model for those years in total?

18   **A.**   Yes, I do.

19   **Q.**   All right.  So with respect to each of the individual

20   categories that are shown on Demonstrative 12, what would

21   the total cost for category 1A, professional, health

22   professional education be for the 15-year period?

23   **A.**   $5.4 million.

24   **Q.**   Let's go ahead and read the whole number.

25   **A.**   Okay.  $5,437,224.

| | | |
|---|---|---|
| 1 | **Q.** | How about category 1B? |
| 2 | **A.** | $538,834. |
| 3 | **Q.** | Category 1C? |
| 4 | **A.** | $35,972. |
| 5 | **Q.** | Category 1D? |
| 6 | **A.** | $17,924,519. |
| 7 | **Q.** | Category 1E? |
| 8 | **A.** | $19,554,622. |
| 9 | **Q.** | Category 1F? |
| 10 | **A.** | $5,229,383. |
| 11 | **Q.** | With respect to category 2, category 2A? |
| 12 | **A.** | $26,674,357. |
| 13 | **Q.** | Category 2B? |
| 14 | **A.** | $1,705,896,182. |
| 15 | **Q.** | Category 2C? |
| 16 | **A.** | $301,682,032. |
| 17 | **Q.** | Category 2D? |
| 18 | **A.** | $6,185,398. |
| 19 | **Q.** | Category 2E? |
| 20 | **A.** | $10,377,665. |
| 21 | **Q.** | Category 3A? |
| 22 | **A.** | $11,623,562. |
| 23 | **Q.** | Category 3B? |
| 24 | **A.** | $42,051,138. |
| 25 | **Q.** | Category 3C? |

1    **A.**   $41,000 -- excuse me -- $41,912,512.

2    **Q.**   Category 3D?

3    **A.**   $3,651,622.

4            MR. HESTER:  Objection, Your Honor.  I think the

5    witness misstated category 3D.

6            THE COURT:  I think he did too.

7            THE WITNESS:  I'm sorry.  Excuse me.

8            THE COURT:  I'll sustain the objection.  You can

9    fix it, Mr. Majestro.

10           MR. MAJESTRO:  Yes.

11   BY MR. MAJESTRO:

12   **Q.**   So there is -- is there, is there an amount for

13   category 3D?

14   **A.**   No, there is not.

15   **Q.**   Okay.  Now let's go to category 3E.

16   **A.**   3E is $3,651,622.

17   **Q.**   Category 4A?

18   **A.**   $95,700,232.

19   **Q.**   Category 4B?

20   **A.**   $33,990,116.

21   **Q.**   Category 4C?

22   **A.**   $212,040,134.

23   **Q.**   Category 4D?

24   **A.**   4E?

25   **Q.**   4D.

1    **A.**    I think we just did 4D.

2    **Q.**    Oh, okay.  I'm sorry.  And then 4E.  Is there a number

3    for 4E?

4    **A.**    No, there is no number for 4E.

5    **Q.**    And if you total all those --

6            THE COURT:  You missed 4D, did you not?

7            MR. MAJESTRO:  What?

8            THE COURT:  Did you not miss 4D?

9    BY MR. MAJESTRO:

10   **Q.**    Well, let's make sure.  Why don't you give us 4D

11   again, or give it to us if we missed it.

12   **A.**    Sure, sure, yes.  $3,941,041.

13   **Q.**    So the total of all of those services over the 15-year

14   period, what is that total?

15   **A.**    $2,544,446,548.

16   **Q.**    Okay.  And so the record is clear, let's go back to --

17   and we just read the names.  I'd like you to read into the

18   record from -- let's go to Demo 4.  And let's just make sure

19   the record is complete.

20           Will you -- can you read into the record what the, what

21   the names of the different categories are, 1A, 1B?

22   **A.**    Sure, yes.  Category 1 is Prevention - Reducing Opioid

23   Over-Supply and Improving Safe Opioid Use.

24           Do you want me to go through each item?

25   **Q.**    Yes, so if somebody is looking at the transcript and

1        they want to know what the number for 1C relates to, they

2        will have a key.

3        **A.**    Okay, yes.

4        **Q.**    That's my fault for not reading them out the first

5        time, but we'll just clean it up this way.

6        **A.**    1A is health professional education.

7                  1B, patient and public education.

8                  1C, safe storage and drug disposal.

9                  1D, community prevention and resiliency.

10                 1E, harm reduction.

11                 1F, surveillance, evaluation, and leadership.

12                 Category 2 is Treatment - Supporting Individuals

13       Affected by the Epidemic.

14                 2A is connecting individuals to care.

15                 2B, treating opioid use disorder.

16                 2C, managing complications attributable to the

17       epidemic.

18                 2D, workforce expansion and resiliency.

19                 2E, distributing naloxone and providing training.

20                 Category 3 is Recovery - Enhancing Public Safety and

21       Reintegration.

22                 3A, public safety.

23                 3B, criminal justice system.

24                 3C, vocational training and job placement.

25                 3D, reengineering the workplace.

```
 1              3E, mental health counseling and grief support.

 2              Category 4 is Addressing Needs of Special Populations.

 3              4A, pregnant women, new mothers, and infants.

 4              4B, adolescents and young adults.

 5              4C, families and children.

 6              4D, homeless and housing insecure individuals.

 7              4E, individuals with opioid misuse.

 8     Q.    Okay.  Thank you, Mr. Barrett.

 9              The methods you used for determining these cost

10     estimates, including the three-step method you testified

11     about, the cost sources you personally developed, the

12     reliance on data from Dr. Alexander's redress model, are

13     they all the types of data and methods reasonably relied

14     upon by experts in the field of forensic economics?

15     A.    Yes.

16     Q.    All right.  Let's switch gears again.  Let's talk about

17     present value.

18              The numbers you gave today and in your, in your August

19     report, were they in today's dollars or future dollars?

20     A.    These are all presented in future dollars.

21     Q.    Can you explain to the Court what that means?

22     A.    As I was explaining previously, once we have the unit

23     costs for the information of all the items in the redress

24     model, I am going to use inflationary data or inflationary

25     trends to increase those base level costs or total costs to
```

1    each year's future value to estimate how much it would

2    actually cost in the year 2022 or 2025 or 2035.

