# TAB 4

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                       AT CHARLESTON

_____x
                              :
THE CITY OF HUNTINGTON,       :    Civil Action
                              :
              Plaintiff,      :    No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
              Defendants.     :
_____x
                              :
CABELL COUNTY COMMISSION,     :    Civil Action
                              :
              Plaintiff,      :    No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
              Defendants.     :
_____x


               BENCH TRIAL - VOLUME 4
  BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
            UNITED STATES DISTRICT COURT
             IN CHARLESTON, WEST VIRGINIA


                     MAY 6, 2021
```

1   that would be the area, but if I saw the legislation, I
2   would be able to tell you more definitively.
3   **Q.**   And prior to this Opioid Reduction Act, a dentist could
4   have prescribed a 30-day supply of opioids, correct?
5   **A.**   Certainly.
6   **Q.**   And, to your knowledge, the Opioid Reduction Act did
7   not contain any new requirements for distributors, correct?
8   **A.**   I do not have that stationed in front of me to say that
9   at this point.
10  **Q.**   And, to your knowledge, the Opioid Reduction Act did
11  not impose limits on the distributions of opioids to
12  pharmacies, correct?
13  **A.**   Could you please repeat that again?
14  **Q.**   Sure.  To your knowledge, the Opioid Reduction Act did
15  not impose limitations on the distributions of opioids to
16  pharmacies?
17  **A.**   I -- I cannot recall for or against that.
18  **Q.**   Now, one of the things you said yesterday, Dr. Gupta,
19  when you were being asked questions by Ms. Kearse was where
20  West Virginia ranks compared to the country is -- was
21  important for you to know as the State Health Commissioner,
22  correct?
23  **A.**   Correct.
24  **Q.**   Let me put another exhibit in front of you.
25          MS. MAINIGI:  Could I have DEF-WV-00747, State of

1   Health presentation?

2         BY MS. MAINIGI:

3   **Q.** Now, Dr. Gupta, this is a PowerPoint presentation that

4   you put together in August, 2018 entitled "Public Health in

5   West Virginia: Brief History and Current State of Health,"

6   correct?

7   **A.** That's what it states, correct.

8   **Q.** And this particular report happens to have your name on

9   the front, correct?

10   **A.** This one does. This presentation does, as well.

11   **Q.** And was this a presentation that you made to others in

12   the State of West Virginia?

13   **A.** This was a presentation and it states on the report I

14   made on August 6th, 2018 to the sanitarian training.

15   **Q.** If you could turn to Page 38 of your report, Dr. Gupta.

16   **A.** I'm here.

17   **Q.** Now, at Slide 38, there's a chart comparing annual

18   prescription per capita in 2016 across all the states; is

19   that right?

20   **A.** That's correct.

21   **Q.** And where does West Virginia rank?

22   **A.** It's highlighted as ranking number one.

23   **Q.** Okay. And what does the number 20.8 mean?

24   **A.** That means 20.8 prescriptions per 100 -- per --

25   actually, per person, per capita.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1  **Q.** And that means West Virginia ranked number one in total
2  prescriptions at that point in time, correct?
3  **A.** That's correct.
4  **Q.** And that's not just opioid prescriptions. This is all
5  prescriptions, correct?
6  **A.** That's correct.
7      THE COURT: Does that mean 20 prescriptions for
8  every person in the state at that time?
9      THE WITNESS: Yes, Your Honor.
10     THE COURT: Is that what that means?
11     THE WITNESS: Yes, Your Honor.
12     BY MS. MAINIGI:
13 **Q.** Now, if you could take a look at Page 68 -- oh, excuse
14 me. Not 68. Let me back up.
15     I believe you have testified before, Dr. Gupta, that
16 West Virginia has a higher than average incidence of people
17 in circumstances that lead to pain, like manual labor jobs,
18 correct?
19     MR. FARRELL: Excuse me, Your Honor. Can we have
20 a date and page reference to his prior testimony?
21     THE COURT: Yes. Yes
22     MS. MAINIGI: Sure. Let's go ahead and put Dr.
23 Gupta's 2016 deposition up at Page 68, Lines 6 through 15.
24     MR. FARRELL: Objection, Your Honor, unless we
25 intend to do cross examination by showing cross examination.

