# TAB 5

```
            IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                     AT CHARLESTON

_____x
                                :
THE CITY OF HUNTINGTON,         :    Civil Action
                                :
              Plaintiff,        :    No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.       :
_____x
                                :
CABELL COUNTY COMMISSION,       :    Civil Action
                                :
              Plaintiff,        :    No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.       :
_____x


                  BENCH TRIAL - VOLUME 27
    BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
               UNITED STATES DISTRICT COURT
               IN CHARLESTON, WEST VIRGINIA


                      JUNE 15, 2021
```

1    MS. WICHT:  -- I'm sorry.  May I just state for
2 purposes of the record the Fourth Circuit has expressly
3 held, and I'm quoting, "reports specifically prepared for
4 purposes of litigation are not by definition of a type
5 reasonably relied upon by experts in the particular field."
6    That's *United States* vs. *Tran Trong Cuong*.  I'm not
7 sure I'm pronouncing that last word correctly.  It's 18 F.3d
8 1132 out of the Fourth Circuit in 1994.
9    THE COURT:  Well, I'm going to let her go ahead
10 and make a record and I'll read that case that I've never
11 heard of before and decide whether to consider it or not.
12    Go ahead.
13    MS. SINGER:  Go ahead, Ms. Keller.
14    MS. WICHT:  Thank you, Your Honor.
15    THE WITNESS:  Prescribing high volumes of opioids
16 or certain drug types, prescribing disproportionally large
17 volume for specialty or geographic area, prescribing a
18 disproportionate volume of opioids relative to
19 non-controlled drugs, large variances or sharp increases in
20 opioid prescribing, prescribing drugs commonly abused with
21 opioids such as Alprazolam, Carisoprodol, Xanax, or Soma and
22 the high volume or proportion of prescriptions paid with
23 cash.
24 BY MS. SINGER:
25 Q.   All right.  We can take that slide down.

1    So, Ms. Keller, based on your review of the data and
2    the documents you reviewed, did you form an opinion as to
3    whether the available data identified certain healthcare
4    providers who could have been identified as outliers based
5    on their prescribing of opioids and the other factors you
6    just listed?
7    **A.**   Yes.
8    **Q.**   And before we turn to them, I also want to be clear
9    about the scope of your opinion.  Are you saying that these
10   healthcare providers were engaged in diversion or unlawful
11   prescribing?
12   **A.**   No.
13   **Q.**   What is your opinion then?
14   **A.**   That they were identifiable in the data, and that's my
15   opinion.
16   **Q.**   And did you identify the top prescribers of opioids in
17   Cabell County from 1997 to 2017?
18   **A.**   Yes, I did.
19   **Q.**   And did you prepare a slide to present this aspect of
20   your testimony?
21   **A.**   Yes, I have.
22            MS. SINGER:  May I publish that slide, please?
23            THE COURT:  Yes.
24   BY MS. SINGER:
25   **Q.**   Slide 10 I believe.

1      Ms. Keller, does this slide identify your findings?
2  **A.**   Yes.
3  **Q.**   And what is it that's reflected on this slide?
4  **A.**   These are the 10 highest opioid prescribers overall for
5  the entire time period of 1997 through 2017 in the IQVIA
6  Xponent data.
7      Among those, we can look at Dr. Deleno Webb.  I'm not
8  quite sure of the proper pronunciation.  But if you could
9  enlarge that, his specialty is in pain medicine.  His total
10 prescriptions were 128,805.  And he prescribed a total of
11 14,431,799 dosage units.
12     Also, he was the top prescriber in terms of dosage
13 units, the third largest prescriber in terms of -- number of
14 prescriptions, and the largest prescriber in the county in
15 terms of MMEs, so the relative strength of the drugs that
16 he, that he prescribed.
17 **Q.**   And were there any other doctors whose prescribing
18 stood out in your review of this data?
19 **A.**   Yes, there are.  We can look at Dr. Fisher who's number
20 2.
21     Dr. Fisher is classified in the IQVIA data as a
22 physical and occupational rehabilitation specialty.  His
23 last year of prescribing, I would like to point out, is 2012
24 even though the dataset goes until 2017 which is notable to
25 point out because he's still the second highest prescriber

