# TAB 8A

```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                           AT CHARLESTON


_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 6
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


MAY 10, 2021

1    accepted in the industry?

2    **A.**    Oh, yes, absolutely.

3    **Q.**    And, Dr. McCann, have you ever worked with the DEA

4    prior to this case as far as the ARCOS data?

5    **A.**    Not that I'm aware of.

6    **Q.**    Do you believe that it limits your ability in any way

7    to -- that you weren't a DEA investigator, a DEA field

8    officer, to take in the data, process it, and organize it?

9    **A.**    No.  Not only did it not limit me, it wouldn't add

10    anything to what I did.  I didn't use any subject matter

11    expertise.  The data that we analyzed are bits.  They're

12    data and we would organize the data.  We would summarize it.

13    We would present it the same whether it was opioid

14    shipments, or shipments of wheat, so long as we had just a

15    very small input, very limited input, on the interpretation

16    of the data, but we got all of that from the -- or virtually

17    all of it from government websites that explained the data.

18        So, just like any other dataset.  You read a manual

19    that explains the data and then organize the data using

20    standard packages.

21            THE COURT:  Dr. McCann, was R developed by SAS, if

22    you know?

23            THE WITNESS:  I don't know.

24            THE COURT:  Okay.

25            BY MR. MOUGEY:

**Q.**   Dr. McCann, would you walk the Court through how you were able to, just generally, 30,000-foot-view, process, validate and summarize the dataset that you received from the DEA?

**A.**   Yes.  I know that we'll get into it in some detail, but at a very high level, we received a lot of data on hard drives; not as much data as it sounds, but 500 million records of data.  Some of that data was relevant to -- was -- touched on the issues in this case.  Some of it did not.

To give you sort of a trivial example, there are some shipments in the data to exporters.  Well, that didn't seem -- to me was not relevant for summarized -- it wasn't relevant to summarize that data.  Couldn't summarize that data.  It was only a few hundredths of a percent or a few tenths of a percent.

But what we did was, we took that data, narrowed it down to shipments from manufacturers, to distributors, to dispensers, and then checked internally that data to find some potential data errors.  In a dataset of 200 million or 400 million transactions, there's just going to be some data errors.  And so, checked for those internally and then checked for those externally by looking at other government data that would bear on the accuracy of the data we received from the DEA.

We then also compared the data to data produced by the

1    defendants in discovery in this case that should be the same

2    and was, in fact, the same.  And then, we supplemented the

3    data with some additional data sourced from the government,

4    not very much, but a little bit of additional information

5    that was useful for then subtotaling and presenting the --

6    summarizing the data.

7    **Q.**   And, Dr. McCann, those steps you just walked through,

8    have those been kind of a similar routine part of your

9    practice, both in your professional experience and your

10   academic experience, as far as gathering, organizing, and

11   processing these large datasets?

12   **A.**   Yes, absolutely.  I can give examples, if you like.

13   **Q.**   I think we'll walk into each one of those.

14        MR. MOUGEY:  Your Honor, I would like to offer Dr.

15   McCann as an expert on data processing, validating,

16   supplementing, reconciling and summarizing large datasets as

17   they relate to ARCOS and the related governmental datasets

18   that we've used to supplement.

19        THE COURT:  Any objection?

20        MR. MAHADY:  Your Honor, I object to the extent

21   the plaintiffs are trying to get Dr. McCann tendered as an

22   expert on ARCOS.  He testified that, prior to this case, he

23   had no experience with ARCOS and he has previously testified

24   that no one that worked at his company had experience with

25   ARCOS.  So, while he may be an expert on large datasets, Mr.

1    Mougey just included ARCOS as a specific category of

2    expertise.

3              THE COURT:  Well, you can cross examine on them.

4    I find Dr. McCann to be an expert on data processing,

5    validating, reconciling and summarizing large datasets as

6    they relate to ARCOS under related governmental datasets.

7    Well, in that statement at the end of ARCOS.

8              MR. MOUGEY:  I'm sorry, Your Honor.

9              THE COURT:  And you can -- I just found him to be

10   an expert, as you've requested, and I was reading what you

11   said.  You made it a little difficult for me there because

12   it's too long.

13             MR. MOUGEY:  I have that tendency to do that.  I'm

14   not sure that won't be the last time today.  Thank you, Your

15   Honor.

16             BY MR. MOUGEY:

17   **Q.**   All right.  Let's start off with a real high level, Dr.

18   McCann, and kind of work down with what you've done.  And I

19   think you just gave a pretty general explanation, but would

20   you please walk the Court through when you received these

21   hard drives, as you previously testified, from the DEA?

22   Walk the Court through the steps of what you did in a little

23   more detail.

24   **A.**   Sure.  So, in the Spring of 2018, three years ago, we

25   received a sample of data from the DEA that reflected opioid