# TAB 8C

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                        AT CHARLESTON

_____x
                              :
THE CITY OF HUNTINGTON,       :    Civil Action
                              :
             Plaintiff,       :    No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
             Defendants.      :
_____x
                              :
CABELL COUNTY COMMISSION,     :    Civil Action
                              :
             Plaintiff,       :    No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
             Defendants.      :
_____x


                   BENCH TRIAL - VOLUME 8
     BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
                UNITED STATES DISTRICT COURT
                IN CHARLESTON, WEST VIRGINIA


                        MAY 12, 2021
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1  **Q.** And if it's just 10,000, can you give us a rough
2  estimate?
3  **A.** If it's just 10,000 -- well, one percent would be 100.
4  And, so, it would be fifteen hundredths of a percent.
5  **Q.** Okay.
6  **A.** So .15 percent.
7  **Q.** Thank you, Dr. McCann. That's all I have for right
8  now. I appreciate your time.
9        THE COURT: Ms. Salgado.
10       MS. SALGADO: One minute, please, as we switch our
11 technical.
12       THE COURT: Yes.
13    (Pause)
14              CROSS EXAMINATION
15 BY MS. SALGADO:
16 **Q.** Good morning, Dr. McCann.
17 **A.** Good morning.
18 **Q.** Thanks for your patience over these last few days. I'm
19 Suzanne Salgado. I represent Cardinal Health and I'll ask
20 you just a few more questions.
21 **A.** Thank you.
22 **Q.** Dr. McCann, as part of your work as an expert in this
23 case, you prepared tables that reflect your analysis of the
24 market share of each of the wholesale distributors in Cabell
25 County and the City of Huntington. Is that right?

1   **A.**   I don't know if I would describe it as analysis, but
2   calculations of the market shares.  Again, they're really
3   subtotals of the data, and we do that for the distributors
4   for various jurisdictions including Cabell County and the
5   City of Huntington.
6   **Q.**   Okay.  I'm going to show you one of those charts and
7   those set of calculations.  It's from your Appendix 9-I and
8   it's Page 25 of that that I'll bring up here.  But let me
9   know if you'd like a hard copy and we can provide you with
10  that as well.
11  **A.**   Thank you.
12  **Q.**   Now, this table presents your analysis -- or excuse
13  me -- your calculations, subtotals of some of the data
14  regarding total dosage units of oxycodone and hydrocodone
15  shipped by all distributors to all dispensers in
16  Cabell/Huntington from 2006 to 2014; correct?
17  **A.**   Correct.
18  **Q.**   And that analysis, as you said, is based on ARCOS data;
19  right?
20  **A.**   Yes.  It might be supplemented a little bit with
21  defendant transaction data, but the primary source is the
22  ARCOS data.
23  **Q.**   Now, according to your analysis of the ARCOS data and
24  any supplementation you may have done, from 2006 to 2014
25  Cardinal Health distributed 17 percent of the oxycodone and

1    hydrocodone shipped to Cabell and Huntington; correct?
2    **A.**    Correct.
3    **Q.**    And it's your understanding that Cardinal Health
4    reported those transactions to the DEA in the ARCOS
5    database; correct?
6    **A.**    Correct.
7    **Q.**    So Cardinal Health knew about the 17 percent of the
8    oxycodone and hydrocodone prescription opioids that were
9    shipped into Cabell and Huntington during that time frame;
10   correct?
11   **A.**    Yes.
12   **Q.**    And as far as you know, -- and the DEA -- excuse me --
13   on the other hand knew about all of the oxycodone and
14   hydrocodone prescription opioids shipped into
15   Cabell/Huntington during that time frame; correct?
16   **A.**    Correct.
17   **Q.**    And I think we discussed this a little bit yesterday,
18   but as far as you're aware, at least before 2018, other than
19   the data on the volume -- or excuse me -- other than
20   Cardinal Health's own shipments, a distributor would not
21   have had access to the data that other wholesale
22   distributors reported to ARCOS; correct?
23          I'll rephrase.  You're not aware of Cardinal Health
24   having access to the data of other distributors during this
25   time frame; correct?

