# TAB 9

```
                  IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                            AT CHARLESTON


_____x
                               :
THE CITY OF HUNTINGTON,        :       Civil Action
                               :
              Plaintiff,       :       No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
              Defendants.      :
_____x
                               :
CABELL COUNTY COMMISSION,      :       Civil Action
                               :
              Plaintiff,       :       No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
              Defendants.      :
_____x
```

                      BENCH TRIAL - VOLUME 14
        BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
                    UNITED STATES DISTRICT COURT
                    IN CHARLESTON, WEST VIRGINIA


                           MAY 20, 2021

1    **Q.**   Okay.  And then you multiplied that number by three?

2    **A.**   The root number times three, yes.

3    **Q.**   Okay.  So, that's your initial triggering system?

4    That's step one in your SOMS process, correct?

5    **A.**   The threshold is the triggering, yes.

6    **Q.**   So, Step 2, if you have a triggering event, you have to

7    do something, right?

8    **A.**   Yes.

9    **Q.**   Yes, I'm sorry.  It's next to you, too.  I apologize.

10   **A.**   It's over here.

11   **Q.**   Does it matter --

12          MS. MAINIGI:  Excuse me, Mr. Fuller.  May I -- I

13   think this is a different demo.  Which demo number is this?

14          MR. FULLER:  I'm sorry.

15          MS. MAINIGI:  You're going to go back to Demo 02?

16   Thank you.

17          MR. FULLER:  Yes, ma'am.

18          BY MR. FULLER:

19   **Q.**   All right.  So, we have to do something if there's a

20   triggering effect, correct?

21   **A.**   Yes.

22   **Q.**   And based on the way your system was designed, did it

23   matter whether you were triggered just by a little bit or

24   triggered by a lot?

25   **A.**   Once there was a trigger, there was an analysis.

1    **Q.**   So, let's -- for example, if we had a threshold that's

2    10,000 pills of oxycodone and someone goes over it by a

3    hundred pills, it still triggers in your system, correct?

4    **A.**   Yes.

5    **Q.**   And you would still have to take action, right?

6    **A.**   Correct.

7    **Q.**   Same example, but let's change the numbers.  10,000

8    pill threshold, but they go over by 5,000 pills.  It doesn't

9    change at least this part of how the process works?  You

10    still have the triggering event and you still have to take

11    action, correct?

12    **A.**   Yes.

13    **Q.**   Okay.  Now, if you choose not to take action, can you

14    cancel and report the order to the DEA?

15    **A.**   We -- I don't know what you mean by if you choose not

16    to take action.  We always took an action to do an

17    evaluation.

18    **Q.**   Okay.  So, your suggestion to the Court is that every

19    order that triggers is going to have some sort of due

20    diligence?

21    **A.**   Yes.

22    **Q.**   And that due diligence is going to be documented,

23    correct?

24    **A.**   That due diligence would be documented in the system.

25    **Q.**   And when we're doing the due diligence, what we're

```
 1    trying to do is to determine whether we can clear this order

 2    or whether we have to report the order to the DEA, correct?

 3    A.   Yes.

 4    Q.   So, let's go to Step 3.  So, Step 3, if we have

 5    adequate due diligence that clears the order, whatever

 6    amount it is, it's your understanding that under your system

 7    you would then be cleared to ship the order?

 8    A.   Yes.

 9    Q.   If you conduct the due diligence and you cannot clear

10    it, meaning you cannot validate the order, it's not likely

11    to be diverted, then you have to -- you have a suspicious

12    order that's not cleared and you have to block it and report

13    it, correct?

14    A.   Yes.

15    Q.   Okay.  Do you know how many suspicious orders you

16    reported into Cabell or Huntington?

17    A.   I do not.

18    Q.   Do you know how many suspicious orders you reported

19    into the State of West Virginia during your time?  And I

20    want to limit the questions.  Let me go back for a second.

21         During your tenure, what we described as Chapter 2,

22    from the end of -- December of '07 to September of '08 -- or

23    to September of '12, do you know how many suspicious orders

24    you reported into Huntington and Cabell County?

25    A.   I do not.
```

1   order that broke a particular size, that -- in the analysis

2   you could look at all of the orders below that to assess a

3   pattern, assess a frequency.

4       And in doing so on a 30-day rotational basis, you were

5   able as a pharmacist, member of the team, to analyze all of

6   the additional characteristics; its size, unusual size,

7   deviating substantially from a normal pattern, and unusual

8   frequency.

9       So the system itself is a very broad, comprehensive

10  system.

11  **Q.**   And let me back up and maybe my question was a little

12  unfair, so let's go back.

13      As to the triggering mechanism, being the threshold,

14  that's based on volume in and of itself; correct?

15  **A.**   The threshold -- the threshold is based upon the -- the

16  threshold is based upon a number, a size.

17  **Q.**   Okay.  So my question pertains just to the threshold

18  and the triggering event.  That only measures volume; right?

19  **A.**   The threshold itself in the way it's constructed

20  assesses a volume analysis.  But inside that volume

21  analysis, because you are looking at specific orders for

22  specific -- specific orders for specific customers, you are

23  able to do in that analysis the deviating from an unusual

24  frequency, unusual frequency, and the rest of --

25              THE COURT:  I'm going to have to interrupt you.

1   I've got a technological breakdown here.

2        (Pause)

3        It's working.  Yeah, that's fine.

4   BY MR. FULLER:

5   **Q.**   So that additional analysis is what your pharmacist

6   would do; correct?

7   **A.**   The pharmacist team, yes, that is correct.

8   **Q.**   And here if we go back to the PowerPoint, it says,

9   "Reporting suspicious orders to the DEA does not relieve the

10  distributor of the responsibility to maintain effective

11  controls to prevent diversion."

12       And you agree with that; correct?

13  **A.**   First of all, this is not my slide.  I believe if you

14  are looking to the correspondence that that statement does

15  appear in DEA correspondences.

16  **Q.**   My question is, as the one running the Anti-Diversion

17  Control Program at Cardinal for the Chapter 2 time frame, do

18  you agree with that statement?

19  **A.**   Yes.  The reporting of suspicious orders is not the

20  totality of the obligation.

21  **Q.**   And a registrant, such as Cardinal, has an obligation

22  beyond just reporting suspicious orders; correct?

23  **A.**   It does.  The, the obligation is to maintain effective

24  controls against diversion.  And amongst, amongst others,

25  you've got the security requirements that are associated

1    with the distribution centers.  So, yeah, there are things

2    beyond just that one particular regulation.

3    **Q.**   So do you agree that shipping suspicious orders is not

4    maintaining effective controls against diversion?

5    **A.**   I would not agree.  The, the obligation is to report

6    suspicious orders.  The, the regulation says develop a

7    system, implement that system to report suspicious orders of

8    controlled substances.  That's the obligation.

9    **Q.**   But you also have an obligation to maintain effective

10   controls to prevent diversion; right?

11   **A.**   In, in the CSA there is that requirement to maintain

12   effective controls against diversion.

13   **Q.**   And, and according to Mr. Mone, effective controls

14   still means we can still ship out onto the streets, into

15   pharmacies suspicious orders?

16   **A.**   No, it does not.

17   **Q.**   So we must not ship suspicious orders to prevent

18   diversion?

19   **A.**   Suspicious -- once a suspicious order is identified,

20   that suspicious order is reported, is reported to DEA and

21   not shipped to the customer.

22   **Q.**   And, so, do you -- I'm a little confused now because

23   what I'm trying to figure out, since it's obviously an issue

24   in the case, is whether maintaining effective controls

25   requires us to not ship suspicious orders.

1    **Q.**    And all this is part of being vigilant as a

2    distributor, as a registrant to ensure we're not

3    over-supplying somebody; correct?

4    **A.**    It is all part of the due diligence process to make a

5    decision as to whether or not an individual customer would

6    become a Cardinal Health customer.

7    **Q.**    Now, could a customer refuse to provide some of this

8    information?

9    **A.**    If a customer -- could they?  Yeah, a customer could

10   refuse to provide some of that information.  Then we would

11   take that under consideration as to whether or not to open

12   them up or not.

13   **Q.**    Meaning that might be a red flag; right?

14   **A.**    We would consider that a, a -- we would consider it

15   amongst the totality of the circumstances as to whether or

16   not we would open a customer and allow them to purchase

17   medicines from us.

18   **Q.**    And what about top prescribers?  Would you obtain that

19   information from them?

20   **A.**    Initially because -- in the initial stages of where we

21   were in the development of the program and because much of

22   the, much of -- not the totality of, but much of the

23   emphasis was on internet pharmacies, the top prescribers

24   were an element of analysis.

25   **Q.**    And then a determination is made as to whether to sign

1    on that customer?

2    **A.**    That is correct.

3    **Q.**    And who determines what the threshold is going to be

4    initially for the customer?

5    **A.**    It was -- the initial thresholds were determined based

6    upon an analysis by the analytics team and the pharmacist

7    team after they have made a determination that the

8    information on the customer was sufficient to open up a

9    customer.

10   **Q.**    Now, let's still deal with new customers, but let's

11   switch over to chains.  Did chains go through a different

12   process in on-boarding?

13   **A.**    Chains did go through a different process in

14   on-boarding.

15   **Q.**    And was that controlled by your department or some

16   other department?

17   **A.**    It was still controlled by our department.

18   **Q.**    And who had control of whether a chain was on-boarded?

19   **A.**    Still our -- still our team had a -- had the decision

20   as to whether or not a new chain would be added to, as a

21   customer.

22   **Q.**    And this important information that we've been talking

23   about, would you get the same information from the chain

24   customer?

25   **A.**    Sometimes we did, sometimes we did not.

1    **Q.**   Why would there be occasions where you would not?

2    **A.**   The occasions where we would not were situations where

3    the, the, the, the data either was not available because it

4    was a, it was a brand new store, there was nothing there,

5    you know, they put a new building in, and sometimes we would

6    use the analysis of the characteristics of the chain in

7    terms of whether it's a 24-hour store, where it was located

8    to place them in the segmented categories that we may have

9    had for that particular chain.

10   **Q.**   Were there certain chains that wouldn't provide you

11   information when requested; for example, CVS?

12   **A.**   To the best of my recollection, whenever we requested

13   information, we received the information from the chain in

14   order to enable the, the, the pharmacist team to make a

15   decision.

16   **Q.**   And then on top of that, I think you stated in the past

17   that you would determine what their SOMS system was; is that

18   correct?

19   **A.**   We would determine based upon the factors that we knew

20   about, the new location, where they fit in terms of

21   characteristics, recognizing that the, the chain itself had

22   some fairly unique, you know, standard characteristics;

23   24-hour stores, you know, where they were located, et

24   cetera, put those into the segmentation.  And we would

25   segment them and start their initial thresholds at that

1    2008?

