# TAB 11A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                           :
THE CITY OF HUNTINGTON,     :      Civil Action
                           :
            Plaintiff,      :      No.  3:17-cv-01362
                           :
v.                          :
                           :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                           :
            Defendants.     :
_____x
                           :
CABELL COUNTY COMMISSION,    :      Civil Action
                           :
            Plaintiff,      :      No. 3:17-cv-01665
                           :
v.                          :
                           :
AMERISOURCEBERGEN DRUG      :
CORPORATION, et al.,        :
                           :
            Defendants.     :
_____x
```

BENCH TRIAL - VOLUME 18
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

MAY 26, 2021

| | |
|---|---|
| 1 | around 2007.  Did you find any pattern or trend with the |
| 2 | same change or iteration with regard to McKesson? |
| 3 | **A.**   Yes, I did. |
| 4 | **Q.**   All right.  So, all three companies had a Suspicious |
| 5 | Order Monitoring System in place up until somewhere around |
| 6 | 2007 when there was a change in the policies that you found? |
| 7 | **A.**   That's correct. |
| 8 | **Q.**   Okay.  Did you find any similarity or pattern amongst |
| 9 | the defendants for their policies and procedures for |
| 10 | suspicious order monitoring in the pre-2007 era? |
| 11 | **A.**   I did, Your Honor. |
| 12 | **Q.**   And have you prepared a slide that depicts a diagram of |
| 13 | your understanding of that type of system? |
| 14 | **A.**   I did, Your Honor, hopefully to make it easier to |
| 15 | understand. |
| 16 | MR. FARRELL:  And, Judge, I'd like to publish |
| 17 | Slide 11. |
| 18 | THE COURT:  Okay.  Slide 11?  That's 12, isn't it? |
| 19 | MR. FARRELL:  Yes, 12.  Yes, Your Honor.  And I |
| 20 | would ask and indulge the Court to allow Mr. Rafalski to |
| 21 | step down and to walk you through this slide, please. |
| 22 | THE COURT:  You may do so, sir. |
| 23 | THE WITNESS:  Simple illustration, Your Honor. |
| 24 | This is an order of pills.  Here's the pharmacy Rx.  They're |
| 25 | making an order to the distributor, making an order to the |

1    distributor for the purchase of pills.  That purchase of

2    pills from the distributor shipped down.

3        As it happened pre-2008, two things would happen.  They

4    -- they would ship the pills and report to the DEA ARCOS and

5    this would indicate that they would ship these pills and

6    post-distribution, which meant after the pills had left the

7    distributor, they would submit an excessive purchase report

8    to the DEA.  Some companies -- all companies did it on a

9    monthly basis and some companies did it on a daily basis.

10   **Q.**   So, Mr. Rafalski, let's start with the ARCOS data.

11   When is the -- when is the ARCOS data reported based on your

12   experience?

13   **A.**   Your Honor, it changed a little bit over time, but it's

14   been quarterly or monthly.

15   **Q.**   And when we're talking about ARCOS data, please

16   distinguish the ARCOS data from the suspicious order

17   reporting.

18   **A.**   The ARCOS data is required by regulation and it only

19   covers the Schedule IIs and the Schedule III narcotics

20   drugs; primarily for this case the hydrocodone.

21   **Q.**   Is that what we're calling transactional data?

22   **A.**   Yes, it is.

23   **Q.**   And then this excessive purchase report, describe for

24   the Court your experience with excessive purchase reports

25   and what you found in the defendants' policies and

1    procedures related to the same.

2    **A.**   How the system would work, Your Honor, is they would

3    calculate an average.  Some of them would calculate an

4    average nationally or by distributor for a type of business.

5    So, in this case, it would be a pharmacy.  They would

6    calculate this average over a 12-month period of data.

7              THE COURT:  Mr. Schmidt?

8              MR. SCHMIDT:  I didn't mean to interrupt.  I'm

9    sorry, Mr. Rafalski.

10             THE WITNESS:  That's okay.

11             MR. SCHMIDT:  Maybe it was made clear, but I will

12   object as vague as to time frame.

13             THE COURT:  Well, I'll sustain the objection.  You

14   can ask him about the time frame.  I'm not sure it is vague

15   based upon his previous testimony, but you can ask him.

16             MR. FARRELL:  I can clarify.

17             MR. SCHMIDT:  Thank you.

18             BY MR. FARRELL:

19   **Q.**   To be clear, you're describing the systems that were in

20   place by each of the three defendants before 2007 or before

21   each of the defendants made a second iteration change of

22   their existing policies and procedures?

23             MS. MAINIGI:  And, Your Honor, my objection on

24   behalf of Cardinal is a little bit different than Mr.

25   Schmidt's.  I object to the extent -- I did hear him mention

1    that time period.  To the extent this purports to represent

2    Cardinal's system in the pre-2007 time period, I object

3    because it is not accurate.  It only reflects one step of a

4    two-step system.

5             MR. SCHMIDT:  I think there's inaccuracy as to

6    McKesson, too, and the last question was compound.

7             MR. NICHOLAS:  It is true that this slide does not

8    accurately reflect the pre-2007 system so we object on that

9    basis, as well.

10            THE COURT:  Well, I think it goes to the weight

11   rather than admissibility of his testimony and you will have

12   ample opportunity to cross examine him on this and I will

13   allow you to go ahead, Mr. Farrell.

14            MR. FARRELL:  Thank you.  You can take your seat,

15   please.

16            THE WITNESS:  Okay.  Thank you, Your Honor.

17            BY MR. FARRELL:

18   **Q.**   I think I've already distributed copies of this to the

19   parties.  Mr. Rafalski, have we identified -- have you

20   identified a particular excessive purchase report that you

21   would like to use as a demonstrative for the Court?

22   **A.**   Yes, sir.

23   **Q.**   And for the record, this is P-14288ii.  I believe it's

24   already admitted in the record.  Copies have been provided

25   from counsel.

```
 1        May I approach?

 2               THE COURT:  Yes.

 3               THE WITNESS:  Thank you.

 4               MR. FARRELL:  Would you please bring back up the

 5   last slide?

 6        You may not want to put it away just yet, Judge.  I'm

 7   going to make a particular point.

 8               THE COURT:  Okay.

 9               BY MR. FARRELL:

10   Q.   So, in general, Mr. Rafalski, we've heard testimony

11   about excessive purchase reports that were submitted by the

12   defendants to the DEA.

13   A.   That's correct, Your Honor.

14   Q.   And is this one such report?

15   A.   Yes, it is, Your Honor.

16   Q.   And, in fact, is this one report and, in particular,

17   Cardinal Health from their Wheeling Distribution Center?

18   A.   Yes, it is.

19   Q.   And is this for one month from one distribution center?

20   A.   I believe it is, yes, sir.

21   Q.   Okay.  And where would this report have been sent?

22   A.   It would have been mailed or delivered, but primarily

23   mailed to each of the DEA Offices in the areas.  Or for

24   Wheeling, it would have been mailed to the nearest DEA

25   Office that would have covered the Wheeling Distribution
```

1    Center.

2    **Q.**   So, by drawing the timeline here, around 2007 for each

3    of the defendants, it was a little bit different, but

4    between the first and second iteration of their SOMS policy,

5    were each of the defendants in practice receiving orders

6    from a pharmacy, shipping the order, and thereafter

7    reporting the transaction to the ARCOS data, and then

8    publishing these after-the-fact reports based on some metric

9    to the DEA?

10          MR. SCHMIDT:  And we'll object.  He's not here as

11   a fact witness and his testimony directly contradicts the

12   testimony, for example, of a fact witness that was here just

13   yesterday.

14          MR. FARRELL:  Judge, if I may, this is not a

15   proper --

16          THE COURT:  Let me hear from Ms. Mainigi.

17          MS. MAINIGI:  Your Honor, my objection is that Mr.

18   Farrell -- we've indulged Mr. Farrell in leading this

19   witness because we know everybody wants to get through the

20   testimony, but he's both testifying and leading the witness

21   at this point.

22          THE COURT:  Mr. Nicholas?

23          MR. NICHOLAS:  I would just join.  Join.

24          THE COURT:  Well, you can ask him leading

25   questions to get him through this, Mr. Farrell, but don't

```
 1    testify.  I mean, don't give him the answer in your

 2    question.

 3              MR. FARRELL:  Yes, Your Honor.

 4              THE COURT:  Okay.

 5              BY MR. FARRELL:

 6    Q.   So, is what we're -- what I'm holding in my hand from

 7    Cardinal Health an exemplar of an after-the-fact report to

 8    the DEA?

 9    A.   That's correct, yes, it is.

10    Q.   And have you studied the criteria or have you found

11    evidence in the record of the criteria that Cardinal Health

12    was used -- using pre-2007 for how you wound up on their

13    ILR?

14    A.   I did.

15    Q.   Okay.  I would ask you to turn to Page -- Bates stamp

16    117 on the bottom.

17    A.   Okay.  I'm there, Your Honor.

18              MR. FARRELL:  Judge, what I'm looking at is in the

19    right-hand corner.  It says 117.  You don't need to actually

20    pull it up.  I can put it on the camera, if you would like.

21              THE COURT:  Okay.

22              BY MR. FARRELL:

23    Q.   So, when you're looking at this document -- let me see

24    if I can get it a little more square.

25         Walk through for us what it is this document is
```

1    intending to communicate.

2    **A.**    Your Honor, this is part of the report, and this is

3    specific for a customer.  So, a little bit down where you

4    see the little dots it starts -- I'll take that particular

5    customer.  Customer number, Medicine Shoppe number 290,

6    Huntington.  It has the address, 2402 Adams, Huntington,

7    West Virginia.  That would be the customer that's purchasing

8    these products from Cardinal Health.

9    **Q.**    And what was the run date or the date that this was

10   report was run?

11   **A.**    May 6th of 2007.

12   **Q.**    And what is the time frame that this report is

13   intending to cover?

14   **A.**    April of 2007.

15   **Q.**    All right.  And so, when you look at the report down at

16   the bottom right-hand corner, do you see this ingredient

17   limit?

18   **A.**    I do.

19   **Q.**    Total grams.  Do you see that here, total grams?

20   **A.**    I do.

21   **Q.**    Through -- through your review, have you been able to

22   determine what an ingredient limit is in Cardinal Health's

23   program?

24   **A.**    I did.

25   **Q.**    What is an ingredient limit?

 1   **A.**   So, that's the -- the actual trigger or threshold that

 2   they have calculated.  If you look below April, 2007, Your

 3   Honor, you will see the factor used as four and for Cardinal

 4   Health they would create an average for the distribution

 5   center of the distribution of oxycodone products.  They'd go

 6   back 12 months and create an average and then they would

 7   times it by four.  And that four would be the ingredient

 8   limit number at the very bottom, 104.82.816 grams.  So, that

 9   essentially is four times the average of the pharmacies that

10   they -- they took into consideration from that distributor.

11   **Q.**   So, to be clear, every month Cardinal Health was

12   running this document and they were taking the average

13   retail pharmacy from that distribution center, they were

14   multiplying it by --

15               THE COURT:  Ms. Mainigi?

16               MS. MAINIGI:  Mr. -- Mr. Farrell is testifying at

17   this point.

18               MR. FARRELL:  I'm trying --

19               MS. MAINIGI:  And summarizing.

20               MR. FARRELL:  I'm summarizing, yes, Judge.

21               THE COURT:  Well, I'm going to overrule the

22   objection and let you do it.  I don't think this is

23   misleading and we're getting him through his testimony and

24   it's complicated and I need to understand it so I'm going to

25   let you do it, Mr. Farrell.

```
 1                    MR. FARRELL:  Thank you.

 2                    BY MR. FARRELL:

 3       Q.   So, Cardinal Health on a monthly basis, and this would

 4       be performed in May, but for the April transactions, would

 5       take the average from the retail pharmacies serviced by that

 6       distribution center and multiply it by four, correct?

 7       A.   That's correct.

 8       Q.   And, in this instance, that means 140 grams would be

 9       the ingredient limit, which is four times the average

10       pharmacy the Wheeling Distribution Center was servicing?

11       A.   That's correct, Your Honor.  Your Honor, the total --

12       the grams column, do you -- do you need me to explain what

13       those are to you?

14                    MS. MAINIGI:  Perhaps Mr. Farrell can ask a

15       question.

16                    THE WITNESS:  Oh, sorry.

17                    THE COURT:  Yes.  I --

18                    MR. FARRELL:  Yes, sir.  Yes, sir.

19                    THE COURT:  Go ahead.

20                    THE WITNESS:  I'm sorry, Your Honor.

21                    BY MR. FARRELL:

22       Q.   So, before we get there, what we have -- what would you

23       describe this ingredient limit, this 104 grams, what does it

24       mean?

