# TAB 12A

```
            IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                     AT CHARLESTON

_____x
                              :
THE CITY OF HUNTINGTON,       :     Civil Action
                              :
            Plaintiff,        :     No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
            Defendants.       :
_____x
                              :
CABELL COUNTY COMMISSION,     :     Civil Action
                              :
            Plaintiff,        :     No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
            Defendants.       :
_____x


                BENCH TRIAL - VOLUME 21
   BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
             UNITED STATES DISTRICT COURT
             IN CHARLESTON, WEST VIRGINIA


                     JUNE 7, 2021
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1      pattern of, of pharmacy purchases that could -- things that
2      should trigger a due diligence review.
3      **Q.**    Okay.  And, and let's turn to the next example, so the
4      next slide, please.
5             So is there a second example that was provided in the
6      distributor initiative briefing?
7      **A.**    Yes.
8      **Q.**    And were those other red flags that DEA explained to
9      distributors?
10     **A.**    They're things that a distributor should look at when
11     questioning and performing due diligence on a specific
12     order, yes.
13     **Q.**    And did you provide a third example?
14     **A.**    Yes.
15            THE COURT:  You said DEA followed up on a
16     suspicious order.  Did DEA follow up on every suspicious
17     order report you see?
18            THE WITNESS:  That's, that's a question that,
19     unfortunately, the department's directed me not to answer
20     questions on what we do with the suspicious orders because
21     it gets into the investigative process and also
22     communication between -- the investigative communication
23     between --
24            MR. SCHMIDT:  If that's the case, Your Honor, then
25     we move to strike his testimony on suspicious orders.  The

1    idea that he can come in and make allegations about
2    suspicious orders and not even answer the Court's basic
3    question of whether they did anything about it, that's not
4    fair to us.
5              THE COURT:  Well, I'm confused and I probably
6    shouldn't stick my nose in this that deeply, but I'm
7    confused.  The witness testified about the lack of person
8    power and resources to do these investigations.
9         And then if I understood you correctly, you said you
10   followed up on all the suspicious order reports.  How did
11   you rationalize those two propositions, --
12             THE WITNESS:  Yes, Your Honor.
13             THE COURT:  -- Mr. Rannazzisi?
14             THE WITNESS:  We did follow up on suspicious
15   orders.  But understand the volume of suspicious orders that
16   should come in is not a huge quantity of orders.  It
17   shouldn't be like boxes of orders.  It should be a very
18   specific order that outlines why it's suspicious, what
19   triggered the suspicion, what triggered the order, what's
20   the historical ordering pattern.  And then we would follow
21   up.
22        But, but we're not talking about 100, 1,000 orders.
23   We're talking about specific suspicious orders.  And that,
24   that -- I can't go over every order.  But if you do
25   suspicious orders appropriately and correctly, you're not

1   going to get 1,000 suspicious orders coming into a, to DEA
2   in one day.
3        What you will get is suspicious orders go into the
4   offices that if they're done appropriately, the agents could
5   use -- agents and investigators can use that to build cases.
6             MR. SCHMIDT: And, Your Honor, our objection still
7   stands. He did not answer Your Honor's question, which is:
8   Do you follow up on all of them? I think by design he
9   didn't answer that question.
10       If we're not allowed to ask him about the details of
11  individual suspicious orders, particularly the relevant ones
12  in this community, whatever his Goldilocks standard is for
13  just the right amount of suspicious orders, then we can't
14  fairly examine him. The testimony should be stricken.
15            MR. NICHOLAS: I think just to -- I agree and I
16  would only add that it is a contested issue as to whether
17  the DEA did do anything with suspicious orders. I mean, we
18  don't agree, and we're challenging that statement.
19       And if we don't have the ability to, to hear the
20  witness testify about it, we -- it's like we're on ice
21  without ice skates or something. We don't have any footing.
22  We can't deal with it.
23            THE COURT: Let me make sure I understand the
24  issue here.
25       The question was probing the, the policies of DEA with

1 regard to suspicious orders.

2 And your objection, Mr. Westfall, was that that would
3 get into their internal regulations and that's outside the
4 scope of the two leading authorizations.

5 MR. WESTFALL: I think if it gets into individual
6 cases of what was happening with suspicious orders except
7 probably perhaps the defendants because anything that
8 they've discussed, that's a little bit different situation,
9 but getting into all the others as far as what happened on
10 an individual basis with each suspicious order I think would
11 be a problem, Your Honor.

12 MS. SINGER: Well, Your Honor, if I may, what I
13 understand the guardrails to be here is that Mr. Rannazzisi
14 can talk about the general practice of the DEA in dealing
15 with suspicious orders. And I think what he's also talking
16 about here are excessive purchase reports, which I'm happy
17 to go into to help address the Court's question.

18 But what he can't do is talk about a particular
19 suspicious order, what the basis for that was, how DEA
20 investigated that order. And I think that is completely
21 consistent with the defendants' ability to probe generally
22 what DEA did or didn't do, as defendants' own motion makes
23 clear.

24 Mr. Rannazzisi is not here to testify about suspicious
25 orders in West Virginia. He's not an expert. His testimony