# TAB 13

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____x
                                :
THE CITY OF HUNTINGTON,         :        Civil Action
                                :
            Plaintiff,          :        No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
            Defendants.  :
_____x
                                :
CABELL COUNTY COMMISSION,       :        Civil Action
                                :
            Plaintiff,          :        No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
            Defendants.  :
_____x


BENCH TRIAL - VOLUME 2
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


MAY 4, 2021

1    **Q.**   And pain as a fifth vital sign was the practice of

2    monitoring patient pain as closely as other vital signs like

3    blood pressure and respiration; correct?

4    **A.**   Correct.

5    **Q.**   It was not only monitoring patient pain, but also

6    treating that pain more aggressively, relieving pain;

7    correct?

8    **A.**   Correct, not necessarily relieving but addressing.

9    **Q.**   Addressing pain, okay.  And that concept, pain as a

10   fifth vital sign, came from the Joint Commission on

11   Accreditation of Healthcare Organizations.  Is that correct?

12   **A.**   That is correct.

13   **Q.**   And that organization, just for ease of reference, is

14   frequently called by the acronym JCAHO or just the Joint

15   Commission; is that correct?

16   **A.**   Joint Commission is the current term.

17   **Q.**   Joint Commission.  Thank you.  So what is the Joint

18   Commission?  What does it do?

19   **A.**   It's not an area of expertise, but it's known to be the

20   regulatory body that the Government uses to identify and

21   evaluate hospitals for safety.

22   **Q.**   And in order for a hospital to participate in federal

23   healthcare programs like Medicaid and Medicare and things

24   like that, the hospital must be accredited by JCAHO.  Is

25   that your understanding?

1    **A.**    That is correct.

2    **Q.**    Okay.  And the Joint Commission made implementing pain

3    as the fifth vital sign a criteria for accreditation in that

4    early to mid 2000 time frame, didn't it?

5    **A.**    Yes.

6    **Q.**    So hospitals and the doctors who were operating in

7    those hospitals had to comply with that requirement;

8    correct?

9    **A.**    Correct.

10   **Q.**    And you would agree, wouldn't you, that pain -- the

11   practice of pain as a fifth vital sign had an effect on

12   physician prescribing practices with respect to opioids;

13   correct?

14   **A.**    For some.

15   **Q.**    For some physicians?

16   **A.**    Uh-huh.

17   **Q.**    Okay.  Are you aware that the City of Huntington has

18   sued the Joint Commission alleging that the Joint

19   Commission's promotion of pain as a fifth vital sign caused

20   the opioid epidemic?

21   **A.**    I was not.

22   **Q.**    Okay.  I'd like to show you some of the allegations

23   from that complaint and just ask you about them.

24          If I could have slide 5, please.

25          This is from the complaint filed by the City of

1    Huntington against JCAHO.  And you can see hopefully on your

2    screen that the city alleged that JCAHO teamed with Purdue

3    Pharma and grossly misrepresented the addictive qualities of

4    opioids and fostered dangerous pain control practices.

5         Do you agree with what the city has alleged there?

6    **A.**   It's not an area that I've dug deeply into, but enough

7    to know that I've seen newspaper articles and, you know, a

8    couple of reports that have talked about the underestimation

9    of risks with opioids and overestimation of utilization of

10   pain.

11   **Q.**   And that link those things, at least in part, to the

12   Joint Commission and their accreditation standards; correct?

13   **A.**   I haven't really seen it linked directly to Joint

14   Commission because the people that developed the pain as a

15   fifth vital sign were people from the American Pain Society

16   and other national organizations that came together to do

17   that from a group.  And I remember that piece only because

18   we had somebody give us a lecture on it in residency, you

19   know, about how it got there.

20   **Q.**   About how pain as a fifth vital sign came to be

21   developed?

22   **A.**   The concept behind it and the idea of having it.

23   **Q.**   Okay.  Okay.  Well, let me --

24        Can I have slide 6, please?

25        I guess I'll say irrespective of how pain as a fifth

1    opioids?

2    **A.**    Not while I was training.

3    **Q.**    Okay.  Do you recall providing a deposition in this

4    matter, Dr. Waller?

5    **A.**    I do.

6    **Q.**    Okay.  Was that about August 3rd, 2020?  Does that

7    sound right?

8    **A.**    Seems correct.

9    **Q.**    And you were under oath at the time of the deposition;

10   correct?

11   **A.**    I was.

12   **Q.**    And you told the truth in your deposition I'm sure;

13   correct.

