# TAB 14

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                       AT CHARLESTON

_____x
                              :
THE CITY OF HUNTINGTON,       :    Civil Action
                              :
              Plaintiff,      :    No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
              Defendants.     :
_____x
                              :
CABELL COUNTY COMMISSION,     :    Civil Action
                              :
              Plaintiff,      :    No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
              Defendants.     :
_____x


              BENCH TRIAL - VOLUME 15
   BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
           UNITED STATES DISTRICT COURT
            IN CHARLESTON, WEST VIRGINIA


                    MAY 21, 2021
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    vital sign; correct?
2    **A.**    Yes, sir.
3    **Q.**    And pain as the fifth vital sign is a reference to the
4    change in the standard of care for treating pain; correct?
5               MR. ACKERMAN:  Objection, Your Honor.
6               THE COURT:  What's the objection?
7               MR. ACKERMAN:  Outside the scope of the direct
8    examination.
9               THE COURT:  Overruled.  He can answer.
10              THE WITNESS:  I, I don't agree with that.
11   BY MR. MAHADY:
12   **Q.**    Okay.  What, what is pain as the fifth vital sign
13   to you?
14   **A.**    It's not a measure of standard of care, that statement.
15   **Q.**    Okay.  For all the years that you've practiced in
16   Cabell/Huntington, was there a change in the way doctors
17   treated pain?
18   **A.**    I, I believe that's correct, although being a
19   pediatrician I'm not sure that was applicable to my
20   practice.
21   **Q.**    I appreciate the distinction.  But you are also on the
22   Board of Cabell-Huntington Hospital; correct?
23   **A.**    I actually just finished my nine-year term on that
24   Board.
25   **Q.**    Okay.  And for a period of time, you were the Chief

1   Medical Officer of Marshall Health; correct?
2   **A.**   I was.
3   **Q.**   Okay.  And pain as the fifth vital sign, I believe
4   you've testified that that came from organizations like the
5   Joint Commission; correct?
6   **A.**   Yes.
7   **Q.**   Okay.  And this standard of care changing led to
8   doctors prescribing opioids more liberally; correct?
9   **A.**   I didn't agree that this was the standard of care.
10  **Q.**   Okay.  Do you recall a period where pain was considered
11  the fifth vital sign?
12  **A.**   I do.
13  **Q.**   Okay.  And during that period where pain was considered
14  the fifth vital sign, were opioids prescribed more liberally
15  than they were in the period prior to that?
16  **A.**   I think that's true.
17  **Q.**   Okay.  And, Dr. Werthammer, I want to focus on 2016.
18  In 2016 you were the Chief Medical Officer of Marshall
19  Health; correct?
20  **A.**   Yes.
21  **Q.**   And Joseph Shapiro, was he the Dean of the Medical
22  School at Marshall at the time period?
23  **A.**   He was.
24  **Q.**   Okay.  And around that 2016-2017 time period, you were
25  also communicating with an individual named Jim Johnson; is

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1  that correct?
2  **A.**  Yes.
3  **Q.**  Okay.  And Jim Johnson, at least at the time, was I
4  think the head of Huntington Mayor's Office of Drug Control
5  Policy; is that right?
6  **A.**  Correct.
7  **Q.**  And why were you communicating with Jim Johnson at that
8  time?
9  **A.**  I was involved in some of the meetings that surrounded
10 the opioid epidemic in Cabell County and Huntington, West
11 Virginia.
12 **Q.**  Okay.
13     Ms. Pierce, could you please hand me Defendants' West
14 Virginia 00473?
15     Your Honor, may I approach the witness?
16        THE COURT:  Yes, you may.
17 BY MR. MAHADY:
18 **Q.**  Dr. Werthammer, I want to direct your attention to
19 the middle of the page first.  Do you see an email from
20 February 5th, 2016, sent by a Werthammer@marshall.edu?
21 **A.**  I do.
22 **Q.**  Was that your email address, or is that your email
23 address?
24 **A.**  Correct.
25 **Q.**  And the signature block that follows, Joseph W.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    Werthammer, M.D., Chief Medical Officer, Joan C. Edwards
2    School of Medicine at Marshall University, is that your
3    signature block?
4    **A.**   It is.
5    **Q.**   Okay.  And is that email on February 5th, is that an
6    email that you sent?
7    **A.**   It was.
8    **Q.**   Okay.  Jim Johnson forwarded you an email with the
9    subject line "How Big Pharma Got People Hooked On Opioids."
10   Do you see that?
11   **A.**   I do.
12   **Q.**   Did you review the email or the -- I'm sorry -- the
13   document from the link at the bottom of the email?
14   **A.**   I, I don't remember doing that, but I'm sure I probably
15   did.
16   **Q.**   Okay.
17           MR. MAHADY:  Your Honor, may I approach the
18   witness?
19           THE COURT:  Yes.
20   BY MR. MAHADY:
21   **Q.**   Dr. Werthammer, I just have a very few questions on
22   this specific document if you want to take a second to
23   look at it.
24   **A.**   Okay.
25   **Q.**   Dr. Werthammer, this article bears a very similar title

