# TAB 16

```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                           AT CHARLESTON

_____x
                              :
THE CITY OF HUNTINGTON,       :       Civil Action
                              :
            Plaintiff,        :       No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
            Defendants.       :
_____x
                              :
CABELL COUNTY COMMISSION,     :       Civil Action
                              :
            Plaintiff,        :       No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
            Defendants.       :
_____x


                   BENCH TRIAL - VOLUME 33
     BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
              UNITED STATES DISTRICT COURT
               IN CHARLESTON, WEST VIRGINIA


                        JULY 1, 2021
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1  Virginia.

2  Then, what we've provided for the Court as a benchmark
3  for comparison purposes, a county average, a state average,
4  and a national average so that you can look at a particular
5  month and see that 40,000 dosage units of oxycodone were
6  sold in say December of 2009 and compare it to the average
7  pharmacies around the country, in the State of West
8  Virginia, and within Cabell County.

9  We also went to great lengths to establish through the
10  defendants' witnesses that their monitoring program was
11  nationwide and systemic.  And what we mean by that is that
12  its successes are nationwide successes.  Systemic successes.
13  But its failures are systemic failures.

14  And, as evidence of that, we've given examples in the
15  far right-hand column of other pharmacies around the state
16  that makes the argument that their systems were functioning
17  impossible.

18  We did so with reference to just oxycodone.  We did so
19  with reference to hydrocodone.  And we did it for each of
20  the three defendants.  We went into painstaking detail to
21  show the actual transactions to actual pharmacies to
22  demonstrate that this conduct applies to Huntington-Cabell
23  County, West Virginia.

24  So, closing argument, we may spend a lot of time going
25  and comparing and giving you specific examples, but to argue

1  that we failed to identify the specific conduct to specific
2  pharmacies is not consistent with the record.  What we would
3  say is the measurement of whether or not their conduct was
4  reasonable can be determined by looking at the volume of
5  pills they sold either on a local level, regional level,
6  state level, or national level.
7      Now, with regard to your comment about negligence or
8  your comment about the -- which standard we apply,
9  regardless of whatever the standard is, whether it's
10 negligence or unreasonable interference, if you're looking
11 for some baseline of what is normal, we've given it to you.
12 And to be able to look at what is abnormal, I submit, is
13 facially evident in the records that we've produced to you.
14     And, if you don't have any other questions, I'll turn
15 the floor back over to Mr. Majestro.
16          THE COURT:  All right.  Thank you.
17          MR. MAJESTRO:  And I -- I apologize for Mr.
18 Rafalski.  I get the two "R" DEA witnesses mixed up.
19     So, let's -- and let's talk a little bit about Mr.
20 Rafalski's testimony.  You know, we heard a lot about --
21 from the defendants about what he didn't testify to, but
22 they didn't tell you a lot about what he did testify to, and
23 he testified that once a suspicious order is flagged it is
24 the -- it's the duty of the defendants to stop the drugs and
25 to stop the shipment of the drugs.

1           He testified about the thousands of transactions under
2    a number of different suspicious order monitoring tests that
3    one could reasonably apply that would have been flagged and
4    shipment stopped had the defendants had a -- had systems in
5    place that would do that.
6           Now, the important thing about Mr. Rafalski's testimony
7    is he went through the defendants' records and there isn't
8    evidence that -- other than this anecdotal, yeah, we were
9    doing -- we were -- we were doing due diligence, but they
10   didn't produce any evidence of that due diligence through
11   Mr. Rafalski or to anyone else.
12          And they say, well, we weren't required to keep the
13   records.  But, certainly, as something as important as that,
14   if it was done, they could give us some specific examples of
15   places where due diligence was conducted and the orders were
16   stopped on a level.
17          But what we do know is that they -- for a long period
18   of time they had policies in place where they didn't stop
19   the shipments.  And what we do know is, as Mr. Farrell has
20   shown you, two of these specific pharmacies, the volume that
21   went into those -- went into those pharmacies.
22          So, the combination of that evidence, we believe, is
23   sufficient for you to conclude that they were not doing
24   their job under the CSA and, as he testified, as Mr.
25   Rannazzisi testified, as a number of the defendants'