# TAB 19

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

TRANSCRIPT OF PROCEEDINGS


```
----------------------------x
                            :
THE CITY OF HUNTINGTON,     :        CIVIL ACTION
                            :        NO. 3:17-cv-01362
         Plaintiff,         :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG       :
CORPORATION, et al.,        :
                            :
         Defendants.        :
                            :
----------------------------x
                            :
CABELL COUNTY COMMISSION,   :        CIVIL ACTION
                            :        NO. 3:17-cv-01665
         Plaintiff,         :
                            :
vs.                         :
                            :
AMERISOURCEBERGEN DRUG       :
CORPORATION, et al.,        :
                            :
         Defendants.        :
                            :
----------------------------x
```


VIDEO PRE-TRIAL CONFERENCE

BEFORE THE HONORABLE DAVID A. FABER
SENIOR UNITED STATES DISTRICT JUDGE


MARCH 18, 2021

```
 1                      P R O C E E D I N G S

 2            THE COURT:  I guess we're ready to go here.

 3        The case is the City of Huntington and Cabell County

 4   Commission against AmerisourceBergen Corporation and others.

 5   The Civil Actions are 3:17-1362 and 3:17-1665.

 6        I set this matter for oral arguments on pending motions

 7   to -- a motion for summary judgment on the nuisance question

 8   and also the issue of proximate cause.

 9        Okay.  Can everybody hear me?

10        (All participants answered in the affirmative.)

11            THE COURT:  Okay.  We'll take up the nuisance

12   issue first.

13        Mr. Heard, are you going to argue that?

14            MR. HEARD:  Yes, Your Honor, I am.  Thank you for

15   the opportunity to address this motion.

16        We have come full circle I think.  It's been almost

17   three years since I first addressed the question of public

18   nuisance with you back in 2017.  I think we've sharpened our

19   thinking since then.

20        What I'd like to do this morning, Your Honor, is put

21   two propositions to you, state them here at the beginning.

22   And then I'd like to step back very quickly to provide two

23   points of context, one that's procedural and one that's

24   factual.  And then I'll go back to these two propositions

25   and dive into them in a little bit more depth.
```

1    The first proposition is this:  That West Virginia law

2    has never recognized a public nuisance claim where the gist

3    of the complaint is that a product causes personal injuries

4    that in turn causes emotional distress or economic loss.

5    Plaintiffs are asking this Court to go where the West

6    Virginia Supreme Court has never gone, against the general

7    trend of the case law, and where the Third Restatement says

8    public nuisance is not meant to go.

9    Now, the second proposition is this:  That the *sine qua*

10   *non* of a public nuisance claim is interference with a public

11   right which by definition is not the right that everyone

12   has.  I could be assaulted or defamed or defrauded or

13   negligently injured.  But it is that very right not to be

14   negligently injured that is at the heart of this case.  And

15   the Restatement says that is a private right, not a public

16   right.

17   And the importance of this proposition, Your Honor, is

18   the plaintiffs dodge this issue.  And if Your Honor comes to

19   grips with it head-on and makes this distinction, comes

20   head-on and deals with this distinction between public and

21   private right, you will be only the second court in this

22   litigation to do so.  And we think that's a fundamental

23   distinction.

24   So before going into these two propositions, let me

25   make this one -- these two statements about background.

1       The statement about procedural background is obvious,

2   but I think it's important to restate.  That is, that the

3   plaintiffs in this litigation elected to sever and put on

4   the back burner all of their claims against all of the other

5   defendants, which is more than 50, all the manufacturer and

6   pharmacy defendants.

7       And the second choice they made was to dismiss all the

8   claims in this case except nuisance.  That's a choice they

9   made.

10      The second point of background is factual.  And I think

11  it's useful here as we get closer to trial where we are so

12  in the weeds about facts and a lot of the language of legal

13  argument is to step back and take some perspective on this

14  public nuisance claim.

15      And consider -- I'm going to tick off some things, Your

16  Honor.  Consider these facts which are undisputed at this

17  point:

18      First, these defendant distributors are licensed by the

19  state and registered by the DEA to distribute prescription

20  opioids to pharmacies that are themselves licensed and

21  registered.

22      Second, that no distributor ever distributed any

23  prescription opioids to a pharmacy customer that was not

24  licensed and registered.

25      Third, that no distributor ever distributed

1    prescription opioids to anyone other than a licensed

2    registered pharmacy.

3          Fourth, that no pharmacy customer of any of these

4    defendants ever dispensed prescription opioids to anyone

5    without a doctor's prescription.

6          Fifth, that none of the distributors by some negligence

7    in their physical security caused these drugs to get lost

8    or, you know, emerge from the warehouse and get out into the

9    community.

10         And, sixth, defendants reported every single shipment

11   of prescription opioids to the DEA such that the DEA knew

12   quarter by quarter, year by year the total volume of opioids

13   that were going into Cabell Huntington and, indeed, knew the

14   total volume of opioids that were going to every -- each and

15   every pharmacy in Cabell.

16         And with that knowledge, the DEA increased the (video

17   inaudible) from 1995 to 2010 and told Congress in testimony

18   that 99 percent of doctors were prescribing (video

19   inaudible).

20         And, Your Honor, I bring to you that there is nothing

21   remotely like this in the public nuisance of West

22   Virginia -- public nuisance law of West Virginia over the

23   last 150 years.

24         West Virginia public nuisance law is about things like

25   coal dust and soot and smoke from a dye works factory and

1  roads that get blocked, and odor, ammunitions factories,

2  junk yards in the middle of town.  They are cases like the

3  *Smithfield* case that you handled in North Carolina that

4  involved odor, nausea-causing odor from the operation of hog

5  farms.

6      That's what West Virginia public nuisance law has been

7  all along, nothing remotely like this.  And the plaintiffs

8  cannot cite you a single case in West Virginia, in fact

9  elsewhere, that's even like that.

10      THE COURT:  Well, what do you have to say on that

11  point about the opinions by Judge Hummel and Judge Thompson

12  that do create some West Virginia law that's against you

13  here, Mr. Heard?

14      MR. HEARD:  Well, Your Honor, I have to -- I have

15  this to say about those cases.

