IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
```

BENCH TRIAL - VOLUME 34
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


JULY 2, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301


**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:            Ayme Cochran, RMR, CRR
Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1            PROCEEDINGS had before The Honorable David A.

 2    Faber, Senior Status Judge, United States District

 3    Court, Southern District of West Virginia, in

 4    Charleston, West Virginia, on July 2, 2021, at 9:00

 5    a.m., as follows:

 6                 THE COURT:  All right.

 7          Do you want to call your witness?

 8                 MR. SCHMIDT:  Yes, Your Honor.  We're ready to go,

 9    if that works for the Court.

10                 THE COURT:  Yes, please.

11                 COURTROOM DEPUTY CLERK:  Sir, would you please

12    state your name?

13                 THE WITNESS:  Christopher Gilligan.

14                 COURTROOM DEPUTY CLERK:  Thank you.  Please raise

15    your right hand.

16         DR. CHRISTOPHER GILLIGAN, DEFENSE WITNESS, SWORN

17                 COURTROOM DEPUTY CLERK:  Thank you.  Please take a

18    seat.

19                 THE COURT:  Good morning, sir.

20                 THE WITNESS:  Good morning.

21                 MR. SCHMIDT:  Your Honor, it's good to be back.

22    We call Chris Gilligan as our first witness.

23          May we proceed?

24                 THE COURT:  Well, it's good to see you, sir.

25                 MR. SCHMIDT:  Thank you.
```

```
1              THE COURT:  We missed you.

2              MR. SCHMIDT:  I missed being here.  I missed you.

3         May we proceed?

4              THE COURT:  Yes, please.

5              MR. SCHMIDT:  Okay.

6                        DIRECT EXAMINATION

7              BY MR. SCHMIDT:

8    Q.   Good morning, Dr. Gilligan.  Please introduce yourself

9    to the Court, if you would, in terms of name and your

10   position, please.

11   A.   Good morning.  I'm Chris Gilligan and I serve as the

12   Chief of the Division of Pain Medicine at Brigham and

13   Women's Hospital in Boston.

14   Q.   What is it that has made you dedicate your career to

15   pain medicine, the discipline that you just mentioned?

16   A.   When you think about what brings a patient to a doctor,

17   one of the main reasons, one of the primary reasons the

18   patients come, is to get relief of -- from pain and, also,

19   for patients who have severe chronic pain conditions, those

20   conditions, not just because of the obvious suffering from

21   pain, but they also prevent patients from -- from

22   functioning, from working; in many cases, taking care of

23   their families, doing the things they need to do and want to

24   do and essentially can take their life away.  And so, when

25   we're able to successfully treat those patients, it's
```

1    incredibly rewarding.

2    **Q.**   Prescription opioids over the course of your career,

3    have they been an important part of pain treatment and pain

4    management?

5    **A.**   Yes, they have.

6    **Q.**   Who's charged with making the judgment about when and

7    by whom prescription opioids should be used?

8    **A.**   Principally, that's doctors.  It's clinicians who are

9    in the exam room with the patient and are getting the

10   information about the patient's case, are examining the

11   patient, have the training and the education to make that

12   decision and, therefore -- and also have the responsibility

13   and the authority to make that decision.

14   **Q.**   From your experience, do distributors play a role in

15   deciding whether doctors prescribe opioids or other

16   medicines?

17   **A.**   No, they do not.

18   **Q.**   Do they play a role in determining the level of opioids

19   that doctors prescribe?

20   **A.**   No.

21   **Q.**   And I'd like to dive into those opinions over the

22   course of our exam but, first, I want to take a step back

23   and spend a little more time giving the Court a sense of

24   your background, if we could.  Let me start off by asking

25   where you went to college?

1    **A.**    I went to Harvard College.

2    **Q.**    And what did you do after college and before medical

3    school?

4    **A.**    I went to Cambridge University in England and did an M.

5    Phil, an M. Phil degree, a Masters degree.

6    **Q.**    Where did you go to medical school after that?

7    **A.**    I went to Yale Medical School.

8    **Q.**    What was it that made you decide you wanted to go to

9    medical school?

10   **A.**    When I was 15, I spent a summer in France and stayed

11   with a family where the father was a doctor and got to know

12   him very well and had tremendous respect for him, and

13   decided that I wanted to be a -- wanted to follow that path.

14   **Q.**    Okay.  And you've done some different things over the

15   course of your career that I want to briefly touch on.

16   Could you first walk us through what you did between

17   graduating from medical school up to the year 2000?

18   **A.**    Yes.  So, I graduated from medical school in 1996.  I

19   did a one-year surgical internship at New York Hospital in

20   New York.

21        After that, I moved up to Boston to Brigham and Women's

22   Hospital to serve as a surgery resident.

23        Then, I got to the two-year research portion of a

24   seven-year surgery residency and I got permission to go back

25   to school during that two-year research period.  So, I went

1    to Harvard Business School.

2         After Harvard Business School, I was intending to just

3    go back to my surgery residency, but my professors at the

4    business school said you need to get some -- some business

5    experience.  I'd only been a doctor.  So, I did Life Science

6    Venture Capital and then I also went and I served in the

7    Army in Israel.  I'm -- my family -- my mother is Jewish,

8    I'm Jewish, and I went to Israel, did my military service

9    there.

10   **Q.**   And how long did you serve in the military in Israel?

11   **A.**   About a year and a half.

12   **Q.**   Did that include a combat function?

13   **A.**   Yes, it did.

14   **Q.**   And can you tell us just a little bit about that?

15   **A.**   I was a battalion doctor in the Golani Brigade, which

16   is an infantry brigade.  So, we were principally tasked with

17   dealing with a lot of different things.

18   **Q.**   Okay.  Did you do further medical training after

19   completing that service and that work you described in 2004?

20   **A.**   Yes.  After that, I went back to Brigham and Women's

21   and did the combined emergency medicine residency at Brigham

22   and Women's and Mass General Hospital.  I shifted from

23   surgery to emergency medicine and completed my emergency

24   medicine residency there and then I stayed on at Mass

25   General to do a pain medicine fellowship.

1    Q.   And what prompted the shift from a surgery focus to a

2    pain medicine focus for you?

3    A.   So, I had been on a cardiac surgery track and I saw

4    that cardiac surgery was really -- patients were being

5    better treated by minimally invasive therapies and

6    interventional cardiologists and such were developing.  And

7    I realized that in pain medicine there was an element where

8    we could do the same thing for patients to try to -- to try

9    to develop better, simpler, safer procedures and treatments

10   to help patients get better.

11   Q.   As I understand your CV, since finishing that

12   fellowship in anesthesia and pain medicine, you've been at

13   different teaching hospitals in Boston; is that correct?

14   A.   That is right.  After finishing the fellowship, I

15   stayed on staff at Mass General Hospital, which is one of

16   the teaching hospitals for Harvard Medical School.

17        Then I went to Beth Israel Deaconess Medical Center,

18   which is another of the teaching hospitals for Harvard

19   Medical School.

20        And then, since 2016, I've been serving as the Chief at

21   Brigham and Women's, which is also one of Harvard's teaching

22   hospitals.

23   Q.   And can you comment just on the standing of Brigham and

24   Women's in the -- in the medical -- in the broader medical

25   community?

1    A.    It's one of the big academic medical centers in Boston

2    charged with taking care of patients, doing research to try

3    to advance our different fields, and teaching medical

4    students, residents, fellows.  Hopefully, the next

5    generation of leaders.

6    Q.    In terms of teaching, is it affiliated with any

7    universities?

8    A.    So, it is a teaching hospital for Harvard Medical

9    School.

10   Q.    Are you -- are you board certified in any areas?

11   A.    I'm board certified in emergency medicine and in pain

12   medicine.

13   Q.    Beyond being board certified yourself, do you play any

14   role in the board certification process for other doctors?

15   A.    I do.  I write the -- some of the board examination

16   questions for the Pain Medicine Boards.

17   Q.    Having walked through your background --

18         MR. SCHMIDT:  May I approach the witness, Your

19   Honor?

20         THE COURT:  Yes, please.

21         BY MR. SCHMIDT:

22   Q.    I'd like to just dive into a little bit of -- a little

23   bit more detail into some of the areas of your background.

24         MR. SCHMIDT:  Am I going to break anyone's heart

25   if I erase this?

```
 1                    THE COURT:  You're a day late on the birthday
 2      cake.
 3                    MR. SCHMIDT:  That's really sweet.
 4                    BY MR. SCHMIDT:
 5      Q.   Throughout your career, have you been involved in
 6      patient care, teaching and research?
 7      A.   Yes.  That would be a good description of -- we talk
 8      about a three-part mission, which is our mission, and that's
 9      a good description of how I've spent my time.
10      Q.   Okay.  I'm going to just walk through some of those,
11      starting with patient care.  Can you give us a sense of the
12      range of pain conditions that, in your work, you treat?
13      A.   So, we treat really a broad and I think a complete
14      range.  We treat patients with back and neck pain, hip and
15      knee pain from arthritis.  We treat a lot of patients.
16      We're the hospital associated with the Dana-Farber Cancer
17      Institute.  We treat conditions that are just defined by the
18      pain, things like shingles.  We treat a lot of patients with
19      headaches.
20           And then, a wide range.  Patients, for example, may
21      have an autoimmune condition like rheumatoid arthritis,
22      things like that, that cause pain, and we treat -- we treat
23      that, as well.
24      Q.   Is that true or not true in terms of the patient
25      population that you see?  Is it a narrow range, a focused
```

1    range, or a broad range?

2    **A.**    So, we're a teaching hospital and we see the entire

3    range.  We see -- we see patients who are homeless.  We see

4    patients who are royalty and fly in from other countries.

5    **Q.**    Do you have just -- not to the person, but a rough

6    estimate of what order of magnitude of patients you've seen

7    and cared for over the course of your career?

8    **A.**    So, I see patients two and a half days a week.  A

9    typical clinic day for me is about 25 patients give or take.

10   My whole career in pain medicine, I've seen -- at least that

11   many days a week I've spent time seeing patients.  Other

12   times, it's been more than that.  So -- and I finished

13   fellowship in 2008.

14   **Q.**    So, are we talking hundreds more, thousands?

15   **A.**    I think -- I think it's thousands.

16   **Q.**    Okay.  And could you orient us to how that tracks in

17   the real world just to illustrate when was the last time you

18   saw a patient?

19   **A.**    Yesterday afternoon right before I went to the airport.

20   **Q.**    Okay.  When is the next time you will see a patient?

21   **A.**    I'm taking vacation next week.

22   **Q.**    Okay.

23   **A.**    So, the following Monday morning.

24   **Q.**    Got it.

25          Do you -- in addition to seeing patients yourself, do

```
1    you also supervise other physicians who are responsible for

2    providing pain management medical care to patients?

3    A.   Yes.  So, we have a pain medicine fellowship and every

4    year we train ten fellows in pain medicine.  In addition, we

5    have the residents from Brigham and we also have a lot of

6    residents who come through and medical students who come

7    through.

8    Q.   Could you give us a sense of what that entails when it

9    comes to the people you're overseeing, their medical

10   treatment and, specifically, their use of prescription

11   medicines?

12   A.   So, we see patients typically together with the

13   trainees, the fellows, or the residents, to evaluate the

14   patient together, make a plan together, and then they --

15   they also participate with us in writing prescriptions,

16   doing procedures, et cetera.

17   Q.   Are there any other leadership roles that you play at

18   Brigham and Women's?

19   A.   Yes.  So, I'm -- I'm one of the Vice Chairs of

20   Anesthesia.  I'm also the Director of the Spine Center at

21   Brigham and Women's Hospital.  And then I serve on the

22   Executive Committee of the Brigham Comprehensive Opioid

23   Response and Education Committee, which is a committee at

24   the Brigham responsible for, as the name implies, both

25   overseeing opioid prescribing and educating physicians and
```

```
 1   other clinicians about opioid prescribing.
 2   Q.   Is that a steering committee?
 3   A.   That's a steering committee, yes.
 4   Q.   Okay.  And could -- does serving on that steering
 5   committee include any role in creating guidelines for
 6   doctors?
 7   A.   Yes.  We write the guidelines for clinicians at Brigham
 8   and Women's about appropriate prescribing of opioids and
 9   other -- and other related topics.
10   Q.   Just at a high level, what is the purpose of guidelines
11   like that?
12   A.   I would say the purpose is to try to give clinicians
13   guidance on essentially how to get it right.  What is the
14   right balance?  Everything in medicine is a balance of risk
15   and benefit and on a specific topic like that you're trying
16   to give guidance about how to best and most appropriately
17   get that decision right.  Those are decisions that,
18   typically, the correct answer is not going to always be yes.
19   The correct answer won't always be no.  And you're trying to
20   give people guidance about where the balance should lie.
21   Q.   Let me shift gears and ask you about your teaching
22   work.  Are you affiliated or are you on the faculty at any
23   medical school?
24   A.   I'm on the faculty at Harvard Medical School.
25   Q.   What do you teach there?
```

1    **A.**    Really, the folks who I've mentioned, the fellows,

2    residents, medical students, where we teach them about the

3    field of pain medicine, how to practice it, how to evaluate

4    patients and the research, et cetera.

5    **Q.**    And how long have you been doing that?

6    **A.**    Since 2008.

7    **Q.**    Over a decade?  Lastly, your research, do you conduct

8    pain research?

9    **A.**    Yes, I do.  Principally clinical trials.

10   **Q.**    And can you give us a sense of what that pain research

11   involves?

12   **A.**    So, it's really a question of trying to take potential

13   new and perhaps better therapies and evaluate.  Do they

14   work?  Are they safe?  Who do they work for?  Who do they

15   not work for?  What could be their role?  Could they

16   represent a better way to treat at least a certain group of

17   patients that -- that we try to treat?

18   **Q.**    Does that include doing research of clinical trials?

19   **A.**    Very much so.  Clinical trials is the focus of it.

20   **Q.**    Are some of the treatments that you're looking at in

21   your clinical trial research potential alternatives to

22   prescription opioid treatments for pain?

23   **A.**    Yes, they are because if we have other alternative

24   therapies that work well and are safe for certain patients

25   and can get them pain relief, return their function, et

1    cetera.  Then, for at least a certain number of those

2    patients, you wouldn't need to be treating them with

3    opioids.

4    **Q.**   Have you published studies and articles in peer-review

5    journals?

6    **A.**   Yes, I have.

7    **Q.**   And by my count you've got about a dozen; does that

8    seem right?

9    **A.**   That might be about right.

10   **Q.**   And I think I undersold you.  I think it's about two

11   dozen, looking at my notes.

12   **A.**   That seems more right.

13   **Q.**   Okay.  I've had trouble with my dozen counting in this

14   -- in this court.  So, it pays to check my math, especially

15   for me.

16        Do you also serve as a peer reviewer for scientific

17   journals?

18   **A.**   Yes, I do.

19   **Q.**   Has that included leading medical journals?

20   **A.**   Yes, it has.

21   **Q.**   Can you give us a couple examples of that?

22   **A.**   The Lancet, The New England Journal of Medicine, some

23   of the more well-regarded journals in the field,

24   specifically, of pain medicine.

25   **Q.**   And that was going to be the next question I asked you.

```
 1    Has that included specifically pain management journals in
 2    addition to general journals like Lancet and like The New
 3    England Journal of Medicine?
 4    A.   It has, yes.
 5    Q.   Have you also served in an editorial role in journals?
 6    A.   Yes.  I serve on the Editorial Board of one of the pain
 7    medicine journals and, in September, I'll become an Editor
 8    in Chief of a different one.
 9    Q.   And last question in this area.  Have you undertaken
10    service for the Department of Defense related to pain
11    treatments?
12    A.   Yes.  I evaluate grant applications with the Department
13    of Defense on topics in the field of pain medicine where
14    they're deciding which ones to fund, as they're trying to do
15    similar things to what we talked about, evaluate, find new
16    and better treatments for pain conditions.
17    Q.   I'm going to put you on the spot a little bit, Dr.
18    Gilligan, and ask you a couple of questions on some of the
19    recognitions you've received, not wanting to make you feel
20    uncomfortable in doing so.
21         Over the course of your career have you received awards
22    for some of the work that you've done?
23    A.   Yes, I have.
24    Q.   And I want to just ask you basic questions about a few
25    of those.  One was you have listed on your CV that you were
```

1    part of a summit on opioid abuse at the White House in 2014.

2    Can you give us a sense of what that involved?

3    **A.**   So, it was -- as the name implies, it was a summit at

4    the White House looking at the topic of opioid abuse.  I

5    think my role was to be there as a specialist in pain

6    medicine because to address that topic you both have to look

7    at the area of addiction medicine, but also, you have to

8    look at the topic of pain medicine because how are you going

9    to treat pain.

10   **Q.**   You also have listed some citizenship awards and

11   something called a Fellowship Excellence Award.  Can you

12   tell us what those are?

13   **A.**   Those are recognitions from the hospitals, the

14   Department of Anesthesia, for -- I think for contributing to

15   the mission of the department and for -- for running a

16   fellowship in pain medicine that was well regarded.

17   **Q.**   Okay.  And this is the hardest one for me personally to

18   ask you about.  It looks like you've gotten something from

19   the Boston Red Sox.  Can you tell us about that?

20   **A.**   They also give -- give an award, I think, for

21   physicians who they think have worked hard to treat their

22   patients and work in our community.

23   **Q.**   Let me shift gears a little bit.  Have you served as an

24   expert witness before this case?

25   **A.**   Yes, I have.

1   **Q.**   How much of your time does that kind of work make up?

2   **A.**   That's typically a very small part of what I do.

3   **Q.**   Have you served as an expert witness for the government

4   in prior matters?

5   **A.**   Yes, I have.

6   **Q.**   And without diving into details, can you give us just a

7   general sense of what that entails?

8   **A.**   So, I served as an expert witness for the U. S.

9   Attorney's Office.  I think that's Department of Justice and

10  the FBI for a doctor who was accused in a criminal case of

11  -- I think the accusation was stopping being a doctor and

12  being essentially a drug dealer.

13  **Q.**   And I saw one time where you were asked to testify by

14  the government in a case involving an opioid company, but

15  you weren't allowed to do so.  Can you tell us what happened

16  there?

17  **A.**   Yeah.  So, some executives at Insys Pharmaceuticals

18  were charged with criminal charges that were related to --

19  Insys produced opioids or does produce opioids.  The defense

20  attorneys for them came, met with me a few times, asking me

21  to serve as a witness for the defense, an expert witness.

22       Then I went to my department.  We have to get

23  permission from our department to serve as an expert

24  witness.  The leadership in my department said that I should

25  not serve as an expert witness and I told them that.

1       Subsequently, the government --

2   **Q.**   I'm sorry.  Did you agree with that view?

3   **A.**   Actually, I did, yes.

4   **Q.**   Okay.

5   **A.**   Subsequently, the attorneys from the government, from

6   the U. S. Attorney's Office, asked if I would serve as their

7   witness, their expert witness in that same case.  I told

8   them that I was surprised because I told them about the

9   conversations I had had with Insys.  They said they didn't

10  think it was problematic, but the judge said that I should

11  not serve as an expert witness since I had both talked to

12  the defense and then subsequently to the U. S. Attorney's

13  Office.

14  **Q.**   Okay.  You're being compensated for your work in this

15  case.  Can you share with us your hourly rate?

16  **A.**   My rate is $800.00 per hour.

17  **Q.**   And in terms of different prescription opioid cases

18  where we have worked with you on behalf of McKesson, how far

19  back in time does that reach?

20  **A.**   For the different cases, I think it's about two years.

21  **Q.**   Has your work included going back through the

22  literature developments in the medical field and reviewing

23  that kind of material?

24  **A.**   Yes, it has.

25  **Q.**   Has your work included making an effort to fully review

1    all of McKesson's documents, or ABDC's documents, or

2    Cardinal's documents?

3    **A.**   No.  I haven't done an in-depth review of all of their

4    documents, no.

5    **Q.**   And why is that?

6    **A.**   I'm a doctor.  I'm an expert in pain medicine.  I'm,

7    frankly, not an expert in healthcare distributors and their

8    business.

9    **Q.**   Got it.

10        I want to just wrap up on some of these points.

11   Throughout the course of your career, has your work and your

12   training focused on the medical management of pain?

13   **A.**   Yes, very much so.

14   **Q.**   Have you been directly involved with the use of

15   prescription opioids and discussions about the standard of

16   care for using prescription opioids since you were in

17   medical school back in the 90s?

18   **A.**   Yes, I have.

19   **Q.**   And as part of your professional work and as a part of

20   your work in this case have you had occasion to study

21   prescribing patterns from before you were in medical school

22   in terms of what's reflected in literature and things like

23   that?

24   **A.**   Yes, I have.

25   **Q.**   From doing that work, have you reached opinions on pain

```
 1    management and the use of prescription opioids in pain
 2    management for purposes of this lawsuit?
 3    A.   Yes, I have.
 4    Q.   Are you offering all of the opinions you offer in those
 5    areas to a reasonable degree of medical certainty?
 6    A.   I am.
 7              MR. SCHMIDT:  Your Honor, at this point, we move
 8    to admit Dr. Chris Gilligan as expert in pain management and
 9    the risks and benefits of prescription opioids.
10              THE COURT:  Any objection?  Hearing none, the
11    Court --
12              MR. FARRELL:  Judge, yes.  If you don't mind, may
13    I voir dire the witness?
14              THE COURT:  Yes.
15                        CROSS EXAMINATION
16    BY MR. FARRELL:
17    Q.   Good morning, Dr. Gilligan.
18    A.   Good morning.
19    Q.   A couple of questions.
20         Are you licensed in West Virginia?
21    A.   No, I am not.
22    Q.   Have you ever practiced medicine in West Virginia?
23    A.   No.
24    Q.   Have you provided healthcare for West Virginians, to
25    your knowledge?
```

1    **A.**   Not -- not that comes to mind immediately, no.

2    **Q.**   And then, real quick, you mentioned the Chair of Pain

3    Medicine.  In part of your administrative role or your

4    oversight of physicians, do you monitor the prescribing

5    practices of those doctors?

6    **A.**   Yes, I do.

7          MR. FARRELL:  No objection and no further

8    questions.

9          THE COURT:  The Court finds that Dr. Gilligan is

10   an expert in the field of pain management and the risks and

11   benefits of prescription opioids.

12       Just curious, what was your Cambridge college?

13          THE WITNESS:  Jesus.

14          THE COURT:  Okay.

15          BY MR. SCHMIDT:

16   **Q.**   So, Dr. Gilligan, I'd like to ask you about the

17   condition of pain and then ask you about prescription

18   opioids as a treatment for pain.  Let's start with the pain

19   first.  Could you tell us just at a high level from your

20   experience how pain impacts the patients you see and why

21   it's important to treat pain?

22   **A.**   So, we see patients who their pain is at the level that

23   they're coming to go see a pain specialist.  And many of our

24   patients have chronic pain conditions.  And for a lot of

25   those patients it's -- their pain is severe, so just their

1    level of suffering is severe.

2          But also very, very important is that, in many cases,

3    they can't work or they can't work the way they want to.  As

4    I mentioned before, they can't take care of their family the

5    way they want to.  They can't participate in the community,

6    socialize, exercise, et cetera.  And so, not only do they

7    have the suffering from the pain, but they have essentially

8    -- we talk about their life being taken away from them by

9    the pain and by the limitation in function from the pain.

10         So, frankly, some of these cases are -- if you're

11   sitting in the room with a patient are very, very brutal.

12   **Q.**   Have you seen over the course of your career the impact

13   that pain directly has upon patients who suffer from it,

14   particularly chronic pain?

15   **A.**   Yes.  I would say on a daily basis when we're -- where

16   we're in clinic I see that.

17   **Q.**   Are you familiar with published data on trying to

18   quantify the costs and the number of people affected by

19   pain, including chronic pain?

20   **A.**   Yes, I am.

21   **Q.**   I'd like to ask you about some of that data, if I may.

22   I'm going to show you a document that the Court has seen

23   before, but is not in evidence, MCWV-1170.

24              MR. SCHMIDT:  May I approach, Your Honor?

25              THE COURT:  Yes.

1          MR. SCHMIDT:  And I apologize.  I feel like I came

2     back and the big documents came back.

3          THE COURT:  We cleaned out the documents while you

4     were gone, Mr. Schmidt.

5          MR. SCHMIDT:  I know.  I'm sorry.

6          BY MR. SCHMIDT:

7     Q.   And so we know what we're looking at, Dr. Gilligan, if

8     we go to the second page of this document, it's titled --

9     and we can actually put it up on the screen.

10          MR. SCHMIDT:  Can you switch that?

11          BY MR. SCHMIDT:

12    Q.   It's entitled Relieving Pain in America.  And then,

13    about halfway down, it says it's from the Institute of

14    Medicine.  And if we go to the next page, the third page of

15    the document using the numbers in the lower left corner, we

16    can see near the bottom that it's from 2011.  Are you

17    familiar with this document from the Institute of Medicine

18    and this report, Relieving Pain in America, from 2011?

19    A.   Yes, I am.

20    Q.   What is the Institute of Medicine?

21    A.   So, the Institute of Medicine is a, frankly, very well

22    regarded group of physicians who have been recognized as

23    leaders and then they will be tasked by the government with

24    writing reports on certain topics that are important to the

25    health of Americans.

1          MR. SCHMIDT:  On that basis, I'm going to move

2    this into evidence as a public report, but if there's an

3    objection, I can lay a little more foundation.

4          THE COURT:  Is there any objection?

5          MR. FARRELL:  No, Your Honor.

6          THE COURT:  It's admitted.

7          MR. SCHMIDT:  Okay.  Thank you for that.

8          BY MR. SCHMIDT:

9    **Q.**   Just in terms of this specific report, do you have an

10   understanding of how this report came to be?

11   **A.**   Well, I think it was the government recognizing that

12   this is a topic that was very important to the health of

13   Americans and a need for data on the scope of the problem,

14   the state of treatments, et cetera, what were the unmet

15   needs in the areas that needed more research and they

16   brought together a group of experts in the field, as well as

17   patient representatives or others.

18   **Q.**   All right.  Let's look at Page 38 of this report, if we

19   could.  And, again, I'm going to be using the numbers in the

20   bottom left corner, which differ from the numbers in the

21   actual document.  And we have it up on the screen.  I'm

22   going to read to you the last paragraph that carries over

23   onto Page 39 and ask you to comment on it.

24         It says pain is a universal experience but unique to

25   each individual.  Is that something you see in your medical

1    practice?

2    **A.**    Yes, it is.

3    **Q.**    It then says across the lifespan, pain - acute and

4    chronic - and let me just pause right there.  We're well

5    into this trial.  I don't know if we've ever defined for the

6    Court what acute and chronic is from a pain management

7    doctor.  Can you tell us what the difference between acute

8    and chronic pain is?

9    **A.**    Sure.  So, a couple of things.  One is the time frame.

10   We typically talk about pain that's acute lasting 6 or 12

11   weeks; if pain is chronic, being longer than that, certainly

12   longer than 12 weeks.

13        There's also a distinction because acute pain is most

14   commonly associated something such as an injury.  Someone

15   breaks their arm, there's actually a helpful signal in that.

16   If I -- if I break my arm and it hurts, it's telling me not

17   to move it, and there's some value in that.

18        Chronic pain is, almost by definition, more than

19   12 weeks and often is not, at that point, serving a useful

20   function.  So, if I break my arm and twelve weeks later it's

21   been set, but it's still hurting severely, that's actually

22   not giving useful information, but there's suffering and

23   there's loss of function.

24   **Q.**    So, to go back to the start of the sentence, it says

25   across the lifespan pain, acute and chronic, is one of the

1    most frequent reasons for physician visits, among the most

2    common reasons for taking medications, and a major cause of

3    work disability.

4        Have you seen all three of those things in your

5    practice in terms of pain as one of the most frequent

6    reasons people see doctors, one of the most frequent reasons

7    they take medicine, and one of the major causes of not being

8    able to work?

9    **A.**    Yes.  I have seen all three of those.

10   **Q.**    All right.  Let's jump ahead, if we could, to Page 47,

11   please.  And there's a box there if we make it a little

12   larger that says pain by the numbers.  And I want to just

13   walk through a couple pieces of data reported in this

14   report.  The first piece of data reported says 100 million,

15   approximate number of U. S. adults with common chronic pain

16   conditions.  Do you see that?

17   **A.**    I do.

18   **Q.**    Have you seen similar estimates of the number of

19   Americans who have chronic pain conditions?

20   **A.**    Yes, I have.

21   **Q.**    And I just want to differentiate between types of

22   chronic pain conditions.  Is cancer pain a chronic pain

23   condition?

24   **A.**    Cancer pain can also be a chronic pain condition.  We

25   talk about chronic pain related to cancer and then chronic

1    non-cancer pain is one of the ways that we divide things.

2    **Q.**    In terms of chronic cancer pain, can you characterize

3    that at all for the Court?  Describe that pain.

4    **A.**    So, chronic cancer pain, we do think of as a distinct

5    topic.  In many instances, somebody may have advanced cancer

6    and they're going to have -- many of those patients will

7    have severe pain, but they also may have -- they,

8    unfortunately, have a limited life expectancy, frankly.  For

9    those patients opioids are typically going to be really one

10   of the foundations of how we're going to treat the pain.

11   For most of those patients, opioids will play a central role

12   in how we're going to treat that pain.

13   **Q.**    And you mentioned non-cancer chronic pain.  Could you

14   tell us some of the conditions that cause non-cancer chronic

15   pain and characterize the relative severity of those?

16   **A.**    So, for non-cancer chronic pain things like severe

17   low-back pain or neck pain, severe hip or knee pain

18   associated with arthritis and, actually, a whole host of

19   things.  Some of the autoimmune conditions, rheumatoid

20   arthritis, Crohn's disease, et cetera.  Chronic migraines.

21   And the list would go on.

22   **Q.**    Okay.  Just rounding out the questions that I was

23   asking you about this number, this is 2011, 100 million.

24   From your experience, has this number of adults in the U. S.

25   with common chronic pain conditions increased over time or

1    decreased over time?

2    **A.**    I think that it's increased over time due to a few

3    things.  One, the population has grown.  It's gotten so much

4    older.  Our population has gotten somewhat heavier and

5    weight is associated with knee and hip arthritis, et cetera.

6    So, I think that, overall, it has grown somewhat.

7    **Q.**    Let's go to the next line and this is actually the

8    statistic we heard about with another expert, 560 to 635

9    billion conservative estimate of the annual cost of chronic

10   pain in America.  Are you familiar -- have you seen

11   estimates like that in the literature in terms of trying to

12   estimate the economic consequences of chronic pain just on a

13   yearly basis?

14   **A.**    Yes, I have.

15   **Q.**    And are they consistent with this number which is north

16   of a half trillion?

17   **A.**    Yes.

18   **Q.**    If we then look at the -- let's skip the next bullet

19   which talks about state and federal government expenditures.

20   There's a number of percentages that run down here talking

21   about different pain conditions.  Could you just walk

22   through the numbers there that you think are meaningful for

23   us to hear about?

24   **A.**    Sure.  So, I would look at the fourth bullet point for

25   women after having a baby and look for -- at that

1    percentage.  10 percent have persistent pain at one year.  I

2    think that's significant.

3        I think, for the next bullet point, the patients who

4    have undergone surgery, specifically, the third dash there,

5    that 2 to 10 percent of these patients have chronic

6    postoperative pain that's severe.  And what's important

7    there is that it's chronic.  That's not right after surgery.

8    That's after they would have been expected to heal up, so to

9    speak.

10       I think the bullet point just below that, 5 percent of

11   the portion of American women 18 to 65 who have headache 15

12   or more days per month, I think that's quite significant.

13       And I think the second to last bullet point, the

14   percentage per U. S. nursing home residents, I would look at

15   the second dash there, that 17 percent have substantial

16   daily pain.

17   **Q.**   A few more questions about this document.

18            MR. SCHMIDT:  Could we go up to Page 162, please?

19            BY MR. SCHMIDT:

20   **Q.**   And if we look here, there's a paragraph -- there's a

21   sub-header that says Patient Access to Opioids.  Do you see

22   that?

23   **A.**   I do.

24   **Q.**   And it states in this 2011 Institute of Medicine

25   publication a reasonable degree of access to pain medication

```
1    - such as the stepped approach of the World Health

2    Organization's pain relief ladder for cancer - has been

3    considered a human right under international law since the

4    1961 adoption of the U. N. Single Convention on Narcotic

5    Drugs.  Do you see that?

6    A.   I do.

7    Q.   And is that -- is that consistent with your perspective

8    in terms of how the medical field views having prescription

9    opioids for appropriate cases?

10   A.   It -- yes, it is.

11   Q.   And then, if we go to the next paragraph, please, it

12   says in the United States, many pain experts agree that

13   physicians should prescribe opioids when necessary

14   regardless of outside pressure as an exercise of their moral

15   and ethical obligations to treat pain.  Do you see that?

16   A.   I do.

17   Q.   Is that something you see within the course of your

18   career, that view among many physicians, that you should

19   prescribe prescription opioids where appropriate when

20   necessary as part of a moral and ethical obligation to their

21   patients?

22   A.   Yes, it is.

23   Q.   All right.  Let's shift gears a little bit.  I want to

24   now talk about treatments for pain and I'm going to touch on

25   prescription opioids in a minute, but before I do, I want to
```

1    talk about nonprescription opioid treatments for pain.  Are

2    there treatments for pain that don't involve any kind of

3    medicine?

4    **A.**    Yes, there are.  Examples would be physical therapy.

5    Not involving medicine would include different

6    interventions, things like acupuncture, chiropractic

7    manipulation.  There's some psychological treatments, things

8    such as teaching patients relaxation techniques, biofeedback

9    et cetera.  So, short answer, there are.

10   **Q.**    Do those types of treatments have limitations in terms

11   of addressing pain?

12   **A.**    They do.  There are some patients who are very much

13   benefited by them and, frankly, with those patients one

14   would likely be stopping there.  And then there are other

15   patients who you try each and every one of those that seems

16   appropriate for their case and, unfortunately, it doesn't

17   work.  It doesn't give them relief.  It doesn't return their

18   function.

19   **Q.**    When it comes to prescription medicines or just

20   medicines generally, before I turn to opioids, are there

21   other kinds of medicines that can be used to treat pain

22   other than prescription opioids?

23   **A.**    Yes, there are.  We use common anti-inflammatory

24   medications, Advil, Motrin, Aleve, things in that class.

25   So, nonsteroidal anti-inflammatories.  We use muscle

1    relaxants.

2         There are groups of medications that are not opioids

3    that we use specifically to treat nerve pain.  Those are

4    medications such as Neurontin.  So, by trade name,

5    Neurontin, and Lyrica, and Cymbalta.

6         And then there's a whole host that are topical things

7    we have patients put on -- on the -- the Lidocaine patch,

8    for example.

9    Q.   Are there limitations to those kinds of treatments?

10   A.   Yes.  Similar to what we just talked about, there are

11   some patients who get excellent relief from them and,

12   perhaps in many of those cases, one would stop there again.

13        There are other patients who don't get relief or can't

14   tolerate side effects.  And then there are some patients

15   where there's a risk so you can't use those medications,

16   where it would be too dangerous to use those medications

17   given that person's specific medical history, accompanying

18   conditions, other medications they take.

19   Q.   And I want to just pick up on an idea you alluded to.

20   You mentioned risks for some patients for those medications'

21   side effects.  Do those medications carry their own distinct

22   risks that you have to take into account when deciding

23   whether to use them?

24   A.   Yes.  Those medications have their own risks that you

25   have to take into account and, frankly, essentially every

1    medication that a doctor prescribes has risks and benefits

2    and the job is to look at the individual patient in front of

3    you, take into account all of the information you have

4    available, weigh the risks and benefits of essentially any

5    medication that you're going to prescribe for that patient.

6    **Q.**    Okay.  So, I want to -- I want to turn from those

7    nonprescription opioid treatments to prescription opioids

8    and pick up on that concept that you were just talking about

9    in terms of benefits and risks and weighing those.  In your

10    opinion, are there patients for whom the benefits of

11    prescription opioids outweigh the risks?

12    **A.**    Yes, there are.

13    **Q.**    And can you talk about why that is?

14    **A.**    So, when we're weighing the risks and benefits of

15    opioid medications, a few things.  One, we can get some

16    information about how high risk a given patient is for

17    developing addiction.  If someone is at high risk for

18    developing addiction, they have a history of substance

19    abuse, they have a history of major untreated psychiatric

20    conditions such as bipolar, strong family history of

21    substance abuse, et cetera, would be at higher risk of

22    addiction.

23         There are other folks who we can identify as being very

24    low risk and there are other factors that come into it,

25    which is what's the patient's condition, the severity of it,

1    to what extent can non-opioid treatments get that patient

2    pain relief and return to function, and then to what extent

3    are those safe for that given patient.  So, there's a whole

4    host of things that come into that risk benefit.

5    **Q.**    That view you just expressed to us about the benefits

6    outweighing the risks for certain patients, do you

7    understand that to be the consensus of the medical community

8    when it comes to prescription opioids?

9    **A.**    Yes, I do.

10    **Q.**    Do you have an understanding as to whether that

11    consensus is reflected in the fact of FDA approval of

12    prescription medicines?

13    **A.**    Yes.  I think that the FDA approval of those

14    medications reflects a consensus that for certain patients,

15    for selected patients' judicious use, the benefits outweigh

16    the risks.

17    **Q.**    I would like to talk a little bit more about, first,

18    the risks of prescription opioids and then some of the

19    benefits.  And to do that I want to use as an illustration

20    point something referred to as a label for a prescription

21    medicine or the prescribing information.  Are you familiar

22    with that document for different prescription medicines, the

23    label, or the prescribing information?

24    **A.**    Yes, I am.  We also call it the package insert

25    sometimes.

```
 1              MR. SCHMIDT:  May I approach, Your Honor?

 2              THE COURT:  Yes.

 3              BY MR. SCHMIDT:

 4    Q.    Doctor, I've handed you what we've marked as MCWV-1197,

 5    which is a label for prescription medicine, and I will

 6    apologize to all concerned in advance.  We seem to have

 7    found the smallest print copy possible of this document.

 8    Fortunately, Mr. Reynolds can blow it up on the screen for

 9    us.

10         If we could start in the upper left corner just to make

11    it large, it says Percocet (oxycodone and acetaminophen

12    tablets) C-II, controlled substance II, Schedule II,

13    prescription only.  Do you see that?

14    A.    I do.

15    Q.    Are you familiar with -- from your work with this label

16    for Percocet, a prescription opioid?

17    A.    Yes, I am.

18    Q.    And just before we look a little bit at the contents of

19    this, what do you understand to be the purpose of a document

20    like this, the label, and who do you understand it to be

21    written for?

22    A.    So, my understanding is that the purpose of the label

23    is in part for clinicians to tell them what's the

24    indication, which of the medications be -- what is it

25    indicated for, what's -- what are some of the risks of the
```

```
1   medication, something about the pharmacology, the contents
2   of the medication.
3        Specific things.  You know, what you should do if the
4   patient has, for example, reduced kidney function with that
5   medication or interactions with other medications.
6        And then there's also some information that's directed
7   to patients and to their families in this.
8   Q.   This version of the label has -- it says right below
9   the title we were looking at, it says revised July, 2018.
10  Do you see that?
11  A.   I do.
12  Q.   Do you have an understanding as to whether the label
13  for a given medicine is regularly and periodically updated
14  over time as new information becomes available?
15  A.   My understanding is that they are, yes.
16  Q.   And I want to pick up on something you were telling us
17  about in terms of some of the information.  If we look at
18  this label, we see here there's a black box warning.  And
19  then, if we scroll down below that past the black box
20  warning, please, it looks like there are different sections,
21  including some of the ones you mentioned.
22        We see something called the description of the
23  medication.  Then, if we go to the next column, we see
24  pharmacokinetics, metabolism and elimination, something you
25  mentioned, indications and usage, contraindications,
```

1    warnings, et cetera.

2         And before diving into just a few of those sections, do

3    you have an understanding that what we're seeing here is

4    written according to a specified format in terms of these

5    different sections and what's supposed to appear, the types

6    of information that are supposed to appear in those

7    different sections?

8              MR. FARRELL:  Objection, Your Honor.  I'm not

9    quite sure that the doctor has been identified as an expert

10   in labeling.

11             MR. SCHMIDT:  I think it's something he deals with

12   every day.  If it's necessary, I can lay more of a

13   foundation but --

14             THE COURT:  It seems to me that the labeling is

15   well within his field of expertise that I qualified him in.

16   So, I'm going to overrule the objection.

17             MR. FARRELL:  Just to preserve for the record, I

18   don't have any problem with him testifying what's in the

19   label.  What I have an objection to is I believe the

20   question of -- is what is his understanding of what the FDA

21   requires to be in the label.

22             BY MR. SCHMIDT:

23   **Q.**   So --

24             THE COURT:  I'm going to allow it.  Overruled.

25             BY MR. SCHMIDT:

**Q.**   Dr. Gilligan, from -- I'm not going to ask you -- we haven't asked you to come here as an FDA expert, have we?

**A.**   You have not, no.

**Q.**   I'm going to ask you just some questions about this label from your perspective as a physician.  As a physician, do you have occasion to consult with labels for a range of different medicines and gather information from them?

**A.**   Yes, I do.

**Q.**   Does that require you to have basic information about how they're formatted, at a high level, what goes into them?

**A.**   Yes, it does.

**Q.**   And so, when you look at different labels, do you see that they have a specified format across different medications with some of these sections we've been talking about, warnings, indications, contraindications, and specified information in those sections?

**A.**   Yes.  This is the typical type content and layout.

**Q.**   And you heard reference to the FDA.  Do you know whether these labels are FDA approved?

**A.**   Yes, they are.

**Q.**   Is that relevant to you in your medical practice?

**A.**   It's relevant to us because the information is useful when you're prescribing these, you know, for all of the type of topics that we've talked about.  It informs your decision to prescribe or not, and how to prescribe, what dose to

```
1    prescribe, et cetera, and it's -- it is important to us that

2    this language has been approved by FDA in terms of feeling

3    comfortable relying on it.

4    Q.   Do you have the understanding that the companies that

5    manufacture these medicines are responsible for the contents

6    of these labels?

7    A.   Yes.  My understanding is that -- and my experience,

8    actually, is that there's a discussion between the company

9    and the FDA about what will be -- what will be agreed to go

10   into the label.

11   Q.   And from your experience when this label sets forth the

12   -- well, let me just ask you a question.  Without getting

13   into the substance here, what do you understand the

14   indications to tell you as a doctor?

15   A.   So, it tells you what condition FDA has approved the

16   medication for use for.

17   Q.   And then, obviously, what do you understand the

18   warnings to tell you?

19   A.   That they want to make it quite clear to you what the

20   potential risks of the medication in question is, what the

21   medication -- what the specific identified risks of

22   whichever medication it may be are so that you know them and

23   can put them into that risk benefit balance that we talked

24   about.

25   Q.   In terms of determining the substance of what this
```

1    label says, including who the medication might be

2    appropriate for, what the warnings that doctors need to

3    understand are, from your experience, do you know of any

4    role that wholesale distributors play in this content?

5    **A.**    No.  My understanding is they play no role in that.

6    **Q.**    All right.  So, let's look at the specific language.

7    And if we could go back to the first page to the black box

8    warning just to try to facilitate the structure here.  It

9    says WARNING:, colon, in all caps, and then it lists a

10   series of conditions, addiction, abuse, and misuse.

11        And then it talks about a risk evaluation, mitigation

12   and strategy.  And it looks like those conditions then

13   repeat with a little bit more information further down.  Do

14   you see that?

15   **A.**    I do.

16   **Q.**    And so, I want to start with the warning about

17   addiction, abuse and misuse.  Could you tell us what those

18   terms mean?

19   **A.**    So, addiction is when a patient develops a compulsive

20   self-destructive craving to use -- essentially an out of

21   control use of -- of a substance and, in this case,

22   oxycodone.  There are many substances, of course, that

23   people can get addicted to.  So, it's a compulsive, and out

24   of control, and self-destructive use of a substance is

25   addiction.

```
 1              THE COURT:  Just a minute.

 2        Mr. Ackerman?

 3              MR. ACKERMAN:  Your Honor, if I may, this document

 4    is not in evidence, I don't believe, unless I missed

 5    something.  And so, I have an objection to displaying it on

 6    the board.

 7              MR. SCHMIDT:  We'll move it into evidence, Your

 8    Honor.

 9              THE COURT:  Any objection to it being admitted,

10    Mr. Ackerman?

11              MR. ACKERMAN:  Hearsay.

12              MR. SCHMIDT:  I think, at a minimum, it can come

13    in for the limited purpose of effect on doctors.  It's

14    MCWV-1157.

15              THE COURT:  I'll admit it for the limited purpose.

16        This is helpful to the Court and I -- I think that the

17    limit -- it's permissible for the limited purpose.

18        Go ahead, Mr. Schmidt.

19              BY MR. SCHMIDT:

20    Q.   I think you had told us what addiction is.  Can you

21    tell us what abuse and misuse are?

22    A.   Sure.  So, abuse and misuse, on the other hand, are

23    just taking the medication, we'd say, for a non-medical use;

24    in other words, taking the medication for the sake of

25    euphoria or whatever, whatever it may be, but not taking it
```

1    for a medical use to get -- to get pain relief.  But someone

2    who is abusing or misusing a drug might be addicted, but

3    they also might not be addicted.  They might just be abusing

4    and misusing it without having -- without -- being addicted.

5    **Q.**    Under that heading it says Percocet exposes patients

6    and other users to the risks of opioid addiction, abuse, and

7    misuse, which can lead to overdose and death.  Can you tell

8    us just at a high level what that's communicating to

9    doctors?

10   **A.**    So, it's being very -- very clear to the doctors that

11   whether a patient develop -- if patients develop an

12   addiction or if they abuse or misuse the medication that

13   these medications can cause an overdose and that an overdose

14   can be deadly.  And so, they are making that very starkly

15   clear.

16   **Q.**    It continues to say assess each patient's risk prior to

17   prescribing Percocet and monitor all patients regularly for

18   the development of these behaviors and conditions.  (See

19   warnings).  Do you see that?

20   **A.**    I do.

21   **Q.**    Can you tell us what that's counseling doctors to do?

22   **A.**    So, that's counseling doctors to do some of the things

23   that we talked about before of -- we call it opioid risk

24   stratification, of looking at all of the information that

25   you have about the patient in front of you; in many cases,

1    using their validated questionnaires that can help you to do

2    risk stratification so to make sure best informed

3    determination, is this patient high risk, medium risk or low

4    risk for addiction abuse and misuse if the doctor prescribes

5    opioid pain medications.

6    **Q.**   And this reference here to see warnings, let's go back,

7    if we could, to the second column to that section we saw

8    briefly that says warnings.  Is this a reference to further

9    information about addiction abuse and misuse?

10   **A.**   Yes.  It's expanding on that topic essentially.

11   **Q.**   I want to go back to the black box warning, if we

12   could, and look at one more section.  If we scroll down a

13   little bit there's also a heading on Neonatal Opioid

14   Withdrawal Syndrome.  And then it has warnings about that

15   again with a cross-reference to the warnings section for

16   further information.  Do you see that?

17   **A.**   I do.

18   **Q.**   We've heard in court about a condition called NAS.  Is

19   that related to this condition?

20   **A.**   Yes.  It's essentially another way of saying -- saying

21   that same thing essentially.

22   **Q.**   And if we go back up to the abuse, addiction and misuse

23   -- addiction abuse and misuse section, just to reemphasize

24   the point, in your experience, do these types of warnings

25   change over time and often become more developed over time?

1    **A.**   Yes.  In my experience, they do change over time and

2    they do have a tendency to become more developed, yes.

3    **Q.**   In terms of these warnings we're focusing on now,

4    addiction, abuse and misuse, have you always understood

5    those to be a serious risk of opioid abuse throughout your

6    career and your medical training?

7    **A.**   Yes, I have.

8    **Q.**   And do you understand that to be a broad understanding

9    within the medical field?

10   **A.**   Yes, I do understand it to be a broad understanding

11   throughout the field of medicine.

12   **Q.**   Does that knowledge of the risk of addiction, abuse,

13   misuse impact how you prescribe opioids?

14   **A.**   Yes, very much so, because it's -- again, with opioid

15   prescribing or all medications it boils down to largely risk

16   versus benefit and, as a key risk, that's a very significant

17   factor in your decision to prescribe or not and, if you do

18   prescribe, what to prescribe, how much to prescribe, how

19   long to prescribe, et cetera.

20   **Q.**   Can addiction be an extremely serious condition?

21   **A.**   Addiction can be a fatal condition.

22   **Q.**   Does the risk in your experience and from your

23   understanding of the science vary across patients you might

24   see?

25   **A.**   I'm sorry.  Can you repeat the question, please?

1   **Q.**   Yes.  I'm sorry.  Does the risk from your experience

2   vary across the range of patients you see, the risk of

3   addiction and abuse and misuse?

4   **A.**   Yes.  The risk of addiction, abuse and misuse varies

5   quite significantly across patients.

6   **Q.**   And can you give us a little more information as to how

7   that's so?

8   **A.**   Sure.  So, we talked already about that there are

9   validated risk stratification questionnaires that you can

10  use with patients.  There are also characteristics.  And

11  those are some of the things we talked about of a personal

12  history of substance abuse, a family history of substance

13  abuse, a major psychiatric condition, such as Bipolar

14  Disorder, ADHD.

15      There are also some just demographic factors, age,

16  gender can play into it, so that you can -- you can say not

17  with perfect accuracy, but with very meaningful information

18  one patient is very at high risk.  One patient is medium

19  risk.  And one patient is low risk.  And you can even

20  identify somebody who might be very, very low risk.

21  **Q.**   And in your experience in your career, you've kind of

22  touched on steps you take with your patients to try to weigh

23  that risk and benefit on an individual patient basis.

24  Taking those steps, can you comment on how common -- how

25  common that you've seen addiction in the patients you treat

1    with prescription opioids?

2    **A.**   So, for the patients who I have initiated the opioids,

3    I have not seen a patient who has developed addiction.  I

4    have treated patients who were referred to me by other

5    physicians who were on opioids who have developed addiction

6    and misuse and abuse.

7             MR. SCHMIDT:  And I apologize.  May I approach,

8    Your Honor?

9             THE COURT:  Yes.

10            MR. SCHMIDT:  I've been sitting up here drinking.

11   I don't know if this is your water.  Oh, it is?  Okay.  I'll

12   give you one more just in case.

13            THE WITNESS:  Thank you.

14            BY MR. SCHMIDT:

15   **Q.**   Just to go back to that last answer you gave me about

16   how rare it is in your practice, how do you know that's true

17   in terms of how do you know you're not seeing addiction that

18   you just don't hear about?

19   **A.**   So, that certainly could be possible, but we're the

20   largest healthcare system in Massachusetts and we have one

21   single computerized medical record where we can see all of

22   the tests, all of the notes, et cetera.

23            And so -- and if a patient does develop a problem with

24   addiction, it's highly, highly likely that over time they

25   will have an encounter with the healthcare system related to

1    that.  And since we're the biggest healthcare system in

2    Massachusetts and have a single computer record that we see

3    and that we monitor our patients, we see them monthly if

4    they're on opioids, we follow urine toxicology, et cetera.

5    We monitor them closely.

6        I think it would be extremely unlikely that one of my

7    patients would develop addiction and that I would not be

8    aware of it.

9    **Q.**   I want to just finish up with some questions about this

10   prescribing information, this label, and then dive into one

11   specific aspect of abuse and misuse with you.  I've been

12   referring to this as a black box warning.  Do you know what

13   that is from your medical practice?

14   **A.**   Yes.  From a doctor's point of view a black box warning

15   is -- not all medications have a black box warning and the

16   FDA puts on the label of certain medications a black box

17   warning when they feel there's a specific serious risk that

18   they want doctors to be particularly aware of, so they put a

19   black box around it.

20       We know to look for that, to take it seriously, and

21   they typically put it, in my experience, at the front of the

22   label, again, to emphasize it to clinicians.

23   **Q.**   One more question on this label.  If we go to the

24   second to last column, or third to last column, I apologize,

25   it says medication guide.  Percocet.  And then it's got an

1    explanation of what Percocet is that reads a little more

2    common sense than the language we were looking at before.

3    Can you tell us what a medication guide is, to your

4    understanding, what it's intended for?

5    **A.**    So, a medication guide is aimed at the patient or the

6    patient's family members; whereas, the other portion was

7    aimed at clinicians, doctors, et cetera, the medication

8    guide is aimed in more -- in simpler language.  So, aimed at

9    the patient, or the patient's family members, or associates.

10   **Q.**    And just focusing on these two bullets, it says

11   Percocet is, and then, one, a strong prescription pain

12   medicine that contains an opioid narcotic that is used to

13   manage pain severe enough to require an opioid analgesic and

14   for which treatments are inadequate and when other pain

15   treatments such as non-opioid pain medicines do not treat

16   your pain well enough or you cannot tolerate them.

17        Is that talking about where the medicine is supposed to

18   be used?

19   **A.**    That's exactly what it's doing, yes.

20   **Q.**    It then says an opioid pain medicine that can put you

21   at risk for overdose and death.  Even if you take your dose

22   correctly as prescribed, you are at risk for opioid

23   addiction, abuse and misuse that can lead to death.  Do you

24   see that?

25   **A.**    I do.

**Q.**   And, again, just recognizing that these documents change over time, is it your understanding that that's what this medication guide now tells patients?

**A.**   That is my understanding, yes.

**Q.**   All right.  That's what I wanted to cover with you on that document.

I want to switch gears a little bit and pick up on a concept that we've heard about, we've sometimes heard referred to as gateway.  In your experience, are there patients you know of or individuals you know of who have misused prescription opioids at one point in time and then later misused heroin?

**A.**   Yes, there are.

**Q.**   Can you comment on how common that is in patients you have treated?

**A.**   So, that's been -- that's been quite rare in patients I've treated.  For example, that has not happened a single time in a patient where I -- that I'm aware of in a patient that I initiated opioids, but I have seen it happen in patients who I have been involved in the treatment where other -- other physicians had initiated the opioids.

**Q.**   Are you aware of scientific literature that speaks to that question and tries to analyze that question?

**A.**   Yes, I am.

**Q.**   I want to show you one article on that as an example,

1    DEF-WV-2331.

2            MR. SCHMIDT:  May I approach, Your Honor?

3            THE COURT:  Yes.

4    **Q.**   Is this an article -- the lead author is Muhuri,

5    M-u-h-u-r-i -- that you have reviewed in connection with

6    your medical practice and in the context of your work in

7    this case?

8    **A.**   Yes, it is.

9    **Q.**   Let's start with the title.  The title says

10   Associations of Non-Medical Pain Reliever Use and Initiation

11   of Heroin Use in the United States.

12       So, I want to just break that down for a little bit.

13   That reference to the word associations, do you have an

14   understanding of what an association is?

15   **A.**   Yes.  That statistically, do the two things go

16   together?  What's the rate with which they go together?

17   **Q.**   From your understanding of medical literature, does the

18   fact that two things statistically go together mean you know

19   there's causation from one to the other?

20   **A.**   No, it does not.

21           MR. ACKERMAN:  Your Honor, just with respect to

22   displaying the document on the board during our -- the

23   plaintiffs' case, we were precluded from putting documents

24   on the board that had not been admitted into evidence.  So,

25   I assume that same rule applies with respect to defendants.

```
 1    They objected on numerous occasions to our attempts to put

 2    documents on the board.

 3              THE COURT:  Well, I --

 4              MR. SCHMIDT:  I think that's gone both ways, but

 5    this is a medical treatise.

 6              THE COURT:  I'm sorry, Mr. Schmidt.

 7              MR. SCHMIDT:  I talked over the Court.  I

 8    apologize.

 9              THE COURT:  Well, you were very rarely precluded

10    from displaying the documents.  It was -- it was whether

11    they could be -- as I recall, whether they could just be

12    displayed before the witness testified, but I consistently

13    allowed you to display documents during the -- to illustrate

14    the witness's testimony, as I recall.

15              MR. ACKERMAN:  With respect, Your Honor, I think

16    there were numerous witnesses where defendants objected to

17    us putting documents on the board.  Personally, I put up Dr.

18    Mohr.  Defendants objected in entirety to us putting

19    documents on the board and we were not permitted to do so.

20         Of course, it's within the discretion of the Court, but

21    I want to make sure that objection is stated for the record.

22              THE COURT:  Well, this is technical and

23    complicated testimony and it's helpful to the Court to have

24    these documents available.  I'm going to overrule the

25    objection and let you go ahead.
```

1          MR. SCHMIDT:  Thank you, Your Honor.

2          BY MR. SCHMIDT:

3     **Q.**   So, sticking with the title, it refers to something

4     called Non-Medical Pain Reliever Use and then, just for ease

5     of tracking, it defines that down below as NMPR, non-medical

6     pain reliever use.  What is that?

7     **A.**   So, non-medical pain reliever use is when a patient

8     takes an opioid pain medication but doesn't take it for a

9     medical reason, doesn't take it for relief of pain, takes it

10    essentially in the categories we talked about of abuse,

11    misuse, et cetera.  So, if they're taking a prescription

12    opioid, but they're taking it to misuse or use it, they are

13    not taking it to treat a medical condition.

14    **Q.**   So, just to be clear I have that, when this article is

15    looking at associations between pain reliever use and

16    heroin, is it looking at people who are using their

17    medicines as prescribed or misusing prescription opioids?

18    **A.**   It's specifically looking at patients who are misusing

19    the prescription opioids.

20    **Q.**   And do you have an understanding as to whether that's

21    the focus of the medical literature in this area when it was

22    looking at the link between prescription opioids and heroin,

23    it was focusing on misuse of prescription opioids?

24    **A.**   That's my understanding, yes.

25    **Q.**   Let's look at the abstract, the summary of the study,

1    and if we could look a little further down, there's a

2    reference that says pooling data from the National Survey on

3    Drug Use and Health, and it summarizes that as NSDUH,

4    conducted annually from 2002 through 2011.  Do you see that

5    reference, the data source for the study?

6    **A.**   I do.

7    **Q.**   Are you familiar with that data source?

8    **A.**   Yes, I am.

9    **Q.**   Could you just give us at a high level what it is?

10   **A.**   So, it's a large national survey that tries to track

11   the rate of drug use, abuse, misuse, et cetera, among

12   Americans.

13   **Q.**   And then the sentence finishes, the study finds that

14   the recent 12 months preceding interview heroin incidence

15   rate was 19 times higher among those who reported prior

16   non-medical pain reliever use -- and if we scroll down just

17   a little bit -- then among those who did not, and it gives

18   the statistics, .39 versus .02 percent.  Do you see that?

19   **A.**   I do.

20   **Q.**   And if we scroll a little further down in the abstract,

21   it says --

22        MR. SCHMIDT:  And can you actually get us the

23   sentence before, as well, Mr. Reynolds?  Is that possible?

24   Oh, wonderful.

25        BY MR. SCHMIDT:

**Q.**   It says, however, the vast majority of NMPR,
non-medical pain reliever users, have not regressed to
heroin use.  Only 3.6 percent of NMPR initiates had
initiated heroin use within the five-year period following
first NMPR use.

At the risk of asking you to state the obvious, can you
tell us what this 3.6 percent figure indicates?

**A.**   Sure.  So, their finding is that for patients who
started misusing, abusing non-medical pain reliever,
abusing, misusing opioid pain medications over the
subsequent 5 years, 3.6 percent of those people did then go
on to initiate heroin use and the remainder did not.

**Q.**   Okay.  So, I'm going to -- if I may, I'm going to ask
you about two sets of statistics from this study.  The first
is the one we just talked about.  And I want to make sure I
have this right.  That 3.6 percent figure, does that address
people who misuse prescription Rx opioids and go on to use
heroin?

**A.**   Yes, it does, over the subsequent five years.

**Q.**   And just -- you might still have the publication in
front of you.  Can you tell us again, just from the board,
what that percentage is of the people who misuse
prescription opioids and go on to use heroin?

**A.**   3.6 percent.

**Q.**   Are you aware of whether the study also looks kind of

1  at it from the other end of the spectrum, among the people

2  who used heroin, how many of them have previously misused

3  prescription opioids?

4  **A.**   Yes.  So, it's about 80 percent of the people who used

5  heroin had previously misused or abused prescription

6  opioids.  I think it's 79. -- 79.5 percent.

7  **Q.**   Okay.  That's where I'll go to next.  So, just so we

8  have it clear for the record, on the right-hand side of the

9  board we have the number of people who misuse prescription

10  opioids and go on to heroin, and that's 3.6 percent.  And

11  then, on the left-hand side of the board, we have the people

12  who use heroin.  What have they previously used?  That's

13  what I'm going to ask you about, okay?

14  **A.**   Okay.

15  **Q.**   And you've already told us about this, but is there

16  data in this study on that question?

17  **A.**   There is.

18  **Q.**   So, let's look at that data.  Probably the easiest way

19  to do it is to go to Page 11, please.  And if we look at

20  Page 11, Table 3 is entitled Percentage Distribution of Past

21  Year Heroin Initiates aged 12 to 49.  And let me just pause

22  there.

23       Is this telling us, actually, by demographic and

24  geographic characteristics and prior illicit drug use

25  status?  Do you see that?

**A.**   I do.

**Q.**   Is this giving us data looking at people who have
started heroin between 12 and 49 in the past year and some
of their characteristics?

**A.**   Yes.  That's exactly what it's telling us.

**Q.**   And if I look at this table, at the top in the orange
or red area, it says Percent Distribution.  And then it's
got different time intervals, 2002-2004, et cetera, all the
way up to a full range of years, 2002-2011.  Do you see
that?

**A.**   I do.

**Q.**   And I'm going to focus on the full range of years.  I'm
not sure it's materially different, but let me just capture
the fullest dataset, 2002-2011, and I want to show the Court
that statistic you were talking about.

So, if we stay on that far right column and go all the
way down to the bottom of the page, do you see at the bottom
of the page they break the group of heroin users they
surveyed out between those who had no prior non-medical pain
reliever use and those who had prior medical pain reliever
use?

**A.**   I do, although it's prior non-medical pain reliever
use.

**Q.**   Oh, I might have misspoke.  Okay, sorry.  And do you
see the statistic you told us about in terms of the

1   percentage of patients who -- the percentage of people who

2   -- I'm sorry.  Let me start my question again.

3        Can you tell us the statistic in terms of the number of

4   people who used heroin in the last year and then, at some

5   point prior to that, had non-medical pain reliever use?

6   **A.**   Yes.  So, 79.5 percent of the people in this age group

7   who initiated heroin use in the -- in the leading to -- in

8   the prior 12 months, 79.5 percent of them had engaged

9   previously in non-medical pain reliever use.

10  **Q.**   Okay.  Is that the same as misuse of prescription

11  opioids?

12  **A.**   That's the same as misuse and abuse of prescription

13  opioids.

14  **Q.**   Is that a meaningful statistic?

15  **A.**   Yes, it is.

16  **Q.**   We see in this study that it is using data up through

17  2011 according to the heading.  Have you considered -- have

18  you continued to see data like this published more closely

19  in time to today?

20  **A.**   Yes, I have.

21  **Q.**   Broadly speaking, do you know whether this number has

22  stayed the same, gone up, gone down?

23  **A.**   Broadly speaking, that number actually has gone down.

24  There are more of the people who have initiated heroin use

25  who actually have not previously misused or abused

 1    prescription opioids in more recent times.

 2    Q.   Okay.  So, I want to stick with this portion of the

 3    article we have up on the screen and under the heading we've

 4    been talking about --

 5         MR. SCHMIDT:  And, Mr. Reynolds, I think you've

 6    actually got the wrong percentage highlighted.  It should be

 7    the bold 79.5 percent.

 8         BY MR. SCHMIDT:

 9    Q.   Under the heading that tells us prior NMPR use and then

10    we see 79.5 percent, the number we have up on the board, do

11    you see that?

12    A.   I do.

13    Q.   In the sub-columns do you see the reference to prior

14    illicit drug use?

15    A.   I do.

16    Q.   All right.  And I want to ask you what that means and

17    then ask you what that data tells us.  Do you see the little

18    footnote marker number 2 there?

19    A.   I do.

20    Q.   If we turn to Page 12 of the article, do you see that

21    it defines what Footnote 2 is, what illicit drugs are?

22    A.   I do.

23    Q.   And could you just read into the record what those are?

24    A.   So, it says illicit drugs include marijuana, hashish,

25    cocaine, including crack, hallucinogens and inhalants.

1    Q.   So, I've written on the board marijuana, cocaine,

2    crack, other illegal drugs.  And so, having that on the

3    board --

4              MR. SCHMIDT:  If we could go back to the bottom of

5    Table 3 on Page 11 of the document, please.

6              BY MR. SCHMIDT:

7    Q.   Under the bold heading Prior Non-Medical Pain Reliever

8    Use, Prior Misuse of Prescription Opioids, do you see where

9    they break out people who had no prior illicit drug use and

10   people who did have prior illicit drug use?

11   A.   I do.

12   Q.   And can you tell us from looking at that data what

13   percentage of heroin users in this study had both prior

14   non-medical pain reliever use and prior illicit drug use?

15   A.   So, for prior illicit drug use, it's 79.5 percent.

16   Q.   And then, I want to look at the heading above, looking

17   at the patients who have no prior non-medical pain reliever

18   use.  Do you see that heading?

19   A.   I do.

20   Q.   And do you see below that where it tells us the

21   patients -- the percentage of the pool who have no prior

22   non-medical pain reliever use, but who have prior illicit

23   drug use, what percentage that is?

24   A.   That's 19.4 percent.

25   Q.   I'm going to ask you what I hope is my toughest

1    question.  I've already shown myself today to be unreliable

2    at math.

3        Can you tell us what these two numbers add up to in

4    terms of the number of heroin users who have some prior

5    illegal drug use?

6    **A.**  So, 98.9 percent.

7    **Q.**  So, a couple questions about that data and how it

8    meshes with your experience.  First of all, this article

9    gives us data on people who misuse prescription opioids.  It

10   gives us data on people who misuse illegal drugs like crack

11   cocaine and cocaine and other drugs.  Are there other

12   factors relevant to substance abuse that may or may not be

13   reported in this article, may not be captured in this data?

14   **A.**  Yes, there are.

15   **Q.**  Could you speak with us about some of those factors?

16   **A.**  So, those are the factors that we talked before of a

17   family history of substance abuse, major psychiatric

18   illnesses such as Bipolar Disorder, et cetera, even

19   demographic factors, age, gender, et cetera, et cetera, that

20   predispose somebody to be at risk for substance abuse,

21   misuse, et cetera.  Those factors apply here, as well as the

22   statistics that we're talking about.

23   **Q.**  Now, focusing on these two numbers here and drawing on

24   your medical experience and your understanding of the

25   science, are you able to say whether of these people who

1    used heroin, who had previously misused prescription

2    opioids, whether if you took away that prescription --

3    misuse of prescription opioids, but still had the other

4    factors, the 98.9 percent who are abusing illegal drugs and

5    then the other factors you just alluded to, whether that

6    would change the heroin rates, do you know?

7    **A.**    You can't say.

8    **Q.**    And why is that?

9    **A.**    Because even if you took away the misuse and abuse of

10   the prescription opioids, all of those other risk factors,

11   there are folks who already are engaged, 98.9 percent of

12   them, in use abuse, misuse of illicit substances.  So, by

13   definition, they're engaged in that and would be at risk of

14   additional substance abuse, including heroin abuse and

15   misuse.

16   **Q.**    Can you say looking at this data whether this is a

17   problem that's isolated to the misuse of prescription

18   opioids, as opposed to a broader substance abuse problem?

19   **A.**    So, it's a broader substance abuse problem where, in

20   some patients or in some individual's case there is misuse

21   and abuse of prescription opioids, but it's a broader

22   substance abuse problem.

23   **Q.**    Let's conclude with that topic.  I want to go back to

24   what we were talking about in terms of benefit and risk.

25   We've spent a lot of time talking about risk, pretty serious

```
 1    risk.  Given those risks of prescription opioids, why is it
 2    that doctors still use prescription opioids?
 3    A.    So, the reason that doctors still use prescription
 4    opioids despite those risks that we've talked about, which
 5    are significant, is that they're our most potent pain
 6    medications and there are some cases where patients have
 7    severe disabling pain that we can't treat successfully
 8    and/or safely with non-opioid treatments.
 9          And so, there's some patients where it clearly does add
10    up in terms of risk benefit to treat them with the opioids
11    and, as we talked about before, there's some patients where
12    those risks we can identify as being substantially lower for
13    that patient.  So, in the end, that risk benefit does fall
14    squarely on using opioids to treat that patient's case.
15    Q.    You talked earlier about your clinical research, your
16    scientific research.  Have there been efforts in the
17    scientific community over time to come up with alternatives
18    to prescription opioids that would be as effective at
19    treating pain without having these risks we've been talking
20    about?
21    A.    Yes.  Identifying a very powerful non-opioid pain
22    medication that's safe and has no risk of addiction has
23    essentially been a holy grail of our field.
24    Q.    Have pain management found that holy grail?
25    A.    Not -- not yet.
```

1    **Q.**   Okay.  Let me talk about data for a little bit on

2    prescription opioids.  Are you familiar --

3           THE COURT:  Is this a good place to stop?  It's

4    about break time, Mr. Schmidt.

5           MR. SCHMIDT:  Sure.  Yeah.  Yeah.

6           THE COURT:  Let's be in recess for about ten

7    minutes.

8        You can step down, Dr. Gilligan.

9           THE WITNESS:  Thank you, Your Honor.

10    (Recess taken)

11    (Proceedings resumed at 10:37 as follows:)

12           THE COURT:  When you're ready, Mr. Schmidt.

13           MR. SCHMIDT:  Thank you, Your Honor.

14   BY MR. SCHMIDT:

15    **Q.**   Dr. Gilligan, I want to pick up with where we were

16    by talking about the benefits of these medicines.

17        You talked a little bit about the search for

18    alternatives.  And I wanted to talk to you a little bit

19    about, in broad terms your understanding of the data

20    regarding these medicines.

21        Are you aware of studies showing that opioids are

22    effective for treating acute pain?

23    **A.**   Yes, I am.

24    **Q.**   And what -- can you speak to what the data shows in

25    terms of using prescription opioids to treat chronic pain?

**A.**   So for chronic pain, the data with chronic opioid
therapy is, frankly, more mixed.  There are studies that
show that if you use chronic opioid therapy for non-cancer
pain cross a population in the study, in some studies that
you don't see an improvement in function, or even a subset
is you don't see an improvement in pain.  Some show
improvement.  Some don't.  And the studies show high rates
of harm, of adverse effects from chronic opioid therapy for
non-cancer pain.

**Q.**   So does that mean that doctors today never use
prescription opioids for chronic non-cancer pain?

**A.**   No, it does not.

**Q.**   So can you explain that -- can you reconcile that for
us?  Why are doctors using it if the study data is mixed?

**A.**   So if the study data is showing across a population in
a study you're not seeing an improvement in function, in
some cases in pain in many of those studies, but there are
certain individual patients who do do very well.

So it's the difference between an individual patient if
you select someone who has low risk for developing problems
with addiction who has a condition that you're being very
selective, the indication for using it for that condition is
really quite strong and the benefit, or the potential
benefit for that patient is quite high.  It's the difference
between there are some individual patients who do very well

1    versus what you see when you look at a population in a study

2    on average.

3    **Q.**   Do you understand that view you just expressed that

4    there are individual patients for whom prescription opioids

5    are appropriate for chronic non-cancer pain, do you

6    understand that view to be the consensus of the medical

7    community?

8    **A.**   Yes, I do.

9    **Q.**   For example, are you familiar with CDC guidelines that

10   have come out in the last several years regarding the use of

11   prescription opioids in chronic non-cancer pain?

12   **A.**   Yes, I am.

13   **Q.**   And do they allow for or recognize that for some

14   patients using prescription opioids for chronic non-cancer

15   pain is appropriate?

16   **A.**   They do.  They spell out what are the circumstances

17   where it would be appropriate to do it.  They spell out how

18   to do it judiciously and cautiously.  They spell out

19   guidance on what types of doses to use, et cetera, how to

20   monitor patients.

21        But the whole point of those guidelines implicit in

22   them is that they are giving you guidance on when and how to

23   appropriately use opioid pain medications for chronic

24   non-cancer pain.

25   **Q.**   Dr. Gilligan, there's been discussion in the case

 1    about -- a little bit of discussion in the case about

 2    prescribing levels of opioids in the United States versus

 3    other countries.

 4         Do you have experience in your medical practice with

 5    use of prescription opioids in countries where they're much

 6    more restricted and conservative in using prescription

 7    opioids?

 8    **A.**   I do.

 9    **Q.**   Can you tell us about that experience?

10    **A.**   Sure.  So in one of my roles at the Brigham is that I'm

11    the Medical Director for an affiliation that we have with a

12    cancer hospital in China.  And in China, the use of opioids

13    for cancer pain and for non-cancer pain is far, far more

14    conservative than it is in the United States.

15    **Q.**   And how do you see that play out in your experience in

16    terms of patient care?

17    **A.**   So there are some patients who we see there who --

18    their pain is -- could be safely and much more effectively

19    controlled if opioids were used in their cases and in the

20    way that we would use it; in other words, cautiously

21    judiciously but appropriately.

22         We see some patients who in our judgment are, for

23    example, dying of cancer and suffering from very, very

24    severe pain that we think could be more effectively and

25    safely treated with opioids.

**Q.**   We've been talking about the risks and benefits of opioid medications.  Do you have a view as to who in the healthcare system is best situated to counsel patients on those benefits, on those risks?

**A.**   I do.

**Q.**   Who is that?

**A.**   I think clinicians, principally doctors, because our education is to have abundant knowledge about the conditions and the medications and their risks and the potential benefits.

Our training is training us to make those judgments, how to take in that information and take it in, weigh in, you know, what's high quality information, what's low quality information that you should tend to discount, et cetera.

And then for these controlled substance prescription medications, that's the, the authority that we get when we get DEA certification, medical license, controlled substance certificate, et cetera, that is both giving us that authority to make a prescribing decision.

And the accompanying oversight bodies in our field are also there for in case a physician stops prescribing appropriately.  And that can be at the level of the hospital, at the Board of Registration of Medicine, could be the DEA pulling somebody's certificate, et cetera.

1      So everything about our education, training, role,

2    authority, and then responsibility and monitoring is, is

3    matched to our role in making those decisions.

4    **Q.**   I want to pull out some of those points you just walked

5    us through in a little more detail if I could.

6      Let me start with, with the first part of what you said

7    for us.  In terms of access to medical records, access to

8    the patient, is, is there anyone or entity in the healthcare

9    system that has more visibility to the patient than the

10   doctor or other clinicians who's treating them?

11   **A.**   No, there isn't because we're the one who's in the exam

12   room.  We're taking the patient's complete relevant medical

13   history and demographic history, et cetera.  We're examining

14   the patient.  We're looking at the results of any relevant

15   test, X-rays, MRIs, lab tests, et cetera.  The other -- at

16   least I can't think of another party that has that level of

17   information specific to that patient.

18   **Q.**   Uh-huh.

19   **A.**   And these decisions are all about the individual

20   details of that individual patient's case.  That's the

21   essence of, of making those decisions appropriately and

22   correctly in individual cases.

23   **Q.**   As a physician, are you bound by both legal

24   responsibilities regarding your patient and ethical

25   responsibilities?

**A.**    Yes, we are.

**Q.**    And do you have a view whether it would further those

legal and ethical responsibilities if you were caring for

your patients and making judgments for your patients other

participants in the healthcare system like distributors were

second-guessing those judgments?

**A.**    I, I don't think that that would be helpful for our

patients.  I don't think that would be helpful for society.

I do not think that that would help to make the decisions be

done more appropriately.

**Q.**    You, you talked about some consequences in your answer

a few moments ago for doctors who don't practice within

those standards.  You were talking about including losing

their ability to practice, maybe going to jail.  And we've

heard some examples of that.

But short of losing a license or criminal action, are

there other controls in your experience that apply to

doctors who are inappropriately prescribing?

**A.**    Yes, there are.

**Q.**    Can you tell us about some of those?

**A.**    So when we have concerns within our healthcare system

about a physician's prescribing, we'll step in and we'll

monitor that physician's prescribing.  We will, for example,

pull 25 charts per month from that patient, that physician's

patients and review those records and look at the records

1    and say were the prescribing decisions in each of those

2    cases made appropriately or not.

3         We'll do didactic education sessions sometimes one on

4    one with that physician and other things along those lines.

5    **Q.**   And you just in giving that answer referred to yourself

6    in the first person plural.  Have you been involved in that

7    kind of review of other physicians' prescribing practices so

8    you can make judgments about whether it's appropriate or

9    inappropriate?

10   **A.**   Yes, I have.

11   **Q.**   Is that something you're able to do just by looking at

12   prescribing records and prescribing levels or, or do you

13   need more patient information?

14   **A.**   When I do that and when we do that in general, we need

15   the patient level information because you can't determine if

16   a given prescribing decision was appropriate or not unless

17   you get the relevant information; in other words, what was

18   the patient's history, what were the findings on exam, what

19   did the tests show, what other therapies were tried, et

20   cetera, to make that determination about that case.

21   **Q.**   Okay.  Does making that determination require you to

22   exercise medical judgment based on your medical training?

23   **A.**   Yes, it does.

24   **Q.**   I'm going to turn to our last topic.  It's a larger

25   topic.  It might take us close to lunch or just shy of

1    lunch.  And it's, it's a concept that we've heard referred

2    to as standard of care.  Is that a concept you're familiar

3    with in medical practice?

4    **A.**   Yes, it is.

5    **Q.**   Can you tell us what that means in terms of medical

6    practice?

7    **A.**   So standard of care in medical practice means the

8    quality of care, the thoroughness, the safety of care that

9    doctors expect to maintain in his or her fields.  Sometimes

10   there's a geographic component to it, you know, in

11   practicing in your field and in the area where you practice,

12   what you would be expected to do.  And that can apply to

13   anything.  That can apply to the -- what you should be

14   expected to have done if somebody came in with a potential

15   heart attack.

16   **Q.**   I want to focus on prescription opioids.  Are you aware

17   of whether the standard of care regarding prescription

18   opioids has changed over the past several decades?

19   **A.**   Yes, it has.

20   **Q.**   And at a high level can you walk us through that

21   change?

22   **A.**   So in the period around the 1990s in particular, a

23   little bit in there, 1980s as well, there was an emphasis on

24   the concept that we were under-treating pain in this country

25   and that we were placing too much emphasis -- that we were

1    exaggerating, would have been the argument, the potential

2    risks of opioids, that we were under-utilizing them and we

3    were leaving too many patients with pain that could have

4    slash should have been treated with opioids.

5        Then as prescribing went up by about certainly I think

6    roughly the mid 2000s, there was much more awareness of the

7    adverse effects and the argument that perhaps we were

8    prescribing too many opioids as opposed to too few, and that

9    we were -- that we should put more emphasis on the potential

10   risks of the medication.

11       Then around 2011 prescribing in the country peaked and

12   started to go down.  And since then, there's been

13   significant emphasis on the, the risks of these medications,

14   potential risks, the fact that there are some patients with

15   chronic non-cancer pain, for example, who don't get

16   significant benefit where -- while there are some people who

17   do.

18       And, so, an emphasis on still using the medications but

19   being more conservative about them as part of the standard

20   of care.

21   **Q.**   Okay.  We, we've heard evidence in this case about

22   prescribing rates in Cabell County, West Virginia.  And I

23   want to just ask you if that's consistent with what you just

24   told us.

25       The evidence is prescribing rates increased in the late

1    '90s up until a peak in about, between 2010, 2012, that

2    range, and then have gone back down.  Is that consistent

3    with those changes in the standard of care that you told us

4    about?

5    **A.**   Yes, it is.

6    **Q.**   Is it consistent with your understanding of national

7    prescribing trends in terms of increasing from the '90s up

8    until sometime in the 2010, 2012 window and then coming back

9    down?

10   **A.**   It is.

11   **Q.**   All right.  I'd like to show you some documents

12   relevant to the standard of care issue and the changes in

13   the standard of care that you talk about in your report.

14        Let me start, if I could, with MC-WV-1135.

15            MR. SCHMIDT:  May I approach, Your Honor?

16            THE COURT:  Yes.

17            MR. SCHMIDT:  Thank you.

18   BY MR. SCHMIDT:

19   **Q.**   And just to orient us, this is a publication from

20   the New England Journal of Medicine.  Are you familiar

21   with that publication?

22   **A.**   Yes, I am.

23   **Q.**   It's dated January 14, 1982.  Can you just characterize

24   for us the role that the New England Journal of Medicine

25   plays in the practice of medicine?

1   **A.**    It's, it's one of the most respected medical journals

2   that there is.

3   **Q.**    And if we look a little further down, there's an

4   editorial called "The Quality of Mercy."  Do you see that?

5   **A.**    I do.

6   **Q.**    Are you familiar -- have you, have you read that

7   editorial that's actually attached there?

8   **A.**    I have.

9   **Q.**    If we go to Page 3 of the document -- we've skipped the

10  full journal but just focused on this editorial.  It's

11  written by someone named Marcia Angell.  Do you know if she

12  had a role at the New England Journal of Medicine at this

13  time?

14  **A.**    Yes.  She was a Deputy Editor at the New England

15  Journal at this time.

16          MR. SCHMIDT:  Your Honor, we'd move this document,

17  MC-WV-1135, into evidence.

18          MR. FARRELL:  Judge, this is a medical article,

19  medical literature, and I don't know that it's appropriate

20  to admit it into the record as evidence.  And to the extent

21  that it's being offered for notice or some other reason, I

22  just don't think it's appropriate from the historical

23  rulings this Court has made about admitting medical

24  literature.

25          MR. SCHMIDT:  Your Honor, just to be --

```
 1              MR. ACKERMAN:  Your Honor, may I add --

 2              THE COURT:  Yes.

 3              MR. ACKERMAN:  -- to my colleague's statement?

 4         To the extent that defendants are relying on 803(18) as

 5    the exception to the hearsay in the document, that exception

 6    does not permit the admission of statements in a learned

 7    treatise, but only permits that a statement in a learned

 8    treatise may be read into evidence but not received as an

 9    exhibit.

10              MR. SCHMIDT:  Your Honor, just to orient the

11    Court, what we're actually moving it in under is 803(16),

12    16, statements in ancient documents, which I find that

13    expression a little hurtful.  It's a statement in a document

14    that was prepared before January 1st, 1998, which this was,

15    and whose authenticity is established.  And this is a

16    self-authenticating document under Rule 902(6).

17              MR. FARRELL:  Judge, I vehemently object to the

18    reference of the year 1998 as being ancient.

19              MR. SCHMIDT:  I join.

20              THE COURT:  Well, you've got a point, Mr. Farrell.

21              MR. FARRELL:  So, in general, Judge, I know this

22    article.  We've talked about this article.  I understand the

23    article.  I support the article.  I know the New England

24    Journal of Medicine is a leading text.  And I also know the

25    point Mr. Schmidt is going to make.
```

 1          I'm simply saying that we haven't been admitting

 2     medical learned treatises into the record, but we have

 3     liberally been using them and referencing them with experts

 4     throughout this trial.

 5          So I have no problem with referencing it or talking

 6     about it.  I'm looking forward to the testimony.  I just --

 7     I don't want to start the, the onslaught of admitting

 8     medical literature as learned treatises or antiquities into

 9     the record.

10               MR. SCHMIDT:  I think the difference here is the

11     clear exception in Subsection (16).  It's, it's pretty black

12     and white.

13               THE COURT:  Well, --

14               MR. FARRELL:  Perhaps, Judge, if it was offered

15     for the limited purpose of notice or limited purpose,

16     something other than a learned treatise because if we're

17     going to start admitting learned treatises, I have a book of

18     learned treatises and articles that we wish we would have

19     admitted during our case-in-chief.

20               MR. SCHMIDT:  I think if they can come in under

21     803(16), they could do that.  It's a pretty specific rule.

22               THE COURT:  It's certainly admissible under

23     803(18) but it can't be admitted if -- we'd have to have him

24     read it if we did that.

25               MR. ACKERMAN:  And, Your Honor, the part that

1    troubles me, and I will be frank with you that I never

2    looked into this, is how 803(16) could work to obviate what

3    appears to be a more applicable exception in 803(18).

4            MR. SCHMIDT:  By its language, a statement in a

5    document that was prepared before January 1st, 1998, and the

6    authenticity is established.

7            THE COURT:  Well, it comes within the literal

8    reading of (16), doesn't it, Mr. Ackerman?

9            MR. ACKERMAN:  I think it does, Your Honor.  I

10   don't dispute that.

11           THE COURT:  I'm going to admit it under 803(16) --

12   BY MR. SCHMIDT:

13   **Q.**   So let's --

14           THE COURT:  -- for the truth of the matter

15   asserted.

16   BY MR. SCHMIDT:

17   **Q.**   Let's look at Page 2, please, of this publication,

18   "The Quality of Mercy."  You'll see that up there at the

19   top.  And I just want to read a couple lines to you.

20           It says, "Few things that a doctor does are more

21   important than relieving pain."

22           Let me pause there.  Is that a view you agree with

23   based on your medical practice?

24   **A.**   Yes, it is.

25   **Q.**   "Yet, the treatment of severe pain in hospitalized

1    patients is regularly and systematically inadequate."

2        Do you see that?

3    **A.**   I do.

4    **Q.**   And we're back in 1982 at this point in time.  Was this

5    a view that started to be expressed in the medical

6    literature at this point in time?

7            MR. FARRELL:  I'm going to make an objection,

8    Judge.  If we're going to admit this, then we should admit

9    it for what it is.  This isn't medical literature.  I

10   believe this is an editorial.

11           MR. SCHMIDT:  I'll rephrase.

12   BY MR. SCHMIDT:

13   **Q.**   Is that a view that started to be expressed in the

14   medical community through various sources at this point

15   in time, that the treatment of severe pain in

16   hospitalized patients is regularly and systematically

17   inadequate?

18           THE COURT:  Overruled.  I'll let him answer that

19   question.

20           THE WITNESS:  Yes, it is.

21   BY MR. SCHMIDT:

22   **Q.**   It goes on to say -- it quotes some data.  And then

23   in the sentence after quoting that data it says, "This

24   is not for want of tools.  It is generally agreed that

25   most pain, no matter how severe, can be effectively

1  relieved by narcotic analgesics."

2       Do you see that?

3  **A.**   I do.

4  **Q.**   And, again, are you familiar with the point that there

5  started to be a movement in the medical profession to do

6  more to treat pain and recognized opioid analgesics as part

7  of that?

8  **A.**   Yes.

9  **Q.**   And, so, where I'm going to go with this --

10       MR. SCHMIDT:  And I'm going to pass out the

11  completed version that we sent last night.  We, we have

12  given counsel a demonstrative we're going to use.  We'll

13  print out a copy, but you should have it from last night.

14  And we'll give out more when we're done.  We're going to

15  build it with some of these articles.

16       Can we go to that please?  I'm just going to track some

17  of these sources up on a board that we're going to see.  And

18  I'm going to make a confession right at the outset.  We had

19  trouble figuring out our timeline at the bottom.

20       So you'll see there's just years here along the bottom

21  and it's not to scale.  We start with the '80s and then jump

22  all the way to the '90s and then kind of slow down a little

23  bit in the '90s.

24       But if you'll bear with me with that, I'm going to put

25  some of these up on the board.

1    So can we start by putting this article up on the

2    board?

3    BY MR. SCHMIDT:

4    **Q.**   Is that that quote we were just looking at from the

5    New England Journal of Medicine about, "It is generally

6    agreed that most pain, no matter how severe, can be

7    effectively relieved by narcotic analgesics"?

8    **A.**   It is, yes.

9    **Q.**   All right.  Let's go back to the article itself.  We'll

10   come back to this board as we look at other publications and

11   documents.

12       If we scroll down into the next paragraph, it says,

13   "One consideration that limits the use of narcotics is the

14   possibility of a variety of side effects."

15       And then it lists several including drowsiness,

16   constipation, urinary retention and, most serious,

17   respiratory depression.

18       "A more important factor is a disproportionate

19   sometimes irrational fear on the part of the medical

20   profession and the public alike that patients will become

21   addicted."

22       Do you see that?

23   **A.**   I do.

24   **Q.**   And are you familiar with that view being expressed by

25   doctors at this point in time going forward that there might

1    be a disproportionate, sometimes irrational fear, on the

2    part of the medical profession and the public that patients

3    will become addicted?

4    **A.**   Yes, that was one of the views that was being put forth

5    at that time.

6    **Q.**   And let me just jump to the end of this article, if I

7    could, back to the author.  I asked you earlier about Marcia

8    Angell.  Is she someone who has standing in the medical

9    profession?

10   **A.**   Yes.  Dr. Angell was, was very respected.

11   **Q.**   Did she have a reputation one way or another in terms

12   of her attitude towards drug companies and manufacturers?

13   **A.**   Yes.  She was well-known as really a fierce critic of

14   the for-profit pharmaceutical companies.

15   **Q.**   Okay.  Let's look at some other things that -- if we

16   could look at that paragraph you pulled up.  It states, "It

17   is instructive to contrast the very low incidence of

18   important side effects with the very high incidence of

19   inadequate pain relief.  I can't think of any other area of

20   medicine, in medicine in which such an extravagant concern

21   for side effects so drastically limits treatment.  We are

22   used to a closer balance between risks and benefits."

23        Do you see that?

24   **A.**   I do.

25   **Q.**   And can you just comment on that statement,

1    particularly this statement at the end about risk and

2    benefits?

3    **A.**    So Dr. Angell is making the point that we discussed

4    before that -- which was a point that was made at this time

5    period that the perception was we're not -- we weren't

6    treating pain aggressively enough and we were exaggerating

7    our understanding of the risks.

8         And, therefore, by definition then that would get your

9    risk benefit calculation off if you accept that argument.

10    **Q.**    And then let's just go to the end of, of this article.

11         "Pain is soul destroying.  No patient should have to

12    endure intense pain unnecessarily.  The quality of mercy is

13    essential to the practice of medicine; here, of all places,

14    it should not be strained."

15         Do you see that?

16    **A.**    I do.

17    **Q.**    And how does that fit with your experience in pain

18    treatment and pain management?

19    **A.**    I think actually she wrote that very, very well.  I

20    think pain is soul destroying.  I think that you wouldn't

21    want to see a pain -- a patient having to endure intense

22    pain unnecessarily.  And I think that the quality of mercy

23    is essential to the practice of medicine.

24    **Q.**    We've, we've walked through a series of statements in

25    this editorial.  Is it meaningful if an editor at the New

1    England Journal of Medicine makes statements like this to

2    the medical profession?

3    **A.**    Yes.  This is a -- the New England Journal of Medicine,

4    as we've discussed, is one of the most respected medical

5    journals.  Dr. Angell was a very well-known and respected

6    figure.  And, so, a statement like this has a significant

7    impact on, on physicians.

8    **Q.**    I'd like to approach with another document, if I may,

9    Defense West Virginia 3699.  I've given you a copy of a

10   document entitled Cancer Pain Relief.  And below the heading

11   you see a crest and it says it's from the World Health

12   Organization in Geneva.  Do you see that?

13   **A.**    I do.

14   **Q.**    And then if we just flip ahead to the third page, it

15   again repeats the title, Cancer Pain Relief, World Health

16   Organization, 1986.  Are you familiar -- are you familiar

17   with this document I've just handed you?

18   **A.**    Yes, I am.

19   **Q.**    Can you comment on the significance of this document in

20   pain management?

21   **A.**    So this document was very, was very significant because

22   it's the document where the World Health Organization

23   introduced their cancer pain treatment letter which became

24   very well-known throughout medicine and, and had a very

25   significant influence on the practice of treating pain

1    across fields of medicine.

2            MR. SCHMIDT:  Your Honor, we move into evidence

3    Defense West Virginia 3699 under the ancient documents

4    exception.

5            MR. ACKERMAN:  I'd renew our objection, Your

6    Honor.  I would just note that the Advisory Committee Note,

7    which Ms. Kearse has helpfully provided me, to Rule 803(16)

8    references letters, records, contracts, maps, and

9    certificates.

10   So I think -- again, it's our position that the ancient

11   document exception was not intended to apply to learned

12   treatises which are referenced in another section.

13           MR. SCHMIDT:  The language, just for the record,

14   that's being referenced is, "Wigmore further states that the

15   ancient document technique of authentication is universally

16   conceded to apply to all sorts of documents."  And then it

17   says "including the examples listed."

18           MR. RUBY:  And, Your Honor, I know Mr. Schmidt

19   doesn't need my help, but with respect to Mr. Ackerman's

20   reference to the term "record," there are definitions, of

21   course, in the Rules of Evidence.

22   And in Rule 101(b)(4) record is defined to include a

23   memorandum or report which certainly would include this

24   document.

25           THE COURT:  I'm going to admit it.  It's admitted.

```
 1    West Virginia 3699 is admitted.

 2    BY MR. SCHMIDT:

 3    Q.   So let's look at what was important about this

 4    document.  And I'd like to, again, using the numbers in

 5    the bottom left corner of the page, if we can go to Page

 6    10, please.  And there's a heading "Nature of Cancer

 7    Pain."  I'm actually going to look at the paragraph

 8    right above that.

 9         So now we're up to 1986.  This tells us numerous

10    published reports indicate that cancer pain is often not

11    treated adequately.

12         Again, is that consistent with some of these

13    discussions from this time period now up to 1986 about doing

14    more to treat pain; in this case, cancer pain?

15    A.   Yes, it is.

16    Q.   "An analysis of 11 reports covering nearly 2,000

17    patients in developed countries," and they emphasize that,

18    "suggests that 50 to 80 percent of patients did not have

19    satisfactory relief.  Many patients with advanced cancer and

20    moderate to severe pain are not given sufficient analgesic

21    medication to control their discomfort."

22         Are you familiar with that kind of data from this time

23    period showing that patients who had cancer pain weren't

24    given satisfactory relief?

25    A.   Yes, I am.
```

1    Q.   It says, "They are restricted to a weak opioid (e.g.

2    codeine) or a stronger drug is given on demand instead of

3    being given at appropriate regular intervals by the clock."

4         Then they talk about developing countries and that data

5    there.

6         And then the final sentence says, "It seems certain,

7    however, that most patients do not receive adequate therapy

8    because of legal and other constraints on access to drugs

9    and notably to the strong opioids."

10        Do you see that?

11   A.   I do.

12   Q.   And, again, was that a sentiment that was being

13   expressed at this time that legal and other constraints on

14   prescription opioids were depriving patients of effective

15   pain relief?

16   A.   Yes.  A constraint such as that and exaggeration of

17   concerns that we talked about from other, that was on other

18   documents were leading clinicians to under-use and --

19   under-use opioid pain medications and to under-treat pain.

20        And, essentially, the argument at that time was that

21   they -- clinicians were typically getting the risk benefits

22   wrong and not treating pain aggressively enough, not using

23   opioid pain medications enough.

24   Q.   Let's go to Page 50, if we could, of this document.  It

25   says, "Reasons for inadequate control of cancer pain."

1           And if you look at the -- I suppose it's the last

2     sentence here, it refers to a misconception by doctors,

3     nurses, and patients to the effect that physical dependence

4     and psychological dependence are interchangeable terms has

5     led to the under-use of opioid analgesics."

6           Do you see that?

7     **A.**   I do.

8     **Q.**   Is it meaningful when the World Health Organization is

9     making a statement like that about under-use of opioid

10    analgesics?

11    **A.**   Yes, it's very meaningful.

12    **Q.**   Okay.  Let's go to the board, if we could, and we'll

13    just add that quote under use of opioid analgesics, 1986.

14          Why is it meaningful that the World Health

15    Organization, WHO, is saying what with reference to cancer

16    pain?

17    **A.**   Because doctors know the World Health Organization.

18    You would be hard-pressed to find a doctor who doesn't know

19    the World Health Organization.  And when they make a

20    statement that's that clear saying that we're under-treating

21    cancer pain and we should use opioids more often, more

22    aggressively to, frankly, do a better job of treating cancer

23    pain, that's a, that's a powerful statement coming from an

24    organization of that stature.

25    **Q.**   Okay.  Let's go back to the document.  I want to jump

1    ahead now to Page 20.

2        And we see a heading on the side, on the page that says

3    "Drug Therapy."  Do you see that?

4    **A.**   I do.

5    **Q.**   It says, "The use of analgesic drugs is the mainstay of

6    cancer pain management."

7        Does that remain true to this day?

8    **A.**   That remains true to, to this day, yes.

9    **Q.**   It says, "When used correctly, analgesics are effective

10   in a high percentage of patients.  A three-step analgesic

11   ladder is suggested (see diagram opposite)."

12       And then if we look at Page 21 -- let's just cull up

13   this diagram that they're referencing.

14       Are you familiar with this diagram?

15   **A.**   Yes, I am.

16   **Q.**   Have you heard it sometimes referred to as a pain

17   ladder?

18   **A.**   Yes, that's what we commonly refer to it as, the World

19   Health Organization pain ladder.

20   **Q.**   Can you just walk us through -- I see one, two, three

21   and then references to different types of pain and

22   treatments.  Can you walk us through what this pain ladder

23   is communicating?

24   **A.**   So it's communicating to doctors and other clinicians

25   that when you encounter a patient with cancer pain, you

1    start with a non-opioid and associated adjuvant medication.

2    If that gives the patient relief, you are typically going to

3    stop there.  If it doesn't, you go up to the next level, the

4    next rung.

5         And if pain is persisting or increasing, at that point

6    it's recommending that you start a weak opioid plus those

7    non-opioids plus those adjuvant medications.  Again, if that

8    works, you're typically going to stop there.

9         But that if the pain persists or increases, you will

10   then go up another rung.  And now you'll go to strong

11   opioids, as well as those non-opioid medications and

12   adjuvants.

13        And you can see at the top that your goal is to achieve

14   for that patient freedom from cancer pain.

15   **Q.**   And picking up on that goal, freedom from cancer pain,

16   did there come a time where the concepts reflecting this

17   ladder, stepping up based on the pain and what worked and

18   didn't work, were applied more broadly in the medical

19   profession in cancer pain?

20   **A.**   Yes.  Over time the same -- this had an influence, of

21   course, on cancer pain.  But also it started to have an

22   influence on treatment of pain including non-cancer pain.

23   **Q.**   Okay.  Let's go back to the timeline, if we could, and

24   again recognizing this is horribly not to scale.  But in

25   1995 you put Oxycontin on there.

1       Are you familiar with the FDA's approval of Oxycontin

2   in 1995?

3   **A.**   Yes, I am.

4   **Q.**   Do you have an understanding as a clinician why it was

5   approved?

6   **A.**   My understanding it that it was approved in line with

7   the same approach of trying to have more, more therapies

8   available, more long-acting opioids available to use to

9   treat cancer pain and non-cancer pain to give clinicians

10  more ways to treat pain.

11  **Q.**   Do you have an understanding as to whether during that

12  broad time period we're talking about, '80s, '90s, as the

13  medical profession was talking about pain more and opioid

14  analgesics more, the FDA approved several opioids during

15  that time interval?

16  **A.**   That is correct.

17  **Q.**   Do you know of any role that distributors play in the

18  approval of prescription opioids?

19  **A.**   I'm not aware of any role that distributors play in the

20  approval of opioids.

21          MR. FARRELL:   Judge, if I may, since we're using a

22  demonstrative, I don't believe the question has been asked

23  to establish the date or the distinction between approved

24  and launched or sold.

25  BY MR. SCHMIDT:

```
 1    Q.    Do you know when Oxycontin was approved?

 2    A.    It was approved in 1995.

 3          THE COURT:  Does that take care of your objection,

 4    Mr. Farrell?

 5          MR. FARRELL:  Sort of.  I also wanted to -- I'll

 6    clean it up on cross.

 7          THE COURT:  Okay.  I'll overrule the objection.  I

 8    think, yeah, it's a matter for cross.

 9       Go ahead, Mr. Schmidt.

10    BY MR. SCHMIDT:

11    Q.    Okay.  I want to ask you about state medical

12    boards.  Are you familiar with state medical boards?

13    A.    Yes, I am.

14    Q.    Do they play a role in, when we talk about standard of

15    care, in setting the standard of care?

16    A.    They do.

17    Q.    What role do they play?

18    A.    So for a doctor to practice, you need your license from

19    your state medical board.  And if you were practicing

20    inappropriately, for example, they would be the folks who

21    could pull your license.

22          So, therefore, as, as a doctor, one tends to pay

23    attention to what the state medical board is calling for in

24    terms of appropriate practice.

25    Q.    Okay.  Did there come a time where state medical boards
```

1    began to take steps to support broader opioid prescribing?

2    **A.**   Yes, there did.

3    **Q.**   As part of your work in this case -- and we've got an

4    expert coming next week who's going to dive into this more,

5    so I'm just going to touch this at a very high level.

6         But as part of your work in this case, did you track

7    whether some of these changes in the standard of care

8    tracked into guidance documents from the West Virginia Board

9    of Medicine?

10   **A.**   Yes, I did.

11            MR. FARRELL:  Judge, I'm going to place an

12   objection on the record.  As indicated in my *voir dire*, this

13   witness is certainly an expert in the national standard of

14   care, but is not licensed in West Virginia, does not

15   practice in West Virginia, and has no basis in fact to make

16   any comments about the West Virginia Board of Medicine.

17            MR. SCHMIDT:  And, Your Honor, I think the fact

18   that he has general pain management experience, general

19   opioid experience makes him eminently qualified to look at

20   West Virginia Board of Medicine documents and comment on

21   whether they're consistent with --

22            THE COURT:  I agree.  I think his expertise has

23   been established to the point where I think he's qualified

24   to look at the West Virginia materials and pass an opinion

25   on -- based on those.  Overruled.

```
1              MR. SCHMIDT:  And I will be brief with this.  May
2      I approach, Your Honor?
3              THE COURT:  Yes.
4              MR. SCHMIDT:  Thank you, Your Honor.
5      BY MR. SCHMIDT:
6      Q.   So just to orient us to what we're looking at,
7      we've put it up on the screen, MC-WV-01219 which is in
8      evidence.  It's from the State of West Virginia, West
9      Virginia Board of Medicine.  And if we look at the
10     second page at the end, we see it was adopted by the
11     West Virginia Board of Medicine in 1997.  Do you see
12     that, Dr. Gilligan?
13     A.   Yes, I do.
14             MR. ACKERMAN:  Your Honor, I just want to note
15     that the document, while in evidence, was admitted for a
16     limited purpose, make that clear.
17             MR. SCHMIDT:  I don't recall if that's correct or
18     not.  But if that's true, we don't take issue with that.  I
19     didn't have that recollection, but I'm not -- I didn't look
20     at that.
21     BY MR. SCHMIDT:
22     Q.   So let's go to the second paragraph of this.  It
23     says, "The purpose of this statement is to clarify the
24     Board of Medicine's position on the appropriate use of
25     opioids for patients with chronic non-malignant pain."
```

```
1          Let me pause there.  What is chronic non-malignant
2    pain?
3    A.   So chronic non-malignant pain is chronic non-cancer
4    pain.
5    Q.   Okay.  "Clarifying those standards show that these
6    patients will receive quality pain management and so that
7    their physicians will not fear legal consequences, including
8    disciplinary action by the board, when they prescribe
9    opioids in a manner described in this document.  It should
10   be understood that the board recognizes that opioids are
11   appropriate treatment for chronic non-malignant pain in
12   selected patients."
13         Do you see that?
14   A.   I do.
15   Q.   Is this consistent with this change in national
16   standards that you've been telling us about at this time in
17   the 1997 time period?
18   A.   Yes, it is.
19   Q.   All right.  Let's go two lines -- two paragraphs down.
20   You talked about the role that state medical boards play in
21   discipline.  Do you remember telling us about that just a
22   moment ago?
23   A.   I do.
24   Q.   It says, "A physician need not fear disciplinary action
25   by the board if complete documentation of prescribing of
```

1    opioids in chronic non-malignant non-cancer pain even in

2    large doses is contained in the medical records."

3         Do you see that?

4    **A.**   I do.

5    **Q.**   And if we can go back to the timeline and put that

6    quote on the timeline under 1997.

7         Just in general terms, what's the import of a statement

8    like that from a, from a State Board of Medicine?

9    **A.**   So for a doctor, that's a clear message.  It's very

10   clearly written saying that if you prescribe opioids even in

11   large doses for non-cancer pain -- and there is a reference

12   that you're going to have to have complete documentation.

13   You're going to have to justify your decision to do that in

14   your medical record which would be for a doctor expected.

15   That in that case, you need not fear disciplinary action.

16        And that's -- that would typically be quite significant

17   to a physician because disciplinary action from a medical

18   board could mean losing your medical license and not being

19   able to practice medicine, for example.

20   **Q.**   Are you familiar with something called the Federation

21   of State Medical Boards?

22   **A.**   Yes, I am.

23   **Q.**   Could you tell us what the Federation of State Medical

24   Boards is?

25   **A.**   So it's a group that tends to write guidelines and

```
 1    documents for -- that are then frequently adopted by medical

 2    boards in the different states.

 3    Q.    Okay.  Are you familiar with publications that the

 4    Federation of State Medical Boards has issued over time

 5    regarding prescription opioids?

 6    A.    Yes, I am.

 7              MR. SCHMIDT:  May I approach, Your Honor?

 8              THE COURT:  Yes.

 9    BY MR. SCHMIDT:

10    Q.    I've given you what I've marked as Defense West

11    Virginia 2937.  If you look at the top of it -- well,

12    actually, let's look at the second line -- the third

13    line, smaller print.

14         Do you see in that sentence there's a reference to the

15    Federation of State Medical Boards, and it's dated May,

16    1998.  Do you see that?

17    A.    I do.

18    Q.    And it says, "Model guidelines for the use of

19    controlled substances for the treatment of pain."

20         Are you familiar with this document?

21    A.    Yes, I am.

22    Q.    At a high level, can you give us an overview of, of

23    what this document is?

24    A.    So it's a document written by the Federation of State

25    Medical Boards spelling out their, their guidelines for the
```

1    appropriate use of controlled substances to treat pain.

2         And then this is the, the -- this sort of document --

3    indeed, this one was -- the sort of document that many state

4    medical boards would then adopt as their, as their

5    guideline.

6              MR. SCHMIDT:  Your Honor, we missed the ancient

7    records exception by a few months for this document, so I'll

8    take up Mr. Farrell's invitation to move it in just for the

9    limited purpose of notice, Defense West Virginia 2937.

10             THE COURT:  Is there any objection?

11             MR. FARRELL:  No, Your Honor.

12             THE COURT:  It's admitted for the limited purpose.

13   BY MR. SCHMIDT:

14   **Q.**  Let's look at some of the language in this

15   document.

16        First of all, if you go to the third paragraph, please,

17   it states, "The board recognizes that controlled substances,

18   including opioid analgesics, may be essential in the

19   treatment of acute pain due to trauma or surgery and chronic

20   pain whether due to cancer or non-cancer origins."

21        Are you familiar with that statement from the

22   Federation of State Medical Boards in 1998?

23   **A.**  Yes, I am.

24   **Q.**  And if we go over to the timeline and put that on a

25   timeline, 1998, can you comment on the significance, if any,

```
1    of the Federation of State Medical Boards issuing this

2    broader statement including the specific recognition that

3    opioid analgesics may be essential for acute pain due to

4    trauma or surgery and chronic pain whether due to cancer or

5    non-cancer?

6    A.   So it's part of the same change over time and

7    encouraging increase in the -- essentially increase in the

8    aggressive treatment of pain with the, the, this concept

9    that we've been perhaps under-treating pain.

10        And it's significant that they're spelling out not just

11   acute pain and not just chronic pain due to cancer, but also

12   including chronic pain due to non-cancer origins.

13   Q.   And do you understand this to be consistent with the

14   standard of care regarding prescription opioids as it was

15   developing in this time period?

16   A.   Yes, I do.

17   Q.   Let's go back to the article itself, please, Defense

18   West Virginia 2937.  And if we go back to that third

19   paragraph, I just want to cull out some other language at

20   the end.

21        "Physicians should recognize that tolerance and

22   physical dependence are normal consequences of sustained use

23   of opioid analgesics and are not synonymous with addiction."

24        Can you explain to us what you understand the

25   Federation of State Medical Boards to be saying with that
```

1    statement?

2    **A.**    So what they're spelling out for physicians is -- and I

3    agree with them, by the way -- if, if you prescribe a

4    significant dose of opioids to any patient over a

5    significant time period, that patient will become physically

6    dependent.

7         So if you were to abruptly stop those opioids from one

8    day to the next, that patient would have a physical

9    withdrawal and would be sick.  But that's not being

10   addicted.  That's just a physical dependence that happens to

11   everybody.  In fact, it happens to every mammal if you give

12   a significant dose over a significant time.

13        Similarly, the tolerance is that if you give a

14   significant dose over a significant time, the medication

15   will have less effect.  The patient will become tolerant.

16   And, again, that's a normal physiologic thing that will

17   happen to everybody with a sufficient dose over a sufficient

18   time, whereas addiction is something that's a psychological

19   phenomenon, compulsive use cravings, that does not happen to

20   everybody.  It happens to a relatively small percentage of

21   patients.  When it does happen, it can be absolutely

22   devastating, so as to not confuse the patient developing

23   physical dependence or physical tolerance with a patient

24   developing addiction.

25   **Q.**    And I'd like to go to the next stop on the timeline.

1    Before I do, we've been focusing on some seminal

2    publications relevant to the standard of care question.

3        Do you have an understanding as to whether there was a

4    much broader discussion occurring regarding standard of care

5    that these are leading examples of?

6    **A.**    These are examples of the evolution of that standard of

7    care, but they reflect a broad discussion across pain

8    medicine, and actually medicine in general, about what's the

9    appropriate way for us to treat pain and what's the

10   appropriate way for us to use opioid pain medications to

11   treat pain.

12            MR. SCHMIDT:  May I approach, Your Honor?

13            THE COURT:  Yes.

14   BY MR. SCHMIDT:

15   **Q.**    I've passed you a document AM-WV-2693.  It says

16   "Joint Commission on Accreditation of Healthcare

17   Organizations Pain Standards for 2001."  Are you

18   familiar with this document?

19   **A.**    Yes, I am.

20   **Q.**    Are you familiar with the entity that issued this

21   document, the Joint Commission on Accreditation of

22   Healthcare Organizations?

23   **A.**    Yes, I am.  We, we call it by the acronym JCAHO.

24   **Q.**    And what role, if any, do they play in the medical

25   profession?

1    **A.**   So JCAHO is the body that accredits hospitals and they

2    accredit other healthcare organizations.  And that

3    accreditation is very important to us to continue to be able

4    to operate our hospitals.  An accredited hospital has

5    implications for reimbursement, et cetera.  So their

6    accreditation is extremely important to us.

7    **Q.**   And these are, are pain standards for 2001.  What, if

8    anything, is the significance of this accreditation on

9    issuing pain standards, or any kind of standards for that

10    matter?

11    **A.**   So the significance of any standards that JCAHO issues

12    is that they come and inspect us on a regular basis.  Often

13    it's a surprise inspection that you don't know of ahead of

14    time where they arrive.  And they inspect whether we're

15    meeting their standards for pain treatment or for keeping

16    the operating rooms sterile, clean enough, or many other

17    things.

18    And it's very, very important to us to maintain our

19    accreditation, and very important for us not to have

20    findings where we're not meeting their standards beyond how

21    we treat pain or other things.

22    **Q.**   Okay.  In terms of these specific pain standards, do

23    you know whether they are influential in the practice of

24    medicine?

25    **A.**   Yes, I do.

**Q.**   How so -- or how were they if at all?

**A.**   So they were influential because they set standards for measuring pain as the fifth vital sign --

**Q.**   Uh-huh.

**A.**   -- which was extremely important because if you think of vital signs, the name, the name says a lot; heart rate, blood pressure, et cetera, key things.  And to then add pain as a fifth vital sign was a very clear message of how important JCAHO felt measuring pain and, by implication, treating pain was and so, therefore, the expectation that hospitals who are going to be inspected by JCAHO would, would meet those sort of standards.

**Q.**   I'd like to look at what exactly this document says on that.

MR. SCHMIDT:  Before I do, we move this document into evidence for the limited purpose of notice, AM-WV-2693.

MR. ACKERMAN:  One thing, Your Honor -- we tried to point this out last night in our objections.  It appears that the back there's a different document that's appended to it.  So you've got ten pages that all appear to be the same document, and then there's something else.

THE COURT:  Beginning on page --

MR. ACKERMAN:  Page 11 at the bottom it looks like something that is Page 13 of a separate document.

MR. SCHMIDT:  I think the cover of the document

```
 1    answers that in the second paragraph.  It refers to the new

 2    pain standards and some examples are pulled out of the six

 3    chapters in which they appear in these six manuals and are

 4    shown below for your information.

 5         So it's, it's an attachment to the original document

 6    that's referenced in the second paragraph on the first page.

 7              THE COURT:  Yeah.  The paragraph on the first page

 8    appears to embrace the parts that you're concerned about,

 9    does it not?

10              MR. ACKERMAN:  I think when it says examples are

11    shown below, it's talking about the content of the document.

12              MR. SCHMIDT:  This document has been on the

13    exhibit list for a long, long time.  It's one of the central

14    documents in the case.  I actually moved it into evidence as

15    an adoptive admission because it's subject to a --

16              THE COURT:  I'm going to admit it for the limited

17    purpose, Mr. Ackerman.  You can object -- do you want the

18    record to show your objection?

19              MR. ACKERMAN:  I think it's on the record, Your

20    Honor.

21              THE COURT:  All right.  It will do so.

22    BY MR. SCHMIDT:

23    Q.  Let's go to Page 12 of this document if we could.

24    It's the number in the middle this time at the bottom.

25    And it says "Standard" at the top.
```

1        And, actually, just before I do, just to make the

2   record complete, Dr. Gilligan, could you look back with me

3   at the first page of the document.

4        The second paragraph says, "The new pain standards and

5   some examples are pulled out of the six chapters in which

6   they appear in these six manuals and are shown below for

7   your information."

8        Do you see that?

9   **A.**   I do.

10  **Q.**   Let's go to Page 11.  Remembering those, those words

11  from the first page about standards and manuals -- I'm

12  sorry, Page 12, please.

13        You see at the top there's a reference to a manual, the

14  Comprehensive Accreditation Manual for Hospitals:  The

15  Official Handbook.  Do you see that?

16  **A.**   I do.

17  **Q.**   And then below that there's a reference to "Standard."

18  Do you see that?

19  **A.**   I do.

20  **Q.**   The standard is patients have the right to appropriate

21  assessment and management of pain.  Do you see that?

22  **A.**   I do.

23  **Q.**   And then it looks like the way this document works is

24  it explains that standard.  And it says, "Pain can be a

25  common part of the patient experience.  Unrelieved pain has

1    adverse physical and psychological effects.  The patient's

2    right to pain management is respected and supported.  The

3    healthcare organization plans, supports, and coordinates

4    activities and resources to assure the pain of all patients

5    is recognized and addressed appropriately."

6        Do you see that?

7    **A.**   I do.

8    **Q.**   And what, if anything, is the import of this being part

9    of an accreditation manual and standard set of that manual

10   in JCAHO?

11   **A.**   So it's of substantial import again because we are

12   accredited by JCAHO and because it's very, very important to

13   us to maintain our accreditation, and very important for our

14   accreditation inspections not to have findings where we're

15   deficient.  So in a set of standards like this, that has a

16   big effect on, on us running the hospital.

17   **Q.**   Let's go back to the page we were looking at, please,

18   if you could pull that back up, 2693, AM-WV-2693, Page 12.

19       And while we're pulling that up, we can look at our

20   hard copy documents just in the interest of time.

21       Do you see there's a heading below the standard below

22   the explanation of the intent of the standard that says

23   "examples of implementation"?  Do you see that?

24   **A.**   I do.

25   **Q.**   And do you see the references, what you were telling us

1    earlier, it says, "Pain is considered a fifth vital sign in

2    the hospital's care of patients.  Pain intensity ratings are

3    recorded during the admission assessment along with

4    temperature, pulse, respiration and blood pressure."

5        Do you see that?

6    **A.**   I do.

7    **Q.**   And was that a significant consideration in the

8    standard of care in medicine at this time?

9    **A.**   That was a significant consideration again because the,

10   the other vital signs have been around for -- temperature,

11   pulse, respiration, blood pressure have been vital signs

12   that are critical to assessing patients.

13       And, so, to add pain as a fifth vital sign was a very

14   clear message about the great importance of measuring pain

15   and, by implication, of treating pain.

16   **Q.**   Okay.  And you see that as, as Item Number 1 under

17   examples.  And let's just go to the board and put that up on

18   the board.

19       We're now to 2001.  Pain is considered the fifth vital

20   sign.

21       Can we go back to the second example, AM-WV-2693.

22   "Every patient is asked a screening question regarding pain

23   on admission."

24       And then let's just jump down to Number 4.  "The

25   following statement on pain management is posted in all

1    patient care areas (patient rooms, clinic rooms, waiting

2    rooms, et cetera).  Statement on pain management:  All

3    patients have a right to pain relief."

4         Could you comment on the impact of some of these

5    examples that were given on how to implement this policy in

6    terms of every patient being asked a screening question

7    about pain, public postings that we've probably all seen,

8    all patients have a right to pain relief.

9    **A.**   So where every patient is asked a screening question

10   about pain on admission, then you're getting a measurement

11   of pain by JCAHO guidance on every patient.  And that's

12   extremely likely to have an effect that you'll now be doing

13   more to treat patients' pain.

14        If the measurement is very high, the likelihood that

15   doctors and nurses will then do something to try to treat it

16   is, I think, a borne out conclusion.  And also having the

17   statement posted in all patient care areas per JCAHO

18   recommendations, per JCAHO standard setting saying all

19   patients have a right to pain relief is, is a very clear

20   statement that if a patient has severe pain, there's a

21   strong implication that doctors and nurses should, in the

22   appropriate fashion one would hope, treat, treat their pain.

23   **Q.**   Let's go to the next item on the timeline.

24             MR. SCHMIDT:  May I approach, Your Honor?

25             THE COURT:  Yes.

BY MR. SCHMIDT:

**Q.**   I've given you MC-WV-1522 which is titled "A Joint Statement from 21 Health Organizations and the Drug Enforcement Administration."

And then if you look on the right, it appears that it lists the different organizations.  Do you see that?

**A.**   I do.

**Q.**   And one of them is -- the sixth one down is the American Medical Association.  Do you see that?

**A.**   I do.

**Q.**   What is the import, if anything, of receiving a statement from the American Medical Association?

**A.**   The American Medical Association is the biggest organization representing doctors in America.  So it's significant when they're endorsing a statement.

**Q.**   If you scroll down, this was in the title, but do you see the reference to the Drug Enforcement Administration being listed?

**A.**   I do.

**Q.**   And it's on the right there, yeah.  And then if we go back to what this joint statement addresses, it states, "Promoting pain relief and preventing abuse of pain medications, a critical balancing act."

Do you see that?

**A.**   I do.

1    **Q.**   Is there -- what significance, if any, does a statement

2    from the DEA on balancing pain relief and preventing abuse

3    to pain medications carry?

4    **A.**   So it's significant because the Drug Enforcement

5    Agency, of course, part of what they're, what they will do

6    is look at inappropriate use of medications and be an

7    enforcement agency.

8        So when they're endorsing promoting pain relief while

9    getting the -- while preventing abuse, that's significant

10   because the doctor who would be -- might be scared to

11   prescribe opioids for fear of getting in trouble with

12   enforcement agencies would take -- would tend to take quite

13   seriously a message from the Drug Enforcement Agency

14   endorsing these medications to treat pain in many

15   situations.

16            MR. SCHMIDT:  I'll move into evidence MC-WV-1522

17   for the limited purpose of notice.

18            THE COURT:  Any objection?

19            MR. ACKERMAN:  For the limited purpose, no

20   objection.

21            THE COURT:  Let me make clear it's notice to, to

22   whom for what?

23            MR. SCHMIDT:  Notice to the medical and healthcare

24   community regarding the contents --

25            THE COURT:  Regarding the changing standards of

```
 1    the abuse of opioids?
 2               MR. SCHMIDT:  Yes, Your Honor.
 3               MR. FARRELL:  I've got an objection to that.  I
 4    think it's notice to the defendants, not notice to --
 5    there's no relevance to the notice to the community.
 6               MR. SCHMIDT:  It's a publication from, among other
 7    sources, the American Medical Association and the branch of
 8    the federal government that regulates all doctors who
 9    prescribe prescription opioids.  We're talking about
10    standard of care.  I think it is relevant to notice to
11    doctors.
12               THE COURT:  I think it is too, Mr. Farrell.  It
13    shows the -- it doesn't come in for the truth of the matter
14    asserted.  It comes in to show notice to the medical
15    profession of the changing standards of the use of opioids.
16    Isn't that the purpose it's offered, Mr. Schmidt?
17               MR. SCHMIDT:  Yes.  I think we actually could move
18    it in as a public record.
19               MR. FARRELL:  Okay.
20               THE COURT:  I'll admit it for the limited purpose.
21       Do you want to object, Mr. Farrell?
22               MR. FARRELL:  No.  I guess I'm just a little
23    confused, but that's okay.
24    BY MR. SCHMIDT:
25    Q.   So let's look at what this statement says.  If we
```

1    look -- there's a line, looks like the third paragraph

2    down, "This consensus statement is necessary based on

3    the following facts."  And then it lists a series of

4    facts.  I'm going to focus on the first two.  Do you see

5    that?

6    **A.**   I do.

7    **Q.**   The first fact, according to this document, that

8    necessitates this consensus statement is that, quote,

9    "Under-treatment of pain is a serious problem in the United

10   States, including pain among patients with chronic

11   conditions and those who are critically ill or near death.

12   Effective pain management is an integral and important part

13   of the quality of medical care and pain should be treated

14   aggressively."

15        Do you see that language?

16   **A.**   Yes, I do.

17   **Q.**   Again, does this reflect the standard of care this time

18   from the entire American Medical Association and the DEA

19   about the needs, in the words of this document, to not

20   simply recognize the problem with under-treatment of pain,

21   but that pain should be treated aggressively?

22   **A.**   Yes, this is part of that changing standard of care.

23   **Q.**   Let's look at the next bullet.  It says, "For many

24   patients opioid analgesics, when used as recommended by

25   established pain management guidelines --" do you see that

1    language?

2    **A.**    I do.

3    **Q.**    And what do you understand that reference to mean,

4    established pain management guidelines?

5    **A.**    Things like the guidance from the Federation of State

6    Medical Boards and other similar guidelines.

7    **Q.**    "For many patients, opioid analgesics, when used as

8    recommended, are the most effective way to treat their pain

9    and often the only treatment option that provides

10    significant relief."  And did I read that correctly?

11    **A.**    Yes, you did.

12    **Q.**    If we switch over to our board and put that on the

13    board, is that significant when the DEA and the AMA are

14    coming out with a statement saying that it's important to

15    treat pain and they're often the only treatment option that

16    provides significant relief?

17    **A.**    Yes, it's important, again the AMA being the biggest

18    organization representing doctors in the U.S. and the DEA

19    being the Drug Enforcement Agency.

20    **Q.**    Okay.  Can we go back to the original document, please,

21    MC-WV-1522.  And do you still have that in front of you?

22        I think we're having some technical problems.  While

23    we're doing that, I'm going to ask you about one other

24    paragraph in here.  It's the third paragraph in the document

25    right before that discussion of the consensus statement

1    being necessary based on the following facts.

2         Do you see where it says, "Preventing drug abuse is an

3    important societal goal but there's consensus by law

4    enforcement agencies, healthcare practitioners, and patient

5    advocates alike that that concern should not hinder a

6    patient's ability to receive the care they need and

7    deserve."

8         Do you see that language?

9    **A.**   I do.

10   **Q.**   Do you have an understanding that there was that

11   consensus described here at this point in time by law

12   enforcement, by healthcare practitioners, by patient

13   advocates that concerns about abuse were important, but they

14   shouldn't hinder a patient's ability to receive the care

15   they need?

16   **A.**   Yes.  My understanding is that that was the consensus

17   view at that time.

18   **Q.**   The FSMB continued to issue guidelines over time?

19   **A.**   Yes, they did.

20   **Q.**   Let's take a look at the next set of guidelines, if I

21   may just have one second, Your Honor.

22              THE COURT:  Yes.

23              MR. SCHMIDT:  May I approach?

24              THE COURT:  Yes.

25   BY MR. SCHMIDT:

1    **Q.**   I've handed you what I've marked as Defense West

2    Virginia 3605.  And let's put it up on the screen just

3    in terms of what we're looking at.  It says "Model

4    Policy for the Use of Controlled Substances, Federation

5    of State Medical Boards."  And then there's a reference

6    to May, 2004.  Do you see that?

7    **A.**   I do.

8    **Q.**   Is this an update on those Federation of State Medical

9    Board standards now from 2004?

10   **A.**   That's correct.

11           MR. SCHMIDT:  We'd move this into evidence for the

12   limited purpose of notice as described before, Your Honor.

13           THE COURT:  Any objection?

14      (No Response)

15           THE COURT:  Hearing none, it's admitted.

16   BY MR. SCHMIDT:

17   **Q.**   If we look in the second paragraph, it states,

18   "Since adoption in April 1998 --"

19           Is that a reference to the earlier guidelines we looked

20   at?

21   **A.**   Yes, it is.

22   **Q.**   "-- the model guidelines for the use of controlled

23   substances for the treatment of pain have been widely

24   distributed to state medical boards, medical professional

25   organizations, other healthcare regulatory boards, patient

```
1    advocacy groups, pharmaceutical companies, state and federal

2    regulatory agencies, and practicing physicians and other

3    healthcare providers.  The model guidelines have been

4    endorsed by the American Academy of Pain Medicine, the Drug

5    Enforcement Administration, the American Pain Society, and

6    the National Association of State Controlled Substances

7    Authorities."

8         Do you have that understanding that their model

9    guidelines were endorsed by various organizations, including

10   the DEA?

11   A.   Yes, that is my understanding.

12   Q.   Let's go to the next paragraph, please.

13        It states, "Notwithstanding progress to date in

14   establishing state pain policies recognizing the legitimate

15   uses of opioid analgesics, there is a significant body of

16   evidence suggesting that both acute and chronic pain

17   continue to be under-treated."

18        Do you see that?

19   A.   I do.

20   Q.   So just to orient us, we're now in 2004.  Are you aware

21   that prescription levels had actually started increasing by

22   this point in time?

23   A.   Yes, I am aware they had.

24   Q.   Was the Federation of State Medical Boards telling

25   doctors they could still do more to treat acute and chronic
```

1    pain?

2    **A.**    Yes, I think that's a fair statement of what they're,

3    of what they're saying.

4    **Q.**    Let's go to Page 3.  Actually, let's just put that

5    statement, if we could, up on the board.

6        We're now to 2004.  Recognizing that they continued --

7    let's go back to Defense West Virginia 3605 at the bottom of

8    Page 2, last sentence, or second to last sentence.

9        It says, "Appropriate pain management is the treating

10   physician's responsibility.  As such, the board will

11   consider the inappropriate treatment of pain to be a

12   departure from standards of practice and will investigate

13   such allegations, recognizing that some types of pain cannot

14   be completely relieved, and taking into account whether the

15   treatment is appropriate for the diagnosis."

16       What's the import of the Federation of State Medical

17   Boards proposing that the medical standard will involve the

18   board considering inappropriate treatment of pain to be a

19   departure from standards of practice and will investigate?

20   **A.**    So what the Federation of State Medical Boards is

21   telling doctors there is that if you do not adequately treat

22   patients' pain, you will have failed to meet the standards

23   of care, or standard of practice care they use.

24       And, again, where medical boards are the bodies that

25   grant you your license and can take your license away, a

1    recommendation of that sort from the Federation of State

2    Medical Boards has a significant influence on doctors.

3    **Q.**   Next sentence repeats or says something similar.

4         Can you cull that out, the next sentence on Page 3?

5         "The board recognizes that controlled substances,

6    including opioid analgesics, may be essential in the

7    treatment of acute pain due to trauma or surgery and chronic

8    pain, whether due to cancer or non-cancer origins."

9         Is that a similar statement about the role of

10   prescription opioids that we saw in the earlier document?

11   **A.**   Yes, it's very similar.  And, again, it specifically

12   calls out chronic non-cancer origin in addition to acute

13   pain and cancer pain.

14   **Q.**   Okay.  Let's go to the next document on our timeline.

15   I want to just illustrate whether this tracked through into

16   West Virginia standards with a document in evidence.

17             MR. SCHMIDT:  May I approach, Your Honor?

18             THE COURT:  Yes.  I don't think you moved 3065

19   into evidence.  Do you want to do that?

20             MR. SCHMIDT:  Yes, I would for the limited purpose

21   of notice, Your Honor.

22             THE COURT:  All right.  Is there any objection?

23             MR. ACKERMAN:  Not for the limited purpose.

24             THE COURT:  All right.  It's admitted for the

25   limited purpose.

```
 1              MR. SCHMIDT:  Thank you, Your Honor.

 2   BY MR. SCHMIDT:

 3   Q.   So if we put MC-WV-1218 up on the screen, do you

 4   see that this is a West Virginia Board of Medicine

 5   quarterly newsletter from January, 2005?

 6   A.   I do.

 7   Q.   And just two quick points on this.

 8        If we can scroll down, please, to the first paragraph.

 9        Remember in that earlier document there was a reference

10   to the inappropriate treatment of pain?

11   A.   I do.

12   Q.   Do you see that defined here in this last sentence for

13   the purposes of this policy, the inappropriate treatment of

14   pain includes non-treatment, under-treatment,

15   over-treatment, and the continued use of ineffective

16   treatments?

17   A.   I, I see that.

18   Q.   And then I just want to look down at the bottom of this

19   page.  Do you remember me reading you that language from the

20   FSMB document about the board will consider the

21   inappropriate treatment of pain to be a departure from

22   standards?

23   A.   I do.

24   Q.   Do you see that same language here adopted by the State

25   of West Virginia, "The board will consider the inappropriate
```

1    treatment of pain to be a departure from standards of

2    practice and will investigate such allegations."

3         Is that guided by the Federation of State Medical

4    Boards?

5    **A.**   That would be my understanding because it's verbatim

6    from what we saw in the FSMB.

7    **Q.**   And if we go to the next page, please, do you see a

8    similar statement from the West Virginia Board of Medicine

9    right at the top recognizing that opioids may be essential

10   in the treatment of acute pain due to trauma or surgery and

11   chronic pain whether due to cancer or non-cancer?

12   **A.**   I see that.

13   **Q.**   And let's, let's put that up on the board if we could.

14        The Court has heard evidence about a book by a Dr.

15   Fishman and I'm not going to -- it's in evidence.  The Court

16   has a copy.  I'm not going to spend a lot of time on it.  It

17   was actually mailed to every doctor in West Virginia called

18   "Responsible Opioid Prescribing."  Are you familiar with

19   that Dr. Fishman book?

20   **A.**   Yes, I'm familiar with the book.

21   **Q.**   And if we -- let's put up on the screen MC-WV-2111 and

22   go to Page 15 of the document.

23        I want to just highlight some language the Court has

24   seen.

25        "Patients should not be denied opioid medications

```
 1    except in light of clear evidence that such medications are

 2    harmful to the patient."

 3         Do you see that?

 4    A.   I do.

 5              MR. SCHMIDT:  Mr. Reynolds, can you put that up on

 6    our board?

 7    BY MR. SCHMIDT:

 8    Q.   We're now to 2008 and the corresponding

 9    transmission of this to all doctors in West Virginia.

10              MR. SCHMIDT:  And if we go back to the book itself

11    and cull out that first bullet that was on Page 15.  Then

12    can you also cull out the third bullet.  Is it possible to

13    get both of them together?

14    BY MR. SCHMIDT:

15    Q.   I read you the first one.  The third one says,

16    "Physicians have a responsibility to minimize the

17    potential for the abuse and diversion of controlled

18    substances."

19         Do you see that?

20    A.   I do.

21    Q.   Do you understand this book that was sent to every West

22    Virginia doctor to be in line with standard of care at this

23    time in terms of when opioids should be prescribed and

24    having a responsibility to minimize the potential for abuse

25    and diversion?
```

1    **A.**    Yes.  I think it was a clear message that on the one

2    hand doctors should appropriately use opioids to treat

3    patients' pain, but that also doctors have a responsibility

4    to think beyond just the patient in front of them to think

5    about the potential for abuse and diversion of those

6    medications.

7    **Q.**    Okay.  How do you mesh those two statements?

8    **A.**    I mesh those two in terms of the same sort of balancing

9    that I think is characteristic in many areas of the practice

10   of medicine, and certainly in this area of prescribing

11   opioid medications that you're talking about, you're talking

12   about significant potential benefits, but you're also

13   talking about significant potential risks, and that the

14   doctor is -- as part of his or her job is supposed to think

15   through those, that risk benefit and weigh it as

16   appropriately as he or she can with the information

17   available to them.

18   **Q.**    Two more documents on this timeline if I could.

19            MR. SCHMIDT:  May I approach, Your Honor?

20            THE COURT:  Yes.

21   BY MR. SCHMIDT:

22   **Q.**    And I'll try to do these as quickly as possible.

23        The first document is Defense West Virginia 1944 which

24   is not in evidence.  The second document is Defense West

25   Virginia 1935 which is in evidence.

1        My question to you is simply if you -- Defense West

2   Virginia 1944 is dated --

3            MR. ACKERMAN:  Your Honor, --

4            MR. SCHMIDT:  -- 2005.

5            MR. ACKERMAN:  We have an objection to the use of

6   Defense West Virginia 1944 because the document did not

7   appear on the expert's materials considered list.

8            MR. SCHMIDT:  It does not.  That is correct.  It's

9   substantively identical in terms of what I'm asking him

10   about to the later version of the document that does.

11            MR. ACKERMAN:  Your Honor, I think we went through

12   this with some of our experts that materials that weren't in

13   the report you're not allowed to ask about.

14            THE COURT:  Well, I'll sustain the objection.  You

15   can use it as a basis to ask him a question if you want to,

16   Mr. Schmidt.

17   BY MR. SCHMIDT:

18   **Q.**   Okay.  Let's start with Defense West Virginia 1935,

19   Page 2.  Do you recognize this is from September 9th,

20   2013, from the State of West Virginia policy on the use

21   of opioid analgesics?

22   **A.**   I do.

23   **Q.**   If you look a little further up, do you see that in

24   this one they're actually clear that they took it from these

25   Federation of State Medical Board documents we've been

1    talking about?

2    **A.**    I see that.

3    **Q.**    And in the interest of time, I will go to the third

4    page of this document.  And do you see in the third

5    paragraph, the first sentence references again the statement

6    about opioid analgesics are useful and can be essential in

7    the various range of pain treatments that we've talked

8    about, acute pain, chronic pain, whether due to cancer or

9    non-cancer causes?

10   **A.**    I see that.

11   **Q.**    And if we go to the two paragraphs down, patients

12   (verbatim) should not fear disciplinary action from the

13   board for ordering, prescribing, dispensing or administering

14   controlled substances, including opioid analgesics, for a

15   legitimate medical purpose in the course of professional

16   practice when current best clinical practices are met.

17        Do you see that?

18   **A.**    I do.

19   **Q.**    And then if we look at the next sentence, they define

20   when use of opioids is for a legitimate medical purpose.

21   And they say if it's based on sound clinical judgment and

22   current best clinical practices, is appropriately documented

23   and is of demonstrable benefit to the patient.  Do you see

24   that?

25   **A.**    I do.

1    Q.   What's the import of a State Board of Medicine telling

2    doctors in that state, statements like this about

3    appropriate use of, of prescription opioids?

4    A.   The importance of it is that the State Medical Board is

5    giving physicians here a fairly clear message that they

6    would not be -- they shouldn't fear disciplinary action by

7    the board as long as they practice meeting the standards of

8    appropriate care.  And, so, that they shouldn't let that

9    fear of potential discipline stop them from using opioid

10   pain medications in an appropriate fashion.

11   Q.   Do you see similar statements -- let's go to the board.

12   Let's put up the two documents we just used, Defense West

13   Virginia 1944 from 2010 and Defense West Virginia 1935 from

14   2013 on the board.  Do you see similar statements in between

15   2005 and 2013?

16   A.   I did.

17   Q.   Okay.

18            MR. SCHMIDT:  Your Honor, may I pass up a copy of

19   this for demonstrative purposes?  Plaintiffs' counsel

20   already has it.

21            THE COURT:  Yes.

22            MR. ACKERMAN:  Of what?

23            MR. SCHMIDT:  Of the completed time line.

24            MR. ACKERMAN:  Oh, okay.

25            MR. SCHMIDT:  Thank you.

```
1          Your Honor, I briefly conferred with Mr. Farrell.  I
2     have about 10 minutes left.  I was hoping to be done.  Mr.
3     Farrell was very gracious to say if I'm not done by noon
4     that that gives him enough time.  This might be -- if that's
5     okay with the Court, this might be a good time to break.
6               THE COURT:  Yeah, let's go ahead and finish the
7     direct and then we'll take the lunch break and come back and
8     you can cross him after lunch.
9               MR. FARRELL:  I think Mr. Schmidt was asking
10    whether or not he could take 10 minutes after the break to
11    finish up and that way --
12              THE COURT:  Is that what you were asking?
13              MR. SCHMIDT:  Yes, but I'm good either way, Your
14    Honor.
15              THE COURT:  Well, I'm going to suggest we come
16    back at 1:30.  Is that okay with everybody?
17              MS. MAINIGI:  Yes, Your Honor.
18              THE COURT:  We'll be in recess until then.
19         (Recess taken at 12:01 p.m.)
20         (Proceedings resumed at 1:27 p.m. as follows:)
21              THE COURT:  Okay, Mr. Majestro.
22              MR. MAJESTRO:  Your Honor, you asked me yesterday
23    how much time we needed to respond to the motions and I
24    wisely waited to see them before I committed myself.
25         Following court yesterday, the defendants began filing
```

1  motions, ended over the noon hour.  They filed five motions

2  totaling 214 pages of text, none of them within the Court's

3  page limits.

4      I understand these are important issues, but I would

5  point out two things about the issues.

6      A lot of what's here is either, is either an attempt to

7  re-litigate issues in a -- with different theories or

8  arguments that have never been raised before in this

9  litigation.

10     Mr. Heard yesterday talked about, "After four years I

11  still haven't seen a case," or such and such.  Well, this

12  is -- the first time he raised that argument was yesterday.

13     And, so, we've had U.S. Supreme Court precedent going

14  back to historical roots of equity jurisdiction.  It's

15  complicated.

16     In addition, you know, our team -- we're allocating

17  resources among the lawyers working on these cases across

18  the country.  Our teams have split up.  We have people

19  currently working on the, on the State Court cases in

20  California, in New York, and also getting ready for the --

21  Judge Polster's trial.  They're getting ready to -- getting

22  the dispositive motions and *Daubert* deadlines for those

23  trials.

24     And as I mentioned to your law clerk before the

25  hearing, I also have a personal event next week that's going

1    to have me out-of-pocket for a few days.

2         With all that, we're not going to file a motion to

3    strike these motions for violation of the page limits.  And

4    I, I admit that we have been a little lax in those.  But

5    it's always been done by consent and never to the extent

6    that this has happened.

7         But you asked me how much time I needed to do the right

8    kind of job and it's a month.

9              THE COURT:  Ms. Mainigi.

10             MS. MAINIGI:  Your Honor, I think a month is, is

11   just way too long for these motions.  I mean, they're

12   clearly timely motions and we know that we filed a lot of

13   papers.  I think our papers are exactly on point and

14   consistent with what we needed to file for directed verdict

15   motions.

16        And, so, with respect to -- there's a couple of points.

17        Number one, they have seven law firms that are working

18   on this matter.  So there are -- I certainly don't begrudge

19   Mr. Majestro taking time off for his daughter's wedding.

20   Absolutely he should be doing that.  But I think that

21   there -- just like we've had to divide up our resources

22   across the country in various jurisdictions, they have done

23   the same thing and this is a trial.  We're in the midst of

24   trial and we're moving.

25             THE COURT:  Have the defendants filed everything

1    they intend to file with regard to the 52(c) motions?

2              MS. MAINIGI:  Yes, Your Honor, to my knowledge.

3    I'm not aware of --

4              THE COURT:  So you're done?

5              MS. MAINIGI:  We're, we're done, Your Honor.

6         And one key important fact that I'd like to share with

7    the Court, which I hope will make everybody's Friday

8    afternoon, we've been taking a close look at our case and

9    we've been taking a look at the types of, the pieces of

10   evidence that we were able to get in during discovery,

11   especially since many of our corporate witnesses were called

12   in the plaintiffs' case.  And, and we think that we're

13   looking on the outside at three more weeks of trial.

14        So, obviously, some of that is dependent on how long

15   the cross-examinations will be.  And, certainly, I don't

16   want to delay Dr. Gilligan by slowing this down on the

17   schedule.  We're certainly happy to discuss that with you

18   all whenever you're ready.  But when we're looking at on the

19   outside three weeks of trial, I do think a month ultimately

20   for briefing and directed verdict is just not feasible.

21        And so our suggestion, Your Honor, is that the

22   proximate cause motion, for example, could be filed within a

23   week, and then everything else within two weeks.  And I do

24   think that the plaintiffs have the resources to get that

25   done.

```
 1          There is many a time where we have made filings
 2     overnight and utilized all of our resources, even those
 3     folks not in trial, to get that work done at the end of the
 4     day.
 5          So we think that would be quite reasonable under the
 6     circumstances, one week for proximate cause and then two
 7     weeks for the balance given that we're looking on the
 8     outside at three weeks.
 9               THE COURT:  Mr. Majestro, how much time do you
10     need to take off for your daughter's wedding?  I want you to
11     go and have a good time.
12               MR. MAJESTRO:  I, I was planning on being gone
13     Thursday, Friday.  I'm putting on one witness next week
14     also.
15          The other point I'd make, Your Honor, is that the --
16     then I planned to be not working the entire weekend.
17          You know, Rule 52(c) -- this sounds to me like if these
18     issues are that complicated that they needed to file two
19     hundred and some pages of briefs that maybe this is another
20     ground for exercising your jurisdiction and deferring ruling
21     on these.
22          If they're going to be done in three weeks, that, that
23     seems to me -- I mean, I -- even under their schedule I
24     assume they're going to be filing a reply.  And, so, it
25     seems to me we're going to be at the end of trial anyway.
```

1        And, so, taking the time to do the motions right -- and

2    I'm especially -- you know, the, the proximate cause motion

3    is not just one motion because all of the three, all of the

4    three defendants touched on proximate cause individually in

5    addition to the global motion.

6        And the 71-page brief that Ms. Mainigi just filed is,

7    is a very complicated one.  It is something that's going

8    to -- and raises completely new issues in the litigation

9    undoing further rulings that Your Honor has already made or

10   attempting to.  And, you know, I think it's a real motion.

11   I'd like the time to do the research and get that stuff

12   right.

13            MS. MAINIGI:  Your Honor, we do think -- these are

14   very serious motions, as Your Honor recognized from the

15   arguments yesterday, and they definitely deserve the

16   attention of this Court when the Court has the opportunity.

17            THE COURT:  And having said that, that deserves

18   Mr. Majestro time to produce the kind of work product that

19   the defendants have produced which is -- all that will be

20   very helpful to me.

21       And I'm going to give you three weeks, Mr. Majestro.

22            MR. MAJESTRO:  I think we can make that work.  I

23   appreciate it, Your Honor.

24            THE COURT:  Three weeks from, three weeks from --

25            MR. MAJESTRO:  Today.

```
 1              THE COURT:  Three weeks from today.  And we're
 2    going to finish the evidence if we stick to the original
 3    schedule and take a couple weeks off and then come back for
 4    final arguments.  But this briefing, I would think, will
 5    certainly facilitate the consideration of the issues that
 6    will be argued in the final arguments if we get that far.
 7              MS. MAINIGI:  Your Honor, with respect to that --
 8    again, we can discuss this later this afternoon or when we
 9    return.  The defendants would, depending on the timing,
10    would really like to fit in final arguments in July if that
11    is possible.
12         And the reason for that, candidly, is various of us --
13    many of us will have to move onward to trial in September in
14    Washington state, and we'd like to spend August with our
15    families and take vacation and all of that.  And, so, we
16    will certainly work consistent with Your Honor's schedule.
17              THE COURT:  Well, let's see where we get.  And
18    finishing by the end of July would certainly be welcomed by
19    the Court.
20              MS. MAINIGI:  I think it would be welcomed by
21    everybody in this courtroom, Your Honor.  But we, we can
22    address that later.  And we can even propose a schedule to
23    the Court and the plaintiffs, if that makes sense to, to
24    you.
25         And it looks like we've decided a date.  We would just
```

1     ask if the plaintiffs are able to get the briefs done on a

2     rolling basis, I think that would certainly help everybody

3     to have that happen within the three-week period.

4               MR. MAJESTRO:  I mean, to the extent that's

5     possible.  I, I anticipate filing -- I'm going to -- some of

6     them are overlapping in the sense that they're the same

7     argument with different factual bases.  So some of them are

8     going to be -- one response will go to multiple motions.

9          So to the extent we can do that, I'm happy to.  But I

10    can't make any promises here until we've gotten further into

11    it.

12              THE COURT:  Okay.  Well, you've got three weeks,

13    Mr. Majestro.

14              MR. MAJESTRO:  Thank you, Your Honor.

15              THE COURT:  And I look forward to your work

16    product.  And we need to get Dr. Gilligan on and off.

17              MR. SCHMIDT:  Your Honor, just -- just as a matter

18    of housekeeping, Your Honor, before the break we had

19    submitted the timeline that we spent building with Dr.

20    Gilligan as a court exhibit.  I just put a sticker on it for

21    official purposes, if I may submit it as McKesson

22    Demonstrative 11.

23              THE COURT:  All right.

24         You may resume the stand, Dr. Gilligan.

25    BY MR. SCHMIDT:

```
 1    Q.   Good afternoon, Dr. Gilligan.  I'll pick up where

 2    we left off.  We walked through --

 3              MR. SCHMIDT:  And, and could we just put up the

 4    timeline just to orient us very quickly, McKesson

 5    Demonstrative 11, if that's possible?

 6    BY MR. SCHMIDT:

 7    Q.   So we walked through these various statements from

 8    the national groups, West Virginia Board of Medicine,

 9    took us up until 2013 with the West Virginia Board of

10    Medicine, repeated a statement about prescription

11    opioids being essential in certain instances in the

12    treatment of acute pain and certain types of chronic

13    pain.

14         Since that time, has the standard of care for

15    prescription opioids continued to evolve?

16    A.   Yes, it has.

17    Q.   And, and how has that impacted prescribing rates in the

18    time period since we were walking through?

19    A.   So in the time period since what we walked through, it

20    has gotten more conservative.

21    Q.   Uh-huh.

22    A.   And accompanying that, prescribing rates have gone

23    down.

24    Q.   From your perspective, has that been driven by the

25    medical profession?
```

1    **A.**    Yes.

2    **Q.**    And if you could characterize the state of prescribing

3    today, how would you characterize that in terms of

4    prescription opioids?

5    **A.**    So it's significantly more conservative than the

6    mind-set in many of the years, or in the years shown there,

7    certainly many of the years shown there, with more awareness

8    of the potential ill effects, adverse effects from

9    medications, risks of the medications for patients, a

10   greater weighting on that, and also with more skepticism

11   about the benefits.

12       Again, you know, some patients do well, but a rise in

13   awareness that many patients won't benefit from them so,

14   therefore, a shifting of the risk benefit.

15   **Q.**    Okay.  Mindful of what you just said, are prescription

16   opioids still prescribed today for acute pain, just more

17   narrower perhaps?

18   **A.**    Yes, they are.

19   **Q.**    Are they still prescribed for cancer pain?

20   **A.**    Yes, they are.

21   **Q.**    And, again, mindful of what you told us about the

22   science on non-cancer chronic pain and what you said just

23   now, are they still prescribed in certain instances for

24   non-cancer chronic pain?

25   **A.**    Yes.

1    **Q.**   I'd like to show you a document on some of these points

2    we've been talking about just now in terms of current

3    standards.

4              MR. SCHMIDT:  May I approach, Your Honor?

5              THE COURT:  Yes, you may.

6    BY MR. SCHMIDT:

7    **Q.**   And just to orient us as to what we're looking at,

8    this is Defense West Virginia 2527.  If we look at the

9    top of the document, we see the AMA logo, the date

10   June 16th, 2020.  And it looks like it's written to the

11   Chief Medical Officer of the U.S. Centers for Disease

12   Control and Prevention.  Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   Are you familiar with this letter from the AMA?

15   **A.**   Yes, I am.

16             MR. SCHMIDT:  Your Honor, we move this into

17   evidence for the limited purpose of notice.

18             THE COURT:  Any objection?

19             MR. FARRELL:  Yes, Your Honor.  I'm not quite sure

20   how an expert witness is able to lay the foundation for a

21   document written by somebody else and sent to a third party

22   about a subject matter that he was not involved in with the

23   drafting or writing of this letter.  Sure, he can testify to

24   it all he wants, but this isn't a vehicle to be entering

25   into the record.

```
 1              THE COURT:  Can you lay a little better
 2   foundation, Mr. Schmidt?
 3              MR. SCHMIDT:  Yeah, yeah, I'll do my best.
 4   BY MR. SCHMIDT:
 5   Q.   First of all, do you understand this to be a
 6   private letter that we somehow obtained or a public
 7   letter?
 8   A.   I understand it to be a public letter.
 9   Q.   Do you understand this document to be publicly
10   available to members of the medical profession?
11   A.   Yes, I do.
12   Q.   And in terms of -- if we look at the first sentence of
13   this document, it says it's on behalf of the American
14   Medical Association and our physicians and medical student
15   members.  Do you see that?
16   A.   I do.
17   Q.   When the AMA is writing on behalf of themselves and
18   their physician medical student members, who is that?
19   A.   Well, the AMA, as we discussed, is the biggest
20   association of doctors in the U.S.
21   Q.   And after they say that they're writing on behalf of
22   themselves and the physicians and medical student members,
23   they say the AMA appreciates the opportunity to --
24              MR. FARRELL:  Objection, Your Honor.  I didn't
25   make my first objection just to provide the opportunity to
```

```
1     read it into the record.

2             MR. SCHMIDT:  I'm trying to lay the foundation as

3     to what the document is and why --

4             THE COURT:  I'm satisfied with the foundation he's

5     laid so far.

6         Mr. Ackerman.

7             MR. ACKERMAN:  Yeah.  I am curious as to Mr. -- or

8     counsel offered the document for purposes of notice.  My

9     question is notice of what to whom?

10            MR. SCHMIDT:  Notice of the consensus in the

11    medical profession to doctors who are being spoken for on --

12    in this letter and to the healthcare system.

13            THE COURT:  I'm going to admit it for the limited

14    purpose.  We need to get through Dr. Gilligan here.

15            MR. SCHMIDT:  Okay.

16            THE COURT:  Go ahead, Mr. Schmidt.

17            MR. SCHMIDT:  Thank you, Your Honor.

18    BY MR. SCHMIDT:

19    Q.   I'll jump past -- well, actually, just to finish

20    this sentence, do you see that there's reference --

21    they're saying they appreciate the opportunity to review

22    and comment on the Centers for Disease Control and

23    Prevention guidelines for prescribing opioids for

24    chronic pain originally published in 2016.

25    A.   I see that.
```

1    **Q.**   Do you remember this morning you and I touched on those

2    CDC guidelines?

3    **A.**   Yes, I do.

4    **Q.**   Could you just remind us of the effect of those CDC

5    guidelines?

6    **A.**   So the CDC guidelines laid out numerous steps

7    recommending essentially that doctors should be more

8    conservative, more cautious in their prescribing of chronic

9    opioid therapy for non-cancer pain.

10   **Q.**   Okay.  Go to Page 3 of the document, please, down at

11   the bottom.  Do you see there's reference to AMA Task

12   Forces?

13   **A.**   Yes, I do.

14   **Q.**   "The Task Forces further affirm that some patients with

15   acute or chronic pain can benefit from taking prescription

16   opioid analgesics at doses that may be greater than

17   guidelines or thresholds put forward by federal agencies."

18   And then it lists other bodies.  Do you see that?

19   **A.**   I do.

20          MR. FARRELL:  Objection, Your Honor.  Again, this

21   is a letter by a third party written to another third party

22   that's being read into the record by a fourth party.  If Dr.

23   Gilligan wants to testify what he believes to be the

24   standard of care, we have no objection.  He's well

25   qualified.  But neither Deborah Dowell nor James Madara have

1    been called into this courtroom.

2            THE COURT:  Mr. Ackerman.

3            MR. ACKERMAN:  Yeah.  I would add that I don't

4    think reading this, this sentence is consistent with

5    admitting the document for a limited purpose.  If it's a

6    limited purpose of notice, that's fine, but --

7            THE COURT:  Well, I'll sustain the objection.  But

8    you can ask him the questions without reference to the

9    document, Mr. Schmidt.

10   BY MR. SCHMIDT:

11   **Q.**  Do you, do you --

12           MR. SCHMIDT:  Where I was going, Your Honor --

13           THE COURT:  If I understand it.

14           MR. SCHMIDT:  Yeah.  What I was going to ask him

15   was does he understand this to be the standard of care.

16   BY MR. SCHMIDT:

17   **Q.**  So do you understand the standard of care in the

18   medical profession to reflect that patients with acute

19   or chronic pain, some patients can benefit from taking

20   prescription opioids at doses that may still be greater

21   than guidelines or thresholds set by the Federal

22   Government or other agencies?

23   **A.**  Yes, I do understand that to be the consensus within

24   the standard of care.

25   **Q.**  And last question about this document.  If we go to the

```
 1    first page, in the last paragraph on the first page there's

 2    language about the nation no longer having a prescription

 3    opioid-driven epidemic.  What we're now facing is a

 4    different --

 5              MR. ACKERMAN:  Objection.

 6              THE COURT:  You're doing the same thing that I

 7    sustained the objection to.

 8    BY MR. SCHMIDT:

 9    Q.   Do you have an understanding, sir, as to whether --

10              MR. ACKERMAN:  I'd ask that the portion that we

11    just objected to be taken off the screen.

12              MR. SCHMIDT:  It's off the screen.

13    BY MR. SCHMIDT:

14    Q.   Do you have an understanding as to whether the

15    nature of, of drug abuse involving opioid products has

16    shifted from prescription drugs to illegal heroin and

17    fentanyl over the past decade?

18    A.   Yes, I do.

19    Q.   And what, what is that understanding?

20    A.   That it has shifted in that way, that it has shifted

21    from abuse and misuse of prescription opioids to abuse and

22    misuse of heroin and fentanyl and fentanyl analogues that

23    are illicit fentanyl, not, not pharmaceutical fentanyl.

24    Q.   Just a few questions to round out our, our time

25    together.
```

1        As a prescribing physician covering the time period

2    we've been talking about, including the increase in

3    prescriptions and then the decrease in prescriptions, do you

4    have an opinion as a prescribing physician as to which

5    healthcare decision-makers in the healthcare process drove

6    those changes in prescribing in both directions?

7    **A.**    Yes, I do.

8    **Q.**    What is that?

9    **A.**    Physicians and other prescribing clinicians.

10   **Q.**    And from your experience, when we were at the peak or

11   moving up to the peak or coming back down, do you have an

12   understanding as to whether that prescribing was driven by

13   good faith medical decisions?

14   **A.**    Yes.  I think the great majority of the

15   over-prescribing was well-intentioned.  The majority of

16   opioid prescribing during much of that period, or perhaps

17   all of that period was by primary care physicians.

18        And, so, I think there was a great majority of cases of

19   well-intentioned clinicians trying to follow what they

20   understood, or in some cases what they had been told, was

21   the right way to treat patients.

22   **Q.**    Do you have a view as to whether distributors drove

23   prescribing decisions by doctors in terms of their

24   understanding of risks and benefits?

25   **A.**    I do.

1    **Q.**    What's that opinion?

2    **A.**    I don't think distributors had an influence on doctors'

3    prescribing decisions.

4    **Q.**    As someone who's had occasion to prescribe medication

5    and prescription opioids throughout your career, have you

6    ever done so based on interactions with a pharmaceutical

7    distributor?

8    **A.**    No, I have not.

9    **Q.**    In your experience, do distributors -- your experience

10    in the real world dealing with other doctors, do

11    distributors play a role that's meaningful in determining

12    how many prescriptions for opioids or any other product get

13    written in a given point in time?

14    **A.**    No, they do not.

15    **Q.**    That's all I have, Dr. Gilligan.  Thank you.

16         THE COURT:  All right.  You may cross-examine.

17              CROSS EXAMINATION

18    BY MR. FARRELL:

19    **Q.**    Good afternoon.  I introduced myself earlier.  I'm

20    Paul Farrell on behalf of the County Commission and City

21    of Huntington plaintiffs in this case.

22         I want to take this opportunity to use your expertise

23    to maybe crystalize or clarify some of the concepts that

24    we've talked about over the past several weeks.

25         We've inartfully used a phrase of a gateway effect.  Is

1    that terminology something that you're familiar with?

2    **A.**    Yes, it is.

3    **Q.**    So -- and I'm very confident that you're familiar with

4    the idea and the medical side of it.  But from a layman's

5    standpoint or a lawyer's standpoint, gateway effect is

6    intended to communicate that one thing transitions to

7    another.

8         What is your understanding of the meaning of gateway

9    effect?

10             MR. SCHMIDT:  And I'll just object to the preamble

11   statement.

12             THE COURT:  Overruled.

13        You understand the question, don't you, Dr. Gilligan?

14             THE WITNESS:  I think I do.

15             THE COURT:  Okay.  Go ahead.

16             THE WITNESS:  So I think the gateway effect is

17   when somebody in the context of substance abuse, when

18   somebody goes from one substance to another substance.

19   BY MR. FARRELL:

20   **Q.**    So we've had testimony about a lot of articles and

21   I want to ask you a couple of them by name just to see

22   if you recognize them.  It's not a test.  But Muhury,

23   M-u-h-u-r-y, was addressed earlier.  And you're familiar

24   with that?

25   **A.**    Yes, I am.

**Q.**   And what about Compton, the Compton article in the New England Journal of Medicine?  Are you familiar with that?

**A.**   I believe I am, yes.

**Q.**   And then most recently there's been another article by McCabe, M-c-C-a-b-e.  Are you familiar with that article?

**A.**   I'd have to see a specific article to know.  There might be more than one McCabe article.

**Q.**   This is very true.  This is 2021 in the Journal of Addiction Medicine entitled "Pills to powder, a 17-year transition from prescription opioids to heroin among U.S. adolescents followed into adulthood."

I'm not going to -- I'm just asking are you generally familiar with that article?

**A.**   I, I don't remember.  I've looked at so many articles, I just don't remember.

**Q.**   Okay.  So let me see if I can read some of the concepts and see if we can agree to it.

First of all, you recognize that the Journal of Addiction Medicine is an authoritative text in the field of the treatment of pain?

**A.**   The Journal of Addiction Medicine is a medical journal in the field of addiction medicine.  I don't -- I'm not sure when you're saying authoritative text exactly what the definition is there.

**Q.**   That's a legal ease term.  Is the Journal of Addiction

1    Medicine one in which physicians like yourself would rely or

2    use to educate themselves on the state of art of the

3    standard of care?

4    **A.**    The Journal of Addiction -- it's one of the medical

5    journals that people in my field might read.  It's a

6    peer-reviewed journal, yes.

7    **Q.**    Pardon me.  I need my spectacles.

8         So in this 2020 article it makes reference to Muhury

9    and Compton and it says this.  And I'd like to ask you

10   whether or not you agree with it.

11        "Although the vast majority of prescription opioid

12   exposure does not lead to heroin use, heroin incidence and

13   prevalence rates were significantly greater among those who

14   reported non-medical prescription opioid misuse."

15             THE COURT:  Mr. Schmidt.

16             MR. SCHMIDT:  My objection is just if we're going

17   to read language that's specifically linked to an article, I

18   think it's fair to give the article to the witness.

19             THE COURT:  Well, let's see where we go with this

20   without doing that.

21        And then if you need to refer to the article, Dr.

22   Gilligan, we'll get you the article.

23             THE WITNESS:  Thank you.

24             MR. FARRELL:  I have to acknowledge, Judge, in my

25   20 years of doing medical malpractice litigation, this is

1    the first time my opposing counsel has asked me to share the

2    medical literature, but I have it with me.

3              THE WITNESS:  Thank you.

4    BY MR. FARRELL:

5    **Q.**   I'm even going to see if I can put it up on the

6    screen.

7         Do you see the paragraph -- I'm going to, I'm going to

8    kind of see if I can draw a line on it.  This is insane.

9    Now that I want to use it, I can't draw a line on it.

10        But if you see the paragraph, it says "the percentage

11   of people."  Do you see that?

12   **A.**   I think so.  The second paragraph?

13   **Q.**   Yes.  Just to orient you, if you look at the title of

14   the document -- at the top -- the bottom left-hand corner it

15   has the journal reference.  You're familiar with the format

16   of these journal articles?

17   **A.**   Yes, I am.

18   **Q.**   And what I want to particularly ask you about is the

19   sentence by sentence.  I'm going to highlight it right here.

20   And I hope I can tie it all together to make sense at the

21   end.  But do you see the sentence I highlighted?

22   **A.**   More or less I can see it on the, on the screen up

23   front here.  I can't see it perfectly, but I think I have a

24   sense of which one you highlighted.

25             MR. FARRELL:  Okay.  I wish I had just read it,

1    Judge.  All right.  So it's highlighted there.

2    BY MR. FARRELL:

3    **Q.**   "Although the vast majority of prescription opioid

4    exposure does not lead to heroin use, heroin incidence

5    and prevalence rates were significantly greater among

6    those who reported non-medical prescription opioid

7    misuse."

8         And the footnotes, I'll represent to you, are to Muhury

9    and Compton.

10        Do you agree that's a fair reflection of what Muhury

11   and Compton would say?

12   **A.**   I think that that's one of the points that was raised

13   in the Muhury article.

14   **Q.**   And do you agree that that's the state of medical

15   knowledge or an accepted position taken by physicians in

16   your field?

17   **A.**   I, I think that -- I personally think that that is a

18   fair statement, yes.

19   **Q.**   All right.  So the very next sentence says, "Based on

20   retrospective data --" what is retrospective data?

21   **A.**   So that's data where you do your study by looking

22   backwards rather than organizing a study that will look --

23   that you say from here going forward we will collect data

24   and interpret it.  Generally, prospective studies are

25   considered a higher grade of science in the majority of

1    cases than retrospective.

2    Q.   So the reference at the end of this sentence, I'll

3    represent that's Muhury again.  And it says, "Based on

4    retrospective data, only one percent of individuals who

5    reported past-year non-medical prescription opioid misuse

6    had used heroin before using prescription opioids."

7         Do you see that sentence?

8    A.   I do.

9    Q.   And I'm going to try to recapture that in normal words.

10        Does that basically mean that, that based on this study

11   looking backwards in time that only one percent of the

12   population of heroin users were using heroin before they

13   were abusing prescription opioids?

14   A.   Yes.  Only one percent of them had past-year

15   non-medical prescription opioids had used heroin before

16   misusing prescription opioids.

17   Q.   And just from a common sense standpoint, in general

18   people are more likely to abuse opium in the powder form

19   before taking opium with a needle.  Is that your experience?

20   A.   I think that people -- some individuals definitely are

21   more likely to use other forms of opioids prior to injecting

22   if they're misusing or abusing them, yes.

23   Q.   And what Muhury is saying is that, that based on this

24   retrospective study, that the number of people that had used

25   heroin first is one percent?

1    **A.**   That in their study the number of people who used

2    heroin prior to non-medical use of prescription opioids was

3    one percent.

4    **Q.**   And then the rest of that sentence says, "Whereas

5    approximately 80 percent of those who reported past-year

6    heroin use had misused prescription opioids before starting

7    heroin."

8        Did I read that correctly?

9    **A.**   Yes, you did.

10   **Q.**   And is that a fair depiction of Muhury's conclusion?

11   **A.**   I think it's partially fair, but I think it's also

12   somewhat incomplete.

13   **Q.**   Okay.  What would be the more complete version?

14   **A.**   That 80 percent of those who used the heroin had

15   engaged in misuse or abuse of non-medical use of

16   prescription opioids, but that a similar number had also

17   used illicit drugs prior to that.

18   **Q.**   Right.  So -- but in general, it's a true statement

19   that four out of five heroin users began abusing

20   prescription opioids before initiating heroin based on the

21   current state of medical literature.  Agreed?

22   **A.**   That is what the Muhury, Muhury's article states, yes.

23   **Q.**   Yes.  I'm asking you whether you agree with that.

24   **A.**   Yes, I do.

25   **Q.**   And do you have any reason to -- any reasonable dispute

1    with the truth of that?

2    **A.**   I don't have a reason to dispute it, no.

3    **Q.**   Now, this McCabe article that I'm showing you got a

4    little bit of acclaim because Dr. Compton who is at the NIH

5    even wrote an editorial in the Journal of Addiction

6    Medicine, a commentary.  Have you had a chance to review his

7    commentary or were you aware that Dr. Compton endorsed the

8    McCabe article?

9    **A.**   I think I'd have to look at the article in question to

10   remember, frankly.  Again, I've looked at so many articles

11   on these topics.

12   **Q.**   Does it really matter, though, if somebody -- if

13   Dr. Compton, even if he's in NIH, does it matter if he

14   agrees with it or not in your opinion?  Does it give it

15   weight?

16   **A.**   It might.

17   **Q.**   Okay.

18           MR. FARRELL:  Judge, may I?

19   BY MR. FARRELL:

20   **Q.**   I'll give you a chance to take a peek at it.  I

21   don't have a whole lot -- I mean, I can go through it

22   with you, but I'll represent to you that it appears to

23   be an acknowledgment by Dr. Compton applauding the first

24   prospective study in your field of medicine regarding

25   the gateway effect.  Is that a fair and accurate

1    depiction of Dr. Compton's commentary?

2    **A.**   I think I, I would, frankly, have to read through it to

3    assess if it's a fair and accurate summary of it.

4    **Q.**   Okay.  Well, how about we go and look at the very first

5    paragraph, just go down to the middle of it where it says

6    "Key Findings."

7        It says, "Key findings include an overall association

8    of both non-medical and medical use of opioid analgesics

9    with transition to heroin use with particular concerns about

10   early non-medical use."

11       This is, this is Dr. Compton's interpretation of the

12   McCabe article.  So do you have any reason to dispute the

13   key findings of the McCabe article that I showed you?

14   **A.**   I, I don't have a reason to dispute the findings, no.

15   **Q.**   Okay.  Well, I guess I'm just trying to fish around to

16   see whether or not you give weight to Dr. Compton's

17   commentary before we get into the McCabe article.

18   **A.**   Yes.  But, again, I'd have to read through it.  It's

19   not a very long article, but I'd have to read through it to

20   have a full opinion on it.

21   **Q.**   That's fair.  Why don't we just go straight to the

22   McCabe article.

23       If we can go to Page 3 of the McCabe article, under the

24   discussion section, the very first sentence says, "This is

25   the first national prospective study to examine the

1    relationships between adolescents' prescription opioid use

2    and misuse and subsequent heroin use over a 17-year period."

3         So do you understand what that sentence means, that

4    description of the study?

5    **A.**   Yes, I do.

6    **Q.**   And does that give you, having looked at it now, any --

7    I'm trying to lead you -- any recollection as to what this

8    article is or whether or not you've read it before?

9    **A.**   I believe that I have read it before.  And I think

10   it's -- what, what it describes is a prospective look at

11   this question of prescription opioid misuse, abuse, use and

12   individuals who initiate heroin use.

13   **Q.**   Does this article have weight in your field?

14   **A.**   I think it has some weight, yes.

15   **Q.**   Basically, what they did was they studied -- over a

16   period of 17 years, they studied over 11,000 high school

17   kids and tracked them to age 35 and looked at and measured

18   the relationship between those that have used and were

19   prescribed prescription opioids and those that initiated

20   heroin.  Agreed?

21   **A.**   Yes.  Again, in an article like this, there's quite a

22   bit of detail.  So there may be many different points.  But

23   I think that's one of the things that it covers, yes.

24   **Q.**   And what it found was that it wasn't four out of five.

25   What it found was that nearly one -- it went in the other

```
 1    direction with initiation.  It said nearly one in three

 2    adolescents who reported non-medical prescription opioid

 3    misuse went on to report heroin use.

 4         This article stands for the proposition that there's a

 5    greater relationship between abusing medical prescription

 6    opioids -- I'm sorry -- that there's a greater relationship

 7    between non-medical use of opioids and initiation of heroin

 8    than we ever thought.  That's the conclusion of this

 9    article.  Agreed?

10              MR. SCHMIDT:  Objection, compound and

11    characterization.

12              THE COURT:  Well, I'll sustain the objection.  You

13    can try again, Mr. Farrell.

14    BY MR. FARRELL:

15    Q.   Dr. Gilligan, did you understand my question?

16    A.   I think so.  Could you repeat the question, please?

17    Q.   Yes.  I'm going to try to repeat it in simpler terms.

18         This article, this, this McCabe article stands for the

19    proposition that abusing prescription opioids has a much

20    higher relationship to the initiation of heroin than the

21    medical community had ever thought before.  Agreed?

22    A.   I think, again, I'd have to read through the, the

23    article to make a real statement about what all of its

24    conclusions are.

25    Q.   Okay.  Sir, have you read the book Dreamland?
```

**A.**    Yes, I have.

**Q.**    And in Dreamland it too talks about the sequencing of prescription opioids to heroin, does it not?

**A.**    Among other things, yes.

**Q.**    So I guess ultimately what I'm asking is this.  If a community is overwhelmed or flooded with prescription opioids -- assume that to be a fact.  I know it may be disputed.  But let's just in a fictional world take 81 million pills and drop it into a community of 100,000 people.  Would you expect that community to see a higher incidence of heroin initiation over time?

**A.**    I think if there are a large number of medications prescribed in any area, there will be some of them that will be diverted, misused, abused.  And, so, that there would be some incidence then where that diversion leading to misuse abuse, there would be some instances where that would lead to someone initiating heroin.  I think that would be statistically likely in any area with a large number of opioid pain medications that were prescribed.

**Q.**    And, so, when you look at it from a statistical standpoint, as the number or the volume of pills would grow higher per capita, would you also expect there to be a parallel increase in diversion and heroin initiation?

MR. SCHMIDT:  Objection, foundation.

THE WITNESS:  I think a process --

```
 1              THE COURT:  Just a minute.  Overruled.

 2         If you understand the question, you can answer it, Dr.

 3    Gilligan.

 4              THE WITNESS:  I think I understand it.

 5         I think it could be in line with what's in that book

 6    Dreamland, but I think it would be very, very

 7    multifactorial.

 8    BY MR. FARRELL:

 9    Q.   Sure.

10    A.   So, I mean, that book Dreamland talked about changes

11    and how heroin got distributed, talked about socioeconomic

12    risk factors, also talked about volume of prescribing.  So I

13    think those sort of processes by their nature are very, very

14    multifactorial.

15    Q.   Is that called -- in pharmaceutical terms is that

16    compounding?  Is that -- these factors sometimes compound on

17    top of each other?

18    A.   No.  Compounding in pharmaceutical is something very

19    technical.  It's when they essentially sort of make a custom

20    medication for you.

21    Q.   Now, you do recall that Dreamland is premised in the

22    Ohio River Valley?

23    A.   I do.

24    Q.   And you're actually in the Ohio River Valley today.

25    A.   Correct.
```

 1   **Q.**   And that Dreamland is the name of a pool in Portsmouth,

 2   Ohio, which if you hopped in the Kanawha River here you

 3   would float down to it?

 4          MR. RUBY:  Your Honor, I'm not sure of the

 5   relevance.

 6          THE COURT:  Where are you going with this, Mr.

 7   Farrell?

 8          MR. FARRELL:  I'm getting there soon.  I'd ask for

 9   just a little bit of leeway to try to establish prescribing

10   patterns.

11          THE COURT:  Well, I'll sustain the objection to

12   the last question but --

13          MR. FARRELL:  Judge, to be --

14          THE COURT:  You said Dreamland is the name of a

15   pool which if you hopped into the river, bla, bla, bla.  I

16   sustain the objection to that portion.

17   BY MR. FARRELL:

18   **Q.**   So to eliminate any debate in this courtroom, you

19   agree and embrace the gateway effect that there does

20   exist in scientific terms a relationship, a direct

21   relationship between the use and abuse of prescription

22   opioids and initiation of heroin?

23   **A.**   I think there's a direct relationship that includes the

24   misuse and abuse of prescription opioids, along with many

25   other predisposing factors that, that then does relate to

1    initiation of heroin.

2    **Q.**    So the gateway effect is true?

3    **A.**    Again, there, there is a transition that can occur that

4    includes many factors including misuse and abuse of

5    prescription opioids, along with other risk factors that can

6    lead to the initiation of heroin.

7    **Q.**    Dr. Gilligan, do you recall giving a presentation in

8    2014, The Interventionalist's Perspective on Psychology and

9    Outcomes?

10   **A.**    Yes, I do.

11   **Q.**    I have your slide deck.

12           MR. FARRELL:  Judge, if I may, I'd like to

13   approach.

14           THE WITNESS:  Thank you.

15   BY MR. FARRELL:

16   **Q.**    Dr. Gilligan, do you recognize this document?

17   **A.**    Yes, I do.

18   **Q.**    What is it?

19   **A.**    It's a slide deck from a presentation that I gave to a

20   group of physicians at a conference on pain medicine.

21   **Q.**    And did you prepare this document?

22   **A.**    Yes, I did.

23   **Q.**    Did you intend this document to be educational for the

24   purposes in which you presented it?

25   **A.**    Yes, I did.

1              MR. FARRELL:  Judge, we'd ask for P-41958 to be

2      admitted into the record.

3              THE COURT:  Is there any objection?

4              MR. SCHMIDT:  Yes, there is, Your Honor.  It's

5      hearsay.  I think they're trying to impeach him with it.

6      That's just impeachment.

7              THE COURT:  I'm not going to admit it, Mr.

8      Farrell, but you can use it as a basis to question about

9      what's in it.

10             MR. FARRELL:  Judge, respectfully, if I can create

11     a record, it's not hearsay.  And if it is, it falls within

12     the catch-all because the author of the document is sitting

13     in the chair.  And any confusion or any question about the

14     veracity of the document can be raised with the author who's

15     sitting in the chair.

16             THE COURT:  What are you referring to as the

17     catch-all, Mr. Farrell?

18             MR. FARRELL:  807.

19             THE COURT:  Okay, residual exception.

20             MR. FARRELL:  Yes, sir.

21             MR. SCHMIDT:  Your Honor, my understanding is

22     we've previously dealt with this issue.  We dealt with this

23     issue with Dr. O'Connell when she testified when we tried to

24     use some of her slides.  And I think Your Honor said they

25     could be used for impeachment but not admitted into the

1    evidence.  We think the same ruling should apply here.

2            MR. RUBY:  And, Your Honor, if you look, Judge, at

3    807(b) there's a notice requirement there in that rule that

4    I don't believe has been satisfied unless the notice was

5    given to Mr. Schmidt.

6            MR. SCHMIDT:  No, it wasn't.

7            MR. FARRELL:  I'll withdraw it, Judge, and we'll

8    just show it up on the screen.

9    BY MR. FARRELL:

10   Q.   Dr. Gilligan, there's a Bates stamp that is

11   artificially created by our numbering system.  I'd like

12   for you to go look at the bottom right-hand page which

13   is -- it says P-41958 and then it's actually Page 29, so

14   the underscore 00029.  I have it up on the screen if

15   you'd like to use the screen.

16           MR. SCHMIDT:  Your Honor, if it's not being

17   admitted, then it should be used for impeachment as opposed

18   to showing it to him and walking through it.

19           THE COURT:  Well, this is cross-examination.  I'm

20   going to allow it.

21       Go ahead, Mr. Farrell.

22   BY MR. FARRELL:

23   Q.   Dr. Gilligan, did you prepare this slide?  It says

24   "Rising Sales, Abuse and Deaths."

25   A.   Yes, I did.

1   **Q.**   Okay.  Would you tell the Judge what this slide means

2   and what the purpose of this slide was?

3   **A.**   So this was shown to change over time and sales of

4   prescription opioids which, which correlates with

5   prescriptions of opioid pain medications.  That's the green

6   line.

7      The purple line is deaths from drug overdoses.  And the

8   orange line is admissions for treatment of addiction.

9   **Q.**   And what conclusions, if any, can you draw from these

10  three trends?

11  **A.**   So the conclusion that I can draw is that as

12  prescriptions went up, deaths and treatment for addiction

13  went up as well.

14  **Q.**   And so what, what -- how would you describe that

15  relationship?  What's the point of putting this slide in

16  your slide deck?

17  **A.**   The point is that over-prescribing by doctors

18  correlated with an increase in treatments for addiction and

19  with an increase in overdoses.

20  **Q.**   And to be fair, it doesn't say "over-prescribing."  You

21  used a different word, did you not?

22  **A.**   I used the word that the CDC -- this is a graphic from

23  the CDC and they use "sales."  But with a prescription

24  medication, sales is prescriptions.  They're one for one.

25  **Q.**   Well, that's not exactly true, is it?  A prescription

1  is one prescription on a pad.  This is tracking sales by

2  kilogram, is it not?

3  **A.**   It's number of prescriptions that -- not a kilogram or

4  a gram of the medication leaves the pharmacy without a

5  prescription.  So prescription medication sales how to be

6  measured correlates with prescriptions for that medication.

7  **Q.**   I'm sorry.  I think we're speaking past each other.

8  The measurement on this is by kilogram of the pills, not by

9  the number of written prescriptions?

10  **A.**   Oh, correct.  The unit that CDC used was, was, was

11  sales per kilogram, yes.

12  **Q.**   All right.  Now, if you go to the very next page, this

13  is Bates stamp Page 30.  Will you describe what this slide

14  is and why you included it in your slide deck?

15  **A.**   Sure.  So this is showing similarly where there was a

16  lot of prescribing.  This is obviously a map of the U.S.

17  where the dark green is, dark green is where there was more

18  prescription of pain, opioid painkillers.  And the dark

19  purple is where there were more drug overdose deaths.  And

20  it's showing geographically where there was more

21  prescribing, there were more deaths.

22  **Q.**   And, so, this is Slide Number 30.  And since it's not

23  in the record, I'm going to use some descriptive words so

24  that we have a written record of this.

25      The top of this says "Deaths Track Sales."  Correct?

1   **A.**   Correct.

2   **Q.**   And the first top half of the screen is the United

3   States of America by, by state.  And can you read aloud what

4   the words are that you wrote on this slide for the green

5   map?

6   **A.**   Sure.  Actually, I took the map from CDC.  So it's

7   words that they wrote.  "Amount of prescription painkillers

8   sold by state per 10,000 people 2010."

9   **Q.**   And then on the bottom half there's the purple map with

10  the purple United States.  Will you read what the tag line

11  is for that?

12  **A.**   "Drug overdose death rates by state per 100,000 people

13  2008."

14  **Q.**   And, so, what was the point of putting in one map

15  tracking sales and in a second map tracking deaths?

16          MR. RUBY:  Your Honor, I'm going to interpose an

17  objection with regard to scope.  The witness's testimony on

18  direct examination went to the change in the standard of

19  care that occurred in the medical field for prescription

20  opioids and the cause of the standard of care.

21      Asking him to testify about, about these slides titled

22  "Deaths Track Sales" or slides along those lines, that's

23  beyond the scope of his direct testimony.

24          THE COURT:  Well, what's your response to that,

25  Mr. Farrell?

1          MR. FARRELL:  I strongly disagree.

2          MR. ACKERMAN:  Your Honor, I would further note

3    that we have made numerous scope objections in our part of

4    the case and you have said if there is a good faith basis to

5    question the witness on cross-examination that the

6    defendants can go ahead.

7        And, certainly, Mr. Farrell has a good faith basis to

8    cross-examine a witness who is testifying about the opioid

9    epidemic based on a slide deck that the witness put together

10   that describes the opioid epidemic.

11          MR. RUBY:  Your Honor, I just -- with respect to

12   Mr. Ackerman, I don't believe that there was any ruling in

13   the -- during the plaintiffs' case during our

14   cross-examinations that, that the principle of scope was out

15   the window.

16          THE COURT:  Well, I'm going to overrule the

17   objection.  You can go ahead, Mr. Farrell.

18          MR. FARRELL:  Thank you.

19   BY MR. FARRELL:

20   **Q.**   So I think the last question I asked was what, what

21   point were you trying to communicate by putting the

22   green map in sales and comparing it to the purple map in

23   deaths?

24   **A.**   So I was trying to teach the doctors who were at the

25   conference that where there is more opioid prescribing

1    geographically, where doctors prescribe more opioids, there

2    tends to be more overdose deaths in those same areas.

3    **Q.**    Now --

4    **A.**    And where there's less prescribing, there are less

5    deaths.

6    **Q.**    Let me -- let's try to be accurate here on this very

7    important point.  What you were trying to demonstrate by

8    using kilograms per capita was that the weight of

9    prescription opioids sold in particular locations had a

10   direct relationship to deaths.  Correct?

11   **A.**    No, incorrect.  That's not what I was trying to teach.

12   I was trying to teach the doctors that where you prescribe

13   more opioids, there are more deaths, and where you prescribe

14   less opioids, there are less deaths.  It was an audience of

15   doctors and that's what I was trying to teach them.

16   **Q.**    I don't, I don't want to parse words with you.  But the

17   measuring stick in the green map is kilograms of

18   prescription opioids, and that in states that had the more

19   weight by kilogram per capita have a darker color.  Correct?

20        MR. SCHMIDT:  I think we've asked and answered

21   this a few times, Your Honor.

22        THE COURT:  I think it is.  I'll sustain the

23   objection.  But I think this is relevant.  I think this goes

24   to -- it's proper cross-examination related to his testimony

25   about the changes in the standards of care and the reasons

1    for it and so forth.  This is consistent with his testimony

2    concerning the reason for the change in the standard.  So I

3    think at least to that extent, it's relevant and proper

4    cross-examination.

5              MR. FARRELL:  But you'd like me to move on?

6              THE COURT:  Yes.  I sustain the last objection.

7    I'm explaining my reasons for ruling in your favor the last

8    time.

9              MR. FARRELL:  I'm catching up.

10             THE COURT:  Okay.

11             MR. FARRELL:  It took nine weeks but --

12   BY MR. FARRELL:

13   **Q.**   So if we flip to the next slide, which is Bates

14   stamp 31, and when you look at this slide, down here at

15   the bottom it says "Policy Impact Prescription

16   Painkiller Overdoses," the CDC website.  Do you remember

17   where you got this picture from?

18   **A.**   Yes.  I got it from the CDC -- from their website or

19   one of their documents.

20   **Q.**   Okay.  Is this a particular report or document?  I

21   didn't understand what the policy impact reference was.

22   **A.**   Oh, I, I, I'm almost certain that that is from the CDC

23   from their website and I think this might have been a report

24   that they, that they had on their website as best I can

25   recall.

```
1    Q.   Okay.  And would you please describe for the Judge what

2    you were trying to communicate with this picture?

3    A.   So what I was trying to demonstrate with that picture

4    is that there are issues, adverse effects related to

5    over-prescribing that went beyond just deaths; that when

6    there's over-prescribing, deaths are a concern but there are

7    other concerns and those are shown here.

8    Q.   So is it fair to say that what you were trying to

9    depict is that for every one death, you could expect to see

10   10 treatment admissions for abuse?

11   A.   Correct.

12   Q.   And for every one death, you could expect to see 32

13   emergency department visits for misuse or abuse?

14   A.   Yes.

15   Q.   And that for every one death, you would expect to see

16   130 people who abuse or are dependent?

17   A.   Yes.

18   Q.   And for every one death, you would expect to see 825

19   non-medical users?

20   A.   Correct.

21   Q.   Have you done any research to study how many deaths

22   happened in Huntington, Cabell County, West Virginia?

23   A.   No, I have not.

24   Q.   The next thing we're going to go to is --

25        MR. FARRELL:  Gina, can you bring up the Seattle
```

1    lecture?

2    BY MR. FARRELL:

3    **Q.**   You were in Seattle recently and gave a lecture,

4    did you not?

5    **A.**   Not quite.  I gave that lecture in -- at a conference

6    in Las Vegas.  But the Seattle Science Foundation is the

7    group that chairs the lectures.

8    **Q.**   I apologize.  I saw Seattle down there and I just made

9    the assumption.  Is this your slide deck from your

10   presentation?

11   **A.**   I believe it is, yes.

12   **Q.**   And, actually, that's not true.  This isn't your slide

13   deck.  This is a screen shot of the video.  It's on YouTube.

14   Are you aware of that?

15   **A.**   Yes, I am.

16   **Q.**   And, so, it's got a lot of hits.  The -- can you tell

17   the Judge who you were speaking to at -- during this

18   lecture?

19   **A.**   So it was to a group of doctors and other clinicians.

20   **Q.**   Was it well-attended?  Was it a big event?

21   **A.**   Yes, something like 200, 300, something like that.

22   **Q.**   Okay.  And the name of this is "Who's to Blame and

23   Who's to Pay for the Opioid Crisis?"  Did you come up with

24   that title?

25   **A.**   No.  The organizers asked me -- gave me that title,

1   asked me to speak on that title.

2   **Q.**   It happens to me all the time when they want something

3   catchy to get people's attention.  This is your, this is --

4          MR. SCHMIDT:  I would object to that

5   characterization.

6   BY MR. FARRELL:

7   **Q.**   So I could play the 10 minutes because -- why did

8   you only have 10 minutes?

9   **A.**   Again, that's the organizers.

10  **Q.**   Yeah.  I mean, it was fantastic, but it was 10 minutes.

11  I could play it but, instead, what I'm going to do is I'm

12  going to try to avoid objections by taking screen shots and

13  having you replicate it.

14      So if we can go to the next slide which is the first

15  slide that you began talking about.  And do you recall

16  telling the panel or telling the group about this, this

17  slide?

18  **A.**   Yes, I do.

19  **Q.**   And, so, this slide is the first slide.  And will you

20  describe what the slide is to the Court, to the Judge?

21  **A.**   Sure.  So it's showing over time in the U.S. the number

22  of drug overdose deaths.  And the period is 1980 to 2018.

23  And then there are some other references -- we can all read

24  them -- peak car crash deaths, HIV deaths, and so forth.

25  **Q.**   And, so, you, you made two comments in here that I'd

1    like to follow up on.  One of them is you said that there

2    was a stark increase.  Can you, can you talk to the judge

3    about the nature of this increase and why, if at all, --

4              MR. SCHMIDT:  And we're not objecting, based on

5    Your Honor's prior rulings, to showing him the slides, but

6    just kind of characterizing statements that wouldn't be

7    admissible by themselves is not proper.  If he wants to try

8    to ask him a question and try to impeach, I think that's

9    reasonable, Your Honor.  But just characterizing what he

10   said is out of context.

11             THE COURT:  You need to ask him the questions, Mr.

12   Farrell.

13             MR. FARRELL:  Yes, Your Honor.

14   BY MR. FARRELL:

15   **Q.**   Would you describe this chart as a stark increase?

16   **A.**   It's definitely a very significant increase over time.

17   **Q.**   Would you use the word yourself "stark," a stark

18   increase?

19   **A.**   I might, yes.

20   **Q.**   Okay.  And then the number of people up here, can you

21   read that number?

22   **A.**   68,557.

23   **Q.**   And you think that's enough people to fill an NFL

24   football stadium?

25   **A.**   Yes, I do.

1    **Q.**   All right.  Let's go to the very next slide.  This is

2    the next evolution in your presentation.  And we're familiar

3    with these in this litigation.  But what are we looking at

4    here?

5    **A.**   So we're looking at the change in the incidence of drug

6    overdose deaths.  And on the left we're comparing 2003.  On

7    the right we're looking at 2017.  And, again, as with some

8    of the others, the darker color is when there's a higher,

9    higher incidence or a higher rate.

10   **Q.**   And you acquired this from the CDC website?

11   **A.**   Correct.

12   **Q.**   And it has not just 2003.  It actually goes back

13   further than that, doesn't it?

14   **A.**   Correct.

15   **Q.**   And in each year there's a picture of the, of the

16   deaths that were reported in the United States.  And when

17   you look from 2003 to 2017, what does it look like happened

18   in the Ohio River Valley?

19   **A.**   The, the rate increased, or the incidence increased.

20   **Q.**   Let's go to the next slide.  Now, I think this is the

21   same slide that we talked about before; correct?

22   **A.**   Or similar there, either the same or similar.

23   **Q.**   Now, let's go to the next one because it's a little bit

24   different.  Do you recall talking about this slide?

25   **A.**   I do.

1    Q.   All right.  Would you please tell the Judge what this

2    slide depicts and why you created it?

3              THE COURT:  Just a minute.

4              MR. SCHMIDT:  I apologize.  I should have asked

5    this before.  Do you have a copy that we can have?

6              MR. FARRELL:  Yes.

7              MR. SCHMIDT:  I'd appreciate that.

8              MR. FARRELL:  It has a bunch of them in there.  It

9    may not be all of them that we use.

10   BY MR. FARRELL:

11   Q.   Okay.  So did you describe this as three waves?

12   A.   I think I did.

13   Q.   Yes.  And, so, would you tell the Court what the first

14   wave was?

15   A.   It is the prescription painkillers.  It's the -- one of

16   the light pink lines that you see there.

17   Q.   So the top, the top one I'm pointing to, that's the

18   first wave of prescription painkillers; correct?

19   A.   Correct.

20   Q.   And then what's the second wave?

21   A.   It is the heroin.

22   Q.   All right.  And that would be this one here; correct?

23   A.   Correct.

24   Q.   And there is a stark increase in the heroin line

25   starting somewhere around 2010.  Agreed?

**A.**    There's a significant increase in the heroin line
starting around 2010, yes.

**Q.**    And then you also said that there is this enormous
fentanyl spike that happens toward the later part of 2010.
Do you recall what you said about the origins of this and
how this came about?

**A.**    I recall some of what I said.  I don't know if I have a
complete recollection.  It was a few years ago.

**Q.**    Tell the Judge, if you would, how these three waves
interplay together, if you recall.

**A.**    So one can see the time lines.  One can see the years
at the bottom.  And the overdose deaths from prescription
painkillers happened earlier.  And then there was a
significant -- in many cases for people, there was a shift
and in other cases --

               COURT REPORTER:  I'm sorry?

               THE WITNESS:  In many cases a, a shift from
prescription painkiller abuse or misuse to abusing heroin
and/or a shift to, to illicit fentanyl.

BY MR. FARRELL:

**Q.**    So is it fair to say that it's your opinion that
those that were suffering from opioid use disorder in
the first wave began to shift to heroin?  Are those your
words?

**A.**    They, they may well be.

1    **Q.**    And the reason for the shift was because heroin was

2    more accessible and less expensive.  Those are your words.

3    You've held that opinion, have you not?

4    **A.**    I have held that opinion, yes.

5    **Q.**    And that you again repeated on this stage that

6    80 percent of the people who were taking heroin had started

7    with prescription opioids.  Is that -- those are your words;

8    correct?

9    **A.**    Yes, they are.

10   **Q.**    And you did not distinguish between medical and

11   non-medical.  In fact you said, quote, "Now, that's either

12   prescription opioids that were prescribed to them or

13   prescription opioids that were diverted and they got their

14   hands on them."

15       Those were your words, were they not?

16   **A.**    Yes.

17   **Q.**    Now, do you recall your report in this case?

18   **A.**    Yes, I do.

19   **Q.**    And, so, you don't have it memorized I'm assuming.  But

20   what I'd like to do is I'd like to reference one particular

21   provision.  And that's on Page 23 where you make mention

22   of -- and I'll just read it to you.

23       "According to the CDC, opioid prescriptions peaked and

24   leveled off between 2010 and 2012 before beginning to fall

25   thereafter."

1       And then you say, "A similar pattern occurred in West

2   Virginia."

3       Do you recall making that statement?

4   **A.**   Yes, I do.

5   **Q.**   And you footnoted it.  And one of the footnotes that

6   you referenced were trends and patterns from a JAMA network

7   article.  Do you recall that?

8   **A.**   More or less.

9   **Q.**   I just have a couple of quick questions for you.  I

10  want -- I'm going to read this provision to you and ask

11  whether or not you will agree with it for the Court.

12          MR. SCHMIDT:  Your Honor, if he's going to read to

13  him from an article, I'd ask that we get a copy of it.

14          THE COURT:  Can you give him a copy of it?

15          MR. FARRELL:  I could.  It's not the normal course

16  of how -- but, yes, I can.

17          MR. SCHMIDT:  I think it's absolutely the normal

18  course that if you're going to represent documents to a

19  witness, the lawyer defending gets them.

20  BY MR. FARRELL:

21  **Q.**   I'll withdraw that and just ask you a question and

22  see whether or not you agree to it.  Okay?  Here's my

23  question:

24      "Closing the path to opioid use disorder will require

25  addressing over-prescription of legal opioids, reducing the

```
 1   availability of illicit opioids, and getting patients with

 2   opiate use disorder into treatment."

 3       Do you agree with that statement, sir?

 4   A.   Yes, I do.

 5           MR. SCHMIDT:  May we get a copy of the article?

 6           MR. FARRELL:  You can have mine.

 7           MR. SCHMIDT:  Thank you.  I appreciate that.

 8   BY MR. FARRELL:

 9   Q.   Let me ask you one more sentence and see whether

10   you agree with this or not.

11       "The magnitude, severity, and chronic nature of the

12   opioid epidemic in the United States is of serious concern

13   to clinicians, the government, the general public, and

14   others."

15       Do you agree with that statement, sir?

16   A.   Yes, I do.

17           MR. FARRELL:  Judge, if you'll give me a second

18   here to clean up and --

19           THE COURT:  Yes, sir.

20   BY MR. FARRELL:

21   Q.   You mentioned the New England Journal of Medicine.

22   And do you know Dan Longo, Dr. Dan Longo who's the

23   editor by chance?

24   A.   I don't think that I do, no.

25   Q.   2016.  I'm going to circulate this to you.  But, again,
```

1    this is a review article much like the 1982.  This is, this

2    is from Nora Volkow and Thomas McLellan, a review article

3    reviewed by Dan Longo, the editor.

4              MR. FARRELL:  Judge, may I approach?

5              THE COURT:  Yes.

6    BY MR. FARRELL:

7    Q.   I want to kind of go down to the, to the second

8    full paragraph, "However."  I'll give you a chance to

9    read it for a second.

10        (Pause)

11        I'll represent for the record that this is March 31st,

12   2016, New England Journal of Medicine, 374 13, titled

13   "Opioid Abuse and Chronic Pain - Misconceptions and

14   Mitigation Strategies" written by Nora D. Volkow, M.D., for

15   the National Institute on Drug Abuse.

16        My question to you is this:  Sir, do you agree that

17   opioid analgesics are widely diverted and improperly used?

18   Do you agree with that statement, sir?

19   A.   I think there is a significant amount of diversion and

20   improper use of opioid analgesics, yes.

21   Q.   And the widespread use of these drugs has resulted in a

22   national epidemic of opioid overdose, deaths, and

23   addictions.  Do you agree with that, sir?

24   A.   No, I think I would give a more -- I think that's one

25   part of it, but I don't think that's a complete statement as

1    stated.

2    **Q.**    Okay.  What would you include with it?

3    **A.**    So I think there was a contribution by the misuse and

4    abuse of opioid pain medications, the non-medical use of

5    opioid pain medications.  But I think there were many other

6    factors that also contributed that the authors are not, not

7    including there, things like the illicit abuse of other

8    illicit drugs and the other factors that we've talked about.

9         I think there were many factors and that that's one.

10   And at least as it's written there, one could take away the

11   impression that it was only one factor.

12   **Q.**    And if you look down further, it says, "Second, the

13   major source of diverted opioids is physician

14   prescriptions."

15        Do you agree with that, sir?

16   **A.**    Again, yes, but it's incomplete.  The major source is

17   that they're prescribed by physicians.  And then the major

18   source is people who receive them, then give them to friends

19   or family.

20   **Q.**    Right.  So the pills -- you can attest today to the

21   Court that the prescription pain pills being prescribed by

22   doctors are being diverted across America?

23   **A.**    I can attest today that when the -- when a pill is

24   diverted that the most common scenario is a doctor

25   prescribed it to somebody and then that person subsequently

1    gave it to a friend or family member, sold it to a friend or

2    family member, had it stolen by a friend or family member,

3    et cetera.

4    **Q.**   My question to you is whether that is happening, not

5    when it happens, but I'm looking to see whether you

6    acknowledge that it is happening.

7    **A.**   Yes, there are certainly instances where a doctor

8    prescribes an opioid to one person and then that opioid

9    subsequently from the patient, or the intended patient gets

10   diverted to someone else after the fact.

11   **Q.**   All right, Doctor, you -- last subject matter.

12        You talked earlier, if you remember the *voir dire* that

13   I asked you whether or not you monitored other physicians.

14   You've looked at the monitoring patterns of other physicians

15   in your role, in leadership role in the medical community,

16   have you not?

17   **A.**   Yes, I've, I've participated in that monitoring.  I've

18   helped in some cases to design that monitoring, yes.

19   **Q.**   All right.  And, so, you're also aware that some of the

20   medical literature that you've cited in your writings and a

21   lot of the medical literature that you have cited in your

22   expert witness report relies upon the IQVIA prescribing

23   data.  Are you familiar with IQVIA?

24   **A.**   Yes, I am.

25   **Q.**   So you're aware that you can track patterns of doctor

1    prescribing by looking at the IQVIA data?

2    **A.**   I'm aware that that's one tool that people have used to

3    try to track that, yes.

4    **Q.**   So I'm going to represent to you that I have a good

5    faith basis to ask you a couple questions about --

6           MR. SCHMIDT:  We'll object to this.  I don't think

7    just showing him -- this is -- if I understand what this

8    document is, this is a document we were given last night

9    that an investigative firm has purportedly gathered from

10   IQVIA regarding Dr. Gilligan's prescribing practices.

11       I don't think it's a proper subject for questioning him

12   on without laying a foundation that he actually recognizes

13   it, which I would be very surprised if he did given the

14   source that it comes from.  It's the company that Dr. Keller

15   used to be -- used to work with apparently ran this report.

16   And I think it should be taken down while we're arguing the

17   objection.

18          THE COURT:  I'll overrule the objection.

19   BY MR. FARRELL:

20   **Q.**   So, Dr. --

21          MR. SCHMIDT:  Your Honor, may I just note one

22   other thing for the record?

23          THE COURT:  Yes.

24          MR. SCHMIDT:  Dr. Keller conceded in her testimony

25   that IQVIA data has various limits.  One of those limits is

1    it doesn't pick up hospital data.

2         Dr. Gilligan has spent his whole career working in a

3    hospital, which is a further reason why showing him data

4    that he can't verify is unreliable.

5              THE COURT:  Well, that might be a matter for

6    redirect.

7         Go ahead, Mr. Farrell.

8    BY MR. FARRELL:

9    Q.   So, Dr. Gilligan, you are a pain medicine doctor;

10   correct?

11   A.   That's correct.

12   Q.   So what I'll represent to you this is is the IQVIA data

13   for pain medicine doctors in the nation and in West Virginia

14   and then you.

15              UNIDENTIFIED SPEAKER:  No.

16              MR. FARRELL:  No?

17              UNIDENTIFIED SPEAKER:  It's Massachusetts.

18              MR. FARRELL:  Oh, it's Massachusetts.

19   BY MR. FARRELL:

20   Q.   So when you look at the blue line of pain medicine

21   and you see on the left-hand side dosage units, is this

22   trend in the blue line consistent with what you've

23   testified today about a general rise in prescribing and

24   then more recently a tapering and a decline?

25   A.   Yes, it is.

1   **Q.**   And when you look at the base line of this from 5,000

2   up to 20,000, that's an increase of three-fold or so.   Would

3   you agree?

4               THE COURT:   Is that Massachusetts data?

5               MR. FARRELL:   The red data is Massachusetts.   The

6   blue data is the nation.   And the line way down here is the

7   doctor.

8               MR. SCHMIDT:   And just so we're clear for the

9   record, Your Honor, this is pain specialists according to

10   however IQVIA, which no witness in this courtroom or

11   probably a lawyer can testify to how they classify people as

12   pain specialists based on the 70 percent of data they have

13   which includes none of hospital data.

14               MR. FARRELL:   This is --

15               THE COURT:   Well, go ahead, Mr. Farrell.   Let's

16   get this done.

17               MR. FARRELL:   There is Lacey Keller, the expert

18   who testified that her methodology --

19               MR. SCHMIDT:   It's actually not Dr. Keller.   She

20   didn't sponsor this.

21   BY MR. FARRELL:

22   **Q.**   So would you agree with me that the rise from 5,000

23   up to around 20,000 and the tapering is consistent with

24   the trend that you saw over time?

25   **A.**   Yes, I would.

**Q.**   And your prescribing patterns are somewhat below the national and the state averages.  Would you agree with that?

**A.**   Yes, but that's because I work with fellows.  So when I see patients, I'm not the one who writes the prescription. I mean, they're trained so the prescriptions on my patients to measure them would show up between ten fellows every year.  So they wouldn't show up under my name.  They would show up under the different fellows' names.

**Q.**   Well, the real point of this was not to show yours, but to show a couple of others.

MR. FARRELL:  Can you bring up the next one, please?

BY MR. FARRELL:

**Q.**   I think the next one is Dr. Philip Fisher.  Do you know who Dr. Philip Fisher is?

**A.**   Not that I remember.

**Q.**   All right.  Do you see here that the same baseline in blue and red but for West Virginia but the scaling is off. Do you see that?

MR. SCHMIDT:  Your Honor, we're now examining based on data he can't sponsor about a doctor he said he doesn't know.

MR. FARRELL:  This is directly --

MR. SCHMIDT:  And I can't imagine how this is related to the scope of anything I covered, let alone the

```
 1   profound foundation issues.

 2              THE COURT:  Well, I think I got the point a while

 3   ago, Mr. Farrell, and you're just beating it into the

 4   ground.

 5              MR. FARRELL:  Judge, --

 6              THE COURT:  I'll sustain the objection.

 7              MR. FARRELL:  Yes, I'm beating it into the ground.

 8   I'm trying to demonstrate overwhelmingly that this isn't a

 9   sea level change.  This is a tsunami.

10              THE COURT:  Well, I understand that's where you're

11   going and where you've been going for half an hour and I

12   understand that.

13              MR. FARRELL:  So, again, you're giving me the time

14   to move on?  I'll do so.

15              THE COURT:  Well, I'm giving you a hint that it's

16   time to move on, Mr. Farrell.

17              MR. FARRELL:  Yes, Your Honor.

18   BY MR. FARRELL:

19   Q.   So you would agree with me that from this pictogram

20   the data from --

21              MR. RUBY:  Your Honor, --

22              THE COURT:  I'll sustain the objection, Mr.

23   Farrell.

24              MR. FARRELL:  How about I go to the next slide?

25   How about we put all of the slides together so that you can
```

```
 1    see how many doctors are so far in excess of the national

 2    and state averages.

 3              MR. SCHMIDT:  Your Honor, same objection.  These

 4    are doctors he hasn't reviewed with data that I don't --

 5    tell me if I'm wrong.  I don't think Dr. Keller sponsored

 6    all this data.

 7              MR. FARRELL:  The point is they just spent three

 8    hours talking about the standard of care when we have

 9    doctors that went to prison.  We have doctors that exceeded

10    the standard of care.

11              MR. SCHMIDT:  He's -- I apologize, Mr. Farrell.  I

12    interrupted you.  I didn't mean to interrupt.

13         Your Honor, standard of care includes wide variations,

14    of course.  And there's nothing in his testimony that denied

15    the proposition that doctors who we have no responsibility

16    for, who we don't regulate had the problems Mr. Farrell

17    talked about.

18         We've had a witness that testified about that and you

19    were able to cross-examine her on it.  This is completely

20    outside his scope and it's, it's completely untethered from

21    any foundation.

22              THE COURT:  Mr. Ruby.

23              MR. RUBY:  Your Honor, I simply wanted to amplify,

24    and Mr. Schmidt just said it again, that the foundation

25    point that these are slides with data that no foundation has
```

1    been laid for.  We don't know where these -- we think these

2    came from a company that plaintiffs have paid to put slides

3    together, but no witness has sponsored these and they're

4    being put in front of the witness and he's being asked to

5    testify about them as if they're evidence.

6            THE COURT:  I'm going to sustain the objection.

7    You've beaten the same point.  If I understand your point,

8    this was made a long time ago and I think you should move

9    on.

10           MR. FARRELL:  One last question.

11   BY MR. FARRELL:

12   **Q.**   Doctor, you would agree with me that the standard

13   of care does not immunize a doctor from blatantly

14   breaching his obligation to do no harm?

15   **A.**   I would agree with you that doctors have an obligation

16   to do no harm.  And I don't think that the standard of care

17   would make an exception -- would justify an exception to

18   that.

19           MR. FARRELL:  No further questions.

20           THE COURT:  Is there anymore?

21           MR. ACKERMAN:  I have a couple, Your Honor.

22           THE COURT:  Go ahead, Mr. Ackerman.

23       Let's take 10 minutes.

24           MR. ACKERMAN:  Okay.

25       (Recess taken at 2:50 p.m.)

1          THE COURT:  All right.  Mr. Ackerman.

2                    **CROSS EXAMINATION**

3          **BY MR. ACKERMAN:**

4     **Q.**   Good afternoon, Dr. Gilligan.  3:00 on the Friday

5     before July 4th weekend is not exactly prime time, so I'm

6     going to do my best to keep this as short as possible.  I

7     want to ask you just about a couple of questions that Mr.

8     Schmidt went through this morning.

9          The first one is MCWV-1522.

10         MR. ACKERMAN:  Gina, if you can pull that up.

11         BY MR. ACKERMAN:

12    **Q.**   And, Dr. Gilligan, I don't know if you have that in

13    front of you.  Dr. Gilligan, this is -- Document 1522 is the

14    joint statement from 21 health organizations and the Drug

15    Enforcement Administration, correct?

16    **A.**   That is correct.

17    **Q.**   And this is a -- you said it was a notice to the

18    medical community that went out around 2001, correct.

19    **A.**   That's correct.

20    **Q.**   And if you would look, sir, at the second to last

21    paragraph, the one that starts drug abuse is a serious

22    problem.  Do you see that?

23    **A.**   I do.

24    **Q.**   And that paragraph reads drug abuse is a serious

25    problem.  Those who legally manufacture, distribute,

1    prescribe and dispense controlled substances must be mindful

2    of and have respect for their inherent abuse potential.

3    Correct?

4    **A.**   I see that, yes.

5    **Q.**   And that's contained within this notice to the medical

6    community, correct?

7    **A.**   That's correct.

8    **Q.**   Let's put that document aside.  One more document, Dr.

9    Gilligan, and that is the first document we went through

10   today and I guess probably the biggest.  It's MCWV-1170.

11        Dr. Gilligan, this is the -- this is the publication by

12   -- I think you said it was from the Institute of Medicine;

13   is that right?

14   **A.**   That's right.

15   **Q.**   And would you just remind, at least me, what is the

16   Institute of Medicine?

17   **A.**   So, it's a group of typically very well respected

18   physicians who are tasked by the government with writing

19   reports at different times on different health topics that

20   are important to Americans.  This report had different pain

21   medicine specialists and then some patient representatives,

22   et cetera.

23   **Q.**   Okay.  If you would turn, sir, to the page that says --

24   Page 163 in the little numbers in the lower left-hand

25   corner, please, and there's a heading that says

1    Effectiveness of Opioids As Pain Relievers.  Let me know

2    when you're there.

3    **A.**   I'm there.

4    **Q.**   Okay.  And do you see where it says Effectiveness of

5    Opioids as Pain Relievers?  Do you see that section?

6    **A.**   I do.

7    **Q.**   And there's a sentence that says the effectiveness of

8    opioids as pain relievers, especially over the long-term, is

9    somewhat unclear, correct?

10   **A.**   I -- I see that.

11   **Q.**   And then there are number of bullet points talking

12   about different studies of the effectiveness of opioids;

13   would you agree with that?

14   **A.**   Yes, I would.

15   **Q.**   And if you look at that last bullet point, it discusses

16   a metaanalysis of studies involving back pain.  Do you see

17   that reference?

18   **A.**   I do.

19   **Q.**   And that sentence says a metaanalysis of studies

20   involving back pain did not show that opioids reduced pain.

21   Did I read that correctly?

22   **A.**   Yes, you did.

23   **Q.**   And then the next sentence says they also found that

24   Substance Use Disorders are common in patients taking

25   opioids for back pain with as many as one fourth of these

1    patients showing abhorrent medication taking behavior.  Did

2    I read that correctly?

3    **A.**   Yes, you did.

4    **Q.**   And that's one finding from the Institute of Medicine,

5    correct?

6    **A.**   That is one point that they make, yes.

7    **Q.**   And do you have an understanding of what abhorrent

8    medication taking behavior means?

9    **A.**   Yes, I do.

10   **Q.**   And what is that?

11   **A.**   That's not taking your medications as prescribed.

12   That's taking them -- could be more -- more frequently than

13   prescribed, not following other instructions.  For example,

14   don't drink alcohol and take this medication and then taking

15   them with alcohol would be an abhorrent use.  So, taking

16   them essentially and not following the instructions that

17   were given in terms of how to take them and it would also

18   include misusing or abusing them.

19   **Q.**   Thank you.  If you would then, sir, turn to the page

20   that is number 165.  Actually, I'm sorry.  Further down on

21   Page 164.  Let me know when you're there.  There's a heading

22   that says Need for Education.

23   **A.**   I'm there.

24   **Q.**   Okay.  And the last sentence of that paragraph reads,

25   however, data from a 2009 survey conducted by SAMHSA, and

1    you understand what SAMHSA is, right?

2    **A.**   Yes, I do.

3    **Q.**   Indicate that some 5 million Americans used pain

4    relievers non-medically in the month prior to the survey and

5    that these medications generally were the result of a

6    medical prescription.  Do you see that sentence?

7    **A.**   I do.

8    **Q.**   And that's another finding of the Institute of

9    Medicine, right?

10    **A.**   That's another point that they include in their report,

11    yes.

12    **Q.**   Thank you.  Now, if we go to the next page, Page 165 --

13          MR. ACKERMAN:  And we're getting close to the end,

14    Your Honor.

15          BY MR. ACKERMAN:

16    **Q.**   There's a section that says Abuse of Opioids.  Do you

17    see that?

18    **A.**   Yes, I do.

19    **Q.**   And there's a reference here that says the diversion of

20    opioid analgesics has become a national public health

21    problem.  Do you see that?

22    **A.**   Yes, I do.

23    **Q.**   And that's yet another topic that the Institute of

24    Medicine included in this report, right?

25    **A.**   Yes, it is.

1    **Q.**   And if you go down to the bottom of the page, sir,

2    there is a sentence -- there is a paragraph that reads

3    opioid medications present some risk.  Do you see that

4    paragraph?

5    **A.**   Yes, I do.

6    **Q.**   And that paragraph reads opioid medications present

7    some risk of abuse by patients, as well, and then it talks

8    about a review of -- of studies.  Do you see -- do you see

9    where I am?

10   **A.**   I think so.  Structured review of 67 studies.

11   **Q.**   Yes.  And there's a reference at the back that says 12

12   percent developed abhorrent drug-related behavior.  Do you

13   see that reference?

14   **A.**   I do.

15   **Q.**   And that's 12 percent of chronic non-cancer pain

16   patients regularly taking opioids; is that right?

17   **A.**   That's right.  The sentence has more to it.  It also

18   includes that 3 percent take a -- develop opioid abuse or

19   addiction, as opposed to the 12 percent.

20   **Q.**   Yes, yes.  And you're right.  The finding is that 3

21   percent developed opioid abuse or addiction, correct?

22   **A.**   Correct.

23   **Q.**   And then 12 percent developed abhorrent drug-related

24   behavior?

25   **A.**   Correct.

1    **Q.**   And what -- do you have an understanding of what

2    abhorrent drug-related behavior is?

3          MR. SCHMIDT:   I think that was asked and answered

4    two minutes ago, Your Honor.

5          MR. ACKERMAN:   So, I think it's a little bit --

6          BY MR. ACKERMAN:

7    **Q.**   Is that the same as the abhorrent medication taking

8    behavior that we just discussed?

9    **A.**   Yes.   It's the same.

10   **Q.**   And then the very next sentence talks about another

11   analysis and it says a recent analysis revealed that half of

12   patients who received a prescription for opioids in 2009 had

13   filled another opioid prescription within the previous

14   30 days.  Do you see that?

15   **A.**   I do.

16   **Q.**   And that's yet another finding that the Institute of

17   Medicine made in this document, correct?

18   **A.**   Correct.

19   **Q.**   Okay.   Last point, which is on the next page, Page 166,

20   sir, there is a heading that says Opioid Use and Costs of

21   Care.   Do you see that?

22   **A.**   I do.

23   **Q.**   Okay.   And that paragraph begins and says opioid use

24   may increase the costs of care.   Did I read that correctly?

25   **A.**   Yes, you did.

1   **Q.**   And that's a finding from this Institute of Medicine,

2   right?

3   **A.**   That's a point in their report, yes.

4   **Q.**   Okay.  And then, sir, would you read into the record

5   the last sentence of that paragraph, which is on the next

6   page, Page 167.

7           MR. RUBY:  Your Honor -- Your Honor, objection.

8   Cost of care is well beyond the scope of the direct exam.

9           THE COURT:  Sustained.

10          MR. ACKERMAN:  Your Honor --

11          THE COURT:  Let's get this done, Mr. Ackerman.

12          MR. ACKERMAN:  This is the last question, is

13   reading this one sentence into the record, but this is a

14   document that defendants introduced and they selectively

15   introduced parts of it and under Rule 106 --

16          THE COURT:  Okay.  Let him read it and let's get

17   this done.

18          MR. ACKERMAN:  Thank you.

19          BY MR. ACKERMAN:

20   **Q.**   Dr. Gilligan, would you please read the last sentence

21   of this paragraph into the record?

22   **A.**   A conservative estimate of the cost to society of

23   prescription opioid abuse in the United States is

24   $9.5 billion dollars in 2005 -- or excuse me -- $9.5 billion

25   in 2005 dollars.

```
 1              MR. ACKERMAN:  Thank you.

 2         Nothing further, Your Honor.

 3              MR. SCHMIDT:  May I proceed, Your Honor?

 4              THE COURT:  Yes.

 5                    REDIRECT EXAMINATION

 6         BY MR. SCHMIDT:

 7    Q.   Let's pick back up with MCWV-1170 just to complete a

 8    few points regarding this Institute of Medicine study and

 9    let's start on Page 163, right where you were just asked

10    questions about, Dr. Gilligan, under the heading

11    Effectiveness of Opioids as Pain Relievers, and it says --

12    language you were just read on cross examination, the

13    effectiveness of opioids as pain relievers, especially over

14    the long-term, is somewhat unclear.  Do you remember being

15    asked about that language?

16    A.   I do.

17    Q.   Is that consistent with what you told us on direct

18    about study data on chronic -- on the use of opioids with

19    chronic non-cancer pain?

20    A.   Yes.  It's exactly consistent with that.

21    Q.   Do you have an understanding as to how much of opioid

22    use has occurred is for acute pain versus chronic non-opioid

23    pain?

24    A.   Excuse me.  How much of opioid use is for acute pain

25    versus chronic non-cancer pain?
```

1    **Q.**   Yes, Doctor.

2    **A.**   I'm not sure that I know an exact numerical number on

3    that.  I -- I believe that chronic non-cancer pain would be

4    -- would be higher numbers, although I'm actually not sure

5    numerically on that point.

6    **Q.**   Okay.  Fair enough.  I want to just show you a couple

7    of the findings here that we didn't get a chance to cover.

8    The first bullet says in a metaanalysis of randomized

9    controlled trials involving non-cancer pain, researchers

10   concluded that the relative effectiveness and risk or

11   benefit of opioids compared with other non-opioid treatments

12   are still to be determined.  Do you see that?

13   **A.**   I do.

14   **Q.**   Is that consistent with what you told us on direct?

15   **A.**   Yes, that is.

16   **Q.**   If you go to the next, Page 164, and let's look above

17   that heading, Need For Education, the first paragraph above

18   that heading.  They reference those research findings above

19   and they say the research findings noted above need to be

20   set against the testimony of people with pain, many of whom

21   derive substantial relief from opioid drugs.  Do you see

22   that?

23   **A.**   I do.

24   **Q.**   Is that consistent with what you told us on direct

25   exam, that individual patient experiences have to be weighed

1    against this study data that is less conclusive?

2    **A.**    Yes, it is.

3    **Q.**    Let's go to Page 3.  I'm sorry.  Let's go to Page 165.

4    I apologize.

5        You were asked about language in this section and I

6    want to show you the second paragraph under Abuse of

7    Opioids.  And do you see there's a sentence five lines down

8    near the end of the line that says more than half?

9    **A.**    I do.

10   **Q.**    More than half, 55 percent in this study of non-medical

11   users of prescription pain relievers obtained the drugs they

12   used most recently from a friend or relative for free; that

13   is, they did not buy or steal them.  Is that data that

14   you've seen repeatedly throughout your work that is a

15   concept we've heard of in court called diversion from the

16   medicine cabinet?

17   **A.**    Yes, that is.

18   **Q.**    Let's go to Page 166.  You were asked some questions

19   about this section on abuse of opioids and you'll see

20   there's language above these bullet points that say --

21        MR. SCHMIDT:  And I'm actually going to need to

22   capture the sentence above and then the bullet points,

23   please.

24        BY MR. SCHMIDT:

25   **Q.**    Current voluntary strategies to reduce opioid abuse

1    include, and then do you see that there is a reference to

2    various programs?

3    **A.**   I do.

4    **Q.**   Do you see that the first one focuses on doctors?

5    **A.**   Yes, I do.

6    **Q.**   Do you see that the second one focuses on doctors?

7    **A.**   I do.

8    **Q.**   Do you see that the third one focuses on patients and

9    how doctors care for patients?

10   **A.**   I do.

11   **Q.**   Next one talks about state Prescription Drug Monitoring

12   Programs.  Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   Next one talks about new drug formulations by

15   manufacturers.  Do you see that?

16   **A.**   Correct.

17   **Q.**   And do you see the next one talks about removing unused

18   drugs from home medicine cabinets and take-back events?  Do

19   you see that?

20   **A.**   Yes, I do.

21   **Q.**   Do any of those specifically speak to conduct by

22   distributors as you understand them?

23   **A.**   No, they do not.

24   **Q.**   All right.  And last question on this document.  Do you

25   recall being asked about the costs of opioid use?

1   **A.**   Yes, I do.

2   **Q.**   Let's go to Page 164, please.  And right above the

3   heading Need For Education there's some language that's

4   italicized for emphasis.  It says, regardless, the majority

5   of people with pain use their prescription drugs properly,

6   are not a source of misuse, and should not be stigmatized or

7   denied access because of the mis-deeds or carelessness of

8   others.  Do you have an understanding if that view of the

9   Institute of Medicine is widely held within medicine?

10  **A.**   Yes, I do.

11  **Q.**   Let's go to another document, MCWV-1522.  This is the

12  2001 joint statement from the DEA, the AMA and 20 other

13  healthcare organizations.  You were shown a sentence in the

14  second paragraph from the bottom.

15          BY MR. SCHMIDT:  If you can cull up that whole

16  paragraph.

17          BY MR. SCHMIDT:

18  **Q.**   Do you remember being asked about the second sentence

19  to those who legally manufacture, distribute, prescribe and

20  dispense controlled substances?

21  **A.**   Yes, I do.

22  **Q.**   Let's look at the very next sentence.  Focusing only on

23  the abuse potential of a drug, however, could erroneously

24  lead to the conclusion that these medications should be

25  avoided when medically indicated generating a sense of fear

1    rather than respect for their legitimate properties.  Do you

2    see that?

3    **A.**   Yes, I do.

4    **Q.**   And, again, did you understand that to be guidance that

5    the medical profession and the healthcare system was

6    receiving at this time from the DEA, from groups like the

7    AMA?

8    **A.**   Yes, I do.

9    **Q.**   Let's go to your presentation, P-41958, and see if we

10   can cull it up on the screen.  And I would like to go to

11   Page 20.  Let's start on Page 30, please.

12       You were shown this map.  And I just want to orient you

13   to the language used where it talks about sales and

14   kilograms.  Do you see that?

15   **A.**   I do.

16   **Q.**   And then, if we go back to Page 29, please, again,

17   Discussion of Sales.  Do you see that?

18   **A.**   I do.

19   **Q.**   And there was a little colloquy between you and Mr.

20   Farrell regarding sales for prescriptions.  Why is it in

21   these documents that you reference sales and sales per

22   kilogram?

23   **A.**   Because that's the unit that CDC uses to report it, but

24   I used it to make a teaching point to physicians about

25   over-prescribing.

1    **Q.**   And that's what I want to see if I can understand, Dr.

2    Gilligan.  What is the relationship, if any, between sales

3    and prescribing?

4    **A.**   So, with a controlled substance that's a prescription,

5    it's a linked relationship.  There is not a sale of a gram

6    or a kilogram without a prescription.  So, sales only go up

7    as prescriptions go up.  So, sales is a surrogate for

8    prescribing.  So, that's why, since it's reported in this

9    unit, I had to use it in this unit, but the teaching point

10   for the doctors was entirely on over-prescribing because

11   sales only occur when a doctor or another clinician writes a

12   prescription.

13   **Q.**   And prescriptions cause sales?

14   **A.**   Yes.  There is no sale without a prescription.

15   **Q.**   One more question on this document.  You were asked

16   about some of the data, including the reference here to

17   abuse.  Do you see that?

18   **A.**   Yes.

19   **Q.**   And I want to just jump ahead to Page 32 of this

20   document.  And do you see you've provided further data on

21   people who abuse prescription pain-killers getting their

22   drugs from a variety of sources?  Do you see that?

23   **A.**   I do.

24   **Q.**   And just -- if we look at three of them, obtained free

25   from friend or relative, 55 percent, in the bottom left, and

1    then, upper right, the third one, took from friend or

2    relative without asking, 4.8.  And then, below that, bought

3    from friend or relative, 11.4.  Do you see that?

4    **A.**    I do.

5    **Q.**    And what's the data source for this data you're

6    reporting here?

7    **A.**    That's from the CDC.

8    **Q.**    And so, according to this data, do we get about

9    70 percent of people who are abusing prescription

10   pain-killers get them from, in one way or another, a friend

11   or relative?

12   **A.**    That's correct.

13   **Q.**    Let's look at the Volkow article you were shown,

14   P-43172, and just a couple simple questions about this

15   article.  I think you were shown language down at the bottom

16   of the first page here in the last full paragraph where it

17   says second.  Do you see that?

18   **A.**    I do.

19   **Q.**    It says, second, the major source of diverted opioids

20   is physician prescriptions.  Do you see that?

21   **A.**    I do.

22   **Q.**    And, first of all, are you aware that this is an

23   article from -- and we can look at the bottom, if you want.

24   You can kind of see it down here at the bottom.  2016.

25   **A.**    Yes, I'm aware.

1   **Q.**   Did you understand, if we pull that down, that

2   statement to be accurate at that time, that the major source

3   of diverted opioids is physician prescriptions?

4   **A.**   Yes, I do understand that to be accurate.

5   **Q.**   They then say, for these reasons, physicians and

6   medical associations have begun questioning prescribing

7   practices for opioids, particularly as they relate to the

8   management of chronic pain.   Do you see that?

9   **A.**   I do.

10   **Q.**   How did that relate to what you told us earlier in

11   terms of changing standards of care from the medical

12   profession about how they prescribe or don't prescribe

13   prescription opioids?

14   **A.**   So, that's that later phase.   This is from 2016, where

15   physicians had more awareness of the potential harms, more

16   awareness of some limitations on the data on efficacy and,

17   therefore, started to prescribe more conservatively.

18   **Q.**   Two other small points in this article.   Could we go to

19   Page 5, please?   You -- when you were talking about this

20   article, I thought I heard you give an answer about

21   something being partly true and I thought I heard you refer

22   to other factors being important.   Am I recalling that

23   correctly?   I'm probably butchering that horribly.

24   **A.**   No.   I think that is a correct statement.

25   **Q.**   Let me show you some specific other factors.   If we

```
1    look at the left-hand column, first full paragraph in the
2    middle, it says however.  Do you see that?  However, we do
3    know that the risk of opioid addiction varies substantially
4    among persons.  Do you see that?
5    A.    I do.
6    Q.    Is that accurate in your view?
7    A.    Yes, and that relates to some of the things we've
8    talked about today.
9    Q.    And it then says the genetic vulnerability accounts for
10   at least 35 to 40 percent of the risk associated with
11   addiction.  Do you see that?
12   A.    I do.
13   Q.    And then they talk about adolescents being at an
14   increased risk.  Do you see that?
15   A.    I do.
16   Q.    And are these some of the factors that you were talking
17   about that are important to consider, things like genetic
18   vulnerability, accounting for at least 35 to 40 percent of
19   the risk associated with addiction?
20   A.    Yes.  That's exactly an example of the sort of factors
21   for who is going to be high risk, who's going to be medium
22   risk, who's going to be low risk, why it's relevant to ask a
23   patient not just do you have a history of substance abuse
24   yourself, but do you have a family history of substance
25   abuse.  It's not a judgment on someone, but it's identifying
```

1    a risk factor in order to try to keep them safe.

2    **Q.**    Let's go to Page 7, please, under Conclusions.  The

3    very bottom, it says, although there are no simple

4    solutions, we recommend three practice and policy changes

5    that can reduce abuse-related risks and improve the

6    treatment of chronic pain.  Do you see that?

7    **A.**    I do.

8    **Q.**    And then, if we go to the next page, please, we can see

9    it hopefully culled out and it looks like the first is

10   increased use of science supported prescribing and

11   management practice.  And then the next one is increased

12   medical school training on pain and addiction.  Do you see

13   that?

14   **A.**    I do.

15   **Q.**    And the third one is increased research on pain,

16   including potentially research on prescription opioids.  Do

17   you see that?

18   **A.**    I do.

19   **Q.**    Are any of those focused on distributors, as you

20   understand them?

21   **A.**    No.

22   **Q.**    Let's look at the McCabe article, please, P-43594.

23   This is the one from 2021, the longitudinal study.  And

24   let's just look at some language we didn't have a chance to

25   see.

```
 1        If we look in the bottom right corner of the first page

 2   in this article it says most adolescents who are prescribed

 3   opioids use them appropriately without an increased risk for

 4   substance misuse.  Do you see that?

 5   A.   I do.

 6   Q.   Is that consistent with the broader data, as you

 7   understand it?

 8   A.   Yes.  That is consistent with the broader data.

 9   Q.   And then you were asked about a commentary on this

10   article from Compton.  Do you remember that?

11   A.   I do.

12   Q.   Let's look at that very quickly, P-41929, and it looks

13   like they have a summary of their commentary here.  Do you

14   see that?

15   A.   I do.

16   Q.   They talk about the McCabe study.  Do you see that

17   reference?

18   A.   I do.

19   Q.   And then they talk about the key findings.  Do you see

20   that?

21   A.   I do.

22   Q.   And the key findings that they reference are an overall

23   association.  Do you see that?

24   A.   I do.

25   Q.   And we talked about this earlier, but I just wanted to
```

```
1    be clear.  What is the difference between association and

2    causation?

3    A.   So, an association is two things that have happened

4    together that go together, but they may not be one causing

5    the other, but there might be other causes that are just

6    causing the two things to occur at the same time, for

7    example.

8    Q.   And do you remember --

9            MR. SCHMIDT:  If we can pull that page down, but

10   keep the document.

11           BY MR. SCHMIDT:

12   Q.   Do you remember being asked about an earlier Compton

13   article?

14   A.   Yes, I do.

15   Q.   Let's take a look at that earlier Compton article

16   really quickly, DEF-WV-2646.  Do you recognize this as a

17   publication by Wilson Compton, New England Journal of

18   Medicine?

19   A.   Yes, I do.

20   Q.   And the title is Relationship Between Non-Medical

21   Prescription Opioid Use and Heroin Use.  Do you see that?

22   A.   I do.

23   Q.   So, is this another example of analyzing people who are

24   misusing prescription opioids and seeing if that happens

25   before heroin use?
```

**A.**   Yes, it is.

**Q.**   Let's look at Page 7, please, of this article.  Under the conclusions, let's look at the second paragraph, please.

The transition from non-medical use of prescription opioids to heroin use appears to be part of the progression of addiction in a sub-group of non-medical users of prescription opioids primarily among persons with frequent non-medical use and those with prescription opioid abuse or dependence.

Let me stop there.  What do you understand that to be saying?

**A.**   So, they're saying when people go from non-medical use of opioid pain-killers to using heroin, that that's part of a progression of an addiction among this group of non-medical users who frequently engage in the non-medical use.

**Q.**   And when -- when you have, from your experience and your understanding of the science, when you have a progression of addiction from one substance to another, can you say that that same path wouldn't be followed by other substances if you took out one substance in the pack?

**A.**   No, you can't.

**Q.**   The next sentence says, although some authors suggest that there is an association between policy driven reductions in the availability --

1          MR. FARRELL:  Judge, I'm going to object to this

2     because I don't want to have to redirect.  This is outside

3     the scope and talks about PDMP and state laws and the impact

4     on opioid prescribing.

5          THE COURT:  Well, that's right, isn't it, Mr.

6     Schmidt?

7          MR. SCHMIDT:  I think that is true, but this is an

8     article he was asked about, and it goes to the subject that

9     he was asked about in terms of links between prescription

10    opioid misuse and heroin.

11         THE COURT:  Well, overruled.  Go ahead.

12         BY MR. SCHMIDT:

13    **Q.**   It says, although some authors suggest that there is an

14    association between policy driven reductions and the

15    availability of prescription opioids and increases in the

16    rates of heroin use, the timing of these shifts, many of

17    which began before policies were robustly implemented makes

18    a causal link unlikely.  Do you see that?

19    **A.**   Yes, I do.

20    **Q.**   What do you understand that to mean?

21    **A.**   That what they're saying is that the shift from people

22    who were misusing prescription opioids, abusing them,

23    shifting to heroin was not driven by policies of decreased

24    opioid prescribing, that the timing doesn't add up and that

25    you can't say there was causation there.

1   **Q.**   Let's look at what they say immediately below that and

2   I'll go on to just one or two more topics.

3        They say, alternatively, heroin market forces,

4   including increased accessibility, reduced price, and high

5   purity of heroin appear to be major drivers of the recent

6   increases in rates of heroin use.  Do you see that?

7   **A.**   Yes, I do.

8   **Q.**   Are you familiar from the scientific literature with

9   studies, some discussed in this article, talking about the

10  influence of heroin market forces, including increased

11  accessibility, reduced price in high purity, and serving as

12  major drivers of increases in heroin use?

13  **A.**   Yes, I am.

14  **Q.**   I'm going to take a gamble, if I could, and see if I

15  can go back to the white board and hope that it's there

16  still.  That didn't work.  Let me try one more time.

17            MR. SCHMIDT:  If that doesn't work, I'll move on,

18  Your Honor.

19        It's not there.  Okay.

20            BY MR. SCHMIDT:

21  **Q.**   Do you remember the white board we drew with the

22  numbers?  I think it was 79.5 percent who -- of people who

23  had used heroin who had previously used prescription

24  opioids?

25  **A.**   Yes, and it was 79.5 percent.

1   Q.   I may get the number wrong, but I think it was 98.9

2   percent of the same number of people who had used heroin had

3   used other illegal drugs?

4   A.   Yes, and it was 98.9 percent.

5   Q.   Okay.  With that idea in mind, you talked in the

6   context of talking about the Seattle talk given in Las Vegas

7   that people transitioned.  Do you remember being asked

8   questions about that?

9   A.   Yes, I do.

10  Q.   In the same way, did people transition from using those

11  illegal drugs to using illegal heroin and fentanyl?

12       Oh, and there it is.  So, let me ask my question again.

13       You talked about the number of people who transitioned

14  from misuse of prescription opioids to heroin.  Do you

15  remember that?

16  A.   I do.

17  Q.   And in the same way that a number of people transition

18  from using these illegal drugs, cocaine, crack, marijuana,

19  others to heroin?

20  A.   Yes, they did.

21  Q.   And are there other factors beyond those discussed in

22  some of these studies, like the mental health history, the

23  family history, discussed in the article that also

24  contributed to this transition?

25  A.   Yes, because those are the risk factors that predispose

1    to substance abuse in general, including these different

2    types.

3    Q.   Does the risk of someone transitioning vary by

4    medication?

5    A.   I think it does in the sense that there are some people

6    who are going to be at higher risk to transition to heroin

7    than others.

8    Q.   And do you know how much different, if any, heroin

9    rates would be if this type of illegal drug abuse were

10   exactly the same and there was less misuse of prescription

11   opioids?  Can we tell that?

12   A.   No.  I don't think you can tell that.

13   Q.   I want to just touch on two more small topics.

14        From your experience as a doctor, does every

15   prescription medicine carry some form of risk?

16   A.   Yes.

17   Q.   And as you prescribe a medication with known risks at a

18   higher level, as doctors do across society, do you expect to

19   see more of the known risks of the medicine, whatever they

20   might be?

21   A.   Yes.  If you prescribe a higher -- or doctors in

22   general prescribe a higher volume of a given medication, you

23   will see more of whatever the adverse effect associated with

24   that medication is in general, yes.

25   Q.   So, why do doctors prescribe medications?

1    **A.**   Because they're -- at least with that individual

2    patient, at that moment, they made a judgment.  They might

3    -- hopefully, it would be right, almost always, but in some

4    cases it might even be wrong.  But their judgment at that

5    moment was that the benefits for that patient outweighed the

6    risks and, therefore, justified prescribing that medication

7    at that dose at that time.

8    **Q.**   When you studied and looked for changes in the standard

9    of care under which opioid prescribing went up, as I

10   understood your testimony earlier, doctors became more aware

11   over time of the risks of addiction and things -- and

12   associated problems; is that fair?

13   **A.**   That's correct.  Over time, doctors gained an

14   increasing awareness of the risks of opioid pain

15   medications.

16   **Q.**   Were doctors always aware, though, that there was some

17   risk of addiction with prescription opioids throughout that

18   time period you were looking at?

19   **A.**   Yes.  Throughout that time period and, actually, for

20   many -- for decades.  Prior to that, doctors have known that

21   those medications have risks, including abuse, addiction, et

22   cetera.

23   **Q.**   Did they understand risks of death even?

24   **A.**   Yes.

25   **Q.**   And so, why did they prescribe more from your

1    understanding?

2    **A.**    Again, because of this balance of risk versus benefit,

3    that their feeling was that, in those instances, the

4    benefits outweighed the risks.

5    **Q.**    Do you know of distributors playing any role in that

6    process?

7    **A.**    Distributors played no role in that process.

8    **Q.**    Last question.  You were asked about a -- last set of

9    questions.  I'm sorry.

10        You were asked about a book called Dreamland.  Do you

11   remember being asked about that, Dreamland, that book that

12   you said you read?

13   **A.**    Yes, I do.

14   **Q.**    Do you recall in that book whether there are chapters

15   and chapters talking about the role of Purdue?

16   **A.**    There were, yes.

17   **Q.**    Do you recall whether there are chapters in that book

18   talking about drug cartels and new steps they took to get

19   heroin to people, aggressive new delivery techniques making

20   it like pizza?

21   **A.**    Yes.  I remember that.

22   **Q.**    We looked through that book.  We couldn't find any

23   mention of distributors.  Do you recall any discussion of

24   distributors in there?

25   **A.**    I don't remember any discussion of distributors in that

1    book.

2    **Q.**   We looked through that book.  We couldn't find any

3    mention of AmerisourceBergen, McKesson, Cardinal.  Do you

4    recall any reference to them in that book?

5    **A.**   I don't recall any reference to the distributors in

6    that book.

7              MR. SCHMIDT:  Thank you, Dr. Gilligan.

8              THE COURT:  Do you have anything else?

9              MR. FARRELL:  No, Your Honor.

10             THE COURT:  May I excuse Dr. Gilligan?

11        Thank you, sir, very much.  You're free to go.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  We appreciate it.

14             THE WITNESS:  Thank you.

15             THE COURT:  Are we done until next Wednesday?

16   Everybody say yes.

17             SIMULTANEOUS SPEAKERS:  Yes, Your Honor.

18             THE COURT:  All right.  I hope everybody enjoys

19   the holiday and I'll see everybody Wednesday morning at

20   9:00.

21        (Trial recessed at 4:10 p.m.)

22

23

24

25

```
 1        CERTIFICATION:

 2                    I, Ayme A. Cochran, Official Court

 3    Reporter, and I, Lisa A. Cook, Official Court Reporter,

 4    certify that the foregoing is a correct transcript from

 5    the record of proceedings in the matter of The City of

 6    Huntington, et al., Plaintiffs vs. AmerisourceBergen

 7    Drug Corporation, et al., Defendants, Civil Action No.

 8    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

 9    reported on July 2, 2021.

10

11           S\Ayme A. Cochran            s\Lisa A. Cook

12              Reporter                     Reporter

13        _

14

15        July 2, 2021

16           Date

17

18

19

20

21

22

23

24

25
```

## $

**$800.00** [1] - 23:16

## '

**'80s** [2] - 84:21, 95:12
**'90s** [5] - 78:1, 78:7, 84:22, 84:23, 95:12

## 0

**00029** [1] - 164:14
**00907** [2] - 2:5, 2:14
**02** [1] - 58:18

## 1

**1** [1] - 111:16
**10** [10] - 34:1, 34:5, 90:6, 130:2, 130:10, 171:10, 173:7, 173:8, 173:10, 190:23
**10,000** [1] - 167:8
**100** [2] - 31:14, 32:23
**100,000** [2] - 159:9, 167:12
**1001** [2] - 4:6, 4:9
**101(b)(4** [1] - 89:22
**1022** [1] - 3:5
**106** [1] - 198:15
**10:37** [1] - 68:11
**11** [8] - 60:19, 60:20, 64:5, 90:16, 107:23, 109:10, 137:22, 138:5
**11,000** [1] - 157:16
**11.4** [1] - 206:3
**12** [15] - 30:10, 30:12, 30:19, 58:14, 60:21, 61:3, 62:8, 63:20, 108:23, 109:12, 110:18, 196:11, 196:15, 196:19, 196:23
**126** [1] - 3:5
**12:01** [1] - 130:19
**13** [2] - 107:24, 181:12
**130** [1] - 171:16
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**14** [1] - 78:23
**15** [4] - 10:10, 34:11, 124:22, 125:11
**1522** [1] - 191:13
**15910** [1] - 3:15
**16** [2] - 80:12, 82:8
**16)** [1] - 81:11
**1600** [1] - 3:15

**162** [1] - 34:18
**163** [2] - 192:24, 199:9
**164** [3] - 194:21, 200:16, 203:2
**165** [3] - 194:20, 195:12, 201:3
**166** [2] - 197:19, 201:18
**167** [1] - 198:6
**16th** [1] - 140:10
**17** [2] - 34:15, 157:16
**17-year** [2] - 149:9, 157:2
**1717** [2] - 6:6, 6:13
**18** [1] - 34:11
**19** [1] - 58:15
**19.4** [1] - 64:24
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1935** [3] - 126:25, 127:18, 129:13
**1944** [4] - 126:23, 127:2, 127:6, 129:13
**1961** [1] - 35:4
**1980** [1] - 173:22
**1980s** [1] - 76:23
**1982** [3] - 78:23, 83:4, 181:1
**1986** [4] - 88:16, 90:9, 90:13, 92:13
**1990s** [1] - 76:22
**1995** [3] - 94:25, 95:2, 96:2
**1996** [1] - 10:18
**1997** [3] - 98:11, 99:17, 100:6
**1998** [7] - 80:14, 80:18, 82:5, 101:16, 102:22, 102:25, 119:18
**1:27** [1] - 130:20
**1:30** [1] - 130:16
**1st** [2] - 80:14, 82:5

## 2

**2** [10] - 1:19, 7:4, 34:5, 63:18, 63:21, 82:17, 121:8, 127:19, 220:9, 220:15
**2,000** [1] - 90:16
**20** [4] - 93:1, 150:25, 203:12, 204:11
**20,000** [2] - 186:2, 186:23
**200** [1] - 172:21
**2000** [1] - 10:17
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21,

5:5
**2000s** [1] - 77:6
**2001** [5] - 105:17, 106:7, 111:19, 191:18, 203:12
**2002** [1] - 58:4
**2002-2004** [1] - 61:8
**2002-2011** [2] - 61:9, 61:14
**2003** [3] - 175:6, 175:12, 175:17
**2004** [5] - 11:19, 119:6, 119:9, 120:20, 121:6
**2005** [5] - 123:5, 127:4, 129:15, 198:24, 198:25
**2008** [4] - 15:13, 18:6, 125:8, 167:13
**2009** [2] - 194:25, 197:12
**2010** [8] - 78:1, 78:8, 129:13, 167:8, 176:25, 177:2, 177:4, 178:24
**2011** [7] - 28:16, 28:18, 32:23, 34:24, 58:4, 62:17, 77:11
**2012** [3] - 78:1, 78:8, 178:24
**2013** [4] - 127:20, 129:14, 129:15, 138:9
**2014** [2] - 21:1, 162:8
**2016** [6] - 12:20, 142:24, 180:25, 181:12, 206:24, 207:14
**2017** [2] - 175:7, 175:17
**2018** [2] - 41:9, 173:22
**202** [2] - 2:4, 2:13
**2020** [2] - 140:10, 150:8
**2021** [6] - 1:19, 7:4, 149:8, 209:23, 220:9, 220:15
**21** [3] - 93:12, 113:3, 191:14
**214** [1] - 131:2
**2216** [1] - 3:7
**23** [1] - 178:21
**25** [3] - 5:5, 15:9, 74:24
**2527** [1] - 140:8
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10

**2693** [1] - 110:18
**28** [3] - 4:3, 4:12, 4:14
**29** [2] - 164:13, 204:16
**2937** [3] - 101:11, 102:9, 103:18
**29464** [3] - 4:4, 4:12, 4:15
**2:50** [1] - 190:25

## 3

**3** [10] - 60:20, 64:5, 79:9, 121:4, 122:4, 143:10, 156:23, 196:18, 196:20, 201:3
**3.6** [6] - 59:3, 59:7, 59:11, 59:16, 59:24, 60:10
**30** [4] - 166:13, 166:22, 197:14, 204:11
**300** [1] - 172:21
**3065** [1] - 122:18
**31** [1] - 170:14
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**31st** [1] - 181:11
**32** [2] - 171:12, 205:19
**32502** [1] - 2:11
**34** [1] - 1:16
**35** [3] - 157:17, 208:10, 208:18
**3605** [2] - 119:2, 121:7
**3699** [3] - 88:9, 89:3, 90:1
**374** [1] - 181:12
**38** [1] - 29:18
**3843** [1] - 5:14
**39** [2] - 29:23, 58:18
**3:00** [1] - 191:4
**3:17-cv-01362** [2] - 1:5, 220:8
**3:17-cv-01665** [2] - 1:11, 220:8

## 4

**4** [1] - 111:24
**4.8** [1] - 206:2
**40** [2] - 208:10, 208:18
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**47** [1] - 31:10
**49** [2] - 60:21, 61:3
**4:10** [1] - 219:21
**4th** [1] - 191:5

## 5

**5** [4] - 34:10, 59:11, 195:3, 207:19
**5,000** [2] - 186:1, 186:22
**50** [2] - 90:18, 91:24
**52(c** [2] - 133:1, 134:17
**55** [2] - 201:10, 205:25
**553** [1] - 6:8
**56** [1] - 3:4
**560** [1] - 33:8
**56th** [1] - 3:5

## 6

**6** [1] - 30:10
**600** [1] - 2:10
**635** [1] - 33:8
**65** [1] - 34:11
**67** [1] - 196:10
**68,557** [1] - 174:22
**6th** [1] - 3:5

## 7

**7** [2] - 209:2, 212:2
**70** [2] - 186:12, 206:9
**70130** [1] - 3:8
**707** [1] - 4:24
**71-page** [1] - 135:6
**716** [1] - 3:12
**725** [2] - 4:19, 4:21
**79** [1] - 60:6
**79.5** [8] - 60:6, 62:6, 62:8, 63:7, 63:10, 64:15, 214:22, 214:25

## 8

**80** [5] - 60:4, 90:18, 154:5, 154:14, 178:6
**801** [1] - 3:10
**803(16** [5] - 80:11, 81:21, 82:2, 82:11, 89:7
**803(18** [2] - 80:4, 81:23
**803(18)** [1] - 82:3
**807** [1] - 163:18
**807(b** [1] - 164:3
**81** [1] - 159:9
**825** [1] - 171:18
**850** [1] - 5:12

## 9

**9.5** [2] - 198:24

**901** [1] - 4:23
**902(6)** [1] - 80:16
**90s** [1] - 24:17
**91436** [1] - 3:16
**98.9** [5] - 65:6, 66:4, 66:11, 215:1, 215:4
**9:00** [2] - 7:4, 219:20
**9th** [2] - 4:6, 127:19

# A

**a.m** [1] - 7:5
**ABDC's** [1] - 24:1
**abhorrent** [7] - 194:1, 194:7, 194:15, 196:12, 196:23, 197:2, 197:7
**ability** [3] - 74:14, 118:6, 118:14
**able** [10] - 8:25, 31:8, 65:25, 75:11, 100:19, 106:3, 133:10, 137:1, 140:20, 189:19
**abruptly** [1] - 104:7
**Absolutely** [1] - 132:20
**absolutely** [2] - 104:21, 179:17
**abstract** [2] - 57:25, 58:20
**abundant** [1] - 72:8
**abuse** [83] - 21:1, 21:4, 38:19, 38:21, 45:10, 45:17, 46:21, 46:22, 47:6, 47:12, 48:4, 48:9, 48:22, 48:23, 49:4, 49:5, 49:12, 50:3, 50:4, 50:12, 50:13, 51:6, 52:11, 53:23, 57:10, 58:11, 62:12, 65:12, 65:17, 65:20, 66:9, 66:12, 66:14, 66:18, 66:19, 66:21, 66:22, 113:22, 114:2, 114:9, 115:1, 118:2, 118:13, 125:17, 125:24, 126:5, 145:15, 145:21, 148:17, 153:18, 154:15, 157:11, 159:16, 161:21, 161:24, 162:4, 171:10, 171:13, 171:16, 177:18, 182:4, 182:7, 191:21, 191:24, 192:2, 196:7, 196:18, 196:21,

198:23, 201:19, 201:25, 203:23, 205:17, 205:21, 208:23, 208:25, 209:5, 212:8, 216:1, 216:9, 217:21
**Abuse** [5] - 164:24, 181:13, 181:15, 195:16, 201:6
**abuse-related** [1] - 209:5
**abused** [3] - 60:5, 62:25, 159:14
**abusing** [14] - 47:2, 47:3, 59:9, 59:10, 66:4, 153:13, 153:22, 154:19, 158:5, 158:19, 177:18, 194:18, 206:9, 213:22
**academic** [1] - 13:1
**Academy** [1] - 120:4
**accept** [1] - 87:9
**accepted** [1] - 152:15
**Access** [1] - 34:21
**access** [5] - 34:25, 73:7, 91:8, 203:7
**accessibility** [2] - 214:4, 214:11
**accessible** [1] - 178:2
**acclaim** [1] - 155:4
**accompanying** [3] - 37:17, 72:21, 138:22
**According** [1] - 178:23
**according** [5] - 42:4, 62:17, 116:7, 186:9, 206:8
**account** [4] - 37:22, 37:25, 38:3, 121:14
**accounting** [1] - 208:18
**accounts** [1] - 208:9
**accredit** [1] - 106:2
**Accreditation** [3] - 105:16, 105:21, 109:14
**accreditation** [7] - 106:3, 106:6, 106:8, 106:19, 110:9, 110:13, 110:14
**accredited** [2] - 106:4, 110:12
**accredits** [1] - 106:1
**accuracy** [1] - 50:17
**accurate** [6] - 155:25, 156:3, 169:6, 207:2, 207:4, 208:6
**accusation** [1] - 22:11
**accused** [1] - 22:10

**acetaminophen** [1] - 40:11
**achieve** [1] - 94:13
**Ackerman** [10] - 46:2, 46:10, 82:8, 108:17, 142:6, 144:2, 168:12, 190:22, 191:1, 198:11
**ACKERMAN** [41] - 4:5, 46:3, 46:11, 55:21, 56:15, 80:1, 80:3, 81:25, 82:9, 89:5, 98:14, 107:17, 107:23, 108:10, 108:19, 114:19, 122:23, 127:3, 127:5, 127:11, 129:22, 129:24, 142:7, 144:3, 145:5, 145:10, 168:2, 190:21, 190:24, 191:3, 191:10, 191:11, 195:13, 195:15, 197:5, 197:6, 198:10, 198:12, 198:18, 198:19, 199:1
**Ackerman's** [1] - 89:19
**acknowledge** [2] - 150:24, 183:6
**acknowledgment** [1] - 155:23
**acquired** [1] - 175:10
**acronym** [1] - 105:23
**act** [1] - 113:23
**acting** [1] - 95:8
**Action** [4] - 1:4, 1:10, 220:7, 220:8
**action** [7] - 74:16, 99:8, 99:24, 100:15, 100:17, 128:12, 129:6
**activities** [1] - 110:4
**actual** [1] - 29:21
**acupuncture** [1] - 36:6
**acute** [22] - 30:3, 30:6, 30:7, 30:10, 30:13, 30:25, 68:22, 102:19, 103:3, 103:11, 120:16, 120:25, 122:7, 122:12, 124:10, 128:8, 138:12, 139:16, 143:15, 144:18, 199:22, 199:24
**add** [8] - 65:3, 67:9, 80:1, 92:13, 107:7,

111:13, 144:3, 213:24
**addicted** [7] - 45:23, 47:2, 47:3, 47:4, 85:21, 86:3, 104:10
**Addiction** [6] - 149:9, 149:19, 149:21, 149:25, 150:4, 155:5
**addiction** [49] - 21:7, 38:17, 38:18, 38:22, 45:10, 45:17, 45:19, 45:25, 46:20, 47:6, 47:12, 48:4, 48:9, 48:22, 48:23, 49:4, 49:12, 49:20, 49:21, 50:3, 50:4, 50:25, 51:3, 51:5, 51:17, 51:24, 52:7, 53:23, 67:22, 69:21, 103:23, 104:18, 104:24, 149:22, 165:8, 165:12, 165:18, 166:19, 196:21, 208:3, 208:11, 208:19, 209:12, 212:6, 212:14, 212:19, 217:11, 217:17, 217:21
**addictions** [1] - 181:23
**addition** [6] - 15:25, 16:4, 20:2, 122:12, 131:16, 135:5
**additional** [1] - 66:14
**address** [3] - 21:6, 59:16, 136:22
**addressed** [2] - 110:5, 148:23
**addresses** [1] - 113:21
**addressing** [2] - 36:11, 179:25
**adequate** [1] - 91:7
**adequately** [2] - 90:11, 121:21
**ADHD** [1] - 50:14
**adjuvant** [2] - 94:1, 94:7
**adjuvants** [1] - 94:12
**administering** [1] - 128:13
**Administration** [4] - 113:4, 113:17, 120:5, 191:15
**administrative** [1] - 26:3
**admissible** [2] - 81:22, 174:7
**admission** [5] - 80:6,

108:15, 111:3, 111:23, 112:10
**admissions** [2] - 165:8, 171:10
**admit** [12] - 25:8, 46:15, 79:20, 82:11, 83:8, 89:25, 108:16, 115:20, 132:4, 142:13, 163:7
**admitted** [14] - 29:6, 46:9, 55:24, 81:19, 81:23, 89:25, 90:1, 98:15, 102:12, 119:15, 122:24, 163:2, 163:25, 164:17
**admitting** [5] - 79:23, 81:1, 81:7, 81:17, 144:5
**adolescents** [4] - 149:11, 158:2, 208:13, 210:2
**adolescents'** [1] - 157:1
**adopt** [1] - 102:4
**adopted** [3] - 98:10, 101:1, 123:24
**adoption** [2] - 35:4, 119:18
**adoptive** [1] - 108:15
**adulthood** [1] - 149:11
**adults** [2] - 31:15, 32:24
**advance** [2] - 13:3, 40:6
**advanced** [2] - 32:5, 90:19
**adverse** [6] - 69:8, 77:7, 110:1, 139:8, 171:4, 216:23
**Advil** [1] - 36:24
**Advisory** [1] - 89:6
**advocacy** [1] - 120:1
**advocates** [2] - 118:5, 118:13
**affected** [1] - 27:18
**affiliated** [2] - 13:6, 17:22
**affiliation** [1] - 71:11
**affirm** [1] - 143:14
**afternoon** [6] - 15:19, 133:8, 136:8, 138:1, 147:19, 191:4
**age** [4] - 50:15, 62:6, 65:19, 157:17
**aged** [1] - 60:21
**agencies** [5] - 114:12, 118:4, 120:2, 143:17, 144:22
**Agency** [3] - 114:5,

114:13, 117:19
**agency** [1] - 114:7
**aggressive** [2] - 103:8, 218:19
**aggressively** [5] - 87:6, 91:22, 92:22, 116:14, 116:21
**ago** [6] - 74:12, 99:22, 177:8, 188:3, 190:8, 197:4
**agree** [27] - 23:2, 35:12, 82:22, 97:22, 104:3, 149:17, 150:10, 152:10, 152:14, 154:23, 161:19, 179:11, 179:22, 180:3, 180:10, 180:15, 181:16, 181:18, 181:23, 182:15, 186:3, 186:22, 187:2, 188:19, 190:12, 190:15, 193:13
**agreed** [3] - 44:9, 83:24, 85:6
**Agreed** [5] - 154:21, 157:20, 158:9, 158:21, 176:25
**agrees** [1] - 155:14
**ahead** [18] - 31:10, 46:18, 56:25, 88:14, 93:1, 96:9, 106:13, 130:6, 142:16, 148:15, 164:21, 168:6, 168:17, 185:7, 186:15, 190:22, 205:19, 213:11
**aimed** [4] - 53:5, 53:7, 53:8
**airport** [1] - 15:19
**al** [4] - 1:7, 1:13, 220:6, 220:7
**alcohol** [2] - 194:14, 194:15
**Aleve** [1] - 36:24
**alike** [2] - 85:20, 118:5
**allegations** [2] - 121:13, 124:2
**allocating** [1] - 131:16
**allow** [3] - 42:24, 70:13, 164:20
**allowed** [3] - 22:15, 56:13, 127:13
**alluded** [2] - 37:19, 66:5
**almost** [3] - 30:18, 170:22, 217:3
**alone** [1] - 187:25

**aloud** [1] - 167:3
**alternative** [1] - 18:23
**alternatively** [1] - 214:3
**alternatives** [3] - 18:21, 67:17, 68:18
**AM-WV-2693** [4] - 105:15, 107:16, 110:18, 111:21
**AMA** [10] - 117:13, 117:17, 140:9, 140:14, 141:17, 141:19, 141:23, 143:11, 203:12, 204:7
**America** [6] - 28:12, 28:18, 33:10, 113:14, 167:3, 182:22
**American** [9] - 34:11, 113:9, 113:12, 113:13, 115:7, 116:18, 120:4, 120:5, 141:13
**Americans** [6] - 28:25, 29:13, 31:19, 58:12, 192:20, 195:3
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**AmerisourceBergen** [3] - 6:2, 219:3, 220:6
**amount** [1] - 181:19
**Amount** [1] - 167:7
**amplify** [1] - 189:23
**analgesic** [4] - 53:13, 90:20, 93:5, 93:10
**analgesics** [23] - 84:1, 84:6, 85:7, 92:5, 92:10, 92:13, 93:9, 95:14, 102:18, 103:3, 103:23, 116:24, 117:7, 120:15, 122:6, 127:21, 128:6, 128:14, 143:16, 156:8, 181:17, 181:20, 195:20
**analogues** [1] - 145:22
**analysis** [3] - 90:16, 197:11
**analyze** [1] - 54:23
**analyzing** [1] - 211:23
**ancient** [6] - 80:12, 80:18, 89:3, 89:10, 89:15, 102:6
**ANDREW** [1] - 5:10
**Anesthesia** [2] - 16:20, 21:14
**anesthesia** [1] - 12:12

**Angell** [5] - 79:11, 86:8, 86:10, 87:3, 88:5
**ANNE** [1] - 4:2
**ANNIE** [1] - 4:11
**annual** [1] - 33:9
**annually** [1] - 58:4
**answer** [9] - 17:18, 17:19, 36:9, 51:15, 74:11, 75:5, 83:18, 160:2, 207:20
**answered** [2] - 169:20, 197:3
**answers** [1] - 108:1
**ANTHONY** [1] - 2:6
**anti** [2] - 36:23, 36:25
**anti-inflammatories** [1] - 36:25
**anti-inflammatory** [1] - 36:23
**anticipate** [1] - 137:5
**antiquities** [1] - 81:8
**anyway** [1] - 134:25
**apologize** [9] - 28:1, 40:6, 51:7, 52:24, 56:8, 172:8, 176:4, 189:11, 201:4
**appear** [7] - 42:5, 42:6, 107:20, 108:3, 109:6, 127:7, 214:5
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appended** [1] - 107:19
**applauding** [1] - 155:23
**applicable** [1] - 82:3
**applications** [1] - 20:12
**applied** [1] - 94:18
**applies** [1] - 55:25
**apply** [7] - 65:21, 74:17, 76:12, 76:13, 89:11, 89:16, 164:1
**appreciate** [5] - 135:23, 142:21, 176:7, 180:7, 219:13
**appreciates** [1] - 141:23
**approach** [19] - 13:18, 27:24, 35:1, 40:1, 51:7, 55:2, 78:15, 88:8, 95:7, 98:2, 101:7, 105:12, 112:24, 118:23, 122:17, 126:19, 140:4, 162:13, 181:4
**appropriate** [25] - 17:8, 35:9, 35:19, 36:16, 45:2, 70:5,

70:15, 70:17, 75:8, 75:16, 79:19, 79:22, 91:3, 96:24, 98:24, 99:11, 102:1, 105:9, 105:10, 109:20, 112:22, 121:15, 129:3, 129:8, 129:10
**Appropriate** [1] - 121:9
**appropriately** [12] - 17:16, 70:23, 71:21, 72:23, 73:21, 74:10, 75:2, 110:5, 126:2, 126:16, 128:22, 210:3
**approval** [5] - 39:11, 39:13, 95:1, 95:18, 95:20
**approved** [9] - 43:19, 44:2, 44:15, 95:5, 95:6, 95:14, 95:23, 96:1, 96:2
**approximate** [1] - 31:15
**April** [1] - 119:18
**Arch** [2] - 6:6, 6:13
**area** [9] - 20:9, 21:7, 57:21, 61:7, 76:11, 86:19, 126:10, 159:13, 159:18
**areas** [8] - 13:10, 13:23, 25:5, 29:15, 112:1, 112:17, 126:9, 169:2
**argued** [1] - 136:6
**arguing** [1] - 184:16
**argument** [6] - 77:1, 77:7, 87:9, 91:20, 131:12, 137:7
**arguments** [5] - 131:8, 135:15, 136:4, 136:6, 136:10
**arm** [3] - 30:15, 30:16, 30:20
**Army** [1] - 11:7
**arrive** [1] - 106:14
**art** [1] - 150:2
**arthritis** [5] - 14:15, 14:21, 32:18, 32:20, 33:5
**article** [66] - 54:25, 55:4, 57:14, 63:3, 63:20, 65:8, 65:13, 79:18, 80:22, 80:23, 85:1, 85:9, 86:6, 87:10, 103:17, 149:1, 149:4, 149:5, 149:6, 149:7, 149:13, 150:8, 150:17, 150:18,

150:21, 150:22, 152:13, 154:22, 155:3, 155:8, 155:9, 156:12, 156:13, 156:17, 156:19, 156:22, 156:23, 157:8, 157:13, 157:21, 158:4, 158:9, 158:18, 158:23, 179:7, 179:13, 180:5, 181:1, 181:2, 206:13, 206:15, 206:23, 207:18, 207:20, 209:22, 210:2, 210:10, 211:13, 211:15, 212:2, 213:8, 214:9, 215:23
**articles** [7] - 19:4, 81:18, 84:15, 148:20, 149:14, 151:16, 155:10
**artificially** [1] - 164:11
**ASHLEY** [1] - 5:3
**aside** [1] - 192:8
**aspect** [1] - 52:11
**asserted** [2] - 82:15, 115:14
**assess** [2] - 47:16, 156:3
**assessing** [1] - 111:12
**assessment** [2] - 109:21, 111:3
**associated** [9] - 14:16, 30:14, 32:18, 33:5, 94:1, 208:10, 208:19, 216:23, 217:12
**associates** [1] - 53:9
**Association** [7] - 113:9, 113:12, 113:13, 115:7, 116:18, 120:6, 141:14
**association** [8] - 55:14, 141:20, 156:7, 210:23, 211:1, 211:3, 212:24, 213:14
**Associations** [1] - 55:10
**associations** [3] - 55:13, 57:15, 207:6
**assume** [3] - 55:25, 134:24, 159:7
**assuming** [1] - 178:19
**assumption** [1] - 172:9
**assure** [1] - 110:4

**AT** [1] - 1:2
**attached** [1] - 79:7
**attachment** [1] - 108:5
**attack** [1] - 76:15
**attempt** [1] - 131:6
**attempting** [1] - 135:10
**attempts** [1] - 56:1
**attended** [1] - 172:20
**attention** [3] - 96:23, 135:16, 173:3
**attest** [2] - 182:20, 182:23
**attitude** [1] - 86:12
**Attorney's** [3] - 22:9, 23:6, 23:12
**attorneys** [2] - 22:20, 23:5
**audience** [1] - 169:14
**August** [1] - 136:14
**authenticating** [1] - 80:16
**authentication** [1] - 89:15
**authenticity** [2] - 80:15, 82:6
**author** [4] - 55:4, 86:7, 163:12, 163:14
**authoritative** [2] - 149:19, 149:23
**Authorities** [1] - 120:7
**authority** [4] - 9:13, 72:17, 72:20, 73:2
**authors** [3] - 182:6, 212:23, 213:13
**autoimmune** [2] - 14:21, 32:19
**availability** [2] - 180:1, 212:25, 213:15
**available** [7] - 38:4, 41:14, 56:24, 95:8, 126:17, 141:10
**average** [1] - 70:2
**averages** [2] - 187:2, 189:2
**Avin** [1] - 3:7
**avoid** [1] - 173:12
**avoided** [1] - 203:25
**Award** [1] - 21:11
**award** [1] - 21:20
**awards** [2] - 20:21, 21:10
**aware** [20] - 52:8, 52:18, 54:18, 54:22, 59:25, 68:21, 76:16, 95:19, 120:20, 120:23, 133:3, 155:7, 172:14, 183:19, 183:25, 184:2, 206:22,

206:25, 217:10, 217:16
**awareness** [6] - 77:6, 139:7, 139:13, 207:15, 207:16, 217:14
**Ayme** [2] - 6:17, 220:2

# B

**baby** [1] - 33:25
**background** [3] - 9:24, 13:17, 13:23
**backwards** [2] - 152:22, 153:11
**balance** [7] - 17:14, 17:20, 44:23, 86:22, 134:7, 218:2
**balancing** [3] - 113:23, 114:2, 126:8
**Baron** [1] - 3:14
**base** [1] - 186:1
**Based** [2] - 152:19, 153:3
**based** [15] - 75:22, 82:23, 94:17, 97:25, 116:2, 118:1, 128:21, 147:6, 153:10, 153:23, 154:20, 168:9, 174:4, 186:12, 187:21
**baseline** [1] - 187:17
**bases** [1] - 137:7
**basic** [2] - 20:24, 43:9
**basis** [12] - 27:15, 29:1, 33:13, 50:23, 97:15, 106:12, 127:15, 137:2, 163:8, 168:4, 168:7, 184:5
**Bates** [3] - 164:10, 166:13, 170:13
**battalion** [1] - 11:15
**Baylen** [1] - 2:11
**bear** [1] - 84:24
**beaten** [1] - 190:7
**beating** [2] - 188:3, 188:7
**became** [2] - 88:23, 217:10
**become** [8] - 20:7, 48:25, 49:2, 85:20, 86:3, 104:5, 104:15, 195:20
**becomes** [1] - 41:14
**BEFORE** [1] - 1:17
**began** [6] - 97:1, 130:25, 154:19, 173:15, 177:23,

213:17
**Beginning** [1] - 107:22
**beginning** [1] - 178:24
**begins** [1] - 197:23
**begrudge** [1] - 132:18
**begun** [1] - 207:6
**behalf** [5] - 23:18, 141:13, 141:17, 141:21, 147:20
**behavior** [6] - 194:1, 194:8, 196:12, 196:24, 197:2, 197:8
**behaviors** [1] - 47:18
**believes** [1] - 143:23
**below** [15] - 34:10, 41:8, 41:19, 57:5, 64:20, 88:10, 108:4, 108:11, 109:6, 109:17, 110:21, 187:1, 206:2, 214:1
**BENCH** [1] - 1:16
**benefit** [20] - 17:15, 39:4, 44:23, 49:16, 50:23, 66:24, 67:10, 67:13, 69:23, 69:24, 77:16, 87:9, 126:15, 128:23, 139:13, 139:14, 143:15, 144:19, 200:11, 218:2
**benefited** [1] - 36:13
**benefits** [22] - 25:9, 26:11, 38:1, 38:4, 38:9, 38:10, 38:14, 39:5, 39:15, 39:19, 68:16, 72:1, 72:4, 72:10, 86:22, 87:2, 91:21, 126:12, 139:11, 146:24, 217:5, 218:4
**best** [8] - 17:16, 48:2, 72:3, 128:16, 128:22, 141:3, 170:24, 191:6
**Beth** [1] - 12:17
**better** [8] - 12:5, 12:9, 12:10, 18:13, 18:16, 20:16, 92:22, 141:1
**Between** [1] - 211:20
**between** [28] - 10:16, 30:7, 31:21, 44:8, 57:15, 57:22, 61:3, 61:19, 69:19, 69:25, 78:1, 86:22, 95:23, 129:14, 157:1, 157:18, 158:5, 158:7, 161:21, 178:10, 178:24, 187:6, 204:19,

205:2, 211:1, 212:24, 213:9, 213:14
**beyond** [7] - 13:13, 106:20, 126:4, 167:23, 171:5, 198:8, 215:21
**big** [4] - 13:1, 28:2, 110:16, 172:20
**biggest** [5] - 52:1, 113:13, 117:17, 141:19, 192:10
**billion** [3] - 33:9, 198:24
**biofeedback** [1] - 36:8
**bipolar** [1] - 38:20
**Bipolar** [2] - 50:13, 65:18
**birthday** [1] - 14:1
**bit** [24] - 11:14, 13:22, 13:23, 20:17, 21:23, 35:23, 39:17, 40:18, 45:13, 48:13, 54:7, 55:12, 58:17, 68:1, 68:17, 68:18, 71:1, 76:23, 84:23, 155:4, 157:22, 161:9, 175:23, 197:5
**bla** [3] - 161:15
**black** [10] - 41:18, 41:19, 45:7, 48:11, 52:12, 52:14, 52:15, 52:16, 52:19, 81:11
**Blame** [1] - 172:22
**blatantly** [1] - 190:13
**blood** [3] - 107:7, 111:4, 111:11
**blow** [1] - 40:8
**blue** [4] - 185:20, 185:22, 186:6, 187:18
**Blvd** [3] - 4:3, 4:12, 4:14
**Board** [17] - 20:6, 72:24, 97:8, 97:16, 97:20, 98:9, 98:11, 98:24, 100:8, 119:9, 123:4, 124:8, 127:25, 129:1, 129:4, 138:8, 138:9
**board** [47] - 13:10, 13:11, 13:13, 13:14, 13:15, 46:6, 55:22, 55:24, 56:2, 56:17, 56:19, 59:21, 60:9, 60:11, 63:10, 64:1, 64:3, 84:17, 84:25, 85:2, 85:10, 92:12, 96:19, 96:23, 99:8, 99:10, 99:25,

100:18, 102:17, 111:17, 111:18, 117:12, 117:13, 121:5, 121:10, 121:18, 122:5, 123:20, 123:25, 124:13, 125:6, 128:13, 129:7, 129:11, 129:14, 214:15, 214:21
**boards** [9] - 96:12, 96:25, 99:20, 101:2, 102:4, 119:24, 119:25, 121:24
**Boards** [16] - 13:16, 100:21, 100:24, 101:4, 101:15, 101:25, 102:22, 103:1, 103:25, 117:6, 119:5, 120:24, 121:17, 121:20, 122:2, 124:4
**bodies** [3] - 72:21, 121:24, 143:18
**body** [2] - 106:1, 120:15
**boils** [1] - 49:15
**bold** [2] - 63:7, 64:7
**Bonasso** [1] - 5:14
**book** [18] - 81:17, 124:14, 124:19, 124:20, 125:10, 125:21, 158:25, 160:5, 160:10, 218:10, 218:11, 218:14, 218:17, 218:22, 219:1, 219:2, 219:4, 219:6
**borne** [1] - 112:16
**Boston** [5] - 8:13, 10:21, 12:13, 13:1, 21:19
**bottom** [26] - 28:16, 29:20, 61:17, 64:4, 84:19, 84:20, 90:5, 107:23, 108:24, 121:7, 123:18, 143:11, 151:14, 164:12, 167:9, 170:15, 177:12, 196:1, 203:14, 205:25, 206:15, 206:23, 206:24, 209:3, 210:1
**bought** [1] - 206:2
**Boulevard** [1] - 3:15
**bound** [1] - 73:23
**box** [10] - 31:11, 41:18, 41:19, 45:7, 48:11, 52:12, 52:14,

52:15, 52:16, 52:19
**Box** [2] - 5:14, 6:8
**branch** [1] - 115:7
**breaching** [1] - 190:14
**break** [11] - 13:24,
30:16, 30:20, 55:12,
61:18, 64:9, 68:4,
130:5, 130:7,
130:10, 137:18
**breaks** - 30:15
**Bridgeside** [1] - 4:3,
4:12, 4:14
**brief** [2] - 98:1, 135:6
**briefing** [2] - 133:20,
136:4
**briefly** [3] - 10:15,
48:8, 130:1
**briefs** [1] - 134:19,
137:1
**Brigade** [1] - 11:15
**brigade** [1] - 11:16
**Brigham** [13] - 8:12,
10:21, 11:20, 11:21,
12:21, 12:23, 16:5,
16:18, 16:21, 16:22,
16:24, 17:7, 71:10
**bring** [2] - 171:25,
187:11
**brings** [1] - 8:16
**broad** [7] - 14:13,
15:1, 49:8, 49:10,
68:19, 95:12, 105:7
**broader** [9] - 12:24,
66:18, 66:19, 66:21,
97:1, 103:2, 105:4,
210:6, 210:8
**broadly** [3] - 62:21,
62:23, 94:18
**brought** [1] - 29:16
**brutal** [1] - 27:11
**Budd** [1] - 3:14
**build** [1] - 84:15
**building** [1] - 137:19
**bullet** [3] - 33:18,
33:24, 34:3, 34:10,
34:13, 116:23,
125:11, 125:12,
193:11, 193:15,
200:8, 201:20,
201:22
**bullets** [1] - 53:10
**bunch** [1] - 176:8
**Burling** [1] - 5:11
**Business** [2] - 11:1,
11:2
**business** [3] - 11:4,
24:8
**butchering** [1] -
207:23
**buy** [1] - 201:13

**BY** [93] - 8:7, 13:21,
14:4, 25:16, 26:15,
28:6, 28:11, 29:8,
34:19, 40:3, 42:22,
42:25, 46:19, 51:14,
57:2, 58:25, 63:8,
64:6, 68:14, 78:18,
82:12, 82:16, 83:12,
83:21, 85:3, 90:2,
95:25, 96:10, 98:5,
98:21, 101:9,
102:13, 105:14,
108:22, 113:1,
115:24, 118:25,
119:16, 123:2,
125:7, 125:14,
126:21, 127:17,
137:25, 138:6,
140:6, 141:4,
142:18, 144:10,
144:16, 145:8,
145:13, 147:18,
148:19, 151:4,
152:2, 155:19,
158:14, 160:8,
161:17, 162:15,
164:9, 164:22,
168:19, 170:12,
172:2, 173:6,
174:14, 176:10,
177:20, 179:20,
180:8, 180:20,
181:6, 184:19,
185:8, 185:19,
186:21, 187:13,
188:18, 190:11,
191:3, 191:11,
195:15, 197:6,
198:19, 199:6,
201:24, 203:15,
203:17, 211:11,
213:12, 214:20

**C**

**C-II** [1] - 40:12
**CA** [1] - 3:16
**CABELL** [1] - 1:10
**Cabell** [3] - 3:2, 77:22,
171:22
**cabell** [1] - 2:2
**cabinet** [1] - 201:16
**cabinets** [1] - 202:18
**cake** [1] - 14:2
**calculation** [1] - 87:9
**California** [1] - 131:20
**CALLAS** [1] - 6:7
**Cambridge** [2] - 10:4,
26:12
**CAMPBELL** [1] - 6:14

**Cancer** [4] - 14:16,
88:10, 88:15, 90:6
**cancer** [67] - 31:22,
31:24, 31:25, 32:1,
32:2, 32:4, 32:5,
32:13, 32:14, 32:16,
35:2, 69:3, 69:9,
69:11, 70:5, 70:11,
70:14, 70:24, 71:12,
71:13, 71:23, 77:15,
88:23, 90:10, 90:14,
90:19, 90:23, 91:25,
92:15, 92:21, 92:22,
93:6, 93:25, 94:14,
94:15, 94:19, 94:21,
94:22, 95:9, 99:3,
100:1, 100:11,
102:20, 103:4,
103:5, 103:11,
103:12, 122:8,
122:12, 122:13,
124:11, 128:8,
128:9, 139:19,
139:22, 139:24,
143:9, 196:15,
199:19, 199:25,
200:3, 200:9
**candidly** [1] - 136:12
**cannot** [2] - 53:16,
121:13
**capita** [3] - 159:22,
169:8, 169:19
**Capital** [1] - 11:6
**Capitol** [1] - 2:7
**caps** [1] - 45:9
**capture** [2] - 61:13,
201:22
**captured** [1] - 65:13
**car** [1] - 173:24
**cardiac** [2] - 12:3,
12:4
**Cardinal** [3] - 4:16,
5:2, 219:3
**Cardinal's** [1] - 24:2
**cardiologists** [1] -
12:6
**Care** [1] - 197:21
**care** [60] - 8:22, 13:2,
14:6, 14:11, 16:2,
24:16, 27:4, 71:16,
76:2, 76:7, 76:8,
76:17, 77:20, 78:3,
78:12, 78:13, 96:3,
96:15, 97:7, 97:14,
103:14, 105:2,
105:4, 105:7, 111:2,
111:8, 112:1,
112:17, 115:10,
116:13, 116:17,
116:22, 118:6,

118:14, 121:23,
125:22, 129:8,
138:14, 143:24,
144:15, 144:17,
144:24, 146:17,
150:3, 167:19,
167:20, 169:25,
189:8, 189:10,
189:13, 190:13,
190:16, 197:24,
198:8, 202:9,
207:11, 217:9
**cared** [1] - 15:7
**career** [14] - 8:14, 9:2,
10:15, 14:5, 15:7,
15:10, 20:21, 24:11,
27:12, 35:18, 49:6,
50:21, 147:5, 185:2
**carelessness** [1] -
203:7
**Carey** [1] - 4:23
**caring** [1] - 74:3
**carries** [1] - 29:22
**carry** [3] - 37:21,
114:3, 216:15
**cartels** [1] - 218:18
**case** [33] - 9:10, 21:24,
22:10, 22:14, 23:7,
23:15, 24:20, 36:16,
45:21, 51:12, 55:7,
55:23, 66:20, 67:14,
70:25, 71:1, 72:22,
73:20, 75:20, 77:21,
81:19, 90:14, 97:3,
97:6, 100:15,
108:14, 131:11,
133:8, 133:12,
147:21, 168:4,
168:13, 178:17
**case-in-chief** [1] -
81:19
**cases** [23] - 8:22,
23:17, 23:20, 27:2,
27:10, 35:9, 37:12,
47:25, 67:6, 69:17,
71:19, 73:22, 75:2,
131:17, 131:19,
146:18, 146:20,
153:1, 177:14,
177:15, 177:17,
183:18, 217:4
**catch** [2] - 163:12,
163:17
**catch-all** [1] - 163:12,
163:17
**catching** [1] - 170:9
**catchy** [1] - 173:3
**categories** [1] - 57:10
**causal** [1] - 213:18
**causation** [1] - 55:19,

211:2, 213:25
**causes** [3] - 31:7,
128:9, 211:5
**causing** [1] - 211:4,
211:6
**cautious** [1] - 143:8
**cautiously** [2] - 70:18,
71:20
**CDC** [15] - 70:9, 143:2,
143:4, 143:6,
165:22, 165:23,
166:10, 167:6,
170:16, 170:18,
170:22, 175:10,
178:23, 204:23,
206:7
**Center** [4] - 3:12, 5:11,
12:17, 16:20
**Centers** [2] - 140:11,
142:22
**centers** [1] - 13:1
**central** [2] - 32:11,
108:13
**certain** [13] - 18:16,
18:24, 19:1, 28:24,
39:6, 39:14, 52:16,
69:18, 91:6, 138:11,
138:12, 139:23,
170:22
**certainly** [17] - 30:11,
51:19, 77:5, 81:22,
89:23, 97:13,
126:10, 132:18,
133:15, 133:17,
136:5, 136:16,
136:18, 137:2,
139:7, 168:7, 183:7
**certainty** [1] - 25:5
**certificate** [2] - 72:19,
72:25
**certificates** [1] - 89:9
**certification** [2] -
13:14, 72:18
**CERTIFICATION** [1] -
220:1
**certified** [3] - 13:10,
13:11, 13:13
**certify** [1] - 220:4
**cetera** [34] - 16:16,
18:4, 19:1, 27:6,
29:14, 32:20, 33:5,
36:9, 38:21, 42:1,
44:1, 49:19, 51:22,
52:4, 53:7, 57:11,
58:11, 61:8, 65:18,
65:19, 65:21, 70:19,
72:15, 72:19, 72:25,
73:13, 73:15, 75:20,
106:5, 107:7, 183:3,
192:22, 217:22

**cetera)** [1] - 112:2
**Chair** [1] - 26:2
**chair** [2] - 163:13, 163:15
**Chairs** [1] - 16:19
**chairs** [1] - 172:7
**chance** [6] - 155:6, 155:20, 180:23, 181:8, 200:7, 209:24
**change** [12] - 48:25, 49:1, 54:2, 66:6, 76:21, 99:15, 103:6, 165:3, 167:18, 170:2, 175:5, 188:9
**changed** [1] - 76:18
**changes** [8] - 78:3, 78:12, 97:7, 146:6, 160:10, 169:25, 209:4, 217:8
**changing** [4] - 114:25, 115:15, 116:22, 207:11
**chapters** [5] - 108:3, 109:5, 218:14, 218:15, 218:17
**characteristic** [1] - 126:9
**characteristics** [3] - 50:10, 60:24, 61:4
**characterization** [2] - 158:11, 173:5
**characterize** [5] - 32:2, 32:15, 78:23, 139:2, 139:3
**characterizing** [2] - 174:6, 174:9
**charged** [3] - 9:6, 13:2, 22:18
**charges** [1] - 22:18
**CHARLES** [1] - 3:11
**Charleston** [6] - 2:8, 3:13, 4:24, 5:15, 6:9, 7:4
**CHARLESTON** [2] - 1:2, 1:18
**chart** [1] - 174:15
**charts** [1] - 74:24
**Chase** [1] - 4:23
**check** [1] - 19:14
**Chesterbrook** [1] - 6:15
**chief** [1] - 81:19
**Chief** [4] - 8:12, 12:20, 20:8, 140:11
**China** [2] - 71:12
**chiropractic** [1] - 36:6
**Chris** [3] - 7:22, 8:11, 25:8
**Christopher** [1] - 7:13
**CHRISTOPHER** [1] -

7:16
**chronic** [72] - 8:19, 26:24, 27:14, 27:19, 30:4, 30:6, 30:8, 30:11, 30:18, 30:25, 31:15, 31:19, 31:22, 31:24, 31:25, 32:2, 32:4, 32:13, 32:14, 32:16, 32:20, 32:25, 33:9, 33:12, 34:5, 34:7, 68:25, 69:1, 69:3, 69:8, 69:11, 70:5, 70:11, 70:14, 70:23, 77:15, 98:25, 99:1, 99:3, 99:11, 100:1, 102:19, 103:4, 103:11, 103:12, 116:10, 120:16, 120:25, 122:7, 122:12, 124:11, 128:8, 138:12, 139:22, 139:24, 142:24, 143:8, 143:15, 144:19, 180:11, 196:15, 199:18, 199:19, 199:22, 199:25, 200:3, 207:8, 209:6
**Chronic** [1] - 181:13
**circulate** [1] - 180:25
**circumstances** [2] - 70:16, 134:6
**cited** [2] - 183:20, 183:21
**citizenship** [1] - 21:10
**City** [4] - 4:1, 5:11, 147:20, 220:5
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 220:7, 220:8
**civil** [1] - 1:10
**clarify** [2] - 98:23, 147:23
**Clarifying** [1] - 99:5
**class** [1] - 36:24
**classify** [1] - 186:11
**clean** [2] - 96:6, 106:16, 180:18
**cleaned** [1] - 28:3
**clear** [19] - 44:19, 47:10, 47:15, 57:14, 60:8, 81:11, 92:20, 98:16, 100:9, 107:8, 111:14, 112:19, 114:21, 125:1, 126:1, 127:24, 129:5, 186:8, 211:1
**clearly** [3] - 67:9, 100:10, 132:12

**clerk** [1] - 131:24
**CLERK** [3] - 7:11, 7:14, 7:17
**clinic** [3] - 15:9, 27:16, 112:1
**clinical** [8] - 18:9, 18:18, 18:19, 18:21, 67:15, 128:16, 128:21, 128:22
**clinician** [2] - 95:4, 205:11
**clinicians** [17] - 9:8, 17:1, 17:7, 17:12, 40:23, 52:22, 53:7, 72:7, 73:10, 91:18, 91:21, 93:24, 95:9, 146:9, 146:19, 172:19, 180:13
**clock** [1] - 91:3
**close** [3] - 75:25, 133:8, 195:13
**closely** [2] - 52:5, 62:18
**closer** [1] - 86:22
**Closing** [1] - 179:24
**cocaine** [5] - 63:25, 64:1, 65:11, 215:18
**Cochran** [3] - 6:17, 220:2, 220:11
**codeine** [1] - 91:2
**colleague's** [1] - 80:3
**collect** [1] - 152:23
**college** [3] - 9:25, 10:2, 26:12
**College** [1] - 10:1
**colloquy** [1] - 204:19
**colon** [1] - 45:9
**color** [2] - 169:19, 175:8
**column** [6] - 41:23, 48:7, 52:24, 61:16, 208:1
**columns** [1] - 63:13
**combat** [1] - 11:12
**combined** [1] - 11:21
**comfortable** [1] - 44:3
**coming** [6] - 26:23, 78:8, 92:23, 97:4, 117:14, 146:11
**comment** [10] - 12:23, 29:23, 50:24, 54:14, 86:25, 88:19, 97:20, 102:25, 112:4, 142:22
**commentary** [6] - 155:6, 155:7, 156:1, 156:17, 210:9, 210:13
**comments** [2] - 97:16, 173:25

**COMMISSION** [1] - 1:10
**Commission** [5] - 2:2, 3:2, 105:16, 105:21, 147:20
**committed** [1] - 130:24
**Committee** [3] - 16:22, 16:23, 89:6
**committee** [4] - 16:23, 17:2, 17:3, 17:5
**common** [12] - 31:2, 31:15, 32:25, 36:23, 50:24, 50:25, 53:2, 54:14, 109:25, 153:17, 182:24, 193:24
**commonly** [2] - 30:14, 93:18
**communicate** [3] - 148:6, 168:21, 171:2
**communicating** [3] - 47:8, 93:23, 93:24
**community** [16] - 12:25, 21:22, 27:5, 39:7, 67:17, 70:7, 83:14, 114:24, 115:5, 158:21, 159:6, 159:9, 159:10, 183:15, 191:18, 192:6
**companies** [4] - 44:4, 86:12, 86:14, 120:1
**company** [4] - 22:14, 44:8, 184:14, 190:2
**compared** [1] - 200:11
**comparing** [2] - 168:22, 175:6
**compensated** [1] - 23:14
**complete** [9] - 14:13, 73:12, 99:25, 100:12, 109:2, 154:13, 177:8, 181:25, 199:7
**completed** [3] - 11:23, 84:11, 129:23
**completely** [4] - 121:14, 135:8, 189:19, 189:20
**completing** [1] - 11:19
**complicated** [4] - 56:23, 131:15, 134:18, 135:7
**component** [1] - 76:10
**compound** [2] - 158:10, 160:16
**compounding** [1] - 160:16
**Compounding** [1] -

160:18
**Comprehensive** [2] - 16:22, 109:14
**Compton** [13] - 149:1, 150:9, 152:9, 152:11, 155:4, 155:7, 155:13, 155:23, 210:10, 211:12, 211:15, 211:17
**Compton's** [3] - 156:1, 156:11, 156:16
**compulsive** [3] - 45:19, 45:23, 104:19
**computer** [2] - 6:19, 52:2
**computerized** [1] - 51:21
**conceded** [2] - 89:16, 184:24
**concept** [7] - 38:8, 54:8, 76:1, 76:2, 76:24, 103:8, 201:15
**concepts** [3] - 94:16, 147:23, 149:16
**concern** [4] - 86:20, 118:5, 171:6, 180:12
**concerned** [2] - 40:6, 108:8
**concerning** [1] - 170:2
**concerns** [5] - 74:21, 91:17, 118:13, 156:9, 171:7
**conclude** [1] - 66:23
**concluded** [1] - 200:10
**conclusion** [5] - 112:16, 154:10, 158:8, 165:11, 203:24
**conclusions** [3] - 158:24, 165:9, 212:3
**Conclusions** [1] - 209:2
**conclusive** [1] - 201:1
**condition** [14] - 14:21, 26:17, 31:23, 31:24, 38:25, 44:15, 48:18, 48:19, 49:20, 49:21, 50:13, 57:13, 69:21, 69:22
**conditions** [20] - 8:19, 8:20, 14:12, 14:17, 20:16, 26:24, 31:16, 31:19, 31:22, 32:14, 32:19, 32:25, 33:21, 37:18, 38:20, 45:10, 45:12, 47:18, 72:8, 116:11

conduct [2] - 18:7, 202:21
conducted [2] - 58:4, 194:25
conference [3] - 162:20, 168:25, 172:5
conferred [1] - 130:1
confession [1] - 84:18
confident [1] - 148:3
confuse [1] - 104:22
confused [1] - 115:23
confusion [1] - 163:13
connection [1] - 55:5
Connolly [2] - 4:18, 5:4
CONROY [1] - 3:3
consensus [12] - 39:7, 39:11, 39:14, 70:6, 116:2, 116:8, 117:25, 118:3, 118:11, 118:16, 142:10, 144:23
consent [1] - 132:5
consequences [4] - 33:12, 74:11, 99:7, 103:22
conservative [8] - 33:9, 71:6, 71:14, 77:19, 138:20, 139:5, 143:8, 198:22
conservatively [1] - 207:17
consider [4] - 121:11, 123:20, 123:25, 208:17
consideration [4] - 85:13, 111:7, 111:9, 136:5
considered [6] - 35:3, 62:17, 111:1, 111:19, 127:7, 152:25
considering [1] - 121:18
consistent [21] - 33:15, 35:7, 77:23, 78:2, 78:6, 90:12, 97:21, 99:15, 103:13, 132:14, 136:16, 144:4, 170:1, 185:22, 186:23, 199:17, 199:20, 200:14, 200:24, 210:6, 210:8
consistently [1] - 56:12
constipation [1] - 85:16
constraint [1] - 91:16

constraints [2] - 91:8, 91:13
consult [1] - 43:6
contained [2] - 100:2, 192:5
contains [1] - 53:12
content [3] - 43:17, 45:4, 108:11
contents [4] - 40:18, 41:1, 44:5, 114:24
context [4] - 55:6, 148:17, 174:10, 215:6
continue [2] - 106:3, 120:17
continued [5] - 62:18, 118:18, 121:6, 123:15, 138:15
Continued [5] - 3:1, 5:1, 5:6, 6:1, 6:10
continues [1] - 47:16
contracts [1] - 89:8
contraindications [2] - 41:25, 43:15
contrast [1] - 86:17
contributed [2] - 182:6, 215:24
contributing [1] - 21:14
contribution [1] - 182:3
control [4] - 45:21, 45:24, 90:21, 91:25
Control [2] - 140:12, 142:22
controlled [15] - 40:12, 71:19, 72:16, 72:18, 101:19, 102:1, 102:17, 119:22, 122:5, 125:17, 128:14, 192:1, 200:9, 203:20, 205:4
Controlled [2] - 119:4, 120:6
controls [1] - 74:17
Convention [1] - 35:4
conversations [1] - 23:9
Cook [3] - 6:18, 220:3, 220:11
coordinates [1] - 110:3
copy [10] - 40:7, 84:13, 88:9, 110:20, 124:16, 129:18, 176:5, 179:13, 179:14, 180:5
corner [7] - 28:15, 29:20, 40:10, 90:5,

151:14, 192:25, 210:1
corporate [1] - 133:11
cORPORATION [2] - 1:7, 1:13
Corporation [2] - 6:2, 220:7
correct [33] - 12:13, 17:18, 17:19, 95:16, 98:17, 119:10, 127:8, 166:10, 175:21, 176:18, 176:22, 178:8, 185:10, 185:11, 191:15, 191:16, 191:18, 191:19, 192:3, 192:6, 192:7, 193:9, 194:5, 196:21, 196:22, 196:25, 197:17, 197:18, 202:16, 206:12, 207:24, 217:13, 220:4
Correct [11] - 160:25, 166:25, 167:1, 169:10, 169:19, 171:11, 171:20, 175:11, 175:14, 176:19, 176:23
correctly [9] - 53:22, 73:22, 93:9, 117:10, 154:8, 193:21, 194:2, 197:24, 207:23
correlated [1] - 165:18
correlates [2] - 165:4, 166:6
corresponding [1] - 125:8
cost [3] - 33:9, 198:8, 198:22
costs [3] - 27:18, 197:24, 202:25
Costs [1] - 197:20
counsel [5] - 72:3, 84:12, 129:19, 142:8, 151:1
counseling [2] - 47:21, 47:22
count [1] - 19:7
counting [1] - 19:13
countries [5] - 15:4, 71:3, 71:5, 90:17, 91:4
country [4] - 76:24, 77:11, 131:18, 132:22
COUNTY [1] - 1:10
County [5] - 2:2, 3:2, 77:22, 147:20,

171:22
couple [17] - 19:21, 20:18, 25:19, 30:9, 31:13, 65:7, 82:19, 132:16, 136:3, 148:21, 179:9, 184:5, 187:10, 190:21, 191:7, 200:6, 206:14
course [17] - 9:2, 9:22, 10:15, 15:7, 20:21, 24:11, 27:12, 35:17, 45:22, 56:20, 89:21, 94:21, 114:5, 128:15, 179:15, 179:18, 189:14
Court [35] - 6:17, 6:18, 7:3, 7:9, 8:9, 9:23, 25:11, 26:9, 27:22, 30:6, 32:3, 46:16, 56:7, 56:20, 56:23, 61:14, 79:23, 80:11, 124:14, 124:15, 124:23, 130:5, 131:13, 131:19, 133:7, 135:16, 136:19, 136:23, 173:20, 176:13, 179:11, 182:21, 220:2, 220:3
COURT [149] - 1:1, 1:17, 7:6, 7:10, 7:19, 7:24, 8:1, 8:4, 13:20, 14:1, 25:10, 25:14, 26:9, 26:14, 27:25, 28:3, 29:4, 29:6, 40:2, 42:14, 42:24, 46:1, 46:9, 46:15, 51:9, 55:3, 56:3, 56:6, 56:9, 56:22, 68:3, 68:6, 68:12, 78:16, 80:2, 80:20, 81:13, 81:22, 82:7, 82:11, 82:14, 83:18, 89:25, 96:3, 96:7, 97:22, 98:3, 101:8, 102:10, 102:12, 105:13, 107:22, 108:7, 108:16, 108:21, 112:25, 114:18, 114:21, 114:25, 115:12, 115:20, 118:22, 118:24, 119:13, 119:15, 122:18, 122:22, 122:24, 126:20, 127:14, 129:21, 130:6, 130:12, 130:15, 130:18, 130:21, 132:9, 132:25,

133:4, 134:9, 135:17, 135:24, 136:1, 136:17, 137:12, 137:15, 137:23, 140:5, 140:18, 141:1, 142:4, 142:13, 142:16, 144:2, 144:7, 144:13, 145:6, 147:16, 148:12, 148:15, 150:15, 150:19, 158:12, 160:1, 161:6, 161:11, 161:14, 163:3, 163:7, 163:16, 163:19, 164:19, 167:24, 168:16, 169:22, 170:6, 170:10, 174:11, 176:3, 177:16, 179:14, 180:19, 181:5, 184:18, 184:23, 185:5, 186:4, 186:15, 188:2, 188:6, 188:10, 188:15, 188:22, 189:22, 190:6, 190:20, 190:22, 191:1, 198:9, 198:11, 198:16, 199:4, 213:5, 213:11, 219:8, 219:10, 219:13, 219:15, 219:18
court [5] - 19:14, 48:18, 130:25, 137:20, 201:15
Court's [1] - 131:2
COURTROOM [3] - 7:11, 7:14, 7:17
courtroom [4] - 136:21, 144:1, 161:18, 186:10
cover [3] - 54:5, 107:25, 200:7
covered [1] - 187:25
covering [2] - 90:16, 146:1
covers [1] - 157:23
Covington [1] - 5:11
crack [4] - 63:25, 64:2, 65:10, 215:18
crash [1] - 173:24
craving [1] - 45:20
cravings [1] - 104:19
create [1] - 163:10
created [2] - 164:11, 176:2

**creating** [1] - 17:5
**crest** [1] - 88:11
**criminal** [3] - 22:10, 22:18, 74:16
**Crisis** [1] - 172:23
**critic** [1] - 86:13
**critical** [2] - 111:12, 113:23
**critically** [1] - 116:11
**Crohn's** [1] - 32:20
**cross** [15] - 48:15, 69:4, 96:6, 96:8, 130:8, 133:15, 147:16, 164:19, 168:5, 168:8, 168:14, 169:24, 170:4, 189:19, 199:12
**CROSS** [3] - 25:15, 147:17, 191:2
**cross-examination** [4] - 164:19, 168:5, 169:24, 170:4
**cross-examinations** [2] - 133:15, 168:14
**cross-examine** [3] - 147:16, 168:8, 189:19
**cross-reference** [1] - 48:15
**CRR** [2] - 6:17, 6:18
**crystalize** [1] - 147:23
**cull** [7] - 93:12, 103:19, 122:4, 125:11, 125:12, 203:15, 204:10
**culled** [1] - 209:9
**curious** [2] - 26:12, 142:7
**current** [5] - 128:16, 128:22, 140:2, 154:21, 201:25
**custom** [1] - 160:19
**CV** [2] - 12:11, 20:25
**Cymbalta** [1] - 37:5

**D**

**daily** [2] - 27:15, 34:16
**Dan** [3] - 180:22, 181:3
**Dana** [1] - 14:16
**Dana-Farber** [1] - 14:16
**dangerous** [1] - 37:16
**dark** [3] - 166:17, 166:18
**darker** [2] - 169:19, 175:8
**dash** [2] - 34:4, 34:15

**data** [63] - 27:17, 27:21, 29:13, 31:13, 31:14, 58:2, 58:5, 58:7, 60:16, 60:18, 61:2, 62:16, 62:18, 63:17, 64:12, 65:7, 65:9, 65:10, 65:13, 66:16, 68:1, 68:19, 68:24, 69:1, 69:14, 69:15, 83:22, 83:23, 90:22, 91:4, 150:20, 152:21, 152:23, 153:4, 183:23, 184:1, 184:25, 185:1, 185:3, 185:12, 186:4, 186:5, 186:6, 186:12, 186:13, 187:21, 188:20, 189:4, 189:6, 189:25, 194:25, 199:18, 201:1, 201:13, 205:16, 205:20, 206:5, 206:8, 207:16, 210:6, 210:8
**dataset** [1] - 61:14
**date** [4] - 95:23, 120:13, 136:25, 140:9
**Date** [1] - 220:16
**dated** [3] - 78:23, 101:15, 127:2
**Daubert** [1] - 131:22
**daughter's** [2] - 132:19, 134:10
**DAVID** [2] - 1:17, 4:5
**David** [1] - 7:1
**days** [5] - 15:8, 15:11, 34:12, 132:1, 197:14
**DC** [6] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12
**De** [2] - 2:4, 2:14
**DEA** [9] - 72:18, 72:25, 114:2, 116:18, 117:13, 117:18, 120:10, 203:12, 204:6
**Deaconess** [1] - 12:17
**deadlines** [1] - 131:22
**deadly** [1] - 47:14
**dealer** [1] - 22:12
**dealing** [2] - 11:17, 147:10
**deals** [1] - 42:11
**dealt** [2] - 163:22
**death** [10] - 47:7, 53:21, 53:23, 116:11, 167:12, 171:9, 171:12,

171:15, 171:18, 217:23
**Deaths** [3] - 164:24, 166:25, 167:22
**deaths** [21] - 165:7, 165:12, 166:19, 166:21, 167:15, 168:23, 169:2, 169:5, 169:10, 169:13, 169:14, 171:5, 171:6, 171:21, 173:22, 173:24, 175:6, 175:16, 177:12, 181:22
**debate** [1] - 161:18
**Deborah** [1] - 143:25
**decade** [2] - 18:7, 145:17
**decades** [2] - 76:18, 217:20
**decide** [1] - 10:8
**decided** [2] - 10:13, 136:25
**deciding** [3] - 9:15, 20:14, 37:22
**decision** [9] - 9:12, 9:13, 17:17, 43:24, 49:17, 72:20, 75:16, 100:13, 146:5
**decision-makers** [1] - 146:5
**decisions** [9] - 17:17, 73:3, 73:19, 73:21, 74:9, 75:1, 146:13, 146:23, 147:3
**deck** [7] - 162:11, 162:19, 165:16, 166:14, 168:9, 172:9, 172:13
**decline** [1] - 185:24
**decrease** [1] - 146:3
**decreased** [2] - 33:1, 213:23
**dedicate** [1] - 8:14
**deeds** [1] - 203:7
**DEF-WV-2331** [1] - 55:1
**DEF-WV-2646** [1] - 211:16
**Defendant** [4] - 4:16, 5:2, 5:7, 6:2
**Defendants** [3] - 1:8, 1:14, 220:7
**defendants** [12] - 55:25, 56:16, 56:18, 80:4, 115:4, 130:25, 132:25, 135:4, 135:19, 136:9, 168:6, 198:14

**defending** [1] - 179:19
**defense** [3] - 22:19, 22:21, 23:12
**Defense** [17] - 20:10, 20:13, 88:9, 89:3, 101:10, 102:9, 103:17, 119:1, 121:7, 126:23, 126:24, 127:1, 127:6, 127:18, 129:12, 129:13, 140:8
**DEFENSE** [1] - 7:16
**deferring** [1] - 134:20
**deficient** [1] - 110:15
**define** [1] - 150:13
**defined** [4] - 14:17, 30:5, 89:22, 123:12
**defines** [2] - 57:5, 63:21
**definitely** [3] - 135:15, 153:20, 174:16
**definition** [4] - 30:18, 66:13, 87:8, 149:24
**definitions** [1] - 89:20
**degree** [4] - 10:5, 25:5, 34:25
**delay** [1] - 133:16
**delivery** [1] - 218:19
**demand** [1] - 91:2
**demographic** [4] - 50:15, 60:23, 65:19, 73:13
**demonstrable** [1] - 128:23
**demonstrate** [3] - 169:7, 171:3, 188:8
**Demonstrative** [2] - 137:22, 138:5
**demonstrative** [3] - 84:12, 95:22, 129:19
**denied** [3] - 124:25, 189:14, 203:7
**Department** [4] - 20:10, 20:12, 21:14, 22:9
**department** [5] - 21:15, 22:22, 22:23, 22:24, 171:13
**departure** [4] - 121:12, 121:19, 123:21, 124:1
**dependence** [6] - 92:3, 92:4, 103:22, 104:10, 104:23, 212:9
**dependent** [3] - 104:6, 133:14, 171:16
**depict** [1] - 171:9
**depiction** [2] - 154:10,

156:1
**depicts** [1] - 176:2
**depression** [1] - 85:17
**depriving** [1] - 91:14
**depth** [1] - 24:3
**Deputy** [1] - 79:14
**DEPUTY** [3] - 7:11, 7:14, 7:17
**derive** [1] - 200:21
**describe** [7] - 32:3, 165:14, 166:13, 171:1, 173:20, 174:15, 176:11
**described** [4] - 11:19, 99:9, 118:11, 119:12
**describes** [2] - 157:10, 168:10
**description** [4] - 14:7, 14:9, 41:22, 157:4
**descriptive** [1] - 166:23
**deserve** [2] - 118:7, 135:15
**deserves** [1] - 135:17
**design** [1] - 183:18
**despite** [1] - 67:4
**destroying** [2] - 87:11, 87:20
**destructive** [2] - 45:20, 45:24
**detail** [3] - 13:23, 73:5, 157:22
**details** [2] - 22:6, 73:20
**determination** [3] - 48:3, 75:20, 75:21
**determine** [1] - 75:15
**determined** [1] - 200:12
**determining** [3] - 9:18, 44:25, 147:11
**devastating** [1] - 104:22
**develop** [6] - 12:9, 47:11, 51:23, 52:7, 196:18
**developed** [8] - 48:25, 49:2, 51:3, 51:5, 90:17, 196:12, 196:21, 196:23
**developing** [8] - 12:6, 38:17, 38:18, 69:20, 91:4, 103:15, 104:22, 104:24
**development** [1] - 47:18
**developments** [1] - 23:22
**develops** [1] - 45:19
**diagnosis** [1] - 121:15

**diagram** [3] - 93:11, 93:13, 93:14
**didactic** [1] - 75:3
**differ** [1] - 29:20
**difference** [5] - 30:7, 69:19, 69:24, 81:10, 211:1
**different** [35] - 10:14, 11:17, 12:13, 13:3, 20:8, 23:17, 23:20, 33:21, 36:5, 39:22, 41:20, 42:5, 42:7, 43:7, 43:12, 43:13, 61:8, 61:13, 93:21, 101:2, 107:19, 113:6, 131:7, 137:7, 145:4, 157:22, 165:21, 175:24, 187:8, 192:19, 192:20, 193:12, 216:1, 216:8
**differentiate** [1] - 31:21
**dire** [3] - 25:13, 97:12, 183:12
**DIRECT** [1] - 8:6
**direct** [10] - 130:7, 161:20, 161:23, 167:18, 167:23, 169:10, 198:8, 199:17, 200:14, 200:24
**directed** [3] - 41:6, 132:14, 133:20
**direction** [1] - 158:1
**directions** [1] - 146:6
**directly** [3] - 24:14, 27:13, 187:23
**Director** [2] - 16:20, 71:11
**disability** [1] - 31:3
**disabling** [1] - 67:7
**disagree** [1] - 168:1
**disciplinary** [6] - 99:8, 99:24, 100:15, 100:17, 128:12, 129:6
**discipline** [3] - 8:15, 99:21, 129:9
**discomfort** [1] - 90:21
**discount** [1] - 72:14
**discovery** [1] - 133:10
**discretion** [1] - 56:20
**discuss** [2] - 133:17, 136:8
**discussed** [7] - 87:3, 88:4, 141:19, 197:8, 214:9, 215:21, 215:23
**discusses** [1] - 193:15

**discussion** [9] - 44:8, 70:25, 71:1, 105:4, 105:7, 117:25, 156:24, 218:23, 218:25
**Discussion** [1] - 204:17
**discussions** [2] - 24:15, 90:13
**disease** [1] - 32:20
**Disease** [2] - 140:11, 142:22
**Disorder** [2] - 50:14, 65:18
**disorder** [3] - 177:22, 179:24, 180:2
**Disorders** [1] - 193:24
**dispense** [2] - 192:1, 203:20
**dispensing** [1] - 128:13
**display** [1] - 56:13
**displayed** [1] - 56:12
**displaying** [2] - 46:5, 55:22, 56:10
**dispositive** [1] - 131:22
**disproportionate** [2] - 85:18, 86:1
**dispute** [5] - 82:10, 154:25, 155:2, 156:12, 156:14
**disputed** [1] - 159:8
**distinct** [2] - 32:4, 37:21
**distinction** [2] - 30:13, 95:23
**distinguish** [1] - 178:10
**distribute** [2] - 191:25, 203:19
**distributed** [2] - 119:24, 160:11
**Distribution** [2] - 60:20, 61:7
**distributor** [1] - 147:7
**distributors** [18] - 9:14, 24:7, 45:4, 74:5, 95:17, 95:19, 146:22, 147:2, 147:9, 147:11, 202:22, 209:19, 218:5, 218:7, 218:23, 218:24, 218:25, 219:5
**District** [2] - 7:2, 7:3
**DISTRICT** [3] - 1:1, 1:1, 1:17
**dive** [4] - 9:21, 13:22, 52:10, 97:4

**diversion** [8] - 125:17, 125:25, 126:5, 159:15, 159:23, 181:19, 195:19, 201:15
**diverted** [9] - 159:14, 178:13, 181:17, 182:13, 182:22, 182:24, 183:10, 206:19, 207:3
**divide** [2] - 32:1, 132:21
**diving** [2] - 22:6, 42:2
**Division** [1] - 8:12
**Doctor** [4] - 40:4, 183:11, 190:12, 200:1
**doctor** [32] - 8:16, 10:11, 11:5, 11:15, 22:10, 22:11, 24:6, 30:7, 38:1, 42:9, 44:14, 48:4, 73:10, 82:20, 92:18, 96:18, 96:22, 100:9, 100:14, 114:10, 124:17, 125:22, 126:14, 182:24, 183:7, 183:25, 185:9, 186:7, 187:21, 190:13, 205:11, 216:14
**doctor's** [1] - 52:14
**doctors** [70] - 9:8, 9:15, 9:19, 13:14, 17:6, 26:5, 31:6, 45:2, 46:13, 47:9, 47:10, 47:21, 47:22, 52:18, 53:7, 67:3, 67:3, 69:10, 69:14, 72:7, 74:12, 74:18, 76:9, 85:25, 92:2, 92:17, 93:24, 112:15, 112:21, 113:14, 115:8, 115:11, 117:18, 120:25, 121:21, 122:2, 125:9, 126:2, 126:3, 129:2, 141:20, 142:11, 143:7, 146:23, 147:10, 165:17, 168:24, 169:1, 169:12, 169:15, 172:19, 182:22, 185:13, 189:1, 189:4, 189:9, 189:15, 190:15, 190:24, 202:6, 202:9, 205:10, 216:18, 216:21, 216:25,

217:10, 217:13, 217:16, 217:20
**doctors'** [1] - 147:2
**document** [100] - 27:22, 28:8, 28:15, 28:17, 29:21, 34:17, 39:22, 40:7, 40:19, 46:3, 54:6, 55:22, 64:5, 79:9, 79:16, 80:5, 80:13, 80:16, 82:5, 88:8, 88:10, 88:17, 88:19, 88:21, 88:22, 89:11, 89:15, 89:24, 90:4, 91:24, 92:25, 98:15, 99:9, 101:20, 101:23, 101:24, 102:2, 102:3, 102:7, 102:15, 105:15, 105:18, 105:21, 107:13, 107:15, 107:19, 107:21, 107:24, 107:25, 108:5, 108:11, 108:12, 108:23, 109:3, 109:23, 116:7, 116:19, 117:20, 117:24, 122:10, 122:14, 122:16, 123:9, 123:20, 124:22, 126:23, 126:24, 127:6, 127:10, 128:4, 140:1, 140:9, 140:21, 141:9, 141:13, 142:3, 142:8, 143:10, 144:5, 144:9, 144:25, 151:14, 162:16, 162:21, 162:23, 163:12, 163:14, 170:20, 184:8, 192:8, 192:9, 197:17, 198:14, 202:24, 203:11, 205:15, 205:20, 211:10
**Document** [1] - 191:13
**documentation** [2] - 99:25, 100:12
**documented** [1] - 128:22
**documents** [31] - 24:1, 24:2, 24:4, 28:2, 28:3, 54:1, 55:23, 56:2, 56:10, 56:13, 56:17, 56:19, 56:24, 78:11, 80:12, 85:11, 89:3, 89:16,

91:18, 97:8, 97:20, 101:1, 108:14, 110:20, 126:18, 127:25, 129:12, 170:19, 179:18, 204:21
**dollars** [2] - 198:24, 198:25
**done** [22] - 10:14, 20:22, 24:3, 74:10, 76:14, 84:14, 130:2, 130:3, 132:5, 132:22, 133:4, 133:5, 133:25, 134:3, 134:22, 137:1, 147:6, 171:21, 186:16, 198:11, 198:17, 219:15
**dosage** [1] - 185:21
**dose** [7] - 43:25, 53:21, 104:4, 104:12, 104:14, 104:17, 217:7
**doses** [5] - 70:19, 100:2, 100:11, 143:16, 144:20
**Douglas** [1] - 4:23
**Dowell** [1] - 143:25
**down** [48] - 28:13, 33:20, 41:19, 45:13, 48:12, 49:15, 55:12, 57:5, 58:1, 58:16, 58:20, 61:17, 62:22, 62:23, 68:8, 77:12, 78:2, 78:9, 79:3, 84:22, 85:12, 99:19, 111:24, 113:8, 113:16, 116:2, 123:8, 123:18, 128:11, 133:16, 138:23, 143:10, 146:11, 156:5, 161:3, 170:14, 172:8, 181:7, 182:12, 184:16, 186:6, 194:20, 196:1, 201:7, 206:15, 206:24, 207:1, 211:9
**dozen** [3] - 19:7, 19:11, 19:13
**Dr** [63] - 8:8, 20:17, 25:8, 25:17, 26:9, 26:16, 28:7, 43:1, 56:17, 68:8, 68:15, 70:25, 86:10, 87:3, 88:5, 98:12, 109:2, 124:14, 124:19, 133:16, 137:16,

137:19, 137:24,
138:1, 142:14,
143:22, 147:15,
148:13, 150:21,
155:4, 155:7,
155:13, 155:23,
156:1, 156:11,
156:16, 158:15,
160:2, 162:7,
162:16, 163:23,
164:10, 164:23,
180:22, 184:10,
184:14, 184:20,
184:24, 185:2,
185:9, 186:19,
187:14, 187:15,
189:5, 191:4,
191:12, 191:13,
192:8, 198:20,
199:10, 205:1,
219:7, 219:10
**dr** [1] - 192:11
**DR** [1] - 7:16
**drafting** [1] - 140:23
**drastically** [1] - 86:21
**draw** [4] - 151:8,
151:9, 165:9, 165:11
**drawing** [1] - 65:23
**Dreamland** [9] -
158:25, 159:2,
160:6, 160:10,
160:21, 161:1,
161:14, 218:10,
218:11
**drew** [1] - 214:21
**drink** [1] - 194:14
**drinking** [1] - 51:10
**Drive** [1] - 6:15
**driven** [6] - 138:24,
145:3, 146:12,
212:24, 213:14,
213:23
**drivers** [2] - 214:5,
214:12
**drop** [1] - 159:9
**drove** [2] - 146:5,
146:22
**drowsiness** [1] -
85:15
**drug** [28] - 22:12, 47:2,
58:11, 60:24, 63:14,
64:9, 64:10, 64:14,
64:15, 64:23, 65:5,
86:12, 91:2, 118:2,
145:15, 165:7,
166:19, 173:22,
175:5, 191:21,
191:24, 196:12,
196:23, 197:2,
202:14, 203:23,

216:9, 218:18
**Drug** [14] - 6:2, 58:3,
93:3, 113:3, 113:17,
114:4, 114:13,
117:19, 120:4,
167:12, 181:15,
191:14, 202:11,
220:7
**DRUG** [2] - 1:7, 1:13
**drug-related** [3] -
196:12, 196:23,
197:2
**drugs** [20] - 63:21,
63:24, 64:2, 65:10,
65:11, 66:4, 91:8,
93:5, 145:16,
154:17, 181:21,
182:8, 200:21,
201:11, 202:18,
203:5, 205:22,
215:3, 215:11,
215:18
**Drugs** [1] - 35:5
**due** [12] - 33:2,
102:19, 102:20,
103:3, 103:4,
103:11, 103:12,
122:7, 122:8,
124:10, 124:11,
128:8
**during** [12] - 10:25,
55:22, 56:13, 81:19,
95:11, 95:14, 111:3,
133:10, 146:16,
168:13, 172:17
**dying** [1] - 71:23

**E**

**e.g** [1] - 91:1
**early** [1] - 156:10
**ease** [2] - 57:4, 149:25
**easiest** [1] - 60:18
**East** [3] - 3:5, 3:12,
4:24
**economic** [1] - 33:12
**Editor** [2] - 20:7, 79:14
**editor** [3] - 87:25,
180:23, 181:3
**editorial** [7] - 20:5,
79:4, 79:7, 79:10,
83:10, 87:25, 155:5
**Editorial** [1] - 20:6
**educate** [1] - 150:2
**educating** [1] - 16:25
**education** [4] - 9:11,
72:8, 73:1, 75:3
**Education** [4] - 16:23,
194:22, 200:17,
203:3

**educational** [1] -
162:23
**effect** [14] - 46:13,
92:3, 104:15,
110:16, 112:12,
143:4, 147:25,
148:5, 148:9,
148:16, 155:25,
161:19, 162:2,
216:23
**Effective** [1] - 116:12
**effective** [5] - 67:18,
68:22, 91:14, 93:9,
117:8
**effectively** [4] - 71:18,
71:24, 83:25, 85:7
**Effectiveness** [3] -
193:1, 193:4, 199:11
**effectiveness** [4] -
193:7, 193:12,
199:13, 200:10
**effects** [11] - 37:14,
37:21, 69:8, 77:7,
85:14, 86:18, 86:21,
110:1, 139:8, 171:4
**efficacy** [1] - 207:16
**effort** [1] - 23:25
**efforts** [1] - 67:16
**Eighth** [1] - 3:10
**either** [5] - 130:13,
131:6, 175:22,
178:11
**element** [1] - 12:7
**eliminate** [1] - 161:18
**elimination** [1] - 41:24
**ELIZABETH** [1] - 6:14
**embrace** [2] - 108:8,
161:19
**emergency** [5] -
11:21, 11:23, 13:11,
171:13
**eminently** [1] - 97:19
**emphasis** [6] - 76:23,
76:25, 77:9, 77:13,
77:18, 203:4
**emphasize** [2] - 52:22,
90:17
**Encino** [1] - 3:16
**encounter** [2] - 51:25,
93:25
**encouraging** [1] -
103:7
**end** [14] - 60:1, 67:13,
86:6, 87:1, 87:10,
98:10, 103:20,
134:3, 134:25,
136:18, 151:21,
153:2, 195:13, 201:8
**ended** [1] - 131:1
**endorsed** [3] - 120:4,

120:9, 155:7
**endorsing** [3] -
113:15, 114:8,
114:14
**endure** [2] - 87:12,
87:21
**Enforcement** [7] -
113:4, 113:17,
114:4, 114:13,
117:19, 120:5,
191:15
**enforcement** [4] -
114:7, 114:12,
118:4, 118:12
**engage** [1] - 212:15
**engaged** [4] - 62:8,
66:11, 66:13, 154:15
**England** [15] - 10:4,
19:22, 20:3, 78:20,
78:24, 79:12, 79:14,
80:23, 85:5, 88:1,
88:3, 149:2, 180:21,
181:12, 211:17
**enjoys** [1] - 219:18
**enormous** [1] - 177:3
**entails** [2] - 16:8, 22:7
**entering** [1] - 140:24
**entire** [3] - 15:2,
116:18, 134:16
**entirely** [1] - 205:10
**entirety** [1] - 56:18
**entitled** [4] - 28:12,
60:20, 88:10, 149:9
**entity** [2] - 73:8,
105:20
**ENU** [1] - 4:17
**epidemic** [5] - 145:3,
168:9, 168:10,
180:12, 181:22
**equity** [1] - 131:14
**erase** [1] - 13:25
**erroneously** [1] -
203:23
**especially** [5] - 19:14,
133:11, 135:2,
193:8, 199:13
**essence** [1] - 73:21
**essential** [8] - 87:13,
87:23, 102:18,
103:3, 122:6, 124:9,
128:6, 138:11
**essentially** [17] - 8:24,
17:13, 22:12, 27:7,
37:25, 38:4, 45:20,
48:10, 48:20, 48:21,
57:10, 67:23, 91:20,
103:7, 143:7,
160:19, 194:16
**establish** [2] - 95:23,
161:9

**established** [5] -
80:15, 82:6, 97:23,
116:25, 117:4
**establishing** [1] -
120:14
**estimate** [4] - 15:6,
33:9, 33:12, 198:22
**estimates** [2] - 31:18,
33:11
**et** [39] - 1:7, 1:13,
16:16, 18:4, 18:25,
27:6, 29:14, 32:20,
33:5, 36:9, 38:21,
42:1, 44:1, 49:19,
51:22, 52:4, 53:7,
57:11, 58:11, 61:8,
65:18, 65:19, 65:21,
70:19, 72:14, 72:19,
72:25, 73:13, 73:15,
75:19, 106:5, 107:7,
112:2, 183:3,
192:22, 217:21,
220:6, 220:7
**ethical** [4] - 35:15,
35:20, 73:24, 74:3
**euphoria** [1] - 46:25
**evaluate** [5] - 16:13,
18:3, 18:13, 20:12,
20:15
**evaluation** [1] - 45:11
**event** [2] - 131:25,
172:20
**events** [1] - 202:18
**Evidence** [1] - 89:21
**evidence** [30] - 27:23,
29:2, 46:4, 46:7,
55:24, 77:21, 77:25,
79:17, 79:20, 80:8,
89:2, 98:8, 98:15,
107:16, 108:14,
114:16, 119:11,
120:16, 122:16,
122:19, 124:14,
124:15, 125:1,
126:24, 126:25,
133:10, 136:2,
140:17, 164:1, 190:5
**evolution** [2] - 105:6,
175:2
**evolve** [1] - 138:15
**exact** [1] - 200:2
**exactly** [10] - 53:19,
61:5, 107:13,
132:13, 149:23,
165:25, 191:5,
199:20, 208:20,
216:10
**exaggerating** [2] -
77:1, 87:6
**exaggeration** [1] -

91:16
exam [6] - 9:9, 9:22, 73:11, 75:18, 198:8, 200:25
examination [7] - 13:15, 164:19, 167:18, 168:5, 169:24, 170:4, 199:12
EXAMINATION [5] - 8:6, 25:15, 147:17, 191:2, 199:5
examinations [2] - 133:15, 168:14
examine [4] - 147:16, 156:25, 168:8, 189:19
examining [3] - 9:10, 73:13, 187:20
example [17] - 14:20, 37:8, 41:4, 54:17, 54:25, 70:9, 71:23, 74:23, 77:15, 96:20, 100:19, 111:21, 133:22, 194:13, 208:20, 211:7, 211:23
examples [12] - 19:21, 36:4, 74:15, 89:17, 105:5, 105:6, 108:2, 108:10, 109:5, 110:23, 111:17, 112:5
exceeded [1] - 189:9
Excellence [1] - 21:11
excellent [1] - 37:11
except [1] - 125:1
exception [10] - 80:5, 81:11, 82:3, 89:4, 89:11, 102:7, 163:19, 190:17
excess [1] - 189:1
excuse [3] - 198:24, 199:24, 219:10
Executive [1] - 16:22
executives [1] - 22:17
exercise [3] - 27:6, 35:14, 75:22
exercising [1] - 134:20
exhibit [3] - 80:9, 108:13, 137:20
exist [1] - 161:20
expanding [1] - 48:10
expect [3] - 76:9, 159:10, 159:22, 171:9, 171:12, 171:15, 171:18, 216:18
expectancy [1] - 32:8

expectation [1] - 107:10
expected [4] - 34:8, 76:12, 76:14, 100:14
expenditures [1] - 33:19
expensive [1] - 178:2
experience [31] - 9:14, 11:5, 26:20, 29:24, 32:24, 44:7, 44:11, 45:3, 48:24, 49:1, 49:22, 50:1, 50:21, 52:21, 54:9, 65:8, 65:24, 71:4, 71:9, 71:15, 74:17, 87:17, 97:18, 97:19, 109:25, 146:10, 147:9, 153:19, 212:17, 216:14
experiences [1] - 200:25
expert [20] - 21:24, 22:3, 22:8, 22:21, 22:23, 22:25, 23:7, 23:11, 24:6, 24:7, 25:8, 26:10, 33:8, 42:9, 43:2, 97:4, 97:13, 140:20, 183:22, 186:17
expert's [1] - 127:7
expertise [2] - 42:15, 97:22, 147:22
experts [4] - 29:16, 35:12, 81:3, 127:12
explain [2] - 69:13, 103:24
explaining [1] - 170:7
explains [1] - 109:24
explanation [2] - 53:1, 110:22
exposes [1] - 47:5
exposure [2] - 150:12, 152:4
expressed [6] - 39:5, 70:3, 83:5, 83:13, 85:24, 91:13
expression [1] - 80:13
extent [8] - 39:1, 39:2, 79:20, 80:4, 132:5, 137:4, 137:9, 170:3
extravagant [1] - 86:20
extremely [5] - 49:20, 52:6, 106:6, 107:5, 112:12

F

FABER [1] - 1:17
Faber [1] - 7:2

facilitate [2] - 45:8, 136:5
facing [1] - 145:3
fact [11] - 39:11, 55:18, 77:14, 97:15, 97:17, 104:11, 116:7, 133:6, 159:7, 178:11, 183:10
factor [4] - 49:17, 85:18, 182:11, 209:1
factors [24] - 38:24, 50:15, 65:12, 65:15, 65:16, 65:19, 65:21, 66:4, 66:5, 66:10, 160:12, 160:16, 161:25, 162:4, 162:5, 182:6, 182:8, 182:9, 207:22, 207:25, 208:16, 208:20, 215:21, 215:25
facts [3] - 116:3, 116:4, 118:1
factual [1] - 137:7
faculty [2] - 17:22, 17:24
failed [1] - 121:22
fair [14] - 121:2, 150:18, 152:10, 152:18, 154:10, 154:11, 155:25, 156:3, 156:21, 165:20, 171:8, 177:21, 200:6, 217:12
fairly [1] - 129:5
faith [4] - 146:13, 168:4, 168:7, 184:5
fall [2] - 67:13, 178:24
falls [1] - 163:11
familiar [38] - 27:17, 28:17, 33:10, 39:21, 40:15, 58:7, 68:2, 70:9, 76:2, 78:20, 79:6, 84:4, 85:24, 88:16, 90:22, 93:14, 95:1, 96:12, 100:20, 101:3, 101:20, 102:21, 105:18, 105:20, 124:18, 124:20, 140:14, 148:1, 148:3, 148:23, 149:2, 149:5, 149:13, 151:15, 175:2, 183:23, 214:8
families [3] - 8:23, 41:7, 136:15
family [14] - 10:11, 11:7, 27:4, 38:20,

50:12, 53:6, 53:9, 65:17, 182:19, 183:1, 183:2, 208:24, 215:23
fantastic [1] - 173:10
far [7] - 23:18, 61:16, 71:13, 136:6, 142:5, 189:1
Farber [1] - 14:16
FARRELL [93] - 2:3, 25:12, 25:16, 26:7, 29:5, 42:8, 42:17, 79:18, 80:17, 80:21, 81:14, 83:7, 95:21, 96:5, 97:11, 102:11, 115:3, 115:19, 115:22, 130:9, 140:19, 141:24, 143:20, 147:18, 148:19, 150:24, 151:4, 151:25, 152:2, 155:18, 155:19, 158:14, 160:8, 161:8, 161:13, 161:17, 162:12, 162:15, 163:1, 163:10, 163:18, 163:20, 164:7, 164:9, 164:22, 168:1, 168:18, 168:19, 170:5, 170:9, 170:11, 170:12, 171:25, 172:2, 173:6, 174:13, 174:14, 176:6, 176:8, 176:10, 177:20, 179:15, 179:20, 180:6, 180:8, 180:17, 180:20, 181:4, 181:6, 184:19, 185:6, 185:16, 185:18, 185:19, 186:5, 186:14, 186:17, 186:21, 187:11, 187:13, 187:23, 188:5, 188:7, 188:13, 188:17, 188:18, 188:24, 189:7, 190:10, 190:11, 190:19, 213:1, 219:9
Farrell [26] - 2:4, 2:13, 80:20, 96:4, 115:12, 115:21, 130:1, 130:3, 147:20, 158:13, 161:7, 163:8, 163:17, 164:21, 167:25,

168:7, 168:17, 174:12, 185:7, 186:15, 188:3, 188:16, 188:23, 189:11, 189:16, 204:20
Farrell's [1] - 102:8
fashion [2] - 112:22, 129:10
fatal [1] - 49:21
father [1] - 10:11
favor [1] - 170:7
FBI [1] - 22:10
FCRR [1] - 6:18
FDA [11] - 39:11, 39:13, 42:20, 43:2, 43:18, 43:19, 44:2, 44:9, 44:15, 52:16, 95:14
FDA's [1] - 95:1
fear [10] - 85:19, 86:1, 99:7, 99:24, 100:15, 114:11, 128:12, 129:6, 129:9, 203:25
feasible [1] - 133:20
Federal [1] - 144:21
federal [4] - 33:19, 115:8, 120:1, 143:17
Federation [17] - 100:20, 100:23, 101:4, 101:15, 101:24, 102:22, 103:1, 103:25, 117:5, 119:4, 119:8, 120:24, 121:16, 121:20, 122:1, 124:3, 127:25
fellows [6] - 13:4, 16:4, 16:13, 18:1, 187:3, 187:6
fellows' [1] - 187:8
Fellowship [1] - 21:11
fellowship [6] - 11:25, 12:12, 12:14, 15:13, 16:3, 21:16
felt [1] - 107:9
fentanyl [8] - 145:17, 145:22, 145:23, 177:4, 177:19, 215:11
Few [1] - 82:20
few [14] - 20:24, 22:20, 33:2, 34:17, 38:15, 42:2, 74:12, 77:8, 102:7, 132:1, 145:24, 169:21, 177:8, 199:8
fictional [1] - 159:8
field [20] - 18:3, 19:23, 20:13, 23:22, 26:10,

12

29:16, 35:8, 42:15,
49:9, 49:11, 67:23,
72:21, 76:11,
149:19, 149:22,
150:5, 152:16,
155:24, 157:13,
167:19
**fields** [3] - 13:3, 76:9,
89:1
**fierce** [1] - 86:13
**fifth** [5] - 107:3, 107:8,
111:1, 111:13,
111:19
**figure** [3] - 59:7,
59:16, 88:6
**figuring** [1] - 84:19
**file** [4] - 132:2, 132:14,
133:1, 134:18
**filed** [5] - 131:1,
132:12, 132:25,
133:22, 135:6
**filing** [3] - 130:25,
134:24, 137:5
**filings** [1] - 134:1
**fill** [1] - 174:23
**filled** [1] - 197:13
**final** [4] - 91:6, 136:4,
136:6, 136:10
**Findings** [1] - 156:6
**findings** [11] - 75:18,
106:20, 110:14,
156:7, 156:13,
156:14, 200:7,
200:18, 200:19,
210:19, 210:22
**fine** [1] - 144:6
**finish** [5] - 52:9,
130:6, 130:11,
136:2, 142:19
**finished** [1] - 15:12
**finishes** [1] - 58:13
**finishing** [3] - 12:11,
12:14, 136:18
**firm** [1] - 184:9
**Firm** [2] - 3:4, 3:7
**firms** [1] - 132:17
**First** [3] - 102:16,
141:5, 149:18
**first** [50] - 7:22, 9:22,
10:16, 26:19, 31:14,
39:17, 45:7, 59:5,
59:14, 65:8, 73:6,
75:6, 108:6, 108:7,
109:3, 109:11,
116:4, 116:7, 123:8,
125:11, 125:15,
126:23, 128:5,
131:12, 141:12,
141:25, 145:1,
151:1, 153:25,

155:23, 156:4,
156:24, 156:25,
167:2, 173:14,
173:19, 176:13,
176:18, 177:23,
191:9, 192:9, 200:8,
200:17, 202:4,
206:16, 206:22,
208:1, 209:9, 210:1
**fish** [1] - 156:15
**Fisher** [2] - 187:14,
187:15
**Fishman** [2] - 124:15,
124:19
**fit** [2] - 87:17, 136:10
**five** [6] - 59:4, 59:19,
131:1, 154:19,
157:24, 201:7
**five-year** [1] - 59:4
**FL** [1] - 2:11
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flip** [2] - 88:14, 170:13
**float** [1] - 161:3
**flooded** [1] - 159:6
**Floor** [1] - 3:5
**fly** [1] - 15:4
**focus** [7] - 12:1, 12:2,
18:19, 57:21, 61:12,
76:16, 116:4
**focused** [4] - 14:25,
24:12, 79:10, 209:19
**focuses** [3] - 202:4,
202:6, 202:8
**focusing** [6] - 49:3,
53:10, 57:23, 65:23,
105:1, 203:22
**fold** [1] - 186:2
**folks** [5] - 18:1, 38:23,
66:11, 96:20, 134:3
**follow** [4] - 10:13,
52:4, 146:19, 174:1
**followed** [2] - 149:11,
212:20
**Following** [1] - 130:25
**following** [7] - 15:23,
59:4, 111:25, 116:3,
118:1, 194:13,
194:16
**follows** [3] - 7:5,
68:11, 130:20
**football** [1] - 174:24
**footnote** [1] - 63:18
**Footnote** [1] - 63:21
**footnoted** [1] - 179:5
**footnotes** [2] - 152:8,
179:5
**FOR** [1] - 1:1
**for-profit** [1] - 86:14
**Forces** [1] - 143:12,

143:14
**forces** [2] - 214:3,
214:10
**foregoing** [1] - 220:4
**form** [2] - 153:18,
216:15
**format** [3] - 42:4,
43:13, 151:15
**formatted** [1] - 43:10
**forms** [1] - 153:21
**formulations** [1] -
202:14
**forth** [4] - 44:11, 86:4,
170:1, 173:24
**fortunately** [1] - 40:8
**forward** [5] - 81:6,
85:25, 137:15,
143:17, 152:23
**Foundation** [1] -
172:6
**foundation** [12] - 29:3,
42:13, 140:20,
141:2, 142:2, 142:4,
159:24, 184:12,
188:1, 189:21,
189:24, 189:25
**foundations** [1] -
32:10
**four** [3] - 131:10,
154:19, 157:24
**fourth** [3] - 33:24,
143:22, 193:25
**frame** [1] - 30:9
**France** [1] - 10:10
**frank** [1] - 82:1
**frankly** [10] - 24:7,
27:10, 28:21, 32:8,
36:13, 37:25, 69:2,
92:22, 155:10, 156:2
**free** [3] - 201:12,
205:24, 219:11
**freedom** [2] - 94:14,
94:15
**frequent** [4] - 31:1,
31:5, 31:6, 212:7
**frequently** [3] - 101:1,
194:12, 212:15
**Friday** [3] - 133:7,
134:13, 191:4
**friend** [8] - 183:1,
183:2, 201:12,
205:25, 206:1,
206:3, 206:10
**friends** [1] - 182:18
**front** [9] - 38:2, 47:25,
52:21, 59:21,
117:21, 126:4,
151:23, 190:4,
191:13
**FSMB** [3] - 118:18,

123:20, 124:6
**full** [7] - 61:9, 61:12,
79:10, 156:20,
181:8, 206:16, 208:1
**Fuller** [2] - 2:4, 2:13
**FULLER** [1] - 2:12
**fullest** [1] - 61:14
**fully** [1] - 23:25
**function** [10] - 11:12,
18:25, 27:9, 30:20,
30:23, 36:18, 39:2,
41:4, 69:5, 69:16
**functioning** [1] - 8:22
**fund** [1] - 20:14

### G

**gained** [1] - 217:13
**gamble** [1] - 214:14
**gateway** [8] - 54:9,
147:25, 148:5,
148:8, 148:16,
155:25, 161:19,
162:2
**gather** [1] - 43:7
**gathered** [1] - 184:9
**gears** [4] - 17:21,
21:23, 35:23, 54:7
**gender** [2] - 50:16,
65:19
**general** [15] - 20:2,
22:7, 75:14, 80:21,
97:18, 100:7, 105:8,
153:17, 154:18,
180:13, 185:23,
216:1, 216:22,
216:24
**General** [3] - 11:22,
11:25, 12:15
**generally** [5] - 36:20,
83:24, 85:5, 149:12,
195:5
**Generally** [1] - 152:24
**generating** [1] -
203:25
**generation** [1] - 13:5
**genetic** [2] - 208:9,
208:17
**Geneva** [1] - 88:12
**geographic** [2] -
60:24, 76:10
**geographically** [2] -
166:20, 169:1
**Gilligan** [4] - 7:13,
7:22, 8:8, 8:11,
20:18, 25:8, 25:17,
26:9, 26:16, 28:7,
43:1, 68:8, 68:15,
70:25, 98:12, 109:2,
133:16, 137:16,

137:20, 137:24,
138:1, 142:14,
143:23, 147:15,
148:13, 150:22,
158:15, 160:3,
162:7, 162:16,
164:10, 164:23,
185:2, 185:9, 191:4,
191:12, 191:13,
192:9, 192:11,
198:20, 199:10,
205:2, 219:7, 219:10
**GILLIGAN** [1] - 7:16
**Gilligan's** [1] - 184:10
**Gina** [2] - 171:25,
191:10
**given** [23] - 37:17,
38:16, 39:3, 41:13,
67:1, 75:16, 84:12,
88:9, 90:20, 90:24,
91:2, 91:3, 101:10,
112:5, 113:2, 134:7,
147:13, 164:5,
184:8, 184:13,
194:17, 215:6,
216:22
**global** [1] - 135:5
**goal** [3] - 94:13, 94:15,
118:3
**Golani** [1] - 11:15
**Government** [1] -
144:22
**government** [10] -
22:3, 22:14, 23:1,
23:5, 28:23, 29:11,
33:19, 115:8,
180:13, 192:18
**gracious** [1] - 130:3
**grade** [1] - 152:25
**graduated** [1] - 10:18
**graduating** [1] - 10:17
**grail** [2] - 67:23, 67:24
**gram** [2] - 166:4,
205:5
**grant** [2] - 20:12,
121:25
**graphic** [1] - 165:22
**great** [3] - 111:14,
146:14, 146:18
**greater** [7] - 139:10,
143:16, 144:20,
150:13, 152:5,
158:5, 158:6
**green** [6] - 165:5,
166:17, 167:4,
168:22, 169:17
**GRETCHEN** [1] - 6:7
**ground** [3] - 134:20,
188:4, 188:7
**group** [13] - 18:16,

28:22, 29:16, 61:18, 62:6, 100:25, 162:20, 172:7, 172:19, 173:16, 192:17, 212:6, 212:14

**groups** [4] - 37:2, 120:1, 138:8, 204:6
**grow** [1] - 159:21
**grown** [2] - 33:3, 33:6
**guess** [4] - 115:22, 156:15, 159:5, 192:10
**guessing** [1] - 74:6
**guidance** [9] - 17:13, 17:16, 17:20, 70:19, 70:22, 97:8, 112:11, 117:5, 204:4
**guide** [5] - 52:25, 53:3, 53:5, 53:8, 54:3
**guided** [1] - 124:3
**guideline** [1] - 102:5
**guidelines** [23] - 17:5, 17:7, 17:10, 70:9, 70:21, 100:25, 101:18, 101:25, 116:25, 117:4, 117:6, 118:18, 118:20, 119:19, 119:22, 120:3, 120:9, 142:23, 143:2, 143:5, 143:6, 143:17, 144:21

**H**

**half** [9] - 11:11, 15:8, 33:16, 167:2, 167:9, 188:11, 197:11, 201:8, 201:10
**halfway** [1] - 28:13
**hallucinogens** [1] - 63:25
**hand** [10] - 7:15, 46:22, 60:8, 60:11, 126:2, 151:14, 164:12, 185:21, 192:24, 208:1
**Handbook** [1] - 109:15
**handed** [3] - 40:4, 88:17, 119:1
**hands** [1] - 178:14
**happy** [2] - 133:17, 137:9
**hard** [3] - 21:21, 92:18, 110:20
**hard-pressed** [1] - 92:18

**hardest** [1] - 21:17
**HARDIN** [1] - 5:3
**harm** [3] - 69:8, 190:14, 190:16
**harmful** [1] - 125:2
**harms** [1] - 207:15
**Harvard** [7] - 10:1, 11:1, 11:2, 12:16, 12:18, 13:8, 17:24
**Harvard's** [1] - 12:21
**hashish** [1] - 63:24
**Hawkins** [1] - 3:7
**headache** [1] - 34:11
**headaches** [1] - 14:19
**header** [1] - 34:21
**heading** [1] - 47:5, 48:13, 62:17, 63:3, 63:9, 64:7, 64:16, 64:18, 88:10, 90:6, 93:2, 110:21, 192:25, 194:21, 197:20, 199:10, 200:17, 200:18, 203:3
**heal** [1] - 34:8
**Health** [13] - 4:16, 5:2, 35:1, 58:3, 88:11, 88:15, 88:22, 92:8, 92:14, 92:17, 92:19, 93:19, 113:3
**health** [6] - 28:25, 29:12, 191:14, 192:19, 195:20, 215:22
**healthcare** [21] - 24:7, 25:24, 51:20, 51:25, 52:1, 72:3, 73:8, 74:5, 74:21, 106:2, 110:3, 114:23, 118:4, 118:12, 119:25, 120:3, 142:12, 146:5, 203:13, 204:5
**Healthcare** [2] - 105:16, 105:22
**hear** [2] - 33:23, 51:18
**heard** [13] - 33:8, 43:18, 48:18, 54:8, 74:15, 76:1, 77:21, 93:16, 124:14, 201:15, 207:20, 207:21
**Heard** [1] - 131:10
**Hearing** [1] - 119:15
**hearing** [2] - 25:10, 131:25
**hearsay** [4] - 46:11, 80:5, 163:5, 163:11
**heart** [3] - 13:24, 76:15, 107:6

**heavier** [1] - 33:4
**held** [3] - 178:3, 178:4, 203:9
**help** [5] - 12:10, 48:1, 74:9, 89:19, 137:2
**helped** [1] - 183:18
**helpful** [6] - 30:15, 46:16, 56:23, 74:7, 74:8, 135:20
**helpfully** [1] - 89:7
**heroin** [82] - 54:12, 57:16, 57:22, 58:14, 59:3, 59:4, 59:12, 59:18, 59:23, 60:2, 60:5, 60:10, 60:12, 61:3, 61:18, 62:4, 62:7, 62:24, 64:13, 65:4, 66:1, 66:6, 66:14, 145:16, 145:22, 149:10, 150:12, 152:4, 153:6, 153:12, 153:15, 153:25, 154:2, 154:6, 154:7, 154:14, 154:19, 154:20, 156:9, 157:2, 157:12, 157:20, 158:3, 158:7, 158:20, 159:3, 159:11, 159:17, 159:23, 160:11, 161:22, 162:1, 162:6, 176:21, 176:24, 177:1, 177:18, 177:23, 178:1, 178:6, 211:25, 212:5, 212:13, 213:10, 213:16, 213:23, 214:3, 214:5, 214:6, 214:10, 214:12, 214:23, 215:2, 215:11, 215:14, 215:19, 216:6, 216:8, 218:19
**Heroin** [3] - 55:11, 60:21, 211:24
**HESTER** [1] - 5:9
**high** [22] - 17:10, 26:19, 38:16, 38:17, 43:10, 47:8, 48:3, 50:18, 58:9, 69:7, 69:24, 72:13, 76:20, 86:18, 93:10, 97:5, 101:22, 112:14, 157:16, 208:21, 214:4, 214:11
**higher** [14] - 38:21, 58:15, 152:25,

158:20, 159:10, 159:22, 175:8, 175:9, 200:4, 216:6, 216:18, 216:21, 216:22
**highlight** [2] - 124:23, 151:19
**highlighted** [4] - 63:6, 151:21, 151:24, 152:1
**highly** [2] - 51:24
**hinder** [2] - 118:5, 118:14
**hint** [1] - 188:15
**hip** [3] - 14:14, 32:17, 33:5
**historical** [2] - 79:22, 131:14
**history** [14] - 37:17, 38:18, 38:19, 38:20, 50:12, 65:17, 73:13, 75:18, 208:23, 208:24, 215:22, 215:23
**hits** [1] - 172:16
**HIV** [1] - 173:24
**holiday** [1] - 219:19
**holy** [2] - 67:23, 67:24
**home** [2] - 34:14, 202:18
**homeless** [1] - 15:3
**Honor** [106] - 7:8, 7:21, 13:19, 25:7, 27:24, 29:5, 40:1, 42:8, 46:3, 46:8, 51:8, 55:2, 55:21, 56:15, 57:1, 68:9, 68:13, 78:15, 79:16, 79:25, 80:1, 80:10, 81:25, 82:9, 89:2, 89:6, 89:18, 97:17, 98:2, 98:4, 98:14, 101:7, 102:6, 102:11, 105:12, 107:17, 108:20, 112:24, 115:2, 118:21, 119:12, 122:17, 122:21, 123:1, 126:19, 127:3, 127:11, 129:18, 130:1, 130:14, 130:17, 130:22, 132:10, 133:2, 133:5, 133:21, 134:15, 135:9, 135:13, 135:14, 135:23, 136:7, 136:21, 137:14, 137:17, 137:18, 140:4,

140:16, 140:19, 141:24, 142:17, 143:20, 144:12, 161:4, 163:4, 163:21, 163:24, 164:2, 164:16, 167:16, 168:2, 168:11, 169:21, 174:9, 174:13, 179:12, 184:21, 186:9, 187:20, 188:17, 188:21, 189:3, 189:13, 189:23, 190:21, 195:14, 197:4, 198:7, 198:10, 199:2, 199:3, 214:18, 219:9, 219:12, 219:17
**Honor's** [2] - 136:16, 174:5
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**hope** [6] - 64:25, 112:22, 133:7, 151:20, 214:15, 219:18
**Hopefully** [1] - 13:4
**hopefully** [2] - 209:9, 217:3
**hoping** [1] - 130:2
**hopped** [2] - 161:2, 161:15
**horribly** [2] - 94:24, 207:23
**Hospital** [6] - 8:13, 10:19, 10:22, 11:22, 12:15, 16:21
**hospital** [10] - 13:8, 14:16, 15:2, 71:12, 72:24, 106:4, 110:16, 185:1, 185:3, 186:13
**hospital's** [1] - 111:2
**hospitalized** [2] - 82:25, 83:16
**hospitals** [8] - 12:13, 12:16, 12:18, 12:22, 21:13, 106:1, 106:4, 107:11
**Hospitals** [1] - 109:14
**host** [3] - 32:18, 37:6, 39:4
**hour** [3] - 23:16, 131:1, 188:11
**hourly** [1] - 23:15
**hours** [1] - 189:8
**House** [2] - 21:1, 21:4
**housekeeping** [1] -

137:18
**human** [1] - 35:3
**hundred** [1] - 134:19
**hundreds** [1] - 15:14
**Huntington** [5] - 3:10, 4:1, 147:21, 171:22, 220:6
**HUNTINGTON** [1] - 1:4
**hurtful** [1] - 80:13
**hurting** [1] - 30:21
**hurts** [1] - 30:16

**I**

**idea** [3] - 37:19, 148:4, 215:5
**identical** [1] - 127:9
**identified** [2] - 42:9, 44:21
**identify** [3] - 38:23, 50:20, 67:12
**identifying** [2] - 67:21, 208:25
**II** [3] - 40:12
**ill** [2] - 116:11, 139:8
**illegal** [10] - 64:2, 65:5, 65:10, 66:4, 145:16, 215:3, 215:11, 215:18, 216:9
**illicit** [16] - 60:24, 63:14, 63:21, 63:24, 64:9, 64:10, 64:14, 64:15, 64:22, 66:12, 145:23, 154:17, 177:19, 180:1, 182:7, 182:8
**illnesses** [1] - 65:18
**illustrate** [3] - 15:17, 56:13, 122:15
**illustration** [1] - 39:19
**imagine** [1] - 187:24
**immediately** [2] - 26:1, 214:1
**immunize** [1] - 190:13
**Impact** [1] - 170:15
**impact** [6] - 27:12, 49:13, 88:7, 112:4, 170:21, 213:3
**impacted** [1] - 138:17
**impacts** [1] - 26:20
**impeach** [2] - 163:5, 174:8
**impeachment** [3] - 163:6, 163:25, 164:17
**implement** [1] - 112:5
**implementation** [1] - 110:23

**implemented** [1] - 213:17
**implication** [3] - 107:9, 111:15, 112:21
**implications** [1] - 106:5
**implicit** [1] - 70:21
**implies** [2] - 16:24, 21:3
**import** [6] - 100:7, 110:8, 110:11, 113:11, 121:16, 129:1
**importance** [2] - 111:14, 129:4
**important** [30] - 9:3, 26:21, 27:2, 28:24, 29:12, 34:6, 44:1, 82:21, 85:18, 86:18, 90:3, 106:3, 106:6, 106:18, 106:19, 107:5, 107:9, 110:12, 110:13, 116:12, 117:14, 117:17, 118:3, 118:13, 131:4, 133:6, 169:7, 192:20, 207:22, 208:17
**impression** [1] - 182:11
**improper** [1] - 181:20
**improperly** [1] - 181:17
**improve** [1] - 209:5
**improvement** [4] - 69:5, 69:6, 69:7, 69:16
**IN** [2] - 1:1, 1:18
**in-depth** [1] - 24:3
**inadequate** [5] - 53:14, 83:1, 83:17, 86:19, 91:25
**inappropriate** [8] - 75:9, 114:6, 121:11, 121:18, 123:10, 123:13, 123:21, 123:25
**inappropriately** [2] - 74:18, 96:20
**inartfully** [1] - 147:25
**incidence** [10] - 58:14, 86:17, 86:18, 150:12, 152:4, 159:11, 159:15, 175:5, 175:9, 175:19
**include** [12] - 11:12, 17:5, 18:18, 36:5, 63:24, 89:22, 89:23,

156:7, 182:2, 194:18, 195:10, 202:1
**included** [6] - 19:19, 20:1, 23:21, 23:25, 166:14, 195:24
**includes** [6] - 123:14, 161:23, 162:4, 186:13, 189:13, 196:18
**including** [26] - 27:19, 41:21, 45:1, 63:25, 66:14, 74:13, 85:15, 89:17, 94:22, 99:7, 102:18, 103:2, 103:12, 116:10, 120:9, 122:6, 128:14, 146:2, 162:4, 182:7, 205:16, 209:16, 214:4, 214:10, 216:1, 217:21
**incomplete** [2] - 154:12, 182:16
**incorrect** [1] - 169:11
**increase** [15] - 103:7, 146:2, 159:23, 165:18, 165:19, 174:2, 174:3, 174:15, 174:16, 174:18, 176:24, 177:1, 186:2, 197:24
**increased** [12] - 32:25, 33:2, 77:25, 175:19, 208:14, 209:10, 209:11, 209:15, 210:3, 214:4, 214:10
**increases** [4] - 94:9, 213:15, 214:6, 214:12
**increasing** [4] - 78:7, 94:5, 120:21, 217:14
**incredibly** [1] - 9:1
**indeed** [1] - 102:3
**indicate** [2] - 90:10, 195:3
**indicated** [3] - 40:25, 97:12, 203:25
**indicates** [1] - 59:7
**indication** [2] - 40:24, 69:22
**indications** [3] - 41:25, 43:15, 44:14
**individual** [12] - 29:25, 38:2, 50:23, 69:18, 69:19, 69:25, 70:4, 73:19, 73:20, 73:22, 200:25, 217:1
**individual's** [1] - 66:20

**individually** [1] - 135:4
**individuals** [4] - 54:10, 153:4, 153:20, 157:12
**ineffective** [1] - 123:15
**infantry** [1] - 11:16
**inflammatories** [1] - 36:25
**inflammatory** [1] - 36:23
**influence** [6] - 88:25, 94:20, 94:22, 122:2, 147:2, 214:10
**influential** [2] - 106:23, 107:2
**information** [31] - 9:10, 30:22, 38:3, 38:16, 39:21, 39:23, 41:6, 41:14, 41:17, 42:6, 43:7, 43:9, 43:16, 43:22, 45:13, 47:24, 48:9, 48:16, 50:6, 50:17, 52:10, 72:12, 72:13, 72:14, 73:17, 75:13, 75:15, 75:17, 108:4, 109:7, 126:16
**informed** [1] - 48:2
**informs** [1] - 43:24
**inhalants** [1] - 63:25
**inherent** [1] - 192:2
**initiate** [2] - 59:12, 157:12
**initiated** [7] - 51:2, 54:19, 54:21, 59:4, 62:7, 62:24, 157:19
**Initiates** [1] - 60:21
**initiates** [1] - 59:3
**initiating** [2] - 154:20, 159:17
**Initiation** [1] - 55:10
**initiation** [8] - 158:1, 158:7, 158:20, 159:11, 159:23, 161:22, 162:1, 162:6
**injecting** [1] - 153:21
**injury** [1] - 30:14
**insane** [1] - 151:8
**insert** [1] - 39:24
**inspect** [2] - 106:12, 106:14
**inspected** [1] - 107:11
**inspection** [1] - 106:13
**inspections** [1] - 110:14
**instances** [6] - 32:5, 138:11, 139:23,

159:16, 183:7, 218:3
**instead** [2] - 91:2, 173:11
**Institute** [16] - 14:17, 28:13, 28:17, 28:20, 28:21, 34:24, 181:15, 192:12, 192:16, 194:4, 195:8, 195:23, 197:16, 198:1, 199:8, 203:9
**instructions** [2] - 194:13, 194:16
**instructive** [1] - 86:17
**Insys** [3] - 22:17, 22:19, 23:9
**integral** [1] - 116:12
**intend** [2] - 133:1, 162:23
**intended** [4] - 53:4, 89:11, 148:6, 183:9
**intending** [1] - 11:2
**intense** [2] - 87:12, 87:21
**intensity** [1] - 111:2
**intent** [1] - 110:22
**intentioned** [2] - 146:15, 146:19
**interactions** [2] - 41:5, 147:6
**interchangeable** [1] - 92:4
**interest** [2] - 110:20, 128:3
**international** [1] - 35:3
**internship** [1] - 10:19
**interplay** [1] - 177:10
**interpose** [1] - 167:16
**interpret** [1] - 152:24
**interpretation** [1] - 156:11
**interrupt** [1] - 189:12
**interrupted** [1] - 189:12
**interval** [1] - 95:15
**intervals** [2] - 61:8, 91:3
**interventional** [1] - 12:6
**Interventionalist's** [1] - 162:8
**interventions** [1] - 36:6
**interview** [1] - 58:14
**introduce** [1] - 8:8
**introduced** [4] - 88:23, 147:19, 198:14, 198:15
**invasive** [1] - 12:5

**investigate** [3] - 121:12, 121:19, 124:2
**investigative** [1] - 184:9
**invitation** [1] - 102:8
**involve** [2] - 36:2, 121:17
**involved** [6] - 14:5, 21:2, 24:14, 54:20, 75:6, 140:22
**involves** [1] - 18:11
**involving** [6] - 22:14, 36:5, 145:15, 193:16, 193:20, 200:9
**IQVIA** [7] - 183:22, 183:23, 184:1, 184:10, 184:25, 185:12, 186:10
**Irpino** [1] - 3:7
**irrational** [2] - 85:19, 86:1
**ISIA** [1] - 5:4
**isolated** [1] - 66:17
**Israel** [4] - 11:7, 11:8, 11:10, 12:17
**issue** [5] - 78:12, 98:18, 118:18, 163:22, 163:23
**issued** [2] - 101:4, 105:20
**issues** [9] - 106:11, 131:4, 131:5, 131:7, 134:18, 135:8, 136:5, 171:4, 188:1
**issuing** [2] - 103:1, 106:9
**italicized** [1] - 203:4
**Item** [1] - 111:16
**item** [1] - 112:23
**itself** [3] - 85:9, 103:17, 125:10

### J

**Jackson** [1] - 6:8
**jail** [1] - 74:14
**JAMA** [1] - 179:6
**James** [1] - 143:25
**January** [4] - 78:23, 80:14, 82:5, 123:5
**JASIEWICZ** [1] - 5:4
**JCAHO** [10] - 105:23, 106:1, 106:11, 107:9, 107:11, 110:10, 110:12, 112:11, 112:17, 112:18
**JEFFREY** [1] - 5:13

**JENNIFER** [1] - 4:18
**Jesus** [1] - 26:13
**Jewish** [2] - 11:7, 11:8
**job** [4] - 38:2, 92:22, 126:14, 132:8
**join** [1] - 80:19
**joint** [3] - 113:21, 191:14, 203:12
**Joint** [3] - 105:16, 105:21, 113:2
**JOSEPH** [1] - 6:4
**journal** [5] - 79:10, 149:21, 150:6, 151:15, 151:16
**Journal** [20] - 19:22, 20:3, 78:20, 78:24, 79:12, 79:15, 80:24, 85:5, 88:1, 88:3, 149:2, 149:8, 149:18, 149:21, 149:25, 150:4, 155:5, 180:21, 181:12, 211:17
**journals** [11] - 19:5, 19:17, 19:19, 19:23, 20:1, 20:2, 20:5, 20:7, 79:1, 88:5, 150:5
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**judge** [4] - 23:10, 25:12, 174:2, 213:1
**JUDGE** [1] - 1:17
**Judge** [27] - 7:2, 79:18, 80:17, 80:21, 81:14, 83:8, 95:21, 97:11, 131:21, 150:24, 152:1, 155:18, 161:13, 162:12, 163:1, 163:10, 164:2, 164:7, 165:1, 171:1, 172:17, 173:20, 176:1, 177:9, 180:17, 181:4, 188:5
**judgment** [7] - 9:6, 71:22, 75:22, 128:21, 208:25, 217:2, 217:4
**judgments** [4] - 72:11, 74:4, 74:6, 75:8
**judicious** [1] - 39:15
**judiciously** [2] - 70:18, 71:21
**JULY** [1] - 1:19
**July** [7] - 7:4, 41:9, 136:10, 136:18, 191:5, 220:9, 220:15
**jump** [1] - 31:10, 84:21, 86:6, 92:25,

111:24, 142:19, 205:19
**June** [1] - 140:10
**jurisdiction** [2] - 131:14, 134:20
**jurisdictions** [1] - 132:22
**Justice** [1] - 22:9
**justified** [1] - 217:6
**justify** [2] - 100:13, 190:17

### K

**Kanawha** [1] - 161:2
**KEARSE** [1] - 4:2
**Kearse** [1] - 89:7
**keep** [3] - 191:6, 209:1, 211:10
**keeping** [1] - 106:15
**Keller** [5] - 184:14, 184:24, 186:17, 186:19, 189:5
**Kelly** [1] - 6:8
**Kessler** [1] - 4:23
**Key** [2] - 156:6, 156:7
**key** [6] - 49:16, 107:7, 133:6, 156:13, 210:19, 210:22
**kidney** [1] - 41:4
**kids** [1] - 157:17
**killers** [3] - 205:21, 206:10, 212:13
**kilogram** [7] - 166:2, 166:3, 166:8, 166:11, 169:19, 204:22, 205:6
**kilograms** [3] - 169:8, 169:17, 204:14
**kind** [15] - 22:1, 23:23, 36:2, 50:21, 59:25, 75:7, 84:22, 90:22, 106:9, 132:8, 135:18, 151:8, 174:6, 181:7, 206:24
**kinds** [2] - 36:21, 37:9
**knee** [3] - 14:15, 32:17, 33:5
**knowledge** [5] - 25:25, 49:12, 72:8, 133:2, 152:15
**known** [6] - 86:13, 88:5, 88:24, 216:17, 216:19, 217:20
**KOUBA** [1] - 4:11

### L

**LA** [1] - 3:8
**lab** [1] - 73:15

**label** [19] - 39:20, 39:23, 40:5, 40:15, 40:20, 40:22, 41:8, 41:12, 41:18, 42:19, 42:21, 43:5, 44:10, 44:11, 45:1, 52:10, 52:16, 52:22, 52:23
**labeling** [2] - 42:10, 42:14
**labels** [4] - 43:6, 43:12, 43:19, 44:6
**Lacey** [1] - 186:17
**ladder** [6] - 35:2, 93:11, 93:17, 93:19, 93:22, 94:17
**laid** [2] - 142:5, 143:6, 190:1
**Lancet** [2] - 19:22, 20:2
**language** [24] - 44:2, 45:6, 53:2, 53:8, 82:4, 89:13, 102:14, 103:19, 116:15, 117:1, 118:8, 123:19, 123:24, 124:23, 145:2, 150:17, 199:12, 199:15, 201:5, 201:20, 203:3, 204:13, 206:15, 209:24
**Lanier** [1] - 3:4
**large** [6] - 40:11, 58:10, 100:2, 100:11, 159:12, 159:18
**largely** [1] - 49:15
**larger** [2] - 31:12, 75:24
**largest** [1] - 51:20
**Las** [2] - 172:6, 215:6
**last** [37] - 15:17, 20:9, 29:22, 34:13, 51:15, 52:24, 62:4, 70:10, 75:24, 84:11, 84:13, 92:1, 107:18, 121:8, 123:12, 144:25, 145:1, 161:12, 168:20, 170:6, 170:7, 183:11, 184:8, 190:10, 191:20, 193:15, 194:24, 197:19, 198:5, 198:12, 198:20, 202:24, 206:16, 218:8
**lasting** [1] - 30:10
**lastly** [1] - 18:7
**late** [2] - 14:1, 77:25
**launched** [1] - 95:24

**LAURA** [1] - 5:10
**Law** [3] - 3:4, 3:7, 3:12
**law** [5] - 35:3, 118:3, 118:11, 131:24, 132:17
**laws** [1] - 213:3
**lawsuit** [1] - 25:2
**lawyer** [2] - 179:19, 186:11
**lawyer's** [1] - 148:5
**lawyers** [1] - 131:17
**lax** [1] - 132:4
**lay** [5] - 29:3, 42:12, 140:20, 141:1, 142:2
**laying** [1] - 184:12
**layman's** [1] - 148:4
**layout** [1] - 43:17
**lead** [9] - 47:7, 53:23, 55:4, 150:12, 152:4, 157:7, 159:16, 162:6, 203:24
**leaders** [2] - 13:5, 28:23
**leadership** [3] - 16:17, 22:24, 183:15
**leading** [6] - 19:19, 62:7, 80:24, 91:18, 105:5, 159:15
**learned** [8] - 80:6, 80:7, 81:2, 81:8, 81:16, 81:17, 81:18, 89:11
**least** [10] - 15:10, 18:16, 19:1, 73:16, 170:3, 182:10, 192:15, 208:10, 208:18, 217:1
**leaves** [1] - 166:4
**leaving** [1] - 77:3
**lecture** [4] - 172:1, 172:3, 172:5, 172:18
**lectures** [1] - 172:7
**led** [1] - 92:5
**Lee** [1] - 3:12
**leeway** [1] - 161:9
**left** [13] - 28:15, 29:20, 40:10, 60:11, 90:5, 130:2, 138:2, 151:14, 175:6, 185:21, 192:24, 205:25, 208:1
**left-hand** [5] - 60:11, 151:14, 185:21, 192:24, 208:1
**legal** [7] - 73:23, 74:3, 91:8, 91:13, 99:7, 149:25, 179:25
**legally** [2] - 191:25, 203:19
**legitimate** [4] -

120:14, 128:15, 128:20, 204:1
**Leon** [2] - 2:4, 2:14
**less** [10] - 104:15, 151:22, 169:4, 169:14, 178:2, 179:8, 201:1, 216:10
**letter** [8] - 88:23, 140:14, 140:23, 141:6, 141:7, 141:8, 142:12, 143:21
**letters** [1] - 89:8
**level** [17] - 9:18, 17:10, 26:19, 26:22, 27:1, 43:10, 47:8, 58:9, 72:23, 73:16, 75:15, 76:20, 94:3, 97:5, 101:22, 188:9, 216:18
**leveled** [1] - 178:24
**levels** [3] - 71:2, 75:12, 120:21
**Levin** [1] - 2:10
**LEYIMU** [1] - 4:13
**liberally** [1] - 81:3
**license** [7] - 72:18, 74:16, 96:18, 96:21, 100:18, 121:25
**licensed** [2] - 25:20, 97:14
**Lidocaine** [1] - 37:7
**lie** [1] - 17:20
**Life** [1] - 11:5
**life** [3] - 8:24, 27:8, 32:8
**lifespan** [2] - 30:3, 30:25
**light** [2] - 125:1, 176:16
**likelihood** [1] - 112:14
**likely** [6] - 36:14, 51:24, 112:12, 153:18, 153:21, 159:18
**limit** [1] - 46:17
**limitation** [1] - 27:9
**limitations** [3] - 36:10, 37:9, 207:16
**limited** [22] - 32:8, 46:13, 46:15, 46:17, 81:15, 98:16, 102:9, 102:12, 107:16, 108:16, 114:17, 114:19, 115:20, 119:12, 122:20, 122:23, 122:25, 140:17, 142:13, 144:5, 144:6
**limits** [6] - 85:13, 86:21, 131:3, 132:3,

184:25
**LINDA** [1] - 4:8
**line** [21] - 33:7, 95:6, 101:12, 101:13, 116:1, 125:22, 129:23, 151:8, 151:9, 160:5, 165:6, 165:7, 165:8, 167:10, 176:24, 177:1, 185:20, 185:22, 186:1, 186:6, 201:8
**lines** [7] - 75:4, 82:19, 99:19, 167:22, 176:16, 177:11, 201:7
**link** [2] - 57:22, 213:18
**linked** [2] - 150:17, 205:5
**links** [1] - 213:9
**Lisa** [2] - 6:18, 220:3
**list** [3] - 32:21, 108:13, 127:7
**listed** [4] - 20:25, 21:10, 89:17, 113:18
**lists** [5] - 45:9, 85:15, 113:6, 116:3, 143:18
**literal** [1] - 82:7
**literature** [16] - 23:22, 24:22, 33:11, 54:22, 55:17, 57:21, 79:19, 79:24, 81:8, 83:6, 83:9, 151:2, 154:21, 183:20, 183:21, 214:8
**litigate** [1] - 131:7
**litigation** [4] - 131:9, 135:8, 150:25, 175:3
**LLC** [1] - 2:4
**locations** [1] - 169:9
**Logan** [2] - 6:5, 6:12
**logo** [1] - 140:9
**long-acting** [1] - 95:8
**long-term** [2] - 193:8, 199:14
**longitudinal** [1] - 209:23
**Longo** [3] - 180:22, 181:3
**look** [87] - 21:6, 21:8, 29:18, 33:18, 33:24, 33:25, 34:14, 34:20, 38:2, 40:18, 41:17, 43:12, 45:6, 48:12, 52:20, 57:25, 58:1, 60:18, 60:19, 61:6, 64:16, 70:1, 74:25, 79:3, 82:17, 85:10, 86:15, 86:16, 90:3, 90:7, 92:1, 93:12,

97:19, 97:24, 98:9, 98:19, 101:11, 101:12, 102:14, 107:13, 109:2, 110:19, 113:5, 114:6, 115:25, 116:1, 116:23, 118:20, 119:17, 123:18, 127:23, 128:19, 133:8, 133:9, 137:15, 140:8, 141:12, 151:13, 152:22, 155:9, 156:4, 157:10, 159:20, 164:2, 164:12, 170:14, 175:17, 182:12, 185:20, 186:1, 191:20, 193:15, 200:16, 203:22, 205:24, 206:13, 206:23, 208:1, 209:22, 209:24, 210:1, 210:12, 211:15, 212:2, 212:3, 214:1
**looked** [10] - 82:2, 119:19, 149:14, 155:10, 157:6, 157:17, 183:14, 217:8, 218:22, 219:2
**looking** [34] - 18:20, 19:11, 21:4, 28:7, 41:9, 47:24, 53:2, 57:15, 57:16, 57:18, 57:22, 61:2, 64:12, 64:16, 66:16, 73:14, 75:11, 81:6, 85:4, 98:6, 110:17, 119:3, 133:13, 133:18, 134:7, 140:7, 152:21, 153:11, 175:3, 175:5, 175:7, 183:5, 184:1, 217:18
**looks** [11] - 21:18, 41:20, 45:12, 59:25, 107:23, 109:23, 116:1, 136:25, 140:10, 209:9, 210:12
**losing** [3] - 74:13, 74:16, 100:18
**loss** [1] - 30:23
**low** [9] - 32:17, 38:24, 48:3, 50:19, 50:20, 69:20, 72:13, 86:17, 208:22
**low-back** [1] - 32:17
**lower** [3] - 28:15, 67:12, 192:24

**lunch** [4] - 75:25, 76:1, 130:7, 130:8
**Lyrica** [1] - 37:5

**M**

**M-c-C-a-b-e** [1] - 149:5
**M.D** [1] - 181:14
**Madara** [1] - 143:25
**Magazine** [1] - 3:7
**magnitude** [2] - 15:6, 180:11
**MAHADY** [1] - 6:4
**mailed** [1] - 124:17
**main** [1] - 8:17
**Mainigi** [2] - 132:9, 135:6
**MAINIGI** [8] - 4:17, 130:17, 132:10, 133:2, 133:5, 135:13, 136:7, 136:20
**mainstay** [1] - 93:5
**maintain** [3] - 76:9, 106:18, 110:13
**MAJESTRO** [7] - 2:6, 130:22, 134:12, 135:22, 135:25, 137:4, 137:14
**Majestro** [7] - 2:6, 130:21, 132:19, 134:9, 135:18, 135:21, 137:13
**major** [12] - 31:2, 31:7, 38:19, 50:13, 65:17, 182:13, 182:16, 182:17, 206:19, 207:2, 214:5, 214:12
**majority** [8] - 59:1, 146:14, 146:15, 146:18, 150:11, 152:3, 152:25, 203:4
**makers** [1] - 146:5
**malignant** [5] - 98:25, 99:1, 99:3, 99:11, 100:1
**malpractice** [1] - 150:25
**mammal** [1] - 104:11
**manage** [1] - 53:13
**management** [25] - 9:4, 16:2, 20:1, 24:12, 25:1, 25:2, 25:8, 26:10, 30:6, 67:24, 87:18, 88:20, 93:6, 97:18, 99:6, 109:21, 110:2, 111:25, 112:2, 116:12, 116:25,

117:4, 121:9, 207:8, 209:11
**manipulation** [1] - 36:7
**manner** [1] - 99:9
**manual** [3] - 109:13, 110:9
**Manual** [1] - 109:14
**manuals** [3] - 108:3, 109:6, 109:11
**manufacture** [3] - 44:5, 191:25, 203:19
**manufacturers** [2] - 86:12, 202:15
**map** [10] - 166:16, 167:5, 167:6, 167:9, 167:14, 167:15, 168:22, 169:17, 204:12
**maps** [1] - 89:8
**March** [1] - 181:11
**Marcia** [2] - 79:11, 86:7
**marijuana** [3] - 63:24, 64:1, 215:18
**MARK** [1] - 3:14
**marked** [3] - 40:4, 101:10, 119:1
**marker** [1] - 63:18
**market** [2] - 214:3, 214:10
**Mass** [3] - 11:22, 11:24, 12:15
**Massachusetts** [6] - 51:20, 52:2, 185:17, 185:18, 186:4, 186:5
**Masters** [1] - 10:5
**matched** [1] - 73:3
**material** [1] - 23:23
**materially** [1] - 61:13
**materials** [3] - 97:24, 127:7, 127:12
**math** [2] - 19:14, 65:2
**matter** [14] - 82:14, 83:25, 85:6, 96:8, 106:10, 115:13, 132:18, 137:17, 140:22, 155:12, 155:13, 183:11, 185:5, 220:5
**matters** [1] - 22:4
**MC-WV-01219** [1] - 98:7
**MC-WV-1135** [2] - 78:14, 79:17
**MC-WV-1218** [1] - 123:3
**MC-WV-1522** [3] - 113:2, 114:16, 117:21

**MC-WV-2111** [1] - 124:21
**McCabe** [12] - 149:5, 149:7, 155:3, 155:8, 156:12, 156:13, 156:17, 156:22, 156:23, 158:18, 209:22, 210:16
**MCCLURE** [1] - 6:3
**MCGINNESS** [1] - 4:2
**McKesson** [5] - 5:8, 23:18, 137:21, 138:4, 219:3
**McKesson's** [1] - 24:1
**McLellan** [1] - 181:2
**MCWV-1157** [1] - 46:14
**MCWV-1170** [3] - 27:23, 192:10, 199:7
**MCWV-1197** [1] - 40:4
**MCWV-1522** [2] - 191:9, 203:11
**mean** [15] - 45:18, 55:18, 69:10, 100:18, 117:3, 132:11, 134:23, 137:4, 153:10, 155:21, 160:10, 173:10, 187:5, 189:12, 213:20
**meaning** [1] - 148:8
**meaningful** [8] - 33:22, 50:17, 62:14, 87:25, 92:8, 92:11, 92:14, 147:11
**means** [6] - 63:16, 76:5, 76:7, 157:3, 165:1, 194:8
**measure** [1] - 187:6
**measured** [2] - 157:17, 166:6
**measurement** [3] - 112:10, 112:14, 166:8
**measuring** [4] - 107:3, 107:9, 111:14, 169:17
**mechanical** [1] - 6:19
**medical** [152] - 10:2, 10:6, 10:9, 10:17, 10:18, 11:18, 12:24, 13:1, 13:3, 16:2, 16:6, 16:9, 17:23, 18:2, 19:19, 23:22, 24:12, 24:17, 24:21, 25:5, 29:25, 35:8, 37:17, 39:7, 43:21, 46:23, 47:1, 49:6, 49:9, 51:21, 52:13, 55:6, 55:17, 56:5,

57:5, 57:7, 57:9, 57:13, 57:21, 58:16, 59:2, 59:9, 61:19, 61:20, 61:22, 62:5, 62:9, 64:14, 64:17, 64:22, 65:24, 70:6, 71:4, 72:18, 73:7, 73:12, 75:22, 76:3, 76:5, 76:7, 79:1, 79:18, 79:19, 79:23, 81:2, 81:8, 82:23, 83:5, 83:9, 83:14, 84:5, 85:19, 86:2, 86:8, 88:2, 88:4, 94:18, 95:13, 96:11, 96:12, 96:19, 96:23, 96:25, 99:20, 100:2, 100:14, 100:17, 100:18, 101:1, 102:4, 105:24, 114:23, 115:14, 116:13, 119:24, 121:17, 121:24, 128:15, 128:20, 138:25, 141:10, 141:14, 141:18, 141:22, 142:11, 144:18, 146:13, 148:4, 149:21, 150:4, 150:14, 150:25, 151:2, 152:6, 152:14, 153:5, 153:15, 154:2, 154:15, 154:21, 156:8, 156:10, 158:2, 158:5, 158:7, 158:21, 167:19, 171:19, 178:10, 178:11, 182:4, 183:15, 183:20, 183:21, 191:18, 192:5, 195:6, 201:10, 204:5, 207:6, 207:11, 209:12, 212:4, 212:6, 212:8, 212:12, 212:15
**Medical** [36] - 10:7, 12:16, 12:17, 12:19, 13:8, 17:24, 55:10, 57:4, 64:7, 71:11, 100:21, 100:23, 101:4, 101:15, 101:25, 102:22, 103:1, 103:25, 113:9, 113:12, 113:13, 115:7, 116:18, 117:6, 119:5, 119:8, 120:24, 121:16,

121:20, 122:2, 124:3, 127:25, 129:4, 140:11, 141:14, 211:20
**medically** [2] - 195:4, 203:25
**medication** [41] - 34:25, 38:1, 38:5, 41:1, 41:2, 41:5, 41:23, 44:16, 44:20, 44:21, 44:22, 45:1, 46:23, 46:24, 47:12, 52:25, 53:3, 53:5, 53:7, 54:3, 57:8, 67:22, 77:10, 90:21, 94:1, 104:14, 147:4, 160:20, 165:24, 166:4, 166:5, 166:6, 194:1, 194:8, 194:14, 197:7, 216:4, 216:17, 216:22, 216:24, 217:6
**medications** [56] - 31:2, 36:24, 37:2, 37:4, 37:15, 37:16, 37:18, 37:21, 37:24, 38:15, 39:14, 40:24, 41:5, 43:14, 47:13, 48:5, 49:15, 52:15, 52:16, 59:10, 67:6, 70:23, 72:2, 72:9, 72:17, 77:13, 77:18, 91:19, 91:23, 94:7, 94:11, 105:10, 113:23, 114:3, 114:6, 114:14, 124:25, 125:1, 126:6, 126:11, 129:10, 139:9, 159:12, 159:19, 165:5, 182:4, 182:5, 194:11, 195:5, 196:3, 196:6, 203:24, 216:25, 217:15, 217:21
**medications'** [1] - 37:20
**Medicine** [48] - 8:12, 13:16, 19:22, 20:3, 26:3, 28:14, 28:17, 28:20, 28:21, 34:24, 72:24, 78:20, 78:24, 79:12, 80:24, 85:5, 88:1, 88:3, 97:9, 97:16, 97:20, 98:9, 98:11, 100:8, 120:4, 123:4, 124:8, 129:1, 138:8, 138:10, 149:2, 149:9,

149:19, 149:21, 150:1, 155:6, 180:21, 181:12, 192:12, 192:16, 194:4, 195:9, 195:24, 197:17, 198:1, 199:8, 203:9, 211:18
**medicine** [59] - 8:15, 11:21, 11:23, 11:24, 11:25, 12:2, 12:7, 12:12, 13:11, 13:12, 15:10, 16:3, 16:4, 17:14, 18:3, 19:24, 20:7, 20:13, 21:6, 21:7, 21:8, 21:16, 24:6, 25:22, 31:7, 36:3, 36:5, 39:21, 40:5, 41:13, 49:11, 53:12, 53:17, 53:20, 78:25, 86:20, 87:13, 87:23, 88:24, 89:1, 100:19, 105:8, 106:24, 111:8, 126:10, 149:22, 155:24, 162:20, 185:9, 185:13, 185:20, 192:21, 201:16, 202:18, 203:9, 216:15, 216:19
**Medicine's** [1] - 98:24
**medicines** [13] - 9:16, 16:11, 36:19, 36:20, 36:21, 39:12, 39:22, 43:7, 44:5, 53:15, 57:17, 68:16, 68:20
**medium** [4] - 48:3, 50:18, 208:21
**meet** [2] - 107:12, 121:22
**meeting** [3] - 106:15, 106:20, 129:7
**member** [2] - 183:1, 183:2
**members** [6] - 53:6, 53:9, 141:10, 141:15, 141:18, 141:22
**memorandum** [1] - 89:23
**memorized** [1] - 178:19
**mental** [1] - 215:22
**mention** [3] - 178:21, 218:23, 219:3
**mentioned** [10] - 8:15, 18:1, 26:2, 27:4, 32:13, 37:20, 41:21, 41:25, 131:24,

180:21
**mercy** [2] - 87:12, 87:22
**Mercy** [2] - 79:4, 82:18
**mesh** [2] - 126:7, 126:8
**meshes** [1] - 65:8
**message** [6] - 100:9, 107:8, 111:14, 114:13, 126:1, 129:5
**met** [2] - 22:20, 128:16
**metaanalysis** [3] - 193:16, 193:19, 200:8
**metabolism** [1] - 41:24
**methodology** [1] - 186:18
**MICHAEL** [2] - 2:12, 3:9
**mid** [1] - 77:6
**middle** [3] - 108:24, 156:5, 208:2
**midst** [1] - 132:23
**might** [24] - 19:9, 45:1, 47:2, 47:3, 49:23, 50:20, 59:20, 61:24, 75:25, 85:25, 114:10, 130:4, 130:5, 149:7, 150:5, 155:16, 170:23, 174:19, 185:5, 211:5, 216:20, 217:2, 217:4
**migraines** [1] - 32:20
**MILDRED** [1] - 3:3
**military** [2] - 11:8, 11:10
**million** [4] - 31:14, 32:23, 159:9, 195:3
**mind** [4] - 25:12, 26:1, 139:6, 215:5
**mind-set** [1] - 139:6
**Mindful** [1] - 139:15
**mindful** [2] - 139:21, 192:1
**mine** [1] - 180:6
**minimally** [1] - 12:5
**minimize** [2] - 125:16, 125:24
**minimum** [1] - 46:12
**minute** [4] - 35:25, 46:1, 160:1, 176:3
**minutes** [8] - 68:7, 130:2, 130:10, 173:7, 173:8, 173:10, 190:23, 197:4
**mis** [1] - 203:7
**mis-deeds** [1] - 203:7

**misconception** [1] - 92:2

**Misconceptions** [1] - 181:13

**missed** [5] - 8:1, 8:2, 46:4, 102:6

**mission** [3] - 14:8, 21:15

**misspoke** [1] - 61:24

**misuse** [55] - 45:10, 45:17, 46:21, 46:22, 47:7, 47:12, 48:4, 48:9, 48:22, 48:23, 49:4, 49:13, 50:3, 50:4, 51:6, 52:11, 53:23, 57:11, 57:12, 57:23, 58:11, 59:17, 59:22, 60:9, 62:10, 62:12, 65:9, 65:10, 65:21, 66:3, 66:9, 66:12, 66:15, 66:17, 66:20, 145:21, 145:22, 150:14, 152:7, 153:5, 154:15, 157:2, 157:11, 158:3, 159:15, 161:24, 162:4, 171:13, 177:18, 182:3, 203:6, 210:4, 213:10, 215:14, 216:10

**Misuse** [1] - 64:8

**misused** [8] - 54:11, 54:12, 60:2, 60:5, 62:25, 66:1, 154:6, 159:14

**misusing** [11] - 47:2, 47:4, 57:17, 57:18, 59:9, 59:10, 153:16, 153:22, 194:18, 211:24, 213:22

**Mitchell** [1] - 2:10

**Mitigation** [1] - 181:14

**mitigation** [1] - 45:11

**mixed** [2] - 69:2, 69:14

**model** [3] - 119:22, 120:3, 120:8

**Model** [2] - 101:18, 119:3

**moderate** [1] - 90:20

**Mohr** [1] - 56:18

**moment** [3] - 99:22, 217:2, 217:5

**moments** [1] - 74:12

**Monday** [1] - 15:23

**monitor** [6] - 26:4, 47:17, 52:3, 52:5, 70:20, 74:23

**monitored** [1] -

183:13

**monitoring** [4] - 73:2, 183:14, 183:17, 183:18

**Monitoring** [1] - 202:11

**month** [6] - 34:12, 74:24, 132:8, 132:10, 133:19, 195:4

**monthly** [1] - 52:3

**months** [3] - 58:14, 62:8, 102:7

**moral** [2] - 35:14, 35:20

**morning** [10] - 7:19, 7:20, 8:8, 8:11, 15:23, 25:17, 25:18, 143:1, 191:8, 219:19

**Morris** [1] - 6:15

**most** [19] - 17:16, 30:13, 31:1, 31:5, 31:6, 32:11, 67:5, 79:1, 83:25, 85:6, 85:16, 88:4, 91:7, 117:8, 149:4, 182:24, 201:12, 210:2

**mother** [1] - 11:7

**motion** [6] - 132:2, 133:22, 135:2, 135:3, 135:5, 135:10

**motions** [12] - 130:23, 131:1, 131:22, 132:3, 132:11, 132:12, 132:15, 133:1, 135:1, 135:14, 137:8

**Motley** [5] - 4:3, 4:5, 4:8, 4:11, 4:14

**Motrin** [1] - 36:24

**MOUGEY** [1] - 2:9

**move** [18] - 25:7, 29:1, 30:17, 46:7, 79:16, 89:2, 102:8, 107:15, 114:16, 115:17, 119:11, 136:13, 140:16, 170:5, 188:14, 188:16, 190:8, 214:17

**moved** [3] - 10:21, 108:14, 122:18

**movement** [1] - 84:5

**moving** [3] - 80:11, 132:24, 146:11

**MR** [336] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:14, 4:5, 4:22, 5:9, 5:10, 5:13, 6:4, 7:8, 7:21, 7:25, 8:2, 8:5,

8:7, 13:18, 13:21, 13:24, 14:3, 14:4, 25:7, 25:12, 25:16, 26:7, 26:15, 27:24, 28:1, 28:5, 28:6, 28:10, 28:11, 29:1, 29:5, 29:7, 29:8, 34:18, 34:19, 40:1, 40:3, 42:8, 42:11, 42:17, 42:22, 42:25, 46:3, 46:7, 46:11, 46:12, 46:19, 51:7, 51:10, 51:14, 55:2, 55:21, 56:4, 56:7, 56:15, 57:1, 57:2, 58:22, 58:25, 63:5, 63:8, 64:4, 64:6, 68:5, 68:13, 68:14, 78:15, 78:17, 78:18, 79:16, 79:18, 79:25, 80:1, 80:3, 80:10, 80:17, 80:19, 80:21, 81:10, 81:14, 81:20, 81:25, 82:4, 82:9, 82:12, 82:16, 83:7, 83:11, 83:12, 83:21, 84:10, 85:3, 89:2, 89:5, 89:13, 89:18, 90:2, 95:21, 95:25, 96:5, 96:10, 97:11, 97:17, 98:1, 98:4, 98:5, 98:14, 98:17, 98:21, 101:7, 101:9, 102:6, 102:11, 102:13, 105:12, 105:14, 107:15, 107:17, 107:23, 107:25, 108:10, 108:12, 108:19, 108:22, 112:24, 113:1, 114:16, 114:19, 114:23, 115:2, 115:3, 115:6, 115:17, 115:19, 115:22, 115:24, 118:23, 118:25, 119:11, 119:16, 122:17, 122:20, 122:23, 123:1, 123:2, 125:5, 125:7, 125:10, 125:14, 126:19, 126:21, 127:3, 127:4, 127:5, 127:8, 127:11, 127:17, 129:18, 129:22, 129:23, 129:24, 129:25, 130:9, 130:13, 130:22, 134:12, 135:22, 135:25, 137:4, 137:14,

137:17, 137:25, 138:3, 138:6, 140:4, 140:6, 140:16, 140:19, 141:3, 141:4, 141:24, 142:2, 142:7, 142:10, 142:15, 142:17, 142:18, 143:20, 144:3, 144:10, 144:12, 144:14, 144:16, 145:5, 145:8, 145:10, 145:12, 145:13, 147:18, 148:10, 148:19, 150:16, 150:24, 151:4, 151:25, 152:2, 155:18, 155:19, 158:10, 158:14, 159:24, 160:8, 161:4, 161:8, 161:13, 161:17, 162:12, 162:15, 163:1, 163:4, 163:10, 163:18, 163:20, 163:21, 164:2, 164:6, 164:7, 164:9, 164:16, 164:22, 167:16, 168:1, 168:2, 168:11, 168:18, 168:19, 169:20, 170:5, 170:9, 170:11, 170:12, 171:25, 172:2, 173:4, 173:6, 174:4, 174:13, 174:14, 176:4, 176:6, 176:7, 176:8, 176:10, 177:20, 179:12, 179:15, 179:17, 179:20, 180:5, 180:6, 180:7, 180:8, 180:17, 180:20, 181:4, 181:6, 184:6, 184:19, 184:21, 184:24, 185:8, 185:16, 185:18, 185:19, 186:5, 186:8, 186:14, 186:17, 186:19, 186:21, 187:11, 187:13, 187:20, 187:23, 187:24, 188:5, 188:7, 188:13, 188:17, 188:18, 188:21, 188:24, 189:3, 189:7, 189:11, 189:23, 190:10, 190:11, 190:19,

190:21, 190:24, 191:3, 191:10, 191:11, 195:13, 195:15, 197:3, 197:5, 197:6, 198:7, 198:10, 198:12, 198:18, 198:19, 199:1, 199:3, 199:6, 201:21, 201:24, 203:15, 203:17, 211:9, 211:11, 213:1, 213:7, 213:12, 214:17, 214:20, 219:7, 219:9

**MRIs** [1] - 73:15

**MS** [22] - 3:3, 3:6, 4:2, 4:8, 4:11, 4:13, 4:17, 4:18, 4:20, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 130:17, 132:10, 133:2, 133:5, 135:13, 136:7, 136:20

**Mt** [3] - 4:4, 4:12, 4:15

**Muhuri** [1] - 55:4

**MUHURI** [1] - 55:5

**Muhury** [8] - 148:22, 150:8, 152:8, 152:10, 152:13, 153:3, 153:23, 154:22

**MUHURY** [1] - 148:23

**Muhury's** [2] - 154:10, 154:22

**multifactorial** [2] - 160:7, 160:14

**multiple** [1] - 137:8

**muscle** [1] - 36:25

**must** [1] - 192:1

# N

**name** [12] - 7:12, 8:9, 16:24, 21:3, 37:4, 107:6, 148:21, 161:1, 161:14, 172:22, 187:7

**named** [1] - 79:11

**names** [1] - 187:8

**Narcotic** [1] - 35:4

**narcotic** [3] - 53:12, 84:1, 85:7

**narcotics** [1] - 85:13

**narrow** [1] - 14:25

**narrower** [1] - 139:17

**NAS** [1] - 48:18

**nation** [3] - 145:2, 185:13, 186:6

**National** [1] - 58:2, 120:6, 181:15

**national** [10] - 58:10, 78:6, 97:13, 99:15, 138:8, 156:25, 181:22, 187:2, 189:1, 195:20
**Nature** [1] - 90:6
**nature** [4] - 145:15, 160:13, 174:3, 180:11
**near** [3] - 28:16, 116:11, 201:8
**nearly** [3] - 90:16, 157:25, 158:1
**necessary** [5] - 35:13, 35:20, 42:12, 116:2, 118:1
**necessitates** [1] - 116:8
**neck** [2] - 14:14, 32:17
**need** [21] - 8:23, 11:4, 19:2, 29:13, 45:2, 75:13, 75:14, 89:19, 96:18, 99:24, 100:15, 118:6, 118:15, 134:10, 137:16, 142:14, 150:7, 150:21, 174:11, 200:19, 201:21
**Need** [3] - 194:22, 200:17, 203:3
**needed** [5] - 29:15, 130:23, 132:7, 132:14, 134:18
**needle** [1] - 153:19
**needs** [2] - 29:15, 116:19
**Neonatal** [1] - 48:13
**nerve** [1] - 37:3
**network** [1] - 179:6
**Neurontin** [2] - 37:4, 37:5
**never** [4] - 69:10, 82:1, 131:8, 132:5
**new** [9] - 18:13, 20:15, 41:14, 108:1, 109:4, 135:8, 202:14, 218:18, 218:19
**New** [19] - 3:5, 3:8, 10:19, 10:20, 19:22, 20:2, 78:20, 78:24, 79:12, 79:14, 80:23, 85:5, 87:25, 88:3, 131:20, 149:1, 180:21, 181:12, 211:17
**newsletter** [1] - 123:5
**next** [53] - 13:4, 15:20, 15:21, 19:25, 28:14, 33:7, 33:18, 34:3,

35:11, 41:23, 60:7, 85:12, 94:3, 94:4, 97:4, 104:8, 104:25, 112:23, 116:23, 118:20, 120:12, 122:4, 122:14, 124:7, 128:19, 131:25, 134:13, 152:19, 166:12, 170:13, 171:24, 173:14, 175:1, 175:2, 175:20, 175:23, 187:11, 187:14, 188:24, 193:23, 195:12, 197:10, 197:19, 198:5, 200:16, 202:11, 202:14, 202:17, 203:22, 209:8, 209:11, 212:23, 219:15
**Next** [1] - 122:3
**NFL** [1] - 174:23
**NICHOLAS** [1] - 6:11
**night** [4] - 84:11, 84:13, 107:18, 184:8
**NIH** [2] - 155:4, 155:13
**nine** [1] - 170:11
**Ninth** [1] - 4:9
**NMPR** [5] - 57:5, 59:1, 59:3, 59:5, 63:9
**Non** [4] - 55:10, 57:4, 64:7, 211:20
**non** [82] - 32:1, 32:13, 32:14, 32:16, 39:1, 46:23, 53:15, 57:5, 57:7, 58:16, 59:2, 59:9, 61:19, 61:22, 62:5, 62:9, 64:14, 64:17, 64:22, 67:8, 67:21, 69:3, 69:9, 69:11, 70:5, 70:11, 70:14, 70:24, 71:13, 77:15, 94:1, 94:7, 94:11, 94:22, 95:9, 98:25, 99:1, 99:3, 99:11, 100:1, 100:11, 102:20, 103:5, 103:12, 122:8, 122:12, 123:14, 124:11, 128:9, 139:22, 139:24, 143:9, 150:14, 152:6, 153:5, 153:15, 154:2, 154:15, 156:8, 156:10, 158:2, 158:7, 171:19, 178:11, 182:4, 195:4,

196:15, 199:19, 199:22, 199:25, 200:3, 200:9, 200:11, 201:10, 212:4, 212:6, 212:8, 212:12, 212:15
**non-cancer** [33] - 32:1, 32:13, 32:14, 32:16, 69:3, 69:9, 69:11, 70:5, 70:11, 70:14, 70:24, 71:13, 77:15, 94:22, 95:9, 99:3, 100:1, 100:11, 102:20, 103:5, 103:12, 122:8, 122:12, 124:11, 128:9, 139:22, 139:24, 143:9, 196:15, 199:19, 199:25, 200:3, 200:9
**non-malignant** [5] - 98:25, 99:1, 99:3, 99:11, 100:11
**non-medical** [33] - 46:23, 57:5, 57:7, 58:16, 59:2, 59:9, 61:19, 61:22, 62:5, 62:9, 64:14, 64:17, 64:22, 150:14, 152:6, 153:5, 153:15, 154:2, 154:15, 156:8, 156:10, 158:2, 158:7, 171:19, 178:11, 182:4, 201:10, 212:4, 212:6, 212:8, 212:12, 212:15
**Non-Medical** [4] - 55:10, 57:4, 64:7, 211:20
**non-medically** [1] - 195:4
**non-opioid** [8] - 39:1, 53:15, 67:8, 67:21, 94:1, 94:11, 199:22, 200:11
**non-opioids** [1] - 94:7
**non-treatment** [1] - 123:14
**none** [4] - 25:10, 119:15, 131:2, 186:13
**nonprescription** [2] - 36:1, 38:7
**nonsteroidal** [1] - 36:25
**noon** [2] - 130:3, 131:1
**Nora** [2] - 181:2,

181:14
**normal** [5] - 103:22, 104:16, 153:9, 179:15, 179:17
**north** [1] - 33:15
**notably** [1] - 91:9
**note** [4] - 89:6, 98:14, 168:2, 184:21
**Note** [1] - 89:6
**noted** [1] - 200:19
**notes** [2] - 19:11, 51:22
**nothing** [2] - 189:14, 199:2
**notice** [21] - 79:21, 81:15, 102:9, 107:16, 114:17, 114:21, 115:4, 115:5, 115:10, 115:14, 119:12, 122:21, 140:17, 142:8, 142:9, 144:6, 164:3, 164:4, 191:17, 192:5
**Notice** [2] - 114:23, 142:10
**Notwithstanding** [1] - 120:13
**NSDUH** [1] - 58:3
**Number** [4] - 111:16, 111:24, 132:17, 166:22
**number** [34] - 19:1, 27:18, 31:15, 31:18, 32:23, 32:24, 33:15, 33:20, 60:9, 62:3, 62:21, 62:23, 63:10, 63:18, 65:4, 108:24, 153:24, 154:1, 154:16, 159:12, 159:18, 159:21, 166:3, 166:9, 173:21, 174:20, 174:21, 193:11, 194:20, 200:2, 215:1, 215:2, 215:13, 215:17
**numbering** [1] - 164:11
**numbers** [11] - 28:15, 29:19, 29:20, 31:12, 33:22, 65:3, 65:23, 90:4, 192:24, 200:4, 214:22
**numerical** [1] - 200:2
**numerically** [1] - 200:5
**numerous** [5] - 56:1, 56:16, 90:9, 143:6, 168:3

**nurses** [3] - 92:3, 112:15, 112:21
**nursing** [1] - 34:14
**NW** [6] - 4:6, 4:9, 4:19, 4:21, 5:5, 5:12
**NY** [1] - 3:5

## O

**O'Connell** [1] - 163:23
**object** [7] - 80:17, 108:17, 115:21, 148:10, 173:4, 184:6, 213:1
**objected** [4] - 56:1, 56:16, 56:18, 145:11
**objecting** [1] - 174:4
**Objection** [5] - 141:24, 143:20, 145:5, 158:10, 159:24
**objection** [46] - 25:10, 26:7, 29:3, 29:4, 42:8, 42:16, 42:19, 46:5, 46:9, 56:21, 56:25, 83:7, 89:5, 96:3, 96:7, 97:12, 102:10, 108:18, 114:18, 114:20, 115:3, 119:13, 122:22, 127:5, 127:14, 140:18, 141:25, 143:24, 144:7, 145:7, 150:16, 158:12, 161:11, 161:16, 163:3, 167:17, 168:17, 169:23, 170:6, 184:17, 184:18, 188:6, 188:22, 189:3, 190:6, 198:7
**objections** [3] - 107:18, 168:3, 173:12
**obligation** [3] - 35:20, 190:14, 190:15
**obligations** [1] - 35:15
**obtained** [3] - 141:6, 201:11, 205:24
**obviate** [1] - 82:2
**obvious** [2] - 8:20, 59:6
**obviously** [3] - 44:17, 133:14, 166:16
**occasion** [2] - 24:20, 43:6, 147:4
**occasions** [1] - 56:1
**occur** [3] - 162:3, 205:11, 211:6

**occurred** [3] - 167:19, 179:1, 199:22
**occurring** [1] - 105:4
**OF** [2] - 1:1, 1:4
**offer** [1] - 25:4
**offered** [4] - 79:21, 81:14, 115:16, 142:8
**offering** [1] - 25:4
**Office** [3] - 22:9, 23:6, 23:13
**Officer** [1] - 140:11
**Official** [3] - 109:15, 220:2, 220:3
**official** [1] - 137:21
**Often** [1] - 106:12
**often** [6] - 30:19, 48:25, 90:10, 92:21, 117:9, 117:15
**Ohio** [4] - 160:22, 160:24, 161:2, 175:18
**older** [1] - 33:4
**one** [134] - 8:17, 10:19, 12:15, 12:21, 13:1, 16:19, 20:6, 20:8, 20:25, 21:17, 22:13, 30:9, 30:25, 31:5, 31:6, 31:7, 32:1, 32:9, 33:3, 34:1, 36:13, 36:15, 37:12, 38:15, 48:12, 50:18, 50:19, 51:12, 51:20, 52:6, 52:10, 52:23, 53:11, 54:11, 54:25, 55:19, 59:15, 71:10, 73:11, 75:3, 75:4, 79:1, 86:4, 86:11, 88:4, 93:20, 96:22, 102:3, 104:7, 108:13, 112:22, 113:8, 117:23, 118:21, 125:15, 126:1, 127:24, 132:17, 133:6, 134:6, 134:13, 135:3, 135:7, 137:8, 148:6, 148:18, 149:7, 150:1, 150:4, 151:24, 152:12, 153:4, 153:11, 153:14, 153:25, 154:3, 157:23, 157:25, 158:1, 165:24, 166:1, 167:14, 170:19, 171:9, 171:12, 171:15, 171:18, 175:23, 176:15, 176:17, 176:22, 177:11, 178:20,

179:5, 180:9, 181:24, 182:9, 182:10, 182:11, 183:8, 184:2, 184:21, 187:4, 187:11, 187:14, 191:9, 191:21, 192:8, 193:25, 194:4, 194:6, 198:13, 202:4, 202:6, 202:8, 202:11, 202:14, 202:17, 205:15, 206:1, 206:10, 209:11, 209:15, 209:23, 211:4, 212:19, 212:21, 214:2, 214:16
**One** [7] - 5:11, 85:13, 107:17, 174:1, 177:11, 184:25, 190:10
**one-year** [1] - 10:19
**ones** [2] - 20:14, 41:21
**onslaught** [1] - 81:7
**onward** [1] - 136:13
**operate** [1] - 106:4
**operating** [1] - 106:16
**opiate** [1] - 180:2
**opinion** [9] - 38:10, 97:24, 146:4, 147:1, 155:14, 156:20, 177:21, 178:3, 178:4
**opinions** [3] - 9:21, 24:25, 25:4
**Opioid** [7] - 16:22, 48:13, 124:18, 172:23, 181:13, 197:20, 211:21
**opioid** [113] - 16:25, 17:1, 18:22, 21:1, 21:4, 22:14, 23:17, 36:1, 38:7, 38:15, 39:1, 40:16, 47:6, 47:23, 48:5, 49:5, 49:14, 53:12, 53:13, 53:15, 53:20, 53:22, 57:8, 57:12, 59:10, 67:8, 67:21, 69:1, 69:3, 69:8, 70:23, 72:2, 84:6, 91:1, 91:19, 91:23, 92:5, 92:9, 92:13, 94:1, 94:6, 94:11, 95:13, 97:1, 97:19, 102:18, 103:3, 103:23, 105:10, 116:24, 117:7, 120:15, 122:6, 124:25, 126:11, 127:21,

128:6, 128:14, 129:9, 143:9, 143:16, 145:3, 145:15, 146:16, 150:11, 150:14, 152:3, 152:6, 153:5, 156:8, 157:1, 157:11, 158:2, 159:19, 165:5, 166:18, 168:8, 168:10, 168:25, 177:22, 178:23, 179:24, 180:12, 181:17, 181:20, 181:22, 182:4, 182:5, 183:8, 195:20, 196:3, 196:6, 196:18, 196:21, 197:13, 197:23, 198:23, 199:21, 199:22, 199:24, 200:11, 200:21, 201:25, 202:25, 208:3, 212:8, 212:13, 213:4, 213:10, 213:24, 217:9, 217:14
**opioid-driven** [1] - 145:3
**Opioids** [7] - 34:21, 64:8, 193:1, 193:5, 195:16, 199:11, 201:7
**opioids** [171] - 9:2, 9:7, 9:15, 9:18, 17:8, 19:3, 22:19, 24:15, 24:16, 25:1, 25:9, 26:11, 26:18, 32:9, 32:11, 35:9, 35:13, 35:19, 35:25, 36:20, 36:22, 37:2, 38:7, 38:11, 39:8, 39:18, 49:13, 51:1, 51:2, 51:5, 52:4, 54:11, 54:19, 54:21, 57:17, 57:19, 57:22, 57:23, 59:17, 59:23, 60:3, 60:6, 60:10, 62:11, 62:13, 63:1, 65:9, 66:2, 66:3, 66:10, 66:18, 66:21, 67:1, 67:2, 67:4, 67:10, 67:14, 67:18, 68:2, 68:21, 68:25, 69:11, 70:4, 70:11, 70:14, 71:2, 71:5, 71:7, 71:12, 71:19, 71:25, 76:16, 76:18, 77:2, 77:4, 77:8, 91:9, 91:14, 92:21, 94:7,

94:11, 95:8, 95:14, 95:18, 95:20, 98:25, 99:9, 99:10, 100:1, 100:10, 101:5, 103:14, 104:4, 104:7, 114:11, 115:1, 115:9, 115:15, 122:10, 124:9, 125:23, 126:2, 128:20, 129:3, 138:11, 138:15, 139:4, 139:16, 142:23, 144:20, 145:21, 147:5, 147:12, 149:10, 153:6, 153:13, 153:15, 153:16, 153:21, 154:2, 154:6, 154:16, 154:20, 157:19, 158:6, 158:7, 158:19, 159:3, 159:7, 161:22, 161:24, 162:5, 165:4, 167:20, 169:1, 169:9, 169:13, 169:14, 169:18, 178:7, 178:12, 178:13, 179:25, 180:1, 182:13, 193:8, 193:12, 193:20, 193:25, 196:16, 197:12, 199:13, 199:18, 200:11, 201:19, 206:19, 207:3, 207:7, 207:13, 209:16, 210:3, 211:24, 212:5, 212:7, 213:15, 213:22, 214:24, 215:14, 216:11, 217:17
**opium** [2] - 153:18, 153:19
**opportunity** [5] - 135:16, 141:23, 141:25, 142:21, 147:22
**opposed** [4] - 66:18, 77:8, 164:17, 196:19
**opposing** [1] - 151:1
**opposite)** [1] - 93:11
**option** [2] - 117:9, 117:15
**orange** [2] - 61:6, 165:8
**order** [2] - 15:6, 209:1
**ordering** [1] - 128:13

**Organization** [8] - 88:12, 88:16, 88:22, 92:8, 92:15, 92:17, 92:19, 93:19
**organization** [4] - 92:24, 110:3, 113:14, 117:18
**Organization's** [1] - 35:2
**Organizations** [3] - 105:17, 105:22, 113:3
**organizations** [6] - 106:2, 113:6, 119:25, 120:9, 191:14, 203:13
**organizers** [2] - 172:25, 173:9
**organizing** [1] - 152:22
**orient** [9] - 15:16, 78:19, 80:10, 98:6, 120:20, 138:4, 140:7, 151:13, 204:12
**origin** [1] - 122:12
**original** [3] - 108:5, 117:20, 136:2
**originally** [1] - 142:24
**origins** [4] - 102:20, 103:12, 122:8, 177:5
**Orleans** [1] - 3:8
**out-of-pocket** [1] - 132:1
**Outcomes** [1] - 162:9
**outset** [1] - 84:18
**outside** [6] - 35:14, 133:13, 133:19, 134:8, 189:20, 213:2
**outweigh** [2] - 38:11, 39:15
**outweighed** [2] - 217:5, 218:4
**outweighing** [1] - 39:6
**over-prescribing** [7] - 146:15, 165:17, 165:20, 171:5, 171:6, 204:25, 205:10
**over-prescription** [1] - 179:25
**over-treatment** [1] - 123:15
**overall** [3] - 33:6, 156:7, 210:22
**overdose** [11] - 47:7, 47:13, 53:21, 166:19, 167:12, 169:2, 173:22, 175:6, 177:12,

181:22
**overdoses** [2] - 165:7, 165:19
**Overdoses** [1] - 170:16
**overlapping** [1] - 137:6
**overnight** [1] - 134:2
**overrule** [5] - 42:16, 56:24, 96:7, 168:16, 184:18
**Overruled** [4] - 83:18, 97:25, 148:12, 160:1
**overruled** [2] - 42:24, 213:11
**overseeing** [2] - 16:9, 16:25
**oversight** [2] - 26:4, 72:21
**overview** [1] - 101:22
**overwhelmed** [1] - 159:6
**overwhelmingly** [1] - 188:8
**own** [2] - 37:21, 37:24
**oxycodone** [2] - 40:11, 45:22
**Oxycontin** [3] - 94:25, 95:1, 96:1

**P**

**P-1200** [1] - 2:7
**P-41929** [1] - 210:12
**P-41958** [3] - 163:1, 164:13, 204:9
**P-43172** [1] - 206:14
**P-43594** [1] - 209:22
**p.m** [4] - 130:19, 130:20, 190:25, 219:21
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**pack** [1] - 212:21
**package** [1] - 39:24
**pad** [1] - 166:1
**Page** [49] - 29:18, 29:23, 31:10, 34:18, 60:19, 60:20, 63:20, 64:5, 79:9, 82:17, 90:5, 91:24, 93:1, 93:12, 107:23, 107:24, 108:23, 109:10, 109:12, 110:18, 121:4, 121:8, 122:4, 124:22, 125:11, 127:19, 143:10, 156:23, 164:13, 166:13, 178:21,

192:24, 194:21, 195:12, 197:19, 198:6, 199:9, 200:16, 201:3, 201:18, 203:2, 204:11, 204:16, 205:19, 207:19, 209:2, 212:2
**page** [35] - 28:8, 28:14, 45:7, 61:17, 61:18, 88:14, 90:5, 93:2, 98:10, 107:22, 108:6, 108:7, 109:3, 109:11, 110:17, 123:19, 124:7, 128:4, 131:3, 132:3, 145:1, 164:12, 166:12, 192:23, 194:19, 195:12, 196:1, 197:19, 198:6, 206:16, 209:8, 210:1, 211:9
**pages** [3] - 107:20, 131:2, 134:19
**paid** [1] - 190:2
**Pain** [23] - 8:12, 13:16, 26:2, 28:12, 28:18, 55:10, 57:4, 64:7, 87:11, 88:10, 88:15, 90:7, 105:17, 109:24, 111:1, 111:2, 111:19, 120:4, 120:5, 181:13, 193:1, 193:5, 199:11
**pain** [351] - 8:15, 8:18, 8:19, 8:21, 9:3, 11:25, 12:2, 12:7, 12:12, 13:11, 14:12, 14:14, 14:15, 14:18, 14:22, 15:10, 16:2, 16:3, 16:4, 18:3, 18:8, 18:10, 18:22, 18:25, 19:24, 20:1, 20:6, 20:10, 20:13, 20:16, 21:5, 21:8, 21:9, 21:16, 24:6, 24:12, 24:25, 25:1, 25:8, 26:10, 26:17, 26:18, 26:20, 26:21, 26:22, 26:23, 26:24, 26:25, 27:7, 27:9, 27:13, 27:14, 27:19, 29:24, 30:3, 30:6, 30:8, 30:10, 30:11, 30:13, 30:18, 30:25, 31:5, 31:12, 31:15, 31:19, 31:22, 31:24, 31:25, 32:1, 32:2, 32:3, 32:4, 32:7,

32:10, 32:12, 32:13, 32:15, 32:16, 32:17, 32:25, 33:10, 33:12, 33:21, 34:1, 34:6, 34:16, 34:25, 35:2, 35:12, 35:15, 35:24, 36:1, 36:2, 36:11, 36:21, 37:3, 39:2, 47:1, 48:5, 53:11, 53:13, 53:14, 53:15, 53:16, 53:20, 57:6, 57:7, 57:8, 57:9, 57:15, 58:16, 59:2, 59:9, 59:10, 61:19, 61:20, 61:22, 62:5, 62:9, 64:14, 64:17, 64:22, 67:5, 67:7, 67:19, 67:21, 67:24, 68:22, 68:25, 69:1, 69:4, 69:6, 69:9, 69:11, 69:17, 70:5, 70:11, 70:15, 70:23, 70:24, 71:13, 71:18, 71:24, 76:24, 77:3, 77:15, 82:21, 82:25, 83:15, 83:25, 84:6, 85:6, 86:19, 87:6, 87:12, 87:17, 87:18, 87:20, 87:21, 87:22, 88:20, 88:23, 88:25, 90:10, 90:14, 90:20, 90:23, 91:15, 91:19, 91:22, 91:23, 91:25, 92:16, 92:21, 92:23, 93:6, 93:16, 93:19, 93:21, 93:22, 93:25, 94:5, 94:9, 94:14, 94:15, 94:17, 94:19, 94:21, 94:22, 95:9, 95:10, 95:13, 97:18, 98:25, 99:2, 99:3, 99:4, 99:6, 99:11, 100:1, 100:11, 101:19, 102:1, 102:19, 102:20, 103:3, 103:4, 103:8, 103:9, 103:11, 103:12, 105:7, 105:9, 105:10, 105:11, 106:7, 106:9, 106:15, 106:21, 106:22, 107:3, 107:7, 107:9, 107:10, 108:2, 109:4, 109:21, 109:25, 110:2, 110:4, 111:13, 111:14, 111:15, 111:22, 111:25, 112:2, 112:3, 112:7, 112:8, 112:10,

112:11, 112:13, 112:19, 112:20, 112:22, 113:22, 114:2, 114:3, 114:8, 114:14, 116:9, 116:10, 116:12, 116:13, 116:20, 116:21, 116:25, 117:4, 117:8, 117:15, 119:23, 120:14, 120:16, 121:1, 121:9, 121:11, 121:13, 121:18, 121:22, 122:7, 122:8, 122:13, 123:10, 123:14, 123:21, 124:1, 124:10, 124:11, 126:3, 128:7, 128:8, 129:10, 138:12, 138:13, 139:16, 139:19, 139:22, 139:24, 142:24, 143:9, 143:15, 144:19, 149:20, 159:19, 162:20, 165:5, 166:18, 182:4, 182:5, 182:21, 185:9, 185:13, 185:20, 186:9, 186:12, 192:20, 193:8, 193:16, 193:20, 193:25, 195:3, 196:15, 199:13, 199:19, 199:22, 199:23, 199:24, 199:25, 200:3, 200:9, 200:20, 201:11, 203:5, 205:21, 206:10, 207:8, 209:6, 209:12, 209:15, 212:13, 217:14
**pain-killers** [3] - 205:21, 206:10, 212:13
**painkiller** [1] - 177:18
**Painkiller** [1] - 170:16
**painkillers** [5] - 166:18, 167:7, 176:15, 176:18, 177:13
**panel** [1] - 173:16
**Papantonio** [1] - 2:10
**papers** [2] - 132:13
**paragraph** [42] - 29:22, 34:20, 35:11, 85:12, 86:16, 90:7,

98:22, 102:16, 103:19, 108:1, 108:6, 108:7, 109:4, 116:1, 117:24, 119:17, 120:12, 123:8, 128:5, 145:1, 151:7, 151:10, 151:12, 156:5, 181:8, 191:21, 191:24, 194:24, 196:2, 196:4, 196:6, 197:23, 198:5, 198:21, 200:17, 201:6, 203:14, 203:16, 206:16, 208:1, 212:3
**paragraphs** [2] - 99:19, 128:13
**parallel** [1] - 159:23
**Pardon** [1] - 150:7
**parse** [1] - 169:16
**part** [29] - 9:3, 14:8, 21:1, 22:2, 24:19, 26:3, 35:20, 40:23, 73:6, 77:19, 81:25, 84:6, 85:19, 86:2, 97:3, 97:6, 103:6, 109:25, 110:8, 114:5, 116:12, 116:22, 126:14, 168:3, 177:4, 181:25, 212:5, 212:13
**partially** [1] - 154:11
**participants** [1] - 74:5
**participate** [2] - 16:15, 27:5
**participated** [1] - 183:17
**particular** [5] - 76:22, 156:9, 169:9, 170:20, 178:20
**particularly** [5] - 27:14, 52:18, 87:1, 151:18, 207:7
**partly** [1] - 207:21
**parts** [2] - 108:8, 198:15
**party** [5] - 73:16, 140:21, 143:21, 143:22
**pass** [3] - 84:10, 97:24, 129:18
**passed** [1] - 105:15
**Past** [1] - 60:20
**past** [10] - 41:19, 61:3, 76:18, 142:19, 145:17, 147:24, 153:5, 153:14, 154:5, 166:7

**past-year** [3] - 153:5,
153:14, 154:5
**patch** [1] - 37:7
**path** [3] - 10:13,
179:24, 212:20
**patient** [77] - 8:16, 9:9,
9:11, 14:6, 14:11,
14:24, 15:18, 15:20,
16:14, 27:11, 29:17,
38:2, 38:5, 38:16,
39:1, 39:3, 41:4,
45:19, 47:11, 47:25,
48:3, 50:18, 50:19,
50:23, 51:3, 51:23,
53:5, 53:9, 54:18,
57:7, 67:13, 69:19,
69:24, 71:16, 73:8,
73:9, 73:14, 73:17,
73:24, 74:24, 75:13,
75:15, 87:11, 87:21,
93:25, 94:2, 94:14,
104:4, 104:5, 104:8,
104:15, 104:22,
104:23, 109:25,
111:22, 112:1,
112:6, 112:9,
112:11, 112:17,
112:20, 118:4,
118:12, 119:25,
125:2, 126:4,
128:23, 183:9,
192:21, 200:25,
208:23, 217:2, 217:5
**Patient** [1] - 34:21
**patient's** [12] - 9:10,
38:25, 47:16, 53:6,
53:9, 67:14, 73:12,
73:20, 75:18, 110:1,
118:6, 118:14
**Patients** [1] - 124:25
**patients** [135] - 8:18,
8:19, 8:21, 8:25,
12:4, 12:8, 12:10,
13:2, 14:14, 14:15,
14:18, 14:20, 15:3,
15:4, 15:6, 15:8,
15:9, 15:11, 15:25,
16:2, 16:12, 18:4,
18:17, 18:24, 19:2,
21:22, 26:20, 26:22,
26:24, 26:25, 27:13,
32:6, 32:9, 32:11,
34:3, 34:5, 35:21,
36:8, 36:12, 36:13,
36:15, 37:7, 37:11,
37:13, 37:14, 37:20,
38:10, 39:6, 39:14,
41:7, 47:5, 47:11,
47:17, 49:23, 50:2,
50:5, 50:10, 50:22,

50:25, 51:2, 51:4,
52:3, 52:7, 54:3,
54:10, 54:14, 54:16,
54:20, 57:18, 59:8,
62:1, 64:17, 64:21,
66:20, 67:6, 67:9,
67:11, 69:18, 69:25,
70:4, 70:14, 70:20,
71:17, 71:22, 72:3,
74:4, 74:8, 74:25,
77:3, 77:14, 83:1,
83:16, 85:20, 86:2,
90:17, 90:18, 90:19,
90:23, 91:7, 91:14,
92:3, 93:10, 98:25,
99:6, 99:12, 104:21,
109:20, 110:4,
111:2, 111:12,
112:3, 112:8,
112:19, 116:10,
116:24, 117:7,
128:11, 139:9,
139:12, 139:13,
143:14, 144:18,
144:19, 146:21,
180:1, 187:4, 187:5,
193:24, 194:1,
196:7, 196:16,
197:12, 202:8, 202:9
**patients'** [4] - 39:15,
112:13, 121:22,
126:3
**pattern** [1] - 179:1
**patterns** [6] - 24:21,
161:10, 179:6,
183:14, 183:25,
187:1
**PAUL** [2] - 2:3, 5:9
**Paul** [1] - 147:20
**pause** [4] - 30:4,
60:21, 82:22, 99:1
**Pause** [1] - 181:10
**Pay** [1] - 172:23
**pay** [1] - 96:22
**pays** [1] - 19:14
**PDMP** [1] - 213:3
**peak** [4] - 78:1,
146:10, 146:11,
173:24
**peaked** [2] - 77:11,
178:23
**PEARL** [1] - 3:6
**peek** [1] - 155:20
**peer** [3] - 19:4, 19:16,
150:6
**peer-review** [1] - 19:4
**peer-reviewed** [1] -
150:6
**Pensacola** [1] - 2:11
**people** [57] - 16:9,

17:20, 27:18, 31:6,
45:23, 57:16, 59:11,
59:17, 59:22, 60:1,
60:4, 60:9, 60:11,
61:2, 62:1, 62:4,
62:6, 62:24, 64:9,
64:10, 65:9, 65:10,
65:25, 77:16,
131:18, 150:5,
151:11, 153:18,
153:20, 153:24,
154:1, 159:10,
167:8, 167:12,
171:16, 174:20,
174:23, 177:14,
178:6, 182:18,
184:2, 186:11,
200:20, 203:5,
205:21, 206:9,
211:23, 212:12,
213:21, 214:22,
215:2, 215:7,
215:10, 215:13,
215:17, 216:5,
218:19
**people's** [1] - 173:3
**per** [13] - 23:16, 34:12,
34:14, 74:24,
112:17, 112:18,
159:22, 166:11,
167:8, 167:12,
169:8, 169:19,
204:21
**percent** [47] - 34:1,
34:5, 34:10, 34:15,
58:18, 59:3, 59:7,
59:11, 59:16, 59:24,
60:4, 60:6, 60:10,
62:6, 62:8, 63:7,
63:10, 64:15, 64:24,
65:6, 66:4, 66:11,
90:18, 153:4,
153:11, 153:14,
153:25, 154:3,
154:5, 154:14,
178:6, 186:12,
196:12, 196:15,
196:18, 196:19,
196:21, 196:23,
201:10, 205:25,
206:9, 208:10,
208:18, 214:22,
214:25, 215:2, 215:4
**Percent** [1] - 61:7
**Percentage** [1] - 60:20
**percentage** [12] -
34:1, 34:14, 59:22,
62:1, 63:6, 64:13,
64:21, 64:23, 93:10,
104:20, 151:10

**percentages** [1] -
33:20
**perception** [1] - 87:5
**Percocet** [7] - 40:11,
40:16, 47:5, 47:17,
52:25, 53:1, 53:11
**perfect** [1] - 50:17
**perfectly** [1] - 151:23
**Perhaps** [1] - 81:14
**perhaps** [6] - 18:13,
37:12, 77:7, 103:9,
139:17, 146:16
**period** [21] - 10:25,
59:4, 76:22, 87:5,
90:13, 90:23, 95:12,
99:17, 103:15,
104:5, 137:3,
138:18, 138:19,
146:1, 146:16,
146:17, 157:2,
157:16, 173:22,
217:18, 217:19
**periodically** [1] -
41:13
**permissible** [1] -
46:17
**permission** [2] -
10:24, 22:23
**permit** [1] - 80:6
**permits** [1] - 80:7
**permitted** [1] - 56:19
**persistent** [1] - 34:1
**persisting** [1] - 94:5
**persists** [1] - 94:9
**person** [4] - 15:5,
75:6, 182:25, 183:8
**person's** [1] - 37:17
**personal** [2] - 50:11,
131:25
**personally** [3] - 21:17,
56:17, 152:17
**persons** [2] - 208:4,
212:7
**Perspective** [1] -
162:8
**perspective** [3] - 35:7,
43:5, 138:24
**PETER** [1] - 2:9
**pharmaceutical** [6] -
86:14, 120:1,
145:23, 147:6,
160:15, 160:18
**Pharmaceuticals** [1] -
22:17
**pharmacokinetics** [1]
- 41:24
**pharmacology** [1] -
41:1
**pharmacy** [1] - 166:4
**phase** [1] - 207:14

**phenomenon** [1] -
104:19
**Phil** [2] - 10:5
**Philadelphia** [2] - 6:6,
6:13
**Philip** [2] - 187:14,
187:15
**phrase** [1] - 147:25
**physical** [8] - 36:4,
92:3, 103:22, 104:8,
104:10, 104:23,
110:1
**physically** [1] - 104:5
**physician** [14] - 31:1,
43:5, 72:22, 73:23,
75:4, 99:24, 100:17,
141:18, 146:1,
146:4, 182:13,
206:20, 207:3
**physician's** [4] -
74:22, 74:23, 74:24,
121:10
**physicians** [27] - 16:1,
16:25, 21:21, 26:4,
28:22, 35:13, 35:18,
51:5, 54:21, 88:7,
99:7, 104:2, 120:2,
129:5, 141:14,
141:22, 146:17,
150:1, 152:15,
162:20, 182:17,
183:13, 183:14,
192:18, 204:24,
207:5, 207:15
**Physicians** [3] -
103:21, 125:16,
146:9
**physicians'** [1] - 75:7
**physiologic** [1] -
104:16
**pick** [8] - 37:19, 38:8,
41:16, 54:7, 68:15,
138:1, 185:1, 199:7
**picking** [1] - 94:15
**pictogram** [1] - 188:19
**picture** [4] - 170:17,
171:2, 171:3, 175:15
**piece** [1] - 31:14
**pieces** [2] - 31:13,
133:9
**PIFKO** [1] - 3:14
**pill** [1] - 182:23
**Pills** [1] - 159:9
**pills** [5] - 159:9,
159:21, 166:8,
182:20, 182:21
**pink** [1] - 176:16
**pizza** [1] - 218:20
**place** [2] - 68:3, 97:11
**places** [1] - 87:13

placing [1] - 76:25
Plaintiff [5] - 1:5, 1:11, 2:2, 3:2, 4:1
Plaintiffs [1] - 220:6
plaintiffs [5] - 133:24, 136:23, 137:1, 147:21, 190:2
Plaintiffs' [1] - 129:19
plaintiffs' [3] - 55:23, 133:12, 168:13
plan [1] - 16:14
planned [1] - 134:16
planning [1] - 134:12
plans [1] - 110:3
play [18] - 9:14, 9:18, 13:13, 16:17, 32:11, 45:4, 45:5, 50:16, 71:15, 95:17, 95:19, 96:14, 96:17, 99:20, 105:24, 147:11, 173:7, 173:11
played [1] - 218:7
playing [1] - 218:5
plays [1] - 78:25
Pleasant [3] - 4:4, 4:12, 4:15
plural [1] - 75:6
plus [2] - 94:6, 94:7
pocket [1] - 132:1
point [49] - 25:7, 30:19, 33:24, 34:3, 34:10, 34:13, 39:20, 48:24, 52:14, 54:11, 62:5, 70:21, 80:20, 80:25, 83:4, 83:6, 83:14, 84:4, 85:25, 87:3, 87:4, 94:5, 97:23, 107:18, 118:11, 120:22, 131:5, 132:13, 134:15, 147:13, 165:15, 165:17, 167:14, 168:21, 169:7, 187:9, 188:2, 189:7, 189:25, 190:7, 193:15, 194:6, 195:10, 197:19, 198:3, 200:5, 204:24, 205:9
pointing [1] - 176:17
points [12] - 24:10, 73:4, 123:7, 132:16, 140:1, 152:12, 157:22, 193:11, 199:8, 201:20, 201:22, 207:18
policies [3] - 120:14, 213:17, 213:23
policy [7] - 112:5, 123:13, 127:20,

170:21, 209:4, 212:24, 213:14
Policy [2] - 119:4, 170:15
Polster's [1] - 131:21
Ponc [1] - 2:4
Ponce [1] - 2:14
pool [3] - 64:21, 161:1, 161:15
pooling [1] - 58:2
population [7] - 14:25, 33:3, 33:4, 69:4, 69:15, 70:1, 153:12
portion [6] - 10:23, 34:11, 53:6, 63:2, 145:10, 161:16
Portsmouth [1] - 161:1
position [4] - 8:10, 89:10, 98:24, 152:15
possibility [1] - 85:14
possible [9] - 40:7, 51:19, 58:23, 125:12, 126:22, 136:11, 137:5, 138:5, 191:6
posted [2] - 111:25, 112:17
postings [1] - 112:7
postoperative [1] - 34:6
potent [1] - 67:5
potential [19] - 18:12, 18:21, 44:20, 69:23, 72:9, 76:14, 77:1, 77:9, 77:14, 125:17, 125:24, 126:5, 126:12, 126:13, 129:9, 139:8, 192:2, 203:23, 207:15
potentially [1] - 209:16
powder [2] - 149:9, 153:18
Powell [1] - 2:6
powerful [2] - 67:21, 92:23
PR [2] - 2:5, 2:14
practice [33] - 18:3, 30:1, 31:5, 43:21, 51:16, 52:13, 55:6, 71:4, 74:12, 74:14, 76:3, 76:6, 76:7, 76:11, 78:25, 82:23, 87:13, 87:23, 88:25, 96:18, 96:24, 97:15, 100:19, 106:23, 121:12, 121:19, 121:23, 124:2, 126:9, 128:16,

129:7, 209:4, 209:11
practiced [1] - 25:22
practices [6] - 26:5, 75:7, 128:16, 128:22, 184:10, 207:7
practicing [3] - 76:11, 96:19, 120:2
practitioners [2] - 118:4, 118:12
preamble [1] - 148:10
precedent [1] - 131:13
preceding [1] - 58:14
precluded [2] - 55:23, 56:9
predispose [2] - 65:20, 215:25
predisposing [1] - 161:25
premised [1] - 160:21
prepare [2] - 162:21, 164:23
prepared [2] - 80:14, 82:5
prescribe [33] - 9:15, 9:19, 35:13, 35:19, 38:5, 43:25, 44:1, 49:13, 49:17, 49:18, 49:19, 99:8, 100:10, 104:3, 114:11, 115:9, 147:4, 169:1, 169:12, 169:13, 192:1, 203:19, 207:12, 207:17, 216:17, 216:21, 216:22, 216:25, 217:25
prescribed [16] - 53:22, 57:17, 125:23, 139:16, 139:19, 139:23, 157:19, 159:13, 159:19, 178:12, 182:17, 182:21, 182:25, 194:11, 194:13, 210:2
prescribes [3] - 38:1, 48:4, 183:8
Prescribing [1] - 124:18
prescribing [71] - 16:25, 17:1, 17:8, 24:21, 26:4, 39:21, 39:23, 43:23, 47:17, 49:15, 52:10, 71:2, 72:20, 72:22, 74:18, 74:22, 74:23, 75:1, 75:7, 75:12, 75:16, 77:5, 77:8, 77:11, 77:22, 77:25, 78:7,

97:1, 99:25, 126:10, 128:13, 138:17, 138:22, 139:2, 142:23, 143:8, 146:1, 146:4, 146:6, 146:9, 146:12, 146:15, 146:16, 146:23, 147:3, 160:12, 161:9, 165:17, 165:20, 166:16, 166:21, 168:25, 169:4, 171:5, 171:6, 183:22, 184:1, 184:10, 185:23, 187:1, 204:25, 205:3, 205:8, 205:10, 207:6, 209:10, 213:4, 213:24, 217:6, 217:9
prescription [154] - 9:2, 9:7, 16:10, 18:22, 23:17, 24:15, 24:16, 25:1, 25:9, 26:11, 26:17, 35:8, 35:19, 35:25, 36:19, 36:22, 38:7, 38:11, 39:8, 39:12, 39:18, 39:20, 39:22, 40:5, 40:13, 40:16, 51:1, 53:11, 54:11, 57:11, 57:17, 57:19, 57:22, 57:23, 59:17, 59:23, 60:3, 60:5, 60:9, 62:10, 62:12, 63:1, 65:9, 66:1, 66:2, 66:3, 66:10, 66:17, 66:21, 67:1, 67:2, 67:3, 67:18, 68:2, 68:25, 69:11, 70:4, 70:11, 70:14, 71:5, 71:6, 72:16, 76:16, 76:17, 91:14, 95:18, 101:5, 103:14, 115:9, 120:21, 122:10, 129:3, 138:10, 138:15, 139:4, 139:15, 143:15, 144:20, 145:2, 145:16, 145:21, 147:5, 149:10, 150:11, 150:14, 152:3, 152:6, 153:5, 153:6, 153:13, 153:15, 153:16, 154:2, 154:6, 154:16, 154:20, 157:1, 157:11, 157:19, 158:2, 158:5, 158:19, 159:3,

159:6, 161:21, 161:24, 162:5, 165:4, 165:23, 165:25, 166:1, 166:5, 166:18, 167:7, 167:19, 169:9, 169:18, 176:15, 176:18, 177:12, 177:18, 178:7, 178:12, 178:13, 179:25, 182:21, 187:4, 195:6, 197:12, 197:13, 198:23, 201:11, 203:5, 205:4, 205:6, 205:12, 205:14, 205:21, 206:9, 207:13, 209:16, 211:24, 212:4, 212:7, 212:8, 213:9, 213:15, 213:22, 214:23, 215:14, 216:10, 216:15, 217:17
Prescription [4] - 64:8, 170:15, 202:11, 211:21
prescriptions [18] - 16:15, 146:3, 147:12, 165:5, 165:12, 165:24, 166:3, 166:6, 166:9, 178:23, 182:14, 187:5, 204:20, 205:7, 205:13, 206:20, 207:3
present [2] - 196:3, 196:6
presentation [5] - 162:7, 162:19, 172:10, 175:2, 204:9
presented [1] - 162:24
preserve [1] - 42:17
pressed [1] - 92:18
pressure [4] - 35:14, 107:7, 111:4, 111:11
pretty [3] - 66:25, 81:11, 81:21
prevalence [2] - 150:13, 152:5
prevent [1] - 8:21
preventing [3] - 113:22, 114:2, 114:9
Preventing [1] - 118:2
Prevention [2] - 140:12, 142:23
previous [1] - 197:13
previously [8] - 60:2, 60:5, 60:12, 62:9,

62:25, 66:1, 163:22, 214:23
**price** [2] - 214:4, 214:11
**primarily** [1] - 212:7
**primary** [2] - 8:17, 146:17
**prime** [1] - 191:5
**principally** [4] - 9:8, 11:16, 18:9, 72:7
**principle** [1] - 168:14
**print** [3] - 40:7, 84:13, 101:13
**prison** [1] - 189:9
**private** [1] - 141:6
**problem** [13] - 29:13, 42:18, 51:23, 66:17, 66:18, 66:19, 66:22, 81:5, 116:9, 116:20, 191:22, 191:25, 195:21
**problematic** [1] - 23:10
**problems** [4] - 69:20, 117:22, 189:16, 217:12
**procedures** [2] - 12:9, 16:16
**proceed** [3] - 7:23, 8:3, 199:3
**proceedings** [1] - 220:5
**Proceedings** [3] - 6:19, 68:11, 130:20
**PROCEEDINGS** [1] - 7:1
**process** [5] - 13:14, 146:5, 159:25, 218:6, 218:7
**processes** [1] - 160:13
**Proctor** [1] - 2:10
**produce** [2] - 22:19, 135:18
**produced** [3] - 6:19, 22:19, 135:19
**product** [3] - 135:18, 137:16, 147:12
**products** [1] - 145:15
**profession** [15] - 84:5, 85:20, 86:2, 86:9, 88:2, 94:19, 95:13, 105:25, 115:15, 138:25, 141:10, 142:11, 144:18, 204:5, 207:12
**professional** [3] - 24:19, 119:24, 128:15
**professors** [1] - 11:3

**profit** [1] - 86:14
**profound** [1] - 188:1
**programs** [1] - 202:2
**Programs** [1] - 202:12
**progress** [1] - 120:13
**progression** [3] - 212:5, 212:14, 212:19
**promises** [1] - 137:10
**Promoting** [1] - 113:22
**promoting** [1] - 114:8
**prompted** [1] - 12:1
**proper** [4] - 169:24, 170:3, 174:7, 184:11
**properly** [1] - 203:5
**properties** [1] - 204:1
**propose** [1] - 136:22
**proposing** [1] - 121:17
**proposition** [3] - 158:4, 158:19, 189:15
**prospective** [4] - 152:24, 155:24, 156:25, 157:10
**provide** [1] - 141:25
**provided** [3] - 25:24, 89:7, 205:20
**providers** [1] - 120:3
**provides** [2] - 117:9, 117:16
**providing** [1] - 16:2
**provision** [2] - 178:21, 179:10
**proximate** [4] - 133:22, 134:6, 135:2, 135:4
**psychiatric** [3] - 38:19, 50:13, 65:17
**psychological** [4] - 36:7, 92:4, 104:18, 110:1
**Psychology** [1] - 162:8
**public** [9] - 29:2, 85:20, 86:2, 112:7, 115:18, 141:6, 141:8, 180:13, 195:20
**publication** [8] - 34:25, 59:20, 78:19, 78:21, 82:17, 115:6, 192:11, 211:17
**publications** [3] - 85:10, 101:3, 105:2
**publicly** [1] - 141:9
**published** [5] - 19:4, 27:17, 62:18, 90:10, 142:24

**pull** [7] - 73:4, 74:24, 96:21, 110:18, 191:10, 207:1, 211:9
**pulled** [3] - 86:16, 108:2, 109:5
**pulling** [2] - 72:25, 110:19
**pulse** [2] - 111:4, 111:11
**Purdue** [1] - 218:15
**purity** [2] - 214:5, 214:11
**purple** [5] - 165:7, 166:19, 167:9, 167:10, 168:22
**purportedly** [1] - 184:9
**purpose** [30] - 17:10, 17:12, 40:19, 40:22, 46:13, 46:15, 46:17, 81:15, 98:16, 98:23, 102:9, 102:12, 107:16, 108:17, 114:17, 114:19, 115:16, 115:20, 119:12, 122:20, 122:23, 122:25, 128:15, 128:20, 140:17, 142:14, 144:5, 144:6, 165:2
**purposes** [6] - 25:2, 123:13, 129:19, 137:21, 142:8, 162:24
**put** [34] - 20:17, 28:9, 37:7, 44:23, 52:18, 52:21, 53:20, 56:1, 56:17, 77:9, 84:24, 86:4, 94:25, 98:7, 100:5, 102:24, 111:17, 117:12, 119:2, 121:4, 123:3, 124:13, 124:21, 125:5, 129:12, 137:20, 138:3, 143:17, 151:5, 168:9, 188:25, 190:2, 190:4, 192:8
**puts** [1] - 52:16
**putting** [8] - 55:23, 56:17, 56:18, 85:1, 134:13, 165:15, 167:14, 168:21

**Q**

**qualified** [4] - 42:15, 97:19, 97:23, 143:25
**quality** [7] - 72:13, 72:14, 76:8, 87:12,

87:22, 99:6, 116:13
**Quality** [2] - 79:4, 82:18
**quantify** [1] - 27:18
**quarterly** [1] - 123:5
**questioning** [2] - 184:11, 207:6
**questionnaires** [2] - 48:1, 50:9
**questions** [22] - 13:16, 20:18, 20:24, 25:19, 26:8, 32:22, 34:17, 43:4, 52:9, 65:7, 144:8, 145:24, 174:11, 179:9, 184:5, 190:19, 191:7, 199:10, 201:18, 206:14, 215:8, 218:9
**quick** [3] - 26:2, 123:7, 179:9
**quickly** [4] - 126:22, 138:4, 210:12, 211:16
**quite** [13] - 34:12, 42:9, 44:19, 50:5, 54:16, 69:23, 69:24, 100:16, 114:12, 134:5, 140:19, 157:21, 172:5
**quote** [5] - 85:4, 92:13, 100:6, 116:8, 178:11
**quotes** [1] - 83:22
**quoting** [1] - 83:23

**R**

**Rafferty** [1] - 2:10
**raise** [1] - 7:14
**raised** [4] - 131:8, 131:12, 152:12, 163:14
**raises** [1] - 135:8
**ran** [1] - 184:15
**randomized** [1] - 200:8
**range** [13] - 14:12, 14:14, 14:20, 14:25, 15:1, 15:3, 43:6, 50:2, 61:9, 61:12, 78:2, 128:7
**rare** [2] - 51:16, 54:16
**rarely** [1] - 56:9
**rate** [8] - 23:15, 23:16, 55:16, 58:11, 58:15, 107:6, 175:9, 175:19
**rates** [12] - 66:6, 69:7, 77:22, 77:25, 138:17, 138:22,

150:13, 152:5, 167:12, 213:16, 214:6, 216:9
**rather** [2] - 152:22, 204:1
**ratings** [1] - 111:2
**rays** [1] - 73:15
**re** [1] - 131:7
**re-litigate** [1] - 131:7
**reach** [1] - 23:19
**reached** [1] - 24:25
**read** [38] - 29:22, 63:23, 79:6, 80:8, 81:24, 82:19, 117:10, 125:15, 142:1, 143:22, 149:16, 150:5, 150:17, 151:25, 154:8, 156:2, 156:18, 156:19, 157:8, 157:9, 158:22, 158:25, 167:3, 167:10, 173:23, 174:21, 178:22, 179:10, 179:12, 181:9, 193:21, 194:2, 197:24, 198:4, 198:16, 198:20, 199:12, 218:12
**reading** [4] - 82:8, 123:19, 144:4, 198:13
**reads** [5] - 53:1, 191:24, 194:24, 196:2, 196:6
**ready** [5] - 7:8, 68:12, 131:20, 131:21, 133:18
**real** [6] - 15:17, 26:2, 135:10, 147:10, 158:23, 187:9
**realized** [1] - 12:7
**really** [11] - 12:4, 14:3, 14:13, 18:1, 18:12, 32:9, 69:23, 86:13, 136:10, 155:12, 211:16
**reason** [11] - 57:9, 67:3, 79:21, 136:12, 154:25, 155:2, 156:12, 156:14, 170:2, 178:1, 185:3
**reasonable** [5] - 25:5, 34:25, 134:5, 154:25, 174:9
**Reasons** [1] - 91:25
**reasons** [9] - 8:17, 31:1, 31:2, 31:6, 169:25, 170:7, 207:5

**recalling** [1] - 207:22
**recapture** [1] - 153:9
**receive** [5] - 91:7, 99:6, 118:6, 118:14, 182:18
**received** [4] - 20:19, 20:21, 80:8, 197:12
**receiving** [2] - 113:11, 204:6
**recent** [4] - 58:14, 63:1, 197:11, 214:5
**recently** [4] - 149:4, 172:3, 185:24, 201:12
**recess** [2] - 68:6, 130:18
**Recess** [3] - 68:10, 130:19, 190:25
**recessed** [1] - 219:21
**recognition** [1] - 103:2
**recognitions** [2] - 20:19, 21:13
**recognize** [8] - 70:13, 103:21, 116:20, 127:19, 148:22, 149:18, 162:16, 211:16
**recognized** [4] - 28:22, 84:6, 110:5, 135:14
**recognizes** [4] - 99:10, 102:17, 122:5, 184:12
**recognizing** [6] - 29:11, 54:1, 94:24, 120:14, 121:13, 124:9
**Recognizing** [1] - 121:6
**recollection** [3] - 98:19, 157:7, 177:8
**recommend** [1] - 209:4
**recommendation** [1] - 122:1
**recommendations** [1] - 112:18
**recommended** [2] - 116:24, 117:8
**recommending** [2] - 94:6, 143:7
**reconcile** [1] - 69:13
**record** [32] - 42:17, 51:21, 52:2, 56:21, 60:8, 63:23, 79:20, 81:2, 81:9, 89:13, 89:20, 89:22, 97:12, 100:14, 108:18, 108:19, 109:2,

115:18, 140:25, 142:1, 143:22, 163:2, 163:11, 166:23, 166:24, 181:11, 184:22, 186:9, 198:4, 198:13, 198:21, 220:5
**recorded** [2] - 6:19, 111:3
**records** [7] - 73:7, 74:25, 75:12, 89:8, 100:2, 102:7
**red** [3] - 61:7, 186:5, 187:18
**Red** [1] - 21:19
**redirect** [2] - 185:6, 213:2
**REDIRECT** [1] - 199:5
**reduce** [2] - 201:25, 209:5
**reduced** [4] - 41:4, 193:20, 214:4, 214:11
**reducing** [1] - 179:25
**reductions** [2] - 212:25, 213:14
**Reed** [2] - 6:4, 6:11
**reemphasize** [1] - 48:23
**refer** [8] - 93:18, 150:21, 207:21
**reference** [40] - 43:18, 48:6, 48:8, 48:15, 55:13, 58:2, 58:5, 63:13, 80:18, 89:20, 92:15, 100:11, 101:14, 109:13, 109:17, 113:17, 117:3, 119:5, 119:19, 123:9, 142:20, 143:11, 144:8, 150:8, 151:15, 153:2, 170:21, 178:20, 193:17, 195:19, 196:11, 196:13, 200:18, 202:1, 204:21, 205:16, 210:17, 210:22, 219:4, 219:5
**referenced** [4] - 89:12, 89:14, 108:6, 179:6
**references** [5] - 89:8, 93:21, 110:25, 128:5, 173:23
**referencing** [3] - 81:3, 81:5, 93:13
**referred** [6] - 39:20, 51:4, 54:9, 75:5,

76:1, 93:16
**referring** [2] - 52:12, 163:16
**refers** [3] - 57:3, 92:2, 108:1
**reflect** [3] - 105:7, 116:17, 144:18
**reflected** [2] - 24:22, 39:11
**reflecting** [1] - 94:16
**reflection** [1] - 152:10
**reflects** [1] - 39:14
**regard** [2] - 133:1, 167:17
**regarded** [3] - 19:23, 21:16, 28:22
**regarding** [13] - 68:20, 70:10, 73:24, 76:17, 101:5, 103:14, 105:4, 111:22, 114:24, 155:24, 184:10, 199:8, 204:20
**Regarding** [1] - 114:25
**regardless** [2] - 35:14, 203:4
**Registration** [1] - 72:24
**regressed** [1] - 59:2
**regular** [2] - 91:3, 106:12
**regularly** [5] - 41:13, 47:17, 83:1, 83:16, 196:16
**regulate** [1] - 189:16
**regulates** [1] - 115:8
**regulatory** [2] - 119:25, 120:2
**reimbursement** [1] - 106:5
**relate** [3] - 161:25, 207:7, 207:10
**related** [13] - 17:9, 20:10, 22:18, 31:25, 48:19, 51:25, 169:24, 171:4, 187:25, 196:12, 196:23, 197:2, 209:5
**relates** [1] - 208:7
**relationship** [11] - 157:18, 158:5, 158:6, 158:20, 161:20, 161:21, 161:23, 165:15, 169:10, 205:2, 205:5
**Relationship** [1] - 211:20
**relationships** [1] - 157:1

**relative** [7] - 32:15, 200:10, 201:12, 205:25, 206:2, 206:3, 206:11
**relatively** [1] - 104:20
**relaxants** [1] - 37:1
**relaxation** [1] - 36:8
**relevance** [2] - 115:5, 161:5
**relevant** [12] - 43:21, 43:22, 65:12, 73:12, 73:14, 75:17, 78:12, 105:2, 115:10, 169:23, 170:3, 208:22
**relief** [23] - 8:18, 18:25, 35:2, 36:17, 37:11, 37:13, 39:2, 47:1, 57:9, 86:19, 90:19, 90:24, 91:15, 94:2, 112:3, 112:8, 112:19, 113:22, 114:2, 114:8, 117:10, 117:16, 200:21
**Relief** [2] - 88:10, 88:15
**relies** [1] - 183:22
**relieved** [3] - 84:1, 85:7, 121:14
**Reliever** [3] - 55:10, 57:4, 64:7
**reliever** [14] - 57:6, 57:7, 57:15, 58:16, 59:2, 59:9, 61:20, 61:22, 62:5, 62:9, 64:14, 64:17, 64:22
**Relievers** [3] - 193:1, 193:5, 199:11
**relievers** [4] - 193:8, 195:4, 199:13, 201:11
**relieving** [1] - 82:21
**Relieving** [2] - 28:12, 28:18
**rely** [1] - 150:1
**relying** [2] - 44:3, 80:4
**remain** [1] - 93:7
**remainder** [1] - 59:12
**remains** [1] - 93:8
**Remember** [1] - 123:9
**remember** [20] - 99:21, 123:19, 143:1, 149:14, 149:15, 155:10, 170:16, 183:12, 187:16, 199:14, 203:18, 210:10, 211:8, 211:12, 214:21, 215:7,

215:15, 218:11, 218:21, 218:25
**Remembering** [1] - 109:10
**remind** [1] - 143:4, 192:15
**removing** [1] - 202:17
**renew** [1] - 89:5
**repeat** [4] - 45:13, 49:25, 158:16, 158:17
**repeated** [2] - 138:10, 178:5
**repeatedly** [1] - 201:14
**repeats** [2] - 88:15, 122:3
**rephrase** [1] - 83:11
**replicate** [1] - 173:13
**reply** [1] - 134:24
**report** [20] - 28:18, 29:2, 29:9, 29:10, 29:18, 31:14, 78:13, 89:23, 127:13, 158:3, 170:20, 170:23, 178:17, 183:22, 184:15, 192:20, 195:10, 195:24, 198:3, 204:23
**reported** [12] - 31:13, 31:14, 58:15, 65:13, 150:14, 152:6, 153:5, 154:5, 158:2, 175:16, 205:8, 220:9
**Reporter** [6] - 6:17, 6:18, 220:3, 220:12
**REPORTER** [1] - 177:16
**reporting** [1] - 206:6
**reports** [4] - 28:24, 90:10, 90:16, 192:19
**represent** [8] - 18:16, 152:8, 153:3, 155:22, 179:18, 181:11, 184:4, 185:12
**representatives** [2] - 29:17, 192:21
**representing** [2] - 113:14, 117:18
**reputation** [1] - 86:11
**require** [4] - 43:9, 53:13, 75:21, 179:24
**requirement** [1] - 164:3
**requires** [1] - 42:21
**research** [19] - 10:23, 10:25, 13:2, 14:6, 18:4, 18:7, 18:8,

18:10, 18:18, 18:21, 29:15, 67:15, 67:16, 135:11, 171:21, 200:18, 200:19, 209:15, 209:16
**researchers** [1] - 200:9
**residency** [4] - 10:24, 11:3, 11:21, 11:24
**resident** [1] - 10:22
**residents** [6] - 13:4, 16:5, 16:6, 16:13, 18:2, 34:14
**residual** [1] - 163:19
**resources** [5] - 110:4, 131:17, 132:21, 133:24, 134:2
**respect** [10] - 10:12, 55:21, 55:25, 56:15, 89:19, 132:16, 136:7, 168:11, 192:2, 204:1
**respected** [6] - 79:1, 86:10, 88:4, 88:5, 110:2, 192:17
**respectfully** [1] - 163:10
**respiration** [2] - 111:4, 111:11
**respiratory** [1] - 85:17
**respond** [1] - 130:23
**Response** [2] - 16:23, 119:14
**response** [2] - 137:8, 167:24
**responsibilities** [3] - 73:24, 73:25, 74:3
**responsibility** [7] - 9:12, 73:2, 121:10, 125:16, 125:24, 126:3, 189:15
**Responsible** [1] - 124:18
**responsible** [3] - 16:1, 16:24, 44:5
**rest** [1] - 154:4
**restricted** [2] - 71:6, 91:1
**result** [1] - 195:5
**resulted** [1] - 181:21
**results** [1] - 73:14
**resume** [1] - 137:24
**resumed** [2] - 68:11, 130:20
**retention** [1] - 85:16
**retrospective** [5] - 152:20, 153:1, 153:4, 153:24
**return** [4] - 18:25, 36:17, 39:2, 136:9

**revealed** [1] - 197:11
**review** [11] - 19:4, 23:25, 24:3, 74:25, 75:7, 142:21, 155:6, 181:1, 181:2, 196:8, 196:10
**reviewed** [4] - 55:5, 150:6, 181:3, 189:4
**reviewer** [1] - 19:16
**reviewing** [1] - 23:22
**revised** [1] - 41:9
**rewarding** [1] - 9:1
**Reynolds** [4] - 40:8, 58:23, 63:5, 125:5
**rheumatoid** [2] - 14:21, 32:19
**Rice** [5] - 4:3, 4:5, 4:8, 4:11, 4:14
**right-hand** [2] - 60:8, 164:12
**rise** [3] - 139:12, 185:23, 186:22
**Rising** [1] - 164:24
**risk** [68] - 17:14, 37:15, 38:16, 38:17, 38:21, 38:24, 39:4, 44:23, 45:11, 47:16, 47:23, 48:2, 48:3, 48:4, 49:5, 49:12, 49:15, 49:16, 49:22, 50:1, 50:2, 50:4, 50:9, 50:18, 50:19, 50:20, 50:23, 52:17, 53:21, 53:22, 59:6, 65:20, 66:10, 66:13, 66:24, 66:25, 67:1, 67:10, 67:13, 67:22, 69:20, 87:1, 87:9, 91:21, 126:15, 139:14, 160:12, 162:5, 196:3, 196:7, 200:10, 208:3, 208:10, 208:14, 208:19, 208:21, 208:22, 209:1, 210:3, 215:25, 216:3, 216:6, 216:15, 217:17, 218:2
**risks** [42] - 25:9, 26:10, 37:20, 37:22, 37:24, 38:1, 38:4, 38:9, 38:11, 38:14, 39:6, 39:16, 39:18, 40:25, 44:20, 44:21, 47:6, 67:1, 67:4, 67:12, 67:19, 72:1, 72:4, 72:9, 77:2, 77:10, 77:13, 77:14, 86:22, 87:7, 126:13,

139:9, 146:24, 209:5, 216:17, 216:19, 217:6, 217:11, 217:14, 217:21, 217:23, 218:4
**River** [4] - 160:22, 160:24, 161:2, 175:18
**river** [1] - 161:15
**RMR** [2] - 6:17, 6:18
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**robustly** [1] - 213:17
**role** [28] - 9:14, 9:18, 13:14, 17:5, 18:15, 20:5, 21:5, 26:3, 32:11, 45:4, 45:5, 73:1, 73:3, 78:24, 79:12, 95:17, 95:19, 96:14, 96:17, 99:20, 105:24, 122:9, 147:11, 183:15, 218:5, 218:7, 218:15
**roles** [2] - 16:17, 71:10
**rolling** [1] - 137:2
**room** [3] - 9:9, 27:11, 73:12
**rooms** [4] - 106:16, 112:1, 112:2
**roots** [1] - 131:14
**rough** [1] - 15:5
**roughly** [1] - 77:6
**round** [1] - 145:24
**rounding** [1] - 32:22
**royalty** [1] - 15:4
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**Ruby** [2] - 4:23, 189:22
**RUBY** [9] - 4:22, 89:18, 161:4, 164:2, 167:16, 168:11, 188:21, 189:23, 198:7
**Rule** [5] - 80:16, 89:7, 89:22, 134:17, 198:15
**rule** [3] - 55:25, 81:21, 164:3
**Rules** [1] - 89:21
**ruling** [4] - 134:20, 164:1, 168:12, 170:7
**rulings** [3] - 79:23, 135:9, 174:5
**run** [1] - 33:20
**rung** [2] - 94:4, 94:10
**running** [2] - 21:15,

110:16
**Rx** [1] - 59:17

**S**

**s\Ayme** [1] - 220:11
**s\Lisa** [1] - 220:11
**safe** [5] - 18:14, 18:24, 39:3, 67:22, 209:1
**safely** [3] - 67:8, 71:18, 71:25
**safer** [1] - 12:9
**safety** [1] - 76:8
**sake** [1] - 46:24
**sale** [2] - 205:5, 205:14
**Sales** [4] - 164:24, 166:25, 167:22, 204:17
**sales** [17] - 165:3, 165:23, 165:24, 166:1, 166:5, 166:11, 167:15, 168:22, 204:13, 204:20, 204:21, 205:2, 205:6, 205:7, 205:11, 205:13
**SALGADO** [1] - 4:20
**SAMHSA** [2] - 194:25, 195:1
**San** [2] - 2:5, 2:14
**satisfactory** [2] - 90:19, 90:24
**satisfied** [2] - 142:4, 164:4
**saw** [8] - 12:3, 15:18, 22:13, 48:7, 122:10, 124:6, 172:8, 186:24
**SC** [3] - 4:4, 4:12, 4:15
**scale** [2] - 84:21, 94:24
**scaling** [1] - 187:18
**scared** [1] - 114:10
**scenario** [1] - 182:24
**schedule** [5] - 133:17, 134:23, 136:3, 136:16, 136:22
**Schedule** [1] - 40:12
**SCHMIDT** [178] - 5:9, 7:8, 7:21, 7:25, 8:2, 8:5, 8:7, 13:18, 13:21, 13:24, 14:3, 14:4, 25:7, 26:15, 27:24, 28:1, 28:5, 28:6, 28:10, 28:11, 29:1, 29:7, 29:8, 34:18, 34:19, 40:1, 40:3, 42:11, 42:22, 42:25, 46:7, 46:12, 46:19, 51:7, 51:10,

51:14, 55:2, 56:4, 56:7, 57:1, 57:2, 58:22, 58:25, 63:5, 63:8, 64:4, 64:6, 68:5, 68:13, 68:14, 78:15, 78:17, 78:18, 79:16, 79:25, 80:10, 80:19, 81:10, 81:20, 82:4, 82:12, 82:16, 83:11, 83:12, 83:21, 84:10, 85:3, 89:2, 89:13, 90:2, 95:25, 96:10, 97:17, 98:1, 98:4, 98:5, 98:17, 98:21, 101:7, 101:9, 102:6, 102:13, 105:12, 105:14, 107:15, 107:25, 108:12, 108:22, 112:24, 113:1, 114:16, 114:23, 115:2, 115:6, 115:17, 115:24, 118:23, 118:25, 119:11, 119:16, 122:17, 122:20, 123:1, 123:2, 125:5, 125:7, 125:10, 125:14, 126:19, 126:21, 127:4, 127:8, 127:17, 129:18, 129:23, 129:25, 130:13, 137:17, 137:25, 138:3, 138:6, 140:4, 140:6, 140:16, 141:3, 141:4, 142:2, 142:10, 142:15, 142:17, 142:18, 144:10, 144:12, 144:14, 144:16, 145:8, 145:12, 145:13, 148:10, 150:16, 158:10, 159:24, 163:4, 163:21, 164:6, 164:16, 169:20, 173:4, 174:4, 176:4, 176:7, 179:12, 179:17, 180:5, 180:7, 184:6, 184:21, 184:24, 186:8, 186:19, 187:20, 187:24, 189:3, 189:11, 197:3, 199:3, 199:6, 201:21, 201:24, 203:15, 203:17, 211:9, 211:11, 213:7, 213:12, 214:17, 214:20,

219:7
**Schmidt** [19] - 28:4, 46:18, 56:6, 68:4, 68:12, 80:25, 89:18, 96:9, 115:16, 127:16, 130:9, 141:2, 142:16, 144:9, 150:15, 164:5, 189:24, 191:8, 213:6
**school** [12] - 10:3, 10:6, 10:9, 10:17, 10:18, 10:25, 11:4, 17:23, 24:17, 24:21, 157:16, 209:12
**School** [7] - 10:7, 11:1, 11:2, 12:16, 12:19, 13:9, 17:24
**science** [6] - 49:23, 65:25, 139:22, 152:25, 209:10, 212:18
**Science** [2] - 11:5, 172:6
**scientific** [6] - 19:16, 54:22, 67:16, 67:17, 161:20, 214:8
**scope** [9] - 29:13, 167:17, 167:23, 168:3, 168:14, 187:25, 189:20, 198:8, 213:3
**screen** [19] - 28:9, 29:21, 40:8, 63:3, 98:7, 119:2, 123:3, 124:21, 145:11, 145:12, 151:6, 151:22, 164:8, 164:14, 164:15, 167:2, 172:13, 173:12, 204:10
**screening** [3] - 111:22, 112:6, 112:9
**scroll** [7] - 41:19, 48:12, 58:16, 58:20, 85:12, 113:16, 123:8
**sea** [1] - 188:9
**search** [1] - 68:17
**seat** [1] - 7:18
**Seattle** [5] - 171:25, 172:3, 172:6, 172:8, 215:6
**Second** [1] - 182:12
**second** [31] - 28:8, 34:13, 34:15, 48:7, 52:24, 74:6, 98:10, 98:22, 101:12, 108:1, 108:6, 109:4, 111:21, 118:21, 119:17, 121:8,

126:24, 151:12, 167:15, 176:20, 180:17, 181:7, 181:9, 191:20, 201:6, 202:6, 203:14, 203:18, 206:17, 206:19, 212:3
**second-guessing** [1] - 74:6
**section** [10] - 48:7, 48:12, 48:15, 48:23, 89:12, 156:24, 193:5, 195:16, 201:5, 201:19
**sections** [6] - 41:20, 42:2, 42:5, 42:7, 43:14, 43:16
**see** [224] - 7:24, 14:25, 15:2, 15:3, 15:8, 15:20, 16:12, 26:20, 26:22, 26:23, 27:16, 28:16, 29:25, 31:6, 31:16, 34:21, 35:5, 35:15, 35:17, 40:13, 41:10, 41:18, 41:22, 41:23, 43:12, 45:14, 47:18, 47:19, 48:6, 48:16, 49:24, 50:2, 51:21, 52:2, 52:3, 53:24, 58:4, 58:18, 60:25, 61:9, 61:17, 61:25, 62:16, 62:18, 63:10, 63:11, 63:13, 63:17, 63:20, 64:8, 64:18, 64:20, 69:5, 69:6, 70:1, 71:15, 71:17, 71:22, 79:4, 82:18, 83:2, 84:2, 84:17, 84:20, 85:22, 86:23, 87:15, 87:21, 88:11, 88:12, 91:10, 92:6, 93:2, 93:3, 93:11, 93:20, 94:13, 98:10, 98:11, 99:13, 100:3, 101:14, 101:16, 109:8, 109:13, 109:15, 109:18, 109:21, 110:6, 110:21, 110:23, 110:25, 111:5, 111:16, 113:6, 113:9, 113:17, 113:24, 116:4, 116:15, 116:25, 118:2, 118:8, 119:6, 120:18, 123:4, 123:12, 123:17, 123:24, 124:7, 124:12, 125:3,

125:19, 127:23, 128:2, 128:4, 128:10, 128:17, 128:23, 129:11, 129:14, 130:24, 136:17, 140:9, 140:12, 141:15, 142:20, 142:25, 143:11, 143:18, 148:21, 149:6, 149:16, 149:17, 150:19, 151:5, 151:7, 151:8, 151:10, 151:11, 151:21, 151:22, 151:23, 153:7, 156:16, 159:10, 171:9, 171:12, 171:15, 171:18, 176:16, 177:11, 179:22, 180:9, 183:5, 185:21, 187:4, 187:17, 187:19, 189:1, 191:22, 192:4, 193:4, 193:5, 193:10, 193:16, 195:6, 195:17, 195:21, 196:3, 196:8, 196:13, 197:14, 197:21, 200:12, 200:21, 201:7, 201:19, 202:1, 202:4, 202:6, 202:8, 202:12, 202:15, 202:17, 202:19, 204:2, 204:9, 204:14, 204:17, 205:1, 205:17, 205:20, 205:22, 206:3, 206:17, 206:20, 206:24, 207:8, 208:2, 208:4, 208:11, 208:14, 209:6, 209:8, 209:12, 209:17, 209:25, 210:4, 210:14, 210:16, 210:19, 210:23, 211:21, 213:18, 214:6, 214:14, 216:19, 216:23, 219:19
**seeing** [6] - 15:11, 15:25, 42:3, 51:17, 69:16, 211:24
**seem** [2] - 19:8, 40:6
**select** [1] - 69:20
**selected** [2] - 39:15, 99:12

**selective** [1] - 69:22
**selectively** [1] - 198:14
**self** [3] - 45:20, 45:24, 80:16
**self-authenticating** [1] - 80:16
**self-destructive** [2] - 45:20, 45:24
**seminal** [1] - 105:1
**SENIOR** [1] - 1:17
**Senior** [1] - 7:2
**Sensabaugh** [1] - 5:14
**sense** [14] - 9:23, 14:11, 16:8, 18:10, 21:2, 22:7, 53:2, 136:23, 137:6, 151:20, 151:24, 153:17, 203:25, 216:5
**sent** [3] - 84:11, 125:21, 140:21
**sentence** [44] - 30:24, 58:13, 58:23, 83:23, 91:6, 92:2, 101:14, 121:8, 122:3, 122:4, 123:12, 128:5, 128:19, 141:12, 142:20, 144:4, 151:19, 151:21, 152:19, 153:2, 153:7, 154:4, 156:24, 157:3, 180:9, 193:7, 193:19, 193:23, 194:24, 195:6, 196:2, 196:17, 197:10, 198:5, 198:13, 198:20, 201:7, 201:22, 203:13, 203:18, 203:22, 212:23
**sentiment** [1] - 91:12
**separate** [1] - 107:24
**September** [3] - 20:7, 127:19, 136:13
**sequencing** [1] - 159:2
**series** [3] - 45:10, 87:24, 116:3
**serious** [10] - 49:5, 49:20, 52:17, 66:25, 85:16, 116:9, 135:14, 180:12, 191:21, 191:24
**seriously** [2] - 52:20, 114:13
**serve** [11] - 8:11, 10:22, 11:10, 16:21, 19:16, 20:6, 22:21,

22:23, 22:25, 23:6, 23:11
**served** [4] - 11:6, 20:5, 21:23, 22:3, 22:8
**service** [3] - 11:8, 11:19, 20:10
**serving** [4] - 12:20, 17:4, 30:19, 214:11
**sessions** [1] - 75:3
**set** [9] - 30:21, 107:2, 110:9, 110:15, 118:20, 139:6, 144:21, 200:20, 218:8
**sets** [2] - 44:11, 59:14
**setting** [2] - 96:15, 112:18
**seven** [2] - 10:24, 132:17
**seven-year** [1] - 10:24
**several** [5] - 70:10, 76:18, 85:15, 95:14, 147:24
**severe** [16] - 8:19, 26:25, 27:1, 32:7, 32:16, 32:17, 34:6, 53:13, 67:7, 71:24, 82:25, 83:15, 83:25, 85:6, 90:20, 112:20
**severely** [1] - 30:21
**severity** [3] - 32:15, 38:25, 180:11
**SHANNON** [1] - 6:3
**share** [3] - 23:15, 133:6, 151:1
**shift** [10] - 12:1, 17:21, 21:23, 35:23, 177:14, 177:17, 177:19, 177:23, 178:1, 213:21
**shifted** [4] - 11:22, 145:16, 145:20
**shifting** [2] - 139:14, 213:23
**shifts** [1] - 213:16
**shingles** [1] - 14:18
**short** [3] - 36:9, 74:16, 191:6
**shot** [1] - 172:13
**shots** [1] - 173:12
**show** [22] - 27:22, 54:25, 61:14, 69:3, 69:6, 69:7, 75:19, 78:11, 99:5, 108:18, 115:14, 140:1, 164:8, 187:6, 187:7, 187:8, 187:9, 187:10, 193:20, 200:6, 201:6, 207:25
**showed** [1] - 156:13

showing [12] - 68:21, 69:15, 90:23, 155:3, 164:18, 166:15, 166:20, 173:21, 174:5, 184:7, 185:3, 194:1
shown [12] - 65:1, 108:4, 108:11, 109:6, 139:6, 139:7, 165:3, 171:7, 203:13, 204:12, 206:13, 206:15
shows [2] - 68:24, 115:13
shy [1] - 75:25
sick [1] - 104:9
side [10] - 37:14, 37:21, 60:8, 60:11, 85:14, 86:18, 86:21, 93:2, 184:8, 185:21
sign [5] - 107:3, 107:8, 111:1, 111:13, 111:20
signal [1] - 30:15
significance [5] - 88:19, 102:25, 106:8, 106:11, 114:1
significant [33] - 34:2, 34:12, 49:16, 67:5, 77:13, 77:16, 88:6, 88:21, 88:25, 100:16, 103:10, 104:4, 104:5, 104:12, 104:14, 111:7, 111:9, 113:15, 114:4, 114:9, 117:10, 117:13, 117:16, 120:15, 122:2, 126:12, 126:13, 174:16, 177:1, 177:14, 181:19
significantly [4] - 50:5, 139:5, 150:13, 152:5
signs [3] - 107:6, 111:10, 111:11
similar [14] - 20:15, 31:18, 37:10, 117:6, 122:3, 122:9, 122:11, 124:8, 129:11, 129:14, 154:16, 175:22, 179:1
similarly [1] - 166:15
Similarly [1] - 104:13
simple [2] - 206:14, 209:3
simpler [3] - 12:9, 53:8, 158:17

simply [4] - 81:1, 116:20, 127:1, 189:23
SIMULTANEOUS [1] - 219:17
SINGER [1] - 4:8
Single [1] - 35:4
single [3] - 51:21, 52:2, 54:17
sitting [4] - 27:11, 51:10, 163:12, 163:15
situated [1] - 72:3
situations [1] - 114:15
six [4] - 108:2, 108:3, 109:5, 109:6
sixth [1] - 113:8
skepticism [1] - 139:10
skip [1] - 33:18
skipped [1] - 79:9
slash [1] - 77:4
slide [27] - 162:11, 162:19, 164:23, 165:1, 165:2, 165:15, 165:16, 166:13, 166:14, 167:4, 168:9, 170:13, 170:14, 172:9, 172:12, 173:14, 173:15, 173:17, 173:19, 173:20, 175:1, 175:20, 175:21, 175:24, 176:2, 188:24
Slide [1] - 166:22
slides [7] - 163:24, 167:21, 167:22, 174:5, 188:25, 189:25, 190:2
slow [1] - 84:22
slowing [1] - 133:16
small [4] - 22:2, 104:20, 207:18, 216:13
smaller [1] - 101:13
smallest [1] - 40:7
Smith [2] - 6:4, 6:11
socialize [1] - 27:6
societal [1] - 118:3
society [3] - 74:8, 198:22, 216:18
Society [1] - 120:5
socioeconomic [1] - 160:11
sold [4] - 95:24, 167:8, 169:9, 183:1
solutions [1] - 209:4
someone [11] - 30:14,

38:17, 47:1, 69:20, 79:11, 86:8, 147:4, 159:17, 183:10, 208:25, 216:3
sometime [1] - 78:8
Sometimes [1] - 76:9
sometimes [7] - 39:25, 54:8, 75:3, 85:19, 86:1, 93:16, 160:16
somewhat [6] - 33:4, 33:6, 154:12, 187:1, 193:9, 199:14
somewhere [1] - 176:25
soon [1] - 161:8
sorry [14] - 23:2, 28:5, 49:25, 50:1, 56:6, 61:24, 62:2, 109:12, 158:6, 166:7, 177:16, 194:20, 201:3, 218:9
sort [8] - 102:2, 102:3, 107:12, 122:1, 126:8, 160:13, 160:19, 208:20
Sort [1] - 96:5
sorts [1] - 89:16
soul [2] - 87:11, 87:20
sound [1] - 128:21
sounds [1] - 134:17
source [10] - 58:5, 58:7, 182:13, 182:16, 182:18, 184:14, 203:6, 206:5, 206:19, 207:2
sources [4] - 83:14, 84:17, 115:7, 205:22
South [1] - 2:11
Southern [1] - 7:3
SOUTHERN [1] - 1:1
Sox [1] - 21:19
SPEAKER [2] - 185:15, 185:17
SPEAKERS [1] - 219:17
speaking [4] - 62:21, 62:23, 166:7, 172:17
speaks [1] - 54:22
specialist [2] - 21:5, 26:23
specialists [3] - 186:9, 186:12, 192:21
specific [14] - 17:15, 29:9, 37:17, 41:3, 44:21, 45:6, 52:11, 52:17, 73:17, 81:21, 103:2, 106:22, 149:6, 207:25
specifically [9] -

16:10, 19:24, 20:1, 34:4, 37:3, 57:18, 122:11, 150:17, 202:21
specified [3] - 42:4, 43:13, 43:16
spectacles [1] - 150:7
spectrum [1] - 60:1
spell [3] - 70:16, 70:17, 70:18
spelling [3] - 101:25, 103:10, 104:2
spend [3] - 9:23, 124:16, 136:14
spent [7] - 10:10, 14:9, 15:11, 66:25, 137:19, 185:2, 189:7
spike [1] - 177:4
Spine [1] - 16:20
split [1] - 131:18
spoken [1] - 142:11
sponsor [2] - 186:20, 187:21
sponsored [2] - 189:5, 190:3
spot [1] - 20:17
Square [2] - 6:5, 6:12
squarely [1] - 67:14
stadium [1] - 174:24
staff [1] - 12:15
stage [1] - 178:5
stamp [3] - 164:10, 166:13, 170:14
stand [1] - 137:24
Standard [2] - 108:25, 109:17
standard [44] - 24:15, 76:2, 76:7, 76:17, 77:19, 78:3, 78:12, 78:13, 96:14, 96:15, 97:7, 97:13, 103:14, 105:2, 105:4, 105:6, 109:20, 109:24, 110:9, 110:21, 110:22, 111:8, 112:18, 115:10, 116:17, 116:22, 121:17, 121:23, 125:22, 138:14, 143:24, 144:15, 144:17, 144:24, 150:3, 167:18, 167:20, 170:2, 189:8, 189:10, 189:13, 190:12, 190:16, 217:8
standards [29] - 74:13, 99:5, 99:16, 106:7, 106:9, 106:11, 106:15,

106:20, 106:22, 107:2, 107:12, 108:2, 109:4, 109:11, 110:15, 114:25, 115:15, 119:9, 121:12, 121:19, 121:22, 122:16, 123:22, 124:1, 129:7, 140:3, 169:25, 207:11
Standards [1] - 105:17
standing [2] - 12:23, 86:8
standpoint [4] - 148:5, 153:17, 159:21
stands [2] - 158:4, 158:18
STANNER [1] - 5:10
stark [5] - 174:2, 174:15, 174:17, 176:24
starkly [1] - 47:14
start [43] - 9:24, 26:18, 30:24, 40:10, 45:16, 55:9, 62:2, 73:6, 78:14, 81:7, 81:17, 84:21, 85:1, 94:1, 94:6, 127:18, 199:9, 204:11
started [10] - 59:9, 61:3, 77:12, 83:5, 83:13, 84:5, 94:21, 120:21, 178:6, 207:17
starting [4] - 14:11, 154:6, 176:25, 177:2
starts [1] - 191:21
state [27] - 7:12, 29:14, 33:19, 59:6, 96:11, 96:12, 96:19, 96:23, 96:25, 99:20, 102:3, 119:24, 120:1, 120:14, 129:2, 136:14, 139:2, 150:2, 152:14, 154:21, 167:3, 167:8, 167:12, 187:2, 189:2, 202:11, 213:3
State [25] - 98:8, 100:8, 100:21, 100:23, 101:4, 101:15, 101:24, 102:22, 103:1, 103:25, 117:5, 119:5, 119:8, 120:6, 120:24, 121:16, 121:20, 122:1, 123:24, 124:3, 127:20, 127:25,

129:1, 129:4, 131:19
**Statement** [2] - 112:2, 113:3
**statement** [46] - 80:3, 80:7, 80:13, 82:4, 86:25, 87:1, 88:6, 92:9, 92:20, 92:23, 98:23, 100:7, 102:21, 103:2, 104:1, 111:25, 112:17, 112:20, 113:12, 113:15, 113:21, 114:1, 115:25, 116:2, 116:8, 117:14, 117:25, 121:2, 121:5, 122:9, 124:8, 128:5, 138:10, 148:11, 152:18, 154:18, 158:23, 179:3, 180:3, 180:15, 181:18, 181:25, 191:14, 203:12, 207:2, 207:24
**statements** [10] - 80:6, 80:12, 87:24, 88:1, 126:7, 129:2, 129:11, 129:14, 138:7, 174:6
**states** [10] - 34:24, 86:16, 89:14, 101:2, 102:17, 113:21, 119:17, 120:13, 154:22, 169:18
**STATES** [2] - 1:1, 1:17
**States** [11] - 7:2, 35:12, 55:11, 71:2, 71:14, 116:10, 167:3, 167:10, 175:16, 180:12, 198:23
**statistic** [5] - 33:8, 61:15, 61:25, 62:3, 62:14
**statistical** [1] - 159:20
**statistically** [3] - 55:15, 55:18, 159:18
**statistics** [3] - 58:18, 59:14, 65:22
**stature** [1] - 92:24
**status** [1] - 60:25
**Status** [1] - 7:2
**STATUS** [1] - 1:17
**stay** [1] - 61:16
**stayed** [4] - 10:10, 11:24, 12:15, 62:22
**steal** [1] - 201:13
**steering** [3] - 17:2, 17:3, 17:4

**stenography** [1] - 6:19
**step** [4] - 9:22, 68:8, 74:22, 93:10
**stepped** [1] - 35:1
**stepping** [1] - 94:17
**steps** [5] - 52:22, 50:24, 97:1, 143:6, 218:18
**sterile** [1] - 106:16
**STEVEN** [1] - 4:22
**stick** [3] - 63:2, 136:2, 169:17
**sticker** [1] - 137:20
**sticking** [1] - 57:3
**stigmatized** [1] - 203:6
**still** [15] - 30:21, 59:20, 66:3, 67:2, 67:3, 77:18, 117:21, 120:25, 131:11, 139:16, 139:19, 139:23, 144:20, 200:12, 214:16
**stolen** [1] - 183:2
**stop** [8] - 37:12, 68:3, 94:3, 94:8, 104:7, 104:25, 129:9, 212:10
**stopping** [2] - 22:11, 36:14
**stops** [1] - 72:22
**straight** [1] - 156:21
**strained** [1] - 87:14
**strategies** [1] - 201:25
**Strategies** [1] - 181:14
**strategy** [1] - 45:12
**stratification** [3] - 47:24, 48:2, 50:9
**Street** [15] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:19, 4:21, 4:24, 5:5, 5:12, 6:6, 6:13
**strike** [1] - 132:3
**strong** [6] - 38:20, 53:11, 69:23, 91:9, 94:10, 112:21
**stronger** [1] - 91:2
**strongly** [1] - 168:1
**structure** [1] - 45:8
**structured** [1] - 196:10
**student** [3] - 141:14, 141:18, 141:22
**students** [3] - 13:4, 16:6, 18:2
**studied** [3] - 157:15, 157:16, 217:8
**studies** [4] - 19:4, 68:21, 69:2, 69:4,

69:7, 69:17, 152:24, 193:12, 193:16, 193:19, 196:8, 196:10, 214:9, 215:22
**study** [29] - 24:20, 57:25, 58:5, 58:13, 59:14, 59:25, 60:16, 62:16, 64:13, 69:4, 69:14, 69:15, 69:16, 70:1, 152:21, 152:22, 153:10, 153:24, 154:1, 155:24, 156:25, 157:4, 171:21, 199:8, 199:18, 201:1, 201:10, 209:23, 210:16
**stuff** [1] - 135:11
**sub** [3] - 34:21, 63:13, 212:6
**sub-columns** [1] - 63:13
**sub-group** [1] - 212:6
**sub-header** [1] - 34:21
**subject** [5] - 108:15, 140:22, 183:11, 184:11, 213:8
**submit** [1] - 137:21
**submitted** [1] - 137:19
**Subsection** [1] - 81:11
**subsequent** [3] - 59:11, 59:19, 157:2
**subsequently** [5] - 23:1, 23:5, 23:12, 182:25, 183:9
**subset** [1] - 69:5
**substance** [28] - 38:18, 38:21, 40:12, 44:13, 44:25, 45:21, 45:24, 50:12, 65:12, 65:17, 65:20, 66:14, 66:18, 66:19, 66:22, 72:16, 72:18, 148:17, 148:18, 205:4, 208:23, 208:24, 210:4, 212:19, 212:21, 216:1
**Substance** [1] - 193:24
**substances** [12] - 45:22, 66:12, 101:19, 102:1, 102:17, 119:23, 122:5, 125:18, 128:14, 192:1, 203:20, 212:21
**Substances** [2] - 119:4, 120:6

**substantial** [3] - 34:15, 110:11, 200:21
**substantially** [2] - 67:12, 208:3
**substantively** [1] - 127:9
**successfully** [2] - 8:25, 67:7
**suffer** [1] - 27:13
**suffering** [6] - 8:20, 27:1, 27:7, 30:22, 71:23, 177:22
**sufficient** [3] - 90:20, 104:17
**suggest** [3] - 130:15, 212:23, 213:13
**suggested** [1] - 93:11
**suggesting** [1] - 120:16
**suggestion** [1] - 133:21
**suggests** [1] - 90:18
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 3:15, 4:6, 4:9, 6:5, 6:12
**summarizes** [1] - 58:3
**summary** [3] - 57:25, 156:3, 210:13
**summer** [1] - 10:10
**summit** [2] - 21:1, 21:3
**supervise** [1] - 16:1
**support** [2] - 80:23, 97:1
**supported** [2] - 110:2, 209:10
**supports** [1] - 110:3
**suppose** [1] - 92:1
**supposed** [4] - 42:5, 42:6, 53:17, 126:14
**Supreme** [1] - 131:13
**surgery** [13] - 10:22, 10:24, 11:3, 11:23, 12:1, 12:3, 12:4, 34:4, 34:7, 102:19, 103:4, 122:7, 124:10
**surgical** [1] - 10:19
**surprise** [1] - 106:13
**surprised** [2] - 23:8, 184:13
**surrogate** [1] - 205:7
**Survey** [1] - 58:2
**survey** [3] - 58:10, 194:25, 195:4
**surveyed** [1] - 61:19
**sustain** [10] - 127:14, 144:7, 158:12, 161:11, 161:16, 169:22, 170:6,

188:6, 188:22, 190:6
**sustained** [3] - 103:22, 145:7, 198:9
**SUZANNE** [1] - 4:20
**sweet** [1] - 14:3
**switch** [3] - 28:10, 54:7, 117:12
**SWORN** [1] - 7:16
**Syndrome** [1] - 48:14
**synonymous** [1] - 103:23
**system** [10] - 51:20, 51:25, 52:1, 72:3, 73:9, 74:5, 74:21, 142:12, 164:11, 204:5
**systematically** [2] - 83:1, 83:16

---

**T**

**Table** [2] - 60:20, 64:5
**table** [1] - 61:6
**tablets** [1] - 40:12
**tag** [1] - 167:10
**take-back** [1] - 202:18
**talks** [10] - 33:19, 45:11, 159:2, 196:7, 197:10, 202:11, 202:14, 202:17, 204:13, 213:3
**tapering** [2] - 185:24, 186:23
**Task** [2] - 143:11, 143:14
**tasked** [3] - 11:16, 28:23, 192:18
**teach** [6] - 17:25, 18:2, 168:24, 169:11, 169:12, 169:15
**teaching** [13] - 12:13, 12:16, 12:18, 12:21, 13:3, 13:6, 13:8, 14:6, 15:2, 17:21, 36:8, 204:24, 205:9
**team** [1] - 131:16
**teams** [1] - 131:18
**technical** [3] - 56:22, 117:22, 160:19
**technique** [1] - 89:15
**techniques** [2] - 36:8, 218:19
**TEMITOPE** [1] - 4:13
**temperature** [2] - 111:4, 111:10
**ten** [4] - 16:4, 68:6, 107:20, 187:6
**tend** [2] - 72:14, 114:12
**tendency** [1] - 49:2

**tends** [3] - 96:22, 100:25, 169:2
**Tenth** [1] - 5:12
**term** [4] - 89:20, 149:25, 193:8, 199:14
**terminology** [1] - 148:1
**terms** [50] - 8:9, 13:6, 14:24, 23:17, 24:22, 29:9, 31:5, 32:2, 33:11, 35:8, 36:10, 38:9, 41:17, 42:4, 44:2, 44:25, 45:18, 49:3, 51:17, 61:25, 62:3, 65:4, 66:24, 67:10, 68:19, 68:25, 71:16, 73:7, 76:5, 78:7, 86:11, 92:4, 96:24, 100:7, 106:22, 112:6, 119:3, 125:23, 126:8, 127:9, 139:3, 140:2, 141:12, 146:23, 158:17, 160:15, 161:20, 194:17, 207:11, 213:9
**test** [2] - 73:15, 148:22
**testified** [5] - 56:12, 163:23, 185:23, 186:18, 189:18
**testify** [6] - 22:13, 140:23, 143:23, 167:21, 186:11, 190:5
**testifying** [2] - 42:18, 168:8
**testimony** [12] - 56:14, 56:23, 81:6, 148:20, 167:17, 167:23, 169:24, 170:1, 184:24, 189:14, 200:20, 217:10
**tests** [3] - 51:22, 73:15, 75:19
**text** [4] - 80:24, 131:2, 149:19, 149:23
**THE** [166] - 1:1, 1:1, 1:4, 1:17, 7:6, 7:10, 7:13, 7:19, 7:20, 7:24, 8:1, 8:4, 13:20, 14:1, 25:10, 25:14, 26:9, 26:13, 26:14, 27:25, 28:3, 29:4, 29:6, 40:2, 42:14, 42:24, 46:1, 46:9, 46:15, 51:9, 51:13, 55:3, 56:3, 56:6, 56:9, 56:22, 68:3,

68:6, 68:9, 68:12, 78:16, 80:2, 80:20, 81:13, 81:22, 82:7, 82:11, 82:14, 83:18, 83:20, 89:25, 96:3, 96:7, 97:22, 98:3, 101:8, 102:10, 102:12, 105:13, 107:22, 108:7, 108:16, 108:21, 112:25, 114:18, 114:21, 114:25, 115:12, 115:20, 118:22, 118:24, 119:13, 119:15, 122:18, 122:22, 122:24, 126:20, 127:14, 129:21, 130:6, 130:12, 130:15, 130:18, 130:21, 132:9, 132:25, 133:4, 134:9, 135:17, 135:24, 136:1, 136:17, 137:12, 137:15, 137:23, 140:5, 140:18, 141:1, 142:4, 142:13, 142:16, 144:2, 144:7, 144:13, 145:6, 147:16, 148:12, 148:14, 148:15, 148:16, 150:15, 150:19, 150:23, 151:3, 158:12, 159:25, 160:1, 160:4, 161:6, 161:11, 161:14, 162:14, 163:3, 163:7, 163:16, 163:19, 164:19, 167:24, 168:16, 169:22, 170:6, 170:10, 174:11, 176:3, 177:17, 179:14, 180:19, 181:5, 184:18, 184:23, 185:5, 186:4, 186:15, 188:2, 188:6, 188:10, 188:15, 188:22, 189:22, 190:6, 190:20, 190:22, 191:1, 198:9, 198:11, 198:16, 199:4, 213:5, 213:11, 219:8, 219:10, 219:12, 219:13, 219:14, 219:15,

219:18
**themselves** [4] - 141:17, 141:22, 150:2, 174:7
**theories** [1] - 131:7
**therapies** [5] - 12:5, 18:13, 18:24, 75:19, 95:7
**Therapy** [1] - 93:3
**therapy** [6] - 36:4, 69:2, 69:3, 69:8, 91:7, 143:9
**thereafter** [1] - 178:25
**therefore** [7] - 9:12, 87:8, 96:22, 107:10, 139:14, 207:17, 217:6
**third** [19] - 28:14, 34:4, 52:24, 88:14, 101:12, 102:16, 103:18, 116:1, 117:24, 125:12, 125:15, 128:3, 128:4, 140:21, 143:21, 202:8, 206:1, 209:15
**Thomas** [2] - 2:10, 181:2
**thoroughness** [1] - 76:8
**thousands** [2] - 15:14, 15:15
**Three** [3] - 6:5, 135:24, 136:1
**three** [24] - 6:12, 14:8, 31:4, 31:9, 93:10, 93:20, 133:13, 133:19, 134:8, 134:22, 135:3, 135:4, 135:21, 135:24, 137:3, 137:12, 158:1, 165:10, 176:11, 177:9, 186:2, 189:7, 205:24, 209:4
**three-fold** [1] - 186:2
**three-part** [1] - 14:8
**three-step** [1] - 93:10
**three-week** [1] - 137:3
**thresholds** [2] - 143:17, 144:21
**throughout** [10] - 14:5, 24:11, 49:5, 49:11, 81:4, 88:24, 147:5, 201:14, 217:17, 217:19
**Thursday** [1] - 134:13
**tie** [1] - 151:20
**timeline** [12] - 84:19, 94:23, 100:5, 100:6,

102:24, 102:25, 104:25, 112:23, 122:14, 126:18, 137:19, 138:4
**timely** [1] - 132:12
**timing** [3] - 136:9, 213:16, 213:24
**TIMOTHY** [1] - 5:9
**title** [11] - 41:9, 55:9, 57:3, 88:15, 113:16, 151:13, 172:24, 172:25, 173:1, 211:20
**titled** [4] - 28:8, 113:2, 167:21, 181:12
**Today** [1] - 135:25
**today** [12] - 62:19, 65:1, 69:10, 136:1, 139:3, 139:16, 160:24, 182:20, 182:23, 185:23, 192:10, 208:8
**together** [16] - 16:12, 16:14, 29:16, 55:16, 55:18, 125:13, 145:25, 151:20, 168:9, 177:10, 188:25, 190:3, 211:4
**tolerance** [3] - 103:21, 104:13, 104:23
**tolerant** [1] - 104:15
**tolerate** [2] - 37:14, 53:16
**took** [9] - 66:2, 66:9, 127:24, 138:9, 167:6, 170:11, 206:1, 212:21, 218:18
**tool** [1] - 184:2
**tools** [1] - 83:24
**top** [14] - 61:6, 82:19, 94:13, 101:11, 108:25, 109:13, 124:9, 140:9, 151:14, 160:17, 166:25, 167:2, 176:17
**topic** [1] - 17:15, 21:4, 21:6, 21:8, 29:12, 32:5, 48:10, 66:23, 75:24, 75:25, 195:23
**topical** [1] - 37:6
**topics** [8] - 17:9, 20:13, 28:24, 43:24, 155:11, 192:19, 214:2, 216:13
**totaling** [1] - 131:2
**touch** [4] - 10:15, 35:24, 97:5, 216:13

**touched** [3] - 50:22, 135:4, 143:1
**toughest** [1] - 64:25
**toward** [1] - 177:4
**towards** [1] - 86:12
**Tower** [2] - 3:4, 4:23
**toxicology** [1] - 52:4
**Track** [2] - 166:25, 167:22
**track** [6] - 12:3, 58:10, 84:16, 97:6, 183:25, 184:3
**tracked** [2] - 97:8, 122:15, 157:17
**tracking** [4] - 57:5, 166:1, 167:15
**tracks** [1] - 15:16
**trade** [1] - 37:4
**train** [1] - 16:4
**trained** [1] - 187:5
**trainees** [1] - 16:13
**training** [9] - 9:11, 11:18, 24:12, 49:6, 72:11, 73:1, 75:22, 209:12
**transcript** [2] - 6:19, 220:4
**transition** [8] - 149:10, 156:9, 162:3, 212:4, 215:10, 215:17, 215:24, 216:6
**transitioned** [2] - 215:7, 215:13
**transitioning** [1] - 216:3
**transitions** [1] - 148:6
**transmission** [1] - 125:9
**trauma** [4] - 102:19, 103:4, 122:7, 124:10
**treat** [46] - 8:25, 14:12, 14:13, 14:14, 14:15, 14:17, 14:18, 14:22, 18:16, 18:17, 21:9, 21:21, 26:21, 32:10, 32:12, 35:15, 36:21, 37:3, 50:25, 53:15, 57:13, 67:7, 67:10, 67:14, 68:25, 84:6, 90:14, 91:19, 95:9, 95:10, 102:1, 105:9, 105:11, 106:21, 112:13, 112:15, 112:22, 114:14, 117:8, 117:15, 120:25, 121:21, 126:2, 146:21
**treated** [10] - 12:5, 51:4, 54:15, 54:17, 71:25, 77:4, 90:11,

116:13, 116:21, 120:17
**treating** [14] - 19:2, 67:19, 68:22, 73:10, 76:24, 87:6, 88:25, 91:22, 92:20, 92:22, 103:9, 107:10, 111:15, 121:9
**treatise** [4] - 56:5, 80:7, 80:8, 81:16
**treatises** [5] - 81:2, 81:8, 81:17, 81:18, 89:12
**treatment** [39] - 9:3, 16:10, 26:18, 54:20, 82:25, 83:15, 86:21, 87:18, 88:23, 94:22, 99:11, 101:19, 102:19, 103:8, 106:15, 116:9, 116:20, 117:9, 117:15, 119:23, 121:11, 121:15, 121:18, 122:7, 123:10, 123:13, 123:14, 123:15, 123:21, 124:1, 124:10, 138:12, 149:20, 165:8, 165:12, 171:10, 180:2, 209:6
**treatments** [22] - 12:9, 18:20, 18:22, 20:11, 20:16, 29:14, 35:24, 36:1, 36:2, 36:7, 36:10, 37:9, 38:7, 39:1, 53:14, 53:15, 67:8, 93:22, 123:16, 128:7, 165:18, 200:11
**tremendous** [1] - 10:12
**trend** [2] - 185:22, 186:24
**trends** [3] - 78:7, 165:10, 179:6
**TRIAL** [1] - 1:16
**Trial** [1] - 219:21
**trial** [11] - 18:21, 30:5, 81:4, 131:21, 132:23, 132:24, 133:13, 133:19, 134:3, 134:25, 136:13
**trials** [5] - 18:9, 18:18, 18:19, 131:23, 200:9
**tried** [3] - 75:19, 107:17, 163:23
**tries** [2] - 54:23, 58:10
**trillion** [1] - 33:16

**trouble** [3] - 19:13, 84:19, 114:11
**troubles** [1] - 82:1
**true** [13] - 14:24, 51:16, 93:7, 93:8, 98:18, 149:8, 154:18, 162:2, 165:25, 172:12, 207:21, 213:7
**truth** [3] - 82:14, 115:13, 155:1
**try** [21] - 12:8, 13:2, 17:12, 18:17, 36:15, 45:8, 50:22, 112:15, 126:22, 153:9, 158:13, 158:17, 161:9, 169:6, 173:12, 174:7, 174:8, 184:3, 209:1, 214:16
**trying** [22] - 17:15, 17:19, 18:12, 20:14, 27:17, 33:11, 95:7, 142:2, 146:19, 156:15, 157:7, 163:5, 168:21, 168:24, 169:7, 169:11, 169:12, 169:15, 171:2, 171:3, 171:8, 188:8
**tsunami** [1] - 188:9
**turn** [6] - 36:20, 38:6, 63:20, 75:24, 192:23, 194:19
**Twelfth** [3] - 4:19, 4:21, 5:5
**twelve** [1] - 30:20
**Two** [1] - 126:18
**two** [31] - 10:23, 10:25, 15:8, 19:10, 23:20, 53:10, 55:15, 55:18, 59:14, 65:3, 65:23, 93:20, 99:19, 116:4, 123:7, 126:7, 126:8, 128:11, 129:12, 131:5, 133:23, 134:6, 134:18, 173:25, 197:4, 207:18, 211:3, 211:6, 214:2, 216:13
**two-year** [2] - 10:23, 10:25
**type** [3] - 43:17, 43:23, 216:9
**types** [10] - 31:21, 36:10, 42:5, 48:24, 70:19, 93:21, 121:13, 133:9, 138:12, 216:2

**typical** [2] - 15:9, 43:17
**typically** [11] - 16:12, 17:18, 22:2, 30:10, 32:9, 52:21, 91:21, 94:2, 94:8, 100:16, 192:17

## U

**U.S** [7] - 117:18, 131:13, 140:11, 141:20, 149:10, 166:16, 173:21
**ultimately** [2] - 133:19, 159:5
**unclear** [2] - 193:9, 199:14
**uncomfortable** [1] - 20:20
**under** [37] - 35:3, 47:5, 63:3, 63:9, 64:7, 76:24, 77:2, 80:11, 80:16, 81:20, 81:22, 82:11, 89:3, 91:18, 91:19, 92:5, 92:9, 92:13, 92:20, 100:6, 103:9, 111:16, 116:20, 120:17, 123:14, 134:5, 134:23, 156:23, 187:7, 187:8, 198:15, 199:10, 201:6, 209:2, 212:2, 217:9
**Under** [1] - 116:9
**under-treat** [1] - 91:19
**under-treated** [1] - 120:17
**under-treating** [3] - 76:24, 92:20, 103:9
**Under-treatment** [1] - 116:9
**under-treatment** [2] - 116:20, 123:14
**under-use** [4] - 91:18, 91:19, 92:5, 92:9
**under-utilizing** [1] - 77:2
**undergone** [1] - 34:4
**underscore** [1] - 164:14
**undersold** [1] - 19:10
**understood** [4] - 49:4, 99:10, 146:20, 217:10
**undertaken** [1] - 20:9
**undoing** [1] - 135:9
**unfortunately** [2] - 32:8, 36:16

**UNIDENTIFIED** [2] - 185:15, 185:17
**unique** [1] - 29:24
**unit** [4] - 166:10, 204:23, 205:9
**UNITED** [2] - 1:1, 1:17
**United** [11] - 7:2, 35:12, 55:11, 71:2, 71:14, 116:9, 167:2, 167:10, 175:16, 180:12, 198:23
**units** [1] - 185:21
**universal** [1] - 29:24
**universally** [1] - 89:15
**universities** [1] - 13:7
**University** [1] - 10:4
**unless** [3] - 46:4, 75:16, 164:4
**unlikely** [2] - 52:6, 213:18
**unmet** [1] - 29:14
**unnecessarily** [2] - 87:12, 87:22
**unreliable** [2] - 65:1, 185:4
**Unrelieved** [1] - 109:25
**untethered** [1] - 189:20
**untreated** [1] - 38:19
**unused** [1] - 202:17
**up** [90] - 10:17, 10:21, 22:1, 24:10, 28:9, 29:21, 34:8, 34:18, 37:19, 38:8, 40:8, 41:16, 48:22, 51:10, 52:9, 54:7, 56:17, 61:9, 62:16, 62:22, 63:3, 63:10, 65:3, 67:10, 67:17, 68:15, 77:5, 78:1, 78:7, 82:18, 84:17, 84:25, 85:1, 86:16, 90:9, 90:13, 93:12, 94:3, 94:10, 94:15, 94:17, 96:6, 98:7, 102:8, 110:18, 110:19, 111:17, 119:2, 121:5, 123:3, 124:13, 124:21, 125:5, 127:23, 129:12, 129:18, 130:11, 131:18, 132:21, 138:1, 138:3, 138:9, 146:11, 151:5, 151:22, 164:8, 164:14, 165:12, 165:13, 170:9, 171:25, 172:23,

174:1, 174:20, 180:18, 185:1, 186:2, 186:23, 187:6, 187:7, 187:8, 187:11, 191:10, 199:7, 203:15, 204:10, 205:6, 205:7, 213:24, 217:9
**update** [1] - 119:8
**updated** [1] - 41:13
**upper** [2] - 40:10, 206:1
**urinary** [1] - 85:16
**urine** [1] - 52:4
**usage** [1] - 41:25
**useful** [4] - 30:19, 30:22, 43:22, 128:6
**users** [11] - 47:6, 59:2, 61:18, 64:13, 65:4, 153:12, 154:19, 171:19, 201:11, 212:6, 212:15
**uses** [2] - 120:15, 204:23
**utilized** [1] - 134:2
**utilizing** [1] - 77:2

## V

**vacation** [2] - 15:21, 136:15
**validated** [2] - 48:1, 50:9
**Valley** [3] - 160:22, 160:24, 175:18
**value** [1] - 30:17
**variations** [1] - 189:13
**varies** [2] - 50:4, 208:3
**variety** [2] - 85:14, 205:22
**various** [8] - 83:14, 120:9, 128:7, 132:22, 136:12, 138:7, 184:25, 202:2
**vary** [3] - 49:23, 50:2, 216:3
**vast** [3] - 59:1, 150:11, 152:3
**Vegas** [2] - 172:6, 215:6
**vehemently** [1] - 80:17
**vehicle** [1] - 140:24
**Ventura** [1] - 3:15
**Venture** [1] - 11:6
**veracity** [1] - 163:14
**verbatim** [2] - 124:5, 128:12
**verdict** [2] - 132:14, 133:20

verify [1] - 185:4
version [4] - 41:8, 84:11, 127:10, 154:13
versus [7] - 49:16, 58:18, 70:1, 71:2, 199:22, 199:25, 218:2
Vice [1] - 16:19
video [1] - 172:13
view [16] - 23:2, 35:18, 39:5, 52:14, 70:3, 70:6, 72:2, 74:2, 82:22, 83:5, 83:13, 85:24, 118:17, 146:22, 203:8, 208:6
views [2] - 35:8, 86:4
violation [1] - 132:3
VIRGINIA [2] - 1:1, 1:18
Virginia [45] - 4:24, 7:3, 7:4, 25:20, 25:22, 77:22, 88:9, 89:3, 90:1, 97:8, 97:14, 97:15, 97:16, 97:20, 97:24, 98:8, 98:9, 98:11, 101:11, 102:9, 103:18, 119:2, 121:7, 122:16, 123:4, 123:25, 124:8, 124:17, 125:9, 125:22, 126:23, 126:25, 127:2, 127:6, 127:18, 127:20, 129:13, 138:8, 138:9, 140:8, 171:22, 179:2, 185:13, 187:18
Virginians [1] - 25:24
visibility [1] - 73:9
visits [2] - 31:1, 171:13
vital [8] - 107:3, 107:6, 107:8, 111:1, 111:10, 111:11, 111:13, 111:19
voir [3] - 25:13, 97:12, 183:12
Volkow [3] - 181:2, 181:14, 206:13
volume [3] - 159:21, 160:12, 216:22
VOLUME [1] - 1:16
voluntary [1] - 201:25
vs [1] - 220:6
vulnerability [2] - 208:9, 208:18

**W**

waited [1] - 130:24
waiting [1] - 112:1
WAKEFIELD [1] - 5:13
walk [7] - 10:16, 14:10, 31:13, 33:21, 76:20, 93:20, 93:22
walked [6] - 13:17, 73:4, 87:24, 138:2, 138:7, 138:19
walking [2] - 138:18, 164:18
wants [3] - 140:24, 143:23, 174:7
warning [4] - 41:18, 41:20, 45:8, 45:16, 48:11, 52:12, 52:14, 52:15, 52:17
WARNING [1] - 45:9
warnings [10] - 42:1, 43:15, 44:18, 45:2, 48:6, 48:8, 48:14, 48:15, 48:24, 49:3
warnings) [1] - 47:19
Washington [7] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12, 136:14
water [1] - 51:11
wave [4] - 176:14, 176:18, 176:20, 177:23
waves [2] - 176:11, 177:9
ways [3] - 32:1, 56:4, 95:10
weak [2] - 91:1, 94:6
WEBB [3] - 3:11
Webb [1] - 3:12
website [5] - 170:16, 170:18, 170:23, 170:24, 175:10
wedding [2] - 132:19, 134:10
Wednesday [2] - 219:15, 219:19
week [9] - 15:8, 15:11, 15:21, 97:4, 131:25, 133:23, 134:6, 134:13, 137:3
weekend [2] - 134:16, 191:5
weeks [18] - 30:11, 30:12, 30:19, 30:20, 133:13, 133:19, 133:23, 134:7, 134:8, 134:22, 135:21, 135:24, 136:1, 136:3, 137:12, 147:24,

170:11
weigh [4] - 38:4, 50:22, 72:12, 126:15
weighed [1] - 200:25
weighing [2] - 38:9, 38:14
weight [7] - 33:5, 155:15, 156:16, 157:13, 157:14, 169:8, 169:19
weighting [1] - 139:10
welcomed [2] - 136:18, 136:20
well-attended [1] - 172:20
well-intentioned [2] - 146:15, 146:19
well-known [3] - 86:13, 88:5, 88:24
well-regarded [1] - 19:23
WEST [2] - 1:1, 1:18
West [45] - 7:3, 7:4, 25:20, 25:22, 25:24, 77:22, 88:9, 89:3, 90:1, 97:8, 97:14, 97:15, 97:16, 97:20, 97:24, 98:8, 98:11, 101:10, 102:9, 103:18, 119:1, 121:7, 122:16, 123:4, 123:25, 124:8, 124:17, 125:9, 125:21, 126:23, 126:24, 127:1, 127:6, 127:18, 127:20, 129:12, 129:13, 138:8, 138:9, 140:8, 171:22, 179:1, 185:13, 187:18
Whereas [1] - 154:4
whereas [2] - 53:6, 104:18
whichever [1] - 44:22
White [2] - 21:1, 21:4
white [3] - 81:12, 214:15, 214:21
WHO [1] - 92:15
whole [8] - 15:10, 32:18, 37:6, 39:3, 70:21, 155:21, 185:2, 203:15
wholesale [1] - 45:4
WICHT [1] - 4:18
wide [2] - 14:20, 189:13
widely [3] - 119:23, 181:17, 203:9
widespread [1] -

181:21
Wigmore [1] - 89:14
Williams [2] - 4:18, 5:4
Wilson [1] - 211:17
window [2] - 78:8, 168:15
wisely [1] - 130:24
wish [2] - 81:18, 151:25
withdraw [2] - 164:7, 179:21
withdrawal [1] - 104:9
Withdrawal [1] - 48:14
witness [28] - 7:7, 7:22, 13:18, 21:24, 22:3, 22:8, 22:21, 22:24, 22:25, 23:7, 23:11, 25:13, 56:12, 97:13, 134:13, 140:20, 150:18, 168:5, 168:8, 168:9, 179:19, 183:22, 186:10, 189:18, 190:3, 190:4
WITNESS [17] - 7:13, 7:16, 7:20, 26:13, 51:13, 68:9, 83:20, 148:14, 148:16, 150:23, 151:3, 159:25, 160:4, 162:14, 177:17, 219:12, 219:14
witness's [2] - 56:14, 167:17
witnesses [2] - 56:16, 133:11
WOELFEL [1] - 3:9
Woelfel [2] - 3:9
women [2] - 33:25, 34:11
Women's [9] - 8:13, 10:21, 11:20, 11:22, 12:21, 12:24, 16:18, 16:21, 17:8
wonderful [1] - 58:24
word [4] - 55:13, 165:21, 165:22, 174:17
words [14] - 46:24, 71:20, 75:17, 109:10, 116:19, 153:9, 166:23, 167:4, 167:7, 169:16, 177:24, 178:2, 178:7, 178:15
works [3] - 7:9, 94:8, 109:23
world [3] - 15:17, 147:10, 159:8

World [9] - 35:1, 88:11, 88:15, 88:22, 92:8, 92:14, 92:17, 92:19, 93:18
wrap [1] - 24:10
write [3] - 13:15, 17:7, 100:25
writes [2] - 187:4, 205:11
writing [6] - 16:15, 28:24, 140:23, 141:17, 141:21, 192:18
writings [1] - 183:20
written [14] - 40:21, 42:4, 64:1, 79:11, 100:10, 101:24, 140:10, 140:21, 143:21, 147:13, 166:9, 166:24, 181:14, 182:10
wrote [4] - 87:19, 155:5, 167:4, 167:7
WU [1] - 5:10
WV [6] - 2:8, 3:10, 3:13, 4:24, 5:15, 6:9

**X**

X-rays [1] - 73:15

**Y**

Yale [1] - 10:7
Year [1] - 60:21
year [17] - 10:17, 10:19, 10:23, 10:24, 10:25, 11:11, 16:4, 34:1, 59:4, 61:3, 62:4, 80:18, 153:5, 153:14, 154:5, 175:15, 187:7
yearly [1] - 33:13
years [15] - 23:20, 59:11, 59:19, 61:9, 61:12, 70:10, 84:20, 131:10, 139:6, 139:7, 150:25, 157:16, 177:8, 177:11
yesterday [6] - 15:19, 130:22, 130:25, 131:10, 131:12, 135:15
York [4] - 3:5, 10:19, 10:20, 131:20
yourself [6] - 8:8, 13:13, 15:25, 75:5, 150:1, 174:17, 208:24

33



YouTube [1] - 172:13