**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE CITY OF HUNTINGTON, | |
|       Plaintiff, | |
| v. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG<br>CORPORATION, et al., | |
|       Defendants. | |
| CABELL COUNTY COMMISSION, | |
|       Plaintiff, | |
| v. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG<br>CORPORATION, et al., | |
|       Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT
<u>ON PARTIAL FINDINGS REGARDING ABATEMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

I.      DEFENDANTS' DISTRIBUTION OF PRESCRIPTION OPIOIDS ............................. 3

II.    PLAINTIFFS' PURPORTED "ABATEMENT" REMEDY ............................................. 4

ARGUMENT ........................................................................................................................ 7

I.      PLAINTIFFS HAVE FAILED TO PROVE THAT THEY ARE ENTITLED TO
AN ABATEMENT REMEDY, PROPERLY CONSTRUED. ........................................ 7

        A.     The Only Remedy Sought by Plaintiffs Is Equitable Abatement. .......................... 7

        B.     Equitable Abatement Does Not Include Recovery of Costs for the
Downstream Effects of the Alleged Nuisance. ....................................................... 8

II.    PLAINTIFFS MAY NOT RECOVER FOR FUTURE TREATMENT COSTS. ........... 14

III.   PLAINTIFFS' ABATEMENT PLAN IGNORES THE REAL WORLD, DOES
NOT EVEN PURPORT TO ADDRESS DEFENDANTS' ALLEGEDLY
WRONGFUL CONDUCT, AND WOULD RESULT IN AN IMPROPER
WINDFALL RECOVERY. ........................................................................................... 19

CONCLUSION.................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Absure, Inc. v. Huffman*,
  213 W. Va. 651, 584 S.E.2d 507 (2003) ................................................................. 6

*Am. Mortg. Network, Inc. v. Shelton*,
  486 F.3d 815 (4th Cir. 2007) ............................................................................... 19

*Bansbach v. Harbin*,
  229 W. Va. 287, 728 S.E.2d 533 (2012) ............................................................... 11

*Berkeley Cty. Comm'n v. Shiley*,
  170 W. Va. 684, 295 S.E.2d 924 (1982) ............................................................... 11

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ....................................................................................... 19, 26

*Brown v. Diversified Distrib. Sys.*, LLC, No. CIV. 13-218 ADM/LIB, 2014 WL
  2718760 (D. Minn. June 16, 2014), *aff'd in part, rev'd in part on other
  grounds*, 801 F.3d 901 (8th Cir. 2015) .................................................................. 6

*Burch v. Nedpower Mount Storm, LLC*,
  220 W. Va. 443, 647 S.E.2d 879 (2007) ............................................................... 11

*City of Chicago v. Beretta U.S.A. Corp.*,
  821 N.E.2d 1099 (Ill. 2004) ................................................................................... 9

*City of Vernon v. S. Cal. Edison Co.*,
  955 F.2d 1361 (9th Cir. 1992) .............................................................................. 18

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) .............................................................................. 18

*Cooper v. Smith & Nephew, Inc.*,
  259 F.3d 194 (4th Cir. 2001) ................................................................................ 25

*Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*,
  362 N.E.2d 968 (N.Y. 1977) ........................................................................... 10, 16

*Duff v. Morgantown Energy Assocs. (M.E.A.)*,
  187 W. Va. 712, 421 S.E.2d 253 (1992) ................................................... 2, 9, 11, 17

*Fellows v. City of Charleston*,
  62 W. Va. 665, 59 S.E. 623 (1907) ....................................................................... 11

*Hagale Indus, Inc. v. Land's End, Inc.*,
  2002 WL 34365830 (W.D. Mo. Dec. 2, 2002) ....................................................................18

*Marshall v. City of Vicksburg*,
  82 U.S. 146 (1872) ..............................................................................................19, 20, 21

*Martin v. Williams*,
  141 W. Va. 595, 93 S.E.2d 835 (1956) ...........................................................................11

*McMechen v. Hitchman-Glendale Consol. Coal Co.*,
  88 W. Va. 633, 107 S.E. 480 (1921) ...............................................................................13

*Mullins v. Hinkle*,
  953 F. Supp. 744 (S.D. W. Va. 1997) ..............................................................................10

*In re Natl. Prescription Opiate Litig.*,
  2019 WL 4043938 (N.D. Ohio August 26, 2019) ............................................................13

*Pender v. Bank of Am. Corp.*,
  736 F. App'x 359 (4th Cir. 2018) ....................................................................................19

*State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*,
  200 W. Va. 221 (1997) ................................................................................... *passim*

*State v. Lead Industries, Ass'n, Inc.*,
  951 A.2d 428 (R.I. 2008) ..................................................................................................9

*Szedlock v. Tenet*,
  139 F. Supp. 2d 725 (E.D. Va. 2001), *aff'd*, 61 F. App'x 88 (4th Cir. 2003).........................19

*Trana Discovery, Inc. v. S. Rsch. Inst.*,
  915 F.3d 249 (4th Cir. 2019) ...........................................................................................25

*United States v. Walton*,
  86 F.3d 1154 (4th Cir. 1996) ...........................................................................................25

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000)..............................................................................................19, 26

*Woods v. Cottrell*,
  55 W. Va. 476, 47 S.E. 275 (1904) ..................................................................................11

**Statutes and Regulations**

21 C.F.R. §1301.74 ..............................................................................................................3

W. Va. Code § 7-1-3kk ......................................................................................................10

W. Va. Code § 8-12-5(23) ..................................................................................................10

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)..........................................................................................11

Dobbs et al., The Law of Torts (2d ed. sup. 2020) ...............................................................11, 13

Prosser & Keeton on Torts...............................................................................................................10

## INTRODUCTION

Throughout this litigation, Plaintiffs have consistently and repeatedly stated that they are seeking **only** equitable abatement, **not** any past or future damages.  The question now before the Court, at the close of Plaintiffs' evidence, is whether Plaintiffs have presented sufficient evidence of their entitlement to equitable abatement relief, properly construed.  For three reasons, Plaintiffs have failed to satisfy their burden, and Defendants[1] are entitled to judgment on partial findings pursuant to Rule 52(c).

*First*, it is well established under West Virginia law that (1) a public nuisance consists of **conduct** that injuriously affects the public health or safety, and (2) abatement consists of eliminating or otherwise addressing that conduct.   Equitable abatement does not include compensation for downstream harms caused by the allegedly tortious conduct—that is damages.  Here, the conduct at issue (*i.e.*, the nuisance) is Defendants' alleged shipment of an excessive volume of prescription opioids into the Cabell/Huntington community.  But Plaintiffs' purported "abatement"[2] remedy does not address Defendants' conduct; instead, it seeks compensation for the myriad downstream harms allegedly caused by opioid addiction and abuse.  Put differently, the remedy Plaintiffs seek—if available at all—would constitute damages.  Because Plaintiffs have waived damages, they are barred from obtaining the only remedy they seek.

*Second*, Plaintiffs' proposed "abatement" plan is fundamentally flawed because it consists in substantial part of costs to treat **future** addiction—that is, treatment costs for people who have

---

[1]  The moving defendants are AmerisourceBergen Drug Corp., Cardinal Health, Inc., and McKesson Corp. (collectively, "Defendants").

