IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
              Plaintiff,        :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.  :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
              Plaintiff,        :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 35
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

JULY 7, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301


**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:            Ayme Cochran, RMR, CRR
Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A.

 2     Faber, Senior Status Judge, United States District

 3     Court, Southern District of West Virginia, in

 4     Charleston, West Virginia, on July 7, 2021, at 9:00

 5     a.m., as follows:

 6               THE COURT:  Good morning, everybody.  Hope

 7     everybody enjoyed the long weekend.  Are you ready to call

 8     your next witness?

 9               MS. MAINIGI:  We are, Your Honor.  We call Mr. --

10     or Dr. Timothy Deer.  He is a standard of care expert, our

11     second and last standard of care expert.

12               THE COURT:  You can take the oath here.

13               COURTROOM DEPUTY CLERK:  Please state your full

14     name.

15               THE WITNESS:  Timothy Ray Deer.

16               COURTROOM DEPUTY CLERK:  What was your last name

17     again?

18               THE WITNESS:  Deer, D-e-e-r, just like the animal.

19               COURTROOM DEPUTY CLERK:  Thank you.  Please raise

20     your right hand.

21          DR. TIMOTHY R. DEER, DEFENSE WITNESS, SWORN

22               COURTROOM DEPUTY CLERK:  Thank you.  Please take a

23     seat.

24               THE COURT:  Good morning, sir.

25               THE WITNESS:  Good morning.
```

```
1                 MS. MAINIGI:

2    Q.   Good morning, Dr. Deer.

3    A.   Good morning.

4    Q.   Where do you currently live?

5    A.   I live in Charleston, West Virginia.

6    Q.   And, Dr. Deer, what do you do for a living?

7    A.   I'm a physician.

8    Q.   What type of physician?

9    A.   Anesthesiology and pain medicine.

10   Q.   Now, you're obviously here testifying as an expert.

11   What is your field of expertise?

12   A.   Pain medicine.

13   Q.   And within pain medicine, is there both -- in terms of

14   what your practice is, is there both interventional and

15   non-interventional pain management?

16   A.   That's correct.  I certainly am known for my work in

17   interventional pain, for the most part, but we also have a

18   multimodal practice where we also have to manage the

19   non-interventional sections, as well.

20   Q.   Can you describe for the Court what interventional pain

21   management is?

22   A.   So, interventional pain treatment really involves work

23   looking at using minimally invasive techniques, such as

24   intradiscal procedures or interspinous procedures, or

25   peripheral nerve procedures to treat pain in a fashion that
```

1    really tries to alleviate the need for medication, the need

2    for, you know, any type of medical treatment other than

3    physical therapy and occupational therapy.

4         So, we combine what we do with the TOT and try to get

5    function better.  We also sometimes can do things now

6    through small tubes and things where we actually can do

7    surgeries for like spinal stenosis or SI Joint Dysfunction

8    without the need for a large spinal fusion or a large spinal

9    surgery.

10        So, we're actually replacing, much like the

11   cardiovascular stint replaced the bypass, we're replacing a

12   lot of large spine procedures now with methods we've

13   developed over the last 25 years.

14   **Q.**   And non-interventional pain management, just to close

15   the loop on that, what is that?

16   **A.**   That's a -- non-interventional pain medicine goes from

17   massage therapy, which we do have PT as part of our

18   practice, all the way to medication management, which

19   includes opioid prescribing, as I know, which is the issue

20   in this case.  So, obviously, multimodal means you do both

21   and most interventionalists, because we take over referred

22   patients, we end up doing both interventional and

23   non-interventional pain treatment.

24   **Q.**   Thank you, Dr. Deer.

25        Let's take a few minutes and walk through your

1    background and qualifications.  And I think we made some

2    slides, with your assistance, that illustrates some of your

3    background and qualifications.

4              MS. MAINIGI:  Matt, if you could put Demonstrative

5    Slide 1 up, please.  Thank you.

6              BY MS. MAINIGI:

7    **Q.**   And, Dr. Deer, is this just a background slide that you

8    helped us create that has pertinent information for you?

9    **A.**   Yes.  That summarizes my educational background.

10   **Q.**   Where are you from originally, Dr. Deer?

11   **A.**   Chesapeake, West Virginia.

12   **Q.**   Where did you go to high school?

13   **A.**   East Bank High School.

14   **Q.**   And where did you go to college?

15   **A.**   West Virginia University Tech, where I was a biology

16   and business major.

17   **Q.**   And, now, you went to West Virginia to play football?

18   **A.**   I went to West Virginia Tech to play football.  Don

19   Nehlen offered me the walk on, but I couldn't afford to do

20   so, so West Virginia Tech gave me a full scholarship.  So,

21   that was a better avenue for me at the time.

22   **Q.**   And how were your grades when you graduated?

23   **A.**   I was summa cum laude.

24   **Q.**   And you went on to medical school, obviously?

25   **A.**   Yes.

```
 1    Q.    Where did you go to medical school?

 2    A.    West Virginia University.

 3    Q.    And what year did you graduate?

 4    A.    1990.

 5    Q.    And how did you graduate in your class?

 6    A.    I was first in my class.

 7    Q.    And then, where did you go on for your residency?

 8    A.    University of Virginia.

 9    Q.    And during residency, what was your specialty?

10    A.    So, I did my first portion of my internship in internal

11    medicine.  And then anesthesiology.  And then, I did a

12    clinical fellowship in pain medicine.

13    Q.    And where was the clinical fellowship in pain medicine?

14    A.    At the University of Virginia.  I did all my training

15    there.

16    Q.    And when did you finish your fellowship, Dr. Deer?

17    A.    End of 1994.

18    Q.    Now, after you wrapped up your schooling and your

19    training in 1994, where did you go to practice at that

20    point?

21    A.    So, I came back to Charleston, West Virginia, where I

22    practice today.

23    Q.    And you began your own practice?

24    A.    I did.  I -- at the time, I had the opportunity to stay

25    in Charlottesville, Virginia with my mentor, John
```

1    Rowlingson, but I had -- you know, I had a couple other

2    things bring me back here.  So, I decided to come back here

3    and it was a -- I think a very good decision to come here.

4    **Q.**   Why did you -- let's pause on that for a minute.  Why

5    did you come back to West Virginia and Charleston to

6    practice?

7    **A.**   Well, really, two reasons.

8         One is, I'm from here.  I love it here.

9         Secondly, you know, that reason goes back to, you know,

10   when I grew up here, my dad and both grandpas were coal

11   miners and I knew people here had a lot of need for

12   treatment.

13        I came home to visit my parents, my wife's parents, and

14   I went to Wal-Mart and watched people walk in and out of

15   Wal-Mart and I realized there was a big need here for what I

16   do.

17        And, secondly, my wife told me I had to come back here.

18   So, that was probably the pressing reason, because she's up

19   Elk River and her parents live there.  So --

20   **Q.**   Generally a good practice to do what your wife says.

21   **A.**   Yeah.  Yeah.  And so, we're still together.  I think

22   that's probably the reason we are.  So --

23   **Q.**   So, you've been practicing in Charleston for about

24   30 years or so?

25   **A.**   27 years, yeah.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

**Q.**    And in pain management?

**A.**    Correct.  I'm board certified in anesthesiology, as
well, but I haven't practiced anesthesia since 1996, when I
went full-time pain.

**Q.**    And where are you practice -- where are you licensed to
practice medicine?

**A.**    West Virginia; Virginia, where I trained; and Florida,
where I -- where I eventually may retire, but maybe not.

**Q.**    And you mentioned the board certification.  Do you have
board certification in anesthesiology; is that right?

**A.**    Correct.  American Board of Anesthesiology and American
Board of Pain Medicine.  And then, I'm also -- I have an
international certification called RIP, which is required
when you practice overseas.  So, I do practice doing studies
in Germany, Holland and Hong Kong.

**Q.**    And what do you do in those jurisdictions?

**A.**    So, when a procedure gets done in America, many times
the FDA won't approve the initial study until it's been
really shown to be safe in other areas.  So, I often will
work on development of the device, and then I'll go either
to Dusseldorf, or to Amsterdam, or Hong Kong to review the
device with the surgeons there.  And so, that's done in
animals and cadavers usually before that.  I usually go
there to help them learn the technique.  And then, once
that's done there, the FDA will often approve a multicenter,

```
 1   prospective study.  And then, we'll do that usually at our
 2   center, along with the Cleveland Clinic and the Mayo Clinic
 3   and some colleagues.
 4   Q.   So, let's talk a little bit about pain management, Dr.
 5   Deer.  Describe for me just at a high level how serious pain
 6   can affect a patient's life.
 7   A.   Well, I know, in this trial, both sides of you see
 8   that.  Certainly, if you -- you know, as an example, if you
 9   have a small business and you're doing well and then you
10   have a herniated disc and you get back surgery, about, you
11   know, 80 percent of the time, you'll do fairly well, but
12   20 percent of the time, you'll get scar tissue or nerve
13   damage and you'll have severe chronic pain that doesn't go
14   away.
15        And then, a lot of times what happens is, you can't
16   work anymore.  So, if you have a small business, it will
17   close.
18        It causes a lot of problems with the family.  So, you
19   get divorced.  Your kids are not happy.
20        And then, you know, if you had employees, they get laid
21   off.
22        And so, it becomes a real, you know, impact on both
23   your pain, your suffering, but also, on your family and
24   society around you.
25        And then, the cost of that patient's care, obviously,
```

1    is pretty astronomical over time.

2    **Q.**   So, we talked about why you came back to West Virginia

3    but what made you decide in the first place to specialize in

4    pain management?

5    **A.**   Well, I went to UVA, actually, to do cardiology because

6    Bill Carter and staff were my mentors here in Charleston and

7    they were doing something called angioplasty, which were

8    thought to be radical.  You know, they thought Dr. Warren

9    was crazy.  And then, they were thinking about a stint,

10   which I thought was really crazy.

11        And when I got to Charlottesville, I really fell in

12   love with the ICU.  I did neuro-ICU work for about four

13   months during my residency.

14        At one point, I decided early on that I wanted to go

15   and do transplant anesthesia.  So, I switched to

16   anesthesiology to do that.  But then, I realized you have to

17   live in a big city to do transplant anesthesia.  And, as I

18   learned about in interventional pain, UVA was the second

19   center in the country, I believe, after University of

20   Washington, to have a full-fledged center.  So, I learned

21   about that technique.

22        And I had a patient on my rotation in my second year of

23   residency who had lung cancer metastasize to her spine and

24   we put a tunneled catheter in around the spine and she died

25   very comfortably four weeks later.  And so, when I saw that,

1    I said this is the future and, you know, using techniques to

2    help people's pain, rather than other options.  So, that

3    really -- that's what engaged me.

4    **Q.**   So, let's shift over to talk about this practice that

5    you've built here.  What's the practice called?

6    **A.**   Spine & Nerve Centers of the Virginias.

7    **Q.**   And is it based right here in Charleston?

8    **A.**   Well, we have -- it's where our main office is, is

9    Charleston.  We have a care center for Southern West

10   Virginia, Kentucky, Virginia.  But we also have offices in

11   other locations.  We have an office in Logan County at Logan

12   General, Boone County at Boone Memorial, Teays Valley at

13   CAMC, and at CAMC here in Charleston.

14   **Q.**   So, let me ask you about the nature of your practice.

15   Do you treat patients with acute pain, cancer pain and

16   chronic non-cancer pain?

17   **A.**   So, let me break down those buckets for the Court.  So,

18   acute pain -- now, let's say, for example, Lord forbid, that

19   today you injured yourself and three or four weeks later,

20   your pain was severe and you needed a nerve procedure.  We

21   may treat you for that, you know, with some sort of simple

22   injection, PT, and you may get better.

23        And so, most people don't need us for that and get

24   better on their own, but we do treat those people.  Then,

25   you have chronic cancer pain, which is a big part of my

1    practice.  You know, it's people who, let's say you had a

2    cancer that grew from your ovary into your spine and now

3    your nerve is getting compressed.  You know, medication

4    doesn't help that type of pain usually much.  So, the

5    oncologist would have someone on a large dose of opioids.

6    They aren't getting better.  They'll send them to see us.

7    We'll convert them over to something like a fentanyl patch

8    --

9                   COURT REPORTER:  Could you slow down just a little

10   bit, please?

11                  THE WITNESS:  Oh, I'm sorry.

12                  COURT REPORTER:  That's okay.

13                  THE WITNESS:  I have this problem with speaking

14   fast even though I'm from here.  So, please just tell me.

15                  COURT REPORTER:  Thank you.

16                  THE WITNESS:  I apologize for that.

17                  COURT REPORTER:  Thank you.

18                  THE WITNESS:  So, we'll switch them over to

19   something like a patch temporarily and then try to get a

20   device in around the nerve.  So, that's cancer pain.

21       We do -- also, we do procedures where we put cement

22   around bones that are fractured from the cancer.  So, that's

23   kind of our main focus.

24       And then, non-cancer is mostly spine for us, but we

25   take referrals only and, usually, they're one of three

1    groups of people.

2         One is local people who usually have been treated by

3    someone in Southern West Virginia, Central West Virginia,

4    usually a family practice.  And usually for, unfortunately,

5    it used to be three or four years.  Now, it's down to about

6    six months.  So, it's really improved.  But then, they'll

7    eventually send them to see us.  If their opioid dose gets

8    too high or they aren't responding, we'll take them over and

9    then we'll try to do things to get them off of or reduce the

10   opioids and improve their function.

11        Group two is people who get sent to me specifically for

12   a procedure.  For example, you know, if a doctor at St.

13   Mary's doesn't do a spinous spacer, he may send me that

14   patient for an interspinous spacer and then I'll send them

15   back.  So, those are very specific procedural things.

16        I do a lot of revision surgeries after implants from

17   around the East Coast.

18        And then, we have an international referral base.

19   Usually, about five to ten patients a year will come from

20   international areas before COVID.  Since COVID, we've had no

21   international patients at all.  I don't know if that will

22   change, but in the past, we've had several international

23   patients for very specific procedures and then they've gone

24   back.

25   **Q.**   And during the course of your practice, Dr. Deer, do

1    you also sometimes prescribe opioid pain medications?

2    **A.**    We do often prescribe opioids.  We receive patients in

3    referral and, when you receive a patient in referral, you

4    take over their care.  And then, when we take over their

5    care, if they're on a high dose of opioid, we take that

6    over, but then the reason people get sent to us normally is

7    that the patient themselves want to find other options or

8    the family doctor gets uncomfortable.  So, we -- we will

9    take those folks over.

10         And I think we'll see, as we talk, it's gotten a lot

11   better in the last years with new legislation, but once we

12   take them over, it takes us anywhere from three months to

13   three years to get them reduced on their opioid dose.  But

14   80-85 percent of the time, our data, which our WVU med

15   students do frequently for us, we get them either off all

16   their opioids or at least half of their opioids.  That's

17   been our experience.

18   **Q.**    And do you have others that work in your practice with

19   you, other doctors?

20   **A.**    We have three physicians and four nurse practitioners

21   in the practice.

22   **Q.**    And you mentioned that a component, a big component of

23   your practice, is referral base.  Can you just explain that

24   to me?

25   **A.**    So, you can't come see us if you want treatment.  I

1    think, if you look at appropriate prescribing and things of

2    that nature, we like to make sure that people try physical

3    therapy and other things.

4         So, you see your family doctor.  You know, you have a

5    herniation, you have stenosis, you have -- and they treat

6    you however they treat you; oftentimes, it's been opioids.

7         And then, over time, they will send you to see us.

8    We'll review records.  If we think we may be able to help

9    you, we'll accept your care, we'll take over your care,

10   we'll take care of you.

11        But referral base means we don't take patients -- you

12   can't call the office and make an appointment.  You have to

13   have a referral to see us.  We screen the records and see if

14   we have some innovation that might help you.

15   **Q.**   Now, Dr. Deer, are you affiliated with any of the local

16   hospitals?

17   **A.**   We are.

18   **Q.**   Which ones?

19   **A.**   Thomas Hospital System, where I'm -- where I spend most

20   of my time, Charleston Area Medical Center, Boone Memorial

21   Hospital, Logan General Hospital.  And then, we're

22   affiliated with WVU, but we don't practice at WVU.  We just

23   have their students.

24   **Q.**   And did you hold the Medical Director title for a

25   period of time at both St. Francis and then Charleston Area

```
 1    Medical Center?

 2    A.    I have.  So, CAMC asked me to be their Medical Director

 3    of Pain when they were converting the Joint Commission

 4    requirements back in turn of the century.  And then, since

 5    that time, I've been serving as Medical Director of Thomas

 6    Health Systems, St. Francis and Thomas.

 7    Q.    And was there a time when you came to also handle the

 8    majority of the patients that were suffering from cancer

 9    pain at the CAMC Cancer Treatment Center?

10    A.    We've had an office at Memorial for many years where

11    it's primarily cancer treatment.  So, yes, that's true.  We

12    also have seen a lot of cancer patients from Thomas, too,

13    Dr. Jonathan Pauley (phonetic), Dr. Shah.

14          And then, from other areas of the state when cancer

15    particularly has metastasized, when somebody has a lot of

16    pain before they go to Hospice.  Someone may live a long

17    time before they need Hospice and we get usually called in

18    when someone is miserable but hasn't really been to the

19    point of going to Hospice yet.  That's kind of where we fall

20    with those patients.

21    Q.    At this point in your practice, do you have any idea,

22    Dr. Deer, about how many patients in total you normally have

23    at any given time?

24    A.    We have about 4,000 patients at a time we follow as a

25    group.  And that can range from someone we see every few
```

1    weeks for some reason or someone we see every six to

2    twelve months.  So, it really, you know, varies, but about

3    4,000 active patients at any one time.  And that comes and

4    goes based on securing acute pain, or recent pain, or people

5    passing away with terminal disease.

6    **Q.**   And is there any other practice in this area that does

7    what you do?

8    **A.**   We're the biggest practice in West Virginia, I think,

9    for pain.  We're the only one in this part of the state.

10   Huntington has a few pain specialists, though, at

11   Cabell-Huntington and St. Mary's that treat pain, as well.

12   WVU has a pain division, Dr. Vaglienti's division.  And

13   there's a few, you know, that do injections around the

14   state, but as far as comprehensive care, we are the largest

15   practice in the state, I believe.

16   **Q.**   So, let's talk a bit about your association with

17   professional organizations related to pain management.  Do

18   you have leadership roles in various pain management

19   organizations or have you had leadership roles?

20   **A.**   I do.  I've been involved in organized medicine because

21   I think it's important to try to change the field with young

22   people.

23          MS. MAINIGI:  So, Matt, let's put up our second

24   slide, if we could, please.

25          BY MS. MAINIGI:

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   And, again, Dr. Deer, you helped us prepare this slide;

2    is that correct?

3    **A.**   That's correct.

4    **Q.**   So, can you walk us through the various societies that

5    you're involved with?

6    **A.**   I'll start.  I'll try to do it in time fashion from

7    earliest to latest.  So, The American Society of

8    Anesthesiologists is about a 50,000 member group that

9    actually is involved with both anesthesiology and pain and,

10   in 2004, I believe, I was asked to be the Chairman of the

11   Pain Division.  I was the first private practitioner, I

12   believe, to ever hold that.  It's always been academicians.

13   And I held that position for four years, developing policy

14   for anesthesiologists to treat both pain and anesthesia for

15   acute pain, like epidurals and things.

16        Then, I was on the board of American Society of

17   Interventional Pain, which is a group that looks at access

18   to care and advancement of interventional techniques.

19        And then I -- during that same time period, I was

20   President of the West Virginia Society of Interventional

21   Pain Physicians for, I think, about 15 years.  Eventually,

22   the younger guys retired me and made me President Emeritus.

23   So, that's a much easier job than being President.  So, I

24   have to say, I like that.

25        I was President of the International Neuromodulation

```
 1    Society, which is -- where I've really spent a lot of my
 2    time in my career.  It's the advancement of innovation with
 3    scientists and physicians of devices, including things like
 4    brain stimulators for Parkinson's disease, spinal
 5    stimulators for pain.  And we also have the main goal of
 6    improving access to third world countries with that.  So,
 7    trying to get companies to make less expensive devices so
 8    that people can get access in places like India and, you
 9    know, Sri Lanka and other places like that.
10         And then, lastly, and I'm sorry.  I don't want to be
11    too long, but the American Society of Pain and
12    Neurosciences, I'm the Chairman, which is sort of like a
13    lifetime title.  I created that society four years -- three
14    years ago.  I think we have about 4,000 members now.  And we
15    created it for really three reasons.
16         One is to mentor young people because a lot of these
17    other societies are great, but you have to really be around
18    a long, long time and be old to get yourself up to do
19    anything.  So, we wanted young people to have a chance to
20    really play leadership roles in research and development.
21         Two is we wanted to increase research.  For example, we
22    have a biomarker study paper going now.  A biomarker is a
23    signal, either in blood, or urine, or genes, and we're doing
24    a lot of work on the urine right now for biomarkers that may
25    predict will you respond to a procedure.  If you have a
```

1    procedure done and your biomarker says you're -- you have

2    bad biomarkers, for example, we my find that that's not the

3    right procedure anymore.  So, we think we can advance that

4    and save a lot of money for society because we can predict

5    the outcome.

6        And then, lastly, and thirdly, we really have a

7    commitment to diversity.  A lot of women have had trouble

8    getting advancement in our field.  It's been a man-based

9    field, for the most part.  So, we have a diversity division

10   led by my friend, Erica Peterson, a neurosurgeon in

11   Arkansas, and she's really done a great job with that.  So

12   that's --

13       So, it's really -- I think we're the -- we may be the

14   biggest pain society in America now, but we're based on

15   research and procedures.

16   **Q.**  Thank you, Dr. Deer.

17       Let's shift over and let's come back to West Virginia.

18   Have you been appointed to any task forces or committees

19   here in West Virginia?

20   **A.**  Yes, I have.

21           MS. MAINIGI:  Matt, could we put up the next

22   slide, please?

23           BY MS. MAINIGI:

24   **Q.**  And, again, I think this is reflective of some of your

25   experience.  Let's start with the top one, the West Virginia

1    Controlled Substance Monitoring Program, CSMP Committee.

2    Tell us about that committee.

3    **A.**   So, that committee came out of the -- I believe came

4    out of the 2012 legislation that established pain clinics

5    and also established the need for doctors to review

6    prescribing history on the Board of Pharmacy record.   They

7    created a committee.

8         Mike Goff, I believe, was the chairman of that

9    committee, a former police officer who now runs the Board of

10   Pharmacy, very -- a very wonderful guy.   And he got a group

11   of physicians who did things like end of life care, pain

12   management.

13        We had dentists because dentists were prescribing a lot

14   of opioids post-surgery for a tooth.   Like they'd give you

15   90 pills for a tooth pull and things like that.   So, we got

16   all these people together and we were looking at death and

17   over-prescribing.

18        So, if someone prescribed a lot of medication and had

19   no deaths, we had the Medical Examiner that was also

20   involved.   Then that was one thing.   But if you had two

21   things going on, a death that we can identify to your

22   practice, you got a letter from our committee that you had

23   had a death related to your prescribing.   Doesn't mean you

24   did anything wrong necessarily, but we wanted you to look at

25   your prescribing.

1              It also created a way to monitor doctor shopping.  So,

2      if we had five physicians giving the same patient pills, it

3      would -- the computer system would pick that up.  The

4      committee would look at it and we would say that's a real

5      red flag and we would send all of those five doctors a

6      letter that your patient has received controlled substances

7      from at least, you know, two other doctors, or whoever it

8      may be.  They should have been seeing it themselves by

9      checking the computer, but most of them weren't in 2012.

10     **Q.**   And we'll go over the 2012 legislation that addressed

11     opioids a little bit later, but can you tell us what the

12     CSMP is briefly?  What did that do?

13     **A.**   It monitors the prescribing physicians in West Virginia

14     and looks for abnormal behavior patterns.  And then it looks

15     at what the specialty is.  For example, if you're a family

16     doctor and you're prescribing more medicine than the

17     Chairman of Pain at WVU, although most academic people don't

18     prescribe much.  Their residents and fellows prescribe for

19     them, but that's a warning sign for us.  We would look at

20     that.

21             And then, it ties that together with the death data

22     from the Medical Examiner.  So, that was the purpose of

23     that, the committee to look at that behavior, and then we

24     meet every few months and Mr. Goff would go over the data

25     with us and we would look at that very carefully and make

1    our recommendations to the State of what they should do.

2    **Q.**   Now, the CSMP data that you all looked at, was that

3    data available to the general public?

4    **A.**   I don't think so.  No.  I think it was to that -- the

5    Board of Pharmacy, I believe, controlled that data.

6    **Q.**   Now, let's turn to the next piece here, Dr. Deer, the

7    West Virginia Safe and Effective Management of Pain, better

8    known as SEMP, guidelines that you participated in, in 2016.

9    Tell us about that.

10   **A.**   So, those guidelines, and we'll talk later about the

11   CDC, Centers for Disease Control, they -- see, there's three

12   things that really helped my practice a lot.  One was the

13   CDC guidelines.  And we'll talk about that in more detail,

14   but the CDC said how you should prescribe medicine, which we

15   had needed for a long time.

16        And then, the CDC gave a grant to WVU and WVU was asked

17   to create guidelines for West Virginia specifically because

18   we had had our issues in Appalachia.  And so, WVU reached

19   out and Mark Garo -- I can't pronounce his name but --

20   Garofoli reached out and they asked me to become the

21   Chairman of that Guideline Committee.

22        I requested doctor Rick Vaglienti be Vice-Chairman.

23   He's Director of Pain at WVU.  And then we got a group of

24   physicians, pharmacists, law enforcement, regulatory bodies

25   and insurance companies to be on this panel.

1    And we looked at, you know, the national guidelines,

2  not just for CDC, but other guidelines, and tried to make a

3  playbook for doctors in West Virginia of how to do things

4  other than opioids to begin with because once you put

5  someone on a lot of opioids and send them to see someone

6  like me, I'm stuck with that opioid issue until I can find

7  other solutions.  So, we prefer you do other things first

8  and that's what this is all about.  And it gives you

9  different guidelines based on what's wrong with your patient

10  and it became pretty heavily adopted in West Virginia.

11  **Q.**   So, the SEMP guidelines essentially gave prescribers

12  direction on how to deal with opioids?

13  **A.**   The CDC, when that came out, the family doctors --

14  because that was primarily made for family physicians to

15  treat pain.  So, they didn't really know what to do.  This

16  gave them some guidance on what else they could do because

17  many of them had only given prescriptions their whole career

18  for opioids.  They had never done anything else.  So, this

19  gave them a play book and the State Medical Association

20  endorsed those guidelines and then, you know, gave them to

21  the Boards of Medicine for both allopathic and osteopathic

22  physicians, Board of Pharmacy.  So, those were widely

23  disseminated to the doctors in West Virginia, and the nurse

24  practitioners and PAs, so they would have some guidance on

25  what to do when you see that chronic pain patient before you

1    start giving them a bunch of medicine.

2    **Q.**    Thank you, Dr. Deer.

3            MS. MAINIGI:  Your Honor, may we approach with

4    some exhibits?

5            THE COURT:  Yes.

6            MS. MAINIGI:  And what we've done, Your Honor, is

7    just for ease, we've put all of the exhibits into a binder

8    for everybody and we can -- we can just scroll through them.

9            THE WITNESS:  Is my speed of speech okay?

10           THE COURT:  I'm sorry?

11           THE WITNESS:  Am I speaking at a good --

12           THE COURT:  That would be up to the court reporter

13   here.  She'll tell us if it's needed.

14           THE WITNESS:  I get carried away sometimes.

15           THE COURT:  I can hear you just fine.

16           THE WITNESS:  Okay.  Okay.  Let me know if I talk

17   too fast.

18           COURT REPORTER:  It's pretty rapid, if you could

19   --

20           THE WITNESS:  A little bit more?

21           COURT REPORTER:  Yes.  I appreciate --

22           THE WITNESS:  Just anytime I get too fast, let me

23   know.  I'm sorry about that.

24           COURT REPORTER:  Thank you.  Thank you.  I'd

25   appreciate that.

```
 1              BY MS. MAINIGI:
 2    Q.   So, Dr. Deer, I'm going to ask you to take a look at
 3    the first exhibit I hope that's in your binder, which is
 4    DEF-WV-03036.
 5              MS. MAINIGI:  Now, this document, Your Honor, was
 6    admitted during Dr. Gupta's testimony.  So, that's an
 7    admitted document.
 8              BY MS. MAINIGI:
 9    Q.   Is that the SEMP Guidelines, Dr. Deer?
10    A.   Yes, it is.
11    Q.   Now, if you turn to Page 4 of the document, Page 4
12    identifies the individuals who worked on the SEMP guidelines
13    along with you?
14    A.   That's correct.
15    Q.   Now, I think you might have mentioned this, but just
16    for clarity, were there state government officials and
17    employees involved in the SEMP guidelines?
18    A.   Yes, there were.
19    Q.   And who were some of those folks?
20    A.   So, if you look through the list there, Dr. Gupta was
21    involved.  He was a West Virginia DHHR person at the time.
22    At that time, we also had the Rational Drug Program Therapy
23    Director.  We had the WVU School of Pharmacy and Medicine
24    Director.  We had the W -- the University Head of the PharmD
25    program.  There was also involvement of Mr. Goff, who is on
```

```
 1   the Board of Pharmacy.  So, those are some of the folks that
 2   were involved in the area of the state government.
 3   Q.   These -- so, these 2016 SEMP guidelines in West
 4   Virginia, has the -- to your knowledge, has the West
 5   Virginia State Medical Association endorsed the guidelines?
 6   A.   The West Virginia State Medical Association has
 7   endorsed the guidelines.
 8   Q.   And how about the West Virginia Pharmacists
 9   Association, have they endorsed the guidelines?
10   A.   They have.
11   Q.   And, to your knowledge, do doctors in West Virginia
12   rely on the SEMP guidelines in their practice?
13   A.   I certainly believe they do.  I've had a lot of
14   discussions with doctors around the state and found this to
15   be helpful to them; some who didn't like it because they
16   thought it was too restrictive.  So, I've heard both sides.
17   I know they actually read them.
18   Q.   Now, let me shift over to another set of guidelines.
19        MS. MAINIGI:  If we can go back to the prior
20   demonstrative, Matt, please.
21        BY MS. MAINIGI:
22   Q.   Dr. Deer, you also did some work with the West Virginia
23   Coalition for Responsible Chronic Pain Management and was
24   that an organization created by the West Virginia
25   Legislature?
```

1    **A.**    It was.

2    **Q.**    And that was created in 2017?

3    **A.**    That's correct.

4    **Q.**    Who were the other members of this coalition appointed

5    by the legislature?

6    **A.**    So, from memory, I'll have to do my best, but the

7    Director of Public Health Medicine at WVU chaired the

8    committee.  We had several pain physicians from around the

9    state, including those who were in small practices doing

10   injections and procedures.  And we also had -- it was led

11   by, again, West Virginia Public Health.  So, you know, as

12   far as the actual names on there, I -- show me a list, I

13   could certainly help you with that, but I can't recall at

14   this point all the names on there.

15   **Q.**    Well, we'll keep moving so we can get through your

16   background.

17          Now, in addition to the SEMP guidelines, have you

18   participated, Dr. Deer, in creating any other opioid-related

19   guidelines?

20   **A.**    I have.

21   **Q.**    And what were those other guidelines?

22   **A.**    So, the American Society of Interventional Pain

23   Physicians, as we talked about a little bit earlier, is

24   primarily based on advancing innovation-like procedures.

25   But, also, many of the members, because they receive

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    referred patients on high dose opioids, need some guidance.

2    So, I was on a consensus group that's now had three

3    different iterations look, because the standard of care

4    changes over time, looking at proper ways to both prescribe

5    opioids, but also, to monitor opioids.

6    **Q.**   And, as I understand it, ASIPP, as this organization is

7    known, issued guidelines in 2006, 2012 and 2017.  Does that

8    sound right to you?

9    **A.**   That's correct.  And I believe, in '22, we'll have

10   another set of guidelines.

11   **Q.**   And why were guidelines issued in those time periods?

12   **A.**   Because over time standard of care changes and I think

13   as it changes, based on research, development and new

14   information, you have to change -- whether you're talking

15   about a surgery, or a medication, or monitoring.  And if you

16   don't change with it, then you would be no longer within the

17   standard of care.

18   **Q.**   We're almost done with your qualifications and

19   background.

20            MS. MAINIGI:  Matt, let's put up Slide 4, please.

21            BY MS. MAINIGI:

22   **Q.**   Now, Dr. Deer, have you been published in your field?

23   **A.**   I have.  I'm getting close, I think, to 300 articles

24   right now.

25   **Q.**   And have you had roles editing journals on topics

1    relating to pain management?

2    **A.**    I have.  I've been on the Editorial Board of multiple

3    journals and then the Associate Editor of Neuromodulation.

4    **Q.**    And have you, in fact, even published your own

5    practitioners guide, second bullet there?

6    **A.**    Yeah.  So, Deer's Treatment of Pain is a textbook we

7    published, I believe, in '19 that's been commonly used for

8    residents and fellows around the country and in

9    international areas.  It's used also through Europe.

10    **Q.**    Do you also teach?

11    **A.**    I do.  I'm at WVU, as far as a clinical professor,

12    which means that medical students rotate with me.  I usually

13    have one or two at a time from WVU and, also, the

14    osteopathic schools, their fourth year students.  I have one

15    right now that is working with me.

16        Also, I've been a visiting professor at many

17    institutions, Mayo Clinic, Cleveland Clinic, Harvard,

18    Stanford.  So, I go and spend a few days with fellows in

19    other areas to talk about some of the research I've done.

20    **Q.**    Now, have you ever testified before the West Virginia

21    Legislature on topics related to pain management?

22    **A.**    I have.  I've been invited to give my thoughts to many

23    committees within the legislature over the years.

24    **Q.**    Have you ever testified as an expert in litigation

25    before, Dr. Deer?

1    **A.**    I have.

2    **Q.**    And have you specifically testified as an expert on

3    pain management previously?

4    **A.**    Yes, I have.

5    **Q.**    Do you recall about how many times courts have found

6    you qualified to testify as an expert?

7    **A.**    I would estimate around 30 times.  I'm not sure that

8    number is exactly correct, but somewhere in that vicinity

9    would be probably accurate.

10   **Q.**    Do you have any sense of how many times it was in

11   federal court?

12   **A.**    I think as an expert in federal court three times.  I

13   think I was a treating physician in federal court many years

14   ago.  I don't know if you could --

15   **Q.**    You don't get credit for that?

16   **A.**    I don't think you get proof of that, but I did testify

17   in federal court in both New York and also in Delaware on at

18   least three occasions.

19   **Q.**    And have you also consulted on litigation for the U. S.

20   Attorney's Office here in Charleston?

21   **A.**    Yes.  I've worked with the U. S. Attorney's Office both

22   here in Charleston, but also, I think up in the Beckley

23   region and also in North Carolina.

24   **Q.**    And I don't want to get into, obviously, any details of

25   cases, but did your work involve consulting on improper

```
 1    opioid prescribing?

 2    A.   Yes.  It was looking at people prescribing improperly

 3    for no medical reason and fraud.

 4         MS. MAINIGI:  Your Honor, at this time, I would

 5    like to tender Dr. Deer as an expert in pain management and

 6    the standard of care for pain management.

 7         THE COURT:  Any objection?

 8         Hearing none, the Court finds Dr. Deer to be an expert

 9    in pain management and the standard of care for pain

10    management.

11         MS. MAINIGI:  Thank you, Your Honor.

12         BY MS. MAINIGI:

13    Q.   Dr. Deer, in your experience, who is it that makes the

14    decision to write a prescription for an opioid medication to

15    a patient?

16    A.   It would be the physician or clinical practice person,

17    which may be a nurse practitioner in some instances.

18    Q.   And, in your opinion, is it appropriate to prescribe

19    opioids for pain management in various instances?

20    A.   In the correct patient, it can be very appropriate.

21    Q.   Now, let's turn to the basis for your expert opinion.

22    At a high level, what is the question you were asked to look

23    at and answer in this case?

24    A.   So, I was asked to look at the standard of care in West

25    Virginia from my arrival here in 1994 until 2021 and how it
```

1    changed regarding opioid prescribing and really what

2    happened in West Virginia.

3    **Q.**    And were you -- you were focused specifically on West

4    Virginia across the board?

5    **A.**    That's correct.

6    **Q.**    Okay.  And are you also familiar with what was

7    happening nationally at the same time?

8    **A.**    As I testified earlier, I'm very involved in national

9    societies, so I do know the national, really, overview.

10   And, also, I know a lot of the folks nationally who were

11   giving lectures on proper opioid prescribing back in those

12   days who we may talk about later.

13   **Q.**    So, how did you go about answering the question that

14   you were charged with?

15   **A.**    Well, so --

16   **Q.**    What did you do?

17   **A.**    First of all, you know, I've been here a long time.  I

18   don't feel as old as I am, but that's how life goes.  So,

19   I've been here a long time.  And so, I have my personal

20   experience, you know, treating well over a hundred thousand

21   patients over the years.

22        But, also, you know, I have looked at what happened

23   with, you know, policies around the state legislature, what

24   happened with societies, which we have members of societies

25   in West Virginia, what happened with the education of

```
 1    doctors.  So, I looked at all of those factors and I think

 2    it really gives a good insight, in my opinion, of what

 3    happened here and what's going on today.

 4    Q.   And were you able to form an opinion, Dr. Deer, with

 5    reasonable degree of certainty about how the standard of

 6    care for the use of opioid medications and the treatment of

 7    pain changed between the early 90s through today?

 8    A.   I felt very confident that I have a very good

 9    impression of how it changed from 1994 until 2021.

10          MS. MAINIGI:  Matt, if we could put up the next

11    slide, please.

12          BY MS. MAINIGI:

13    Q.   Dr. Deer, did you help us prepare this demonstrative

14    which provides an overview of where you're going with your

15    opinions?

16    A.   I did.

17    Q.   So, tell us at a high level, what is your opinion?

18    A.   Well, so, at a high level, there's -- in my career

19    there's been three main phases in West Virginia.  There was

20    the initial when I first got here and right before I got

21    here there was a liberalization of prescribing of opioids

22    for basically anyone who complained of pain around the

23    state.  And then, that went on until around 2010.

24    Q.   And it started about when?

25    A.   Probably in the late 80s as legislation and articles
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    started to appear in national and international literature

2    that it was a human right to be treated for pain.  So,

3    probably late 80s.  And then, in the early 90s, we saw more

4    prescribing.  And then, around 1996, it changed

5    dramatically.

6    **Q.**    And why did it change dramatically in '96?

7    **A.**    Because new drugs came along that were really said to

8    be less addictive and, certainly, most physicians believed

9    that to be true.

10   **Q.**    And are you referring specifically to Oxy, which is

11   manufactured by Purdue?

12   **A.**    The primary drug was OxyContin.  I mean, MS Contin and

13   thera-gesic patches were also in that group, but OxyContin

14   was the primary drug that was going to be the wonder drug,

15   if you will.  We all believed that to be probably the case

16   based on the marketing and research at the company who

17   developed that drug.

18   **Q.**    Now, so, in this first phase, which you said went until

19   about 2010; is that right?

20   **A.**    I can -- again, that's a number I can live with.

21   Certainly, some of those lines are blurry of what exact

22   years that may be.

23   **Q.**    So, did you see then the standard of care evolve

24   towards prescribing more opioids?

25   **A.**    Oh, absolutely.  You know, as a referral-only practice,

1    you know, we would get -- you know, if you get a patient

2    sent to you from Oceana on ten pills a day and you take over

3    their care, you know, that's 300 pills a month.  That's 360

4    pills a year for one patient.  You can't just take them off

5    that day, right?  You have to make adjustments and you have

6    to try other things.  So, we would get those patients, you

7    know, and, certainly, we would have to find solutions for

8    them because, obviously, that's -- I never felt that was

9    going to be an appropriate long-term dose for the patients.

10   So, we saw that from -- really, as the 90s progressed, we

11   saw more and more of that, all the way -- and we'd get

12   people off, 80-85 percent of people either off or reduced by

13   half.  But then, new patients would come in.  So, the funnel

14   kept filling up.  So, I saw it firsthand every day of my

15   practice.

16   **Q.**   So, let me pause on one thing.  You mentioned -- we

17   spoke just a moment ago about Purdue.  Did you personally

18   have any professional interactions with Purdue during this

19   time period, this first phase?

20   **A.**   I did.  So, Purdue Frederick was a company that

21   presented research that OxyContin was less addictive and

22   long-term solution for chronic people who needed opioids.

23   They also sponsored several county societies.  So, for CAMC,

24   for Thomas, for St. Francis.

25       I would go out to Roane County, for example, or Raleigh

1    County, or Huntington to give ground rounds and they would

2    have a sponsor for the event.  And so, they would both give

3    the honorary to the speaker, which was $500 or a $1,000.00.

4    They would also sponsor the event itself.  And so, I did

5    work in that capacity and --

6    **Q.**   Did there come a time when you decided to stop doing

7    work for Purdue?

8    **A.**   Well, so, you know, I -- from 1996, when they came out

9    until probably the early part of 2000, I really felt that

10   the teaching around the country that long-term opioids were

11   better than short-term was correct until I started seeing

12   more and more of what was going on with the drug OxyContin.

13       And when I gave a lecture -- just to be clear, when I

14   gave a lecture they were sponsoring a program on, I always

15   talk about the same thing.  I talk about procedures as a way

16   to spare people from opioids when possible.  So, I would

17   talk about that and I wouldn't use their slides.  And so,

18   that was an issue with them a bit.

19   **Q.**   Did something happen in the early '00s that caused you

20   to stop even participating in anything they sponsored?

21   **A.**   It did.  Two things happened.  I actually heard some of

22   their speakers talk about you could give people with alcohol

23   addiction their drug and it wouldn't be a problem.  I felt

24   that was totally crazy.  Every -- every bit of information

25   says that's wrong.

1          And then, Dr. Haddox, who was their Medical Director,

2     talked a lot about, you know, that no one was really

3     addicted, they were undertreated, you give them more and

4     more.  And I heard him -- we were speaking together at

5     Embassy Suites at a meeting put on by the State Medical

6     Association.  I was speaking on procedures, he was speaking

7     on opioids, and I really felt that was bad information to

8     give physicians.  So, we had a real break in our thought

9     processes.

10    **Q.**   Now, after you had this experience with Purdue, did you

11    stop prescribing opioids?

12    **A.**   No.  I think opioids -- again, it's a complicated

13    issue.  When we get referrals on a patient that's been on an

14    opioid for three years and they say it's helping them and

15    their urine screen is good and they've been compliant with

16    their family doctor, you can't easily just take them off

17    their opioid.  You have to find a solution to help them.

18         Most people that get to see us want to get off of

19    opioids.  That's why they often request from the family

20    physician, I want to go see Dr. Kim or Dr. Deer, one of my

21    colleagues.  And so, we then come up with a strategy, a

22    plan.

23         Many of those people, for example, have never been to

24    physical therapy.  Something that simple.  We have a

25    physical therapy department.  Many of those people had a,

1   you know, a joint problem that we can easily burn the joint

2   and help them, but they've never been offered that.  So, a

3   lot of times, it was just the family physician didn't know

4   what options existed.  And so -- so, we didn't quit

5   prescribing opioids in general and, in fact, we didn't quit

6   prescribing Oxycodone in patients who were on it already,

7   but we did try to find other solutions and I no longer

8   believed the comment that it wasn't addictive because I

9   started seeing some people have an addiction in the

10  community.

11  **Q.**   Now, let's shift over to your second phase.  So, you've

12  got the first phase.  And describe to me what you saw

13  happening in this 2010 to 2015 time period with the second

14  phase.

15  **A.**   Well, so, you know, we started seeing more discussion

16  about the problem, you know, and I think it became -- people

17  started pushing back a bit.  We had -- and we'll talk in

18  more detail, but we had everyone saying you have to up the

19  dose.  You have to treat the patient with opioids.  You have

20  to look at the fifth vital sign and make sure they are

21  treated properly.

22       And then, in 2010 or so, we starting seeing people like

23  myself pushing back and saying I'm not sure that's right.

24  We need to look at it carefully.

25       And, in 2012, the West Virginia Legislature asked for

```
 1    advice from myself and others and they created the West
 2    Virginia act that made pain clinics be certified.  And what
 3    I mean by that is, if someone gave more than 51 percent of
 4    their patients a controlled substance, they fell under that
 5    legislation even if they were a family doctor because, at
 6    that time, you could be a family physician calling yourself
 7    a pain clinic giving people opioids all day long, right?
 8    That was appropriate under the rules before 2012 in West
 9    Virginia.
10        In 2012, that legislation said you have to meet certain
11    criteria to be treating pain chronically.  And I think that
12    was a big step forward in '12.  It wasn't enough probably to
13    change the standard of care, we'll talk more about that
14    later, but it helped.
15    Q.   Let's talk about the third phase then, 2015 through --
16    through the present.  Describe for us what was happening
17    particularly in West Virginia during that phase.
18    A.   So, in '15 to '21, I think, again, we've seen a really
19    good change in West Virginia, I think, and it goes back to
20    several factors.  One is the CDC came out with guidelines
21    and while it's a national thing, local physicians in West
22    Virginia -- and, again, they were -- they were written
23    originally for primary care and family practice.
24        People who had given people high dose opioids for years
25    read the CDC guidelines.  15 morphine equivalents should be
```

1    what the goal is, or less.  98 at the most unless someone is

2    end of life.  And that really made people change their

3    prescribing some, not all, but it helped.

4         Then the SEMP guidelines came out in '16 and we

5    published those.  That helped because then they had a way to

6    enforce or adjudicate the CDC guidelines in their practice.

7         And then, thirdly, and I think probably most

8    importantly for me because if you watch my prescribing

9    taking people over in this '10, '11, which was up here

10   because I got those people coming to me that way versus '18

11   and now through '21.

12        We saw the 2018 legislation in West Virginia about

13   limiting prescribing, which was the best thing that's

14   happened to our state, in my opinion, as far as this issue

15   goes, really limit how much family physicians gave patients

16   before they sent them to see me.

17        So, now, most patients sent to see us, unless they're

18   cancer patients on minimal or no opioid.  So, that

19   conservatism phase, I think, has been very -- in my opinion,

20   very good for the people in West Virginia.

21   **Q.**   So, in addition to your own practice, did you see a

22   change in this later third time period in prescribing trends

23   in West Virginia?

24   **A.**   Oh, absolutely.  I think if you look at the West

25   Virginia data from the last few years overall, hydrocodone

```
 1    and oxycodone both are way down as prescribed for patients.

 2    Also, many family physicians from all over the state,

 3    really, that '18 law scared them a bit because they had been

 4    prescribing in ways that were not anywhere remotely familiar

 5    to the '18 law.  So, I had phone calls from probably, you

 6    know, a third of the family physicians in West Virginia

 7    asking me what they should do.  And so, that was good

 8    because, in the past, I didn't get those phone calls.  So, I

 9    think that was a good thing.

10    Q.  And so, it sounds like you've also changed or adjusted

11    your own opioid prescribing in the last several years?

12    A.  Oh.  Absolutely.  So, you know, to give you an example,

13    in 2005, when we received a patient on high dose OxyContin

14    and, again, they had no signs of addiction, their drug -- we

15    screen everybody with a drug screen from the day we meet

16    them.  The drug screen was good.  The Board of Pharmacy was

17    good, but they were on this high dose.  We would have to

18    figure out how to get them off that drug and do other

19    things, right, make -- sometimes, it took a long time

20    because the patient had really bad problems.  Sometimes, it

21    took a long time because of insurance approval of

22    procedures.

23         For example, Medicaid would not approve procedures, but

24    they would approve the drug.  So, it really -- we take

25    Medicaid or practices that do take Medicaid.  So, we saw all
```

1   that going on and sometimes it would take us three or

2   four years to get someone down below the 15 morphine

3   equivalence or off the medication.

4        And then, 2020, if I'd get 100 patients in a month,

5   maybe two or three will be on opioids.

6        So, I mean, I can't tell you the difference.  It's

7   amazing.  You can see it in my numbers, for example,

8   because, again, remember, we take only referred patients.

9   So, we only see you if your doctor has already treated you

10  for at least three to six months.

11       So, I think it's been striking to me what those three

12  things we just talked about, the CDC, SEMP and the state

13  legislation did to improve that.

14  **Q.**   So, let's come back for a moment and define standard of

15  care.  Can you tell the Court what you mean when you use

16  that phrase?

17  **A.**   So, standard of care means what a reasonable doctor

18  would do within their field of medicine in a situation and

19  that's the standard of care.

20  **Q.**   And are standards of care typically written down or

21  formalized?

22  **A.**   Some are written down.  For example, guidelines that we

23  write for devices, if it says give antibiotics before

24  surgery, if we don't do that and the person gets an

25  infection, you're going to probably be in trouble.  So,

1    that's a written standard of care.

2         Some aren't written; they're understood.  For example,

3    you know, I just read a book on the Spanish Flu and Johns

4    Hopkins in those days, they would bleed you for Spanish Flu

5    and that was standard of care.  Didn't work very well in

6    1918.  But today, if you did that, you would lose your

7    license.  So, I mean, standard of changes based on, you

8    know, common knowledge.  Everyone decided that was a bad

9    idea.  So, that's not written down, but it doesn't need to

10   be.

11   **Q.**  So, the standard of care is not static?  It can be

12   dynamic?

13   **A.**   It's usually dynamic in most things.  There are certain

14   rules that I think that always stay the same, but in many

15   areas of care, it changes based on new evidence or research

16   and that's why research is so important.

17   **Q.**   And are prescribers expected to prescribe medications

18   consistent with whatever the then existing standard of care

19   is?

20   **A.**   I don't know about the word expected, but I think

21   physicians do follow the standard of care.  So, if you're

22   told you're undertreating people and, again, back in that

23   first phase, I was often called to M&M conferences at

24   hospitals to give my opinion was the doctor undertreating

25   someone because a complaint would come in.

1        So, if you're told that you're undertreating people,

2   you get more likely to treat people with opioids.  If you're

3   told you're overtreating people, you tend to back off.  So,

4   I think they do change with -- I think doctors do change

5   their prescribing habits based on the standard of care.

6   **Q.**   And to your -- it sounds like this is what you're

7   alluding to.  To your experience, can there be consequences

8   for prescribers if they don't follow the existing standard

9   of care?

10  **A.**   Sometimes.  I mean, there are people that I see

11  patients from who I think did a terrible job with the

12  standard of care, but nothing happened to them because the

13  patient had no harm.  But other people may lose their

14  license.

15       And you asked me about the federal prosecutors I've

16  worked with in the past and people have lost licenses and

17  gone to jail for prescribing without a medical reason or

18  they can lose their Board of Medicine license or they can

19  get sued in civil court for malpractice.

20  **Q.**   So, Dr. Deer, who has access to the information needed

21  to determine whether a prescriber is prescribing consistent

22  with the standard of care?

23  **A.**   Well, I would -- I will give you my best answer and it

24  may be not totally correct.  I think the Board of Pharmacy,

25  the DEA and, eventually, the Board of Medicine if it's given

1    to them.

2    **Q.**   And in your experience, Dr. Deer, do wholesale

3    distributors have access to information that would allow

4    them to determine whether a particular doctor is prescribing

5    within the standard of care?

6    **A.**   Not in my --

7              MR. FITZSIMMONS:  Objection.

8              THE WITNESS:  I'm sorry, sir.

9              MR. FITZSIMMONS:  I need to object.  I believe

10   it's outside the scope of the qualification for the standard

11   of care.  We're now bringing in acts of the distributorship

12   which, according to the report, is limited not to -- does

13   not include the distributorship conduct whatsoever.

14             THE COURT:  Well, overruled.  I'm going to let him

15   answer, if he knows, from his own personal knowledge.

16             THE WITNESS:  I don't have any knowledge of any

17   distributor involvement in that based on my personal

18   experience.

19             BY MS. MAINIGI:

20   **Q.**   So, I want to focus back on the standard of care for

21   pain management.

22             THE COURT:  I think I should sustain the objection

23   in view of his last answer, Ms. Mainigi.  You go ahead.

24             MS. MAINIGI:  Thank you, Your Honor.

25             BY MS. MAINIGI:

1    **Q.**    When did you see the standard of care begin to change?

2    **A.**    That's a complicated question.  Could you rephrase

3    that?  I'm not sure I understand.

4    **Q.**    Yeah.  No, that is -- that is not a good question.

5         So, for example, when you were in medical school, was

6    it the standard for physicians to routinely prescribe opioid

7    medications for chronic pain?

8    **A.**    So, when I was at WVU, you know, we didn't have any

9    lectures on pain at all and that was pretty common.  Now,

10   I'm working with some people at Hopkins to make a good

11   curriculum for medical schools.  And the only thing I saw

12   with opioids there was a doctor named Dr. Moss (phonetic),

13   who was Head of Palliative Care.  And that was really all I

14   saw opioid-wise when I was a medical student.  I would see

15   people after surgery get opioids, usually Tylox or Percocet.

16   And so, that was about it in med school.

17   **Q.**    And so, did you come by the mid-90s to know of a

18   concept called pain as the fifth vital sign?

19   **A.**    So, when I was leaving UVA coming here, I was starting

20   to see at UVA people on a lot of pills a day, short-acting

21   pills.  And so, I was starting to see a change a little bit

22   in the early '90s, but it wasn't to the point it got to much

23   later.

24        So, when I came to West Virginia, I started hearing

25   about the fifth vital sign as I went to society meetings and

1    Joint Commission and things of that nature.  So, that became

2    a term that was really propagated around the United States.

3         You know, you have your blood pressure.  You have a

4    pulse.  You have your respiratory rate.  You have your

5    temperature.  That's what most -- you know, I have a

6    daughter who is a nurse.  That's what most nurses would

7    check in the hospital.

8         And then, it was added to the Veterans Administration,

9    which I know there's one down in Huntington, as well as the

10   Joint Commission accredited hospitals, a fifth vital sign,

11   which was pain assessment and treatment.

12   **Q.**   And so, pain as the fifth vital sign, that meant that

13   that was something like blood pressure that actually got

14   asked about at the hospital or tested?

15   **A.**   Once that became accepted as an important factor, it

16   was required.  You know, when you asked me earlier about

17   CAMC, one of the reasons I became Medical Director of CAMC

18   of Pain, they had to meet the Joint Commission requirements

19   as pain for the fifth vital sign.  It meant that every

20   patient that walks in the hospital, inpatient or outpatient,

21   or to the VA, had to ask the pain level and follow that

22   throughout the care and then make adjustments to the pain

23   and get the pain below a five out of ten.

24   **Q.**   And so, were there several organizations that promoted

25   pain as the fifth vital sign?

```
 1   A.    There were several.  I think the biggest was American

 2   Pain Society, which was a society dealing with mostly

 3   non-interventional pain.

 4   Q.    And have you ever been a member of the American Pain

 5   Society?

 6   A.    I was.  I joined that society, like many other

 7   societies, early on, never played any leadership role there

 8   in any fashion because they were more non-interventional,

 9   but they had a journal called Pain, which was the highest

10   rated journal in our field for many years, and we published

11   an article on stimulation of the spine there in 2015 that's

12   a landmark article.

13   Q.    And, at the time, did you view the American Pain

14   Society as a respected organization?

15   A.    They had some of the more experienced doctors in the

16   field, mostly non-interventional, but some of the more

17   well-published doctors.  So, yes, they were well respected

18   back in those days.

19            MS. MAINIGI:  Your Honor, I'd like to put up on

20   the screen DEF-WV-02395.

21        Matt, if you could put that up, please.

22            BY MS. MAINIGI:

23   Q.    Do you recognize, Dr. Deer, this document from the

24   American Pain Society?

25   A.    I do.  It was widely seen around our field.
```

```
1    Q.    Okay.  And can you describe it?  What is it?
2    A.    So, this is a document by the society, American Pain
3    Society, from 1995, right after I got to West Virginia and
4    the year after.  And then, it's a statement from the --
5    presidential address from Dr. James Campbell, who I know
6    well from Johns Hopkins.  He was from the Department of
7    Neurosurgery there and he was giving the keynote address and
8    he called for this change and then their board agreed with
9    him and made a push to make that important.
10   Q.    So, James Campbell was the Head of the American Pain
11   Society at the time?
12   A.    Yes, he was.
13   Q.    And he was -- he practiced at Johns Hopkins?
14   A.    He still does.  I had a call with him about an
15   experiment in the spinal fluid a few months ago, but he
16   still -- but he doesn't see patients any longer.  He does
17   research only now, I think.
18   Q.    So, if you could --
19          MS. MAINIGI:  Matt, if we could highlight the
20   statement from Dr. Campbell at the top.
21          BY MS. MAINIGI:
22   Q.    If you could read that out loud, please?
23   A.    I'll try my best.  That's a long way from me.
24   Q.    And I'm sorry, Dr. Deer.  You have a binder in front of
25   you.
```

```
 1    A.    Oh, okay.  I think I can do it.

 2    Q.    Okay.

 3    A.    It's not on, but I'll try my best to read that from

 4    here.  I feel like I'm at the Department of Motor Vehicles.

 5    Q.    You're at the opthamologist.

 6    A.    Vital signs are taken seriously.  If pain were assessed

 7    with the same zeal as other vital signs are, it would have a

 8    much better chance of being treated properly.  We need to

 9    train doctors and nurses to treat pain as a vital sign.

10    Quality care means that pain is measured and treated.  Dr.

11    Campbell.

12    Q.    You did a good job with that.  Thank you.

13    A.    Thanks.  I can't go any smaller than that from this

14    distance, please.

15    Q.    Now, is it not up on your screen, Dr. Deer?

16    A.    No.  There's nothing up on my screen.

17    Q.    Oh, okay.

18    A.    It's dark.

19    Q.    The binder in front of you -- well, next time, we'll

20    turn to the binder.

21    A.    Oh, thank you.

22    Q.    So, this document was in '95 and then OxyContin came

23    out in 1996; is that right?

24    A.    Not exactly.  OxyContin, I believe, was actually

25    approved in '95.  I think '96 was when Purdue Frederick
```

1    started to market OxyContin as a product, but I think it was

2    approved in '95, if I remember correctly.

3    **Q.**   Now, in your opinion, did these messages from Dr.

4    Campbell and the American Pain Society affect the medical

5    community?

6    **A.**   Oh, they were -- they were hugely impactful [sic] and

7    people made changes immediately to their practice because of

8    this fifth vital sign.

9    **Q.**   How do you know that?

10   **A.**   I lived through it.  Everybody admitted to the hospital

11   had to be treated -- to go home like, for example, if you

12   had your knee replaced, at that time, Dave Santrock was

13   doing a lot of knee replacements at my hospital, one of my

14   dear friends.  And so, he would replace your knee and before

15   you'd go home Day 2 or 3, but after this came about, you

16   couldn't go home unless your pain was down to a 4.

17        So, most doctors, I mean, there are people like me.  I

18   can go do a nerve block.  I can do a femoral nerve block to

19   help your knee pain and you might go home.

20        But most doctors don't do that type of procedure.  So,

21   they would give you, you know, pills because they had to get

22   you below 4.  So, when people left the hospital, they had a

23   month's pills and they went back to their family doctor.

24   And then, many times, they stayed on their pills because

25   they've got chronic knee pain even though they had the

1    replacement.  So, that really changed greatly anybody that

2    went to the hospital for any reason, including outpatient

3    treatment, how they were treating them.

4              MS. MAINIGI:  Your Honor, I would like to move to

5    admit 02395 into evidence.

6              THE COURT:  Any objection?

7              MR. FITZSIMMONS:  No objection.

8              THE COURT:  It's admitted.

9              By MS. MAINIGI:

10   Q.   I'm going to ask you -- and let's let you turn in your

11   binder, Dr. Deer --

12   A.   I have the screen now.

13   Q.   -- if that's helpful.  Oh, you have the screen now?

14   Okay.

15             MS. MAINIGI:  Matt, if you could put on the screen

16   DEF-WV-03074, it should be the next document in the binder.

17             BY MS. MAINIGI:

18   Q.   Now, this is a document from the VA entitled Pain as

19   the Fifth Vital Sign Tool Kit.  Are you familiar with this

20   document?

21   A.   Yes, I am.

22   Q.   And what's the date on the document, just so we can

23   place it?

24   A.   October 2000.

25   Q.   Now, let's turn to Page 13, if you could, of the

1    document, and there's a section there, Section 4, called The

2    Pain Screening Process.  Could you read that section,

3    please?

4    **A.**   Be happy to.  Pain as the fifth vital sign is a

5    strategy for promoting increased attention to unrecognized

6    and undertreated pain among patients receiving care in the

7    Veterans Hospital Administration healthcare system.  The

8    strategy calls for a routine screening, where patients are

9    asked whether they are experiencing pain and are then asked

10   to rate the intensity of their pain using the 0 to 10

11   numeric rating scale on which 0 equals no pain while 10

12   represents the worst possible pain.  The number reported by

13   each patient is the pain score and should be documented in

14   the medical record.  The presence of pain at any level

15   serves as a cue to the provider to conduct additional

16   assessment and to initiate interventions designed to promote

17   pain relief, as clinically indicated.

18   **Q.**   So, is this document from the VA an example of an

19   organization promoting the under -- promoting the fact that

20   pain is undertreated and should be dealt with?

21   **A.**   That's correct.

22        MS. MAINIGI:  Your Honor, at this time, I would

23   like to move for the admission of 03074 into evidence.

24        THE COURT:  Any objection?

25        MR. FITZSIMMONS:  No objection, Your Honor.

```
 1                  THE COURT:  It's admitted.

 2                  By MS. MAINIGI:

 3     Q.   Now, that was the VA.  Are you aware if during this

 4     time period, Dr. Deer, hospitals also began to adopt

 5     policies to address the undertreatment of pain?

 6     A.   So, most hospitals that anyone in this room will go to,

 7     hopefully, are accredited because that's important that they

 8     meet standards.  Joint Commission adopted the fifth vital

 9     sign as one of those standards of approval of your hospital

10     facility or outpatient surgery center.

11     Q.   And let me ask you to turn -- well, you can look at the

12     screen, if you'd prefer, but it is -- the document is

13     WV-2693 in the binder.  Should be the next tab.  It's the

14     Joint Commission pain standards which have already been

15     admitted for a limited purpose under Dr. Gilligan.  Are

16     these, in fact, the Joint Commission pain standards?

17     A.   Those are that document, yes, ma'am.

18     Q.   And those are from 2001?

19     A.   Correct.

20     Q.   And do you have an opinion, Dr. Deer, as to what impact

21     this guidance, along with the APS guidance and the VA

22     guidance, had on the standard of care for prescribing

23     opioids during this time period?

24     A.   I feel it greatly shifted, in my experience, the

25     standard of care towards more opioid prescribing for anyone
```

1    admitted to any hospital.

2    **Q.**   Now, this guidance doesn't expressly tell doctors to

3    prescribe more opioids, does it?

4    **A.**   It does not.

5    **Q.**   So, why did it change the standard of care?

6    **A.**   Because, you know, there's an old saying if you have a

7    hammer that looks like a nail in medicine where you do the

8    same thing for everyone.  So, if you went to see in a

9    hospital that had someone who could do a shoulder block

10   after shoulder surgery, you may get that.  It may help your

11   shoulder pain to get you home.  We do a lot of those today

12   in 2021.

13        But if you didn't have someone to do a block if you had

14   a shoulder replacement or a rotator cuff repair, that's

15   quite painful.  So, to get you out of the hospital, you

16   know, originally, it said pain below 5, but as you saw in

17   that thing I just read, it said any pain at all.  If you

18   complain of pain, many physicians who are good physicians,

19   who didn't -- wasn't trying to cause harm, gave the person

20   opioids in the hospital by IV and then shifted to pills to

21   let them go home because, otherwise, they couldn't meet the

22   standard -- the Joint Commission standards.

23   **Q.**   And this change in the standard of care during this

24   time period, was that consistent with the practice you saw

25   at hospitals in West Virginia?

1    **A.**   Oh, absolutely.

2    **Q.**   And, to your knowledge, did this pain as the fifth

3    vital sign concept affect prescribing by doctors outside of

4    the VA and outside of hospitals, as well?

5    **A.**   I think it did because, again, when those patients went

6    back to their home, then they often had been taking opioids

7    successfully, giving them pain relief.  The family doctor

8    would often keep them on that medication.

9    **Q.**   Now, were prescribers at the time who prescribed more

10   opioids in accordance with that changing standard of care,

11   were they, in your opinion, acting reasonably in light of

12   the information available to them at the time?

13   **A.**   Based on their knowledge base and their options, they

14   were, based on the information.

15   **Q.**   Now, are you aware of whether wholesale distributors

16   had any involvement in any of these documents?

17           MR. FITZSIMMONS:  Judge, I'm going to object.  I

18   thought we already established that it's (unintelligible) --

19           COURT REPORTER:  I'm sorry, sir.  I'm having

20   trouble hearing you.  Is your mic on?

21           MR. FITZSIMMONS:  I'm sorry.  Is my mic on?

22           COURT REPORTER:  I don't think so.

23           MR. FITZSIMMONS:  It's not.  I'm sorry.  I

24   apologize.

25       I thought we already objected once as to the area of a

```
 1    distributorship's action and this is -- I believe Your Honor
 2    sustained that objection and this question is specific,
 3    trying to elicit now distributorship conduct by this
 4    witness, who has already testified he knows nothing about
 5    that.
 6              THE COURT:  Well, I'm going to let him answer the
 7    question if he can.  The reason I sustained the last
 8    objection was that he said he didn't -- he didn't know.
 9              MR. FITZSIMMONS:  That's correct, Judge.  That's
10    why I'm objecting again.
11              THE COURT:  That's --
12              MR. FITZSIMMONS:  And unless he changes his
13    testimony --
14              THE COURT:  I'll reserve my ruling and let you
15    question him a little further, Ms. Mainigi.
16              MS. MAINIGI:  Thank you, Your Honor.
17              BY MS. MAINIGI:
18    Q.   Do you remember the question, Dr. Deer?
19    A.   Please repeat it.
20    Q.   Absolutely.  Do you have -- are you aware of any
21    distributor involvement in any of these documents that we've
22    been talking about, the Joint Commission, the VA tool kit?
23    A.   I have no knowledge of any distributor roles or
24    actions.
25              THE COURT:  I'll overrule the objection, Mr.
```

1    Fitzsimmons.

2                BY MS. MAINIGI:

3    **Q.**   Now, at the same time --

4                THE COURT:  The question went to what he

5    personally knew and he said he didn't have any knowledge and

6    I think the answer was appropriately admitted.

7                MR. FITZSIMMONS:  Thank you, Your Honor.

8                BY MS. MAINIGI:

9    **Q.**   Dr. Deer, around the same time that the Joint

10   Commission issued its standards in 2001, did the DEA issue a

11   statement related to the treatment of pain?

12   **A.**   They did.

13   **Q.**   Okay.

14               MS. MAINIGI:  I'm going to ask, Matt, that we put

15   on the screen MCWV-01522, which is already admitted for

16   limited purpose under Dr. Gilligan.

17               BY MS. MAINIGI:

18   **Q.**   And, Dr. Deer, is this a statement that you were

19   referring to?

20   **A.**   It is.

21   **Q.**   And this statement from the DEA, as well as 21 health

22   organizations in 2001, is this statement consistent with the

23   standard of care that you just testified about?

24   **A.**   That is one of the components physicians looked at for

25   their decision making.

1    **Q.**   Now, Dr. Deer, I think you helped us prepare another

2    slide that identified some of the key developments in West

3    Virginia and nationally related to the changing standard of

4    care from the 1990s through the present; do you recall that?

5    **A.**   I do recall that, yes.

6    **Q.**   Okay.

7              MS. MAINIGI:  Your Honor, I'm going to put a

8    demonstrative on the screen and let me explain to you what

9    it is.

10        Matt, if you could put -- put it up there.

11        What this is, Your Honor, is Dr. McCann -- this was an

12   admitted exhibit under Dr. McCann.  It was, I think, a 1006

13   summary charge that Your Honor admitted.  For the record,

14   it's P-44711_0009 and what it shows, according to Dr.

15   McCann, is the distribution of oxycodone and hydrocodone by

16   all distributors from 1997 to 2019.

17             BY MS. MAINIGI:

18   **Q.**   Does this chart look familiar to you, Dr. Deer?

19   **A.**   Yes, it does.

20   **Q.**   Okay.  So, we just talked about a few major events that

21   occurred.  You just testified about the launch of OxyContin

22   and introduction of pain as the fifth vital sign in 1996; is

23   that correct?

24   **A.**   That's correct.

25             MS. MAINIGI:  So, Matt, let's add that to our

```
 1    chart.

 2              BY MS. MAINIGI:

 3    Q.   And then, you also testified about the VA's adoption of

 4    pain as the fifth vital sign in 2000 and the Joint

 5    Commission's adoption in 2001; is that correct?

 6    A.   That's correct.

 7              MS. MAINIGI:  So, let's add those to the chart.

 8              BY MS. MAINIGI:

 9    Q.   And then, you just testified right now about the DEA

10    statement promoting pain relief?

11    A.   That's correct.

12              MS. MAINIGI:  And let's add that to the chart.

13              BY MS. MAINIGI:

14    Q.   So, let's shift over to what was happening in West

15    Virginia in this time period.  Let's take a look at

16    WV-01219, which is an admitted document.  It was admitted

17    during Dr. Waller's testimony.  What -- what is this

18    document, Dr. Deer?

19    A.   This is a Board of Medicine statement clarifying the

20    use of opioids for the treatment of chronic non-malignant

21    pain.

22    Q.   And I think if we turn to Page 2, we'll see the date on

23    this document.  What is that date?

24    A.   July 14th, 1997.

25              MS. MAINIGI:  And let's go back to the first page
```

1    and let's take a look at the second paragraph, Matt, if you

2    could highlight that.

3              BY MS. MAINIGI:

4    **Q.**   And if you could read that to us, Dr. Deer?

5    **A.**   Happy to.  The purpose of this statement is to clarify

6    the Board of Medicine's position on the appropriate use of

7    opioids for patients with chronic non-malignant pain so that

8    these patients will receive quality pain management and so

9    that their physicians will not fear legal consequences,

10   including disciplinary action by the board, when they

11   prescribe opioids in a manner described in this statement.

12   It should be understood that the board recognizes that

13   opioids are appropriate treatment for chronic non-malignant

14   patient in selected patients.

15   **Q.**   So, first, let's just define chronic non-malignant

16   pain.  What is that?

17   **A.**   So, chronic pain is pain that lasts -- and it's been

18   defined different ways, but pain that lasts more than

19   12 weeks.  Some people define that as chronic pain.  Others

20   have described chronic pain as pain that lasts longer than

21   you would expect tissue healing to occur.

22             So, for example, if you have a trauma to your leg, you

23   would expect it to get better over time and it doesn't.  And

24   you still have nerve abnormalities.  So, that's two

25   definitions that are widely used.

1    **Q.**   And non-malignant pain would mean non-cancer pain

2    basically?

3    **A.**   Correct.   That means your pain is not cancer-related

4    pain.

5    **Q.**   So, before this time period, let's say before 1997,

6    were doctors generally prescribing opioid medications for

7    chronic non-malignant pain in their ordinary practice?

8    **A.**   They were, but not -- not very often and not very high

9    doses.   They were using short-acting drugs like Percocet,

10   Tylox, Dermabond.   You know, and they were -- they were

11   afraid to go to higher doses because of fear of the Board of

12   Medicine taking their license if they gave too much

13   medication in those early days.

14   **Q.**   So, what do you take from this statement issued by the

15   Board of Medicine in 1997?   What's your interpretation of

16   that?

17   **A.**   Well, I think it goes back to what was going on in the

18   country we've talked about a little bit.   The fifth vital

19   sign came out, as far as recommendation from APS.   Doctors

20   were starting to think that pain was a right.   The World

21   Health Organization had said that it was right for cancer

22   pain.   Then that was then transferred over to non-cancer

23   pain.   And I think the Board of Medicine in West Virginia,

24   getting advice from doctors, we all thought that, you know,

25   longer-acting drugs may be better and safer.   And from

1    people like the Federation of State Medical Boards that they

2    should be allowed treatment of pain because they thought it

3    was undertreated and undertreatment became -- became a big

4    fear then of doctors after this type of statement came out.

5    **Q.**   Well, let's take a look at the fourth paragraph in this

6    document on the first page.

7              MS. MAINIGI:  Matt, if you could blow that up.

8              BY MS. MAINIGI:

9    **Q.**   So, that paragraph reads a physician need not fear

10   disciplinary action by the board if complete documentation

11   of prescribing of opioids in chronic non-malignant pain,

12   even in large doses, is contained in the medical records.

13   What do you take from that statement?

14   **A.**   I take from this that, you know, this is one of the

15   things we talked about earlier.  When I would get someone to

16   come in and see me after three years of pain treatment on a

17   really high dose, I think doctors felt comfortable just

18   going up on the dose rather than referring them to a

19   specialist.  So, this is, I think, very -- a very common

20   practice of, you know, upping the dose until someone got

21   better or got a side effect.

22   **Q.**   So, at the bottom of the first page there is a

23   suggested references section, and there are two articles

24   that are listed as references.  Are you familiar with those

25   articles?

1    **A.**    I'm very familiar with both those articles.

2    **Q.**    And can you just summarize for me at a high level what

3    your understanding is of the point of those articles?

4    **A.**    So, the Portenoy article is famous, famous in our

5    field, because Russell Portenoy, a neurologist in New York,

6    he had treated cancer patients for many years.  He said that

7    you should keep upping your dose until you get the effect,

8    which would be --

9                MR. FITZSIMMONS:  Judge, I'm going to object.

10    He's setting forth what the author of an article meant,

11    which is hearsay, and I don't see any foundation for him to

12    be doing that at this point.  So, this is improper.

13                THE COURT:  I will sustain that one, Ms. Mainigi.

14                MR. FITZSIMMONS:  Thank you, Judge.

15                MS. MAINIGI:  Your Honor, he -- well, I can

16    establish some foundation.

17                THE COURT:  All right.  Go ahead.

18                BY MS. MAINIGI:

19    **Q.**    Dr. Deer, are you familiar with the Russell Portenoy

20    article?

21    **A.**    I know the article well and the physician pretty well.

22    **Q.**    And was it a seminal article in the treatment of pain

23    during this time period?

24    **A.**    It was.

25    **Q.**    Was it widely read and distributed?

1    **A.**    It was.

2    **Q.**    And did the West Virginia Board of Medicine cite it as

3    a suggested reference to physicians in West Virginia?

4    **A.**    They did.

5            MS. MAINIGI:  Your Honor, I think I've established

6    foundation.  And I think this would fall under 703.  The

7    question that I would come back to, with your permission to

8    pose to Dr. Deer is, could he describe at a high level the

9    gist of what Dr. Portenoy was saying in his article.

10           THE COURT:  I don't think 703 makes it admissible.

11   He can -- he can refer to it as the basis of his opinion.

12   Can you get around it under one of the exceptions to the

13   hearsay rule?

14           MS. MAINIGI:  Your Honor, I think we really just

15   need it for notice.  We're not going for the truth of the

16   matter.  We just -- it was notice to the medical and

17   healthcare community about what the standard of care was at

18   the time.

19           THE COURT:  Which exhibit are we talking about

20   here?  I've lost my place.

21           MS. MAINIGI:  Oh, Your Honor, it's in your binder.

22           MR. FITZSIMMONS:  1219.

23           THE COURT:  What's the number, the exhibit?

24           MS. MAINIGI:  1219, Your Honor, in the binder, and

25   you'll see it's a --

```
 1                 THE COURT:  Well, hasn't it already been admitted?

 2                 MS. MAINIGI:  The document -- let me just double

 3       check.  This document has been admitted.  I'm just asking

 4       him about the suggested references that the Board of

 5       Medicine tells doctors in West Virginia to go look at.  The

 6       other point of that -- the other hearsay --

 7                 THE COURT:  Just a minute.

 8                 MS. MAINIGI:  Yes, Your Honor.

 9                 THE COURT:  Mr. Fitzsimmons?

10                 MR. FITZSIMMONS:  Judge, this is a footnote and

11       she's now asking this witness to tell us what's in the

12       article.  It's hearsay at its greatest.

13                 THE COURT:  I will sustain the objection, Ms.

14       Mainigi.

15                 MR. FITZSIMMONS:  Thank you, Your Honor.

16                 MS. MAINIGI:  Your Honor, if I might just --

17                 THE COURT:  He can -- he can refer to it as the

18       basis of his opinion, but I don't think he can get into the

19       substance of the -- of the article.  I'll sustain the

20       objection.

21                 MS. MAINIGI:  Okay.  Thank you, Your Honor.

22                 BY MS. MAINIGI:

23       Q.   Was this article from Dr. Portenoy, Dr. Deer, an

24       article that physicians during this time period could have

25       reasonably relied upon?
```

1    **A.**    Many did.

2    **Q.**    And could you elaborate on that, please?

3    **A.**    Many physicians adopted the philosophy that you upped

4    the dose of opioids until someone got better, their pain

5    below a 3 or a 4, or they had a side effect.  And there was

6    no ceiling, was what Dr. Portenoy always stated in his

7    lectures and things around the country.  And so, you should

8    keep going up even to a thousand milligrams a day without

9    any fear of any problems in a patient.  That was his

10    teaching and the article's gist.

11    **Q.**    And how about the second article, is this an article

12    you're also familiar with, The Use of Opioids for the

13    Treatment of Chronic Pain:  A Consensus Statement?

14    **A.**    I am.

15    **Q.**    And was that an article that was relied upon, to your

16    knowledge, by doctors in West Virginia in their prescribing?

17    **A.**    I believe that it was.

18    **Q.**    And in what direction did that article take them, as

19    far as prescribing?

20    **A.**    Just for the Court's knowledge, these two societies, I

21    was members of both.  They were the two largest pain

22    societies in the country at the time.  They had a lot of, I

23    would say, older non-interventional physicians writing these

24    statements who were opioid experts and they both -- they

25    recommended that patients be treated with opioids, again, to

1    proper doses without side effects.

2    **Q.**   So, did this Position Statement from the Board of

3    Medicine in West Virginia, did that get distributed to

4    physicians in West Virginia?

5    **A.**   It did.  I think all physicians in West Virginia

6    received that board policy.

7    **Q.**   Okay.  If I could ask you to turn to the next document,

8    which is WV-03003, can you identify this document for us,

9    please, Dr. Deer?

10   **A.**   Yes.  We now receive our Board of Medicine newsletters

11   via e-mail, but this was -- they used to mail this to all

12   the doctors licensed in West Virginia every quarter or this

13   was one for a year, it looks like, from January to December,

14   but it would come to all licensed physicians in West

15   Virginia.

16   **Q.**   So, this went to all licensed physicians?

17   **A.**   I believe so, yes.

18   **Q.**   Okay.  And if you turn to Page 6 of the document, which

19   is the very last page, at the top of that page, on the

20   right, it says board issues statement on the use of opioids

21   for the treatment of chronic non-malignant pain.  To your

22   knowledge, was that the statement we were just looking at?

23   **A.**   Yes, it was.

24   **Q.**   Okay.  And could you go ahead and read this, the rest

25   of this statement, please?

**A.**   Certainly.

MR. FITZSIMMONS:  Judge, I'm going to object to having him read the news information into the record at this point.

MS. MAINIGI:  Your Honor, I can go ahead and move this document into evidence.  So, why don't I go ahead and do that.  And it would come under the ancient document exception, Your Honor.  Documents like this, also, this newsletter, were actually admitted through Dr. Waller.

THE COURT:  Any objection?

MR. FITZSIMMONS:  I don't know what the date was, Judge, on that.

THE COURT:  This is '97.  December of '97.  January --

MR. FITZSIMMONS:  It doesn't make the date then, I don't believe.

MS. MAINIGI:  It does.  January '98 is the cutoff.

MR. FITZSIMMONS:  If it's January of -- if it is, it is.

THE COURT:  Well, let me look.  Statement in a document that was prepared before January 1st, 1998 and whose authenticity is established.  It's admitted.

MS. MAINIGI:  Thank you, Your Honor.

BY MS. MAINIGI:

**Q.**   So, Dr. Deer, could you just read that statement from

```
 1    the board, please?
 2    A.    The Board's ad hoc committee on Americans with
 3    disabilities had several meetings with interested parties on
 4    the issue of pain management.  At the July, 1997 meeting,
 5    the full board approved the committee's Position Statement
 6    on the use of opioids for the treatment of chronic
 7    non-malignant pain.  In September, 1997, the board mailed
 8    its Position Statement to all physicians currently holding
 9    an active medical license in the State of West Virginia.  If
10    you are interested in receiving a copy of this Position
11    Statement, please contact the board.
12    Q.    Thank you, Dr. Deer.
13          MS. MAINIGI:  Matt, let's go back to our chart.
14          THE COURT:  Just a minute.  Just so the record
15    will be clear, I admitted the exhibit, DEF-WV-03003, under
16    the ancient documents records exception to the hearsay rule,
17    which is found in 803(16).
18          MS. MAINIGI:  Thank you, Your Honor.
19          BY MS. MAINIGI:
20    Q.    Dr. Deer, would you add the West Virginia Board of
21    Medicine statement from 1997 to this chart?
22    A.    Oh, absolutely.  It changed people's perceptions.
23          MS. MAINIGI:  Matt, if we could go ahead and add
24    it, please.  Oh, it's there.  Sorry.
25          BY MS. MAINIGI:
```

```
1    Q.   Dr. Deer --

2              MS. MAINIGI:  Actually, Your Honor, would now be a

3    good time for a break before I turn to another document?

4              THE COURT:  Yes, I think it would be.

5         You can step down during the break, Dr. Deer.

6              THE WITNESS:  Thank you, sir.

7              THE COURT:  We'll be in recess for about ten

8    minutes.

9         (Recess taken)

10        (Proceedings resumed at 10:38 a.m. as follows:)

11             MS. MAINIGI:  Your Honor, I apologize.  The

12   witness will be right out of the men's room.

13             THE COURT:  That's all right.  We usually check to

14   see if everybody is back, but this time we didn't do that.

15        (Pause)

16        Thank you, Dr. Deer.

17   BY MS. MAINIGI:

18   Q.   All right, Dr. Deer, we left off in '97 in West

19   Virginia.  Do you recall from 1998 something called the

20   Intractable Pain Act in West Virginia?

21   A.   I recall it well.

22             MS. MAINIGI:  I'm going to ask, Matt, if you could

23   put up on the screen 03106.  And that is also in the binder.

24   BY MS. MAINIGI:

25   Q.   What was the Intractable Pain Act?  Let's start
```

1    with that, Dr. Deer.

2    **A.**    So it was an act that talked about prescribing

3    medication for patients who had intractable pain.

4    **Q.**    And what is intractable pain?  What's that definition?

5    **A.**    So intractable means that reasonable attempts have been

6    made to treat someone's pain.  For example, I have an

7    overuse injury of my tendon in my ankle right now.  And, so,

8    if I got to physical therapy, it didn't help me.  If I had

9    injections, it didn't help me.  If a medication didn't help

10   me, that would be intractable pain.  It doesn't go away with

11   normal treatment.

12   **Q.**    Is it similar to chronic pain?

13   **A.**    Well, it can be chronic pain.  So you can have chronic

14   pain -- let's say, for example, you're a lawyer and you sit

15   all day and your back hurts and it hurts you all the time,

16   that's chronic pain.  But it may not be intractable because

17   you go home, you stretch, you get in the hot tub, you feel

18   fine.  Right?  So it's chronic pain but not intractable.

19        Intractable means it's so severe that you just can't

20   get rid of it and it affects your life, your, your psyche,

21   and everything about you.  It becomes part of you almost.

22            MS. MAINIGI:  Your Honor, this document that is

23   03106, which is the Intractable Pain Act from the West

24   Virginia legislature, I'd ask the Court to take judicial

25   notice of this document.

```
 1                 THE COURT:  Any objection?
 2                 MR. FITZSIMMONS:  No objection, Your Honor.
 3                 THE COURT:  It's judicially noticed and admitted.
 4                 MS. MAINIGI:  Thank you, Your Honor.
 5      BY MS. MAINIGI:
 6      Q.   So taking a look at the, the document where it
 7      starts with at the top "An act," could you read that,
 8      please, Dr. Deer?
 9      A.   Yes.  "An act to amend Chapter 30 of the Code of West
10      Virginia, one thousand nine hundred thirty-one, as amended
11      by adding thereto a new article, designated Article 3(a),
12      relating to limiting disciplinary actions against certain
13      health professionals prescribing, administering, or
14      dispensing controlled substances in the management of
15      intractable pain."
16      Q.   So this -- the concept that's reflected in this act,
17      Dr. Deer, was that consistent with the '97 Board of Medicine
18      Physician Statement that we looked at earlier?
19      A.   It was very consistent with what the Board of Medicine
20      had said a year earlier.
21      Q.   And what was the goal here, to your understanding?
22      A.   I think the goal was really intended to be a good goal
23      to, to treat people who needed treatment.  So I think the
24      intent was, was, was, you know, at the time reasonable and
25      felt to be a need.
```

```
 1    Q.   And if we look at the bottom of the first page going on
 2    to the second page, starting with "a physician shall not --"
 3         MS. MAINIGI:  And, Matt, why don't we go ahead and
 4    highlight the relevant provisions there.  The highlighted
 5    portion I think would be Number 2.
 6    BY MS. MAINIGI:
 7    Q.   So Number 2 refers to disciplinary sanctions --
 8    that a physician would not be subject to disciplinary
 9    sanctions by the state if the physician prescribed,
10    administered, or dispensed pain-relieving controlled
11    substances for the purpose of alleviating or controlling
12    intractable pain when, in the case of intractable pain
13    involving a patient who is not dying, the physician
14    discharges his or her professional obligation to relieve
15    the patient's intractable pain even though the dosage
16    exceeds the average dosage of a pain-relieving
17    controlled substance, if the physician can demonstrate
18    by reference to an accepted guideline that his or her
19    practice substantially complied with that accepted
20    guideline.
21         What do you take that to mean?
22    A.   Well, I think it was telling physicians that if someone
23    had chronic pain that was non-cancerous, they still should
24    be treated like a cancer patient basically with higher doses
25    without fear of retribution against the doctor and if they
```

1    documented why they were doing it in their chart.

2    **Q.**   And would you say that -- we just looked at that Board

3    of Medicine statement from '97 which had references to the

4    Portnoy article and others.  Do you recall that?

5    **A.**   I do.

6    **Q.**   And would you say that an article like that was an

7    accepted guideline or reference for physicians at the time?

8    **A.**   It became an accepted standard.

9    **Q.**   Now, if we take a look at the last sentence there,

10   still under Number 2, it says evidence of non-compliance

11   with an accepted guideline is not sufficient alone to

12   support disciplinary or criminal action.

13        How do you take that sentence?

14   **A.**   Well, --

15        MR. FITZSIMMONS:  Judge, I'd like to lodge an

16   objection.  This is a doctor who's now providing us with

17   legal opinions of legislation.  It's outside the scope of

18   his expertise --

19        MS. MAINIGI:  Your Honor, Dr. Deer discussed --

20        MR. FITZSIMMONS:  -- as the question was phrased.

21        MS. MAINIGI:  I'm sorry.

22        MR. FITZSIMMONS:  As the question was phrased.

23        MS. MAINIGI:  I can rephrase, Your Honor, but Dr.

24   Deer discussed the Intractable Pain Act.

25        THE COURT:  I'll sustain the objection.  You can

```
 1    try another way, Ms. Mainigi.
 2              MS. MAINIGI:  Sure.
 3    BY MS. MAINIGI:
 4    Q.   To your understanding, Dr. Deer, -- well, let's
 5    step back.  Did you look at the 1998 Intractable Pain
 6    Act as part of formulating your expert opinion?
 7    A.   I did.
 8    Q.   And did you have an understanding of the Intractable
 9    Pain Act in the time period in which this act was passed in
10    the course of your normal practice?
11    A.   I did.
12    Q.   And you went back and reviewed the Intractable Pain Act
13    as part of putting your report together?
14    A.   That's correct.
15    Q.   And you've relied on the Intractable Pain Act in
16    formulating your opinions?
17    A.   One of the things I relied on.
18    Q.   This last sentence that, that we've referred to, did
19    you form an impression in the course of formulating your
20    opinions as to what you understood that last sentence to
21    mean?
22    A.   The last sentence, in my opinion, means that the doctor
23    didn't have to follow the guidelines, whatever the
24    guidelines were, and still may not get in any trouble
25    because I think the board was saying the guidelines had not
```

1    caught up with current treatment standard of care.  This was

2    how I took it at the time.

3    **Q.**   Do you understand -- do you have an understanding of

4    what motivated the passage of the Intractable Pain Act?

5    **A.**   I think many factors including, you know, the, the

6    overall thought process throughout West Virginia and the

7    country that patients had the right to be treated for

8    chronic pain.  And intractable pain, which was severer pain,

9    was the highlight of that focus.

10   **Q.**   Let's go back to your chart, Dr. Deer.  Should we go

11   ahead and add the Intractable Pain Act to your chart?

12   **A.**   I think it is a factor.

13   **Q.**   Now, let me show you next from West Virginia in 2001

14   something called the Joint Policy Statement on Pain

15   Management at the End of Life.  And that is 02413.

16       What was this Joint Policy Statement?  Let's start with

17   this.  Who was issuing this Joint Policy Statement?

18   **A.**   It was the West Virginia Boards of Examiners of

19   Registered Professional Nurses, Medicine, Osteopathy, and

20   Pharmacy.

21   **Q.**   And is there a date on the document that we see?

22   **A.**   I don't see the date.

23   **Q.**   I think if you turn to --

24   **A.**   There we go.

25   **Q.**   -- the last page.

1    **A.**    January through March.  It was approved January through

2    March of 2001.

3    **Q.**    And is this a statement you were familiar with at the

4    time the statement came out?

5    **A.**    Yes, it was.

6    **Q.**    And is this a statement that you reviewed again in the

7    course of formulating your opinions here today?

8    **A.**    Yes, I did.

9              MS. MAINIGI:  Your Honor, at this time I'd like to

10   move to admit 02413 into evidence.

11             THE COURT:  Is there any objection?

12             MR. FITZSIMMONS:  No objection, Your Honor.

13             THE COURT:  It's admitted.

14   BY MS. MAINIGI:

15   **Q.**    So let's take a look at a few portions of this

16   policy statement from the various boards in West

17   Virginia.

18        If we turn to the second page, there is a heading

19   entitled "Management of Pain."

20        Now, I'm going to ask you to focus on the highlighted

21   sections.  What do the highlighted portions of this document

22   tell doctors about the role of opioids in pain management?

23   **A.**    Well, it tells them, first of all, you have to assess

24   whether someone is in pain, which I think is smart.  You

25   should always do that.  You need to treat it promptly.

1           And then, and then it goes from there to the need to

2    recognize if someone becomes tolerant.

3           And for the Court, tolerance means you need more of

4    anything to get the same effect.  That's tolerance.

5           And physically dependent, which means that if you quit

6    taking something, you have symptoms of withdrawal.  And that

7    that happens with every opioid patient over time, and that

8    that has nothing to do with addiction which is abnormal

9    behavior to get a drug.

10          THE COURT:  Doctor, let me ask you a question.

11          What's the difference between physical dependence and

12   addiction?

13          THE WITNESS:  So physical dependence means if

14   you're taking a medication -- like say, for example, someone

15   who took Xanax at bedtime for anxiety and they quit taking

16   the medication and they had a seizure or they felt sweaty

17   and felt bad, that's physical dependence.  The body is used

18   to that.  The receptors are full of that drug.  And when the

19   drug is gone, they, they feel the physical effects of it.

20          They're not -- once they get through that, that phase,

21   they don't crave the drug.  So that means they were

22   dependent upon it physically, but they didn't have an

23   abnormal craving unrelated to a medical issue.

24          If they're addicted to Xanax like, unfortunately, many

25   high school students have become, they take it for reasons

1    other than anxiety.  They take it for reasons like to get

2    high.

3          And when they, when they quit taking it, they crave it.

4    They're not -- because they're in withdrawal.  They crave it

5    because they need it psychologically.  And they would steal,

6    rob, break into your house, do whatever they can do to get

7    the drug.

8                THE COURT:  Thank you, sir.

9                THE WITNESS:  Yes.

10   BY MS. MAINIGI:

11   **Q.**   And, so, the, the last sentence that's highlighted,

12   what do you take that to mean, Dr. Deer?

13   **A.**   Let me read it first to refresh myself.

14        (Pause)

15        So it's saying that governmental policies that were

16   intended for -- to stop diversion of drugs should not

17   interfere with the doctor prescribing medications at the end

18   of life.

19        So, therefore, you would maybe prescribe medicines you

20   wouldn't normally prescribe in that patient because they're

21   in a terminal condition either at their home or in a

22   hospice.

23   **Q.**   Okay.  Now I'm going to ask you to take a look at

24   another policy statement, this time just from the West

25   Virginia Board of Medicine related to the use of opioids in

1    treating other types of pain.  This is from 2005.  So it is

2    MC-WV-1218.  This document was already admitted under Dr.

3    Waller.

4         So this policy statement, Dr. Deer, does this -- does

5    it limit itself to a particular circumstance, the policy for

6    the use of controlled substances for the treatment of pain?

7    **A.**   I believe this policy was about non-cancer pain as well

8    as cancer pain.

9    **Q.**   And who issued this policy statement?

10   **A.**   The Board of Medicine.

11   **Q.**   Was this -- I'm sorry.

12   **A.**   In West Virginia.

13   **Q.**   Would this policy statement have been distributed to

14   doctors in West Virginia?

15   **A.**   Yes.  If you had a license to practice medicine here,

16   whether you lived here or outside the State of West

17   Virginia, you would have received this newsletter.

18   **Q.**   So if we take a look at the first page and the last

19   sentence of the first paragraph, what types of pain

20   treatment did the board define as inappropriate treatment of

21   pain?

22   **A.**   So this, this board recommendation told doctors that if

23   you had a patient complain of pain and you didn't treat

24   their pain or if you didn't treat them enough, if you were

25   under-treating their pain, or if you over-treated their

1    pain, or if you offered them ineffective treatment that you

2    kept doing over and over again, all of those were forms of

3    inappropriate treatment.

4    **Q.**   And if you look at the last paragraph on the first

5    page, and I think the last sentence that starts with "as

6    such," so the, the inappropriate treatment of pain included

7    under-treatment; is that correct?

8    **A.**   That's correct.

9    **Q.**   And, so, what do you take from this last sentence about

10   board action?

11   **A.**   So in '97 we talked about the board saying you can give

12   more medication without fear if you document the select

13   patient.  And here the board said if you under-treat with

14   opioids, basically you would be investigated.  And it led to

15   many complaints at that time against doctors for

16   under-treatment of pain.

17   **Q.**   In your experience here in West Virginia during this

18   time period, was this a real concern for physicians being

19   investigated for the under-treatment of pain?

20   **A.**   It was for some, I mean certainly not for all, but it

21   was for some.  In fact, I was, as I said earlier, asked

22   sometimes to comment in a hospital about someone

23   under-treating someone and to review a chart and give an

24   opinion.

25   **Q.**   Now, let's flip over to the second page, Dr. Deer,

1    please, and that first sentence at the top of that page.

2    What do you understand the board to be saying there?

3    **A.**   That the board recognized that opioids, controlled

4    substances, may be essential to treat both acute pain, so

5    when you break your leg or fall off a scaffolding; after

6    surgery, so when you have your appendix removed; chronic

7    pain, which we've defined, whether due to cancer or

8    non-cancer origins.

9    **Q.**   So the board was saying that opioids were essentially

10   appropriate for the treatment of all kinds of pain?

11   **A.**   It was basically a reinforcement of the 1997 statement

12   expanding a bit to include all types of pain.

13          MS. MAINIGI:   Now, Matt, if we can come back to

14   the chart.

15   BY MR. FITZSIMMONS:

16   **Q.**   Dr. Deer, can we go ahead and add this 2005 Board

17   of Medicine policy statement to the chart?

18   **A.**   I believe that we would, yes.

19   **Q.**   Now, we've been focusing on actions from the Board of

20   Medicine and other boards from West Virginia from '97, 2001,

21   and 2005.

22          To your understanding and knowledge, was West Virginia

23   the only Board of Medicine in the country that was issuing

24   guidelines and policies like this at the time?

25   **A.**   No, not at all.

1   **Q.**   What did you understand was happening in the rest of

2   the country?

3   **A.**   Well, so there was a, a group called the Federation of

4   State Medical Boards that gave advice to medical boards

5   around the country.  And many of those boards adopted those

6   recommendations.  So I think West Virginia was, along with

7   many other boards, creating the same types of policies.

8   **Q.**   And the guidelines from the Federation of State Medical

9   Boards just -- those also have an impact on physician

10   prescribing in West Virginia?

11   **A.**   They do in West Virginia for sure because certainly

12   some of the, some of the materials that the Federation of

13   State Medical Boards published were given to West Virginia

14   physicians.

15   **Q.**   And how do you know that?

16   **A.**   Because I received a copy of the book Dr. Fishman wrote

17   as part of that process of Federation of State Medical

18   Boards.

19   **Q.**   And we'll come back to Dr. Fishman's book in a second.

20        Now, in the binder, then, I think, just for the purpose

21   of the record, I think the Federation model guidelines were

22   covered with Dr. Gilligan who was here on Friday.  So we're

23   going to skip over those with you.  But those are, for the

24   purpose of the record, 02937 and 03605.

25        So let's stick with the West Virginia Board of Medicine

1    in 2005.  And I'm going to ask you to look at 3010.  And

2    it's another West Virginia Board of Medicine quarterly

3    newsletter.

4         And I'm going to ask you to turn to Page 5 of this

5    newsletter, please.

6         Page 5 of this newsletter is a letter to the head of

7    the DEA from, among other Attorney Generals, the Attorney

8    General of the State of West Virginia, Darrel McGraw.  There

9    are multiple Attorney Generals that sent a letter to the

10   head of the DEA.

11        Have you had a chance to review this letter?

12   **A.**   Yes, I have.

13   **Q.**   What is your understanding of the gist of the letter?

14   **A.**   Well, so they write a letter to Ms. Tandy who I had the

15   chance to meet.  She was the Director of the DEA under

16   President Bush.

17             MR. FITZSIMMONS:  Judge, I'm going to lodge an

18   objection as to him interpreting the Attorney General's

19   letter as to what it means to him.

20             MS. MAINIGI:  Your Honor, I think it was notice to

21   him and other doctors in West Virginia because the letter

22   was published in the Board of Medicine newsletter which went

23   to all licensed physicians in West Virginia.  They received

24   the newsletter and had an opportunity to review the letter

25   that the AG sent to the DEA and interpret the meaning of the

1    letter.

2            THE COURT:  Can't he testify as to what -- his

3    understanding of what the, what the letter meant to him,

4    Mr. Fitzsimmons?

5            MR. FITZSIMMONS:  It's hearsay, Judge, for him to

6    get up here and interpret that this is -- it's hearsay.

7    It's an out-of-court declaration that's being offered at

8    this time.  She said notice but it's for the truth as to

9    what's in there.

10            MS. MAINIGI:  Your Honor, --

11            MR. FITZSIMMONS:  It's improper.

12            MS. MAINIGI:  I'm sorry.  Go ahead.

13            MR. FITZSIMMONS:  I think that's totally improper,

14    Your Honor.

15            MS. MAINIGI:  Your Honor, it is not offered for

16    the truth of the statement at this point.  It is purely

17    offered as notice, as many of these documents were that came

18    in through Dr. Gilligan and many other experts here, of

19    notice to the healthcare community of what was happening in,

20    in the world, essentially, in their location with respect to

21    the standard of care.

22    I also think under 902(5) this newsletter is a

23    publication that's issued by a public authority and is

24    self-authenticating.  So I think the authenticity is

25    established.  But hearsay -- this is being offered purely

1    for notice, Your Honor.  And it is also expert reliance

2    materials, Your Honor.

3              THE COURT:  Well, 902 just authenticates it.  It

4    doesn't get around the hearsay problem if I understand it.

5              MS. MAINIGI:  No.  And on the hearsay issue, Your

6    Honor, it's just notice to the healthcare community.  And it

7    is part of the reliance materials that Dr. Deer relied upon.

8              THE COURT:  Well, I'll let him testify as to what

9    it is and who it was sent to if he knows.  Beyond that, I'll

10   sustain the objection.

11   BY MS. MAINIGI:

12   **Q.**  Dr. Deer, what is your understanding of the gist of

13   the letter from the Attorney General of West Virginia to

14   the head of the DEA?

15   **A.**  So --

16             MR. FITZSIMMONS:  I'm going to object.  I think

17   that's the same exact question I objected to.

18             THE COURT:  Yeah.  I'll sustain the objection to

19   that question.

20             MS. MAINIGI:  Your Honor, then I misunderstood

21   what you were going to let him testify to.  Could you repeat

22   that, please?

23             THE COURT:  Well, maybe I made myself unclear.

24   But I think he can testify as to what it is and who it was

25   sent to and that's about it, what his understanding of the

```
 1    purpose of it was.

 2              MS. MAINIGI:  Thank you, Your Honor.

 3              THE COURT:  But don't get into the substance

 4    because I think the substance is hearsay.

 5              MS. MAINIGI:  Okay.  Thank you, Your Honor, for

 6    that clarification.

 7    BY MS. MAINIGI:

 8    Q.   Dr. Deer, could you tell us what your understanding

 9    was of the purpose of the letter?

10    A.   Yes.  The purpose was to communicate to the DEA

11    concerns of the Attorney Generals around the country about

12    opioid prescribing and limitations therefore.

13    Q.   And, specifically, what about opioid prescribing and

14    limitations?

15    A.   That was a concern.  They felt the state had the same

16    responsibility to oversee it and the federal government was

17    overseeing it, and there was communication about who should

18    be overseeing it.

19    Q.   And the -- did the Attorneys General express a view as

20    to what the DEA should be doing?

21    A.   They felt that the shift was more towards

22    anti-diversion and it should be more towards treatment.

23    Q.   Thank you.  Let's see.

24              MS. MAINIGI:  Your Honor, at this time I would

25    like to move for the admission of 3010 into evidence.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1              THE COURT:  Which one is that?

 2              MS. MAINIGI:  It's the newsletter that we've been

 3    talking about, Your Honor, and the --

 4              THE COURT:  I've got that.

 5         Do you have any objection to that, Mr. Fitzsimmons?

 6              MR. FITZSIMMONS:  Judge, I believe you sustained

 7    the objection I had previously made.

 8              THE COURT:  Well, I think I did.

 9              MS. MAINIGI:  The objection was sustained, Your

10    Honor, as I understood it, as to the question.  But news

11    letters like this were actually introduced into evidence

12    with Dr. Waller, for example, as well as several other

13    witnesses and --

14              THE COURT:  Well, it comes in for the limited

15    purpose of notice but not for the truth.  Is that right?

16              MS. MAINIGI:  That's correct.

17              THE COURT:  Well, I'll admit it for the limited

18    purpose.

19              MS. MAINIGI:  Thank you, Your Honor.

20    BY MS. MAINIGI:

21    Q.   So we talked earlier about the 1998 Intractable

22    Pain Act.  Do you recall that, Dr. Deer?

23    A.   I do.

24    Q.   And do you recall that in 2009 the West Virginia

25    legislature amended the Intractable Pain Act?
```

1    **A.**    I do.

2    **Q.**    Let me ask you to take a look at 3067 which is the 2009

3    Management of Pain Act.  Are you familiar with that act, Dr.

4    Deer?

5    **A.**    Yes, I am.

6    **Q.**    And did you rely on that act in the course of forming

7    your opinions here today?

8    **A.**    I did.

9    **Q.**    And were you familiar with the act at the time it was

10    passed in 2009?

11    **A.**    I was.

12          MS. MAINIGI:  Your Honor, I'd like the Court -- to

13    ask the Court to take judicial notice of 03067.

14          THE COURT:  Any objection?

15          MR. FARRELL:  Not to you taking judicial notice,

16    Judge.

17       I would like to place on the record, aside from the

18    examination of this witness, that the subject of some of

19    these questions was the subject of motions *in limine* and

20    *Daubert* motions by the defendants prior to trial.

21          And, in fact, you struck one of our expert witnesses

22    from the DEA who was going to testify about the Controlled

23    Substances Act.

24          So I would just like to note my continued objection to

25    witnesses in this court being served as legal experts.

```
 1              MS. MAINIGI:  Your Honor, --

 2              THE COURT:  Well, --

 3              MS. MAINIGI:  -- we don't agree with that

 4   statement.  This is a -- this is a standard of care expert.

 5   And these acts in West Virginia obviously served the purpose

 6   of modifying the standard of care for West Virginia

 7   physicians, of which Dr. Deer is one.

 8              THE COURT:  The 03067 is judicially noticed and

 9   admitted.

10   BY MS. MAINIGI:

11   Q.   Dr. Deer, if you'd take a look at the top of that

12   document that references the act.  It says "an act" and

13   then it goes on to describe it.

14        Can you just basically explain to us what your

15   understanding is of what the legislature did here?

16              MR. FITZSIMMONS:  Judge, I'm going to object to

17   him giving legal opinions as to the legislature.

18              MS. MAINIGI:  Your Honor, he's doing this from his

19   point of view as an expert on standard of care and a West

20   Virginia treating physician who had to at the time interpret

21   what the legislature was doing vis-à-vis this act.

22              THE COURT:  I'll overrule the objection.  I think

23   he can refer to it as a basis for his expert opinion.  Go

24   ahead.

25              THE WITNESS:  They took the word "intractable" out
```

1     of the previous legislation.  We updated it with the word --

2     just chronic pain.  So they made it easier to treat patients

3     who didn't have severe pain.

4     BY MS. MAINIGI:

5     **Q.**   Was the '98 legislation related or limited to

6     intractable pain?

7     **A.**   That's correct.

8     **Q.**   And this 2009 legislation was amended to apply to all

9     pain?

10    **A.**   They took the word "intractable" out of this

11    legislation.

12          THE COURT:  Yeah.  I think this is admissible.

13    He's -- his testimony is the course of the changes of the

14    standard of care over time and I think that his testimony

15    here is relevant to that.  So the objection is overruled.

16          MS. MAINIGI:  Thank you, Your Honor.

17         And just for the purpose of the record, to respond to

18    Mr. Farrell's objection further, I'll just note for the

19    record that, as we know, there were a number of company

20    witnesses that were called by the plaintiffs to come and

21    testify in this matter.

22         And the plaintiffs, in the course of all of that

23    testimony, elicited a number of -- posed a number of

24    questions and elicited testimony about those individual lay

25    person witnesses' understanding of DEA regulations as well

```
 1    as the CSA.
 2    BY MS. MAINIGI:
 3    Q.   You can put that document away, Dr. Deer.
 4         And let's take a look at another joint statement issued
 5    in 2010.  And that is 2414.
 6         We had earlier looked at a 2001 joint statement on pain
 7    management from a number of boards in West Virginia; right?
 8    A.   Correct.
 9    Q.   Okay.  And in 2010 there seems to be a reissuance of
10    the 2001 joint statement.  If you go to Page 4 of 2414, what
11    is the date of the adoption?
12    A.   March 12, 2001, initially but re-adopted May 10th,
13    2010.
14    Q.   And are you familiar with this 2010 joint policy
15    statement, the re-adoption of the 2001 statement?
16    A.   Yes, I am.
17    Q.   To your understanding, did this re-adoption encourage
18    or discourage prescribing of opioids?
19    A.   It encouraged prescribing of opioids.
20         MS. MAINIGI:  Your Honor, just, just as the
21    earlier joint policy statement was admitted, I'd like to
22    move for the admission of 2414, please.
23         THE COURT:  Any objection to this one?
24         MR. FITZSIMMONS:  No objection, Judge.
25         THE COURT:  It's admitted.
```

```
 1    BY MS. MAINIGI:

 2    Q.    Let's go back to our chart, Dr. Deer.  And in your

 3    chart would you add the 2009 Management of Pain Act as

 4    well as the 2010 joint policy statement?

 5    A.    I would.

 6    Q.    So, Dr. Deer, we've looked at a number of, of

 7    statements and policies and acts from West Virginia.  Do you

 8    have an opinion on the relationship between the standard of

 9    care for prescribing opioids for the treatment of pain and

10    all of the West Virginia laws and policies that we've been

11    discussing?

12    A.    I think there's no doubt that the things on our graph

13    to the board changed the standard of care in West Virginia.

14    Q.    In what manner?

15    A.    It led to increased opioid prescribing around the

16    state.

17    Q.    And do you have an opinion on whether West Virginia

18    prescribers, in fact, prescribed opioid medications more

19    freely in accordance with the guidance that was issued by

20    the various bodies in West Virginia?

21    A.    I felt certain they did.  And I saw it personally in

22    the referral base that we have.  As those acts became law,

23    we saw patients getting sent to us with more and more

24    opioids.

25    Q.    And do you have an opinion on whether doctors who in
```

1    accordance with this guidance issued in West Virginia, those

2    doctors who more freely prescribed opioid medications to

3    their patients, were they acting reasonably based on the

4    information available to them at the time?

5    **A.**    I think at the time, the vast majority of those doctors

6    were acting within reasonable medical standards and standard

7    of care.

8    **Q.**    And does that include the doctors who formed your

9    referral base, so the family doctors that referred patients

10   to you at the time?

11   **A.**    I would say that the family doctors referred to me and

12   followed along those guides and treated patients with

13   high-dose opioids sometimes for many years before they sent

14   someone to see me because that was the tools they understood

15   at that time.

16   **Q.**    Now, you, you referenced Dr. Fishman earlier.  And one

17   thing we've not discussed yet is physician education.

18        Do you have an opinion as to whether physician

19   education played a role in the standard of care for pain

20   treatment?

21   **A.**    So physician education -- and it's something called

22   continuing -- for the Court, continuing medical education is

23   something we all have to do to keep our license updated.

24        So every physician has to undergo continuing education.

25   And part of that required education in West Virginia became

```
 1    education on pain.  So it definitely made an impact overall
 2    as we got near 2010.
 3    Q.    Now, did Dr. Fishman teach at various continuing
 4    medical education events in West Virginia, to your
 5    knowledge?
 6    A.    He taught in person at a state medical association
 7    sponsored seminar on pain.  And he also taught via video
 8    because every doctor in West Virginia at one point had to
 9    watch his lecture to recertify their license.
10    Q.    And are you familiar with Dr. Fishman's book,
11    Responsible Opioid Prescribing?
12    A.    I am.
13          MS. MAINIGI:  And I believe, Your Honor, just for
14    the purpose of the record, this book was admitted during Dr.
15    Waller's testimony and is 02111.
16    BY MS. MAINIGI:
17    Q.    Was this book disseminated to doctors in West
18    Virginia?
19    A.    It was.
20    Q.    And did the West Virginia -- in addition to inviting
21    Dr. Fishman to come speak in West Virginia, did the West
22    Virginia Board of Medicine promote Dr. Fishman's teachings
23    in both -- essentially into early 2010?
24    A.    At that time, based on my recollection, in order to
25    renew yourself, you had to receive a lecture from
```

1      Dr. Fishman on opioid prescribing, a lecture from me on

2      procedures.  I think there was a third lecture.  I can't

3      remember what that was.  I think it was three hours of CME

4      and I can't recall the third lecture.  But you had to go

5      on-line and watch that or go to an in-person event.

6      **Q.**   And do you have an opinion on the impact that, that the

7      CMEs that Dr. Fishman and others were involved with, what

8      impact that had on doctors in West Virginia regarding the

9      prescribing of opioids?

10     **A.**   CME impacts your -- based on the evidence provided by

11     the speaker.  So, you know, I think any CME that's well done

12     is going to be impactful based on the evidence that that

13     person chooses to present.

14     **Q.**   And, again, doctors who prescribed in accordance with

15     the standard of care articulated at these CMEs and in

16     Dr. Fishman's book, in your opinion were they acting

17     reasonably in light of the information available to them at

18     the time?

19     **A.**   At the time of that decision-making process from the

20     physician, yes.

21     **Q.**   Now, I want to shift over to demographics in West

22     Virginia, Dr. Deer.

23         Do you have an opinion on whether demographics in West

24     Virginia had an effect at which -- had an effect on the rate

25     at which opioids were prescribed by West Virginia

1    physicians?

2    **A.**   I believe that it had a large impact on prescribing in

3    West Virginia versus other places.

4    **Q.**   And did you assist us in preparing a slide that

5    summarized those factors?

6    **A.**   I did.

7              MS. MAINIGI:  Matt, if we could put that on the

8    screen, please.

9    BY MS. MAINIGI:

10   **Q.**   Were these the factors you noted in your report and

11   on the slide?

12   **A.**   I think those are all the factors but one.

13   **Q.**   Well, let's go through the, the factors.

14        What do you mean that higher rates of chronic pain had

15   an effect on higher opioid prescribing in West Virginia?

16   **A.**   If you look at the demographic data, West Virginians

17   have more arthritis than any other state I believe.  We

18   have -- I think we're third in obesity, and obesity has been

19   linked very closely to chronic pain.

20        For example, if you gain four pounds -- if you gain

21   one pound, it puts four pounds of weight on your spine and

22   your knees and your hips.  So it's important.

23        We also have a higher rate of chronic pain among

24   smokers with vascular disease.

25        So there are many factors that leads to our chronic

1    pain rate being higher.  We'll get to some of other ones

2    over the next three bullet points we have here.

3    **Q.**   And -- well, let's, let's move to the second.  Tell me

4    about the older population in West Virginia and how that

5    contributes to higher opioid prescribing.

6    **A.**   Well, we're on average four years older than other

7    states.  We have young people like Mike there that's leaving

8    the state for jobs and old people staying.  And we have a

9    death rate that's greater than the birth rate so -- less

10   than the birth rate.

11        So we're, we're older.  We're getting older.  And if

12   you look at data, the older population has a higher risk of

13   chronic pain diseases.

14   **Q.**   And then your, your third example is that there are

15   more injuries with more workers in physically demanding jobs

16   in West Virginia which also leads to higher opioid

17   prescribing.  Explain that.

18   **A.**   Well, we're a tough group of people in West Virginia,

19   you know.  And back in the days from '94 to probably about

20   2008, we had a lot of coal miners being injured.  We don't

21   have as many now, unfortunately for jobs.  But we also had

22   timbering and plants and construction.

23        So we have a, we have a blue collar work force that

24   works really hard.  And if you look at the data on that,

25   they get injured more than physicians and attorneys get

1    injured and need treatment.  And many times they were

2    treated with opioids.

3    **Q.**    And the last factor you list is insurance policies.

4    Can you explain what you mean by that?

5    **A.**    Well, again, many physicians that are specialists don't

6    accept West Virginia Medicaid.  I do.  I grew up with not

7    much money, so I always feel it's my need to take care of

8    everyone.

9         And a lot of times we can't get approval for innovative

10   therapies because of the budget of Medicaid, and other

11   insurers too, Workers' Compensation, you know, public

12   employees.  Sometimes it's limited to what you can do and I

13   think that sometimes led to a denial of referral to a

14   specialist, whether it be a pain specialist or a

15   neurosurgeon.  And that, that patient stayed in the primary

16   care specialist's office on medication.  So I think all

17   these factors played a role.

18   **Q.**    And, so, how did that translate into West Virginia --

19   West Virginia residents perhaps having a higher rate of

20   opioid prescribing?

21   **A.**    I think all those factors together led the primary care

22   specialists particularly to start people on opioids.  And

23   then they stayed on those medications sometimes for life

24   once they were on them.

25   **Q.**    Thank you, Dr. Deer.  We can take that down.

1      Now, we spent a long time on your first phase.  Let's

2  shift over to the second phase of the standard of care that

3  you mentioned earlier in your overview.

4      Just remind us briefly what the second phase is.

5  **A.**   So I think in 2010 we started seeing a real peak in

6  people on high doses of opioids in the state.  I know that

7  personally because they were sent to see me and I accepted

8  them as patients.  So it got pretty bad.

9      And we also had a need to I think determine what a pain

10  clinic was.  So around 2011 we started seeing changes to try

11  to turn the situation back towards therapies other than

12  opioids.

13  **Q.**   And I think you referred to the second phase as

14  balancing.  Explain that to us.

15  **A.**   Well, I think the pendulum has swung so far to the

16  pro-opioid side by physicians' prescribing habits that it

17  became very, very difficult to understand what to do with

18  some of these patients who still were in severe pain despite

19  high-dose opioids.

20      So there was a movement by I think several parties to

21  try to figure out ways to allow treatment but be more

22  balanced and try to think of ways to use other therapies

23  other than opioids.  So -- and to control better how those

24  were prescribed.

25  **Q.**   Now, in 2012 there was legislation passed called the

```
1    CSMP and Chronic Pain Clinic Licensing Act.  Are you

2    familiar with that legislation?

3    A.   Yes, I am.

4    Q.   Okay.  And did you tell us earlier that you served on a

5    committee related to the CSMP?

6    A.   I did.

7    Q.   And was that a committee associated with this

8    legislation?

9    A.   It was.

10   Q.   Let me ask you to take a look at 03105.

11             MS. MAINIGI:  And for the purpose of the record,

12   this is Senate Bill 437 which was actually admitted during

13   Dr. Gupta's testimony.

14   BY MS. MAINIGI:

15   Q.   Now, did this law impose new requirements on

16   doctors?

17   A.   It did.

18   Q.   If you take a look at Page 19 of the act, do you see

19   the heading -- and 19, just for everybody's benefit, I'm

20   going by the page numbers on the lower left.

21             MS. MAINIGI:  And if we could focus on the very

22   bottom of Page 19, Matt.

23   BY MS. MAINIGI:

24   Q.   So is one of the things this act did, Dr. Deer, did

25   it require doctors to check the Controlled Substances
```

1    Monitoring Program before prescribing opioids to certain

2    patients?

3    **A.**   It did.

4    **Q.**   And did that requirement exist before this law was

5    passed?

6    **A.**   There was no requirement before this law was passed.

7    **Q.**   And what did that help with if a doctor was consulting

8    and, and by law was told to consult the CSMP before

9    prescribing opioids?

10   **A.**   I think it really helped with doctor-shopping, if you

11   will, because if they were receiving medication from other

12   doctors and the doctor had to check that data bank, they saw

13   that before they prescribed a controlled substance.  So it

14   helped with the issue if patients went to multiple doctors

15   for the same type of drug.

16   **Q.**   So did that mean, as a hypothetical, a patient who went

17   to see three different physicians and got controlled

18   substances prescriptions from all three physicians, that

19   that patient may not be able to do that anymore since these

20   doctors were required to check the CSMP?

21   **A.**   Well, it certainly -- the first person may not have

22   seen it, but the next two should have seen it if it was

23   reported by the pharmacy who filled the prescription to the

24   pharmacy board.

25   **Q.**   And the act did a couple of other things too.

1    If you turn to the prior page, Page 18 at the very

2    bottom, there's a reference at the bottom to the Review

3    Committee making determinations on a case by case basis on

4    specific unusual prescribing or dispensing patterns

5    indicated by outliers in the system for abnormal or unusual

6    usage patterns of controlled substances.

7    What is your understanding of what this act required in

8    this regard?

9    **A.**    It required the Board of Pharmacy to create a committee

10   to look at abnormal prescribing by doctors.

11   **Q.**    And what was the committee looking for?

12   **A.**    People that were outliers and the amount of medicine to

13   individuals, as well as people who were prescribing to --

14   you know, people that were actually in the same family.

15   They were looking at people who had deaths.  The medical

16   examiner was part of this committee.  So if there was a

17   death and there was a high prescriber with a lot of death

18   rates, those sort of issues.

19   **Q.**    And what would -- would there be contact made with some

20   of the doctors who were reviewed?  What would happen?

21   **A.**    So, as I said earlier, Mr. Goff ran that committee that

22   I was on.  So we reviewed every two months all the data.  So

23   if a doctor had a death and they were prescribing a

24   controlled substance to that patient, they received a letter

25   from our committee that they needed to review their

1    prescribing habits.

2         We didn't say they caused their death, but it certainly

3    let them know that we were aware of the death and we wanted

4    them to look.  And, of course, some doctors received

5    multiple of those letters, you know.  And, certainly, that

6    was a big issue for the Board of Pharmacy Oversight

7    Committee.

8         Then they looked at were people prescribing multiple

9    classes of drugs to the same person because that can also be

10   an issue.

11        And then people that had more than five doctors

12   prescribing to them, all those doctors received a letter

13   from this committee saying that you have a patient -- they

14   should have seen it themselves from the Board of Pharmacy

15   check.  But they got a letter saying you have a patient

16   who's seeing more than three physicians for a controlled

17   substance and they were asked to review their chart.

18        So it was all informational to them initially what was

19   going on in their practice in case they were in need of

20   education.

21   **Q.**   And, so, the CSMP, coming back to that database for a

22   moment, the CSMP database was accessible by physicians; is

23   that right?

24   **A.**   Every time you see a patient, you could access that

25   with your password of what the patient had received from

1    other physicians and from yourself.

2    **Q.**   But the general public could not access the CSMP?

3    **A.**   I think that would be a HIPAA violation for the general

4    public to access what a patient was given.

5    **Q.**   And the third thing this act did -- I think you

6    referred to it earlier, Dr. Deer -- is there were provisions

7    in the act related to pain management clinics.  Do you

8    recall that?

9    **A.**   I do.

10   **Q.**   And what do you understand the act to include with

11   respect to pain management clinics?

12   **A.**   So there were people who were family doctors calling

13   themselves a pain clinic who had no training.  And if they

14   were prescribing more than 51 percent of their patients a

15   controlled substance, then they would fall under this act.

16        And what that led to -- and, again, I remember the

17   committee that helped draft this law.  They would go out and

18   be certified then.  And they had many things they had to

19   meet as a criteria.  It was really a way to get better

20   control of some of these centers that were really not doing

21   the right types of therapy for patients.

22   **Q.**   So was there a licensing requirement and an inspection

23   requirement?

24   **A.**   If you had over 51 percent of your patients on a

25   controlled substance, that was true.  If you didn't meet

1    that criteria, you were excluded from that.  But physicians

2    who had more than 51 percent of their patients receiving a

3    controlled substance were inspected and were either licensed

4    or told to desist in their treatment.

5    **Q.**   So these three elements of the 2012 act, to your

6    understanding, what was the intended effect of these new

7    requirements?

8    **A.**   It was to, I believe, to look at the prescribing habits

9    of physicians to try to get a handle on who actually was

10   treating pain in a more exact fashion and a more appropriate

11   way.  So that was kind of the main gist of this act I

12   believe.

13   **Q.**   And was there -- now, this act, did it limit in any way

14   the amount of opioids a physician could prescribe?

15   **A.**   It didn't limit the amount at all.  It was a first

16   step, though, I think toward the balancing as I talked

17   about.

18        So, you know, in '11 the secession began.  In '12 this

19   happened.  That was the first step.  It was a good step

20   towards improving things.  It still didn't limit the doses

21   that people could prescribe to patients without looking at

22   other options.

23            MS. MAINIGI:  Matt, if we could put our chart back

24   up.

25   BY MS. MAINIGI:

1   **Q.**   And, Dr. Deer, should we add this 2012 legislation

2   to your chart?

3   **A.**   I would.

4   **Q.**   Now, third phase of the standard of care that you

5   referenced, you said that was approximately 2015 to today.

6   Can you just again briefly describe that phase for us?

7   **A.**   So I think this is the most important phase as far as a

8   solution to this issue.  It's the phase where we had a

9   number of parties trying to better define the balance of

10  prescribing versus abuse and addiction.  So -- and who would

11  really be proper in looking at, again, updates on evidence

12  of what really actually worked instead of the conservatism

13  of opioid prescribing which has been impactful to the

14  standard of care, and I think it resulted in that downward

15  curve.  I know that from looking at this curve also in my

16  own experience.

17  **Q.**   So we've mentioned a couple of times the 2015 CDC

18  guidelines.  Those are at 02523.  Those have been admitted

19  through Dr. Gupta.

20       If you could take a look at those, are those, in fact,

21  the 2016 CDC guidelines?

22  **A.**   Those are the CDC guidelines from 2016.

23  **Q.**   And did these guidelines make recommendations about how

24  doctors should limit the quantity of opioid medications they

25  prescribe to patients?

1    **A.**    It talked about both quantity and dose.

2    **Q.**    To your understanding, were these the first guidelines

3    from the federal government that told doctors they should

4    carefully reassess evidence of individual benefits and risks

5    when increasing dosage above daily thresholds?

6    **A.**    I believe that it is.

7    **Q.**    And were they the first federal guidelines that told

8    doctors treating acute pain that they could generally limit

9    prescriptions to a several-day supply, I think a three-day

10   supply?

11   **A.**    I believe that it was.

12   **Q.**    And I think you testified earlier that your committee

13   put together the SEMP guidelines partly in reaction to the

14   CDC guidelines coming out.  Is that fair?

15   **A.**    The CDC gave West Virginia a grant to create that

16   committee to -- you know, this is a guideline but it doesn't

17   really tell a primary care doctor what to do for example.

18        This was intended -- it says in this guideline for

19   primary care, although I feel like it applies to everyone

20   because it's good guidance.  I think the CDC did a very good

21   job.  Some people haven't liked this guidance, thought it

22   was too restricting.  But I think it was very good.

23        And, so, the SEMP guidelines then were really created

24   to give a play book to doctors in West Virginia on, okay, if

25   you're going to do what the CDC says, how do you achieve

1    that?

2        So I think that was meant to be really a supplement to

3    CDC for our state particularly.  And a few other states

4    adopted our SEMP guidelines as well.  I know Arizona did.

5    There are pain societies and others.

6    **Q.**   And, and I -- just for your benefit, if you need them,

7    Dr. Deer, the SEMP guidelines are at the very front of your

8    binder and they are 3036 and are admitted.  They were also

9    released in 2016; right?

10   **A.**   That's right.  I believe this was -- March was the CDC

11   and I think the SEMP was October I believe.

12   **Q.**   And did the CDC and SEMP guidelines encourage doctors

13   to caution basically now when prescribing opioids?

14   **A.**   I think the CDC gave doctors a play book on amounts and

15   dosing.  And I think SEMP gave doctors a play book on what

16   to do instead of opioids when possible.

17   **Q.**   And to your knowledge, do doctors in West Virginia rely

18   on both the CDC guidelines from 2016 as well as the SEMP

19   guidelines from 2016?

20   **A.**   I think it had a major impact on prescribing.

21   **Q.**   And how do you know that?

22   **A.**   Because, again, like I said earlier, back from '97 to

23   2015 or '16 I was receiving patients on more and more

24   controlled substances referred to me and my partners.  And

25   we would spend time trying to find solutions.

1        And after these two documents came out, we started to

2    see a decline in that.  The amounts were less.  The doses

3    were less.  So -- and people were sending patients earlier

4    to see us.  They didn't wait five years after back surgery.

5    They waited three months after back surgery.

6        So I saw a shift in both the amount of drugs and the

7    time line of when people got sent to see us.  But, again, it

8    was after these two, two major pieces of information were

9    given to physicians.

10   **Q.**   And, so, is it your opinion, Dr. Deer, that the 2016

11   CDC guidelines as well as the SEMP guidelines had a role in

12   changing the standard of care in West Virginia?

13   **A.**   I think they had major positive impacts in changing the

14   standard of care in West Virginia.

15           MS. MAINIGI:  So let's come back to our chart,

16   Matt.

17   BY MS. MAINIGI:

18   **Q.**   And, Dr. Deer, should we add the CDC guidance as

19   well as the SEMP guidelines to your chart?

20   **A.**   Absolutely.

21   **Q.**   Now, following on 2016 as we see distributions going

22   down in that time period, did the West Virginia legislature

23   pass any other legislation related to opioid prescribing?

24   **A.**   In 2018 the West Virginia legislature passed new

25   legislation.

```
1    Q.   And what was that called?

2    A.   I don't remember the name exactly of the bill, but it

3    was a bill about really proper prescribing of opioids.

4    Q.   And just -- I will ask you to take a look at 3054.  And

5    does that refresh your recollection as to what it was

6    called?

7    A.   It does, the Opioid Reduction Act.  It seemed too

8    obvious to be the real name of the bill, but I think that

9    was it.

10        MS. MAINIGI:  Your Honor, I ask the Court to take

11   judicial notice of the Opioid Reduction Act, 3054.

12        THE COURT:  Any objection?

13        MR. FITZSIMMONS:  No objection.

14        THE COURT:  It's noticed and admitted.

15   BY MS. MAINIGI:

16   Q.   Now, if you turn to Page 3 of this document, I

17   think it's 16-54-4.  And under Subsection (e) --

18        MS. MAINIGI:  If we could blow that up, Matt.

19   BY MS. MAINIGI:

20   Q.   And that section is entitled "Opioid Prescription

21   Limitations."  And can you describe to us what (e) says?

22   A.   Yes.  It really says -- it gives a guidance for

23   doctors.  ER, four days of opioids for an injury; no more

24   than four days if you're in an outpatient setting with

25   Schedule II opioids, no more than four-day supply.
```

```
1        And if you decided that someone should be treated for

2   pain, no more than a three-day supply as an outpatient.  And

3   then dentists and optometrists could only -- could not issue

4   more than a three-day supply after surgery.

5        And then lastly, as you've highlighted here, a

6   practitioner other than a dentist or optometrist could only

7   give a seven-day supply, the lowest effective dose which in

8   the medical judgment of practitioner would be best in the

9   course of treatment for his or her condition.

10       So it really limited when someone come to you

11  complaining of pain how much medication you could give

12  either emergently, acutely, or after a procedure, for

13  example.

14  Q.   And was -- to your knowledge, was this type of

15  legislation being passed in other states as well?

16  A.   It was.

17  Q.   So let me ask you to look a bit further down on Page 3

18  at (g).  Did that provision, Dr. Deer, limit doctors to

19  prescribing only a thirty-day supply of opioids with two

20  more thirty-day refills if that doctor checked the CSMP

21  database?

22  A.   That's correct.  It required them to give only that

23  first month.  And then they could give two additional

24  prescriptions after that.  And they had to check along that

25  time the data bank to see if they were getting other
```

1    prescriptions.

2    **Q.**   And was this the first time the state had imposed an

3    objective limit on how many opioid medications doctors could

4    prescribe?

5    **A.**   Yes, because there were doctors who would previously

6    write three months of prescriptions for someone in high

7    doses and say, "See me in three months," and send them home

8    with that.  And that was not uncommon, particularly in

9    southern West Virginia.

10       So this said you can't do that.  You have to reassess

11   the patient, make sure they still need the prescription.  So

12   I think this was a very helpful piece of legislation.

13   **Q.**   And if you turn to Page 5 under 16-54-5, subsequent

14   prescriptions and limitations, do you see that the act

15   required doctors to inform patients about alternatives to

16   opioid medications and the risks associated with opioid

17   medications before prescribing them?

18   **A.**   Yes.  I think both those were very important.  The risk

19   had to be at least noted that this could be addictive and

20   could cause side effects.  But also they had to tell them

21   other alternatives, whether it be injections, devices,

22   physical therapy.  Before this act, they never had to

23   mention anything but medication to the patient.

24   **Q.**   So to your understanding, what was the intended effect

25   of this legislation on inappropriate opioid prescribing?

1   **A.**   I think the CDC was helpful, but it didn't go far

2   enough as far as some of the problems we've seen.  And I

3   think this lent doctors some guidance on how to do a better

4   job of really prescribing more judiciously initially because

5   as I said earlier, once someone chronically has been on a

6   medication, it's very difficult to reduce it or limit it.

7        So this is looking at the initiation of opioid

8   therapies somewhat and I think that's where my advice has

9   been for some time.

10            MS. MAINIGI:  Matt, if we could go back to the

11   chart.

12   BY MS. MAINIGI:

13   **Q.**   Should we add the 2018 West Virginia Opioid

14   Reduction Act?

15   **A.**   It is a major factor in changing the standard of care

16   in West Virginia in a positive light.

17   **Q.**   So these recent laws from 2012 -- and guidelines from

18   2012, 2016 and 2018, have they together resulted in a change

19   of the standard of care in West Virginia?

20   **A.**   I think the data shows there's no doubt about that.

21   **Q.**   And did any of those requirements exist before 2011?

22   **A.**   No.  I think the '12 act was written based on what we

23   were seeing before '12.  And there was no act before that

24   that limited prescribing or anything else to do with

25   opioids.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   In your opinion, Dr. Deer, do doctors in West Virginia

2    today have the information that they need to make good

3    decisions about prescribing opioids?

4              MR. FITZSIMMONS:   Judge, I'm going to object to

5    him testifying globally as to all doctors.   As to

6    anesthesiologists or people involved in his specialty, which

7    he's certainly recognized as a specialist in pain medicine,

8    I believe he can testify.   But for him to get in here and

9    talk about what gynecologists, obstetricians, pulmonologists

10   and other doctors in the medical profession, I think it's

11   far in excess of his expertise.

12             MS. MAINIGI:   Your Honor --

13             THE COURT:   The question was in his opinion as an

14   expert do doctors in West Virginia today have the

15   information that they need to make good decisions.

16      I'm going to overrule the objection and allow him to

17   answer that.   Now, the issues you raised I think would be

18   appropriate for cross-examination, but I'm going to overrule

19   the objection to that question.

20             MR. FITZSIMMONS:   Your Honor, may I put one more

21   thing on the record?   I apologize.

22             THE COURT:   Yes, you may, absolutely.

23             MR. FITZSIMMONS:   In West Virginia as an expert

24   you have to be an expert and qualify within the specialty

25   actually that you practice.   And you have to practice so

```
 1    much of that time.

 2         He's already testified he's not a primary care

 3    physician, doesn't practice in primary care.  All of his

 4    practice is referral care.

 5         So he would not qualify -- could not qualify as an

 6    expert in West Virginia to testify as an expert in anything

 7    other than anesthesiology or pain management.

 8              THE COURT:  Well, your objection will be preserved

 9    for the record, Mr. Fitzsimmons.  But he is an expert in

10    pain management and I think this generally goes to that

11    subject.  But your objection is shown on the record.

12         Go ahead, Ms. Mainigi.

13              MS. MAINIGI:  Thank you, Your Honor.

14    BY MS. MAINIGI:

15    Q.   Dr. Deer, are you aware whether there have, in

16    fact, been a decrease in prescriptions for opioid

17    medications in West Virginia since 2011?

18    A.   Yes.  There's been a major decrease in prescribing of

19    controlled substances, particularly Schedule IIs.

20    Q.   I'm going to ask you to turn to 850, the last document

21    in the binder.  Can you identify what this document is?

22    A.   I was waiting for you to show it up on the screen.

23    It's a West Virginia Board of Pharmacy Controlled Substance

24    Annual Report from 2018 which I believe might be the last

25    year recommending that, right around that time.
```

```
 1   Q.   And are you familiar with this report?

 2   A.   I'm very familiar with it.

 3   Q.   Is this report made available publicly to your

 4   knowledge?

 5   A.   I think that it is.

 6           MS. MAINIGI:  Matt, if we could put that up on the

 7   screen.

 8           THE WITNESS:  There we go.

 9   BY MS. MAINIGI:

10   Q.   Now, is the purpose of this report to outline the

11   activities of the Board of Pharmacy in administering the

12   CSMP?

13   A.   Yes.

14           MS. MAINIGI:  Your Honor, I would like to move for

15   the admission of 00850.

16           THE COURT:  Any objection?

17           MR. FITZSIMMONS:  No objection, Judge.

18           THE COURT:  It's admitted.

19   BY MS. MAINIGI:

20   Q.   If you could turn to Page 4 of the document,

21   please.  Now, what does in 2018 the West Virginia Board

22   of Pharmacy say has been the change in dispensing of

23   hydrocodone and oxycodone since 2011?

24   A.   Want me to read that portion?

25           It says that the opioids, Schedule II, hydrocodone and
```

1    oxycodone, have seen the most significant drop in numbers

2    with a combined decrease of over 61 million doses since 2011

3    and 18 million dose increase last year alone going up to

4    2018.  So that's in Figure 5.

5    **Q.**   And, so, if we take a look at Figure 5 -- let's go to

6    that -- which I think is on the next page.  And that's

7    entitled "West Virginia Opioid Drug Doses Dispensed."

8        So what does this chart show about the trend in

9    dispensing hydrocodone and oxycodone?

10   **A.**   I think it shows what we've talked about from the 2018

11   law, 2016 CDC, and 2016 SEMP, that the opioid prescribing

12   for hydrocodone and oxycodone, the market has been reduced.

13       It also shows that buprenorphine has gone up some.  And

14   that before was used only for abuse as a drug for addiction.

15   But now it's been approved for pain in low doses and it's

16   thought to be less addictive because it's an antagonist,

17   which for the Court means it actually has both pain

18   reduction and opioid abuse reduction properties.

19       This mimmicks exactly -- if we go to 2011 to '18, this

20   mimmicks exactly what we've seen.  In 2011 we probably

21   reached our peak of receiving maybe 50 to 100 patients a

22   month that came to see us on high-dose opioids which we'd

23   have to take over and try to manage.

24       And now in 2018 we're seeing very few people come to

25   see us on high-dose opioids at all, which means we're going

1    to have a better chance of helping them.  And it's gotten

2    even less so I believe in the last year.  We're seeing even

3    less and less.

4         So I think this mirrors what I've seen personally in

5    our practice as a referral for most of southern West

6    Virginia.  It shows that those three things that we talked

7    about have been successful, I believe, in changing the

8    standard of care towards a more judicial approach to opioid

9    prescribing.

10   **Q.**   And the three things we talked about, can you explain

11   what you mean by that?

12   **A.**   Yeah.  The three things we talked about was the 2018

13   legislation which we talked about a moment ago; the SEMP

14   guidelines which are the play book for West Virginia

15   doctors; and the CDC guidance which gave us dosing

16   recommendations.

17   **Q.**   And what about the 2012 legislation?

18   **A.**   The 2012 legislation helped us, I believe, to really

19   establish what a pain clinic was because there were people

20   calling themselves pain clinics who had no training, no

21   expertise, no ability to do multi-modal therapies where you

22   have physical therapy and other therapies available.

23        And I think it also gave some notice that you had to go

24   back and check the Board of Pharmacy records.  It also

25   established the Board of Pharmacy committee which I think

1    really was -- in fact, some of the people that were

2    prescribing haphazardly were found to be noted in that

3    committee's findings.

4    **Q.**   And let me come back to your practice which you said is

5    an exclusively referral practice; right?

6    **A.**   Correct.

7    **Q.**   And is it family physicians primarily that are

8    referring to you?

9    **A.**   Well, so, if you look at our data from referral

10   sources, we get referrals from everyone, you know, from

11   surgeons who operate on someone's spine, from thoracic

12   surgeons who have taken out a tumor from your lung, from

13   urologists with prostate cancer, gynecologists with pelvic

14   pain.

15       But the vast majority of our patients come from the

16   family physician, probably 90 percent.  Those other

17   specialties make up, each of them, a percent or two, maybe

18   80 percent family practice I would say.

19       I think we're talking about the non-cancer population.

20   The cancer population is a whole different bucket.  Those

21   are mostly from the oncologists, but sometimes from

22   radiation oncologists, sometimes from family physicians.

23   **Q.**   So from your practice, which is other physicians

24   referring to you, do you have a pretty good sense of the

25   prescribing patterns of other types of physicians in West

1    Virginia?

2    **A.**    I think as you look at the report we've been talking

3    about, the 2018 report, Figure 3 shows the controlled

4    substances doses dispensed.  That's a mirror image of what

5    I've seen because as we saw that peak on that graph in 2012,

6    that's when I saw my peak.

7         Everybody that came to me almost from southern West

8    Virginia was on 100 milligrams of morphine equivalents a day

9    or more.  And we, we would then take that patient and try to

10   do a spinal cord pacemaker or an ablation, reduce their

11   doses.

12        And we were successful.  But every time we got rid of

13   some of those opioid burdens, there was a new sieve of

14   people coming in who were on the same dosage.  Right?  So we

15   kept seeing it get refilled.

16        After 2015-'16 it started to decrease.  After '18, the

17   legislation we talked about.  Most people that come to see

18   me now are on no opioids or very little except for my cancer

19   patients.

20        The reason that's important -- I just published a new

21   study with the Mayo Clinic on combined patient population.

22   We showed our devices work better in lower dose with no

23   opioids.  So our chances are better now than they were

24   before of helping you.

25        So I think we've seen a real shift and I've seen it

1    personally in my own prescribing habits because I take over

2    what I can.

3    **Q.**   Okay.  So just to summarize now what we've been talking

4    about for the last few hours, Dr. Deer, in your opinion, has

5    the standard of care for the prescription of opioids changed

6    over time?

7    **A.**   It's been quite a journey and it's changed dramatically

8    over time in different directions.

9    **Q.**   And has that changing standard of care affected the

10   rate at which doctors prescribe opioids in West Virginia

11   over time?

12   **A.**   I think the data shows that it has.  That's my personal

13   experience.

14   **Q.**   And in your opinion, do physicians affect the standard

15   of care?

16   **A.**   Well, physicians determine the standard of care, if you

17   will, because we, we hold each other accountable for what

18   we're doing and we learn from each other.  Sometimes we

19   learn things that later prove to be untrue based on new

20   research and development.

21        So that's why the standard of care changes.  I may have

22   an opinion in 1997 that in 2015 you see that was incorrect

23   looking backward.  So it changes based on new information.

24   That's why research is so important and that's why, you

25   know, a big part of my practice is research and development.

**Q.**   Did the DEA affect the standard of care?

**A.**   I think it did.  I think the local DEA people I know are wonderful people and very good, but nationally the policies that Ms. Tandy and others --

          MR. FITZSIMMONS:  Judge, I'm going to object to him testifying about policies of the DEA.

          THE COURT:  Sustained.

          MR. FITZSIMMONS:  I don't think he's qualified.

BY MS. MAINIGI:

**Q.**   Did the VA affect the standard of care?

**A.**   Yes.  The VA policies on fifth vital sign affected standard of care.

**Q.**   And did the Joint Commission affect the standard of care?

**A.**   Joint Commission definitely affected the standard of care.

**Q.**   And I think you've already answered this, but did West Virginia's legislature affect the standard of care?

**A.**   Legislation definitely affected the standard of care.

**Q.**   And did West Virginia's Board of Medicine affect the standard of care?

**A.**   Board of Medicine certainly helps determine the standard of care.

**Q.**   In your opinion, based on your experience and your understanding, did wholesale distributors have any affect on

1    the rate at which doctors in West Virginia prescribed

2    opioids?

3              MR. FITZSIMMONS:  Judge, this is the third time, I

4    think, that I've objected.  He's been designated not to

5    testify -- he doesn't know anything about distributors.

6              THE COURT:  Well, you'll have to lay a basis for

7    it, Ms. Mainigi.  I think the question is objectionable as

8    it stands.

9              MS. MAINIGI:  Okay, Your Honor.  I'll just

10   withdraw the question for now.

11   BY MS. MAINIGI:

12   **Q.**   Dr. Deer, in terms of your own practice, explain to

13   us how your practice is a mirror on what's happened in

14   West Virginia.

15   **A.**   Well, I believe that, you know, when we -- when you

16   take patients off the street because they requested seeing

17   you or you get a family doctor or you are a specialist, you

18   will get patients based on who's heard about your practice

19   or how you market or advertise your practice.

20        As a referral only practice, we actually receive

21   patients that, again, throughout the State of West Virginia

22   and they're sent to see us already undergoing certain

23   treatments.

24        As we talked about earlier, you know, 10 years ago

25   everyone was on high-dose opioids.  Now we're seeing other

```
 1    things being tried.  So I think it goes to show you that

 2    West Virginia, greatest state in America in my opinion -- I

 3    know you're not from here -- we've made a good effort to

 4    change things as a whole and we've evolved.  Hopefully we'll

 5    continue to evolve for the better and we'll continue to make

 6    progress.

 7    Q.   Thank you, Dr. Deer.

 8               MS. MAINIGI:  I have no further questions, Your

 9    Honor.  I'd like to go ahead and mark the timeline as

10    Cardinal Demonstrative Number 2 and provide a copy to the

11    Court.

12               THE COURT:  You may do so.  And it's five till

13    12:00.  Let's adjourn until 2:00 rather than start your

14    cross-examination, Mr. Fitzsimmons.  Is that okay with you?

15               MR. FITZSIMMONS:  That's good with me, Judge.

16               THE COURT:  Okay.

17         We have to ask you to come back at 2:00, Dr. Deer.

18               THE WITNESS:  Yes, sir.  Thank you, sir.

19               THE COURT:  We'll see everybody at 2:00.

20               MS. MAINIGI:  Thank you, Your Honor.

21         (Recess taken at 11:55 a.m.)

22               THE COURT:  If you'll resume the witness stand,

23    Dr. Deer.

24               THE WITNESS:  Thank you, sir.

25               THE COURT:  All right, sir.  You may proceed.
```

```
 1              MR. FITZSIMMONS:  Thank you, Your Honor.

 2                      CROSS EXAMINATION

 3              BY MR. FITZSIMMONS:

 4    Q.    Good afternoon to you.  Dr. Deer, how are you?

 5    A.    Good, sir.  How are you?

 6    Q.    I'm doing fine, thank you.  We met for the first time

 7    today, a little bit earlier this morning, and exchanged some

 8    pleasantries at that time; is that right?

 9    A.    That's true.

10    Q.    Okay.  All right.  So, you've been on the stand here

11    for awhile.  I'm going to try to ask you some very direct

12    questions and, hopefully, get those answers from you, which

13    I know we will here today.

14          Do you agree that there is an opioid epidemic crisis in

15    this country right now?

16    A.    Absolutely.  It's been going on for awhile now.

17    Q.    It's been going on for sometime, too; is that correct?

18    A.    Yes, sir.

19    Q.    At least before 2006; is that correct?

20    A.    Yes, sir.

21    Q.    And that crisis and that epidemic, can we interchange

22    those two words, crisis and epidemic?

23    A.    I don't know.

24    Q.    Have you done that?

25    A.    I wouldn't argue that point.  They're both pretty bad.
```

1    Either way, it's a bad thing.

2    **Q.**   One of the things, I don't want to have word fights, or

3    games, or things like that.

4    **A.**   Yes.

5    **Q.**   So, can we agree that epidemic, crisis, that's what's

6    going on here in this country?

7    **A.**   Again, I'm not a wordsmith.  I don't disagree with you.

8    I'm not sure they're the same word, but yeah.  I mean,

9    that's fine.

10   **Q.**   Okay.  All right.  Do you agree that there's an

11   epidemic, a prescription opioid epidemic, that's existed in

12   West Virginia?

13   **A.**   I think that's -- I think that's -- there's been a lot

14   of prescriptions in West Virginia.  I'm not sure I would

15   call that an epidemic for the reasons we've talked about

16   today in the discussion.  Certainly, it's changed, though,

17   recently in the last few years, which has been, I think,

18   very good, in my opinion.

19   **Q.**   2006, we certainly were in the opioid -- prescription

20   opioid epidemic here?

21   **A.**   Well, again, not to be argumentative, but what I would

22   say is that based on what we talked about earlier today, I

23   think the standard of care evolved that way to a lot of

24   prescriptions being written and the majority -- and the vast

25   majority for legitimate reasons and, certainly, it's changed

1    now back to less prescribing.  So, I don't know if that's --

2    I wouldn't call that an epidemic as much as a situation that

3    occurred.

4    **Q.**   Doctor, I will repeat my question.  In 2006, was there

5    a prescription opioid epidemic in this state?

6         MS. MAINIGI:  Objection.  Asked and answered, Your

7    Honor.

8         THE COURT:  Overruled.

9         THE WITNESS:  I'm not sure I would call that an

10   epidemic for the reasons I stated earlier about standard of

11   care.  There were a lot of prescriptions written in West

12   Virginia, for sure, a high volume of prescriptions in 2006.

13   And that continued until about 2018, I believe, when the law

14   that we talked about earlier came into effect.

15        BY MR. FITZSIMMONS:

16   **Q.**   Do you agree that there was a large volume of

17   prescription pills and opioid pills distributed into this

18   state back in the 2006 year?

19        MS. MAINIGI:  Objection.  Scope.  Outside the

20   scope of this expert's expertise, Your Honor.

21        THE COURT:  Overruled.

22        THE WITNESS:  So, I would use the word prescribed

23   because that's what I'm familiar with and I assume, if you

24   prescribe a pill, someone has to distribute the pill.  So,

25   there was a lot of pills prescribed in West Virginia.  I

```
 1    think, if that's the question, the answer is --

 2          (Unintelligible cross-talk)

 3          Yes, sir, I agree with that.

 4               BY MR. FITZSIMMONS:

 5    Q.   And that volume, whether you use the word epidemic or

 6    crisis, that volume was a cause, one of the causes of the

 7    opioid crisis or epidemic at that time?

 8               MS. MAINIGI:  Objection.  Calls for a legal

 9    conclusion.

10               THE WITNESS:  So, I think that --

11               THE COURT:  Just a minute.

12               MR. FITZSIMMONS:  Hold one second, Doctor.  The

13    judge has to rule.

14               THE WITNESS:  Oh, sorry.

15               MR. FITZSIMMONS:  That's okay.

16               THE COURT:  He's asking about the cause, not for a

17    legal conclusion.

18          You can answer the question.

19               THE WITNESS:  Would you repeat the question, sir?

20    I'm sorry.

21               BY MR. FITZSIMMONS:

22    Q.   Yeah.  I'll try to, okay?  Sometimes I miss a word or

23    two.

24          But the volume of the prescription opioids into the

25    state back in 2006 was a cause of the crisis or epidemic,
```

1    opioid epidemic or crisis that we talked about; is that

2    correct?

3    **A.**    I think as we look backwards to what the standard of

4    care was back in 2006, it was more opioids prescribed then

5    than we would now recommend someone prescribe.  So, I would

6    say, in retrospect, it was excessive.

7    **Q.**    That's a yes?

8    **A.**    I think that's a yes.  I just want to make sure we're

9    on the same page with our question.

10   **Q.**    All right.  All right, good.

11   **A.**    So, yeah.

12   **Q.**    All right.  And you are not an expert on all the

13   various type causes for this epidemic here, opioid

14   prescription epidemic in West Virginia; is that a correct

15   statement?

16   **A.**    That's correct, sir.

17   **Q.**    Right.  And you've told us that both in your

18   deposition, your report, and in every writing that you've

19   had in this case; is that correct?

20   **A.**    Yes, sir.

21   **Q.**    All right.  And we still have an opioid crisis today

22   that we're still fighting; is that correct?

23   **A.**    I think it's evolved into non-prescribed drugs, from

24   what I've seen, like heroin and fentanyl and all the things

25   people use.  So, but it's still a crisis nonetheless and

```
1    people still have problems in West Virginia with opioids.
2    Q.   Heroin is an opioid, is it not?
3    A.   Yes, sir.
4    Q.   How about fentanyl?
5    A.   Fentanyl is an opioid.
6    Q.   Okay.
7    A.   Yes, sir.
8    Q.   So, opioids, we still have problems with opioids,
9    right?
10   A.   Well, that was the answer I was giving you.  I think
11   that it's changed over time, but it's still an opioid
12   problem in West Virginia.
13   Q.   And so, we also know, Doctor, I think you do, that
14   around 2012, '14, in that time period approximately, it
15   looks like the opioid, prescription opioids, started to go
16   down on this Pill Mountain, we call it, that you see, that
17   big orange mountain here; is that right?
18   A.   Yes, sir, that's correct.
19   Q.   Okay.  And that's when fentanyl and heroin started to
20   go upwards?  Are you aware of that?
21   A.   I'm not aware of that, but until -- I don't know that,
22   that fact.  I haven't looked at that.  Certainly, if you
23   have any -- anything you want me to look at, but I'm not
24   disagreeing with you.  Just I don't -- I don't treat
25   addiction and I don't know much about -- I always defer to
```

1    my addiction experts around the area.  So -- but I have no

2    reason to disagree with you.

3    **Q.**   All right.  So, you're a specialist in anesthesiology?

4    **A.**   Well, I am board certified as an anesthesiologist, but

5    I haven't practiced.  I haven't put anybody to sleep since

6    --

7    **Q.**   Sir -- sir, so --

8    **A.**   -- 1996.  So, if you'd ask me to put you to sleep --

9            MS. MAINIGI:  Your Honor, if the witness could be

10   allowed to finish the answer that he's been asked to give.

11           THE COURT:  Well, yeah.  He can explain his

12   answer, Mr. Fitzsimmons.

13           MR. FITZSIMMONS:  I thought I did, Judge.  I

14   thought I was being very polite, but I apologize if I

15   didn't.

16           THE WITNESS:  Oh, I was just saying, I haven't

17   practiced anesthesiology really, haven't put anyone to sleep

18   since 1996.  So, if I put you to sleep today, you would be

19   in grave danger probably because I would be outdated and not

20   know what I'm doing.

21        But I practiced a sub-specialty of anesthesia called,

22   you know, pain medicine since 1994, but in '96, only pain

23   medicine.

24           BY MR. FITZSIMMONS:

25   **Q.**   Okay.  So, you go into internal medicine, and you go

```
 1    into anesthesiology, and now you're -- and you've been in

 2    pain management basically?

 3    A.   Yes, sir.

 4    Q.   That's your thing?

 5    A.   Yes, sir.

 6    Q.   And you're board certified?

 7    A.   Yes, sir.

 8    Q.   All right.  You are not a primary care physician; is

 9    that a true statement?

10    A.   That's a true statement.

11    Q.   And a primary care physician is one that treats primary

12    illnesses and then typically refers more serious-type cases

13    out if they can't handle it, like a family practice medicine

14    person or a general internal medicine person; is that

15    correct?

16    A.   I think that's true, sir.  Yes, sir.

17    Q.   But the entire medical community prescribes pills,

18    including opioids, if they're registered and licensed to do

19    that, right?

20    A.   That's right.

21    Q.   Obstetricians, gynecologists, pulmonologists,

22    orthopedics, surgeons, general surgeons; is that right?

23    A.   Everything you said is true, yes.

24    Q.   Okay.  All right.  So, and you also -- from your

25    experience with dealing with pain management, you realize
```

1    and I think you've acknowledged that prescription opioids in

2    this state, in this country, are principally -- are

3    principally prescribed by primary care physicians; is that a

4    true statement?

5    **A.**    That would be a true statement.

6    **Q.**    Over 65 percent of the primary prescriptions in this

7    state come from primary care physicians; is that correct?

8    **A.**    Yes, sir, I believe that's correct.

9    **Q.**    One of which is not you?

10   **A.**    That is correct, also, sir.

11   **Q.**    Okay.  So, I think I heard you give a general standard

12   of care and I wanted to -- I did want to share that with you

13   a little bit and talk -- discussion about standard of care.

14   Whose standard of care are you talking about?  Are we

15   talking about lawyers?  Are we talking about pharmacists?

16   Are we talking about distributors?  Are we talking aobut

17   obstetricians?  Pain management?  People -- who -- who are

18   you expressing -- were you expressing the standard of care

19   opinion on when you were asking --

20            THE COURT:  Just a minute.  Ms. Mainigi?

21            MS. MAINIGI:  Sorry, Your Honor.  I was just

22   waiting for the question to finish.  Objection to the form

23   of the question, Your Honor.

24            THE COURT:  Well, overruled.  The answer [sic] is

25   whose standard of care are you talking about.  Can you

1    answer that question, please?

2            THE WITNESS:  Yes, sir, I believe I can.  So, it

3    will take me a moment to answer it.

4            BY MR. FITZSIMMONS:

5    **Q.**   Yes.  Do you want me to ask it?

6    **A.**   No.  I can answer it.  It's going to take me a moment.

7    So, standard of care would be more reasonable a doctor would

8    do in a situation based on the standard set for doctors by

9    doctors, in my opinion, overall over time influenced by

10   other outside variables that we've talked about today.

11           And, for example, a standard of care of postoperative

12   wound care may be the same for a vascular surgeon, or a

13   pulmonologist, or a general surgeon because it's wound care.

14   So, standard of care in opioids, there are parts of that

15   that apply to all physicians who prescribe an opioid,

16   whether they be an anesthesiologist or a primary care

17   specialist.

18           So, there are -- standard of care is set based on what

19   you're doing and then it applies back to who you are and

20   what your training is.  So, there's some overlap there in

21   standard of care based on your specialty and what you're

22   doing and they can be unique.

23           For example, how to do a pap smear is very unique to a

24   gynecologist.  And, you know, how to -- how to use

25   antibodies preoperatively is the same for all surgeons.  So,

```
1    if you see what I'm saying, there's overlaps.
2         So, standard of care is set by the medical community
3    for the medical community and often is specialty related,
4    but sometimes crosses specialty.
5    Q.   So, to break it down, you were testifying about
6    standard of care of doctors?
7    A.   Correct.
8    Q.   But only the overlapping aspects of prescription
9    opioids among those professions, those specialties?
10   A.   I'm not sure I understand your question.  I'm sorry.
11   Q.   You used overlapping.  I'm trying to get an idea.  You
12   aren't an obstetrician?  You've never practiced obstetrics?
13   A.   Well, if an obstetrician today gave -- I'll give you a
14   -- can I give you an example?
15   Q.   Could you answer the question?
16   A.   I'm going to answer your question with an example, if I
17   could.
18   Q.   You are not an obstetrician?
19   A.   Or no.  I didn't answer that part of the question.  You
20   asked another question first.  Sorry.  No, I'm not an
21   obstetrician for sure.
22   Q.   All right.  So, do you know when obstetricians
23   prescribe opioid pills?
24   A.   I do often because they refer those patients to me for
25   chronic pelvic pain, for example.  So, they may have been on
```

1     an opioid for a long time, but now, we're doing new

2     procedures for that issue around the sacral nerve root.  So,

3     we often get that patient sent to us.

4         So, I know when they prescribe opioids.  You may -- I

5     may not know why they  chose to choose to start the opioid.

6     That may be a different issue altogether.  That's what I

7     meant by overlapping in these issues.  They're a little more

8     complicated than just that.

9     **Q.**   Have you ever written standards of care for opioid

10    prescriptions?

11    **A.**   Is there a written standard of care?

12    **Q.**   Any written document, uh-huh, that you put in writing?

13    **A.**   There are written guidelines for opioid prescribing.

14    That can be part of the standard of care.

15    **Q.**   That's what you were talking this morning?

16    **A.**   Earlier, I said that --

17        (Cross-talk)

18            THE WITNESS:  I didn't mean to interrupt you.  I'm

19    sorry.  Did I interrupt you?

20        I was saying earlier that they can be written or they

21    can be -- community determines it over time, you know,

22    different means, speeches, and I think this includes both.

23            BY MR. FITZSIMMONS:

24    **Q.**   So, your written guidelines in 2012, those are standard

25    of care, I think you said; is that right?

```
 1    A.    No.  I don't think I said that.

 2    Q.    Are they?

 3    A.    Which guidelines are you talking about in '12?

 4    Q.    A set of guidelines that you were one of the chief --

 5    A.    You mean the SEMP guidelines in 2015, '16 --

 6          (Cross-talk)

 7    Q.    You were talking about the ASIPP guidelines, which

 8    actually made this chart.  You got a little flag today for

 9    that.

10    A.    Yeah.  I don't think they're standard of care.  I think

11    they're part of what determines standard of care in the

12    guideline because a guideline is only as good -- they're a

13    consensus, if you will.  So, they're written by multiple

14    people and everyone agrees.

15          It's almost like when you have a -- you know, a bill

16    that people debate on what's appropriate to put in a bill

17    with Congress.  We debate on what's appropriate.  There's

18    not a hundred -- you have to have 80 percent of the people

19    agree to any section of a guideline to make it a consensus

20    guideline.  Otherwise, it would be a unanimous guideline.

21    That's why you call it a consensus guideline.  So, I

22    wouldn't say they're standard of care, but they help make

23    the standard of care.

24    Q.    Are you finished with your answer?

25    A.    Yes, sir, I am.
```

```
 1    Q.    Okay.  So, this approximately hundred-page two-part

 2    guidelines that you and 35 other physicians put together,

 3    call them guidelines, you're disavowing that they are

 4    standard of care for the prescribing of opioids?

 5    A.    Many guidelines say in them --

 6    Q.    Is that a true statement?

 7              MS. MAINIGI:  Objection.

 8              COURT REPORTER:  I'm sorry --

 9              MS. MAINIGI:  Misstates the witness's testimony.

10              THE WITNESS:  I was trying to answer.

11              THE COURT:  Just a minute.  Well, I'm not sure

12    he's explained his answer.

13         Go ahead.  You can -- you can continue.

14              THE WITNESS:  Thank you, sir.

15         Could you repeat the question?

16              BY MR. FITZSIMMONS:

17    Q.    Is that a true statement?

18    A.    I lost the question.  Sorry.

19    Q.    Are you disavowing that the guidelines that you and

20    30-some other physicians put together in 2012 under a group

21    called ASIPP, American Society of Interventional Pain

22    Physicians Guidelines for Responsible Opiate Prescribing and

23    Chronic Non-Cancer Pain, Part 1, Evidence Assessment and

24    Part 2, Evidence Assessment is the standard of care?

25    A.    So, I'd like to explain my answer, if I could.
```

1    **Q.**    Could you the answer the question first?

2    **A.**    Well, I don't think it's a yes or no.  It's a different

3    answer than that.

4         (Cross-talk)

5    **Q.**    The answer is no?  Okay.

6    **A.**    I'd like to --

7              MS. MAINIGI:  Your Honor, if he could just be

8    allowed to answer the question.

9         (Unintelligible cross-talk)

10             MR. FITZSIMMONS:  I'm sorry.

11             THE COURT:  Yeah.  Let him finish, Mr.

12   Fitzsimmons.

13             MR. FITZSIMMONS:  Yeah.  I couldn't -- I can't

14   hear his answer.

15        Could you pull the mic a little closer to you if --

16             THE WITNESS:  Sure.  So, let me explain my answer,

17   if I could.

18        So, most guidelines that I've written, including all

19   the device guidelines that I've read, say this is not meant

20   to be by itself a standard of care.  So, guidelines usually

21   are not the standard of care by itself.

22        So, we -- I don't think we ever said it was a standard

23   of care and I would be surprised if that document said it

24   was the standard of care.  It's one of the factors that goes

25   into standard of care.

1          So, I'm not avowing the standard of care or disavowing

2     it.  Guidelines, there's also something in '17, I think an

3     update of that same paper.  They are what's going on at the

4     moment, but many guidelines, by the time they go through the

5     journal process --

6               COURT REPORTER:  I'm sorry.  Can you slow down for

7     me, please?

8               THE WITNESS:  I'm sorry.

9               COURT REPORTER:  Thank you.

10              THE WITNESS:  Many guidelines, by the time they go

11    through the journal process need to be updated almost

12    immediately by the time they're written.  So, I don't think

13    guidelines have ever been the standard of care and I don't

14    think I've ever said that.  But they contribute to the

15    standard of care as one factor we determine to look at.

16              BY MR. FITZSIMMONS:

17    **Q.**   So, the 2017 one that also got one of the flags is not

18    a standard of care?

19    **A.**   It's a determining factor of the standard of care, but

20    not the standard of care.

21    **Q.**   Not the standard of care, right?  2012, those ones also

22    for ASIPP were not standard of care?

23    **A.**   By itself are not standard of care.

24    **Q.**   In 2006, when you wrote the paper on the guidelines,

25    were not standard of care; is that true?

1    **A.**    By themselves, they're not standard of care.

2    **Q.**    And so, let me ask you, you have all these writings on

3    guidelines.  Have you ever put in writing the standard of

4    care for opioid prescriptions that we all can read?

5    **A.**    I don't think that there is a paper that puts that in

6    direct writing because of the evolution of it but,

7    certainly, if you have something you would like me to look

8    at, I would be happy to.

9    **Q.**    Thank you, Doctor.

10        All right.  Let's talk about -- first of all, you know

11   that you're here testifying in a case brought by Cabell

12   County and Huntington as the plaintiffs; is that correct?

13   **A.**    Yes, sir.

14   **Q.**    All right.  And it's against -- this portion of the

15   case is against three distributors, you now know, one of

16   which hired you?  I think McKesson hired you?

17   **A.**    Cardinal.

18   **Q.**    Or, I'm sorry, Cardinal.

19        (Cross-talk

20   **Q.**    Cardinal hired you?  That's correct.  All right.  And

21   they're the only ones that hired you as an expert in this

22   case; is that true?

23   **A.**    I believe that to be true, yes, sir.

24   **Q.**    Okay.  All right.  And you understood it was about the

25   opioid crisis generally and your experiences, I guess?

1    **A.**   I was asked to look at how prescribing had changed

2    among physicians from the beginning of my career until what

3    I hope is not the end yet.  I hope I have a few years left.

4    We'll see.

5    **Q.**   Okay.  Hopefully, you do, Doctor.

6         All right.  So, you were supplied information -- or did

7    you harvest and dig up all the documents, just go out and do

8    that yourself, or have you had assistance with attorneys

9    providing you with documents and a lot of those flagged

10   items and things like that for you to look at?

11   **A.**   So, there are things that I think are important in my

12   own mind, like some of the legislation we've discussed

13   today, CDC guidelines, SEMP guidelines.  And there are other

14   documents that I was provided, too, in our discussion that

15   the Cardinal company thought might be helpful to my

16   evaluation.

17   **Q.**   All right.  Anybody else supply you with information?

18   **A.**   Not that I know of, sir.

19   **Q.**   No?  Okay.

20        All right.  And when you met, did you meet only with

21   Cardinal Health and, obviously, I don't want to -- well, I

22   do want to know what you -- so, I'm not going to ask you

23   what was said and you --

24   **A.**   I think I only met with Cardinal Health --

25   **Q.**   Just Cardinal Health --

```
1          (Cross-talk)

2     Q.   Counsel --

3     A.   Yes, sir.

4          COURT REPORTER:  I'm sorry.  I'm having a hard

5     time with the cross-talk.

6       I got part of your answer.  I think I only met with

7     Cardinal --

8          THE WITNESS:  I think that to be true, yeah.  I'll

9     -- I'll -- I tell you what, I'll pause.  So, sorry if I'm

10    talking too fast.  I get that way after a few coffees at

11    lunch.  I apologize.

12         MR. FITZSIMMONS:  All right.  Are we caught up?

13         COURT REPORTER:  Go ahead.  I'll try.

14         MR. FITZSIMMONS:  All right.  We'll try.  All

15    right.

16         BY MR. FITZSIMMONS:

17    Q.   Let's talk about what you didn't do and what you didn't

18    review, okay, in this case.

19    A.   Yes, sir.

20    Q.   All right.  So, Cabell County is the plaintiff in this

21    case, together with the City of Huntington.  All right?  So,

22    did you ever obtain the number of prescribed opioids from

23    Cardinal Health that were distributed into Cabell County?

24    Did you have that number over this 20 -- let's say 20-year

25    period.  Let's take it from '96 to 2021.  That makes it
```

1   25 years.

2   **A.**   I don't believe so.  Certainly, they gave me a lot of

3   information.  If it were there, I don't recall it.

4   **Q.**   My question is, do you believe that you received it?

5   If it's no, just --

6   **A.**   I don't -- I don't believe.  I'm under oath.  I want to

7   make sure I don't mislead, but I don't think I ever received

8   that and I don't recall receiving it.

9   **Q.**   Did you ever receive any data on the number of

10  pharmacies in Cabell County or Huntington?

11  **A.**   I do not recall ever receiving that information.

12  **Q.**   Did you ever receive any information as to the doctors

13  that were there that were actually had -- were registrants

14  that had the ability to prescribe opioid pills?

15  **A.**   No, sir, I did not.

16  **Q.**   Didn't have any of that?  Did you have any data as to

17  the volume of pills, the actual amount that was distributed

18  into this particular county for any specific year during the

19  last 25 years?

20  **A.**   In Cabell County?

21  **Q.**   Yes.  Yeah.  I'm only going to ask about Cabell --

22        (Cross-talk)

23            THE WITNESS:  No, sir, I do not.

24            BY MR. FITZSIMMONS:

25  **Q.**   Or Huntington?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **A.**   No, sir.

2    **Q.**   Do you know how many physicians were indicted or busted

3    for some type of pill pushing in Cabell County during the

4    last 25 years?

5    **A.**   I do not.

6    **Q.**   Do you know of any?

7    **A.**   You know, I think Dr. Fisher was in that county, I

8    believe.  I remember when he got indicted and --

9    **Q.**   You heard something about --

10   **A.**   -- I think he got convicted.  No.  I think one of my

11   junior partners was testifying against him before the Board

12   of Medicine.

13   **Q.**   Well, we're interested -- I'm interested in what you

14   know.

15   **A.**   I know he got --

16   **Q.**   Do you have any knowledge, any specific facts about

17   this Dr. Fisher as to what he did or didn't do or she did?

18   **A.**   No, other than a newspaper reporting or a television

19   reporting that he was indicted and convicted of a crime

20   related to a relationship -- or the person was prescribing

21   without medical cause or something.

22   **Q.**   So, your answer is no, you have no personal knowledge?

23   **A.**   That's true.  That's true.

24   **Q.**   True?  All right.  So, do you have any knowledge as to

25   how many addicts were in -- drug addicts were in Cabell

```
 1    County in 1996, 2001, 2010?

 2    A.   I assume you're talking about people who had addiction

 3    treatment?

 4    Q.   People that formally could be diagnosed as an addict,

 5    addiction?

 6    A.   So, they've been diagnosed by someone?

 7    Q.   By someone, yes.

 8    A.   Okay.  No.  I don't have a clue.

 9    Q.   Did you ever try to check to find out that?

10    A.   That's not part of what I was looking at.  It was

11    addiction -- I'm not an addictionologist, nor do I look at

12    addiction.

13    Q.   Okay.  Did you ever ask the people that hired you for

14    information concerning the prescriptions and data that they

15    had for all the pills for each of the years over the last,

16    let's say, 10, 15 years?  Did you ask them can we see your

17    data and how much you distributed to Cabell County before I

18    go before this Court and give opinions?

19    A.   Specific to Cabell County?

20    Q.   I think that's been my last 20 questions.

21         (Cross-talk)

22    A.   I just wanted to make sure.  No, I didn't -- I didni't

23    look at that data, as far as I know.

24    Q.   Did you ask for it?

25    A.   Well, I wasn't looking at the issues of Cabell County
```

```
 1    addiction rates.  I was looking at the overall standard of
 2    care of prescribing in West Virginia.
 3    Q.   Did you ever ask for any information about overdoses as
 4    to prescription opioids in Huntington or Cabell County?  Did
 5    you ever ask to see those or have you ever seen any
 6    information on that?
 7    A.   So, that was a long question.  So, the last part of
 8    your question --
 9    Q.   I can break it down.
10    A.   No, no.  The last part of your question is did I ever
11    see any of that.  During our committee we talked about
12    earlier, if there was a death in Cabell County, that would
13    have been reviewed by our committee from 2012 to '18.  I
14    don't recall that specifically, though, and I didn't ask for
15    specific data for this case.  So, I hope that answered your
16    question.
17    Q.   So, any of the -- there's what's called related harms
18    conditions that arise from addiction, that are more
19    prevalent because of the addiction, like HIV, Hepatitis B,
20    C, endocarditis.  Are you familiar with that?
21    A.   No, sir.  I don't know anything about that.
22    Q.   You wouldn't even know that, what I just stated
23    medically, whether that's true or not; is that right?
24    A.   Well, I think --
25         (Cross-talk)
```

```
1    Q.   Is that true?  You don't know?

2    A.   I'm sorry.  The last part of your question, can you

3    repeat?

4    Q.   The last part, is that true?  You don't even know --

5    A.   No, before that.  I'm sorry.

6    Q.   Before --

7                COURT REPORTER:  I'm sorry --

8                MR. FITZSIMMONS:  Yeah.  I thought the witness

9    jumped in, but let me -- let me --

10               BY MR. FITZSIMMONS:

11   Q.   I'll give you a signal and you can answer.

12   A.   Okay, thank you.

13   Q.   All right.  So, you don't even know if Hepatitis B,

14   Hepatitis C, HIV, endocarditis, or any of these other

15   diseases or conditions, are related to a person that is an

16   addict?

17   A.   Well --

18   Q.   Is that a true statement?

19               MS. MAINIGI:  Your Honor, objection.  This is

20   completely outside the scope of Mr. --

21        (Cross-talk)

22               THE COURT:  I'm sorry.  This is way beyond the

23   scope of his direct, isn't it, Mr. Fitzsimmons?

24               MR. FITZSIMMONS:  Well, Judge --

25               THE COURT:  I realize that a wide latitude needs
```

```
 1    to be allowed on cross --
 2                 MR. FITZSIMMONS:  Well, Your Honor, I --
 3                 THE COURT:  But this is pretty far afield.
 4                 MR. FITZSIMMONS:  It has to do with his not --
 5    look, he's giving an opinion on standard of care for the
 6    entire medical world of all these different specialties and
 7    we've allowed him to do that and we've objected.  And now
 8    he's being challenged, being tested, as to his knowledge
 9    because of -- because this is very -- opioids is the essence
10    of this case, the prescription opioid use.  And as to his
11    opinions in Cabell County, it shows one of the questions
12    Your Honor had asked several times, and I was watching on
13    the monitor, Judge, back in those days, back in the early
14    weeks.  You were interested in Cabell County.
15        So, this is a problem in Cabell County and his lack or
16    knowledge about addicts and what goes on is very important
17    as to his opinions.  He's given an opinion that you're going
18    to have to apply to Cabell County and what he keeps
19    testifying, that's -- this is what's going on in Cabell
20    County and Dr. Deer, who's very qualified --
21                 THE COURT:  What's it got to do with the changing
22    standard of care?  And that's -- that's all he testified
23    about, wasn't it, Ms. Mainigi?
24                 MS. MAINIGI:  That's exactly right, Your Honor.
25    That's all his report covers.  They've had notice of that
```

```
1    for a long time and I -- I realize this may be a technique

2    of Mr. Fitzsimmons to cover all the things that have -- that

3    he didn't look at.  And I do believe Your Honor has allowed

4    wide latitude on this, but this is just improper questioning

5    given the scope of his testimony, as well as his report.

6              MR. FITZSIMMONS:  Judge, I'll move on from that

7    question.

8              THE COURT:  I think it's outside the scope.  I

9    will sustain --

10        (Cross-talk)

11             MR. FITZSIMMONS:  I think it goes to his

12   credibility --

13             COURT REPORTER:  I'm sorry.  Did you say sustain

14   it --

15             MR. FITZSIMMONS:  -- on the standard of care on

16   this -- in this particular case.

17             BY MR. FITZSIMMONS:

18   Q.   So, you're testifying as to Cabell County.  How many

19   hospitals are are in Cabell County?

20   A.   So, Cabell County is in West Virginia.  I'm testifying

21   to standard of care in West Virginia for prescribing.  I

22   didn't specifically look at Cabell County as a whole.  St.

23   Mary's and Cabell-Huntington just merged.  I believe they're

24   one hospital now.  That's the main hospital.

25        Across the river in Ashland are two other hospitals, I
```

1    do believe.  Our Lady of Bellefonte went bankrupt, though,

2    so I think they are now owned by King's Daughters.  And I

3    think there are some surgery centers there, but the two main

4    hospitals are Cabell-Huntington and St. Mary's.

5          There's also a VA there run by the Veterans

6    Administration, which is part of Marshall Medical School, I

7    do believe.

8    **Q.**    Okay.  So, there's two hospitals and a VA?

9    **A.**    Well, I told you I didn't specifically --

10   **Q.**    Two or one --

11   **A.**    I didn't look specifically at Cabell County, but that's

12   the -- that's what I'm familiar with.

13   **Q.**    Well, whether there's two or one, are you -- do you

14   have privileges in Cabell County hospitals?

15   **A.**    No, not currently.

16   **Q.**    How long has it been since you were privileged over

17   there?

18   **A.**    I think about 20 years ago.  They actually asked me to

19   do some very specific things at St. Mary's.  I think I

20   briefly held privileges there back in the late 90s, but that

21   was it.

22   **Q.**    You gave an opinion that -- I think I wrote it down.

23   It was somewhere a little bit after 11:00 this morning.  You

24   gave an opinion that most of the doctors, I think we were

25   talking about in the country, comply with the standard of

```
 1    care that you had testified about, whatever that standard

 2    was.  Did I hear that correctly?  My hearing is not very

 3    good sometimes.

 4    A.    In the country?  So, certainly, I think most prescribed

 5    drugs follow that pattern, as you see around the country and

 6    West Virginia.  That became a standard as those phases

 7    happened.  I think the majority did, the vast majority.

 8    Q.    So, is that a yes?

 9    A.    I think that would be a yes.

10    Q.    And so, most is not all; am I correct?

11    A.    I think that's correct, sir.  Yes, sir.

12    Q.    So, all those other persons then are violating the

13    standard of care?  You're familiar with that term, violation

14    of standard of care in malpractice cases and things like

15    that, right?

16              MS. MAINIGI:  Objection.  Form.  The question

17    doesn't make any sense, Your Honor.

18              THE COURT:  Overruled.

19        If you understand the question, Dr. Deer, you can

20    answer it.

21              THE WITNESS:  I think I understand it, Your Honor,

22    but I'll try.

23        If you're outside the standard of care, you're

24    violating the standard of care, yes, sir.

25              BY MR. FITZSIMMONS:
```

1  **Q.**   That's another yes, right?

2  **A.**   I believe that would be a yes.  I just like to quantify

3  myself to make sure I understand your question and my

4  answers.  So, I have to say them.  So --

5  **Q.**   Okay.  I'm trying to -- I'm actually trying to get very

6  clear questions to you so there's no misunderstanding.

7  **A.**   Yes, sir.

8  **Q.**   All right.  So, people that don't -- that don't follow

9  the standard of care, that violate the standard of care,

10  many of those people are diverting pills, are they not?

11  **A.**   So, I think that's two separate -- with all due

12  respect, I think you're asking me a question that doesn't

13  match.  The physician outside the standard of care is not

14  diverting pills, but their improper prescribing could cause

15  diversion by someone else.  So, it's a different answer than

16  what you asked.

17  **Q.**   Let me change the question.  If you insert the word

18  results, the people who violate the standard of care results

19  in some diversion?

20  **A.**   If you're --

21  **Q.**   If --

22         MS. MAINIGI:  Objection, Your Honor.  All I would

23  ask is, if Mr. Fitzsimmons could ask his question and not

24  keep layering onto his question and let the witness answer.

25  I'm sure the court reporter continues to have a difficult

1    time.

2         Again, I am sure he's not trying to confuse the witness

3    at all or put words in his mouth, but I'd really appreciate

4    it if he -- if Mr. Fitzsimmons could just ask the question

5    and then let the witness answer.

6              THE COURT:  Can you slow down a little bit, Mr.

7    Fitzsimmons?

8              MR. FITZSIMMONS:  Yes, Your Honor.  Try to take --

9    I'm actually going pretty slow for normal, for most times.

10             BY MR. FITZSIMMONS:

11   **Q.**   All right.  Dr. Deer, so the physician, when there's a

12   violation of the standard of care, that can result in a

13   diversion; is that correct?

14   **A.**   I believe the answer to that would be yes.

15   **Q.**   Okay.  Thank you.  And you agree that there are lot of

16   bad prescribers; is that true?

17   **A.**   You have to quantify what a lot is.  I think the ones

18   that I have seen that, again, in my work reviewing charts

19   for different parties and bad physicians, you know, they

20   seem to stick out like a sore thumb usually.  And so, I

21   don't know if it's a lot or the ones that we notice are

22   quite dangerous to the community.

23   **Q.**   All right.  So, in response to a question by Attorney

24   Metz -- or, no, that was Ms. Gaffney in your deposition.  Do

25   you recall your deposition?

1   **A.**   I do recall Ms. Gaffney from Seattle, yes, sir, I do.

2   **Q.**   Do you recall having your deposition taken under oath

3   September 21st, 2020?

4   **A.**   I do.

5   **Q.**   And there had been a question asked --

6             MS. MAINIGI:  Objection, Your Honor.  I don't

7   think this is the proper way to impeach.

8             THE COURT:  Well, are you --

9             MS. MAINIGI:  I don't know what he's doing.

10             THE COURT:  Is this a prior inconsistent

11   statement, Mr. Fitzsimmons?

12             MR. FITZSIMMONS:  It will be when -- yes, but I'm

13   trying to lay that foundation first.

14             THE COURT:  Okay, go ahead.

15             MR. FITZSIMMONS:  It's -- no, it's not necessarily

16   an inconsistent statement.  It's his answer.

17             MS. MAINIGI:  Oh, well, Your Honor, that's

18   improper.  He can impeach with a prior inconsistent

19   statement.

20             THE COURT:  If it's not inconsistent, you can't

21   use it, Mr. Fitzsimmons.

22             MR. FITZSIMMONS:  Okay.  So, it's inconsistent

23   then because he said he didn't know what a lot meant.

24             THE WITNESS:  I don't know what a lot means in

25   context.

```
1            MS. MAINIGI:  But, Your Honor -- objection, Your
2    Honor.  He just told the Court that it's not inconsistent.
3            MR. FITZSIMMONS:  No, I said that --
4    (unintelligible)
5            COURT REPORTER:  I'm sorry.  I can't hear that.
6            THE COURT:  Don't argue with each other.  I'm
7    trying to figure this out.  Is it inconsistent or not?
8            MR. FITZSIMMONS:  It is inconsistent with his
9    answer, yes.
10           THE COURT:  Well, then I will let you use it and
11   then we'll find out if it is or not, Ms. Mainigi.
12           BY MR. FITZSIMMONS:
13   Q.   Do you recall in response to --
14           MR. FITZSIMMONS:  This is -- put it up on the --
15   we have 130, starting Line 5, if we have to go back to the
16   question.
17           MS. MAINIGI:  Could we get a page cite, please,
18   Your Honor?
19           MR. FITZSIMMONS:  Yes.  130, Page 5.  130, Line 5.
20           MS. MAINIGI:  Your Honor, my objection is that the
21   question that was posed that reflects the answer, I would
22   ask, first of all, Mr. Fitzsimmons to bring the answer off
23   the screen until this issue is resolved.
24           MR. FITZSIMMONS:  Okay.  Take that off, please.
25       And, Judge, I'll withdraw the question.
```

```
 1                    MS. MAINIGI:  Thank you.

 2                    THE COURT:  Well, what was the question you asked

 3      him that you think his answer was inconsistent with what

 4      you're going to do here?

 5                    MR. FITZSIMMONS:  Yeah.  I'm going to withdraw the

 6      question and I'll ask another.  I'm going to ask a question.

 7                    THE COURT:  Okay.  All right.

 8                    BY MR. FITZSIMMONS:

 9      Q.    Okay.  All right.  So, do you agree that there was a

10      lot of bad behavior by prescribers prescribing prescription

11      opioids in West Virginia?

12                    MS. MAINIGI:  Objection to form.  Bad behavior?  I

13      don't know what that means.

14                    THE COURT:  Overruled.  He can answer that one.

15                    THE WITNESS:  I think there were some doctors who

16      prescribed inappropriately.

17                    THE COURT:  You understand bad behavior to be

18      inappropriate --

19                    THE WITNESS:  Well, I would think that would mean

20      inappropriate prescribing, is what it referred to.

21                    BY MR. FITZSIMMONS:

22      Q.    Was that a lot?

23      A.    Well, again, I know you were going back to my

24      deposition where it says a lot.  But, certainly, there is a

25      lot of doctors who mis-prescribe, but if you look at the
```

```
 1    percentage of doctors, it's pretty low, but we do notice
 2    that -- and one is too many in West Virginia, in my opinion,
 3    and there were a lot more than one for sure.
 4              MR. FITZSIMMONS:  Gina, could you put 130, Line 5,
 5    start with Line 5 all the way through?
 6              MS. MAINIGI:  Objection, Your Honor.  I'm taking a
 7    look at where I think Mr. Fitzsimmons is in the deposition
 8    and I object --
 9              MR. FITZSIMMONS:  So, I was just --
10              MS. MAINIGI:  Excuse me?
11          So, Your Honor, this is not a prior inconsistent
12    statement.
13              THE COURT:  Overruled.  Let's see where he goes
14    with this.
15              MS. MAINIGI:  I would just ask, Your Honor, that
16    he not put it on the screen.
17              THE COURT:  Oh, okay.
18              MS. MAINIGI:  And that he ask the question and get
19    the answer.
20              THE COURT:  Ask the question and then put it on
21    the screen.
22              MR. FITZSIMMONS:  I'm sorry, Your Honor.
23              THE COURT:  I think she's right.  Don't put it on
24    the screen until you have asked him the question and then --
25              BY MR. FITZSIMMONS:
```

1    **Q.**   Do you recall, Doctor, testifying that you knew there

2    was a lot of bad behavior by prescribers and there were some

3    good behavior by prescribers who didn't know any better in

4    retrospect?

5            MS. MAINIGI:  Objection, Your Honor.  That is not

6    the question that was asked of Dr. Deer at his deposition.

7    The proper way to impeach or to use a prior inconsistent

8    statement is to actually ask the question that was

9    previously asked, not try to summarize the answer that was

10   provided.

11           THE COURT:  Well, that's right, Mr. Fitzsimmons.

12   What specific question --

13           MR. FITZSIMMONS: Judge, I --

14           THE COURT:  Well --

15           MS. MAINIGI:  Your Honor, if I may, the question

16   that was asked was, as a West Virginia Doctor, can you

17   describe the impact that the shipment -- this enormous

18   amount of pills has had on communities in West Virginia.

19   That was the question that was asked at the deposition.

20           THE COURT:  And how did he answer it here?  Did he

21   answer that question here?

22           MS. MAINIGI:  Well, Your Honor, I would object to

23   the question.  I mean, obviously, it was asked at the

24   deposition, but I would object to the question because it's

25   outside the scope.

1          THE COURT:  Well, I'm going to let him go to the

2     deposition because I don't know what happened at the

3     deposition until I see it.

4          So, go ahead and finish it, Mr. Fitzsimmons.

5          MS. MAINIGI:  Well, could the witness -- Your

6     Honor, could the witness be allowed to answer the question

7     if that's the question?

8          THE COURT:  I thought he did answer it.

9          MS. MAINIGI:  This question has not been posed to

10    the witness, Your Honor, so if -- the question that was

11    actually asked at the deposition, if that could actually be

12    posed to the witness, that would be the proper form for any

13    inconsistent statement.

14         THE COURT:  Well, I think that's right, Mr.

15    Fitzsimmons.

16         MR. FITZSIMMONS:  Judge, he's answered as to the

17    word a lot.  He said he didn't know what that meant and I

18    asked him whether he had used it in describing it, which is

19    why the deposition testimony -- his words were being used to

20    impeach him as to what he doesn't know.

21         THE COURT:  Well --

22         MR. FITZSIMMONS: He's testified under oath.

23         THE COURT:  I'm going to let him do it, Ms.

24    Mainigi.  I think this is a Tempest in a Teapot and, until I

25    see the transcript, I'm not going to be able to tell whether

1    it's inconsistent or not, but so your objection will be

2    preserved for the record.

3         You go ahead, Mr. Fitzsimmons.

4              MR. FITZSIMMONS:  Thank you, Judge.

5         Gina, would you put up starting with 129, 23, which is

6    the question?

7              BY MR. FITZSIMMONS:

8    **Q.**   All right.  Do you recall, Doctor, being asked the

9    question, as a West Virginia doctor, can you describe the

10   impact that the shipment of these -- this enormous amount of

11   pills has had on communities in West Virginia?  And there

12   was an objection.

13        Your answer was, I have no clue.  I mean, I know that

14   there was too many people on opioids because they're

15   prescribed too often by too many people.  And there were

16   pill mills, as well, that were prescribed -- that were

17   selling opioids to people for cash with no medical records.

18        So, I know there was a lot of bad behavior by

19   prescribers and there was some good behavior by prescribers

20   who didn't know any better in retrospect.

21             MS. MAINIGI:  Your Honor, I object on several

22   grounds.  I object and ask this be stricken because it

23   clearly is not impeachment.  This was just an avenue for Mr.

24   Simmons [sic] to read out loud a portion of a

25   mischaracterized answer of Dr. Deer's.

```
1           THE COURT:  Well, it doesn't appear to me to be
2     inconsistent with what he testified to on the stand.
3           MS. MAINIGI:  I ask that this prior back-and-forth
4     be stricken from the record, Your Honor.
5           MR. FITZSIMMONS:  Judge, he said --
6           THE COURT:  Well, I'm not going to strike it
7     because I can figure it out and I don't think it's
8     inconsistent.  So, the weight I'm going to give it is pretty
9     minimal.  Go ahead, Mr. -- if any.  Go ahead, Mr.
10    Fitzsimmons.
11          BY MR. FITZSIMMONS:
12    Q.   Doctor, as you sit here today, you have no information
13    or data as to how many pills were diverted into Cabell
14    County during the period of 2006 up to 2017; is that true?
15    A.   No, sir, I do not.
16    Q.   And you don't know how many pills were diverted into
17    Cabell County during that period of time that would be
18    considered -- that would be delivered by any of the
19    distributors that are defendants in this case; is that true?
20    A.   No, sir, I do not.
21    Q.   Are you aware of any document or seen anything from any
22    West Virginia state agency, board, board associations,
23    Medical Boards, or distributors, to stop monitoring for
24    orders of opioids that were suspicious for diversion?
25          MS. MAINIGI:  Objection, Your Honor.
```

```
 1              BY MR. FITZSIMMONS:
 2    Q.   Have you ever seen anything?
 3              MS. MAINIGI:  Excuse me.  Objection.  Outside the
 4    scope.  And I believe Mr. Fitzsimmons successfully objected
 5    several times to me asking questions about distributors, so
 6    I don't view this as any different.
 7              THE COURT:  I'll sustain the objection.  I think
 8    it's outside the scope.
 9              BY MR. FITZSIMMONS:
10    Q.   Doctor, you are not suggesting that because there was a
11    standard of care that doctors are immune from prescribing
12    opioids that are in excess or not medically warranted, are
13    you?
14    A.   So, I'm trying to answer your question.  So, if you
15    think about standard of care, if they're in excess for
16    non-medical reasons, it's definitely a breach.  If they're
17    in excess because of poor education, they still may be
18    within the standard of care if they have done no harm.
19         So, could you re-word your question to me?  I think
20    that's the best answer I can give you the way it's worded
21    currently.
22    Q.   No.  That's it.  It's a sufficient answer.
23         You've actually -- you're in neuromodulation and that,
24    that's the type of treatment that you do; is that correct,
25    basically?
```

1    **A.**    It's what we do most of our FDA studies on, yes, sir.

2    **Q.**    And back in 2012, you do agree that there was an opioid

3    epidemic at that time here in West Virginia, in Cabell

4    County; is that right?

5    **A.**    Yes, sir, I do.

6    **Q.**    And you recall writing that guideline, one of the

7    authors, among others, called the Guidelines For a

8    Responsible Opioid Prescribing back in 2012; is that

9    correct?

10   **A.**    Which one was that, sir?  I'm sorry.

11   **Q.**    It's the ASIPP.  It's a two-part --

12   **A.**    Oh, the ASIPP?  Yes, sir.  I believe I wrote the

13   neuromodulation section of that, along with Dr. Staats from

14   Hopkins.

15   **Q.**    And in that --

16            MR. FITZSIMMONS:  And it's Demo 275, counsel.

17            BY MR. FITZSIMMONS:

18   **Q.**    In that, you were trying to reduce the incidence of

19   abuse and drug diversion at that time; is that correct?  Is

20   that one of the purposes?

21   **A.**    I think that was one of the goals.  I think the other

22   goal was to give guidance to members of that society on how

23   to prescribe because they were mostly interventionalists and

24   it wasn't their primary area.

25   **Q.**    All right.  And the results of your study in putting

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    that guideline together, there was good evidence that

2    non-medical use of opioids is extensive and one-third of

3    chronic pain patients may not use prescribed opioids as

4    prescribed or may abuse them and illicit drug use is

5    significantly higher in these patients.

6                MS. MAINIGI:  Objection, Your Honor.

7                BY MR. FITZSIMMONS:

8    Q.   Is that correct?

9                MS. MAINIGI:  Mr. Fitzsimmons is clearly reading

10   from a document.  If the witness could be provided the

11   document, that would be helpful, because we cannot check to

12   see what's being read out loud.

13               MR. FITZSIMMONS:  I thought I did.  I said Demo

14   275.

15               MS. MAINIGI:  Do you have an exhibit?

16        Your Honor, if Mr. Fitzsimmons could --

17               THE COURT:  Show her the document.

18               MS. MAINIGI:  -- pass along an exhibit, please.

19               MR. FITZSIMMONS:  Your Honor, may I approach the

20   witness?

21               THE COURT:  Yes.

22               BY MR. FITZSIMMONS:

23   Q.   It's small print.

24   A.   I'm okay with that.  I have more trouble far away.

25   That is really small though.

```
 1            All right.  Which page, sir?

 2      Q.   Front page.

 3      A.   Front page?  Okay.

 4      Q.   Yes, sir.  I was reading results number one.

 5      A.   Okay.  I'm with you, sir.  Yes, I've read that section,

 6      sir.

 7      Q.   Okay.  So, did I read that correctly?

 8      A.   Yes, sir, I believe you did.

 9      Q.   And number 2 indicates, under results, there's good

10      evidence that opioid prescriptions are increasing rapidly,

11      as the majority of prescriptions are from non-pain

12      physicians.  And then it goes on.  Did I read that portion

13      correctly?

14      A.   Yes, sir.

15      Q.   Is there anything after that that changes the -- in

16      your opinion, the meaning of what I read?

17      A.   No.  I don't think so.

18      Q.   All right.  Number 3, there's good evidence that the

19      increased supply of opioids, use of high-dose opioids,

20      doctor shoppers, and patients with multiple co-morbid

21      factors contribute to the majority of the fatalities.  Did I

22      read that correctly?

23      A.   I think --

24            MS. MAINIGI:  Objection, Your Honor.  I don't

25      think that this document can serve as -- and objection that
```

1    the document is up.  It's not been admitted into evidence.

2    And objection that Mr. Fitzsimmons is just reading out loud

3    from this document.  He hasn't -- he's, himself, reading out

4    loud from the document.  He's not asking Dr. Deer any

5    questions about the document.

6              THE COURT:  Well, this is cross examination and

7    we've got to get through this and I can give it such weight

8    as it deserves, if any.

9         Go ahead, Mr. Fitzsimmons.

10             BY MR. FITZSIMMONS:

11   **Q.**   Doctor, all right.  You can put that document down for

12   now.

13   **A.**   Okay.

14   **Q.**   All right.  So, you mentioned some characteristics of

15   West Virginians, medically importantly, I think, that you

16   believe were contributing factors to some increase of opioid

17   prescriptions in West Virginia; is that correct?

18   **A.**   That's correct.

19   **Q.**   Okay.  And you can't quantify what increase there was

20   because you haven't done that tally or any research on how

21   much the increase was, whether it was a large amount or

22   small; is that correct?

23   **A.**   That's correct.

24   **Q.**   All right.  So, the characteristics that you talk

25   about, and it's in your report, you mentioned and testified

1   here today to counsel for Cardinal that people in West

2   Virginia had hard labor, I guess -- I guess tougher type

3   jobs, physical, more physical jobs, and that that

4   contributed to an increase in the opioids; is that right?

5   **A.**   I believe that's correct, yes, sir.

6   **Q.**   And you saw that Pill Mountain with the date and it

7   shows the pills running from clear back in the 1990s, I

8   think up, and -- it peaks up around 2012, '14, area, takes a

9   dip and then starts down again after that.  Do you remember

10  that?

11  **A.**   Yes.  Yes, sir.

12          MS. MAINIGI:  Objection, Your Honor, to the

13  characterization of Pill Mountain.

14          BY MR. FITZSIMMONS:

15  **Q.**   Did I fairly --

16  **A.**   Yes, sir.

17  **Q.**   -- characterize that?

18          THE COURT:  Well, overruled.  Go ahead.

19          BY MR. FITZSIMMONS:

20  **Q.**   So, you talk about Cabell County.  Do you know how many

21  coal -- and you mention in your report you cite a study from

22  the City of Huntington as your basis that City of Huntington

23  requested some grant, but they were talking about the entire

24  State of West Virginia, as opposed to Cabell County; do you

25  recall that?

1    **A.**    I don't recall that but, certainly, I wouldn't dispute

2    it.

3    **Q.**    All right.  So, you were never provided with any

4    information about coal mining jobs in that county, were you?

5    **A.**    In that county particularly, no.

6    **Q.**    Okay.  And that's one of the best known hard labor jobs

7    that we're all proud of, is our coal miners in this state,

8    right?

9    **A.**    It used to be.  We don't have as many jobs as we used

10   to, unfortunately.

11   **Q.**    Well, I noticed that when you were asked by counsel the

12   question was stopped at 2008.  It was 1998 to 2008.  Do you

13   know how many -- how much coal was actually mined in Cabell

14   County during those years?

15   **A.**    No, sir, I do not.

16   **Q.**    Would it surprise you, and I have it here if anybody

17   wants to check, but there was zero coal mined not only from

18   that, but clear back from 1990 in Cabell County?

19   **A.**    Yeah.  Coal --

20          MS. MAINIGI:  Objection.

21          THE COURT:  He said he didn't know.  I will

22   sustain the objection.

23          BY MR. FITZSIMMONS:

24   **Q.**    So, you can't use that coal mining as a tough thing as

25   a reason for increase in pills in that county, can you?

```
 1                MS. MAINIGI:  Objection.  Argumentative.

 2                THE WITNESS:  So, I wouldn't know the number of --

 3      sorry, sir.

 4                THE COURT:  Overruled.  You can answer that.

 5                THE WITNESS:  I wouldn't know the number of

 6      chronic injuries from the past because a lot of these

 7      chronic pain patients take around 30-40 years.  There might

 8      be some but, certainly, I can't quantify in any way.  So, I

 9      think you're right.

10                BY MR. FITZSIMMONS:

11      Q.   And logging jobs, also, you mentioned.  Do you know how

12      many logging jobs they have in Cabell County?

13      A.   No.  I don't know at all.

14      Q.   Did the defense attorneys ever give you any information

15      on these jobs?

16      A.   No, sir.

17      Q.   Would you be surprised that there are none?

18      A.   Logging would be more in like Ronceverte and Rainelle

19      and those areas, I would think.

20      Q.   And you also mentioned construction jobs in Cabell

21      County.  How many big buildings have you seen go up in

22      Cabell County that would have workers on it that were maybe

23      having harder labor that would, according to you, require

24      maybe a greater amount for treatment?

25      A.   So, I have absolutely seen Marshall grow, as I've gone
```

```
 1    through there.  So, I think they do build some buildings

 2    down there.  St. Mary's has grown.  Cabell has grown.  So, I

 3    think there are some construction jobs in Cabell County.  I

 4    don't -- I haven't quantified that in any way.

 5    Q.   And they -- they didn't provide you with any

 6    information whatsoever as to the number of construction jobs

 7    or any of the hard labor jobs; is that right?

 8    A.   That's correct.

 9    Q.   So, you also used age as a factor and West Virginia on

10    the average, we're all four years older than, I guess, the

11    average person in the United States or something like that.

12    So --

13    A.   Our average age is four years older than the average

14    age of Americans.

15    Q.   Did you know that as to the number of people over the

16    age of 65 that we're the fifteenth lowest in the entire

17    country?  Did you know that?

18    A.   I haven't seen those statistics.  I would be happy to

19    look at them.

20    Q.   Because they didn't provide you -- because nobody

21    provided you with those statistics, did they?

22    A.   That's not what I'm familiar with from the report from

23    Bill Crouch's group, Health and Human Services, but it

24    certainly could be accurate.

25    Q.   So, you talked a little bit about the opioid epidemic.
```

1   There are things being done to abate that epidemic that

2   you're actually participating in with the type of treatment

3   that you do?

4   **A.**   Yes, sir.

5   **Q.**   All right.  All right.  What's the name of your clinic,

6   Doctor?

7   **A.**   Spine & Nerve Centers of the Virginias.

8   **Q.**   And has it always been called that?

9   **A.**   No.  It was the Center for Pain Relief from '94 until,

10   I don't know, 2010 maybe.  I don't remember when we changed

11   the name of that.

12   **Q.**   And you changed the name?  All right.  So, you have

13   this 2006 paper also that you have authored.  It's a

14   guideline, opioid guideline, and the management of chronic

15   non-cancer pain.  Do you recall being one of the authors of

16   that article back in --

17   **A.**   Which journal was that in, sir?

18   **Q.**   That's in the Pain physician journal.

19   **A.**   I don't recall that specifically, but I think it's Part

20   2 of the one you mentioned earlier maybe.

21   **Q.**   Pardon me?

22   **A.**   Is this the second version of the first one you

23   mentioned earlier?

24   **Q.**   No.  It's a separate guideline that you published.

25   **A.**   Which one is --

1          MS. MAINIGI:  Your Honor, objection.  If I could

2     interject in here.  If counsel could identify the exhibit

3     number and provide a copy, please.

4          MR. FITZSIMMONS:  Yes.  We intend to do that.

5     It's DEF-WV-02368.

6        Your Honor, may I approach the witness?

7          THE COURT:  Yes.

8          THE WITNESS:  Thank you, sir.

9          MR. FITZSIMMONS:  Okay.  That's small print, also.

10         THE WITNESS:  Yes.  This is an earlier guidance

11    than the previous, I believe.  I think the previous was 12

12    this is 6.

13         BY MR. FITZSIMMONS:

14    **Q.**   Right.  Six years earlier?

15    **A.**   Yes, sir.

16    **Q.**   Looks like almost every five or six years you do a new

17    guideline.

18    **A.**   I think that's pretty accurate because you have to see

19    what's happened in the research in that interim period of

20    time.

21    **Q.**   I understand.  And you probably haven't read this

22    recently, have you?

23    **A.**   Probably not since 2006.

24    **Q.**   Okay.  All right.  And on the first page, it says

25    background, opioid -- first of all, you're one of the

1    authors of this document, are you not?

2    **A.**    It's a consensus document, so I would have written a

3    portion of it.  And, usually, I would contribute to the

4    interventional parts of these things, not the whole

5    document.

6    **Q.**    And it indicates in the first sentence, opioid abuse

7    has increased at an alarming rate.  First sentence.  Do you

8    see that?

9    **A.**    Yes.

10   **Q.**    Do you agree that back in 2006 it had been increasing

11   at an alarming rate?

12   **A.**    Yes.  We were seeing --

13   **Q.**    Clear up -- I'm sorry.

14   **A.**    We were starting to see issues with medications at that

15   point.

16   **Q.**    It still had been increasing as late as 2012-2014, up

17   to that point; is that right?

18   **A.**    I think that's accurate.

19   **Q.**    Okay.  And on Page 2, Doctor, the page in the upper

20   left-hand corner in the third full paragraph, it says,

21   however, documented abuse of opioids is increasing at an

22   alarming rate.  Did I read that correctly?

23   **A.**    I don't see where you are.  I'm sorry.

24   **Q.**    Oh, I'm sorry.

25   **A.**    Page 2?

1    **Q.**   It's on Page 2.

2    **A.**   Can you highlight that for me?  Okay.  I see it now,

3    sir.  Thank you.

4    **Q.**   Okay.  Did I read that correctly, Doctor?

5    **A.**   Yes, sir, you sure did.

6    **Q.**   In the United States with 4.6 percent of the world's

7    population, this is as of 2006, uses 80 percent of the

8    world's opioids.  Did I read that correctly?

9    **A.**   I believe that to be correct.

10   **Q.**   Was that a true statement at that time?

11   **A.**   I --

12   **Q.**   2006?

13   **A.**   Yes, sir, it is.  I would say that's most likely

14   accurate.  That was from the DEA, Drug Diversion Control

15   Division, so they should know.

16   **Q.**   And so, when we talk about the history of the standard

17   of care, you're in that middle category at that point, are

18   you not, 2006?

19   **A.**   What do you mean by middle?

20   **Q.**   I thought you broke it into three groups.

21   **A.**   Oh, okay.  You mean the phases?  I wasn't sure where

22   you were going with that.  So, the phase we discussed, that

23   would be in the middle phase at that point.

24   **Q.**   We're in the 2006 time period when you write this,

25   right?

1    **A.**    I think that was Phase 1 still, I believe.  I would

2    have to see that.  Will you show that?  2006, we were still

3    seeing it going up.

4    **Q.**    Still going up, up until 2012-14, right in there?

5    **A.**    '11 is when we started seeing some changes.  So, up to

6    2010, it was still going up, but '11 to '15 was moderation.

7    And '15 until now --

8    **Q.**    On Page -- Page 5, Doctor, it says on the left column,

9    second full paragraph down, as per the C-A-S-A, CASA.  Do

10   you see that paragraph?

11   **A.**    Yes, sir, I sure do.

12   **Q.**    I'm going to read it.  As per the CASA report, and CASA

13   stands for Center For Addiction and Substance Abuse, for the

14   bottom line is that the United States is in the throes, and

15   that's spelled t-h-r-o-e-s, of an epidemic of controlled

16   prescription drug abuse and addiction with 15.1 million

17   people admitting to abusing prescription drugs, dash, and

18   then it goes on.  Did I read that correctly?

19   **A.**    It appears that you did, yes, sir.

20   **Q.**    Was that a true statement, 2006?

21   **A.**    Again, this was most likely written by one of the

22   addiction people in this consensus.  And so, I have no

23   reason to question if they would be accurate.

24   **Q.**    Did you sign off on this document?

25   **A.**    I would have been one of the authors, yes, sir.  That

1    means 80 percent of the people would agree with every part

2    of it to be a consensus document.

3    **Q.**   Is there anything that you have that you could show us

4    in the court today that you disagree with the paper that you

5    signed off as author or  --

6    **A.**   No, sir.  No, sir.  There is nothing I recall that I

7    would disagree with.

8    **Q.**   All right.  All right.  Doctor, on -- on that same

9    page, far right column, about 13 lines up approximately, it

10   starts with the abuse of controlled prescription drugs.

11   Okay.  So, let me just ask and -- excuse me.  You guys write

12   a lot of medical articles.  I think you said that you had

13   over 200 journal articles and things.  That's part of your

14   research and stuff to help educate the -- usually other

15   medical personnel, but also the public?

16   **A.**   That's correct.

17   **Q.**   Okay.  All right.  And you've done a great deal of

18   authorship and trying to lead that charge and things that

19   are important to you or that you find that you think can be

20   helpful; is that right?

21   **A.**   That's correct.

22   **Q.**   All right.  And so, it's important to make sure from a

23   science standpoint that people put these articles together

24   and write them accurately and truthfully; is that right?

25   **A.**   I believe that's a true statement, yes, sir.

1    **Q.**    That's why they have this process called peer review?

2    **A.**    That's right.

3    **Q.**    Now, is the pain management journal peer-reviewed?

4    **A.**    Yes, sir.

5    **Q.**    This one is peer-reviewed?  So, the article we're

6    talking about right now was peer-reviewed?

7    **A.**    We would have had usually three people review the

8    article that were objective and make edit recommendations.

9    And then, in order for it to be accepted for publication,

10   you have to make a response to those edits.  So, this would

11   have gone through a peer review with at least three people.

12   That's the standard for most journals.  Some use four or

13   five reviewers.  So, that's what you would do.

14   **Q.**    All right.  So, is there a process that if you don't

15   agree with the article, that you file some note or something

16   or objection?

17   **A.**    Well, I think if you didn't agree with the article as a

18   whole, you would take your name off the article, I would

19   think.

20   **Q.**    Take it off?

21   **A.**    If you don't agree with portions of it, you can either

22   find a middle ground, which often happens, or there's

23   certain areas where you have no expertise at all and you

24   have to defer that to your colleagues who are the experts in

25   that area and you trust them to write that section.

1           So, not to be long-winded.  For example, when we're

2      writing about neuro submission guidelines, which I have four

3      coming out the next few months, the part on brain

4      stimulation for Parkinson's tremor, I didn't write that

5      part.  I have really no knowledge of that part.  My

6      colleague, Jeff Arle, at Harvard wrote that part so far and

7      some other folks.  And so, I trust his expertise.

8           So, I would -- I would sign on as an agreeing author,

9      but I wouldn't have any expertise in the area of brain

10     stimulation for Parkinson's, just to give an example of

11     that.

12     **Q.**   So, in other ways, you could file a comment and say I

13     don't agree with this one line?

14     **A.**   If you didn't agree, you could file a comment, if you

15     chose to, or if you trust the person with expertise, you

16     would just sign off on it because you trust what they say.

17     **Q.**   Trustworthy even though you aren't the specialist,

18     right?

19     **A.**   Well, you often have one of the experts in the world

20     writing that part.  So, you assume they're chosen because

21     they are the expert on that part.

22     **Q.**   Can we agree, Doctor, you didn't write anything about

23     this article whatsoever to disavow, disagree, or say I've

24     got a hunch it might not be right or even close?

25     **A.**   I'm not saying today I disagree either.  I'm just

1    saying I wouldn't have written parts that aren't to do with

2    procedures usually, but I would have, you know, read those

3    parts and, certainly, I don't recall disagreeing with them.

4    **Q.**   All right.  Let me read then the thirteenth line up.

5    It says the abuse of controlled prescription drugs was

6    foreshadowed by dramatic increases in their manufacture and

7    distribution and the number of prescriptions written and

8    filled.  And then it has a cite.  Did I read that correctly?

9    **A.**   It appears that you have.

10   **Q.**   Was that a true statement when you made it as a part of

11   an author of this paper?

12          MS. MAINIGI:  Objection, Your Honor.  This is well

13   outside the scope, the distribution and manufacture, as Mr.

14   Fitzsimmons already established several times during the

15   direct exam.  It is outside the scope of this witness's

16   expertise.

17          THE COURT:  Well, overruled.  You can answer the

18   question.  Go ahead.

19          THE WITNESS:  I would assume if you write a

20   prescription, someone has to distribute that prescription.

21   That's about the length of my knowledge of distribution.

22          BY MR. FITZSIMMONS:

23   **Q.**   Because you had some some of the most intelligent

24   researchers in this area that were making that statement in

25   2006, right?

1    **A.**    Well, I think there's some smart people on that paper,

2    yeah.

3    **Q.**    And then, on Page 8, Doctor,  and I just have a few

4    more questions, I think, and we'll be done, but Page 8 under

5    the title drug diversion for your paper?

6    **A.**    Yes, sir.

7    **Q.**    Do you see that?

8    **A.**    Yes, sir, I do.

9    **Q.**    All right.  I'm going to read it to you.

10         MR. FITZSIMMONS:  Can you highlight that, Gina,

11   for the doctor and for the judge?  Just go down, the first

12   sentence, I think.  Got it?  Okay.  So, just the first

13   sentence, can you highlight that, down to distribution

14   process?

15         BY MR. FITZSIMMONS:

16   **Q.**    All right.  Dr. Deer, I think you said it's been a long

17   time.  You have not seen this article or that provision or

18   anything like that for probably your guess is back to 2006;

19   is that right?

20   **A.**    No.  I mean, you asked me if I had read it.  I haven't

21   read the full article.  I may have looked at the article at

22   some point, but I don't --

23   **Q.**    You may have seen --

24   **A.**    I don't recall reading the whole article, no.

25   **Q.**    You haven't studied it; is that fair to say?

1    A.    That's fair to say.

2    Q.    Or even in preparation for this trial, you haven't been

3    through it?

4    A.    Well, I've looked at the overall beginning of these

5    articles, but I didn't read the whole article, I don't

6    believe.

7    Q.    All right.

8    A.    But we're looking at it now.

9    Q.    Okay.  Let me read it to you.  This is a statement made

10   by your paper in 2006, when we had an alarming rate of

11   increase of opioid at that time being prescribed, right, a

12   crisis, epidemic in this country.  And your paper says drug

13   diversion in boldface print, Section 3.7.  Did I read that

14   correctly?

15   A.    Yes, sir, you did.

16   Q.    And then it says drugs can be diverted from their

17   lawful purpose to illicit use at any point in the

18   pharmaceutical manufacturing and distribution process.

19         Doctor, you would not have written that statement

20   unless it was true at that time or authored it; is that

21   true?

22              MS. MAINIGI:  Objection.  Foundation.  I don't

23   think it's been established that he wrote that statement,

24   Your Honor.

25              THE COURT:  Well, can you clear that up, Mr.

1    Fitzsimmons?

2              BY MR. FITZSIMMONS:

3    **Q.**   You're the author of this paper.  You review it, right?

4    **A.**   So, let me make sure we're on the same page.

5    **Q.**   Sure.

6    **A.**   I was an author of this paper.

7    **Q.**   You are an author?

8    **A.**   I wouldn't have written this section, but I don't have

9    any reason to think it was incorrect.  The person who would

10   have written this section would have been someone with

11   expertise in diversion and addiction, not me, but I would

12   have signed off on the paper at the time because I would

13   trust their judgment.

14        And, usually, you have to cite what you say.  There

15   should be a citation somewhere in that section of what

16   they're talking about.  I assume there is a citation, but

17   that -- that's how it usually works.  They cite something

18   and they write it and, again, this is way outside of my area

19   of expertise.  I'm not an expert in that area, but whoever

20   wrote that portion would have been someone who the society

21   felt was an expert in addiction and diversion.

22              THE COURT:  So, if I heard him correctly, he

23   didn't write it, but he doesn't disagree with it.

24              BY MR. FITZSIMMONS:

25   **Q.**   You don't disagree with it as an author and you have a

```
1    duty to actually step up and disagree if you do disagree and

2    you didn't do that?

3    A.   I think if I had a major disagreement with anything in

4    any paper, you and I are just meeting, but I'm not quiet.  I

5    would have spoken out with a major disagreement.  And this

6    section is more that I would defer to the expertise of

7    someone else because I have no expertise in diversion.

8    Q.   All right.  So, Doctor, from 2006 then to 2012, if you

9    pull that thing called IQVIA, have you ever heard of that?

10   A.   Yes, sir.

11   Q.   You're familiar with that?  You've seen their stats?

12   A.   Yes, sir, I have.

13   Q.   Okay, sure.

14            MR. FITZSIMMONS:  So, Gina, could you get P-41960?

15   Is that right, Mr. Farrell, 41960?  That's it.

16            MS. MAINIGI:  Your Honor, I have an objection.

17            THE COURT:  Okay.

18            MS. MAINIGI:  There's been no foundation laid for

19   this document.  It's not in evidence.  We have no

20   authentication of this document that has occurred by any

21   prior witness or fact witness.  The witness has not seen

22   this document before.  I don't think there's a basis to be

23   putting it on the screen.

24        I don't think --

25            THE COURT:  Well, he said he -- he was asked if he
```

```
 1   heard of IQVIA and he said yes.  And he said you're familiar

 2   with that and seeing their stats?  And he said, yes, sir, I

 3   have.

 4        Go ahead, Mr. Fitzsimmons.

 5             MR. FITZSIMMONS:  Thank you.

 6        Judge, may I approach the witness?

 7             THE COURT:  Yes.

 8             MR. FITZSIMMONS:  Thank you.

 9             MS. MAINIGI:  Your Honor, my objection, if I may,

10   is -- continues to the specific stats that are described

11   here, which are not statistics.  I think a foundation needs

12   to be laid and Gryphon, as I understand it, is simply the

13   plaintiffs' consultants.  No one from Gryphon has come to

14   testify about these numbers.

15             THE COURT:  Well, I'll overrule the objection.

16   This is cross examination and wide latitude is to be allowed

17   and I think this provides a good faith basis for the

18   questions to be asked.

19        So, you go ahead, Mr. Fitzsimmons.

20             BY MR. FITZSIMMONS:

21   Q.   So, Dr. Deer, you've actually seen these types of

22   statistics, I think you said?

23   A.   Not -- not this particular thing --

24   Q.   Not that format?

25   A.   Not this particular company.
```

1    **Q.**   You've been told about your rankings though, that --

2    **A.**   Well, I know we are the largest practice in the State

3    of West Virginia, referral only.  So, obviously, I know the

4    trends of our practice mirrors the State of West Virginia.

5    **Q.**   Okay.  All right.  So, this is -- tracks a period of

6    20 years, okay?  And does that appear correct to you?

7    **A.**   Yes.

8    **Q.**   And this is tracking the prescribing rate for you as a

9    doctor, Timothy Deer?

10   **A.**   Myself and my nurse practitioners, who also write.

11          MS. MAINIGI:  Objection again, Your Honor.

12   Foundation.  I don't think he can lay a foundation with this

13   particular witness with the questions.

14          THE COURT:  Overruled.  Let's get through this.

15   Go ahead, please.

16          THE WITNESS:  Myself and my nurse practitioners,

17   who I also write the prescriptions for --

18          BY MR. FITZSIMMONS:

19   **Q.**   And during -- during --

20          COURT REPORTER:  I'm sorry.  Myself and --

21          THE WITNESS:  Myself and my nurse practitioners,

22   who I also write the practitioners for the nurse

23   practitioners.

24          BY MR. FITZSIMMONS:

25   **Q.**   You write prescriptions for other doctors?

```
 1    A.   I think you're misquoting what I just said, sir.

 2    Q.   I didn't hear.

 3    A.   I said our nurse practitioners do not write Schedule

 4    IIs.  I will write that prescription if it's received

 5    together.

 6    Q.   So, you write them for the nurse practitioners that are

 7    prescribing?

 8    A.   No, that's not true.  That's not what I said.  You

 9    continue to take me out of context.  I said when a nurse

10    practitioner sees a patient with me, we would actually write

11    that prescription.

12    Q.   So, Doctor, looking at the chart from 1997 to 2017, you

13    were in the top five ranked in the county in prescribing

14    opioids; is that correct?

15    A.   In Kanawha County?

16    Q.   Yeah, up until 2017.  In Kanawha County, yes.

17    A.   I would think that would be correct because of our

18    population we see, yes.

19    Q.   Right.  And if you go all the way over to the MMEs,

20    you're in the top two or three for about 12 years and then

21    you drop down to number five up until 2017.  And then

22    there's a drastic change in 2017; is that right?

23    A.   I'm 116th in the state in '17.  That tells me what a

24    good job we were doing.  Yes, we were --

25    Q.   Could you answer the question?
```

1    **A.**    I'm answering that.  So, yeah, I do see that increase

2    and I see we're down to 116th in the state by '17.

3    **Q.**    And let's talk on Page 3 of that exhibit, bottom table,

4    Table 5.  Do you see that?  It's a -- 20-year history?

5    **A.**    Yes, sir, I do.

6    **Q.**    Now, this is during the same time period we talked

7    about opioids rising at an alarming rate, crisis, epidemic

8    in your papers from 2012 to 2006.  That this was an alarming

9    rate and problems at that time.  Generally, that's the time

10   period we're talking here; is that right?

11   **A.**    I think this is from '97 to '17.  So, this is a longer

12   time period.

13   **Q.**    All right.  And during that period of time for

14   prescribing hydrocodone in your county, which is Kanawha

15   County, you were the second highest prescriber of

16   hydrocodone, which is an opioid; is that correct?

17   **A.**    That's correct.

18   **Q.**    And you were the first number one for oxycodone, which

19   is another opioid in Kanawha County during that same period

20   of time; is that right?

21   **A.**    For the ten-milligram strength, not for the five.

22   **Q.**    And there's three types of fentanyl, different --

23   different quantities to the fentanyl?  There's a .1, .075

24   and a .05; is that right?

25   **A.**    That's correct.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1   **Q.**   And for fentanyl, which is a -- it can be a lethal drug

2   and it is one in the overdoses; is that right?

3   **A.**   So, not in this form, no, that's not correct, sir.

4   **Q.**   Is fentanyl a -- can be a lethal drug?

5   **A.**   You asked me about this particular graph.  These are

6   fentanyl patches for cancer patients and I don't know of any

7   fatality at all in our practice from that because I would

8   have known from the committee we talked about.  So, the

9   answer would be, in this group of people, which is about

10  98 percent cancer patients, I don't know of any fatalities

11  from fentanyl patches.  You're talking about injected

12  fentanyl by people out by the bus station.  That's a

13  different group of people.

14  **Q.**   So, were you ranked as number one fentanyl prescriber

15  for all three versions of the fentanyl under that table?

16  **A.**   Kanawha County, I would have been probably the only

17  person prescribing that drug for the cancer population.

18  **Q.**   And so, fortunately, somebody did a graph of your

19  prescriptions of opioids so we could kind of look at the

20  Pill Mountain and your prescription habits from clear back

21  in 2000.

22          MR. FITZSIMMONS:  Gina, could you put the last

23  page on there, Page 4, please?  Oh, it's on there?  All

24  right.

25          BY MR. FITZSIMMONS:

1    **Q.**   So, the blue -- reading this is pain medicine.  These

2    are all the specialists in pain medicine.  You're a

3    specialist.  And this goes from 20 -- or it goes from even

4    before 2000 all the way through 2017, this chart.  This is a

5    20-year period --

6    **A.**   Correct.

7    **Q.**   -- being graphed out.  The bottom blue is for all pain

8    specialists, people exactly in your specialty, as to what

9    they were prescribing in opioids.  Is that what that shows?

10   **A.**   That's incorrect.

11   **Q.**   Is that what the graph says?

12        MS. MAINIGI:  Objection.  Foundation.  Your Honor,

13   there's -- this witness has not seen the graph.  He doesn't

14   know whose data is contained within this graph.

15        THE WITNESS:  So, I would say -- oh, sorry.

16        THE COURT:  Overruled.  Answer the question.

17        THE WITNESS:  No.  That's incorrect because

18   anybody that does pain medicine at all, you could do

19   anesthesia four days a week and you can do pain one, which

20   is very common around the country.  Then you would be

21   considered pain medicine, but you may do maybe four days of

22   pain medicine.  If you're an academic center like Dr.

23   Gilligan, you don't write prescriptions at all.  Your

24   residents and fellows write for you.  So, this graph is

25   totally incorrect and misleading.  I don't know who

1    developed it, but it's totally wrong.

2    **Q.**    Doctor, okay.  As to the graph at the upper left-hand

3    corner right after the title, which the title says physician

4    dosage units compared to specialty averages, hyphen, Timothy

5    Deer.  IQVIA, West Virginia, 1997 to 2017.  Right underneath

6    that is a little descriptor of what the colors blue, red and

7    green for the three graphs that are drawn on that chart; do

8    you see that?

9    **A.**    I do.

10    **Q.**    And under the blue one, the first one, does it say pain

11    medicine?

12    **A.**    It says that.

13    **Q.**    All right.  And blue would be on the graph, the bottom

14    one; is that correct?

15    **A.**    Correct.

16    **Q.**    And then it has red, which is pain -- says pain

17    medicine.  Did I read that correctly?

18    **A.**    You did.

19    **Q.**    And that's the one, the lower one there; is that

20    correct?

21    **A.**    Correct.

22    **Q.**    And then, the green is what they have for you; is that

23    right?

24    **A.**    Correct.

25    **Q.**    All right.  Do you -- do you notice any resemblance

1    with that in the pill mountain, Doctor, as to the

2    prescribing?

3    **A.**    I do think that our practice mirrors what happened in

4    West Virginia since we are referral-only.  So, I think that

5    is what I -- that really reestablishes what I said earlier

6    on multiple occasions.  We do follow our referral base.

7         You see now in '17 we're way below anyone on that

8    graph.  But I also will tell you that the other two lines

9    without full-time pain practices are large groups.  So, I

10   think this is a misrepresentation of data, which is really,

11   I think, unfortunate.

12        But having said that, I'm really happy that, by '17,

13   we're well below anyone and I think that goes back to the

14   work we've done to eliminate opioids now that we've taken

15   more people off opioids than anyone in the State of West

16   Virginia, maybe the whole country.

17   **Q.**    And when did you start -- or did the practice pick up

18   on the neuromodulation that you were actually selling

19   devices and you do -- and it's kind of like a TENS unit, the

20   electrical stimulators and things like that.  I know that

21   was one of the early versions, but do you do that type of

22   treatment where somebody gets electrical shock and it kind

23   of stops the nerve from transmitting the signal?  That's

24   kind of an example, but that's my understanding.

25   **A.**    So, I think that the way you explained that is really

1      hard for me to answer.  So, if you're okay with it, I'll

2      clarify the question.

3      **Q.**   Would you, please?  Thank you.

4      **A.**   So, we have been doing neuromodulation since 1993, but

5      really in the last ten years, our work with the FDA devices

6      and really establishing new software and artificial

7      intelligence, actually, for the spine has really been

8      evolving greatly.  So, that's in the last five years.  Our

9      success of FDA approval of new devices and utilization has

10     really grown tremendously.

11          So, from '15 on, we've seen devices much more

12     effectively.  We've also developed peripheral nerve devices

13     for nerves and extremities.  So, again, most of those people

14     come in and come out of our practice off opioids.  That's a

15     major tool we've used to reduce that and we have the data

16     from our medical students that show that very clearly.

17               COURT REPORTER:  Can you please slow down for me?

18     I'm really sorry.

19               THE WITNESS:  I'm sorry.  We do -- I'll do better.

20     We have the data from our research that shows that very

21     clearly, that if you come to our practice on a high risk

22     opioid, which this doesn't reflect this.  This is a horrible

23     graph, but in the data, you have about an 80 percent chance

24     of getting off your opioid or being reduced by half.

25          The problem we had back in 1997 to 2015, they kept

1    coming in high volumes to our practice because we are the

2    only center for Southern West Virginia.  So, I think that's

3    really representative of that and it does mirror the

4    practice in West Virginia quite well.

5         So, the answer would be, we've been doing those

6    therapies for a long time.  For the last five years or so,

7    our success rates have climbed down to about 80 percent.  We

8    were about 50 percent before based on just technology

9    improvements.

10   **Q.**   Are you done with your answer?

11   **A.**   Yes, sir, I am.

12   **Q.**   All right.  So, in 2017, is that around when you

13   changed the name and got rid of the other name?

14   **A.**   No, that's not true.  I think it was earlier than that.

15   I think.  I don't think it was '17.  Could be, but I don't

16   think so.

17   **Q.**   Around that time?

18   **A.**   I think about '15 or so.

19   **Q.**   People were criticizing pain clinics and things like

20   that?

21   **A.**   I didn't like the name because I think it didn't

22   represent what we do, as well, because most of our studies

23   are on the spine and nerves.

24   **Q.**   And can you explain this chart?  I mean, its highest

25   level also now just falls off the chart almost here in the

```
 1    last couple of years.  You don't prescribe any opioids now?
 2             MS. MAINIGI:  Objection, Your Honor.  Once again,
 3    Mr. Deer -- Dr. Deer did not put this chart together.  He
 4    has no idea where the data came from.  So, he can't explain
 5    it.  There's no foundation laid for this data.
 6             THE COURT:  Well, I think it provides a good faith
 7    basis for the questions and I think he's explaining his
 8    answers very effectively.  So, I'm going to allow it.
 9    Overruled.
10             THE WITNESS:  So, I don't -- I don't start new
11    patients on opioids ever.  That's not something I do.  We
12    actually take over opioids from referring sources from all
13    over the place and then we try to bring them off.  So, what
14    you're seeing there is, I think from that data that I --
15    again, it's incorrect.
16        What you're seeing, though, overall is that as we are
17    more successful, as we have been in people getting off
18    opioids, our referral base has, because of the things we
19    talked about, CDC, SEMP guidelines, and the 2018 law, they
20    are sending us people now who they haven't started yet.
21        If you're not on opioids when you come to see us, your
22    odds are you'll never be on opioid.  So, I think you're
23    seeing now our referral base changing because we're a
24    reflection of the referral base in Southern West Virginia.
25    And then, you're seeing our success we've had for sometime
```

```
1    now, getting about 80 percent of the people off opioids, and

2    sometimes more than that.

3         And sometimes, totally eliminating an opioid, but when

4    we don't eliminate it, we may reduce it by at least half.

5    So, I think we've had great success.  But the funnel of new

6    people coming in has improved dramatically, is what we're

7    seeing.

8              MR. FITZSIMMONS:  Judge, I think I probably --

9    could we take break ten minutes early?  I think --

10             THE COURT:  Yeah.  It's time for a break anyway.

11   Let's come back at 3:30.

12        You can step down, Doctor, during the break.

13             THE WITNESS:  Thank you.

14             THE COURT:  We'll be in recess until 3:30.

15        (Recess taken)

16        (Proceedings resumed at 3:29 p.m. as follows:)

17             THE COURT:  You can resume the stand, Dr.

18   Deer.

19        All right, Mr. Fitzsimmons, go ahead.

20             MR. FITZSIMMONS:  No further questions, Judge.

21             MS. MAINIGI:  Your Honor, just a few.

22                     REDIRECT EXAMINATION

23   BY MS. MAINIGI:

24   Q.   Dr. Deer, I don't know --

25             MS. MAINIGI:  Gina, can you put up that chart that
```

1    you had up before, the one that we had up?

2    BY MS. MAINIGI:

3    **Q.**   Okay.  Dr. Deer, we were looking at this chart with

4    Mr. Fitzsimmons right before we broke.  Do you have any

5    idea how the data was collected for this chart?

6    **A.**   I do not.

7    **Q.**   And you don't know who Gryphon is, do you?

8    **A.**   I do not.

9    **Q.**   You don't know who Ann Ritter at Motley Rice is, do

10   you?

11   **A.**   I do not.

12   **Q.**   And it seems like those are the people involved in

13   gathering this information; is that correct?

14   **A.**   Yes, ma'am.

15   **Q.**   So let's look at this chart, though, and in particular

16   the components of it.  So where it says "pain medicine," do

17   you have any idea who the doctors are that went into that

18   sample?

19   **A.**   No, I don't actually.

20   **Q.**   And you have a couple of specialties.  You're an

21   anesthesiologist.  You also specialize in pain medicine.  Is

22   that correct?

23   **A.**   That's correct.

24   **Q.**   And I take it there aren't very many people like you in

25   West Virginia.  Is that fair?

```
 1    A.    I think we have about six people who do full-time pain.

 2    Q.    And you don't know if the folks in pain medicine as

 3    defined by the Gryphon in this chart included those six

 4    people or included a broader range of anesthesiologists;

 5    right?

 6    A.    We have probably 200 that do anesthesia with a little

 7    bit of pain.  And they're considered pain medicine too by

 8    many because they do one day a month or one day a week.

 9    Q.    So if you were compared to six other people versus 200

10    people, that would really affect the numbers; correct?

11    A.    Well, anesthesiologists generally do part-time pain,

12    treat more -- do more injections because they don't follow

13    patients chronically.

14    Q.    And, so, they may not be prescribing opioids very

15    often?

16    A.    That's correct.  That's true nationwide, not just in

17    West Virginia.

18    Q.    Now, I think you were asked a question about -- a few

19    questions about coal mining.

20          We can take that down.

21          Are you familiar with Mayor Steve Williams of

22    Huntington?

23    A.    I know the name.

24    Q.    Okay.  And are you aware that the City of Huntington,

25    as led by Mayor Williams, has actually said the following;
```

```
 1    that the continuing economic distress --

 2              MR. FITZSIMMONS:  Judge, --

 3    BY MS. MAINIGI:

 4    Q.   -- due to coal --

 5              THE COURT:  Just a minute.

 6              MR. FITZSIMMONS:  Could I have a citation for what

 7    she's referencing?

 8              MS. MAINIGI:  Yes.  I am citing the Mayor's

 9    Institute Case Statement, Defendants' West Virginia 902.

10    It's a document.  This is redirect, so I wasn't aware of

11    what you were going to ask on cross so I don't have a copy.

12              MS. KEARSE:  I think we have a copy.

13              MS. MAINIGI:  Okay.  If you want to pull it up,

14    that's fine.  I just have one question about it.

15              MR. FITZSIMMONS:  I'd like to look at the

16    document, please.

17              THE COURT:  You may.

18    BY MS. MAINIGI:

19    Q.   Okay.  So, Dr. Deer, are you aware that the City of

20    Huntington --

21              MR. FITZSIMMONS:  Judge, I'm still reading the

22    document.

23              MS. MAINIGI:  Your Honor, I don't know why that

24    would prevent me from asking a question.

25              THE COURT:  Go ahead, please.
```

1    BY MS. MAINIGI:

2    **Q.**   Are you aware that the City of Huntington has said

3    that, quote, continuing economic distress due to coal

4    and manufacturing decline has intensified the spread of

5    opioid use in Huntington to unthinkable proportions, end

6    quote?

7         Were you aware of that?

8    **A.**   I was not aware of that.

9    **Q.**   Does it make sense to you what the Mayor said?

10   **A.**   It does because if you have an economy or city that's

11   bigger than smaller cities around it, you're impacted by the

12   decline of employers in your region.

13   **Q.**   And did you tell us that you come from a family of coal

14   miners?

15   **A.**   Yes.  My dad worked at Island Creek Coal in Kelly, West

16   Virginia, and my grandpa in the same mines, and my other

17   grandpa at Slider's Creek as a strip-miner.

18   **Q.**   Thank you, Dr. Deer.

19            THE COURT:  Do you have anything further of this

20   witness?

21            MR. FITZSIMMONS:  Nothing further.

22            THE COURT:  May --

23        Mr. Hester.

24            MR. HESTER:  Yes, Your Honor.  I was just ready to

25   call my next witness.

```
 1              THE COURT:  Oh, okay.

 2         Dr. Deer, thank you, sir, very much.

 3              THE WITNESS:  It's been a real honor to be here.

 4    Thank you so much.

 5              THE COURT:  Glad to have you.  Good luck to you.

 6              MR. HESTER:  Your Honor, the defendants call

 7    Dr. James Hughes to the stand.

 8              THE COURT:  Okay.

 9              THE CLERK:  Sir, please state your name.

10              THE WITNESS:  James Hughes.

11              THE CLERK:  Thank you.  Please raise your right

12    happen.

13    JAMES HUGHES, DEFENDANTS' WITNESS, SWORN

14              THE CLERK:  Thank you.  Please take a seat.

15              THE COURT:  Good afternoon, Dr. Hughes.

16              THE WITNESS:  Good afternoon, Your Honor.

17                       DIRECT EXAMINATION

18    BY MR. HESTER:

19    Q.   Good afternoon, Dr. Hughes.

20    A.   Good afternoon.

21    Q.   Could you please introduce yourself to the Court?

22    A.   My name is James Hughes of Belgrade, Maine.

23    Q.   And what is your field of specialty, Dr. Hughes?

24    A.   I am an economist who specializes in applied

25    microeconomics, mainly labor economics and health economics.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**    And could you describe what health economics is?

2    **A.**    Sure.  Health economics is the study of the markets

3    that get health services distributed.  And it merits a

4    special field because the markets in health economics are

5    very different from the markets, say, for appliances or

6    automobiles or other articles.

7         For example, in pharmaceuticals the, the person who

8    decides what product is going to be purchased is not someone

9    who actually is paying for it or is consuming it.  And

10   that's very different from markets in other areas of

11   economy.

12   **Q.**    And does health economics include the study of public

13   and private insurance companies and other entities that pay

14   for healthcare services in the United States?

15   **A.**    Yes, it does.

16   **Q.**    And are those entities sometimes referred to as payers?

17   **A.**    They are.

18   **Q.**    Could you give me some examples of payers?

19   **A.**    Sure.  So payers are among the ones that you might

20   think of, CIGNA, United Healthcare.  But it also includes

21   government agencies like Medicare, Medicaid, and in the

22   State of West Virginia the Public Employees Health -- excuse

23   me -- Public Employees Insurance Association.

24   **Q.**    So, Dr. Hughes, we're going to get into your opinions

25   in more detail.  But at the very highest level of

1    generality, what were you asked to do in this case?

2    **A.**   I was asked to examine the role of these payers in the

3    prescribing of opioids in West Virginia.

4    **Q.**   So before we delve into your opinions, I'd like to give

5    the Court a sense of your background.  What's your

6    educational background?

7    **A.**   I have a BA in International and Comparative Studies

8    from Boston University; a Master's Degree in Economics from

9    Boston University; and a Ph.D. in Economics from the

10   University of Michigan.

11   **Q.**   And between the time that you got your Master's Degree

12   in Economics and your Ph.D., did you, did you work in

13   various pursuits?

14   **A.**   I did.  I worked at the United States Environmental

15   Protection Agency.  I worked at the OECD in Paris.  I worked

16   at SRI International in Palo Alto, and also for the Rand

17   Corporation briefly.

18   **Q.**   And at a high level, what did your work as an economist

19   detail during those years?

20   **A.**   I was either the author or supervisor of reports that

21   examined how economic incentives could make the regulatory

22   system more efficient and improve compliance with

23   regulations.

24   **Q.**   So after you earned your Ph.D., Dr. Hughes, what did

25   you do then?

1   **A.**   After I earned my Ph.D., I started as an Assistant

2   Professor at the State University of New York at Albany.

3       From there, I moved as an Assistant Professor to

4   Amherst College in Massachusetts, and then to Bates College

5   in Lewiston, Maine, as an Assistant Professor.  Over time, I

6   became an Associate Professor and then a Full Professor.

7   **Q.**   And you mentioned these years as a Professor at

8   different colleges and universities.  A Professor in what,

9   Dr. Hughes?

10  **A.**   I'm sorry.  Professor of Economics.

11  **Q.**   And what is your current position?

12  **A.**   I am a -- at Bates College I am Professor of Economics

13  Emeritus.

14  **Q.**   And what is Bates College?

15  **A.**   It's a small liberal arts college in Maine.

16  **Q.**   And how would you describe the reputation of the

17  economics department at Bates College?

18  **A.**   I think the college was quite proud of its economics

19  department.  There was a study that ranked the Bates

20  economics department as second in the country in the number

21  of times that our colleagues' research was cited by other

22  researchers.

23  **Q.**   And do you hold a current title at Bates College?

24  **A.**   Yes.  I am the Thomas Sowell Professor of Economics

25  Emeritus.

1    **Q.**   And, so, you refer to an Emeritus position.  Does that

2    mean you're retired?

3    **A.**   I am indeed.

4    **Q.**   And when did you retire?

5    **A.**   July 30th, 2020.

6    **Q.**   And before you retired, were you a tenured member of

7    the faculty?

8    **A.**   I was.

9    **Q.**   And what does it mean that you're the Thomas Sowell

10   Professor?

11   **A.**   The Thomas Sowell Professorship is what's called an

12   Endowed Chair.  It's a title that is funded by a donation

13   from a benefactor and it's awarded -- it's a higher honor

14   than simply being a Full Professor.

15   **Q.**   And before you retired from, from your teaching role,

16   what kind of classes did you teach at Bates College?

17   **A.**   I taught most everything in applied microeconomics.  I

18   taught health economics, labor economics, environmental

19   economics, economics of intellectual property, introductory

20   and intermediate microeconomic theory, introductory

21   macroeconomic theory.  And there's probably some others I'm

22   not remembering.

23   **Q.**   Let me ask you about your teaching in health economics

24   specifically.  Did that include a focus on health insurance

25   as part of a course on health economics?

1    **A.**   Yes, it did.  In fact, the first time I taught health

2    economics in the '90s, we structured the entire course

3    around what was at the time called Hillary Care, President

4    Clinton's failed but proposed health insurance scheme.

5    **Q.**   And, so, did that involve looking at the interactions

6    between insurers and payers, patient prescribers and the way

7    that medicine gets dispensed in the United States vis-à-vis

8    insurance?  Was that a core part of what you were doing?

9    **A.**   Yes, I mean exactly.  That proposal would have affected

10   pretty much every aspect of the health delivery system,

11   including insurance, payers, pharmaceuticals, hospital

12   services and the like.

13   **Q.**   And did you teach on the subject of health insurance

14   over a number of years while you were at Bates?

15   **A.**   Yes, I've taught health insurance on a number of

16   occasions.

17   **Q.**   And --

18   **A.**   I'm sorry, health economics on a number of occasions.

19   **Q.**   And that included health insurance?

20   **A.**   Yes, it did.

21   **Q.**   Have you received any awards or honors for your

22   teaching?

23   **A.**   Yes.  I am happy to say I've been the only person to

24   win the Kroepsch Teaching Award at Bates twice.

25   **Q.**   And what is the Kroepsch Teaching Award?

**A.**   It's a teaching award that is awarded based on student input.

**Q.**   And aside from your teaching role, did you hold any leadership positions in the economics department at Bates?

**A.**   In the economics department I served as Department Chair for about six years.

**Q.**   And what did that role entail?

**A.**   That was basically organizing the teaching and advising duties of the economics faculty, but also responsibility for promoting the interests of the department both within the college and outside the college.

**Q.**   Did you serve on any college committees that had interactions with insurers?

**A.**   Yes.  I was a member and sometimes chaired what was called the Ad Hoc Benefits Committee.  And that was a committee that reviewed insurance proposals, health insurance proposals, and chose the insurance program that the college would offer to its faculty and staff.

**Q.**   In addition to your teaching role, Dr. Hughes, is research another major component of your professional work?

**A.**   It is.

**Q.**   And on what topics have you engaged in that kind of research?

**A.**   I have engaged in research in labor economics and health economics, and also on the prescription drug

```
1    industry.

2    Q.    And have you received grant funding for your research?

3    A.    Yes.  I received several minor and one major grant for

4    my research from Bates College.  And then after my

5    dissertation, I received a major grant from the Robert Wood

6    Johnson Foundation, which is a renown funding agency in the

7    area of healthcare.

8    Q.    And have you published academically?

9    A.    I have.

10   Q.    And about how many peer-reviewed papers have you

11   published?

12   A.    Approximately two dozen.

13   Q.    And have you given lectures nationally and

14   internationally related to your research?

15   A.    Yes.  I've given several lectures both around Maine,

16   around the country, as well as places like Berlin,

17   Amsterdam, Hong Kong, or Beijing.

18   Q.    And we're talking about your research work.  Has some

19   of that research involved health insurance in the

20   pharmaceutical industry?

21   A.    Yes.

22   Q.    And have you done any research into the economics of

23   substance abuse?

24   A.    Yes, I have.  I had a post-doctoral fellowship at the

25   Brandeis University Heller School.  I believe it's the
```

```
 1    Heller School for Public Health.  And that was -- I was the

 2    co-author of studies on substance abuse and substance abuse

 3    treatment.

 4    Q.   Have you done other research on the pharmaceutical

 5    industry?

 6    A.   Yes.  In the course of my consulting work, I have done

 7    extensive research on the pharmaceutical industry.

 8    Q.   And about how many years does that span?

 9    A.   About 25 years.

10    Q.   And is much of that work published?

11    A.   No.  Unfortunately, I believe that much of this work

12    would be publishable but, unfortunately, the data that I was

13    using in my consulting work was all confidential.  So I was

14    not able to publish it.

15    Q.   Now, you mentioned 25 years of research work related to

16    the pharmaceutical industry.  How much of that focused on

17    health insurance issues?

18    A.   Almost all of it.

19    Q.   Dr. Hughes, let's turn to another part of your

20    professional work.  Do you also serve as an expert witness

21    from time to time?

22    A.   I do.

23    Q.   And approximately how many cases have you testified as

24    an expert over the course of your career?

25    A.   It's somewhere between 30 and 40 over 25 years.
```

1   **Q.**   And have those cases focused on matters involving the

2   pharmaceutical industry and insurance matters?

3   **A.**   Yes, almost all of them.

4   **Q.**   And in addition to those cases, have you also been

5   asked to offer opinions in several other opioid litigation

6   matters?

7   **A.**   I have.  I've been asked to offer opinions in the Ohio

8   case, here in West Virginia, the State of Washington, and

9   the State of Rhode Island.

10   **Q.**   Are you being compensated for your work in this case?

11   **A.**   I am.

12   **Q.**   And what is your hourly rate?

13   **A.**   My hourly rate is $950 an hour.

14   **Q.**   How long have you been working on this case involving

15   the City of Huntington and Cabell County?

16   **A.**   I began work in July of 2020.

17   **Q.**   And what tasks have you worked on since you started

18   working on this project?  What have you, what have you done

19   to pursue this project?

20   **A.**   Sure.  I have researched the, the situation, the

21   insurance situation in West Virginia, reviewed documents,

22   reviewed the record in the case, deposition testimony, and

23   some of the documents that have been produced.

24   **Q.**   Now, did you perform any original analyses of insurance

25   claims data as part of your work in the case?

1    **A.**    No, I have not.

2    **Q.**    And why not?

3    **A.**    Well, first of all, I -- it wasn't really within the

4    scope of my assignment.  But, secondly, I don't believe it

5    was necessary to reach the conclusions that I did.

6         The record has much information.  There's a lot of

7    public, publicly available reports.  And these were adequate

8    to demonstrate that the tools that I discussed were

9    available and usable and effective.

10   **Q.**    Did you receive help from support staff in performing

11   your work in this case?

12   **A.**    Yes.  I was, I was assisted by the staff at Cornerstone

13   Research.

14   **Q.**    And what is Cornerstone Research?

15   **A.**    Cornerstone Research is a -- I would call it a

16   multi-faceted consulting firm.

17   **Q.**    And what is your relationship with Cornerstone?

18   **A.**    I've worked with Cornerstone for about 10 years on

19   various matters.

20   **Q.**    So, Dr. Hughes, we've talked about your involvement in

21   teaching and academic research, expert witness matters and

22   research.  Through all of those different areas of your

23   professional life, have you had a real focus on health

24   insurance matters related to the pharmaceutical industry?

25   **A.**    Yes, I believe I would characterize it that way.

1    **Q.**   And have you developed a specific expertise in health

2    insurance matters and economics of health insurance as they

3    relate to the pharmaceutical industry?

4    **A.**   Health insurance and the pharmaceutical distribution

5    system, yes, I believe I have.

6    **Q.**   And how long have you been focused in this area?

7    **A.**   About 25 years.

8              MR. HESTER:  Your Honor, I now tender the witness

9    as an expert in health economics and health insurance

10   related to prescription medicines.

11             THE COURT:  Any objection?

12             MR. MAJESTRO:  No, Your Honor.

13   BY MR. HESTER:

14   **Q.**   Dr. Hughes, before we get into your opinions --

15             THE COURT:  Let me --

16             MR. HESTER:  Oh, I'm sorry, Your Honor.  Sorry.  I

17   was on a roll.

18             THE COURT:  I find that Dr. Hughes is an expert in

19   the area of health economics and health insurance -- how did

20   you phrase it?

21             MR. HESTER:  Yes.  I said, Your Honor, an expert

22   in health economics and health insurance related to

23   prescription medicines.

24             THE COURT:  I find him to be an expert in those

25   fields.  You may proceed.

1             MR. HESTER:  Thank you, Your Honor.

2     BY MR. HESTER:

3     **Q.**   Dr. Hughes, before we get into your opinions, I'd

4     like to cover some of the topics that you're not

5     addressing in your opinions today.

6          Have you been asked to determine or apportion causation

7     in this matter?

8     **A.**   I have not.

9     **Q.**   Are you offering any opinions related to an assignment

10    of fault or blame to any parties?

11    **A.**   No.

12    **Q.**   And are you offering an evaluation of any subject

13    outside of health insurance and how health insurance affects

14    the prescribing of opioids?

15    **A.**   I am not.

16    **Q.**   All right.  So now, Dr. Hughes, let's begin by talking

17    a little bit about the various participants in the market

18    for prescription pharmaceuticals.  And I'd like to focus on

19    the role of payers.  You mentioned payers before and I'd

20    like to focus on the role of payers and how prescription

21    medicines go to patients with the assistance of payers.

22         So we'll put up a schematic here.

23         So, Dr. Hughes, is this a schematic that you prepared

24    as part of your expert report to explain the way this

25    industry works?

1    **A.**    Yes, it is.

2    **Q.**    And over on the left-hand side we see a familiar set of

3    terminologies; a manufacturer, distributor, pharmacy,

4    patient.  Do you see that?

5    **A.**    I do.

6    **Q.**    And then could you describe generally what, what you

7    have over here?  You have pharmacy benefit managers, health

8    insurers, and plan sponsors.

9        What, what are those parties and what do they signify

10    in terms of the way this industry works?

11    **A.**    If we start in the lower right-hand corner, we have

12    listed West Virginia Medicaid, PEIA, and other plan

13    sponsors.

14        Plan sponsors are entities that organize and provide

15    healthcare to their beneficiaries or employers -- excuse

16    me -- employees.

17        So, typically, plan sponsors tend to be employers,

18    union benefit plans.  And they also can include government

19    agencies like Medicare and Medicaid.

20        If we move up to health insurer managed care

21    organization, this refers to -- largely refers to the type

22    of insurance companies that you're used to hearing, Aetna,

23    United Healthcare, and the like.  And these are

24    organizations that sell in various forms health insurance

25    services to the plan sponsors and the beneficiaries of the

1    plan sponsors.

2    **Q.**   So let me stop you there for just a second, Dr. Hughes,

3    so we make sure we cover all these points.

4        So you mentioned this plan sponsors which are down here

5    in the lower corner.  Is the State of West Virginia a plan

6    sponsor?

7    **A.**   Yes, through the West Virginia -- excuse me -- West

8    Virginia Medicaid and the PEIA.

9    **Q.**   And what is the role of the state in administering

10   Medicaid?

11   **A.**   Medicaid is a joint federal and state health insurance

12   program for low income individuals.  Each state has somewhat

13   different regulations that govern Medicaid.  And each state

14   governs its own Medicaid program in compliance with federal

15   rules that basically dictate the minimum benefits that have

16   to be included in every plan.

17   **Q.**   And you also list on this diagram PEIA.  Is that the

18   Public Employees Insurance Agency?

19   **A.**   It is, yes.

20   **Q.**   And what is the PEIA?

21   **A.**   PEIA is an organization that provides health insurance

22   to public employees and some school districts in West

23   Virginia.

24   **Q.**   So the diagram, in addition to these plan sponsors,

25   lists health insurers.  How are health insurers different

1    from plan sponsors?

2    **A.**    Health insurers are the companies that actually

3    organize and sell the healthcare services that -- where you

4    purchase health insurance from.

5    **Q.**    And then the diagram also lists pharmacy benefit

6    managers.  What are they?

7    **A.**    Pharmacy benefit managers are companies that, as the

8    name implies, they administer the pharmacy benefits for the

9    health insurance and plan sponsor organizations.

10          Primarily, they adjudicate pharmacy claims and pay the

11   pharmacy and bill the health insurer.  But over time they've

12   also expanded into other ancillary services that they

13   provide in the industry.

14   **Q.**    So these three types of entities that we've been

15   discussing, plan sponsors, health insurers, and pharmacy

16   benefit managers, collectively is that what we refer to as

17   payers?

18   **A.**    Yes, it is.

19   **Q.**    Dr. Hughes, in connection with your work on this

20   matter, did you review data on the percent of people in West

21   Virginia who are covered by health insurance?

22   **A.**    Yes, I have.

23   **Q.**    And what was the source of that data?

24   **A.**    The source of that data was a Kaiser Family Foundation

25   document on health insurance coverage by payer by state.

1  **Q.**   And what is the Kaiser Family Foundation data based

2  upon?

3  **A.**   The Kaiser -- this Kaiser Family Foundation study was

4  based on data from the U.S. Census Bureau as contained in

5  the American Community Survey which is run every year by the

6  Census Bureau.

7  **Q.**   And did you rely on this Kaiser Family Foundation data

8  in forming your opinions in this case?

9  **A.**   I did.

10 **Q.**   And is this the type of data that you would rely upon

11 as a health economist, broadly speaking?

12 **A.**   Yes.

13 **Q.**   And do you consider it a reliable source of

14 information?

15 **A.**   Yes.  The Kaiser Family Foundation information is

16 commonly used by economic and other researchers in the

17 health field.

18 **Q.**   Have you prepared a demonstrative based on the Kaiser

19 Family Foundation data to show --

20 **A.**   Yes.

21 **Q.**   -- the coverage rates in West Virginia for people who

22 are, have coverage for health insurance?

23 **A.**   Yes.  Sorry.  Yes, I have.

24 **Q.**   All right.  So, Dr. Hughes, what does this

25 demonstrative show at a high level?  What's it purporting to

1    show?

2    **A.**    Well, at a high level, it shows the total number -- on

3    the far right-hand side in the top row, it shows the total

4    number of people who are insured in West Virginia, which is

5    about 1.6 million.  And --

6    **Q.**    In 2018?

7    **A.**    Yes, I'm sorry, in 2018.  And going across the top row,

8    it shows about 773,000 have employer insurance.  55,000 have

9    individual or non-group insurance.  And that would largely

10   be people getting insurance through the healthcare,

11   marketplace of the Affordable Care Act.  463,000 in

12   Medicaid; 329,000 in Medicare; 22,000 in military; and

13   108,000 individuals are uninsured.

14   **Q.**    And what does this data reflect about the percentage of

15   people in West Virginia who have health insurance?

16   **A.**    Overall, about 94 percent of people in West Virginia

17   have health insurance.

18   **Q.**    And could you also provide us with a percentage of --

19   what percentage of people are insured under health employer

20   sponsored plans?

21   **A.**    Just under half, about 44 percent under employer health

22   insurance plans.

23   **Q.**    And what percentage are covered by West Virginia

24   Medicaid?

25   **A.**    That's 26 percent.

1    **Q.**    And what percentage are covered by Medicare?

2    **A.**    About 19 percent.

3    **Q.**    And the remaining are covered by health insurance

4    directly from an insurance company or through the military?

5    **A.**    That's correct.

6    **Q.**    With about 6.2 percent of the population of West

7    Virginia being unemployed -- I'm sorry -- uninsured?

8    **A.**    Correct.

9    **Q.**    Would you expect the Medicaid percentage that we show

10   here, 26 percent, would you expect that Medicaid percentage

11   to be about the same for Cabell and Huntington?

12   **A.**    No.  I would expect the percentage to be higher in

13   Cabell County and Huntington.

14   **Q.**    At the percentage of people covered by Medicaid?

15   **A.**    Yes, the percentage of people covered by Medicaid.  I

16   would expect that to be higher in Cabell County and

17   Huntington.

18   **Q.**    And why would you expect that?

19   **A.**    Well, the primary qualification for Medicaid is one's

20   level of income.  And the income level in Cabell County is

21   substantially below the statewide average.  So I would

22   expect the Medicaid percentage to be somewhat above the

23   statewide average for Medicaid coverage.

24   **Q.**    Would you expect to see any difference in Cabell County

25   and the City of Huntington with respect to the percentage of

1    people who are insured by some health insurance?

2    **A.**    No.  I would expect that to be about the same,

3    especially by 2018 with the Medicaid -- yes, excuse me --

4    with the Medicaid expansion under the Affordable Care Act.

5    **Q.**    What is the income eligibility requirement for

6    Medicaid?

7    **A.**    The basic eligibility requirement is you have to earn

8    less than 138 percent of the federal poverty level.

9    **Q.**    And do you know roughly what percentage of the Cabell

10   County population is below the poverty level?

11   **A.**    I understand that -- I understand that it's said to be

12   about 30 percent of the population of Cabell County is below

13   the poverty level.

14   **Q.**    Is that based on testimony from Mayor Williams?

15   **A.**    Yes.  I couldn't remember his name.  Thank you.

16   **Q.**    And would you expect -- if, if roughly 30 percent of

17   Cabell County and the City of Huntington population is below

18   the poverty line, would you expect even more people than

19   that would fall within the 138 percent eligibility

20   requirement for Medicaid?

21   **A.**    Yes.  I mean, I think it's safe to conclude that in

22   Cabell County, 30 percent or more of the population would at

23   least be eligible for Medicaid.  Whether or not they

24   actually sign up for it is another question.

25   **Q.**    Did you review data as well, Dr. Hughes, on the retail

1    prescription drugs that are filled at pharmacies and are

2    subject to some sort of insurance reimbursement?

3    **A.**   Yes, I have.

4    **Q.**   And what was the source of that data?

5    **A.**   That is another Kaiser Family Foundation document, this

6    one on prescription, prescription payment by payer type.

7    **Q.**   And is that a document you also relied on in forming

8    your opinions in this case?

9    **A.**   Yes, it was.

10   **Q.**   And the type of data that you would generally rely on

11   as a health economist?

12   **A.**   Yes.

13   **Q.**   And do you consider the Kaiser Family Foundation data

14   on insurance coverage for prescription drugs to be a

15   reliable source of information?

16   **A.**   Yes, in this case, yes.

17   **Q.**   Did you prepare a demonstrative based on that data to

18   aid your testimony?

19   **A.**   I did indeed.

20   **Q.**   So, Dr. Hughes, what does this demonstrative show at a

21   high level?

22   **A.**   Again, in 2019, this shows the reimbursement rate for

23   prescriptions by type of payer, commercial insurance,

24   Medicare, Medicaid, and cash payers.

25   **Q.**   And when you refer to reimbursement rates, what do you

```
 1    mean by that?
 2    A.    A reimbursement rate is the -- in this case, the
 3    fraction of payments for prescriptions by insurers.  So we
 4    refer to -- when my insurance company pays for my
 5    prescription, it's referred to as reimbursed for that
 6    prescription.
 7    Q.    So let's focus on the percentage line here, the
 8    percentage of, of prescriptions covered by the different
 9    forms of insurance.  Could you just state what you're seeing
10    here on this demonstrative?
11    A.    Sure.  Commercial insurance, about 41 percent of
12    prescriptions were covered by commercial insurance;
13    Medicare, about 29 percent; Medicaid, about 25 percent; and
14    only about 4 percent were paid in cash.
15                 THE COURT:  What if there's a co-pay?  Did you
16    figure that in?
17                 THE WITNESS:  This doesn't have to do with
18    dollars, Your Honor.  This just is the count of
19    prescriptions.
20                 THE COURT:  Oh, okay.
21    BY MR. HESTER:
22    Q.    So does this tell us, Dr. Hughes, what percentage
23    of the prescriptions in West Virginia for all drugs,
24    what percentage of the prescriptions are covered by
25    insurance?
```

1    **A.**    Yes.

2    **Q.**    And what's that percentage?

3    **A.**    That percentage is about 96 percent.

4    **Q.**    And about 4 percent of prescriptions in West Virginia

5    are paid for in cash?

6    **A.**    That's correct.

7    **Q.**    Now, this is, this is covering all prescription drugs

8    in West Virginia; correct?

9    **A.**    That's correct.

10   **Q.**    Would you expect a breakdown in terms of insurance

11   coverage to be the same for prescription opioids?

12   **A.**    No, I would not.

13   **Q.**    What would you expect the difference to be?

14   **A.**    I would expect a higher fraction of the opioid

15   prescriptions would be paid for by Medicaid.

16   **Q.**    And would you expect the total percentage of

17   prescriptions covered by some form of insurance to be the

18   same; in other words, about 96 percent of prescription

19   opioid prescriptions would be covered by insurance?

20   **A.**    Yes, I would think so.

21   **Q.**    And why is that, Dr. Hughes?

22   **A.**    There were two things in there.  I'm sorry.  Why is

23   what?

24   **Q.**    I'm sorry.  Why, why would you expect that the

25   percentage coverage for insurance for prescription opioids

1    would be comparable to the percentage coverage for all

2    prescriptions?

3    **A.**    Yes.  Again, because of the Medicaid expansion under

4    the Affordable Care Act, we saw before that almost all West

5    Virginians are covered by some sort of insurance.  And, so,

6    they would also have prescription drug coverage that would

7    go along with that.

8    **Q.**    So your understanding would be roughly speaking

9    something in the range of 96 percent of prescription opioids

10   dispensed in West Virginia would be covered by some form of

11   insurance?

12   **A.**    I would think so, in the mid 90 percentile, yeah.

13   **Q.**    Let's talk a little bit about the incentives of payers.

14   Are payers only willing to reimburse for prescriptions that

15   are medically necessary?

16   **A.**    Yes, that's -- I believe that's correct.

17   **Q.**    And why is that?

18   **A.**    To pay for medically unnecessary prescriptions is, in

19   effect, a waste of money.  The insurer is paying for a

20   prescription that does not yield a commensurate medical

21   benefit to the patient.

22          And, so, that raises the cost of the insurance company.

23   And it's a cost that they have to recover through higher

24   premiums charged to beneficiaries and to plan sponsors.

25   **Q.**    Is there also a policy requirement under West Virginia

1      Medicaid about paying only for medically necessary services?

2   **A.**    Yes.  West Virginia Medicaid has a written policy that

3      it will cover only medically necessary health services.

4   **Q.**    Now, you've been speaking generally about medically

5      necessary health services.  Would that same point apply to

6      reimbursement by insurers of prescription opioids?

7   **A.**    Yes, I believe it would.

8   **Q.**    And, so, what does that mean in terms of the payers'

9      reimbursement practices?  Let me strike that and start over.

10         What does this point mean about insurers looking at

11     medically necessary services?  What would that mean about

12     their reimbursement practices with respect to prescription

13     opioids?

14  **A.**    It means that they have incentive to use tools at their

15     disposal in order to determine and make sure that the

16     prescriptions that are reimbursed are, in fact, medically

17     necessary.

18  **Q.**    And would insurers be looking, therefore, at the

19     medical necessity of a prescription in evaluating whether

20     they would reimburse for it?

21  **A.**    Yes.

22  **Q.**    And would they also be looking at the number of pills

23     included in a prescription in evaluating whether it was

24     medically necessary and appropriate to reimburse?

25  **A.**    Yes.  They only want to reimburse for the number of

1      pills necessary to treat the patient's condition.

2      **Q.**   So how do payers determine whether a particular

3      prescription or a whole wide range of prescriptions are

4      medically necessary and appropriate?  How do they do that?

5      **A.**   Well, one of the ways they do it is through a practice

6      known as prior authorization through which the physician

7      when prescribing a particular drug has to provide an

8      explanation and justification for that, prescribing that

9      drug based on the patient's condition, the patient's medical

10     history, their co-morbidities and the like.

11     **Q.**   Do payers also have doctors on staff who are engaged in

12     the process of evaluating medical necessity if there are

13     reimbursements?

14     **A.**   Yes.  The medical insurers have formulary committees

15     that are tasked with deciding what drugs are going to be

16     covered and at what level.  Those panels have physicians on

17     board that bring the current state of medical knowledge and

18     the current best practice into the discussion.

19         And, also, physicians are involved in insurer's drug

20     utilization reviews which are data based reviews that are

21     conducted to, again, try to make sure that they are

22     reimbursing only those prescriptions that are medically

23     necessary.

24     **Q.**   So how, how are payers' practices in evaluating medical

25     necessity of reimbursement for prescription opioids or any

1     other prescription drug, how are those practices affected by

2     evolving standards of care?

3     **A.**    Well, that's the role of the doctors on formulary

4     committees and on drug utilization reviews.  As time goes on

5     and more knowledge is gained about particular drugs or more

6     knowledge is gained about the, the medical results of

7     prescribing particular drugs, those factors regarding the

8     standard of care come into the discussions on what drugs

9     will be included on the formulary as well as the utilization

10    review which is a retrospective look at how effective

11    particular drugs have been at treating particular ailments.

12    **Q.**    So, so is it fair to say that the payers' approach to

13    determine what prescriptions are medically necessary and

14    what they will reimburse will evolve over time as the

15    standard of care evolves?  Is that a fair way to put it?

16    **A.**    Yes, I believe that's fair.

17    **Q.**    By only reimbursing what payers consider to be

18    medically necessary, are the payers purporting to supplant

19    or replace the judgment of doctors?

20    **A.**    No, I don't believe so.  I believe that the process

21    like prior authorization is basically a chance for the, for

22    two things to happen; for the doctor to reflect on the

23    prescription that he or she is writing to make sure that it

24    fits with the patient's needs and the patient's medical

25    history and other factors, and it's a check on the doctor to

1    make sure that they are either adhering to the standard of

2    care that the payer has set, or if they're not adhering to

3    the standard of care to justify why they're not.

4         But it also bears pointing out that the doctor's

5    medical judgment is unquestioned by payers when the prior --

6    when there's not prior authorization on the drug.  Doctors

7    are considered to have determined that prescriptions are

8    medically necessary and the payers generally reimburse these

9    without question.

10   **Q.**   And, Dr. Hughes, in your experience over many years of

11   studying this industry, do payers, in fact, perform analyses

12   and employ tools to identify or limit medically unnecessary

13   prescriptions?

14   **A.**   Yes, all the time.

15   **Q.**   And do payers have processes in place to reject

16   coverage for prescriptions that they deem medically

17   unnecessary?

18   **A.**   Exactly.  So prior authorization is one way to do this.

19   And failure to adhere to, say, step therapy is another

20   reason to reject a prescription.

21   **Q.**   So when a payer reimburses for a prescription, does

22   that fact indicate that the payer concluded that the

23   reimbursed prescription was medically necessary?

24   **A.**   Yes, I believe that's true.

25   **Q.**   And would that same point apply to reimbursement for

1    prescription opioids?

2    **A.**    Yes.

3    **Q.**    So, Dr. Hughes, now let's pivot a little bit and talk

4    about information flows.  Let's go back to this

5    demonstrative.

6        So we talked about plan sponsors.  We talked about

7    health insurance, pharmacy benefit managers.  Let's talk

8    about the information that payers have about a particular

9    prescription and let's -- so, Dr. Hughes, we've now put some

10   lines up on this board reflecting information.

11       Could you describe what that is reflecting?

12   **A.**    Sure.  A primary source of information to the payers is

13   the claims information that comes from the pharmacy.  It

14   flows generally initially to the pharmacy benefits manager

15   or to the health insurer depending on basically the terms of

16   the contract.

17       Claims information also flows from pharmacy benefit

18   managers to the health insurers.  And that can be in the

19   form of raw claims information or one of the ancillary

20   services I was talking about before.

21       Pharmacy benefit managers can and do perform various

22   analyses on behalf of the insurers.  And, so, they may get

23   claims information that has already been processed in some

24   way or to answer a particular question that the health

25   insurer asks.

1          From the patient, the patient gives the physician

2     medical information.  The physician passes on through the

3     doctor's claim to the health insurer, passes on that medical

4     information to the health insurance organization.  And the

5     health insurer passes on utilization information,

6     utilization reviews back to the payers.

7     **Q.**   So the claims data that the payers would receive

8     includes information about the patient, the prescriber, and

9     the service or the prescription provided; is that correct?

10    **A.**   The claims information would contain a lot of different

11    details.  So it would include information on the provider,

12    the patient, the pharmacy, the drug, the dosage of the drug,

13    the number of the pills.  And it would also be available how

14    many prescriptions for how many different drugs the patient

15    might also be taking.

16    **Q.**   And, so, how is it that the payers obtain this

17    information?

18    **A.**   When the claim is adjudicated when the pharmacy turns

19    it into the pharmacy benefits manager to be reimbursed for

20    the prescription that they've dispensed, they transmit this

21    claims information electronically to the pharmacy benefits

22    manager who then turns it over either again in the raw form

23    or in processed form to health insurers and to payers.

24    **Q.**   So do payers collect this kind of individual data for

25    every claim they process?

1    **A.**    They do.

2    **Q.**    And would that include every claim they process for the

3    reimbursement of a prescription opioid?

4    **A.**    It would.

5    **Q.**    Do payers have the ability to analyze the prescribing

6    and prescription trends using that kind of claims data?

7    **A.**    Yes, they have that ability and they, they make use of

8    that ability.

9    **Q.**    And I wanted to ask you in your experience studying

10   this industry over a long time, have you seen evidence that,

11   in fact, payers do undertake that kind of analysis of claims

12   data as it arrives?

13   **A.**    Yes.  It is an on-going -- major insurers, major payers

14   will either have in-house data capabilities or they have

15   vendors that they go to that process and provide analyses of

16   particular questions that the payer puts them in.

17   **Q.**    So, so can payers use the claims data they receive to

18   identify trends and the number of, let's say, prescription

19   opioid prescriptions that they paid for that were written by

20   particular doctors?

21   **A.**    Yes, they could.

22   **Q.**    Could they use that kind of claims data on prescription

23   opioids to analyze individuals who are receiving particular

24   prescriptions for opioids?

25   **A.**    Yes, they could do that as well.

1    **Q.**    Could they undertake as well to evaluate the opioids

2    that they're reimbursing of particular pharmacies?

3    **A.**    Yes, they could do it at the pharmacy level as well.

4    **Q.**    Would payers have the ability to identify patients who

5    are receiving high volumes of prescription opioids?

6    **A.**    Yes, the prescriptions that they've reimbursed, yes.

7    **Q.**    And would they also have the ability to evaluate

8    doctors who are writing high volumes of prescriptions?

9    **A.**    Yes, they would.

10   **Q.**    And have you reviewed examples that are consistent with

11   these kinds of analyses, that payers analyze claims data in

12   these ways to look at patients, to look at doctors, to look

13   at individual pharmacies?

14   **A.**    Yes, I have.

15   **Q.**    I wanted to focus particularly on two specific payers

16   that we've already talked about a little bit, West Virginia

17   Medicaid and the Public Employees Insurance Agency.

18        Have you reviewed the deposition testimony of

19   individuals involved in administering those health plans?

20   **A.**    I have.

21   **Q.**    And have you reviewed documents related to those health

22   plans?

23   **A.**    I have.

24   **Q.**    And based on your review of the deposition testimony

25   and documents, do you have an opinion as to whether West

1    Virginia Medicaid and the Public Employees Insurance Agency

2    were performing these kinds of analyses that we've just

3    discussed in relation to different prescriptions?

4    **A.**    Yes.  I did examine that and they are performing the

5    types of analyses that we just discussed previously.

6    **Q.**    And would you expect private payers to be engaging in

7    the same kind of analyses of the prescriptions that they

8    reimburse?

9    **A.**    I know they are, yes.

10   **Q.**    Do the claims data and the, and the ability to analyze

11   information, the kind of information that's shown on the

12   board here, does that apply only to prescriptions that the

13   payers reimburse?

14   **A.**    Yes.  If the -- if a prescription is reimbursed by a

15   different payer or if a prescription is paid in cash, that

16   payer would not -- it would be -- it's not impossible, but

17   it would be unlikely that the payer would get claims

18   information on that.

19   **Q.**    Is there another database that contains information

20   about all opioids dispensed in the State of West Virginia?

21   **A.**    Yes.  Since 2004, I believe, West Virginia has run the

22   Controlled Substance Monitoring Program which collects data

23   on every opioid prescription dispensed in West Virginia.

24   **Q.**    And can the CSMP be used to perform all of the analyses

25   for controlled substances prescribing that we've just been

1    discussing in relation to claims data?

2    **A.**    Yes.  And the Bureau of Pharmacy presents annual

3    reports that contain many of the types of analyses that we

4    just discussed.

5    **Q.**    And, Dr. Hughes, are you aware as to when West Virginia

6    mandated that doctors use the CSMP before writing opioid

7    prescriptions?

8    **A.**    I believe that was in 2019.

9    **Q.**    Does West Virginia Medicaid have access to the CSMP?

10   **A.**    They do on a patient by patient basis.

11   **Q.**    Can anyone else access the CSMP if they want?

12   **A.**    Not anyone else.  There is -- in the law that

13   established the CSMP and as it's been amended, there's a

14   list of types of organizations and individuals who are able

15   to access the CSMP.

16   **Q.**    Do distributors have access to the CSMP?

17   **A.**    No, they do not.

18   **Q.**    Does PEIA have access to the CSMP?  And PEIA again is

19   the Public Employees Insurance Agency.  Does that have

20   access to the CSMP?

21   **A.**    They do not.  As a state organization, they could

22   petition for such access but they, they do not currently

23   have access.

24   **Q.**    All right.  So, Dr. Hughes, we've been talking so far

25   about information flows and the information available to

1    payers through claims data and the like.

2        Let's also talk about tools that are available to

3    payers that would allow them to influence opioid

4    prescribing.

5        And before we do that, I wanted to clarify that the

6    claims information we've been talking about, these are flows

7    of information that would apply to any kind of prescription,

8    so that would include prescription opioids that are being

9    reimbursed by insurers; correct?

10   **A.**   That's correct, yes.

11   **Q.**   So now let's talk about tools that are available in

12   order to influence opioid prescribing or prescribing of

13   other drugs.

14       So now, Dr. Hughes, we've put another set of lines --

15           MR. HESTER:  Your Honor, I promise this is the

16   last set of lines we'll put up.

17           THE WITNESS:  I'm sorry.

18   BY MR. HESTER:

19   **Q.**   And we've put up some more lines.  Could you

20   describe what these red lines are meant to show on this

21   diagram?

22   **A.**   Sure.  The general term "prescription management tools"

23   refers to how the health insurers and the pharmacy benefit

24   managers leverage this claims information that they receive

25   into tools that can be used to affect the prescribing of

1    opioids or any other drug that -- whose prescribing they

2    wish to modify.

3    Q.   So is it fair to say, Dr. Hughes, that information on

4    claims is coming into this group of payers?  Is that fair?

5    A.   That's true, yes.

6    Q.   And then the payers have tools available to them to

7    respond to that information flow and try to exercise control

8    over the way that prescribing activity takes place?  Is that

9    fair?

10   A.   Yeah, exactly.  They make use of that information in

11   devising appropriate tools for modifying prescriber behavior

12   primarily.

13   Q.   So, Dr. Hughes, let's talk about some examples of some

14   tools that payers have at their disposal to influence

15   prescribing behavior.

16        So I've written up on the board "tools to influence

17   prescribing."  Are there some good examples you would offer

18   of tools that are available to payers that can influence

19   prescribing behavior?

20   A.   Yes.  There are three that I think are the strongest

21   tools.  And those are prior authorization.  Secondly would

22   be step therapy.  And thirdly would be quantity limits.

23   Q.   Are those tools that only payers can use to influence

24   prescribing behavior?

25   A.   That's correct.

1    **Q.**   Why is that?

2    **A.**   They are the ones who decide the rules on what is going

3    to be reimbursed and what's not going to be reimbursed.

4    **Q.**   Why did you pick these three examples that I've listed

5    up here on the board?  Why did you pick those three as the

6    examples of tools that are available to influence

7    prescribing behavior?

8    **A.**   Well, short of choosing not to cover a particular drug

9    at all, these are the -- I believe the three strongest tools

10   that are available to effect prescriber prescribing

11   behavior.

12   **Q.**   So let's go through these one at a time quickly.

13        What is prior authorization?

14   **A.**   Prior authorization, we're already talked about that a

15   little.  It's a procedure that's used widely for

16   prescription drugs.  And it is a system where the doctor is

17   required to provide a fact-based explanation or

18   justification for prescribing one drug over another.

19        And that gives the payer the opportunity to review the

20   doctor's explanation and decide whether they agree that the

21   prescription is medically necessary or to decide that the

22   prescription is not medically necessary.

23   **Q.**   And what happens if the doctor does not get prior

24   authorization?

25   **A.**   Then the prescription would not be reimbursed by the

1    payer.

2    **Q.**    And how can payers use prior authorization to encourage

3    limits on the amount of opioids prescribed?

4    **A.**    Well, there's really two ways.  I mean, first of all,

5    the process of having to explain the rationale based on the

6    patient's condition, the patient's medical history, the

7    patient's age, overall health, the exercise of having to

8    explain that in the course of writing a prescription gives

9    the doctor the opportunity to reflect on a particular

10   prescription and to decide whether the drug is appropriate,

11   the dosage is appropriate, the number of pills is

12   appropriate.  So the hope is that the doctors are, are

13   providing a thoughtful explanation and justification.

14        The second way is, of course, if there are drugs that

15   are on prior authorization and drugs in the same therapeutic

16   class that aren't on prior authorization, or drugs that

17   accomplish the same goal that are not on prior

18   authorization, the doctor may simply choose not to take the

19   time to complete the prior authorization form and switch

20   from an opioid to some other prescription drug.

21   **Q.**    So just to clarify or expand on that point --

22   **A.**    Uh-huh.

23   **Q.**    -- could there be a situation where an opioid is on

24   prior authorization and some other alternative pain

25   treatment is not on prior authorization, so the doctor might

```
 1    be incentivized to pick the drug that's not subject to prior
 2    authorization?  Is that your point?
 3    A.    Yes.  They may just not want to engage in the prior
 4    authorization exercise and just prescribe something else
 5    that would not require prior authorization.
 6    Q.    What is step therapy, the second point you raised?
 7    A.    Step therapy is a tool by which a patient -- let's take
 8    a -- take an example.  Suppose a doctor wishes to prescribe
 9    a brand name opioid.  A step therapy program might require
10    that before that brand name opioid would be approved to be
11    prescribed that the patient has to be tried on perhaps an
12    alternative therapy like physical therapy or a non-opioid
13    medication and demonstrate that the treatment has failed.
14    And only after the treatment has failed would they be
15    willing to reimburse the -- in this case, the brand name
16    opioid.
17    Q.    So how can payers use step therapy to encourage limits
18    on the amount of opioid prescribing?
19    A.    Well, hopefully if the initial non-opioid therapy is
20    successful in treating the patient's pain, then that's one
21    less opioid prescription that is written.
22    Q.    What are quantity limits?  That's the last of the three
23    we discussed.
24    A.    Yeah, that's very basic.  It's just simply saying
25    that -- the insurer is saying we will not reimburse for more
```

1    than X number of pills.  So maybe in a month we will only

2    reimburse for 30 or 60 pills.  And you have to -- basically

3    would have to go through prior authorization if the doctor

4    wanted to prescribe more.

5    **Q.**   So to perhaps state the obvious, how would that

6    encourage limits on the amount of opioid prescribing?

7    **A.**   I think the easiest way to think of it to the extent

8    that it's effective, quantity limits can reduce the average

9    number of pills in an opioid prescription.  And through

10   reducing that average number of pills per prescription,

11   fewer opioids are out in the world.

12   **Q.**   Have you reviewed literature regarding the

13   effectiveness of these kinds of tools for affecting

14   prescribing behavior?

15   **A.**   I have.

16   **Q.**   And can you provide an example of that?

17   **A.**   Yes.  There was a -- what's called a mega analysis of

18   15 different studies on prior authorization.  And it was

19   concluded that prior authorization reduces the prescribing

20   of the target drug by an average of about 52 percent.

21   **Q.**   Have experts recognized that these tools can be used

22   effectively to encourage limits on prescribing of opioids in

23   particular?

24   **A.**   Yes.  There have been studies, academic studies as well

25   as government reports and government task force, that have

1    emphasized that these types of tools can be effective in

2    reducing the prescribing of opioids.

3    **Q.**    Now, we've been talking about these tools to limit

4    prescribing behavior.  And, of course, that's imposed by

5    insurers.  Would this also have an impact on prescribing for

6    patients who don't have insurance?

7    **A.**    Yes.  Research has shown that to the extent that

8    prescribers' behavior for insurance companies, for patients

9    that have insurance, to the extent that they alter their

10   prescribing behavior, they also follow the same changes when

11   treating patients without insurance.

12        So even if a patient doesn't have insurance, use of

13   these tools may well affect the type of product that a

14   doctor would prescribe for uninsured patients.

15   **Q.**    Now, are these prescription management tools like prior

16   authorization, step therapy, or quantity limits meant to

17   supplant the judgments of prescribers?

18   **A.**    No, it's not intended at all to replace the judgment of

19   prescribers.  And, again, if there's -- if these are not

20   used, then -- which is also quite common in pharmaceuticals,

21   where these tools are not used, the insurance company is

22   relying completely on the doctor's judgment that a

23   prescription is medically necessary and they fill the --

24   excuse me -- they reimburse for the prescription without any

25   question.

1          But the prior authorization and step therapy again is

2     two steps; first of all, to make -- to incentivize the

3     doctor to reflect that their treatment is, indeed,

4     appropriate for the patient and for the payer to assure

5     themselves that the doctor is adhering to whatever standard

6     of care the payer has designated.  And if they are not, to

7     explain themselves as to why they're not adhering to that

8     particular standard of care.

9     **Q.**   Now, Dr. Hughes, have you undertaken an analysis of

10    whether payers in West Virginia used the prescription

11    management tools that we've just been discussing to limit

12    opioid prescribing?

13    **A.**   I have.

14    **Q.**   And which payers did you look at for your analysis?

15    **A.**   I examined West Virginia Medicaid and the Public

16    Employees Insurance Agency.

17    **Q.**   Why did you pick those payers?

18    **A.**   As public organizations, they have much publicly

19    available information.  And there was also additional

20    information that was produced in the course of this

21    litigation.

22    **Q.**   And, roughly, between the two of them, what percentage

23    of the West Virginia population did they insure?

24    **A.**   Medicaid is about 26 percent and PEIA I believe is

25    about 14 percent.  So it's about 40 percent in total.

1    **Q.**   Would you expect other payers, other insurers to behave

2    similarly to what you've observed with the West Virginia

3    Medicaid and the Public Employees Insurance Agency?

4    **A.**   Yes.  Whether an insurer is a public entity or a

5    private company, they face the same incentives to minimize

6    the cost of providing adequate and effective care.

7    **Q.**   So what did you find in your analysis with respect to

8    the use of these prescription management tools?

9    **A.**   I found that early on, meaning in the early part of the

10   21st Century, Medicaid and PEIA made use of these tools, but

11   really only made use of these tools in ways that were

12   designed to control costs as opposed to promote any

13   particular clinical outcome.

14   **Q.**   And when you say promote any clinical outcome, what do

15   you mean by that?

16   **A.**   I mean taking into account the risk benefit balance

17   that has to be made with controlled substances like opioids,

18   taking that into account in devising their prior

19   authorization or step therapy or quantity limit rule.

20   **Q.**   Did you see evidence that in more recent years West

21   Virginia Medicaid and the Public Employees Insurance Agency

22   have, in fact, undertaken prescription management tools to

23   achieve clinical outcomes as you've described?

24   **A.**   Yes.  And especially in the post-2016 period, both

25   organizations took steps that indicate that they were making

1    use of these tools in response to clinical concerns in

2    addition to cost control.

3    **Q.**   And let's give the Court an example of what you found.

4    Let's first talk about quantity limits.

5        When did West Virginia Medicaid first impose quantity

6    limits for the class of opioid prescriptions?  And if it

7    would help you, Dr. Hughes, if it helps refresh your

8    recollection, we can provide your report to you.

9    **A.**   No.  Quantity limits, I believe they were -- excuse me.

10   I believe quantity limits were first used around 2005.

11   **Q.**   And when did West Virginia Medicaid implement quantity

12   limits for short-acting opioids in particular?

13   **A.**   That was 2009.

14   **Q.**   And what about dosage quantity limits?

15   **A.**   The -- sorry.  Excuse my faulty memory.  The 2009

16   quantity limits were strictly counts of pills.  120 pills

17   for a thirty-day period was the, was the quantity limit.

18   That had nothing to do with dosage.

19       And then later in the 2015-2016 period, they began to

20   impose quantity limits, for example, for opioid therapy that

21   was going to extend longer than 90 days; that the prescriber

22   could only prescribe 50 MME per day for such therapy.  And

23   if they wanted to exceed that dosage, they had to obtain

24   prior authorization.

25   **Q.**   So you mentioned these quantity limits, one imposed in

1    2009, one imposed around 2015-2016.  Is there any reason

2    that West Virginia Medicaid could not have imposed those

3    quantity limits earlier if it had so chosen?

4    **A.**    No, there's no reason.

5    **Q.**    Let's talk about step therapy requirements.  Did

6    Medicaid implement a step therapy requirement for

7    prescription opioids?

8    **A.**    Yes, they did.

9    **Q.**    And what's the first example of that that you saw?

10   **A.**    That is about 2005.  But the step therapy then was

11   designed almost exclusively to incentivize patients to

12   use -- excuse me -- to incentivize providers to prescribe

13   generic opioids rather than branded opioids.

14        So the step therapy was basically you had to initiate

15   the patient on, say, two generic opioids.  And they had to

16   be shown to be ineffective for the patient before they would

17   approve the branded opioid.

18        But that use of the tool is, you know, strictly for

19   cost control because in either event, it was an opioid that

20   was to be prescribed.

21   **Q.**    And was there a later period when West Virginia

22   Medicaid required step therapy with a focus more on clinical

23   outcomes?

24   **A.**    Right.  Well, following the, the 2015-2016 change, they

25   changed the step therapy to where before -- now, remember,

1      we had the prior authorization was required if you wanted to

2      exceed 50 MME a day for a long-term opioid therapy.

3          Before the doctor would be allowed to even submit that

4      prior authorization, now the patient had to be initiated on

5      a non-opioid therapy like, say, physical therapy.  And that

6      had to be shown to be ineffective before the doctor would

7      even be allowed to petition for -- petition with prior

8      authorization for a higher dosage.

9      **Q.**   Let's talk about the Public Employees Insurance Agency.

10     Did you prepare a demonstrative to aid in your testimony to

11     illustrate its use of step therapy and quantity limits?

12     **A.**   I did.

13     **Q.**   All right.  Let's put that up on the board.

14         So, Dr. Hughes, is this a, is this a demonstrative

15     exhibit you prepared?

16     **A.**   It is.

17     **Q.**   And what does this graph show?

18     **A.**   This graph shows the percentage of opioids that

19     required step therapy or quantity limits under PEIA's PDL,

20     which stands for preferred drug list.

21     **Q.**   So let's focus first on the requirement for step

22     therapy.  What -- now, let me go first to quantity limits.

23     What happened with quantity limits under their insurance

24     program?

25     **A.**   Basically, prior to 2016, only about, somewhat less

1 than 40 percent of the opioids on their preferred drug list

2 required quantity limits.  And then after 2016 is when it

3 went from less than 40 percent to where 100 percent or every

4 single opioid on their PDL was subject to quantity limits.

5 **Q.** So, again, we're talking about the Public Employees

6 Insurance Agency, or a state insurer; correct?

7 **A.** That's correct.

8 **Q.** And, so, as of 2016, they imposed quantity limits for

9 every prescription opioid that was on their preferred drug

10 list?

11 **A.** That's correct.

12 **Q.** And before that time, it was in the range of 30 to

13 40 percent who were subject to quantity limits?

14 **A.** That's correct.

15 **Q.** Let's talk about what the step therapy requirements

16 were as imposed by PEIA.

17 **A.** Yes.  So prior to 2015, there was a relatively small

18 number of opioids on their PDL that was subject to step

19 therapy.

20 In the 2015 to 2020 period, I should say I guess the

21 2015 to 2019 period, no opioids on the PEIA preferred drug

22 list required step therapy.

23 Then in 2020, this jumped from zero up to almost

24 50 percent of the opioids on their preferred drug list would

25 now require step therapy.

1   **Q.**   So going back to these quantity limits for a minute,

2   this change where 100 percent of the opioids on their

3   preferred list were subject to quantity limits, do you have

4   an understanding as to what that corresponds with in terms

5   of other developments related to opioids around this time?

6   **A.**   Yes.  In 2016 the CDC, the --

7   **Q.**   Centers for Disease Control?

8   **A.**   Thank you.  I'm sorry, Your Honor.  It's late.

9            THE COURT:  It happens to me all the time.

10           THE WITNESS:  I'm sorry.  Yes.  The Centers for

11  Disease Control issued detailed guidelines on opioid use in

12  treating pain.  And this -- these were guidelines that many

13  insurers, including PEIA, as well as West Virginia Medicaid,

14  tried to adopt in this time period.

15  BY MR. HESTER:

16  **Q.**   So we see this major change in the imposition of

17  quantity limits as of 2016.  Without being too specific

18  on the years, would you expect to see other insurers in

19  West Virginia behaving roughly in the same way?

20  **A.**   Yes, I would because that -- the CDC report I think

21  would be considered a, a strong statement of what the

22  standard of care should be.  And that would have a big

23  influence on not just public insurers, but also private

24  insurers in West Virginia as well as everywhere else.

25  **Q.**   So let's talk about prior authorization.  Did you

1    prepare a chart on that as well, Dr. Hughes?

2    **A.**    I did.

3    **Q.**    So, again, this chart is relating to, to Public

4    Employees Insurance Agency and their preferred drug list.

5    And could you describe roughly what it's showing here?

6    **A.**    Sure.  So in the first column it's the date of the

7    preferred drug list.  So preferred drug lists evolve over

8    time as new products come on the market or products turn

9    generic or whatever the case may be.  So there is a new one

10   at least every year, sometimes more often.

11        And the second column is the number of opioids on the

12   preferred drug list of the PEIA.

13        And then the third column is the percentage of that

14   number of opioids that does not require prior authorization;

15   that the doctor can write a prescription and the PEIA will

16   reimburse it without question.

17        And the last column is the percentage of -- in 2012

18   those 11 opioids that were subject to prior authorization.

19   **Q.**    So let's try to just aggregate this a bit.  So if we

20   look up through 2017, roughly speaking, what's the range of

21   opioids that were not subject to prior authorization?

22   **A.**    The range is roughly two-thirds to three-quarters of

23   the opioids were not subject to prior authorization.

24   **Q.**    And then starting in 2018, what's roughly the range of

25   the opioids that were subject to prior authorization?

1    **A.**    After that period, it's basically 85 percent up to

2    100 percent.

3    **Q.**    And do you understand that, again, to be linked to the

4    CDC guidelines?

5    **A.**    Yes.  According to deposition testimony, I recall that

6    they would -- that these organizations were seeking to

7    implement the CDC guidelines.

8    **Q.**    Now, we're obviously looking at one large insurer in

9    West Virginia, public insurer.  Would you expect other

10   insurers in West Virginia to behave similarly to have begun

11   imposing more prior authorization requirements for opioids

12   in the 2016-2017 period?

13   **A.**    Yes.  They all faced the, the same constraints and they

14   are all cognizant of the CDC guidelines.  So I would expect

15   them to behave similarly.  The timing might differ by a year

16   or two, but I would expect them all to be moving in that

17   direction.

18   **Q.**    Is there any reason that tools like prior

19   authorization, step therapy, and quantity limits could not

20   have been implemented earlier than they were?

21   **A.**    None to my knowledge, no.

22   **Q.**    And, Dr. Hughes, do you construe these changes in step,

23   step therapy, prior authorization, quantity limits, does

24   that reflect a change in the standard of care?

25   **A.**    Yes.  I mean, the, the CDC guidelines would be a

1    significant change in the, in the standard of care.

2    **Q.**   And would it be your understanding or opinion that

3    prior to that time when we see fewer of these prescription

4    management tools, that reflects a difference in the standard

5    of care vis-à-vis prescription opioids?

6    **A.**   That's a conclusion I would draw, yes.

7    **Q.**   Dr. Hughes, are you familiar with alternatives to

8    opioids for the treatment of pain?

9    **A.**   Yes.

10   **Q.**   And what are some examples of those alternative pain

11   treatments?

12   **A.**   Physical therapy, occupational therapy, acupuncture,

13   chiropractic care.

14   **Q.**   And have you reviewed literature regarding the extent

15   to which payers covered those kinds of alternative pain

16   treatments --

17   **A.**   I have.

18   **Q.**   -- as compared to the degree to which they covered

19   prescription opioids for the treatment of pain?

20   **A.**   Yes, I have.

21   **Q.**   And what did you find?

22   **A.**   I found that these alternatives were sometimes not

23   covered.  And when they were covered, they tended to have

24   fairly strict limits on, say, the number of visits of

25   physical therapy or the number of visits for chiropractic

```
 1    care and the requirement to obtain prior authorization to
 2    obtain additional physical therapy limits.
 3         So there was more restrictions put on earlier on these
 4    alternative treatments.  And Medicaid, for example, doesn't
 5    cover acupuncture at all.  PEIA covers it, but only in
 6    particular circumstances.
 7    Q.   So is it fair to say that the insurance coverage for
 8    prescription opioids was more extensive than alternatives
 9    for the treatment of pain?
10    A.   I think that's fair to say, yes.
11    Q.   And have you looked at this point specifically in West
12    Virginia?
13    A.   Yes, I have.
14    Q.   And have you determined whether West Virginia Medicaid,
15    for example, has limits on chiropractic services and
16    physical therapy for the treatment of pain?
17    A.   They do.  There's limits on the number of visits that
18    can be prescribed.
19    Q.   And you mentioned that West Virginia Medicaid does not
20    cover acupuncture at all?
21    A.   That's correct.  They do not.
22    Q.   Is West Virginia different from other states, to your
23    experience, in relation to insurance coverage for
24    alternative forms of pain treatment?
25    A.   Yes, they are different.  There are states that, for
```

1    example, have no quantity limits on physical therapy.  There

2    are states that have fairly liberal access to acupuncture.

3         Again, each state sets its own Medicaid rules.  And,

4    so, there's a great deal of variation.  But there are states

5    that were covered much more, much more easily for the

6    patient to obtain these alternatives compared to West

7    Virginia.

8    **Q.**   So, for example, are there other states that cover

9    acupuncture through Medicaid for the treatment of pain?  Is

10   that a "yes"?  I'm sorry.

11   **A.**   I'm sorry.  Yes, it is.  Sorry.

12   **Q.**   Why, why, in your opinion and to your understanding,

13   Dr. Hughes, do payers impose coverage restrictions on these

14   alternative treatments for -- to opioids for the treatment

15   of pain?

16   **A.**   It appears to be because these treatments tend to be

17   more expensive.  And, so, in an attempt to control costs,

18   they place limits on the availability of those alternative

19   treatments.

20   **Q.**   What, if any, impact would you expect to see from the

21   inconsistent or lesser coverage for alternative pain

22   treatments as compared to prescription opioids for the

23   treatment of pain?

24   **A.**   Well, I understand that payers consider pain to be a

25   problem.  And, so, if the alternatives are not available, I

```
 1   would expect that it would lead, at the margin, to a larger
 2   quantity of opioid prescriptions.
 3   Q.   Are you aware of distributors playing any role in
 4   payers' decisions about whether to require prior
 5   authorization, step therapy, or quantity limits for opioid
 6   medications?
 7   A.   No, I'm not.
 8   Q.   Are you aware of distributors playing any role in
 9   payers' decisions about whether or how much to cover
10   alternative pain treatments?
11   A.   No.
12   Q.   Are you aware of distributors playing any role at all
13   in payers' decisions on coverage for prescription opioids?
14   A.   No.
15        MR. HESTER:  Your Honor, at this point, I pass the
16   witness.
17        THE COURT:  It's almost 10 till 5:00.  Perhaps we
18   should postpone the cross until tomorrow morning.
19     Is that acceptable to everybody?
20        MR. MAJESTRO:  That's fine, Your Honor.
21        MR. HESTER:  Well, Your Honor, I don't --
22        MR. MAJESTRO:  I can't finish in 10 minutes if
23   that's your question.
24        MR. HESTER:  I just wanted to see how long Mr.
25   Majestro thought he would take.
```

```
 1                    MR. MAJESTRO:  It's going to be more than 10
 2       minutes.
 3                    THE COURT:  You're not going to do it in 10
 4       minutes, are you, Mr. Majestro?
 5                    MR. MAJESTRO:  No, Your Honor.
 6                    MR. HESTER:  All right.  That's fine, Your Honor.
 7                    THE COURT:  If you could do in 10, we'd finish
 8       today.
 9                    MR. MAJESTRO:  Mr. Farrell probably could, but
10       I'm, I'm --
11                    THE COURT:  Dr. Hughes, I'm going to have to ask
12       you to come back at 9:00 in the morning, sir.
13                    THE WITNESS:  I'm at your disposal, Your Honor.
14                    THE COURT:  Thank you.  And I'll see everybody at
15       9:00.
16            (Trial recessed at 4:50 p.m.)
17
18
19
20
21
22
23
24
25
```

```
 1       CERTIFICATION:

 2                 I, Ayme A. Cochran, Official Court

 3       Reporter, and I, Lisa A. Cook, Official Court Reporter,

 4       certify that the foregoing is a correct transcript from

 5       the record of proceedings in the matter of The City of

 6       Huntington, et al., Plaintiffs vs. AmerisourceBergen

 7       Drug Corporation, et al., Defendants, Civil Action No.

 8       3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

 9       reported on July 7, 2021.

10

11            S\Ayme A. Cochran            s\Lisa A. Cook

12               Reporter                     Reporter

13          _

14

15            July 7, 2021

16               Date

17

18

19

20

21

22

23

24

25
```

## $

**$1,000.00** [1] - 42:3
**$500** [1] - 42:3
**$950** [1] - 218:13

## '

**'00s** [1] - 42:19
**'10** [1] - 46:9
**'11** [4] - 46:9, 113:18, 184:5, 184:6
**'12** [5] - 45:12, 113:18, 121:22, 121:23, 145:3
**'14** [2] - 138:14, 176:8
**'15** [5] - 45:18, 184:6, 184:7, 201:11, 202:18
**'16** [3] - 46:4, 116:23, 145:5
**'17** [7] - 148:2, 195:23, 196:2, 196:11, 200:7, 200:12, 202:15
**'18** [6] - 46:10, 47:3, 47:5, 125:19, 128:16, 155:13
**'19** [1] - 35:7
**'21** [2] - 45:18, 46:11
**'22** [1] - 34:9
**'90s** [2] - 52:22, 214:2
**'94** [2] - 105:19, 180:9
**'95** [3] - 56:22, 56:25, 57:2
**'96** [4] - 40:6, 56:25, 139:22, 151:25
**'97** [9] - 75:13, 77:18, 79:17, 81:3, 88:11, 89:20, 116:22, 196:11
**'98** [2] - 75:17, 98:5

## 0

**0** [2] - 59:10, 59:11
**00850** [1] - 124:15
**00907** [2] - 2:5, 2:14
**02111** [1] - 102:15
**02395** [1] - 58:5
**02413** [2] - 83:15, 84:10
**02523** [1] - 114:18
**02937** [1] - 90:24
**03067** [2] - 96:13, 97:8
**03074** [1] - 59:23
**03105** [1] - 108:10
**03106** [2] - 77:23, 78:23
**03605** [1] - 90:24

**05** [1] - 196:24
**075** [1] - 196:23

## 1

**1** [4] - 10:5, 146:23, 184:1, 196:23
**1.6** [1] - 226:5
**10** [10] - 59:10, 59:11, 131:24, 154:16, 219:18, 262:17, 262:22, 263:1, 263:3, 263:7
**100** [6] - 48:4, 125:21, 128:8, 255:3, 256:2, 258:2
**1001** [2] - 4:6, 4:9
**1006** [1] - 65:12
**1022** [1] - 3:5
**108,000** [1] - 226:13
**10:38** [1] - 77:10
**10th** [1] - 99:12
**11** [1] - 257:18
**116th** [2] - 195:23, 196:2
**11:00** [1] - 159:23
**11:55** [1] - 132:21
**12** [4] - 67:19, 99:12, 181:11, 195:20
**120** [1] - 252:16
**1219** [2] - 71:22, 71:24
**126** [1] - 3:5
**1219** [1] - 169:5
**12:00** [1] - 132:13
**13** [2] - 58:25, 185:9
**130** [4] - 164:15, 164:19, 166:4
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**138** [2] - 228:8, 228:19
**14** [1] - 250:25
**14th** [1] - 66:24
**15** [5] - 23:21, 45:25, 48:2, 154:16, 248:18
**15.1** [1] - 184:16
**15910** [1] - 3:15
**16-54-4** [1] - 118:17
**16-54-5** [1] - 120:13
**1600** [1] - 3:15
**1717** [2] - 6:6, 6:13
**18** [2] - 110:1, 125:3
**19** [4] - 108:18, 108:19, 108:22, 227:2
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1918** [1] - 49:6
**1990** [2] - 11:4, 177:18
**1990s** [2] - 65:4, 176:7
**1993** [1] - 201:4

**1994** [5] - 11:17, 11:19, 37:25, 39:9, 139:22
**1995** [1] - 55:3
**1996** [8] - 13:3, 40:4, 42:8, 56:23, 65:22, 139:8, 139:18, 154:1
**1997** [12] - 65:16, 66:24, 68:5, 68:15, 76:4, 76:7, 76:21, 89:11, 129:22, 195:12, 199:5, 201:25
**1998** [5] - 75:21, 77:19, 82:5, 95:21, 177:12
**1st** [1] - 75:21

## 2

**2** [12] - 57:15, 66:22, 80:5, 80:7, 81:10, 132:10, 146:24, 174:9, 180:20, 182:19, 182:25, 183:1
**20** [6] - 14:12, 151:24, 154:20, 159:18, 194:6, 198:3
**20-year** [3] - 151:24, 196:4, 198:5
**200** [3] - 185:13, 206:6, 206:9
**2000** [5] - 42:9, 58:24, 66:4, 197:21, 198:4
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21, 5:5
**2001** [12] - 60:18, 64:10, 64:22, 66:5, 83:13, 84:2, 89:20, 99:6, 99:10, 99:12, 99:15, 154:1
**2004** [2] - 23:10, 241:21
**2005** [7] - 47:13, 87:1, 89:16, 89:21, 91:1, 252:10, 253:10
**2006** [24] - 34:7, 133:19, 134:19, 135:4, 135:12, 135:18, 136:25, 137:4, 148:24, 170:14, 180:13, 181:23, 182:10, 183:7, 183:12, 183:18, 183:24, 184:2, 184:20, 188:25, 189:18,

**190:10, 192:8, 196:8
**2008** [3] - 105:20, 177:12
**2009** [8] - 95:24, 96:2, 96:10, 98:8, 100:3, 252:13, 252:15, 253:1
**2010** [15] - 39:23, 40:19, 44:13, 44:22, 99:5, 99:9, 99:13, 99:14, 100:4, 102:2, 102:23, 107:5, 154:1, 180:10, 184:6
**2011** [7] - 107:10, 121:21, 123:17, 124:23, 125:2, 125:19, 125:20
**2012** [26] - 26:4, 27:9, 27:10, 34:7, 44:25, 45:8, 45:10, 107:25, 113:5, 114:1, 121:17, 121:18, 126:17, 126:18, 128:5, 138:14, 144:24, 146:20, 148:21, 155:13, 172:2, 172:8, 176:8, 192:8, 196:8, 257:17
**2012-14** [1] - 184:4
**2012-2014** [1] - 182:16
**2015** [13] - 44:13, 45:15, 54:11, 114:5, 114:17, 116:23, 129:22, 145:5, 201:25, 255:17, 255:20, 255:21
**2015-'16** [1] - 128:16
**2015-2016** [3] - 252:19, 253:1, 253:24
**2016** [17] - 28:8, 32:3, 114:21, 114:22, 116:9, 116:18, 116:19, 117:10, 117:21, 121:18, 125:11, 254:25, 255:2, 255:8, 256:6, 256:17
**2016-2017** [1] - 258:12
**2017** [12] - 33:2, 34:7, 148:17, 170:14, 195:12, 195:16, 195:21, 195:22, 198:4, 199:5, 202:12, 257:20
**2018** [17] - 46:12, 117:24, 121:13, 121:18, 123:24, 124:21, 125:4, 125:10, 125:24,

**126:12, 128:3, 135:13, 203:19, 226:6, 226:7, 228:3, 257:24
**2019** [4] - 65:16, 229:22, 242:8, 255:21
**202** [2] - 2:4, 2:13
**2020** [6] - 48:4, 163:3, 213:5, 218:16, 255:20, 255:23
**2021** [8] - 1:19, 7:4, 37:25, 39:9, 61:12, 151:25, 264:9, 264:15
**21** [1] - 64:21
**21st** [2] - 163:3, 251:10
**22,000** [1] - 226:12
**2216** [1] - 3:7
**23** [1] - 169:5
**2414** [3] - 99:5, 99:10, 99:22
**25** [10] - 5:5, 9:13, 152:1, 152:19, 153:4, 217:9, 217:15, 217:25, 220:7, 230:13
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26** [3] - 226:25, 227:10, 250:24
**27** [1] - 12:25
**275** [2] - 172:16, 173:14
**28** [3] - 4:3, 4:12, 4:14
**29** [1] - 230:13
**29464** [3] - 4:4, 4:12, 4:15
**2:00** [3] - 132:13, 132:17, 132:19

## 3

**3** [7] - 57:15, 73:5, 118:16, 119:17, 128:3, 174:18, 196:3
**3(a** [1] - 79:11
**3.7** [1] - 190:13
**30** [9] - 12:24, 36:7, 79:9, 217:25, 228:12, 228:16, 228:22, 248:2, 255:12
**30-40** [1] - 178:7
**30-some** [1] - 146:20
**300** [2] - 34:23, 41:3

**3010** [2] - 91:1, 94:25
**3036** [1] - 116:8
**3054** [2] - 118:4, 118:11
**3067** [1] - 96:2
**30th** [1] - 213:5
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**32502** [1] - 2:11
**329,000** [1] - 226:12
**35** [2] - 1:16, 146:2
**360** [1] - 41:3
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 264:8
**3:17-cv-01665** [2] - 1:11, 264:8
**3:29** [1] - 204:16
**3:30** [2] - 204:11, 204:14

### 4

**4** [12] - 31:11, 34:20, 57:16, 57:22, 59:1, 73:5, 99:10, 124:20, 197:23, 230:14, 231:4
**4,000** [3] - 21:24, 22:3, 24:14
**4.6** [1] - 183:6
**40** [5] - 217:25, 250:25, 255:1, 255:3, 255:13
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**41** [1] - 230:11
**41960** [1] - 192:15
**437** [1] - 108:12
**44** [1] - 226:21
**463,000** [1] - 226:11
**4:50** [1] - 263:16

### 5

**5** [13] - 61:16, 91:4, 91:6, 120:13, 125:4, 125:5, 164:15, 164:19, 166:4, 166:5, 184:8, 196:4
**50** [5] - 125:21, 202:8, 252:22, 254:2, 255:24
**50,000** [1] - 23:8
**51** [4] - 45:3, 112:14, 112:24, 113:2
**52** [1] - 248:20
**55,000** [1] - 226:8
**553** [1] - 6:8
**56** [1] - 3:4

**56th** [1] - 3:5
**5:00** [1] - 262:17

### 6

**6** [2] - 74:18, 181:12
**6.2** [1] - 227:6
**60** [1] - 248:2
**600** [1] - 2:10
**61** [1] - 125:2
**65** [2] - 141:6, 179:16
**6th** [1] - 3:5

### 7

**7** [4] - 1:19, 7:4, 264:9, 264:15
**70130** [1] - 3:8
**703** [2] - 71:6, 71:10
**707** [1] - 4:24
**716** [1] - 3:12
**725** [2] - 4:19, 4:21
**773,000** [1] - 226:8

### 8

**8** [2] - 189:3, 189:4
**80** [8] - 14:11, 127:18, 145:18, 183:7, 185:1, 201:23, 202:7, 204:1
**80-85** [2] - 19:14, 41:12
**801** [1] - 3:10
**803(16)** [1] - 76:17
**80s** [2] - 39:25, 40:3
**85** [1] - 258:1
**850** [2] - 5:12, 123:20

### 9

**90** [4] - 26:15, 127:16, 232:12, 252:21
**901** [1] - 4:23
**902** [2] - 93:3, 207:9
**902(5** [1] - 92:22
**90s** [4] - 39:7, 40:3, 41:10, 159:20
**91436** [1] - 3:16
**94** [1] - 226:16
**96** [3] - 231:3, 231:18, 232:9
**98** [2] - 46:1, 197:10
**9:00** [3] - 7:4, 263:12, 263:15
**9th** [1] - 4:6

### A

**a.m** [3] - 7:5, 77:10, 132:21
**abate** [1] - 180:1
**ability** [8] - 126:21, 152:14, 239:5, 239:7, 239:8, 240:4, 240:7, 241:10
**ablation** [1] - 128:10
**able** [6] - 20:8, 39:4, 109:19, 168:25, 217:14, 242:14
**abnormal** [5] - 27:14, 85:8, 85:23, 110:5, 110:10
**abnormalities** [1] - 67:24
**Absolutely** [1] - 117:20
**absolutely** [9] - 40:25, 46:24, 47:12, 62:1, 63:20, 76:22, 122:22, 133:16, 178:25
**Abuse** [1] - 184:13
**abuse** [13] - 114:10, 125:14, 125:18, 172:19, 173:4, 182:6, 182:21, 184:16, 185:10, 188:5, 216:23, 217:2
**abusing** [1] - 184:17
**academic** [4] - 27:17, 198:22, 219:21, 248:24
**academically** [1] - 216:8
**academicians** [1] - 23:12
**accept** [2] - 20:9, 106:6
**acceptable** [1] - 262:19
**accepted** [8] - 53:15, 80:18, 80:19, 81:7, 81:8, 81:11, 107:7, 186:9
**access** [17] - 23:17, 24:6, 24:8, 50:20, 51:3, 111:24, 112:2, 112:4, 242:9, 242:11, 242:15, 242:16, 242:18, 242:20, 242:22, 242:23, 261:2
**accessible** [1] - 111:22
**accomplish** [1] - 246:17
**accordance** [4] - 62:10, 100:19, 101:1, 103:14

**According** [1] - 258:5
**according** [3] - 51:12, 65:14, 178:23
**account** [2] - 251:16, 251:18
**accountable** [1] - 129:17
**accredited** [2] - 53:10, 60:7
**accurate** [6] - 36:9, 179:24, 181:18, 182:18, 183:14, 184:23
**accurately** [1] - 185:24
**achieve** [2] - 115:25, 251:23
**ACKERMAN** [1] - 4:5
**acknowledged** [1] - 141:1
**act** [27] - 45:2, 78:2, 79:7, 79:9, 79:16, 82:9, 96:3, 96:6, 96:9, 97:12, 97:21, 108:18, 108:24, 109:25, 110:7, 112:5, 112:7, 112:10, 112:15, 113:5, 113:11, 113:13, 120:14, 120:22, 121:22, 121:23
**Act** [22] - 77:20, 77:25, 78:23, 81:24, 82:6, 82:9, 82:12, 82:15, 83:4, 83:11, 95:22, 95:25, 96:3, 96:23, 100:3, 108:1, 118:7, 118:11, 121:14, 226:11, 228:4, 232:4
**acting** [8] - 52:20, 62:11, 68:9, 68:25, 101:3, 101:6, 103:16, 252:12
**action** [5] - 63:1, 67:10, 69:10, 81:12, 88:10
**Action** [4] - 1:4, 1:10, 264:7, 264:8
**actions** [3] - 63:24, 79:12, 89:19
**active** [2] - 22:3, 76:9
**activities** [1] - 124:11
**activity** [1] - 244:8
**acts** [4] - 51:11, 97:5, 100:7, 100:22
**actual** [2] - 33:12, 152:17
**acupuncture** [5] - 259:12, 260:5,

**260:20, 261:2, 261:9
**acute** [6] - 16:15, 16:18, 22:4, 23:15, 89:4, 115:8
**acutely** [1] - 119:12
**ad** [1] - 76:2
**Ad** [1] - 215:15
**add** [11] - 65:25, 66:7, 66:12, 76:20, 76:23, 83:11, 89:16, 100:3, 114:1, 117:18, 121:13
**added** [1] - 53:8
**addict** [2] - 154:4, 156:16
**addicted** [2] - 43:3, 85:24
**Addiction** [1] - 184:13
**addiction** [20] - 42:23, 44:9, 47:14, 85:8, 85:12, 114:10, 125:14, 138:25, 139:1, 154:2, 154:5, 154:11, 154:12, 155:1, 155:18, 155:19, 184:16, 184:22, 191:11, 191:21
**addictionologist** [1] - 154:11
**addictive** [5] - 40:8, 41:21, 44:8, 120:19, 125:16
**addicts** [3] - 153:25, 157:16
**adding** [1] - 79:11
**addition** [7] - 33:17, 46:21, 102:20, 215:19, 218:4, 223:24, 252:2
**additional** [4] - 59:15, 119:23, 250:19, 260:2
**address** [3] - 55:5, 55:7, 60:5
**addressed** [1] - 27:10
**addressing** [1] - 221:5
**adequate** [2] - 219:7, 251:6
**adhere** [1] - 236:19
**adhering** [4] - 236:1, 236:2, 250:5, 250:7
**adjourn** [1] - 132:13
**adjudicate** [2] - 46:6, 224:10
**adjudicated** [1] - 238:18
**adjusted** [1] - 47:10
**adjustments** [2] - 41:5, 53:22

administer [1] - 224:8
administered [1] - 80:10
administering [4] - 79:13, 124:11, 223:9, 240:19
Administration [3] - 53:8, 59:7, 159:6
admissible [2] - 71:10, 98:12
admission [4] - 59:23, 94:25, 99:22, 124:15
admit [3] - 58:5, 84:10, 95:17
admitted [31] - 31:6, 31:7, 57:10, 58:8, 60:1, 60:15, 61:1, 64:6, 64:15, 65:12, 65:13, 66:16, 72:1, 72:3, 75:9, 75:22, 76:15, 79:3, 84:13, 87:2, 97:9, 99:21, 99:25, 102:14, 108:12, 114:18, 116:8, 118:14, 124:18, 175:1
admitting [1] - 184:17
adopt [2] - 60:4, 256:14
adopted [6] - 29:10, 60:8, 73:3, 90:5, 99:12, 116:4
adoption [5] - 66:3, 66:5, 99:11, 99:15, 99:17
advance [1] - 25:3
advancement [3] - 23:18, 24:2, 25:8
advancing [1] - 33:24
advertise [1] - 131:19
advice [4] - 45:1, 68:24, 90:4, 121:8
advising [1] - 215:8
Aetna [1] - 222:22
affect [13] - 14:6, 57:4, 62:3, 129:14, 130:1, 130:10, 130:13, 130:18, 130:20, 130:25, 206:10, 243:25, 249:13
affected [6] - 129:9, 130:11, 130:15, 130:19, 214:9, 235:1
affecting [1] - 248:13
affects [2] - 78:20, 221:13
affiliated [2] - 20:15, 20:22
afford [1] - 10:19
Affordable [3] -

226:11, 228:4, 232:4
afield [1] - 157:3
afraid [1] - 68:11
afternoon [5] - 133:4, 209:15, 209:16, 209:19, 209:20
AG [1] - 91:25
age [5] - 179:9, 179:13, 179:14, 179:16, 246:7
agencies [2] - 210:21, 222:19
agency [2] - 170:22, 216:6
Agency [11] - 211:15, 223:18, 240:17, 241:1, 242:19, 250:16, 251:3, 251:21, 254:9, 255:6, 257:4
aggregate [1] - 257:19
ago [7] - 24:14, 36:14, 41:17, 55:15, 126:13, 131:24, 159:18
agree [19] - 97:3, 133:14, 134:5, 134:10, 135:16, 136:3, 145:19, 162:15, 165:9, 172:2, 182:10, 185:1, 186:15, 186:17, 186:21, 187:13, 187:14, 187:22, 245:20
agreed [1] - 55:8
agreeing [1] - 187:8
agrees [1] - 145:14
ahead [28] - 51:23, 70:17, 74:24, 75:5, 75:6, 76:23, 80:3, 83:11, 89:16, 92:12, 97:24, 123:12, 132:9, 146:13, 151:13, 163:14, 168:4, 169:3, 170:9, 175:9, 176:18, 188:18, 193:4, 193:19, 194:15, 204:19, 207:25
aid [2] - 229:18, 254:10
ailments [1] - 235:11
al [4] - 1:7, 1:13, 264:6, 264:7
alarming [6] - 182:7, 182:11, 182:22, 190:10, 196:7, 196:8
Albany [1] - 212:2
alcohol [1] - 42:22

alleviate [1] - 9:1
alleviating [1] - 80:11
allopathic [1] - 29:21
allow [5] - 51:3, 107:21, 122:16, 203:8, 243:3
allowed [10] - 69:2, 139:10, 147:8, 157:1, 157:7, 158:3, 168:6, 193:16, 254:3, 254:7
alluding [1] - 50:7
Almost [1] - 217:18
almost [12] - 34:18, 78:21, 128:7, 145:15, 148:11, 181:16, 202:25, 218:3, 232:4, 253:11, 255:23, 262:17
alone [2] - 81:11, 125:3
alter [1] - 249:9
alternative [10] - 246:24, 247:12, 259:10, 259:15, 260:4, 260:24, 261:14, 261:18, 261:21, 262:10
alternatives [7] - 120:15, 120:21, 259:7, 259:22, 260:8, 261:6, 261:25
Alto [1] - 211:16
altogether [1] - 144:6
amazing [1] - 48:7
amend [1] - 79:9
amended [4] - 79:10, 95:25, 98:8, 242:13
America [3] - 13:17, 25:14, 132:2
American [15] - 13:11, 23:7, 23:16, 24:11, 33:22, 54:1, 54:4, 54:13, 54:24, 55:2, 55:10, 57:4, 146:21, 225:5
Americans [2] - 76:2, 179:14
AmerisourceBergen [2] - 6:2, 264:6
AMERISOURCEBERGEN [2] - 1:7, 1:13
Amherst [1] - 212:4
amount [12] - 110:12, 113:14, 113:15, 117:6, 152:17, 167:18, 169:10, 175:21, 178:24, 246:3, 247:18, 248:6

amounts [2] - 116:14, 117:2
Amsterdam [2] - 13:21, 216:17
analyses [10] - 218:24, 236:11, 237:22, 239:15, 240:11, 241:2, 241:5, 241:7, 241:24, 242:3
analysis [5] - 239:11, 248:17, 250:9, 250:14, 251:7
analyze [4] - 239:5, 239:23, 240:11, 241:10
ancient [2] - 75:7, 76:16
ancillary [2] - 224:12, 237:19
ANDREW [1] - 5:10
anesthesia [7] - 13:3, 15:15, 15:17, 23:14, 139:21, 198:19, 206:6
anesthesiologist [3] - 139:4, 142:16, 205:21
Anesthesiologists [1] - 23:8
anesthesiologists [4] - 23:14, 122:6, 206:4, 206:11
Anesthesiology [1] - 13:11
anesthesiology [10] - 8:9, 11:11, 13:2, 13:10, 15:16, 23:9, 123:7, 139:3, 139:17, 140:1
angioplasty [1] - 15:7
animal [1] - 7:18
animals [1] - 13:23
ankle [1] - 78:7
Ann [1] - 205:9
ANNE [1] - 4:2
ANNIE [1] - 4:11
Annual [1] - 123:24
annual [1] - 242:2
answer [63] - 37:23, 50:23, 51:15, 51:23, 63:6, 64:6, 122:17, 136:1, 136:18, 138:10, 139:10, 139:12, 141:24, 142:1, 142:3, 142:6, 143:15, 143:16, 143:19, 145:24, 146:10, 146:12, 146:25, 147:1,

147:3, 147:5, 147:8, 147:14, 147:16, 151:6, 153:22, 156:11, 160:20, 161:15, 161:24, 162:5, 162:14, 163:16, 164:9, 164:21, 164:22, 165:3, 165:14, 166:19, 167:9, 167:20, 167:21, 168:6, 168:8, 169:13, 169:25, 171:14, 171:20, 171:22, 178:4, 188:17, 195:25, 197:9, 198:16, 201:1, 202:5, 202:10, 237:24
answered [4] - 130:17, 135:6, 155:15, 168:16
answering [2] - 38:13, 196:1
answers [3] - 133:12, 161:4, 203:8
antagonist [1] - 125:16
ANTHONY [1] - 2:6
anti [1] - 94:22
anti-diversion [1] - 94:22
antibiotics [1] - 48:23
antibodies [1] - 142:25
anxiety [2] - 85:15, 86:1
anytime [1] - 30:22
anyway [1] - 204:10
aobut [1] - 141:16
apologize [6] - 17:16, 62:24, 77:11, 122:21, 139:14, 151:11
Appalachia [1] - 28:18
appear [3] - 40:1, 170:1, 194:6
APPEARANCES [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
appendix [1] - 89:6
appliances [1] - 210:5
applied [2] - 209:24, 213:17
applies [2] - 115:19, 142:19
apply [7] - 98:8, 142:15, 157:18, 233:5, 236:25, 241:12, 243:7

appointed [2] - 25:18, 33:4
appointment [1] - 20:12
apportion [1] - 221:6
appreciate [3] - 30:21, 30:25, 162:3
approach [6] - 30:3, 126:8, 173:19, 181:6, 193:6, 235:12
appropriate [19] - 20:1, 37:18, 37:20, 41:9, 45:8, 67:6, 67:13, 89:10, 113:10, 122:18, 145:16, 145:17, 233:24, 234:4, 244:11, 246:10, 246:11, 246:12, 250:4
appropriately [1] - 64:6
approval [4] - 47:21, 60:9, 106:9, 201:9
approve [5] - 13:18, 13:25, 47:23, 47:24, 253:17
approved [6] - 56:25, 57:2, 76:5, 84:1, 125:15, 247:10
APS [2] - 60:21, 68:19
Arch [2] - 6:6, 6:13
area [14] - 22:6, 32:2, 62:25, 139:1, 172:24, 176:8, 186:25, 187:9, 188:24, 191:18, 191:19, 216:7, 220:6, 220:19
Area [2] - 20:20, 20:25
areas [10] - 13:19, 18:20, 21:14, 35:9, 35:19, 49:15, 178:19, 186:23, 210:10, 219:22
argue [1] - 133:25, 164:6
argumentative [2] - 134:21, 178:1
arise [1] - 155:18
Arizona [1] - 116:4
Arkansas [1] - 25:11
Arle [1] - 187:6
arrival [1] - 37:25
arrives [1] - 239:12
arthritis [1] - 104:17
article [31] - 54:11, 54:12, 70:4, 70:10, 70:20, 70:21, 70:22, 71:9, 72:12, 72:19,

72:23, 72:24, 73:11, 73:15, 73:18, 79:11, 81:4, 81:6, 180:16, 186:5, 186:8, 186:15, 186:17, 186:18, 187:23, 189:17, 189:21, 189:24, 190:5
Article [1] - 79:11
article's [1] - 73:10
articles [1] - 34:23, 39:25, 69:23, 69:25, 70:1, 70:3, 185:12, 185:13, 185:23, 190:5, 210:6
articulated [1] - 103:15
artificial [1] - 201:6
arts [1] - 212:15
Ashland [1] - 158:25
ASHLEY [1] - 5:3
aside [2] - 96:17, 215:3
ASIPP [6] - 34:6, 145:7, 146:21, 148:22, 172:11, 172:12
aspect [1] - 214:10
aspects [1] - 143:8
assess [1] - 84:23
assessed [1] - 56:6
assessment [2] - 53:11, 59:16
Assessment [2] - 146:23, 146:24
assignment [2] - 219:4, 221:9
assist [1] - 104:4
assistance [3] - 10:2, 150:8, 221:21
Assistant [3] - 212:1, 212:3, 212:5
assisted [1] - 219:12
Associate [2] - 35:3, 212:6
associated [2] - 108:7, 120:16
Association [6] - 29:19, 32:5, 32:6, 32:9, 43:6, 210:23
association [2] - 22:16, 102:6
associations [1] - 170:22
assume [5] - 135:23, 154:2, 187:20, 188:19, 191:16
assure [1] - 250:4
astronomical [1] - 15:1

AT [1] - 1:2
attempt [1] - 261:17
attempts [1] - 78:5
attention [1] - 59:5
Attorney [7] - 91:7, 91:9, 91:18, 93:13, 94:11, 162:23
Attorney's [2] - 36:20, 36:21
attorneys [1] - 105:25, 150:8, 178:14
Attorneys [1] - 94:19
authenticates [1] - 93:3
authenticating [1] - 92:24
authentication [1] - 192:20
authenticity [2] - 75:22, 92:24
author [10] - 70:10, 185:5, 187:8, 188:11, 191:3, 191:6, 191:7, 191:25, 211:20, 217:2
authored [2] - 180:13, 190:20
authority [1] - 92:23
authorization [39] - 234:6, 235:21, 236:6, 236:18, 244:21, 245:13, 245:14, 245:24, 246:2, 246:15, 246:16, 246:18, 246:19, 246:24, 246:25, 247:2, 247:4, 247:5, 248:3, 248:18, 248:19, 249:16, 250:1, 251:19, 252:24, 254:1, 254:4, 254:8, 256:25, 257:14, 257:18, 257:21, 257:23, 257:25, 258:11, 258:19, 258:23, 260:1, 262:5
authors [4] - 172:7, 180:15, 182:1, 184:25
authorship [1] - 185:18
automobiles [1] - 210:6
availability [1] - 261:18
available [18] - 28:3, 62:12, 101:4, 103:17, 124:3,

126:22, 219:7, 219:9, 238:13, 242:25, 243:2, 243:11, 244:6, 244:18, 245:6, 245:10, 250:19, 261:25
avenue [2] - 10:21, 169:23
average [11] - 80:16, 105:6, 179:10, 179:11, 179:13, 227:21, 227:23, 248:8, 248:10, 248:20
averages [1] - 199:4
Avin [1] - 3:7
avowing [1] - 148:1
Award [2] - 214:24, 214:25
award [1] - 215:1
awarded [2] - 213:13, 215:1
awards [1] - 214:21
aware [18] - 60:3, 62:15, 63:20, 111:3, 123:15, 138:20, 138:21, 170:21, 206:24, 207:10, 207:19, 208:2, 208:7, 208:8, 242:5, 262:3, 262:8, 262:12
awhile [1] - 133:11, 133:16
Ayme [1] - 6:17, 264:2

## B

BA [1] - 211:7
back-and-forth [1] - 170:3
background [9] - 10:1, 10:3, 10:7, 10:9, 33:16, 34:19, 181:25, 211:5, 211:6
backward [1] - 129:23
backwards [1] - 137:3
bad [15] - 25:2, 43:7, 47:20, 49:8, 85:17, 107:8, 133:25, 134:1, 162:16, 162:19, 165:10, 165:12, 165:17, 167:2, 169:18
balance [2] - 114:9, 251:16
balanced [1] - 107:22
balancing [2] - 107:14, 113:16
bank [2] - 109:12,

119:25
Bank [1] - 10:13
bankrupt [1] - 159:1
Baron [1] - 3:14
base [10] - 18:18, 19:23, 20:11, 62:13, 100:22, 101:9, 200:6, 203:18, 203:23, 203:24
based [39] - 16:7, 22:4, 25:8, 25:14, 29:9, 33:24, 34:13, 40:16, 49:7, 49:15, 50:5, 51:17, 62:13, 62:14, 101:3, 102:24, 103:10, 103:12, 121:22, 129:19, 129:23, 130:24, 131:18, 134:22, 142:8, 142:18, 142:21, 202:8, 215:1, 225:1, 225:4, 225:18, 228:14, 229:17, 234:9, 234:20, 240:24, 245:17, 246:5
basic [2] - 228:7, 247:24
basis [11] - 37:21, 71:11, 72:18, 97:23, 110:3, 131:6, 176:22, 192:22, 193:17, 203:7, 242:10
Bates [11] - 212:4, 212:12, 212:14, 212:17, 212:19, 212:23, 213:16, 214:14, 214:24, 215:4, 216:4
Baylen [1] - 2:11
bears [1] - 236:4
became [13] - 29:10, 44:16, 53:1, 53:15, 53:17, 69:3, 81:8, 100:22, 101:25, 107:17, 160:6, 212:6
Beckley [1] - 36:22
become [2] - 28:20, 85:25
becomes [3] - 14:22, 78:21, 85:2
bedtime [1] - 85:15
BEFORE [1] - 1:17
began [5] - 11:23, 60:4, 113:18, 218:16, 252:19
begin [3] - 29:4, 52:1, 221:16

**beginning** [2] - 150:2, 190:4
**begun** [1] - 258:10
**behalf** [1] - 237:22
**behave** [3] - 251:1, 258:10, 258:15
**behaving** [1] - 256:19
**behavior** [20] - 27:14, 27:23, 85:9, 165:10, 165:12, 165:17, 167:2, 167:3, 169:18, 169:19, 244:11, 244:15, 244:19, 244:24, 245:7, 245:11, 248:14, 249:4, 249:8, 249:10
**Beijing** [1] - 216:11
**Belgrade** [1] - 209:22
**Bellefonte** [1] - 159:1
**below** [11] - 48:2, 53:23, 57:22, 61:16, 73:5, 200:7, 200:13, 227:21, 228:10, 228:12, 228:17
**BENCH** [1] - 1:16
**benefactor** [1] - 213:13
**beneficiaries** [3] - 222:15, 222:25, 232:24
**benefit** [13] - 108:19, 116:6, 222:7, 222:18, 224:5, 224:7, 224:16, 232:21, 237:7, 237:17, 237:21, 243:23, 251:16
**benefits** [6] - 115:4, 223:15, 224:8, 237:14, 238:19, 238:21
**Benefits** [1] - 215:15
**Berlin** [1] - 216:16
**best** [9] - 33:6, 46:13, 50:23, 55:23, 56:3, 119:8, 171:20, 177:6, 234:18
**better** [24] - 9:5, 10:21, 16:22, 16:24, 17:6, 19:11, 28:7, 42:11, 56:8, 67:23, 68:25, 69:21, 73:4, 107:23, 112:19, 114:9, 121:3, 126:1, 128:22, 128:23, 132:5, 167:3, 169:20, 201:19
**between** [7] - 39:7, 85:11, 100:8,

211:11, 214:6, 217:25, 250:22
**beyond** [1] - 156:22
**Beyond** [1] - 93:9
**big** [11] - 12:15, 15:17, 16:25, 19:22, 45:12, 69:3, 111:6, 129:25, 138:17, 178:21, 256:22
**bigger** [1] - 208:11
**biggest** [3] - 22:8, 25:14, 54:1
**Bill** [3] - 15:6, 108:12, 179:23
**bill** [6] - 118:2, 118:3, 118:8, 145:15, 145:16, 224:11
**binder** [14] - 30:7, 31:3, 55:24, 56:19, 56:20, 58:11, 58:16, 60:13, 71:21, 71:24, 77:23, 90:20, 116:8, 123:21
**biology** [1] - 10:15
**biomarker** [3] - 24:22, 25:1
**biomarkers** [2] - 24:24, 25:2
**birth** [2] - 105:9, 105:10
**bit** [25] - 14:4, 17:10, 22:16, 27:11, 30:20, 33:23, 42:18, 42:24, 44:17, 47:3, 52:21, 68:18, 89:12, 119:17, 133:7, 141:13, 159:23, 162:6, 179:25, 206:7, 221:17, 232:13, 237:3, 240:16, 257:19
**blame** [1] - 221:10
**bleed** [1] - 49:4
**block** [4] - 57:18, 61:9, 61:13
**blood** [4] - 24:23, 53:3, 53:13
**blow** [2] - 69:7, 118:18
**blue** [6] - 105:23, 198:1, 198:7, 199:6, 199:10, 199:13
**blurry** [1] - 40:21
**Blvd** [3] - 4:3, 4:12, 4:14
**board** [36] - 13:2, 13:9, 13:10, 23:16, 38:4, 55:8, 67:10, 67:12, 69:10, 74:6, 74:20, 76:1, 76:5, 76:7, 76:11, 82:25, 87:20,

87:22, 88:10, 88:11, 88:13, 89:2, 89:3, 89:9, 100:13, 109:24, 139:4, 140:6, 170:22, 234:17, 237:10, 241:12, 244:16, 244:5, 254:13
**Board** [45] - 13:11, 13:12, 26:6, 26:9, 28:5, 29:22, 32:1, 35:2, 47:16, 50:18, 50:24, 50:25, 66:19, 67:6, 68:11, 68:15, 68:23, 71:2, 72:4, 74:2, 74:10, 76:20, 79:17, 79:19, 81:2, 86:25, 87:10, 89:16, 89:19, 89:23, 90:25, 91:2, 91:22, 102:22, 110:9, 111:6, 111:14, 123:23, 124:11, 124:21, 126:24, 126:25, 130:20, 130:22, 153:11
**Board's** [1] - 76:2
**boards** [6] - 84:16, 89:20, 90:4, 90:5, 90:7, 99:7
**Boards** [8] - 29:21, 69:1, 83:18, 90:4, 90:9, 90:13, 90:18, 170:23
**bodies** [2] - 28:24, 100:20
**body** [1] - 85:17
**boldface** [1] - 190:13
**Bonasso** [1] - 5:14
**bones** [1] - 17:22
**book** [12] - 29:19, 49:3, 90:16, 90:19, 102:10, 102:14, 102:17, 103:16, 115:24, 116:14, 116:15, 126:14
**Boone** [3] - 16:12, 20:20
**Boston** [2] - 211:8, 211:9
**bottom** [9] - 69:22, 80:1, 108:22, 110:2, 184:14, 196:3, 198:7, 199:13
**Boulevard** [1] - 3:15
**Box** [2] - 5:14, 6:8
**brain** [3] - 24:4, 187:3, 187:9
**brand** [3] - 247:9, 247:10, 247:15

**branded** [2] - 253:13, 253:17
**Brandeis** [1] - 216:25
**breach** [1] - 171:16
**break** [11] - 16:17, 43:8, 77:3, 77:5, 86:6, 89:5, 143:5, 155:9, 204:9, 204:10, 204:12
**breakdown** [1] - 231:10
**Bridgeside** [3] - 4:3, 4:12, 4:14
**briefly** [5] - 27:12, 107:4, 114:6, 159:20, 211:17
**bring** [4] - 12:2, 164:22, 203:13, 234:17
**bringing** [1] - 51:11
**broader** [1] - 206:4
**broadly** [1] - 225:11
**broke** [2] - 183:20, 205:4
**brought** [1] - 149:11
**bucket** [1] - 127:20
**buckets** [1] - 16:17
**Budd** [1] - 3:14
**budget** [1] - 106:10
**build** [1] - 179:1
**buildings** [2] - 178:21, 179:1
**built** [1] - 16:5
**bullet** [2] - 35:5, 105:2
**bunch** [1] - 30:1
**buprenorphine** [1] - 125:13
**burdens** [1] - 128:13
**Bureau** [3] - 225:4, 225:6, 242:2
**Burling** [1] - 5:11
**burn** [1] - 44:1
**bus** [1] - 197:12
**Bush** [1] - 91:16
**business** [3] - 10:16, 14:9, 14:16
**busted** [1] - 153:2
**BY** [108] - 10:6, 22:25, 25:23, 31:1, 31:8, 32:21, 34:21, 37:12, 39:12, 51:19, 51:25, 54:22, 55:21, 58:17, 63:17, 64:2, 64:8, 64:17, 65:17, 66:2, 66:8, 66:13, 67:3, 69:8, 70:18, 72:22, 75:24, 76:19, 76:25, 77:17, 77:24, 79:5, 80:6, 82:3, 84:14, 86:10, 89:15, 93:11,

94:7, 95:20, 97:10, 98:4, 99:2, 100:1, 102:16, 104:9, 108:14, 108:23, 113:25, 117:17, 118:15, 118:19, 121:12, 123:14, 124:9, 124:19, 130:9, 131:11, 133:3, 135:15, 136:4, 136:21, 139:24, 142:4, 144:23, 146:16, 148:16, 151:16, 152:24, 156:10, 158:17, 160:25, 162:10, 164:12, 165:8, 165:21, 166:25, 169:7, 170:11, 171:1, 171:9, 172:17, 173:7, 175:10, 176:14, 176:19, 177:23, 178:10, 181:13, 188:22, 189:15, 191:2, 191:24, 193:20, 194:18, 194:24, 197:25, 204:23, 205:2, 207:3, 207:18, 208:1, 209:18, 220:13, 221:2, 230:21, 243:18, 256:15
**bypass** [1] - 9:11

---

## C

**CA** [1] - 3:16
**CABELL** [1] - 1:10
**Cabell** [50] - 3:2, 22:11, 149:11, 151:20, 151:23, 152:10, 152:20, 152:21, 153:3, 153:25, 154:17, 154:19, 154:25, 155:4, 155:12, 157:11, 157:14, 157:15, 157:18, 157:19, 158:18, 158:19, 158:20, 158:22, 158:23, 159:4, 159:11, 159:14, 170:13, 170:17, 172:3, 176:20, 176:24, 177:13, 177:18, 178:12, 178:20, 178:22, 179:2, 179:3, 218:15,

227:11, 227:13,
227:16, 227:20,
227:24, 228:9,
228:12, 228:17,
228:22
**cabell** [1] - 2:2
**Cabell-Huntington** [3]
- 22:11, 158:23,
159:4
**cadavers** [1] - 13:23
**CALLAS** [1] - 6:7
**CAMC** [7] - 16:13,
21:2, 21:9, 41:23,
53:17
**Campbell** [5] - 55:5,
55:10, 55:20, 56:11,
57:4
**CAMPBELL** [1] - 6:14
**cancer** [31] - 15:23,
16:15, 16:16, 16:25,
17:2, 17:20, 17:22,
17:24, 21:8, 21:11,
21:12, 21:14, 46:18,
68:1, 68:3, 68:21,
68:22, 70:6, 80:24,
87:7, 87:8, 89:7,
89:8, 127:13,
127:19, 127:20,
128:18, 180:15,
197:6, 197:10,
197:17
**Cancer** [2] - 21:9,
146:23
**cancer-related** [1] -
68:3
**cancerous** [1] - 80:23
**cannot** [1] - 173:11
**capabilities** [1] -
239:14
**capacity** [1] - 42:5
**Capitol** [1] - 2:7
**Cardinal** [13] - 4:16,
5:2, 132:10, 149:17,
149:18, 149:20,
150:15, 150:21,
150:24, 150:25,
151:7, 151:23, 176:1
**cardiology** [1] - 15:5
**cardiovascular** [1] -
9:11
**care** [176] - 7:10, 7:11,
14:25, 16:9, 19:4,
19:5, 20:9, 20:10,
22:14, 23:18, 26:11,
34:3, 34:12, 34:17,
37:6, 37:9, 37:24,
39:6, 40:23, 41:3,
45:13, 45:23, 48:15,
48:17, 48:19, 48:20,
49:1, 49:5, 49:11,

49:15, 49:18, 49:21,
50:5, 50:9, 50:12,
50:22, 51:5, 51:11,
51:20, 52:1, 53:22,
56:10, 59:6, 60:22,
60:25, 61:5, 61:23,
62:10, 64:23, 65:4,
71:17, 83:1, 92:21,
97:4, 97:6, 97:19,
98:14, 100:9,
100:13, 101:7,
101:19, 103:15,
106:7, 106:16,
106:21, 107:2,
114:4, 114:14,
115:17, 115:19,
117:12, 117:14,
121:15, 121:19,
123:2, 123:3, 123:4,
126:8, 129:5, 129:9,
129:15, 129:16,
129:21, 130:1,
130:10, 130:12,
130:14, 130:16,
130:18, 130:19,
130:21, 130:23,
134:23, 135:11,
137:4, 140:8,
140:11, 141:3,
141:7, 141:12,
141:13, 141:14,
141:18, 141:25,
142:7, 142:11,
142:12, 142:13,
142:14, 142:16,
142:18, 142:21,
143:2, 143:6, 144:9,
144:11, 144:14,
144:25, 145:10,
145:11, 145:22,
145:23, 146:4,
146:24, 147:20,
147:21, 147:23,
147:24, 147:25,
148:1, 148:13,
148:15, 148:18,
148:19, 148:20,
148:21, 148:22,
148:23, 148:25,
149:1, 149:4, 155:2,
157:5, 157:22,
158:15, 158:21,
160:1, 160:13,
160:14, 160:23,
160:24, 161:9,
161:13, 161:18,
162:12, 171:11,
171:15, 171:18,
183:17, 222:20,
235:2, 235:8,
235:15, 236:2,

236:3, 250:6, 250:8,
251:6, 256:22,
258:24, 259:1,
259:5, 259:13, 260:1
**Care** [5] - 52:13,
214:3, 226:11,
228:4, 232:4
**career** [5] - 24:2,
29:17, 39:18, 150:2,
217:24
**carefully** [3] - 27:25,
44:24, 115:4
**Carey** [1] - 4:23
**Carolina** [1] - 36:23
**carried** [1] - 30:14
**Carter** [1] - 15:6
**CASA** [4] - 184:9,
184:12
**case** [30] - 9:20, 37:23,
40:15, 80:12, 110:3,
111:19, 137:19,
149:11, 149:15,
149:22, 151:18,
151:21, 155:15,
157:10, 158:16,
170:19, 211:1,
218:8, 218:10,
218:14, 218:22,
218:25, 219:11,
225:8, 229:8,
229:16, 230:2,
247:15, 257:9
**Case** [1] - 207:9
**cases** [6] - 36:25,
140:12, 160:14,
217:23, 218:1, 218:4
**cash** [5] - 169:17,
229:24, 230:14,
231:5, 241:15
**category** [1] - 183:17
**catheter** [1] - 15:24
**caught** [2] - 83:1,
151:12
**causation** [1] - 221:6
**caused** [2] - 42:19,
111:2
**causes** [3] - 14:18,
136:6, 137:13
**caution** [1] - 116:13
**CDC** [35] - 28:11,
28:13, 28:14, 28:16,
29:2, 29:13, 45:20,
45:25, 46:6, 48:12,
114:17, 114:21,
114:22, 115:14,
115:15, 115:20,
115:25, 116:3,
116:10, 116:12,
116:14, 116:18,
117:11, 117:18,

121:1, 125:11,
126:15, 150:13,
203:19, 256:6,
256:20, 258:4,
258:7, 258:14,
258:25
**ceiling** [1] - 73:6
**cement** [1] - 17:21
**Census** [2] - 225:4,
225:6
**Center** [7] - 3:12, 5:11,
20:20, 21:1, 21:9,
180:9, 184:13
**center** [7] - 14:2,
15:19, 15:20, 16:9,
60:10, 198:22, 202:2
**Centers** [5] - 16:6,
28:11, 180:7, 256:7,
256:10
**centers** [2] - 112:20,
159:3
**Central** [1] - 18:3
**century** [1] - 21:4
**Century** [1] - 251:10
**certain** [7] - 45:10,
49:13, 79:12,
100:21, 109:1,
131:22, 186:23
**certainly** [27] - 8:16,
14:8, 32:13, 33:13,
40:8, 40:21, 41:7,
75:1, 88:20, 90:11,
109:21, 111:2,
111:5, 122:7,
130:22, 134:16,
134:19, 134:25,
138:22, 149:7,
152:2, 160:4,
165:24, 177:1,
178:8, 179:24, 188:3
**certainty** [1] - 39:5
**CERTIFICATION** [1] -
264:1
**certification** [3] - 13:9,
13:10, 13:13
**certified** [5] - 13:2,
45:2, 112:18, 139:4,
140:6
**certify** [1] - 264:4
**Chair** [2] - 213:12,
215:6
**chaired** [2] - 33:7,
215:14
**chairman** [1] - 26:8
**Chairman** [5] - 23:10,
24:12, 27:17, 28:21,
28:22
**challenged** [1] - 157:8
**chance** [7] - 24:19,
56:8, 91:11, 91:15,

126:1, 201:23,
235:21
**chances** [1] - 128:23
**change** [26] - 18:22,
22:21, 34:14, 34:16,
40:6, 45:13, 45:19,
46:2, 46:22, 50:4,
52:1, 52:21, 55:8,
61:5, 61:23, 121:18,
124:22, 132:4,
161:17, 195:22,
253:24, 256:2,
256:16, 258:24,
259:1
**changed** [18] - 38:1,
39:7, 39:9, 40:4,
47:10, 58:1, 76:22,
100:13, 129:5,
129:7, 134:16,
134:25, 138:11,
150:1, 180:10,
180:12, 202:13,
253:25
**changes** [15] - 34:4,
34:12, 34:13, 49:7,
49:15, 57:7, 63:12,
98:13, 107:10,
129:21, 129:23,
174:15, 184:5,
249:10, 258:22
**changing** [9] - 62:10,
65:3, 117:12,
117:13, 121:15,
126:7, 129:9,
157:21, 203:23
**Chapter** [1] - 79:9
**characteristics** [2] -
175:14, 175:24
**characterization** [1] -
176:13
**characterize** [2] -
176:17, 219:25
**charge** [2] - 65:13,
185:18
**charged** [2] - 38:14,
232:24
**CHARLES** [1] - 3:11
**Charleston** [18] - 2:8,
3:13, 4:24, 5:15, 6:9,
7:4, 8:5, 11:21, 12:5,
12:23, 15:6, 16:7,
16:9, 16:13, 20:20,
20:25, 36:20, 36:22
**CHARLESTON** [2] -
1:2, 1:18
**Charlottesville** [2] -
11:25, 15:11
**chart** [35] - 65:18,
66:1, 66:7, 66:12,
76:13, 76:21, 81:1,

83:10, 83:11, 88:23, 89:14, 89:17, 100:2, 100:3, 111:17, 113:23, 114:2, 117:15, 117:19, 121:11, 125:8, 145:8, 195:12, 198:4, 199:7, 202:24, 202:25, 203:3, 204:25, 205:3, 205:5, 205:15, 206:3, 257:1, 257:3
**charts** [1] - 162:18
**Chase** [1] - 4:23
**check** [13] - 53:7, 72:3, 77:13, 108:25, 109:12, 109:20, 111:15, 119:24, 126:24, 154:9, 173:11, 177:17, 235:25
**checked** [1] - 119:20
**checking** [1] - 27:9
**Chesapeake** [1] - 10:11
**Chesterbrook** [1] - 6:15
**chief** [1] - 145:4
**chiropractic** [3] - 259:13, 259:25, 260:15
**choose** [2] - 144:5, 246:18
**chooses** [1] - 103:13
**choosing** [1] - 245:8
**chose** [3] - 144:5, 187:15, 215:17
**chosen** [2] - 187:20, 253:3
**chronic** [37] - 14:13, 16:16, 16:25, 29:25, 41:22, 52:7, 57:25, 66:20, 67:7, 67:13, 67:15, 67:17, 67:19, 67:20, 68:7, 69:11, 74:21, 76:6, 78:12, 78:13, 78:16, 78:18, 80:23, 83:8, 89:6, 98:2, 104:14, 104:19, 104:23, 104:25, 105:13, 143:25, 173:3, 178:6, 178:7, 180:14
**Chronic** [4] - 32:23, 73:13, 108:1, 146:23
**chronically** [3] - 45:11, 121:5, 206:13
**CIGNA** [1] - 210:20
**circumstance** [1] -

87:5
**circumstances** [1] - 260:6
**citation** [3] - 191:15, 191:16, 207:6
**cite** [6] - 71:2, 164:17, 176:21, 188:8, 191:14, 191:17
**cited** [1] - 212:21
**cities** [1] - 208:11
**citing** [1] - 207:8
**city** [2] - 15:17, 208:10
**City** [12] - 4:1, 5:11, 151:21, 176:22, 206:24, 207:19, 208:2, 218:15, 227:25, 228:17, 264:5
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 264:7, 264:8
**civil** [2] - 1:10, 50:19
**claim** [4] - 238:3, 238:18, 238:25, 239:2
**claims** [20] - 218:25, 224:10, 237:13, 237:19, 237:23, 238:7, 238:10, 238:21, 239:6, 239:11, 239:17, 239:22, 240:11, 241:10, 241:17, 242:1, 243:1, 243:6, 243:24, 244:4
**Claims** [1] - 237:17
**clarification** [1] - 94:6
**clarify** [4] - 67:5, 201:2, 243:5, 246:21
**clarifying** [1] - 66:19
**clarity** [1] - 31:16
**class** [4] - 11:5, 11:6, 246:16, 252:6
**classes** [2] - 111:9, 213:16
**clear** [8] - 42:13, 76:15, 161:6, 176:7, 177:18, 182:13, 190:25, 197:20
**clearly** [4] - 169:23, 173:9, 201:16, 201:21
**CLERK** [7] - 7:13, 7:16, 7:19, 7:22, 209:9, 209:11, 209:14
**Cleveland** [2] - 14:2, 35:17
**climbed** [1] - 202:7
**clinic** [5] - 45:7,

107:10, 112:13, 126:19, 180:5
**Clinic** [6] - 14:2, 35:17, 108:1, 128:21
**clinical** [9] - 11:12, 11:13, 35:11, 37:16, 251:13, 251:14, 251:23, 252:1, 253:22
**clinically** [1] - 59:17
**clinics** [6] - 26:4, 45:2, 112:7, 112:11, 126:20, 202:19
**Clinton's** [1] - 214:4
**close** [4] - 9:14, 14:17, 34:23, 187:24
**closely** [1] - 104:19
**closer** [1] - 147:15
**clue** [2] - 154:8, 169:13
**CME** [3] - 103:3, 103:10, 103:11
**CMEs** [2] - 103:7, 103:15
**co** [4] - 174:20, 217:2, 230:15, 234:10
**co-author** [1] - 217:2
**co-morbid** [1] - 174:20
**co-morbidities** [1] - 234:10
**co-pay** [1] - 230:15
**Coal** [1] - 208:15
**coal** [13] - 12:10, 105:20, 176:21, 177:4, 177:7, 177:13, 177:17, 177:19, 177:24, 206:19, 207:4, 208:3, 208:13
**Coalition** [1] - 32:23
**coalition** [1] - 33:4
**Coast** [1] - 18:17
**Cochran** [3] - 6:17, 264:2, 264:11
**Code** [1] - 79:9
**coffees** [1] - 151:10
**cognizant** [1] - 258:14
**collar** [1] - 105:23
**colleague** [1] - 187:6
**colleagues** [3] - 14:3, 43:21, 186:24
**colleagues'** [1] - 212:21
**collect** [1] - 238:24
**collected** [1] - 205:5
**collectively** [1] - 224:16
**collects** [1] - 241:22
**college** [7] - 10:14,

212:15, 212:18, 215:11, 215:12, 215:18
**College** [8] - 212:4, 212:12, 212:14, 212:17, 212:23, 213:16, 216:4
**colleges** [1] - 212:8
**colors** [1] - 199:6
**column** [6] - 184:8, 185:9, 257:6, 257:11, 257:13, 257:17
**combine** [1] - 9:4
**combined** [2] - 125:2, 128:21
**comfortable** [1] - 69:17
**comfortably** [1] - 15:25
**coming** [9] - 46:10, 52:19, 111:21, 115:14, 128:14, 187:3, 202:1, 204:6, 244:4
**commensurate** [1] - 232:20
**comment** [4] - 44:8, 88:22, 187:12, 187:14
**commercial** [2] - 229:23, 230:12
**Commercial** [1] - 230:11
**COMMISSION** [1] - 1:10
**Commission** [14] - 2:2, 3:2, 21:3, 53:1, 53:10, 53:18, 60:8, 60:14, 60:16, 61:22, 63:22, 64:10, 130:13, 130:15
**Commission's** [1] - 66:5
**commitment** [1] - 25:7
**Committee** [5] - 26:1, 28:21, 110:3, 111:7, 215:15
**committee** [25] - 26:2, 26:3, 26:7, 26:9, 26:22, 27:4, 27:23, 33:8, 76:2, 108:5, 108:7, 110:9, 110:11, 110:16, 110:21, 110:25, 111:13, 112:17, 115:12, 115:16, 126:25, 155:11, 155:13, 197:8, 215:16

**committee's** [2] - 76:5, 127:3
**committees** [5] - 25:18, 35:23, 215:12, 234:14, 235:4
**common** [5] - 49:8, 52:9, 69:19, 198:20, 249:20
**commonly** [2] - 35:7, 225:16
**communicate** [1] - 94:10
**communication** [1] - 94:17
**communities** [2] - 167:18, 169:11
**Community** [1] - 225:5
**community** [10] - 44:10, 57:5, 71:17, 92:19, 93:6, 140:17, 143:2, 143:3, 144:21, 162:22
**companies** [7] - 24:7, 28:25, 210:13, 222:22, 224:2, 224:7, 249:8
**company** [10] - 40:16, 41:20, 98:19, 150:15, 193:25, 227:4, 230:4, 232:22, 249:21, 251:5
**comparable** [1] - 232:1
**Comparative** [1] - 211:7
**compared** [5] - 199:4, 206:9, 259:18, 261:6, 261:22
**compensated** [1] - 218:10
**Compensation** [1] - 106:11
**complain** [2] - 61:18, 87:23
**complained** [1] - 39:22
**complaining** [1] - 119:11
**complaint** [1] - 49:25
**complaints** [1] - 88:15
**complete** [2] - 69:10, 246:19
**completely** [2] - 156:20, 249:22
**compliance** [3] - 81:10, 211:22, 223:14

**compliant** [1] - 43:15
**complicated** [3] - 43:12, 52:2, 144:8
**complied** [1] - 80:19
**comply** [1] - 159:25
**component** [3] - 19:22, 215:20
**components** [2] - 64:24, 205:16
**comprehensive** [1] - 22:14
**compressed** [1] - 17:3
**computer** [3] - 6:19, 27:3, 27:9
**concept** [3] - 52:18, 62:3, 79:16
**concern** [2] - 88:18, 94:15
**concerning** [1] - 154:14
**concerns** [2] - 94:11, 252:1
**conclude** [1] - 228:21
**concluded** [2] - 236:22, 248:19
**conclusion** [3] - 136:9, 136:17, 259:6
**conclusions** [1] - 219:5
**condition** [5] - 86:21, 119:9, 234:1, 234:9, 246:6
**conditions** [2] - 155:18, 156:15
**conduct** [3] - 51:13, 59:15, 63:3
**conducted** [1] - 234:21
**conferences** [1] - 49:23
**confident** [1] - 39:8
**confidential** [1] - 217:13
**confuse** [1] - 162:2
**Congress** [1] - 145:17
**connection** [1] - 224:19
**Connolly** [2] - 4:18, 5:4
**CONROY** [1] - 3:3
**Consensus** [1] - 73:13
**consensus** [7] - 34:2, 145:13, 145:19, 145:21, 182:2, 184:22, 185:2
**consequences** [2] - 50:7, 67:9
**conservatism** [2] - 46:19, 114:12
**consider** [4] - 225:13,

229:13, 235:17, 261:24
**considered** [5] - 170:18, 198:21, 206:7, 236:7, 256:21
**consistent** [7] - 49:18, 50:21, 61:24, 64:22, 79:17, 79:19, 240:10
**constraints** [1] - 258:13
**construction** [4] - 105:22, 178:20, 179:3, 179:6
**construe** [1] - 258:22
**consult** [1] - 109:8
**consultants** [1] - 193:13
**consulted** [1] - 36:19
**consulting** [5] - 36:25, 109:7, 217:6, 217:13, 219:16
**consuming** [1] - 210:9
**contact** [2] - 76:11, 110:19
**contain** [2] - 238:10, 242:3
**contained** [3] - 69:12, 198:14, 225:4
**contains** [1] - 241:19
**context** [2] - 163:25, 195:9
**Contin** [1] - 40:12
**continue** [4] - 132:5, 146:13, 195:9
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continued** [2] - 96:24, 135:13
**continues** [2] - 161:25, 193:10
**continuing** [6] - 101:22, 101:24, 102:3, 207:1, 208:3
**contract** [1] - 237:16
**contribute** [3] - 148:14, 174:21, 182:3
**contributed** [1] - 176:4
**contributes** [1] - 105:5
**contributing** [1] - 175:16
**Control** [4] - 28:11, 183:14, 256:7, 256:11
**control** [7] - 107:23, 112:20, 244:7, 251:12, 252:2, 253:19, 261:17

**Controlled** [5] - 26:1, 96:22, 108:25, 123:23, 241:22
**controlled** [24] - 27:6, 28:5, 45:4, 79:14, 80:10, 80:17, 87:6, 89:3, 109:13, 109:17, 110:6, 110:24, 111:16, 112:15, 112:25, 113:3, 116:24, 123:19, 128:3, 184:15, 185:10, 188:5, 241:25, 251:17
**controlling** [1] - 80:11
**convert** [1] - 17:7
**converting** [1] - 21:3
**convicted** [2] - 153:10, 153:19
**Cook** [3] - 6:18, 264:3, 264:11
**copy** [6] - 76:10, 90:16, 132:10, 181:3, 207:11, 207:12
**cord** [1] - 128:10
**core** [1] - 214:8
**corner** [4] - 182:20, 199:3, 222:11, 223:5
**Cornerstone** [5] - 219:12, 219:14, 219:15, 219:17, 219:18
**CORPORATION** [2] - 1:7, 1:13
**Corporation** [3] - 6:2, 211:17, 264:7
**Correct** [3] - 99:8, 127:6, 227:8
**correct** [92] - 8:16, 13:2, 13:11, 23:2, 23:3, 31:14, 33:3, 34:9, 36:8, 37:20, 38:5, 42:11, 50:24, 59:21, 60:19, 63:9, 65:23, 65:24, 66:5, 66:6, 66:11, 68:3, 82:14, 88:7, 88:8, 95:16, 98:7, 119:22, 133:17, 133:19, 137:2, 137:14, 137:16, 137:19, 137:22, 138:18, 140:15, 141:7, 141:8, 141:10, 143:7, 149:12, 149:20, 160:10, 160:11, 162:13, 171:24, 172:9,

172:19, 173:8, 175:17, 175:18, 175:22, 175:23, 176:5, 179:8, 183:9, 185:16, 185:21, 194:6, 195:14, 195:17, 196:16, 196:17, 196:25, 197:3, 198:6, 199:14, 199:15, 199:20, 199:21, 199:24, 205:13, 205:22, 205:23, 206:10, 206:16, 227:5, 231:6, 231:8, 231:9, 232:16, 238:9, 243:9, 243:10, 244:25, 255:6, 255:7, 255:11, 255:14, 260:21, 264:4
**correctly** [13] - 57:2, 160:2, 174:7, 174:13, 174:22, 182:22, 183:4, 183:8, 184:18, 188:8, 190:14, 191:22, 199:17
**corresponds** [1] - 256:4
**cost** [6] - 14:25, 232:22, 232:23, 251:6, 252:2, 253:19
**costs** [2] - 251:12, 261:17
**counsel** [5] - 151:2, 172:16, 176:1, 177:11, 181:2
**count** [1] - 230:18
**countries** [1] - 24:6
**country** [23] - 15:19, 35:8, 42:10, 68:18, 73:7, 73:22, 83:7, 89:23, 90:2, 90:5, 94:11, 133:15, 134:6, 141:2, 159:25, 160:4, 160:5, 179:17, 190:12, 198:20, 200:16, 212:20, 216:16
**counts** [1] - 252:16
**county** [8] - 41:23, 152:18, 153:7, 177:4, 177:5, 177:25, 195:13, 196:14
**COUNTY** [1] - 1:10
**County** [54] - 2:2, 3:2, 16:11, 16:12, 41:25,

42:1, 149:12, 151:20, 151:23, 152:10, 152:20, 153:3, 154:1, 154:17, 154:19, 154:25, 155:4, 155:12, 157:11, 157:14, 157:15, 157:18, 157:20, 158:18, 158:19, 158:20, 158:22, 159:11, 159:14, 170:14, 170:17, 172:4, 176:20, 176:24, 177:14, 177:18, 178:12, 178:21, 178:22, 179:3, 195:15, 195:16, 196:15, 196:19, 197:16, 218:15, 227:13, 227:16, 227:20, 227:24, 228:10, 228:12, 228:17, 228:22
**couple** [5] - 12:1, 109:25, 114:17, 203:1, 205:20
**course** [17] - 18:25, 82:10, 82:19, 84:7, 96:6, 98:13, 98:22, 111:4, 119:9, 213:25, 214:2, 217:6, 217:24, 246:8, 246:14, 249:4, 250:20
**court** [10] - 30:12, 36:11, 36:12, 36:13, 36:17, 50:19, 92:7, 96:25, 161:25, 185:4
**Court** [22] - 6:17, 6:18, 7:3, 8:20, 16:17, 37:8, 48:15, 78:24, 85:3, 96:12, 96:13, 101:22, 118:10, 125:17, 132:11, 154:18, 164:2, 209:21, 211:5, 252:3, 264:2, 264:3
**COURT** [178] - 1:1, 1:17, 7:6, 7:12, 7:24, 17:9, 17:12, 17:15, 17:17, 30:5, 30:10, 30:12, 30:15, 30:18, 30:21, 30:24, 37:7, 51:14, 51:22, 58:6, 58:8, 59:24, 60:1, 62:19, 62:22, 63:6, 63:11, 63:14, 63:25, 64:4, 70:13, 70:17,

71:10, 71:19, 71:23, 72:1, 72:7, 72:9, 72:13, 72:17, 75:10, 75:13, 75:20, 76:14, 77:4, 77:7, 77:13, 79:1, 79:3, 81:25, 84:11, 84:13, 85:10, 86:8, 92:2, 93:3, 93:8, 93:18, 93:23, 94:3, 95:1, 95:4, 95:8, 95:14, 95:17, 96:14, 97:2, 97:8, 97:22, 98:12, 99:23, 99:25, 118:12, 118:14, 122:13, 122:22, 123:8, 124:16, 124:18, 130:7, 131:6, 132:12, 132:16, 132:19, 132:22, 132:25, 135:8, 135:21, 136:11, 136:16, 139:11, 141:20, 141:24, 146:8, 146:11, 147:11, 148:6, 148:9, 151:4, 151:13, 156:7, 156:22, 156:25, 157:3, 157:21, 158:8, 158:13, 160:18, 162:6, 163:8, 163:10, 163:14, 163:20, 164:5, 164:6, 164:10, 165:2, 165:7, 165:14, 165:17, 166:13, 166:17, 166:20, 166:23, 167:11, 167:14, 167:20, 168:1, 168:8, 168:14, 168:21, 168:23, 170:1, 170:6, 171:7, 173:17, 173:21, 175:6, 176:18, 177:21, 178:4, 181:7, 188:17, 190:25, 191:22, 192:17, 192:25, 193:7, 193:15, 194:14, 194:20, 198:16, 201:17, 203:6, 204:10, 204:14, 204:17, 207:5, 207:17, 207:25, 208:19, 208:22, 209:1, 209:5, 209:8, 209:15, 220:11,

220:15, 220:18, 220:24, 230:15, 230:20, 256:9, 262:17, 263:3, 263:7, 263:11, 263:14
**Court's** [1] - 73:20
**COURTROOM** [4] - 7:13, 7:16, 7:19, 7:22
**courts** [1] - 36:5
**cover** [9] - 158:2, 221:4, 223:3, 233:3, 245:8, 260:5, 260:20, 261:8, 262:9
**coverage** [15] - 224:25, 225:21, 225:22, 227:23, 229:14, 231:11, 231:25, 232:1, 232:6, 236:16, 260:7, 260:23, 261:13, 261:21, 262:13
**covered** [20] - 90:22, 224:21, 226:23, 227:1, 227:3, 227:14, 227:15, 230:8, 230:12, 230:24, 231:17, 231:19, 232:5, 232:10, 234:16, 259:15, 259:18, 259:23, 261:5
**covering** [1] - 231:7
**covers** [2] - 157:25, 260:5
**COVID** [2] - 18:20
**Covington** [1] - 5:11
**crave** [3] - 85:21, 86:3, 86:4
**craving** [1] - 85:23
**crazy** [2] - 15:9, 15:10, 42:24
**create** [4] - 10:8, 28:17, 110:9, 115:15
**created** [8] - 24:13, 24:15, 26:7, 27:1, 32:24, 33:2, 45:1, 115:23
**creating** [2] - 33:18, 90:7
**credibility** [1] - 158:12
**credit** [1] - 36:15
**Creek** [2] - 208:15, 208:17
**crime** [1] - 153:19
**criminal** [1] - 81:12
**crisis** [13] - 133:14, 133:21, 133:22,

134:5, 136:6, 136:7, 136:25, 137:1, 137:21, 137:25, 149:25, 190:12, 196:7
**criteria** [3] - 45:11, 112:19, 113:1
**criticizing** [1] - 202:19
**Cross** [8] - 144:17, 145:6, 149:19, 151:1, 152:22, 154:21, 155:25, 156:21
**cross** [12] - 122:18, 132:14, 136:2, 147:4, 147:9, 151:5, 157:1, 158:10, 175:6, 193:16, 207:11, 262:18
**CROSS** [1] - 133:2
**cross-examination** [2] - 122:18, 132:14
**cross-talk** [5] - 136:2, 147:4, 147:9, 151:5, 158:10
**Cross-talk** [8] - 144:17, 145:6, 149:19, 151:1, 152:22, 154:21, 155:25, 156:21
**crosses** [1] - 143:4
**Crouch's** [1] - 179:23
**CRR** [2] - 6:17, 6:18
**CSA** [1] - 99:1
**CSMP** [21] - 26:1, 27:12, 28:2, 108:1, 108:5, 109:8, 109:20, 111:21, 111:22, 112:2, 119:20, 124:12, 241:24, 242:6, 242:9, 242:11, 242:13, 242:15, 242:16, 242:18, 242:20
**cue** [1] - 59:15
**cuff** [1] - 61:14
**cum** [1] - 10:23
**current** [5] - 83:1, 212:11, 212:23, 234:17, 234:18
**curriculum** [1] - 52:11
**curve** [2] - 114:15
**cutoff** [1] - 75:17

**D**

**dad** [2] - 12:10, 208:15
**daily** [1] - 115:5
**damage** [1] - 14:13

**danger** [1] - 139:19
**dangerous** [1] - 162:22
**dark** [1] - 56:18
**Darrel** [1] - 91:8
**dash** [1] - 184:17
**data** [61] - 19:14, 27:21, 27:24, 28:2, 28:3, 28:5, 46:25, 104:16, 105:12, 105:24, 109:12, 110:22, 119:25, 121:20, 127:9, 129:12, 152:9, 152:16, 154:14, 154:17, 154:23, 155:15, 170:13, 198:14, 200:10, 201:15, 201:20, 201:23, 203:4, 203:5, 203:14, 205:5, 217:12, 218:25, 224:20, 224:23, 224:24, 225:1, 225:4, 225:7, 225:10, 225:19, 226:14, 228:25, 229:4, 229:10, 229:13, 229:17, 234:20, 238:7, 238:24, 239:6, 239:12, 239:14, 239:17, 239:22, 240:11, 241:10, 241:22, 242:1, 243:1
**database** [4] - 111:21, 111:22, 119:21, 241:19
**Date** [1] - 264:16
**date** [10] - 58:22, 66:22, 66:23, 75:11, 75:15, 83:21, 83:22, 99:11, 176:6, 257:6
**Daubert** [1] - 96:20
**daughter** [1] - 53:6
**Daughters** [1] - 159:2
**Dave** [1] - 57:12
**David** [1] - 7:1
**DAVID** [2] - 1:17, 4:5
**days** [12] - 35:18, 38:12, 49:4, 54:18, 68:13, 105:19, 118:23, 118:24, 157:13, 198:19, 198:21, 252:21
**DC** [6] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12
**De** [2] - 2:4, 2:14
**DEA** [17] - 50:25, 64:10, 64:21, 66:9,

91:7, 91:10, 91:15, 91:25, 93:14, 94:10, 94:20, 96:22, 98:25, 130:1, 130:2, 130:6, 183:14
**deal** [3] - 29:12, 185:17, 261:4
**dealing** [2] - 54:2, 140:25
**dealt** [1] - 59:20
**dear** [1] - 57:14
**death** [11] - 26:16, 26:21, 26:23, 27:21, 105:9, 110:17, 110:23, 111:2, 111:3, 115:12
**deaths** [2] - 26:19, 110:15
**debate** [2] - 145:16, 145:17
**December** [2] - 74:13, 75:13
**decide** [5] - 15:3, 245:2, 245:20, 245:21, 246:10
**decided** [5] - 12:2, 15:14, 42:6, 49:8, 119:1
**decides** [1] - 210:8
**deciding** [1] - 234:15
**decision** [4] - 12:3, 37:14, 64:25, 103:19
**decision-making** [1] - 103:19
**decisions** [5] - 122:3, 122:15, 262:4, 262:9, 262:13
**declaration** [1] - 92:7
**decline** [3] - 117:2, 208:4, 208:12
**decrease** [4] - 123:16, 123:18, 125:2, 128:16
**deem** [1] - 236:16
**Deer** [105] - 7:10, 7:15, 7:18, 8:2, 9:24, 10:10, 14:5, 18:25, 20:15, 21:22, 23:1, 25:16, 28:6, 30:2, 31:2, 31:9, 32:22, 33:18, 34:22, 35:25, 37:5, 37:8, 37:13, 39:4, 39:13, 43:20, 50:20, 51:2, 54:23, 55:24, 56:15, 58:11, 60:4, 60:20, 63:18, 64:18, 65:1, 65:18, 66:18, 67:4, 70:19, 71:8, 72:23, 74:9, 75:25, 76:12, 76:20,

77:1, 77:5, 77:16, 77:18, 78:1, 79:8, 79:17, 81:19, 81:24, 82:4, 83:10, 86:12, 87:4, 88:25, 89:16, 93:7, 93:12, 94:8, 95:22, 96:4, 97:7, 97:11, 99:3, 100:2, 100:6, 103:22, 106:25, 108:24, 112:6, 114:1, 116:7, 117:10, 117:18, 119:18, 122:1, 123:15, 129:4, 131:12, 132:7, 132:17, 132:23, 133:4, 157:20, 160:19, 162:11, 167:6, 175:4, 189:16, 193:21, 194:9, 199:5, 203:3, 204:18, 204:24, 205:3, 207:19, 208:18, 209:2
**DEER** [2] - 7:18, 7:21
**deer** [5] - 8:6, 10:7, 11:16, 64:9, 203:3
**Deer's** [2] - 35:6, 169:25
**DEF-WV-02368** [1] - 181:5
**DEF-WV-02395** [1] - 54:20
**DEF-WV-03003** [1] - 76:15
**DEF-WV-03036** [1] - 31:4
**DEF-WV-03074** [1] - 58:16
**Defendant** [4] - 4:16, 5:2, 5:7, 6:2
**Defendants** [3] - 1:8, 1:14, 264:7
**defendants** [3] - 96:20, 170:19, 209:6
**Defendants'** [1] - 207:9
**DEFENDANTS'** [1] - 209:13
**DEFENSE** [1] - 7:21
**defense** [1] - 178:14
**defer** [3] - 138:25, 186:24, 192:6
**define** [5] - 48:14, 67:15, 67:19, 87:20, 114:9
**defined** [3] - 67:18, 89:7, 206:3
**definitely** [4] - 102:1, 130:15, 130:19,

171:16
**definition** [1] - 78:4
**definitions** [1] - 67:25
**Degree** [2] - 211:8, 211:11
**degree** [2] - 39:5, 259:18
**Delaware** [1] - 36:17
**delivered** [1] - 170:18
**delivery** [1] - 214:10
**delve** [1] - 211:4
**demanding** [1] - 105:15
**Demo** [2] - 172:16, 173:13
**demographic** [1] - 104:16
**demographics** [2] - 103:21, 103:23
**demonstrate** [3] - 80:17, 219:8, 247:13
**Demonstrative** [2] - 10:4, 132:10
**demonstrative** [11] - 32:20, 39:13, 65:8, 225:18, 225:25, 229:17, 229:20, 230:10, 237:5, 254:10, 254:14
**denial** [1] - 106:13
**dentist** [1] - 119:6
**dentists** [3] - 26:13, 119:3
**Department** [3] - 55:6, 56:4, 215:5
**department** [7] - 43:25, 212:17, 212:19, 212:20, 215:4, 215:5, 215:10
**dependence** [3] - 85:11, 85:13, 85:17
**dependent** [2] - 85:5, 85:22
**deposition** [17] - 137:18, 162:24, 162:25, 163:2, 165:24, 166:7, 167:6, 167:19, 167:24, 168:2, 168:3, 168:11, 168:19, 218:22, 240:18, 240:24, 258:5
**DEPUTY** [4] - 7:13, 7:16, 7:19, 7:22
**Dermabond** [1] - 68:10
**describe** [17] - 8:20, 14:5, 44:12, 45:16, 55:1, 71:8, 97:13,

114:6, 118:21, 167:17, 169:9, 210:1, 212:16, 222:6, 237:11, 243:20, 257:5
**described** [4] - 67:11, 67:20, 193:10, 251:23
**describing** [1] - 168:18
**descriptor** [1] - 199:6
**deserves** [1] - 175:8
**designated** [3] - 79:11, 131:4, 250:6
**designed** [3] - 59:16, 251:12, 253:11
**desist** [1] - 113:4
**despite** [1] - 107:18
**detail** [4] - 28:13, 44:18, 210:25, 211:19
**detailed** [1] - 256:11
**details** [2] - 36:24, 238:11
**determinations** [1] - 110:3
**determine** [10] - 50:21, 51:4, 107:9, 129:16, 130:22, 148:15, 221:6, 233:15, 234:2, 235:13
**determined** [2] - 236:7, 260:14
**determines** [2] - 144:21, 145:11
**determining** [1] - 148:19
**developed** [5] - 9:13, 40:17, 199:1, 201:12, 220:1
**developing** [1] - 23:13
**development** [5] - 13:20, 24:20, 34:13, 129:20, 129:25
**developments** [2] - 65:2, 256:5
**device** [4] - 13:20, 13:22, 17:20, 147:19
**devices** [10] - 24:3, 24:7, 48:23, 120:21, 128:22, 200:19, 201:5, 201:9, 201:11, 201:12
**devising** [2] - 244:11, 251:18
**DHHR** [1] - 31:21
**diagnosed** [2] - 154:4, 154:6
**diagram** [4] - 223:17,

223:24, 224:5, 243:21
**dictate** [1] - 223:15
**didni't** [1] - 154:22
**died** [1] - 15:24
**differ** [1] - 258:15
**difference** [5] - 48:6, 85:11, 227:24, 231:13, 259:4
**different** [30] - 29:9, 34:3, 67:18, 109:17, 127:20, 129:8, 144:6, 144:22, 147:2, 157:6, 161:15, 162:19, 171:6, 196:22, 196:23, 197:13, 210:5, 210:10, 212:8, 219:22, 223:13, 223:25, 230:8, 238:10, 238:14, 241:3, 241:15, 248:18, 260:22, 260:25
**difficult** [3] - 107:17, 121:6, 161:25
**dig** [1] - 150:7
**dip** [1] - 176:9
**DIRECT** [1] - 209:17
**direct** [4] - 133:11, 149:6, 156:23, 188:15
**direction** [3] - 29:12, 73:18, 258:17
**directions** [1] - 129:8
**directly** [1] - 227:4
**Director** [10] - 20:24, 21:2, 21:5, 28:23, 31:23, 31:24, 33:7, 43:1, 53:17, 91:15
**disabilities** [1] - 76:3
**disagree** [10] - 134:7, 139:2, 185:4, 185:7, 187:23, 187:25, 191:23, 191:25, 192:1
**disagreeing** [2] - 138:24, 188:3
**disagreement** [2] - 192:3, 192:5
**disavow** [1] - 187:23
**disavowing** [3] - 146:3, 146:19, 148:1
**disc** [1] - 14:10
**discharges** [1] - 80:14
**disciplinary** [6] - 67:10, 69:10, 79:12, 80:7, 80:8, 81:12
**discourage** [1] - 99:18
**discussed** [10] -

81:19, 81:24, 101:17, 150:12, 183:22, 219:8, 241:3, 241:5, 242:4, 247:23
**discussing** [4] - 100:11, 224:15, 242:1, 250:11
**discussion** [5] - 44:15, 134:16, 141:13, 150:14, 234:18
**discussions** [2] - 32:14, 235:8
**disease** [3] - 22:5, 24:4, 104:24
**Disease** [3] - 28:11, 256:7, 256:11
**diseases** [2] - 105:13, 156:15
**Dispensed** [1] - 125:7
**dispensed** [7] - 80:10, 128:4, 214:7, 232:10, 238:20, 241:20, 241:23
**dispensing** [4] - 79:14, 110:4, 124:22, 125:9
**disposal** [3] - 233:15, 244:14, 263:13
**dispute** [1] - 177:1
**disseminated** [2] - 29:23, 102:17
**dissertation** [1] - 216:5
**distance** [1] - 56:14
**distress** [2] - 207:1, 208:3
**distribute** [2] - 135:24, 188:20
**distributed** [8] - 70:25, 74:3, 87:13, 135:17, 151:23, 152:17, 154:17, 210:3
**distribution** [7] - 65:15, 188:7, 188:13, 188:21, 189:13, 190:18, 220:4
**distributions** [1] - 117:21
**distributor** [4] - 51:17, 63:21, 63:23, 222:3
**distributors** [14] - 51:3, 62:15, 65:16, 130:25, 131:5, 141:16, 149:15, 170:19, 170:23, 171:5, 242:16,

262:3, 262:8, 262:12
**distributorship** [3] -
51:11, 51:13, 63:3
**distributorship's** [1] -
63:1
**District** [2] - 7:2, 7:3
**DISTRICT** [3] - 1:1,
1:1, 1:17
**districts** [1] - 223:22
**Diversion** [1] - 183:14
**diversion** [12] - 86:16,
94:22, 161:15,
161:19, 162:13,
170:24, 172:19,
189:5, 190:13,
191:11, 191:21,
192:7
**diversity** [2] - 25:7,
25:9
**diverted** [3] - 170:13,
170:16, 190:16
**diverting** [2] - 161:10,
161:14
**division** [3] - 22:12,
25:9
**Division** [2] - 23:11,
183:15
**divorced** [1] - 14:19
**doctor** [47] - 18:12,
19:8, 20:4, 27:1,
27:16, 28:22, 43:16,
45:5, 48:9, 48:17,
49:24, 51:4, 52:12,
57:23, 62:7, 80:25,
81:16, 82:22, 86:17,
102:8, 109:7,
109:10, 109:12,
110:23, 115:17,
119:20, 131:17,
142:7, 169:9,
174:20, 189:11,
194:9, 235:22,
235:25, 245:16,
245:23, 246:9,
246:18, 246:25,
247:8, 248:3,
249:14, 250:3,
250:5, 254:3, 254:6,
257:15
**Doctor** [25] - 85:10,
135:4, 136:12,
138:13, 149:9,
150:5, 167:1,
167:16, 169:8,
170:12, 171:10,
175:11, 180:6,
182:19, 183:4,
184:8, 185:8,
187:22, 189:3,
190:19, 192:8,

195:12, 199:2,
200:1, 204:12
**doctor's** [4] - 236:4,
238:3, 245:20,
249:22
**doctor-shopping** [1] -
109:10
**doctoral** [1] - 216:24
**doctors** [91] - 19:19,
26:5, 27:5, 27:7,
29:3, 29:13, 29:23,
32:11, 32:14, 39:1,
50:4, 54:15, 54:17,
56:9, 57:17, 57:20,
61:2, 62:3, 68:6,
68:19, 68:24, 69:4,
69:17, 72:5, 73:16,
74:12, 84:22, 87:14,
87:22, 88:15, 91:21,
100:25, 101:2,
101:5, 101:8, 101:9,
101:11, 102:17,
103:8, 103:14,
108:16, 108:25,
109:12, 109:14,
109:20, 110:10,
110:20, 111:4,
111:11, 111:12,
112:12, 114:24,
115:3, 115:8,
115:24, 116:12,
116:14, 116:15,
116:17, 118:23,
119:18, 120:3,
120:5, 120:15,
121:3, 122:1, 122:5,
122:10, 122:14,
126:15, 129:10,
131:1, 142:8, 142:9,
143:6, 152:12,
159:24, 165:15,
165:25, 166:1,
171:11, 194:25,
205:17, 234:11,
235:3, 235:19,
239:20, 240:8,
240:12, 242:6,
246:12
**Doctors** [1] - 236:6
**document** [66] - 31:5,
31:7, 31:11, 54:23,
55:2, 56:22, 58:16,
58:18, 58:20, 58:22,
59:1, 59:18, 60:12,
60:17, 66:16, 66:18,
66:23, 69:6, 72:2,
72:3, 74:7, 74:8,
74:18, 75:6, 75:7,
75:21, 77:3, 78:22,
78:25, 79:6, 83:21,

84:21, 87:2, 88:12,
97:12, 99:3, 118:16,
123:20, 123:21,
124:20, 144:12,
147:23, 170:21,
173:10, 173:11,
173:17, 174:25,
175:1, 175:3, 175:4,
175:5, 175:11,
182:1, 182:2, 182:5,
184:24, 185:2,
192:19, 192:20,
192:22, 207:10,
207:16, 207:22,
224:25, 229:5, 229:7
**documentation** [1] -
69:10
**documented** [3] -
59:13, 81:1, 182:21
**documents** [13] -
62:16, 63:21, 75:8,
76:16, 92:17, 117:1,
150:7, 150:9,
150:14, 218:21,
218:23, 240:21,
240:25
**dollars** [1] - 230:18
**Don** [1] - 10:18
**donation** [1] - 213:12
**done** [22] - 13:17,
13:22, 13:25, 25:1,
25:11, 29:18, 30:6,
34:18, 35:19,
103:11, 133:24,
171:18, 175:20,
180:1, 185:17,
189:4, 200:14,
202:10, 216:22,
217:4, 217:6, 218:18
**dosage** [11] - 80:15,
80:16, 115:5,
128:14, 199:4,
238:12, 246:11,
252:14, 252:18,
252:23, 254:8
**dose** [25] - 17:5, 18:7,
19:5, 19:13, 34:1,
41:9, 44:19, 45:24,
47:13, 47:17, 69:17,
69:18, 69:20, 70:7,
73:4, 101:13,
107:19, 115:1,
119:7, 125:3,
125:22, 125:25,
128:22, 131:25,
174:19
**doses** [13] - 68:9,
68:11, 69:12, 74:1,
80:24, 107:6,
113:20, 117:2,

120:7, 125:2,
125:15, 128:4,
128:11
**Doses** [1] - 125:7
**dosing** [2] - 116:15,
126:15
**double** [1] - 72:2
**doubt** [2] - 100:12,
121:20
**Douglas** [1] - 4:23
**down** [33] - 16:17,
17:9, 18:5, 47:1,
48:2, 48:20, 48:22,
49:9, 53:9, 57:16,
77:5, 106:25,
117:22, 119:17,
138:16, 143:5,
148:6, 155:9,
159:22, 162:6,
175:11, 176:9,
179:2, 184:9,
189:11, 189:13,
195:21, 196:2,
201:17, 202:7,
204:12, 206:20,
223:4
**downward** [1] -
114:14
**dozen** [1] - 216:12
**dr** [1] - 64:9
**Dr** [187] - 7:10, 8:2,
8:6, 9:24, 10:7,
10:10, 11:16, 14:4,
15:8, 18:25, 20:15,
21:13, 21:22, 22:12,
23:1, 25:16, 28:6,
30:2, 31:2, 31:6,
31:9, 31:20, 32:22,
33:18, 34:22, 35:25,
37:5, 37:8, 37:13,
39:4, 39:13, 43:1,
43:20, 50:20, 51:2,
52:12, 54:23, 55:5,
55:20, 55:24, 56:10,
56:15, 57:3, 58:11,
60:4, 60:15, 60:20,
63:18, 64:16, 64:18,
65:1, 65:11, 65:12,
65:14, 65:18, 66:17,
66:18, 67:4, 70:19,
71:8, 71:9, 72:23,
73:6, 74:9, 75:9,
75:25, 76:12, 76:20,
77:1, 77:5, 77:16,
77:18, 78:1, 79:8,
79:17, 81:19, 81:23,
82:4, 83:10, 86:12,
87:2, 87:4, 88:25,
89:16, 90:16, 90:19,
90:22, 92:18, 93:7,

93:12, 94:8, 95:12,
95:22, 96:3, 97:7,
97:11, 99:3, 100:2,
100:6, 101:16,
102:3, 102:10,
102:14, 102:21,
102:22, 103:1,
103:7, 103:16,
103:22, 106:25,
108:13, 108:24,
112:6, 114:1,
114:19, 116:7,
117:10, 117:18,
119:18, 122:1,
123:15, 129:4,
131:12, 132:7,
132:17, 132:23,
133:4, 153:7,
153:17, 157:20,
160:19, 162:11,
167:6, 169:25,
172:13, 175:4,
189:16, 193:21,
198:22, 203:3,
204:17, 204:24,
205:3, 207:19,
208:18, 209:2,
209:7, 209:15,
209:19, 209:23,
210:24, 211:24,
212:9, 215:19,
217:19, 219:20,
220:14, 220:18,
221:3, 221:16,
221:23, 223:2,
224:19, 225:24,
228:25, 229:20,
230:22, 231:21,
236:10, 237:3,
237:9, 242:5,
242:24, 243:14,
244:3, 244:13,
250:9, 252:7,
254:14, 257:1,
258:22, 259:7,
261:13, 263:11
**DR** [1] - 7:21
**draft** [1] - 112:17
**dramatic** [1] - 188:6
**dramatically** [4] -
40:5, 40:6, 129:7,
204:6
**drastic** [1] - 195:22
**draw** [1] - 259:6
**drawn** [1] - 199:7
**Drive** [1] - 6:15
**drop** [2] - 125:1,
195:21
**Drug** [5] - 6:2, 31:22,
125:7, 183:14, 264:7

**drug** [53] - 40:12, 40:14, 40:17, 42:12, 42:23, 47:14, 47:15, 47:16, 47:18, 47:24, 85:9, 85:18, 85:19, 85:21, 86:7, 109:15, 125:14, 153:25, 172:19, 173:4, 184:16, 189:5, 190:12, 197:1, 197:4, 197:17, 215:25, 232:6, 234:7, 234:9, 234:19, 235:1, 235:4, 236:6, 238:12, 244:1, 245:8, 245:18, 246:10, 246:20, 247:1, 248:20, 254:20, 255:1, 255:9, 255:21, 255:24, 257:4, 257:7, 257:12
**DRUG** [2] - 1:7, 1:13
**drugs** [27] - 40:7, 68:9, 68:25, 86:16, 111:9, 117:6, 137:23, 160:5, 184:17, 185:10, 188:5, 190:16, 229:1, 229:14, 230:23, 231:7, 234:15, 235:5, 235:7, 235:8, 235:11, 238:14, 243:13, 245:16, 246:14, 246:15, 246:16
**due** [4] - 89:7, 161:11, 207:4, 208:3
**during** [31] - 11:9, 15:13, 18:25, 23:19, 31:6, 41:18, 45:17, 60:3, 60:23, 61:23, 66:17, 70:23, 72:24, 77:5, 88:17, 102:14, 108:12, 152:18, 153:3, 155:11, 170:14, 170:17, 177:14, 188:14, 194:19, 196:6, 196:13, 196:19, 204:12, 211:19
**Dusseldorf** [1] - 13:21
**duties** [1] - 215:9
**duty** [1] - 192:1
**dying** [1] - 80:13
**dynamic** [2] - 49:12, 49:13
**Dysfunction** [1] - 9:7

**E**

**e-mail** [1] - 74:11
**earliest** [1] - 23:7
**early** [14] - 15:14, 39:7, 40:3, 42:9, 42:19, 52:22, 54:7, 68:13, 102:23, 157:13, 200:21, 204:9, 251:9
**earn** [1] - 228:7
**earned** [2] - 211:24, 212:1
**ease** [1] - 30:7
**easier** [2] - 23:23, 98:2
**easiest** [1] - 248:7
**easily** [3] - 43:16, 44:1, 261:5
**East** [5] - 3:5, 3:12, 4:24, 10:13, 18:17
**economic** [4] - 207:1, 208:3, 211:21, 225:16
**economics** [27] - 209:25, 210:1, 210:2, 210:4, 210:12, 212:17, 212:18, 212:20, 213:18, 213:19, 213:23, 213:25, 214:2, 214:18, 215:4, 215:5, 215:9, 215:24, 215:25, 216:22, 220:2, 220:9, 220:19, 220:22
**Economics** [6] - 211:8, 211:9, 211:12, 212:10, 212:12, 212:24
**economist** [4] - 209:24, 211:18, 225:11, 229:11
**economy** [2] - 208:10, 210:11
**edit** [1] - 186:8
**editing** [1] - 34:25
**Editor** [1] - 35:3
**Editorial** [1] - 35:2
**edits** [1] - 186:10
**educate** [1] - 185:14
**education** [11] - 38:25, 101:17, 101:19, 101:21, 101:22, 101:24, 101:25, 102:1, 102:4, 111:20, 171:17
**educational** [2] - 10:9, 211:6
**effect** [12] - 69:21,
**70:7, 73:5, 85:4, 103:24, 104:15, 113:6, 120:24, 135:14, 232:19, 245:10
**effective** [6] - 119:7, 219:9, 235:10, 248:8, 249:1, 251:6
**Effective** [1] - 28:7
**effectively** [3] - 201:12, 203:8, 248:22
**effectiveness** [1] - 248:13
**effects** [3] - 74:1, 85:19, 120:20
**efficient** [1] - 211:22
**effort** [1] - 132:3
**Eighth** [1] - 3:10
**either** [15] - 13:20, 19:15, 24:23, 41:12, 86:21, 113:3, 119:12, 134:1, 186:21, 187:25, 211:20, 236:1, 238:22, 239:14, 253:19
**elaborate** [1] - 73:2
**electrical** [2] - 200:20, 200:22
**electronically** [1] - 238:21
**elements** [1] - 113:5
**elicit** [1] - 63:3
**elicited** [2] - 98:23, 98:24
**eligibility** [3] - 228:5, 228:7, 228:19
**eligible** [1] - 228:23
**eliminate** [2] - 200:14, 204:4
**eliminating** [1] - 204:3
**ELIZABETH** [1] - 6:14
**Elk** [1] - 12:19
**Embassy** [1] - 43:5
**emergently** [1] - 119:12
**Emeritus** [4] - 23:22, 212:13, 212:25, 213:1
**emphasized** [1] - 249:1
**employ** [1] - 236:12
**Employees** [12] - 210:22, 210:23, 223:18, 240:17, 241:1, 242:19, 250:16, 251:3, 251:21, 254:9, 255:5, 257:4
**employees** [5] - 14:20, 31:17, 106:12, 222:16, 223:22
**employer** [2] - 226:8, 226:19, 226:21
**employers** [3] - 208:12, 222:15, 222:17
**Encino** [1] - 3:16
**encourage** [6] - 99:17, 116:12, 246:2, 247:17, 248:6, 248:22
**encouraged** [1] - 99:19
**end** [7] - 9:22, 11:17, 26:11, 46:2, 86:17, 150:3, 208:5
**End** [1] - 83:15
**endocarditis** [2] - 155:20, 156:14
**endorsed** [4] - 29:20, 32:5, 32:7, 32:9
**Endowed** [1] - 213:12
**enforce** [1] - 46:6
**enforcement** [1] - 28:24
**engage** [1] - 247:3
**engaged** [4] - 16:3, 215:22, 215:24, 234:11
**engaging** [1] - 241:6
**enjoyed** [1] - 7:7
**enormous** [1] - 167:17, 169:10
**entail** [1] - 215:7
**entire** [5] - 140:17, 157:6, 176:23, 179:16, 214:2
**entities** [4] - 210:13, 210:16, 222:14, 224:14
**entitled** [4] - 58:18, 84:19, 118:20, 125:7
**entity** [1] - 251:4
**ENU** [1] - 4:17
**environmental** [1] - 213:18
**Environmental** [1] - 211:14
**epidemic** [23] - 133:14, 133:21, 133:22, 134:5, 134:11, 134:15, 134:20, 135:2, 135:5, 135:10, 136:5, 136:7, 136:25, 137:1, 137:13, 137:14, 172:3, 179:25,
**employees** [5] - 14:20,
**180:1, 184:15, 190:12, 196:7
**epidurals** [1] - 23:15
**equals** [1] - 59:11
**equivalence** [1] - 48:3
**equivalents** [2] - 45:25, 128:8
**ER** [1] - 118:23
**Erica** [1] - 25:10
**especially** [2] - 228:3, 251:24
**essence** [1] - 157:9
**essential** [1] - 89:4
**essentially** [4] - 29:11, 89:9, 92:20, 102:23
**establish** [2] - 70:16, 126:19
**established** [10] - 26:4, 26:5, 62:18, 71:5, 75:22, 92:25, 126:25, 188:14, 190:23, 242:13
**establishing** [1] - 201:6
**estimate** [1] - 36:7
**et** [4] - 1:7, 1:13, 264:6, 264:7
**Europe** [1] - 35:9
**evaluate** [2] - 240:1, 240:7
**evaluating** [4] - 233:19, 233:23, 234:12, 234:24
**evaluation** [2] - 150:16, 221:12
**event** [4] - 42:2, 42:4, 103:5, 253:19
**events** [2] - 65:20, 102:4
**eventually** [4] - 13:8, 18:7, 23:21, 50:25
**everywhere** [1] - 256:24
**evidence** [19] - 49:15, 58:5, 59:23, 75:6, 81:10, 84:10, 94:25, 95:11, 103:10, 103:12, 114:11, 115:4, 173:1, 174:10, 174:18, 175:1, 192:19, 239:10, 251:20
**Evidence** [2] - 146:23, 146:24
**evolution** [1] - 149:6
**evolve** [4] - 40:23, 132:5, 235:14, 257:7
**evolved** [3] - 132:4, 134:23, 137:23
**evolves** [1] - 235:15

13

**evolving** [2] - 201:8, 235:2
**exact** [3] - 40:21, 93:17, 113:10
**exactly** [9] - 36:8, 56:24, 118:2, 125:19, 125:20, 157:24, 198:8, 214:9, 244:10
**Exactly** [1] - 236:18
**exam** [1] - 188:15
**examination** [5] - 96:18, 122:18, 132:14, 175:6, 193:16
**EXAMINATION** [3] - 133:2, 204:22, 209:17
**examine** [2] - 211:2, 241:4
**examined** [2] - 211:21, 250:15
**Examiner** [2] - 26:19, 27:22
**examiner** [1] - 110:16
**Examiners** [1] - 83:18
**example** [43] - 14:8, 16:18, 18:12, 24:21, 25:2, 27:15, 41:25, 43:23, 47:12, 47:23, 48:7, 48:22, 49:2, 52:5, 57:11, 59:18, 67:22, 78:6, 78:14, 85:14, 95:12, 104:20, 105:14, 115:17, 119:13, 142:11, 142:23, 143:14, 143:16, 143:25, 187:1, 187:10, 200:24, 210:7, 247:8, 248:16, 252:3, 252:20, 253:9, 260:4, 260:15, 261:1, 261:8
**examples** [7] - 210:18, 240:10, 244:13, 244:17, 245:4, 245:6, 259:10
**exceed** [2] - 252:23, 254:2
**exceeds** [1] - 80:16
**except** [1] - 128:18
**exception** [2] - 75:8, 76:16
**exceptions** [1] - 71:12
**excess** [4] - 122:11, 171:12, 171:15, 171:17
**excessive** [1] - 137:6

**exchanged** [2] - 133:7
**excluded** [1] - 113:1
**exclusively** [2] - 127:5, 253:11
**Excuse** [1] - 252:15
**excuse** [10] - 166:10, 171:3, 185:11, 210:22, 222:15, 223:7, 228:3, 249:24, 252:9, 253:12
**exercise** [3] - 244:7, 246:7, 247:4
**exhibit** [10] - 31:3, 65:12, 71:19, 71:23, 76:15, 173:15, 173:18, 181:2, 196:3, 254:15
**exhibits** [2] - 30:4, 30:7
**exist** [2] - 109:4, 121:21
**existed** [2] - 44:4, 134:11
**existing** [2] - 49:18, 50:8
**expand** [1] - 246:21
**expanded** [1] - 224:12
**expanding** [1] - 89:12
**expansion** [2] - 228:4, 232:3
**expect** [25] - 67:21, 67:23, 227:9, 227:10, 227:12, 227:16, 227:18, 227:22, 227:24, 228:2, 228:16, 228:18, 231:10, 231:13, 231:14, 231:16, 231:24, 241:6, 251:1, 256:18, 258:9, 258:14, 258:16, 261:20, 262:1
**expected** [2] - 49:17, 49:20
**expensive** [2] - 24:7, 261:17
**experience** [17] - 19:17, 25:25, 37:13, 38:20, 43:10, 50:7, 51:2, 51:18, 60:24, 88:17, 114:16, 129:13, 130:24, 140:25, 236:10, 239:9, 260:23
**experienced** [1] - 54:15
**experiences** [1] - 149:25

**experiencing** [1] - 59:9
**experiment** [1] - 55:15
**expert** [35] - 7:10, 7:11, 8:10, 35:24, 36:2, 36:6, 36:12, 37:5, 37:8, 37:21, 82:6, 93:1, 96:21, 97:4, 97:19, 97:23, 122:14, 122:23, 122:24, 123:6, 123:9, 137:12, 149:21, 187:21, 191:19, 191:21, 217:20, 217:24, 219:21, 220:9, 220:18, 220:21, 220:24, 221:24
**expert's** [1] - 135:20
**expertise** [15] - 8:11, 81:18, 122:11, 126:21, 135:20, 186:23, 187:7, 187:9, 187:15, 188:16, 191:11, 191:19, 192:6, 192:7, 220:1
**experts** [7] - 73:24, 92:18, 96:25, 139:1, 186:24, 187:19, 248:21
**explain** [15] - 19:23, 65:8, 97:14, 106:4, 126:10, 131:12, 139:11, 146:25, 147:16, 202:24, 203:4, 221:24, 246:5, 246:8, 250:7
**Explain** [2] - 105:17, 107:14
**explained** [2] - 146:12, 200:25
**explaining** [1] - 203:7
**explanation** [4] - 234:8, 245:17, 245:20, 246:13
**express** [1] - 94:19
**expressing** [2] - 141:18
**expressly** [1] - 61:2
**extend** [1] - 252:21
**extensive** [3] - 173:2, 217:7, 260:8
**extent** [4] - 248:7, 249:7, 249:9, 259:14
**extremities** [1] - 201:13

# F

**FABER** [1] - 1:17
**Faber** [1] - 7:2
**face** [1] - 251:5
**faced** [1] - 258:13
**faceted** [1] - 219:16
**facility** [1] - 60:10
**fact** [19] - 35:4, 44:5, 59:19, 60:16, 88:21, 96:21, 100:18, 114:20, 123:16, 127:1, 138:22, 192:21, 214:1, 233:16, 236:11, 236:22, 239:11, 245:17, 251:22
**fact-based** [1] - 245:17
**factor** [7] - 53:15, 83:12, 106:3, 121:15, 148:15, 148:19, 179:9
**factors** [15] - 39:1, 45:20, 83:5, 104:5, 104:10, 104:12, 104:13, 104:25, 106:17, 106:21, 147:24, 174:21, 175:16, 235:7, 235:25
**facts** [1] - 153:16
**faculty** [3] - 213:7, 215:9, 215:18
**failed** [3] - 214:4, 247:13, 247:14
**failure** [1] - 236:19
**fair** [12] - 115:14, 189:25, 190:1, 205:25, 235:12, 235:15, 235:16, 244:3, 244:4, 244:9, 260:7, 260:10
**fairly** [4] - 14:11, 176:15, 259:24, 261:2
**faith** [2] - 193:17, 203:6
**fall** [5] - 21:19, 71:6, 89:5, 112:15, 228:19
**falls** [1] - 202:25
**familiar** [26] - 38:6, 47:4, 58:19, 65:18, 69:24, 70:1, 70:19, 73:12, 84:3, 96:3, 96:9, 99:14, 102:10, 108:2, 124:1, 124:2, 135:23, 155:20, 159:12, 160:13, 179:22, 192:11,

193:1, 206:21, 222:2, 259:7
**family** [30] - 14:18, 14:23, 18:4, 19:8, 20:4, 27:15, 29:13, 29:14, 43:16, 43:19, 44:3, 45:5, 45:6, 45:23, 46:15, 47:2, 47:6, 57:23, 62:7, 101:9, 101:11, 110:14, 112:12, 127:7, 127:16, 127:18, 127:22, 131:17, 140:13, 208:13
**Family** [8] - 224:24, 225:1, 225:3, 225:7, 225:15, 225:19, 229:5, 229:13
**famous** [2] - 70:4
**far** [18] - 22:14, 33:12, 35:11, 46:14, 68:19, 73:19, 107:15, 114:7, 121:1, 121:2, 122:11, 154:23, 157:3, 173:24, 185:9, 187:6, 226:3, 242:24
**FARRELL** [2] - 2:3, 96:15
**Farrell** [4] - 2:4, 2:13, 192:15, 263:9
**Farrell's** [1] - 98:18
**fashion** [4] - 8:25, 23:6, 54:8, 113:10
**fast** [4] - 17:14, 30:17, 30:22, 151:10
**fatalities** [2] - 174:21, 197:10
**fatality** [1] - 197:7
**fault** [1] - 221:10
**faulty** [1] - 252:15
**FCRR** [1] - 6:18
**FDA** [5] - 13:18, 13:25, 172:1, 201:5, 201:9
**fear** [7] - 67:9, 68:11, 69:4, 69:9, 73:9, 80:25, 88:12
**federal** [11] - 36:11, 36:12, 36:13, 36:17, 50:15, 94:16, 115:3, 115:7, 223:11, 223:14, 228:8
**Federation** [6] - 69:1, 90:3, 90:8, 90:12, 90:17, 90:21
**fell** [2] - 15:11, 45:4
**fellows** [4] - 27:18, 35:8, 35:18, 198:24
**fellowship** [4] - 11:12,

11:13, 11:16, 216:24
**felt** [13] - 39:8, 41:8,
42:9, 42:23, 43:7,
69:17, 79:25, 85:16,
85:17, 94:15, 94:21,
100:21, 191:21
**femoral** [1] - 57:18
**fentanyl** [13] - 17:7,
137:24, 138:4,
138:19, 196:22,
196:23, 197:1,
197:4, 197:6,
197:11, 197:12,
197:14, 197:15
**Fentanyl** [1] - 138:5
**few** [20] - 9:25, 21:25,
22:10, 22:13, 27:24,
35:18, 46:25, 55:15,
65:20, 84:15, 116:3,
125:24, 129:4,
134:17, 150:3,
151:10, 187:3,
189:3, 204:21,
206:18
**fewer** [2] - 248:11,
259:3
**field** [13] - 8:11, 22:21,
25:8, 25:9, 34:22,
48:18, 54:10, 54:16,
54:25, 70:5, 209:23,
210:4, 225:17
**fields** [1] - 220:25
**fifteenth** [1] - 179:16
**Fifth** [1] - 58:19
**fifth** [15] - 44:20,
52:18, 52:25, 53:10,
53:12, 53:19, 53:25,
57:8, 59:4, 60:8,
62:2, 65:22, 66:4,
68:18, 130:11
**fighting** [1] - 137:22
**fights** [1] - 134:2
**figure** [5] - 47:18,
107:21, 164:7,
170:7, 230:16
**Figure** [3] - 125:4,
125:5, 128:3
**file** [3] - 186:15,
187:12, 187:14
**fill** [1] - 249:23
**filled** [3] - 109:23,
188:8, 229:1
**filling** [1] - 41:14
**findings** [1] - 127:3
**fine** [7] - 30:15, 78:18,
133:6, 134:9,
207:14, 262:20,
263:6
**finish** [7] - 11:16,
139:10, 141:22,

147:11, 168:4,
262:22, 263:7
**finished** [1] - 145:24
**Firm** [2] - 3:4, 3:7
**firm** [1] - 219:16
**first** [57] - 11:6, 11:10,
15:3, 23:11, 29:7,
31:3, 38:17, 39:20,
40:18, 41:19, 44:12,
49:23, 66:25, 67:15,
69:6, 69:22, 80:1,
84:23, 86:13, 87:18,
87:19, 88:4, 89:1,
107:1, 109:21,
113:15, 113:19,
115:2, 115:7,
119:23, 120:2,
133:6, 143:20,
147:1, 149:10,
163:13, 164:22,
180:22, 181:24,
181:25, 182:6,
182:7, 189:11,
189:12, 196:18,
199:10, 214:1,
219:3, 246:4, 250:2,
252:4, 252:5,
252:10, 253:9,
254:21, 254:22,
257:6
**firsthand** [1] - 41:14
**Fisher** [2] - 153:7,
153:17
**Fishman** [6] - 90:16,
101:16, 102:3,
102:21, 103:1, 103:7
**Fishman's** [4] - 90:19,
102:10, 102:22,
103:16
**fits** [1] - 235:24
**fitzsimmons** [20] -
139:12, 147:12,
156:23, 158:2,
162:4, 162:7,
163:11, 166:7,
167:11, 168:4,
168:15, 169:3,
170:10, 173:9,
173:16, 175:2,
175:9, 191:1, 193:4,
193:19
**FITZSIMMONS** [132] -
51:7, 51:9, 58:7,
59:25, 62:17, 62:21,
62:23, 63:9, 63:12,
64:7, 70:9, 70:14,
71:22, 72:10, 72:15,
75:2, 75:11, 75:15,
75:18, 79:2, 81:15,
81:20, 81:22, 84:12,

89:15, 91:17, 92:5,
92:11, 92:13, 93:16,
95:6, 97:16, 99:24,
118:13, 122:4,
122:20, 122:23,
124:17, 130:5,
130:8, 131:3,
132:15, 133:1,
133:3, 135:15,
136:4, 136:12,
136:15, 136:21,
139:13, 139:24,
142:4, 144:23,
146:16, 147:10,
147:13, 148:16,
151:12, 151:14,
151:16, 152:24,
156:8, 156:10,
156:24, 157:2,
157:4, 158:6,
158:11, 158:15,
158:17, 160:25,
162:8, 162:10,
163:12, 163:15,
163:22, 164:3,
164:8, 164:12,
164:14, 164:19,
164:24, 165:5,
165:8, 165:21,
166:4, 166:9,
166:22, 166:25,
167:13, 168:16,
168:22, 169:4,
169:7, 170:5,
170:11, 171:1,
171:9, 172:16,
172:17, 173:7,
173:13, 173:19,
173:22, 175:10,
176:14, 176:19,
177:23, 178:10,
181:4, 181:9,
181:13, 188:22,
189:10, 189:15,
191:2, 191:24,
192:14, 193:5,
193:8, 193:20,
194:18, 194:24,
197:22, 197:25,
204:8, 204:20,
207:2, 207:6,
207:15, 207:21,
208:21
**Fitzsimmons** [13] -
64:1, 72:9, 92:4,
95:5, 123:9, 132:14,
161:23, 163:21,
164:22, 171:4,
188:14, 204:19,
205:4
**five** [14] - 18:19, 27:2,

27:5, 53:23, 111:11,
117:4, 132:12,
181:16, 186:13,
195:13, 195:21,
196:21, 201:8, 202:6
**FL** [1] - 2:11
**flag** [2] - 27:5, 145:8
**flagged** [1] - 150:9
**flags** [1] - 148:17
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**fledged** [1] - 15:20
**flip** [1] - 88:25
**Floor** [1] - 3:5
**Florida** [1] - 13:7
**flow** [1] - 244:7
**flows** [5] - 237:4,
237:14, 237:17,
242:25, 243:6
**Flu** [2] - 49:3, 49:4
**fluid** [1] - 55:15
**focus** [13] - 17:23,
51:20, 83:9, 84:20,
108:21, 213:24,
219:23, 221:18,
221:20, 230:7,
240:15, 253:22,
254:21
**focused** [4] - 38:3,
217:16, 218:1, 220:6
**focusing** [1] - 89:19
**folks** [6] - 19:9, 31:19,
32:1, 38:10, 187:7,
206:2
**follow** [10] - 21:24,
49:21, 50:8, 53:21,
82:23, 160:5, 161:8,
200:6, 206:12,
249:10
**followed** [1] - 101:12
**following** [3] - 117:21,
206:25, 253:24
**follows** [3] - 7:5,
77:10, 204:16
**football** [2] - 10:17,
10:18
**footnote** [1] - 72:10
**FOR** [1] - 1:1
**forbid** [1] - 16:18
**force** [2] - 105:23,
248:25
**forces** [1] - 25:18
**foregoing** [1] - 264:4
**foreshadowed** [1] -
188:6
**form** [14] - 39:4, 82:19,
141:22, 160:16,
165:12, 168:12,
197:3, 231:17,
232:10, 237:19,

238:22, 238:23,
246:19
**formalized** [1] - 48:21
**formally** [1] - 154:4
**format** [1] - 193:24
**formed** [1] - 101:8
**former** [1] - 26:9
**forming** [3] - 96:6,
225:8, 229:7
**forms** [4] - 88:2,
222:24, 230:9,
260:24
**formulary** [2] - 234:14,
235:3, 235:9
**formulating** [4] - 82:6,
82:16, 82:19, 84:7
**forth** [2] - 70:10, 170:3
**fortunately** [1] -
197:18
**forward** [1] - 45:12
**Foundation** [9] -
216:6, 224:24,
225:1, 225:3, 225:7,
225:15, 225:19,
229:5, 229:13
**foundation** [11] -
70:11, 70:16, 71:6,
163:13, 190:22,
192:18, 193:11,
194:12, 198:12,
203:5
**four** [20] - 15:12,
15:25, 16:19, 18:5,
19:20, 23:13, 24:13,
48:2, 104:20,
104:21, 105:6,
118:23, 118:24,
118:25, 179:10,
179:13, 186:12,
187:2, 198:19,
198:21
**four-day** [1] - 118:25
**fourth** [2] - 35:14, 69:5
**fraction** [2] - 230:3,
231:14
**fractured** [1] - 17:22
**Francis** [3] - 20:25,
21:6, 41:24
**fraud** [1] - 37:3
**Frederick** [2] - 41:20,
56:25
**freely** [2] - 100:19,
101:2
**frequently** [1] - 19:15
**Friday** [1] - 90:22
**friend** [1] - 25:10
**friends** [1] - 57:14
**front** [5] - 55:24,
56:19, 116:7, 174:2,
174:3

**Full** [2] - 212:6, 213:14
**full** [11] - 7:13, 10:20, 13:4, 15:20, 76:5, 85:18, 182:20, 184:9, 189:21, 200:9, 206:1
**full-fledged** [1] - 15:20
**full-time** [3] - 13:4, 200:9, 206:1
**Fuller** [2] - 2:4, 2:13
**FULLER** [1] - 2:12
**function** [2] - 9:5, 18:10
**funded** [1] - 213:12
**funding** [2] - 216:2, 216:6
**funnel** [2] - 41:13, 204:5
**fusion** [1] - 9:8
**future** [1] - 16:1

## G

**g)** [1] - 119:18
**Gaffney** [1] - 162:24
**gaffney** [1] - 163:1
**gain** [2] - 104:20
**gained** [2] - 235:5, 235:6
**games** [1] - 134:3
**Garo** [1] - 28:19
**Garofoli** [1] - 28:20
**gathering** [1] - 205:13
**General** [5] - 16:12, 20:21, 91:8, 93:13, 94:19
**general** [9] - 28:3, 44:5, 112:2, 112:3, 140:14, 140:22, 141:11, 142:13, 243:22
**General's** [1] - 91:18
**generality** [1] - 211:1
**generally** [12] - 12:20, 68:6, 115:8, 123:10, 149:25, 196:9, 206:11, 222:6, 229:10, 233:4, 236:8, 237:14
**Generals** [3] - 91:7, 91:9, 94:11
**generic** [3] - 253:13, 253:15, 257:9
**genes** [1] - 24:23
**Germany** [1] - 13:15
**gesic** [1] - 40:13
**Gilligan** [5] - 60:15, 64:16, 90:22, 92:18, 198:23
**Gina** [6] - 166:4,

169:5, 189:10, 192:14, 197:22, 204:25
**gist** [5] - 71:9, 73:10, 91:13, 93:12, 113:11
**given** [11] - 21:23, 29:17, 45:24, 50:25, 90:13, 112:4, 117:9, 157:17, 158:5, 216:13, 216:15
**Glad** [1] - 209:5
**globally** [1] - 122:5
**goal** [7] - 24:5, 46:1, 79:21, 79:22, 172:22, 246:17
**goals** [1] - 172:21
**goff** [2] - 27:24, 31:25
**Goff** [2] - 26:8, 110:21
**govern** [1] - 223:13
**government** [8] - 31:16, 32:2, 94:16, 115:3, 210:21, 222:18, 248:25
**governmental** [1] - 86:15
**governs** [1] - 223:14
**grades** [1] - 10:22
**graduate** [2] - 11:3, 11:5
**graduated** [1] - 10:22
**grandpa** [2] - 208:16, 208:17
**grandpas** [1] - 12:10
**grant** [6] - 28:16, 115:15, 176:23, 216:2, 216:3, 216:5
**graph** [14] - 100:12, 128:5, 197:5, 197:18, 198:11, 198:13, 198:14, 198:24, 199:2, 199:13, 200:8, 201:23, 254:17, 254:18
**graphed** [1] - 198:7
**graphs** [1] - 199:7
**grave** [1] - 139:19
**great** [5] - 24:17, 25:11, 185:17, 204:5, 261:4
**greater** [2] - 105:9, 178:24
**greatest** [2] - 72:12, 132:2
**greatly** [3] - 58:1, 60:24, 201:8
**green** [2] - 199:7, 199:22
**GRETCHEN** [1] - 6:7
**grew** [3] - 12:10, 17:2,

106:6
**ground** [2] - 42:1, 186:22
**grounds** [1] - 169:22
**group** [15] - 21:25, 23:8, 23:17, 26:10, 28:23, 34:2, 40:13, 90:3, 105:18, 146:20, 179:23, 197:9, 197:13, 226:9, 244:4
**Group** [1] - 18:11
**groups** [3] - 18:1, 183:20, 200:9
**grow** [1] - 178:25
**grown** [2] - 179:2, 201:10
**Gryphon** [4] - 193:12, 193:13, 205:7, 206:3
**guess** [6] - 149:25, 176:2, 179:10, 189:18, 255:20
**guidance** [17] - 29:16, 29:24, 34:1, 60:21, 60:22, 61:2, 100:19, 101:1, 115:20, 115:21, 117:18, 118:22, 121:3, 126:15, 172:22, 181:10
**guide** [1] - 35:5
**guideline** [18] - 80:18, 80:20, 81:7, 81:11, 115:16, 115:18, 145:12, 145:19, 145:20, 145:21, 172:6, 173:1, 180:14, 180:24, 181:17
**Guideline** [1] - 28:21
**Guidelines** [3] - 31:9, 146:22, 172:7
**guidelines** [82] - 28:8, 28:10, 28:13, 28:17, 29:1, 29:2, 29:9, 29:11, 29:20, 31:12, 31:17, 32:3, 32:5, 32:7, 32:9, 32:12, 32:18, 33:17, 33:19, 33:21, 34:7, 34:10, 34:11, 45:20, 45:25, 46:4, 46:6, 48:22, 82:23, 82:24, 82:25, 89:24, 90:8, 90:21, 114:18, 114:21, 114:22, 114:23, 115:2, 115:7, 115:13, 115:14, 115:23, 116:4, 116:7, 116:12,

116:18, 116:19, 117:11, 117:19, 121:17, 126:14, 144:13, 144:24, 145:3, 145:4, 145:5, 145:7, 146:2, 146:3, 146:5, 146:19, 147:18, 147:19, 147:20, 148:2, 148:4, 148:10, 148:13, 148:24, 149:3, 150:13, 187:2, 203:19, 256:11, 256:12, 258:4, 258:7, 258:14, 258:25
**guides** [1] - 101:12
**Gupta** [2] - 31:20, 114:19
**Gupta's** [2] - 31:6, 108:13
**guy** [1] - 26:10
**guys** [2] - 23:22, 185:11
**gynecologist** [1] - 142:24
**gynecologists** [3] - 122:9, 127:13, 140:21

## H

**habits** [6] - 50:5, 107:16, 111:1, 113:8, 129:1, 197:20
**Haddox** [1] - 43:1
**half** [5] - 19:16, 41:13, 201:24, 204:4, 226:21
**hammer** [1] - 61:7
**hand** [6] - 7:20, 182:20, 199:2, 222:2, 222:11, 226:3
**handle** [3] - 21:7, 113:9, 140:13
**haphazardly** [1] - 127:2
**happy** [7] - 14:19, 59:4, 67:5, 149:8, 179:18, 200:12, 214:23
**hard** [6] - 105:24, 151:4, 176:2, 177:6, 179:7, 201:1
**harder** [1] - 178:23
**HARDIN** [1] - 5:3
**harm** [3] - 50:13, 61:19, 171:18
**harms** [1] - 155:17
**Harvard** [2] - 35:17,

187:6
**harvest** [1] - 150:7
**Hawkins** [1] - 3:7
**head** [3] - 91:6, 91:10, 93:14
**Head** [3] - 31:24, 52:13, 55:10
**heading** [2] - 84:18, 108:19
**healing** [1] - 67:21
**Health** [16] - 4:16, 5:2, 21:6, 33:7, 33:11, 68:21, 150:21, 150:24, 150:25, 151:23, 179:23, 210:2, 210:22, 217:1, 220:4, 224:2
**health** [70] - 64:21, 79:13, 209:25, 210:1, 210:3, 210:4, 210:12, 213:18, 213:23, 213:24, 213:25, 214:1, 214:4, 214:10, 214:13, 214:15, 214:18, 214:19, 215:16, 215:25, 216:19, 217:17, 219:23, 220:1, 220:2, 220:9, 220:19, 220:22, 221:13, 222:7, 222:20, 222:24, 223:11, 223:21, 223:25, 224:4, 224:9, 224:11, 224:15, 224:21, 224:25, 225:11, 225:17, 225:22, 226:15, 226:17, 226:19, 226:21, 227:3, 228:1, 229:11, 233:3, 233:5, 237:7, 237:15, 237:18, 237:24, 238:3, 238:4, 238:5, 238:23, 240:19, 240:21, 243:23, 246:7
**Healthcare** [2] - 210:20, 222:23
**healthcare** [5] - 59:7, 71:17, 92:19, 93:6, 210:14, 216:7, 222:15, 224:3, 226:10
**hear** [5] - 30:15, 147:14, 160:2, 164:5, 195:2

**heard** [9] - 32:16, 42:21, 43:4, 131:18, 141:11, 153:9, 191:22, 192:9, 193:1
**hearing** [5] - 37:8, 52:24, 62:20, 160:2, 222:22
**hearsay** [11] - 70:11, 71:13, 72:6, 72:12, 76:16, 92:5, 92:6, 92:25, 93:4, 93:5, 94:4
**heavily** [1] - 29:10
**held** [2] - 23:13, 159:20
**Heller** [2] - 216:25, 217:1
**help** [19] - 13:24, 16:2, 17:4, 20:8, 20:14, 33:13, 39:13, 43:17, 44:2, 57:19, 61:10, 78:8, 78:9, 109:7, 145:22, 185:14, 219:10, 252:7
**helped** [11] - 10:8, 23:1, 28:12, 45:14, 46:3, 46:5, 65:1, 109:10, 109:14, 112:17, 126:18
**helpful** [7] - 32:15, 58:13, 120:12, 121:1, 150:15, 173:11, 185:20
**helping** [3] - 43:14, 126:1, 128:24
**helps** [1] - 130:22, 252:7
**Hepatitis** [3] - 155:19, 156:13, 156:14
**herniated** [1] - 14:10
**herniation** [1] - 20:5
**heroin** [3] - 137:24, 138:2, 138:19
**Hester** [1] - 208:23
**HESTER** [18] - 5:9, 208:24, 209:6, 209:18, 220:8, 220:13, 220:16, 220:21, 221:1, 221:2, 230:21, 243:15, 243:18, 256:15, 262:15, 262:21, 262:24, 263:6
**high** [35] - 10:12, 14:5, 18:8, 19:5, 34:1, 37:22, 39:17, 39:18, 45:24, 47:13, 47:17, 68:8, 69:17, 70:2, 71:8, 85:25, 86:2,

101:13, 107:6, 107:19, 110:17, 120:6, 125:22, 125:25, 131:25, 135:12, 174:19, 201:21, 202:1, 211:18, 225:25, 226:2, 229:21, 240:5, 240:8
**High** [1] - 10:13
**high-dose** [8] - 101:13, 107:19, 125:22, 125:25, 131:25, 174:19
**higher** [17] - 68:11, 80:24, 104:14, 104:15, 104:23, 105:1, 105:5, 105:12, 105:16, 106:19, 173:5, 213:13, 227:12, 227:16, 231:14, 232:23, 254:8
**highest** [4] - 54:9, 196:15, 202:24, 210:25
**highlight** [7] - 55:19, 67:2, 80:4, 83:9, 183:2, 189:10, 189:13
**highlighted** [5] - 80:4, 84:20, 84:21, 86:11, 119:5
**Hillary** [1] - 214:3
**himself** [1] - 175:3
**HIPAA** [1] - 112:3
**hips** [1] - 104:22
**hired** [5] - 149:16, 149:20, 149:21, 154:13
**history** [6] - 26:6, 183:16, 196:4, 234:10, 235:25, 246:6
**HIV** [2] - 155:19, 156:14
**hoc** [1] - 76:2
**Hoc** [1] - 215:15
**hold** [6] - 20:24, 23:12, 129:17, 136:12, 212:23, 215:3
**holding** [1] - 76:8
**Holland** [1] - 13:15
**home** [11] - 12:13, 57:11, 57:15, 57:16, 57:19, 61:11, 61:21, 62:6, 78:17, 86:21, 120:7
**Hong** [3] - 13:15,

13:21, 216:17
**Honor** [134] - 7:9, 30:3, 30:6, 31:5, 37:4, 37:11, 51:24, 54:19, 58:4, 59:22, 59:25, 63:1, 63:16, 64:7, 65:7, 65:11, 65:13, 70:15, 71:5, 71:14, 71:21, 71:24, 72:8, 72:15, 72:16, 72:21, 75:5, 75:8, 75:23, 76:18, 77:2, 77:11, 78:22, 79:2, 79:4, 81:19, 81:23, 84:9, 84:12, 91:20, 92:10, 92:14, 92:15, 93:1, 93:2, 93:6, 93:20, 94:2, 94:5, 94:24, 95:3, 95:10, 95:19, 96:12, 97:1, 97:18, 98:16, 99:20, 102:13, 118:10, 122:12, 122:20, 123:13, 124:14, 131:9, 132:9, 132:20, 133:1, 135:7, 135:20, 139:9, 141:21, 141:23, 147:7, 156:19, 157:2, 157:12, 157:24, 158:3, 160:17, 160:21, 161:22, 162:8, 163:6, 163:17, 164:1, 164:2, 164:18, 164:20, 166:6, 166:11, 166:15, 166:22, 167:5, 167:15, 167:22, 168:6, 168:10, 169:21, 170:4, 170:25, 173:6, 173:16, 173:19, 174:24, 176:12, 181:1, 181:6, 188:12, 190:24, 192:16, 193:9, 194:11, 198:12, 203:2, 204:21, 207:23, 208:24, 209:6, 209:16, 220:8, 220:12, 220:16, 220:21, 221:1, 230:18, 243:15, 256:8, 262:15, 262:20, 262:21, 263:5, 263:6, 263:13
**honor** [2] - 209:3, 213:13

**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**honorary** [1] - 42:3
**honors** [1] - 214:21
**hope** [6] - 7:6, 31:3, 150:3, 155:15, 246:12
**Hopefully** [1] - 132:4
**hopefully** [4] - 60:7, 133:12, 150:5, 247:19
**Hopkins** [5] - 49:4, 52:10, 55:6, 55:13, 172:14
**horrible** [1] - 201:22
**Hospice** [3] - 21:16, 21:17, 21:19
**hospice** [1] - 86:22
**hospital** [16] - 53:7, 53:14, 53:20, 57:10, 57:13, 57:22, 58:2, 60:9, 61:1, 61:9, 61:15, 61:20, 88:22, 158:24, 214:11
**Hospital** [4] - 20:19, 20:21, 59:7
**hospitals** [12] - 20:16, 49:24, 53:10, 60:4, 60:6, 61:25, 62:4, 158:19, 158:25, 159:4, 159:8, 159:14
**hot** [1] - 78:17
**hour** [1] - 218:13
**hourly** [2] - 218:12, 218:13
**hours** [2] - 103:3, 129:4
**house** [2] - 86:6, 239:14
**hugely** [1] - 57:6
**Hughes** [40] - 209:7, 209:10, 209:15, 209:19, 209:22, 209:23, 210:24, 211:24, 212:9, 215:19, 217:19, 219:20, 220:14, 220:18, 221:3, 221:16, 221:23, 223:2, 224:19, 225:24, 228:25, 229:20, 230:22, 231:21, 236:10, 237:3, 237:9, 242:5, 242:24, 243:14, 244:3, 244:13, 250:9, 252:7, 254:14, 257:1, 258:22, 259:7,

261:13, 263:11
**HUGHES** [1] - 209:13
**human** [1] - 40:2
**Human** [1] - 179:23
**hunch** [1] - 187:24
**hundred** [4] - 38:20, 79:10, 145:18, 146:1
**hundred-page** [1] - 146:1
**Huntington** [27] - 3:10, 4:1, 22:10, 22:11, 42:1, 53:9, 149:12, 151:21, 152:10, 152:25, 155:4, 158:23, 159:4, 176:22, 206:22, 206:24, 207:20, 208:2, 208:5, 218:15, 227:11, 227:13, 227:17, 227:25, 228:17, 264:6
**HUNTINGTON** [1] - 1:4
**hurts** [2] - 78:15
**hydrocodone** [8] - 46:25, 65:15, 124:23, 124:25, 125:9, 125:12, 196:14, 196:16
**hyphen** [1] - 199:4
**hypothetical** [1] - 109:16

## I

**ICU** [2] - 15:12
**idea** [6] - 21:21, 49:9, 143:11, 203:4, 205:5, 205:17
**identified** [1] - 65:2
**identifies** [1] - 31:12
**identify** [7] - 26:21, 74:8, 123:21, 181:2, 236:12, 239:18, 240:4
**II** [2] - 118:25, 124:25
**IIs** [2] - 213:19, 195:4
**illicit** [2] - 173:4, 190:17
**illnesses** [1] - 140:12
**illustrate** [1] - 254:11
**illustrates** [1] - 10:2
**image** [1] - 128:4
**immediately** [2] - 57:7, 148:12
**immune** [1] - 171:11
**impact** [12] - 14:22, 60:20, 90:9, 102:1, 103:6, 103:8, 104:2,

116:20, 167:17,
169:10, 249:5,
261:20
**impacted** [1] - 208:11
**impactful** [3] - 57:6,
103:12, 114:13
**impacts** [2] - 103:10,
117:13
**impeach** [4] - 163:7,
163:18, 167:7,
168:20
**impeachment** [1] -
169:23
**implants** [1] - 18:16
**implement** [3] -
252:11, 253:6, 258:7
**implemented** [1] -
258:20
**implies** [1] - 224:8
**important** [14] - 22:21,
49:16, 53:15, 55:9,
60:7, 104:22, 114:7,
120:18, 128:20,
129:24, 150:11,
157:16, 185:19,
185:22
**importantly** [2] - 46:8,
175:15
**impose** [4] - 108:15,
252:5, 252:20,
261:13
**imposed** [7] - 120:2,
249:4, 252:25,
253:1, 253:2, 255:8,
255:16
**imposing** [1] - 258:11
**imposition** [1] -
256:16
**impossible** [1] -
241:16
**impression** [2] - 39:9,
82:19
**improper** [7] - 36:25,
70:12, 92:11, 92:13,
158:4, 161:14,
163:18
**improperly** [1] - 37:2
**improve** [3] - 18:10,
48:13, 211:22
**improved** [2] - 18:6,
204:6
**improvements** [1] -
202:9
**improving** [2] - 24:6,
113:20
**IN** [2] - 1:1, 1:18
**in-house** [1] - 239:14
**in-person** [1] - 103:5
**inappropriate** [6] -
87:20, 88:3, 88:6,

120:25, 165:18,
165:20
**inappropriately** [1] -
165:16
**incentive** [1] - 233:14
**incentives** [3] -
211:21, 232:13,
251:5
**incentivize** [3] - 250:2,
253:11, 253:12
**incentivized** [1] -
247:1
**incidence** [1] - 172:18
**include** [10] - 51:13,
89:12, 101:8,
112:10, 210:12,
213:24, 222:18,
238:11, 239:2, 243:8
**included** [7] - 88:6,
206:3, 206:4,
214:19, 223:16,
233:23, 235:9
**includes** [4] - 9:19,
144:22, 210:20,
238:8
**including** [6] - 24:3,
33:9, 58:2, 67:10,
83:5, 140:18,
147:18, 214:11,
256:13
**income** [4] - 223:12,
227:20, 228:5
**inconsistent** [16] -
163:10, 163:16,
163:18, 163:20,
163:22, 164:2,
164:7, 164:8, 165:3,
166:11, 167:7,
168:13, 169:1,
170:2, 170:8, 261:21
**incorrect** [6] - 129:22,
191:9, 198:10,
198:17, 198:25,
203:15
**increase** [9] - 24:21,
125:3, 175:16,
175:19, 175:21,
176:4, 177:25,
190:11, 196:1
**increased** [4] - 59:5,
100:15, 174:19,
182:7
**increases** [1] - 188:6
**increasing** [5] - 115:5,
174:10, 182:10,
182:16, 182:21
**indeed** [3] - 213:3,
229:19, 250:3
**India** [1] - 24:8
**indicate** [2] - 236:22,

251:25
**indicated** [2] - 59:17,
110:5
**indicates** [2] - 174:9,
182:6
**indicted** [3] - 153:2,
153:8, 153:19
**individual** [5] - 98:24,
115:4, 226:9,
238:24, 240:13
**individuals** [7] -
31:12, 110:13,
223:12, 226:13,
239:23, 240:19,
242:14
**industry** [13] - 216:1,
216:20, 217:5,
217:7, 217:16,
218:2, 219:24,
220:3, 221:25,
222:10, 224:13,
236:11, 239:10
**ineffective** [3] - 88:1,
253:16, 254:6
**infection** [1] - 48:25
**influence** [8] - 243:3,
243:12, 244:14,
244:16, 244:18,
244:23, 245:6,
256:23
**influenced** [1] - 142:9
**inform** [1] - 120:15
**information** [62] -
10:8, 34:14, 42:24,
43:7, 50:20, 51:3,
62:12, 62:14, 75:3,
101:4, 103:17,
117:8, 122:2,
122:15, 129:23,
150:6, 150:17,
152:3, 152:11,
152:12, 154:14,
155:3, 155:6,
170:12, 177:4,
178:14, 179:6,
205:13, 219:6,
225:14, 225:15,
229:15, 237:4,
237:8, 237:10,
237:12, 237:13,
237:17, 237:19,
237:23, 238:2,
238:4, 238:5, 238:8,
238:10, 238:11,
238:17, 238:21,
241:11, 241:18,
241:19, 242:25,
243:6, 243:7,
243:24, 244:3,
244:7, 244:10,

250:19, 250:20
**informational** [1] -
111:18
**initial** [3] - 13:18,
39:20, 247:19
**initiate** [2] - 59:16,
253:14
**initiated** [1] - 254:4
**initiation** [1] - 121:7
**injected** [1] - 197:11
**injection** [1] - 16:22
**injections** [5] - 22:13,
33:10, 78:9, 120:21,
206:12
**injured** [4] - 16:19,
105:20, 105:25,
106:1
**injuries** [2] - 105:15,
178:6
**injury** [2] - 78:7,
118:23
**innovation** [3] - 20:14,
24:2, 33:24
**innovation-like** [1] -
33:24
**innovative** [1] - 106:9
**inpatient** [1] - 53:20
**input** [1] - 215:2
**insert** [1] - 161:17
**insight** [1] - 39:2
**inspected** [1] - 113:3
**inspection** [1] -
112:22
**instances** [2] - 37:17,
37:19
**instead** [2] - 114:12,
116:16
**Institute** [1] - 207:9
**institutions** [1] - 35:17
**Insurance** [11] -
210:23, 223:18,
240:17, 241:1,
242:19, 250:16,
251:3, 251:21,
254:9, 255:6, 257:4
**insurance** [72] - 28:25,
47:21, 106:3,
210:13, 213:24,
214:4, 214:8,
214:11, 214:13,
214:15, 214:19,
215:16, 215:17,
216:19, 217:17,
218:2, 218:21,
218:24, 219:24,
220:2, 220:4, 220:9,
220:19, 220:22,
221:13, 222:22,
222:24, 223:11,
223:21, 224:4,

224:9, 224:21,
224:25, 225:22,
226:8, 226:9,
226:10, 226:15,
226:17, 226:22,
227:3, 227:4, 228:1,
229:2, 229:14,
229:23, 230:4,
230:9, 230:11,
230:12, 230:25,
231:10, 231:17,
231:19, 231:25,
232:5, 232:11,
232:22, 237:7,
238:4, 249:6, 249:8,
249:9, 249:11,
249:12, 249:21,
254:23, 260:7,
260:23
**insure** [1] - 250:23
**insured** [3] - 226:4,
226:19, 228:1
**insurer** [12] - 222:20,
224:11, 232:19,
237:15, 237:25,
238:3, 238:5,
247:25, 251:4,
255:6, 258:8, 258:9
**insurer's** [1] - 234:19
**insurers** [26] - 106:11,
214:6, 215:13,
222:8, 223:25,
224:2, 224:15,
230:3, 233:6,
233:10, 233:18,
234:14, 237:18,
237:22, 238:23,
239:13, 243:9,
243:23, 249:5,
251:1, 256:13,
256:18, 256:23,
256:24, 258:10
**intellectual** [1] -
213:19
**intelligence** [1] -
201:7
**intelligent** [1] - 188:23
**intend** [1] - 181:4
**intended** [6] - 79:22,
86:16, 113:6,
115:18, 120:24,
249:18
**intensified** [1] - 208:4
**intensity** [1] - 59:10
**intent** [1] - 79:24
**interactions** [3] -
41:18, 214:5, 215:13
**interchange** [1] -
133:21
**interested** [5] - 76:3,

76:10, 153:13,
157:14
**interests** [1] - 215:10
**interfere** [1] - 86:17
**interim** [1] - 181:19
**interject** [1] - 181:2
**intermediate** [1] -
213:20
**internal** [3] - 11:10,
139:25, 140:14
**international** [7] -
13:13, 18:18, 18:20,
18:21, 18:22, 35:9,
40:1
**International** [3] -
23:25, 211:7, 211:16
**internationally** [1] -
216:14
**internship** [1] - 11:10
**interpret** [3] - 91:25,
92:6, 97:20
**interpretation** [1] -
68:15
**interpreting** [1] -
91:18
**interrupt** [2] - 144:18,
144:19
**interspinous** [2] -
8:24, 18:14
**Interventional** [4] -
23:17, 23:20, 33:22,
146:21
**interventional** [17] -
8:14, 8:15, 8:17,
8:19, 8:20, 8:22,
9:14, 9:16, 9:22,
9:23, 15:18, 23:18,
54:3, 54:8, 54:16,
73:23, 182:4
**interventionalists** [2]
- 9:21, 172:23
**interventions** [1] -
59:16
**Intractable** [13] -
77:20, 77:25, 78:19,
78:23, 81:24, 82:5,
82:8, 82:12, 82:15,
83:4, 83:11, 95:21,
95:25
**intractable** [14] - 78:3,
78:4, 78:5, 78:10,
78:16, 78:18, 79:15,
80:12, 80:15, 83:8,
97:25, 98:6, 98:10
**intradiscal** [1] - 8:22
**introduce** [1] - 209:21
**introduced** [1] - 95:11
**introduction** [1] -
65:22
**introductory** [2] -

213:19, 213:20
**invasive** [1] - 8:23
**investigated** [2] -
88:14, 88:19
**invited** [1] - 35:22
**inviting** [1] - 102:20
**involve** [2] - 36:25,
214:5
**involved** [14] - 22:20,
23:5, 23:9, 26:20,
31:17, 31:21, 32:2,
38:8, 103:7, 122:6,
205:12, 216:19,
234:19, 240:19
**involvement** [5] -
31:25, 51:17, 62:16,
63:21, 219:20
**involves** [1] - 8:22
**involving** [3] - 80:13,
218:1, 218:14
**IQVIA** [3] - 192:9,
193:1, 199:5
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**Island** [2] - 208:15,
218:9
**issue** [17] - 9:19, 29:6,
42:18, 43:13, 46:14,
64:10, 76:4, 85:23,
93:5, 109:14, 111:6,
111:10, 114:8,
119:3, 144:2, 144:6,
164:23
**issued** [10] - 34:7,
34:11, 64:10, 68:14,
87:9, 92:23, 99:4,
100:19, 101:1,
256:11
**issues** [8] - 28:18,
74:20, 110:18,
122:17, 144:7,
154:25, 182:14,
217:17
**issuing** [2] - 83:17,
89:23
**items** [1] - 150:10
**iterations** [1] - 34:3
**itself** [5] - 42:4, 87:5,
147:20, 147:21,
148:23
**IV** [1] - 61:20

### J

**Jackson** [1] - 6:8
**jail** [1] - 50:17
**James** [5] - 55:5,
55:10, 209:7,
209:10, 209:22
**JAMES** [1] - 209:13

**January** [7] - 74:13,
75:14, 75:17, 75:18,
75:21, 84:1
**JASIEWICZ** [1] - 5:4
**Jeff** [1] - 187:6
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:18
**job** [7] - 23:23, 25:11,
50:11, 56:12,
115:21, 121:4,
195:24
**jobs** [15] - 105:8,
105:15, 105:21,
176:3, 177:4, 177:6,
177:9, 178:11,
178:12, 178:15,
178:20, 179:3,
179:6, 179:7
**John** [1] - 11:25
**Johns** [3] - 49:3, 55:6,
55:13
**Johnson** [1] - 216:6
**joined** [1] - 54:6
**Joint** [17] - 9:7, 21:3,
53:1, 53:10, 53:18,
60:8, 60:14, 60:16,
61:22, 63:22, 64:9,
66:4, 83:14, 83:16,
83:17, 130:13,
130:15
**joint** [9] - 44:1, 99:4,
99:6, 99:10, 99:14,
99:21, 100:4, 223:11
**Jonathan** [1] - 21:13
**JOSEPH** [1] - 6:4
**journal** [8] - 54:9,
54:10, 148:5,
148:11, 180:17,
180:18, 185:13,
186:3
**journals** [3] - 34:25,
35:3, 186:12
**journey** [1] - 129:7
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**judge** [12] - 62:17,
70:9, 72:10, 75:2,
136:13, 158:6,
167:13, 168:16,
170:5, 189:11,
193:6, 204:8
**Judge** [24] - 7:2, 63:9,
70:14, 75:12, 81:15,
91:17, 92:5, 95:6,
96:16, 97:16, 99:24,
122:4, 124:17,
130:5, 131:3,
132:15, 139:13,
156:24, 157:13,
164:25, 169:4,

204:20, 207:2,
207:21
**JUDGE** [1] - 1:17
**judgment** [6] - 119:8,
191:13, 235:19,
236:5, 249:18,
249:22
**judgments** [1] -
249:17
**judicial** [5] - 78:24,
96:13, 96:15,
118:11, 126:8
**judicially** [2] - 79:3,
97:8
**judiciously** [1] - 121:4
**July** [7] - 7:4, 66:24,
76:4, 213:5, 218:16,
264:9, 264:15
**JULY** [1] - 1:19
**jumped** [2] - 156:9,
255:23
**junior** [1] - 153:11
**jurisdictions** [1] -
13:16
**justification** [3] -
234:8, 245:18,
246:13
**justify** [1] - 236:3

### K

**Kaiser** [9] - 224:24,
225:1, 225:3, 225:7,
225:15, 225:18,
229:5, 229:13
**Kanawha** [5] - 195:15,
195:16, 196:14,
196:19, 197:16
**KEARSE** [2] - 4:2,
207:12
**keep** [6] - 33:15, 62:8,
70:7, 73:8, 101:23,
161:24
**keeps** [1] - 157:18
**Kelly** [2] - 6:8, 208:15
**Kentucky** [1] - 16:10
**kept** [4] - 41:14, 88:2,
128:15, 201:25
**Kessler** [1] - 4:23
**key** [1] - 65:2
**keynote** [1] - 55:7
**kids** [1] - 14:19
**Kim** [1] - 43:20
**kind** [16] - 17:23,
21:19, 113:11,
197:19, 200:19,
200:22, 200:24,
213:16, 215:22,
238:24, 239:6,
239:11, 239:22,

241:7, 241:11, 243:7
**kinds** [5] - 89:10,
240:11, 241:2,
248:13, 259:15
**King's** [1] - 159:2
**Kit** [1] - 58:19
**kit** [1] - 63:22
**knee** [5] - 57:12,
57:13, 57:14, 57:19,
57:25
**knees** [1] - 104:22
**knowledge** [28] - 32:4,
32:11, 49:8, 51:15,
51:16, 62:2, 62:13,
63:23, 64:5, 73:16,
73:20, 74:22, 89:22,
102:5, 116:17,
119:14, 124:4,
153:16, 153:22,
153:24, 157:8,
157:16, 187:5,
188:21, 234:17,
235:5, 235:6, 258:21
**known** [6] - 8:16, 28:8,
34:7, 177:6, 197:8,
212:5
**knows** [3] - 51:15,
63:4, 93:9
**Kong** [3] - 13:15,
13:21, 216:17
**KOUBA** [1] - 4:11
**Kroepsch** [2] -
214:24, 214:25

### L

**LA** [1] - 3:8
**labor** [7] - 176:2,
177:6, 178:23,
179:7, 209:25,
213:18, 215:24
**lack** [1] - 157:15
**Lady** [1] - 159:1
**laid** [4] - 14:20,
192:18, 193:12,
203:5
**landmark** [1] - 54:12
**Lanier** [1] - 3:4
**Lanka** [1] - 24:9
**large** [10] - 9:8, 9:12,
17:5, 69:12, 104:2,
135:16, 175:21,
200:9, 258:8
**largely** [1] - 222:21,
226:9
**larger** [1] - 262:1
**largest** [3] - 22:14,
73:21, 194:2
**last** [42] - 7:11, 7:16,
9:13, 19:11, 46:25,

47:11, 51:23, 63:7, 74:19, 81:9, 82:18, 82:20, 82:22, 83:25, 86:11, 87:18, 88:4, 88:5, 88:9, 106:3, 123:20, 123:24, 125:3, 126:2, 129:4, 134:17, 152:19, 153:4, 154:15, 154:20, 155:7, 155:10, 156:2, 156:4, 197:22, 201:5, 201:8, 202:6, 203:1, 243:16, 247:22, 257:17

**lastly** [3] - 24:10, 25:6, 119:5

**lasts** [3] - 67:17, 67:18, 67:20

**late** [5] - 39:25, 40:3, 159:20, 182:16, 256:8

**latest** [1] - 23:7

**latitude** [3] - 156:25, 158:4, 193:16

**laude** [1] - 10:23

**launch** [1] - 65:21

**LAURA** [1] - 5:10

**Law** [3] - 3:4, 3:7, 3:12

**law** [13] - 28:24, 47:3, 47:5, 100:22, 108:15, 109:4, 109:6, 109:8, 112:17, 125:11, 135:13, 203:19, 242:12

**lawful** [1] - 190:17

**laws** [2] - 100:10, 121:17

**lawyer** [1] - 78:14

**lawyers** [1] - 141:15

**lay** [4] - 98:24, 131:6, 163:13, 194:12

**layering** [1] - 161:24

**lead** [2] - 185:18, 262:1

**leadership** [5] - 22:18, 22:19, 24:20, 54:7, 215:4

**leads** [2] - 104:25, 105:16

**learn** [3] - 13:24, 129:18, 129:19

**learned** [2] - 15:18, 15:20

**least** [10] - 19:16, 27:7, 36:18, 48:10, 120:19, 133:19, 186:11, 204:4, 228:23, 257:10

**leaving** [2] - 52:19, 105:7

**lecture** [7] - 42:13, 42:14, 102:9, 102:25, 103:1, 103:2, 103:4

**lectures** [5] - 38:11, 52:9, 73:7, 216:13, 216:15

**led** [8] - 25:10, 33:10, 88:14, 100:15, 106:13, 106:21, 112:16, 206:25

**Lee** [1] - 3:12

**left** [8] - 57:22, 77:18, 108:20, 150:3, 182:20, 184:8, 199:2, 222:2

**left-hand** [3] - 182:20, 199:2, 222:2

**leg** [2] - 67:22, 89:5

**legal** [6] - 67:9, 81:17, 96:25, 97:17, 136:8, 136:17

**legislation** [27] - 19:11, 26:4, 27:10, 39:25, 45:5, 45:10, 46:12, 48:13, 81:17, 98:1, 98:5, 98:8, 98:11, 107:25, 108:2, 108:8, 114:1, 117:23, 117:25, 119:15, 120:12, 120:25, 126:13, 126:17, 126:18, 128:17, 150:12

**Legislation** [1] - 130:19

**Legislature** [3] - 32:25, 35:21, 44:25

**legislature** [11] - 33:5, 35:23, 38:23, 78:24, 95:25, 97:15, 97:17, 97:21, 117:22, 117:24, 130:18

**legitimate** [1] - 134:25

**length** [1] - 188:21

**lent** [1] - 121:3

**Leon** [2] - 2:4, 2:14

**less** [16] - 24:7, 40:8, 41:21, 46:1, 105:9, 117:2, 117:3, 125:16, 126:2, 126:3, 135:1, 228:8, 247:21, 254:25, 255:3

**lesser** [1] - 261:21

**lethal** [2] - 197:1, 197:4

**letter** [17] - 26:22,

27:6, 91:6, 91:9, 91:11, 91:13, 91:14, 91:19, 91:21, 91:24, 92:1, 92:3, 93:13, 94:9, 110:24, 111:12, 111:15

**letters** [2] - 95:11, 111:5

**level** [21] - 14:5, 37:22, 39:17, 39:18, 53:21, 59:14, 70:2, 71:8, 202:25, 210:25, 211:18, 225:25, 226:2, 227:20, 228:8, 228:10, 228:13, 229:21, 234:16, 240:3

**leverage** [1] - 243:24

**Levin** [1] - 2:10

**Lewiston** [1] - 212:5

**LEYIMU** [1] - 4:13

**liberal** [2] - 212:15, 261:2

**liberalization** [1] - 39:21

**license** [8] - 49:7, 50:14, 50:18, 68:12, 76:9, 87:15, 101:23, 102:9

**licensed** [7] - 13:5, 74:12, 74:14, 74:16, 91:23, 113:3, 140:18

**licenses** [1] - 50:16

**Licensing** [1] - 108:1

**licensing** [1] - 112:22

**Life** [1] - 83:15

**life** [8] - 14:6, 26:11, 38:18, 46:2, 78:20, 86:18, 106:23, 219:23

**lifetime** [1] - 24:13

**light** [3] - 62:11, 103:17, 121:16

**likely** [3] - 50:2, 183:13, 184:21

**limine** [1] - 96:19

**limit** [15] - 46:15, 87:5, 113:13, 113:15, 113:20, 114:24, 115:8, 119:18, 120:3, 121:6, 236:12, 249:3, 250:11, 251:19, 252:17

**Limitations** [1] - 118:21

**limitations** [3] - 94:12, 94:14, 120:14

**limited** [9] - 51:12, 60:15, 64:16, 95:14,

95:17, 98:5, 106:12, 119:10, 121:24

**limiting** [2] - 46:13, 79:12

**limits** [38] - 244:22, 246:3, 247:17, 247:22, 248:6, 248:8, 248:22, 249:16, 252:4, 252:6, 252:9, 252:10, 252:12, 252:14, 252:16, 252:20, 252:25, 253:3, 254:11, 254:19, 254:22, 254:23, 255:2, 255:4, 255:8, 255:13, 256:1, 256:3, 256:17, 258:19, 258:23, 259:24, 260:2, 260:15, 260:17, 261:1, 261:18, 262:5

**LINDA** [1] - 4:8

**line** [7] - 103:5, 117:7, 184:14, 187:13, 188:4, 228:18, 230:7

**Line** [4] - 164:15, 164:19, 166:4, 166:5

**lines** [8] - 40:21, 185:9, 200:8, 237:10, 243:14, 243:16, 243:19, 243:20

**linked** [2] - 104:19, 258:3

**Lisa** [2] - 6:18, 264:3

**list** [14] - 31:20, 33:12, 106:3, 223:17, 242:14, 254:20, 255:1, 255:10, 255:22, 255:24, 256:3, 257:4, 257:7, 257:12

**listed** [3] - 69:24, 222:12, 245:4

**lists** [3] - 223:25, 224:5, 257:7

**literature** [3] - 40:1, 248:12, 259:14

**litigation** [4] - 35:24, 36:19, 218:5, 250:21

**live** [6] - 8:4, 8:5, 12:19, 15:17, 21:16, 40:20

**lived** [2] - 57:10, 87:16

**living** [1] - 8:6

**LLC** [1] - 2:4

**local** [4] - 18:2, 20:15, 45:21, 130:2

**location** [1] - 92:20

**locations** [1] - 16:11

**lodge** [2] - 81:15, 91:17

**Logan** [5] - 6:5, 6:12, 16:11, 20:21

**logging** [3] - 178:11, 178:12, 178:18

**long-term** [4] - 41:9, 41:22, 42:10, 254:2

**long-winded** [1] - 187:1

**longer-acting** [1] - 68:25

**look** [71] - 20:1, 26:24, 27:4, 27:19, 27:23, 27:25, 31:2, 31:20, 34:3, 37:22, 37:24, 44:20, 44:24, 46:24, 60:11, 65:18, 66:15, 67:1, 69:5, 72:5, 75:20, 79:6, 80:1, 81:9, 82:5, 84:15, 86:23, 87:18, 88:4, 91:1, 96:2, 97:11, 99:4, 104:16, 105:12, 105:24, 108:10, 108:18, 110:10, 111:4, 113:8, 114:20, 118:4, 119:17, 125:5, 127:9, 128:2, 137:3, 138:23, 148:15, 149:7, 150:1, 150:10, 154:11, 154:23, 157:5, 158:3, 158:22, 159:11, 165:25, 166:7, 179:19, 197:19, 205:15, 207:15, 235:10, 240:12, 250:14, 257:20

**looked** [14] - 28:2, 29:1, 38:22, 39:1, 64:24, 79:18, 81:2, 99:6, 100:6, 111:8, 138:22, 189:21, 190:4, 260:11

**looking** [23] - 8:23, 26:16, 34:4, 37:2, 74:22, 110:11, 110:15, 113:21, 114:11, 114:15, 121:7, 129:23, 154:10, 154:25, 155:1, 190:8, 195:12, 205:3, 214:5, 233:10, 233:18, 233:22,

258:8
**looks** [7] - 23:17, 27:14, 61:7, 74:13, 138:15, 181:16
**loop** [1] - 9:15
**Lord** [1] - 16:18
**lose** [3] - 49:6, 50:13, 50:18
**lost** [3] - 50:16, 71:20, 146:18
**loud** [5] - 55:22, 169:24, 173:12, 175:2, 175:4
**love** [2] - 12:8, 15:12
**low** [3] - 125:15, 166:1, 223:12
**lower** [5] - 108:20, 128:22, 199:19, 222:11, 223:5
**lowest** [2] - 119:7, 179:16
**luck** [1] - 209:5
**lunch** [1] - 151:11
**lung** [2] - 15:23, 127:12

# M

**M&M** [1] - 49:23
**ma'am** [2] - 60:17, 205:14
**macroeconomic** [1] - 213:21
**Magazine** [1] - 3:7
**MAHADY** [1] - 6:4
**mail** [2] - 74:11
**mailed** [1] - 76:7
**main** [7] - 16:8, 17:23, 24:5, 39:19, 113:11, 158:24, 159:3
**Maine** [4] - 209:22, 212:5, 212:15, 216:15
**MAINIGI** [209] - 4:17, 7:9, 8:1, 10:4, 10:6, 22:23, 22:25, 25:21, 25:23, 30:3, 30:6, 31:1, 31:5, 31:8, 32:19, 32:21, 34:20, 34:21, 37:4, 37:11, 37:12, 39:10, 39:12, 51:19, 51:24, 51:25, 54:19, 54:22, 55:19, 55:21, 58:4, 58:9, 58:15, 58:17, 59:22, 60:2, 63:16, 63:17, 64:2, 64:8, 64:14, 64:17, 65:7, 65:17, 65:25, 66:2, 66:7, 66:8, 66:12, 66:13,

66:25, 67:3, 69:7, 69:8, 70:15, 70:18, 71:5, 71:14, 71:21, 71:24, 72:2, 72:8, 72:16, 72:21, 72:22, 75:5, 75:17, 75:23, 75:24, 76:13, 76:18, 76:19, 76:23, 76:25, 77:2, 77:11, 77:17, 77:22, 77:24, 78:22, 79:4, 79:5, 80:3, 80:6, 81:19, 81:21, 81:23, 82:2, 82:3, 84:9, 84:14, 86:10, 89:13, 91:20, 92:10, 92:12, 92:15, 93:5, 93:11, 93:20, 94:2, 94:5, 94:7, 94:24, 95:2, 95:9, 95:16, 95:19, 95:20, 96:12, 97:1, 97:3, 97:10, 97:18, 98:4, 98:16, 99:2, 99:20, 100:1, 102:13, 102:16, 104:7, 104:9, 108:11, 108:14, 108:21, 108:23, 113:23, 113:25, 117:15, 117:17, 118:10, 118:15, 118:18, 118:19, 121:10, 121:12, 122:12, 123:13, 123:14, 124:6, 124:9, 124:14, 124:19, 130:9, 131:9, 131:11, 132:8, 132:20, 135:6, 135:19, 136:8, 139:9, 141:21, 146:7, 146:9, 147:7, 156:19, 157:24, 160:16, 161:22, 163:6, 163:9, 163:17, 164:1, 164:17, 164:20, 165:1, 165:12, 166:6, 166:10, 166:15, 166:18, 167:5, 167:15, 167:22, 168:5, 168:9, 169:21, 170:3, 170:25, 171:3, 173:6, 173:9, 173:15, 173:18, 174:24, 176:12, 177:20, 178:1, 181:1, 188:12, 190:22, 192:16, 192:18, 193:9,

194:11, 198:12, 203:2, 204:21, 204:23, 204:25, 205:2, 207:3, 207:8, 207:13, 207:18, 207:23, 208:1
**Mainigi** [11] - 51:23, 63:15, 70:13, 72:14, 82:1, 123:12, 131:7, 141:20, 157:23, 161:11, 168:24
**MAJESTRO** [7] - 2:6, 220:12, 262:20, 262:22, 263:1, 263:5, 263:9
**Majestro** [3] - 2:6, 262:25, 263:4
**major** [16] - 10:16, 65:20, 116:20, 117:8, 117:13, 121:15, 123:18, 192:3, 192:5, 201:15, 215:20, 216:3, 216:5, 239:13, 256:16
**majority** [9] - 21:8, 101:5, 127:15, 134:24, 134:25, 160:7, 174:11, 174:21
**malignant** [9] - 66:20, 67:7, 67:13, 67:15, 68:1, 68:7, 69:11, 74:21, 76:7
**malpractice** [2] - 50:19, 160:14
**man** [1] - 25:8
**man-based** [1] - 25:8
**manage** [2] - 8:18, 125:23
**managed** [1] - 222:20
**management** [39] - 8:15, 8:21, 9:14, 9:18, 13:1, 14:4, 15:4, 22:17, 22:18, 26:12, 35:1, 35:21, 36:3, 37:5, 37:6, 37:9, 37:10, 37:19, 51:21, 67:8, 76:4, 79:14, 84:22, 99:7, 112:7, 112:11, 123:7, 123:10, 140:2, 140:25, 141:17, 180:14, 186:3, 243:22, 249:15, 250:11, 251:8, 251:22, 259:4
**Management** [6] - 28:7, 32:23, 83:15, 84:19, 96:3, 100:3

**manager** [3] - 237:14, 238:19, 238:22
**managers** [8] - 222:7, 224:6, 224:7, 224:16, 237:7, 237:18, 237:21, 243:24
**mandated** [1] - 242:6
**manner** [2] - 67:11, 100:14
**manufacture** [2] - 188:6, 188:13
**manufactured** [1] - 40:11
**manufacturer** [1] - 223:3
**manufacturing** [2] - 190:18, 208:4
**March** [4] - 84:1, 84:2, 99:12, 116:10
**margin** [1] - 262:17
**MARK** [1] - 3:14
**mark** [1] - 132:9
**Mark** [1] - 28:19
**market** [5] - 57:1, 125:12, 131:19, 221:17, 257:8
**marketing** [1] - 40:16
**marketplace** [1] - 226:11
**markets** [4] - 210:2, 210:4, 210:5, 210:10
**Marshall** [2] - 159:6, 178:25
**Mart** [2] - 12:14, 12:15
**Mary's** [6] - 18:13, 22:11, 158:23, 159:4, 159:19, 179:2
**Massachusetts** [1] - 212:4
**massage** [1] - 9:17
**Master's** [2] - 211:8, 211:11
**match** [1] - 161:13
**materials** [3] - 90:12, 93:2, 93:7
**matt** [3] - 39:10, 54:21, 65:10
**Matt** [23] - 10:4, 22:23, 25:21, 32:20, 34:20, 55:19, 58:15, 64:14, 65:25, 67:1, 69:7, 76:13, 76:23, 77:22, 80:3, 89:13, 104:7, 108:22, 113:23, 117:16, 118:18, 121:10, 124:6
**matter** [7] - 71:16, 98:21, 221:7, 224:20, 264:5

**matters** [7] - 218:1, 218:2, 218:6, 219:19, 219:21, 219:24, 220:2
**Mayo** [3] - 14:2, 35:17, 128:21
**Mayor** [4] - 206:21, 206:25, 208:9, 228:14
**Mayor's** [1] - 207:8
**MC-WV-1218** [1] - 87:2
**McCann** [2] - 65:11, 65:12, 65:15
**MCCLURE** [1] - 6:3
**MCGINNESS** [1] - 4:2
**McGraw** [1] - 91:8
**McKesson** [2] - 5:8, 149:16
**MCWV-01522** [1] - 64:15
**mean** [39] - 26:23, 40:12, 45:3, 48:6, 48:15, 49:7, 50:10, 57:17, 68:1, 80:21, 82:21, 86:12, 88:20, 104:14, 106:4, 109:16, 126:11, 134:8, 144:18, 145:5, 165:19, 167:23, 169:13, 183:19, 183:21, 189:20, 202:24, 213:2, 213:9, 214:9, 228:21, 230:1, 233:8, 233:10, 233:11, 246:4, 251:15, 251:16, 258:25
**meaning** [3] - 91:25, 174:16, 251:9
**means** [21] - 9:20, 20:11, 35:12, 48:17, 56:10, 68:3, 78:5, 78:19, 82:22, 85:3, 85:5, 85:13, 85:21, 91:19, 125:17, 125:25, 144:22, 163:24, 165:13, 185:1, 233:14
**meant** [11] - 53:12, 53:19, 70:10, 92:3, 116:2, 144:7, 147:19, 163:23, 168:17, 243:20, 249:16
**measured** [1] - 56:10
**mechanical** [1] - 6:19
**med** [2] - 19:14, 52:16
**Medicaid** [52] - 47:23,

47:25, 106:6, 106:10, 210:21, 222:12, 222:19, 223:8, 223:10, 223:11, 223:13, 223:14, 226:12, 226:24, 227:9, 227:10, 227:14, 227:15, 227:19, 227:22, 227:23, 228:3, 228:4, 228:6, 228:20, 228:23, 229:24, 230:13, 231:15, 232:3, 233:1, 233:2, 240:17, 241:1, 242:9, 250:15, 250:24, 251:3, 251:10, 251:21, 252:5, 252:11, 253:2, 253:6, 253:22, 256:13, 260:4, 260:14, 260:19, 261:3, 261:9

**medical** [47] - 9:2, 10:24, 11:1, 35:12, 37:3, 50:17, 52:5, 52:11, 52:14, 57:4, 59:14, 69:12, 71:16, 76:9, 85:23, 90:4, 101:6, 101:22, 102:4, 102:6, 110:15, 119:8, 122:10, 140:17, 143:2, 143:3, 153:21, 157:6, 169:17, 171:16, 173:2, 185:12, 185:15, 201:16, 232:20, 233:19, 234:9, 234:12, 234:14, 234:17, 234:24, 235:6, 235:24, 236:5, 238:2, 238:3, 246:6

**Medical** [20] - 20:20, 20:24, 21:1, 21:2, 21:5, 26:19, 27:22, 29:19, 32:5, 32:6, 43:1, 43:5, 53:17, 69:1, 90:4, 90:8, 90:13, 90:17, 159:6, 170:23

**medically** [22] - 155:23, 171:12, 175:15, 232:15, 232:18, 233:1, 233:3, 233:4, 233:11, 233:16, 233:24, 234:4, 234:22, 235:13,

235:18, 236:8, 236:12, 236:16, 236:23, 245:21, 245:22, 249:23

**Medicare** [6] - 210:21, 222:19, 226:12, 227:1, 229:24, 230:13

**medication** [20] - 9:1, 9:18, 17:3, 26:18, 34:15, 37:14, 48:3, 62:8, 68:13, 78:3, 78:9, 85:14, 85:16, 88:12, 106:16, 109:11, 119:11, 120:23, 121:6, 247:13

**medications** [16] - 19:1, 39:6, 49:17, 52:7, 68:6, 86:17, 100:18, 101:2, 106:23, 114:24, 120:3, 120:16, 120:17, 123:17, 182:14, 262:6

**Medicine** [31] - 13:12, 29:21, 31:23, 33:7, 50:18, 50:25, 66:19, 68:12, 68:15, 68:23, 71:2, 72:5, 74:3, 74:10, 76:21, 79:17, 79:19, 81:3, 83:19, 86:25, 87:10, 89:17, 89:20, 89:23, 90:25, 91:2, 91:22, 102:22, 130:20, 130:22, 153:12

**medicine** [34] - 8:9, 8:12, 8:13, 9:16, 11:11, 11:12, 11:13, 13:6, 22:20, 27:16, 28:14, 30:1, 48:18, 61:7, 87:15, 110:12, 122:7, 139:22, 139:23, 139:25, 140:13, 140:14, 198:1, 198:2, 198:18, 198:21, 198:22, 199:11, 199:17, 205:16, 205:21, 206:2, 206:7, 214:7

**Medicine's** [1] - 67:6

**medicines** [4] - 86:19, 220:10, 220:23, 221:21

**meet** [10] - 27:24, 45:10, 47:15, 53:18, 60:8, 61:21, 91:15, 112:19, 112:25,

150:20

**meeting** [3] - 43:5, 76:4, 192:4

**meetings** [2] - 52:25, 76:3

**mega** [1] - 248:17

**member** [4] - 23:8, 54:4, 213:6, 215:14

**members** [6] - 24:14, 33:4, 33:25, 38:24, 73:21, 172:22

**Memorial** [3] - 16:12, 20:20, 21:10

**memory** [2] - 33:6, 252:15

**men's** [1] - 77:12

**mention** [2] - 120:23, 176:21

**mentioned** [18] - 13:9, 19:22, 31:15, 41:16, 107:3, 114:17, 175:14, 175:25, 178:11, 178:20, 180:20, 180:23, 212:7, 217:15, 221:19, 223:4, 252:25, 260:19

**mentor** [2] - 11:25, 24:16

**mentors** [1] - 15:6

**merged** [1] - 158:23

**merits** [1] - 210:3

**messages** [1] - 57:3

**met** [4] - 133:6, 150:20, 150:24, 151:6

**metastasize** [1] - 15:23

**metastasized** [1] - 21:15

**methods** [1] - 9:12

**Metz** [1] - 162:24

**mic** [3] - 62:20, 62:21, 147:15

**MICHAEL** [2] - 2:12, 3:9

**Michigan** [1] - 211:10

**microeconomic** [1] - 213:20

**microeconomics** [2] - 209:25, 213:17

**mid** [1] - 232:12

**mid-90s** [1] - 52:17

**middle** [4] - 183:17, 183:19, 183:23, 186:22

**might** [13] - 20:14, 31:15, 57:19, 72:16, 123:24, 150:15, 178:7, 187:24,

210:19, 238:15, 246:25, 247:9, 258:15

**Mike** [2] - 26:8, 105:7

**MILDRED** [1] - 3:3

**military** [2] - 226:12, 227:4

**milligram** [1] - 196:21

**milligrams** [2] - 73:8, 128:8

**million** [4] - 125:2, 125:3, 184:16, 226:5

**mills** [1] - 169:16

**mimmicks** [1] - 125:19, 125:20

**mind** [1] - 150:12

**mined** [2] - 177:13, 177:17

**miner** [1] - 208:17

**miners** [4] - 12:11, 105:20, 177:7, 208:14

**mines** [1] - 208:16

**minimal** [2] - 46:18, 170:9

**minimally** [1] - 8:23

**minimize** [1] - 251:5

**minimum** [1] - 223:15

**mining** [3] - 177:4, 177:24, 206:19

**minor** [1] - 216:3

**minute** [8] - 12:4, 72:7, 76:14, 136:11, 141:20, 146:11, 207:5, 256:1

**minutes** [6] - 9:25, 77:8, 204:9, 262:22, 263:2, 263:4

**mirror** [3] - 128:4, 131:13, 202:3

**mirrors** [3] - 126:4, 194:4, 200:3

**mis** [1] - 165:25

**mis-prescribe** [1] - 165:25

**mischaracterized** [1] - 169:25

**miserable** [1] - 21:18

**mislead** [1] - 152:7

**misleading** [1] - 198:25

**misquoting** [1] - 195:1

**misrepresentation** [1] - 200:10

**miss** [1] - 136:22

**misstates** [1] - 146:9

**misunderstanding** [1] - 161:6

**misunderstood** [1] - 93:20

**Mitchell** [1] - 2:10

**MME** [2] - 252:22, 254:2

**MMEs** [1] - 195:19

**modal** [1] - 126:21

**model** [1] - 90:21

**moderation** [1] - 184:6

**modify** [1] - 244:2

**modifying** [2] - 97:6, 244:11

**moment** [7] - 41:17, 48:14, 111:22, 126:13, 142:3, 142:6, 148:4

**money** [3] - 25:4, 106:7, 232:19

**monitor** [3] - 27:1, 34:5, 157:13

**monitoring** [2] - 34:15, 170:23

**Monitoring** [3] - 26:1, 109:1, 241:22

**monitors** [1] - 27:13

**month** [6] - 41:3, 48:4, 119:23, 125:22, 206:8, 248:1

**month's** [1] - 57:23

**months** [12] - 15:13, 18:6, 19:12, 22:2, 27:24, 48:10, 55:15, 110:22, 117:5, 120:6, 120:7, 187:3

**morbid** [1] - 174:20

**morbidities** [1] - 234:10

**morning** [10] - 7:6, 7:24, 7:25, 8:2, 8:3, 133:7, 144:15, 159:23, 262:18, 263:12

**morphine** [3] - 45:25, 48:2, 128:8

**Morris** [1] - 6:15

**Moss** [1] - 52:12

**most** [34] - 8:17, 9:21, 16:23, 20:19, 25:9, 27:9, 27:17, 40:8, 43:18, 46:1, 46:7, 46:17, 49:13, 53:5, 53:6, 57:17, 57:20, 60:6, 114:7, 125:1, 126:5, 147:18, 159:24, 160:4, 160:10, 162:9, 172:1, 183:13, 184:21, 186:12, 188:23, 201:13, 202:22, 213:17

**Most** [1] - 128:17

**mostly** [5] - 17:24, 54:2, 54:16, 127:21, 172:23
**motions** [2] - 96:19, 96:20
**motivated** [1] - 83:4
**Motley** [6] - 4:3, 4:5, 4:8, 4:11, 4:14, 205:9
**Motor** [1] - 56:4
**MOUGEY** [1] - 2:9
**Mountain** [4] - 138:16, 176:6, 176:13, 197:20
**mountain** [2] - 138:17, 200:1
**mouth** [1] - 162:3
**move** [10] - 58:4, 59:23, 75:5, 84:10, 94:25, 99:22, 105:3, 124:14, 158:6, 222:20
**moved** [1] - 212:3
**movement** [1] - 107:20
**moving** [2] - 33:15, 258:16
**MR** [168] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:14, 4:5, 4:22, 5:9, 5:10, 5:13, 6:4, 51:7, 51:9, 58:7, 59:25, 62:17, 62:21, 62:23, 63:9, 63:12, 64:7, 70:9, 70:14, 71:22, 72:10, 72:15, 75:2, 75:11, 75:15, 79:2, 81:15, 81:20, 81:22, 84:12, 89:15, 91:17, 92:5, 92:11, 92:13, 93:16, 95:6, 96:15, 97:16, 99:24, 118:13, 122:4, 122:20, 122:23, 124:17, 130:5, 130:8, 131:3, 132:15, 133:1, 133:3, 135:15, 136:4, 136:12, 136:15, 136:21, 139:13, 139:24, 142:4, 144:23, 146:16, 147:10, 147:13, 148:16, 151:12, 151:14, 151:16, 152:24, 156:8, 156:10, 156:24, 157:2, 157:4, 158:6, 158:11, 158:15,

158:17, 160:25, 162:8, 162:10, 163:12, 163:15, 163:22, 164:3, 164:8, 164:12, 164:14, 164:19, 164:24, 165:5, 165:8, 165:21, 166:4, 166:9, 166:22, 166:25, 167:13, 168:16, 168:22, 169:4, 169:7, 170:5, 170:11, 171:1, 171:9, 172:16, 172:17, 173:7, 173:13, 173:19, 173:22, 175:10, 176:14, 176:19, 177:23, 178:10, 181:4, 181:9, 181:13, 188:22, 189:10, 189:15, 191:2, 191:24, 192:14, 193:5, 193:8, 193:20, 194:18, 194:24, 197:22, 197:25, 204:8, 204:20, 207:2, 207:6, 207:15, 207:21, 208:21, 208:24, 209:6, 209:18, 220:8, 220:12, 220:13, 220:16, 220:21, 221:1, 221:2, 230:21, 243:15, 243:18, 256:15, 262:15, 262:20, 262:21, 262:22, 262:24, 263:1, 263:5, 263:6, 263:9
**MS** [225] - 3:3, 3:6, 4:2, 4:8, 4:11, 4:13, 4:17, 4:18, 4:20, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 7:9, 8:1, 10:4, 10:6, 22:23, 22:25, 25:21, 25:23, 30:3, 30:6, 31:1, 31:5, 31:8, 32:19, 32:21, 34:20, 34:21, 37:4, 37:11, 37:12, 39:10, 39:12, 40:12, 51:19, 51:24, 51:25, 54:19, 54:22, 55:19, 55:21, 58:4, 58:9, 58:15, 58:17, 59:22, 60:2, 63:16, 63:17, 64:2, 64:8, 64:14, 64:17, 65:7,

65:17, 65:25, 66:2, 66:7, 66:8, 66:12, 66:13, 66:25, 67:3, 69:7, 69:8, 70:15, 70:18, 71:5, 71:14, 71:21, 71:24, 72:2, 72:8, 72:16, 72:21, 72:22, 75:5, 75:17, 75:23, 75:24, 76:13, 76:18, 76:19, 76:23, 76:25, 77:2, 77:11, 77:17, 77:22, 77:24, 78:22, 79:4, 79:5, 80:3, 80:6, 81:19, 81:21, 81:23, 82:2, 82:3, 84:9, 84:14, 86:10, 89:13, 91:20, 92:10, 92:12, 92:15, 93:5, 93:11, 93:20, 94:2, 94:5, 94:7, 94:24, 95:2, 95:9, 95:16, 95:19, 95:20, 96:12, 97:1, 97:3, 97:10, 97:18, 98:4, 98:16, 99:2, 99:20, 100:1, 102:13, 102:16, 104:7, 104:9, 108:11, 108:14, 108:21, 108:23, 113:23, 113:25, 117:15, 117:17, 118:10, 118:15, 118:18, 118:19, 121:10, 121:12, 122:12, 123:13, 123:14, 124:6, 124:9, 124:14, 124:19, 130:9, 131:9, 131:11, 132:8, 132:20, 135:6, 135:19, 136:8, 139:9, 141:21, 146:7, 146:9, 147:7, 156:19, 157:24, 160:16, 161:22, 163:6, 163:9, 163:17, 164:1, 164:17, 164:20, 165:1, 165:12, 166:6, 166:10, 166:15, 166:18, 167:5, 167:15, 167:22, 168:5, 168:9, 169:21, 170:3, 170:25, 171:3, 173:6, 173:9, 173:15, 173:18, 174:24, 176:12, 177:20, 178:1, 181:1, 188:12,

190:22, 192:16, 192:18, 193:9, 194:11, 198:12, 203:2, 204:21, 204:23, 204:25, 205:2, 207:3, 207:8, 207:12, 207:13, 207:18, 207:23, 208:1
**Mt** [3] - 4:4, 4:12, 4:15
**multi** [2] - 126:21, 219:16
**multi-faceted** [1] - 219:16
**multi-modal** [1] - 126:21
**multicenter** [1] - 13:25
**multimodal** [2] - 8:18, 9:20
**multiple** [8] - 35:2, 91:9, 109:14, 111:5, 111:8, 145:13, 174:20, 200:6

# N

**nail** [1] - 61:7
**name** [20] - 7:14, 7:16, 28:19, 118:2, 118:8, 180:5, 180:11, 180:12, 186:18, 202:13, 202:21, 206:23, 209:9, 209:22, 224:8, 228:15, 247:9, 247:10, 247:15
**named** [1] - 52:12
**names** [2] - 33:12, 33:14
**national** [5] - 29:1, 38:8, 38:9, 40:1, 45:21
**nationally** [5] - 38:7, 38:10, 65:3, 130:3, 216:13
**nationwide** [1] - 206:16
**nature** [3] - 16:14, 20:2, 53:1
**near** [1] - 102:2
**necessarily** [2] - 26:24, 163:15
**necessary** [18] - 219:5, 232:15, 233:1, 233:3, 233:5, 233:11, 233:17, 233:24, 234:1, 234:4, 234:23, 235:13, 235:18, 236:8, 236:23,

245:21, 245:22, 249:23
**necessity** [3] - 233:19, 234:12, 234:25
**need** [29] - 9:1, 9:8, 12:11, 12:15, 16:23, 21:17, 26:5, 34:1, 44:24, 49:9, 51:9, 56:8, 69:9, 71:15, 79:25, 84:25, 85:1, 85:3, 86:5, 106:1, 106:7, 107:9, 111:19, 116:6, 120:11, 122:2, 122:15, 148:11
**needed** [7] - 16:20, 28:15, 30:13, 41:22, 50:20, 79:23, 110:25
**needs** [3] - 156:25, 193:11, 235:24
**Nehlen** [1] - 10:19
**Nerve** [2] - 16:6, 180:7
**nerve** [11] - 8:25, 14:12, 16:20, 17:3, 17:20, 57:18, 67:24, 144:2, 200:23, 201:12
**nerves** [2] - 201:13, 202:23
**neuro** [2] - 15:12, 187:2
**neuro-ICU** [1] - 15:12
**neurologist** [1] - 70:5
**neuromodulation** [4] - 171:23, 172:13, 200:18, 201:4
**Neuromodulation** [2] - 23:25, 35:3
**Neurosciences** [1] - 24:12
**neurosurgeon** [2] - 25:10, 106:15
**Neurosurgery** [1] - 55:7
**never** [9] - 29:18, 41:8, 43:23, 44:2, 54:7, 120:22, 143:12, 177:3, 203:22
**New** [5] - 3:5, 3:8, 36:17, 70:5, 212:2
**new** [21] - 19:11, 34:13, 40:7, 41:13, 49:15, 79:11, 108:15, 113:6, 117:24, 128:13, 128:20, 129:19, 129:23, 144:1, 181:16, 201:6, 201:9, 203:10, 204:5, 257:8, 257:9

**news** [2] - 75:3, 95:10
**newsletter** [9] - 75:9, 87:17, 91:3, 91:5, 91:6, 91:22, 91:24, 92:22, 95:2
**newsletters** [1] - 74:10
**newspaper** [1] - 153:18
**next** [14] - 7:8, 25:21, 28:6, 39:10, 56:19, 58:16, 60:13, 74:7, 83:13, 105:2, 109:22, 125:6, 187:3, 208:25
**NICHOLAS** [1] - 6:11
**nine** [1] - 79:10
**Ninth** [1] - 4:9
**nobody** [1] - 179:20
**non** [36] - 8:15, 8:19, 9:14, 9:16, 9:23, 16:16, 17:24, 54:3, 54:8, 54:16, 66:20, 67:7, 67:13, 67:15, 68:1, 68:7, 68:22, 69:11, 73:23, 74:21, 76:7, 80:23, 81:10, 87:7, 89:8, 127:19, 137:23, 171:16, 173:2, 174:11, 180:15, 226:9, 247:12, 247:19, 254:5
**Non** [1] - 146:23
**non-cancer** [8] - 16:16, 17:24, 68:1, 68:22, 87:7, 89:8, 127:19, 180:15
**Non-Cancer** [1] - 146:23
**non-cancerous** [1] - 80:23
**non-compliance** [1] - 81:10
**non-group** [1] - 226:9
**non-interventional** [9] - 8:15, 8:19, 9:14, 9:16, 9:23, 54:3, 54:8, 54:16, 73:23
**non-malignant** [9] - 66:20, 67:7, 67:13, 67:15, 68:1, 68:7, 69:11, 74:21, 76:7
**non-medical** [2] - 171:16, 173:2
**non-opioid** [3] - 247:12, 247:19, 254:5
**non-pain** [1] - 174:11
**non-prescribed** [1] -

137:23
**None** [1] - 258:21
**none** [2] - 37:8, 178:17
**nonetheless** [1] - 137:25
**normal** [3] - 78:11, 82:10, 162:9
**normally** [3] - 19:6, 21:22, 86:20
**North** [1] - 36:23
**note** [3] - 96:24, 98:18, 186:15
**noted** [3] - 104:10, 120:19, 127:2
**Nothing** [1] - 208:21
**nothing** [6] - 50:12, 56:16, 63:4, 85:8, 185:6, 252:18
**notice** [18] - 71:15, 71:16, 78:25, 91:20, 92:8, 92:17, 92:19, 93:1, 93:6, 95:15, 96:13, 96:15, 118:11, 126:23, 157:25, 162:21, 166:1, 199:25
**noticed** [4] - 79:3, 97:8, 118:14, 177:11
**number** [45] - 36:8, 40:20, 59:12, 71:23, 98:19, 98:23, 99:7, 100:6, 114:9, 151:22, 151:24, 152:9, 174:4, 174:9, 174:18, 178:2, 178:5, 179:6, 179:15, 181:3, 188:7, 195:21, 196:18, 197:14, 212:20, 214:14, 214:15, 214:18, 226:2, 226:4, 233:22, 233:25, 238:13, 239:18, 246:11, 248:1, 248:9, 248:10, 255:18, 257:11, 257:14, 259:24, 259:25, 260:17
**Number** [4] - 80:5, 80:7, 81:10, 132:10
**numbers** [5] - 48:7, 108:20, 125:1, 193:14, 206:10
**numeric** [1] - 59:11
**nurse** [11] - 19:20, 29:23, 37:17, 53:6, 194:10, 194:16, 194:21, 194:22,

195:3, 195:6, 195:9
**Nurses** [1] - 83:19
**nurses** [2] - 53:6, 56:9
**NW** [6] - 4:6, 4:9, 4:19, 4:21, 5:5, 5:12
**NY** [1] - 3:5

## O

**oath** [4] - 7:12, 152:6, 163:2, 168:22
**obesity** [2] - 104:18
**object** [13] - 51:9, 62:17, 70:9, 75:2, 93:16, 97:16, 122:4, 130:5, 166:8, 167:22, 167:24, 169:21, 169:22
**objected** [5] - 62:25, 93:17, 131:4, 157:7, 171:4
**objecting** [1] - 63:10
**objection** [77] - 37:7, 51:22, 58:6, 58:7, 59:24, 59:25, 63:2, 63:8, 63:25, 72:13, 72:20, 75:10, 79:1, 79:2, 81:16, 81:25, 84:11, 84:12, 91:18, 93:10, 93:18, 95:5, 95:7, 95:9, 96:14, 96:24, 97:22, 98:15, 98:18, 99:23, 99:24, 118:12, 118:13, 122:16, 122:19, 123:8, 123:11, 124:16, 124:17, 135:6, 135:19, 136:8, 141:22, 146:7, 156:19, 160:16, 161:22, 163:6, 164:1, 164:20, 165:12, 166:6, 167:5, 169:1, 169:12, 170:25, 171:3, 171:7, 173:6, 174:24, 174:25, 175:2, 176:12, 177:20, 177:22, 178:1, 181:1, 186:16, 188:12, 190:22, 192:16, 193:9, 193:15, 194:11, 198:12, 203:2, 220:11
**Objection** [1] - 51:7
**objectionable** [1] - 131:7
**objective** [2] - 120:3, 186:8

**obligation** [1] - 80:14
**observed** [1] - 251:2
**obstetrician** [4] - 143:12, 143:13, 143:18, 143:21
**obstetricians** [4] - 122:9, 140:21, 141:17, 143:22
**obstetrics** [1] - 143:12
**obtain** [6] - 151:22, 238:16, 252:23, 260:1, 260:2, 261:6
**obvious** [2] - 118:8, 248:5
**obviously** [11] - 8:10, 9:20, 10:24, 14:25, 36:24, 41:8, 97:5, 150:21, 167:23, 194:3, 258:8
**occasions** [4] - 36:18, 200:6, 214:16, 214:18
**occupational** [2] - 9:3, 259:12
**occur** [1] - 67:21
**occurred** [3] - 65:21, 135:3, 192:20
**Oceana** [1] - 41:2
**October** [2] - 58:24, 116:11
**odds** [1] - 203:22
**OECD** [1] - 211:15
**OF** [2] - 1:1, 1:4
**offer** [4] - 215:18, 218:5, 218:7, 244:17
**offered** [7] - 10:19, 44:2, 88:1, 92:7, 92:15, 92:17, 92:25
**offering** [2] - 221:9, 221:12
**office** [5] - 16:8, 16:11, 20:12, 21:10, 106:16
**Office** [2] - 36:20, 36:21
**officer** [1] - 26:9
**offices** [1] - 16:10
**Official** [2] - 264:2, 264:3
**officials** [1] - 31:16
**often** [16] - 13:19, 13:25, 19:2, 43:19, 49:23, 62:6, 62:8, 68:8, 143:3, 143:24, 144:3, 169:15, 186:22, 187:19, 206:15, 257:10
**oftentimes** [1] - 20:6
**Ohio** [1] - 218:7
**old** [4] - 24:18, 38:18,

61:6, 105:8
**older** [8] - 73:23, 105:4, 105:6, 105:11, 105:12, 179:10, 179:13
**on-going** [1] - 239:13
**on-line** [1] - 103:5
**once** [9] - 13:24, 19:11, 29:4, 53:15, 62:25, 85:20, 106:24, 121:5, 203:2
**oncologist** [1] - 17:5
**oncologists** [2] - 127:21, 127:22
**one** [101] - 12:8, 15:14, 17:25, 18:2, 22:3, 22:9, 24:16, 25:25, 26:20, 28:12, 35:13, 35:14, 41:4, 41:16, 43:2, 43:20, 45:20, 53:9, 53:17, 57:13, 60:9, 64:24, 69:14, 70:13, 71:12, 74:13, 79:10, 95:1, 96:21, 97:7, 99:23, 101:16, 102:8, 104:12, 104:21, 108:24, 122:20, 134:2, 136:6, 136:12, 140:11, 141:9, 145:4, 147:24, 148:15, 148:17, 149:15, 153:10, 157:11, 158:24, 159:10, 159:13, 165:14, 166:2, 166:3, 172:6, 172:10, 172:20, 172:21, 173:2, 174:4, 177:6, 180:15, 180:20, 180:22, 180:25, 181:25, 184:21, 184:25, 186:5, 187:13, 187:19, 193:13, 196:18, 197:2, 197:14, 198:19, 199:10, 199:14, 199:19, 200:21, 205:1, 206:8, 207:14, 216:3, 229:6, 234:5, 236:18, 237:19, 245:12, 245:18, 247:20, 252:25, 253:1, 257:9, 258:8
**One** [2] - 5:11, 82:17
**one's** [1] - 227:19
**one-third** [1] - 173:2
**ones** [8] - 20:18,

105:1, 148:21,
149:21, 162:17,
162:21, 210:19,
245:2
**operate** [1] - 127:11
**Opiate** [1] - 146:22
**opinion** [44] - 37:18,
37:21, 39:2, 39:4,
39:17, 46:14, 46:19,
49:24, 57:3, 60:20,
62:11, 71:11, 72:18,
82:6, 82:22, 88:24,
97:23, 100:8,
100:17, 100:25,
101:18, 103:6,
103:16, 103:23,
117:10, 122:1,
122:13, 129:4,
129:14, 129:22,
130:24, 132:2,
134:18, 141:19,
142:9, 157:5,
157:17, 159:22,
159:24, 166:2,
174:16, 240:25,
259:2, 261:12
**opinions** [20] - 39:15,
81:17, 82:16, 82:20,
84:7, 96:7, 97:17,
154:18, 157:11,
157:17, 210:24,
211:4, 218:5, 218:7,
220:14, 221:3,
221:5, 221:9, 225:8,
229:8
**Opioid** [7] - 102:11,
118:7, 118:11,
118:20, 121:13,
125:7, 172:8
**opioid** [117] - 9:19,
18:7, 19:1, 19:5,
19:13, 29:6, 33:18,
37:1, 37:14, 38:1,
38:11, 39:6, 43:14,
43:17, 46:18, 47:11,
52:6, 52:14, 60:25,
68:6, 73:24, 85:7,
94:12, 94:13,
100:15, 100:18,
101:2, 103:1,
104:15, 105:5,
105:16, 106:20,
107:16, 114:13,
114:24, 117:23,
120:3, 120:16,
120:25, 121:7,
123:16, 125:11,
125:18, 126:8,
128:13, 133:14,
134:11, 134:19,

134:20, 135:5,
135:17, 136:7,
137:1, 137:13,
137:21, 138:2,
138:5, 138:11,
138:15, 142:15,
143:23, 144:1,
144:5, 144:9,
144:13, 149:4,
149:25, 152:14,
157:10, 172:2,
174:10, 175:16,
179:25, 180:14,
181:25, 182:6,
190:11, 196:16,
196:19, 201:22,
201:24, 203:22,
204:3, 208:5, 218:5,
231:14, 231:19,
239:3, 239:19,
241:23, 242:6,
243:3, 243:12,
246:20, 246:23,
247:9, 247:10,
247:12, 247:16,
247:18, 247:19,
247:21, 248:6,
248:9, 250:12,
252:6, 252:20,
253:17, 253:19,
254:2, 254:5, 255:4,
255:9, 256:11,
262:2, 262:5
**opioid-related** [1] -
33:18
**opioid-wise** [1] -
52:14
**opioids** [173] - 17:5,
18:10, 19:2, 19:16,
20:6, 26:14, 27:11,
29:4, 29:5, 29:12,
29:18, 34:1, 34:5,
37:19, 39:21, 40:24,
41:22, 42:10, 42:16,
43:7, 43:11, 43:12,
43:19, 44:5, 44:19,
45:7, 45:24, 48:5,
50:2, 52:12, 52:15,
60:23, 61:3, 61:20,
62:6, 62:10, 66:20,
67:7, 67:11, 67:13,
69:11, 73:4, 73:25,
74:20, 76:6, 84:22,
86:25, 88:14, 89:3,
89:9, 99:18, 99:19,
100:9, 100:24,
101:13, 103:9,
103:25, 106:2,
106:22, 107:6,
107:12, 107:19,
107:23, 109:1,

109:9, 113:14,
116:13, 116:16,
118:3, 118:23,
118:25, 119:19,
121:25, 122:3,
124:25, 125:22,
125:25, 128:18,
128:23, 129:5,
129:10, 131:2,
131:25, 136:24,
137:4, 138:1, 138:8,
138:15, 140:18,
141:1, 142:14,
143:9, 144:4, 146:4,
151:22, 155:4,
157:9, 165:11,
169:14, 169:17,
170:24, 171:12,
173:2, 173:3,
174:19, 176:4,
182:21, 183:8,
195:14, 196:7,
197:19, 198:9,
200:14, 200:15,
201:14, 203:1,
203:11, 203:12,
203:18, 203:21,
204:1, 206:14,
211:3, 221:14,
231:11, 231:25,
232:9, 233:6,
233:13, 234:25,
237:1, 239:23,
239:24, 240:1,
240:5, 241:20,
243:8, 244:1, 246:3,
248:11, 248:22,
249:2, 251:17,
252:12, 253:7,
253:13, 253:15,
254:18, 255:1,
255:18, 255:21,
255:24, 256:2,
256:5, 257:11,
257:14, 257:18,
257:21, 257:23,
257:25, 258:11,
259:5, 259:8,
259:19, 260:8,
261:14, 261:22,
262:13
**Opioids** [1] - 73:12
**opportunity** [4] -
11:24, 91:24,
245:19, 246:9
**opposed** [2] - 176:24,
251:12
**opthamologist** [1] -
56:5
**options** [5] - 16:2,

19:7, 44:4, 62:13,
113:22
**optometrist** [1] -
119:6
**optometrists** [1] -
119:3
**orange** [1] - 138:17
**order** [4] - 102:24,
186:9, 233:15,
243:12
**orders** [1] - 170:24
**ordinary** [1] - 68:7
**organization** [8] -
32:24, 34:6, 54:14,
59:19, 222:21,
223:21, 238:4,
242:21
**Organization** [1] -
68:21
**organizations** [10] -
22:17, 22:19, 53:24,
64:22, 222:24,
224:9, 242:14,
250:18, 251:25,
258:6
**organize** [2] - 222:14,
224:3
**organized** [1] - 22:20
**organizing** [1] - 215:8
**original** [1] - 218:24
**originally** [3] - 10:10,
45:23, 61:16
**origins** [1] - 89:8
**Orleans** [1] - 3:8
**orthopedics** [1] -
140:22
**osteopathic** [2] -
29:21, 35:14
**Osteopathy** [1] -
83:19
**otherwise** [2] - 61:21,
145:20
**out-of-court** [1] - 92:7
**outcome** [3] - 25:5,
251:13, 251:14
**outcomes** [2] -
251:23, 253:23
**outdated** [1] - 139:19
**outliers** [2] - 110:5,
110:12
**outline** [1] - 124:10
**outpatient** [5] - 53:20,
58:2, 60:10, 118:24,
119:2
**outside** [19] - 51:10,
62:3, 62:4, 81:17,
87:16, 135:19,
142:10, 156:20,
158:8, 160:23,
161:13, 167:25,

171:3, 171:8,
188:13, 188:15,
191:18, 215:11,
221:13
**ovary** [1] - 17:2
**over-prescribing** [1] -
26:17
**over-treated** [1] -
87:25
**Overall** [1] - 226:16
**overall** [8] - 46:25,
83:6, 102:1, 142:9,
155:1, 190:4,
203:16, 246:7
**overdoses** [2] - 155:3,
197:2
**overlap** [1] - 142:20
**overlapping** [3] -
143:8, 143:11, 144:7
**overlaps** [1] - 143:1
**overrule** [5] - 63:25,
97:22, 122:16,
122:18, 193:15
**overruled** [14] - 51:14,
98:15, 135:8,
135:21, 141:24,
160:18, 165:14,
166:13, 176:18,
178:4, 188:17,
194:14, 198:16,
203:9
**overseas** [1] - 13:14
**oversee** [1] - 94:16
**overseeing** [2] -
94:17, 94:18
**Oversight** [1] - 111:6
**overtreating** [1] - 50:3
**overuse** [1] - 78:7
**overview** [3] - 38:9,
39:14, 107:3
**own** [12] - 11:23,
16:24, 35:4, 46:21,
47:11, 51:15,
114:16, 129:1,
131:12, 150:12,
223:14, 261:3
**owned** [1] - 159:2
**Oxy** [1] - 40:10
**Oxycodone** [1] - 44:6
**oxycodone** [7] - 47:1,
65:15, 124:23,
125:1, 125:9,
125:12, 196:18
**OxyContin** [9] - 40:12,
40:13, 41:21, 42:12,
47:13, 56:22, 56:24,
57:1, 65:21

## P

**P-1200** [1] - 2:7
**P-41960** [1] - 192:14
**P-44711_0009** [1] - 65:14
**p.m** [2] - 204:16, 263:16
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**pacemaker** [1] - 128:10
**page** [27] - 66:25, 69:6, 69:22, 74:19, 80:1, 80:2, 83:25, 84:18, 87:18, 88:5, 88:25, 89:1, 108:20, 110:1, 125:6, 137:9, 146:1, 164:17, 174:1, 174:2, 174:3, 181:24, 182:19, 185:9, 191:4, 197:23
**Page** [25] - 31:11, 58:25, 66:22, 74:18, 91:4, 91:6, 99:10, 108:18, 108:22, 110:1, 118:16, 119:17, 120:13, 124:20, 164:19, 182:19, 182:25, 183:1, 184:8, 189:3, 189:4, 196:3, 197:23
**paid** [5] - 230:14, 231:5, 231:15, 239:19, 241:15
**pain** [250] - 8:9, 8:12, 8:13, 8:15, 8:17, 8:20, 8:22, 8:25, 9:14, 9:16, 9:23, 11:12, 11:13, 13:1, 13:4, 14:4, 14:5, 14:13, 14:23, 15:4, 15:18, 16:2, 16:15, 16:16, 16:18, 16:20, 16:25, 17:4, 17:20, 19:1, 21:9, 21:16, 22:4, 22:9, 22:10, 22:11, 22:12, 22:17, 22:18, 23:9, 23:14, 23:15, 24:5, 25:14, 26:4, 26:11, 29:15, 29:25, 33:8, 35:1, 35:21, 36:3, 37:5, 37:6, 37:9, 37:19, 39:7, 39:22, 40:2, 45:2, 45:7, 45:11, 51:21, 52:7, 52:9, 52:18, 53:11, 53:12, 53:19, 53:21, 53:22, 53:23, 53:25, 54:3,

56:6, 56:9, 56:10, 57:16, 57:19, 57:25, 59:4, 59:6, 59:9, 59:10, 59:11, 59:12, 59:13, 59:14, 59:17, 59:20, 60:5, 60:14, 60:16, 61:11, 61:16, 61:17, 61:18, 62:2, 62:7, 64:11, 65:22, 66:4, 66:10, 66:21, 67:7, 67:8, 67:16, 67:17, 67:18, 67:19, 67:20, 68:1, 68:3, 68:4, 68:7, 68:20, 68:22, 68:23, 69:2, 69:11, 69:16, 70:22, 73:4, 73:21, 74:21, 76:4, 76:7, 78:3, 78:4, 78:6, 78:10, 78:12, 78:13, 78:14, 78:16, 78:18, 79:15, 80:10, 80:12, 80:15, 80:16, 80:23, 83:8, 84:22, 84:24, 87:1, 87:6, 87:7, 87:8, 87:19, 87:21, 87:23, 87:24, 87:25, 88:1, 88:6, 88:16, 88:19, 89:4, 89:7, 89:10, 89:12, 98:2, 98:3, 98:6, 98:9, 99:6, 100:9, 101:19, 102:1, 102:7, 104:14, 104:19, 104:23, 105:1, 105:13, 106:14, 107:9, 107:18, 112:7, 112:11, 112:13, 113:10, 115:8, 116:5, 119:2, 119:11, 122:7, 123:7, 123:10, 125:15, 125:17, 126:19, 126:20, 127:14, 139:22, 140:2, 140:25, 141:17, 143:25, 173:3, 174:11, 178:7, 180:15, 186:3, 198:1, 198:2, 198:7, 198:18, 198:19, 198:21, 198:22, 199:10, 199:16, 200:9, 202:19, 205:16, 205:21, 206:1, 206:2, 206:7, 206:11, 246:24, 247:20, 256:12, 259:8, 259:10, 259:15, 259:19,

260:9, 260:16, 260:24, 261:9, 261:15, 261:21, 261:23, 261:24, 262:10
**Pain** [45] - 13:12, 21:3, 23:11, 23:17, 23:21, 24:11, 27:17, 28:7, 28:23, 32:23, 33:22, 35:6, 53:18, 54:2, 54:4, 54:9, 54:13, 54:24, 55:2, 55:10, 57:4, 58:18, 59:2, 73:13, 77:20, 77:25, 78:23, 81:24, 82:5, 82:9, 82:12, 82:15, 83:4, 83:11, 83:14, 84:19, 95:22, 95:25, 96:3, 100:3, 108:1, 146:21, 146:23, 180:9, 180:18
**pain-relieving** [2] - 80:10, 80:16
**painful** [1] - 61:15
**Palliative** [1] - 52:13
**Palo** [1] - 211:16
**panel** [1] - 28:25
**panels** [1] - 234:16
**pap** [1] - 142:23
**Papantonio** [1] - 2:10
**paper** [15] - 24:22, 148:3, 148:24, 149:5, 180:13, 185:4, 188:11, 189:1, 189:5, 190:10, 190:12, 191:3, 191:6, 191:12, 192:4
**papers** [2] - 196:8, 216:10
**paragraph** [8] - 67:1, 69:5, 69:9, 87:19, 88:4, 182:20, 184:9, 184:10
**pardon** [1] - 180:21
**parents** [3] - 12:13, 12:19
**Paris** [1] - 211:15
**Parkinson's** [3] - 24:4, 187:4, 187:10
**Part** [3] - 146:23, 146:24, 180:19
**part** [42] - 8:17, 9:17, 16:25, 22:9, 25:9, 42:9, 78:21, 82:6, 82:13, 90:17, 93:7, 101:25, 110:16, 129:25, 143:19, 144:14, 145:11, 146:1, 151:6,

154:10, 155:7, 155:10, 156:2, 156:4, 159:6, 172:11, 185:1, 185:13, 187:3, 187:5, 187:6, 187:20, 187:21, 188:10, 206:11, 213:25, 214:8, 217:19, 218:25, 221:24, 251:9
**part-time** [1] - 206:11
**participants** [1] - 221:17
**participated** [2] - 28:8, 33:18
**participating** [2] - 42:20, 180:2
**particular** [28] - 51:4, 87:5, 152:18, 158:16, 193:23, 193:25, 194:13, 197:5, 205:15, 234:2, 234:7, 235:5, 235:7, 235:11, 237:8, 237:24, 239:16, 239:20, 239:23, 240:2, 245:8, 246:9, 248:23, 250:8, 251:13, 252:12, 260:6
**particularly** [8] - 21:15, 45:17, 106:22, 116:3, 120:8, 123:19, 177:5, 240:15
**parties** [6] - 76:3, 107:20, 114:9, 162:19, 221:10, 222:9
**partly** [1] - 115:13
**partners** [2] - 116:24, 153:11
**parts** [4] - 142:14, 182:4, 188:1, 188:3
**PAs** [1] - 29:24
**pass** [3] - 117:23, 173:18, 262:15
**passage** [1] - 83:4
**passed** [7] - 82:9, 96:10, 107:25, 109:5, 109:6, 117:24, 119:15
**passes** [3] - 238:2, 238:3, 238:5
**passing** [1] - 22:5
**password** [1] - 111:25
**past** [4] - 18:22, 47:8, 50:16, 178:6

**patch** [2] - 17:7, 17:19
**patches** [3] - 40:13, 197:6, 197:11
**patient** [60] - 15:22, 18:14, 19:3, 19:7, 27:2, 27:6, 29:9, 29:25, 37:15, 37:20, 41:1, 41:4, 43:13, 44:19, 47:13, 47:20, 50:13, 53:20, 59:13, 67:14, 73:9, 80:13, 80:24, 85:7, 86:20, 87:23, 88:13, 106:15, 109:16, 109:19, 110:24, 111:13, 111:15, 111:24, 111:25, 112:4, 120:11, 120:23, 128:9, 128:21, 144:3, 195:10, 214:6, 222:4, 232:21, 238:1, 238:8, 238:12, 238:14, 242:10, 247:7, 247:11, 249:12, 250:4, 253:15, 253:16, 254:4, 261:6
**patient's** [12] - 14:6, 14:25, 80:15, 234:1, 234:9, 235:24, 246:6, 246:7, 247:20
**patients** [79] - 9:22, 16:15, 18:19, 18:21, 18:23, 19:2, 20:11, 21:8, 21:12, 21:20, 21:22, 21:24, 22:3, 34:1, 38:21, 41:6, 41:9, 41:13, 44:6, 45:4, 46:15, 46:17, 46:18, 47:1, 48:4, 48:8, 50:11, 55:16, 59:6, 59:8, 62:5, 67:7, 67:8, 67:14, 70:6, 73:25, 78:3, 83:7, 98:2, 100:23, 101:3, 101:9, 101:12, 107:8, 107:18, 109:2, 109:14, 112:14, 112:21, 112:24, 113:2, 113:21, 114:25, 116:23, 117:3, 120:15, 125:21, 127:15, 128:19, 131:16, 131:18, 131:21, 143:24, 173:3, 173:5, 174:20, 178:7, 197:6,

197:10, 203:11, 206:13, 221:21, 240:4, 240:12, 249:6, 249:8, 249:11, 249:14, 253:11
**pattern** [1] - 160:5
**patterns** [4] - 27:14, 110:4, 110:6, 127:25
**PAUL** [2] - 2:3, 5:9
**Pauley** [1] - 21:13
**pause** [3] - 12:4, 41:16, 151:9
**Pause** [2] - 77:15, 86:14
**pay** [4] - 210:13, 224:10, 230:15, 232:18
**payer** [14] - 224:25, 229:6, 229:23, 236:2, 236:21, 236:22, 239:16, 241:15, 241:16, 241:17, 245:19, 246:1, 250:4, 250:6
**payers** [54] - 210:16, 210:18, 210:19, 211:2, 214:6, 214:11, 221:19, 221:20, 221:21, 224:17, 229:24, 232:13, 232:14, 234:2, 234:11, 235:17, 235:18, 236:5, 236:8, 236:11, 236:15, 237:8, 237:12, 238:6, 238:7, 238:16, 238:23, 238:24, 239:5, 239:11, 239:13, 239:17, 240:4, 240:11, 240:15, 241:6, 241:13, 243:1, 243:3, 244:4, 244:6, 244:14, 244:18, 244:23, 246:2, 247:17, 250:10, 250:14, 250:17, 251:1, 259:15, 261:13, 261:24
**payers'** [6] - 233:8, 234:24, 235:12, 262:4, 262:9, 262:13
**paying** [3] - 210:9, 232:19, 233:1
**payment** [1] - 229:6
**payments** [1] - 230:3
**pays** [1] - 230:4

**PDL** [3] - 254:19, 255:4, 255:18
**peak** [4] - 107:5, 125:21, 128:5, 128:6
**peaks** [1] - 176:8
**PEARL** [1] - 3:6
**peer** [6] - 186:1, 186:3, 186:5, 186:6, 186:11, 216:10
**peer-reviewed** [4] - 186:3, 186:5, 186:6, 216:10
**PEIA** [15] - 222:12, 223:8, 223:17, 223:20, 223:21, 242:18, 250:24, 251:10, 255:16, 255:21, 256:13, 257:12, 257:15, 260:5
**PEIA's** [1] - 254:19
**pelvic** [2] - 127:13, 143:25
**pendulum** [1] - 107:15
**Pensacola** [1] - 2:11
**People** [1] - 110:12
**people** [127] - 12:11, 12:14, 16:23, 16:24, 17:1, 18:1, 18:2, 18:11, 19:6, 20:2, 22:4, 22:22, 24:8, 24:16, 24:19, 26:16, 27:17, 37:2, 41:12, 41:22, 42:16, 42:22, 43:18, 43:23, 43:25, 44:9, 44:16, 44:22, 45:7, 45:24, 46:2, 46:9, 46:10, 46:20, 49:22, 50:1, 50:2, 50:3, 50:10, 50:13, 50:16, 52:10, 52:15, 52:20, 57:7, 57:17, 57:22, 67:19, 69:1, 79:23, 105:7, 105:8, 105:18, 106:22, 107:6, 110:13, 110:14, 110:15, 111:8, 111:11, 112:12, 113:21, 115:21, 117:3, 117:7, 122:6, 125:24, 126:19, 127:1, 128:14, 128:17, 130:2, 130:3, 137:25, 138:1, 141:17, 145:14, 145:16, 145:18, 154:2, 154:4, 154:13, 161:8, 161:10,

161:18, 169:14, 169:15, 169:17, 176:1, 179:15, 184:17, 184:22, 185:1, 185:23, 186:7, 186:11, 189:1, 197:9, 197:12, 197:13, 198:8, 200:15, 201:13, 202:19, 203:17, 203:20, 204:1, 204:6, 205:12, 205:24, 206:1, 206:4, 206:9, 206:10, 224:20, 225:21, 226:4, 226:10, 226:15, 226:16, 226:19, 227:14, 227:15, 228:1, 228:18
**people's** [2] - 16:2, 76:22
**per** [4] - 184:9, 184:12, 248:10, 252:22
**percent** [53] - 14:11, 14:12, 19:14, 41:12, 45:3, 112:14, 112:24, 113:2, 127:16, 127:17, 127:18, 141:6, 145:18, 183:6, 183:7, 185:1, 197:10, 201:23, 202:7, 202:8, 204:1, 224:20, 226:16, 226:21, 226:25, 227:2, 227:6, 227:10, 228:8, 228:12, 228:16, 228:19, 228:22, 230:11, 230:13, 230:14, 231:3, 231:4, 231:18, 232:9, 248:20, 250:24, 250:25, 255:1, 255:3, 255:13, 255:24, 256:2, 258:1, 258:2
**percentage** [27] - 166:1, 226:14, 226:18, 226:19, 226:23, 227:1, 227:9, 227:10, 227:12, 227:14, 227:15, 227:22, 227:25, 228:9, 230:7, 230:8, 230:22, 230:24, 231:2, 231:3, 231:16, 231:25,

232:1, 250:22, 254:18, 257:13, 257:17
**percentile** [1] - 232:12
**perceptions** [1] - 76:22
**Percocet** [2] - 52:15, 68:9
**perform** [4] - 218:24, 236:11, 237:21, 241:24
**performing** [3] - 219:10, 241:2, 241:4
**Perhaps** [1] - 262:17
**perhaps** [3] - 106:19, 247:11, 248:5
**period** [37] - 20:25, 23:19, 41:19, 44:13, 46:22, 60:4, 60:23, 61:24, 66:15, 68:5, 70:23, 72:24, 82:9, 88:18, 117:22, 138:14, 151:25, 170:14, 170:17, 181:19, 183:24, 194:5, 196:6, 196:10, 196:12, 196:13, 196:19, 198:5, 251:24, 252:17, 252:19, 253:21, 255:20, 255:21, 256:14, 258:1, 258:12
**periods** [1] - 34:11
**peripheral** [2] - 8:25, 201:12
**permission** [1] - 71:7
**person** [20] - 31:21, 37:16, 48:24, 61:19, 98:25, 102:6, 103:5, 103:13, 109:21, 111:9, 140:14, 153:20, 156:15, 179:11, 187:15, 191:9, 197:17, 210:7, 214:23
**personal** [5] - 38:19, 51:15, 51:17, 129:12, 153:22
**personally** [6] - 41:17, 64:5, 100:21, 107:7, 126:4, 129:1
**personnel** [1] - 185:15
**persons** [1] - 160:12
**pertinent** [1] - 10:8
**PETER** [1] - 2:9
**Peterson** [1] - 25:10
**petition** [3] - 242:22, 254:7
**Ph.D** [4] - 211:9,

211:12, 211:24, 212:1
**pharmaceutical** [9] - 190:18, 216:20, 217:4, 217:7, 217:16, 218:2, 219:24, 220:3, 220:4
**pharmaceuticals** [4] - 210:7, 214:11, 221:18, 249:20
**pharmacies** [4] - 152:10, 229:1, 240:2, 240:13
**Pharmacists** [1] - 32:8
**pharmacists** [2] - 28:24, 141:15
**Pharmacy** [20] - 26:6, 26:10, 28:5, 29:22, 31:23, 32:1, 47:16, 50:24, 83:20, 110:9, 111:6, 111:14, 123:23, 124:11, 124:22, 126:24, 126:25, 224:7, 237:21, 242:2
**pharmacy** [19] - 109:23, 109:24, 222:3, 222:7, 224:5, 224:8, 224:10, 224:11, 224:15, 237:7, 237:13, 237:14, 237:17, 238:12, 238:18, 238:19, 238:21, 240:3, 243:23
**PharmD** [1] - 31:24
**Phase** [1] - 184:1
**phase** [20] - 40:18, 41:19, 44:11, 44:12, 44:14, 45:15, 45:17, 46:19, 49:23, 85:20, 107:1, 107:2, 107:4, 107:13, 114:4, 114:6, 114:7, 114:8, 183:22, 183:23
**phases** [3] - 39:19, 160:6, 183:21
**Philadelphia** [2] - 6:6, 6:13
**philosophy** [1] - 73:3
**phone** [2] - 47:5, 47:8
**phonetic** [2] - 21:13, 52:12
**phrase** [2] - 48:16, 220:20
**phrased** [2] - 81:20, 81:22
**Physical** [1] - 259:12
**physical** [19] - 9:3, 20:2, 43:24, 43:25,

78:8, 85:11, 85:13,
85:17, 85:19,
120:22, 126:22,
176:3, 247:12,
254:5, 259:25,
260:2, 260:16, 261:1
**physically** [3] - 85:5,
85:22, 105:15
**physician** [33] - 8:7,
8:8, 36:13, 37:16,
43:20, 44:3, 45:6,
69:9, 70:21, 80:2,
80:8, 80:9, 80:13,
80:17, 90:9, 97:20,
101:17, 101:18,
101:21, 101:24,
103:20, 113:14,
123:3, 127:16,
140:8, 140:11,
161:13, 162:11,
180:18, 199:3,
234:6, 238:1, 238:2
**Physician** [1] - 79:18
**Physicians** [3] -
23:21, 33:23, 146:22
**physicians** [64] -
19:20, 24:3, 26:11,
27:2, 27:13, 28:24,
29:14, 29:22, 33:8,
40:8, 43:8, 45:21,
46:15, 47:2, 47:6,
49:21, 52:6, 61:18,
64:24, 67:9, 71:3,
72:24, 73:3, 73:23,
74:4, 74:5, 74:14,
74:16, 76:8, 80:22,
81:7, 88:18, 90:14,
91:23, 97:7, 104:1,
105:25, 106:5,
109:17, 109:18,
111:16, 111:22,
112:1, 113:1, 113:9,
117:9, 127:7,
127:22, 127:23,
127:25, 129:14,
129:16, 141:3,
141:7, 142:15,
146:2, 146:20,
150:2, 153:2,
162:19, 174:12,
234:16, 234:19
**physicians'** [1] -
107:16
**pick** [6] - 27:3, 200:17,
245:4, 245:5, 247:1,
250:17
**piece** [2] - 28:6,
120:12
**pieces** [1] - 117:8
**PIFKO** [1] - 3:14

**pill** [5] - 135:24, 153:3,
169:16, 200:1
**Pill** [4] - 138:16, 176:6,
176:13, 197:20
**pills** [37] - 26:15, 27:2,
41:2, 41:3, 41:4,
52:20, 52:21, 57:21,
57:23, 57:24, 61:20,
135:17, 135:25,
140:17, 143:23,
152:14, 152:17,
154:15, 161:10,
161:14, 167:18,
169:11, 170:13,
170:16, 176:7,
177:25, 233:22,
234:1, 238:13,
246:11, 248:1,
248:2, 248:9,
248:10, 252:16
**pivot** [1] - 237:3
**place** [8] - 15:3, 58:23,
71:20, 96:17,
203:13, 236:15,
244:8, 261:18
**places** [4] - 24:8, 24:9,
104:3, 216:16
**Plaintiff** [5] - 1:5, 1:11,
2:2, 3:2, 4:1
**plaintiff** [1] - 151:20
**Plaintiffs** [1] - 264:6
**plaintiffs** [3] - 98:20,
98:22, 149:12
**plaintiffs'** [1] - 193:13
**plan** [15] - 43:22,
222:8, 222:12,
222:17, 222:25,
223:1, 223:4, 223:5,
223:16, 223:24,
224:1, 224:9,
224:15, 232:24,
237:6
**Plan** [1] - 222:14
**plans** [5] - 222:18,
226:20, 226:22,
240:19, 240:22
**plants** [1] - 105:22
**play** [8] - 10:17, 10:18,
24:20, 29:19,
115:24, 116:14,
116:15, 126:14
**playbook** [1] - 29:3
**played** [3] - 54:7,
101:19, 106:17
**playing** [3] - 262:3,
262:8, 262:12
**Pleasant** [3] - 4:4,
4:12, 4:15
**pleasantries** [1] -
133:8

**point** [28] - 11:20,
15:14, 21:19, 21:21,
33:14, 52:22, 70:3,
70:12, 72:6, 75:4,
92:16, 97:19, 102:8,
133:25, 182:15,
182:17, 183:17,
183:23, 189:22,
190:17, 233:5,
233:10, 236:25,
246:21, 247:2,
247:6, 260:11,
262:15
**pointing** [1] - 236:4
**points** [2] - 105:2,
223:3
**police** [1] - 26:9
**policies** [11] - 38:23,
60:5, 86:15, 89:24,
90:7, 100:7, 100:10,
106:3, 130:4, 130:6,
130:11
**Policy** [3] - 83:14,
83:16, 83:17
**policy** [15] - 23:13,
74:6, 84:16, 86:24,
87:4, 87:5, 87:7,
87:9, 87:13, 89:17,
99:14, 99:21, 100:4,
232:25, 233:2
**polite** [1] - 139:14
**Ponc** [1] - 2:4
**Ponce** [1] - 2:14
**poor** [1] - 171:17
**population** [14] -
105:4, 105:12,
127:19, 127:20,
128:21, 183:7,
195:18, 197:17,
227:6, 228:10,
228:12, 228:17,
228:22, 250:23
**Portenoy** [6] - 70:4,
70:5, 70:19, 71:9,
72:23, 73:6
**portion** [8] - 11:10,
80:5, 124:24,
149:14, 169:24,
174:12, 182:3,
191:20
**portions** [3] - 84:15,
84:21, 186:21
**Portnoy** [1] - 81:4
**pose** [1] - 71:8
**posed** [4] - 98:23,
164:21, 168:9,
168:12
**position** [4] - 23:13,
67:6, 212:11, 213:1
**Position** [4] - 74:2,

76:5, 76:8, 76:10
**positions** [1] - 215:4
**positive** [2] - 117:13,
121:16
**possible** [3] - 42:16,
59:12, 116:16
**post** [2] - 26:14,
216:24
**post-2016** [1] - 251:24
**post-doctoral** [1] -
216:24
**post-surgery** [1] -
26:14
**postoperative** [1] -
142:11
**postpone** [1] - 262:18
**pound** [1] - 104:21
**pounds** [2] - 104:20,
104:21
**poverty** [4] - 228:8,
228:10, 228:13,
228:18
**Powell** [1] - 2:6
**PR** [2] - 2:5, 2:14
**practice** [70] - 8:14,
8:18, 9:18, 11:19,
11:22, 11:23, 12:6,
12:20, 13:5, 13:6,
13:14, 16:4, 16:5,
16:14, 17:1, 18:4,
18:25, 19:18, 19:21,
19:23, 20:22, 21:21,
22:6, 22:8, 22:15,
26:22, 28:12, 32:12,
37:16, 40:25, 41:15,
45:23, 46:6, 46:21,
57:7, 61:24, 68:7,
69:20, 80:19, 82:10,
87:15, 111:19,
122:25, 123:3,
123:4, 126:5, 127:4,
127:5, 127:18,
127:23, 129:25,
131:12, 131:13,
131:18, 131:19,
131:20, 140:13,
194:2, 194:4, 197:7,
200:3, 200:17,
201:14, 201:21,
202:1, 202:4, 234:5,
234:18
**practiced** [6] - 13:3,
55:13, 139:5,
139:17, 139:21,
143:12
**practices** [7] - 33:9,
47:25, 200:9, 233:9,
233:12, 234:24,
235:1
**practicing** [1] - 12:23

**practitioner** [5] -
23:11, 37:17, 119:6,
119:8, 195:10
**practitioners** [10] -
19:20, 29:24, 35:5,
194:10, 194:16,
194:21, 194:22,
194:23, 195:3, 195:6
**predict** [2] - 24:25,
25:4
**prefer** [2] - 29:7, 60:12
**preferred** [10] -
254:20, 255:1,
255:9, 255:21,
255:24, 256:3,
257:4, 257:7, 257:12
**premiums** [1] - 232:24
**preoperatively** [1] -
142:25
**preparation** [1] -
190:2
**prepare** [6] - 23:1,
39:13, 65:1, 229:17,
254:10, 257:1
**prepared** [4] - 75:21,
221:23, 225:18,
254:15
**preparing** [1] - 104:4
**prescribe** [33] - 19:1,
19:2, 27:18, 28:14,
34:4, 37:18, 49:17,
52:6, 61:3, 67:11,
86:19, 86:20,
113:14, 113:21,
114:25, 120:4,
129:10, 135:24,
137:5, 142:15,
143:23, 144:4,
152:14, 165:25,
172:23, 203:1,
247:4, 247:8, 248:4,
249:14, 252:22,
253:12
**prescribed** [28] -
26:18, 47:1, 62:9,
80:9, 100:18, 101:2,
103:14, 103:25,
107:24, 109:13,
131:1, 135:22,
135:25, 137:4,
137:23, 141:3,
151:22, 160:4,
165:16, 169:15,
169:16, 173:3,
173:4, 190:11,
246:3, 247:11,
253:20, 260:18
**prescriber** [8] - 50:21,
110:17, 196:15,
197:14, 238:8,

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

244:11, 245:10, 252:21

**prescribers** [14] - 29:11, 49:17, 50:8, 62:9, 100:18, 162:16, 165:10, 167:2, 167:3, 169:19, 214:6, 249:17, 249:19

**prescribers'** [1] - 249:8

**prescribes** [1] - 140:17

**Prescribing** [3] - 102:11, 146:22, 172:8

**prescribing** [132] - 9:19, 20:1, 26:6, 26:13, 26:17, 26:23, 26:25, 27:13, 27:16, 37:1, 37:2, 38:1, 38:11, 39:21, 40:4, 40:24, 43:11, 44:5, 44:6, 46:3, 46:8, 46:13, 46:22, 47:4, 47:11, 50:5, 50:17, 50:21, 51:4, 60:22, 60:25, 62:3, 68:6, 69:11, 73:16, 73:19, 78:2, 79:13, 86:17, 90:10, 94:12, 94:13, 99:18, 99:19, 100:9, 100:15, 103:1, 103:9, 104:2, 104:15, 105:5, 105:17, 106:20, 107:16, 109:1, 109:9, 110:4, 110:10, 110:13, 110:23, 111:1, 111:8, 111:12, 112:14, 113:8, 114:10, 114:13, 116:13, 116:20, 117:23, 118:3, 119:19, 120:17, 120:25, 121:4, 121:24, 122:3, 123:18, 125:11, 126:9, 127:2, 127:25, 129:1, 135:1, 144:13, 146:4, 150:1, 153:20, 155:2, 158:21, 161:14, 165:10, 165:20, 171:11, 194:8, 195:7, 195:13, 196:14, 197:17, 198:9, 200:2,

206:14, 211:3, 221:14, 234:7, 234:8, 235:7, 239:5, 241:25, 243:4, 243:12, 243:25, 244:1, 244:8, 244:15, 244:17, 244:19, 244:24, 245:7, 245:10, 245:18, 247:18, 248:6, 248:14, 248:19, 248:22, 249:2, 249:4, 249:5, 249:10, 250:12

**prescription** [94] - 37:14, 109:23, 120:11, 129:5, 134:11, 134:19, 135:5, 135:17, 136:24, 137:14, 138:15, 141:1, 143:8, 155:4, 157:10, 165:10, 184:16, 184:17, 185:10, 188:5, 188:20, 195:4, 195:11, 197:20, 215:25, 220:10, 220:23, 221:18, 221:20, 229:1, 229:6, 229:14, 230:5, 230:6, 231:7, 231:11, 231:18, 231:25, 232:6, 232:9, 232:20, 233:6, 233:12, 233:19, 233:23, 234:3, 234:25, 235:1, 235:23, 236:20, 236:21, 236:23, 237:1, 237:9, 238:9, 238:20, 239:3, 239:6, 239:18, 239:22, 240:5, 241:14, 241:15, 241:23, 243:7, 243:8, 243:22, 245:16, 245:21, 245:22, 245:25, 246:8, 246:10, 246:20, 247:21, 248:9, 248:10, 249:15, 249:23, 249:24, 250:10, 251:8, 251:22, 253:7, 255:9, 257:15, 259:3, 259:5, 259:19, 260:8, 261:22, 262:13

**Prescription** [1] - 118:20

**prescriptions** [56] - 29:17, 109:18, 115:9, 119:24, 120:1, 120:6, 120:14, 123:16, 134:14, 134:24, 135:11, 135:12, 141:6, 144:10, 149:4, 154:14, 174:10, 174:11, 175:17, 188:7, 194:17, 194:25, 197:19, 198:23, 229:23, 230:3, 230:8, 230:12, 230:19, 230:23, 230:24, 231:4, 231:15, 231:17, 231:19, 232:2, 232:14, 232:18, 233:16, 234:3, 234:22, 235:13, 236:7, 236:13, 236:16, 238:14, 239:19, 239:24, 240:6, 240:8, 241:3, 241:7, 241:12, 242:7, 252:6, 262:2

**presence** [1] - 59:14

**present** [3] - 45:16, 65:4, 103:13

**presented** [1] - 41:21

**presents** [1] - 242:2

**preserved** [2] - 123:8, 169:2

**President** [6] - 23:20, 23:22, 23:23, 23:25, 91:16, 214:3

**presidential** [1] - 55:5

**pressing** [1] - 12:18

**pressure** [2] - 53:3, 53:13

**pretty** [14] - 15:1, 29:10, 30:18, 52:9, 70:21, 107:8, 127:24, 133:25, 157:3, 162:9, 166:1, 170:8, 181:18, 214:10

**prevalent** [1] - 155:19

**prevent** [1] - 207:24

**previous** [3] - 98:1, 181:11

**previously** [5] - 36:3, 95:7, 120:5, 167:9, 241:5

**Primarily** [1] - 224:10

**primarily** [5] - 21:11,

29:14, 33:24, 127:7, 244:12

**primary** [19] - 40:12, 40:14, 45:23, 106:15, 106:21, 115:17, 115:19, 123:2, 123:3, 140:8, 140:11, 141:3, 141:6, 141:7, 142:16, 172:24, 229:19, 237:12

**principally** [2] - 141:2, 141:3

**print** [3] - 173:23, 181:9, 190:13

**private** [5] - 23:11, 210:13, 241:6, 251:5, 256:23

**privileged** [1] - 159:16

**privileges** [2] - 159:14, 159:20

**pro** [1] - 107:16

**pro-opioid** [1] - 107:16

**problem** [9] - 17:13, 42:23, 44:1, 44:16, 93:4, 138:12, 157:15, 201:25, 261:25

**problems** [7] - 14:18, 47:20, 73:9, 121:2, 138:1, 138:8, 196:9

**procedural** [1] - 18:15

**procedure** [9] - 13:17, 16:20, 18:12, 24:25, 25:1, 25:3, 57:20, 119:12, 245:15

**procedures** [16] - 8:24, 8:25, 9:12, 17:21, 18:23, 25:15, 33:10, 33:24, 42:15, 43:6, 47:22, 47:23, 103:2, 144:2, 188:2

**proceed** [2] - 132:25, 220:25

**Proceedings** [3] - 6:19, 77:10, 204:16

**proceedings** [1] - 264:5

**PROCEEDINGS** [1] - 7:1

**process** [15] - 83:6, 90:17, 103:19, 148:5, 148:11, 186:1, 186:14, 189:14, 190:18, 234:12, 235:20, 238:25, 239:2, 239:15, 246:5

**Process** [1] - 59:2

**processed** [2] - 237:23, 238:23

**processes** [2] - 43:9, 236:15

**Proctor** [1] - 2:10

**produced** [3] - 6:19, 218:23, 250:20

**product** [3] - 57:1, 210:8, 249:13

**products** [2] - 257:8

**profession** [1] - 122:10

**Professional** [1] - 83:19

**professional** [6] - 22:17, 41:18, 80:14, 215:20, 217:20, 219:23

**professionals** [1] - 79:13

**professions** [1] - 143:9

**Professor** [12] - 212:2, 212:3, 212:5, 212:6, 212:7, 212:8, 212:10, 212:12, 212:24, 213:10, 213:14

**professor** [2] - 35:11, 35:16

**Professorship** [1] - 213:11

**Program** [4] - 26:1, 31:22, 109:1, 241:22

**program** [7] - 31:25, 42:14, 215:17, 223:12, 223:14, 247:9, 254:24

**progress** [1] - 132:6

**progressed** [1] - 41:10

**project** [2] - 218:18, 218:19

**promise** [1] - 243:15

**promote** [4] - 59:16, 102:22, 251:12, 251:14

**promoted** [1] - 53:24

**promoting** [5] - 59:5, 59:19, 66:10, 215:10

**promptly** [1] - 84:25

**pronounce** [1] - 28:19

**proof** [1] - 36:16

**propagated** [1] - 53:2

**proper** [8] - 34:4, 38:11, 74:1, 114:11, 118:3, 163:7, 167:7, 168:12

**properly** [2] - 44:21, 56:8

**properties** [1] - 125:18

property [1] - 213:19
proportions [1] - 208:5
proposal [1] - 214:9
proposals [2] - 215:16, 215:17
proposed [1] - 214:4
prosecutors [1] - 50:15
prospective [1] - 14:1
prostate [1] - 127:13
Protection [1] - 211:15
proud [2] - 177:7, 212:18
prove [1] - 129:19
provide [12] - 132:10, 179:5, 179:20, 181:3, 222:14, 224:13, 226:18, 234:7, 239:15, 245:17, 248:16, 252:8
provided [7] - 103:10, 150:14, 167:10, 173:10, 177:3, 179:21, 238:9
provider [2] - 59:15, 238:11
providers [1] - 253:12
provides [4] - 39:14, 193:17, 203:6, 223:21
providing [4] - 81:16, 150:9, 246:13, 251:6
provision [2] - 119:18, 189:17
provisions [2] - 80:4, 112:6
psyche [1] - 78:20
psychologically [1] - 86:5
PT [2] - 9:17, 16:22
public [13] - 28:3, 92:23, 106:11, 112:2, 112:4, 185:15, 210:12, 219:7, 223:22, 250:18, 251:4, 256:23, 258:9
Public [15] - 33:7, 33:11, 210:22, 210:23, 217:1, 223:18, 240:17, 241:1, 242:19, 250:15, 251:3, 251:21, 254:9, 255:5, 257:3
publication [2] - 92:23, 186:9

publicly [3] - 124:3, 219:7, 250:18
publish [1] - 217:14
publishable [1] - 217:12
published [13] - 34:22, 35:4, 35:7, 46:5, 54:10, 54:17, 90:13, 91:22, 128:20, 180:24, 216:8, 216:11, 217:10
pull [4] - 26:15, 147:15, 192:9, 207:13
pulmonologist [1] - 142:13
pulmonologists [2] - 122:9, 140:21
pulse [1] - 53:4
purchase [1] - 224:4
purchased [1] - 210:8
Purdue [7] - 40:11, 41:17, 41:18, 41:20, 42:7, 43:10, 56:25
purely [2] - 92:16, 92:25
purporting [2] - 225:25, 235:18
purpose [18] - 27:22, 60:15, 64:16, 67:5, 80:11, 90:20, 90:24, 94:1, 94:9, 94:10, 95:15, 95:18, 97:5, 98:17, 102:14, 108:11, 124:10, 190:17
purposes [1] - 172:20
pursue [1] - 218:19
pursuits [1] - 211:13
push [1] - 55:9
pushing [3] - 44:17, 44:23, 153:3
put [53] - 10:4, 15:24, 17:21, 22:23, 25:21, 29:4, 30:7, 34:20, 39:10, 43:5, 54:19, 54:21, 58:15, 64:14, 65:7, 65:10, 77:23, 99:3, 104:7, 113:23, 115:13, 122:20, 124:6, 139:5, 139:8, 139:17, 139:18, 144:12, 145:16, 146:2, 146:20, 149:3, 162:3, 164:14, 166:4, 166:16, 166:20, 166:23, 169:5, 175:11, 185:23,

197:22, 203:3, 204:25, 221:22, 235:15, 237:9, 243:14, 243:16, 243:19, 254:13, 260:3
puts [3] - 104:21, 149:5, 239:16
putting [3] - 82:13, 172:25, 192:23

**Q**

qualification [2] - 51:10, 227:19
qualifications [3] - 10:1, 10:3, 34:18
qualified [3] - 36:6, 130:8, 157:20
qualify [3] - 122:24, 123:5
quality [2] - 56:10, 67:8
quantified [1] - 179:4
quantify [4] - 161:2, 162:17, 175:19, 178:8
quantities [1] - 196:23
Quantity [1] - 252:9
quantity [33] - 114:24, 115:1, 244:22, 247:22, 248:8, 249:16, 251:19, 252:4, 252:5, 252:10, 252:11, 252:14, 252:16, 252:17, 252:20, 252:25, 253:3, 254:11, 254:19, 254:22, 254:23, 255:2, 255:4, 255:8, 255:13, 256:1, 256:3, 256:17, 258:19, 258:23, 261:1, 262:2, 262:5
quarter [1] - 74:12
quarterly [1] - 91:2
quarters [1] - 257:22
questioning [1] - 158:4
questions [16] - 96:19, 98:24, 132:8, 133:12, 154:20, 157:11, 161:6, 171:5, 175:5, 189:4, 193:18, 194:13, 203:7, 204:20, 206:19, 239:16
quickly [1] - 245:12
quiet [1] - 192:4

quit [5] - 44:4, 44:5, 85:5, 85:15, 86:3
quite [6] - 61:15, 129:7, 162:22, 202:4, 212:18, 249:20
quote [2] - 208:3, 208:6

**R**

radiation [1] - 127:22
radical [1] - 15:8
Rafferty [1] - 2:10
Rainelle [1] - 178:18
raise [2] - 7:19, 209:11
raised [2] - 122:17, 247:6
raises [1] - 232:22
Raleigh [1] - 41:25
ran [1] - 110:21
Rand [1] - 211:16
range [8] - 21:25, 206:4, 232:9, 234:3, 255:12, 257:20, 257:22, 257:24
ranked [3] - 195:13, 197:14, 212:19
rankings [1] - 194:1
rapid [1] - 30:18
rapidly [1] - 174:10
rate [22] - 53:4, 59:10, 103:24, 104:23, 105:1, 105:9, 105:10, 106:19, 129:10, 131:1, 182:7, 182:11, 182:22, 190:10, 194:8, 196:7, 196:9, 218:12, 218:13, 229:22, 230:2
rated [1] - 54:10
rates [6] - 104:14, 110:18, 155:1, 202:7, 225:21, 229:25
rather [4] - 16:2, 69:18, 132:13, 253:13
rating [1] - 59:11
Rational [1] - 31:22
rationale [1] - 246:5
raw [2] - 237:19, 238:22
Ray [1] - 7:15
re [4] - 99:12, 99:15, 99:17, 171:19
re-adopted [1] - 99:12
re-adoption [2] - 99:15, 99:17

re-word [1] - 171:19
reach [1] - 219:5
reached [3] - 28:18, 28:20, 125:21
reaction [1] - 115:13
read [40] - 32:17, 45:25, 49:3, 55:22, 56:3, 59:2, 61:17, 67:4, 70:25, 74:24, 75:3, 75:25, 79:7, 86:13, 124:24, 147:19, 149:4, 169:24, 173:12, 174:5, 174:7, 174:12, 174:16, 174:22, 181:21, 182:22, 183:4, 183:8, 184:12, 184:18, 188:2, 188:4, 188:8, 189:9, 189:20, 189:21, 190:5, 190:9, 190:13, 199:17
reading [4] - 173:9, 174:4, 175:2, 175:3, 189:24, 198:1, 207:21
reads [1] - 69:9
ready [2] - 7:7, 208:24
real [9] - 14:22, 27:4, 43:8, 88:18, 107:5, 118:8, 128:25, 209:3, 219:23
realize [3] - 140:25, 156:25, 158:1
realized [2] - 12:15, 15:16
really [72] - 8:22, 9:1, 12:7, 13:19, 15:10, 15:11, 16:3, 18:6, 21:18, 22:2, 24:1, 24:15, 24:17, 24:20, 25:6, 25:11, 25:13, 28:12, 29:15, 38:1, 38:9, 39:2, 40:7, 41:10, 42:9, 43:2, 43:7, 45:18, 46:2, 46:15, 47:3, 47:20, 47:24, 52:13, 53:2, 58:1, 69:17, 71:14, 79:22, 105:24, 109:10, 112:19, 112:20, 114:11, 114:12, 115:17, 115:23, 116:2, 118:3, 118:22, 119:10, 121:4, 126:18, 127:1, 139:17, 162:3, 173:25, 187:5,

200:5, 200:10, 200:12, 200:25, 201:5, 201:6, 201:7, 201:10, 201:18, 202:3, 206:10, 219:3, 246:4, 251:11
**reason** [18] - 12:9, 12:18, 12:22, 19:6, 22:1, 37:3, 50:17, 58:2, 63:7, 128:20, 139:2, 177:25, 184:23, 191:9, 236:20, 253:1, 253:4, 258:18
**reasonable** [6] - 39:5, 48:17, 78:5, 79:24, 101:6, 142:7
**reasonably** [4] - 62:11, 72:25, 101:3, 103:17
**reasons** [9] - 12:7, 24:15, 53:17, 85:25, 86:1, 134:15, 134:25, 135:10, 171:16
**reassess** [2] - 115:4, 120:10
**receive** [13] - 19:2, 19:3, 33:25, 67:8, 74:10, 102:25, 131:20, 152:9, 152:12, 219:10, 238:7, 239:17, 243:24
**received** [17] - 27:6, 47:13, 74:6, 87:17, 90:16, 91:23, 110:24, 111:4, 111:12, 111:25, 152:4, 152:7, 195:4, 214:21, 216:2, 216:3, 216:5
**receiving** [10] - 59:6, 76:10, 109:11, 113:2, 116:23, 125:21, 152:8, 152:11, 239:23, 240:5
**recent** [3] - 22:4, 121:17, 251:20
**recently** [2] - 134:17, 181:22
**receptors** [1] - 85:18
**recertify** [1] - 102:9
**recess** [2] - 77:7, 204:14
**Recess** [3] - 77:9, 132:21, 204:15
**recessed** [1] - 263:16
**recognize** [2] - 54:23,

85:2
**recognized** [3] - 89:3, 122:7, 248:21
**recognizes** [1] - 67:12
**recollection** [3] - 102:24, 118:5, 252:8
**recommend** [1] - 137:5
**recommendation** [2] - 68:19, 87:22
**recommendations** [5] - 28:1, 90:6, 114:23, 126:16, 186:8
**recommended** [1] - 73:25
**recommending** [1] - 123:25
**record** [20] - 26:6, 59:14, 65:13, 75:3, 76:14, 90:21, 90:24, 96:17, 98:17, 98:19, 102:14, 108:11, 122:21, 123:9, 123:11, 169:2, 170:4, 218:22, 219:6, 264:5
**recorded** [1] - 6:19
**records** [20] - 20:8, 20:13, 69:12, 76:16, 126:24, 169:17
**recover** [1] - 232:23
**red** [4] - 27:5, 199:6, 199:16, 243:20
**REDIRECT** [1] - 204:22
**redirect** [1] - 207:10
**reduce** [7] - 18:9, 121:6, 128:10, 172:18, 201:15, 204:4, 248:8
**reduced** [4] - 19:13, 41:12, 125:12, 201:24
**reduces** [1] - 248:19
**reducing** [2] - 248:10, 249:2
**Reduction** [2] - 118:7, 118:11, 121:14
**reduction** [2] - 125:18
**Reed** [2] - 6:4, 6:11
**reestablishes** [1] - 200:5
**refer** [8] - 71:11, 72:17, 97:23, 143:24, 213:1, 224:16, 229:25, 230:4
**reference** [4] - 71:3, 80:18, 81:7, 110:2
**referenced** [2] -

101:16, 114:5
**references** [5] - 69:23, 69:24, 72:4, 81:3, 97:12
**referencing** [1] - 207:7
**referral** [21] - 18:18, 19:3, 19:23, 20:11, 20:13, 40:25, 100:22, 101:9, 106:13, 123:4, 126:5, 127:5, 127:9, 131:20, 194:3, 200:4, 200:6, 203:18, 203:23, 203:24
**referral-only** [2] - 40:25, 200:4
**referrals** [3] - 17:25, 43:13, 127:10
**referred** [12] - 9:21, 34:1, 48:8, 82:18, 101:9, 101:11, 107:13, 112:6, 116:24, 165:20, 210:16, 230:5
**referring** [6] - 40:10, 64:19, 69:18, 127:8, 127:24, 203:12
**refers** [5] - 80:7, 140:12, 222:21, 243:23
**refilled** [1] - 128:15
**refills** [1] - 119:20
**reflect** [6] - 201:22, 226:14, 235:22, 246:9, 250:3, 258:24
**reflected** [1] - 79:16
**reflecting** [2] - 237:10, 237:11
**reflection** [1] - 203:24
**reflective** [1] - 25:24
**reflects** [2] - 164:21, 259:4
**refresh** [3] - 86:13, 118:5, 252:7
**regard** [1] - 110:8
**regarding** [5] - 38:1, 103:8, 235:7, 248:12, 259:14
**region** [2] - 36:23, 208:12
**Registered** [1] - 83:19
**registered** [1] - 140:18
**registrants** [1] - 152:13
**regulations** [3] - 98:25, 211:23, 223:13
**regulatory** [2] - 28:24, 211:21

reimburse [13] - 232:14, 233:20, 233:24, 233:25, 235:14, 236:8, 241:8, 241:13, 247:15, 247:25, 248:2, 249:24, 257:16
**reimbursed** [10] - 230:5, 233:16, 236:23, 238:19, 240:6, 241:14, 243:9, 245:3, 245:25
**reimbursement** [10] - 229:2, 229:22, 229:25, 230:2, 233:6, 233:9, 233:12, 234:25, 236:25, 239:3
**reimbursements** [1] - 234:13
**reimburses** [1] - 236:21
**reimbursing** [3] - 234:22, 235:17, 240:2
**reinforcement** [1] - 89:11
**reissuance** [1] - 99:9
**reject** [2] - 236:15, 236:20
**relate** [1] - 220:3
**related** [24] - 22:17, 26:23, 33:18, 35:21, 64:11, 65:3, 68:3, 86:25, 98:5, 108:5, 112:7, 117:23, 143:3, 153:20, 155:17, 156:15, 216:14, 217:15, 219:24, 220:10, 220:22, 221:9, 240:21, 256:5
**relating** [3] - 35:1, 79:12, 257:3
**relation** [3] - 241:3, 242:1, 260:23
**relationship** [3] - 100:8, 153:20, 219:17
**relatively** [1] - 255:17
**released** [1] - 116:9
**relevant** [2] - 80:4, 98:15
**reliable** [2] - 225:13, 229:15
**reliance** [2] - 93:1, 93:7
**relied** [6] - 72:25, 73:15, 82:15, 82:17,

93:7, 229:7
**relief** [3] - 59:17, 62:7, 66:10
**Relief** [1] - 180:9
**relieve** [1] - 80:14
**relieving** [2] - 80:10, 80:16
**rely** [6] - 32:12, 96:6, 116:17, 225:7, 225:10, 229:10
**relying** [1] - 249:22
**remaining** [1] - 227:3
**remember** [11] - 48:8, 57:2, 63:18, 103:3, 112:16, 118:2, 153:8, 176:9, 180:10, 228:15, 253:25
**remembering** [1] - 213:22
**remind** [1] - 107:4
**remotely** [1] - 47:4
**removed** [1] - 89:6
**renew** [1] - 102:25
**renown** [1] - 216:6
**repair** [1] - 61:14
**repeat** [6] - 63:19, 93:21, 135:4, 136:19, 146:15, 156:3
**rephrase** [2] - 52:2, 81:23
**replace** [3] - 57:14, 235:19, 249:18
**replaced** [2] - 9:11, 57:12
**replacement** [2] - 58:1, 61:14
**replacements** [1] - 57:13
**replacing** [2] - 9:10, 9:11
**report** [18] - 51:12, 82:13, 104:10, 124:1, 124:3, 124:10, 128:2, 128:3, 137:18, 157:25, 158:5, 175:25, 176:21, 179:22, 184:12, 221:24, 252:8, 256:20
**Report** [1] - 123:24
**reported** [3] - 59:12, 109:23, 264:9
**Reporter** [6] - 6:17, 6:18, 264:3, 264:12
**REPORTER** [19] - 17:9, 17:12, 17:15, 17:17, 30:18, 30:21,

30:24, 62:19, 62:22, 146:8, 148:6, 148:9, 151:4, 151:13, 156:7, 158:13, 164:5, 194:20, 201:17
**reporter** [2] - 30:12, 161:25
**reporting** [2] - 153:18, 153:19
**reports** [4] - 211:20, 219:7, 242:3, 248:25
**represent** [1] - 202:22
**representative** [1] - 202:3
**represents** [1] - 59:12
**reputation** [1] - 212:16
**request** [1] - 43:19
**requested** [3] - 28:22, 131:16, 176:23
**require** [7] - 108:25, 178:23, 247:5, 247:9, 255:25, 257:14, 262:4
**required** [14] - 13:13, 53:16, 101:25, 109:20, 110:7, 110:9, 119:22, 120:15, 245:17, 253:22, 254:1, 254:19, 255:2, 255:22
**requirement** [11] - 109:4, 109:6, 112:22, 112:23, 228:5, 228:7, 228:20, 232:25, 253:6, 254:21, 260:1
**requirements** [8] - 21:4, 53:18, 108:15, 113:7, 121:21, 253:5, 255:15, 258:11
**Research** [4] - 219:13, 219:14, 219:15, 249:7
**research** [32] - 24:20, 24:21, 25:15, 34:13, 35:19, 40:16, 41:21, 49:15, 49:16, 55:17, 129:20, 129:24, 129:25, 175:20, 181:19, 185:14, 201:20, 212:21, 215:20, 215:23, 215:24, 216:2, 216:4, 216:14, 216:18, 216:19, 216:22, 217:4,

217:7, 217:15, 219:21, 219:22
**researched** [1] - 218:20
**researchers** [3] - 188:24, 212:22, 225:16
**resemblance** [1] - 199:25
**reserve** [1] - 63:14
**residency** [4] - 11:7, 11:9, 15:13, 15:23
**residents** [4] - 27:18, 35:8, 106:19, 198:24
**resolved** [1] - 164:23
**respect** [6] - 92:20, 112:11, 161:12, 227:25, 233:12, 251:7
**respected** [2] - 54:14, 54:17
**respiratory** [1] - 53:4
**respond** [3] - 24:25, 98:17, 244:7
**responding** [1] - 18:8
**response** [4] - 162:23, 164:13, 186:10, 252:1
**responsibility** [2] - 94:16, 215:9
**Responsible** [4] - 32:23, 102:11, 146:22, 172:8
**rest** [2] - 74:24, 90:1
**restricting** [1] - 115:22
**restrictions** [2] - 260:3, 261:13
**restrictive** [1] - 32:16
**result** [1] - 162:12
**resulted** [2] - 114:14, 121:18
**results** [6] - 161:18, 172:25, 174:4, 174:9, 235:6
**resume** [2] - 132:22, 204:17
**resumed** [2] - 77:10, 204:16
**retail** [1] - 228:25
**retire** [1] - 13:8, 213:4
**retired** [4] - 23:22, 213:2, 213:6, 213:15
**retribution** [1] - 80:25
**retrospect** [3] - 137:6, 167:4, 169:20
**retrospective** [1] - 235:10
**Review** [1] - 110:2
**review** [18] - 13:21, 20:8, 26:5, 88:23,

91:11, 91:24, 110:25, 111:17, 151:18, 186:1, 186:7, 186:11, 191:3, 224:20, 228:25, 235:10, 240:24, 245:19
**reviewed** [17] - 82:12, 84:6, 110:20, 110:22, 155:13, 186:3, 186:5, 186:6, 215:16, 216:10, 218:21, 218:22, 240:10, 240:18, 240:21, 248:12, 259:14
**reviewers** [1] - 186:13
**reviewing** [1] - 162:18
**reviews** [4] - 234:20, 235:4, 238:6
**revision** [1] - 18:16
**Rhode** [1] - 218:9
**Rice** [6] - 4:3, 4:5, 4:8, 4:11, 4:14, 205:9
**Rick** [1] - 28:22
**rid** [3] - 78:20, 128:12, 202:13
**right-hand** [2] - 222:11, 226:3
**RIP** [1] - 13:13
**rising** [1] - 196:7
**risk** [4] - 105:12, 120:18, 201:21, 251:16
**risks** [2] - 115:4, 120:16
**Ritter** [1] - 205:9
**river** [1] - 158:25
**River** [1] - 12:19
**RMR** [2] - 6:17, 6:18
**Roane** [1] - 41:25
**rob** [1] - 86:6
**ROBERT** [1] - 6:11
**Robert** [1] - 216:5
**ROBERTSON** [1] - 3:6
**role** [17] - 54:7, 84:22, 101:19, 106:17, 117:11, 211:2, 213:15, 215:3, 215:7, 215:19, 221:19, 221:20, 223:9, 235:3, 262:3, 262:8, 262:12
**roles** [5] - 22:18, 22:19, 24:20, 34:25, 63:23
**roll** [1] - 220:17
**Ronceverte** [1] - 178:18
**room** [2] - 60:6, 77:12

**root** [1] - 144:2
**rotate** [1] - 35:12
**rotation** [1] - 15:22
**rotator** [1] - 61:14
**roughly** [9] - 228:9, 228:16, 232:8, 250:22, 256:19, 257:5, 257:20, 257:22, 257:24
**rounds** [1] - 42:1
**routine** [1] - 59:8
**routinely** [1] - 52:6
**row** [2] - 226:3, 226:7
**Rowlingson** [1] - 12:1
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**RUBY** [1] - 4:22
**Ruby** [1] - 4:23
**rule** [4] - 71:13, 76:16, 136:13, 251:19
**rules** [5] - 45:8, 49:14, 223:15, 245:2, 261:3
**ruling** [1] - 63:14
**run** [3] - 159:5, 225:5, 241:21
**running** [1] - 176:7
**runs** [1] - 26:9
**Russell** [2] - 70:5, 70:19

**S**

**s\Ayme** [1] - 264:11
**s\Lisa** [1] - 264:11
**sacral** [1] - 144:2
**Safe** [1] - 28:7
**safe** [2] - 13:19, 228:21
**safer** [1] - 68:25
**SALGADO** [1] - 4:20
**sample** [1] - 205:18
**San** [2] - 2:5, 2:14
**sanctions** [2] - 80:7, 80:9
**Santrock** [1] - 57:12
**save** [1] - 25:4
**saw** [21] - 15:25, 40:3, 41:10, 41:11, 41:14, 44:12, 46:12, 47:25, 52:11, 52:14, 61:16, 61:24, 100:21, 100:23, 109:12, 117:6, 128:5, 128:6, 176:6, 232:4, 253:9
**SC** [3] - 4:4, 4:12, 4:15
**scaffolding** [1] - 89:5
**scale** [1] - 59:11
**scar** [1] - 14:12
**scared** [1] - 47:3

**Schedule** [4] - 118:25, 123:19, 124:25, 195:3
**schematic** [2] - 221:22, 221:23
**scheme** [1] - 214:4
**SCHMIDT** [1] - 5:9
**scholarship** [1] - 10:20
**school** [7] - 10:12, 10:24, 11:1, 52:5, 52:16, 85:25, 223:22
**School** [5] - 10:13, 31:23, 159:6, 216:25, 217:1
**schooling** [1] - 11:18
**schools** [2] - 35:14, 52:11
**science** [1] - 185:23
**scientists** [1] - 24:3
**scope** [14] - 51:10, 81:17, 135:19, 135:20, 156:20, 156:23, 158:5, 158:8, 167:25, 171:4, 171:8, 188:13, 188:15, 219:4
**score** [1] - 59:13
**screen** [23] - 20:13, 43:15, 47:15, 47:16, 54:20, 56:15, 56:16, 58:12, 58:13, 58:15, 60:12, 64:15, 65:8, 77:23, 104:8, 123:22, 124:7, 164:23, 166:16, 166:21, 166:24, 192:23
**Screening** [1] - 59:2
**screening** [1] - 59:8
**scroll** [1] - 30:8
**seat** [2] - 7:23, 209:14
**Seattle** [1] - 163:1
**secession** [1] - 113:18
**second** [26] - 7:11, 15:18, 15:22, 22:23, 35:5, 44:11, 44:13, 67:1, 73:11, 80:2, 84:18, 88:25, 90:19, 105:3, 107:2, 107:4, 107:13, 136:12, 180:22, 184:9, 196:15, 212:20, 223:2, 246:14, 247:6, 257:11
**Secondly** [1] - 244:21
**secondly** [3] - 12:9, 12:17, 219:4
**section** [12] - 59:1,

59:2, 69:23, 118:20,
145:19, 172:13,
174:5, 186:25,
191:8, 191:10,
191:15, 192:6
**Section** [2] - 59:1,
190:13
**sections** [2] - 8:19,
84:21
**securing** [1] - 22:4
**See** [1] - 120:7
**see** [90] - 14:7, 17:6,
18:7, 19:10, 19:25,
20:4, 20:7, 20:13,
21:25, 22:1, 28:11,
29:5, 29:25, 40:23,
43:18, 43:20, 46:16,
46:17, 46:21, 48:7,
48:9, 50:10, 52:1,
52:14, 52:20, 52:21,
55:16, 61:8, 66:22,
69:16, 70:11, 71:25,
77:14, 83:21, 83:22,
94:23, 101:14,
107:7, 108:18,
109:17, 111:24,
117:2, 117:4, 117:7,
117:21, 119:25,
120:14, 125:22,
125:25, 128:17,
129:22, 131:22,
132:19, 138:16,
143:1, 150:4,
154:16, 155:5,
155:11, 160:5,
166:13, 168:3,
168:25, 173:12,
181:18, 182:8,
182:14, 182:23,
183:2, 184:2,
184:10, 189:7,
195:18, 196:1,
196:2, 196:4, 199:8,
200:7, 203:21,
222:2, 222:4,
227:24, 251:20,
256:16, 256:18,
259:3, 261:20,
262:24, 263:14
**seeing** [24] - 27:8,
42:11, 44:9, 44:15,
44:22, 107:5,
107:10, 111:16,
121:23, 125:24,
126:2, 128:15,
131:16, 131:25,
182:12, 184:3,
184:5, 193:2,
203:14, 203:16,
203:23, 203:25,

204:7, 230:9
**seeking** [1] - 258:6
**seem** [1] - 162:20
**sees** [1] - 195:10
**seizure** [1] - 85:16
**select** [1] - 88:12
**selected** [1] - 67:14
**self** [1] - 92:24
**self-authenticating**
[1] - 92:24
**sell** [2] - 222:24, 224:3
**selling** [2] - 169:17,
200:18
**seminal** [1] - 70:22
**seminar** [1] - 102:7
**SEMP** [25] - 28:8,
29:11, 31:9, 31:12,
31:17, 32:3, 32:12,
33:17, 46:4, 48:12,
115:13, 115:23,
116:4, 116:7,
116:11, 116:12,
116:15, 116:18,
117:11, 117:19,
125:11, 126:13,
145:5, 150:13,
203:19
**Senate** [1] - 108:12
**send** [8] - 17:6, 18:7,
18:13, 18:14, 20:7,
27:5, 29:5, 120:7
**sending** [2] - 117:3,
203:20
**SENIOR** [1] - 1:17
**Senior** [1] - 7:2
**Sensabaugh** [1] - 5:14
**sense** [5] - 36:10,
127:24, 160:17,
208:9, 211:5
**sent** [15] - 18:11, 19:6,
41:2, 46:16, 46:17,
91:9, 91:25, 93:9,
93:25, 100:23,
101:13, 107:7,
117:7, 131:22, 144:3
**sentence** [14] - 81:9,
81:13, 82:18, 82:20,
82:22, 86:11, 87:19,
88:5, 88:9, 89:1,
182:6, 182:7,
189:12, 189:13
**separate** [2] - 161:11,
180:24
**September** [2] - 76:7,
163:3
**serious** [2] - 14:5,
140:12
**serious-type** [1] -
140:12
**seriously** [1] - 56:6

**serve** [3] - 174:25,
215:12, 217:20
**served** [4] - 96:25,
97:5, 108:4, 215:5
**serves** [1] - 59:15
**service** [1] - 238:9
**services** [12] - 210:3,
210:14, 214:12,
222:25, 224:3,
224:12, 233:1,
233:3, 233:5,
233:11, 237:20,
260:15
**Services** [1] - 179:23
**serving** [1] - 21:5
**set** [10] - 32:18, 34:10,
142:8, 142:18,
143:2, 145:4, 222:2,
236:2, 243:14,
243:16
**sets** [1] - 261:3
**setting** [2] - 70:10,
118:24
**seven** [1] - 119:7
**seven-day** [1] - 119:7
**several** [18] - 18:22,
33:8, 41:23, 45:20,
47:11, 53:24, 54:1,
76:3, 95:12, 107:20,
115:9, 157:12,
169:21, 171:5,
188:14, 216:3,
216:15, 218:5
**several-day** [1] -
115:9
**severe** [5] - 14:13,
16:20, 78:19, 98:3,
107:18
**severer** [1] - 83:8
**Shah** [1] - 21:13
**shall** [1] - 80:2
**SHANNON** [1] - 6:3
**share** [1] - 141:12
**shift** [10] - 16:4, 25:17,
32:18, 44:11, 66:14,
94:21, 103:21,
107:2, 117:6, 128:25
**shifted** [2] - 60:24,
61:20
**shipment** [2] - 167:17,
169:10
**shock** [1] - 200:22
**shoppers** [1] - 174:20
**shopping** [2] - 27:1,
109:10
**short** [5] - 42:11,
52:20, 68:9, 245:8,
252:12
**short-acting** [3] -
52:20, 68:9, 252:12

**short-term** [1] - 42:11
**shoulder** [4] - 61:9,
61:10, 61:11, 61:14
**show** [16] - 33:12,
83:13, 123:22,
125:8, 132:1,
173:17, 184:2,
185:3, 201:16,
225:19, 225:25,
226:1, 227:9,
229:20, 243:20,
254:17
**showed** [1] - 128:22
**showing** [1] - 257:5
**shown** [6] - 13:19,
123:11, 241:11,
249:7, 253:16, 254:6
**shows** [16] - 65:14,
121:20, 125:10,
125:13, 126:6,
128:3, 129:12,
157:11, 176:7,
198:9, 201:20,
226:2, 226:3, 226:8,
229:22, 254:18
**SI** [1] - 9:7
**sic** [3] - 57:6, 141:24,
169:24
**side** [7] - 69:21, 73:5,
74:1, 107:16,
120:20, 222:2, 226:3
**sides** [2] - 14:7, 32:16
**sieve** [1] - 128:13
**Sign** [1] - 58:19
**sign** [21] - 27:19,
44:20, 52:18, 52:25,
53:10, 53:12, 53:19,
53:25, 56:9, 57:8,
59:4, 60:9, 62:3,
65:22, 66:4, 68:19,
130:11, 184:24,
187:8, 187:16,
228:24
**signal** [3] - 24:23,
156:11, 200:23
**signed** [2] - 185:5,
191:12
**significant** [2] - 125:1,
259:1
**significantly** [1] -
173:5
**signify** [1] - 222:9
**signs** [3] - 47:14, 56:6,
56:7
**similar** [1] - 78:12
**similarly** [2] - 251:2,
258:10, 258:15
**Simmons** [1] - 169:24
**simple** [2] - 16:21,
43:24

**simply** [4] - 193:12,
213:14, 246:18,
247:24
**SINGER** [1] - 4:8
**single** [1] - 255:4
**sit** [2] - 78:14, 170:12
**situation** [7] - 48:18,
107:11, 135:2,
142:8, 218:20,
218:21, 246:23
**six** [9] - 19:6, 22:1,
48:10, 181:14,
181:16, 206:1,
206:3, 206:9, 215:6
**skip** [1] - 90:23
**sleep** [3] - 139:5,
139:8, 139:17,
139:18
**Slide** [2] - 10:5, 34:20
**slide** [8] - 10:7, 22:24,
23:1, 25:22, 39:11,
65:2, 104:4, 104:11
**Slider's** [1] - 208:17
**slides** [2] - 10:2, 42:17
**slow** [5] - 17:9, 148:6,
162:6, 162:9, 201:17
**small** [10] - 9:6, 14:9,
14:16, 33:9, 173:23,
173:25, 175:22,
181:9, 212:15,
255:17
**smaller** [2] - 56:13,
208:11
**smart** [2] - 84:24,
189:1
**smear** [1] - 142:23
**Smith** [2] - 6:4, 6:11
**smokers** [1] - 104:24
**societies** [10] - 23:4,
24:17, 38:9, 38:24,
41:23, 54:7, 73:20,
73:22, 116:5
**society** [10] - 14:24,
24:13, 25:4, 25:14,
52:25, 54:2, 54:6,
55:2, 172:22, 191:20
**Society** [14] - 23:7,
23:16, 23:20, 24:1,
24:11, 33:22, 54:2,
54:5, 54:14, 54:24,
55:3, 55:11, 57:4,
146:21
**software** [1] - 201:6
**solution** [3] - 41:22,
43:17, 114:8
**solutions** [4] - 29:7,
41:7, 44:7, 116:25
**someone** [39] - 17:5,
18:3, 21:16, 21:18,
21:25, 22:1, 26:18,

29:5, 45:3, 46:1,
48:2, 49:25, 61:9,
61:13, 69:15, 69:20,
73:4, 80:22, 84:24,
85:2, 85:14, 88:22,
88:23, 101:14,
119:1, 119:10,
120:6, 121:5,
135:24, 137:5,
154:6, 154:7,
161:15, 188:20,
191:10, 191:20,
192:7, 210:8
**sometime** [2] -
133:17, 203:25
**Sometimes** [2] -
106:12, 129:18
**sometimes** [22] - 9:5,
19:1, 30:14, 47:19,
47:20, 48:1, 50:10,
88:22, 101:13,
106:13, 106:23,
127:21, 127:22,
136:22, 143:4,
160:3, 204:2, 204:3,
210:16, 215:14,
257:10, 259:22
**somewhat** [4] - 121:8,
223:12, 227:22,
254:25
**somewhere** [4] - 36:8,
159:23, 191:15,
217:25
**sore** [1] - 162:20
**Sorry** [4] - 143:20,
220:16, 225:23,
261:11
**sorry** [55] - 17:11,
24:10, 30:10, 30:23,
51:8, 55:24, 62:19,
62:21, 62:23, 76:24,
81:21, 87:11, 92:12,
136:14, 136:20,
141:21, 143:10,
144:19, 146:8,
146:18, 147:10,
148:6, 148:8,
149:18, 151:4,
151:9, 156:2, 156:5,
156:7, 156:22,
158:13, 164:5,
166:22, 172:10,
178:3, 182:13,
182:23, 182:24,
194:20, 198:15,
201:18, 201:19,
212:10, 214:18,
220:16, 226:7,
227:7, 231:22,
231:24, 243:17,

252:15, 256:8,
256:10, 261:10,
261:11
**sort** [5] - 16:21, 24:12,
110:18, 229:2, 232:5
**sound** [1] - 34:8
**sounds** [2] - 47:10,
50:6
**source** [6] - 224:23,
224:24, 225:13,
229:4, 229:15,
237:12
**sources** [2] - 127:10,
203:12
**South** [1] - 2:11
**Southern** [2] - 7:3,
16:9, 18:3, 202:2,
260:11
**SOUTHERN** [1] - 1:1
**southern** [3] - 120:9,
126:5, 128:7
**Sowell** [3] - 212:24,
213:9, 213:11
**spacer** [2] - 18:13,
18:14
**span** [1] - 217:8
**Spanish** [2] - 49:3,
49:4
**spare** [1] - 42:16
**speaker** [2] - 42:3,
103:11
**speakers** [1] - 42:22
**speaking** [9] - 17:13,
30:11, 43:4, 43:6,
225:11, 232:8,
233:4, 257:20
**special** [1] - 210:4
**specialist** [9] - 69:19,
106:14, 122:7,
131:17, 139:3,
142:17, 187:17,
198:3
**specialist's** [1] -
106:16
**specialists** [5] - 22:10,
106:5, 106:22,
198:2, 198:8
**specialize** [2] - 15:3,
205:21
**specializes** [1] -
209:24
**specialties** [4] -
127:17, 143:9,
157:6, 205:20
**specialty** [11] - 11:9,
27:15, 122:6,
122:24, 139:21,
142:21, 143:3,
143:4, 198:8, 199:4,
209:23

**specific** [14] - 18:15,
18:23, 63:2, 110:4,
152:18, 153:16,
154:19, 155:15,
159:19, 167:12,
193:10, 220:1,
240:15, 256:17
**specifically** [13] -
18:11, 28:17, 36:2,
38:3, 40:10, 94:13,
155:14, 158:22,
159:9, 159:11,
180:19, 213:24,
260:11
**speech** [1] - 30:9
**speeches** [1] - 144:22
**speed** [1] - 30:9
**spelled** [1] - 184:15
**spend** [3] - 20:19,
35:18, 116:25
**spent** [2] - 24:1, 107:1
**spinal** [6] - 9:7, 9:8,
24:4, 55:15, 128:10
**Spine** [2] - 16:6, 180:7
**spine** [10] - 9:12,
15:23, 15:24, 17:2,
17:24, 54:11,
104:21, 127:11,
201:7, 202:23
**spinous** [1] - 18:13
**spoken** [1] - 192:5
**sponsor** [4] - 42:2,
42:4, 223:6, 224:9
**sponsored** [4] - 41:23,
42:20, 102:7, 226:20
**sponsoring** [1] -
42:14
**sponsors** [12] - 222:8,
222:13, 222:14,
222:17, 222:25,
223:1, 223:4,
223:24, 224:1,
224:15, 232:24,
237:6
**spread** [1] - 208:4
**Square** [2] - 6:5, 6:12
**SRI** [1] - 211:16
**Sri** [1] - 24:9
**st** [1] - 158:22
**St** [8] - 18:12, 20:25,
21:6, 22:11, 41:24,
159:4, 159:19, 179:2
**Staats** [1] - 172:13
**staff** [5] - 15:6,
215:18, 219:10,
219:12, 234:11
**stand** [5] - 132:22,
133:10, 170:2,
204:17, 209:7
**standard** [146] - 7:10,

7:11, 34:3, 34:12,
34:17, 37:6, 37:9,
37:24, 39:5, 40:23,
45:13, 48:14, 48:17,
48:19, 49:1, 49:5,
49:7, 49:11, 49:18,
49:21, 50:5, 50:8,
50:12, 50:22, 51:5,
51:10, 51:20, 52:1,
52:6, 60:22, 60:25,
61:5, 61:22, 61:23,
62:10, 64:23, 65:3,
71:17, 81:8, 83:1,
92:21, 97:4, 97:6,
97:19, 98:14, 100:8,
100:13, 101:6,
101:19, 103:15,
107:2, 114:4,
114:14, 117:12,
117:14, 121:15,
121:19, 126:8,
129:5, 129:9,
129:14, 129:16,
129:21, 130:1,
130:10, 130:12,
130:13, 130:15,
130:18, 130:19,
130:21, 130:23,
134:23, 135:10,
137:3, 141:11,
141:13, 141:14,
141:18, 141:25,
142:7, 142:8,
142:11, 142:14,
142:18, 142:21,
143:2, 143:6,
144:11, 144:14,
144:24, 145:10,
145:11, 145:22,
145:23, 146:4,
146:24, 147:20,
147:21, 147:22,
147:24, 147:25,
148:1, 148:13,
148:15, 148:18,
148:19, 148:20,
148:21, 148:22,
148:23, 148:25,
149:1, 149:3, 155:1,
157:5, 157:22,
158:15, 158:21,
159:25, 160:1,
160:6, 160:13,
160:14, 160:23,
160:24, 161:9,
161:13, 161:18,
162:12, 171:11,
171:15, 171:18,
183:16, 186:12,
235:8, 235:15,
236:1, 236:3, 250:5,

250:8, 256:22,
258:24, 259:1, 259:4
**standards** [10] -
48:20, 60:8, 60:9,
60:14, 60:16, 61:22,
64:10, 101:6, 144:9,
235:2
**standpoint** [1] -
185:23
**stands** [3] - 131:8,
184:13, 254:20
**Stanford** [1] - 35:18
**STANNER** [1] - 5:10
**start** [13] - 23:6, 25:25,
30:1, 77:25, 83:16,
106:22, 132:13,
144:5, 166:5,
200:17, 203:10,
222:11, 233:9
**started** [18] - 39:24,
40:1, 42:11, 44:9,
44:15, 44:17, 52:24,
57:1, 107:5, 107:10,
117:1, 128:16,
138:15, 138:19,
184:5, 203:20,
212:1, 218:17
**starting** [9] - 44:22,
52:19, 52:21, 68:20,
80:2, 164:15, 169:5,
182:14, 257:24
**starts** [4] - 79:7, 88:5,
176:9, 185:10
**State** [24] - 28:1,
29:19, 32:5, 32:6,
43:5, 69:1, 76:9,
87:16, 90:4, 90:8,
90:13, 90:17, 91:8,
131:21, 176:24,
194:2, 194:4,
200:15, 210:22,
212:2, 218:8, 218:9,
223:5, 241:20
**state** [45] - 7:13,
21:14, 22:9, 22:14,
22:15, 31:16, 32:2,
32:14, 33:9, 38:23,
39:23, 46:14, 47:2,
48:12, 80:9, 94:15,
100:16, 102:6,
104:17, 105:8,
107:6, 116:3, 120:2,
132:2, 135:5,
135:18, 136:25,
141:2, 141:7,
170:22, 177:7,
195:23, 196:2,
209:9, 223:9,
223:11, 223:12,
223:13, 224:25,

230:9, 234:17, 242:21, 248:5, 255:6, 261:3

**statement** [62] - 55:4, 55:20, 64:11, 64:18, 64:21, 64:22, 66:10, 66:19, 67:5, 67:11, 68:14, 69:4, 69:13, 74:20, 74:22, 74:25, 75:20, 75:25, 76:21, 81:3, 84:3, 84:4, 84:6, 84:16, 86:24, 87:4, 87:9, 87:13, 89:11, 89:17, 92:16, 97:4, 99:4, 99:6, 99:10, 99:15, 99:21, 100:4, 137:15, 140:9, 140:10, 141:4, 141:5, 146:6, 146:17, 156:18, 163:11, 163:16, 163:19, 166:12, 167:8, 168:13, 183:10, 184:20, 185:25, 188:10, 188:24, 190:9, 190:19, 190:23, 256:21

**Statement** [10] - 73:13, 74:2, 76:5, 76:8, 76:11, 79:18, 83:14, 83:16, 83:17, 207:9

**statements** [2] - 73:24, 100:7

**States** [8] - 7:2, 53:2, 179:11, 183:6, 184:14, 210:14, 211:14, 214:7

**STATES** [2] - 1:1, 1:17

**states** [8] - 105:7, 116:3, 119:15, 260:22, 260:25, 261:2, 261:4, 261:8

**statewide** [2] - 227:21, 227:23

**static** [1] - 49:11

**station** [1] - 197:12

**statistics** [4] - 179:18, 179:21, 193:11, 193:22

**stats** [3] - 192:11, 193:2, 193:10

**Status** [1] - 7:2

**STATUS** [1] - 1:17

**stay** [2] - 11:24, 49:14

**stayed** [3] - 57:24, 106:15, 106:23

**staying** [1] - 105:8

**steal** [1] - 86:5

**stenography** [1] - 6:19

**stenosis** [2] - 9:7, 20:5

**Step** [1] - 247:7

**step** [33] - 45:12, 77:5, 82:5, 113:16, 113:19, 192:1, 204:12, 236:19, 244:22, 247:6, 247:9, 247:17, 249:16, 250:1, 251:19, 253:5, 253:6, 253:10, 253:14, 253:22, 253:25, 254:11, 254:19, 254:21, 255:15, 255:18, 255:22, 255:25, 258:19, 258:22, 258:23, 262:5

**steps** [2] - 250:2, 251:25

**Steve** [1] - 206:21

**STEVEN** [1] - 4:22

**stick** [2] - 90:25, 162:20

**still** [23] - 12:21, 55:14, 55:16, 67:24, 80:23, 81:10, 82:24, 107:18, 113:20, 120:11, 137:21, 137:22, 137:25, 138:1, 138:8, 138:11, 171:17, 182:16, 184:1, 184:2, 184:4, 184:6, 207:21

**stimulation** [3] - 54:11, 187:4, 187:10

**stimulators** [3] - 24:4, 24:5, 200:20

**stint** [2] - 9:11, 15:9

**stop** [6] - 42:6, 42:20, 43:11, 86:16, 170:23, 223:2

**stopped** [1] - 177:12

**stops** [1] - 200:23

**strategy** [3] - 43:21, 59:5, 59:8

**street** [1] - 131:16

**Street** [15] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:19, 4:21, 4:24, 5:5, 5:12, 6:6, 6:13

**strength** [1] - 196:21

**stretch** [1] - 78:17

**stricken** [2] - 169:22, 170:4

**strict** [1] - 259:24

**strictly** [2] - 252:16, 253:18

**strike** [2] - 170:6, 233:9

**striking** [1] - 48:11

**strip** [1] - 208:17

**strip-miner** [1] - 208:17

**strong** [1] - 256:21

**strongest** [2] - 244:20, 245:9

**struck** [1] - 96:21

**structured** [1] - 214:2

**stuck** [1] - 29:6

**student** [2] - 52:14, 215:1

**students** [6] - 19:15, 20:23, 35:12, 35:14, 85:25, 201:16

**studied** [1] - 189:25

**studies** [7] - 13:14, 172:1, 202:22, 217:2, 248:18, 248:24

**Studies** [1] - 211:7

**study** [10] - 13:18, 14:1, 24:22, 128:21, 172:25, 176:21, 210:2, 210:12, 212:19, 225:3

**studying** [2] - 236:11, 239:9

**stuff** [1] - 185:14

**sub** [1] - 139:21

**sub-specialty** [1] - 139:21

**subject** [16] - 80:8, 96:18, 96:19, 123:11, 214:13, 221:12, 229:2, 247:1, 255:4, 255:13, 255:18, 256:3, 257:18, 257:21, 257:23, 257:25

**submission** [1] - 187:2

**submit** [1] - 254:3

**Subsection** [1] - 118:17

**subsequent** [1] - 120:13

**Substance** [4] - 26:1, 123:23, 184:13, 241:22

**substance** [14] - 45:4, 72:19, 80:17, 94:3, 94:4, 109:13, 110:24, 111:17, 112:15, 112:25,

113:3, 216:23, 217:2

**Substances** [2] - 96:23, 108:25

**substances** [12] - 27:6, 79:14, 80:11, 87:6, 89:4, 109:18, 110:6, 116:24, 123:19, 128:4, 241:25, 251:17

**substantially** [2] - 80:19, 227:21

**success** [4] - 201:9, 202:7, 203:25, 204:5

**successful** [4] - 126:7, 128:12, 203:17, 247:20

**successfully** [2] - 62:7, 171:4

**sued** [1] - 50:19

**suffering** [2] - 14:23, 21:8

**sufficient** [2] - 81:11, 171:22

**suggested** [3] - 69:23, 71:3, 72:4

**suggesting** [1] - 171:10

**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 3:15, 4:6, 4:9, 6:5, 6:12

**Suites** [1] - 43:5

**summa** [1] - 10:23

**summarize** [3] - 70:2, 129:3, 167:9

**summarized** [1] - 104:5

**summarizes** [1] - 10:9

**summary** [1] - 65:13

**supervisor** [1] - 211:20

**supplant** [2] - 235:18, 249:17

**supplement** [1] - 116:2

**supplied** [1] - 150:6

**supply** [9] - 115:9, 115:10, 118:25, 119:2, 119:4, 119:7, 119:19, 150:17, 174:19

**support** [2] - 81:12, 219:10

**Suppose** [1] - 247:8

**surgeon** [2] - 142:12, 142:13

**surgeons** [6] - 13:22, 127:11, 127:12, 140:22, 142:25

**surgeries** [2] - 9:7, 18:16

**surgery** [13] - 9:9, 14:10, 26:14, 34:15, 48:24, 52:15, 60:10, 61:10, 89:6, 117:4, 117:5, 119:4, 159:3

**surprise** [1] - 177:16

**surprised** [2] - 147:23, 178:17

**Survey** [1] - 225:5

**suspicious** [1] - 170:24

**sustain** [11] - 51:22, 70:13, 72:13, 72:19, 81:25, 93:10, 93:18, 158:9, 158:13, 171:7, 177:22

**Sustained** [1] - 130:7

**sustained** [4] - 63:2, 63:7, 95:6, 95:9

**SUZANNE** [1] - 4:20

**sweaty** [1] - 85:16

**switch** [2] - 17:18, 246:19

**switched** [1] - 15:15

**SWORN** [2] - 7:21, 209:13

**swung** [1] - 107:15

**symptoms** [1] - 85:6

**system** [7] - 27:3, 59:7, 110:5, 211:22, 214:10, 220:5, 245:16

**System** [1] - 20:19

**Systems** [1] - 21:6

## T

**tab** [1] - 60:13

**table** [2] - 196:3, 197:15

**Table** [1] - 196:4

**tally** [1] - 175:20

**Tandy** [2] - 91:14, 130:4

**target** [1] - 248:20

**task** [2] - 25:18, 248:25

**tasked** [1] - 234:15

**tasks** [1] - 218:17

**taught** [6] - 102:6, 102:7, 213:17, 213:18, 214:1, 214:15

**teach** [4] - 35:10, 102:3, 213:16, 214:13

**Teaching** [2] - 214:24, 214:25

**teaching** [10] - 42:10, 73:10, 213:15,

213:23, 214:22,
215:1, 215:3, 215:8,
215:19, 219:21
**teachings** [1] - 102:22
**Teapot** [1] - 168:24
**Teays** [1] - 16:12
**Tech** [3] - 10:15,
10:18, 10:20
**technique** [3] - 13:24,
15:21, 158:1
**techniques** [3] - 8:23,
16:1, 23:18
**technology** [1] - 202:8
**television** [1] - 153:18
**TEMITOPE** [1] - 4:13
**temperature** [1] - 53:5
**Tempest** [1] - 168:24
**temporarily** [1] - 17:19
**ten** [7] - 18:19, 41:2,
53:23, 77:7, 196:21,
201:5, 204:9
**ten-milligram** [1] -
196:21
**tend** [3] - 50:3,
222:17, 261:16
**tended** [1] - 259:23
**tender** [2] - 37:5,
220:8
**tendon** [1] - 78:7
**TENS** [1] - 200:19
**Tenth** [1] - 5:12
**tenured** [1] - 213:6
**term** [8] - 41:9, 41:22,
42:10, 42:11, 53:2,
160:13, 243:22,
254:2
**terminal** [2] - 22:5,
86:21
**terminologies** [1] -
222:3
**terms** [7] - 8:13,
131:12, 222:10,
231:10, 233:8,
237:15, 256:4
**terrible** [1] - 50:11
**tested** [2] - 53:14,
157:8
**testified** [17] - 35:20,
35:24, 36:2, 38:8,
63:4, 64:23, 65:21,
66:3, 66:9, 115:12,
123:2, 157:22,
160:1, 168:22,
170:2, 175:25,
217:23
**testify** [12] - 36:6,
36:16, 92:2, 93:8,
93:21, 93:24, 96:22,
98:21, 122:8, 123:6,
131:5, 193:14

**testifying** [10] - 8:10,
122:5, 130:6, 143:5,
149:11, 153:11,
157:19, 158:18,
158:20, 167:1
**testimony** [19] - 31:6,
63:13, 66:17, 98:13,
98:14, 98:23, 98:24,
102:15, 108:13,
146:9, 158:5,
168:19, 218:22,
228:14, 229:18,
240:18, 240:24,
254:10, 258:5
**textbook** [1] - 35:6
**THE** [224] - 1:1, 1:1,
1:4, 1:17, 7:6, 7:12,
7:15, 7:18, 7:24,
7:25, 7:11, 17:13,
17:16, 17:18, 30:5,
30:9, 30:10, 30:11,
30:12, 30:14, 30:15,
30:16, 30:20, 30:22,
37:7, 51:8, 51:14,
51:16, 51:22, 58:6,
58:8, 59:24, 60:1,
63:6, 63:11, 63:14,
63:25, 64:4, 70:13,
70:17, 71:10, 71:19,
71:23, 72:1, 72:7,
72:9, 72:13, 72:17,
75:10, 75:13, 75:20,
76:14, 77:4, 77:6,
77:7, 77:13, 79:1,
79:3, 81:25, 84:11,
84:13, 85:10, 85:13,
86:8, 86:9, 92:2,
93:3, 93:8, 93:18,
93:23, 94:3, 95:1,
95:4, 95:8, 95:14,
95:17, 96:14, 97:2,
97:8, 97:22, 97:25,
98:12, 99:23, 99:25,
118:12, 118:14,
122:13, 122:22,
123:8, 124:8,
124:16, 124:18,
130:7, 131:6,
132:12, 132:16,
132:18, 132:19,
132:22, 132:24,
132:25, 135:8,
135:9, 135:21,
135:22, 136:10,
136:11, 136:14,
136:16, 136:19,
139:11, 139:16,
141:20, 141:24,
142:2, 144:18,
146:10, 146:11,
146:14, 147:11,

147:16, 148:8,
148:10, 151:8,
152:23, 156:22,
156:25, 157:3,
157:21, 158:8,
160:18, 160:21,
162:6, 163:8,
163:10, 163:14,
163:20, 163:24,
164:6, 164:10,
165:2, 165:7,
165:14, 165:15,
165:17, 165:19,
166:13, 166:17,
166:20, 166:23,
167:11, 167:14,
167:20, 168:1,
168:8, 168:14,
168:21, 168:23,
170:1, 170:6, 171:7,
173:17, 173:21,
175:6, 176:18,
177:21, 178:2,
178:4, 178:5, 181:7,
181:8, 181:10,
188:17, 188:19,
190:25, 191:22,
192:17, 192:25,
193:7, 193:15,
194:14, 194:16,
194:21, 198:15,
198:16, 198:17,
201:19, 203:6,
203:10, 204:10,
204:13, 204:14,
204:17, 207:5,
207:17, 207:25,
208:19, 208:22,
209:1, 209:3, 209:5,
209:8, 209:9,
209:10, 209:11,
209:14, 209:15,
209:16, 220:11,
220:15, 220:18,
220:24, 230:15,
230:17, 230:20,
243:17, 256:9,
256:10, 262:17,
263:3, 263:7,
263:11, 263:13,
263:14
**themselves** [8] - 19:7,
27:8, 111:14,
112:13, 126:20,
149:1, 250:5, 250:7
**theory** [2] - 213:20,
213:21
**thera** [1] - 40:13
**thera-gesic** [1] - 40:13
**therapeutic** [1] -

246:15
**therapies** [7] - 106:10,
107:11, 107:22,
121:8, 126:21,
126:22, 202:6
**Therapy** [1] - 31:22
**therapy** [49] - 9:3,
9:17, 20:3, 43:24,
43:25, 78:8, 112:21,
120:22, 126:22,
236:19, 244:22,
247:6, 247:7, 247:9,
247:12, 247:17,
247:19, 249:16,
250:1, 251:19,
252:20, 252:22,
253:5, 253:6,
253:10, 253:14,
253:22, 253:25,
254:2, 254:5,
254:11, 254:19,
254:22, 255:15,
255:19, 255:22,
255:25, 258:19,
258:23, 259:12,
259:25, 260:2,
260:16, 261:1, 262:5
**therefore** [3] - 86:19,
94:12, 233:18
**thereto** [1] - 79:11
**they've** [9] - 18:23,
43:15, 44:2, 57:25,
154:6, 157:25,
224:11, 238:20,
240:6
**thinking** [1] - 15:9
**third** [14] - 24:6, 45:15,
46:22, 47:6, 103:2,
103:4, 104:18,
105:14, 112:5,
114:4, 131:3, 173:2,
182:20, 257:13
**thirdly** [3] - 25:6, 46:7,
244:22
**thirds** [1] - 257:22
**thirteenth** [1] - 188:4
**thirty** [4] - 79:10,
119:19, 119:20,
252:17
**thirty-day** [3] - 119:19,
119:20, 252:17
**thirty-one** [1] - 79:10
**Thomas** [9] - 2:10,
20:19, 21:5, 21:6,
21:12, 41:24,
212:24, 213:9,
213:11
**thoracic** [1] - 127:11
**thoughtful** [1] -
246:13

**thoughts** [1] - 35:22
**thousand** [3] - 38:20,
73:8, 79:10
**Three** [1] - 6:5
**three** [50] - 6:12,
16:19, 17:25, 18:5,
19:12, 19:13, 19:20,
24:13, 24:15, 28:11,
34:2, 36:12, 36:18,
39:19, 43:14, 48:1,
48:5, 48:10, 48:11,
69:16, 103:3, 105:2,
109:17, 109:18,
111:16, 113:5,
115:9, 117:5, 119:2,
119:4, 120:6, 120:7,
126:6, 126:10,
126:12, 149:15,
183:20, 186:7,
186:11, 195:20,
196:22, 197:15,
199:7, 224:14,
244:20, 245:4,
245:5, 245:9,
247:22, 257:22
**three-day** [3] - 115:9,
119:2, 119:4
**three-quarters** [1] -
257:22
**thresholds** [1] - 115:5
**throes** [1] - 184:14
**THROES** [1] - 184:15
**throughout** [3] -
53:22, 83:6, 131:21
**thumb** [1] - 162:20
**ties** [1] - 27:21
**timbering** [1] - 105:22
**timeline** [1] - 132:9
**timing** [1] - 258:15
**Timothy** [4] - 7:10,
7:15, 194:9, 199:4
**TIMOTHY** [2] - 5:9,
7:21
**tissue** [2] - 14:12,
67:21
**title** [7] - 20:24, 24:13,
189:5, 199:3,
212:23, 213:12
**today** [27] - 11:22,
16:19, 39:3, 39:7,
49:6, 61:11, 84:7,
96:7, 114:5, 122:2,
122:14, 133:7,
133:13, 134:16,
134:22, 137:21,
139:18, 142:10,
143:13, 145:8,
150:13, 170:12,
176:1, 185:4,
187:25, 221:5, 263:8

**together** [15] - 12:21, 26:16, 27:21, 43:4, 82:13, 106:21, 115:13, 121:18, 146:2, 146:20, 151:21, 173:1, 185:23, 195:5, 203:3
**tolerance** [2] - 85:3, 85:4
**tolerant** [1] - 85:2
**tomorrow** [1] - 262:18
**took** [7] - 47:19, 47:21, 83:2, 85:15, 97:25, 98:10, 251:25
**Tool** [1] - 58:19
**tool** [4] - 63:22, 201:15, 247:7, 253:18
**tools** [32] - 101:14, 219:8, 233:14, 236:12, 243:2, 243:11, 243:22, 243:25, 244:6, 244:11, 244:14, 244:16, 244:18, 244:21, 244:23, 245:6, 245:9, 248:13, 248:21, 249:1, 249:3, 249:13, 249:15, 249:21, 250:11, 251:8, 251:10, 251:11, 251:22, 252:1, 258:18, 259:4
**tooth** [2] - 26:14, 26:15
**top** [10] - 25:25, 55:20, 74:19, 79:7, 89:1, 97:11, 195:13, 195:20, 226:3, 226:7
**topics** [4] - 34:25, 35:21, 215:22, 221:4
**TOT** [1] - 9:4
**total** [5] - 21:22, 226:2, 226:3, 231:16, 250:25
**totally** [6] - 42:24, 50:24, 92:13, 198:25, 199:1, 204:3
**tough** [2] - 105:18, 177:24
**tougher** [1] - 176:2
**toward** [1] - 113:16
**towards** [7] - 40:24, 60:25, 94:21, 94:22, 107:11, 113:20, 126:8
**Tower** [2] - 3:4, 4:23
**tracking** [1] - 194:8
**tracks** [1] - 194:5

**train** [1] - 56:9
**trained** [1] - 13:7
**training** [5] - 11:14, 11:19, 112:13, 126:20, 142:20
**transcript** [3] - 6:19, 168:25, 264:4
**transferred** [1] - 68:22
**translate** [1] - 106:18
**transmit** [1] - 238:20
**transmitting** [1] - 200:23
**transplant** [2] - 15:15, 15:17
**trauma** [1] - 67:22
**treat** [23] - 8:25, 16:15, 16:21, 16:24, 20:5, 20:6, 22:11, 23:14, 29:15, 44:19, 50:2, 56:9, 78:6, 79:23, 84:25, 87:23, 87:24, 88:13, 89:4, 98:2, 138:24, 206:12, 234:1
**treated** [15] - 18:2, 40:2, 44:21, 48:9, 56:8, 56:10, 57:11, 70:6, 73:25, 80:24, 83:7, 87:25, 101:12, 106:2, 119:1
**treating** [14] - 36:13, 38:20, 45:11, 58:3, 87:1, 87:25, 88:23, 97:20, 113:10, 115:8, 235:11, 247:20, 249:11, 256:12
**Treatment** [3] - 21:9, 35:6, 73:13
**treatment** [55] - 8:22, 9:2, 9:23, 12:12, 19:25, 21:11, 39:6, 53:11, 58:3, 64:11, 66:20, 67:13, 69:2, 69:16, 70:22, 74:21, 76:6, 78:11, 79:23, 83:1, 87:6, 87:20, 88:1, 88:3, 88:6, 88:7, 88:16, 88:19, 89:10, 94:22, 100:9, 101:20, 106:1, 107:21, 113:4, 119:9, 154:3, 171:24, 178:24, 180:2, 200:22, 217:3, 246:25, 247:13, 247:14, 250:3, 259:8, 259:19, 260:9, 260:16, 260:24,

261:9, 261:14, 261:23
**treatments** [9] - 131:23, 259:11, 259:16, 260:4, 261:14, 261:16, 261:19, 261:22, 262:10
**treats** [1] - 140:11
**tremendously** [1] - 201:10
**tremor** [1] - 187:4
**trend** [1] - 125:8
**trends** [4] - 46:22, 194:4, 239:6, 239:18
**Trial** [1] - 263:16
**TRIAL** [1] - 1:16
**trial** [3] - 14:7, 96:20, 190:2
**tried** [4] - 29:2, 132:1, 247:11, 256:14
**tries** [1] - 9:1
**trouble** [5] - 25:7, 48:25, 62:20, 82:24, 173:24
**true** [37] - 21:11, 40:9, 112:25, 133:9, 140:9, 140:10, 140:16, 140:23, 141:4, 141:5, 146:6, 146:17, 148:25, 149:22, 149:23, 151:8, 153:23, 153:24, 155:23, 156:1, 156:4, 156:18, 162:16, 170:14, 170:19, 183:10, 184:20, 185:25, 188:10, 190:20, 190:21, 195:8, 202:14, 206:16, 236:24, 244:5
**trust** [5] - 186:25, 187:7, 187:15, 187:16, 191:13
**trustworthy** [1] - 187:17
**truth** [4] - 71:15, 92:8, 92:16, 95:13
**truthfully** [1] - 185:24
**try** [29] - 9:4, 17:19, 18:9, 20:2, 22:21, 23:6, 41:6, 44:7, 55:23, 56:3, 82:1, 107:10, 107:21, 107:22, 113:9, 125:23, 128:9, 133:11, 136:22, 151:13, 151:14,

154:9, 160:22, 162:8, 167:9, 203:13, 234:21, 244:7, 257:19
**trying** [15] - 24:7, 61:19, 63:3, 114:9, 116:25, 143:11, 146:10, 161:5, 162:2, 163:13, 164:7, 171:14, 172:18, 185:18
**tub** [1] - 78:17
**tubes** [1] - 9:6
**tumor** [1] - 127:12
**tunneled** [1] - 15:24
**turn** [21] - 21:4, 28:6, 31:11, 37:21, 56:20, 58:10, 58:25, 60:11, 66:22, 74:7, 74:18, 77:3, 83:23, 84:18, 91:4, 107:11, 110:1, 118:16, 120:13, 123:20, 124:20, 217:19, 257:8
**turns** [2] - 238:18, 238:22
**Twelfth** [3] - 4:19, 4:21, 5:5
**twelve** [1] - 22:2
**twice** [1] - 214:24
**two** [42] - 12:7, 18:11, 24:21, 26:20, 27:7, 35:13, 42:21, 48:5, 67:24, 69:23, 73:20, 73:21, 109:22, 110:22, 117:1, 117:8, 119:19, 119:23, 127:17, 133:22, 136:23, 146:1, 158:25, 159:3, 159:8, 159:10, 159:13, 161:11, 172:11, 195:20, 200:8, 216:12, 231:22, 235:22, 240:15, 246:4, 250:2, 250:22, 253:15, 257:22, 258:16
**two-part** [2] - 146:1, 172:11
**two-thirds** [1] - 257:22
**Tylox** [2] - 52:15, 68:10
**type** [20] - 8:8, 9:2, 17:4, 57:20, 69:4, 109:15, 119:14, 137:13, 140:12, 153:3, 171:24, 176:2, 180:2,

200:21, 222:21, 225:10, 229:6, 229:10, 229:23, 249:13
**types** [13] - 87:1, 87:19, 89:12, 90:7, 112:21, 127:25, 193:21, 196:22, 224:14, 241:5, 242:3, 242:14, 249:1
**typically** [3] - 48:20, 140:12, 222:17

---

### U

**U.S** [1] - 225:4
**unanimous** [1] - 145:20
**unclear** [1] - 93:23
**uncomfortable** [1] - 19:8
**uncommon** [1] - 120:8
**under** [39] - 45:4, 45:8, 59:19, 60:15, 64:16, 65:12, 71:6, 71:12, 75:7, 76:15, 81:10, 87:2, 87:25, 88:7, 88:13, 88:16, 88:19, 88:23, 91:15, 92:22, 112:15, 118:17, 120:13, 146:20, 152:6, 163:2, 168:22, 174:9, 189:4, 197:15, 199:10, 226:19, 226:21, 228:4, 232:3, 232:25, 254:19, 254:23
**under-treat** [1] - 88:13
**under-treating** [2] - 87:25, 88:23
**under-treatment** [3] - 88:7, 88:16, 88:19
**undergo** [1] - 101:24
**undergoing** [1] - 131:22
**underneath** [1] - 199:5
**understood** [6] - 49:2, 67:12, 82:20, 95:10, 101:14, 149:24
**undertake** [2] - 239:11, 240:1
**undertaken** [2] - 250:9, 251:22
**undertreated** [4] - 43:3, 59:6, 59:20, 69:3
**undertreating** [3] - 49:22, 49:24, 50:1

**undertreatment** [2] - 60:5, 69:3
**unemployed** [1] - 227:7
**unfortunate** [1] - 200:11
**unfortunately** [5] - 18:4, 85:24, 105:21, 177:10, 217:12
**Unfortunately** [1] - 217:11
**uninsured** [3] - 226:13, 227:7, 249:14
**unintelligible** [2] - 62:18, 164:4
**Unintelligible** [2] - 136:2, 147:9
**union** [1] - 222:18
**unique** [2] - 142:22, 142:23
**unit** [1] - 200:19
**United** [10] - 7:2, 53:2, 179:11, 183:6, 184:14, 210:14, 210:20, 211:14, 214:7, 222:23
**UNITED** [2] - 1:1, 1:17
**units** [1] - 199:4
**universities** [1] - 212:8
**University** [11] - 10:15, 11:2, 11:8, 11:14, 15:19, 31:24, 211:8, 211:9, 211:10, 212:2, 216:25
**unless** [5] - 46:1, 46:17, 57:16, 63:12, 190:20
**unlikely** [1] - 241:17
**unnecessary** [3] - 232:18, 236:12, 236:17
**unquestioned** [1] - 236:5
**unrecognized** [1] - 59:5
**unrelated** [1] - 85:23
**unthinkable** [1] - 208:5
**untrue** [1] - 129:19
**unusual** [2] - 110:4, 110:5
**up** [75] - 9:22, 10:5, 11:18, 12:10, 12:18, 22:23, 24:18, 25:21, 27:3, 30:12, 34:20, 36:22, 39:10, 41:14, 43:21, 44:18, 46:9,

54:19, 54:21, 56:15, 56:16, 65:10, 69:7, 69:18, 73:8, 77:23, 83:1, 92:6, 106:6, 113:24, 118:18, 123:22, 124:6, 125:3, 125:13, 127:17, 150:7, 151:12, 164:14, 169:5, 170:14, 175:1, 176:8, 178:21, 182:13, 182:16, 184:3, 184:4, 184:5, 184:6, 185:9, 188:4, 190:25, 192:1, 195:16, 195:21, 200:17, 204:25, 205:1, 207:13, 221:22, 222:20, 228:24, 237:10, 243:16, 243:19, 244:16, 245:5, 254:13, 255:23, 257:20, 258:1
**update** [1] - 148:3
**updated** [3] - 98:1, 101:23, 148:11
**updates** [1] - 114:11
**upped** [1] - 73:3
**upper** [2] - 182:19, 199:2
**upping** [2] - 69:20, 70:7
**upwards** [1] - 138:20
**urine** [3] - 24:23, 24:24, 43:15
**urologists** [1] - 127:13
**usable** [1] - 219:9
**usage** [1] - 110:6
**uses** [1] - 183:7
**utilization** [6] - 201:9, 234:20, 235:4, 235:9, 238:5, 238:6
**UVA** [4] - 15:5, 15:18, 52:19, 52:20

**V**

**VA** [11] - 53:21, 58:18, 59:18, 60:3, 60:21, 62:4, 63:22, 130:10, 130:11, 159:5, 159:8
**VA's** [1] - 66:3
**Vaglienti** [1] - 28:22
**Vaglienti's** [1] - 22:12
**Valley** [1] - 16:12
**variables** [1] - 142:10
**variation** [1] - 261:4
**varies** [1] - 22:2

**various** [12] - 22:18, 23:4, 37:19, 84:16, 100:20, 102:3, 137:13, 211:13, 219:19, 221:17, 222:24, 237:21
**vascular** [2] - 104:24, 142:12
**vast** [4] - 101:5, 127:15, 134:24, 160:7
**Vehicles** [1] - 56:4
**vendors** [1] - 239:15
**Ventura** [1] - 3:15
**version** [1] - 180:22
**versions** [2] - 197:15, 200:21
**versus** [4] - 46:10, 104:3, 114:10, 206:9
**Veterans** [3] - 53:8, 59:7, 159:9
**via** [2] - 74:11, 102:7
**Vice** [1] - 28:22
**Vice-Chairman** [1] - 28:22
**vicinity** [1] - 36:8
**video** [1] - 102:7
**view** [5] - 51:23, 54:13, 94:19, 97:19, 171:6
**violate** [2] - 161:9, 161:18
**violating** [2] - 160:12, 160:24
**violation** [3] - 112:3, 160:13, 162:12
**Virginia** [242] - 4:24, 7:3, 7:4, 8:5, 10:11, 10:15, 10:17, 10:18, 10:20, 11:2, 11:8, 11:14, 11:21, 11:25, 12:5, 13:7, 15:2, 16:10, 18:3, 22:8, 23:20, 25:17, 25:19, 25:25, 27:13, 28:7, 28:17, 29:3, 29:10, 29:23, 31:21, 32:4, 32:5, 32:6, 32:8, 32:11, 32:22, 32:24, 33:11, 35:20, 37:25, 38:2, 38:4, 38:25, 39:19, 44:25, 45:2, 45:9, 45:17, 45:19, 45:22, 46:12, 46:20, 46:23, 46:25, 47:6, 52:24, 55:3, 61:25, 65:3, 66:15, 68:23, 71:2, 71:3, 72:5, 73:16, 74:3, 74:4, 74:5, 74:12, 74:15,

76:9, 76:20, 77:19, 77:20, 78:24, 79:10, 83:6, 83:13, 83:18, 84:17, 86:25, 87:12, 87:14, 87:17, 88:17, 89:20, 89:22, 90:6, 90:10, 90:11, 90:13, 90:25, 91:2, 91:8, 91:21, 91:23, 93:13, 95:24, 97:5, 97:6, 97:20, 99:7, 100:7, 100:10, 100:13, 100:17, 100:20, 101:1, 101:25, 102:4, 102:8, 102:18, 102:20, 102:21, 102:22, 103:8, 103:22, 103:24, 103:25, 104:3, 104:15, 105:4, 105:16, 105:18, 106:6, 106:18, 106:19, 115:15, 115:24, 116:17, 117:12, 117:14, 117:22, 117:24, 120:9, 121:13, 121:16, 121:19, 122:1, 122:14, 122:23, 123:6, 123:17, 123:23, 124:21, 125:7, 126:6, 126:14, 128:1, 128:8, 129:10, 131:1, 131:14, 131:21, 132:2, 134:12, 134:14, 135:12, 135:25, 137:14, 138:1, 138:12, 155:2, 158:20, 158:21, 160:6, 165:11, 166:2, 167:16, 167:18, 169:9, 169:11, 170:22, 172:3, 175:17, 176:2, 176:24, 179:9, 194:3, 194:4, 199:5, 200:4, 200:16, 202:2, 202:4, 203:24, 205:25, 206:17, 207:9, 208:16, 210:22, 211:3, 218:8, 218:21, 222:12, 223:5, 223:7, 223:8, 223:23, 224:21, 225:21, 226:4, 226:15, 226:16,

226:23, 227:7, 230:23, 231:4, 231:8, 232:10, 232:25, 233:2, 240:16, 241:1, 241:20, 241:21, 241:23, 242:5, 242:9, 250:10, 250:15, 250:23, 251:2, 251:21, 252:5, 252:11, 253:2, 253:21, 256:13, 256:19, 256:24, 258:9, 258:10, 260:12, 260:14, 260:19, 260:22, 261:7
**VIRGINIA** [2] - 1:1, 1:18
**Virginia's** [2] - 130:18, 130:20
**Virginians** [3] - 104:16, 175:15, 232:5
**Virginias** [2] - 16:6, 180:7
**vis-à-vis** [3] - 97:21, 214:7, 259:5
**visit** [1] - 12:13
**visiting** [1] - 35:16
**visits** [3] - 259:24, 259:25, 260:17
**vital** [18] - 44:20, 52:18, 52:25, 53:10, 53:12, 53:19, 53:25, 56:6, 56:7, 56:9, 57:8, 59:4, 60:8, 62:3, 65:22, 66:4, 68:18, 130:11
**Vital** [1] - 58:19
**volume** [7] - 135:12, 135:16, 136:5, 136:6, 136:24, 152:17
**VOLUME** [1] - 1:16
**volumes** [3] - 202:1, 240:5, 240:8
**vs** [1] - 264:6

**W**

**wait** [1] - 117:4
**waited** [1] - 117:5
**waiting** [2] - 123:22, 141:22
**WAKEFIELD** [1] - 5:13
**Wal** [2] - 12:14, 12:15
**Wal-Mart** [2] - 12:14, 12:15
**walk** [4] - 9:25, 10:19,

12:14, 23:4
**walks** [1] - 53:20
**Waller** [3] - 75:9, 87:3, 95:12
**Waller's** [2] - 66:17, 102:15
**wants** [1] - 177:17
**warning** [1] - 27:19
**warranted** [1] - 171:12
**Warren** [1] - 15:8
**Washington** [8] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12, 15:20, 218:8
**waste** [1] - 232:19
**watch** [3] - 46:8, 102:9, 103:5
**watched** [1] - 12:14
**watching** [1] - 157:12
**ways** [10] - 34:4, 47:4, 67:18, 107:21, 107:22, 187:12, 234:5, 240:12, 246:4, 251:11
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**week** [2] - 198:19, 206:8
**weekend** [1] - 7:7
**weeks** [5] - 15:25, 16:19, 22:1, 67:19, 157:14
**weight** [3] - 104:21, 170:8, 175:7
**well-published** [1] - 54:17
**WEST** [2] - 1:1, 1:18
**West** [241] - 7:3, 7:4, 8:5, 10:11, 10:15, 10:17, 10:18, 10:20, 11:2, 11:21, 12:5, 13:7, 15:2, 16:9, 18:3, 22:8, 23:20, 25:17, 25:19, 25:25, 27:13, 28:7, 28:17, 29:3, 29:10, 29:23, 31:21, 32:3, 32:4, 32:6, 32:8, 32:11, 32:22, 32:24, 33:11, 35:20, 37:24, 38:2, 38:3, 38:25, 39:19, 44:25, 45:1, 45:8, 45:17, 45:19, 45:21, 46:12, 46:20, 46:23, 46:24, 47:6, 52:24, 55:3, 61:25, 65:2, 66:14, 68:23, 71:2, 71:3, 72:5, 73:16, 74:3, 74:4, 74:5, 74:12, 74:14, 76:9, 76:20, 77:18, 77:20,

78:23, 79:9, 83:6, 83:13, 83:18, 84:16, 86:24, 87:12, 87:14, 87:16, 88:17, 89:20, 89:22, 90:6, 90:10, 90:11, 90:13, 90:25, 91:2, 91:8, 91:21, 91:23, 93:13, 95:24, 97:5, 97:6, 97:19, 99:7, 100:7, 100:10, 100:13, 100:17, 100:20, 101:1, 101:25, 102:4, 102:8, 102:17, 102:20, 102:21, 103:8, 103:21, 103:23, 103:25, 104:3, 104:15, 104:16, 105:4, 105:16, 105:18, 106:6, 106:18, 106:19, 115:15, 115:24, 116:17, 117:12, 117:14, 117:22, 117:24, 120:9, 121:13, 121:16, 121:19, 122:1, 122:14, 122:23, 123:6, 123:17, 123:23, 124:21, 125:7, 126:5, 126:14, 127:25, 128:7, 129:10, 130:17, 130:20, 131:1, 131:14, 131:21, 132:2, 134:12, 134:14, 135:11, 135:25, 137:14, 138:1, 138:12, 155:2, 158:20, 158:21, 160:6, 165:11, 166:2, 167:16, 167:18, 169:9, 169:11, 170:22, 172:3, 175:15, 175:17, 176:1, 176:24, 179:9, 194:3, 194:4, 199:5, 200:4, 200:15, 202:2, 202:4, 203:24, 205:25, 206:17, 207:9, 208:15, 210:22, 211:3, 218:8, 218:21, 222:12, 223:5, 223:7, 223:22, 224:20, 225:21, 226:4, 226:15, 226:16, 226:23,

227:6, 230:23, 231:4, 231:8, 232:4, 232:10, 232:25, 233:2, 240:16, 240:25, 241:20, 241:21, 241:23, 242:5, 242:9, 250:10, 250:15, 250:23, 251:2, 251:20, 252:5, 252:11, 253:2, 253:21, 256:13, 256:19, 256:24, 258:9, 258:10, 260:11, 260:14, 260:19, 260:22, 261:6
**whatsoever** [1] - 51:13, 179:6, 187:23
**whole** [10] - 29:17, 127:20, 132:4, 158:22, 182:4, 186:18, 189:24, 190:5, 200:16, 234:3
**wholesale** [3] - 51:2, 62:15, 130:25
**WICHT** [1] - 4:18
**wide** [4] - 156:25, 158:4, 193:16, 234:3
**widely** [5] - 29:22, 54:25, 67:25, 70:25, 245:15
**wife** [2] - 12:17, 12:20
**wife's** [1] - 12:13
**Williams** [5] - 4:18, 5:4, 206:21, 206:25, 228:14
**willing** [2] - 232:14, 247:15
**win** [1] - 214:24
**winded** [1] - 187:1
**wise** [1] - 52:14
**wish** [1] - 244:2
**wishes** [1] - 247:8
**withdraw** [3] - 131:10, 164:25, 165:5
**withdrawal** [2] - 85:6, 86:4
**witness** [30] - 7:8, 63:4, 72:11, 77:12, 96:18, 132:22, 139:9, 156:8, 161:24, 162:2, 162:5, 168:5, 168:6, 168:10, 168:12, 173:10, 173:20, 181:6, 192:21, 193:6, 194:13, 198:13, 208:20, 208:25, 217:20,

219:21, 220:8, 262:16
**WITNESS** [62] - 7:15, 7:18, 7:21, 7:25, 17:11, 17:13, 17:16, 17:18, 30:9, 30:11, 30:14, 30:16, 30:20, 30:22, 51:8, 51:16, 77:6, 85:13, 86:9, 97:25, 124:8, 132:18, 132:24, 135:9, 135:22, 136:10, 136:14, 136:19, 139:16, 142:2, 144:18, 146:10, 146:14, 147:16, 148:8, 148:10, 151:8, 152:23, 160:21, 163:24, 165:15, 165:19, 178:2, 178:5, 181:8, 181:10, 188:19, 194:16, 194:21, 198:15, 198:17, 201:19, 203:10, 204:13, 209:3, 209:10, 209:13, 209:16, 230:17, 243:17, 256:10, 263:13
**witness's** [2] - 146:9, 188:15
**witnesses** [4] - 95:13, 96:21, 96:25, 98:20
**witnesses'** [1] - 98:25
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**women** [1] - 25:7
**wonder** [1] - 40:14
**wonderful** [2] - 26:10, 130:3
**Wood** [1] - 216:5
**word** [12] - 49:20, 97:25, 98:1, 98:10, 134:2, 134:8, 135:22, 136:5, 136:22, 161:17, 168:17, 171:19
**worded** [1] - 171:20
**words** [4] - 133:22, 162:3, 168:19, 231:18
**wordsmith** [1] - 134:7
**workers** [2] - 105:15, 178:22
**Workers'** [1] - 106:11
**works** [4] - 105:24, 191:17, 221:25, 222:10

**world** [5] - 24:6, 92:20, 157:6, 187:19, 248:11
**World** [1] - 68:20
**world's** [2] - 183:6, 183:8
**worst** [1] - 59:12
**wound** [2] - 142:12, 142:13
**wrapped** [1] - 11:18
**write** [24] - 37:14, 48:23, 91:14, 120:6, 183:24, 185:11, 185:24, 186:25, 187:4, 187:22, 188:19, 191:18, 191:23, 194:10, 194:17, 194:22, 194:25, 195:3, 195:4, 195:6, 195:10, 198:23, 198:24, 257:15
**writing** [12] - 73:23, 137:18, 144:12, 149:3, 149:6, 172:6, 187:2, 187:20, 235:23, 240:8, 242:6, 246:8
**writings** [1] - 149:2
**written** [29] - 45:22, 48:20, 48:22, 49:1, 49:2, 49:9, 121:22, 134:24, 135:11, 144:9, 144:11, 144:14, 144:13, 144:20, 144:24, 145:13, 147:18, 148:12, 182:2, 184:21, 188:1, 188:7, 190:19, 191:8, 191:10, 233:2, 239:19, 244:16, 247:21
**wrote** [7] - 90:16, 148:24, 159:22, 172:12, 187:6, 190:23, 191:20
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10, 3:13, 4:24, 5:15, 6:9
**WV-01219** [1] - 66:16
**WV-03003** [1] - 74:8
**WV-2693** [1] - 60:13
**WVU** [14] - 19:14, 20:22, 22:12, 27:17, 28:16, 28:18, 28:23, 31:23, 33:7, 35:11, 35:13, 52:8

## X

**Xanax** [2] - 85:15, 85:24

## Y

**year** [16] - 11:3, 15:22, 18:19, 35:14, 41:4, 55:4, 74:13, 79:20, 123:25, 125:3, 126:2, 135:18, 152:18, 225:5, 257:10, 258:15
**years** [60] - 9:13, 12:24, 12:25, 18:5, 19:11, 19:13, 21:10, 23:13, 23:21, 24:13, 24:14, 35:23, 36:13, 38:21, 40:22, 43:14, 45:24, 46:25, 47:11, 48:2, 54:10, 69:16, 70:6, 101:13, 105:6, 117:4, 131:24, 134:17, 150:3, 152:1, 152:19, 153:4, 154:15, 154:16, 159:18, 177:14, 178:7, 179:10, 179:13, 181:14, 181:16, 194:6, 195:20, 201:5, 201:8, 202:6, 203:1, 211:19, 212:7, 214:14, 215:6, 217:8, 217:9, 217:15, 217:25, 219:18, 220:7, 236:10, 251:20, 256:18
**yield** [1] - 232:20
**York** [4] - 3:5, 36:17, 70:5, 212:2
**young** [4] - 22:21, 24:16, 24:19, 105:7
**younger** [1] - 23:22
**yourself** [7] - 16:19, 24:18, 45:6, 102:25, 112:1, 150:8, 209:21

## Z

**zeal** [1] - 56:7
**zero** [2] - 177:17, 255:23