```
                  IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                             AT CHARLESTON


_____x
                               :
THE CITY OF HUNTINGTON,        :        Civil Action
                               :
              Plaintiff,       :        No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
              Defendants.      :
_____x
                               :
CABELL COUNTY COMMISSION,      :        Civil Action
                               :
              Plaintiff,       :        No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
              Defendants.      :
_____x
```

BENCH TRIAL - VOLUME 36
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


JULY 8, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301


**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:            Ayme Cochran, RMR, CRR
Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1        PROCEEDINGS had before The Honorable David A. Faber,

 2   Senior Status Judge, United States District Court, Southern

 3   District of West Virginia, in Charleston, West Virginia, on

 4   July 8, 2021, at 9:00 a.m., as follows:

 5             THE COURT:  Good morning, everybody.

 6        Dr. Hughes, are you in the courtroom?

 7             THE WITNESS:  I am, sir.

 8             THE COURT:  You may resume the stand.

 9        JAMES W. HUGHES, DEFENDANTS' WITNESS, RESUMED THE

10   WITNESS STAND

11             THE COURT:  Good morning, sir.

12             THE WITNESS:  Good morning, Your Honor.

13             THE COURT:  All right, Mr. Majestro, you may

14   proceed.

15             MR. MAJESTRO:  Thank you, Your Honor.

16                       CROSS EXAMINATION

17   BY MR. MAJESTRO:

18   Q.   Dr. Hughes, when did payers start paying attention

19   to the number of opioid prescriptions written in West

20   Virginia?

21   A.   It seems it was -- really got serious about 2016, 2017.

22   Q.   And that was because they were seeing a large increase

23   in those prescriptions; correct?

24   A.   Yes, I believe that's correct.

25   Q.   And those -- that number of pills was a red flag that
```

1    caused them to rethink their coverage; correct?

2    **A.**   That certainly would be part of it, but also I think in

3    that time period there was the CDC guidelines that were

4    introduced that had a big effect on payers' behavior.

5    **Q.**   Okay.  Let's go back and, and talk a little bit about

6    your experience.

7         You've been a testifying expert witness for the

8    pharmaceutical industry for 20 years; is that correct?

9    **A.**   20, 25 years.

10   **Q.**   Okay.  And, in addition, you've done consulting work

11   for 10, 15 pharmaceutical companies outside of litigation;

12   correct?

13   **A.**   Excuse me.  Could you say that again?

14   **Q.**   You've done additional consulting work for, for the

15   pharmaceutical industry; correct?

16   **A.**   Outside of expert witness work?

17   **Q.**   Yes.

18   **A.**   No, sir.

19   **Q.**   Okay.  How many cases have you served as an expert

20   witness?

21   **A.**   In total, it's between 30 and 40.

22   **Q.**   And it's true that all but two of those you served as

23   an expert for the defense; correct?

24   **A.**   Yes, that sounds correct.

25   **Q.**   And you've never published any peer-reviewed studies

```
 1    about the pharmaceutical industry, prescription drug
 2    markets, distributors, or opioids; correct?
 3    A.    That's correct.  None of the work I do as an expert is
 4    publishable because of confidentiality.
 5    Q.    And your work in this area has been only as a paid
 6    expert, then, correct, for industry?
 7    A.    I'm sorry?
 8    Q.    Your work in this area has been only as a paid expert
 9    for industry; correct?
10    A.    Yes, that's correct.
11    Q.    So the report and testimony that -- the report you
12    issued in this case and the testimony you've given doesn't
13    address any of the plaintiffs' experts; correct?
14    A.    That's correct.  I did not review any of the plaintiff
15    expert reports.
16    Q.    You've never been to Cabell County or Huntington, West
17    Virginia; correct?
18    A.    I grew up in Pittsburgh and we were in West Virginia a
19    lot.  Probably.  But if I was, I don't remember.
20    Q.    Okay.  Since childhood?
21    A.    Since childhood is fair to say, yes.
22    Q.    So the, the time period where the opioid epidemic has,
23    has blossomed, you've not been to Huntington or Cabell
24    County?
25    A.    That's correct, sir.
```

1   **Q.**   And you're not familiar with the breakdown of payers

2   for prescription drugs in Cabell or Huntington; correct?

3   **A.**   That's correct.  We looked very hard for that type of

4   information and we were not able to find it broken down by

5   county in West Virginia.

6   **Q.**   Okay.  So in this case, as you made pretty clear

7   yesterday, your, your focus is on the payers.  Is it fair to

8   say you're basically saying that payers have tools to reduce

9   the use of opioids?

10   **A.**   Yes, they do.

11   **Q.**   And, essentially, now payers are reducing the supply of

12   opioids through the control of payment; correct?

13   **A.**   They have definitely tightened up their controls,

14   that's true.

15   **Q.**   And that reduction in opioid supply to these patients

16   doesn't require pain to be untreated, does it?

17   **A.**   I'm sorry, I couldn't hear you.  Could you repeat that

18   please?

19   **Q.**   Sure.  The reduction in supply caused by the payers

20   doesn't require the patients' pain to be untreated; correct?

21   **A.**   That's my understanding, yes.

22   **Q.**   And that reduction in opioid use by the payer entities

23   are -- those entities are outside the doctor/patient

24   relationship; correct?

25   **A.**   Well, yeah, from an economic standpoint, they're what's

1    referred to as a third-party payer.  So they are not privy

2    to the, to the discussions between the doctor and the

3    patient.

4    **Q.**   In your report, you don't offer any opinions regarding

5    whether distributors have tools that also could affect the,

6    the doctor/patient decision to prescribe opioids; correct?

7    **A.**   That's true.  My, my report was confined to payers.

8    **Q.**   Now, in this case -- and you've never done any work for

9    a distributor prior to the opioid litigation; correct?

10   **A.**   No, sir.  That is -- I'm sorry.  It's been 25 years, so

11   I kind of have to go through the list.  I'm sorry.

12   **Q.**   And, so, so, in the past 25 years -- so you said -- I'm

13   sorry.  I'm not sure I understood your answer.

14   **A.**   I said "no."

15   **Q.**   Okay.  In preparing your report, you didn't speak with

16   any of the employees of the distributor defendants in this

17   case; correct?

18   **A.**   I did not.

19   **Q.**   You don't cite any of the distributors' documents in

20   your report; correct?

21   **A.**   That's correct.

22   **Q.**   You didn't review any data produced by distributors;

23   correct?

24   **A.**   Excuse me?

25   **Q.**   You didn't review -- sorry.  You didn't review any data

```
 1    produced by the distributors in this case; correct?

 2    A.    Because I'm not hearing "did" or "didn't," but I did

 3    not review any data from distributors.

 4    Q.    Maybe I'll get a little closer to the mic and see if

 5    that helps.  And you're not offering opinions on what

 6    distributors could have done or should have done to prevent

 7    prescriptions from being filled; correct?

 8    A.    That's correct.

 9    Q.    And you're not aware of what tools distributors could

10    have had access to; correct?

11    A.    That is also correct, yes.

12    Q.    You have no opinion whether they had -- do you know

13    what IMS data is?  IMS data?

14    A.    Yes, sir.  But I believe now it's called IQVIA.

15    Q.    It is.

16    A.    Okay.

17    Q.    So you know what that is?

18    A.    Yes, I do.

19    Q.    You don't have any opinions as to whether the

20    distributors had access to that; correct?

21    A.    I wasn't asked to do anything like that.

22    Q.    Did you look at whether the distributors had access to

23    switch data or claims data?

24    A.    No, sir, I did not.

25    Q.    Or dispensing data?
```

1    **A.**    No, sir.

2    **Q.**    Now, distributors did have access to their own

3    transactional data; correct?

4    **A.**    That's correct.

5    **Q.**    And that data would have showed 81 million opiate pills

6    into Cabell County and Huntington; correct?

7                MR. HESTER:  Your Honor, objection.  The scope of

8    the witness's testimony on direct was confined to payers.

9    It did not get into the conduct of distributors and we were

10   quite clear that he was not offering opinions related to

11   distributors.  So I object as beyond the scope.

12               THE COURT:  Where are you going with this, Mr.

13   Majestro?

14               MR. MAJESTRO:  Well, I guess I wonder what

15   relevance this witness has and we'll get to that later.  But

16   this is the last question I have on, on that part.

17               THE COURT:  Okay, overruled.  I'll let you ask him

18   the question.

19   BY MR. MAJESTRO:

20   **Q.**    So the distributors did have access to

21   transactional data that would have shown 81 million

22   pills shipped into Cabell County and Huntington;

23   correct?

24   **A.**    I don't know what their data would have shown.  I did

25   not review any of their data.

1    **Q.**   But they would have had access to their own data;

2    correct?

3    **A.**   Whatever that is, yes, they would have access to their

4    data.

5    **Q.**   Okay, fair enough.  You understand that opioids are

6    controlled substances distributed as part of a closed system

7    where all participants, including the distributors in this

8    case, have to be licensed by the DEA and the State Board of

9    Pharmacy?

10              MR. HESTER:  Again, Your Honor, I object as beyond

11   the scope.  We did not get into these issues of the DEA

12   regulations or anything related to these questions of

13   authority that counsel is raising.

14              THE COURT:  Well, this is cross-examination and

15   I'm supposed to give -- allow wide latitude here.  So I'll

16   overrule the objection.

17         You can go ahead, Mr. Majestro.

18              MR. MAJESTRO:  Thank you.

19   BY MR. MAJESTRO:

20   **Q.**   Do you need me to repeat the question?

21   **A.**   Yes, please.

22   **Q.**   You understand that opioids are controlled substances

23   distributed as part of a closed system where all

24   participants, including the distributors in this case, have

25   to be licensed by the DEA and the State Board of Pharmacy;

1    correct?

2    **A.**    I know that opioids are a controlled substance.  The

3    rest of it is not something I have at the tip of my tongue.

4    **Q.**    Fair enough.  You're aware that distributors have --

5    that there are regulations requiring the distributors to

6    take care that controlled substances aren't diverted?

7    **A.**    Again, I didn't look into anything having to do with

8    distributors.  So that could be correct, but I don't have

9    any knowledge of that myself.

10   **Q.**    And you're -- so, then, you're not offering any

11   opinions as to whether distributors met those duties because

12   you don't know what the duties were; correct?

13   **A.**    That's correct.

14   **Q.**    Let's talk about payers.  Payers are not part of the

15   closed system for distribution of opioids; correct?

16   **A.**    Again, I'm not privy to what -- who's involved in the

17   closed system, so I don't know that one way or the other.

18   **Q.**    So in any of your work, did you come across any

19   testimony or documents or reports or laws that required

20   payers to be licensed by the DEA?

21   **A.**    I did not see anything like that, no.

22   **Q.**    Or the State Board of Pharmacy?

23   **A.**    Correct.  I didn't see anything like that.

24   **Q.**    And do you -- can you testify regarding whether payers

25   have any duties to actively monitor for diversion of

1    controlled substances?

2    **A.**   I don't know one way or the other.

3    **Q.**   But you're not offering any opinions that payers failed

4    to comply with any applicable laws; correct?

5    **A.**   No, sir.  That would be a legal conclusion.

6    **Q.**   And you're not aware of any conduct that might show

7    that payers might have transgressed any applicable laws in

8    their coverage of opioids?

9    **A.**   Yeah.  That was beyond the scope of what I was asked to

10   do and it would be a legal conclusion I believe.

11   **Q.**   In your report and testimony, you don't assign any

12   fault for the opioid epidemic to payers; correct?

13   **A.**   I believe in my deposition I referred to it as a

14   contributing factor, but fault, no.  Fault as a legal

15   concept certainly, no.

16   **Q.**   Okay.  And, so, you have no knowledge of whether payers

17   had any duty, so you can't say they were at fault?

18   **A.**   Correct.

19   **Q.**   And nowhere in your report or your testimony do you

20   opine that payers' access to data absolves distributors of

21   potential fault related to the opioid epidemic?

22   **A.**   Yeah, that's beyond the scope of my assignment I

23   believe.

24   **Q.**   So you're an economist; correct?

25   **A.**   That's correct.

1    **Q.**   Economists commonly perform quantitative analysis;

2    correct?

3    **A.**   Theoretical and quantitative analysis, yes.

4    **Q.**   Can you explain to the Court what quantitative analysis

5    is?

6    **A.**   Basically, quantitative analysis is generally

7    considered to be the analyses of data using statistical

8    tools.

9    **Q.**   And in this case, you did not perform any quantitative

10   analysis; correct?

11   **A.**   That's correct.  And as I said yesterday, I didn't

12   think it was necessary given all of the other evidence that

13   was available to me.

14   **Q.**   You didn't attempt to quantify how many fewer pills, if

15   any, would have been shipped to Cabell and Huntington if

16   payers had acted differently; correct?

17   **A.**   That's correct.  I performed no such analysis.

18   **Q.**   You didn't calculate or measure the extent to which

19   payers could have theoretically lessened the epidemic by

20   using tools to control opioid prescribing; correct?

21   **A.**   No, I did not have the data and was not asked to do

22   that.

23   **Q.**   And you're not aware of anyone else that has done that

24   analysis for Cabell and Huntington; correct?

25   **A.**   I'm not aware of anyone else, that's correct.

1    **Q.**   You're not opining that payers' systems were designed

2    to detect diversion or abuse of controlled substances;

3    correct?

4    **A.**   No, I -- sorry.  No.

5    **Q.**   And, in fact, payer systems are primarily motivated by

6    decreasing cost, not preventing addiction and diversion;

7    correct?

8    **A.**   Well, I think it's a little more complicated than that.

9    Certainly, the tools that I talked about yesterday, prior

10   authorization and step therapy and quantity limits,

11   certainly had their genesis back in the '80s in terms of

12   controlling.

13        But, certainly, in the post-2010 and post-2016-2017

14   period, these tools have been used, I believe, for clinical

15   reasons to reduce opioid dispensing for clinical reasons as

16   opposed to only cost control.

17   **Q.**   So in essence, though, without quantitative analysis,

18   you would be speculating as to what would have happened in

19   the alternative universe where payers adopted these controls

20   earlier?

21   **A.**   Oh, I don't believe so.  I believe the, the academic

22   literature and testimony of, of the Medicaid representatives

23   is very clear that prior authorization and step therapy and

24   these tools are effective and, by extension, would have been

25   effective at any time they were imposed.

**Q.**   Those tools were being used -- initiated while other
regulatory and legal and standard of care changes were
happening at the same time; correct?

**A.**   Yes.

**Q.**   So you can't, you can't identify those changes on any
causative basis because you have not done quantitative
analysis on those changes?

**A.**   Well, to the extent that the changes in these rules,
the changes in these tools were in response to changes in
the standard of care, for example, the CDC guidelines, along
with other reports and other research that the, that the
payers did, I think from a statistical standpoint it would
be very difficult to disentangle because the change in the
tools happened because of the change in the standard of
care.

     So I think statistically it wouldn't be possible to
separate out how much of it was the tool and how much of it
was the change in the standard of care.

**Q.**   Fair enough.  And you can't do that sitting here today
on the stand?

**A.**   No, sir.

**Q.**   Payers cannot directly impact cash customers; correct?

**A.**   Directly, no, but academic research shows that
indirectly it can affect cash customers.

**Q.**   And four and a quarter percent of West Virginia

```
 1    prescriptions are cash?  Did I remember that correctly from
 2    yesterday?
 3    A.    Yes, sir, I believe so.
 4    Q.    What percent of opioid prescriptions are cash?
 5    A.    We did not have access to data for that.  Given -- as I
 6    said yesterday, given Medicaid expansion, I would expect it
 7    to be about the same.  But I don't have -- I did not -- I
 8    was not able to find any data to that question.
 9    Q.    And you don't have any data on what percentage of
10    diverted opioid prescriptions were paid for by cash, do you?
11    A.    That's correct.
12    Q.    Were you aware that the DEA considers cash payments a
13    red flag for diversion?
14    A.    No, sir.  That was outside the scope of my assignment.
15    Q.    And were you aware that where you have high diversion,
16    you have a high percentage of cash payments?
17    A.    Again, that was outside the scope of my assignment.
18    Q.    You have no knowledge of like pill mill pharmacies or
19    pill mill doctors?
20    A.    That was not anything that I looked at, no, sir.
21    Q.    In this case we've heard evidence of a pharmacy,
22    SafeScript, with more than 80 percent of prescription
23    opioids paid for in cash.  Payer actions would have had
24    limited impact on this pharmacy; correct?
25                MR. HESTER:  Your Honor, I object to lack of
```

```
 1    foundation and also well beyond the scope of the direct.
 2              THE COURT:  Well, overruled.  I'll let him answer.
 3    BY MR. MAJESTRO:
 4    Q.   You can answer, Doctor.
 5    A.   I'm sorry?
 6    Q.   The Judge said you can answer.
 7    A.   Oh, I'm sorry, sir.  I didn't hear you.  Could you
 8    repeat it, please?
 9    Q.   Sure.  Payer actions -- well, let me follow up.  We've
10    heard evidence of a pharmacy, SafeScript Pharmacy in
11    Huntington, with more than 80 percent of prescription
12    opioids paid for in cash.  Payer actions would have had
13    limited impact on this pharmacy; correct?
14              MR. NICHOLAS:  Your Honor, I will object.  I don't
15    believe that was the testimony.  There's no foundation for
16    that and that's inaccurate.  So I object on that basis.
17              THE COURT:  Well, I'm going to allow it.  This
18    relates to the actions of payers and I think it is within
19    the scope and --
20              MR. MAJESTRO:  And Mr. Farrell corrected me that
21    it's 86 percent of control versus non-control.  That was the
22    testimony.  I stand corrected.
23    BY MR. MAJESTRO:
24    Q.   So the question is that payer actions at a pharmacy
25    that is being -- where the customers are substantially
```

1    predominantly paying in cash would have limited impact;

2    correct?

3    **A.**   I think that's an open question given that presumably

4    those cash prescriptions were prescriptions that were being

5    written by physicians.  And as the standard of care evolved,

6    presumably that would affect the physician writing the

7    prescription.

8    **Q.**   And that assumption is that those were legitimate

9    prescriptions that were being written for medical,

10   appropriate medical use; correct?

11   **A.**   I -- I'm sorry.  Could you say that again?

12   **Q.**   I said you're assuming that the prescriptions taken to

13   a pharmacy where 86 percent are paying in cash were written

14   for a legitimate medical purpose?

15   **A.**   The prescriptions were written by a physician.  The

16   purpose I can't speak to.

17   **Q.**   Yeah.  And, and a physician motivated by -- not

18   motivated by a legitimate medical purpose whose customers

19   pay in cash, payer actions would have little impact on them;

20   correct?

21   **A.**   Yes, I believe that's correct.

22   **Q.**   In this case, you saw no evidence that distributors

23   ever warned the payers that there was a problem in Cabell

24   and Huntington with too many opioid pills; correct?

25   **A.**   That was kind of beyond the scope of what I was asked

1    to do.

2    **Q.**   You didn't see any evidence in looking at, through the

3    materials you were provided; correct?

4    **A.**   Well, correct, but that would have been distributor

5    materials and I didn't see any of those.

6    **Q.**   Payers can share data that doesn't reveal patient HIPAA

7    protected personal information; correct?

8    **A.**   It's complicated but, yes, they can.

9    **Q.**   And you saw no evidence that these defendant

10   distributors ever inquired of payers why 81 million opioid

11   pills were distributed by these defendants in Cabell County

12   and Huntington, a city with -- an area with a population of

13   90,000 people?

14   **A.**   No, sir.  That was beyond the scope of my assignment.

15   **Q.**   Thank you, Dr. Hughes.  That's all I have.

16            THE COURT:  Any other cross?

17            MS. KEARSE:  No, Your Honor.

18            THE COURT:  Any redirect?

19            MR. HESTER:  No questions, Your Honor.

20            THE COURT:  All right.  May Dr. Hughes be excused?

21       (No Response)

22            THE COURT:  Dr. Hughes, thank you, sir, very much.

23   You're free to go.

24            THE WITNESS:  Thank you, Your Honor.

25            THE COURT:  I would have made them finish you

```
 1    yesterday if I had known it was going to be short.  So I

 2    apologize for the inconvenience.

 3              THE WITNESS:  Nothing could be done.  Thank you.

 4              MR. MAJESTRO:  I will say that the evening allowed

 5    me to improve my outline substantially.

 6              THE COURT:  Okay.  All right.

 7              MR. MAHADY:  Good morning, Your Honor.

 8              THE COURT:  Good morning, Mr. Mahady.

 9              MR. MAHADY:  AmerisourceBergen is going to call

10    Theodore Martens, retired partner from PwC, as its next

11    witness.

12              THE COURT:  Okay.

13              MR. MAHADY:  He can come in and take the stand.

14              THE CLERK:  Could you please state your full name?

15              THE WITNESS:  Theodore Martens, M-a-r-t-e-n-s.

16              THE CLERK:  Thank you.  Please raise your right

17    hand.

18    THEODORE MARTENS, DEFENDANTS' WITNESS, SWORN

19              THE CLERK:  Thank you.  Please take a seat.

20                       DIRECT EXAMINATION

21    BY MR. MAHADY:

22    Q.   Mr. Martens, good morning.

23    A.   Good morning.

24    Q.   Mr. Martens, can you please introduce yourself to the

25    Court?
```

1    **A.**    I'm Ted Martens.  I'm a retired PwC.  I reside in

2    Demarest, D-e-m-a-r-e-s-t, New Jersey.

3    **Q.**    Mr. Martens, we're going to come back to your

4    professional background in a second, but I want to start

5    with your educational history.

6         Can you please describe your educational background to

7    the Court.

8    **A.**    Bachelor of Science in biology, Fairfield University,

9    and an MBA in accounting, Fairleigh Dickinson University.

10   **Q.**    Now, while you were obtaining your MBA, were you also

11   working?

12   **A.**    I was, yes.

13   **Q.**    And where were you working at the time?

14   **A.**    At one of the predecessor firms to PwC, Coopers &

15   Lybrand.  I joined the audit staff there in 1978.

16   **Q.**    Okay.  Mr. Martens, are you a certified public

17   accountant?

18   **A.**    I am, yes.

19   **Q.**    And how long have you been a certified public

20   accountant?

21   **A.**    Since 1981, licensed in the State of New York.

22   **Q.**    Okay.  At any point in time did you hold temporary

23   licenses anywhere else?

24   **A.**    I did, yes.

25   **Q.**    And where was that?

**A.**   In the states of Texas and West Virginia.

**Q.**   Okay.  I want to go back to your time at Coopers & Lybrand.  Can you please explain to the Court what your role was on the audit staff?

**A.**   As a member of the audit staff, basically being assigned to audits of publicly held companies, their financial statements, and within each staff classification doing different accounts, auditing different accounts and ultimately was admitted to the firm as an audit partner in 1987.

**Q.**   Okay.  And as a member of the audit staff and a CPA at the time, did you regularly work with the internal records of large companies?

**A.**   Yes.

**Q.**   And would that include their sales data?

**A.**   Yes.

**Q.**   Okay.  Now, at some point did you become a partner?

**A.**   I did in 1987.

**Q.**   Okay.  And did you remain in the audit staff after that?

**A.**   Yes.  I was assigned to various accounts and was the signing partner in terms of releasing financial statements and signing on behalf of the firm.

**Q.**   Okay.  And at any point, did your role change?

**A.**   It did.  In 1990 I was asked to start a forensic

```
 1   accounting practice in the New York office of the firm.
 2   Q.   Okay.  And can you explain for the Court what forensic
 3   accounting is?
 4   A.   Forensic accounting is a specialized area of accounting
 5   typically -- engagements are -- we were involved in
 6   engagements where there's disputes involved and typically
 7   retained by counsel to focus in on specific issues at hand,
 8   drilling down on those matters and so forth, and then being
 9   prepared to analyze the information and provide and assist
10   counsel and the courts at times and so forth under the
11   circumstances.
12   Q.   Okay.  And, again, as a forensic accountant, did you
13   work with large datasets?
14   A.   Yes.
15   Q.   And did you analyze large datasets?
16   A.   Yes.
17   Q.   Would you consider yourself a forensic accountant?
18   A.   Yes.
19   Q.   Would you consider yourself an expert in forensic
20   accounting?
21   A.   Yes.
22   Q.   Would you consider yourself an expert in data
23   analytics?
24   A.   Yes.
25   Q.   Okay.  At some point did Coopers & Lybrand merge with
```

 1   another company?

 2   **A.**   Yes.  In 1998 Coopers & Lybrand merged with Price

 3   Waterhouse to form PricewaterhouseCoopers.

 4   **Q.**   Okay.  And, so, you then became a partner at

 5   PricewaterhouseCoopers?

 6   **A.**   That's correct.

 7   **Q.**   Okay.  And at some point did you retire from

 8   PricewaterhouseCoopers?

 9   **A.**   Yes.

10   **Q.**   When was that?

11   **A.**   That would have been in 2012.  The firm has a mandatory

12   retirement age of age 60.  I was extended as an active

13   partner for a year and then retired in 2012.

14   **Q.**   Okay.  So for the period from 2012 to 2019, in many

15   respects you considered -- you continued to work for PwC in

16   a partner-type capacity.  Is that fair?

17   **A.**   Correct.  I was extended beyond 2012 for up through

18   July of 2019 in a client, a client consultancy capacity in

19   large part given the significant matters that I was involved

20   in for a period of time.

21   **Q.**   Okay.  And we're going to come back to those matters in

22   a couple minutes.  But in your consultancy capacity, did you

23   continue to work with teams at PwC?

24   **A.**   Correct.

25   **Q.**   And did those teams help you in analyzing data for the

1   engagements you were involved in?

2   **A.**   That's correct.  Nothing really, nothing really changed

3   in terms of transitioning from an active partner to

4   functioning in a client consultancy capacity.

5   **Q.**   Okay.  And as both an active partner at PwC for many

6   years in the client consultancy capacity, did you serve as

7   an expert?

8   **A.**   Yes.

9   **Q.**   Okay.  And did you serve as an expert in matters

10  involving state and federal litigation?

11  **A.**   That's correct, yes.

12  **Q.**   Approximately how many times have you served as an

13  expert?

14  **A.**   Well, if you include the times I've given deposition

15  testimony and along with trial testimony and arbitration

16  testimony, I would say approximately anywhere from 125 to

17  150 times.  That's an estimate.

18  **Q.**   Are you aware of a court, state/federal, ever

19  precluding you from testifying?

20  **A.**   No.

21  **Q.**   Okay.  Can you give this Court some examples of matters

22  where you've testified as an expert?

23  **A.**   I was retained by the State Department in matters or

24  claims brought before the Iran U.S. Claims Tribunal.  And I

25  was the lead valuation expert on behalf of the State

1    Department in what were I'll best describe as non-military

2    asset valuations and testified before the members of the

3    tribunal, a tribunal comprised of nine judges sitting in The

4    Hague, Netherlands, three American judges, three Iranian

5    judges, and then three judges from other countries, and

6    testifying there and providing my opinions with respect to

7    the calculation of how those assets should be valued with

8    respect to claims brought by the Islamic Republic of Iran

9    against this country.

10        Another matter that comes to mind is the Thomas Petters

11   ponzi scheme.  This is one of the largest frauds in the

12   history of this country.

13        I've testified in countless occasions assisting the

14   trustee in claw back litigations pending, in large part, in

15   court in the Minneapolis, St. Paul area.

16        In addition to the claw back litigations where the

17   trustee is looking to recover funds from the net winners of

18   the scheme of the fraud, I've also testified in two

19   substantive consolidation trials.

20        The third matter that comes to mind is the Tobacco

21   Master Litigation -- the Tobacco Master Settlement.  And

22   there I worked on that matter from its start, from its

23   inception right up through until -- for the better part of

24   20 years.

25        And there the -- that work has -- I've been testifying

1   with respect to matters that have been brought by

2   non-participating manufacturers, as well as rulings I made

3   over the years as the partner responsible for the firm's

4   role as the independent auditor of that settlement, and

5   those rulings being settled through arbitration per the

6   settlement agreement and testifying at those -- at the

7   arbitration proceedings.

8   **Q.**   Have you ever served as an expert in matters involving

9   other large accounting firms?

10  **A.**   Yes.

11  **Q.**   Can you describe that for the Court, please?

12  **A.**   Ernst & Young.  I was the -- I was their liability

13  expert in the *Ernst & Young* vs. *Cendant* litigation and

14  testified in that matter.  It was one of the largest -- at

15  the time, I believe the largest accounts malpractice matters

16  pending.

17  **Q.**   Okay.  Now, in those four matters you just discussed,

18  has that involved large amounts of data?

19  **A.**   Yes, in all instances, that's correct.

20  **Q.**   And have you and your team at PwC been tasked with

21  processing and analyzing the data to support your expert

22  work in those matters?

23  **A.**   Yes.

24  **Q.**   Okay.  Have you ever -- any experience as an expert in

25  cases involving the pharmaceutical industry?

1    **A.**    Yes.

2    **Q.**    Can you explain that to the Court?

3    **A.**    A number of years ago, I was retained by IMS Health to

4    analyze pharmaceutical data.  And there, as I recall, it was

5    an intellectual property matter.

6    **Q.**    Okay.  And, Mr. Martens, just so we're clear, you have

7    not analyzed any IMS data in this case; correct?

8    **A.**    That's correct.

9    **Q.**    And you're not an expert on IMS data; correct?

10   **A.**    That's correct.

11   **Q.**    Okay.  Now, in addition to serving in an expert

12   capacity, have you had the opportunity to work with federal

13   and state judges?

14   **A.**    Yes, I have.

15   **Q.**    Can you explain that to the Court?

16   **A.**    I've been a member of the faculty of the National

17   Judicial College.  The National Judicial College is located

18   on the campus of the University of Nevada in Reno.

19          And there I -- as a faculty member, I was an instructor

20   at a program entitled "Financial Statements in the

21   Courtroom."  It's a program that's been offered to teach the

22   judges, teach them general accepted accounting principles,

23   financial statement preparation, and then the roles of CPAs

24   in terms of the services provided; auditing those financial

25   statements, preparing reviews, compilations, other forms of

1    financial information.

2         I teach the forensic accounting section of the program.

3    I prepare the materials and get into the business evaluation

4    section of the program as well.  We -- the program -- most

5    of the time the judges will attend in Reno.  Also at times

6    we take the program on the road.

7         For many years the program was offered through the

8    Federal Judiciary Center for Federal District and Federal

9    Bankruptcy Court judges.  We've had probably over the

10   years -- I'd say over the past 25 years or so 6,000 judges

11   attend the program.

12   **Q.**   Okay.  I want to take a slight detour and ask you about

13   a different part of your background.  Have you had any

14   military service?

15   **A.**   Yes.

16   **Q.**   Okay.  And can you explain that for the Court, please?

17   **A.**   I'm a retired Lieutenant Colonel, New Jersey Army

18   National Guard.  I was a combat engineer and officer 30

19   years.

20   **Q.**   Okay.  And were you working with the -- or serving with

21   the Army National Guard while you were a partner at Coopers

22   & Lybrand and PwC?

23   **A.**   Yes.

24   **Q.**   Okay.  And can you explain to the Court any of the

25   engagements that you had with the New Jersey National Guard?

**A.**   Well, it was -- you know, in terms of the military,
moving up through the chain of command as an officer in the
engineer battalion and then as the division engineer on
staff at Fort -- it was headquartered at Fort Dix, New
Jersey.  I mean, those, those positions were -- you know,
let you move up through the chain of command, you know.
Those were my experiences there.

My last billet in the Guard was a newly formed -- as
the Commander of a newly formed civil support team, an
anti-terrorism unit.

And at the time of 9/11, I was training at the National
Guard Terrorism Center in San Luis Obispo, California, with
other members of my team.  And we were ordered to report to
the World Trade Center that next day and so forth to assist
in the operations there.

**Q.**   Did you receive any awards or commendations during your
time with the New Jersey National Guard?

**A.**   The highest award I received was the Meritorious
Service Medal.  And that was in connection with an exercise
that was performed at Fort Leavenworth, Kansas.

**Q.**   Okay.  Thank you, Mr. Martens.  I want to come back to
this matter.

THE COURT:  Did you have any active duty before
you went in the Guard, Mr. Martens?

THE WITNESS:  No, Judge, other than the active

```
 1    duty once within the Guard, basic training and advanced

 2    individual training.

 3    BY MR. MAHADY:

 4    Q.   Coming back to this matter, in this matter, Mr.

 5    Martens, did you work with a team at PwC?

 6    A.   I did, yes.

 7    Q.   And can you generally describe the makeup of the team?

 8    A.   The team's -- not just -- not that this is unique per

 9    se to this job, but all of our jobs are typically staffed in

10    the same manner.  There are people like myself with core

11    accounting, core worthy background, and then typically

12    people with technology backgrounds, people that have, that

13    have grown up with, say, degrees in computer science and the

14    like and so forth.

15         And then there's other various -- to the extent we're

16    involved in different functional -- not so much functional

17    but industry kind of situations and so forth that require

18    additional specialists and we'll bring them on board as

19    well.

20    Q.   Okay.  And was there a team that you worked closely

21    with for this matter?

22    A.   Yes.  The individual that was -- I worked closely with

23    in terms of -- in charge of really and leading the

24    technology people, his name was Rohan Sen, S-e-n.

25    Q.   And what is Mr. Sen's educational background, if you
```

1    know?

2    **A.**    He has a Bachelor's, a Master's, and a Ph.D. in

3    computer science, computer science field at Washington

4    University of St. Louis.

5    **Q.**    And at all times, did you actively oversee the work

6    performed by the individuals on the team?

7    **A.**    All work on this matter was performed under my review

8    and supervision.

9    **Q.**    Okay.

10              MR. MAHADY:  Your Honor, at this time we tender

11    Theodore Martens as an expert in forensic accounting and

12    data analytics.

13              THE COURT:  Any objection?

14              MR. FARRELL:  Judge, I'd like to preserve my

15    objection until I get a better understanding of which

16    datasets this expert is an expert in.  Certainly he's very

17    well qualified.

18              THE COURT:  I guess I should reserve my ruling.

19    You remind me at the appropriate time, Mr. Mahady.

20              MR. MAHADY:  Thank you, Your Honor.  If I don't

21    remind you, I'm sure someone on my team will remind me to do

22    so.

23              THE COURT:  Okay.

24              MR. MAHADY:  I am going to move forward, though,

25    with asking him about some of his opinions if that's okay.

1    BY MR. MAHADY:

2    **Q.**   Mr. Martens, what opinions are you offering here

3    today?

4    **A.**   I was asked to, to perform certain analyses of

5    Amerisource's business in Cabell County and the City of

6    Huntington for the period of 2006 through 2014.  And I'm

7    here to -- here today to share my opinions with respect to

8    the results of those analyses.

9    **Q.**   Okay.  And have you reached any opinions about the

10   results of these analyses?

11   **A.**   I have, yes.

12   **Q.**   And what are those opinions?

13   **A.**   The opinions are that Amerisource is a full-line,

14   full-line distributor of opioid and non-opioid drug

15   medications in Cabell County and the City of Huntington.

16   The mix of their business is such that they -- that

17   Amerisource sells significantly more non-opioid medications

18   than opioid medications.

19        And the tracking, the tracking, the growth, if you

20   will, the change in the business seems to track both between

21   those who compare the overall business with that of the

22   changes in the opioid business as well.

23   **Q.**   Okay.  Thank you, Mr. Martens.

24        I want to now focus on the data that underlies your

25   analysis.  Can you describe to the Court what data you

1    reviewed to form your opinions?

2    **A.**    The data was largely Amerisource transactional data,

3    but then also too using Dr. McCann's ARCOS data as well.

4    **Q.**    Okay.  And can you describe the transactional data?

5    What is it?

6    **A.**    The Amerisource transactional data details essentially

7    all of the shipments, the sales that Amerisource made.  And,

8    once again, the focus is on Cabell County and the City of

9    Huntington.

10         And that information details the pharmacy names, their

11   customers, their addresses, their various, you know, each

12   drug that's sold as a different, as a separate line item,

13   the national drug code, the NDC numbers are there, as well

14   as then the quantity shipped, item size, item form, data of

15   that nature.

16   **Q.**    Okay.  Sticking with the geographic scope of your

17   opinions here today, I believe you've testified that it's

18   Cabell County and the City of Huntington; correct?

19   **A.**    Correct.

20   **Q.**    Okay.  And you're not providing any opinions here today

21   about specific pharmacies within Cabell County or the City

22   of Huntington; correct?

23   **A.**    That's correct.

24   **Q.**    Okay.  And I believe you also testified that your

25   analysis is confined to the period from 2006 to 2014; right?

1    **A.**   That's correct.

2    **Q.**   And why did you pick that time period?

3    **A.**   That time period jives with the ARCOS time period, the

4    ARCOS data time period of 2006 to 2014.

5    **Q.**   Okay.  And do you understand that was the time period

6    that was the focus of plaintiffs' expert Craig McCann?

7    **A.**   That's my understanding, yes.

8    **Q.**   Okay.  Did you review the trial testimony of Craig

9    McCann?

10   **A.**   I did, yes.

11   **Q.**   Okay.  And did you recall Mr. McCann testifying --

12   Dr. McCann testifying that he determined Amerisource's

13   transactional data to be reliable?

14   **A.**   I do recall that testimony, yes.

15   **Q.**   And have you reached the same conclusion in your expert

16   work?

17   **A.**   Yes.

18   **Q.**   Okay.  I want to focus a little bit more about what's

19   included in your analysis which we will get to.

20        Your analysis includes all of AmerisourceBergen's

21   customers in Cabell County and the City of Huntington;

22   correct?

23   **A.**   That's correct.

24   **Q.**   And, so, that would include independent pharmacies?

25   **A.**   Yes.

1    **Q.**    Retail pharmacies?

2    **A.**    Yes.

3    **Q.**    And hospitals as well; right?

4    **A.**    That's correct.

5    **Q.**    And would that include Cabell-Huntington Hospital and

6    St. Mary's?

7    **A.**    Yes.

8    **Q.**    And why did you include all of AmerisourceBergen's

9    customers and not just limit it to pharmacies?

10    **A.**    To give a, I believe, more complete picture, if you

11    will, a depiction of the full scope and breadth of the

12    business of Amerisource in Cabell County and the City of

13    Huntington.

14    **Q.**    Okay.  And you understand that AmerisourceBergen --

15              THE COURT:  Just a minute.

16              MR. MAHADY:  Sure.

17              MR. FARRELL:  Judge, based on the proffer from

18    this witness, we have no objection to his qualifications for

19    those datasets.

20              THE COURT:  All right.  I find Dr. -- I find Mr.

21    Martens to be an expert in the fields of forensic accounting

22    and data analytics.

23              MR. MAHADY:  Thank you, Your Honor.

24        You threw me off, Paul, in a good way, but we'll get

25    back to it.

1    BY MR. MAHADY:

2    **Q.**    All right.  The data that you analyzed includes

3    products that were shipped both in solid form and liquid

4    form; correct?

5    **A.**    That's correct.

6    **Q.**    All right.  And the data that --

7    **A.**    This is -- by the way, this is the Amerisource data.

8    **Q.**    Correct.  And the AmerisourceBergen data that you

9    analyzed for Cabell County and the City of Huntington also

10   included medications that were both opioid medications and

11   non-opioid medications as well; correct?

12   **A.**    That's correct.

13   **Q.**    Okay.  And can you explain again why you considered

14   both opioid medications and non-opioid medications?

15   **A.**    Once again, basically to give the, to give the Court a

16   full and complete picture of the scope and breadth of

17   Amerisource's sales in, in Cabell County and the City of

18   Huntington.

19   **Q.**    Okay.  Mr. Martens, how did you determine looking at

20   the data whether or not an item was an opioid or some other

21   non-opioid medication?

22   **A.**    With respect to identifying opioid medication, there we

23   utilized the NDC codes from the Amerisource data and then

24   matched and compared them with the NDC codes in the ARCOS

25   data.  And when we found a match, that drug was considered

1    and treated as an opioid drug.

2    **Q.**   Okay.  And since it's been a little while since we've

3    talked about the ARCOS data, just so we're clear, when we're

4    talking about the ARCOS data, we are talking about opioid

5    shipments; correct?

6    **A.**   That's correct.

7    **Q.**   Okay.

8    **A.**   This is the, the data that Dr. McCann had processed and

9    so forth.  That's the data we, we compared it to.

10   **Q.**   Okay.  Sticking for a second with the non-opioid

11   medications, were there any types of medications that were

12   more prevalent than others in AmerisourceBergen's data for

13   non-opioid medications?

14   **A.**   Well, there was -- the ones that come to mind are blood

15   pressure medications, antidepressants, diuretics, different,

16   different drugs dealing with asthma, things of that nature.

17   **Q.**   Okay.  And as far as how you quantify the shipments of

18   those units for both opioids and non-opioids, can you

19   explain to the Court how you did that?

20   **A.**   We applied a, a consistent approach in the sense that

21   to identify dosage units for the opioids, we multiplied and

22   took the quantity shipped times the item size that was

23   detailed in the, in the data.

24        And in the case of dealing with the opioid

25   transactions, we were able to check, to check our

1    calculations there with respect to those dosage units

2    reflected in the ARCOS data and found that our, our

3    calculations were in agreement.

4         And we applied the same approach when it came to

5    dealing with the liquid, the liquid form of these drugs;

6    taking quantity shipped times the item size and arriving at

7    the dosage units with respect to the liquid form of these

8    drugs as well.

9         So there was a consistent approach, not only consistent

10   between opioids and non-opioids, but also between liquid

11   form and solid form.

12   **Q.**   Was AmerisourceBergen's transactional data for Cabell

13   County and the City of Huntington voluminous?

14   **A.**   Very much so, yes.

15   **Q.**   Are we talking about a couple hundred transactions or

16   are we talking about tens of thousands of transactions

17   across all products?

18   **A.**   Probably more on the order of magnitude of tens of

19   thousands of transactions.

20   **Q.**   Okay.  And have you prepared summaries reflecting the

21   substance of the data?

22   **A.**   The results of the work, yes.

23   **Q.**   Okay.

24         MR. MAHADY:  Ms. Pierce, if you can please hand

25   the witness AM-WV-02768 and AM-WV-02769.

1      And, Mr. Serp, if you don't mind pulling up

2  AM-WV-02768.

3  BY MR. MAHADY:

4  **Q.**  Mr. Martens, starting with 02768, can you please

5  describe generally for the Court what we're looking at

6  here?

7  **A.**  What this, with this graph represents is for the period

8  2006 to 2014 this, this graph is all, all -- the blue line

9  is the total both in liquid form and solid form of the

10  dosage units by transaction year for all opioid and

11  non-opioid transactions in Cabell County and City of

12  Huntington.

13  **Q.**  Okay.  So stopping there for one second, this blue line

14  here that we see trending, this includes all products

15  shipped by AmerisourceBergen into Cabell County and the City

16  of Huntington; correct?

17  **A.**  That's correct.

18  **Q.**  Will you describe for the Court what the yellow line

19  is?

20  **A.**  The yellow, the yellow line is a subset of that data.

21  And the yellow line reflects the transactions involving the

22  ARCOS 14 drugs.

23  **Q.**  Okay.  And for purposes of this analysis, does this

24  include both opioids and non-opioids in solid form and

25  liquid form?

1    **A.**   It's both.  It's both solid and liquid, yes.

2    **Q.**   Okay.  And did you make any observations when you

3    looked at this chart?

4    **A.**   I think the observation that, that one can make is in

5    terms of the trends.  As you start to see the overall

6    business growing for the period in those early years, you

7    see sort of -- you see a similar trend with regards to the

8    growth in the ARCOS 14 drug line as well.

9         The one thing that you find is happening here, though,

10   is that the non-opioid growth appears to be outpacing the

11   opioid growth during that time frame.

12   **Q.**   Okay.  And just so we're clear here, if I understand

13   you correctly, what you're saying is looking at the blue

14   line, this blue line, non-opioid growth is outpacing the

15   growth of the opioid products; is that correct?

16   **A.**   That's correct.

17   **Q.**   Okay.  And based off of your analysis, did both the all

18   prescription drugs and the opioid distribution drugs peak in

19   or around the same time?

20   **A.**   They appear to have peaked in the same time frame

21   there, that being the year 2009.

22   **Q.**   Okay.  So we're looking up here to the blue line and

23   down here for the yellow line?

24   **A.**   That's correct.

25   **Q.**   Okay.  Mr. Martens, can we move to the next chart that

1    you prepared?  I believe that number is 2769.

2    **A.**    2769.

3              MR. MAHADY:  Mr. Serp, can you pull that up?

4    BY MR. MAHADY:

5    **Q.**    Okay.  And, Mr. Martens, can you generally describe

6    for the Court what this chart shows?

7    **A.**    What this chart shows is, once again, this is for all

8    products, all medications for the period 2006 through 2014,

9    Cabell County and the City of Huntington, essentially the

10   business mix.

11        You have in the, in the blue bars there on the chart

12   the percentage of non-opioid transactions, and then with the

13   orange the percentage of opioid transactions for each of the

14   years.

15   **Q.**    Okay.  So if we just start in 2006, just so I

16   understand this correctly, to make sure I understand it

17   correctly, the entire bar reflects the totality of

18   AmerisourceBergen's distribution into Cabell County and the

19   City of Huntington for 2006; correct?

20   **A.**    The entire bar, that's correct, yes.

21   **Q.**    Okay.  And this includes both liquid and solid form

22   drugs; correct?

23   **A.**    For this, for this chart, that's correct, yes.

24   **Q.**    Okay.  And am I correct that 5.76 percent of

25   AmerisourceBergen's distribution for that year, 2006,

1    reflected opioid medications?

2    **A.**   That's correct.

3    **Q.**   And 94.24 percent reflected non-opioid medications?

4    **A.**   That is correct.

5    **Q.**   Okay.  And I know this is somewhat annoying, but can

6    you just go through from 2006 to 2014 and just read the

7    percentage of opioids and the percentage of non-opioid

8    medication for each year just for the record?

9              MR. FARRELL:  Judge, I'm sorry.  If it saves any

10   time, the plaintiffs would stipulate and allow for the

11   admission of the document if he doesn't want to read it all

12   in.

13             MR. MAHADY:  That does save some time.  We were

14   going to move at the end for the admission of these under

15   Federal Rule of Evidence 1006.  We can do that now.

16             THE COURT:  Is there any objection to the

17   admission into evidence of these documents?

18             MR. FARRELL:  No, Your Honor.

19             THE COURT:  Okay.  They are both admitted.  02769

20   and 02768 are admitted.

21             MR. MAHADY:  Thank you, Your Honor.

22   BY MR. MAHADY:

23   **Q.**   So, Mr. Martens, I'm not going to have you read the

24   numbers now.  But did you make any observations off of

25   your analysis reflected in this chart?

1    **A.**    I think what the chart reflects is, is that the sale of

2    the non-opioid medications was significantly greater than

3    the opioid medication transactions for all of the years

4    within the time period.

5    **Q.**    Okay.  And just circling back on one point, the two

6    charts we looked at, those included medications that were

7    shipped in liquid form; correct?

8    **A.**    These, these two drugs are both liquid and solid.

9    **Q.**    Okay.  And that would include medications that were

10   shipped to the hospitals and pharmacies in liquid form;

11   correct?

12   **A.**    That's correct.

13   **Q.**    Okay.  Did you also prepare two charts that just

14   focused solely on medications shipped in solid form?

15   **A.**    I did, yes.

16   **Q.**    Okay.

17              MR. MAHADY:  Ms. Pierce, can you hand those to Mr.

18   Martens, please?

19        Mr. Serp, if you can please pull up AM-WV-02770.

20   BY MR. MAHADY:

21   **Q.**    Okay.  Mr. Martens, can you please describe

22   generally what this chart reflecting your analysis and

23   summary contains?

24   **A.**    This chart reflects the similar analysis as to what I

25   just described with respect to the, the first two charts.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1          This chart, however, is focused solely on solids only;

2     in other words, taking from the item form of the

3     transactional data solids, pills, caplets, capsules and

4     identifying the total dosage units by year, 2006 through

5     2014 for transactions in Cabell County and the City of

6     Huntington.  That's the blue line at the top, and then a

7     subset of that data in the orange line below for the ARCOS

8     14 drug data.

9     **Q.**   Okay.  So just so I'm clear, the blue line reflects all

10    solid form medications that AmerisourceBergen distributed

11    into Cabell County and the City of Huntington for the 2006

12    to 2014 time period; correct?

13    **A.**   Solids only, correct, yes.

14    **Q.**   Okay.  And the orange line down here reflects the

15    opioid solid form that AmerisourceBergen shipped into Cabell

16    County and the City of Huntington for that time period as

17    well; correct?

18    **A.**   That's correct.

19    **Q.**   Okay.  Could we please move to the next chart which is,

20    for the record, AM-WV-02771.

21         And, Mr. Martens, can you describe what this chart

22    shows?

23    **A.**   This is now a bar chart reflecting the percentages of

24    non-opioid versus opioid sales transactions, solids only,

25    into -- you know, distributed to Cabell County and City of

1    Huntington for the period 2006 to 2014.

2    **Q.**    Okay.  So even if we were to strip out

3    AmerisourceBergen's distribution of liquid products to its

4    customers in Cabell County and City of Huntington, only

5    84.31 -- or only 15.69 percent of the pill forms were for

6    opioid products; correct?

7    **A.**    That's correct, right.

8    **Q.**    And 84.31 percent of the pill form products that it

9    shipped into Cabell County and the City of Huntington were

10   for something other than opioid products; correct?

11   **A.**    That's correct.  Those are non-opioid medications.

12   **Q.**    Okay.  And is that generally consistent across the time

13   period from 2006 to 2014?

14   **A.**    Generally consistent.  I think you'll find that

15   there's -- the distribution -- appears to be generally

16   consistent, yes.  There's a few percentage points here and

17   there.  But by and large, you can see that there's a, still

18   a significant amount of non-opioid medications being

19   transacted, distributed when compared to the opioid

20   transactions.

21   **Q.**    Okay.  Let's see if we can spare the witness and the

22   Court from reading the numbers.

23          MR. MAHADY:  Your Honor, at this time we will move

24   AM-WV-02770 and AM-WV-02771 into evidence under Federal Rule

25   of Evidence 1006.

```
 1                    THE COURT:  Any objections?

 2                    MR. FARRELL:  No objection, Your Honor.

 3                    THE COURT:  They're both admitted.

 4                    MR. MAHADY:  Thank you, Your Honor.

 5      BY MR. MAHADY:

 6      Q.   Mr. Martens, do you offer all of the opinions here

 7      today with a reasonable degree of professional

 8      certainty?

 9      A.   I do.

10                    MR. MAHADY:  At this time, I have no further

11      questions.  Thank you, Mr. Martens.

12                    THE COURT:  Okay.  You may cross-examine.

13                              CROSS EXAMINATION

14      BY MR. FARRELL:

15      Q.   Good morning, Doctor.  My name is Paul Farrell.  We

16      haven't had a chance to meet yet.

17      A.   Good morning.  I'm not a doctor.

18      Q.   Oh, I'm sorry.  You have the pedigree of one with your

19      background and experience.

20      A.   Well, thank you.

21      Q.   I just had a couple of questions for you.

22           You testified that you reviewed Dr. McCann's processed

23      ARCOS data as part of your analysis; correct?

24      A.   That's correct.

25      Q.   And you said that you also reviewed the
```

1    AmerisourceBergen transactional data?

2    **A.**   That's correct.

3    **Q.**   And just to be clear that you're aware that

4    AmerisourceBergen's transactional data is broader in time

5    than the ARCOS data?

6    **A.**   I understand that there's broader data available, yes.

7    **Q.**   And I believe you just testified that the

8    AmerisourceBergen data you found to be reliable.  My

9    question is did you also find the McCann processed data to

10   be reliable as well?

11   **A.**   I did, yes.

12   **Q.**   No faults with Dr. McCann's math?

13   **A.**   With respect to Dr. McCann's math on --

14   **Q.**   The processed data.

15   **A.**   The processed data, yes.

16   **Q.**   No faults?

17   **A.**   I don't know if I could go so far as to say no faults,

18   sir, but I found it to be reliable.

19   **Q.**   Thank you.

20          MR. FARRELL:  Can we bring up 2768 that was just

21   admitted?

22   BY MR. FARRELL:

23   **Q.**   Exhibit 2768, the bottom line here is the opioids

24   sold by AmerisourceBergen into Huntington, Cabell County

25   between 2006 and 2014; correct?

1    **A.**    That's correct.

2    **Q.**    And this is just the -- this framing of time is just

3    because that's what the overlap is between ARCOS and

4    AmerisourceBergen's transactional data?

5    **A.**    That's how, that's how the analysis was performed and

6    that's how this chart reflects the results of the analysis

7    to match with the ARCOS time frame.

8    **Q.**    Now, if you were to add up all of these numbers on the

9    bottom line, it comes to -- and I won't ask you to do the

10    math -- 49 million dosage units.

11         My question, sir, is have you undertaken any analysis

12    as to whether 49 million dosage units have any economic

13    impact upon Huntington/Cabell County, West Virginia?

14    **A.**    I have not performed such an analysis, no, sir.

15    **Q.**    Did you make some analysis as to whether during this

16    time frame 49 million pills were appropriate for the size

17    population?

18    **A.**    I have not performed such an analysis, no, sir.

19    **Q.**    And did you take the orange line here that goes over

20    time and compare it to other orange lines for other counties

21    in West Virginia?

22    **A.**    I have not performed that task, no, sir.

23    **Q.**    Or any other county in the United States?

24    **A.**    I have not performed that, no, sir.

25    **Q.**    But could you have, based upon the data provided by

1    AmerisourceBergen, compared the volume of pills in

2    Huntington/Cabell County to other places around the country?

3    **A.**    Well, to the extent I had the data, I could re-perform,

4    I could re-perform that analysis, yes, sir, not just, not

5    just around the country but for the State of West Virginia

6    if that's your question.

7    **Q.**    Okay.  And what about pricing?  Were you able to

8    determine the -- how much revenue was generated from the

9    sale of these pills?

10   **A.**    I did not, I did not do that calculation, no, sir.

11   **Q.**    But could you have?

12   **A.**    I'm not sure.  I'd have to, I'd have to check to see if

13   the information is available.  I would assume that these

14   transactions are driven over the sales and the sales ledgers

15   at the company and then identify what the, what was for each

16   item and so forth in the charts and so forth pulling that

17   off the transactional data.

18   **Q.**    And when were you hired in this case, sir?

19   **A.**    It's hard -- I started working on the State of West

20   Virginia information I want to say probably in the summer of

21   2020.

22   **Q.**    Thank you.  No further questions.

23           THE COURT:  Any redirect, Mr. Mahady?

24           MR. MAHADY:  No redirect, Your Honor.  Thank you.

25           THE COURT:  May the witness be excused?

```
 1                    MR. FARRELL:  Yes, Your Honor.

 2                    THE COURT:  Colonel Martens, thank you, sir, very

 3      much.  You're free to go.

 4                    THE WITNESS:  Thank you, Judge.

 5                    MR. HESTER:  Your Honor, the defense calls our

 6      next witness, Dr. Kevin Murphy.

 7                    THE COURT:  All right.

 8                    MR. HESTER:  Is it convenient for the Court to

 9      take a break now or would you prefer that we get started?

10      I'm happy to do it either way, Your Honor.

11                    THE COURT:  Well, let's go ahead and take 10 now.

12           (Recess taken at 10:03 a.m.)

13                    THE COURT:  All right.  Mr. Hester?

14                    MR. HESTER:  Your Honor, the defense calls Dr.

15      Kevin Murphy to the stand as our next witness.

16                    COURTROOM DEPUTY CLERK:  Please state your name.

17                    THE WITNESS:  Kevin M. Murphy.

18                    COURTROOM DEPUTY CLERK:  Thank you.  Please raise

19      your right hand.

20              DR. KEVIN M. MURPHY, DEFENSE WITNESS, SWORN

21                    COURTROOM DEPUTY CLERK:  Thank you.  Please take a

22      seat.

23                    THE COURT:  Good morning, sir.

24                    THE WITNESS:  Good morning, Your Honor.

25                            DIRECT EXAMINATION
```

**BY MR. HESTER:**

**Q.**   Good morning, Dr. Murphy.  Could you please introduce yourself to the Court?

**A.**   Yes.  My name is Kevin M. Murphy.  I'm a George J. Stigler Distinguished Service Professor of Economics in the Graduate School of Business in the Department of Economics at the University of Chicago.

**Q.**   And, Dr. Murphy, when did you complete your education?

**A.**   I got my BA, I believe, in 1981 from UCLA, University of Southern -- University of California at Los Angeles, and I got my Ph.D. degree from the University of Chicago in 1986.

**Q.**   And how long have you been an economics professor at University of Chicago?

**A.**   I started teaching at University of Chicago, I believe, in 1983 while I -- before I finished my Ph.D. degree, I started teaching at the university and I've been there since then teaching.  From '83 until today, I teach at the university.

**Q.**   And what departments do you teach in at the university?

**A.**   I teach in both Booth School of Business and the Department of Economics.

**Q.**   So, Dr. Murphy, could you give the Court a sense as to the reputation of the University of Chicago in the field of economics?

**A.**   It has a pretty good reputation in economics.  It's
produced probably the most number of Nobel Prize winners, I
think, out there.  People like Milton Friedman and George
Stigler, very famous economists taught there.  Gary Becker
was one of my mentors out there.

THE COURT:  I'm well familiar with the reputation
of the University of Chicago.

MR. HESTER:  It was a little bit of a softball for
Dr. Murphy.

BY MR. HESTER:

**Q.**   What courses do you teach at the University of Chicago?

**A.**   I teach microeconomics, which is the study of markets
and how markets work.  I also teach labor economics.  I also
teach public policy.  I also teach a course in sports
analytics.  But the core of my teaching is really in the
microeconomics area and I'm very fortunate to be able to
teach in both Booth and the Department of Economics Ph.D.
program in that.

**Q.**   And, Dr. Murphy, when you refer to microeconomics,
maybe you could expand on that a little bit more.  What's
the focus of microeconomics?

**A.**   In economics, we make two broad distinctions between
macroeconomics, which is the people who talk about GEP and
the growth of the economy as a whole and things like that.
I like to think of that as the voodoo side of economics.

1     Then we do the microeconomics, which is kind of what I

2     do, which is really the study of markets and how markets

3     work.  And that's what I do in my research and that's what I

4     do in my teaching.  It gives you some insights at the macro

5     level, but it's much more focused on individual markets and

6     how they operate.

7     **Q.**  And so, is it fair to say that the focus of your work

8     is on the behavior of firms and the behavior of particular

9     markets?

10    **A.**  Yeah.  I would say to understand a market, you usually

11    have to think about both the supply and the demand side.

12    Where you think about the customers and the ultimate users

13    of a product on one side and the providers of the product on

14    the other side, including the supply chain component of

15    that.  That's a part of economics we cover a lot in micro

16    called drive demand, where we study demand for various

17    components or parts of the products that are ultimately

18    sold.

19    **Q.**  And beyond your role in teaching, Dr. Murphy, do you

20    publish academic research in the field of economics?

21    **A.**  I do.  I've published a number of papers in a pretty

22    wide area of economics.

23    **Q.**  Do you have a sense roughly as to how many papers

24    you've authored or co-authored?

25    **A.**  About 80, I think I've published on, either authored or

1  co-authored over my career.

2  **Q.**   And have those articles been published in a number of

3  the leading scholarly and professional journals?

4  **A.**   Yes, they have.  I've published in Journal of Political

5  Economy, American Economic Review, Quarterly Journal of

6  Economics.  Those are probably the top journals in

7  economics.

8  **Q.**   And have some of the articles that you've written been

9  widely cited in the field?

10  **A.**   They have.  I have a number of works in different areas

11  that have been pretty widely cited.

12  **Q.**   Are there a few you could just give us as

13  illustrations?

14  **A.**   Yeah.  I did -- I did some of the early work on growth

15  and income and equality and changes in the patterns of

16  unemployment and education.  I've done work on health

17  economics and the value of improvements in health and

18  longevity that's been widely cited in the health economics

19  area.

20      I've done work on the markets for illegal drugs,

21  addiction.  Those would probably be the areas that are cited

22  most.  Similarly, my work on economic growth also is pretty

23  highly cited.

24  **Q.**   Have you also published some books on economics?

25  **A.**   I have.  I've published books on social economics, on

1    price theory, which is really throughout my microeconomics

2    courses that I teach and particularly my Ph.D. class.  Also,

3    edited books on healthcare and markets and value of health

4    and longevity.

5    **Q.**   Dr. Murphy, have you received any awards during the

6    course of your career in economics?

7    **A.**   I have.  I received the John Bates Clark medal, which

8    is -- at the time was awarded every other year to the

9    outstanding American economist under 40.  As you can guess,

10   that was awhile back.  I'm no longer under 40.

11        I also received a MacArthur from the MacArthur

12   Foundation and I was awarded the Kenneth J. Arrow prize for

13   the outstanding paper in health economics.  So, yeah, I have

14   a number of awards.

15   **Q.**   Other than your work at the University of Chicago, are

16   you also affiliated with any other organizations?

17   **A.**   I am.  I -- I'm affiliated with Charles River

18   Associates where I am a senior consultant.

19   **Q.**   Are you also a member of some academic academies?

20   **A.**   Yes.  I'm a member of the American Academy of Arts and

21   Sciences, a member of the Society of Labor Economists.  I

22   don't remember all of the other ones.

23   **Q.**   Are you also affiliated with the Econometric Society?

24   **A.**   Yes.  I'm a fellow of the Econometric Society.  Sorry.

25   I forgot about that one.

**Q.**   And do you also have a role with the National Bureau of Economic Research?

**A.**   I do.  I'm a -- I don't remember the title, but I've been with the NBER, the National Bureau of Economic Research, for -- since the 80s.  So, you know, almost 40 years now.

**Q.**   Dr. Murphy, you mentioned you serve as a senior consultant to Charles River Associates.  Can you describe what Charles River Associates is?

**A.**   Yes.  It's a consulting firm and, certainly, the part I'm involved is an economic consulting operation where we consult on a wide range of matters, including litigation matters like this.

**Q.**   And are there some particular kinds of matters that you focused on in your consulting work for Charles River?

**A.**   I've done a fair number of different things. Antitrust.  I do a lot of work in antitrust.  I've done work on patent damages.  I've done work on labor cases.  I've done work on health -- you know, healthcare-related things. I've done a number of things.

**Q.**   So, during your time at Charles River Associates or in relation to that affiliation that you have, have you worked on problems related to the pharmaceutical industry?

**A.**   I have.  I've worked on a number of pharmaceutical matters.

1    **Q.**   Have you previously served as an expert witness in

2    litigation?

3    **A.**   Yes, I have.

4    **Q.**   And how many times roughly have you served as an expert

5    witness?

6    **A.**   You know, it's hard to know.  I can't remember.

7    Testifying in trial, probably between 10 and 20 would be the

8    number of times I've testified at trial.  I've given more

9    deposition testimonies than that, clearly, because a lot of

10   things don't go to trial.

11   **Q.**   And have a number of your expert engagements involved

12   matters related to health economics or the pharmaceutical

13   industry?

14   **A.**   They have.

15   **Q.**   Have you previously been qualified as an expert in the

16   field of economics?

17   **A.**   Yes, I have.

18   **Q.**   Have you previously submitted expert testimony to the

19   United States Congress?

20   **A.**   Yes, I have.

21   **Q.**   Could you describe that briefly?

22   **A.**   Yeah.  I just -- I have testified before the U. S.

23   Senate on minimum wages, would be the one that I remember.

24   **Q.**   And have you previously submitted expert testimony, as

25   well, to state regulatory bodies?

1    **A.**    I have.

2    **Q.**    Could you describe that just briefly?

3    **A.**    Yeah.  I've submitted testimony in Illinois, before

4    state regulatory bodies in Illinois.

5    **Q.**    In the course of your expert engagements, are you

6    always representing private companies or have you also

7    worked for other kinds of entities?

8    **A.**    I've worked for the federal government.  I've consulted

9    for both Department of Justice and the Federal Trade

10   Commission.

11           MR. HESTER:  Your Honor, at this time, we would

12   tender Dr. Murphy as an expert in the field of economics

13   with a specialty in health economics.

14           THE COURT:  Any objection?

15           MR. FARRELL:  Again, reserving the right,

16   depending on the subject matter that he's being proffered

17   for here, but he's certainly an expert in both those general

18   fields.

19           THE COURT:  Well, I find him to obviously be an

20   expert in the fields of economics and especially health

21   economics.

22           BY MR. HESTER:

23   **Q.**    So, Dr. Murphy, in your career as a professional

24   economist, have you developed an expertise in market forces

25   and supply chain?  I think that's probably a pretty easy one

1    for you.

2    **A.**    Yeah.  I think I answered that already.  And, yes,

3    that's part of -- a big part of what we do in

4    microeconomics.

5    **Q.**    And does any of that expertise relate specifically to

6    economics of healthcare markets?

7    **A.**    It does.  I've done work on healthcare markets, you

8    know, related to both innovation, as well as payment

9    structures, things like that, about how those -- the forces

10   that work in healthcare markets.

11   **Q.**    And in connection with your work on this matter, have

12   you reviewed materials related to the Closed System of

13   Distribution for controlled substances like prescription

14   opioids?

15   **A.**    I have.  Again, I am not an expert from the point of

16   view of all the legal aspects and the regulatory aspects.  I

17   am an economist.  So, my understanding is the economics of

18   that industry and how that industry works from an economics

19   perspective.

20   **Q.**    And based on your experience and your review of these

21   materials, have you been able to develop an understanding as

22   to the role from an economics perspective that distributors

23   play in that system of distribution of controlled

24   substances?

25   **A.**    I have.

1   **Q.**   And what's the -- what's the understanding you've been

2   able to develop?

3   **A.**   Well, I think the way to think about it is

4   distributors' role is that they -- they purchase

5   pharmaceuticals from manufacturers and distribute them and

6   sell them to the pharmacies or other distribution outlets

7   downstream and, therefore, the amount that they distribute

8   is -- for example, of a controlled substance like opioids

9   would be determined by the prescribing behavior because it's

10   the prescribing behavior that determines the amount that

11   pharmacies are going to need to fill those prescriptions and

12   that then in turn determines how many prescription opioids

13   are going to be shipped.

14   **Q.**   So now, there's been testimony in this case about an

15   alleged oversupply of prescription opioids in Cabell County

16   and the City of Huntington.  Have you had a chance to review

17   some of that testimony?

18   **A.**   I have.  And let me kind of tell you how an economist

19   would think about that.  In economics we make a distinction

20   between three things that are related but different.

21       One is what we might call quantity, or consumption, or

22   level of output, depending on whether you're looking at it

23   from the consumer's point of view, or the producer's point

24   of view, or just the market point of view.  That's the

25   outcome.  That's how many units were sold in the

1    marketplace.

2         We think of a separate thing called supply, which is on

3    the -- forces that work on the supplier side of the market

4    and demand and the quantity you see is a function of both

5    the supply and demand.

6         It's not a measure of supply per se.  It's a measure of

7    the quantity which is a function of both.  So you want to

8    keep that in your mind when you talk about like the level of

9    output or the level of consumption.  It really is an

10   outcome.

11        And, for example, you can't say, well, geez, we had

12   more output and, therefore, there was an increase in supply.

13   Economists wouldn't think about it that way.

14        You know, people consume more gasoline.  It could be

15   because we discover a lot of oil and oil prices go down and

16   people buy more gasoline because it's cheaper, but it also

17   could be a bunch of people move to the suburbs and they get

18   richer and they demand more gasoline and the quantity of

19   gasoline goes up for demand forces.  And just the fact that

20   the quantity went up doesn't tell you it was something going

21   on on the supply side.

22   Q.   And so, in relation in particular to the distribution

23   of prescription opioids and the sale of prescription

24   opioids, is there a particular driver of demand that you've

25   identified?

**A.**   Yeah.  As I said a bit ago, I think prescriptions -- if you wanted to think about market like this and what's going to determine the quantity, it's going to be the prescribing behavior.

**Q.**   And why is that?

**A.**   Well, because in order to sell a prescription, legitimate prescription, or a legal prescription in this marketplace, you have to have a prescription.

This is not like you go down to the grocery store and say, you know, oh, I see there's a stack of doughnuts.  I'll buy some doughnuts.  That's not how this works.

You need a prescription to buy it and my understanding of the evidence in this case is that the opioids that were distributed were distributed overwhelmingly for -- through prescriptions.  So, it's prescriptions would be the driver.

**Q.**   And you had mentioned before, Dr. Murphy, that the responsibility for prescriptions lies where?

**A.**   Well, if you think about who influences the prescriptions primarily, at the point of the spear, kind of like where that actually happens, it's going to be the doctors and the patients, right?

Ultimately, the doctor is going to decide to write a prescription and the patient plays a role in that and, you know, then there's a question of whether patient fills that or not.  That's also a patient level.  So, it's doctor and

1   patient that probably play the greatest roles.  All the

2   other things that might influence doctors and patients but,

3   ultimately, it's going to work through them.

4   **Q.**   So, given these factors that you're discussing in this

5   industry, do distributors determine the quantity of

6   prescription opioids that are sold in a community?

7   **A.**   Well, they -- not directly because they don't really --

8   they don't really have levers at the level of prescription,

9   that if you think about a distributor's decision, they're

10  not deciding about whether to supply opioids for a

11  particular prescription and they're not deciding whether

12  those opioids dispensed through that prescription are going

13  to be used by legitimate use or diverted in some other way

14  once they're outside the pharmacy, right?  They don't --

15  they don't act at that level.  They act at a more aggregate

16  level where they're making decisions on -- you know, on --

17  their distributing the product to the pharmacy, but not

18  affecting the prescriptions directly.

19  **Q.**   And when a pharmacy places orders with a distributor,

20  what's your understanding as to what the pharmacy is doing?

21  How does the pharmacy decide on how much it chooses to order

22  from a distributor?

23  **A.**   Again, I'm going to give you economics, right?  The

24  pharmacies are a profit maximizing business.  They're out

25  there looking for their -- to run their business.  They're

1    going to distribute opioids, it's my understanding, pursuant

2    to prescriptions.

3        So, when they order, they're going to order based on

4    what they expect to get in terms of prescription volume.  It

5    doesn't -- it's not in their interest to have opioids just

6    piling up in the pharmacy if there's not prescriptions to be

7    filled.  So, they're going to base their orders on some

8    anticipated notion of prescriptions.  That's what economics

9    tells us.

10   **Q.**   So, is an association between the quantity of opioids

11   sold in a community and the -- and opioid mortality

12   significant or meaningful from an economic perspective?

13   **A.**   Well, I think it depends on the question you're asking.

14   If you're asking does that tell me something about, say,

15   distributor behavior, probably not.  Not very helpful in

16   that regard.

17       The idea that when there are more opioids being

18   consumed there might be more things like overdoses, that

19   kind of in an extreme sense has to be true, right, because

20   if you didn't consume any opioids, you couldn't overdose on

21   prescription opioids.

22       So, it doesn't really tell you about why.  It doesn't

23   tell you what happened.  It just tells you kind of the

24   outcome, not -- not the genesis of that outcome.

25   **Q.**   So, there's an association between the quantity of

1    opioids sold in the community and opioid mortality

2    established that distributors' conduct caused that increased

3    mortality?

4              MR. FARRELL:  Judge, before we move forward, I

5    just wanted to make sure that the testimony that was being

6    elicited is from an economic standpoint and an economic

7    analysis only.  That question was broad enough that it

8    invokes other disciplines perhaps, such as epidemiology, but

9    to the extent that the question is parked or framed in terms

10   of economics, we have no objection.

11             THE COURT:  Well, I'll overrule it.  Well, you

12   don't have an objection.

13       You can answer the question, Dr. Murphy, if you

14   remember what it was.

15             THE WITNESS:  Can I get it repeated?

16             BY MR. HESTER:

17   **Q.**   Sure, sure, sure.

18   **A.**   That would help me.  Sorry about that.

19   **Q.**   Dr. Murphy, does an association between quantity of

20   opioids sold in the community and opioid mortality establish

21   that distributors' conduct caused that increased mortality?

22   **A.**   No.  I mean, again, if you study the economics, there's

23   -- you know, that would -- that association would exist even

24   if distributors did nothing to cause that.

25   **Q.**   So, maybe just talk a little bit more broadly from the

1    perspective of economics, Dr. Murphy, about the relationship

2    between these terms association and causation.  Talk a

3    little bit about that.

4    **A.**   Well, they're different because association, it's

5    really more of a statistical concept but, you know, part of

6    economics is we do a lot of statistical work and, certainly,

7    that's a big part of my career, is applying economics to

8    data.

9         Association just tells you things move together.

10   There's a tendency for A to go up when B goes up.

11        So, for example, you would see an association between

12   rain and the use of umbrellas, right?  There's a pretty

13   strong association.  People tend to use umbrellas when it's

14   raining, but you wouldn't infer that umbrellas cause it to

15   rain.

16        You know, I might have a drought.  I can't run outside

17   with my umbrella and put it up and get rain to come down.

18   You know, that would be a misinterpretation and that would

19   be an example of distinction between -- in that case, it's

20   sort of simple because causality runs the other way.

21        Sometimes, things are associated where there's no

22   causality either way.  They just are both caused by the same

23   forces.  So, there's a big difference between association

24   and causation.

25   **Q.**   So, when we use this phrase association, does it

1    signify that two things are observed happening together or

2    sequentially?  Is that what it means?

3    **A.**    Association could be different types of association.

4    There's what we would call a time series association, which

5    means over time they happen together.  There could be a

6    cross-sectional association, the same locations where A

7    happens, B also happens; or when A doesn't happen, B doesn't

8    happen, right?  Those would be both notions of association,

9    one over the time dimension and one over the cross-sectional

10   dimension.

11   **Q.**    So, Dr. Murphy, have you analyzed the relationship

12   between the shipments of prescription opioids and

13   opioid-related mortality?

14   **A.**    I have.

15   **Q.**    And have you prepared a demonstrative as part of your

16   expert report in this matter that would assist in explaining

17   your analysis?

18   **A.**    Yes, I have.

19             MR. HESTER:  So, let's see if we can put that up

20   on the board.

21             BY MR. HESTER:

22   **Q.**    So, Dr. Murphy, we've put up on the board here an

23   exhibit from your expert report.  Can you describe what's

24   depicted on this chart?

25   **A.**    Yeah.  This has got two lines on it, so this is what we

1   call a line chart.  The years are on the horizontal axis and

2   what we're measuring is on the vertical axis.  So, those

3   lines tell you at each year point for that year what was the

4   level of the indicated variable.

5        So, the left hand axis is MMEs per adults in West

6   Virginia.  That's the blue line.  And it shows you how it

7   behaves.

8        So, basically, MME per adult was going up from the

9   beginning of the dataset here and peaks right around

10  2011-2012, after which it has a pretty precipitous decline.

11       So, actually, if you look at this outcome we call

12  quantity or shipments it's right at the outcome.  It's not a

13  measure of supply.  It's just a measure of outcome.  That

14  was what shipments did over this period of time.

15       So, they first rose and then declined in the last, you

16  know, seven years, six years or seven years of the data.

17  **Q.**   And let me just pause you there again just to make sure

18  we've got it clear between this point you made about supply

19  and quantity.  The blue line, which shows a rise between

20  1995-96 and 2010-11 and then a decline going out to 2017,

21  that's reflecting a quantity in the marketplace; is that

22  fair to say?

23  **A.**   Yes.  I mean, you could think about it as it's

24  quantities of shipments.  It's the number of opioids

25  shipped.  It's quantity measure.  It's a measure of the

1      outcome in the market, which is a function of both supply

2      and demand.

3      **Q.**   And as a matter of economics you would view that

4      quantity as the outcome of decision making by doctors?

5      **A.**   I think if you -- yeah.  Ultimately, in this case, it

6      would be determined by the decision making of doctors and

7      patients, right, because doctors work to get -- you know,

8      the prescription is something that's done between the doctor

9      and the patient because, hopefully, doctors take some input

10     from the patients and my understanding is that they do.  So,

11     it would be the both of them and that's not to say that

12     there are other things that come in.

13         For example, I saw somebody earlier today talked about

14     payers.  Payers have some influence on those prescriptions

15     because they determine the terms under which, for example,

16     reimbursement is going to happen, which is going to

17     influence prescribing behavior.  So, they're kind of inside

18     that -- that -- that decision making process.

19     **Q.**   So, let's look at the underline here, the black line.

20     Could you describe what that is, Dr. Murphy?

21     **A.**   That's mortality rate measured as deaths per 100,000

22     people.  So, it's the opioid mortality rate, including both

23     licit and illicit opioids.  I think people talked about that

24     already, so I'm not introducing anything new there, but it's

25     all types of opioid mortality over that time period.

1          And what you see here is it's not a really simple

2     association, right?  We're not talking causation at this

3     point.  We're talking about just simple association.  The

4     association here isn't one where one goes up the other one

5     always goes up.  We had two very distinct periods.  They

6     were both going up.  So, that's called -- up through 2010 or

7     so, maybe it's '11, you know, right around in that time

8     period.

9          And then they -- you know, if anything, mortality

10    accelerates and shipments go down.  So, you have to kind of

11    understand.  You know, if you want to understand what's

12    going on, you really want to understand both those periods.

13    How do I -- how do I think about the marketplace from an

14    economics standpoint what's going on in those two periods.

15    **Q.**   So, just to be clear, the opioid mortality line here

16    includes both illicit and prescription opioids, correct?

17    **A.**   It does.  That's what I said.  The mortality -- all

18    opioid mortality -- the shipment data are only -- obviously,

19    because they'll come from ARCOS, they're going to be

20    prescription opioids.

21    **Q.**   And could you expand a little bit on your point that

22    it's not a simple association?

23    **A.**   Yeah.  We talked earlier about association, right?  We

24    talked about it as one thing goes up, the other one goes up

25    or one goes up and the other goes down.  Those would be

1   called positive and negative associations.

2       The associations here look really different in these

3   two time periods.  We had this first period where they were

4   both going up; and then, we had the second period where one

5   -- the shipments are going down but, if anything, the

6   mortality is going up faster, not slower.

7   **Q.**   And so, what does that tell you about the need to

8   evaluate this association?  Where do you go from here as

9   you're evaluating this?

10  **A.**   Well, I think you need to try to understand those two

11  periods.  You need to understand what was going on in that

12  earlier period.  And then, you particularly need to

13  understand that later period and you need to understand

14  well, geez, why is mortality going up in this later period

15  while prescription opioid shipments are actually going down?

16  So, it's getting behind these figures, I think, that's

17  important.

18  **Q.**   So, let's talk first about that pre-2010 period, Dr.

19  Murphy.  During that pre-2010 period, again, what do you see

20  happening with prescription opioid shipments and opioid

21  mortality?

22  **A.**   They're both going up and, again, that's telling me

23  that people -- there were more pills being consumed or

24  presumably.  It would certainly be more shipped and more

25  prescriptions being written.  So, we had more and more

1     prescriptions for opioids over this period and over that

2     period mortality was going up.

3         It doesn't tell us a causal story in a sense of was it

4     supply, was it demand.  There probably is some link between

5     quantity of one and the other because, as I said earlier,

6     you can't overdose if you don't take it in the first place.

7         But that doesn't establish, for example, something like

8     a causal relationship back to distributors, again, because

9     it's coming through prescriptions, presumably, it's working

10    through prescriptions.  And, as I said earlier, distributors

11    aren't really the primary or even significant determinant of

12    those prescriptions being written.

13    **Q.**   So then, let's look at the post-2010 period.  At that

14    time, after 2010, what's happening between prescription

15    opioid shipments and opioid mortality?

16    **A.**   Well, we'll get behind that in a minute, but what's

17    happening at the gross level, obviously, as I said earlier,

18    is that prescription -- shipments of prescription opioids

19    are going down, but mortality is going up and, indeed, going

20    up more rapidly, if anything, than it was before.

21    **Q.**   And so, what was driving the increase in opioid

22    mortality in this period after 2010?

23    **A.**   It was an expansion, if you -- well, we'll see this in

24    a moment.  It's an expansion in the use of heroin and, in

25    particular, the growth of fentanyl as a much more lethal

1    form of illicit opioid.

2    **Q.**   And have you had occasion to analyze this point about

3    the relative impact of illegal opioids like fentanyl and

4    heroin on opioid mortalities?  Is that something that you've

5    looked at for the process?

6    **A.**   I have.

7    **Q.**   And what are the results you've reached at the highest

8    level?  We'll drill into it in more detail, but what are the

9    -- what's the highest level conclusion you've reached?

10   **A.**   I would say it was what I said just a moment ago, that

11   it's really the growth and mortality in that later period

12   that's really driven by a growth in, first, heroin

13   mortality; and then, later, a substantial growth in

14   fentanyl-related mortality.

15   **Q.**   So, let's go on to the next exhibit where we can drill

16   into this a little bit more.  So, we've put up Exhibit 33,

17   Dr. Murphy.  Is this another exhibit from your report?

18   **A.**   It is.  It was Exhibit number 33 in my report.  That's

19   where the 33 came from because it's not 33 for today.  We're

20   sparing you a lot of the other ones.

21   **Q.**   What does this chart reflect?

22   **A.**   It looks at adult deaths per 100,000.  So, that's a

23   mortality rate.  And it breaks it out between prescription

24   opioids, which is the black line, and heroin and fentanyl

25   together, which is the blue line.

1        So, I'm not separating heroin and fentanyl right now.

2    I'm putting those together.  So, we'll call those the

3    illicit opioids, heroin and fentanyl, although some of the

4    fentanyl is actually prescription.  So, it's not quite all

5    illicit even though, in the later period, most of it is

6    going to be illicit, but --

7    **Q.**   So, just for the record, could you describe the shape

8    of the -- of the black line, the prescription opioid line?

9    **A.**   Yeah.  The prescription opioid line is rising up

10   through that same 2011 or so period, after which it

11   declines.

12       Now, I should say one thing.  Sometimes and it's not --

13   you know, we have people when they die who have both heroin

14   or fentanyl and prescription opioids.  In this figure, I've

15   put that mixed group into the heroin and fentanyl category.

16   That's the more lethal category.

17   **Q.**   Why did you do that?

18   **A.**   It seemed -- if you were going to put them one place or

19   the other, it seemed like a better place because those are

20   the more lethal drugs.  So, it seemed to make more sense to

21   put them there.

22       I've also re-done this chart done the other way.  It'll

23   make the heroin and fentanyl line go up a little less

24   because you're taking people out of that one and the decline

25   in the prescription one is a little -- is less.  So, it

```
1    won't change qualitatively the story.  I just wanted to make
2    sure that was clear how I had done it.
3    Q.   So, this is showing opioid mortality rates.  So -- so,
4    what does it show about the prescription opioid mortality
5    rates?
6    A.   Well, it says that they were going up until about 2011.
7    And then, since 2011, they've been going down.
8    Q.   And what does it show about the illicit drug mortality
9    rate, heroin and illicit fentanyl?
10   A.   Well, be careful.  Remember, heroin is illicit, but
11   fentanyl, there's some of both, right?  And chemically you
12   can't tell whether it was prescription fentanyl or -- or
13   illicit fentanyl.  So, they're combined together in this
14   blue line, but that huge increase in that later period, I
15   will give you -- show you how you know that in the later
16   period is mostly the illicit fentanyl driving that.
17   Q.   Yeah.  I was going to ask you that.  Your understanding
18   is most of the spike period here we're seeing after 2011 or
19   so reflects illicit fentanyl?
20   A.   Yeah.  I think that's generally accepted.  I think Dr.
21   Keyes, you know, found the same thing.  I don't -- I don't
22   know of anybody who would disagree with that as the big
23   story for that later period.
24   Q.   So now, let's go to the next exhibit.  Dr. Murphy,
25   we've put up another chart on adult opioid mortality rates.
```

1    What does this chart show?

2    **A.**    Again, this is -- now this is taking that -- remember

3    in that previous graph, 33, I had heroin and fentanyl

4    together?  Here, I'm breaking them out separately.  And so,

5    I've got the green line being the heroin and fentanyl being

6    the blue line.

7        Now, again, we're going to have this overlap issue.

8    So, I've put in the fentanyl category anything that has

9    fentanyl.  So, if it's fentanyl and heroin, it goes in the

10   blue line.  If it's only heroin, it goes in the green line.

11   **Q.**    And just for the record, could you describe what the

12   heroin line -- what the shape of the heroin line is?

13   **A.**    Yeah.  The heroin really begins increasing pretty

14   significantly.  It had been creeping up earlier, but it

15   really begins increasing around 2010.  It peaks in 2015,

16   after which it declines somewhat.  Fentanyl is pretty flat

17   between 2010 and 2013, but then skyrockets starting around

18   2013.

19              THE COURT:  Mr. Farrell?

20              MR. FARRELL:  I would simply ask for a geographic

21   scope to be proffered for the record, Your Honor.

22              BY MR. HESTER:

23   **Q.**    What is the geographic scope of this chart, Dr. Murphy?

24   **A.**    Thank you very much for clarifying.  This is the U. S.

25   as a whole.  So, this is the U. S. chart.  This is opioid

1    mortality for the U. S. as a whole and what we just talked

2    about, all those timing issues, pertain specifically to the

3    U. S. as a whole.

4    **Q.**   That's a nice segue to the next question I had on my

5    outline.  Do these patterns also hold true in West Virginia,

6    Dr. Murphy?

7    **A.**   Yeah.  I mean, at a general level, you see a similar

8    timing story for West Virginia.  All of the magnitudes are

9    different.  Now, that's an important thing to keep in mind.

10   **Q.**   So, let's go to Exhibit 35.

11   **A.**   Right.

12   **Q.**   So, Dr. Murphy, what do these charts show?

13   **A.**   Well, these charts do -- remember, we had just looked

14   at 33 and 34, which were the U. S. as a whole.  33 was

15   prescription in the black line and heroin and fentanyl in

16   the blue line.  We've just re-done that here in the same

17   methodology for West Virginia.

18        And, again, what you see is that the prescription

19   mortality is rising up until about 2011 and declines after

20   2011 and the heroin and fentanyl mortality again starts

21   going up.  Again, it was rising, but it starts rising much

22   more rapidly after, you know, 2012 or so.

23   **Q.**   And then, what does Exhibit 36 show?

24   **A.**   Exhibit 36 shows kind of a similar pattern to what we

25   saw before, which is, you know, heroin first rising after

1   2010, rising up peaking, in this case, around 2013 and then

2   going down and fentanyl really taking off after 2013.

3        Two things to note here.  Again, I've done the

4   divisions of the overlaps the same way I did before.  So,

5   the overlap story is the same.

6        But also, the scales here.  That scale, I think, on the

7   other chart went to 14.  The scale here goes to 50.  So,

8   even though they look similar in terms of shapes, it's a

9   much bigger magnitude in West Virginia.  So, what happened

10  in the U. S. happened to a greater extent in West Virginia.

11  **Q.**   And when you say a greater extent, what do you mean by

12  that, Dr. Murphy?

13  **A.**   Just the magnitude.  Just, you know, so we're at a peak

14  here.  At a heroin and fentanyl death rate above 40, we're

15  going to peak for the U. S. as a whole at a much smaller

16  number than that.

17  **Q.**   So, as we look at these West Virginia charts, what does

18  this tell you about the present day opioid mortality in West

19  Virginia?

20  **A.**   It's overwhelmingly driven by heroin and fentanyl and,

21  in particular, fentanyl.  Fentanyl is where the action is in

22  terms of morality today.

23  **Q.**   And when you're referring to fentanyl, are you

24  referring to illicit fentanyl?

25  **A.**   It's -- and we'll see some evidence more from this

1     later.  You know, not all fentanyl is going to illicit.

2     There is -- there is prescription fentanyl, but the big

3     increase is from illicit fentanyl.

4     **Q.**   Dr. Murphy, have you performed an analysis as to

5     whether increased prescription opioid shipments prior to

6     2010 drove the increase in illicit opioid mortality after

7     2010?  Is that a question you've looked at?

8     **A.**   I have.  I've done some economic analyses to try to get

9     at that question.

10    **Q.**   And maybe we could just pause again for a second.

11    What's the reason to look back at shipments before 2010 of

12    prescription opioids to evaluate the impact on opioid

13    mortality after 2010?  What's the reason to do that?

14    **A.**   Well, there are two reasons.  One is, obviously, the

15    story in the late-year period is illicit mortality,

16    particularly in mortality associated with fentanyl.  The

17    greatest level of shipments were occurring in that earlier

18    period and, in my understanding of what I've read in Dr.

19    Keyes and others of the plaintiffs' theories, is that really

20    what we see in that later period was driven by the

21    prescribing behavior that happened in the earlier period.

22    And so, it was the earlier prescription opioid, you know,

23    decisions or the outcomes that drove the later period.  And

24    I tried to evaluate that from an economic standpoint.

25    **Q.**   And what is the opinion you've reached at a high level?

**A.**   I would say the theory -- the economic evidence doesn't really fit that theory very well.  I think that the evidence that I've seen really seems to say, you know, there's a lot of things going on after 2010-11 that really aren't that well associated or, you know, don't fit with the story that it was the result of the conduct pre-2011.

**Q.**   So -- so, in other words, what is the link you see between shipments of prescription opioids before 2010 and the increases you observe in illicit opioid mortality after 2010?

**A.**   Well, I'm going to evaluate that for purposes of my analysis on three dimensions.  I'm going to look first across states.  And I'm going to ask was this states where we saw more shipments in that earlier period the same states where we saw more morality at the later period, right?  That is, under the theory that it was the shipment levels that were driving, remember, we're not talking about causality back to distributor.  That's even yet further removed.

We're just here looking at did higher shipments associated with more mortality later?  Higher shipments before 2010, are they associated with higher mortality later?

A second one is if you look at who is dying, you know, look at like by ages and gender, who is it that's dying in that post-period?  Are those the same groups of people who

1    were taking prescription opioids or abusing prescription

2    opioids in that earlier period?  That is, is there somehow

3    to link these two things up either by looking across states

4    or linking them by looking across people?  You don't really

5    see that.

6         And, finally, I'm going to look at this rise in a later

7    period and show that, in fact, it's very different in

8    different parts of the country even though different parts

9    of the country have very similar prescribing behavior early.

10   And that also says there's something else going on here and

11   it has to do with the illicit supply of opioids in this

12   world.

13   **Q.**   So, let's drill into each of those in more detail, but

14   I first wanted to clarify a point you made just now in your

15   answer, which was you said this is even separate and apart

16   from whether distributors caused the increase in shipments.

17   And could you just explain that again just to make it clear

18   what your analysis is?

19   **A.**   Yeah, because everything I'm doing right now is just to

20   say is it the same places where there were lots of shipments

21   that have -- in the early period have more mortality in a

22   later period?  Is it the same groups who had lots of

23   prescriptions in the early period and who had more mortality

24   in the later period?  And are there differences across

25   regions of the country in those outcomes even though they

87

1    were very similar in terms of shipment?

2         So, nothing in there is ascribing why those shipments

3    were what they were in the early period.  Given what they

4    were, does that seem to drive the later period?

5    **Q.**   And so, all of this analysis is based on your earlier

6    discussion about the reasons that shipments increased based

7    on prescribing behavior?

8    **A.**   Yeah.  It would be -- it really is about the outcome.

9    The outcome was driven by prescribing behavior and did that

10   higher prescribing behavior somehow predict what we see

11   later, either cross-sectionally, group-wise, and understand

12   the differences across regions.

13   **Q.**   So, let's drill into more detail on these three points

14   you've made.  First, I believe you said that the data do not

15   show a strong relationship between shipments of prescription

16   opioids in 2000 and increased mortality from heroin or

17   fentanyl later?

18   **A.**   Right.  So, I'm going to divide the world.  If we're

19   looking at shipments, I'm going to look pre-2010 and I'm

20   going to measure for each state how much -- how much on a

21   per capita basis there was in terms of shipments.  Remember,

22   this is just an outcome.

23        And then, I'm going to measure mortality in the later

24   period and say is there a relationship there?  Do the places

25   have more quantity in the early period the same places that

1    had more mortality in the later period?

2    **Q.**   So, let's put up Exhibit 49 from your report.  So, Dr.

3    Murphy, maybe we can just take one of these plots and have

4    you explain what it signifies.

5    **A.**   Yeah.  Each state is going to be a dot on this plot,

6    right?  So, for each state, we know what the MME shipments

7    were per adult per year, 1997 to 2010.  That determines

8    where you are on the horizontal axis.

9         And then, we look at your mortality rate and, in the

10   left-hand panel, we're looking at heroin mortality.  In the

11   right-hand panel, we're looking at fentanyl mortality.  And

12   we're asking is there a relationship here?  Do we see a

13   relationship between where you are on the horizontal axis

14   and where you are on the vertical axis, which if you thought

15   that it was consumption or quantity in the earlier period

16   that was really an explanatory factor for mortality in a

17   later period, you would expect to see an association here.

18        And what you really see is a very weak association.  In

19   the left-hand panel, the unweighted correlation is .16.  The

20   population correlation is .006, essentially 0, but both of

21   those numbers are quite small.

22   **Q.**   So, let's just go back --

23   **A.**   And you can kind of see it in the picture.  There's not

24   a clear pattern in this picture.  It tells you one is

25   strongly associated with the other and, indeed, a

```
 1    correlation of .16 is -- for this sample size is not
 2    statistically significant; that is, it's not something
 3    greater than what you'd expect to see by chance, which is
 4    the statistical notions of significance.
 5    Q.   So, you're referring to these correlation coefficients
 6    that are stated up here?
 7    A.   Yeah.  The .16 on the left and .13 on the right.  One
 8    way to think about it is .16 is the correlation.  You have
 9    to actually square that number, which becomes like .02 --
10    you know -- 256.  So, it tells you that about a little --
11    about two and a half percent of the variation in mortality
12    is explained by shipments.  Essentially none.  That means 97
13    and a half percent and, on the right-hand panel, .13 squared
14    is 1.6.  0169, which is less than two percent.  It says
15    essentially all the variations not explained by -- by
16    shipments in the earlier period.
17    Q.   So, in other words, the variation, the variation in
18    death rates, is not explained by the variation in shipment
19    rates in the earlier period?
20    A.   Not to any significant extent.
21    Q.   And so, what is that telling you?  What conclusion do
22    you draw from this?
23    A.   Well, a story -- again, this doesn't get back to
24    whether it was, you know, distributor behavior, but even
25    beyond that, just saying what is it -- there's a story that
```

1    says what's driving mortality in the later period, the level

2    of shipments in the earlier period as an outcome, we just

3    don't see it.  It's just not there in the cross-section

4    here.

5    **Q.**   So, the conclusion you draw is that you can't see a

6    relationship between these death rates in the later period

7    and the shipment rates in the earlier period?

8    **A.**   I would say it's not just you can't see.  You can

9    measure and that's what the correlation does here.  And the

10   correlation says there's really not a relationship.  And the

11   overwhelming amount of the variations do something else, not

12   the shipments.

13   **Q.**   So, let's -- let's turn to the next analysis you did.

14   I believe you mentioned that you see age differences between

15   the population that was prescribed opioids prior to 2010 and

16   those who were overdosing from the legal over -- of opioids

17   after 2010.  Is that a fair characterization?

18   **A.**   Yeah.  I think it gets at this question, again,  of

19   whether there's a link; that is, is it the people who are

20   getting more prescriptions in the early period who then

21   moved over to illicit opioids and were dying from illicit

22   opioids in the later period?

23         And if that -- you know, a simple version of that story

24   would be you should see the same groups, right?  The groups

25   that were getting lots of prescriptions, consuming lots of

1    opioids, would be the same groups that would show up later.

2    **Q.**   So, let's take a look at Exhibit 44 from your report.

3    What conclusions do you draw on that issue?

4    **A.**   Yeah.  If you look at prescriptions in the earlier

5    period, again, that's 2001 to 2010, the biggest groups

6    getting the prescriptions were, number one, older women.

7    That's 51 years of age and older.  They accounted for

8    31.6 percent of prescriptions.  Older men, 51 and older,

9    counted for 25.3 percent of prescriptions.

10        And young men and young women accounted for very few

11   prescriptions, only 3 percent for males and another 3

12   percent for women.  So, young people together were like 6

13   percent; whereas, older men and women were, what is that,

14   57 percent.  So, you know, almost ten times as much

15   prescriptions among the older people as the younger people.

16   **Q.**   And then, what do you see in terms of the mortality

17   rates in the later period?

18   **A.**   Well, you see kind of the reverse, that the biggest

19   mortality rates are for the young in this case, where the

20   younger individuals and the middle-age individuals who are

21   the bulk of mortality and the older people account for --

22   particularly older women, remember, who are the biggest

23   people getting the prescriptions in the earlier period are

24   very much underrepresented in the mortality data.

25   **Q.**   So, what's the significance of that?  What does it tell

1    you when you observe that the group that was receiving the

2    most -- the highest percentage of prescriptions in the

3    earlier period isn't reflected in the later mortality

4    levels?  What's the significance?

5           MR. FARRELL:  Again, as we change to each slide,

6    all I'd ask is, for the record, the geographic scope be

7    defined.

8           BY MR. HESTER:

9    Q.   What are you discussing here, Dr. Murphy?

10   A.   This is nationwide data for -- we can do mortality

11   state by state, but because of the data we have on the

12   prescriptions, we can't do state by state.  So, we were --

13   we had to do this one at the national level.

14   Q.   And do these mortality figures that you're analyzing at

15   the U. S. level, do you see them as having relevance in West

16   Virginia?

17   A.   Yeah.  Because the age patterns you can see, you know,

18   they're not exactly the same, but qualitatively they're

19   going to be very similar.  And you would see something

20   similar to this, I believe, if you looked at what -- we know

21   on the mortality side we would see something similar to this

22   and I don't have reason to believe the prescription side

23   would be different.

24   Q.   So, what conclusion do you draw when you see a heavy

25   weighting of older people and the prescriptions between 2001

1    and 2010 and a heavier weighting of mortality in a younger

2    group after 2010?  What conclusion do you draw?

3    **A.**   It sort of says a story that says it's the people who

4    were getting the prescriptions back then who then shifted

5    over to getting -- to consuming illicit opioids.  It doesn't

6    fit the data very well, particularly when you look at the

7    younger group, because a lot of that younger group, you

8    know, the bottom half of that 15 to 30 group were children

9    in the earlier periods.  So, they're going to be -- you

10   know, they weren't there at all.  So, you know, it does say

11   that that simple story doesn't really fit the data very

12   well.

13   **Q.**   And when you say the simple story, what are you

14   referring to there?

15   **A.**   I'm saying the simple story of individuals transiting

16   from -- that what you're seeing in the later period is just

17   the same group of people who used to be getting

18   prescriptions now abusing nonprescription opioids.

19   **Q.**   Have you also looked at these -- this same point about

20   age differences in terms of overdose levels?

21   **A.**   I have because, you know, one of the things of looking

22   at prescriptions is you could say, well, geez, those are

23   getting the prescriptions, but how do I know who is actually

24   abusing them?  And, you know, that age distribution can be

25   different.

1          And so, what I did is, I used mortality for both now.

2    I'm going to use mortality, who's dying in the earlier

3    period, and comparing that to who -- the distribution of who

4    is dying in the later period.  So, it's getting closer to

5    looking at abuse rather than prescriptions.

6    **Q.**   So, let's look at Exhibit 47.  So, Dr. Murphy, what

7    does this chart show?  It's age distribution at the time of

8    death by opioid type.  What does that tell you?

9    **A.**   Okay.  This is a little complicated.  I mean, I think

10   people are probably familiar with the usual kind of bell

11   curve story.  It's just telling you how a population is

12   distributed across ages.

13         So, for example, the black line in this figure, I'll

14   say this is for the U. S.  So, this is for the U. S. as a

15   whole.

16         The black line in this figure is telling us that the

17   modal level of age is in the -- around age 50, right; that

18   is, the peak of that black line is about age 50.

19   **Q.**   And when you say the black line, you're referring to

20   the prescription opioid line during that period, 1999 to

21   2010?

22   **A.**   Correct.  In that earlier period, we're looking now not

23   at who is getting a prescription, but whose overdose deaths,

24   and we're saying the biggest numbers in that period are

25   50-year-olds, around 50.  And, you know, kind of the highest

1    levels are running, say, in this graph between 40 and 60,

2    whatever you want to say.  That's the peak of the black

3    line.

4    Q.   And then, when we look at this, at both the green and

5    the blue lines, those are showing us heroin and fentanyl

6    overdoses, 2010 to 2018; is that right?

7    A.   Right.  So, you know, roughly ten years later.  Kind of

8    think of it that way.  We're looking at what age groups are

9    the predominant among the illicit deaths and you can see

10   that's predominantly to the left.

11   Q.   So, when it's an age group that has an average roughly

12   around what?

13   A.   Well, an average -- you can't -- the mode is about 30,

14   right?  The biggest -- what we call the mode, that's where

15   the highest point of this curve is around 30.

16        But you can see that there's a skewed much more left

17   toward younger ages for the later mortality; whereas, the

18   earlier period mortality was skewed much more right.  And,

19   remember, these are ten years apart and people are getting

20   older.

21        So, if it was the same folks the curve would be moving

22   to the right, not to the left, right?  Because, remember,

23   this is -- the green and blue lines, we're ten years later.

24   So, somebody who is at 40 on the black line would be ten

25   years to the right on the green or blue line.

1    **Q.**    So, what conclusion do you draw from this chart?

2    **A.**    It's kind of -- it says it sort of similar to what we

3    saw with the prescriptions.  There's a difference in the

4    groups, a pretty substantial difference in who is overdosing

5    on illicit opioids in a later period, and who was overdosing

6    on prescription opioids in the earlier period.

7    **Q.**    So, what does that tell you about this point of

8    transition from prescription opioids to illegal -- illegal

9    opioids?

10   **A.**    It says it's -- again, it gets -- it pushes against a

11   view that this is really the same population of individuals

12   moving from one to the other.

13   **Q.**    You also had mentioned geographic differences in opioid

14   and, in particular, fentanyl mortality, I believe; is that

15   right?

16   **A.**    Yes.

17   **Q.**    And could you explain that in more detail?

18   **A.**    Yeah.  It turns out that the story of what happened

19   with opioid mortality, in particular, heroin and fentanyl

20   mortality is pretty different in the eastern U. S. and the

21   western U. S.

22   **Q.**    Let's put up a chart from your report on that.  What

23   does this chart reflect?

24   **A.**    Okay.  The chart reflects -- again, it's kind of like

25   the first chart we put up today where we had shipments on

1    the blue line and we have mortality on the black line.  We

2    have the same concepts we used in the first chart we put up.

3    **Q.**   So, just for the record, could you describe what you

4    show here in terms of states east of the Mississippi and

5    west of the Mississippi?

6    **A.**   Yes.  So the left-hand panel is states west of the

7    Mississippi.  If we're measuring shipments per -- per MME

8    per adult year by year in the blue line on the left.  On the

9    right we're measuring exactly the same thing, but for the

10   east to the Mississippi River, that's the -- that's the blue

11   line on the right.

12        And you can see they're not exactly the same, but

13   follows the same general pattern.  Both the east and the

14   west, the shipment data rise until we get to about 2010 or

15   '11 and then decline.  They're a little higher east than

16   they were west but, you know, the general pattern is very,

17   very similar.

18        Actually, interestingly, if you look at mortality

19   pre-2010, it's also very similar, that by the time you get

20   to 2010, they're both right around 7 or 8 in terms of

21   mortality.

22        But then, after 2010, they just behave completely

23   different.  In the west, the mortality rises only very

24   slightly.  In the east, mortality goes way up, goes from,

25   you know, 7 or 8 up to the 20s.  So, very different stories

1    east and west and mortality, even though they're very

2    similar stories on shipments and, indeed, even though they

3    were very similar stories on mortality prior to 2010.

4    **Q.**   And so, what conclusion do you draw from this?

5    **A.**   Well, something else is going on in this period and

6    it's differing a lot between the east and the west and, as

7    it turns out, the most logical one and the one that seems to

8    be supported by the data is it has to do with the nature of

9    the heroin supply in the two parts of the country, that the

10   western U. S. has traditionally been supplied with black tar

11   heroin, which is much harder to cut with fentanyl, and the

12   eastern U. S. is much more powder heroin for which fentanyl

13   is much easier to use.

14   **Q.**   And so, when you said, Dr. Murphy, something else is

15   going on, something else aside from what?  What are you --

16   **A.**   What I'm saying is it's not the shipment story per se

17   as it is the nature of the illicit drug market and changes

18   in the illicit drug market, and particularly the expansion

19   of fentanyl and the availability of fentanyl, which is much

20   greater in the east than in the west, accounts for the much

21   greater increase in mortality in that greater period.

22   **Q.**   And so, let's look at Exhibit 42.  So, again, here's

23   another take on this geographic variation point.  Could you

24   describe what this reflects, Dr. Murphy?

25   **A.**   Again, remember when we broke out the opioid mortality

1    rates between prescription opioids and heroin and fentanyl.

2    I did that in my second chart that I had.

3         This does it separately, exact same calculation, but

4    separately for east and west.  And what you see is the

5    prescription opioid mortality looks like -- kind of behaves

6    the same way east and west.  It goes up until about 2010 or

7    '11 and then goes down both east and west.

8         But you see the heroin and fentanyl mortality just goes

9    way, way faster in the west than it does the east and,

10   really, the biggest distinction between the two is that

11   latest period where fentanyl really plays the big role.

12   **Q.**   And do you have an understanding as to why that would

13   be, why -- why the fentanyl mortality would be rising so

14   much faster in the east?

15   **A.**   Yeah.  It's back to what I said before.  It's really

16   the nature of the supply chain in the illicit market, right?

17   It's the illicit market supply chain that's driving that.

18   **Q.**   And could you describe in a little more particularity

19   what it is about the supply chain that makes fentanyl more

20   likely to be showing up in the east than the west?

21   **A.**   Yeah.  I think my understanding and, again, this has

22   been -- you know, people -- this has been looked at by

23   people in literature, is that it has to do with the nature

24   of the supply chain in terms of the types of heroin that are

25   being distributed in two parts with black tar heroin for

1    Mexico being the primary supply of heroin in the west and

2    powder heroin, I believe, mostly from Colombia being a

3    supply in the east.

4    **Q.**   And so, what's the -- what's the significance of powder

5    heroin versus black tar heroin for the fentanyl issue?

6    **A.**   Well, the economics of fentanyl are a very cheap way

7    for drug dealers to lower -- a way for them to lower their

8    cost is to use fentanyl rather than heroin in their powder.

9    It's much harder to mix the fentanyl in, in the black tar

10   heroin, is my understanding.  I'm not a drug dealer, so I

11   can't tell you by firsthand experience, but my -- that's my

12   understanding of how it works.

13   **Q.**   So, let's -- let's put up the next chart, please.  So,

14   Dr. Murphy, this is another chart that's compiled from data

15   out of your report.  Could you explain what this one

16   reflects?

17   **A.**   Yeah.  This is heroin and fentanyl mortality east and

18   west of the Mississippi and you really do see that there's a

19   divergence that happens east and west in that post-2011

20   period.

21        So, I've got three lines on this chart, the national

22   line which, you know, would be the same as what we had in

23   the first chart we went through today.  We have the east,

24   which is the orangish line.  And the west, which is the blue

25   line.  And you can just see how different they are.

1        You know, they kind of are about the same in 2010 and

2    really kind of had gone up together through 2010.  And then,

3    they just spread apart dramatically afterward.

4    **Q.**   And you said they spread apart.  Can you just, for the

5    record, describe what happens after 2010?

6    **A.**   Yeah.  The heroin and fentanyl mortality in the west

7    rises from, you know, let's say 3, a little less than 3 in

8    2010.  In the west, it goes up to, reading this chart here,

9    6 and a half or so.  And nationally it goes up from about

10   that same level to, you know, 13 and a half.  And in the

11   east it goes up to, you know, 19, over 19.

12   **Q.**   So, what's the significance of these geographic

13   variations?  What does that tell you, Dr. Murphy?

14   **A.**   It highlights the importance of the illicit drug market

15   in driving the increase in mortality in that later period.

16   It really highlights the role that the illicit drug market

17   played.

18   **Q.**   And do you see it as contradicting the simple story of

19   a transition from prescription to illegal drugs?

20   **A.**   I would say it -- it's kind of -- it kind of tells you

21   that there's something else going on.  It's not saying that

22   that couldn't be anything.  It's just saying if you want to

23   understand this later period, you've really got to look at

24   the illicit market.

25       Now, when you combine it with the other pieces of

1    information, right, the other -- I take the first one where

2    I had the scatter chart across states.  Combining all of

3    these together says, look, earlier supply doesn't seem to

4    tell the story on any of these dimensions.  It doesn't tell

5    you which states.  It doesn't tell you which individuals.

6    And it doesn't explain the biggest difference we see, which

7    is geographic.

8    **Q.**   Now, we were discussing this point about the

9    differences in the ages between the people who had either

10   received prescriptions for opioids or had overdosed on

11   opioids during the earlier period up to 2010 and the later

12   period of looking at both overdoses and for heroin and

13   fentanyl.  Does that point -- that point was based on

14   national data; is that right, Dr. Murphy?

15   **A.**   That was based on national data.

16   **Q.**   Now, would you -- would you view that point as applying

17   to West Virginia?

18   **A.**   Like I said, I can't do the prescription one for West

19   Virginia, although I would have viewed it as applying.  You

20   can do the age one for West Virginia.  You would have some

21   issues because data suppression in CDC WONDER, but when you

22   do that, you see that same -- you see kind of qualitatively

23   that same distinction with a shift left in the distribution

24   in a later period to younger ages in West Virginia.  It's

25   just harder to do because you have less data.

1  **Q.**   So, what's the conclusion out of these three factors?

2  What's the conclusion you draw about the story of a

3  transition from prescription opioids to illegal drugs?

4  **A.**   The economic evidence doesn't fit that story very well

5  at all.  That, you know, like I said before, it's not in the

6  same states.  It's not in the same groups.  And the big

7  distinction we see east and west doesn't seem to be

8  explained by that.

9  **Q.**   Let me shift gears, Dr. Murphy, and talk about Dr.

10  Keyes and her OUD methodology.  Are you familiar with the

11  analysis that Dr. Keyes engaged in to estimate an OUD

12  population in Cabell County and the City of Huntington?

13  **A.**   Yes, I am.

14  **Q.**   And have you reviewed her testimony and work papers on

15  that issue?

16  **A.**   Yes, I have.

17  **Q.**   And based on that review, have you come to an

18  understanding at a general level as to how Dr. Keyes

19  purports to estimate the prevalence of OUD in

20  Cabell-Huntington?

21  **A.**   Yes, I have.

22  **Q.**   And can you describe for the Court at a general level

23  how Dr. Keyes estimated the prevalence of OUD in

24  Cabell-Huntington?

25  **A.**   Yeah.  What she attempted to do was use the number of

1    drug overdose deaths together with a mortality rate to

2    calculate an implied population at risk; in this case, an

3    implied OUD population.

4    **Q.**   And would it help you to explain your point to work on

5    the board for a minute?

6    **A.**   It sure would.  It would put me back in a much more

7    familiar setting for me.

8              MR. HESTER:  Your Honor, may Dr. Murphy approach

9    the board?

10             THE COURT:  You may step down, Dr. Murphy.  Put on

11   your teacher hat.

12             THE WITNESS:  Yes.

13      Uh-oh.  I'm used to blackboards, so this is high tech

14   for me.

15             MR. HESTER:  I'm going to erase it for you first.

16             THE WITNESS:  You even have an eraser?  How are

17   you going to erase it?  This is fancy.

18             MR. HESTER:  Nice, huh?

19             THE WITNESS:  We don't have these in Chicago.  I

20   always use a chalkboard.  All right.  So --

21             BY MR. HESTER:

22   **Q.**   Okay.  So, Dr. Murphy, why don't you explain your

23   understanding of Dr. Keyes' methodology?

24   **A.**   Yeah.  I'm going to start, actually, predicate of that

25   methodology.  So, if you think about just the simple kind of

1    mathematics of it, you can think of deaths for a group,

2    whatever group you're looking at, would be -- should be

3    equal to the population in that group times the mortality

4    rate in that group, right?

5        So, if I had a population of a million people and I had

6    a 1 percent death rate, I could multiply a million by .01

7    and I would say I expect 10,000 deaths.  That's just -- it's

8    really arithmetic, right?  It sort of says this is

9    population times the death rate should give me the number of

10   deaths.  And, in fact, if you constructed your death rate

11   from this data this would hold exactly, right, because that

12   would be the definition.

13       Now, you can reverse this same equation using algebra

14   and re-write this as deaths divided by the mortality rate

15   should be equal to the population.  The same equation just

16   re-written by saying, okay, I can infer the population if I

17   know deaths for that population and I know the mortality

18   rate for that population.

19       You know, now, what's important is that when you do

20   this, you have deaths corresponding to the population you

21   want and you have the mortality rate corresponding to the

22   population you want.

23       If you got the wrong number of deaths, because you look

24   at deaths for a different population, you're not going to

25   get your population back from this formula.  And if you have

1    the wrong mortality rate, you're not going to get the

2    population back.

3    **Q.**   And based on your review of Dr. Keyes' work and her

4    work papers, do you have an opinion as to whether she

5    reliably applied this methodology?

6    **A.**   No.

7         MR. FARRELL:  Judge, I'm going to place a

8    preliminary objection on foundation.  Again, from an

9    economic standpoint, I don't think there's any standing to

10   argue with the University of Chicago professor, but for

11   purposes of the Economics Department of Chicago criticizing

12   the Epidemiology Department of Columbia, I think we're

13   getting ready to start a war.

14        THE COURT:  Well, I -- I'll overrule your

15   objection.  You can cross examine him on this, Mr. Farrell,

16   but I don't --

17        MR. FARRELL:  Yes, Your Honor.

18        THE COURT:  I'm going to let him go ahead.

19   Go ahead, Dr. Murphy.

20        BY MR. HESTER:

21   **Q.**   Yes.  Go ahead, Dr. Murphy.

22   **A.**   You know, I think the algebra works the same in

23   economics and in epidemiology.  They're both based on

24   mathematics and this is -- as you can tell, this is pretty

25   straightforward math.

1    Q.   And let me ask you a question just to put that in

2    context.  As an economist, do you undertake this kind of

3    effort to estimate populations?  Is that something you do in

4    your work?

5    A.   Sure.  We do this all the time.  We're trying to

6    estimate something, an input from an output or an output

7    from an input.  You just do exactly this.  If you know every

8    unit of input produces ten units of output, then you can

9    say, you know, input times how many units they produce

10   should be output and vice versa.

11        And if I know the output, I can say how much input do I

12   need by dividing.

13   Q.   And so, I had asked you, did you reach an opinion about

14   the -- about whether Dr. Keyes reliably applied this basic

15   algebra to come up with an OUD population?

16   A.   I did.  And like I said, to make this work, you need to

17   have deaths for that population because if you have a

18   different number of deaths than the deaths that came out of

19   that population, obviously, this formula won't hold anymore.

20        And if you have the wrong mortality rate, then this

21   formula is not going to be reliable either.

22        So, if you mess those up, there's going to be a

23   problem.

24   Q.   So, let me have you go back now, Dr. Murphy, to your

25   seat and I'll ask you a few more questions about that.

1      So, Dr. Murphy, you made the point that the methodology

2  depends -- the methodology for estimating the OUD population

3  depends on the accuracy of the death number and the

4  mortality rate.  Did you reach a view as to whether Dr.

5  Keyes got these numbers right?

6  **A.**   Right.  Again, it's important.  It's not that you have

7  a death, the right number of deaths.  You have to have the

8  deaths for that population that you're trying to estimate

9  and you have to have the mortality rate that applies to that

10 population you're trying to estimate.

11     So, it's not just that you have the right number of

12 deaths from some other calculation.  You need the right

13 number for this calculation, which means the deaths and the

14 mortality rates have to correspond to the population.

15     In this case, we're interested in estimating the OUD

16 population, so we need to have deaths for that population

17 and the right mortality rate for that OUD population.

18 **Q.**   And did you reach a view as to whether Dr. Keyes came

19 up with the right death number for that estimation of the

20 OUD population?

21 **A.**   I did.  She -- she used all overdose deaths, which

22 would include people who don't have OUD.  So, she's got

23 deaths in that death number that don't correspond to the

24 population she's trying to estimate.

25 **Q.**   What's the significance of that point?

**A.**   Well, as the formula kind of shows you, if you put too many people in the death category, you're going to get too many people implied in that population, right, because if you're 10 percent too high on the deaths, you're 10 percent too high on the population.  It just carries straight over.

**Q.**   Is it reasonable to assume that anyone who overdoses from any drug has OUD?

**A.**   No.  It's certainly -- you know, somebody who overdosed -- there's no reason to presume somebody who overdosed on a non-opioid has OUD, but even there are going to be people who overdose on opioids that don't have OUD.

**Q.**   And does Dr. Keyes provide any support for the assertion that everyone who overdoses from any drug has OUD?

**A.**   No.

**Q.**   You also testified that Dr. Keyes made an error in the denominator in the mortality rate; is that right?

**A.**   Yeah.  She made several errors, actually, in calculating the mortality rate.

One is she tries to calibrate the proper mortality rate for the population using a calibration exercise based on heroin and fentanyl deaths between 2011 and 2015, but she doesn't do that correctly because she -- she comes -- she basically looked at data and said that the death rate for illicit opioids tripled over this period and then uses 3 as the multiple for fentanyl mortality relative to -- to

1    non-fentanyl mortality basically in her formula.

2        But because 2015, not everything was fentanyl, that's

3    going to tend to underestimate the higher lethality of

4    fentanyl because, you know, it would only be equal to the

5    fentanyl mortality if you had a hundred percent shift.  So

6    she's kind of missed on that one.

7        And then there's some other details of how she didn't

8    do it correctly either but, you know, that was probably the

9    biggest one on that dimension.  So, mis-calibrated to the

10   2011, 2015 data.

11       And then, secondly, remember, I said you have to have

12   the right mortality rate for this population.  And she's

13   applying this to deaths in -- in West Virginia, Cabell

14   County, and she's -- and, therefore, she's trying to

15   estimate the population of OUD in Cabell County.

16       In order to make this formula work, you have to have

17   the mortality rate for Cabell County for that population,

18   right?  It doesn't work if you have the national one or

19   something that doesn't fit.

20       And because fentanyl grew much more in the east than in

21   the west, the mortality rate in Cabell County is higher than

22   you would think based on places where fentanyl was less part

23   of it.

24   Q.   And does that point that you're making go back to the

25   graphs we looked at before where you showed that the level

1    of fentanyl mortality was much higher in the east of the

2    Mississippi states versus west Mississippi?

3    **A.**   Yes.  And, in fact, if you do that calculation that she

4    did, it's not the right calculation.  So, if you just say

5    I'm going to do what she did and I'm just going to fix that

6    and I'm going to use 4.6 as the number which you would get

7    in the east of the Mississippi rather than 3, right, that

8    would be just fixing one.

9         You haven't fixed the numerator.  You haven't fixed

10   deaths.  You haven't fixed all this calibration stuff.  You

11   just say I'm just going to change and say, look, the number

12   you need to use to fit the eastern data is much greater than

13   you need for the national data.  So, I'm going to use 4.6,

14   which is the eastern number, as opposed to 3, which is the

15   national number.

16        Then what you do is, remember, she estimates, I

17   believe, 8252 as the OUD population.  It goes down to like

18   5496.

19   **Q.**   Now, I want to go back to that calculation in just a

20   minute, Dr. Murphy, and make sure we got that right, but at

21   a high level, first, is your view that the -- the errors by

22   Dr. Keyes affected both the deaths and the mortality numbers

23   that she relied on to estimate the OUD population?

24   **A.**   Yeah.  Her methodology overstates deaths, which is

25   going to push you toward higher population.  Now,

1    overestimating the population and she tended to

2    underestimate the mortality rate, which also goes in the

3    same direction of pushing the population up.

4    **Q.**   So, what's the net effect of those two errors that you

5    believe in terms of her OUD number?

6    **A.**   The population she estimates is going to be too high as

7    a result of making errors in both increasing what we call

8    the enumerator, the top number, and decreasing the

9    denominator, or the bottom number.

10   **Q.**   So, I want to go back now to this point you made about

11   the corrected calculations.  Let's put aside these flaws of

12   -- the broader flaws of methodology you've discussed and

13   let's talk just about the fentanyl adjustment that Dr. Keyes

14   made.

15       Can you describe what she did?  What was her

16   methodology?

17   **A.**   Yeah.  It's fascinating.  She wasn't clear about what

18   she did in her report, but, I mean, I think it was clear

19   from her testimony she went to I think it was about -- I

20   can't remember who the paper was.  She went to a paper and

21   she looked at illicit opioid mortality nationally and how it

22   changed between 2011 and 2015.

23   **Q.**   Is that Dow (phonetic) you're thinking of?

24   **A.**   Yeah, Dow.  I knew it wasn't Powell.  That's another

25   person.  But it was Dow, that's correct.

1    And she estimated it.  It roughly tripled over that

2    time period and she says, okay, I'm going to use that as the

3    effect of having a fentanyl in the supply rather than

4    non-fentanyl supply.

5    But then, when she applies it in her formula, she does

6    it in a way that would imply that that's the number

7    associated with fentanyl compared to non-fentanyl, which it

8    wouldn't be, because 2015 it wasn't a hundred percent

9    fentanyl.  So, you know, the overall number is going to be a

10    weighted average.  So, you would need a higher number for

11    fentanyl to fit the 2015 data if you did it correctly.

12    **Q.**   And that's --

13    **A.**   Now, she does a bunch of other stuff that's not right

14    either.  She got weights by deaths instead of weights by

15    populations.  And there's a lot of things that she kind of

16    messed up.

17    But if you just fixed that one, if you just said,

18    look, I'm going to do what she did and I'm going to put 4.6,

19    the number for the east rather than the 3 is the number for

20    the west.  So, you haven't fixed even the way she did it,

21    just the number she plugged in.

22    **Q.**   So, you're using this number 4.6.  Where do you derive

23    that?

24    **A.**   That's just to her methodology, but focused on the east

25    rather than west because, if you're going to calibrate out

1    for 2011 to 2015, remember, we need the mortality rate for

2    this population.  We don't need the mortality rate for a

3    different population.

4        We need a mortality rate for the folks in West Virginia

5    if you're going to estimate OUD in West Virginia.  And a

6    better estimate of that is going to be the eastern number

7    than it is the national number.

8    **Q.**   And where -- and where does that 4.6 come from?  Where

9    does that eastern number come from?

10   **A.**   Do exactly what she did.  Just estimate how much that

11   mortality went up between 2011 and 2015 and use that number.

12   **Q.**   And so, if you put that 4.6 number in instead of the

13   3-times multiplier she used, what is the number that you

14   come up with in terms of an OUD?

15   **A.**   I remember -- I believe her number was 8252.  I think

16   the corrected number, just correcting that one thing, would

17   be 5496.

18   **Q.**   And roughly how much smaller is that than Dr. Keyes'

19   estimate of the OUD population?

20   **A.**   About a -- almost a third.  About a third.

21   **Q.**   Now, do you believe that that number that you just gave

22   us, 5496, is a reliable estimate of the OUD population of

23   Cabell-Huntington?

24   **A.**   I don't think it is because we've still not corrected

25   the other flaws.  We haven't corrected the deaths in the

1    numerator and we haven't corrected the other methodological

2    flaws in how she created her mortality rate.

3        Remember, all this depends on getting the right deaths

4    and getting the right mortality rates.  If you don't have

5    them both, you're bound to not get the right answer.  And I

6    think, just as that 4.6 number shows, it can lead to

7    substantial differences.

8    **Q.**   So, but you're applying the 4.6 number the 5496 OUD

9    population that you've just given us?  That assumes all of

10   the other elements of her methodology?

11   **A.**   Correct.  I just replaced number 3 with 4.6 in her

12   exact formula.

13   **Q.**   Do you believe that that OUD number, 5496, is more

14   accurate than Dr. Keyes' estimate of 8252?

15   **A.**   I would believe it would be more accurate, but it

16   wouldn't be something that I would be willing to rely on as

17   a -- as a number.

18   **Q.**   As an economist, what conclusion do you draw from the

19   fact that making one adjustment like this in one assumption

20   on the geographic nature of fentanyl changes the OUD

21   estimate that much?

22           MR. FARRELL:  Judge, I do think now we're probably

23   getting beyond the --

24           THE COURT:  Yes.  Do you want to remove the --

25           MR. FARRELL:  Well, that, too.

```
 1              THE COURT:  I didn't understand what you said, Mr.

 2    Farrell.

 3              MR. FARRELL:  Well, I think that now, this last

 4    question, I think we now have gone beyond into the field of

 5    epidemiology and that may be improper.

 6              MR. HESTER:  I mean, Your Honor, I was asking Dr.

 7    Murphy his view as an economist.

 8              THE COURT:  Yeah.  Overruled.  I will allow it.

 9         Go ahead.

10              BY MR. HESTER:

11    Q.   Dr. Murphy, from your perspective as a professional

12    economist, what conclusion do you draw from the fact that

13    changing one assumption like this alters the estimate in

14    this -- by this magnitude?

15    A.   Well, I think it's an illustration of how much those

16    assumptions matter.  I mean, you know, sometimes you can

17    have an economic model or, you know, a model that's not

18    limited to economics in which changes in assumptions don't

19    matter very much.  They somehow -- you know, they -- they're

20    not really a key driver of the output.

21         And what you illustrate with that example is that that

22    assumption in particular, which is not different than a lot

23    of the other elements of her analysis, has a substantial

24    effect.  So, you worry that you got the numbers right.

25    Q.   And so, does that bear on your judgment about the
```

```
 1    reliability of her estimates?
 2    A.   Yeah.  I think it would say given that I know that
 3    there were a lot of things that were not done correct [sic]
 4    and we really don't have the deaths or the mortality rate
 5    for the population you're trying to estimate, I don't see
 6    how you can make a reliable estimate.
 7              MR. HESTER:  Thank you, Dr. Murphy.
 8         I'll pass the witness, Your Honor.
 9              THE COURT:  Okay.  You may cross examine.
10              MR. FARRELL:  Judge, is it possible for us to take
11    a five-minute break?
12              THE COURT:  Yes.  I think the court reporter will
13    appreciate that, too.  Five minutes.
14         (Recess taken)
15              THE COURT:  Okay, Mr. Farrell.
16              MR. FARRELL:  Thank you.
17                        CROSS EXAMINATION
18              BY MR. FARRELL:
19    Q.   I introduced myself briefly.  My name is Paul Farrell
20    and I've got some questions for you.  Well, lesson number
21    one that I was taught by my elders is never debate economics
22    with an economist.  So, what I do have is some general
23    broader questions that I want to walk through with you.
24         The first thing is, I went and typed in supply and
25    demand for kids and I came up with this graph.
```

```
 1              MR. FARRELL:  Can you put it up, please?  The
 2   supply and demand with the equilibrium, please.  No, the one
 3   before that.  Yeah, this one.
 4              BY MR. FARRELL:
 5   Q.   So, I promise I'm not going to embarrass myself by
 6   going into too great detail, but I am trying to understand
 7   your viewpoint as an economist in this case.
 8        So, would you describe for the judge in general what
 9   this is?
10   A.   Well, as it's stated, it is a supply and demand
11   diagram.  So, it says the quantity we get in the equilibrium
12   depends on the willingness of sellers in this case to supply
13   the product to suppliers and the willingness of buyers to
14   buy the product, which is the demand side.
15        So, you know, we usually think of, you know, maybe this
16   is gasoline and this is, you know, a quantity of gasoline on
17   the horizontal axis.  Demand would be driven by how much
18   people want to drive and, you know, fuel economy of cars and
19   all kinds of things like that.
20        And the supply side would be determined by, you know,
21   availability of petroleum and the costs of refining and
22   things like that.
23   Q.   So, in general, the blue line is the supply line,
24   correct?
25   A.   That would be what we call supply curve.
```

1    **Q.**    Supply curve.  And it has a little bit of elasticity to

2    it?

3    **A.**    It does.  And it depends on -- how much elasticity

4    depends on lots of factors you can study in different

5    markets.

6    **Q.**    So, I'm hoping to get some brownie points with the

7    terminology.  But, in general, the supply curve on the

8    bottom, suppliers are willing to supply more quantity the

9    higher the price.  Is that in general?

10   **A.**    All else equal, yeah.  I mean, you've got to be careful

11   to say why is the price higher but yes.  I mean, all else

12   equal, suppliers will be more willing to supply the higher

13   the price.

14   **Q.**    And, in general, consumers, or the people that are

15   demanding, they're willing to buy less the higher the price?

16   **A.**    That generally is true, too.  That's kind of called the

17   law of demand.

18   **Q.**    And somewhere in between these two intersect in the

19   absence of government oversight in laissez faire economics

20   and they intersect at a natural market at an equilibrium

21   price, correct?

22   **A.**    Yeah.  Equilibrium would extend even if, for example,

23   there were taxes or other government interventions, they

24   might affect supply and they might affect demand, but you

25   still think there's an equilibrium, even when the government

1    is intervening.  It's just a different equilibrium than you

2    would have absent government intervention.

3             MR. FARRELL:  Now, could we go to the next slide?

4    **Q.**   So, what I wanted to try to illustrate here is this is

5    the supply, but I've taken out the demand because the demand

6    for those that are addicted is a little different, is it

7    not?

8    **A.**   Well, what do you mean by different?  I mean, it still

9    obeys the law of demand.  I mean, it still -- it still obeys

10   that they buy more when the price is lower and they buy less

11   when the price is higher.

12        In fact, the empirical evidence on addiction is

13   elasticity, it's not clear whether it's more elastic or less

14   elastic honestly.

15        I've actually written on this and Gary Becker and I

16   published papers on addiction.  So --

17   **Q.**   I'm aware.

18   **A.**   Okay.

19   **Q.**   In fact, you've said that there is more -- I'm not

20   saying absolutely an elastic, but you have said in your

21   papers that there is some inelasticity based on the nature

22   of addiction?

23        For instance, let me say it in a different way.  If

24   you're addicted to opium you're probably going to want to

25   get your fix or get as much as you can no matter the price

1    until some ceiling, which makes the line maybe a little more

2    like that.

3             MR. HESTER:  Your Honor, object to form.  That's a

4    -- that's a long talk before a question.

5             THE WITNESS:  I would say having studied

6    addiction, I don't think that's what the picture looks like.

7             BY MR. FARRELL:

8    **Q.**   Okay.

9    **A.**   If you look at cigarettes, it doesn't look like that.

10   We've done some work on -- on illicit drugs.  They tend to

11   be inelastic, which means their elasticity is less than 1,

12   which means a 10 percent increase in price leads to a less

13   than 10 percent reduction in quantity.  But that's not

14   unusual for non-addictive drugs.

15            For example, gasoline demand is very inelastic.  That's

16   more like .1.  It would be less than the elasticity of many

17   addictive substances.

18            So, I don't think -- you might want to say they

19   relatively tend to be inelastic, but that's not unusual.

20   All kinds of commodities have relatively inelastic demand.

21   **Q.**   So, let's just take, say, heroin.  Let's take an

22   addicted person to heroin or opium.  What would the demand

23   curve look like?

24   **A.**   It would be downward sloping.  They would consume more

25   MMEs as MMEs get cheaper.  And it wouldn't -- it would not

```
1    look like the one you drew because it wouldn't show a very

2    low price responsiveness typically.

3    Q.   So, what would it look like?

4    A.   It would -- it would tend to be like the standard

5    demand curve downward sloping.  That, you know, people use

6    more as MMEs get cheaper.

7         That work's been done.  A colleague of mine, Casey

8    Mulligan, for example, has done a lot of work looking at how

9    the price per MME has affected consumptions of MMEs and he's

10   -- you know, his analysis shows there's a significant price

11   response.

12   Q.   And so, that's one of the points that you've made in

13   your papers, is it not, for the economic justification for

14   legalizing illicit drugs; is that fair?

15   A.   Well, I think you're overly simplifying what we said.

16   Q.   I'm sure I am.

17   A.   I think we compared -- I think what we said is you

18   might want to make them legal and tax them rather than make

19   them illegal and have them taxed implicitly through

20   violence, and crime, and all those other things and having

21   them less safe because they're available on the streets.

22        And, you know, we saw that with prohibition.  I mean,

23   we have prohibition on alcohol.  It was just tremendously

24   disruptive.  And there are lots of costs of having them

25   illegal.
```

1            I'm not saying you want to make them cheap and widely

2       available, but you don't -- I mean, illegal prohibitions,

3       ineffective prohibitions, are very costly because you end up

4       with all of these ancillary costs.

5            And, more importantly, you know, they end up being

6       ineffective.  They're not great at reducing quantity.  At

7       the same time, they're good at increasing lots of costs.

8            So, you know, we haven't had a great experience with

9       the war on drugs in my opinion.  I think -- and people are

10      beginning to realize the kind of costs we've had.  That

11      doesn't say you want unfettered access to things, but it

12      says the current methodology we're using isn't very

13      effective.

14      **Q.**   And so, Dr. Murphy, let me see if I can be a little

15      more concise.  You've written an article for The Wall Street

16      Journal and published at least three different times an

17      economic model suggesting that rather than arrest our way

18      out of the problem, it may be more beneficial to legalize

19      illicit drugs and regulate them; is that fair?

20      **A.**   I think that's right.  I think you would avoid the kind

21      of death rates we see today with illicit fentanyl where, you

22      know, people aren't out there trying to die by and large,

23      but because of the way they're supplied in a market that --

24      you know, where you have people buying things from -- they

25      have no recourse through the courts or anything else because

1    they're engaged in illegal transactions.  The costs on the

2    consumers, as well as the communities and suppliers, are

3    going to be high.  And that's why you want to get out of

4    that.

5    **Q.**   Right.  And so, I read your Wall Street Journal

6    article, but it's based on your papers and your papers use

7    an actual economic modeling system to make your point; is

8    that fair?

9    **A.**   That is true.

10   **Q.**   And it has a lot of formulas in it and it's pretty

11   complex but, theoretically, economists can come up with

12   modeling for this?

13   **A.**   You can, but it's not just theoretical.  I mean, it's

14   really -- a lot of it is empirical.

15       It's actually saying, look, I can link the theory to

16   the data.  I can actually see the consequences of how a --

17   how a prohibition market works.

18       I can see the fact that the products that people get

19   are of inferior consistency and quality to what they would

20   get in a more standard marketplace.  I can see that the

21   violence associated with contract enforcement or the lack of

22   contract enforcement in the illicit markets is a huge

23   problem.

24       You end up with all of these people in prison.  Costs

25   them to be there.  Costs us to put them there.

1       We have communities and countries kind of destroyed by

2   the illegal nature of the product.  And those are high costs

3   that we pay as a society and as a -- really, as a population

4   in the world.

5   **Q.**   Now, you also have noted in your writings that there's

6   probably some political opposition to legalizing illicit

7   drugs; agreed?

8   **A.**   Oh, there is, although less.  I mean, you know, it was

9   -- you know, if you thought about, you know, 30 years ago or

10  40 years ago, it wasn't very many people who, you know, even

11  thought marijuana should be legalized, right?  We're moving

12  in that direction.

13      Guys like Milton Friedman were like, hey, you know,

14  this is a very costly system we have here and he was -- you

15  know, for long in that direction.

16      I mean, Gary Becker and I at the university and George

17  Schultz, who passed away recently, who was a good friend of

18  mine and Gary's, you know, these are all people who fought

19  thinking about these issues, seriously was a good idea that

20  -- that it was a way to potentially -- not that we wouldn't

21  be better off in a world where people didn't abuse drugs and

22  things like that.  It's just, if you want to get there, the

23  way we're trying to get that isn't very effective.

24  **Q.**   So, let me see if I can jump to a real quick topic

25  here.  So, I'm going to try to take a non-graphic model and

1    just talk about supply and demand of opioids, right?

2         You've testified you have some basic knowledge but, in

3    general, you can't get addicted to an opioid unless you are

4    exposed to an opioid; would you agree with me?

5    **A.**   Yes.  I mean, to consume an opioid you have to consume

6    it and generally it's hard to get addicted to something

7    without consuming it first.  Addiction tends to follow

8    consumption.

9    **Q.**   Okay.  In this instance, it's impossible to get

10   addicted to opioids unless you have been exposed to opioids;

11   agreed?

12   **A.**   I think that's right.  I'm not a doctor, so I can't

13   say, but that's my understanding of how it works.  It's

14   addictions driven through past consumption.

15   **Q.**   Okay.  So, if you supply somebody with an opioid and

16   they consume it and become addicted to it, that also tends

17   to generate demand; would you agree with that?

18   **A.**   Well, it generates -- it could generate future demand;

19   that is, there's some feedback effect, but past demand would

20   also generate future demand.  Again, it's consumption that

21   generates future demand, not supply.  Right?  It's

22   consumption that generates future demand in an addiction

23   framework.

24   **Q.**   So, instead of demand, if we just put here "patient",

25   and instead of supply, we put a "pharmacy", right, what I

```
1    want to ask you is this -- you're shaking your head no.

2    A.   I don't -- I don't see how those are analogous, how

3    pharmacies telling me just about supply and how a patient is

4    telling me just about demand.  So --

5    Q.   Well, I'm attempting to change the diagram.  The

6    pharmacy supplies pills to patients, correct?

7    A.   Yeah, but not in the economic sense.  I mean, they're

8    not the determinants on the supply side, right?

9    Q.   Yeah.  So, this is where I'm going with this.  I'm

10   trying to go through the closed chain of distribution in the

11   Controlled Substance Act and you're here today talking about

12   supply and demand from an economic standpoint and what are

13   the driving factors as if we're in graduate school at the

14   University of Chicago studying markets; agreed?

15        MR. HESTER:  Your Honor, I object to the question.

16   It's just argumentative.

17        THE COURT:  Sustained.

18        MS. HARDIN:  Join, Your Honor.

19        THE COURT:  Sustained.

20        MR. FARRELL:  I thought it was a pretty good

21   argument.

22        THE COURT:  Well, but --

23        BY MR. FARRELL:

24   Q.   So, in general, you understand that patients go to

25   pharmacies to get their prescriptions filled?
```

**A.**   That's true.

**Q.**   And in order to do so, they have to go see a doctor

first and get a prescription?  You understand that?

**A.**   Yes.

**Q.**   And that pharmacies have to buy their pills from

distributors?  Do you understand that?

**A.**   Yeah.  I mean, although it's a little complicated

because the pharmacies also have deals with the

manufacturers, right, because --

**Q.**   Well, it's just --

**A.**   No.  I'm just saying the distributors in this industry

are a little different than distributors in other industries

because the pharmacies actually have direct relationships

with the manufacturers and the distributors really handle

the distribution part, not the contracting part often with

the pharmacies.  I think that's a little different than, for

example, most wholesale distribution models.

**Q.**   Agreed.  I'm not going to dispute any of that.

Here's the point that I'm going to try to make.  Have

you made any attempt to assess in your analysis the duties

imposed by the Controlled Substances Act between the

distributors and the pharmacies?

**A.**   I have not offered an opinion on the regulatory

environment or the legal.  Those are outside of my areas of

expertise.

1   **Q.**   One last follow-up on this.  If we have the supply and

2   demand and let's just say that here's the demand and here's

3   the supply, is there some terminology in economics where the

4   federal government, through regulation or otherwise, comes

5   in and tries to limit the amount of supply -- that's not

6   working very well -- tries to limit the amount of supply by

7   putting some type of cap on it?

8   **A.**   Sometimes, but that would be a price cap, the way

9   you're drawing it, I think, but yeah.

10  **Q.**   Okay.  Well, how would you account for the supply and

11  demand in the field of opioids for the government's rules

12  for the distributors to block suspicious orders?  How would

13  you account for that in economic terms?

14              MR. HESTER:  Object to form, Your Honor.

15              MS. HARDIN:  Same, Your Honor.

16              THE COURT:  Yeah.  I think the question is

17  confusing, Mr. Farrell.  I'll sustain the objection.

18              BY MR. FARRELL:

19  **Q.**   Is there any way for an economist to build into your

20  analysis rules on what limits supply?

21  **A.**   I would say yes, that economists can look at -- so, for

22  example, we know here that the drugs that were delivered

23  were delivered pursuant to prescriptions.

24              THE COURT:  Mr. Farrell, how much more are you

25  going to have?

```
 1              MR. FARRELL:  We can take a lunch break.

 2              THE COURT:  We can what?

 3              MR. FARRELL:  Take a lunch break.

 4              THE COURT:  Well, are you going to have -- we're

 5    not going to be able to finish with Dr. Murphy in the next

 6    few minutes, are we?

 7              MR. FARRELL:  If you give me a few seconds to

 8    whisper, I'll have a few questions.

 9              THE COURT:  Do you have any re-direct at this

10    point, Mr. Hester?

11              MR. HESTER:  Not at this point, Your Honor.

12              THE COURT:  Okay.  Maybe we can finish up here.

13         (Pause)

14              MR. FARRELL:  Judge, I'm advised we should take a

15    lunch break.

16              MR. HESTER:  Your Honor, there is one thing I

17    should say, though.  Dr. Murphy has a commitment in another

18    matter where he has to testify tomorrow and I assume you're

19    not going to go the full afternoon, but I wanted to check.

20              MR. FARRELL:  I'm certain of it.

21              THE COURT:  What is the time you're trying to get

22    out of town, Dr. Murphy?

23              THE WITNESS:  I have a flight at 6:00 p.m.

24              MR. HESTER:  So, I think we're fine, as long as

25    it's not going to be a long process.
```

```
 1              THE COURT:  Okay.  I'm going to ask you to come
 2    back at 2:00, Dr. Murphy, and we'll be in recess until 2:00.
 3         (Recess taken)
 4              THE COURT:  Good afternoon, Dr. Murphy.
 5              THE WITNESS:  Good afternoon, Your Honor.
 6              THE COURT:  Okay, Mr. Farrell, you may continue.
 7              MR. FARRELL:  Can we bring up the Exhibit 1 from
 8    the demonstratives the defendants used, please?  There we
 9    go.
10              BY MR. FARRELL:
11    Q.   Dr. Murphy, I have a couple of questions, and some of
12    this is just orientation to make a couple of subtle points.
13    This is Exhibit 26 from your report and I want to first come
14    over here and I'm going to draw a little square around MME
15    per adult.  Do you see that?
16    A.   Yes, I do.
17    Q.   Okay.  What's your understanding of what MME per adult
18    means?
19    A.   It's a morphine equivalent measured on a per adult per
20    year basis.  So, it's --
21    Q.   And this is -- would another word be -- for it the
22    weight of the drug or how much of the -- of the morphine
23    milligram equivalent is present?
24    A.   Yeah.  It's the equivalent amount of weight measured in
25    morphine equivalence.  So, it's not the weight of the actual
```

1    drug.  It would be translated to morphine equivalence

2    weight.

3    **Q.**   And this comes from the ARCOS data, correct?

4    **A.**   That does come -- well, yes.  The blue line comes from

5    the ARCOS data.

6    **Q.**   And so, this would be a measurement, for a lack of a

7    better word, of volume?  Would you agree with that?

8    **A.**   It would be a measure of volume, right.  There's other

9    things you could do, but I think this has become kind of the

10   most common measure of volume for this marketplace.

11   **Q.**   And so, in particular, what you've measured here is

12   prescription opioid by volume; agreed?

13   **A.**   For West Virginia by year per -- measured on a per

14   adult basis.

15   **Q.**   Yes, sir.  And then the line though here, this line,

16   this black line, is all opioid deaths; agreed?

17   **A.**   That's correct.

18   **Q.**   So, it would include prescription opioids and, say,

19   heroin or fentanyl?

20   **A.**   Yes.  It would be all opioid deaths, as well as

21   combinations of those, like I talked about earlier.

22   **Q.**   And so, the purpose of this graph is to demonstrate

23   that there was a period of time where the volume of

24   prescription opioids into West Virginia correlated to a

25   parallel track of opioid deaths, more or less; agreed?

1   **A.**   Yeah.  They were both going up in that earlier period.

2   Parallel is harder to say from this graph, but they were

3   both going up.

4   **Q.**   And so, here's ultimately, I guess, what my question

5   is.  Right here at this point, this inflection point, you'll

6   agree with me that something happened?

7   **A.**   Well, yeah.  I mean, but you circled that whole later

8   period.  So, the point at which something happens is kind of

9   where things turn.  Not where they cross.  I don't think

10   where they cross is of particular significance.

11   **Q.**   So, somewhere in here?

12   **A.**   Well, which line are you referring to, the blue one or

13   the black one?

14   **Q.**   Well, I think I'm just talking about in general, that

15   the prescription opioids are going down and the deaths are

16   going up.  They've changed courses.  Something has changed.

17   **A.**   Right.  The only thing I was referring to is usually

18   when you talk about an inflection point, it's not a range.

19   It's a point.

20   **Q.**   Yes, sir.

21   **A.**   So, you would typically say there was some kind of

22   inflection.  That term is misused because, in mathematics,

23   inflection actually means something different.

24        What we're really talking about is the turning point in

25   that blue line from rising to falling.  And then, the black

```
1    line is kind of an acceleration that happens in that black

2    line later.

3    Q.   So, my question to you is this.  Do you believe that

4    people addicted to prescription opioids have been

5    transitioning to heroin?

6    A.   Some have, but not as a population as a whole.  There

7    have been some people transition.

8    Q.   Is this from -- from your personal knowledge or from

9    your academic knowledge as an economist?

10   A.   This would be from reading the literature out there and

11   looking at the data.  The data I analyze in my report

12   doesn't specifically follow individuals, although a lot of

13   the papers and other things I've looked at in the academic

14   literature look more at individuals.  And you do see some

15   individuals moving across those categories.

16   Q.   So, you understand, sir, that there is testimony and

17   scientific literature in the record to suggest that there is

18   a strong correlation between prescription opioid misuse and

19   the initiation of heroin?

20            MR. HESTER:  Object on foundation grounds, Your

21   Honor.

22            THE WITNESS:  Most of the studies don't actually

23   look at that.

24            THE COURT:  Just a second.

25       I'll overrule the objection.  Go ahead.
```

1              THE WITNESS:  I'm sorry.  I'm sorry.  I should

2    have waited.

3         Most of the studies that I look at don't really look at

4    that correlation.  They actually look at people who initiate

5    heroin and ask what fraction of those previously used

6    prescription opioids, which is not an association, right?

7    It's -- because it's not how is one related to the other.

8    It's just a conditional probability in that direction.

9    **Q.**   So, you understand that the medical literature and the

10   testimony that has been introduced in this court is that

11   four out of five heroin users previously used or abused

12   prescription opioids?

13   **A.**   It depends on what time period you're looking at.

14   That's changed dramatically, for example, in recent years

15   where a lot more people are initiating on heroin now who

16   haven't previously used prescription opioids.

17   **Q.**   And you --

18   **A.**   So, you've got to be careful in terms of what time

19   period you're talking about.

20   **Q.**   Yes, sir.  All right.  So, let me change it around and

21   put it in a different perspective just to make a theoretical

22   point.  I would like for you to assume that four out of five

23   people that use heroin started out on prescription opioids.

24   Can you assume that for me?

25   **A.**   Please define what you mean by started out.  That's the

```
1    first drug they took?

2    Q.    All right.  And so, let me start it another way.  I

3    want you to assume that there is a relationship, a gateway,

4    a transition, between abusing prescription opioids and using

5    heroin.  I want you to assume that as a fact, okay?

6    A.    Define what you mean by gateway because it's been used

7    and misused in these discussions.  So, you need to define

8    what you mean by gateway.

9    Q.    Yes, sir.  We've had about 30 days worth of debate on

10   it and I fully understand that.  What I'm trying to simply

11   do is have you assume that the body of evidence or the

12   argument establishing a gateway effect is, in fact, true.

13   It doesn't mean you have to agree with it.  I just want you

14   to assume that as a fact.

15   A.    I just want you to define when you say the evidence has

16   found a gateway.  Tell me what you mean constitutes a

17   gateway.  Does that mean if you're saying -- are you saying

18   a number of the people who start on heroin have previously

19   used prescription opioids?  In no scientific sense would you

20   say that's a gateway.  If that's what you mean by gateway,

21   that's not a gateway.

22   Q.    Yes, I understand.  I want you, whatever framework you

23   want to use for gateway, whatever level of evidence, I want

24   you just to assume for a moment that people that use

25   prescription opioids are going to end up using heroin.
```

1    How's that?

2    **A.**    Okay.  That's counterfactual, but --

3    **Q.**    It's theoretical and it's hypothetical.  If that's

4    true, then you would also agree with me that -- from your

5    testimony that the heroin east of the Mississippi is more

6    likely to have fentanyl; agreed?

7    **A.**    I think in recent years, in particular.  It wasn't true

8    always, but in recent years, more likely than heroin east of

9    the Mississippi would contain fentanyl.

10   **Q.**    And I want you to assume that fentanyl laced heroin is

11   causing fatal overdoses, particularly east of the

12   Mississippi.  I want you to assume those three facts.

13        My question to you, sir, is if you assume those three

14   facts are true, does that not, in fact, explain the change

15   in the trajectory on Exhibit 26?

16   **A.**    I -- you're asking does that explain the actual world

17   or could you construct a world where that would happen?

18   **Q.**    I'm just asking you.  You said that something happened.

19   There's lots of factors involved.  And I'm asking you, if

20   you assume those three facts to be true, whether or not that

21   is an explanation for the change we see in Exhibit 26

22   between the volume of prescription opioids and the number of

23   fatal overdoses from opioids?

24   **A.**    I would say you could construct such a world.  I don't

25   think it fits the actual world.  That's -- there are too

1    many other things that don't fit with that.

2              MR. FARRELL:  Can we go to Slide 5, please?

3              BY MR. FARRELL:

4    **Q.**   So, I wanted to discuss with you very briefly again the

5    scatter diagram and to make sure that we are on the same

6    page.

7         This is heroin mortality between 2010 and 2018 on the

8    left and fentanyl mortality between 2013 and 2018 on the

9    right by state, correct?

10   **A.**   Those are the vertical axes.  The horizontal axes are

11   the -- in both cases are what it says.

12   **Q.**   And so, what your ultimate point here is, is that if

13   you take the average prescription opioid shipment over time

14   and put it on a scatter diagram with the number of deaths,

15   you're saying that the disparity or that the spread of this

16   data indicates a weak association?  That's your ultimate

17   point, correct?

18   **A.**   Yeah.

19   **Q.**   So --

20   **A.**   Not just the dots, but the statistics both suggest a

21   weak association.

22   **Q.**   Yes, sir.  In economic terms?

23   **A.**   Probably more statistical terms, to be honest, but yes,

24   we can call it economics.

25   **Q.**   Yes, sir.  But, ultimately, if you take the dot here

1    for heroin mortality what we can draw from this is that West

2    Virginia is at the higher end of the rest of the country for

3    heroin mortality; agreed?

4    **A.**   Yes.  You know, I don't know what number it is.  Over

5    this period, on average, it was in the top group.

6    **Q.**   And the same thing over here with fentanyl, is West

7    Virginia is at what appears to be on your graph the second

8    highest fentanyl mortality in the country; agreed?

9    **A.**   That's what it appears.  I believe that's correct.

10    That's what it says in the graph.

11    **Q.**   Now, if we go to the next slide, which is Page 6, and

12    the last -- the last one that we'll discuss, and I'm not

13    going to bother erasing it because I know I'll mess it up.

14    But in general -- I wrote this down.

15        Correct me if I'm wrong, but what you are -- is the

16    purpose of this slide or is it your testimony that the

17    people that are getting the pills are not the people dying

18    from the pills?  Is that a fair assessment as to what your

19    opinion is today based on the statistics?

20    **A.**   Well, in this graph, we're looking at people getting

21    the prescriptions and people -- in that previous period and

22    people dying from illicit opioids in a later period.  That's

23    how I would put it.

24    **Q.**   So, let me rephrase it.  The people that are getting

25    the prescriptions are not the people that are dying of

1    opioid overdoses later?  That's your -- that's your

2    position?

3    **A.**    Yeah.  I mean, that was paraphrasing, yes.

4    **Q.**    So, could it also be, in a theoretical sense, could an

5    explanation for that be that the pills that people are

6    getting by prescription are diverting it to the black

7    market?  Is that a theoretical possibility?

8    **A.**    It is.  That's why I did the other graph.

9    **Q.**    And so, is that not just a theoretical possibility but,

10   in fact, is that your -- your conclusion as an economist

11   that the pills, the prescription pills that were given to

12   patients with prescriptions in their hand, were more likely

13   than not diverting those pills to others that were then

14   overdosing on licit and illicit opium?

15   **A.**    I am not saying that because I don't think it's more --

16   I don't have any evidence to say that it's more likely than

17   not that that's where those pills were going.  I don't think

18   we have an idea of the fraction that they're going to other

19   people.

20   **Q.**    But that -- but to be fair, your position is, is that

21   there's something to be said, there is an explanation for

22   why it is that people that are receiving the prescriptions

23   aren't the ones that are dying from the prescriptions?

24   **A.**    Well, you can't read this graph that way because I

25   seriously doubt that the pills that these people got from

1    prescriptions in 2001 to 2002 are leading to heroin and

2    fentanyl deaths for people ten years later.

3         I mean, those pills, they transformed from prescription

4    opioids to heroin and fentanyl and then were ingested by

5    people a decade later, is that what you're saying, because

6    that's what's on this graph?

7    **Q.**   No, no.  No, no.  Let's put this graph aside.

8         I'm asking you, sir, based on your review, do you think

9    that there was a substantial amount of prescription opioids

10   that were diverted in Huntington, Cabell County, West

11   Virginia from the people who originally presented the

12   prescription?

13   **A.**   My -- I haven't done the study of that, but my

14   understanding is that there were diversions from the pills

15   after those prescriptions were filled and there was also

16   abuse by people who received those prescriptions both.

17   **Q.**   Thank you.

18             MR. FARRELL:  Judge, may I have a moment?

19             THE COURT:  Yes.

20        (Pause)

21             MR. FARRELL:  That's all the questions I have,

22   Doctor.  Thank you for coming to West Virginia.  It was a

23   pleasure to meet you.

24             THE WITNESS:  Thank you so much.

25             THE COURT:  Mr. Hester, do you want to re-direct?

```
 1              MR. HESTER:  Just one -- just one point, Your

 2    Honor.

 3                        REDIRECT EXAMINATION

 4              BY MR. HESTER:

 5    Q.    Dr. Murphy, Mr. Farrell asked you some questions about

 6    an assumption that four out of five people who are heroin

 7    users began by misusing prescription opioids.  Why would

 8    that not be sufficient, in your view, to conclude that

 9    prescription opioid misuse is a gateway to heroin?

10    A.    Because it simply says a lot of people -- a lot of the

11    people who ended up on heroin previously did something.  Let

12    me replace assuming prescription opioids with drinking

13    water.  Basically, a hundred percent of the people who

14    initiated on heroin previously drank water.  That just -- it

15    doesn't -- that's not looking at the probabilities the right

16    way.

17              There's also a serious problem with the -- with the

18    theory because let's assume that there are people who move

19    from prescription opioids to heroin and when -- when

20    prescription opioids become less available, but what will

21    happen if you made prescription opioids less available, more

22    people initiate directly on heroin.  You might actually end

23    up with more people on heroin, not fewer.  That's a problem.

24              And the plaintiffs' experts in this case don't talk

25    about that at all.  And that, in fact, is not a theoretical
```

143

possibility, but an actual reality that, as the availability

of the prescription opioids have gone down, more people now

initiate on heroin.  You could actually end up with more

people on heroin.  And you have to take account of that

pathway.

     The second thing I would say is the fact that people do

A and B doesn't mean there's a gateway or that they move

from A to B when one becomes less available.

     Give you an example.  Think about Coke and Pepsi.  What

would happen if we reduced the availability of Coke?  I mean

Coca-Cola, not the other kind of coke.  More people would

drink Pepsi.  People who used to drink Coke will start

drinking Pepsi.

     That doesn't mean there's a gateway from Coke to Pepsi.

It doesn't mean if we didn't have Coke around, there would

be fewer people drinking Pepsi.  There would be more people

drinking Pepsi if we didn't have Coke because they wouldn't

be able to drink Coke.

     The point is that this evidence that people move from A

to B when A becomes less available, in economic terms, that

just means there are substitutes.  It doesn't tell you it's

a gateway.

Q.   And so, let me ask a few questions to follow up on

that, Dr. Murphy.  Is your point that if you simply observe

a temporal sequence or a sequence of events, somebody uses

1    or misuses one drug and then subsequently misuses another

2    drug that you cannot infer a gateway from that temporal

3    sequence of events?

4    **A.**   Exactly.  And you can't because -- for exactly the

5    reasons I talked about.  There's several ways that will

6    happen.

7         One is that you're looking at people who have a

8    propensity to do both.  So, often, they'll do A before B.

9         The second one is they can just -- you know, you can

10   have the kind of situation that I talked about with the Coke

11   and Pepsi.

12   **Q.**   I want you to build on this point.  Are you aware of

13   evidence suggesting that people who misuse or abuse

14   prescription opioids before they abuse heroin also have

15   abused other substances?

16   **A.**   Yes.  That -- the evidence is very clear on that, that

17   many of those who, you know, it was mentioned abused

18   prescription opioids before they used heroin also abused

19   other drugs.

20   **Q.**   What's the significance of that point?

21   **A.**   Well, it gets back to economics because, when it gets

22   back to the economics, it's that some people are prone to

23   abuse and they'll abuse prescription opioids if they're

24   available.  If they're not available, they'll abuse

25   something else.  Or maybe they'll abuse multiple drugs.

1          And in some of the patterns we observe of people doing

2     multiple things in sequence or at the same time reflect

3     those differences across individuals and you have to take

4     that into account.

5     Q.    In particular, why would it be relevant if people have

6     abused other substances before abusing prescription opioids

7     and before abusing heroin?  Why would that be relevant in

8     assessing the gateway?

9               MR. FARRELL:  Objection, Your Honor.  I think this

10    goes far afield of the Economic School of Chicago.  This is

11    back into epidemiology, as well as the evidence we heard

12    from several other experts.

13              THE COURT:  Overruled.

14         Go ahead, Mr. Hester.

15              THE WITNESS:  I would say it gets to this -- two

16    things.  One is differences across people and the propensity

17    to use drugs of different types.  And, also, it gets to this

18    substitute concept, that simply seeing people switch from

19    one to the other or when one becomes less available moves to

20    the other tells us two things.

21         One is that there are people who have a propensity to

22    do both.  And, two, it tells us that one is a substitute for

23    the other.  If I can't get one, I'll do the other one, kind

24    of like my Coke and Pepsi example.

25    Q.    And so, is your point that substitutes are not the same

```
1    as gateways?

2    A.    No.  You can have, in fact, substitutes have -- often

3    have nothing to do with gateways.

4              MR. HESTER:  Thank you, Dr. Murphy.  Those are all

5    the questions I have.

6              THE COURT:  Anything else, Mr. Farrell?

7              MR. FARRELL:  Yes, sir.

8                        RECROSS EXAMINATION

9              BY MR. FARRELL:

10   Q.    Dr. Murphy, you understand that prescription opioids

11   and heroin have the same molecule, same molecular structure?

12   They both -- they both are from the morphine molecule?

13   A.    I understand that; not from my economics training,

14   however.

15   Q.    Yes, sir.  So, from an economics standpoint, is it fair

16   to say that prescription opioids and heroin are substitutes

17   for each other?

18   A.    You would -- in economics, you always have to be

19   careful.  That would be a factor making me think they would

20   be substitutes.  I think we generally look for empirical

21   evidence that they are substitutes because you can come up

22   with examples that look like they would be substitutes and

23   turn out to be complements.  I teach a whole lecture on that

24   in my class.  I don't want to bore you with that today.

25   Q.    I certainly don't want to get bored with it.  So, your
```

```
 1    testimony is that heroin and prescription opioids are

 2    empirically substitutes?

 3              MR. HESTER:  Your Honor, I believe that misstates

 4    his testimony.

 5              THE WITNESS:  I will clarify it.

 6              THE COURT:  Just a minute.  Just a minute.

 7         Well, I'll let him answer.  Go ahead.

 8              MR. FARRELL:  It had a question mark at the end.

 9              BY MR. FARRELL:

10    Q.   I'm asking you --

11    A.   You know, I -- I would say if you focus on abuse of

12    prescription opioids and abuse of heroin, they're probably

13    closer to be substitutes.  I think heroin is less --

14    probably not really a substitute for legitimate use of

15    prescription opioids.  It's -- you know, people don't

16    substitute much on that margin.

17              MR. FARRELL:  Very good.  Thank you.

18              THE COURT:  What's the difference between

19    substitute and a complement?  I think I missed that part.

20              THE WITNESS:  A complement are two things that get

21    used together, like tennis ball and tennis rackets.  That

22    would be a complement.

23         And substitute would be like Coke or Pepsi.  I like

24    cola.  I can drink Coke or I can drink Pepsi.

25              THE COURT:  Okay.
```

1          Anything else of Dr. Murphy?

2                    MR. HESTER:  No, Your Honor.  Thank you.

3                    THE COURT:  Dr. Murphy, thank you, sir, very much.

4      I hope you have a good trip out of town and it's been a

5      pleasure having you here.  Thank you, sir.

6                    THE WITNESS:  Thank you so much, Your Honor.

7                    THE COURT:  Yes, ma'am?

8                    MS. MAINIGI:  Your Honor, I think there is another

9      witness coming this afternoon, but I just wanted to go ahead

10     and alert the Court, much as I did last week, about where we

11     stand, the defendants in our schedule.

12         I think that we may -- we're moving quickly and we're

13     skinnying down a little bit.  So, I think we may be done as

14     early -- depending on the length of cross examinations, as

15     early as the middle of next week.  I've alerted the

16     plaintiffs to that fact.

17         We're going to be spending some time in the next day or

18     two as a group working through the remainder of our

19     witnesses and I think right now the plaintiffs have notice

20     per our various stipulations of who we are intending to

21     call.  Some folks may drop off that list.

22         What we would propose, Your Honor, is that after we've

23     had a chance to further confer that we speak to the

24     plaintiffs tonight and perhaps come to Your Honor with a

25     proposal for timing of closings and findings of fact,

1    conclusions of law, and perhaps we could spend some time on

2    that tomorrow.

3        I do think that since we are moving so quickly and we

4    moved through more quickly than expected on some of the --

5    these witnesses that we may end up ending a little earlier

6    today.  The witness that we have after the next witness

7    can't be here until tomorrow.

8        I think that might be our only witness tomorrow.  So,

9    we may end a little earlier tomorrow, too, which I think

10   would be welcomed by everyone in this courtroom.

11       And then, we also -- I don't want to forget that we

12   also have depo designations, of course, that we'll continue

13   to work through that we'll submit to the Court next week.

14   So --

15              THE COURT:  Well, that's all welcome news, Ms.

16   Mainigi.  You mentioned proposed findings and conclusions.

17   You submitted those a long time ago but, obviously, they'll

18   be --

19              MS. MAINIGI:  Updated.

20              THE COURT:  Updated based on what's happened

21   during the course of the trial, so I can look forward to

22   getting new ones then.

23              MS. MAINIGI:  Ultimately, yes, Your Honor.  Yes.

24   Exactly right.

25              THE COURT:  Okay.  Well, that all sounds good.

1          MS. MAINIGI:  I thought Your Honor and this Court

2     might appreciate that news.

3          THE COURT:  I'm looking for an appropriate word.

4        (Laughter)

5          MS. MAINIGI:  Well, that's all I have for today,

6     Your Honor.  I think we've got one more witness and, as I

7     said, it's possible that we may not go to the end of today.

8          THE COURT:  Are we ready to go with that other

9     witness or do we need to take a break?

10        Ms. Wu?

11         MS. WU:  Yes, Your Honor.  We'll just get the

12    witness.

13         THE COURT:  Okay.  Very good.

14         COURTROOM DEPUTY CLERK:  Sir, please state your

15    name.

16         THE WITNESS:  Peter Boberg.

17         COURTROOM DEPUTY CLERK:  Thank you.  Please raise

18    your right hand.

19              **PETER BOBERG, DEFENSE WITNESS, SWORN**

20         COURTROOM DEPUTY CLERK:  Thank you.  Please take a

21    seat.

22         THE COURT:  Good afternoon, sir.

23         THE WITNESS:  Good morning, Your Honor.  Or good

24    afternoon rather.

25         MS. WU:  May we proceed, Your Honor?

```
1              THE COURT:  Yes, please.

2              MS. WU:  Thank you.

3                      DIRECT EXAMINATION

4         BY MS. WU:

5    Q.   Doctor Boberg, would you please introduce yourself to

6    the Court?

7    A.   Yes.  Good morning.  My name is Peter Boberg.

8    Q.   Doctor, how are you currently employed?

9    A.   I'm an economist at Charles River Associates.

10   Q.   What is your understanding of why you're here to

11   testify today?

12   A.   I was asked to look at the flagging analysis of --

13   performed by Dr. McCann on the ARCOS data and testified to

14   and relied on by Mr. Rafalski.

15   Q.   Now, Doctor, before we go into your qualifications, I

16   want to briefly orient the Court to the opinions that you're

17   going to get into in more detail.

18        What are the flagging methodologies that you just

19   referenced?

20   A.   Dr. McCann developed six methodologies that he applies

21   to ARCOS shipment data from distributors to pharmacies in

22   Cabell County and Huntington, West Virginia and he applies

23   the algorithms to flag shipments that he believes were

24   caused suspicious or unlawful.

25   Q.   Thank you, Doctor.
```

1           MS. WU:  Mr. Reynolds, could we please put up

2   Rafalski Demonstrative 223 at Page 14?  I'm putting this up.

3   This will refresh us on some testimony which was provided

4   earlier in the case.

5           BY MS. WU:

6   **Q.**   Doctor Boberg, are the six methodologies identified in

7   this demonstrative those that you were asked to review in

8   connection with your work in this case?

9   **A.**   Yes, they are.

10  **Q.**   What specifically were you asked to review with regard

11  to these methodologies presented by Mr. Rafalski?

12  **A.**   I was asked to review the methodologies to make sure I

13  understood how Dr. McCann implemented the algorithms and

14  then to assess the reliability and validity of the results

15  he obtained using those algorithms.

16  **Q.**   Doctor, you just mentioned Dr. McCann, who testified

17  earlier in this trial.  Is it your understanding that Dr.

18  McCann did the modeling work that Mr. Rafalski relied on to

19  present these six methodologies to the Court?

20  **A.**   Yes.  That's correct.

21  **Q.**   What did you conclude about the reliability of these

22  six methodologies presented by Mr. Rafalski?

23  **A.**   After studying the methodologies, I found the results

24  to be unreliable and invalid.  And that was really for three

25  main reasons.

1      One, I found the results to be lacking in robustness.

2    They're driven almost entirely by a single assumption for

3    which Dr. McCann doesn't provide any basis.  And when I

4    remove that assumption, the results essentially go away.

5      Second, I find that they're inconsistent across the

6    different methodologies.  So, running methodologies that

7    ostensibly do the same thing, they achieve very different

8    results and that suggests they're unreliable.

9      And, third, I looked at the results and compared them

10   to other evidence.  In particular, I looked at the DEA's

11   estimates of the actual rate of diversion out of the

12   controlled channel and found Dr. McCann's estimates were

13   very, very different than the DEA's estimates and so,

14   concluded that his results were unreliable.

15   **Q.**   Okay.  So, I want to unpack those just very briefly for

16   the Court's benefit.  You mentioned assumptions.  How do the

17   assumptions used in these models relate to your opinion

18   about the reliability or lack thereof of these

19   methodologies?

20   **A.**   Well, as I said, the assumptions that Dr. McCann makes,

21   he assumes that after a shipment is flagged every subsequent

22   shipment must also be flagged and he really provides no

23   basis for that.  He didn't investigate whether that

24   assumption was valid or true and, yet, it drives almost all

25   of his results.  And so, I find that makes his results

1   unreliable.

2   **Q.**   You also mentioned that these six results presented by

3   Mr. Rafalski have inconsistent results.  How does the

4   inconsistency in those results impact your determination

5   that the methodologies are unreliable?

6   **A.**   Well, when I find that Dr. McCann's results as flagging

7   72 percent of shipments as unlawful using Method A, but only

8   28 percent, for example, using Method B, you know, both

9   numbers can't be right.  Both sets of flagged shipments

10   can't -- you know, it can't be correct.

11       Dr. McCann provides no guidance about which one is

12   correct or a framework with which to evaluate which one is

13   correct.  And so, that -- really, that inconsistency means

14   the results are unreliable.

15   **Q.**   Now, the last critique that you offered in brief is

16   that the results of Mr. Rafalski's six methodologies are

17   unrelated to real world information.  Can you explain that

18   for the Court?

19   **A.**   Yes.  I saw that Dr. McCann was flagging a very large

20   percentage of shipments into Huntington and Cabell County as

21   unlawful and suspicious and I wanted to know, you know, is

22   that -- is there some evidence that helps us understand

23   whether that's a reliable estimate.

24       And the DEA does determine the level of diversion out

25   of the controlled channel as part of its obligations.  And

1    that level is very, very low.  It's about .1 percent in the

2    case of oxy and hydro and that just doesn't compare with

3    what Dr. McCann's findings -- his -- his flagging is far in

4    excess of that.  And so, I find that's unreliable.

5    **Q.**   Thank you, Doctor.

6          MS. WU:  Mr. Reynolds, we can take down the

7    demonstrative.

8          BY MS. WU:

9    **Q.**   Dr. Boberg, were you also asked to perform some

10   analyses that are specific to McKesson?

11   **A.**   Yes, I was.

12   **Q.**   And what analyses were you asked to perform?

13   **A.**   I was asked to look at McKesson's market share in

14   Huntington and Cabell County and look at Dr. McCann's

15   calculation of that market share.

16   **Q.**   Thank you, Doctor.  So, now that we've provided an

17   overview of your opinions in this case, let's talk about

18   your qualifications.

19        How would you describe the expertise that you bring to

20   the work that you have done for this case?

21   **A.**   Well, most of my work involves applying economics and

22   econometrics in the principles of data analysis to various

23   settings.  So, sometimes that's in litigation cases in

24   courts like this one.  Most often, it's before regulators

25   like the Federal Trade Commission or the Department of

1    Justice.

2    **Q.**   Doctor, how did you become an expert in econometrics

3    and data analysis?

4    **A.**   I received my Ph.D. in Economics from the University of

5    Michigan.  Prior to that, a Bachelor's in Economics from the

6    University of Alberta in Canada.  And then, after my Ph.D.,

7    I joined Charles River Associates, where I've been for the

8    last 21 years.

9    **Q.**   What is Charles River Associates, or CRA, as sometimes

10   we refer to it?

11   **A.**   It's an economic consulting firm based in Boston.

12   **Q.**   What type of work and analysis have you undertaken

13   during your career as an economist at CRA?

14   **A.**   Well, I've worked on cases in a lot of different areas,

15   a lot of different industries, a lot of different types of

16   matters.

17       I do have quite a bit of experience looking at the

18   pharmaceutical industry.  I've looked at matters involving

19   pharmaceutical manufacturing, pharmaceutical distribution,

20   pharmacy benefit management, retail pharmacy.  So, I do have

21   experience analyzing large datasets in that type of context.

22   **Q.**   Doctor, can you give the Court some examples of the

23   type of data analytics that you've undertaken in the course

24   of your career?

25   **A.**   Sure.  An example would be for a merger of large

1    national retail chain pharmacies.  I was retained by the

2    Federal Trade Commission to assist them in their antitrust

3    evaluation of that transaction.  In that context, I analyzed

4    terabytes of prescription data from thousands of pharmacies

5    on thousands of drugs for multiple years.  So, that's the

6    type of data analytics I get involved in.

7    **Q.**    Doctor, is it common for you to be called upon to

8    review the models or analyses put forward by other experts

9    and economists?

10   **A.**    Yes, it is.

11   **Q.**    Doctor, during the course of your career, have you

12   published articles in the fields of econometrics and

13   modeling?

14   **A.**    Yes, I have.

15   **Q.**    And have you also lectured or been asked to give

16   presentations in those same areas?

17   **A.**    Yes, I have.

18   **Q.**    Based on your expertise in economics and data analysis,

19   have you been asked to serve as an expert in litigation

20   previously?

21   **A.**    Yes.  Occasionally, yes.

22   **Q.**    Have you ever testified at trial in any of those

23   matters?

24   **A.**    Yes, once.

25   **Q.**    Is your work in the litigation context a significant

1    portion of the work that you do at CRA?

2    **A.**    No.  Most of my work is not -- not in litigation.

3    **Q.**    Thank you, Doctor.

4         MS. WU:  Your Honor, I'd tender Dr. Boberg as an

5    expert qualified in econometrics and the analysis of large

6    datasets.

7         THE COURT:  Any -- any objection?

8         MR. FARRELL:  Judge, may I voir dire the witness?

9         THE COURT:  Pardon me?

10        MR. FARRELL:  May I voir dire the witness?

11        THE COURT:  Yes, you may.

12                    **CROSS EXAMINATION**

13        **BY MR. FARRELL:**

14   **Q.**    Dr. Boberg, I introduced myself briefly.  My name is

15   Paul Farrell.  I have a couple of questions for you.  Have

16   you ever designed or implemented a Suspicious Order

17   Monitoring System for anybody in the pharmaceutical industry

18   dealing with controlled substances?

19   **A.**    I have not.

20   **Q.**    Are you familiar with or an expert in the field of

21   tracking pharmaceuticals within the closed chain of

22   distribution?

23   **A.**    I'm not an expert on that.

24   **Q.**    All right.  And I was a little confused, but do you

25   intend to offer opinions on whether the criteria that form

1    the basis of Dr. McCann's algorithms are appropriate?

2    **A.**    No.  I was asked to look at Dr. McCann's application of

3    the algorithms, not the underlying algorithms.

4    **Q.**    That's what I was getting to.  You're going to simply

5    take for truth the six methodologies that were just shown to

6    you and advise the Court whether or not those six

7    methodologies were appropriately inputted by Dr. McCann with

8    the data; is that my understanding?

9    **A.**    I have been asked to look at how Dr. McCann applied the

10   algorithm.  So, I'm looking at his application of the

11   algorithms.  And that includes assumptions that he made to

12   implement the algorithms, choices he made along the way, and

13   the results that he obtained as a result of his application.

14   **Q.**    Well, your expert report says on Paragraph 62, I offer

15   no opinion on whether the criteria that form the basis for

16   Dr. McCann's algorithms, with or without Dr. McCann's

17   assumption about flagging all reported transactions

18   thereafter, are appropriate for flagging shipments.

19       Are you -- are you intending to testify today that you

20   do have comments upon Dr. McCann's assumptions?

21   **A.**    What I'm saying in that paragraph is that I'm not

22   offering an opinion as to whether a particular methodology,

23   if it were used by a distributor, for example, is

24   appropriate or not.  That's not something I have expertise

25   on.  I'm simply looking at Dr. McCann's application of the

```
 1    algorithm and how he obtained his results in assessing

 2    whether that application is reliable.

 3              MR. FARRELL:  Okay, thank you.

 4              THE COURT:  Do you object to his -- me finding him

 5    as an expert, Mr. Farrell?

 6              MR. FARRELL:  I don't think so, Judge.

 7              THE COURT:  The Court finds Dr. Boberg to be a

 8    qualified expert witness in the fields of -- I will have to

 9    look in my notes here.

10         I can't read my writing, Ms. Wu.  You will have to tell

11    me again.

12              MS. WU:  Your Honor, we tender Dr. Boberg as an

13    expert witness qualified in the fields of econometrics and

14    the analysis of large datasets.

15              THE COURT:  All right.  I find Dr. Boberg to be a

16    qualified witness expert in the fields of econometrics, data

17    analysis and large datasets.

18         Did that get it?

19              MS. WU:  Yes, Your Honor.  Thank you.

20         May we proceed?

21              THE COURT:  You may proceed.

22              MS. WU:  Thank you.

23              BY MS. WU:

24    Q.   Doctor, before we talk about those analyses, Dr.

25    McCann's application of the methodologies that you just
```

1    discussed, I would like to talk about the dataset that Dr.

2    McCann started with.  Did you review Dr. McCann's trial

3    testimony concerning the dataset that he used to complete

4    his work in this case?

5    **A.**   Yes, I did.

6    **Q.**   What is your understanding of the nature of the dataset

7    that Dr. McCann employed?

8    **A.**   Dr. McCann built a dataset that consists of

9    pharmaceutical shipments from distributors to pharmacies in

10   Huntington and Cabell County using ARCOS data, which is data

11   from the DEA, as well as supplements that were data from the

12   defendant distributors, Cardinal, McKesson and ABDC.

13   **Q.**   Doctor, do you have an understanding of why Dr. McCann

14   supplemented the ARCOS data with transactional data from the

15   distributor defendants in this case?

16   **A.**   Yes.  The ARCOS data Dr. McCann has is limited to the

17   time frame 2006 to 2014.  So, he uses the distributor data

18   to fill in areas outside of that and, as well, he has some

19   gaps in the ARCOS data.  And so, he uses the defendant

20   distributor data to augment or supplement and correct in the

21   cases the ARCOS data.

22   **Q.**   Doctor, in connection with your work in this case, did

23   you spend time reviewing Dr. McCann's dataset?

24   **A.**   Yes, I did.

25   **Q.**   And what did your review of Dr. McCann's dataset

1    involve?

2    **A.**   I looked at the underlying code that Dr. McCann

3    provided that he wrote to build his dataset and looked at

4    the data itself.

5    **Q.**   Did you review Dr. McCann's dataset for accuracy?

6    **A.**   No, I -- I did not review it for accuracy.  I was asked

7    to evaluate the reliability of Dr. McCann's application of

8    the algorithms.  I wanted to use the same data as Dr.

9    McCann.  And so, I just wanted to understand how he put that

10   data together, but I didn't look -- I didn't assess whether

11   the data themselves are reliable.

12   **Q.**   Do you have an opinion on whether Dr. McCann's data

13   itself is reliable?

14   **A.**   No, I do not.

15   **Q.**   So, I'd like to continue with this dataset as assembled

16   by Dr. McCann.  Does that dataset include the information

17   for all orders received by the distributor defendants in

18   this case?

19   **A.**   No, it does not.  So, as I said earlier, it's shipment

20   data, so it does not include all orders.

21   **Q.**   Why is it that a dataset which includes shipments only

22   might differ from a dataset that would include all orders?

23   **A.**   Well, there are a few reasons that orders might not

24   turn into shipments.  So, one is that the distributors may

25   be conducting due diligence and blocking orders, in which

1    case they would not turn into shipments.

2        It could also be the case that orders are received and

3    drugs are unavailable, out of stock, and so, there's no

4    shipment that occurs.  Or it could be that orders come in

5    and there's financial issues that -- that prevent the order

6    from turning into a shipment.

7    **Q.**   So, there are various reasons that the data for

8    shipments and orders may differ significantly?

9    **A.**   Yes, that's correct.

10   **Q.**   Doctor, based on your review of evidence in this case,

11   are you aware that the distributor defendants, McKesson,

12   ABDC and Cardinal, in fact, operated regulatory programs

13   that did block orders for prescription opioids?

14           MR. FARRELL:  Objection, Your Honor.  I think this

15   is outside the scope of his expertise and is cumulative with

16   the testimony directly from the defendants.  I don't think

17   this witness has been qualified to be offering opinions

18   about the SOMS system McKesson used.

19           MS. WU:  Your Honor, the witness is providing his

20   input based on review of evidence in order to explain the

21   nature of the dataset that Dr. McCann presented and not to

22   opine on the nature of the programs operated by the

23   defendants.

24           THE COURT:  Overruled.

25       You may proceed.

```
 1              MS. WU:  Okay.

 2              BY MS. WU:

 3    Q.   Doctor, do you need the question again?

 4    A.   Sure.

 5    Q.   Okay.  Based on the evidence that you reviewed in this

 6    case, are you aware that the defendants, ABDC, McKesson and

 7    Cardinal, did, in fact, operate programs that blocked

 8    certain orders for prescription opioids?

 9    A.   Yes.  I reviewed a file of blocked orders from

10    McKesson, for instance.

11    Q.   Are those blocked orders reflected in the McKesson data

12    that you reviewed for purposes of this case reflected in the

13    -- in the shipment data that McCann used, Dr. McCann used,

14    to present his work in this case?

15    A.   No.  Those blocked orders would be examples of the kind

16    of orders that we talked about that don't end up in the

17    shipment data that Dr. McCann analyzed.

18    Q.   Dr. Boberg, in your opinion, why does it matter that

19    Dr. McCann used data which is limited to shipments in order

20    to try to identify suspicious orders?

21    A.   Well, it really means he's running --

22              MR. FARRELL:  Objection, Your Honor.  Again, if

23    this is application to algorithms to data, that's one thing.

24    If this is talking about the legal requirements of

25    identifying suspicious orders, that's something completely
```

1    different, Judge.

2              MS. WU:  Your Honor, the witness is talking about

3    providing testimony as to the appropriateness of the data

4    that Dr. McCann used, not as to the nature of the programs.

5              THE COURT:  I think this is an appropriate basis

6    for what I expect his expert opinion to be.  I will overrule

7    the objection and let you go ahead.

8              MS. WU: Thank you, Judge.

9              THE WITNESS:  So, the dataset that he relies on is

10   not the right dataset to run the algorithms on for purposes

11   of flagging orders because of shipments and if, you know,

12   orders are not in the data, the orders that are not in the

13   data are likely to be the ones that the algorithms would be

14   trying to flag and that's going to make the algorithms flag

15   the wrong shipments.

16             BY MS. WU:

17   **Q.**   Thank you, Doctor.  So, now I want to turn to some of

18   those methodologies which Mr. Rafalski presented to the

19   Court.  As an initial matter, have you reviewed Mr.

20   Rafalski's trial testimony from this case?

21   **A.**   Yes, I have.

22   **Q.**   And you testified a few moments ago that Mr. Rafalski

23   relied on the work of Dr. McCann in order to run

24   methodologies for flagging purposes, correct?

25   **A.**    Yes, that's correct.

1    **Q.**   Did you review Dr. McCann's trial testimony about those

2    flagging methodologies?

3    **A.**   Yes, I did.

4    **Q.**   And did you also review his work papers and deposition

5    in this case?

6    **A.**   Yes.  Dr. McCann testified in his deposition about --

7    about the methodologies and I reviewed that, as well as his

8    report and backup materials.

9    **Q.**   Based on your review of Dr. McCann's work, were you

10   able to understand how Dr. McCann's six flagging

11   methodologies operate?

12   **A.**   Yes.  I was able to essentially write my own code that

13   replicated what Dr. McCann did based on his descriptions and

14   backup materials.  And so, I was able to satisfy myself that

15   I understood Dr. McCann's analysis.

16          MS. WU:  Mr. Reynolds, could we put back up on the

17   screen Rafalski Demonstrative 223 at Page 14?

18          BY MS. WU:

19   **Q.**   Dr. Boberg, once again, these are the six

20   methodologies, the flagging methodologies that Mr. Rafalski

21   presented to the Court, correct?

22   **A.**   Yes, that's correct.

23   **Q.**   Based on your review of Mr. Rafalski's trial testimony

24   on this case, in this case, do you have an understanding

25   that Mr. Rafalski believes certain of these flagging

1    methodologies are unreliable?

2    **A.**    Yes.  I believe Mr. Rafalski testified that he relies

3    on Methods A and B, but views Methods C, D, E and F as

4    unreliable.

5    **Q.**    Okay.  So, based on Mr. Rafalski's testimony, we'll

6    drop Methods C, D, E and F from our list and we'll focus our

7    work this afternoon on Methods A and B.  So, let's do that

8    now.

9         So, Method A, as described by Mr. Rafalski to this

10   Court, is the maximum monthly trailing six-month thresholds.

11   Do you see that, Dr. Boberg?

12   **A.**    Yes, I do.

13   **Q.**    Okay.

14         MS. WU:  Now, to help us talk about this Method A,

15   Mr. Reynolds, could we please put up McKesson Demo 2 at Page

16   1?

17         BY MS. WU:

18   **Q.**    Dr. Boberg, is this demonstrative a presentation of how

19   Dr. McCann's Methodology A operates?

20   **A.**    Yes, it is.

21   **Q.**    Using this demonstrative, could you describe for the

22   Court your understanding of how Dr. McCann's Method A

23   functions to flag orders?

24   **A.**    Yes.  So, this demonstrative provides sort of a made-up

25   dataset of shipments from a distributor to a pharmacy of a

1      particular drug and the numbers represent dosage units

2      shipped in the month.

3           What Dr. McCann's Method A algorithm does is it looks

4      at the first six months.  That's January, February, March,

5      April, May, June and finds the maximum across those six

6      months, which is the 10,000 dosage units shipped in

7      February.

8           It then uses that maximum, the 10,000, as a threshold

9      and tests whether the shipment volume in the seventh month,

10     July, exceeds that threshold or not.

11          In this case, it does not.  It's only 4,900.  So, July

12     is not flagged.

13          Then the algorithm proceeds to the next month, August,

14     which shows the dosage unit volume of 10,100.  That does

15     exceed the threshold from the prior, the maximum from the

16     prior six months, the 10,000.  And so, August gets flagged

17     and we've turned that red in the demonstrative.

18     **Q.**   Now, from that point on, I see that the balance of the

19     orders in this demonstrative are also flagged red.  Are they

20     flagged because Method A flags orders that exceed the

21     threshold or for some other reason?

22     **A.**   For other reasons.  So, Dr. McCann's algorithm after

23     August would no longer flag, for instance, September because

24     September's volume is only 7,000.  So, it's below the

25     threshold, which is the maximum from the prior six months.

1      But Dr. McCann, instead of simply applying the

2   algorithm, he adds this additional assumption that once he

3   flags a shipment from a distributor to a pharmacy of a

4   particular drug, he assumes that every subsequent shipment

5   should also be flagged, viewed as suspicious and unlawful.

6   So, he turns the entire set of shipments red.

7   **Q.**   And just for clarity based on some questions you

8   received from Mr. Farrell, is that assumption separate from

9   the underlying algorithm that Dr. McCann utilized for Method

10  A?

11  **A.**   Yes.  It's a separate assumption, that's correct.

12  **Q.**   Dr. Boberg, what would happen to Method A if you

13  removed that automatic flagging assumption as employed by

14  Dr. McCann?

15  **A.**   What would happen is you'd no longer flag the vast

16  majority of the shipments.  You would only flag those

17  shipments in August.

18  **Q.**   And we've now gone to the second page of McKesson

19  Demonstrative 2.  How does this second page of the

20  demonstrative illustrate the impact of removing that

21  assumption?

22  **A.**   Well, as we've just said, and indicated, and shown on

23  the screen, it's a pretty dramatic effect in this example.

24  We'll see it's a dramatic effect in Dr. McCann's actual

25  results, as well, but it means that he is really excessively

flagging shipments by using -- applying this assumption.

And when we take the assumption away, Dr. McCann's algorithm

flag very few shipments.

**Q.** Thank you, Doctor.

MS. WU:  Mr. Reynolds, we can take down the

demonstrative.

BY MS. WU:

**Q.** Dr. Boberg, based on your review of the record in this

case, including testimony from Dr. McCann and Mr. Rafalski,

do you have an understanding of why they implemented this

automatic flagging assumption?

**A.** Well, Dr. McCann really doesn't provide a basis, as far

as I understand he was asked to apply the assumption by

counsel.

Mr. Rafalski says that the assumption is reflective of

the idea that there was no due diligence done on the first

order and, therefore, every subsequent shipment should be

blocked and regarded as suspicious and unlawful.

So, I think Dr. McCann provides no basis.  Mr. Rafalski

explains the assumption.

**Q.** Dr. Boberg, based on your review of record evidence in

this case, are you aware of any evidence which is contrary

to that assumption as employed by Dr. McCann?

**A.** Yes.  As we were just speaking about a bit ago, I

reviewed, for instance, blocked order reports from McKesson

1    that showed due diligence was being done and orders were

2    being blocked.  So, that type -- that shows that the

3    assumption that Dr. McCann has made is really not valid.

4    **Q.**   Dr. Boberg, in your opinion, does Dr. McCann's decision

5    to automatically flag subsequent orders using this

6    assumption affect the validity and reliability of his Method

7    A?

8    **A.**   Yes.  As we will see, it really impacts the robustness

9    of the analysis.  When we take that assumption away, his

10   results really go away.

11   **Q.**   Dr. Boberg, did you prepare some charts in connection

12   with your work in this case and the report that you prepared

13   which help illustrate the power of that assumption in Dr.

14   McCann's work?

15   **A.**   Yes, I did.

16        MS. WU:  Mr. Reynolds, could we please put up

17   Boberg Demonstrative number 3, please?

18        BY MS. WU:

19   **Q.**   Dr. Boberg, are these the charts from your report which

20   set forth your presentation of the automatic flagging

21   methods?

22   **A.**   Yes, they are.

23   **Q.**   Dr. Boberg, can you use these charts to explain for the

24   Court what is represented on the left-hand side in terms of

25   presentation of Dr. McCann's implementation of Method A with

1   the automatic flagging assumption?

2   **A.**   Yes.  On the left-hand side I've provided a visual

3   depiction of Dr. McCann's results.  So, the -- the picture

4   shows the results of Dr. McCann's Method A applied to ARCOS

5   data shipments from all distributors, or from the three

6   defendant distributors into Huntington and Cabell County,

7   West Virginia.

8        The height of the bars, each bar, represents the

9   monthly shipment volume for that month.  And then, I've

10  colored the bar dependent on whether Dr. McCann's algorithm

11  is flagging shipments or not.  So, the fraction of the bar

12  that's colored red is the fraction of shipments that Dr.

13  McCann is flagging with his application of the algorithm.

14  And I've colored blue the portion that represents the

15  fraction that he's not flagging.

16  **Q.**   Dr. Boberg, what proportion of shipments did Dr. McCann

17  flag as suspicious using his Method A with the automatic

18  flagging assumption turned on?

19  **A.**   So, with the assumption he's flagging about 72 percent,

20  71.9 percent of shipments.

21  **Q.**   Doctor, is there a way to determine the amount of

22  shipments that were automatically flagged by Dr. McCann

23  based on the automatic flagging assumption, as opposed to

24  the algorithm?

25  **A.**   Yes.  So, what I was able to do is take Dr. McCann's

1    code and essentially turn off -- you know, there's a line in

2    the code that imposes the assumption and I can turn that

3    piece of code off and re-run his algorithm so that it's the

4    same analysis.  I'm just taking out the assumption.

5    **Q.**   And did you, in fact, re-run the algorithm for Method A

6    with the automatic flagging assumption turned off?

7    **A.**   Yes, I did.

8    **Q.**   Are the results of that analysis presented in the

9    right-hand chart on the screen?

10   **A.**   Yes, that's correct.

11   **Q.**   Dr. Boberg, could you describe for the Court, using

12   your chart, the results of removing the automatic flagging

13   assumption from Dr. McCann's Method A?

14   **A.**   Sure.  So, on the right-hand side, I provided the

15   visual depiction analysis as on the left but, again,

16   removing that assumption.  And you can see that almost all

17   the bars turn blue, or almost entirely blue, and Dr.

18   McCann's analysis, once we turn off that single assumption,

19   flags only 3 percent, about 3 percent, 3.1 percent of

20   shipments.

21   **Q.**   Dr. Boberg, based on the work that you've done and

22   these two charts depicting it, are you able to calculate the

23   percentage of shipments flagged by Dr. McCann's Method A

24   that were flagged only due to the automatic flagging

25   assumption?

1    **A.**    Yes.  That would be 96 percent.  So, 96 percent of the

2    red bars on the left are due solely to the assumption for

3    which Dr. McCann provided no basis.

4    **Q.**    And just to clarify, that almost 96 percent of

5    shipments flagged by Dr. McCann's Method A were for

6    shipments that did not exceed the thresholds that he had set

7    under Method A, correct?

8    **A.**    That's correct.

9    **Q.**    Doctor, in your opinion, is Dr. McCann's Method A a

10   valid and reliable approach for flagging suspicious orders?

11   **A.**    No.  Given the lack of robustness, when you take one

12   assumption away, I would say they're not reliable.

13   **Q.**    Thank you, Doctor.

14          MS. WU:  Mr. Reynolds, could we put back up on the

15   screen Rafalski Demonstrative 213 at Page 14?

16          BY MS. WU:

17   **Q.**    So, all we have left now is Method B.  And, Doctor, Mr.

18   Rafalski referred to Method B as the trailing six-month

19   maximum monthly fixed after first triggered threshold.  Do

20   you see that, Doctor?

21   **A.**    Yes.  It's a mouthful.  I do see that.

22   **Q.**    Sure is.  Okay.  Doctor, can you describe to the Court

23   how Method B, presented by Mr. Rafalski based on Dr.

24   McCann's underlying work, operates?

25   **A.**    Yes.  Method B is almost the same as Method A.  It

1    starts out the same way, looks at the six -- prior six

2    months to establish the maximum as the threshold, but

3    whereas Method A says once I flag a shipment, I will assume

4    that every subsequent shipment has to be flagged, Method B

5    uses a different assumption.  It doesn't make that

6    assumption but, instead, assumes that the threshold needs to

7    be fixed forever.

8          So, once -- once Dr. McCann sees a flag, then he

9    freezes the threshold and uses that same threshold for the

10   rest of -- of the period.

11   **Q.**   Dr. Boberg, what is the impact of fixing the threshold

12   under Method B?

13   **A.**   It's quite similar to what happens when he uses the

14   assumption in Method A.  It essentially ensures that there

15   can be no legitimate increase in volume of shipments into

16   Huntington or Cabell County.  It would -- any legitimate

17   increase in shipments would be flagged as unlawful and

18   suspicious by the assumption.

19   **Q.**   Dr. Boberg, did you prepare some charts that would help

20   you describe the impact of the fixed threshold on Method B?

21   **A.**   Yes, I did.

22   **Q.**   Mr. Reynolds, could we please put up Boberg

23   Demonstrative number 4?

24         Doctor, are these the charts that you prepared in order

25   to illustrate the impact of Dr. McCann's fixed threshold

1    assumption on Method B?

2    **A.**    Yes, they are.

3    **Q.**    Doctor, starting with the left-hand chart, could you

4    describe for the Court the impact of the fixed threshold

5    assumption as run by Dr. McCann?

6    **A.**    Yes.  The left-hand side presents a visual depiction of

7    the results of Dr. McCann's Method B, again, applied to the

8    ARCOS data for shipments into Huntington and Cabell County.

9         And this time, with the assumption that the threshold

10   should be fixed, Dr. McCann's algorithm is flagging about

11   28 percent of shipments, 27.6 percent.

12   **Q.**    So, that's about 28 percent of shipments with that

13   fixed threshold assumption turned on, correct?

14   **A.**    That's correct.

15   **Q.**    Dr. Boberg, what happens when you apply Method B,

16   re-run the model, removing that fixed threshold assumption?

17   **A.**    So, I've shown that on the right-hand side with the

18   chart on the right-hand side and that reduces the flagging

19   to about 3 percent rather than the 28 percent that Dr.

20   McCann flagged.

21   **Q.**    Dr. Boberg, are you able to calculate, based on your

22   work in this case as presented by these charts, what

23   percentage of shipments flagged by Dr. McCann's Method B

24   were flagged due to the application of the fixed threshold

25   assumption?

1   **A.**   That's about 89 percent.  So, 89 percent of the red

2   bars on the left are really due solely to that assumption

3   that the threshold should be fixed.

4   **Q.**   So, they were flagged due to the assumption, as opposed

5   to the underlying algorithm associated with Method B,

6   correct?

7   **A.**   That's correct.

8   **Q.**   Doctor, in your opinion, is Method B with the fixed

9   threshold assumption turned on a valid and reliable method

10  for identifying suspicious orders?

11  **A.**   Well, again, just from the perspective of data

12  analysis, when the results of an analysis hinge so

13  critically on an assumption, there's no support for the

14  assumption.  That means the results are really not reliable.

15  **Q.**   Thank you, Doctor.  So, you also flagged that Dr.

16  McCann's results are inconsistent in terms of the results

17  that they've produced and I'd like to turn to that opinion.

18      Have you prepared a demonstrative that would help you

19  explain the inconsistency in the results presented by Dr.

20  McCann's Methods A and B?

21  **A.**   Yes, I have.

22      MS. WU:  Mr. Reynolds, could we please put up

23  Boberg Demonstrative number 6, please?

24      BY MS. WU:

25  **Q.**   Dr. Boberg, is this your demonstrative presenting the

1    difference in results under Dr. McCann's Method A and B with

2    his assumptions turned on?

3    **A.**    Yes.

4    **Q.**    Can you explain the difference in results presented in

5    these charts?

6    **A.**    Yes.  So, on the left under Method A with his

7    assumption that every subsequent shipment should be flagged,

8    Dr. McCann flagged about 72 percent of shipments.  On the

9    right, using Method B, which is supposedly also flagging the

10   shipments that should be regarded as suspicious and

11   unlawful, Dr. McCann, with his alternative threshold --

12   fixed threshold assumption, is flagging 28 percent of

13   shipments.

14   **Q.**    Dr. Boberg, does this inconsistency impact the

15   reliability of Dr. McCann's analyses?

16   **A.**    Yes.  When -- again, sort of from the perspective of

17   analyzing data, when you have two methods that are supposed

18   to be doing the same thing and they get such dramatically

19   different results, that's a sign of inconsistency.

20        Dr. McCann doesn't do anything to explain why these

21   methods are getting different answers and doesn't provide

22   any guidance or framework for figuring out which of them

23   might be correct, if any, and that, from the perspective of

24   data analytics, says that they're really not reliable.

25   **Q.**    Thank you, Doctor.

1          MS. WU:  Mr. Reynolds, we can take down the

2     demonstrative.

3          BY MS. WU:

4     Q.   Dr. Boberg, at the outset of your testimony, you also

5     offered the opinion that data analysts are supposed to check

6     their results.  They're supposed to take the results and

7     check them against real world data; do you recall that?

8     A.   Yes, I do.

9     Q.   Why is it important for a data analyst to check results

10    against real world information?

11    A.   Well, one of the things that often happens when you run

12    data analysis is there's, you know, questions about, you

13    know, you can often get numbers to say a lot of different

14    things depending on how you analyze them and how you present

15    them.  And so, it's really important when you look at the

16    results of the data analysis to see if they're corroborated

17    by other types of evidence.

18         So, that might be documentary evidence, or testimony,

19    or scientific studies, or, you know, in this case,

20    information from regulators, but it is important to make

21    sure that the results you're getting are verified or

22    validated by other sources.

23    Q.   Is it generally accepted in your field of economics and

24    data analysis to conduct those types of real world data

25    checks?

1    **A.**    Yes.

2    **Q.**    Based on your review of the record in this case, do you

3    know if Dr. McCann undertook any type of check of his data

4    results against real world information?

5    **A.**    No, he did not.  He ran the algorithms and reported the

6    results, but he didn't do anything to test them or check

7    their validity or reliability.

8    **Q.**    Dr. Boberg, did you, yourself, undertake the exercise

9    of checking Dr. McCann's results against real world

10   information?

11   **A.**    Yes.

12   **Q.**    What exercise did you undertake?

13   **A.**    Well, given the large percentage of shipments that Dr.

14   McCann flagged as suspicious and unlawful, I looked for a

15   source of information that might be informative as to what

16   the actual amount of diversion is out of the controlled

17   channel and I found the DEA does -- you know, has an

18   obligation to estimate that number each year and they made

19   those estimates public in 2018 and in 2019.  So, I compared

20   Dr. McCann's flagging of shipments against the DEA's

21   estimate of the actual diversion out of the controlled

22   channel as kind of a check.

23   **Q.**    And the data analysis that you've conducted outside of

24   this case and other opioid litigation, is it common for you

25   to look at a government regulator as a source of information

1    to conduct a data check?

2    **A.**    Yes.  So, for example, we might turn to the CMS, the

3    Center for Medicare/Medicaid Studies, to get data in the

4    case of hospital or pharmaceutical matters that involve

5    Medicare, for example.  So, here, I turned to the DEA as the

6    regulator for this particular area.

7    **Q.**    Doctor, have you prepared a demonstrative that would

8    help you explain the data check that you conducted comparing

9    Dr. McCann's results to DEA information?

10   **A.**    Yes, I did.

11          MS. WU:  Mr. Reynolds, could we please put up

12   Boberg Demonstrative number 7?

13          BY MS. WU:

14   **Q.**    Dr. Boberg, is this the demonstrative chart, actually,

15   that you prepared in connection with your work in this case?

16   **A.**    Yes, it is.

17   **Q.**    Could you describe --

18          MR. FARRELL:  Objection, Your Honor.  I don't

19   think the foundation has been laid for what the DEA said was

20   the percentage of diversion that occurred and if the DEA did

21   say such a thing, it would be hearsay, and I don't believe

22   that the foundation has been laid to establish this opinion.

23          MS. WU:  Your Honor, certainly, Dr. Boberg may

24   rely on hearsay evidence.  He has been qualified as an

25   expert.  I believe that Mr. Farrell's concerns will be

```
1    addressed as we walk through Dr. McCann's explanation of

2    this chart, if you provide us a little bit of leeway.

3            THE COURT:  Yeah.  I think this goes to the weight

4    rather than the admissibility of the opinion and the rules

5    are clear that he can rely on the evidence that's not

6    admissible if it forms a legitimate basis for his opinion.

7        Mr. Farrell, do you want to say anything else?

8            MR. FARRELL:  I do, Judge.  I would like to know

9    what the evidence is he's relying on.

10           THE COURT:  Well --

11           MS. WU:  Your Honor, we will talk through the

12   actual data source and, also, Mr. Farrell is free to cross

13   examine the witness using his reliance materials.

14           THE COURT:  Yes.  Overruled.

15       Go ahead, please.

16           MS. WU:  Thank you, Your Honor.

17           BY MS. WU:

18   Q.   Dr. Boberg, how did you identify DEA reporting as a

19   real world check for Dr. McCann's data analysis?

20   A.   Well, the DEA has the obligation to estimate the

21   diversion out of the controlled channel and it does that

22   each year.  So, I looked on the DEA's website and found

23   their estimates of diversion out of the controlled channel.

24           THE COURT:  What's wrong with that, Mr. Farrell?

25           MR. FARRELL:  Nothing, Your Honor.  I'll sit down.
```

1          THE COURT:  You can cross examine him on it, but

2     he's just explaining what he relied on as a basis of his

3     opinion and if you can bring out that it's not a valid basis

4     on cross, then -- then we'll go from there.

5          BY MS. WU:

6     **Q.**   Doctor Boberg, based on your review of the publicly

7     available estimates from DEA, what percentage of hydrocodone

8     and oxycodone did DEA estimate was diverted from the closed

9     system for the year 2018?

10    **A.**   That's about .1 percent.

11    **Q.**   And has the DEA published similar estimates for the

12    year 2019?

13    **A.**   Yes.

14    **Q.**   Now, having laid that foundation for the DEA

15    information that you utilized for your work, could you

16    explain to the Court the data comparison that you conducted

17    comparing Dr. McCann's Method A results from DEA estimates

18    of diversion from the closed system?

19    **A.**   Yes.  So, on the left-hand side, I've shown -- provided

20    a visual depiction of the percentage of shipments in effect

21    that the DEA says were diverted.  So, this is -- I calculate

22    this as the DEA's estimate of diversion out of the

23    controlled channel divided by total shipments in the U. S.

24    and that gives me a percentage.

25          And across the various opioids and, as we said for oxy

1  and hydro, that percentage is about .1 percent.  It's less

2  than a quarter of a percent across all the drugs that I had

3  data for.

4      On the right-hand side, I've compared that with the

5  results of Dr. McCann's application of the Method A

6  algorithm to shipments into Cabell County and Huntington,

7  West Virginia, where he's flagging 72 percent of shipments

8  as unlawful and suspicious and likely connected to diversion

9  out of the controlled channel.

10  **Q.**   Dr. Boberg, from your perspective as a data analyst,

11  how are DEA's estimates relevant to your evaluation of Dr.

12  McCann's analysis?

13  **A.**   Well, if Dr. McCann is flagging such a large share of

14  shipments, one would expect that the DEA would be estimating

15  a fairly large amount of diversion out of the controlled

16  channel.  That's not what I see.

17      So, I find that Dr. McCann is flagging far in excess of

18  any number that would be consistent with the estimates of

19  actual diversion out of the controlled channel by the DEA.

20  **Q.**   Thank you, Doctor.

21          MS. WU:  Mr. Reynolds, we can take down the

22  demonstrative.

23          BY MS. WU:

24  **Q.**   Now, I would like to turn to the last area that you had

25  introduced to the Court, which is McKesson's market share.

1    You testified earlier that you were asked to analyze

2    McKesson's market share as it relates to the distribution of

3    prescription opioids in Cabell County, correct?

4    **A.**   Yes, that's correct.

5    **Q.**   What materials do you rely on in order to conduct that

6    analysis?

7    **A.**   I relied on the ARCOS data as prepared by Dr. McCann.

8    **Q.**   And so, that's the ARCOS data as supplemented with

9    transactional data from McKesson, correct?

10   **A.**   That's correct.

11   **Q.**   Doctor, have you prepared a demonstrative to assist you

12   in explaining your analysis of McKesson's market share to

13   the Court?

14   **A.**   I have.

15          MS. WU:  Mr. Reynolds, could we please put up

16   Boberg Demonstrative number 9?  Thank you.

17          BY MS. WU:

18   **Q.**   Doctor, is this the demonstrative that you prepared to

19   assist with the presentation of your analysis of McKesson's

20   market share?

21   **A.**   Yes, it is.

22   **Q.**   Dr. Boberg, are you aware that McKesson ships

23   prescription opioids to the VA Medical Center in Huntington,

24   West Virginia?

25   **A.**   Yes, I am.

1    Q.   Based on your review of Dr. McCann's flagging

2    methodologies in this case, are you aware of whether or not

3    Dr. McCann applied those flagging methodologies to shipments

4    of prescription opioids that McKesson made to the VA

5    Hospital?

6    A.   No.  Dr. McCann applied his algorithms to shipments to

7    chain and independent pharmacies only.  He did not include

8    the VA Hospital.

9    Q.   Doctor, did you undertake to calculate the percentage

10   of McKesson's distribution of oxycodone and hydrocodone to

11   Cabell County for the years 2006 to 2014 that went to the VA

12   Medical Center?

13   A.   Yes.

14   Q.   And what percentage did you calculate?

15   A.   That's up on the chart.  It's 76, about 76 percent,

16   76.1.

17   Q.   Dr. Boberg, were you able to determine what Dr.

18   McCann's market share in Huntington and Cabell County would

19   be as compared to other distributors if you removed the VA

20   from McKesson's shipments of hydrocodone and oxycodone?

21   A.   Yes.

22   Q.   What percentage did you calculate?

23   A.   I calculated about 6 percent.  And that's the same

24   number that Dr. McCann calculates using the same data.

25              MS. WU:  Thank you, Doctor.  I have no further

1    questions at this time.

2            THE COURT:  All right.  Let's take a break here

3    and then we'll come back and subject you to cross

4    examination, Dr. Boberg.

5            THE WITNESS:  Thank you.

6        (Recess taken)

7        (Proceedings resumed at 3:27 p.m. as follows:)

8            THE COURT:  You can resume the witness stand,

9    sir.

10       Go ahead, Mr. Farrell.

11                      CROSS EXAMINATION

12   BY MR. FARRELL:

13   **Q.**   Good afternoon.  I'm Paul Farrell.  We met off the

14   record.  I have a few questions for you.

15           MR. FARRELL:  Can we bring up the first slide with

16   the methodologies?

17       Judge, may I?

18           THE COURT:  Yes, please.

19   BY MR. FARRELL:

20   **Q.**   Dr. Boberg, you understand that these six

21   methodologies were presented to this Court through

22   former DEA Agent James Rafalski?

23   **A.**   Yes.

24   **Q.**   And you understand that Methodology A came from a

25   literal interpretation of the *Masters* vs. *Pharmaceutical*

1    case published by the Circuit Court in the District of

2    Columbia?

3    **A.**   I, I'm not familiar with --

4    **Q.**   You weren't aware of that?

5    **A.**   I'm generally familiar with the connections of the -- a

6    connection being drawn to *Masters* but, you know, I'm not an

7    expert on *Masters*.

8    **Q.**   And you understand that Mr. Rafalski was actually the

9    investigator from the DEA on the *Masters* case?

10   **A.**   I understand that from his, his trial transcript.

11   **Q.**   And then subsequent to that, you understand that B

12   comes from using not the *Masters* language from the Circuit

13   Court of the District of Columbia.  B is actually using the

14   policy manual from *Masters Pharmaceutical.*

15        Did you understand that?

16   **A.**   Well, let me just clarify.  I mean, Method A and Method

17   B, as Dr. McCann applies them, has these assumptions in

18   them.  And as I understand it, those are not part of *Masters*

19   or, or other sources.

20   **Q.**   That's not my question.  My question is do you

21   understand that the testimony from this case from Mr.

22   Rafalski was that A and B come from *Masters Pharmaceutical*

23   distributor?

24   **A.**   A and B, as Dr. McCann ran them or, I mean -- as he ran

25   them, no, because Dr. McCann runs them on shipment data

1    rather than orders.  And he's invoking assumptions that, as

2    I understand it, are not part of the methodology.

3    **Q.**   Okay.  Sir, you understand that the DEA has testified

4    in this case through their 30(b)(6) witness on what to do

5    with all future orders?  Do you understand that's in the

6    record?

7          MS. WU:  Your Honor, objection, foundation.  This

8    isn't the proper witness to cross with DEA testimony he's

9    never reviewed.

10         THE COURT:  Well, this is cross-examination.  Go

11   ahead, Mr. Farrell.  I think wide latitude should be

12   permitted here.  Go ahead.

13   BY MR. FARRELL:

14   **Q.**   Were you aware that the DEA itself has validated

15   the concept of once you block a suspicious order, you

16   should block all future shipments until cleared?

17   **A.**   That's not something I'm aware of from reviewing

18   testimony.

19         THE COURT:  Mr. Mahady.

20         MR. MAHADY:  Your Honor, I would just note that we

21   do object on foundation grounds to that question and

22   statement.  And I think Mr. Prevoznik's deposition testimony

23   and what's been designated by both sides speaks for itself.

24   But that's just for the record.

25         THE COURT:  Well, overruled.

1          Go ahead, Mr. Farrell.

2     BY MR. FARRELL:

3     **Q.**   Let me put it in a different context.  You

4     understand that some of the defendants themselves, like

5     AmerisourceBergen, had policies in effect that said that

6     once an order is blocked, all future shipments of the

7     same base code should also be blocked until cleared of

8     due diligence?

9     **A.**   So, again, that -- what I was asked to look at is Dr.

10    McCann's application of these algorithms, so I'm not

11    familiar with what the defendant distributors' policies

12    were.

13    **Q.**   And you understand that Methodology E comes directly

14    from McKesson, the distributor that hired you in this case?

15    **A.**   I, I don't think that's -- I don't think that's a

16    correct way to say that.  No, I don't agree.

17    **Q.**   Well, let me say it in a different way.  Have you read

18    the deposition of Nate Hartle who is the 30(b)(6) deponent

19    for McKesson?

20    **A.**   I have not.

21    **Q.**   Okay.  Are you aware that he testified about this 8,000

22    dosage unit limit rule?  It's in his testimony.

23    **A.**   Again, as -- what I look at is Dr. McCann's application

24    of these algorithms.  So I did not review that testimony.

25    **Q.**   Sir, I'm asking you whether or not you have looked at

1    the deposition of Nate Hartle and understand that

2    Methodology E is McKesson's methodology.

3    **A.**   I have not reviewed the testimony.

4    **Q.**   Have you applied Methodology E to the data?

5              MS. WU:  Your Honor, foundation.  I don't believe

6    that Mr. Farrell has a good faith basis to continue this

7    line of questioning when the witness has said that he has

8    not reviewed these materials.

9              MR. FARRELL:  Judge, my good faith basis -- I'm

10   sorry.

11             THE COURT:  Well, the fact that he hasn't reviewed

12   them is part of the point you're making, isn't it?

13             MR. FARRELL:  Yes.

14             THE COURT:  Okay.  Overruled.  Go ahead.

15   BY MR. FARRELL:

16   **Q.**   In fact, have you actually tried to apply

17   McKesson's own algorithm to McKesson's data to see how

18   many orders should have been flagged?

19   **A.**   That's not what I was asked to do.  No, I have not.  I

20   looked at Dr. McCann's application of the algorithms, not

21   McKesson's programs.

22   **Q.**   In the materials that you've reviewed, have you seen

23   anywhere where McKesson has actually run their algorithm on

24   their retrospective data to try to figure out what should

25   have been flagged?

1    **A.**    Again, I focused on Dr. McCann's application of these

2    algorithms.  I have not looked at how the distributors were

3    running the programs.

4    **Q.**    This is what has been affectionately referred to by me

5    alone as the matrix.  And it has pharmacies in

6    Huntington/Cabell County, West Virginia.

7         Have you attempted to run any algorithm on the actual

8    data from the pharmacies in Huntington/Cabell County, West

9    Virginia?

10   **A.**    I'm trying to process your question.

11        First of all, I have never seen that before, so I don't

12   know what you're referring to.  But what I've done is

13   replicated Dr. McCann's application of these algorithms on

14   ARCOS data, as well as the defendant distributor data.

15        To the extent that pharmacy shipments to a specific

16   pharmacy you're referring to are in those data, then I have

17   run Dr. McCann's application of the algorithms on those --

18   on shipments to those pharmacies.

19             MR. FARRELL:  Go to the next slide, please.  I'm

20   sorry.  From the defendants, the one with all of the months

21   and the seats.  It's like an arena.  There we go.

22   BY MR. FARRELL:

23   **Q.**    So do you recall talking about this, this

24   particular slide?  You understand how it's supposed to

25   run, do you not?

**A.**   There were two questions there.  I do recall referring to this slide, yes.

**Q.**   So, basically, the idea under the *Masters* methodology is you take a look at a period of time and you try to find an average; correct?

**A.**   So, no.  Dr. McCann's algorithm, what it does is looks at the maximum across the last six months, not the average.

**Q.**   We'll use that.  What's the maximum here for the last six weeks or six months in this, in this example?

**A.**   As I said earlier, it's 10,000 from February, 10,000 dosage units from February.

**Q.**   And, so, if there are sales in excess of 10,000, it's supposed to trigger something.  Agreed?

**A.**   Just to be clear, the way the algorithm works is if the cumulative shipment volume within a month exceeds the maximum monthly shipments from any of the prior six months, then that shipment is flagged and shipments for the remaining, remainder of the month are flagged.

**Q.**   Perfect.  So once you reach some threshold, it's supposed to be flagged.  Agreed?

**A.**   That's what the algorithm does, yes.

**Q.**   Okay.  So what's supposed to happen after the flag?

**A.**   The algorithm moves to the next month and evaluates the shipments of that month against the prior six months. That's what the algorithm does.

1    **Q.**   I see.  I see.  What do the policies of McKesson say

2    should be done after the flag?

3    **A.**   Dr. McCann didn't review the policies --

4    **Q.**   I'm not asking you that.  What do the policies of

5    McKesson say should be done after the flag?

6    **A.**   That's not something I reviewed.

7    **Q.**   Let me give you an example.  Let's go to the very next

8    one.  The very next one is the one that, where you say this

9    is what it should look like using this theoretical

10   distribution month by month.  Do you see this?

11   **A.**   I see the chart.

12   **Q.**   Okay.  Have you made an attempt to run that same, same

13   analysis to a pharmacy, say, in Logan County, West Virginia,

14   that's averaging 180,000 pills a month?

15   **A.**   Again, all I can say is to the extent that the

16   pharmacies you're referring to are in Dr. McCann's data,

17   then Dr. McCann has run his algorithm on those shipments.

18   And I have also run Dr. McCann's algorithm on those

19   shipments.

20   **Q.**   Sir, let me ask you in a different way.  If let's say

21   in a small town of 400 people McKesson is selling 100,000

22   prescription opioids a month and an algorithm flags it and

23   says something's going on here.  Should McKesson still be

24   able to ship 100,000 every month thereafter?  Is that your

25   opinion?

1    **A.**    I don't have an opinion about that.  That's not

2    something that I have expertise on.

3    **Q.**    Your testimony was that the DEA estimates that

4    .1 percent of prescription opioids are being diverted.  Are

5    you taking that information from the congressional testimony

6    that 99.99 percent of doctors are trying to do the good

7    thing?  Is that where you're getting that data from?

8    **A.**    No.

9    **Q.**    Where are you getting that from?

10   **A.**    As I testified, and as I specified in my report, I went

11   to the DEA's website where they publish their estimates of

12   diversion out of the controlled channel of a number of

13   drugs, and they publish that in kilograms.

14        And I took their estimate of diversion out of the

15   controlled channel and I divided by total shipments to come

16   up with an estimate of what fraction of shipments are then

17   diverted out of the controlled channel.

18   **Q.**    Where does the DEA get this from?

19   **A.**    That's something that the DEA does.  I don't have --

20   I'm not an expert on how the DEA estimates its diversion out

21   of the controlled channel.  But that's one of the things

22   that it's obligated to do and one of the things that it does

23   each year.

24   **Q.**    You understand that there have been no less than 15 DEA

25   agents who have been deposed in this case and that's -- what

1    you've just said is nowhere in the record?

2    **A.**   Is that a question?

3    **Q.**   Yes.  Do you understand that that is nowhere in the

4    record in this case?

5    **A.**   I have not reviewed the entire record of this case, so

6    I wouldn't know that.

7    **Q.**   So let me just take one particular example and see if

8    we can get there.  And I'm going to take the most ridiculous

9    of examples as I can.

10          Do you know where Mingo County, West Virginia, is?

11   **A.**   I do not.

12   **Q.**   In Mingo County, West Virginia, let's just --

13              THE COURT:  Just a minute, Mr. Farrell.

14         Ms. Wu.

15              MS. WU:  Your Honor, just for the record, we

16   object based on geographic scope.  And if we're going to

17   continue, I'd ask for a running objection.  But I don't

18   think this is appropriate or relevant.

19              THE COURT:  Well, I'll let him -- he's using it as

20   an example.  I'll let him go ahead and do it.

21   BY MR. FARRELL:

22   **Q.**   In Mingo County, West Virginia, if 268,000 doses of

23   hydrocodone are sold in one month to one pharmacy, is it

24   your testimony that only .1 percent of those are being

25   diverted?

1    **A.**   No.  My testimony is that the DEA estimates that, that

2    the level of diversion out of the controlled channel of

3    oxycodone, hydrocodone in 2018 and '19 is consistent with

4    about .1 percent of shipment volumes being diverted out of

5    the controlled channel.

6    **Q.**   Last question, Doctor.  This is an exhibit in this case

7    and it demonstrates a volume of pills that were sold into

8    the geographic region of Huntington/Cabell County, West

9    Virginia.

10       Based on your knowledge of algorithms to detect

11   suspicious orders, would you expect that any of these

12   orders, any of these shipments to be suspicious?

13   **A.**   Well, it's zip code 255 and 257 which is not the same

14   as Huntington and Cabell County.

15   **Q.**   Let's just ignore anything but the pattern.  Is there

16   anything suspicious about this pattern of the sale of

17   prescription opioids?

18   **A.**   How do you want me to interpret the word "suspicious"

19   there?

20   **Q.**   Well, you've testified today -- you're here today

21   talking about algorithms to detect suspicious orders.  So

22   we'll use whatever, whatever measure you want to use.  Let's

23   just use the broader one, "suspicious."  Is there anything

24   suspicious about this demonstrative?

25   **A.**   Well, the only context I have for suspicious in this

1    case is Dr. McCann's use of the word "suspicious" to

2    characterize the results of his application of algorithms to

3    the ARCOS data of shipments into Huntington and Cabell

4    County, West Virginia.

5    **Q.**   All right.

6    **A.**   So I have not run his, his algorithms on those data,

7    but I have run them on, on shipments into Cabell County and

8    Huntington, West Virginia.

9    **Q.**   If this is the sale of beer in Huntington, Cabell

10   County, West Virginia, is there anything suspicious about

11   this pattern?

12   **A.**   I don't think I can answer the question.  I don't have

13   a definition of "suspicious" with respect to beer shipments.

14   **Q.**   If this was machine guns sold into West Virginia, is

15   there anything suspicious about this pattern?

16   **A.**   Again, same thing.  Suspicious as defined by Dr. McCann

17   relates back to the, the Suspicious Order Monitoring

18   Programs and his use of the algorithms applied to ARCOS

19   data.  So that's the context in which I think I, I would use

20   the term "suspicious" here.

21   **Q.**   Let me try one last time.  If this is the number of

22   home runs that were hit in a major league baseball season

23   and you looked at this over time, would you find anything

24   suspicious about this pattern?

25   **A.**   Again, same thing.  This is -- you know, the purpose of

```
 1    talking about suspicious to me is -- relates back to Dr.

 2    McCann.  He's the one who uses the word "suspicious."  I'm

 3    simply looking at Dr. McCann's application of algorithms

 4    where he's flagging 72 percent of shipments as suspicious

 5    and unlawful and assessing whether that makes any sense.

 6              MR. FARRELL:  Thank you.  No further questions,

 7    Judge.

 8              THE COURT:  Any redirect, Ms. Wu?

 9              MS. WU:  Nothing further.  Thank you.

10              THE COURT:  May Dr. Boberg be excused?

11              MR. FARRELL:  Yes, Your Honor.

12              THE COURT:  Thank you, Dr. Boberg.  You're free to

13    go.  Thank you, sir, very much.

14              THE WITNESS:  Thank you very much, Your Honor.

15              MS. MAINIGI:  So, Your Honor, I think that's the

16    extent of our witnesses for today.  As I mentioned, we have

17    a Cardinal witness similar to the prior two witnesses.  He

18    had a -- he had prior testimony scheduled for today.  So we

19    can put him on first thing in the morning.

20              THE COURT:  Will he be here first thing in the

21    morning?

22              MS. MAINIGI:  He will be here first thing in the

23    morning.  He's actually here.  He's doing that testimony by

24    Zoom right now.  So he's, he's in town.

25              THE COURT:  I'm sorry.  I interrupted you.  You go
```

1    ahead.

2              MS. MAINIGI:  And that will be our only witness

3    tomorrow.  So just in terms of the amount of time that would

4    take, probably somewhat comparable.

5              THE COURT:  Okay.  Well, we'll start at 9:00 in

6    the morning.

7          Is there anything else to do today before we adjourn?

8          (No Response)

9              THE COURT:  Hearing none, I'll see everybody at

10   9:00.

11             MS. MAINIGI:  Thank you.

12         (Trial recessed at 3:46 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATION:

2                    I, Ayme A. Cochran, Official Court

3      Reporter, and I, Lisa A. Cook, Official Court Reporter,

4      certify that the foregoing is a correct transcript from

5      the record of proceedings in the matter of The City of

6      Huntington, et al., Plaintiffs vs. AmerisourceBergen

7      Drug Corporation, et al., Defendants, Civil Action No.

8      3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9      reported on July 8, 2021.

10

11              S\Ayme A. Cochran              s\Lisa A. Cook

12                Reporter                      Reporter

13          _

14

15            July 8, 2021

16                Date

17

18

19

20

21

22

23

24

25

**'**

**'11** [3] - 75:7, 97:15, 99:7
**'19** [1] - 197:3
**'80s** [1] - 18:11
**'83** [1] - 56:18

## 0

**0** [1] - 88:20
**006** [1] - 88:20
**00907** [2] - 2:5, 2:14
**01** [1] - 105:6
**0169** [1] - 89:14
**02** [1] - 89:9
**02768** [2] - 44:4, 47:20
**02769** [1] - 47:19

## 1

**1** [11] - 105:6, 121:11, 121:16, 131:7, 155:1, 167:16, 183:10, 184:1, 195:4, 196:24, 197:4
**1.6** [1] - 89:14
**10** [7] - 8:11, 55:11, 62:7, 109:4, 121:12, 121:13
**10,000** [7] - 105:7, 168:6, 168:8, 168:16, 193:10, 193:12
**10,100** [1] - 168:14
**100,000** [4] - 74:21, 78:22, 194:21, 194:24
**1001** [2] - 4:6, 4:9
**1006** [2] - 47:15, 50:25
**1022** [1] - 3:5
**10:03** [1] - 55:12
**125** [1] - 29:16
**126** [1] - 3:5
**13** [1] - 89:7, 89:13, 101:10
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**14** [7] - 44:22, 45:8, 49:8, 83:7, 152:2, 166:17, 174:15
**15** [3] - 8:11, 93:8, 195:24
**15.69** [1] - 50:5
**150** [1] - 29:17
**15910** [1] - 3:15
**16** [4] - 88:19, 89:1, 89:7, 89:8
**1600** [1] - 3:15
**1717** [2] - 6:6, 6:13

## 2

**180,000** [1] - 194:14
**19** [2] - 101:11
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1978** [1] - 25:15
**1981** [2] - 25:21, 56:9
**1983** [1] - 56:16
**1986** [1] - 56:12
**1987** [2] - 26:10, 26:18
**1990** [1] - 26:25
**1995-96** [1] - 73:20
**1997** [1] - 88:7
**1998** [1] - 28:2
**1999** [1] - 94:20

## 2

**2** [2] - 167:15, 169:19
**20** [4] - 8:8, 8:9, 30:24, 62:7
**2000** [1] - 87:16
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21, 5:5
**2001** [3] - 91:5, 92:25, 141:1
**2002** [1] - 141:1
**2006** [16] - 37:6, 38:25, 39:4, 44:8, 46:8, 46:15, 46:19, 46:25, 47:6, 49:4, 49:11, 50:1, 50:13, 52:25, 161:17, 186:11
**2009** [1] - 45:21
**2010** [32] - 75:6, 77:14, 77:22, 81:15, 81:17, 83:1, 84:6, 84:7, 84:11, 84:13, 85:8, 85:10, 85:21, 88:7, 90:15, 90:17, 91:5, 93:1, 93:2, 94:21, 95:6, 97:14, 97:20, 97:22, 98:3, 99:6, 101:1, 101:2, 101:5, 101:8, 102:11, 138:7
**2010-11** [2] - 73:20, 85:4
**2011** [11] - 79:10, 80:6, 80:7, 80:18, 82:19, 82:20, 109:21, 110:10, 112:22, 114:1, 114:11
**2011-2012** [1] - 73:10
**2012** [5] - 28:11, 28:13, 28:14, 28:17, 82:22
**2013** [5] - 81:17, 81:18, 83:1, 83:2, 138:8

## 2

**2014** [13] - 37:6, 38:25, 39:4, 44:8, 46:8, 47:6, 49:5, 49:12, 50:1, 50:13, 52:25, 161:17, 186:11
**2015** [9] - 81:15, 109:21, 110:2, 110:10, 112:22, 113:8, 113:11, 114:1, 114:11
**2016** [1] - 7:21
**2017** [2] - 7:21, 73:20
**2018** [6] - 95:6, 138:7, 138:8, 180:19, 183:9, 197:3
**2019** [4] - 28:14, 28:18, 180:19, 183:12
**202** [2] - 2:4, 2:13
**2020** [1] - 54:21
**2021** [4] - 1:19, 7:4, 201:9, 201:15
**20s** [1] - 97:25
**21** [1] - 156:8
**213** [1] - 174:15
**2216** [1] - 3:7
**223** [2] - 152:2, 166:17
**25** [5] - 5:5, 8:9, 11:10, 11:12, 33:10
**25.3** [1] - 91:9
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**255** [1] - 197:13
**256** [1] - 89:10
**257** [1] - 197:13
**25701** [1] - 3:10
**26** [3] - 131:13, 137:15, 137:21
**268,000** [1] - 196:22
**27.6** [1] - 176:11
**2768** [2] - 52:20, 52:23
**2769** [2] - 46:1, 46:2
**28** [8] - 4:3, 4:12, 4:14, 154:8, 176:11, 176:12, 176:19, 178:12
**29464** [3] - 4:4, 4:12, 4:15
**2:00** [2] - 131:2

## 3

**3** [13] - 91:11, 101:7, 109:24, 111:7, 111:14, 113:19, 115:11, 117:17, 173:19, 176:19
**3-times** [1] - 114:13

## 3

**3.1** [1] - 173:19
**30** [7] - 8:21, 33:18, 93:8, 95:13, 95:15, 125:9, 136:9
**30(b)(6** [2] - 189:4, 190:18
**31.6** [1] - 91:8
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**32502** [1] - 2:11
**33** [7] - 78:16, 78:18, 78:19, 81:3, 82:14
**34** [1] - 82:14
**35** [1] - 82:10
**36** [3] - 1:16, 82:23, 82:24
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 201:8
**3:17-cv-01665** [2] - 1:11, 201:8
**3:27** [1] - 187:7
**3:46** [1] - 200:12

## 4

**4** [1] - 175:23
**4,900** [1] - 168:11
**4.6** [9] - 111:6, 111:13, 113:18, 113:22, 114:8, 114:12, 115:6, 115:8, 115:11
**40** [8] - 8:21, 60:9, 60:10, 61:5, 83:14, 95:1, 95:24, 125:10
**400** [1] - 194:21
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**42** [1] - 98:22
**44** [1] - 91:2
**47** [1] - 94:6
**49** [4] - 53:10, 53:12, 53:16, 88:2

## 5

**5** [1] - 138:2
**5.76** [1] - 46:24
**50** [4] - 83:7, 94:17, 94:18, 94:25
**50-year-olds** [1] - 94:25
**51** [2] - 91:7, 91:8
**5496** [5] - 111:18, 114:17, 114:22, 115:8, 115:13
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**57** [1] - 91:14

## 6

**6** [5] - 91:12, 101:9, 139:11, 177:23, 186:23
**6,000** [1] - 33:10
**60** [2] - 28:12, 95:1
**600** [1] - 2:10
**62** [1] - 159:14
**6:00** [1] - 130:23
**6th** [1] - 3:5

## 7

**7** [3] - 97:20, 97:25, 181:12
**7,000** [1] - 168:24
**70130** [1] - 3:8
**707** [1] - 4:24
**71.9** [1] - 172:20
**716** [1] - 3:12
**72** [5] - 154:7, 172:19, 178:8, 184:7, 199:4
**725** [2] - 4:19, 4:21
**76** [2] - 186:15
**76.1** [1] - 186:16

## 8

**8** [6] - 1:19, 7:4, 97:20, 97:25, 201:9, 201:15
**8,000** [1] - 190:21
**80** [3] - 20:22, 21:11, 58:25
**801** [1] - 3:10
**80s** [1] - 61:5
**81** [3] - 13:5, 13:21, 23:10
**8252** [1] - 111:17, 114:15, 115:14
**84.31** [2] - 50:5, 50:8
**850** [1] - 5:12
**86** [2] - 21:21, 22:13
**89** [2] - 177:1

## 9

**9** [1] - 185:16
**9/11** [1] - 34:11
**90,000** [1] - 23:13
**901** [1] - 4:23
**91436** [1] - 3:16
**94.24** [1] - 47:3
**96** [3] - 174:1, 174:4
**97** [1] - 89:12
**99.99** [1] - 195:6
**9:00** [3] - 7:4, 200:5, 200:10
**9th** [1] - 4:6

# A

**a.m** [2] - 7:4, 55:12
**ABDC** [3] - 161:12, 163:12, 164:6
**able** [17] - 10:4, 20:8, 42:25, 54:7, 57:16, 64:21, 65:2, 130:5, 143:18, 166:10, 166:12, 166:14, 172:25, 173:22, 176:21, 186:17, 194:24
**absence** [1] - 119:19
**absent** [1] - 120:2
**absolutely** [1] - 120:20
**absolves** [1] - 16:20
**abuse** [12] - 18:2, 94:5, 125:21, 141:16, 144:13, 144:14, 144:23, 144:24, 144:25, 147:11, 147:12
**abused** [5] - 135:11, 144:15, 144:17, 144:18, 145:6
**abusing** [6] - 86:1, 93:18, 93:24, 136:4, 145:6, 145:7
**academic** [6] - 18:21, 19:23, 58:20, 60:19, 134:9, 134:13
**academies** [1] - 60:19
**Academy** [1] - 60:20
**accelerates** [1] - 75:10
**acceleration** [1] - 134:1
**accepted** [3] - 32:22, 80:20, 179:23
**access** [10] - 12:10, 12:20, 12:22, 13:2, 13:20, 14:1, 14:3, 16:20, 20:5, 123:11
**account** [5] - 91:21, 129:10, 129:13, 143:4, 145:4
**accountant** [4] - 25:17, 25:20, 27:12, 27:17
**accounted** [2] - 91:7, 91:10
**accounting** [12] - 25:9, 27:1, 27:3, 27:4, 27:20, 31:9, 32:22, 33:2, 35:11, 36:11, 40:21
**accounts** [5] - 26:8, 26:21, 31:15, 98:20
**accuracy** [3] - 108:3,

162:5, 162:6
**accurate** [2] - 115:14, 115:15
**achieve** [1] - 153:7
**ACKERMAN** [1] - 4:5
**Act** [2] - 127:11, 128:21
**act** [2] - 68:15
**acted** [1] - 17:16
**Action** [4] - 1:4, 1:10, 201:7, 201:8
**action** [1] - 83:21
**actions** [6] - 20:23, 21:9, 21:12, 21:18, 21:24, 22:19
**active** [5] - 28:12, 29:3, 29:5, 34:23, 34:25
**actively** [2] - 15:25, 36:5
**actual** [12] - 124:7, 131:25, 137:16, 137:25, 143:1, 153:11, 169:24, 180:16, 180:21, 182:12, 184:19, 192:7
**add** [1] - 53:8
**addicted** [8] - 120:6, 120:24, 121:22, 126:3, 126:6, 126:10, 126:16, 134:4
**addiction** [8] - 18:6, 59:21, 120:12, 120:16, 120:22, 121:6, 126:7, 126:22
**addictions** [1] - 126:14
**addictive** [2] - 121:14, 121:17
**addition** [3] - 8:10, 30:16, 32:11
**additional** [3] - 8:14, 35:18, 169:2
**address** [1] - 9:13
**addressed** [1] - 182:1
**addresses** [1] - 38:11
**adds** [1] - 169:2
**adjourn** [1] - 200:7
**adjustment** [2] - 112:13, 115:19
**admissibility** [1] - 182:4
**admissible** [1] - 182:6
**admission** [3] - 47:11, 47:14, 47:17
**admitted** [5] - 26:9, 47:19, 47:20, 51:3, 52:21

**adopted** [1] - 18:19
**adult** [9] - 73:8, 78:22, 80:25, 88:7, 97:8, 131:15, 131:17, 131:19, 132:14
**adults** [1] - 73:5
**advanced** [1] - 35:1
**advise** [1] - 159:6
**advised** [1] - 130:14
**affect** [6] - 11:5, 19:24, 22:6, 119:24, 171:6
**affected** [2] - 111:22, 122:9
**affecting** [1] - 68:18
**affectionately** [1] - 192:4
**affiliated** [3] - 60:16, 60:17, 60:23
**affiliation** [1] - 61:22
**afield** [1] - 145:10
**afternoon** [8] - 130:19, 131:4, 131:5, 148:9, 150:22, 150:24, 167:7, 187:13
**age** [15] - 28:12, 90:14, 91:7, 91:20, 92:17, 93:20, 93:24, 94:7, 94:17, 94:18, 95:8, 95:11, 102:20
**Agent** [1] - 187:22
**agents** [1] - 195:25
**ages** [5] - 85:24, 94:12, 95:17, 102:9, 102:24
**aggregate** [1] - 68:15
**ago** [8] - 32:3, 67:1, 78:10, 125:9, 125:10, 149:17, 165:22, 170:24
**agree** [7] - 126:4, 126:17, 132:7, 133:6, 136:13, 137:4, 190:16
**Agreed** [2] - 193:13, 193:20
**agreed** [10] - 125:7, 126:11, 127:14, 128:18, 132:12, 132:16, 132:25, 137:6, 139:3, 139:8
**agreement** [2] - 31:6, 43:3
**ahead** [19] - 14:17, 55:11, 106:18, 106:19, 106:21, 116:9, 134:25, 145:14, 147:7, 148:9, 165:7,

182:15, 187:10, 189:11, 189:12, 190:1, 191:14, 196:20, 200:1
**al** [4] - 1:7, 1:13, 201:6, 201:7
**Alberta** [1] - 156:6
**alcohol** [1] - 122:23
**alert** [1] - 148:10
**alerted** [1] - 148:15
**algebra** [3] - 105:13, 106:22, 107:15
**algorithm** [27] - 159:10, 160:1, 168:3, 168:13, 168:22, 169:2, 169:9, 170:2, 172:10, 172:13, 172:24, 173:3, 173:5, 176:10, 177:5, 184:6, 191:17, 191:23, 192:7, 193:6, 193:14, 193:21, 193:23, 193:25, 194:17, 194:18, 194:22
**algorithms** [28] - 151:23, 152:13, 152:15, 159:1, 159:3, 159:11, 159:12, 159:16, 162:8, 164:23, 165:10, 165:13, 165:14, 180:5, 186:6, 190:10, 190:24, 191:20, 192:2, 192:13, 192:17, 197:10, 197:21, 198:2, 198:6, 198:18, 199:3
**alleged** [1] - 65:15
**allow** [4] - 14:15, 21:17, 47:10, 116:8
**allowed** [1] - 24:4
**almost** [9] - 61:5, 91:14, 114:20, 153:2, 153:24, 173:16, 173:17, 174:4, 174:25
**alone** [1] - 192:5
**alternative** [2] - 18:19, 178:11
**alters** [1] - 116:13
**AM-WV-02768** [2] - 43:25, 44:2
**AM-WV-02769** [1] - 43:25
**AM-WV-02770** [2] - 48:19, 50:24

**AM-WV-02771** [2] - 49:20, 50:24
**American** [4] - 30:4, 59:5, 60:9, 60:20
**Amerisource** [8] - 37:13, 37:17, 38:2, 38:6, 38:7, 40:12, 41:7, 41:23
**Amerisource's** [3] - 37:5, 39:12, 41:17
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**AmerisourceBergen** [13] - 6:2, 24:9, 40:14, 41:8, 44:15, 49:10, 49:15, 52:1, 52:8, 52:24, 54:1, 190:5, 201:6
**AmerisourceBergen's** [9] - 39:20, 40:8, 42:12, 43:12, 46:18, 46:25, 50:3, 52:4, 53:4
**amount** [12] - 50:18, 65:7, 65:10, 90:11, 129:5, 129:6, 131:24, 141:9, 172:21, 180:16, 184:15, 200:3
**amounts** [1] - 31:18
**analogous** [1] - 127:2
**analyses** [10] - 17:7, 37:4, 37:8, 37:10, 84:8, 155:10, 155:12, 157:8, 160:24, 178:15
**analysis** [64] - 17:1, 17:3, 17:4, 17:6, 17:10, 17:17, 17:24, 18:17, 19:7, 37:25, 38:25, 39:19, 39:20, 44:23, 45:17, 47:25, 48:22, 48:24, 51:23, 53:5, 53:6, 53:11, 53:14, 53:15, 53:18, 54:4, 70:7, 72:17, 84:4, 85:12, 86:18, 87:5, 90:13, 103:11, 116:23, 122:10, 128:20, 129:20, 151:12, 155:22, 156:3, 156:12, 157:18, 158:5, 160:14, 160:17, 166:15, 171:9, 173:4, 173:8, 173:15, 173:18, 177:12, 179:12, 179:16, 179:24, 180:23, 182:19,

184:12, 185:6, 185:12, 185:19, 194:13
**analyst** [2] - 179:9, 184:10
**analysts** [1] - 179:5
**analytics** [7] - 27:23, 36:12, 40:22, 57:15, 156:23, 157:6, 178:24
**analyze** [7] - 27:9, 27:15, 32:4, 78:2, 134:11, 179:14, 185:1
**analyzed** [6] - 32:7, 41:2, 41:9, 72:11, 157:3, 164:17
**analyzing** [5] - 28:25, 31:21, 92:14, 156:21, 178:17
**ancillary** [1] - 123:4
**ANDREW** [1] - 5:10
**Angeles** [1] - 56:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 4:11
**annoying** [1] - 47:5
**answer** [9] - 11:13, 21:2, 21:4, 21:6, 70:13, 86:15, 115:5, 147:7, 198:12
**answered** [1] - 64:2
**answers** [1] - 178:21
**ANTHONY** [1] - 2:6
**anti** [1] - 34:10
**anti-terrorism** [1] - 34:10
**anticipated** [1] - 69:8
**antidepressants** [1] - 42:15
**antitrust** [3] - 61:17, 157:2
**apart** [4] - 86:15, 95:19, 101:3, 101:4
**apologize** [1] - 24:2
**appear** [1] - 45:20
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**applicable** [2] - 16:4, 16:7
**application** [19] - 159:2, 159:10, 159:13, 159:25, 160:2, 160:25, 162:7, 164:23, 172:13, 176:24, 184:5, 190:10, 190:23, 191:20, 192:1, 192:13, 192:17, 198:2, 199:3

**applied** [11] - 42:20, 43:4, 106:5, 107:14, 159:9, 172:4, 176:7, 186:3, 186:6, 191:4, 198:18
**applies** [5] - 108:9, 113:5, 151:20, 151:22, 188:17
**apply** [3] - 170:13, 176:15, 191:16
**applying** [8] - 71:7, 102:16, 102:19, 110:13, 115:8, 155:21, 169:1, 170:1
**appreciate** [2] - 117:13, 150:2
**approach** [5] - 42:20, 43:4, 43:9, 104:8, 174:10
**appropriate** [9] - 22:10, 36:19, 53:16, 150:3, 159:1, 159:18, 159:24, 165:5, 196:18
**appropriately** [1] - 159:7
**appropriateness** [1] - 165:3
**April** [1] - 168:5
**arbitration** [3] - 29:15, 31:5, 31:7
**Arch** [2] - 6:6, 6:13
**ARCOS** [31] - 38:3, 39:3, 39:4, 41:24, 42:3, 42:4, 43:2, 44:22, 45:8, 49:7, 51:23, 52:5, 53:3, 53:7, 75:19, 132:3, 132:5, 151:13, 151:21, 161:10, 161:14, 161:16, 161:19, 161:21, 172:4, 176:8, 185:7, 185:8, 192:14, 198:3, 198:18
**area** [10] - 9:5, 9:8, 23:12, 27:4, 30:15, 57:16, 58:22, 59:19, 181:6, 184:24
**areas** [6] - 59:10, 59:21, 128:24, 156:14, 157:16, 161:18
**arena** [1] - 192:21
**argue** [1] - 106:10
**argument** [2] - 127:21, 136:12
**argumentative** [1] - 127:16
**arithmetic** [1] - 105:8

**Army** [2] - 33:17, 33:21
**arrest** [1] - 123:17
**arriving** [1] - 43:6
**Arrow** [1] - 60:12
**article** [2] - 123:15, 124:6
**articles** [3] - 59:2, 59:8, 157:12
**Arts** [1] - 60:20
**ascribing** [1] - 87:2
**ASHLEY** [1] - 5:3
**aside** [3] - 98:15, 112:11, 141:7
**aspects** [2] - 64:16
**assembled** [1] - 162:15
**assertion** [1] - 109:13
**assess** [3] - 128:20, 152:14, 162:10
**assessing** [3] - 145:8, 160:1, 199:5
**assessment** [1] - 139:18
**asset** [1] - 30:2
**assets** [1] - 30:7
**assign** [1] - 16:11
**assigned** [2] - 26:6, 26:21
**assignment** [4] - 16:22, 20:14, 20:17, 23:14
**assist** [6] - 27:9, 34:14, 72:16, 157:2, 185:11, 185:19
**assisting** [1] - 30:13
**associated** [9] - 71:21, 84:16, 85:5, 85:20, 85:21, 88:25, 113:7, 124:21, 177:5
**Associates** [7] - 60:18, 61:8, 61:9, 61:21, 151:9, 156:7, 156:9
**association** [27] - 69:10, 69:25, 70:19, 70:23, 71:2, 71:4, 71:9, 71:11, 71:13, 71:23, 71:25, 72:3, 72:4, 72:6, 72:8, 75:2, 75:3, 75:4, 75:22, 75:23, 76:8, 88:17, 88:18, 135:6, 138:16, 138:21
**associations** [2] - 76:1, 76:2
**assume** [16] - 54:13, 109:6, 130:18, 135:22, 135:24, 136:3, 136:5,

136:11, 136:14, 136:24, 137:10, 137:12, 137:13, 137:20, 142:18, 175:3
**assumes** [4] - 115:9, 153:21, 169:4, 175:6
**assuming** [2] - 22:12, 142:12
**assumption** [55] - 22:8, 115:19, 116:13, 116:22, 142:6, 153:2, 153:4, 153:24, 159:17, 169:2, 169:8, 169:11, 169:13, 169:21, 170:1, 170:2, 170:11, 170:13, 170:15, 170:20, 170:23, 171:3, 171:6, 171:9, 171:13, 172:1, 172:18, 172:19, 172:23, 173:2, 173:4, 173:6, 173:13, 173:16, 173:18, 173:25, 174:2, 174:12, 175:5, 175:6, 175:14, 175:18, 176:1, 176:5, 176:9, 176:13, 176:16, 176:25, 177:2, 177:4, 177:9, 177:13, 177:14, 178:7, 178:12
**assumptions** [10] - 116:16, 116:18, 153:16, 153:17, 153:20, 159:11, 159:20, 178:2, 188:17, 189:1
**asthma** [1] - 42:16
**AT** [1] - 1:2
**attempt** [3] - 17:14, 128:20, 194:12
**attempted** [2] - 103:25, 192:7
**attempting** [1] - 127:5
**attend** [2] - 33:5, 33:11
**attention** [1] - 7:18
**audit** [6] - 25:15, 26:4, 26:5, 26:9, 26:11, 26:19
**auditing** [2] - 26:8, 32:24
**auditor** [1] - 31:4
**audits** [1] - 26:6
**augment** [1] - 161:20

**August** [4] - 168:13, 168:16, 168:23, 169:17
**authored** [4] - 58:24, 58:25, 59:1
**authority** [1] - 14:13
**authorization** [2] - 18:10, 18:23
**automatic** [9] - 169:13, 170:11, 171:20, 172:1, 172:17, 172:23, 173:6, 173:12, 173:24
**automatically** [2] - 171:5, 172:22
**availability** [4] - 98:19, 118:21, 143:1, 143:10
**available** [13] - 17:13, 52:6, 54:13, 122:21, 123:2, 142:20, 142:21, 143:8, 143:20, 144:24, 145:19, 183:7
**average** [7] - 95:11, 95:13, 113:10, 138:13, 139:5, 193:5, 193:7
**averaging** [1] - 194:14
**Avin** [1] - 3:7
**avoid** [1] - 123:20
**award** [1] - 34:18
**awarded** [2] - 60:8, 60:12
**awards** [3] - 34:16, 60:5, 60:14
**aware** [20] - 12:9, 15:4, 16:6, 17:23, 17:25, 20:12, 20:15, 29:18, 52:3, 120:17, 144:12, 163:11, 164:6, 170:22, 185:22, 186:2, 188:4, 189:14, 189:17, 190:21
**awhile** [1] - 60:10
**axes** [2] - 138:10
**axis** [7] - 73:1, 73:2, 73:5, 88:8, 88:13, 88:14, 118:17
**Ayme** [2] - 6:17, 201:2

## B

**BA** [1] - 56:9
**Bachelor** [1] - 25:8
**Bachelor's** [2] - 36:2, 156:5
**background** [6] -

25:4, 25:6, 33:13, 35:11, 35:25, 51:19
**backgrounds** [1] - 35:12
**backup** [2] - 166:8, 166:14
**balance** [1] - 168:18
**ball** [1] - 147:21
**Bankruptcy** [1] - 33:9
**bar** [6] - 46:17, 46:20, 49:23, 172:8, 172:10, 172:11
**Baron** [1] - 3:14
**bars** [5] - 46:11, 172:8, 173:17, 174:2, 177:2
**base** [2] - 69:7, 190:7
**baseball** [1] - 198:22
**based** [39] - 40:17, 45:17, 53:25, 64:20, 69:3, 87:5, 87:6, 102:13, 102:15, 103:17, 106:3, 106:23, 109:20, 110:22, 120:21, 124:6, 139:19, 141:8, 149:20, 156:11, 157:18, 163:10, 163:20, 164:5, 166:9, 166:13, 166:23, 167:5, 169:7, 170:8, 170:21, 172:23, 173:21, 174:23, 176:21, 180:2, 183:6, 186:1, 196:16
**Based** [1] - 197:10
**basic** [3] - 35:1, 107:14, 126:2
**basis** [18] - 19:6, 21:16, 87:21, 131:20, 132:14, 153:3, 153:23, 159:1, 159:15, 165:5, 170:12, 170:19, 174:3, 182:6, 183:2, 183:3, 191:6, 191:9
**Bates** [1] - 60:7
**battalion** [1] - 34:3
**Baylen** [1] - 2:11
**bear** [1] - 116:25
**became** [1] - 28:4
**Becker** [3] - 57:4, 120:15, 125:16
**become** [5] - 26:17, 126:16, 132:9, 142:20, 156:2
**becomes** [4] - 89:9, 143:8, 143:20,

145:19
**beer** [2] - 198:9, 198:13
**BEFORE** [1] - 1:17
**began** [1] - 142:7
**beginning** [2] - 73:9, 123:10
**begins** [2] - 81:13, 81:15
**behalf** [2] - 26:23, 29:25
**behave** [1] - 97:22
**behaves** [2] - 73:7, 99:5
**behavior** [14] - 8:4, 58:8, 65:9, 65:10, 67:4, 69:15, 74:17, 84:21, 86:9, 87:7, 87:9, 87:10, 89:24
**behind** [2] - 76:16, 77:16
**believes** [2] - 151:23, 166:25
**bell** [1] - 94:10
**below** [2] - 49:7, 168:24
**BENCH** [1] - 1:16
**beneficial** [1] - 123:18
**benefit** [2] - 153:16, 156:20
**best** [1] - 30:1
**better** [6] - 30:23, 36:15, 79:19, 114:6, 125:21, 132:7
**between** [47] - 8:21, 11:2, 37:20, 43:10, 52:25, 53:3, 57:22, 62:7, 65:20, 69:10, 69:25, 70:19, 71:2, 71:11, 71:19, 71:23, 72:12, 73:18, 73:19, 74:8, 77:4, 77:14, 78:23, 81:17, 85:8, 87:15, 88:13, 90:6, 90:14, 92:25, 95:1, 98:6, 99:1, 99:10, 102:9, 109:21, 112:22, 114:11, 119:18, 128:21, 134:18, 136:4, 137:22, 138:7, 138:8, 147:18
**beyond** [12] - 13:11, 14:10, 16:9, 16:22, 21:1, 22:25, 23:14, 28:17, 58:19, 89:25, 115:23, 116:4
**big** [8] - 8:4, 64:3, 71:7, 71:23, 80:22, 84:2, 99:11, 103:6

**bigger** [1] - 83:9
**biggest** [8] - 91:5, 91:18, 91:22, 94:24, 95:14, 99:10, 102:6, 110:9
**billet** [1] - 34:8
**biology** [1] - 25:8
**bit** [14] - 8:5, 39:18, 57:8, 57:20, 67:1, 70:25, 71:3, 75:21, 78:16, 119:1, 148:13, 156:17, 170:24, 182:2
**black** [20] - 74:19, 78:24, 79:8, 82:15, 94:13, 94:16, 94:18, 94:19, 95:2, 95:24, 97:1, 98:10, 99:25, 100:5, 100:9, 132:16, 133:13, 133:25, 134:1, 140:6
**blackboards** [1] - 104:13
**block** [4] - 129:12, 163:13, 189:15, 189:16
**blocked** [9] - 164:7, 164:9, 164:11, 164:15, 170:18, 170:25, 171:2, 190:6, 190:7
**blocking** [1] - 162:25
**blood** [1] - 42:14
**blossomed** [1] - 9:23
**blue** [29] - 44:8, 44:13, 45:13, 45:14, 45:22, 46:11, 49:6, 49:9, 73:6, 73:19, 78:25, 80:14, 81:6, 81:10, 82:16, 95:5, 95:23, 95:25, 97:1, 97:8, 97:10, 100:24, 118:23, 132:4, 133:12, 133:25, 172:14, 173:17
**Blvd** [3] - 4:3, 4:12, 4:14
**board** [5] - 35:18, 72:20, 72:22, 104:5, 104:9
**Board** [3] - 14:8, 14:25, 15:22
**Boberg** [48] - 150:16, 151:5, 151:7, 152:6, 155:9, 158:4, 158:14, 160:7, 160:12, 160:15, 164:18, 166:19, 167:11, 167:18, 169:12, 170:8,

170:21, 171:4, 171:11, 171:17, 171:19, 171:23, 172:16, 173:11, 173:21, 175:11, 175:19, 175:22, 176:15, 176:21, 177:23, 177:25, 178:14, 179:4, 180:8, 181:12, 181:14, 181:23, 182:18, 183:6, 184:10, 185:16, 185:22, 186:17, 187:4, 187:20, 190:10, 199:12
**BOBERG** [1] - 150:19
**bodies** [2] - 62:25, 63:4
**body** [1] - 136:11
**Bonasso** [1] - 5:14
**books** [3] - 59:24, 59:25, 60:3
**Booth** [2] - 56:21, 57:17
**bore** [1] - 146:24
**bored** [1] - 146:25
**Boston** [1] - 156:11
**bother** [1] - 139:13
**bottom** [5] - 52:23, 53:9, 93:8, 112:9, 119:8
**Boulevard** [1] - 3:15
**bound** [1] - 115:5
**Box** [2] - 5:14, 6:8
**breadth** [2] - 40:11, 41:16
**break** [7] - 55:9, 117:11, 130:1, 130:3, 130:15, 150:9, 187:2
**breakdown** [1] - 10:1
**breaking** [1] - 81:4
**breaks** [1] - 78:23
**Bridgeside** [3] - 4:3, 4:12, 4:14
**brief** [1] - 154:15
**briefly** [7] - 62:21, 63:2, 117:19, 138:4, 151:16, 153:15, 158:14
**bring** [6] - 35:18, 52:20, 131:7, 155:19, 183:3, 187:15
**broad** [2] - 57:22, 70:7
**broader** [5] - 52:4, 52:6, 112:12, 117:23, 197:23
**broadly** [1] - 70:25

**broke** [1] - 98:25
**broken** [1] - 10:4
**brought** [3] - 29:24, 30:8, 31:1
**brownie** [1] - 119:6
**Budd** [1] - 3:14
**build** [3] - 129:19, 144:12, 162:3
**built** [1] - 161:8
**bulk** [1] - 91:21
**bunch** [2] - 66:17, 113:13
**Bureau** [2] - 61:1, 61:4
**Burling** [1] - 5:11
**Business** [2] - 56:6, 56:21
**business** [11] - 33:3, 37:5, 37:16, 37:20, 37:21, 37:22, 40:12, 45:6, 46:10, 68:24, 68:25
**buy** [8] - 66:16, 67:11, 67:12, 118:14, 119:15, 120:10, 128:5
**buyers** [1] - 118:13
**buying** [1] - 123:24
**BY** [60] - 7:17, 13:19, 14:19, 21:3, 21:23, 24:21, 35:3, 37:1, 41:1, 44:3, 46:4, 47:22, 48:20, 51:5, 51:14, 52:22, 56:1, 57:10, 63:22, 70:16, 72:21, 81:22, 92:8, 104:21, 106:20, 116:10, 117:18, 118:4, 121:7, 127:23, 129:18, 131:10, 138:3, 142:4, 146:9, 147:9, 151:4, 152:5, 155:8, 158:13, 164:2, 165:16, 166:18, 167:17, 170:7, 171:18, 174:16, 177:24, 179:3, 181:13, 183:5, 184:23, 185:17, 187:12, 187:19, 189:13, 190:2, 191:15, 192:22, 196:21

**C**

**CA** [1] - 3:16
**Cabell** [57] - 3:2, 9:16, 9:23, 10:2, 13:6, 13:22, 17:15, 17:24,

22:23, 23:11, 37:5,
37:15, 38:8, 38:18,
38:21, 39:21, 40:5,
40:12, 41:9, 41:17,
43:12, 44:11, 44:15,
46:9, 46:18, 49:5,
49:11, 49:15, 49:25,
50:4, 50:9, 52:24,
65:15, 103:12,
103:20, 103:24,
110:13, 110:15,
110:17, 110:21,
114:23, 141:10,
151:22, 154:20,
155:14, 161:10,
172:6, 175:16,
176:8, 184:6, 185:3,
186:11, 186:18,
197:14, 198:3,
198:7, 198:9
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington** [4]
- 40:5, 103:20,
103:24, 114:23
**calculate** [8] - 17:18,
104:2, 173:22,
176:21, 183:21,
186:9, 186:14,
186:22
**calculated** [1] -
186:23
**calculates** [1] - 186:24
**calculating** [1] -
109:18
**calculation** [9] - 30:7,
54:10, 99:3, 108:12,
108:13, 111:3,
111:4, 111:19,
155:15
**calculations** [3] -
43:1, 43:3, 112:11
**calibrate** [2] - 109:19,
113:25
**calibrated** [1] - 110:9
**calibration** [2] -
109:20, 111:10
**California** [2] - 34:12,
56:10
**CALLAS** [1] - 6:7
**CAMPBELL** [1] - 6:14
**campus** [1] - 32:18
**Canada** [1] - 156:6
**cannot** [2] - 19:22,
144:2
**cap** [2] - 129:7, 129:8
**capacity** [6] - 28:16,
28:18, 28:22, 29:4,
29:6, 32:12
**capita** [1] - 87:21

**Capitol** [1] - 2:7
**caplets** [1] - 49:3
**capsules** [1] - 49:3
**Cardinal** [6] - 4:16,
5:2, 161:12, 163:12,
164:7, 199:17
**care** [6] - 15:6, 19:2,
19:10, 19:15, 19:18,
22:5
**career** [7] - 59:1, 60:6,
63:23, 71:7, 156:13,
156:24, 157:11
**careful** [4] - 80:10,
119:10, 135:18,
146:19
**Carey** [1] - 4:23
**carries** [1] - 109:5
**cars** [1] - 118:18
**case** [64] - 9:12, 10:6,
11:8, 11:17, 12:1,
14:8, 14:24, 17:9,
20:21, 22:22, 32:7,
42:24, 54:18, 65:14,
67:13, 71:19, 74:5,
83:1, 91:19, 104:2,
108:15, 118:7,
118:12, 142:24,
152:4, 152:8, 155:2,
155:17, 155:20,
161:4, 161:15,
161:22, 162:18,
163:1, 163:2,
163:10, 164:6,
164:12, 164:14,
165:20, 166:5,
166:24, 168:11,
170:9, 170:22,
171:12, 176:22,
179:19, 180:2,
180:24, 181:4,
181:15, 186:2,
188:1, 188:9,
188:21, 189:4,
190:14, 195:25,
196:4, 196:5, 197:6,
198:1
**cases** [7] - 8:19,
31:25, 61:18,
138:11, 155:23,
156:14, 161:21
**Casey** [1] - 122:7
**cash** [13] - 19:22,
19:24, 20:1, 20:4,
20:10, 20:12, 20:16,
20:23, 21:12, 22:1,
22:4, 22:13, 22:19
**categories** [1] -
134:15
**category** [4] - 79:15,
79:16, 81:8, 109:2

**causal** [2] - 77:3, 77:8
**causality** [3] - 71:20,
71:22, 85:17
**causation** [3] - 71:2,
71:24, 75:2
**causative** [1] - 19:6
**caused** [7] - 8:1,
10:19, 70:2, 70:21,
71:22, 86:16, 151:24
**causing** [1] - 137:11
**CDC** [3] - 8:3, 19:10,
102:21
**ceiling** [1] - 121:1
**Cendant** [1] - 31:13
**Center** [8] - 3:12, 5:11,
33:8, 34:12, 34:14,
181:3, 185:23,
186:12
**certain** [4] - 37:4,
130:20, 164:8,
166:25
**certainly** [11] - 8:2,
16:15, 18:11, 18:13,
61:10, 63:17, 71:6,
76:24, 109:8,
146:25, 181:23
**Certainly** [2] - 18:9,
36:16
**certainty** [1] - 51:8
**CERTIFICATION** [1] -
201:1
**certified** [2] - 25:16,
25:19
**certify** [1] - 201:4
**chain** [12] - 34:2, 34:6,
58:14, 63:25, 99:16,
99:17, 99:19, 99:24,
127:10, 157:1,
158:21, 186:7
**chalkboard** [1] -
104:20
**chance** [4] - 51:16,
65:16, 89:3, 148:23
**change** [12] - 19:13,
19:14, 19:18, 26:24,
37:20, 80:1, 92:5,
111:11, 127:5,
135:20, 137:14,
137:21
**changed** [5] - 29:2,
112:22, 133:16,
135:14
**changes** [8] - 19:2,
19:5, 19:7, 19:8,
19:9, 37:22, 59:15,
98:17, 115:20,
116:18
**changing** [1] - 116:13
**channel** [16] - 153:12,
154:25, 180:17,

180:22, 182:21,
182:23, 183:23,
184:9, 184:16,
184:19, 195:12,
195:15, 195:17,
195:21, 197:2, 197:5
**characterization** [1] -
90:17
**characterize** [1] -
198:2
**charge** [1] - 35:23
**Charles** [8] - 60:17,
61:8, 61:9, 61:15,
61:21, 151:9, 156:7,
156:9
**CHARLES** [1] - 3:11
**Charleston** [6] - 2:8,
3:13, 4:24, 5:15, 6:9,
7:3
**CHARLESTON** [2] -
1:2, 1:18
**chart** [46] - 45:3,
45:25, 46:6, 46:7,
46:11, 46:23, 47:25,
48:1, 48:22, 48:24,
49:1, 49:19, 49:21,
49:23, 53:6, 72:24,
73:1, 78:21, 79:22,
80:25, 81:1, 81:23,
81:25, 83:7, 94:7,
96:1, 96:22, 96:23,
96:24, 96:25, 97:2,
99:2, 100:13,
100:14, 100:21,
100:23, 101:8,
102:2, 173:9,
173:12, 176:3,
176:18, 181:14,
182:2, 186:15,
194:11
**charts** [15] - 48:6,
48:13, 48:25, 54:16,
82:12, 82:13, 83:17,
171:11, 171:19,
171:23, 173:22,
175:19, 175:24,
176:22, 178:5
**Chase** [1] - 4:23
**cheap** [2] - 100:6,
123:1
**cheaper** [3] - 66:16,
121:25, 122:6
**check** [13] - 42:25,
54:12, 130:19,
179:5, 179:7, 179:9,
180:3, 180:6,
180:22, 181:1,
181:8, 182:19
**checking** [1] - 180:9
**checks** [1] - 179:25

**chemically** [1] - 80:11
**Chesterbrook** [1] -
6:15
**Chicago** [13] - 56:7,
56:11, 56:14, 56:15,
56:24, 57:7, 57:11,
60:15, 104:19,
106:10, 106:11,
127:14, 145:10
**childhood** [2] - 9:20,
9:21
**children** [1] - 93:8
**choices** [1] - 159:12
**chooses** [1] - 68:21
**cigarettes** [1] - 121:9
**circled** [1] - 133:7
**circling** [1] - 48:5
**Circuit** [2] - 188:1,
188:12
**circumstances** [1] -
27:11
**cite** [1] - 11:19
**cited** [5] - 59:9, 59:11,
59:18, 59:21, 59:23
**City** [25] - 4:1, 5:11,
37:5, 37:15, 38:8,
38:18, 38:21, 39:21,
40:12, 41:9, 41:17,
43:13, 44:11, 44:15,
46:9, 46:19, 49:5,
49:11, 49:16, 49:25,
50:4, 50:9, 65:16,
103:12, 201:5
**CITY** [1] - 1:4
**city** [1] - 23:12
**Civil** [3] - 1:4, 201:7,
201:8
**civil** [2] - 1:10, 34:9
**Claims** [1] - 29:24
**claims** [3] - 12:23,
29:24, 30:8
**clarify** [4] - 86:14,
147:5, 174:4, 188:16
**clarifying** [1] - 81:24
**clarity** [1] - 169:7
**Clark** [1] - 60:7
**class** [2] - 60:2,
146:24
**classification** [1] -
26:7
**claw** [2] - 30:14, 30:16
**clear** [19] - 10:6,
13:10, 18:23, 32:6,
42:3, 45:12, 49:9,
52:3, 73:18, 75:15,
80:2, 86:17, 88:24,
112:17, 112:18,
120:13, 144:16,
182:5, 193:14
**cleared** [2] - 189:16,

190:7
**clearly** [1] - 62:9
**CLERK** [9] - 24:14, 24:16, 24:19, 55:16, 55:18, 55:21, 150:14, 150:17, 150:20
**client** [4] - 28:18, 29:4, 29:6
**clinical** [2] - 18:14, 18:15
**Closed** [1] - 64:12
**closed** [8] - 14:6, 14:23, 15:15, 15:17, 127:10, 158:21, 183:8, 183:18
**closely** [2] - 35:20, 35:22
**closer** [3] - 12:4, 94:4, 147:13
**closings** [1] - 148:25
**CMS** [1] - 181:2
**co** [2] - 58:24, 59:1
**co-authored** [2] - 58:24, 59:1
**Coca** [1] - 143:11
**Coca-Cola** [1] - 143:11
**Cochran** [3] - 6:17, 201:2, 201:11
**code** [8] - 38:13, 162:2, 166:12, 173:1, 173:2, 173:3, 190:7, 197:13
**codes** [2] - 41:23, 41:24
**coefficients** [1] - 89:5
**coke** [1] - 143:11
**Coke** [11] - 143:9, 143:10, 143:12, 143:14, 143:15, 143:17, 143:18, 144:10, 145:24, 147:23, 147:24
**Cola** [1] - 143:11
**cola** [1] - 147:24
**colleague** [1] - 122:7
**College** [2] - 32:17
**Colombia** [1] - 100:2
**Colonel** [2] - 33:17, 55:2
**colored** [3] - 172:10, 172:12, 172:14
**Columbia** [3] - 106:12, 188:2, 188:13
**combat** [1] - 33:18
**combinations** [1] - 132:21
**combine** [1] - 101:25
**combined** [1] - 80:13

**combining** [1] - 102:2
**Coming** [1] - 35:4
**coming** [3] - 77:9, 141:22, 148:9
**command** [2] - 34:2, 34:6
**Commander** [1] - 34:9
**commendations** [1] - 34:16
**comments** [1] - 159:20
**COMMISSION** [1] - 1:10
**Commission** [5] - 2:2, 3:2, 63:10, 155:25, 157:2
**commitment** [1] - 130:17
**commodities** [1] - 121:20
**common** [3] - 132:10, 157:7, 180:24
**commonly** [1] - 17:1
**communities** [1] - 124:2, 125:1
**community** [4] - 68:6, 69:11, 70:1, 70:20
**companies** [4] - 8:11, 26:6, 26:13, 63:6
**company** [2] - 28:1, 54:15
**comparable** [1] - 200:4
**compare** [3] - 37:21, 53:20, 155:2
**comparing** [3] - 94:3, 181:8, 183:17
**comparison** [1] - 183:16
**compilations** [1] - 32:25
**compiled** [1] - 100:14
**complement** [3] - 147:19, 147:20, 147:22
**complements** [1] - 146:23
**complete** [4] - 40:10, 41:16, 56:8, 161:3
**completely** [2] - 97:22, 164:25
**complex** [1] - 124:11
**complicated** [4] - 18:8, 23:8, 94:9, 128:7

**comply** [1] - 16:4
**component** [1] - 58:14
**components** [1] - 58:17
**comprised** [1] - 30:3
**computer** [4] - 6:19, 35:13, 36:3
**concept** [4] - 16:15, 71:5, 145:18, 189:15
**concepts** [1] - 97:2
**concerning** [1] - 161:3
**concerns** [1] - 181:25
**concise** [1] - 123:15
**conclude** [2] - 142:8, 152:21
**concluded** [1] - 153:14
**conclusion** [15] - 16:5, 16:10, 39:15, 78:9, 89:21, 90:5, 92:24, 93:2, 96:1, 98:4, 103:1, 103:2, 115:18, 116:12, 140:10
**conclusions** [3] - 91:3, 149:1, 149:16
**conditional** [1] - 135:8
**conduct** [8] - 13:9, 16:6, 70:2, 70:21, 85:6, 179:24, 181:1, 185:5
**conducted** [3] - 180:23, 181:8, 183:16
**conducting** [1] - 162:25
**confer** [1] - 148:23
**confidentiality** [1] - 9:4
**confined** [3] - 11:7, 13:8, 38:25
**confused** [1] - 158:24
**confusing** [1] - 129:17
**Congress** [1] - 62:19
**congressional** [1] - 195:5
**connected** [1] - 184:8
**connection** [7] - 34:19, 64:11, 152:8, 161:22, 171:11, 181:15, 188:6
**connections** [1] - 188:5
**Connolly** [2] - 4:18, 5:4
**CONROY** [1] - 3:3
**consequences** [1] - 124:16
**consider** [3] - 27:17, 27:19, 27:22

**considered** [4] - 17:7, 28:15, 41:13, 41:25
**considers** [1] - 20:12
**consistency** [1] - 124:19
**consistent** [8] - 42:20, 43:9, 50:12, 50:14, 50:16, 184:18, 197:3
**consists** [1] - 161:8
**consolidation** [1] - 30:19
**constitutes** [1] - 136:16
**construct** [2] - 137:17, 137:24
**constructed** [1] - 105:10
**consult** [1] - 61:12
**consultancy** [4] - 28:18, 28:22, 29:4, 29:6
**consultant** [2] - 60:18, 61:8
**consulted** [1] - 63:8
**consulting** [6] - 8:10, 8:14, 61:10, 61:11, 61:15, 156:11
**consume** [6] - 66:14, 69:20, 121:24, 126:5, 126:16
**consumed** [2] - 69:18, 76:23
**consumer's** [1] - 65:23
**consumers** [2] - 119:14, 124:2
**consuming** [3] - 90:25, 93:5, 126:7
**consumption** [7] - 65:21, 66:9, 88:15, 126:8, 126:14, 126:20, 126:22
**consumptions** [1] - 122:9
**contain** [1] - 137:9
**contains** [1] - 48:23
**context** [7] - 107:2, 156:21, 157:3, 157:25, 190:3, 197:25, 198:19
**continue** [6] - 28:23, 131:6, 149:12, 162:15, 191:6, 196:17
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continued** [1] - 28:15
**contract** [2] - 124:21, 124:22
**contracting** [1] -

128:15
**contradicting** [1] - 101:18
**contrary** [1] - 170:22
**contributing** [1] - 16:14
**control** [5] - 10:12, 17:20, 18:16, 21:21
**controlled** [26] - 14:6, 14:22, 15:2, 15:6, 16:1, 18:2, 64:13, 64:23, 65:8, 153:12, 154:25, 158:18, 180:16, 180:21, 182:21, 182:23, 183:23, 184:9, 184:15, 184:19, 195:12, 195:15, 195:17, 195:21, 197:2, 197:5
**Controlled** [2] - 127:11, 128:21
**controlling** [1] - 18:12
**controls** [2] - 10:13, 18:19
**convenient** [1] - 55:8
**Cook** [3] - 6:18, 201:3, 201:11
**Coopers** [5] - 25:14, 26:2, 27:25, 28:2, 33:21
**core** [3] - 35:10, 35:11, 57:15
**cORPORATION** [1] - 1:7, 1:13
**Corporation** [2] - 6:2, 201:7
**Correct** [6] - 15:23, 16:18, 28:17, 28:24, 38:19, 41:8
**correct** [160] - 7:23, 7:24, 8:1, 8:8, 8:12, 8:15, 8:23, 8:24, 9:2, 9:3, 9:6, 9:9, 9:10, 9:13, 9:14, 9:17, 9:25, 10:2, 10:3, 10:12, 10:20, 10:24, 11:6, 11:9, 11:17, 11:20, 11:21, 11:23, 12:1, 12:7, 12:8, 12:10, 12:11, 12:20, 13:3, 13:4, 13:6, 13:23, 14:2, 15:1, 15:8, 15:12, 15:13, 15:15, 16:4, 16:12, 16:24, 16:25, 17:2, 17:10, 17:11, 17:16, 17:17, 17:20, 17:24, 17:25, 18:3, 18:7, 19:3, 19:22, 20:11,

20:24, 21:13, 22:2, 22:10, 22:20, 22:21, 22:24, 23:3, 23:4, 23:7, 28:6, 29:2, 29:11, 31:19, 32:7, 32:8, 32:9, 32:10, 38:18, 38:22, 38:23, 39:1, 39:22, 39:23, 40:4, 41:4, 41:5, 41:11, 41:12, 42:5, 42:6, 44:16, 44:17, 45:15, 45:16, 45:24, 46:19, 46:20, 46:22, 46:23, 46:24, 47:2, 47:4, 48:7, 48:11, 48:12, 49:12, 49:13, 49:17, 49:18, 50:6, 50:7, 50:10, 50:11, 51:23, 51:24, 52:2, 52:25, 53:1, 75:16, 94:22, 112:25, 115:11, 117:3, 118:24, 119:21, 127:6, 132:3, 132:17, 138:9, 138:17, 139:9, 139:15, 152:20, 154:10, 154:12, 154:13, 161:20, 163:9, 165:24, 165:25, 166:21, 166:22, 169:11, 173:10, 174:7, 174:8, 176:13, 176:14, 177:6, 177:7, 178:23, 185:3, 185:4, 185:9, 185:10, 190:16, 193:5, 201:4
**corrected** [7] - 21:20, 21:22, 112:11, 114:16, 114:24, 114:25, 115:1
**correcting** [1] - 114:16
**correctly** [7] - 20:1, 45:13, 46:16, 46:17, 109:22, 110:8, 113:11
**correlated** [1] - 132:24
**correlation** [9] - 88:19, 88:20, 89:1, 89:5, 89:8, 90:9, 90:10, 134:18, 135:4
**correspond** [2] - 108:14, 108:23
**corresponding** [2] - 105:20, 105:21
**corroborated** [1] - 179:16
**cost** [3] - 18:6, 18:16,

100:8
**costly** [2] - 123:3, 125:14
**costs** [9] - 118:21, 122:24, 123:4, 123:7, 123:10, 124:1, 124:24, 124:25, 125:2
**counsel** [4] - 14:13, 27:7, 27:10, 170:14
**counted** [1] - 91:9
**counterfactual** [1] - 137:2
**counties** [1] - 53:20
**countless** [1] - 30:13
**countries** [2] - 30:5, 125:1
**country** [10] - 30:9, 30:12, 54:2, 54:5, 86:8, 86:9, 86:25, 98:9, 139:2, 139:8
**county** [2] - 10:5, 53:23
**COUNTY** [1] - 1:10
**County** [59] - 2:2, 3:2, 9:16, 9:24, 13:6, 13:22, 23:11, 37:5, 37:15, 38:8, 38:18, 38:21, 39:21, 40:12, 41:9, 41:17, 43:13, 44:11, 44:15, 46:9, 46:18, 49:5, 49:11, 49:16, 49:25, 50:4, 50:9, 52:24, 53:13, 54:2, 65:15, 103:12, 110:14, 110:15, 110:17, 110:21, 141:10, 151:22, 154:20, 155:14, 161:10, 172:6, 175:16, 176:8, 184:6, 185:3, 186:11, 186:18, 192:6, 192:8, 194:13, 196:10, 196:12, 196:22, 197:8, 197:14, 198:4, 198:7, 198:10
**couple** [6] - 28:22, 43:15, 51:21, 131:11, 131:12, 158:15
**course** [7] - 57:14, 60:6, 63:5, 149:12, 149:21, 156:23, 157:11
**courses** [3] - 57:11, 60:2, 133:16
**COURT** [113] - 1:1, 1:17, 7:5, 7:8, 7:11,

7:13, 13:12, 13:17, 14:14, 21:2, 21:17, 23:16, 23:18, 23:20, 23:22, 23:25, 24:6, 24:8, 24:12, 34:23, 36:13, 36:18, 36:23, 40:15, 40:20, 47:16, 47:19, 51:1, 51:3, 51:12, 54:23, 54:25, 55:2, 55:7, 55:11, 55:13, 55:23, 57:6, 63:14, 63:19, 70:11, 81:19, 104:10, 106:14, 106:18, 115:24, 116:1, 116:8, 117:9, 117:12, 117:15, 127:17, 127:19, 127:22, 129:16, 129:24, 130:2, 130:4, 130:9, 130:12, 130:21, 131:1, 131:4, 131:6, 134:24, 141:19, 141:25, 145:13, 146:6, 147:6, 147:18, 147:25, 148:3, 148:7, 149:15, 149:20, 149:25, 150:3, 150:8, 150:13, 150:22, 151:1, 158:7, 158:9, 158:11, 160:4, 160:7, 160:15, 160:21, 163:24, 165:5, 182:3, 182:10, 182:14, 182:24, 183:1, 187:2, 187:8, 187:18, 189:10, 189:19, 189:25, 191:11, 191:14, 196:13, 196:19, 199:8, 199:10, 199:12, 199:20, 199:25, 200:5, 200:9
**court** [4] - 29:18, 30:15, 117:12, 135:10
**Court** [52] - 6:17, 6:18, 7:2, 17:4, 24:25, 25:7, 26:3, 27:2, 29:21, 31:11, 32:2, 32:15, 33:9, 33:16, 33:24, 37:25, 41:15, 42:19, 44:5, 44:18, 46:6, 50:22, 55:8, 56:3, 56:23, 103:22, 148:10, 149:13, 150:1, 151:6,

151:16, 152:19, 154:18, 156:22, 159:6, 160:7, 165:19, 166:21, 167:10, 167:22, 171:24, 173:11, 174:22, 176:4, 183:16, 184:25, 185:13, 187:21, 188:1, 188:13, 201:2, 201:3
**Court's** [1] - 153:16
**Courtroom** [1] - 32:21
**courtroom** [2] - 7:6, 149:10
**COURTROOM** [6] - 55:16, 55:18, 55:21, 150:14, 150:17, 150:20
**courts** [3] - 27:10, 123:25, 155:24
**cover** [1] - 58:15
**coverage** [2] - 8:1, 16:8
**Covington** [1] - 5:11
**CPA** [1] - 26:11
**CPAs** [1] - 32:23
**CRA** [3] - 156:9, 156:13, 158:1
**Craig** [2] - 39:6, 39:8
**created** [1] - 115:2
**creeping** [1] - 81:14
**crime** [1] - 122:20
**criteria** [2] - 158:25, 159:15
**critically** [1] - 177:13
**criticizing** [1] - 106:11
**critique** [1] - 154:15
**cross** [18] - 14:14, 23:16, 51:12, 72:6, 72:9, 87:11, 90:3, 106:15, 117:9, 133:9, 133:10, 148:14, 182:12, 183:1, 183:4, 187:3, 189:8, 189:10
**CROSS** [5] - 7:16, 51:13, 117:17, 158:12, 187:11
**cross-examination** [2] - 14:14, 189:10
**cross-examine** [1] - 51:12
**cross-section** [1] - 90:3
**cross-sectional** [2] - 72:6, 72:9
**cross-sectionally** [1] - 87:11
**CRR** [2] - 6:17, 6:18

**cumulative** [2] - 163:15, 193:15
**current** [1] - 123:12
**curve** [8] - 94:11, 95:15, 95:21, 118:25, 119:1, 119:7, 121:23, 122:5
**customers** [9] - 19:22, 19:24, 21:25, 22:18, 38:11, 39:21, 40:9, 50:4, 58:12
**cut** [1] - 98:11

## D

**damages** [1] - 61:18
**data** [177] - 11:22, 11:25, 12:3, 12:13, 12:23, 12:25, 13:3, 13:5, 13:21, 13:24, 13:25, 14:1, 14:4, 16:20, 17:7, 17:21, 20:5, 20:8, 20:9, 23:6, 26:15, 27:22, 28:25, 31:18, 31:21, 32:4, 32:7, 32:9, 36:12, 37:24, 37:25, 38:2, 38:3, 38:4, 38:6, 38:14, 39:4, 39:13, 40:22, 41:2, 41:6, 41:7, 41:8, 41:20, 41:23, 41:25, 42:3, 42:4, 42:8, 42:9, 42:12, 42:23, 43:2, 43:12, 43:21, 44:20, 49:3, 49:7, 49:8, 51:23, 52:1, 52:4, 52:5, 52:6, 52:8, 52:9, 52:14, 52:15, 53:4, 53:25, 54:3, 54:17, 71:8, 73:16, 75:18, 87:14, 91:24, 92:10, 92:11, 93:6, 93:11, 97:14, 98:8, 100:14, 102:14, 102:15, 102:21, 102:25, 105:11, 109:23, 110:10, 111:12, 111:13, 113:11, 124:16, 132:3, 132:5, 134:11, 138:16, 151:13, 151:21, 155:22, 156:3, 156:23, 157:4, 157:6, 157:18, 159:8, 160:16, 161:10, 161:11, 161:14, 161:16, 161:17, 161:19, 161:20,

161:21, 162:4,
162:8, 162:10,
162:11, 162:12,
162:20, 163:7,
164:11, 164:13,
164:17, 164:19,
164:23, 165:3,
165:12, 165:13,
172:5, 176:8,
177:11, 178:17,
178:24, 179:5,
179:7, 179:9,
179:12, 179:16,
179:24, 180:3,
180:23, 181:1,
181:3, 181:8,
182:12, 182:19,
183:16, 184:3,
184:10, 185:7,
185:8, 185:9,
186:24, 188:25,
191:4, 191:17,
191:24, 192:8,
192:14, 192:16,
194:16, 195:7,
198:3, 198:6, 198:19

**dataset** [17] - 73:9,
161:1, 161:3, 161:6,
161:8, 161:23,
161:25, 162:3,
162:5, 162:15,
162:16, 162:21,
162:22, 163:21,
165:9, 165:10,
167:25

**datasets** [8] - 27:13,
27:15, 36:16, 40:19,
156:21, 158:6,
160:14, 160:17

**Date** [1] - 201:16

**DAVID** [2] - 1:17, 4:5

**David** [1] - 7:1

**days** [1] - 136:9

**DC** [6] - 4:7, 4:10,
4:19, 4:21, 5:5, 5:12

**De** [2] - 2:4, 2:14

**DEA** [33] - 14:8, 14:11,
14:25, 15:20, 20:12,
154:24, 161:11,
180:17, 181:5,
181:9, 181:19,
181:20, 182:18,
182:20, 183:7,
183:8, 183:11,
183:14, 183:17,
183:21, 184:14,
184:19, 187:22,
188:9, 189:3, 189:8,
189:14, 195:3,
195:18, 195:19,

195:20, 195:24,
197:1

**DEA's** [7] - 153:10,
153:13, 180:20,
182:22, 183:22,
184:11, 195:11

**dealer** [1] - 100:10

**dealers** [1] - 100:7

**dealing** [4] - 42:16,
42:24, 43:5, 158:18

**deals** [1] - 128:8

**death** [14] - 83:14,
89:18, 90:6, 94:8,
105:6, 105:9,
105:10, 108:3,
108:7, 108:19,
108:23, 109:2,
109:23, 123:21

**deaths** [39] - 74:21,
78:22, 94:23, 95:9,
104:1, 105:1, 105:7,
105:10, 105:14,
105:17, 105:20,
105:23, 105:24,
107:17, 107:18,
108:7, 108:8,
108:12, 108:13,
108:16, 108:21,
108:23, 109:4,
109:21, 110:13,
111:10, 111:22,
111:24, 113:14,
114:25, 115:3,
117:4, 132:16,
132:20, 132:25,
133:15, 138:14,
141:2

**debate** [2] - 117:21,
136:9

**decade** [1] - 141:5

**decide** [2] - 67:22,
68:21

**deciding** [2] - 68:10,
68:11

**decision** [6] - 11:6,
68:9, 74:4, 74:6,
74:18, 171:4

**decisions** [2] - 68:16,
84:23

**decline** [4] - 73:10,
73:20, 79:24, 97:15

**declined** [1] - 73:15

**declines** [3] - 79:11,
81:16, 82:19

**decreasing** [2] - 18:6,
112:8

**defendant** [6] - 23:9,
161:12, 161:19,
172:6, 190:11,
192:14

**Defendant** [4] - 4:16,
5:2, 5:7, 6:2

**defendants** [12] -
11:16, 23:11, 131:8,
148:11, 161:15,
162:17, 163:11,
163:16, 163:23,
164:6, 190:4, 192:20

**Defendants** [3] - 1:8,
1:14, 201:7

**DEFENDANTS'** [2] -
7:9, 24:18

**DEFENSE** [2] - 55:20,
150:19

**defense** [3] - 8:23,
55:5, 55:14

**define** [4] - 135:25,
136:6, 136:7, 136:15

**defined** [2] - 92:7,
198:16

**definitely** [1] - 10:13

**definition** [2] - 105:12,
198:13

**degree** [3] - 51:7,
56:11, 56:16

**degrees** [1] - 35:13

**delivered** [2] - 129:22,
129:23

**demand** [37] - 58:11,
58:16, 66:4, 66:5,
66:18, 66:19, 66:24,
74:2, 77:4, 117:25,
118:2, 118:10,
118:14, 118:17,
119:17, 119:24,
120:5, 120:9,
121:15, 121:20,
121:22, 122:5,
126:1, 126:17,
126:18, 126:19,
126:20, 126:21,
126:22, 126:24,
127:4, 127:12,
129:2, 129:11

**demanding** [1] -
119:15

**Demarest** [1] - 25:2

**DEMAREST** [1] - 25:2

**Demo** [1] - 167:15

**demonstrate** [1] -
132:22

**demonstrates** [1] -
197:7

**Demonstrative** [9] -
152:2, 166:17,
169:19, 171:17,
174:15, 175:23,
177:23, 181:12,
185:16

**demonstrative** [19] -

72:15, 152:7, 155:7,
167:18, 167:21,
167:24, 168:17,
168:19, 169:20,
170:6, 177:18,
177:25, 179:2,
181:7, 181:14,
184:22, 185:11,
185:18, 197:24

**demonstratives** [1] -
131:8

**denominator** [2] -
109:16, 112:9

**Department** [9] -
29:23, 30:1, 56:6,
56:22, 57:17, 63:9,
106:11, 106:12,
155:25

**departments** [1] -
56:20

**dependent** [1] -
172:10

**depicted** [1] - 72:24

**depicting** [1] - 173:22

**depiction** [5] - 40:11,
172:3, 173:15,
176:6, 183:20

**depo** [1] - 149:12

**deponent** [1] - 190:18

**deposed** [1] - 195:25

**deposition** [8] - 16:13,
29:14, 62:9, 166:4,
166:6, 189:22,
190:18, 191:1

**DEPUTY** [5] - 55:16,
55:18, 55:21,
150:14, 150:17,
150:20

**derive** [1] - 113:22

**describe** [32] - 25:6,
30:1, 31:11, 35:7,
37:25, 38:4, 44:5,
44:18, 46:5, 48:21,
49:21, 61:8, 62:21,
63:2, 72:23, 74:20,
79:7, 81:11, 97:3,
98:24, 99:18, 101:5,
103:22, 112:15,
118:8, 155:19,
167:21, 173:11,
174:22, 175:20,
176:4, 181:17

**described** [2] - 48:25,
167:9

**descriptions** [1] -
166:13

**designated** [1] -
189:23

**designations** [1] -
149:12

**designed** [2] - 18:1,
158:16

**destroyed** [1] - 125:1

**detail** [6] - 78:8, 86:13,
87:13, 96:17, 118:6,
151:17

**detailed** [1] - 42:23

**details** [3] - 38:6,
38:10, 110:7

**detect** [3] - 18:2,
197:10, 197:21

**determinant** [1] -
77:11

**determinants** [1] -
127:8

**determination** [1] -
154:4

**determine** [8] - 41:19,
54:8, 67:3, 68:5,
74:15, 154:24,
172:21, 186:17

**determined** [4] -
39:12, 65:9, 74:6,
118:20

**determines** [3] -
65:10, 65:12, 88:7

**detour** [1] - 33:12

**develop** [2] - 64:21,
65:2

**developed** [2] - 63:24,
151:20

**diagram** [4] - 118:11,
127:5, 138:5, 138:14

**Dickinson** [1] - 25:9

**die** [2] - 79:13, 123:22

**differ** [2] - 162:22,
163:8

**difference** [7] - 71:23,
96:3, 96:4, 102:6,
147:18, 178:1, 178:4

**differences** [9] -
86:24, 87:12, 90:14,
93:20, 96:13, 102:9,
115:7, 145:3, 145:16

**different** [52] - 26:8,
33:13, 35:16, 38:12,
42:15, 42:16, 59:10,
61:16, 65:20, 71:4,
72:3, 76:2, 82:9,
86:7, 86:8, 92:23,
93:25, 96:20, 97:23,
97:25, 100:25,
105:24, 107:18,
114:3, 116:22,
119:4, 120:1, 120:6,
120:8, 120:23,
123:16, 128:12,
128:16, 133:23,
135:21, 145:17,
153:6, 153:7,

153:13, 156:14,
156:15, 165:1,
175:5, 178:19,
178:21, 179:13,
190:3, 190:17,
194:20
**differently** [1] - 17:16
**differing** [1] - 98:6
**difficult** [1] - 19:13
**diligence** [4] - 162:25,
170:16, 171:1, 190:8
**dimension** [3] - 72:9,
72:10, 110:9
**dimensions** [2] -
85:12, 102:4
**dire** [2] - 158:8,
158:10
**direct** [5] - 13:8, 21:1,
128:13, 130:9,
141:25
**DIRECT** [3] - 24:20,
55:25, 151:3
**direction** [4] - 112:3,
125:12, 125:15,
135:8
**directly** [6] - 19:22,
68:7, 68:18, 142:22,
163:16, 190:13
**Directly** [1] - 19:23
**disagree** [1] - 80:22
**disciplines** [1] - 70:8
**discover** [1] - 66:15
**discuss** [2] - 138:4,
139:12
**discussed** [3] - 31:17,
112:12, 161:1
**discussing** [3] - 68:4,
92:9, 102:8
**discussion** [1] - 87:6
**discussions** [2] -
11:2, 136:7
**disentangle** [1] -
19:13
**disparity** [1] - 138:15
**dispensed** [1] - 68:12
**dispensing** [2] -
12:25, 18:15
**dispute** [1] - 128:18
**disputes** [1] - 27:6
**disruptive** [1] - 122:24
**distinct** [1] - 75:5
**distinction** [5] - 65:19,
71:19, 99:10,
102:23, 103:7
**distinctions** [1] -
57:22
**Distinguished** [1] -
56:5
**distribute** [3] - 65:5,
65:7, 69:1

**distributed** [10] - 14:6,
14:23, 23:11, 49:10,
49:25, 50:19, 67:14,
94:12, 99:25
**distributing** [1] -
68:17
**Distribution** [1] -
64:13
**distribution** [21] -
15:15, 45:18, 46:18,
46:25, 50:3, 50:15,
64:23, 65:6, 66:22,
93:24, 94:3, 94:7,
102:23, 127:10,
128:15, 128:17,
156:19, 158:22,
185:2, 186:10,
194:10
**distributor** [20] - 11:9,
11:16, 23:4, 37:14,
68:19, 68:22, 69:15,
85:18, 89:24,
159:23, 161:15,
161:17, 161:20,
162:17, 163:11,
167:25, 169:3,
188:23, 190:14,
192:14
**distributor's** [1] - 68:9
**distributors** [42] - 9:2,
11:5, 11:22, 12:1,
12:3, 12:6, 12:9,
12:20, 12:22, 13:2,
13:9, 13:11, 13:20,
14:7, 14:24, 15:4,
15:5, 15:8, 15:11,
16:20, 22:22, 23:10,
64:22, 68:5, 70:24,
77:8, 77:10, 86:16,
128:6, 128:11,
128:12, 128:14,
128:22, 129:12,
151:21, 161:9,
161:12, 162:24,
172:5, 172:6,
186:19, 192:2
**distributors'** [5] -
11:19, 65:4, 70:2,
70:21, 190:11
**District** [5] - 7:2, 7:3,
33:8, 188:1, 188:13
**DISTRICT** [3] - 1:1,
1:1, 1:17
**diuretics** [1] - 42:15
**divergence** [1] -
100:19
**diversion** [21] - 15:25,
18:2, 18:6, 20:13,
20:15, 153:11,
154:24, 180:16,

180:21, 181:20,
182:21, 182:23,
183:18, 183:22,
184:8, 184:15,
184:19, 195:12,
195:14, 195:20,
197:2
**diversions** [1] -
141:14
**diverted** [10] - 15:6,
20:10, 68:13,
141:10, 183:8,
183:21, 195:4,
195:17, 196:25,
197:4
**diverting** [2] - 140:6,
140:13
**divide** [1] - 87:18
**divided** [3] - 105:14,
183:23, 195:15
**dividing** [1] - 107:12
**division** [1] - 34:3
**divisions** [1] - 83:4
**Dix** [1] - 34:4
**doctor** [10] - 11:2,
51:17, 67:22, 67:25,
74:8, 126:12, 128:2,
151:5, 152:6, 183:6
**Doctor** [39] - 21:4,
51:15, 141:22,
151:8, 151:15,
151:25, 152:16,
155:5, 155:16,
156:2, 156:22,
157:7, 157:11,
158:3, 160:24,
161:13, 161:22,
163:10, 164:3,
165:17, 170:4,
172:21, 174:9,
174:13, 174:17,
174:20, 174:22,
175:24, 176:3,
177:8, 177:15,
178:25, 181:7,
184:20, 185:11,
185:18, 186:9,
186:25, 197:6
**doctor/patient** [2] -
10:23, 11:6
**doctors** [8] - 20:19,
67:21, 68:2, 74:4,
74:6, 74:7, 74:9,
195:6
**document** [1] - 47:11
**documentary** [1] -
179:18
**documents** [3] -
11:19, 15:19, 47:17
**done** [36] - 8:10, 8:14,

11:8, 12:6, 17:23,
19:6, 24:3, 59:16,
59:20, 61:16, 61:17,
61:18, 61:19, 61:20,
64:7, 74:8, 79:22,
80:2, 82:16, 83:3,
84:8, 117:3, 121:10,
122:7, 122:8,
141:13, 148:13,
155:20, 170:16,
171:1, 173:21,
192:12, 194:2, 194:5
**dosage** [12] - 42:21,
43:1, 43:7, 44:10,
49:4, 53:10, 53:12,
168:1, 168:6,
168:14, 190:22,
193:11
**doses** [1] - 196:22
**dot** [2] - 88:5, 138:25
**dots** [1] - 138:20
**doubt** [1] - 140:25
**doughnuts** [2] -
67:10, 67:11
**Douglas** [1] - 4:23
**Dow** [3] - 112:23,
112:24, 112:25
**down** [26] - 10:4, 27:8,
45:23, 49:14, 66:15,
67:9, 71:17, 75:10,
75:25, 76:5, 76:15,
77:19, 80:7, 83:2,
99:7, 104:10,
111:17, 133:15,
139:14, 143:2,
148:13, 155:6,
170:5, 179:1,
182:25, 184:21
**downstream** [1] - 65:7
**downward** [2] -
121:24, 122:5
**DR** [1] - 55:20
**dr** [1] - 171:4
**Dr** [255] - 7:6, 7:18,
23:15, 23:20, 23:22,
38:3, 39:12, 40:20,
42:8, 51:22, 52:12,
52:13, 55:6, 55:14,
56:2, 56:8, 56:23,
57:9, 57:19, 58:19,
60:5, 61:7, 63:12,
63:23, 67:16, 70:13,
70:19, 71:1, 72:11,
72:22, 74:20, 76:18,
78:17, 80:20, 80:24,
81:23, 82:6, 82:12,
83:12, 84:4, 84:18,
88:2, 92:9, 94:6,
98:14, 98:24,
100:14, 101:13,

102:14, 103:9,
103:11, 103:18,
103:23, 104:8,
104:10, 104:22,
104:23, 106:3,
106:19, 106:21,
107:14, 107:24,
108:1, 108:4,
108:18, 109:12,
109:15, 111:20,
111:22, 112:13,
114:18, 115:14,
116:6, 116:11,
117:7, 123:14,
130:5, 130:17,
130:22, 131:2,
131:4, 131:11,
142:5, 143:24,
146:4, 146:10,
148:1, 148:3,
151:13, 151:20,
152:13, 152:16,
152:17, 153:3,
153:12, 153:20,
154:6, 154:11,
154:19, 155:3,
155:9, 155:14,
158:4, 158:14,
159:1, 159:2, 159:7,
159:9, 159:16,
159:20, 159:25,
160:7, 160:12,
160:15, 160:24,
161:1, 161:2, 161:7,
161:8, 161:13,
161:16, 161:23,
161:25, 162:2,
162:5, 162:7, 162:8,
162:12, 162:16,
163:21, 164:13,
164:17, 164:18,
164:19, 165:4,
165:23, 166:1,
166:6, 166:9,
166:10, 166:13,
166:15, 166:19,
167:11, 167:18,
167:19, 167:22,
168:3, 168:22,
169:1, 169:9,
169:12, 169:14,
169:24, 170:2,
170:8, 170:9,
170:12, 170:19,
170:21, 170:23,
171:3, 171:4,
171:11, 171:13,
171:19, 171:23,
171:25, 172:3,
172:4, 172:10,
172:12, 172:16,

172:22, 172:25, 173:11, 173:13, 173:17, 173:21, 173:23, 174:3, 174:5, 174:9, 174:23, 175:8, 175:11, 175:19, 175:25, 176:5, 176:7, 176:10, 176:15, 176:19, 176:21, 176:23, 177:15, 177:19, 177:25, 178:1, 178:8, 178:11, 178:14, 178:15, 178:20, 179:4, 180:3, 180:8, 180:9, 180:13, 180:20, 181:9, 181:14, 181:23, 182:1, 182:18, 182:19, 183:17, 184:5, 184:10, 184:11, 184:13, 184:17, 185:7, 185:22, 186:1, 186:3, 186:6, 186:17, 186:24, 187:4, 187:20, 188:17, 188:24, 188:25, 190:9, 190:23, 191:20, 192:1, 192:13, 192:17, 193:6, 194:3, 194:16, 194:17, 194:18, 198:1, 198:16, 199:1, 199:3, 199:10, 199:12

**dramatic** [2] - 169:23, 169:24
**dramatically** [3] - 101:3, 135:14, 178:18
**drank** [1] - 142:14
**draw** [12] - 89:22, 90:5, 91:3, 92:24, 93:2, 96:1, 98:4, 103:2, 115:18, 116:12, 131:14, 139:1
**drawing** [1] - 129:9
**drawn** [1] - 188:6
**drew** [1] - 122:1
**drill** [4] - 78:8, 78:15, 86:13, 87:13
**drilling** [1] - 27:8
**drink** [5] - 143:12, 143:18, 147:24
**drinking** [4] - 142:12, 143:13, 143:16,

143:17
**drive** [3] - 58:16, 87:4, 118:18
**Drive** [1] - 6:15
**driven** [8] - 54:14, 78:12, 83:20, 84:20, 87:9, 118:17, 126:14, 153:2
**driver** [3] - 66:24, 67:15, 116:20
**drives** [1] - 153:24
**driving** [7] - 77:21, 80:16, 85:17, 90:1, 99:17, 101:15, 127:13
**drop** [2] - 148:21, 167:6
**drought** [1] - 71:16
**drove** [2] - 84:6, 84:23
**DRUG** [2] - 1:7, 1:13
**drug** [25] - 9:1, 37:14, 38:12, 38:13, 41:25, 42:1, 45:8, 49:8, 80:8, 98:17, 98:18, 100:7, 100:10, 101:14, 101:16, 104:1, 109:7, 109:13, 131:22, 132:1, 136:1, 144:1, 144:2, 168:1, 169:4
**Drug** [2] - 6:2, 201:7
**drugs** [28] - 10:2, 42:16, 43:5, 43:8, 44:22, 45:18, 46:22, 48:8, 59:20, 79:20, 101:19, 103:3, 121:10, 121:14, 122:14, 123:9, 123:19, 125:7, 125:21, 129:22, 144:19, 144:25, 145:17, 157:5, 163:3, 184:2, 195:13
**due** [9] - 162:25, 170:16, 171:1, 173:24, 174:2, 176:24, 177:2, 177:4, 190:8
**during** [1] - 34:16, 45:11, 53:15, 60:5, 61:21, 76:19, 94:20, 102:11, 149:21, 156:13, 157:11
**duties** [4] - 15:11, 15:12, 15:25, 128:20
**duty** [3] - 16:17, 34:23, 35:1
**dying** [9] - 85:23, 85:24, 90:21, 94:2, 94:4, 139:17,

139:22, 139:25, 140:23

## E

**early** [10] - 45:6, 59:14, 86:9, 86:21, 86:23, 87:3, 87:25, 90:20, 148:14, 148:15
**easier** [1] - 98:13
**east** [28] - 97:4, 97:10, 97:13, 97:15, 97:24, 98:1, 98:6, 98:20, 99:4, 99:6, 99:7, 99:9, 99:14, 99:20, 100:3, 100:17, 100:19, 100:23, 101:11, 103:7, 110:20, 111:1, 111:7, 113:19, 113:24, 137:5, 137:8, 137:11
**East** [3] - 3:5, 3:12, 4:24
**eastern** [6] - 96:20, 98:12, 111:12, 111:14, 114:6, 114:9
**easy** [1] - 63:25
**Econometric** [2] - 60:23, 60:24
**econometrics** [5] - 155:22, 156:2, 157:12, 158:5, 160:13, 160:16
**economic** [22] - 10:25, 53:12, 59:22, 61:11, 69:12, 70:6, 84:8, 84:24, 85:1, 104:4, 106:9, 116:17, 122:13, 123:17, 124:7, 127:7, 127:12, 129:13, 138:22, 143:20, 156:11
**Economic** [4] - 59:5, 61:2, 61:4, 145:10
**Economics** [8] - 56:5, 56:6, 56:22, 57:17, 59:6, 106:11, 156:4, 156:5
**economics** [51] - 56:13, 56:25, 57:1, 57:13, 57:22, 57:25, 58:15, 58:20, 58:22, 59:7, 59:17, 59:18, 59:24, 59:25, 60:6, 60:13, 62:12, 62:16, 63:12, 63:13, 63:20, 63:21, 64:6, 64:17,

64:18, 64:22, 65:19, 68:23, 69:8, 70:10, 70:22, 71:1, 71:6, 71:7, 74:3, 75:14, 100:6, 106:23, 116:18, 117:21, 119:19, 129:3, 138:24, 144:21, 144:22, 146:13, 146:15, 146:18, 155:21, 157:18, 179:23
**economist** [16] - 16:24, 60:9, 63:24, 64:17, 65:18, 107:2, 115:18, 116:7, 116:12, 117:22, 118:7, 129:19, 134:9, 140:10, 151:9, 156:13
**economists** [5] - 57:4, 66:13, 124:11, 129:21, 157:9
**Economists** [2] - 17:1, 60:21
**economy** [2] - 57:24, 118:18
**Economy** [1] - 59:5
**edited** [1] - 60:3
**education** [2] - 56:8, 59:16
**educational** [3] - 25:5, 25:6, 35:25
**effect** [10] - 8:4, 112:4, 113:3, 116:24, 126:19, 136:12, 169:23, 169:24, 183:20, 190:5
**effective** [4] - 18:24, 18:25, 123:13, 125:23
**effort** [1] - 107:3
**Eighth** [1] - 3:10
**either** [9] - 55:10, 58:25, 71:22, 86:3, 87:11, 102:9, 107:21, 110:8, 113:14
**elastic** [3] - 120:13, 120:14, 120:20
**elasticity** [5] - 119:1, 119:3, 120:13, 121:11, 121:16
**elders** [1] - 117:21
**elements** [2] - 115:10, 116:23
**elicited** [1] - 70:6
**ELIZABETH** [1] - 6:14
**embarrass** [1] - 118:5
**empirical** [3] - 120:12,

124:14, 146:20
**empirically** [1] - 147:2
**employed** [4] - 151:8, 161:7, 169:13, 170:23
**employees** [1] - 11:16
**Encino** [1] - 3:16
**end** [13] - 47:14, 123:3, 123:5, 124:24, 136:25, 139:2, 142:22, 143:3, 147:8, 149:5, 149:9, 150:7, 164:16
**ended** [1] - 142:11
**ending** [1] - 149:5
**enforcement** [2] - 124:21, 124:22
**engaged** [2] - 103:11, 124:1
**engagements** [6] - 27:5, 27:6, 29:1, 33:25, 62:11, 63:5
**engineer** [3] - 33:18, 34:3
**ensures** [1] - 175:14
**entire** [4] - 46:17, 46:20, 169:6, 196:5
**entirely** [2] - 153:2, 173:17
**entities** [3] - 10:22, 10:23, 63:7
**entitled** [1] - 32:20
**ENU** [1] - 4:17
**enumerator** [1] - 112:8
**environment** [1] - 128:24
**epidemic** [4] - 9:22, 16:12, 16:21, 17:19
**epidemiology** [4] - 70:8, 106:23, 116:5, 145:11
**Epidemiology** [1] - 106:12
**equal** [5] - 105:3, 105:15, 110:4, 119:10, 119:12
**equality** [1] - 59:15
**equation** [2] - 105:13, 105:15
**equilibrium** [6] - 118:2, 118:11, 119:20, 119:22, 119:25, 120:1
**equivalence** [2] - 131:25, 132:1
**equivalent** [3] - 131:19, 131:23, 131:24
**erase** [2] - 104:15,

104:17
**eraser** [1] - 104:16
**erasing** [1] - 139:13
**Ernst** [2] - 31:12, 31:13
**error** [1] - 109:15
**errors** [4] - 109:17, 111:21, 112:4, 112:7
**especially** [1] - 63:20
**essence** [1] - 18:17
**essentially** [10] - 10:11, 38:6, 46:9, 88:20, 89:12, 89:15, 153:4, 166:12, 173:1, 175:14
**establish** [4] - 70:20, 77:7, 175:2, 181:22
**established** [1] - 70:2
**establishing** [1] - 136:12
**estimate** [28] - 29:17, 103:11, 103:19, 107:3, 107:6, 108:8, 108:10, 108:24, 110:15, 111:23, 114:5, 114:6, 114:10, 114:19, 114:22, 115:14, 115:21, 116:13, 117:5, 117:6, 154:23, 180:18, 180:21, 182:20, 183:8, 183:22, 195:14, 195:16
**estimated** [2] - 103:23, 113:1
**estimates** [17] - 111:16, 112:6, 117:1, 153:11, 153:12, 153:13, 180:19, 182:23, 183:7, 183:11, 183:17, 184:11, 184:18, 195:3, 195:11, 195:20, 197:1
**estimating** [3] - 108:2, 108:15, 184:14
**estimation** [1] - 108:19
**et** [4] - 1:7, 1:13, 201:6, 201:7
**evaluate** [6] - 76:8, 84:12, 84:24, 85:11, 154:12, 162:7
**evaluates** [1] - 193:23
**evaluating** [1] - 76:9
**evaluation** [3] - 33:3, 157:3, 184:11
**evening** [1] - 24:4

**events** [2] - 143:25, 144:3
**evidence** [35] - 17:12, 20:21, 21:10, 22:22, 23:2, 23:9, 47:17, 50:24, 67:13, 83:25, 85:1, 85:2, 103:4, 120:12, 136:11, 136:15, 136:23, 140:16, 143:19, 144:13, 144:16, 145:11, 146:21, 153:10, 154:22, 163:10, 163:20, 164:5, 170:21, 170:22, 179:17, 179:18, 181:24, 182:5, 182:9
**Evidence** [2] - 47:15, 50:25
**evolved** [1] - 22:5
**exact** [2] - 99:3, 115:12
**exactly** [9] - 92:18, 97:9, 97:12, 105:11, 107:7, 114:10, 144:4, 149:24
**examination** [3] - 14:14, 187:4, 189:10
**EXAMINATION** [10] - 7:16, 24:20, 51:13, 55:25, 117:17, 142:3, 146:8, 151:3, 158:12, 187:11
**examinations** [1] - 148:14
**examine** [5] - 51:12, 106:15, 117:9, 182:13, 183:1
**example** [28] - 19:10, 65:8, 66:11, 71:11, 71:19, 74:13, 74:15, 77:7, 94:13, 116:21, 119:22, 121:15, 122:8, 128:17, 129:22, 135:14, 143:9, 145:24, 154:8, 156:25, 159:23, 169:23, 181:2, 181:5, 193:9, 194:7, 196:7, 196:20
**examples** [5] - 29:21, 146:22, 156:22, 164:15, 196:9
**exceed** [3] - 168:15, 168:20, 174:6
**exceeds** [2] - 168:10, 193:15
**excess** [3] - 155:4, 184:17, 193:12

**excessively** [1] - 169:25
**Excuse** [2] - 8:13, 11:24
**excused** [3] - 23:20, 54:25, 199:10
**exercise** [4] - 34:19, 109:20, 180:8, 180:12
**exhibit** [5] - 72:23, 78:15, 78:17, 80:24, 197:6
**Exhibit** [14] - 52:23, 78:16, 78:18, 82:10, 82:23, 82:24, 88:2, 91:2, 94:6, 98:22, 131:7, 131:13, 137:15, 137:21
**exist** [1] - 70:23
**expand** [2] - 57:20, 75:21
**expansion** [4] - 20:6, 77:23, 77:24, 98:18
**expect** [8] - 20:6, 69:4, 88:17, 89:3, 105:7, 165:6, 184:14, 197:11
**expected** [1] - 149:4
**experience** [8] - 8:6, 31:24, 51:19, 64:20, 100:11, 123:8, 156:17, 156:21
**experiences** [1] - 34:7
**expert** [54] - 8:7, 8:16, 8:19, 8:23, 9:3, 9:6, 9:8, 9:15, 27:19, 27:22, 29:7, 29:9, 29:13, 29:22, 29:25, 31:8, 31:13, 31:21, 31:24, 32:9, 32:11, 36:11, 36:16, 39:6, 39:15, 40:21, 62:1, 62:4, 62:11, 62:15, 62:18, 62:24, 63:5, 63:12, 63:17, 63:20, 64:15, 72:16, 72:23, 156:2, 157:19, 158:5, 158:20, 158:23, 159:14, 160:5, 160:8, 160:13, 160:16, 165:6, 181:25, 188:7, 195:20
**expertise** [8] - 63:24, 64:5, 128:25, 155:19, 157:18, 159:24, 163:15, 195:2
**experts** [4] - 9:13, 142:24, 145:12,

157:8
**explain** [26] - 17:4, 26:3, 27:2, 32:2, 32:15, 33:16, 33:24, 41:13, 42:19, 86:17, 88:4, 96:17, 100:15, 102:6, 104:4, 104:22, 137:14, 137:16, 154:17, 163:20, 171:23, 177:19, 178:4, 178:20, 181:8, 183:16
**explained** [4] - 89:12, 89:15, 89:18, 103:8
**explaining** [2] - 72:16, 183:2, 185:12
**explains** [1] - 170:20
**explanation** [4] - 137:21, 140:5, 140:21, 182:1
**explanatory** [1] - 88:16
**exposed** [2] - 126:4, 126:10
**extend** [1] - 119:22
**extended** [2] - 28:12, 28:17
**extension** [1] - 18:24
**extent** [11] - 17:18, 19:8, 35:15, 54:3, 70:9, 83:10, 83:11, 89:20, 192:15, 194:15, 199:16
**extreme** [1] - 69:19

# F

**Faber** [1] - 7:1
**FABER** [1] - 1:17
**fact** [25] - 18:5, 66:19, 86:7, 105:10, 111:3, 115:19, 116:12, 120:12, 120:19, 124:18, 136:5, 136:12, 136:14, 137:14, 140:10, 142:25, 143:6, 146:2, 148:16, 148:25, 163:12, 164:7, 173:5, 191:11, 191:16
**factor** [3] - 16:14, 88:16, 146:19
**factors** [5] - 68:4, 103:1, 119:4, 127:13, 137:19
**facts** [3] - 137:12, 137:14, 137:20
**faculty** [2] - 32:16,

32:19
**failed** [1] - 16:3
**fair** [14] - 9:21, 10:7, 14:5, 28:16, 58:7, 61:16, 73:22, 90:17, 122:14, 123:19, 124:8, 139:18, 140:20, 146:15
**Fair** [2] - 15:4, 19:19
**faire** [1] - 119:19
**Fairfield** [1] - 25:8
**Fairleigh** [1] - 25:9
**fairly** [1] - 184:15
**faith** [2] - 191:6, 191:9
**falling** [1] - 133:25
**familiar** [9] - 10:1, 57:6, 94:10, 103:10, 104:7, 158:20, 188:3, 188:5, 190:11
**famous** [1] - 57:4
**fancy** [1] - 104:17
**far** [6] - 42:17, 52:17, 145:10, 155:3, 170:12, 184:17
**FARRELL** [69] - 2:3, 36:14, 40:17, 47:9, 47:18, 51:2, 51:14, 52:20, 52:22, 55:1, 63:15, 70:4, 81:20, 92:5, 106:7, 106:17, 115:22, 115:25, 116:3, 117:10, 117:16, 117:18, 118:1, 118:4, 120:3, 121:7, 127:20, 127:23, 129:18, 130:1, 130:3, 130:7, 130:14, 130:20, 131:7, 131:10, 138:2, 138:3, 141:18, 141:21, 145:9, 146:7, 146:9, 147:8, 147:9, 147:17, 158:8, 158:10, 158:13, 160:3, 160:6, 163:14, 164:22, 181:18, 182:8, 182:25, 187:12, 187:15, 187:19, 189:13, 190:2, 191:9, 191:13, 191:15, 192:19, 192:22, 196:21, 199:6, 199:11
**Farrell** [26] - 2:4, 2:13, 21:20, 51:15, 81:19, 106:15, 116:2, 117:15, 117:19, 129:17, 129:24,

131:6, 142:5, 146:6, 158:15, 160:5, 169:8, 182:7, 182:12, 182:24, 187:10, 187:13, 189:11, 190:1, 191:6, 196:13
**Farrell's** [1] - 181:25
**fascinating** [1] - 112:17
**faster** [3] - 76:6, 99:9, 99:14
**fatal** [2] - 137:11, 137:23
**fault** [4] - 16:12, 16:14, 16:17, 16:21
**Fault** [1] - 16:14
**faults** [3] - 52:12, 52:16, 52:17
**FCRR** [1] - 6:18
**February** [4] - 168:4, 168:7, 193:10, 193:11
**federal** [4] - 29:10, 32:12, 63:8, 129:4
**Federal** [8] - 33:8, 47:15, 50:24, 63:9, 155:25, 157:2
**feedback** [1] - 126:19
**fellow** [1] - 60:24
**fentanyl** [83] - 77:25, 78:3, 78:14, 78:24, 79:1, 79:3, 79:4, 79:14, 79:15, 79:23, 80:9, 80:11, 80:12, 80:13, 80:16, 80:19, 81:3, 81:5, 81:8, 81:9, 81:16, 82:15, 82:20, 83:2, 83:14, 83:20, 83:21, 83:23, 83:24, 84:1, 84:2, 84:3, 84:16, 87:17, 88:11, 95:5, 96:14, 96:19, 98:11, 98:12, 98:19, 99:1, 99:8, 99:11, 99:13, 99:19, 100:5, 100:6, 100:8, 100:9, 100:17, 101:6, 102:13, 109:21, 109:25, 110:1, 110:2, 110:4, 110:5, 110:20, 110:22, 111:1, 112:13, 113:3, 113:4, 113:7, 113:9, 113:11, 115:20, 123:21, 132:19, 137:6, 137:9, 137:10, 138:8, 139:6, 139:8, 141:2,

141:4
**fentanyl-related** [1] - 78:14
**few** [12] - 50:16, 59:12, 91:10, 107:25, 130:6, 130:7, 130:8, 143:23, 162:23, 165:22, 170:3, 187:14
**fewer** [3] - 17:14, 142:23, 143:16
**field** [10] - 36:3, 56:24, 58:20, 59:9, 62:16, 63:12, 116:4, 129:11, 158:20, 179:23
**fields** [7] - 40:21, 63:18, 63:20, 157:12, 160:8, 160:13, 160:16
**figure** [4] - 9:14, 94:13, 94:16, 191:24
**figures** [2] - 76:16, 92:14
**figuring** [1] - 178:22
**file** [1] - 164:9
**fill** [2] - 65:11, 161:18
**filled** [4] - 12:7, 69:7, 127:25, 141:15
**fills** [1] - 67:24
**finally** [1] - 86:6
**Financial** [1] - 32:20
**financial** [6] - 26:7, 26:22, 32:23, 32:24, 33:1, 163:5
**findings** [3] - 148:25, 149:16, 155:3
**fine** [1] - 130:24
**finish** [3] - 23:25, 130:5, 130:12
**finished** [1] - 56:16
**firm** [6] - 26:9, 26:23, 27:1, 28:11, 61:10, 156:11
**Firm** [2] - 3:4, 3:7
**firm's** [1] - 31:3
**firms** [3] - 25:14, 31:9, 58:8
**First** [1] - 192:11
**first** [28] - 48:25, 73:15, 76:3, 76:18, 77:6, 78:12, 82:25, 85:12, 86:14, 87:14, 96:25, 97:2, 100:23, 102:1, 104:15, 111:21, 117:24, 126:7, 128:3, 131:13, 136:1, 168:4, 170:16, 174:19, 187:15,

199:19, 199:20, 199:22
**firsthand** [1] - 100:11
**fit** [9] - 85:2, 85:5, 93:6, 93:11, 103:4, 110:19, 111:12, 113:11, 138:1
**fits** [1] - 137:25
**five** [5] - 117:11, 117:13, 135:11, 135:22, 142:6
**five-minute** [1] - 117:11
**fix** [2] - 111:5, 120:25
**fixed** [17] - 111:9, 111:10, 113:17, 113:20, 174:19, 175:7, 175:20, 175:25, 176:4, 176:10, 176:13, 176:16, 176:24, 177:3, 177:8, 178:12
**fixing** [2] - 111:8, 175:11
**FL** [1] - 2:11
**flag** [11] - 7:25, 20:13, 151:23, 165:14, 167:23, 168:23, 169:15, 169:16, 170:3, 171:5, 172:17, 175:3, 175:8, 193:22, 194:2, 194:5
**flagged** [27] - 153:21, 153:22, 154:9, 168:12, 168:16, 168:19, 168:20, 169:5, 172:22, 173:23, 173:24, 174:5, 175:4, 175:17, 176:20, 176:23, 176:24, 177:4, 177:15, 178:7, 178:8, 180:14, 191:18, 191:25, 193:17, 193:18, 193:20
**flagging** [39] - 151:12, 151:18, 154:6, 154:19, 155:3, 159:17, 159:18, 165:11, 165:24, 166:2, 166:10, 166:20, 166:25, 169:13, 170:1, 170:11, 171:20, 172:1, 172:11, 172:13, 172:15, 172:18, 172:19, 172:23, 173:6,

173:12, 173:24, 174:10, 176:10, 176:18, 178:9, 178:12, 180:20, 184:7, 184:13, 184:17, 186:1, 186:3, 199:4
**flags** [4] - 168:20, 169:3, 173:19, 194:22
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flat** [1] - 81:16
**flaws** [4] - 112:11, 112:12, 114:25, 115:2
**flight** [1] - 130:23
**Floor** [1] - 3:5
**focus** [10] - 10:7, 27:7, 37:24, 38:8, 39:6, 39:18, 57:21, 58:7, 147:11, 167:6
**focused** [6] - 48:14, 49:1, 58:5, 61:15, 113:24, 192:1
**folks** [3] - 95:21, 114:4, 148:21
**follow** [5] - 21:9, 126:7, 129:1, 134:12, 143:23
**follow-up** [1] - 129:1
**follows** [3] - 7:4, 97:13, 187:7
**FOR** [1] - 1:1
**forces** [5] - 63:24, 64:9, 66:3, 66:19, 71:23
**foregoing** [1] - 201:4
**forensic** [8] - 26:25, 27:2, 27:12, 27:17, 27:19, 33:2, 36:11, 40:21
**Forensic** [1] - 27:4
**forever** [1] - 175:7
**forget** [1] - 149:11
**forgot** [1] - 60:25
**form** [26] - 28:3, 38:1, 38:14, 41:3, 41:4, 43:5, 43:7, 43:11, 44:9, 44:24, 44:25, 46:21, 48:7, 48:10, 48:14, 49:2, 49:10, 49:15, 50:8, 78:1, 121:3, 129:14, 158:25, 159:15
**formed** [2] - 34:8, 34:9
**former** [1] - 187:22
**forms** [3] - 32:25, 50:5, 182:6
**formula** [8] - 105:25,

107:19, 107:21, 109:1, 110:1, 110:16, 113:5, 115:12
**formulas** [1] - 124:10
**Fort** [3] - 34:4, 34:20
**forth** [9] - 27:8, 27:10, 34:14, 35:14, 35:17, 42:9, 54:16, 171:20
**fortunate** [1] - 57:16
**forward** [6] - 36:24, 70:4, 149:21, 157:8
**fought** [1] - 125:18
**Foundation** [1] - 60:12
**foundation** [10] - 21:1, 21:15, 106:8, 134:20, 181:19, 181:22, 183:14, 189:7, 189:21, 191:5
**four** [5] - 19:25, 31:17, 135:11, 135:22, 142:6
**fraction** [6] - 135:5, 140:18, 172:11, 172:12, 172:15, 195:16
**frame** [5] - 45:11, 45:20, 53:7, 53:16, 161:17
**framed** [1] - 70:9
**framework** [4] - 126:23, 136:22, 154:12, 178:22
**framing** [1] - 53:2
**fraud** [1] - 30:18
**frauds** [1] - 30:11
**free** [4] - 23:23, 55:3, 182:12, 199:12
**freezes** [1] - 175:9
**Friedman** [2] - 57:3, 125:13
**friend** [1] - 125:17
**fuel** [1] - 118:18
**full** [6] - 24:14, 37:13, 37:14, 40:11, 41:16, 130:19
**full-line** [2] - 37:13, 37:14
**FULLER** [1] - 2:12
**Fuller** [2] - 2:4, 2:13
**fully** [1] - 136:10
**function** [3] - 66:4, 66:7, 74:1
**functional** [2] - 35:16
**functioning** [1] - 29:4
**functions** [1] - 167:23
**funds** [1] - 30:17
**future** [7] - 126:18, 126:20, 126:21,

126:22, 189:5,
189:16, 190:6

# G

gaps [1] - 161:19
Gary [3] - 57:4,
120:15, 125:16
Gary's [1] - 125:18
gasoline [7] - 66:14,
66:16, 66:18, 66:19,
118:16, 121:15
gateway [7] - 136:3,
136:6, 136:8,
136:12, 136:16,
136:17, 136:20,
136:21, 136:23,
142:9, 143:7,
143:14, 143:22,
144:2, 145:8
gateways [2] - 146:1,
146:3
gears [1] - 103:9
geez [3] - 66:11,
76:14, 93:22
gender [1] - 85:24
general [17] - 32:22,
63:17, 82:7, 97:13,
97:16, 103:18,
103:22, 117:22,
118:8, 118:23,
119:7, 119:9,
119:14, 126:3,
127:24, 133:14,
139:14
generally [13] - 17:6,
35:7, 44:5, 46:5,
48:22, 50:12, 50:15,
80:20, 119:16,
126:6, 146:20,
179:23, 188:5
Generally [1] - 50:14
generate [2] - 126:17,
126:18, 126:20
generated [1] - 54:8
generates [3] -
126:18, 126:21,
126:22
genesis [2] - 18:11,
69:24
geographic [11] -
38:16, 81:20, 81:23,
92:6, 96:13, 98:23,
101:12, 102:7,
115:20, 196:16,
197:8
George [3] - 56:4,
57:3, 125:16
GEP [1] - 57:23
Given [1] - 20:5

given [14] - 9:12,
17:12, 20:6, 22:3,
28:19, 29:14, 62:8,
68:4, 87:3, 115:9,
117:2, 140:11,
174:11, 180:13
government [7] - 63:8,
119:19, 119:23,
119:25, 120:2,
129:4, 180:25
government's [1] -
129:11
Graduate [1] - 56:6
graduate [1] - 127:13
graph [14] - 44:7, 44:8,
81:3, 95:1, 117:25,
132:22, 133:2,
139:7, 139:10,
139:20, 140:8,
140:24, 141:6, 141:7
graphic [1] - 125:25
graphs [1] - 110:25
great [3] - 118:6,
123:6, 123:8
greater [8] - 48:2,
83:10, 83:11, 89:3,
98:20, 98:21, 111:12
greatest [2] - 68:1,
84:17
green [5] - 81:5,
81:10, 95:4, 95:23,
95:25
GRETCHEN [1] - 6:7
grew [2] - 9:18, 110:20
grocery [1] - 67:9
gross [1] - 77:17
grounds [2] - 134:20,
189:21
group [15] - 79:15,
87:11, 92:1, 93:2,
93:7, 93:8, 93:17,
95:11, 105:1, 105:2,
105:3, 105:4, 139:5,
148:18
group-wise [1] - 87:11
groups [9] - 85:25,
86:22, 90:24, 91:1,
91:5, 95:8, 96:4,
103:6
growing [1] - 45:6
grown [1] - 35:13
growth [13] - 37:19,
45:8, 45:10, 45:11,
45:14, 45:15, 57:24,
59:14, 59:22, 77:25,
78:11, 78:12, 78:13
Guard [8] - 33:18,
33:21, 33:25, 34:8,
34:12, 34:17, 34:24,
35:1

guess [4] - 13:14,
36:18, 60:9, 133:4
guidance [2] - 154:11,
178:22
guidelines [2] - 8:3,
19:10
guns [1] - 198:14
guys [1] - 125:13

# H

Hague [1] - 30:4
half [5] - 89:11, 89:13,
93:8, 101:9, 101:10
hand [23] - 24:17,
27:7, 43:24, 48:17,
55:19, 73:5, 88:10,
88:11, 88:19, 89:13,
97:6, 140:12,
150:18, 171:24,
172:2, 173:9,
173:14, 176:3,
176:6, 176:17,
176:18, 183:19,
184:4
handle [1] - 128:14
happy [1] - 55:10
hard [4] - 10:3, 54:19,
62:6, 126:6
harder [4] - 98:11,
100:9, 102:25, 133:2
HARDIN [3] - 5:3,
127:18, 129:15
Hartle [2] - 190:18,
191:1
hat [1] - 104:11
Hawkins [1] - 3:7
head [1] - 127:1
headquartered [1] -
34:4
Health [3] - 4:16, 5:2,
32:3
health [9] - 59:16,
59:17, 59:18, 60:3,
60:13, 61:19, 62:12,
63:13, 63:20
healthcare [5] - 60:3,
61:19, 64:6, 64:7,
64:10
healthcare-related [1]
- 61:19
hear [2] - 10:17, 21:7
heard [3] - 20:21,
21:10, 145:11
hearing [1] - 12:2
Hearing [1] - 200:9
hearsay [2] - 181:21,
181:24
heavier [1] - 93:1
heavy [1] - 92:24

height [1] - 172:8
held [1] - 26:6
help [8] - 28:25, 70:18,
104:4, 167:14,
171:13, 175:19,
177:18, 181:8
helpful [1] - 69:15
helps [2] - 12:5,
154:22
heroin [81] - 77:24,
78:4, 78:12, 78:24,
79:1, 79:3, 79:13,
79:15, 79:23, 80:9,
80:10, 81:3, 81:5,
81:9, 81:10, 81:12,
81:13, 82:15, 82:20,
82:25, 83:14, 83:20,
87:16, 88:10, 95:5,
96:19, 98:9, 98:11,
98:12, 99:1, 99:8,
99:24, 99:25, 100:1,
100:2, 100:5, 100:8,
100:10, 100:17,
101:6, 102:12,
109:21, 121:21,
121:22, 132:19,
134:5, 134:19,
135:5, 135:11,
135:15, 135:23,
136:5, 136:18,
136:25, 137:5,
137:8, 137:10,
138:7, 139:1, 139:3,
141:1, 141:4, 142:6,
142:9, 142:11,
142:14, 142:19,
142:22, 142:23,
143:3, 143:4,
144:14, 144:18,
145:7, 146:11,
146:16, 147:1,
147:12, 147:13
HESTER [38] - 5:9,
13:7, 14:10, 20:25,
23:19, 55:5, 55:8,
55:14, 56:1, 57:8,
57:10, 63:11, 63:22,
70:16, 72:19, 72:21,
81:22, 92:8, 104:8,
104:15, 104:18,
104:21, 106:20,
116:6, 116:10,
117:7, 121:3,
127:15, 129:14,
130:11, 130:16,
130:24, 134:20,
142:1, 142:4, 146:4,
147:3, 148:2
Hester [4] - 55:13,
130:10, 141:25,

145:14
high [10] - 20:15,
20:16, 84:25,
104:13, 109:4,
109:5, 111:21,
112:6, 124:3, 125:2
higher [16] - 85:19,
85:20, 85:21, 87:10,
97:15, 110:3,
110:21, 111:1,
111:25, 113:10,
119:9, 119:11,
119:12, 119:15,
120:11, 139:2
highest [7] - 34:18,
78:7, 78:9, 92:2,
94:25, 95:15, 139:8
highlights [2] -
101:14, 101:16
highly [1] - 59:23
hinge [1] - 177:12
HIPAA [1] - 23:6
hired [2] - 54:18,
190:14
history [2] - 25:5,
30:12
hit [1] - 198:22
hold [4] - 25:22, 82:5,
105:11, 107:19
home [1] - 198:22
honest [1] - 138:23
honestly [1] - 120:14
Honor [72] - 7:12,
7:15, 13:7, 14:10,
20:25, 21:14, 23:17,
23:19, 23:24, 24:7,
36:10, 36:20, 40:23,
47:18, 47:21, 50:23,
51:2, 51:4, 54:24,
55:1, 55:5, 55:10,
55:14, 55:24, 63:11,
81:21, 104:8,
106:17, 116:6,
117:8, 121:3,
127:15, 127:18,
129:14, 129:15,
130:11, 130:16,
131:5, 134:21,
142:2, 145:9, 147:3,
148:2, 148:6, 148:8,
148:22, 148:24,
149:23, 150:1,
150:6, 150:11,
150:23, 150:25,
158:4, 160:12,
160:19, 163:14,
163:19, 164:22,
165:2, 181:18,
181:23, 182:11,
182:16, 182:25,

189:7, 189:20,
191:5, 196:15,
199:11, 199:14,
199:15
**HONORABLE** [1] -
1:17
**Honorable** [1] - 7:1
**hope** [1] - 148:4
**hopefully** [1] - 74:9
**hoping** - 119:6
**horizontal** [5] - 73:1,
88:8, 88:13, 118:17,
138:10
**Hospital** [3] - 40:5,
186:5, 186:8
**hospital** [1] - 181:4
**hospitals** [2] - 40:3,
48:10
**huge** [2] - 80:14,
124:22
**Hughes** [5] - 7:6, 7:18,
23:15, 23:20, 23:22
**HUGHES** [1] - 7:9
**hundred** [4] - 43:15,
110:5, 113:8, 142:13
**Huntington** [55] -
3:10, 4:1, 9:16, 9:23,
10:2, 13:6, 13:22,
17:15, 17:24, 21:11,
22:24, 23:12, 37:6,
37:15, 38:9, 38:18,
38:22, 39:21, 40:5,
40:13, 41:9, 41:18,
43:13, 44:12, 44:16,
46:9, 46:19, 49:6,
49:11, 49:16, 50:1,
50:4, 50:9, 52:24,
65:16, 103:12,
103:20, 103:24,
114:23, 141:10,
151:22, 154:20,
155:14, 161:10,
172:6, 175:16,
176:8, 184:6,
185:23, 186:18,
197:14, 198:3,
198:8, 198:9, 201:6
**HUNTINGTON** [1] -
1:4
**Huntington/Cabell** [5]
- 53:13, 54:2, 192:6,
192:8, 197:8
**hydro** [2] - 155:2,
184:1
**hydrocodone** [5] -
183:7, 186:10,
186:20, 196:23,
197:3
**hypothetical** [1] -
137:3

**I**

**idea** [5] - 69:17,
125:19, 140:18,
170:16, 193:3
**identified** [2] - 66:25,
152:6
**identify** [5] - 19:5,
42:21, 54:15,
164:20, 182:18
**identifying** [4] - 41:22,
49:4, 164:25, 177:10
**ignore** [1] - 197:15
**illegal** [11] - 59:20,
78:3, 96:8, 101:19,
103:3, 122:19,
122:25, 123:2,
124:1, 125:2
**illicit** [41] - 74:23,
75:16, 78:1, 79:3,
79:5, 79:6, 80:8,
80:9, 80:10, 80:13,
80:16, 80:19, 83:24,
84:1, 84:3, 84:6,
84:15, 85:9, 86:11,
90:21, 93:5, 95:9,
96:5, 98:17, 98:18,
99:16, 99:17,
101:14, 101:16,
101:24, 109:24,
112:21, 121:10,
112:14, 123:19,
123:21, 124:22,
125:6, 139:22,
140:14
**Illinois** [2] - 63:3, 63:4
**illustrate** [5] - 116:21,
120:4, 169:20,
171:13, 175:25
**illustration** [1] -
116:15
**illustrations** [1] -
59:13
**impact** [15] - 19:22,
20:24, 21:13, 22:1,
22:19, 53:13, 78:3,
84:12, 154:4,
169:20, 175:11,
175:20, 175:25,
176:4, 178:14
**impacts** [1] - 171:8
**implement** [1] -
159:12
**implementation** [1] -
171:25
**implemented** [3] -
152:13, 158:16,
170:10
**implicitly** [1] - 122:19
**implied** [3] - 104:2,

104:3, 109:3
**imply** [1] - 113:6
**importance** [1] -
101:14
**important** [7] - 76:17,
82:9, 105:19, 108:6,
179:9, 179:15,
179:20
**importantly** [1] - 123:5
**imposed** [2] - 18:25,
128:21
**imposes** [1] - 173:2
**impossible** [1] - 126:9
**improper** [1] - 116:5
**improve** [1] - 24:5
**improvements** [1] -
59:17
**IMS** [5] - 12:13, 32:3,
32:7, 32:9
**IN** [2] - 1:1, 1:18
**inaccurate** [1] - 21:16
**inception** [1] - 30:23
**include** [13] - 26:15,
29:14, 39:24, 40:5,
40:8, 44:24, 48:9,
108:22, 132:18,
162:16, 162:20,
162:22, 186:7
**included** [3] - 39:19,
41:10, 48:6
**includes** [7] - 39:20,
41:2, 44:14, 46:21,
75:16, 159:11,
162:21
**including** [6] - 14:7,
14:24, 58:14, 61:12,
74:22, 170:9
**income** [1] - 59:15
**inconsistency** [5] -
154:4, 154:13,
177:19, 178:14,
178:19
**inconsistent** [3] -
153:5, 154:3, 177:16
**inconvenience** [1] -
24:2
**increase** [12] - 7:22,
66:12, 77:21, 80:14,
84:3, 84:6, 86:16,
98:21, 101:15,
121:12, 175:15,
175:17
**increased** [5] - 70:2,
70:21, 84:5, 87:6,
87:16
**increases** [1] - 85:9
**increasing** [4] - 81:13,
81:15, 112:7, 123:7
**indeed** [3] - 77:19,
88:25, 98:2

**independent** [3] -
31:4, 39:24, 186:7
**indicated** [2] - 73:4,
169:22
**indicates** [1] - 138:16
**indirectly** [1] - 19:24
**individual** [3] - 35:2,
35:22, 58:5
**individuals** [10] - 36:6,
91:20, 93:15, 96:11,
102:5, 134:12,
134:14, 134:15,
145:3
**industries** [2] -
128:12, 156:15
**industry** [15] - 8:8,
8:15, 9:1, 9:6, 9:9,
31:25, 35:17, 61:23,
62:13, 64:18, 68:5,
128:11, 156:18,
158:17
**ineffective** [2] - 123:3,
123:6
**inelastic** [4] - 121:11,
121:15, 121:19,
121:20
**inelasticity** [1] -
120:21
**infer** [3] - 71:14,
105:16, 144:2
**inferior** [1] - 124:19
**inflection** [4] - 133:5,
133:18, 133:22,
133:23
**influence** [3] - 68:2,
74:14, 74:17
**influences** [1] - 67:18
**information** [19] -
10:4, 23:7, 27:9,
33:1, 38:10, 54:13,
54:20, 102:1,
154:17, 162:16,
179:10, 179:20,
180:4, 180:10,
180:15, 180:25,
181:9, 183:15, 195:5
**informative** [1] -
180:15
**ingested** [1] - 141:4
**initial** [1] - 165:19
**initiate** [3] - 135:4,
142:22, 143:3
**initiated** [2] - 19:1,
142:14
**initiating** [1] - 135:15
**initiation** [1] - 134:19
**innovation** [1] - 64:8
**input** [7] - 74:9, 107:6,
107:7, 107:8, 107:9,
107:11, 163:20

**inputted** [1] - 159:7
**inquired** [1] - 23:10
**inside** [1] - 74:17
**insights** [1] - 58:4
**instance** [5] - 120:23,
126:9, 164:10,
168:23, 170:25
**instances** [1] - 31:19
**instead** [6] - 113:14,
114:12, 126:24,
126:25, 169:1, 175:6
**instructor** [1] - 32:19
**intellectual** [1] - 32:5
**intend** [1] - 158:25
**intending** [2] - 148:20,
159:19
**interest** [1] - 69:5
**interested** [1] - 108:15
**interestingly** [1] -
97:18
**internal** [1] - 26:12
**interpret** [1] - 197:18
**interpretation** [1] -
187:25
**interrupted** [1] -
199:25
**intersect** [2] - 119:18,
119:20
**intervening** [1] - 120:1
**intervention** [1] -
120:2
**interventions** [1] -
119:23
**introduce** [3] - 24:24,
56:2, 151:5
**introduced** [5] - 8:4,
117:19, 135:10,
158:14, 184:25
**introducing** [1] -
74:24
**invalid** [1] - 152:24
**investigate** [1] -
153:23
**investigator** [1] -
188:9
**invokes** [1] - 70:8
**invoking** [1] - 189:1
**involve** [2] - 162:1,
181:4
**involved** [11] - 15:16,
27:5, 27:6, 28:19,
29:1, 31:18, 35:16,
61:11, 62:11,
137:19, 157:6
**involves** [1] - 155:21
**involving** [5] - 29:10,
31:8, 31:25, 44:21,
156:18
**IQVIA** [1] - 12:14
**Iran** [2] - 29:24, 30:8

**Iranian** [1] - 30:4
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**Islamic** [1] - 30:8
**issue** [4] - 81:7, 91:3, 100:5, 103:15
**issued** [1] - 9:12
**issues** [6] - 14:11, 27:7, 82:2, 102:21, 125:19, 163:5
**it'll** [1] - 79:22
**item** [8] - 38:12, 38:14, 41:20, 42:22, 43:6, 49:2, 54:16
**itself** [4] - 162:4, 162:13, 189:14, 189:23

**J**

**Jackson** [1] - 6:8
**JAMES** [1] - 7:9
**James** [1] - 187:22
**January** [1] - 168:4
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:18
**Jersey** [5] - 25:2, 33:17, 33:25, 34:5, 34:17
**jives** [1] - 39:3
**job** [1] - 35:9
**jobs** [1] - 35:9
**John** [1] - 60:7
**join** [1] - 127:18
**joined** [2] - 25:15, 156:7
**JOSEPH** [1] - 6:4
**Journal** [4] - 59:4, 59:5, 123:16, 124:5
**journals** [2] - 59:3, 59:6
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**judge** [8] - 70:4, 106:7, 115:22, 117:10, 118:8, 130:14, 141:18, 158:8
**Judge** [14] - 7:2, 21:6, 34:25, 36:14, 40:17, 47:9, 55:4, 160:6, 165:1, 165:8, 182:8, 187:17, 191:9, 199:7
**JUDGE** [1] - 1:17
**judges** [9] - 30:3, 30:4, 30:5, 32:13, 32:22, 33:5, 33:9, 33:10
**judgment** [1] - 116:25

**Judicial** [2] - 32:17
**Judiciary** [1] - 33:8
**July** [6] - 7:4, 28:18, 168:10, 168:11, 201:9, 201:15
**JULY** [1] - 1:19
**jump** [1] - 125:24
**June** [1] - 168:5
**Justice** [2] - 63:9, 156:1
**justification** [1] - 122:13

**K**

**Kansas** [1] - 34:20
**KEARSE** [2] - 4:2, 23:17
**keep** [2] - 66:8, 82:9
**Kelly** [1] - 6:8
**Kenneth** [1] - 60:12
**Kessler** [1] - 4:23
**Kevin** [4] - 55:6, 55:15, 55:17, 56:4
**KEVIN** [1] - 55:20
**key** [1] - 116:20
**Keyes** [13] - 80:21, 84:19, 103:10, 103:11, 103:18, 103:23, 107:14, 108:5, 108:18, 109:12, 109:15, 111:22, 112:13
**Keyes'** [4] - 104:23, 106:3, 114:18, 115:14
**kids** [1] - 117:25
**kilograms** [1] - 195:13
**kind** [42] - 11:11, 22:25, 35:17, 58:1, 65:18, 67:19, 69:19, 69:23, 74:17, 75:10, 82:24, 88:23, 91:18, 94:10, 94:25, 95:7, 96:2, 96:24, 99:5, 101:1, 101:2, 101:20, 102:22, 104:25, 107:2, 109:1, 110:6, 113:15, 119:16, 123:10, 123:20, 125:1, 132:9, 133:8, 133:21, 134:1, 143:11, 144:10, 145:23, 164:15, 180:22
**kinds** [4] - 61:14, 63:7, 118:19, 121:20
**knowledge** [7] - 15:9, 16:16, 20:18, 126:2,

134:8, 134:9, 197:10
**known** [1] - 24:1
**KOUBA** [1] - 4:11

**L**

**LA** [1] - 3:8
**labor** [2] - 57:13, 61:18
**Labor** [1] - 60:21
**laced** [1] - 137:10
**lack** [5] - 20:25, 124:21, 132:6, 153:18, 174:11
**lacking** [1] - 153:1
**laid** [3] - 181:19, 181:22, 183:14
**laissez** [1] - 119:19
**language** [1] - 188:12
**Lanier** [1] - 3:4
**large** [19] - 7:22, 26:13, 27:13, 27:15, 28:19, 30:14, 31:9, 31:18, 50:17, 123:22, 154:19, 156:21, 156:25, 158:5, 160:14, 160:17, 180:13, 184:13, 184:15
**largely** [1] - 38:2
**largest** [3] - 30:11, 31:14, 31:15
**Last** [1] - 197:6
**last** [14] - 13:16, 34:8, 73:15, 116:3, 129:1, 139:12, 148:10, 154:15, 156:8, 184:24, 193:7, 193:8, 198:21
**late** [1] - 84:15
**late-year** [1] - 84:15
**latest** [1] - 99:11
**latitude** [2] - 14:15, 189:11
**Laughter** [1] - 150:4
**LAURA** [1] - 5:10
**law** [3] - 119:17, 120:9, 149:1
**Law** [3] - 3:4, 3:7, 3:12
**laws** [3] - 15:19, 16:4, 16:7
**lead** [2] - 29:25, 115:6
**leading** [3] - 35:23, 59:3, 141:1
**leads** [1] - 121:12
**league** [1] - 198:22
**least** [1] - 123:16
**Leavenworth** [1] - 34:20
**lecture** [1] - 146:23

**lectured** [1] - 157:15
**ledgers** [1] - 54:14
**Lee** [1] - 3:12
**leeway** [1] - 182:2
**left** [21] - 73:5, 88:10, 88:19, 89:7, 95:10, 95:16, 95:22, 97:6, 97:8, 102:23, 138:8, 171:24, 172:2, 173:15, 174:2, 174:17, 176:3, 176:6, 177:2, 178:6, 183:19
**left-hand** [8] - 88:10, 88:19, 97:6, 171:24, 172:2, 176:3, 176:6, 183:19
**legal** [10] - 16:5, 16:10, 16:14, 19:2, 64:16, 67:7, 90:16, 122:18, 128:24, 164:24
**legalize** [1] - 123:18
**legalized** [1] - 125:11
**legalizing** [2] - 122:14, 125:6
**legitimate** [9] - 22:8, 22:14, 22:18, 67:7, 68:13, 147:14, 175:15, 175:16, 182:6
**length** [1] - 148:14
**Leon** [2] - 2:4, 2:14
**less** [23] - 79:23, 79:25, 89:14, 101:7, 102:25, 110:22, 119:15, 120:10, 120:13, 121:11, 121:12, 121:16, 122:21, 125:8, 132:25, 142:20, 142:21, 143:8, 143:20, 145:19, 147:13, 184:1, 195:24
**lessened** [1] - 17:19
**lesson** [1] - 117:20
**lethal** [3] - 77:25, 79:16, 79:20
**lethality** [1] - 110:3
**level** [28] - 58:5, 65:22, 66:8, 66:9, 67:25, 66:8, 68:15, 68:16, 73:4, 77:17, 78:8, 78:9, 82:7, 84:17, 84:25, 90:1, 92:13, 92:15, 94:17, 101:10, 103:18, 103:22, 110:25, 111:21, 136:23,

154:24, 155:1, 197:2
**levels** [4] - 85:16, 92:4, 93:20, 95:1
**levers** [1] - 68:8
**Levin** [1] - 2:10
**LEYIMU** [1] - 4:13
**liability** [1] - 31:12
**licensed** [4] - 14:8, 14:25, 15:20, 25:21
**licenses** [1] - 25:23
**licit** [2] - 74:23, 140:14
**lies** [1] - 67:17
**Lieutenant** [1] - 33:17
**likely** [7] - 99:20, 137:6, 137:8, 140:12, 140:16, 165:13, 184:8
**limit** [4] - 40:9, 129:5, 129:6, 190:22
**limited** [6] - 20:24, 21:13, 22:1, 116:18, 161:16, 164:19
**limits** [2] - 18:10, 129:20
**LINDA** [1] - 4:8
**line** [68] - 37:13, 37:14, 38:12, 44:8, 44:13, 44:18, 44:20, 44:21, 45:8, 45:14, 45:22, 45:23, 49:6, 49:7, 49:9, 49:14, 52:23, 53:9, 53:19, 73:1, 73:6, 73:19, 74:19, 75:15, 78:24, 78:25, 79:8, 79:9, 79:23, 80:14, 81:5, 81:6, 81:10, 81:12, 82:15, 82:16, 94:13, 94:16, 94:18, 94:19, 94:20, 95:3, 95:24, 95:25, 97:1, 97:8, 97:11, 100:22, 100:24, 100:25, 118:23, 121:1, 132:4, 132:15, 132:16, 133:12, 133:25, 134:1, 134:2, 173:1, 191:7
**lines** [6] - 53:20, 72:25, 73:3, 95:5, 95:23, 100:21
**link** [5] - 77:4, 85:7, 86:3, 90:19, 124:15
**linking** [1] - 86:4
**liquid** [13] - 41:3, 43:5, 43:7, 43:10, 44:9, 44:25, 45:1, 46:21, 48:7, 48:8, 48:10, 50:3
**Lisa** [2] - 6:18, 201:3

**list** [3] - 11:11, 148:21, 167:6
**literal** [1] - 187:25
**literature** [6] - 18:22, 99:23, 134:10, 134:14, 134:17, 135:9
**litigation** [11] - 8:11, 11:9, 29:10, 31:13, 61:12, 62:2, 155:23, 157:19, 157:25, 158:2, 180:24
**Litigation** [1] - 30:21
**litigations** [2] - 30:14, 30:16
**LLC** [1] - 2:4
**located** [1] - 32:17
**locations** [1] - 72:6
**Logan** [3] - 6:5, 6:12, 194:13
**logical** [1] - 98:7
**longevity** [2] - 59:18, 60:4
**look** [55] - 12:22, 15:7, 73:11, 74:19, 76:2, 77:13, 83:8, 83:17, 84:11, 85:12, 85:23, 85:24, 86:6, 87:19, 88:9, 91:2, 91:4, 93:6, 94:6, 95:4, 97:18, 98:22, 101:23, 102:3, 105:23, 111:11, 113:18, 121:9, 121:23, 122:1, 122:3, 124:15, 129:21, 134:14, 134:23, 135:3, 135:4, 146:20, 146:22, 149:21, 151:12, 155:13, 155:14, 159:2, 159:9, 160:9, 162:10, 179:15, 180:25, 190:9, 190:23, 193:4, 194:9
**looked** [25] - 10:3, 20:20, 45:3, 48:6, 78:5, 82:13, 84:7, 92:20, 93:19, 99:2, 109:23, 110:25, 112:21, 134:13, 153:9, 153:10, 156:18, 162:2, 162:3, 180:14, 182:22, 190:25, 191:20, 192:2, 198:23
**looking** [31] - 23:2, 30:17, 41:19, 44:5,

45:13, 45:22, 65:22, 68:25, 85:19, 86:3, 86:4, 87:19, 88:10, 88:11, 93:21, 94:5, 94:22, 95:8, 102:12, 105:2, 122:8, 134:11, 135:13, 139:20, 142:15, 144:7, 150:3, 156:17, 159:10, 159:25, 199:3
**looks** [6] - 78:22, 99:5, 121:6, 168:3, 175:1, 193:6
**Los** [1] - 56:10
**Louis** [1] - 36:4
**low** [2] - 122:2, 155:1
**lower** [1] - 100:7, 120:10
**Luis** [1] - 34:12
**lunch** [3] - 130:1, 130:3, 130:15
**Lybrand** [5] - 25:15, 26:3, 27:25, 28:2, 33:22

## M

**M-a-r-t-e-n-s** [1] - 24:15
**ma'am** [1] - 148:7
**MacArthur** [2] - 60:11
**machine** [1] - 198:14
**macro** [1] - 58:4
**macroeconomics** [1] - 57:23
**made-up** [1] - 167:24
**Magazine** [1] - 3:7
**magnitude** [4] - 43:18, 83:9, 83:13, 116:14
**magnitudes** [1] - 82:8
**MAHADY** [28] - 6:4, 24:7, 24:9, 24:13, 24:21, 35:3, 36:10, 36:20, 36:24, 37:1, 40:16, 40:23, 41:1, 43:24, 44:3, 46:3, 46:4, 47:13, 47:21, 47:22, 48:17, 48:20, 50:23, 51:4, 51:5, 51:10, 54:24, 189:20
**Mahady** [4] - 24:8, 36:19, 54:23, 189:19
**main** [1] - 152:25
**MAINIGI** [4] - 4:17, 148:8, 149:19, 149:23, 150:1, 150:5, 199:15, 199:22, 200:2, 200:11

**Mainigi** [1] - 149:16
**MAJESTRO** [11] - 2:6, 7:15, 7:17, 13:14, 13:19, 14:18, 14:19, 21:3, 21:20, 21:23, 24:4
**Majestro** [4] - 2:6, 7:13, 13:13, 14:17
**major** [1] - 198:22
**majority** [1] - 169:16
**makeup** [1] - 35:7
**males** [1] - 91:11
**malpractice** [1] - 31:15
**management** [1] - 156:20
**mandatory** [1] - 28:11
**manner** [1] - 35:10
**manual** [1] - 188:14
**manufacturers** [4] - 31:2, 65:5, 128:9, 128:14
**manufacturing** [1] - 156:19
**March** [1] - 168:4
**margin** [1] - 147:16
**marijuana** [1] - 125:11
**mark** [1] - 147:8
**MARK** [1] - 3:14
**market** [24] - 58:10, 63:24, 65:24, 66:3, 67:2, 74:1, 98:17, 98:18, 99:16, 99:17, 101:14, 101:16, 101:24, 119:20, 123:23, 124:17, 140:7, 155:13, 155:15, 184:25, 185:2, 185:12, 185:20, 186:18
**marketplace** [6] - 66:1, 67:8, 73:21, 75:13, 124:20, 132:10
**markets** [15] - 9:2, 57:12, 57:13, 58:2, 58:5, 58:9, 59:20, 60:3, 64:6, 64:7, 64:10, 119:5, 124:22, 127:14
**MARTENS** [1] - 24:18
**Martens** [26] - 24:10, 24:15, 24:22, 24:24, 25:1, 25:3, 25:16, 32:6, 34:21, 34:24, 35:5, 36:11, 37:2, 37:23, 40:21, 41:19, 44:4, 45:25, 46:5, 47:23, 48:18, 48:21, 49:21, 51:6, 51:11,

55:2
**Mary's** [1] - 40:6
**Master** [2] - 30:21
**Master's** [1] - 36:2
**Masters** [9] - 187:25, 188:6, 188:7, 188:9, 188:12, 188:14, 188:18, 188:22, 193:3
**match** [2] - 41:25, 53:7
**matched** [1] - 41:24
**materials** [1] - 23:3, 23:5, 33:3, 64:12, 64:21, 166:8, 166:14, 182:13, 185:5, 191:8, 191:22
**math** [4] - 52:12, 52:13, 53:10, 106:25
**mathematics** [3] - 105:1, 106:24, 133:22
**matrix** [1] - 192:5
**matter** [21] - 30:10, 30:20, 30:22, 31:14, 32:5, 34:22, 35:4, 35:21, 36:7, 63:16, 64:11, 72:16, 74:3, 116:16, 116:19, 120:25, 130:18, 164:18, 165:19, 201:5
**matters** [20] - 27:8, 28:19, 28:21, 29:9, 29:21, 29:23, 31:1, 31:8, 31:15, 31:17, 31:22, 61:12, 61:13, 61:14, 61:25, 62:12, 156:16, 156:18, 157:23, 181:4
**maximizing** [1] - 68:24
**maximum** [10] - 167:10, 168:5, 168:8, 168:15, 168:25, 174:19, 175:2, 193:7, 193:8, 193:16
**MBA** [2] - 25:9, 25:10
**McCann** [67] - 39:6, 39:9, 39:11, 39:12, 42:8, 52:9, 151:13, 151:20, 152:13, 152:16, 152:18, 153:3, 153:20, 154:11, 154:19, 159:7, 159:9, 161:2, 161:7, 161:8, 161:13, 161:16, 162:2, 162:9,

162:16, 163:21, 164:13, 164:17, 164:19, 165:4, 165:23, 166:6, 166:13, 169:1, 169:9, 169:14, 170:9, 170:12, 170:19, 170:23, 171:3, 172:13, 172:16, 172:22, 174:3, 175:8, 176:5, 176:20, 178:8, 178:11, 178:20, 180:3, 180:14, 184:13, 184:17, 185:7, 186:3, 186:6, 186:24, 188:17, 188:24, 188:25, 194:3, 194:17, 198:16, 199:2
**McCann's** [73] - 38:3, 51:22, 52:12, 52:13, 153:12, 154:6, 155:3, 155:14, 159:1, 159:2, 159:16, 159:20, 159:25, 160:25, 161:2, 161:23, 161:25, 162:5, 162:7, 162:12, 166:1, 166:9, 166:10, 166:15, 167:19, 167:22, 168:3, 168:22, 169:24, 170:2, 171:4, 171:14, 171:25, 172:3, 172:4, 172:10, 172:25, 173:13, 173:18, 173:23, 174:5, 174:9, 174:24, 175:25, 176:7, 176:10, 176:23, 177:16, 177:20, 178:1, 178:15, 180:9, 180:20, 181:9, 182:1, 182:19, 183:17, 184:5, 184:12, 186:1, 186:18, 190:10, 190:23, 191:20, 192:1, 192:13, 192:17, 193:6, 194:16, 194:18, 198:1, 199:3
**MCCLURE** [1] - 6:3
**MCGINNESS** [1] - 4:2
**McKesson** [21] - 5:8, 155:10, 161:12, 163:11, 163:18,

164:6, 164:10, 164:11, 167:15, 169:18, 170:25, 185:9, 185:22, 186:4, 190:14, 190:19, 191:23, 194:1, 194:5, 194:21, 194:23
**McKesson's** [1] - 155:13, 184:25, 185:2, 185:12, 185:19, 186:10, 186:20, 191:2, 191:17, 191:21
**mean** [38] - 34:5, 70:22, 73:23, 82:7, 83:11, 94:9, 112:18, 116:6, 116:16, 119:10, 119:11, 120:8, 120:9, 122:22, 123:2, 124:13, 125:8, 125:16, 126:5, 127:7, 128:7, 133:7, 135:25, 136:6, 136:8, 136:13, 136:16, 136:17, 136:20, 140:3, 141:3, 143:7, 143:10, 143:14, 143:15, 188:16, 188:24
**meaningful** [1] - 69:12
**means** [13] - 72:2, 72:5, 89:12, 108:13, 121:11, 121:12, 131:18, 133:23, 143:21, 154:13, 164:21, 169:25, 177:14
**measure** [13] - 17:18, 66:6, 73:13, 73:25, 87:20, 87:23, 90:9, 132:8, 132:10, 197:22
**measured** [5] - 74:21, 131:19, 131:24, 132:11, 132:13
**measurement** [1] - 132:6
**measuring** [3] - 73:2, 97:7, 97:9
**mechanical** [1] - 6:19
**medal** [1] - 60:7
**Medal** [1] - 34:19
**Medicaid** [2] - 18:22, 20:6
**Medical** [2] - 185:23, 186:12
**medical** [5] - 22:9,

22:10, 22:14, 22:18, 135:9
**Medicare** [1] - 181:5
**Medicare/Medicaid** [1] - 181:3
**medication** [4] - 41:21, 41:22, 47:8, 48:3
**medications** [22] - 37:15, 37:17, 37:18, 41:10, 41:11, 41:14, 42:11, 42:13, 42:15, 46:8, 47:1, 47:3, 48:2, 48:6, 48:9, 48:14, 49:10, 50:11, 50:18
**meet** [2] - 51:16, 141:23
**member** [7] - 26:5, 26:11, 32:16, 32:19, 60:19, 60:20, 60:21
**members** [2] - 30:2, 34:13
**men** [3] - 91:8, 91:10, 91:13
**mentioned** [10] - 61:7, 67:16, 90:14, 96:13, 144:17, 149:16, 152:16, 153:16, 154:2, 199:16
**mentors** [1] - 57:5
**merge** [1] - 27:25
**merged** [1] - 28:2
**merger** [1] - 156:25
**Meritorious** [1] - 34:18
**mess** [2] - 107:22, 139:13
**messed** [1] - 113:16
**met** [2] - 15:11, 187:13
**Method** [42] - 154:7, 154:8, 167:9, 167:14, 167:22, 168:3, 168:20, 169:9, 169:12, 171:6, 171:25, 172:4, 172:17, 173:5, 173:13, 173:23, 174:5, 174:7, 174:9, 174:17, 174:18, 174:23, 174:25, 175:3, 175:4, 175:12, 175:14, 175:20, 176:1, 176:7, 176:15, 176:23, 177:5, 177:8, 178:1, 178:6, 178:9, 183:17, 184:5, 188:16
**method** [1] - 177:9

**methodological** [1] - 115:1
**methodologies** [28] - 151:18, 151:20, 152:6, 152:11, 152:12, 152:19, 152:22, 152:23, 153:6, 153:19, 154:5, 154:16, 159:5, 159:7, 160:25, 165:18, 165:24, 166:2, 166:7, 166:11, 166:20, 167:1, 186:2, 186:3, 187:16, 187:21
**methodology** [17] - 82:17, 103:10, 104:23, 104:25, 106:5, 108:1, 108:2, 111:24, 112:12, 112:16, 113:24, 115:10, 123:12, 159:22, 189:2, 191:2, 193:3
**Methodology** [5] - 167:19, 187:24, 190:13, 191:2, 191:4
**methods** [3] - 171:21, 178:17, 178:21
**Methods** [5] - 167:3, 167:6, 167:7, 177:20
**Mexico** [1] - 100:1
**mic** [1] - 12:4
**MICHAEL** [2] - 2:12, 3:9
**Michigan** [1] - 156:5
**micro** [1] - 58:15
**microeconomics** [7] - 57:12, 57:16, 57:19, 57:21, 58:1, 60:1, 64:4
**middle** [2] - 91:20, 148:15
**middle-age** [1] - 91:20
**might** [19] - 16:6, 16:7, 65:21, 68:2, 69:18, 71:16, 119:24, 121:18, 122:18, 142:22, 149:8, 150:2, 162:22, 162:23, 178:23, 179:18, 180:15, 181:2
**MILDRED** [1] - 3:3
**military** [3] - 30:1, 33:14, 34:1
**mill** [2] - 20:18, 20:19
**milligram** [1] - 131:23
**million** [8] - 13:5,

13:21, 23:10, 53:10, 53:12, 53:16, 105:5, 105:6
**Milton** [2] - 57:3, 125:13
**mind** [6] - 30:10, 30:20, 42:14, 44:1, 66:8, 82:9
**mine** [2] - 122:7, 125:18
**Mingo** [3] - 196:10, 196:12, 196:22
**minimum** [1] - 62:23
**Minneapolis** [1] - 30:15
**minute** [8] - 40:15, 77:16, 104:5, 111:20, 117:11, 147:6, 196:13
**minutes** [3] - 28:22, 117:13, 130:6
**mis** [1] - 110:9
**mis-calibrated** [1] - 110:9
**misinterpretation** [1] - 71:18
**missed** [2] - 110:6, 147:19
**Mississippi** [11] - 97:4, 97:5, 97:7, 97:10, 100:18, 111:2, 111:7, 137:5, 137:9, 137:12
**misstates** [1] - 147:3
**misuse** [3] - 134:18, 142:9, 144:13
**misused** [2] - 133:22, 136:7
**misuses** [2] - 144:1
**misusing** [1] - 142:7
**Mitchell** [1] - 2:10
**mix** [3] - 37:16, 46:10, 100:9
**mixed** [1] - 79:15
**MME** [6] - 73:8, 88:6, 97:7, 122:9, 131:14, 131:17
**MMEs** [5] - 73:5, 121:25, 122:6, 122:9
**modal** [1] - 94:17
**mode** [2] - 95:13, 95:14
**model** [5] - 116:17, 123:17, 125:25, 176:16
**modeling** [4] - 124:7, 124:12, 152:18, 157:13
**models** [3] - 128:17, 153:17, 157:8

**molecular** [1] - 146:11
**molecule** [2] - 146:11, 146:12
**moment** [4] - 77:24, 78:10, 136:24, 141:18
**moments** [1] - 165:22
**monitor** [1] - 15:25
**Monitoring** [2] - 158:17, 198:17
**month** [16] - 167:10, 168:2, 168:9, 168:13, 172:9, 174:18, 193:15, 193:18, 193:23, 193:24, 194:10, 194:14, 194:22, 194:24, 196:23
**monthly** [4] - 167:10, 172:9, 174:19, 193:16
**months** [10] - 168:4, 168:6, 168:16, 168:25, 175:2, 192:20, 193:7, 193:9, 193:16, 193:24
**morality** [2] - 83:22, 85:15
**morning** [18] - 7:5, 7:11, 7:12, 24:7, 24:8, 24:22, 24:23, 51:15, 51:17, 55:23, 55:24, 56:2, 150:23, 151:7, 199:19, 199:21, 199:23, 200:6
**morphine** [5] - 131:19, 131:22, 131:25, 132:1, 146:12
**Morris** [1] - 6:15
**mortalities** [1] - 78:4
**mortality** [117] - 69:11, 70:1, 70:3, 70:20, 70:21, 72:13, 74:21, 74:22, 74:25, 75:9, 75:15, 75:17, 75:18, 76:6, 76:14, 76:21, 77:2, 77:15, 77:19, 77:22, 78:11, 78:13, 78:14, 78:23, 80:3, 80:4, 80:8, 80:25, 82:1, 82:19, 82:20, 83:18, 84:6, 84:13, 84:15, 84:16, 85:9, 85:20, 85:21, 86:21, 86:23, 87:16, 87:23, 88:1, 88:9, 88:10, 88:11, 88:16, 89:11, 90:1, 91:16, 91:19,

91:21, 91:24, 92:3,
92:10, 92:14, 92:21,
93:1, 94:1, 94:2,
95:17, 95:18, 96:14,
96:19, 96:20, 97:1,
97:18, 97:21, 97:23,
97:24, 98:1, 98:3,
98:21, 98:25, 99:5,
99:8, 99:13, 100:17,
101:6, 101:15,
104:1, 105:3,
105:14, 105:17,
105:21, 106:1,
107:20, 108:4,
108:9, 108:14,
108:17, 109:16,
109:18, 109:19,
109:25, 110:1,
110:5, 110:12,
110:17, 110:21,
111:1, 111:22,
112:2, 112:21,
114:1, 114:2, 114:4,
114:11, 115:2,
115:4, 117:4, 138:7,
138:8, 139:1, 139:3,
139:8
**most** [15] - 33:4, 57:2,
59:22, 79:5, 80:18,
92:2, 98:7, 128:17,
132:10, 134:22,
135:3, 155:21,
155:24, 158:2, 196:8
**mostly** [2] - 80:16,
100:2
**motivated** [3] - 18:5,
22:17, 22:18
**Motley** [5] - 4:3, 4:5,
4:8, 4:11, 4:14
**MOUGEY** [1] - 2:9
**mouthful** [1] - 174:21
**move** [12] - 34:6,
36:24, 45:25, 47:14,
49:19, 50:23, 66:17,
70:4, 71:9, 142:18,
143:7, 143:19
**moved** [2] - 90:21,
149:4
**moves** [1] - 145:19,
193:23
**moving** [7] - 34:2,
95:21, 96:12,
125:11, 134:15,
148:12, 149:3
**MR** [156] - 2:3, 2:6,
2:9, 2:12, 3:9, 3:11,
3:14, 4:5, 4:22, 5:9,
5:10, 5:13, 6:4, 7:15,
7:17, 13:7, 13:14,
13:19, 14:10, 14:18,

14:19, 20:25, 21:3,
21:14, 21:20, 21:23,
23:19, 24:4, 24:7,
24:9, 24:13, 24:21,
35:3, 36:10, 36:14,
36:20, 36:24, 37:1,
40:16, 40:17, 40:23,
41:1, 43:24, 44:3,
46:3, 46:4, 47:9,
47:13, 47:18, 47:21,
47:22, 48:17, 48:20,
50:23, 51:2, 51:4,
51:5, 51:10, 51:14,
52:20, 52:22, 54:24,
55:1, 55:5, 55:8,
55:14, 56:1, 57:8,
57:10, 63:11, 63:15,
63:22, 70:4, 70:16,
72:19, 72:21, 81:20,
81:22, 92:5, 92:8,
104:8, 104:15,
104:18, 104:21,
106:7, 106:17,
106:20, 115:22,
115:25, 116:3,
116:6, 116:10,
117:7, 117:10,
117:16, 117:18,
118:1, 118:4, 120:3,
121:3, 121:7,
127:15, 127:20,
127:23, 129:14,
129:18, 130:1,
130:3, 130:7,
130:11, 130:14,
130:16, 130:20,
130:24, 131:7,
131:10, 134:20,
138:2, 138:3,
141:18, 141:21,
142:1, 142:4, 145:9,
146:4, 146:7, 146:9,
147:3, 147:8, 147:9,
147:17, 148:2,
158:8, 158:10,
158:13, 160:3,
160:6, 163:14,
164:22, 181:18,
182:8, 182:25,
187:12, 187:15,
187:19, 189:13,
189:20, 190:2,
191:9, 191:13,
191:15, 192:19,
192:22, 196:21,
199:6, 199:11
**MS** [76] - 3:3, 3:6, 4:2,
4:8, 4:11, 4:13, 4:17,
4:18, 4:20, 5:3, 5:4,
5:10, 6:3, 6:7, 6:14,
23:17, 127:18,

129:15, 148:8,
149:19, 149:23,
150:1, 150:5,
150:11, 150:25,
151:2, 151:4, 152:1,
152:5, 155:6, 155:8,
158:4, 160:12,
160:19, 160:22,
160:23, 163:19,
164:1, 164:2, 165:2,
165:8, 165:16,
166:16, 166:18,
167:14, 167:17,
170:5, 170:7,
171:16, 171:18,
174:14, 174:16,
177:22, 177:24,
179:1, 179:3,
181:11, 181:13,
181:23, 182:11,
182:16, 182:17,
183:5, 184:21,
184:23, 185:15,
185:17, 186:25,
189:7, 191:5,
196:15, 199:9,
199:15, 199:22,
200:2, 200:11
**Mt** [3] - 4:4, 4:12, 4:15
**Mulligan** [1] - 122:8
**multiple** [4] - 109:25,
144:25, 145:2, 157:5
**multiplied** [1] - 42:21
**multiplier** [1] - 114:13
**multiply** [1] - 105:6
**Murphy** [62] - 55:6,
55:15, 55:17, 56:2,
56:4, 56:8, 56:23,
57:9, 57:19, 58:19,
60:5, 61:7, 63:12,
63:23, 67:16, 70:13,
70:19, 71:1, 72:11,
72:22, 74:20, 76:19,
78:17, 80:24, 81:23,
82:6, 82:12, 83:12,
84:4, 88:3, 92:9,
94:6, 98:14, 98:24,
100:14, 101:13,
102:14, 103:9,
104:8, 104:10,
104:22, 106:19,
106:21, 107:24,
108:1, 111:20,
116:7, 116:11,
117:7, 123:14,
130:5, 130:17,
130:22, 131:2,
131:4, 131:11,
142:5, 143:24,
146:4, 146:10,

148:1, 148:3
**MURPHY** [1] - 55:20
**must** [1] - 153:22

**N**

**name** [9] - 24:14,
35:24, 51:15, 55:16,
56:4, 117:19,
150:15, 151:7,
158:14
**names** [1] - 38:10
**Nate** [2] - 190:18,
191:1
**National** [9] - 32:16,
32:17, 33:18, 33:21,
33:25, 34:11, 34:17,
61:1, 61:4
**national** [10] - 38:13,
92:13, 100:21,
102:14, 102:15,
110:18, 111:13,
111:15, 114:7, 157:1
**nationally** [2] - 101:9,
112:21
**nationwide** [1] - 92:10
**natural** [1] - 119:20
**nature** [13] - 38:15,
42:16, 98:8, 98:17,
99:16, 99:23,
115:20, 120:21,
125:2, 161:6,
163:21, 163:22,
165:4
**NBER** [1] - 61:4
**NDC** [3] - 38:13,
41:23, 41:24
**necessary** [1] - 17:12
**need** [21] - 14:20,
65:11, 67:12, 76:7,
76:10, 76:11, 76:12,
76:13, 107:12,
107:16, 108:12,
108:16, 111:12,
111:13, 113:10,
114:1, 114:2, 114:4,
136:7, 150:9, 164:3
**needs** [1] - 175:6
**negative** [1] - 76:1
**net** [2] - 30:17, 112:4
**Netherlands** [1] - 30:4
**Nevada** [1] - 32:18
**never** [6] - 8:25, 9:16,
11:8, 117:21, 189:9,
192:11
**New** [9] - 3:5, 3:8,
25:2, 25:21, 27:1,
33:17, 33:25, 34:4,
34:17
**new** [2] - 74:24,

149:22
**newly** [2] - 34:8, 34:9
**news** [2] - 149:15,
150:2
**next** [23] - 24:10,
34:14, 45:25, 49:19,
55:6, 55:15, 78:15,
80:24, 82:4, 90:13,
100:13, 120:3,
130:5, 139:11,
148:15, 148:17,
149:6, 149:13,
168:13, 192:19,
193:23, 194:7, 194:8
**nice** [2] - 82:4, 104:18
**NICHOLAS** [2] - 6:11,
21:14
**nine** [1] - 30:3
**Ninth** [1] - 4:9
**Nobel** [1] - 57:2
**non** [29] - 21:21, 30:1,
31:2, 37:14, 37:17,
41:11, 41:14, 41:21,
42:10, 42:13, 42:18,
43:10, 44:11, 44:24,
45:10, 45:14, 46:12,
47:3, 47:7, 48:2,
49:24, 50:11, 50:18,
109:10, 110:1,
113:4, 113:7,
121:14, 125:25
**non-addictive** [1] -
121:14
**non-control** [1] -
21:21
**non-fentanyl** [3] -
110:1, 113:4, 113:7
**non-graphic** [1] -
125:25
**non-military** [1] - 30:1
**non-opioid** [18] -
37:14, 37:17, 41:11,
41:14, 41:21, 42:10,
42:13, 44:11, 45:10,
45:14, 46:12, 47:3,
47:7, 48:2, 49:24,
50:11, 50:18, 109:10
**non-opioids** [3] -
42:18, 43:10, 44:24
**non-participating** [1] -
31:2
**None** [1] - 9:3
**none** [2] - 89:12,
200:9
**nonprescription** [1] -
93:18
**note** [2] - 83:3, 189:20
**noted** [1] - 125:5
**notes** [1] - 160:9
**Nothing** [3] - 24:3,

29:2, 199:9
**nothing** [5] - 29:2,
70:24, 87:2, 146:3,
182:25
**notice** [1] - 148:19
**notion** [1] - 69:8
**notions** [2] - 72:8,
89:4
**nowhere** [3] - 16:19,
196:1, 196:3
**number** [72] - 7:19,
7:25, 32:3, 46:1,
57:2, 58:21, 59:2,
59:10, 60:14, 61:16,
61:20, 61:24, 62:8,
62:11, 73:24, 78:18,
83:16, 89:9, 91:6,
103:25, 105:9,
105:23, 107:18,
108:3, 108:7,
108:11, 108:13,
108:19, 108:23,
111:6, 111:11,
111:14, 111:15,
112:5, 112:8, 112:9,
113:6, 113:9,
113:10, 113:19,
113:21, 113:22,
114:6, 114:7, 114:9,
114:11, 114:12,
114:13, 114:15,
114:16, 114:21,
115:6, 115:8,
115:11, 115:13,
115:17, 117:20,
136:18, 137:22,
138:14, 139:4,
171:17, 175:23,
177:23, 180:18,
181:12, 184:18,
185:16, 186:24,
195:12, 198:21
**numbers** [12] - 38:13,
47:24, 50:22, 53:8,
88:21, 94:24, 108:5,
111:22, 116:24,
154:9, 168:1, 179:13
**numerator** [2] - 111:9,
115:1
**NW** [6] - 4:6, 4:9, 4:19,
4:21, 5:5, 5:12
**NY** [1] - 3:5

## O

**obeys** [2] - 120:9
**Obispo** [1] - 34:12
**object** [12] - 13:11,
14:10, 20:25, 21:14,
21:16, 121:3,

127:15, 129:14,
134:20, 160:4,
189:21, 196:16
**objection** [22] - 13:7,
14:16, 36:13, 36:15,
40:18, 47:16, 51:2,
63:14, 70:10, 70:12,
106:8, 106:15,
129:17, 134:25,
145:9, 158:7,
163:14, 164:22,
165:7, 181:18,
189:7, 196:17
**objections** [1] - 51:1
**obligated** [1] - 195:22
**obligation** [2] -
180:18, 182:20
**obligations** [1] -
154:25
**observation** [1] - 45:4
**observations** [2] -
45:2, 47:24
**observe** [4] - 85:9,
92:1, 143:24, 145:1
**observed** [1] - 72:1
**obtained** [3] - 152:15,
159:13, 160:1
**obtaining** [1] - 25:10
**obviously** [6] - 63:19,
75:18, 77:17, 84:14,
107:19, 149:17
**occasion** [1] - 78:2
**occasionally** [1] -
157:21
**occasions** [1] - 30:13
**occurred** [1] - 181:20
**occurring** [1] - 84:17
**occurs** [1] - 163:4
**OF** [2] - 1:1, 1:4
**offer** [4] - 11:4, 51:6,
158:25, 159:14
**offered** [5] - 32:21,
33:7, 128:23,
154:15, 179:5
**offering** [7] - 12:5,
13:10, 15:10, 16:3,
37:2, 159:22, 163:17
**office** [1] - 27:1
**officer** [2] - 33:18,
34:2
**Official** [2] - 201:2,
201:3
**often** [6] - 128:15,
144:8, 146:2,
155:24, 179:11,
179:13
**oil** [2] - 66:15
**older** [10] - 91:6, 91:7,
91:8, 91:13, 91:15,
91:21, 91:22, 92:25,

95:20
**once** [14] - 35:1, 38:8,
46:7, 68:14, 157:24,
166:19, 169:2,
173:18, 175:3,
175:8, 189:15,
190:6, 193:19
**Once** [1] - 41:15
**one** [101] - 15:17, 16:2,
25:14, 30:11, 31:14,
44:13, 45:4, 45:9,
48:5, 51:18, 57:5,
58:13, 60:25, 62:23,
63:25, 65:21, 72:9,
75:4, 75:24, 75:25,
76:4, 77:5, 79:12,
79:18, 79:24, 79:25,
84:14, 85:23, 88:3,
88:24, 89:7, 91:6,
92:13, 93:21, 96:12,
98:7, 100:15, 102:1,
102:18, 102:20,
109:19, 110:6,
110:9, 110:18,
111:8, 113:17,
114:16, 115:19,
116:13, 117:21,
118:2, 118:3, 122:1,
122:12, 129:1,
130:16, 133:12,
133:13, 135:7,
139:12, 142:1,
143:8, 144:1, 144:7,
144:9, 145:16,
145:19, 145:21,
145:22, 145:23,
150:6, 153:1,
154:11, 154:12,
155:24, 162:24,
164:23, 174:11,
179:11, 184:14,
192:20, 194:8,
195:21, 195:22,
196:7, 196:23,
197:23, 198:21,
199:2
**One** [1] - 5:11
**ones** [6] - 42:14,
60:22, 78:20,
140:23, 149:22,
165:13
**open** [1] - 22:3
**operate** [3] - 58:6,
164:7, 166:11
**operated** [2] - 163:12,
163:22
**operates** [2] - 167:19,
174:24
**operation** [1] - 61:11
**operations** [1] - 34:15

**opiate** [1] - 13:5
**opine** [2] - 16:20,
163:22
**opining** [1] - 18:1
**opinion** [24] - 12:12,
84:25, 106:4,
107:13, 123:9,
128:23, 139:19,
153:17, 159:15,
159:22, 162:12,
164:18, 165:6,
171:4, 174:9, 177:8,
177:17, 179:5,
181:22, 182:4,
182:6, 183:3,
194:25, 195:1
**opinions** [21] - 11:4,
12:5, 12:19, 13:10,
15:11, 16:3, 30:6,
36:25, 37:2, 37:7,
37:9, 37:12, 37:13,
38:1, 38:17, 38:20,
51:6, 151:16,
155:17, 158:25,
163:17
**opioid** [101] - 7:19,
9:22, 10:15, 10:22,
11:9, 16:12, 16:21,
17:20, 18:15, 20:4,
20:10, 22:24, 23:10,
37:14, 37:17, 37:18,
37:22, 41:10, 41:11,
41:14, 41:20, 41:21,
41:22, 42:1, 42:4,
42:10, 42:13, 42:24,
44:10, 44:11, 45:10,
45:11, 45:14, 45:15,
45:18, 46:12, 46:13,
47:1, 47:3, 47:7,
48:2, 48:3, 49:15,
49:24, 50:6, 50:10,
50:11, 50:18, 50:19,
69:11, 70:1, 70:20,
72:13, 74:22, 74:25,
75:15, 75:18, 76:15,
76:20, 77:15, 77:21,
78:1, 78:4, 79:8,
79:9, 80:3, 80:4,
80:25, 81:25, 83:18,
84:5, 84:6, 84:12,
84:22, 85:9, 94:8,
94:20, 96:13, 96:19,
98:25, 99:5, 109:10,
112:21, 126:3,
126:4, 126:5,
126:15, 132:12,
132:16, 132:20,
132:25, 134:18,
138:13, 140:1,
142:9, 180:24

**opioid-related** [1] -
72:13
**opioids** [116] - 9:2,
10:9, 10:12, 11:6,
14:5, 14:22, 15:2,
15:15, 16:8, 20:23,
21:12, 42:18, 42:21,
43:10, 44:24, 47:7,
52:23, 64:14, 65:8,
65:12, 65:15, 66:23,
66:24, 67:13, 68:6,
68:10, 68:12, 69:1,
69:5, 69:10, 69:17,
69:20, 69:21, 70:1,
70:20, 72:12, 73:24,
74:23, 75:16, 75:20,
77:1, 77:18, 78:3,
78:24, 79:3, 79:14,
84:12, 85:8, 86:1,
86:2, 86:11, 87:16,
90:15, 90:16, 90:21,
90:22, 91:1, 93:5,
93:18, 96:5, 96:6,
96:8, 96:9, 99:1,
102:10, 102:11,
103:3, 109:11,
109:24, 126:1,
126:10, 129:11,
132:18, 132:24,
133:15, 134:4,
135:6, 135:12,
135:16, 135:23,
136:4, 136:19,
136:25, 137:22,
137:23, 139:22,
141:4, 141:9, 142:7,
142:12, 142:19,
142:20, 142:21,
143:2, 144:14,
144:18, 144:23,
145:6, 146:10,
146:16, 147:1,
147:12, 147:15,
163:13, 164:8,
183:25, 185:3,
185:23, 186:4,
194:22, 195:4,
197:17
**opium** [3] - 120:24,
121:22, 140:14
**opportunity** [1] -
32:12
**opposed** [4] - 18:16,
111:14, 172:23,
177:4
**opposition** [1] - 125:6
**orange** [5] - 46:13,
49:7, 49:14, 53:19,
53:20
**orangish** [1] - 100:24

**Order** [2] - 158:16, 198:17
**order** [17] - 43:18, 67:6, 68:21, 69:3, 110:16, 128:2, 163:5, 163:20, 164:19, 165:23, 170:17, 170:25, 175:24, 185:5, 189:15, 190:6
**ordered** [1] - 34:13
**orders** [35] - 68:19, 69:7, 129:12, 162:17, 162:20, 162:22, 162:23, 162:25, 163:2, 163:4, 163:8, 163:13, 164:8, 164:9, 164:11, 164:15, 164:16, 164:20, 164:25, 165:11, 165:12, 167:23, 168:19, 168:20, 171:1, 171:5, 174:10, 177:10, 189:1, 189:5, 191:18, 197:11, 197:12, 197:21
**organizations** [1] - 60:16
**orient** [1] - 151:16
**orientation** [1] - 131:12
**originally** [1] - 141:11
**Orleans** [1] - 3:8
**ostensibly** [1] - 153:7
**otherwise** [1] - 129:4
**OUD** [26] - 103:10, 103:11, 103:19, 103:23, 104:3, 107:15, 108:2, 108:15, 108:17, 108:20, 108:22, 109:7, 109:10, 109:11, 109:13, 110:15, 111:17, 111:23, 112:5, 114:5, 114:14, 114:19, 114:22, 115:8, 115:13, 115:20
**outcome** [13] - 65:25, 66:10, 69:24, 73:11, 73:12, 73:13, 74:1, 74:4, 87:8, 87:9, 87:22, 90:2
**outcomes** [2] - 84:23, 86:25
**outlets** [1] - 65:6

**outline** [2] - 24:5, 82:5
**outpacing** [2] - 45:10, 45:14
**output** [9] - 65:22, 66:9, 66:12, 107:6, 107:8, 107:10, 107:11, 116:20
**outset** [1] - 179:4
**outside** [10] - 8:11, 10:23, 20:14, 20:17, 68:14, 71:16, 128:24, 161:18, 163:15, 180:23
**Outside** [1] - 8:16
**outstanding** [2] - 60:9, 60:13
**overall** [3] - 37:21, 45:5, 113:9
**overdose** [7] - 69:20, 77:6, 93:20, 94:23, 104:1, 108:21, 109:11
**overdosed** [3] - 102:10, 109:8, 109:9
**overdoses** [8] - 69:18, 95:6, 102:12, 109:6, 109:13, 137:11, 137:23, 140:1
**overdosing** [4] - 90:16, 96:4, 96:5, 140:14
**overestimating** [1] - 112:1
**overlap** [3] - 53:3, 81:7, 83:5
**overlaps** [1] - 83:4
**overly** [1] - 122:15
**overrule** [5] - 14:16, 70:11, 106:14, 134:25, 165:6
**Overruled** [2] - 182:14, 191:14
**overruled** [6] - 13:17, 21:2, 116:8, 145:13, 163:24, 189:25
**oversee** [1] - 36:5
**oversight** [1] - 119:19
**overstates** [1] - 111:24
**oversupply** [1] - 65:15
**overview** [1] - 155:17
**overwhelming** [1] - 90:11
**overwhelmingly** [2] - 67:14, 83:20
**own** [4] - 13:2, 14:1, 166:12, 191:17
**oxy** [2] - 155:2, 183:25
**oxycodone** [4] - 183:8, 186:10,

186:20, 197:3

## P

**P-1200** [1] - 2:7
**p.m** [3] - 130:23, 187:7, 200:12
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**page** [3] - 138:6, 169:18, 169:19
**Page** [5] - 139:11, 152:2, 166:17, 167:15, 174:15
**paid** [5] - 9:5, 9:8, 20:10, 20:23, 21:12
**pain** [2] - 10:16, 10:20
**panel** [5] - 88:10, 88:11, 88:19, 89:13, 97:6
**Papantonio** [1] - 2:10
**paper** [3] - 60:13, 112:20
**papers** [11] - 58:21, 58:23, 103:14, 106:4, 120:16, 120:21, 122:13, 124:6, 134:13, 166:4
**Paragraph** [1] - 159:14
**paragraph** [1] - 159:21
**parallel** [2] - 132:25, 133:2
**paraphrasing** [1] - 140:3
**pardon** [1] - 158:9
**parked** [1] - 70:9
**part** [25] - 8:2, 13:16, 14:6, 14:23, 15:14, 28:19, 30:14, 30:23, 33:13, 51:23, 58:15, 61:10, 64:3, 71:5, 71:7, 72:15, 110:22, 128:15, 147:19, 154:25, 188:18, 189:2, 191:12
**participants** [2] - 14:7, 14:24
**participating** [1] - 31:2
**particular** [21] - 58:8, 61:14, 66:22, 66:24, 68:11, 77:25, 83:21, 96:14, 96:19, 116:22, 132:11, 133:10, 137:7, 145:5, 153:10, 159:22, 168:1, 169:4, 181:6, 192:24, 196:7

**particularity** [1] - 99:18
**particularly** [7] - 60:2, 76:12, 84:16, 91:22, 93:6, 98:18, 137:11
**partner** [4] - 24:10, 26:9, 26:17, 26:22, 28:4, 28:13, 28:16, 29:3, 29:5, 31:3, 33:21
**partner-type** [1] - 28:16
**parts** [5] - 58:17, 86:8, 98:9, 99:25
**party** [1] - 11:1
**pass** [1] - 117:8
**passed** [1] - 125:17
**past** [4] - 11:12, 33:10, 126:14, 126:19
**patent** [1] - 61:18
**pathway** [1] - 143:5
**patient** [9] - 11:3, 23:6, 67:23, 67:24, 67:25, 68:1, 74:9, 126:24, 127:3
**patients** [8] - 10:15, 67:21, 68:2, 74:7, 74:10, 127:6, 127:24, 140:12
**patients'** [1] - 10:20
**pattern** [9] - 82:24, 88:24, 97:13, 97:16, 197:15, 197:16, 198:11, 198:15, 198:24
**patterns** [4] - 59:15, 82:5, 92:17, 145:1
**PAUL** [2] - 2:3, 5:9
**Paul** [6] - 30:15, 40:24, 51:15, 117:19, 158:15, 187:13
**pause** [2] - 73:17, 84:10
**Pause** [2] - 130:13, 141:20
**pay** [2] - 22:19, 125:3
**payer** [5] - 10:22, 11:1, 18:5, 21:24, 22:19
**Payer** [3] - 20:23, 21:9, 21:12
**payers** [24] - 7:18, 10:1, 10:7, 10:8, 10:11, 10:19, 11:7, 13:8, 15:14, 15:20, 15:24, 16:3, 16:7, 16:12, 16:16, 17:16, 17:19, 18:19, 19:12, 21:18, 22:23, 23:10, 74:14

**Payers** [3] - 15:14, 19:22, 23:6
**payers'** [3] - 8:4, 16:20, 18:1
**paying** [3] - 7:18, 22:1, 22:13
**payment** [2] - 10:12, 64:8
**payments** [2] - 20:12, 20:16
**peak** [5] - 45:18, 83:13, 83:15, 94:18, 95:2
**peaked** [1] - 45:20
**peaking** [1] - 83:1
**peaks** [2] - 73:9, 81:15
**PEARL** [1] - 3:6
**pedigree** [1] - 51:18
**peer** [1] - 8:25
**peer-reviewed** [1] - 8:25
**pending** [2] - 30:14, 31:16
**Pensacola** [1] - 2:11
**people** [95] - 23:13, 35:10, 35:12, 35:24, 57:3, 57:23, 66:14, 66:16, 66:17, 71:13, 74:22, 74:23, 76:23, 79:13, 79:24, 85:25, 86:4, 90:19, 91:12, 91:15, 91:21, 91:23, 92:25, 93:3, 93:17, 94:10, 95:19, 99:22, 99:23, 102:9, 105:5, 108:22, 109:2, 109:3, 109:10, 118:18, 119:14, 122:5, 123:9, 123:22, 123:24, 124:18, 124:24, 125:10, 125:18, 125:21, 134:4, 134:7, 135:4, 135:15, 135:23, 136:18, 136:24, 139:17, 139:20, 139:21, 139:22, 139:24, 139:25, 140:5, 140:19, 140:22, 140:25, 141:2, 141:5, 141:11, 141:16, 142:6, 142:10, 142:11, 142:13, 142:18, 142:22, 142:23, 143:2, 143:4, 143:6, 143:11, 143:12, 143:16, 143:19,

144:7, 144:13, 144:22, 145:1, 145:5, 145:16, 145:18, 145:21, 147:15, 194:21
**Pepsi** [10] - 143:9, 143:12, 143:13, 143:14, 143:16, 143:17, 144:11, 145:24, 147:23, 147:24
**per** [22] - 31:5, 35:8, 66:6, 73:5, 73:8, 74:21, 78:22, 87:21, 88:7, 97:7, 97:8, 98:16, 122:9, 131:15, 131:17, 131:19, 132:13, 148:20
**percent** [58] - 19:25, 20:4, 20:22, 21:11, 21:21, 22:13, 46:24, 47:3, 50:5, 50:8, 89:11, 89:13, 89:14, 91:8, 91:9, 91:11, 91:12, 91:13, 91:14, 105:6, 109:4, 110:5, 113:8, 121:12, 121:13, 142:13, 154:7, 154:8, 155:1, 172:19, 172:20, 173:19, 174:1, 174:4, 176:11, 176:12, 176:19, 177:1, 178:8, 178:12, 183:10, 184:1, 184:2, 184:7, 186:15, 186:23, 195:4, 195:6, 196:24, 197:4, 199:4
**percentage** [20] - 20:9, 20:16, 46:12, 46:13, 47:7, 50:16, 92:2, 154:20, 173:23, 176:23, 180:13, 181:20, 183:7, 183:20, 183:24, 184:1, 186:9, 186:14, 186:22
**percentages** [1] - 49:23
**Perfect** [1] - 193:19
**perform** [7] - 17:1, 17:9, 37:4, 54:3, 54:4, 155:9, 155:12
**performed** [11] - 17:17, 34:20, 36:6, 36:7, 53:5, 53:14, 53:18, 53:22, 53:24,

84:4, 151:13
**perhaps** [3] - 70:8, 148:24, 149:1
**period** [104] - 8:3, 9:22, 18:14, 28:14, 28:20, 37:6, 38:25, 39:2, 39:3, 39:4, 39:5, 44:7, 45:6, 46:8, 48:4, 49:12, 49:16, 50:1, 50:13, 73:14, 74:25, 75:8, 76:3, 76:4, 76:12, 76:13, 76:14, 76:18, 76:19, 77:1, 77:2, 77:13, 77:22, 78:11, 79:5, 79:10, 80:14, 80:16, 80:18, 80:23, 84:15, 84:18, 84:20, 84:21, 84:23, 85:14, 85:15, 85:25, 86:2, 86:7, 86:21, 86:22, 86:23, 86:24, 87:3, 87:4, 87:24, 87:25, 88:1, 88:15, 88:17, 89:16, 89:19, 90:1, 90:2, 90:6, 90:7, 90:20, 90:22, 91:5, 91:17, 91:23, 92:3, 93:16, 94:3, 94:4, 94:20, 94:22, 94:24, 95:18, 96:5, 96:6, 98:5, 98:21, 99:11, 100:20, 101:15, 101:23, 102:11, 102:12, 102:24, 109:24, 113:2, 132:23, 133:1, 133:8, 135:13, 135:19, 139:5, 139:21, 139:22, 175:10, 193:4
**periods** [6] - 75:5, 75:12, 75:14, 76:3, 76:11, 93:9
**permitted** [1] - 189:12
**person** [2] - 112:25, 121:22
**personal** [2] - 23:7, 134:8
**perspective** [10] - 64:19, 64:22, 69:12, 71:1, 116:11, 135:21, 177:11, 178:16, 178:23, 184:12
**pertain** [1] - 82:2
**Peter** [2] - 150:16, 151:7
**PETER** [2] - 2:9, 150:19

**petroleum** [1] - 118:21
**Petters** [1] - 30:10
**Ph.D** [7] - 36:2, 56:11, 56:16, 57:17, 60:2, 156:4, 156:6
**pharmaceutical** [15] - 8:8, 8:11, 8:15, 9:1, 31:25, 32:4, 61:23, 61:24, 62:12, 156:18, 156:19, 158:17, 161:9, 181:4
**Pharmaceutical** [3] - 187:25, 188:14, 188:22
**pharmaceuticals** [2] - 65:5, 158:21
**pharmacies** [25] - 20:18, 38:21, 39:24, 40:1, 40:9, 48:10, 65:6, 65:11, 68:24, 127:3, 127:25, 128:5, 128:8, 128:13, 128:16, 128:22, 151:21, 157:1, 157:4, 161:9, 186:7, 192:5, 192:8, 192:18, 194:16
**Pharmacy** [4] - 14:9, 14:25, 15:22, 21:10
**pharmacy** [23] - 20:21, 20:24, 21:10, 21:13, 21:24, 22:13, 38:10, 68:14, 68:17, 68:19, 68:20, 68:21, 69:6, 126:25, 127:6, 156:20, 167:25, 169:3, 192:15, 192:16, 194:13, 196:23
**Philadelphia** [2] - 6:6, 6:13
**phonetic** [1] - 112:23
**phrase** [1] - 71:25
**physician** [3] - 22:6, 22:15, 22:17
**physicians** [1] - 22:5
**pick** [1] - 39:2
**picture** [6] - 40:10, 41:16, 88:23, 88:24, 121:6, 172:3
**piece** [1] - 173:3
**pieces** [1] - 101:25
**Pierce** [2] - 43:24, 48:17
**PIFKO** [1] - 3:14
**piling** [1] - 69:6
**pill** [4] - 20:18, 20:19, 50:5, 50:8
**pills** [25] - 7:25, 13:5, 13:22, 17:14, 22:24,

23:11, 49:3, 53:16, 54:1, 54:9, 76:23, 127:6, 128:5, 139:17, 139:18, 140:5, 140:11, 140:13, 140:17, 140:25, 141:3, 141:14, 194:14, 197:7
**Pittsburgh** [1] - 9:18
**place** [4] - 77:6, 79:18, 79:19, 106:7
**places** [6] - 54:2, 68:19, 86:20, 87:24, 87:25, 110:22
**plaintiff** [1] - 9:14
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**Plaintiffs** [1] - 201:6
**plaintiffs** [4] - 47:10, 148:16, 148:19, 148:24
**plaintiffs'** [4] - 9:13, 39:6, 84:19, 142:24
**play** [2] - 64:23, 68:1
**played** [1] - 101:17
**plays** [2] - 67:23, 99:11
**Pleasant** [3] - 4:4, 4:12, 4:15
**pleasure** [2] - 141:23, 148:5
**plot** [1] - 88:5
**plots** [1] - 88:3
**plugged** [1] - 113:21
**point** [51] - 25:22, 26:17, 26:24, 27:25, 28:7, 48:5, 64:15, 65:23, 65:24, 67:19, 73:3, 73:18, 75:3, 75:21, 78:2, 86:14, 93:19, 95:15, 96:7, 98:23, 102:8, 102:13, 102:16, 104:4, 108:1, 108:25, 110:24, 112:10, 124:7, 128:19, 130:10, 130:11, 133:5, 133:8, 133:18, 133:19, 133:24, 135:22, 138:12, 138:17, 142:1, 143:19, 143:24, 144:12, 144:20, 145:25, 168:18, 191:12
**points** [5] - 50:16, 87:13, 119:6, 122:12, 131:12

**policies** [5] - 190:5, 190:11, 194:1, 194:3, 194:4
**policy** [2] - 57:14, 188:14
**political** [1] - 125:6
**Political** [1] - 59:4
**Ponc** [1] - 2:4
**Ponce** [1] - 2:14
**ponzi** [1] - 30:11
**population** [53] - 23:12, 53:17, 88:20, 90:15, 94:11, 96:11, 103:12, 104:2, 104:3, 105:3, 105:5, 105:9, 105:15, 105:16, 105:17, 105:18, 105:20, 105:22, 105:24, 105:25, 106:2, 107:15, 107:17, 107:19, 108:2, 108:8, 108:10, 108:14, 108:16, 108:17, 108:20, 108:24, 109:3, 109:5, 109:20, 110:12, 110:15, 110:17, 111:17, 111:23, 111:25, 112:1, 112:3, 112:6, 114:2, 114:3, 114:19, 114:22, 115:9, 117:5, 125:3, 134:6
**populations** [2] - 107:3, 113:15
**portion** [2] - 158:1, 172:14
**position** [2] - 140:2, 140:20
**positions** [1] - 34:5
**positive** [1] - 76:1
**possibility** [3] - 140:7, 140:9, 143:1
**possible** [3] - 19:16, 117:10, 150:7
**post** [1] - 85:25
**post-2010** [2] - 18:13, 77:13
**post-2011** [1] - 100:19
**post-2016-2017** [1] - 18:13
**post-period** [1] - 85:25
**potential** [1] - 16:21
**potentially** [1] - 125:20
**powder** [4] - 98:12, 100:2, 100:4, 100:8

**Powell** [2] - 2:6, 112:24
**power** [1] - 171:13
**PR** [2] - 2:5, 2:14
**practice** [1] - 27:1
**pre-2010** [4] - 76:18, 76:19, 87:19, 97:19
**pre-2011** [1] - 85:6
**precipitous** [1] - 73:10
**precluding** [1] - 29:19
**predecessor** [1] - 25:14
**predicate** [1] - 104:24
**predict** [1] - 87:10
**predominant** [1] - 95:9
**predominantly** [2] - 22:1, 95:10
**prefer** [1] - 55:9
**preliminary** [1] - 106:8
**preparation** [1] - 32:23
**prepare** [4] - 33:3, 48:13, 171:11, 175:19
**prepared** [12] - 27:9, 43:20, 46:1, 72:15, 171:12, 175:24, 177:18, 181:7, 181:15, 185:7, 185:11, 185:18
**preparing** [2] - 11:15, 32:25
**prescribe** [1] - 11:6
**prescribed** [1] - 90:15
**prescribing** [10] - 17:20, 65:9, 65:10, 67:3, 74:17, 84:21, 86:9, 87:7, 87:9, 87:10
**prescription** [106] - 9:1, 10:2, 20:22, 21:11, 22:7, 45:18, 64:13, 65:12, 65:15, 66:23, 67:6, 67:7, 67:8, 67:12, 67:23, 68:6, 68:8, 68:11, 68:12, 69:4, 69:21, 72:12, 74:8, 75:16, 75:20, 76:15, 76:20, 77:14, 77:18, 78:23, 79:4, 79:8, 79:9, 79:14, 79:25, 80:4, 80:12, 82:15, 82:18, 84:2, 84:5, 84:12, 84:22, 85:8, 86:1, 87:15, 92:22, 94:20, 94:23, 96:6, 96:8, 99:1, 99:5, 101:19, 102:18, 103:3,

128:3, 132:12, 132:18, 132:24, 133:15, 134:4, 134:18, 135:6, 135:12, 135:16, 135:23, 136:4, 136:19, 136:25, 137:22, 138:13, 140:6, 140:11, 141:3, 141:9, 141:12, 142:7, 142:9, 142:12, 142:19, 142:20, 142:21, 143:2, 144:14, 144:18, 144:23, 145:6, 146:10, 146:16, 147:1, 147:12, 147:15, 157:4, 163:13, 164:8, 185:3, 185:23, 186:4, 194:22, 195:4, 197:17
**prescriptions** [57] - 7:19, 7:23, 12:7, 20:1, 20:4, 20:10, 22:4, 22:9, 22:12, 22:15, 65:11, 67:1, 67:15, 67:17, 67:19, 68:18, 69:2, 69:6, 69:8, 74:14, 76:25, 77:1, 77:9, 77:10, 77:12, 86:23, 90:20, 90:25, 91:4, 91:6, 91:8, 91:9, 91:11, 91:15, 91:23, 92:2, 92:12, 92:25, 93:4, 93:18, 93:22, 93:23, 94:5, 96:3, 102:10, 127:25, 129:23, 139:21, 139:25, 140:12, 140:22, 140:23, 141:1, 141:15, 141:16
**present** [5] - 83:18, 131:23, 152:19, 164:14, 179:14
**presentation** [4] - 167:18, 171:20, 171:25, 185:19
**presentations** [1] - 157:16
**presented** [13] - 141:11, 152:11, 152:22, 154:2, 163:21, 165:18, 166:21, 173:8, 174:23, 176:22, 177:19, 178:4, 187:21

**presenting** [1] - 177:25
**presents** [1] - 176:6
**preserve** [1] - 36:14
**pressure** [1] - 42:15
**presumably** [4] - 22:3, 22:6, 76:24, 77:9
**presume** [1] - 109:9
**pretty** [16] - 10:6, 57:1, 58:21, 59:11, 59:22, 63:25, 71:12, 73:10, 81:13, 81:16, 96:4, 96:20, 106:24, 124:10, 127:20, 169:23
**prevalence** [2] - 103:19, 103:23
**prevalent** [1] - 42:12
**prevent** [2] - 12:6, 163:5
**preventing** [1] - 18:6
**previous** [2] - 81:3, 139:21
**previously** [11] - 62:1, 62:15, 62:18, 62:24, 135:5, 135:11, 135:16, 136:18, 142:11, 142:14, 157:20
**Prevoznik's** [1] - 189:22
**price** [14] - 60:1, 119:9, 119:11, 119:13, 119:15, 119:21, 120:10, 120:11, 120:25, 121:12, 122:2, 122:9, 122:10, 129:8
**Price** [1] - 28:2
**prices** [1] - 66:15
**PricewaterhouseCoopers** [3] - 28:3, 28:5, 28:8
**pricing** [1] - 54:7
**primarily** [2] - 18:5, 67:19
**primary** [2] - 77:11, 100:1
**principles** [2] - 32:22, 155:22
**prison** [1] - 124:24
**private** [1] - 63:6
**privy** [2] - 11:1, 15:16
**prize** [1] - 60:12
**Prize** [1] - 57:2
**probabilities** [1] - 142:15
**probability** [1] - 135:8
**problem** [6] - 22:23, 107:23, 123:18,

124:23, 142:17, 142:23
**problems** [1] - 61:23
**proceed** [5] - 7:14, 150:25, 160:20, 160:21, 163:25
**proceedings** [2] - 31:7, 201:5
**Proceedings** [2] - 6:19, 187:7
**PROCEEDINGS** [1] - 7:1
**proceeds** [1] - 168:13
**process** [4] - 74:18, 78:5, 130:25, 192:10
**processed** [5] - 42:8, 51:22, 52:9, 52:14, 52:15
**processing** [1] - 31:21
**Proctor** [1] - 2:10
**produce** [1] - 107:9
**produced** [5] - 6:19, 11:22, 12:1, 57:2, 177:17
**producer's** [1] - 65:23
**produces** [1] - 107:8
**product** [6] - 58:13, 68:17, 118:13, 118:14, 125:2
**products** [11] - 41:3, 43:17, 44:14, 45:15, 46:8, 50:3, 50:6, 50:8, 50:10, 58:17, 124:18
**professional** [5] - 25:4, 51:7, 59:3, 63:23, 116:11
**Professor** [1] - 56:5
**professor** [2] - 56:13, 106:10
**proffer** [1] - 40:17
**proffered** [2] - 63:16, 81:21
**profit** [1] - 68:24
**program** [9] - 32:20, 32:21, 33:2, 33:4, 33:6, 33:7, 33:11, 57:18
**programs** [6] - 163:12, 163:22, 164:7, 165:4, 191:21, 192:3
**Programs** [1] - 198:18
**prohibition** [3] - 122:22, 122:23, 124:17
**prohibitions** [2] - 123:2, 123:3
**promise** [1] - 118:5
**prone** [1] - 144:22
**propensity** [3] - 144:8,

145:16, 145:21
**proper** [2] - 109:19, 189:8
**property** [1] - 32:5
**proportion** [1] - 172:16
**proposal** [1] - 148:25
**propose** [1] - 148:22
**proposed** [1] - 149:16
**protected** [1] - 23:7
**provide** [6] - 27:9, 109:12, 153:3, 170:12, 178:21, 182:2
**provided** [10] - 23:3, 32:24, 53:25, 152:3, 155:16, 162:3, 172:2, 173:14, 174:3, 183:19
**providers** [1] - 58:13
**provides** [4] - 153:22, 154:11, 167:24, 170:19
**providing** [4] - 30:6, 38:20, 163:19, 165:3
**public** [4] - 25:16, 25:19, 57:14, 180:19
**publicly** [2] - 26:6, 183:6
**publish** [3] - 58:20, 195:11, 195:13
**publishable** [1] - 9:4
**published** [12] - 8:25, 58:21, 58:25, 59:2, 59:4, 59:24, 59:25, 120:16, 123:16, 157:12, 183:11, 188:1
**pull** [2] - 46:3, 48:19
**pulling** [2] - 44:1, 54:16
**purchase** [1] - 65:4
**purports** [1] - 103:19
**purpose** [6] - 22:14, 22:16, 22:18, 132:22, 139:16, 198:25
**purposes** [6] - 44:23, 85:11, 106:11, 164:12, 165:10, 165:24
**pursuant** [2] - 69:1, 129:23
**push** [1] - 111:25
**pushes** [1] - 96:10
**pushing** [1] - 112:3
**put** [42] - 71:17, 72:19, 72:22, 78:16, 79:15, 79:18, 79:21, 80:25, 81:8, 88:2, 96:22,

96:25, 97:2, 100:13, 104:6, 104:10, 107:1, 109:1, 112:11, 113:18, 114:12, 118:1, 124:25, 126:24, 126:25, 135:21, 138:14, 139:23, 141:7, 152:1, 157:8, 162:9, 166:16, 167:15, 171:16, 174:14, 175:22, 177:22, 181:11, 185:15, 190:3, 199:19

**putting** [3] - 79:2, 129:7, 152:2

**PwC** [9] - 24:10, 25:1, 25:14, 28:15, 28:23, 29:5, 31:20, 33:22, 35:5

## Q

**qualifications** [3] - 40:18, 151:15, 155:18

**qualified** [8] - 36:17, 62:15, 158:5, 160:8, 160:13, 160:16, 163:17, 181:24

**qualitatively** [3] - 80:1, 92:18, 102:22

**quality** [1] - 124:19

**quantify** [2] - 17:14, 42:17

**quantitative** [7] - 17:1, 17:3, 17:4, 17:6, 17:9, 18:17, 19:6

**quantities** [1] - 73:24

**quantity** [27] - 18:10, 38:14, 42:22, 43:6, 65:21, 66:4, 66:7, 66:18, 66:20, 67:3, 68:5, 69:10, 69:25, 70:19, 73:12, 73:19, 73:21, 73:25, 74:4, 77:5, 87:25, 88:15, 118:11, 118:16, 119:8, 121:13, 123:6

**quarter** [2] - 19:25, 184:2

**Quarterly** [1] - 59:5

**questioning** [1] - 191:7

**questions** [21] - 14:12, 23:19, 51:11, 51:21, 54:22, 107:25, 117:20, 117:23, 130:8, 131:11,

141:21, 142:5, 143:23, 146:5, 158:15, 169:7, 179:12, 187:1, 187:14, 193:1, 199:6

**quick** [1] - 125:24

**quickly** [3] - 148:12, 149:3, 149:4

**quite** [5] - 13:10, 79:4, 88:21, 156:17, 175:13

## R

**rackets** [1] - 147:21

**Rafalski** [22] - 151:14, 152:2, 152:11, 152:18, 152:22, 154:3, 165:18, 165:22, 166:17, 166:20, 166:25, 167:2, 167:9, 170:9, 170:15, 170:19, 174:15, 174:18, 174:23, 187:22, 188:8, 188:22

**Rafalski's** [3] - 165:20, 166:23, 167:5

**rafalski's** [1] - 154:16

**Rafferty** [1] - 2:10

**rain** [3] - 71:12, 71:15, 71:17

**raining** [1] - 71:14

**raise** [3] - 24:16, 55:18, 150:17

**raising** [1] - 14:13

**ran** [3] - 180:5, 188:24

**range** [2] - 61:12, 133:18

**rapidly** [2] - 77:20, 82:22

**rate** [33] - 74:21, 74:22, 78:23, 80:9, 83:14, 88:9, 104:1, 105:4, 105:6, 105:9, 105:10, 105:14, 105:18, 105:21, 106:1, 107:20, 108:4, 108:9, 108:17, 109:16, 109:18, 109:19, 109:23, 110:12, 110:17, 110:21, 112:2, 114:1, 114:2, 114:4, 115:2, 117:4, 153:11

**rates** [13] - 80:3, 80:5, 80:25, 89:18, 89:19, 90:6, 90:7, 91:17,

91:19, 99:1, 108:14, 115:4, 123:21

**rather** [12] - 94:5, 100:8, 111:7, 113:3, 113:19, 113:25, 122:18, 123:17, 150:24, 176:19, 182:4, 189:1

**re** [11] - 54:3, 54:4, 79:22, 82:16, 105:14, 105:16, 130:9, 141:25, 173:3, 173:5, 176:16

**re-direct** [2] - 130:9, 141:25

**re-done** [2] - 79:22, 82:16

**re-perform** [2] - 54:3, 54:4

**re-run** [3] - 173:3, 173:5, 176:16

**re-write** [1] - 105:14

**re-written** [1] - 105:16

**reach** [4] - 107:13, 108:4, 108:18, 193:19

**reached** [5] - 37:9, 39:15, 78:7, 78:9, 84:25

**read** [8] - 47:6, 47:11, 47:23, 84:18, 124:5, 140:24, 160:10, 190:17

**reading** [3] - 50:22, 101:8, 134:10

**ready** [2] - 106:13, 150:8

**real** [8] - 125:24, 154:17, 179:7, 179:10, 179:24, 180:4, 180:9, 182:19

**reality** [1] - 143:1

**realize** [1] - 123:10

**really** [61] - 7:21, 29:2, 35:23, 57:15, 58:2, 60:1, 66:9, 68:7, 68:8, 69:22, 71:5, 75:1, 75:12, 76:2, 77:11, 78:11, 78:12, 81:13, 81:15, 83:2, 84:19, 85:2, 85:3, 85:4, 86:4, 87:8, 88:16, 88:18, 90:10, 93:11, 96:11, 99:10, 99:11, 99:15, 100:18, 101:2, 101:16, 101:23, 105:8, 116:20, 117:4, 124:14, 125:3, 128:14,

133:24, 135:3, 147:14, 152:24, 153:22, 154:13, 164:21, 169:25, 170:12, 171:3, 171:8, 171:10, 177:2, 177:14, 178:24, 179:15

**reason** [5] - 84:11, 84:13, 92:22, 109:9, 168:21

**reasonable** [2] - 51:7, 109:6

**reasons** [9] - 18:15, 84:14, 87:6, 144:5, 152:25, 162:23, 163:7, 168:22

**receive** [1] - 34:16

**received** [10] - 34:18, 60:5, 60:7, 60:11, 102:10, 141:16, 156:4, 162:17, 163:2, 169:8

**receiving** [2] - 92:1, 140:22

**recent** [3] - 135:14, 137:7, 137:8

**recently** [1] - 125:17

**Recess** [4] - 55:12, 117:14, 131:3, 187:6

**recess** [1] - 131:2

**recessed** [1] - 200:12

**record** [20] - 47:8, 49:20, 79:7, 81:11, 81:21, 92:6, 97:3, 101:5, 134:17, 170:8, 170:21, 180:2, 187:14, 189:6, 189:24, 196:1, 196:4, 196:5, 196:15, 201:5

**recorded** [1] - 6:19

**records** [1] - 26:12

**recourse** [1] - 123:25

**recover** [1] - 30:17

**RECROSS** [1] - 146:8

**red** [8] - 7:25, 20:13, 168:17, 168:19, 169:6, 172:12, 174:2, 177:1

**redirect** [4] - 23:18, 54:23, 54:24, 199:8

**REDIRECT** [1] - 142:3

**reduce** [2] - 10:8, 18:15

**reduced** [1] - 143:10

**reduces** [1] - 176:18

**reducing** [2] - 10:11, 123:6

**reduction** [4] - 10:15,

10:19, 10:22, 121:13

**Reed** [2] - 6:4, 6:11

**refer** [2] - 57:19, 156:10

**referenced** [1] - 151:19

**referred** [4] - 11:1, 16:13, 174:18, 192:4

**referring** [11] - 83:23, 83:24, 89:5, 93:14, 94:19, 133:12, 133:17, 192:12, 192:16, 193:1, 194:16

**refining** [1] - 118:21

**reflect** [3] - 78:21, 96:23, 145:2

**reflected** [7] - 43:2, 47:1, 47:3, 47:25, 92:3, 164:11, 164:12

**reflecting** [4] - 43:20, 48:22, 49:23, 73:21

**reflective** [1] - 170:15

**reflects** [11] - 44:21, 46:17, 48:1, 48:24, 49:9, 49:14, 53:6, 80:19, 96:24, 98:24, 100:16

**refresh** [1] - 152:3

**regard** [2] - 69:16, 152:10

**regarded** [2] - 170:18, 178:10

**regarding** [2] - 11:4, 15:24

**regards** [1] - 45:7

**region** [1] - 197:8

**regions** [2] - 86:25, 87:12

**regularly** [1] - 26:12

**regulate** [1] - 123:19

**regulation** [1] - 129:4

**regulations** [2] - 14:12, 15:5

**regulator** [2] - 180:25, 181:6

**regulators** [2] - 155:24, 179:20

**regulatory** [6] - 19:2, 62:25, 63:4, 64:16, 128:23, 163:12

**reimbursement** [1] - 74:16

**relate** [2] - 64:5, 153:17

**related** [12] - 13:10, 14:12, 16:21, 61:19, 61:23, 62:12, 64:8, 64:12, 65:20, 72:13, 78:14, 135:7

**relates** [4] - 21:18, 185:2, 198:17, 199:1
**relation** [2] - 61:22, 66:22
**relationship** [11] - 10:24, 71:1, 72:11, 77:8, 87:15, 87:24, 88:12, 88:13, 90:6, 90:10, 136:3
**relationships** [1] - 128:13
**relative** [2] - 78:3, 109:25
**relatively** [2] - 121:19, 121:20
**releasing** [1] - 26:22
**relevance** [2] - 13:15, 92:15
**relevant** [4] - 145:5, 145:7, 184:11, 196:18
**reliability** [8] - 117:1, 152:14, 152:21, 153:18, 162:7, 171:6, 178:15, 180:7
**reliable** [16] - 39:13, 52:8, 52:10, 52:18, 107:21, 114:22, 117:6, 154:23, 160:2, 162:11, 162:13, 174:10, 174:12, 177:9, 177:14, 178:24
**reliably** [2] - 106:5, 107:14
**reliance** [1] - 182:13
**relied** [6] - 111:23, 151:14, 152:18, 165:23, 183:2, 185:7
**relies** [2] - 165:9, 167:2
**rely** [4] - 115:16, 181:24, 182:5, 185:5
**relying** [1] - 182:9
**remain** [1] - 26:19
**remainder** [2] - 148:18, 193:18
**remaining** [1] - 193:18
**remember** [22] - 9:19, 20:1, 60:22, 61:3, 62:6, 62:23, 70:14, 80:10, 81:2, 82:13, 85:17, 87:21, 91:22, 95:19, 95:22, 98:25, 110:11, 111:16, 112:20, 114:1, 114:15, 115:3
**remind** [3] - 36:19, 36:21
**remove** [2] - 115:24,

153:4
**removed** [3] - 85:18, 169:13, 186:19
**removing** [4] - 169:20, 173:12, 173:16, 176:16
**Reno** [2] - 32:18, 33:5
**repeat** [3] - 10:17, 14:20, 21:8
**repeated** [1] - 70:15
**rephrase** [1] - 139:24
**replace** [1] - 142:12
**replaced** [1] - 115:11
**replicated** [2] - 166:13, 192:13
**report** [25] - 9:11, 11:4, 11:7, 11:15, 11:20, 16:11, 16:19, 34:13, 72:16, 72:23, 78:17, 78:18, 88:2, 91:2, 96:22, 100:15, 112:18, 131:13, 134:11, 159:14, 166:8, 171:12, 171:19, 195:10
**reported** [3] - 159:17, 180:5, 201:9
**Reporter** [6] - 6:17, 6:18, 201:3, 201:12
**reporter** [1] - 117:12
**reporting** [1] - 182:18
**reports** [4] - 9:15, 15:19, 19:11, 170:25
**represent** [1] - 168:1
**representatives** [1] - 18:22
**represented** [1] - 171:24
**representing** [1] - 63:6
**represents** [3] - 44:7, 172:8, 172:14
**Republic** [1] - 30:8
**reputation** [3] - 56:24, 57:1, 57:6
**require** [3] - 10:16, 10:20, 35:17
**required** [1] - 15:19
**requirements** [1] - 164:24
**requiring** [1] - 15:5
**research** [4] - 19:11, 19:23, 58:3, 58:20
**Research** [2] - 61:2, 61:5
**reserve** [1] - 36:18
**reserving** [1] - 63:15
**reside** [1] - 25:1
**respect** [10] - 30:6, 30:8, 31:1, 37:7,

41:22, 43:1, 43:7, 48:25, 52:13, 198:13
**respects** [1] - 28:15
**Response** [2] - 23:21, 200:8
**response** [2] - 19:9, 122:11
**responsibility** [1] - 67:17
**responsible** [1] - 31:3
**responsiveness** [1] - 122:2
**rest** [3] - 15:3, 139:2, 175:10
**result** [3] - 85:6, 112:7, 159:13
**results** [49] - 37:8, 37:10, 43:22, 53:6, 78:7, 152:14, 152:23, 153:1, 153:4, 153:8, 153:9, 153:14, 153:25, 154:2, 154:3, 154:4, 154:6, 154:14, 154:16, 159:13, 160:1, 169:25, 171:10, 172:3, 172:4, 173:8, 173:12, 176:7, 177:12, 177:14, 177:16, 177:19, 178:1, 178:4, 178:19, 179:6, 179:9, 179:16, 179:21, 180:4, 180:6, 180:9, 181:9, 183:17, 184:5, 198:2
**resume** [2] - 7:8, 187:8
**resumed** [1] - 187:7
**RESUMED** [1] - 7:9
**retail** [2] - 156:20, 157:1
**Retail** [1] - 40:1
**retained** [4] - 27:7, 29:23, 32:3, 157:1
**rethink** [1] - 8:1
**retire** [1] - 28:7
**retired** [4] - 24:10, 25:1, 28:13, 33:17
**retirement** [1] - 28:12
**retrospective** [1] - 191:24
**reveal** [1] - 23:6
**revenue** [1] - 54:8
**reverse** [2] - 91:18, 105:13
**review** [9] - 9:14, 11:22, 11:25, 12:3, 13:25, 36:7, 39:8,

64:20, 65:16, 103:17, 106:3, 141:8, 152:7, 152:10, 152:12, 157:8, 161:2, 161:25, 162:5, 162:6, 163:10, 163:20, 166:1, 166:4, 166:9, 166:23, 170:8, 170:21, 180:2, 183:6, 186:1, 190:24, 194:3
**Review** [1] - 59:5
**reviewed** [19] - 8:25, 38:1, 51:22, 51:25, 64:12, 103:14, 164:5, 164:9, 164:12, 165:19, 166:7, 170:25, 189:9, 191:3, 191:8, 191:11, 191:22, 194:6, 196:5
**reviewing** [2] - 161:23, 189:17
**reviews** [1] - 32:25
**Reynolds** [13] - 152:1, 155:6, 166:16, 167:15, 170:5, 171:16, 174:14, 175:22, 177:22, 179:1, 181:11, 184:21, 185:15
**Rice** [5] - 4:3, 4:5, 4:8, 4:11, 4:14
**richer** [1] - 66:18
**ridiculous** [1] - 196:8
**right-hand** [7] - 88:11, 89:13, 173:9, 173:14, 176:17, 176:18, 184:4
**rise** [3] - 73:19, 86:6, 97:14
**rises** [2] - 97:23, 101:7
**rising** [8] - 79:9, 82:19, 82:21, 82:25, 83:1, 99:13, 133:25
**risk** [1] - 104:2
**River** [9] - 60:17, 61:8, 61:9, 61:15, 61:21, 97:10, 151:9, 156:7, 156:9
**RMR** [2] - 6:17, 6:18
**road** [1] - 33:6
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**robustness** [3] - 153:1, 171:8, 174:11
**Rohan** [1] - 35:24
**role** [10] - 26:3, 26:24,

31:4, 58:19, 61:1, 64:22, 65:4, 67:23, 99:11, 101:16
**roles** [2] - 32:23, 68:1
**rose** [1] - 73:15
**roughly** [6] - 58:23, 62:4, 95:7, 95:11, 113:1, 114:18
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**RUBY** [1] - 4:22
**Ruby** [1] - 4:23
**Rule** [2] - 47:15, 50:24
**rule** [1] - 190:22
**rules** [4] - 19:8, 129:11, 129:20, 182:4
**ruling** [1] - 36:18
**rulings** [2] - 31:2, 31:5
**run** [18] - 68:25, 71:16, 165:10, 165:23, 173:3, 173:5, 176:5, 176:16, 179:11, 191:23, 192:7, 192:17, 192:25, 194:12, 194:17, 194:18, 198:6, 198:7
**running** [5] - 95:1, 153:6, 164:21, 192:3, 196:17
**runs** [3] - 71:20, 188:25, 198:22

# S

**S-e-n** [1] - 35:24
**s\Ayme** [1] - 201:11
**s\Lisa** [1] - 201:11
**safe** [1] - 122:21
**SafeScript** [2] - 20:22, 21:10
**sale** [5] - 48:1, 54:9, 66:23, 197:16, 198:9
**sales** [7] - 26:15, 38:7, 41:17, 49:24, 54:14, 193:12
**SALGADO** [1] - 4:20
**sample** [1] - 89:1
**San** [3] - 2:5, 2:14, 34:12
**satisfy** [1] - 166:14
**save** [1] - 47:13
**saves** [1] - 47:9
**saw** [9] - 22:22, 23:9, 74:13, 82:25, 85:14, 85:15, 96:3, 122:22, 154:19
**SC** [3] - 4:4, 4:12, 4:15
**scale** [2] - 83:6, 83:7

**scales** [1] - 83:6
**scatter** [3] - 102:2, 138:5, 138:14
**schedule** [1] - 148:11
**scheduled** [1] - 199:18
**scheme** [2] - 30:11, 30:18
**SCHMIDT** [1] - 5:9
**scholarly** [1] - 59:3
**School** [3] - 56:6, 56:21, 145:10
**school** [1] - 127:13
**Schultz** [1] - 125:17
**science** [3] - 35:13, 36:3
**Science** [1] - 25:8
**Sciences** [1] - 60:21
**scientific** [3] - 134:17, 136:19, 179:19
**scope** [19] - 13:7, 13:11, 14:11, 16:9, 16:22, 20:14, 20:17, 21:1, 21:19, 22:25, 23:14, 38:16, 40:11, 41:16, 81:21, 81:23, 92:6, 163:15, 196:16
**screen** [1] - 166:17, 169:23, 173:9, 174:15
**se** [3] - 35:9, 66:6, 98:16
**season** [1] - 198:22
**seat** [4] - 24:19, 55:22, 107:25, 150:21
**seats** [1] - 192:21
**second** [14] - 25:4, 42:10, 44:13, 76:4, 84:10, 85:23, 99:2, 134:24, 139:7, 143:6, 144:9, 153:5, 169:18, 169:19
**secondly** [1] - 110:11
**seconds** [1] - 130:7
**section** [3] - 33:2, 33:4, 90:3
**sectional** [2] - 72:6, 72:9
**sectionally** [1] - 87:11
**see** [83] - 12:4, 15:21, 15:23, 23:2, 23:5, 44:14, 45:5, 45:7, 50:17, 50:21, 54:12, 66:4, 67:10, 71:11, 72:19, 75:1, 76:19, 77:23, 82:7, 82:18, 83:25, 84:20, 85:7, 86:5, 87:10, 88:12, 88:17, 88:18, 88:23, 89:3, 90:3, 90:5,

90:8, 90:14, 90:24, 91:16, 91:18, 92:15, 92:17, 92:19, 92:21, 92:24, 95:9, 95:16, 97:12, 99:4, 99:8, 100:18, 100:25, 101:18, 102:6, 102:22, 103:7, 117:5, 123:14, 123:21, 124:16, 124:18, 124:20, 125:24, 127:2, 128:2, 131:15, 134:14, 137:21, 167:11, 168:18, 169:24, 171:8, 173:16, 174:20, 174:21, 179:16, 184:16, 191:17, 194:1, 194:10, 194:11, 196:7, 200:9
**seeing** [4] - 7:22, 80:18, 93:16, 145:18
**seem** [3] - 87:4, 102:3, 103:7
**sees** [1] - 175:8
**segue** [1] - 82:4
**sell** [2] - 65:6, 67:6
**sellers** [1] - 118:12
**selling** [1] - 194:21
**sells** [1] - 37:17
**Sen** [1] - 35:24
**Sen's** [1] - 35:25
**Senate** [1] - 62:23
**SENIOR** [1] - 1:17
**Senior** [1] - 7:2
**senior** [2] - 60:18, 61:7
**Sensabaugh** [1] - 5:14
**sense** [10] - 42:20, 56:23, 58:23, 69:19, 77:3, 79:20, 127:7, 136:19, 140:4, 199:5
**separate** [6] - 19:17, 38:12, 66:2, 86:15, 169:8, 169:11
**separately** [3] - 81:4, 99:3, 99:4
**separating** [1] - 79:1
**September** [1] - 168:23
**September's** [1] - 168:24
**sequence** [4] - 143:25, 144:3, 145:2
**sequentially** [1] - 72:2
**series** [1] - 72:4
**serious** [2] - 7:21, 142:17
**seriously** [2] - 125:19,

140:25
**Serp** [3] - 44:1, 46:3, 48:19
**serve** [4] - 29:6, 29:9, 61:7, 157:19
**served** [6] - 8:19, 8:22, 29:12, 31:8, 62:1, 62:4
**service** [1] - 33:14
**Service** [2] - 34:19, 56:5
**services** [1] - 32:24
**serving** [2] - 32:11, 33:20
**set** [3] - 169:6, 171:20, 174:6
**sets** [1] - 154:9
**setting** [1] - 104:7
**settings** [1] - 155:23
**settled** [1] - 31:5
**Settlement** [1] - 30:21
**settlement** [2] - 31:4, 31:6
**seven** [2] - 73:16
**seventh** [1] - 168:9
**several** [3] - 109:17, 144:5, 145:12
**shaking** [1] - 127:1
**SHANNON** [1] - 6:3
**shape** [2] - 79:7, 81:12
**shapes** [1] - 83:8
**share** [10] - 23:6, 37:7, 155:13, 155:15, 184:13, 184:25, 185:2, 185:12, 185:20, 186:18
**shift** [3] - 102:23, 103:9, 110:5
**shifted** [1] - 93:4
**ship** [1] - 194:24
**shipment** [28] - 75:18, 85:16, 87:1, 89:18, 90:7, 97:14, 98:16, 138:13, 151:21, 153:21, 153:22, 162:19, 163:4, 163:6, 164:13, 164:17, 168:9, 169:3, 169:4, 170:17, 172:9, 175:3, 175:4, 178:7, 188:25, 193:15, 193:17, 197:4
**shipments** [99] - 38:7, 42:5, 42:17, 72:12, 73:12, 73:14, 73:24, 75:10, 76:5, 76:15, 76:20, 77:15, 77:18, 84:5, 84:11, 84:17, 85:8, 85:14, 85:19,

85:20, 86:16, 86:20, 87:2, 87:6, 87:15, 87:19, 87:21, 88:6, 89:12, 89:16, 90:2, 90:12, 96:25, 97:7, 98:2, 151:23, 154:7, 154:9, 154:20, 159:18, 161:9, 162:21, 162:24, 163:1, 163:8, 164:19, 165:11, 165:15, 167:25, 169:6, 169:16, 169:17, 170:1, 170:3, 172:5, 172:11, 172:12, 172:16, 172:20, 172:22, 173:20, 173:23, 174:5, 174:6, 175:15, 175:17, 176:8, 176:11, 176:12, 176:23, 178:8, 178:10, 178:13, 180:13, 180:20, 183:20, 183:23, 184:6, 184:7, 184:14, 186:3, 186:6, 186:20, 189:16, 190:6, 192:15, 192:18, 193:16, 193:17, 193:24, 194:17, 194:19, 195:15, 195:16, 197:12, 198:3, 198:7, 198:13, 199:4
**shipped** [17] - 13:22, 17:15, 38:14, 41:3, 42:22, 43:6, 44:15, 48:7, 48:10, 48:14, 49:15, 50:9, 65:13, 73:25, 76:24, 168:2, 168:6
**ships** [1] - 185:22
**short** [1] - 24:1
**show** [13] - 16:6, 80:4, 80:8, 80:15, 81:1, 82:12, 82:23, 86:7, 87:15, 91:1, 94:7, 97:4, 122:1
**showed** [3] - 13:5, 110:25, 171:1
**showing** [3] - 80:3, 95:5, 99:20
**shown** [6] - 13:21, 13:24, 159:5, 169:22, 176:17, 183:19
**shows** [13] - 19:23,

46:6, 46:7, 49:22, 73:6, 73:19, 82:24, 109:1, 115:6, 122:10, 168:14, 171:2, 172:4
**sic** [1] - 117:3
**side** [19] - 57:25, 58:11, 58:13, 58:14, 66:3, 66:21, 92:21, 92:22, 118:14, 118:20, 127:8, 171:24, 172:2, 173:14, 176:6, 176:17, 176:18, 183:19, 184:4
**sides** [1] - 189:23
**sign** [1] - 178:19
**significance** [8] - 89:4, 91:25, 92:4, 100:4, 101:12, 108:25, 133:10, 144:20
**significant** [8] - 28:19, 50:18, 69:12, 77:11, 89:2, 89:20, 122:10, 157:25
**significantly** [4] - 37:17, 48:2, 81:14, 163:8
**signifies** [1] - 88:4
**signify** [1] - 72:1
**signing** [2] - 26:22, 26:23
**similar** [18] - 45:7, 48:24, 82:7, 82:24, 83:8, 86:9, 87:1, 92:19, 92:20, 92:21, 96:2, 97:17, 97:19, 98:2, 98:3, 175:13, 183:11, 199:17
**similarly** [1] - 59:22
**simple** [10] - 71:20, 75:1, 75:3, 75:22, 90:23, 93:11, 93:13, 93:15, 101:18, 104:25
**simplifying** [1] - 122:15
**simply** [9] - 81:20, 136:10, 142:10, 143:24, 145:18, 159:4, 159:25, 169:1, 199:3
**SINGER** [1] - 4:8
**single** [2] - 153:2, 173:18
**sit** [1] - 182:25
**sitting** [2] - 19:19, 30:3
**situation** [1] - 144:10

**situations** [1] - 35:17
**six** [25] - 73:16, 151:20, 152:6, 152:19, 152:22, 154:2, 154:16, 159:5, 159:6, 166:10, 166:19, 167:10, 168:4, 168:5, 168:16, 168:25, 174:18, 175:1, 187:20, 193:7, 193:9, 193:16, 193:24
**six-month** [2] - 167:10, 174:18
**size** [5] - 38:14, 42:22, 43:6, 53:16, 89:1
**skewed** [2] - 95:16, 95:18
**skinnying** [1] - 148:13
**skyrockets** [1] - 81:17
**Slide** [1] - 138:2
**slide** [8] - 92:5, 120:3, 139:11, 139:16, 187:15, 192:19, 192:24, 193:2
**slight** [1] - 33:12
**slightly** [1] - 97:24
**sloping** [2] - 121:24, 122:5
**slower** [1] - 76:6
**small** [2] - 88:21, 194:21
**smaller** [2] - 83:15, 114:18
**Smith** [2] - 6:4, 6:11
**social** [1] - 59:25
**society** [1] - 125:3
**Society** [3] - 60:21, 60:23, 60:24
**softball** [1] - 57:8
**sold** [11] - 38:12, 52:24, 58:18, 65:25, 68:6, 69:11, 70:1, 70:20, 196:23, 197:7, 198:14
**solely** [4] - 48:14, 49:1, 174:2, 177:2
**solid** [10] - 41:3, 43:11, 44:9, 44:24, 45:1, 46:21, 48:8, 48:14, 49:10, 49:15
**solids** [3] - 49:1, 49:3, 49:24
**Solids** [1] - 49:13
**someone** [1] - 36:21
**something's** [1] - 194:23
**sometimes** [6] - 71:21, 79:12,

116:16, 129:8, 155:23, 156:9
**somewhat** [3] - 47:5, 81:16, 200:4
**somewhere** [2] - 119:18, 133:11
**SOMS** [1] - 163:18
**sorry** [19] - 9:7, 10:17, 11:10, 11:11, 11:13, 11:25, 18:4, 21:5, 21:7, 22:11, 47:9, 51:18, 60:24, 70:18, 135:1, 191:10, 192:20, 199:25
**sort** [7] - 45:7, 71:20, 93:3, 96:2, 105:8, 167:24, 178:16
**sounds** [2] - 8:24, 149:25
**source** [3] - 180:15, 180:25, 182:12
**sources** [2] - 179:22, 188:19
**South** [1] - 2:11
**Southern** [2] - 7:2, 56:10
**SOUTHERN** [1] - 1:1
**spare** [1] - 50:21
**sparing** [1] - 78:20
**speaking** [1] - 170:24
**speaks** [1] - 189:23
**spear** [1] - 67:19
**specialists** [1] - 35:18
**specialized** [1] - 27:4
**specialty** [1] - 63:13
**specific** [4] - 27:7, 38:21, 155:10, 192:15
**specifically** [4] - 64:5, 82:2, 134:12, 152:10
**specified** [1] - 195:10
**speculating** [1] - 18:18
**spend** [2] - 149:1, 161:23
**spending** [1] - 148:17
**spike** [1] - 80:18
**sports** [1] - 57:14
**spread** [3] - 101:3, 101:4, 138:15
**square** [2] - 89:9, 131:14
**Square** [2] - 6:5, 6:12
**squared** [1] - 89:13
**St** [3] - 30:15, 36:4, 40:6
**stack** [1] - 67:10
**staff** [7] - 25:15, 26:4, 26:5, 26:7, 26:11, 26:19, 34:4

**staffed** [1] - 35:9
**stand** [7] - 7:8, 19:20, 21:22, 24:13, 55:15, 148:11, 187:8
**STAND** [1] - 7:10
**standard** [7] - 19:2, 19:10, 19:14, 19:18, 22:5, 122:4, 124:20
**standing** [1] - 106:9
**standpoint** [8] - 10:25, 19:12, 70:6, 75:14, 84:24, 106:9, 127:12, 146:15
**STANNER** [1] - 5:10
**start** [12] - 7:18, 25:4, 26:25, 30:22, 45:5, 46:15, 104:24, 106:13, 136:2, 136:18, 143:12, 200:5
**started** [7] - 54:19, 55:9, 56:15, 56:17, 135:23, 135:25, 161:2
**starting** [3] - 44:4, 81:17, 176:3
**starts** [3] - 82:20, 82:21, 175:1
**State** [8] - 14:8, 14:25, 15:22, 25:21, 29:23, 29:25, 54:5, 54:19
**state** [15] - 24:14, 29:10, 32:13, 55:16, 62:25, 63:4, 87:20, 88:5, 88:6, 92:11, 92:12, 138:9, 150:14
**state/federal** [1] - 29:18
**statement** [2] - 32:23, 189:22
**statements** [3] - 26:7, 26:22, 32:25
**Statements** [1] - 32:20
**STATES** [2] - 1:1, 1:17
**states** [11] - 26:1, 85:13, 85:14, 86:3, 97:4, 97:6, 102:2, 102:5, 103:6, 111:2
**States** [3] - 7:2, 53:23, 62:19
**statistical** [6] - 17:7, 19:12, 71:5, 71:6, 89:4, 138:23
**statistically** [2] - 19:16, 89:2
**statistics** [2] - 138:20, 139:19
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**stenography** [1] - 6:19

**step** [3] - 18:10, 18:23, 104:10
**STEVEN** [1] - 4:22
**Sticking** [2] - 38:16, 42:10
**Stigler** [2] - 56:5, 57:4
**still** [7] - 50:17, 114:24, 119:25, 120:8, 120:9, 194:23
**stipulate** [1] - 47:10
**stipulations** [1] - 148:20
**stock** [1] - 163:3
**stopping** [1] - 44:13
**store** [1] - 67:9
**stories** [3] - 97:25, 98:2, 98:3
**story** [21] - 77:3, 80:1, 80:23, 82:8, 83:5, 84:15, 85:5, 89:23, 89:25, 90:23, 93:3, 93:11, 93:13, 93:15, 94:11, 96:18, 98:16, 101:18, 102:4, 103:2, 103:4
**straight** [1] - 109:5
**straightforward** [1] - 106:25
**Street** [17] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:19, 4:21, 4:24, 5:5, 5:12, 6:6, 6:13, 123:15, 124:5
**streets** [1] - 122:21
**strip** [1] - 50:2
**strong** [3] - 71:13, 87:15, 134:18
**strongly** [1] - 88:25
**structure** [1] - 146:11
**structures** [1] - 64:9
**studied** [1] - 121:5
**studies** [4] - 8:25, 134:22, 135:3, 179:19
**Studies** [1] - 181:3
**study** [6] - 57:12, 58:2, 58:16, 70:22, 119:4, 141:13
**studying** [2] - 127:14, 152:23
**stuff** [2] - 111:10, 113:13
**subject** [2] - 63:16, 187:3
**submit** [1] - 149:13
**submitted** [4] - 62:18, 62:24, 63:3, 149:17
**subsequent** [7] - 153:21, 169:4, 170:17, 171:5,

175:4, 178:7, 188:11
**subsequently** [1] - 144:1
**subset** [2] - 44:20, 49:7
**substance** [3] - 15:2, 43:21, 65:8
**Substance** [1] - 127:11
**substances** [11] - 14:6, 14:22, 15:6, 16:1, 18:2, 64:13, 64:24, 121:17, 144:15, 145:6, 158:18
**Substances** [1] - 128:21
**substantial** [5] - 78:13, 96:4, 115:7, 116:23, 141:9
**substantially** [2] - 21:25, 24:5
**substantive** [1] - 30:19
**substitute** [6] - 145:18, 145:22, 147:14, 147:16, 147:19, 147:23
**substitutes** [9] - 143:21, 145:25, 146:2, 146:16, 146:20, 146:21, 146:22, 147:2, 147:13
**subtle** [1] - 131:12
**suburbs** [1] - 66:17
**sufficient** [1] - 142:8
**suggest** [2] - 134:17, 138:20
**suggesting** [2] - 123:17, 144:13
**suggests** [1] - 153:8
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 3:15, 4:6, 4:9, 6:5, 6:12
**summaries** [1] - 43:20
**summary** [1] - 48:23
**summer** [1] - 54:20
**supervision** [1] - 36:8
**supplement** [1] - 161:20
**supplemented** [2] - 161:14, 185:8
**supplements** [1] - 161:11
**supplied** [2] - 98:10, 123:23
**supplier** [1] - 66:3
**suppliers** [4] - 118:13, 119:8, 119:12, 124:2

**supplies** [1] - 127:6
**supply** [53] - 10:11, 10:15, 10:19, 58:11, 58:14, 63:25, 66:2, 66:5, 66:6, 66:12, 66:21, 68:10, 73:13, 73:18, 74:1, 77:4, 86:11, 98:9, 99:16, 99:17, 99:19, 99:24, 100:1, 100:3, 102:3, 113:3, 113:4, 117:24, 118:2, 118:10, 118:12, 118:20, 118:23, 118:25, 119:1, 119:7, 119:8, 119:12, 119:24, 120:5, 126:1, 126:15, 126:21, 126:25, 127:3, 127:8, 127:12, 129:1, 129:3, 129:5, 129:6, 129:10, 129:20
**support** [4] - 31:21, 34:9, 109:12, 177:13
**supported** [1] - 98:8
**supposed** [8] - 14:15, 178:17, 179:5, 179:6, 192:24, 193:13, 193:20, 193:22
**supposedly** [1] - 178:9
**suppression** [1] - 102:21
**Suspicious** [3] - 158:16, 198:16, 198:17
**suspicious** [32] - 129:12, 151:24, 154:21, 164:20, 164:25, 169:5, 170:18, 172:17, 174:10, 175:18, 177:10, 178:10, 180:14, 184:8, 189:15, 197:11, 197:12, 197:16, 197:18, 197:21, 197:23, 197:24, 197:25, 198:1, 198:10, 198:13, 198:15, 198:20, 198:24, 199:1, 199:2, 199:4
**sustain** [1] - 129:17
**sustained** [2] - 127:17, 127:19
**SUZANNE** [1] - 4:20

**switch** [2] - 12:23, 145:18
**SWORN** [3] - 24:18, 55:20, 150:19
**system** [10] - 14:6, 15:14, 15:15, 15:17, 64:23, 124:7, 125:14, 163:18, 183:9, 183:18
**System** [2] - 64:12, 158:17
**systems** [2] - 18:1, 18:5

# T

**tar** [4] - 98:10, 99:25, 100:5, 100:9
**task** [1] - 53:22
**tasked** [1] - 31:20
**taught** [2] - 57:4, 117:21
**tax** [1] - 122:18
**taxed** [1] - 122:19
**taxes** [1] - 119:23
**teach** [14] - 32:21, 32:22, 33:2, 56:18, 56:20, 56:21, 57:11, 57:12, 57:13, 57:14, 57:17, 60:2, 146:23
**teacher** [1] - 104:11
**teaching** [6] - 56:15, 56:17, 56:18, 57:15, 58:4, 58:19
**team** [8] - 31:20, 34:9, 34:13, 35:5, 35:7, 35:20, 36:6, 36:21
**team's** [2] - 28:23, 28:25
**teams** [2] - 28:23, 28:25
**tech** [1] - 104:13
**technology** [2] - 35:12, 35:24
**Ted** [1] - 25:1
**TEMITOPE** [1] - 4:13
**temporal** [2] - 143:25, 144:2
**temporary** [1] - 25:22
**ten** [7] - 91:14, 95:7, 95:19, 95:23, 95:24, 107:8, 141:2
**tend** [5] - 71:13, 110:3, 121:10, 121:19, 122:4
**tended** [1] - 112:1
**tendency** [1] - 71:10
**tender** [4] - 36:10, 63:12, 158:4, 160:12
**tends** [2] - 126:7, 126:16

**tennis** [2] - 147:21
**tens** [2] - 43:16, 43:18
**Tenth** [1] - 5:12
**terabytes** [1] - 157:4
**term** [2] - 133:22, 198:20
**terminology** [2] - 119:7, 129:3
**terms** [30] - 18:11, 26:22, 29:3, 32:24, 34:1, 35:23, 45:5, 69:4, 70:9, 71:2, 74:15, 83:8, 83:22, 87:1, 87:21, 91:16, 93:20, 97:4, 97:20, 99:24, 112:5, 114:14, 129:13, 135:18, 138:22, 138:23, 143:20, 171:24, 177:16, 200:3
**terrorism** [1] - 34:10
**Terrorism** [1] - 34:12
**test** [1] - 180:6
**testified** [24] - 29:22, 30:2, 30:13, 30:18, 31:14, 38:17, 38:24, 51:22, 52:7, 62:8, 62:22, 109:15, 126:2, 151:13, 152:16, 157:22, 165:22, 166:6, 167:2, 185:1, 189:3, 190:21, 195:10, 197:20
**testify** [4] - 15:24, 130:18, 151:11, 159:19
**testifying** [8] - 8:7, 29:19, 30:6, 30:25, 31:6, 39:11, 39:12, 62:7
**testimonies** [1] - 62:9
**testimony** [52] - 9:11, 9:12, 13:8, 15:19, 16:11, 16:19, 18:22, 21:15, 21:22, 29:15, 29:16, 39:8, 39:14, 62:18, 62:24, 63:3, 65:14, 65:17, 70:5, 103:14, 112:19, 134:16, 135:10, 137:5, 139:16, 147:1, 147:4, 152:3, 161:3, 163:16, 165:3, 165:20, 166:1, 166:23, 167:5, 170:9, 179:4, 179:18, 188:21, 189:8, 189:18,

189:22, 190:22, 190:24, 191:3, 195:3, 195:5, 196:24, 197:1, 199:18, 199:23
**tests** [1] - 168:9
**Texas** [1] - 26:1
**THE** [147] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:7, 7:8, 7:9, 7:11, 7:12, 7:13, 13:12, 13:17, 14:14, 21:2, 21:17, 23:16, 23:18, 23:20, 23:22, 23:24, 23:25, 24:3, 24:6, 24:8, 24:12, 24:14, 24:15, 24:16, 24:19, 34:23, 34:25, 36:13, 36:18, 36:23, 40:15, 40:20, 47:16, 47:19, 51:1, 51:3, 51:12, 54:23, 54:25, 55:2, 55:4, 55:7, 55:11, 55:13, 55:17, 55:23, 55:24, 57:6, 63:14, 63:19, 70:11, 70:15, 81:19, 104:10, 104:12, 104:16, 104:19, 106:14, 106:18, 115:24, 116:1, 116:8, 117:9, 117:12, 117:15, 121:5, 127:17, 127:19, 127:22, 129:16, 129:24, 130:2, 130:4, 130:9, 130:12, 130:21, 130:23, 131:1, 131:4, 131:5, 131:6, 134:22, 134:24, 135:1, 141:19, 141:24, 141:25, 145:13, 145:15, 146:6, 147:5, 147:6, 147:18, 147:20, 147:25, 148:3, 148:6, 148:7, 149:15, 149:20, 149:25, 150:3, 150:8, 150:13, 150:16, 150:22, 150:23, 151:1, 158:7, 158:9, 158:11, 160:4, 160:7, 160:15, 160:21, 163:24, 165:5, 165:9, 182:3, 182:10, 182:14, 182:24, 183:1, 187:2, 187:5, 187:8, 187:18, 189:10,

189:19, 189:25, 191:11, 191:14, 196:13, 196:19, 199:8, 199:10, 199:12, 199:14, 199:20, 199:25, 200:5, 200:9
**themselves** [2] - 162:11, 190:4
**THEODORE** [1] - 24:18
**Theodore** [3] - 24:10, 24:15, 36:11
**Theoretical** [1] - 17:3
**theoretical** [8] - 124:13, 135:21, 137:3, 140:4, 140:7, 140:9, 142:25, 194:9
**theoretically** [2] - 17:19, 124:11
**theories** [1] - 84:19
**theory** [6] - 60:1, 85:1, 85:2, 85:16, 124:15, 142:18
**therapy** [2] - 18:10, 18:23
**thereafter** [2] - 159:18, 194:24
**therefore** [4] - 65:7, 66:12, 110:14, 170:17
**thereof** [1] - 153:18
**they've** [3] - 80:7, 133:16, 177:17
**thinking** [2] - 112:23, 125:19
**third** [5] - 11:1, 30:20, 114:20, 153:9
**third-party** [1] - 11:1
**Thomas** [2] - 2:10, 30:10
**thousands** [4] - 43:16, 43:19, 157:4, 157:5
**Three** [1] - 6:5
**three** [15] - 6:12, 30:4, 30:5, 65:20, 85:12, 87:13, 100:21, 103:1, 123:16, 137:12, 137:13, 137:20, 152:24, 172:5
**threshold** [23] - 168:8, 168:10, 168:15, 168:21, 168:25, 174:19, 175:2, 175:6, 175:9, 175:11, 175:20, 175:25, 176:4, 176:9, 176:13, 176:16, 176:24,

177:3, 177:9,
178:11, 178:12,
193:19
**thresholds** [2] -
167:10, 174:6
**threw** [1] - 40:24
**throughout** [1] - 60:1
**tightened** [1] - 10:13
**timing** [3] - 82:2, 82:8,
148:25
**TIMOTHY** [1] - 5:9
**tip** [1] - 15:3
**title** [1] - 61:3
**Tobacco** [2] - 30:20,
30:21
**today** [26] - 19:19,
37:3, 37:7, 38:17,
38:20, 51:7, 56:18,
74:13, 78:19, 83:22,
96:25, 100:23,
123:21, 127:11,
139:19, 146:24,
149:6, 150:5, 150:7,
151:11, 159:19,
197:20, 199:16,
199:18, 200:7
**together** [13] - 71:9,
72:1, 72:5, 78:25,
79:2, 80:13, 81:4,
91:12, 101:2, 102:3,
104:1, 147:21,
162:10
**tomorrow** [6] -
130:18, 149:2,
149:7, 149:8, 149:9,
200:3
**tongue** [1] - 15:3
**tonight** [1] - 148:24
**took** [3] - 42:22,
136:1, 195:14
**tool** [1] - 19:17
**tools** [11] - 10:8, 11:5,
12:9, 17:8, 17:20,
18:9, 18:14, 18:24,
19:1, 19:9, 19:14
**top** [4] - 49:6, 59:6,
112:8, 139:5
**topic** [1] - 125:24
**total** [5] - 8:21, 44:9,
49:4, 183:23, 195:15
**totality** [1] - 46:17
**toward** [2] - 95:17,
111:25
**Tower** [2] - 3:4, 4:23
**town** [4] - 130:22,
148:4, 194:21,
199:24
**track** [2] - 37:20,
132:25
**tracking** [3] - 37:19,

158:21
**Trade** [4] - 34:14,
63:9, 155:25, 157:2
**traditionally** [1] -
98:10
**trailing** [2] - 167:10,
174:18
**training** [4] - 34:11,
35:1, 35:2, 146:13
**trajectory** [1] - 137:15
**transacted** [1] - 50:19
**transaction** [2] -
44:10, 157:3
**transactional** [14] -
13:3, 13:21, 38:2,
38:4, 38:6, 39:13,
43:12, 49:3, 52:1,
52:4, 53:4, 54:17,
161:14, 185:9
**transactions** [15] -
42:25, 43:15, 43:16,
43:19, 44:11, 44:21,
46:12, 46:13, 48:3,
49:5, 49:24, 50:20,
54:14, 124:1, 159:17
**transcript** [3] - 6:19,
188:10, 201:4
**transformed** [1] -
141:3
**transgressed** [1] -
16:7
**transiting** [1] - 93:15
**transition** [5] - 96:8,
101:19, 103:3,
134:7, 136:4
**transitioning** [2] -
29:3, 134:5
**translated** [1] - 132:1
**treated** [1] - 42:1
**tremendously** [1] -
122:23
**trend** [1] - 45:7
**trending** [1] - 44:14
**trends** [1] - 45:5
**trial** [13] - 29:15, 39:8,
62:7, 62:8, 62:10,
149:21, 152:17,
157:22, 161:2,
165:20, 166:1,
166:23, 188:10
**TRIAL** [1] - 1:16
**Trial** [1] - 200:12
**trials** [1] - 30:19
**Tribunal** [1] - 29:24
**tribunal** [2] - 30:3
**tried** [2] - 84:24,
191:16
**tries** [3] - 109:19,
129:5, 129:6
**trigger** [1] - 193:13

**triggered** [1] - 174:19
**trip** [1] - 148:4
**tripled** [2] - 109:24,
113:1
**true** [14] - 8:22, 10:14,
11:7, 69:19, 82:5,
119:16, 124:9,
128:1, 136:12,
137:4, 137:7,
137:14, 137:20,
153:24
**trustee** [2] - 30:14,
30:17
**truth** [1] - 159:5
**try** [9] - 76:10, 84:8,
120:4, 125:25,
128:19, 164:20,
191:24, 193:4,
198:21
**trying** [15] - 107:5,
108:8, 108:10,
108:24, 110:14,
117:5, 118:6,
123:22, 125:23,
127:10, 130:21,
136:10, 165:14,
192:10, 195:6
**turn** [14] - 65:12,
90:13, 133:9,
146:23, 162:24,
163:1, 165:17,
173:1, 173:2,
173:17, 173:18,
177:17, 181:2,
184:24
**turned** [7] - 168:17,
172:18, 173:6,
176:13, 177:9,
178:2, 181:5
**turning** [2] - 133:24,
163:6
**turns** [3] - 96:18, 98:7,
169:6
**Twelfth** [3] - 4:19,
4:21, 5:5
**two** [32] - 8:22, 30:18,
48:5, 48:8, 48:13,
48:25, 57:22, 72:1,
72:25, 75:5, 75:14,
76:3, 76:10, 83:3,
84:14, 86:3, 89:11,
89:14, 98:9, 99:10,
99:25, 112:4,
119:18, 145:15,
145:20, 145:22,
147:20, 148:18,
173:22, 178:17,
193:1, 199:17
**type** [10] - 10:3, 28:16,
94:8, 129:7, 156:12,

156:21, 156:23,
157:6, 171:2, 180:3
**typed** [1] - 117:24
**types** [8] - 42:11, 72:3,
74:25, 99:24,
145:17, 156:15,
179:17, 179:24
**typically** [6] - 27:5,
27:6, 35:9, 35:11,
122:2, 133:21

## U

**U.S** [1] - 29:24
**UCLA** [1] - 56:9
**uh-oh** [1] - 104:13
**ultimate** [3] - 58:12,
138:12, 138:16
**ultimately** [8] - 26:9,
58:17, 67:22, 68:3,
74:5, 133:4, 138:25,
149:23
**umbrella** [1] - 71:17
**umbrellas** [3] - 71:12,
71:13, 71:14
**unavailable** [1] -
163:3
**under** [13] - 27:10,
36:7, 47:14, 50:24,
60:9, 60:10, 74:15,
85:16, 174:7,
175:12, 178:1,
178:6, 193:3
**underestimate** [2] -
110:3, 112:2
**underlies** [1] - 37:24
**underline** [1] - 74:19
**underlying** [5] - 159:3,
162:2, 169:9,
174:24, 177:5
**underrepresented** [1]
- 91:24
**understood** [3] -
11:13, 152:13,
166:15
**undertake** [4] - 107:2,
180:8, 180:12, 186:9
**undertaken** [3] -
53:11, 156:12,
156:23
**undertook** [1] - 180:3
**unemployment** [1] -
59:16
**unfettered** [1] - 123:11
**unique** [1] - 35:8
**unit** [4] - 34:10, 107:8,
168:14, 190:22
**United** [3] - 7:2, 53:23,
62:19
**UNITED** [2] - 1:1, 1:17

**units** [14] - 42:18,
42:21, 43:1, 43:7,
44:10, 49:4, 53:10,
53:12, 65:25, 107:8,
107:9, 168:1, 168:6,
193:11
**universe** [1] - 18:19
**university** [4] - 56:17,
56:19, 56:20, 125:16
**University** [18] - 25:8,
25:9, 32:18, 36:4,
56:7, 56:9, 56:10,
56:11, 56:14, 56:15,
56:24, 57:7, 57:11,
60:15, 106:10,
127:14, 156:4, 156:6
**unlawful** [10] - 151:24,
154:7, 154:21,
169:5, 170:18,
175:17, 178:11,
180:14, 184:8, 199:5
**unless** [2] - 126:3,
126:10
**unpack** [1] - 153:15
**unrelated** [1] - 154:17
**unreliable** [9] -
152:24, 153:8,
153:14, 154:1,
154:5, 154:14,
155:4, 167:1, 167:4
**untreated** [2] - 10:16,
10:20
**unusual** [2] - 121:14,
121:19
**unweighted** [1] -
88:19
**up** [105] - 9:18, 10:13,
21:9, 28:17, 30:23,
34:2, 34:6, 35:13,
44:1, 45:22, 46:3,
48:19, 52:20, 53:8,
66:19, 66:20, 69:6,
71:10, 71:17, 72:19,
72:22, 73:8, 75:4,
75:5, 75:6, 75:24,
75:25, 76:4, 76:6,
76:14, 76:22, 77:2,
77:19, 77:20, 78:16,
79:9, 79:23, 80:6,
80:25, 81:14, 82:19,
82:21, 83:1, 86:3,
88:2, 89:6, 91:1,
96:22, 96:25, 97:2,
97:24, 97:25, 99:6,
99:20, 100:13,
101:2, 101:8, 101:9,
101:11, 102:11,
107:15, 107:22,
108:19, 112:3,
113:16, 114:11,

114:14, 117:25, 118:1, 123:3, 123:5, 124:11, 124:24, 129:1, 130:12, 131:7, 133:1, 133:3, 133:16, 136:25, 139:13, 142:11, 142:23, 143:3, 143:23, 146:21, 149:5, 152:1, 152:2, 164:16, 166:16, 167:15, 167:24, 171:16, 174:14, 175:22, 177:22, 181:11, 185:15, 186:15, 187:15, 195:16

**updated** [2] - 149:19, 149:20

**users** [3] - 58:12, 135:11, 142:7

**uses** [9] - 109:24, 143:25, 161:17, 161:19, 168:8, 175:5, 175:9, 175:13, 199:2

**usual** [1] - 94:10

**utilized** [3] - 41:23, 169:9, 183:15

---

## V

**VA** [5] - 185:23, 186:4, 186:8, 186:11, 186:19

**valid** [5] - 153:24, 171:3, 174:10, 177:9, 183:3

**validated** [2] - 179:22, 189:14

**validity** [3] - 152:14, 171:6, 180:7

**valuation** [1] - 29:25

**valuations** [1] - 30:2

**value** [2] - 59:17, 60:3

**valued** [1] - 30:7

**variable** [1] - 73:4

**variation** [5] - 89:11, 89:17, 89:18, 98:23

**variations** [4] - 89:15, 90:11, 101:13

**various** [8] - 26:21, 35:15, 38:11, 58:16, 148:20, 155:22, 163:7, 183:25

**vast** [1] - 169:15

**Ventura** [1] - 3:15

**verified** [1] - 179:21

**versa** [1] - 107:10

**version** [1] - 90:23

---

**versus** [4] - 21:21, 49:24, 100:5, 111:2

**vertical** [3] - 73:2, 88:14, 138:10

**vice** [1] - 107:10

**view** [12] - 64:16, 65:23, 65:24, 74:3, 96:11, 102:16, 108:4, 108:18, 111:21, 116:7, 142:8

**viewed** [2] - 102:19, 169:5

**viewpoint** [1] - 118:7

**views** [1] - 167:3

**violence** [2] - 122:20, 124:21

**VIRGINIA** [2] - 1:1, 1:18

**Virginia** [50] - 4:24, 7:3, 7:20, 9:17, 9:18, 10:5, 19:25, 26:1, 53:13, 53:21, 54:5, 54:20, 73:6, 82:5, 82:8, 82:17, 83:9, 83:10, 83:17, 83:19, 92:16, 102:17, 102:19, 102:20, 102:24, 110:13, 114:4, 114:5, 132:13, 132:24, 139:2, 139:7, 141:11, 141:22, 151:22, 172:7, 184:7, 185:24, 192:6, 192:9, 194:13, 196:10, 196:12, 196:22, 197:9, 198:4, 198:8, 198:10, 198:14

**visual** [4] - 172:2, 173:15, 176:6, 183:20

**voir** [2] - 158:8, 158:10

**volume** [15] - 54:1, 69:4, 132:7, 132:8, 132:10, 132:12, 132:23, 137:22, 168:9, 168:14, 168:24, 172:9, 175:15, 193:15, 197:7

**VOLUME** [1] - 1:16

**volumes** [1] - 197:4

**voluminous** [1] - 43:13

**voodoo** [1] - 57:25

**vs** [3] - 31:13, 187:25, 201:6

---

## W

**wages** [1] - 62:23

**waited** [1] - 135:2

**WAKEFIELD** [1] - 5:13

**walk** [2] - 117:23, 182:1

**Wall** [2] - 123:15, 124:5

**war** [2] - 106:13, 123:9

**warned** [1] - 22:23

**Washington** [7] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12, 36:3

**water** [2] - 142:13, 142:14

**Waterhouse** [1] - 28:3

**ways** [1] - 144:5

**weak** [3] - 88:18, 138:16, 138:21

**WEBB** [1] - 3:11

**Webb** [1] - 3:12

**website** [2] - 182:22, 195:11

**week** [3] - 148:10, 148:15, 149:13

**weeks** [1] - 193:9

**weight** [5] - 131:22, 131:24, 131:25, 132:2, 182:3

**weighted** [1] - 113:10

**weighting** [2] - 92:25, 93:1

**weights** [1] - 113:14

**welcome** [1] - 149:15

**welcomed** [1] - 149:10

**West** [49] - 7:3, 7:19, 9:16, 9:18, 10:5, 19:25, 26:1, 53:13, 53:21, 54:5, 54:19, 73:5, 82:5, 82:8, 82:17, 83:9, 83:10, 83:17, 83:18, 92:15, 102:17, 102:18, 102:20, 102:24, 110:13, 114:4, 114:5, 132:13, 132:24, 139:1, 139:6, 141:10, 141:22, 151:22, 172:7, 184:7, 185:24, 192:6, 192:8, 194:13, 196:10, 196:12, 196:22, 197:8, 198:4, 198:8, 198:10, 198:14

**WEST** [2] - 1:1, 1:18

**west** [24] - 97:5, 97:6, 97:14, 97:16, 97:23,

---

98:1, 98:6, 98:20, 99:4, 99:6, 99:7, 99:9, 99:20, 100:1, 100:18, 100:19, 100:24, 101:6, 101:8, 103:7, 110:21, 111:2, 113:20, 113:25

**western** [2] - 96:21, 98:10

**whereas** [3] - 91:13, 95:17, 175:3

**whisper** [1] - 130:8

**whole** [10] - 57:24, 81:25, 82:1, 82:3, 82:14, 83:15, 94:15, 133:7, 134:6, 146:23

**wholesale** [1] - 128:17

**WICHT** [1] - 4:18

**wide** [4] - 14:15, 58:22, 61:12, 189:11

**widely** [4] - 59:9, 59:11, 59:18, 123:1

**Williams** [2] - 4:18, 5:4

**willing** [4] - 115:16, 119:8, 119:12, 119:15

**willingness** [2] - 118:12, 118:13

**winners** [2] - 30:17, 57:2

**wise** [1] - 87:11

**witness** [36] - 8:7, 8:16, 8:20, 13:15, 24:11, 40:18, 43:25, 50:21, 54:25, 55:6, 55:15, 62:1, 62:5, 117:8, 148:9, 149:6, 149:8, 150:6, 150:9, 150:12, 158:8, 158:10, 160:8, 160:13, 160:16, 163:17, 163:19, 165:2, 182:13, 187:8, 189:4, 189:8, 191:7, 199:17, 200:2

**WITNESS** [33] - 7:7, 7:9, 7:10, 7:12, 23:24, 24:3, 24:15, 24:18, 34:25, 55:4, 55:17, 55:20, 55:24, 70:15, 104:12, 104:16, 104:19, 121:5, 130:23, 131:5, 134:22, 135:1, 141:24, 145:15, 147:5, 147:20, 148:6, 150:16, 150:19,

---

150:23, 165:9, 187:5, 199:14

**witness's** [1] - 13:8

**witnesses** [4] - 148:19, 149:5, 199:16, 199:17

**WOELFEL** [1] - 3:9

**Woelfel** [2] - 3:9

**women** [5] - 91:6, 91:10, 91:12, 91:13, 91:22

**wonder** [1] - 13:14

**WONDER** [1] - 102:21

**word** [6] - 131:21, 132:7, 150:3, 197:18, 198:1, 199:2

**words** [3] - 49:2, 85:7, 89:17

**work's** [1] - 122:7

**works** [8] - 59:10, 64:18, 67:11, 100:12, 106:22, 124:17, 126:13, 193:14

**world** [15] - 86:12, 87:18, 125:4, 125:21, 137:16, 137:17, 137:24, 137:25, 154:17, 179:7, 179:10, 179:24, 180:4, 180:9, 182:19

**World** [1] - 34:14

**worry** [1] - 116:24

**worth** [1] - 136:9

**worthy** [1] - 35:11

**write** [3] - 67:22, 105:14, 166:12

**writing** [2] - 22:6, 160:10

**writings** [1] - 125:5

**written** [11] - 7:19, 22:5, 22:9, 22:13, 22:15, 59:8, 76:25, 77:12, 105:16, 120:15, 123:15

**wrote** [2] - 139:14, 162:3

**WU** [50] - 5:10, 150:11, 150:25, 151:2, 151:4, 152:1, 152:5, 155:6, 155:8, 158:4, 160:12, 160:19, 160:22, 160:23, 163:19, 164:1, 164:2, 165:2, 165:8, 165:16, 166:16, 166:18, 167:14, 167:17, 170:5, 170:7, 171:16,

171:18, 174:14,
174:16, 177:22,
177:24, 179:1,
179:3, 181:11,
181:13, 181:23,
182:11, 182:16,
182:17, 183:5,
184:21, 184:23,
185:15, 185:17,
186:25, 189:7,
191:5, 196:15, 199:9
**Wu** [4] - 150:10,
160:10, 196:14,
199:8
**WV** [6] - 2:8, 3:10,
3:13, 4:24, 5:15, 6:9

## Y

**year** [20] - 28:13,
44:10, 45:21, 46:25,
47:8, 49:4, 60:8,
73:3, 84:15, 88:7,
97:8, 131:20,
132:13, 180:18,
182:22, 183:9,
183:12, 195:23
**years** [34] - 8:8, 8:9,
11:10, 11:12, 29:6,
30:24, 31:3, 32:3,
33:7, 33:10, 33:19,
45:6, 46:14, 48:3,
61:6, 73:1, 73:16,
91:7, 95:7, 95:19,
95:23, 95:25, 125:9,
125:10, 135:14,
137:7, 137:8, 141:2,
156:8, 157:5, 186:11
**yellow** [5] - 44:18,
44:20, 44:21, 45:23
**yesterday** [6] - 10:7,
17:11, 18:9, 20:2,
20:6, 24:1
**York** [3] - 3:5, 25:21,
27:1
**Young** [2] - 31:12,
31:13
**young** [4] - 91:10,
91:12, 91:19
**younger** [7] - 91:15,
91:20, 93:1, 93:7,
95:17, 102:24
**yourself** [7] - 24:24,
27:17, 27:19, 27:22,
56:3, 151:5, 180:8

## Z

**zip** [1] - 197:13
**Zoom** [1] - 199:24