```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                        AT CHARLESTON


_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
```

BENCH TRIAL - VOLUME 37
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


JULY 9, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:            Ayme Cochran, RMR, CRR
Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A. Faber,

 2    Senior Status Judge, United States District Court, Southern

 3    District of West Virginia, in Charleston, West Virginia, on

 4    July 9, 2021, at 9:00 a.m., as follows:

 5          THE COURT:  Good morning, everybody.

 6          MS. MAINIGI:  Your Honor, just to clean up the

 7    housekeeping, we've accepted -- or we would be willing to

 8    accept, if Your Honor is still willing to offer, the

 9    invitation to do closings the week of the 26th.

10          And, so, the plaintiffs and defendants have agreed to

11    do the closings on the 27th and 28th if that still suits

12    Your Honor.

13          We would also propose six hours per side.  And

14    defendants will probably divide up 2-2-2 for planning

15    purposes.

16          THE COURT:  Okay.  27 and 28?

17          MS. MAINIGI:  Yes, Your Honor.

18          THE COURT:  Mr. Farrell.

19          MR. FARRELL:  Yes, sir.  And, so, the

20    plaintiffs -- I don't know that we would use the entire six

21    hours.  All we insist on is equal time available.  And we

22    would also like to reserve for rebuttal closing.

23          THE COURT:  Okay.  Well, this tells me all I need

24    to know for now and that's what we'll do.

25          MS. MAINIGI:  Thank you, Your Honor.
```

```
 1              THE COURT:  Now, are we ready to -- we have one
 2    witness today; is that right?
 3              MS. WICHT:  That's right, Your Honor.
 4              THE COURT:  Okay.
 5              MS. WICHT:  Good morning, Your Honor.  Cardinal
 6    Health calls John MacDonald.
 7              THE COURT:  Okay, Ms. Wicht.
 8              THE CLERK:  Would you please state your name.
 9              THE WITNESS:  John J. MacDonald, III.
10              THE CLERK:  Thank you.  Please raise your right
11    hand.
12    JOHN J. MACDONALD, III, DEFENDANTS' WITNESS, SWORN
13              THE CLERK:  Thank you.  Please take a seat.
14              THE COURT:  Good morning, sir.
15              THE WITNESS:  Good morning.
16              THE COURT:  Whenever you're ready, Ms. Wicht.
17              MS. WICHT:  Thank you, Your Honor.
18                        DIRECT EXAMINATION
19    BY MS. WICHT:
20    Q.   Good morning, Mr. MacDonald.  Could you please
21    start by introducing yourself to the Court?
22    A.   Good morning.  My name is John Joseph McDonald, III.
23    Q.   And what is your current job, Mr. MacDonald?
24    A.   I am the Principal Executive Officer and President of
25    the Berkeley Research Group.
```

1    **Q.**    And what is the Berkeley Research Group, or BRG as

2    we've commonly referred to it?

3    **A.**    It's a global consulting firm comprised of

4    approximately 1,400 individuals.  We have many services, but

5    one of our dominant services is we provide expertise in

6    legal and investigation settings.

7    **Q.**    And were you one of the founding members of Berkeley

8    Research Group?

9    **A.**    I was.

10   **Q.**    And could you -- are you a member of any particular

11   practice groups or practice areas at BRG?

12   **A.**    In addition to serving in an executive role with the

13   firm, I am one of the senior leaders of our health analytics

14   practice.

15   **Q.**    And could you just briefly describe the type of work

16   that you do at BRG in addition to your -- let's leave aside

17   your sort of executive responsibilities with the firm.

18   Other than that, could you describe the work you do?

19   **A.**    I deal with economic, financial, and accounting issues

20   within the healthcare space, particularly related to roles

21   and matters involving very large datasets.

22        So I have a particular emphasis around data analytics.

23   I have worked with all types of entities within the

24   healthcare continuum, but with a special focus on the

25   pharmaceutical supply chain.

**Q.**   And how long have you been doing that type of work,
data analytics in the healthcare space, or data analytics in
general?

**A.**   25 plus years.

**Q.**   And did you work at other companies prior to founding
BRG and working there?

**A.**   I have.

**Q.**   And what are some of the other companies that you
worked at?

**A.**   I began my career with Navigant Consulting, actually at
a predecessor brand name of Navigant Consulting from
predominantly accounting and finance oriented individuals.

I left Navigant to join the Law and Economic Consulting
Group which was a firm of Ph.D. economists.

I founded the Healthcare Practice at LECG.  And then
with a group of the economists from LECG and a few others,
founded the Berkeley Research Group approximately 11 years
ago.

**Q.**   And how long -- you mentioned that you have 25 to 30
years of experience in sort of general data analytics work.
How much of that time has been focused on the healthcare
industry would you estimate?

**A.**   Over the last 25 years, 95 percent plus.

**Q.**   And over the course of your career, has your consulting
work involved the analysis of large datasets?

1    **A.**    It has always involved the analysis of large datasets.

2    The definition of "large" has obviously evolved over time

3    from -- there was a time when a couple of gigabytes of data

4    was considered very large.  And we've moved into a world

5    where terabytes and approaching petabytes of data is now

6    what we deal with.

7    **Q.**    And has your healthcare data analytics work included

8    analysis of trends and patterns in data over time?

9    **A.**    Yes.

10   **Q.**    And has your healthcare data analytics work involved

11   developing approaches to identify outlier events or

12   activities?

13   **A.**    That is very often a core element of the work that I do

14   with the healthcare data, yes.

15   **Q.**    And could you explain what you mean by the term

16   "outlier" and sort of how you do outlier identification in

17   large datasets, just generally conceptually?

18   **A.**    So the identification -- or outlier identification and

19   evaluation I consider to be a two-step process.  And this is

20   something I have spoken on at conferences.

21        The first step is to employ an algorithm or a

22   programmatic approach to identify things that may be a

23   candidate for being tagged as unusual or outside of the

24   norm.

25        And then the second step is to apply a, a more

1    subjective -- not subjective -- or expert oriented

2    evaluation to put the data points into the context of the

3    situation that surrounds them.  So identify with program and

4    then evaluate with judgment.

5    **Q.**   Okay.  And I think you mentioned earlier that you have

6    done particularly a large amount of work with the

7    pharmaceutical supply chain; is that right?

8    **A.**   I have.

9    **Q.**   And could you just describe generally, not identifying

10   particular clients, but what types of companies you've

11   worked with in the past in the healthcare -- in the

12   pharmaceutical supply chain?  Excuse me.

13   **A.**   There are three main elements of the -- or types of

14   players in the pharmaceutical supply chain.

15        At the one end, you have the manufacturers, suppliers.

16   In the middle you have the suppliers or the wholesalers.

17   And then at the other end, you have the dispensers.  And

18   that can be retail pharmacies, mail-order pharmacies,

19   hospital pharmacies, et cetera.

20        And I have had substantial experience working directly

21   with pharmaceutical clients analyzing their data under a

22   variety of issues or needs.  I've worked with the

23   distributors.  And I've worked extensively with the end

24   dispensers.

25   **Q.**   And in connection with that work that you've done in

1    the, in the pharmaceutical supply chain over the course of

2    your career, have you examined large datasets of, for

3    example, purchase and sales transactions?

4    **A.**    I have.

5    **Q.**    And in connection with your work in this case, were

6    there a variety of large datasets that you analyzed?

7    **A.**    There have been, yes.

8    **Q.**    And could you just list off a few of those datasets

9    that you analyzed for your work in this case?

10   **A.**    There's the dataset as produced by the plaintiff, what

11   I have referred to as the McCann dataset.  The McCann

12   dataset is an aggregated dataset that Mr. McCann has built

13   from ARCOS data and other datasets that have been produced

14   by the distributors.  I have looked at his dataset.

15        I have looked at the underlying ARCOS data in its, in

16   its native format, both the details data that has been

17   produced in this litigation, as well as the publicly

18   available data.

19        I have analyzed federal Medicaid Part D data that is

20   available, publicly available.  I have identified various

21   coding sets.

22        One example would be from Elsevier which is a coding

23   set that allows you to group types of drugs into drug

24   families or drug categories.  I've interacted with

25   pharmaceutical prescription data.

1    **Q.**   How about data that was produced by Cardinal Health?

2    Is there Cardinal Health produced data that you analyzed in

3    this case?

4    **A.**   There has been.  There have been data -- Cardinal

5    Health distribution dataset which is the distributions from

6    its sales system into the, the Cabell/Huntington region not

7    only for opioid-related products, but for all distributions

8    into the region.

9         I've also analyzed data related to their anti-diversion

10   program, so the, the data identifying held orders, which of

11   those held orders were released versus cut and reported to

12   the DEA.  I've looked at data related to their due diligence

13   efforts.

14   **Q.**   And have you -- Mr. MacDonald, have you testified

15   previously as an expert in courts or other tribunals?

16   **A.**   I have.

17   **Q.**   And approximately how many times have you testified in

18   court or another tribunal?

19   **A.**   Prior to today in a, in a court or tribunal I believe I

20   have testified three times in a court setting and one time

21   in a, in an arbitration setting.

22   **Q.**   And on each of those occasions, were you qualified to

23   testify as an expert witness?

24   **A.**   I have been, yes.

25   **Q.**   And you have given -- have you given previous expert

1    testimony outside of court; for example, in a deposition

2    setting?

3    **A.**    I've been deposed several dozen times.  I don't have a

4    precise count.

5    **Q.**    And speaking just very generally at a high level, what

6    were the assignments that you were asked to undertake in

7    this case to offer testimony today?

8    **A.**    I was asked to look at the flagging methodologies as

9    presented by the plaintiff experts in this case.

10        I've also been asked to look at the underlying data to

11   be able to evaluate that data in the context of prescribing

12   histories, prescribing data, quota data, so to both respond

13   to plaintiff experts and to be able to describe the data

14   that was being viewed by Cardinal in the normal course of

15   business or that was available to the regulators and law

16   enforcement in the normal course of business.

17   **Q.**    Okay.  And we'll get into the substance and the details

18   of your opinion.  But did your review and analysis of the

19   datasets that you've described, based on your experience in

20   data analytics, allow you to reach certain conclusions about

21   Cardinal Health's distribution of medications and about

22   certain opinions offered by some of the plaintiffs' experts?

23   **A.**    It has.

24   **Q.**    And when you were reaching those conclusions that we'll

25   talk about today, did you rely on principles and methods

1    that are widely used in your field?

2    **A.**    I have.

3              MS. WICHT:  Your Honor, at this time I would offer

4    Mr. MacDonald as an expert in data analytics related to the

5    pharmaceutical supply chain.

6              THE COURT:  Any objection?

7              MR. FULLER:  Not to that qualification.

8              THE COURT:  I'm sorry?

9              MR. FULLER:  Not to that qualification, Your

10   Honor.

11             THE COURT:  All right.  The Court finds that Mr.

12   MacDonald is an expert in data analytics related to the

13   pharmaceutical supply chain.

14             THE WITNESS:  Thank you, Your Honor.

15             MS. WICHT:  Thank you, Your Honor.

16   BY MS. WICHT:

17   **Q.**    Okay.  Mr. MacDonald, as part of your work in this

18   case, did you review information reflecting the rate at

19   which West Virginians were prescribed medications?

20   **A.**    I have.

21   **Q.**    And did you evaluate how those rates compared to

22   national rates?

23   **A.**    I have.

24   **Q.**    And did you prepare a chart that reflects your analysis

25   today?

1   **A.**   I have.

2   **Q.**   Okay.

3           MS. WICHT:  Your Honor, I'd ask to publish Slide

4   1, please.

5           THE COURT:  All right.  You may.

6   BY MS. WICHT:

7   **Q.**   Okay.  Mr. MacDonald, just at a very high level,

8   could you please describe what is the nature of the

9   analysis that's reflected in this graph?

10  **A.**   This graph depicts the rate at which West Virginians

11  are prescribed pharmaceutical products relative to the

12  national average.  The data is pulled from an on-line data

13  source.  The source is the Kaiser Family Foundation which is

14  a very large, not-for-profit research institute that

15  publishes on a variety of healthcare-related issues.

16  **Q.**   I'm sorry.

17  **A.**   For example, if you look at 2005, the way to read this

18  chart is the average West Virginian in 2005 was prescribed

19  15.3 pharmaceutical prescriptions.  And that is 41.7 percent

20  higher than the national average of, of prescriptions per

21  capita.

22  **Q.**   Okay.  So if we look at this chart, then, Mr.

23  MacDonald, am I correctly understanding that what's being

24  reflected by the blue bars is the amount that West

25  Virginians are above the national average?  Is that right?

1    **A.**    That is correct.

2    **Q.**    And you mentioned in 2005 it was 41.7 percent above the

3    national average.  And how much above the national average

4    was West Virginia in 2010?

5    **A.**    54 percent above the national average.

6    **Q.**    And according to the data that you reviewed, how many

7    prescriptions per capita were there in West Virginia in

8    2010?

9    **A.**    18.5.

10   **Q.**    And let's do the same for 2015, Mr. MacDonald.  How

11   many -- what was the average prescriptions per capita for

12   West Virginians in 2015?

13   **A.**    21.8.

14   **Q.**    And was that above the national average and by how

15   much?

16   **A.**    That was above the national average by nearly

17   72 percent.

18   **Q.**    And these figures, Mr. MacDonald, are these for all

19   prescriptions of any kind, not just opioids, just all

20   medications?

21   **A.**    They are inclusive of opioids, but it is everything.

22   It's heart medication.  It's Lipitor.  It is anything that

23   involves a prescription.

24   **Q.**    And did you conduct additional analyses comparing the

25   levels of opioids in West Virginia as compared to national

```
 1   levels?

 2   A.   I have.

 3   Q.   And did you prepare a chart reflecting that analysis as

 4   well?

 5   A.   I have.

 6           MS. WICHT:  Mr. Simmons, if we could move to Slide

 7   2, please.

 8   BY MS. WICHT:

 9   Q.   Okay.  Turning to the next set of bars on our

10   graph, Mr. MacDonald, first, could you just start by

11   identifying what data you were analyzing in those blue

12   bars?

13   A.   This is from the distribution data as reflected in the

14   ARCOS retail drug summaries.

15   Q.   And, again, what is the -- what's being represented in

16   the graph?  In other words, what is, what is the blue --

17   what are the blue bars showing us?

18   A.   The blue bars show that the volume of opioids

19   distributed into Virginia [sic] on a per capita basis is

20   45 percent higher than the volume of opioids distributed on

21   a per capita basis throughout the entire United States.

22           THE COURT:  You said Virginia.  I think you meant

23   West Virginia.

24           THE WITNESS:  I'm sorry.  West Virginia.  I live

25   in Virginia.
```

```
1            THE COURT:  We're very sensitive about that.
2         (Laughter)
3            THE WITNESS:  I -- my sincere apology to all West
4     Virginians.
5            MS. WICHT:  Thank you, Your Honor.
6     BY MS. WICHT:
7     Q.    Okay.  So the blue bar reflects that West Virginia
8     is 45.3 percent above the national average in terms of
9     the distribution of prescription opioids; is that
10    correct?  Did I understand that correctly?
11    A.    You did.  That is correct.
12    Q.    And does that reflect distributions to all dispensers
13    in West Virginia?
14    A.    It does.
15    Q.    And did you do an analysis to, to look at the
16    distributions made only to hospitals in West Virginia?
17    A.    I have.
18    Q.    Okay.  And tell us the results when you look only at
19    hospitals in West Virginia.
20    A.    So the hospital population is a subset of the larger
21    population.  So isolating just on distributions directly to
22    hospitals in West Virginia, they are 40.5 percent higher on
23    average on a per capita basis compared to distributions made
24    to hospitals on a per capita basis nationally.
25    Q.    So is it fair to say, Mr. MacDonald, that West Virginia
```

1    is substantially higher than the national average in terms

2    of both the volume of all prescriptions and the volume of

3    opioids?

4    **A.**   Yes.  And, in fact, it's higher when you look at all

5    prescriptions.

6    **Q.**   Relative to opioids?

7    **A.**   Relative to the opioids, yes.  But they are above

8    average on a per capita basis compared to the national

9    averages.

10   **Q.**   Did you also review data in the course of your work

11   related to West Virginians' use of certain non-opioid pain

12   medications?

13   **A.**   I have.

14   **Q.**   And did you prepare a table that reflects your

15   analysis?

16   **A.**   I have.

17             MS. WICHT:  Mr. Simmons, could we please publish

18   Slide 3?

19   BY MS. WICHT:

20   **Q.**   Okay.  Mr. MacDonald, is this the table that you

21   prepared?

22   **A.**   It is.

23   **Q.**   Okay.  So let's start by identifying what data you were

24   analyzing here, please.

25   **A.**   So I do not have access to a dataset or was unable to

1   identify and achieve access to a dataset that dealt with the

2   entire population for non-opioid pain medication.  However,

3   there is a publicly available dataset from the federal

4   government dealing with Medicaid beneficiaries --

5   **Q.**   Medi --

6   **A.**   I'm sorry, Medicare beneficiaries that, that allows one

7   to look at the prescribing behavior across all drugs within

8   the Medicare population.

9        What I have prepared here is a comparison on a per

10  capita basis within the Medicare population within

11  Virginia -- West Virginia and within the, the entire nation.

12  **Q.**   Before we go to the results of that, let me just ask

13  you one more question about the data.  I see that the table

14  reflects that you were looking at the years 2013 through

15  2016.  And could you just explain why those were the years

16  that you were analyzing here?

17  **A.**   The -- those were the years that the data was available

18  on-line at the time I published my report.

19  **Q.**   Okay.  And then if we look at the first line in the

20  table, it lists a drug product that's labeled as NSAIDS.  Do

21  you understand that to refer to non-steroidal

22  anti-inflammatory drugs?

23  **A.**   I do.  That's a class of pain relievers that are

24  non-opioid related pain relievers.

25  **Q.**   But they are prescription pain relievers?  Is that your

1    understanding?

2    **A.**    That is correct.

3    **Q.**    Okay.  And what did you conclude from the Medicare Part

4    D prescription claims data about West Virginians'

5    prescription rates for pain medications?

6    **A.**    As reflected in the federal Medicare data, West

7    Virginians receive 24 percent more prescriptions for NSAIDS

8    than the national average.

9    **Q.**    So West Virginians are -- in this dataset, West

10   Virginians are above the national average with respect to

11   receiving prescriptions for non-opioid pain relievers,

12   NSAIDS; is that right?

13   **A.**    That is correct.

14   **Q.**    And are they also above the national average with

15   respect to receiving prescriptions for opioid medications?

16   **A.**    The, the Medicare population is above average in West

17   Virginia relative to the Medicare population nationally.

18   **Q.**    So according to this data, would it be fair to say that

19   there's a generally higher prescription rate of pain

20   medications in West Virginia, not just higher prescription

21   rates of opioids?

22   **A.**    In my opinion, that's what this chart suggests, yes.

23   **Q.**    Okay.

24            MS. WICHT:  You can take that one down,

25   Mr. Simmons.  Thank you.

1    BY MS. WICHT:

2    **Q.**   Okay.  I'm going to switch topics, Mr. MacDonald,

3    and we're going to start talking about the flagging

4    methodologies.

5         Did you review the expert reports of Dr. McCann and of

6    Mr. Rafalski in this case?

7    **A.**   I have.

8    **Q.**   And have you reviewed the transcripts of the testimony

9    that both Dr. McCann and Mr. Rafalski provided here at

10   trial?

11   **A.**   I have.

12   **Q.**   And just to, to set the stage, Mr. Rafalski offered

13   several different methodologies for potentially flagging

14   pharmacy orders as part of a Suspicious Order Monitoring

15   System; right?

16   **A.**   My understanding and observation is he offered six

17   separate methodologies.

18   **Q.**   And then Dr. McCann sort of implemented those

19   methodologies across his dataset.  And then Mr. Rafalski

20   came into court and testified about those results.  Is that

21   your understanding?

22   **A.**   That is my understanding.

23   **Q.**   Now, did Mr. Rafalski give testimony about which of the

24   six methodologies he believed were viable?

25   **A.**   He focuses on two of his methodologies as viable or

1    relevant in this matter.

2    **Q.**    And were those referred to as Method A and Method B?

3    **A.**    That is my understanding of how he referred to them,

4    yes.

5    **Q.**    Okay.  And did you do, in the course of your work, some

6    data analysis to evaluate how those methodologies operate in

7    terms of flagging orders?

8    **A.**    I have.

9    **Q.**    Okay.  I'm going to start with Method A which Mr.

10   Rafalski also called the six-month trailing method.

11         Now, I know the Court has just heard about this

12   yesterday, so just -- could you just very briefly describe

13   your understanding of how Method A worked?

14   **A.**    Method A looks at sequences of numbers in groups of

15   seven.  And if the seventh number is higher than any of the

16   prior six numbers, it is flagged.

17         And, so, you look at the seventh transaction, decide

18   whether it should be flagged or not.  The algorithm makes a

19   determination.  It then moves to the eighth transaction.

20   And based on transactions two through six, if number eight

21   is higher than two through six, it automatically flags that

22   transaction.

23   **Q.**    And under Method A, once a -- and the transactions

24   that, that Dr. McCann and Mr. Rafalski were looking at in

25   this case were, were shipments, correct, shipments of opioid

1  medications?

2  **A.**   They were aggregated shipments on a month-by-month

3  basis.

4  **Q.**   And then under Method A, once a shipment is flagged,

5  what happens to orders after that?

6  **A.**   Every subsequent shipment is automatically flagged.

7  **Q.**   Now, do you believe in your opinion, Mr. MacDonald,

8  that Method A, the six-month trailing method, is a reliable

9  method to identify orders that are outliers?

10  **A.**   Absolutely not.

11  **Q.**   And why not?

12  **A.**   Because it is indiscriminate in its flagging behavior.

13  I -- regardless of the type of sequence of numbers you throw

14  at it, it, it flags a reasonably similar number of

15  transactions.

16      You can throw weather temperature data at it and it

17  flags a high percentage of the temperature data as, as

18  suspect or just flags.  It doesn't make a determination.  It

19  just says "flagged."

20      You can throw random numbers like dice rolls at it and

21  it flags them.  You can throw opioid prescription order data

22  and it flags them.

23  **Q.**   As part of your testing of the reliability of Method A,

24  did you analyze how Method A would apply to distributions of

25  non-controlled substances by Cardinal Health in Cabell and

 1    Huntington?

 2    **A.**   I have.

 3    **Q.**   And did you prepare a table that reflects that analysis

 4    in your results?

 5    **A.**   I have.

 6              MS. WICHT:  I'll ask to publish, please,

 7    Mr. Simmons, Slide 4.

 8    BY MS. WICHT:

 9    **Q.**   Okay.  Mr. MacDonald, let's start by -- could you

10    just please tell us first what the items above the black

11    line across the table represent, the hydrocodone and the

12    oxycodone numbers here?

13    **A.**   Focused on the data points in the time frame from 2006

14    to 2018 within the McCann dataset, that is the percentage of

15    total hydrocodone and oxycodone orders within the Cardinal

16    Health order system that are flagged by the McCann slash

17    Rafalski process.

18    **Q.**   And I see -- just as a slight detour, I see this is

19    pulled from your report and I see it's referred to here as

20    Method 1.

21         So just to clarify, Mr. Rafalski had, had lettered his

22    methods, right, Method A, B, C, D, et cetera, but that Dr.

23    McCann referred to them by numbers?

24    **A.**   He had.  So Rafalski Method A is equivalent to -- it is

25    the same thing as McCann Method 1.

1    Q.   Okay.  So these numbers, 84.1 percent and 93.3 percent,

2    are the orders that were flagged by Dr. McCann and Mr.

3    Rafalski for hydrocodone and oxycodone respectively in this

4    time period; correct?

5    A.   In the time period 2006 through 2018, that is correct.

6    Q.   Okay.  And could you please generally describe the

7    analysis that, that you did here below the black line in

8    your table?

9    A.   Well, to test the ability of this flagging methodology

10   to identify true outlier events, I have created a, a

11   sequence of monthly orders from Cardinal Health into the

12   Track 2 pharmacies related to five commonly prescribed

13   non-controlled substance related pharmaceutical products.

14   Q.   And, so, this is from -- just to be clear, this was

15   applied to the actual Cardinal Health distribution data;

16   correct?  These were not hypothetical numbers; this is

17   actually what Cardinal Health shipped?

18   A.   It's taking the equivalent data to what's, what's being

19   run through for oxycodone and hydrocodone -- when I say

20   equivalent, it's from -- the original source is the Cardinal

21   distribution data.  And I have just run it through in the

22   identical fashion as to how Mr. McCann technically executes

23   the model.

24   Q.   Okay.  And, so, when you applied Mr. Rafalski's Method

25   A to thyroid medication, for example, that was shipped by

1    Cardinal Health into pharmacies in Cabell and Huntington,

2    what percentage of dosage units did Method A flag of all

3    thyroid medication shipments?

4    **A.**    92.4 percent.

5    **Q.**    And when you looked at -- you looked at a few different

6    types of high blood pressure medication.  And when you

7    applied Mr. Rafalski's Method A to Cardinal Health's

8    shipment of high blood pressure medication into pharmacies

9    in Cabell and Huntington, what were the results?  What

10   percentage were flagged?

11   **A.**    Well, there were two, two specific high blood pressure

12   medicines we looked at.  And the range, the range of

13   flagging was between 92.1 and 93.6 percent.

14   **Q.**    And how about Metformin which is an anti-diabetic

15   medication?  When you applied Method A to Cardinal Health's

16   shipments of that anti-diabetic medication into Cabell and

17   Huntington, what percentage of orders did it flag?

18   **A.**    93.3 percent.

19   **Q.**    So is it fair to say that when you applied Mr.

20   Rafalski's Method A to non-controlled substances, it also --

21   similar to what it had been with oxycodone and hydrocodone,

22   it ended up flagging over 90 percent of the orders?

23   **A.**    Demonstrating that as a flagging mechanism, this

24   mechanism is indiscriminate.  It just flags.

25   **Q.**    And I think you mentioned earlier that you had tested

 1   it on some other things in addition to non-controlled

 2   substances.  Could you just tell us a little bit about that?

 3   **A.**   I designed a -- a simulated a series of several hundred

 4   thousand dice rolls.  And it just automatically flags dice

 5   rolls despite the fact that they're perfectly random, one

 6   through six, and it flags at roughly the same rate.

 7        I threw a series of temperatures at it and it flags

 8   perfectly normal temperatures.  And it just flags.

 9        This is a methodology that will flag any normal

10   distribution of numbers and, again, proving its failure to

11   flag outlier events.  If you throw a series of dice rolls

12   where you have a six-sided dice with a six on each side, it

13   will never flag that series of numbers, despite the fact

14   that that is truly an outlier event.  It wouldn't flag that,

15   but it will flag a normal rolling of dice.

16        So it just flags normal and expected sequences of

17   numbers.  And that's a phenomenon that Mr. McCann

18   acknowledges in his deposition to this, to this case.

19   **Q.**   In your opinion, is Rafalski Method A or McCann Method

20   1, whichever way we want to refer to it, a reliable way to

21   identify pharmacy orders that are outliers?

22   **A.**   Absolutely not.

23   **Q.**   And you mentioned in the beginning of your testimony

24   that, that outlier identification is a two-step process.

25   And, and where is it in that process that this methodology

1    is failing in your opinion?

2    **A.**    It completely fails to take into the context the size

3    of the pharmacy, the nature of the pharmacy, is it a

4    pharmacy that's linked to a hospital.  It failed to take

5    into account whether the pharmacy has a growing market share

6    in its region or a declining market share.  It applies

7    literally no context to what's going on in the environment

8    around, around the pharmacy customer and the orders.

9    **Q.**    And would you consider that, Mr. MacDonald, to be sort

10   of the second step of what you described as outlier analysis

11   where you have to look at the, the context and make a

12   judgment?

13   **A.**    Those would be the initial steps of a contextual

14   analysis.  There can be a lot of factors that would explain

15   something that is flagged by an algorithm but is really, in

16   fact, normal and expected.

17        So you have to apply a contextual analysis to, to the

18   process of flagging unusual orders, which is a process

19   that's directly referred to by the DEA when they say that a

20   pharmaceutical distributor is in a position to know its

21   customers.

22   **Q.**    And would you say that Rafalski Method A, even as to

23   that first step, sort of applying an algorithm and

24   identifying potential outliers, does the methodology fail

25   even on that step as well?

1    **A.**    It's, it's indiscriminate.  It does not identify

2    outliers.  There are mechanisms and other scenarios that you

3    can say, the things you identify outliers.  These algorithms

4    do not identify outliers.  They just flag in a predictable

5    fashion a high percentage of whatever transaction set or

6    dataset you feed through the algorithm machine.

7    **Q.**    Let's turn to discuss Method B which Mr. Rafalski

8    called the six-month trailing fixed first triggered method.

9    And, again, recognizing that the Court has heard a little

10   bit about this just yesterday, could you just please briefly

11   describe how you understand Method B to operate?

12   **A.**    Very similar to Method A.  It, it's based on looking at

13   sequences, seven numbers at a time looking at the seventh

14   number and the prior six.

15        However, unlike the first method that it does that in a

16   continuous basis and then has a carry-forward methodology,

17   this one continues to evaluate every, every order.

18        But once it's triggered the first time, it establishes

19   a threshold for that drug to that pharmacy, and every order

20   that exceeds that threshold in the future.

21        So this artificial threshold that's created by the

22   initial trigger is just assumed by the algorithm to somehow

23   be relevant to every transaction into the future regardless

24   of how far into the future the data series goes.

25   **Q.**    And in your opinion, Mr. MacDonald, do you believe that

