```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT CHARLESTON


_____x
                              :
THE CITY OF HUNTINGTON,       :      Civil Action
                              :
            Plaintiff,        :      No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
            Defendants.  :
_____x
                              :
CABELL COUNTY COMMISSION,     :      Civil Action
                              :
            Plaintiff,        :      No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
            Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 38
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


JULY 12, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1          PROCEEDINGS had before The Honorable David A. Faber,

2     Senior Status Judge, United States District Court, Southern

3     District of West Virginia, in Charleston, West Virginia, on

4     July 12, 2021, at 9:00 a.m., as follows:

5                    THE COURT:  Good morning.

6                    SIMULTANEOUS SPEAKERS:  Good morning, Your Honor.

7                    THE COURT:  You can call your next witness.

8                    MR. HESTER:  The defense calls Dr. Robert Rufus to

9     the stand.

10                    COURTROOM DEPUTY CLERK:  Sir, would you please

11     state your name?

12                    THE WITNESS:  Robert James Rufus.

13                    COURTROOM DEPUTY CLERK:  Thank you.  Could you

14     raise your right hand?

15            **DR. ROBERT J. RUFUS, DEFENSE WITNESS, SWORN**

16                    COURTROOM DEPUTY CLERK:  Thank you.  Please take a

17     seat.

18                    THE WITNESS:  Your Honor.

19                    THE COURT:  Good morning, sir.

20                         **DIRECT EXAMINATION**

21            **BY MR. HESTER:**

22     **Q.**   Good morning, Dr. Rufus.

23     **A.**   Good morning.

24     **Q.**   Could you please introduce yourself to the Court?

25     **A.**   My name is Robert James Rufus.

```
 1    Q.    And, Dr. Rufus, what is your profession?
 2    A.    I'm a certified public accountant.
 3    Q.    And did you establish your own accounting firm at one
 4    point?
 5    A.    I did.  I started Rufus & Rufus Accounting Corporation
 6    in 1985.
 7    Q.    And where was that based, Dr. Rufus?
 8    A.    Huntington, West Virginia.
 9    Q.    And how many years did your firm operate in Huntington?
10    A.    Operated as Rufus & Rufus until 2017.  And it morphed
11    into Rufus & Miller, which operated from 2017 through 2019.
12    Q.    And did you live in Huntington during those years?
13    A.    I did.  I lived in Huntington for 30 years.
14    Q.    And where did you grow up before you lived in
15    Huntington, Dr. Rufus?
16    A.    I grew up outside of Beckley, West Virginia, a small
17    town called Shady Spring.
18    Q.    Where did you go to college?
19    A.    I did my undergrad work at Concord College, now Concord
20    University.
21    Q.    Where is that based?
22    A.    It's in Athens, West Virginia.
23    Q.    And what did you study at Concord?
24    A.    I have a degree in Business Administration with a
25    concentration in Accounting.  I graduated with honors in
```

1    1978.

2    **Q.**   And do you have any other degrees?

3    **A.**   Yes.  I have a Masters in Business Administration from

4    Marshall University with concentration in Accounting and I

5    received that in 1981.  I also have a Doctorate in Business

6    Administration with concentration in Accounting, which I

7    earned from Nova Southeastern University.

8    **Q.**   And when did you receive your Doctorate in Accounting?

9    **A.**   In 2007.

10   **Q.**   Are you a certified public accountant?

11   **A.**   I am.

12   **Q.**   And what is public accounting, just at a high level?

13   **A.**   Public accounting is the offering of accounting

14   services to the public.  I mean, that's an awkward

15   definition, but that's, in essence, what it is.

16   **Q.**   And when did you become a certified public accountant,

17   Dr. Rufus?

18   **A.**   I became a CPA in 1981.

19   **Q.**   And are you still practicing as a CPA?

20   **A.**   I am.

21   **Q.**   Do you have any other certifications aside from your

22   certification as a CPA?

23   **A.**   Yes.  I'm also certified in financial forensics and I

24   was also certified as a valuation analyst.

25   **Q.**   And what do those certification qualify you to do?

1   **A.**   Well, it's not so much what they qualify, but what they

2   signify.  Those certifications signify a high level of

3   achievement and competence in the accounting profession.

4   **Q.**   Are you a member of any professional societies?

5   **A.**   I'm a member of the West Virginia Society of CPAs.  I'm

6   also a member of the American Institute of Certified Public

7   Accountants.

8   **Q.**   So, we talked about your becoming a CPA in 1981.  After

9   you became a CPA, what did you do next?

10  **A.**   Well, actually, after I graduated, I went to work for

11  the Internal Revenue Service and I worked as an IRS agent in

12  Huntington for roughly five years.

13  **Q.**   And what were you doing as an IRS agent?

14  **A.**   Well, as an IRS agent, I did the examination of

15  personal, corporate and business tax returns.

16  **Q.**   And then you mentioned that you started your own firm.

17  That was in 1985?

18  **A.**   Yes.  When I left the Internal Revenue Service, I

19  formed Rufus & Rufus Accounting Corporation.

20  **Q.**   And roughly, at a high generality again, what services

21  did your firm provide?

22  **A.**   Well, the nature of our services evolved.  We started

23  out as a public accounting firm and public accounting firms

24  offer a variety of services.  They offer accounting

25  services, financial statement and preparation, tax return

1    preparation, IRS representation, audit work, management

2    advisory services.

3        Our firm then evolved into a higher level of service

4    offering where we went into forensic accounting, support

5    litigation, a lot of business valuations, arbitration-type

6    work.

7    **Q.**   And what type of clients did you work with at your

8    firm?

9    **A.**   Well, just a full array of firms.  We worked with

10   professionals, physicians, attorneys, dentists, engineers,

11   insurance companies, insurance agents, contractors, just

12   about everything you can imagine.  Auto dealers.

13   **Q.**   You mentioned your evolution into forensic accounting.

14   Could you describe what forensic accounting is?

15   **A.**   Forensic accounting, as the name implies, is the

16   application of accounting concepts and principles in a legal

17   setting.  But -- I mean, but normally forensic accounting is

18   fully defined by what we do and, again, it's an array of

19   anything related to legal matters.

20   **Q.**   And is that an area that you focused on for some period

21   of years, forensic accounting?

22   **A.**   It is.  Forensic accounting and tax work.

23   **Q.**   And what type of work are you doing today?

24   **A.**   Well, I'm doing -- you mean as I sit here?

25   **Q.**   No.  A little more broadly than just sitting here.

**A.**   Okay.  I do tax work.  I do some management consulting.

And I do some mergers and acquisition work.

**Q.**   So, Dr. Rufus, I'd like to turn to another part of your

professional life.  Have you also been a teacher and an

academic?

**A.**   I have.  I started my teaching career when I was with

the IRS.  My first teaching assignment was with the West

Virginia College of Graduate Studies, which is now part of

Marshall University.  I think that was in 1983 or '82.

I taught graduate finance from -- during that period,

1982, I think, up through -- or 1982 through 1992.  I was an

adjunct professor with Marshall University, intermittently

teaching accounting and tax as needed.

When I left the Internal Revenue Service in 1985 I went

to work full time, really, for Ohio University at the same

time I was building our firm.  As an instructor I taught

economics both in macro and micro.  I taught finance.  And I

taught accounting.

In 2007, I think, I took a teaching position with

Charleston University, where I taught in their executive

masters and business administration.  I taught the Capstone

program.

In 2008, I was the lead instructor and program

developer for the masters in forensic accounting, which was

offered through the University of Charleston, and I taught

1    and ran that program from 2008, I think, through 2018.

2    **Q.**   What was your -- what was your role at the University

3    of Charleston as the program coordinator and lead instructor

4    in forensic accounting?

5    **A.**   Well, actually, it was a double role.  The program was

6    developed through an entity called the Forensic Institute,

7    which was owned by myself, my associate, Dr. Laura Miller,

8    Judge Dwane Tinsley and Stacey Halloran.  And we developed a

9    forensic program and contracted to -- with the University of

10   Charleston to implement the program.

11       We were responsible for program updates.  We were

12   responsible for case materials, case assignments, case

13   overview.  And then, we carried that to the classroom where

14   we -- where we employed the program with students.

15   **Q.**   Did you also publish any academic papers or books, Dr.

16   Rufus?

17   **A.**   Yes.  Through -- through the years I've published on

18   forensic accounting primarily with a focus on some of the

19   things that we emphasized in the program, critical thinking,

20   research, writing, data, data analysis.

21       I also published a textbook called Forensic Accounting.

22   That was published with Pearson, which is the largest

23   academic publisher in the world.

24   **Q.**   What year was your textbook published?

25   **A.**   I think it was 2014.

1    **Q.**   And is your textbook used around the country by a

2    number of colleges?

3    **A.**   The last conversation I had with Pearson, which was a

4    couple of years ago, it was used in more than a hundred

5    colleges and universities in the country.

6    **Q.**   So, let me turn now to another part of your

7    professional life, Dr. Rufus.  Do you periodically serve as

8    an expert witness in litigation and arbitration?

9    **A.**   I do.

10   **Q.**   And how does your expertise as a forensic accountant

11   come into play as an expert witness?

12   **A.**   Well, it comes into play from start to finish.  What

13   forensic accountants do is really driven by the nature of

14   the engagement.  We employ critical thinking.  We understand

15   data.  At the end of the day, our objective is to gather

16   sufficient reliable data, put it in a form where we can give

17   a legally sufficient opinion.

18   **Q.**   When you're serving as an expert, have you generally

19   been retained by plaintiffs, or defendants, or has it been a

20   mix?

21   **A.**   It's a mix.

22   **Q.**   And so, in preparing for your work in this case, did

23   you work with a team to develop your opinions?

24   **A.**   I did.  I worked with two teams.  I worked with my

25   former associate, Dr. Laura Miller.  Dr. Miller assisted

1    with writing and editing and proofing of the narrative work.

2         I also worked with a group from Alvarez & Marsal.  They

3    were generally responsible for data collection.  They also

4    did proofing of worksheets and also helped me navigate

5    various websites in order to collect data.

6    **Q.**   How long did you and your team work on this project

7    before you submitted your report in August of last year?

8    **A.**   How long?  I -- I don't know.  I think we were engaged

9    in February and I think our -- but it was roughly 500 hours

10   worth of work.

11   **Q.**   And after you submitted your expert report, have you

12   continued to engage in this project and put time into it

13   after you submitted your expert report?

14   **A.**   Yes, that's correct.  I've continued to inform myself

15   about the project.  I've also reviewed supplemental

16   deposition testimony and amendments to other expert reports.

17   **Q.**   So, let's just summarize bits.  We've talked about your

18   involvement in teaching and academic research, your

19   experience as an expert witness and, of course, your deep

20   background in accounting matters, including forensic

21   accounting.  Throughout those different areas, what's been

22   the focus of your work?

23   **A.**   Well, throughout those different areas, the focus of my

24   work has been in forensic accounting.

25   **Q.**   And how long have you been focused on this area of

1    forensic accounting?

2    **A.**   Well, again, I left the Internal Revenue Service in

3    1985 and I carried with me those skills and that training.

4    So, I would say for at least 35 years.

5            MR. HESTER:  Your Honor, I now tender the witness

6    as an expert in public and forensic accounting.

7            THE COURT:  Any objection?

8            MR. MAJESTRO:  Your Honor, we don't have any

9    objection generally.  Some of the matters in Mr. Rufus's

10   report we believe stray beyond that expertise and -- but on

11   the general level, we have no objection to the expertise.

12   I'll make a -- if he offers that testimony, I'll object at

13   the time.

14           THE COURT:  All right.  The Court finds Dr. Rufus

15   to be a qualified expert in the fields of public and

16   forensic accounting.

17           BY MR. HESTER:

18   **Q.**   So, Dr. Rufus, before we get into your opinions in this

19   case, I'd like to identify several topics on which you're

20   not offering opinions, just to be clear on the scope of what

21   you're discussing with the Court today.

22           Are you offering any opinions on causation or fault?

23   **A.**   I am not.

24   **Q.**   Are you offering any opinions on whether any of the

25   abatement programs that are proposed by Dr. Alexander are

```
 1   necessary?
 2   A.   I am not.
 3   Q.   Are you offering any opinions on the medical judgments
 4   that underlie Dr. Alexander's proposed abatement plan?
 5   A.   I am not.
 6   Q.   Are you offering any opinions on capacity or
 7   effectiveness of existing programs in Huntington and Cabell
 8   County?
 9   A.   No.
10   Q.   Are you offering any opinions on the conduct of
11   distributors?
12   A.   No.
13   Q.   And are you offering any opinions related to the volume
14   of prescription opioids distributed into West Virginia or,
15   specifically, into Huntington and Cabell County?
16   A.   No.
17   Q.   All right.  So now, Dr. Rufus, let's turn to your
18   opinions.
19        What were you asked to do in this case at a high level?
20   A.   At a high level, I was engaged to do two things.  One,
21   I was engaged to identify and quantify investments made by
22   the plaintiffs and programs that were designed to help
23   manage the opioid crisis.  And the second component at a
24   high level would be to consider the economic drivers of the
25   expert reports of Dr. Alexander and George Barrett.
```

1    **Q.**   So, let's talk about the first part of your work.   Are

2    you able to offer opinions on the expenditures that

3    Huntington or Cabell County have made for programs that they

4    have identified as addressing the opioid crisis?

5    **A.**   Yes.

6    **Q.**   And how did you go about determining the programs that

7    are funded or administered by the City of Huntington or

8    Cabell County that they've identified as addressing the

9    opioid crisis?   How did you do that work?

10   **A.**   Well, actually, it was a process.   It was really a

11   four-step process, if you will.   The first thing I did was

12   identify or list out of all the programs that were

13   identified by the plaintiffs either in response to

14   interrogatories or identified in the public domain.   And

15   then, I attempted to reduce that -- that population or that

16   list and I was able to do that by the publication City of

17   Solutions, which identified each of those programs in great

18   detail and also helped me identify which programs were

19   managed, if you will, or funded by the City or the County.

20        And then, after that population was reduced, those

21   programs were identified, the third step would be to gather

22   as much financial information as was available.   And that

23   included primarily grant applications and budgets.

24        And then having identified those programs and the

25   financials, I wanted to confirm my understanding of that and

```
 1    I did that through the reading of various depositions, Mayor
 2    Williams or -- and, also, Dr. O'Connell, Chief Rader, Ms.
 3    Priddy, and things of that nature.
 4    Q.   And since you've compiled your report, have you
 5    reviewed additional materials to confirm your judgments
 6    about the programs that are either administered by or funded
 7    by the City or the County that relate to the opioid crisis?
 8    A.   Since I've issued my report?
 9    Q.   Yes.
10    A.   Yes, I have.
11    Q.   And what have you done to confirm some of the judgments
12    you reached?
13    A.   Well, again, it was the same process.  I looked at
14    revised reports.  I looked at the budget of the City of
15    Huntington.  I've looked at information in the public domain
16    regarding obligations related to those programs.
17         For example, Mayor Williams in his City of the State
18    Address noted that the City was going to start funding the
19    LEAD program and that the City was going to start funding
20    the Compass program, which is one of the six programs that I
21    identified.  So, that's information I acquired subsequently.
22    Q.   Did you also review trial testimony in this case to
23    confirm some of your judgments about the program that are
24    administered or funded by the City or the County?
25    A.   Oh, yeah.  Absolutely.  Primarily, I think it would be
```

1    Dr. O'Connell's testimony that was very helpful in making

2    sure I understood the framing of the programs and who

3    managed the programs and how they were funded, as well as

4    the trial testimony of Mayor Williams.

5    **Q.**    So, let me ask you, Dr. Rufus, if you can look at a

6    demonstrative here and we'll put this up on the board.  Dr.

7    --

8    **A.**    Excuse me one second.  Is it going to come up on the

9    screen beside of me?

10   **Q.**    Is that next to you, too?

11   **A.**    Okay, here it is.  Okay.  I've got it.

12   **Q.**    So, Dr. Rufus, first, at a very high level, what is

13   this table that we've put up?

14   **A.**    This is a table that I -- that I presented in my report

15   that was issued and it is a summary table.  And, again,

16   you'll see it's noted as Table 2.13 and, reading left from

17   right, it identifies what the program is and then I break

18   down the various funding for the program.

19   **Q.**    So, let me just set the table here a little bit.  Does

20   this table reflect your findings as to the programs that you

21   concluded were the ones that the City or the County had

22   identified as ones they administer or fund related to the

23   opioid crisis?

24   **A.**    Yes, it does.

25   **Q.**    Okay.  And then we'll talk about the cost data and the

1   numbers shortly, but let's first walk briefly through the

2   programs.  So, the first program that you have up on the

3   list is the Law Enforcement Assisted Diversion Program.  Do

4   you see that?

5   **A.**   I do.

6   **Q.**   Is that also referred to as LEAD?

7   **A.**   It is.

8   **Q.**   And can you describe, just generally, what that is?

9   **A.**   Well, as the -- as the name implies, it's a law

10  enforcement diversion program.  It's a pre-booking program

11  where law enforcement attempts to move individuals into

12  treatment instead of into the justice system.  Those are

13  individuals that generally are identified as having

14  substance abuse and/or mental health issues.

15  **Q.**   And what's your understanding of this next one, the

16  Harm Reduction Program?

17  **A.**   My understanding of Harm Reduction is it is not a

18  prevention program.  It is a strategy -- a battery of

19  programs and the strategy is to reduce the harm associated

20  with drug use.

21  **Q.**   Now, is that Harm Reduction Program run by Cabell

22  County or the City of Huntington?

23  **A.**   It is not.  It is run and managed by the Cabell County

24  Health Department.

25  **Q.**   So, why did you include that on your list here?

1    **A.**   It was included on the list because the Health

2    Department is in part funded by a special levy through

3    Cabell County.

4    **Q.**   So, the next one down is the Drug Court/WEAR.  What's

5    your understanding of what that is?

6    **A.**   Well, the drug court is a special court that's

7    supervised by the West Virginia Supreme Court.  The WEAR

8    program is Women Empowerment and Addiction Recovery, I

9    think, and that was a grant program to support women in the

10   drug court who had generally been involved in prostitution

11   and, again, it was a program to move them to treatment and

12   away from -- and away from criminal justice.

13   **Q.**   The next one on the list is Turn Around.  What does

14   that refer to?

15   **A.**   Turn Around was another grant program.  The City of

16   Huntington partnered with the West Virginia Regional Jail on

17   that program and it provides counseling for non-felony

18   inmates, again, to move them into -- into a better life, if

19   you will.

20   **Q.**   The next one down is the Quick Response Team.  What's

21   your understanding of what that relates to?

22   **A.**   The Quick Response Team, as the name implies, it's the

23   quick response to suspected overdose individuals.  Within

24   72 hours or something the team goes out.  They attempt to

25   contact the individual and they attempt to link them to

1    treatment and away from drug abuse.

2    **Q.**   And the last one on the list there is Compass.  What

3    does that refer to, to your understanding?

4    **A.**   That's the Compassion Fatigue Program for First

5    Responders in the City of Huntington.

6    **Q.**   So, I notice that the Mayor's Office of Drug Control

7    Policy isn't listed here.  Why is that?

8    **A.**   Because at the date of my report, it was my

9    understanding that that program had been either shut down or

10   discontinued.

11   **Q.**   And have you identified any specific costs that have

12   been allocated to the Mayor's Office of Drug Control Policy?

13   **A.**   You mean after my report?

14   **Q.**   Yes.

15   **A.**   Yes.  Subsequent to my report, I reviewed the budget of

16   the City of Huntington for 2021-22 and there was an

17   allocation or a budget item for the Mayor's Office of Drug

18   Control Policy, which was roughly $100,000.00.

19   **Q.**   So, the six programs that you've listed here that we've

20   just gone through, plus the Mayor's Office of Drug Control

21   Policy, are those the only programs that you have identified

22   that are either funded or administered by the City or the

23   County that specifically relate to opioid issues?

24   **A.**   Yes, that's correct.

25   **Q.**   And you also compiled the costs for these programs; is

1    that right?

2    **A.**    That's correct.

3    **Q.**    And how did you calculate those costs?

4    **A.**    The costs were calculated in major part from the grant

5    applications and budget data that I was provided with

6    respect to each one of the programs.

7    **Q.**    So, you have a part of this chart that shows City and

8    County funds and there's a first column here for direct.

9    What does that refer to?

10   **A.**    Direct contribution would be out-of-pocket contribution

11   or cash contribution.

12   **Q.**    So, that would be a cash contribution or cash payment

13   by the City or County?

14   **A.**    Yes, that's correct.

15   **Q.**    The next column shows in-kind contributions.  What does

16   that refer to?

17   **A.**    Well, the programs, as you'll see, most of them request

18   a matching by the City or County and that in-kind reflects

19   the matching component and it's normally an allocation of

20   personnel costs.

21   **Q.**    So, just for the record, how much do you show in the

22   direct funding by the City or the County?

23   **A.**    For -- for all the programs, $5,162.00.

24   **Q.**    And how much do you show for in-kind contributions by

25   the City or the County?

1    **A.**   For all the programs, it's $131,358.00.

2    **Q.**   And these numbers, by the way, Dr. Rufus, all of the

3    numbers on this chart are annual numbers; is that right?

4    **A.**   Yes, that's correct.

5    **Q.**   So, the total -- what do you show as the total funding

6    by the City or the County for these programs?

7    **A.**   $136,520.00.

8    **Q.**   And then, if we wanted to add the number that you

9    mentioned for the Mayor's Office of Drug Control Policy,

10   what would that be, if you added that in?

11   **A.**   Again, that's another hundred thousand dollars, so it

12   would be $236,520.00.

13   **Q.**   And so, now let's turn to these other columns.  You've

14   got a column here for external funds.  What does that

15   signify?

16   **A.**   External funds reflects a third-party investment in the

17   program and most of that is from grant funding.

18   **Q.**   When you say third-party investment in the program, can

19   you just explain what you mean by that?

20   **A.**   Yeah.  Third party would be the grantor.  In other

21   words, it might be SAMHSA, it might by the Bureau of

22   Justice.  It can be any third party other than -- other than

23   the plaintiffs.

24   **Q.**   So, this column for external funds reflects grant money

25   or other -- other money coming from third parties to support

1    these programs that you have listed here; is that right?

2    **A.**    That's correct.

3    **Q.**    And what's the total that you show for the grant

4    funding?

5    **A.**    The total is $1,934,188.00.

6    **Q.**    So, if we put together the total costs of these

7    programs that you've identified here as being the only ones

8    that are funded or administered by the City or the County

9    related specifically to opioid issues, what's the total

10   dollar amount of these programs?

11   **A.**    Total dollar amount is $2,070,708.00 and, again, if you

12   added in the Mayor's Office of Drug Control Policy, the

13   hundred thousand dollars, it would be $2,170,708.00.

14   **Q.**    Now, we talked about this point of grant money coming

15   to the City or the County to support some of these programs.

16   Are you aware of some changes that are coming with respect

17   to the funding of some of these programs?

18   **A.**    I am.  I'm aware of that through various ways, but I'm

19   aware that -- again, I mentioned the LEAD program and I

20   think the mayor has testified that the City is going to be

21   funding that.  And so that would be -- that's roughly

22   $43,000.00, is what I think he put in the budget.

23        And, again, when I say evidence I've looked at, I've

24   looked at trial testimony and I've also looked at the City's

25   new budget.  And there was a budgeted provision for a

1    counselor for the LEAD program and, again, that's $43,000.

2         Also, I understand that the City is going to assume and

3    take over the responsibility for the Compass program and I

4    think in the budget it was $301,000.00.

5         I also understand that the funding for the Quick

6    Response Team is dried up.  And I think Ms. Priddy, who is

7    the coordinator of that team, has testified that that budget

8    is about $350,000.00 a year.

9    **Q.**   So, let's just clarify that, what you've just said.

10   So, you indicated that the LEAD program, which today shows

11   grant funding of about $83,000.00; is that right?

12   **A.**   That's correct.  That's right.

13   **Q.**   And your point was that the LEAD program would be

14   budgeted in the City budget at $43,000 this coming year?

15   **A.**   Well, not the program is not identified, but the

16   individual who is going to be working in the program, which

17   is the counselor, is going to be identified and the budgeted

18   item for her or him was $43,000.00.

19   **Q.**   And you mentioned the Compass program which shows grant

20   funding of $338,000; is that right?

21   **A.**   That's correct.

22   **Q.**   And the City is going to be funding it at the level of

23   what did you say, $301,000?

24   **A.**   Yes, that's correct.

25   **Q.**   And then, you had also mentioned the Quick Response

1   Team program, or QRT, and you had said that it would be

2   funded at the level of $350,000; is that right?

3   **A.**   That's correct.

4   **Q.**   What was the grant level received for the Quick

5   Response Team last year?

6   **A.**   Well -- well, last year was an extended year, but the

7   Quick Response Team was a three-year grant program.  It was

8   extended for another year and I think if you -- if you did

9   the math differently, it would work out to about $350,000 a

10  year.

11  **Q.**   So, the three items that you mentioned that the City

12  and the County are now budgeting that they previously

13  received grant money for, they're slightly below the amounts

14  that they were receiving in grant money; is that right?

15  **A.**   Yes, that's correct.

16  **Q.**   Do you also understand, Dr. Rufus, that for these three

17  programs where the grant money may not be available, that

18  there could be new grants coming that would support these

19  programs as you look ahead?

20  **A.**   Yes.  Yes.  That's certainly possible.  I mean, grant

21  funding is provided by policy makers and, as long as policy

22  makers identify a problem then, normally, money is made

23  available for the problem, but grant money is not

24  guaranteed.  That's a fact.

25  **Q.**   The -- whatever the change between the grant money and

1    the funding from the City or the County, would you expect

2    the total for these programs to stay in this range that you

3    show here?

4    **A.**    Yes, that's correct.  I certainly wouldn't expect it to

5    be more than -- more than $2 million dollars a year.

6    **Q.**    Aside from the specific programs that we've just

7    discussed, Dr. Rufus, have you seen any other evidence of

8    added cost for the City or the County that they've occurred

9    due to the opioid crisis?

10   **A.**    Yes.

11   **Q.**    And how did you evaluate that?

12   **A.**    Well, I guess the first question would be how is it

13   identified.  One of the things I did is I took the budgets

14   and the financial statements for each respective party, the

15   City of Huntington and also Cabell County, and I did a time

16   series analysis.

17        I went back to 2013, tracked it all the way up through

18   the current budget, which would be ending 2022, and I was

19   looking for ticks or upticks in expenses.

20        And for the City of Huntington, for example, I really

21   focused on public safety to see if there was a swing in

22   incremental costs, if you will.  I looked at detailed data

23   as it relates to the Police Department and the Fire

24   Department.  And I did not identify any upticks, which you

25   would expect if you're seeing this blur into the City.

1          Oh, I'm sorry.

2     **Q.**   Well, when you say you didn't identify any upticks, can

3     you explain what you mean by that?

4     **A.**   Well, any -- any incremental costs.  In other words,

5     the costs associated with the City and the budgetary process

6     is really pretty smooth over the period.  There's some

7     growth and there's some changes, but as a rule, the

8     allocation of the budget is very smooth.

9          I was able to confirm, or at least my understanding on

10    the City budget with the testimony of Captain Underwood, I

11    think that's his name, who is the administrator with the

12    Huntington Police Department, where he testified that no

13    additional funding had been requested by the Police

14    Department as it relates to the opioid management and that

15    they'd always come in under budget.

16    **Q.**   So, let me set the table a little bit on what you did

17    first.  So, what was the period of years that you were

18    looking at in terms of financial statements for the City and

19    the County?

20    **A.**   I went back all the way to 2013.

21    **Q.**   Up to what time period?

22    **A.**   For the County, I went to 2021.  That was the last

23    budget that was posted.  For the City, I went and included

24    their current budget, which was the 2021-2022.

25    **Q.**   And was your objective -- what was your objective in

1    looking at those budgets over time?  What were you trying to

2    assess?

3    **A.**    Well, actually, I was attempting to assess several

4    things.  One is to identify what the City does, what

5    services are offered, how revenue is generated, what are the

6    components of their budget.  So, in other words, what

7    services are offered, how much does it cost, and how is it

8    funded.

9          And then, I took the next step to say the focus should

10   be -- or at least for me -- in public safety.  So, public

11   safety includes the Police Department and Fire Department.

12   So, I looked at the detail data for those two entities

13   looking for incremental costs that I could identify to the

14   opioid crisis.

15   **Q.**    Did you see any large increases in costs as you looked

16   at that period from 2013 up to 2020-2021?

17   **A.**    I did not, at the City level, at any rate.

18   **Q.**    And -- okay.  So, first, let's focus on the city

19   budget.  You did not see during that period any meaningful

20   changes in cost?

21   **A.**    I did not, no.

22   **Q.**    What about at the county level?

23   **A.**    At the county level, I did see some changes which I

24   thought were significant changes that might lend itself to

25   the opioid crisis.

1    **Q.**   And what was that?

2    **A.**   Well, there were two changes.  One was payments to the

3    regional jail system, so -- which was erratic.  It went from

4    $3 million a year, to $4 million, to $5 million.  And now,

5    it's leveled back off to $3 million.

6         So, then I had to go back to say let me understand what

7    is happening with the regional jail system.  And in my

8    report I put out a narrative as it relates to that, but

9    there was certainly an uptick as it relates to payments to

10   the regional jail system.

11   **Q.**   And how much was the uptick roughly?

12   **A.**   Well, again, it changed.  It went from $3 million, to

13   $4 million, to $5 million, back to $3 million.  So, you

14   know, the change could be $2 million bucks.

15   **Q.**   And those are payments made by the County to the -- to

16   the jail system, the Western Regional Jail?

17   **A.**   Yes, that's correct.

18   **Q.**   And aside from the jail, did you see any other

19   meaningful changes in costs from this period from 2013 to

20   2020-21 for the County?

21   **A.**   Yeah.  In the county budget, I also noticed there was

22   an increase in the sheriff's budget, roughly a half million

23   bucks.

24   **Q.**   Aside from those two points, did you see any other

25   meaningful changes in costs for the county budget?

1    **A.**    I did not.

2    **Q.**    Dr. Rufus, have you also evaluated whether the City or

3    the County -- oh, let me go back for a second before we do

4    that.

5         You had mentioned the testimony of Captain Underwood.

6    What was the significance of that to you?

7    **A.**    The significance of that to me, I read the -- I read

8    the deposition of Runyon, who was the city finance manager,

9    I believe, and his testimony in his deposition was that the

10   opioid crisis had an impact all the way through the

11   financial system of the city and I was looking for that.  I

12   was searching for that.

13        But when I read Captain Underwood's deposition, what he

14   said was, that's not true, that they had the money that they

15   needed, they -- that they were active in securing grants.

16   They had never asked for additional funding for opioid

17   fights and that they had always come in under budget.  But

18   that's what I was looking at.  I was looking for incremental

19   costs that I could candidly tie to the opioid crisis.

20   **Q.**    Did you also see deposition testimony from the mayor,

21   Mayor Williams, that bore on these issues?

22   **A.**    Yes.  During his deposition and also his trial

23   testimony was that the City of Huntington had not spent any

24   money in fighting the opioid crisis, or at least not

25   directly, that funds were available for alternative sources

1    grants.  But moreover was that the City had no intentions of

2    spending money for these programs.

3    **Q.**   Dr. Rufus, have you evaluated whether the City or the

4    County have excess revenues or unassigned funds?

5    **A.**   Yeah.  That's one of the things I did when I went

6    through the City's financial statements, is a large

7    component of their budget is unassigned fund bounds, and

8    that fund bounds moved I think it was -- maybe in 2019 it

9    was $6 million.  The end of 2021 it was $15 million.  And I

10   think the projected for the 2022 budget is $17 million.

11   **Q.**   What does it mean when you say something is -- has

12   unassigned funds or you identified unassigned funds in the

13   city budget?

14   **A.**   The concept of unassigned funds is really -- is fully

15   to fund by the Auditor's Office, but it includes

16   unrestricted funds; in other words, money left over at the

17   end of the period.

18   **Q.**   So -- so are unassigned funds reflective of money that

19   is left over after all the expenses are paid by the City for

20   the year?

21   **A.**   That's correct.  It's available funding for whatever

22   purpose the City and the Council decide.

23   **Q.**   And could you say again what was the trajectory of the

24   unassigned funds over the period you reviewed?

25   **A.**   It increased every year.  I mean, an odd observation I

1   made was during the period, the financial condition of the

2   city actually improved.  I think Mayor Williams testified

3   that the health of the city was better now than it's been in

4   50 years.

5        But at any rate, the trend went from $6 million to $15

6   million and now it's projected to be $17 million, which is

7   about 25 percent of the overall budget.

8   **Q.**   Have the City or the County directed any of these

9   excess funds, this leftover money, have they directed any of

10  that to address opioid issues?

11  **A.**   No.  And, as I mentioned, Mayor Williams testified that

12  he was not going to do that.  Now, when you talk about

13  excess funding, I didn't mention the County.  From the

14  county budget, it's indicated that there was $500,000 and I

15  think the projected budget for 2021 is going to be $600,000.

16  **Q.**   So, when you say $600,000, that means leftover money in

17  the county budget that they're not spending?

18  **A.**   That's correct.

19  **Q.**   And have you seen any indication that the county is

20  allocating that leftover money to any opioid issues?

21  **A.**   No.

22  **Q.**   All right.  Let's shift gears from your discussion of

23  the city and the county budgets and let's talk about Dr.

24  Alexander's redress model.

25       Dr. Rufus, what did you consider, at a general level

1    again, when you were looking at Dr. Alexander's redress

2    model in the ways that Mr. Barrett costed out that model?

3    **A.**    Well, my approach is actually a little different.  I

4    started with the Barrett report and I read his summary as to

5    say what was he engaged to do and what did he rely on.  And

6    then I went from the Barrett report to the Alexander report.

7    But, I mean, in essence what I was doing when Barrett's --

8    his calculation indicated there was a $2.5 billion dollar

9    number and my first question was, I need to break it down to

10   make sure I understand what the drivers of that number are.

11   So, again, I went from Barrett's report into Alexander's

12   report.

13   **Q.**   What do you mean when you say the drivers of those

14   numbers?

15   **A.**    In other words, what causes -- or what programs are

16   being proposed and what drives the $2.5 billion dollar

17   number.  So, I was asking, you know, is it population?  Is

18   it cost?  Is it something else?  I mean, again, I was

19   curious to know what was driving the number.

20   **Q.**   So, let's put up a demonstrative.  Dr. Rufus, did you

21   prepare this demonstrative?

22   **A.**    I did.

23   **Q.**   And what does it reflect at a general level?

24   **A.**    At a general level, reading left to right, it

25   identifies the various programs that are in Dr. Alexander's

1    plan and it breaks it down by category and then subcategory.

2    And then, it identifies the costs that have been assigned to

3    those various plans by George Barrett.  And then, on the far

4    right would be the subtotal of those individual categories.

5    **Q.**   So, let's -- let's just break this down just a little

6    bit more.  So, we have categories listed here, Category 1

7    for prevention with 1A through F underneath it.  Category 2

8    for treatment, 2A through 2E.  Category 3 for recovery, with

9    3A through 3E.  And Category 4, addressing needs for special

10   populations, 4A to 4E.  What are those categories?

11   **A.**   What are those categories?

12   **Q.**   Are those the categories in Dr. Alexander's redress

13   model?

14   **A.**   Yes, that's correct.

15   **Q.**   And then, what are the numbers here?  Dr. Alexander

16   didn't derive the numbers, did he, for the redress model?

17   **A.**   He did not.  As I said, this really is framed with --

18   from George Barrett's report and the numbers are driven or

19   calculated by George Barrett based upon information he

20   received from Dr. Alexander.

21   **Q.**   So -- so, Dr. Rufus, is it fair to say you've put

22   together here the categories from Dr. Alexander's redress

23   model along with the numbers assigned by Dr. -- by Mr.

24   Barrett?

25   **A.**   Yes, that's correct.

1   **Q.**   And then, we have -- over on this right-hand side, we

2   have some numbers.  What do those reflect?

3   **A.**   Those reflect -- as I mentioned, those are the totals

4   of those respective categories.

5   **Q.**   So, for the record, what is the total cost that you

6   show for Category 1, prevention?

7   **A.**   $48,720,555.00.

8   **Q.**   And what is the total cost for Category 2, treatment?

9   **A.**   $2,050,815,634.00.

10   **Q.**   And what's the total cost for Category 3, recovery?

11   **A.**   $99,238,834.00.

12   **Q.**   And what's the total cost for Category 4 addressing the

13   needs for special populations?

14   **A.**   $345,671,523.00.

15   **Q.**   Now, are any of these numbers discounted for net

16   present value?

17   **A.**   No.  This is all future value.

18   **Q.**   And what's your understanding at a high level, Dr.

19   Rufus, as to what's covered by Categories 2, 3 and 4?

20   **A.**   Categories 2, 3 and 4, it's my understanding is that is

21   the downstream costs or byproduct, if you will, of drug use.

22   **Q.**   So, do Categories 2, 3, and 4 include money for

23   treatment for people who are abusing drugs?

24   **A.**   Yes, that's correct.

25   **Q.**   And what do you mean by downstream costs?

1    **A.**   Well, it's the consequence.  It's the after fact.  It's

2    the byproduct.  It's not a prevention.  It's after someone,

3    or someone's family, or family member, has been addicted to

4    opioids.

5    **Q.**   When you say the consequence, or the after effect, the

6    byproduct, the byproduct of what?

7    **A.**   Of drug use.

8    **Q.**   And so, Categories 2, 3 and 4 would also include

9    different kinds of treatment, such as people with HIV, or

10   hepatitis, or OUD, correct?

11   **A.**   Yes, that's correct.  Yes, that's right.

12   **Q.**   So, Dr. Rufus, I'm going to get you a calculator.

13           MR. HESTER:  May I approach, Your Honor?

14           THE COURT:  Yes.

15           BY MR. HESTER:

16   **Q.**   Dr. Rufus, can you -- can you tell us the percentage of

17   Dr. Alexander's total abatement costs that are reflected in

18   Categories 2, 3 and 4?

19   **A.**   Well, that was a bad process.  I've calculated this

20   before and it's roughly 98 percent, but I will try it one

21   more time, if you would like.

22   **Q.**   Doctor Rufus, you could subtract -- you could -- you

23   could do it the other way around, right?  You could take the

24   first category?

25   **A.**   Thank you.

```
1              MR. MAJESTRO:  The calculator failures continue.

2              THE WITNESS:  Yes, that's correct.

3         Well, yeah.  It's up in the air on me.  So, let me do

4    it one other way.

5              BY MR. HESTER:

6    Q.   So we don't take the time of the Court, Dr. Rufus, how

7    -- just explain to me how you would calculate that.

8    A.   How I could calculate the percentage?  I would -- I

9    would do it one of two ways.  I could take the $48,720,555

10   and divide that by the total, which was $2,544,446,548 and

11   that's going to be roughly 2 percent.  Or I could add those

12   three together and divide it the same way and that's going

13   to be approximately 98 percent.

14   Q.   So, Categories 2, 3 and 4, if you added them together,

15   come out to about 98 percent of the total?

16   A.   That's correct.

17   Q.   And, again, for the record, the total for all of these

18   four categories is what, Dr. Rufus?

19   A.   That's $2,544,446,548.00.

20   Q.   Okay.  So now, let's look more specifically at the

21   prevention category which, as you said, is roughly 2 percent

22   of the total, correct?

23   A.   That's correct.

24   Q.   Now, within this prevention category, there's an item

25   or a category for harm reduction.  Do you see that?
```

1    **A.**   I do.

2    **Q.**   How -- what's the dollar amount of that harm reduction

3    category?

4    **A.**   $19 -- $19,554,622.00.

5    **Q.**   And do you have an understanding, Dr. Rufus, as to

6    what's included in that harm reduction category?

7    **A.**   Yeah.  I -- I mentioned that earlier.  This is not

8    prevention.  This is -- these include various strategies to

9    reduce the harm of drug use.

10   **Q.**   And, particularly, what kind of drug use?  Do you have

11   an understanding?

12   **A.**   Well, it's -- Needle Exchange Program is the primary.

13   Also, drug testing kits, HIV screening, things of that

14   nature.

15   **Q.**   So, is it your understanding that the harm reduction

16   category is for IV drug users?

17   **A.**   Yes, that's correct.

18   **Q.**   And let me ask you, as well, to look at the first item

19   under this category, which is for Health Professional

20   Education.  What's the dollar amount assigned to that

21   category?

22   **A.**   $5,437,224.00.

23   **Q.**   And in your review of the city and the county budgets,

24   have you seen any indication that the City and the County

25   either fund or administer any programs to educate

1   prescribers on the prescribing of opioids?

2   **A.**   I saw nothing related to education for prescribers, no.

3   **Q.**   So, if -- again, I'm going to -- I'm going to dare to

4   undertake some math with you.  If you pull out Health

5   Professional Education and Harm Reduction, could you tell me

6   what remains in this Category 1 on prevention?

7   **A.**   I will.  Just give me one more -- well, wait a minute.

8   It locked up on me again one more time.  Yes.  It equals

9   $43,283,331.00.

10  **Q.**   Dr. Rufus, I wanted you to subtract the Harm Reduction

11  and Health Professional Education --

12  **A.**   Oh, and the education --

13  **Q.**   -- from the $48 million figure?

14  **A.**   Okay.  Okay.  The net is $23,723,709.00.

15  **Q.**   All right.  Thank you.

16  **A.**   I should have brought my own calculator.

17  **Q.**   So, let's go back, if we can, to the treatment

18  category.  And I wanted to ask you a bit more about

19  treatment costs.  Dr. Alexander's calculations include

20  numbers for the treatment for OUD, correct?

21  **A.**   That's correct.

22  **Q.**   And did you also look at Mr. Barrett's calculations of

23  the costs for treatment?

24  **A.**   I did, yes.

25  **Q.**   And let me show you a demonstrative on this subject.

1          Did you prepare this demonstrative, Dr. Rufus?

2     **A.**   I did.

3     **Q.**   And could you describe generally, first of all, just at

4     the top what this is relating to?

5     **A.**   This is relating to the four levels of treatment that

6     were contained in Dr. Alexander's plan.  This is the formula

7     at the top, number of people, average daily cost times the

8     number of days, would give me the total cost.

9     **Q.**   Let me pause you there.

10    **A.**   Yes.

11    **Q.**   So, when Dr. Alexander came up with his treatment

12    levels, did he make an assumption about the number of people

13    and the average daily cost and the number of days that would

14    be involved in that treatment?

15    **A.**   He did.

16    **Q.**   And then, Mr. Barrett made those calculations?

17    **A.**   That's correct.

18    **Q.**   And what -- and let's focus first on the outpatient

19    entry.  What was his assumption about the number of days for

20    outpatient treatment?

21    **A.**   His assumption was 365 days.

22    **Q.**   And so, in this first line item here, you show

23    outpatient, an outpatient number of $971,357,386.00.  What

24    does that reflect?

25    **A.**   That reflects the average cost of treatment times the

1    number of people in that particular category times 365 days.

2    **Q.**    Does it reflect the average or the total?

3    **A.**    The number is the total.

4    **Q.**    Yes.  So -- so, this outpatient number here, the

5    $971 million dollars, what does that reflect?

6    **A.**    That that's the total of -- that's the cost associated

7    with that treatment program.

8    **Q.**    And it's based on an assumption of what?

9    **A.**    Of 365 days of outpatient care.

10    **Q.**    Did you calculate the costs for that outpatient

11    treatment using a different number of days?

12    **A.**    I did.  I went into George Barrett's report, his

13    program, and changed the 365 days of outpatient care to

14    71 days.

15    **Q.**    And what's the reason that you used 71 days to do the

16    re-calculation?

17    **A.**    Well, as I've referenced in my slide, it's for the TEDS

18    2018 survey data.

19    **Q.**    What is the TEDS data?

20    **A.**    TEDS data is treatment episodes and it's data that's

21    published by SAMHSA.

22    **Q.**    What's the significance of 71 days out of the TEDS

23    data?  What does that tell you?

24    **A.**    That -- that -- what's the significance, that's a

25    incredible source as to the average days of treatment in

1    that particular category.

2    **Q.**   So, tell me what the 71 days is as found in the TEDS

3    data.  What does it reflect?

4    **A.**   It reflects the average treatment period as compared to

5    365 days.

6    **Q.**   So, if we use that TEDS number, you engaged in a

7    re-calculation of Mr. Barrett's cost numbers based on that

8    71 days of treatment?

9    **A.**   I did.  And the difference was roughly $800 million

10   dollars.

11   **Q.**   So, let me just, for the record, put the numbers in.

12   What's Mr. Barrett's number for outpatient treatment

13   assuming 365 days?

14   **A.**   It was $971,357,386.00.

15   **Q.**   And what's -- if you calculate it using 71 days based

16   on the TEDS data for the duration of treatment in 2018,

17   what's the outpatient treatment number?

18   **A.**   $188,948,971.00.

19   **Q.**   And did you do the same sort of calculation changing

20   the number of outpatient days for the other three days of

21   categories in the treatment in the redress model?

22   **A.**   I did.

23   **Q.**   And how do you that at a rough level?  What did you do?

24   **A.**   At a rough level, I went into each category and where a

25   365-day number was used for outpatient care or whatever the

1    number had been used, I changed it to 71 for the max.

2    **Q.**   So, let's just read into the record what you found for

3    the three categories.  What did you find for intensive

4    outpatient?  What was the change if you used 71 days of

5    outpatient treatment rather than assumption of a full year?

6    **A.**   I didn't put the change on my slide, but I can tell

7    what the new number is.

8    **Q.**   Yes.  Just read off the number, please.

9    **A.**   The number as calculated by George Barrett was

10   $371,953,917.00.  Recalculating that using the TEDS data

11   resulted in an amount of $179,853,566.00.

12   **Q.**   How about for rehab/residential, what was the -- what

13   were the numbers?

14   **A.**   The numbers calculated by George Barrett were

15   $183,137,911.00.  The recalculation was $111,910,346.00.

16   **Q.**   And what about for the inpatient treatment as we've

17   calculated using 71 days as an assumption for the outpatient

18   part of treatment?

19   **A.**   The amount calculated by George Barrett was

20   $41,843,310.00 [sic].  The recalculated amount is

21   $25,734,792.00.

22   **Q.**   So, did you develop a total of the difference if you

23   assumed this TEDS data using the 71 days of outpatient

24   treatment versus the assumption in Dr. Alexander's model?

25   **A.**   I did.  And the difference is reflected on the bottom

1    of the screen.  It's $1,061,849,848.00.

2    **Q.**   Dr. Rufus, as part of your analysis -- let's switch to

3    a new topic.

4         As part of your analysis, did you look at the basis for

5    how Dr. Alexander derived his starting OUD population?

6         Maybe I should back up.  You understand that the

7    redress model is based on this starting OUD population that

8    Dr. Alexander then used for his calculations?

9    **A.**   Yes.

10   **Q.**   And what's your understanding is the basis for how he

11   derived the starting OUD number that then led through his

12   model?

13   **A.**   I didn't have a basis per se.  He relied on information

14   that was provided to him by Dr. Keyes in her calculations.

15   **Q.**   And what year was -- did Dr. Keyes use in estimating

16   the OUD population?

17   **A.**   Her estimated OUD population was for 2018.

18   **Q.**   And what year does Dr. Alexander's OUD population begin

19   in?

20   **A.**   In 2021.

21   **Q.**   And did Dr. Alexander adjust the OUD population from

22   2020 to 2021?

23   **A.**   From 2020 to '22 -- 2021, he did.  He made a 4 percent

24   adjustment.

25   **Q.**   Did he make any adjustment in Dr. Keyes' 28 numbers for

1    the period between 2018 and 2020?

2    **A.**    He did not.

3    **Q.**    And do you have an understanding as to why he did that?

4    **A.**    As to why he did not make an adjustment?

5    **Q.**    Yes.

6    **A.**    I don't, actually.  I read his testimony and I don't

7    think he ever clearly stated why he didn't do it.

8    **Q.**    So, does Dr. Alexander's starting OUD population, which

9    adjusted for 2020 over to 2021, did it make any adjustments

10   for the changes during the period from 2018-2020?

11   **A.**    No.

12   **Q.**    Now, do you have an understanding that Dr. Alexander's

13   redress model projects a reduction of overdoses and overdose

14   deaths by 50 percent over 15 years?

15   **A.**    Yes.  I read his report and his scaling was as such,

16   yes.

17   **Q.**    Have you evaluated whether overdoses and overdose

18   deaths have already decreased by roughly that amount in

19   Cabell County and Huntington?

20   **A.**    Yes, I have.

21   **Q.**    And what data did you look at to determine this?

22   **A.**    I looked at data from the West Virginia data dashboard.

23   I've also looked at evidence that was presented during

24   discovery regarding opioid overdose deaths and, as well as

25   overdose cause.

1   **Q.**   And let me show you a demonstrative.  Did you prepare

2   this demonstrative, Dr. Rufus?

3   **A.**   I did.

4   **Q.**   And what does this demonstrative reflect with respect

5   to opioid overdose deaths in Cabell County?

6   **A.**   Well, as you can see, it's done by year, by number, and

7   what it reflects on the far right is a reduction in overdose

8   deaths in Cabell County by 46.7 from 2017 to 2019.

9   **Q.**   And what are the numbers for 2017 to 2018 and 2019 for

10  opioid overdose deaths?

11  **A.**   What are the actual numbers?  2017, it was 182.  2018,

12  it was 137.  2019, it was 97.

13  **Q.**   And that amounts to what, a percentage reduction of?

14  **A.**   That's a reduction of 46.7 percent.

15  **Q.**   Now, let's talk about suspected drug overdoses in

16  Cabell County.  What does this demonstrative reflect on

17  overdoses in Cabell County?

18  **A.**   It reflects an overall reduction from 2017-2019 of

19  52 percent.

20  **Q.**   And could you read the numbers into the record for the

21  Court from 2017-2019 for suspected drug overdoses?

22  **A.**   Certainly.  2017, it was 1,831.  2018, it was 1,089.

23  2019, it was 878.

24  **Q.**   So, Dr. Rufus, over this three-year period that you're

25  looking at overdoses decreased by 52 percent and overdose

```
1    deaths decreased by 46.7 percent?

2    A.   Yes, that's correct.

3    Q.   What does Dr. Alexander's plan predict for a 15-year

4    period?

5    A.   He proposes a 50-percent reduction over the 15, over

6    the 15-year period.

7              MR. HESTER:  Thank you, Dr. Rufus.  Those are all

8    the questions I have.

9         I'll pass the witness.

10             MR. MAJESTRO:  Your Honor, he's cut out a bunch

11   from his report.  I think if we could take a 15-minute

12   break, I could probably cut my cross by about -- by over

13   half an hour.

14             THE COURT:  Okay.  We'll be in recess.

15        You need about 15 minutes?

16             MR. MAJESTRO:  Yes, sir.

17             THE COURT:  All right.  We'll be in recess until a

18   quarter after 10:00.

19        (Recess taken)

20        (Proceedings resumed at 10:15 a.m. as follows:)

21             THE COURT:  Mr. Rufus, you can resume the

22   witness stand, sir.

23             MR. MAJESTRO:  Ready, Your Honor?

24             THE COURT:  Yes, Mr. Majestro.

25             MR. MAJESTRO:  Thank you.
```

1       Gina, can you bring up their Demonstrative Slide Number

2  1?  Maybe on the last day I'll figure out how to work this.

3  BY MR. MAJESTRO:

4  **Q.**   All right, Dr. Rufus, the -- your Table 2.13, the

5  costs you allege were expended by the city and county on

6  the opioid epidemic -- first of all, you don't challenge

7  Dr. Alexander on what was medically necessary, his

8  testimony on what is medically necessary for his

9  abatement proposal; correct?

10  **A.**   I do not.  That's correct.

11  **Q.**   What the city and county spent is a fraction of that

12  number; correct?

13  **A.**   Yes, that's correct.

14  **Q.**   What the city and county spent is not necessarily what

15  is needed; correct?

16  **A.**   That's probably true.

17  **Q.**   It might be more of a reflection on the city's -- city

18  and county's ability to pay; correct?

19  **A.**   No, I don't think it has any -- I'm sorry.  Was there

20  an objection?

21       I don't think it has anything to do with their ability

22  to pay at all.  I think -- for example, I think Mayor

23  Williams stated it best is they're not in the business of

24  providing healthcare.  That's not what they do.  That's not

25  what city government does.  And it's certainly not what

1    county government does.  So it's not a matter of capacity to

2    pay.  It's a matter of function.

3    **Q.**   So you're -- well, we'll leave it at that.

4         Let's go to Slide 3.  I'm sorry, Slide 2.

5         So the category -- I'm going to make the math easy for

6    us.

7    **A.**   Okay.

8    **Q.**   In Category 2B, what's the number under Mr. Barrett's

9    calculations of Dr. Alexander's abatement plan?

10   **A.**   $1,705,896,182.

11   **Q.**   Okay.  Let's remember that number.

12        Then if we can go back to Slide 4.

13        Your testimony by dropping the days to 71 -- first of

14   all, Dr. Alexander's 365 days is not -- his testimony is not

15   that each person would need an average of 365 days.  It's a

16   weighted average.  Correct?

17   **A.**   Well, it's a weighted average cost.  It is an

18   incorporation of outpatient treatment days equaling 365 days

19   for each component year but, but it's a component cost in

20   the other three levels, that's correct.

21   **Q.**   Okay.  And that's not the case with the 71 days under

22   the test data; correct?

23   **A.**   I'm not sure -- I'm not sure what the question is.

24   **Q.**   That it's not -- the 71 days is not a weighted average

25   cost?

1    **A.**   It's, it's an average time -- average treatment program

2    plan for outpatient care.

3    **Q.**   Okay.  So I'm going to bring the calculator -- I'm

4    going to have you bring the calculator back.  And to make

5    this easier, we're going to, we're going to lop off the last

6    three, the last three digits.

7        Let's take the one million -- one billion seven hundred

8    five thousand eight hundred ninety-six and change it to

9    1,705,896.

10   **A.**   Are you changing that where?

11   **Q.**   So let's take -- go back to Category 2B from Slide 2.

12   Just for ease of math, you can, you can remove the last

13   three digits.

14   **A.**   Okay.

15   **Q.**   Thousand millions instead of billions.  Okay.  So --

16   **A.**   Yeah.

17   **Q.**   So one seven zero eight nine six minus your total

18   difference of one zero six one eight four nine.

19   **A.**   Okay.

20   **Q.**   What have you got?

21   **A.**   Well, I wasn't actually doing the math because I don't

22   have a calculator.

23   **Q.**   Oh, sorry.

24             MR. HESTER:  I'm sorry.

25             THE WITNESS:  I should have brought my own

1   calculator.

2   BY MR. MAJESTRO:

3   Q.   The iPhones work the best.  You just turn them

4   sideways and you can go out to billions.

5        Okay.  Let's try again.  1,705,896 minus 1,061,849.

6   A.   It's too small for me.  706,896?

7   Q.   Yes.

8   A.   One million -- 1,706,896 minus 1,000,061?

9   Q.   Yes.

10  A.   My screen just went out.  There we go.  Actually, I've

11  got that number.  Hold that screen for just a second, the

12  next screen.  705,896 minus -- the next screen -- minus

13  1,061,849 equals 644,047.

14  Q.   And that would -- and we add the three numbers -- the

15  three zeros back and it would be -- so what would the total

16  be?

17  A.   If we added the three zeros back, it would be 644

18  million.

19  Q.   Okay.  And, so, based on your, your use of the TEDS

20  data, the number would be 644 million?

21  A.   Assuming we just did the math together correctly.

22  Q.   That's what I got, so I think there's a reasonable

23  chance that we're correct.  And the -- and under Dr.

24  Alexander and Mr. Barrett's calculations, it would be

25  roughly 1.7 billion?

1    **A.**    That's correct.

2    **Q.**    So we have a range between those, those two numbers of

3    approximately a billion dollars.  But if the Judge -- if the

4    Judge agreed with your number, we'd get 644 million.  If the

5    Judge agrees with Dr. Alexander and Mr. Barrett, it's

6    1.7 billion, or the number could be anywhere in between?

7    **A.**    That's correct.

8    **Q.**    That's all I have.  Thank you.

9              THE COURT:  Any redirect, Mr. Hester?

10             MR. HESTER:  No redirect, Your Honor.

11             THE COURT:  May Dr. Rufus be excused?

12        (No Response)

13             THE COURT:  Thank you, sir.  You're free to go.

14             THE WITNESS:  Yes, Your Honor.

15             MS. WICHT:  Your Honor, while we're getting set up

16   for the next witness, we have a few Cardinal Health

17   documents to move into the record.  May I approach and do

18   that while we make the changeover?

19             THE COURT:  Yes.

20             MS. WICHT:  Thank you, Your Honor.

21        By agreement and stipulation with the plaintiffs,

22   Cardinal Health is moving the following exhibits into the

23   record.  And I have a thumb drive to hand up to the clerk.

24        The exhibit numbers are CAH-WV-65, CAH-WV-70,

25   CAH-WV-73, CAH-WV-103, CAH-WV-104, CAH-WV-476, CAH-WV-562,

1    and finally CAH-WV-564.  And by agreement of the parties,

2    those documents -- we ask to have those documents admitted

3    to the record.

4            THE COURT:  All right.  There being no objection,

5    they're all admitted.

6            MS. WICHT:  Thank you.  May I approach with the

7    thumb drive?

8            THE COURT:  Yes.

9            MS. WICHT:  Thank you.

10           MS. MCCLURE:  Good morning, Your Honor.  The

11   defense calls Ms. Stephenie Colston.

12           THE CLERK:  Would you please state your full name?

13           THE WITNESS:  Stephenie Webber Colston.

14           THE CLERK:  I'm sorry.  What was the middle name?

15           THE WITNESS:  Webber.

16     **STEPHENIE WEBBER COLSTON, DEFENDANTS' WITNESS, SWORN**

17           THE CLERK:  Thank you.  Please take a seat.

18           THE COURT:  Good morning, ma'am.

19           THE WITNESS:  Good morning.

20                      DIRECT EXAMINATION

21   BY MS. MCCLURE:

22   **Q.**  Good morning, Ms. Colston.

23   **A.**  Good morning.

24   **Q.**  Could you please introduce yourself to the Court?

25   **A.**  My name is Stephenie W. Colston.

1    **Q.**   And, Ms. Colston, what is your current occupation?

2    **A.**   I am President and Chief Executive Officer of Colston

3    Consulting Group.

4    **Q.**   And what does Colston Consulting Group consult about?

5    **A.**   My company consults about mostly behavioral health

6    services, programs.  That includes both mental health and

7    substance use disorder services, though I have to say in the

8    last few years that I've been doing this, this last seven,

9    it has been probably 95 percent substance use disorder

10   services.

11   **Q.**   And who do you advise in that consulting capacity about

12   substance use disorder?

13   **A.**   A very diverse clientele, including state governments,

14   local community substance use disorder providers.  I have

15   worked with Pew Trust, for example, on a report that, that

16   the trust did on substance use disorder funding throughout

17   the country.  Gosh.  I've consulted with municipalities

18   about substance use disorder services and faith-based

19   organizations.

20   **Q.**   And how long have you been in this consulting role for

21   substance use disorder?

22   **A.**   Since January of 2013.

23   **Q.**   And, Ms. Colston, did you put together a few slides

24   that outline your educational experience -- educational

25   background and professional experience?

```
1    A.    I did.

2    Q.    And would it assist you to pull those slides up --

3    A.    Yes, it would.

4    Q.    -- as we go through your testimony?

5    A.    Yes.  Thank you.

6    Q.    Okay.

7              MS. MCCLURE:  Your Honor, I'd publish

8    Demonstrative Number 1.

9              THE COURT:  Yes.

10   BY MS. MCCLURE:

11   Q.    Could you explain to the Court what your

12   educational background is?

13   A.    Yes.  All of my degrees are from the University of

14   Oklahoma, thus the logo I guess.  Bachelor's Degree in

15   sociology; Master's Degree in political science; and for a

16   number of years I held all but dissertation status in the

17   political science department, but my area was federal,

18   state, and local public administration.

19   Q.    And did that also include federal, state, public

20   administration for that all-but-dissertation status of

21   substance abuse funding?

22   A.    It did.  Actually, a substance abuse block grant was

23   the topic of my dissertation.

24   Q.    And let's move on to the next slide, Demonstrative 2,

25   your work history.  What was your first job experience
```

```
 1   focusing on substance use and abuse?

 2   A.   The Chief of Operations for the Oklahoma Department of

 3   Mental Health and Substance Abuse Services.

 4   Q.   And what years was that?

 5   A.   1982 to 1984.

 6   Q.   And as Chief of Operations of the Oklahoma Department

 7   of Mental Health and Substance Abuse Services, what were

 8   your job responsibilities?

 9   A.   I was responsible for all operations of department

10   state-operated and state-funded services throughout the

11   entire State of Oklahoma.

12   Q.   So did that include finance, personnel, or performance,

13   conducting audits?

14   A.   Yes.  It included all of the financial operations of

15   the department.  It included human resources.  It included

16   audit services where -- that were both clinical and

17   financial in nature.  It included all of the data that the

18   department gathered from the providers and reported through

19   the federal government.

20   Q.   Okay.  Now, you're not a clinician; right?

21   A.   That's correct.

22   Q.   But you had oversight in the operations role of the

23   entire department; correct?

24   A.   Correct.

25   Q.   And did you move to another position within that
```

```
 1    organization?

 2    A.    I did.  I -- in 1984 I became Inspector General.

 3    Q.    And is that -- that's not on the slide.  So between '84

 4    and '85 you had another role with the Oklahoma Department of

 5    Mental Health and Substance Abuse; correct?

 6    A.    Yes, that's correct.

 7    Q.    And what's the Inspector General?  What were your

 8    primary responsibilities in that role?

 9    A.    Well, the Inspector General basically investigated all

10    complaints about employees or services relating to

11    individuals within the department's care.

12    Q.    Did it also include investigations of the services that

13    are funded by the department?

14    A.    It did.

15    Q.    Okay.

16    A.    Yes.

17    Q.    And then what did you do after that?

18    A.    As a result of an investigation, I determined some

19    quality of care and financial problems -- excuse me -- with

20    one of our major state-operated community mental health

21    centers and made several recommendations about employees and

22    leadership.

23          And then the -- my boss, the commissioner, asked me to

24    become the Executive Director and Chief Executive Officer of

25    that center and basically turn it around.
```

1    **Q.**   And did you, in fact, become CEO of that community

2    mental health center?

3    **A.**   Yes, I did from 1985 to 1988.

4    **Q.**   '85 to -- I'm sorry.  What year?

5    **A.**   '88.

6    **Q.**   Can you describe that facility for the Court?  Is it

7    just one, one facility or is it broader?

8    **A.**   The center was what is called the Comprehensive

9    Community Mental Health Center and was at the time

10   considered to be a one-stop shop for an eight-county

11   catchment area in Southwestern Oklahoma.

12        And I had three satellite offices in three of those

13   eight counties.  And then the main center with all of its

14   services was in Lawton, Comanche County, Oklahoma.

15   **Q.**   And can you very briefly at a high level describe the

16   kind of units that were in that main center in Lawton,

17   Oklahoma?

18   **A.**   Yes.  We had a psychiatric intensive care unit which

19   typically involved legally-involved individuals brought into

20   the police and the sheriff's office.  We had mental health

21   residential services.  We had substance abuse outpatient and

22   residential services, mobile crisis -- I'm missing --

23   transitional housing.

24   **Q.**   Is it fair to say that that facility involved the

25   complete continuum of care for mental health and substance

1    abuse?

2    **A.**    Yes.

3    **Q.**    And between 1982 and 1998 -- I'm sorry.  Let me start

4    over.  Between 1982 and 1988 was mental health and substance

5    abuse treatment changing?

6    **A.**    Yes.  During my tenure at the Oklahoma Department of

7    Mental Health Services, we basically moved the entire system

8    from a hospital-based system to a community-based system.

9    **Q.**    And, so, approximately how many patients when you

10   started that position in -- or with this department in 1982,

11   how many mental health and substance abuse patients would

12   have been in an inpatient capacity?

13   **A.**    Probably 90 percent --

14   **Q.**    And by --

15   **A.**    -- of them.

16   **Q.**    Okay.  And by 1988, about how many patients were in a

17   community-based capacity?

18   **A.**    About 50 percent.

19   **Q.**    And were there any credentialing or status concerns at

20   this facility when you took it over in 1985 in terms of

21   Joint Commission or Medicaid?

22   **A.**    Yes.  There were, there were clinical leadership

23   issues.  There were patient care issues.  There were general

24   quality of care issues.  And the facility was just about to

25   lose its Medicare certification, and because of its deemed

1   status, its Joint Commission accreditation status.

2   **Q.**   So let me just understand the last thing you said about

3   deemed status.  If you lose your Medicaid and Medicare

4   status from the federal government, what does the Joint

5   Commission think or do about that in your experience?

6   **A.**   Well, the deemed status typically means -- this is

7   mostly Medicare for, you know, a state facility like that.

8   If, if you enjoy Medicare certification, you are deemed to

9   be eligible and meet Joint Commission standards.

10  **Q.**   And if you don't meet Medicare certification, what's

11  the Joint Commission --

12  **A.**   Not only will Medicare come visit you, but the Joint

13  Commission will come visit you.

14  **Q.**   And how about the reverse?  If you lose your Joint

15  Commission status, do you also put your Medicare and

16  Medicaid reimbursement status at risk in your experience?

17  **A.**   Yes, yes.

18  **Q.**   Okay.  And, so, what were your primary responsibilities

19  at this mental health facility?

20  **A.**   I was in charge of all -- everything that happened at

21  the facility I was responsible for it.

22  **Q.**   And how long were you in that position?

23  **A.**   Three years.

24  **Q.**   And then how about -- what was your next position after

25  that?

```
 1    A.    I was recruited to work for a psychiatric facility that
 2    was a for-profit facility in Richmond, Virginia.
 3    Q.    And how long did you hold that position?
 4    A.    Three years.
 5    Q.    And what was your next position?  We are now at 1991;
 6    correct?
 7    A.    Yes.  I went to work for a federal contractor, a
 8    government contractor in the DC area.
 9    Q.    And with what agency specifically did that federal
10    contractor have a contract with?
11    A.    The Substance Abuse and Mental Health Services
12    Administration of the United States Department of Health and
13    Human Services.
14    Q.    Okay.  And did you prepare a slide about what SAMHSA is
15    for the Court today?
16    A.    I did.
17    Q.    Okay.
18          MS. MCCLURE:  If we could pull up that slide.
19    BY MS. MCCLURE:
20    Q.    So what is SAMHSA?
21    A.    SAMHSA is the federal agency that is responsible -- one
22    of its responsibilities is to administer both the substance
23    abuse and mental health block grants.  For example, the
24    Substance Abuse Block Grant is the largest line item in
25    SAMHSA's budget.  So it's a huge, huge grant for the
```

1    country.

2         And then SAMHSA also distributes targeted -- and by

3    that, it could be, for example, opioid use disorder --

4    discretionary funding for both mental health and substance

5    abuse services.

6    **Q.**   Okay.  How long were you in the SAMHSA federal

7    contractor position?

8    **A.**   From 1991 to 2003.

9    **Q.**   And what were your job responsibilities?

10   **A.**   When I began, I was the team leader for the State

11   Technical Reviews Project.  And --

12   **Q.**   Let me stop you right there.  Technical reviews, what

13   is a technical review?  It sounds like it could be IT.  Is

14   it IT related?

15   **A.**   No, ma'am, not necessarily at all.  We would -- we

16   brought teams together of experts in, in substance abuse

17   clinical, financial, and managerial activities.

18        We would go to a state -- and I would guess I

19   personally participated in about 65 percent of, of the state

20   reviews -- and often would spend a month there interviewing

21   and understanding everything that happened at the state

22   agency realm.  So in this particular case, that would be the

23   West Virginia Department of Health and Human Resources, and

24   how the federal block grant money flows from the state level

25   either directly to community substance abuse providers or

1    through a regional entity and then to the provider.

2    **Q.**   And I think you said it was a team.  Was your role

3    often as the team leader?

4    **A.**   Yes.

5    **Q.**   When you said you participated in probably 65 percent

6    of the state reviews, did you personally travel to states to

7    conduct these technical reviews of how the state was

8    distributing the block grant money?

9    **A.**   Yes.

10   **Q.**   And, so, the purpose -- am I right -- is to establish

11   compliance, that the state is complying with the federal

12   government rules, regulations for distribution of that fund?

13   **A.**   Correct.

14   **Q.**   And in connection with those reviews, did you review

15   documents from the state?

16   **A.**   Yes.  We had very specific protocols and procedures.

17   We pre-site.  We would request, oh, gosh, hundreds of

18   documents probably from the state each -- in each of those

19   three areas; management, clinical, finance.  And the team

20   member assigned to that category would review them.

21        From that information, we would develop an interview

22   list, send it to the state, create a schedule of on-site

23   interviews.  And then we would actually begin the reviews.

24   We always gathered additional documents on-site.

25   **Q.**   And what, what was the end product?  At the conclusion

```
 1     of a state technical review, what, what was the end product

 2     that you would deliver?

 3     A.    A report was provided to the Substance Abuse Mental

 4     Health Services Administration and the state with our

 5     recommendations about compliance.

 6     Q.    Okay.  And, so, you said you started there as team lead

 7     in 1991.  What was your role by the time you left in 2003,

 8     12 years later?

 9     A.    I was a Vice President in the company and it was one of

10     several projects within my portfolio.

11     Q.    So that first technical review, I think you said that

12     was treatment related.  What were the other projects in your

13     portfolio by the time you left in 2003?

14     A.    A very similar project to do state substance abuse

15     prevention reviews, and then a project to provide training

16     and technical assistance to substance abuse community-based

17     provider organizations throughout the country to improve

18     basically their business practices.

19     Q.    And then what was your next position in 2003?

20     A.    I was asked to be the senior substance abuse adviser

21     for the SAMHSA administrator.

22     Q.    Okay.  And is the SAMHSA administrator in the federal

23     government a presidential appointee?

24     A.    He is a presential appointee and Senate confirmed, has

25     that status.
```

1    **Q.**   Okay.  And how many senior advisers did the SAMHSA

2    administrator have in this time period when you were there

3    from 2003 to 2005?

4    **A.**   Two.

5    **Q.**   Okay.

6    **A.**   One for mental health, one for substance abuse.

7    **Q.**   And which, which role did you have?  The mental health

8    or the substance abuse?

9    **A.**   Substance abuse.

10   **Q.**   And, so, what, what were your job responsibilities as

11   the senior adviser for substance abuse to the SAMHSA

12   administrator?

13   **A.**   In the federal government there is something called the

14   Senior Executive Service which is pretty much the highest

15   before you become an administrator.  It was a Senior

16   Executive Service equivalent position, but I was hired as a

17   special expert.  And I was basically his confidential

18   adviser on any and all things related to substance abuse

19   that SAMHSA dealt with.

20        I regularly represented him in congressional

21   testimony -- I did that once -- but mostly to internal and

22   external stakeholders, internal staff, represented his

23   interests, represented his direction, gave direction to

24   center directors relating to his, his priorities.

25   **Q.**   Did you have any responsibility for anything related to

1    the block grants in this time period from 2003 to 2005 for

2    substance abuse?

3    **A.**   Anything that related to the substance abuse block

4    grant, I -- if, if it rose to the level of the

5    administrator's office, I was involved in it.  And mostly I

6    was involved in it because of my expertise with that topic.

7    **Q.**   And did this job include any policy-making role?

8    **A.**   It included a fairly significant level of policy;

9    again, representing his priorities, making sure that his

10   policies and, frankly, the White House policies were adhered

11   to, and working through with the staff how to implement

12   those policies.

13   **Q.**   Strategic planning responsibility?

14   **A.**   Lots of strategic planning.  We did a lot of -- we did

15   a review of both the mental health and substance abuse block

16   grants and how they could be improved to assist states and

17   have fewer set-asides.

18   **Q.**   Now, that was '03 to 2005.  I believe it was the full

19   three years.  Correct?

20   **A.**   Correct.

21   **Q.**   Did you have any further detail during that time

22   period?

23   **A.**   Yes, I did.

24   **Q.**   Tell us about that.

25   **A.**   Okay.  I was detailed to the White House Office of

1    National Drug Control Policy in 2004 for a period of four

2    months.

3    **Q.**   And what was your title in that position?

4    **A.**   I was the Senior Adviser to the ONDCP Director for

5    Demand Reduction.

6    **Q.**   What's Demand Reduction?

7    **A.**   It is the prevention and treatment, basically, system

8    in the country.

9    **Q.**   And were there any particular crises or issues that

10   were -- that came up during this four-month time period when

11   you were detailed?

12   **A.**   Oh, gosh.  Probably the most challenging was -- there

13   were several.  And there would be briefings, of course, at

14   ONDCP daily that were -- had various levels of clearance.

15   And, for example, it could be anything from coca leaves to

16   Mexican heroin.  So those briefings were generally

17   classified.

18   **Q.**   And to be clear, I'm not asking you to divulge

19   classified information.

20   **A.**   Well, thank you so much.

21   **Q.**   I'm just trying to get a sense -- was there a meth

22   crisis at the time?

23   **A.**   There was absolutely a methamphetamine crisis.  And we

24   had many discussions with the Drug Enforcement

25   Administration about supply and demand.  We were trying

1    to -- from the demand perspective, we were trying to explain

2    that there were people who had legitimate reasons for taking

3    pseudoephedrine.  Some of us have allergies.  And the DEA

4    was pretty focused on the supply; let's just get them off

5    the shelves.  So we would have lively discussions about the

6    differences and the approach between supply reduction and

7    demand reduction.

8    **Q.**   Okay.  Let's, let's head back to the Demonstrative 2

9    about your work history.  What was your next position in

10   2005?

11   **A.**   I came back to Florida.  I had moved there.  I came

12   back to Florida as the Single State Authority for Substance

13   Abuse, a substance abuse director.

14   **Q.**   So who was your employer then?

15   **A.**   The Florida Department of Children and Families.

16   **Q.**   And what -- so that's a State of Florida employment?

17   **A.**   Yes.

18   **Q.**   And what years were you in this position with Florida?

19   **A.**   Actually, when I was hired -- I forgot to say -- I had

20   two positions, the Director of Substance Abuse for the

21   Department of Children and Families and Deputy Director for

22   Treatment for the Governor's Office of Drug Control.  So I

23   had both of those positions.

24   **Q.**   And what were your primary responsibilities in this

25   role as Director of Substance Abuse for Florida?

1    **A.**   Basically responsible for all of the -- the

2    distribution of all funds, federal state, to the providers;

3    had major strategic planning roles; and did any number of --

4    we were primarily responsible for monitoring the funding and

5    the programs.  So there were -- it was a very active time

6    and we were pretty much operating a system of care that was

7    very complex for about 19 million people.

8    **Q.**   And I think you used the phrase Single State Authority.

9    What is -- what does Single State Authority mean?

10   **A.**   It's a, it's a federal term that the Substance Abuse

11   and Mental Health Services Administration uses to designate

12   an agency to be responsible for either the mental health or

13   the substance abuse block grant.

14   **Q.**   And, so, is that an agency, one agency in every state?

15   **A.**   Yes.

16   **Q.**   And, so, when you say that you were the Single State

17   Authority for Florida, is that by virtue of you holding the

18   title of Director of Substance Abuse for the Department of

19   Children and Families?

20   **A.**   Yes.  The Governor designated --

21   **Q.**   Okay.

22   **A.**   -- that office.  And then whoever is the Director of

23   that office is the Single State Authority.

24   **Q.**   And, so, from 2005 to 2012 you were the Single State

25   Authority responsible for distributing block grant funds and

1    strategic planning for the State of Florida substance abuse?

2    **A.**    That's correct.

3    **Q.**    And then in 2013, is that when you started your

4    consulting company?

5    **A.**    Yes.

6    **Q.**    And what kinds of activities -- we talked a little

7    earlier about the kinds of clients that you have in this

8    consulting capacity.  But what types of activities have you

9    been performing in this consulting role since 2013?

10   **A.**    I have assisted the state over a five-year period of

11   time to design and develop their 1115 Medicaid Substance Use

12   Disorder Waiver.

13       I have worked with faith-based organizations to assist

14   them in becoming Medicaid eligible.  I have worked with a

15   variety of community-based organizations to help them become

16   Medicaid certified and be able to treat the Medicaid

17   population.

18       I have -- oh, gosh, I'm trying to remember.

19   **Q.**    Have you been hired by the federal government in this

20   role --

21   **A.**    Oh, yes, I have.  I'm sorry.

22   **Q.**    -- since 2013?

23   **A.**    Yes, I have.  I have basically been asked to be a

24   federal grant reviewer, a peer reviewer for the medication

25   assisted treatment, PDOA, prescription drug overdose,

         1    federal grant that is distributed to not only state

         2    governments, but directly to community-based organizations.

         3    Q.   And have your roles since 2013 advising your various

         4    clients included strategic planning and sustainability

         5    analyses?

         6    A.   Yes.  You know, it's -- the funding environment has

         7    been challenging for substance abuse providers.  And I've

         8    done a good bit actually of strategic planning to try to

         9    help community-based substance abuse organizations become

        10    more stable both financially and, frankly, programmatically.

        11    And I have done a lot of sustainability planning for boards.

        12    Q.   And were you selected by SAMHSA to become -- to be a

        13    Medicaid SUD specialist and provide technical assistance to

        14    states in this capacity?

        15    A.   Yes.

        16    Q.   And, Ms. Colston, have you ever testified before as an

        17    expert?

        18    A.   No.

        19    Q.   What's your hourly rate for expert work in this matter?

        20    A.   For testimony or non-testimony?

        21    Q.   How about both?

        22    A.   Okay.  For non-testimony my rate is $350 an hour.  And

        23    for testimony it is $750 an hour.

        24    Q.   And approximately how much time would you estimate

        25    you've spent in total reviewing materials and preparing both

1   your report and for testimony in this case?

2   **A.**   I would, I would estimate over 500 hours.

3   **Q.**   And, so, since your report is it -- you've continued to

4   review materials; is that right?

5   **A.**   I certainly do.  I -- that's my job.

6   **Q.**   And you're aware that we've updated your materials;

7   correct?

8   **A.**   Yes, I am.

9   **Q.**   And what was the purpose of you reviewing materials

10   since your report in preparation for your testimony here

11   today?

12   **A.**   So that I remain current on what is occurring.

13   **Q.**   And do those materials confirm your judgments that you

14   had already issued in your report?

15   **A.**   Yes.

16   **Q.**   And, so, what were you asked to do in connection with

17   this case?  What, what kinds of materials?  What kinds of

18   analyses?

19   **A.**   I was asked to review the West Virginia substance abuse

20   system and the landscape of substance abuse programs

21   throughout the system of care in West Virginia.

22        I was asked to review the financing of substance use

23   disorder services throughout the West Virginia system of

24   care.  And that would include Medicaid, block grants, state.

25        I was asked to review the Cabell County and City of

1    Huntington substance use disorder program landscape I would

2    call it, how many providers are there.  And, and I was asked

3    to review the financing of those.

4        I was asked to review Dr. Alexander's -- I believe the

5    title is his abatement plan, his plan to address the opioid

6    crisis.  And I think that's it.

7    **Q.**   And I believe you said that the City of Huntington and

8    the county's programs and services.  Do you have an

9    understanding as to whether the programs and services you

10   reviewed are actually city and county programs or whether

11   they are the programs and services located in the county?

12   **A.**   Located in Cabell County, Huntington.

13   **Q.**   And did you also become familiar with, with data

14   relating to substance use and opioid use disorder in West

15   Virginia and Cabell County?

16   **A.**   Yes, and trends, frankly, across.

17   **Q.**   Okay.  And, now, we've gone through your work history.

18   So let's summarize briefly your experience with substance

19   use disorders.

20            MS. MCCLURE:  And, Ritchie, if we could bring up

21   Slide Number 4, please.

22   BY MS. MCCLURE:

23   **Q.**   Let's start with financing.  Do you have experience

24   with financing and funding?

25   **A.**   Yes.  I think the -- probably the, the experience

1    that's most relevant here is the diversity.  And that's,

2    that's represented by my Colston Consulting Group.

3        Right now I -- I'm involved in just about every aspect

4    of financing on behalf of either states or community-based

5    organizations or, you know, like the Pew thing.

6    **Q.**   And you have experience with Medicaid and the state

7    plans --

8    **A.**   Yes.

9    **Q.**   -- as well as waivers?

10   **A.**   Yes.  And probably the most relevant with Medicaid and

11   waivers is my work with the State of Alaska on their 1115

12   SUD waiver.

13   **Q.**   Okay.  And we'll get into what that is a little bit

14   later.

15   **A.**   Okay.

16   **Q.**   So just keeping with your experience, you have

17   experience with the SAPT block grants?  That's the Substance

18   Abuse Prevention and Treatment block grants?

19   **A.**   Yes, the state reviews that I mentioned earlier.

20   **Q.**   And targeted discretionary funding?  You have

21   experience with that?

22   **A.**   Yes.  I learned the most during my experience with

23   SAMHSA about that.

24   **Q.**   And how about historical substance use trends?

25   **A.**   Again, I think, I think really paying attention to

1    trends and, and developing policy based on those would have

2    been at SAMHSA and the White House Office of National Drug

3    Control Policy.

4    **Q.**   And Florida as well?

5    **A.**   And Florida as well, yes.

6    **Q.**   And same thing, program operations, you have experience

7    in that area?

8    **A.**   I do.  I've run them.  I work with community-based

9    organizations now.  I did reviews of them for 12 years.  So

10   I -- that's one of those cross-cutting categories.

11   **Q.**   And how about that last category, needs assessment?  Do

12   you have experience with needs assessment?

13   **A.**   I was asked to do a -- well, of course, I've reviewed

14   many state needs assessments because it's a block grant

15   requirement, or it always has been.

16       And I was -- when I was Vice President at the

17   government contracting company that I worked for, I was

18   asked to do a white paper, I guess I would call it, on how

19   states conduct needs assessments and the quality thereof.

20   **Q.**   Okay.  So in these areas -- in the area of substance

21   use disorder, you have worked for the federal government, at

22   a state level, as a provider, as well as a consultant at all

23   of -- worked as a consultant advising all of those?

24   **A.**   That's correct.

25           MS. MCCLURE:  Your Honor, at this time I would

```
 1    tender Ms. Stephenie Colston as an expert in the area of

 2    systems, programs, and services that provide care for people

 3    with substance use disorder, their structure, financing, and

 4    how to assess them, and trends in the substances that are

 5    being abused.

 6              THE COURT:  Is there any objection?

 7              MR. FARRELL:  No, Your Honor.

 8              THE COURT:  The Court finds Ms. Colston to be an

 9    expert in the area of systems, programs, and services that

10    provide care for people with substance use disorder, the

11    structure, financing, and how to assess them, and trends in

12    the substances that are being abused.

13        Did I get that right, Ms. McClure?

14              MS. MCCLURE:  You did.  Thank you, Your Honor.

15    BY MS. MCCLURE:

16    Q.   Now, Ms. Colston, are you here today to provide an

17    opinion as to the cause of the opioid epidemic?

18    A.   No, I'm not.

19    Q.   Are you here today to provide an opinion on diversion?

20    A.   No, I'm not.

21    Q.   Are you here today to provide an opinion as to what

22    plaintiffs have referred to as the gateway theory?

23    A.   No.

24    Q.   And are you here today to provide an opinion on the

25    conduct of distributor defendants?
```

1    **A.**    No.

2    **Q.**    Okay.  Let's talk about funding the federal government

3    provides to states municipalities and provider organizations

4    for substance abuse.

5              MS. MCCLURE:  And, Ritchie, if we could --

6    BY MS. MCCLURE:

7    **Q.**    Did you prepare a demonstrative that would assist

8    with this portion of your testimony?

9    **A.**    I did.

10   **Q.**    Okay.

11             MS. MCCLURE:  If we could pull up Demonstrative 5.

12   BY MS. MCCLURE:

13   **Q.**    Okay.  And what broad categories or types of

14   funding does the federal government provide for

15   substance abuse?

16   **A.**    For our purposes, the Substance Abuse Prevention and

17   Treatment block grant, the targeted and discretionary grants

18   from the federal government that I, that I spoke about

19   earlier, Medicaid, and Medicare.

20   **Q.**    Okay.  So there's four buckets up there.  Let's walk

21   first through the SAPT block grant, the Substance Abuse

22   Prevention and Treatment block grant.

23             MS. MCCLURE:  If we could populate that, Ritchie.

24   BY MS. MCCLURE:

25   **Q.**    Okay.  So you discussed this earlier in your

1    testimony about your background in Florida, the Single

2    State Authority.  That was your role in Florida?

3    **A.**   That's correct.

4    **Q.**   Okay.  So is the entire SAPT block grant intended for

5    substance abuse?

6    **A.**   Yes.

7    **Q.**   Do you know what the national amount of that SAPT block

8    grant is?

9    **A.**   $1.8 billion.

10   **Q.**   Okay.  And do you know what fiscal year that was for?

11   **A.**   '19.

12   **Q.**   And that's for the country?

13   **A.**   Yes, ma'am, every state and territory.

14   **Q.**   So describe how the SAPT block grant works for the

15   Court.

16   **A.**   Well, the SAPT block grant is distributed from the

17   federal government to the Single State Authority.  And

18   depending on the structure of the substance abuse system in

19   that state, the money can flow either through a regional

20   entity, which some of the block grant money does here in

21   West Virginia.  For Cabell County, that would be Prestera.

22   And then the money can be distributed from the Single State

23   Authority directly to community providers.

24   **Q.**   Okay.  So let's pause there for a minute.  You said

25   that the federal government gives each state an amount?

1    **A.**    Correct.

2    **Q.**    How does the federal government decide what that amount

3    is?

4    **A.**    There's a congressional formula that is mandated.  And

5    it is based on population, income, or cost of services, not

6    income -- I'm sorry -- and a financial index.

7    **Q.**    And is every state and territory eligible to receive

8    the SAPT block grant?

9    **A.**    Yes.

10   **Q.**    And when you say the congressional formula, who then

11   executes that formula and applies that congressional formula

12   in doling it out?

13   **A.**    The Substance Abuse Mental Health Services

14   Administration.

15   **Q.**    SAMHSA?

16   **A.**    SAMHSA, yes.

17   **Q.**    And what is the purpose of the SAPT block grant?  What

18   does it cover?

19   **A.**    For -- historically, the block grant has covered I

20   would say probably 75 to 80 percent of substance abuse

21   services throughout the country.  You know, within about the

22   last 15 years, Medicaid has become a primary payer of

23   substance use disorder funding.  But traditionally SAPT was

24   pretty much all some of us had out there.

25   **Q.**    And that 75 to 80 percent figure, you're using that

1    historically --

2    A.    Yes, ma'am.

3    Q.    -- and -- okay.  And who -- what, what individuals

4    would be anticipated to receive block -- services and

5    programs that come through this block grant funding?

6    A.    Generally, states distribute the block grant to

7    individuals who are not Medicaid eligible, who are not

8    Medicare eligible, and don't have private insurance, so the

9    individuals that remain.

10   Q.    So it doesn't go directly to individuals.  It goes to

11   programs and services --

12   A.    Correct. It goes to providers.

13   Q.    Let me just -- she can only take down one at a time.

14   So let me make sure I finish my question.

15   A.    Okay.  Sorry.

16   Q.    It's okay.  So the money goes through the federal

17   government to the Single State Authority to then programs

18   and service providers to provide services to those low

19   income individuals who may not qualify for Medicare or

20   Medicaid.  Do I have that right?

21   A.    You do, though it may pass through a regional substate

22   entity.  And that could be a county government.  It could

23   be --

24   Q.    And is the SAPT block grant just or only intended to

25   provide individuals with medicine or is it broader than

1    that?

2    **A.**    It's much broader than that.  It includes that, but it,

3    it basically supports psychotherapeutic outpatient services

4    and intensive outpatient services and partial

5    hospitalization.

6         There is a 20 percent financial set-aside for

7    prevention programs to be certain that prevention programs

8    are provided in states throughout the country.

9         And there are set-asides for women, pregnant women and

10   women with dependent children and injecting drug users.

11        So there are a series of requirements in that block

12   grant that states have to comply with.

13   **Q.**    And, so, does a set-aside mean that the state has to

14   insure that that portion of the funds that go to that state

15   are set aside to cover a particular kind of population?

16   **A.**    Yes.

17   **Q.**    Okay.  But all of the SAPT block grant services,

18   whether it's medication or psychotherapy or peer recovery,

19   is all related to substance abuse; correct?

20   **A.**    That's correct.

21   **Q.**    And, so, once the federal funds are designated, what

22   happens next for a state?

23   **A.**    The state distributes the, the funding to whatever

24   entities, you know, based on the structure of the state that

25   I mentioned earlier.  And then the community-based

```
 1   organizations provide the services in compliance with

 2   federal requirements.

 3   Q.   So some states, is it fair to say, provide funds

 4   directly to regions I think you said?  Some states provide

 5   funds to programs and service providers directly; right?

 6   A.   That's correct.

 7   Q.   And do some states decide to provide funds through the

 8   county system?

 9   A.   Yes, they do.

10   Q.   Okay.

11   A.   Many do.

12   Q.   And how about West Virginia, if we could talk about the

13   West Virginia piece for a minute.  What's your understanding

14   as to how SAPT block grant money is distributed by the

15   Single State Authority for West Virginia?

16   A.   Well, the block grant application for federal fiscal

17   years '20 and '21 reported that they, they distribute the

18   money -- they have six regions throughout the state.  And

19   within those six regions, they have 13 comprehensive

20   behavioral health centers that are responsible for ensuring

21   a continuum of care in their region.  In Cabell's case, it

22   is Prestera Center.  And --

23   Q.   Let me pause there for a minute.

24   A.   Sure.

25   Q.   One of the 13 comprehensive community behavioral health
```

1    centers for the State of West Virginia is located in Cabell

2    County?

3    **A.**   That's correct, the largest actually.

4    **Q.**   Okay.

5    **A.**   And they indicated that they also distribute block

6    grant money directly to community providers.

7    **Q.**   Do you know what portion -- after those set-asides that

8    you previously discussed, what portion of the SAPT block

9    grant distributed to West Virginia has been allocated by

10   West Virginia for treatment and recovery support?

11   **A.**   I think it ranges from 70 to 80 percent.

12   **Q.**   How long has this SAPT block grant been in existence at

13   the federal level?

14   **A.**   Since 1982.

15   **Q.**   Any changes recently to the amount of the SAPT block

16   grant awarded to West Virginia?

17   **A.**   Yes.  West Virginia for the past many years has been

18   receiving approximately 8.4 million a year.  For 2021 they

19   received 23.1 million dollars.

20   **Q.**   Okay.  Now, let's talk about this next bucket of

21   federal funding for substance use disorder, targeted and

22   discretionary funding.  What kinds of grants or federal

23   funding is there under these categories?

24   **A.**   The major --

25   **Q.**   I think that you may have --

1    **A.**   I do.  I was just trying not to turn this way.  I'm

2    happy to do that.

3          The first major funder would be the Department of

4    Justice.  And in my report I talk about the amount of money

5    that came to West Virginia and probably Cabell County.  I

6    did actually.

7          But, for example, funding drug courts throughout West

8    Virginia and in Cabell County, this money was used to fund

9    the Women Empowerment Addiction Resource, I believe, W-E-A-R

10   program --

11   **Q.**   Uh-huh.

12   **A.**   -- which is kind of a novel program.

13         The Centers for Disease Control and Prevention is the

14   next major category.  And West Virginia received a state

15   opioid surveillance system grant and then an enhanced grant.

16   They call it ESOOS, E-S-O-O-S.  And that basically was

17   used -- part of that funding was used to develop the Office

18   of Drug Control's data dashboard on overdose deaths.

19   **Q.**   Is that the DHHR dashboard?

20   **A.**   Yes, yes.  I'm sorry.  It is.  And, so, you can monitor

21   any number of things through that dashboard.  It's quite

22   good.

23         The next organization is HRSA, the Health Resources

24   Services Administration.  They generally fund federally

25   qualified health centers throughout the country.  But they

1    also have the rural opioid community program that they've

2    been funding, and Prestera Center has received some of that

3    funding.

4    **Q.**    So is that additional funding that Prestera and Cabell

5    County received on top of the SAPT block grant that you

6    previously talked about?

7    **A.**    Yes.  And then, of course, last but certainly not least

8    SAMHSA has provided the bulk of opioid-related discretionary

9    funding to West Virginia and other states.

10   **Q.**    Okay.  Let's start with that first grant on the left,

11   the STR.  What does that mean?

12   **A.**    The State Targeted Response grant was pretty much the

13   first SAMHSA grant to -- provided to states regarding the

14   opioid crisis.

15   **Q.**    And what years was that provided in?

16   **A.**    2017 and 2018.

17   **Q.**    Now, are you aware of how much funding West Virginia

18   received pursuant to the STR?

19   **A.**    5.88 million a year, which would be just under

20   12 million.  But --

21   **Q.**    Go ahead.

22   **A.**    No.  That's all right.

23   **Q.**    Are you aware of a March, 2020, report titled States'

24   Use of Grant Funding for a Targeted Response to the Opioid

25   Crisis prepared by the Office of Inspector General for

1    Health and Human Services?

2    **A.**   I am.

3          MS. MCCLURE:   And, Your Honor, may I approach?

4    BY MS. MCCLURE:

5    **Q.**   Now, Ms. Colston, is this the report, the title I

6    just read, States' Use of Grant Funding for a Targeted

7    Response to the Opioid Crisis?

8    **A.**   Yes.

9    **Q.**   And who issues this -- who issues this report?

10   **A.**   The United States Department of Health and Human

11   Services Office of Inspector General.

12   **Q.**   Just try to stay a little closer to the microphone.

13   **A.**   The United States Department of Health and Human

14   Services Office of the Inspector General.

15   **Q.**   And have you seen this report before?

16   **A.**   Yes, I have.

17   **Q.**   And did you, in fact, rely on it in your report?

18   **A.**   I did.

19   **Q.**   And if we turn to --

20          MS. MCCLURE:   Ritchie, could you pull this

21   document up on the screen?

22   BY MS. MCCLURE:

23   **Q.**   If we turn to the second page past the cover, the

24   page right after this, and at the top can you read that

25   first sentence under what OIG found?

1   **A.**   "More than 300 million dollars, almost a third of the

2   total nationwide grant funding for the state targeted

3   response to the opioid crisis grant program, remained

4   unspent after two years."

5   **Q.**   And, so, that's a national total; correct?

6   **A.**   Yes.

7   **Q.**   Okay.

8          MS. MCCLURE:   And, Your Honor, at this time I move

9   the admission of this DEF-WV-03237 into evidence.

10          THE COURT:   Is there any objection?

11          MR. ACKERMAN:   The objection I have, Your Honor,

12   is hearsay.   And the issue I have is that this is an expert

13   witness who certainly can testify that she relied on the

14   document.   But in terms of setting a foundation to establish

15   a hearsay exception, I don't know that the witness has any

16   knowledge outside of what's stated in the document.

17          MS. MCCLURE:   Your Honor, the document itself

18   reflects on the cover of it and the face of it this is

19   similar to the OIG report that was admitted via Chris

20   Zimmerman's testimony.   It's a different report, but it is

21   Office of Inspector General report in the Health and Human

22   Services.   I can speak with the witness briefly regarding

23   some additional foundation.

24   BY MS. MCCLURE:

25   **Q.**   Ms. Colston, are you aware of reports issued by

1    Offices of Inspector General as a general concept?

2    **A.**    Yes, I am.

3    **Q.**    And, in fact, were you an Inspector General for a time

4    period in a state?

5    **A.**    Yes.

6    **Q.**    And, so, is it your understanding that if -- that

7    reports issued by Inspector Generals are official reports

8    issued by public entities reflecting the, the information

9    and materials that the agency is expected to and has a

10   responsibility to report on?

11   **A.**    Yes.

12   **Q.**    Okay.  And this document is indicated on the face and

13   the cover of it that it was issued by the Deputy Inspector

14   General for Evaluation and Inspections for Health and Human

15   Services in March, 2020; correct?

16   **A.**    Yes.

17          MS. MCCLURE:  And, Your Honor, I believe that

18   pursuant to the public records exception, 803(8), this is a

19   civil case and this reflects factual findings from what

20   appears on the face of the document to be legally authorized

21   investigation of the Health and Human Services

22   Administration.

23          THE COURT:  Mr. Ackerman.

24          MR. ACKERMAN:  Your Honor, I'm not sure that

25   testimony cures the objection.  All the witness testified

1     was what the face of the document said and that she was --

2     and that she was familiar with these types of reports.

3         Again, I have no issue with an expert witness

4     testifying as to what that expert relied on and why.  I do

5     have an issue with an expert witness seeking to have a

6     document moved in for the truth of the matter asserted

7     through a witness who had no personal knowledge of the

8     document other than the fact that it was something that the

9     person relied on in their report.

10        MS. MCCLURE:  Your Honor, personal knowledge is

11    not required under this exception.  In fact, it's just -- in

12    803(8) -- sorry -- 803(8)(A)(iii), in a civil case, factual

13    findings from a legally authorized investigation.

14        OIG report from -- a different OIG report for -- from

15    2019 was admitted with Chris Zimmerman on May 13th.  That

16    was an OIG report specifically aimed at the DEA.  Personal

17    knowledge is not a required element here.  And the face of

18    the document, as well as the information contained within

19    it, lays the foundation for the public records exception.

20        THE COURT:  Well, it's pretty much

21    self-authenticating by what it says.

22        MS. MCCLURE:  Not just authenticating based on

23    what it says but it, in fact, provides -- the document

24    itself provides the foundation pursuant to 803(8).

25        THE COURT:  I'll overrule the objection and let it

1    in under 803(8).

2    BY MS. MCCLURE:

3    **Q.**    And, Ms. Colston, what is your understanding as to

4    what this -- why this Inspector General report had been

5    commissioned in the first place?

6    **A.**    Well, it was the first major federal funding related to

7    the opioid crisis.  And that was stated in the report that

8    that was the primary reason.

9    **Q.**    Okay.  And if we could look at the bottom of Page 7 of

10   the report.  You know what.  I'm not giving you the right

11   number.  Hold on.  It's Page 10 in the bottom left corner.

12       What is this chart to your understanding?

13   **A.**    On Page 7?

14   **Q.**    It's actually -- if you look in the little left-hand

15   side, there's a bunch of numbers and it ends in 000010.

16   **A.**    Okay.  I'm sorry.  Is it on Page 10?

17   **Q.**    So if you're looking at the original page numbers for

18   the document --

19   **A.**    Uh-huh.

20   **Q.**    -- which is the right corner, it's 7.  The bottom left

21   corner has some numbers and it's the one that ends in 10.

22   **A.**    Yes.

23   **Q.**    It's also on your screen.

24   **A.**    Yes.

25   **Q.**    Okay.  What do you understand this chart to reflect?

1    **A.**   It lists the 14 states that, that were part of the

2    study and how much -- less than half of the funding was

3    expended.  So they go from the state that spent the least,

4    or actually in this case a territory, Micronesia, and then

5    all the way to Arizona which spent 49.4.

6    **Q.**   Okay.  And is West Virginia on this list?

7    **A.**   It is.  It is number -- it is the fourth highest,

8    indicating that West Virginia spent 34.1 percent of its

9    state targeted response grant within -- by the end of the

10   two-year STR grant period.

11   **Q.**   And, so, how much of the STR grant that was received by

12   the State of West Virginia does this report indicate was

13   unspent at the conclusion of that two-year period?

14   **A.**   65.9 percent.

15   **Q.**   And, again, that two-year period was 2017 and 2018?

16   **A.**   Yes.

17          THE COURT:  Doctor -- Ms. Colston, what happens to

18   the money if it isn't spent?

19          THE WITNESS:  The, the state generally requests a

20   no-cost extension.  And in this actual IG report, the

21   Substance Abuse and Mental Health Services Administration

22   had to justify to the Office of Inspector General why they

23   kept granting all of the no-cost extensions across the

24   country.  So that's generally what happened.

25          THE COURT:  Okay.  Thank you.

1    BY MS. MCCLURE:

2    **Q.**   And, so, the money -- you're saying that SAMHSA

3    did, in fact, grant West Virginia an extension to

4    continue to try to have this money become spent;

5    correct?

6    **A.**   Yes, yes.

7    **Q.**   Okay.  And what was the money supposed to be used for?

8    If we could turn to the -- back to that first page of the

9    document.  On the right-hand side and on your screen there's

10   a gray box.

11   **A.**   Oh, expand access.  The purpose of the grant as stated

12   was to expand access to evidence-based opioid use disorder

13   treatment, to reduce unmet treatment needs, and to reduce

14   the number of opioid-related deaths, overdose deaths.

15   **Q.**   And do you recall whether this report called out the

16   fact that West Virginia had a high level of overdose deaths?

17   **A.**   Yes.  The report actually expresses concern that West

18   Virginia had such a large amount that was unspent given that

19   it had basically the highest opioid overdose death rate in

20   the country.

21   **Q.**   And you don't know why West Virginia had not spent that

22   two-thirds of the STR grant money; correct?

23   **A.**   This document does not discuss that.

24   **Q.**   Okay.  And, in fact, is it your understanding from this

25   document that there had been a formula used by SAMHSA to

1    allocate STR grant money; correct?  Or maybe not from this

2    document, but you understand that generally?

3    **A.**    Yes, yes.  The, the STR grant was supposed to be used

4    for -- and was allocated to states with, with higher opioid

5    overdose deaths.

6    **Q.**    And are you aware as to whether West Virginia -- in

7    addition to the formula amount that SAMHSA afforded to West

8    Virginia, whether West Virginia, in fact, received

9    additional funds on top of that formula amount?

10   **A.**    Yes.  There was a supplemental amount that was provided

11   to the three states with, with exceptionally high opioid

12   overdose rates.  West Virginia was one of those, and it was

13   approximately a million dollars.

14   **Q.**    Okay.  And that's on top of the regular?

15   **A.**    On top of the regular.

16   **Q.**    And, so, let's go back to our federal funding

17   Demonstrative 5.  And what does the SOR bucket there mean?

18   **A.**    The state opioid response grant was kind of the

19   replacement of the state targeted response grant.  It began

20   in 2018 and continues to this day.  It is substantially

21   larger than the amount for West Virginia and every other

22   state.

23   **Q.**    Do you mean it's substantially larger than the STR?

24   **A.**    Yes, yes, ma'am.

25   **Q.**    And what is the amount that you understand that West

1    Virginia has been receiving since 2018 pursuant to the SOR

2    grant.

3    **A.**    For 2018 and '19 they received approximately

4    28 million.  For 2020 and 2021 they allocated $43 million to

5    be spent over the two years.

6    **Q.**    And we also have a category there called "others."

7    What kind of grants are associated with that last bucket?

8    **A.**    Well, the -- in West Virginia's case, the medication

9    assisted treatment, prescription drug overdose grant that I

10   talked about earlier, the MAT PDOA.

11        Then there is a strategic prevention framework

12   prescription opioid grant.  And then there is a preventing

13   drug overdose grant called the PDO grant.

14        Those are additional grants that West Virginia has

15   received.

16   **Q.**    Okay.  Moving on, then, we're going to go to our third

17   category in blue on this screen which is Medicaid.  Broadly

18   speaking, high level, how does Medicaid work?

19   **A.**    Medicaid is a federal state partnership.  And both the

20   federal government and the state government provide funding

21   for Medicaid.

22   **Q.**    And who is eligible for Medicaid?

23   **A.**    Individuals who are of low income.

24   **Q.**    And is Medicaid a type of insurance, health insurance?

25   **A.**    It is a public health insurance program, yes.

1    **Q.**    And how is that sharing determined?  You said it was a
2    federal state shared partnership.
3    **A.**    The federal share is determined by the federal medical
4    assistance percentage.  And that is calculated every year.
5    And there is an inverse relationship between income.  So the
6    lower a state's income, the higher the FMAP, which is the
7    acronym for that, is.
8    **Q.**    And, so, is that states per capita income?
9    **A.**    Per capita income.
10   **Q.**    And, so, lower income results in a higher level of
11   federal reimbursement?
12   **A.**    That's correct.
13   **Q.**    Do you know what West Virginia's FMAP is today?
14   **A.**    Today?  74.3 percent.
15   **Q.**    And was that as of 2018 the 74.3 percent?
16   **A.**    Yes, it was.  And for 2021 it's well over 80 percent.
17   **Q.**    Okay.  So that means, if I understand it, that today
18   the State of West Virginia is responsible for 20 percent of
19   the Medicaid cost and the federal government is responsible
20   for about 80 percent?
21   **A.**    That's correct.
22   **Q.**    And, so, Medicaid protects individuals; is that right?
23   **A.**    Provides --
24   **Q.**    Or reimbursement for individuals?
25   **A.**    -- medical services to individuals, yes.

1   **Q.**   Okay.  And is this like a grant, or how is this

2   different from the grants that we've been talking about on

3   the left-hand side of the screen?

4   **A.**   Generally speaking, Medicaid is the more stable --

5   considered to be a more stable source of, of funding.  It is

6   not grant-based.  There, there isn't -- the only time

7   periods where, where an individual may not be able to

8   receive Medicaid is if they're -- you know, it's an income

9   based eligibility requirement for individuals.  And if their

10  income becomes higher than the Medicaid established

11  threshold, then they would not be -- no longer be eligible

12  for Medicaid.

13  **Q.**   Is Medicaid sometimes referred to as entitlement

14  funding?

15  **A.**   It is, yes.

16  **Q.**   Okay.  And, so, once you qualify, if your income does

17  not rise above whatever the maximum is, you remain on that?

18  **A.**   Pretty much on, yeah.

19  **Q.**   Is it subject to any month-to-month analysis or

20  renewal?

21  **A.**   No.

22  **Q.**   Okay.  And, so, this was not like grants that Dr.

23  O'Connell -- whose testimony I believe you read; correct?

24  **A.**   Yes.

25  **Q.**   It's not like those grants in the sense that there's a

1    time period --

2    **A.**    Correct.

3    **Q.**    -- and then they expire?

4    **A.**    I believe she was talking about the category of

5    targeted and discretionary.

6    **Q.**    And is Medicaid coverage for substance use disorder,

7    including opioid use disorder, is that again limited to just

8    the provision of medicines or is it a broader set of

9    services than that?

10   **A.**    No.  It is a broader set of services, including

11   psychotherapeutic -- psychotherapy at any service setting;

12   outpatient, inpatient, physician supervised.  And it

13   provides an entire continuum of substance use disorder

14   services.

15   **Q.**    So when you say entire continuum or full continuum,

16   it's the full scope of substance use disorders that are

17   available today --

18   **A.**    Uh-huh.

19   **Q.**    -- in West Virginia to patients who are diagnosed with

20   substance use or opioid use disorder?

21   **A.**    Correct.

22   **Q.**    Do you know what the percent of individuals is in West

23   Virginia covered by Medicaid?

24   **A.**    I've seen ranges from 26 to 33 percent.

25   **Q.**    Okay.  And let's talk about changes to Medicaid, and

1     specifically Medicaid coverage for substance use disorder.

2     Affordable Care Act.  Did Affordable -- the Affordable Care

3     Act change Medicaid in a way that affected the provision of

4     substance use disorder services?

5     **A.**   It did.  The Affordable Care Act actually established

6     substance use disorder services as one of the 10 essential

7     benefits for health plans.

8     **Q.**   So what's the effect of substance use disorder services

9     now being designated as one of the 10 essential benefits --

10    I'm sorry -- 10 elements of essential --

11    **A.**   Benefits.

12    **Q.**   -- health benefits?

13    **A.**   It, it kind of makes substance use disorders a more

14    permanent part of the Affordable Care Act.  In other words,

15    they have granted that status to substance use disorders.

16    **Q.**   Did the Affordable Care Act mean that more people

17    qualified and were eligible for Medicaid?

18    **A.**   It did.

19    **Q.**   A couple more?  Many more?  What's your understanding?

20    **A.**   Oh, gosh.  Thousands more, thousands more.

21    **Q.**   And, so, previously, prior to the Affordable Care Act,

22    what had been the population serviced by Medicaid?

23    **A.**   Medicaid serves millions of people in West Virginia, a

24    third of, what, 1.8 million, I believe, the population.  And

25    the Affordable Care Act enhanced the number of enrollees,

1    right, of Medicaid enrollees, oh, gosh, 60-, 70-, 80,000.

2    **Q.**   Did it change the eligibility requirement so that

3    people became eligible for Medicaid even if they had earned

4    more money than the pre-Affordable Care Act time period

5    would have allowed them?

6    **A.**   It did, yes, ma'am.

7    **Q.**   Okay.  Did the Affordable Care Act do anything for

8    substance use services for private health insurance?  I'm

9    asking a question a little bit outside of the Medicaid

10   world.  But to your knowledge, did the Affordable Care Act

11   do something for substance use services for people who had

12   private insurance?

13   **A.**   Yes.

14   **Q.**   What did it do?

15   **A.**   It -- they -- that designation as an essential health

16   benefit covered both private insurance health plans and

17   Medicaid.

18   **Q.**   So did that mean that private insurance plans had to

19   then cover those, --

20   **A.**   Yes.

21   **Q.**   -- substance use disorder as now one of the 10

22   essential health benefits?

23   **A.**   Yes.

24   **Q.**   And how is the Affordable Care Act paid for?  If that's

25   a poor question, did the federal government for a time

1    period pay for the expanded population that was now eligible

2    for Medicaid?

3    **A.**    The Affordable Care Act between 2014 and 2016 federal

4    government paid 100 percent.  Now in West Virginia the

5    federal government pays 94 percent.

6    **Q.**    So does that mean -- we previously talked about the

7    80 percent and the 20 percent for West Virginia, meaning

8    that the federal government covered 80 percent of Medicaid.

9         For the expanded population, this new population that

10   was now eligible for Medicaid, is it fair to say that the

11   federal government pays 94 percent for that expanded

12   population?

13   **A.**    Yes.

14   **Q.**    Okay.  And, so, to your understanding, that changed the

15   number of West Virginians and those in Cabell County who had

16   coverage for substance use disorder services through

17   Medicaid?

18   **A.**    Yes.

19            MS. MCCLURE:  And can we pull up Demonstrative 6?

20   BY MS. MCCLURE:

21   **Q.**    Did you prepare a slide to talk a little bit about

22   this?

23   **A.**    Yes, ma'am, I did.

24            MS. MCCLURE:  If we could pull up 6.

25   BY MS. MCCLURE:

1    **Q.**   So tell me what this slide depicts.

2    **A.**   This slide shows that based on, you know, the state

3    data that in 2013, which was actually when the Affordable

4    Care Act was passed, there were 5,837 individuals with

5    opioid use disorder diagnoses in West Virginia.  And this is

6    from Medicaid, of course, --

7    **Q.**   Yep.

8    **A.**   -- at a cost of seven million.

9    **Q.**   And then what happened in 2017 -- by 2017?

10   **A.**   By 2017 the number of individuals diagnosed with opioid

11   use disorder increased to 34,440 individuals.

12   **Q.**   So was this the number of individuals diagnosed or the

13   number of individuals who had a diagnosis and are covered by

14   Medicaid?

15   **A.**   Yes, the latter.  Thank you for the clarification.  And

16   the amount of funding had increased to 84.9 million which we

17   rounded.

18   **Q.**   And do you have an understanding today as to who the

19   largest payer in West Virginia is for buprenorphine

20   prescriptions?

21   **A.**   Yes.  It's Medicaid.  Medicaid pays for approximately

22   45 percent of buprenorphine.

23   **Q.**   And what is buprenorphine?

24   **A.**   Buprenorphine is used -- it's one of the three FDA

25   approved medications to treat opioid use disorder.

1    Q.   And has West Virginia done any forecasting as to what

2    the number of Medicaid enrollees and the population would be

3    for West Virginians with opioid use disorder through 2022?

4    A.   I believe so.  I believe they have.  I'm sorry.

5    Q.   I'm sorry.  Did you say you do believe they have?

6    A.   I do believe they have.  I'm sorry.

7    Q.   Okay.  And what's your understanding of that West

8    Virginia estimate of what the -- will the coverage continue

9    to expand in your estimate?

10   A.   Yes, West Virginia --

11   Q.   In West Virginia's estimate.

12   A.   West Virginia's estimate is that the number of

13   individuals with opioid use disorder will increase.

14   Q.   Okay.  And coverage by Medicaid for individuals with

15   opioid use disorder is predicted by West Virginia to

16   increase as well; correct?

17   A.   Yes.

18   Q.   Okay.  Now, we've talked a couple of times about

19   something called an 1115 waiver.  What is substance use --

20   sorry -- substance abuse waiver under 1115?

21   A.   By definition, a waiver waives certain requirements,

22   federal requirements that Medicaid imposes for, for federal

23   reimbursement.

24   Q.   Okay.  Have you prepared a slide to talk about that?

25   A.   Yes, I have.

```
1              MS. MCCLURE:  Let's pull up Slide 7, please.
2    BY MS. MCCLURE:
3    Q.   And what does this slide depict?
4    A.   This slide talks about Medicaid's history and then the
5    relationship between Medicaid and substance abuse over time.
6    Q.   So when was Medicaid created?
7    A.   1965.
8    Q.   And what's kind of the model?  How is Medicaid referred
9    to?  It's a what kind of model?
10   A.   Medicaid has emerged, thus the name, from a medical
11   kind of model.  So if you look on the left, physical health
12   was really the original purpose of Medicaid in terms of
13   mandatory benefits.  And optional benefits included mental
14   health; very few substance abuse, you know, in the '60s,
15   '70s, and '80s.
16   Q.   Okay.
17   A.   And mostly inpatient-based family practice individuals
18   and specialists were reimbursed for physical health.
19   Because psychiatrists have always been a major part of
20   mental health, inpatient and outpatient psychiatric therapy
21   was provided through Medicaid.
22   Q.   And, and in Medicaid there was -- was there a
23   particular type of institution that was excluded from
24   coverage or reimbursement historically for mental health
25   facilities?
```

1    **A.**    Yes, the state psychiatric hospitals, which at the time

2    Medicaid was passed were primarily, if not solely, funded by

3    state general revenue.

4    **Q.**    So Medicaid said the state is responsible for paying

5    those state mental institutions run by the state.  We're not

6    allowing reimbursement for those.  Is that right?

7    **A.**    That's correct.

8    **Q.**    And what's that -- what was that called?

9    **A.**    It's call the IMD, Institute for Mental Disease,

10   exclusion.  In other words, they're excluded from Medicaid.

11   **Q.**    And how is that defined?  The IMD exclusion applies to

12   what?

13   **A.**    Over the years, it has been -- it began singular,

14   singularly being applied to mental health.  But over the

15   years, any substance abuse residential facility over 16 beds

16   was also included.

17   **Q.**    Okay.  So just to draw a distinction between inpatient

18   and residential, if I'm an individual who has need of

19   hospital care related to either substance use or mental

20   health, was that covered?

21   **A.**    Yes.

22   **Q.**    Under original Medicaid?

23   **A.**    Yes.

24   **Q.**    But if it's a residential treatment program, that is

25   traditionally not covered by Medicaid?

1   **A.**   That's correct.

2   **Q.**   And were those residential treatment programs for

3   substance abuse generally 28-day programs?

4   **A.**   At the time, they were, yes.

5   **Q.**   And were there -- were they -- did they usually -- were

6   they usually physician-led or not historically?

7   **A.**   No.   In my report I talk about the history of the

8   addiction field with limited physician involvement.   That,

9   that was primarily -- the treatment was primarily provided

10  by counselors who were in recovery themselves.   And those

11  criteria did not meet Medicaid reimbursement.

12  **Q.**   So the IMD exclusion was eventually thought to and, in

13  fact, did cover exclusion for residential treatment

14  services, meaning substance abuse coverage not reimbursed

15  through Medicaid historically; correct?

16  **A.**   Correct.

17  **Q.**   And that doesn't mean no substance abuse services are

18  covered by Medicaid, but the primary historical substance

19  abuse model of residential treatment facilities was not

20  covered by Medicaid; correct?

21  **A.**   Correct.

22  **Q.**   Okay.   And what kinds of services would have been

23  related to substance abuse and historically covered by

24  Medicaid?   We talked about one, that inpatient scenario

25  where I actually require the services of a physician.

1    Right?

2    **A.**   Outpatient -- pardon me -- outpatient services.

3    **Q.**   So therapy, for example?

4    **A.**   Outpatient psychotherapy, yes.

5    **Q.**   By a doctor?

6    **A.**   Yes.  Well, physician-supervised, --

7    **Q.**   Okay.

8    **A.**   -- which means they have to be involved, yeah.

9    **Q.**   So doctor-involved treatment?

10   **A.**   That's correct.

11   **Q.**   Okay.  And, so, what do we call the services that

12   Medicaid generally reimburses for historically?  Are they

13   referred to as the Medicaid state plan services?

14   **A.**   Yes.  Every state in the country that receives Medicaid

15   has to have a Medicaid state plan that articulates all of

16   the services that are required by the federal government and

17   those optional services.

18   **Q.**   Okay.  So then we talked about the state plan.  This is

19   the history of how it worked.  What changed?

20   **A.**   The 1115 waiver was developed in 2015 through a letter

21   basically that the centers for Medicaid and Medicare

22   services sent to every state Medicaid director, told them

23   about an opportunity for states to apply for an 1115

24   substance use disorder waiver, the primary goal of which was

25   to expand access to treatment and provide a full continuum

1    of substance use disorder services that were reimbursed by

2    Medicaid.

3    **Q.**   Okay.  So the 1115 of what?

4    **A.**   It is a statute -- section 1115 is a statute that

5    allows the Secretary of the United States Department of

6    Health and Human Services to, to approve a state

7    implementing an innovation.  It could be an innovation in

8    service delivery, for example, managed care, let's say,

9    instead of fee for service reimbursement.

10        So it allows the Secretary to say, okay, I'm going to

11   waive this requirement here and let you demonstrate whether

12   this works over a five-year period of time.

13   **Q.**   Okay.  So this 1115 waiver, a letter went out from CMS,

14   Center for Medicaid Services; right?

15   **A.**   Yes.

16   **Q.**   To each state?

17   **A.**   Yes.

18   **Q.**   So if we have, going back to our chart, we have IMD

19   being excluded from Medicaid, would this waiver mean that

20   then the IMD exclusion would not apply if the state got

21   approval from CMS for the activity sought by its waiver?

22   **A.**   Yes.  If the state requests it in their waiver

23   application, CMS has approved it all over the country.  So

24   they've approved the exclusion of the IMD requirement.

25   **Q.**   So it's a waiver of the exclusion --

1   **A.**   I know.

2   **Q.**   -- meaning that then it's covered; right?

3   **A.**   Yes.

4   **Q.**   Okay.  And if we look at our chart here, if we take the

5   lines there, if we move to the right, is this now what

6   Medicaid looks like with an 1115 waiver with then Medicaid

7   covering that substance abuse for residential treatment?

8   **A.**   Yes, --

9   **Q.**   Okay.

10   **A.**   -- regardless of its size.

11   **Q.**   And we've gotten rid of that dark black line?

12   **A.**   Yes, we have.

13   **Q.**   It expanded coverage; right?

14   **A.**   Yes.

15   **Q.**   And you've talked about a time limit for the 1115

16   waiver.  What is that time period?

17   **A.**   Five years.

18   **Q.**   And I believe you said it was a, a research grant; is

19   that right?

20   **A.**   It's called a Research and Demonstration grant.  So the

21   states have an opportunity with the substance use disorder

22   1115 waiver to again demonstrate that there is something

23   they are doing, for example, providing a full continuum when

24   they haven't had one before.

25   **Q.**   A full continuum of what?

1    **A.**   Of substance abuse services to see if more people are

2    served, if people have better treatment outcomes, that kind

3    of thing.  It varies by waiver and by state.

4    **Q.**   Okay.  So is the purpose to try to improve health

5    outcomes and healthcare?

6    **A.**   That is the bottom line, yes.

7    **Q.**   Okay.  And can that five-year period be extended for an

8    1115 waiver?

9    **A.**   Yes, it can.

10   **Q.**   How do you know that?

11   **A.**   I beg your pardon?

12   **Q.**   How do you know that?

13   **A.**   Well, I probably have researched every one of them in

14   preparation for my work with Alaska, and I've certainly read

15   West Virginia's several times, and all of the correspondence

16   which is available publicly.  So, yes, I've read every --

17   **Q.**   So you've read about 1115 waivers.  But my question is

18   can that five-year period, can states apply for an

19   extension?

20   **A.**   Yes, they can and they do.

21   **Q.**   And what happens if the services during that five-year

22   research grant period -- if the state at the end of it is

23   able to demonstrate that it works, what then?

24   **A.**   The federal government would probably begin

25   negotiations to try to get as many of those services in the

1    state plan as they could.

2    **Q.**    And if the services are then included in a state plan,

3    these additional substance use disorder services, would that

4    also then be subject to another five-year period or are they

5    just in the plan?

6    **A.**    They're just in the plan.

7    **Q.**    And is that more stable and sustainable than just the

8    five-year period?

9    **A.**    It certainly is.

10   **Q.**    Okay.  And did you review -- you've already said that.

11   Did West Virginia apply for an 1115 waiver?

12   **A.**    Yes, they did in 2016.

13   **Q.**    And do you know if they received approval for that 1115

14   waiver?

15   **A.**    They did.  They received approval in 2017 and began

16   service delivery in January of 2018.

17   **Q.**    So that's a period of five years through, through the

18   end of 2022?

19   **A.**    Yes.

20   **Q.**    And have you reviewed what Medicaid services are now

21   available in West Virginia for substance use disorder?

22   **A.**    I have.

23   **Q.**    Okay.  And did you prepare a demonstrative about those

24   services?

25   **A.**    I did.

1    **Q.**   Okay.

2            MS. MCCLURE:  If we could pull that up, that's

3    Demonstratives 9 and 10.

4    BY MS. MCCLURE:

5    **Q.**   So, Ms. Colston, does this -- what's the column on

6    the left mean there, that ASAM column?

7    **A.**   That column is the level of care identified by the

8    American Society of Addiction Medicine.  They are considered

9    to be the industry standard for establishing levels of care

10   and staffing and programmatic requirements.

11   **Q.**   Okay.  And, so, the American Society of Addiction

12   Medicine, ASAM, is like a universal standard?

13   **A.**   It is.

14   **Q.**   Okay.

15   **A.**   Yes.

16   **Q.**   And that -- the middle column where it says "benefit,"

17   where is that wording taken from?

18   **A.**   Usually it's a Medicaid term.  Medicaid provides

19   benefit to benefit -- it's a service.  It is a benefit to

20   individuals eligible for Medicaid.

21   **Q.**   And does the description of the benefit match up with

22   that ASAM for each of these levels?

23   **A.**   It does.

24   **Q.**   And on the right each of those entries says state plan

25   or 1115.  What does that mean?

1    **A.**    That means that either the benefit is allowed under the

2    state plan or it is a benefit that was established by the

3    1115 waiver.

4    **Q.**    And, so, this represents, then, the spectrum of SUD,

5    substance use disorder, services available in West Virginia

6    today; correct?

7    **A.**    Yes, it represents the continuum of substance use

8    disorder services.

9    **Q.**    You've predicted my next question which is does this

10   represent the full continuum then of SUD services available

11   to Medicaid enrollees in West Virginia today?

12   **A.**    Yes.

13   **Q.**    From 2018 forward?

14   **A.**    Yes.

15   **Q.**    And for the record, Ms. Colston, we're going to please

16   review each of the benefits.  I don't think we need to read

17   in the ASAM number.  But if you could -- the benefit in the

18   first line, SBIRT, what is that?

19   **A.**    That is screening, brief intervention, referral and

20   treatment.

21   **Q.**    And in West Virginia is that covered by Medicaid?

22   **A.**    Yes, it's covered by the state plan.

23   **Q.**    And how about peer recovery support services?  Is that

24   covered by Medicaid in West Virginia?

25   **A.**    It is by the 1115 waiver.

1   **Q.**   And outpatient services?

2   **A.**   State plan.

3   **Q.**   Intensive outpatient?

4   **A.**   State plan.

5   **Q.**   Partial hospitalization?

6   **A.**   State plan.

7   **Q.**   And, again, if we want to know what exactly the

8   benefits are here for each of these levels, that would

9   depend on the West Virginia contract with the federal

10  government; is that right?

11  **A.**   Yes.

12  **Q.**   For benefits?

13  **A.**   Yes.

14  **Q.**   And I just wrote on this.  Apologies.  Clinical managed

15  low intensity residential, is that covered in West Virginia?

16  **A.**   Yes, by the 1115.

17  **Q.**   How about clinically managed population specific high

18  intensity residential?

19  **A.**   1115.

20  **Q.**   And clinically managed high intensity residential?

21  **A.**   1115.

22  **Q.**   Those last three that we've discussed, is that a

23  significant change brought about by the 1115 waiver because

24  historically residential substance abuse would not have been

25  covered?

1      **A.**   Yes.

2      **Q.**   And medically monitored intensive inpatient?

3      **A.**   State plan.

4      **Q.**   Medically managed intensive inpatient services?

5      **A.**   State plan.

6      **Q.**   Ambulatory withdrawal management services?

7      **A.**   State plan.

8      **Q.**   Ambulatory withdrawal management services Level II?

9      **A.**   Yeah, state plan.

10     **Q.**   Clinically managed residential withdrawal management

11     services?

12     **A.**   That's the 1115.

13     **Q.**   Okay.  And medically managed -- I'm sorry.  Medically

14     monitored inpatient withdrawal management services?

15     **A.**   State plan.

16     **Q.**   Opioid treatment program services?

17     **A.**   That's for methadone services and that's the 1115

18     waiver.

19     **Q.**   Okay.  Office-based opioid treatment?

20     **A.**   State plan.

21     **Q.**   Targeted case management?

22     **A.**   State plan.

23     **Q.**   Transportation?

24     **A.**   1115.

25     **Q.**   And naloxone administration services?

```
 1    A.    State plan.

 2    Q.    Let's look back at that transportation.  Is there any

 3    other federal funding for transportation that exists in

 4    addition to the 1115 waiver for patients who need

 5    transportation for substance use disorder treatment?

 6    A.    Yes.

 7    Q.    What is that funding?

 8    A.    The state opioid response grant.

 9    Q.    So that's the SOR grants that we previously discussed?

10    A.    Yes, it is.

11    Q.    And perhaps given everything we've talked about today,

12    this is maybe a question with an obvious answer, Ms.

13    Colston, but do Cabell County and the City of Huntington pay

14    for Medicaid coverage for Medicaid enrollees?

15    A.    No.

16    Q.    Okay.  Let's go back to our Demonstrative 5 and we're

17    going to talk about the last bucket on that demonstrative,

18    Medicare.

19          And is Medicare another source of federal funding that

20    can cover or reimburse for substance use disorder services?

21    A.    Yes, it is.

22    Q.    And when I say substance use disorder services, is that

23    a broader term than opioid use disorder services?

24    A.    Yes, it is.  Opioid use disorder services are a subset,

25    if you will, of the substance use disorder services.
```

1    **Q.**   Okay.  And at a very high level, how do Medicaid and

2    Medicare differ?

3    **A.**   Medicare is based on an individual's disability or age.

4    So those of us over age 65 are automatically eligible for

5    Medicare.  And then any individual 18 years or older can

6    qualify by virtue of their disability.

7    **Q.**   And is this like Medicaid in that it is not like a

8    grant in its entitlement funding?

9    **A.**   That's correct.

10   **Q.**   Has Medicare coverage for SUD expanded, substance use

11   disorder expanded over the past 10 years?

12   **A.**   Yes.

13   **Q.**   And do you know the percentage of people covered by

14   Medicare in West Virginia approximately?

15   **A.**   I believe it's 26 percent.

16   **Q.**   Did you discuss that in your report?

17   **A.**   I did.

18   **Q.**   Okay.

19   **A.**   I did.  I'm sorry.  I just can't remember the exact

20   number.

21   **Q.**   Would looking at your report refresh your recollection?

22   **A.**   Yes, it would.  Yes, thank you.

23          MR. FARRELL:  Judge, I don't mind if she just

24   verbally reminds her.

25          THE WITNESS:  Yeah.

```
 1    BY MS. MCCLURE:

 2    Q.   Does your report indicate that it's about

 3    20 percent?

 4    A.   Yes, it does.

 5    Q.   Thank you.

 6    A.   Thank you.

 7             MS. MCCLURE:  Thank you, Mr. Farrell.

 8    BY MS. MCCLURE:

 9    Q.   Do you know what -- so there's two ways to qualify

10    for Medicare:  Age, disability status?

11    A.   Correct.

12    Q.   Do you know what percentage of people in West Virginia

13    qualify for Medicare due to that disability status?

14    A.   Well, I know that West Virginia has the highest rate

15    of, of disability.  That might be the 26 percent figure.

16    But they do have the highest disability rate in the country,

17    West Virginia does.

18    Q.   And did you prepare a demonstrative showing what

19    Medicare covers for opioid use disorder and substance use

20    disorder?

21    A.   Yes.

22             MS. MCCLURE:  Okay.  If we could pull up

23    Demonstrative 11.

24             THE WITNESS:  Uh-huh.

25    BY MS. MCCLURE:
```

```
1    Q.   And so, Ms. Colston, does this slide indicate that

2    Medicare covers both inpatient and outpatient programs

3    for substance use disorder?

4    A.   Yes, it does.

5    Q.   And medications used in treatment but not methadone?

6    A.   Uh-huh.

7    Q.   Correct?

8    A.   Uh-huh.

9    Q.   She can't --

10   A.   Yes, yes.

11   Q.   And -- but methadone we've seen is covered in other

12   ways in West Virginia; right?

13   A.   Yes.

14   Q.   And partial hospitalization covered by Medicare?

15   A.   Yes.

16   Q.   And as of January 1st, 2020, this opioid treatment

17   program under Part B does cover that methadone; correct?

18   A.   Yes, that's correct.

19   Q.   And counseling and therapy; right?

20   A.   Psychotherapy, yes.

21   Q.   And do all of those categories hold true for Medicare

22   enrollees in Huntington and Cabell?

23   A.   Yes.

24   Q.   And is there an OTP, or an opioid treatment program in

25   Huntington today?
```

1   **A.**   Yes, there is.

2   **Q.**   Do you know what that's called?

3   **A.**   Comprehensive -- Huntington Comprehensive Treatment

4   Center.

5   **Q.**   And historically from 2018 to today, has the number of

6   enrollees in Medicare been expanding in West Virginia?

7   **A.**   Yes.

8   **Q.**   Okay.  And, again, this may be a question with an

9   obvious answer, but do Cabell and Huntington pay for

10   Medicare coverage for the city and county Medicare

11   enrollees?

12   **A.**   No.  It's a federally funded program.

13   **Q.**   Okay.  And I believe you've looked at other kinds of

14   coverage like private health insurance.  You understand that

15   there are individuals in Huntington/Cabell who have private

16   health insurance, not Medicare, not Medicaid, not these

17   federal programs.  Right?

18   **A.**   Yes.

19   **Q.**   And do you know what percentage of the West Virginia

20   population that has some healthcare insurance coverage?

21   **A.**   I believe it's 94 percent.

22   **Q.**   And do you understand that that number is the same or

23   different or about, or higher in Cabell/Huntington?

24   **A.**   I think it's about the same in Cabell/Huntington.

25   **Q.**   Okay.  So we've been talking a lot --

1           MS. MCCLURE:  We can take that slide down.

2      BY MS. MCCLURE:

3      Q.   We've been talking about federal funding for

4      substance use and abuse.  Is there also state funding in

5      West Virginia for substance use disorder?

6      A.   Yes, there is.

7           MS. MCCLURE:  And, Your Honor, I'm about -- I'm

8      about to move into a new area and probably have about, about

9      half an hour remaining of testimony.  This would be a good

10     time, given the shift, to do a break if that would be okay

11     with the Court.

12          THE COURT:  Are we going to be able to finish Ms.

13     Colston?

14          MS. MCCLURE:  I do believe we will be able to.

15     It, of course -- I certainly will be able to.  I believe it

16     depends on the scope of cross.  So I would ask Mr. Farrell

17     to advise time period which, of course, I haven't finished

18     the direct yet.  But I will represent that I have about half

19     an hour remaining for Ms. Colston.

20          THE COURT:  Let me ask the plaintiffs how long you

21     expect.

22          MS. KEARSE:  Your Honor, I would anticipate we

23     could get our cross, if the two of us are doing cross, by

24     the end of the day.

25          THE COURT:  All right.

```
 1              I'm going to ask you to come back at 2:00, Ms. Colston,
 2       and we'll resume then.  And we'll be in recess until 2:00.
 3                    MS. MCCLURE:  Thank you, Your Honor.
 4              (Recess taken at 11:58 a.m.)
 5                    THE COURT:  Do we have a witness?
 6                    THE WITNESS:  I'm here.
 7                    THE COURT:  Oh.  You can resume the witness stand,
 8       Ms. Colston.
 9                    MS. MCCLURE:  May I continue, Your Honor?
10                    THE COURT:  Yes, please.
11                    BY MS. MCCLURE:
12       Q.   Ms. Colston, shifting to a different topic area, did
13       you prepare a slide that discusses some data on recent
14       overdose deaths in Cabell and Huntington from the DHHR
15       website?
16       A.   Yes.
17       Q.   Okay.
18                    MS. MCCLURE:  Could we put up that demonstrative,
19       please?
20                    BY MS. MCCLURE:
21       Q.   Can you tell us, what does this demonstrative depict?
22       A.   This depicts the emerging threat of fatal
23       methamphetamine overdoses in West Virginia.
24       Q.   And what does this chart measure?  It's hard to see,
25       but the chart on the right under the title you read,
```

1    Emerging Threat Fatal Methamphetamine Overdoses, those four

2    different color schemes, can you just walk through for the

3    record what each of them shows, the colors, what each of

4    them are?

5    **A.**    Yes.   The -- I'll start with the bottom, blue.   That is

6    methamphetamine and heroin.

7    **Q.**    Okay.   And the next, yellow?

8    **A.**    The one on top is methamphetamine and fentanyl.   Next

9    is methamphetamine and any opioid.   That's the pink.   And

10   then, I guess what I would call lavender is methamphetamine.

11   **Q.**    And that last one is methamphetamine alone?

12   **A.**    Yes.

13   **Q.**    And is that the highest one on that chart?

14   **A.**    It is.

15   **Q.**    Okay.   And what does this generally depict about

16   methamphetamine and overdoses?

17   **A.**    That between the first quarter of 2015 and the fourth

18   quarter of 2020, it substantially increased with peaks in

19   the third quarter of 2018 and the first and third quarters

20   of 2020.   Just keeps going up.

21   **Q.**    Okay.   And so, based on your review of the materials,

22   what substances are the most common reasons for drug

23   overdoses in Cabell County?

24   **A.**    Are you talking about the class of drugs?

25   **Q.**    Correct.

```
 1    A.    Psychostimulant.

 2          Oh, sorry.

 3                MR. ACKERMAN:   Objection, Your Honor.   I thought

 4    at the beginning of this testimony we were talking about we

 5    weren't -- this witness was not offering any opinions

 6    related to causation and these questions appear to be going

 7    directly to causation issues.

 8                MS. MCCLURE:   Your Honor, Ms. Colston was

 9    qualified as an expert in trends regarding Substance Use

10    Disorder.

11                THE COURT:   Yeah, overruled.   Overruled.   She can

12    answer.

13                MS. MCCLURE:   Thank you.

14                BY MS. MCCLURE:

15    Q.    Do you need the question repeated?

16    A.    Yes, please.

17    Q.    Okay.   And based on your review of the materials, what

18    do you understand is the most common drugs involved in

19    overdoses in Cabell County?

20    A.    Psychostimulants.

21    Q.    And just to be clear, a psychostimulant is what?

22    A.    Includes drugs like methamphetamines and cocaine.

23    Q.    And is opioid a psychostimulant?

24    A.    No, ma'am.

25    Q.    Ms. Colston, in your opinion today, is there a
```

1    prescription opioid crisis in Cabell County?

2    **A.**    No.   There's -- there is a psychostimulant problem,

3    specifically methamphetamine, today in Cabell County.

4    **Q.**    But it's your opinion that there's not a prescription

5    opioid crisis today?

6    **A.**    That's correct.

7    **Q.**    And what information do you have or have you seen that

8    supports that conclusion that's your opinion?

9    **A.**    As I mentioned in my report, the dispensing rate, the

10   MME dosage, the number of practitioners who are issuing

11   prescription opioids, have all gone down and that's what I'm

12   basing it on.

13   **Q.**    So, prescribing has decreased?

14   **A.**    Prescribing has decreased.

15   **Q.**    And are you aware of Dr. Alexander's testimony

16   regarding a decrease in drug overdose death rates between

17   2016 and 2019?

18   **A.**    Yes.

19   **Q.**    Okay.  Do you recall what that decrease was

20   approximately?

21   **A.**    I do not.  Sorry.

22   **Q.**    How would you characterize what the current problem is

23   broadly today in Cabell County?

24   **A.**    I believe it is a Substance Use Disorder crisis

25   basically.

1    **Q.**   Okay.  And if we could --

2               MS. MCCLURE:  Your Honor, may I approach with a

3    document?

4               THE COURT:  Yes.

5               MS. MCCLURE:  This is DEF-WV-696.  If I recall --

6               MR. FARRELL:  Judge, before we get started, just

7    to save time, we object to this witness being the vehicle

8    for this document.  This document was written by somebody

9    and sent to someone else, neither of which is the party

10   sitting in the stand today.

11              MS. MCCLURE:  So, Your Honor, Ms. Colston is here

12   testifying as an expert today.  Pursuant to Rule 703 she is

13   entitled to rely on materials that have not been admitted

14   into the record.  There's no question that experts are

15   entitled to rely on hearsay.

16              THE COURT:  Well, that's right.  She relied upon

17   it in forming her opinion and I think she can refer to it,

18   but that doesn't make it admissible.

19              MS. MCCLURE:  And to be clear, I'm not moving

20   admission of this document today.  It's forming the basis.

21   It's going to be used in her testimony as for the

22   information.

23              BY MS. MCCLURE:

24   **Q.**   Ms. Colston, have you seen this letter previously?

25   **A.**   Yes, I have.

1    **Q.**   And did you rely on it in forming your opinions?

2    **A.**   Yes, I did.  Yes, I did.

3    **Q.**   What is the date of this letter?

4    **A.**   October 18th, 2019.

5    **Q.**   And what do you understand this letter to be?

6    **A.**   The letter appears to be in response to several

7    questions by the Chairman of the Committee on Energy and

8    Commerce.

9    **Q.**   Can you turn to the final -- actually, let me tell you

10   the correct page.  The page that has a signature on it,

11   which if you look in those little numbers in the left-hand

12   corner at the very bottom, it ends in 00013.

13   **A.**   Yes, I see that.

14   **Q.**   Who signs this letter?

15   **A.**   Commissioner Christina R. Mullins.

16   **Q.**   And what is she a commissioner of?

17   **A.**   DHHR's Bureau for Behavioral Health.

18   **Q.**   And do you have an understanding as to what that means

19   for Christina Mullins' responsibilities in West Virginia for

20   distribution of federal funds?

21   **A.**   Well, she has a similar role that I had in Florida.

22   She is the -- she has the responsibility for federal

23   substance abuse, and mental health funds, for that matter.

24   **Q.**   Is it your understanding that at the time she authored

25   this letter she was, in fact, the single state authority for

1    West Virginia?

2    **A.**   Yes.  That's my understanding.

3    **Q.**   And can you explain your understanding of why she's

4    writing this letter?

5              MR. FARRELL:  Objection, Your Honor.

6              BY MS. MCCLURE:

7    **Q.**   And I'll direct --

8              MR. FARRELL:  Objection, Your Honor.

9              MS. MCCLURE:  Okay.

10             MR. FARRELL:  Calls for speculation.

11             MS. MCCLURE:  I will rephrase, Your Honor.

12        If you could pull up the letter, Richie, and publish

13   the first page, the very first paragraph at the top.

14             MR. FARRELL:  Objection, Your Honor.  She can rely

15   upon the information in here, but I don't think it's

16   permissible for her just to start reading into the record

17   what the letter says.

18             THE COURT:  Well, I think that's right.  You can

19   use it as a basis to question her, Ms. McClure, but I think

20   I'll sustain the objection to her reading the letter into

21   the record.

22             BY MS. MCCLURE:

23   **Q.**   Ms. Colston, do you have an understanding that this

24   letter is responding to a house -- a congressional inquiry

25   to the single state authority for West Virginia?

```
1              MR. ACKERMAN:  Objection.  Leading.

2              THE COURT:  Sustained.

3              MS. MCCLURE:  A moment, Your Honor.

4         (Pause)

5              BY MS. MCCLURE:

6    Q.   Have you seen letters like this before in your capacity

7    either in Florida or in your consulting capacity where

8    states respond to congressional inquiries?

9    A.   Yes.

10   Q.   What is your understanding of the nature of the

11   congressional inquiry to which Ms. Mullins was responding in

12   her capacity as the single state authority?

13   A.   It appears that Congressman Pallone is asking her about

14   how federal opioid funds are used, distributed, deployed in

15   West Virginia.

16   Q.   And is it your understanding that Commissioner Mullins

17   was writing in her official capacity at the direction of the

18   Cabinet Secretary in West Virginia?

19             MR. FARRELL:  Objection, Your Honor.  I'm not

20   quite sure the basis is in this letter for what the witness

21   just said.

22        I'll remind the Court that this is one of the documents

23   that gives rise to the Energy and Commerce Report which you

24   have excluded and it says on the very first paragraph that

25   this letter was sent by one person to another requesting
```

1    information regarding West Virginia's response to the opioid

2    crisis.  I'm not quite sure what -- where the basis for the

3    testimony is coming from.

4              MS. MCCLURE:  Your Honor, the addressee of the

5    letter, the person to whom it is addressed, is not relevant

6    for inquiry, other than the fact it was a congressional

7    inquiry.  And Ms. Mullins, in her capacity as the single

8    state authority for West Virginia, is providing a statement

9    to Congress on the fact that opioid money remained unspent

10   in -- from -- that West Virginia received and was unable to

11   spend.

12       There's not a problem with the witness's answer that

13   she just gave, I think, which is what his request

14   specifically relates to, is the answer that she provided as

15   to what the letter reveals, and that Ms. Colston relied on

16   this letter in forming her opinion that West Virginia did

17   not spend a significant portion of its federal funds.

18             THE COURT:  Well, you can -- you can ask her that,

19   but I'm not going to let you go into the letter any further

20   than you have, Ms. McClure.  I think the objection is well

21   taken and you can get around it if you can.

22             BY MS. MCCLURE:

23   **Q.**   Ms. Colston, why did you rely on this letter?

24   **A.**   Because it indicated that West Virginia -- it

25   documented that West Virginia did not spend all of its

1    federal funding.

2    **Q.**   Did Ms. Mullins make any statements about positive

3    impacts in this letter that --

4              MR. FARRELL:  Objection, Your Honor.  Same basis.

5    She can ask the witness whether or not West Virginia spent

6    the money and how she knows it, but not read or recite from

7    the letter.

8              THE COURT:  Sustained.  Sustained.  I'll sustain

9    the objection.

10             BY MS. MCCLURE:

11   **Q.**   Ms. Colston, do you have an understanding as to whether

12   West Virginia spent the significant federal funding it

13   received between 2016 and 2019?

14   **A.**   Yes.  According to the information in this letter, they

15   did not spend all of the money that they --

16   **Q.**   Do you have an understanding as to -- I'm sorry.  I

17   didn't mean to cut you off.

18   **A.**   That's all right.

19   **Q.**   Do you have an understanding as to how much money

20   approximately West Virginia had been afforded by federal

21   funding as reflected?

22   **A.**   I believe it was $147 million.  And then Ms. Mullins --

23   I'm trying to remember the percentage.  I probably won't,

24   Your Honor, but it was around $65 or $66 million had been

25   allocated.

1    Q.   And do you have an understanding as to if those numbers

2    are correct that you've just offered, what that amount of

3    unspent federal spending was for opioids out of the $148

4    million?

5    A.   Probably about $80 million.

6    Q.   Did this letter also inform your opinion as to what

7    West Virginia had done with the money that it had spent, the

8    $65 million out of the $148 million?

9    A.   Yes.  I believe --

10   Q.   And is your understanding that West Virginia had

11   deployed some of that money?

12   A.   Yes.

13   Q.   And do you have an understanding as to whether Ms.

14   Mullins characterized that money as helpful --

15             MR. FARRELL:  Objection.

16             BY MS. MCCLURE:

17   Q.   -- to West Virginia's response?

18             MR. FARRELL:  Objection, Your Honor.

19             THE COURT:  I'll sustain the objection, Ms.

20   McClure.

21             BY MS. MCCLURE:

22   Q.   Ms. Colston, do you have an understanding as to how Ms.

23   Mullins characterized the money that had been spent by West

24   Virginia pursuant to the SAPP grant and other grants?

25             MR. FARRELL:  Objection.

```
1              THE COURT:  Sustained.  Sustained.

2              BY MS. MCCLURE:

3    Q.   Ms. Colston, did you find Ms. Mullins' letter -- I'm

4    sorry.  Let me rephrase.

5         Ms. Colston, did you rely on Ms. Mullins' letter in

6    forming your opinions here today?

7    A.   Yes.

8    Q.   Is that -- does that testimony that you relied on, that

9    letter, extend to the impact of the funding that West

10   Virginia had received?

11   A.   Yes.

12   Q.   And what opinions or conclusions were you able to draw

13   in relying on the letter from Ms. Mullins about the impact

14   of the funding that West Virginia received?

15   A.   Well, she -- she basically says for the first --

16              MR. FARRELL:  Objection, Your Honor.

17              THE COURT:  Sustained.

18              BY MS. MCCLURE:

19   Q.   So, without characterizing what Ms. Mullins said, can

20   you explain how this letter impacted your understanding and

21   then formed the basis for your reliance opinions here today?

22   A.   My understanding is that the money was essential to

23   building a treatment infrastructure for West Virginia and

24   increasing access to Opioid Use Disorder services.

25   Q.   Now, you testified a minute ago regarding the
```

1    psychostimulant crisis you believed exists in Cabell County.

2    Did this letter form any basis for your understanding of

3    that crisis?

4    **A.**   Yes, it did.

5    **Q.**   In what way?

6    **A.**   Because Commissioner Mullins was basically advising --

7              MR. FARRELL:  Objection.

8              THE COURT:  Yes.  This --

9              MS. MCCLURE:  Okay.

10             THE COURT:  Sustained.

11             BY MS. MCCLURE:

12   **Q.**   Ms. Colston, did you review Dr. Alexander's expert

13   report and trial testimony in this matter?

14   **A.**   Yes, I did.

15   **Q.**   And at a high level, do you have an understanding as to

16   Dr. Alexander's goal or purpose was in this matter, what he

17   was asked to do?

18   **A.**   Dr. Alexander was asked to provide the State with a

19   plan to mitigate the opioid crisis.

20   **Q.**   And do you have an opinion as to Dr. Alexander's plan

21   in terms of abating the opioid crisis?

22   **A.**   I believe the plan -- excuse me -- lacks important

23   information about existing treatment capacity and prevention

24   capacity in Cabell County and the City of Huntington, West

25   Virginia.

1    **Q.**    Have you conducted needs assessments previously?

2    **A.**    I have reviewed needs assessments.  I do not recall

3    conducting a needs assessment.

4    **Q.**    Have you reviewed the needs assessment to determine

5    whether those assessments are performed with adequate

6    methodology and to achieve the purpose for which they're

7    drafted?

8    **A.**    Yes, I have.

9    **Q.**    And what is the purpose of a needs assessment?

10   **A.**    A needs assessment is a -- is a systematic process to

11   basically determine whether existing capacity meets an

12   identified need.  So, a needs assessment would include

13   looking -- for substance abuse would include looking at

14   prevalence, doing an inventory of existing services and

15   programs, and their capacity, and their funding, and their

16   utilization rate, and -- and identifying the gaps and making

17   recommendations to move forward to address the need.

18   **Q.**    And in your opinion, based on your review of Dr.

19   Alexander's plan, did you see him offer specifics about

20   existing community capacity?

21   **A.**    Dr. Alexander mentioned several programs, but he did

22   not discuss capacity numbers.

23   **Q.**    Okay.  Are you familiar with programs and services in

24   Huntington that provide Substance Use Disorder, for example,

25   to women?

1    **A.**    Yes, I am.

2    **Q.**    Could you provide any information about those?

3    **A.**    Yes.  Project Hope at Marshall University provides

4    services to women.  PROACT, it's an outpatient group,

5    provides services to women.  Hoops Family Services provides

6    support services to women whose children are in the Neonatal

7    Intensive Care Unit.

8         There is -- there are residential programs at Prestera

9    that are women-specific.  There is Recovery Point's HER

10   House.  There are Oxford recovery houses that are specific

11   to women.  And I'm missing some, I'm sure.

12   **Q.**    And did you see Dr. Alexander address the capacity,

13   meaning the utilization rate, or the capacity, the

14   availability of treatment for those particular facilities?

15   **A.**    No.

16   **Q.**    Did Dr. Alexander provide information about the number

17   of people served on a yearly basis?

18   **A.**    No.

19   **Q.**    How about waiting list information and data and

20   evidence about waiting lists?

21   **A.**    No.

22   **Q.**    And would that information be, in your experience,

23   important to have to evaluate the need in a community?

24   **A.**    I don't see how you can evaluate need in a community

25   without it.

1    **Q.**   Okay.  And the programs and services you just listed

2    were ones for women.  Is it your understanding that there

3    are other programs and services for men, for children, for

4    families in the Huntington-Cabell community?

5    **A.**   Yes.  And other special populations, such as

6    justice-involved populations.

7    **Q.**   And did you see any information detail evidence about

8    the number of providers by a specific type of service?

9    **A.**   No.

10   **Q.**   Okay.  Number of persons served per year?

11   **A.**   No.

12   **Q.**   For any of the programs and services?

13   **A.**   No.

14   **Q.**   Utilization rate?

15   **A.**   No.

16   **Q.**   Did you see information about staff -- staff members

17   per service, the ratio of staff members?

18   **A.**   No.

19   **Q.**   Did you see information about payers and how programs

20   are funded?

21   **A.**   No, ma'am.

22   **Q.**   Medicaid claims data?

23   **A.**   No.

24   **Q.**   And would this information that we've just listed off

25   about providers' utilization, et cetera, be important to

1    conduct a needs analysis?

2    **A.**    Yes.

3    **Q.**    Is it your understanding that this type of needs

4    assessment information -- and I'll use needs assessment

5    information to refer broadly to all of those capacity

6    utilization payers, numbers served, et cetera.  Do you

7    understand that?

8    **A.**    Yes, ma'am.

9    **Q.**    Okay.  Is that type of needs assessment information

10   available, to your knowledge, in this record in this case?

11   **A.**    No.

12   **Q.**    And during your time as a federal contractor for

13   SAMHSA, your responsibility included reviewing needs

14   assessments, correct?

15   **A.**    Yeah.  The -- yes.  The needs assessment was a

16   requirement of that.

17   **Q.**    And your time at SAMHSA as a federal contractor

18   required evaluating needs assessments to see if they were

19   sufficient, demonstrated a need?

20   **A.**    Yes.

21   **Q.**    And, to your knowledge, is there a needs assessment for

22   Cabell County and the City of Huntington related to Opioid

23   Use Disorder in this record?

24   **A.**    No.

25   **Q.**    Could you today conduct a needs assessment based on the

```
1    information in this record if you wanted to?

2    A.    No.

3    Q.    Is your opinion that the record contains evidence that

4    there is a full continuum of SUD services and OUD services

5    available to the Huntington-Cabell County community?

6    A.    The record?

7    Q.    Is it your opinion -- let me rephrase that.  Have you

8    seen services and programs that cover the full spectrum of

9    Substance Use Disorder services in Cabell and Huntington

10   today?

11   A.    Yes.

12   Q.    And we're not going to go through in detail each of

13   those programs and services, but is it your understanding

14   that the majority or any of the programs and services that

15   you've seen are funded by Huntington-Cabell County?

16   A.    I believe maybe one is funded by Cabell County and the

17   City of Huntington.

18   Q.    And you're familiar with Dr. Alexander's report?

19   A.    Yes.

20   Q.    Did you see a list of individuals with who he had

21   spoken?

22   A.    I did.

23   Q.    And is it your -- did you see any specific information,

24   evidence or data from those individuals that then later

25   informed his opinion about what he claimed was needed?
```

1    **A.**   No, I didn't.

2    **Q.**   Is it your opinion today that Dr. Alexander's plan does

3    not account for existing programs and services in

4    Cabell-Huntington, their capacity, and how they are funded?

5    **A.**   Correct.  That's correct.

6            MS. MCCLURE:  May I have a moment, Your Honor?

7            THE COURT:  Yes.

8        (Pause)

9            MS. MCCLURE:  Thank you, Your Honor.  No further

10   questions at this time.

11           THE COURT:  All right.  You may cross examine.

12                       **CROSS EXAMINATION**

13           **BY MR. FARRELL:**

14   **Q.**   Good afternoon.  My name is Paul Farrell.  It's nice to

15   meet you.

16   **A.**   Nice to meet you.

17   **Q.**   I have a couple of questions for you.  I've read your

18   report and I've listened to your testimony today.  And so,

19   I'd like to see if I can use my words to fairly encapsulate

20   the scope of your testimony.

21       Is it fair to say that your -- your testimony is that

22   the federal and state governments have spent money abating

23   the opioid epidemic?

24   **A.**   It's my opinion that the federal and state monies have

25   provided funding to -- to respond to the opioid crisis.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   Okay.  And you cite in your report that I believe West

2    Virginia's 2017 Medicaid expenditure for the OUD population

3    totalled over $338 million dollars; is that right?

4    **A.**   Yes.  That is a report by Minot Health.

5    **Q.**   And the Medicaid population is about 25 percent of the

6    State's population, you said?

7    **A.**   Correct.

8    **Q.**   So, if you multiply that out, if 25 percent of the

9    population is -- the state Medicaid is $338 million, would

10   it be fair to say that the OUD population, there's an

11   expenditure of about a billion dollars a year in West

12   Virginia?

13   **A.**   No.  I don't believe that.  I don't believe so.

14   **Q.**   Okay.  So then, let's just stick with the premise.  You

15   are saying that in 2017, West Virginia's Medicaid

16   expenditure was $338 million dollars?

17   **A.**   Well, you have to clarify, sir, what that's for.  The

18   $338 million dollars was for physical and behavioral health

19   and Opioid Use Disorder and Substance Use Disorder services

20   for individuals who were diagnosed with Opioid Use Disorder.

21   It's a little more specific.

22   **Q.**   Yes, ma'am.  And you've also believed that spending

23   money on evidence based healthcare services has been

24   effective in abating the opioid epidemic?

25   **A.**   I believe that evidence based practices are essential

```
 1    to improving health and essential to being able to respond
 2    to drug crises, yes.
 3    Q.   And so, specifically, expending money on evidence based
 4    practices is necessary to abate the opioid epidemic; true?
 5              MS. MCCLURE:  Objection, Your Honor.  Asked and
 6    answered.
 7              THE WITNESS:  I believe I've already --
 8              THE COURT:  Overruled.
 9         You can answer it if you can, Ms. Colston.
10              THE WITNESS:  Okay, thank you.
11         It's a little more specific a question than -- than I
12    think is actually the reality.  The reality is, evidence
13    based practices have -- their very nature is there's some
14    research behind the evidence based practice.
15         If you're referring to medication assisted treatment
16    for Opioid Use Disorders, then I would say medication
17    assisted treatment, Buprenorphine, Methadone, Naltrexone,
18    have scientific evidence of their effectiveness for
19    individuals with Opioid Use Disorder.
20              BY MR. FARRELL:
21    Q.   And so, you would support spending money on those
22    practices to abate the opioid epidemic?
23              MS. MCCLURE:  Objection, Your Honor, to the
24    continued use of the word abatement.
25              THE COURT:  She said she doesn't agree there is an
```

1    epidemic.

2              MR. FARRELL:  Oh.

3              THE COURT:  Isn't that right?

4              THE WITNESS:  That's correct.

5              MR. FARRELL:  Well, let's back up.

6              BY MR. FARRELL:

7    **Q.**   Is there currently an opioid epidemic in the United

8    States?

9    **A.**   I believe there is a broader Substance Use Disorder

10   problem in the United States and that it shifts from drug to

11   drug.  So, today it may be psychostimulants, which it

12   appears to be, as opposed to opioids.

13        And -- and to clarify, today, many individuals and most

14   individuals use more than one substance.  So -- so, pointing

15   a finger at any one of those substances is not quite what I

16   think is accurate.

17   **Q.**   Okay.  So, let me see if I can tease this out a little

18   bit.  You spent your professional career approving grants

19   for substance abuse, correct?

20   **A.**   Approving grants?  I have spent my years doing a lot

21   with grants relating to substance abuse, monitoring them,

22   approving them, utilizing them as a provider.

23   **Q.**   So, the answer is yes?

24   **A.**   The answer is yes.

25   **Q.**   Okay.  So --

1    **A.**    A little broader an answer to that question.

2    **Q.**    In that time frame --

3            MS. MCCLURE:  Your Honor, I would just request

4    that the witness be permitted to finish her answer prior to

5    Mr. Farrell asking questions.

6            THE COURT:  Yeah.  You're a little too eager to

7    get on with it here, Mr. Farrell.  Give her a chance to

8    explain her answer.

9            MR. FARRELL:  Well, it is the last witness on the

10   last day of the last trial.  So, yes, I am eager.

11           BY MR. FARRELL:

12   **Q.**    But I apologize for over-speaking you.

13   **A.**    That's all right.

14   **Q.**    So, let's back up.  Do you acknowledge that at some

15   point there have been declarations that the United States is

16   suffering from an opioid epidemic?

17   **A.**    Yes.

18   **Q.**    And you're aware that there -- that there is a current

19   body of medical literature that supports the idea that there

20   is presently an opioid epidemic in the United States?

21   **A.**    I'm not aware of current research that indicates we are

22   still experiencing an epidemic.  I am aware of research that

23   indicates it's a polysubstance abuse crisis that we suffer

24   and a broad Substance Use Disorder.

25   **Q.**    So, when you say poly, poly is a fancy word for many,

1    correct?

2    **A.**   Yes, it is.

3    **Q.**   And one of those many would be opioids?

4    **A.**   Correct.  And psychostimulants.

5    **Q.**   Okay, psychostimulants.  But this case is about

6    opioids.  So, what I'm asking you is, is whether or not you

7    believe that there is a significant public health crisis in

8    Huntington, Cabell County, West Virginia which includes the

9    use and abuse of opioids?

10   **A.**   It includes the use and abuse of many drugs, sir.

11   **Q.**   Yes.  I'm aware of your testimony and I'm asking you

12   whether or not --

13   **A.**   Yes.  Opioids would be one of those many.

14   **Q.**   Yes, thank you.

15   **A.**   If that's the question.

16   **Q.**   Thank you.

17         Now, you believe that money is needed in the future to

18   provide healthcare services to those suffering from

19   Substance Use Disorder to abate the epidemic; true?

20   **A.**   I'm sorry.  That was a very long question.

21         MS. MCCLURE:  Your Honor, I would just lodge a

22   continuing objection to the continued use of the word

23   abatement, as opposed -- she has corrected every question --

24         THE COURT:  Is that your objection, too, Ms.

25   Hardin?

1            MS. HARDIN:  Yes, sir.

2            MR. FARRELL:  Well, to be fair, Judge, I believe

3    the transcript -- the witness was literally asked and used

4    the word abatement during direct testimony, but I'd be

5    willing to substitute the word abatement for some other

6    synonym if that helps.

7            THE COURT:  Well, we've talked a lot about

8    abatement for weeks.  I'm going to let you go ahead and ask

9    her about it using the word abatement.

10           MR. FARRELL:  Okay.

11           THE COURT:  And we'll -- but give her a chance to

12   explain her answer.

13           MR. FARRELL:  Yes, sir.

14           THE COURT:  She may not agree with you.

15           BY MR. FARRELL:

16   **Q.**  So, and I believe that in Footnote 3 on Page 3 of your

17   report you make reference to the legal term abatement, which

18   isn't something in your field; is that right?

19   **A.**  Correct.

20   **Q.**  And, instead --

21           MS. MCCLURE:  Your Honor, I request that if Mr.

22   Farrell is going to inquire about things that she said in

23   her report that he provide her with a copy of her -- of her

24   report.

25           THE COURT:  Do you have a copy of her report you

```
 1    could give her, Mr. Farrell?

 2                MR. FARRELL:  I do, but I don't really intend to

 3    spend any time on it.

 4                THE COURT:  Okay.  If you need to refer to your

 5    report, tell us, and we'll get it for you.  Otherwise, we're

 6    going to let him go ahead.

 7                THE WITNESS:  Okay, thank you.

 8                BY MR. FARRELL:

 9    Q.   I think what you had said was that you would rather

10    call them response programs; is that fair?

11    A.   Yes.

12    Q.   All right.  So, I'm going to start using response

13    programs instead.

14    A.   Okay.

15    Q.   Do you believe that spending money on evidence based

16    response programs is effective in abating whatever opioid

17    epidemic presently exists in Huntington-Cabell County, West

18    Virginia?

19    A.   I believe that response programs which address any drug

20    being abused in Cabell County should use evidence based

21    practices.  It is not specific to opioid.  Evidence based

22    practices are essential for individuals to improve.

23    Q.   And so, you believe -- do you believe that more money

24    in the future is needed to fund these programs?

25    A.   What programs?
```

1    **Q.**   The programs that we've been talking about all morning?

2    **A.**   Response programs?

3    **Q.**   Yes.

4    **A.**   I'm not sure I do.  I think you have to do a needs

5    assessment and understand what the existing capacity is and

6    determine where your gaps in services are.  So, I guess I

7    would not agree with that statement just wholesale.

8         You've got to know what you have before you allocate

9    resources.  How do you -- how do you allocate resources

10   without knowing what is currently in place and whether

11   they're full, or whether they're empty, or whether they have

12   a waiting list, for example?  Does that make sense?

13   **Q.**   Yes, ma'am.

14   **A.**   All righty.

15   **Q.**   So, let me ask you this.  Will you agree that there

16   currently exists a substance abuse epidemic in the United

17   States?

18   **A.**   In the United States?

19   **Q.**   Yes.

20   **A.**   An epidemic?

21   **Q.**   Yes.

22   **A.**   No.  I think a series of crises that shift from drug to

23   drug.

24   **Q.**   Is there a substance use epidemic in West Virginia

25   presently?

1    **A.**    I think that there is a substance use -- a series of

2    crises in West Virginia that have occurred over many years,

3    actually.

4    **Q.**    Yes, ma'am.  And what about in Huntington, Cabell

5    County, West Virginia, is there a substance use crisis going

6    on in Huntington-Cabell county, West Virginia?

7    **A.**    Yes, I believe there is.

8    **Q.**    And is -- and opioids are a component of that substance

9    use crisis, correct?

10    **A.**    One of several, yes.

11    **Q.**    Very good.  Do you believe that the substance use

12    crisis in Huntington-Cabell County, West Virginia

13    significantly interferes with the public health?

14    **A.**    I think it -- oh.

15            MS. HARDIN:  I'm just going to note an objection

16    for the record, Your Honor, to the extent that that calls

17    for a legal conclusion.

18            THE COURT:  Overruled.  I don't think it does.

19            THE WITNESS:  Could you repeat the question?  I'm

20    sorry.

21            MR. FARRELL:  Yes.

22            BY MR. FARRELL:

23    **Q.**    Do you believe that the opioid crisis in

24    Huntington-Cabell County, West Virginia significantly

25    interferes with the public health?

1    **A.**   Well, I -- I think I've stated several times I don't

2    believe there is a -- a single drug crisis, whether it's

3    opioid or anything else in Cabell County.  I believe there

4    are several drugs that are being used and it's more a

5    polysubstance issue.  There are several drugs that are being

6    used and, frankly, being used -- if you look at the overdose

7    data that we provided earlier, it's clear.  It's illicit

8    fentanyl that is the primary opioid that is the issue now.

9    It is also methamphetamine.  It is also psych -- other

10   psychostimulants.  So --

11   **Q.**   So, let me rephrase it.  Do you believe that the

12   polysubstance abuse that's going on in Huntington-Cabell

13   County significantly interferes with the public health?

14   **A.**   I believe it interferes with the public health,

15   absolutely.

16   **Q.**   Now, at some point in time, do you believe there was an

17   opioid epidemic in the United States?

18   **A.**   I believe -- as I mentioned earlier -- I believe I've

19   answered this.  I believe that there have been a series of

20   shifting drug crises throughout this country for many, many

21   decades and they shift from one drug to the other.

22        There have been at least five heroin crises that I can

23   think of off the top of my head.  There have been

24   methamphetamine crises prior to the current one.  There

25   certainly has been an opioid crisis as one of the

1    classifications of drugs.  So, many, many drugs involved.

2    **Q.**    Okay.  So, my understanding from your report is that

3    whenever that opioid crisis shift -- whatever time frame it

4    lasted, your primary criticism of the plaintiffs is one that

5    we are asserting a single causal argument.  Do you recognize

6    that terminology?

7    **A.**    Now, are you referring to my report?  Because I'm not

8    here to offer any opinions about causation.

9    **Q.**    Yes, ma'am.  I understand.  In your report, you do,

10   though, do you not?

11   **A.**    In my report, I talk about that, but that's not what

12   I'm here today to discuss.

13   **Q.**    Yes, ma'am.  So, I have a question to ask.

14   **A.**    Yes, sir.

15   **Q.**    Is it fair to say that you believe that oversupply is

16   not the causal factor of the opioid epidemic?

17              MS. MCCLURE:  Your Honor, I would just note that

18   Ms. Colston has been clear about what she's offered here

19   today to do and what she's not offered here today to do.

20   So, I would just object on the basis of scope at this point.

21              THE COURT:  Well, I'll let her answer that

22   question, but --

23              MR. FARRELL:  We won't go far afield with this,

24   Judge.

25              THE COURT:  I'm sorry?

1          MR. FARRELL:  I said we will not go far afield

2    with this subject.

3          THE COURT:  Okay.  If you can answer the question,

4    do so.

5          THE WITNESS:  Would you repeat the question?

6    Sorry.

7          BY MR. FARRELL:

8    **Q.**   Yes, ma'am.  My understanding is that you take the

9    position that oversupply of prescription opioids is not the

10   causal factor of the opioid epidemic, but is only a causal

11   factor?

12   **A.**   That's correct.

13         MR. FARRELL:  I have no further questions, Judge.

14   Thank you.

15         THE COURT:  Do you have any redirect, Ms. McClure?

16         MS. KEARSE:  I have a couple of questions, Your

17   Honor.

18         THE COURT:  Oh, okay.  Ms. Kearse.

19                    **CROSS EXAMINATION**

20         **BY MS. KEARSE:**

21   **Q.**   Good afternoon, Dr. Colston.  Just a couple of

22   questions I want to follow up with on what you testified

23   about today and specifically to follow up on Mr. Farrell,

24   some of his questions there, too, but you obviously

25   mentioned you read documents about Cabell County, City of

1    Huntington, and you read testimony, as well, correct?

2    **A.**   I've read hundreds of pieces of information about

3    Cabell County.

4    **Q.**   Okay.  So, you're well aware that at least the

5    testimony has revealed over a thousand Cabell County

6    residents have died from an opioid-related overdose?

7    **A.**   During what period of time?

8    **Q.**   From 2001 to 2018?  Are you aware of that testimony?

9    **A.**   I -- I believe that -- is that Mr. Hunter?  I'm not

10    real sure.

11    **Q.**   Dr. Smith?

12    **A.**   I beg your pardon?

13    **Q.**   Dr. Smith?  Never heard of him?  Okay.  Dr. Smith?

14    **A.**   I'm aware of that statistic.

15    **Q.**   And you've read about the thousands of overdose calls

16    that the City and County employees have answered?

17    **A.**   Yes.

18    **Q.**   Okay.  And you've read and heard testimony about the

19    thousands of deployments of naloxone that has been

20    administered in Cabell County; is that correct?

21    **A.**   Yes.

22    **Q.**   And naloxone, as the Court has heard, is a treatment

23    for someone that overdoses from opioids; is that correct?

24    **A.**   Yes.

25    **Q.**   Okay.  And naloxone is still present between the Fire

1    Department, the Health Department, the schools and the

2    police all are equipped with naloxone?

3    **A.**    Well, I believe -- I believe that's accurate.  I don't

4    recall the details, but I also know that the Cabell County

5    -- Huntington Health Department restricted access to syringe

6    services.  So, there's -- there's been some restriction of

7    the availability, but I'm not -- I'm sorry.  I don't

8    remember if that's naloxone.

9    **Q.**    And that --

10             MS. MCCLURE:  Your Honor, again, if we can let the

11   witness finish.

12             THE WITNESS:  Okay.

13             THE COURT:  Yeah.  Let her finish her answer.

14             MS. MCCLURE:  Thank you.

15             BY MS. KEARSE:

16   **Q.**    Do you know specifics about why there was a

17   restriction?

18   **A.**    Yes.  I believe I do.

19   **Q.**    Because -- okay.  Restricted to Cabell County

20   residents; is that fair?

21   **A.**    Yes.

22   **Q.**    Okay.  And you --

23   **A.**    I'm sorry.  Would you tell me who you are?  You didn't

24   introduce yourself.

25   **Q.**    Okay.  I'm sorry.  I'm Anne Kearse.  I'm one of the

```
 1    attorneys here that represents the City of Huntington.  I

 2    apologize for that.

 3  A.    That's okay.

 4  Q.    We have not previously met.

 5        Okay.  And a couple other questions on the funds in

 6    regards to the opioid crisis and I want to be clear on a

 7    couple of things.  The opioid crisis as it exists today, to

 8    the extent it exists, does it still have an impact on the

 9    community and City of Huntington and Cabell County?

10  A.    Well, it depends on how you define the opioid crisis,

11    number one.  I believe we probably have a different way of

12    defining it.  It is an illicit fentanyl crisis and it is a

13    methamphetamine crisis and, sometimes, they are used

14    together and cause overdoses.  So, that premise, I probably

15    disagree with.

16  Q.    Okay.  Well, let me ask you this, Doctor.  You

17    mentioned Dr. Mullins, who is the Commissioner of Bureau of

18    Health; is that correct?

19  A.    Uh-huh.

20  Q.    Did you read her deposition that was given in this

21    case?

22  A.    Yes.

23  Q.    Okay.  It's listed among your reliance materials; is

24    that correct?

25  A.    Yes.  I think so.
```

1   **Q.**   And do you know Dr. Mullins' testimony was taken after

2   some of the things you just discussed today about what you

3   relied on in regards to Dr. Mullins?  It was taken --

4   **A.**   Probably.  It probably was.

5   **Q.**   Okay.  Well, do you have any reason to disagree that

6   Dr. Mullins testified that the -- there was a lot to still

7   do in regards to the opioid crisis in Cabell County and City

8   of Huntington?

9              THE COURT:  Ms. Hardin?

10             MS. HARDIN:  Objection, Your Honor.  She cannot

11   use this witness to get Ms. Mullins' testimony into the

12   record, particularly when there were such vociferous

13   objections to us using a letter that Ms. Mullins had signed.

14   So, we object to this line of questioning.

15             MS. KEARSE:  I'm just asking her if she recalls as

16   to the testimony --

17             MS. MCCLURE:  Your Honor, I join that objection,

18   especially in light of the fact that we were prevented from

19   doing the same.

20             THE COURT:  Just a minute.

21        I'm going to sustain the objection, Ms. Kearse.

22             BY MS. KEARSE:

23   **Q.**   Doctor, in regards to the grants and funding that is

24   available to various cities and counties in regards to -- to

25   the opioid addiction and other substance use addictions, is

1    there any guarantee that the state and federal governments

2    will provide additional funding in the future?

3    **A.**   Well, they certainly have increased funding for several

4    years and, if you look at President Biden's 2022 budget, he

5    increases it by over a billion dollars.  So, I have no

6    reason to doubt that that funding very well may continue.

7    **Q.**   Do you recall your testimony in this case, and I can

8    show it to you if you want to, that you had no clue of the

9    future, what the future holds?

10   **A.**   Correct.  Correct.  I remember that.

11            MS. KEARSE:  Okay.  No further questions.

12            THE WITNESS:  Okay.

13            MS. MCCLURE:  Your Honor, a moment.

14       (Pause)

15                     **REDIRECT EXAMINATION**

16            **BY MS. MCCLURE:**

17   **Q.**   Ms. Colston, very briefly, picking up on a line of

18   questioning you were just asked.  As -- as an overall trend,

19   is it your opinion that the federal government is making it

20   easier for people with OUD to receive services, programs and

21   medication for SUD and OUD?

22            MR. ACKERMAN:  Objection to the leading, Your

23   Honor.

24            THE COURT:  Well --

25            MS. MCCLURE:  Your Honor, I'll rephrase.

1          BY MS. MCCLURE:

2     **Q.**   Ms. Colston, do you have an opinion as to whether the

3     federal government is making any changes that address and

4     affect the ability of individuals with OUD and SUD to

5     receive treatment funding and services?

6     **A.**   Yes.  The federal government -- the federal government

7     funding has substantially increased access to services with

8     its hundreds of millions of dollars of funding.

9     **Q.**   And is it your opinion based on your expertise and

10    years of work in this field that that trajectory is likely

11    to continue in the future?

12    **A.**   Yes.

13    **Q.**   And what do you base that opinion on?

14    **A.**   I base that opinion on the increase in state opioid

15    response grant money, the increase in substance abuse

16    prevention and treatment grant money, and the fact that the

17    President of the United States just introduced a budget that

18    has an additional substantial increase in funding.

19    **Q.**   And is that opinion also informed by West Virginia's

20    grant of the 1115 waiver for Medicaid?

21    **A.**   Yes, it is.  Yes, it is.

22    **Q.**   Ms. Colston, are the opinions you've offered here today

23    to a reasonable degree of professional certainty?

24    **A.**   Yes, they are.

25              MS. MCCLURE:  I have no further questions, Your

1    Honor.

2              THE COURT:  Anything else, Mr. Farrell or Ms.

3    Kearse?

4              MR. FARRELL:  No, Your Honor.

5              THE COURT:  You can step down, ma'am, and thank

6    you very much.  You're free to go.

7              THE WITNESS:  Thank you.

8              THE COURT:  Thank you, Ms. Colston.

9              THE WITNESS:  Thank you, sir.

10             MR. HESTER:  Good afternoon, Your Honor.

11             THE COURT:  Good afternoon, Mr. Hester.

12             MR. HESTER:  The defense has no further witnesses

13   to call, but we do have a few housekeeping matters before we

14   close our record.

15        The first is that we have three settlement agreements

16   that we wanted to move into evidence.  These are settlement

17   agreements between each of the defendants and the State of

18   West Virginia.

19        We also want to move into evidence three final

20   judgments in relation to those matters that underlie the --

21   or relate to the settlement agreements.  And we've raised

22   this with the plaintiffs and they have no objection.

23        The three settlement agreements are DEF-WV-2150,

24   DEF-WV-2151, DEF-WV-2152.  And the three final judgments are

25   DEF-WV-3854, DEF-WV-3855 and DEF-WV-3856.

```
1              THE COURT:  What's the relevance of these, Mr.

2    Hester?

3              MR. HESTER:  Your Honor, as the Court will recall

4    before trial, we had moved for summary judgment on the basis

5    of res judicata based on these settlement agreements and we

6    understand there's a rule in the Fourth Circuit that summary

7    judgment rulings are not preserved for appeal unless there's

8    evidence presented in the record in relation to those

9    motions.  So, we're simply preserving our record on these

10   points, Your Honor.

11             THE COURT:  Well, you sure did answer my question,

12   Mr. Hester.

13             MR. HESTER:  Well, it -- we understand the Court's

14   ruling, but we wanted to preserve our record on this.

15             THE COURT:  And I understand there's no objection

16   to any of that?

17             MR. MAJESTRO:  Yes, Your Honor.  We don't object

18   to the authenticity of those documents for the reasons we've

19   stated in our briefing in response to summary judgment

20   motions.  We don't -- the underlying basis that they're

21   being offered doesn't -- isn't applicable in this case and

22   -- without re-stating all of those arguments, but we don't

23   have any objection to inputting those into the evidentiary

24   record subject to our objections on the relevance.

25             MR. HESTER:  May I approach, Your Honor?
```

```
 1              THE COURT:  Yes, you may.

 2              MR. HESTER:  And then, Your Honor, in addition, we

 3     have filed a memorandum with the Court today.  It's a trial

 4     memorandum in relation to judicial admissions that are found

 5     in the plaintiffs' complaints.  And so, we want to move

 6     orally for the admission into the record of the judicial

 7     admissions that are covered by this trial memorandum, which

 8     we have filed within the past hour with the Court.

 9              THE COURT:  Is there any objection to this?

10              MR. FARRELL:  Yes, Your Honor, there is.  I'm sure

11     there's a whole bunch of reasons, but the main thing is, is

12     that they could file a motion for summary judgment.  They

13     could have filed 12(b)(6).  The complaint is in the record,

14     but I'm not quite sure that this is the proper vehicle to

15     begin putting in judicial admissions by parties at the end

16     of the day.

17              THE COURT:  Well, shouldn't I read the document

18     and then decide whether to admit it or not, Mr. Farrell?  I

19     mean, I'm kind of in the dark here.

20              MR. FARRELL:  Yeah.  Judge, I would recommend that

21     you read it first and then make a decision afterwards and

22     perhaps allow us to file a responsive brief.

23              MR. ACKERMAN:  To piggyback on Mr. Farrell, not

24     only should you read it, I would like the opportunity to

25     read it, as well, and respond on behalf of my client.
```

```
 1            THE COURT:  Well, you can read it and file
 2   anything you want to in response and I'll read whatever you
 3   give me and make a decision.
 4            MR. HESTER:  And simply to explain it, Your Honor,
 5   just so that -- so that you understand at least why we're
 6   doing this, our view is that these are judicial admissions.
 7   They're admissions from the plaintiffs' complaint in this
 8   matter, but we understood that, as a matter of evidence,
 9   they need to be in the record and this is why we're
10   submitting them and moving for their admission before the
11   close of our evidence.
12            THE COURT:  All right.
13            MR. HESTER:  So, if I may approach, Your Honor?
14            THE COURT:  Yes.
15            MR. FARRELL:  Judge, I would simply make -- or for
16   the record -- that the complaint that we filed are
17   allegations and that it's not a verified complaint in
18   federal court.  So, I'm still -- I've been practicing
19   20-some years and I've never experienced this.  So, I will
20   withhold judgment until we get the chance to file responses.
21            THE COURT:  Well, I'm going to reserve my ruling
22   on this until I read the paper.
23            MR. HESTER:  Thank you, Your Honor.
24            THE COURT:  And whatever is offered in response.
25            MR. HESTER:  And I think we have some deposition
```

1    designations to address.  Thank you, Your Honor.

2              MS. MAINIGI:  Good afternoon, Your Honor.

3              THE COURT:  Good afternoon, Ms. Mainigi.

4              MS. MAINIGI:  I think we have several deposition

5    designations that the parties are still working through, in

6    addition to the issues that Mr. Hester raised.

7         So, June Howard is ready to pass up.  And then there

8    are five other deposition designations that we're still in

9    the process of working through.  So, if we can keep the

10   record open until those get completed, that would be quite

11   helpful, Your Honor, since we are ending a little earlier

12   than expected.

13        Those five, for the purpose of the record, are Darren

14   Cox, Robert Knittle, Michael Mapes, the Cabell County

15   30(b)(6) witness and Gilberto Quintero.

16             MR. FARRELL:  Judge, can I -- we would like to

17   have an opportunity to respond.  These witnesses aren't

18   unavailable.  And so, I'm not quite sure of the propriety of

19   just putting into the record depositions, but to that

20   extent, we'll work with counsel on it.

21             THE COURT:  Well, I thought you had agreed that --

22   to do this.  Are these --

23             MS. MAINIGI:  I think we're going back and forth,

24   Your Honor, on the actual designations, but these are

25   witnesses, to our knowledge, that are unavailable.

1          Mr. Mapes, for example, is formerly with the DEA.  Mr.

2     Quintero is a former Cardinal employee that is no longer

3     under our control.  June Howard is DEA.

4          And with respect to the others --

5               MR. WICHT:  The others are -- they're outside the

6     subpoena power of this Court, Your Honor.  Their depositions

7     were taken in discovery outside of the subpoena power.

8               THE COURT:  And they're unavailable, right?

9               MR. FARRELL:  Judge, Beth Thompson lives 40 miles

10    to the west of here.  That's within the jurisdiction of the

11    court.  She lives in Huntington, West Virginia.

12              MS. WICHT:  She was deposed, Your Honor, as a

13    30(b)(6) witness for Cabell County and that's what we're

14    introducing, which is a statement of a party opponent.

15              MR. FARRELL:  Your Honor --

16              MR. WICHT:  Or against the party.

17              MR. IRPINO:  Anthony Irpino on behalf of Cabell

18    County.  We are in the process of working through these with

19    the defendants.  The five listed outside of Ms. Howard are

20    the ones that we are working through.

21         Three of those, including Beth Thompson, we received

22    notice of yesterday.  The normal process takes over a week.

23    We usually get them on Mondays; then we respond by

24    Wednesday; then they respond by Friday and we go through a

25    process.

```
 1          So, three of them, we're still in the early stage of,

 2     one of which Mr. Farrell referenced.  The other two were at

 3     the end of that process and should be ready for submission

 4     shortly.

 5              THE COURT:  Well, work it out if you can and, if

 6     you can't, then you're going to have to find a way to submit

 7     the issue to me with enough -- what I need to know about

 8     whether they're available or not and so forth so I can make

 9     a ruling.

10              MS. MAINIGI:  Yes, Your Honor.  We can certainly

11     do that.  And I think subject to -- subject to these

12     deposition designations and the issues raised by Mr. Hester,

13     Your Honor, certainly on behalf of Cardinal, we rest.

14              THE COURT:  All right.

15              MR. HESTER:  Yes.  And the same on behalf of

16     McKesson, Your Honor.  We rest subject to resolving these

17     remaining issues on the depositions.

18              THE COURT:  Mr. Nicholas?

19              MR. NICHOLAS:  As do we on behalf of

20     AmerisourceBergen.

21              THE COURT:  All right.  So, subject to these few

22     loose ends, we're done with the evidence; is that right?

23              MR. FARRELL:  Judge, for rebuttal, we would like

24     to call -- no, I'm --

25          (Laughter)
```

```
 1              THE COURT:  That was my next question, Mr.

 2     Farrell, whether you had any rebuttal or not?

 3              MR. FARRELL:  We do not, Judge.

 4              THE COURT:  Okay.

 5              MR. HESTER:  Yes, Your Honor.

 6              MS. MAINIGI:  That's correct, Your Honor.

 7              THE COURT:  Does that take care of everything?

 8              MR. HESTER:  Takes care of the evidence, Your

 9     Honor.  Thank you.

10              THE COURT:  Except for closing arguments and set

11     aside and allotted, what, six hours a side?

12              MS. MAINIGI:  Yes, Your Honor.

13              THE COURT:  Is that what we did?  In a foolish

14     moment, did I do that?

15              MS. MAINIGI:  A weak moment, Your Honor.

16              THE COURT:  And I am looking forward to hearing

17     the arguments and I'll probably have a few questions as we

18     go along, but I'm more interested in your interpretation of

19     the evidence.  But I'll reserve the right to ask some

20     questions as we go along, if I feel the need to do that.

21          Anything else before we adjourn until the closing

22     arguments?

23              MR. MAJESTRO:  Your Honor, I -- on behalf of the

24     plaintiff, we would like to thank the Court and the court

25     staff for all the patience they've shown us over these
```

1    weeks.

2              MS. MAINIGI:  We absolutely concur, Your Honor.  I

3    think there's been an incredible amount of patience and

4    goodwill that has been displayed by all of the court staff

5    and we're quite grateful.

6              MR. HESTER:  And, Your Honor, we appreciate all

7    the courtesy that the Court has shown to all the parties and

8    all of the court staff.  It's been -- it's been a pleasure

9    to be appearing before you.

10             THE COURT:  Mr. Nicholas, you have to say

11   something, too.

12             MR. NICHOLAS:  I guess I do.  It's pretty

13   impressive.  It's been a really long trial and it's been

14   pretty amazing.  So, thank you very much.

15             THE COURT:  Well, I appreciate that and I have my

16   law clerks and my courtroom deputy to thank for keeping me

17   under control.

18        And I will say this.  I have had a lot of good lawyers

19   in my court in 30 years on my bench, but I don't think I've

20   ever had this many in one case at the same time and I -- I

21   appreciate the work that all of you have done and I look

22   forward to the arguments.  See you then.

23             SIMULTANEOUS SPEAKERS:  Thank you, Your Honor.

24        (Trial recessed at 2:44 p.m.)

25

```
 1

 2

 3

 4

 5    CERTIFICATION:

 6              I, Ayme A. Cochran, Official Court

 7    Reporter, and I, Lisa A. Cook, Official Court Reporter,

 8    certify that the foregoing is a correct transcript from

 9    the record of proceedings in the matter of The City of

10    Huntington, et al., Plaintiffs vs. AmerisourceBergen

11    Drug Corporation, et al., Defendants, Civil Action No.

12    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

13    reported on July 12, 2021.

14

15         S\Ayme A. Cochran              s\Lisa A. Cook

16           Reporter                       Reporter

17       _

18

19         July 12, 2021

20           Date

21

22

23

24

25
```

## $

**$1,061,849,848.00** [1] - 47:1
**$1,705,896,182** [1] - 52:10
**$1,934,188.00** [1] - 26:5
**$100,000.00** [1] - 23:18
**$111,910,346.00** [1] - 46:15
**$131,358.00** [1] - 25:1
**$136,520.00** [1] - 25:7
**$147** [1] - 133:22
**$148** [2] - 134:3, 134:8
**$15** [2] - 34:9, 35:5
**$17** [2] - 34:10, 35:6
**$179,853,566.00** [1] - 46:11
**$183,137,911.00** [1] - 46:15
**$188,948,971.00** [1] - 45:18
**$19** [1] - 41:4
**$19,554,622.00** [1] - 41:4
**$2,050,815,634.00** [1] - 38:9
**$2,070,708.00** [1] - 26:11
**$2,170,708.00** [1] - 26:13
**$2,544,446,548** [1] - 40:10
**$2,544,446,548.00** [1] - 40:19
**$23,723,709.00** [1] - 42:14
**$236,520.00** [1] - 25:12
**$25,734,792.00** [1] - 46:21
**$301,000** [1] - 27:23
**$301,000.00** [1] - 27:4
**$338** [4] - 143:3, 143:9, 143:16, 143:18
**$338,000** [1] - 27:20
**$345,671,523.00** [1] - 38:14
**$350** [1] - 74:22
**$350,000** [2] - 28:2, 28:9
**$350,000.00** [1] - 27:8
**$371,953,917.00** [1] - 46:10
**$41,843,310.00** [1] - 46:20
**$43** [1] - 97:4

**$43,000** [2] - 27:1, 27:14
**$43,000.00** [2] - 26:22, 27:18
**$43,283,331.00** [1] - 42:9
**$48** [1] - 42:13
**$48,720,555** [1] - 40:9
**$48,720,555.00** [1] - 38:7
**$5,162.00** [1] - 24:23
**$5,437,224.00** [1] - 41:22
**$500,000** [1] - 35:14
**$600,000** [2] - 35:15, 35:16
**$65** [2] - 133:24, 134:8
**$66** [1] - 133:24
**$750** [1] - 74:23
**$80** [1] - 134:5
**$800** [1] - 45:9
**$83,000.00** [1] - 27:11
**$971** [1] - 44:5
**$971,357,386.00** [2] - 43:23, 45:14
**$99,238,834.00** [1] - 38:11

## '

**'03** [1] - 69:18
**'19** [2] - 81:11, 97:3
**'20** [1] - 85:17
**'21** [1] - 85:17
**'22** [1] - 47:23
**'60s** [1] - 106:14
**'70s** [1] - 106:15
**'80s** [1] - 106:15
**'82** [1] - 12:9
**'84** [1] - 60:3
**'85** [2] - 60:4, 61:4
**'88** [1] - 61:5

## 0

**000010** [1] - 93:15
**00013** [1] - 129:12
**00907** [2] - 2:5, 2:14

## 1

**1** [5] - 37:6, 38:6, 42:6, 51:2, 58:8
**1,000,061** [1] - 54:8
**1,061,849** [2] - 54:5, 54:13
**1,089** [1] - 49:22
**1,705,896** [2] - 53:9, 54:5
**1,706,896** [1] - 54:8

**1,831** [1] - 49:22
**1.7** [2] - 54:25, 55:6
**1.8** [2] - 81:9, 101:24
**10** [9] - 93:11, 93:16, 93:21, 101:6, 101:9, 101:10, 102:21, 114:3, 119:11
**100** [1] - 103:4
**1001** [2] - 4:6, 4:9
**1022** [1] - 3:5
**10:00** [1] - 50:18
**10:15** [1] - 50:20
**11** [1] - 120:23
**1115** [28] - 73:11, 77:11, 105:19, 105:20, 109:20, 109:23, 110:3, 110:4, 110:13, 111:6, 111:15, 111:22, 112:8, 112:17, 113:11, 113:13, 114:25, 115:3, 115:25, 116:16, 116:19, 116:21, 116:23, 117:12, 117:17, 117:24, 118:4, 160:20
**11:58** [1] - 124:4
**12** [7] - 1:19, 7:4, 67:8, 78:9, 88:20, 170:13, 170:19
**12(b)(6)** [1] - 163:13
**126** [1] - 3:5
**13** [2] - 85:19, 85:25
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**137** [1] - 49:12
**13th** [1] - 92:15
**14** [1] - 94:1
**15** [4] - 48:14, 50:5, 50:15, 82:22
**15-minute** [1] - 50:11
**15-year** [2] - 50:3, 50:6
**15910** [1] - 3:15
**16** [1] - 107:15
**1600** [1] - 3:15
**1717** [2] - 6:6, 6:13
**18** [1] - 119:5
**182** [1] - 49:11
**18th** [1] - 129:4
**19** [1] - 72:7
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1965** [1] - 106:7
**1978** [1] - 9:1
**1981** [3] - 9:5, 9:18, 10:8
**1982** [7] - 12:11, 59:5, 62:3, 62:4, 62:10,

86:14
**1983** [1] - 12:9
**1984** [2] - 59:5, 60:2
**1985** [6] - 8:6, 10:17, 12:14, 16:3, 61:3, 62:20
**1988** [3] - 61:3, 62:4, 62:16
**1991** [3] - 64:5, 65:8, 67:7
**1992** [1] - 12:11
**1998** [1] - 62:3
**1A** [1] - 37:7
**1st** [1] - 121:16

## 2

**2** [16] - 29:5, 32:14, 37:7, 38:8, 38:19, 38:20, 38:22, 39:8, 39:18, 40:11, 40:14, 40:21, 52:4, 53:11, 58:24, 71:8
**2.13** [2] - 20:16, 51:4
**2.5** [2] - 36:8, 36:16
**20** [4] - 84:6, 98:18, 103:7, 120:3
**20-some** [1] - 164:19
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21, 5:5
**2001** [1] - 155:8
**2003** [6] - 65:8, 67:7, 67:13, 67:19, 68:3, 69:1
**2004** [1] - 70:1
**2005** [5] - 68:3, 69:1, 69:18, 71:10, 72:24
**2007** [2] - 9:9, 12:19
**2008** [2] - 12:23, 13:1
**2012** [1] - 72:24
**2013** [10] - 29:17, 30:20, 31:16, 32:19, 57:22, 73:3, 73:9, 73:22, 74:3, 104:3
**2014** [2] - 13:25, 103:3
**2015** [2] - 109:20, 125:17
**2016** [4] - 103:3, 113:12, 127:17, 133:13
**2017** [14] - 8:10, 8:11, 49:8, 49:9, 49:11, 49:22, 88:16, 94:15, 104:9, 104:10, 113:15, 143:2, 143:15
**2017-2019** [2] - 49:18, 49:21

**2018** [19] - 13:1, 44:18, 45:16, 47:17, 48:1, 49:9, 49:11, 49:22, 88:16, 94:15, 96:20, 97:1, 97:3, 98:15, 113:16, 115:13, 122:5, 125:19, 155:8
**2018-2020** [1] - 48:10
**2019** [10] - 8:11, 34:8, 49:8, 49:9, 49:12, 49:23, 92:15, 127:17, 129:4, 133:13
**202** [2] - 2:4, 2:13
**2020** [10] - 47:22, 47:23, 48:1, 48:9, 88:23, 91:15, 97:4, 121:16, 125:18, 125:20
**2020-2021** [1] - 31:16
**2020-21** [1] - 32:20
**2021** [14] - 1:19, 7:4, 30:22, 34:9, 35:15, 47:20, 47:22, 47:23, 48:9, 86:18, 97:4, 98:16, 170:13, 170:19
**2021-2022** [1] - 30:24
**2021-22** [1] - 23:16
**2022** [5] - 29:18, 34:10, 105:3, 113:18, 159:4
**2216** [1] - 3:7
**23.1** [1] - 86:19
**25** [4] - 5:5, 35:7, 143:5, 143:8
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26** [3] - 100:24, 119:15, 120:15
**28** [5] - 4:3, 4:12, 4:14, 47:25, 97:4
**28-day** [1] - 108:3
**29464** [3] - 4:4, 4:12, 4:15
**2:00** [2] - 124:1, 124:2
**2:44** [1] - 169:24
**2A** [1] - 37:8
**2B** [2] - 52:8, 53:11
**2E** [1] - 37:8

## 3

**3** [15] - 32:4, 32:5, 32:12, 32:13, 37:8, 38:10, 38:19, 38:20, 38:22, 39:8, 39:18,

40:14, 52:4, 148:16
**30** [2] - 8:13, 169:19
**30(b)(6** [2] - 165:15, 166:13
**300** [1] - 90:1
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**32502** [1] - 2:11
**33** [1] - 100:24
**34,440** [1] - 104:11
**34.1** [1] - 94:8
**35** [1] - 16:4
**365** [9] - 43:21, 44:1, 44:9, 44:13, 45:5, 45:13, 52:14, 52:15, 52:18
**365-day** [1] - 45:25
**38** [1] - 1:16
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 170:12
**3:17-cv-01665** [2] - 1:11, 170:12
**3A** [1] - 37:9
**3E** [1] - 37:9

**4**

**4** [13] - 32:4, 32:13, 37:9, 38:12, 38:19, 38:20, 38:22, 39:8, 39:18, 40:14, 47:23, 52:12, 76:21
**40** [1] - 166:9
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**45** [1] - 104:22
**46.7** [3] - 49:8, 49:14, 50:1
**49.4** [1] - 94:5
**4A** [1] - 37:10
**4E** [1] - 37:10

**5**

**5** [5] - 32:4, 32:13, 80:11, 96:17, 118:16
**5,837** [1] - 104:4
**5.88** [1] - 88:19
**50** [3] - 35:4, 48:14, 62:18
**50-percent** [1] - 50:5
**500** [2] - 15:9, 75:2
**52** [2] - 49:19, 49:25
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5

**6**

**6** [4] - 34:9, 35:5, 103:19, 103:24
**60** [1] - 102:1
**600** [1] - 2:10
**644** [3] - 54:17, 54:20, 55:4
**644,047** [1] - 54:13
**65** [3] - 65:19, 66:5, 119:4
**65.9** [1] - 94:14
**6th** [1] - 3:5

**7**

**7** [4] - 93:9, 93:13, 93:20, 106:1
**70** [2] - 86:11, 102:1
**70130** [1] - 3:8
**703** [1] - 128:12
**705,896** [1] - 54:12
**706,896** [1] - 54:6
**707** [1] - 4:24
**71** [13] - 44:14, 44:15, 44:22, 45:2, 45:8, 45:15, 46:1, 46:4, 46:17, 46:23, 52:13, 52:21, 52:24
**716** [1] - 3:12
**72** [1] - 22:24
**725** [2] - 4:19, 4:21
**74.3** [2] - 98:14, 98:15
**75** [2] - 82:20, 82:25

**8**

**8.4** [1] - 86:18
**80** [7] - 82:20, 82:25, 86:11, 98:16, 98:20, 103:7, 103:8
**80,000** [1] - 102:1
**801** [1] - 3:10
**803(8** [2] - 91:18, 92:12
**803(8)** [2] - 92:24, 93:1
**803(8)(A)(iii** [1] - 92:12
**84.9** [1] - 104:16
**850** [1] - 5:12
**878** [1] - 49:23

**9**

**9** [1] - 114:3
**90** [1] - 62:13
**901** [1] - 4:23
**91436** [1] - 3:16
**94** [3] - 103:5, 103:11, 122:21
**95** [1] - 57:9

**97** [1] - 49:12
**98** [3] - 39:20, 40:13, 40:15
**9:00** [1] - 7:4
**9th** [1] - 4:6

**A**

**a.m** [3] - 7:4, 50:20, 124:4
**abate** [3] - 144:4, 144:22, 147:19
**abatement** [13] - 16:25, 17:4, 39:17, 51:9, 52:9, 76:5, 144:24, 147:23, 148:4, 148:5, 148:8, 148:9, 148:17
**abating** [4] - 136:21, 142:22, 143:24, 149:16
**ability** [3] - 51:18, 51:21, 160:4
**able** [11] - 18:2, 18:16, 30:9, 73:16, 99:7, 112:23, 123:12, 123:14, 123:15, 135:12, 144:1
**absolutely** [4] - 19:25, 70:23, 152:15, 169:2
**Abuse** [16] - 59:3, 59:7, 60:5, 64:11, 64:24, 67:3, 71:13, 71:20, 71:25, 72:10, 72:18, 77:18, 80:16, 80:21, 82:13, 94:21
**abuse** [60] - 21:14, 23:1, 58:21, 58:22, 59:1, 61:21, 62:1, 62:5, 62:11, 64:23, 65:5, 65:16, 65:25, 67:14, 67:16, 67:20, 68:6, 68:8, 68:9, 68:11, 68:18, 69:2, 69:3, 69:15, 71:13, 72:13, 73:1, 74:7, 74:9, 75:19, 75:20, 80:4, 80:15, 81:5, 81:18, 82:20, 84:19, 105:20, 106:5, 106:14, 107:15, 108:3, 108:14, 108:17, 108:19, 108:23, 111:7, 112:1, 116:24, 123:4, 129:23, 137:13, 145:19, 145:21, 146:23, 147:9, 147:10, 150:16, 152:12,

160:15
**abused** [3] - 79:5, 79:12, 149:20
**abusing** [1] - 38:23
**academic** [4] - 12:5, 13:15, 13:23, 15:18
**access** [6] - 95:11, 95:12, 109:25, 135:24, 156:5, 160:7
**according** [1] - 133:14
**account** [1] - 142:3
**accountant** [4] - 8:2, 9:10, 9:16, 14:10
**accountants** [1] - 14:13
**Accountants** [1] - 10:7
**accounting** [27] - 8:3, 9:12, 9:13, 10:3, 10:23, 10:24, 11:4, 11:13, 11:14, 11:15, 11:16, 11:17, 11:21, 11:22, 12:13, 12:18, 12:24, 13:4, 13:18, 15:20, 15:21, 15:24, 16:1, 16:6, 16:6, 16:16
**Accounting** [7] - 8:5, 8:25, 9:4, 9:6, 9:8, 10:19, 13:21
**accreditation** [1] - 63:1
**accurate** [2] - 145:16, 156:3
**achieve** [1] - 137:6
**achievement** [1] - 10:3
**Ackerman** - 91:23
**ACKERMAN** [7] - 4:5, 90:11, 91:24, 126:3, 131:1, 159:22, 163:23
**acknowledge** [1] - 146:14
**acquired** [1] - 19:21
**acquisition** [1] - 12:2
**acronym** [1] - 98:7
**Act** [13] - 101:2, 101:3, 101:5, 101:14, 101:16, 101:21, 101:25, 102:4, 102:7, 102:10, 102:24, 103:3, 104:4
**Action** [4] - 1:4, 1:10, 170:11, 170:12
**active** [2] - 33:15, 72:5
**activities** [3] - 65:17, 73:6, 73:8
**activity** [1] - 110:21
**actual** [3] - 49:11, 94:20, 165:24

**add** [3] - 25:8, 40:11, 54:14
**added** [5] - 25:10, 26:12, 29:8, 40:14, 54:17
**addicted** [1] - 39:3
**addiction** [2] - 108:8, 158:25
**Addiction** [4] - 22:8, 87:9, 114:8, 114:11
**addictions** [1] - 158:25
**addition** [4] - 96:7, 118:4, 163:2, 165:6
**additional** [11] - 19:5, 30:13, 33:16, 66:24, 88:4, 90:23, 96:9, 97:14, 113:3, 159:2, 160:18
**address** [7] - 35:10, 76:5, 137:17, 138:12, 149:19, 160:3, 165:1
**Address** - 19:18
**addressed** [1] - 132:5
**addressee** [1] - 132:4
**addressing** [4] - 18:4, 18:8, 37:9, 38:12
**adequate** [1] - 137:5
**adhered** [1] - 69:10
**adjourn** [1] - 168:21
**adjunct** [1] - 12:12
**adjust** [1] - 47:21
**adjusted** [1] - 48:9
**adjustment** [3] - 47:24, 47:25, 48:4
**adjustments** [1] - 48:9
**administer** [3] - 20:22, 41:25, 64:22
**administered** [6] - 18:7, 19:6, 19:24, 23:22, 26:8, 155:20
**administration** [4] - 12:21, 58:18, 58:20, 117:25
**Administration** [11] - 8:24, 9:3, 9:6, 64:12, 67:4, 70:25, 72:11, 82:14, 87:24, 91:22, 94:21
**administrator** [6] - 30:11, 67:21, 67:22, 68:2, 68:12, 68:15
**administrator's** [1] - 69:5
**admissible** [1] - 128:18
**admission** [4] - 90:9, 128:20, 163:6, 164:10

**admissions** [5] - 163:4, 163:7, 163:15, 164:6, 164:7
**admit** [1] - 163:18
**admitted** [5] - 56:2, 56:5, 90:19, 92:15, 128:13
**advise** [2] - 57:11, 123:17
**adviser** [3] - 67:20, 68:11, 68:18
**Adviser** [1] - 70:4
**advisers** [1] - 68:1
**advising** [3] - 74:3, 78:23, 136:6
**advisory** [1] - 11:2
**affect** [1] - 160:4
**affected** [1] - 101:3
**Affordable** [14] - 101:2, 101:5, 101:14, 101:16, 101:21, 101:25, 102:4, 102:7, 102:10, 102:24, 103:3, 104:3
**afforded** [2] - 96:7, 133:20
**afield** [2] - 153:23, 154:1
**afternoon** [6] - 142:14, 154:21, 161:10, 161:11, 165:2, 165:3
**afterwards** [1] - 163:21
**Age** [1] - 120:10
**age** [2] - 119:3, 119:4
**agency** [7] - 64:9, 64:21, 65:22, 72:12, 72:14, 91:9
**agent** [3] - 10:11, 10:13, 10:14
**agents** [1] - 11:11
**ago** [2] - 14:4, 135:25
**agree** [4] - 144:25, 148:14, 150:7, 150:15
**agreed** [2] - 55:4, 165:21
**agreement** [2] - 55:21, 56:1
**agreements** [5] - 161:15, 161:17, 161:21, 161:23, 162:5
**agrees** [1] - 55:5
**ahead** [4] - 28:19, 88:21, 148:8, 149:6
**aimed** [1] - 92:16
**air** [1] - 40:3

**al** [4] - 1:7, 1:13, 170:10, 170:11
**Alaska** [2] - 77:11, 112:14
**Alexander** [16] - 16:25, 17:25, 36:6, 37:15, 37:20, 43:11, 47:5, 47:8, 47:21, 51:7, 54:24, 55:5, 136:18, 137:21, 138:12, 138:16
**Alexander's** [25] - 17:4, 35:24, 36:1, 36:11, 36:25, 37:12, 37:22, 39:17, 42:19, 43:6, 46:24, 47:18, 48:8, 48:12, 50:3, 52:9, 52:14, 76:4, 127:15, 136:12, 136:16, 136:20, 137:19, 141:18, 142:2
**all-but-dissertation** [1] - 58:20
**allegations** [1] - 164:17
**allege** [1] - 51:5
**allergies** [1] - 71:3
**allocate** [3] - 96:1, 150:8, 150:9
**allocated** [5] - 23:12, 86:9, 96:4, 97:4, 133:25
**allocating** [1] - 35:20
**allocation** [3] - 23:17, 24:19, 30:8
**allotted** [1] - 168:11
**allow** [1] - 163:22
**allowed** [2] - 102:5, 115:1
**allowing** [1] - 107:6
**allows** [2] - 110:5, 110:10
**almost** [1] - 90:1
**alone** [1] - 125:11
**alternative** [1] - 33:25
**Alvarez** [1] - 15:2
**amazing** [1] - 169:14
**Ambulatory** [2] - 117:6, 117:8
**amendments** [1] - 15:16
**American** [3] - 10:6, 114:8, 114:11
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**AmerisourceBergen** [3] - 6:2, 167:20, 170:10
**amount** [22] - 26:10,

26:11, 41:2, 41:20, 46:11, 46:19, 46:20, 48:18, 81:7, 81:25, 82:2, 86:15, 87:4, 95:18, 96:7, 96:9, 96:10, 96:21, 96:25, 104:16, 134:2, 169:3
**amounts** [2] - 28:13, 49:13
**analyses** [2] - 74:5, 75:18
**analysis** [6] - 13:20, 29:16, 47:2, 47:4, 99:19, 140:1
**analyst** [1] - 9:24
**ANDREW** [1] - 5:10
**Anne** [1] - 156:25
**ANNE** [1] - 4:2
**ANNIE** [1] - 4:11
**annual** [1] - 25:3
**answer** [16] - 118:12, 122:9, 126:12, 132:12, 132:14, 144:9, 145:23, 145:24, 146:1, 146:4, 146:8, 148:12, 153:21, 154:3, 156:13, 162:11
**answered** [3] - 144:6, 152:19, 155:16
**Anthony** [1] - 166:17
**ANTHONY** [1] - 2:6
**anticipate** [1] - 123:22
**anticipated** [1] - 83:4
**Apologies** [1] - 116:14
**apologize** [2] - 146:12, 157:2
**appeal** [1] - 162:7
**appear** [1] - 126:6
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appearing** [1] - 169:9
**applicable** [1] - 162:21
**application** [3] - 11:16, 85:16, 110:23
**applications** [2] - 18:23, 24:5
**applied** [1] - 107:14
**applies** [2] - 82:11, 107:11
**apply** [4] - 109:23, 110:20, 112:18, 113:11
**appointee** [1] - 67:23, 67:24
**appreciate** [3] - 169:6, 169:15, 169:21

**approach** [9] - 36:3, 39:13, 55:17, 56:6, 71:6, 89:3, 128:2, 162:25, 164:13
**approval** [3] - 110:21, 113:13, 113:15
**approve** [1] - 110:6
**approved** [2] - 104:25, 110:23, 110:24
**approving** [3] - 145:18, 145:20, 145:22
**arbitration** [2] - 11:5, 14:8
**arbitration-type** [1] - 11:5
**Arch** [2] - 6:6, 6:13
**area** [11] - 11:20, 15:25, 58:17, 61:11, 64:8, 78:7, 78:20, 79:1, 79:9, 123:8, 124:12
**areas** [4] - 15:21, 15:23, 66:19, 78:20
**argument** [1] - 153:5
**arguments** [5] - 162:22, 168:10, 168:17, 168:22, 169:22
**Arizona** [1] - 94:5
**array** [2] - 11:9, 11:18
**articulates** [1] - 109:15
**ASAM** [4] - 114:6, 114:12, 114:22, 115:17
**ASHLEY** [1] - 5:3
**aside** [8] - 9:21, 29:6, 32:18, 32:24, 84:6, 84:13, 84:15, 168:11
**asides** [3] - 69:17, 84:9, 86:7
**aspect** [1] - 77:3
**asserted** [1] - 92:6
**asserting** [1] - 153:5
**assess** [4] - 31:2, 31:3, 79:4, 79:11
**assessment** [14] - 78:11, 78:12, 137:3, 137:4, 137:9, 137:10, 137:12, 140:4, 140:9, 140:15, 140:21, 140:25, 150:5
**assessments** [7] - 78:14, 78:19, 137:1, 137:2, 137:5, 140:14, 140:18
**assigned** [4] - 37:2, 37:23, 41:20, 66:20

**assignment** [1] - 12:7
**assignments** [1] - 13:12
**assist** [4] - 58:2, 69:16, 73:13, 80:7
**assistance** [3] - 67:16, 74:13, 98:4
**Assisted** [1] - 21:3
**assisted** [6] - 14:25, 73:10, 73:25, 97:9, 144:15, 144:17
**associate** [2] - 13:7, 14:25
**associated** [4] - 21:19, 30:5, 44:6, 97:7
**assume** [1] - 27:2
**assumed** [1] - 46:23
**Assuming** [1] - 54:21
**assuming** [1] - 45:13
**assumption** [7] - 43:12, 43:19, 43:21, 44:8, 46:5, 46:17, 46:24
**AT** [1] - 1:2
**Athens** [1] - 8:22
**attempt** [2] - 22:24, 22:25
**attempted** [1] - 18:15
**attempting** [1] - 31:3
**attempts** [1] - 21:11
**attention** [1] - 77:25
**attorneys** [2] - 11:10, 157:1
**audit** [2] - 11:1, 59:16
**Auditor's** [1] - 34:15
**audits** [1] - 59:13
**August** [1] - 15:7
**authenticating** [1] - 92:21, 92:22
**authenticity** [1] - 162:18
**authored** [1] - 129:24
**Authority** [11] - 71:12, 72:8, 72:9, 72:17, 72:23, 72:25, 81:2, 81:17, 81:23, 83:17, 85:15
**authority** [4] - 129:25, 130:25, 131:12, 132:8
**authorized** [2] - 91:20, 92:13
**auto** [1] - 11:12
**automatically** [1] - 119:4
**availability** [2] - 138:14, 156:7
**available** [14] - 18:22, 28:17, 28:23, 33:25,

34:21, 100:17, 112:16, 113:21, 115:5, 115:10, 140:10, 141:5, 158:24, 167:8
**average** [12] - 43:7, 43:13, 43:25, 44:2, 44:25, 45:4, 52:15, 52:16, 52:17, 52:24, 53:1
**Avin** [1] - 3:7
**awarded** [1] - 86:16
**aware** [16] - 26:16, 26:18, 26:19, 75:6, 88:17, 88:23, 90:25, 96:6, 127:15, 146:18, 146:21, 146:22, 147:11, 155:4, 155:8, 155:14
**awkward** [1] - 9:14
**Ayme** [2] - 6:17, 170:6

**B**

**Bachelor's** [1] - 58:14
**background** [4] - 15:20, 57:25, 58:12, 81:1
**bad** [1] - 39:19
**Baron** [1] - 3:14
**Barrett** [12] - 17:25, 36:2, 36:4, 36:6, 37:3, 37:19, 37:24, 43:16, 46:9, 46:14, 46:19, 55:5
**Barrett's** [9] - 36:7, 36:11, 37:18, 42:22, 44:12, 45:7, 45:12, 52:8, 54:24
**base** [2] - 160:13, 160:14
**based** [45] - 8:7, 8:21, 37:19, 44:8, 45:7, 45:15, 47:7, 54:19, 57:18, 62:8, 62:17, 67:16, 73:13, 73:15, 74:2, 74:9, 77:4, 78:1, 78:8, 82:5, 84:24, 84:25, 92:22, 95:12, 99:6, 99:9, 104:2, 106:17, 117:19, 119:3, 125:21, 126:17, 137:18, 140:25, 143:23, 143:25, 144:3, 144:13, 144:14, 149:15, 149:20, 149:21, 160:9, 162:5
**basing** [1] - 127:12

**basis** [14] - 47:4, 47:10, 47:13, 128:20, 130:19, 131:20, 132:2, 133:4, 135:21, 136:2, 138:17, 153:20, 162:4, 162:20
**battery** [1] - 21:18
**Baylen** [1] - 2:11
**became** [4] - 9:18, 10:9, 60:2, 102:3
**Beckley** [1] - 8:16
**become** [10] - 9:16, 60:24, 61:1, 68:15, 73:15, 74:9, 74:12, 76:13, 82:22, 95:4
**becomes** [1] - 99:10
**becoming** [2] - 10:8, 73:14
**beds** [1] - 107:15
**BEFORE** [1] - 1:17
**beg** [2] - 112:11, 155:12
**began** [4] - 65:10, 96:19, 107:13, 113:15
**begin** [4] - 47:18, 66:23, 112:24, 163:15
**beginning** [1] - 126:4
**behalf** [7] - 77:4, 163:25, 166:17, 167:13, 167:15, 167:19, 168:23
**behavioral** [4] - 57:5, 85:20, 85:25, 143:18
**Behavioral** [1] - 129:17
**behind** [1] - 144:14
**below** [1] - 28:13
**bench** [1] - 169:19
**BENCH** [1] - 1:16
**benefit** [9] - 102:16, 114:16, 114:19, 114:21, 115:1, 115:2, 115:17
**benefits** [9] - 101:7, 101:9, 101:12, 102:22, 106:13, 115:16, 116:8, 116:12
**Benefits** [1] - 101:11
**beside** [1] - 20:9
**best** [2] - 51:23, 54:3
**Beth** [2] - 166:9, 166:21
**better** [3] - 22:18, 35:3, 112:2
**between** [16] - 28:25,

48:1, 55:2, 55:6, 60:3, 62:3, 71:6, 98:5, 103:3, 106:5, 107:17, 125:17, 127:16, 133:13, 155:25, 161:17
**Between** [1] - 62:4
**beyond** [1] - 16:10
**Biden's** [1] - 159:4
**billion** [9] - 36:8, 36:16, 53:7, 54:25, 55:3, 55:6, 81:9, 143:11, 159:5
**billions** [2] - 53:15, 54:4
**bit** [9] - 20:19, 30:16, 37:6, 42:18, 74:8, 77:13, 102:9, 103:21, 145:18
**bits** [1] - 15:17
**black** [1] - 111:11
**block** [37] - 58:22, 64:23, 65:24, 66:8, 69:1, 69:3, 69:15, 72:13, 72:25, 75:24, 77:17, 77:18, 78:14, 80:17, 80:21, 80:22, 81:4, 81:7, 81:14, 81:16, 81:20, 82:8, 82:17, 82:19, 83:4, 83:5, 83:6, 83:24, 84:11, 84:17, 85:14, 85:16, 86:5, 86:9, 86:12, 86:15, 88:5
**Block** [1] - 64:24
**blue** [2] - 97:17, 125:5
**blur** [1] - 29:25
**Blvd** [3] - 4:3, 4:12, 4:14
**board** [1] - 20:6
**boards** [1] - 74:11
**body** [1] - 146:19
**Bonasso** [1] - 5:14
**booking** [1] - 21:10
**books** [1] - 13:15
**bore** [1] - 33:21
**boss** [1] - 60:23
**bottom** [7] - 46:25, 93:9, 93:11, 93:20, 112:6, 125:5, 129:12
**Boulevard** [1] - 3:15
**bounds** [2] - 34:7, 34:8
**Box** [2] - 5:14, 6:8
**box** [1] - 95:10
**break** [5] - 20:17, 36:9, 37:5, 50:12, 123:10
**breaks** [1] - 37:1
**Bridgeside** [3] - 4:3,

4:12, 4:14
**brief** [2] - 115:19, 163:22
**briefing** [1] - 162:19
**briefings** [2] - 70:13, 70:16
**briefly** [5] - 21:1, 61:15, 76:18, 90:22, 159:17
**bring** [4] - 51:1, 53:3, 53:4, 76:20
**broad** [2] - 80:13, 146:24
**broader** [8] - 61:7, 83:25, 84:2, 100:8, 100:10, 118:23, 145:9, 146:1
**Broadly** [1] - 97:17
**broadly** [3] - 11:25, 127:23, 140:5
**brought** [5] - 42:16, 53:25, 61:19, 65:16, 116:23
**bucket** [4] - 86:20, 96:17, 97:7, 118:17
**buckets** [1] - 80:20
**bucks** [2] - 32:14, 32:23
**Budd** [1] - 3:14
**budget** [31] - 19:14, 23:15, 23:17, 24:5, 26:22, 26:25, 27:4, 27:7, 27:14, 29:18, 30:8, 30:10, 30:15, 30:23, 30:24, 31:6, 31:19, 32:21, 32:22, 32:25, 33:17, 34:7, 34:10, 34:13, 35:7, 35:14, 35:15, 35:17, 64:25, 159:4, 160:17
**budgetary** [1] - 30:5
**budgeted** [3] - 26:25, 27:14, 27:17
**budgeting** [1] - 28:12
**budgets** [5] - 18:23, 29:13, 31:1, 35:23, 41:23
**building** [2] - 12:16, 135:23
**bulk** [1] - 88:8
**bunch** [3] - 50:10, 93:15, 163:11
**buprenorphine** [3] - 104:19, 104:22, 104:23
**Buprenorphine** [2] - 104:24, 144:17
**Bureau** [2] - 3:21, 129:17, 157:17
**Burling** [1] - 5:11

**business** [5] - 10:15, 11:5, 12:21, 51:23, 67:18
**Business** [3] - 8:24, 9:3, 9:5
**BY** [54] - 7:21, 16:17, 39:15, 40:5, 51:3, 54:2, 56:21, 58:10, 64:19, 76:22, 79:15, 80:6, 80:12, 80:24, 89:4, 89:22, 90:24, 93:2, 95:1, 103:20, 103:25, 106:2, 114:4, 120:1, 120:8, 120:25, 123:2, 124:11, 124:20, 126:14, 128:23, 130:6, 130:22, 131:5, 132:22, 133:10, 134:16, 134:21, 135:2, 135:18, 136:11, 142:13, 144:20, 145:6, 146:11, 148:15, 149:8, 151:22, 154:7, 154:20, 156:15, 158:22, 159:16, 160:1
**byproduct** [4] - 38:21, 39:2, 39:6

**C**

**CA** [1] - 3:16
**Cabell** [61] - 3:2, 17:7, 17:15, 18:3, 18:8, 21:21, 21:23, 22:3, 29:15, 48:19, 49:5, 49:8, 49:16, 49:17, 75:25, 76:12, 76:15, 81:21, 86:1, 87:5, 87:8, 88:4, 103:15, 118:13, 121:22, 122:9, 124:14, 125:23, 126:19, 127:1, 127:3, 127:23, 136:1, 136:24, 139:4, 140:22, 141:5, 141:9, 141:15, 141:16, 142:4, 147:8, 149:17, 149:20, 151:4, 151:6, 151:12, 151:24, 152:3, 152:12, 154:25, 155:3, 155:5, 155:20, 156:4, 156:19, 157:9, 158:7, 165:14,

166:13, 166:17
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell's** [1] - 85:21
**Cabell-Huntington** [1] - 142:4
**Cabell/Huntington** [2] - 122:23, 122:24
**Cabinet** [1] - 131:18
**CAH-WV-103** [1] - 55:25
**CAH-WV-104** [1] - 55:25
**CAH-WV-476** [1] - 55:25
**CAH-WV-562** [1] - 55:25
**CAH-WV-564** [1] - 56:1
**CAH-WV-65** [1] - 55:24
**CAH-WV-70** [1] - 55:24
**CAH-WV-73** [1] - 55:25
**calculate** [5] - 24:3, 40:7, 40:8, 44:10, 45:15
**calculated** [8] - 24:4, 37:19, 39:19, 46:9, 46:14, 46:17, 46:19, 98:4
**calculation** [4] - 36:8, 44:16, 45:7, 45:19
**calculations** [7] - 42:19, 42:22, 43:16, 47:8, 47:14, 52:9, 54:24
**calculator** [7] - 39:12, 40:1, 42:16, 53:3, 53:4, 53:22, 54:1
**CALLAS** [1] - 6:7
**CAMPBELL** [1] - 6:14
**candidly** [1] - 33:19
**cannot** [1] - 158:10
**capacity** [23] - 17:6, 52:1, 57:11, 62:12, 62:17, 73:8, 74:14, 131:6, 131:7, 131:12, 131:17, 132:7, 136:23, 136:24, 137:11, 137:15, 137:20, 137:22, 138:12, 138:13, 140:5, 142:4, 150:5
**capita** [2] - 98:8, 98:9
**Capitol** [1] - 2:7
**Capstone** [1] - 12:21
**Captain** [3] - 30:10,

33:5, 33:13
**Cardinal** [6] - 4:16, 5:2, 55:16, 55:22, 166:2, 167:13
**Care** [14] - 101:2, 101:5, 101:14, 101:16, 101:21, 101:25, 102:4, 102:7, 102:10, 102:24, 103:3, 104:4, 138:7
**care** [22] - 44:9, 44:13, 45:25, 53:2, 60:11, 60:19, 61:18, 61:25, 62:23, 62:24, 72:6, 75:21, 75:24, 79:2, 79:10, 85:21, 107:19, 110:8, 114:7, 114:9, 168:7, 168:8
**career** [2] - 12:6, 145:18
**Carey** [1] - 4:23
**carried** [2] - 13:13, 16:3
**case** [23] - 13:12, 14:22, 16:19, 17:19, 19:22, 52:21, 65:22, 75:1, 75:17, 85:21, 91:19, 92:12, 94:4, 97:8, 117:21, 140:10, 147:5, 157:21, 159:7, 162:21, 169:20
**cash** [3] - 24:11, 24:12
**catchment** [1] - 61:11
**categories** [15] - 37:4, 37:6, 37:10, 37:11, 37:12, 37:22, 38:4, 38:20, 40:18, 45:21, 46:3, 78:10, 80:13, 86:23, 121:21
**Categories** [5] - 38:19, 38:22, 39:8, 39:18, 40:14
**category** [21] - 37:1, 39:24, 40:21, 40:24, 40:25, 41:3, 41:6, 41:16, 41:19, 41:21, 42:18, 44:1, 45:1, 45:24, 52:5, 66:20, 78:11, 87:14, 97:6, 97:17, 100:4
**Category** [11] - 37:6, 37:7, 37:8, 37:9, 38:6, 38:8, 38:10, 38:12, 42:6, 52:8, 53:11
**causal** [4] - 153:5, 153:16, 154:10

**causation** [4] - 16:22, 126:6, 126:7, 153:8
**causes** [1] - 36:15
**center** [6] - 60:25, 61:2, 61:8, 61:13, 61:16, 68:24
**Center** [7] - 3:12, 5:11, 61:9, 85:22, 88:2, 110:14, 122:4
**centers** [5] - 60:21, 85:20, 86:1, 87:25, 109:21
**Centers** [1] - 87:13
**CEO** [1] - 61:1
**certain** [2] - 84:7, 105:21
**certainly** [15] - 28:20, 29:4, 32:9, 49:22, 51:25, 75:5, 88:7, 90:13, 112:14, 113:9, 123:11, 152:25, 159:3, 167:10, 167:13
**certainty** [1] - 160:23
**CERTIFICATION** [1] - 170:5
**certification** [5] - 9:22, 9:25, 62:25, 63:8, 63:10
**certifications** [2] - 9:21, 10:2
**certified** [6] - 8:2, 9:10, 9:16, 9:23, 9:24, 73:16
**Certified** [1] - 10:6
**certify** [1] - 170:8
**cetera** [2] - 139:25, 140:6
**Chairman** [1] - 129:7
**challenge** [1] - 51:6
**challenging** [2] - 70:12, 74:7
**chance** [4] - 54:23, 146:7, 148:11, 164:20
**change** [8] - 28:25, 32:14, 46:4, 46:6, 53:8, 101:3, 102:2, 116:23
**changed** [5] - 32:12, 44:13, 46:1, 103:14, 109:19
**changeover** [1] - 55:18
**changes** [12] - 26:16, 30:7, 31:20, 31:23, 31:24, 32:2, 32:19, 32:25, 48:10, 86:15, 100:25, 160:3
**changing** [3] - 45:19,

53:10, 62:5
**characterize** [1] - 127:22
**characterized** [2] - 134:14, 134:23
**characterizing** [1] - 135:19
**charge** [1] - 63:20
**CHARLES** [1] - 3:11
**CHARLESTON** [2] - 1:2, 1:18
**Charleston** [10] - 2:8, 3:13, 4:24, 5:15, 6:9, 7:3, 12:20, 12:25, 13:3, 13:10
**chart** [9] - 24:7, 25:3, 93:12, 93:25, 110:18, 111:4, 124:24, 124:25, 125:13
**Chase** [1] - 4:23
**Chesterbrook** [1] - 6:15
**Chief** [5] - 19:2, 57:2, 59:2, 59:6, 60:24
**children** [2] - 84:10, 138:6, 139:3
**Children** [3] - 71:15, 71:21, 72:19
**Chris** [2] - 90:19, 92:15
**Christina** [2] - 129:15, 129:19
**Circuit** [1] - 162:6
**cite** [1] - 143:1
**cities** [1] - 158:24
**CITY** [1] - 1:4
**city** [15] - 31:18, 33:8, 33:11, 34:13, 35:2, 35:3, 35:23, 41:23, 51:5, 51:11, 51:14, 51:17, 51:25, 76:10, 122:10
**City** [61] - 4:1, 5:11, 18:7, 18:16, 18:19, 19:7, 19:14, 19:17, 19:18, 19:19, 19:24, 20:21, 21:22, 22:15, 23:5, 23:16, 23:22, 24:7, 24:13, 24:18, 24:22, 24:25, 25:6, 26:8, 26:15, 26:20, 27:2, 27:14, 27:22, 28:11, 29:1, 29:8, 29:15, 29:20, 29:25, 30:5, 30:10, 30:18, 30:23, 31:4, 31:17, 33:2, 33:23, 34:1, 34:3, 34:19, 34:22, 35:8, 41:24, 75:25,

76:7, 118:13, 136:24, 140:22, 141:17, 154:25, 155:16, 157:1, 157:9, 158:7, 170:9
**City's** [2] - 26:24, 34:6
**city's** [1] - 51:17
**Civil** [3] - 1:4, 170:11, 170:12
**civil** [3] - 1:10, 91:19, 92:12
**claimed** [1] - 141:25
**claims** [1] - 139:22
**clarification** [1] - 104:15
**clarify** [3] - 27:9, 143:17, 145:13
**class** [1] - 125:24
**classifications** [1] - 153:1
**classified** [2] - 70:17, 70:19
**classroom** [1] - 13:13
**clear** [7] - 16:20, 70:18, 126:21, 128:19, 152:7, 153:18, 157:6
**clearance** [1] - 70:14
**clearly** [1] - 48:7
**CLERK** [6] - 7:10, 7:13, 7:16, 56:12, 56:14, 56:17
**clerk** [1] - 55:23
**clerks** [1] - 169:16
**client** [1] - 163:25
**clientele** [1] - 57:13
**clients** [3] - 11:7, 73:7, 74:4
**Clinical** [1] - 116:14
**clinical** [4] - 59:16, 62:22, 65:17, 66:19
**clinically** [2] - 116:17, 116:20
**Clinically** [1] - 117:10
**clinician** [1] - 59:20
**close** [2] - 161:14, 164:11
**closer** [1] - 89:12
**closing** [2] - 168:10, 168:21
**clue** [1] - 159:8
**CMS** [3] - 110:13, 110:21, 110:23
**coca** [1] - 70:15
**cocaine** [1] - 126:22
**Cochran** [3] - 6:17, 170:6, 170:15
**collect** [1] - 15:5
**collection** [1] - 15:3
**college** [1] - 8:18

**College** [2] - 8:19, 12:8
**colleges** [2] - 14:2, 14:5
**color** [1] - 125:2
**colors** [1] - 125:3
**Colston** [45] - 56:11, 56:13, 56:22, 56:25, 57:1, 57:2, 57:4, 57:23, 74:16, 77:2, 79:1, 79:8, 79:16, 89:5, 90:25, 93:3, 94:17, 114:5, 115:15, 118:13, 121:1, 123:13, 123:19, 124:1, 124:8, 124:12, 126:8, 126:25, 128:11, 128:24, 130:23, 132:15, 132:23, 133:11, 134:22, 135:3, 135:5, 136:12, 144:9, 153:18, 154:21, 159:17, 160:2, 160:22, 161:8
**COLSTON** [1] - 56:16
**column** [8] - 24:8, 24:15, 25:14, 25:24, 114:5, 114:6, 114:7, 114:16
**columns** [1] - 25:13
**Comanche** [1] - 61:14
**coming** [6] - 25:25, 26:14, 26:16, 27:14, 28:18, 132:3
**Commerce** [2] - 129:8, 131:23
**COMMISSION** [1] - 1:10
**Commission** [9] - 2:2, 3:2, 62:21, 63:1, 63:5, 63:9, 63:11, 63:13, 63:15
**commissioned** [1] - 93:5
**Commissioner** [4] - 129:15, 131:16, 136:6, 157:17
**commissioner** [2] - 60:23, 129:16
**Committee** [1] - 129:7
**common** [2] - 125:22, 126:18
**community** [23] - 57:14, 60:20, 61:1, 62:8, 62:17, 65:25, 67:16, 73:15, 74:2, 74:9, 77:4, 78:8, 81:23, 84:25, 85:25,

86:6, 88:1, 137:20, 138:23, 138:24, 139:4, 141:5, 157:9
**Community** [1] - 61:9
**community-based** [9] - 62:8, 62:17, 67:16, 73:15, 74:2, 74:9, 77:4, 78:8, 84:25
**companies** [1] - 11:11
**company** [4] - 57:5, 67:9, 73:4, 78:17
**compared** [1] - 45:4
**Compass** [4] - 19:20, 23:2, 27:3, 27:19
**Compassion** [1] - 23:4
**competence** [1] - 10:3
**compiled** [2] - 19:4, 23:25
**complaint** [4] - 163:13, 164:7, 164:16, 164:17
**complaints** [2] - 60:10, 163:5
**complete** [1] - 61:25
**completed** [1] - 165:10
**complex** [1] - 72:7
**compliance** [3] - 66:11, 67:5, 85:1
**comply** [1] - 84:12
**complying** [1] - 66:11
**component** [6] - 17:23, 24:19, 34:7, 52:19, 151:8
**components** [1] - 31:6
**Comprehensive** [3] - 61:8, 122:3
**comprehensive** [2] - 85:19, 85:25
**computer** [1] - 6:19
**concentration** [3] - 8:25, 9:4, 9:6
**concept** [2] - 34:14, 91:1
**concepts** [1] - 11:16
**concern** [1] - 95:17
**concerns** [1] - 62:19
**concluded** [1] - 20:21
**conclusion** [4] - 66:25, 94:13, 127:8, 151:17
**conclusions** [1] - 135:12
**Concord** [3] - 8:19, 8:23
**concur** [1] - 169:2
**condition** [1] - 35:1
**conduct** [6] - 17:10, 66:7, 78:19, 79:25,

140:1, 140:25
**conducted** [1] - 137:1
**conducting** [2] - 59:13, 137:3
**confidential** [1] - 68:17
**confirm** [6] - 18:25, 19:5, 19:11, 19:23, 30:9, 75:13
**confirmed** [1] - 67:24
**Congress** [1] - 132:9
**congressional** [8] - 68:20, 82:4, 82:10, 82:11, 130:24, 131:8, 131:11, 132:6
**Congressman** [1] - 131:13
**connection** [2] - 66:14, 75:16
**Connolly** [2] - 4:18, 5:4
**CONROY** [1] - 3:3
**consequence** [2] - 39:1, 39:5
**consider** [2] - 17:24, 35:25
**considered** [3] - 61:10, 99:5, 114:8
**consult** [1] - 57:4
**consultant** [2] - 78:22, 78:23
**consulted** [1] - 57:17
**consulting** [7] - 12:1, 57:11, 57:20, 73:4, 73:8, 73:9, 131:7
**Consulting** [3] - 57:3, 57:4, 77:2
**consults** [1] - 57:5
**contact** [1] - 22:25
**contained** [2] - 43:6, 92:18
**contains** [1] - 141:3
**continue** [6] - 40:1, 95:4, 105:8, 124:9, 159:6, 160:11
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continued** [5] - 15:12, 15:14, 75:3, 144:24, 147:22
**continues** [1] - 96:20
**continuing** [1] - 147:22
**continuum** [11] - 61:25, 85:21, 100:13, 100:15, 109:25, 111:23, 111:25, 115:7, 115:10, 141:4
**contract** [2] - 64:10,

116:9
**contracted** [1] - 13:9
**contracting** [1] - 78:17
**contractor** [6] - 64:7, 64:8, 64:10, 65:7, 140:12, 140:17
**contractors** [1] - 11:11
**contribution** [4] - 24:10, 24:11, 24:12
**contributions** [2] - 24:15, 24:24
**control** [2] - 166:3, 169:17
**Control** [10] - 23:6, 23:12, 23:18, 23:20, 25:9, 26:12, 70:1, 71:22, 78:3, 87:13
**Control's** [1] - 87:18
**conversation** [1] - 14:3
**Cook** [3] - 6:18, 170:7, 170:15
**coordinator** [2] - 13:3, 27:7
**copy** [2] - 148:23, 148:25
**corner** [4] - 93:11, 93:20, 93:21, 129:12
**corporate** [1] - 10:15
**Corporation** [4] - 6:2, 8:5, 10:19, 170:11
**cORPORATION** [2] - 1:7, 1:13
**Correct** [13] - 52:16, 59:24, 66:13, 69:19, 69:20, 82:1, 83:12, 100:2, 100:21, 108:16, 108:21, 120:11, 121:7
**correct** [95] - 15:14, 23:24, 24:2, 24:14, 25:4, 26:2, 27:12, 27:21, 27:24, 28:3, 28:15, 29:4, 32:17, 34:21, 35:18, 37:14, 37:25, 38:24, 39:10, 39:11, 40:2, 40:16, 40:22, 40:23, 41:17, 42:20, 42:21, 43:17, 50:2, 51:9, 51:10, 51:12, 51:13, 51:15, 51:18, 52:20, 52:22, 54:23, 55:1, 55:7, 59:21, 59:23, 60:5, 60:6, 64:6, 73:2, 75:7, 78:24, 81:3, 84:19, 84:20, 85:6, 86:3, 90:5, 91:15,

95:5, 95:22, 96:1, 98:12, 98:21, 99:23, 105:16, 107:7, 108:1, 108:15, 108:20, 109:10, 115:6, 119:9, 121:17, 121:18, 125:25, 127:6, 129:10, 134:2, 140:14, 142:5, 143:7, 145:4, 145:19, 147:1, 147:4, 148:19, 151:9, 154:12, 155:1, 155:20, 155:23, 157:18, 157:24, 159:10, 168:6, 170:8
**corrected** [1] - 147:23
**correctly** [1] - 54:21
**correspondence** [1] - 112:15
**cost** [23] - 20:25, 29:8, 31:7, 31:20, 36:18, 38:5, 38:8, 38:10, 38:12, 43:7, 43:8, 43:13, 43:25, 44:6, 45:7, 52:17, 52:19, 52:25, 82:5, 94:20, 94:23, 98:19, 104:8
**costed** [1] - 36:2
**costs** [22] - 23:11, 23:25, 24:3, 24:4, 24:20, 26:6, 29:22, 30:4, 30:5, 31:13, 31:15, 32:19, 32:25, 33:19, 37:2, 38:21, 38:25, 39:17, 42:19, 42:23, 44:10, 51:5
**Council** [1] - 34:22
**counsel** [1] - 165:20
**counseling** [2] - 22:17, 121:19
**counselor** [2] - 27:1, 27:17
**counselors** [1] - 108:10
**counties** [2] - 61:13, 158:24
**country** [16] - 14:1, 14:5, 57:17, 65:1, 67:17, 70:8, 81:12, 82:21, 84:8, 87:25, 94:24, 95:20, 109:14, 110:23, 120:16, 152:20
**COUNTY** [1] - 1:10
**county** [20] - 31:22, 31:23, 32:21, 32:25, 35:14, 35:17, 35:19,

35:23, 41:23, 51:5,
51:11, 51:14, 52:1,
61:10, 76:10, 76:11,
83:22, 85:8, 122:10,
151:6
**County** [82] - 2:2, 3:2,
17:8, 17:15, 18:3,
18:8, 18:19, 19:7,
19:24, 20:21, 21:22,
21:23, 22:3, 23:23,
24:8, 24:13, 24:18,
24:22, 24:25, 25:6,
26:8, 26:15, 28:12,
29:1, 29:8, 29:15,
30:19, 30:22, 32:15,
32:20, 33:3, 34:4,
35:8, 35:13, 41:24,
48:19, 49:5, 49:8,
49:16, 49:17, 61:14,
75:25, 76:12, 76:15,
81:21, 86:2, 87:5,
87:8, 88:5, 103:15,
118:13, 125:23,
126:19, 127:1,
127:3, 127:23,
136:1, 136:24,
140:22, 141:5,
141:15, 141:16,
147:8, 149:17,
149:20, 151:5,
151:12, 151:24,
152:3, 152:13,
154:25, 155:3,
155:5, 155:16,
155:20, 156:4,
156:19, 157:9,
158:7, 165:14,
166:13, 166:18
**county's** [2] - 51:18,
76:8
**couple** [8] - 14:4,
101:19, 105:18,
142:17, 154:16,
154:21, 157:5, 157:7
**course** [7] - 15:19,
70:13, 78:13, 88:7,
104:6, 123:15,
123:17
**Court** [26] - 6:17, 6:18,
7:2, 7:24, 16:14,
16:21, 22:7, 40:6,
49:21, 56:24, 58:11,
61:6, 64:15, 79:8,
81:15, 123:11,
131:22, 155:22,
162:3, 163:3, 163:8,
166:6, 168:24,
169:7, 170:6, 170:7
**court** [9] - 22:6, 22:10,
164:18, 166:11,

168:24, 169:4,
169:8, 169:19
**COURT** [98] - 1:1,
1:17, 7:5, 7:7, 7:19,
16:7, 16:14, 39:14,
50:14, 50:17, 50:21,
50:24, 55:9, 55:11,
55:13, 55:19, 56:4,
56:8, 56:18, 58:9,
79:6, 79:8, 90:10,
91:23, 92:20, 92:25,
94:17, 94:25,
123:12, 123:20,
123:25, 124:5,
124:7, 124:10,
126:11, 128:4,
128:16, 130:18,
131:2, 132:18,
133:8, 134:19,
135:1, 135:17,
136:8, 136:10,
142:7, 142:11,
144:8, 144:25,
145:3, 146:6,
147:24, 148:7,
148:11, 148:14,
148:25, 149:4,
151:18, 153:21,
153:25, 154:3,
154:15, 154:18,
156:13, 158:9,
158:20, 159:24,
161:2, 161:5, 161:8,
161:11, 162:1,
162:11, 162:15,
163:1, 163:9,
163:17, 164:1,
164:12, 164:14,
164:21, 164:24,
165:3, 165:21,
166:8, 167:5,
167:14, 167:18,
167:21, 168:1,
168:4, 168:7,
168:10, 168:13,
168:16, 169:10,
169:15
**Court's** [1] - 162:13
**Court/WEAR** [1] - 22:4
**courtesy** [1] - 169:7
**COURTROOM** [3] -
7:10, 7:13, 7:16
**courtroom** [1] -
169:16
**courts** [1] - 87:7
**cover** [10] - 82:18,
84:15, 89:23, 90:18,
91:13, 102:19,
108:13, 118:20,
121:17, 141:8

**coverage** [13] - 100:6,
101:1, 103:16,
105:8, 105:14,
106:24, 108:14,
111:13, 118:14,
119:10, 122:10,
122:14, 122:20
**covered** [21] - 38:19,
82:19, 100:23,
102:16, 103:8,
104:13, 107:20,
107:25, 108:18,
108:20, 108:23,
111:2, 115:21,
115:22, 115:24,
116:15, 116:25,
119:13, 121:11,
121:14, 163:7
**covering** [1] - 111:7
**covers** [2] - 120:19,
121:2
**Covington** [1] - 5:11
**Cox** [1] - 165:14
**CPA** [5] - 9:18, 9:19,
9:22, 10:8, 10:9
**CPAs** [1] - 10:5
**create** [1] - 66:22
**created** [1] - 106:6
**credentialing** [1] -
62:19
**criminal** [1] - 22:12
**crises** [7] - 70:9,
144:2, 150:22,
151:2, 152:20,
152:22, 152:24
**Crisis** [2] - 88:25, 89:7
**crisis** [42] - 17:23,
18:4, 18:9, 19:7,
20:23, 29:9, 31:14,
31:25, 33:10, 33:19,
33:24, 61:22, 70:22,
70:23, 76:6, 88:14,
90:3, 93:7, 127:1,
127:5, 127:24,
132:2, 136:1, 136:3,
136:19, 136:21,
142:25, 146:23,
147:7, 151:5, 151:9,
151:12, 151:23,
152:2, 152:25,
153:3, 157:6, 157:7,
157:10, 157:12,
157:13, 158:7
**criteria** [1] - 108:11
**critical** [2] - 13:19,
14:14
**criticism** [1] - 153:4
**CROSS** [2] - 142:12,
154:19
**cross** [6] - 50:12,

78:10, 123:16,
123:23, 142:11
**cross-cutting** [1] -
78:10
**CRR** [2] - 6:17, 6:18
**cures** [1] - 91:25
**curious** [1] - 36:19
**current** [8] - 29:19,
30:24, 57:1, 75:12,
127:22, 146:18,
146:21, 152:24
**cut** [3] - 50:10, 50:12,
133:17
**cutting** [1] - 78:10

**D**

**daily** [3] - 43:7, 43:13,
70:14
**dare** [1] - 42:3
**dark** [2] - 111:11,
163:19
**Darren** [1] - 165:13
**dashboard** [4] - 48:22,
87:18, 87:19, 87:21
**data** [33] - 13:20,
14:15, 14:16, 15:3,
15:5, 20:25, 24:5,
29:22, 31:12, 44:18,
44:19, 44:20, 44:23,
45:3, 45:16, 46:10,
46:23, 48:21, 48:22,
52:22, 54:20, 59:17,
76:13, 87:18, 104:3,
124:13, 138:19,
139:22, 141:24,
152:7
**date** [2] - 23:8, 129:3
**Date** [1] - 170:20
**David** [1] - 7:1
**DAVID** [2] - 1:17, 4:5
**days** [29] - 43:8,
43:13, 43:19, 43:21,
44:1, 44:9, 44:11,
44:13, 44:14, 44:15,
44:22, 44:25, 45:2,
45:5, 45:8, 45:13,
45:15, 45:20, 46:4,
46:17, 46:23, 52:13,
52:14, 52:15, 52:18,
52:21, 52:24
**DC** [7] - 4:7, 4:10,
4:19, 4:21, 5:5, 5:12,
64:8
**De** [2] - 2:4, 2:14
**DEA** [4] - 71:3, 92:16,
166:1, 166:3
**dealers** [1] - 11:12
**dealt** [1] - 68:19
**death** [2] - 95:19,

127:16
**deaths** [13] - 48:14,
48:18, 48:24, 49:5,
49:8, 49:10, 50:1,
87:18, 95:14, 95:16,
96:5, 124:14
**decades** [1] - 152:21
**decide** [4] - 34:22,
82:2, 85:7, 163:18
**decision** [2] - 163:21,
164:3
**declarations** [1] -
146:15
**decrease** [2] - 127:16,
127:19
**decreased** [5] - 48:18,
49:25, 50:1, 127:13,
127:14
**deemed** [4] - 62:25,
63:3, 63:6, 63:8
**deep** [1] - 15:19
**DEF-WV-03237** [1] -
90:9
**DEF-WV-2150** [1] -
161:23
**DEF-WV-2151** [1] -
161:24
**DEF-WV-2152** [1] -
161:24
**DEF-WV-3854** [1] -
161:25
**DEF-WV-3855** [1] -
161:25
**DEF-WV-3856** [1] -
161:25
**DEF-WV-696** [1] -
128:5
**Defendant** [4] - 4:16,
5:2, 5:7, 6:2
**Defendants** [3] - 1:8,
1:14, 170:11
**defendants** [4] -
14:19, 79:25,
161:17, 166:19
**DEFENDANTS'** [1] -
56:16
**defense** [3] - 7:8,
56:11, 161:12
**DEFENSE** [1] - 7:15
**define** [1] - 157:10
**defined** [2] - 11:18,
107:11
**defining** [1] - 157:12
**definition** [2] - 9:15,
105:21
**degree** [2] - 8:24,
160:23
**Degree** [2] - 58:14,
58:15
**degrees** [2] - 9:2,

58:13
**deliver** [1] - 67:2
**delivery** [2] - 110:8, 113:16
**Demand** [2] - 70:5, 70:6
**demand** [3] - 70:25, 71:1, 71:7
**demonstrate** [3] - 110:11, 111:22, 112:23
**demonstrated** [1] - 140:19
**Demonstration** [1] - 111:20
**demonstrative** [15] - 20:6, 36:20, 36:21, 42:25, 43:1, 49:1, 49:2, 49:4, 49:16, 80:7, 113:23, 118:17, 120:18, 124:18, 124:21
**Demonstrative** [9] - 51:1, 58:8, 58:24, 71:8, 80:11, 96:17, 103:19, 118:16, 120:23
**Demonstratives** [1] - 114:3
**dentists** [1] - 11:10
**Department** [24] - 21:24, 22:2, 29:23, 29:24, 30:12, 30:14, 31:11, 59:2, 59:6, 60:4, 62:6, 64:12, 65:23, 71:15, 71:21, 72:18, 87:3, 89:10, 89:13, 110:5, 156:1, 156:5
**department** [7] - 58:17, 59:9, 59:15, 59:18, 59:23, 60:13, 62:10
**department's** [1] - 60:11
**dependent** [1] - 84:10
**depict** [3] - 106:3, 124:21, 125:15
**depicts** [2] - 104:1, 124:22
**deployed** [2] - 131:14, 134:11
**deployments** [1] - 155:19
**deposed** [1] - 166:12
**deposition** [11] - 15:16, 33:8, 33:9, 33:13, 33:20, 33:22, 157:20, 164:25, 165:4, 165:8, 167:12

**depositions** [4] - 19:1, 165:19, 166:6, 167:17
**Deputy** [2] - 71:21, 91:13
**DEPUTY** [3] - 7:10, 7:13, 7:16
**deputy** [1] - 169:16
**derive** [1] - 37:16
**derived** [2] - 47:5, 47:11
**describe** [6] - 11:14, 21:8, 43:3, 61:6, 61:15, 81:14
**description** [1] - 114:21
**design** [1] - 73:11
**designate** [1] - 72:11
**designated** [3] - 72:20, 84:21, 101:9
**designation** [1] - 102:15
**designations** [5] - 165:1, 165:5, 165:8, 165:24, 167:12
**designed** [1] - 17:22
**detail** [5] - 18:18, 31:12, 69:21, 139:7, 141:12
**detailed** [3] - 29:22, 69:25, 70:11
**details** [1] - 156:4
**determine** [4] - 48:21, 137:4, 137:11, 150:6
**determined** [3] - 60:18, 98:1, 98:3
**determining** [1] - 18:6
**develop** [5] - 14:23, 46:22, 66:21, 73:11, 87:17
**developed** [3] - 13:6, 13:8, 109:20
**developer** [1] - 12:24
**developing** [1] - 78:1
**DHHR** [2] - 87:19, 124:14
**DHHR's** [1] - 129:17
**diagnosed** [4] - 100:19, 104:10, 104:12, 143:20
**diagnoses** [1] - 104:5
**diagnosis** [1] - 104:13
**died** [1] - 155:6
**differ** [1] - 119:2
**difference** [4] - 45:9, 46:22, 46:25, 53:18
**differences** [1] - 71:6
**different** [15] - 15:21, 15:23, 36:3, 39:9, 44:11, 90:20, 92:14,

99:2, 122:23, 124:12, 125:2, 157:11
**differently** [1] - 28:9
**digits** [2] - 53:6, 53:13
**direct** [6] - 24:8, 24:10, 24:22, 123:18, 130:7, 148:4
**DIRECT** [2] - 7:20, 56:20
**directed** [2] - 35:8, 35:9
**direction** [3] - 68:23, 131:17
**directly** [9] - 33:25, 65:25, 74:2, 81:23, 83:10, 85:4, 85:5, 86:6, 126:7
**Director** [7] - 60:24, 70:4, 71:20, 71:21, 71:25, 72:18, 72:22
**director** [2] - 71:13, 109:22
**directors** [1] - 68:24
**disability** [6] - 119:3, 119:6, 120:10, 120:13, 120:15, 120:16
**disagree** [2] - 157:15, 158:5
**discontinued** [1] - 23:10
**discounted** [1] - 38:15
**discovery** [2] - 48:24, 166:7
**discretionary** [6] - 65:4, 77:20, 80:17, 86:22, 88:8, 100:5
**discuss** [4] - 95:23, 119:16, 137:22, 153:12
**discussed** [6] - 29:7, 80:25, 86:8, 116:22, 118:9, 158:2
**discusses** [1] - 124:13
**discussing** [1] - 16:21
**discussion** [1] - 35:22
**discussions** [2] - 70:24, 71:5
**Disease** [2] - 87:13, 107:9
**Disorder** [14] - 73:12, 126:10, 127:24, 135:24, 137:24, 140:23, 141:9, 143:19, 143:20, 144:19, 145:9, 146:24, 147:19
**disorder** [51] - 57:7, 57:9, 57:12, 57:14,

57:16, 57:18, 57:21, 65:3, 75:23, 76:1, 76:14, 78:21, 79:3, 79:10, 82:23, 86:21, 95:12, 100:6, 100:7, 100:13, 100:20, 101:1, 101:4, 101:6, 101:8, 102:21, 103:16, 104:5, 104:11, 104:25, 105:3, 105:13, 105:15, 109:24, 110:1, 111:21, 113:3, 113:21, 115:5, 115:8, 118:5, 118:20, 118:22, 118:23, 118:24, 118:25, 119:11, 120:19, 120:20, 121:3, 123:5
**Disorders** [1] - 144:16
**disorders** [4] - 76:19, 100:16, 101:13, 101:15
**dispensing** [1] - 127:9
**displayed** [1] - 169:4
**dissertation** [3] - 58:16, 58:20, 58:23
**distinction** [1] - 107:17
**distribute** [3] - 83:6, 85:17, 86:5
**distributed** [7] - 17:14, 74:1, 81:16, 81:22, 85:14, 86:9, 131:14
**distributes** [2] - 65:2, 84:23
**distributing** [2] - 66:8, 72:25
**distribution** [3] - 66:12, 72:2, 129:20
**distributor** [1] - 79:25
**distributors** [1] - 17:11
**District** [2] - 7:2, 7:3
**DISTRICT** [3] - 1:1, 1:1, 1:17
**diverse** [1] - 57:13
**Diversion** [1] - 21:3
**diversion** [2] - 21:10, 79:19
**diversity** [1] - 77:1
**divide** [2] - 40:10, 40:12
**divulge** [1] - 70:18
**Doctor** [3] - 94:17, 157:16, 158:23
**doctor** [3] - 39:22, 109:5, 109:9

**doctor-involved** [1] - 109:9
**Doctorate** [2] - 9:5, 9:8
**document** [21] - 89:21, 90:14, 90:16, 90:17, 91:12, 91:20, 92:1, 92:6, 92:8, 92:18, 92:23, 93:18, 95:9, 95:23, 95:25, 96:2, 128:3, 128:8, 128:20, 163:17
**documented** [1] - 132:25
**documents** [9] - 55:17, 56:2, 66:15, 66:18, 66:24, 131:22, 154:25, 162:18
**doling** [1] - 82:12
**dollar** [6] - 26:10, 26:11, 36:8, 36:16, 41:2, 41:20
**dollars** [15] - 25:11, 26:13, 29:5, 44:5, 45:10, 55:3, 86:19, 90:1, 96:13, 143:3, 143:11, 143:16, 143:18, 159:5, 160:8
**domain** [2] - 18:14, 19:15
**done** [8] - 19:11, 49:6, 74:8, 74:11, 105:1, 134:7, 167:22, 169:21
**dosage** [1] - 127:10
**double** [1] - 13:5
**doubt** [1] - 159:6
**Douglas** [1] - 4:23
**down** [11] - 20:18, 22:4, 22:20, 23:9, 36:9, 37:1, 37:5, 83:13, 123:1, 127:11, 161:5
**downstream** [2] - 38:21, 38:25
**dr** [1] - 20:6
**Dr** [93] - 7:8, 7:22, 8:1, 8:7, 8:15, 9:17, 12:3, 13:7, 13:15, 14:7, 14:25, 16:14, 16:18, 16:25, 17:4, 17:17, 17:25, 19:2, 20:1, 20:5, 20:12, 25:2, 28:16, 29:7, 33:2, 34:3, 35:23, 35:25, 36:1, 36:20, 36:25, 37:12, 37:15, 37:20, 37:21, 37:22, 37:23, 38:18, 39:12, 39:16,

39:17, 40:6, 40:18, 41:5, 42:10, 42:19, 43:1, 43:6, 43:11, 46:24, 47:2, 47:5, 47:8, 47:14, 47:15, 47:18, 47:21, 47:25, 48:8, 48:12, 49:2, 49:24, 50:3, 50:7, 51:4, 51:7, 52:9, 52:14, 54:23, 55:5, 55:11, 76:4, 99:22, 127:15, 136:12, 136:16, 136:18, 136:20, 137:18, 137:21, 138:12, 138:16, 141:18, 142:2, 154:21, 155:11, 155:13, 157:17, 158:1, 158:3, 158:6
**DR** [1] - 7:15
**drafted** [1] - 137:7
**draw** [2] - 107:17, 135:12
**dried** [1] - 27:6
**drive** [2] - 55:23, 56:7
**Drive** [1] - 6:15
**driven** [2] - 14:13, 37:18
**drivers** [3] - 17:24, 36:10, 36:13
**drives** [1] - 36:16
**driving** [1] - 36:19
**dropping** [1] - 52:13
**Drug** [14] - 6:2, 22:4, 23:6, 23:12, 23:17, 23:20, 25:9, 26:12, 70:1, 70:24, 71:22, 78:2, 87:18, 170:11
**DRUG** [2] - 1:7, 1:13
**drug** [28] - 21:20, 22:6, 22:10, 23:1, 38:21, 39:7, 41:9, 41:10, 41:13, 41:16, 49:15, 49:21, 73:25, 84:10, 87:7, 97:9, 97:13, 125:22, 127:16, 144:2, 145:10, 145:11, 149:19, 150:22, 150:23, 152:2, 152:20, 152:21
**drugs** [9] - 38:23, 125:24, 126:18, 126:22, 147:10, 152:4, 152:5, 153:1
**due** [2] - 29:9, 120:13
**duration** [1] - 45:16
**During** [1] - 62:6
**during** [14] - 8:12,

12:10, 31:19, 33:22, 35:1, 48:10, 48:23, 69:21, 70:10, 77:22, 112:21, 140:12, 148:4, 155:7
**Dwane** [1] - 13:8

**E**

**E-S-O-O-S** [1] - 87:16
**eager** [2] - 146:6, 146:10
**early** [1] - 167:1
**earned** [2] - 9:7, 102:3
**ease** [1] - 53:12
**easier** [2] - 53:5, 159:20
**East** [3] - 3:5, 3:12, 4:24
**easy** [1] - 52:5
**economic** [1] - 17:24
**economics** [1] - 12:17
**editing** [1] - 15:11
**educate** [1] - 41:25
**Education** [3] - 41:20, 42:5, 42:11
**education** [2] - 42:2, 42:12
**educational** [3] - 57:24, 58:12
**effect** [2] - 39:5, 101:8
**effective** [2] - 143:24, 149:16
**effectiveness** [2] - 17:7, 144:18
**eight** [5] - 53:8, 53:17, 53:18, 61:10, 61:13
**eight-county** [1] - 61:10
**Eighth** [1] - 3:10
**either** [12] - 18:13, 19:6, 23:9, 23:22, 41:25, 65:25, 72:12, 77:4, 81:19, 107:19, 115:1, 131:7
**element** [1] - 92:17
**elements** [1] - 101:10
**eligibility** [2] - 99:9, 102:2
**eligible** [13] - 63:9, 73:14, 82:7, 83:7, 83:8, 97:22, 99:11, 101:17, 102:3, 103:1, 103:10, 114:20, 119:4
**ELIZABETH** [1] - 6:14
**emerged** [1] - 106:10
**emerging** [1] - 124:22
**Emerging** [1] - 125:1
**emphasized** [1] -

13:19
**employ** [1] - 14:14
**employed** [1] - 13:14
**employee** [1] - 166:2
**employees** [3] - 60:10, 60:21, 155:16
**employer** [1] - 71:14
**employment** [1] - 71:16
**Empowerment** [2] - 22:8, 87:9
**empty** [1] - 150:11
**encapsulate** [1] - 142:19
**Encino** [1] - 3:16
**end** [11] - 14:15, 34:9, 34:17, 66:25, 67:1, 94:9, 112:22, 113:18, 123:24, 163:15, 167:3
**ending** [2] - 29:18, 165:11
**ends** [4] - 93:15, 93:21, 129:12, 167:22
**Energy** [2] - 129:7, 131:23
**Enforcement** [2] - 21:3, 70:24
**enforcement** [2] - 21:10, 21:11
**engage** [1] - 15:12
**engaged** [5] - 15:8, 17:20, 17:21, 36:5, 45:6
**engagement** [1] - 14:14
**engineers** [1] - 11:10
**enhanced** [2] - 87:15, 101:25
**enjoy** [1] - 63:8
**enrollees** [8] - 101:25, 102:1, 105:2, 115:11, 118:14, 121:22, 122:6, 122:11
**ensuring** [1] - 85:20
**entire** [6] - 59:11, 59:23, 62:7, 81:4, 100:13, 100:15
**entities** [3] - 31:12, 84:24, 91:8
**entitled** [2] - 128:13, 128:15
**entitlement** [2] - 99:13, 119:8
**entity** [4] - 13:6, 66:1, 81:20, 83:22
**entries** [1] - 114:24
**entry** [1] - 43:19

**ENU** [1] - 4:17
**environment** [1] - 74:6
**epidemic** [19] - 51:6, 79:17, 142:23, 143:24, 144:4, 144:22, 145:1, 145:7, 146:16, 146:20, 146:22, 147:19, 149:17, 150:16, 150:20, 150:24, 152:17, 153:16, 154:10
**episodes** [1] - 44:20
**equaling** [1] - 52:18
**equals** [2] - 42:8, 54:13
**equipped** [1] - 156:2
**equivalent** [1] - 68:16
**erratic** [1] - 32:3
**ESOOS** [1] - 87:16
**especially** [1] - 158:18
**essence** [2] - 9:15, 36:7
**essential** [9] - 101:6, 101:9, 101:10, 102:15, 102:22, 135:22, 143:25, 144:1, 149:22
**establish** [3] - 8:3, 66:10, 90:14
**established** [3] - 99:10, 101:5, 115:2
**establishing** [1] - 114:9
**estimate** [6] - 74:24, 75:2, 105:8, 105:9, 105:11, 105:12
**estimated** [1] - 47:17
**estimating** [1] - 47:15
**et** [6] - 1:7, 1:13, 139:25, 140:6, 170:10, 170:11
**evaluate** [3] - 29:11, 138:23, 138:24
**evaluated** [3] - 33:2, 34:3, 48:17
**evaluating** [1] - 140:18
**Evaluation** [1] - 91:14
**eventually** [1] - 108:12
**evidence** [26] - 26:23, 29:7, 48:23, 90:9, 95:12, 138:20, 139:7, 141:3, 141:24, 143:23, 143:25, 144:3, 144:12, 144:14, 144:18, 149:15, 149:20, 149:21, 161:16, 161:19,

162:8, 164:8, 164:11, 167:22, 168:8, 168:19
**evidence-based** [1] - 95:12
**evidentiary** [1] - 162:23
**evolution** [1] - 11:13
**evolved** [2] - 10:22, 11:3
**exact** [1] - 119:19
**exactly** [1] - 116:7
**EXAMINATION** [5] - 7:20, 56:20, 142:12, 154:19, 159:15
**examination** [1] - 10:14
**examine** [1] - 142:11
**example** [14] - 19:17, 29:20, 51:22, 57:15, 64:23, 65:3, 70:15, 87:7, 109:3, 110:8, 111:23, 137:24, 150:12, 166:1
**except** [1] - 168:10
**exception** [4] - 90:15, 91:18, 92:11, 92:19
**exceptionally** [1] - 96:11
**excess** [3] - 34:4, 35:9, 35:13
**Exchange** [1] - 41:12
**excluded** [4] - 106:23, 107:10, 110:19, 131:24
**exclusion** [7] - 107:10, 107:11, 108:12, 108:13, 110:20, 110:24, 110:25
**excuse** [2] - 20:8, 60:19, 136:22
**excused** [1] - 55:11
**executes** [1] - 82:11
**executive** [1] - 12:20
**Executive** [5] - 57:2, 60:24, 68:14, 68:16
**exhibit** [1] - 55:24
**exhibits** [1] - 55:22
**existence** [1] - 86:12
**existing** [7] - 17:7, 136:23, 137:11, 137:14, 137:20, 142:3, 150:5
**exists** [6] - 118:3, 136:1, 149:17, 150:16, 157:7, 157:8
**expand** [4] - 95:11, 95:12, 105:9, 109:25
**expanded** [6] - 103:1,

103:9, 103:11, 111:13, 119:10, 119:11
**expanding** [1] - 122:6
**expect** [4] - 29:1, 29:4, 29:25, 123:21
**expected** [2] - 91:9, 165:12
**expended** [2] - 51:5, 94:3
**expending** [1] - 144:3
**expenditure** [3] - 143:2, 143:11, 143:16
**expenditures** [1] - 18:2
**expenses** [2] - 29:19, 34:19
**experience** [17] - 15:19, 57:24, 57:25, 58:25, 63:5, 63:16, 76:18, 76:23, 76:25, 77:6, 77:16, 77:17, 77:21, 77:22, 78:6, 78:12, 138:22
**experienced** [1] - 164:19
**experiencing** [1] - 146:22
**expert** [22] - 14:8, 14:11, 14:18, 15:11, 15:13, 15:16, 15:19, 16:6, 16:15, 17:25, 68:17, 74:17, 74:19, 79:1, 79:9, 90:12, 92:3, 92:4, 92:5, 126:9, 128:12, 136:12
**expertise** [5] - 14:10, 16:10, 16:11, 69:6, 160:9
**experts** [2] - 65:16, 128:14
**expire** [1] - 100:3
**explain** [10] - 25:19, 30:3, 40:7, 58:11, 71:1, 130:3, 135:20, 146:8, 148:12, 164:4
**expresses** [1] - 95:17
**extend** [1] - 135:9
**extended** [3] - 28:6, 28:8, 112:7
**extension** [3] - 94:20, 95:3, 112:19
**extensions** [1] - 94:23
**extent** [3] - 151:16, 157:8, 165:20
**external** [4] - 25:14, 25:16, 25:24, 68:22

# F

**Faber** [1] - 7:1
**FABER** [1] - 1:17
**face** [5] - 90:18, 91:12, 91:20, 92:1, 92:17
**facilities** [3] - 106:25, 108:19, 138:14
**facility** [11] - 61:6, 61:7, 61:24, 62:20, 62:24, 63:7, 63:19, 63:21, 64:1, 64:2, 107:15
**fact** [18] - 28:24, 39:1, 61:1, 89:17, 91:3, 92:8, 92:11, 92:23, 95:3, 95:16, 95:24, 96:8, 108:13, 129:25, 132:6, 132:9, 158:18, 160:16
**factor** [3] - 153:16, 154:10, 154:11
**factual** [2] - 91:19, 92:12
**failures** [1] - 40:1
**fair** [10] - 37:21, 61:24, 85:3, 103:10, 142:21, 143:10, 148:2, 149:10, 153:15, 156:20
**fairly** [2] - 69:8, 142:19
**faith** [2] - 57:18, 73:13
**faith-based** [2] - 57:18, 73:13
**familiar** [4] - 76:13, 92:2, 137:23, 141:18
**families** [1] - 139:4
**Families** [3] - 71:15, 71:21, 72:19
**family** [3] - 39:3, 106:17
**Family** [1] - 138:5
**fancy** [1] - 146:25
**far** [4] - 37:3, 49:7, 153:23, 154:1
**FARRELL** [43] - 2:3, 79:7, 119:23, 128:6, 130:5, 130:8, 130:10, 130:14, 131:19, 133:4, 134:15, 134:18, 134:25, 135:16, 136:7, 142:13, 144:20, 145:2, 145:5, 145:6, 146:9, 146:11, 148:2, 148:10, 148:13, 148:15, 149:2, 149:8, 151:21,

151:22, 153:23, 154:1, 154:7, 154:13, 161:4, 163:10, 163:20, 164:15, 165:16, 166:9, 166:15, 167:23, 168:3
**Farrell** [15] - 2:4, 2:13, 120:7, 123:16, 142:14, 146:5, 146:7, 148:22, 149:1, 154:23, 161:2, 163:18, 163:23, 167:2, 168:2
**fatal** [1] - 124:22
**Fatal** [1] - 125:1
**Fatigue** [1] - 23:4
**fault** [1] - 16:22
**FCRR** [1] - 6:18
**FDA** [1] - 104:24
**February** [1] - 15:9
**federal** [72] - 58:17, 58:19, 59:19, 63:4, 64:7, 64:9, 64:21, 65:6, 65:24, 66:11, 67:22, 68:13, 72:2, 72:10, 73:19, 73:24, 74:1, 78:21, 80:2, 80:14, 80:18, 81:17, 81:25, 82:2, 83:16, 84:21, 85:2, 85:16, 86:13, 86:21, 86:22, 93:6, 96:16, 97:19, 97:20, 98:2, 98:3, 98:11, 98:19, 102:25, 103:3, 103:5, 103:8, 103:11, 105:22, 109:16, 112:24, 116:9, 118:3, 118:19, 122:17, 123:3, 129:20, 129:22, 131:14, 132:17, 133:1, 133:12, 133:20, 134:3, 140:12, 140:17, 142:22, 142:24, 159:1, 159:19, 160:3, 160:6, 164:18
**federally** [2] - 87:24, 122:12
**fee** [1] - 110:9
**felony** [1] - 22:17
**fentanyl** [3] - 125:8, 152:8, 157:12
**few** [7] - 55:16, 57:8, 57:23, 106:14, 161:13, 167:21, 168:17

**fewer** [1] - 69:17
**field** [3] - 108:8, 148:18, 160:10
**fields** [1] - 16:15
**fighting** [1] - 33:24
**fights** [1] - 33:17
**figure** [4] - 42:13, 51:2, 82:25, 120:15
**file** [4] - 163:12, 163:22, 164:1, 164:20
**filed** [4] - 163:3, 163:8, 163:13, 164:16
**final** [3] - 129:9, 161:19, 161:24
**finally** [1] - 56:1
**finance** [5] - 12:10, 12:17, 33:8, 59:12, 66:19
**financial** [14] - 9:23, 10:25, 18:22, 29:14, 30:18, 33:11, 34:6, 35:1, 59:14, 59:17, 60:19, 65:17, 82:6, 84:6
**financially** [1] - 74:10
**financials** [1] - 18:25
**financing** [7] - 75:22, 76:3, 76:23, 76:24, 77:4, 79:3, 79:11
**findings** [3] - 20:20, 91:19, 92:13
**finger** [1] - 145:15
**finish** [6] - 14:12, 83:14, 123:12, 146:4, 156:11, 156:13
**finished** [1] - 123:17
**Fire** [3] - 29:23, 31:11, 155:25
**Firm** [2] - 3:4, 3:7
**firm** [8] - 8:3, 8:9, 10:16, 10:21, 10:23, 11:3, 11:8, 12:16
**firms** [2] - 10:23, 11:9
**first** [37] - 12:7, 18:1, 18:11, 20:12, 21:1, 21:2, 24:8, 29:12, 30:17, 31:18, 36:9, 39:24, 41:18, 43:3, 43:18, 43:22, 51:6, 52:13, 58:25, 67:11, 80:21, 87:3, 88:10, 88:13, 89:25, 93:5, 93:6, 95:8, 115:18, 125:17, 125:19, 130:13, 131:24, 135:15, 161:15, 163:21
**First** [1] - 23:4

**fiscal** [2] - 81:10, 85:16
**Five** [1] - 111:17
**five** [14] - 10:12, 53:8, 73:10, 110:12, 112:7, 112:18, 112:21, 113:4, 113:8, 113:17, 152:22, 165:8, 165:13, 166:19
**five-year** [7] - 73:10, 110:12, 112:7, 112:18, 112:21, 113:4, 113:8
**FL** [1] - 2:11
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**Floor** [1] - 3:5
**Florida** [14] - 71:11, 71:12, 71:15, 71:16, 71:18, 71:25, 72:17, 73:1, 78:4, 78:5, 81:1, 81:2, 129:21, 131:7
**flow** [1] - 81:19
**flows** [1] - 65:24
**FMAP** [2] - 98:6, 98:13
**focus** [6] - 13:18, 15:22, 15:23, 31:9, 31:18, 43:18
**focused** [4] - 11:20, 15:25, 29:21, 71:4
**focusing** [1] - 59:1
**follow** [2] - 154:22, 154:23
**following** [1] - 55:22
**follows** [2] - 7:4, 50:20
**foolish** [1] - 168:13
**Footnote** [1] - 148:16
**FOR** [1] - 1:1
**for-profit** [1] - 64:2
**forecasting** [1] - 105:1
**foregoing** [1] - 170:8
**forensic** [18] - 11:4, 11:13, 11:14, 11:15, 11:17, 11:21, 11:22, 12:24, 13:4, 13:9, 13:18, 14:10, 14:13, 15:20, 15:24, 16:1, 16:6, 16:16
**Forensic** [2] - 13:6, 13:21
**forensics** [1] - 9:23
**forgot** [1] - 71:19
**form** [2] - 14:16, 136:2
**formed** [2] - 10:19, 135:21
**former** [2] - 14:25, 166:2
**formerly** [1] - 166:1

**forming** [5] - 128:17, 128:20, 129:1, 132:16, 135:6
**formula** [8] - 43:6, 82:4, 82:10, 82:11, 95:25, 96:7, 96:9
**forth** [2] - 165:23, 167:8
**forward** [4] - 115:13, 137:17, 168:16, 169:22
**foundation** [4] - 90:14, 90:23, 92:19, 92:24
**four** [8] - 18:11, 40:18, 43:5, 53:18, 70:1, 70:10, 80:20, 125:1
**four-month** [1] - 70:10
**four-step** [1] - 18:11
**fourth** [2] - 94:7, 125:17
**Fourth** [1] - 162:6
**fraction** [1] - 51:11
**frame** [2] - 146:2, 153:3
**framed** [1] - 37:17
**framework** [1] - 97:11
**framing** [1] - 20:2
**frankly** [4] - 69:10, 74:10, 76:16, 152:6
**free** [2] - 55:13, 161:6
**Friday** [1] - 166:24
**full** [14] - 11:9, 12:15, 46:5, 56:12, 69:18, 100:15, 100:16, 109:25, 111:23, 111:25, 115:10, 141:4, 141:8, 150:11
**Fuller** [2] - 2:4, 2:13
**FULLER** [1] - 2:12
**fully** [2] - 11:18, 34:14
**function** [1] - 52:2
**fund** [9] - 20:22, 34:7, 34:8, 34:15, 41:25, 66:12, 87:8, 87:24, 149:24
**funded** [18] - 18:7, 18:19, 19:6, 19:24, 20:3, 22:2, 23:22, 26:8, 28:2, 31:8, 59:10, 60:13, 107:2, 122:12, 139:20, 141:15, 141:16, 142:4
**funder** [1] - 87:3
**funding** [70] - 19:18, 19:19, 20:18, 24:22, 25:5, 25:17, 26:4, 26:17, 26:21, 27:5, 27:11, 27:20, 27:22,

28:21, 29:1, 30:13, 33:16, 34:21, 35:13, 57:16, 58:21, 65:4, 72:4, 74:6, 76:24, 77:20, 80:2, 80:14, 82:23, 83:5, 84:23, 86:21, 86:22, 86:23, 87:7, 87:17, 88:2, 88:3, 88:4, 88:9, 88:17, 90:2, 93:6, 94:2, 96:16, 97:20, 99:5, 99:14, 104:16, 118:3, 118:7, 118:19, 119:8, 123:3, 123:4, 133:1, 133:12, 133:21, 135:9, 135:14, 137:15, 142:25, 158:23, 159:2, 159:3, 159:6, 160:5, 160:7, 160:8, 160:18
**Funding** [2] - 88:24, 89:6
**funds** [26] - 24:8, 25:14, 25:16, 25:24, 33:25, 34:4, 34:12, 34:14, 34:16, 34:18, 34:24, 35:9, 72:2, 72:25, 84:14, 84:21, 85:3, 85:5, 85:7, 96:9, 129:20, 129:23, 131:14, 132:17, 157:5
**future** [7] - 38:17, 147:17, 149:24, 159:2, 159:9, 160:11

## G

**gaps** [2] - 137:16, 150:6
**gateway** [1] - 79:22
**gather** [4] - 14:15, 18:21
**gathered** [2] - 59:18, 66:24
**gears** [1] - 35:22
**General** [12] - 60:2, 60:7, 60:9, 88:25, 89:11, 89:14, 90:21, 91:1, 91:3, 91:14, 93:4, 94:22
**general** [7] - 16:11, 35:25, 36:23, 36:24, 62:23, 91:1, 107:3
**generality** [1] - 10:20
**Generally** [2] - 83:6, 99:4
**generally** [15] - 14:18, 15:3, 16:9, 21:8,

21:13, 22:10, 43:3, 70:16, 87:24, 94:19, 94:24, 96:2, 108:3, 109:12, 125:15
**Generals** [1] - 91:7
**generated** [1] - 31:5
**George** [8] - 17:25, 37:3, 37:18, 37:19, 44:12, 46:9, 46:14, 46:19
**Gilberto** [1] - 165:15
**Gina** [1] - 51:1
**given** [4] - 95:18, 118:11, 123:10, 157:20
**goal** [2] - 109:24, 136:16
**goodwill** [1] - 169:4
**Gosh** [1] - 57:17
**gosh** [5] - 66:17, 70:12, 73:18, 101:20, 102:1
**government** [34] - 51:25, 52:1, 59:19, 63:4, 64:8, 66:12, 67:23, 68:13, 73:19, 78:17, 78:21, 80:2, 80:14, 80:18, 81:17, 81:25, 82:2, 83:17, 83:22, 97:20, 98:19, 102:25, 103:4, 103:5, 103:8, 103:11, 109:16, 112:24, 116:10, 159:19, 160:3, 160:6
**governments** [4] - 57:13, 74:2, 142:22, 159:1
**Governor** [1] - 72:20
**Governor's** [1] - 71:22
**Graduate** [1] - 12:8
**graduate** [1] - 12:10
**graduated** [2] - 8:25, 10:10
**grant** [84] - 18:23, 22:9, 22:15, 24:4, 25:17, 25:24, 26:3, 26:14, 27:11, 27:19, 28:4, 28:7, 28:13, 28:14, 28:17, 28:20, 28:23, 28:25, 58:22, 64:25, 65:24, 66:8, 69:4, 72:13, 72:25, 73:24, 74:1, 78:14, 80:17, 80:21, 80:22, 81:4, 81:8, 81:14, 81:16, 81:20, 82:8, 82:17, 82:19, 83:5, 83:6, 83:24, 84:12, 84:17, 85:14, 85:16,

86:6, 86:9, 86:12, 86:16, 87:15, 88:5, 88:10, 88:12, 88:13, 90:2, 90:3, 94:9, 94:10, 94:11, 95:3, 95:11, 95:22, 96:1, 96:3, 96:18, 96:19, 97:2, 97:9, 97:12, 97:13, 99:1, 99:6, 111:18, 111:20, 112:22, 118:8, 119:8, 134:24, 160:15, 160:16, 160:20
**Grant** [3] - 64:24, 88:24, 89:6
**grant-based** [1] - 99:6
**granted** [1] - 101:15
**granting** [1] - 94:23
**grantor** [1] - 25:20
**grants** [22] - 28:18, 33:15, 34:1, 64:23, 69:1, 69:16, 75:24, 77:17, 77:18, 80:17, 86:22, 97:7, 97:14, 99:2, 99:22, 99:25, 118:9, 134:24, 145:18, 145:20, 145:21, 158:23
**grateful** [1] - 169:5
**gray** [1] - 95:10
**great** [1] - 18:17
**GRETCHEN** [1] - 6:7
**grew** [1] - 8:16
**Group** [3] - 57:3, 57:4, 77:2
**group** [2] - 15:2, 138:4
**grow** [1] - 8:14
**growth** [1] - 30:7
**guarantee** [1] - 159:1
**guaranteed** [1] - 28:24
**guess** [7] - 29:12, 58:14, 65:18, 78:18, 125:10, 150:6, 169:12

## H

**half** [5] - 32:22, 50:13, 94:2, 123:9, 123:18
**Halloran** [1] - 13:8
**hand** [7] - 7:14, 38:1, 55:23, 93:14, 95:9, 99:3, 129:11
**happy** [1] - 87:2
**hard** [1] - 124:24
**HARDIN** [4] - 5:3, 148:1, 151:15, 158:10
**Hardin** [2] - 147:25,

158:9
**Harm** [5] - 21:16, 21:17, 21:21, 42:5, 42:10
**harm** [6] - 21:19, 40:25, 41:2, 41:6, 41:9, 41:15
**Hawkins** [1] - 3:7
**head** [2] - 71:8, 152:23
**health** [46] - 21:14, 35:3, 57:5, 57:6, 60:20, 61:2, 61:20, 61:25, 62:4, 62:11, 63:19, 64:23, 65:4, 68:6, 68:7, 69:15, 72:12, 85:20, 85:25, 87:25, 97:24, 97:25, 101:7, 101:12, 102:8, 102:15, 102:16, 102:22, 106:11, 106:14, 106:18, 106:20, 106:24, 107:14, 107:20, 112:4, 122:14, 122:16, 129:23, 143:18, 144:1, 147:7, 151:13, 151:25, 152:13, 152:14
**Health** [34] - 4:16, 5:2, 21:24, 22:1, 41:19, 42:4, 42:11, 55:16, 55:22, 59:3, 59:7, 60:5, 61:9, 62:7, 64:11, 64:12, 65:23, 67:4, 72:11, 82:13, 87:23, 89:1, 89:10, 89:13, 90:21, 91:14, 91:21, 94:21, 110:6, 129:17, 143:4, 156:1, 156:5, 157:18
**healthcare** [5] - 51:24, 112:5, 122:20, 143:23, 147:18
**heard** [3] - 155:13, 155:18, 155:22
**hearing** [1] - 168:16
**hearsay** [3] - 90:12, 90:15, 128:15
**held** [1] - 58:16
**help** [3] - 17:22, 73:15, 74:9
**helped** [2] - 15:4, 18:18
**helpful** [3] - 20:1, 134:14, 165:11
**helps** [1] - 148:6
**hepatitis** [1] - 39:10
**HER** [1] - 138:9
**heroin** [3] - 70:16,

125:6, 152:22
**Hester** [6] - 55:9,
161:11, 162:2,
162:12, 165:6,
167:12
**HESTER** [25] - 5:9,
7:8, 7:21, 16:5,
16:17, 39:13, 39:15,
40:5, 50:7, 53:24,
55:10, 161:10,
161:12, 162:3,
162:13, 162:25,
163:2, 164:4,
164:13, 164:23,
164:25, 167:15,
168:5, 168:8, 169:6
**high** [16] - 9:12, 10:2,
10:20, 17:19, 17:20,
17:24, 20:12, 38:18,
61:15, 95:16, 96:11,
97:18, 116:17,
116:20, 119:1,
136:15
**higher** [6] - 11:3, 96:4,
98:6, 98:10, 99:10,
122:23
**highest** [6] - 68:14,
94:7, 95:19, 120:14,
120:16, 125:13
**hired** [3] - 68:16,
71:19, 73:19
**historical** [2] - 77:24,
108:18
**historically** [9] -
82:19, 83:1, 106:24,
108:6, 108:15,
108:23, 109:12,
116:24, 122:5
**history** [6] - 58:25,
71:9, 76:17, 106:4,
108:7, 109:19
**HIV** [2] - 39:9, 41:13
**hold** [2] - 64:3, 121:21
**Hold** [2] - 54:11, 93:11
**holding** [1] - 72:17
**holds** [1] - 159:9
**Honor** [89] - 7:6, 7:18,
16:5, 16:8, 39:13,
50:10, 50:23, 55:10,
55:14, 55:15, 55:20,
56:10, 58:7, 78:25,
79:7, 79:14, 89:3,
90:8, 90:11, 90:17,
91:17, 91:24, 92:10,
123:7, 123:22,
124:3, 124:9, 126:3,
126:8, 128:2,
128:11, 130:5,
130:8, 130:11,
130:14, 131:3,

131:19, 132:4,
133:4, 133:24,
134:18, 135:16,
142:6, 142:9, 144:5,
144:23, 146:3,
147:21, 148:21,
151:16, 153:17,
154:17, 156:10,
158:10, 158:17,
159:13, 159:23,
159:25, 161:1,
161:4, 161:10,
162:3, 162:10,
162:17, 162:25,
163:2, 163:10,
164:4, 164:13,
164:23, 165:1,
165:2, 165:11,
165:24, 166:6,
166:12, 166:15,
167:10, 167:13,
167:16, 168:5,
168:6, 168:9,
168:12, 168:15,
168:23, 169:2,
169:6, 169:23
**HONORABLE** [1] -
1:17
**Honorable** [1] - 7:1
**honors** [1] - 8:25
**Hoops** [1] - 138:5
**Hope** [1] - 138:3
**hospital** [2] - 62:8,
107:19
**hospital-based** [1] -
62:8
**hospitalization** [3] -
84:5, 116:5, 121:14
**hospitals** [1] - 107:1
**hour** [6] - 50:13,
74:22, 74:23, 123:9,
123:19, 163:8
**hourly** [1] - 74:19
**hours** [4] - 15:9,
22:24, 75:2, 168:11
**House** [4] - 69:10,
69:25, 78:2, 138:10
**house** [1] - 130:24
**housekeeping** [1] -
161:13
**houses** [1] - 138:10
**housing** [1] - 61:23
**Howard** [3] - 165:7,
166:3, 166:19
**HRSA** [1] - 87:23
**huge** [2] - 64:25
**human** [1] - 59:15
**Human** [9] - 64:13,
65:23, 89:1, 89:10,
89:13, 90:21, 91:14,

91:21, 110:6
**hundred** [5] - 14:4,
25:11, 26:13, 53:7,
53:8
**hundreds** [3] - 66:17,
155:2, 160:8
**hunter** [1] - 155:9
**Huntington** [54] -
3:10, 4:1, 8:8, 8:9,
8:12, 8:13, 8:15,
10:12, 17:7, 17:15,
18:3, 18:7, 19:15,
21:22, 22:16, 23:5,
23:16, 29:15, 29:20,
30:12, 33:23, 48:19,
76:1, 76:7, 76:12,
118:13, 121:22,
121:25, 122:3,
122:9, 124:14,
136:24, 137:24,
139:4, 140:22,
141:5, 141:9,
141:15, 141:17,
142:4, 147:8,
149:17, 151:4,
151:6, 151:12,
151:24, 152:12,
155:1, 156:5, 157:1,
157:9, 158:8,
166:11, 170:10
**HUNTINGTON** [1] -
1:4
**Huntington-Cabell** [8]
- 139:4, 141:5,
141:15, 149:17,
151:6, 151:12,
151:24, 152:12
**Huntington/Cabell** [1]
- 122:15

---

# I

**idea** [1] - 146:19
**identified** [19] - 18:4,
18:8, 18:13, 18:14,
18:17, 18:21, 18:24,
19:21, 20:22, 21:13,
23:11, 23:21, 26:7,
27:15, 27:17, 29:13,
34:12, 114:7, 137:12
**identifies** [3] - 20:17,
36:25, 37:2
**identify** [9] - 16:19,
17:21, 18:12, 18:18,
28:22, 29:24, 30:2,
31:4, 31:13
**identifying** [1] -
137:16
**IG** [1] - 94:20
**II** [1] - 117:8

**illicit** [2] - 152:7,
157:12
**imagine** [1] - 11:12
**IMD** [6] - 107:9,
107:11, 108:12,
110:18, 110:20,
110:24
**impact** [4] - 33:10,
135:9, 135:13, 157:8
**impacted** [1] - 135:20
**impacts** [1] - 133:3
**implement** [2] - 13:10,
69:11
**implementing** [1] -
110:7
**implies** [3] - 11:15,
21:9, 22:22
**important** [3] -
136:22, 138:23,
139:25
**imposes** [1] - 105:22
**impressive** [1] -
169:13
**improve** [3] - 67:17,
112:4, 149:22
**improved** [2] - 35:2,
69:16
**improving** [1] - 144:1
**IN** [2] - 1:1, 1:18
**in-kind** [3] - 24:15,
24:18, 24:24
**include** [12] - 21:25,
38:22, 39:8, 41:8,
42:19, 58:19, 59:12,
60:12, 69:7, 75:24,
137:12, 137:13
**included** [14] - 18:23,
22:1, 30:23, 41:6,
59:14, 59:15, 59:17,
69:8, 74:4, 106:13,
107:16, 113:2,
140:13
**includes** [7] - 31:11,
34:15, 57:6, 84:2,
126:22, 147:8,
147:10
**including** [5] - 15:20,
57:13, 100:7,
100:10, 166:21
**income** [12] - 82:5,
82:6, 83:19, 97:23,
98:5, 98:6, 98:8,
98:9, 98:10, 99:8,
99:10, 99:16
**incorporation** [1] -
52:18
**increase** [6] - 32:22,
105:13, 105:16,
160:14, 160:15,
160:18

**increased** [6] - 34:25,
104:11, 104:16,
125:18, 159:3, 160:7
**increases** [2] - 31:15,
159:5
**increasing** [1] -
135:24
**incredible** [2] - 44:25,
169:3
**incremental** [4] -
29:22, 30:4, 31:13,
33:18
**index** [1] - 82:6
**indicate** [3] - 94:12,
120:2, 121:1
**indicated** [6] - 27:10,
35:14, 36:8, 86:5,
91:12, 132:24
**indicates** [2] - 146:21,
146:23
**indicating** [1] - 94:8
**indication** [2] - 35:19,
41:24
**individual** [6] - 22:25,
27:16, 37:4, 99:7,
107:18, 119:5
**individual's** [1] -
119:3
**Individuals** [1] - 97:23
**individuals** [34] -
21:11, 21:13, 22:23,
60:11, 61:19, 83:3,
83:7, 83:9, 83:10,
83:19, 83:25, 98:22,
98:24, 98:25, 99:9,
100:22, 104:4,
104:10, 104:11,
104:12, 104:13,
105:13, 105:14,
106:17, 114:20,
122:15, 141:20,
141:24, 143:20,
144:19, 145:13,
145:14, 149:22,
160:4
**industry** [1] - 114:9
**inform** [2] - 15:14,
134:6
**information** [29] -
18:22, 19:15, 19:21,
37:19, 47:13, 66:21,
70:19, 91:8, 92:18,
127:7, 128:22,
130:15, 132:1,
133:14, 136:23,
138:2, 138:16,
138:19, 138:22,
139:7, 139:16,
139:19, 139:24,
140:4, 140:5, 140:9,

141:1, 141:23, 155:2
**informed** [2] - 141:25,
160:19
**infrastructure** [1] -
135:23
**injecting** [1] - 84:10
**inmates** [1] - 22:18
**innovation** [2] - 110:7
**inpatient** [11] - 46:16,
62:12, 100:12,
106:17, 106:20,
107:17, 108:24,
117:2, 117:4,
117:14, 121:2
**inpatient-based** [1] -
106:17
**inputting** [1] - 162:23
**inquire** [1] - 148:22
**inquiries** [1] - 131:8
**inquiry** [4] - 130:24,
131:11, 132:6, 132:7
**Inspections** [1] -
91:14
**Inspector** [13] - 60:2,
60:7, 60:9, 88:25,
89:11, 89:14, 90:21,
91:1, 91:3, 91:7,
91:13, 93:4, 94:22
**instead** [5] - 21:12,
53:15, 110:9,
148:20, 149:13
**Institute** [3] - 10:6,
13:6, 107:9
**institution** [1] - 106:23
**institutions** [1] - 107:5
**instructor** [3] - 12:16,
12:23, 13:3
**insurance** [13] - 11:11,
83:8, 97:24, 97:25,
102:8, 102:12,
102:16, 102:18,
122:14, 122:16,
122:20
**insure** [1] - 84:14
**intend** [1] - 149:2
**intended** [2] - 81:4,
83:24
**intensity** [3] - 116:15,
116:18, 116:20
**intensive** [5] - 46:3,
61:18, 84:4, 117:2,
117:4
**Intensive** [2] - 116:3,
138:7
**intentions** [1] - 34:1
**interested** [1] - 168:18
**interests** [1] - 68:23
**interferes** [4] - 151:13,
151:25, 152:13,
152:14

**intermittently** [1] -
12:12
**internal** [2] - 68:21,
68:22
**Internal** [4] - 10:11,
10:18, 12:14, 16:2
**interpretation** [1] -
168:18
**interrogatories** [1] -
18:14
**intervention** [1] -
115:19
**interview** [1] - 66:21
**interviewing** [1] -
65:20
**interviews** [1] - 66:23
**introduce** [3] - 7:24,
56:24, 156:24
**introduced** [1] -
160:17
**introducing** [1] -
166:14
**inventory** [1] - 137:14
**inverse** [1] - 98:5
**investigated** [1] - 60:9
**investigation** [3] -
60:18, 91:21, 92:13
**investigations** [1] -
60:12
**investment** [2] -
25:16, 25:18
**investments** [1] -
17:21
**involved** [13] - 22:10,
43:14, 61:19, 61:24,
69:5, 69:6, 77:3,
109:8, 109:9,
126:18, 139:6, 153:1
**involvement** [2] -
15:18, 108:8
**iPhones** [1] - 54:3
**IRPINO** [1] - 166:17
**Irpino** [2] - 3:7, 166:17
**IRS** [5] - 10:11, 10:13,
10:14, 11:1, 12:7
**ISIA** [1] - 5:4
**issue** [6] - 90:12, 92:3,
92:5, 152:5, 152:8,
167:7
**issued** [7] - 19:8,
20:15, 75:14, 90:25,
91:7, 91:8, 91:13
**issues** [16] - 21:14,
23:23, 26:9, 33:21,
35:10, 35:20, 62:23,
62:24, 70:9, 89:9,
126:7, 165:6,
167:12, 167:17
**issuing** [1] - 127:10
**IT** [2] - 65:13, 65:14

**item** [6] - 23:17, 27:18,
40:24, 41:18, 43:22,
64:24
**items** [1] - 28:11
**itself** [3] - 31:24,
90:17, 92:24
**IV** [1] - 41:16

**J**

**Jackson** [1] - 6:8
**Jail** [2] - 22:16, 32:16
**jail** [5] - 32:3, 32:7,
32:10, 32:16, 32:18
**James** [2] - 7:12, 7:25
**January** [3] - 57:22,
113:16, 121:16
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:18
**job** [6] - 58:25, 59:8,
65:9, 68:10, 69:7,
75:5
**join** [1] - 158:17
**Joint** [7] - 62:21, 63:1,
63:4, 63:9, 63:11,
63:12, 63:14
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**judge** [6] - 128:6,
163:20, 164:15,
165:16, 166:9,
167:23
**Judge** [10] - 7:2, 13:8,
55:3, 55:4, 55:5,
119:23, 148:2,
153:24, 154:13,
168:3
**JUDGE** [1] - 1:17
**judgment** [5] - 162:4,
162:7, 162:19,
163:12, 164:20
**judgments** [7] - 17:3,
19:5, 19:11, 19:23,
75:13, 161:20,
161:24
**judicata** [1] - 162:5
**judicial** [4] - 163:4,
163:6, 163:15, 164:6
**July** [3] - 7:4, 170:13,
170:19
**JULY** [1] - 1:19
**June** [2] - 165:7, 166:3
**jurisdiction** [1] -
166:10
**justice** [3] - 21:12,
22:12, 139:6
**Justice** [2] - 25:22,
87:4

**justice-involved** [1] -
139:6
**justify** [1] - 94:22

**K**

**KEARSE** [8] - 4:2,
123:22, 154:16,
154:20, 156:15,
158:15, 158:22,
159:11
**Kearse** [4] - 154:18,
156:25, 158:21,
161:3
**keep** [1] - 165:9
**keeping** [2] - 77:16,
169:16
**keeps** [1] - 125:20
**Kelly** [1] - 6:8
**kept** [1] - 94:23
**Kessler** [1] - 4:23
**Keyes** [2] - 47:14,
47:15
**Keyes'** [1] - 47:25
**kind** [15] - 24:15,
24:18, 24:24, 41:10,
61:16, 84:15, 87:12,
96:18, 97:7, 101:13,
106:8, 106:9,
106:11, 112:2,
163:19
**kinds** [8] - 39:9, 73:6,
73:7, 75:17, 86:22,
108:22, 122:13
**kits** [1] - 41:13
**Knittle** [1] - 165:14
**knowing** [1] - 150:10
**knowledge** [8] -
90:16, 92:7, 92:10,
92:17, 102:10,
140:10, 140:21,
165:25
**knows** [1] - 133:6
**KOUBA** [1] - 4:11

**L**

**LA** [1] - 3:8
**lacks** [1] - 136:22
**landscape** [2] - 75:20,
76:1
**Lanier** [1] - 3:4
**large** [3] - 31:15, 34:6,
95:18
**larger** [2] - 96:21,
96:23
**largest** [4] - 13:22,
64:24, 86:3, 104:19
**last** [23] - 14:3, 15:7,
23:2, 28:5, 28:6,

30:22, 51:2, 53:5,
53:6, 53:12, 57:8,
63:2, 78:11, 82:22,
88:7, 97:7, 116:22,
118:17, 125:11,
146:9, 146:10
**lasted** [1] - 153:4
**latter** [1] - 104:15
**Laughter** [1] - 167:25
**LAURA** [1] - 5:10
**Laura** [2] - 13:7, 14:25
**lavender** [1] - 125:10
**law** [3] - 21:9, 21:11,
169:16
**Law** [4] - 3:4, 3:7,
3:12, 21:3
**Lawton** [2] - 61:14,
61:16
**lawyers** [1] - 169:18
**lays** [1] - 92:19
**lead** [3] - 12:23, 13:3,
67:6
**LEAD** [6] - 19:19,
21:6, 26:19, 27:1,
27:10, 27:13
**leader** [2] - 65:10,
66:3
**leadership** [2] - 60:22,
62:22
**leading** [2] - 131:1,
159:22
**learned** [1] - 77:22
**least** [6] - 16:4, 30:9,
31:10, 33:24, 88:7,
94:3, 152:22, 155:4,
164:5
**leave** [1] - 52:3
**leaves** [1] - 70:15
**led** [2] - 47:11, 108:6
**Lee** [1] - 3:12
**left** [17] - 10:18, 12:14,
16:2, 20:16, 34:16,
34:19, 36:24, 67:7,
67:13, 88:10, 93:11,
93:14, 93:20, 99:3,
106:11, 114:6,
129:11
**left-hand** [3] - 93:14,
99:3, 129:11
**leftover** [3] - 35:9,
35:16, 35:20
**legal** [4] - 11:16,
11:19, 148:17,
151:17
**legally** [4] - 14:17,
61:19, 91:20, 92:13
**legally-involved** [1] -
61:19
**legitimate** [1] - 71:2
**lend** [1] - 31:24

Leon [2] - 2:4, 2:14
less [1] - 94:2
letter [31] - 109:20, 110:13, 128:24, 129:3, 129:5, 129:6, 129:14, 129:25, 130:4, 130:12, 130:17, 130:20, 130:24, 131:20, 131:25, 132:5, 132:15, 132:16, 132:19, 132:23, 133:3, 133:7, 133:14, 134:6, 135:3, 135:5, 135:9, 135:13, 135:20, 136:2, 158:13
letters [1] - 131:6
Level [1] - 117:8
level [32] - 9:12, 10:2, 11:3, 16:11, 17:19, 17:20, 17:24, 20:12, 27:22, 28:2, 28:4, 31:17, 31:22, 31:23, 35:25, 36:23, 36:24, 38:18, 45:23, 45:24, 61:15, 65:24, 69:4, 69:8, 78:22, 86:13, 95:16, 97:18, 98:10, 114:7, 119:1, 136:15
leveled [1] - 32:5
levels [7] - 43:5, 43:12, 52:20, 70:14, 114:9, 114:22, 116:8
Levin [1] - 2:10
levy [1] - 22:2
LEYIMU [1] - 4:13
life [3] - 12:4, 14:7, 22:18
light [1] - 158:18
likely [1] - 160:10
limit [1] - 111:15
limited [2] - 100:7, 108:8
LINDA [1] - 4:8
line [7] - 43:22, 64:24, 111:11, 112:6, 115:18, 158:14, 159:17
lines [1] - 111:5
link [1] - 22:25
Lisa [2] - 6:18, 170:7
list [12] - 18:12, 18:16, 21:3, 21:25, 22:1, 22:13, 23:2, 66:22, 94:6, 138:19, 141:20, 150:12
listed [8] - 23:7, 23:19, 26:1, 37:6, 139:1, 139:24, 157:23,

166:19
listened [1] - 142:18
lists [2] - 94:1, 138:20
literally [1] - 148:3
literature [1] - 146:19
litigation [2] - 11:5, 14:8
live [1] - 8:12
lived [2] - 8:13, 8:14
lively [1] - 71:5
lives [2] - 166:9, 166:11
LLC [1] - 2:4
local [2] - 57:14, 58:18
located [2] - 76:11, 86:1
Located [1] - 76:12
locked [1] - 42:8
lodge [1] - 147:21
Logan [2] - 6:5, 6:12
logo [1] - 58:14
look [16] - 20:5, 28:19, 40:20, 41:18, 42:22, 47:4, 48:21, 93:9, 93:14, 106:11, 111:4, 118:2, 129:11, 152:6, 159:4, 169:21
looked [12] - 19:13, 19:14, 19:15, 26:23, 26:24, 29:22, 31:12, 31:15, 48:22, 48:23, 122:13
looking [14] - 29:19, 30:18, 31:1, 31:13, 33:11, 33:18, 36:1, 49:25, 93:17, 119:21, 137:13, 168:16
looks [1] - 111:6
loose [1] - 167:22
lop [1] - 53:5
lose [3] - 62:25, 63:3, 63:14
low [3] - 83:18, 97:23, 116:15
lower [2] - 98:6, 98:10

M

ma'am [17] - 56:18, 65:15, 81:13, 83:2, 96:24, 102:6, 103:23, 126:24, 139:21, 140:8, 143:22, 150:13, 151:4, 153:9, 153:13, 154:8, 161:5
macro [1] - 12:17
Magazine [1] - 3:7

MAHADY [1] - 6:4
main [3] - 61:13, 61:16, 163:11
MAINIGI [9] - 4:17, 165:2, 165:4, 165:23, 167:10, 168:6, 168:12, 168:15, 169:2
Mainigi [1] - 165:3
MAJESTRO [11] - 2:6, 16:8, 40:1, 50:10, 50:16, 50:23, 50:25, 51:3, 54:2, 162:17, 168:23
Majestro [2] - 2:6, 50:24
major [8] - 24:4, 60:20, 72:3, 86:24, 87:3, 87:14, 93:6, 106:19
majority [1] - 141:14
makers [2] - 28:21, 28:22
manage [1] - 17:23
managed [10] - 18:19, 20:3, 21:23, 110:8, 116:14, 116:17, 116:20, 117:4, 117:10, 117:13
management [9] - 11:1, 12:1, 30:14, 66:19, 117:6, 117:8, 117:10, 117:14, 117:21
manager [1] - 33:8
managerial [1] - 65:17
mandated [1] - 82:4
mandatory [1] - 106:13
Mapes [2] - 165:14, 166:1
March [2] - 88:23, 91:15
MARK [1] - 3:14
Marsal [1] - 15:2
Marshall [4] - 9:4, 12:9, 12:12, 138:3
Master's [1] - 58:15
Masters [1] - 9:3
masters [2] - 12:21, 12:24
MAT [1] - 97:10
match [1] - 114:21
matching [2] - 24:18, 24:19
materials [13] - 13:12, 19:5, 74:25, 75:4, 75:6, 75:9, 75:13, 75:17, 91:9, 125:21, 126:17, 128:13,

157:23
math [6] - 28:9, 42:4, 52:5, 53:12, 53:21, 54:21
matter [10] - 52:1, 52:2, 74:19, 92:6, 129:23, 136:13, 136:16, 164:8, 170:9
matters [5] - 11:19, 15:20, 16:9, 161:13, 161:20
max [1] - 46:1
maximum [1] - 99:17
mayor [2] - 26:20, 33:20
Mayor [7] - 19:1, 19:17, 20:4, 33:21, 35:2, 35:11, 51:22
Mayor's [6] - 23:6, 23:12, 23:17, 23:20, 25:9, 26:12
MCCLURE [91] - 6:3, 56:10, 56:21, 58:7, 58:10, 64:18, 64:19, 76:20, 76:22, 78:25, 79:14, 79:15, 80:5, 80:6, 80:11, 80:12, 80:23, 80:24, 89:3, 89:4, 89:20, 89:22, 90:8, 90:17, 90:24, 91:17, 92:10, 92:22, 93:2, 95:1, 103:19, 103:20, 103:24, 103:25, 106:1, 106:2, 114:2, 114:4, 120:1, 120:7, 120:8, 120:22, 120:25, 123:1, 123:2, 123:7, 123:14, 124:3, 124:9, 124:11, 124:18, 124:20, 126:8, 126:13, 126:14, 128:2, 128:5, 128:11, 128:19, 128:23, 130:6, 130:9, 130:11, 130:22, 131:3, 131:5, 132:4, 132:22, 133:10, 134:16, 134:21, 135:2, 135:18, 136:9, 136:11, 142:6, 142:9, 144:5, 144:23, 146:3, 147:21, 148:21, 153:17, 156:10, 156:14, 158:17, 159:13, 159:16, 159:25, 160:1, 160:25

McClure [5] - 79:13, 130:19, 132:20, 134:20, 154:15
MCGINNESS [1] - 4:2
McKesson [2] - 5:8, 167:16
mean [27] - 9:14, 11:17, 11:24, 23:13, 25:19, 28:20, 30:3, 34:11, 34:25, 36:7, 36:13, 36:18, 38:25, 72:9, 84:13, 88:11, 96:17, 96:23, 101:16, 102:18, 103:6, 108:17, 110:19, 114:6, 114:25, 133:17, 163:19
meaning [4] - 103:7, 108:14, 111:2, 138:13
meaningful [3] - 31:19, 32:19, 32:25
means [6] - 35:16, 63:6, 98:17, 109:8, 115:1, 129:18
measure [1] - 124:24
mechanical [1] - 6:19
Medicaid [97] - 62:21, 63:3, 63:16, 73:11, 73:14, 73:16, 74:13, 75:24, 77:6, 77:10, 80:19, 82:22, 83:7, 83:20, 97:17, 97:18, 97:19, 97:21, 97:22, 97:24, 98:19, 98:22, 99:4, 99:8, 99:10, 99:12, 99:13, 100:6, 100:23, 100:25, 101:1, 101:3, 101:17, 101:22, 101:23, 102:1, 102:3, 102:9, 102:17, 103:2, 103:8, 103:10, 103:17, 104:6, 104:14, 104:21, 105:2, 105:14, 105:22, 106:5, 106:6, 106:8, 106:10, 106:12, 106:21, 106:22, 107:2, 107:4, 107:10, 107:22, 107:25, 108:11, 108:15, 108:18, 108:20, 108:24, 109:12, 109:13, 109:14, 109:15, 109:21, 109:22,

110:2, 110:14, 110:19, 111:6, 113:20, 114:18, 114:20, 115:11, 115:21, 115:24, 118:14, 119:1, 119:7, 122:16, 139:22, 143:2, 143:5, 143:9, 143:15, 160:20

**Medicaid's** [1] - 106:4

**medical** [5] - 17:3, 98:3, 98:25, 106:10, 146:19

**medically** [4] - 51:7, 51:8, 117:2, 117:13

**Medically** [2] - 117:4, 117:13

**Medicare** [28] - 62:25, 63:3, 63:7, 63:8, 63:10, 63:12, 63:15, 80:19, 83:8, 83:19, 109:21, 118:18, 118:19, 119:2, 119:3, 119:5, 119:10, 119:14, 120:10, 120:13, 120:19, 121:2, 121:14, 121:21, 122:6, 122:10, 122:16

**medication** [6] - 73:24, 84:18, 97:8, 144:15, 144:16, 159:21

**medications** [2] - 104:25, 121:5

**medicine** [1] - 83:25

**Medicine** [2] - 114:8, 114:12

**medicines** [1] - 100:8

**meet** [5] - 63:9, 63:10, 108:11, 142:15, 142:16

**meets** [1] - 137:11

**member** [5] - 10:4, 10:5, 10:6, 39:3, 66:20

**members** [2] - 139:16, 139:17

**memorandum** [3] - 163:3, 163:4, 163:7

**men** [1] - 139:3

**Mental** [11] - 59:3, 59:7, 60:5, 61:9, 62:7, 64:11, 67:3, 72:11, 82:13, 94:21, 107:9

**mental** [22] - 21:14, 57:6, 60:20, 61:2,

61:20, 61:25, 62:4, 62:11, 63:19, 64:23, 65:4, 68:6, 68:7, 69:15, 72:12, 106:13, 106:20, 106:24, 107:5, 107:14, 107:19, 129:23

**mention** [1] - 35:13

**mentioned** [18] - 10:16, 11:13, 25:9, 26:19, 27:19, 27:25, 28:11, 33:5, 35:11, 38:3, 41:7, 77:19, 84:25, 127:9, 137:21, 152:18, 154:25, 157:17

**mergers** [1] - 12:2

**met** [1] - 157:4

**meth** [1] - 70:21

**Methadone** [1] - 144:17

**methadone** [4] - 117:17, 121:5, 121:11, 121:17

**Methamphetamine** [1] - 125:1

**methamphetamine** [12] - 70:23, 124:23, 125:6, 125:8, 125:9, 125:10, 125:11, 125:16, 127:3, 152:9, 152:24, 157:13

**methamphetamines** [1] - 126:22

**methodology** [1] - 137:6

**Mexican** [1] - 70:16

**MICHAEL** [2] - 2:12, 3:9

**Michael** [1] - 165:14

**micro** [1] - 12:17

**Micronesia** [1] - 94:4

**microphone** [1] - 89:12

**middle** [2] - 56:14, 114:16

**might** [5] - 25:21, 31:24, 51:17, 120:15

**MILDRED** [1] - 3:3

**miles** [1] - 166:9

**Miller** [4] - 8:11, 13:7, 14:25

**million** [47] - 29:5, 32:4, 32:5, 32:12, 32:13, 32:14, 32:22, 34:9, 34:10, 35:5, 35:6, 42:13, 44:5, 45:9, 53:7, 54:8,

54:18, 54:20, 55:4, 72:7, 86:18, 86:19, 88:19, 88:20, 90:1, 96:13, 97:4, 101:24, 104:8, 104:16, 133:22, 133:24, 134:4, 134:5, 134:8, 143:3, 143:9, 143:16, 143:18

**millions** [3] - 53:15, 101:23, 160:8

**mind** [1] - 119:23

**Minot** [1] - 143:4

**minus** [5] - 53:17, 54:5, 54:8, 54:12

**minute** [6] - 42:7, 81:24, 85:13, 85:23, 135:25, 158:20

**minutes** [1] - 50:15

**missing** [2] - 61:22, 138:11

**Mitchell** [1] - 2:10

**mitigate** [1] - 136:19

**mix** [2] - 14:20, 14:21

**MME** [1] - 127:10

**mobile** [1] - 61:22

**model** [15] - 35:24, 36:2, 37:13, 37:16, 37:23, 45:21, 46:24, 47:7, 47:12, 48:13, 106:8, 106:9, 106:11, 108:19

**moment** [5] - 131:3, 142:6, 159:13, 168:14, 168:15

**Mondays** [1] - 166:23

**money** [54] - 25:24, 25:25, 26:14, 28:13, 28:14, 28:17, 28:22, 28:23, 28:25, 33:14, 33:24, 34:2, 34:16, 34:18, 35:9, 35:16, 35:20, 38:22, 65:24, 66:8, 81:19, 81:20, 81:22, 83:16, 85:14, 85:18, 86:6, 87:4, 87:8, 94:18, 95:2, 95:4, 95:7, 95:22, 96:1, 102:4, 132:9, 133:6, 133:15, 133:19, 134:7, 134:11, 134:14, 134:23, 135:22, 142:22, 143:23, 143:3, 144:21, 147:17, 149:15, 149:23, 160:15, 160:16

**monies** [1] - 142:24

**monitor** [1] - 87:20

**monitored** [2] - 117:2, 117:14

**monitoring** [2] - 72:4, 145:21

**month** [4] - 65:20, 70:10, 99:19

**month-to-month** [1] - 99:19

**months** [1] - 70:2

**moreover** [1] - 34:1

**morning** [11] - 7:5, 7:6, 7:19, 7:22, 7:23, 56:10, 56:18, 56:19, 56:22, 56:23, 150:1

**morphed** [1] - 8:10

**Morris** [1] - 6:15

**most** [9] - 24:17, 25:17, 70:12, 77:1, 77:10, 77:22, 125:22, 126:18, 145:13

**mostly** [5] - 57:5, 63:7, 68:21, 69:5, 106:17

**motion** [1] - 163:12

**motions** [2] - 162:9, 162:20

**Motley** [5] - 4:3, 4:5, 4:8, 4:11, 4:14

**MOUGEY** [1] - 2:9

**move** [13] - 21:11, 22:11, 22:18, 55:17, 58:24, 59:25, 90:8, 111:5, 123:8, 137:17, 161:16, 161:19, 163:5

**moved** [5] - 34:8, 62:7, 71:11, 92:6, 162:4

**Moving** [1] - 97:16

**moving** [3] - 55:22, 128:19, 164:10

**MR** [100] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:14, 4:5, 4:22, 5:9, 5:10, 5:13, 6:4, 7:8, 7:21, 16:5, 16:8, 16:17, 39:13, 39:15, 40:1, 40:5, 50:7, 50:10, 50:16, 50:23, 50:25, 51:3, 53:24, 54:2, 55:10, 79:7, 90:11, 91:24, 119:23, 126:3, 128:6, 130:5, 130:8, 130:10, 130:14, 131:1, 131:19, 133:4, 134:15, 134:18, 134:25, 135:16, 136:7, 142:13, 144:20,

145:2, 145:5, 145:6, 146:9, 146:11, 148:2, 148:10, 148:13, 148:15, 149:2, 149:8, 151:21, 151:22, 153:23, 154:1, 154:7, 154:13, 159:22, 161:4, 161:10, 161:12, 162:3, 162:13, 162:17, 162:25, 163:2, 163:10, 163:20, 163:23, 164:4, 164:13, 164:15, 164:23, 164:25, 165:16, 166:5, 166:9, 166:15, 166:16, 166:17, 167:15, 167:19, 167:23, 168:3, 168:5, 168:8, 168:23, 169:6, 169:12

**MS** [128] - 3:3, 3:6, 4:2, 4:8, 4:11, 4:13, 4:17, 4:18, 4:20, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 55:15, 55:20, 56:6, 56:9, 56:10, 56:21, 58:7, 58:10, 64:18, 64:19, 76:20, 76:22, 78:25, 79:14, 79:15, 80:5, 80:6, 80:11, 80:12, 80:23, 80:24, 89:3, 89:4, 89:20, 89:22, 90:8, 90:17, 90:24, 91:17, 92:10, 92:22, 93:2, 95:1, 103:19, 103:20, 103:24, 103:25, 106:1, 106:2, 114:2, 114:4, 120:1, 120:7, 120:8, 120:22, 120:25, 123:1, 123:2, 123:7, 123:14, 123:22, 124:3, 124:9, 124:11, 124:18, 124:20, 126:8, 126:13, 126:14, 128:2, 128:5, 128:11, 128:19, 128:23, 130:6, 130:9, 130:11, 130:22, 131:3, 131:5, 132:4, 132:22, 133:10, 134:16, 134:21, 135:2, 135:18, 136:9, 136:11,

142:6, 142:9, 144:5,
144:23, 146:3,
147:21, 148:1,
148:21, 151:15,
153:17, 154:16,
154:20, 156:10,
156:14, 156:15,
158:10, 158:15,
158:17, 158:22,
159:11, 159:13,
159:16, 159:25,
160:1, 160:25,
165:2, 165:4,
165:23, 166:12,
167:10, 168:6,
168:12, 168:15,
169:2
**Mt** [3] - 4:4, 4:12, 4:15
**Mullins** [15] - 129:15,
131:11, 131:16,
132:7, 133:2,
133:22, 134:14,
134:23, 135:13,
135:19, 136:6,
157:17, 158:3,
158:6, 158:13
**Mullins'** [5] - 129:19,
135:3, 135:5, 158:1,
158:11
**multiply** [1] - 143:8
**municipalities** [2] -
57:17, 80:3

### N

**naloxone** [6] - 117:25,
155:19, 155:22,
155:25, 156:2, 156:8
**Naltrexone** [1] -
144:17
**name** [11] - 7:11, 7:25,
11:15, 21:9, 22:22,
30:11, 56:12, 56:14,
56:25, 106:10,
142:14
**narrative** [2] - 15:1,
32:8
**National** [2] - 70:1,
78:2
**national** [2] - 81:7,
90:5
**nationwide** [1] - 90:2
**nature** [7] - 10:22,
14:13, 19:3, 41:14,
59:17, 131:10,
144:13
**navigate** [1] - 15:4
**necessarily** [2] -
51:14, 65:15
**necessary** [4] - 17:1,

51:7, 51:8, 144:4
**need** [16] - 36:9,
50:15, 52:15,
107:18, 115:16,
118:4, 126:15,
137:12, 137:17,
138:23, 138:24,
140:19, 149:4,
164:9, 167:7, 168:20
**needed** [6] - 12:13,
33:15, 51:15,
141:25, 147:17,
149:24
**Needle** [1] - 41:12
**needs** [24] - 37:9,
38:13, 78:11, 78:12,
78:14, 78:19, 95:13,
137:1, 137:2, 137:3,
137:4, 137:9,
137:10, 137:12,
140:1, 140:3, 140:4,
140:9, 140:13,
140:15, 140:18,
140:21, 140:25,
150:4
**negotiations** [1] -
112:25
**Neonatal** [1] - 138:6
**net** [2] - 38:15, 42:14
**never** [3] - 33:16,
155:13, 164:19
**new** [6] - 26:25, 28:18,
46:7, 47:3, 103:9,
123:8
**New** [2] - 3:5, 3:8
**next** [25] - 7:7, 10:9,
20:10, 21:15, 22:4,
22:13, 22:20, 24:15,
31:9, 54:12, 55:16,
58:24, 63:24, 64:5,
67:19, 71:9, 84:22,
86:20, 87:14, 87:23,
115:9, 125:7, 125:8,
168:1
**nice** [2] - 142:14,
142:16
**Nicholas** [2] - 167:18,
169:10
**NICHOLAS** [3] - 6:11,
167:19, 169:12
**nine** [2] - 53:17, 53:18
**ninety** [1] - 53:8
**ninety-six** [1] - 53:8
**Ninth** [1] - 4:9
**no-cost** [2] - 94:20,
94:23
**non** [3] - 22:17, 74:20,
74:22
**non-felony** [1] - 22:17
**non-testimony** [2] -

74:20, 74:22
**normal** [1] - 166:22
**normally** [3] - 11:17,
24:19, 28:22
**note** [2] - 151:15,
153:17
**noted** [2] - 19:18,
20:16
**nothing** [1] - 42:2
**notice** [2] - 23:6,
166:22
**noticed** [1] - 32:21
**Nova** [1] - 9:7
**novel** [1] - 87:12
**Number** [3] - 51:1,
58:8, 76:21
**number** [56] - 14:2,
25:8, 36:9, 36:10,
36:17, 36:19, 43:7,
43:8, 43:12, 43:13,
43:19, 43:23, 44:1,
44:3, 44:4, 44:11,
45:6, 45:12, 45:17,
45:20, 45:25, 46:1,
46:7, 46:8, 46:9,
47:11, 49:6, 51:12,
52:8, 52:11, 54:11,
54:20, 55:4, 55:6,
58:16, 72:3, 87:21,
93:11, 94:7, 95:14,
101:25, 103:15,
104:10, 104:12,
104:13, 105:2,
105:12, 115:17,
119:20, 122:5,
122:22, 127:10,
138:16, 139:8,
139:10, 157:11
**numbers** [30] - 21:1,
25:2, 25:3, 36:14,
37:15, 37:16, 37:18,
37:23, 38:2, 38:15,
42:20, 45:7, 45:11,
46:13, 46:14, 47:25,
49:9, 49:11, 49:20,
54:14, 55:2, 55:24,
93:15, 93:17, 93:21,
129:11, 134:1,
137:22, 140:6
**NW** [6] - 4:6, 4:9, 4:19,
4:21, 5:5, 5:12
**NY** [1] - 3:5

### O

**O'Connell** [2] - 19:2,
99:23
**O'Connell's** [1] - 20:1
**object** [5] - 16:12,
128:7, 153:20,

158:14, 162:17
**objection** [39] - 16:7,
16:9, 16:11, 51:20,
56:4, 79:6, 90:10,
90:11, 91:25, 92:25,
126:3, 130:5, 130:8,
130:14, 130:20,
131:1, 131:19,
132:20, 133:4,
133:9, 134:15,
134:18, 134:19,
134:25, 135:16,
136:7, 144:5,
144:23, 147:22,
147:24, 151:15,
158:10, 158:17,
158:21, 159:22,
161:22, 162:15,
162:23, 163:9
**objections** [2] -
158:13, 162:24
**objective** [3] - 14:15,
30:25
**obligations** [1] - 19:16
**observation** [1] -
34:25
**obvious** [2] - 118:12,
122:9
**obviously** [1] - 154:24
**occupation** [1] - 57:1
**occurred** [2] - 29:8,
151:2
**occurring** [1] - 75:12
**October** [1] - 129:4
**odd** [1] - 34:25
**OF** [2] - 1:1, 1:4
**offer** [5] - 10:24, 18:2,
137:19, 153:8
**offered** [9] - 12:25,
31:5, 31:7, 134:2,
153:18, 153:19,
160:22, 162:21,
164:24
**offering** [10] - 9:13,
11:4, 16:20, 16:22,
16:24, 17:3, 17:6,
17:10, 17:13, 126:5
**offers** [1] - 16:12
**Office** [17] - 23:6,
23:12, 23:17, 23:20,
25:9, 26:12, 34:15,
69:25, 71:22, 78:2,
87:17, 88:25, 89:11,
89:14, 90:21, 94:22,
117:19
**office** [4] - 61:20,
69:5, 72:22, 72:23
**Office-based** [1] -
117:19
**Officer** [2] - 57:2,

60:24
**Offices** [1] - 91:1
**offices** [1] - 61:12
**Official** [2] - 170:6,
170:7
**official** [2] - 91:7,
131:17
**often** [2] - 65:20, 66:3
**Ohio** [1] - 12:15
**OIG** [5] - 89:25, 90:19,
92:14, 92:16
**Oklahoma** [9] - 58:14,
59:2, 59:6, 59:11,
60:4, 61:11, 61:14,
61:17, 62:6
**older** [1] - 119:5
**on-site** [2] - 66:22,
66:24
**once** [3] - 68:21,
84:21, 99:16
**ONDCP** [2] - 70:4,
70:14
**One** [4] - 5:11, 54:8,
68:6, 85:25
**one** [62] - 8:3, 17:20,
19:20, 20:8, 21:15,
22:4, 22:13, 22:20,
23:2, 24:6, 29:13,
31:4, 32:2, 34:5,
39:20, 40:4, 40:9,
42:7, 42:8, 53:7,
53:17, 53:18, 60:20,
61:7, 61:10, 64:21,
67:9, 68:6, 72:14,
78:10, 83:13, 93:21,
96:12, 101:6, 101:9,
102:21, 104:24,
108:24, 111:24,
112:13, 125:8,
125:11, 125:13,
131:22, 131:25,
141:16, 145:14,
145:15, 147:3,
147:13, 151:10,
152:21, 152:24,
152:25, 153:4,
156:25, 157:11,
167:2, 169:20
**one-stop** [1] - 61:10
**ones** [5] - 20:21,
20:22, 26:7, 139:2,
166:20
**open** [1] - 165:10
**operate** [1] - 8:9
**operated** [4] - 8:10,
8:11, 59:10, 60:20
**operating** [1] - 72:6
**Operations** [2] - 59:2,
59:6
**operations** [4] - 59:9,

59:14, 59:22, 78:6
**opinion** [24] - 14:17,
79:17, 79:19, 79:21,
79:24, 126:25,
127:4, 127:8,
128:17, 132:16,
134:6, 136:20,
137:18, 141:3,
141:7, 141:25,
142:2, 142:24,
159:19, 160:2,
160:9, 160:13,
160:14, 160:19
**opinions** [18] - 14:23,
16:18, 16:20, 16:22,
16:24, 17:3, 17:6,
17:10, 17:13, 17:18,
18:2, 126:5, 129:1,
135:6, 135:12,
135:21, 153:8,
160:22
**Opioid** [10] - 88:24,
89:7, 117:16,
118:24, 135:24,
140:22, 143:19,
143:20, 144:16,
144:19
**opioid** [86] - 17:23,
18:4, 18:9, 19:7,
20:23, 23:23, 26:9,
29:9, 30:14, 31:14,
31:25, 33:10, 33:16,
33:19, 33:24, 35:10,
35:20, 48:24, 49:5,
49:10, 51:6, 65:3,
76:5, 76:14, 79:17,
87:15, 88:1, 88:8,
88:14, 90:3, 93:7,
95:12, 95:14, 95:19,
96:4, 96:11, 96:18,
97:12, 100:7,
100:20, 104:5,
104:10, 104:25,
105:3, 105:13,
105:15, 117:19,
118:8, 118:23,
120:19, 121:16,
121:24, 125:9,
126:23, 127:1,
127:5, 131:14,
132:1, 132:9,
136:19, 136:21,
142:23, 142:25,
143:24, 144:4,
144:22, 145:7,
146:16, 146:20,
149:16, 149:21,
151:23, 152:3,
152:8, 152:17,
152:25, 153:3,
153:16, 154:10,

155:6, 157:6, 157:7,
157:10, 158:7,
158:25, 160:14
**opioid-related** [3] -
88:8, 95:14, 155:6
**opioids** [13] - 17:14,
39:4, 42:1, 127:11,
134:3, 145:12,
147:3, 147:6, 147:9,
147:13, 151:8,
154:9, 155:23
**opponent** [1] - 166:14
**opportunity** [4] -
109:23, 111:21,
163:24, 165:17
**opposed** [2] - 145:12,
147:23
**optional** [2] - 106:13,
109:17
**orally** [1] - 163:6
**order** [1] - 15:5
**organization** [2] -
60:1, 87:23
**organizations** [10] -
57:19, 67:17, 73:13,
73:15, 74:2, 74:9,
77:5, 78:9, 80:3,
85:1
**original** [3] - 93:17,
106:12, 107:22
**Orleans** [1] - 3:8
**otherwise** [1] - 149:5
**OTP** [1] - 121:24
**OUD** [16] - 39:10,
42:20, 47:5, 47:7,
47:11, 47:16, 47:17,
47:18, 47:21, 48:8,
141:4, 143:2,
143:10, 159:20,
159:21, 160:4
**out-of-pocket** [1] -
24:10
**outcomes** [2] - 112:2,
112:5
**outline** [1] - 57:24
**outpatient** [28] -
43:18, 43:20, 43:23,
44:4, 44:9, 44:10,
44:13, 45:12, 45:17,
45:20, 45:25, 46:4,
46:5, 46:17, 46:23,
52:18, 53:2, 61:21,
84:3, 84:4, 100:12,
106:20, 109:2,
116:1, 116:3, 121:2,
138:4
**Outpatient** [2] - 109:2,
109:4
**outside** [6] - 8:16,
90:16, 102:9, 166:5,

166:7, 166:19
**over-speaking** [1] -
146:12
**overall** [3] - 35:7,
49:18, 159:18
**overdose** [23] - 22:23,
48:13, 48:17, 48:24,
48:25, 49:5, 49:7,
49:10, 49:25, 73:25,
87:18, 95:14, 95:16,
95:19, 96:5, 96:12,
97:9, 97:13, 124:14,
127:16, 152:6,
155:6, 155:15
**overdoses** [12] -
48:13, 48:17, 49:15,
49:17, 49:21, 49:25,
124:23, 125:16,
125:23, 126:19,
155:23, 157:14
**Overdoses** [1] - 125:1
**overrule** [1] - 92:25
**overruled** [4] - 126:11,
144:8, 151:18
**oversight** [1] - 59:22
**oversupply** [2] -
153:15, 154:9
**overview** [1] - 13:13
**own** [4] - 8:3, 10:16,
42:16, 53:25
**owned** [1] - 13:7
**Oxford** [1] - 138:10

---

**P**

**P-1200** [1] - 2:7
**p.m** [1] - 169:24
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**Page** [5] - 93:9, 93:11,
93:13, 93:16, 148:16
**page** [7] - 89:23,
89:24, 93:17, 95:8,
129:10, 130:13
**paid** [3] - 34:19,
102:24, 103:4
**Pallone** [1] - 131:13
**Papantonio** [1] - 2:10
**paper** [2] - 78:18,
164:22
**papers** [1] - 13:15
**paragraph** [2] -
130:13, 131:24
**pardon** [3] - 109:2,
112:11, 155:12
**Part** [1] - 121:17
**part** [14] - 12:3, 12:8,
14:6, 18:1, 22:2,
24:4, 24:7, 46:18,
47:2, 47:4, 87:17,

94:1, 101:14, 106:19
**partial** [2] - 84:4,
121:14
**Partial** [1] - 116:5
**participated** [2] -
65:19, 66:5
**particular** [7] - 44:1,
45:1, 65:22, 70:9,
84:15, 106:23,
138:14
**particularly** [2] -
41:10, 158:12
**parties** [5] - 25:25,
56:1, 163:15, 165:5,
169:7
**partnered** [1] - 22:16
**partnership** [2] -
97:19, 98:2
**party** [8] - 25:16,
25:18, 25:20, 25:22,
29:14, 128:9,
166:14, 166:16
**pass** [5] - 50:9, 83:21,
165:7
**passed** [2] - 104:4,
107:2
**past** [4] - 86:17, 89:23,
119:11, 163:8
**patience** [2] - 168:25,
169:3
**patient** [1] - 62:23
**patients** [5] - 62:9,
62:11, 62:16,
100:19, 118:4
**PAUL** [2] - 2:3, 5:9
**Paul** [1] - 142:14
**Pause** [3] - 131:4,
142:8, 159:14
**pause** [3] - 43:9,
81:24, 85:23
**pay** [6] - 51:18, 51:22,
52:2, 103:1, 118:13,
122:9
**payer** [2] - 82:22,
104:19
**payers** [2] - 139:19,
140:6
**paying** [2] - 77:25,
107:4
**payment** [1] - 24:12
**payments** [3] - 32:2,
32:9, 32:15
**pays** [3] - 103:5,
103:11, 104:21
**PDO** [1] - 97:13
**PDOA** [2] - 73:25,
97:10
**peaks** [1] - 125:18
**PEARL** [1] - 3:6
**Pearson** [2] - 13:22,

14:3
**peer** [3] - 73:24,
84:18, 115:23
**Pensacola** [1] - 2:11
**people** [19] - 38:23,
39:9, 43:7, 43:12,
44:1, 71:2, 72:7,
79:2, 79:10, 101:16,
101:23, 102:3,
102:11, 112:1,
112:2, 119:13,
120:12, 138:17,
159:20
**per** [4] - 47:13, 98:8,
139:10, 139:17
**Per** [1] - 98:9
**percent** [43] - 35:7,
39:20, 40:11, 40:13,
40:15, 40:21, 47:23,
48:14, 49:14, 49:19,
49:25, 50:1, 57:9,
62:13, 62:18, 65:19,
66:5, 82:20, 82:25,
84:6, 86:11, 94:8,
94:14, 98:14, 98:15,
98:16, 98:18, 98:20,
100:22, 100:24,
103:4, 103:5, 103:7,
103:8, 103:11,
104:22, 119:15,
120:3, 120:15,
122:21, 143:5, 143:8
**percentage** [8] -
39:16, 40:8, 49:13,
98:4, 119:13,
120:12, 122:19,
133:23
**performance** [1] -
59:12
**performed** [1] - 137:5
**performing** [1] - 73:9
**perhaps** [2] - 118:11,
163:22
**period** [40] - 11:20,
12:10, 30:6, 30:17,
30:21, 31:16, 31:19,
32:19, 34:17, 34:24,
35:1, 45:4, 48:1,
48:10, 49:24, 50:4,
50:6, 68:2, 69:1,
69:22, 70:1, 70:10,
73:10, 91:4, 94:10,
94:13, 94:15, 100:1,
102:4, 103:1,
110:12, 111:16,
112:7, 112:18,
112:22, 113:4,
113:8, 113:17,
123:17, 155:7
**periodically** [1] - 14:7

periods [1] - 99:7
permanent [1] - 101:14
permissible [1] - 130:16
permitted [1] - 146:4
person [4] - 52:15, 92:9, 131:25, 132:5
personal [3] - 10:15, 92:7, 92:10
Personal [1] - 92:16
personally [2] - 65:19, 66:6
personnel [2] - 24:20, 59:12
persons [1] - 139:10
perspective [1] - 71:1
PETER [1] - 2:9
Pew [2] - 57:15, 77:5
Philadelphia [2] - 6:6, 6:13
phrase [1] - 72:8
physical [3] - 106:11, 106:18, 143:18
physician [5] - 100:12, 108:6, 108:8, 108:25, 109:6
physician-led [1] - 108:6
physician-supervised [1] - 109:6
physicians [1] - 11:10
picking [1] - 159:17
piece [1] - 85:13
pieces [1] - 155:2
PIFKO [1] - 3:14
piggyback [1] - 163:23
pink [1] - 125:9
place [2] - 93:5, 150:10
plaintiff [1] - 168:24
Plaintiff [5] - 1:5, 1:11, 2:2, 3:2, 4:1
plaintiffs [9] - 14:19, 17:22, 18:13, 25:23, 55:21, 79:22, 123:20, 153:4, 161:22
Plaintiffs [1] - 170:10
plaintiffs' [2] - 163:5, 164:7
plan [34] - 17:4, 37:1, 43:6, 50:3, 52:9, 53:2, 76:5, 109:13, 109:15, 109:18, 113:1, 113:2, 113:5, 113:6, 114:24, 115:2, 115:22,

116:2, 116:4, 116:6, 117:3, 117:5, 117:7, 117:9, 117:15, 117:20, 117:22, 118:1, 136:19, 136:20, 136:22, 137:19, 142:2
planning [7] - 69:13, 69:14, 72:3, 73:1, 74:4, 74:8, 74:11
plans [5] - 37:3, 77:7, 101:7, 102:16, 102:18
play [2] - 14:11, 14:12
Pleasant [3] - 4:4, 4:12, 4:15
pleasure [1] - 169:8
plus [1] - 23:20
pocket [1] - 24:10
point [6] - 8:4, 26:14, 27:13, 146:15, 152:16, 153:20
Point's [1] - 138:9
pointing [1] - 145:14
points [2] - 32:24, 162:10
police [2] - 61:20, 156:2
Police [4] - 29:23, 30:12, 30:13, 31:11
policies [3] - 69:10, 69:12
policy [5] - 28:21, 69:7, 69:8, 78:1
Policy [8] - 23:7, 23:12, 23:18, 23:21, 25:9, 26:12, 70:1, 78:3
policy-making [1] - 69:7
political [2] - 58:15, 58:17
poly [2] - 146:25
polysubstance [3] - 146:23, 152:5, 152:12
Ponc [1] - 2:4
Ponce [1] - 2:14
poor [1] - 102:25
populate [1] - 80:23
population [27] - 18:15, 18:20, 36:17, 47:5, 47:7, 47:16, 47:17, 47:18, 47:21, 48:8, 73:17, 82:5, 84:15, 101:22, 101:24, 103:1, 103:9, 103:12, 105:2, 116:17, 122:20, 143:2,

143:5, 143:6, 143:9, 143:10
populations [4] - 37:10, 38:13, 139:5, 139:6
portfolio [2] - 67:10, 67:13
portion [6] - 80:8, 84:14, 86:7, 86:8, 132:17
position [14] - 12:19, 59:25, 62:10, 63:22, 63:24, 64:3, 64:5, 65:7, 67:19, 68:16, 70:3, 71:9, 71:18, 154:9
positions [2] - 71:20, 71:23
positive [1] - 133:2
possible [1] - 28:20
posted [1] - 30:23
Powell [1] - 2:6
power [2] - 166:6, 166:7
PR [2] - 2:5, 2:14
practice [2] - 106:17, 144:14
practices [7] - 67:18, 143:25, 144:4, 144:13, 144:22, 149:21, 149:22
practicing [2] - 9:19, 164:18
practitioners [1] - 127:10
pre [3] - 21:10, 66:17, 102:4
pre-Affordable [1] - 102:4
pre-booking [1] - 21:10
pre-site [1] - 66:17
predict [1] - 50:3
predicted [2] - 105:15, 115:9
pregnant [1] - 84:9
premise [2] - 143:14, 157:14
preparation [4] - 10:25, 11:1, 75:10, 112:14
prepare [9] - 36:21, 43:1, 49:1, 64:14, 80:7, 103:21, 113:23, 120:18, 124:13
prepared [2] - 88:25, 105:24
preparing [2] - 14:22, 74:25

prescribers [2] - 42:1, 42:2
prescribing [3] - 42:1, 127:13, 127:14
prescription [8] - 17:14, 73:25, 97:9, 97:12, 127:1, 127:4, 127:11, 154:9
prescriptions [1] - 104:20
present [2] - 38:16, 155:25
presented [3] - 20:14, 48:23, 162:8
presential [1] - 67:24
presently [3] - 146:20, 149:17, 150:25
preserve [1] - 162:14
preserved [1] - 162:7
preserving [1] - 162:9
President [5] - 57:2, 67:9, 78:16, 159:4, 160:17
presidential [1] - 67:23
Prestera [5] - 81:21, 85:22, 88:2, 88:4, 138:8
pretty [9] - 30:6, 68:14, 71:4, 72:6, 82:24, 88:12, 92:20, 169:12, 169:14
Pretty [1] - 99:18
prevalence [1] - 137:14
prevented [1] - 158:18
preventing [1] - 97:12
prevention [5] - 21:18, 37:7, 38:6, 39:2, 40:21, 40:24, 41:8, 42:6, 67:15, 70:7, 84:7, 97:11, 136:23, 160:16
Prevention [4] - 77:18, 80:16, 80:22, 87:13
previously [9] - 28:12, 86:8, 88:6, 101:21, 103:6, 118:9, 128:24, 137:1, 157:4
Priddy [2] - 19:3, 27:6
primarily [7] - 13:18, 18:23, 19:25, 72:4, 107:2, 108:9
primary [10] - 41:12, 60:8, 63:18, 71:24, 82:22, 93:8, 108:18, 109:24, 152:8, 153:4
principles [1] - 11:16
priorities [2] - 68:24, 69:9

private [7] - 83:8, 102:8, 102:12, 102:16, 102:18, 122:14, 122:15
PROACT [1] - 138:4
problem [6] - 28:22, 28:23, 127:2, 127:22, 132:12, 145:10
problems [1] - 60:19
procedures [1] - 66:16
proceedings [1] - 170:9
Proceedings [2] - 6:19, 50:20
PROCEEDINGS [1] - 7:1
process [1] - 18:10, 18:11, 19:13, 30:5, 39:19, 137:10, 165:9, 166:18, 166:22, 166:25, 167:3
Proctor [1] - 2:10
produced [1] - 6:19
product [2] - 66:25, 67:1
profession [2] - 8:1, 10:3
Professional [3] - 41:19, 42:5, 42:11
professional [6] - 10:4, 12:4, 14:7, 57:25, 145:18, 160:23
professionals [1] - 11:10
professor [1] - 12:12
profit [1] - 64:2
program [52] - 12:22, 12:23, 13:1, 13:3, 13:5, 13:9, 13:10, 13:11, 13:14, 13:19, 19:19, 19:20, 19:23, 20:17, 20:18, 21:2, 21:10, 21:18, 22:8, 22:9, 22:11, 22:15, 22:17, 23:9, 25:17, 25:18, 26:19, 27:1, 27:3, 27:10, 27:13, 27:15, 27:16, 27:19, 28:1, 28:7, 44:7, 44:13, 53:1, 76:1, 78:6, 87:10, 87:12, 88:1, 90:3, 97:25, 107:24, 117:16, 121:17, 121:24, 122:12
Program [5] - 21:3, 21:16, 21:21, 23:4,

41:12
**programmatic** [1] - 114:10
**programmatically** [1] - 74:10
**programs** [79] - 16:25, 17:7, 17:22, 18:3, 18:6, 18:12, 18:17, 18:18, 18:21, 18:24, 19:6, 19:16, 19:20, 20:2, 20:3, 20:20, 21:2, 21:19, 23:19, 23:21, 23:25, 24:6, 24:17, 24:23, 25:1, 25:6, 26:1, 26:7, 26:10, 26:15, 26:17, 28:17, 28:19, 29:2, 29:6, 34:2, 36:15, 36:25, 41:25, 57:6, 72:5, 75:20, 76:8, 76:9, 76:10, 76:11, 79:2, 79:9, 83:5, 83:11, 83:17, 84:7, 85:5, 108:2, 108:3, 121:2, 122:17, 137:15, 137:21, 137:23, 138:8, 139:1, 139:3, 139:12, 139:19, 141:8, 141:13, 141:14, 142:3, 149:10, 149:13, 149:16, 149:19, 149:24, 149:25, 150:1, 150:2, 159:20
**Project** [2] - 65:11, 138:3
**project** [5] - 15:6, 15:12, 15:15, 67:14, 67:15
**projected** [3] - 34:10, 35:6, 35:15
**projects** [3] - 48:13, 67:10, 67:12
**proofing** [2] - 15:1, 15:4
**proper** [1] - 163:14
**proposal** [1] - 51:9
**proposed** [3] - 16:25, 17:4, 36:16
**proposes** [1] - 50:5
**propriety** [1] - 165:18
**prostitution** [1] - 22:10
**protects** [1] - 98:22
**protocols** [1] - 66:16
**provide** [25] - 10:21, 67:15, 74:13, 79:2, 79:10, 79:16, 79:19, 79:21, 79:24, 80:14,

83:18, 83:25, 85:1, 85:3, 85:4, 85:7, 97:20, 109:25, 136:18, 137:24, 138:2, 138:16, 147:18, 148:23, 159:2
**provided** [14] - 24:5, 28:21, 47:14, 67:3, 84:8, 88:8, 88:13, 88:15, 96:10, 106:21, 108:9, 132:14, 142:25, 152:7
**provider** [5] - 66:1, 67:17, 78:22, 80:3, 145:22
**providers** [12] - 57:14, 59:18, 65:25, 72:2, 74:7, 76:2, 81:23, 83:12, 83:18, 85:5, 86:6, 139:8
**providers'** [1] - 139:25
**Provides** [1] - 98:23
**provides** [9] - 22:17, 80:3, 92:23, 92:24, 100:13, 114:18, 138:3, 138:5
**providing** [3] - 51:24, 111:23, 132:8
**provision** [3] - 26:25, 100:8, 101:3
**pseudoephedrine** [1] - 71:3
**psych** [1] - 152:9
**psychiatric** [4] - 61:18, 64:1, 106:20, 107:1
**psychiatrists** [1] - 106:19
**psychostimulant** [5] - 126:1, 126:21, 126:23, 127:2, 136:1
**psychostimulants** [5] - 126:20, 145:11, 147:4, 147:5, 152:10
**psychotherapeutic** [2] - 84:3, 100:11
**Psychotherapy** [1] - 121:20
**psychotherapy** [3] - 84:18, 100:11, 109:4
**public** [26] - 8:2, 9:10, 9:12, 9:13, 9:14, 9:16, 10:23, 16:6, 16:15, 18:14, 19:15, 29:21, 31:10, 58:18, 58:19, 91:8, 91:18, 92:19, 97:25, 147:7, 151:13, 151:25,

152:13, 152:14
**Public** [1] - 10:6
**publication** [1] - 18:16
**publicly** [1] - 112:16
**publish** [3] - 13:15, 58:7, 130:12
**published** [5] - 13:17, 13:21, 13:22, 13:24, 44:21
**publisher** [1] - 13:23
**pull** [11] - 42:4, 58:2, 64:18, 80:11, 89:20, 103:19, 103:24, 106:1, 114:2, 120:22, 130:12
**purpose** [11] - 34:22, 66:10, 75:9, 82:17, 95:11, 106:12, 112:4, 136:16, 137:6, 137:9, 165:13
**purposes** [1] - 80:16
**pursuant** [6] - 88:18, 91:18, 92:24, 97:1, 128:12, 134:24
**put** [14] - 14:16, 15:12, 20:6, 20:13, 26:6, 26:22, 32:8, 36:20, 37:21, 45:11, 46:6, 57:23, 63:15, 124:18
**putting** [2] - 163:15, 165:19

---

## Q

**QRT** [1] - 28:1
**qualified** [4] - 16:15, 87:25, 101:17, 126:9
**qualify** [7] - 9:25, 10:1, 83:19, 99:16, 119:6, 120:9, 120:13
**quality** [3] - 60:19, 62:24, 78:19
**quantify** [1] - 17:21
**quarter** [4] - 50:18, 125:17, 125:18, 125:19
**quarters** [1] - 125:19
**questioning** [2] - 158:14, 159:18
**questions** [15] - 50:8, 126:6, 129:7, 142:10, 142:17, 146:5, 154:13, 154:16, 154:22, 154:24, 157:5, 159:11, 160:25, 168:17, 168:20
**Quick** [6] - 22:20, 22:22, 27:5, 27:25, 28:4, 28:7

**quick** [1] - 22:23
**Quintero** [2] - 165:15, 166:2
**quite** [8] - 87:21, 131:20, 132:2, 145:15, 163:14, 165:10, 165:18, 169:5

---

## R

**Rader** [1] - 19:2
**Rafferty** [1] - 2:10
**raise** [1] - 7:14
**raised** [3] - 161:21, 165:6, 167:12
**ran** [1] - 13:1
**range** [2] - 29:2, 55:2
**ranges** [2] - 86:11, 100:24
**rate** [11] - 31:17, 35:5, 74:19, 74:22, 95:19, 120:14, 120:16, 127:9, 137:16, 138:13, 139:14
**rates** [2] - 96:12, 127:16
**rather** [2] - 46:5, 149:9
**ratio** [1] - 139:17
**re** [3] - 44:16, 45:7, 162:22
**re-calculation** [2] - 44:16, 45:7
**re-stating** [1] - 162:22
**reached** [1] - 19:12
**read** [32] - 33:7, 33:13, 36:4, 46:2, 46:8, 48:6, 48:15, 49:20, 89:6, 89:24, 99:23, 112:14, 112:16, 112:17, 115:16, 124:25, 133:6, 142:17, 154:25, 155:1, 155:2, 155:15, 155:18, 157:20, 163:17, 163:21, 163:24, 163:25, 164:1, 164:2, 164:22
**reading** [5] - 19:1, 20:16, 36:24, 130:16, 130:20
**Ready** [1] - 50:23
**ready** [2] - 165:7, 167:3
**real** [1] - 155:10
**reality** [2] - 144:12
**really** [11] - 12:15, 14:13, 18:10, 29:20, 30:6, 34:14, 37:17,

77:25, 106:12, 149:2, 169:13
**realm** [1] - 65:22
**reason** [4] - 44:15, 93:8, 158:5, 159:6
**reasonable** [2] - 54:22, 160:23
**reasons** [4] - 71:2, 125:22, 162:18, 163:11
**rebuttal** [2] - 167:23, 168:2
**recalculated** [1] - 46:20
**recalculating** [1] - 46:10
**recalculation** [1] - 46:15
**receive** [6] - 9:8, 82:7, 83:4, 99:8, 159:20, 160:5
**received** [20] - 9:5, 28:4, 28:13, 37:20, 86:19, 87:14, 88:2, 88:5, 88:18, 94:11, 96:8, 97:3, 97:15, 113:13, 113:15, 132:10, 133:13, 135:10, 135:14, 166:21
**receives** [1] - 109:14
**receiving** [3] - 28:14, 86:18, 97:1
**recent** [1] - 124:13
**recently** [1] - 86:15
**recess** [3] - 50:14, 50:17, 124:2
**Recess** [2] - 50:19, 124:4
**recessed** [1] - 169:24
**recite** [1] - 133:6
**recognize** [1] - 153:5
**recollection** [1] - 119:21
**recommend** [1] - 163:20
**recommendations** [3] - 60:21, 67:5, 137:17
**record** [34] - 24:21, 38:5, 40:17, 45:11, 46:2, 49:20, 55:17, 55:23, 56:3, 115:15, 125:3, 128:14, 130:16, 130:21, 140:10, 140:23, 141:1, 141:3, 141:6, 151:16, 158:12, 161:14, 162:8, 162:9, 162:14, 162:24, 163:6,

163:13, 164:9,
164:16, 165:10,
165:13, 165:19,
170:9
**recorded** [1] - 6:19
**records** [2] - 91:18,
92:19
**recovery** [7] - 37:8,
38:10, 84:18, 86:10,
108:10, 115:23,
138:10
**Recovery** [2] - 22:8,
138:9
**recruited** [1] - 64:1
**REDIRECT** [1] -
159:15
**redirect** [3] - 55:9,
55:10, 154:15
**redress** [8] - 35:24,
36:1, 37:12, 37:16,
37:22, 45:21, 47:7,
48:13
**reduce** [5] - 18:15,
21:19, 41:9, 95:13
**reduced** [1] - 18:20
**Reduction** [7] - 21:16,
21:17, 21:21, 42:5,
42:10, 70:5, 70:6
**reduction** [12] - 40:25,
41:2, 41:6, 41:15,
48:13, 49:7, 49:13,
49:14, 49:18, 50:5,
71:6, 71:7
**Reed** [2] - 6:4, 6:11
**refer** [7] - 22:14, 23:3,
24:9, 24:16, 128:17,
140:5, 149:4
**reference** [1] - 148:17
**referenced** [2] - 44:17,
167:2
**referral** [1] - 115:19
**referred** [5] - 21:6,
79:22, 99:13, 106:8,
109:13
**referring** [2] - 144:15,
153:7
**reflect** [11] - 20:20,
36:23, 38:2, 38:3,
43:24, 44:2, 44:5,
45:3, 49:4, 49:16,
93:25
**reflected** [3] - 39:17,
46:25, 133:21
**reflecting** [1] - 91:8
**reflection** [1] - 51:17
**reflective** [1] - 34:18
**reflects** [9] - 24:18,
25:16, 25:24, 43:25,
45:4, 49:7, 49:18,
90:18, 91:19

**refresh** [1] - 119:21
**regarding** [8] - 19:16,
48:24, 88:13, 90:22,
126:9, 127:16,
132:1, 135:25
**regardless** [1] -
111:10
**regards** [5] - 157:6,
158:3, 158:7,
158:23, 158:24
**region** [1] - 85:21
**regional** [6] - 32:3,
32:7, 32:10, 66:1,
81:19, 83:21
**Regional** [2] - 22:16,
32:16
**regions** [2] - 85:4,
85:18, 85:19
**regular** [2] - 96:14,
96:15
**regularly** [1] - 68:20
**regulations** [1] - 66:12
**rehab/residential** [1] -
46:12
**reimburse** [1] - 118:20
**reimbursed** [3] -
106:18, 108:14,
110:1
**reimbursement** [8] -
63:16, 98:11, 98:24,
105:23, 106:24,
107:6, 108:11, 110:9
**reimburses** [1] -
109:12
**relate** [3] - 19:7,
23:23, 161:21
**related** [20] - 11:19,
17:13, 19:16, 20:22,
26:9, 42:2, 65:14,
67:12, 68:18, 68:25,
69:3, 84:19, 88:8,
93:6, 95:14, 107:19,
108:23, 126:6,
140:22, 155:6
**relates** [6] - 22:21,
29:23, 30:14, 32:8,
32:9, 132:14
**relating** [6] - 43:4,
43:5, 60:10, 68:24,
76:14, 145:21
**relation** [3] - 161:20,
162:8, 163:4
**relationship** [2] - 98:5,
106:5
**relevance** [2] - 162:1,
162:24
**relevant** [3] - 77:1,
77:10, 132:5
**reliable** [1] - 14:16
**reliance** [2] - 135:21,

157:23
**relied** [8] - 47:13,
90:13, 92:4, 92:9,
128:16, 132:15,
135:8, 158:3
**rely** [8] - 36:5, 89:17,
128:13, 128:15,
129:1, 130:14,
132:23, 135:5
**relying** [1] - 135:13
**remain** [3] - 75:12,
83:9, 99:17
**remained** [2] - 90:3,
132:9
**remaining** [3] - 123:9,
123:19, 167:17
**remains** [1] - 42:6
**remember** [6] - 52:11,
73:18, 119:19,
133:23, 156:8,
159:10
**remind** [1] - 131:22
**reminds** [1] - 119:24
**remove** [1] - 53:12
**renewal** [1] - 99:20
**repeat** [2] - 151:19,
154:5
**repeated** [1] - 126:15
**rephrase** [5] - 130:11,
135:4, 141:7,
152:11, 159:25
**replacement** [1] -
96:19
**report** [66] - 15:7,
15:11, 15:13, 16:10,
19:4, 19:8, 20:14,
23:8, 23:13, 23:15,
32:8, 36:4, 36:6,
36:11, 36:12, 37:18,
44:12, 48:15, 50:11,
57:15, 67:3, 75:1,
75:3, 75:10, 75:14,
87:4, 88:23, 89:5,
89:9, 89:15, 89:17,
90:19, 90:20, 90:21,
91:10, 92:9, 92:14,
92:16, 93:4, 93:7,
93:10, 94:12, 94:20,
95:15, 95:17, 108:7,
119:16, 119:21,
120:2, 127:9,
136:13, 141:18,
142:18, 143:1,
143:4, 148:17,
148:23, 148:24,
148:25, 149:5,
153:2, 153:7, 153:9,
153:11
**Report** [1] - 131:23
**reported** [3] - 59:18,

85:17, 170:13
**Reporter** [6] - 6:17,
6:18, 170:7, 170:16
**reports** [7] - 15:16,
17:25, 19:14, 90:25,
91:7, 92:2
**represent** [2] - 115:10,
123:18
**representation** [1] -
11:1
**represented** [4] -
68:20, 68:22, 68:23,
77:2
**representing** [1] -
69:9
**represents** [3] - 115:4,
115:7, 157:1
**request** [5] - 24:17,
66:17, 132:13,
146:3, 148:21
**requested** [1] - 30:13
**requesting** [1] -
131:25
**requests** [2] - 94:19,
110:22
**require** [1] - 108:25
**required** [4] - 92:11,
92:17, 109:16,
140:18
**requirement** [6] -
78:15, 99:9, 102:2,
110:11, 110:24,
140:16
**requirements** [5] -
84:11, 85:2, 105:21,
105:22, 114:10
**res** [1] - 162:5
**research** [7] - 13:20,
15:18, 111:18,
112:22, 144:14,
146:21, 146:22
**Research** [1] - 111:20
**researched** [1] -
112:13
**reserve** [2] - 164:21,
168:19
**residential** [15] -
61:21, 61:22,
107:15, 107:18,
107:24, 108:2,
108:13, 108:19,
111:7, 116:15,
116:18, 116:20,
116:24, 117:10,
138:8
**residents** [2] - 155:6,
156:20
**resolving** [1] - 167:16
**Resource** [1] - 87:9
**Resources** [2] - 65:23,

87:23
**resources** [3] - 59:15,
150:9
**respect** [4] - 24:6,
26:16, 49:4, 166:4
**respective** [2] - 29:14,
38:4
**respond** [7] - 131:8,
142:25, 144:1,
163:25, 165:17,
166:23, 166:24
**Responders** [1] - 23:5
**responding** [2] -
130:24, 131:11
**Response** [10] -
22:20, 22:22, 27:6,
27:25, 28:5, 28:7,
55:12, 88:12, 88:24,
89:7
**response** [19] - 18:13,
22:23, 90:3, 94:9,
96:18, 96:19, 118:8,
129:6, 132:1,
134:17, 149:10,
149:12, 149:16,
149:19, 150:2,
160:15, 162:19,
164:2, 164:24
**responses** [1] -
164:20
**responsibilities** [8] -
59:8, 60:8, 63:18,
64:22, 65:9, 68:10,
71:24, 129:19
**responsibility** [6] -
27:3, 68:25, 69:13,
91:10, 129:22,
140:13
**responsible** [14] -
13:11, 13:12, 15:3,
59:9, 63:21, 64:21,
72:1, 72:4, 72:12,
72:25, 85:20, 98:18,
98:19, 107:4
**responsive** [1] -
163:22
**rest** [2] - 167:13,
167:16
**restricted** [2] - 156:5,
156:19
**restriction** [2] - 156:6,
156:17
**result** [1] - 60:18
**resulted** [1] - 46:11
**results** [1] - 98:10
**resume** [3] - 50:21,
124:2, 124:7
**resumed** [1] - 50:20
**retained** [1] - 14:19
**return** [1] - 10:25

returns [1] - 10:15
revealed [1] - 155:5
reveals [1] - 132:15
revenue [2] - 31:5, 107:3
Revenue [4] - 10:11, 10:18, 12:14, 16:2
revenues [1] - 34:4
reverse [1] - 63:14
review [20] - 19:22, 41:23, 65:13, 66:14, 66:20, 67:1, 67:11, 69:15, 75:4, 75:19, 75:22, 75:25, 76:3, 76:4, 113:10, 115:16, 125:21, 126:17, 136:12, 137:18
reviewed [9] - 15:11, 19:5, 23:15, 34:24, 76:10, 78:13, 113:20, 137:2, 137:4
reviewer [2] - 73:24
reviewing [3] - 74:25, 75:9, 140:13
Reviews [1] - 65:11
reviews [9] - 65:12, 65:20, 66:6, 66:7, 66:14, 66:23, 67:15, 77:19, 78:9
revised [1] - 19:14
Rice [5] - 4:3, 4:5, 4:8, 4:11, 4:14
Richie [1] - 130:12
Richmond [1] - 64:2
rid [1] - 111:11
right-hand [2] - 38:1, 95:9
righty [1] - 150:14
rise [2] - 99:17, 131:23
risk [1] - 63:16
Ritchie [4] - 76:20, 80:5, 80:23, 89:20
RMR [2] - 6:17, 6:18
ROBERT [2] - 6:11, 7:15
Robert [4] - 7:8, 7:12, 7:25, 165:14
ROBERTSON [1] - 3:6
role [15] - 13:2, 13:5, 57:20, 59:22, 60:4, 60:8, 66:2, 67:7, 68:7, 69:7, 71:25, 73:9, 73:20, 81:2, 129:21
roles [2] - 72:3, 74:3
rose [1] - 69:4
rough [2] - 45:23, 45:24
roughly [13] - 10:12,

10:20, 15:9, 23:18, 26:21, 32:11, 32:22, 39:20, 40:11, 40:21, 45:9, 48:18, 54:25
rounded [1] - 104:17
RPR [1] - 6:18
RPR-RMR-CRR-FCRR [1] - 6:18
RUBY [1] - 4:22
Ruby [1] - 4:23
Rufus [47] - 7:8, 7:12, 7:22, 7:25, 8:1, 8:5, 8:7, 8:10, 8:11, 8:15, 9:17, 10:19, 12:3, 13:16, 14:7, 16:14, 16:18, 17:17, 20:5, 20:12, 25:2, 28:16, 29:7, 33:2, 34:3, 35:25, 36:20, 37:21, 38:19, 39:12, 39:16, 39:22, 40:6, 40:18, 41:5, 42:10, 43:1, 47:2, 49:2, 49:24, 50:7, 50:21, 51:4, 55:11
RUFUS [1] - 7:15
Rufus's [1] - 16:9
Rule [1] - 128:12
rule [2] - 30:7, 162:6
rules [1] - 66:12
ruling [3] - 162:14, 164:21, 167:9
rulings [1] - 162:7
run [4] - 21:21, 21:23, 78:8, 107:5
Runyon [1] - 33:8
rural [1] - 88:1

## S

s\Ayme [1] - 170:15
s\Lisa [1] - 170:15
safety [3] - 29:21, 31:10, 31:11
SALGADO [1] - 4:20
SAMHSA [24] - 25:21, 44:21, 64:14, 64:20, 64:21, 65:2, 65:6, 67:21, 67:22, 68:1, 68:11, 68:19, 74:12, 77:23, 78:2, 82:15, 82:16, 88:8, 88:13, 95:2, 95:25, 96:7, 140:13, 140:17
SAMHSA's [1] - 64:25
San [2] - 2:5, 2:14
SAPP [1] - 134:24
SAPT [10] - 77:17, 80:21, 81:4, 81:7, 81:14, 81:16, 82:8,

82:17, 82:23, 83:24, 84:17, 85:14, 86:8, 86:12, 86:15, 88:5
satellite [1] - 61:12
save [1] - 128:7
saw [1] - 42:2
SBIRT [1] - 115:18
SC [3] - 4:4, 4:12, 4:15
scaling [1] - 48:15
scenario [1] - 108:24
schedule [1] - 66:22
schemes [1] - 125:2
SCHMIDT [1] - 5:9
schools [1] - 156:1
science [2] - 58:15, 58:17
scientific [1] - 144:18
scope [5] - 16:20, 100:16, 123:16, 142:20, 153:20
screen [11] - 20:9, 47:1, 54:10, 54:11, 54:12, 89:21, 93:23, 95:9, 97:17, 99:3
screening [2] - 41:13, 115:19
se [1] - 47:13
searching [1] - 33:12
seat [2] - 7:17, 56:17
second [5] - 17:23, 20:8, 33:3, 54:11, 89:23
Secretary [3] - 110:5, 110:10, 131:18
section [1] - 110:4
securing [1] - 33:15
see [27] - 20:16, 21:4, 24:17, 29:21, 31:15, 31:19, 31:23, 32:18, 32:24, 33:20, 40:25, 49:6, 112:1, 124:24, 129:13, 137:19, 138:12, 138:24, 139:7, 139:16, 139:19, 140:18, 141:20, 141:23, 142:19, 145:17, 169:22
seeing [1] - 29:25
seeking [1] - 92:5
selected [1] - 74:12
self [1] - 92:21
self-authenticating [1] - 92:21
Senate [1] - 67:24
send [1] - 66:22
Senior [4] - 7:2, 68:14, 68:15, 70:4
senior [3] - 67:20, 68:1, 68:11

SENIOR [1] - 1:17
Sensabaugh [1] - 5:14
sense [3] - 70:21, 99:25, 150:12
sent [3] - 109:22, 128:9, 131:25
sentence [1] - 89:25
series [5] - 29:16, 84:11, 150:22, 151:1, 152:19
serve [1] - 14:7
served [4] - 112:2, 138:17, 139:10, 140:6
serves [1] - 101:23
Service [6] - 10:11, 10:18, 12:14, 16:2, 68:14, 68:16
service [10] - 11:3, 83:18, 85:5, 100:11, 110:8, 110:9, 113:16, 114:19, 139:8, 139:17
serviced [1] - 101:22
Services [19] - 59:3, 59:7, 62:7, 64:11, 64:13, 67:4, 72:11, 82:13, 87:24, 89:1, 89:11, 89:14, 90:22, 91:15, 91:21, 94:21, 110:6, 110:14, 138:5
services [105] - 9:14, 10:20, 10:22, 10:24, 10:25, 11:2, 31:5, 31:7, 57:6, 57:7, 57:10, 57:18, 59:10, 59:16, 60:10, 60:12, 61:14, 61:21, 61:22, 65:5, 75:23, 76:8, 76:9, 76:11, 79:2, 79:9, 82:5, 82:21, 83:4, 83:11, 83:18, 84:3, 84:4, 84:17, 85:1, 98:25, 100:9, 100:10, 100:14, 101:4, 101:6, 101:8, 102:8, 102:11, 103:16, 108:14, 108:17, 108:22, 108:25, 109:2, 109:11, 109:13, 109:16, 109:17, 109:22, 110:1, 112:1, 112:21, 112:25, 113:2, 113:3, 113:20, 113:24, 115:5, 115:8, 115:10, 115:23, 116:1, 117:4, 117:6, 117:8,

117:11, 117:14, 117:16, 117:17, 117:25, 118:20, 118:22, 118:23, 118:24, 118:25, 135:24, 137:14, 137:23, 138:4, 138:5, 138:6, 139:1, 139:3, 139:12, 141:4, 141:8, 141:9, 141:13, 141:14, 142:3, 143:19, 143:23, 147:18, 150:6, 156:6, 159:20, 160:5, 160:7
serving [1] - 14:18
set [12] - 20:19, 30:16, 55:15, 69:17, 84:6, 84:9, 84:13, 84:15, 86:7, 100:8, 100:10, 168:10
set-aside [2] - 84:6, 84:13
set-asides [3] - 69:17, 84:9, 86:7
setting [3] - 11:17, 90:14, 100:11
settlement [5] - 161:15, 161:16, 161:21, 161:23, 162:5
seven [4] - 53:7, 53:17, 57:8, 104:8
several [14] - 16:19, 31:3, 60:21, 67:10, 70:13, 112:15, 129:6, 137:21, 151:10, 152:1, 152:4, 152:5, 159:3, 165:4
Shady [1] - 8:17
SHANNON [1] - 6:3
share [1] - 98:3
shared [1] - 98:2
sharing [1] - 98:1
shelves [1] - 71:5
sheriff's [2] - 32:22, 61:20
shift [5] - 35:22, 123:10, 150:22, 152:21, 153:3
shifting [2] - 124:12, 152:20
shifts [1] - 145:10
shop [1] - 61:10
shortly [2] - 21:1, 167:4
show [10] - 24:21, 24:24, 25:5, 26:3, 29:3, 38:6, 42:25,

43:22, 49:1, 159:8
**showing** [1] - 120:18
**shown** [2] - 168:25, 169:7
**shows** [6] - 24:7, 24:15, 27:10, 27:19, 104:2, 125:3
**shut** [1] - 23:9
**sic]** [1] - 46:20
**side** [5] - 38:1, 93:15, 95:9, 99:3, 168:11
**sideways** [1] - 54:4
**signature** [1] - 129:10
**signed** [1] - 158:13
**significance** [4] - 33:6, 33:7, 44:22, 44:24
**significant** [6] - 31:24, 69:8, 116:23, 132:17, 133:12, 147:7
**significantly** [3] - 151:13, 151:24, 152:13
**signify** [3] - 10:2, 25:15
**signs** [1] - 129:14
**similar** [3] - 67:14, 90:19, 129:21
**simply** [3] - 162:9, 164:4, 164:15
**SIMULTANEOUS** [2] - 7:6, 169:23
**SINGER** [1] - 4:8
**single** [6] - 129:25, 130:25, 131:12, 132:7, 152:2, 153:5
**Single** [1] - 71:12, 72:8, 72:9, 72:16, 72:23, 72:24, 81:1, 81:17, 81:22, 83:17, 85:15
**singular** [1] - 107:13
**singularly** [1] - 107:14
**sit** [1] - 11:24
**site** [3] - 66:17, 66:22, 66:24
**sitting** [2] - 11:25, 128:10
**six** [8] - 19:20, 23:19, 53:8, 53:17, 53:18, 85:18, 85:19, 168:11
**size** [1] - 111:10
**skills** [1] - 16:3
**slide** [15] - 44:17, 46:6, 58:24, 60:3, 64:14, 64:18, 103:21, 104:1, 104:2, 105:24, 106:3, 106:4, 121:1,

123:1, 124:13
**Slide** [7] - 51:1, 52:4, 52:12, 53:11, 76:21, 106:1
**slides** [2] - 57:23, 58:2
**slightly** [1] - 28:13
**small** [2] - 8:16, 54:6
**Smith** [5] - 6:4, 6:11, 155:11, 155:13
**smooth** [2] - 30:6, 30:8
**societies** [1] - 10:4
**Society** [3] - 10:5, 114:8, 114:11
**sociology** [1] - 58:15
**solely** [1] - 107:2
**Solutions** [1] - 18:17
**someone** [3] - 39:2, 128:9, 155:23
**sometimes** [2] - 99:13, 157:13
**SOR** [3] - 96:17, 97:1, 118:9
**Sorry** [1] - 83:15
**sorry** [31] - 30:1, 51:19, 52:4, 53:23, 53:24, 56:14, 61:4, 62:3, 73:21, 82:6, 87:20, 92:12, 93:16, 101:10, 105:4, 105:5, 105:6, 105:20, 117:13, 119:19, 126:2, 127:21, 133:16, 135:4, 147:20, 151:20, 153:25, 154:6, 156:7, 156:23, 156:25
**sort** [1] - 45:19
**sought** [1] - 110:21
**sounds** [1] - 65:13
**source** [3] - 44:25, 99:5, 118:19
**sources** [1] - 33:25
**South** [1] - 2:11
**Southeastern** [1] - 9:7
**Southern** [1] - 7:2
**SOUTHERN** [1] - 1:1
**Southwestern** [1] - 61:11
**SPEAKERS** [2] - 7:6, 169:23
**speaking** [3] - 97:18, 99:4, 146:12
**special** [6] - 22:2, 22:6, 37:9, 38:13, 68:17, 139:5
**specialist** [1] - 74:13
**specialists** [1] - 106:18

**specific** [11] - 23:11, 29:6, 66:16, 116:17, 138:9, 138:10, 139:8, 141:23, 143:21, 144:11, 149:21
**specifically** [11] - 17:15, 23:23, 26:9, 40:20, 64:9, 92:16, 101:1, 127:3, 132:14, 144:3, 154:23
**specifics** [2] - 137:19, 156:16
**spectrum** [2] - 115:4, 141:8
**speculation** [1] - 130:10
**spend** [6] - 65:20, 132:11, 132:17, 132:25, 133:15, 149:3
**spending** [6] - 34:2, 35:17, 134:3, 143:22, 144:21, 149:15
**spent** [18] - 33:23, 51:11, 51:14, 74:25, 94:3, 94:5, 94:8, 94:18, 95:4, 95:21, 97:5, 133:5, 133:12, 134:7, 134:23, 142:22, 145:18, 145:20
**spoken** [1] - 141:21
**Spring** [1] - 8:17
**Square** [2] - 6:5, 6:12
**stable** [4] - 74:10, 99:4, 99:5, 113:7
**Stacey** [1] - 13:8
**staff** [8] - 68:22, 69:11, 139:16, 139:17, 168:25, 169:4, 169:8
**staffing** [1] - 114:10
**stage** [1] - 167:1
**stakeholders** [1] - 68:22
**stand** [4] - 7:9, 50:22, 124:7, 128:10
**standard** [2] - 114:9, 114:12
**standards** [1] - 63:9
**STANNER** [1] - 5:10
**start** [9] - 14:12, 19:18, 19:19, 62:3, 76:23, 88:10, 125:5, 130:16, 149:12
**started** [9] - 8:5, 10:16, 10:22, 12:6,

36:4, 62:10, 67:6, 73:3, 128:6
**starting** [4] - 47:5, 47:7, 47:11, 48:8
**State** [33] - 19:17, 59:11, 65:10, 71:12, 71:16, 72:8, 72:9, 72:16, 72:23, 72:24, 73:1, 77:11, 81:2, 81:17, 81:22, 83:17, 85:15, 86:1, 88:12, 94:12, 98:18, 116:2, 116:4, 116:6, 117:3, 117:5, 117:7, 117:15, 117:20, 117:22, 118:1, 136:18, 161:17
**state** [87] - 7:11, 56:12, 57:13, 58:18, 58:19, 59:10, 60:20, 63:7, 65:18, 65:19, 65:21, 65:24, 66:6, 66:7, 66:11, 66:15, 66:18, 66:22, 67:1, 67:4, 67:14, 72:2, 72:14, 73:10, 74:1, 75:24, 77:6, 77:19, 78:14, 78:22, 81:13, 81:19, 81:25, 82:7, 84:13, 84:14, 84:22, 84:23, 84:24, 85:18, 87:14, 90:2, 91:4, 94:3, 94:9, 94:19, 96:18, 96:19, 96:22, 97:19, 97:20, 98:2, 104:2, 107:1, 107:3, 107:4, 107:5, 109:13, 109:14, 109:15, 109:18, 109:22, 110:6, 110:16, 110:20, 110:22, 112:3, 112:22, 113:1, 113:2, 114:24, 115:2, 115:22, 117:9, 118:8, 123:4, 129:25, 130:25, 131:12, 132:8, 142:22, 142:24, 143:9, 159:1, 160:14
**state's** [1] - 98:6
**State's** [1] - 143:6
**state-funded** [1] - 59:10
**state-operated** [2] - 59:10, 60:20
**statement** [4] - 10:25, 132:8, 150:7, 166:14
**statements** [4] - 29:14, 30:18, 34:6,

133:2
**STATES** [2] - 1:1, 1:17
**states** [22] - 66:6, 69:16, 74:14, 77:4, 78:19, 80:3, 83:6, 84:8, 84:12, 85:3, 85:4, 85:7, 88:9, 88:13, 94:1, 96:4, 96:11, 98:8, 109:23, 111:21, 112:18, 131:8
**States** [13] - 7:2, 64:12, 89:10, 89:13, 110:5, 145:8, 145:10, 146:15, 146:20, 150:17, 150:18, 152:17, 160:17
**States'** [2] - 88:23, 89:6
**stating** [1] - 162:22
**statistic** [1] - 155:14
**status** [14] - 58:16, 58:20, 62:19, 63:1, 63:3, 63:4, 63:6, 63:15, 63:16, 67:25, 101:15, 120:10, 120:13
**Status** [1] - 7:2
**STATUS** [1] - 1:17
**statute** [2] - 110:4
**stay** [2] - 29:2, 89:12
**stenography** [1] - 6:19
**step** [4] - 18:11, 18:21, 31:9, 161:5
**Stephenie** [4] - 56:11, 56:13, 56:25, 79:1
**STEPHENIE** [1] - 56:16
**STEVEN** [1] - 4:22
**stick** [1] - 143:14
**still** [9] - 9:19, 146:22, 155:25, 157:8, 158:6, 164:18, 165:5, 165:8, 167:1
**stipulation** [1] - 55:21
**stop** [2] - 61:10, 65:12
**STR** [8] - 88:11, 88:18, 94:10, 94:11, 95:22, 96:1, 96:3, 96:23
**Strategic** [1] - 69:13
**strategic** [6] - 69:14, 72:3, 73:1, 74:4, 74:8, 97:11
**strategies** [1] - 41:8
**strategy** [2] - 21:18, 21:19
**stray** [1] - 16:10
**Street** [15] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12,

4:6, 4:9, 4:19, 4:21,
4:24, 5:5, 5:12, 6:6,
6:13
**structure** [4] - 79:3,
79:11, 81:18, 84:24
**students** [1] - 13:14
**Studies** [1] - 12:8
**study** [2] - 8:23, 94:2
**subcategory** [1] - 37:1
**subject** [9] - 42:25,
99:19, 113:4, 154:2,
162:24, 167:11,
167:16, 167:21
**submission** [1] -
167:3
**submit** [1] - 167:6
**submitted** [3] - 15:7,
15:11, 15:13
**submitting** [1] -
164:10
**subpoena** [2] - 166:6,
166:7
**subsequent** [1] -
23:15
**subsequently** [1] -
19:21
**subset** [1] - 118:24
**substance** [109] -
21:14, 57:7, 57:9,
57:12, 57:14, 57:16,
57:18, 57:21, 58:21,
58:22, 59:1, 61:21,
61:25, 62:4, 62:11,
64:22, 65:4, 65:16,
65:25, 67:14, 67:16,
67:20, 68:6, 68:8,
68:11, 68:18, 69:2,
69:3, 69:15, 71:13,
72:13, 73:1, 74:7,
74:9, 75:19, 75:20,
75:22, 76:1, 76:14,
76:18, 77:24, 78:20,
79:3, 79:10, 80:4,
80:15, 81:5, 81:18,
82:20, 82:23, 84:19,
86:21, 100:6,
100:13, 100:16,
100:20, 101:1,
101:4, 101:6, 101:8,
101:13, 101:15,
102:8, 102:11,
102:21, 103:16,
105:19, 105:20,
106:5, 106:14,
107:15, 107:19,
108:3, 108:14,
108:17, 108:18,
108:23, 109:24,
110:1, 111:7,
111:21, 112:1,

113:3, 113:21,
115:5, 115:7,
116:24, 118:5,
118:20, 118:22,
118:25, 119:10,
120:19, 121:3,
123:4, 123:5,
129:23, 137:13,
145:14, 145:19,
145:21, 150:16,
150:24, 151:1,
151:5, 151:8,
151:11, 158:25,
160:15
**Substance** [26] - 59:3,
59:7, 60:5, 64:11,
64:24, 67:3, 68:9,
71:12, 71:20, 71:25,
72:10, 72:18, 73:11,
77:17, 80:16, 80:21,
82:13, 94:21, 126:9,
127:24, 137:24,
141:9, 143:19,
145:9, 146:24,
147:19
**substances** [4] - 79:4,
79:12, 125:22,
145:15
**substantial** [1] -
160:18
**substantially** [4] -
96:20, 96:23,
112:16, 160:7
**substate** [1] - 83:21
**substitute** [1] - 148:5
**subtotal** [1] - 37:4
**subtract** [2] - 39:22,
42:10
**SUD** [8] - 74:13,
77:12, 115:4,
115:10, 119:10,
141:4, 159:21, 160:4
**suffer** [1] - 146:23
**suffering** [2] - 146:16,
147:18
**sufficient** [3] - 14:16,
14:17, 140:19
**Suite** [9] - 2:4, 2:7,
2:10, 2:13, 3:15, 4:6,
4:9, 6:5, 6:12
**summarize** [2] -
15:17, 76:18
**summary** [6] - 20:15,
36:4, 162:4, 162:6,
162:19, 163:12
**supervised** [3] - 22:7,
100:12, 109:6
**supplemental** [2] -
15:15, 96:10
**supply** [3] - 70:25,

71:4, 71:6
**support** [9] - 11:4,
22:9, 25:25, 26:15,
28:18, 86:10,
115:23, 138:6,
144:21
**supports** [3] - 84:3,
127:8, 146:19
**supposed** [2] - 95:7,
96:3
**Supreme** [1] - 22:7
**surveillance** [1] -
87:15
**survey** [1] - 44:18
**suspected** [3] - 22:23,
49:15, 49:21
**sustain** [4] - 130:20,
133:8, 134:19,
158:21
**sustainability** [2] -
74:4, 74:11
**sustainable** [1] -
113:7
**sustained** [7] - 131:2,
133:8, 135:1,
135:17, 136:10
**SUZANNE** [1] - 4:20
**swing** [1] - 29:21
**switch** [1] - 47:2
**SWORN** [2] - 7:15,
56:16
**synonym** [1] - 148:6
**syringe** [1] - 156:5
**system** [17] - 21:12,
32:3, 32:7, 32:10,
32:16, 33:11, 62:7,
62:8, 70:7, 72:6,
75:20, 75:21, 75:23,
81:18, 85:8, 87:15
**systematic** [1] -
137:10
**systems** [2] - 79:2,
79:9

**T**

**table** [6] - 20:13,
20:14, 20:15, 20:19,
20:20, 30:16
**Table** [2] - 20:16, 51:4
**talks** [1] - 106:4
**Targeted** [4] - 88:12,
88:24, 89:6, 117:21
**targeted** [8] - 65:2,
77:20, 80:17, 86:21,
90:2, 94:9, 96:19,
100:5
**taught** [7] - 12:10,
12:16, 12:17, 12:18,
12:20, 12:21, 12:25

**tax** [5] - 10:15, 10:25,
11:22, 12:1, 12:13
**teacher** [1] - 12:4
**teaching** [5] - 12:6,
12:7, 12:13, 12:19,
15:18
**team** [9] - 14:23, 15:6,
22:24, 27:7, 65:10,
66:2, 66:3, 66:19,
67:6
**Team** [6] - 22:20,
22:22, 27:6, 28:1,
28:5, 28:7
**teams** [2] - 14:24,
65:16
**tease** [1] - 145:17
**Technical** [2] - 65:11,
65:12
**technical** [6] - 65:13,
66:7, 67:1, 67:11,
67:16, 74:13
**TEDS** [10] - 44:17,
44:19, 44:20, 44:22,
45:2, 45:6, 45:16,
46:10, 46:23, 54:19
**TEMITOPE** [1] - 4:13
**tender** [2] - 16:5, 79:1
**Tenth** [1] - 5:12
**tenure** [1] - 62:6
**term** [4] - 72:10,
114:18, 118:23,
148:17
**terminology** [1] -
153:6
**terms** [5] - 30:18,
62:20, 90:14,
106:12, 136:21
**territory** [3] - 81:13,
82:7, 94:4
**test** [1] - 52:22
**testified** [10] - 26:20,
27:7, 30:12, 35:2,
35:11, 74:16, 91:25,
135:25, 154:22,
158:6
**testify** [1] - 90:13
**testifying** [2] - 92:4,
128:12
**testimony** [48] - 15:16,
16:12, 19:22, 20:1,
20:4, 26:24, 30:10,
33:5, 33:9, 33:20,
33:23, 48:6, 51:8,
52:13, 52:14, 58:4,
68:21, 74:20, 74:22,
74:23, 75:1, 75:10,
80:8, 81:1, 90:20,
91:25, 99:23, 123:9,
126:4, 127:15,
128:21, 132:3,

135:8, 136:13,
142:18, 142:20,
142:21, 147:11,
148:4, 155:1, 155:5,
155:8, 155:18,
158:1, 158:11,
158:16, 159:7
**testing** [1] - 41:13
**textbook** [3] - 13:21,
13:24, 14:1
**THE** [125] - 1:1, 1:1,
1:4, 1:17, 7:5, 7:7,
7:12, 7:18, 7:19,
16:7, 16:14, 39:14,
40:2, 50:14, 50:17,
50:21, 50:24, 53:25,
55:9, 55:11, 55:13,
55:14, 55:19, 56:4,
56:8, 56:12, 56:13,
56:14, 56:15, 56:17,
56:18, 56:19, 58:9,
79:6, 79:8, 90:10,
91:23, 92:20, 92:25,
94:17, 94:19, 94:25,
119:25, 120:24,
123:12, 123:20,
123:25, 124:5,
124:6, 124:7,
124:10, 126:11,
128:4, 128:16,
130:18, 131:2,
132:18, 133:8,
134:19, 135:1,
135:17, 136:8,
136:10, 142:7,
142:11, 144:7,
144:8, 144:10,
144:25, 145:3,
145:4, 146:6,
147:24, 148:7,
148:11, 148:14,
148:25, 149:4,
149:7, 151:18,
151:19, 153:21,
153:25, 154:3,
154:5, 154:15,
154:18, 156:12,
156:13, 158:9,
158:20, 159:12,
159:24, 161:2,
161:5, 161:7, 161:8,
161:9, 161:11,
162:1, 162:11,
162:15, 163:1,
163:9, 163:17,
164:1, 164:12,
164:14, 164:21,
164:24, 165:3,
165:21, 166:8,
167:5, 167:14,
167:18, 167:21,

168:1, 168:4, 168:7, 168:10, 168:13, 168:16, 169:10, 169:15
**themselves** [1] - 108:10
**theory** [1] - 79:22
**therapy** [3] - 106:20, 109:3, 121:19
**thereof** [1] - 78:19
**they've** [5] - 18:8, 29:8, 88:1, 110:24, 168:25
**thinking** [2] - 13:19, 14:14
**third** [11] - 18:21, 25:16, 25:18, 25:20, 25:22, 25:25, 90:1, 97:16, 101:24, 125:19
**third-party** [2] - 25:16, 25:18
**thirds** [1] - 95:22
**Thomas** [1] - 2:10
**Thompson** [2] - 166:9, 166:21
**thousand** [4] - 25:11, 26:13, 53:8, 155:5
**Thousand** [1] - 53:15
**Thousands** [1] - 101:20
**thousands** [3] - 101:20, 155:15, 155:19
**threat** [1] - 124:22
**Threat** [1] - 125:1
**Three** [3] - 6:5, 63:23, 64:4
**three** [28] - 6:12, 28:7, 28:11, 28:16, 40:12, 45:20, 46:3, 49:24, 52:20, 53:6, 53:13, 54:14, 54:15, 54:17, 61:12, 66:19, 69:19, 96:11, 104:24, 116:22, 161:15, 161:19, 161:23, 161:24, 166:21, 167:1
**three-year** [2] - 28:7, 49:24
**threshold** [1] - 99:11
**throughout** [13] - 15:21, 15:23, 57:16, 59:10, 67:17, 75:21, 75:23, 82:21, 84:8, 85:18, 87:7, 87:25, 152:20
**thumb** [2] - 55:23, 56:7

**ticks** [1] - 29:19
**tie** [1] - 33:19
**TIMOTHY** [1] - 5:9
**Tinsley** [1] - 13:8
**title** [5] - 70:3, 72:18, 76:5, 89:5, 124:25
**titled** [1] - 88:23
**today** [41] - 11:23, 16:21, 27:10, 64:15, 75:11, 79:16, 79:19, 79:21, 79:24, 98:13, 98:17, 100:17, 104:18, 115:6, 115:11, 118:11, 121:25, 122:5, 126:25, 127:3, 127:5, 127:23, 128:10, 128:12, 128:20, 135:6, 135:21, 140:25, 141:10, 142:2, 142:18, 145:11, 145:13, 153:12, 153:19, 154:23, 157:7, 158:2, 160:22, 163:3
**Today** [1] - 98:14
**together** [8] - 26:6, 37:22, 40:12, 40:14, 54:21, 57:23, 65:16, 157:14
**took** [4] - 12:19, 29:13, 31:9, 62:20
**top** [10] - 43:4, 43:7, 88:5, 89:24, 96:9, 96:14, 96:15, 125:8, 130:13, 152:23
**topic** [4] - 47:3, 58:23, 69:6, 124:12
**topics** [1] - 16:19
**total** [27] - 25:5, 26:3, 26:5, 26:6, 26:9, 26:11, 29:2, 38:5, 38:8, 38:10, 38:12, 39:17, 40:10, 40:15, 40:17, 40:22, 43:8, 44:2, 44:3, 44:6, 46:22, 53:17, 54:15, 74:25, 90:2, 90:5
**totalled** [1] - 143:3
**totals** [1] - 38:3
**Tower** [2] - 3:4, 4:23
**town** [1] - 8:17
**tracked** [1] - 29:17
**traditionally** [2] - 82:23, 107:25
**training** [2] - 16:3, 67:15
**trajectory** [1] - 34:23, 160:10

**transcript** [3] - 6:19, 148:3, 170:8
**transitional** [1] - 61:23
**Transportation** [1] - 117:23
**transportation** [3] - 118:2, 118:3, 118:5
**travel** [1] - 66:6
**treat** [2] - 73:16, 104:25
**treatment** [64] - 21:12, 22:11, 23:1, 37:8, 38:8, 38:23, 39:9, 42:17, 42:19, 42:20, 42:23, 43:5, 43:11, 43:14, 43:20, 43:25, 44:7, 44:11, 44:20, 44:25, 45:4, 45:8, 45:12, 45:16, 45:17, 45:21, 46:5, 46:16, 46:18, 46:24, 52:18, 53:1, 62:5, 67:12, 70:7, 73:25, 86:10, 95:13, 97:9, 107:24, 108:2, 108:9, 108:13, 108:19, 109:9, 109:25, 111:7, 112:2, 115:20, 117:16, 117:19, 118:5, 121:5, 121:16, 121:24, 135:23, 136:23, 138:14, 144:15, 144:17, 155:22, 160:5, 160:16
**Treatment** [5] - 71:22, 77:18, 80:17, 80:22, 122:3
**trend** [2] - 35:5, 159:18
**trends** [6] - 76:16, 77:24, 78:1, 79:4, 79:11, 126:9
**TRIAL** [1] - 1:16
**trial** [10] - 19:22, 20:4, 26:24, 33:22, 136:13, 146:10, 162:4, 163:3, 163:7, 169:13
**Trial** [1] - 169:24
**true** [5] - 33:14, 51:16, 121:21, 144:4, 147:19
**Trust** [1] - 57:15
**trust** [1] - 57:16
**truth** [1] - 92:6
**try** [7] - 39:20, 54:5, 74:8, 89:12, 95:4, 112:4, 112:25

**trying** [7] - 31:1, 70:21, 70:25, 71:1, 73:18, 87:1, 133:23
**Turn** [1] - 22:13
**turn** [12] - 12:3, 14:6, 17:17, 22:15, 25:13, 54:3, 60:25, 87:1, 89:19, 89:23, 95:8, 129:9
**Twelfth** [3] - 4:19, 4:21, 5:5
**Two** [1] - 68:4
**two** [17] - 14:24, 17:20, 31:12, 32:2, 32:24, 40:9, 55:2, 71:20, 90:4, 94:10, 94:13, 94:15, 95:22, 97:5, 120:9, 123:23, 167:2
**two-thirds** [1] - 95:22
**two-year** [3] - 94:10, 94:13, 94:15
**type** [8] - 11:5, 11:7, 11:23, 97:24, 106:23, 139:8, 140:3, 140:9
**types** [3] - 73:8, 80:13, 92:2
**typically** [2] - 61:19, 63:6

## U

**unable** [1] - 132:10
**unassigned** [7] - 34:4, 34:7, 34:12, 34:14, 34:18, 34:24
**unavailable** [3] - 165:18, 165:25, 166:8
**Under** [1] - 107:22
**under** [17] - 30:15, 33:17, 41:19, 52:8, 52:21, 54:23, 86:23, 88:19, 89:25, 92:11, 93:1, 105:20, 115:1, 121:17, 124:25, 166:3, 169:17
**undergrad** [1] - 8:19
**underlie** [2] - 17:4, 161:20
**underlying** [1] - 162:20
**underneath** [1] - 37:7
**understood** [2] - 20:2, 164:8
**undertake** [1] - 42:4
**Underwood** [2] - 30:10, 33:5
**Underwood's** [1] -

33:13
**Unit** [1] - 138:7
**unit** [1] - 61:18
**UNITED** [2] - 1:1, 1:17
**United** [13] - 7:2, 64:12, 89:10, 89:13, 110:5, 145:7, 145:10, 146:15, 146:20, 150:16, 150:18, 152:17, 160:17
**units** [1] - 61:16
**universal** [1] - 114:12
**universities** [1] - 14:5
**University** [12] - 8:20, 9:4, 9:7, 12:9, 12:12, 12:15, 12:20, 12:25, 13:2, 13:9, 58:13, 138:3
**unless** [1] - 162:7
**unmet** [1] - 95:13
**unrestricted** [1] - 34:16
**unspent** [5] - 90:4, 94:13, 95:18, 132:9, 134:3
**up** [41] - 8:14, 8:16, 12:11, 20:6, 20:8, 20:13, 21:2, 27:6, 29:17, 30:21, 31:16, 36:20, 40:3, 42:8, 43:11, 47:6, 51:1, 55:15, 55:23, 58:2, 64:18, 70:10, 76:20, 80:11, 80:20, 89:21, 103:19, 103:24, 106:1, 114:2, 114:21, 120:22, 124:18, 125:20, 130:12, 145:5, 146:14, 154:22, 154:23, 159:17, 165:7
**updated** [1] - 75:6
**updates** [1] - 13:11
**uptick** [2] - 32:9, 32:11
**upticks** [3] - 29:19, 29:24, 30:2
**users** [2] - 41:16, 84:10
**uses** [1] - 72:11
**utilization** [5] - 137:16, 138:13, 139:14, 139:25, 140:6
**utilizing** [1] - 145:22

## V

**valuation** [1] - 9:24
**valuations** [1] - 11:5
**value** [2] - 38:16, 38:17
**varies** [1] - 112:3
**variety** [2] - 10:24, 73:15
**various** [10] - 15:5, 19:1, 20:18, 26:18, 36:25, 37:3, 41:8, 70:14, 74:3, 158:24
**vehicle** [2] - 128:7, 163:14
**Ventura** [1] - 3:15
**verbally** [1] - 119:24
**verified** [1] - 164:17
**versus** [1] - 46:24
**via** [1] - 90:19
**Vice** [2] - 67:9, 78:16
**view** [1] - 164:6
**Virginia** [106] - 4:24, 7:3, 8:6, 8:16, 8:22, 10:5, 12:8, 17:14, 22:7, 22:16, 48:22, 64:2, 65:23, 75:19, 75:21, 75:23, 76:15, 81:21, 85:12, 85:13, 85:15, 86:1, 86:9, 86:10, 86:16, 86:17, 87:5, 87:8, 87:14, 88:9, 88:17, 94:6, 94:8, 94:12, 95:3, 95:16, 95:18, 95:21, 96:6, 96:8, 96:12, 96:21, 97:1, 97:14, 98:18, 100:19, 100:23, 101:23, 103:4, 103:7, 104:5, 104:19, 105:1, 105:8, 105:10, 105:15, 113:11, 113:21, 115:5, 115:11, 115:21, 115:24, 116:9, 116:15, 119:14, 120:12, 120:14, 120:17, 121:12, 122:6, 122:19, 123:5, 124:23, 129:19, 130:1, 130:25, 131:15, 131:18, 132:8, 132:10, 132:16, 132:24, 132:25, 133:5, 133:12, 133:20, 134:7, 134:10, 134:24, 135:10, 135:14,

135:23, 136:25, 143:12, 147:8, 149:18, 150:24, 151:2, 151:5, 151:6, 151:12, 151:24, 161:18, 166:11
**VIRGINIA** [2] - 1:1, 1:18
**Virginia's** [10] - 97:8, 98:13, 105:11, 105:12, 112:15, 132:1, 134:17, 143:2, 143:15, 160:19
**Virginians** [2] - 103:15, 105:3
**virtue** [2] - 72:17, 119:6
**visit** [2] - 63:12, 63:13
**vociferous** [1] - 158:12
**VOLUME** [1] - 1:16
**volume** [1] - 17:13
**vs** [1] - 170:10

## W

**wait** [1] - 42:7
**waiting** [3] - 138:19, 138:20, 150:12
**waive** [1] - 110:11
**waiver** [24] - 77:12, 105:19, 105:20, 105:21, 109:20, 109:24, 110:13, 110:19, 110:21, 110:22, 110:25, 111:6, 111:16, 111:22, 112:3, 112:8, 113:11, 113:14, 115:3, 115:25, 116:23, 117:18, 118:4, 160:20
**Waiver** [1] - 73:12
**waivers** [3] - 77:9, 77:11, 112:17
**waives** [1] - 105:21
**WAKEFIELD** [1] - 5:13
**walk** [3] - 21:1, 80:20, 125:2
**Washington** [6] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12
**ways** [5] - 26:18, 36:2, 40:9, 120:9, 121:12
**weak** [1] - 168:15
**WEAR** [2] - 22:7, 87:9
**WEBB** [1] - 3:11
**Webb** [1] - 3:12

**Webber** [2] - 56:13, 56:15
**WEBBER** [1] - 56:16
**website** [1] - 124:15
**websites** [1] - 15:5
**Wednesday** [1] - 166:24
**week** [1] - 166:22
**weeks** [2] - 148:8, 169:1
**weighted** [3] - 52:16, 52:17, 52:24
**West** [116] - 7:3, 8:8, 8:16, 8:22, 10:5, 12:7, 17:14, 22:7, 22:16, 48:22, 65:23, 75:19, 75:21, 75:23, 76:14, 81:21, 85:12, 85:13, 85:15, 86:1, 86:9, 86:10, 86:16, 86:17, 87:5, 87:7, 87:14, 88:9, 88:17, 94:6, 94:8, 94:12, 95:3, 95:16, 95:17, 95:21, 96:6, 96:7, 96:8, 96:12, 96:21, 96:25, 97:8, 97:14, 98:13, 98:18, 100:19, 100:22, 101:23, 103:4, 103:7, 103:15, 104:5, 104:19, 105:1, 105:3, 105:7, 105:10, 105:11, 105:12, 105:15, 112:15, 113:11, 113:21, 115:5, 115:11, 115:21, 115:24, 116:9, 116:15, 119:14, 120:12, 120:14, 120:17, 121:12, 122:6, 122:19, 123:5, 124:23, 129:19, 130:1, 130:25, 131:15, 131:18, 132:1, 132:8, 132:10, 132:16, 132:24, 132:25, 133:5, 133:12, 133:20, 134:7, 134:10, 134:17, 134:23, 135:9, 135:14, 135:23, 136:24, 143:1, 143:11, 143:15, 147:8, 149:17, 150:24, 151:2, 151:5, 151:6, 151:12, 151:24,

160:19, 161:18, 166:11
**west** [1] - 166:10
**WEST** [2] - 1:1, 1:18
**Western** [1] - 32:16
**white** [1] - 78:18
**White** [3] - 69:10, 69:25, 78:2
**whole** [1] - 163:11
**wholesale** [1] - 150:7
**WICHT** [8] - 4:18, 55:15, 55:20, 56:6, 56:9, 166:5, 166:12, 166:16
**Williams** [9] - 4:18, 5:4, 19:2, 19:17, 20:4, 33:21, 35:2, 35:11, 51:23
**willing** [1] - 148:5
**withdrawal** [4] - 117:6, 117:8, 117:10, 117:14
**withhold** [1] - 164:20
**witness** [27] - 7:7, 14:8, 14:11, 15:19, 16:5, 50:9, 50:22, 55:16, 90:13, 90:15, 90:22, 91:25, 92:3, 92:5, 92:7, 124:5, 124:7, 126:5, 128:7, 131:20, 133:5, 146:4, 146:9, 148:3, 156:11, 158:11, 165:15, 166:13
**WITNESS** [24] - 7:12, 7:15, 7:18, 40:2, 53:25, 55:14, 56:13, 56:15, 56:16, 56:19, 94:19, 119:25, 120:24, 124:6, 144:7, 144:10, 145:4, 149:7, 151:19, 154:5, 156:12, 159:12, 161:7, 161:9
**witness's** [1] - 132:12
**witnesses** [3] - 161:12, 165:17, 165:25
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**Women** [2] - 22:8, 87:9
**women** [11] - 22:9, 84:9, 84:10, 137:25, 138:4, 138:5, 138:6, 138:9, 138:11, 139:2
**women-specific** [1] - 138:9
**word** [6] - 144:24,

146:25, 147:22, 148:4, 148:5, 148:9
**wording** [1] - 114:17
**words** [8] - 25:21, 30:4, 31:6, 34:16, 36:15, 101:14, 107:10, 142:19
**works** [3] - 81:14, 110:12, 112:23
**worksheets** [1] - 15:4
**world** [2] - 13:23, 102:10
**worth** [1] - 15:10
**writing** [4] - 13:20, 15:1, 130:4, 131:17
**written** [1] - 128:8
**wrote** [1] - 116:14
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10, 3:13, 4:24, 5:15, 6:9

## Y

**year** [37] - 13:24, 15:7, 27:8, 27:14, 28:5, 28:6, 28:7, 28:8, 28:10, 29:5, 32:4, 34:20, 34:25, 46:5, 47:15, 47:18, 49:6, 49:24, 52:19, 61:4, 73:10, 81:10, 86:18, 88:19, 94:10, 94:13, 94:15, 98:4, 110:12, 112:7, 112:18, 112:21, 113:4, 113:8, 139:10, 143:11
**yearly** [1] - 138:17
**years** [38] - 8:9, 8:12, 8:13, 10:12, 11:21, 13:17, 14:4, 16:4, 30:17, 35:4, 48:14, 57:8, 58:16, 59:4, 63:23, 64:4, 67:8, 69:19, 71:18, 78:9, 82:22, 85:17, 86:17, 88:15, 90:4, 97:5, 107:13, 107:15, 111:17, 113:17, 119:5, 119:11, 145:20, 151:2, 159:4, 160:10, 164:19, 169:19
**yellow** [1] - 125:7
**yesterday** [1] - 166:22
**York** [1] - 3:5
**yourself** [3] - 7:24, 56:24, 156:24

## Z

**zero** [2] - 53:17, 53:18
**zeros** [2] - 54:15, 54:17
**Zimmerman** [1] - 92:15
**Zimmerman's** [1] - 90:20