# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CITY OF HUNTINGTON**
    **Plaintiff,**
**v.**                                 **Civil Action No. 3:17-cv-01362**
**AMERISOURCEBERGEN DRUG**
**CORPORATION, et al.,**
    **Defendants.**
_____

**CABELL COUNTY COMMISSION,**
    **Plaintiff,**                       ***Consolidated Case*:**
**v.**                                **Civil Action No. 3:17-cv-01665**
**AMERISOURCEBERGEN DRUG**
**CORPORATION, et al.,**
    **Defendants.**
_____

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT ON PARTIAL FINDINGS ON CAUSATION

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………...1

LEGAL STANDARD…………………………………………………………………………..3

ARGUMENT…………………………………………………………………………………...4

I. Plaintiffs Provide Ample Evidence of Factual Causation—That
Defendants' Failures Have Contributed to the Opioid Epidemic
Harms in Their Communities………………………………………………….…..4

    A. Defendants' Failures Contributed to the Nuisance Harms………………….....5

        1. Defendants' Conduct Contributed to Diversion in Cabell
and Huntington………………………………………………………...6

        2. Diversion Occurs Across State and Local Boundaries……………..……10

        3. Diversion and Oversupply Caused Opioid Epidemic Harms…………….13

            a. Opioid Epidemic Harms—*Overdose Deaths*…………………….15

            b. Opioid Epidemic Harms—*Opioid Use Disorder*………………....17

            c. Opioid Epidemic Harms—*Heroin/Fentanyl Use*………………...20

            d. Opioid Epidemic Harms—*Infectious Diseases*…………………..26

            e. Opioid Epidemic Harms—*Child and Family Harms*…………….29

    B. Defendants' Causation Arguments Based on Prescribing Standards Ignore
Their Own Diversion-Control Failures as Concurrent Causes
of the Nuisance Harms in Cabell and Huntington………………………………30

        1. A Public Nuisance, Like Any Harm, May Have More Than
One Proximate Cause Under West Virginia Law……………….. ……...31

        2. Defendants' Diversion Control Failures Caused Shipments
of Tens of Millions of Opioid Dosage Units Outside of the
Prescribing Standard of Care…………………………………………….31

            a. Defendants' Shipments for Outlier Prescribers………………….32

            b. Defendants' Shipments to Outlier Pharmacies………….………..36

i

3.      Defendants' Conduct is a Concurrent Cause of the Opioid
        Epidemic Nuisance Harms Even Without Regard to the
        Bad Faith Prescribing and Dispensing it Enabled............................42

II.     Plaintiffs Also Provide Ample Evidence of Legal Causation—That the
        Opioid Epidemic Harms Were Reasonably Foreseeable to Defendants
        as Distributors of Controlled Substances.……………………………………………..45

        A.      Defendants Cannot Prevail on Legal Causation by Using "Directness"
                Concepts Imported from Federal Statutes to Rewrite West Virginia'
                Longstanding and Recently Reaffirmed Foreseeability Standard……………..…47

        B.      Substantial Evidence Shows That the Opioid Epidemic Harms
                Were Reasonably Foreseeable to Defendants…………………………………...50

                1.      Foreseeability of Diversion………………………………………52

                2.      Foreseeability of Public Health and Safety Harms from
                        Diversion and Oversupply………………………………………..…53

                3.      Foreseeability of Heroin Addiction Harms from Diversion
                        and Oversupply of Prescription Opioids…………………………55

        CONCLUSION………………………………………………………………………..57

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aikens v. Debow*, 208 W. Va. 486, 541 S.E.2d 576 (2000)…………………………………..47-48

*Anderson v. Moulder*, 183 W. Va. 77, 394 S.E.2d 61 (1990)………………………………..46, 50

*Associated Gen. Contractors of Calif., Inc. v. Calif. State Council
     of Carpenters*, 459 U.S. 519 (1983)…………………………………………………...47

*Brooke Cty. Comm'n v. Purdue Pharma L.P.*, No. 17-C-248
     (W. Va. Cir. Ct. Dec. 28, 2018)…………………………………………………………...5

*Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994)…………………………………………………….3

*Cherrey v. Thompson Steel Co., Inc.*, 805 F. Supp. 1257 (D. Md. 1992)…………………………3

*City and County of San Francisco v. Purdue Pharma L.P.*,
     491 F. Supp. 3d 610 (N.D. Cal. 2020)……………………………………….10, 44, 48, 51

*City of Charleston v. Joint Comm'n*, 473 F. Supp. 3d 596 (S.D. W. Va. 2020)…………48, 49-50

*Direct Sales Co. v. U.S.*, 319 U.S. 703 (1943)……………………………………………...51

*Employer Teamsters v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463
     (S.D. W. Va. 2013)……………………………………………………………48-49, 50

*Estate of Hough ex rel. Lemaster v. Estate of Hough ex rel. Berkeley
     Cty. Sheriff*, 205 W. Va. 537, 519 S.E.2d 640 (1999)…………………………………46

*Gillingham v. Stephenson*, 209 W. Va. 741, 551 S.E.2d 663 (2001)……………………………...4

*Gonzalez v. Raich*, 545 U.S. 1 (2005)……………………………………………………...50-51

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992)………………………………...48, 49

*In re Flood Litig.*, 216 W. Va. 534, 607 S.E.2d 863 (2004)……………………………………46

*In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804, 2019 WL 4178617
     (N.D. Ohio Sept. 3, 2019)…………………………………………………………...51

*In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804, 2019 WL 3917575
     (N.D. Ohio Aug. 19, 2019)………………………………………………………………43

*In re Nat'l Prescr. Opiate Litig.*, 2019 WL 2468267 (N.D. Ohio April 1, 2019)
(Ruiz, M.J., Report and Recommendation), *adopted in relevant part*,
2019 WL 3737023 (N.D. Ohio June 13, 2019) (Polster, J.)……………………………………5

*In re Nat'l Prescr. Opiate Litig.: County of Summit, Ohio v. Purdue Pharma
L.P.*, No. 1:17-md-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018)………………49

*Lester v. Rose*, 147 W. Va. 575, 130 S.E.2d 80 (1963)……………………………………………47

*MacDonald v. City Hosp., Inc.*, 227 W. Va. 707, 715 S.E.2d 405 (2011)…………………………..4

*Marcus v. Staubs*, 230 W. Va. 127, 736 S.E.2d 360 (2012)……………………………………46

*Masters Pharm., Inc. v. Drug Enforcement Administration*, 861 F.3d 206
(D.C. Cir. 2017)………………………………………………………………………43

*Mays v. Chang*, 213 W. Va. 220, 579 S.E.2d 561 (2003)…………………………………………4

*Miller v. Whitworth*, 193 W. Va. 262, 455 S.E.2d 821 (1995)……………………………………46

*Mother v. State of Hawaii*, 283 Fed. Appx. 514 (9th Cir. June 20, 2008)…………………………..3

*NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435 (E.D.N.Y. 2003)…………………………………..5

*Noman v. Virginia Pocahontas Coal Co.*, 68 W. Va. 405, 69 S.E. 857 (1910)…………………..5

*Ohio Valley Envtl. Coalition, Inc. v. Fola Coal Co., LLC*, No. 2:13-5006,
2014 WL 4925492 (S.D. W. Va. Sept. 30, 2014)……………………………………………3

*Stephens v. Rakes*, 235 W. Va. 555, 775 S.E.2d 107 (2015)……………………………..4, 31, 44

*Sydenstricker v. Mohan*, 217 W. Va. 552, 618 S.E.2d 561 (2005)…………………………...46-47

*Tracy ex rel. Tracy v. Cottrell*, 206 W. Va. 363, 524 S.E.2d 879 (1999)…………………………4

*U.S. v. Moore*, 423 U.S. 122 (1975)…………………………………………………………50, 51

*U.S. ex rel. Ervin and Assoc's, Inc. v. Hamilton Securities Grp., Inc.*,
298 F. Supp. 2d 91 (D.D.C. 2004)……………………………………………………...3

*Wal-Mart Stores East, L.P. v. Ankrom*, ___ W. Va. ___, 854 S.E.2d 257
(W. Va. 2020)………………………………………………………………45-46, 50

*Wehner v. Weinstein*, 191 W. Va. 149, 444 S.E.2d 27 (1994)……………………………4, 31, 47

*Williams v. Columbus Producing Co.*, 80 W. Va. 683, 93 S.E. 809 (1917)……………………..46

iv

**Statutes and Regulations**

21 U.S.C. § 801(2)…………………………………………………………………………50

21 C.F.R. § 1301.71(a)…………………………………………………………………...51

**Court Rules**

Fed. R. Civ. P. 52(c)……………………………………………………………………………3

**Miscellaneous**

116 Cong. Rec. 996 (1970) …………………………………………………………...50

H.R. Rep. No. 91-1444…………………………………………………………………..50

*Restatement Second of Torts*, § 433B……………………………………………………..4

*Restatement Second of Torts*, § 433B, cmt. b……………………………………………..4

S. Rep. No. 91-613………………………………………………………………………50

Plaintiffs the City of Huntington and Cabell County Commission submit this Memorandum of Law in Opposition to Defendants' Motion for Judgment on Partial Findings on Proximate Causation (ECF No. 1440, 1440-1).  Plaintiffs also oppose herein each Defendant's separately-filed Motion for Judgment to the extent it raises causation issues.  *See* McKesson Memo. of Law (ECF No. 1439-1) §§ I.A, I.C; ABDC Memo. of Law (ECF No. 1443-1) § I.E; Cardinal Memo. of Law (ECF No. 1446-1) § II.  Plaintiffs state in opposition as follows.

## INTRODUCTION

Defendants' systematic failures to maintain effective controls against diversion manifested in Cabell County and the City of Huntington through their unlawful shipments of flagged orders containing tens of millions of opioid dosage units into a region of 100,000 people. The diversion of many of these pills into the illegal drug market both substantially and foreseeably contributed to the opioid epidemic harms that plague Cabell and Huntington to this day.  Plaintiffs' evidence demonstrating the foregoing more than satisfies their burden of proof on the factual and legal causation elements of their public nuisance claim.

In moving for judgment, Defendants try to avoid this conclusion by rewriting West Virginia law on proximate causation and ignoring much of Plaintiffs' evidence.  Defendants argue primarily that the staggering amounts of their opioid shipments were due to an increase in good faith prescribing triggered by changes in the standard of care for pain treatment.  This argument, however, ignores Plaintiffs' evidence showing that Defendants shipped millions of opioid pills to Cabell, Huntington, and nearby pharmacies that were not, and clearly at the time could not have been, prescribed for legitimate medical purposes within the usual course of professional practice.  These shipments include:

- ABDC and Cardinal supplying Cabell pharmacies that filled prescriptions written by a single physician who prescribed over 14,000,000 opioid dosage units before

1

he surrendered his medical license while under investigation for treating patients with excessive doses of opioids; and <u>ABDC</u> separately supplying a Huntington pharmacy that filled prescriptions written by another physician who prescribed over 10,000,000 opioid dosage units before losing his medical license for improper prescribing practices connected with seven patient deaths; *see infra* § I.B.2.a; and

- <u>McKesson</u> shipping over 5,800,000 hydrocodone and oxycodone pills to a single pharmacy in a community of just 1,700 people in a neighboring county, and over 4,900,000 hydrocodone and oxycodone pills in two years to another pharmacy in a community of just 406 people in a neighboring county; *see infra* § I.B.2.b.

These individual doctors prescribing tens of millions of opioid dosage units and pharmacies ordering vast quantities of opioids far out of proportion to their surrounding populations demonstrate that something else *in addition to* the evolving standard of care drove Defendants' shipments.  Under well-established West Virginia law, Defendants' failures to maintain effective controls against diversion and the changing standard of care are *concurrent*, *not superseding*, causes of the opioid epidemic public nuisance in Cabell and Huntington.

Defendants likewise err and misstate West Virginia law in arguing that their failures to maintain effective controls against diversion are "too remote" from the diversion harms that have occurred in Cabell and Huntington.  They contend that a "direct relation" based on a counting of steps between conduct and harm is required. This ignores well-established West Virginia law under which proximate or legal causation is assessed based upon the reasonable foreseeability of the harms to a defendant.  Plaintiffs again have produced abundant evidence showing that the diversion and opioid epidemic harms that have occurred, including the epidemic's evolution from one of prescription opioids to one also intertwined with heroin abuse, were reasonably foreseeable to Defendants as a matter of law, history, science, and basic common sense.

For each of these reasons and as set forth more fully below, the motions for judgment on partial findings based upon proximate causation should be denied.

**LEGAL STANDARD**

"If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter a judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c).  In applying Rule 52(c), the Fourth Circuit has inquired whether the plaintiff has "proved a *prima facie* case" and, "if so, whether the *prima facie* case was rebutted." *Carter v. Ball*, 33 F.3d 450, 457 (4th Cir. 1994).  This Court has emphasized that the focus is not on "whether Plaintiffs have met their ultimate burden . . . by a preponderance of the evidence," but on the "character and quantity of the evidence presented by Plaintiffs" and whether it is "sufficient to defeat a motion for judgment on partial findings." *Ohio Valley Envtl. Coalition, Inc. v. Fola Coal Co., LLC*, No. 2:13-5006, 2014 WL 4925492, at *12 (S.D. W. Va. Sept. 30, 2014).

Unlike under Rule 50, the Court under Rule 52(c), "as trier of the facts, must weigh and consider all of the evidence presented." *Cherrey v. Thompson Steel Co., Inc.*, 805 F. Supp. 1257, 1261 (D. Md. 1992).  Although it "is not to make the special inferences in considering the evidence in plaintiff's case[,]" *id.*, the Court as trier of fact "retains the authority, if not the obligation, to draw reasonable inferences from the facts found." *U.S. ex rel. Ervin and Assoc's, Inc. v. Hamilton Securities Grp., Inc.*, 298 F. Supp. 2d 91, 93 n.3 (D.D.C. 2004); *see also Mother v. State of Hawaii*, 283 Fed. Appx. 514, 515 (9th Cir. June 20, 2008) (although trial court "was not obligated to draw all inferences in the plaintiff's favor, it *could* draw such inferences in the plaintiff's favor as the evidence warranted.") (emphasis in original).

"A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)." Fed. R. Civ. P. 52(c).

