# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CITY OF HUNTINGTON**
    **Plaintiff,**

**v.**                                 **Civil Action No. 3:17-cv-01362**

**AMERISOURCEBERGEN DRUG CORPORATION, et al.,**
    **Defendants.**

_____

**CABELL COUNTY COMMISSION,**
    **Plaintiff,**                            *Consolidated Case*:

**v.**                                 **Civil Action No. 3:17-cv-01665**

**AMERISOURCEBERGEN DRUG CORPORATION, et al.,**
    **Defendants.**

_____

## PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR JUDGMENT RE: ABATEMENT

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................................................. iv

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

I. There is an Opioid Epidemic in Cabell/Huntington ..................................................... 2

II. There is One Opioid Epidemic ................................................................................. 4

III. The Abatement Plan ............................................................................................... 5

      1. Prevention ...................................................................................................... 6

      2. Treatment ....................................................................................................... 7

      3. Recovery ........................................................................................................ 7

      4. Special Populations ........................................................................................ 8

IV. The Opioid Epidemic in Cabell/Huntington Must be Abated to Stop the Continued
Spread Of the Epidemic in the Community ................................................................ 8

V. The Elements of the Abatement Plan are Necessary to Abate the Opioid Epidemic in
Cabell/Huntington ................................................................................................... 11

ARGUMENT ................................................................................................................ 13

I. Plaintiffs' Abatement Plan Sounds in Equity and Cannot be Characterized as
Damages ................................................................................................................. 13

II. Plaintiffs' Claims Are Not Barred by the "Adequate Remedy at Law" Doctrine .......... 18

    A. The Adequate Remedy of Law Bar to Equitable Relief Does Not Apply to
Governmental Plaintiffs ..................................................................................... 18

    B. Damage Claims are an Inadequate Remedy for the Opioid Epidemic .............. 20

III. The Remedy of Abatement Extends to the Elimination of the Opioid Epidemic
and is not Limited to Eliminating the Defendants' Contributing Conduct ................... 23

    A. A *Condition* that Interferes with Public Rights is a Public Nuisance ................. 23

    B. Abatement is not Limited to Eliminating the Defendants' Wrongful Conduct .. 25

IV. The Statute of Limitations Does Not Bar Plaintiffs' Abatement Claim ...................... 29

V. Because Defendants Are Responsible for the Abatement of the Opioid Epidemic in
Cabell/Huntington, the Scope of the Abatement Plan is both Necessary and
Appropriate ........................................................................................................... 30

    A. Defendants are Jointly and Severally Liable for the Opioid Epidemic in
Cabell/Huntington ............................................................................................. 31

      1. Joint and several liability applies to Plaintiffs' claims ................................. 31

2.  Defendants have not met their twin burdens of showing either that the
    harms from the public nuisance are capable of being apportioned or any
    reasonable basis for apportionment ................................................................. 33

B.  Defendants' Specific Challenges to the Scope of Abatement Plan Fail .............. 35

    1.  The Abatement Plan will not result in a windfall ......................................... 35

    2.  Plaintiffs' expert testimony establishes their entitlement to future OUD
        treatment costs ............................................................................................. 37

    3.  The Abatement Plan does not require remediation based on the wrongs
        of others ........................................................................................................ 41

CONCLUSION  ............................................................................................................... 42

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Ayers v. Jackson Township,* 106 N.J. 557, 525 A.2d 287 (1987)................................17

*Baker v. City of Wheeling*, 117 W. Va. 362, 185 S.E. 842 (1936) ............................31

*Bank of Weston v. Thomas*, 75 W.Va. 321, 83 S.E. 985 (1914)................................32

*Barth v. Firestone Tire & Rubber Co.*, 661 F. Supp. 193 (N.D. Cal. 1987)……………17, 21-22

*Berkeley Cnty. Comm'n v. Shiley*, 170 W. Va. 684, 295 S.E.2d 924 (1982) ............................27

*Blankenship v. General Motors Corp.*, 185 W. Va. 350, 406 S.E.2d 781 (1991) .....................33

*Burch v. Nedpower Mount Storm, LLC,* 220 W. Va. 443, 647 S.E.2d 879 (2007) ...................24

*Burns v. Jaquays Min. Corp.,* 156 Ariz. 375, 752 P.2d 28 (App.Ct.1987) ...............................17

*CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300, (W. Va. May 30, 2014)............26

*Cook v. Rockwell Int'l Corp.*, 778 F. Supp. 512, 515 (D. Colo. 1991)......................................17

*Corvello v. New England Gas Co.*, 532 F. Supp.2d 396 (D.R.I. 2008)......................................17

*Day v. NLO, Inc.*, 144 F.R.D. 330 (S.D. Ohio 1992) .................................................................16

*Donovan v. Philip Morris USA, Inc.,* 268 F.R.D. 1 (D. Mass. 2010)........................................17

*Duff v. Morgantown Energy Assocs. (M.E.A.),*187 W. Va. 712, 421 S.E.2d 253 (1992) .....24,26

*Dunn v. Rockwell,*689 S.E.2d 255 (W. Va. 2009) .................................................................29,30

*Env't Def. Fund, Inc. v. Lamphier,*714 F.2d 331 (4th Cir. 1983) .........................................18-20

*Fellows v. City of Charleston*, 62 W. Va. 665, 59 S.E. 623 (1907) .........................................27

*Grant Thornton, LLP v. FDIC*, 694 F. Supp. 2d 506 (S.D. W. Va. 2010) ...............................33

*Grant Thornton, LLP v. FDIC*, 435 Fed. Appx. 188 (4th Cir. June 17, 2011)........................32

*Guaranty Trust Co. v. York*, 326 U.S. 99 (1945).......................................................................19

*Hagale Indus., Inc. v. Land's End, Inc.*, No. 00-3474-CV-S-4, 2002 WL 34365830
  (W.D. Mo. Dec. 2, 2002) ...............................................................................41

*Hark v. Mountain Fork Lumber Co.,* 127 W. Va. 586, 34 S.E.2d 348 (1945) ...........................24

*Hendricks v. Stalnaker*, 181 W. Va. 31, 380 S.E.2d 1980 (1989) ...........................................24

*In re Copley Pharm., Inc.*, 161 F.R.D. 456 (D. Wyo. 1995) ...................................................17

*In re Nat'l Prescription Opiate Litig.*, 2019 WL 4043938,
  N.D. Ohio Aug. 26, 2019 ..............................................................................  2,13-16,21

*In re Lead Paint Litig.*, 924 A.2d 484 (N.J. 2007) ...................................................................15

*In re NLO, Inc.*, 5 F.3d 154 (6th Cir. 1993) ............................................................................16

*In re Opioid Litig.,* No. 19-C-9000, W.Va. Cir. Ct. Kanawha Cty, July 29, 2020 ...................14

*Jaffee v. U.S.*, 592 F.2d 712 (3d Cir. 1979) .............................................................................17

*Johnson by Johnson v. General Motors Corp.,* 190 W. Va. 236, 438 S.E.2d 28 (1993)........32,33

*Kellar v. James*, 63 W.Va. 139, 59 S.E. 939 (1907) ...............................................................32

*Kenney v. Liston*, 233 W. Va. 620, 760 S.E.2d 434 (2014).......................................................36

*Marcus v. Staubs*, 230 W. Va. 127, 736 S.E.2d 360 (2012)......................................................41

*Martin v. Williams*, 141 W. Va. 595, 93 S.E.2d 835 (1956)...............................23-24, 27

*McMechen v. Hitchman-Glendale Consol. Coal Co.*,
  88 W. Va. 633, 107 S.E. 480 (1921) ..................................................................32-33

*Northfield Twp. v. Kircher*, No. 212260, 2000 WL 33409146,
  (Mich. Ct. App. Aug. 11, 2000) .........................................................................26

*O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311 (C.D. Cal. 1998) ........................................22

*People v. Conagra Grocery Prods. Co.*, 17 Cal. App. 5th 51 (2017) ...........................14P,15,28

*Phillips v. Larry's Drive-In Pharmacy, Inc.,* 220 W. Va. 484, 647 S.E.2d 920 (2007) .............32

*Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086 (1946) .........................................26

*Rederford v. U.S. Airways, Inc.*, 589 F.3d 30 (1st Cir. 2009). ...................................................18

*Shafer v. United States,* 229 F.2d 124 (4th Cir.1956) ...........................................................18-19

*Sharon Steel Corp. v. City of Fairmont*, 175 W. Va. 479, 334 S.E.2d 616 (1985) ...................24

*Sitzes v. Anchor Motor Freight, Inc.*, 169 W. Va. 698, 289 S.E.2d 679 (1982).........................31

*Sonner v. Premier Nutrition Corp.,*971 F.3d 834 (9th Cir. 2020) .........................................19-20

*SSMC, Inc. v. N.V. Steffen,*102 F.3d 704 (4th Cir. 1996) ...........................................................19

*State ex rel AmerisourceBergen Drug Corp. v. Moats,* No. 20-0694, 2021 WL 2390204
   (W.Va. June 11, 2021) ............................................................................................... 14,32

*State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.,*
   200 W. Va. 221, 488 S.E.2d 901 (1997) ...............................................................passim

*SER Mike Hunter v. Purdue Pharma L.P., et al.,* Case No. CJ-2017-816 (Aug. 26, 2019)......15

*State of Washington v. McKesson,* No. 19-2-06975-9 SEA
   (King County, Wash July 6, 2021)...............................................................................15

*Stolt-Nielsen, S.A. v. United States,* 442 F.3d 177 (3d Cir. 2006)...............................................20

*Taylor v. Culloden Pub. Serv. Dist.,*214 W.Va. 639, 591 S.E.2d 197 (W.Va. 2003)................29

*Terrace v. Thompson,* 263 U.S. 197, 44 S. Ct. 15, 68 L. Ed. 255 (1923) ...................................20

*Thanos v. D.C.,* 109 A.3d 1084, 1093–94 (D.C. 2014)................................................................26

*United States v. Articles of Drug,* 633 F. Supp. 316 (D. Neb. 1986) .........................................19

*United States v. Articles of Drug,* 825 F.2d 1238 (8th Cir. 1987).............................................19

*United States v. Price*, 688 F.2d 204 (3d Cir. 1982) ...................................................................17

*United States v. Shelton Wholesale, Inc.,* 34 F. Supp. 2d 1147 (W.D. Mo. 1999)....................19

*United States v. Shelton Wholesale, Inc.,* 277 F.3d 998 (8th Cir. 2002) ....................................19

*Woods v. Cottrell*, 55 W. Va. 476, 47 S.E. 275 (1904) ...............................................................27

*Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993) ..............................................17

*Ypsilanti Charter Twp. v. Kircher*, 281 Mich. App. 251, 761 N.W.2d 761 (2008) ...................26

**Code and Regulations**

W. Va. Code § 55-7-13c(a) (2015)...................................................................32

W. Va. Code § 55-7-24 (2005) (repealed 2015)...............................................32

**Other Publications**

30A C.J.S. Equity § 23 .....................................................................................20

58 Am. Jur. 2d Nuisances § 288......................................................................26

Black's Law Dictionary (10th ed. 2014) ..........................................................27

Dobbs, Law of Remedies (3d ed.) § 2.5 & n.201(1) ........................................20

Restatement (Second) of Torts § 821B(2)(A) ..................................................21

Restatement (Second) of Torts § 821C(2)(B) ..................................................21

Restatement (Third) of Torts § 26, cmt. g)......................................................33

## INTRODUCTION

Defendants have jointly moved for Judgment on Partial Findings Regarding Abatement.[1] In its separately filed Motion for Judgment, Cardinal Health also seeks judgment relating to the abatement remedy.[2]  Plaintiffs file this consolidated response in opposition.