3    **Q.**    And, so, do forensic economists traditionally calculate

4    data like this as a present value?

5    **A.**    Yes.

6    **Q.**    And why do they do that?

7    **A.**    The expectation is that any award would be presented in

8    a lump sum.  The lump sum would earn interest.  And, so, by

9    discounting to present value, we account for the interest

10    earning that the lump sum award would earn if it was

11    invested.

12    **Q.**    In this case, what interest rate did you pick to

13    discount to present value?

14    **A.**    3.73 percent.

15    **Q.**    And what, what does that represent?

16    **A.**    I looked at the annual historic average, annual

17    interest rates over 30 years on two different types of

18    investments.

19         I looked at six-month maturing U.S. treasury bills.

20    And I looked at 10-year maturing U.S. security treasury

21    notes.

22         I looked at each one of those annual rates individually

23    across 30 years, and then did an average of all those rates.

24    The average across that time period was 3.73 percent.

25    **Q.**    And do you believe that's the appropriate rate to use

1    in this case?

2    **A.**    It is, yes.  I believe it's consistent with the rates

3    that appear in peer-reviewed methodologies for forensic

4    economics.  It is also consistent with an expectation of

5    what the investment would use.  It's the same rate that I

6    use in all the other cases that I calculate.

7    **Q.**    And are you familiar with Mr. Rufus who issued a report

8    in this case?

9    **A.**    I am, yes.

10   **Q.**    Did he in his report and his testimony offer a

11   different rate?

12   **A.**    He did, yes.

13   **Q.**    And what rate did he offer?

14   **A.**    2.85 percent.

15   **Q.**    How does your interest rate compare to that rate by

16   Mr. Rufus?

17   **A.**    My rate is --

18          MS. WICHT:  Objection, Your Honor.  If I

19   understand what's happening here, I think Mr. Barrett is

20   being asked to rebut testimony that has not yet been offered

21   by any defense expert.  I think the Court previously

22   declined to allow such testimony.

23          THE COURT:  Well, why do you have to have the

24   other figure when he's using 3.73 to reduce to present

25   value?

1          MR. MAJESTRO:  The answer, Your Honor, is it shows

2     that his figure is reasonable in comparison to the defense's

3     experts and testimony.  It gives Your Honor a point to refer

4     to.

5          THE COURT:  Well --

6          MS. WICHT:  Well, Your Honor, if, if Mr. Rufus

7     comes and testifies and offers a rate, they can

8     cross-examine about that, but I don't think it's proper to

9     pre-but the testimony.

10          THE COURT:  I'll sustain the objection, Mr.

11     Majestro.

12     BY MR. MAJESTRO:

13     Q.   Did calculating to present value affect any of the

14     other calculations in your report?

15     A.   Yes, it did.

16     Q.   And can you explain that?

17     A.   Well, each year it's expected that a lump sum award

18     would be invested and earn interest.  And, so, because of

19     the compounding effect of interest, each successive year

20     from a present value perspective would result in a

21     discounting to present value.

22          So the reduced to present value number is going to be

23     less than the future value number that we've previously

24     discussed.

25     Q.   Okay.  And did -- however, did you change -- other than

1    the discounting to present value -- well, I'll withdraw that

2    question.  What date did you use to start the present value

3    calculation?

4    **A.**   September 1st of 2021.

5    **Q.**   And when you started with September -- why did you

6    start with September 1st, 2021?

7    **A.**   I was specifically asked to assume that the date of

8    award would be September 1st of 2021.  And, so, at that

9    point, the lump sum would begin earning interest.

10   **Q.**   And what was the present value of the sum of the costs

11   of Dr. Alexander's programs?

12   **A.**   The present value total of all of the categories?

13   **Q.**   Yes, that you calculated.

14   **A.**   $1,802,428,070.

15          MR. MAJESTRO:  And, Gina, can you bring up the

16   summary page?  The other one.  Sorry.

17   BY MR. MAJESTRO:

18   **Q.**   So, now, you testified that you started from

19   September 1, 2021.  Does that impact the -- does that

20   impact the numbers in the 2021 column on Attachment M?

21   **A.**   Not with regard to the future value because the, the

22   sum total of all the future values that we discussed

23   previously, the 2.544 billion-dollar number, that is derived

24   from looking at the individual subtotals from each

25   individual item all through Appendix M, so each one of those

1    individual tabs.

2    **Q.**   So to get to, to get to starting with September 1,

3    2021, did you have to modify those final numbers that we've

4    already talked about in this Attachment M?

5    **A.**   Yes.  In Column J here in the year 2021, I prorated all

6    of the values in that column for the first year to be

7    representative of four months or 122 days in this year.

8    **Q.**   And what was -- what's the total for 2021 then?

9    **A.**   Prorated for four months it's $48,247,194.

10   **Q.**   And that -- I believe you testified before that for the

11   entire year the number was 144,346,000.  Correct?

12   **A.**   Yes, that's correct.

13   **Q.**   If you didn't prorate 2021, what would the present

14   value be?

15   **A.**   It would be approximately $90 million more.

16   **Q.**   1.89 billion?

17   **A.**   Oh, the present value total?  I'm sorry.