1         MS. MAINIGI: Well, you asked for a citation, so I
2 thought I'd put it up. Do you not want me to put it up?
3         THE COURT: Do you want it down, Mr. Farrell?
4         MR. FARRELL: No. I'm just curious as to whether
5 or not we're going to be allowed to show cross examination
6 to witnesses before we actually cross examine them. I'm
7 okay with that.
8         MS. MAINIGI: I thought you asked for a citation,
9 so I thought I'd put it up because you might not have it
10 handy.
11        THE COURT: Well, I'm going to let -- I'm going to
12 allow this. We need to get through this. Go ahead, please.
13        MS. MAINIGI: Yes, Your Honor.
14    Let's go ahead and put it up, Matt, please.
15        BY MS. MAINIGI:
16 Q.  And in your 2016 deposition, you were asked, Doctor
17 Gupta, How would you characterize the rate of legitimate
18 pain in West Virginia", and you responded at that point in
19 time, "I would characterize it by the following. There's
20 reason to believe, certainly, that because of the mining and
21 number of other labor activities that West Virginians have -
22 traditionally have had a lot of laborious work in the
23 industry and, as a result, that one can argue that
24 historically that could be higher levels of pain related to
25 the work in those industries." Do you recall testifying in

1 didn't need it is someone who's writing that, that decision
2 is being made in context with the doctor and the patient
3 together.
4 However, it's influenced by a lot of other factors like
5 ultimately the judgment and decision is made by the doctor,
6 but the influence of that goes beyond just the physician,
7 just -- or just the prescriber.
8 **Q.** But the point I wanted to make is there, there was a
9 standard clinical practice for a number of years in West
10 Virginia and elsewhere to write prescriptions with too many
11 days of pills; correct?
12 **A.** I don't know if it was standard practice but, yes, the
13 culture was of -- typically would be that if you got a, you
14 know, a kid got a football injury or a tooth pulled, you
15 would easily write several more days of prescriptions than
16 you would require or evidence would suggest that you would
17 need.
18 **Q.** And, so, -- and, and that's the point made here in this
19 document, extra pills. When you refer there to "extra,"
20 you're talking about pills that weren't needed to treat the
21 pain for which they were prescribed; right?
22 **A.** So, so any pills that are used for any purpose other
23 than specifically for reasons are all illegitimate pills.
24 And that's part of the diversion.
25 **Q.** But you could have a good doctor who writes a perfectly

1   legitimate prescription for a knee sprain, but writes for
2   too many days; correct?
3   **A.**   Correct.  And all of those extra days are illegitimate
4   prescriptions and illegitimate dose and leads to diversion.
5   **Q.**   Yeah.  Maybe it's just this word "legitimate" or
6   "illegitimate," but it's a, it's a medical judgment that's
7   appropriate.  The doctor might appropriately decide somebody
8   needed some pain pills for a knee sprain, but the doctor
9   gave too many days in that prescription; correct?
10  **A.**   Yeah.  It's, it's, it is possible.  It's probable for a
11  good doctor to make a good sound judgment for the need of
12  opioids, but make a mistake on the duration of the need of
13  opioids.
14          So instead of three days, you write for 30 days, that's
15  a problem.  And not everybody who does that is necessarily a
16  bad doctor or bad prescriber.  That's what was happening.
17  **Q.**   That was a common mistake in the medical profession;
18  correct?
19  **A.**   It was.  It was a behavior.  It was a culture.
20  **Q.**   It was a culture of writing too many days of pills for
21  a given need; correct?
22  **A.**   A culture of attempting to reduce pain from a scale of
23  whatever to zero for every American, every West Virginian
24  that they could possibly do.
25  **Q.**   But I'm focusing particularly on this point about the

1  culture of writing more days than was needed.  If the kid
2  has a high school knee sprain, the kid's not going to need
3  30 days of pills, but the doctors were often writing 30 days
4  of pills; correct?
5  **A.**  So, Mr. Hester, you have to look for the intent behind
6  that.  What's the intent of a good physician?  Physicians
7  don't go through medical school, residency, Board of
8  Medicine, license to hurt their patients.
9      So the intent here was because the belief was you have
10 to bring the patient down from whatever level to zero.  So
11 intent was good for good doctors.  Yet, because of that
12 intent, they perhaps wrote for longer than they should have
13 written for.