1	**Q.**	Yes.  Or did you prepare a slide that reflected your
2	findings with regard to his prescribing over time?
3	**A.**	That would be very helpful.
4	**Q.**	All right.
5	**A.**	And I did prepare that.
6		MS. SINGER:  Your Honor, may we publish that
7	slide?
8		THE COURT:  Yes.
9	BY MS. SINGER:
10	**Q.**	All right.  Ms. Keller, does slide 14 reflect your
11	findings with respect to the volume of Dr. Webb's
12	prescribing?
13		MR. SCHMIDT:  If we're refreshing recollection,
14	we'd ask that it be handled as refreshing.  It has been for
15	every other witness.  I think this is again leading.
16		THE COURT:  Well, are you refreshing recollection?
17	You're not, are you?
18		MS. SINGER:  No, Your Honor.  This is a slide that
19	Ms. Keller prepared.
20		THE COURT:  Overruled.  Go ahead.
21		THE WITNESS:  Dr. Webb was one of the top five
22	prescribers in Cabell County every year between 1998 and
23	2016.
24	     Between 1997 and 2017 he prescribed 10 million dosage
25	units of oxycodone alone.  That made him first in the State

1    of West Virginia in terms of prescribed dosage units of that
2    drug.
3         He prescribed four times the volume of opioids, not
4    just oxycodone.  I think I've missed a tab -- tabbed that
5    in.  It should just be four times the volume of opioids
6    prescribed on average compared to other pain management
7    specialists in the state and nation.
8         By 2011 Webb was prescribing 1.1 million dosage units.
9    To put that in perspective, that's the equivalent of
10   prescribing more than 130 pills for every hour of every day.
11   And that's without sleeping, without eating, doing nothing
12   but prescribing.
13        Over 30 percent of the pills that he prescribed were
14   for oxycodone 30 milligrams.  And 70 percent of the --
15   70.6 percent of the prescription opioid dosage units written
16   by Webb that were filled at the Drug Emporium Barboursville
17   store were for opioids.
18   BY MS. SINGER:
19   **Q.**   And, Ms. Keller, did you also prepare a slide that
20   demonstrates visually Mr. -- Dr. Webb's prescribing
21   compared to other doctors in his specialty?
22   **A.**   Yes.
23   **Q.**   And would that slide assist your testimony?
24   **A.**   Yes.
25             MS. SINGER:  Your Honor, may we publish those

1  slides?

2  BY MS. SINGER:

3  **Q.**  So, Ms. Keller, turning you to slide 15, is this a

4  slide you prepared?

5  **A.**  It was.

6  **Q.**  And what does this slide demonstrate?

7  **A.**  This is a chart from my report that shows the

8  prescribing history of Dr. Webb shown in green as compared

9  to the other specialty -- other prescribers of his

10  specialty.

11     The state and the nation are there at the bottom.

12  They're in blue and red.  It's somewhat difficult to see,

13  but the next slide you'll see for a different specialty

14  would be easier.

15     So on the left you can see this is the prescribed

16  dosage units.  So in some months it's upwards of 120,000

17  dosage units.  And this is the monthly prescribing.  The

18  totals that I provided to you earlier were the annual

19  prescribing totals.  And I have another slide that I would

20  like --

21  **Q.**  Before we move to that, how does Dr. Webb's prescribing

22  compare to other doctors in his specialty as a psychiatrist?

23  **A.**  It is far greater.  I know I spoke earlier to pain

24  management specialists, but I don't recall exactly what it

25  is for psychiatry, the comparison.  But, I mean, in some

1  **Q.**  The pilot agreement itself.  In Paragraph 2, it says,
2  "Evaluation period/license.  As of the effective date and
3  for a period of 30 days thereafter, the services are
4  provided and licensed."
5  **A.**  I see that.  Thank you.
6  **Q.**  Okay.  Yeah.  So, that's your understanding, correct,
7  that the agreement was for Cardinal Health's outside counsel
8  to have access to that database for 30 days?
9  **A.**  Yes.
10 **Q.**  And you have no knowledge of what, if anything,
11 Cardinal Health or its outside counsel did with that data,
12 correct?
13 **A.**  Correct.
14 **Q.**  And you have no knowledge as to whether or not Cardinal
15 Health found that data to be helpful or unhelpful in
16 connection with its Suspicious Order Monitoring Program,
17 correct?
18 **A.**  Correct.  The data, of course, could be informative,
19 but I -- I don't know how Cardinal found the data to be.
20 **Q.**  Well, you don't even know what's in the CS -- at the
21 time that you offered your opinions in this case, Ms.
22 Keller, you had no knowledge of what was in the CS Ratings
23 database, correct?  You had never personally reviewed it?
24 **A.**  Correct.
25 **Q.**  You testified on direct examination to your opinion