1  **A.**   Correct.
2  **Q.**   Dr. McCann, yesterday you were referring to some
3  tables -- or excuse me -- a table showing the pharmacies in
4  Cabell and Huntington that received shipments of oxycodone
5  and hydrocodone between 2006 and 2014.  And I want to go
6  through one of those.
7        If we could please pull up P-44752 and go to the second
8  page of that document.
9        I'd like to focus in particular on A-Plus Care Pharmacy
10 listed here.  According to your chart, how many dosage units
11 of oxycodone and hydrocodone were shipped to A-Plus Care
12 Pharmacy?
13 **A.**   583,000.
14 **Q.**   And how many MMEs of oxycodone and hydrocodone were
15 shipped to A-Plus Care Pharmacy according to your chart?
16 **A.**   17,365,587.
17 **Q.**   And A-Plus Care Pharmacy is listed here because it is
18 in Cabell, right, or it was in Cabell?
19 **A.**   Correct.
20 **Q.**   But you didn't testify about which distributor sold
21 oxycodone and hydrocodone to A-Plus Care Pharmacy during
22 Mr. Mougey's questioning of you; right?
23 **A.**   I don't recall discussing this pharmacy.
24 **Q.**   Let me show you a table that you prepared as part of
25 your expert materials before you came to testify.  In

1	**Q.**	Would you agree with me that this chart shows that the
2	DEA aggregate production quota for oxycodone in 2010 was at
3	least ten times greater than it was in 1997?
4	**A.**	Yes.
5	**Q.**	You testified about several other charts that showed
6	distributions of oxycodone and hydrocodone by all
7	distributors to all dispensers from 1997 to 2019; do you
8	recall that?
9	**A.**	Yes.
10	**Q.**	Let's pull up Plaintiffs' 44711, Page 4, please.  This
11	is one of your charts and it represents shipments of
12	oxycodone and hydrocodone reflected in the ARCOS Retail Drug
13	Summary Reports converted by you into MMEs for the entire
14	United States, correct?
15	**A.**	Correct.
16	**Q.**	You've testified that this chart showed that from 1997
17	to 2010 the volume of oxycodone and hydrocodone for the
18	entire United States increased by approximately ten or
19	eleven-fold; do you recall that?
20	**A.**	Yes.
21	**Q.**	Let's pull up Plaintiffs' Exhibit 44711, Page 8,
22	please.  This chart represents shipments of oxycodone and
23	hydrocodone also reflected in the ARCOS Retail Drug Summary
24	Reports and converted by you into MMEs for the entire State
25	of West Virginia; is that right?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1   **A.**   Yes.
2   **Q.**   You testified that this chart shows that from 1997 to
3   2010 the volume of oxycodone and hydrocodone shipped to the
4   entire State of West Virginia increased also by
5   approximately ten or eleven-fold; do you recall that?
6   **A.**   Yes.
7   **Q.**   So, the magnitude of the increase was approximately the
8   same for the State of West Virginia as it was for the United
9   States as a whole, correct?
10  **A.**   Yes.
11  **Q.**   Let's pull up P-44711, Page 11, please.  This chart
12  represents shipments of oxycodone and hydrocodone also
13  reflected in the ARCOS Retail Drug Summary Reports and
14  converted by you into MMEs for the three-digit zip codes in
15  West Virginia that encompass Cabell and Huntington, correct?
16  **A.**   Yes.
17  **Q.**   And you testified that this chart shows that from 1997
18  to 2010 the volume of oxycodone and hydrocodone shipped to
19  the three-digit zip codes that encompass Cabell and
20  Huntington also increased by approximately ten-fold; do you
21  recall that?
22  **A.**   Yes.
23  **Q.**   So, the magnitude of the increase was approximately the
24  same in Cabell-Huntington as it was for the State of West
25  Virginia, as well as the United States as a whole, correct?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1  **A.**  Correct.
2  **Q.**  So, across the DEA oxycodone quota and your analysis of
3  total distributions of oxycodone and hydrocodone to the
4  United States, West Virginia, and Cabell, and Huntington,
5  the trend is the same, we see about a ten-fold increase; do
6  you agree?
7  **A.**  Yes.
8  **Q.**  If we could pull up the demonstrative putting those
9  side-by-side.  So, that's why when you look at these charts
10 together, you see the similar upward slope from 1997 to
11 2010, correct?
12 **A.**  I'm sorry.  What do you mean by "that's why"?
13 **Q.**  Because it's a similar factor, because it's the same
14 factor of ten, we see a similar trend across all of these
15 graphs, correct?
16 **A.**  I'm sorry.  Yes.  The -- the graphs all reflect a
17 roughly ten-fold increase and so, visually, they appear to
18 have the same slope.
19 **Q.**  Okay.  Now, you created these -- the charts that you
20 made, the ones that the orange and blue lines, using
21 publicly available information from the ARCOS Retail Drug
22 Summary Reports, correct?
23 **A.**  Yes.
24 **Q.**  And you accessed those reports on-line?
25 **A.**  Yes.