2    **A.**   Oh, yeah.  At the beginning -- at the beginning of the

3    implementation of the changes to migrate to this type of

4    system, we were paper-based.

5    **Q.**   Next Power -- next point says "Questionnaire sent to

6    QRA by customer, the plausibility evaluation."

7    **A.**   Yes.

8    **Q.**   Is that where you're evaluating the basis of their

9    explanation?

10   **A.**   That is where the pharmacist team would take the

11   information based upon their knowledge and experience, the

12   pharmacist and analytics, to look at the data that was

13   coming back and to make a decision what to do with that

14   order.

15   **Q.**   And this is verified by a site visit?

16   **A.**   There, there were opportunities whereby the pharmacist

17   team, in their evaluation, would say this is plausible,

18   plausibility evaluation.  If the order is not suspicious,

19   let's go look at the pharmacy to see the rest of the story,

20   the totality of the story, you know.  And we would set up

21   our investigatory team to go do a site visit.

22   **Q.**   And this is all a process that has to be gone through

23   when we have a triggering event to clear an order; correct?

24   **A.**   Not necessarily.  This process -- the, the verification

25   by a site visit was not an absolute default.  As I said

1   earlier in the last response, the pharmacist may determine

2   that the order was okay, the plausibility piece.  But in, in

3   their professional decision, they wanted a site visit.

4        And, so, they would set up a site visit with the

5   investigatory team.  It didn't change the nature of their

6   assessment of the order.  It just said let's go to the

7   customer for the rest of the story.

8   **Q.**   This process that's gone through, we would see some of

9   that documented in the due diligence file for that

10  particular customer; correct?

11  **A.**   In the early stages of the system, those -- the

12  documentation would be on paper in a file.  Later on, that

13  information was retained in an electronic system.

14       The documentation was not the totality of the -- what

15  was going on in the heads of the professionals that we were

16  using.  It may simply have been a summary analysis, a

17  shorthand version of, say, yes, I've done my diligence and

18  I've done the totality of the circumstances review and I've

19  made a decision.

20  **Q.**   But we're going to have the questionnaire -- we're

21  going to have the response to the questionnaire.  Any of

22  that additional information is going to be compiled in that;

23  correct?

24  **A.**   Some of that information -- you know, the questionnaire

25  more than likely would be there.  Some of that information

1   would be retained.

2       However, depending upon the time frame and the

3   circumstances, not every document is going to be in

4   existence today 12 years later -- well, 11, however many

5   years later we are -- on a paper system.  Some of those

6   paper systems were -- the records retention policy was two

7   years and some of those paper documents don't exist any

8   more.

9   **Q.**   Let's go to Page 122.

10          THE COURT:  Let me ask you a question that just

11   occurred to me.  And I'm sorry to interrupt the flow here

12   and I may have missed it.  But did DEA provide any guidance

13   or have any input into how you determined your threshold

14   requirements?

15          THE WITNESS:  Absolutely none.  The DEA -- the DEA

16   said, "You built the system.  It's your system and your

17   responsibility," essentially.  So they didn't, they didn't

18   provide any of the substantive guidance on how to --

19          THE COURT:  So you determined the way you

20   established the threshold requirements completely on your

21   own?

22          THE WITNESS:  There -- so when counsel asked me

23   the question about the multiplication times three, to the

24   best of my recollection, there was a DEA public -- I forget

25   what it's called -- Advisory Committee, Public Advisory

1    Committee whereby they came together and made some

2    recommendations.  We used that same kind of -- because it

3    was on the DEA site, we sort of used it as a framework

4    within which to make our decisions about thresholds.

5              THE COURT:  I completely interrupted your flow

6    there, Mr. Fuller.

7              MR. FULLER:  You can interrupt any time, Judge.

8              THE WITNESS:  You get to do that.

9    BY MR. FULLER:

10   **Q.**   And the Court had a great question.  The, the

11   involvement of the DEA -- you referred to, I think,

12   what's referred to as the chemical handlers; right?

13   **A.**   Yes.

14   **Q.**   And chemical handlers is designed based, I think you

15   stated, on the Meth Act?

16   **A.**   To the best of my recollection, yes.

17   **Q.**   And it's designed to identify extraordinary orders of

18   List I chemicals; is that right?

19   **A.**   Yes, I believe that's accurate.

20   **Q.**   So it's not necessarily applicable to controlled

21   substances unless they contain List I chemicals.

22   **A.**   It's not necessarily -- you're right.  It is not

23   necessarily applicable, but it does provide a reasonable,

24   rational framework within which to begin a discussion or a

25   thought process about how to develop such a system.

95

1    **Q.**   And that system is designed, or the chemical handlers

2    is identifying extraordinary sizes of List I chemicals;

3    correct?

4    **A.**   That is correct.

5    **Q.**   Okay.  Let's change to -- so the QRA evaluation --

6    **A.**   Yes, sir.

7    **Q.**   -- determination has to be made at Cardinal as to

8    whether an order is plausible and suspicious or not

9    plausible and suspicious; correct?

10   **A.**   Yes.

11   **Q.**   And it, it's determined -- if the order is not

12   plausible and suspicious, you set out the process that's

13   going to occur; correct?

14   **A.**   Yes.  And the only point that I would make note of is

15   that the order was already blocked because it -- you know,

16   in most instances because it had a threshold.

17   **Q.**   It blocked at the triggering mechanization we looked at

18   earlier; correct?

19   **A.**   Yes, correct.

20   **Q.**   And then the suspicious order has to be reported to the

21   DEA; is that right?

22   **A.**   Once you determine that it is suspicious, the order is

23   reported to the Drug Enforcement Administration.

24   **Q.**   Sales is notified as well; right?

25   **A.**   That is correct.

1    **Q.**   And who is Chris Anderson?  Do you know?

2    **A.**   Okay.  I learned from the last time I'm going to read

3    what it says down below.  He is the Director of Operational

4    Excellence and Quality Systems.

5    **Q.**   There's always a good way to cheat a little bit, huh?

6    **A.**   Yeah.

7    **Q.**   All right.  It says here -- you write to Chris, and

8    this is October 1st of 2008, that, "I made a few changes to

9    the slides and some information has changed a bit."  Right?

10   **A.**   Yes, sir.

11   **Q.**   And you attached several documents -- well, actually, I

12   think it's one PowerPoint presentation.  Correct?

13   **A.**   The documents, I believe, originated with Chris.

14   **Q.**   Right.  You're sending them back to him after you made

15   some changes?

16   **A.**   Yes, yes.

17   **Q.**   And have you seen these slides before as well?

18   **A.**   I undoubtedly have seen these slides before, but I

19   don't recall them currently, you know.  It's 12 years ago.

20              MR. FULLER:  Your Honor, I would move into

21   evidence Plaintiffs' 1930.

22              THE COURT:  Any objection to 1930?

23              MS. MAINIGI:  No objection, Your Honor, provided

24   that the witness can corroborate a foundation.  I note that

25   there are some notes on the page in addition to the slides.

1    And the witness has testified that he's flipped through the

2    slides.  I don't know if he can corroborate the notes that

3    are on the slides.

4    BY MR. FULLER:

5    **Q.**   Mr. Mone, let me ask a question.  Mr. Mone, when

6    you went through this, were you reviewing the totality

7    of the PowerPoint?

8    **A.**   To the best of my recollection, I was reviewing my

9    components of the slides.

10   **Q.**   And you made edits to those?

11   **A.**   Apparently, I did.  What those edits were, I don't

12   recall what they were.

13   **Q.**   Sure.  You don't have an independent recollection today

14   of what edits you made?

15   **A.**   Right.

16   **Q.**   But according to your statement in the email, you made

17   edits and then you sent it back?

18   **A.**   Yes.

19           MR. FULLER:  Judge, I would move for the

20   admission.

21           MS. MAINIGI:  Your Honor, I still don't think a

22   foundation has been laid for the notes portion of the

23   slides.

24           THE COURT:  Did you make the notes, Mr. Mone?

25           THE WITNESS:  I did not.

```
 1              THE COURT:  Do you know who did?

 2              THE WITNESS:  I do not.

 3              MS. MAINIGI:  I'm fine with admitting it without

 4     the notes.

 5              THE COURT:  Let's excise the notes and admit it

 6     without the notes.  How about that, Mr. Fuller?  Are you

 7     happy with that?

 8              MR. FULLER:  Judge, I think he would have reviewed

 9     it, but that's fine.  I don't have any objection.

10              THE COURT:  Okay.  1930 is admitted, but the Court

11     will not consider the notes.  They're not -- the notes are

12     not admitted.  The rest of the exhibit is admitted.

13              MR. ACKERMAN:  Your Honor, --

14     BY MR. FULLER:

15     Q.   Mr. Mone, turn to Page 18 of the document.

16     A.   Yes, sir.

17     Q.   This is the idea of the mentality behind your system,

18     isn't it?  First we identify; correct?

19     A.   Correct.

20     Q.   That's through our triggering system?

21     A.   Right.

22     Q.   Then we block, meaning we can't ship the order; right?

23     A.   That is a component of the triggering system.

24     Q.   Then we have to conduct due diligence.  And if we don't

25     surpass the due diligence threshold, meaning clear the
```

1    **Q.**   Mr. Mone, did you use these to monitor how the system

2    was functioning?

3    **A.**   These were tools that were used by the team to make

4    assessments of the program.

5    **Q.**   And then, these are all based off the thresholds,

6    correct?

7    **A.**   These reports are based off of threshold, that is

8    correct.

9    **Q.**   Now, we talked about setting the thresholds earlier and

10   you're setting them, at least initially, end of 2007,

11   beginning of 2008, correct?

12   **A.**   That was the initial thresholds setting process, yes.

13   **Q.**   Before your arrival, Cardinal didn't use these type of

14   thresholds, right?  They used Ingredient Limit Reports?

15   **A.**   Before I got there, Ingredient Limit Reports were being

16   -- were done and when I got there, they were already -- the

17   system was already in the beginning stages of making

18   adjustments to an electronic system.

19        I don't recall how -- I don't recall how those initial

20   orders, you know, that they were establishing in the

21   immediate term before I got there were done.

22   **Q.**   But you implemented this threshold system we've been

23   talking about today?

24   **A.**   I improved -- I improved the entire -- I would like to

25   think I improved the entire system that was there.

1   **Q.**   And so, when you devised how these thresholds were

2   going to be set using the system we talked about earlier,

3   subcategorizing the customers, then subcategorizing them on

4   size, then determining an average and tripling it, what did

5   you do to take into consideration that the company was in

6   the throes of an opioid epidemic?

7   **A.**   The considerations that we made were to take our

8   assumptions that we were making in terms of where to place

9   those thresholds and bounce those up against external

10   experts to make certain that the assumptions that we were

11   making were -- were appropriate.