25       A.   The 104 grams is the actual active narcotic amount
```

1    that's contained in four times the average, 12-month

2    average.

3    **Q.**   And so --

4         THE COURT:  Let me interrupt you.  I'm unclear as

5    to what an excessive purchase is and how -- what the basis

6    is for determining if a purchase is excessive.  Are you

7    getting there?

8         MR. FARRELL:  I'm trying to, yes, Your Honor.

9         THE COURT:  Okay.

10         BY MR. FARRELL:

11   **Q.**   So, the ingredient limit of 104 grams is four times the

12   average of the retail pharmacies for that month for this

13   distribution center, correct?

14   **A.**   That's correct.

15   **Q.**   And was Cardinal Health using that as a benchmark to

16   determine what an excessive order was?

17   **A.**   Yes.  It would monitor the purchases of each of its

18   customers and any customer that exceeded that 104.82816

19   would fall onto the list.

20   **Q.**   Now, this particular customer in Huntington, West

21   Virginia and for oxycodone-based drug, you'll see here a

22   list of all of the orders from that month from The Medicine

23   Shoppe to Cardinal Health, correct?

24   **A.**   Yes.

25   **Q.**   And what type -- can you walk through briefly the types

1    of drugs that were ordered here?

2    **A.**    This is specific for oxycodone products, Your Honor.

3    So, every product that's on this list is -- contains

4    oxycodone.   The first one, Roxicet, those are combination

5    drugs, five milligrams of oxycodone and 325 milligrams of

6    acetaminophen.

7        You fall down below the next three.   Those are

8    OxyContin drugs.   Those are -- contain just oxycodone.   And

9    so, the 80 milligrams would be the active ingredient of

10   oxycodone in each pill.

11   **Q.**   So, let's -- let's stop right there for a second and

12   give just one example.   So, if we're looking at one

13   particular transaction here, this would be a quantity of

14   four, 100 tabs of Oxy 80s, correct?

15   **A.**    Yes.

16   **Q.**   So, that's a particular request or transaction for 400

17   oxy 80 tabs?

18   **A.**    That's correct, Your Honor.

19   **Q.**   Now, in the far right-hand corner what Cardinal Health

20   has done is they've taken the active ingredient for each of

21   these orders and then totalled them for a customer total; is

22   that right?

23   **A.**    That's correct.

24   **Q.**   So, in this month of April, 2007, Cardinal Health

25   shipped to The Medicine Shoppe 157 grams of oxycodone,

1    correct?

2    **A.**    That's correct.

3    **Q.**    And after shipping it, it then reported to the DEA and

4    this report that that month exceeded the cap of 104 grams?

5    **A.**    Yes.  The 104 grams, Your Honor, didn't stop the

6    distribution.  It was just the measure of when to place

7    these customers onto this list.

8                THE COURT:  I need to stop you.  My realtime has

9    gone awry.

10                COURT REPORTER:  Can I have one minute, please?

11                THE COURT:  Yes.

12        (Pause)

13                COURT REPORTER:  Is it on now?

14                THE COURT:  Yes.

15                COURT REPORTER:  I think something -- it's sorted

16    out.  Okay.

17                BY MR. FARRELL:

18    **Q.**    So, using --

19                MR. FARRELL:  I'm sorry, Judge.  May I continue?

20                THE COURT:  Yes.

21                BY MR. FARRELL:

22    **Q.**    So, using this as an exemplar, The Medicine Shoppe

23    would be the pharmacy, correct?

24    **A.**    That's correct.

25    **Q.**    And it made orders from Cardinal Health?

1    **A.**    That's correct.

2    **Q.**    And all of those orders got shipped that are on that

3    list?

4    **A.**    That's correct.

5    **Q.**    Those orders, either on a monthly or quarterly basis,

6    the transactions would be reported to the ARCOS database,

7    correct?

8    **A.**    Yes.

9    **Q.**    And because the orders for that month from this

10   pharmacy exceeded four times the average, this pharmacy got

11   included in an excessive purchase report sent to the DEA?

12   **A.**    That's a correct statement, Your Honor.

13   **Q.**    And so, whether you call it an ingredient limit report

14   or an excessive purchase report, the defendants pre-2007

15   were identifying some type of threshold that if you exceeded

16   it, got reported to the DEA?

17            THE COURT:  Mr. Schmidt?

18            MR. SCHMIDT:  And, Your Honor, he's giving very

19   specific testimony about Cardinal.  If he's going to make

20   these sweeping assertions, he should give the similar

21   testimony about McKesson, and I assume ABDC is taking the

22   same view.

23            MS. MAINIGI:  And, Your Honor, I have a continuing

24   objection because his testimony seems to reflect that

25   there's only a one-step process and there was a two-step

1    process.

2            MR. FARRELL:  Judge, if I may, these are --

3            THE COURT:  Let me hear from Mr. Nicholas before

4    that.

5        You go ahead.

6            MR. NICHOLAS:  I just join in both objections as

7    are articulated.  I don't need to re-state them.

8            THE COURT:  Mr. Farrell?

9            MR. FARRELL:  These are improper objections, Your

10   Honor.  To stand up and say that I'm wrong is not the

11   appropriate time for this.  They have the opportunity to get

12   up and cross and ask these questions.

13           THE COURT:  Yeah.  I'll overrule the objection.

14   Let's press on.

15           BY MR. FARRELL:

16   Q.   Mr. Rafalski, sometime around the year 2007 from your

17   prior testimony each of the three distributors changed the

18   way in which they were performing their suspicious order

19   monitoring, correct?

20   A.   That's correct, Your Honor.

21   Q.   Have you prepared a diagram that illustrates the design

22   of the system used or the common design features used by

23   each of the three defendants after 2007?

24   A.   Yes, I have.

25           MR. FARRELL:  And, Judge, at this time what I

1    would like to do is I would like to publish the second half

2    of this slide and ask Mr. Rafalski to step down and describe

3    it for the Court.

4            THE COURT:  You may do so.

5            THE WITNESS:  Thank you, Your Honor.

6        Ready, Your Honor?

7            MR. FARRELL:  Hold on.

8            THE WITNESS:  As -- as the previous, this is the

9    pharmacy and this is an order that's transmitted to the

10   distributor for purchase of controlled substances.  Upon --

11   prior to the shipment, we now have the change in the system.

12   This is a Suspicious Order Monitoring System.  You can kind

13   of characterize it as a little computer or little box.

14   Built into that is a way that they monitor the flow of drugs

15   and calculate the amounts and this makes a decision.

16       There's a trigger or threshold that's set inside of

17   this system and if it's below the trigger of the threshold,

18   the purchase flows through, goes to ship, and the -- and the

19   company also reports to ARCOS.

20       If it -- if it triggers the system, in other words,

21   like the ingredient limit report, if it hits that threshold,

22   it stops the order and it now holds it as part of this

23   system.

24            BY MR. FARRELL:

25   Q.   Now, Mr. Rafalski, once the system holds an order, how

1    -- what is the design process that's supposed to follow?

2    **A.**    So, when we talk about a suspicious order, Your Honor,

3    the suspicion is that this order could be diverted.   In

4    other words, it could fall into illicit hands.   The

5    maintenance of effective controls to prevent diversion is

6    what's the key issue here in that the company has -- has --

7    takes this held order and they make a decision on whether

8    they're going to ship it.

9        Part of that decision process is commonly called due

10   diligence.   It's an internal investigation where they look

11   at some internal information and facts and circumstances,

12   take some action as warranted, and the company would make a

13   decision.

14       If they believe that this suspicion is dispelled, that

15   dispels the potential for diversion, then that order would

16   flow down to the customer and also be reported to ARCOS.

17       If, in fact, they conduct this investigation and they

18   can't clear or dispel the suspicion, then that order would

19   be blocked and cancelled and it would be reported to the

20   DEA.

21           MR. FARRELL:   Thank you.   Take your seat, please.

22           MS. MAINIGI:   Your Honor, my objection is just the

23   characterization of the testimony is on its face different

24   from the characterization of the chart.   There is the

25   shipped order and the held order.   At that point, there's no

1    the game.  These are -- these are flagged orders, but they

2    are not suspicious orders, and that's an important

3    distinction and I think the record has to be clear on that.

4            THE COURT:  Well, these are things that can be

5    cleared up on cross, it seems to me, and I'm going to allow

6    you to go ahead.  Overruled.

7        Go ahead, Mr. Farrell.

8            MR. FARRELL:  All right.

9            BY MR. FARRELL:

10   **Q.**   So, in your analysis did you rely upon the fact that a

11   triggering order should block all future orders of the same

12   drug type?

13   **A.**   Yes.

14   **Q.**   And if the system is working as designed, there's an

15   immediate process to be able to determine whether to ship or

16   block?

17   **A.**   That's correct, Your Honor.

18   **Q.**   And if you ship, that means you have cleared the

19   suspicion that it's being diverted, correct?

20   **A.**   That's correct, Your Honor.

21   **Q.**   And if you block it, that means you're suspicious these

22   pills are getting diverted?

23   **A.**   You -- you've conducted your due diligence and you

24   can't dispel the suspicion, the potential for diversion,

25   Your Honor.

1    **Q.**   Now, to be clear --

2           THE COURT:  And your testimony is that that was

3    built into the system here that all three of these

4    defendants had in place?

5           THE WITNESS:  Yes, sir.  Starting between 2007 and

6    2008, they all designed a system to do exactly that.

7           THE COURT:  But that was your understanding of

8    what the system was and what it was designed to do?

9           THE WITNESS:  In general terms, yes, sir.

10          THE COURT:  Go ahead, Mr. Farrell.

11          BY MR. FARRELL:

12   **Q.**   So, the system is designed to have a trigger, correct?

13   **A.**   Yes.

14   **Q.**   Now, if you set that trigger at ten pills a month,

15   based on your experience, how many times will this system go

16   ding, ding, ding?

17   **A.**   A lot because they don't sell pills in -- ten pills.

18   So, usually, the smallest amount is a hundred, generally

19   speaking.  There's some drugs that are a little smaller.

20   So, every transaction would go ding, ding, ding, Your Honor.

21   **Q.**   And if you set this trigger at 40,000 pills a month,

22   how many times would the system go ding, ding, ding?

23   **A.**   It wouldn't until you bought 40,000 and 100 pills, Your

24   Honor.

25   **Q.**   And so, based on your experience -- well, no.  I'm

1    going to back up a minute.  We'll circle back to that.

2        So, what we're going to do now is we're going to talk

3    about the different triggers that you have seen from your

4    investigations, as well as from your review of this case.

5        Before we get there, just to be clear, once the system

6    triggers, the order should be held until due diligence can

7    make sure it's not being diverted, correct?

8    **A.**   Yes.  Yes, Your Honor, that's my opinion.

9            MR. FARRELL:  Judge, this is a bigger block that

10   we're about to go into, if you'd want to take a break.

11           THE COURT:  Well, does anybody need a break?

12   We've already taken one this morning.

13           MR. FARRELL:  I'm good.

14           THE COURT:  Let's go forward full speed ahead, Mr.

15   Farrell.

16           MR. FARRELL:  Yes, sir.

17       All right.  Let's go to the next slide, please.  Wait,

18   no.  Don't do that.

19           BY MR. FARRELL:

20   **Q.**   Mr. Rafalski --

21   **A.**   Yes, Mr. Farrell?

22   **Q.**   Have you identified methodologies by which registrants

23   have used or you have experienced or seen as a triggering

24   mechanism for their SOMS?

25   **A.**   Yes, I have.

1   **Q.**   And have you prepared a slide that identifies the

2   various methodologies that you have employed when reviewing

3   data?

4   **A.**   I have, Your Honor.

5   **Q.**   And would looking at that slide assist you in your

6   testimony with the Court?

7   **A.**   Yes, it would.

8          MR. FARRELL:  Judge, if permitted, I would like to

9   publish slide 14.

10      Okay.  I know that this is -- this is the slog.  And

11  so, Judge, I'm going to try to be very methodical, but this

12  is -- this is a technical portion.

13          THE COURT:  All right.

14          BY MR. FARRELL:

15  **Q.**   Mr. Rafalski, is there one particular golden rule on

16  what the trigger should be?

17  **A.**   No, Your Honor.

18  **Q.**   Okay.  Describe for the judge what guidance is

19  available out there for how high to set the trigger or how

20  low to set the trigger.

21  **A.**   Well, that determination, Your Honor, is for the

22  company, the registrant.  The regulation, the suspicious

23  order monitoring regulation, speaks to it and it says that

24  they would typically be trying to identify orders of unusual

25  size, deviating substantially from a normal pattern or an

```
1    unusual frequency.

2         In the cases of these systems, they're only looking at

3    the volume and it's a critical decision to try to determine

4    for each customer what would be the usual amount of drugs

5    that they were purchasing.

6    Q.   Now, have you been privy to the actual computer code

7    algorithm used by each of the defendants inside their

8    suspicious order monitoring systems?

9    A.   It was not provided as part of the litigation, Your

10   Honor.

11   Q.   But based on your experience as a DEA investigator,

12   have you been able to generally replicate what that number

13   should look like?

14   A.   I'm not sure I understand your question, what -- what

15   the numbers should look like.

16   Q.   The threshold.

17   A.   It would be calculated to depend on what the system is

18   or how they designed the system.

19   Q.   And have you been able to discern how each of these

20   systems have been generally designed?

21   A.   Yes, I have.

22   Q.   Now, to be clear, how many different systems are

23   possible?

24   A.   It would be a huge number, Your Honor, because you have

25   to take in consideration the range of types of registrants
```

1    that could purchase.  So, if you're distributing drugs to a

2    hospital, you could be looking at a large number.  You could

3    be distributing drugs to a veterinarian, a veterinarian's

4    office.  He would have the ability -- he or she would have

5    the ability to purchase drugs.

6         So, there, you would be looking at a smaller amount and

7    a smaller type, a different type.  Veterinarians wouldn't

8    have use for drugs like Adderall.  So, it's my belief that

9    the regulation, the way it is, allows the flexibility for a

10   registrant to desire a -- design a system to meet their

11   business needs and to service their customers.

12   **Q.**  So, this gets back to purpose.  When we're designing

13   this trigger, when we're designing this function, this

14   threshold, this algorithm at the stage of the transaction,

15   what is it that we're trying to flag?  What's the purpose of

16   flagging certain orders?

17   **A.**  We're trying to identify an order, Your Honor, that has

18   a suspicion of diversion, that is outside of what's normal

19   and what's usual.

20   **Q.**  So, looking at this, have you identified several

21   different methodologies and then -- and then applied those

22   methodologies to the data?

23   **A.**  I have.

24   **Q.**  And so, in general, will you identify for the record

25   what each of these, A, B, C, D, E and F are?  We're talking

1    a hundred thousand feet looking at it because we're going to

2    walk through each of them.

3    **A.**    The first one, Your Honor, is maximum monthly trailing

4    six-month threshold.  That is the system that was used by

5    Masters Pharmaceutical that was discussed in the DC

6    appellate ruling.

7         B, that's a -- the trailing six-month maximum monthly

8    fixed after first triggered threshold.  That's a repeat of

9    the Masters system, but used in my review, it's going to be

10   used a little differently.  I think we're going to explain

11   that.

12        The third one, C, twice trailing 12-month average,

13   that's based on the Mallinckrodt system that was in the

14   litigation in one of the other cases.

15        D, three times the 12-month average is ABDC and

16   Cardinal.  Was used at one of the systems that they used in

17   the time periods I showed you earlier.

18            MS. MAINIGI:  Objection, Your Honor, to the

19   testimony.  That is outside the scope of his report.  It was

20   not identified.  His number -- or his letter D methodology

21   was not disclosed in his report as identified with Cardinal.

22            THE COURT:  Mr. Farrell?

23            MR. FARRELL:  Judge, I'm not quite sure how to

24   respond to that.  It's an enormous report.  But I think it

25   was undisputed that Cardinal was running a three-times

```
 1                    THE COURT:  Well, I think I've -- I've got it so
 2       far.  So, let's move on to the next step.
 3                    MR. FARRELL:  Yes, Your Honor.  I apologize.
 4                    BY MR. FARRELL:
 5       Q.   So, now let's move on to C, twice trailing 12-month.
 6       A.   Can I make a correction on the previous one?
 7       Q.   Yes.
 8       A.   On the B methodology?  So, it doesn't -- it doesn't
 9       stop --
10                    MR. SCHMIDT:  I didn't mean to interrupt.
11                    THE COURT:  Yeah.  Go ahead.
12                    MR. SCHMIDT:  But I would like to say something
13       after.
14                    THE WITNESS:  It doesn't cut all of those orders
15       and only ship that amount.  It would only ship the orders
16       that didn't exceed that red line.
17                    THE COURT:  Okay, Mr. Schmidt.
18                    MR. SCHMIDT:  And that's what I flagged, Your
19       Honor.  That's my concern with the leading.  He actually led
20       him into improper testimony that had I not objected would
21       stand on the record.
22                    MR. FARRELL:  Well, Judge, I would think that his
23       objection is what led him into this.
24                    THE COURT:  Well, I'm going to overrule the
25       objection at this point and you can go ahead.
```

```
 1              MR. FARRELL:  All right.

 2              BY MR. FARRELL:

 3    Q.   So, twice trailing 12 months, please walk the judge

 4    through how that type of methodology would be employed.

 5    A.   Your Honor, if we go back to the chart and you see the

 6    transaction that would flow from month 1 to month 12, we get

 7    to month 12 and that's the trailing 12 months.  So the

 8    system would look back to 12 months.  It would take each of

 9    the monthly transactions and create an average.  And then it

10    would take two times of that average.

11              Generally, in this kind of an illustration, that would

12    be right around six, month 6 approximately.  So, it would be

13    two times of month six.

14    Q.   So, backing up, the 12-month average, average of what?

15    A.   Distribution of pills.  Each one of those bars

16    represent the number of pills that go out each month but,

17    Your Honor, this is -- it's trailing 12 months so --

18    Q.   Mr. Rafalski, hold on a second.  Average of that

19    customer?  Average of that region?  Average of that nation?