14   **A.**    To the best of my ability, yes, for all six and a half

15   hours.

16   **Q.**    Okay.  Oh, I'm sorry.

17              MS. WICHT:  I'm going to ask if Dr. Waller's

18   deposition transcript could be passed out.  And we have

19   three copies to hand to the Court and the staff --

20              THE COURT:  Okay.

21              MS. WICHT:  -- and a copy for the witness and a

22   copies for all the parties.

23   BY MS. WICHT:

24   **Q.**    And, Doctor, do you have the transcript in front of

25   you?

1    **A.**    I do.

2    **Q.**    And I'll ask you -- I'm going to play the clip for you,

3    but I'll ask you to turn to Page 56 and you're welcome to

4    follow along.  And I'm going to play a clip from Page 56,

5    lines 8 through 18.  And if you could play clip 8, please.

6         (Video deposition played as follows:)

7         "Q.  Okay.  Just to clarify, is it your understanding

8    that as of 2003 to 2006, a portion of the medical field felt

9    that opioids were safe and effective for the treatment of

10   chronic pain?"

11        "A.  I can't speak for everybody, but it was the

12   general gestalt at the time given that pain as the fifth

13   vital sign was being implemented in hospitals and as such

14   that it was felt that that was the only lever we had to pull

15   for the treatment of pain for those that didn't do a deeper

16   dive, yeah."

17   BY MS. WICHT:

18   **Q.**    Was that the testimony that you provided in your

19   deposition, Dr. Waller?

20   **A.**    It is.

21   **Q.**    And doctors who were prescribing opioid medications for

22   chronic non-cancer pain at this point in time -- at that

23   point in time?

24   **A.**    Uh-huh.

25   **Q.**    Sorry.  You have no reason to believe that those

1  doctors were not acting in good faith in the practice of

2  medicine; correct?

3  **A.**   No.  I felt like as chief resident, some were lazy.

4  But that was, that was the point that I had made on that

5  one.  But it wasn't the gestalt at my location.  It was the

6  gestalt as I had stated there.  So both were the same.

7  **Q.**   And just to clarify, because I think when I asked the

8  question and you answered "no," I think the record might be

9  a little bit unclear.

10      So you have no reason to believe that doctors who were

11  prescribing opioid medications for chronic non-cancer pain

12  at that time were not acting in good faith; correct?

13      I just put a lot of negatives in there.  I'm sorry.

14  Why don't we strike that and try it again.

15      Okay.  Doctors who were prescribing opioid medications

16  for chronic non-cancer pain in the mid 2000s, you have no

17  reason to believe that they were not operating in the good

18  faith practice of medicine; correct?

19  **A.**   To remove the negative and return to positive, I

20  believe that they were acting in good faith.

21  **Q.**   Thank you.  You improved that and I appreciate it.

22      I want to ask you about a book authored by Dr. Scott

23  Fishman titled *Responsible Opioid Prescribing.*  Are you

24  familiar with that book?

25  **A.**   I am.

105

1    **Q.**   Do you know that that was published in approximately

2    2007, so just shortly after you finished your residency?

3    **A.**   It was.

4    **Q.**   And did that book purport to describe, as its title

5    suggests, methods for doctors to engage in responsible

6    prescribing of prescription opioids?

7    **A.**   I don't remember -- I don't recall the specifics of the

8    book.  I read it I think back at that time because it was

9    distributed in the State of Michigan where I was practicing.

10   **Q.**   And was it -- when you say it was distributed in the

11   State of Michigan, you mean that the Board of Medicine in

12   the State of Michigan distributed it out to every doctor in

13   the State of Michigan?  Is that correct?

14   **A.**   Made a copy available, yes.  I don't know who did it.

15   I assume -- you know, I'll take your word for it being some

16   body other than myself purchased it.

17   **Q.**   Some regulatory body made a copy available to every --

18   **A.**   Someone said, "You have to read this," which is not

19   uncommon in medical school, residency, or reality.

20   **Q.**   You get publications thrust upon you that you're

21   required to read?

22   **A.**   Yes.

23   **Q.**   Are you familiar with what the plaintiffs in this case

24   have said about Dr. Fishman's book in their complaint?