| | |
|---|---|
| 1 | to the subject line of the email that we were just looking |
| 2 | at; correct? |
| 3 | **A.**   Yes. |
| 4 | **Q.**   Okay.  This article, "How Big Pharma Got People Hooked |
| 5 | On Dangerous Opioids And Made Tons Of Money Off Of It," this |
| 6 | article references Purdue Pharma; correct? |
| 7 | **A.**   Yes. |
| 8 | **Q.**   There's no reference in this article relating to the |
| 9 | wholesale distributors; correct? |
| 10 | **A.**   Well, I think as I pointed out in my deposition, I |
| 11 | agree with this, that the information promulgated by big |
| 12 | pharma and that you cannot become addicted to opioids if |
| 13 | you're truly in pain certainly contributed in physicians' |
| 14 | minds that there's safety in being able to prescribe opioids |
| 15 | for pain without fearing the consequence of addiction.  So |
| 16 | I, I agree with that as I pointed out in my deposition. |
| 17 | **Q.**   Okay.  And I appreciate that.  And as it relates to |
| 18 | this article, it's referencing Purdue Pharma as the |
| 19 | manufacturer behind that marketing campaign; correct? |
| 20 | **A.**   I, I think that's exactly correct.  And I think big |
| 21 | pharma did provide that information to doctors and their |
| 22 | detail, detail men came to doctors' offices and espoused the |
| 23 | same information.  And, yet, -- and the doctors prescribed |
| 24 | that, those opioids and the distributors sent those opioids |
| 25 | out. |

1   **Q.**   Okay.  And as I think we said in the beginning, it was
2   the prescribing that drove the demand; correct?
3   **A.**   Well, I think the prescribing and -- to some degree,
4   and also some of these miscreants that we talked about like
5   pharmaceutical pharmacy representatives and some physicians.
6   **Q.**   Okay.  Thank you, Your Honor [sic].  I'm sorry.  Thank
7   you, Dr. Werthammer.
8        If we can go back to the email, please.
9        Dr. Werthammer, can you please read your reply on
10  February 5th, 2016?
11  **A.**   "Unfortunately, it was not big pharma who wrote the
12  prescriptions.  It was me and my colleagues, Joe."
13  **Q.**   Okay.  And in response to your email, Dr. Shapiro, who
14  is the Dean of the Medical School, wrote, "We had some help.
15  Pain as the fifth vital sign comes to mind." Correct?
16  **A.**   Correct.
17  **Q.**   Okay.  And he's referring to what we've discussed
18  earlier as pain as the fifth vital sign; correct?
19  **A.**   Correct.
20  **Q.**   Okay.  And Kenneth Burner, he replies, "Dr. Shapiro, I
21  couldn't agree with you more.  Kenny."  Is that right?
22  **A.**   That's what it says, correct.
23  **Q.**   Okay.  And Kenny Burner was associated, as the email
24  suggests, with the Appalachian HIDTA; correct?
25  **A.**   That's what it says.  I don't, I do not know that

```
1   person.
2   Q.   Okay.  You can put that document aside.
3        Actually, before you do, this email does not contain
4   any references to wholesale distributors; correct?
5   A.   Correct.
6   Q.   Okay.  You can put that document aside.  I'd like to
7   show you another document.
8        Ms. Pierce, if you can please hand me --
9        Actually, before we do, Your Honor, we move to admit
10  not the article, simply Defendants' WV 00473.
11              THE COURT:  You want just the email chain in?
12              MR. MAHADY:  Yes, Your Honor.
13              MR. FARRELL:  Objection, hearsay.
14              MR. MAHADY:  Your Honor, we believe this email
15  goes to the state of mind of Dr. Werthammer in around 2016.
16       We also think that beyond this document being admitted
17  for the truth of the matter, there's also kind of a
18  non-hearsay ground to admit this document.  And that is the
19  fact that these communications were happening in 2016,
20  you'll see in 2017, with individuals in the community in the
21  medical profession who have testified that they have direct
22  personal knowledge of use and abuse of opioids in Cabell,
23  Huntington.
24              THE COURT:  Well, I'm not going to admit the
25  document, but it's perfectly proper for you to cross-examine
```