16      First, there's no West Virginia Supreme Court

17  authority.  So of these seven decisions -- and they're at

18  page -- as Your Honor knows, they're at Page 11 of the

19  opposition.  Of the seven decisions they cite, West Virginia

20  decisions, five of the seven are unpublished.  Six of the

21  seven contain not a word of analysis on this point about

22  whether a product-based or personal-injury-based claim can

23  support a public nuisance claim.

24      Judge Thompson's decision from Boone County, verbatim

25  adoption of the plaintiffs' findings of fact, not a word of

1   analysis as to this issue.

2        Judge Hummel's decision in the *Brooke County Commission*

3   case, verbatim adoption of the plaintiffs' findings of fact,

4   unpublished, one conclusory sentence that simply says public

5   nuisance isn't limited to land.

6             THE COURT:  Do you -- I'm sorry.  Go ahead, Mr.

7   Heard.

8             MR. HEARD:  Judge Moats' order in the, in the Mass

9   Litigation Panel, unpublished, one sentence saying, "We're

10  not going to revisit Judge Hummel."  Three one-paragraph

11  orders from the Supreme Court declining to consider writs of

12  prohibition.

13       In the *Lemongello* case, another Circuit Court opinion,

14  unpublished, one sentence, no analysis, no citation or

15  authority.

16       Your Honor, I would submit to you these Circuit Court

17  opinions can't even buy a ticket of admission for

18  consideration for *Erie* purposes.  These kind of unpublished,

19  unreasoned, copied, verbatim decisions don't buy anything

20  more than a standing room ticket with an unobstructed view

21  of the upper reaches of the balcony.  These are the weakest

22  kind of authorities.

23            THE COURT:  And you don't attach any significance

24  to the fact that the Supreme Court declined to review those

25  cases?

1          MR. HEARD:  No significance to that whatsoever

2     under West Virginia law.  That has no persuasive data.

3          And, Your Honor, I would say here -- return to this

4     first question.  This is first and foremost an impression of

5     *Erie*.  And I would feel presumptuous even saying a word to

6     you about *Erie*.  You've been sitting on the bench for 30

7     years.  You've done this countless times.

8          So the only thing I would ask Your Honor to do is

9     consider three things:

10         One historical fact, one new case which I have to give

11    you, and to ask you to re-read one case that I know is

12    familiar to you.

13         The historical fact, as I've already alluded to, is

14    that there are 17 West Virginia Supreme Court opinions since

15    1878, an average of one every six years.  There's no case

16    where the gist of the complaint was that a product causes

17    personal injury which results in emotional distress.  That's

18    just not in West Virginia Supreme Court case law.  And there

19    is abundant West Virginia Supreme Court case law.  That's

20    the historical fact.

21         Your Honor, the new case that I would like to ask you

22    to consider -- and I regret that we overlooked it in our

23    briefing -- is *Callihan*, C-a-l-l-i-h-a-n, *Callihan* vs.

24    *Surnaik Holdings*.  It's a 2018 decision by Chief Judge

25    Johnston of this court dismissing a public nuisance claim.

 1    And this is what he said, and I quote:

 2         "A public nuisance claim is an interference with land

 3    use or enjoyment that affects the general public."

 4         And that is the most recent West Virginia public

 5    nuisance law by either the West Virginia Supreme Court or a

 6    Federal Court.

 7         And then the old case that I know you're familiar

 8    with --

 9              THE COURT:  Did that case get published, Mr.

10    Heard?

11              MR. HEARD:  It did.  2018 Westlaw 6313012, 6313012

12    in 2018.

13         Now, the older case is *Rhodes* vs. *Dupont*.  That

14    involved contamination of the City of Parkersburg water

15    supply.  But it sort of provides uncanny guidance here

16    because in that case, as here, the plaintiffs were asking

17    the court to predict that the West Virginia court would

18    adopt a rule it had never adopted.

19         But there it had to do with common law battery, not

20    nuisance but common law battery.  Everybody in that case

21    agreed that the West Virginia Supreme Court had always held

22    that battery requires harmful bodily contact.  They didn't

23    have that in that case.  Nobody had personal injuries.  They

24    were saying there were detectable levels of chemicals in

25    their blood.  And they said that the Restatement, Sections

1    15 and 18, would recognize that as a battery.

2        But the Fourth Circuit in *Rhodes* affirming Judge

3    Goodwin said, no, the West Virginia Supreme Court has never

4    adopted that theory.  It's never adopted those sections of

5    the Restatement and, in fact, has held that in every single

6    case that harmful bodily contact is required.

7        We have, we have just that scenario here.  The West

8    Virginia Supreme Court has always applied this to misuses of

9    land or interference with land, never the products that

10   cause personal injury and emotional distress.

11       And on top of that, the Fourth Circuit sometimes says,

12   you know, if there's not Supreme Court authority, you can

13   look to general treatises, you can look to restatements, you

14   can look to general trends of the law.

15       Here we have from the Third Restatement the view that

16   it's inapt to apply public nuisance to claims like this.

17   And we have the Third Restatement saying, and I quote, there

18   is a clear national trend to limit public nuisance to land

19   use.

20       So if we look to the restatements, if we look to the

21   general treatises, if we look to the general trend of the

22   law in conjunction with the actions of the West Virginia

23   Supreme Court, this is a step too far from *Erie*.

24       Now, that takes us, Your Honor, to this first -- to the

25   second proposition which is a true intellectual challenge I

1    think.

2          Public nuisance requires interference with a public

3    right.  And here we have at most interference with a private

4    right.

5          The one point on which the parties agree is that the

6    *sine qua non* of a public nuisance claim is interference with

7    a public right.  Plaintiffs even plead it in their

8    complaint.

9          So the question is:  What, what is a public right?  And

10   the interesting and unavoidable fact is that the Restatement

11   defines public right both by what it is and what it is not.

12   It offers both an affirmative definition and a negative

13   definition.  And it offers them in consecutive sentences.

14         It says that what a public right is is a right held in

15   common by the general public.  And it says what it is not is

16   the right that everyone has not to be assaulted or defamed

17   or defrauded or negligently injured.

18         So the key to defining a public right is defining the

19   difference between a public right and a private right.  And

20   we can be sure that if public right is defined so

21   expansively that nothing is left but the realm of private

22   right, then you've done something wrong.

23         But that's what every opinion in this litigation so far

24   has done.  It has considered what is the public right

25   without even considering the Restatement's negative

1   definition that a public right is not the right that

2   everyone has not to be defrauded or negligently injured.