[2]  For the reasons set forth herein, Plaintiffs' proposed remedial plan does not constitute "abatement."  For the purposes of this brief, however, Defendants refer to the remedial plan using Plaintiffs' title, the "abatement plan."  Additionally, Defendants use Plaintiffs' future value dollar calculations to refer to the costs set out by the plan, but maintain that any monetary award would need to be converted into present value.

not yet become addicted to opioids but may (according to Plaintiffs) become addicted at some point in the future.  It is well established in West Virginia that Plaintiffs "bear a heavy burden" in attempting to recover for these kinds of indeterminate harms resulting from a prospective nuisance.  *See, e.g.*, *Duff v. Morgantown Energy Assocs. (M.E.A.)*, 187 W. Va. 712, 721, 41 S.E. 2d 253, 262 (1992).  Because Plaintiffs have failed to present ***any*** evidence of any continuing ***or*** future conduct, let alone evidence that Defendants' future conduct will constitute a public nuisance, they have failed to satisfy ***any*** burden with respect to treatment costs for future addiction, let alone the "heavy burden" that applies under West Virginia law.

*Third*, it is well established that equity abhors windfalls, and yet Plaintiffs' proposed abatement remedy would necessarily result in a massive windfall to Plaintiffs, for a plan that—as Plaintiffs' own expert witnesses admit—is not tied in any way to Defendants' alleged actionable conduct.  Indeed, the testimony of Plaintiffs' experts made it abundantly clear that the abatement plan advanced by Plaintiffs is completely unmoored from reality:  it seeks billions of dollars to fund services that Plaintiffs ***have never*** and ***will never*** pay for, and it does not take into account any of the substantial ongoing efforts in Cabell/Huntington to remedy opioid addiction and abuse.  Further, Dr. Alexander readily admitted that his abatement plan "would provide services and treatment to individuals who ***never took prescription opioids***."   6/28 Tr. at 119:17–120:1 (emphasis added).  While treating those individuals may be sound social policy, there is no factual or legal basis for requiring ***Defendants*** to pay for those services.  Plaintiffs' so-called "abatement" plan thus lacks any fit to this case and cannot support the remedy Plaintiffs seek.  And, in the

absence of the abatement claim, Plaintiffs have entirely failed to prove entitlement to any remedy, and judgment under Rule 52(c) is warranted.[3]

## FACTUAL BACKGROUND

### I.    DEFENDANTS' DISTRIBUTION OF PRESCRIPTION OPIOIDS

Defendants distribute prescription opioids—along with a wide range of other pharmaceutical and medical products—to DEA-registered and State-licensed dispensers in Cabell/Huntington, who in turn order those medications based on the aggregate volume of prescriptions written by DEA-registered and State-licensed prescribers.  Pursuant to their statutory and regulatory obligations, each defendant operates a "suspicious order monitoring" program designed to identify orders of prescription opioids that meet the regulatory definition of "suspicious."  21 C.F.R. §1301.74(b).  Defendants have systematically blocked shipment of all "suspicious" orders to Cabell/Huntington (and every other jurisdiction in the country) since at least 2008.[4]

The level of opioid prescribing in Cabell/Huntington has decreased by more than 50% since 2010,[5] and the volume of prescription opioids shipped by Defendants into Cabell/Huntington has decreased at a corresponding rate.[6]  In particular, the evidence shows that Defendants' distribution

---

[3] Defendants also incorporate by reference the arguments made regarding statute of limitations in Def. Cardinal Health's Mem. in Support of Cardinal Health's Motion for Judgment.

[4] *See, e.g.*, 6/9 Tr. at 13:18–24 (Mr. Rannazzisi agreeing that "by 2008 every defendant in this case had a policy in place that involved blocking flagged orders"); 5/26 Tr. (Rafalski) at 250:23–251:3.

[5] *See, e.g.*, 5/6 Tr. at 58:7–11 (Dr. Gupta testifying that opioid prescribing in West Virginia decreased by 52% between 2013 and 2019); 6/15 Tr. at 204:25–205:4 (Plaintiffs' expert Dr. Lacey Keller admitting that "after increasing from 1997 to 2010, opioid prescriptions in Cabell County generally fell from 2010 through 2017").

[6] Dr. Craig McCann's data analysis shows that Defendants' distribution into the two zip codes encompassing Cabell/Huntington (as well as parts of six other counties) has declined by two-thirds

of prescription opioids into Cabell/Huntington began to decrease rapidly in 2014 and has continued to decrease each year since.[7]

## II.     PLAINTIFFS' PURPORTED "ABATEMENT" REMEDY

Plaintiffs' self-styled "abatement" remedy is derived principally from the combined testimony of two expert witnesses: (1) Dr. G. Caleb Alexander, who identifies hypothetical categories of "abatement" programs that Plaintiffs could implement, and (2) George Barrett, who purports to calculate the cost of those programs.   The evidence demonstrates, however, that Plaintiffs' "abatement" plan has virtually nothing to do with addressing Defendants' alleged conduct (*i.e.*, the shipment of "excessive" pills) or the alleged "flood" or "oversupply" of prescription opioids in Cabell/Huntington.   For example, Dr. Alexander admitted that his abatement plan (1) "does not recommend any new licensing requirements for distributors," (2) "does not propose any new reporting requirements for distributors," and (3) "does not propose any new physical security requirements for distributors."   6/28 Tr. at 123:19–22, 124:7–17, 124:19–22.

Only one portion of Dr. Alexander's abatement plan—"**Category 1 – Prevention**"—even arguably relates to reducing the supply of prescription opioids.[8]   But that category amounts to *less than 2%* of the total cost of the abatement plan.[9]   And, more fundamentally, the subcategories of

---

from its peak, and that "[distribution] levels in 2019 are about the same as back in [the] 2001 window." 5/11 Tr. at 160:13–161:4; *see also* Trial Ex. P-44711 at 12.

[7] *See* Trial Ex. P-44711 at 12.

[8] *See* 6/28 Tr. at 36:11–38:19, 129:19–137:18 (Dr. Alexander describing Category 1 of his abatement plan, titled "Prevention-Reducing Opioid Oversupply and Improving Safe Opioid Use").

[9] "Category 1: Prevention" totals to $48,720,554, only 1.91% of the $2,544,446,548 total.   6/29 Tr. at 106:11–12 (Mr. Barrett stating total cost calculation); *id.* at 106:19–107:10 (Mr. Barrett listing cost calculations for Category 1); *see also* Ex. A (DEMO-272_00012).

interventions in that category have nothing to do with Defendants' alleged conduct.  Instead, they relate primarily to (1) educating **prescribers** about prescribing opioids and treating opioid use disorder ("OUD"), (2) educating **the public** about the risks of legal and illegal opioid use, and (3) harm reduction and monitoring programs such as syringe exchange services and data collection.[10]

Instead of addressing Defendants' alleged conduct or the alleged "flood" or "oversupply" of opioids, the overwhelming majority of Plaintiffs' abatement plan is directed to addressing the myriad downstream harms allegedly caused by opioid addiction and abuse.  By way of illustration:

- **"Category 2 – Treatment"** consists of direct medical treatment and other related services for people with opioid use disorder.  *See* 6/28 Tr. at 137:17–141:13 (Dr. Alexander describing the Category 2 programs).  This single category accounts for ***more than $2 billion***,[11] or approximately 80.6%, of Plaintiffs' total "abatement" demand.

- **"Category 3 – Recovery"** consists of nearly $100 million[12] to address the downstream effects of OUD, including (1) expansion of police capabilities (Category 3A), (2) expansion of drug-related capabilities in the justice system (Category 3B), (3) creating and encouraging employment opportunities for people with OUD (Categories 3C, D), and (4) expanding mental health services and grief support for people affected by OUD.  *See* 6/28 Tr. at 141:14–143:9 (Dr. Alexander describing the Category 3 programs).

---

[10] *See, e.g.* 6/28 Tr. at 37:4–38:19 (Dr. Alexander describing the public education components of Category 1); *id.* at 130:10–22 ("Q.  [T]he Health Professional Education is focusing particularly on educating doctors and other prescribers, correct?  A. It's focused on educating healthcare providers, but not just about the oversupply of opioids, but also about the identification and treatment of people that have Opioid Use Disorder."); *id.* at 37:4–38:19 (Dr. Alexander describing programs in Category 1).  Dr. Alexander admitted that "opioids have been oversupplied in the community *through the hands of prescribers*."  6/28 Tr. at 122:18–123:2 (emphasis added).  Dr. Alexander's proposed pill collection program accounts for *$35,972*, only 0.0014% of the total cost.  6/29 Tr. at 107:3–4 (Mr. Barrett listing calculation for Category 1C); *see also* Ex. A, DEMO-272_00012.