```
 1    Method B, the six-month trailing fixed first triggered

 2    method, is a reliable method to identify orders that are

 3    outliers?

 4    A.    Again, I believe it is indiscriminate and it is

 5    incapable of identifying outliers.

 6    Q.    And as you did for Method A, did you conduct certain

 7    tests of the reliability of Mr. Rafalski's Method B?

 8    A.    I have.

 9    Q.    And as you did for Method A, did you test how Method B

10    would apply to Cardinal Health's distributions of

11    non-controlled substances in Cabell and Huntington?

12    A.    I have.

13    Q.    And did you prepare a table that reflects your results?

14    A.    I did.

15          MS. WICHT:  Mr. Simmons, I'd ask you to publish

16    Slide 5, please.

17    BY MS. WICHT:

18    Q.    And is this the result of that analysis, Mr.

19    MacDonald?

20    A.    It is, looking at the same five non-controlled

21    substance products in the prior chart.

22    Q.    Okay.  So, again, starting above the black line where

23    we're looking at hydrocodone and oxycodone, could you just

24    please describe what's reflected in the chart there?

25    A.    During the period 2006 to 2018, Mr. McCann's algorithm
```

1    that was directed by, my understanding, by, by Mr. Rafalski

2    flagged 40.5 percent of the hydrocodone orders.

3    **Q.**   And those are Cardinal Health orders, orders to

4    Cardinal Health; correct?

5    **A.**   Orders from Cardinal Health to the Track 2 pharmacy

6    customers.

7    **Q.**   Okay.  And with respect to oxycodone, Method B in this

8    time period would flag 66 percent of Cardinal Health's

9    distributions to Cabell and Huntington; correct?

10   **A.**   That is correct.

11   **Q.**   And then tell us about what you did here below the

12   black line in the table.

13   **A.**   Similar to the prior chart, I ran the Cardinal Health

14   orders for five non-controlled substance prescription drug

15   products that were distributed to Track 2 pharmacies by

16   Cardinal Health during this period and determined what

17   percentage of those orders would have been flagged by the

18   Method B, Rafalski Method B.

19   **Q.**   So when you looked at, again, at thyroid medications,

20   Mr. MacDonald, what percentage of Cardinal Health shipments

21   to Cabell and Huntington pharmacies of thyroid medication

22   would be flagged by Mr. Rafalski's Method B?

23   **A.**   56.8 percent.

24   **Q.**   And you looked again at the two different classes of

25   high blood pressure drugs into Cabell/Huntington.  And what

1    percentage of those shipments would be flagged by Mr.

2    Rafalski's Method B?

3    **A.**    62.4 percent and 71 percent.

4    **Q.**    And the anti-diabetic medication, Metformin, what

5    percentage of Cardinal Health shipments of those drugs into

6    Cabell/Huntington would be flagged by the application of Mr.

7    Rafalski's Method B?

8    **A.**    75.5 percent.

9    **Q.**    Now, I skipped one that I want to come back to, a

10   diuretic drug called -- I think it's pronounced Furosemide,

11   but I'm not certain about that.  We'll call it a diuretic.

12   And what percentage of shipments of those drugs into

13   Cabell/Huntington would be flagged by Mr. Rafalski's Method

14   B?

15   **A.**    25.8 percent.

16   **Q.**    And I notice that one is a good bit lower than the

17   other ones.  And did you analyze why that was the case, Mr.

18   MacDonald?

19   **A.**    Method B is particularly indiscriminate in flagging any

20   series of numbers that has a growth trend embedded in it,

21   and not flagging or flagging at a lesser rate any series of

22   numbers that has a declining trend in the data.  And that

23   has to do with how it sets the, the threshold based on an

24   early occurrence in the data series.

25   **Q.**    So is it fair to say that the application of Method B

1    to non-controlled substance shipments by Cardinal Health

2    would flag a very large percentage of those orders just as

3    it flagged a large percentage of oxycodone and hydrocodone

4    orders?

5    **A.**    Yes.

6    **Q.**    And if the prescribing of a particular medication, any

7    medication, is growing over time, what impact does that have

8    with respect to how Method B will apply to it?

9    **A.**    It accelerates or increases the percentage of, of

10   orders in this case that would be flagged.  It is

11   particularly indiscriminate in identifying or flagging data

12   points in a growing series.

13   **Q.**    And did you review data and information in this case,

14   Mr. MacDonald, that indicated that prescriptions for opioids

15   were, in fact, growing over the time period of this

16   analysis?

17   **A.**    I think that the record is clear and what was available

18   in the publicly available DEA numbers made it clear that the

19   prescribing experience for opioids was increasing during

20   this period.

21          That number is reflected in the APQ numbers.  It's

22   reflected in the publicly available summary level ARCOS

23   data.  It's, it's not surprising.  It's what was observable.

24   **Q.**    And what conclusions -- well, let me just -- in your

25   opinion, Mr. MacDonald, is Rafalski Method B a reliable way

1    to identify pharmacy orders that are outliers?

2    **A.**    Absolutely not.

3    **Q.**    And, again, sort of in your, your two-step process for

4    outlier analysis, where is this method failing in your

5    opinion?

6    **A.**    Well, it fails on the first step because it is

7    indiscriminate.  It does not identify outlier events.  It

8    just flags.  It's particularly flawed in the second step.

9    There is no contextual analysis applied in this methodology.

10    **Q.**    Okay.  I want to turn -- I want to talk about the time

11    period of the data that you reviewed, Mr. MacDonald.

12            When you were analyzing Cardinal Health's distribution

13    data that was produced in this case, what was the date range

14    for which you had that data?

15    **A.**    1996 through 2018 I believe.

16    **Q.**    And as you reviewed Dr. McCann and Mr. Rafalski's

17    flagging analysis, did you come to understand that Cardinal

18    Health happened to possess and, therefore, had produced data

19    for a longer time period than the other defendants?

20    **A.**    I did make that note, yes.

21    **Q.**    And what was the impact of having those additional

22    years of Cardinal Health data on the results of the flagging

23    analysis that was done by Mr. Rafalski and Dr. McCann?

24    **A.**    It caused more of Cardinal's transactions to be flagged

25    than would have been flagged had they produced data from

1   similar time periods to the other defendants.

2   **Q.**   So more Cardinal Health orders -- a larger number of

3   Cardinal Health orders were flagged by Dr. McCann and Mr.

4   Rafalski just because Cardinal Health had data covering a

5   longer time period?

6   **A.**   And as Mr. McCann notes, that the longer the time

7   period, the more likely that a series will be flagged.  So

8   he acknowledges that the length of data increases the

9   likelihood.  So a long-term predictable customer will get

10  flagged more readily than a, a shorter-term customer.

11  **Q.**   And have you prepared a sample chart that tests and

12  demonstrates the impact on the Method B flagging analysis

13  caused by the time period of the Cardinal data?

14  **A.**   I have.

15          MS. WICHT:  And, Mr. Simmons, I'll ask you to put

16  up Slide 6, please.

17  BY MS. WICHT:

18  **Q.**   And does this reflect your analysis on that

19  question, Mr. MacDonald?

20  **A.**   It does.

21  **Q.**   Okay.  Could you please describe for us what is

22  reflected -- we have two side-by-side -- I don't know what

23  you call these kind of charts.  Scatter dot charts?  What do

24  you call them?

25  **A.**   Scatter graphs.

1    **Q.**   Scatter graphs, okay.  Could you describe what's

2    reflected in the one on the left?

3    **A.**   This -- you can see that it's -- both charts have the

4    same data points.  The dots are on there, but the colors of

5    the dots change.

6         So as analyzed by Mr. McCann, the left -- on the

7    left-hand side he applies the entire dataset, including the

8    Cardinal data produced prior to the ARCOS data.

9         And it demonstrates that -- you can see there if you

10   squint your eyes, Your Honor, the blue dots on the far left

11   represent orders that were not flagged by the Cardinal

12   Method B -- I'm sorry -- by the McCann Method 2 or the

13   Rafalski Method B.  The --

14   **Q.**   So are the -- I'm sorry.

15   **A.**   I was going to say the orange dots are all of the

16   orders that are flagged.

17   **Q.**   Okay.  So each dot, then, reflects an aggregate month

18   of orders; is that right?

19   **A.**   That is correct.

20   **Q.**   Okay.  And as Dr. McCann and Mr. Rafalski ran the

21   analysis across the entire time period of the data that

22   Cardinal Health produced, these dots on the left reflect the

23   results of that flagging analysis; is that right?

24   **A.**   That is correct.

25   **Q.**   And we see some blue dots that are not flagged under

1    the line, and we see a large number of orange dots that are

2    flagged above the line; right?

3    **A.**    That is correct.

4    **Q.**    Okay.  And tell me what you did in the chart that's on

5    the right here.

6    **A.**    So I re-ran this series of numbers through the McCann

7    model.  I -- my report refers to it as the McCann model, but

8    Rafalski/McCann model.  But blinding the machine from data

9    prior to 2006, so as if the only data that had been produced

10   was the 2006 forward data.

11        And you can see that the number of non-flagged

12   transactions goes through the roof.  The blue dots again are

13   flagged -- monthly orders that would not have been flagged.

14   And you have a small number of orders that would have been

15   flagged at the -- in the 2006 time frame.

16   **Q.**    So is the only change that you made in the analysis

17   here just changing the, the start date of the application of

18   the methodology?

19   **A.**    That's the only thing I changed.

20   **Q.**    And with the -- when you started in 1996, started the

21   flagging analysis in 1996, what percentage of the months of

22   orders are flagged under Rafalski Method B?

23   **A.**    88 percent --

24   **Q.**    And --

25   **A.**    -- for this sample pharmacy.

1    **Q.**   For this sample pharmacy, yes.  And if you do nothing

2    but change the start date of the analysis, what percentage

3    of orders for this particular sample pharmacy would be

4    flagged if you started the analysis in 2006?

5    **A.**   Less than 4 percent.

6    **Q.**   So did your analysis show, Mr. MacDonald, that the time

7    period of the data considered has a large impact on the

8    percentage of orders that are flagged under Rafalski Method

9    B?

10   **A.**   It does.

11   **Q.**   And then when Mr. Rafalski reported the number of

12   dosage units that were in orders he flagged, was that figure

13   for Cardinal Health also substantially inflated because of

14   the longer time period of Cardinal Health data considered?

15   **A.**   It was under all methodologies, but particularly under

16   the Rafalski Method B methodology.  It's substantially

17   overstated.

18   **Q.**   And that's, that's a good clarification.  I was

19   actually going to go back to that as well.  We're, we're

20   doing Methodology B.  But does this also have an impact on

21   how Methodology A applies to Cardinal Health orders?

22   **A.**   Not as large of an impact, but it does have an impact,

23   yes.

24   **Q.**   You, you talked for a moment about the impact of -- if

25   there's a growing trend for prescriptions of a drug, how

1    that will impact the flagging methodologies.  Let me just

2    ask you one other thing.

3        Leaving aside prescriptions, if a pharmacy, a

4    particular pharmacy is growing in its business, it's serving

5    more customers or it's filling more prescriptions overall,

6    how will that growth trend affect the results of the

7    flagging methodologies, A and B?

8    **A.**   Because the flagging methodologies don't take the

9    context into account at all, a growing trend, whether that

10   growing trend is related to the overall market or related to

11   a particular pharmacy or related to a distributor's market

12   share with that particular pharmacy, a growing trend will

13   get flagged more often automatically.

14   **Q.**   Okay.  Our last topic this morning, Mr. MacDonald.  Did

15   Dr. McCann and Mr. Rafalski -- well, you understand that Dr.

16   McCann and Mr. Rafalski analyzed Cardinal Health's shipments

17   of opioid medications to pharmacies in Cabell and

18   Huntington; right?

19   **A.**   I, I do understand that, yes.

20   **Q.**   And I think you mentioned this already, but did

21   Cardinal Health produce shipment data about non-opioid

22   medications into pharmacies in Cabell and Huntington?

23   **A.**   Cardinal Health has produced its, its distribution data

24   to its customers in Cabell/Huntington.

25   **Q.**   And did Dr. McCann analyze that data from what you

1    could see?

2    **A.**    The non-controlled substance data?

3    **Q.**    Yes, sir.

4    **A.**    There's no indication that he has addressed it at all.

5    **Q.**    And did you see an indication that Mr. Rafalski

6    analyzed that data?

7    **A.**    None whatsoever.

8    **Q.**    So, for example, if a pharmacy received a large volume

9    of orders for prescription opioids, did Dr. McCann or Mr.

10   Rafalski's analyses reflect whether that pharmacy also

11   received a large volume of other medications like blood

12   pressure medication or cholesterol or anti-diabetic

13   medication?

14   **A.**    This is a good example of contextual analysis that is

15   completely ignored by Mr. Rafalski and Mr. McCann.

16   **Q.**    Did you -- in your work in this case, did you analyze

17   Cardinal Health's shipments of non-controlled medications

18   into Cabell County and Huntington?

19   **A.**    I have.

20   **Q.**    And why did you do that analysis, Mr. MacDonald?

21   **A.**    For a few reasons.  First, I know that it has been

22   indicated by the DEA and representatives of the DEA that it

23   is a relevant measure and a factor that does put controlled

24   substance orders into context.

25        Mr. Wright in his deposition in the Track 1 litigation

1    testified that a controlled substance ratio of 20 percent

2    controlled substances, 80 percent non-controlled substances

3    is normal, does not indicate anything untoward.  And, in

4    fact, there are instances where controlled substance ratios

5    higher than 20/80 are appropriate and normal.

6    **Q.**   And the higher than 20 percent could be based on other

7    contextual analysis factors; is that, is that correct?

8    **A.**   Correct.

9    **Q.**   So what analysis did you conduct of the non-controlled

10    substance data produced by Cardinal Health related to Cabell

11    and Huntington customers?

12    **A.**   I looked at, on an aggregated basis, the percentage of

13    controlled substances to non-controlled substances

14    distributed by Cardinal to the Track 2 pharmacies.  And for

15    the controlled substances, I broke them down between opioids

16    and non-opioids.

17    **Q.**   And did you prepare a graphic that represents the

18    results of that analysis?

19    **A.**   I have.

20            MS. WICHT:  Mr. Simmons, I'll ask you to publish

21    Slide 7, please.

22    BY MS. WICHT:

23    **Q.**   And, Mr. MacDonald, could you please describe the

24    results of your analysis as reflected in this chart?

25    **A.**   Again, this is Cardinal Health distributions to its

1    retail pharmacy customers in the Cabell/Huntington region

2    during the period 2006 through 2018.  It's all, all volume.

3        And it demonstrates that 85 percent of the

4    distributions were for non-controlled substances.

5    7 percent, just over 7 percent were for opioid-related

6    products.  And 7.9 percent were for non-opioid related

7    controlled substances.

8    **Q.**   So there's, there's probably been a little too much

9    math in this case for my liking, but I think this is an easy

10   one.  Does this mean that based on your analysis of the

11   data, approximately 92.9 percent of the medications Cardinal

12   Health shipped to retail pharmacies in Cabell and Huntington

13   were not opioids?

14   **A.**   You've done your math correct, Ms. Wicht.

15   **Q.**   Okay.  Thank you.  So what conclusion do you draw from

16   this analysis, Mr. MacDonald?

17   **A.**   That at the aggregate level, there's no indication that

18   the distributions by Cardinal Health to its retail

19   pharmacies during this time period were outside of the norm.

20   **Q.**   And why did you consider them in aggregate in that way?

21   Why did you consider all the pharmacies together?  Just

22   describe what the, what the impact of that was.

23   **A.**   Well, I was looking at -- put in relation to Cardinal

24   Health's ability to put this into the context, the overall

25   trends of distributions into, into this particular region

```
 1     based on data it had in its purview.

 2               MS. WICHT:  May I take a moment, Your Honor?

 3               THE COURT:  Yes.

 4          (Pause)

 5               MS. WICHT:  That's all I have.  Thank you very

 6     much, Mr. MacDonald.

 7               THE COURT:  Mr. MacDonald, what's your educational

 8     background?

 9               THE WITNESS:  I'm an accounting major from

10     Georgetown University.

11               THE COURT:  You may cross-examine.

12               MR. FULLER:  Judge, it's going to be me.  And if

13     you don't mind -- and I know it's early for a break, but I

14     told Ms. Wicht I wouldn't be longer than her, so we're

15     probably about halfway.  Do you mind if we take a ten-minute

16     break?

17               THE COURT:  No.  We'll be in recess for 10

18     minutes.

19          You can step down.

20               THE WITNESS:  Thank you, Your Honor.

21          (Recess taken at 9:55 a.m.)

22               THE COURT:  Please resume the witness stand, Mr.

23     MacDonald.

24               THE WITNESS:  Thank you.

25               THE COURT:  All right, sir.
```

```
 1              MR. FULLER:  May it please the Court.  Mike Fuller

 2      on behalf of the plaintiffs.

 3                         CROSS EXAMINATION

 4              BY MR. FULLER:

 5      Q.   Mr. MacDonald, we met earlier this morning, correct?

 6      A.   I met you in the lobby, correct.

 7      Q.   And I think this is the first time either of us at

 8      least recollect meeting each other, right?

 9      A.   That is correct.

10      Q.   All right.  So, I wanted to chat with you a little bit

11      about the work you've done in this case and what you've

12      reviewed and what you haven't reviewed; is that fair?

13      A.   That's fair.

14      Q.   Okay.  So, you have looked at Mr. McCann's report, or

15      Dr. McCann's report, Mr. Rafalski's report, as well as their

16      sworn testimony, correct?

17      A.   I have.

18      Q.   And attached to your report is an attachment number 2

19      which provides your reliance materials, correct?

20      A.   As I recall, that's the -- I don't remember if that's

21      number 2, but my report has a chart of the materials I have

22      relied upon.

23      Q.   And you testified earlier some of the datasets that you

24      looked at, some provided by Cardinal, some that you sourced

25      yourself, right?
```

1    **A.**   That is correct.

2    **Q.**   Now, you also mentioned due diligence, that you

3    reviewed some sets of due diligence; is that correct?

4    **A.**   That is correct.

5    **Q.**   Now, let me --

6            MR. FULLER:  And I'm going to give defense counsel

7    a copy of -- if we can pull up Plaintiffs' Demonstrative

8    Slide number 1.

9        And, Judge, I actually have a P, number, too,

10   Plaintiff's Exhibit 23656.  This is the defendants'

11   discovery responses in this matter.

12       May I approach the witness, Judge?

13           THE COURT:  Yes, you may.

14           BY MR. FULLER:

15   **Q.**   If you'll go to -- and so you know, Mr. MacDonald, the

16   P number on the front is paginated, as well, and if you'll

17   go to Page 9.

18           MS. WICHT:  I'm sorry.  Did you say Page 9, Mr.

19   Fuller?

20           MR. FULLER:  Yes.

21           MS. WICHT:  Thank you.

22           MR. FULLER:  And I'm going to have her put up

23   Demonstrative number 1, which actually is a demonstrative of

24   the answer to interrogatory or combined discovery request

25   number 4.

```
1              BY MR. FULLER:

2     Q.   All right.  Do you have that in front of you, Mr.

3     MacDonald?

4     A.   I can -- I have it in my hand and on the screen, yes.

5     Q.   All right.  So, supplemental response to request number

6     4.  Cardinal identifies their centralized due diligence.  Do

7     you have an understanding of what's meant by centralized due

8     diligence?

9     A.   I could hazard a guess, but I don't have an explicit --

10    Q.   Perfect.  So, let's walk through it.

11    A.   Okay.

12    Q.   So, when you talked earlier, you said there was a

13    two-step process to these analyses that you did, correct?

14    A.   Correct.

15    Q.   There is an ID with a program or some sort of automated

16    system, right?

17    A.   That was my testimony, yes.  That's my approach.

18    Q.   We've talked about it in this litigation as sort of a

19    triggering mechanism or like a methodology that Mr. Rafalski

20    provided to Dr. McCann.  Does that make sense?

21    A.   The triggering methodology in this case is

22    indiscriminate, but I understand what you're saying, yes.

23    Q.   Okay.  And then the second part is I think you said

24    evaluate with judgment; is that correct?