3

## ARGUMENT

**I.      Plaintiffs Provide Ample Evidence of Factual Causation—That Defendants'
         Failures Have Contributed to the Opioid Epidemic Harms in Their Communities.**

Under West Virginia law, an actionable harm may and often will have more than one

factual cause.  *See*, *e.g.*, *Wehner v. Weinstein*, 191 W. Va. 149, 155, 444 S.E.2d 27, 33 (1994)

("We long have recognized the doctrine of concurrent negligence . . . .").  Where a harm has

multiple causes, the "'plaintiff's burden of proof is to show that a [defendant's] breach of a

particular duty of care was ***a*** proximate cause of the plaintiff's injury, ***not the sole*** proximate

cause.'"  *Stephens v. Rakes*, 235 W. Va. 555, 565, 775 S.E.2d 107, 117 (2015) (quoting *Mays v.

Chang*, 213 W. Va. 220, 224, 579 S.E.2d 561, 565 (2003)) (emphasis added); *see also*

*MacDonald v. City Hosp., Inc.*, 227 W. Va. 707, 725, 715 S.E.2d 405, 423 (2011) (same)

(quoting *Mays*).  In this setting, "liability may attach so long as the negligence of a tortfeasor

contributes in any degree to the injury."  *Wehner*, 191 W. Va. at 155, 444 S.E.2d at 33.

This is not meant to be a heavy burden.  The *Restatement Second of Torts*, § 433B, which

West Virginia courts apply, *see*, *e.g.*, *Tracy ex rel. Tracy v. Cottrell*, 206 W. Va. 363, 380, 524

S.E.2d 879, 896 (1999), recognizes that the "fact of causation is incapable of mathematical

proof, since no man can say with absolute certainty what would have occurred if the defendant

had acted otherwise."  *Restatement Second of Torts*, § 433B, cmt. b.  Thus, "[i]f, as a matter of

ordinary experience, a particular act or omission might be expected to produce a particular result,

and if that result has in fact followed, the conclusion may be justified that the causal relation

exists."  *Id.*  This is especially so where, as here, a plaintiff shows a statutory or regulatory

violation.  *See*, *e.g.*, *Gillingham v. Stephenson*, 209 W. Va. 741, 749, 551 S.E.2d 663, 671 (2001)

("'The violation of the statute is rightly considered the proximate cause of any injury which is a

natural, probable, and anticipated consequence of the nonobservance.'") (quoting *Noman v. Virginia Pocahontas Coal Co.*, Syl. pt. 2, 68 W. Va. 405, 69 S.E. 857 (1910)).

The burden of proving causation is less strict for a public nuisance claim than for an ordinary negligence claim. *See*, *e.g.*, *Brooke Cty. Comm'n v. Purdue Pharma L.P.*, No. 17-C-248 (W. Va. Cir. Ct. Dec. 28, 2018) at 14 ("'The rule employed with respect to limitations on liability, whatever label is used, in public nuisance actions must be less restrictive than in individual tort actions.' As such, in public nuisance claims, 'where the welfare and safety of an entire community is at stake, the cause need not be so proximate as in individual negligence cases.'") (quoting *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 497 (E.D.N.Y. 2003)); *see also In re Nat'l Prescr. Opiate Litig.*, 2019 WL 2468267, at *32 (N.D. Ohio April 1, 2019) (Ruiz, M.J., Report and Recommendation) (same) (quoting *NAACP*), *adopted in relevant part*, 2019 WL 3737023, at *9-11 (N.D. Ohio June 13, 2019) (Polster, J.).

### A.   Defendants' Failures Contributed to the Nuisance Harms.

Defendants' failures to maintain effective controls resulted in them shipping tens of millions of opioid dosage units into Cabell and Huntington through orders that should have been flagged for suspicion and blocked pending or absent investigation. Plaintiffs' diversion control investigations and Suspicious Order Monitoring Systems (SOMS) expert, James Rafalski, applied Defendants' own metrics and those used by other distributors and/or approved by a U.S. Court of Appeals (Methods (A)-(F)), 5/26 Trial Tr. (Rafalski) at 87-95, and determined that:

- ABDC shipped orders totaling at least 9,380,000 (Method B) dosage units of oxycodone and hydrocodone that should have been flagged and blocked, unless investigated and cleared; *id.* at 98, 101;

- Cardinal shipped orders totaling at least 18,577,000 (Method B) dosage units of oxycodone and hydrocodone that should have been flagged and blocked, unless investigated and cleared; *id.*;

- <u>McKesson</u> shipped orders totaling at least 3,196,000 (Method B) dosage units of oxycodone and hydrocodone that should have been flagged and blocked, unless investigated and cleared; *id.*; and thus that

- <u>Defendants</u> combined shipped orders totaling at least 31,153,000 dosage units of oxycodone and hydrocodone into Cabell and Huntington that should have been flagged and blocked, unless investigated and cleared.

Mr. Rafalski further found that there was insufficient evidence in Defendants' customer files to dispel the suspicions raised by these orders and permit their shipment, *id.* at 102, and Defendants have not shown otherwise.  This conduct by Defendants thus contributed substantially to the public nuisance harms of the opioid epidemic in Cabell and Huntington.

> **1.     Defendants' Conduct Contributed to Diversion in Cabell and Huntington.**

Defendants collectively and individually contend that Plaintiffs have not produced evidence that the opioids they shipped were diverted.  *See* Memo. of Law re Proximate Causation (ECF No. 1440-1) ("Prox. Cause Memo.") at 28; McKesson Memo. of Law (ECF No. 1439-1 ("McKesson Memo.") at 7-9; ABDC Memo. of Law ECF No. 1443-1) ("ABDC Memo.") at 37.  This is incorrect.  Substantial evidence from all sides of this case—the U.S. Drug Enforcement Administration ("DEA"); Plaintiffs' experts; fact witnesses; Defendants' experts; and Defendants themselves—shows otherwise, that Defendants' failure to maintain effective controls against diversion in fact resulted in the occurrence of diversion.

Plaintiff's history of opiate use and abuse and drug policy expert, Dr. David Courtwright, testified that the core purpose of the Controlled Substances Act and its predecessor statute, the Harrison Act, and the "closed system" of distribution they created "was to prevent diversion." 5/5 Trial Tr. (Courtwright) at 43; *see also id.* ("In effect, what the Harrison Act did is it deputized the registrants to help prevent the problem of diversion.").

Former DEA Deputy Assistant Administrator for the Office of Diversion Control Joseph Rannazzisi explained how the closed system is meant to operate to prevent diversion.  6/7 Trial Tr. (Rannazzisi) at 175 ("So, this Closed System of Distribution overall is just a system of accountability to ensure that nothing is leaving the system and going into the illicit marketplace . . . .").  Any breach of this closed system, such as Defendants' failures as distributors to maintain effective controls, results in the diversion of controlled substances into the illicit market, as Mr. Rannazzisi further explained:

> If there's a breach in the integrity of the closed system, drugs are funneled out of that supply chain into the illicit market.  It's a total – it's a breakdown.  A breakdown of the system will cause diversion.  And that's – it's as simple as that. It doesn't get any more simple.

*Id.* at 180-81; *see also id.* at 180 (distributors' "Suspicious Order Monitoring Program is your tool" to prevent diversion); *id.* at 184 ("But those internet pharmacies were an immediate [diversion] threat that we had to deal with.  So we kind of shifted and used the distributors as a choke point to stop that flow.").

Other DEA testimony echoes Mr. Rannazzisi's understanding of how a failure by Defendants or other distributors to maintain effective controls causes diversion to occur.  *See* 5/31/19 Tr. Dep. of Matthew Strait at 34-35 (DEA Rule 30(b)(6) testimony that distributors' setting of arbitrary thresholds "could actually create oversupplies"); *id.* at 41-42 ("DEA is of the opinion that increases in availability could have the unintended consequence of increasing diversion and abuse."); 4/18/19 Tr. Dep. of Thomas Prevoznik at 642 (30(b)(6) testimony that DEA agrees that a registrant's "failure to comply enables more diversion" and that "the more pills which unlawfully enter the market results in more diversion").[1]

---

[1] The Court should reject Cardinal's attempt to blame DEA for their own failures to follow the law.  *See* Cardinal Memo. of Law (ECF No. 1446-1) ("Cardinal Memo.") at 34 ("DEA knew this

Plaintiffs' epidemiology and drug overdose expert, Dr. Gordon Smith, noted in his testimony the DEA's finding that the primary methods of drug diversion in West Virginia and the Appalachian region during the time period at issue were the "illegal sale and distribution by healthcare professionals," as well as "employee theft, forged prescription, and the internet." 6/10 Trial Tr. (Smith) at 221. Similarly, Plaintiffs' epidemiology and opioid use disorder expert, Dr. Katherine Keyes, testified that an increased volume of prescription opioids, such as that brought about by a failure to maintain effective controls, is a substantial factor contributing to diversion into the illicit market. 6/15 Trial Tr. (Keyes) at 31-32 ("My opinion is that it is a substantial contributing factor.").

Plaintiffs' diversion control investigations expert, James Rafalski, similarly testified that a distributor or other DEA registrant's failure to maintain effective controls by shipping without first dispelling the suspicion of a flagged order can result in diversion. 5/26 Trial Tr. (Rafalski) at 104 ("If you don't dispel the suspicion of that order and of future orders, if you hadn't

_____

information, and the evidence demonstrates that knowing it did not prompt the agency to take any enforcement activity—or any action whatsoever—to limit prescribing, dispensing, or distributing."). Mr. Rannazzisi rebutted this contention. *See* 6/7 Trial Tr. (Rannazzisi) at 178-79 ("It's extremely difficult with the number of people that we have to look at, all the practitioners and all the retail pharmacies, and then concentrate on the manufacturers and distributors as well. We don't have a huge amount of resources to do that."); *id.* at 179 ("*The Controlled Substances Act was set up so a supply chain could police itself* . . . ."); *see also* 5/5 Trial Tr. (Courtwright) at 43-44 ("There were half a million people who were registered under the Controlled Substances Act. Government did not have enough agents to oversee every narcotic transaction. It needed help. That's why the law is written the way it is."). The same is true of Cardinal's attempt to blame DEA's annual quotas for the oversupply. *See* Cardinal Memo. at 38 ("DEA raised the opioid quota year after year . . . ."). As Mr. Rannazzisi explained, DEA cannot segregate the effects of its quota-setting on medical and non-medical users. *See* 6/8 Trial Tr. (Rannazzisi) at 200 ("But if I come in and say, you know what, I'm just going to cut it by 20 percent, then that's 20 percent less but that patient – the patient population and those drug seekers are competing now for 20 percent less."). In the first instance, DEA *did* take repeated actions against Defendants. Regardless, the duties at issue here are those of *Defendants*, not the DEA, and Cardinal's position is akin to a reckless driver trying to avoid responsibility for the harms he causes by blaming the police for failing to catch him.

8

removed that suspicion of diversion or dispelled it, more likely than not, that's what would occur . . . ."). He further testified that Defendants' failures in this respect likely caused diversion of prescription opioids into the illicit market in Cabell and Huntington. *See id.* at 112-13 (agreeing that "the orders the defendants knew or should have known were suspicions were likely to be diverted into the illicit market in Huntington-Cabell County, West Virginia.").

Huntington's Former Chief of Police, William Holbrook, described his department's observation of the same connection between a registrant's diversion control failures and the occurrence of diversion on the streets of his city:

> Often times, especially with diversion, an investigation would start with a call to a tip line, a pharmacy calling, a traffic stop and finding prescription pills in somebody's possession and they not have a legitimate prescription, or the would have one and you would find multiple pharmacies or doctors they had been to. So you would see some evidence where it looked like maybe a pharmacist or a doctor potentially was, again, distributing, prescribing drugs, opioids irresponsibly.

6/17 Trial Tr. (Holbrook) at 207-08.

Defendants' own representatives and experts also bear out the foregoing. McKesson's Rule 30(b)(6) designee, former Vice President of Regulatory Affairs and Compliance Nathan Hartle, acknowledged McKesson's statement in its operations manual that "[i]t is extremely important that McKesson employees comply fully with the regulations and the following guidelines" on diversion control, and agreed that this is "extremely important" in order to "prevent the diversion of controlled substances." 7/31/18 Tr. 30(b)(6) Dep. of Nathan Hartle at 108; *see also id.* at 58-59 (agreeing that diversion can happen if McKesson does not follow the laws governing the closed system of distribution); *id.* at 268 ("Using common sense and basic logic, you could assume the more pills that are out there, the more potential for diversion there could be."). Defendants' pain management standard of care expert, Dr. Timothy Deer, similarly recognized that prescribing outside of the standard of medical care can cause diversion. *See* 7/7

9

Trial Tr. (Deer) at 161 ("Q.  The physician outside the standard of care is not diverting pills, but their improper prescribing could cause diversion by someone else.").[2]

In sum, the testimony of the parties' expert and fact witnesses alike including those from the DEA establishes that breaches of the duty to maintain effective controls can and does cause diversion of controlled substances into the illicit market, as occurred in Cabell and Huntington.

## 2.   Diversion Occurs Across State and Local Boundaries.

Substantial evidence also shows that where diversion occurs, as it did here, it is not constrained by or within state, county, or municipal boundaries.  Here, too, the testimony of former DEA Deputy Assistant Administrator for the Office of Diversion Control Mr. Rannazzisi helps to demonstrate the point.  Mr. Rannazzisi testified as to his familiarity while at DEA with the term "Oxy Express," which he understood to mean as follows:

> 'Oxy Express' was a term given to people that go down to Florida to visit pill mills.  They might go three, four, five at a time and then load up either by car, or by bus, or even by plane and take the drugs back to where they came from.  But Oxy Express originally was the I-75 Corridor going up into – going up through Georgia, past Georgia, and then spreading out into the Midwest.

6/8 Trial Tr. (Rannazzisi) at 24; *see also id.* at 25 ("You go down, you visit multiple pill mills, multiple prescription mills.  You get your drug from pharmacies in the area and you take them back to wherever you came from.").  Mr. Rannazzisi specifically tied this interstate diversion of prescription opioids to Defendants' distribution activity.  *See* 6/7 Trial Tr. (Rannazzisi) at 191-92

---

[2]  To the extent Defendants argue that this diversion is irrelevant because it takes place when the opioid pills are not in their possession, *see* Prox. Cause Memo. at 7-8 ("[T]here is no evidence of . . . diversion while prescription opioids were within Defendants' possession or control . . . ."), this argument fails.  *See, e.g.*, *City and County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 683-84 (N.D. Cal. 2020) ("Distributors' role in the supply chain may end after it delivers prescriptions to pharmacies, but this does not mean that its causal conduct in the transactions ceases to be operative.  Because Distributors' alleged failure to stop suspicious orders remains active in producing the City's injury, their conduct falls within the definition of operative.") (internal quotation marks and citation omitted).

(describing large-scale diversion occurring through internet pharmacies and spreading "across the country" and "across all of the states"); *id.* at 185 ("Amerisource, McKesson, and Cardinal had a big role in [supplying] those internet pharmacies.").