Cabell County and Huntington are in the throes of an opioid epidemic.  Defendants do not really dispute this fact.  As Plaintiffs explain in response to Defendants other Rule 52(c) motions, Defendants' conduct in failing to maintain adequate controls against diversion of controlled substances and their shipment of over 80 million opioid pills to Cabell/Huntington led to this epidemic.[3] Plaintiffs also have established how Defendants are a proximate cause of the opioid epidemic in Cabell/Huntington.[4]

In the instant motions, Defendants challenge Plaintiffs' proposed abatement remedy. Plaintiffs' expert testimony, primarily through Dr. Caleb Alexander, presents an abatement plan that would abate the opioid epidemic in Cabell/Huntington ("Abatement Plan" or "Plan"). Plaintiffs seek an order to abate the nuisance they have proven – the opioid epidemic – by creating a Court supervised trust fund to implement the Abatement Plan and alleviate the nuisance in Cabell/Huntington.  Defendants' challenges to this plan fall into two categories:

First, Defendants challenge this Court's powers in equity to order abatement of the opioid epidemic.  Defendants argue that the relief sought by Plaintiffs – an injunctive order to create a

---

[1] Doc. 1451.

[2] Doc. 1453. Cardinal's remaining arguments for the entry of judgment will be discussed separately.

[3] *See* Doc. 1469 at 23 (Pltfs' Memo. of Law in Opposition to Defendants' Motions for Judgment on Partial Findings on Causation).

[4] *Id.* at 32.

fund – is unprecedented.  While, as Judge Polster recognized, the litigation over the opioid crisis is "unlike any other case,"[5] the use of this Court's broad equitable powers to order the creation of a fund in equity is hardly unprecedented as there are numerous trial and appellate court decisions from both state and federal court that support this remedy.

Second, Defendants challenge the scope of the abatement plan – arguing that elements of the plan are too far downstream, unrelated to their conduct, or unrelated to the opioid epidemic. These challenges are based on faulty legal assumptions and rely on factually incorrect and incomplete characterizations of the evidence.  Defendants are a proximate cause of the opioid epidemic in Cabell/Huntington, and as the epidemic is indivisible, Defendants' responsibilities run to the elimination of the nuisance as a whole, not just their contribution to it.  Factually, the evidence supports each element of the plan as necessary to abate the opioid epidemic in Cabell/Huntington.

Defendants' motions for judgment under Rule 52(c) should be denied.

---

[5] *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4043938, at *2 (N.D. Ohio Aug. 26, 2019)

## STATEMENT OF FACTS

**I.     There Is an Opioid Epidemic in Cabell/Huntington.**

There is an ongoing opioid epidemic in Cabell/Huntington.[6] Dr. G. Caleb Alexander, an expert in the field of epidemiology and opioid abatement intervention,[7] testified that the impact of the opioid epidemic in Cabell/Huntington is reasonably certain to continue.[8] Dr. Alexander emphasized that "there is overwhelming evidence regarding the nature of continuing harms."[9] He testified that the "ongoing morbidity and mortality continue to persist to this day."[10]

Dr. Alexander testified that 137 individuals died of overdose in 2018.[11] He noted that 7,900 individuals in Cabell/Huntington presently have opioid use disorder ("OUD"), which constitutes eight or nine percent of the population.[12] Dr. Alexander emphasized that "it is hard to find communities in the United States that have this many individuals with opioid addiction."[13]

Other witnesses confirmed Dr. Alexander's testimony.  Chief Holbrook, Chief of Police in Huntington, gave a first-hand description of the community:

---

[6] 6/11 Tr. (Keyes) at 198 (no epidemiologist would dispute that there is an opioid epidemic in the U.S., WV, Cabell/Huntington); 6/16/ Tr. (Yingling) at 155 (County, Hospital Boards have made findings in the last ten years that there is an opioid epidemic in Cabell County); (Keyes—6/11 Tr. at 199 (increase in overdose death rates over time for U.S., higher in WV, higher-still in Cabell-Huntington); 6/11 Tr. (Keyes) at 200 (Cabell has highest overdose death rate in West Virginia, which consistently exceeds the national average; Cabell has been in top-five counties in U.S. in terms of overdose deaths); 6/11 Tr. (Keyes) at 201-202 (Cabell County opioid overdose rate is greater than West Virginia's overdose rate, which is greater than the overdose rate in the U.S.).

[7] Trial Tr. 6/28 (Alexander) at 18-19.

[8] *Id.* at 28.

[9] *Id.* at 24.

[10] *Id.* at 28.

[11] *Id.* at 26; Trial Tr. 6/10 Tr. (Smith) at 134-35 (In Cabell County between 2001 and  2018, there were 1,002 opioid-related deaths in Cabell County).

[12] Trial Tr. 6/28 (Alexander) at 26.

[13] Id. at 26.

What I saw happen during my time as a Police Chief was something that it really has affected me just profoundly. There was not one person through some connection – there was no degree of separation by the time I left Huntington that a friend, family, neighbor had not been touched by this problem, had not lost a loved one, had not, you know, reached financial ruin because of their efforts to address an addiction problem with a loved one. I saw friends that I went to school with and grew up with, I attended funerals for their children. It was difficult going to crime scenes. My, my children, they, they lost friends….And I've never experienced anything like what I saw when I left Huntington. And, and those challenges remain today…[14]

Thus, this evidence of ongoing harms in the community establishes that the  harms associated with the opioid epidemic continue to persist today.

## II.    There is One Opioid Epidemic.

Notwithstanding Defendants' assertion that the opioid epidemic is separate from the illicit drug problem in Cabell/Huntington, the testimony during trial established that there is one opioid epidemic for both prescription and illicit opioids. Dr. Keyes testified that the vast majority of individuals who use heroin began with prescription opioid use and that small increases in this progression creates a significant public health burden.[15] Chief Holbrook found that heroin abuse was "a direct result of the predominant prescription drug threat in Appalachia."[16] Dr. Alexander further found that the epidemic that now exists in Cabell/Huntington is an opioid epidemic irrespective of the heroin and fentanyl epidemic because "prescription opioids and heroin and fentanyl are two sides of the same coin."[17] Dr. Alexander explained that they have the same effects on the body and produce the same type of physical dependency and risks of addiction.[18] He

---

[14] Trial Tr. 6/17 (Holbrook) at 224-25; Trial Tr. 5/19 (Perry) at 200 (opioid epidemic in Cabell/Huntington; it has affected every family).

[15] Trial Tr. 6/15 (Keyes) at 18.

[16] Trial Tr. 6/17 (Holbrook) at 222.

[17] Trial Tr. 6/28 (Alexander) at 26.

[18] *Id.* at 27.

explained that "while the community in the early stages of the epidemic was predominantly flooded with prescription opioids and while now heroin and illicit fentanyl have taken on heightened concern," he would characterize the "epidemic as an opioid epidemic, not one of one particular type of opioid or another."[19]

## III.    The Abatement Plan.

Plaintiffs presented a plan to abate the opioid epidemic in Cabell/Huntington developed by Dr. Alexander. The Abatement Plan includes four broad categories of recommendations: prevention, treatment, recovery, and special populations.[20] The Plan addresses overdoses, opioid addiction, and other health problems for a fifteen-year duration, from 2021 to 2035.[21]  The Plan takes into account that current programs are insufficient to abate the opioid epidemic because current programs are at or near capacity, funding is unstable, the number of deaths continue to rise as does the number of people with active addiction, and there is a demand to scale up services.[22] Based on his experience and research, Dr. Alexander predicts that addiction and death will decrease by fifty percent in fifteen years if the Plan is implemented.[23]

---

[19] *Id.* at 27; 6/10 Tr. (Smith) at 136 (very little heroin overdose deaths before 2001; rise in prescription opioids, followed by rise in heroin); *Id.* at 138 (2001-2011, prescription opioid deaths significantly exceeded illicit opiate deaths); *Id.* at 138-39 (2001-2018, prescription deaths flatten, illicit deaths dramatically increase); *Id*. at 139-40 (fatal overdose rate in Cabell County increased from 16.6 to 213.9 per 100,000).

[20] Trial Tr. 6/28 (Alexander) at 36.

[21] *Id.* at 29.

[22] *Id.* at 97-99.

[23] *Id.* at 98.

### 1.    Prevention

The Prevention components of the Abatement Plan focus on preventing further cases of opioid addiction as well as helping to ensure that those who have active addiction and who are not yet in treatment do not die before they get access to treatment.[24] It includes the following:

Health professional education involves special programming for health care providers to determine the appropriate treatment for pain, but also to taper patients from opioids to avoid full-blown addiction and to identify and manage people with opioid addiction.[25]

Patient and public education ensures that patients and the general public understand that opioids have serious and not uncommon risks, that they know that the evidence for opioids for the treatment of chronic pain is limited, and that they are aware of the need to safely store and dispose of opioids to avoid additional exposures and the spread of addiction.[26]

Safe storage and disposal addresses that as the volume of drugs increase, so too does the risk that drugs will be kept in the patients' home, where they may be diverted or contribute to opioid misuse, addiction, and overdose, especially among children and adolescents.[27]

Harm reduction focuses on "meeting people where they are at" to minimize the risk of overdose and the spread of infectious diseases, such as Hepatitis C and HIV, which have also grown in Cabell/Huntington. It also connects those with addiction to treatment opportunities.[28] One element of harm reduction is the widespread availability of naloxone, which, according to

---

[24] Trial Tr. 6/28 (Alexander) at 36.

[25] *Id.* at 37.

[26] *Id.*

[27] *Id.*

[28] *Id.* at 38.

several witnesses, has been extraordinarily effective in reducing mortality from opioid use, misuse, and addiction.[29]

Surveillance, evaluation and leadership allows for refinement and fine-tuning of the Plan over time as the epidemic continues to evolve.[30']

Leadership involves the overall governance of the Plan.[31]

### 2.    Treatment

Treatment involves providing services and programs for opioid addiction and resulting harms like HIV and Hepatitis C.[32] It encompasses treatment for opioid use disorder, connecting individuals to care, including Quick Response Teams, managing the complications of addiction, workforce expansion and resiliency, and naloxone distribution and training to reverse overdoses.[33] The Plan recommends four levels of care: inpatient, residential rehab, intensive outpatient, and outpatient.[34]   In particular, the Plan enables the availability of medically assisted treatment for addiction ("MAT"), through drugs like buprenorphine, which has been found to dramatically increase the likelihood that individuals will be able to maintain their recovery.[35]

### 3.    Recovery

Recovery involves programs to help people and the community recover from the epidemic.[36] It is not directly related to treating people with addiction. It includes public safety,

---

[29] Trial Tr. 5/7 at 35.

[30] Trial Tr. 6/28 (Alexander) at 38.

[31] *Id.* at  38.

[32] *Id.* at 47.

[33] *Id.* at 47-48.

[34] *Id.* at 93.

[35] *Id.* at 53.

[36] *Id.* at 60.

criminal justice system, vocational training and job placement, which will assist not only individuals with addiction, but employers and the economy, in rebuilding, and mental health counseling and grief support.[37]

### 4. Special Populations

Special populations include programs and services for pregnant women, women with newborns, recently incarcerated, children, and families.[38] These programs include: treatment for infants with neonatal abstinence syndrome and mothers; adolescents with non-medical opioid use or trauma associated with family mortality and addiction; programs for  children in the school system, including related to drug use prevention, and for children in foster care, given the epidemic's impact on child welfare; supportive housing for those in recovery; and assistance for people with opioid misuse short of addiction.[39]

## IV. The Opioid Epidemic in Cabell/Huntington Must Be Abated to Stop the Continued Spread of the Epidemic in the Community.

The interconnected problems related to the opioid crisis are extensive. The devastation of the opioid epidemic in the community will impact generations of families.[40]  The continuation of the epidemic leads to its growth and spread as addiction among family members increases the risk that children too will suffer from the disease.