18   **Q.**   Yes.

19   **A.**   Yes.  The grand present value total would be

20   $1.89 billion, roughly $90 million more.

21   **Q.**   Okay.

22           MR. MAJESTRO:  We can take that down now.  Let's

23   bring up Demonstrative Slide 13.

24   BY MR. MAJESTRO:

25   **Q.**   So your total cost figure has changed between when

```
1    you submitted your report in August and now; correct?
2    A.   Yes.
3    Q.   Can you, can you describe for the Court what your total
4    costs were in the various revisions that you performed?
5    A.   Yes.  These, of course, represent the future value
6    calculations.  From the report in August of 2020, it was
7    2.589.
8    Q.   Why don't you go ahead and read the whole number.
9    A.   Sure, yes, absolutely.  $2,589,054,447.
10   Q.   Okay.  On August 26 you submitted a second set of
11   calculations.  What was -- what, what changed to require
12   those new calculations?
13   A.   There was an updated redress model with some revisions
14   from Dr. Alexander and Dr. Young.  And in addition to that,
15   there was a small error identified in the housing cost
16   formula that had to do with averages.
17   Q.   And what was the total in the August 26th report?
18   A.   The subsequent report increased slightly to
19   $2,598,789,021.
20   Q.   Did you also submit a revised attachment in September
21   of 2020?
22   A.   Yes.
23   Q.   And what necessitated those revisions?
24   A.   That year -- or excuse me -- that report in September
25   of 2020, we updated the cost of peer family mentoring based
```

1    summary tab?  Expand the whole spreadsheet, please.  I think

2    you've got some columns hidden.  Unhide the columns, please.

3             BY MR. MAJESTRO:

4    **Q.**   Okay.  Mr. Barrett, we've identified this document

5    before, but so, for the record -- for the record, can you

6    identify it again?

7    **A.**   Yes.  This is a summary of the individual future value

8    and present value calculations for each individual item in

9    the redress model.

10   **Q.**   And the -- and Column -- Column V, can you tell us what

11   that is?

12   **A.**   I'm sorry.  Was that B as in Bravo?

13   **Q.**   V as in Victor.

14   **A.**   V?

15   **Q.**   I may be looking at it wrong.

16   **A.**   Yes.  V represents the year 2033.

17   **Q.**   Well, I need some new glasses.

18             MR. MAJESTRO:  Move over, Gina.  We're looking for

19   two columns over, I believe.  No, the other way.  Sorry.

20   Yes.  What column is that?  It's Y.

21             THE WITNESS:  Column Y is the 15-year total of

22   each individual item from the redress model.

23             MR. MAJESTRO:  Okay.

24        And, Gina, can you hide every column after the name

25   label to Column Y so we can just read Column Y and the

1    labels?

2         Okay.  And hide all that stuff, too.  I don't know what

3    that is.

4         And make it a little bigger, please.  Thank you.

5              BY MR. MAJESTRO:

6    **Q.**   Okay.  Mr. Barrett, the -- how does this summary differ

7    from Demonstrative Slide 12 in detail?

8    **A.**   Well, that's it.  That's the keyword.  It is detailed.

9    It's an item by item calculation of the summary total

10   15-year costs of the redress model.

11             MR. MAJESTRO:  Your Honor, may I approach?

12             THE COURT:  Yes.

13             BY MR. MAJESTRO:

14   **Q.**   So, I have what we have on the screen printed off as

15   Demonstrative 274.  So, for reading purposes, it will be

16   easier.

17        So, Mr. Barrett, is Demonstrative 274 the same

18   information that we had from the -- your exhibit -- your

19   Attachment M, P-41954?

20   **A.**   Yes, it is.

21   **Q.**   Okay.  So, I'm going to ask you to read some numbers

22   into the record again.

23        So, under Category 1A1, Academic Detailing, what is the

24   -- what is the number that is in the -- in Column Y?

25   **A.**   $1,306,672.00.

1    **Q.**   And what does that represent?

2    **A.**   The total 15-year future value cost of the academic

3    detailing subcategory of 1A1, Academic Detailing.

4    **Q.**   And to close the loop, the subcategories, where do

5    those subcategories come from?

6    **A.**   From Dr. Alexander's redress model.  Each individual

7    item is identified and I'm categorizing that as being a

8    specific or a sub item.

9    **Q.**   I'm sorry.  I didn't hear you.

10   **A.**   A specific or sub item under the categories.

11   **Q.**   Thank you.  And Category 1A2, Continuing Healthcare

12   Provider Education, what is the total for that category?

13   **A.**   $4,130,552.00.

14   **Q.**   And Patient and Public Education, what is the total for

15   that category?

16   **A.**   $538,834.00.

17   **Q.**   And Safe Storage and Drug Disposal Programs, what is

18   the total?

19   **A.**   $35,972.00.

20   **Q.**   Category 1D1a, Community Resiliency Coalition Staffing

21   Director, what is the total for that category?

22   **A.**   $1,644,299.00.

23   **Q.**   Category 1D1b, Community Resiliency Coalition Staffing:

24   Community Organizers, what is the total for that category?

25   **A.**   $986,146.00.