14 **Q.**  And now what we ended up with is a whole series of
15 these.  We take all those prescriptions that were written by
16 all these doctors that were for too many days, and what we
17 end up with in the aggregate is a lot of pills that are in
18 medicine cabinets or drawers of people's homes and they end
19 up then out in the community; correct?
20 **A.**  So all of these prescriptions -- and, and I go back to
21 the pill mills and bad doctors because that's where the
22 volume is.  It's going on and they were all going to the
23 pharmacy and they were all being brought in and they were
24 dispensed and that's exactly where they end up as you
25 stated.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1  **Q.**  Let me ask you to look just a little further down on
2  this same page.  It's in "Discussion and Recommendations."
3      And there you say in the first sentence, "The most
4  promising approaches to opioid prescribing combine education
5  and tools for all prescribers with an enhanced enforcement
6  for the relatively few prescribers who are violating
7  standards of care."
8      Do you see that?
9  **A.**  I do.
10 **Q.**  And I think this is exactly what we were talking about,
11 Dr. Gupta, but let me just confirm it.
12     When you talk about a promising approach to address
13 opioid prescribing is education and tools for all
14 prescribers, that was to address the problem of the good
15 doctor who was writing for too many days; correct?
16 **A.**  Correct, and, and also make sure that the bad doctors
17 were understanding that these tools and other things were
18 available as well.
19 **Q.**  Exactly.  So for all doctors, the point was educate
20 them more that if you've got a kid with a high school knee
21 injury, don't send him home with 30 days of pills.  Send him
22 home with a fewer number of days of pills.  Correct?
23 **A.**  We believe if we can help educate doctors and other
24 prescribers and provide those tools, especially in terms of
25 the best knowledge in opioid prescribing, it would help make

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    a dent in the entire volume problem.
2         And then we'd be left with the bad doctors and we would
3    have to obviously -- the second statement, part of the
4    statement says "enhance enforcement."  It would help us get
5    better control over the bad doctors.
6    **Q.**   But let's keep focusing on the good doctors.  I haven't
7    asked you about the bad doctors.  But on the good doctors,
8    you've actually seen this play out, haven't you, that this
9    thinking that you have has led to a significant reduction in
10   opioid prescribing levels in West Virginia because doctors
11   become better educated.  Correct?
12   **A.**   I would say amongst a number of other factors.
13   Clearly, the education, the tools have been helpful in
14   reducing and changing the culture of, of writing large
15   prescriptions, high dose for long periods.
16   **Q.**   Let's talk about the second half.  There's a reference
17   to enhanced enforcement for the relatively few prescribers
18   who are violating standards of care.  Do you see that?
19   **A.**   Yes.
20   **Q.**   So when you say there are relatively few prescribers
21   who are violating the standards of care, your point is most
22   prescribers thought they were doing the right thing with the
23   standard of care at the time and there were relatively few
24   who weren't?
25   **A.**   Yeah.  There were more prescribers trying to do the

1  right thing than those who weren't, meaning in West Virginia
2  there were more good doctors than bad doctors at any one
3  point in time.
4  **Q.** Most of the doctors thought they were doing the right
5  thing. As you said, they were sending somebody home trying
6  to treat their pain. They thought they were doing the right
7  thing, but they were giving too many pills.
8  **A.** Their intent was to help their patient because that was
9  the culture. That was the education. That was the
10 influence. That was their understanding.
11 **Q.** And, and you and others in the State of West Virginia
12 have worked on changing that culture of prescribing behavior
13 to tighten it up; correct?
14 **A.** We have tried to do our best.
15 **Q.** But -- again, at the end of the day, you ultimately
16 have to rely on the good judgment and thoughtful approach of
17 individual doctors to get prescribing under control;
18 correct?
19 **A.** Yes, but there's a number of factors that influences
20 that judgment.
21     One of those things we did in Bureau of Public Health
22 was we began something called counter-detailing. This is,
23 this is our folks going to doctors' officers and providing
24 them this education and tools, knowing there was already
25 detailing happening that was telling them the other way

1 around for years.

2 So one of the things we would do is academic detailing. 3 So instead of pharmaceutical detailing, we were doing 4 academic detailing. That's actually a term. And we were 5 doing that because this was part of the education, as we 6 discussed, to get those doctors to understand the science, 7 the evidence. It was a tool they need to be able to more 8 judiciously prescribe opioids.

9 **Q.** That was a statewide program you ran?

10 **A.** Yes.

11 **Q.** And did it help?