1  that if defendants had possessed the IQVIA Xponent database
2  they could have used it to identify the top one percent of
3  prescribers in Cabell County based on volume, correct?
4  **A.**   Using the IQVIA Xponent data, yes.
5  **Q.**   Yes.  I'm sorry.
6  **A.**   Yes.
7  **Q.**   I switched back.  Okay.  But now, you're not offering
8  an opinion that any prescription written by any of the
9  individual doctors that you identified as being in the top
10 one percent was medically improper or medically unnecessary,
11 correct?
12 **A.**   I know that I do cite to articles that speak to the
13 improperness of that.  So, to the extent that those are in
14 my reliance materials and report, then those are there, but
15 --
16 **Q.**   I'm not asking you for what you read in an article or
17 document, Ms. Keller.  I'm asking for your own opinion.  As
18 an expert testifying in this case, you are not offering an
19 opinion that any prescription written by any individual
20 doctor you identified as being in the top one percent was
21 medically improper or medically unnecessary, correct?
22 **A.**   Correct.
23 **Q.**   And you could not offer any such opinion because that
24 would be outside of your expertise, correct?
25 **A.**   Correct.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

| | |
|---|---|
| 1 | **Q.** You've not had any medical training, correct? |
| 2 | **A.** Correct. |
| 3 | **Q.** And you're not an expert in the field of pharmacy |
| 4 | practice, correct? |
| 5 | **A.** I'm not quite sure what that terms means. And, just to |
| 6 | be clear, I've offered opinions on suspicious order |
| 7 | monitoring, compliance metric implementation and other |
| 8 | matters, but beyond that -- |
| 9 | **Q.** But not in this case, right? |
| 10 | **A.** Correct. |
| 11 | **Q.** Okay. So, you're not an expert in the regulations that |
| 12 | govern the dispensing of controlled substances by |
| 13 | pharmacists, correct? |
| 14 | **A.** Correct. Again, the same answer as earlier. I have |
| 15 | implemented compliance metrics in other matters, but not |
| 16 | this one. |
| 17 | **Q.** And your prior work does not give you the expertise to |
| 18 | offer an opinion about the regulations that govern the |
| 19 | dispensing of controlled substances by pharmacists, correct? |
| 20 | **A.** Correct. |
| 21 | **Q.** So, you're not here offering an opinion that any |
| 22 | prescriptions written by any of the top one percent of |
| 23 | prescribers should not have been filled by a pharmacist, |
| 24 | correct? |
| 25 | **A.** I'm not offering that opinion, but I do know that I |

1   I can't really interpret that part.
2   **Q.**   And then, Paragraph 4 identifies particular patients or
3   individuals for whom he cannot prescribe, correct,
4   controlled substances?
5   **A.**   Yes, that he can't prescribe them to Patient 19, 21,
6   22, any current employees or immediate family members.
7   **Q.**   And then, as you noted in the next paragraph, it says
8   that the winding down of his practice shall include the safe
9   and medically appropriate titration of medications for
10  current patients, correct?
11  **A.**   Correct.
12  **Q.**   So, during the time period -- during the three-month
13  period when he was winding down his practice, Dr. Webb could
14  still practice medicine, but in a more limited way, correct?
15  **A.**   That calls for an opinion that I'm not prepared to
16  give.  I don't know exactly what this consent order allowed
17  him to do.
18  **Q.**   Okay.  You have no opinion about that?
19  **A.**   Right.
20  **Q.**   Fair enough.  Okay.
21      Now, you testified earlier that certain due diligence
22  documents from Cardinal Health identified Dr. Webb as a
23  prescriber whose prescriptions were being filled by a
24  certain pharmacy in Cabell County.  Do you recall that?
25  **A.**   Generally, yes, but the details, I'd like to review.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1   **Q.**   Okay.  Well, if we come to a question that you're not
2   able to answer, we can do that.
3         Now, you pointed to a particular Cardinal Health
4   document in February of 2012 that showed a particular
5   Cardinal Health pharmacy customer filled prescriptions
6   written by Dr. Webb, correct?
7   **A.**   That document, I would like to see, please.
8   **Q.**   441 -- I'm sorry -- P-44170.
9   **A.**   Okay.
10  **Q.**   And at the pages that you referenced in your testimony
11  this morning, that document reflected that this pharmacy
12  filled prescriptions for Dr. Webb in the time frame of
13  approximately February, 2012, correct?
14  **A.**   I'm sorry.  Let me get there.  I'm sorry.  I lost the
15  other half of it.  Just give me one moment.
16  **Q.**   Sure.
17  **A.**   Yes.
18  **Q.**   Okay.  Now --
19  **A.**   Well, it's for the time period -- I'm sorry to
20  interrupt you.  It's for a longer time period.  It's from
21  November 2011 through February 2012.
22  **Q.**   Okay, fair enough.  But at the time that Dr. Webb was
23  identified in that 2012 Cardinal Health document, you agree
24  that Dr. Webb was still licensed to practice medicine in the
25  State of West Virginia, correct?