1  **Q.**  Those Retail Drug Summary Reports reflect distributions
2  to each state broken up by three digit zip code within that
3  state year by year and quarter by quarter, right?
4  **A.**  Correct.
5  **Q.**  And you testified that those Retail Drug Summary
6  Reports, which date back to 1997, have been publicly
7  available for many years, potentially as early as 1998,
8  correct?
9  **A.**  Correct.
10 **Q.**  So, individuals in Cabell and Huntington, law
11 enforcement, public health officials, City Council members,
12 Cabell County Commissioners, could have access to this
13 publicly available information of quarterly shipments to the
14 255 and 257 zip codes when it was posted, correct?
15 **A.**  I don't know one way or another, but I don't know any
16 reason why not.
17 **Q.**  You don't know any reason why not, right?
18 **A.**  Correct.
19 **Q.**  You can take that back down.  Thank you.
20      Many of the charts and graphs you testified about with
21 Mr. Mougey reflect your calculation of how many prescription
22 opioids were shipped to jurisdictions on a per capita basis;
23 do you recall that?
24 **A.**  Yes.
25 **Q.**  So, let's discuss briefly the per capita calculations

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1   **A.**   Yes.
2   **Q.**   And for other of the distribution centers, you didn't
3   provide the names or locations, but you did provide the
4   unique DEA registration number, correct?
5   **A.**   Correct.
6   **Q.**   And each of those numbers corresponds to an
7   identifiable distribution center, right?
8   **A.**   Correct.
9   **Q.**   And you may not have identified it, but it would be
10  possible to be identified, correct?
11  **A.**   Correct.  I'm not sure why the city and state is not on
12  this for those two or three -- three that just have the DEA
13  number.
14  **Q.**   Okay.  So --
15           THE COURT:  Excuse me.  Dr. McCann, did the
16  documentation that was furnished to you include the
17  shipments to every pharmacy by these three defendants in
18  West Virginia, for example?
19           THE WITNESS:  Yes, Your Honor.
20           BY MS. SALGADO:
21  **Q.**   On this chart, if none of these -- assuming none of
22  these DEA registration numbers corresponds to Cardinal
23  Health's distribution center in Lakeland, Florida, then that
24  means, according to your analysis, the Cardinal Health
25  distribution center in Lakeland didn't ship any hydrocodone

1   or oxycodone to Cabell-Huntington, correct?
2            THE COURT:  I'm sorry to interrupt again.
3            MS. SALGADO:  That's okay.
4            THE COURT:  I didn't ask the precise question I
5   wanted you to answer.  I asked you if the data included the
6   shipments of every pharmacy.  What I meant to ask was did it
7   show the specific shipments to each specific pharmacy?
8            THE WITNESS:  Oh, yes.  The data is -- if you
9   visualized it, it would be millions of lines of data, each
10  line showing a specific shipment of a specific drug package
11  from -- from a distributor and identifying which
12  distribution facility it came from to a specific pharmacy.
13  It will give the pharmacy's DEA number and the physical
14  location of the pharmacy, as well as the name and some other
15  information, but that's for every single shipment into
16  Cabell County and the City of Huntington.
17           THE COURT:  Okay.  I'm sorry to interrupt you.
18           MS. SALGADO:  That's okay.  No problem.
19           BY MS. SALGADO:
20  Q.   Just back on this, Dr. McCann, I believe you answered
21  this, but making sure we're clear, that if none of the DEA
22  registration numbers on this chart corresponds to Cardinal
23  Health's Lakeland, Florida distribution center, then that
24  means, according to your analysis, the Cardinal Health
25  Lakeland Distribution Center did not ship any oxycodone or

1   hydrocodone into Cabell-Huntington, correct?
2   **A.**   At least not directly into Cabell County and the City
3   of Huntington.
4   **Q.**   And the same is true for Cardinal Health's Auburn,
5   Washington facility?
6   **A.**   Yes.  Same answer, not directly, at least into Cabell
7   County and the City of Huntington.
8   **Q.**   And the same is true for Cardinal Health's Swedesboro,
9   New Jersey Distribution Center?
10  **A.**   Correct.
11  **Q.**   And the same is true for Cardinal Health's Stafford,
12  Texas Distribution Center, correct?
13  **A.**   Correct.
14  **Q.**   Dr. McCann, you're not aware of any shipment by any
15  distributor in this courtroom to a pharmacy that was not
16  registered with the DEA and licensed by its state regulator,
17  correct?
18  **A.**   Correct.
19  **Q.**   And of all the distributor shipments that you've
20  analyzed, you're not aware of a single shipment shipped to a
21  pharmacy without an order placed by that pharmacy for that
22  shipment, correct?
23  **A.**   Correct.
24           MS. SALGADO:  That's all I have.  Thank you so
25  much.