12   **Q.**   And then that led you to the conclusion that it was

13   still a good idea to multiply the average by three?

14   **A.**   Yes.  When we sent -- when we sent it out and had

15   external folks look at the process, they came back with an

16   assessment with the assumptions that we were making were

17   appropriate.

18   **Q.**   Now, we've talked about the thresholds.  We've talked

19   about that they're tracked.  You guys had a -- and I said

20   you guys.  I'm sorry.  Cardinal had an electronic system for

21   tracking these thresholds and I think you testified earlier

22   these were kept in the normal course, correct?

23   **A.**   That is correct.

24   **Q.**   You also tracked threshold changes in the normal

25   course; is that right?

1    **A.**   Through system track changes, we did.

2    **Q.**   You had access to these systems?

3    **A.**   I did have access to the systems, yes.

4    **Q.**   As well as the rest of your team; is that right?

5    **A.**   Absolutely.

6    **Q.**   Now, not only with threshold changes, but threshold

7    events.  We see here that on certain months, for example,

8    May of '08, we have the 421 threshold events.  Those are

9    tracked, as well, correct?

10   **A.**   Which document are you referring to?

11   **Q.**   I'm sorry.  I'm on 7509, the one that has your e-mail

12   attached to it.

13   **A.**   Okay, thank you.  7509?  And what was your statement --

14   question?

15   **Q.**   Yes, sir.  I'll ask the question again.  Where we have

16   June of '08 the 421 threshold events --

17   **A.**   Yes.

18   **Q.**   Those are also tracked within Cardinal's system; is

19   that right?

20   **A.**   Yes, they were.

21   **Q.**   Those were also accessible by you?

22   **A.**   Pardon?

23   **Q.**   You also have access to those?

24   **A.**   I did.

25   **Q.**   No longer?

1    **A.**   Correct.

2    **Q.**   You did at the time?

3    **A.**   Correct.

4    **Q.**   Your team had access to those?

5    **A.**   They did.

6    **Q.**   It's something that your department would use on a

7    regular basis in maintaining the anti-diversion system,

8    correct?

9    **A.**   Yes, they would.

10   **Q.**   You also tracked all the suspicious orders that were

11   reported, correct?

12   **A.**   Yes, we did.

13   **Q.**   You could look up and see how many suspicious orders

14   were reported in certain geographic areas, as well as

15   particular pharmacies; is that right?

16   **A.**   Yes, we could.

17   **Q.**   You had access to that system?

18   **A.**   Undoubtedly, I had access to the system.  I'm not sure

19   I knew the ability to extract that information out of the

20   system.

21   **Q.**   That may be something that you asked one of your other

22   team members --

23   **A.**   Yes.

24   **Q.**   -- to pull for you; is that fair?

25   **A.**   Yes.

```
 1    Q.   Okay.

 2              MR. FULLER:  Your Honor, at this time, I would

 3    like to move in P-14294.  We disclosed this last night and

 4    there was no objection.

 5              MS. MAINIGI:  We have no objection, Your Honor, to

 6    its admission.  Obviously, we can -- if it's something he's

 7    going to question the witness on, we can take that piece of

 8    it up as it goes, but we have no objection to its admission.

 9              THE COURT:  Okay, it's admitted.

10              PLAINTIFF EXHIBIT P-14294 ADMITTED

11              MR. FULLER:  Your Honor, I'm going to test my

12    luck.  I'm going to move for admission of P-44275.

13              MS. MAINIGI:  Same position, Your Honor.

14              THE COURT:  Admitted.

15              PLAINTIFF EXHIBIT P-44275 ADMITTED

16              MR. FULLER:  And I would move for admission of

17    P-42071.

18              MS. MAINIGI:  One moment, Your Honor.

19              THE COURT:  Yes.

20       (Pause)

21              MS. MAINIGI:  Same position, Your Honor.

22              THE COURT:  All right.  It's admitted.

23              PLAINTIFF EXHIBIT 42071 ADMITTED

24              BY MR. FULLER:

25    Q.   Mr. Mone, a moment ago when we were talking about the
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    design of the thresholds and taking into consideration the

 2    epidemic, you mentioned relying on third-party experts.

 3    What third-party experts would that be?

 4    A.   Well, we subjected our SOM program to Deloitte.  We

 5    subjected elements of it to IBM Watson.  There were

 6    improvements that we looked at and we submitted to a Ph.D.

 7    at Ohio State.  There may, in fact, be more, but those are

 8    the three I can think of right now.

 9    Q.   Now, let me try to inquire on those.  The submission to

10    Ohio State came further on in the system, correct?

11    A.   It did.

12    Q.   The submission to Cegedim Dendrite was earlier on in

13    the system, correct?

14             MS. MAINIGI:  Objection.  I don't think that is

15    the testimony.  I don't think Mr. Mone said Cegedim

16    Dendrite.  He said IBM Watson, he said Deloitte, and he said

17    Ohio State.

18             THE COURT:  Sustained.

19             BY MR. FULLER:

20    Q.   Mr. Mone, I'm handing you what's marked for

21    identification purposes as Plaintiffs' Exhibit 80.  Have you

22    seen this document before?

23    A.   I have not.

24    Q.   You had -- do you have any understanding of what this

25    Investigative Demand Committee Report would be?
```

1    **A.**    No.

2    **Q.**    Sure.

3    **A.**    May I -- may I make a correction?

4    **Q.**    Sure.

5    **A.**    Because I'm just not certain.  I may actually have seen

6    parts of this document in a prior deposition, but I haven't

7    seen the document, the whole thing.

8    **Q.**    Fair enough.  So, you may have recollection of this

9    document from a prior deposition; you don't remember seeing

10   it during the course of your employment?

11   **A.**    I do not.  Do not.

12   **Q.**    Do you remember whether in the beginning of -- end of

13   2012, beginning 2013, whether there was an investigation

14   conducted related to the SOMS systems at Cardinal?

15   **A.**    I recall a -- for lack of a better term, I recall an

16   internal -- an internal inquiry into the Suspicious Order

17   Monitoring Program.

18   **Q.**    And were you interviewed related to that process?

19   **A.**    To the best of my recollection, I was.

20   **Q.**    Do you believe some of your team members may have been

21   interviewed in that process?

22   **A.**    Undoubtedly, they were, more than likely.

23   **Q.**    And was that looking at and reviewing the SOMS system

24   in place and any potential changes that may need to be made?

25   **A.**    I would assume that's what they were looking at.

```
1              THE COURT:  Yeah.
2         (Pause)
3              MR. FULLER:  Your Honor, I'll pass the witness.
4              THE COURT:  All right.  Thank you, Mr. Fuller.
5         Ms. Mainigi?
6              MS. MAINIGI:  Yes, Your Honor.
7         Mr. Simmons, are we ready to go or do you need a couple
8    of minutes?
9         We probably just need a couple of minutes of
10   transition, Your Honor, if that's okay.
11             THE COURT:  Okay.  Let's just -- I'll stay on the
12   bench.
13             MS. MAINIGI:  Sure.
14             THE COURT:  And you can go ahead and do it that
15   way.
16             MS. MAINIGI:  Thank you, Your Honor.
17             MS. MAINIGI:  Mr. Simmons, are we ready?
18        Good afternoon, Mr. Mone.
19             THE WITNESS:  Good afternoon.
20        Mr. Simmons, let's go ahead and put Demonstrative 2 up.
21                        CROSS EXAMINATION
22             BY MS. MAINIGI:
23   Q.   I just want to take a few minutes and review your
24   background before you came to Cardinal, Mr. Mone.
25   A.   Okay.
```

```
1    Q.   Does this demonstrative accurately reflect your

2    qualifications and background before you came to Cardinal

3    Health?

4    A.   It is a summary of my background, yes.

5    Q.   And can you describe for us your educational

6    background, please?

7    A.   So, educationally, I attended the University of

8    Florida.  I graduated from there twice, once from the

9    College of Pharmacy and once from the College of Law.

10   Q.   Could you pull the microphone a little bit closer?  I'm

11   having a little bit of a hard time.

12   A.   Okay.  Is that -- is that better?

13   Q.   Yes.  That's wonderful.

14   A.   Sorry.

15   Q.   Have you worked as a practicing pharmacist?

16   A.   I have.

17   Q.   And did you also work for the Florida Board of

18   Pharmacy?

19   A.   I did.

20   Q.   Can you tell us at high level what you did for the

21   Florida Board of Pharmacy?

22   A.   When I went to work for the Board of Pharmacy, I was a

23   prosecutor for the Florida Board.

24   Q.   And are there particular types of actions you

25   prosecuted?
```

1    **A.**   The -- the actions that were found to have probable

2    cause.  So, I would prosecute at the administrative law

3    level pharmacists and pharmacies over allegations of

4    deviations from the standard and statutes for the practice

5    of pharmacy and pharmacists.

6    **Q.**   And did that work give you experience in pharmacy

7    regulation?

8    **A.**   It did.

9    **Q.**   And then, did you later work for the Florida Attorney

10   General's Office?

11   **A.**   I did.

12   **Q.**   And describe for us what you did there.

13   **A.**   I served as the General Counsel for Administrative

14   Regulatory Boards, the Board of Osteopathic Medicine,

15   Veterinary Medicine, Podiatric Medicine, and I also served

16   as an Assistant on the Board of Medicine's Probable Cause

17   Panel.

18   **Q.**   And did you have occasion in that role to address

19   issues related to opioids and other controlled substances?

20   **A.**   I did as it related to those practitioners who were

21   licensed in those particular fields.

22   **Q.**   After the Florida AG's office, what was your next role?

23   **A.**   I was -- I was voted, I was elected, I'm not sure what

24   the right term is.  The Kentucky Board of Pharmacy decided

25   to hire me as their Executive Director.

1   Q.   Tell us about that role.  What did you do there?

2   A.   For -- I was the Chief Administrative, Chief Executive,

3   Chief Operating Officer of the state body that is known as

4   the Board of Pharmacy.

5   Q.   Now, in that Executive Director role, did you take any

6   steps related to the prevention of the misuse of

7   prescription medications?

8   A.   Yes.

9   Q.   Can you describe that for us, please?

10  A.   Sure.  While I was the Executive Director of the Board,

11  in conjunction with the Cabinet for Health -- the Cabinet

12  for Drug Services, the title I may have messed up, but at

13  the instance of the Attorney General, Drug Control and the

14  Board of Pharmacy worked on the establishment of the

15  Prescription Monitoring Program in Kentucky.

16  Q.   And what was the Prescription Monitoring Program that

17  you worked on?