20    What is it an average of?

21    A.   It depends how they -- how they set it, how the company

22    sets it.  They could set it by groups of pharmacies,

23    individual pharmacies.  And how we applied it, or how I

24    applied it, actually, in the methodology was it was applied

25    -- in one segment of time of the analysis, it was the State
```

1    of West Virginia transaction average.  And there was a

2    section during ARCOS period where it was the national

3    average.  And it would be two times the national average, if

4    that answers your question --

5    **Q.**   I think so.

6    **A.**   -- about the methodology or about the example.

7    **Q.**   Now, when we say the word trailing, explain to the

8    judge what that terminology, that lexicon means, trailing?

9    **A.**   So, as the transactions, Your Honor, move left to

10   right, when it goes to month 13, month 1 just falls off and

11   it recalculates the average.  And it would continue to do

12   that function system from that point on.

13   **Q.**   Now, under D, three times 12-month average, how does

14   that work?

15   **A.**   It essentially is the same description I gave you, Your

16   Honor, for the -- for the previous, the two times, but this

17   time it would go three times the average.

18        And, Your Honor, just for the illustration, the line

19   wouldn't go straight across because, as the next month hit,

20   as this chart is illustrated, it would bump up a little bit

21   each time.

22   **Q.**   All right.  Now, let's go to E, maximum 8,000 dosage

23   units.  Tell me how putting a threshold cap should work.

24   **A.**   That's what this describes.  In this case, there was a

25   decision that the maximum amount of drugs that could be

1    oxycodone dosage units.

2        For hydrocodone, 16,159,150, or 90.2 percent.

3        Finally, at the bottom, McKesson, for oxycodone

4    2,098,560, 52.7 percent.

5        And for hydrocodone dosage units, 2,484,640, or 66.6

6    percent.

7    **Q.**   And, finally, the last methodology, F, the pickers and

8    packers maximum daily dosage units, would you please report

9    to the Court your findings?

10   **A.**   AmerisourceBergen for oxycodone dosage units,

11   12,459,020, 97.3 percent.

12       For hydrocodone dosage units, 22,582,020, or

13   99.8 percent of dosage units.

14       Cardinal Health for oxycodone, 16,527,880 dosage units,

15   or 96.2 percent.

16       For hydrocodone, 17,688,100, or 98 percent of dosage

17   units.

18       McKesson for oxycodone dosage units, 3,713,000, or

19   93.2 percent dosage units.

20       And for hydrocodone dosage units, 3,648,650, 97.9

21   percent.

22   **Q.**   Very good.  Now, Mr. Rafalski, this -- these numbers

23   that you've just read into the record --

24   **A.**   Yes, sir.

25   **Q.**   -- are in the -- you're using the assumption that there

```
1    is no due diligence and this is what should have happened

2    when the fire alarm went off, correct?

3    A.   Assuming no due diligence.  What -- I don't --

4    Q.   So -- so, have we asked you to review all of the due

5    diligence files made available in this litigation?

6    A.   Yes, sir, you have.

7    Q.   And have you identified them in your reliance

8    materials?

9    A.   I have, Your Honor.

10   Q.   And have you gone through the customer files and the

11   documents produced by AmerisourceBergen, McKesson and

12   Cardinal Health?

13   A.   I have, Your Honor.

14   Q.   And have you found sufficient evidence in the record to

15   dispel the suspicion of any of these orders that -- that

16   were or should have been flagged?

17   A.   I have not, Your Honor.

18   Q.   Now, let's go to -- did we ask you to review the actual

19   suspicious orders that were reported and disclosed by the

20   defendants in this litigation?

21   A.   Yes.  I'm not sure you asked me to.  I mean, that was

22   part of what I did as part of my review of all of the

23   material, but that was one of the primary things that I

24   looked at.

25             MR. FARRELL:  Can we please bring up at that
```

1    AmerisourceBergen slide?

2            BY MR. FARRELL:

3    Q.   Mr. Rafalski, you previously testified that there were

4    77,398 transactions by AmerisourceBergen with pharmacies in

5    Huntington-Cabell County, West Virginia.  Based on your

6    review of the files, how many of those transactions were

7    reported by AmerisourceBergen to the DEA as suspicious?

8    A.   As listed there, Your Honor, by year, I believe that

9    total is 45.

10   Q.   And will you read into the record each of the years and

11   the numbers?

12   A.   2007, 2 pre-shipping reporting; 2008, 4 pre-shipment

13   reporting; 2009, 12 pre-shipment reporting; 2010, 5

14   pre-shipment reporting; 2011, 1 pre-shipment reporting;

15   2012, 4 pre-shipment reporting; and 2013, 11 pre-shipment

16   reporting.  And there were -- no reporting post-shipment.

17   Q.   How about -- I'm told that you missed 2014.

18   A.   Oh, I'm sorry.  Your Honor, 6 for 2014.

19   Q.   And then, in 2015, '16, '17 and '18, how many were

20   there?

21   A.   There were 0, Your Honor.

22   Q.   So, out of the 77,000-plus transactions, what's the

23   total number of orders reported as suspicious?

24   A.   45.

25   Q.   Now, what is it that we're suspicious of?  Let's talk

1    to the judge briefly.  Why are -- what are we suspicious of

2    happening?

3    **A.**   Diversion.  Potential for diversion, Your Honor.

4    **Q.**   Diversion of what?

5    **A.**   Of the controlled substances, that they could leak or

6    be not used properly.  It would be an illicit use.

7    **Q.**   And so, if you're suspicious, are you suspicious of the

8    orders more likely than not being diverted into the illicit

9    market?

10   **A.**   That's correct.  If you don't dispel the suspicion of

11   that order and of future orders, if you hadn't removed that

12   suspicion of diversion or dispelled it, more likely than

13   not, that's what would occur, Your Honor, or my belief.

14   **Q.**   Let's go to the next slide.  This is Cardinal Health.

15   Of the 92,915 transactions, which admittedly go into a

16   longer data time frame than the other defendants, how many

17   suspicious orders were you able to find in the record

18   between 1996 and 2012 -- 2011?

19   **A.**   0.

20   **Q.**   Well, that's not true, is it, Mr. Rafalski?

21   **A.**   Oh, I think that's changed.  I'm sorry.  For 2010 would

22   be the first order that was discovered.

23   **Q.**   So, between -- in 1996, how many suspicious orders were

24   reported?

25   **A.**   0 up through 19 -- 2009.

1    **Q.**   And then in 2010, how many were reported?

2    **A.**   1.

3    **Q.**   And how about 2012?

4    **A.**   2012, 115.

5    **Q.**   I'm sorry.  I missed 2011.

6    **A.**   2011, 0.

7    **Q.**   And then, beginning in 2012, how many suspicious orders

8    were reported?

9    **A.**   15 for 2012; 86 for 2013; 5 for --

10          THE COURT:  Did you say 15 for 2012?

11          THE WITNESS:  115, Your Honor.  I'm sorry.  Again,

12   86 for 2013; 5 for 2014; 19 for 2015; 34 for 2016; 32 for

13   2017.

14   **Q.**   So, just for purposes of the record, between 1996 and

15   2011, Cardinal Health reported one suspicious order?

16   **A.**   That's correct, Your Honor.

17   **Q.**   Now, let's go to the next slide, please.  And, again,

18   this is McKesson and of the 18,862 transactions, how many

19   suspicious orders were reported by McKesson from 1996

20   through 2012?

21   **A.**   That would be 0, Your Honor.

22   **Q.**   And then beginning in 2013, how many suspicious orders

23   were reported?

24   **A.**   Five orders in 2013; 29 orders in 2014; 20 orders in

25   2015; 10 orders in 2016; 2 in 2017; and 13 in 2018, Your

 1    Honor.

 2    **Q.**   Now, with regard to Rite Aid, McKesson's relationship

 3    with Rite Aid, did you find any evidence in the record that

 4    McKesson conducted sufficient due diligence of the Rite Aid

 5    stores in Huntington-Cabell County, West Virginia?

 6    **A.**   I did not, Your Honor.

 7    **Q.**   Did you find any evidence that McKesson conducted

 8    sufficient due diligence when increasing thresholds of

 9    hydrocodone and oxycodone for Rite Aid stores in

10    Huntington-Cabell County, West Virginia?

11    **A.**   Your Honor, I did not.

12    **Q.**   And did you find any evidence that McKesson was

13    sufficiently monitoring Rite Aid's self-distribution of

14    hydrocodone to its stores in Huntington-Cabell County, West

15    Virginia?

16          MR. SCHMIDT:  Objection, Your Honor.  Based on an

17    implied legal duty that doesn't exist, we can't monitor

18    someone's independent conduct from us.

19          THE COURT:  Well, overruled.

20       Go ahead, Mr. Farrell.

21          THE WITNESS:  No, they didn't, Your Honor.

22          BY MR. FARRELL:

23    **Q.**   And did you find sufficient evidence of an appropriate

24    Level I or Level II review by McKesson for retail national

25    account customers in Huntington-Cabell County, West

1    Virginia?

2    **A.**    I did not, Your Honor.

3    **Q.**    Mr. Rafalski, do you have an opinion whether

4    AmerisourceBergen maintained effective control to prevent

5    diversion of prescription opioids into the illicit market in

6    Huntington-Cabell County, West Virginia?

7    **A.**    Yes, Your Honor, I do.

8    **Q.**    What is that opinion?

9    **A.**    Failure to maintain effective controls to prevent

10   diversion of controlled substances.

11            MR. NICHOLAS:  Your Honor, I'll object and ask to

12   strike that testimony as a legal conclusion.

13            THE COURT:  Well, overruled.

14            BY MR. FARRELL:

15   **Q.**   So, let's back up.  Do you have an opinion and I'll --

16   I'm going to use the collective to save us some time.

17            THE COURT:  Overrule the objection and deny the

18   motion to strike.

19       Go ahead, Mr. Farrell.

20            BY MR. FARRELL:

21   **Q.**    Do you have an opinion whether AmerisourceBergen

22   maintained effective control to prevent diversion of

23   prescription opioids into the illicit market in

24   Huntington-Cabell County, West Virginia?

25   **A.**    I do.

1    **Q.**    What is that opinion?

2    **A.**    That they did, Your Honor.

3    **Q.**    Do you have an opinion whether Cardinal Health

4    maintained effective control to prevent diversion of

5    prescription opioids into the illicit market in

6    Huntington-Cabell County, West Virginia?

7              MS. MAINIGI:  Objection, Your Honor.  Calls for a

8    legal conclusion inconsistent with the Geldhof ruling.

9              THE WITNESS:  I do, Your Honor.

10             BY MR. FARRELL:

11   **Q.**    What is that opinion?

12   **A.**    That they did.

13   **Q.**    That they did not?

14   **A.**    They did not.  I'm sorry.  Yes.

15   **Q.**    Do you have an opinion whether McKesson maintained

16   effective control to prevent diversion of prescription

17   opioids into the illicit market in Huntington-Cabell County,

18   West Virginia?

19             MR. SCHMIDT:  Same objection, Your Honor.

20             THE COURT:  Overruled.

21             THE WITNESS:  I do, Your Honor.

22             BY MR. FARRELL:

23   **Q.**    What is that opinion?

24   **A.**    That they did not.

25   **Q.**    Do you have an opinion whether AmerisourceBergen,

```
 1    Cardinal Health and McKesson each individually designed and

 2    operated an effective system to identify, block and report

 3    suspicious orders arising out of Huntington-Cabell County,

 4    West Virginia?

 5    A.   I do, Your Honor.

 6    Q.   And what is that opinion?

 7    A.   That they did not.

 8    Q.   Do you have an opinion whether these failures were

 9    systemic?

10    A.   I do, Your Honor.

11    Q.   And what is your opinion?

12    A.   That they were.

13    Q.   Do you have an opinion --

14         THE COURT:  What do you mean by systemic failure?

15         THE WITNESS:  Systemic would -- the difference

16    would be when I looked at the due diligence, maybe there was

17    a flaw or a missed one.  Systemic would mean that it was

18    widespread, that it was --

19         THE COURT:  Okay.  Ms. Mainigi?

20         MS. MAINIGI:  I object to that, Your Honor.  He

21    has absolutely no basis in terms of what he reviewed to do

22    that and ultimately it calls for a legal conclusion but we

23    can cross examine him on it.

24         THE COURT:  Overruled.

25         MR. FARRELL:  All right.  I'm being told that I
```

```
 1    need to -- because of the objections and the clarity, I need

 2    to go back and re-ask the first question on

 3    AmerisourceBergen.

 4                BY MR. FARRELL:

 5    Q.   You've stated earlier that you do -- let me start all

 6    over with that.  Do you have an opinion whether

 7    AmerisourceBergen maintained effective control to prevent

 8    diversion of prescription opioids into the illicit market in

 9    Cabell County, West Virginia?

10    A.   I do, Your Honor.

11    Q.   And what is your opinion?

12    A.   They did not.

13                THE COURT:  Haven't you already asked him that?

14                MR. FARRELL:  I was told that I --

15                THE COURT:  Oh, you wanted to rephrase the

16    question?

17                MR. FARRELL:  I was told I bollixed it and so I

18    was trying to fix it.

19                THE WITNESS:  I might have misunderstood it, Your

20    Honor.

21                THE COURT:  Okay.  All right.  I'm sorry.  Go

22    ahead.

23                BY MR. FARRELL:

24    Q.   Do you have an opinion whether these systemic failures

25    were a substantial factor in the diversion of prescription
```

1    Statement."  Do you see that?  It's immediately below in the

2    upper left corner.

3    **A.**    I do see that under "Action," yes, sir.

4    **Q.**    This is the kind of DEA policy statement specifically

5    relating to prescription opioids that we were just

6    referencing; correct?

7    **A.**    Generally, yes.  I think this is a proposal for

8    multiple prescriptions for Schedule II.  But I agree that's

9    what the policy statement says.

10                MR. SCHMIDT:  We move this into evidence,

11   Defendants' West Virginia 3076.

12                THE COURT:  Is there any objection?

13                MR. FARRELL:  Yes, Your Honor.

14                THE COURT:  What is it?

15                MR. FARRELL:  Well, this is hearsay, and unless

16   this Court takes judicial notice of a public document.  But

17   in addition to that, there's been no foundation that this

18   witness is familiar with this policy statement from the DEA.

19                MR. SCHMIDT:  I don't think the witness -- an

20   expert witness gets to decide the scope of his cross

21   examination by a limited review of documents.  There is

22   foundation that this is the type of document he would look

23   at.

24                THE COURT:  This comes in under the public records

25   exception to the hearsay rule, does it not?

1          MR. SCHMIDT:  Yes.

2          THE COURT:  Objection is overruled.  I'll admit

3    it.

4    BY MR. SCHMIDT:

5    Q.   Okay.  Let's put it up on the screen, please.  And

6    we don't need to go back through the background

7    information.

8         What I want to do is go to Page 5 of the document

9    looking at the numbers in the lower left-hand corner,

10   please.  And tell me when you're there.  And we also have it

11   up on the screen.  It's just to your right.  Do you see

12   that?

13   A.   Yes.  One second.

14   Q.   And, specifically, if we cull out the right column,

15   there's a heading that says, "The number of physicians who

16   prescribe controlled substances in violation of the CSA is

17   extremely small and there is no DEA crack-down on

18   physicians."

19        Do you see that?

20   A.   I see what that says, yes.

21   Q.   And then it says in 2006 in the Federal Register in

22   this official DEA policy statement, DEA recognizes that the

23   overwhelming majority of American physicians who prescribe

24   controlled substances do so for legitimate medical purposes.

25        Do you disagree with that statement?

1    **A.**   I do not.

2    **Q.**   You agree with that?

3    **A.**   Yes, Your Honor, I agree with that.

4    **Q.**   In fact, the overwhelming majority of physicians who

5    prescribe controlled substances do so in a legitimate manner

6    that will never warrant scrutiny by federal or state law

7    enforcement officials.

8         Do you agree with that?

9    **A.**   Your Honor, I do agree with that statement, too.

10   **Q.**   Do you recall when you were at the DEA that the head of

11   the Office of Diversion Control was Joseph Rannazzisi?

12   **A.**   I do, sir.

13   **Q.**   And you're aware that he has publicly stated under oath

14   in testimony that 99 point -- 99 percent of doctors

15   prescribe opioids for legitimate medical purposes?  You and

16   I have looked at that testimony together.  Correct?

17   **A.**   Your Honor, we have and I do recall that testimony.

18   **Q.**   And you agree with that testimony; correct?

19   **A.**   Yes.

20   **Q.**   You're aware that the former head of the DEA, Robert

21   Patterson, has similarly testified under oath to our United

22   States Congress that 99.99 percent of doctors are trying to

23   do right by their patients?

24   **A.**   I do not recall that testimony, hearing that testimony

25   before, Your Honor.

1    **Q.**   I've shown you that testimony.  Do you recall that?

2    **A.**   I do not.  99.99?  I do not.

3    **Q.**   Well, do you agree -- let me ask it this way.  Do you

4    agree with the statement made by Mr. Patterson of the DEA,

5    formerly of the DEA testifying in front of Congress that

6    99.99 percent of doctors are trying to do the right thing?

7         Do you agree or disagree with that statement?

8    **A.**   It's a difficult decision, Your Honor, because I'm

9    thinking about the approximately one million physicians in

10   the United States and calculating what one tenth of

11   one percent would be.  I guess generally I don't have any

12   information to disagree with it.

13   **Q.**   Okay.

14   **A.**   I'm not, I'm not as certain when you bring it down to

15   one tenth of one percent.

16   **Q.**   Okay.  No reason to disagree with it?

17   **A.**   No, I don't have any information to disagree other than

18   my experience in working with the DEA might taint my opinion

19   a little bit because I -- you know, prior to that, I didn't

20   have the same contact with physicians that were having

21   problems with dispensing and all other issues.  But other

22   than that, I do not, Mr. Schmidt.

23   **Q.**   You agree that the medical community bears some

24   responsibility for the opioid crisis; correct?

25   **A.**   Your Honor, I believe that probably everybody bears

1    some responsibility for the opioid crisis.  I, I don't think

2    that anyone can sit here today that took a role in trying to

3    combat it would ever say they did everything perfectly.

4    **Q.**   Does that include the DEA?

5    **A.**   That includes the DEA.

6    **Q.**   Does that include Joe Rannazzisi, former head of the

7    Office of Diversion Control of the DEA?

8    **A.**   I guess Mr. Rannazzisi would speak for himself.

9    **Q.**   I'm asking your view, sir.

10   **A.**   I, I've already stated I think everybody, if they were

11   able to look back and look at what they did, I don't think

12   there's anybody in America that could say, "I did everything

13   perfect."

14   **Q.**   Does that include Mr. Rannazzisi in your view?

15   **A.**   If I make a statement like that, I guess I would hope

16   that he could look back and feel the same way.

17   **Q.**   Now, I'll come back to my question and ask you about

18   doctors.  Do doctors -- do you agree that doctors bear some

19   responsibility for the opioid crisis?

20   **A.**   I believe they do.

21   **Q.**   You're testifying here as a DEA expert; correct?

22   **A.**   I don't know if I'm a DEA expert.  I'm not employed

23   anymore.  I'm an expert, I guess, with a DEA background.

24   **Q.**   Okay.  I don't want to split hairs.  You've come here

25   as an expert on DEA topics as a former employee of the DEA;