25   **A.**   Not specifically, no.

```
 1    represents her good faith opinion, correct, what she's

 2    written?

 3    A.   No.  This is, you know, her good faith opinion, yes.

 4    Q.   Okay, okay.  I'm sorry.  I'm going to hand out one more

 5    thing.  I'd like to hand you another segment of the book.

 6    I'm going to hand you what's been marked for identification

 7    purposes as DEF-WV-03125.

 8         Okay.  And if I could have slide 15, please.

 9         So, Dr. Waller, this is Chapter 9 of the ASAM handbook

10    on pain and addiction.  Correct?

11    A.   Appears so, yes.

12    Q.   And it's titled "Understanding and Preventing Opioid

13    Misuse and Abuse."  Correct?

14    A.   Correct.

15    Q.   Now, the format of the ASAM handbook is that at the end

16    of each chapter, there are suggestions for further reading

17    on the topics discussed; correct?

18    A.   For which portion?  I'm sorry.

19    Q.   At the end of each chapter.

20    A.   Oh, at the end of each chapter.  I'm sorry.  Yes.

21    Q.   Okay.  And there are resources for more information on

22    the topic discussed in that chapter; correct?

23    A.   Correct.

24    Q.   Okay.  In fact, if you flip to the end of 03125 that's

25    in front of you, the end of Chapter 9, you'll see actually
```

1    on the second to last page there you'll see "for more

2    information on the topics discussed."  Correct?

3    **A.**    Uh-huh.

4    **Q.**    And that's on the slide -- if I could have slide 18,

5    please.

6          And you see listed as more information on the topics

7    discussed, among other things, you'll see Dr. Fishman's

8    book, *Responsible Opioid Prescribing*."  Correct?

9    **A.**    I do see that.

10   **Q.**    And the handbook says that, "This 150-page book by pain

11   expert Scott Fishman, M.D., translates the FSMB's model

12   policy on pain management into practical guidelines for

13   office-based practice."

14         Do you see that?

15   **A.**    I do see that.

16   **Q.**    Now, that's the same book that plaintiffs allege here

17   misled doctors about the risks of prescribing opioids and

18   causing them to overprescribe opioids; correct?

19   **A.**    That's correct.

20   **Q.**    And the same book that you earlier expressed your

21   disagreement with; correct?

22   **A.**    Correct.

23   **Q.**    So is it your testimony as you sit here today that as

24   one of the editors of this handbook that the particular

25   resources cited by the authors in Chapter 9 are not

1   materials on which physicians reasonably could rely?

2   **A.**   I think the way that they -- well, first, if I had been

3   the author, that wouldn't have been in there.  I wasn't,

4   however.

5       The -- however, the way that they talk about it is just

6   an explanation of the FSMB's -- a further explanation of the

7   FSMB's guidelines and not as a tool to rely on, but more

8   just an explanation of those guidelines for practitioners.

9   **Q.**   Well, they describe it as practical guidelines for

10  office-based practice; correct?

11  **A.**   Well, built on top of the FSMB guidelines.  I mean, so

12  basically they're describing it as a distillation of those.

13  They're not describing it as you have to go here.  They're

14  just describing it as -- the FSMB has guidelines.

15      And, therefore, this is a book that further delineates

16  those guidelines into the ability to apply it.  I wouldn't

17  state that they're holding it up with a gold star.  I think

18  they're just very specifically stating here that it's there.

19  **Q.**   Well, they're pointing physicians -- or they're

20  pointing clinicians who might read this book and want more

21  information on the topic discussed, they're pointing them to

22  Dr. Fishman's book; correct?

23  **A.**   Yeah, as a resource to understand how to implement the

24  FSMB guidelines.

25  **Q.**   Did you, did you tell the authors of this chapter

1    **Q.**   All right.  And were you aware that by the late 1990s,

2    there was a greater emphasis on using opioids to treat pain?

3    **A.**   As mentioned in some lectures that I had had, again,

4    going through medical school and residency, but not as an

5    experiential moment.

6    **Q.**   And did you know that the Board of Medicine in this

7    policy statement had stated that the Board recognizes that

8    opioids are appropriate treatment for chronic non-malignant

9    pain in selective patients?  Were you aware that the Board

10   of Medicine had issued that guidance to the doctors of West

11   Virginia?

12   **A.**   I think that's not the -- that single statement is not

13   the totality of the advice given the way that I had read it.

14   I agree that sentence is in there, but it's qualified by the

15   preceding sentence, which is more specific.

16   **Q.**   No, but I wanted to ask you about the sentence I wanted

17   to point you to.  And my question is, were you aware that

18   the Board of Medicine had told the doctors of West Virginia

19   that the Board recognizes that opioids are appropriate

20   treatment for chronic non-malignant pain in selective

21   patients?  Were you aware of that?