3         So let me, let me explain why this is a private right

4   and why it is not a public right.

5         It's about a private right, Your Honor, most simply

6   because every aspect of the claim has to do with personal

7   injury.  The cause that's alleged, the harm that's alleged,

8   the remedy that's sought all have to do with personal

9   injury.

10        The cause is quite clear that -- every version of the

11  plaintiffs' complaint tells us that the originating cause of

12  the opioid epidemic in Cabell Huntington is a deceptive

13  marketing campaign by manufacturers that defrauded doctors

14  into overprescribing the drugs, a violation of the right not

15  to be defrauded the Restatement says is a private right

16  that's alleged.

17        From this overprescribing and misprescribing is an

18  epidemic of addiction and overdose deaths, a violation of

19  the right not to be negligently injured, which the

20  Restatement says is a private right.

21        And the remedy behind plaintiffs' expert reports,

22  $2 billion.  Out of $2.6 billion that's asked for,

23  80 percent is for treatment of addiction, treatment of the

24  personal injuries.

25        So every aspect of this claim has to do with personal

1  injuries which in the Restatement definition is a violation

2  of the right that everybody has not to be either defrauded

3  or negligently injured.

4      Now, the question I think that raises, of course, is:

5  Does this understanding of private right that I've given you

6  mean that matters of public health never implicate public

7  rights?  And the answer is, "No."

8      But it's crucial to look at the Restatement because the

9  Restatement, Comment G, explains the difference between

10 public and private right with reference to a public health

11 example.  Now, what could be better for our circumstances

12 than that?  And the example they give is of an

13 epidemic-causing contagious disease.

14     Now, it's noteworthy that the plaintiffs in their

15 opposition quote some general language from the Restatement

16 about public health.  But what they don't do is look at the

17 examples that the Restatement gives us and then look at the

18 case citations that support those examples.  And the

19 examples --

20         THE COURT:  Let me interrupt you here and ask you

21 a question, Mr. Heard.  It's on my mind and I'll forget it

22 if I don't ask it now.

23     There was a suggestion in the, in the brief on your

24 side -- and I don't know whether you wrote it or not, one of

25 your colleagues obviously did -- that if I threw out the

1  negligence claim, there would be other theories that the --

2  that were originally pleaded that the plaintiffs could go

3  back and adopt and, and give renewed viability to their

4  case.

5      I don't see any of those theories that I'm familiar

6  with that would run to the municipal corporations here as a

7  legitimate plan.

8      If it's a negligence case, it would be -- well, I think

9  of the asbestos cases.  The -- this was a hugely harmful

10  commodity that permeated the whole country, the whole world

11  maybe, and the plaintiffs in all those cases were

12  individuals.  None of them went to any governmental entity

13  that would have to clean up any of the mess.

14      I just want you to address the proposition in the brief

15  that if the nuisance claim goes out, the case is still

16  viable.

17          MR. HEARD:  Let me address that in three ways,

18  Your Honor.

19      What we said in the brief and what I said in brief by

20  way of introduction this morning were these things.

21      The first prop -- the first thing is if Your Honor

22  dismisses the public nuisance claim, the case against the

23  distributors is gone.  But the plaintiffs severed and

24  retained the claims against all the other defendants, which

25  number more than 50.  And they maintain all claims against

1    those other defendants.

2        Now, the other thing I said was they elected to dismiss

3    their negligence, RICO, civil conspiracy, unjust enrichment

4    claims against these three distributor defendants.  They

5    made that election.  They made that bed and they have to lie

6    in it.

7        So Your Honor asks if they hadn't dismissed those

8    claims and Your Honor granted summary judgment here, now in

9    theory would they, would they have a viable negligence claim

10   or RICO claim or unjust enrichment claim.  We say not.  We

11   would argue not.  But there's no way to test that because

12   they chose to dismiss those claims.

13       Your Honor mentions the asbestos or tobacco litigation.

14   And maybe this is sliding off your answer a bit, but I think

15   those litigations are telling because those certainly

16   implicated the public health in a colloquial sense.

17       But the courts recognized in those litigations that

18   those involved personal injuries and treated them as product

19   liability personal injury cases.  No court ever seemed to

20   think that those sustained a public nuisance claim.

21       In fact, they were dismissed because when the insurers

22   did what the city and county seek to do here, which is say,

23   "Well, we were economically harmed," they will incur

24   economic costs in the future, the Court said that's a

25   derivative claim and they dismissed it.  They didn't say

1    that's a public nuisance claim and uphold it.

2        If that is an answer to Your Honor's question -- I want

3    to leave no doubt that there are occasions when interference

4    with a true, with a true public right can also implicate the

5    public health.

6        The Restatement gives the example of contagious

7    disease.  It says the threat of communication to smallpox to

8    even one person can constitute a public nuisance claim

9    because of the possibility that it can uncontrollably

10   spread.

11       And the companion example that the Restatement gives

12   has to do with a fire hazard.  If I maintain a fire hazard

13   on my property, the Restatement says that may constitute an

14   interference with public right because of the risk of

15   conflagration.  The fire may uncontrollably spread.

16       And what that shows us is that an interference with the

17   public right and an interference with public health

18   intersect when the public health problem interferes with our

19   ability to be in public, to exercise our public rights, to

20   congregate in public, to travel in public in the very way

21   that our lives in that regard have been hampered over the

22   last year by the COVID-19.  We've all experienced this very

23   example the Restatement gives us in the last 12 months.

24       And you see that even further if we go down a layer in

25   the Restatement to the case citations that support these two

1   examples because the case citations are all about

2   interference with public right and interference with public

3   health as a manner of the spread of disease.

4       So the examples and the case citations are maintenance

5   of a malarial pond, defective sewers, keeping diseased

6   animals on property, maintenance of a hog pen where the

7   Court's discussion indicates that dead carcasses were left

8   lying around threatening the spread of typhoid fever and

9   scarlet fever, and two cases involving the unlicensed

10  practice of medicine where the case discussion explicitly

11  says if you've got an unlicensed doctor, there may be a

12  failure to maintain sanitary methods to prevent the spread

13  of disease.

14      So that's what we're missing here.  We don't have a

15  matter of public health in a colloquial sense, but we don't

16  have interference with a public right in the way that

17  contagious disease interferes with the right of the

18  public -- ability to exercise public rights and be in a

19  public sphere.