[11] Category 2 totals to $2,050,815,634.  *See* 6/29 Tr. at 107:11–20 (Mr. Barrett listing calculations for Category 2); *see also* Ex. A (DEMO-272_00012).

[12] Category 3 totals to $99,238,834.  *See* 6/29 Tr. (Barrett) at 107:21–108:16 (Mr. Barrett listing calculations for Category 3); *see also* Ex. A (DEMO-272_00012).

- **"Category 4 – Special Populations"** consists of just under $350 million[13] to fund services for "special populations that are adversely affected by opioid use and misuse and by OUD," 6/28 Tr. at 143:10–15, including services to support (1) pregnant woman with OUD and babies with NAS (Category 4A), (2) children and families affected by OUD (Categories 4B, C), (3) homeless or housing insecure individuals affected by OUD (Category 4D), and (4) individuals who misuse opioids (Category 4E), *id*. at 143:16–145:8.

Collectively, these services to treat and address the alleged downstream effects of opioid addiction and misuse comprise ***more than 98%*** of Plaintiffs' total "abatement" plan.[14]

Moreover, none of the interventions listed in Dr. Alexander's abatement plan are limited to people allegedly harmed by prescription opioids. Thus, the interventions are avowedly not limited to prescription opioids shipped by Defendants—let alone to prescription opioids ***wrongfully*** shipped by Defendants:

> Q. Is it correct that the abatement plan you set forth would provide services and treatment to individuals who never took prescription opioids?
>
> A. Yes, it is.
>
> Q. And do you agree . . . that there are individuals in [Cabell/Huntington] who have OUD who have, in fact, never used a prescription opioid?
>
> A. Yes, I do.

6/28 Tr. (Alexander) at 119:17–120:6; *see also id.* at 120:16–121:10 (Dr. Alexander confirming that his abatement plan would cover people who had only ever used illegal opioids like heroin, illegal fentanyl, or Carfentanil).

---

[13] Category 4 totals to $345,671,523. *See* 6/29 Tr. (Barrett) at 108:17–109:12 (Mr. Barrett listing calculations for Category 4); *see* also Ex. A (DEMO-272_00012).

[14] *See supra* n.7.

**ARGUMENT**

Absent some form of available relief, Plaintiffs' public nuisance claims cannot proceed. *See Absure, Inc. v. Huffman*, 213 W. Va. 651, 655, 584 S.E.2d 507, 511 (2003) ("It is a rather well settled principle of the law that more is necessary to maintain a civil action than a simple breach of the duty. There must also be an injury."); *Brown v. Diversified Distrib. Sys.*, LLC, No. CIV. 13-218 ADM/LIB, 2014 WL 2718760, at *11 (D. Minn. June 16, 2014), *aff'd in part, rev'd in part on other grounds*, 801 F.3d 901 (8th Cir. 2015) (explaining that Plaintiff's claim must "fail for want of available relief"). Because Plaintiffs have waived damages and have failed to prove their entitlement to any form of cognizable abatement relief, they have failed to demonstrate the existence of a compensable injury and Defendants are entitled to judgment under Rule 52(c).

**I.  PLAINTIFFS HAVE FAILED TO PROVE THAT THEY ARE ENTITLED TO AN ABATEMENT REMEDY, PROPERLY CONSTRUED.**

The only remedy Plaintiffs seek in this case is abatement. Properly construed, however, abatement here could consist of, at most, enjoining Defendants' allegedly wrongful conduct or eliminating the "flood" of pills that Defendants allegedly shipped into Cabell/Huntington. But Plaintiffs do not seek such relief, and Plaintiffs have not introduced any evidence (1) that Defendants continue to "flood" Cabell/Huntington with prescription opioids, or (2) that there remains any excess supply of pills in the Cabell/Huntington community as a result of Defendants' allegedly wrongful past conduct.

**A.  The Only Remedy Sought by Plaintiffs Is Equitable Abatement.**

After this case was remanded from the MDL, Plaintiffs made clear that they are seeking only equitable abatement of Defendants' alleged misconduct, and not any past or future economic losses. *See* Pls.' Position Statement (ECF No. 139) at 4 ("Plaintiffs have waived all past and future economic losses" and instead "seek abatement which is 'equitable in nature and provides a

7

prospective remedy'"). Since that time, Plaintiffs have consistently and repeatedly reaffirmed that position. *See, e.g.*, ECF No. 225 at 5 ("Plaintiffs have **waived all claims for damages**, including punitive damages. Plaintiffs' public nuisance claims seeking **only the equitable remedy of abatement** are not tort actions for compensatory damages. . . ." (emphasis added)).[15]

### B.   Equitable Abatement Does Not Include Recovery of Costs for the Downstream Effects of the Alleged Nuisance.

The public nuisance at issue is Defendants' alleged conduct in shipping an excessive volume of prescription opioids to DEA-registered and state-licensed dispensaries in Cabell/Huntington. As a matter of settled law, abatement consists of enjoining the offending conduct, and in the case of certain environmental nuisances, removing the contaminant from the environment.

Though styled as "abatement," the recovery Plaintiffs seek has virtually nothing to do with stopping Defendants' alleged conduct (*i.e.*, the shipment of "excessive" pills) or removing the alleged "flood" or "oversupply" of prescription opioids in Cabell/Huntington. *See supra* pp.4–6. Instead, Plaintiffs' so-called abatement remedy consists almost entirely of compensation for downstream harm caused by opioid addiction and abuse. *See id.* Those may be damages, but they are not abatement, and so are not recoverable in this lawsuit.

A simple analogy illustrates the issue. If a defendant wrongfully dumps pollutants into a lake, that may constitute a public nuisance. If a court finds that it does, the court could—as part

---

[15] *See also, e.g.*, ECF No. 125 at 1, n.1 ("Plaintiffs *waive past damages* for economic losses sustained by the CABELL COUNTY COMMISSION and CITY OF HUNTINGTON."); ECF No. 153 at 2 ("In order to expedite trial, Plaintiffs have streamlined their case by *dismissing . . . damages*. . . . [T]here is no right to a jury trial in a governmental public nuisance case seeking *only abatement*."); ECF No. 286 at 1 ("Plaintiffs have expressly *disclaimed damages* in this action and seek *only equitable, prospective relief* in the form of abatement."); ECF No. 813 at 2 ("Plaintiffs' public nuisance claims *seeking abatement* as an equitable remedy are *not tort actions for compensatory damages*.").

of an abatement remedy—enjoin the defendant from dumping further pollutants into the lake.  It could also order the defendant to remediate the site by removing the existing pollutants from the lake.  And, as part of that injunctive relief ordering the defendant to remove the pollutants from the lake and/or to stop the offending conduct, the court could, perhaps, order the defendants to pay some money incident to the injunction.  But a court may not order—and no court has ever ordered—a defendant to pay for the future medical treatment of the people who were harmed by drinking polluted water from the lake.

Yet that is effectively the relief Plaintiffs request here.  They seek, under the guise of abatement, to have defendants pay for (1) the future medical treatment of people with OUD in Cabell/Huntington, and (2) other remediation programs directed to combatting the downstream effects of that OUD (*e.g.*, workforce training, vocational programs, housing assistance, assistance for infants with NAS, etc.).  *See supra* pp.4–6.  Under settled law, that is not abatement and is not an available remedy in this case.