25    A.   To provide -- to evaluate -- I didn't use those words,
```

1    but I -- but to bring the context, to evaluate the scenario

2    and situation around the data you're looking at.

3    **Q.**   Right.  You said you've got to look at contextual

4    factors?

5    **A.**   Correct.

6    **Q.**   Okay.  Well, what Cardinal has done is they have

7    identified due diligence, which does -- the basis of it is

8    contextual factors, other factors that may be considered

9    when looking at a suspicious order or a potentially

10   suspicious order.  Because you testified that you reviewed

11   due diligence, let me ask you, when you say due diligence,

12   what do you mean?

13   **A.**   I -- the due diligence that has been produced in this

14   case.  So, the due diligence that was available and had been

15   maintained in the matter and has been produced in the case,

16   I reviewed the due diligence as produced.  So, I looked at

17   the site visits, the record of held orders.  That's what I

18   was referring to.

19   **Q.**   Okay.  So, let's read this discovery response.

20   Cardinal Health incorporates by reference its objections and

21   response to this request as stated above.  Subject to and

22   without waiving its objections, Cardinal Health responds

23   that it has produced centralized due diligence files for its

24   customers in Track 2 at the following production numbers.

25   Did I read that right?

1    **A.**    You read that correctly.

2    **Q.**    Okay.  And then it provides a whole bunch of Bates

3    numbers.  Do you see that in the document?

4    **A.**    I do.

5    **Q.**    As well as DEA numbers, correct?

6    **A.**    I do.

7    **Q.**    So, Cardinal has told us that these are their

8    centralized due diligence files for the CT2 customers.  Do

9    you know how many pages of these documents you actually

10    reviewed?

11           MS. WICHT:  I'll object, Your Honor, just on the

12    basis that I think the witness testified that he -- he

13    obviously didn't write this document and when it said

14    centralized due diligence files, I think he testified that

15    he wasn't sure what that meant in this particular context of

16    this legal document.

17           THE COURT:  Well, he testified as to what he did

18    review to prepare his opinions and this is cross.  I'll let

19    you pursue it, Mr. Fuller.  I'm not sure where --

20           MR. FULLER:  Sure.  And -- and --

21           THE COURT:  -- you're going, but I will let you

22    pursue it.

23           MR. FULLER:  Thank you, Your Honor.

24           BY MR. FULLER:

25    **Q.**    Let me make sure we're clear.  You've testified already

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    that you reviewed due diligence produced in this case,

2    right?

3    **A.**    I have reviewed due diligence produced in this case.

4    **Q.**    Okay.  This is the specific due diligence that Cardinal

5    identified when ordered to by the Court.  Are you aware that

6    there's only three pages from this spreadsheet actually in

7    your reliance materials?

8    **A.**    I have not cross-referenced this sheet to my reliance

9    materials, so I don't know that.

10   **Q.**    And the reliance materials that you identified as an

11   attachment to your report are all the documents you were

12   provided and that you're relying on for all of your

13   opinions, correct?

14   **A.**    They are the -- designated as the documents I relied

15   upon for producing my report.

16   **Q.**    And that you're relying on for your opinions, correct,

17   Mr. MacDonald?

18   **A.**    Those are the documents I'm relying upon for the

19   opinions that are detailed in my report and that is what I

20   am testifying to, what is in my report.

21   **Q.**    Okay.  And sitting here today, without going through

22   your attachment number 2 to your report, you're not sure

23   whether any of these documents are listed; is that fair?

24   **A.**    I have not cross-referenced this list to the list in my

25   report.  I have reviewed substantial numbers of due

1    diligence events.  I did not endeavor to review every single

2    one.  I was not trying to audit the historical due

3    diligence.  I was pointing out that due diligence did take

4    place and that due diligence is completely ignored by

5    plaintiff experts.

6    **Q.**   Well, what type of due diligence did you review?  Let

7    me ask you that.

8    **A.**   I reviewed the record of orders being actually flagged

9    and evaluated and either cut and reported to the DEA or

10   cleared and shipped.  I reviewed on a sample basis the form

11   and existence of site visits where a representative of

12   Cardinal Health visited particular pharmacies.  I reviewed

13   the number of times site visits took place to various

14   pharmacies as reported in the dataset.

15   **Q.**   Fair enough.

16          MR. FULLER:  So, let's now go to Plaintiffs'

17   Demonstrative Slide 3, Gina.

18          BY MR. FULLER:

19   **Q.**   Let's talk about the SOMS system.  Are you aware of the

20   components that comprise a Suspicious Order Monitoring

21   System?

22   **A.**   When you refer to the components, as designated by the

23   DEA?

24   **Q.**   No.  How about like Cardinal?  That's who you're

25   testifying on behalf of, right?

1    **A.**   I am aware of the Cardinal Health SOMS system.  I did

2    not -- I was not retained to evaluate its system or to

3    comment on its overall effectiveness.  I have observed that

4    this system existed and for the period in which data has

5    been produced.  I have confirmed that they executed their

6    system as described, which is contrary to observations made

7    by Mr. Rafalski.

8    **Q.**   All right.  So, let's pick that apart.  You're not here

9    to testify as to the adequacy of their system, correct?

10   **A.**   That is not what I was retained to do and it's not an

11   opinion covered in my report.

12   **Q.**   So, you're not providing any opinions in that regard,

13   right?

14   **A.**   I am providing an opinion that I observed that they did

15   have a system and I have confirmed that their system, in

16   terms of paying attention to the thresholds that they did

17   set, that they operated based on those thresholds.  I am not

18   offering an opinion as to thresholds themselves, but the

19   execution of the Cardinal system, Cardinal system, I am

20   offering opinion that they did execute it as designed.

21   **Q.**   Okay.  Do you know when they started using a threshold

22   system?

23   **A.**   It is covered in my report.  I don't have all of --

24   their system has evolved over time.  As I recall, the system

25   began in 2008 and what's available in the data as produced

1    is from 2013 forward.

2    **Q.**   Okay.  So, what about prior to 2008, did they have a

3    system?

4    **A.**   I was -- my understanding is that they did have a

5    system.  I've seen indications of it.  I was not explicitly

6    retained to review that system or comment on the evolution

7    of Cardinal's strategic order monitoring system over time.

8    **Q.**   Fair enough.  This, I will represent to you, is from

9    Cardinal's own documents and it was a PowerPoint that was

10   created in 2008 that sort of lays out a SOMS system, okay?

11   **A.**   Okay.

12   **Q.**   And it starts with describing -- it starts with

13   describing the order coming in.  Do you see that?

14   **A.**   I do.

15          MR. WICHT:  I'm sorry to interrupt.  Mr. Fuller,

16   if this comes from a Cardinal Health document, could we

17   please be directed to that?

18          MR. FULLER:  Yes.  It is Michael Mone's PowerPoint

19   -- (unintelligible)

20          COURT REPORTER:  I'm sorry.  I couldn't hear that.

21          MR. WICHT:  Yeah.  Perhaps with an exhibit number

22   or ideally a copy.

23          MR. FULLER:  Well, I'm just using this as a

24   demonstrative, but if I can get you a P number, I will.

25       I will get you that P number in a moment, but I'm just

1   using this as a demonstrative.

2           BY MR. FULLER:

3   **Q.**   So, the order comes in.  As you discussed earlier,

4   there was a threshold system in place, right?

5   **A.**   Yes.

6   **Q.**   And that threshold system is that mechanical system

7   that would identify and potentially block an order, right?

8   **A.**   Flag or block an order, yes.

9   **Q.**   Okay.  Do you know what the next step in the process is

10  according to Cardinal?

11          MS. WICHT:  Your Honor, I'll object that Mr. Mone

12  offered testimony in this case and his testimony in this

13  case was that this was -- this graphic did not represent how

14  Cardinal Health's system actually operated.  So, I think

15  this is mischaracterizing the record in the case.

16          THE COURT:  Well, this is cross.  I'm -- he's

17  allowed some latitude here.  I'm going to allow it.

18      Overruled.

19      Go ahead, Mr. Fuller.

20          MR. FULLER:  Thank you, Your Honor.

21          BY MR. FULLER:

22  **Q.**   Do you know what the next step in the system was?

23  **A.**   My understanding in the system was to evaluate the held

24  order.

25  **Q.**   Questionnaire, fax, and/or call, which was the due

1    diligence component, right?

2    **A.**    I have not seen this document before, so if you're

3    representing that that's the evaluation, I -- I -- I

4    observed in the data that they flagged orders that exceeded

5    the threshold.  The terminology used in the system is they

6    held those orders.  They then evaluated those orders.  Some

7    of the orders were cut and reported to the DEA and, based on

8    the contextual analysis, some of the orders were cleared.

9    **Q.**    Great.  Let's talk about the contextual analysis.  Have

10   you -- do you believe that you reviewed all the due

11   diligence to determine whether they did an adequate

12   contextual analysis to dispel the suspicion of the flagged

13   orders?

14   **A.**    That was not what I was asked to do.  I did not review

15   the entire set of due diligence that occurred.  It is my

16   understanding that that due diligence was not necessarily

17   consistently maintained over the years.  I wouldn't have

18   expected it to have been.  I was looking for indications of

19   the process, not to validate that each step in the process

20   in every occurrence took place.

21   **Q.**    So, and maybe I can short circuit this.  What I'm

22   wanting to establish is that you're not here offering any

23   opinions as to the adequacy of due diligence that may have

24   been conducted or not conducted by Cardinal Health, correct?

25   **A.**    I have, with the benefit of 20/20 hindsight conducted

1    certain contextual analyses that demonstrate that there are

2    reasonable explanations to an overwhelming majority of the

3    transactions flagged by Mr. McCann's model or method.  I am

4    not here to testify to the adequacy or effectiveness of any

5    particular piece of due diligence.  I have not reviewed all

6    of the due diligence.

7    **Q.**   Okay.  So, if I can digest what you've said, you're not

8    here to provide any opinions as to the adequacy of

9    Cardinal's due diligence at the time.  You're providing a

10   hindsight review of the orders to give them some sort of

11   context that may justify those orders and shipments?

12   **A.**   I am not speaking to the overall adequacy of the

13   Cardinal due diligence process.  My opinion is that the

14   plaintiff experts don't look at due diligence at all.  They

15   don't acknowledge contextual analysis.  They didn't look at

16   what was produced.

17       I have looked enough at what was produced to determine

18   that they did have a process for looking at the contextual

19   analysis in a realtime basis.  I then applied some

20   contextual analyses with the benefit of 20/20 hindsight to

21   demonstrate that there were factors at play even many years

22   later and still observable that provide context to the

23   ordering process.  I am not, and I agree, I am not

24   testifying to the adequacy of Cardinal's overall due

25   diligence or the adequacy of any particular step.

1    **Q.**   Now, you say Mr. Rafalski nor Mr. McCann gave any

2    context or reviewed any due diligence.  Are you aware that

3    all of centralized due diligence that we looked at a moment

4    ago that Cardinal identified is all on Mr. Rafalski's

5    reliance list or are you unaware of that fact?

6    **A.**   I have read his report and his testimony and he offers

7    no description of -- he looks at the list and just says

8    that's not good enough.  He doesn't provide any description

9    of, on a step-by-step basis, what about the due diligence

10   was or was not adequate.  In my estimation, Mr. Rafalski

11   just looked at it and sloughed it all off to the side.

12   **Q.**   So, the contextual factors that you identified, you

13   talked about some of them with counsel, right?  Talked about

14   controlled versus non-controlled?

15   **A.**   Correct.

16   **Q.**   And you also mentioned in your report the data going

17   back to '96 was a contextual issue that you listed, correct?

18   **A.**   That's a method issue.  I would not --

19   **Q.**   Okay.  Fair enough.  The hydration -- hydrocodone being

20   rescheduled, you listed that as a contextual issue, right?

21   **A.**   That is correct.

22   **Q.**   The proximity to a hospital, I think you said anything

23   within a quarter of a mile, that was another contextual

24   issue that you listed, correct?

25   **A.**   That is correct.

**Q.**   304(b) [sic] contracts?

**A.**   340(b).

**Q.**   I'm sorry.

**A.**   Yes.

**Q.**   Zip code here or the area code here is 304.  I apologize.  I'm sorry.

**A.**   Oh, okay.  340(b) is a drug pricing program that makes drugs available to socioeconomic disadvantaged groups at favorable pricing through hospitals.  And so, similar to proximity to the hospital, contracting with a hospital for distribution or filling of 340(b) products is a unique and pertinent activity.

**Q.**   Now, I think you conceded that there would be additional contextual factors to potentially consider, right?  You weren't using your list as an exhaustive list?

**A.**   I think you needed to be there at the time to have a complete view of the context of each order.

**Q.**   Right.  Or review what was going on at the time or what was actually done at the time, correct?

**A.**   Related to each individual order.

**Q.**   Yes, absolutely.  So, sort of the due diligence contextual issues as they existed at the time, correct?

**A.**   Related to each order, correct.

**Q.**   And you didn't look for that in Cardinal's productions, did you?  Did you search Cardinal's productions?  They

1    produced millions of documents.  You didn't search for that

2    in their productions, did you?

3    **A.**   I may have had -- I didn't do an exhaustive search for

4    that.

5    **Q.**   Did you ask counsel to provide that to you?  Did you

6    say, hey, I want to see all the due diligence that was done

7    at the time on certain of these orders?

8    **A.**   I asked for an inventory of the due diligence that

9    existed in the production.

10   **Q.**   And we can compare your reliance list with the document

11   that was shown us to the discovery response to determine

12   whether you were given those documents or not, right?

13   Because you would have listed them in your reliance document

14   if you had been provided them?

15   **A.**   If I had relied on it.

16             MR. FULLER:  May I approach the witness, Judge?

17             THE COURT:  Yes.

18             BY MR. FULLER:

19   **Q.**   I've just handed you a Congressional Hearing Report

20   entitled OxyContin Use and Abuse.  It's Plaintiffs 41774.

21   Have you seen this document before, Mr. MacDonald?

22   **A.**   I may have.  I don't recall.  I've seen lots of

23   government documents in this case.  I don't recall if I've

24   seen this one or not.

25   **Q.**   And what's going in the country and things impacting

1   opioids or opioid abuse is another contextual factor to be

2   considered, correct?

3   **A.**   It's what's going on on a national basis when you're

4   evaluating --

5   **Q.**   National --

6               COURT REPORTER:  I'm sorry --

7               MR. FULLER:  I'm sorry.

8               THE WITNESS:  What's going on on a national basis

9   as you're -- and is known and well talked about when you're

10  evaluating individual orders and you're being directed by

11  the DEA that the vast majority of physicians are doing right

12  by their patients and the DEA expected for distributions to

13  happen, I don't know that looking at national trends was a

14  required step in looking at the contextual factors around a

15  particular order.  This is the context of standard of care

16  and opioid prescribing patterns on a national basis.

17  **Q.**   Sure.  So, let's look at what Congress was looking at

18  back at the OxyContin Use and Abuse.  If you turn to Page 10

19  --

20  **A.**   Is it 10 as marked up top or in the Bates number?

21  **Q.**   No.  I think it's 6 marked up top.

22  **A.**   Okay.

23  **Q.**   If you go to --

24  **A.**   I'm with you.

25  **Q.**   -- bottom of that page, it says the last full sentence

1     on that page, while OxyContin diversion and abuse appears to

2     have begun in rural areas, such as Appalachia, it now has

3     spread to urban areas.

4          Do you see that?

5     **A.**   I see that sentence, yes.

6     **Q.**   And this was a congressional hearing related to the use

7     and abuse of OxyContin.  Is this something that could have

8     been considered as a contextual factor?

9               MS. WICHT:  Objection, Your Honor.  I believe the

10    witness has testified that he's not sure if he's ever seen

11    this document before.  So, I don't -- I'm not -- I object to

12    him being asked to comment on it and how it would factor

13    into contextual analysis.

14              THE COURT:  Well, overruled.  I think this is

15    appropriate cross examination.

16         Go ahead, Mr. Fuller.

17              MR. FULLER:  Thank you, Judge.

18              THE WITNESS:  I cannot contemplate or I cannot

19    come up with a way or a reason that when evaluating

20    individual orders to pharmacies how this observation relates

21    to individual orders.  The distributors had to look at

22    individual orders in the context of those orders and make a

23    determination of whether or not they were of unusual size,

24    pattern or frequency.

25         This is speaking to a national trend that was in the

```
 1   public purview.  It was in the purview of the DEA and, as

 2   you point out, Congress, and the medical community.  I don't

 3   know how I would have applied that statement to evaluating

 4   one order from the next.

 5           BY MR. FULLER:

 6   Q.   Even if you can't apply it to one order or the next, is

 7   it something to be considered generally?

 8   A.   My understanding is that the DEA requirements and what

 9   the DEA required of the distributors was to design systems

10   to evaluate orders of unusual size, pattern or frequency.

11   So, considered by who?  I don't know who I would have --

12   it's not my role to say who should have been considering it,

13   but I don't find relevance in that statement in the context

14   of evaluating individual orders.

15   Q.   Fair enough.

16           MR. FULLER:  Judge, I would move in Plaintiffs'

17   41774 as a self-authenticating document for the purposes of

18   notice only.

19           MS. WICHT:  Your Honor, we object.  I don't -- I

20   don't think that this witness is a proper witness to move in

21   documents.  I don't think that -- with Mr. Fuller's moving

22   it in for notice, I don't know notice to who.  He's not

23   established anything about anyone having this information.

24   So, we would object to the admission of this document at

25   this time.
```

```
 1                    THE COURT:  How do I get around the hearsay on
 2       this?
 3                    MR. FULLER:  Judge, I'm offering it for notice
 4       only.  It's notice to the entire country.
 5                    THE COURT:  Notice of what, Mr. Fuller?
 6                    MR. FULLER:  OxyContin use and abuse, Judge.  It's
 7       an investigation into the use and abuse of OxyContin.  And
 8       now that Mr. Ackerman is standing up, I'll let him chime in.
 9                    MR. ACKERMAN:  Judge, to the extent --
10                    THE COURT:  Welcome back, Mr. Ackerman.
11                    MR. ACKERMAN:  Well, thank you, Your Honor.
12          To the extent you are concerned about hearsay, I would
13       note that the statement from the DEA that was read into the
14       record would be a public record pursuant to Rule 803(8)(a).
15                    THE COURT:  Well, this is a congressional hearing
16       and way back, days ago, we had the same issue come up and I
17       didn't let the document in because of concerns I expressed
18       about how objective these things are in the political
19       context.
20          Ms. Wicht, do you want to say something else?
21                    MS. WICHT:  No.  Well, no, Your Honor.  I think we
22       agree with, I guess, what I'm inferring as the path that the
23       Court is on.  The document is hearsay.  There's not been --
24       there's not been any foundation laid as far as who it might
25       be notice to.
```

```
 1                 THE COURT:  I'm not going to admit the document,

 2    Mr. Fuller, but I think it's permissible for you to use as a

 3    basis for your cross examination.

 4                 MR. FULLER:  Thank you, Judge.

 5                 THE COURT:  So, you can use it to that extent, but

 6    I'm not going to admit it into evidence.

 7                 MR. FULLER:  Thank you, Your Honor.

 8             I'm going to move now and approach the witness, if I

 9    may, Judge?

10                 THE COURT:  Yes, you may.

11                 MR. FULLER:  MC-WV-01764.

12                 BY MR. FULLER:

13    Q.   Mr. MacDonald, this is a document that's already in

14    evidence.  I'm going to ask you a similar question here, if

15    you don't mind.  If you would turn to Page 14.

16    A.   Was I supposed to get two copies?

17    Q.   Oh, I'm sorry.

18    A.   I missed what page you said to turn to.

19    Q.   14.

20    A.   Again, per the Bates number or the page number?

21    Q.   Per the created P stamp number, yeah.  Bottom right.

22    Bottom -- yeah, bottom right.  It's the paragraph that

23    starts with media reports.  Do you see that?

24    A.   I do.

25    Q.   The second sentence in there reads, rural communities
```

1    in Maine, Kentucky, Ohio, Pennsylvania, Virginia and West

2    Virginia were reportedly being devastated by the abuse and

3    diversion of OxyContin.

4         Is that a factor that should be considered when

5    distributing orders into West Virginia on behalf of the

6    distributors?

7    **A.**   My observation is that they are distributing orders to

8    pharmacies in the context of an overall level of permissible

9    distributions as published by the DEA in the aggregate

10   production quota number.  These numbers -- my observation is

11   that they line up well with the prescribing.  Well,

12   particularly when you look at -- I've looked at this

13   jurisdiction in the State of West Virginia, that the orders

14   that were being distributed were in line with the volume

15   that was being prescribed by the physicians within West

16   Virginia.  I don't know how I would use this statement to

17   evaluate a particular order.

18   **Q.**   Sure.  And let's talk about the other contextual

19   factors that you identified.  You don't give any weight to

20   them, correct?  So, for example -- and let me try to clear

21   that up.

22        When you say we look at a contextual factor of

23   controlled versus non-controlled, you're not saying that

24   just because it's a certain percentage that it means it's an

25   okay order to ship, are you?

1    **A.**    I am not trying to reach an independent conclusion of

2    which orders were okay to ship or not to ship.  My opinion

3    is that Mr. McCann -- or Dr. McCann and Mr. Rafalski have

4    not done anything to design an effective flagging or

5    evaluation methodology themselves.

6         My opinion is that Cardinal had a system in place.  It

7    was threshold based.  A threshold based system is

8    appropriate.  It is -- it's the beginnings of an algorithmic

9    approach for identifying potential outliers.  And I see

10   indications that they were employing contextual analysis in

11   the forms of their due diligence.

12        I independently throw out some examples of contextual

13   analysis that Mr. McCann and Mr. Rafalski do not do.  You're

14   correct I don't weight one as being more important than the

15   other, not to say that if I were there at that point in

16   time, that Cardinal may have applied a relative waiting

17   approach.  I have not attempted to do so.

18             MR. FULLER:  So, let's go to Demonstrative number

19   -- Slide number 5, Gina.

20             BY MR. FULLER:

21   **Q.**    Did you consider at all when you were looking at it --

22   or let me ask differently.

23        Would the contextual factor include the amount of

24   opioids being shipped into differing states?  Would that be

25   a comparison that could be done?

1    **A.**   There are -- again, macrolevel trends like this do not

2    bear on the particular distinction between individual

3    orders.  This would not give me the ability to evaluate

4    individual orders.

5    **Q.**   Sure.  But it could signal a red flag that might be --

6    should be looked into by one of the distributors, correct?

7             MS. WICHT:  Your Honor, I'm going to object at

8    this point as beyond the scope.  The witness is here to

9    testify about data and his analysis of data and what it

10   showed and I think we've gone pretty far down the road on

11   questions about, you know, things that should or shouldn't

12   have been considered and things that may be red flags and I

13   think we -- we've gone well beyond the scope of direct at

14   this point.

15            THE COURT:  Well, I'm going to allow this.  He

16   talked about the comparison of West Virginia pills and

17   national averages and so forth and I think this is arguably

18   relevant to that.

19        So, go ahead, Mr. Fuller.

20            MR. FULLER:  Thank you, Judge.

21            BY MR. FULLER:

22   **Q.**   So, here we're comparing West Virginia and the number

23   of oxycodone pills that Cardinal shipped into West Virginia

24   over the ARCOS time frame.  And you remember what that was,

25   right, Mr. MacDonald?

1    **A.**    I do.

2    **Q.**    6 to 14?

3    **A.**    Correct.

4    **Q.**    Okay.  And 131 million pills shipped into West

5    Virginia; while Illinois, a state with a population of

6    12.8 million people, got 77.9 million dosage units.  That's

7    significantly different than the percentage of additional

8    prescriptions that you were showing on a national basis for

9    West Virginia, correct?

10    **A.**    The -- this is isolated on Cardinal.  The market share

11    of each distributor by state is different.  Certainly,

12    distributors are stronger in certain states.  You have

13    significant practice patterns or standard of care

14    differences from state to state.

15        My analysis demonstrates that the overall distributions

16    of controlled substances in the state aligns with the rate

17    above average of all pharmaceutical products into West

18    Virginia.  So, there are health and demographic differences

19    from state to state.

20        I don't take any per se takeaways from this other than

21    you've shown me two numbers and pointed that one number is

22    larger than the other.  That does not provide context to me.

23        I've demonstrated that the per capita distributions

24    into West Virginia are below what the -- on a per capita

25    basis what the DEA was publishing as an aggregate production

1    quota.  They are in line with the prescriber level data, the

2    rate at which West Virginia physicians were writing

3    prescriptions.  The distributions and the number of

4    prescriptions are reasonably well aligned.

5         So, as a distributor evaluating individual orders, I

6    don't know that there's anything they could have done with

7    this data beyond what I've just described, looking at the

8    APQ, et cetera, and it would not have allowed -- this data

9    does not have a bearing on individual orders.  Is that order

10   of unusual size, pattern or frequency.

11   **Q.**   Did you -- you listed it on your reliance material.

12   Did you read Mr. Reardon's deposition?

13   **A.**   I -- I don't recall all of the elements of it but, yes,

14   I have read it.

15   **Q.**   He was in charge of the anti-diversion program from

16   basically the beginning of time until 2008; do you recall

17   that?

18   **A.**   I recall that he had a senior position, yes.

19   **Q.**   Do you recall that he testified that this is the type

20   of information that he would like to have been made aware

21   of?

22        MR. WICHT:  Objection, Your Honor.  I don't know

23   that that's in the record in this case and I don't know what

24   the basis is for that question.  I object.

25        THE COURT:  I'm going to allow it.  You're

```
 1   entitled to a wide latitude here and this is arguably

 2   relevant.

 3        Go ahead, Mr. Fuller.

 4             THE WITNESS:  I don't have his testimony

 5   memorized.  I don't know that he said that or not.

 6             BY MR. FULLER:

 7   Q.   So, let's go to Slide number 9.  This compares West

 8   Virginia to Texas.  Do you know Texas has 29.2 million

 9   people?

10   A.   I -- I don't have state-by-state populations memorized,

11   but that number seems plausible to me.

12   Q.   We can agree it's a big state, right?

13   A.   We can agree it's a big state.

14   Q.   Okay.  And they, as far as the oxycodone, while West

15   Virginia got 131 million, Texas only got 79 million, almost

16   -- a little more than half for a state that is about

17   fourteen times the size of West Virginia.  Would that be a

18   contextual factor that you might want to consider?

19   A.   Not necessarily.  When I'm evaluating individual

20   orders, it does not take into account Cardinal's market

21   share between the two states.  It does not take into account

22   standard of care practices by the medical community.  It

23   does not have a bearing on individual orders.