Another law enforcement fact witness, Appalachia High Intensity Drug Trafficking Area ("HIDTA") Director Vic Brown, connected cross-border diversion of prescription opioid pills to the Appalachian region and specifically to Cabell and Huntington:

> The Appalachian region, obviously, was one of the hardest hit regions in the country for opioid abuse.  We had a great amount of citizens traveling out of state to obtain prescription medication, to south Florida most specifically, and other states as well, because Kentucky had a very robust prescription monitoring program . . . .

5/17/20 Tr. 30(b)(6) Dep. of Vic Brown at 18; *see also id.* at 249-50 (connecting diversion from Florida back to West Virginia and surrounding states); *id.* at 254-55 ("Q. In your role at HIDTA – at AHIDTA, you've also reported on the trend of pills from Florida being diverted into Huntington.  Is that Correct?  A.  That's correct.").

Defendants and their employees likewise readily acknowledge this occurrence of diversion across state, county, and municipal boundaries.  McKesson's former Vice President of Regulatory Affairs and Compliance, Mr. Hartle, agreed with the statement that "[d]rugs don't just – because you sell it to one particular pharmacy doesn't – in one particular town doesn't mean that drug is staying in that town[.]"  8/1/18 Tr. Dep. of Nathan Hartle at 319; *see also id.* at 320 ("I'm aware of . . . how drugs move and migrate . . . ."); *id.* at 323 ("I agree that diversion migrates.").

So, too, did Mr. Hartle's successor as McKesson's Vice President of Regulatory Affairs and Compliance, Gary Boggs, agree with the statement that:

> [D]rugs that find their way into the illegal distribution system in a given community will not remain in that community; they will – some of those drugs will migrate to adjacent communities and even different states.

1/17/19 Tr. Dep. of Gary Boggs at 259-60.  In fact, Mr. Boggs prepared a PowerPoint presentation titled "Drug Diversion Migration Out of Florida," which he described as depicting "the criminal schemes of pill mills in Florida, and where those that were complicit in the criminal scheme . . . would take those [drugs] . . . out of Florida and into other locations throughout the United States.").

ABDC's representatives concur in this assessment.  ABDC Director of Diversion Control and Security, Edward Hazewski, testified that "it was generally discussed information in the industry" that "people would travel to places like Florida and bring pills back into other areas like West Virginia and Ohio."  10/25/19 Tr. Dep. of Edward Hazewski at 71-72; *see also id.* at 72-73 (agreeing that "someone who has a legitimate medical need for a prescription probably wouldn't be driving out of the area to get their prescription").  ABDC's former Vice President of Sales for West Virginia, Lisa Mash, likewise expressed her familiarity from company training and other sources with the term "Oxy Express" and its reference to pill migration from Florida and through West Virginia.  7/28/20 Tr. Dep. of Lisa Mash at 81-82; *see also id.* at 118 (field employees were trained to be aware of "license plates from various states, more than would constitute a local customer base").

ABDC's Senior Vice President of Corporate Security and Regulatory Affairs, Chris Zimmerman, similarly testified that the "*Pillbillies*" song parody email he circulated among ABDC employees contained an implicit recognition that there was opioid diversion or pill migration between Florida and West Virginia.  5/13 Trial Tr. (Zimmerman) at 90 ("Q. This is an implicit recognition that there was pill migration from Florida up into Mountaineer land?  A.

Somebody wrote a parody that included that, yes."); *see also id.* (acknowledging use of the terms "Blue Highway" and "Oxy Express" for migration of opioid pills "up from Florida").

The foregoing testimony by DEA, other law enforcement, and Defendants' own representatives alike makes clear that the diversion occurring in and near Cabell and Huntington was not constrained by state, county, or municipal borders.

### 3.    Diversion and Oversupply Caused Opioid Epidemic Harms.

The evidence also makes clear that the diversion and oversupply of prescription opioid pills contributed to the opioid epidemic harms that continue to this day to afflict the Cabell and Huntington communities.  Here, too, the testimony of former DEA Deputy Assistant Administrator for the Office of Diversion Control Mr. Rannazzisi helps to demonstrate the point. Mr. Rannazzisi testified that when "there's a breach in the integrity of the closed system, drugs are funneled out of that supply chain into the illicit market.  It's a total – it's a breakdown."  6/7 Trial Tr. (Rannazzisi) at 180-81.  He then explained that exactly this occurred while he was Deputy Assistant Administrator, during which time he observed:

> The market being flooded, the illicit marketplace being flooded with opioids, benzodiazepines, mild stimulants, people becoming addicted, people overdosing, police officers required, being required to carry naloxone, which is not part of their duties up until a few years ago when we had to start carrying it because the overdoses were outrageous, and of course, you know, losing loved ones.

*Id.* at 181.

Plaintiffs' epidemiology and opioid use disorder expert, Dr. Keyes, echoes Mr. Rannazzisi's assessment that the oversupply of and exposure to prescription opioids fueled the opioid epidemic both nationally and in Cabell and Huntington.  Dr. Keyes testified that there is a "causal association between the supply of prescription opioids in Cabell/Huntington and the increase in opioid-related harms."  6/11 Trial Tr. (Keyes) at 204; *see also id.* at 217 ("My

opinion is that the opioid supply and oversupply is causally related to the opioid-related

harms."); 6/15 Trial Tr. (Keyes) at 31 ("My opinion is that there is a causal relationship between

volume and harm.").  Dr. Keyes further explained that her opinions are consistent with the

consensus statement of the Association for Schools of Public Health, which states:

> The tremendous expansion of the supply of powerful high potency, as well as
> long-acting prescription opioids led to scaled increases in prescription opioid
> dependence, . . .

6/11 Trial Tr. (Keyes) at 171; *see also id.* ("Opioid Use Disorder is caused by repeated exposure

to opioids.").

Plaintiffs other experts—Dr. Smith in epidemiology and drug overdoses, and Dr. David

Courtwright in the history of opiate use and abuse and drug policy—concur in Dr. Keyes's

assessment that the oversupply of prescription opioids fueled the opioid epidemic.  *See* 6/10 Trial

Tr. (Smith) at 216 ("Then I saw the introduction of the prescription opioids.  My [overdose] rates

were completely flat . . . .  And then we saw the exponential growth, yes.  But it was at the

beginning when they were almost entirely new.  . . .  And it was entirely a prescription problem

at the beginning."); 5/5 Trial Tr. (Courtwright) at 28 ("supply and exposure were both critical" to

past opioid epidemics, where "opiates were widely available not only from physicians, but in

patent medicines which often contained opium and morphine . . . ."); *id.* at 29 ("[T]he per capita

consumption of medicinal opiates in the United States tripled between 1870 and 1890, which

was right in the heart of that first epidemic.").

Here, too, Defendants' employees and experts readily agree with these assessments that

the diversion and oversupply of prescription opioids can and did cause opioid epidemic harms

like those afflicting Cabell and Huntington.  *See* 1/17/19 Dep. Tr. of Gary Boggs at 134-35

(testimony of McKesson's Vice President of Regulatory Affairs and Compliance that "there is a

correlation between diversion and – and associated problems with diversion" and agreeing that "the greater the amount of diversion, the greater the likelihood is of ensuing harm, such as addiction and death."); 7/12 Trial Tr. (Colston) at 154 (Defendants' substance use disorder care systems expert, Stephanie Colston, agreeing that "oversupply of prescription opioids is not *the* causal factor of the opioid epidemic, but is only *a* causal factor.").

The opioid epidemic public health harms in Cabell and Huntington to which Defendants' conduct contributed are addressed below in greater detail.

### a.    Opioid Epidemic Harms—*Overdose Deaths*

The evidence also makes clear that one of the opioid epidemic harms in Cabell and Huntington caused by Defendants' failure to maintain effective controls and the attendant diversion and oversupply of opioid pills is the sharply increased incidence and rate of opioid overdose deaths.

Plaintiffs' epidemiology and drug overdose expert, Dr. Smith, explained in detail how the increase in the supply of opioid pills after the turn of this century led to a sharp increase in opioid overdose deaths in Cabell and Huntington.  Dr. Smith first noted that prescription opioid poisoning death was so rare before the year 2000 that he had to rely on West Virginia-wide data on drug poisonings to assess its occurrence.  *See* 6/10 Trial Tr. (Smith) at 118, 125-126 ("[T]here were so few overdose deaths from opioids that I had to go to the next level of grouping what they do, which was all accidental overdoses of which the drug poisonings are part of.").  This data showed that the number of drug-poisoning deaths in West Virginia was low and stable between 1979 and 1999, with an average of fewer than 76 drug-poisoning deaths per year Statewide.  *Id.* at 128-29; *see also id.* at 130 ("This broad category which I showed earlier includes the drug poisoning and includes specifically opioid overdoses was relatively flat until 2000.").

15

From 2001 on, however, the rate of opioid overdose deaths soared.  In 2001, the first year for which Dr. Smith was able to obtain drug-specific poisoning death data for Cabell County, this data showed that there were 16 drug-poisoning deaths in Cabell County alone, of which the vast majority—14 of the 16—were opioid-related.  *Id.* at 133 ("This is very specific to Cabell County data and of those 14 were – the next column over is those that are opioid-related.").  For the years from 2001 to 2018, there was a total of 1,002 opioid-related deaths in Cabell, representing almost 90% of all drug-poisoning deaths in the county.  *Id.* at 134.

While the absolute number of opioid-related poisoning deaths soared in Cabell, so too did the rate of fatal overdoses, from 16.6 to 213.9 per 100,000 between 2001 and 2017.  *Id.* at 139-40.  This represents an increase of almost 1,200%.

Dr. Smith further demonstrates both that the supply and the diversion of prescription opioids were instrumental in bringing about this epidemic of overdose deaths in Cabell and Huntington.  *See id.* at 141 (agreeing that "there is an ongoing role of prescription opioids as a cause of drug overdose mortality in the Cabell-Huntington community" because "there is an increase and there is a very continued presence of illicit – of both – of opioids and prescription opioids over this period of time.").  With respect to diversion, Dr. Smith explained how a study of 295 overdose deaths in 2008 in West Virginia as a whole showed that pharmaceutical diversion was associated with 186 (63%) of the deaths, while another 63 (21.4%) showed evidence of doctor-shopping.  *Id.* at 145-46.  More specifically, Dr. Smith explained how opioid analgesics were taken by 275 of the 295 decedents (93.2%), but that less than half of these decedents (122 of 275, or 44.4%) had ever been prescribed opioids.  *Id.* at 147.  Dr. Smith thus concluded as follows:

> My conclusion from reading the literature, looking at my own reports and what I found, was that there was a very, very conclusive evidence that prescription drugs

16

and prescription opioids in particular play – continue to play a very important role in the drug overdose deaths in West Virginia.

*Id.* at 153.

Other expert and fact witnesses, including those in law enforcement and public health, and at least one of Defendants' own representatives, concur. *See* 6/11 Trial Tr. (Keyes) at 182 (Plaintiffs' epidemiology and opioid use disorder expert, Dr. Keyes, opining that increased prescription opioid supply and exposure caused increased mortality in Cabell and Huntington); *id.* at 217-18 (opioid oversupply is a substantial factor in overdose deaths in Cabell-Huntington); 6/7 Trial Tr. (Rannazzisi) at 180-81 (former DEA Deputy Assistant Administrator, Mr. Rannazzisi, explaining that breach of closed system causes flooding of illicit market with opioids, resulting in increased overdose deaths); 5/6 Trial Tr. (Gupta) at 149 (former West Virginia Bureau of Public Health Commissioner, Dr. Rahul Gupta, reading from report he commissioned concluding that: "The number one cause of drug overdose deaths was associated opiates, making West Virginia number one in the nation."); 7/31/18 Tr. 30(b)(6) Dep. of Nathan Hartle at 294 (McKesson's 30(b)(6) testimony that: "The volume of opioids in the market and diversion is related to opioid deaths, certainly.").

Plaintiffs thus have demonstrated that Defendants' diversion control failures and the resulting diversion and oversupply of opioid pills are a contributing factor to the public health harms of overdose deaths in Cabell and Huntington.

### b.    Opioid Epidemic Harms—*Opioid Use Disorder*

The evidence further makes clear that another opioid epidemic harm in Cabell and Huntington caused by Defendants' failure to maintain effective controls and the attendant diversion and oversupply of opioid pills is the sharply increased incidence and rate of Opioid Use Disorder ("OUD").

17

Plaintiffs' epidemiology and OUD expert, Dr. Keyes, explained how the increase in the supply of opioid pills led to a sharp increase in the rate and incidence of OUD in Cabell and Huntington.  Dr. Keyes began with the "consensus statement" of the Association for Schools of Public Health that "Opioid Use Disorder is caused by repeated exposure to opioids" and that the "tremendous expansion of the supply of powerful led to scaled increases in prescription opioid dependence . . . ."  6/11 Trial Tr. (Keyes) at 171.  She then stated her own expert opinion as follows:

> I reviewed the literature and compared them to all of the key factors that we look at and they all point in one direction and that is that increased exposure to the supply of prescription opioids caused harms in Cabell-Huntington.

*Id.* at 182; *see also id.* (among the harms caused by the increased exposure was "Opioid Use Disorder.  I would also list diversion and non-medical use.").

Dr. Keyes then explained the epidemiological bases (the Bradford Hill factors) supporting her opinion that the increased prescription opioid supply caused OUD harms in Cabell and Huntington.  The first is that there is a "dose-response" relationship between supply and exposure on the one hand and development of OUD on the other.  *Id.* at 185 ("Duration can be considered a measure of dose because, as the duration goes on, you're exposed to a higher dose.  This has been shown repeatedly in the epidemiological literature with regard to Opioid Use Disorder, both among people who are taking a prescription and among people who are using prescription opioids non-medically."); *see also id.* at 186-89 (explaining Edlund study showing direct relationship between increased dose and duration of opioid use and higher incidence of OUD, including that people taking high-dosage opioids for over 90 days were 122 times more likely to develop OUD, which Dr. Keyes described as an "extraordinarily strong" association).

Dr. Keyes further explained how the dose-response relationship between supply/exposure and development of OUD is shown by another study ("Ghertner") of the relationship between "prescription opioids distributed in U.S. counties" and the "level of opioid-related hospitalizations." *Id.* at 192.  The Ghertner study found that each increase in the distribution of prescription opioids by county was associated with a 4% increase in opioid-related hospitalizations.  *Id.* ("So this study showed more supply, more hospitalizations.").