Dr. Rahul Gupta, former Senior Vice President and Chief Medical and Health Officer of March of Dimes testified that, from a public health standpoint, addiction is a public health issue.[41]

---

[37] *Id.* at  59-64.

[38] *Id.* at  64.

[39] *Id.* at 66.

[40] Trial Tr. 6/16 (Yingling) at 162-64 ("this is a generational problem").

[41] Trial Tr. 5/5 (Gupta) at 59.

Dr. Gupta explained it is "really troubling because now we're going to another phase of this illness where people are going to be left with not only a really difficult to treat life-long disease, but the potential to spread it to other people easily."[42] Dr. Alexander concurred, testifying that the continued existence of the epidemic leads to "intergenerational perpetuation of addiction."[43]  He concluded:

> So, I think these are two of several examples of how there's a very real prospect and every reason to believe that there will be people in the future that will develop addiction or other -- have other adverse consequences from the epidemic who are not necessarily currently addicted.[44]

Dr. Gupta recognized that "with addiction what happens is the individual, it's their health. It's their family. It's their neighbors. It's their community. It's the economics of the community. And it's everything that happens."[45] He described the problem as one affecting schools, jobs, and public health.[46] He explained that the epidemic has led to the free flow of pills in elementary, middle, and high schools.[47] The heroin problem has increased needle sharing, which has led to the spread of deadly diseases including HIV, Hepatitis B, and Hepatitis C.[48]

---

[42] *Id.* at 91.

[43] Trial Tr. 6/28 (Alexander) at 49-51.

[44] Trial Tr. 6/29 (Alexander) at 10; *see also id.* at 9 (Dr. Alexander opining that "individuals who are not current or past opioid users [will] still be harmed by the opioid epidemic that exists in this community").

[45] Trial Tr. 5/5 (Gupta) at 90; Trial Tr. 5/19 (Perry) at 200.

[46] *Id.*; Trial Tr. 5/19 (Perry) at 200.

[47] Trial Tr.  5/5 (Gupta) at 90.

[48] Trial Tr. 5/5 (Gupta) at 90-91; Trial Tr. 6/17 (Feinberg) at 109 (infections associated with IV and other drug use are serious part of the public health crisis of the opioid epidemic); *Id.* at 116, *Id.* at 121 (Cabell had the highest number of new HIV cases in West Virginia through 2019).

Dr. Lyn O'Connell, Associate Director of Addiction Sciences for the Joan C. Edward's School of Medicine, described how the opioid epidemic involves an "intersectional problem" that is necessary to treat holistically:

> And so, as we sort of look through these long-term approaches, that's sort of the recurring theme, that as we look at early intervention, we want a system built around that. If we look at high school and college age youth and their intervention, we want a healthy system built around them. If we look at law enforcement, we want to ensure that they are healthy themselves and that they're also doing best practices with the people they're engaging and that doesn't always need to be jail or incarceration, that there might be other diversions or pathways for folks. And then, similarly, that as we look at the long-term, we need healthy grand families…So, as we look at those systems the long-term approaches go through each of those and how they can be connected because all of this is what we would deem intersectional.[49]

Dr. Kevin Yingling, Chairman of the Board of the Cabell County Health Department and Chairman of the Board of the Tri-State Medical Missions, and former Chairman of the Marshall University School of Medicine's Department of Internal Medicine, testified that the related harms include "infections such as Hepatitis B, Hepatitis C, and HIV.[50] He further testified that related harms include the outcomes of pregnant mothers and their offspring who were affected by their addiction.[51] It also "includes the hospitalization of those patients who have complications, such as endocarditis, abscesses, spinal cord abscesses, and other related harms within that population that are hospitalized."[52]  It further includes "the longer term care of these individuals."[53] In addition to that, Dr. Yingling described that:

> [Y]ou have displaced families….I see small children who have nobody to take care of them. I see family—a person telling me I wasn't able to come get my medicine

---

[49] Trial Tr. 5/27 (O'Connell) at 192; Trial Tr. 5/28 (O'Connell) at 31-32.

[50] Trial Tr. 6/16 (Yingling) at 157.

[51] *Id.*

[52] *Id.*

[53] *Id.*

last week because I was in court trying to figure out how I would obtain the privileges to see my child. Or my child was going to be placed in foster care and how disruptive that was to me.[54]

Dr. Yingling explained that his personal experience observing the trials and tribulations related to the harms of addiction are that the mothers "move from addiction through pregnancy, deliver their child, the child has Neonatal Abstinence Syndrome, and then has to be cared for if you will, put into a new culture. Can't go back into the environment they've been in before."[55] In sum, Dr. Yingling testified that "the related harms of addiction have cut at the very core and the fabric of our community. The have jeopardized many, many things in our community."[56]

It is for these reasons that it is necessary to address the opioid epidemic as a whole in Cabell/Huntington. As Dr. Alexander explained:

The plan is a multi-faceted plan, and treatment of opioid addiction is an important part of it. But the plan also includes many interventions that will help to address complications that individuals with opioid addiction may experience such as hepatitis C or HIV and, and overall to support a treatment system that can allow these individuals with opioid addiction to, to resume healthy and, and productive lives.[57]

## V.   The Elements of the Abatement Plan are Necessary to Abate the Opioid Epidemic in Cabell/Huntington.

Dr. Alexander's plan is "intended to address the opioid epidemic."[58] He indicated that the population involved does not stay static.[59]  Dr Alexander emphasized that "there is one opioid epidemic...there's a lot of dynamics of different directions that people may develop harms and

---

[54] *Id.* at 158.

[55] *Id.* at 162.

[56] *Id.* at 158.

[57] Trial Tr. 6/28 (Alexander) at 29.

[58] *Id.* at 30.

[59] *Id.* at 150.

experience harms and, you know, move towards recovery and then backslide, but it's one opioid epidemic. And so, my plan addresses that."[60]

With respect to the need for the Abatement Plan, Dr. Alexander after being asked whether "all of this [is] really necessary for Cabell County and the City of Huntington" to which he responded: "Yes, it is necessary."[61]  And, with respect to whether existing programs were sufficient to abate the opioid epidemic, Dr. Alexander testified about the need for a comprehensive plan, noting that "one can't do abatement well on a month-by-month basis."[62]  On this point he opined:

> I think without a scale-up and an increase in the scope and breadth and extent of services the opioid epidemic may remain the defining legacy of this community in years to come.
>
> . . . .
>
> There are many programs and they, frankly, have done a remarkable job with not very much, but if you examine the magnitude of the opioid epidemic, it's clear, and I believe that I have made it clear, that much more is needed.[63]

Finally, Dr. Alexander testified that Huntington and Cabell County have the institutional capacity to carry out the Abatement Plan.[64]

---

[60] *Id.* at 152.

[61] *Id.* at 110.

[62] *Id.* at 111.

[63] *Id.* at 113.

[64] *Id.*

**ARGUMENT**

I.      **Plaintiffs' Abatement Plan Sounds in Equity and Cannot be Characterized as Damages.**

Defendants argue that Plaintiffs' Abatement Plan constitutes damages and is therefore an improper equitable remedy.[65]  Defendants' argument misconstrues both the Abatement Plan and the law.   Plaintiffs' Abatement Plan is limited to rectifying the going forward harms resulting from the opioid epidemic, that is, the conditions that constitute the public nuisance Defendants' have caused.   As such, it meets the applicable test for an equitable abatement plan as a remedy for a public nuisance.

Ironically, Defendants begin this argument by correctly citing the applicable legal principle:   "Unlike damages, which are intended to "compensate the harmed party for harms already caused by the nuisance," the *"abatement remedy is intended to compensate the plaintiff for the costs of rectifying the nuisance, going forward."*[66]  Defendants then leap to the unsupported conclusion that "rectifying the alleged nuisance would be to reduce the supply of prescription opioids—not to treat and address downstream effects of OUD."[67]   Defendants are wrong.

Here, every element of Plaintiffs' Abatement Plan meets Defendants' test in that they all constitute "compensat[ion to] the plaintiff[s] for the costs of rectifying the nuisance, going forward."[68] Defendants identify no element of the abatement plan that is not linked to rectifying the opioid epidemic public nuisance, nor do they offer any plan to redress the serious, ongoing epidemic in Cabell/Huntington.

---

[65] Doc. 1451 at 8-13; Doc. 1453 at 49-56.

[66] Doc. 1451at p.13 (quoting *In re Natl. Prescription Opiate Litig.*, 2019 WL 4043938, at *1 (N.D. Ohio August 26, 2019) (emphasis added).

[67] *Id.* at 14.

[68]  *Id.* at p.13.

Like the abatement fund ordered in *People v. ConAgra Grocery Products Co.,*[69] the remedy here clearly constitutes abatement:

> Here, plaintiff sought the equitable remedy of abatement for the nuisance because the hazard created by defendants was continuing to cause harm to children, and that harm could be prevented only by removing the hazard. Plaintiff did not seek to recover for any prior accrued harm nor did it seek compensation of any kind. The deposits that the trial court required defendants to make into the abatement account would be utilized not to recompense anyone for accrued harm but solely to pay for the prospective removal of the hazards defendants had created.[70]

The opioid epidemic here is a hazard created by Defendants; it continues to cause harm; and the Abatement Plan is designed to remove the hazard that is causing the harm. Plaintiffs do not seek to recover for any prior accrued harms, nor compensation of any kind for future harms, such as lost revenue or property values. Unlike a damage award where the Plaintiffs are free to expend the recovery any way they choose, an equitable fund for abatement of the opioid epidemic can only be utilized to pay for the prospective elimination of the epidemic.

Defendants argue that no West Virginia Court has required the funding of an abatement plan to reduce the effects of a public nuisance. The West Virginia Mass Litigation Panel ("MLP"), however, characterized similar claims as equitable in the state court opioid litigation.[71] As Judge

---

[69] 17 Cal. App. 5th 51, 227 Cal. Rptr. 3d 499 (2017).

[70] 17 Cal. App. 5th at 133, 227 Cal. Rptr. 3d at 569.

[71] *See In re Opioid Litig.*, No. 19-C-9000 (W. Va. Cir. Ct., Kanawha Cty. July 29, 2020) at 5, ¶¶ 5-6 ("[T]he Panel concludes that the Apportionment Statutes (both the 2005 Act and the 2015 Act) do not apply to Plaintiffs' equitable claims of public nuisance . . . . The statutes apply only to claims for damages and do not refer to abatement or other equitable relief."); *id.* at 9, ¶¶ 13-14 ("Damages, whether future or past, are focused on compensation for an injury or loss to make the injured party whole. Abatement is to rectify the nuisance itself. . . . The Court concludes and holds that [nuisance abatement] costs are in the nature of equitable relief, not past damages.").

The Supreme Court of Appeals of West Virginia addressed the MLP's orders in a writ proceeding. *State ex rel. AmerisourceBergen Drug Corp. v. Moats*, No. 20-0694, 2021 WL 2390204, at *8 (W. Va. June 11, 2021). The Court specifically noted that "other courts have recognized that an injunction may entail the payment of money by a defendant." *Id.* at *7. Many of the plaintiffs in *ABDC, supra,* however, had pending claims for damages. Therefore, the Court granted the writ

14

Polster noted, these same Defendants' arguments "appear to confuse the forward-looking, equitable remedy of abatement and the rearward-looking remedy of damages."[72] Other Courts addressing the opioid litigation have ruled similarly,[73] as have other courts hearing public nuisance cases sounding in equity.[74]

Cardinal separately argues, as a matter of federal law, that any money awarded must be incidental to a prohibitory injunction.[75] This Court, however, has previously noted that while abatement usually takes the form of an injunction, in the run of the mill case where an injunction requiring the defendant to undertake such remediation is feasible; here, however, "defendants 'do not have the requisite infrastructure,'" and, thus "it is unclear why the court could not order funding

---

to the extent that the Panel's orders required legal claims to be tried after the bench trial. *Id.* at *10. Notably, the Court upheld the equitable nature of the State's public nuisance claim and did not grant the writ with respect to the State. *Id.* at * 8, n.55. Like the Plaintiffs here, the State in *ABDC* had waived and was not seeking damages in its public nuisance. *Id.* at *4 (noting State's argument that 2015 Non-Party Fault Act did not apply to State's claims seeking abatement of public nuisance).