1   **Q.**   Category 1D2, Community Resiliency Space, what is the
2   total for that category?
3   **A.**   $278,974.00.
4   **Q.**   Category 1D3, Community Resiliency Coalition Funding,
5   what is the total for that category?
6   **A.**   $15,015,100.00.
7   **Q.**   Category 1E1, Syringe Service Programs, what is the
8   total for that category?
9   **A.**   $12,619,008.00.
10  **Q.**   Category 1E2a, Drug Checking Machines, what is the
11  total for that category?
12  **A.**   $87,826.00.
13  **Q.**   Category 1E2a, Drug Checking Machines Recurring Costs
14  Per Year, what is the total for that category?
15  **A.**   $1,303,333.00.
16  **Q.**   Category 1E3, Fentanyl Test Strips, what is the total
17  for that category?
18  **A.**   $5,544,455.00.
19  **Q.**   Category 1F1, Executive Director, what is the total for
20  that category?
21  **A.**   $1,644,299.00.
22  **Q.**   And to be clear, that is a subcategory of -- what is
23  that a subcategory of?
24  **A.**   It falls under the main category of Prevention and the
25  subcategory of Surveillance, Evaluation and Leadership.

133

1   **Q.**   Okay.  And then another subcategory would be 1F2, Data

2   Analysts.  What is the subtotal for that subcategory, 1F2?

3   **A.**   $3,275,608.00.

4   **Q.**   And another subcategory from 1F, 1F3, Staff Assistant,

5   what is the total for that for a 15-year period?

6   **A.**   $309,476.00.

7   **Q.**   Okay.  Let's go to Category 2.  So, Category 2A1,

8   Helpline, is that a subcategory?

9   **A.**   Yes, it is.

10  **Q.**   And what is it a subcategory of?

11  **A.**   It falls under the main category of Treatment and the

12  subcategory of Connecting Individuals to Care.

13  **Q.**   Okay.  And for that subcategory Helpline, what is the

14  total for the 15-year period?

15  **A.**   $3,187,386.00.00.

16  **Q.**   Category 2A2, Peer Review [sic] Coaches, what is the

17  total for that subcategory?

18  **A.**   $5,845,435.00.

19  **Q.**   Category 2A3, Transportation Assistance, what is the

20  total for that subcategory?

21  **A.**   $4,138,646.00.

22  **Q.**   And moving to Category 2A4, the Quick Response Teams,

23  there are three subcategories under that, I see.  What is

24  the -- first one is 2A4a, Addiction Counselor (QRT).  What

25  is the total for that subcategory?

**A.**   $1,151,591.00.

**Q.**   The next one is 2A4b, First Responder (QRT).  What is the total for that subcategory?

**A.**   $833,214.00.

**Q.**   The next one is 2A4c, Peer Coach (QRT).  What is the total for that category, subcategory?

**A.**   $4 -- I'm sorry.  $433,000.00.

**Q.**   2A5, Bridge Programs, what is the total for that subcategory?

**A.**   $11,085,085.00.

**Q.**   So, moving to Category 2B, Treating Opioid Use Disorder, the first category -- subcategory under that is Category -- Subcategory 2B1, Outpatient Treatment.  What is the total for that subcategory?

**A.**   $971,357,386.00.

**Q.**   Category 2B2, Intensive Outpatient Treatment, what is the total for that subcategory?

**A.**   $371,953,917.00.

**Q.**   Category 2B3, Residential Treatment, what is the total for that subcategory?

**A.**   $183,137,911.00.

**Q.**   2B4, Inpatient Treatment, what is the total for that subcategory?

**A.**   $41,848,310.00.

**Q.**   Category 2B5, Buprenorphine, what is the total for that

1    subcategory?

2    **A.**   $72,912,030.00.

3    **Q.**   Category 2B6, Methadone, what is the total for that

4    subcategory?

5    **A.**   $33,695,230.00.

6    **Q.**   Category 2B7, Naltrexone, what is the total for that

7    subcategory?

8    **A.**   $30,991,399.00.

9    **Q.**   Okay.  Category 2C is Managing Complications

10   Attributable to the Epidemic.  Category 2C1 is Human

11   Immunodeficiency Virus/Hepatitis C Virus Screening.  What is

12   the total under that subcategory?

13   **A.**   $1,475,808.00.

14   **Q.**   2C2, Hepatitis C Virus Treatment, what is the total of

15   that subcategory?

16   **A.**   $102,070,764.00.

17   **Q.**   Category 2C3, Human Immunodeficiency Virus Treatment,

18   what is the total of that subcategory?

19   **A.**   $115,462,871.00.

20   **Q.**   Subcategory 2C4, Endocarditis Treatment, what is the

21   total for that subcategory?

22   **A.**   $82,672,589.00.

23   **Q.**   Category 2D is Expanding the Healthcare Workforce.  The

24   first subcategory is Recruitment and Retention.  What is the

25   total of that subcategory?

1     A.    $205,077.00.

2     Q.    Category 2D2 is Medical Social Workers.  What is the

3     total of that subcategory?

4     A.    $3,648,561.00.

5     Q.    Category 2D3 is Reducing Burnout/Compassion Fatigue.

6     What is the total of that subcategory?

7     A.    $2,331,760.00.

8     Q.    Category 2E is Distributing Naloxone and Providing

9     Training.  Subcategory 2E1 is First Responders Training.

10    What is the total of that subcategory?

11    A.    $754,489.00.

12    Q.    Category 2E2 is Narcan for First Responders.  What is

13    the total of that subcategory?

14    A.    $1,686,285.00.

15    Q.    Subcategory 2E3 is Injectable Naloxone for Emergency

16    Departments.  What is the total of that subcategory?

17    A.    $343,540.00.

18    Q.    Category 2E4a, Take-Home Kit For Opioid Use Disorder

19    Population, what is the total of that subcategory?

20    A.    $550,791.00.

21    Q.    2E4b, Narcan for Opioid Use Disorder Population, what

22    is the total of that subcategory?

23    A.    $6,870,609.00.

24    Q.    Category 2E5a, Naloxone Public Lock Boxes, what is the

25    subtotal for that category?

1   **A.**   $29,220.00.

2   **Q.**   Category 2E5b, Narcan For Public Lock Boxes (Doses For

3   Boxes), what is the total of that subcategory?

4   **A.**   $142,731.00.