12 **A.** We believed so.

13 **Q.** And the way it helped was doctors then had more 14 knowledge about imposing reasonable limits on how many days 15 of prescriptions they would write?

16 **A.** We were sharing the best practices, science that was 17 available with doctors attempting to get them to take the 18 best possible care of their patients with, within safety and 19 efficacy, safety from opioids and understanding addiction 20 but, at the same time, understanding that here are all these 21 non-pharmaceutical options. Here are all the pharmaceutical 22 non-opioid options. And then you think about opioids.

23 **Q.** And then going back to the relatively few, the other 24 side of the coin, the relatively few prescribers who were 25 violating the standards of care, it's only been a handful of

1   Registered Nurses to prescribe, as well. So -- and for even
2   physicians, it's usually the staff that does it. And so, in
3   the answer can anybody else, it's usually the staff was
4   doing the query, but there's nothing beyond their office or
5   any prescriber for that who is licensed to prescribe.
6   **Q.** Okay. Thank you, Dr. Gupta.
7   Okay. Let's switch gears and then we'll wrap up. The
8   Board of Medicine, you've testified that you served as the
9   Secretary of the Board of Medicine for approximately four
10  years; does that sound right?
11  **A.** Yes, Ms. Callas.
12  **Q.** And the Board of Medicine for those doctors that are
13  MDs in the State of West Virginia is both a regulatory body,
14  the licensing body, and they also conduct investigations; is
15  that your understanding?
16  **A.** Yes. And educational body, as well, I think we can
17  agree on.
18  **Q.** Okay. The Board of Medicine decides and can
19  investigate whether a physician has engaged in the improper
20  practices of medicine; is that right?
21  **A.** If they are violating the -- what we have called the
22  West Virginia Medical Practice Act, then there could be
23  complaint lodged. There's a formal procedure and a Board
24  does not itself make that decision and go and pick doctors.
25  There has to be a formal complaint launched according to

1	clearly the statute.  And then, that complaint could be
2	investigated through the Board of Medicine's investigators.
3	And there is a Complaint Committee to which the complaint
4	goes through.  So, it is an entire process that has -- that
5	has elements to it.
6	**Q.**	Okay.  Well, let's break that down a little bit.  That
7	was helpful.  So, if -- if there is no complaint, the Board
8	of Medicine does not just initiate an investigation of a
9	doctor on its own; is that right?
10	**A.**	That's correct.
11	**Q.**	And if the Board of Medicine were to receive
12	information from, let's say, this CSMP Review Committee,
13	then here are your top five prescribers, that is not a basis
14	to initiate an investigation, is it?
15	**A.**	That's correct.
16	**Q.**	Okay.  So, we need a complaint about a prescriber to
17	initiate an investigation of that doctor's prescribing
18	practices?
19	**A.**	A formal complaint has to be filed in accordance with
20	the law regulating the Board of Medicine.
21	**Q.**	And, as the Secretary of the Board of Medicine, you
22	were at times involved in that investigation process to the
23	extent there might be a consent order that was issued?
24	**A.**	So, I can talk about my role.  I was not a member of
25	the Complaint Committee, but I was the Secretary of Board.

1    I definitely -- the orders, consent orders, were signed by
2    myself, the Board President, and there were rare occasions
3    in which the President, the Vice President would be
4    conflicted in making that decision in which I would chair
5    the Committee to make the decision on that particular
6    physician specifically.
7             THE COURT:  Where did the complaints come from
8    typically?
9             THE WITNESS:  Your Honor, they could come from
10   individuals like patients.  They can come from a pharmacy.
11   They could come from -- the State Health Commissioner can
12   file a complaint if a physician -- so, and all of those
13   things have happened, but anybody, any member of the public,
14   can file a complaint.
15            BY MS. CALLAS:
16   Q.   Now --
17            THE COURT:  Okay.  So, if I knew there was a
18   pharmacy downtown and I -- that was writing these
19   prescriptions and basically running a pain clinic, I could
20   file a complaint and it would be investigated?
21            THE WITNESS:  Yes, Your Honor.  If anyone would
22   file -- it's an on-line system, as well, anonymous.  It's
23   held anonymous by law and anyone can file a complaint if
24   they know anything about any wrongdoings of any physician
25   licensed under the Board and they would initiate the

*Ayme A. Cochran, RMR, CRR (304) 347-3128*