1   **A.**   Yes.  He did not lose his license until 2017.
2   **Q.**   And Cardinal Health didn't know in February of 2012
3   that Dr. Webb would have his license revoked five years
4   later in 2017, did it?
5   **A.**   No.  I don't believe that -- I'm not offering the
6   opinion that Cardinal could see into the future.  I do offer
7   the opinion that, at that time, they could have seen the
8   prescribing practices of Dr. Webb, including, for this
9   particular location, prescribing 313 of the 582
10  prescriptions.
11  **Q.**   And am I correct that at any time you saw Dr. Webb
12  identified in any of the defendants' documents, Dr. Webb was
13  still actively licensed to practice medicine by the State of
14  West Virginia, correct?
15  **A.**   I don't know that I can testify on every document for
16  every doctor.  That's a bit of a big memory test for me.
17  **Q.**   Well, I'm asking you if you can recall, as you sit here
18  today, seeing a document that reflects prescriptions being
19  filled by -- that were written by Dr. Webb at a time when he
20  was not actively licensed by the West Virginia Board of
21  Medicine?  Can you recall any such instance?
22  **A.**   I can't remember a specific document, no.
23  **Q.**   Okay.  Now, you've testified that the IQVIA Xponent
24  data could have shown that Dr. Webb was -- could have shown
25  to defendants that Dr. Webb was within the top one percent

1  in a year, correct?
2  **A.**   Where are you -- can you --
3  **Q.**   Sure.  Absolutely.  Would it help to look at your
4  report in order to refresh your recollection on those facts?
5  **A.**   I still have it up here.
6  **Q.**   Okay.  If you turn to Page 8, Paragraph 21 of your
7  report.  That's the very last sentence, I believe, of that
8  paragraph.
9  **A.**   Appreciate that.  By 2010, the average prescriber in
10 Cabell County was writing prescriptions totaling over 26,000
11 dosage units and 450,000 MMEs.
12 **Q.**   Now, you also know in that time period from 1997
13 through 2010 that there were just more doctors writing
14 prescriptions in Cabell County, correct?  And I'm happy to
15 direct you.
16             MS. WICHT:  If we can have Slide 19, please.
17             BY MS. WICHT:
18 **Q.**   I'm happy to direct you to the table in your report
19 that lays that out.  And we're going to -- this is Table 3
20 from your report and I'm just going to highlight that first
21 column which lays out the number of opioid prescribers as a
22 whole number, correct?
23 **A.**   Yes.  This is the total number of opioid prescribers.
24 Now, it may be different than total doctors because not all
25 doctors may prescribe, but this is -- and, again, it's

1    opioid prescribers appearing in the IQVIA Xponent data.
2    **Q.**   Okay.  So, in 1997, according to your table in 1997,
3    there were 392 opioid prescribers in Cabell County, correct?
4    **A.**   Correct.
5    **Q.**   And then, by 2010, there were 556 opioid prescribers in
6    Cabell County, correct?
7    **A.**   Correct.
8    **Q.**   And now, you don't have any reason to believe that
9    those additional prescribers were not appropriately licensed
10   and registered, correct?
11   **A.**   That -- I'm not offering that opinion.
12   **Q.**   Okay.  So, between 1997 and 2010, in your analysis of
13   the data, you saw increasing numbers of opioid prescribers
14   in Cabell County, increasing numbers of opioid prescriptions
15   in Cabell County, and increasing numbers of opioid pills per
16   prescription in Cabell County, correct?
17   **A.**   Correct.
18   **Q.**   More prescribers writing more prescriptions for more
19   pills, correct?
20   **A.**   Generally, yes.
21   **Q.**   Okay.
22            MS. WICHT:  If we could please go back to Slide
23   20, to Figure 1 in your report.
24            BY MS. WICHT:
25   **Q.**   Okay.  So, after increasing from 1997 to 2010, opioid

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    prescriptions in Cabell County generally fell from 2010
2    through 2017, although with a bit of a notch upward there in
3    late 2014 or early 2015, correct?
4    **A.**   Yes.
5    **Q.**   And, again, you don't have -- you're not offering an
6    opinion on why prescriptions decreased in that time period,
7    correct?
8    **A.**   Correct.
9    **Q.**   You just observed in the data that they did, correct?
10   **A.**   Correct.
11   **Q.**   I'd like to show you another chart that's been admitted
12   into evidence in this case.  It's Slide 21, P-44711, Page
13   11.  Now, this is a chart by another plaintiffs' expert, Dr.
14   McCann.  You know Dr. McCann, don't you?
15   **A.**   I know his name.  By name.  I don't know him well.
16   **Q.**   Okay.  And Dr. McCann used publicly available ARCOS
17   data to track the distribution of oxycodone and hydrocodone
18   into the three-digit zip code containing Cabell-Huntington
19   by all distributors from '97 through 2019.
20           MS. WICHT:  And may I approach the screen, Your
21   Honor?
22           THE COURT:  Yes.
23           BY MS. WICHT:
24   **Q.**   And I'll just represent to you, Ms. Keller, that the
25   information about what Dr. McCann was looking at is