18  A.   It's called KASPER and it was an all-schedule

19  electronic reporting system that was implemented in

20  Kentucky.

21  Q.   And what was the goal of that Prescription Monitoring

22  Program?

23  A.   The goal of the -- at least as far as I could

24  determine, the goal of the Prescription Monitoring Program

25  was to provide a tool so -- to the practitioners, those who

1    wrote prescriptions, as well as those who dispensed

2    prescriptions, to obtain a more full picture of the

3    patient's use of controlled substances.

4    **Q.**   And when you say practitioner, are you referring to

5    prescribers?

6    **A.**   Yes.  Practitioners who have the authority to

7    prescribe, yes.

8    **Q.**   And who had access to this system that you helped with?

9    **A.**   The practitioners, the prescribers, the dispensers,

10   Drug Control themselves and I'm --

11   **Q.**   Did wholesale -- I'm sorry.

12   **A.**   And I'm sure whoever else was in the statute that said

13   that they could have it.  I just don't recall all the rest

14   of the folks.

15   **Q.**   Do you recall whether wholesale distributors had access

16   to this program?

17   **A.**   They did not.  The program contains protected health

18   information and wholesalers do not have access to the

19   information.

20   **Q.**   Besides the Kentucky Board of Pharmacy, can you

21   describe other positions that you've held related to

22   pharmacy?

23   **A.**   Yeah.  On the slide, it reflects that I was a member of

24   the Ohio Board of Pharmacy.  I served two terms there as

25   President of the Board.  I suspect you can look at my career

```
 1    and say I tried to spend most of my career in public

 2    service.

 3         And then the last bullet there is the National

 4    Association of Boards of Pharmacy where I -- as a -- as the

 5    Executive Director of the Kentucky Board of Pharmacy, I was

 6    elected to the Executive Committee of NEVP, but probably

 7    more significantly for me, is that for more than 20 years, I

 8    have served on the multi -- the Multi-State Pharmacy

 9    Jurisprudence Exam Review Committee.

10    Q.   And what does that committee do?

11    A.   It's the committee that puts together the law exam that

12    every pharmacist in the country takes in order to get a

13    license to be a pharmacist or to reciprocate from state to

14    state.

15    Q.   Thank you, Mr. Mone.

16         MS. MAINIGI:  Now, we can go ahead and take that

17    down, Mr. Simmons.

18         BY MS. MAINIGI:

19    Q.   You spent some time with Mr. Fuller just setting the

20    stage in terms of the timetable that you were -- the time

21    period that you were at Cardinal Health running the

22    Anti-Diversion System; do you recall that?

23    A.   I do.

24    Q.   And I think you told us that Mr. Steve Reardon came

25    before you in terms of running the Anti-Diversion Program;
```

1    is that right?

2    **A.**    It is.

3    **Q.**    And then Mr. Todd Cameron came after you in terms of

4    running the Anti-Diversion Program at Cardinal, correct?

5    **A.**    He did.

6    **Q.**    So, when you arrived in December, 2007, you said that

7    the Cardinal Health Anti-Diversion Program was in the

8    process of changing; do you recall that?

9    **A.**    I do.

10   **Q.**    What was your understanding of why the Cardinal program

11   was changing in that time period?

12   **A.**    My understanding of the basis for the change was that

13   Mr. Reardon had attended a DEA Industry Conference a few

14   months earlier and came back and began the development of

15   the electronic -- the electronic component of the Suspicious

16   Order Monitoring System.

17   **Q.**    Now, what is your understanding of what happened at the

18   conference?

19   **A.**    My understanding of what happened at the conference was

20   that a competitor had presented in conjunction with the DEA

21   and explained their new electronic system for reporting

22   suspicious orders and that the expectation of the DEA had

23   changed relative to when Suspicious Order Reports would be

24   sent to DEA.

25   **Q.**    Was that competitor AmerisourceBergen?

1    **A.**    It was.

2    **Q.**    And do you recall whether that conference was in that

3    September, 2007 time period right before you arrived?

4    **A.**    Yeah.  It was -- it was shortly before, so September is

5    probably right.

6    **Q.**    And with respect to the DEA expectations that you

7    understood as you came in and took over the Anti-Diversion

8    System, you mentioned the electronic system.  Were there any

9    other components that you're recalling got -- that Mr.

10   Reardon brought back for implementation?

11   **A.**    I call it the three prongs of what we did, which was

12   Know Your Customer, electronic monitoring and

13   investigations.

14   **Q.**    Those were the three prongs that Mr. Reardon brought

15   back?

16   **A.**    To the best of my recollection, that's what were

17   brought back.

18   **Q.**    And if I could ask you to bring that a little bit

19   closer to you.  Still having a little bit of difficulty.

20   **A.**    I'm sorry.

21   **Q.**    That's better.  Thank you.

22        Now, when you arrived in December, 2007, Cardinal

23   Health was in the process of building out a system

24   consistent with the new expectations of DEA?

25   **A.**    I would say that's a fair statement.

```
 1    Q.   And you were charged with assisting an implementation

 2    of those changes?

 3    A.   Yes, I was.

 4    Q.   Now, did you come to understand whether there was any

 5    discussion at the conference about whether suspicious orders

 6    should be shipped?

 7    A.   I did.

 8    Q.   And what was your understanding?

 9    A.   That suspicious orders were not to be shipped to

10    customers.

11    Q.   Did you understand that that expectation was the same

12    or different than it had been before?

13    A.   That it was different.

14    Q.   In your understanding, was there a statutory or

15    regulatory requirement to not ship suspicious orders?

16    A.   Given that the statutory reference to suspicious orders

17    hasn't changed since, from what I could tell back then and

18    what I understand to be the current language, since the

19    language itself hasn't changed, it had to be a change in

20    expectations.

21    Q.   A change in expectations by the DEA?

22    A.   Correct.

23    Q.   Now, after you became the Head of Cardinal Health's

24    Anti-Diversion Team, did Cardinal Health receive any letters

25    from the DEA about their new expectations?
```

```
 1    never changed, it had to be in compliance.

 2            MR. ACKERMAN:  Your Honor, I object on the ground

 3    that I --

 4            THE COURT:  One lawyer.

 5            MR. ACKERMAN:  I'm objecting for the City of

 6    Huntington, Your Honor.

 7            THE COURT:  Oh, okay.  I'm sorry, Mr. Ackerman.

 8            MR. ACKERMAN:  Yes.  We've switched now, so my

 9    microphone is back on.  Object to that -- I think the

10    witness's answer stated a legal conclusion.  The question

11    was a yes or no question, but the -- but in explaining the

12    answer, the witness stated a legal conclusion.  So, I'd

13    object on that ground and move to strike.

14            THE COURT:  Well, it's his understanding of what

15    the situation requires.  I'm going to overrule that and let

16    him answer.

17            BY MS. MAINIGI:

18    Q.   Now, let me -- we'll cover some changes, Mr. Mone,

19    specific changes that you made going forward, but let me ask

20    you, besides the changes that got made at the end of 2007,

21    beginning of 2008, while you were Head of Anti-Diversion,

22    was this the only time that Cardinal Health made changes to

23    its system?

24    A.   No.  We were engaged in a continuous improvement

25    process the entire time I was there.
```

165

1    Q.   Now, do you recall Mr. Fuller asking you some questions

2    about this 2008 settlement with the DEA?

3    A.   I -- I vaguely recall them, yes.

4         MS. MAINIGI:  Your Honor, as you know, we have

5    objected to a discussion of that based on geographic scope

6    and we retain our objection to that, but I am going to ask a

7    few questions since Mr. Fuller was allowed to ask questions

8    and we don't waive --

9         THE COURT:  You may ask questions without waiving

10   the objection.

11        MS. MAINIGI:  Yes, Your Honor.  Thank you.

12        THE COURT:  That's fine.  The objection will be

13   preserved.

14        BY MS. MAINIGI:

15   Q.   Around the same time that you took your position at

16   Anti-Diversion at the end of 2007, did the DEA begin

17   enforcement actions related to certain Cardinal Health

18   Distribution Centers?

19   A.   Yes.

20   Q.   Now, in terms of timeline, if I represent to you that

21   the ABDC Conference was September 2007, do you recall when

22   the first immediate suspension order against a Cardinal

23   Health Distribution Center occurred?

24        MR. FULLER:  Objection, foundation, Judge.

25        THE COURT:  Overruled.  If he remembers, he can

1    answer.

2              THE WITNESS:  To the best of my recollection, it

3    was -- it was towards the end of November of 2007.

4              BY MS. MAINIGI:

5    Q.   And was that the Auburn-Washington State facility?

6    A.   Auburn was the first one, yes.

7    Q.   And then were there two more in December, the month

8    that you arrived?

9    A.   Yes.

10   Q.   And were those Lakeland, Florida and Swedesboro, New

11   Jersey?

12   A.   Yes.  Swedesboro on my 50th birthday.

13   Q.   Happy birthday.

14   A.   Thank you.

15   Q.   Was there also an Order to Show Cause in January, 2008?

16   A.   I do not recall whether it was December or January, but

17   I do recall an Order to Show Cause.

18   Q.   And do you recall that was Stafford, Texas?

19   A.   It was Texas.

20   Q.   And each of those four distribution centers, Mr. Mone,

21   had a separate registration with the DEA; is that correct?

22   A.   They did, yes.

23   Q.   And do you recall generally what type of pharmacies

24   were involved in the 2008 DEA action?

25   A.   They were predominantly what in the literature and the

```
1    DEA language were called internet pharmacies.

2    Q.   To your recollection by this point in time, had

3    Cardinal Health taken measures to ensure that none of its

4    customers were acting as internet pharmacies?

5    A.   Yes.

6    Q.   Now, do you recall around that time how many

7    distribution centers Cardinal Health had approximately?

8    A.   I know that there were more than 20.  I don't recall

9    the specific number.

10   Q.   And do you recall any allegation in this point in time,

11   the end of 2007, beginning of 2008, against the Wheeling,

12   West Virginia Cardinal Health Distribution Center?

13   A.   No.  I don't believe there was anything ever about

14   Wheeling.

15   Q.   And, to your knowledge, did any of the distribution

16   centers at issue in the 2008 enforcement actions ship

17   controlled substances to West Virginia?

18   A.   To pharmacies in West Virginia?

19   Q.   Correct.

20   A.   No.

21   Q.   And I think you've already testified that by the time

22   you got some of these enforcement actions, Cardinal Health

23   had already begun to make changes to its Suspicious Order

24   Monitoring System?

25   A.   Yes, it had.
```

1    **A.**    Sure.  He held onto the compliance officers, which is

2    why you see only a dotted line to me.  They actually are --

3    they're actually a solid line in to Steve.

4    **Q.**    And you meant -- I'm sorry.  Go ahead.

5    **A.**    And Steve handled the Distribution Center licensing and

6    security and the other components of the Distribution

7    Center.

8    **Q.**    So, what do the compliance officers do at the

9    distribution centers?