```
 1    correct?
 2    A.    Yes.  I just didn't want to be a DEA expert.
 3    Q.    Are you aware of the DEA's 360 programs?
 4    A.    Not in great detail.  It was something that was
 5    starting right around my retirement.  I think it wasn't
 6    really fully rolled out until after I left in 2017.
 7    Q.    Okay.  Have you had occasion to look at the DEA's 360
 8    program covering Cabell County in connection with your work
 9    in this case?
10    A.    I have not, Your Honor.
11    Q.    Do you know what causes the DEA has identified through
12    their 360 project as causes of the opioid crisis in Cabell
13    County?
14    A.    No, I do not.
15    Q.    That's not something you've looked at in your work?
16    A.    I believe that I may have looked at a document or some
17    information regarding that.  I don't have a direct
18    recollection and I don't want to guess on that topic, Your
19    Honor.
20          MR. SCHMIDT:  May I approach, Your Honor?
21    BY MR. SCHMIDT:
22    Q.    I've handed you a document marked Defendants' West
23    Virginia 2628.  Do you see on the cover it says "DEA 360
24    Strategy"?
25    A.    I see that, Your Honor.
```

```
 1   Q.   And if you look at Page 7 of the document --
 2   A.   Okay.
 3   Q.   -- do you see that it covers Cabell, among other
 4   counties?
 5   A.   I see that, sir.
 6   Q.   It was launched in February, 2017.  Do you see that?
 7   A.   I do.
 8   Q.   And it covers Cabell County; correct?
 9   A.   That's a correct statement, sir.
10   Q.   Do you see on Page 9 that they have a chart with
11   factors contributing to the opioid problem in West Virginia?
12   A.   I see that page, yeah, Your Honor.
13   Q.   And do you see under that the third factor is
14   over-prescribing of opioids?  Do you see that?
15   A.   I agree that that is what that statement says.
16   Q.   Do you agree that's a factor contributing to the opioid
17   problem in West Virginia, doctors over-prescribing opioids?
18   A.   I think that's a logical statement that there would be
19   some over-prescribing or prescribing issues that would lead
20   to that issue.
21   Q.   Do you see they have data and they cite someone named
22   Dr. Gupta who this Court has heard from already?
23              MR. FARRELL:  Can you give me a page number?
24              MR. SCHMIDT:  Oh, yes, of course.  I might have
25   read the wrong one, Page 9.  It's 4 on the document.  But if
```

1    you look at the lower numbers, those are the numbers I'm

2    going to be using all through the document.

3    BY MR. SCHMIDT:

4    **Q.**   Do you take any issue with the data cited here

5    regarding prescribers over-prescribing opioids in West

6    Virginia coming from the DEA and from Dr. Gupta?

7    **A.**   Your Honor, I don't have any problems with the data.  I

8    don't have any independent knowledge, or I haven't done any

9    research or looked up, you know, to be able to give an

10   informed comment on that.  I don't have any reason to not

11   believe the data, sir.

12   **Q.**   Do you see that there's discussion in this DEA 360

13   publication citing Dr. Gupta, citing the DEA, citing the

14   National Institute on Drug Abuse talking about factors

15   contributing to the opioid problem in West Virginia?  There

16   is no mention of distributors?

17   **A.**   There is not, Your Honor, at least on the two pages

18   we've reviewed so far.

19            MR. SCHMIDT:  We'll move this into evidence, Your

20   Honor, Defendants' West Virginia 2628.

21            MR. FARRELL:  Objection; hearsay, foundation, and

22   geographic scope.

23            THE COURT:  How does it come in, Mr. Schmidt?

24            MR. SCHMIDT:  I think it's an official record, and

25   it's certainly a record of the type experts use and would

```
 1    rely on under 703.
 2              THE COURT:  Well, they can consider it under 703.
 3    That doesn't necessarily make it admissible under 703.  Is
 4    there an exception to the hearsay rule?
 5              MR. SCHMIDT:  I think it's a government
 6    publication.
 7    BY MR. SCHMIDT:
 8    Q.   Is this a document you reviewed before, Mr.
 9    Rafalski?
10    A.   I've never seen this before, sir.
11    Q.   Okay.
12              MR. SCHMIDT:  I won't move it in, then, Your
13    Honor.
14              THE COURT:  All right.
15    BY MR. SCHMIDT:
16    Q.   In terms of Cabell County and Huntington, you don't
17    know how many doctors in Cabell/Huntington -- Cabell
18    County and Huntington who wrote prescriptions for
19    opioids during the time period you were looking at in
20    this case; correct?
21    A.   Your Honor, I did not research that topic, so I do not
22    know.
23    Q.   So it follows that you conducted no analysis of how
24    many doctors were prescribing legitimately in
25    Huntington/Cabell versus illegitimately.  True?
```

1    **A.**   I did not conduct any research on that and I did not

2    look into that matter.  So I do not have an opinion on it.

3    **Q.**   I'm trying to get you off today, so I'm going to ask

4    you if you can answer just my question.  I'm just going to

5    try to ask "yes/no" questions where I can.

6    **A.**   Okay.  Your Honor, when I can answer "yes/no" I will.

7              THE COURT:  Okay.  And you can explain your answer

8    when you desire to do so.

9              THE WITNESS:  I understand, Your Honor.

10   BY MR. SCHMIDT:

11   **Q.**   Your report and your testimony doesn't identify a

12   single doctor who you have identified in Cabell County

13   or Huntington who was prescribing improperly or engaging

14   in diversion.  True?

15   **A.**   That's correct.

16   **Q.**   You talked about Dr. Ognen, a pill mill doctor you

17   investigated in -- was it Michigan?

18   **A.**   Toledo, Ohio, sir.

19   **Q.**   In Toledo, Ohio, during your work at the DEA.  Do you

20   recall that?

21   **A.**   I do.

22   **Q.**   You didn't conduct that type of investigation of any

23   doctors in Huntington or Cabell as part of your work in this

24   case; correct?

25   **A.**   I was not requested to do that type of analysis, Your

1    Honor.

2    **Q.**   So did you do it?

3    **A.**   I did not.

4    **Q.**   Okay.  You've not done any kind of analysis of the

5    medical needs for prescription opioids in Cabell County or

6    Huntington relative to the national average; correct?

7    **A.**   That's a correct statement.  I did not do that.

8    **Q.**   So it follows that you can't identify a single instance

9    where an order from McKesson or ABDC or Cardinal went to

10   fill a prescription written by a doctor in Cabell County or

11   Huntington where the doctor was prescribing improperly or

12   engaging in diversion.  True?

13   **A.**   I don't think that's a true statement.

14   **Q.**   Which doctors had prescriptions filled by one of these

15   defendants that was acting improperly or engaging in

16   diversion?

17   **A.**   Well, I'm aware of an incident through reviewing of

18   records, doing some research on some of the records for some

19   of the pharmacies that there was a, a pharmacy located in

20   Huntington that was filling prescriptions for the whole pain

21   clinic.

22   **Q.**   Okay.

23   **A.**   And all 12 of the people involved with the whole pain

24   clinic were all indicted.

25        During the time frame that those doctors were

1    prescribing, they were filling prescriptions.  There was a

2    pharmacy or pharmacies in this area filling prescriptions

3    for them.

4         Now, I don't have any independent knowledge to say

5    those specific prescriptions.  But based on the totality of

6    all the circumstances, I would say it's likely that there

7    were prescriptions issued that were illicit during that time

8    period.

9    **Q.**   Do you know of any pills shipped by McKesson, ABDC, or

10   Cardinal that specifically went to a pill mill doctor or an

11   improper prescription?

12   **A.**   As I just testified, I think in this case it's likely.

13   I think the pharmacy I recall being was a customer of

14   McKesson.

15   **Q.**   Do you know if that happened?

16   **A.**   The distribution?

17   **Q.**   Yes, the distribution of pills -- you just mentioned

18   McKesson -- by McKesson that went to fill a prescription

19   that was written by a pill mill doctor?

20   **A.**   I don't know that they filled that specific

21   prescription.  I just know they went to the pharmacy.

22   **Q.**   What was that McKesson customer?

23   **A.**   I'm drawing a blank on it.

24   **Q.**   It's no one you mentioned in your report; correct?

25   **A.**   It's not in my report, no, sir.

1   **Q.**   It's no one you mentioned in your testimony; correct?

2   **A.**   Not so far, that's correct.

3   **Q.**   And you realize we're done with your affirmative

4   testimony from Mr. Farrell; correct?

5   **A.**   I am.

6   **Q.**   Okay.  In a similar vein, are you aware of any pills

7   that were shipped by McKesson, ABDC, or Cardinal that ended

8   up filling a prescription that was dispensed other than in

9   response to a licensed prescriber writing a prescription?

10  **A.**   No, I'm not, Your Honor.

11  **Q.**   Let's talk about pharmacies.  Pharmacies dispense

12  prescription opioids in response to prescriptions; correct?

13  **A.**   That's correct, sir.

14  **Q.**   And the DEA registers the pharmacies, and the West

15  Virginia Board of Pharmacy licenses the pharmacies in West

16  Virginia; correct?

17  **A.**   That's correct.

18  **Q.**   And both of those, that registration, that licensing

19  are both important; correct?

20  **A.**   Yes.  It's required by law.

21  **Q.**   You're not aware of Cardinal, ABDC, or McKesson ever

22  supplying a pharmacy that was not licensed by the DEA?

23  **A.**   I do not, Your Honor.

24  **Q.**   You understand that under DEA rules when you were at

25  the DEA and to this day that pharmacies have a corresponding

1    responsibility to that of the doctor when it comes to

2    prescriptions?

3    **A.**    Yes, but, more specifically, the pharmacist.

4    **Q.**    The pharmacist?

5    **A.**    Not the pharmacy.

6    **Q.**    What is that corresponding responsibility that a

7    pharmacist has?

8    **A.**    They're supposed to ensure that that prescription was

9    issued for a legitimate medical need and, if necessary, that

10    there was a proper doctor/patient relationship.

11        If while filling the prescription they identify any

12    anomalies or red flags, they have an obligation to resolve

13    those before issuing the prescription.

14    **Q.**    And that language, that corresponding responsibility is

15    written into the regulation; correct?

16    **A.**    It is a regulation, sir.

17    **Q.**    There's no reference to a corresponding responsibility

18    of distributors, correct, in the regulation?

19    **A.**    There is not.

20    **Q.**    So is it accurate to say that pharmacies have

21    meaningful responsibilities when it comes to prescription

22    opioids?

23    **A.**    Yes, but, more specifically, pharmacists.

24    **Q.**    Are you aware of any prescription in this case relating

25    to the defendants that was dispensed without a pharmacist

1    present with that pharmacist having that corresponding

2    responsibility?

3    **A.**   I am not, Your Honor.  That was not part of what I did

4    research for for my report.

5    **Q.**   And it's because of that corresponding responsibility

6    that pharmacists have that at the DEA they're often referred

7    to as the last line of defense against diversion; correct?

8    **A.**   I've never heard that specific term about pharmacists

9    but --

10   **Q.**   Okay.

11   **A.**   -- I don't dispute that that could be a term used.

12   **Q.**   You never heard that in your work at DEA?

13   **A.**   No, I did not.

14   **Q.**   Okay.

15   **A.**   I, I heard that used for other entities in the closed

16   system, but not for pharmacists.

17   **Q.**   A pharmacy can't dispense a prescription opioid without

18   having a prescription from a licensed healthcare prescriber

19   and properly evaluating it.  True?

20   **A.**   Could you say the end again?  I'm sorry.

21   **Q.**   Sure.  A pharmacy can't dispense prescription opioids

22   without having a prescription in hand from a licensed

23   healthcare professional and properly evaluating it.

24   Correct?

25   **A.**   Generally speaking.  There's some emergency provisions,

1    Your Honor, where the prescription can follow-up within a

2    certain time frame.  So that's part of having it in hand.

3    But, basically, that's a true statement, Your Honor.

4    **Q.**   All right.  And that statement is true no matter how

5    many prescription opioids are distributed; correct?

6    **A.**   That's correct.

7    **Q.**   The number of pills that a pharmacy dispenses are

8    directed by the number of prescriptions written by

9    healthcare professionals.  True?

10   **A.**   Generally speaking, yes.

11   **Q.**   You don't know how many pharmacies dispensed

12   prescription opioids during the time period you were looking

13   at in Cabell County and Huntington; correct?

14   **A.**   I don't know them off of my -- off the top of my head,

15   but I do have a chart where I have for the three defendants

16   the number of pharmacies.  The totality of all the

17   pharmacies, if there were ones that were receiving

18   controlled substances outside of the three defendants, I

19   would not have those.  So --

20   **Q.**   You weren't -- you weren't tasked with evaluating the

21   pharmacies in Cabell County and Huntington in terms of

22   whether they were complying with their legal obligations;

23   correct?

24   **A.**   That's correct, Your Honor.  I wasn't evaluating

25   pharmacies.

1    **Q.**   You weren't asked to review specific pharmacy records,

2    how the records were maintained, whether they were

3    dispensed, whether their corresponding responsibility was

4    fulfilled by the pharmacists; correct?

5    **A.**   That's a correct statement, Mr. Schmidt.

6    **Q.**   So you did not undertake those reviews; correct?

7    **A.**   I did not, Your Honor.

8    **Q.**   Correspondingly, you do not know of any pharmacies in

9    Cabell County or Huntington -- let me actually ask you a

10   different question.  You're not offering any opinions about

11   whether diversion occurred at a pharmacy level; correct?

12   **A.**   I haven't put that opinion in my report, so I guess

13   that's a true statement, Your Honor.

14   **Q.**   You understand that some of the large pharmacy chains

15   act as distributors themselves by self-distributing to

16   themselves; correct?

17   **A.**   There's -- it's a possibility for a pharmacy, but

18   there's a rule, a percent rule of how much they can do that.

19   **Q.**   With respect, I didn't ask you -- I just asked you if

20   it's correct.  Is it correct that some chain pharmacies

21   self-distribute?

22   **A.**   General knowledge, I know that.  As far as within

23   Cabell County and Huntington, I don't have any knowledge of

24   that occurring.

25   **Q.**   Do you know of any pharmacy, chain pharmacy in

1    Huntington or Cabell County that self-distributes?

2    **A.**   No, I do not.

3    **Q.**   Okay.  Some of the pharmacies that are large chains are

4    pharmacies like CVS, Walgreens, Rite-Aid; correct?

5    **A.**   Yes.

6    **Q.**   And you know they self-distribute in other locations;

7    correct?

8    **A.**   I know I've seen things where they might transfer

9    controlled substances back and forth to each other, which is

10   permissible.

11   **Q.**   This is now, by my count, the fifth case where you're

12   giving opinions against various defendants, is that correct,

13   regarding prescription opioids?

14   **A.**   Yes.

15   **Q.**   In other cases you've given the opinions that those

16   chain pharmacies I mentioned have caused the opioid crisis;

17   correct?

18   **A.**   Yes.

19   **Q.**   In fact, you're going to leave this court and go to

20   give a deposition in another case where you're giving the

21   opinion that those chain pharmacies in another jurisdiction

22   have caused the opioid crisis; correct?

23   **A.**   That's correct.

24   **Q.**   You know that they had stores in Huntington/Cabell;

25   correct?

1    **Q.**   Dated April 15th, 2019?

2    **A.**   Yes, sir.

3    **Q.**   And do you see item 4 right above your signature,

4    "Deposition testimony by current Insys employees has

5    confirmed that Insys failed to implement any SOMS system or

6    maintain any SOMS protocols until 2018."

7         Do you see that?

8    **A.**   I see that, Your Honor.

9    **Q.**   Were you being truthful when you provided that report,

10   sir?

11   **A.**   I was.  I just didn't recall it, sir.

12   **Q.**   Let me ask you now about distributors.  Distributors

13   ship medications from the manufacturers that make them to

14   pharmacies and other entities that dispense them; correct?

15   **A.**   Yes, any registrant that has the ability to purchase

16   them, yes, sir.

17   **Q.**   In doing that, distributors play an important role in

18   ensuring an adequate and uninterrupted supply of legitimate

19   prescription opioids; correct?

20   **A.**   I believe that's the role -- one of the roles of a

21   distributor, yes, sir.

22   **Q.**   They don't fill prescriptions brought to them.  That's

23   the role of the pharmacy.  Correct?

24   **A.**   That's correct, Your Honor.

25   **Q.**   They don't check the prescriptions that patients bring

1    into a pharmacy; correct?

2    **A.**    That's a correct statement.

3    **Q.**    In fact, they don't have access to individual patient

4    prescriptions or individual patient data; correct?

5    **A.**    That's a correct statement.

6    **Q.**    Privacy laws actually prevent that; correct?

7    **A.**    HIPAA requirements would prohibit that, sir.

8    **Q.**    Those are privacy laws; right?

9    **A.**    Yes, they are.

10    **Q.**    So distributors don't have the information to evaluate

11    the medical need of an individual patient presenting an

12    individual prescription; correct?

13    **A.**    That's a correct statement, Your Honor, they do not.

14    **Q.**    You're not aware of any instance where one of the three

15    distributors in this case directly interacted with a doctor

16    or a patient in Huntington or Cabell County, are you?

17    **A.**    I'm not aware if that occurred, sir.

18    **Q.**    Let me ask you a question about the relationship

19    between pharmacies and distributors.  You're aware that when

20    a distributor cuts off a customer, it's common that that

21    pharmacy will go find another distributor to supply its

22    pills; right?

23    **A.**    That's true, yes, sir.

24    **Q.**    In fact, in your work experience you're aware of no

25    instance ever when a pharmacy has cut off -- I'm sorry -- a

1    distributor has cut off a pharmacy and that pharmacy has

2    gone out of business because they can't find another

3    distributor; correct?

4    **A.**   No, I'm not, not immediately.

5    **Q.**   What does cut off a pharmacy is if the DEA pulls the

6    pharmacist's registration -- or I'm sorry -- the pharmacy's

7    registration; correct?

8    **A.**   Yes.  If the DEA or the state was to remove the

9    licensure from the pharmacy, they would stop immediately.

10   **Q.**   You agree that there are hundreds of distributors in

11   the United States?

12   **A.**   Yes.

13   **Q.**   And you agree from reviewing Dr. McCann's data that

14   dozens of distributors supply pharmacies in Huntington and

15   Cabell?

16   **A.**   Dozens?  I think that may be a little high, but I

17   don't, I don't have any direct recollection to dispute that.

18   **Q.**   Dr. McCann testified it was 36.  Is that accurate?

19   **A.**   If he testified, then that's accurate.

20   **Q.**   Okay.  And that's two and a half dozen; right?

21   **A.**   Yes.

22   **Q.**   You conducted no analysis of the distributors that

23   shipped into Huntington and Cabell County other than

24   McKesson, Cardinal, and ABDC; correct?

25   **A.**   That's correct, Your Honor.  Those are the only three I

1    reviewed.

2    **Q.**   To take one example of the distributors you failed to

3    address, the distributor Miami-Luken had a high level of

4    conduct in West Virginia; correct?

5    **A.**   I'm aware that they were distributing also into the

6    county and the city at considerable amounts, Your Honor.

7    **Q.**   Do they still exist?

8    **A.**   I believe they do.  I think they have some legal

9    matters pending, but I think they still have their

10   registration.

11   **Q.**   What are those legal matters pending?

12   **A.**   I believe there are some criminal charges pending

13   against the company.

14   **Q.**   And you did no analysis of Miami-Luken's efforts to

15   prevent diversion and comply with the CSA; correct?

16   **A.**   I was not asked to do that.  No, Your Honor, I did not.

17   **Q.**   Did you look at a pharmacy called A-Plus Pharmacy in

18   your work?

19   **A.**   In Cabell and Huntington?

20   **Q.**   Yes.  It was a Miami-Luken pharmacy.

21   **A.**   I believe so.

22   **Q.**   Do you know that -- then you know that ABDC, Cardinal,

23   and McKesson never supplied A-Plus Pharmacy?

24   **A.**   I'm not sure on that, sir.

25   **Q.**   Well, did you see in Dr. McCann's data that they never