22   **A.**   No, I was not aware of that for all the reasons stated

23   earlier.

24   **Q.**   And if you go to the fourth paragraph, did you know

25   that the Board had told the doctors of West Virginia in 1997

1    that a doctor need not fear disciplinary action by the Board

2    if complete documentation of prescribing of opioids in

3    chronic non-malignant pain, even in large doses, is

4    contained in medical records?

5    **A.**   Again, not aware given I had not seen this document.

6    **Q.**   So, when you -- this document reflects that the Board

7    of Medicine recognized that doctors could make a legitimate

8    decision to prescribe opioids even in large doses for

9    chronic pain, correct?

10   **A.**   I think that's over-attributing a memo in my mind.

11   **Q.**   That's what it says.

12   **A.**   It's not a guidance.  So, a physician would not

13   interpret it as such.  There are no references.  It's not

14   direct guidance.  It's a letter stating do your job and

15   we're going to back off.  And that's basically what I would

16   pull from that.

17   **Q.**   And the Board here referred in particular to the

18   prescribing of opioids for chronic non-malignant pain even

19   in large doses as something that would not lead to

20   disciplinary action if adequately documented.  That's what

21   the Board said, correct?

22   **A.**   When all other measures fail, as stated in the first

23   paragraph.  I just think it's important for context that it

24   wasn't stated in isolation that feel free to write whatever

25   you want.  They were pretty specific on the documentation on

1    the back of the page.  The amount of documentation required

2    for this is almost an impossibility, quite honestly, from a

3    medical standpoint but, you know, when they put that there

4    plus, you know --

5    **Q.**   Dr. Waller, I asked you a very specific question.  You

6    just referred back to when all other measures fail.  That's

7    referring to the use of opioids in circumstances of

8    suffering in the terminally ill when all other measures

9    fail, correct?

10   **A.**   It was -- so, if they're stating -- if they're stating

11   that when all other measures fail, then you can use opioids

12   in someone who is dying, my assumption is that they would

13   also attribute that same statement to someone who is not

14   dying from an illness of the pain that they have.

15   **Q.**   That's not what it says, correct?

16   **A.**   As a physician, I'm interpreting it differently than a

17   lawyer.

18   **Q.**   Well, I -- let's focus on the language then, Dr.

19   Waller.  The language of the second sentence in the first

20   paragraph says, "There's a general consensus that opioids

21   have a place in relieving intractable pain and suffering in

22   the terminally ill when other measures fail regardless of

23   diagnosis."  Do you see that?

24   **A.**   I see that.

25   **Q.**   So, that's stating a general consensus, correct?

1    take notice.

2    **Q.**    Okay.  Let me show you another document.

3              MR. HESTER:  May I approach, Your Honor?

4              THE COURT:  You don't have to ask me every time.

5    Once is good enough.

6              MR. HESTER:  All right.  I try to be friendly.

7              BY MR. HESTER:

8    **Q.**    Dr. Waller, I've handed you a document.  It's McKesson

9    Exhibit 1218.  It's headed "West Virginia Board of Medicine

10   Quarterly Newsletter" from 2005.  Have you seen this

11   document before, Dr. Waller?

12   **A.**    No, sir, not that I recall.

13   **Q.**    Were you aware that the Board of Medicine in 2005 had

14   issued another policy statement for the use of controlled

15   substances for the treatment of pain?

16   **A.**    I was not aware of this document.

17   **Q.**    Is this the kind of document that you're generally

18   aware of that State Medical Boards issue from time to time

19   as a way to educate doctors in their state about

20   developments in the practice of medicine?

21   **A.**    In West Virginia, it seems this is the pathway that

22   they use.

23   **Q.**    And let me ask you to look at the first page and the

24   notice, which is right up at the top, and you can see that

25   it states here that the West Virginia Board of Medicine

156

1    adopted this policy at its meeting in January, 2005.  Do you

2    see that?

3    **A.**   I do.

4    **Q.**   And then, a few sentences further down, it says, "The

5    following policy overrides all statements and policies

6    relating to controlled substances for the treatment of pain

7    previously adopted by the Board with one exception relating

8    to end of life treatment."  Do you see that?

9    **A.**   I do.

10   **Q.**   And were you aware that there was this decision made by

11   the Board of Medicine around this time to issue a policy

12   statement on the use of controlled substances for treating

13   pain in West Virginia?

14   **A.**   No, sir, I was not.