20      And that takes us, I think, to the answer, Your Honor,

21  to the question of why is this case not about interference

22  with a public right.

23      Looking again at that first half of the definition in

24  the Restatement, the affirmative definition, a right held in

25  common by the general public.  A right held in common is

1    collective in nature.  It's collective in nature because

2    historically it's involved interference with indivisible

3    resources; the air we breathe, the water we drink, the

4    waterways we navigate, the public spaces in which we

5    congregate, the public roads on which we travel.

6        It is not the right not to be negligently injured

7    because while those are rights everyone has, they're rights

8    that everyone has individually, not collectively.  And, so,

9    the Restatement says those are private rights.

10       And this is not interference with a public right

11   because it's not interference with those collectively held

12   public resources.  We're not talking about a public health

13   problem like contagious disease that keeps us from being in

14   public or traveling in public, you know, being in this

15   courtroom in public.

16       One doesn't catch addiction.  It's not a contagious

17   disease.  And, so, it's a private right because every aspect

18   of the claim is personal injury.  It's not a public right

19   because it's not about these rights held in common

20   collectively regarding indivisible resources.

21       So last of all, Your Honor, my last point is to say,

22   well, what are the plaintiffs arguing here?  What is their

23   argument for why this is interference with a public right?

24       Now, as to Pages 3 to 5, 3 to 6 of their brief, they

25   actually call upon deposition testimony to make the case for

1   why this is interference with a public right.  And I think

2   there are two aspects, but they substantially overlap.

3       One is to say there are a lot of people who have been

4   addicted and overdosed, so there's something going on about

5   the large numbers of people who have been affected by

6   addiction and overdose.

7       And, secondly, there's a statement on their part that

8   the whole community is affected.  And the line in the brief

9   is "no one has been left untouched."

10      I invite Your Honor to go back and look at those

11  examples because when they say no one has been left

12  untouched, they refer to law enforcement, first responders,

13  healthcare providers, and friends and family of the addicted

14  and the dead.

15      And the testimony they cite goes like this.  These are

16  paraphrases.  They refer to law enforcement and first

17  responders who have been exposed to trauma; the first

18  responders, quote, who go into houses where mothers have

19  overdosed.  It's answering the same emergency call for the

20  same person two or three times a day.  It's my partner who's

21  dead because she overdosed.  It's testimony that all

22  children know about -- all children know about growing up is

23  death.

24      And what's clear about those examples -- and this is

25  the argument of interference with a public right.  They are

1    describing the emotional distress of bystanders, bystanders

2    who have witnessed personal injury.

3         And there is no more well established rule in West

4    Virginia common law that the only marital and blood

5    relations can recover for the emotional distress of

6    witnessing of another.

7         What plaintiffs are really trying to do here is

8    circumvent that common law rule and actually upending it and

9    turning it on its head because they would say if there are

10   enough people personally injured and there are enough

11   bystanders who have witnessed that personal injury day in

12   and day out, then what has historically been prohibited

13   recovery under West Virginia law, no bystander recovery,

14   somehow becomes attached to a public nuisance.  And that has

15   to be wrong.  There's no support in West Virginia law to

16   that.

17        So, Your Honor, I would say in summary they chose to

18   drop all the things of public nuisance.  And I submit to

19   Your Honor they did that because the remedy for public

20   nuisance is sometimes abatement.  And for them, they believe

21   abatement -- with abatement, the sky's the limit.  That's

22   why they made that election.

23        They're asking the Court to go where no court has gone

24   before in saying that West Virginia public nuisance law

25   encompasses products that cause personal injury that, in

1   turn, lead to widespread emotional distress and economic

2   loss.

3        And precisely because this is about products that cause

4   personal injury, it's not about interference with a public

5   right.  If Your Honor does what no other court has done and

6   makes this distinction between public and private right that

7   the Restatement definition requires, this is interference

8   with a private right, not with the indivisible, collectively

9   held public resources that give rise to a public right and

10  that implicate the public health when there's something like

11  the spread of disease involved.

12       Thank you, Your Honor.

13            THE COURT:  Thank you, Mr. Heard.

14       I'm informed that Mr. Majestro is going to respond to

15  this.  Is that correct?  I don't have him up on the screen

16  here.

17            MR. MAJESTRO:  Yes, Your Honor.  Am I here now?

18  Can you see me?

19            THE COURT:  Yeah.  You're loud and clear,

20  Mr. Majestro.  Go ahead.

21            MR. MAJESTRO:  Thank you, Your Honor.

22       It's interesting to be back here responding to the same

23  argument that Mr. Heard made all those years ago.  A lot has

24  happened since then, as he, as he explained.  But he left

25  some things out and we're going to go over some of those.

1    And I would like to make some, some introductory remarks.

2         Defendants' arguments are essentially factually and

3    legally incorrect.

4         Factually, the defendants are mischaracterizing the

5    harms at issue because they're incorrectly arguing that only

6    individual product rights are implicated by the devastation

7    that the opioid epidemic has caused.  And I'll go through

8    the evidence in more detail than Mr. Heard did.

9         But the evidence in this case shows exactly the

10   opposite effects.  The effects of the opioid epidemic are

11   far-reaching throughout the community.  And the public

12   nuisance law doctrine gives the public the right to be free

13   of this scourge which causes a substantial interference with

14   the public health and safety rights common to the general

15   public.  And this is -- these are decisions that both --

16   that the courts all over the country in the context of this

17   litigation.

18        The defendants' argument misses the point because it

19   mixes up the distinction between a public nuisance case

20   brought by a private party and the broader case available to

21   a public entity seeking to enforce the public's rights.

22        And, so, when you look at the cases, the opioid cases

23   from around the country and, in fact, even at the Third

24   Restatement they cite, these distinctions are evident and

25   govern here.

1      A couple of points I want to make in response to Mr.

2  Heard's --

3          THE COURT:  Do you have a case that specifically

4  is on point with regard to opioids that supports your

5  position?

6          MR. MAJESTRO:  Sure, Your Honor.  There are -- I

7  mean, we have lots of cases.  If you want to go there now, I

8  was going to get to that in a bit, but let's -- let me go --

9  fast forward.