*1.  **A public nuisance consists of wrongful conduct.***  Under West Virginia law, a public nuisance is "the ***doing of or the failure to do something*** that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public[.]"  *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 245 n.28, 488 S.E.2d 901, 925 n.28 (1997) (emphasis added); *accord Duff*, 187 W. Va. at 716 ("A public nuisance is an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons.").  Put differently, a public nuisance is ***conduct*** that operates to injuriously affect the public, not all of the downstream effects of the conduct.[16]  That is consistent

---

[16] West Virginia's conduct-based definition of public nuisance is consistent with influential public nuisance case law from other jurisdictions.  *See, e.g.*, *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d

with black-letter tort law, which makes clear that "liability must be based upon **conduct** which is socially unreasonable."  Prosser & Keeton on Torts ch. 1, § 1, p. 6; *see also* Dobbs et al., The Law of Torts (2d ed. sup. 2020), § 1 ("A tort is **conduct** that amounts to a legal wrong and that causes harm for which courts will impose civil liability."); *Mullins v. Hinkle*, 953 F. Supp. 744, 749 (S.D. W. Va. 1997) ("A claim of tort requires **conduct** causing harm and is completed when the harm occurs.").

This Court has already recognized that the alleged nuisance in this case is Defendants' conduct.  For instance, in denying Defendants' motion for summary judgment on standing, the Court noted that "the scope of the activity sought to be abated defines the relevant **conduct**," and that "the relevant **conduct** is the alleged violations of law in connection with defendants' distribution of pharmaceutical drugs."[17]  The Court further noted that Plaintiffs may only seek "a remedy for a subset of defendants' operations"—namely, "abatement of [Defendants' alleged] violations" of law.[18]

---

428, 446 (R.I. 2008) (defining public nuisance as "*behavior* that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community" or "an *act or omission* which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all."); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1113 (Ill. 2004) (defining public nuisance as "the *doing of or the failure to do something* that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public."); *Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*, 362 N.E.2d 968, 971 (N.Y. 1977) (stating that public nuisance "consists of *conduct or omissions* which offend, interfere with or cause damage to the public").

[17] Memorandum Opinion and Order (17-cv-01362, ECF No. 1248) at 15 ("Plaintiffs frame the nuisance per se as defendants' alleged violations of law in connection with prescription drug distribution. They seek *abatement of those violations*; they do not attack the very existence of defendants . . . ." (emphasis added)).

[18] *Id.*

*2. Abatement consists of eliminating the offending conduct.*  Under West Virginia law, Plaintiffs' remedy is limited to "elimination of hazards to public health and safety" and "abate[ment]" of the alleged public nuisance.[19]  Equitable abatement has historically been limited to an ***injunction*** designed to eliminate the allegedly tortious conduct or, in certain environmental nuisance cases, an injunction to remove the contaminant from the environment.  *See, e.g.*, *Duff*, 187 W. Va. at 716 (noting that "courts generally grant injunctions to abate existing nuisances").[20]  That is confirmed by well-established principles of tort law, which provide that abatement consists of an injunction designed to make the plaintiff "free from the activity in question."  Dobbs, I Law of Remedies § 5.7(3); *see also* Black's Law Dictionary (10th ed. 2014) ("Abatement is generally defined as the act of *eliminating or nullifying*. . . . Abatement is often discussed in the context of reducing or removing of something that has been found to be a nuisance or a problem.").  Thus, "abatement" in the context of this case can consist only of enjoining Defendants from continuing to ship excessive amounts of prescription opioids into Cabell/Huntington and, ***at most***, removing

---

[19] *See* W. Va. Code §§ 7-1-3kk (granting county commissions limited authority); 8-12-5(23) (same for municipalities).

[20] *See also, e.g.*, *Bansbach v. Harbin*, 229 W. Va. 287, 728 S.E.2d 533, 538 (2012) (referring to injunction requiring party to halt activity as abatement); *Burch v. Nedpower Mount Storm, LLC*, 220 W. Va. 443, 456, 647 S.E.2d 879, 892–94 (2007) (using abatement and injunctive relief interchangeably, and holding that "an unsightly activity may be abated when it occurs in a residential area and is accompanied by other nuisances"); *Berkeley Cnty. Comm'n v. Shiley*, 170 W. Va. 684, 686, 295 S.E.2d 924, 926 (1982) (discussing state and local officials' power under state law to bring suits seeking injunctions to "abate" nuisances); *Martin v. Williams*, 141 W. Va. 595, 605, 93 S.E.2d 835, 841 (1956) ("Mandatory injunctions are awarded for the abatement of nuisances more frequently than for other purposes."); *Fellows v. City of Charleston*, 62 W. Va. 665, 59 S.E. 623, 625 (1907) ("The town has power to enforce its ordinance, and, if necessary for the abatement or removal of the [public] nuisance, may remove or destroy the thing creating the nuisance[.]"); *Woods v. Cottrell*, 55 W. Va. 476, 47 S.E. 275, 277 (1904) (a public nuisance "may be abated as part of the judgment, and the thing with which the nuisance is done may be destroyed").

any "flood" or "oversupply" of prescription opioids that Defendants allegedly shipped into Cabell/Huntington in the past.

Plaintiffs have compared this case to *Kermit Lumber* and environmental nuisance cases more generally.[21]  *See, e.g.*, Pls.' Opp. to Defs.' Mot. for Summary Judgment Regarding Statute of Limitations (ECF No. 288).  But even under *Kermit Lumber*, Plaintiffs' remedy fails.  There, the relevant conduct was the depositing of arsenic "on the Kermit Lumber business site in amounts above the regulatory limits," which then "flow[ed] into the Tug Fork River."  200 W.Va. at 245.  Recognizing that "[t]he object of a public nuisance action is to abate or stop the harm to the public health, safety, and the environment," the court held on the facts of that case that the nuisance "continue[d] *until the hazardous waste is removed*."  *Id.* at 245 n.29 (emphasis added). The abatement in *Kermit Lumber* therefore consisted of removing the excessive or above-limits arsenic from the environment.  *See id.* at 245.  Tellingly, *Kermit Lumber* did not hold that the plaintiff could recover, as abatement, for downstream harms to the community resulting from the contamination in the Tug River, such as treatment for injuries from those who consumed or came in contact with contaminated water.[22]

---

[21] Defendants deny that this case—which involves the highly regulated wholesale distribution of FDA-approved prescription medications to DEA-registered and State-licensed dispensaries—is factually similar to *Kermit Lumber*, which concerned the dumping of industrial wastes that leached into the Tug Fork River.  *Kermit Lumber*, 200 W.Va. at 245.  Indeed, any comparison of this case and *Kermit Lumber* reveals the dissimilarities between Defendants' conduct and the type of conduct that has been recognized as a public nuisance by the West Virginia Supreme Court of Appeals.  The fact that this case is unlike any other recognized in the state's public nuisance jurisprudence confirms that West Virginia never before has recognized a nuisance based on the sale of products, unconnected to land use, and this case is not a proper public nuisance case.  *See* ECF No. 1004.

[22] To be sure, the plaintiff in *Kermit Lumber* sought additional remedies beyond the removal of the excess arsenic from the Kermit Lumber site.  But the plaintiff in that case also brought other causes of action under which damages were available and did not waive any claim to damages on its public nuisance cause of action.  *See* Ex. B (*Kermit Lumber* Complaint) at Prayer for Relief

Here, therefore, abatement would consist of an injunction to stop the flow of excessive pills into Cabell/Huntington and/or the removal of excessive pills from the community.  Abatement would not consist of treatment of those who came into contact with the excessive pills and were harmed as a result.  But, as explained below, that is precisely the relief Plaintiffs seek under the guise of abatement.