24   Q.   So, let's go to Demonstrative Slide 14.  And these are

25   the methodologies.  The judge saw this yesterday with
```

1    another witness.

2         Do you recognize those as the methodologies A through

3    F?

4         And it should be on the screen next to you, too, I

5    think.

6    **A.**   Those appear to be the six methodologies laid out by

7    Mr. Rafalski and Mr. McCann.

8    **Q.**   And each methodology is slightly different, correct, in

9    how it's ran or how it operates?

10   **A.**   They are not identical.  They have similarities in that

11   they're indiscriminate, but they have differences, as well.

12   **Q.**   So, each of them, when they are ran, and I think you

13   described the maximum monthly trailing six-month threshold,

14   A, earlier.  And the way it was done, or asked to be done by

15   Mr. Rafalski, is to look at a six-month time frame and flag

16   anything above the highest one of the past six months,

17   right?

18   **A.**   It looks at the seventh month in the context of the

19   prior six months, that is correct.

20   **Q.**   Right.  And you said that methodology flagged a huge

21   number of orders, correct?

22   **A.**   A huge number of any numerical sequence that I put

23   through it.

24   **Q.**   But it's not that part of the methodology that flags so

25   many of the orders, is it?  The additional assumption that

1    Mr. Rafalski came up with related to the due diligence, or

2    the lack thereof, is what caused the high volume of

3    flagging; isn't that true?

4    **A.**   A -- it is indiscriminate even in its ability.  It does

5    not identify outliers.  The -- when you throw a sequence of

6    numbers, where every number in the sequence is an expected

7    number, like a random dice throw, it still identifies a

8    meaningful percentage.

9        The percentages reported by Mr. McCann and Mr. Rafalski

10   as flagged, a large portion of those percentages are flagged

11   due to what they refer to as the carry-forward flagging

12   methodology.

13   **Q.**   And that's -- that carry-forward that you're referring

14   to is the assumption that Mr. Rafalski has testified to

15   because of the lack of due diligence, at least in his

16   opinion, correct?

17   **A.**   It's -- what it is related to, Mr. Rafalski -- I -- his

18   opinions are his opinions.  I view what he did as he didn't

19   look at the due diligence.

20       He makes a blanket statement that whatever due

21   diligence is observable, it's not good enough.  He doesn't

22   find a single element of due diligence, a site visit, a

23   single site visit, that happened the month after a flagging

24   event happened and say, well, yes, that -- that flag should

25   now be turned off because some due diligence took place.

1          He makes no attempt to lay on top of and say what

2     impact did the due diligence that they did do have on the

3     flagging methodology.  He ignores all of it.

4     **Q.**   And so, that's my question.  But we established

5     earlier, right, that you're not here to evaluate the due

6     diligence, so you can't say whether any due diligence was

7     good or not, correct, that Cardinal did?

8     **A.**   I cannot speak to the overall adequacy of Cardinal's

9     due diligence.  It's not what I was asked to look at.

10          I can point to the fact that they did some due

11     diligence and Mr. Rafalski did not consider that due

12     diligence on a case-by-case basis, yet, he carries forward

13     the flagging on a case-by-base basis.

14     **Q.**   And you would agree that all of these differing

15     contextual factors should be considered, whether by Mr.

16     Rafalski and Mr. McCann, Dr. McCann, or Cardinal at the

17     time, correct?

18     **A.**   I have stated that it is important to conduct

19     contextual analyses.  I am not prescribing a required list

20     of contextual analyses.  I have simply presented some

21     examples of the types of contextual analyses I would have

22     been looking at as I sat there.

23          Some of these are contextual analyses I know Cardinal

24     was looking at.  They did look at the controlled percentage,

25     for example.  It's contained in the due diligence files.

1   **Q.**   And you didn't devise a system to flag orders yourself,

2   did you?

3   **A.**   I did not independently design a flagging methodology,

4   no.   I was not asked to do that.

5           MR. FULLER:   Let's go, if we have it, to

6   Defendant's Demonstrative Slide number 7.

7           BY MR. FULLER:

8   **Q.**   And in keeping my promise both, actually, to the Court

9   and Ms. Wicht, I'm almost done with you, okay?

10  **A.**   Okay.

11  **Q.**   All right.   So, this is a slide you testified to about

12  earlier, right?

13  **A.**   This is the slide, yes.

14  **Q.**   And if we're looking at it -- and I think it will still

15  write.   Total controlled substances is almost 15 percent,

16  right?

17  **A.**   It's just under 15 percent, yes.

18  **Q.**   Half nearly is opioids, correct?

19  **A.**   Your math is reasonable, yes.

20  **Q.**   Thank you.   You're probably the only one that thinks

21  so.

22          Are you aware that that's a contextual factor that

23  should be considered, that half of the controlled substances

24  that Cardinal was shipping in to CT2 was opioids?

25  **A.**   That is not outside of the norm of what I've observed

1    in several jurisdictions or regions around the country.

2    Q.   Where do you believe that you have also seen that half

3    of the controlled substances were opioids?

4    A.   In national data within -- well, let me put it this

5    way.  Data that has been produced in other litigations.

6            MR. FULLER:  Judge, if I can have one minute?

7        (Pause)

8            MR. FULLER:  Ms. Gina, if we can go back to Slide

9    number 14 from our slide deck.

10           BY MR. FULLER:

11   Q.   So, are you aware that Cardinal used a -- in setting

12   thresholds, used a three-times multiplier for the average?

13   A.   It's my understanding that they applied it in a

14   different fashion and that the Rafalski/McCann application

15   is not identical to what -- between what Cardinal did in the

16   early years on a limited geographic basis.

17   Q.   Is that because of the assumption that they used or

18   there were other differences?

19   A.   I don't know what you're referring to.

20   Q.   The assumption once it's flagged, it's always flagged

21   or the lack of due diligence.  Is that the difference you're

22   making or is there some other difference?

23   A.   My understanding is that the application of it is also

24   different.  I don't recall the precise nature of the

25   difference.

1    **Q.**   Okay.  Now, you're aware that the country's in an

2    opioid epidemic, right, and that epidemic has been going on

3    for sometime?

4    **A.**   I understand that there have been negative impacts of

5    opioid use in the U. S.  I understand that there's a pain

6    crisis, as well.  But, yes, I'm aware that there are

7    downsides to the use of opioids.

8    **Q.**   And if you're setting something that's three times the

9    average, whatever you're using as your average will dictate

10    how high that is, correct?

11          MS. WICHT:  Objection, Your Honor.  Mr. MacDonald

12    previously testified that he hadn't evaluated how thresholds

13    were set and he was not here to offer any opinions on how

14    they should be set.

15          THE COURT:  Well, overruled.  Mr. Fuller, you can

16    ask him.  Let's --

17          MR. FULLER:  Let me see if I can clean it up a

18    little bit.

19          BY MR. FULLER:

20    **Q.**   If the country is in the middle of an opioid epidemic,

21    should that be considered when setting thresholds or not in

22    your mind?

23    **A.**   In setting thresholds for identifying orders of unusual

24    size, pattern or frequency, Cardinal employed a method for

25    setting thresholds.  This particular threshold that you're

1  reporting -- responding to is indiscriminate based on the

2  particulars of a pharmacy.  That sets the same threshold for

3  all pharmacies, whether or not it's the CVS in a particular

4  market, or a particular -- a small pharmacy on the outskirts

5  of town.

6  **Q.**  And last thing, Mr. MacDonald, I want to clarify.

7  Earlier you testified that you saw the Cardinal

8  transactional data from '96 to 2018, correct?

9  **A.**  That is correct.

10  **Q.**  But just a moment ago you testified about a more

11  limited set of data or limited time frame.  I want to say

12  you said 2013.  Are you related to -- or relating that to

13  the due diligence that you reviewed?

14  **A.**  The thresholds dataset where the thresholds are

15  maintained in electronic format.

16  **Q.**  Yes, sir.

17  **A.**  The data produces from 2013 forward.  The 1996 data

18  forward is the actual order data, the transactional data.

19  **Q.**  So, you don't recollect seeing threshold data prior to

20  2013?

21  **A.**  Not in a comprehensive electronic fashion, no.

22  **Q.**  All right.  Did you apply Cardinal's system to the

23  data, to their own data?

24  **A.**  The threshold system, I applied the thresholds

25  contained in electronic format to the Cardinal data, yes.

1    **Q.**   For the 2013 forward?

2    **A.**   That's when those thresholds were in place.  The

3    thresholds are dynamic.  They evolve over time as the

4    pharmacies evolve over time.

5            MR. FULLER:  Judge, I don't have anything further.

6            THE COURT:  Anything else, Ms. Wicht?

7            MS. WICHT:  At the risk of trying the Court's

8    patience, I have, I think, five questions.

9            THE COURT:  Okay.  Go ahead, please.

10           MS. WICHT:  Thank you.

11                        **RE-DIRECT EXAMINATION**

12                   **BY MS. WICHT:**

13   **Q.**   Mr. MacDonald, you were asked some questions about due

14   diligence files by Mr. Fuller and I just have a few

15   follow-up questions on what it is that you reviewed.  Did

16   you review data reflecting thresholds that had been set by

17   Cardinal Health with respect to its pharmacy customers in

18   Cabell-Huntington?

19   **A.**   I have.

20   **Q.**   Did you review data reflecting orders that were held as

21   a result -- by Cardinal Health as a result of the

22   application of those thresholds?

23   **A.**   I have.

24   **Q.**   Did you review data reflecting the results of the

25   analysis of held orders?

1    **A.**   Not the analysis itself in a comprehensive basis, but

2    as you point out, the result was the order cut and reported

3    or was it subsequently shipped, yes, I did review the

4    results.

5    **Q.**   Did you review data reflecting the occurrence of site

6    visits?

7    **A.**   I did.

8    **Q.**   Again, not analyzing the adequacy of the visits

9    themselves, but data reflecting that they occurred?

10    **A.**   I have.

11    **Q.**   And are you aware that those datasets that you just

12    described reside outside of Cardinal Health's centralized

13    due diligence files?

14    **A.**   I -- I am aware of that, yes.

15           MS. WICHT:  Thank you very much.  That's all I

16    have, Your Honor.

17           THE COURT:  Do you have anything else, Mr. Fuller?

18           MR. FULLER:  No, Your Honor.

19           THE COURT:  May Mr. MacDonald be excused?

20           MR. FULLER:  Unless he wants to hang out for the

21    weekend, Judge.

22           THE WITNESS:  Better than Virginia.  I'll stay in

23    West Virginia.

24           THE COURT:  You can stay all day, Mr. MacDonald.

25        (Laughter)

```
 1                   MR. FULLER:  Good save.

 2                   THE COURT:  You're excused, Mr. MacDonald.

 3                   THE WITNESS:  Do I do anything with the exhibits?

 4                   THE COURT:  You can just leave them there and

 5      we'll take care of them.

 6                   THE WITNESS:  Thank you very much.

 7                   THE COURT:  Okay.  Is there anything else we need

 8      to do before we leave for the weekend, Mr. --

 9                   MR. FARRELL:  Oh, yes.  The defense has identified

10      six witnesses that they intend to call next week.  And so

11      would that -- more than six?

12                   MS. MAINIGI:  It's the list that was provided.

13                   MR. FARRELL:  And so, does that mean -- we would

14      like to have some clarification whether or not the remainder

15      of the subpoenaed witnesses that are not on that list may be

16      officially released.

17                   MS. MAINIGI:  Your Honor, we have certainly

18      provided notice to Mr. Farrell for Monday.  I'm happy --

19      we're happy to talk to him offline and give him direction on

20      any witnesses he has questions about.

21                   THE COURT:  Who has the witnesses subpoenaed, Mr.

22      Farrell?

23                   MR. FARRELL:  I'm sorry?  Say again.

24                   THE COURT:  Do the defendants have witnesses

25      subpoenaed?
```

1            MR. FARRELL:  Yes, Your Honor.

2            THE COURT:  Well, as long as they give you a list

3     of the ones they expect to call, isn't that good enough?

4            MR. FARRELL:  If you say so.  We have a number of

5     -- we have a number of people around the state who have been

6     subpoenaed and they're holding calendars and physicians that

7     are holding calendars.  And so, I'm simply asking for the

8     Court to declare that --

9            THE COURT:  Subpoenaed by the defendants, right?

10           MR. FARRELL:  Yes, Your Honor.

11           THE COURT:  Well, why don't you talk about this

12    and if you can let any of them go, I encourage you to do

13    that.

14           MS. MAINIGI:  Absolutely, Your Honor.  This is the

15    first that it's being raised.  It was not raised with us

16    previously, but we're happy to do that right now after court

17    is dismissed.

18           THE COURT:  All right.

19        Is that good enough, Mr. Farrell?

20           MR. FARRELL:  I doubt it, but we'll talk about it

21    again on Monday.

22           THE COURT:  Well, that's the best you're going to

23    get right now.

24           MR. FARRELL:  Yes, sir.

25           THE COURT:  All right.  But you have the list for

```
 1    next week, right?

 2              MS. MAINIGI:  Yes, Your Honor.

 3              MR. FARRELL:  Yes.

 4              THE COURT:  Are we still going to finish next

 5    week?

 6              MS. MAINIGI:  That's our strong expectation, Your

 7    Honor.

 8              MR. NICHOLAS:  Yes, we will finish next week.

 9              MR. HESTER:  That's what we're planning, Your

10    Honor.

11              THE COURT:  Well, good, as I said yesterday.

12         If there's nothing else, I will see everybody Monday

13    morning at 9:00.

14              MS. MAINIGI:  Thank you, Your Honor.  Have a good

15    weekend.

16         (Trial recessed at 3:46 p.m.)

17

18

19

20    CERTIFICATION:

21              I, Ayme A. Cochran, Official Court

22    Reporter, and I, Lisa A. Cook, Official Court Reporter,

23    certify that the foregoing is a correct transcript from

24    the record of proceedings in the matter of The City of

25    Huntington, et al., Plaintiffs vs. AmerisourceBergen
```

```
1    Drug Corporation, et al., Defendants, Civil Action No.

2    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

3    reported on July 9, 2021.

4

5            S\Ayme A. Cochran              s\Lisa A. Cook

6               Reporter                       Reporter

7        _

8

9            July 9, 2021

10              Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**'**

**'96** [2] - 59:17, 79:8

# 0

**00907** [2] - 2:5, 2:14

# 1

**1** [7] - 17:4, 27:20, 27:25, 30:20, 43:25, 48:8, 48:23
**1,400** [1] - 9:4
**10** [3] - 46:17, 62:18, 62:20
**1001** [2] - 4:6, 4:9
**1022** [1] - 3:5
**11** [1] - 10:17
**12.8** [1] - 70:6
**126** [1] - 3:5
**1300** [1] - 6:15
**131** [2] - 70:4, 72:15
**1311** [2] - 2:4, 2:14
**14** [5] - 66:15, 66:19, 70:2, 72:24, 77:9
**15** [2] - 76:15, 76:17
**15.3** [1] - 17:19
**15910** [1] - 3:15
**1600** [1] - 3:15
**1717** [2] - 6:6, 6:13
**18.5** [1] - 18:9
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1996** [4] - 37:15, 40:20, 40:21, 79:17

# 2

**2** [10] - 19:7, 28:12, 34:5, 34:15, 39:12, 44:14, 47:18, 47:21, 50:24, 52:22
**2-2-2** [1] - 7:14
**20** [2] - 44:1, 44:6
**20/20** [2] - 57:25, 58:20
**20/80** [1] - 44:5
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21, 5:5
**2005** [3] - 17:17, 17:18, 18:2
**2006** [8] - 27:13, 28:5, 33:25, 40:9, 40:10, 40:15, 41:4, 45:2
**2008** [4] - 54:25, 55:2, 55:10, 71:16
**2010** [2] - 18:4, 18:8

**2013** [6] - 22:14, 55:1, 79:12, 79:17, 79:20, 80:1
**2015** [2] - 18:10, 18:12
**2016** [1] - 22:15
**2018** [6] - 27:14, 28:5, 33:25, 37:15, 45:2, 79:8
**202** [2] - 2:4, 2:13
**2021** [4] - 1:19, 7:4, 85:3, 85:9
**21.8** [1] - 18:13
**2216** [1] - 3:7
**23656** [1] - 48:10
**24** [1] - 23:7
**25** [4] - 5:5, 10:4, 10:19, 10:23
**25.8** [1] - 35:15
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26th** [1] - 7:9
**27** [1] - 7:16
**27th** [1] - 7:11
**28** [4] - 4:3, 4:12, 4:14, 7:16
**28th** [1] - 7:11
**29.2** [1] - 72:8
**29464** [3] - 4:4, 4:12, 4:15

# 3

**3** [2] - 21:18, 53:17
**30** [1] - 10:19
**304** [1] - 60:5
**304(b** [1] - 60:1
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**32502** [1] - 2:11
**340(b** [2] - 60:7, 60:11
**340(b)** [1] - 60:2
**37** [1] - 1:16
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 85:2
**3:17-cv-01665** [2] - 1:11, 85:2
**3:46** [1] - 84:16

# 4

**4** [4] - 27:7, 41:5, 48:25, 49:6
**40.5** [2] - 20:22, 34:2
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**41.7** [2] - 17:19, 18:2

**41774** [2] - 61:20, 64:17
**45** [1] - 19:20
**45.3** [1] - 20:8

# 5

**5** [2] - 33:16, 68:19
**54** [1] - 18:5
**553** [1] - 6:8
**56** [1] - 3:4
**56.8** [1] - 34:23
**56th** [1] - 3:5

# 6

**6** [3] - 38:16, 62:21, 70:2
**600** [1] - 2:10
**62.4** [1] - 35:3
**64** [1] - 34:8
**6th** [1] - 3:5

# 7

**7** [4] - 44:21, 45:5, 76:6
**7.9** [1] - 45:6
**70130** [1] - 3:8
**707** [1] - 4:24
**71** [1] - 35:3
**716** [1] - 3:12
**72** [1] - 18:17
**725** [2] - 4:19, 4:21
**75.5** [1] - 35:8
**77.9** [1] - 70:6
**79** [1] - 72:15

# 8

**80** [1] - 44:2
**801** [1] - 3:10
**803(8)(a)** [1] - 65:14
**84.1** [1] - 28:1
**85** [1] - 45:3
**850** [1] - 5:12
**88** [1] - 40:23

# 9

**9** [7] - 1:19, 7:4, 48:17, 48:18, 72:7, 85:3, 85:9
**90** [1] - 29:22
**901** [1] - 4:23
**91436** [1] - 3:16
**92.1** [1] - 29:13
**92.4** [1] - 29:4
**92.9** [1] - 45:11
**93.3** [2] - 28:1, 29:18

**93.6** [1] - 29:13
**95** [1] - 10:23
**9:00** [2] - 7:4, 84:13
**9:55** [1] - 46:21
**9th** [1] - 4:6

# A

**a.m** [2] - 7:4, 46:21
**ability** [4] - 28:9, 45:24, 69:3, 74:4
**able** [2] - 15:11, 15:13
**absolutely** [2] - 60:21, 83:14
**Absolutely** [3] - 26:10, 30:22, 37:2
**Abuse** [2] - 61:20, 62:18
**abuse** [6] - 62:1, 63:1, 63:7, 65:6, 65:7, 67:2
**accelerates** [1] - 36:9
**accept** [1] - 7:8
**accepted** [1] - 7:7
**access** [2] - 21:25, 22:1
**according** [3] - 18:6, 23:18, 56:10
**account** [4] - 31:5, 42:9, 72:20, 72:21
**accounting** [3] - 9:19, 10:12, 46:9
**achieve** [1] - 22:1
**ACKERMAN** [3] - 4:5, 65:9, 65:11
**Ackerman** [2] - 65:8, 65:10
**acknowledge** [1] - 58:15
**acknowledges** [2] - 30:18, 38:8
**Action** [4] - 1:4, 1:10, 85:1, 85:2
**activities** [1] - 11:12
**activity** [1] - 60:12
**actual** [2] - 28:15, 79:18
**addition** [3] - 9:12, 9:16, 30:1
**additional** [5] - 18:24, 37:21, 60:14, 70:7, 73:25
**addressed** [1] - 43:4
**adequacy** [9] - 54:9, 57:23, 58:4, 58:8, 58:12, 58:24, 58:25, 75:8, 81:8
**adequate** [2] - 57:11, 59:10
**admission** [1] - 64:24

**admit** [2] - 66:1, 66:6
**affect** [1] - 42:6
**aggregate** [5] - 39:17, 45:17, 45:20, 67:9, 70:25
**aggregated** [3] - 13:12, 26:2, 44:12
**ago** [4] - 10:18, 59:4, 65:16, 79:10
**agree** [5] - 58:23, 65:22, 72:12, 72:13, 75:14
**agreed** [1] - 7:10
**ahead** [5] - 56:19, 63:16, 69:19, 72:3, 80:9
**al** [4] - 1:7, 1:13, 84:25, 85:1
**algorithm** [7] - 11:21, 25:18, 31:15, 31:23, 32:6, 32:22, 33:25
**algorithmic** [1] - 68:8
**algorithms** [1] - 32:3
**aligned** [1] - 71:4
**aligns** [1] - 70:16
**allow** [4] - 15:20, 56:17, 69:15, 71:25
**allowed** [2] - 56:17, 71:8
**allows** [2] - 13:23, 22:6
**almost** [3] - 72:15, 76:9, 76:15
**AmerisourceBergen** [2] - 6:2, 84:25
**AMERISOURCEBERGEN** [2] - 1:7, 1:13
**amount** [3] - 12:6, 17:24, 68:23
**analyses** [9] - 18:24, 43:10, 49:13, 58:1, 58:20, 75:19, 75:20, 75:21, 75:23
**analysis** [50] - 10:25, 11:1, 11:8, 15:18, 16:24, 17:9, 19:3, 20:15, 21:15, 25:6, 27:3, 28:7, 31:10, 31:14, 31:17, 33:18, 36:16, 37:4, 37:9, 37:17, 37:23, 38:12, 38:18, 39:21, 39:23, 40:16, 40:21, 41:2, 41:4, 41:6, 43:14, 43:20, 44:7, 44:9, 44:18, 44:24, 45:10, 45:16, 57:8, 57:9, 57:12, 58:15, 59:19, 63:13, 68:10, 68:13, 69:9, 70:15, 80:25,

81:1
**analytics** [10] - 9:13, 9:22, 10:2, 10:20, 11:7, 11:10, 15:20, 16:4, 16:12
**analyze** [4] - 26:24, 35:17, 42:25, 43:16
**analyzed** [8] - 13:6, 13:9, 13:19, 14:2, 14:9, 39:6, 42:16, 43:6
**analyzing** [6] - 12:21, 19:11, 21:24, 22:16, 37:12, 81:8
**ANDREW** [1] - 5:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 4:11
**answer** [1] - 48:24
**ANTHONY** [1] - 2:6
**anti** [7] - 14:9, 22:22, 29:14, 29:16, 35:4, 43:12, 71:15
**anti-diabetic** [4] - 29:14, 29:16, 35:4, 43:12
**anti-diversion** [2] - 14:9, 71:15
**anti-inflammatory** [1] - 22:22
**apart** [1] - 54:8
**apologize** [1] - 60:6
**apology** [1] - 20:3
**Appalachia** [1] - 63:2
**appear** [1] - 73:6
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**application** [6] - 35:6, 35:25, 40:17, 77:14, 77:23, 80:22
**applied** [11] - 28:15, 28:24, 29:7, 29:15, 29:19, 37:9, 58:19, 64:3, 68:16, 77:13, 79:24
**applies** [3] - 31:6, 39:7, 41:21
**apply** [7] - 11:25, 26:24, 31:17, 33:10, 36:8, 64:6, 79:22
**applying** [1] - 31:23
**approach** [7] - 11:22, 48:12, 49:17, 61:16, 66:8, 68:9, 68:17
**approaches** [1] - 11:11
**approaching** [1] - 11:5
**appropriate** [3] - 44:5, 63:15, 68:8

**APQ** [2] - 36:21, 71:8
**arbitration** [1] - 14:21
**Arch** [2] - 6:6, 6:13
**ARCOS** [6] - 13:13, 13:15, 19:14, 36:22, 39:8, 69:24
**area** [1] - 60:5
**areas** [3] - 9:11, 63:2, 63:3
**arguably** [2] - 69:17, 72:1
**artificial** [1] - 32:21
**ASHLEY** [1] - 5:3
**aside** [2] - 9:16, 42:3
**assignments** [1] - 15:6
**assumed** [1] - 32:22
**assumption** [4] - 73:25, 74:14, 77:17, 77:20
**AT** [1] - 1:2
**attached** [1] - 47:18
**attachment** [3] - 47:18, 52:11, 52:22
**attempt** [1] - 75:1
**attempted** [1] - 68:17
**attention** [1] - 54:16
**audit** [1] - 53:2
**authenticating** [1] - 64:17
**automated** [1] - 49:15
**automatically** [4] - 25:21, 26:6, 30:4, 42:13
**available** [13] - 7:21, 13:18, 13:20, 15:15, 22:3, 22:17, 36:17, 36:18, 36:22, 50:14, 54:25, 60:8
**average** [22] - 17:12, 17:18, 17:20, 17:25, 18:3, 18:5, 18:11, 18:14, 18:16, 20:8, 20:23, 21:1, 21:8, 23:8, 23:10, 23:14, 23:16, 70:17, 77:12, 78:9
**averages** [2] - 21:9, 69:17
**Avin** [1] - 3:7
**aware** [11] - 52:5, 53:19, 54:1, 59:2, 71:20, 76:22, 77:11, 78:1, 78:6, 81:11, 81:14
**Ayme** [2] - 6:17, 84:21