Dr. Keyes then explained the additional epidemiological bases supporting her opinion that increased exposure/supply caused increased OUD harms in Cabell-Huntington as follows:

- <u>Temporality</u>—"So for temporal relationships what we're really looking for is people who didn't have a history of opioid use disorder before they were prescribed opioids, for example . . . .  And we want to establish that the cause precedes the effect.  And that's well documented in the epidemiological literature . . . ."; *id.* at 193;

- <u>Strength of Association</u>—"And, generally, I think there's consensus in my field that the strongest risk factor for [OUD] is prescription opioid exposure."; *id.* at 194;

- <u>Consistency</u>—"Consistency means do you observe the same relationship . . . over and over and over again in different studies that are conducted in different ways."' *id.* at 194-95;

- <u>Biological Plausibility</u>—agreeing that the medical literature references the biological plausibility of increased prescription opioid supply and exposure causing increased incidence of OUD; *id.* at 195;

- <u>Alternative Explanations</u>—"Certainly one that's been discussed a lot is economic conditions.  . . .  And what's been demonstrated in well-done studies . . . [is] that economic conditions really, when you analyze the data in a rigorous way, play a relatively small role in the opioid-related harms that we've seen in the United States over the last 15 years."; *id.* at 195-96.

Based on these epidemiological factors, Dr. Keyes concluded that "the opioid supply and oversupply is causally related to the opioid-related harms" and agreed that this includes "being a substantial factor in [OUD] in Huntington/Cabell County."  *Id.* at 217-18; *see also* 6/14 Trial Tr.

19

(Keyes) at 175 (identifying 8,252 OUD cases in Cabell-Huntington, of which 7,109 are attributed to prescription opioids).

Several of Plaintiffs' fact witnesses in law enforcement have observed at ground-level the same relationship found by Dr. Keyes between prescription opioid diversion and supply and the development of OUD-related public health harms. *See* 6/7 Trial Tr. (Rannazzisi) at 180-81 (breach of closed system causes "the illicit marketplace being flooded with opioids, benzodiazepines, mild stimulants, people becoming addicted, people overdosing . . . .")/ 6/17 Trial Tr. (Holbrook) at 196 (testimony of former Huntington Chief of Police, Mr. Holbrook, that the "prevalence of drugs depends on demand, supply and demand. And there was an outrageously strong appetite, demand for drugs in Huntington. And we had an addicted population, unfortunately.").

Plaintiffs thus have demonstrated that Defendants' diversion control failures and the resulting diversion and oversupply of opioid pills are a contributing factor to the public health harms of increased OUD in Cabell and Huntington.

### c.      Opioid Epidemic Harms—*Heroin/Fentanyl Use*

The evidence also demonstrates that another of the opioid epidemic harms in Cabell and Huntington caused by Defendants' failure to maintain effective controls and the attendant oversupply of opioid pills is the transition, starting in the early 2010's, of opioid-addicted persons from using pills to using heroin and fentanyl.

The evidence of the causal relationship between increased prescription opioid use and abuse and the transition to heroin is overwhelming. Five of Plaintiffs' expert witnesses testified as to this causal relationship, as did four of Plaintiffs' fact witnesses based on their ground-level

observation, three of Defendants' own diversion-control employees, and two of Defendants' expert witnesses.  Each of these is addressed in turn.

Plaintiffs' neuroscience, addiction, and pain expert, Dr. Corey Waller, established the biological or neuroscientific basis for the causal relationship between prescription opioid use and heroin use.  Dr. Waller explained that the neuroscientific relationship between the use of these drugs is so strong that *it is not even a gateway relationship* from the one to the other:

> I don't use a gateway.  It's no different.  I mean, for some people it doesn't – it's no different for them because when they take oxycodone or hydrocodone, for them if they have that same change in the brain chemistry, they might as well have taken the other.  It doesn't matter.  It's an opioid that binds in the brain disproportionately releasing this dopamine and causing the same behavioral phenomenon with this need to search for dopamine.

5/4 Trial Tr. (Waller) at 71; *id.* ("Q. Does the brain know the difference between whether or not this is hydrocodone, oxycodone, or heroin?  A. It has no idea."); *id.* at 71-72 (agreeing that it is "the same mu-receptor that is receiving the same neurotransmission"); *id.* at 72 ("But it's not a gateway theory really.  It's just . . . the brain doesn't know what drug you just gave it.  It just knows the action that it has.").

Dr. Waller thus concluded that there is a "clear connection" between prescription opioid abuse and heroin abuse.  *Id.* at 204.  He based this opinion on both his experience as a clinician and his expertise in neuroscience.  *See id.* ("And as I have spoken to [patients], the clear majority of those talk about the first prescription.  And they talk about it with the same clarity as someone with an alcohol use disorder would talk about their first drink.  And they would say, '[t]he first time that I took this pill, I felt totally different.'"); *id.* at 205 ("[E]specially in people who are opioid naïve or don't have other injuries or things like this, just taking an opioid does have those ramifications on the brain to varying degrees amongst individuals.  But, at the same time, it is predictable in its nature.  . . .  And now, even though those were prescription and taken as

prescribed, we now have someone that as we remove it, those behaviors of addiction become very apparent.").

Dr. Keyes, Plaintiffs' epidemiology and OUD expert, agreed that "there is a causal connection between prescription opioids and heroin."  6/11 Trial Tr. (Keyes) at 169.  Her touchstone for this opinion, again, is the consensus statement of the Association for Schools of Public Health, which states that the "tremendous expansion of the supply of powerful high potency, as well as long-acting prescription opioids" led to both "scaled increases in prescription opioid dependence" and the "transition of many to illicit opioids, including fentanyl and its analogs which have subsequently driven exponential increases in overdoses."  *Id.* at 171.

Dr. Keyes explained that there is substantial support for her opinion that prescription opioid supply and use causes heroin use in epidemiological literature.  This includes studies showing that since the expansion of prescription opioid prescribing and distribution in the 1990s, most people (70-80%) who have used heroin started with a prescription opioid first.  *Id.* at 173-74 (citing Cicero, other studies; noting that the 80% statistic is on the National Institute of Drug Abuse website).  It also includes a prospective study using Veterans Administration data following over 3,000 U.S. military veterans between the ages of 40 and 60, and finding that those who used prescription opioids were more than five times as likely to use heroin.  *Id.* at 176-77 (discussing Banerji study).  Dr. Keyes also addressed several of the Bradford Hill criteria that support her opinion that prescription opioid use is causally related to the transition to heroin use.  *See id.* at 180 (biological plausibility—"They have similar pharmacological properties."); *id.* at 193 (temporality—"And that's well documented in the epidemiological literature that means 80 percent of people used prescription opioids before they used heroin . . . .").

While Dr. Keyes also agreed that the absolute risk of a prescription opioid user transitioning to heroin is relatively small in light of the far greater number of prescription users, she emphasized that even a small risk creates a large population when prescription opioid use is widespread.  6/14 Trial Tr. (Keyes) at 196 ("The point is that while the absolute risk is small, the population prevalence is large."); 6/15 Trial Tr. (Keyes) at 18 (agreeing with statement that "even small increases in progression to heroin use creates a significant public health burden.").

Dr. Keyes thus concluded that Defendants' distribution of 80 million prescription opioid pills into Cabell and Huntington is a substantial factor contributing to the heroin-related harms afflicting these communities.  6/15 Trial Tr. (Keyes) at 27-29; *see also id.* at 31 (providing opinion that "an increase in the volume of prescription opioids causally leads to an increase in heroin use.").

At least three other of Plaintiffs' public health experts concur with Dr. Keyes and Dr. Waller's opinions that prescription opioid supply, use, and abuse cause heroin abuse.  *See* 6/10 Trial Tr. (Smith) at 136 ("[U]p until 2001, heroin was not much of a problem and, as you could see, the red line is all of the prescription opioids.  And so, you'll see a very dramatic rise in prescription opioids over the same period of time.  And during this period of time there was very little heroin certainly being found in the people that had died."); *id.* ("We really started to see the increase [in heroin] beginning in 2011."); 6/17 Trial Tr. (McGuire) at 75 (testimony of Plaintiffs' health economist expert, Dr. Thomas McGuire, noting White House Council of Economic Advisors statement that prescription opioids "have high potential for abuse which can lead users to substitute more lethal opioids without accepted medical uses such as heroin or illicitly produce fentanyl."); 6/28 Trial Tr. (Alexander) at 26-27 (testimony of Plaintiffs' epidemiology and opioid abatement intervention expert, Dr. Caleb Alexander, that "prescription opioids and heroin and

23

fentanyl are two sides of the same coin.  They have the same effects on the body.  They produce

the same type of physical dependency and the same risks of addiction."); *id.* at 27 ("So while the

community in the early stages of the epidemic was predominantly flooded with prescription

opioids and while now heroin and illicit fentanyl have taken on heightened concern, *I would*

*characterize the epidemic as an opioid epidemic, not one of one particular type of opioid or*

*another*.").

Many of Plaintiffs' fact witnesses, particularly those in public health and law

enforcement positions, likewise observed a relationship between prescription opioid use and

heroin use from their ground-level vantage point.  Former West Virginia Bureau of Public Health

Commissioner, Dr. Gupta, testified that his office's Social Autopsy Report showed overdose

victims filling prescriptions 12 months before but not ingesting opioid pills within 30 days of the

overdose, meaning "they quit filling prescriptions . . . .  They died of heroin and fentanyl.  That

is a very clear pathway from prescription drugs to fentanyl and heroin."  5/5 Trial Tr. (Gupta) at

168-69; *see also* P-41901_00051 (HIV Epidemiologic Profile West Virginia) ("The abuse of

prescription medication has been a serious issue in the State for a while.  But now, users are

turning to cheaper and more potent opioids – heroin and fentanyl.  Nationwide, among new

heroin users, 75.0% report having abused prescription opioids before using heroin.").

Scott Lemley of the City of Huntington Mayor's Office of Drug Control Policy testified

that his Office's community engagement showed that people "started out on a prescription pill

and then they moved over to heroin because that was what they could get, that's what they could

find, that's what was affordable to them because eventually [pills] became more scarce."  5/21

Trial Tr. (Lemley) at 142.

24

Former Hunting Chief of Police, Mr. Holbrook, testified that "with respect to the opioids, we, we knew that as prices would go up . . . that folks would not be able to pay that and they would turn to cheaper alternatives.  And there was great risk with some of those cheaper alternatives, heroin being one of them."  6/17 Trial Tr. (Holbrook) at 219; *see also* P-41374 (2012 HPD Threat Assessment and Drug Strategy) ("Heroin has also become an emerging threat to our community due to the availability and affordability of the drug.  *Many people who have developed opiate addictions due to abuse of prescription medication turn to heroin due to the lower price: $30-80 for a prescription pill compared to $20-25 for a dosage unit of heroin.*") (emphasis added); 5/17/20 Tr. 30(b)(6) Dep. of Vic Brown at 273 (Appalachia HIDTA Director, Mr. Brown: "It is the availability, is the main driving factor in switching to heroin.  Once the availability of the opioids became less prevalent due to price and availability, many of those users switched over to heroin and fentanyl and other derivatives of synthetic opioids.").

So, too, do Defendants' diversion control employees recognize the causal connection whereby prescription opioid use or abuse leads to heroin abuse.  *See* 5/14 Trial Tr. (May) at 30-31 (testimony of ABDC Senior Vice President of Diversion Control, David May, that person cut off from prescription can "on his own go out into the streets and find a substitute for those drugs that he was taking[,] . . . I think, in the realm of possibilities, yes, that can – that can absolutely happen."); 5/13 Trial Tr. (Zimmerman) at 88-89 (testimony of ABDC Senior Vice President of Corporate Security and Regulatory Affairs, Mr. Zimmerman, that "I've heard OxyContin referred to as hillbilly heroin, yes."); 8/1/18 Dep. Tr. of Nathan Hartle at 37 (testimony of McKesson's former Vice President of Regulatory Affairs and Compliance, Mr. Hartle, agreeing that "narcotic painkiller abuse, opioid abuse, [can be] a gateway to heroin use.").

25

Defendants' experts likewise accepted and even embraced the conclusion that prescription opioid use and abuse can cause heroin abuse. Defendants' pain management and prescription opioids risks and benefits expert, Dr. Christopher Gilligan, testified that:

- He does not dispute the Compton study's findings of "an overall association of both non-medical and medical use of opioid analgesics with transition to heroin use with particular concerns about early non-medical use."; 7/2 Trial. Tr. (Gilligan) at 156;

- "I think if there are a large number of medications prescribed in any area, there will be some of them that will be diverted, misused, abused. And so, that there would be . . . some instances where that would lead to someone initiating heroin. I think that would be statistically likely in any area with a large number of opioid pain medications that were prescribed."; *id.* at 159; and that

- "I think there's a direct relationship that includes the misuse and abuse of prescription opioids, along with many other predisposing factors that, that then does related to initiation of heroin."; *id.* at 161-62.

So, too, did Defendants' health economics expert, Dr. Kevin Murphy, echo Dr. Waller's opening assessment of the close relationship between prescription opioids and heroin, testifying with respect to their non-medical use that "if you focus on abuse of prescription opioids and abuse of heroin, they're probably closer to substitutes . . . like Coke or Pepsi." 7/8 Trial Tr. (Murphy) at 147.

The evidence thus overwhelmingly demonstrates that Defendants' diversion control failures and the resulting diversion and supply of opioid pills are a contributing factor to the public health harms of heroin and fentanyl abuse that continue to this day to afflict the Cabell and Huntington communities.

### d.    Opioid Epidemic Harms—*Infectious Diseases*

The evidence further makes clear that another of the opioid epidemic harms in Cabell and Huntington caused by Defendants' failure to maintain effective controls and the attendant

diversion and oversupply of opioid pills is an increased rate of infectious diseases, including HIV, Hepatitis B and C, and Endocarditis.

Plaintiffs' infectious diseases expert, Dr. Judith Feinberg, explained how the opioid epidemic harms include the development of viral and bacterial infections through heroin injection. Dr. Feinberg testified that:

> [T]he vast majority of the infections that people get who are injecting opioids are blood-borne infections. You are injecting material that isn't sterile and that has been prepared in unsterile equipment and injected, you know, if it's a shared syringe with now an unsterile syringe through skin that is typically not clean.
>
> So you've got the opportunity to directly introduce organisms into the blood. And, of course, then it's easy for them to get anywhere in the body.
>
> . . . [T]he infections that cause the greatest morbidity and mortality are the ones that enter the blood.

6/17 Trial Tr. (Feinberg) at 112. These include viral infections like HIV and Hepatitis B and C, as well as bacterial infections such as Endocarditis, an infection of the heart valves. *Id.* at 113.