[72] *In re Nat'l Prescription Opiate Litig.,* No. 1:17-MD-2804, 2019 WL 4043938, at *1.

[73] *SER Mike Hunter v. Purdue Pharma L.P., et al.,* Case No. CJ-2017-816 (Aug. 26, 2019) at awarding abatement remedy that included addiction treatment); *State of Washington v. McKesson,* No. 19-2-06975-9 SEA (King County, Wash July 6, 2021) (holding in opioid case where Dr. Alexander is expert witness proposing similar abatement plan that "Abatement is an equitable remedy, even when the relief sought in abatement is monetary." (citing *ConAgra, supra*)).

[74]*People v. Conagra Grocery Prods. Co.,* 17 Cal. App. 5th 51, 132 (2017) ("The abatement funds was not a 'thinly disguised' damages award. The distinction between an abatement order and a damages award is stark. . . . An equitable remedy's sole purpose is to eliminate the hazard that is causing prospective harm to the plaintiff."); *In re Lead Paint Litig.*, 924 A.2d 484, 499 (N.J. 2007) ("[T]he public entity, as the modern representative of the sovereign in public nuisance litigation, has only the right to abate. Although, historically that has included the right to visit upon the owner of the land from which the public nuisance emanates, the obligations, *including the costs*, of the abatement, there is no right . . . for the public entity to seek to collect money damages in general." (internal citations omitted) (emphasis added)).

[75] Defendants argue that, for this proposition, federal law sets forth this Court's equitable jurisdiction. Doc. No. 1451 at 14. Caselaw on this issue rarely makes the distinction between state and federal equity jurisprudence – with courts at both levels looking back to England for guidance. As such, Plaintiffs believe that the cited state decisions are persuasive authority.

as the functional equivalent."[76]  Judge Polster summarized the rationale behind the abatement fund

requested by Plaintiffs:

> If Defendants are eventually found liable for creating the opioid crisis, there is no realistic way the Court could order either that: (1) Defendants abate the crisis themselves (Defendants do not have the requisite infrastructure), or (2) Plaintiffs abate the crisis and then order Defendants to pay Plaintiffs the costs incurred in doing so (Plaintiffs do not have the financial resources). Thus, the Court must, if Defendants are found liable, have some mechanism to predict and fairly award prospective future costs to abate the crisis.[77]

The abatement fund sought by Plaintiffs is consistent with both the purposes behind abatement

and the broad equitable power of the Court.

Finally, Cardinal argues that there are no examples of a federal court ordering the creation

of an equitable fund pursuant to its equitable powers.  To the contrary, courts across the country

have found that a federal court order creating a court-supervised fund, most commonly in the

context of medical monitoring cases, is a proper exercise of equitable jurisdiction rather than a

claim for damages.   The Court in  *Day v. NLO, Inc.*, explained the distinction:

> [A] court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data produced is utilized for group studies. In this situation, a defendant, of course, would finance the program as well as being required by the Court to address issues as they develop during the program   administration. *Under these   circumstances,   the   relief   constitutes injunctive relief . . . .*[78]

---

[76] Doc. 1285 at p.6 (footnotes omitted) (quoting *In re Nat'l Prescription Opiate Litig.,* 2019 WL 4043938, at *2).

[77] *In re Nat'l Prescription Opiate Litig.,* 2019 WL 4043938, at *2.

[78] 144 F.R.D. 330, 335-36 (S.D.Ohio 1992) (emphasis added); *see also In re NLO, Inc.*, 5 F.3d 154, 159 (6th Cir. 1993) (denying writ in *Day*) (cases relied upon by the district court "generally support the proposition that such relief is injunctive in nature").

There are many other examples.[79]  These holdings are not limited to medical monitoring cases.[80]

The Abatement Plan here seeks the abatement of the public nuisance (the opioid epedemic), rather than compensation for past harms.    The structure of the Abatement Plan falls squarely within the cases cited above.   Plaintiffs seek a Court-supervised fund to implement the Abatement Plan.   The Abatement Plan is remedial and specifically directed at abating the opioid epidemic (rather than compensating for past or projected injuries).   Unlike a damage award which can be used for any purpose, the use of the proposed fund is restricted to implementing the Abatement

---

[79] *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 713 (D. Ariz. 1993) ("Here, plaintiffs do not merely seek money from Hughes. Plaintiffs seek to implement a court-supervised program requiring ongoing, elaborate medical monitoring.  Accordingly, plaintiffs' relief qualifies as injunctive relief. . . ."); *Cook v. Rockwell Int'l Corp.*, 778 F. Supp. 512, 515 (D. Colo. 1991) ("Rockwell argues that dismissal is appropriate because a medical monitoring claim is not cognizable as "injunctive relief." I conclude that dismissal of this claim is not appropriate."); *Barth v. Firestone Tire & Rubber Co.*, 661 F. Supp. 193, 204 (N.D. Cal. 1987) (finding equitable claim for establishment and maintenance of a monitoring program which will pool and share knowledge about the results of the alleged exposure and will provide for diagnosis and preventive medical advice); *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 23 (D. Mass. 2010); *In re Copley Pharm., Inc.*, 161 F.R.D. 456, 469 (D. Wyo. 1995) ("During the course of the trial, the Court will also consider evidence relevant to the Plaintiffs' request for the equitable remedy of medical monitoring. . . [B]ecause of the equitable nature of medical monitoring, this issue should not be submitted to the jury.").  There are also many examples of state courts so holding.  *See, e.g., Ayers v. Jackson Township,* 106 N.J. 557, 525 A.2d 287, 314 (1987) ("[T]he use of a court-supervised fund to administer medical-surveillance payments in mass exposure cases ... is a highly appropriate exercise of the Court's equitable powers."); *Burns v. Jaquays Min. Corp.,* 156 Ariz. 375, 752 P.2d 28, 34 (App.Ct.1987) (holding that court-supervised medical surveillance fund is exercise of court's equitable powers).

[80] *Corvello v. New England Gas Co.*, 532 F. Supp. 2d 396, 398–99 (D.R.I. 2008) (refusing to dismiss claim for injunctive relief where plaintiffs brought public nuisance claims seeking compensatory damages and an injunction requiring defendant to "pay money into a fund sufficient to clean and remediate the contamination"); *United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982) ("A request for funds for a diagnostic study of the public health threat posed by the continuing contamination and its abatement is not, in any sense, a traditional form of damages."). Cardinal tries to limit *Price* to relief available under federal statutes, *see* Doc. 1453-1 at 54-56, while asserting that there is a general rule against equitable relief in the form of payment of money. *Id.* (citing *Jaffee v. U.S.*, 592 F.2d 712, 715 (3d Cir. 1979).  *Jaffee*, however, involved claims not by a government plaintiff seeking to abate a public nuisance, but private plaintiffs seeking to defray their costs for future personal *injury* treatment, which the court held is "a traditional form of damages in tort compensation for medical expenses to be incurred in the future."  592 F.2d 715.

Plan.   Moreover, the Abatement Plan contemplates that resources will be distributed to accomplish its goals, including through institutions like Marshall University. Simply put, the remedy falls within equity – it is not "a repackaged claim for damages."[81]

## II.    Plaintiffs' Claims Are Not Barred by the "Adequate Remedy at Law" Doctrine.

Cardinal claims that Plaintiffs have an adequate remedy at law that, as a matter of federal jurisdictional law, bars their abatement claim in equity.[82]   Cardinal's argument relies on inapposite case law involving claims by private parties. The standard is applied differently in the context of governmental actions – especially ones like this involving public health and safety.   Moreover, the "legal remedies" argued by Cardinal to be adequate are insufficient to constitute an adequate remedy at law.

### A.    The Adequate Remedy of Law Bar to Equitable Relief Does Not Apply to Governmental Plaintiffs.

As the Fourth Circuit has made clear in *Env't Def. Fund, Inc. v. Lamphier*, claims for equitable relief by governmental plaintiffs are held to a different standard than claims brought by private parties.[83]   This is particularly true "[w]here the plaintiff is a sovereign and where the activity may endanger the public health."   In such cases, the emphasis shifts from traditional equitable concerns "to concern for the general public interest."[84]   Thus, a governmental plaintiff is "not bound to conform with the requirements of private litigation," such as "show[ing] irreparable injury and that it [lacks] an adequate remedy at law," when it acts to effectuate

---

[81] *Rederford v. U.S. Airways, Inc.*, 589 F.3d 30, 37 (1st Cir. 2009).

[82] *See* Doc. 1453 at 40-49.

[83] 714 F.2d 331, 337 (4th Cir. 1983) ("the law of injunctions differs with respect to governmental plaintiffs (or private attorneys general) as opposed to private individuals").

[84] *Id.* at 337-38 (quoting *Shafer v. United States*, 229 F.2d 124, 128 (4th Cir.1956)).

statutory policies; instead, the requirement is only that the relief be "in the public interest."[85] And, *Lamphier* specifically held that "this rationale applies equally to *state enforcement of federal and state health laws*."[86]

Thus, under *Lamphier,* all that is required is a showing that the Abatement Plan is "in the public interest," without regard to whether there is any purportedly adequate legal remedy. Here, there is no reasonable argument that the abatement plan is not in the public interest and Defendants do not contend otherwise.

Cardinal's out of circuit precent does not change this analysis. Cardinal relies heavily on *Sonner v. Premier Nutrition Corp.*,[87] an outlier decision of the Ninth Circuit. While Cardinal suggests that the Fourth Circuit agrees,[88] the agreement by our circuit noted by the *Sonner* Court was with the proposition that "that state law cannot circumscribe a federal court's equitable powers even when state law affords the rule of decision."[89] *Sonner,* which involved a private class action, does not cite or address *Lamphier*'s holdings regarding the requirements for an equitable relief sought by a governmental entity. Similarly, district courts applying *Sonner* to dismiss claims for

---

[85] *Id.* at 338 (quoting *Shafer, supra*); *see also United States v. Shelton Wholesale, Inc.,* 34 F. Supp. 2d 1147, 1166–67 (W.D. Mo. 1999) ("When the Government seeks an injunction pursuant to statute to protect the public health, the requirements applicable to private litigants in equity do not apply. The Government need not show irreparable harm, or inadequate remedy at law." (citations omitted)), *aff'd,* 277 F.3d 998 (8th Cir. 2002); *United States v. Articles of Drug,* 633 F. Supp. 316, 326 (D. Neb. 1986) ("[T]he government is not bound to prove the absence of an adequate remedy at law where a statute authorizes an injunction."), *aff'd in part, rev'd in part on other grounds,* 825 F.2d 1238 (8th Cir. 1987).

[86] *Id.* (emphasis added).

[87] 971 F.3d 834 (9th Cir. 2020).

[88] Doc. 1453 at 43 (citing *SSMC, Inc. v. N.V. Steffen*, 102 F.3d 704, 708 (4th Cir. 1996).

[89] *Sonner*, 971 F.3d at 843; *see also SSMC*, 102 F.3d at 708 ("'State law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's Courts.'") (quoting *Guaranty Trust Co. v. York*, 326 U.S. 99, 106 (1945)).

equitable relief highlighted by Cardinal all involve claims by private entities, and all the cited decisions were from California district courts in the Ninth Circuit.[90]  *Lamphier,* as a decision of the Fourth Circuit, is binding here and mandates rejection of Cardinal's claim.