5   **Q.**   Category 3 is Recovery - Enhancing Public Safety and

6   Reintegration.  Category 3A under that is Public Safety and

7   Category 3A1 is Law Enforcement Assisted Diversion, or the

8   LEAD Program.  What is the total for the LEAD Program?

9   **A.**   $1,549,023.00.

10   **Q.**   Category 3A2, Community-Oriented Policing, what is the

11   total for that subcategory?

12   **A.**   $7,331,972.00.

13   **Q.**   Category 3A3, Specialized Overdose Units, what is the

14   total for that subcategory?

15   **A.**   $2,320,177.00.

16   **Q.**   3A4, Stigma Reduction Training, what is the total of

17   that subcategory?

18   **A.**   $422,390.00.

19   **Q.**   Category 3B is Criminal Justice System.  Subcategory

20   3B1 is Drug Courts.  What is the total for Subcategory 3B1?

21   **A.**   $30,037,783.00.

22   **Q.**   Category 3B2 is Re-Entry and Reintegration.  What is

23   the total for that subcategory?

24   **A.**   $3,256,624.00.

25   **Q.**   Category 3B3, Transitional Housing for Newly Released,

```
 1    what is the total for that subcategory?
 2    A.    $8,756,731.00.
 3    Q.    Category 3C is Vocational Training and Job Placement.
 4    What is the total for that category?
 5    A.    $41,000 -- excuse me.  $41,912,512.00.
 6    Q.    Category 3D, Reengineering the Workplace, there's no
 7    total for that, correct?
 8    A.    Yes, 0.
 9    Q.    Category 3E Mental Health Counseling and Grief Support,
10    what is the total for that subcategory?
11    A.    $3,651,622.00.
12    Q.    Moving along to Category 4, which is Addressing Needs
13    of Special Populations, first subcategory is Category 4A,
14    Pregnant Women, New Mothers, and Infants and the first
15    subcategory under that is Subcategory 4A1, Prenatal Opioid
16    Use Disorder Screening.  What is the total for that
17    subcategory?
18    A.    $1,700,805.00.
19    Q.    What is the total of Subcategory 4A2, Prenatal
20    Psychosocial Services?
21    A.    $2,262,182.00.
22    Q.    What is the total for Subcategory 4A2b, Postpartum
23    Psychosocial Services?
24    A.    $40,737,082.00.
25    Q.    What is the total for Category 4A3, Prenatal and
```

```
1     Postpartum Housing Services?
2     A.   $4,637,786.00.
3     Q.   Subcategory 4A4a, Interventions For Infants Exposed to
4     Opioids in Utero, what is the total for that subcategory?
5     A.   $29,399,201.00.
6     Q.   Subcategory 4A4b, Early Interventions for Infants
7     Exposed to Opioids in Utero (0-5 Years Old), what is the
8     total for that subcategory?
9     A.   $14,499,537.00.
10    Q.   4A4c, Special Education and Psychosocial Services for
11    Infants Exposed (6-21 Years Old), what is the total for that
12    subcategory?
13    A.   $2,463,640.00.
14    Q.   Category 4B is Adolescents and Young Adults.  Under
15    that subcategory 4B1 is School Based Prevention Programs.
16    What is the total for that subcategory?
17    A.   $32,977,433.00.
18    Q.   Subcategory 4B2 is Adolescents Screening for Opioid Use
19    Disorder.  What is the subtotal of that subcategory?
20    A.   $1,012,684.00.
21    Q.   The next category is Category 4C, Families and
22    Children.  The first subcategory under that is 4C1a, Support
23    For Children Living With Parents with Opioid Use Disorder.
24    What is the total of that subcategory?
25    A.   $40,561,122.00.
```

1  **Q.**   Subcategory 4C1b, Support for Children Living With

2  Parents with Opioid Use Disorder, and this is for

3  Interventions.  What is the total for that subcategory?

4  **A.**   $63,355,918.00.

5  **Q.**   Category 4C2a, Support For Children in Foster Care.

6  This is the Foster Care Cost Per Child.  What is the total

7  for that subcategory?

8  **A.**   $81,823,239.00.

9  **Q.**   Subcategory 4C2b, Support For Children in Foster Care

10  (Socio-Emotional Support), what is the total for that

11  subcategory?

12  **A.**   $10,491,017.00.

13  **Q.**   Subcategory 4C2c, Support for Children in Foster Care,

14  this is the Intensive Parent-Child Interventions.  What is

15  the total for that subcategory?

16  **A.**   $1,509,602.00.

17  **Q.**   Category 4C2d, Support For Children in Foster Care

18  (Family Drug Courts), what is the total for that

19  subcategory?

20  **A.**   $9,258,373.00.

21  **Q.**   Category 4C3a, Support for Adopted Children and

22  Families (Adoption Cost Per Child), what is the total for

23  that subcategory?

24  **A.**   $4,081,672.00.