10   **A.**    Well, they're -- a lot of things.  They're responsible

11   for the cage and vault.  They're responsible for licensing.

12   They're responsible for maintaining the on-site records.

13   They're responsible for communicating to -- to

14   anti-diversion.  And they're responsible to communicate up

15   to Steve.

16   **Q.**    Now, I see underneath you is Know Your Customer and I

17   know that's a component of the system going forward, but can

18   you describe why it's on the org chart?

19   **A.**    Yeah.  We -- what we did was, you know, as I indicated

20   before, any good system is a PPT, people, process, and

21   technology.  And so, we took the components of the system,

22   grouped individuals into areas of excellence, and placed

23   them in the system so that the Know Your Customer folks or

24   the intake folks, the Know Your Customer analyst folks that

25   worked with the pharmacists.

1    **Q.**   So did -- did the Know Your Customer folks evaluate and

2    conduct diligence on new customers?

3    **A.**   They did.

4    **Q.**   And also existing customers?

5    **A.**   They did.

6    **Q.**   And were there -- there were questionnaires associated

7    with that process?  Did they fill those questionnaires out?

8    **A.**   They did not fill the questionnaires out.

9              MR. ACKERMAN:  Your Honor, a leading objection to

10   the last question.

11             MS. MAINIGI:  I'm just trying to move this along,

12   Your Honor.

13             THE COURT:  Yeah, overruled.  We need to get

14   through this and I don't see any harm to the question and

15   then the answer.

16             THE WITNESS:  The answer is they didn't fill it

17   out.  The customers filled it out.

18             BY MS. MAINIGI:

19   **Q.**   What did the Know Your Customer folks do with the

20   questionnaires?

21   **A.**   They took it and where there -- as I indicated to

22   counsel this morning, where there were objective ways of

23   assessing what the customer provided, they would look those

24   up, you know, licensure, and make sure that the licensure

25   was right, and the objective data that they could find, and

1    then they would pass that on to the pharmacist.

2    **Q.**   Then there is electronic order monitoring and

3    pharmacists.  And I know you referred several time to

4    pharmacists with Mr. Fuller.  Can you describe the role of

5    those individuals?

6    **A.**   These pharmacists were, as Mr. Fuller and I had the

7    unfortunate discussion about pharmacists being -- these are

8    our pharmacists who were assessing -- were doing the

9    assessment of both the data that was provided through the

10   Know Your Customer piece, as well as doing the evaluation of

11   the threshold events.

12   **Q.**   And then there's an Investigations Team.  What did they

13   do?

14   **A.**   When the pharmacist made a request for additional

15   information, the pharmacist would send it over to the

16   Investigatory Team, who would then do a site visit -- to do

17   a site visit of the pharmacy and those -- the boxes are our

18   folks and we had additional -- and we talked about it

19   earlier.  We had the additional consultants that would go

20   out and do those inspections.

21   **Q.**   And then the Analytics Team, what did the Analytics

22   Team do?

23   **A.**   The Analytics Team was the team that produced the data

24   that Mr. Fuller provided to me earlier and would work with

25   the IT Team to -- to build the analytics capability.

1    **Q.**   Now, as a wholesale distributor, is it fair to say

2    Cardinal Health supplies a lot of products beyond opioids to

3    its customers?

4    **A.**   Yes.  We're a full -- full line -- Cardinal Health is a

5    full line pharmaceutical wholesale distributor.

6    **Q.**   What are the other types of products at a very high

7    level that Cardinal Health provides?

8    **A.**   Very high level, your asthma inhalers.  You know, your

9    hospital supplies we provide from -- oh, from Band-Aids to

10   specialty medications in the distribution channel.

11   **Q.**   As a wholesale distributor, does Cardinal Health

12   develop opioids?

13   **A.**   It does not.  It is not a manufacturer.

14   **Q.**   Does it seek approval from the FDA to market opioids?

15   **A.**   It does not.

16   **Q.**   Does Cardinal Health develop or conduct clinical tests

17   on the risks and benefits of opioids?

18             MR. FULLER:  Object to form.  Foundation.

19             THE COURT:  Overruled.

20             THE WITNESS:  To the best of my knowledge, we

21   don't have any clinical folks that do that.

22             BY MS. MAINIGI:

23   **Q.**   We've talked about the Closed System of Distribution.

24   Can you describe what the Closed System of Distribution

25   means?

```
 1    meeting their corresponding responsibility, and then

 2    prepares it and dispenses it to the patient.

 3    Q.   So, if no patient comes in with a prescription to a

 4    pharmacy, what happens to the medication that the pharmacy

 5    ordered from Cardinal Health?

 6    A.   It sits on the shelf.

 7    Q.   And does that apply to all medications or just

 8    controlled substances?

 9    A.   Everything.  You know, any legend drug, any -- let me

10    -- I don't want to have definitions of legend drugs.  Any

11    prescription item first requires the patient to present a

12    valid prescription to the pharmacist.

13    Q.   Now, within this Closed System were quotas set by DEA

14    as to the nationwide amount of opioids that could be

15    produced?

16    A.   Yes.  And that applies to the manufacturer of the

17    product, the quotas.

18    Q.   And, to your knowledge, did Cardinal Health ever ship

19    in excess of the DEA quotas?

20    A.   It would be impossible for Cardinal Health to ship in

21    excess of the quota.

22    Q.   Why is that?

23    A.   Well, because Cardinal Health is not -- first of all,

24    the easy answer is Cardinal Health is not the only

25    distributor.  And there are no dosage -- there are no
```

1      amounts above what the DEA quota is that can be

2      manufactured, so no one could distribute more than what the

3      quota was.

4      **Q.**   To your knowledge, did Cardinal Health ever ship to a

5      pharmacy in Cabell or Huntington that was not registered

6      with the DEA and licensed by the State of West Virginia?

7      **A.**   To the best of my knowledge, we would not ship to any

8      customer that was not registered by the State or the -- in

9      the jurisdictions where the state required controlled

10     substance registration and a DEA registration.

11     **Q.**   And, to your knowledge, did Cardinal Health ever ship

12     prescription opioids to a pharmacy in Cabell or Huntington

13     that Cardinal Health knew or should have known was

14     dispensing for a purpose other than to fill legitimate

15     prescriptions written by doctors?

16     **A.**   No.

17     **Q.**   Now, when it comes to some of the reporting that

18     Cardinal Health does to the DEA, is there reporting called

19     ARCOS that you're familiar with?

20     **A.**   Yes.

21     **Q.**   Can you describe what that is?

22     **A.**   Well, firstly, that -- the ARCOS reporting vault fell

23     under Steve.

24     **Q.**   Steve Reardon?

25     **A.**   Steve Reardon, yeah.  He's not there anymore, but Steve

```
 1    Reardon.  That's the component of that security and what
 2    have you that Steve did on the QRA side.
 3         But the ARCOS Report is a report that is required to be
 4    submitted by -- I think it's manufacturers and distributors
 5    for all schedule Is, all Schedule IIs, and narcotic IIIs.
 6    Q.   So, for every single pill, Mr. Mone, the controlled
 7    substance that Cardinal Health shipped, did the DEA know who
 8    it shipped to?
 9    A.   Ultimately, DEA would know -- be able to know that
10    information.  It directly gets every month the ARCOS Reports
11    which would -- now, mind you, we don't have any Schedule Is,
12    but it's all Schedule IIs and Narcotic IIIs.
13    Q.   And would the DEA know when that shipment occurred?
14    A.   Yes.
15    Q.   At any point during your time with Cardinal Health's
16    Anti-Diversion Team from 2008 to 2012 did DEA inform
17    Cardinal Health that it believed its shipments to Cabell
18    County or Huntington were excessive?
19    A.   No.  There was no communication from DEA with regard to
20    that.
21    Q.   At any point during your time with Cardinal Health's
22    Anti-Diversion Team from 2008 to 2012 did DEA inform
23    Cardinal Health that its shipments to any particular
24    pharmacy in Cabell County or Huntington were excessive?
25    A.   No, they did not.
```

```
 1              MS. MAINIGI:  Your Honor, I'm about to change

 2     sections.  Would now be a good time for our break?

 3              THE COURT:  Yes.  Let's take about a ten-minute

 4     break here.

 5          (Recess taken)

 6          (Proceedings resumed at 3:40 p.m.)

 7              THE COURT:  Mr. Mone, you can come on back up,

 8     sir.

 9     BY MS. MAINIGI:

10     Q.   Welcome back, Mr. Mone.

11     A.   Thank you.

12     Q.   During the time that you worked at Cardinal, were you

13     provided the resources necessary for the Anti-Diversion work

14     that you led?

15     A.   Yes.

16     Q.   And during your tenure did the Anti-Diversion staff

17     grow?

18     A.   It did.

19     Q.   Let's walk through the main components of the

20     Suspicious Order Monitoring System that you helped to design

21     and lead.

22          Demonstrative 5, Mr. Simmons, which counsel has no

23     objection to, Your Honor.

24     BY MS. MAINIGI:

25     Q.   So let's start with the Know Your Customer
```

```
 1   component.  I think you've talked about that a bit with

 2   Mr. Fuller, but did that part of the system involve

 3   gathering information about new customers?

 4   A.   It did.

 5   Q.   And, and how did that work?  Describe it to us at a

 6   high level.

 7   A.   Well, the customer process was a holistic process that

 8   involved all of the Cardinal Health team members.  It

 9   involved the sales folks that were at the, that were at the

10   customer.  It involved merchandisers.  It involved the, the

11   questionnaire.  It involved the assessment of the answers on

12   the questionnaire.  The compliance officers could on

13   occasion, and would on occasion, go to do ride-alongs with

14   the, the folks.  So we built a program that was, you know,

15   holistic.

16   Q.   And what did you do with the information that got

17   gathered as part of Know Your Customer?

18   A.   Well, in the initial stages, it was paper and we kept

19   that paper and it was used by the pharmacists in their

20   evaluations.

21   Q.   Now, after a new customer was on-boarded, did the Know

22   Your Customer process continue?

23   A.   It did.  It was a continuous -- you know, customers

24   changed.  Things changed with regard to the business.  So it

25   was a continuous process.
```

**Q.**   The second component of the system, Electronic Order

Monitoring, can you describe that part of the system,

please?

**A.**   Well, that was the technology component of the system

whereby the, the system -- there's a warehouse management

system which -- there's a warehouse management system

that -- in which the orders are placed.  And as a module on

top of and alongside it, there was the Electronic Order

Monitoring component that reviewed those orders that came

in.

**Q.**   And this is where the thresholds are that you spoke to

Mr. Fuller about?

**A.**   Yes.

**Q.**   And can you describe -- I know it's a very elaborate

process in terms of setting the thresholds, but at a high

level can you describe the threshold process?