```
 1   answers on the application can fraudulently obtain a DEA

 2   registration."

 3        Do you see that?

 4   A.   I see it.

 5   Q.   Do you have any reason to question the truth of that as

 6   to registration decisions made for Huntington/Cabell?

 7   A.   I do not.

 8   Q.   Let's look at the last sentence.

 9        "Indeed, one diversion investigator told us that even

10   if an applicant answered "yes" to one or more of the

11   liability questions, some of her colleagues do not follow up

12   to determine whether the applicant should be denied a DEA

13   registration."

14        Do you see that?

15             MR. FARRELL:  Objection, Your Honor.

16             THE COURT:  What's the basis?

17             MR. FARRELL:  Hearsay within hearsay.

18             MR. SCHMIDT:  It's a report --

19             THE COURT:  Well, this is cross-examination.  He

20   can answer it if he can.

21   BY MR. SCHMIDT:

22   Q.   Do you see that?

23   A.   Yes, sir, I do see that.  Is this restricted to Cabell

24   County and Huntington?

25   Q.   I haven't asked a question.  I just asked if you saw
```

1    it.

2    **A.**   Oh, okay.  I'm sorry.

3    **Q.**   Do you have any reason to take issue with the truth of

4    that statement as applied to registration in

5    Huntington/Cabell?

6    **A.**   I do not, sir.

7    **Q.**   Do you know the DEA can use ARCOS data to determine the

8    volume of opioids supplied by all distributors to a

9    pharmacy; correct?

10   **A.**   I do.

11   **Q.**   They can use ARCOS data to determine the volume of

12   opioids supplied by all distributors to a county; correct?

13   **A.**   I'm sorry?  To a --

14   **Q.**   To a county.

15   **A.**   Yes.

16   **Q.**   You've seen this document that we have marked as

17   Defendants' West Virginia 642; correct?

18   **A.**   It looks familiar.  I'm not positive.

19   **Q.**   We had a chance to talk about it in your New York

20   deposition; correct?

21   **A.**   I believe so.

22   **Q.**   You'll remember we actually took a break from your

23   deposition so you could go and confirm on the DEA website

24   that this is, in fact, a publication available on the DEA

25   website talking about the ARCOS database; correct?

1    **A.**   I recall it except I think one of the attorneys for the

2    defendants actually found it but, yes.

3    **Q.**   Yes.  One of my colleagues in this room found it and

4    pointed you to it and you were able to confirm that this is

5    from the DEA's website?

6    **A.**   Yes.  And then I was willing to discuss it, yes, sir.

7              MR. SCHMIDT:  We move this into evidence, Your

8    Honor.

9              THE COURT:  Any objection?

10             MR. FARRELL:  Just a second, Your Honor.

11        (Pause)

12   BY MR. SCHMIDT:

13   **Q.**   And to lay just a further foundation, you've read

14   the testimony of Kyle Wright as taken in the broader

15   opioids litigation; correct?

16   **A.**   Yes, sir.

17   **Q.**   And this is an exhibit to his deposition because it

18   was, in fact, a presentation he conducted; correct?

19   **A.**   Yes.

20             MR. FARRELL:  No objection, Your Honor.

21             THE COURT:  It's admitted.

22   BY MR. SCHMIDT:

23   **Q.**   Let's put this up on the board.  It says "ARCOS

24   Automation of Reports and Consolidated Order System."

25   This is this ARCOS database we've been talking about;

1          THE COURT:  Do you know why DEA did not permit

2     disclosure before 2018?

3          THE WITNESS:  For a while, Your Honor, they used

4     to say it was proprietary.  But then I, I think also they

5     felt there, there was input from distributors and

6     manufacturers, that they would use the data as a tool to go

7     in and try to see what market share was and then try to

8     take -- fight each other on, you know, where they knew that

9     they could market a product and where it was being

10    distributed.  I think there was that visibility that was a

11    problem.

12    BY MR. SCHMIDT:

13    Q.   They were forced to overcome those concerns and

14    grant access; correct?

15    A.   I think the opioid epidemic helped them overcome those

16    concerns.

17    Q.   An act of Congress helped them overcome those concerns;

18    right?

19    A.   Yes.

20    Q.   The DEA failed to act in that regard; correct?

21    A.   I'm not sure what guidance they had to take that

22    position, but they did not act.  That's an accurate

23    statement.

24    Q.   Let's go back to 21, please.  Do you remember talking

25    about how the DEA had the ability to look at a county by

1    county basis and determine whether that county was average,

2    above average, below average?

3    **A.**   I do.

4    **Q.**   Are you aware of the DEA ever looking at City of

5    Huntington or Cabell County and telling any distributor the

6    level of distribution to that county was wrong?

7    **A.**   I'm not aware whether that did or did not occur, Your

8    Honor.

9    **Q.**   You were asked a question about whether distributors

10   ever analyzed volume to a specific county.  Did DEA, to your

11   knowledge, ever look at the overall distribution or any one

12   distributor's distribution to Huntington or Cabell County

13   and make a judgment that it should be different?

14   **A.**   Not that I'm aware of, Your Honor.

15   **Q.**   Was any such judgment ever communicated to any

16   distributor in this case?

17   **A.**   Not that I'm aware of, Your Honor.

18   **Q.**   I want to go back to the quotas for opioids that we

19   touched on earlier.  And let's go back -- do you still have

20   that Office of the Inspector General report in front of you?

21   **A.**   I do.

22   **Q.**   Exhibit DEF-WV-1597, please.  And if you could start by

23   looking at Page 7 of that document.  I'm sorry, Page 12 of

24   that document, again looking at the numbers in the bottom

25   right-hand corner.

1      If you look at the numbered paragraphs, I want to ask

2 you a question about that Paragraph Number 1, please.

3      Do you see that in Number 1 they're discussing the APQ,

4 aggregate production quota or, as they refer to it in the

5 first clause, the national quota?  Do you see that?

6 **A.**   I do.

7 **Q.**   I want to look at the second sentence if we could and

8 ask you if you have this understanding of what quota is.

9      Quote:  "The maximum amounts of each basic class of

10 Schedule I and II controlled substances the DEA

11 administrator deems necessary for manufacture in a calendar

12 year by all pharmaceutical manufacturers combined."

13      And this is the part I want you to focus on:

14      "For the estimated medical, scientific, research, and

15 industrial needs of the United States or for lawful export."

16      Is that your understanding of how the quota is supposed

17 to be set?

18 **A.**   I do.  That is my understanding, Your Honor.

19 **Q.**   And, specifically, is it your understanding that the

20 quota is supposed to be based on estimated medical need and

21 other delineated needs?

22 **A.**   Yes, Your Honor, that's the criteria.

23 **Q.**   Should citizens be able to rely on the DEA

24 appropriately setting quota based on medical and other

25 listed needs?  Yes or no?

 1   **A.**   Yes, Your Honor.

 2   **Q.**   Let's look at Page 18, please.

 3        You're aware the DEA has been faulted for not meeting

 4   that trust that has been given to it in terms of setting the

 5   quota; correct?

 6   **A.**   I'm, I'm aware that they've been criticized for their

 7   handling of the quota, yes, sir.

 8   **Q.**   Let's look at Page 18, please.

 9        Do you see that -- if we cull out the first paragraph,

10   please.

11        In the second sentence it talks about the rising opioid

12   overdose death rate.  Do you see that?

13   **A.**   I do.

14   **Q.**   And then in the next sentence it says, "Yet, from 2003

15   to 2013, DEA authorized manufacturers to produce substantial

16   amounts of opioids."

17        And then it gives an example.  "For example, the

18   aggregate production quota, APQ, of oxycodone in the U.S.

19   increased over 400 percent from 34,482 kilograms in 2002 to

20   a high of 153,750 kilograms in 2013."

21        Do you see that?

22   **A.**   I do.

23   **Q.**   And you're aware that that's factually true?

24   **A.**   I don't dispute it.  I, I don't know that that's, you

25   know, a, a factual statement.  I don't have any reason to

1    not believe it either, Your Honor.

2    **Q.**   And if we look at the next page, it actually shows us

3    the amount by which the quota has gone up.  Do you see that?

4    **A.**   I do.

5    **Q.**   As the plaintiffs' diversion control investigations

6    expert in this case, do you take any issue with the numbers

7    in this report regarding the DEA's quota?

8    **A.**   I think it bears some scrutiny, but I wasn't present

9    when they -- I don't know what material they reviewed.  I

10   don't know how those decisions were made.  I know we

11   discussed it before.

12       I, I have some concerns about just whacking the quota.

13   I think that's what it was called for for a period of time.

14   But, obviously, with the opioid epidemic raging, I'm not

15   sure raising it is, was the most prudent.  But it's

16   difficult for me to give you an opinion when I wasn't

17   actually involved with that decision-making, Mr. Schmidt.

18   **Q.**   All I was asking you was do you take issue with these

19   numbers?

20   **A.**   I do not.

21   **Q.**   Okay.  Let's look back at the page we were looking at,

22   Page 18.

23   **A.**   Okay.

24   **Q.**   In the second paragraph it says, "However, it was not

25   until 2017 that then acting DEA administrator Chuck

```
 1    Rosenberg reduced the APQ for most controlled substances,

 2    including oxycodone, by 25 percent."