15        MR. HESTER:  Your Honor, I would move McKesson

16   Exhibit 1218 into evidence.

17             THE COURT:  Mr. Farrell?

18        MR. FARRELL:  Generally, as a plaintiffs' lawyer,

19   Judge, I'm in favor of liberal admission of documents into

20   the record.  As long as we're afforded the same privilege, I

21   have no objection.

22        MR. HESTER:  I can't make any commitments on that,

23   Your Honor.  We're moving on this particular document.

24             THE COURT:  Well, based on this witness's

25   testimony, I don't think I can let it in if you object, Mr.

```
1    Farrell.  Do you object?
2              MR. FARRELL:  I do not object, Your Honor.
3              THE COURT:  All right.  It's admitted, there being
4    no objection from any of the other parties.
5                MCKESSON DEFENSE EXHIBIT 1218 ADMITTED
6              BY MR. HESTER:
7    Q.   Dr. Waller, let me point you to the second paragraph of
8    this document on the first page and if you go to the
9    sentence that begins accordingly, where it says,
10   "Accordingly, this policy has been developed to clarify
11   Board's position on pain control", do you see that?
12   A.   I do see that.
13   Q.   And do you have an understanding as you look at this
14   document that it is a policy that was meant to clarify the
15   Board of Medicine's position on using controlled substances
16   in West Virginia to treat pain?
17   A.   With the second part of the sentence, it seems to talk
18   about that, but without fully kind of reading it and
19   absorbing it, I'm not going to know what pain they're
20   talking about because all it says is "position on pain
21   control", which is overtly vague.
22   Q.   Let me ask you to look at the second page, please.  Do
23   you see right at the first sentence at the top of the second
24   page, it says, "The Board recognizes that controlled
25   substances, including opioid analgesics, may be essential in
```

```
1    the treatment of acute pain due to trauma or surgery and

2    chronic pain, whether due to cancer or non-cancer origins"?

3    Do you see that?

4    A.   I do.

5    Q.   And were you aware that this was the policy as stated

6    by the West Virginia Board of Medicine for the treatment of

7    pain in West Virginia?

8    A.   I was not.

9    Q.   Were you aware there was a Congressional hearing in

10   2001 on the abuse of OxyContin?

11   A.   Not that I recall, no.

12   Q.   Something we heard about yesterday in openings.  You --

13   you weren't aware of this?

14   A.   I was not.

15   Q.   So -- so, I take it you don't know whether this policy

16   statement was issued after those Congressional hearings

17   since you're not aware of whether there were such

18   Congressional hearings?

19   A.   Well, you stated that the Congressional hearings were

20   in 2001 and the policy statement is 2005, so my assumption

21   would be this was after that, but --

22   Q.   Four years later, correct?

23   A.   Based on the math.

24   Q.   If I'm right on my 2001 date?

25   A.   If you -- if -- I will take your word for the dates
```

1    given.

2    **Q.**    Okay.  Let me ask you to look at another document,

3    please.  Dr. Waller, I've handed you Defendant's

4    Exhibit 2796, another quarterly newsletter issued by the

5    West Virginia Board of Medicine, this one dated in 2009.

6    Have you seen this document before?

7    **A.**    I have not.  You know, I wasn't asked to prepare

8    statements on this, so I think this is going to be a common

9    theme.  My specific report was designed for me to answer

10   basic questions about the proper use of pain, but not to

11   really evaluate specific things.  I'm happy to look at each

12   of these.  I just -- I think my answers are going to be

13   consistently I don't know.

14   **Q.**    You did talk about the use of opioids for the treatment

15   of pain, correct?

16   **A.**    And I'm happy to answer and can answer all questions

17   related to my opinions on that.

18   **Q.**    And I really just had one question for you on this, Dr.

19   Waller, which I think is easy enough to cover.  If you go to

20   Page 6 of the document and you should look at these little

21   numbers to the bottom left corner.

22   **A.**    Okay.

23   **Q.**    And this, this refers to the Board of Medicine in the

24   Spring of 2008 distributing a book to every licensed

25   physician and physician's assistant in West Virginia.  Do

1    **A.**    True.  Correct as based on the reference.  And I

2    haven't read that specific reference, so that's their

3    interpretation of the reference, yes.

4    **Q.**    And at the bottom of that same paragraph, there's a

5    statement by Dr. Compton that "pharmaceutical companies were

6    developing a new generation of extended-release opioid

7    analgesics that contained more opioid per pill, but were

8    promised to be less addicting, including Purdue Pharma's

9    OxyContin."  Do you see that?

10   **A.**    I do.