10     First, I would, I would point out, Your Honor, we have

11 the West Virginia cases that I think are -- it's important

12 that the West Virginia trial courts in opioid litigation

13 brought by public entities have unanimously rejected these

14 claims.

15     In addition, these -- by these defendants.  And, in

16 addition, when these defendants sought to get review from

17 the Supreme Court of Appeals on prohibition, they've been

18 denied.

19     Now, those decisions aren't binding in the case, but we

20 would contend that the unanimity of those decisions under

21 West Virginia law should be persuasive to this, to this

22 Court.

23     The -- and I want to mention -- I what to mention

24 *Callihan*, the decision he raised for the first time.

25     Judge Johnston's decision in *Callihan* was a private

1    party pollution case arising out of a fire occurring on

2    land.  So a discussion of whether or not nuisances occurring

3    on land, Judge Johnston did not hold that nuisances are

4    limited to land.  He said nuisances occur -- nuisances on

5    land can constitute a public nuisance.  And, again, that was

6    in the context of the private claim.

7         And I want to talk a little bit more about -- before we

8    get to the court cases, I want to talk a little bit more

9    about precedent in Federal Courts.

10        You know, we cite the applicable law on Page 11,

11   Footnote 2 of our brief.

12        In *Wells* vs. *Liddy*, under the *Erie* doctrine the Fourth

13   Circuit said Your Honor's task was to predict what the

14   Supreme Court will rule.  The Court noted in doing so, you

15   can consider a broad range of sources, including trial court

16   decisions.

17        The Federal Practice and Procedure treatise notes while

18   Circuit Court decisions provide persuasive guidance to a

19   Federal Court sitting in diversity, particularly when

20   they're uniform, as here.

21        And even the U.S. Supreme Court case in the *Estate of*

22   *Bosch* case said that if there's no decision by the state's

23   highest court, then federal authorities must apply what law

24   they find to be state law after giving proper regard to

25   relevant rulings of other courts of the state.

1    So given the unanimity of what the West Virginia courts

2    have said in the context of this very litigation, we think

3    that that, that is persuasive.

4    You know, the --

5    Gina, can you pull up Slide 7?  We'll see if it works

6    this time.

7    So back on June 27th, 2017, when I last argued this

8    motion, there was one decision in the United States dealing

9    with opioid litigation with respect to the question of

10   whether the opioid epidemic could constitute invasion of a

11   private right that, that would satisfy the public nuisance

12   test.  That was Judge Thompson's opinion in the Boone County

13   case.

14   Let's look at -- and you will recall then, Your Honor,

15   that Mr. Heard said that -- we, we argued a lot about what

16   the, the gun cases and the lead paint cases and other cases.

17   And Mr. Heard offered the argument that the trend was

18   against me in that.  But let's look what happened in the

19   context of these cases.

20   So on January 22nd, 2020, when this case got remanded

21   back to you, the decision by 17 states had confirmed that

22   the opioid epidemic results in interference with public

23   nuisance cases against these defendants and other defendants

24   in the distribution chain.

25   So it's California, South Carolina, three orders out of

1   Kentucky, two orders out of Alaska, orders in State and

2   Federal Court in Ohio, New Hampshire, the additional West

3   Virginia decisions, Minnesota, Tennessee, Vermont, Arkansas,

4   Florida, Rhode Island, New Mexico, Massachusetts, Alabama,

5   and Nevada.

6        Go to the next slide, Gina.

7        So then since then, we've had additional decisions from

8   Massachusetts, New York, Missouri, Vermont, Tennessee,

9   another New Mexico opinion, and another California opinion

10  which was decided, and we're going to provide that to you as

11  supplemental authority.

12       Just last week, the Circuit Court in the Santa Clara

13  opioid litigation brought by Santa Clara and Orange County,

14  California, rejected these same arguments regarding the

15  scope of public nuisance claim.

16       So that's a total of 20 states that have rejected these

17  arguments in the context of this very litigation.

18       Now, there's some -- to be fair, there are -- and

19  defendants have cited.  There are some cases that have

20  dismissed public nuisance claims in opioid cases brought by

21  Attorney Generals in Delaware, Connecticut.  Defendants

22  provided a resent decision in Illinois and, and South

23  Dakota.

24       But those decisions largely rely on prior decisions

25  from the Supreme Court in those cases which we would contend

1    have adopted a minority position rejecting nuisance claims

2    arising out of product cases like the lead paint and the gun

3    sales.

4         For example, the Illinois opinion felt -- the trial

5    court in Illinois felt it was bound by the Illinois Supreme

6    Court's *Beretta* decision which we don't think was the right

7    result anyway, but that Illinois court was bound by that

8    decision.  So the majority two to one recognizes these

9    claims in the context of opioid litigation.

10        Now, interestingly enough, Mr. Heard is asking you to

11   rule that no other court -- to conduct an analysis that no

12   other court has done in these litigations.  He's asking you

13   to -- he's saying all of these arguments that they've made

14   all across the country, every other court, including the

15   courts in West Virginia, got it wrong when they rejected it.

16   And he's asking you to apply this distinction that doesn't

17   exist in the context, context of nuisance law, a distinction

18   that it's important that he admit no other court has really

19   done this.

20             THE COURT:  Well, the, the Illinois court in the

21   gun case and the Rhode Island court in the lead paint case,

22   those cases seem to me to hold just the opposite of what

23   you're asking me to do.  How do you get around those cases?

24             MR. MAJESTRO:  Well, those cases are, are -- you

25   know, there is -- in the context of the gun and the lead

1   paint cases, Illinois and Rhode Island went one way.  Ohio

2   and California went another way on those cases.

3        The, the cases like -- and we have the -- the map I

4   have in Ohio, the opioid courts have, have gone our way, as

5   have cases in California.

6        In addition, the cases in all of these other

7   jurisdictions that don't have binding authority with respect

8   to lead or guns or something similar have, have also applied

9   the broad test in the Second Restatement and found opioid

10  cases are recognizable public nuisance cases.

11       And I want to deal with the, the Third Restatement

12  argument and -- because that's Mr. Heard's big point as to

13  why the trend exists on those.

14       And first I'd point out that the limitation to

15  property, the exclusion of products, no West Virginia case

16  holds that.  There are cases involving -- unquestionably,

17  there are cases involving property damage or nuisances

18  arising out of property.  And -- but there is not a case

19  that says you're limited to that or that, that products

20  claims are excluded.