*3.  The relief Plaintiffs seek does not consist of eliminating Defendants' allegedly wrongful conduct.*  The relief that Plaintiffs seek is not abatement.  Plaintiffs' abatement plan—presented through Dr. Alexander and Mr. Barrett—consists almost entirely of payments to address the downstream consequences of opioid use and abuse—principally, medical treatment of addiction and other medical services. *See supra* pp.4–6. That relief, if available at all, would be damages, not abatement.

As the Supreme Court of Appeals of West Virginia has recognized, the distinction between "abatement of nuisances and recovery of damages for injuries occasioned by wrongful acts, constituting nuisances," is both "apparent" and "vast." *McMechen v. Hitchman-Glendale Consol. Coal Co.*, 88 W. Va. 633, 107 S.E. 480, 482 (1921); *see also* Prosser and Keeton, The Law of Torts, § 631 (5th ed. 1984) (referring to the "fundamental distinction between entitlement to damages and entitlement to abatement of the nuisance").  Unlike damages, which are intended to "compensate the harmed party for harms already caused by the nuisance," the "abatement remedy is intended to compensate the plaintiff for the costs of rectifying the nuisance, going forward." *In re Natl. Prescription Opiate Litig.*, 2019 WL 4043938, at *1 (N.D. Ohio August 26, 2019); *see also* Dobbs, I Law of Remedies § 5.7(3) (damages, unlike abatement, are directed to compensating

---

¶¶ 3–4, 7 (separately seeking "remediation and cleanup of the contaminated soil" *and* "compensatory damages for Defendants' liability associated with common law public nuisance").

the plaintiff for "the cost[s] of eliminating the nuisance effects"). Here, rectifying the alleged nuisance would be to reduce the supply of prescription opioids—not to treat and address downstream effects of OUD.

Plaintiffs cannot point to a single West Virginia case in which the cost to redress ***the effects*** of a public nuisance were awarded ***as abatement***. While this Court concluded that equitable abatement can potentially include an award of money, the money must be incidental to an injunction to stop conduct or, as in the case of *Kermit Lumber*, to fund the removal of the nuisance-causing agent from the environment. *See Kermit Lumber*, 200 W. Va. at 245 (assuming "clean up" costs to be recoverable to remediate the public nuisance).

Here, Plaintiffs' requested remedy is directed entirely toward addressing the downstream effects of the alleged nuisance in Cabell/Huntington, not toward rectifying Defendants' allegedly wrongful conduct or removing from the community the excess pills that allegedly resulted from that conduct. *See supra* pp. 4–6. While some of the requested OUD treatment and assistance directed towards remediating the downstream effects of opioid addiction and abuse might arguably be damages, it is plainly not abatement.

In sum, as a matter of West Virginia substantive law, the Court may not award as abatement monetary relief designed to remediate the alleged downstream effects of opioid addiction and abuse. Defendants are thus entitled to judgment under Rule 52(c).

## II.   PLAINTIFFS MAY NOT RECOVER FOR FUTURE TREATMENT COSTS.

Plaintiffs' abatement plan also suffers from yet another critical defect: it consists in very large part of treatment and other medical expenses for Cabell/Huntington residents who are ***not now addicted*** to opioids but ***may***, according to Plaintiffs, become addicted at some point in the future. *See, e.g.*, 6/28 Tr. (Alexander) at 150:10–13 ("Q.  And you also assume that there are new people who develop OUD over the 15-year period covered by your redress model in addition to

14

your starting population, correct?  A.  Yes."); *id.* at 150:19–151:9 (Dr. Alexander testifying that his abatement plan covers "individuals on chronic high dose prescription opioids now that may not yet have developed opioid addiction, but will by 2024").  Because Plaintiffs have not come close to meeting their burden to prove that these future addictions are reasonably certain to result from Defendants' allegedly wrongful conduct, Plaintiffs are not entitled to recover for the costs of treating this speculative future OUD population.[23]  And because Plaintiffs' abatement experts admit that they have no way to separate out the costs associated with this speculative OUD population from Plaintiffs' overall treatment cost amount, Defendants are entitled to judgment on the entirety of Plaintiffs' claim to recover treatments costs.

There can be no doubt that Plaintiffs' so-called abatement plan consists in substantial part of costs to treat a ***future*** population of people with OUD—including Cabell/Huntington residents who are currently just 10 years old.[24]  More than $2.1 billion of Plaintiffs' $2.54 billion abatement plan is earmarked to fund direct medical treatment for future OUD and OUD-related medical costs.[25]  And, while Plaintiffs' experts expressly disavowed the ability to disaggregate current and

---

[23] Plaintiffs' claims for treatment and related costs also fail because the treatment population includes not only people who use prescription opioids, but also people who use illegal opioids like heroin and fentanyl.  6/28 Tr. (Alexander) at 120:16–22.

[24] *See, e.g.*, 6/28 Tr. at 151:19–152:7 ("Q.  And so, your point is that there's some people in that OUD population who come in and out and you're going to have new people coming into that top line population, correct?  A.  Yes.  Q.  And that might include — just as an example, that could include a child who is ten years old as of 2021 and has never used opioids[,] begins abusing heroin in 2027 as a teenager and develops OUD.  That — that child would be included in your OUD numbers, correct?  A.  It would … .").

[25] At least three of the interventions in Plaintiffs' proposed abatement plan involve treatment programs for populations including future OUD: (1) treating opioid use disorder (for which Plaintiffs have requested $1,705,896,182), (2) managing complications attributable to the epidemic (*e.g.*, screening and treatment for HIV, HCV, and endocarditis attributable to intravenous drug use, for which Plaintiffs have requested $301,682,032), and (3) treatment and care for pregnant women, new mothers, and infants with opioid use disorder or neonatal abstinence disorder (for which Plaintiffs have requested $95,700,232).  Together, these three items add up to

future treatment costs,[26] the trial evidence makes clear that a large majority of the treatment expenses included in the abatement plan are for individuals who do not currently have OUD.

Dr. Alexander's abatement plan assumes treatment for approximately 3,000 individuals a year, for every year until 2035. While Dr. Alexander was unable to estimate the number of people with OUD who could successfully be treated in a year, according to another Plaintiff witness, Dr. Waller, the one-year success rate for OUD treatment is approximately 84%. *See* 5/4 Tr. at 216:6–15. Thus, even accepting as true Dr. Alexander's assumption that 7,882 people in Cabell/Huntington currently have opioid use disorder that is somehow attributable to Defendants' alleged wrongdoing[27]—an assumption based on Dr. Keyes's inflated and unfounded estimate that approximately 8,200 people in Cabell/Huntington had opioid use disorder in 2018[28]—it is clear that all or virtually all of the current OUD population could be treated in just four years' time (3,000 x 0.84 x 4 = 10,080). *See* 6/28 Tr. at 162:3–12 (Dr. Alexander agreeing that if 80% of people in treatment enter remission after one year and no *new* people enter the OUD population,

---

$2,103,278,447. *See* 6/29 Tr. (Barrett) at 107:13–14 (listing costs for Category 2B - Treating Opioid Use Disorder); *id.* at 107:14–16 (listing costs for Category 2C - Managing Complications Attributable to the Epidemic); *id.* at 108:17–18 (listing costs for Category 4A - Pregnant Women, New Mothers, and Infants); *see also* Ex. B (DEMO-272_00012).

[26] *See, e.g.*, 6/28 Tr. (Alexander) at 153:5–10 ("Q. So, you've not estimated how many people would develop OUD each year during the period covered by your model, correct? A. Right. I've not — I've not estimated the proportions that are developing opioid addiction anew in each subsequent year."); *id.* at 154:6–12 ("Q. [I]n terms of the methodology, you have not separated out in any of these years the people who have newly developed OUD during the 15-year period as contrasted with the people who had OUD at the start of the 15 years? You have not done that, correct? A. Yes, correct."); 6/29 Tr. (Barrett) at 197:2–7 ("Q. But I'm really just asking, you don't have any way to do that? If we, if we asked you to separate out the costs that you set out here between people who develop OUD in the future versus people who have OUD as of today, you don't have a way to separate those costs? A. I do not.").