**B**

**background** [1] - 46:8

**bar** [1] - 20:7
**Baron** [1] - 3:14
**bars** [5] - 17:24, 19:9, 19:12, 19:17, 19:18
**base** [1] - 75:13
**based** [12] - 15:19, 25:20, 32:12, 35:23, 44:6, 45:10, 46:1, 54:17, 57:7, 68:7, 79:1
**basis** [25] - 19:19, 19:21, 20:23, 20:24, 21:8, 22:10, 26:3, 32:16, 44:12, 50:7, 51:12, 53:10, 58:19, 59:9, 62:3, 62:8, 62:16, 66:3, 70:8, 70:25, 71:24, 75:12, 75:13, 77:16, 81:1
**Bates** [3] - 51:2, 62:20, 66:20
**Baylen** [1] - 2:11
**bear** [1] - 69:2
**bearing** [2] - 71:9, 72:23
**BEFORE** [1] - 1:17
**began** [2] - 10:10, 54:25
**beginning** [2] - 30:23, 71:16
**beginnings** [1] - 68:8
**begun** [1] - 63:2
**behalf** [3] - 47:2, 53:25, 67:5
**behavior** [2] - 22:7, 26:12
**below** [3] - 28:7, 34:11, 70:24
**BENCH** [1] - 1:16
**beneficiaries** [2] - 22:4, 22:6
**benefit** [2] - 57:25, 58:20
**Berkeley** [4] - 8:25, 9:1, 9:7, 10:17
**best** [1] - 83:22
**better** [1] - 81:22
**between** [5] - 29:13, 44:15, 69:2, 72:21, 77:15
**beyond** [3] - 69:8, 69:13, 71:7
**big** [2] - 72:12, 72:13
**bit** [5] - 30:2, 32:10, 35:16, 47:10, 78:18
**black** [4] - 27:10, 28:7, 33:22, 34:12
**blanket** [1] - 74:20
**blinding** [1] - 40:8
**block** [2] - 56:7, 56:8

**blood** [5] - 29:6, 29:8, 29:11, 34:25, 43:11
**blue** [9] - 17:24, 19:11, 19:16, 19:17, 19:18, 20:7, 39:10, 39:25, 40:12
**Blvd** [3] - 4:3, 4:12, 4:14
**Bonasso** [1] - 5:14
**bottom** [4] - 62:25, 66:21, 66:22
**Boulevard** [1] - 3:15
**Box** [2] - 5:14, 6:8
**brand** [1] - 10:11
**break** [2] - 46:13, 46:16
**BRG** [4] - 9:1, 9:11, 9:16, 10:6
**Bridgeside** [3] - 4:3, 4:12, 4:14
**briefly** [3] - 9:15, 25:12, 32:10
**bring** [1] - 50:1
**broke** [1] - 44:15
**Budd** [1] - 3:14
**built** [1] - 13:12
**bunch** [1] - 51:2
**Burling** [1] - 5:11
**business** [3] - 15:15, 15:16, 42:4
**BY** [28] - 8:19, 16:16, 17:6, 19:8, 20:6, 21:19, 24:1, 27:8, 33:17, 38:17, 44:22, 47:4, 48:14, 49:1, 51:24, 53:18, 56:2, 56:21, 61:18, 64:5, 66:12, 68:20, 69:21, 72:6, 76:7, 77:10, 78:19, 80:12

**C**

**CA** [1] - 3:16
**CABELL** [1] - 1:10
**Cabell** [14] - 3:2, 26:25, 29:1, 29:9, 29:16, 33:11, 34:9, 34:21, 42:17, 42:22, 43:18, 44:10, 45:12, 80:18
**cabell** [1] - 2:2
**Cabell-Huntington** [1] - 80:18
**Cabell/Huntington** [6] - 14:6, 34:25, 35:6, 35:13, 42:24, 45:1
**calendars** [2] - 83:6, 83:7
**CALLAS** [1] - 6:7

**CAMPBELL** [1] - 6:14
**candidate** [1] - 11:23
**cannot** [3] - 63:18, 75:8
**capita** [11] - 17:21, 18:7, 18:11, 19:19, 19:21, 20:23, 20:24, 21:8, 22:10, 70:23, 70:24
**Capitol** [1] - 2:7
**Cardinal** [84] - 4:16, 5:2, 8:5, 14:1, 14:2, 14:4, 15:14, 15:21, 26:25, 27:15, 28:11, 28:15, 28:17, 28:20, 29:1, 29:7, 29:15, 33:10, 34:3, 34:4, 34:5, 34:8, 34:13, 34:16, 34:20, 35:5, 36:1, 37:12, 37:17, 37:22, 38:2, 38:3, 38:4, 38:13, 39:8, 39:11, 39:22, 41:13, 41:14, 41:21, 42:16, 42:21, 42:23, 43:17, 44:10, 44:14, 44:25, 45:11, 45:18, 45:23, 47:24, 49:6, 50:6, 50:20, 50:22, 51:7, 52:4, 53:12, 53:24, 54:1, 54:19, 55:16, 56:10, 56:14, 57:24, 58:13, 59:4, 68:6, 68:16, 69:23, 70:10, 75:7, 75:16, 75:23, 76:24, 77:11, 77:15, 78:24, 79:7, 79:25, 80:17, 80:21, 81:12
**Cardinal's** [10] - 37:24, 55:7, 55:9, 58:9, 58:24, 60:24, 60:25, 72:20, 75:8, 79:22
**care** [4] - 62:15, 70:13, 72:22, 82:5
**career** [3] - 10:10, 10:24, 13:2
**Carey** [1] - 4:23
**carries** [1] - 75:12
**carry** [3] - 32:16, 74:11, 74:13
**carry-forward** [3] - 32:16, 74:11, 74:13
**case** [29] - 13:5, 13:9, 14:3, 15:7, 15:9, 16:18, 24:6, 25:25, 30:18, 35:17, 36:10, 36:13, 37:13, 43:16, 45:9, 47:11, 49:21, 50:14, 50:15, 52:1,

52:3, 56:12, 56:13, 56:15, 61:23, 71:23, 75:12, 75:13
**case-by-base** [1] - 75:13
**case-by-case** [1] - 75:12
**categories** [1] - 13:24
**caused** [3] - 37:24, 38:13, 74:2
**Center** [2] - 3:12, 5:11
**centralized** [7] - 49:6, 49:7, 50:23, 51:8, 51:14, 59:3, 81:12
**certain** [9] - 15:20, 15:22, 21:11, 33:6, 35:11, 58:1, 61:7, 67:24, 70:12
**certainly** [2] - 70:11, 82:17
**CERTIFICATION** [1] - 84:20
**certify** [1] - 84:23
**cetera** [3] - 12:19, 27:22, 71:8
**chain** [7] - 9:25, 12:7, 12:12, 12:14, 13:1, 16:5, 16:13
**change** [3] - 39:5, 40:16, 41:2
**changed** [1] - 40:19
**changing** [1] - 40:17
**charge** [1] - 71:15
**CHARLES** [1] - 3:11
**Charleston** [6] - 2:8, 3:13, 4:24, 5:15, 6:9, 7:3
**CHARLESTON** [2] - 1:2, 1:18
**chart** [12] - 16:24, 17:18, 17:22, 19:3, 23:22, 33:21, 33:24, 34:13, 38:11, 40:4, 44:24, 47:21
**charts** [3] - 38:23, 39:3
**Chase** [1] - 4:23
**chat** [1] - 47:10
**Chesterbrook** [1] - 6:15
**chime** [1] - 65:8
**cholesterol** [1] - 43:12
**circuit** [1] - 57:21
**City** [3] - 4:1, 5:11, 84:24
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 85:1, 85:2
**civil** [1] - 1:10
**claims** [1] - 23:4

**clarification** [2] - 41:18, 82:14
**clarify** [2] - 27:21, 79:6
**class** [1] - 22:23
**classes** [1] - 34:24
**clean** [2] - 7:6, 78:17
**clear** [5] - 28:14, 36:17, 36:18, 51:25, 67:20
**cleared** [2] - 53:10, 57:8
**CLERK** [3] - 8:8, 8:10, 8:13
**clients** [2] - 12:10, 12:21
**closing** [1] - 7:22
**closings** [2] - 7:9, 7:11
**Cochran** [3] - 6:17, 84:21, 85:5
**code** [2] - 60:5
**coding** [2] - 13:21, 13:22
**colors** [1] - 39:4
**combined** [1] - 48:24
**coming** [1] - 55:13
**comment** [3] - 54:3, 55:6, 63:12
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**commonly** [1] - 9:2, 28:12
**communities** [1] - 66:25
**community** [1] - 64:2, 72:22
**companies** [3] - 10:5, 10:8, 12:10
**compare** [1] - 61:10
**compared** [4] - 16:21, 18:25, 20:23, 21:8
**compares** [1] - 72:7
**comparing** [2] - 18:24, 69:22
**comparison** [3] - 22:9, 68:25, 69:16
**complete** [1] - 60:17
**completely** [3] - 31:2, 43:15, 53:4
**component** [1] - 57:1
**components** [2] - 53:20, 53:22
**comprehensive** [2] - 79:21, 81:1
**comprise** [1] - 53:20
**comprised** [1] - 9:3
**computer** [1] - 6:19
**conceded** [1] - 60:13

**conceptually** [1] - 11:17
**concerned** [1] - 65:12
**concerns** [1] - 65:17
**conclude** [1] - 23:3
**conclusion** [2] - 45:15, 68:1
**conclusions** [3] - 15:20, 15:24, 36:24
**conduct** [4] - 18:24, 33:6, 44:9, 75:18
**conducted** [3] - 57:24, 57:25
**conferences** [1] - 11:20
**confirmed** [2] - 54:5, 54:15
**Congress** [2] - 62:17, 64:2
**congressional** [2] - 63:6, 65:15
**Congressional** [1] - 61:19
**connection** [2] - 12:25, 13:5
**Connolly** [2] - 4:18, 5:4
**CONROY** [1] - 3:3
**consider** [8] - 11:19, 31:9, 45:20, 45:21, 60:14, 68:21, 72:18, 75:11
**considered** [13] - 11:4, 41:7, 41:14, 50:8, 62:2, 63:8, 64:7, 64:11, 67:4, 69:12, 75:15, 76:23, 78:21
**considering** [1] - 64:12
**consistently** [1] - 57:17
**Consulting** [3] - 10:10, 10:11, 10:13
**consulting** [2] - 9:3, 10:24
**contained** [2] - 75:25, 79:25
**contemplate** [1] - 63:18
**context** [21] - 12:2, 15:11, 31:2, 31:7, 31:11, 42:9, 43:24, 45:24, 50:1, 51:15, 58:11, 58:22, 59:2, 60:17, 62:15, 63:22, 64:13, 65:19, 67:8, 70:22, 73:18
**contextual** [36] - 31:13, 31:17, 37:9,

43:14, 44:7, 50:3, 50:8, 57:8, 57:9, 57:12, 58:1, 58:15, 58:18, 58:20, 59:12, 59:17, 59:20, 59:23, 60:14, 60:22, 62:1, 62:14, 63:8, 63:13, 67:18, 67:22, 68:10, 68:12, 68:23, 72:18, 75:15, 75:19, 75:20, 75:21, 75:23, 76:22
**Continued** [3] - 3:1, 5:1, 5:6, 6:1, 6:10
**continues** [1] - 32:17
**continuous** [1] - 32:16
**continuum** [1] - 9:24
**contracting** [1] - 60:10
**contracts** [1] - 60:1
**contrary** [1] - 54:6
**controlled** [30] - 26:25, 28:13, 29:20, 30:1, 33:11, 33:20, 34:14, 36:1, 43:2, 43:17, 43:23, 44:1, 44:2, 44:4, 44:9, 44:13, 44:15, 45:4, 45:7, 59:14, 67:23, 70:16, 75:24, 76:15, 76:23, 77:3
**Cook** [3] - 6:18, 84:22, 85:5
**copies** [1] - 66:16
**copy** [2] - 48:7, 55:22
**core** [1] - 11:13
**Corporation** [2] - 6:2, 85:1
**cORPORATION** [2] - 1:7, 1:13
**correct** [59] - 18:1, 20:10, 20:11, 23:2, 23:13, 25:25, 28:4, 28:5, 28:16, 34:4, 34:9, 34:10, 39:19, 39:24, 40:3, 44:7, 45:14, 47:5, 47:6, 47:9, 47:16, 47:19, 48:1, 48:3, 48:4, 49:13, 49:14, 49:24, 50:5, 51:5, 52:13, 52:16, 54:9, 57:24, 59:15, 59:17, 59:21, 59:24, 59:25, 60:19, 60:22, 60:23, 62:2, 67:20, 68:14, 69:6, 70:3, 70:9, 73:8, 73:19, 73:21, 74:16, 75:7, 75:17, 76:18, 78:10, 79:8, 79:9, 84:23

**Correct** [1] - 44:8
**correctly** [3] - 17:23, 20:10, 51:1
**counsel** [2] - 48:6, 59:13, 61:5
**count** [1] - 15:4
**country** [4] - 61:25, 65:4, 77:1, 78:20
**country's** [1] - 78:1
**COUNTY** [1] - 1:10
**County** [3] - 2:2, 3:2, 43:18
**couple** [1] - 11:3
**course** [6] - 10:24, 13:1, 15:14, 15:16, 21:10, 25:5
**Court** [14] - 6:17, 6:18, 7:2, 8:21, 16:11, 25:11, 32:9, 47:1, 52:5, 65:23, 76:8, 83:8, 84:21, 84:22
**COURT** [59] - 1:1, 1:17, 7:5, 7:16, 7:18, 7:23, 8:1, 8:4, 8:7, 8:14, 8:16, 16:6, 16:8, 16:11, 17:5, 19:22, 20:1, 46:3, 46:7, 46:11, 46:17, 46:22, 46:25, 48:13, 51:17, 51:21, 55:20, 56:16, 61:17, 62:6, 63:14, 65:1, 65:5, 65:10, 65:15, 66:1, 66:5, 66:10, 69:15, 71:25, 78:15, 80:6, 80:9, 81:17, 81:19, 81:24, 82:2, 82:4, 82:7, 82:21, 82:24, 83:2, 83:9, 83:11, 83:18, 83:22, 83:25, 84:4, 84:11
**court** [6] - 14:18, 14:19, 14:20, 15:1, 24:20, 83:16
**Court's** [1] - 80:7
**courts** [1] - 14:15
**covered** [2] - 54:11, 54:23
**covering** [1] - 38:4
**Covington** [1] - 5:11
**created** [4] - 28:10, 32:21, 55:10, 66:21
**crisis** [1] - 78:6
**cross** [7] - 46:11, 51:18, 52:8, 52:24, 56:16, 63:15, 66:3
**CROSS** [1] - 47:3
**cross-examine** [1] - 46:11
**cross-referenced** [2] -

52:8, 52:24
**CRR** [2] - 6:17, 6:18
**CT2** [2] - 51:8, 76:24
**current** [1] - 8:23
**customer** [3] - 31:8, 38:9, 38:10
**customers** [9] - 31:21, 34:6, 42:5, 42:24, 44:11, 45:1, 50:24, 51:8, 80:17
**cut** [4] - 14:11, 53:9, 57:7, 81:2
**CVS** [1] - 79:3

## D

**data** [111] - 9:22, 10:2, 10:20, 11:3, 11:5, 11:7, 11:8, 11:10, 11:14, 12:2, 12:21, 13:13, 13:15, 13:16, 13:18, 13:19, 13:25, 14:1, 14:2, 14:4, 14:9, 14:10, 14:12, 15:10, 15:11, 15:12, 15:13, 15:20, 16:4, 16:12, 17:12, 18:6, 19:11, 19:13, 21:10, 21:23, 22:13, 22:17, 23:4, 23:6, 23:18, 25:6, 26:16, 26:17, 26:21, 27:13, 28:15, 28:18, 28:21, 32:24, 35:22, 35:24, 36:11, 36:13, 36:23, 37:11, 37:13, 37:14, 37:18, 37:22, 37:25, 38:4, 38:8, 38:13, 39:4, 39:8, 39:21, 40:8, 40:9, 40:10, 41:7, 41:14, 42:21, 42:23, 42:25, 43:2, 43:6, 44:10, 45:11, 46:1, 50:2, 54:4, 54:25, 57:4, 59:16, 69:9, 71:1, 71:7, 71:8, 77:4, 77:5, 79:8, 79:11, 79:17, 79:18, 79:19, 79:23, 79:25, 80:16, 80:20, 80:24, 81:5, 81:9
**dataset** [16] - 13:10, 13:11, 13:12, 13:14, 14:5, 21:25, 22:1, 22:3, 23:9, 24:19, 27:14, 32:6, 39:7, 53:14, 79:14
**datasets** [11] - 9:21, 10:25, 11:1, 11:17, 13:2, 13:6, 13:8,

13:13, 15:19, 47:23, 81:11
**date** [3] - 37:13, 40:17, 41:2
**Date** [1] - 85:10
**David** [1] - 7:1
**DAVID** [2] - 1:17, 4:5
**days** [1] - 65:16
**DC** [6] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12
**De** [2] - 2:4, 2:14
**DEA** [17] - 14:12, 31:19, 36:18, 43:22, 51:5, 53:9, 53:23, 57:7, 62:11, 62:12, 64:1, 64:8, 64:9, 65:13, 67:9, 70:25
**deal** [2] - 9:19, 11:6
**dealing** [1] - 22:4
**dealt** [1] - 22:1
**decide** [1] - 25:17
**deck** [1] - 77:9
**declare** [1] - 83:8
**declining** [2] - 31:6, 35:22
**Defendant** [4] - 4:16, 5:2, 5:7, 6:2
**Defendant's** [1] - 76:6
**defendants** [6] - 7:10, 7:14, 37:19, 38:1, 82:24, 83:9
**Defendants** [3] - 1:8, 1:14, 85:1
**defendants'** [1] - 48:10
**DEFENDANTS'** [1] - 8:12
**defense** [2] - 48:6, 82:9
**definition** [1] - 11:2
**demographic** [1] - 70:18
**demonstrate** [2] - 58:1, 58:21
**demonstrated** [1] - 70:23
**demonstrates** [4] - 38:12, 39:9, 45:3, 70:15
**Demonstrating** [1] - 29:23
**Demonstrative** [6] - 48:7, 48:23, 53:17, 68:18, 72:24, 76:6
**demonstrative** [3] - 48:23, 55:24, 56:1
**depicts** [1] - 17:10
**deposed** [1] - 15:3
**deposition** [4] - 15:1, 30:18, 43:25, 71:12

**describe** [13] - 9:15, 9:18, 12:9, 15:13, 17:8, 25:12, 28:6, 32:11, 33:24, 38:21, 39:1, 44:23, 45:22
**described** [6] - 15:19, 31:10, 54:6, 71:7, 73:13, 81:12
**describing** [2] - 55:12, 55:13
**description** [2] - 59:7, 59:8
**design** [3] - 64:9, 68:4, 76:3
**designated** [2] - 52:14, 53:22
**designed** [2] - 30:3, 54:20
**despite** [2] - 30:5, 30:13
**detailed** [1] - 52:19
**details** [2] - 13:16, 15:17
**determination** [3] - 25:19, 26:18, 63:23
**determine** [2] - 57:11, 58:17, 61:11
**determined** [1] - 34:16
**detour** [1] - 27:18
**devastated** [1] - 67:2
**developing** [1] - 11:11
**devise** [1] - 76:1
**diabetic** [4] - 29:14, 29:16, 35:4, 43:12
**dice** [7] - 26:20, 30:4, 30:11, 30:12, 30:15, 74:7
**dictate** [1] - 78:9
**difference** [3] - 77:21, 77:22, 77:25
**differences** [4] - 70:14, 70:18, 73:11, 77:18
**different** [8] - 24:13, 29:5, 34:24, 70:7, 70:11, 73:8, 77:14, 77:24
**differently** [1] - 68:22
**differing** [2] - 68:24, 75:14
**digest** [1] - 58:7
**diligence** [57] - 14:12, 48:2, 48:3, 49:6, 49:8, 50:7, 50:11, 50:13, 50:14, 50:16, 50:23, 51:8, 51:14, 52:1, 52:3, 52:4, 53:1, 53:3, 53:4, 53:6, 57:1, 57:11, 57:15, 57:16, 57:23,

58:5, 58:6, 58:9, 58:13, 58:14, 58:25, 59:2, 59:3, 59:9, 60:21, 61:6, 61:8, 68:11, 74:1, 74:15, 74:19, 74:21, 74:22, 74:25, 75:2, 75:6, 75:9, 75:11, 75:12, 75:25, 77:21, 79:13, 80:14, 81:13
**DIRECT** [2] - 8:18, 80:11
**direct** [1] - 69:13
**directed** [3] - 34:1, 55:17, 62:10
**direction** [1] - 82:19
**directly** [3] - 12:20, 20:21, 31:19
**disadvantaged** [1] - 60:8
**discovery** [4] - 48:11, 48:24, 50:19, 61:11
**discuss** [1] - 32:7
**discussed** [1] - 56:3
**dismissed** [1] - 83:17
**dispel** [1] - 57:12
**dispensers** [3] - 12:17, 12:24, 20:12
**distinction** [1] - 69:2
**distributed** [5] - 19:19, 19:20, 34:15, 44:14, 67:14
**distributing** [2] - 67:5, 67:7
**distribution** [10] - 14:5, 15:21, 19:13, 20:9, 28:15, 28:21, 30:10, 37:12, 42:23, 60:11
**distributions** [18] - 14:5, 14:7, 20:12, 20:16, 20:21, 20:23, 26:24, 33:10, 34:9, 44:25, 45:4, 45:18, 45:25, 62:12, 67:9, 70:15, 70:23, 71:3
**distributor** [3] - 31:20, 70:11, 71:5
**distributor's** [1] - 42:11
**distributors** [7] - 12:23, 13:14, 63:21, 64:9, 67:6, 69:6, 70:12
**DISTRICT** [3] - 1:1, 1:1, 1:17
**District** [2] - 7:2, 7:3
**diuretic** [2] - 35:10, 35:11
**diversion** [14] - 14:9,

63:1, 67:3, 71:15
**divide** [1] - 7:14
**document** [15] - 51:3, 51:13, 51:16, 55:16, 57:2, 61:10, 61:13, 61:21, 63:11, 64:17, 64:24, 65:17, 65:23, 66:1, 66:13
**documents** [10] - 51:9, 52:11, 52:14, 52:18, 52:23, 55:9, 61:1, 61:12, 61:23, 64:21
**dominant** [1] - 9:5
**done** [14] - 12:6, 12:25, 37:23, 45:14, 47:11, 50:6, 60:19, 61:6, 68:4, 68:25, 71:6, 73:14, 76:9
**dosage** [3] - 29:2, 41:12, 70:6
**dot** [2] - 38:23, 39:17
**dots** [8] - 39:4, 39:5, 39:10, 39:15, 39:22, 39:25, 40:1, 40:12
**doubt** [1] - 83:20
**Douglas** [1] - 4:23
**down** [4] - 23:24, 44:15, 46:19, 69:10
**downsides** [1] - 78:7
**dozen** [1] - 15:3
**Dr** [18] - 24:5, 24:9, 24:18, 25:24, 27:22, 28:2, 37:16, 37:23, 38:3, 39:20, 42:15, 42:25, 43:9, 47:15, 49:20, 68:3, 75:16
**draw** [1] - 45:15
**Drive** [1] - 6:15
**Drug** [2] - 6:2, 85:1
**DRUG** [2] - 1:7, 1:13
**drug** [9] - 13:23, 13:24, 19:14, 22:20, 32:19, 34:14, 35:10, 41:25, 60:7
**drugs** [7] - 13:23, 22:7, 22:22, 34:25, 35:5, 35:12, 60:8
**due** [58] - 14:12, 48:2, 48:3, 49:6, 49:7, 50:7, 50:11, 50:13, 50:14, 50:16, 50:23, 51:8, 51:14, 52:1, 52:3, 52:4, 52:25, 53:2, 53:3, 53:4, 53:6, 56:25, 57:10, 57:15, 57:16, 57:23, 58:5, 58:6, 58:9, 58:13, 58:14, 58:24, 59:2, 59:3, 59:9,

60:21, 61:6, 61:8, 68:11, 74:1, 74:11, 74:15, 74:19, 74:20, 74:22, 74:25, 75:2, 75:5, 75:6, 75:9, 75:10, 75:11, 75:25, 77:21, 79:13, 80:13, 81:13
**During** [1] - 33:25
**during** [4] - 34:16, 36:19, 45:2, 45:19
**dynamic** [1] - 80:3

### E

**early** [3] - 35:24, 46:13, 77:16
**East** [3] - 3:5, 3:12, 4:24
**easy** [1] - 45:9
**economic** [1] - 9:19
**Economic** [1] - 10:13
**economists** [2] - 10:14, 10:16
**educational** [1] - 46:7
**effective** [1] - 68:4
**effectiveness** [2] - 54:3, 58:4
**efforts** [1] - 14:13
**eight** [1] - 25:20
**Eighth** [1] - 3:10
**eighth** [1] - 25:19
**either** [2] - 47:7, 53:9
**electronic** [3] - 79:15, 79:21, 79:25
**element** [2] - 11:13, 74:22
**elements** [2] - 12:13, 71:13
**ELIZABETH** [1] - 6:14
**Elsevier** [1] - 13:22
**embedded** [1] - 35:20
**emphasis** [1] - 9:22
**employ** [1] - 11:21
**employed** [1] - 78:24
**employing** [1] - 68:10
**Encino** [1] - 3:16
**encourage** [1] - 83:12
**end** [3] - 12:15, 12:17, 12:23
**endeavor** [1] - 53:1
**ended** [1] - 29:22
**enforcement** [1] - 15:16
**entire** [8] - 7:20, 19:21, 22:2, 22:11, 39:7, 39:21, 57:15, 65:4
**entities** [1] - 9:23
**entitled** [2] - 61:20,