With respect to HIV, Dr. Feinberg testified that "for people who inject drugs, every time you inject, there's a 1 in 160 chance of acquiring HIV" and that "the more times you inject, . . . that risk accumulates." *Id.* at 115. This makes injection drug use that second most common way to contract HIV. *Id.* This causal relationship is borne out by data from Cabell County, which shows that there were 69 new HIV cases in 2019 of which 90% were among people who inject drugs. *Id.* at 117.

With respect to Hepatitis C, Dr. Feinberg testified that it is even more contagious than HIV, with approximately 40% of injection drug users contracting Hepatitis C in their first year of use. *Id.* at 128. As a result, West Virginia has for the past two decades been among the top two or three states for rate of Hepatitis C infection, *id.* at 129, while the rate of Hepatitis C infection in Cabell County is far higher still, reaching a rate of 10.3 cases per 100,000 people, which was more than

double the already-high Statewide rate of infection.  *Id.* at 130 (comparing Cabell rate of 10.3 per 100,000 with West Virginia rate of 5.1 per 100,000).

With respect to Hepatitis B, Dr. Feinberg testified that it too is highly associated with injection drug use and that, as a result, West Virginia has had the highest Hepatitis B rates in the United States for over a decade.  *Id.* at 135-36.  At present, the incidence of Hepatitis B in West Virginia is 14 times the national average.  *Id.* at 136.  Here again, Cabell County has among the highest rates of Hepatitis B infections among West Virginia's counties, measuring 17 cases per 100,000 people in 2016.  *Id.*

Finally, as to Endocarditis, Dr. Feinberg testified that its most common cause is bacteria injected through the skin.  *Id.* at 140.  Although Endocarditis is not actively surveilled, a recent study across four West Virginia hospitals that included two in Cabell and Huntington showed that a significant proportion of the 762 Endocarditis cases observed are in people in or near Cabell and Huntington.  *Id.* at 144.

Dr. Feinberg thus concluded that "[t]here's no question in my mind" that the public health crises of bloodborne disease and opioid use in Cabell County are related.  *Id.* at 159.  This conclusion is consistent with that of Plaintiffs' epidemiology and OUD expert, Dr. Keyes, who likewise concluded that exposure or supply of prescription opioids has a positive causal association with bloodborne diseases, including HIV, Hepatitis, and Endocarditis.  6/11 Trial Tr. (Keyes) at 183-84, 217-18.

Plaintiffs thus have demonstrated that Defendants' diversion control failures and the resulting diversion and oversupply of opioid pills are a contributing factor to the public health harms of the vastly increased number of infectious disease cases of HIV, Hepatitis B and C, and Endocarditis in Cabell and Huntington.

28

**e.** **Opioid Epidemic Harms—*Child and Family Harms***

The evidence also makes clear that another of the opioid epidemic harms in Cabell and Huntington caused by Defendants' failure to maintain effective controls and the attendant diversion and oversupply of opioid pills is the severe disruption of family and child welfare, including the intergenerational transmission of OUD.

Plaintiffs' expert on the impact of opioids on children and families, Dr. Nancy Young, explained how the opioid epidemic has increased the number of child welfare system placements in the United States and in West Virginia specifically, noting both that placement rates have increased over the past decade and that 80% of placements are related to substance abuse, the "overwhelming" number of which involve opioids.  6/16 Trial Tr. (Young) at 19-20, 33.  The opioid epidemic also has increased the percentage of children being placed with strangers rather than other family members.  *Id.* at 21.  These placements are likely to be trauma-inducing for the children, and increase their own risk of developing OUD or suffering other adverse developmental effects.  *Id.* at 22, 41-42, 46, 58-59.

Dr. Young further explained that in Cabell and Huntington, data showed that over a time period there were 612 pregnant women admitted for treatment with OUD for prescription opioids. *Id.* at 34.  Here, too, this prenatal exposure increases the risk of distress, developmental delays, lower IQ, neuropsychiatric hospitalizations, lower educational attainment, and need for special education services.  *Id.* at 62.  Plaintiffs' epidemiology and OUD expert, Dr. Keyes, concurs that the increased exposure to and supply of prescription opioids in the community has a positive causal association with child health harms including Neonatal Abstinence Syndrome ("NAS").  6/11 Trial Tr. (Keyes) at 183; 6/14 Tr. (Keyes) at 12 (exposure to opioids causes child and family harms). So, too, does Plaintiffs' epidemiology and opioid abatement remedies expert, Dr. Alexander,

recognize that the opioid epidemic has created a need to "disrupt the cycle, the intergenerational cycle of addiction, if we get people into treatment and we'll disrupt and prevent the intergenerational perpetuation of addiction going forward."  6/28 Trial Tr. (Alexander) at 49; *id.* at 49-50 ("[W]hen I say intergenerational perpetuation of addiction, what I mean is that this gets passed down not invariably, but not uncommonly from grandparent to parent to child and so on.").

Huntington Fire Department Chief Jan Rader described from an up close vantage point the harms that addiction and overdose have rained down on Cabell and Huntington families:

> Comforting a mother, or a father, or a brother, or a sister, or a child, you know, we don't have the training for that, but there's a lot of carnage left behind from an overdose.
>
> There's a ripple effect.  Your first responders are affected.  Your family's affected. Some kids lose a parent to jail, maybe they die, they go into the foster care system. You have grandparents raising children of their children and maybe even a great.
>
> So it's just – it's widespread.  You know, the school systems, teachers deal with children that are being raised in environments where they are struggling, they're not able to eat regularly, things like that.  It just goes on and on and on.  A lot of carnage.

5/7 Trial Tr. (Rader) at 42.

Plaintiffs thus have demonstrated that Defendants' diversion control failures and the resulting diversion and oversupply of opioid pills are a contributing factor to the child and family health and safety harms, and all of the other opioid epidemic nuisance harms, that continue to overwhelm Cabell and Huntington's communities.

**B.      Defendants' Causation Arguments Based on Prescribing Standards Ignore Their Own Diversion Control Failures as Concurrent Causes of the Nuisance Harms in Cabell and Huntington.**

Defendants do not, and cannot, dispute the existence of the foregoing opioid epidemic harms in Cabell and Huntington.  Nor do they seriously dispute that these harms were caused by prescription opioid pills, the vast majority of which they distributed.

Instead, Defendants try to deflect blame for these harms by arguing that all or substantially all of the 80 million plus opioid pills they shipped to Cabell and Huntington were prescribed in accordance with the then-prevailing standard of care for pain treatment.  Plaintiffs' evidence demonstrates that this argument is incorrect as a factual matter.  Defendants therefore cannot, under well-established West Virginia law, avoid liability for their diversion control failures by hiding behind prescribing standards.

### 1.    A Public Nuisance, Like Any Harm, May Have More Than One Proximate Cause Under West Virginia Law.

As set forth above, *supra* § I, West Virginia law recognizes the likelihood that certain harms will have more than one cause-in-fact.  *See Wehner*, *supra*, 191 W. Va. at 155, 444 S.E.2d at 33 (recognizing doctrine of "concurrent negligence").  In this setting, the plaintiff's burden is to show that a particular defendant's conduct "was a proximate cause of the plaintiff's injury, not the sole proximate cause." *Stephens*, *supra*, 235 W. Va. at 565, 775 S.E.2d at 117 (internal quotation marks and citations omitted).  The plaintiff satisfies this burden by showing that the defendant's conduct "contributes in any degree to the injury."  *Wehner*, 191 W. Va. at 155, 444 S.E.2d at 33.

Plaintiffs readily satisfy this burden.  As set forth below, the evidence shows that Defendants' diversion control failures resulted in them shipping tens of millions of opioid dosage units to and near Cabell and Huntington that could not have been prescribed for medically legitimate purposes, even under the then-prevailing standard of care for pain treatment.

### 2.    Defendants' Diversion Control Failures Caused Shipments of Tens of Millions of Opioid Dosage Units Outside of the Prescribing Standard of Care.

Defendants contend that the volume of opioids they shipped to Cabell and Huntington "was overwhelmingly due to an increase in good-faith prescribing by doctors, triggered by a change in

the standard of care for the treatment of pain." Prox. Cause Memo.") at 1.[3]  Plaintiffs' evidence shows otherwise.  Tens of millions of the opioid pills Defendants shipped to and near Cabell and Huntington could not have been prescribed in accordance with the standard of care, and instead could only have been intended for illicit, non-medical use.  Defendants' systemic failures to maintain effective controls against diversion are an unquestionable cause of this immense volume of shipments.

### a.     **Defendants' Shipments for Outlier Prescribers**

Plaintiffs' data analytics expert, Lacey Keller, examined "outlier" prescribing in Cabell and Huntington, which she defined as "something outside of the norm, something well above average, sometimes it's very visually – you're able to see it visually because the outlier is so extreme."  6/15 Trial Tr. (Keller) at 60-61.  Based on her review of prescribing data that was available to Defendants, Ms. Keller concluded that Defendants "had access to or had in their possession dispensing data that would allow them to identify outlier prescribers" in Cabell and Huntington.  *Id.* at 67.

Most stark among these "outlier" prescribers was Dr. Deleno Webb of Huntington, whose prescriptions were filled by pharmacies supplied by Defendants ABDC and Cardinal.  Dr. Webb issued over 128,000 opioid prescriptions between 1997 and 2017, prescribing 14,431,799 dosage units by himself.  *Id.* at 117.  This made him the largest prescriber in Cabell County in terms of both dosage units and morphine milligram equivalents (MME's).  *Id.*  Dr. Webb's 14 million-plus prescribed opioid dosage units over this 20-year period would represent more than 10% of the total opioid dosage units shipped to Cabell County *as a whole* for the shorter ARCOS data period of

---

[3] *See also* Cardinal Memo. at 38 ("Manufacturers' deceptive marketing not only caused prescriptions to 'skyrocket' over time, but also caused that increased prescribing to be perceived as consistent with the standard of care.").

2006 to 2014.  *See* 5/10 Trial Tr. (McCann) at 65 (127,902,911 opioid dosage units shipped to Cabell County during ARCOS period).

Early on in this prescribing period, in 2005, the West Virginia Workers' Compensation Commission banned Dr. Webb from receiving payment for treating injured workers based on claims that he was prescribing OxyContin without conducting physical examinations.  *Id.* at 123. He nonetheless was able to continue to get prescriptions filled.  By 2011, Dr. Webb was prescribing 1.1 million opioid dosage units annually, which Ms. Keller explained is "the equivalent of prescribing more than 130 pills for every hour of every day.  And that's without sleeping, without eating, doing nothing but prescribing.  *Id.* at 130.  Ms. Keller thus concluded that Dr. Webb was an outlier prescriber. *Id.* at 133.[4]

Defendants ABDC and Cardinal's diversion control failures and distributions were instrumental to Dr. Webb's outlier opioid prescribing in Cabell County.  Over 70% (*i.e.*, 10 million) of the prescription opioid dosage units written by Dr. Webb were filled at the Drug Emporium pharmacy store in Barboursville.  *Id.* at 130.  ABDC was a primary distributor for Drug Emporium, supplying it with large quantities of oxycodone and hydrocodone.  *See* 5/10 Trial Tr. (McCann) at 121, 124, 150.

Other of Dr. Webb's opioid prescriptions were filled by a Medicine Shoppe pharmacy store.  *See* 6/15 Trial Tr. (Keller) at 76-77, 192-93.  For the month of February 2012, Dr. Webb was far and away the Medicine Shoppe store's largest oxycodone prescriber, prescribing more than half (313 of 582) of the store's oxycodone prescriptions.  *Id.* at 77, 189.  The store's next largest oxycodone prescriber issued 119 prescriptions, less than half of Dr. Webb's amount.  *Id.* at

---

[4] Dr. Webb's prescribing ended in 2017, when he voluntarily surrendered his physician's license following a West Virginia Board of Medicine investigation into claims that he commonly treated patients with excessive doses of opioids and benzodiazepines.  *Id.* at 123.

77.  This led Ms. Keller to conclude that "even to the naked eye, Dr. Webb is an outlier." *Id.* Cardinal was the primary distributor for, and the corporate owner of, Medicine Shoppe, supplying it with large quantities of oxycodone and hydrocodone. *See id.* at 188-89; 5/10 Trial Tr. (McCann) at 133, 135, 138, 149.

Close behind Dr. Webb was Dr. Philip Fisher, Cabell County's second largest opioid prescriber.  Dr. Fisher prescribed a similarly disproportionate 10 million opioid dosage units and 268 million MME's between 1997 and 2012.  6/15 Trial Tr. (Keller) at 117-18.  His prescribing stopped in 2012 because his license was suspended when he was under investigation for using pre-signed prescription forms, improperly delegating authorization of prescription refills, failure to document treatment, and prescribing related to at least seven patient deaths. *Id.* at 117, 134-36. Ms. Keller thus concluded that Dr. Fisher, too, was an outlier prescriber. *Id.* at 137.

ABDC's diversion control failures and distributions also facilitated Dr. Fisher's outlier prescribing.  His prescriptions were filled by, *inter alia*, SafeScript Pharmacy in Huntington, which ABDC supplied. *See* 5/19 Trial Tr. (Perry) at 131; P-16651 (SafeScript email to ABDC naming Dr. Fisher); *see also* 5/10 Trial Tr. (McCann) at 116, 119 (ABDC's oxycodone shipments to SafeScript far in excess of its national, state, and local average pharmacy order volumes).

This evidence based just on Dr. Webb and Dr. Fisher and the *24 million-plus opioid dosage units* they prescribed in Cabell County before losing their licenses undercuts Defendants' contention that the opioid epidemic was fueled solely or "overwhelmingly" by good faith prescribing within the prevailing standard of care.  Defendants' repeatedly cite the DEA's statements that "99% of doctors were acting in good faith[.]"  Prox. Cause Memo. at 20; *id.* at 5

34

("99 percent of the doctors are ***perfect***") (emphasis in original).[5]  This undocumented figure alone, however, leaves out the fact that even a small number of doctors prescribing in bad faith outside of the standard of care can *and did* have an outsized and immense impact, as the DEA itself recognizes:

> DEA always had, and continues to have, a legal obligation to investigate the extremely small fraction of physicians who use their DEA registration to commit criminal acts or otherwise violate the CSA.

> DEA takes this obligation seriously because *even just one physician who uses his/her DEA registration for criminal purposes can cause enormous harm.*  In the words of one commenter:  'It takes only a few untrained or unscrupulous physicians to create a large – large pockets of addicts.

6/10 Trial Tr. (Rannazzisi) at 84-85.