### B.    Damage Claims Are an Inadequate Remedy for the Opioid Epidemic.

The long-established standard for determining whether a remedy at law is as follows: "Before equitable relief is foreclosed, the legal remedy must be as complete, practical, and efficient as the equitable remedy available."[91]  Here, even if *Sonner's* analysis governed, the damage claims identified by Cardinal do not constitute adequate remedies at law.

Cardinal points to pleadings where these Plaintiffs and other public entities bringing opioid epidemic cases sought recovery of damages and argues that the availability of damages constitutes an adequate remedy at law with respect to the abatement plan's addiction treatment expenditures. Cardinal conflates Plaintiffs' long abandoned damage claims with the instant public nuisance claim.  Because they are separate claims seeking separate relief, tort damage claims cannot be an adequate remedy for a claim to abate a public nuisance.

Here, Plaintiffs are bringing an equitable public nuisance claim where the remedy sought is abatement of the public nuisance.   Such a claim vindicates the government's interest in securing public rights – such as protection against interference with "the public health, the public safety,

---

[90] *See* Doc. 1453 at 43 n.139.

[91] Dobbs, Law of Remedies (3d ed.) § 2.5 & n.201(1) (citing *Terrace v. Thompson,* 263 U.S. 197, 214, 44 S. Ct. 15, 17, 68 L. Ed. 255 (1923) ("the legal remedy must be as complete, practical and efficient as that which equity could afford"); *see also* 30A C.J.S. Equity § 23 (The existence of a remedy at law does not deprive equity of jurisdiction unless that remedy is clear, full, adequate, and complete. . . . Thus, equity will assume jurisdiction if one's remedy at law is not as complete as, or would be more difficult than, the remedy in equity, or is less effective, or is less complete or satisfactory.") (footnotes omitted)); *Stolt-Nielsen, S.A. v. United States,* 442 F.3d 177, 187 (3d Cir. 2006), *as amended* (May 16, 2006) (same).

the public peace, the public comfort or the public convenience."[92]   When a public agency has authority to represent a political subdivision in bringing the public nuisance claim, the body can, as here, maintain a proceeding to enjoin or abate a public nuisance.[93]   The second type of claim is a claim for damages.  As Judge Polster explains, the two claims are fundamentally different:

> In a traditional public nuisance case, a municipal entity who is harmed by the maintenance of a nuisance will give notice to and ask the offending party to abate the nuisance. If the offending party is unable or unwilling to abate, the harmed party can, when appropriate, abate the nuisance themselves or ask the court for the right to do so, and then seek compensation for the costs of abating the nuisance. This compensation is equitable in nature. The goal is not to compensate the harmed party for harms already caused by the nuisance. This would be an award of damages. Instead, an abatement remedy is intended to compensate the plaintiff for the costs of rectifying the nuisance, going forward.[94]

However, the fact that Plaintiffs once sought damages (and even if such claims remained) does not change the nature of the abatement remedy, but instead underscores its difference from damages.  The Abatement Plan sought by Plaintiffs is forward looking and does not seek recovery of any past expenditures.  Instead, Plaintiffs seek an abatement order calling for the creation of a trust fund that will "rectify the nuisance going forward."

Finally, Cardinal focuses on the Abatement Plan expenditures for substance abuse treatment and equates them to the recovery of future medical expenses in a tort action.  Courts, in the context of resolving medical monitoring claims, have long distinguished the recovery by individuals for future medical expenses from the creation of an equitable fund for purposes of determining whether a legal remedy was adequate.  For example, the Court in *Barth v. Firestone*

---

[92] Restatement (Second) of Torts § 821B(2)(A).

[93] *Id.* at § 821C(2)(B); *id* at  cmt c ("A public official who is authorized to represent the state or an appropriate subdivision in an action to abate or enjoin a public nuisance may of course maintain the action.").

[94] *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4043938, at *1.

*Tire & Rubber Co.,* concluded that "no remedy at law exists that would permit a court to fashion an underlying remedy such as the medical monitoring fund sought here" where plaintiffs sought the establishment and maintenance of a monitoring program which will pool and share knowledge about the results of the alleged exposure and will provide for diagnosis and preventive medical advice.[95] The Court noted that "plaintiffs still may seek other forms of remedy at law, but the monitoring program sought here is not a remedy available at law."[96]

The Abatement Plan here is analogous to these medical monitoring funds.  As noted above, the Abatement Plan seeks the creation of a Court-supervised fund that does more than pay for treatment for individuals.  The Plan creates the necessary treatment infrastructure, expands the treatment workforce, and connects individuals to care (including programs to decrease relapse and increase retention in treatment).[97]  And unlike a claim for damages, the money in trust fund Plaintiffs seek is restricted to implementing the Abatement Plan to abate the opioid epidemic.

Simply paying for the cost to respond to people who are overdosing, or infants born withdrawing is clearly an inadequate remedy for this epidemic.  It is especially inadequate for a governmental entity seeking to prevent harm to its residents, and not merely to carry away the bodies.  As in *Barth v. Firestone Tire & Rubber Co., supra,* as no remedy at law exists that would

---

[95] 661 F. Supp. 193, 205 (N.D. Cal. 1987).

[96] *Id.; see also O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 337–38 (C.D. Cal. 1998) ("Recovering the *cost* of future medical monitoring on an individual basis, however, will not provide Plaintiffs with the relief they seek, as Plaintiffs' program is designed not only to detect signs of latent disease, but also to *share information* regarding the identification and development of latent diseases among class members." (emphasis in original)).

[97] Trial Tr. June 28, 2021 (Alexander) at  47-52 (The plan recommends four types of treatment: inpatient, residential health, intensive outpatient, and routine inpatient. The Plan encompasses treatment for opioid use disorder, connecting individuals to care, including Quick Response Teams, managing the complications of addiction, workforce expansion and resiliency, and naloxone distribution and training to reverse overdoses).

permit a court to fashion an underlying remedy like the Abatement Plan as part of a damage award, damage claims at law are not adequate remedies.  Thus, any damage claim is inadequate to abate the opioid epidemic and is not a remedy that is "complete, practical, and efficient" substitute for the Plaintiffs' claims seeking implementation of the entire Abatement Plan through the establishment of a Court-supervised fund.

III.    **The Remedy of Abatement Extends to the Elimination of the Opioid Epidemic and Is Not Limited to Eliminating Defendants' Contributing Conduct.**

Defendants argue that the remedy of abatement is limited to an injunction stopping conduct.[98]  This argument premised on the incorrect notion that a nuisance may only be defined based upon conduct.[99] This premise is incorrect as a matter of law, as West Virginia common law has long recognized that a *condition* that substantially interferes with public rights constitutes a public nuisance.  Moreover, case law establishes the right of a public entity to seek, as abatement, the remediation of the conditions caused by the nuisance as abatement.

A.    **A *Condition* that Interferes with Public Rights Is a Public Nuisance.**

West Virginian decisions consistently hold that conditions that interfere with a public right constitute a public nuisance.  In 1955, the Supreme Court of Appeals held in *Martin v. Williams* that "[a] condition is a nuisance when it clearly appears that enjoyment of property is materially lessened, and physical comfort of persons in their homes is materially interfered with

---

[98] Doc. 1441-1 at 9.

[99] Doc. 1441-1 at 9.

thereby."[100]   Modern decisions have recognized *Martin's* holding.[101]   And, other cases make it clear that either an act *or* condition can constitute a nuisance.[102]

The two West Virginia decisions cited by Defendants are consistent with this long line of authority.   Nothing in the footnote cited by Defendants from *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.* limits a public nuisance to "conduct" or excludes a condition that interferes with public health or safety from the public nuisance definition.[103]   On the contrary, the *Kermit Lumber* Court expressly quotes the broad language noted above from both *Hark* and *Sharon Steel*.[104]   Defendants also inexplicably quote the very language from *Duff v. Morgantown Energy Assocs. (M.E.A.)* confirming that "[a] public nuisance is an act *or condition* that unlawfully operates to hurt or inconvenience an indefinite number of persons."[105]

Defendants improperly conflate what is necessary to establish *liability* for a public nuisance with the resulting condition which – after liability is proven – is the proper focus for the remedy of abatement.   Defendants point to this Court's discussions of the requirements for standing for a public nuisance claim where the Court noted that "the scope of the activity sought to be abated defines the relevant conduct" and that "the relevant conduct is the alleged violations of law in

---

[100] 141 W.Va. 595, 610–611, 93 S.E.2d 835, 844 (1956) (citations omitted).

[101] *Burch v. Nedpower Mount Storm, LLC,* 220 W. Va. 443, 450–51, 647 S.E.2d 879, 886–87 (2007); *Hendricks v. Stalnaker*, 181 W. Va. 31, 33, 380 S.E.2d 198, 200 (1989).

[102] *Hark v. Mountain Fork Lumber Co.,* 127 W. Va. 586, 595, 34 S.E.2d 348, 354 (1945) ("A public nuisance is  an act or condition that  unlawfully  operates to  hurt or inconvenience  an indefinite number of persons."); *Hendricks*, 181 W. Va. at 31, 380 S.E.2d at  200 ("This definition of nuisance includes acts or conditions that affect either the general public or a limited number of persons."); *Sharon Steel Corp. v. City of Fairmont*, 175 W. Va. 479, 483, 334 S.E.2d 616, 620–21 (1985) (quoting *Hark*).

[103] 200 W. Va. 221, 245, n.28, 488 S.E.2d 901, 925, n.28 (1997) ("The term 'public nuisance' does not have an exact definition.").

[104] 200 W. Va. at 241, 488 S.E.2d at 921.

[105] Doc. 1441-1 at p. 9 (quoting *Duff,* 187 W. Va. at 716, 421 S.E.2d at 257) (emphasis added).

connection with defendants' distribution of pharmaceutical drugs."[106] These statements must be viewed in the context of the liability decision before the Court at that time. This Court's dicta regarding the scope of abatement do not support Defendants' attempted limitation of the remedy of abatement.   Indeed, this Court in the very same decision referred to examples of other nuisances as "conditions" that municipalities should be able to "sue to abate" under their public nuisance authority.[107]

While Defendants' conduct is unquestionably a necessary element in determining their liability in a public nuisance abatement action,[108] it does not follow that the remedy of abatement is limited solely to stopping the conduct when harms to public health and safety would otherwise remain.   Neither this Court nor any other West Virginia court have interpreted requirements relating to proof of conduct as limitations on the availability or scope of abatement of the condition resulting from the conduct of all Defendants.

### B.   Abatement is Not Limited to Eliminating Defendants' Wrongful Conduct.

The equitable remedy of abatement is broad.   Because a nuisance includes the resulting harmful conditions caused by Defendants' conduct, the remedy extends to the abatement of those consequences. In this case, the remedy extends to the elimination of the opioid epidemic in Cabell/Huntington.

---

[106] Doc. 1441-1 at p. 10 & n.17 (quoting Doc. 1248-0 at 14-15, Order Denying Summary Judgement Regarding Standing).

[107] Doc. 1248-0 at 14.

[108] *See, e.g.,* Doc. 1294-0 (Order Denying Summary Judgment Regarding Fault).

Jurisdiction in equity to abate a nuisance is broad.  Courts find "broad equitable authority to abate [a] nuisance."[109]  This is hornbook law:

> An action to abate a public nuisance is one of an equitable nature. Equity has always had the authority to abate a public nuisance. The purpose of giving equity jurisdiction in public nuisance actions is to offer remedies more complete than those available at law.[110]

This is consistent with West Virginia law.   Indeed, the Supreme Court of Appeals held in *CashCall, Inc. v. Morrisey*, that courts "have broad powers to fashion equitable relief," and "a court's equitable powers assume an even broader, more flexible character when the public interest is involved."[111]   The *CashCall* Court quoted the U.S. Supreme Court's caution on limiting equitable jurisdiction:

> [T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.[112]

Defendants' limitation of the broad remedy of abatement to an injunction halting their conduct is clearly contrary to these equitable principles.