25  **Q.**   Subcategory 4C3b, Support For Adopted Children and

```
 1    Families (Socio-Emotional Support), what is the total for
 2    that subcategory?
 3    A.    $790,580.00.
 4    Q.    Subcategory 4C3c, Support For Adopted Children and
 5    Families (Intensive Parent-Child Interventions), what is the
 6    total for that subcategory?
 7    A.    $168,610.00.
 8    Q.    Moving to Category 4D, Homeless and Housing Insecure
 9    Individuals.  One subcategory under that, 4D1, Permanent
10    Supportive Housing, what is the total for that subcategory?
11    A.    $3,941,041.00.
12    Q.    The numbers you've just read, did all of those numbers
13    represent the 15-year total of the costs for Dr. Alexander's
14    abatement plan?
15    A.    Yes.
16    Q.    Now, with respect to the -- I asked you this question
17    earlier this morning with respect to the other numbers you
18    read, but let's just complete the circle in the record.  To
19    a reasonable degree of professional certainty in the field
20    of forensic economics, are the numbers you just -- the
21    numbers you just read your opinion regarding the costs of --
22    for Dr. Alexander's redress model for each of those
23    categories for the 15-year period?
24    A.    Yes, sir, they are.
25    Q.    And in -- those are all numbers you calculated?
```

**A.**    Yes, I did.

**Q.**    And in calculating those numbers, you used the same methods for determining these cost estimates, including the three-step method, the cost sources you personally developed, the reliance on data from Dr. Alexander's redress model, and those are all -- are those all types of data methods reasonably relied upon by experts in the field of forensic economics?

**A.**    Yes, they are.

**Q.**    And to be clear, these -- the numbers in these subcategories are more detail than the numbers that you read for us this morning, correct?

**A.**    Yes.  There were more numbers that we read because they are individual items under the subcategories that we read this morning.

**Q.**    And so, these are not -- in addition to those numbers, these are another way of slicing those same numbers you read this morning and giving the Court more detail about what those numbers are comprised of?

**A.**    That's right.  This is an individual calculation of each item.

MR. MAJESTRO:  Your Honor, if I may have a couple of minutes to confer with my colleagues?

THE COURT:  Yes.

(Pause)

1   **Q.**   Yes.  If you -- if you go to -- so, are you in 2B?

2   **A.**   2-Bravo, yes.

3   **Q.**   Yes.  And if you go to the third page of 2-Bravo,

4   there's a category of suggested costs.

5   **A.**   Right below the blue box that says OUD treatment drug

6   costs?

7   **Q.**   Just above it.

8   **A.**   Yes.  Yes, I do see it.  Yes.

9   **Q.**   And do you see the cost items there, the sourcing, are

10  based -- are based on Medicaid reimbursement levels?

11  **A.**   I don't see the word Medicaid anywhere in that blue box

12  paragraph.

13  **Q.**   Let me -- let me ask you to look a little further down.

14  Do you see there's references to Buprenorphine and Methadone

15  treatment?

16  **A.**   Yes.  Yes, I do.

17  **Q.**   Do you see there's references there to Medicaid?

18  **A.**   I do, yes.

19  **Q.**   Reimbursement levels.  And do you -- do you understand

20  -- you don't have an understanding, or not, as to whether or

21  not Dr. Alexander based his costing for the treatment levels

22  on Medicaid reimbursement levels?  You don't know one way or

23  the other?

24  **A.**   No, sir, I do not.

25  **Q.**   Are you aware that treatment for OUD is a medical cost

1    that is subject to insurance, whether by Medicaid, or by

2    other forms of health insurance?

3    **A.**   No, I'm not aware of that.

4    **Q.**   So, you don't know one way or the other as to whether

5    insurance applies to medical treatment for OUD?

6    **A.**   No.  I've never examined that.

7    **Q.**   And do you know one way or the other whether Medicaid

8    applies to treatment for babies born with NAS?

9    **A.**   No.  I've not investigated that either.

10   **Q.**   So, let's -- if I -- if I look at the four largest

11   items here in your summary sheet --

12   **A.**   Sure.

13   **Q.**   The four largest items, the first one is treating

14   Opioid Use Disorder.  That's 1.7 billion, right?

15   **A.**   That is correct, yes.

16   **Q.**   And then, the next item down, 2C, which is 300 million,

17   is Managing Complications Attributable to the Epidemic.  Do

18   you see that?

19   **A.**   I do, yes.

20   **Q.**   And that's for treatment with people with HIV,

21   Hepatitis C, and other bloodborne diseases, correct?

22   **A.**   Just a moment just to review.  There are multiple

23   health conditions which are identified here.  It looks like

24   Hepatitis C, HIV, and endocarditis are specifically

25   identified, yes.

1    **Q.**   So -- so, those are also medical conditions that would

2    be subject to treatment under this redress model, right?

3    **A.**   Yes.  Costs for the treatment of those conditions are

4    included in the redress model.

5    **Q.**   Right.  So, if we take those two together, and I

6    recognize what you've said, that you're not sure whether

7    insurance applies to these categories, but if we take those

8    two together, the 1.7 billion and the 300 million, if

9    insurance applies to that, that would apply to about

10   $2 billion dollars of the total costs, correct, if insurance

11   applies?

12   **A.**   I don't feel comfortable in making such a conclusion

13   because I'm -- I don't know if you're asking me in the

14   assumption from the hypothetical that all of the costs are

15   being paid by Medicare.  So, I would -- I would answer your

16   question by saying if the assumption is that all of these

17   costs are irrelevant, then we could add those together and

18   then they would be excluded, but --

19   **Q.**   No, I'm not -- I wasn't asking if they are irrelevant.

20   I was just -- I was really trying to confirm, and I am

21   asking you to assume something.

22   **A.**   Okay.  Please explain.

23   **Q.**   I'm asking you to assume that those two categories are

24   subject to insurance, whether it's Medicaid, private health

25   insurance, other forms of insurance.  And there are other

1    witnesses who have testified about this question.

2    **A.**    Sure.

3    **Q.**    I'm asking you to assume that if that's true, that

4    would amount to about $2 billion dollars of your total costs

5    estimated here?

6    **A.**    See, I'm not -- I'm not comfortable with that because

7    even in insurance plans there are 80/20 plans and some

8    insurance plans aren't that good.

9    **Q.**    I'm asking you to assume it, sir.

10   **A.**    Assume a hundred percent coverage and that someone else

11   would be paying for these types of things?