**A.**   Yeah.  The threshold process was a process whereby we

took the totality of the circumstances that we knew and the

characteristics of the pharmacy and the description of the

patients that they treated, put, put that into a -- put that

into the thought, put that into the thought process and made

an evaluation of the type of customer that they were,

segmenting the classification that they were, whether they

were a retail pharmacy or a hospital or a chain pharmacy,

and then sub sub-setting them into sizes.

1    **Q.**   So were there individualized thresholds for each

2    pharmacy customer?

3    **A.**   There were individual thresholds for each pharmacy

4    customer over -- well, even the initial one was

5    individualized for that pharmacy, but it was individualized

6    in a, in a bucket.  And then over time, it became even more

7    customized.

8    **Q.**   And what would the categories of information that went

9    into or were considered in setting a threshold?

10   **A.**   Well, we looked at their prior, prior history if it was

11   available.  We looked at the characteristics of the pharmacy

12   because like a Hospice pharmacy is going to look totally

13   different than a psych pharmacy which is going to look

14   totally different than a compounding pharmacy.

15        And they all may be retail independents, but their

16   individual characteristics are going to differ in terms of

17   how they are likely to order controlled substances, as well

18   as every other drug.

19   **Q.**   And over the years that you were there, did you modify

20   or enhance your threshold setting methodology?

21   **A.**   Yes.  Over time we consistently looked at and built

22   models to run the data against to adjust to be as precise as

23   we could be given the limited information that we had.

24   **Q.**   So if an order went above the threshold that was set

25   for that particular pharmacy, what would happen next?

1    **A.**   Well, the, the order would be held and the pharmacist

2    would conduct an evaluation.

3    **Q.**   Mr. Simmons, could we go back to the chart for a

4    moment.

5        So the pharmacist in the Electronic Order Monitoring,

6    those pharmacists would review the order then?

7    **A.**   That is correct.

8    **Q.**   And what -- to your knowledge, what are some of the

9    things that that pharmacist or pharmacist team would do at

10   that stage when an order had kicked to them?

11   **A.**   Well, among other things -- and I can't tell you

12   exactly what each pharmacist would do because there's a,

13   there's a professional analysis that goes along with it.

14       But they would look at the Know Your Customer

15   information that they had available to them.  They'd look at

16   the data that they had available to them in the system.

17   They would look at the order.  They would look at where the

18   pharmacy is located.

19       They would look at -- they would look at, you know,

20   things like their relationship to a hospital, the customer,

21   where they were.  It's the totality of the circumstances

22   for, for that pharmacy.

23       Whatever we had and whatever they thought we needed, if

24   they needed something else, they'd go to the Know Your

25   Customer folks or they'd pick up the phone and call the

1    pharmacy, or they would try and get the information that was

2    necessary to, to make an appropriate assessment.

3    **Q.**   Mr. Simmons, could you put the other back up.

4        Now, when the pharmacist had, had an order that had

5    kicked over to them, could their evaluation sometimes

6    involve a visit to the pharmacy?

7    **A.**   Yes.

8    **Q.**   And could you describe that to me?

9    **A.**   Well, a visit to the pharmacy would be a, a -- the

10   investigative -- it's interesting.  I'm going to say this.

11   The investigative folks were the primary folks that were

12   responsible for doing the investigations, plus the

13   consultants that were investigators.  And most of those were

14   former DEA diversion investigators that we used.

15       Those folks would go in and they would use the

16   framework of the Know Your Customer questionnaire as a basis

17   for their inquiry when they got to the pharmacy.

18       So they did this like -- they, they did a pre-review of

19   the data.  And they would look at everything that we had.

20   They would fill out a pre-review.  And then the investigator

21   would go in and get information to support or to support and

22   affirm the information that they had, or if something had

23   changed like, for example, they bought the files and -- you

24   know, a chain pharmacy bought a file of a pharmacy that a

25   pharmacy had closed, oh, there's, there's a change, and the

1    independent pharmacy bought the files of the pharmacy that

2    closed, there's a change.  How many prescriptions did you

3    buy, what type of patients, all of that would go into it and

4    then they would write a report.

5    **Q.**   And, so, site visits may kick out of the electronic

6    order monitoring process, but they might also be part of the

7    investigations process?

8    **A.**   Yeah, yeah.  They, they weren't required to be done

9    that way, you know.  But both ways could result in, in, in

10   an investigation.

11   **Q.**   Now, who were the people who would conduct the site

12   visit?

13   **A.**   Well, when, when I got there, I'm a firm believer in

14   cross functionality of folks.  So the investigators that we

15   hired -- we hired former police.  We hired former -- we

16   hired former Board of Pharmacy inspectors.  We hired former

17   Medicaid fraud unit inspectors.  And that was the type of

18   individual that I wanted, but I wanted a broad swath of them

19   so that they could cross-train each other.

20   **Q.**   And, so, those were some of the types of folks you

21   hired as investigators who visited the pharmacy?

22   **A.**   Yes.

23   **Q.**   And the site visit process, was there a checklist or

24   something that they worked off of?

25   **A.**   Like I said, they used the Know Your Customer

1  questionnaire as -- used the Know Your Customer

2  questionnaire as a framework.  They did have their own

3  document, but that's the framework that they used.

4  **Q.**  Now, did you personally ever conduct site visits?

5  **A.**  I did on occasion, rare occasions, but I did.

6  **Q.**  Now, we've talked a lot about suspicious orders.  At

7  what point does a pharmacist in the Anti-Diversion group

8  decide whether an order is suspicious?

9  **A.**  They would decide that at the end of the evaluation

10  that they made about the totality of the circumstances for

11  that pharmacy and that order.

12  **Q.**  And when a pharmacist made a determination that an

13  order was suspicious, what did Cardinal Health do next?

14  **A.**  The order was reported to DEA.

15  **Q.**  Was it shipped?

16  **A.**  No.

17  **Q.**  To your knowledge, during your time at Cardinal Health,

18  did the company ever ship a suspicious order?

19  **A.**  No, it did not.

20  **Q.**  I'm going to show you briefly a document that was

21  previously admitted, Mr. Mone, and I don't think you've

22  necessarily seen it, but I just want to ask you a couple of

23  questions off of it.

24     Defendants' 1.

25        MR. FULLER:  Judge, I would object to the

1    broadcasting until the witness has laid a foundation for it.

2              THE COURT:  Okay.

3              MS. MAINIGI:  It's an admitted document, Your

4    Honor.

5              THE COURT:  It's already been admitted, Mr.

6    Fuller.  Put it back up.

7    BY MS. MAINIGI:

8    **Q.**   Now, Mr. Mone, what I'm putting in front of you is

9    Defendants' Exhibit 1 which I will submit to you is the

10   presentation that was provided at the September 11th,

11   2007, DEA conference by AmerisourceBergen.  And I know

12   you did not see this presentation at the time.  I know

13   you didn't attend the conference.  I know Mr. Reardon

14   did.

15        There are just a couple of components of the program

16   that were put forward in this conference that I just want

17   you to look at and comment as to whether they compare to the

18   Cardinal system that you helped put together.

19             MR. FULLER:  Judge, I'm going to object.  She's

20   going to question a witness who hasn't seen a document that

21   you've prevented me from doing repeatedly about whatever is

22   in the document?

23             MR. ACKERMAN:  At a conference where the witness

24   did not attend.

25             MS. MAINIGI:  Your Honor, he, he's testified that

```
 1    Cardinal modeled their system from this conference.  Others

 2    did attend it and he's the primary architect of the new

 3    system at Cardinal.

 4        I've represented that he has not seen the document

 5    before.  I just want to walk through some of the generic

 6    components in the document.

 7             MR. ACKERMAN:  We maintain our foundation

 8    objection, Your Honor.

 9             THE COURT:  I'll sustain the objection.

10             MS. MAINIGI:  We can take that down, Your Honor.

11    Is it all right if I just run through a few of the

12    components orally?

13             THE COURT:  You can ask the questions and see

14    where we go.

15             MS. MAINIGI:  Okay.  That's fine, Your Honor.

16    BY MS. MAINIGI:

17    Q.   You can set aside, Mr. Mone, the document.  I'm

18    looking at Page 6 of the document.  You described to us

19    a Know Your Customer component just now to the Cardinal

20    system; correct?

21    A.   I did.

22    Q.   And you also described an Order Monitoring Program type

23    component and Electronic Monitoring Program component?

24    A.   Yes.

25    Q.   And did you describe to me an investigations component?
```

1    **A.**    I did.

2    **Q.**    And was there training also done at Cardinal Health

3    related to Anti-Diversion?

4    **A.**    Yes.

5    **Q.**    Can you describe that for me at a high level?

6    **A.**    At a high level we built modules, training modules that

7    were a component of performance metrics for employees that

8    involved reviewing the presentation and taking a test and

9    requiring you to get 100 percent on the test before you

10   could -- otherwise, you would be in this constant loop of

11   watching the slides again until you got 100 percent of the

12   answers correct.

13   **Q.**    Who -- let me back up.  Who received training on

14   Anti-Diversion at Cardinal Health?

15   **A.**    Well, to the best of my knowledge, I'm going to say

16   just about everybody.  What we did was -- Anti-Diversion was

17   everybody's -- was everyone's responsibility.  And the folks

18   that I know that did were the, the sales folks, the sales op

19   folks, my folks, and the distribution center employees.  I

20   know those folks did.

21   **Q.**    And you were describing this 100 percent -- everybody

22   had to take a test and get 100 percent on the test; is that

23   right?

24   **A.**    You got the question wrong, you went back through the

25   slides again.  And I think the testing folks were even mean

1    because when you got to the questions, they rearranged the

2    answers so that you couldn't memorize that the answer was,

3    the one you put was C and, you know, they were just sneaky.

4    **Q.**   Okay.   Now, your Know Your Customer due diligence, did

5    Cardinal Health's program for Know Your Customer also

6    include a new account set-up process, the new account

7    questionnaires?

8    **A.**   It did.

9    **Q.**   And you discussed already the on-site visit.   Is that

10   fair?

11   **A.**   Yes.

12   **Q.**   Monthly sales limits.   Did Cardinal Health have monthly

13   sales limits for its customers?

14   **A.**   I don't know what you mean by sales limits.

15   **Q.**   Did Cardinal's system segment customers by size

16   initially?

17   **A.**   Yes, it did.

18   **Q.**   And Cardinal Health called those thresholds?

19   **A.**   Yes.

20   **Q.**   During the time you were head of Anti-Diversion at

21   Cardinal Health, did the Wheeling distribution center have a

22   DEA registration that entire time?

23   **A.**   It did.