 3        Do you see that?

 4    A.   I do.

 5    Q.   And if we look at the next page, you can see that

 6    illustrated graphically.  Do you see that?

 7    A.   I do.

 8    Q.   Do you take any issue with the factual accuracy of

 9    that?

10    A.   I do not.

11    Q.   Now, maybe you touched on this in that other answer.

12    Was it a good thing that the DEA reduced the quota?

13    A.   I think it's a good thing as long as they monitor to

14    make sure that cutting the quota didn't deprive people who

15    legitimately needed the medication to receive it.

16        And I say that because if you can start to diminish the

17    diversion, then it's okay to cut the quota.  But just

18    cutting the quota and there's a problem in America, you

19    know, one of the unintended consequences is always a concern

20    that people that need drugs don't get them.

21    Q.   Okay.  If you impose arbitrary limits, you might impact

22    diversion, but you might also keep it from people who need

23    it; correct?

24    A.   That's, that's my point, yes, sir.

25    Q.   And that's true at the DEA; correct?
```

1    A.    I just think that --

2    Q.    In terms of their quota.  I'm sorry.

3    A.    Pardon me?

4    Q.    In terms of their quota.

5    A.    I just think it's -- I think it's a by-product of

6    taking an act without realizing what the consequences are.

7    You know, it's -- if depriving people who need opioids

8    legitimately so that there's less diversion, I, I -- you

9    know, that's a decision that people way above where I was in

10   the DEA made, but it's a concern to me because, you know,

11   they're important medications for some people.

12   Q.    That would be a concern for distributors too.  If they

13   arbitrarily imposed limits on prescription opioids, that

14   could also deprive medication from people who needed it.

15   True?

16   A.    I hope it's a concern for everyone.  I hope there's not

17   somebody that would say, "I don't want people to be able to

18   obtain medication."

19   Q.    Is what I said true, sir?

20   A.    Yeah, it's true.

21   Q.    Thank you.  If we look at the heading -- let's go back

22   to 17.

23         Just -- not less than two years ago, the heading on

24   this page, the OIG was concluding DEA was slow to respond to

25   the dramatic increase in opioid abuse and needs to more

1          MR. SCHMIDT:  Thank you.

2          THE COURT:  It's admitted.

3          MR. SCHMIDT:  Let's go ahead and put it up on the

4     screen.  If we could go to the second page of the document,

5     please.

6     BY MR. SCHMIDT:

7     **Q.**   Do you see it's got a heading called "Where the

8     Drugs Come From"?

9     **A.**   I do.

10    **Q.**   And the last sentence of that paragraph says, "More

11    than three out of four people who misuse prescription

12    painkillers use drugs prescribed to someone else."

13         Do you see that?

14    **A.**   Yes.

15    **Q.**   Do you take any issue with that, with that statistic?

16    **A.**   No, I do not.  That's I think a little different than

17    the previous one.  I think the previous one was more

18    directed at family members and friends.

19    **Q.**   You agree that when a prescription is legitimately

20    written and dispensed, distributors have no control over

21    what happens to it after that point?

22    **A.**   That's a correct statement.  I agree with that, Your

23    Honor.

24         THE COURT:  We probably ought to take a break when

25    you get to a stopping point.  Is this a good place?

```
 1              MR. SCHMIDT:  This is that point, Your Honor.

 2              THE COURT:  All right.  Let's be in recess for 10

 3      minutes.

 4          (Recess taken at 3:12 p.m.)

 5              THE COURT:  You may resume, Mr. Schmidt.

 6              MR. SCHMIDT:  Thank you.

 7              BY MR. SCHMIDT:

 8      Q.   Mr. Rafalski, let me pick up where we were.  Do you

 9      have in front of you the CDC publication MCWV-2096?

10      A.   I do, sir.

11      Q.   Let me just go back to Page 7.  I'm told I read it into

12      the record wrong.  Is the statistic they provide on Page 7

13      the following:  Quote, more than three out of four people

14      who misuse prescription pain-killers use drugs prescribed to

15      someone else?  Is that the quote?

16      A.   Yes.

17      Q.   And you take no issue with that?

18      A.   I do not.

19      Q.   All right.  I want to come to your flagging

20      methodologies.  And before I come to your flagging

21      methodologies, I'm just going to ask you general questions

22      about the obligations that distributors have; fair?

23      A.   Yes.

24      Q.   Distributors have a duty to report all their sales to

25      the DEA for the DEA's ARCOS database, correct?
```

1    **A.**   All the ARCOS required drugs.

2    **Q.**   Yes.  And you agree that ARCOS uniquely has access to

3    all of the data submitted by each DEA registrant across the

4    country?

5    **A.**   I'd agree with that, Your Honor.

6    **Q.**   ARCOS is compiled by DEA in accordance with law,

7    correct?

8    **A.**   Yes, sir.

9    **Q.**   It's used for developing quota?

10   **A.**   That's correct, Your Honor.

11   **Q.**   It's used for analyzing distribution trends?

12   **A.**   That's correct a statement, Your Honor.

13   **Q.**   It's used for internal audits?

14   **A.**   Internal audits?

15   **Q.**   Yes, sir.

16   **A.**   Can you define that a little further for me?

17   **Q.**   Sure.

18         MR. SCHMIDT:  Could we put up the expert report

19   from Mr. Rafalski in this case, P-42216, just for

20   demonstrative purposes, and go to Page 17?  P-42216, please.

21   Now -- this is the wrong tab.  It should be Tab 18.  There

22   we go.  Could we look at Page 17, please?  And could we cull

23   out the second paragraph, please?

24         BY MR. SCHMIDT:

25   **Q.**   This is what I was reading to you from, sir.  Do you

1    see that it states the ARCOS DADS system uniquely has access

2    to all of the data submitted by each DEA registrant across

3    the country?

4    **A.**   I see that paragraph and I see what part you're

5    speaking of, yes, sir.

6    **Q.**   And then it says the data is compiled by DEA in

7    accordance with law.  Do you see that?

8    **A.**   I see that statement.

9    **Q.**   Is that accurate?

10   **A.**   Yes, sir.

11   **Q.**   DEA uses it for inspections, correct?

12   **A.**   Yes.

13   **Q.**   They use it for investigations, correct?

14   **A.**   That's correct.

15   **Q.**   And they use it for other analyses, as well, correct?

16   **A.**   That's correct.

17   **Q.**   You're aware that Dr. McCann confirmed through his work

18   that the distributors in this case reported all of their

19   sales into DEA's ARCOS database, all of their required

20   sales, between 2006 and 2014?

21   **A.**   Except, I believe, there was a gap of data, I believe,

22   for Cardinal for a short period of time.

23   **Q.**   Okay.  And did you see his testimony where he explained

24   that that could have been due to a recordkeeping issue on

25   the DEA side?

1    **A.**    Yes.  I'm just trying to answer your question

2    accurately, sir.

3    **Q.**    And you don't take any issue with Dr. McCann's

4    conclusion that the ARCOS data received from the defendants

5    in this case is reliable, do you?

6    **A.**    I do not take an exception to that, Your Honor.

7    **Q.**    Distributors also have a duty to report suspicious

8    orders to the DEA, correct?

9    **A.**    Yes, sir, when discovered.

10   **Q.**    And let's -- let's take a look at that definition.  I

11   think this is a regulation, so I think the Court can take

12   notice of it without me moving it in as an exhibit.

13        So, if I may just put it up on the screen, please.

14   It's DEF-WV- 2254.  And this is the regulation as quoted

15   from the DEA website.

16        And if we could just cull out A paragraph.  Actually,

17   that's the wrong paragraph.  I'm sorry.

18             THE COURT:  Is there any objection to me taking

19   judicial notice of this, Mr. Farrell?

20             MR. FARRELL:  Not that I can think of.

21             MR. SCHMIDT:  Let's cull up Paragraph B, please.

22             THE COURT:  Well, I want to give you the

23   opportunity.

24             MR. FARRELL:  This is -- this is -- this is the

25   CFR, correct?

1          MR. SCHMIDT:  Yes.

2          THE COURT:  It's judicially noticed.

3          BY MR. SCHMIDT:

4    Q.   And do you see it defines suspicious orders and the

5    last sentence here is orders of unusual size, orders

6    deviating substantially from a normal pattern, and orders of

7    unusual frequency?  Do you recognize that as the regulatory

8    definition of a suspicious order?

9    A.   That's what the regulation says, yes, sir.

10   Q.   Are you aware that this -- how long has this regulation

11   been in place?

12   A.   1971, Your Honor.

13   Q.   Are you aware that just in the last year the DEA has

14   proposed amending this regulation?

15   A.   I am.

16   Q.   Are you aware that the subject of the proposed DEA

17   amendment is including in the regulation a do not ship

18   requirement?

19   A.   I am.

20   Q.   Are you aware that another subject of the proposed

21   amendment is including in the text of the regulation

22   provisions regarding recordkeeping?

23   A.   I'm aware of that, also.

24   Q.   There's no express reference in this definition of a

25   suspicious order to likely diversion, is there?

1    **A.**    Well, it's my belief, Your Honor, the word suspicious

2    is suspicious of the diversion, although I do agree with Mr.

3    Schmidt it does not say that, but it's what it's suspicious

4    of.

5    **Q.**    And that's -- that phrase you just used, suspicious of

6    diversion, that phrase appears nowhere in here?

7    **A.**    That's correct.

8    **Q.**    Instead, it refers to orders of unusual size,

9    frequency, pattern, correct?

10   **A.**    I think that qualifies some of the things that -- that

11   may define it.

12   **Q.**    And you're aware that there are all kinds of

13   circumstances when an order can be of unusual size, pattern

14   or frequency, but not be diverted?

15   **A.**    That's a correct statement.  I agree with that, Your

16   Honor.

17   **Q.**    One example of that is a pharmacy might have a Cancer

18   Center open nearby and suddenly they have an unusual

19   pattern, orders of unusual size, or orders of an unusual

20   frequency, right?

21   **A.**    That's correct.

22   **Q.**    That could show up as a suspicious order even though

23   none of them are being diverted, correct?

24   **A.**    Ultimately, if due diligence was done, that would be a

25   conclusion that a distributor could come to, that's correct.

1    **Q.**   Another example, a pharmacy could be across the street

2    from another pharmacy that closes and so, all of that closed

3    pharmacy's customers start coming to the pharmacy that's

4    still open, correct?

5    **A.**   Yes.   That's another scenario, although that -- that

6    also has some potential issues that would have to be

7    resolved, but I don't disagree with that statement.

8    **Q.**   And all I'm asking you, sir, is that can be an instance

9    where an order looks like it has unusual size, frequency or

10   pattern, but there's no diversion, correct?

11   **A.**   That's a possibility, yes, sir.

12   **Q.**   And do you have any idea, have you seen any studies

13   that tell us how many of the orders that meet this

14   definition are actually diverted?

15   **A.**   Well, I know there's a comment in the new proposed

16   rule.   Other than that, I've never seen anything that gave

17   an approximation.

18   **Q.**   Do you know if you take the body of suspicious orders

19   that have occurred over time how many of them are actually

20   diverted?

21   **A.**   I don't know that, no, sir.   I don't know that, Your

22   Honor.

23   **Q.**   Do you know if it's above or below five percent, ten

24   percent?

25   **A.**   I don't know, Your Honor.

1    Q.   Let me focus on some of the numbers that you showed the

2    Court.  I tried to count the numbers of Suspicious Order

3    Reports you identified in your 2007-2008 time period and I

4    got 416 from all three defendants.  Does that sound right?

5    A.   Yes, sir.

6    Q.   Including 79 from McKesson?

7    A.   That's correct.

8    Q.   And that's even though you didn't count any DU45s for

9    McKesson from before 2007, correct?

10   A.   That's correct.

11   Q.   Can you -- whether it's those pre-2007 orders or any of

12   the orders you identified, can you point to any action DEA

13   took on any suspicious order that McKesson, Cardinal or ABDC

14   made for Cabell County or Huntington?

15   A.   I cannot, Your Honor.

16   Q.   You're not aware of any Suspicious Order Reports

17   regarding pharmacies in Huntington or Cabell that led to any

18   investigation by DEA, correct?

19   A.   I am not, Your Honor, although I didn't review or look

20   to determine that, but I'm not independently aware of that.

21   Q.   You can't point me to any orders that any one of these

22   three defendants shipped into Huntington or Cabell where the

23   DEA came to them and said you should not have shipped that

24   specific order, correct?

25   A.   That's a true statement.  I didn't -- do not know that,

1  Your Honor.

2  **Q.**   Are you aware that since 2007 and 2008, ABDC, Cardinal

3  and McKesson have blocked orders that go above specific

4  thresholds?

5  **A.**   I'm aware of that, those changes upon that time period,

6  yes, sir.

7  **Q.**   How many have they blocked?

8  **A.**   I don't recall.

9  **Q.**   Do you recognize it's hundreds of thousands nationwide?

10  **A.**   I didn't look at nationwide.

11         MR. FARRELL:  Objection, Your Honor, geographic

12  scope.

13         THE COURT:  Overruled.

14         THE WITNESS:  I do not know, Mr. Schmidt.

15         BY MR. SCHMIDT:

16  **Q.**   Do you know how many it is in West Virginia?

17         MR. FARRELL:  Objection, Your Honor, on the same

18  basis.

19         THE COURT:  Overruled.

20         THE WITNESS:  I do not.

21         BY MR. SCHMIDT:

22  **Q.**   Do you know how many it is in Huntington-Cabell?

23  **A.**   In the totality, I do not.

24  **Q.**   You would agree that if you block an order, that

25  obviously keeps it from being distributed and it would not

```
1    lead to diversion, correct?

2    A.   Say one more time.  I'm sorry.

3    Q.   If you block an order, that would obviously keep it

4    from being distributed and it would not lead to diversion?

5    A.   That's a correct statement, Your Honor.  I agree with

6    that.

7    Q.   Blocking the order of opioid pills before shipment is

8    what prevents diversion from occurring, correct?

9    A.   Yes, Your Honor, that's what prevents it.

10   Q.   You'd agree that not reporting the suspicious order to

11   DEA is not what causes diversion, correct?

12   A.   That -- I agree with that statement, Your Honor.

13   Q.   Now, let's talk about your flagging methodologies.

14   You've performed them -- you showed some pretty big numbers

15   in those methodologies; do you remember that?

16   A.   Yes, I remember.  There were big numbers.

17   Q.   Some of them were 80-90 percent, correct?

18   A.   That's correct.

19   Q.   You've performed those across various jurisdictions,

20   correct?