11   **Q.**    That's a true statement, correct?

12   **A.**    Factually correct, yes.

13   **Q.**    Okay.  Let me point you to the second paragraph in the

14   second column -- or the right-hand column.  Sorry.  About

15   midway through, there's a statement that it became common

16   for patients to go home from emergency rooms, hospitals and

17   dental offices with prescriptions for enough opioids to last

18   several weeks to a month to treat their acute pain, yet

19   often needing only a few pills before their pain could be

20   managed with over-the-counter medications.  Do you see that?

21   **A.**    I do.

22   **Q.**    And that's a true statement, correct?

23   **A.**    Again, per their interpretation of the reference, but

24   as a direct matter, that was not the case from the emergency

25   medicine field as I had interpreted it during my time

1     practicing emergency medicine.

2     **Q.**   Do you have any reason to doubt Dr. Compton's

3     conclusions as an epidemiologist here?

4     **A.**   His conclusions on the other reference but, again, you

5     know, it becomes a domino of what that reference looks like

6     and what it stated.  So, I can't state with certainty how

7     his interpretation took place from a one-sentence statement

8     from an entire paper.  That's a lot to consolidate.

9     **Q.**   Let me ask you to look at the next sentence where he

10    states -- where Dr. Compton states, "As a result of these

11    shifts in practice, the supply of prescription opioids

12    increased four-fold between 1999 and 2010."  Do you see

13    that?

14    **A.**   I do.

15    **Q.**   "And unused pills became increasingly available for

16    diversion and misuse."  Do you see that?

17    **A.**   I do.

18    **Q.**   Is that a true statement?

19    **A.**   Well, "the unused pills became increasingly available",

20    yes, I think that's a -- that's a lot of supposition in the

21    other -- there's a lot of assumption based on those last two

22    words.

23    **Q.**   Let me point you to the last sentence of the paragraph

24    where Dr. Compton states in the last clause, "More than half

25    of people who misuse prescription opioids report obtaining

1    them from family or friends who have prescriptions."  Do you

2    see that?

3    **A.**    I do.

4    **Q.**    That's a true statement, correct?

5    **A.**    At the time from those data.

6    **Q.**    So now, let's talk more about illicit drugs, such as

7    heroin and Fentanyl.  On the first page, let me take you all

8    the way back to the first page of the article in the

9    left-hand column, bottom of the page.  Dr. Compton states

10   that the, quote, "Opioid crisis in the United States is

11   really two sets of intertwined issues:  Misuse of and

12   addiction to prescription opioid analgesics, which

13   predominated in the first decade of the crisis, and, more

14   recently, use of and addiction to illicit opioids."  Do you

15   see that?

16   **A.**    I do.

17   **Q.**    That is a true statement, correct?

18   **A.**    I'm going to re-read it, if it's okay, just to make

19   sure.

20   **Q.**    Sure.

21   **A.**    I think he left one out, but --

22   **Q.**    Did I leave out a word or --

23   **A.**    He left out a cause, but -- he said two sets of

24   intertwined issues and I'd say it was more of a three-set

25   braided issue, but --

1    **Q.**   So, do you agree with the statement that Dr. Compton

2    sets out here?

3    **A.**   I think it's incomplete.

4    **Q.**   Let me ask you about the next sentence.  "Within the

5    rubric of illicit opioid use, a further distinction can be

6    drawn between the resurgent use of heroin and the problem of

7    both deliberate and unintentional use of even more potent

8    synthetic opioid drugs; namely, illicitly made Fentanyl and

9    its analogs."  Do you see that?

10   **A.**   I do see that.

11   **Q.**   And that's a true statement, correct?

12   **A.**   From an epidemiologist's point of view, yes.

13   **Q.**   Let me ask you to look at the second column on Page 1,

14   the last sentence of that carryover paragraph.  Dr. Compton

15   states that, "Synthetic opioids are now almost twice as

16   commonly involved in overdose deaths as prescription opioids

17   or heroin."  Do you see that?

18   **A.**   I see that.

19   **Q.**   That's a true statement, correct?

20   **A.**   I would have to look at the reference for exactly what

21   they were looking at, but I would take it as such.

22   **Q.**   Let me ask you to turn to Page 5 of the document.  At

23   the very bottom of the left-hand column and carrying over to

24   the top of the right-hand column, Dr. Compton states that,

25   "There was a marked increase in overdose deaths from