21       In fact, in addition to the opioid litigation, the

22  *Lemongello* case that we cited dealt with guns.  A West

23  Virginia Circuit Court has accepted a public nuisance case

24  arising out of guns.

25       Now, you know, I would be remiss if I didn't defend my

1    State Court judges that I appear regularly before.  Their

2    decisions are maybe not to detail that maybe Your Honor

3    does.  And it is -- as is common in West Virginia, the

4    courts, after ruling, allow submission of Proposed Findings

5    of Facts and Conclusions of Law which are often adopted by,

6    by those courts.

7         West Virginia law is clear that does not make those

8    decisions any less the law or any less the ruling of the

9    Court.  The fact that, that, that the winning counsel

10   drafted the argument that was accepted by the Court is

11   indicative of the strength of the argument, not a reason to

12   disregard it.

13        So let's talk about the Third Restatement.  The Third

14   Restatement has generally been viewed as a viable departure

15   from the settled standards of tort law.  Itself indicates

16   that it's an almost total overhaul of the Restatement

17   (Second) in the introduction.

18        Unlike its predecessor which has been adopted all

19   throughout the country, and particularly with respect to the

20   Second Restatement's test for public nuisance, the Third

21   Restatement has not widely been adopted by the states.

22   Generally, in Kansas, Pennsylvania and Connecticut Supreme

23   Courts have rejected it.

24        More importantly, no state's highest court has adopted

25   Section 8 of the, of the Second Restatement unlike here

1    where in the -- in other contexts we have Supreme Court

2    opinions like California, like Ohio, like other places that

3    have adopted our view of the Second Restatement with respect

4    to public nuisance claims.

5         But, finally, and most importantly -- and this is where

6    I think Mr. Heard gets it wrong.  He's talking -- his --

7    most of his argument deals with cases addressing the

8    question of when a private party can bring a public nuisance

9    claim.

10        And there's a distinction in the law, and the Second

11   Restatement makes this clear, that a private party must show

12   a special injury different from members of the public and

13   community in order to bring a public nuisance claim.

14        So there are a lot of public nuisance claims brought by

15   private parties; for example, the *Callihan* decision that,

16   that Mr. Heard said.

17        Now, what's really significant is the Third Restatement

18   confirms this distinction.  Section 8 provides -- the notes

19   to Section 8 provide the provision applies only to claims

20   for economic loss by a private party who has suffered an

21   injury, quote, distinct in kind from those suffered by

22   members affected, of the affected community in general.

23   That's, that's what Section 8 says.

24        The comment to Section 8 makes it clear, however, that

25   the provision is not intended to apply to public nuisance

1  actions brought by public officials.

2     Comment 8 says in addition to the common law claims

3  recognized here, public officials may bring civil or

4  criminal actions against a defendant who creates a public

5  nuisance.  The definition of a public nuisance for those

6  purposes tends to be considerably broader than the common

7  law definition recognized by this section as a basis for a

8  private suit.

9     So that -- it's very clear that the Third Restatement

10 keeps and recognizes this distinction between private -- or

11 public nuisance claims brought by private parties and public

12 nuisance claims brought by public entities.

13    You know, he, he points out that we have lots of

14 different -- he tries to characterize this case as an

15 amalgamation of a bunch of different product claims.

16    But if you take his argument, every governmental public

17 nuisance claim can be broken down for amalgamation of

18 injuries to members of the public.

19    Take contamination for example, individuals who

20 directly suffer property damage from hazardous waste spills

21 on their property.  But the fact that those spills are

22 creating a hazard to the public doesn't take those cases

23 outside the realm of a public nuisance action.

24    The abatement remedy to clean up that action to stop

25 the continued harm to the public doesn't take those claims

1  outside the realm of a public nuisance action.  That's what

2  governments do.  They look at the injury to the public and

3  take the action to abate that injury by getting rid of the

4  harmful conditions that, that the, that the public nuisance

5  has caused.  In this case, a large part of that is treatment

6  of the opioid epidemic to stop the harm to the public.

7      The difference between asbestos and other personal

8  injuries or those sorts of claims, it's different because if

9  I get an asbestos disease, my disease -- the effects of my

10 disease are generally limited to my immediate household.

11     What this epidemic has caused is a, a destruction of a

12 community which implicates the public's right to health,

13 safety, et cetera.  And I want to go and talk about some of

14 the factual testimony that Mr. Lane [sic] blew through.

15     Gina, bring up -- let's start with slide -- let's just

16 go through the slides.  Let's start with Slide 1.

17     Okay.  Jan Rader, the Chief of the Huntington Fire

18 Department, says, "There's not one person in this area that

19 I know of that has not been touched or had collateral

20 damage.  It is horrendous."  She described it as a war zone

21 for first responders.  It is a war zone for children, that

22 they all know growing up -- all they know growing up is

23 death and destruction.

24     Go to Slide 2.

25     Mr. Lemley, a former member of the City's Office of

1   Drug Control Policy:  "The opioid epidemic has affected

2   every aspect of what we do in Huntington.  It's

3   socioeconomic.  It affects the university.  It affects our

4   medical community.  It affects our quality of life and our

5   parks.  It affects our first responders.  It affects our

6   property values."

7        Go to Slide 3.

8        Mr. Merry, the Director of the EMS -- and Mr. Lane

9   [sic] read from some of this.  But I -- and, and he's,

10  he's -- Mr. Lane [sic] is right.  There is trauma that is --

11  that the EMS and the police and fire have gone through

12  because of dealing with the consequences of this opioid

13  epidemic.

14       But when you have the, the, the very public officials

15  that, whose job it is to protect the public who are facing

16  trials, who are quitting jobs early, and that's what the

17  testimony says, that, that, that the opioid epidemic is

18  running off the people whose job it is to protect the

19  public.

20       The public has a right to have their public officials

21  that are protecting them, their health and their safety,

22  free from the, these kind of stresses that distract them

23  from otherwise doing their job.

24       Let's go to Slide -- let's skip Slide 4 and go to Slide

25  5.

1    Dr. McGuire is one of our experts and let's talk about

2    that.  I think he gives a good description of one of the

3    other ways that this epidemic affects the public.