[27] 6/28 Tr. (Alexander) at 156:17–21.

[28] 6/11 Tr. (Keyes) at 212:4–8; 6/28 Tr. (Alexander) at 150:14–18.

"you wouldn't have any more people with addiction in Cabell County" after four years of treatment).  Yet Dr. Alexander assumes that 11 additional years of treatment for nearly 3,000 people a year—enough treatment for approximately 24,000-25,000 additional people with newly developed OUD, assuming an 84% remission rate[29]—will be needed as part of his "abatement plan."

Under West Virginia law, where "the nuisance of which the plaintiffs complain is prospective, the plaintiffs bear a heavy burden of proving that harm is reasonably certain to result from" the defendant's conduct.  *Duff*, 187 W. Va. at 721.  In particular, "[t]he plaintiff seeking the injunction to abate the prospective nuisance bears the burden of proving that the proposed conduct will constitute a nuisance 'beyond all ground of fair questioning.'"  *Id.* at 717 n.9; *see also* Memorandum Opinion and Order (ECF No. 1248) at 10 (quoting *Duff*).  Here, to the extent the Court credits Plaintiffs' assertion that the nuisance consists of a population of people who are addicted to or otherwise abusing legal or illegal opioids, it is plain that—insofar as the speculative future OUD population is concerned concerned—the nuisance is prospective.  Accordingly, to prove their entitlement to abatement, Plaintiffs bore the "heavy burden" of proving "beyond all grounds for fair questioning" that Defendants' conduct will cause those future addictions to occur. They have not come close to doing so.

Even assuming *arguendo* that Plaintiffs proved that Defendants' conduct somehow caused the current addiction of approximately 7,900 Cabell/Huntington residents, there is absolutely no evidence whatsoever that Defendants' allegedly wrongful conduct is responsible for the future addiction of different Cabell/Huntington residents (including residents as young as 10 years old). Under Plaintiffs' theory of the case, Defendants' alleged failures to maintain effective controls

---

[29] 6/28 Tr. (Alexander) at 164:2–25.

against diversion and "over-distribution" of prescription opioids caused a number of Cabell/Huntington residents to become addicted to prescription and/or non-prescription opioids. But Plaintiffs did not even attempt to introduce any evidence that any Defendant has done anything wrong since at least 2013.   *See* Mem. of Law in Support of Defs.' Mot. for Judgment on Partial Findings Regarding Proximate Causation at 21, filed contemporaneously herewith.  And Plaintiffs have provided no evidence of future conduct at all, let alone future conduct that is wrongful and will cause the future addiction of Cabell and Huntington residents.  Under these circumstances, there is no basis on which to conclude—let alone to a reasonable certainty—that Defendants' past conduct will cause a person who is not currently addicted to opioids to become addicted at some indeterminate point in the future.

Moreover, because Plaintiffs' abatement experts testified that they are incapable of separating out the costs of treating future OUD from the costs of treating current OUD, the Court should reject Plaintiffs' claim for a treatment-costs "abatement" remedy in its entirety.  Where, as here, Plaintiffs' experts fail to make a "distinction[] between costs incurred because of lawful or unlawful conduct, their estimates are unreliable and inadmissible." *Hagale Indus., Inc. v. Lands' End, Inc.*, 2002 WL 34365830, at *5 (W.D. Mo. Dec. 2, 2002).  *See also City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372–73 (9th Cir. 1992) (affirming summary judgment where plaintiff's damages study was excluded because it "failed to segregate the losses, if any, caused by acts which were not antitrust violations from those that were" and thus "plaintiffs could make no showing of the amount of damages"); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (explaining that "expert opinion [that] was the basis of the [plaintiffs'] damage case" "should not have been admitted because it . . . did not separate lawful from unlawful

18

conduct").  Accordingly, Defendants are entitled to judgment under Rule 52(c) on Plaintiffs' claim for treatment costs.

### III. PLAINTIFFS' ABATEMENT PLAN IGNORES THE REAL WORLD, DOES NOT EVEN PURPORT TO ADDRESS DEFENDANTS' ALLEGEDLY WRONGFUL CONDUCT, AND WOULD RESULT IN AN IMPROPER WINDFALL RECOVERY.

It is well established that federal courts sitting in equity may not award more than is necessary to make a plaintiff whole.  *See, e.g.*, *Pender v. Bank of Am. Corp.*, 736 F. App'x 359, 371 (4th Cir. 2018) ("[C]ourts and commentators have cautioned against awarding a plaintiff equitable relief . . . to the extent doing so would amount to a windfall or penalize a defendant."); *Am. Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 820 (4th Cir. 2007) (concluding that counterclaimants' requested relief, which amounted to a windfall recovery, "offends traditional notions of equity"); *Szedlock v. Tenet*, 139 F. Supp. 2d 725, 736 (E.D. Va. 2001) (holding that "equitable principles require an appropriate offset to ensure that plaintiff is ***only made whole*** and is ***not awarded a windfall***."), *aff'd*, 61 F. App'x 88 (4th Cir. 2003); *see also Marshall v. City of Vicksburg*, 82 U.S. 146, 149 (1872) ("Equity never, under any circumstances, lends its aid to enforce a forfeiture or penalty, or anything in the nature of either.").  Put differently, equity abhors windfall recoveries, and courts must carefully guard against equitable awards that put plaintiffs in a better position than they would have occupied absent the allegedly wrongful conduct.

Accordingly, Plaintiffs' abatement plan should be excluded because it bears no relation to the disputed issues in this case.  In particular, the proposed plan fails to address (1) how much, if any, unmet need exists for opioid-related services in Cabell/Huntington; (2) whether the City and County would or *could* implement and administer the numerous programs Plaintiffs propose; or (3) any ties to Defendants' alleged wrongdoing.  If the abatement plan is excluded, moreover,

Defendants are entitled to judgment under Rule 52(c) because there is a wholesale failure on the part of Plaintiffs to prove their entitlement to any remedy. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Weisgram v. Marley Co.*, 528 U.S. 440, 445 (2000) (affirming conclusion that defendant's motion for judgment as a matter of law should have been granted where testimony of plaintiffs' expert witness, which was the sole evidence supporting plaintiff's product defect claim, was "speculative and not shown to be scientifically sound" and therefore not properly admitted).

      *1. Plaintiffs' Proposed Plan Fails to Take Into Account Unmet Need.*  Here, as Plaintiffs' own expert witnesses admit, Plaintiffs' "abatement" plan is not grounded in any record evidence concerning real-world programs in Cabell/Huntington that require (or even could benefit from) additional funding.[30]   In fact, Plaintiffs' plan completely ignores the Cabell/Huntington community's ongoing efforts to combat opioid addiction and abuse in favor of an abstract "wish

---

[30] *See, e.g.*, 6/28 Tr. (Alexander) at 96:18–22 ("Q. Now, Dr. Alexander, in estimating the level of services required, did you subtract out the level of services that are currently being provided in the City of Huntington and Cabell County? A. No, I did not."); *id.* at 125:6–12 ("Q. Well, were you asked to provide an opinion as to the sources of funding for currently existing programs in connection with your expert report? A. No, I was not."); 6/29 Tr. (Barrett) at 158:20–24 ("Q. And so, you didn't look at the capacity for treatment that already exists in the community, correct? A. No. And I'm not so sure that Dr. Alexander looked at capacity either. Dr. Alexander was looking at the needs, as opposed to what's currently available."); *id.* at 160:4–12 ("Q. And you did not look at whether the existing treatment capacity in Cabell-Huntington could encompass treatment of 3,000 people with OUD, correct? A. Again, I don't understand the validity of that question because the task here is to estimate the costs. Whether or not the healthcare facilities have the capability of providing that level of care is really not something that I was asked to calculate and that the redress model doesn't identify."); *id.* at 157:9–14 ("Q. And you did not make any adjustments to your cost estimates or your calculations to take account of programs that are being currently offered in Cabell and Huntington, correct? A. No. That is not how Dr. Alexander had developed his redress model.").

list" of services that are completely unmoored from the reality of what the Plaintiffs have funded in the past or what they would be capable of funding in the future.[31] That is fatal to Plaintiffs' abatement plan in two distinct respects.