72:1
**ENU** [1] - 4:17
**environment** [1] - 31:7
**epidemic** [3] - 78:2, 78:20
**equal** [1] - 7:21
**equivalent** [3] - 27:24, 28:18, 28:20
**establish** [1] - 57:22
**established** [2] - 64:23, 75:4
**establishes** [1] - 32:18
**estimate** [1] - 10:22
**estimation** [1] - 59:10
**et** [7] - 1:7, 1:13, 12:19, 27:22, 71:8, 84:25, 85:1
**evaluate** [14] - 12:4, 15:11, 16:21, 25:6, 32:17, 49:24, 49:25, 50:1, 54:2, 56:23, 64:10, 67:17, 69:3, 75:5
**evaluated** [3] - 53:9, 57:6, 78:12
**evaluating** [7] - 62:4, 62:10, 63:19, 64:3, 64:14, 71:5, 72:19
**evaluation** [4] - 11:19, 12:2, 57:3, 68:5
**event** [2] - 30:14, 74:24
**events** [5] - 11:11, 28:10, 30:11, 37:7, 53:1
**evidence** [2] - 66:6, 66:14
**evolution** [1] - 55:6
**evolve** [2] - 80:3, 80:4
**evolved** [2] - 11:2, 54:24
**EXAMINATION** [3] - 8:18, 47:3, 80:11
**examination** [2] - 63:15, 66:3
**examine** [1] - 46:11
**examined** [1] - 13:2
**example** [9] - 13:3, 13:22, 15:1, 17:17, 28:25, 43:8, 43:14, 67:20, 75:25
**examples** [2] - 68:12, 75:21
**exceeded** [1] - 57:4
**exceeds** [1] - 32:20
**Excuse** [1] - 12:12
**excused** [2] - 81:19, 82:2
**execute** [1] - 54:20

**executed** [1] - 54:5
**executes** [1] - 28:22
**execution** [1] - 54:19
**executive** [2] - 9:12, 9:17
**Executive** [1] - 8:24
**exhaustive** [2] - 60:15, 61:3
**exhibit** [1] - 55:21
**Exhibit** [1] - 48:10
**exhibits** [1] - 84:3
**existed** [3] - 54:4, 60:22, 61:9
**existence** [1] - 53:11
**expect** [1] - 83:3
**expectation** [1] - 84:6
**expected** [5] - 30:16, 31:16, 57:18, 62:12, 74:6
**experience** [4] - 10:20, 12:20, 15:19, 36:19
**expert** [7] - 12:1, 14:15, 14:23, 14:25, 16:4, 16:12, 24:5
**expertise** [1] - 9:5
**experts** [5] - 15:9, 15:13, 15:22, 53:5, 58:14
**explain** [3] - 11:15, 22:15, 31:14
**explanations** [1] - 58:2
**explicit** [1] - 49:9
**explicitly** [1] - 55:5
**expressed** [1] - 65:17
**extensively** [1] - 12:23
**extent** [3] - 65:9, 65:12, 66:5
**eyes** [1] - 39:10

### F

**FABER** [1] - 1:17
**Faber** [1] - 7:1
**fact** [8] - 21:4, 30:5, 30:13, 31:16, 36:15, 44:4, 59:5, 75:10
**factor** [9] - 43:23, 62:1, 63:8, 63:12, 67:4, 67:22, 68:23, 72:18, 76:22
**factors** [11] - 31:14, 44:7, 50:4, 50:8, 58:21, 59:12, 60:14, 62:14, 67:19, 75:15
**fail** [1] - 31:24
**failed** [1] - 31:4
**failing** [2] - 31:1, 37:4
**fails** [2] - 31:2, 37:6

**failure** [1] - 30:10
**fair** [11] - 20:25, 23:18, 29:19, 35:25, 47:12, 47:13, 52:23, 53:15, 55:8, 59:19, 64:15
**families** [1] - 13:24
**Family** [1] - 17:13
**far** [5] - 32:24, 39:10, 65:24, 69:10, 72:14
**FARRELL** [11] - 2:3, 7:19, 82:9, 82:13, 82:23, 83:1, 83:4, 83:10, 83:20, 83:24, 84:3
**Farrell** [6] - 2:4, 2:13, 7:18, 82:18, 82:22, 83:19
**fashion** [4] - 28:22, 32:5, 77:14, 79:21
**favorable** [1] - 60:9
**fax** [1] - 56:25
**FCRR** [1] - 6:18
**federal** [3] - 13:19, 22:3, 23:6
**feed** [1] - 32:6
**few** [5] - 11:16, 13:8, 29:5, 43:21, 80:14
**field** [1] - 16:1
**figure** [1] - 41:12
**figures** [1] - 18:18
**files** [6] - 50:23, 51:8, 51:14, 75:25, 80:14, 81:13
**filling** [2] - 42:5, 60:11
**finance** [1] - 10:12
**financial** [1] - 9:19
**finish** [2] - 84:4, 84:8
**firm** [4] - 9:3, 9:13, 9:17, 10:14
**Firm** [2] - 3:4, 3:7
**First** [1] - 43:21
**first** [12] - 11:21, 19:10, 22:19, 27:10, 31:23, 32:8, 32:15, 32:18, 33:1, 37:6, 47:7, 83:15
**five** [4] - 28:12, 33:20, 34:14, 80:8
**fixed** [2] - 32:8, 33:1
**FL** [1] - 2:11
**flag** [15] - 29:2, 29:17, 30:9, 30:11, 30:13, 30:14, 30:15, 32:4, 34:8, 36:2, 56:8, 69:5, 73:15, 74:24, 76:1
**flagged** [44] - 25:16, 25:18, 26:4, 26:6, 26:19, 27:16, 28:2, 29:10, 31:15, 34:2,

34:17, 34:22, 35:1, 35:6, 35:13, 36:3, 36:10, 37:24, 37:25, 38:3, 38:7, 38:10, 39:11, 39:16, 39:25, 40:2, 40:11, 40:13, 40:15, 40:22, 41:4, 41:8, 41:12, 42:13, 53:8, 57:4, 57:12, 58:3, 73:20, 74:10, 77:20
**flagging** [29] - 15:8, 24:3, 24:13, 25:7, 26:12, 28:9, 29:13, 29:22, 29:23, 31:18, 35:19, 35:21, 36:11, 37:17, 37:22, 38:12, 39:23, 40:21, 42:1, 42:7, 42:8, 68:4, 74:3, 74:11, 74:23, 75:3, 75:13, 76:3
**flags** [15] - 25:21, 26:14, 26:17, 26:18, 26:21, 26:22, 29:24, 30:4, 30:6, 30:7, 30:8, 30:16, 37:8, 69:12, 73:24
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flawed** [1] - 37:8
**Floor** [1] - 3:5
**focus** [1] - 9:24
**focused** [1] - 10:21
**Focused** [1] - 27:13
**focuses** [1] - 24:25
**follow** [1] - 80:15
**follow-up** [1] - 80:15
**following** [1] - 50:24
**follows** [1] - 7:4
**FOR** [1] - 1:1
**foregoing** [1] - 84:23
**form** [1] - 53:10
**format** [3] - 13:16, 79:15, 79:25
**forms** [1] - 68:11
**forth** [1] - 69:17
**forward** [9] - 32:16, 40:10, 55:1, 74:11, 74:13, 75:12, 79:17, 79:18, 80:1
**foundation** [1] - 65:24
**Foundation** [1] - 17:13
**founded** [2] - 10:15, 10:17
**founding** [2] - 9:7, 10:5
**fourteen** [1] - 72:17
**frame** [5] - 27:13, 40:15, 69:24, 73:15,

79:11

**frequency** [4] - 63:24, 64:10, 71:10, 78:24

**front** [2] - 48:16, 49:2

**full** [1] - 62:25

**Fuller** [14] - 2:4, 2:13, 47:1, 48:19, 51:19, 55:15, 56:19, 63:16, 65:5, 66:2, 69:19, 72:3, 80:14, 81:17

**fuller** [1] - 78:15

**FULLER** [49] - 2:12, 16:7, 16:9, 46:12, 47:1, 47:4, 48:6, 48:14, 48:20, 48:22, 49:1, 51:20, 51:23, 51:24, 53:16, 53:18, 55:18, 55:23, 56:2, 56:20, 56:21, 61:16, 61:18, 62:7, 63:17, 64:5, 64:16, 65:3, 65:6, 66:4, 66:7, 66:11, 66:12, 68:18, 68:20, 69:20, 69:21, 72:6, 76:5, 76:7, 77:6, 77:8, 77:10, 78:17, 78:19, 80:5, 81:18, 81:20, 82:1

**Fuller's** [1] - 64:21

**Furosemide** [1] - 35:10

**future** [3] - 32:20, 32:23, 32:24

### G

**general** [2] - 10:3, 10:20

**generally** [6] - 11:17, 12:9, 15:5, 23:19, 28:6, 64:7

**geographic** [1] - 77:16

**Georgetown** [1] - 46:10

**gigabytes** [1] - 11:3

**Gina** [3] - 53:17, 68:19, 77:8

**given** [3] - 14:25, 61:12

**global** [1] - 9:3

**government** [2] - 22:4, 61:23

**graph** [4] - 17:9, 17:10, 19:10, 19:16

**graphic** [2] - 44:17, 56:13

**graphs** [2] - 38:25, 39:1

**great** [1] - 57:9

**GRETCHEN** [1] - 6:7

**Group** [5] - 8:25, 9:1, 9:8, 10:14, 10:17

**group** [2] - 10:16, 13:23

**groups** [3] - 9:11, 25:14, 60:8

**growing** [9] - 31:5, 36:7, 36:12, 36:15, 41:25, 42:4, 42:9, 42:10, 42:12

**growth** [2] - 35:20, 42:6

**guess** [2] - 49:9, 65:22

### H

**half** [4] - 72:16, 76:18, 76:23, 77:2

**halfway** [1] - 46:15

**hand** [3] - 8:11, 39:7, 49:4

**handed** [1] - 61:19

**hang** [1] - 81:20

**happy** [3] - 82:18, 82:19, 83:16

**HARDIN** [1] - 5:3

**Hawkins** [1] - 3:7

**hazard** [1] - 49:9

**Health** [43] - 4:16, 5:2, 8:6, 14:1, 14:2, 14:5, 26:25, 27:16, 28:11, 28:15, 28:17, 29:1, 34:3, 34:4, 34:5, 34:13, 34:16, 34:20, 35:5, 36:1, 37:18, 37:22, 38:2, 38:3, 38:4, 39:22, 41:13, 41:14, 41:21, 42:21, 42:23, 44:10, 44:25, 45:12, 45:18, 50:20, 50:22, 53:12, 54:1, 55:16, 57:24, 80:17, 80:21

**health** [2] - 9:13, 70:18

**Health's** [11] - 15:21, 29:7, 29:15, 33:10, 34:8, 37:12, 42:16, 43:17, 45:24, 56:14, 81:12

**Healthcare** [1] - 10:15

**healthcare** [9] - 9:20, 9:24, 10:2, 10:21, 11:7, 11:10, 11:14, 12:11, 17:15

**healthcare-related** [1] - 17:15

**hear** [1] - 55:20

**heard** [2] - 25:11, 32:9

**hearing** [2] - 63:6,

65:15

**Hearing** [1] - 61:19

**hearsay** [3] - 65:1, 65:12, 65:23

**heart** [1] - 18:22

**held** [7] - 14:10, 14:11, 50:17, 56:23, 57:6, 80:20, 80:25

**HESTER** [2] - 5:9, 84:9

**high** [10] - 15:5, 17:7, 26:17, 29:6, 29:8, 29:11, 32:5, 34:25, 74:2, 78:10

**higher** [11] - 17:20, 19:20, 20:22, 21:1, 21:4, 23:19, 23:20, 25:15, 25:21, 44:5, 44:6

**highest** [1] - 73:16

**hindsight** [3] - 57:25, 58:10, 58:20

**historical** [1] - 53:2

**histories** [1] - 15:12

**holding** [2] - 83:6, 83:7

**Honor** [39] - 7:6, 7:8, 7:12, 7:17, 7:25, 8:3, 8:5, 8:17, 16:3, 16:10, 16:14, 16:15, 17:3, 20:5, 39:10, 46:2, 46:20, 51:11, 51:23, 56:11, 56:20, 63:9, 64:19, 65:11, 65:21, 66:7, 69:7, 71:22, 78:11, 81:16, 81:18, 82:17, 83:1, 83:10, 83:14, 84:2, 84:7, 84:10, 84:14

**HONORABLE** [1] - 1:17

**Honorable** [1] - 7:1

**hospital** [6] - 12:19, 20:20, 31:4, 59:22, 60:10

**hospitals** [5] - 20:16, 20:19, 20:22, 20:24, 60:9

**hours** [2] - 7:13, 7:21

**housekeeping** [1] - 7:7

**huge** [2] - 73:20, 73:22

**hundred** [1] - 30:3

**Huntington** [16] - 3:10, 4:1, 27:1, 29:1, 29:9, 29:17, 33:11, 34:9, 34:21, 42:18, 42:22, 43:18, 44:11, 45:12, 80:18, 84:25

**HUNTINGTON** [1] -

1:4

**hydration** [1] - 59:19

**hydrocodone** [9] - 27:11, 27:15, 28:3, 28:19, 29:21, 33:23, 34:2, 36:3, 59:19

**hypothetical** [1] - 28:16

### I

**ID** [1] - 49:15

**ideally** [1] - 55:22

**identical** [3] - 28:22, 73:10, 77:15

**identification** [4] - 11:16, 11:18, 30:24

**identified** [8] - 13:20, 50:7, 52:5, 52:10, 59:4, 59:12, 67:19, 82:9

**identifies** [2] - 49:6, 74:7

**identify** [15] - 11:11, 11:22, 12:3, 22:1, 26:9, 28:10, 30:21, 32:1, 32:3, 32:4, 33:2, 37:1, 37:7, 56:7, 74:5

**identifying** [8] - 12:9, 14:10, 19:11, 21:23, 31:24, 33:5, 36:11, 68:9, 78:23

**ignored** [2] - 43:15, 53:4

**ignores** [1] - 75:3

**III** [3] - 8:9, 8:12, 8:22

**Illinois** [1] - 70:5

**impact** [11] - 36:7, 37:21, 38:12, 41:7, 41:20, 41:22, 41:24, 42:1, 45:22, 75:2

**impacting** [1] - 61:25

**impacts** [1] - 78:4

**implemented** [1] - 24:18

**important** [2] - 68:14, 75:18

**IN** [2] - 1:1, 1:18

**incapable** [1] - 33:5

**include** [1] - 68:23

**included** [1] - 11:7

**including** [1] - 39:7

**inclusive** [1] - 18:21

**incorporates** [1] - 50:20

**increases** [2] - 36:9, 38:8

**increasing** [1] - 36:19

**independent** [1] - 68:1

**independently** [2] - 68:12, 76:3

**indicate** [1] - 44:3

**indicated** [2] - 36:14, 43:22

**indication** [3] - 43:4, 43:5, 45:17

**indications** [3] - 55:5, 57:18, 68:10

**indiscriminate** [11] - 26:12, 29:24, 32:1, 33:4, 35:19, 36:11, 37:7, 49:22, 73:11, 74:4, 79:1

**individual** [12] - 60:20, 62:10, 63:20, 63:21, 63:22, 64:14, 69:2, 69:4, 71:5, 71:9, 72:19, 72:23

**individuals** [2] - 9:4, 10:12

**industry** [1] - 10:22

**inferring** [1] - 65:22

**inflammatory** [1] - 22:22

**inflated** [1] - 41:13

**information** [4] - 16:18, 36:13, 64:23, 71:20

**initial** [2] - 31:13, 32:22

**insist** [1] - 7:21

**instances** [1] - 44:4

**institute** [1] - 17:14

**intend** [1] - 82:10

**interacted** [1] - 13:24

**interrogatory** [1] - 48:24

**interrupt** [1] - 55:15

**introducing** [1] - 8:21

**inventory** [1] - 61:8

**investigation** [2] - 9:6, 65:7

**invitation** [1] - 7:9

**involved** [3] - 10:25, 11:1, 11:10

**involves** [1] - 18:23

**involving** [1] - 9:21

**Irpino** [1] - 3:7

**ISIA** [1] - 5:4

**isolated** [1] - 70:10

**isolating** [1] - 20:21

**issue** [5] - 59:17, 59:18, 59:20, 59:24, 65:16

**issues** [4] - 9:19, 12:22, 17:15, 60:22

**items** [1] - 27:10

**itself** [1] - 81:1

## J

**Jackson** [1] - 6:8
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:18
**job** [1] - 8:23
**John** [3] - 8:6, 8:9, 8:22
**JOHN** [1] - 8:12
**join** [1] - 10:13
**JOSEPH** [1] - 6:4
**Joseph** [1] - 8:22
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**judge** [4] - 64:16, 72:25, 77:6, 80:5
**JUDGE** [1] - 1:17
**Judge** [13] - 7:2, 46:12, 48:9, 48:12, 61:16, 63:17, 65:3, 65:6, 65:9, 66:4, 66:9, 69:20, 81:21
**judgment** [3] - 12:4, 31:12, 49:24
**JULY** [1] - 1:19
**July** [3] - 7:4, 85:3, 85:9
**jurisdiction** [1] - 67:13
**jurisdictions** [1] - 77:1
**justify** [1] - 58:11

## K

**Kaiser** [1] - 17:13
**KEARSE** [1] - 4:2
**keeping** [1] - 76:8
**Kelly** [1] - 6:8
**Kentucky** [1] - 67:1
**Kessler** [1] - 4:23
**kind** [2] - 18:19, 38:23
**known** [1] - 62:9
**KOUBA** [1] - 4:11

## L

**LA** [1] - 3:8
**labeled** [1] - 22:20
**lack** [3] - 74:2, 74:15, 77:21
**laid** [2] - 65:24, 73:6
**Lanier** [1] - 3:4
**large** [18] - 9:21, 10:25, 11:1, 11:2, 11:4, 11:17, 12:6, 13:2, 13:6, 17:14, 36:2, 36:3, 40:1, 41:7, 41:22, 43:8, 43:11, 74:10
**larger** [3] - 20:20,

38:2, 70:22
**last** [4] - 10:23, 42:14, 62:25, 79:6
**latitude** [2] - 56:17, 72:1
**Laughter** [2] - 20:2, 81:25
**LAURA** [1] - 5:10
**law** [1] - 15:15
**Law** [4] - 3:4, 3:7, 3:12, 10:13
**lay** [1] - 75:1
**lays** [1] - 55:10
**leaders** [1] - 9:13
**least** [2] - 47:8, 74:15
**leave** [3] - 9:16, 82:4, 82:8
**Leaving** [1] - 42:3
**LECG** [2] - 10:15, 10:16
**Lee** [1] - 3:12
**left** [6] - 10:13, 39:2, 39:6, 39:7, 39:10, 39:22
**left-hand** [1] - 39:7
**legal** [2] - 9:6, 51:16
**length** [1] - 38:8
**Leon** [2] - 2:4, 2:14
**Less** [1] - 41:5
**lesser** [1] - 35:21
**lettered** [1] - 27:21
**level** [6] - 15:5, 17:7, 36:22, 45:17, 67:8, 71:1
**levels** [2] - 18:25, 19:1
**Levin** [1] - 2:10
**LEYIMU** [1] - 4:13
**likelihood** [1] - 38:9
**likely** [1] - 38:7
**limited** [3] - 77:16, 79:11
**LINDA** [1] - 4:8
**line** [12] - 17:12, 22:18, 22:19, 27:11, 28:7, 33:22, 34:12, 40:1, 40:2, 67:11, 67:14, 71:1
**linked** [1] - 31:4
**Lipitor** [1] - 18:22
**Lisa** [2] - 6:18, 84:22
**list** [13] - 13:8, 52:24, 59:5, 59:7, 60:15, 61:10, 75:19, 82:12, 82:15, 83:2, 83:25
**listed** [6] - 52:23, 59:17, 59:20, 59:24, 61:13, 71:11
**lists** [1] - 22:20
**literally** [1] - 31:7
**litigation** [3] - 13:17,

43:25, 49:18
**litigations** [1] - 77:5
**live** [1] - 19:24
**LLC** [1] - 2:4
**lobby** [1] - 47:6
**Logan** [2] - 6:5, 6:12
**long-term** [1] - 38:9
**look** [25] - 15:8, 15:10, 17:17, 17:22, 20:15, 20:18, 21:4, 22:7, 22:19, 25:17, 31:11, 50:3, 58:14, 58:15, 60:24, 62:17, 63:21, 67:12, 67:22, 73:15, 74:19, 75:9, 75:24
**looked** [17] - 13:14, 13:15, 14:12, 29:5, 29:12, 34:19, 34:24, 44:12, 47:14, 47:24, 50:16, 58:17, 59:3, 59:11, 67:12, 69:6
**looking** [19] - 22:14, 25:24, 32:12, 32:13, 33:20, 33:23, 45:23, 50:2, 50:9, 57:18, 58:18, 62:13, 62:14, 62:17, 68:21, 71:7, 75:22, 75:24, 76:14
**looks** [3] - 25:14, 59:7, 73:18
**lower** [1] - 35:16

## M

**MacDonald** [48] - 8:6, 8:9, 8:20, 8:23, 14:14, 16:4, 16:12, 16:17, 17:7, 17:23, 18:10, 18:18, 19:10, 20:25, 21:20, 24:2, 26:7, 27:9, 31:9, 32:25, 33:19, 34:20, 35:18, 36:14, 36:25, 37:11, 38:19, 41:6, 42:14, 43:20, 44:23, 45:16, 46:6, 46:7, 46:23, 47:5, 48:15, 49:3, 52:17, 61:21, 66:13, 69:25, 78:11, 79:6, 80:13, 81:19, 81:24, 82:2
**MACDONALD** [1] - 8:12
**machine** [2] - 32:6, 40:8
**macrolevel** [1] - 69:1
**Magazine** [1] - 3:7
**MAHADY** [1] - 6:4
**mail** [1] - 12:18
**mail-order** [1] - 12:18

**main** [1] - 12:13
**Maine** [1] - 67:1
**MAINIGI** [10] - 4:17, 7:6, 7:17, 7:25, 82:12, 82:17, 83:14, 84:2, 84:6, 84:14
**maintained** [3] - 50:15, 57:17, 79:15
**MAJESTRO** [1] - 2:6
**Majestro** [1] - 2:6
**major** [1] - 46:9
**majority** [2] - 58:2, 62:11
**manufacturers** [1] - 12:15
**MARK** [1] - 3:14
**marked** [2] - 62:20, 62:21
**market** [7] - 31:5, 31:6, 42:10, 42:11, 70:10, 72:20, 79:4
**material** [1] - 71:11
**materials** [5] - 47:19, 47:21, 52:7, 52:9, 52:10
**math** [3] - 45:9, 45:14, 76:19
**matter** [4] - 25:1, 48:11, 50:15, 84:24
**matters** [1] - 9:21
**maximum** [1] - 73:13
**MC-WV-01764** [1] - 66:11
**McCann** [38] - 13:11, 13:12, 24:5, 24:9, 24:18, 25:24, 27:14, 27:16, 27:23, 27:25, 28:2, 28:22, 30:17, 30:19, 37:16, 37:23, 38:3, 38:6, 39:6, 39:12, 39:20, 40:6, 40:7, 42:15, 42:16, 42:25, 43:9, 43:15, 49:20, 59:1, 68:3, 68:13, 73:7, 74:9, 75:16
**McCann's** [4] - 33:25, 47:14, 47:15, 58:3
**MCCLURE** [1] - 6:3
**McDonald** [1] - 8:22
**MCGINNESS** [1] - 4:2
**McKesson** [1] - 5:8
**mean** [4] - 11:15, 45:10, 50:12, 82:13
**meaningful** [1] - 74:8
**means** [1] - 67:24
**meant** [3] - 19:22, 49:7, 51:15
**measure** [1] - 43:23
**mechanical** [2] - 6:19,

56:6
**mechanism** [3] - 29:23, 29:24, 49:19
**mechanisms** [1] - 32:2
**Medi** [1] - 22:5
**media** [1] - 66:23
**Medicaid** [2] - 13:19, 22:4
**medical** [2] - 64:2, 72:22
**Medicare** [7] - 22:6, 22:8, 22:10, 23:3, 23:6, 23:16, 23:17
**medication** [14] - 18:22, 22:2, 28:25, 29:3, 29:6, 29:8, 29:15, 29:16, 34:21, 35:4, 36:6, 36:7, 43:12, 43:13
**medications** [14] - 15:21, 16:19, 18:20, 21:12, 23:5, 23:15, 23:20, 26:1, 34:19, 42:17, 42:22, 43:11, 43:17, 45:11
**medicines** [1] - 29:12
**meeting** [1] - 47:8
**member** [1] - 9:10
**members** [1] - 9:7
**memorized** [2] - 72:5, 72:10
**mentioned** [8] - 10:19, 12:5, 18:2, 29:25, 30:23, 42:20, 48:2, 59:16
**met** [2] - 47:5, 47:6
**Metformin** [2] - 29:14, 35:4
**Method** [48] - 25:2, 25:9, 25:13, 25:14, 25:23, 26:4, 26:8, 26:23, 26:24, 27:20, 27:22, 27:24, 27:25, 28:24, 29:2, 29:7, 29:15, 29:20, 30:19, 31:22, 32:7, 32:11, 32:12, 33:1, 33:6, 33:7, 33:9, 34:7, 34:18, 34:22, 35:2, 35:7, 35:13, 35:19, 35:25, 36:8, 36:25, 38:12, 39:12, 39:13, 40:22, 41:8, 41:16
**method** [11] - 25:10, 26:8, 26:9, 32:8, 32:15, 33:2, 37:4, 58:3, 59:18, 78:24
**methodologies** [15] - 15:8, 24:4, 24:13,