Ms. Keller then demonstrated that this is exactly what happened in Cabell and Huntington. She found that available prescribing data showed that the "*top 1 percent of prescribers*[,] around 5 to 9 [prescribers] in a given year[,] *prescribed upwards of over 40 percent of dosage units and 60 percent of MMEs in a given year.*"  6/15 Trial Tr. (Keller) at 61.  This prescribing by just five to nine doctors per year resulted in the shipment of over 80 million opioid dosage units and 1.6 *billion* MMEs into Cabell and Huntington.  *Id.*  This includes the 24 million-plus dosage units and 700 million-plus MMEs prescribed by Dr. Webb and Dr. Fisher alone.[6]

---

[5]  *See also* Cardinal Memo. at 9, 28, 35 (citing same statements).  Even taking Defendants' "99% of prescribers" figure on its own terms, Dr. Webb's and Dr. Fisher's prescribing placed them both well outside of the 99%.  *See* 6/15 Trial Tr. (Keller) at 66 (Dr. Webb "was not only among the top 1 percent in Cabell County, but *he was among the top .02 percent nationally.*"); *see also id.* ("Next is Dr. Fisher, who was ranked 633rd in the nation.  *He was among the top .03 percent*.").

[6]  Defendants try to blunt the impact of this evidence by citing to Dr. Keyes's testimony that "Pill mills do not explain in any significant way the expansion of opioid prescribing and opioid-related harm in the U.S."  Prox. Cause Memo. at 20-21 (quoting 6/14 Trial Tr. (Keyes) at 131). Dr. Keyes's statement is inapposite because it addresses the U.S. as a whole, not the West Virginia and Cabell/Huntington-specific evidence presented here.

Defendants' diversion control duties are intended to protect against the public health harms attendant to just this type of bad faith, non-medically legitimate prescribing that their conduct enabled.  This is precisely why Defendants' invocation of good faith prescribing and the prevailing standard of care does not relieve them of responsibility for the diversion and public health harms caused by the bad faith prescribing they enabled.

### b.  Defendants' Shipments to Outlier Pharmacies

Plaintiffs' data processing expert, Dr. Craig McCann, performed a similar and more extensive analysis of Defendants' opioid shipments to Cabell, Huntington, and nearby pharmacies. The data he analyzes showed much the same—that Defendants' shipments do not solely or "overwhelmingly" reflect good faith prescribing pursuant to the standard of care.  Just the opposite, Dr. McCann's data showed that all three Defendants shipped quantities of oxycodone and hydrocodone to pharmacies in and near Cabell and Huntington that vastly exceeded their own national, state, and local per-pharmacy shipment averages.

**ABDC**, for example, made per-pharmacy monthly oxycodone shipments averaging 5,036 dosage units nationally, 8,229 dosage units in West Virginia, and 10,743 in Cabell-Huntington. 5/10 Trial Tr. (McCann) at 116.  Yet its shipments to the SafeScript pharmacy store in Huntington averaged 35,551 dosage units per month.  *Id.* at 119.  This is over seven times ABDC's national average, four times its West Virginia average, and three times its Cabell-Huntington average, and thus cannot be explained solely or "overwhelmingly" by the prescribing standard of care.  This difference between ABDC's national shipping average and its Huntington SafeScript average also represents an excess of over 360,000 dosage units of oxycodone per year that ABDC shipped into Cabell and Huntington.

Similarly, ABDC's shipments of oxycodone to the McCloud Family Pharmacy in Huntington averaged 18,028 dosage units per month.  *Id.* at 120.  This is over 3.5 times ABDC's national average, double its West Virginia average, and almost double its Cabell-Huntington average, and thus again cannot be explained solely or "overwhelmingly" by the prescribing standard of care.  This difference also represents an excess of over 150,000 dosage units of oxycodone per year that ABDC shipped into Cabell and Huntington.

For three other West Virginia pharmacy stores outside Cabell County—Fritz's Pharmacy and Wellness; Bypass Pharmacy; and Four Seasons Pharmacy—ABDC's shipments of oxycodone averaged 36,325, 41,735, and 31,430 dosage units per month respectively.  *Id.* at 122.  These range from over six to over eight times ABDC's national average and three to four times its West Virginia average, and thus again cannot be explained solely or "overwhelmingly" by the prescribing standard of care.  These differences also represent an excess of almost 95,000 dosage units *monthly* and over 1,100,000 dosage units per year of oxycodone that ABDC shipped into West Virginia.

ABDC's hydrocodone shipments tell a similar story.  ABDC made per-pharmacy monthly hydrocodone shipments averaging 7,457 dosage units nationally, 14,448 dosage units in West Virginia, and 16,530 in Cabell-Huntington.  *Id.* at 124.  Yet its shipments to Fruth Pharmacy #12 in Huntington averaged 46,285 dosage units per month.  *Id.*  This is over six times ABDC's national average, three times its West Virginia average, and well more than double its Cabell-Huntington average, and thus cannot be explained solely or "overwhelmingly" by the prescribing standard of care.  This difference also represents an excess of over 460,000 dosage units per year of hydrocodone that ABDC shipped into Cabell and Huntington.

Similarly, ABDC's shipments of hydrocodone to Fruth Pharmacy #5 in Milton averaged 35,218 dosage units per month.  *Id.*  This is almost five times ABDC's national average and more than double both its West Virginia and its Cabell-Huntington averages, and thus again cannot be explained solely or "overwhelmingly" by the prescribing standard of care.  This difference also represents an excess of over 330,000 dosage units of hydrocodone per year that ABDC shipped into Cabell County to a town of approximately 2,000 people.

For three other West Virginia pharmacy stores outside Cabell County—Fruth #1 in Mason County; Chapman Pharmacy; and Larry's Drive-In Pharmacy in Boone County—ABDC's shipments of hydrocodone averaged 70,481, 58,268, and 67,457 dosage units per month respectively.  *Id.* at 125-28.  These range from almost eight to over nine times ABDC's national average and over four to almost five times its West Virginia average, and thus again cannot be explained solely or "overwhelmingly" by the prescribing standard of care.  These differences also represent an excess of over 160,000 dosage units *monthly* and almost 2,000,000 dosage units per year of hydrocodone that ABDC shipped into West Virginia.

**Cardinal**, similarly, made per-pharmacy monthly oxycodone shipments averaging 4,975 dosage units nationally, 5,460 dosage units in West Virginia, and 6,989 dosage units in Cabell-Huntington.  *Id.* at 132.  Yet its shipments to the Medicine Shoppe in Huntington averaged 18,644 dosage units per month.  *Id.* at 133.  This is over three times Cardinal's national and West Virginia averages and well over double its Cabell-Huntington average, and thus cannot be explained solely or "overwhelmingly" by the prescribing standard of care.  This difference between Cardinal's national shipping average and its Huntington Medicine Shoppe average also represents an excess of over 150,000 dosage units of oxycodone per year that Cardinal shipped into Cabell and Huntington.

Similarly, Cardinal's shipments of oxycodone to a CVS pharmacy store in Huntington averaged 14,292 dosage units per month. *Id.* at 134. This is almost three times Cardinal's national and West Virginia averages and more than double its Cabell-Huntington average, and thus again cannot be explained solely or "overwhelmingly" by the prescribing standard of care. This difference between Cardinal's national shipping average and its Huntington CVS average also represents an excess of over 100,000 dosage units of oxycodone per year that Cardinal shipped into Cabell and Huntington.

For Fruth #1 Pharmacy in Mason County, Cardinal's shipments of oxycodone averaged 17,763 dosage units per month. *Id.* at 136. This is over three times Cardinal's national and West Virginia averages and more than double its Cabell-Huntington average, and thus again cannot be explained solely or "overwhelmingly" by the prescribing standard of care. This difference between Cardinal's national shipping average and its Fruth #1 average also represents an excess of over 145,000 dosage units per year of oxycodone that Cardinal shipped into the county neighboring Cabell and Huntington.

Cardinal's hydrocodone shipments tell a similar story. Cardinal made per-pharmacy monthly hydrocodone shipments averaging 3,014 nationally, 7,005 dosage units in West Virginia, and 6,389 in Cabell-Huntington. *Id.* at 137. Yet its shipments to Fruth Pharmacy #12 in Huntington averaged 29,155 dosage units per month. *Id.* This is over nine times Cardinal's national average and over four times its West Virginia and Cabell-Huntington averages, and thus cannot be explained solely or "overwhelmingly" by the prescribing standard of care. This difference between Cardinal's national shipping average and its Fruth #12 average also represents an excess of over 300,000 dosage units per year of hydrocodone that Cardinal shipped into Cabell and Huntington.

39

For three other West Virginia pharmacy stores outside Cabell County—Family Discount; Fruth #1; and Hurley Drug—Cardinal's shipments of hydrocodone averaged 75,447, 55,391, and 39,092 dosage units per month respectively. *Id.* at 138. These range from 13 to 25 times Cardinal's national average and five to eleven times its West Virginia and Cabell-Huntington averages, and thus again cannot be explained solely or "overwhelmingly" by the prescribing standard of care. These differences also represent an excess of over 160,000 dosage units *monthly* and almost 2,000,000 dosage units per year of hydrocodone that Cardinal shipped into the region surrounding Cabell and Huntington.

**McKesson**, similarly, made per-pharmacy monthly oxycodone shipments averaging 4,294 dosage units nationally, 4,559 dosage units in West Virginia, and 4,467 dosage units in Cabell-Huntington. *Id.* at 140. Yet its shipments to the Rite Aid #968 pharmacy store in Huntington averaged 7,552 dosage units per month. *Id.* at 141. This is over 1.5 times McKesson's national, West Virginia, and Cabell-Huntington averages, and thus cannot be explained solely or "overwhelmingly" by the prescribing standard of care. This difference between McKesson's national shipping average and its Rite Aid #968 average also represents an excess of almost 40,000 dosage units of oxycodone per year that McKesson shipped into Cabell and Huntington.

For three other West Virginia pharmacy stores outside Cabell County—Crab Orchard Pharmacy; Colony Drug; and Meds 2 Go—McKesson's shipments of oxycodone averaged 25,002, 32,600, and 22,859 dosage units per month respectively. *Id.* at 141-42. These range from five to seven times McKesson's national, West Virginia, and Cabell-Huntington averages, and thus cannot be explained solely or "overwhelmingly" by the prescribing standard of care. These differences also represent an excess of over 67,000 dosage units *monthly* and over 800,000 dosage units per year of oxycodone that McKesson shipped into West Virginia.

McKesson's hydrocodone shipments tell a similar story. McKesson made per-pharmacy monthly hydrocodone shipments averaging 4,086 dosage units nationally, 4,582 dosage units in West Virginia, and 2,102 dosage units in Cabell-Huntington. *Id.* at 143. Yet its hydrocodone shipments to three West Virginia pharmacy stores outside Cabell County—Four Seasons; Larry's Drive-In; and Man Pharmacy—averaged 59,246, 43,068, and 40,517 dosage units per month. *Id.* at 144. These range from 8 to 28 times McKesson's national, West Virginia, and Cabell-Huntington averages, and thus again cannot be explained solely or "overwhelmingly" by the prescribing standard of care. These differences also represent an excess of over 130,000 dosage units *monthly* and over 1,500,000 dosage units per year of hydrocodone that McKesson shipped into West Virginia.

Two other southern West Virginia pharmacy stores to which McKesson distributed tell an even more shocking story. From 2006 to 2014, McKesson shipped 5,818,020 hydrocodone and oxycodone pills, the vast majority of which was hydrocodone, to Family Discount Pharmacy in Mt. Shamrock, which had a population of just 1,700 people. 8/1/18 Dep. Tr. of Nathan Hartle at 472. The hydrocodone shipments averaged 197,341 dosage units per month, 5/10 Trial Tr. (McCann) at 144, which is almost 50 times McKesson's national average, and thus again cannot be explained solely or "overwhelmingly" by the prescribing standard of care. This difference also represents an excess of over 193,000 dosage units *monthly* and over 2,300,000 dosage units per year of hydrocodone that McKesson shipped into this town of just 1,700 people.

Similarly, in 2006 and 2007, McKesson shipped 4,836,310 hydrocodone pills and 119,400 oxycodone pills to Sav-Rite Pharmacy in Kermit, which had a population of just 406 people. 8/1/18 Dep. Tr. of Nathan Hartle at 450-55. The DEA itself agreed with respect to these shipments

by McKesson that there is no conceivable medical need for a town of 400 people to receive almost 5,000,000 opioid pills in two years. 4/18/19 30(b)(6) Dep. Tr. of Thomas Prevoznik at 605-07.[7]

These shipments by Defendants of tens of millions of opioid pills to and for outlier pharmacies and physicians demonstrate that their diversion control failures contributed substantially to the opioid epidemic nuisance harms in Cabell and Huntington *independently* of the prescribing standard of care.[8]  For this reason alone, Defendants' failures are a concurrent cause of the nuisance harms and their motion for judgment on proximate causation should be denied.

> **3.     Defendants' Conduct is a Concurrent Cause of the Opioid Epidemic Harms Even Without Regard to the Bad Faith Prescribing and Dispensing it Enabled.**

Even if the above evidence did not exist and Defendants' were right that the immense volume of opioids they shipped to Cabell and Huntington was due solely or primarily to increased

---

[7]  McKesson renews its argument that it is entitled to judgment based on its purportedly "tiny" six-percent market share in Cabell County.  *See* McKesson Memo. at 7-9.  The Court correctly rejected this argument, *see* April 28, 2021 Order (ECF No. 1291), which McKesson first raised in its motion to dismiss on derivative sovereign immunity grounds (ECF No. 1012).  This market share is substantially greater than those found by the MDL Court to be more than *de minimis* and thus to support claims.  *See* Pltfs' Opp. to Motion to Dismiss on Derivative Sovereign Immunity Grounds (ECF No. 1084) at 12-13.  Moreover, McKesson's shipment of over 10 million opioid dosage units to towns of 1,700 and 400 people in nearby counties, coupled with Plaintiffs' evidence that diversion crosses state and local boundaries, *supra* § I.A.2, only underscores that the Court ruled correctly in rejecting McKesson's argument and should not reconsider this ruling.

[8]  These shipments also help rebut Defendants' assertion that the main form of opioid diversion in . . . Cabell/Huntington . . . was 'medicine cabinet' diversion."  Prox. Cause Memo. at 24-25.  As the DEA has explained: "'While studies . . . indicate that only a small percent . . . get controlled pharmaceuticals via the internet, the majority obtaining substances illicitly from family and friends or by stealing them from the medicine cabinet[,] they typically acquire less pills than on the internet.  By contrast, DEA investigations clearly reveal that individuals illicitly ordering via the internet frequently receive 100 to 120 pills at a time.  Thus, those who receive their drugs via rogue internet pharmacies are netting more pills than they would from friends of the family medicine cabinet.'"  6/8 Trial Tr. (Rannazzisi) at 190-91 (quoting DEA presentation).

good-faith prescribing, Defendants still would be liable because their diversion control failures still would be a concurrent cause of the opioid oversupply and public nuisance harms.