The majority of the cases cited by Defendants simply stand for the proposition that a Court has the power to "grant injunctions to abate existing nuisances."[113] These statements are

---

[109] *Ypsilanti Charter Twp. v. Kircher*, 281 Mich. App. 251, 275–76, 761 N.W.2d 761, 777 (2008); *see also Thanos v. D.C.,* 109 A.3d 1084, 1093–94 (D.C. 2014) ("the broad authority to fashion equitable relief for the purposes of enjoining, abating, and preventing the continuation or recurrence of [the] nuisance"); *Northfield Twp. v. Kircher*, No. 212260, 2000 WL 33409146, at *1 (Mich. Ct. App. Aug. 11, 2000) ("Trial courts have broad discretion in fashioning appropriate remedies to abate public nuisances." (citations and internal quotations omitted)).

[110] 58 Am. Jur. 2d Nuisances § 288.

[111] No. 12-1274, 2014 WL 2404300, at *19 (Mem.) (W. Va. May 30, 2014).

[112] *Id.* (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086 (1946)).

[113] Doc. 1441-1 at p. 11 (quoting, *Duff, supra*).

unremarkable, and none of these cases even address any limit on the remedy of abatement.[114] Indeed here, Abatement Plan – which seeks to eliminate the opioid epidemic – is precisely "the eliminating or nullifying [or] reducing or removing of something that has been found to be a nuisance or a problem" described in Defendants' authorities.[115]

Defendants concede that in environmental cases, "[t]he object of a public nuisance action is to abate or stop the harm to the public health, safety, and the environment," where abatement consists of removing the excessive or above-limits pollution from the environment.[116]  For this proposition, Defendants rely on *Kermit Lumber*, where the defendant's arsenic pollution migrated offsite, threating the health and safety of the public.  Tellingly, the *Kermit Lumber* Court did not limit the State's abatement to stopping Defendants' operations, a remedy that would have been meaningless as the defendant there had ceased operations at the site.[117]  Instead, as Defendants acknowledge, the State sought remediation and cleanup of the arsenic.[118]  And, while the State also sought damages in *Kermit Lumber,* it sought damages in addition to abatement.[119]

---

[114] *See* Doc. 1441-1 at p. 11 & n. 2. These decisions are either examples of using abatement to stop the offending conduct (*Fellows v. City of Charleston*, 62 W. Va. 665, 59 S.E. 623, 625 (1907) ("The town has power to enforce its ordinance, and, if necessary for the abatement or removal of the [public] nuisance, may remove or destroy the thing creating the nuisance[.]") and *Woods v. Cottrell*, 55 W. Va. 476, 47 S.E. 275, 277 (1904) (a public nuisance "may be abated as part of the judgment, and the thing with which the nuisance is done may be destroyed")) or involve decisions that recognize the general power of a court to award abatement as a remedy for a nuisance (*Berkeley Cnty. Comm'n v. Shiley*, 170 W. Va. 684, 686, 295 S.E.2d 924, 926 (1982) (discussing state and local officials' power under state law to bring suits seeking injunctions to "abate" nuisances) and *Martin v. Williams*, 141 W. Va. 595, 605, 93 S.E.2d 835, 841 (1956) ("Mandatory injunctions are awarded for the abatement of nuisances more frequently than for other purposes.").

[115] Doc. 1451-1 at p.11 (citing Black's Law Dictionary (10th ed. 2014)).

[116] Doc. 1451 at p.12 (quoting *Kermit Lumber, supra*).

[117] *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co*., 200 W. Va. 221, 226, n. 4, 488 S.E.2d 901, 906, n. 4 (1997).

[118] Doc. 1451 at p.12, n.22.

[119] *Id.*

Defendants argue that the *Kermit Lumber* Court did not extend abatement to medical treatment – a remedy that was not requested by the State in *Kermit Lumber*.   Even if the absence of express approval of a remedy not sought has any precedential value, the nuisance here – the opioid epidemic – is materially different from the environmental contamination in *Kermit Lumber*. Treatment of addiction is necessary here because addiction itself results in many other of the conditions that constitute interference with public rights:   crime, communicable diseases, destruction of neighborhoods, burdens on social systems, etc.[120]   Defendants' interpretation of *Kermit Lumber* also is simply inconsistent with that Court's focus on the importance of abating the continuing harms of the unabated nuisance.[121]

Thus, an "abatement order is an equitable remedy," and its "sole purpose is to eliminate the hazard that is causing prospective harm to the plaintiff."[122] Here, the Abatement Plan proposes to alleviate the opioid epidemic which is the hazard causing the prospective harms identified above.

---

[120] Trial Tr. 6/17/21 (Feinberg) at 109 (infections associated with IV and other drug use are serious part of the public health crisis of opioid epidemic); Trial Tr. 5/27/21 (Zerkle) at 184-85 (Crimes connected to opioid epidemic include shoplifting, burglary, theft, disorderly conduct, DUI); 6/14/21 Trial Tr. at 12 (harms to children and families occur when opioid use is high); Trial Tr. 6/30 (Williams) at 46 (as epidemic unfolded, City's neighborhoods were crumbling);  Trial Tr. 5/27 (Zerkle) at 119-20 (addiction draining workforce in County, declining population and tax base; City of Huntington owns 350+ abandoned homes); Trial Tr. 6/28 (Alexander) at 25 (opioid epidemic in Cabell-Huntington includes burdened child welfare system and strained school system).

[121] *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901 (W.Va. 1997).

[122] *ConAgra*, 17 Cal. App. 5th at 132, 227 Cal. Rptr. 3d at 569.

## IV.   The Statute of Limitations Does Not Bar Plaintiffs' Abatement Claim.

Cardinal recycles its previous statute of limitations argument, framing it as related to the abatement remedy. This Court summarily rejected Defendants' previous attempt at dismissal based on the statute of limitations,[123] and the argument in the instant motion provides no real new grounds for dismissal. Plaintiffs, incorporate their previous briefing,[124] and offer two brief responses to the instant arguments.

First, Cardinal ignores that in *Dunn v. Rockwell*, the Supreme Court of Appeals held there is no statute of limitations for a claim sounding in equity.[125] Cardinal is likely to argue that Plaintiffs remedy is a legal one, an argument that is refuted above. And, as Cardinal has repeatedly emphasized, Plaintiffs have waived all damage claims. Cardinal may also argue that *Dunn* is inconsistent with *Kermit Lumber,* but *Dunn* was decided *eight years after Kermit Lumber* and does not exclude nuisance abatement actions from its broad holding. Finally, Defendants' previous argument that *Taylor v. Culloden Pub. Serv. Dist.*, imposes a one-year look back fails, as *Taylor's* rule applies when the claims are for distinct instances of *damages*, not a forward-looking abatement remedy.[126] Indeed, *Taylor* explicitly recognized the *Kermit Lumber* rule for an unabated *public nuisance,* that the one-year statute of limitations does not begin to run until the "harm or endangerment to the public health, safety and the environment is abated."[127]

---

[123] Order, Doc. 1247 (March 31, 2021) ("Defendants' Motion for Summary Judgment on Statute of Limitations (ECF No. 240) is denied").

[124] Doc. 288, Plaintiffs' Opposition to Defendants' Motion for Summary Judgment Regarding Statute of Limitations (April 6, 2020).

[125] Syl. pt. 6, 689 S.E.2d 255 (W. Va. 2009).

[126] 591 S.E.2d at 205.

[127] *Id.* (quoting *Kermit Lumber*). *Taylor,* a private nuisance action, declined to consider whether plaintiffs should have been permitted to amend their complaint to assert a public nuisance claim,

29

Second, Cardinal acknowledges that *Kermit Lumber*, provides that a public nuisance claim must be filed within one year of when the alleged nuisance is abated.[128]  Here we have an admitted, unabated public nuisance.   As such, this case is governed by *Kermit Lumber's* holding in syllabus point 11, that when "a public nuisance action is brought in order to remediate" harms to public health, public safety, and the environment, the statute of limitations does not begin to run, "until the harm or endangerment to the public health, safety and the environment is abated."[129]

Cardinal attempts to reframe the nuisance – arguing that the nuisance is their act of distributing pills.  The premise of this argument – that the focus should be on conduct not condition – is also refuted above. Regardless, with respect to any statute of limitations argument under *Kermit Lumber,* it is undisputed that here, "the harm or endangerment to the public health, safety and the environment is [un]abated," such that the statute of limitations remains tolled. [130]

Cardinal's attempts at dismissal of Plaintiffs' abatement claims on the basis of the statute of limitations fails regardless of whether *Dunn* or *Kermit Lumber* governs.

## V.     Because Defendants Are Responsible for the Abatement of the Opioid Epidemic in Cabell/Huntington, the Scope of the Abatement Plan is both Necessary and Appropriate.

In addition to their structural challenge to the requested Court-supervised fund to implement the Abatement Plan, Defendants collectively, and Cardinal, in its separate motion, challenge the scope of the Abatement Plan.  The premise for these arguments – that Defendants' liability is for something other than abatement of the opioid epidemic in Cabell/Huntington--is

---

holding "there is no need for Appellants *to seek the benefit*" of the *Kermit Lumber* rule, given its conclusion that the statute of limitations did not present a bar. *Id.* (emphasis added).

[128] Doc. 1453 at 69.

[129] 488 S.E.2d at 901.

[130] *Id.*

false, and the remedies set forth in the Abatement Plan all are designed to accomplish that goal. This Court should implement the plan in its entirety.

### A.    Defendants are Jointly and Severally Liable for the Opioid Epidemic in Cabell/Huntington.

Defendants are jointly and severally liable to abate the opioid epidemic in Cabell/Huntington.   Three initial points underlie Plaintiffs' position.   First, Plaintiffs have established that Defendants are both a cause in fact and a proximate cause of the opioid epidemic.[131]   Second, as a result of this Court's previous ruling, the principles of common-law joint and several liability apply in this case.   Third, Defendants have not met their burden of showing both (i) that the harms from the opioid epidemic in Cabell/Huntington are capable of being apportioned and (ii) that a reasonable basis for apportionment exists.   These three premises lead inescapably to the conclusion that Defendants are jointly responsible for the abatement of the opioid epidemic in Cabell/Huntington.

### 1.    Joint and several liability applies to Plaintiffs' claims.

West Virginia's common law rule is that joint tortfeasors presumptively are jointly and severally liable to satisfy a judgment.[132]  Long ago, the Supreme Court of Appeals recognized that defendants who were concurrently liable in creating a nuisance were subject to joint liability.[133] Moreover, joint liability for abatement of a public nuisance is subject to a different and more liberal standard in equity:

> Upon the state of facts here disclosed, the law courts could only give damages for the wrong, and, if Defendants are not jointly liable, they could not be jointly sued at law.  Their creation or maintenance of nuisances, or both, is an entirely different thing.  As to that, they could be sued in equity before any damage had occurred.

---

[131] Doc. 1469.

[132] *Sitzes v. Anchor Motor Freight, Inc.*, 169 W. Va. 698, 289 S.E.2d 679, 684 (1982).

[133] *Baker v. City of Wheeling*, 117 W. Va. 362, 185 S.E. 842, 844 (1936).

> They could be enjoined by way of prevention of the contemplated injury. Although brought into existence or maintained by the separate acts of a number of persons, a nuisance, considered in all of its aspects and elements, may be an entire thing. Limited in its functions to a mere matter of compensation for damages, a court of law could not, under all circumstances, treat it as an entirety, but a court of equity can do so, because of its more extensive remedial powers.