12   **Q.**    Yes.

13   **A.**    Then the total would be $2 billion dollars because $300

14   million plus $1.7 billion is $2 billion, yes.

15   **Q.**    And let me ask you, also, there's a line entry at --

16   the next largest item, if I look at your total --

17   **A.**    Sure.

18   **Q.**    The next largest item is one for families and children.

19   Do you see that?

20   **A.**    I do, yes.

21   **Q.**    And that's -- that's the next largest item, the

22   $212 million dollars, correct?

23   **A.**    Yes, it is.

24   **Q.**    And that -- that relates to parent-child interventions

25   and foster care services and the like, correct?

1    **A.**    I would agree with that generalization, yes.

2    **Q.**    And you're aware that the State of West Virginia pays

3    for foster care services, correct?

4    **A.**    I am, yes.

5    **Q.**    And you're also aware that the State provides and pays

6    for all child welfare, family court and adoption services,

7    correct?

8    **A.**    I'm aware that there's a reimbursement rate that the

9    State offers.  I'm not in a position to say that that rate

10   is adequate in funding the redress model that Dr. Alexander

11   has identified.

12   **Q.**    But you're aware that that category of family services

13   is paid for by the State of West Virginia, correct?

14   **A.**    There's a monthly stipend that the State pays for

15   foster families and there's also a -- I wouldn't say it's a

16   fee, but it's a payment that is made in support of

17   adoptions.

18   **Q.**    Let me ask you to look at the next largest item, which

19   is the care for pregnant women, new mothers and infants,

20   which is 4A.

21   **A.**    Yes.

22   **Q.**    That's the next largest item in your totals, right?

23   It's $95 million dollars?

24   **A.**    It may be.  I did not rank these in order of size, but

25   I would agree.  I would take your assumption, yes.

1    **Q.**   For some reason, my eye went to the largest ones.  So,

2    when I look at it, that -- confirm with me if I'm right, Mr.

3    Barrett, that's the fourth largest item on your list?

4    **A.**   That sounds right, yes.

5    **Q.**   And that -- that $95 million dollar figure applies to

6    medical care and other forms of treatment for new mothers,

7    babies born with NAS, and babies born with complications

8    arising out of NAS, correct?

9    **A.**   I believe the broad category is actually more general

10   than that.  So, for example, there are postpartum

11   psychosocial services which are provided for new mothers.

12   So, I couldn't tell you whether specifically these are just

13   for NAS children, infants.  I don't know.

14   **Q.**   Do you have an understanding -- I'm looking now at your

15   detailed category listing, so it has things like Prenatal

16   Opioid Use Disorder Screening, Prenatal Psychosocial

17   Services, Postpartum Psychosocial Services, Interventions

18   For Infants Exposed to Opioids in Utero.  Do you have an

19   understanding that those are generally covered by insurance,

20   Medicaid and other forms of insurance?

21   **A.**   No, I do not.

22   **Q.**   Well, I will just ask you to assume again that if those

23   are, so we -- so, I now want to add up these four

24   categories.  We've talked about treatment for OUD.  We've

25   talked about complications, which would include HIV,

1   **Q.**   And that was a plan produced by the city?

2   **A.**   And submitted to the U.S. Department of Housing and

3   Urban Development.

4   **Q.**   And using that approach, you priced a one-bedroom

5   apartment at $959 in 2015 dollars; right?

6   **A.**   Yes, that is correct.

7   **Q.**   And a two-bedroom apartment you priced at $1,156 in

8   2015 dollars; correct?

9   **A.**   Correct.

10   **Q.**   Are you aware that according to the HUD data, the fair

11   market rent for the Huntington metro area in 2015 was about

12   $519 for a one-bedroom apartment?

13   **A.**   Well, as this was an abatement plan for Huntington, I

14   utilized Huntington costs.  I didn't assume that any of the

15   housing would take place in rural Kentucky, which includes

16   counties included in the Huntington metropolitan statistical

17   area.

18   **Q.**   So do you know whether the rent in the Huntington metro

19   area is different from the rent outside of Huntington?

20   **A.**   Clearly, it is.  This was a document that was submitted

21   to the same agency that you're asking me about with regard

22   to the Huntington MSA.

23        The City of Huntington from this study reported that

24   their fair market rent value for a one-bedroom was $959 per

25   month and a two-bedroom was $1,156 per month.

1    **Q.**   Okay.

2                 MR. HESTER:   May I approach, Your Honor?

3    BY MR. HESTER:

4    **Q.**   Mr. Barrett, we've handed you a document marked as

5    MC-WV-2301 which is the HUD fair market rent for

6    Huntington for FY 2015.   Do you see that?

7    **A.**   I would disagree with you that it's for Huntington.

8    This is the Huntington/Ashland/West Virginia/Kentucky/Ohio

9    metropolitan statistical area which includes Boyd County,

10   Kentucky, Greenup County, Kentucky, and Wayne County, West

11   Virginia, --

12   **Q.**   Okay.

13   **A.**   -- as well as Lawrence County, Ohio.

14   **Q.**   So -- okay.   I, I understand what you're saying.   But

15   the cost in which you used was about double this one; right?

16   **A.**   Based upon data from the similar source specific for

17   Huntington, it was -- I would agree with that, yes, not

18   quite double for a two-bedroom, but approximately $1,000 a

19   month, yes.

20   **Q.**   Let's look at another example.

21        Dr. Alexander's model includes continuing medical

22   education for prescribers and practitioners.   I think you

23   discussed that earlier; right?

24   **A.**   And that was tab 1A2?