24   **Q.**   And in that time period, 2007 to 2012, did distribution

25   centers have to periodically renew their DEA registration?

```
 1    A.    They -- they're required to periodically renew.  I

 2    think it's a three-year license.

 3    Q.    So, to your knowledge, did DEA renew the Wheeling, West

 4    Virginia, distribution center license each time it applied?

 5    A.    I would submit to you that it did.

 6    Q.    Is it your understanding that if the DEA had ever had a

 7    problem with the Wheeling facility that they would have let

 8    you know about it?

 9    A.    I would like to believe that they would have.

10    Q.    Is it fair to say that if the DEA had an issue with

11    Cabell/Huntington pharmacies, they would have done something

12    about it to your understanding?

13              MR. ACKERMAN:  Objection, speculating.

14              THE COURT:  Well, if he knows.

15              THE WITNESS:  I, I would like to believe they

16    would inform me.

17    BY MS. MAINIGI:

18    Q.    To receive and maintain a DEA registration, did DEA

19    have to determine that Cardinal Health had to provide

20    effective controls to guard against diversion?

21    A.    Yes.

22    Q.    And did that involve physical security measures?

23    A.    Yes.

24    Q.    Did it involve suspicious order reporting?

25    A.    Yes.
```

1   **Q.**   Now, the physical security measures we haven't talked

2   about much.  But at a high level, what did the regulations

3   require?

4   **A.**   The regulations on physical security are rather

5   extensive I think is a good word there.  There's, there's

6   the amount of rebar that has to be in the concrete and how

7   wide the, the cage has to be -- it has to be set -- and who

8   can have access to the cage and vault.

9        Those, those physical security requirements -- the

10  cameras that you have to have.  You know, there's a lot of

11  extensive regulations on physical security.

12  **Q.**   So there's a lot of details built into those

13  regulations?

14  **A.**   Oh, yeah.

15  **Q.**   Now, as to the suspicious order reporting requirement,

16  what did the regulations require?

17  **A.**   The suspicious order -- it's a fairly small section

18  that says that, that upon discovery, the, the -- you must,

19  you must -- and I'm probably going to get this wrong --

20  design and implement the system to identify to the

21  registrants suspicious orders of controlled substances.  It

22  was maybe 60 words and that's it.

23  **Q.**   Now, did Cardinal Health report suspicious orders not

24  just to the DEA but any other state regulatory body in West

25  Virginia?

```
 1        And, Your Honor, I'd like to move into evidence while
 2   we're waiting Cardinal 30.
 3            THE COURT:  Is there any -- you're moving into
 4   evidence 30?
 5            MS. MAINIGI:  Yes, Your Honor.
 6            THE COURT:  Is there any objection to 30?
 7            MR. FULLER:  No, Your Honor.
 8            THE COURT:  It's admitted.
 9            THE WITNESS:  May I amend my last statement?
10   BY MS. MAINIGI:
11   Q.   Yes, please.
12   A.   Not only was it our SOM people, but because this had to
13   do with the, the database, this also applied to the
14   individuals that maintained the database of customers.
15   Q.   Thank you, Mr. Mone.
16        Please take a look at Cardinal 745.  And could you
17   identify this SOP for us, please?
18   A.   This is the process to establish SOM threshold limits.
19   Q.   And did you help put this together as well?
20   A.   To the best of my recollection, I participated.
21   Q.   And do you know who else assisted in putting this
22   together?
23   A.   It would have been the analytics people.
24   Q.   And this is the process followed by who to set
25   thresholds?
```

1   **A.**   It is the framework and methodology when formulating

2   thresholds by the analytics people and, of course, the

3   pharmacists.

4   **Q.**   And, to the best of your knowledge, were these

5   procedures followed at Cardinal Health to set thresholds?

6   **A.**   To the best of my knowledge, they were.

7           MS. MAINIGI:  Your Honor, I'd like to move in

8   Cardinal 745, please.

9           THE COURT:  Any objection to 745?

10          MR. FULLER:  No, Your Honor.

11          MS. MAINIGI:  Could I have Cardinal --

12          THE COURT:  It's admitted.

13          MS. MAINIGI:  Thank you, Your Honor.

14  BY MS. MAINIGI:

15  **Q.**   Cardinal 743.  Could you identify that, please, Mr.

16  Mone?

17  **A.**   It is the SOP for threshold event review,

18  self-verification; decision making and threshold outcome

19  communication.

20  **Q.**   So the last SOP related to setting the threshold.  What

21  related to the threshold does this SOP cover?

22  **A.**   This covers the rest of the story with regard to what

23  is done with reports.

24  **Q.**   And, so, does this cover what happens if something

25  kicks out of a threshold analysis or review?

```
 1    A.   Yes, it does.

 2    Q.   Does it -- is it one of the tools that gets used to

 3    help determine whether an order is reported as suspicious or

 4    not?

 5    A.   Yes, it does.

 6    Q.   And, to your knowledge, were these -- was this SOP

 7    followed at Cardinal?

 8    A.   To the best of my knowledge, yes.

 9         MS. MAINIGI:  Your Honor, I'd like to move for the

10    admission of 743.

11         THE COURT:  Any objection to 743?

12         MR. FULLER:  No objection.

13         MR. ACKERMAN:  No objection.

14         THE COURT:  It's admitted.

15    BY MS. MAINIGI:

16    Q.   Now, Mr. Mone, was there any involvement by the

17    sales department in the threshold event review process?

18    A.   No.

19         MS. MAINIGI:  May I ask for Cardinal 740, please.

20    BY MS. MAINIGI:

21    Q.   Coming back on sales for a moment while we hand

22    this out, so sales, the sales staff did not participate

23    in setting customer thresholds?

24    A.   They did not.

25    Q.   Did sales staff participate in raising or lowering
```

1    **A.**    We did.

2    **Q.**    Did Cardinal Health request ARCOS information from the

3    DEA?

4    **A.**    Yes, we did.

5    **Q.**    Why?

6    **A.**    Well, if you go back to the question you asked about

7    who can see all of the data when there are multiple

8    suppliers, there is a point in time when we requested the

9    ARCOS data so that we would know not, not the "who" of the

10   other suppliers, just the "what" and the volume of the

11   "what" so that we could add that into our evaluation about

12   the customer.

13   **Q.**    Cardinal Health wanted to integrate into its evaluation

14   process how much other distributors were sending to a

15   particular pharmacy.  Is that fair?

16   **A.**    Yeah, the rest of the story.

17   **Q.**    Did the DEA provide that information?

18   **A.**    They did not.

19   **Q.**    Why not?

20   **A.**    To the best of my recollection, they claimed it was

21   proprietary information.

22   **Q.**    Did Cardinal just ask for that information once or

23   multiple times?

24   **A.**    Multiple times.

25   **Q.**    Did Cardinal Health also ask the DEA to provide it with

1   any information that the DEA possessed indicating that any

2   Cardinal Health customer was engaged in diversion so that

3   Cardinal could cease distributing controlled substances to

4   that customer?

5   **A.**   To the best of my recollection, that was in a request

6   to DEA.

7   **Q.**   And did the DEA agree to let you know if it was aware

8   of Cardinal Health's customers engaged in diversion?

9   **A.**   I -- to the best of my recollection, I don't recall

10   that there ever was a response to that request.

11   **Q.**   We've talked a lot today about Cardinal Health SOM

12   system and its components.  Did Cardinal Health share the

13   details about its Anti-Diversion system with the DEA?

14   **A.**   Yes, it did.

15   **Q.**   On more than one occasion?

16   **A.**   More than one occasion.

17   **Q.**   As part of that effort did you meet in early 2009 with

18   Barbara Boockholdt of the DEA?

19   **A.**   I did.

20   **Q.**   And remind us, who is Barbara Boockholdt?

21   **A.**   Barbara Boockholdt was -- maybe she was Chief of

22   Regulatory, or she was Chief of the Policy Section at DEA

23   and was our contact at DEA, at DEA headquarters.

24   **Q.**   So this early 2009 meeting, describe that to me.

25   **A.**   The early 2009 meeting was about -- I'd say it was

1    almost a week.

2    **Q.**   The meeting was a week?

3    **A.**   Pardon?

4    **Q.**   The meeting was a week?

5    **A.**   Yeah, more than, you know, I think approximately a

6    week.  Barbara and several other DEA diversion investigators

7    came in to review our system.

8    **Q.**   What do you mean by came in to review your system?

9    **A.**   They came into Dublin and we sat downstairs in a, in a,

10   in a room, in a meeting room and we went through our SOM

11   system.

12   **Q.**   And did that involve reviewing the SOPs and other

13   policies related to the SOM system?

14   **A.**   Yes, it did.

15   **Q.**   Like the policies we looked at earlier today?

16   **A.**   Yes.

17   **Q.**   Did it involve reviewing how Cardinal Health set

18   thresholds for its customers?

19   **A.**   Yes, it did.

20   **Q.**   Did you describe to Ms. Boockholdt and her colleagues

21   how Cardinal Health was identifying and reporting suspicious

22   orders at that point in time in 2009?

23   **A.**   Yes.

24   **Q.**   Did Ms. Boockholdt and her colleagues request

25   particular policies to review as you described the system?

1    **A.**   Yes, she did.

2    **Q.**   And did you provide those to her?

3    **A.**   Yes.

4    **Q.**   Were copies provided or she just reviewed them?

5    **A.**   She reviewed them.  And where, where she requested

6    information, we prepared them.  And the ones that were not

7    readily available, to the best of my recollection, were put

8    on a thumb drive and mailed to her.

9    **Q.**   Did you show her the reports that the SOM system

10   generated?

11   **A.**   I did.

12   **Q.**   Mr. Mone, were you transparent with the DEA about the

13   way Cardinal's SOM system worked?

14   **A.**   Yes, very.

15   **Q.**   Did you hold anything back?

16   **A.**   No.

17   **Q.**   In that early 2009 meeting with Ms. Boockholdt and her

18   colleagues, did the DEA identify any fault in the way that

19   Cardinal reported suspicious orders?

20   **A.**   No. Barbara nor the team identified or told us -- if

21   they, if they identified them, they didn't tell us about

22   them.  To the best of my knowledge, they didn't identify

23   any.

24   **Q.**   During your time at Cardinal, were there customers that

25   Cardinal refused to on-board because of a diversion concern?

1   **A.**   Oh, yes.

2   **Q.**   During your time at Cardinal, did Cardinal ever

3   terminate customers?

4   **A.**   Oh, yes.

5   **Q.**   And when you terminated a customer, did you also notify

6   the DEA?

7   **A.**   Yes, we did.

8   **Q.**   Was the DEA aware of the number of suspicious orders

9   reported by Cardinal in the time frame that you were at

10  Cardinal Health?

11          MR. ACKERMAN:  Objection, speculation as to the

12  awareness of the DEA.

13          THE COURT:  Well, do you know the answer to that?

14          THE WITNESS:  Well, what I -- Your Honor, what I

15  can say is that we submitted them to them.  What they did

16  with them after we submitted them to them, I don't know.