21   A.   I performed them for Cabell County and for Huntington,

22   City of Huntington.  Is that your question?

23   Q.   No.  And for Cuyahoga County.  And for Summit County.

24   A.   Oh.

25   Q.   And for Nassau County.  And for Suffolk County.  And
```

```
 1    for two counties in the State of Iowa; correct?
 2    A.    That's -- that's accurate.  I thought we were talking
 3    --
 4              MR. FARRELL:  Objection, Your Honor.  Objection,
 5    Your Honor, compound.
 6              THE COURT:  Sustained.  You can break it up.
 7              BY MR. SCHMIDT:
 8    Q.    You performed it for Cuyahoga County?
 9    A.    I did.
10    Q.    You performed it for Summit County?
11    A.    I did, Your Honor.
12    Q.    You performed it for Nassau County?
13    A.    I did, Your Honor.
14    Q.    Performed it for Suffolk County?
15    A.    Yes, I did, Your Honor.
16    Q.    You performed it for two counties in the State of Ohio
17    where you're going to go give testimony in two weeks
18    regarding pharmacies?
19    A.    That's correct, Your Honor.
20    Q.    And every one of those analyses, you always get similar
21    numbers to what you get here, right?
22    A.    They're high numbers.  I don't -- I don't remember -- I
23    don't recall if they're -- how close they are to being
24    similar, but they're all high numbers.  I agree with that
25    statement.
```

1    **Q.**   You didn't look at any of them at the time you wrote

2    your expert report and adopted them; correct?

3    **A.**   That's correct.

4    **Q.**   Not one of the initial orders; not one of the follow-up

5    orders; correct?

6    **A.**   That's correct.  I'm sorry.  I didn't know that was a

7    question.

8    **Q.**   And you -- as an illustration of that, you haven't

9    looked at which pharmacies generate the most flagged orders

10   under your methodology, correct?

11   **A.**   At the time we talked before, I didn't, we didn't, but

12   I've since went back and reviewed all of the triggers, so --

13   **Q.**   Okay.  Do you know which pharmacy triggered the least

14   orders under your method?

15   **A.**   Not as I sit here.  I didn't memorize and recite them,

16   but I did look and see which ones triggered and -- how quick

17   they triggered and the amounts they triggered based on our

18   previous conversations.

19   **Q.**   Where did Rite Aids fit in the picture?  Were they the

20   most?  Were they the least?  Were they somewhere in between?

21           COURT REPORTER:  I'm sorry.  Can you slow down

22   just a little for me?

23           MR. SCHMIDT:  Yes.  I'm sorry.

24           COURT REPORTER:  Were they the most --

25           MR. SCHMIDT:  Actually, I'll withdraw the

```
 1    question.

 2              BY MR. SCHMIDT:

 3    Q.   None of that is in your report?  None of that was in

 4    your opinions before the Court today, correct?

 5    A.   That's correct.

 6    Q.   And you performed no analysis in your report or in your

 7    opinions today of whether pharmacies that took more or less

 8    care to meet their corresponding responsibility had more or

 9    less flagged orders, correct?

10    A.   That's -- I made no correlation between the

11    pharmacists' corresponding responsibility and the flagged

12    orders, Your Honor.

13    Q.   This is a long one.  I apologize for that.  I wrote no

14    correlation with corresponding responsibilities.  In terms

15    of these orders that you claim were likely diverted, you

16    don't know how many of those orders went to fill legitimate

17    medical need, correct?

18    A.   I do not, Your Honor.

19    Q.   You don't know whether it's 99 percent of the flagged

20    orders that went to legitimate medical need, 1 percent, or

21    some other number?

22    A.   I do not know, Your Honor.

23    Q.   So, the results of your methodologies are not based on

24    any estimate of medical need, correct?

25    A.   That's correct.  It doesn't include a basis for a -- or
```

1    a requirement for medical need.

2    **Q.**   And I believe you said in your direct examination at

3    one point that 90 percent of the pills should not have been

4    shipped.  Do you remember saying something to that effect?

5    **A.**   Yes.  Based on the assumption, that's correct.

6    **Q.**   Now, if that view were followed, how many cancer

7    patients would have been deprived of medication?

8    **A.**   Well --

9    **Q.**   How many, sir, do you know?

10   **A.**   So, what I report to the judge, what I report to you,

11   Your Honor, is -- is more likely than not how many of those

12   pills could have the potential for diversion because the

13   first order didn't have a due diligence inspection or didn't

14   dispel the diversion.

15       It's not saying that none of those 90 percent would

16   actually have been distributed because they actually were

17   when there was no due diligence.  What I'm saying is the

18   likeliness of the potential of diversion is based on the

19   fact that that first order wasn't clear and that that

20   suspicion of diversion is present.

21           MR. SCHMIDT:  Your Honor, may I ask the witness to

22   answer my question now?

23           THE COURT:  Yeah.  Yeah.  The question was how

24   many, wasn't it?

25           BY MR. SCHMIDT:

1    **Q.**    Yeah.  Do you know how many?

2    **A.**    I do not, Your Honor.

3    **Q.**    Do you know how many patients recovering from surgery

4    would be deprived of medication if your opinions were

5    followed?

6    **A.**    I do not.

7    **Q.**    Do you know how many patients receiving end of life

8    care would be deprived of medications if your opinions were

9    followed?

10   **A.**    Your Honor, I do not.

11   **Q.**    Do you know how many doctor prescriptions for

12   legitimate medical need would not be filled if your opinions

13   were followed?

14   **A.**    I do not, Your Honor.

15   **Q.**    And so, I take it you have not done a specific

16   assessment if you haven't looked at the orders and you've

17   not looked at which ones were based on medical need and

18   you've not done an assessment of whether specific flagged

19   orders led to specific harm; true?

20   **A.**    That's a correct statement, Your Honor.

21   **Q.**    So, I'll write not based on harm.  Now, I want to get

22   at this point in another way and I think what I'd like to do

23   is if I can show you some of those demonstratives that you

24   looked at with Mr. Farrell.

25            MR. SCHMIDT:  Do I need to switch the screen

1    around?  This is fraught with possibility for disaster, but

2    okay.  Could we put Slide 17 and Slide 18 up next to each

3    other, please?

4              BY MR. SCHMIDT:

5    **Q.**    You talked about having six different methods.  This is

6    just two of them, Method A, Method B, and those are going to

7    be the ones I'm going to focus on most of all for reasons

8    we'll talk about.

9    **A.**    Okay.

10   **Q.**    I want to just give two illustrations.  You did Method

11   A and Method B for oxycodone for McKesson, correct?

12   **A.**    Yes.

13   **Q.**    And using Method A, you get 87.9 percent.  Do you see

14   that?

15   **A.**    Yes.

16   **Q.**    Using Method B, you get 22.2 percent.  Do you see that?

17   **A.**    I do.

18   **Q.**    Pretty big difference, right?

19   **A.**    That's a big difference.

20   **Q.**    87.9 percent is over 400 percent times this estimate of

21   20.2 percent, correct?

22   **A.**    It is.

23   **Q.**    Which of those two is the right number?

24   **A.**    I believe that the larger one is.

25   **Q.**    Okay.  We'll talk about the difference between those

1    **A.**    Yes.

2    **Q.**    And counties, correct?

3    **A.**    That's correct.

4    **Q.**    Have you gone to any of your clients and said you

5    should use this to make your registration decisions for

6    pharmacies, or distributors, or your re-registration

7    decisions?

8    **A.**    I have not done that, but I have not been asked either,

9    Your Honor.  I haven't approached anyone to try to tell them

10   to do that.

11   **Q.**    Has anyone in the world that you know of adopted the

12   stylized illustrations that you have presented to the Court

13   in this case?

14   **A.**    I have no knowledge that anyone has used these based on

15   my publications in the -- in my report that's now open to

16   the public.

17   **Q.**    Okay.  So, it's been open to the public and no one has

18   used it, correct?

19   **A.**    Not that I'm aware of.  I said I'm not aware if anyone

20   has.

21   **Q.**    Let's go back to your slide presentation, please, and

22   if we could cull up Page 14 of your slide presentation.

23   This is your list of the six methodologies, correct?

24   **A.**    That's correct, Your Honor.

25   **Q.**    Let's go through a few of them.  Am I correct that when

1    it comes to methodologies, C through F, you have not used

2    those methods?

3    **A.**   Well, it wouldn't be up to me to use or not.  If -- if

4    you're asking me -- if he's asking me, Your Honor, would I

5    -- if someone was to come to me and say should I use these

6    methodologies, I'm not a DEA person anymore.  I would tell

7    them no and I would give them reasons why.

8    **Q.**   Let me try it one more time.  You would not use methods

9    C through F, correct?

10   **A.**   If I owned a company, a distributor, and I was going to

11   design a suspicious order system, that's the basis for your

12   question, that's correct, I would not use those.

13   **Q.**   Let's focus on these other two.  You say Masters here.

14   Do you see that?

15   **A.**   Yes.

16   **Q.**   That's a reference to the Masters decision, right?

17   **A.**   That's correct.

18   **Q.**   You don't say Masters here, correct?

19   **A.**   Only probably because it didn't fit on the slide, but

20   it's -- it's also a Masters.

21   **Q.**   It's also a Masters?  That's where I was going,

22   correct?

23   **A.**   Yes.  It just treats it different with removing the

24   assumption.

25   **Q.**   And you acknowledge that Method A differs from Masters

1    in important regards, correct?

2    **A.**    Yes.

3    **Q.**    Let's talk about that.  And before I do, I'm going to

4    talk about both Method A and Method B.  This case is the

5    first of your several cases where you've used these

6    methodologies that you used Method B; is that right?

7    **A.**    That's correct.

8    **Q.**    And you adopted Method B after we had the chance to

9    critique the way Method A was conducted in your other cases,

10   correct?

11   **A.**    That's part of the reason, Your Honor, in depositions,

12   questions in depositions, to take a look at it a different

13   way.

14   **Q.**    Okay.  Let's talk about that so the Court is on the

15   same page as us.  Method A and Method B are the same

16   generally except that Method A uses what you refer to as a

17   due diligence assumption and Method B does not, correct?

18   **A.**    That's correct.

19   **Q.**    And that's what explains that chasm between the two

20   numbers, 87 percent and 20 percent, right?

21   **A.**    Yes.  More specifically, A differs from B because B --

22   the assumption in B is, is that a suspicious order is

23   identified but yet, the shipping continues.  The only

24   difference is it's fixed after the first triggered threshold

25   and that's done for a different reason.

1    Q.   Okay.  And I'm going to dig into that but, first, I

2    just want to add to this point we've been discussing.

3         New methodology following criticism.  I want to talk

4    about that difference, that due diligence assumption.  When

5    Dr. McCann ran Method A for you, the way he ran Method A was

6    by using the assumption that distributors did not conduct

7    any diligence on the first flagged suspicious order,

8    correct?

9    A.   That's correct.

10   Q.   And so, what that means is anytime a first order gets

11   flagged, everything else gets flagged, correct?

12   A.   That's correct for each pharmacy.

13   Q.   And you have not looked at those initial orders for

14   McKesson, Cardinal and ABDC that are the initial flagged

15   orders under your Method A, correct?

16   A.   Could you -- could you ask that a little further and

17   rephrase it?  I'm --

18   Q.   Sure.  Of course, I can.

19   A.   -- not sure I understand.

20   Q.   I'll ask it just -- just the way we've talked about it

21   before.  Have you looked at those initial orders for

22   McKesson, Cardinal and ABDC that are the initial flagged

23   orders of your Method A?

24   A.   I have not, Your Honor.

25   Q.   Did you individually review any of them to see if you

1    just looked at the order on its face whether you would

2    consider it to be suspicious?

3    **A.**   I did not, Your Honor.

4    **Q.**   Did you review the diligence files for every one of

5    these tens of millions of flagged orders?

6    **A.**   Some, I would say, yes.

7    **Q.**   It wouldn't be possible to review all of them, though,

8    and you did not review all of them, correct?

9    **A.**   That's correct.  I -- I reviewed the files of the

10   defendants, so if -- and I believe those files were past the

11   trigger date.  So, I would have reviewed some of the files.

12   **Q.**   Okay.  You don't know how many of the orders initially

13   flagged under your methodologies were actually investigated

14   and determined not to be suspicious, correct?

15   **A.**   Based on the systemic failure, I guess I couldn't rule

16   out possibility that one of them or two of them were

17   investigated, Your Honor, but just based on my review, there

18   was very little to no due diligence investigations, so I

19   would say I wouldn't have to review that to have an opinion

20   on that.

21   **Q.**   Can we cull up the September 11th, 2020 transcript at

22   Page 99, Lines 9-17?  And do you see I asked you, do you

23   know of those initial flagged orders under Method A how many

24   between 0 and 100 percent were actually investigated and the

25   flag cleared by the defendants?  Answer, I don't have a

1    definitive answer to that, sir.  Okay.  That's not something

2    you tried to evaluate, correct?  Answer, I did not.  Did I

3    read that correctly?

4    **A.**   You did.

5    **Q.**   Were you being truthful in giving that testimony?

6    **A.**   I was.

7    **Q.**   And, in fact, you don't have a number as to how many of

8    these tens of millions of orders should have been reported

9    to the DEA as suspicious, correct?

10   **A.**   Well, in Methodology A, if the due diligence is not --

11   the -- the suspicion is not dispelled, there's no due

12   diligence, then every order after that first order.

13   **Q.**   Can we look at the September 11th, 2020 transcript at

14   Page 102, please, on Line 20-23?  Do you see where I asked

15   you how many of these tens of millions of orders should have

16   been reported to the DEA as suspicious?  Do you see that?

17   **A.**   I do.  And I believe that's a different question than

18   you asked me.

19   **Q.**   Okay.  What's the answer to how many of these -- the

20   record will say what it says.  Let me finish my impeachment

21   and then we can move on.  The answer is, I don't have a

22   number, sir.  Do you see that?

23   **A.**   I would agree with that statement.

24   **Q.**   So, in case we misunderstood each other, let me just

25   ask you.  Do you know how many of these tens of millions of

1    orders should have been reported to the DEA as suspicious?

2    **A.**    No, I do not.

3    **Q.**    For shorthand, I'm going to write don't know how many

4    reportable.

5        So, let's go back to this -- this difference between

6    Method A and Method B and I want to illustrate for the

7    Court, if I could, how it works --

8    **A.**    Sure.

9    **Q.**    -- in terms of that initial order gets flagged and

10   everything after gets flagged, okay?

11   **A.**    Sure.

12   **Q.**    And do you recall that in his report, Dr. McCann gives

13   an illustration, and I just don't remember if you copied it

14   into your report, but he gives an illustration of a pharmacy

15   where, in a six-month period, you had 5,000, and then

16   10,000, and then 7,000, and 8,000, and 9,000, and 9,500

17   pills.  Do you remember that illustration?  I can show it to

18   you, if you would like.

19   **A.**    I generally recall it.  I do not believe it's in my

20   report.

21            MR. SCHMIDT:  Okay.  So, let's -- if we could put

22   up McKesson Demonstrative 2, please, just for illustration.

23   Do I need to switch the screen?

24       So, we have tried to replicate that example.  It's

25   probably going to be covered by that offense.  There we go.

1    Q.   And it's only been for the past couple of years,

2    correct?

3    A.   I believe I've only read one report based on that law.

4    Q.   And you recall that we've had the chance to do math

5    together on that and calculate that for the past couple

6    years for oxycodone and hydrocodone and the DEA's

7    calculations are less than .1 percent diversion using their

8    method, correct?

9    A.   Yes.  And I believe that I didn't agree with that.

10   Q.   You've done the type of calculation of actual diversion

11   that the DEA has conducted, correct?

12   A.   I have not.  I just draw -- I make that statement just

13   based on the pure number.

14   Q.   You've never published your estimates, your flagging

15   methods, with a source like the Federal Register as you know

16   the DEA has?

17   A.   I have not, Your Honor.

18   Q.   And you're not aware of anyone who has tried to conduct

19   the same types of calculations of actual diversion that the

20   DEA has conducted, which show less than .1 percent diversion

21   and come up with different numbers, are you?

22   A.   I am not.

23   Q.   Okay.  I'm going to change gears now and this will

24   probably take us through the day.  Starting in 2007 and

25   2008, are you aware that McKesson, ABDC and Cardinal began

1    automatically blocking orders that exceed thresholds?

2    **A.**    I am.  All of them develop new programs in that time

3    frame and all of them included a block of orders.

4    **Q.**    You can't point me to any company before 2007 that

5    blocked every order that went over a threshold or that it

6    reported to the DEA, correct?

7    **A.**    As I sit here, I'm not aware of one, but I can't say

8    that one didn't exist, Your Honor.

9    **Q.**    And do you know of a prior public occasion when the DEA

10   said any order you identify as suspicious should not be

11   shipped prior to this 2007 window we're talking about?

12   **A.**    In those exact terms, Your Honor, that's -- I do not

13   know of that.

14   **Q.**    DEA never specifically told McKesson, ABDC or Cardinal

15   not to ship an order identified as suspicious before that

16   time period, correct?

17   **A.**    Not in those exact terms, although I think there's been

18   discussions where they talk about the maintenance of

19   effective controls to prevent diversion, and they talk about

20   identifying a suspicious order, and they talk about

21   companies having a liability or a responsibility for public

22   interest.  So, I think if you put that together, it says

23   that, but to actually -- if I understand the correction to

24   say do not ship, no, I am not aware that they've said that

25   in that way.

1    **Q.**   Before 2007, DEA never took action against the company

2    because they reported orders, but did not block them,

3    correct?

4    **A.**   I don't want to split hairs.  Southwood might have been

5    in 2006, but --

6    **Q.**   Southwood was 2007, sir.  If you want to look back at

7    your slide with it on it, I can refresh you.  Why don't we

8    put that up?

9    **A.**   I think that may be the ruling, but I think the action

10   -- action might have been sooner, but I'm not disputing the

11   2007.

12   **Q.**   Okay.

13   **A.**   I don't want to argue about a year.

14   **Q.**   And you, yourself, acknowledged that there was no do

15   not ship requirement before 2007 when you were a DEA agent,

16   correct?

17   **A.**   I -- I recall that I was testifying.  We've discussed

18   it before and I was asked and I believe I said it was a

19   change in policy.

20   **Q.**   In this 2007 time frame, correct?

21   **A.**   I don't remember the exact time frame.  I think it was

22   just in reference to -- I don't remember if I testified in

23   reference to the distributor briefings or the Rannazzisi

24   letters.

25   **Q.**   Okay.  Those all happened in the 2006-2007 time frame,

253

1    correct?

2    **A.**    Well, the distributor briefings were in '05.

3    **Q.**    They started in early January 2006 and went into 2007

4    according to your testimony, correct?

5    **A.**    The distributor briefings?

6    **Q.**    The distributor initiative?

7    **A.**    I believe they occurred for the defendants in '5 and

8    '6.

9    **Q.**    Okay.  Well, whatever year we're talking about in that

10   window, you testified that before that time the DEA never

11   told distributors not to ship orders they were reporting,

12   correct?

13   **A.**    I don't know if I testified to those exact words.  I do

14   recall that, when questioned about it, I said it was a

15   change in policy and that was based on some information that

16   was provided me by another diversion investigator.

17   **Q.**    Okay.  Let me ask you about the context where this

18   testimony came up.  You were involved in a case called

19   *United States v. $463,497.72*.  Do you remember that?

20   **A.**    Yes, sir.

21   **Q.**    You were actually the chief investigator in that case,

22   correct?

23   **A.**    I was.

24   **Q.**    And you were deposed in that case?

25   **A.**    That's where I made the statement, sir.

1    **Q.**   And you testified at trial in that case?

2    **A.**   I didn't testify to that at trial, but I did at the

3    deposition, yes, sir.

4    **Q.**   In that case, you testified that distributors were

5    first told about the do not ship requirement as part of the

6    distributor initiative, correct?

7    **A.**   I believe -- I believe that's a true statement.  I

8    think that that's the first time the DEA made a more

9    definitive statement do not ship.

10   **Q.**   And you said -- I'm sorry.

11   **A.**   No, go ahead.

12   **Q.**   You said those distributors briefings began in January,

13   2006, correct?

14   **A.**   If that's what I testified to, looking at -- now

15   looking at some of the distributor briefings as part of my

16   review of records in this case, I see that they were in

17   2005.

18   **Q.**   And that's since you've been hired as a plaintiffs

19   expert and given documents by plaintiffs' attorneys,

20   correct?  True?

21   **A.**   Well, yes, looking at discovery material, that's

22   correct.

23   **Q.**   I want to focus on what you were doing when you were

24   severing the United States Government as a diversion

25   investigator.  At that time, you said distributor briefing

1    started in January, 2006, correct?

2    **A.**    If I made that statement, then that's what I believed

3    at that time and it would have been provided to me by

4    another diversion investigator, not actually looking at the

5    documents of the briefing.

6    **Q.**    And you testified that the do not ship requirement is

7    not contained in the regulations or the statutes, correct?

8    **A.**    The actual words do not ship do not appear anywhere in

9    the statute or in the regulations.

10   **Q.**    And you said that they were only informed of it by the

11   DEA in these distributor briefings, correct?

12   **A.**    I was aware they were informed of it then, yes, sir.

13   **Q.**    There was a published court decision based on your

14   testimony, correct?

15   **A.**    Yes, there was, Your Honor.

16   **Q.**    And you read that decision when it came out?

17   **A.**    I did.

18   **Q.**    You testified in that case, before the judge in that

19   case?

20   **A.**    I did, Your Honor.

21   **Q.**    And your colleagues testified in that case, before the

22   judge in that case?

23   **A.**    Yes, other diversion investigators, if you mean that,

24   yes, sir.

25   **Q.**    That is what I mean, sir.

1    **A.**   Yes, sir.

2    **Q.**   You had the chance to sit there and hear them testify?

3    **A.**   I did sit there.  I was the officer in charge of the

4    investigation, Your Honor.  I watched all their testimony.

5    **Q.**   Because you were the chief investigator in this case,

6    correct?

7    **A.**   I was.

8    **Q.**   Do you recognize what I've marked as DEF-WV-2661 as the

9    case where you testified and where you were, in fact, the

10   chief investigator?

11   **A.**   I do recognize this, Your Honor.

12         MR. SCHMIDT:  Your Honor, again, we don't think

13   it's appropriate to move a case into evidence, but I do

14   think it's relevant, and the Court can take judicial notice

15   of it.  So, absent objection, I will put it up on the

16   screen.

17         THE COURT:  All right.

18         MR. SCHMIDT:  Let's go to Page 5 of this decision.

19   And can we cull out the first paragraph under (f)?  It

20   states -- the second sentence there states the regulations

21   do not prescribe any particular form or style of monitoring

22   system.  Do you see that?

23   **A.**   I do see it and I believe that's an accurate statement.

24   **Q.**   Got me on my next question.  Thank you.  Let's go to

25   Page 6, please, and if we could cull out the third and the

1    **Q.**    And do you know that they're talking about the do not
2    ship requirement there?
3    **A.**    I believe that's what they're referring to.
4    **Q.**    And they say that change in policy apparently prompted
5    concern within the DEA compliance sectors that confusion
6    would result since the prior report only, that's the
7    opposite of blocking, right?  Yes?
8    **A.**    Yes.  Yes.  I'm sorry.  I didn't know you were done.  I
9    didn't know you were done speaking.  I'm sorry.
10   **Q.**    That change in policy apparently prompted concern
11   within the DEA compliance sectors that confusion would
12   result since the prior report-only policy had been in place
13   for 35 years.  Do you see that?
14   **A.**    That's what this says, yes, sir.
15   **Q.**    Therefore, DEA personnel began to conduct distributor
16   briefings to familiarize drug wholesalers with the new
17   policy.  Do you see that?
18   **A.**    That's what it says, Your Honor.
19   **Q.**    And that's the distributor briefings we've been talking
20   about in '06 and '07, correct?
21   **A.**    Yes, it is.
22   **Q.**    And then there's reference to Kyle Wright conducting
23   one of those distributor briefings, correct?
24   **A.**    That's correct.
25   **Q.**    And I think you might have been involved in some later,

1   but you were not involved in any during that time period,

2   correct?

3   **A.**   I went and actually watched a distributor briefing.

4   Didn't participate other than to observe it in the Fall of

5   2008.

6   **Q.**   And then, let's look down in the next paragraph.   In

7   all events, Wright -- that's a reference to Kyle Wright, one

8   of your colleagues at DEA, right?

9   **A.**   Yes.

10   **Q.**   Wright testified that the DEA was aware that it was

11   standard practice in the industry to file Suspicious Order

12   Reports while continuing to ship products.   Do you see that?

13   **A.**   I see that.

14   **Q.**   And you are aware that Agent Wright gave that

15   testimony, right?   You watched him give it?

16   **A.**   I'm aware of it, Your Honor.

17   **Q.**   It goes on to say and that practice had been approved

18   by the DEA.   You're aware he gave that testimony, correct?

19   **A.**   I'm aware he did.

20   **Q.**   You watched him give it, correct?

21   **A.**   I did.

22   **Q.**   And as the chief investigator on this case, you never

23   stood up to disagree with him, correct?

24   **A.**   I did not.

25   **Q.**   Let's go to Page 6, please, of the opinion.   I guess

1    we're actually on Page 6, further down, second paragraph

2    from the bottom.  Mentions another one of your colleagues in

3    this second sentence.  Do you know who Michael Mapes is?

4    **A.**    I do.

5    **Q.**    Also one of your colleagues at DEA?

6    **A.**    He was also employed at the DEA.  I guess he would be a

7    colleague.  To me, that infers there's some kind of like a

8    personal relationship versus just another employee, but

9    either way.

10   **Q.**    One of your fellow agents at DEA?

11   **A.**    Yes, investigators, that's correct.

12   **Q.**    Fellow investigators.  This says Wright's supervisor,

13   Michael Mapes, told distributors at the DEA's Pharmaceutical

14   Industry Conference on September 11th, 2007 that the DEA's

15   new interpretation of the suspicious order regulation was

16   that the distributors should suspend shipments if they

17   routinely report suspicious orders with no reason to -- with

18   reason to believe they are destined for the illicit market.

19   Mapes informed Wright of that policy interpretation as well.

20   Do you see that?

21   **A.**    I do.

22   **Q.**    Did you take any issue with that testimony when you

23   were there?

24   **A.**    I didn't at that time.  I don't agree with it now.

25   **Q.**    Well, do you have any facts that let you say