4    He says, "One pernicious and impossible-to-miss harm

5    from the opioid epidemic is neighborhood blight, the

6    degradation of neighborhoods contaminated by drug sellers,

7    drug users, and crime.  The association between crime, empty

8    homes, and neighborhood decline is widely documented.  Homes

9    and neighborhoods in the Cabell Huntington community have

10   been severely adversely affected by the opioid epidemic with

11   hundreds of homes demolished due to abandonment, crime, and

12   uninhabitability."

13   "The opioid epidemic degrades neighborhoods along many

14   dimensions.  Risk of crime, loss of safe public space, loss

15   of connection with neighbors and other harms interfere with

16   residents' ability to appreciate where they live.

17   Degradation lowers home property values and lowers

18   residents' valuation of parks, public transportation,

19   schools, and other local public services."

20   Now, Mr. Lane [sic] was explaining that what

21   differentiates these other public nuisances from the opioid

22   epidemic is that it affects, affects people's ability to go

23   out in public spaces.

24   As Dr. McGuire testified, and anyone who has had any

25   kind -- I know Your Honor has lived in the middle of the

1   opioid epidemic down in southern West Virginia.  The

2   degradation to these public spaces, that is exactly the kind

3   of problem that Mr. Heard is saying causes burdens on the

4   public.

5        Go to Slide 6, Gina.

6        Lastly, we can't omit the public interest in our

7   children and the education of our children.

8        Dr. Keyes, one of our other experts, is going to

9   testify that children in the Cabell Huntington community are

10  expected to experience a large burden of psychiatric

11  disorders and learning disorders throughout pre-school and

12  school-age developmental periods due to in-utero exposure to

13  opioids, as well as parental opioid use during development.

14  The burden of parental and caregiver opioid use to children

15  in the Cabell Huntington community is on-going and

16  significant, disrupting the home as well as the learning

17  environment.

18       So the opioid effect, like pollution, like air

19  pollution, like noise, is not just limited to those directly

20  impacted.  It's -- it expands to their children.  And

21  because those children have problems in our school system

22  and our public services system, it impacts the children of

23  those who aren't even, who aren't even directly impacted by

24  the opioid crisis because it burdens the educational system.

25       That is the kind of public right, the right to

1    education and, in fact, the right to education is a

2    fundamental right under our state constitution that is

3    burdened by this opioid epidemic.

4         These are public rights.  These are not individual

5    claims for property damage.  They're not individual claims

6    for personal injuries, those claims that we have gotten rid

7    of in this case.  Our claim is seeking to, to correct the

8    public impacts the scourge of the opioid epidemic has on our

9    community.

10        So, finally, I want to just deal with generally West

11   Virginia public nuisance law.  And let's look at what the

12   cases actually say.

13        First of all, none of the cases say that, that we have

14   to have a, have to have some link to land.  None of the

15   cases say products are excluded.

16        The cases define public nuisance in a broad sense.  In

17   *Duff*, for example, the Supreme Court said a public nuisance

18   is an act or condition that unlawfully operates to hurt or

19   inconvenience an indefinite number of parties.

20        The Restatement which is adopted by a number of

21   decisions applying West Virginia law says that interference

22   with public rights that involve a significant interference

23   with the public health, the public safety, public peace, the

24   public comfort, the public convenience, that is what an

25   interference with a public right is under the Second

1   Restatement test.

2       Numerous cases we've cited, *Kermit Lumber*, *Rhodes* vs.

3   *DuPont*, they all stand for the proposition that interfering

4   with public health constitutes a public nuisance.

5       Now, again, Mr. Lane [sic] is back to his distinction

6   between these -- the, the things like epidemic, like

7   epidemics or hog farms, those sorts of, those sorts of

8   things.

9       I would submit to you those distinctions matter more in

10  the context of a private person bringing a public nuisance

11  claim.  Where the, where we are dealing with the public

12  governmental entity that has an interest in, in the peace

13  and security and safety of a community, those distinctions

14  are as important as, as the Third Restatement and the Second

15  Restatement recognizes.

16      You know, so, let's take infectious disease.  An

17  infectious disease is, is no different than the epidemic

18  that's caused here.

19      As I, as I demonstrated with the factual testimony, the

20  opioid epidemic infects the community not directly in terms

21  of disease, but infects the community in a manner that, that

22  creates interference with public rights.

23      It's -- an infectious disease is still a collection of,

24  of individuals who are sick.  But because of the, the

25  presence of a condition that impacts the public level as a

1   whole, that is what differentiates a public right that is

2   recognizable in public nuisance cases.

3       The final point I would make, and that is the

4   Controlled Substances Act has been totally ignored by

5   Mr. Lane [sic].  Now, Mr. Lane [sic] started off his

6   discussion, as the distributors do in all this case, talking

7   about the fact that the pharmacies are licensed, they are

8   licensed, the prescriptions were issued by doctors.

9       But what differentiates this case from some of the gun

10  cases and some of the lead paint cases and some of the

11  (video inaudible) keep talking about conduct that -- and we

12  had this argument last time, that violates the Federal

13  Controlled Substances Act.

14      The Controlled Substances Act places duties on these

15  very defendants to stop the, the harms that were caused by

16  the use of opioids for other than medical purposes.

17      Diversion under the Controlled Substances Act is

18  foreseeable.  And I'm not going to restate the argument we

19  had last time, but that is the distinction.

20      And the fact that the defendants sold massive

21  quantities of drugs to licensed pharmacies who then filled

22  prescriptions issued by pill mill doctors doesn't immunize

23  them from their responsibility under the Controlled

24  Substances Act to stop suspicious orders and prevent

25  diversion.  And the reason for that is because it's

1    foreseeable that these harms to the public would occur.

2         So for those reasons, unless Your Honor has any

3    questions, that's all we have today.

4              THE COURT:  Thank you, Mr. Majestro.

5         Mr. Heard, do you want to respond to any of this?

6              MR. HEARD:  Yes, Your Honor, three points.

7         First, on the question of authority and what is good

8    authority, I heard Mr. Majestro say several times that the

9    authority he is citing is persuasive.  Persuasive authority

10   has reasoning that provides reasons for the conclusion.

11        The second point, the Circuit Court authority that they

12   cited contains no reasoning.  The 25 non-West Virginia cases

13   that are cited in their table of authorities, not one of

14   them contains any reasoning distinguishing between a public

15   and private right.