First, the record evidence demonstrates that (1) there are myriad programs currently in operation in Cabell/Huntington to combat the opioid crisis[32] and (2) Plaintiffs do not run and have historically provided no funding for those programs.[33] Although Plaintiffs' witnesses admit that those programs have been successful in reducing the prevalence of OUD and opioid-related harms

---

[31] *See* 6/28 Tr. (Alexander) at 97:12–17 ("Q. Now, Dr. Alexander, does your analysis of the population and cost inputs for the abatement plan include any estimate of the costs or losses incurred by Cabell County or the City of Huntington in the past? A. No. My plan is forward looking. It's not backward looking."); *id.* at 125:13–126:9 (explaining that he offers no opinion as to whether Plaintiffs would fund the proposed programs); 6/29 Tr. (Barrett) at 156:23–157:1 ("Q. But you don't know whether the programs that [Dr. Alexander] proposes in his redress model already exist in Huntington and Cabell County? You didn't look at that question? A. No. That was outside of my field of expertise."); *id.* at 169:5–10 ("Q. And you did not make any effort to determine who pays for the current programs that are already being conducted and run in Cabell-Huntington? A. No."). Notably, Plaintiffs' abatement plan also ignores the Cabell/Huntington community's reasonable estimate of how much is actually necessary to abate the opioid crisis. As part of the "Resiliency Plan," the Cabell/Huntington community estimated a need for $50 million dollars to treat opioid addiction and abuse for the next "four decades." *See* Trial Ex. DEF-WV-01457 (August 20 Resiliency Plan Draft) at 29; *see also* 5/28 Tr. (O'Connell) at 71:9–72:4. That figure—which is more than *$2 billion less* than Plaintiffs are now claiming—was ultimately stripped from the plan immediately before it was published in coordination with Plaintiffs' lawyers. 5/28 Tr. (O'Connell) at 108:24–110:16.

[32] *See, e.g.*, Trial Ex. DEF-WV-02653 (City of Solutions) at 15–53 (detailing existing opioid-related services in Cabell/Huntington); 5/27 Tr. at 208:17–235:17 (Dr. Lyn O'Connell describing a number of existing opioid-related services in Cabell/Huntington).

[33] *See, e.g.*, 6/7 Tr. at 36:23–37:5, 69:15–17, 74:20–25, 79:6–11, 82:16–21, 85:6–16, 92:19–24, 97:6–11, 99:23–100:3, 122:2–19 (Dr. O'Connell testifying that neither Cabell County nor the City of Huntington runs any of the treatment programs operating in the community and that she is not aware of Cabell County or the City of Huntington providing any funding for those programs); 5/27 Tr. at 156:4–157:6 (Sherriff Zerkle testifying that the Cabell/Huntington community has approximately 3,000 treatment beds, and "the County is not paying for any of it").

in Cabell/Huntington,[34] Plaintiffs' abatement plan ignores those programs and consequently *makes no attempt* to determine the unmet need for OUD treatment or other opioid-related services in Cabell/Huntington.[35]   Thus, Plaintiffs' abatement plan proceeds from the demonstrably false assumption that abatement efforts must start from scratch, when in reality the Cabell/Huntington community has already devised and funded numerous services that have reduced the aggregate burden of opioid use and abuse without any meaningful financial assistance from Plaintiffs.

Plaintiffs have provided *zero evidence* concerning how the $2.5 billion they have requested fits into this larger picture, or whether that amount is necessary and appropriate to meet the unmet need for services (to the extent one exists) in Cabell/Huntington.  And Dr. Alexander, the architect of the plan, admitted that he had no opinion regarding:

- sources of funding for the currently existing services in Cabell/Huntington, 6/28 Tr. at 125:6–12;

- whether Plaintiffs have historically provided any funding to the currently-existing services, 6/28 Tr. at 125:13–24; or

- whether Plaintiffs "would need to pay for any aspect of [his] abatement plan should it be put in place," 6/28 Tr. at 126:5–13.

---

[34] *See, e.g.*, Trial Ex. DEF-WV-02653 (City of Solutions) at 7 (Huntington Mayor Steve Williams detailing how the City engaged in "months of aggressive action that resulted in a decline of overdoses, and increase in referrals to treatment, and a reduction in drug-related crime," which resulted in a "reputation across the country as the 'epicenter of the solution' to the epidemic"); 6/30 Tr. (Williams) at 160:20–22 ("Q. The City of Huntington has been a model for how to address the opioid problem; correct? A. Yes. And that model is changing on a monthly basis.").

[35] *See, e.g.*, 6/28 Tr. (Alexander) at 96:18–22 ("Q. Now, Dr. Alexander, in estimating the level of services required, did you subtract out the level of services that are currently being provided in the City of Huntington and Cabell County? A. No, I did not."); 6/29 Tr. (Barrett) at 158:20–24 ("Q. And so, you didn't look at the capacity for treatment that already exists in the community, correct? A. No. And I'm not so sure that Dr. Alexander looked at capacity either. Dr. Alexander was looking at the needs, as opposed to what's currently available."); *id.* at 160:4–12 ("Q. And you did not look at whether the existing treatment capacity in Cabell-Huntington could encompass treatment of 3,000 people with OUD, correct? . . . [A.] Whether or not the healthcare facilities have the capability of providing that level of care is really not something that I was asked to calculate and that the redress model doesn't identify.").

Accordingly, Dr. Alexander's analysis lacks "fit" to the facts of this case and is not helpful to the Court in determining how much (if any) should be awarded *to Plaintiffs* to abate the opioid crisis in Cabell/Huntington.[36]

  **2.  *Plaintiffs' Proposed Plan Fails to Address Whether the City and County Could or Would Provide the Identified Programs.***  Even assuming *arguendo* that there is an unmet need for $2.5 billion in opioid-related services in Cabell/Huntington, Plaintiffs' abatement plan ignores the fact that the City of Huntington and Cabell County will not provide the overwhelming majority of that future funding.  More than $2.1 billion of Plaintiffs' proposed abatement plan consists of costs to treat the addiction and related medical complications of Cabell/Huntington residents.  *See supra* n.25.  But Huntington Mayor Steve Williams testified that:

- he "***never*** would ***expect the city*** government ***to actually start running*** treatment programs ***or funding treatment programs***," 6/30 Tr. at 143:24–144:1;

- the city has "***never funded*** opioid **treatmen**t," *id.* at 132:18;

- treatment programs "***will never be and should never be***" funded from the budget of the City of Huntington, *id.* at 168:2–6;

- "[n]one of [the treatment programs] are funded from the budget of Cabell County," *id.* at 168:7–9;

- "[m]any of them receive funding from Medicaid," *id.* at 168:10–11, and;

- "[m]any of them receive funding from private insurance," *id.* at 168:12–14.

Further, as a matter of federal entitlement, those treatment costs are reimbursable by Medicare and Medicaid pursuant to the Section 1115 Substance Use Disorder Waiver.[37]  In other words,

---

[36] *See supra* nn.30–31 & accompanying text.