24:17, 24:19, 24:24, 24:25, 25:6, 41:15, 42:1, 42:7, 42:8, 72:25, 73:2, 73:6
**methodology** [17] - 28:9, 30:9, 30:25, 31:24, 32:16, 37:9, 40:18, 41:16, 49:19, 49:21, 68:5, 73:8, 73:20, 73:24, 74:12, 75:3, 76:3
**Methodology** [2] - 41:20, 41:21
**methods** [2] - 15:25, 27:22
**Michael** [1] - 55:18
**MICHAEL** [2] - 2:12, 3:9
**middle** [2] - 12:16, 78:20
**might** [3] - 65:24, 69:5, 72:18
**Mike** [1] - 47:1
**MILDRED** [1] - 3:3
**mile** [1] - 59:23
**million** [6] - 70:4, 70:6, 72:8, 72:15
**millions** [1] - 61:1
**mind** [4] - 46:13, 46:15, 66:15, 78:22
**minute** [2] - 46:15, 77:6
**minutes** [1] - 46:18
**mischaracterizing** [1] - 56:15
**missed** [1] - 66:18
**Mitchell** [1] - 2:10
**model** [5] - 28:23, 40:7, 40:8, 58:3
**moment** [5] - 41:24, 46:2, 55:25, 59:3, 79:10
**Monday** [3] - 82:18, 83:21, 84:12
**Mone** [1] - 56:11
**Mone's** [1] - 55:18
**Monitoring** [2] - 24:14, 53:20
**monitoring** [1] - 55:7
**month** [11] - 25:10, 26:2, 26:8, 32:8, 33:1, 39:17, 73:13, 73:15, 73:18, 74:23
**month-by-month** [1] - 26:2
**monthly** [3] - 28:11, 40:13, 73:13
**months** [3] - 40:21, 73:16, 73:19
**morning** [9] - 7:5, 8:5,

8:14, 8:15, 8:20, 8:22, 42:14, 47:5, 84:13
**Morris** [1] - 6:15
**Motley** [5] - 4:3, 4:5, 4:8, 4:11, 4:14
**MOUGEY** [1] - 2:9
**move** [4] - 19:6, 64:16, 64:20, 66:8
**moved** [1] - 11:4
**moves** [1] - 25:19
**moving** [1] - 64:21
**MR** [78] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:14, 4:5, 4:22, 5:9, 5:10, 5:13, 6:4, 7:19, 16:7, 16:9, 46:12, 47:1, 47:4, 48:6, 48:14, 48:20, 48:22, 49:1, 51:20, 51:23, 51:24, 53:16, 53:18, 55:15, 55:18, 55:21, 55:23, 56:2, 56:20, 56:21, 61:16, 61:18, 62:7, 63:17, 64:5, 64:16, 65:3, 65:6, 65:9, 65:11, 66:4, 66:7, 66:11, 66:12, 68:18, 68:20, 69:20, 69:21, 71:22, 72:6, 76:5, 76:7, 77:6, 77:8, 77:10, 78:17, 78:19, 80:5, 81:18, 81:20, 82:1, 82:9, 82:13, 82:23, 83:1, 83:4, 83:10, 83:20, 83:24, 84:3, 84:8, 84:9
**MS** [64] - 3:3, 3:6, 4:2, 4:8, 4:11, 4:13, 4:17, 4:18, 4:20, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 7:6, 7:17, 7:25, 8:3, 8:5, 8:17, 8:19, 16:3, 16:15, 16:16, 17:3, 17:6, 19:6, 19:8, 20:5, 20:6, 21:17, 21:19, 23:24, 24:1, 27:6, 27:8, 33:15, 33:17, 38:15, 38:17, 44:20, 44:22, 46:2, 46:5, 48:18, 48:21, 51:11, 56:11, 63:9, 64:19, 65:21, 69:7, 78:11, 80:7, 80:10, 80:12, 81:15, 82:12, 82:17, 83:14, 84:2, 84:6, 84:14
**Mt** [3] - 4:4, 4:12, 4:15
**multiplier** [1] - 77:12

# N

**name** [3] - 8:8, 8:22, 10:11
**nation** [1] - 22:11
**national** [25] - 16:22, 17:12, 17:20, 17:25, 18:3, 18:5, 18:14, 18:16, 18:25, 20:8, 21:1, 21:8, 23:8, 23:10, 23:14, 62:3, 62:5, 62:8, 62:13, 62:16, 63:25, 69:17, 70:8, 77:4
**nationally** [2] - 20:24, 23:17
**native** [1] - 13:16
**nature** [3] - 17:8, 31:3, 77:24
**Navigant** [3] - 10:10, 10:11, 10:13
**nearly** [2] - 18:16, 76:18
**necessarily** [2] - 57:16, 72:19
**need** [2] - 7:23, 82:7
**needed** [1] - 60:16
**needs** [1] - 12:22
**negative** [1] - 78:4
**never** [1] - 30:13
**New** [2] - 3:5, 3:8
**next** [10] - 19:9, 56:9, 56:22, 64:4, 64:6, 73:4, 82:10, 84:1, 84:4, 84:8
**NICHOLAS** [2] - 6:11, 84:8
**Ninth** [1] - 4:9
**non** [25] - 21:11, 22:2, 22:21, 22:24, 23:11, 26:25, 28:13, 29:20, 30:1, 33:11, 33:20, 34:14, 36:1, 40:11, 42:21, 43:2, 43:17, 44:2, 44:9, 44:13, 44:16, 45:4, 45:6, 59:14, 67:23
**non-controlled** [16] - 26:25, 28:13, 29:20, 30:1, 33:11, 33:20, 34:14, 36:1, 43:2, 43:17, 44:2, 44:9, 44:13, 45:4, 59:14, 67:23
**non-flagged** [1] - 40:11
**non-opioid** [6] - 21:11, 22:2, 22:24, 23:11, 42:21, 45:6
**non-opioids** [1] -

44:16
**non-steroidal** [1] - 22:21
**None** [1] - 43:7
**norm** [3] - 11:24, 45:19, 76:25
**normal** [9] - 15:14, 15:16, 30:8, 30:9, 30:15, 30:16, 31:16, 44:3, 44:5
**not-for-profit** [1] - 17:14
**note** [2] - 37:20, 65:13
**notes** [1] - 38:6
**nothing** [2] - 41:1, 84:12
**notice** [9] - 35:16, 64:18, 64:22, 65:3, 65:4, 65:5, 65:25, 82:18
**NSAIDS** [3] - 22:20, 23:7, 23:12
**number** [43] - 25:15, 25:20, 26:14, 32:14, 36:21, 38:2, 40:1, 40:11, 40:14, 41:11, 47:18, 47:21, 48:8, 48:9, 48:16, 48:23, 48:25, 49:5, 52:22, 53:13, 55:21, 55:24, 55:25, 62:20, 66:20, 66:21, 67:10, 68:18, 68:19, 69:22, 70:21, 71:3, 72:7, 72:11, 73:21, 73:22, 74:6, 74:7, 76:6, 77:9, 83:4, 83:5
**numbers** [24] - 25:14, 25:16, 26:13, 26:20, 27:12, 27:23, 28:1, 28:16, 30:10, 30:13, 30:17, 32:13, 35:20, 35:22, 36:18, 36:21, 40:6, 50:24, 51:3, 51:5, 52:25, 67:10, 70:21, 74:6
**numerical** [1] - 73:22
**NW** [6] - 4:6, 4:9, 4:19, 4:21, 5:5, 5:12
**NY** [1] - 3:5

# O

**object** [7] - 51:11, 56:11, 63:11, 64:19, 64:24, 69:7, 71:24
**objection** [4] - 16:6, 63:9, 71:22, 78:11
**objections** [2] - 50:20, 50:22

**objective** [1] - 65:18
**observable** [3] - 36:23, 58:22, 74:21
**observation** [4] - 24:16, 63:20, 67:7, 67:10
**observations** [1] - 54:6
**observed** [4] - 54:3, 54:14, 57:4, 76:25
**obviously** [2] - 11:2, 51:13
**occasions** [1] - 14:22
**occurred** [2] - 57:15, 81:9
**occurrence** [3] - 35:24, 57:20, 81:5
**OF** [2] - 1:1, 1:4
**offer** [4] - 7:8, 15:7, 16:3, 78:13
**offered** [4] - 15:22, 24:12, 24:16, 56:12
**offering** [4] - 54:18, 54:20, 57:22, 65:3
**offers** [1] - 59:6
**Officer** [1] - 8:24
**Official** [2] - 84:21, 84:22
**officially** [1] - 82:16
**offline** [1] - 82:19
**often** [2] - 11:13, 42:13
**Ohio** [1] - 67:1
**on-line** [2] - 17:12, 22:18
**once** [4] - 25:23, 26:4, 32:18, 77:20
**One** [2] - 5:11, 13:22
**one** [26] - 8:1, 9:5, 9:7, 9:13, 12:15, 14:20, 22:6, 22:13, 23:24, 30:5, 32:17, 35:9, 35:16, 39:2, 42:2, 45:10, 53:2, 61:24, 64:4, 64:6, 68:14, 69:6, 70:21, 73:16, 76:20, 77:6
**ones** [2] - 35:17, 83:3
**operate** [1] - 25:6, 32:11
**operated** [2] - 54:17, 56:14
**operates** [1] - 73:9
**opinion** [16] - 15:18, 23:22, 26:7, 30:19, 31:1, 32:25, 36:25, 37:5, 54:11, 54:14, 54:18, 54:20, 58:13, 68:2, 68:6, 74:16
**opinions** [11] - 15:22,

51:18, 52:13, 52:16, 52:19, 54:12, 57:23, 58:8, 74:18, 78:13
**opioid** [17] - 14:7, 21:11, 22:2, 22:24, 23:11, 23:15, 25:25, 26:21, 42:17, 42:21, 45:5, 45:6, 62:1, 62:16, 78:2, 78:5, 78:20
**opioid-related** [2] - 14:7, 45:5
**opioids** [22] - 18:19, 18:21, 18:25, 19:18, 19:20, 20:9, 21:3, 21:6, 21:7, 23:21, 36:14, 36:19, 43:9, 44:15, 44:16, 45:13, 62:1, 68:24, 76:18, 76:24, 77:3, 78:7
**orange** [2] - 39:15, 40:1
**Order** [2] - 24:14, 53:20
**order** [24] - 12:18, 26:21, 27:16, 32:17, 32:19, 50:9, 50:10, 55:7, 55:13, 56:3, 56:7, 56:8, 56:24, 60:17, 60:20, 60:23, 62:15, 64:4, 64:6, 67:17, 67:25, 71:9, 79:18, 81:2
**ordered** [1] - 52:5
**ordering** [1] - 58:23
**Orders** [1] - 34:5
**orders** [72] - 14:10, 14:11, 24:14, 25:7, 26:5, 26:9, 27:15, 28:2, 28:11, 29:17, 29:22, 30:21, 31:8, 31:18, 33:2, 34:2, 34:3, 34:14, 34:17, 36:2, 36:4, 36:10, 37:1, 38:2, 38:3, 39:11, 39:16, 39:18, 40:13, 40:14, 40:22, 41:3, 41:8, 41:12, 41:21, 43:9, 43:24, 50:17, 53:8, 57:4, 57:6, 57:7, 57:8, 57:13, 58:10, 58:11, 61:7, 62:10, 63:20, 63:21, 63:22, 64:10, 64:14, 67:5, 67:7, 67:13, 68:2, 69:3, 69:4, 71:5, 71:9, 72:20, 72:23, 73:21, 73:25, 76:1, 78:23, 80:20, 80:25

**oriented** [2] - 10:12, 12:1
**original** [1] - 28:20
**Orleans** [1] - 3:8
**outlier** [11] - 11:11, 11:16, 11:18, 28:10, 30:11, 30:14, 30:24, 31:10, 37:4, 37:7
**outliers** [11] - 26:9, 30:21, 31:24, 32:2, 32:3, 32:4, 33:3, 33:5, 37:1, 68:9, 74:5
**outside** [5] - 11:23, 15:1, 45:19, 76:25, 81:12
**outskirts** [1] - 79:4
**overall** [9] - 42:5, 42:10, 45:24, 54:3, 58:12, 58:24, 67:8, 70:15, 75:8
**overruled** [3] - 56:18, 63:14, 78:15
**overstated** [1] - 41:17
**overwhelming** [1] - 58:2
**own** [2] - 55:9, 79:23
**oxycodone** [10] - 27:12, 27:15, 28:3, 28:19, 29:21, 33:23, 34:7, 36:3, 69:23, 72:14
**OxyContin** [7] - 61:20, 62:18, 63:1, 63:7, 65:6, 65:7, 67:3

## P

**P-1200** [1] - 2:7
**p.m** [1] - 84:16
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**page** [4] - 62:25, 63:1, 66:18, 66:20
**Page** [4] - 48:17, 48:18, 62:18, 66:15
**pages** [2] - 51:9, 52:6
**paginated** [1] - 48:16
**pain** [9] - 21:11, 22:2, 22:23, 22:24, 22:25, 23:5, 23:11, 23:19, 78:5
**Papantonio** [1] - 2:10
**paragraph** [1] - 66:22
**part** [5] - 16:17, 24:14, 26:23, 49:23, 73:24
**Part** [2] - 13:19, 23:3
**particular** [19] - 9:10, 9:22, 12:10, 36:6, 41:3, 42:4, 42:11,

42:12, 45:25, 51:15, 53:12, 58:5, 58:25, 62:15, 67:17, 69:2, 78:25, 79:3, 79:4
**particularly** [7] - 9:20, 12:6, 35:19, 36:11, 37:8, 41:15, 67:12
**particulars** [1] - 79:2
**past** [2] - 12:11, 73:16
**path** [1] - 65:22
**patience** [1] - 80:8
**patients** [1] - 62:12
**pattern** [4] - 63:24, 64:10, 71:10, 78:24
**patterns** [3] - 11:8, 62:16, 70:13
**PAUL** [2] - 2:3, 5:9
**Pause** [2] - 46:4, 77:7
**paying** [1] - 54:16
**PEARL** [1] - 3:6
**Pennsylvania** [1] - 67:1
**Pensacola** [1] - 2:11
**people** [3] - 70:6, 72:9, 83:5
**per** [15] - 7:13, 17:20, 18:7, 18:11, 19:19, 19:21, 20:23, 20:24, 21:8, 22:9, 66:20, 66:21, 70:20, 70:23, 70:24
**percent** [34] - 10:23, 17:19, 18:2, 18:5, 18:17, 19:20, 20:8, 20:22, 23:7, 28:1, 29:4, 29:13, 29:18, 29:22, 34:2, 34:8, 34:23, 35:3, 35:8, 35:15, 40:23, 41:5, 44:1, 44:2, 44:6, 45:3, 45:5, 45:6, 45:11, 76:15, 76:17
**percentage** [22] - 26:17, 27:14, 29:2, 29:10, 29:17, 32:5, 34:17, 34:20, 35:1, 35:5, 35:12, 36:2, 36:3, 36:9, 40:21, 41:2, 41:8, 44:12, 67:24, 70:7, 74:8, 75:24
**percentages** [2] - 74:9, 74:10
**perfect** [1] - 49:10
**perfectly** [2] - 30:5, 30:8
**perhaps** [1] - 55:21
**period** [18] - 28:4, 28:5, 33:25, 34:8, 34:16, 36:15, 36:20,

37:11, 37:19, 38:5, 38:7, 38:13, 39:21, 41:7, 41:14, 45:2, 45:19, 54:4
**periods** [1] - 38:1
**permissible** [2] - 66:2, 67:8
**pertinent** [1] - 60:12
**petabytes** [1] - 11:5
**PETER** [1] - 2:9
**Ph.D** [1] - 10:14
**pharmaceutical** [14] - 9:25, 12:7, 12:12, 12:14, 12:21, 13:1, 13:25, 16:5, 16:13, 17:11, 17:19, 28:13, 31:20, 70:17
**pharmacies** [20] - 12:18, 12:19, 28:12, 29:1, 29:8, 34:15, 34:21, 42:17, 42:22, 44:14, 45:12, 45:19, 45:21, 53:12, 53:14, 63:20, 67:8, 79:3, 80:4
**pharmacy** [23] - 24:14, 30:21, 31:3, 31:4, 31:5, 31:8, 32:19, 34:5, 37:1, 40:25, 41:1, 41:3, 42:3, 42:4, 42:11, 42:12, 43:8, 43:10, 45:1, 79:2, 79:4, 80:17
**phenomenon** [1] - 30:17
**Philadelphia** [2] - 6:6, 6:13
**physicians** [4] - 62:11, 67:15, 71:2, 83:6
**pick** [1] - 54:8
**piece** [1] - 58:5
**PIFKO** [1] - 3:14
**pills** [3] - 69:16, 69:23, 70:4
**place** [7] - 53:4, 53:13, 56:4, 57:20, 68:6, 74:25, 80:2
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**plaintiff** [5] - 13:10, 15:9, 15:13, 53:5, 58:14
**Plaintiff's** [1] - 48:10
**Plaintiffs** [2] - 61:20, 84:25
**plaintiffs** [3] - 7:10, 7:20, 47:2
**plaintiffs'** [1] - 15:22
**Plaintiffs'** [3] - 48:7, 53:16, 64:16

**planning** [2] - 7:14, 84:9
**plausible** [1] - 72:11
**play** [1] - 58:21
**players** [1] - 12:14
**Pleasant** [3] - 4:4, 4:12, 4:15
**plus** [2] - 10:4, 10:23
**point** [6] - 64:2, 68:15, 69:8, 69:14, 75:10, 81:2
**pointed** [1] - 70:21
**pointing** [1] - 53:3
**points** [4] - 12:2, 27:13, 36:12, 39:4
**political** [1] - 65:18
**Ponc** [1] - 2:4
**Ponce** [1] - 2:14
**population** [8] - 20:20, 20:21, 22:2, 22:8, 22:10, 23:16, 23:17, 70:5
**populations** [1] - 72:10
**portion** [1] - 74:10
**position** [2] - 31:20, 71:18
**possess** [1] - 37:18
**potential** [2] - 31:24, 68:9
**potentially** [4] - 24:13, 50:9, 56:7, 60:14
**Powell** [1] - 2:6
**PowerPoint** [2] - 55:9, 55:18
**PR** [2] - 2:5, 2:14
**Practice** [1] - 10:15
**practice** [4] - 9:11, 9:14, 70:13
**practices** [1] - 72:22
**precise** [2] - 15:4, 77:24
**predecessor** [1] - 10:11
**predictable** [2] - 32:4, 38:9
**predominantly** [1] - 10:12
**prepare** [7] - 16:24, 19:3, 21:14, 27:3, 33:13, 44:17, 51:18
**prepared** [3] - 21:21, 22:9, 38:11
**prescribed** [5] - 16:19, 17:11, 17:18, 28:12, 67:15
**prescriber** [1] - 71:1
**prescribing** [8] - 15:11, 15:12, 22:7, 36:6, 36:19, 62:16,

67:11, 75:19
**prescription** [1] - 13:25, 18:23, 20:9, 22:25, 23:4, 23:5, 23:19, 23:20, 26:21, 34:14, 43:9
**prescriptions** [17] - 17:19, 17:20, 18:7, 18:11, 18:19, 21:2, 21:5, 23:7, 23:11, 23:15, 36:14, 41:25, 42:3, 42:5, 70:8, 71:3, 71:4
**presented** [2] - 15:9, 75:20
**President** [1] - 8:24
**pressure** [5] - 29:6, 29:8, 29:11, 34:25, 43:12
**pretty** [1] - 69:10
**previous** [1] - 14:25
**previously** [3] - 14:15, 78:12, 83:16
**pricing** [2] - 60:7, 60:9
**Principal** [1] - 8:24
**principles** [1] - 15:25
**proceedings** [1] - 84:24
**Proceedings** [1] - 6:19
**PROCEEDINGS** [1] - 7:1
**process** [14] - 11:19, 27:17, 30:24, 30:25, 31:18, 37:3, 49:13, 56:9, 57:19, 58:13, 58:18, 58:23
**Proctor** [1] - 2:10
**produce** [1] - 42:21
**produced** [26] - 6:19, 13:10, 13:13, 13:17, 14:1, 14:2, 37:13, 37:18, 37:25, 39:8, 39:22, 40:9, 42:23, 44:10, 50:13, 50:15, 50:16, 50:23, 52:1, 52:3, 54:5, 54:25, 58:16, 58:17, 61:1, 77:5
**produces** [1] - 79:17
**producing** [1] - 52:15
**product** [1] - 22:20
**production** [4] - 50:24, 61:9, 67:10, 70:25
**productions** [3] - 60:24, 60:25, 61:2
**products** [8] - 14:7, 17:11, 28:13, 33:21, 34:15, 45:6, 60:11,

70:17
**profit** [1] - 17:14
**program** [5] - 12:3, 14:10, 49:15, 60:7, 71:15
**programmatic** [1] - 11:22
**promise** [1] - 76:8
**pronounced** [1] - 35:10
**proper** [1] - 64:20
**propose** [1] - 7:13
**provide** [7] - 9:5, 49:25, 58:8, 58:22, 59:8, 61:5, 70:22
**provided** [7] - 24:9, 47:24, 49:20, 52:12, 61:14, 82:12, 82:18
**provides** [2] - 47:19, 51:2
**providing** [3] - 54:12, 54:14, 58:9
**proving** [1] - 30:10
**proximity** [2] - 59:22, 60:10
**public** [2] - 64:1, 65:14
**publicly** [5] - 13:17, 13:20, 22:3, 36:18, 36:22
**publish** [5] - 17:3, 21:17, 27:6, 33:15, 44:20
**published** [2] - 22:18, 67:9
**publishes** [1] - 17:15
**publishing** [1] - 70:25
**pull** [1] - 48:7
**pulled** [2] - 17:12, 27:19
**purchase** [1] - 13:3
**purposes** [2] - 7:15, 64:17
**pursuant** [1] - 65:14
**pursue** [2] - 51:19, 51:22
**purview** [3] - 46:1, 64:1
**put** [8] - 12:2, 38:15, 43:23, 45:23, 45:24, 48:22, 73:22, 77:4

**Q**

**qualification** [2] - 16:7, 16:9
**qualified** [1] - 14:22
**quarter** [1] - 59:23
**questionnaire** [1] - 56:25

**questions** [5] - 69:11, 80:8, 80:13, 80:15, 82:20
**quota** [3] - 15:12, 67:10, 71:1

**R**

**Rafalski** [43] - 24:6, 24:9, 24:12, 24:19, 24:23, 25:10, 25:24, 27:17, 27:21, 27:24, 28:3, 30:19, 31:22, 32:7, 34:1, 34:18, 36:25, 37:23, 38:4, 39:13, 39:20, 40:22, 41:8, 41:11, 41:16, 42:15, 42:16, 43:5, 43:15, 49:19, 54:7, 59:1, 59:10, 68:3, 68:13, 73:7, 73:15, 74:1, 74:9, 74:14, 74:17, 75:11, 75:16
**Rafalski's** [12] - 28:24, 29:7, 29:20, 33:7, 34:22, 35:2, 35:7, 35:13, 37:16, 43:10, 47:15, 59:4
**Rafalski/McCann** [2] - 40:8, 77:14
**Rafferty** [1] - 2:10
**raise** [1] - 8:10
**raised** [2] - 83:15
**ran** [5] - 34:13, 39:20, 40:6, 73:9, 73:12
**random** [3] - 26:20, 30:5, 74:7
**range** [3] - 29:12, 37:13
**rate** [7] - 16:18, 17:10, 23:19, 30:6, 35:21, 70:16, 71:2
**rates** [4] - 16:21, 16:22, 23:5, 23:21
**ratio** [1] - 44:1
**ratios** [1] - 44:4
**RE** [1] - 80:11
**re** [1] - 40:6
**RE-DIRECT** [1] - 80:11
**re-ran** [1] - 40:6
**reach** [2] - 15:20, 68:1
**reaching** [1] - 15:24
**read** [8] - 17:17, 50:19, 50:25, 51:1, 59:6, 65:13, 71:12, 71:14
**readily** [1] - 38:10
**reads** [1] - 66:25
**ready** [2] - 8:1, 8:16
**really** [1] - 31:15