Defendants have a legal duty not to ship orders they have or should have identified as suspicious unless the order is cleared. *See Masters Pharm., Inc. v. Drug Enforcement Administration*, 861 F.3d 206, 212-13 (D.C. Cir. 2017) ("Once a distributor has reported a suspicious order, it must make one of two choices: decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order (the Shipping Requirement)."); *id.* at 221-22 ("As noted above, the Shipping requirement mandates that pharmaceutical companies exercise 'due diligence' before shipping any suspicious order."); *see also In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804, 2019 WL 3917575, at *9 (N.D. Ohio Aug. 19, 2019) ("In sum, the Court concludes that the CSA statutory and regulatory duties to maintain effective controls against diversion includes a duty not to ship suspicious orders.").

As set forth above, *supra* § I.A, Plaintiffs' diversion control investigations and SOMS expert, Mr. Rafalski, determined using Defendants' own metrics and those used by other distributors and/or approved by the D.C. Circuit in *Masters* that Defendants shipped orders totaling at least 31,153,000 dosage units of oxycodone and hydrocodone into Cabell and Huntington that should have been flagged and blocked pending or absent investigation.  This includes orders shipped by ABDC totaling 9,380,000 dosage units, 5/26 Trial Tr. (Rafalski) at 98 (Method B), by Cardinal totaling 18,577,000 dosage units, *id.* (Method B), and by McKesson totaling 3,196,000 dosage units, *id.* (Method B).  He further found that there was insufficient evidence in Defendants' customer files to dispel the suspicions raised by these orders and permit their shipment, *id.* at 102, and Defendants have not shown otherwise.

Since Defendants were under a legal duty not to ship these orders absent due diligence, these shipments are a concurrent and actionable cause of the diversion, oversupply, and nuisance harms in Cabell and Huntington.  This is precisely what the court held in *City and County of San Francisco*, *supra*, another remanded MDL bellwether case.  There, the same distributor defendants as here argued for dismissal on the grounds that their conduct could not be the legal cause of opioid epidemic harms because "Manufacturers' marketing campaign 'created the new standard of care' causing an increase in prescriptions that Distributors had 'no ability (and no duty) to second-guess.'"  *Id.* at 683 (quoting Distributors' motion briefs).  The court rejected this argument, holding instead that distributors could be liable because:

> Manufacturers' alleged false marketing and Defendants' alleged failure to maintain effective controls to prevent diversion are both independent causes of the City's harms. . . . [T]he City has not alleged that Manufacturers' false marketing caused the Distributors' failure to maintain effective controls, nor vice versa.  Rather, both parties' conduct allegedly caused the City's injuries.

*Id.*  The same conclusion applies here under well-established West Virginia law.  *See*, *e.g.*, *Stephens*, 235 W. Va. at 565, 775 S.E.2d at 117 (the "plaintiff's burden of proof is to show that a [defendant's] breach of a particular duty of care was *a* proximate cause of the plaintiff's injury, *not the sole* proximate cause.") (emphasis added).[9]

It also is fair that Defendants be held liable in the face of manufacturers' concurrent promotional conduct to change the standard of care towards increased opioid prescribing.  As

---

[9] Defendants' argument that Plaintiffs have failed prove that their conduct, as opposed to good faith prescribing, is a cause of the opioid epidemic harms, *see* Prox. Cause. Memo. at 16; Cardinal Memo. at 26-32, thus is incorrect.  Since Defendants had a legal duty to stop flagged orders and only ship them if investigation cleared them, which they did not do, this failure caused the harms regardless of what any investigations *might have* shown because those investigations were not done and the shipments therefore could not be made.  Indeed, Cardinal's argument against finding cause-in-fact depends relies upon the occurrence of unlawful conduct.  *See* Cardinal Memo. at 32 (describing hypothetical flagged pharmacy's switch to a different distributor when over limit to evade the no-shipping requirement).

Plaintiffs have demonstrated, Defendants themselves took an active part in assisting and enhancing the manufacturers' opioid-promotion activity. *See* 6/11 Trial Tr. (Mohr) at 24-27 (ABDC predecessor and affiliate companies' provision of opioid promotional services to manufacturers); *id.* 39-40 (describing McKesson Market Update, situational analysis on prescription abandonment data provided to Janssen); *id.* at 43-45 (McKesson qualitative research of family physicians for Purdue to increase OxyContin prescribing); *id.* at 56-57 (Cardinal savings card for Purdue to promote opioid sales); *id.* at 58-59 (McKesson RX Focus Launch, auto-ship program promoting newly-launched drugs to high-dispensing pharmacists); *id.* at 59-60 (McKesson savings card for Janssen to promote Nucynta sales); *id.* at 60-61 (McKesson free pills sampling program for Nucynta). Based on her review of these and other opioid promotional programs engaged in by Defendants, Dr. Mohr concluded that "[t]his was some of the most sophisticated marketing that I've seen[,]" *id.* at 75-76, and that Defendants "benefitted financially from the incremental lift due to their marketing programs." *Id.* at 77.

The Court thus should hold that Defendants' diversion control failures substantially contributed to Cabell and Huntington's opioid epidemic harms, and that changing prescribing standards were at most a concurrent, not a superseding, cause.

## II. Plaintiffs Also Provide Ample Evidence of Legal Causation—That the Opioid Epidemic Harms Were Reasonably Foreseeable to Defendants as Distributors of Controlled Substances.

Under West Virginia law, a defendant's conduct that contributes to (*i.e.*, is a factual cause of) the plaintiff's harm also is deemed a legal or proximate cause if the harm that occurred was reasonably foreseeable to the defendant. Any intervening events occurring between the defendant's conduct and the plaintiff's harm are assessed based on their reasonable foreseeability. As the West Virginia Supreme Court of Appeals recently re-affirmed:

> [N]ot every intervening event wipes out another's preceding negligence.  In fact, 'a tortfeasor whose negligence is a substantial factor in bringing about injuries is not relieved from liability by the intervening acts of third persons if those acts were reasonably foreseeable by the original tortfeasor at the time of his negligent conduct.'

*Wal-Mart Stores East, L.P. v. Ankrom*, ___ W. Va. ___, 854 S.E.2d 257, 270 (W. Va. 2020) (quoting *Syl. Pt. 13, Anderson v. Moulder*, 183 W. Va. 77, 394 S.E.2d 61 (1990)).

This is so *even if the third party's intervening acts were intentional or criminal.  See*, *e.g.*, *Estate of Hough ex rel. Lemaster v. Estate of Hough ex rel. Berkeley Cty. Sheriff*, 205 W. Va. 537, 545, 519 S.E.2d 640, 648 (1999) ("'[A] duty will be imposed if a landlord's affirmative actions or omissions have unreasonably created or increased the risk of injury to the tenant from the criminal activity of a third party.'") (quoting *Syl. Pt. 6, Miller v. Whitworth*, 193 W. Va. 262, 266, 455 S.E.2d 821 (1995)); *see also Marcus v. Staubs*, 230 W. Va. 127, 139, 736 S.E.2d 360, 372 (2012) ("Petitioner essentially argues that criminal acts are *per se* intervening causes. . . .  Once again, however, petitioner relies on a generality . . . with little regard for the exception [that] . . . a tortfeasor whose negligence is a substantial factor in bringing about injuries is not relieved from liability if the intervening acts were reasonably foreseeable . . . .'") (quoting *Anderson*, *supra*). The inquiry where intervening criminal acts have occurred is whether the defendant's "'wrongful acts co-operate with, augment, or accelerate those forces to the injury of another . . . .'" *In re Flood Litig.*, 216 W. Va. 534, 549, 607 S.E.2d 863, 878 (2004) (quoting *Syl. Pt. 1, Williams v. Columbus Producing Co.*, 80 W. Va. 683, 93 S.E. 809 (1917)).

A defendant asserting that intervening acts are a superseding cause that relieve it from liability bears the burden of proof.  *See*, *e.g.*, *Sydenstricker v. Mohan*, 217 W. Va. 552, 559, 618 S.E.2d 561, 568 (2005) ("Insofar as intervening cause is a recognized defense in this State, the defense can be established only through the introduction of evidence by a defendant that shows

the negligence of another party or a nonparty.").  The defendant must show that the intervening conduct "'constitutes a new and effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury.'"  *Wehner*, *supra*, 191 W. Va. at 155, 444 S.E.2d at 33 (quoting *Syl. Pt. 16*, *Lester v. Rose*, 147 W. Va. 575, 130 S.E.2d 80 (1963)).  Defendants have made no such showing here.

> ### A.  Defendants Cannot Prevail on Legal Causation by Using "Directness" Concepts Imported from Federal Statutes to Rewrite West Virginia's Long-Established and Recently Reaffirmed Foreseeability Standard.

Despite the foregoing, Defendants try to argue that reasonable foreseeability *is not* the standard for legal causation in West Virginia.  *See* Prox. Cause Memo. at 37 ("Plaintiffs likely will argue that the proper standard . . . is 'foreseeability.'  . . .  Plaintiffs are wrong on the law.  It is well-established in West Virginia that 'remoteness is a component of proximate cause.'") (quoting *Aikens v. Debow*, 208 W. Va. 486, 492, 541 S.E.2d 576, 582 (2000)).  It is Defendants who are wrong on the law.

First, the cited *Aikens* case reaffirms that foreseeability is the touchstone for legal causation.  The "remoteness" language Defendants quote is from a passage describing *federal* law.  *See Aikens*, 208 W. Va. at 492, 541 S.E.2d at 582 ("The Supreme Court reasoned that the doctrine of remoteness is a component of proximate cause, which in turn embraces the concept that 'the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing.'") (quoting *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 536 (1983) (antitrust case)).  The Supreme Court of Appeals in *Aikens* went on to hold under West Virginia law that a plaintiff sustaining purely economic damages may recover in tort in circumstances showing that "the tortfeasor had a duty to the particular plaintiff

and that *the injury complained of was clearly foreseeable to the tortfeasor*." *Id.* at 499, 541 S.E.2d at 589 (emphasis added).

Second, Defendants' reliance on other federal case law to try to rewrite West Virginia law is equally unavailing. Defendants argue that "[t]o avoid judgment on proximate causation grounds, Plaintiffs must have evidence of a '***direct relation*** between the injury asserted and the injurious conduct alleged'" and that, "[i]n assessing whether there is a 'direct relation' between claimed injuries and conduct, 'the general tendency of the law . . . is not to go beyond the first step' in the causal chain." Prox. Cause Memo. at 12-13 and n.23 (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 and 271-72 (1992)) (emphasis in Memo.).[10] This argument, too, fails because *Holmes* addresses federal, not West Virginia law. *See* 503 U.S. at 265-68 (addressing federal RICO causation standard); *see also City and County of San Francisco*, 491 F. Supp. 3d at 657 (dismissing RICO claims based on opioid marketing and promotion where "the City's harm extends well beyond the first step."); *but see id.* at 683 (denying dismissal of public nuisance claims on proximate causation grounds where, "just an Manufacturers' alleged false promotion could foreseeably result in increased opioid addiction, abuse, and overdoses, *Distributors' alleged failure to maintain effective controls against diversion could foreseeably result in the same harms.*") (emphasis added). The same conclusion applies here.

Finally, Defendants also fail in making arguments based on two decisions of this Court—*Employer Teamsters v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463 (S.D. W. Va. 2013), and *City of Charleston v. Joint Comm'n*, 473 F. Supp. 3d 596 (S.D. W. Va. 2020). *See* Prox. Cause Memo. at 13-14, 27-28, 36, 37. In *Employer Teamsters*, the Court addressed implied warranty and

---

[10] *See also* Cardinal Memo. at 39 (listing purported steps between conduct and harm with no assessment of foreseeability).

unjust enrichment claims by a health insurer for economic losses caused by the defendant's deceptive marketing of a prescription drug taken by some of the plaintiffs' insureds.  473 F. Supp. 3d at 466.  The Court applied the *Holmes* "direct relation" standard of legal causation, *id.* at 475, in dismissing these contract-based claims, but did so without addressing (or having occasion to address) the foreseeability standard of legal causation for non-contractual tort claims under West Virginia law.

In *City of Charleston*, the Court addressed negligence and unjust enrichment claims by the city against the Joint Commission on Accreditation of Health Care Organizations for its conduct influencing the medical standard of care for pain treatment towards greater opioid prescribing.  *See* 473 F. Supp. 3d at 608.  In dismissing the claims, the Court held that there was no special relationship or privity of contract between the parties to prevent application of the economic loss rule as a bar to claims for purely economic damages.  *Id.* at 619.  After recognizing this ground for dismissal, the Court proceeded to discuss the separate question of duty and held that the city's claim involved harms from the opioid epidemic that were not foreseeable to the Joint Commission as a trade association.  *Id.* at 622.

In so ruling, the Court noted the MDL Court's decision in *In re Nat'l Prescr. Opiate Litig.: County of Summit, Ohio v. Purdue Pharma L.P.*, No. 1:17-md-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018), which upheld government plaintiffs' negligence claims against opioid manufacturers and distributors.  *See City of Charleston*, 473 F. Supp. 3d at 620.  The Court found that the Joint Commission as a trade association was differently situated from opioid manufacturers and distributors, which operate under diversion-control duties that make public health and safety harms like those at issue there and here foreseeable.  *Id.* at 621 ("Unlike the manufacturer and

distributor defendants in *Summit County*, defendants here had no control or responsibility over the manufacturing or distributing of opioids.").

Since *Employer Teamsters* addressed contract-based claims, not tort claims, and *City of Charleston* expressly distinguished claims against distributors with respect to duty and foreseeability, neither supports overturning well-established West Virginia law applying reasonable foreseeability as the standard for assessing legal causation. Indeed, the Supreme Court of appeals recently, and subsequent to the decisions in both *Employer Teamsters* and *City of Charleston*, reaffirmed that "'a tortfeasor whose negligence is a substantial factor in brining about injuries is not relieved from liability by the intervening acts of third persons if those acts were reasonably foreseeable by the original tortfeasor at the time of his negligent conduct.'" *Wal-Mart*, 854 S.E.2d at 270 (quoting *Anderson v. Moulder*, *supra*). The Court therefore should reject Defendants' legal arguments on proximate causation.

### B. Substantial Evidence Shows That the Opioid Epidemic Harms Were Reasonably Foreseeable to Defendants.

The opioid epidemic public health and safety harms afflicting Cabell and Huntington were foreseeable to Defendants when they engaged in the diversion control failure conduct Plaintiffs have proven. This foreseeability is demonstrated in the Controlled Substances Act itself, which sets forth Congress's finding that the "illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2).