*McMechen v. Hitchman-Glendale Consol. Coal Co.*, 88 W. Va. 633, 107 S.E. 480, 482 (1921).

While recently West Virginia Legislature limited the application of the common law rule of joint and several liability,[134] those enactments apply only to causes of action seeking damages.[135] The current 2015 Act does not apply to Plaintiffs' public nuisance claim seeking only equitable abatement relief. This Court recognized the inapplicability of these statutes in granting Plaintiffs' motion to strike Defendants' notices of non-party fault served pursuant to the 2015 Act.[136] Thus, common law joint and several liability applies in this case.[137]

---

[134] *See* W. Va. Code § 55-7-13c(a) (2015) ("2015 Act"); *see also* W. Va. Code § 55-7-24 (2005) (repealed 2015).

[135] W. Va. Code § 55-7-13c(a).

[136] *See* Order issued March 31, 2021 (ECF No. 1247) at 1 ("Plaintiffs' Motion to Strike Defendants' Notices of Non-Party Fault (ECF No. 224) is Granted"); *see also* Doc. No. 1083-3, *writ* denied, *State ex rel. AmerisourceBergen Drug Corp. v. Hon. Alan D. Moats*, ___ W. Va. ___, ___ S.E.2d ___, 2021 WL 2390204, at *2 (W. Va. June 11, 2021) ("We conclude that the Panel did not clearly err when it found that the 2015 amendments do not apply to the public nuisance claims."). As Justice Hutchinson recognized, this Court's order is consistent with the long-standing maxim that "[s]tatutes in derogation of the common law are strictly construed." *Id.* at *19 (Hutchinson, J., concurring) (quoting syl. pt. 1, *Kellar v. James*, 63 W.Va. 139, 59 S.E. 939 (1907) and citing syl. pt. 3, *Bank of Weston v. Thomas*, 75 W.Va. 321, 83 S.E. 985 (1914); syl. pt. 5, *Phillips v. Larry's Drive-In Pharmacy, Inc.*, 220 W. Va. 484, 647 S.E.2d 920 (2007).

[137] *See,* Doc. No. 1083-3.

2.   **Defendants have not met their twin burdens of showing either that the harms from the public nuisance are capable of being apportioned or any reasonable basis for apportionment.**

Since joint and several liability applies, once Plaintiffs establish that Defendants are "*a factor in causing some aspect of [their] harm*," the Plaintiffs have made a "*prima facie* showing," and Defendants then have the burden of showing the harm "is capable of apportionment."[138] Thus, Defendants bear the burden of demonstrating that both the Plaintiffs' harm and the applicable remedy are divisible.[139]

A public nuisance by its nature is a condition that typically is indivisible and for which liability cannot be apportioned.  The West Virginia Supreme Court of Appeals recognized over a century ago that, "[a]lthough brought into existence or maintained by the separate acts of a number of persons, a nuisance, considered in all of its aspects and elements, may be an entire thing."[140] This is especially so where, as here, a court is determining the application of an equitable remedy such as abatement.[141]  Defendants therefore must demonstrate that the nuisance harms caused by each potentially responsible party are clearly separable, or else their liability is joint and several.

---

[138] *Blankenship v. General Motors Corp.*, 185 W. Va. 350, 406 S.E.2d 781, 786 (1991) (emphasis in original); *see also Johnson by Johnson v. General Motors Corp.*, 190 W. Va. 236, 438 S.E.2d 28, 34 (1993) ("'If the alleged defect is proven by Plaintiffs by a preponderance of the evidence to have been a factor in causing Plaintiffs' injuries, then the manufacturer can limit its liability by showing that Plaintiffs' injuries are capable of apportionment between the initial collision and any injury enhanced by the alleged defect.'") (quoting jury instruction).

[139] *See*, *e.g.*, *Johnson*, 190 W. Va. 236, 438 S.E.2d at 33 ("However, if the jury is unable to apportion the damages, then the injury is indivisible and . . . the tortfeasors will then be jointly and severally liable."); *Grant Thornton, LLP v. FDIC*, 694 F. Supp. 2d 506, 525 (S.D. W. Va. 2010) (Faber, J.) ("'Unless sufficient evidence permits the factfinder to determine that damages are divisible, they are indivisible.'") (quoting Restatement (Third) of Torts § 26, cmt. g), *rev'd on other grounds*, 435 Fed. Appx. 188 (4th Cir. June 17, 2011).

[140] *McMechen*, 88 W. Va. 633, 107 S.E. at 482.

[141] *See id.* ("Limited in its functions to a mere matter of compensation for damages, a court of law could not, under all circumstances, treat [the nuisance] as an entirety, but a court of equity can do so, because of its more extensive remedial powers.").

Thus, Defendants' arguments that Plaintiffs' abatement plan should be rejected because it is not tied to Defendants' conduct fail on this basis. As do the claims that the Abatement Plan is not tailored to the wrong in this case because the Abatement Plan treats addicts who did not first become addicted as a result of Defendants' conduct.[142] Defendants complain that Plaintiffs have left the Court to speculate regarding what portions of the Plaintiffs' Abatement Plan is related to Defendants' unreasonable conduct;[143] however, the burden is on Defendants to show that the loss can be allocated and show a reasonable basis for the allocation.

Defendants are a proximate cause of the opioid epidemic in Cabell/Huntington and the evidence shows that it is reasonably certain that all of the elements of the Abatement Plan are necessary to abate the harms of the Opioid Epidemic.[144] Here, Defendants have not met their burden of showing both that (i) harms caused by the public nuisance are divisible and can clearly or reasonably be apportioned and (ii) that a reasonable basis for apportionment exists. Consequently, Defendants are jointly and severally responsible for the abatement of the opioid epidemic in Cabell County.

---

[142] *See* Doc. 1451 at 14-15.This argument also fails because the existence of the opioid epidemic proximately caused by Defendants is a contagion in the community that is a cause of new addictions -- regardless of whether the new addicts became addicted to pills or other opioids. Trial Tr. June 28, 2021 (Alexander) ("My plan is to abate the opioid epidemic in the community and I don't think that that can be done without – I think there's one epidemic, not two; an opioid epidemic, not a prescription epidemic and a fentanyl and heroin epidemic.").

[143] Doc. 1453 at 68-69.

[144] Trial Tr. 6/29 (Barrett) at 158 ("Dr. Alexander was looking at the needs, as opposed to what's currently available").

**B.     Defendants' Specific Challenges to the Scope of Abatement Plan Fail.**

Defendants make a number of other challenges to the Abatement Plan. Defendants' challenges are both factually inaccurate and/or ignore Defendants' liability to abate the opioid epidemic. None succeed.

**1.     The Abatement Plan will not result in a windfall.**

Defendants claim that the Abatement Plan will result in a windfall. This is not true.

As an initial matter, a windfall to Cabell/Huntington would be an impossibility. Plaintiffs anticipate that a trust fund managed by trustees would be created to implement the Abatement Plan and that the trust would be governed by a board with representatives from the community, and appropriate professionals with established community partnerships.  The trustees would be under the continuing jurisdiction of the Court.  Plaintiffs anticipate that the trust documents and this Court's order establishing the fund would limit expenditures to implementing elevating the opioid epidemic in Cabell/Huntington as set forth in the Abatement Plan.

As the Abatement Plan proposes, ongoing monitoring would ensure that funds are directed appropriately; thus, for example, if take-up rates for treatment are initially lower than projected, funding would be used to increase supports to connect residents to treatment and to provide that treatment in later years.  Because neither Cabell nor Huntington would receive the funds, there could never be a windfall. Moreover, as Dr. Alexander repeatedly testified, the Plan itself is conservative, relying, for instance, on providing lower cost, non-in-patient treatment for the majority of individuals in treatment.[145]

---

[145] Trial Tr. June 28, 2021 (Alexander) at 165.

Defendants claim that the Abatement Plan fails to consider the amount of unmet need. Similarly, Defendants argue that that the majority of the programs under the Abatement Plan have not traditionally been provided by Plaintiffs and that the Plaintiffs do not intend to provide those programs and services.  Neither will lead to a windfall.

First, with respect to current funding, there is no question on this record that the current funding is unstable,[146] and stability is necessary for epidemic response efforts to be effective.[147] Moreover, current funding is clearly insufficient to implement the Abatement Plan and abate the opioid epidemic.[148] In addition to there being no guarantee, the current funding, largely consisting of grants, is also an irrelevant collateral source. [149]  The same is true for Medicare, Medicaid, and Private insurance.[150]  Defendants should not receive a windfall by letting private insurers, taxpayers, and those private entities who fund grants continue to bear the burden of attempting to fund the remediation of the opioid epidemic which Defendants caused.  And, as noted above, there can be no windfall to the Plaintiffs here because the use of the funds will be limited to the

---

[146] 6/16 Trial Tr. (Young) at 36 (existing grant funding is insufficient to sustain needed family support services); Trial Tr.6/28/21 (Alexander) at 34-36 (existing community programs would not suffice to abate the opioid epidemic, based on participant interviews, wait lists, programs at or near capacity, anticipated increased demand, unstable funding, continuing deaths, addiction); Trial Tr. 7/12/21 (Colston) at 159 (testified that she has no idea what the future holds with respect to federal or state funding of Cabell-Huntington response programs).

[147] 5/28 Tr. (O'Connell) at 36 (community needs long-term sustainable, reliable funding to make its epidemic response efforts work).

[148] Trial Tr. 6/29/2021 (Barrett) at 167-168 ("Being a local economist, I can't imagine that Huntington has $1.7 billion dollars available to invest today to cover the costs of this redress model over the next 15 years.").

[149] *Kenney v. Liston*, 233 W. Va. 620, 632, 760 S.E.2d 434, 446 (2014) (services rendered gratuitously or paid for by another are collateral sources).

[150] *Kenney v. Liston*, 760 S.E.2d at 629-630, fn. 41 and fn. 42 (Medicare, Medicaid, and private insurance are collateral sources under West Virginia law).  Of course, none of Defendants' "windfall" analysis considers subrogation claims by these payors.

Abatement Plan. Under these circumstances, the equities counsel against allowing Defendants to receive a windfall.[151]

Second, it was never the intent that Plaintiffs themselves implement the Abatement Plan. With respect to the past, the evidence shows Plaintiffs did not have the funds to implement the Plan.[152]  Plaintiffs seek the creation of a court supervised trust fund to implement the Abatement Plan.  It will be the responsibility of the officers of the fund to manage the implementation of the Abatement Plan.   Finally, the evidence at trial proves that the community has the ability to implement the services called for under the Abatement Plan.[153]

### 2.     Plaintiffs' expert testimony establishes their entitlement to future OUD treatment costs.

Defendants argue that Dr. Alexander's abatement plan overstates treatment need because another Plaintiff's expert,  Dr. Waller, testified that "the one-year success rate for OUD treatment is approximately 84%."[154]   From this misrepresentation of  Dr. Waller's testimony, Defendants jump to the conclusion that a large majority of the treatment expenses included in the abatement plan are not recoverable for individuals who do not currently have OUD.  Defendants are factually wrong.

---

[151] Plaintiffs recognize that the Court made a pretrial ruling conditionally admitting the evidence of these third-party payments. Doc. 1281-0 at 6. The Court reserved ruling on the question of whether "the collateral source rule does or does not apply as a substantive rule of damages in this case." *Id.* at p.7, n.3.

[152] *See supra* n. 148.

[153] Trial Tr. 6/28 (Alexander) at 97-99 (The Plan takes into account that the current programs are insufficient to abate the opioid epidemic because current programs or at or near capacity, funding is unstable, the number of deaths continue to rise as does the number of people with active addiction, and there is a demand to scale up services). *Id.* at 98 (Based on his experience and research, Dr. Alexander predicts that addiction and death will decrease by fifty percent in fifteen years if the Plan is implemented).