25   **Q.**   Yes.   I'm just going to ask you a few general questions

```
 1    first.

 2    A.    Okay.

 3    Q.    But just to confirm that one of the redress model

 4    elements is continuing medical education for prescribers;

 5    correct?

 6    A.    Yes, it is.

 7    Q.    And to calculate the cost for that item, you multiply

 8    the total hours of continuing medical education times the

 9    median hourly wage for physicians and other prescribers;

10    correct?

11    A.    The specific occupations were identified by Dr.

12    Alexander in the redress model.  I then estimated the median

13    annual -- or excuse me -- the median hourly wage in this

14    case for the occupations that he identified.

15    Q.    So, in other words, to break that down a little bit,

16    this is for people who would receive continuing medical

17    education.  And you applied a wage rate for people who would

18    be undergoing that continuing medical education.  Correct?

19    A.    It seems to be the theory that Dr. Alexander is

20    proposing that these individuals would be missing out on

21    work and, therefore, need to be compensated for the time

22    that they're missing.

23    Q.    Are you aware of any profession where practitioners are

24    paid to attend continuing medical education?

25    A.    I think you're looking at it incorrectly.  The way that
```

1    this has been modeled, as I understand it, would be an

2    opportunity cost.

3        The hours that these medical professionals are not

4    being able to provide the professional medical services to

5    the area, they would be missing out on compensation because

6    of the need to have the training identified in the redress

7    model.  They can't be in two places at two different times.

8        That's what an economist does.  That's what we do.

9    When I talked earlier this morning about identifying how we

10   make choices in a world of scarce resources, this is a

11   classic example of that.  And the principle of opportunity

12   cost is well established in the study of economics.

13       So if these wages are missing for these folks because

14   they're not at work and they're getting the continuing

15   education hours, well, then, they're lost.

16   **Q.**   Let me break it up into two parts.

17       In the analysis in the answer you just gave, who

18   suffers the opportunity cost?  The doctor; correct?

19   **A.**   I'm not in a position to say who the loss is to.  I'm

20   simply calculating the value of the redress model.

21   **Q.**   Well, okay.  But the opportunity cost of somebody who's

22   attending continuing medical education is the doctor who's

23   not otherwise available to be working; correct?

24   **A.**   I would agree with that, yes.

25   **Q.**   And, so, who's incurring that opportunity cost?  The

```
 1   redress plan includes treatment for people with OUD who

 2   develop that OUD in the future who do not have OUD as of

 3   today; correct?

 4   A.   Not specifically, no.

 5   Q.   Did you say you listened to Dr. Alexander's testimony?

 6   A.   I, I did listen to his testimony.  And I do recall him

 7   testifying about these being dynamic population numbers and

 8   that individuals would go out of the, the abatement plan and

 9   new people would come into the abatement plan.  But I have

10   no distinct knowledge about the mechanics or the theory

11   behind his model.

12   Q.   But you do understand that people are included in the

13   redress model that you calculated who develop OUD in the

14   future?

15   A.   I would have to go back and actually look at his

16   testimony from yesterday.  I just vaguely remember that

17   being discussed, that there were additions to and people

18   going out.

19   Q.   If, if there are people who are added who have -- who

20   develop OUD in the future or part of this redress plan that

21   you've costed out or calculated out, you don't have a way to

22   separate the cost attributable to people who develop OUD in

23   the future from people who have OUD as of today; correct?

24   A.   I do not, no.  And as I understood his testimony

25   yesterday, it wouldn't be appropriate to do that in this
```

```
1    model.
2    Q.   But I'm really just asking, you don't have any way to
3    do that?  If we, if we asked you to separate out the costs
4    that you set out here between people who develop OUD in the
5    future versus people who have OUD as of today, you don't
6    have a way to separate those costs?
7    A.   I do not.
8    Q.   And, likewise, if we look backwards and if we said how
9    much of this cost is for people who had OUD as of 2016 or
10   2015 or 2013 or any year, you don't have a way to determine
11   how much of the cost is allocated that way?
12   A.   I do not, no.  I'm relying on Dr. Alexander's opinions
13   on those matters.
14   Q.   Thank you, Mr. Barrett.  That's all I have.  Thank you.
15             THE COURT:  Is there any other cross?
16        Ms. Wicht?
17             MS. WICHT:  No, there's no questions from us, Your
18   Honor.
19             THE COURT:  Mr. Nicholas?
20             MR. NICHOLAS:  No questions, no.
21             THE COURT:  Do you have any redirect, Mr.
22   Majestro?
23             MR. MAJESTRO:  Yes.
24                       REDIRECT EXAMINATION
25   BY MR. MAJESTRO:
```

1    **Q.**   To confirm, Mr. Barrett, the methodology you used

2    in this case is similar to methods you've applied

3    before?

4    **A.**   Yes.  In all the cases that I work on, these

5    methodologies are the same.

6    **Q.**   And it wasn't clear in your testimony.  Have you worked

7    on cases with reports larger than 34 million?

8    **A.**   I can't recall specifically what the amounts are, but

9    I've had big cases over the years including mountaintop

10   mining.  I've worked just very recently on a

11   multi-billion-dollar case involving class action of

12   individuals.  So, yes, I have worked on a lot of big cases.

13   **Q.**   And my understanding from our discussions was that

14   that's a case that's happened after your deposition?

15   **A.**   The, the class action case that -- yes, back in the

16   spring it happened, yes.

17   **Q.**   This spring?

18   **A.**   This spring of 2021, yes, sir.

19         MR. MAJESTRO:  Let's pull up Slide 14 again.

20   BY MR. MAJESTRO:

21   **Q.**   The questions Mr. Hester asked you about all of the

22   things you didn't do, that's consistent with what we

23   went through on direct as reflected in Slide 14.  Isn't

24   that true?

25   **A.**   That is true, yes, sir.