17          THE COURT:  Okay.  Overruled.

18  BY MS. MAINIGI:

19  **Q.**   We've talked a bit about the Cardinal policies.  As

20  to the implementation of those policies, was the DEA

21  able to see individual customer files?

22  **A.**   Yes, they were.

23  **Q.**   Did the DEA visit distribution centers after this early

24  2009 meeting that you had?

25  **A.**   Yes, they did, approximately I'd say two months later,

223

```
 1    within two months.

 2    Q.    Within two months of this early 2009 meeting they

 3    visited distribution centers?

 4    A.    They did.

 5    Q.    Did they tell you they were going to visit?

 6    A.    Yes.  It was part of the MOA that they were going to

 7    conduct on-site visits.

 8    Q.    Do you know how many visits they conducted?

 9    A.    They, they conducted, to the best of my recollection,

10    all of the ones in the MOA except Swedesboro.

11    Q.    And were there more than the four in the MOA --

12    A.    Yes.

13    Q.    -- that they visited?

14    A.    Correct.

15    Q.    Were they done on different days or all on the same

16    day?

17    A.    All on the same day.

18    Q.    Were you at any of the distribution centers that they

19    conducted a visit to?

20    A.    Yes, I was.

21    Q.    And, to your recollection, what happened at that visit?

22    A.    Well, the, the DEA diversion investigators did a deep

23    dive into the SOM system and wanted it explained as to how

24    the system operated, and wanted to know how the compliance

25    officers and the cage and vault employees were integrated
```

1  into the system.  And they wanted to see SOM reports and

2  customer due diligence files.

3  **Q.**  Was it your impression that they were looking to verify

4  the system worked as you had indicated it did?

5  **A.**  Yes.  I think it was a verification visit based upon

6  what Barbara had done for a week to see that it actually did

7  what we said it did.

8  **Q.**  And in the visits did the DEA request information about

9  particular customers?

10  **A.**  They did.

11  **Q.**  Did they review due diligence files for those

12  customers?

13  **A.**  They did.

14  **Q.**  To your recollection, did they offer any criticism of

15  the due diligence files during those visits?

16  **A.**  To the best of my recollection, during the visit I

17  participated in, they made no concerns about the due

18  diligence files that they looked at.

19  **Q.**  To the best of your recollection, did they offer any

20  comments about how long documentation needed to be held in

21  due diligence files?

22  **A.**  No, they did not.

23  **Q.**  To your knowledge, has the DEA ever instructed

24  distributors to maintain information in due diligence files

25  indefinitely?

225

1    **A.**    No.

2    **Q.**    What are DEA cyclical inspections?

3    **A.**    So as I testified earlier, and I believe that it's a

4    three-year registration, the cyclical inspections are the

5    inspections by DEA within that three-year license window

6    whereby the DEA diversion investigators come in and go

7    through the distribution center.

8         They go through their records.  They go through the

9    cage and vault.  They request an audit.  You know, they

10   usually have an open inventory that they want to look at and

11   they want to make sure that all of the, you know -- if the

12   computer says that you have 5,000 of X, they want to be able

13   to go onto the shelf and count, and they count up 5,000 of

14   X.  So that's what that cyclical inspection looks like.

15   **Q.**    And during these cyclical inspections by the DEA, did

16   they have full access to Cardinal's policies and procedures?

17   **A.**    They did.

18   **Q.**    Full access to files about customers including due

19   diligence?

20   **A.**    Yes.  To the extent that they would ask for them, the

21   team would prepare them and ship them to either the

22   distribution center or directly to the DEA diversion

23   investigator.

24   **Q.**    Now, as you updated the SOM system over the course of

25   your time in the Anti-Diversion at Cardinal, did you keep

1    the DEA updated as to any changes or improvements you were

2    making?

3    **A.**   Yes, I did.

4    **Q.**   How did you do that?

5    **A.**   I -- sometimes I would just call Barbara and sometimes

6    I would fly up and show Barbara -- have a meeting with

7    Barbara, you know, schedule a meeting with Barbara, sit

8    down, bring my laptop, open up the laptop, show what we were

9    doing, and have a conversation with Barbara and her team

10   about the improvements.  You know, quite frankly, it was a

11   continuous policy improvement process I was proud of.

12   **Q.**   Did it matter to you what the DEA thought about what

13   you were doing?

14   **A.**   Yeah, it did, a lot.

15   **Q.**   Why?

16   **A.**   Well, you saw my career.  I'm a public service guy.

17   This is about a, a -- you know, as I told Mr. Fuller

18   earlier, you know, what you have is a, is a public health

19   crisis.  And I firmly believe that it's, it's a process

20   whereby everybody has to participate, you know, within their

21   lane, what they can do to help do the right thing in their

22   lane.  And I wanted her to know what we were doing.

23        And I -- you know, quite frankly, I'd known Barbara for

24   many years and I expected her to tell me -- I expected her

25   to tell me, you know, "Hey, we don't like what you're doing,

1  change it."  And, quite frankly, I would have.

2  **Q.**   And did you also communicate with various Boards of

3  Pharmacy about what you were doing?

4  **A.**   Oh, yes.

5  **Q.**   Did you communicate with the West Virginia Board of

6  Pharmacy about suspicious order monitoring?

7  **A.**   Yes.  I, I -- you went back through my career.  As a

8  former Executive Director of the Board, there's kind of a

9  relationship between the Executive Directors.  And, so, yes,

10  I communicated not only with the Executive Directors, but

11  when we talked about the MPJE, when the West Virginia Board

12  would send inspectors to the MPJE meeting, I would

13  communicate with them as well there, not just about the

14  MPJE.

15  **Q.**   To your recollection, did you explain the Cardinal

16  Health Suspicious Order Monitoring System to the West

17  Virginia Board of Pharmacy?

18  **A.**   To the best of my recollection, I did.  They knew the

19  essential parameters of it.

20  **Q.**   Did they express any concerns to you?

21  **A.**   No, neither -- none of them did.

22  **Q.**   And did you tell me earlier that you did -- Cardinal

23  Health did report suspicious orders to the West Virginia

24  Board of Pharmacy as well?

25  **A.**   Yes, we did.

```
 1              MS. MAINIGI:  Your Honor, I, I continue to reserve
 2    my objection on the 2012 settlement.  But because Mr. Fuller
 3    asked questions about it, I'll ask a couple as well.
 4              THE COURT:  All right.
 5    BY MS. MAINIGI:
 6    Q.   Describe for me what the 2012 action by DEA against
 7    Cardinal Health involved.  What facility?
 8    A.   It involved the Lakeland facility, Lakeland, Florida
 9    facility.
10    Q.   And did it concern specific pharmacies in Florida?
11    A.   It did.
12    Q.   How many?
13    A.   Four.
14    Q.   Now, had Barbara Boockholdt made a recommendation to
15    you for additional due diligence for Cardinal Health
16    customers in Florida?
17    A.   She did.
18    Q.   What was that time period approximately?
19    A.   I don't recall when she, when she asked me to do that.
20    Q.   Did she identify any particular customers?
21    A.   No, she did not.
22    Q.   Now, the pharmacies that dispense controlled
23    substances, they're obviously licensed by the DEA; right?
24    A.   Yes.
25    Q.   And the DEA can certainly take action against
```

1  pharmacies; correct?

2  **A.**   Yes, they can.

3  **Q.**   When Ms. Boockholdt voiced this concern to you, what

4  did you do?

5  **A.**   Well, we were in the process -- you know, obviously the

6  investigators would have their, their investigative

7  schedule.  And they were scheduled to go down to Florida

8  anyway, and Vince is from Florida.

9       What we did was we got a team together and we looked at

10  the data.  To the best of my recollection, we took like the

11  top 50 customers and sent the whole, the whole team down to

12  Florida to do site visits on, on those Florida customers.

13  She asked me to do it.  I did it.

14  **Q.**   Did you continue doing business with all the customers

15  that you did site inspections on down there?

16  **A.**   No, we did not.

17  **Q.**   What was the result of the process?

18  **A.**   The result of the process was that we determined that

19  there were -- and I don't remember how many.  There were

20  pharmacies that based upon the site visit reflected a --

21  reflected a concern about their corresponding meeting and

22  corresponding responsibility.  And, therefore, we made the

23  decision no longer to conduct business with them.

24  **Q.**   And did the Lakeland action involve some pharmacies

25  that you had already cut off?

1    **A.**   Yes, they did.

2    **Q.**   During the time period that you were head of Cardinal's

3    Anti-Diversion system, did you believe that it was

4    effective?

5    **A.**   Yes, I, I believe it was -- I don't know that you could

6    have very effective, but, yes, it was effective.

7    **Q.**   Did you believe Cardinal Health complied with DEA

8    regulations and the Controlled Substances Act?

9    **A.**   Yes, I did.

10   **Q.**   Now, during your time as the head of Cardinal Health

11   Anti-Diversion Program, did you ever allow an order to be

12   shipped that you believed was going to be used for anything

13   other than a legitimate medical purpose?

14   **A.**   No.

15          MS. MAINIGI:  I have no further questions.

16          THE COURT:  Is there going to be any cross of Mr.

17   Mone by the other defendants?

18          MR. HESTER:  None from us, Your Honor.

19          MR. NICHOLAS:  No, Your Honor.

20          THE COURT:  How much redirect are you going to

21   have, Mr. Fuller?

22          MR. FULLER:  I hope not much, Judge.

23          THE COURT:  Can you do it in seven minutes?

24          MR. FULLER:  We're sure going to try.

25          THE COURT:  Okay.  Let's go.

                          REDIRECT EXAMINATION

1
2    BY MR. FULLER:
3    **Q.**   Mr. Mone, you said just a moment ago that
4    Ms. Boockholdt under your system pointed out issues in
5    Florida and you went on down there and you found some
6    problems and you cut off pharmacies; right?
7    **A.**   When -- I missed some of the beginning part of your
8    question.
9    **Q.**   I'm sorry.  When Ms. Mainigi was asking you about Ms.
10   Boockholdt and her telling you about the Florida issue and
11   you said that you guys went down to Florida and you cut off
12   a bunch of pharmacies; right?
13   **A.**   There, there wasn't a Florida issue per se.  What
14   Barbara said was you should -- she was recommending that you
15   go down and look at your Florida customers because of
16   Florida being Florida.
17   **Q.**   Sure.  And your system is the same nationwide, which
18   we've already established, and you cut off a bunch of
19   Florida customers; correct?
20   **A.**   We cut off customers based upon our site visit review,
21   yes.
22   **Q.**   It was hundreds of customers, wasn't it?
23   **A.**   No.  We visited, we visited a little more than 50 and
24   we cut off -- I don't remember how many, but we -- as a
25   result of that visit -- as a result of that effort, I