```
1    2017; is that right?

2    A.   Yes, I do, Your Honor.

3    Q.   All right.  Let's cull that decision up.  That's

4    DEF-WV-3532.

5         MR. SCHMIDT:  And, again, Your Honor because it's

6    a court decision, we're not moving it into evidence.  We're

7    asking the Court to take notice of it.

8         THE WITNESS:  Thank you.

9         MR. SCHMIDT:  Thank you.

10   And I will put it up on the screen absent objection.

11        BY MR. SCHMIDT:

12   Q.   Do you see that this is a copy of the Masters decision

13   we were just looking at from the D. C. Circuit decided June,

14   2017?

15   A.   Yes, I do, Your Honor.

16   Q.   And I would like to show you just one portion of that

17   decision.

18   Could we go to Page 14, please?  And if we could cull

19   out the paragraph in the bottom right corner.

20        And I want to look at the sentence that begins as noted

21   above.  Do you see that sentence, Mr. Rafalski?  As noted

22   above, the shipping requirement mandates that pharmaceutical

23   companies exercise due diligence before shipping any

24   suspicious order.  Do you see that?

25   A.   I do.
```

```
1    Q.   And that's the do not ship requirement we've been

2    talking about, correct?

3    A.   That's -- that's correct.

4    Q.   Let's read the next sentence now.  DEA first

5    articulated that requirement in Southwood, and Masters

6    claims that the administrator expanded on it here.  Did I

7    read that correctly without the legal citation?

8    A.   You did.

9    Q.   And this opinion that you rely on, and cite in your

10   report, and actually worked on while at the DEA says DEA

11   first articulated that do not ship requirement in Southwood.

12   Remind us again when the Southwood decision was.

13   A.   2007.

14   Q.   Thank you, sir.  One more question on this topic.  This

15   is in evidence for notice P-33.  This is the first of the

16   two letters from Mr. Rannazzisi that you cited on your list

17   of guidance materials.  You're familiar with this document,

18   sir?

19   A.   I am, Your Honor.

20   Q.   This is one of the two letters you cited as one of your

21   guidance materials?

22   A.   It is.

23   Q.   Dated September 27th, 2006?

24   A.   Yes, it is, Your Honor.

25   Q.   And it is from Joseph Rannazzisi, correct?
```

1    **A.**    That's correct.

2    **Q.**    So, this pre-dates that Southwood decision we just

3    talked about that the Masters decision says was the first

4    articulation of the do not ship requirement, correct?

5    **A.**    I'd agree with that statement, Your Honor.

6    **Q.**    All right.  Let's look at this letter predating that

7    first articulation of the do not ship requirement.  Would

8    you go with me to the second page, please?  If we look at

9    the second paragraph, Mr. Rannazzisi writes, DEA recognizes

10   that the overwhelming majority of registered distributors

11   act lawfully and take appropriate measures to prevent

12   diversion.  Did I read that correctly?

13   **A.**    You read it correctly.

14   **Q.**    Here's my question, sir.  At this time, when Mr.

15   Rannazzisi said that the overwhelming majority of registered

16   distributors act lawfully and take appropriate measures to

17   prevent diversion from before this time period, before 2006,

18   is there any distributor you can point me to that blocked

19   every order it reported to the DEA?

20   **A.**    I'm not aware of that, Your Honor.

21   **Q.**    Switching gears.  There's not a specific record

22   retention requirement under law for federal diligence files,

23   correct?

24   **A.**    It doesn't -- in the Federal Register, it doesn't

25   specifically speak to due diligence files.

1    **Q.**   It doesn't say how long they need to be maintained,

2    correct?

3    **A.**   No.  I believe that's one of the areas of the

4    maintenance of effective control is to prevent diversion to

5    keep those records to document your decisions and your

6    actions, but it doesn't specifically say that, Your Honor,

7    anywhere in the federal regulations.

8    **Q.**   There are specific recordkeeping requirements for some

9    types of documents, right?

10   **A.**   Yes, there are.  They are a part of what's used to

11   control and to guide the -- keep the closed system intact,

12   required records.

13   **Q.**   Just not for diligence files, correct?

14   **A.**   There is not -- doesn't speak to due diligence files.

15           MR. SCHMIDT:  Okay.  Let's -- I have one more

16   small topic I can start.  I'm not done.  I've got more to

17   ask, but I can do one more small topic, Your Honor, or I can

18   --

19           THE COURT:  We've got seven minutes before your

20   sand runs out of the glass here.

21           MR. SCHMIDT:  I think I can get it done in the

22   seven minutes.  If not, I'll pick up tomorrow.

23        Could we put back up the demonstrative?  And could we

24   go to Page 7?

25           BY MR. SCHMIDT:

1    **Q.**   This says number of transactions into Huntington and

2    Cabell County, West Virginia.  Do you see that?

3    **A.**   I do, Your Honor.

4    **Q.**   Lists that number of transactions in the Huntington and

5    Cabell County for AmerisourceBergen, Cardinal Health,

6    McKesson, correct?

7    **A.**   That's what it -- that's what it says, Your Honor.

8    **Q.**   And it purports to do that for different periods of

9    time for each one of those, correct?

10   **A.**   Yes.  That was based on the transaction data that was

11   provided.

12   **Q.**   Do you understand you're missing large numbers of

13   transactions into Huntington and Cabell on this slide?

14   **A.**   Yes, I do, and the slide probably more accurately

15   should have said retail pharmacies.

16   **Q.**   Okay.  You're missing the VA, correct?

17   **A.**   I am.

18   **Q.**   You're missing other hospitals, correct?

19   **A.**   Yes, hospitals.  Only -- only data that's on display

20   for you, Your Honor, as retail pharmacies as customers.

21   **Q.**   You're missing specialty pharmacies, like compounding

22   pharmacies?

23   **A.**   Yes.

24   **Q.**   Okay.  And why did you limit this in this way?  Why did

25   you exclude those categories when you wanted to talk about