16        The plaintiffs cannot have it both ways.  They can't

17   say, as Mr. Majestro did, that these cases apply the

18   Restatement test in 821B and, at the same time, ignore the

19   fact that none of these decisions address the very

20   definition that the Restatement gives in back-to-back

21   sentences.

22        A public right is a right held in common.  It is not

23   the private right that everyone has not to be negligently

24   injured.  If they don't make that distinction, they are not

25   persuasive.

1    And I'm perfectly happy for Your Honor to read all of

2  those non-West Virginia cases they cited.  If Your Honor

3  meets the intellectual challenge of coming to terms with

4  that difference, you will be only the second case.

5    And the first case is the *Brooke County* case which

6  applied the Illinois Supreme Court decision Your Honor

7  referred to which got this distinction right.

8    The second thing I would say, Your Honor, is we're not

9  citing the Restatement (Third) because we say the West

10  Virginia Supreme Court would adopt it.  We're citing the

11  Restatement (Third) for the statement of fact that the

12  Restatement makes.  And it says liability on such theories,

13  that is, product-based theories, has been rejected by most

14  courts.

15    Even if Your Honor disregards that statement in the

16  Restatement (Third), the Delaware Court in the opioid

17  litigation said the same thing.  Quote:  "There is a clear

18  national trend to limit public nuisance to land use."

19    I ask Your Honor to look at that Fourth Circuit

20  decision in *Rhodes* vs. *DuPont* for a second reason.  That

21  case involved contamination of the water supply of

22  Parkersburg and contained both a private and public nuisance

23  claim.

24    If Your Honor wants to come to grips with whether

25  something interferes with a public or private right, and

1   whether the so-called destruction of the community makes

2   this a public nuisance case, *Rhodes* indicates the proper

3   line of analysis.

4       In that case the plaintiffs, in support of their

5   private nuisance claim said, yes, DuPont put chemicals into

6   the public water supply, but that public water got pumped

7   into our private homes and, therefore, that supports a

8   private nuisance claim.

9       And the Fourth Circuit said, no, that analysis is

10  entirely mistaken.  The point of first impact where the

11  contamination first affected, first interfered is with the

12  public water supply.  And, so, that point of first impact

13  defines this nuisance as a public nuisance because it's

14  interfering with a public right.

15      In that same way, distribution of opioids clearly

16  affects in the first instance and has its immediate first

17  impact on the persons who are addicted and suffer personal

18  injury.  It's only secondarily that the first responders and

19  healthcare providers and children suffer emotional trauma.

20  And it's only third-hand that property values are supposedly

21  affected.

22      And (video inaudible) in the first instance, this is

23  all about personal injury, about addiction, is that

24  80 percent of the remedy that plaintiffs seek is for a

25  remedy for personal injury.  They're seeking two billion

1    dollars out of 2.6 to provide addiction treatment for the

2    people personally injured.

3        The last point, Your Honor, is this.  Mr. Majestro

4    mentions the Controlled Substances Act.  The Restatement

5    says in Comment E that a violation of statute or regulation

6    or ordinance may provide the basis for a public nuisance

7    claim where the statute or ordinance brands the conduct as a

8    public nuisance.

9        No West Virginia statute or regulation, no ordinance of

10   Cabell or Huntington, nor the CSA, brands the distribution

11   of opioids as a public nuisance.  And, in fact, this is an

12   argument the plaintiffs don't even make in their opposition,

13   just resurrecting it today.

14       So at the end, I would simply say there is the old

15   adage with which you're all familiar:  Hard cases make bad

16   law.  Before today I looked back to see what the original

17   meaning of that term was.  You know, there's a tendency to

18   bend the law when there are sympathetic plaintiffs.  But

19   when that happens, hard cases make bad law.

20       And, in fact, the authority that the plaintiffs cite in

21   their brief, not one of them addressed the fundamental

22   distinction in the Restatement definition.  It's a

23   give-away.

24       But so far, the sympathetic case that makes for bad

25   law, there's a fundamental distinction between public and

1   private right.  It's not implicated here.  And the

2   defendants are entitled to summary judgment.

3        Thank you.

4        THE COURT:  Let's take a break before we go to the

5   proximate cause issue.  We'll be in recess for five or ten

6   minutes and then we'll come back and look at the other

7   issues before the Court today.

8        (Recess taken from 12:09 p.m. until 12:20 p.m.)

9        THE COURT:  All right, we're ready to go back on

10  the record in the Cabell County cases, and the next issue is

11  the proximate cause issue.

12       And, Mr. Hester, I believe it's your turn to bat.

13       MR. HESTER:  Yes.  Thank you, Your Honor.  I guess

14  early good afternoon to you.

15       This motion turns on the requirements of West Virginia

16  law that proximate causation cannot be established if the

17  chain of causation leading to the alleged harm is remote.

18       The plaintiffs don't dispute the facts that bear on

19  this remoteness issue.  They do not contest that their

20  alleged harm from defendants' distribution of opioids occurs

21  only after a doctor prescribes opioids, a pharmacist

22  dispenses opioids, a third party illegally diverts opioids,

23  and a third party uses opioids illegally.

24       Now, the plaintiffs' brief discusses three different

25  categories of evidence relating to their alleged harm.  But

1    the important point is that none of that evidence disputes

2    this four-step chain of causation.

3         The plaintiffs point to a flood or an excessive supply

4    of opioids.  They point to correlations between opioid

5    volumes and opioid harms.  And they point to a failure to

6    control for suspicious orders which they allege led to an

7    excessive volume of opioids.

8         Those are all contested factual issues, Your Honor.

9    But the essential point for purposes of this motion is that

10   none of this evidence creates an issue of fact on the

11   four-step chain of causation that I've described.

12        No matter how many pills defendants shipped, and even

13   accepting the plaintiffs' allegation that the volume is

14   excessive, the pills would have sat on a shelf harming no

15   one unless a doctor prescribes, a pharmacist dispenses, a

16   third party diverts, and a third party uses opioids

17   illegally.

18        So this four-step causal chain for plaintiffs' theory

19   of harm from the distribution of opioids is undisputed.  The

20   only remaining question is over the legal standard that

21   applies to this undisputed chain of causation.

22        And the West Virginia Supreme Court has made clear that

23   remoteness is an essential element of proximate causation

24   under West Virginia law.  It's set forth clearly in the

25   *Aikens* decision.  Quote:  "Remoteness is a component of