[37] *See* Trial Ex. DEF-WV-02653 (City of Solutions) at 64 (stating that "with the advent of the Medicaid SUD waiver, many of the services" offered by the Great Rivers System for Addiction Care "will be reimbursed by Medicaid"); *see also* 5/21 Tr. at 57:9–12 (Dr. Werthammer testifying that "West Virginia Medicaid bears the burden of those charges and collections" for PROACT);

Plaintiffs ask this Court to award them billions of dollars in treatment costs that will indisputably be paid for by the federal government or private insurance.[38]  Principles of equity forbid precisely that type of windfall recovery.  *See supra* pp.19–20.

**3. *Plaintiffs' Proposed Plan is Not Tied To Defendants' Alleged Wrongdoing.***  Plaintiffs' so-called abatement plan also lacks any fit to the case and should be excluded because it is not— and does not even purport to be—tied in any way to Defendants' alleged wrongdoing.

Plaintiffs' principal abatement expert, Dr. Alexander, freely admits that his abatement plan is not in any way tailored to address Defendants' alleged wrongdoing.  *See, e.g.*, 6/28 Tr. at 121:17–20 (Dr. Alexander agreeing that he was "not offering any opinions … that are specific to any of the three distributor defendants").  For example, Defendants' alleged wrongdoing consists of allegedly shipping too many prescription opioid pills into Cabell/Huntington.  *See, e.g.*, Third Amend. Compl. ¶¶ 801–03, 805, 823, 862 (alleging that Defendants failed to adequately monitor and report to regulators "suspicious orders," which allegedly resulted in "excessive distribution[s]"

---

5/27 Tr. at 156:4–157:6 (Cabell County Sherriff Charles Zerkle testifying that the government is "starting to pump a ton of money" into addiction treatment and that while "the County is not paying for any of it," Medicaid and Medicare are); 6/7 Tr. at 48:16–21, 59:22–60:5 (Dr. Lyn O'Connell agreeing that medicated assisted treatment is subject to reimbursement); 6/16 Tr. at 99:12–100:3 ("Q.  Well, are you aware that West Virginia applied for the 1115 waiver and now has an expanded substance use disorder coverage for Medicaid recipients including peer recovery support?  A.  Yes, I am familiar with the 1115 waiver. . . . Q.  And you would agree that that waiver expands the substance use disorder treatment options for individuals covered by Medicaid in West Virginia; correct?  A.  Yes.  I would agree that that expansion means that more West Virginians are eligible and that the package of services that are included in the waiver for healthcare . . . are covered now under Medicaid that that is available because of the funds that are paid into the Federal Government."); 6/28 Tr. at 127:6–17 (Dr. Alexander admitting that medication assisted treatment is reimbursed through Medicaid and private insurance).

[38] This is not a hypothetical conflict.  After the State of Oklahoma settled its opioid-related claims against Purdue Pharma in 2019, the Centers for Medicare & Medicaid Services wrote a letter to the Oklahoma State Medicaid Director stating that the federal government is "entitled to a portion" of the State's $270 million settlement.  Ex. C, Letter from Bill Brooks, Director, Centers for Medicaid & CHIP Services, to Beck Pasternik-Ikard (June 12, 2019).

of opioid medicines into Huntington and Cabell County).  Yet Dr. Alexander admitted that, under the abatement plan that Plaintiffs want Defendants to underwrite, OUD treatment would be provided even for "someone never touched a prescription opioid" but instead "started using heroin . . . or illegal fentanyl" sometime in the future. 6/28 Tr. at 120:7–22; *see also id.* (Alexander) at 121:2–8.

Similarly, Plaintiffs elicited testimony from Dr. Alexander regarding the public- and prescriber-education components of his "abatement" plan, 6/28 Tr. at 37:8–19, which Dr. Alexander suggested were necessary in part because of "false assurance that prescribers have had both regarding the safety of opioids, as well as their effectiveness for chronic non-cancer pain," *id.* at 122:13–123:2.  But the undisputed evidence shows that—to the extent prescribers or the public were ever misled regarding the risks and effectiveness of opioid medicines—Defendants had absolutely nothing to do with that.[39]

Because Dr. Alexander's plan includes significant components that manifestly lack any connection to the allegedly wrongful conduct that Plaintiffs seek to abate, it lacks any fit to this case, is not helpful to the Court, and should be excluded.  *See, e.g.*, Memorandum Opinion and Order (ECF No. 1262) at 3 ("The touchstone of whether a witness may testify as an expert under Fed. R. Evid. 702 is . . . whether he would be 'helpful,' but it is helpfulness to the *trier of fact*, not to a party's case, that counts.") (quoting *Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1296 (4th Cir. 1995)) (emphasis in original); *United States v. Walton*, 86 F.3d 1154 (4th Cir. 1996) (holding that

---

[39] *See* Defs.' contemporaneously filed Mem. of Law in Support of Defs.' Mot. for Judgment on Partial Findings Regarding Proximate Causation.

"opinion of the expert must fit the facts" and affirming exclusion of expert testimony that did not do so).[40]

In sum, Plaintiffs' abstract abatement plan bears no relation to the disputed issues in this case—*i.e.*, how much money is necessary to meet the unmet need for opioid-related services in Cabell/Huntington or Defendants' alleged wrongdoing. Instead, it would amount to a multi-billion dollar windfall for the City of Huntington and Cabell County—two entities that (1) have not previously provided even a fraction of that funding and (2) will not do so in the future—to address issues completely unmoored from Defendants' alleged conduct. Where, as here, there is a wholesale failure of proof as to Plaintiffs' entitlement to a remedy, judgment is warranted as a matter of law. *See, e.g.*, *Brooke Group Ltd.*, 509 U.S. at 242; *Weisgram*, 528 U.S. at 446. Accordingly, Plaintiffs' abatement plan should be excluded, and Defendants are entitled to judgment under Rule 52(c).

## CONCLUSION

For the foregoing reasons, Plaintiffs have failed to prove their entitlement to any abatement relief, and Defendants are entitled to judgment on partial findings under Rule 52(c).

---

[40] *See also Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (district court must "ensure that any and all scientific testimony . . . is not only relevant, but reliable"); *Trana Discovery, Inc. v. S. Rsch. Inst.*, 915 F.3d 249, 255 (4th Cir. 2019) (concluding that "[a]n expert must offer an opinion that fits the case at hand" and methodologies "that simply ignore[] key evidence veer[] into speculation").

Dated: July 1, 2021                        Respectfully Submitted,

***McKesson Corporation***
By Counsel:

*/s/ Timothy C. Hester*
Timothy C. Hester
Christian J. Pistilli
Laura Flahive Wu
Andrew P. Stanner
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
cpistilli@cov.com
lflahivewu@cov.com
astanner@cov.com

*/s/ Paul W. Schmidt*
Paul W. Schmidt
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York
Tel: (212) 841-1000
pschmidt@cov.com

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

***AmerisourceBergen Drug Corporation***
By Counsel:

*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
Post Office Box 553

Charleston, West Virginia 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
nicholas@reedsmith.com
smcclure@reedsmith.com

**Cardinal Health, Inc.**
By Counsel:

/s/ Enu Mainigi
Enu Mainigi
F. Lane Heard III
Jennifer G. Wicht
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW Washington,
DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard @wc.com
jwicht@wc.com
ahardin@wc.com

Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
Raymond S. Franks II (WVSB No.
6523)
David R. Pogue (WVSB No. 10806)
CAREY DOUGLAS KESSLER &
RUBY PLLC
901 Chase Tower, 707 Virginia
Street, East
P.O. Box 913
Charleston, WV 25323

28

Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
drpogue@cdkrlaw.com
rsfranks@cdkrlaw.com

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on this 1st day of July, 2021, the foregoing "MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS RE: ABATEMENT" was served using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Timothy C. Hester*
Timothy C. Hester (DC 370707)