**realtime** [1] - 58:19
**Reardon's** [1] - 71:12
**reason** [1] - 63:19
**reasonable** [2] - 58:2, 76:19
**reasonably** [2] - 26:14, 71:4
**reasons** [1] - 43:21
**rebuttal** [1] - 7:22
**receive** [1] - 23:7
**received** [2] - 43:8, 43:11
**receiving** [2] - 23:11, 23:15
**recess** [1] - 46:17
**Recess** [1] - 46:21
**recessed** [1] - 84:16
**recognize** [1] - 73:2
**recognizing** [1] - 32:9
**recollect** [2] - 47:8, 79:19
**record** [8] - 36:17, 50:17, 53:8, 56:15, 65:14, 71:23, 84:24
**recorded** [1] - 6:19
**red** [2] - 69:5, 69:12
**Reed** [2] - 6:4, 6:11
**refer** [4] - 22:21, 30:20, 53:22, 74:11
**reference** [1] - 50:20
**referenced** [2] - 52:8, 52:24
**referred** [7] - 9:2, 13:11, 25:2, 25:3, 27:19, 27:23, 31:19
**referring** [5] - 50:18, 74:13, 77:19
**refers** [1] - 40:7
**reflect** [4] - 20:12, 38:18, 39:22, 43:10
**reflected** [10] - 17:9, 17:24, 19:13, 23:6, 33:24, 36:21, 36:22, 38:22, 39:2, 44:24
**reflecting** [7] - 16:18, 19:3, 80:16, 80:20, 80:24, 81:5, 81:9
**reflects** [7] - 16:24, 20:7, 21:14, 22:14, 27:3, 33:13, 39:17
**regard** [1] - 54:12
**regardless** [2] - 26:13, 32:23
**region** [5] - 14:6, 14:8, 31:6, 45:1, 45:25
**regions** [1] - 77:1
**regulators** [1] - 15:15
**related** [23] - 9:20, 14:7, 14:9, 14:12, 16:4, 16:12, 17:15,

21:11, 22:24, 28:12, 28:13, 42:10, 42:11, 44:10, 45:5, 45:6, 60:20, 60:23, 63:6, 74:1, 74:17, 79:12
**relates** [1] - 63:20
**relating** [1] - 79:12
**relation** [1] - 45:23
**Relative** [2] - 21:6, 21:7
**relative** [3] - 17:11, 23:17, 68:16
**released** [2] - 14:11, 82:16
**relevance** [1] - 64:13
**relevant** [5] - 25:1, 32:23, 43:23, 69:18, 72:2
**reliability** [2] - 26:23, 33:7
**reliable** [4] - 26:8, 30:20, 33:2, 36:25
**reliance** [4] - 47:19, 52:7, 52:8, 52:10, 59:5, 61:10, 61:13, 71:11
**relied** [3] - 47:22, 52:14, 61:15
**relievers** [4] - 22:23, 22:24, 22:25, 23:11
**rely** [1] - 15:25
**relying** [3] - 52:12, 52:16, 52:18
**remainder** [1] - 82:14
**remember** [2] - 47:20, 69:24
**report** [18] - 22:18, 27:19, 40:7, 47:14, 47:15, 47:18, 47:21, 52:11, 52:15, 52:19, 52:20, 52:22, 52:25, 54:11, 54:23, 59:6, 59:16
**Report** [1] - 61:19
**reported** [8] - 14:11, 41:11, 53:9, 53:14, 57:7, 74:9, 81:2, 85:3
**reportedly** [1] - 67:2
**REPORTER** [2] - 55:20, 62:6
**Reporter** [6] - 6:17, 6:18, 84:22, 85:6
**reporting** [1] - 79:1
**reports** [2] - 24:5, 66:23
**represent** [4] - 27:11, 39:11, 55:8, 56:13
**representative** [1] - 53:11

**representatives** [1] - 43:22
**represented** [1] - 19:15
**representing** [1] - 57:3
**represents** [1] - 44:17
**request** [3] - 48:24, 49:5, 50:21
**required** [3] - 62:14, 64:9, 75:19
**requirements** [1] - 64:8
**rescheduled** [1] - 59:20
**Research** [4] - 8:25, 9:1, 9:8, 10:17
**research** [1] - 17:14
**reserve** [1] - 7:22
**reside** [1] - 81:12
**respect** [5] - 23:10, 23:15, 34:7, 36:8, 80:17
**respectively** [1] - 28:3
**respond** [1] - 15:12
**responding** [1] - 79:1
**responds** [1] - 50:22
**response** [4] - 49:5, 50:19, 50:21, 61:11
**responses** [1] - 48:11
**responsibilities** [1] - 9:17
**result** [4] - 33:18, 80:21, 81:2
**results** [13] - 20:18, 22:12, 24:20, 27:4, 29:9, 33:13, 37:22, 39:23, 42:6, 44:18, 44:24, 80:24, 81:4
**resume** [1] - 46:22
**retail** [5] - 12:18, 19:14, 45:1, 45:12, 45:18
**retained** [3] - 54:2, 54:10, 55:6
**review** [17] - 15:18, 16:18, 21:10, 24:5, 36:13, 51:18, 53:1, 53:6, 55:6, 57:14, 58:10, 60:18, 80:16, 80:20, 80:24, 81:3, 81:5
**reviewed** [21] - 18:6, 24:8, 37:11, 37:16, 47:12, 48:3, 50:10, 50:16, 51:10, 52:1, 52:3, 52:25, 53:8, 53:10, 53:12, 57:10, 58:5, 59:2, 79:13, 80:15

**Rice** [5] - 4:3, 4:5, 4:8, 4:11, 4:14
**risk** [1] - 80:7
**RMR** [2] - 6:17, 6:18
**road** [1] - 69:10
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**role** [2] - 9:12, 64:12
**roles** [1] - 9:20
**rolling** [1] - 30:15
**rolls** [4] - 26:20, 30:4, 30:5, 30:11
**roof** [1] - 40:12
**roughly** [1] - 30:6
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**Ruby** [1] - 4:23
**RUBY** [1] - 4:22
**Rule** [1] - 65:14
**run** [2] - 28:19, 28:21
**rural** [2] - 63:2, 66:25

**S**

**s\Ayme** [1] - 85:5
**s\Lisa** [1] - 85:5
**sales** [2] - 13:3, 14:6
**SALGADO** [1] - 4:20
**sample** [5] - 38:11, 40:25, 41:1, 41:3, 53:10
**San** [2] - 2:5, 2:14
**sat** [1] - 75:22
**save** [1] - 82:1
**saw** [2] - 72:25, 79:7
**SC** [3] - 4:4, 4:12, 4:15
**Scatter** [3] - 38:23, 38:25, 39:1
**scenario** [1] - 50:1
**scenarios** [1] - 32:2
**SCHMIDT** [1] - 5:9
**scope** [2] - 69:8, 69:13
**screen** [2] - 49:4, 73:4
**se** [1] - 70:20
**search** [3] - 60:25, 61:1, 61:3
**seat** [1] - 8:13
**second** [5] - 11:25, 31:10, 37:8, 49:23, 66:25
**see** [20] - 22:13, 27:18, 27:19, 39:3, 39:9, 39:25, 40:1, 40:11, 43:1, 43:5, 51:3, 55:13, 61:6, 63:4, 63:5, 66:23, 68:9, 78:17, 84:12
**seeing** [1] - 79:19
**self** [1] - 64:17

**self-authenticating** [1] - 64:17
**Senior** [1] - 7:2
**senior** [2] - 9:13, 71:18
**SENIOR** [1] - 1:17
**Sensabaugh** [1] - 5:14
**sense** [1] - 49:20
**sensitive** [1] - 20:1
**sentence** [3] - 62:25, 63:5, 66:25
**separate** [1] - 24:17
**sequence** [5] - 26:13, 28:11, 73:22, 74:5, 74:6
**sequences** [2] - 25:14, 30:16, 32:13
**series** [11] - 30:3, 30:7, 30:11, 30:13, 32:24, 35:20, 35:21, 35:24, 36:12, 38:7, 40:6
**services** [2] - 9:4, 9:5
**serving** [2] - 9:12, 42:4
**set** [10] - 13:23, 19:9, 24:12, 32:5, 54:17, 57:15, 78:13, 78:14, 79:11, 80:16
**sets** [4] - 13:21, 35:23, 48:3, 79:2
**setting** [8] - 14:20, 14:21, 15:2, 77:11, 78:8, 78:21, 78:23, 78:25
**settings** [1] - 9:6
**seven** [2] - 25:15, 32:13
**seventh** [4] - 25:15, 25:17, 32:13, 73:18
**several** [4] - 15:3, 24:13, 30:3, 77:1
**SHANNON** [1] - 6:3
**share** [5] - 31:5, 31:6, 42:12, 70:10, 72:21
**sheet** [1] - 52:8
**ship** [3] - 67:25, 68:2
**shipment** [4] - 26:4, 26:6, 29:8, 42:21
**shipments** [13] - 25:25, 26:2, 29:3, 29:16, 34:20, 35:1, 35:5, 35:12, 36:1, 42:16, 43:17, 58:11
**shipped** [8] - 28:17, 28:25, 45:12, 53:10, 68:24, 69:23, 70:4, 81:3
**shipping** [1] - 76:24
**short** [1] - 57:21

**shorter** [1] - 38:10
**shorter-term** [1] - 38:10
**show** [2] - 19:18, 41:6
**showed** [1] - 69:10
**showing** [2] - 19:17, 70:8
**shown** [2] - 61:11, 70:21
**sic** [2] - 19:19, 60:1
**side** [6] - 7:13, 30:12, 38:22, 39:7, 59:11
**side-by-side** [1] - 38:22
**sided** [1] - 30:12
**signal** [1] - 69:5
**significant** [1] - 70:13
**significantly** [1] - 70:7
**similar** [6] - 26:14, 29:21, 32:12, 38:1, 60:9, 66:14
**Similar** [1] - 34:13
**similarities** [1] - 73:10
**Simmons** [7] - 19:6, 21:17, 23:25, 27:7, 33:15, 38:15, 44:20
**simply** [2] - 75:20, 83:7
**simulated** [1] - 30:3
**sincere** [1] - 20:3
**SINGER** [1] - 4:8
**single** [3] - 53:1, 74:22, 74:23
**site** [6] - 50:17, 53:11, 53:13, 74:22, 74:23, 81:5
**sitting** [1] - 52:21
**situation** [2] - 12:3, 50:2
**six** [22] - 7:13, 7:20, 24:16, 24:24, 25:10, 25:16, 25:20, 25:21, 26:8, 30:6, 30:12, 32:8, 32:14, 33:1, 73:6, 73:13, 73:15, 73:16, 73:19, 82:10, 82:11
**six-month** [6] - 25:10, 26:8, 32:8, 33:1, 73:13, 73:15
**six-sided** [1] - 30:12
**size** [6] - 31:2, 63:23, 64:10, 71:10, 72:17, 78:24
**skipped** [1] - 35:9
**slash** [1] - 27:16
**Slide** [14] - 17:3, 19:6, 21:18, 27:7, 33:16, 38:16, 44:21, 48:8, 53:17, 68:19, 72:7,

**slide** [3] - 76:11, 76:13, 77:9
**slight** [1] - 27:18
**slightly** [1] - 73:8
**sloughed** [1] - 59:11
**small** [2] - 40:14, 79:4
**Smith** [2] - 6:4, 6:11
**socioeconomic** [1] - 60:8
**sometime** [1] - 78:3
**SOMS** [3] - 53:19, 54:1, 55:10
**sorry** [15] - 16:8, 17:16, 19:24, 22:6, 39:12, 39:14, 48:18, 55:15, 55:20, 60:3, 60:6, 62:6, 62:7, 66:17, 82:23
**sort** [12] - 9:17, 10:20, 11:16, 24:18, 31:9, 31:23, 37:3, 49:15, 49:18, 55:10, 58:10, 60:21
**source** [3] - 17:13, 28:20
**sourced** [1] - 47:24
**South** [1] - 2:11
**Southern** [1] - 7:2
**SOUTHERN** [1] - 1:1
**space** [2] - 9:20, 10:2
**speaking** [2] - 15:5, 58:12, 63:25
**special** [1] - 9:24
**specific** [2] - 29:11, 52:4
**spoken** [1] - 11:20
**spread** [1] - 63:3
**spreadsheet** [1] - 52:6
**Square** [2] - 6:5, 6:12
**squint** [1] - 39:10
**stage** [1] - 24:12
**stamp** [1] - 66:21
**stand** [1] - 46:22
**standard** [3] - 62:15, 70:13, 72:22
**standing** [1] - 65:8
**STANNER** [1] - 5:10
**start** [8] - 8:21, 19:10, 21:23, 24:3, 25:9, 27:9, 40:17, 41:2
**started** [4] - 40:20, 41:4, 54:21
**starting** [1] - 33:22
**starts** [3] - 55:12, 66:23
**state** [14] - 8:8, 70:5, 70:11, 70:14, 70:16, 70:19, 72:10, 72:12, 72:13, 72:16, 83:5

State [1] - 67:13
state-by-state [1] - 72:10
statement [5] - 64:3, 64:13, 65:13, 67:16, 74:20
states [3] - 68:24, 70:12, 72:21
STATES [2] - 1:1, 1:17
States [2] - 7:2, 19:21
STATUS [1] - 1:17
Status [1] - 7:2
stay [2] - 81:22, 81:24
stenography [1] - 6:19
step [19] - 11:19, 11:21, 11:25, 30:24, 31:10, 31:23, 31:25, 37:3, 37:6, 37:8, 46:19, 49:13, 56:9, 56:22, 57:19, 58:25, 59:9, 62:14
step-by-step [1] - 59:9
steps [1] - 31:13
steroidal [1] - 22:21
STEVEN [1] - 4:22
still [6] - 7:8, 7:11, 58:22, 74:7, 76:14, 84:4
strategic [1] - 55:7
Street [15] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:19, 4:21, 4:24, 5:5, 5:12, 6:6, 6:13
strong [1] - 84:6
stronger [1] - 70:12
subject [1] - 50:21
subjective [2] - 12:1
subpoenaed [5] - 82:15, 82:21, 82:25, 83:6, 83:9
subsequent [1] - 26:6
subsequently [1] - 81:3
subset [1] - 20:20
substance [10] - 15:17, 28:13, 33:21, 34:14, 36:1, 43:2, 43:24, 44:1, 44:4, 44:10
substances [15] - 26:25, 29:20, 30:2, 33:11, 44:2, 44:13, 44:15, 45:4, 45:7, 70:16, 76:15, 76:23, 77:3
substantial [2] - 12:20, 52:25
substantially [3] - 21:1, 41:13, 41:16

suggests [1] - 23:22
Suite [9] - 2:4, 2:7, 2:10, 2:13, 3:15, 4:6, 4:9, 6:5, 6:12
suits [1] - 7:11
summaries [1] - 19:14
summary [1] - 36:22
supplemental [1] - 49:5
suppliers [2] - 12:15, 12:16
supply [7] - 9:25, 12:7, 12:12, 12:14, 13:1, 16:5, 16:13
supposed [1] - 66:16
surprising [1] - 36:23
surrounds [1] - 12:3
suspect [1] - 26:18
suspicion [1] - 57:12
suspicious [2] - 50:9, 50:10
Suspicious [2] - 24:14, 53:20
SUZANNE [1] - 4:20
switch [1] - 24:2
sworn [1] - 47:16
SWORN [1] - 8:12
system [33] - 14:6, 27:16, 49:16, 53:19, 54:1, 54:2, 54:4, 54:6, 54:9, 54:15, 54:19, 54:22, 54:24, 55:3, 55:5, 55:6, 55:7, 55:10, 56:4, 56:6, 56:14, 56:22, 56:23, 57:5, 68:6, 68:7, 76:1, 79:22, 79:24
System [2] - 24:15, 53:21
systems [1] - 64:9

T

table [9] - 21:14, 21:20, 22:13, 22:20, 27:3, 27:11, 28:8, 33:13, 34:12
tagged [1] - 11:23
takeaways [1] - 70:20
technically [1] - 28:22
TEMITOPE [1] - 4:13
temperature [2] - 26:16, 26:17
temperatures [2] - 30:7, 30:8
ten [1] - 46:15
ten-minute [1] - 46:15
Tenth [1] - 5:12
terabytes [1] - 11:5

term [3] - 11:15, 38:9, 38:10
terminology [1] - 57:5
terms [4] - 20:8, 21:1, 25:7, 54:16
test [2] - 28:9, 33:9
tested [1] - 29:25
testified [18] - 14:14, 14:17, 14:20, 14:20, 44:1, 47:23, 50:10, 51:12, 51:14, 51:17, 51:25, 63:10, 71:19, 74:14, 76:11, 78:12, 79:7, 79:10
testify [4] - 14:23, 54:9, 58:4, 69:9
testifying [1] - 52:20, 53:25, 58:24
testimony [11] - 15:1, 15:7, 24:8, 24:23, 30:23, 47:16, 49:17, 56:12, 59:6, 72:4
testing [1] - 26:23
tests [2] - 33:7, 38:11
Texas [3] - 72:8, 72:15
THE [76] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:16, 7:18, 7:23, 8:1, 8:4, 8:7, 8:8, 8:9, 8:10, 8:13, 8:14, 8:15, 8:16, 16:6, 16:8, 16:11, 16:14, 17:5, 19:22, 19:24, 20:1, 20:3, 46:3, 46:7, 46:9, 46:11, 46:17, 46:20, 46:22, 46:24, 46:25, 48:13, 51:17, 51:21, 56:16, 61:17, 62:8, 63:14, 63:18, 65:1, 65:5, 65:10, 65:15, 66:1, 66:5, 66:10, 69:15, 71:25, 72:4, 78:15, 80:6, 80:9, 81:17, 81:19, 81:22, 81:24, 82:2, 82:3, 82:4, 82:6, 82:7, 82:21, 82:24, 83:2, 83:9, 83:11, 83:18, 83:22, 83:25, 84:4, 84:11
themselves [3] - 54:18, 68:5, 81:9
therefore [1] - 37:18
thereof [1] - 74:2
thinks [1] - 76:20
Thomas [1] - 2:10
thousand [1] - 30:4
Three [1] - 6:5
three [6] - 6:12, 12:13, 14:20, 52:6, 77:12,

78:8
three-times [1] - 77:12
threshold [15] - 32:19, 32:20, 32:21, 35:23, 54:21, 56:4, 56:6, 57:5, 68:7, 73:13, 78:25, 79:2, 79:19, 79:24
thresholds [15] - 54:16, 54:17, 54:18, 77:12, 78:12, 78:21, 78:23, 78:25, 79:14, 79:24, 80:2, 80:3, 80:16, 80:22
threw [1] - 30:7
throughout [1] - 19:21
throw [2] - 26:13, 26:16, 26:20, 26:21, 30:11, 68:12, 74:5, 74:7
thyroid [4] - 28:25, 29:3, 34:19, 34:21
TIMOTHY [1] - 4:17
today [6] - 8:2, 14:19, 15:7, 15:25, 16:25, 52:21
together [1] - 45:21
took [3] - 53:13, 57:20, 74:25
top [3] - 62:20, 62:21, 75:1
topic [1] - 42:14
topics [1] - 24:2
total [2] - 27:15, 76:15
Tower [2] - 3:4, 4:23
town [1] - 79:5
Track [6] - 28:12, 34:5, 34:15, 43:25, 44:14, 50:24
trailing [5] - 25:10, 26:8, 32:8, 33:1, 73:13
transaction [5] - 25:17, 25:19, 25:22, 32:5, 32:23
transactional [2] - 79:8, 79:18
transactions [7] - 13:3, 25:20, 25:23, 26:15, 37:24, 40:12, 58:3
transcript [2] - 6:19, 84:23
transcripts [1] - 24:8
trend [8] - 35:20, 35:22, 41:25, 42:6, 42:9, 42:10, 42:12, 63:25
trends [4] - 11:8, 45:25, 62:13, 69:1

TRIAL [1] - 1:16
Trial [1] - 84:16
trial [1] - 24:10
tribunal [2] - 14:18, 14:19
tribunals [1] - 14:15
trigger [1] - 32:22
triggered [3] - 32:8, 32:18, 33:1
triggering [2] - 49:19, 49:21
true [2] - 28:10, 74:3
truly [1] - 30:14
try [1] - 67:20
trying [3] - 53:2, 68:1, 80:7
turn [5] - 32:7, 37:10, 62:18, 66:15, 66:18
turned [1] - 74:25
Turning [1] - 19:9
Twelfth [4] - 4:19, 4:21, 5:5
two [14] - 11:19, 24:25, 25:20, 25:21, 29:11, 30:24, 34:24, 37:3, 38:22, 49:13, 66:16, 70:21, 72:21
two-step [4] - 11:19, 30:24, 37:3, 49:13
type [5] - 9:15, 10:1, 26:13, 53:6, 71:19
types [6] - 9:23, 12:10, 12:13, 13:23, 29:6, 75:21

U

unable [1] - 21:25
unaware [1] - 59:5
under [9] - 12:21, 25:23, 26:4, 39:25, 40:22, 41:8, 41:15, 76:17
underlying [2] - 13:15, 15:10
undertake [1] - 15:6
unintelligible [1] - 55:19
unique [1] - 60:11
United [2] - 7:2, 19:21
UNITED [2] - 1:1, 1:17
units [3] - 29:2, 41:12, 70:6
University [1] - 46:10
unless [1] - 81:20
unlike [1] - 32:15
untoward [1] - 44:3
unusual [6] - 11:23, 31:18, 63:23, 64:10, 71:10, 78:23

up [16] - 7:6, 7:14,
29:22, 38:16, 48:7,
48:22, 62:20, 62:21,
63:19, 65:8, 65:16,
67:11, 67:21, 74:1,
78:17, 80:15
urban [1] - 63:3

## V

validate [1] - 57:19
variety [3] - 12:22,
13:6, 17:15
various [2] - 13:20,
53:13
vast [1] - 62:11
Ventura [1] - 3:15
versus [3] - 14:11,
59:14, 67:23
viable [2] - 24:24,
24:25
view [2] - 60:17, 74:18
viewed [1] - 15:14
VIRGINIA [2] - 1:1,
1:18
Virginia [39] - 4:24,
7:3, 18:4, 18:7,
18:25, 19:19, 19:22,
19:23, 19:24, 19:25,
20:7, 20:13, 20:16,
20:19, 20:22, 20:25,
22:11, 23:17, 23:20,
67:1, 67:2, 67:5,
67:13, 67:16, 69:16,
69:22, 69:23, 70:5,
70:9, 70:18, 70:24,
71:2, 72:8, 72:15,
72:17, 81:22, 81:23
Virginian [1] - 17:18
Virginians [8] - 16:19,
17:10, 17:25, 18:12,
20:4, 23:7, 23:9,
23:10
Virginians' [2] - 21:11,
23:4
visit [2] - 74:22, 74:23
visited [1] - 53:12
visits [5] - 50:17,
53:11, 53:13, 81:6,
81:8
VOLUME [1] - 1:16
volume [9] - 19:18,
19:20, 21:2, 43:8,
43:11, 45:2, 67:14,
74:2
vs [1] - 84:25

## W

waiting [1] - 68:16

waiving [1] - 50:22
WAKEFIELD [1] - 5:13
walk [1] - 49:10
wants [1] - 81:20
Washington [6] - 4:7,
4:10, 4:19, 4:21, 5:5,
5:12
weather [1] - 26:16
WEBB [1] - 3:11
Webb [1] - 3:12
week [5] - 7:9, 82:10,
84:1, 84:5, 84:8
weekend [3] - 81:21,
82:8, 84:15
weight [2] - 67:19,
68:14
welcome [1] - 65:10
WEST [2] - 1:1, 1:18
West [43] - 7:3, 16:19,
17:10, 17:18, 17:24,
18:4, 18:7, 18:12,
18:25, 19:23, 19:24,
20:3, 20:7, 20:13,
20:16, 20:19, 20:22,
20:25, 21:11, 22:11,
23:4, 23:6, 23:9,
23:16, 23:20, 67:1,
67:5, 67:13, 67:15,
69:16, 69:22, 69:23,
70:4, 70:9, 70:17,
70:24, 71:2, 72:7,
72:14, 72:17, 81:23
whatsoever [1] - 43:7
whichever [1] - 30:20
whole [1] - 51:2
wholesalers [1] -
12:16
WICHT [44] - 4:18, 8:3,
8:5, 8:17, 8:19, 16:3,
16:15, 16:16, 17:3,
17:6, 19:6, 19:8,
20:5, 20:6, 21:17,
21:19, 23:24, 24:1,
27:6, 27:8, 33:15,
33:17, 38:15, 38:17,
44:20, 44:22, 46:2,
46:5, 48:18, 48:21,
51:11, 55:15, 55:21,
56:11, 63:9, 64:19,
65:21, 69:7, 71:22,
78:11, 80:7, 80:10,
80:12, 81:15
Wicht [7] - 8:7, 8:16,
45:14, 46:14, 65:20,
76:9, 80:6
wide [1] - 72:1
widely [1] - 16:1
Williams [2] - 4:18,
5:4
willing [2] - 7:7, 7:8

witness [12] - 8:2,
14:23, 46:22, 48:12,
51:12, 61:16, 63:10,
64:20, 66:8, 69:8,
73:1
WITNESS [15] - 8:9,
8:12, 8:15, 16:14,
19:24, 20:3, 46:9,
46:20, 46:24, 62:8,
63:18, 72:4, 81:22,
82:3, 82:6
witnesses [5] - 82:10,
82:15, 82:20, 82:21,
82:24
WOELFEL [1] - 3:9
Woelfel [2] - 3:9
words [2] - 19:16,
49:25
world [1] - 11:4
Wright [1] - 43:25
write [2] - 51:13, 76:15
writing [1] - 71:2
WU [1] - 5:10
WV [6] - 2:8, 3:10,
3:13, 4:24, 5:15, 6:9

## Y

years [11] - 10:4,
10:17, 10:20, 10:23,
22:14, 22:15, 22:17,
37:22, 57:17, 58:21,
77:16
yesterday [4] - 25:12,
32:10, 72:25, 84:11
York [1] - 3:5
yourself [3] - 8:21,
47:25, 76:1

## Z

zip [1] - 60:5