The Supreme Court also has recognized that, in enacting the CSA, "Congress was particularly concerned with the diversion of drugs from legitimate to illegitimate channels." *U.S. v. Moore*, 423 U.S. 122, 135 (1975) (citing H.R. Rep. No. 91-1444, p. 6; S. Rep. No. 91-613, pp. 4, 6; 116 Cong. Rec. 996 (1970)); *see also Gonzalez v. Raich*, 545 U.S. 1, 12-13 (2005) ("Congress

was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels.") (citing *Moore*).  Indeed, even before the CSA's enactment in 1970, the Supreme Court had recognized in applying prior drug control statutes that "[t]he difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, aris[es] from the latter's inherent capacity for harm and from the very fact that they are restricted . . . ."  *Direct Sales Co. v. U.S.*, 319 U.S. 703, 711 (1943).

Defendants' duty to maintain "effective controls and procedures to guard against theft and diversion of controlled substances[,]" 21 C.F.R. § 1301.71(a), arise out of this inherent capacity to cause public health and safety harms.  This is precisely why other courts addressing public nuisance claims against opioid distributors and manufacturers based upon breaches of CSA duties have held that the foreseeability element of proximate causation is evident in the duty and breach themselves.  *See, e.g.*, *In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804, 2019 WL 4178617, at *4 (N.D. Ohio Sept. 3, 2019) ("Because Plaintiffs have presented evidence that shows they suffered the sort of injury that would be an expected consequence of the wrongful conduct, Plaintiffs have done enough to withstand summary judgment on this issue.").  As Judge Breyer explained in *City and County of San Francisco*, *supra*:

> The very existence of the duties to maintain effective controls supports the nation that opioid use is foreseeable.  "A lack of reasonable care in the handling, distribution, and administration of controlled substances can foreseeably harm the individuals who take them.  That's why they're 'controlled' in the first place—overuse or misuse can lead to addictions and long-term health problems.

610 F. Supp. 3d at 680 (quoting *Dent v. NFL*, 902 F.3d 1109, 1119 (9th Cir. 2018)).

Whether this was self-evident or not, Plaintiffs also have produced substantial evidence showing that the opioid epidemic's public health and safety harms were reasonably foreseeable to and foreseen by Defendants.

51

### 1.      Foreseeability of Diversion

Substantial evidence from all sides of this case—the DEA; Plaintiffs' experts; and Defendants themselves—demonstrates the common sense fact that Defendants' failures to maintain effective controls against diversion and a resulting oversupply would foreseeably result in the occurrence of diversion.

The DEA testified to this point blank.  In its Rule 30(b)(6) deposition, DEA's Acting Section Chief of Pharmaceutical Investigations in the Diversion Control Division, Mr. Prevoznik, testified that DEA agrees "*diversion is foreseeable if registrants fail to comply with federal law*" and "failure to comply with federal law enables more diversion."  4/18/19 Tr. 30(b)(6) Dep. of Thomas Prevoznik at 642; *see also* 6/7 Trial Tr. (Rannazzisi) at 180 ("Your Suspicious Order Monitoring Program is your tool [to prevent diversion]."); 5/31/19 Tr. Dep. of Matthew Strait at 34-35 (30(b)(6) designee testifying that "DEA is of the opinion that increases in availability could have the unintended consequence of increasing diversion and abuse.").

Plaintiffs' expert in the history of opiate use and abuse and drug policy, Dr. Courtwright, testified that the purpose of the CSA's predecessor statute, the Harrison Act, "was to make sure that all narcotic transactions were confined to legitimate medical channels," and that there was "no way you could possibly accomplish that without supervising the whole chain from importation all the way down to the pharmacist and the physician."  5/5 Tr. (Courtwright) at 34.

All three Defendants and/or their representatives concurred that a failure to maintain effective controls against diversion makes diversion likely or foreseeable.  *See* 7/31/18 Tr. 30(b)(6) Dep. of Nathan Hartle at 364 (McKesson's agreement that "one of the foreseeable harms of engaging in unlawful conduct in the distribution of prescription opioids is diversion."); *id.* at 268 ("Using common sense and basic logic, you could assume the more pills that are out there, the

more potential for diversion there could be."); 8/1/18 Dep. of Nathan Hartle at 84-85 (McKesson's former Vice President of Regulatory Affairs and Compliance, testifying that it is "fairly common sense" that "without sustained sources of supply, major diversion schemes wither away"); 11/30/18 Tr. Dep. of Steve Reardon at 420-21 (Cardinal's former Vice President of Quality and Regulatory Affairs, agreeing that "when we're talking about suspicious orders, what we're trying to do is prevent diversion"); 10/25/19 Tr. Dep. of Edward Hazewski at 61-62 (ABDC's Director of Diversion Control and Security, testifying that "based on information from the DEA and other industry sources, Oxycodone was a high risk for potential diversion . . . ."); *id.* at 71-72 ("It was generally discussed information in the industry" that "people would travel to places like Florida and bring pills back into other areas like West Virginia . . . .").

So, too, did Defendants' pain management and prescription opioids risks and benefits expert, Dr. Gilligan, testify that "if there are a large number of medications prescribed in any area, there will be some of them that will be diverted, misused, abused." 7/2 Trial Tr. (Gilligan) at 159.

There is thus little if any question that it was reasonably foreseeable to and actually foreseen by Defendants that their failure to maintain effective controls would lead to diversion of the opioid pills and other controlled substances they distributed.

### 2. Foreseeability of Public Health and Safety Harms from Diversion and Oversupply

There likewise is widespread agreement among the DEA, Plaintiffs' experts, and Defendants that diversion and oversupply of prescription opioids made the public health and safety harms that are afflicting Cabell and Huntington foreseeable.

Starting again with the DEA, its former Deputy Assistant Administrator for the Office of Diversion Control, Mr. Rannazzisi, testified that when the closed system of distribution is breached and diversion occurs, the result is:

> The market being flooded, the illicit marketplace being flooded with opioids, benzodiazepines, mild stimulants, people becoming addicted, people overdosing, police officers required, being required to carry naloxone, which is not part of their duties up until a few years ago when we had to start carrying it because the overdoses were outrageous, and of course, you know, losing loved ones.

6/7 Trial Tr. (Rannazzisi) at 181.

Plaintiffs' expert in the history of opiate use and abuse and drug policy, Dr. Courtwright, agreed that "the historical record contain[s] evidence from primary sources that supply was a substantial factor in giving rise to the prior opioid epidemics in the United States[,]" and elaborated that "the per capita consumption of medicinal opiates in the United States tripled between 1870 and 1890, which was right in the heart of that first epidemic."  5/5 Trial Tr. (Courtwright) at 28-29.  This historical experience was knowable to Defendants, as it was to Congress and the DEA when they enacted the statutes and regulations giving rise to Defendants' duties.

Plaintiffs' neuroscience, addiction, and pain expert, Dr. Waller, agrees that, from a biological and neuroscientific perspective, the increase in exposure from increased supply of opioids makes increased addiction harms foreseeable:

> [W]hat happens as the dopamine goes down after they take it – and, again, especially in people who are opioid naïve or don't have other injuries or things like this, just taking an opioid does have those ramifications on the brain to varying degrees amongst individuals.  But, at the same time, it is predictable in its nature. . . .  And now, even though those were prescription and taken as prescribed, we now have someone that as we remove it, those behaviors of addiction become very apparent.

5/4 Trial Tr. (Waller) at 204-05.

Plaintiffs' epidemiology and OUD expert, Dr. Keyes, likewise demonstrates that increased supply and exposure made increased addiction and other public health harms foreseeable based on the strength of the scientific consensus over this connection.  *See* 6/11 Trial Tr. (Keyes) at 171 (reading Association for Schools of Public Health consensus statement that the "tremendous

54

expansion of the supply of powerful high potency, as well as long-acting prescription opioids led to scaled increases in prescription opioid dependence . . . ."); *id.* at 194 ("I think there's consensus in my field that the strongest risk factor for Opioid Use Disorder is prescription opioid exposure."); 6/15 Trial Tr. (Keyes) at 21 ("My opinion is that there's substantial consensus in my field in epidemiological literature to support a role for distribution of opioids and the creation of an opioid-rich environment in facilitation of the increase in prescription Opioid Use Disorder and the opioid crisis in the Cabell-Huntington community.").

Here, too, Defendants and their representatives concur in these assessments that diversion and oversupply of prescription opioids made addiction and other public health harms foreseeable. McKesson's Rule 30(b)(6) designee, Mr. Hartle, testified that "[t]he volume of opioids in the market and diversion is related to opioid deaths, certainly." Tr. 30(b)(6) Dep. of Nathan Hartle at 294; *see also id.* at 278 (agreeing that the "public health dangers associated with the diversion and abuse of controlled prescription drugs have been *well-recognized over the years by Congress, DEA, HDMA and its members, and public health authorities.*"); 1/17/19 Tr. Dep. of Gary Boggs at 133-34 (McKesson's current Vice President of Regulatory Affairs and Compliance, Mr. Boggs, testifying that "there is a correlation between diversion and associated problems with diversion" such as "rising opioid deaths").

### 3. Foreseeability of Heroin Addiction Harms from Diversion and Oversupply of Prescription Opioids

There also is widespread agreement among Plaintiffs' and Defendants' expert witnesses on facts showing that the development of heroin addiction harms was another foreseeable consequence of the diversion and oversupply of prescription opioid pills into communities like Cabell and Huntington.

Plaintiffs' neuroscience, addiction, and pain expert, Dr. Waller, explained that prescription opioid and heroin abuse are closely related because of their identical molecular structure, whereby the human brain does not differentiate between them.  5/4 Trial Tr. at 71 ("I don't use a gateway. It's no different.  I mean, for some people it doesn't – it's no different for them because when they take oxycodone or hydrocodone, for them if they have that same change in the brain chemistry, they might as well have taken the other.  It doesn't matter."); *id.* at 48 ("The molecular structure and shape equals that you have the same structure, which gives you the same function, *which gives you the same predictable outcome*.").[11]

Plaintiffs' epidemiology and OUD expert, Dr. Keyes, concurs that this relationship is predictable from the perspective of her field.  *See* 6/11 Trial Tr. (Keyes) at 171 (reading Association for Schools of Public Health consensus statement that the "tremendous expansion of long-acting prescription opioids led to . . .the transition of many to illicit opioids, including fentanyl and its analogs which have subsequently driven exponential increases in overdose."); *id.* at 172 ("I believe that the evidence in the medical literature is – overwhelmingly supports the validity of this statement."); 6/14 Trial Tr. (Keyes) at 218 ("I believe my scientific writings would be consistent with the gateway effect.  There's really no debate in the literature on that.").

Defendants' representatives and experts do not dispute these assessments.  *See* 8/1/18 Tr. Dep. of Nathan Hartle at 480 (McKesson's former Vice President of Regulatory Affairs and Compliance, Mr. Hartle, acknowledging presentations he gave stating that "once people are addicted to opioids, narcotic opioids, *their chances of them moving to heroin are dramatically*

---

[11] *See also* 6/28 Trial Tr. (Alexander) at 26-27 (testimony of Plaintiffs' epidemiology and opioid abatement intervention expert, Dr. Alexander, that "prescription opioids and heroin and fentanyl are *two sides of the same coin*.  They have the same effects on the body.  They produce the same type of physical dependency and the same risks of addiction. . . .  I would characterize the epidemic as an opioid epidemic, not one of one particular type of opioid or another.").

*increased*."); 7/2 Trial Tr. (Gilligan) at 161-62 (Defendants' pain management and prescription opioids risks and benefits expert, Dr. Gilligan, testifying that "I think there's a direct relationship that includes the misuse and abuse of prescription opioids, along with many other predisposing factors, that then does relate to initiation of heroin.").

Indeed, Defendants' health economics expert, Dr. Murphy, all but echoed Dr. Waller in explaining the human brain's lack of differentiation between prescription opioids and heroin: "I would say if you focus on abuse of prescription opioids and abuse of heroin, they're probably closer to be[ing] substitutes. . . . And substitute would be like Coke or Pepsi." 7/8 Trial Tr. (Murphy) at 147.

In light of this evidence, the Court should reject Defendants' contention that "any connection between Defendants' delivery of FDA-approved prescription opioids and harms flowing from the abuse of illegal opioids such as heroin and illicit fentanyl is too remote as a matter of law." Prox. Cause Memo. at 35. Plaintiffs have demonstrated that the increased heroin abuse and other opioid-related public health and safety harms afflicting Cabell and Huntington are and were foreseeable to Defendants when they engaged in the conduct that brought about these harms. Since Defendants do not and cannot show otherwise, their motion for judgment on proximate causation should be denied.

## **CONCLUSION**

For all of the reasons set forth, the Court should deny Defendants' Motions for Judgment on Partial Findings regarding causation.

Dated:  July 22, 2021                           Respectfully submitted,

**THE CITY OF HUNTINGTON**                      **CABELL COUNTY COMMISSION**
/s/ *Anne McGinness Kearse*                     /s/ *Paul T. Farrell, Jr.*
Anne McGinness Kearse                           Paul T. Farrell, Jr.
WVSB No. 12547                                  WVSB Bar No. 7443
Joseph F. Rice                                  **FARRELL & FULLER LLC**
**MOTLEY RICE LLC**                             1311 Ponce de Leon Ave., Suite 202
28 Bridgeside Blvd.                             San Juan, Puerto Rico 00907
Mount Pleasant, SC 29464                        Mobile: 304-654-8281
Tel: 843-216-9000                               paul@farrell.law
Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com                            /s/ *Anthony J. Majestro*
                                                Anthony J. Majestro
Linda Singer                                    WVSB No. 5165
David I. Ackerman                               **POWELL & MAJESTRO, PLLC**
**MOTLEY RICE LLC**                             405 Capitol Street, Suite P-1200
401 9th Street NW, Suite 1001                   Charleston, WV 25301
Washington, DC 20004                            304-346-2889 / 304-346-2895 (f)
Tel:  202-232-5504                              amajestro@powellmajestro.com
Fax:  202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com                        Michael A. Woelfel
                                                WVSB No. 4106
                                                **WOELFEL AND WOELFEL, LLP**
Charles R. "Rusty" Webb                         801 Eighth Street
WV No. 4782                                     Huntington, West Virginia 25701
**THE WEBB LAW CENTRE**                         Tel. 304.522.6249
716 Lee Street, East                            Fax. 304.522.9282
Charleston, West Virginia 25301                 mikewoelfel3@gmail.com
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

58

## CERTIFICATE OF SERVICE

I certify that on July 22, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Anthony J. Majestro*