[154] Doc. 1451 at 16 (citing 5/4 Tr. at 216:6–15).

Dr. Waller was asked about "the short-term remission rate after one year" and testified that among "people on the medication" (i.e., patients who remain in medication-assisted treatment), the rate reflected in the academic literature is 70%.[155]  Thus, Dr. Waller's testimony referred to the "remission rate" among a subpopulation of individuals who receive medication-assisted treatment and remain in treatment for a full year; it did not refer to all individuals who *enter* medication-assisted treatment during a year.[156]  This is an important distinction because, as Dr. Alexander testified when asked about "treatment relapse or drop out," the occurrence of "relapse is an important feature of Opioid Use Disorder."[157]  Likewise, Dr. Lynn O'Connell testified about retention rates at the PROACT program in Cabell County, stating, "[W]e know that abstaining and stopping opioid use and finding a life of what we define as long-term recovery often takes individuals many attempts."[158]

Defendants also err by assuming without evidence that an individual who has been in treatment for one year and is in remission would no longer receive any form of treatment.  Dr. Alexander testified that opioid addiction "is a lifelong disorder [a]nd people, especially people that

---

[155] 5/4 Tr. (Waller) at 216. The 84% figure defendants rely on for their argument refers to the corresponding rate that Dr. Waller has achieved in his practice.  However, there is no basis for applying that rate to the population of individuals to receive treatment under Dr. Alexander's abatement plan.  For example, there is no indication of the distribution of levels of care (outpatient, outpatient intensive, rehabilitation and residential, or inpatient), the number of patients surveyed, or whether the patients are representative of the patient population in Cabell County or constitute a random sample. *See* 6/28 Tr. (Alexander) at 93-94. (Dr. Alexander testifying about American Society of Addiction Medicine levels of care).

[156] Trial Tr. 5/4 (Waller) at 211(explaining the 70% figure as "if they're retained in treatment at one year, their chances of maintaining what we call short-term or long-term remission in addiction").

[157]  Trial Tr. 6/28 (Alexander) at 50.

[158]  Trial Tr. 6/7 (O'Connell) at 57.

have active addiction, need long-term treatment."[159]   When asked to consider a hypothetical situation similar to the one Defendants advance in their brief, Dr. Alexander responded, "I mean, we're back to the assumption because I'm not aware of recommendations that people only receive treatment for one year."[160]   Relapse can also occur after someone has completed a course of treatment and is no longer receiving treatment.[161]

Moreover, Dr. Alexander's testimony establishes that the population of people with opioid use disorder is not static.[162]   Further, Dr. Alexander clearly rejected the assumption that underlies Defendants' math:

> Q. . . . We'd have another group of 2,500 in remission after the third year, and another group in remission of 2,500 after the fourth year, right? If we assumed an 80 percent remission –
>
> A. [by Dr. Alexander:]  If you would assume that this was a static population, *but we talked about the fact that this was a dynamic population*.[163]

Based on the evidence in the record, it is reasonable to infer that of the approximately 3,000 people Dr. Alexander estimates can receive treatment for opioid use disorder at a given time, some are

---

[159] Trial Tr. 6/28 (Alexander) at 170; *see also id.* at 51(Dr. Alexander referring to the heightened risk of death among individuals who have discontinued treatment); Trial Tr. 6/7 (O'Connell) at 19 (Dr. O'Connell testifying that "some individuals need to be on medication assisted treatment for a year; others, five years; others, it may be a lifetime").

[160] Trial Tr. 6/28 (Alexander) at 163; *see also* Trial Tr. 6/7 (O'Connell) at 58 (Dr. O'Connell testifying:  "For medication assisted treatment, the standard is that an individual should receive treatment for no less than one year.").

[161]  Trial Tr. 6/17 (Feinberg) at 150 (Dr. Feinberg noting that "Opioid Use Disorder is a chronic relapsing brain disease"); Trial Tr. 6/28 (Alexander) at 152 (Dr. Alexander referring to "someone who is living a happy, healthy life in recovery now in treatment from prescription Opioid Use Disorder who relapses").

[162] Trial Tr. 6/28 (Alexander) at 150-151 ("Q. . . . But it's not going to be a static population over time, correct?"  "A.  Yes.  It's a dynamic population. . . . [T]he individual people are not necessarily the same people.").

[163] Trial Tr. 6/28 (Alexander) at 161 (emphasis added).

entering treatment for the first time, some are continuing a course of treatment from previous years, some previously entered treatment but did not complete a full course of treatment, and some had completed a full course of treatment but have relapsed.

As such, Defendants' contention that one can calculate the number of unique people receiving OUD treatment in four years by multiplying the number of people who would receive opioid use disorder by 84% and then again by 4 is based on a series of assumptions that have no foundation in the evidence and which have been contradicted by testimony offered by Plaintiffs' well-credentialed expert witnesses.  Significantly, Defendants have not offered their own expert epidemiologist to estimate the number of individuals needing treatment in Cabell/Huntington, instead choosing to rely on unfounded, back-of-the-envelope math by defense counsel.[164]

Even if Defendants' argument had a legitimate factual premise, it legally misses the point. As a result of the epidemic, people will become addicted to and overdose on opioids.  There will be new cases that are required to be abated, whether or not they are the direct result of Defendants' conduct.  They will be a part of the opioid epidemic.  Defendants will remain a proximate cause of the epidemic.  In addition, trial evidence establishes that the existence of the opioid epidemic independently causes new addicts.[165]  Finally, to the extent Defendants wish to be relieved of

---

[164] *See, e.g.*, Trial Tr. 7/12 (Rufus) at 51 ("Q. [Y]ou don't challenge Dr. Alexander on what was medically necessary, his testimony on what is medical necessary for his abatement proposal; correct?  A. [by defense expert Rufus] I do not.  That's correct").

[165] Trial Tr. 6/28 (Alexander) at 152 (Dr. Alexander explained that you can have people who newly develop OUD in the future for all sorts of reasons and who join the population, and you could also have people who drop out of the population); *Id.* at 154 (Recognizing that "there is one opioid epidemic…there's a lot of dynamic of different directions that people may develop harms and experience harms and, you know, move towards recovery and then backslide, but it's one opioid epidemic. And so, my plan addresses that.").

40

liability for this part of the opioid epidemic in Cabell/Huntington, it is their burden to convince the Court what portion of this harm is proper to allocate elsewhere.[166]

### 3. The Abatement Plan does not require remediation based on the wrongs of others.

Cardinal challenges a number of remedies in the Abatement Plan as improperly requiring remediation based on the wrongs of others.[167]  But it does not address whether these alleged wrongs are foreseeably related to the harms it caused.[168]   Cardinal does not deny that these supposed wrongs of others are part and parcel of the opioid epidemic – indeed, with respect to physicians and medical boards, Defendants made them the focus of their defense.[169]  In any event, Cardinal's liability for these elements is a consequence of joint liability.[170]

The challenge to certain categories of the Abatement Plan as remote fairs no better. Defendants do not even attempt to argue that the need for any of these programs were not foreseeable –the touchstone for determining remoteness.[171]   Nor could they. For example, it

---

[166] The cases cited by Defendants are inapposite, as the experts failed to segregate conduct for which Defendants were liable from conduct for which *no one* was culpable.  *See, e.g., Hagale Indus., Inc. v. Land's End, Inc.*, No. 00-3474-CV-S-4, 2002 WL 34365830, at *5 (W.D. Mo. Dec. 2, 2002) ("Mr. Roberts' and most of Mr. Stickley's calculations are inadmissible because they failed to classify which costs were incurred because of Lands' End's alleged conduct and which costs were unavoidable.").  Here, because Defendants are a proximate cause of the epidemic, they are responsible for the entire epidemic unless they meet their burden to separate and allocate parts of the harm to others).

[167] Doc. 1453 at 56-64.

[168] *See*, *e.g.*, *Marcus v. Staubs*, 230 W. Va. 127, 139, 736 S.E.2d 360, 372 (2012) ("Petitioner essentially argues that criminal acts are *per se* intervening causes.  . . .  Once again, however, petitioner reles on a generality . . . with little regard for the exception [that] . . . a tortfeasor whose negligence is a substantial factor in bringing about injuries is not relieved from liability if the intervening acts were reasonably foreseeable.").

[169] Doc. 1453 at 23.

[170] See § V.A. herein.

[171] Doc. 1469 at 47-50.

41

certainly is foreseeable that if you generate a need for substance abuse treatment, additional medical professionals need to be trained to provide those services.

Finally, many of the rest of the challenged programs are parts of the opioid epidemic that must be addressed if the epidemic is to be abated.  School children in households with families with opioid use disorder, drug checking services, harm reduction services such as needle exchanges, and testing for HIV and HCV fall into this category.[172]   These are all necessary elements of the plan to abate the opioid epidemic in Cabell/Huntington.

## CONCLUSION

For all of the reasons set forth, this Court should deny Defendants' Motion for Judgment regarding Plaintiffs' abatement claims.

---

[172] Cardinal tries to distort Professor Alexander's recognition of the epidemic-relatedness of these public health harms and their treatment services by stating that "Cardinal is not responsible for 'the history of trauma' faced by 'women who are commercial sex workers' or the stresses of adolescence."  Doc. 1453 at 67 (quoting 6/28 Trial Tr. (Alexander) at 62.  Professor Alexander's testimony was describing an existing Cabell/Huntington court program he examined when developing his Redress Model.  *See* Trial Tr. 6/28. (Alexander) at 33-34 (."[T]he WEAR program is a separate tract within the Drug Court for women who are commercial sex workers and who have a history of trauma.").  Professor Alexander's Redress Model does not single out commercial sex workers for unique services but *does* recognize that many pregnant women and new mothers with OUD have likewise experienced significant traumas, including sexual assault and domestic violence.

Dated: July 26, 2021                                 Respectfully submitted,


**THE CITY OF HUNTINGTON**                           **CABELL COUNTY COMMISSION**

/s/ *Anne McGinness Kearse*                          /s/ *Paul T. Farrell Jr.*
Anne McGinness Kearse (WVSB No 12547)                Paul T. Farrell, Jr. (WVSB Bar No. 7443)
Joseph F. Rice                                       **FARRELL & FULLER LLC**
**MOTLEY RICE LLC**                                  1311 Ponce de Leon Ave., Suite 202
28 Bridgeside Blvd.                                  San Juan, Puerto Rico 00907
Mount Pleasant, SC 29464                             Mobile: 304-654-8281
Tel: 843-216-9000                                    paul@farrell.law
Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com
                                                     /s/ *Anthony J. Majestro*
Linda Singer                                         Anthony J. Majestro (WVSB No. 5165)
David I. Ackerman                                    **POWELL & MAJESTRO, PLLC**
**MOTLEY RICE LLC**                                  405 Capitol Street, Suite P-1200
401 9th Street NW, Suite 1001                        Charleston, WV 25301
Washington, DC 20004                                 304-346-2889 / 304-346-2895 (f)
Tel:  202-232-5504                                   amajestro@powellmajestro.com
Fax:  202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com                             Michael A. Woelfel (WVSB No. 4106)
                                                     **WOELFEL AND WOELFEL, LLP**
                                                     801 Eighth Street
Charles R. "Rusty" Webb (WVSB No. 4782)              Huntington, West Virginia 25701
**The Webb Law Centre, PLLC**                        Tel. 304.522.6249
716 Lee Street, East                                 Fax. 304.522.9282
Charleston, West Virginia 25301                      mikewoelfel3@gmail.com
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

**CERTIFICATE OF SERVICE**

I certify that on July 26, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ *Anthony J. Majestro*