IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
              Plaintiff,        :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.   :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
              Plaintiff,        :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 39
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

JULY 27, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:             Ayme Cochran, RMR, CRR
Court Reporter:             Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1            PROCEEDINGS had before The Honorable David A. Faber,
 2    Senior Status Judge, United States District Court, Southern
 3    District of West Virginia, in Charleston, West Virginia, on
 4    July 27, 2021, at 9:00 a.m., as follows:
 5            THE COURT:  Good morning, everybody.
 6            SIMULTANEOUS SPEAKERS:  Good morning, Your Honor.
 7            THE COURT:  I want to go over the schedule here
 8    just to make sure that I understand it and we're all on the
 9    same page.
10        The plaintiffs will take four hours today and rather
11    than break in the middle of their argument, we'll take a
12    late lunch.  And they're reserving two hours for rebuttal.
13        AmerisourceBergen will do a two-hour argument this
14    afternoon.  Tomorrow, we'll have Cardinal for two hours and
15    McKesson for two hours in the morning, take another late
16    lunch, and then come back for the plaintiffs' rebuttal.  Is
17    that -- is my understanding on that correct?
18            MS. MAINIGI:  That's correct, Your Honor.
19            MR. NICHOLAS:  Yes, Your Honor.
20            MR. HESTER:  Yes, sir.
21            THE COURT:  All right.  Mr. Farrell, are you going
22    to lead off here?
23        And I understand the mic is going to be down
24    temporarily, so keep that in mind.
25            MR. FARRELL:  Keep my voice up.
```

```
 1            THE COURT:  Right.

 2            MR. FARRELL:  Good morning, Judge.

 3            THE COURT:  Good morning, Mr. Farrell.

 4            MR. FARRELL:  I have the honor today to speak on

 5    behalf of Cabell County, West Virginia and, as you

 6    mentioned, I will reserve for tomorrow a few personal

 7    observations.  Today is about business and tomorrow will be

 8    more personal.

 9        So, I wanted to start off with where we began not only

10    in the opening, but in the first witnesses at trial.  And if

11    you'll recall, we called Dr. David Courtright as a witness

12    in this case.  He was the second witness.  And he was the

13    author.  And he wrote the books about the opioids and public

14    policy.  And he said something that I -- I think is poignant

15    for all of us to remember because this is an historic case.

16        What he said was, is that a historian is a person who

17    tries to tell a true story about the past based on primary

18    and secondary sources with an emphasis on primary sources

19    where they are available.

20        We endeavored throughout the last 38 days of trial, 40

21    live witnesses, 28 video witnesses, to present to you the

22    facts for you to assemble into the true story of what

23    happened in our community.

24        Distilling this down into some very basic fundamental

25    principles, what we have is, we have a number of puzzle
```

1      pieces.  Some people begin with a puzzle by taking and

2      separating them into colors.  Others break it out into

3      themes.  Sometimes, we build the frame first.  But what I

4      wanted to do was I wanted to get down to the very essence of

5      what our case is about and I drew up a formula as simple as

6      I could draw it up.

7          81 million pills distributed to a community of a

8      hundred thousand people or less isn't a substantial factor

9      in the opioid epidemic.  It will cause an opioid epidemic.

10         I want to start with that premise.  These three facts

11     on either side of the equal sign are undisputed in this

12     case.  There is no one who will stand up and has testified

13     in this court that the number 81 million is wrong.

14         The data that we entered, that we subpoenaed the

15     federal government for, that we fought for for a year, that

16     we processed, that we brought to you in painstaking detail,

17     is undisputed.

18         You have also taken notice of the population of

19     Huntington-Cabell County.  That's undisputed.  And I would

20     venture to say on the right hand of the equation there's

21     barely anyone that will dispute there is an opioid epidemic

22     in Huntington-Cabell County, West Virginia.  These are

23     facts, Judge.  Now, the link between the left side and the

24     right side is where we spent most of the trial and most of

25     the debate.

1        So, sometimes what lawyers like to do is they like to

2   go through all of the evidence, witness, by witness, by

3   witness, and almost like with a score card, as a baseball

4   fan, go through each witness and say, well, this witness hit

5   a single.  And this witness, he hit a home run.  And this

6   witness struck out.  And go -- if we were to do this for all

7   the live witnesses and all the video depositions, I'd

8   probably exhaust the entire amount of time that we have.

9        But instead, right up front, what I would like to do,

10  with your permission, is to present to you video clips of

11  two witnesses that were submitted for your review.  And

12  those two witnesses are Nathan Hartle and Tom Prevoznik.

13  They're both very short clips and they go right to the heart

14  of our causation case.

15       And so, for a little bit of background, Nathan Hartle

16  was designated by McKesson as their 30(b)(6) designee.  And

17  he was the very first witness that was deposed in this case.

18  The very first one.

19       On July 31st, 2018, I took his deposition in a 30(b)(6)

20  capacity and my colleague, who was here, Mr. Troy Rafferty,

21  took his deposition the following day, on August 1st, 2018,

22  in his individual capacity in regulatory compliance for

23  chain pharmacies.

24            MR. HESTER:  Your Honor, I hate to object, but I

25  do need to raise the point we have a motion pending as to

1    Nathan Hartle and to exclude his testimony from this trial

2    and I just need to preserve the record, need to preserve

3    that point.

4              THE COURT:  All right.  The record will show your

5    objection.  I'm going to allow him to do it, Mr. Hester, and

6    --

7              MR. MAJESTRO:  Your Honor --

8              THE COURT:  Mr Majestro?  I'm sorry.

9              MR. MAJESTRO:  Could we all just agree that all of

10   the objections that we've raised to evidence on both sides

11   are preserved so we don't disrupt each other over the course

12   of these closings?

13             THE COURT:  Well, I think they are, Mr. Majestro.

14             MR. MAJESTRO:  I do, too, Your Honor, and that's

15   why I would just like to let Mr. Farrell be able to continue

16   without any further interruptions.

17             THE COURT:  Okay, Mr. Farrell.  Go ahead.

18             MR. FARRELL:  The second witness that we're going

19   to show is Thomas Prevosnik and he is the Deputy Assistant

20   Administrator of Diversion Control Division for the DEA.

21   And he was designated as the 30(b)(6) designee by the DEA on

22   a laundry list of specific topics by both the plaintiffs and

23   the defendants and was deposed over three days.  Three

24   eight-hour days, we sat this nice gentleman in a chair and

25   asked him questions.  I have a short clip from him, as well,

 1    where I asked him five questions, a syllogism, if you will,

 2    that takes us through the causal connections.

 3         So, the first is Nate Hartle.

 4         (Recording played in open court as follows)

 5         If a wholesale distributor engages in unlawful conduct,

 6    should it be held accountable for the societal costs of

 7    prescription drug abuse?

 8         I believe distributors have a responsibility in

 9    preventing diversion.

10         Well, back to McKesson Corporation, which is you

11    sitting in the chair today.  Knowing what you know as the

12    30(b)(6) representative, the corporate designee, knowing

13    about your past conduct, knowing about the past interactions

14    with the DEA, I'm going to ask you again:  Does McKesson

15    Corporation accept partial responsibility for the societal

16    costs of prescription drug abuse in America?

17         Again, you know, I -- we're part of the closed system,

18    so we're responsible for preventing diversion.

19         So the answer is?

20         Again, I think we're responsible for something.  I

21    don't know what -- how you define all societal costs and --

22    I still believe it depends on different circumstances.

23         Sir, we're not going to parse out percentages.

24         Yeah.

25         Let's just talk globally for McKesson Corporation.  So

1    I don't want to put words in your mouth because it's got to

2    come out of your mouth.  So, the answer is yes or no?

3         I would say yes, partially.

4         (Recording concluded)

5              MR. FARRELL:  The second video clip is from Thomas

6    Prevosnick and I asked him five questions and he gives five

7    answers.

8         (Recording played in open court as follows)

9         Does the DEA take the position that the purpose of the

10   Controlled Substances Act and its federal regulations is to

11   prevent diversion?

12        Yes.

13        Does the DEA agree that diversion is foreseeable if

14   registrants fail to comply with federal law?

15        Correct.

16        And failure to comply enables more diversion.  Does the

17   DEA agree with that?

18        Yes.

19        Does the DEA believe that more diversion is detrimental

20   to public health and safety?

21        Yes.

22        Does the DEA agree that the more pills which unlawfully

23   enter the market results in more diversion?

24        Yes.

25        (Recording concluded)

1     MR. FARRELL:  So, Judge, respectfully, what we've

2  done in this case from July 31st of 2018 until you will see

3  here in April of 2019, we slowly built a record and we bring

4  this record to you and we believe that the record that we

5  have established has sufficient facts for us to meet all of

6  the elements of our case.  These two witnesses are but a

7  piece of the puzzle that we've put together.

8     So, in essence, where we're at in summation, Judge, is

9  here.  This is no different really than a jury trial, the

10  difference being you are both the finder of fact, as well as

11  making legal decisions.

12     Now, normally what would happen is that we would go

13  back in chambers with a court reporter and we would argue

14  for sometimes a day about the jury instructions.  And then

15  we would submit them and, in fact, in the old days, you

16  would put down in the left-hand corner "accepted",

17  "rejected", or "modified", or "withdrawn", and you'd have

18  all of these checks on those boxes.

19     THE COURT:  You did that in state court.  I never

20  let the lawyers do that.  I had ways to cut that short.

21     (Laughter)

22     MR. FARRELL:  So, what we've had here is we've had

23  plenty of briefing, 12(b)(6), 56, 62(c).  The law is the law

24  and I'm not going to dwell on it.  I'm not going to spend a

25  lot of time.  But I do want to point out a couple of key

1    components that summarize, from our perspective, the

2    elements that we're going to use.

3         So, jury instruction number 1, let's start with this.

4    And I think this addresses some of the questions that you

5    raised earlier and, you know, it's one of the things we

6    addressed when we first tried to understand public nuisance.

7         The term public nuisance is incapable of an exact and

8    exhaustive definition which fits all cases, because the

9    controlling facts are seldom alike, and each case stands on

10   its own footing.  That's 1960, *Harless v. Workman*.

11        I want to direct your attention to this last part.

12   Each case stands on its own footing.

13        So, what's the footing that we stand on, right?  What

14   -- where is it -- where are we coming from when we decide

15   that this is a public nuisance case?

16        And I'd like to make a reference to something that

17   Judge Goodwin said back in 2017 that caught my attention.

18   You're probably aware that your brethren has a few cases

19   with plea agreements and he's made some -- some opinions

20   that went all the way to the Fourth Circuit and this is what

21   he says:  There is a clear, present, and deadly heroin and

22   opioid crisis in this community.  West Virginia is ground

23   zero.

24        So, from this standing, this is the footing upon which

25   we're going to bring a public nuisance case.  We have two

1    very good pieces of law for us to take a look at.  The first

2    is general in nature.

3         And you'll recall that Judge Chambers, your brother in

4    Huntington, has *Sigman v. CSX,* a 2016 case, where he cites

5    and acknowledges *Hart v. Mountain Fork Lumber Company* from

6    1945.  And in this it's three sentences.  It's probably the

7    most cited reference in West Virginia law on public

8    nuisance.

9         And, Judge, if I may step down?

10              THE COURT:  Yes.

11              MR. FARRELL:  And what I'd like to do, and I know

12   I'm going to be off mic, but I'll try to raise my voice a

13   little here.

14              THE COURT:  I'm hearing you just fine so far, Mr.

15   Farrell.

16              MR. FARRELL:  1, 2 and 3, three sentences, and I'd

17   like just to draw your eyes and your attention to a couple

18   of key things.

19        A public nuisance is an act or condition.  So, we have

20   alleged the condition in this case is the opioid epidemic

21   and we've definitively defined it in the record as

22   addiction, abuse, morbidity and mortality.

23        Number two, there's a distinction between public

24   nuisance and private nuisance.  We've briefed this.  We've

25   talked about it.  But this is really my first chance to make

1    some commentary on it.

2        You see, the individuals in the community have standing

3    to bring a cause of action on their own behalf on behalf of

4    their own damages.  The County Commission and the city

5    government could bring a private cause of action for their

6    own expenditures.  That's not what we've done here.

7        Rather, what we've done is rather than bring cases on

8    behalf of the standing of the individual, we've brought the

9    case on behalf of the general public because, as number 3

10   says, it is the duty of the proper public official to

11   vindicate those rights.

12       The next section is the Restatement of Tort (Second)

13   and, as you'll recall, there's a whole string cite where

14   federal and state courts have acknowledged that West

15   Virginia precedent follows the Restatement (Second) of

16   torts.

17       These are the elements that we tick off as we go down

18   our list of evidence.  This is the framework of the puzzle.

19   This is the burden we have to carry.

20       And what it's my intention to do is, through a verdict

21   form, walk you through each of those elements and show you

22   in the record where we have established facts to support

23   your findings.  That's my intention for today.

24       So, there are eight questions that I think are

25   pertinent.  There may be more, right, but there are eight

1    that I think are a proper framework for us to address.  And

2    I could sit here for an entire day and go through all of the

3    evidence.

4         Notably, you didn't make any findings of cumulative

5    throughout the trial.  That's with kudos to my colleagues on

6    both sides.  But there is voluminous evidence that you can

7    draw on.

8         So, question number 1, is there presently an opioid

9    epidemic in Huntington-Cabell County, West Virginia?  Even

10   if everybody believes this to be true, we still have the

11   burden to come to you and prove it.

12        We could ask you to take judicial notice.  We could

13   file admissions.  But, in essence, we have to create a

14   record for you to check yes on this.

15        This is the evidence that we have put into the record

16   that we believe is undisputed.  It's a heavy weight of

17   evidence.

18        Between 2015 and 2020, we presented the testimony of

19   Connie Priddy and through three exhibits, two entered by the

20   plaintiffs and one by the defendants, we've established

21   6,494 overdoses occurred in Huntington-Cabell County, West

22   Virginia.  That's a population of less than a hundred

23   thousand people.

24        Through Dr. Smith, you'll recall Dr. Smith, Gordon

25   Smith, who is the Australian epidemiologist who is now at

West Virginia University.  He didn't extrapolate.  He didn't
study with numbers and take -- he went and studied himself
the number of fatalities in Huntington-Cabell County, West
Virginia.  The gold standard.

I don't know of any other place in the country that has
gone into that much detail to document the overdose
fatalities in Huntington-Cabell County, West Virginia.
1,151 lost souls to the opioid epidemic.

We called Dr. Joe Werthammer.  You will recall Dr.
Werthammer was a neonatologist and he was the one that came
in and talked about how they started with so many babies
that they had to divide out their neonatal unit between a
NICU and an NTU, a Neonatal Therapeutic Unit, Lily's Place,
and he testified that he estimates that today, in
Huntington-Cabell County, West Virginia, there are living
2,500 babies, young children born and diagnosed with
Neonatal Abstinence Syndrome.  This is the group of young
children that we will be taking care of for the rest of
their lives in this community.

And then the final piece is the Opioid Use Disorder.
You heard from several different places, but as you recall,
Dr. Katherine Keyes, she was the epidemiologist from
Columbia, and she came in and she walked through the
methodology of what she estimated to be the number of people
that are currently suffering from Opioid Use Disorder in

1    Huntington-Cabell County, West Virginia.

2         Our population has dipped down since the 2010 census to

3    somewhere around 90,000.  So, that's 8,200.  That's almost

4    ten percent of the residents could be classified as

5    suffering from Opioid Use Disorder.

6         But not only did we present those facts.  We also asked

7    the defendants themselves.  We said, do you acknowledge

8    there's an opioid epidemic?

9         You heard perhaps some of the lawyers throughout the

10   case stand up and say nobody is disputing that there's a

11   problem in Huntington, but the lawyers aren't evidence.  The

12   witnesses are.

13        We also brought in four different expert witnesses.

14   And then, if you look here, starting at the bottom left, we

15   presented evidence from a national perspective; the bottom

16   right, from a state perspective; the top left, from a county

17   perspective; and the top right from a city perspective.

18        And then we called witnesses, both in public health and

19   in public safety, who each testified.

20        Now, I could do this for all eight of the questions.

21   I'm only going to go into this much detail on the first one,

22   but we have actually documented for you by transcript record

23   and page the references to submit to the Court.  For each of

24   the experts the question was specifically asked of them,

25   including the defendant's own expert.

1          We've submitted the documents.  The first is the OIG

2     Report, which you probably have 15 copies of by now because

3     of the number of references to it.

4          This is the -- this is the historical overview.

5          You'll recall Dr. Gupta when he came into office.  One

6     of the things he did was to document what was actually

7     happening in West Virginia.

8          The Resiliency Plan where the County and City and all

9     the healthcare providers and community leaders got together.

10    They have offered evidence that there's an opioid epidemic.

11         The City of Solutions with our mayor, who is here with

12    us today, they've put into record that there is an opioid

13    epidemic.  So, we think definitively you can sit here and

14    say check yes to number 1.  We got number 1 down, a check

15    mark yes.

16         I don't think there'll be much dispute, but when we go

17    through the rest of the questions, you'll see they are of

18    increasing importance.  I staged them that way.  And I'm

19    going to just highlight for the Court where I'd like to draw

20    your attention to make a definitive answer.

21         The second question, is the opioid epidemic a

22    significant interference with public health and safety?

23    Now, initially, we thought perhaps this was a legal question

24    because the defendants filed a 12(b)(6) and there has been

25    some argument, which was denied.  This Court has said that

1    the -- that at least from a public health perspective it is

2    a public right.

3         But even if we get over the legal obstacle, which we

4    have, we nonetheless spent time in this courtroom

5    establishing a factual record to support your finding.  The

6    first thing that you can reference is Congress itself, in

7    1970 -- as a side note, when I first began looking into this

8    case, the first thing that I did was I went and looked at

9    the U. S. Code.  And in the very first provision, 801, it

10   has a statement that I probably could not have written any

11   better myself for this case.

12        The illegal distribution, among other things, of

13   controlled substances have a substantial and detrimental

14   effect on the health and general welfare of the American

15   people.

16        You can also go and look at the definition of "addict"

17   in the U. S. Code.  In 802(1), the very first definition in

18   the Controlled Substances Act, it says that the addict means

19   any individual who habitually uses any narcotic drug so as

20   to endanger the public morals, health, safety, or welfare.

21   In Huntington-Cabell County, West Virginia ten percent of

22   our population is addicted.

23        We also put in testimony from Mr. Prevoznik from the

24   DEA.  He makes a comment that filling suspicious orders is a

25   detriment to the public health and safety.

1        The testimony of Joe Rannazzisi, who came live to

2   testify, and what he said, that the failure to maintain

3   effective controls is an imminent threat to public safety.

4        We asked witnesses.  You'll recall Chris Zimmerman, the

5   Senior Vice President from AmerisourceBergen.  I asked him

6   specifically, do you acknowledge that the opioid epidemic

7   has had a devastating impact on public health and public

8   safety?  He says yes.

9        Joe Werthammer, Dr. Gupta, and then even Dr. Gilligan

10  from Harvard, Women's and Brigham Hospital.  And I want to

11  read to you the statement that I read to him because I think

12  this answers question number 2 in the affirmative.

13       Question, the magnitude, severity and chronic nature of

14  the opioid epidemic in the United States is of serious

15  concern to clinicians, the government, the general public

16  and others.  Do you agree with that statement, sir?  He

17  said, yes, I do.

18       Two more documents.  The only medical literature that's

19  entered in the record at the defendants' request is from Dr.

20  Compton, the National Institute of Health, the 2019 article,

21  and he specifically references that the opioid epidemic is a

22  crisis in terms of both mortality and morbidity and

23  underscored the complexity of the public health, public

24  safety, and clinical response.

25       And then, finally, you have the Harm Reduction Plan

1    that the State of West Virginia entered.

2         The heroin and opioid epidemic is one of the great

3    public health problems of our time, period.  That's a fact.

4    And, of course, this Court, last year, referenced that our

5    Former President of the United States has entered --

6    declared that the opioid crisis is a public health

7    emergency.  I don't think that there's any reasonable person

8    that can say that number 2 is anything other than a yes.

9    Number 2 is a yes definitively in this record.  It should be

10   undisputed.

11        Number 3, was diversion of prescription opioids a

12   substantial factor giving rise to and fueling the opioid

13   epidemic?  What this is, is general causation, Judge.  We

14   had to identify for the record the concept that what was

15   driving and fueling this opioid epidemic was the diversion

16   of prescription opioids.

17        And, as Joe Rannazzisi testified, a breakdown of the

18   closed system will cause diversion.  Will cause diversion.

19   And he said on Volume 21, Page 178, Lines 2 through 4, when

20   prescription opioids are diverted, they're used illicitly.

21   People become addicted, people overdose, and people die.

22        In Joe Rannazzisi's first Dear Registrant letters to

23   the defendants, that's P-32 at Page 10, it says that the

24   dangerous and potentially lethal consequences of such abuse,

25   even just one distributor that uses its DEA registration to

1    facilitate diversion can cause enormous harm.  I'm going to

2    come back to that word facilitate eventually.

3        I'm not going to read each of the question, but this is

4    a repeat.  The five questions we asked the DEA, the five

5    questions in the record, April 18th, 2019, Page 641 through

6    643.  Diversion happens in America and when the volume goes

7    up, the diversion goes up.  And the more diversion there is,

8    the more dangerous it is to public health and safety.

9        Now, Your Honor, you could also check yes to number 3

10   just by using common sense and basic logic.  As Nate Hartle

11   said in the very first deposition in the case, using common

12   sense and basic logic, you can assume the more pills that

13   are out there, the more potential for diversion there could

14   be, right?

15       But you don't have to guess because you will recall Dr.

16   David Courtright came in this courtroom and testified that

17   the historical record contains evidence from primary sources

18   that supply was a substantial factor giving rise to prior

19   opioid epidemics in the United States.

20       You'll recall, Judge Faber, that there were no

21   questions asked of Dr. Courtright.  His testimony went in

22   uninterrupted.  Un-refuted.  And what his testimony here

23   says is that supply being a substantial factor is not just a

24   theory.  It's a historical fact.  It makes it foreseeable.

25       You also have from Harvard Medical School Dr. Gilligan.

1    His testimony, Page -- Volume 34, which is Day 34.  At Page

2    181, Lines 19 through 20, he testified, there is a

3    significant amount of diversion and improper use of opioid

4    analgesics.

5        Now, to get to one final point, and I'm not going to

6    belabor this because it's technical, but it's important.

7    And I put it up front to make sure that I had enough energy

8    and focus to walk through this.

9        Dr. Gupta, when he was here as our Commissioner of

10   Public Health, published a series of reports and I have put

11   the P numbers that are all in evidence on this.  These

12   reports that he walked through for a day and a half

13   definitively established what was happening with diversion

14   in West Virginia.

15       And I want to talk about the social autopsy for a

16   second.  I feel as if this part of the testimony didn't come

17   in as clean as -- as I was hoping.  It's because it's a

18   technical piece.  He was being cross-examined on it.  And

19   so, it wasn't a format.  So, the record is in.  You can read

20   this at P-44211.  But I want to explain what he did.

21       Dr. Gupta wanted to figure out what was happening and

22   why people were dying from opioid overdoses.  And so, he

23   went and identified every single overdose that happened in

24   the State of West Virginia in the year 2016, all 830 of

25   them.

1      And, in essence, what he did was contact tracing.  He

2    went backwards in time with the help of all of his

3    colleagues to trace the history of each of those

4    individuals.  And what he was able to determine was that

5    there was a significant percentage of those that died that

6    had prescription opioids in their system with no

7    prescription.

8      That is the seminal evidence, the first case in the

9    country to do that.  Not a subset.  He wasn't extrapolating.

10   He went and looked at every single overdose in West Virginia

11   in 2016.

12     So, the question number 3, was diversion of

13   prescription opioids a substantial factor?  We have put on

14   sufficient evidence for this Court to find that nobody can

15   dispute that diversion is a substantial factor in the opioid

16   epidemic in Huntington-Cabell County, in West Virginia, and

17   in the United States.

18     Question number 4 is not typically a question that a

19   jury would entertain.  This is a legal question.  Do the

20   defendants owe a duty to maintain effective control?

21     I just want to make a couple of comments on this, on

22   stuff that perhaps hasn't had the emphasis to draw your

23   attention to at the end.  Dr. Courtright testified, and it's

24   un-refuted, that the Controlled Substances Act reformed drug

25   policy in the United States creating one organic body of

1    law, which included a closed system to prevent diversion of

2    prescription narcotics.  This goes to foreseeability.

3         The reason and purpose of the Controlled Substances Act

4    was to prevent diversion.  And violation of the Controlled

5    Substances Act leads to diversion, an un-refuted historical

6    fact in the record.

7         This is -- this is another aspect that we've kind of

8    bounced around.  What level of conduct?  What's the

9    measuring stick for the conduct for the defendants?

10        Is it the Controlled Substances Act?  Is it the CFR?

11   Is it negligence?  Is it -- what is -- how do we measure the

12   conduct?

13        Well, I want to point out a couple of things because

14   this kind of dovetails into the remoteness argument, as

15   well.  In 1983, *Robertson v. LeMaster*, my good friend, Bob

16   Fitzsimmons, continues to remind me this is the most

17   underused syllabus point in civil practice.

18        One who engages in affirmative conduct, and thereafter

19   realizes or should realize that such conduct has created an

20   unreasonable risk of harm to another, is under a duty to

21   exercise reasonable care to prevent the threatened harm.

22        So, in this context, Judge, the defendants, the

23   distributors, engaged in affirmative conduct by distributing

24   81 million prescription opioids into a community of less

25   than a hundred thousand people.

1        Now, just taking a step back, what do you think is

2    going to happen anywhere in America if you dump 81 million

3    pills of pharmaceutical grade heroin into a community of a

4    hundred thousand?  It's not conjecture.  It's a fact.

5        They were under a duty to prevent the threatened harm

6    of abuse, addiction, morbidity and mortality and they

7    failed.  Their argument is that the injury that we're

8    alleging, the harm, the related harm of the opioid epidemic,

9    is too remote for them to be responsible.

10       Again, from West Virginia law in 1988, *Sewell v.*

11   *Gregory*, the test is -- the test is would the ordinary man

12   in the defendants' position, knowing what he knew or should

13   have known, anticipate that harm of the general nature of

14   that suffered was likely to result?

15       Again, what is that they knew and, if they didn't know,

16   should they have known was the nature of a general harm of

17   dumping 81 million pills of prescription opioids into a

18   community?  How can anybody say that heroin is too remote of

19   a consequence after dumping 81 million pills of the same

20   molecule into a community?

21       The risk reasonably to be perceived defines the duty to

22   be obeyed, *Mallet v. Pickens,* representing Justice Cardozo,

23   that's *Palsgraf*.  They would have you find that the related

24   harms are remote from the distribution of 81 million pills.

25   We would argue that they're direct and we'll get into that

1    more later.

2         Now, I'm going to fly through these because this is

3    still under duty, but I do want to make reference, and this

4    is for the Court, that in the DEA 30(b)(6) deposition the

5    DEA was asked two things.

6         One, they were asked, do you agree with the plaintiffs'

7    positions?  And, two, do you agree with the defendants'

8    positions?

9         But, more importantly, we framed the questions in terms

10   of was this consistent with the advice that you were giving

11   to the defendants?

12        The record is replete with repeated statements from the

13   DEA and, Judge, I'm here to tell you that the positions

14   taken by the DEA are consistent with *Masters Pharmaceutical*.

15   Consistent with the MDL in Cleveland with Judge Polster.

16   They're consistent with Judge Breyer in San Francisco.  And

17   they're consistent with every, every piece of legal ruling

18   you've made in this case and that the defense positions that

19   it has taken regarding the Controlled Substances Act in this

20   deposition have been repudiated.

21        In fact, I want to walk through precisely where one of

22   the conflicts is.  You'll recall Chris Zimmerman.  He is the

23   Senior Vice President for AmerisourceBergen.  He testified

24   it's not our job to police the pharmacies.  It's not our

25   job.

 1          He testified that the duty that they have is only

 2     imposed upon AmerisourceBergen while the pills are in their

 3     possession.  Diversion, to him, means I didn't have any

 4     leakage from our warehouse.

 5          He testified that they're responsible to make sure that

 6     transportation company gets the pills from the -- from their

 7     warehouse to the pharmacies.

 8          And then, as you recall, I held up Joe Rannazzisi's

 9     letter number 1 from 2006 and I read to him the passage.  I

10     read to him the passage about due diligence to avoid

11     suspicious orders and his answer in Volume 8, Page 218,

12     Lines 19 through Page 219, Line 4, is that he doesn't agree

13     with the DEA's position in Rannazzisi letter 1.

14          Nonetheless, we believe that Your Honor was correct and

15     that the factual record supports your finding that the

16     defendants do owe a duty.

17          So, the next question, number 5, and I guess this

18     question we spent a lot of time on.  Was the conduct by the

19     defendants unreasonable?

20          So, as you'll recall in the standing order that you

21     entered and in the briefing, there is a debate on what kind

22     of conduct is actionable.  This Court has written an order,

23     and we agree, that the conduct that the defendants engaged

24     in will be measured by reasonableness.

25          And so, with that, if you look at the undisputed record

1    in this case of the volume of pills sold by the defendants,

2    it's -- it's more than 80 million pills.

3         Judge, I proffer for the Court and I say to you that on

4    its face, selling 81 million pills to a town of less than a

5    hundred thousand people, prescription opioids, is

6    unreasonable per se.  I don't know of anywhere else in the

7    country that can show this tsunami of pills.

8         What I have also done with this is to support Question

9    5 with any permutation of any legal change.  I have what we

10   call in state court special interrogatories, but in the

11   Federal Rules, they call them a special verdict.  I came up

12   with a special verdict for you, Judge, and it has six

13   questions in it so that each of these six questions is

14   supportive of finding the conduct was unreasonable.

15        Now, make it clear, we don't have to prove all six of

16   these for you to find in our favor.  You've just got to find

17   one.  One on any of these six questions, we believe is

18   sufficient for you to find under public nuisance law of an

19   unreasonable interference.  And I'm going to walk through

20   each of them.

21        Did the defendants unreasonably fail to maintain

22   effective control to prevent diversion?  Now, I think this

23   answer we've established with the volume alone that the

24   answer is yes.  It has to be yes.

25        But to illustrate this, I was thinking about the

 1    findings of fact because, as you know, we've had teams of

 2    lawyers on both sides working on these findings of facts and

 3    conclusions of law but, ultimately, you're going to have to

 4    write this order.  And I think, I hope, I pray, that you

 5    believe we've presented overwhelming evidence for this

 6    statement to be true and you're going to have to fill in the

 7    blank.

 8         And there's -- various courts have used various words

 9    and phrases, but you're going to have to come up with your

10    own synonym.  So, I've got a couple for you.

11         The massive volume of prescription opioids distributed

12    by the defendants demonstrates failure to maintain effective

13    control.  You could call it sheer volume, colossal volume,

14    mountainous volume for West Virginia mountains, staggering,

15    astronomical, obscene.

16         But here's the point, Judge.  There's only one word you

17    have to use to make this finding and that's unreasonable.

18    We think you check yes to 5-a under any of these adjectives

19    on volume alone.

20         Now, 5-b, did the defendants fail to design and operate

21    an effective Suspicious Order Monitoring System?  This is,

22    as some of my colleagues say, is when we got into the weeds,

23    went down a rabbit hole.  But I want to spend a few minutes

24    talking about, just in general, a couple of things.

25         Judge, when you look at any one of the matrixes, it's a

1    series of transactions.  The defendants have an obligation

2    under law to look at these series of transactions and

3    identify orders of unusual size, frequency or deviation from

4    a normal pattern.

5         What we've done in discovery is we've attempted to

6    apply their own rules.  That's C -- that's D, E and F.

7    We've attempted to apply the rules that come from the

8    *Masters Pharmaceutical* case.  That's A and B.  And we

9    attempted to apply the rule that our expert witness, Jim

10   Rafalski, used in the *Mallinckrodt* case.

11        What we're suggesting to you, Judge, is it doesn't

12   matter which of these you use.  And what's interesting is

13   that the defendants didn't rebut this by showing up and

14   applying their own matrix.

15        In fact, when they called their witnesses, their

16   algorithm experts, we asked them, did you apply the

17   methodology, the algorithm of the company that hired you to

18   come here today?  And they said no.

19        They would poke holes in everybody else's algorithms,

20   but as I'm going to demonstrate, no matter which of these

21   algorithms we used, the patterns of the volume in this case,

22   the alarm bells should have been going off and, if the alarm

23   was not going off, then there's a design defect in their

24   program to begin with.

25        So, here's how we start it, and this is a point that we

1    probably tested your patience with, but it was necessary for

2    a very important reason.  The systems the defendants were

3    using were nationwide and systemic.  What that means is, is

4    that there was a corporate headquarter policy.  There was a

5    single system and it applied to every distribution center in

6    America.

7         We put the volume, the page, and the line numbers

8    because we think this is an important fact that is

9    undisputed in the record.

10        When you look at the testimony of Joe Rannazzisi, he --

11   we've cited in the record each of the three companies'

12   testimony that documents that the administrative actions

13   that were taken were taken for systemic failures.

14        And then, finally, we showed that the defendants were

15   warned by the DEA.  That's the black flags.  And that each

16   defendant was sanctioned by the DEA.  And we put the P

17   numbers in, which are the exhibits for you to look at

18   directly.

19        Another point for you to consider on their designs.

20   Each defendant, at some point in time, used a three-times

21   multiplier to flag suspicious orders.  So, as you recall,

22   one of the things that I try to do is to use analogy and

23   experience to try to understand new concepts.

24        And this is the new analogy I have for you -- a hot

25   water tank.  What -- what do you think your hot water tank

1    is set at in your basement?  110 maybe, right?  There is

2    some level of hot water that is acceptable.

3        If you set your hot water tank's safety valve, then it

4    doesn't trigger unless it gets up to 330 degrees.  You're

5    missing an entire range of some dangerously hot water.

6        That's what a three-times multiplier is.  Their alarm

7    bells were set for a hot water tank to give people notice if

8    the water got higher than three times 110.  And, as we'll

9    show you, the water got up to five times, six times, seven

10   times, eight times in the record.  And if the alarm went

11   off, then somebody re-set it and shipped again the next

12   month.

13       This is another point that I think is a problem for the

14   defendants.  It's undisputed in the record.  Once the system

15   was flagged, they were under an obligation to freeze the

16   account.

17       And, Judge, I even pulled -- if you'll recall, Steve

18   Mays from AmerisourceBergen, he testified with this

19   document.  This was the policy at AmerisourceBergen from '07

20   to 2014.  And you'll recall we walked through the sequence,

21   the flow of events.

22       And once an order is flagged by the system, it is --

23   the system is designed to hold current and all future orders

24   from customers of like items.  Once the fire alarm goes off

25   and the system is triggered, all further shipments are

1    supposed to be locked out until somebody comes in and does

2    due diligence and hits the re-set button.

3        This is why, when you look at some of the data that

4    we've put in, we can't find a whole lot of due diligence.

5    So, this is why, when you look at this compilation slide of

6    two different things, this is 44765 on the threshold, and

7    this is one of Craig McCann's charts.

8        This is SafeScript Pharmacy.  Here's the date range.

9    Here's the volume by month.  So, when you look at this, the

10   national average is somewhere around 5,000.  If you take

11   three times 5,000, the line should be somewhere around here.

12   AmerisourceBergen shipped more than that to this pharmacy

13   repeatedly and there is no due diligence sufficient to come

14   in and say it was justified.

15       Some of these defendants used thresholds.  This is the

16   threshold for SafeScript in the record.  As of July of '07,

17   their threshold was 10,000 pills.  What that means is the

18   algorithm should have shut down any pills above 10,000 in a

19   month and, as you can see, every month is in excess of

20   10,000 without any justification in the due diligence.

21       Furthermore, when you go down and look at the threshold

22   changes, somebody internally was raising the alarm level all

23   the way up to 45,000 pills a month before it gets triggered.

24   Perhaps they got tired of the fire alarm being tripped

25   repeatedly, and so they raised the threshold, but we don't

1    know because there's no due diligence.

2         The defendants are going to argue, oh, but there was

3    due diligence.  We just didn't keep the records long enough.

4    We weren't required to keep the records long enough.

5         And as the DEA testified under 30(b)(6), that is an

6    argument they've heard before.  And in the *Masters*

7    *Pharmaceutical* case, on Page 218, the DC Circuit Court not

8    only rejected that as an affirmative defense, they used it

9    as evidence that no such transaction occurred.

10        5-c and 5-d, I could spend all day on our matrices.

11   Right?  These are the three matrices.  But what I've done

12   instead is this.

13        I've made for Your Honor copies of my big board and

14   what I'm asking you to do is to take these back into

15   chambers, true and accurate blowups of the paper, stick it

16   on your big oak desk, and then look through it yourself.

17        Column 1 is the national average.  Column 2 is the

18   state average.  Column 3 is the county average.  We then put

19   month, by month, by month, the transactions with pharmacies

20   in Huntington-Cabell County, West Virginia.

21        And then, just to show this wasn't an anomaly, but that

22   it was a systemic failure, we put all of the others over

23   here from around the region.  And the defendants, what the

24   defendants' argument in this is, is not that any of these

25   numbers -- I want to get this right.

1          Their argument is not that these numbers are incorrect.

2     Their argument is, is that you shouldn't be allowed to see

3     outside of Cabell County.  Let me say that again.

4          I'm not being pejorative about it.  They're good

5     lawyers.  I respect every one of them.  It's the same

6     defense I would make.

7          They're not arguing that this volume is wrong.  What

8     they're arguing is you should only look at this part.  I

9     submit to you, sir, that if you look at just this part, you

10    can reach every conclusion supporting our case.  And, when

11    you look at the rest, there's no doubt that this system, if

12    it was designed to trigger, then they were not operating it

13    as such.

14         So, I have P numbers.  On one side is the hydrocodone.

15    On the other is oxycodone and with your permission --

16         Now, 5-e, the defendants argued that it has to be

17    reckless conduct, that they can't be held liable in public

18    nuisance unless their conduct is reckless.  I guess they're

19    immune unless the conduct rises to the level of reckless.

20         Well, I've got three pieces of evidence, and I'm not

21    going to belabor the point, but this is probably the one

22    that I think jumps out at me immediately and that's because

23    it comes from AmerisourceBergen.  And you'll notice it's the

24    Columbus division, Lockbourne.

25         This is the fellow in charge of regulatory compliance

1    for Huntington-Cabell County, West Virginia.  That's his

2    job.  And what he's talking about in 2012 is when SafeScript

3    got shut down by the DEA and he said, hey, you might want to

4    look at this.

5        But that's not why I bring your attention to it.  I

6    bring your attention to it because of his signature block.

7    My signature block says, "Facts are stubborn things" from

8    John Adams.  His signature block is from Pope John XXIII and

9    says, "See everything, overlook a great deal, correct a

10   little."  If that's not the perfect argument for me to make

11   in closing of what happened here, the defendants saw

12   everything.  They overlooked a great deal.  And they

13   corrected very little.

14       Number 2, and this is a little more callous, but I put

15   it in here simply because this goes to heroin and related

16   harms.  The defendants knew it.  The lawyers make great

17   lawyer arguments.  The defendants know heroin is a related

18   foreseeable harm from prescription opioids.  And the reason

19   they know it is that, in this article, in this e-mail

20   string, P-16690, when you read it yourself, the article says

21   that prescription drug sales are plummeting and that heroin

22   deaths are rising.

23       That's what this e-mail string is doing.  It's

24   forwarding that newsletter and this fellow says, good.  Let

25   them move to heroin and meth.  We don't have to monitor

 1    that.  Now, this goes to the people at the top of the chain,

 2    including Michael Oriente, who took the stand.

 3        And then, finally, for Cardinal Health, they identified

 4    back in 2012, in P-2803(8), a particular pharmacy in

 5    Huntington, West Virginia, The Medicine Shoppe, and in this

 6    e-mail the Cardinal Health person said that there was a

 7    black hole.  And then I want to read into the record what

 8    this says.

 9        "This pharmacy has experienced significant growth from

10    the stimulant drug families and new pain clinic business.

11    QRA vetted the new pediatrician prescribing stimulants and

12    nothing significant appeared from a DEA license search."

13        And this is the next sentence.  "A competitor in town

14    was raided by the DEA, which resulted in the arrest of a

15    non-pharmacist owner.  The Medicine Shoppe has seen a

16    significant growth in both areas and, to my knowledge, a

17    site visit has not been conducted after submitting six

18    requests to validate growth and the information being

19    provided to corporate."

20        What they're talking about here is the SafeScript

21    getting shut down and the -- the people that were going to

22    the SafeScript are now going to the Medicine Shoppe.  And

23    when you go and look at Cardinal Health's matrix and you

24    look at the volume here, you'll see that the people on the

25    ground were asking corporate to look into it and they sold

```
 1    more pills.

 2         This is like playing Whack A Mole for the DEA and

 3    Cardinal Health knew it.  They were sending requests for

 4    somebody to validate this growth of this black hole and

 5    nothing happened.

 6         5-f, this is -- this is going to be my -- my favorite

 7    portion of today's closing.  Did the defendants

 8    intentionally disregard the health and safety of the general

 9    public in Huntington and Cabell County?

10         The defendants say that they have to have conduct

11    that's reckless or intentional.  We say it's unreasonable.

12    I say you have ample evidence to answer this case in the

13    affirmative and you need to look no further than *Direct*

14    *Sales v. United States*.  *Direct Sales v. United States*, this

15    is the case that was given to the defendants in 2005 during

16    the distributor initiative.

17         Sometimes my colleagues make fun of me for talking

18    about this old case so often.  I'm going to talk about it

19    again.  And I'm going to try to do my best, Judge, to get

20    your attention to read this case.  And so, I've done a

21    couple of things to do that.

22         The first thing I've done is this.  I have on loan --

23              THE COURT:  What makes you think I haven't already

24    read it, Mr. Farrell?

25         (Laughter)
```

1          MR. FARRELL:  See?  That's good feedback.

2      I have here in my hand the original United States

3  Supreme Court Reports, Volume 319, and I put a tab in here

4  for *Direct Sales*.  I'm hoping you'll read it from the

5  original book.  This is a 1943 book.

6      Now, I'll leave it with your clerk, but I have to tell

7  you, we borrowed it from the WVU College of Law library.

8  And so, you'll have to return it eventually.

9      Can I approach?

10          THE COURT:  Okay.

11          MR. FARRELL:  Now, the second way I'm going to try

12  to get your attention is this.  Do you see where I

13  highlighted who wrote the opinion, Wiley Rutledge?  I don't

14  remember Wiley Rutledge.  He didn't write too many opinions,

15  but he is notable because he's had two famous law clerks.

16  One of them is Jean Paul Stevens and the other is a fellow

17  named Dean Louis Pollak.  He was the Dean of Yale while you

18  were there.

19          THE COURT:  I picked him up in the rain and gave

20  him a ride home one night.

21      (Laughter)

22          MR. FARRELL:  The other thing I wanted to point

23  out is, I wanted to point out from the *Direct Sales* case,

24  it's on appeal from South Carolina.  It's on appeal from the

25  Fourth Circuit.  And one of the three judges on the panel

1      from the Fourth Circuit was a man by the name of Judge

2      Elliott Northcott.  Do you recall that name?

3                THE COURT:  Yes.

4                MR. FARRELL:  He was the West Virginia sitting

5      assignment and, as a matter of fact, he was the former city

6      attorney for the City of Huntington.

7           So, the quote that I put out here that you'll read in

8      the context is that it seems too clear for argument that Dr.

9      Tate, who was both the physician and the dispenser in this

10     case, could not have possibly used anything like the

11     quantity of morphine shipped by the wholesaler in his

12     legitimate practice as a doctor in a small town.

13          The Fourth Circuit used a word, another adjective, that

14     I think is more apt for us to insert into our colloquy here.

15     The volume, the Fourth Circuit said, was inconceivable.

16          So, getting back to up on appeal in the high court, I

17     pulled out three points.  And the reason why I pulled these

18     three points out is because I think that not only does it

19     provide the framework for what happened, but it gives you

20     causation, as well as related harms.

21          The first quote, narcotic drugs have an inherent

22     capacity for harm and from the very fact they are

23     restricted, which makes a difference in the quantity of

24     proof required to show knowledge that the buyer will utilize

25     the article unlawfully.

        In this case, it was a criminal conviction for
conspiracy based on the volume of pills sold by the
wholesaler to the dispenser.  The United States Supreme
Court said that the knowledge -- it makes a difference
because this is the very nature of the -- of the narcotic.

        Do you see the very first part?  Inherent capacity for
harm, from the very fact that they are restricted.  Provides
a basis that they have knowledge that that volume of pills,
the buyer would utilize unlawfully.

        The second portion, and as you read this case, what you
will find is that some of the defenses raised here in this
courtroom were raised in *Direct Sales*.  In fact, the
wholesaler in that case said all we have to do is make sure
that the guy we drop it off for has his Harrison stamp, his
Harrison narcotic stamp, and then we're done, just like the
defendants in this case have said all we have to do is make
sure the pharmacy has a DEA registration.

        What the United States Supreme Court found was there is
no legal obstacle to finding the supplier not only knows and
acquiesces, but joins both mind and hand with him to make
its accomplishment possible.

        And in what perhaps is the best statement on causation
I can think of, the primary effect of this volume of pills
in this case by the United States Supreme Court, the primary
effect of the conduct is to create black markets for dope

1    and increase illegal demand and consumption.

2         We think you can answer all six questions in the

3    affirmative.  It takes us to 6.

4         Now, this is a specific causation.  What this is, is

5    some dispute of whether an oversupply by the defendants had

6    related harms.  That's a technical defense that they've

7    raised and they're not arguing in the opposite.  They

8    haven't put any proof it's not true.  They're just saying

9    that we can't prove it.

10        Well, we wrote a question and we asked our expert from

11   Columbia.  We put into the record, do you have an opinion

12   whether the volume sold by these three companies would be a

13   substantial factor giving rise to and fueling the opioid

14   epidemic and its related harms?  And she said, yes.  My

15   opinion is that it's a substantial contributing factor.

16        We also asked the same question of Dr. Gilligan.  So,

17   you have Harvard and you have Columbia.  And Dr. Gilligan

18   frankly testified consistently with Dr. -- with Columbia,

19   with Dr. Keyes.  And what he said is that I think if there

20   are a large number of medications prescribed in any area,

21   there will be some of them that will be diverted, misused,

22   abused.

23        And so, that there would be some incidence then where

24   that diversion, leading to misuse, abuse, there would be

25   some instances where that would lead someone to initiate

1    heroin.

2        And this is the -- this is the part that grabbed my

3    attention.  I think that would be statistically likely in

4    any area with a large number of opioid pain medications that

5    were prescribed.  There is no other place in America that

6    has more prescriptions per capita than in Huntington-Cabell

7    County, West Virginia and, if there is, then we rank up near

8    the top.

9        Dr. Gupta said the same thing.  You'll recall he used

10   the flooding analogy.  He said that this area was flooding

11   and that we were doing all that we could, but we were

12   drowning.  And he made a poignant remark at the end.  We

13   were drowning and we didn't open the floodgates, which is a

14   theme I will return to tomorrow.

15       And then, in the last question of the last witness that

16   I asked a question of, Dr. Colston, I asked Ms. Colston, my

17   understanding is that you take the position that an

18   oversupply of prescription opioids is not the causal factor

19   of the opioid epidemic, but is only a causal factor?  And

20   she said that's correct.

21       And under Professor Cady's tort exam, it reminds me

22   that all we have to prove is that it is a causal factor and

23   not the causal factor.  So, we think the record undeniably

24   establishes number 6 in the affirmative.

25       Now, this is question number 7, is the opioid epidemic

1    abatable?  And this is where perhaps I'm hoping to engage

2    you because what we are trying to establish is that this

3    epidemic is abatable.  Judge, we can make a difference.

4         Dr. Alexander testified this is not a moonshot.  We put

5    on evidence and you heard from the people in our community,

6    boots on the ground that are dealing with this every single

7    day, and what they're doing to try to piece together grants

8    and funding and what works for them.

9         We've also overlaid on top of that from the leading

10   expert in the country, from Johns Hopkins Bloomberg School

11   of Public Health a plan.  And he says we can do it if we

12   provide treatment programs.

13        The expert from Harvard agreed.  The expert from

14   Harvard testified on Day 34, Page 179, Lines 28 and --

15   through Page 180, Line 4.  Dr. Gilligan agrees with the

16   statement that closing the path to Opioid Use Disorder will

17   require addressing overprescription of legal opioids,

18   reducing the availability of illicit opioids, and getting

19   patients with Opiate Use Disorder into treatment.

20        This is important, Judge, because based upon the social

21   autopsy, what Dr. Gupta found is that 81 percent of the

22   people that died from a drug overdose of opioids in 2016 had

23   interacted with our healthcare system.

24        The point we're trying to make here, Judge, is we can

25   reach them.  We've designed an evidence-based treatment

1    program that can make a difference.  We have the

2    infrastructure and the people in our community are willing

3    to do the work, which leads us to number 8, our abatement

4    plan.

5         As you'll recall, the abatement plan has four aspects

6    to it.  We have an economist come in and put a number on

7    each of the categories.  You'll recall that the largest

8    section of it is Section 2-b., 1.7 billion for treating the

9    Opioid Use Disorder.  And you'll recall that the only real

10   debate with this is the number because Dr. Rufus, from the

11   defendants' own expert, he said that we don't need that

12   much.  We only need 644 -- 644-million worth, not the 1.7

13   billion.

14        And as you'll recall, Mr. Majestro asked him, so you're

15   saying that the appropriate number is somewhere between 644

16   and 1.7 billion?  Now, I have a personal opinion on where

17   you should land between the two but, ultimately, what we're

18   trying to do is we're trying to create treatment programs

19   that we can make a difference and save lives and we can be a

20   shining example in our community and the nation on how to

21   get out of this problem.

22        Category 3 is public safety.  We've put in on what we

23   need to keep our community safe.

24        Category 4 is the supporting special individuals.

25        So now, my dismount, as I tell people, before we take

 1    our break.

 2         The defendants are going to make summation arguments

 3    and talk about the standard of care.  They're going to talk

 4    about statutes.

 5         Well, let me back up because, see, Dr. Courtright

 6    testified on the second day of trial about the historical

 7    life cycle of the opioid epidemic and I'd like to come back

 8    and re-visit it because what this is, is the foreseeable

 9    outline of what the defendants are arguing.

10         This is what Dr. Courtright said.  Well, it starts off

11    with an increase in incidence, large number of new cases,

12    and it continues to grow.  And then, there's a public

13    reaction to that.  There's concern.  There's newspaper

14    stories like Eric Eyre's Pulitzer Prize winning story.

15         There are angry speeches in Congress like when the CEOs

16    testified in Congress.  There are papers that are given at

17    professional meetings by physicians exploring the increase

18    in something like morphine addiction.

19         And there's a reaction.  And the reaction leads to

20    reform, both within the medical profession and, also, often

21    statutes to deal with the problem.

22         Judge, this is not new.  The defense is foreseeable.

23    This is the foreseeable life cycle when you open Pandora's

24    Box and you let out the opium.  It has consequences.  It's

25    toppled governments.

1        81 million pills into the community and this is what

2    happened.  It got people's attention.  It got Congress.  It

3    got newspapers.  It got reform.  A change in the standard of

4    care.

5        What we're suggesting, Judge, is the un-refuted

6    testimony is that everything they've said is completely

7    predictable and it's why the Controlled Substances Act was

8    written the way it was.

9        The second thing the distributors are going to do is

10   they're going to try to -- they're going to say, Judge,

11   we're just one aspect of the whole opioid epidemic.  I've

12   made a black hole of puzzle pieces to try to demonstrate an

13   image for the opioid epidemic and what the distributors

14   initially do is they try to sever their connection to the

15   opioid epidemic.  That's the first defense that they've

16   done.

17       They've asked you to throw the case out for intervening

18   and superseding cause.  We don't believe -- and they have

19   the burden to show that.  And we don't believe that they've

20   established their burden of proof for either of them.  What

21   their arguments are, are remoteness, that it's not

22   foreseeable that dumping 81 million pills into a community

23   of less than a hundred thousand is going to have adverse

24   consequences.  We don't believe that this is credible.

25       The second thing that they do is they're going to say,

1    okay, if we are responsible for the entire opioid epidemic,

2    so are a bunch of other people.  And they blame the

3    manufacturers, and bad doctors, and good doctors, and

4    pharmacies, and the State of West Virginia, or the Board of

5    Pharmacy, the Board of Medicine, PEIA, the FDA for approving

6    the daggone stuff and the DEA.

7         But, Judge, two comments on this.  Number one, the

8    distributors are the only ones in this case and they didn't

9    file cross-claims against any of them.  And the law, as it

10   stands, if you follow Judge Moats at the MLP and you accept

11   on the face value the rejection of the writ of prohibition,

12   it doesn't matter if there's anybody else with substantial

13   fault because it's joint and several liability and they

14   should know it.

15        So, if that is the case, there is a contingency plan.

16   The contingency plan for the defendants is to try to sever

17   the indivisible harm.

18             THE COURT:  Judge Copenhaver didn't buy that last

19   argument you made in his City of Charleston case.  How is

20   that different from your situation here?

21             MR. FARRELL:  Let's back up.  He didn't buy that

22   they were --

23             THE COURT:  That -- that the other actors in the

24   picture -- well, if I understood his opinion correctly, he

25   held that the fact that there were other causes and other

1    actors preempted the liability or made -- did away with the

2    liability of one of the actors; is that right?  Did I read

3    the case correctly?

4              MR. FARRELL:  So, I will have to come back and

5    piece it together.  What we are talking about are the remand

6    cases from the State of West Virginia back to Boone?

7              THE COURT:  Talking about the opinion he wrote.

8    And I had it in my hand awhile ago and I didn't bring it in

9    here.

10             MR. FARRELL:  So, Mr. Majestro is my legal expert.

11   Are you talking about the remand where the doctors were

12   severed?

13             MR. MAJESTRO:  Talking about the City of

14   Charleston.

15             MR. FARRELL:  I'm going to defer to Mr. Majestro.

16             MR. MAJESTRO:  Your Honor, I think I can answer

17   the question.  A very quick answer to that.

18        Yes, Judge Copenhaver did that.  With respect to the

19   claims against the particular defendants in that case, the

20   Joint Commission, he specifically noted in that case, this

21   case is not like the cases that the counties brought in 51

22   and specifically distinguished the Cuyahoga County and

23   Summit County case, which is identical and on four -- all

24   fours of this case.

25             THE COURT:  Okay.

1          MR. FARRELL:  Yes.  He said that it is too remote

2     for the JCHO.  We think that, nonetheless, if you want to

3     put JCHO into this bucket, there has to be the same analysis

4     done for each of these defendants and that's the burden of

5     the defendants in this case, not us.

6          So, if they want to allocate fault, they have to do two

7     things.  One is, they have to show it's divisible.  And then

8     they have to meet their burden of proof on cross-claims and

9     they haven't.

10         So, as a result, if as a contingency they are on the

11    hook, if you do find liability and you do address the opioid

12    epidemic as an indivisible harm, then their backup plan is

13    to try to sever out of it a particular piece of pie and that

14    is why they've stuck so hard onto the gateway theory.

15         They're trying to exclude from the opioid epidemic that

16    they're responsible for all things heroin and

17    fentanyl-related.  They're trying to separate that.  That's

18    their main goal.

19         So, that's why, Judge, the first witness we called in

20    this case was Corey Waller.  That's the first time he had

21    ever testified.  He's the only expert you qualified in this

22    case on neuroscience.

23         And he testified about the structure, function and

24    outcome of the morphine molecule.  You will recall his tag

25    lines.  A molecule is identical.  The brain doesn't know the

1    difference between hydrocodone, oxycodone and heroin.  And

2    the outcomes are the same, addiction, overdose and death.

3        And this is followed up by Dr. Kerri Keyes.  You'll

4    recall Dr. Keyes put on the entire record in the affirmative

5    as to what the gateway effect and how it's established in

6    known epidemiology.

7        And then you will recall Dr. Gilligan.  And I don't

8    want to belabor the point, but I went through Dr. Gilligan,

9    his testimony, and I grabbed out a couple of quotes.  And

10   I've got them here and I can read them all into the record.

11       He says on Page 152, "Although the vast majority of

12   prescription opioid exposure does not lead to heroin use,

13   heroin incidence and prevalence rates were significantly

14   greater among those who reported non-medical prescription

15   opioid misuse", end quote.

16       You asked a question at some point in time about

17   whether or not this is going to apply to people that started

18   on heroin without ever seeing prescription opioids.  We

19   asked Dr. Gilligan that question and what he said was only

20   one percent of the population abusing non-medical

21   prescription opioids started with heroin.  He said people

22   who used heroin prior to non-medical use prescription

23   opioids was one percent.  That was Page 153.

24       Page 154, four out of five heroin users began with

25   abusing prescription opioids.

1    On 178, again, remember, we had that thing with the

2    kilograms versus deaths.  He said 80 percent of the people

3    talking heroin started with prescription opioids.

4    On Page 171, he said for every death, you could expect

5    ten treatment admissions, 32 emergency department visits,

6    130 people who abuse or are dependent, and 825 non-medical

7    users.

8    On page 178, he said those suffering from OUD shift to

9    heroin because it is more accessible and less expensive.

10    Judge, what I'm proposing to you is this.  The

11    defendants would have you either find them too remote in

12    their conduct to be responsible, or have them share

13    responsibility, or have you carve out some small sliver that

14    they're responsible for.

15    And what I'm here to say, Judge, is that we have

16    established a record.  We have done what we promised we

17    would do 38 trial days ago.  And there is one opioid

18    epidemic and what we're asking for is your help.  We have

19    the workers.  We need the funding.

20    So, with that, Judge, I conclude my comments today on

21    behalf of Cabell County.  That's the work we put in.  And,

22    tomorrow, I'll have a few personal comments I've held back.

23    So, after this break, my colleague, Ms. Anne Kearse, is

24    going to step up and she has the voice of the City of

25    Huntington and those that live in it.  Thank you for your

```
 1   time.
 2           THE COURT:  All right.  This is a good place to
 3   take a ten-minute break.
 4        (Recess taken)
 5        (Proceedings resumed at 10:45 a.m. as follows:)
 6           MS. MAINIGI:  Your Honor, if I may just be
 7   heard before Ms. Kearse begins.
 8        Your Honor, we have heard Mr. Farrell mention several
 9   times in his closing that he intends to save part of his
10   argument, part of his statements, including his personal
11   statements, for tomorrow.  And we think that is absolutely
12   improper.
13        Mr. Farrell's rebuttal needs to be limited, and I think
14   this is well established, limited to rebutting whatever the
15   defendants' arguments happen to be today and tomorrow.  He
16   can't save an entire part of his closing statement for later
17   in the day tomorrow because, among many other reasons, we
18   obviously would not have an opportunity to then respond at
19   that point.
20        So we object to that.  He's obviously noted it.  We
21   obviously are fine if he wants to add to his closing
22   statements either now or after Ms. Kearse.  But we certainly
23   would be objecting to him raising tomorrow that which he
24   could have raised today.
25           THE COURT:  Well, is this going to be rebuttal
```

```
 1    tomorrow or what do you anticipate they're going to say?
 2    And he says "yes."
 3              MR. FARRELL:  Yes, Judge.  I'm aware of the Rules
 4    of Civil Procedure.
 5              THE COURT:  All right.  Well, he's on notice now,
 6    Ms. Mainigi.
 7              MS. MAINIGI:  Thank you, Your Honor.
 8              THE COURT:  All right, Ms. Kearse.
 9              MS. KEARSE:  Good morning, Your Honor.
10              THE COURT:  Good morning.
11              MS. KEARSE:  I understand the mics are still not
12    lapel so --
13              THE COURT:  Well, so far I'm hearing you
14    adequately.
15              MS. KEARSE:  Okay, great.
16         Your Honor, on behalf of the City of Huntington and --
17    I want to take this time today, in addition to Mr. Farrell,
18    to talk about the -- to drill down more on the community
19    harms with that.
20         But the City of Huntington and Cabell County together
21    have brought before Your Honor a single cause of action, and
22    that's the public nuisance, against these three companies
23    here today with one remedy of abatement of the public
24    nuisance.
25         Your Honor has heard, as Mr. Farrell showed you
```

1    earlier, from a number of witnesses that includes the

2    community.  They include members of the City of Huntington.

3    They include members of Cabell County.  They include

4    institutions of WVU and Marshall and various law

5    enforcement, public health officials, and people on the

6    ground who actually witnessed first-hand the opioid crisis

7    in Cabell County and City of Huntington, and also have

8    studied the opioid crisis in City of Huntington.

9         Your Honor, in addition to the witnesses, the documents

10   have appeared from your bench there.  But you have a

11   mountain of, of exhibits that I imagine the law clerks are

12   having fun with as well.

13        But in those documents, you know, today I hope to shed

14   light on a couple of those documents.  But they're so, so

15   numerous, as Mr. Farrell indicated, that I think our

16   findings of fact that will follow these arguments will be

17   very, very detailed as well into what are in those

18   documents, but I'd like to highlight a few of those today.

19        Your Honor, you've heard the evidence and we submit to

20   Your Honor that we have demonstrated the City of Huntington

21   and Cabell County are still in the midst of an opioid

22   epidemic.

23        They've been harmed by defendants' failures to maintain

24   effective controls to prevent the diversion of prescription

25   pills into their communities, and the public health and

1    safety of the community has been significantly interfered

2    with the rise of this public nuisance.

3        And the City of Huntington and Cabell County are well

4    positioned to implement an opioid abatement plan and a

5    response to the public nuisance, address the crisis in the

6    community.

7        Your Honor, today, as an advocate but also a voice in

8    the community, I want to go through some of the testimony

9    today because it's important for Cabell County and City of

10   Huntington that their testimony was heard in this courtroom

11   and the record is made for your Court's consideration.

12       Simply put, we believe the evidence presented

13   demonstrates that the fact that the health, safety, and the

14   welfare of these communities are at stake, but we believe

15   there's a pathway to recovery.

16       Mr. Farrell went over some of the expert testimony

17   there, but I want to start with the exposure of prescription

18   opioids as the driving force of the public nuisance.  The

19   accessibility and over-supply that is in the record of

20   prescription pills have ravaged this community and it's

21   undisputed that the more pills that are out there, the more

22   potential there is for diversion.

23       Mr. Farrell played clips today for Your Honor so

24   they -- the first one and the third one were actually played

25   for you by video deposition and the designations that you'll

have before you.  And also you've heard from Dr. Keyes.

But I want to take it a step further now from the, from the DEA and from the experts there and talk about our community and what they were seeing and the extent of the diversion on there.

You'll remember the first -- one of the first weeks we called Dr. Gupta.  And Mr. Farrell referred to Dr. Gupta again today.  And I asked Dr. Gupta about the, the public health and, and the exposure to prescription opioids in the community with that.

Dr. Gupta was very clear.  Opioid addiction is a matter of public health.  Through this trial, witnesses have focused on the public health and public safety of a community based on public nuisance to show the interference that the opioid crisis has had on their community.

The plaintiffs called Dr. Gupta.  And I asked Dr. Gupta to educate the Court a little bit about public health since this is going to be well-founded in public health principles and, and safety.

Public health is fundamentally the art and science of designing strategies, actions, aspects that help lead to the prevention of disease, promotion of health, as well as those strategies ultimately that would provide high quality both prevention, surveillance, and treatment in terms of addressing long-term public health problems, as well as the

most pressing contemporary public health problems in a broad definition.

And I think this is important, Your Honor, as we carry through with, with the, the evidence that's before you and as we move towards our proposed abatement plan.

But I asked -- I also asked him, "Can addiction be a public health matter?"

"Addiction is a public health matter."

"How is addiction a public health matter specifically to opioids?"

"Whenever any condition is causing West Virginians to die every year by double percentage increase, that issue becomes a public health matter, period.  The reason that people were using drugs and dying of overdose is because of the addiction."

Your Honor, opioid addiction has been a driving force to the opioid crisis in Cabell and Huntington.

In addition to Dr. Gupta, every local witness that came before Your Honor explained that the opioid epidemic and the addiction was widespread throughout Cabell and Huntington. And I'd like to take a little bit of time and just refresh Your Honor with some of the witnesses.  Some of them were in the first week.

You'll remember Jan Rader, 27 years on the City of Huntington.  She brought her medic bag with you [sic] and

1     showed you about the Narcan on that.  And Jan Rader is not

2     with us today.  She's at the International Firefighters

3     Convention actually.

4                THE COURT:  She told me firemen still rescue

5     kittens from trees.

6                MS. KEARSE:  On a good day, they get to do that,

7     yes, Your Honor.

8          And Chief Rader oversees six stations, 88 firefighters.

9     And, and she told you -- we'll go through some of the

10    testimony about that.  But one of the things as, as to the

11    widespread community harms I wanted to focus on on that,

12    "Chief Rader, when you and your firefighters and other first

13    responders are going out on overdoses, is it throughout the

14    community?"

15         "It's everywhere."

16         She's been to restaurants where working -- workers,

17    clientele, doctors' offices, dentists' offices, been to the

18    park.  She and her 88 firefighters who carry naloxone on

19    their cars and the police with naloxone have been everywhere

20    within the community overdoses.  Nobody is immune from it.

21    She's seen overdoses from as young as 12 and as old as 78.

22    There's no boundaries.

23         Again, sometimes you look over and there's a four- or

24    five-year-old watching to revive their patient (verbatim).

25    She told you about going to overdoses of the classmates and

1     her friends, pervasive in the community.

2          She also testified, Your Honor, on that Friday about

3     how her -- she and her men and other community members would

4     be comforting families of overdose victims and testified

5     about the ripple effect.

6          And the ripple effect is important as we talk about the

7     community health and the community fact that addiction is a

8     public health matter, as Dr. Gupta testified on that.  She

9     testified it's widespread and a lot of carnage.

10         You remember Connie Priddy who testified the day before

11    Jan Rader.  And she talked a lot about the QRT.  But both

12    she and Chief Rader talked about the number of overdoses

13    they were going on.

14         Connie Priddy testified that 95 percent of the

15    overdoses that she goes on are opioid-related.  And Ms.

16    Priddy testified that there's no typical overdose person.

17    Really, it cuts across every socioeconomic line.

18         Our team will tell you that they have sat in an

19    apartment with a dirt floor, a mattress, and they sit in

20    million-dollar homes.  It cuts across gender.  It cuts

21    across race.  It cuts across every socioeconomic line.

22    There is no typical person of the overdoses.

23         You heard on another Friday from Chief Holbrook.  Chief

24    Holbrook was a life-long resident of, of Huntington until he

25    went down to Columbia, South Carolina, where he is now.

1    But the opioid epidemic went from one end of the city

2    to the other.  It really affected people from all walks of

3    life.  It didn't matter where you were, who you knew, where

4    you lived, what color your skin was, or how much money you

5    made.  People were focused on fueling their addiction.

6    Again, Chief Holbrook testified, "What I saw during my

7    time as a Police Chief was something that really has

8    affected me profoundly.  There was not one person through

9    some connection, there was no degree of separation by the

10    time I left Huntington that a friend, family, neighbor had

11    not been touched by this problem, had not lost a loved one,

12    had not reached financial ruin because of their efforts to

13    address an addiction problem with a loved one."

14    Plaintiffs called Scott Lemley.  This is similar to

15    Chief Rader.  You heard throughout the testimony in a

16    small-knit community of Huntington and Cabell County you

17    couldn't get away from going places and actually seeing your

18    friends, seeing your classmates, and seeing your family.

19    Scott Lemley, who was a crime analyst who does all the

20    data gathering for the City of Huntington and the Mayor's

21    Office of Drug Control Policy, also was asked about the

22    geographical nature and the widespread community harms that

23    opioid addiction had.

24    Again, it was persuasive throughout the entire city.

25    It varied, very young, very old.  From a race standpoint, it

1    generally followed the demographics.  But it went from

2    teenagers to 70-year-olds and made it difficult to address

3    and went through the entire community.

4         And Dr. Yingling, Associate Professor at Marshall

5    University and Chairman of the Board of the

6    Cabell/Huntington Health Department, testified the related

7    harms of addiction have cut at every core of the fabric of

8    our community.  They have jeopardized many in our community.

9         This should not be in dispute, Your Honor.  There's

10   been widespread harm throughout the community, throughout

11   all socioeconomic, throughout race within the City of

12   Huntington and Cabell County.

13        Mr. Farrell actually showed you this one earlier.  This

14   is Chief -- this is Mayor Williams's forward within the City

15   of Solutions that we'll talk more about that you've seen

16   throughout the trial, again reiterating the fact that every

17   community is being harmed and, more importantly, that the

18   families, neighborhoods, and epidemic is a

19   non-discriminating disease.

20        Presence of pills.  Diverted prescription opioids

21   infiltrated the City of Huntington and Cabell County.  And

22   the diversion of opioids into the illegal markets create a

23   massive demand.  The enormous quantity of pills shipped

24   helped show that diversion was occurring.

25        There was abundant evidence, Your Honor, throughout the

trial that as the pills came in and pills were seen by the

community, there also began to be an intertwining of heroin

abuse, a reasonably foreseeable event to the defendants as a

matter of law, history, science, and basic common sense.

As the breaches of diversion were occurring in the

closed system, impact was bubbling on the surface of these

communities.

The first responders were seeing a change.  We talked

about Chief Rader, a Fire Chief -- a firefighter since 1994.

She saw an occasional overdose, occasional death.  Most of

the time she testified it was the alcohol [sic] that someone

would know on the corner, the alcoholic.

Sheriff Zerkle talked about in the early days as a

police officer, they didn't see deaths.  They didn't see

bodies.  They didn't see what subsequent years and resent

years have seen.

Again, Chief Holbrook testified they were also seeing

an incredible volume of finding people in possession of

prescription pills.

Jan Rader testified, "We started seeing overdoses.  And

at these scenes, we would see pill bottles, oxycodone,

hydrocodone typically."

Sheriff Zerkle testified, "Huntington was flooded with

pills.  We had an overwhelming amount of prescription

opioids being dispensed in our county."

1        And Mayor Williams testified, "It became apparent to me

2    the heavy abundance of opioid pills being distributed within

3    the community had heroin -- and heroin."

4        Scott Lemley testified as well to the fact that when

5    they were doing their work and gathering information on drug

6    seizures that he did for the HPD, he would see Oxycontin,

7    Opana, Roxy 30 as examples in the seizures that the HPD were

8    getting of diverted drugs, prescription pills, opioids, and

9    more prescription pills.

10        This is boots on the ground and there's ample evidence

11    that we'll provide of additional documents and testimony

12    supporting the eyewitness testimony in addition to what the

13    experts concluded in epidemiological studies of City of

14    Huntington and Cabell County.

15        We also had reports from the -- you'll remember, Your

16    Honor, I did show some of these in, in opening.  But we

17    actually went through these with the witnesses, particularly

18    Skip Holbrook and Scott Lemley, with what the HPD and the

19    reports were putting out into the community.

20        2011 the HPD, Huntington Police Department, annual

21    report, emerging threats.  Currently the most prevalent

22    emerging threat to our community is the illegal diversion of

23    powerful pain medications such as oxycodone and oxymorphone.

24        In 2012, currently there are two emerging threats;

25    first, illegal diversion of powerful pain medications such

1    as oxycodone and oxymorphone, and the second was the growing

2    use of heroin which has contributed to a significant rise in

3    overdose deaths.

4        At that time, West Virginia was second in the nation

5    for prescription overdose deaths.

6        The threat assessments also, in addition to the HPD

7    reports, also talk about the diversion and abuse of

8    prescription drugs in our region as an epidemic and the

9    tragic cost to our communities.  It's a community issue

10   overburdening law enforcement, adding to prison population,

11   overwhelming treatment facilities, and undermining the

12   employability of work force and, most important, devastating

13   families.  Again, a public health crisis in Cabell County

14   and City of Huntington.

15       In 2012 oxycodone seizures alone increased by

16   1,773 percent from 2010 totals.

17       Many people who have developed opioid addictions due to

18   abuse of prescription medication turn to heroin.  This is

19   from the folks on the ground seeing this.  It's not expert

20   testimony, but what they're seeing in their community.

21       Many people who have developed opioid addictions due to

22   abuse of prescription medication turn to heroin due to the

23   lower price, 30 to 80 dollars for a prescription pill

24   compared to 20 to 25 for a dosage unit of heroin.  Boots on

25   the ground.

1        What it did to the public health and public safety of

2    our community is clear through these reports.  The vast

3    majority of property crime offenses investigated by the HPD

4    are directly related to the drug trade.

5        Most theft is perpetuated by individuals addicted to

6    drugs and in need of a means to support their habit.

7    Therefore, any successes we experience in drug enforcement

8    and treatment initiatives will positively affect property

9    crime trends.

10        And we'll go -- there's more of these too but, again,

11    all of our drug reduction efforts must include collaboration

12    with other law enforcement agencies, as well as those

13    agencies focused on addiction, treatment, and education, a

14    core part of our case, a core part of our abatement plan,

15    Your Honor.

16        2014 you'll remember Chief Holbrook testifying about

17    his letter to the Mayor with that.  But two years later

18    they're still seeing a growing number -- growing use of

19    heroin as the number one threat now in the City of

20    Huntington.

21        The influx of heroin into the area over the past few

22    years has contributed to a significant rise in overdose

23    cases.

24        You'll remember Chief Holbrook testifying that this

25    report was the most important document he wrote to the

1    Mayor.  It outlined in detail the greatest threat to ever

2    face our community, a pervasive drug culture and associated

3    crime.  Exhibit 41527 will be in detail with Your Honor with

4    that.

5         But Chief Holbrook testified I saw -- he saw his town

6    being decimated by the addiction.  He saw the addiction

7    explode.  He saw the seizures explode.  And the pill

8    seizures were going up and the overdoses were going up.  We

9    were also seeing property crime go up.

10        The diversion and abuse of controlled pharmaceutical

11   drugs, particularly opioid-based pain relievers, will

12   continue to be the most serious threat to Huntington, 2014.

13        Although there's been an emergence of cheaper

14   alternatives such as heroin, diversion of abuse of

15   prescription drugs continues to pose a threat to our city.

16   The most commonly diverted pharmaceuticals in our area

17   continues to be narcotic analgesics such as oxycodone,

18   hydrocodone, and methadone.

19        Again, the cost associated with the supply and demand

20   for prescription opioids was occurring.  And the opportunity

21   for cheaper alternatives was being made as a heroin

22   significant threat.  The lower cost of heroin compared to

23   the price of pharmaceutical drugs has created a significant

24   problem for drug enforcement.

25        Chief Holbrook actually specifically talked to

1     diversion and what he was seeing within the City of

2     Huntington and Cabell County.  Oftentimes, especially with

3     diversion, an investigation would start with a call on a tip

4     line, a pharmacy calling, a traffic stop, and finding

5     prescription pills in somebody's possession that they had

6     not seen -- or not have a legitimate prescription, or one

7     would have multiple pharmacies or doctors that they had been

8     to.

9          You'd see evidence of what they looked like, maybe a

10    pharmacist or a doctor again, distributing prescription

11    drugs and opioids irresponsibly.

12         And the threats go on, Your Honor, about the direct

13    results of the prominent prescription drug trend in

14    Appalachia.  The abuse and the availability of heroin will

15    continue because of the high levels of prescription drug

16    abuse.  The availability preference and demands for

17    prescription drugs, primarily opioids, has laid the

18    foundation for the heroin market; again, Chief Holbrook,

19    boots on the ground.

20         The heroin distribution and abuse in Huntington grew

21    significantly in 2013.  And, again, this is a direct result

22    of the predominant prescription drug threat in Huntington.

23         Your Honor heard from the Mayor.  You heard from Chief

24    Rader.  You heard from Scott Lemley and others in the

25    community about the rising levels of overdoses and addiction

1    and what was next.

2         Chief -- Mayor Williams testified if you name the

3    problem, you own it.  He felt like he had to do something

4    aggressive.  Serious level of addiction in our community and

5    we need the people to join together.

6         Your Honor has heard about the various reports.  And

7    these -- I would put these as some of the milestones within

8    the community to come together as starting in 2015, 2014,

9    and then into the other things with the Mayor's Office of

10   Drug Control Policy.

11        I show these to you, Your Honor -- we'll go through

12   some of these things here because this was a community

13   responding to the crisis.  This was a community looking at

14   the crisis not only from a law enforcement, but also from a

15   medical area of addiction with that.  And we'll go through

16   some of the things.

17        But these programs are also -- we went over in detail

18   with you to show you that not only has the city and county

19   come together, but they are familiar with the issues.  They

20   have an infrastructure in place and a partnership in place

21   that many community members talked about with that.

22        The strategic plan.  You heard from, from Chief Rader

23   who talked about one of their missions was to deal with the

24   addiction issues.

25        Scott Lemley, "We had to look at the data."  They

1    looked at the data.  They gathered the data.  They had to

2    work with the data to see what is really percolating here

3    and how we're going to respond to it.

4         The strategic plan encompassed hundreds of meetings and

5    over thousands of hours.  They went out into the community

6    and talked to law enforcement.  They talked to medical

7    communities.  They talked to numerous people in the

8    community in order to put a plan together on behalf of the

9    community and with the community's help with that on there.

10   They spent hours of time speaking and people hearing about

11   opioid addiction and the consequences of such.

12        You saw two strategic plans.  And the purpose in the

13   2017 was -- the purpose of this report is to provide a new

14   two-year strategic plan outlining the Mayor's Office of Drug

15   Control Policy key efforts in suggesting its continued

16   commitment to the opioid crisis.

17        Three areas of focus:  Prevention, treatment, and

18   recovery and law enforcement.

19        Mr. Farrell mentioned that in the portion of the data

20   gathered that they had in 2017 they reported that they

21   were -- 10 percent of their population were addicted to

22   opioids.  Huntington and Cabell and Wayne counties was

23   facing an epidemic.

24        Again, the Mayor's Office of Drug Control Policy aimed

25   to improve its efforts in three key areas of prevention,

1    treatment, and recovery and law enforcement.

2         Areas that the community came together to work on was

3    to divert people with drug addiction into treatment and to

4    help them re-enter society once in recovery; reduce the

5    incidence of Neonatal Abstinence Syndrome; prevent the

6    spread of blood-borne pathogens; expand programs for

7    outpatient treatment; develop treatment and recovery

8    programs for women and children; streamline the

9    stakeholders' efforts and data; and reduce drug trafficking.

10        This is a city and county, Your Honor, that came

11   together and put out strategic plans to identify what issues

12   that they had and try to deal with them the best they could.

13   They gathered data to show the influx of opioid addiction

14   and the impact on crime.

15        Mayor Williams testified that the mission is not

16   accomplished.  Their strategic plans laid the foundation and

17   the framework for the community to be able to come together.

18   And what came out of these plans was really a community

19   coming together.

20        Jan Rader talked about the fact that when they went out

21   there to see who was where and who was doing what and bring

22   the partnerships together, this laid the foundation for the

23   City of Solutions.  It laid the foundation for the community

24   to work together.  It laid the foundation for the programs

25   that we talked about to deal with the opioid epidemic at

1    that time.

2         Again, Your Honor, these, these two documents -- you

3    heard testimony from Lyn O'Connell about the resiliency

4    plan.  You saw various drafts of the resiliency plan, of

5    Cabell County coming together on a forward-looking, what are

6    we going to do today and tomorrow, and the City of

7    Solutions.

8         What have we done?  What did we learn as we came

9    through the Mayor's Office of Drug Control Policy?  What did

10   we learn from the community on there about opioid addiction

11   and drug addiction and the solutions on there?

12        These are cornerstones to our infrastructure of being

13   able to carry out future plans.

14        We asked Lyn O'Connell -- you remember Lyn.  I think

15   she was on the stand for three days, Lyn at Marshall

16   University who at the addiction services has worked very

17   closely with the City of Huntington and Cabell County and a

18   very pillar of the community.

19        "Does the community have the foundation and the

20   infrastructure to do what it needs to do?"

21        "The groundwork is there.  We're standing on solid

22   foundation right now.  We have the community partners.

23   We're uniquely situated because as a community, we chose not

24   to bury our heads in the sand and acknowledge our problems.

25   But, rather, we're living in an epidemic."

1          Mayor Williams also testified about the partnerships

2     and the coming together.  And as he testified, there's a

3     formula that works in his mind and is very simple.  It's

4     that collaboration leads to partnerships.  You collaborate,

5     you start to create partnerships.  Then you establish a

6     level of trust.  The outcome, not the tactic, the outcome

7     ends up being hope.  Again, this is coming together from the

8     opioid epidemic they're still dealing with today.

9          Some of the experts that Mr. Farrell -- I want to touch

10    on a couple of things of, of how we get here.  We just

11    talked about the boots on the ground as they were seeing the

12    percolation of the pills there.

13         We brought Dr. Smith.  If you remember, Dr. Smith was

14    from New Zealand, a WVU epidemiologist.  Dr. Smith spent

15    time as he went through files to look at data.  And you

16    remember he had two different types of data that he was

17    reviewing.  He had CDC data, and then he had to go through

18    data that was before 2000 to see the trends of overdoses of

19    addiction.

20         And you'll recall his testimony that it was almost

21    stunning to him that before 19 -- 1999, I think he used that

22    year or 2000, he did not see any overdoses.  He saw some,

23    but there was very, very limited on that.

24         To me, the most important thing on the slide -- I'm

25    going to show -- this is a demo slide.  The heroin was not

1    much of a problem.  And as you can see, the red line of the

2    prescription opioids, that's all you saw was the dramatic

3    rise in prescription opioids over the same period of time.

4         And during this period of time, there was very little

5    heroin certainly being found in people who were dying.  And

6    it's important as we see the transition as we heard from the

7    witnesses, as we heard from the experts, the drug in force

8    to the opioid epidemic was prescription pills.

9         Dr. Smith testified about his data.  Before 2000, only

10   76 drug cases per year in West Virginia from 1979 to 1999.

11        2001 to 2016, drug poisoning deaths in Cabell County

12   alone 14 of 16 were opioid-related.

13        From 2001 to 2016, 1,002 opioid-related deaths in

14   Cabell County representing 90 percent of all the related

15   deaths in the county.

16        And 2001 to 2018, the rate of opioid-related poisoning

17   deaths in Cabell County soared from 16.6 to 213.9 percent,

18   one thousand -- one hundred thousand between 2001 and 2017.

19        Dr. Smith also talked about a medical article that we

20   showed Your Honor that he had brought in his expert

21   investigation.  2008 JAMA was an article that actually

22   looked at a study that looked at 2006 deaths in West

23   Virginia.

24        So we went to the social autopsy that we heard Dr.

25   Gupta talk about in 2006 where they went through all the

 1    death certificates.

 2         In 2008 there was a study, the Hall study that did a

 3    similar thing, looked at the 2006 overdose deaths.

 4         And the studies showed that 295 overdose deaths, 186,

 5    63 percent, were associated with pharmaceutical diversion.

 6    And another 63, 21 percent, showed evidence of

 7    doctor-shopping.  275 to 295, 93 percent, showed opioid

 8    analgesics taken, but fewer than half had been prescribed.

 9    Again, prescription opioids causing harm to the communities.

10         2008 Social Autopsy, and then we had the 2016 Social

11    Autopsy.

12         Dr. Smith testified about his various data search and

13    his conclusion.  And I believe Your Honor even asked him a

14    question about this, about present day, what he sees with

15    prescription opioids.

16         My conclusion from reading the literature, looking at

17    my own reports, and what I found was that there is very,

18    very conclusive evidence that prescription opioids in

19    particular play -- continue to play a very important role in

20    the drug overdose deaths in West Virginia.

21         As you'll recall, Your Honor, he looked through

22    statewide and he focused on Cabell County.

23         And, likewise, he's not the only expert who has found

24    that there was historically not much illicit opioid trade.

25    As you'll recall, Mr. Farrell referenced a Compton article

that was used in the cross-examination of Dr. Waller.

Appalachia historically did not have much illicit opioid trade, but became some of the epicenters of the prescription opioid crisis.  These new population of persons with addiction to prescription type opioids were primed for even greater dependence and crisis from the coming influx of heroin and illicit fentanyl in subsequent years, their document used on our expert.

You've heard the testimony of Dr. Keyes who came and also from her epidemiological studies and research concluded that the increased prescription opioid supply and exposure caused the increased mortality in Cabell and Huntington.

She took what our citizens saw and did the study and came to the same conclusion.  Opioid over-supply is a substantial factor in overdose deaths in Cabell and Huntington.

Again, Dr. Gupta in talking about his 2001 and 2015 report, the number one cause of drug overdose deaths was associated with opiates, making West Virginia number one in the nation.

THE COURT:  Ms. Kearse, in your view, did the over-supply actually create a demand for the illegal pills or did it just satisfy the demand that was already there?  I don't think any of your witnesses addressed that.

MS. KEARSE:  Specifically, I think, Your Honor --

1    I think part of our -- the over-supply of the pills that

2    were presented into the community created an addiction to

3    the prescription pills.

4         And Mr. Majestro will tell me if I get anything

5    legalese on that one.  But, but from the evidence, that's

6    what we have seen just from the, from the experts, but also

7    from testimony from, from our witnesses and clients who have

8    testified before Your Honor.

9         Dr. Rahul Gupta -- Mr. Farrell touched on some of

10   these.  I'm going to touch on one report.  We've talked

11   about the 2001 and 2015 a bit.  And just to remind Your

12   Honor, we went through this report, and this was a time when

13   Dr. Gupta became the public commissioner of the State of

14   West Virginia.

15        And the first thing he did was go back and say, "What

16   has been going on?" And actually commissioned a study, a

17   very important study.  He wanted to understand better from

18   the dead so they could help with the living.

19        He testified extensively on this, this chart and his

20   findings on that both in Cabell County specifically

21   throughout and, again, the driving force of opioid addiction

22   within the city and county of Cabell County.  Over 6,000

23   drug overdose deaths in West Virginia from 2015 were

24   opioid-related.

25        And you'll see, Your Honor, there's other drugs and

1    other things within these reports there, but the

2    over-arching driving force of all of these studies and the

3    results coming from those are the opioids detected in the

4    drug overdose deaths.  And I'm not going to go into much

5    detail with that.

6         But I wanted to highlight one other report that we

7    didn't spend a lot of time on.  It was a long couple days

8    with Dr. Gupta.  But he did testify about the 2016 outbreak

9    in the City of Huntington and Cabell County.

10        On August -- in August, 2016, within five hours there

11   were 28 overdoses, one death, and there may have been two

12   subsequent to that.  On this day, the, the City of

13   Huntington and Cabell County contacted the county health

14   department who then contacted Dr. Gupta and asked, "We need

15   to do something.  What is going on?"

16        Dr. Gupta did the same thing as he did in the social

17   autopsy in 2016, and did a study just specific for Cabell

18   County on that day of what happened with 28 overdoses with

19   that.

20        And with that, what he found was three areas that

21   needed to be focused on.  But, again, at least with this

22   time, he actually had living people because they didn't all

23   die.  They could actually go through the records and

24   interview and talk to people of what they did, not all 28,

25   but a number of them.

1          And what he found was that one of the things that they

2     recommended, in addition to gathering data, was the

3     continuum of care was missing when you have someone who

4     overdosed.  How do we get out of a cycle of overdose?  How

5     do we deal with addiction?

6          And one of the things he actually testified to -- and

7     I'll read this to Your Honor for the record.  Again, another

8     study to find out what can we do to -- for the future.

9          "And did you follow up --"

10         Question:  "And did you follow up on these

11    interventions with various community folks with Cabell and

12    Huntington?"

13         "Yes."

14         "So we began to think, okay, how do we work with those

15    recommendations moving forward?  So one of the things we

16    created at the point was called a QRT."

17         Your Honor heard a lot of testimony about the Quick

18    Response Teams.  Quick Response Teams became necessary as

19    some of the cornerstones of what the community needs and

20    other communities in regard to overdoses on that.

21         "QRTs are generally a team of first responders, a

22    social worker, and someone from the Health Department.  So

23    if someone is in the hospital, comes in, and is discharged,

24    within 24 to 72 hours a QRT will go back to the point and

25    ask them, 'Hey, what are all these things we can help you

with?  Can we offer you treatment?  Can we offer you
naloxone?  Can we offer you any other assistance?'  The idea
here was to prevent these people from dying and overdosing
and offering them a non-judgment way of treatment."

The three recommendations that came out were basically
surveillance, the healthcare system response, and community
response, again moving the opioid epidemic into the need for
the surveillance to understand the data, for the healthcare
response to ensure that there's a continuum of care that
someone in the throes of addiction can get the treatment.

It specifically talks about the medically assisted
therapy treatment that we've talked about in our abatement
plan and others have testified through trial and a community
response.

Opioid use disorder.  Mr. Farrell touched about this.
I'll go quickly through this.  But Dr. Keyes talked about
that.  And I'll just, I'll just remind the Court of one of
the consensus statements there; that opioid use disorder is
caused by repeated exposures to opioids.

It seems obvious that you can't have opioid use
disorder without the exposure to opioids.  But Dr. Keyes
took great length and time of going through her analysis to
confirm that through epidemiology, that that is what she has
seen in Cabell County and City of Huntington.

And the tremendous expansion, the supply of powerful,

1    high-potency, as well as long-acting prescription opioids

2    led to scaled increases in prescription opioid dependence.

3    That should be undisputed in this trial.

4        I'll talk a little bit about some of the related harms

5    quickly so that we can just go over some of the evidence

6    that we had.  But then you'll remember I showed this, this

7    earlier about the fabric of the community.

8        But Dr. Yingling laid out a number of the related harms

9    of addiction, as did a number of other experts that I'll

10   highlight with that.  And we kind of drilled down by

11   different subject matter so we could provide Your Honor

12   additional testimony from experts on different things.

13       But the related harms of the addiction of opioids in a

14   community has been the infections of hepatitis B and C; the

15   pregnant mothers and their offsprings affected by addiction;

16   the overflow of the patients in the emergency rooms; the

17   hospitalization of patients; long-term care for those

18   suffering from addiction; and the support systems and strain

19   on Cabell County, City of Huntington; the loss of life,

20   obviously, and the sadness if a loved one dies; the economic

21   outcome of loss of life and displaced families; neglected

22   children placed in foster care.

23       We took what Dr. Yingling talked about as a fact

24   witness and what he's observed as a lifelong resident of

25   City of Huntington and Cabell County and took these -- asked

1    the experts for them to look at their things too.

2        You'll remember Dr. Feinberg.  Dr. Feinberg is a

3    infectious disease specialist at WVU.  And Dr. Feinberg came

4    in to talk about specifically what she had seen in southern

5    West Virginia and specifically what she has witnessed in

6    Cabell County and what she has studied and published on

7    regarding infectious disease and harms.

8        And sometimes these are subject matters that aren't

9    easy to talk about with that.  And sometimes it's hard to

10   even imagine if you haven't been with someone in the throes

11   of addiction of how we've gotten to injected use of drugs

12   and how we get to then the, the harms of infectious

13   diseases.

14       But she testified about the people who inject drugs.

15   Every time you inject, there's a 1 in 160 chance of

16   acquiring HIV.  She talked about the new cases that were

17   coming to Cabell County.  In 2019, 90 percent were among

18   people who inject drugs, opioid-related drugs.

19       And West Virginia has consistently been the top two or

20   three states for hepatitis C infections, while Cabell County

21   has been higher still.

22       She talked about the various hepatitis B, endocarditis.

23   And Dr. Feinberg testified there's no question in her mind,

24   in her professional opinion that the public health crisis of

25   blood-borne disease and opioid use in Cabell County are

1    related.

2        You heard from Dr. Young.  Dr. Young came in and talked

3    about the children of family harms and the opioid epidemic

4    increased child welfare with 80 percent related to substance

5    abuse and the overwhelming number which involve opioids.

6        She talked about the opioid epidemic increasing the

7    percentage of children and the harms to the children with

8    that, as Your Honor will recall.

9        She testified about the pregnant women in Cabell County

10   being admitted for treatment with OUD for prescription

11   opioids, all ways of interventions that need to be

12   implemented in order to work with the opioid addicted

13   population that the city and county are facing today.

14       Again, Dr. Keyes and Dr. Alexander both looking from

15   expert epidemiological studies.  Dr. Keyes:  Increased

16   exposure to the supply of prescription opioids in a

17   community has a positive causal association with child

18   health harms, including Neonatal -- NAS which Your Honor

19   heard about from Dr. Werthammer and others.

20       Dr. Alexander who we'll talk about more with the

21   abatement plan:  The opioid epidemic has created a need to

22   disrupt the cycle, the intergenerational cycle of addiction.

23   This gets passed down not invariably but not uncommonly from

24   a grandparent to a parent to a child and so on.

25       I believe all of our witnesses that came before Your

1    Honor from the community talked about these various issues

2    that then were studied by the experts.

3         I'll touch on this and Mr. Farrell touched on this too,

4    but this will be in the record, Your Honor, and we'll have

5    cites for you.  But when we talk about the transition to

6    heroin and the intertwining of the prescription pills and

7    use of heroin, in addition to Dr. Waller's testimony about

8    the molecular structure, Dr. Keyes testified about the

9    volume of prescription pills increasing to heroin.

10        Dr. Gupta testified that we are consistently gathering

11   data that was showing the use of prescriptions.  And because

12   the supply had reduced, they had transitioned to seek drugs

13   predominantly.

14        You heard from Doctor -- from Skip Holbrook that I

15   showed you earlier.  I believe Mr. Farrell showed you both

16   Dr. Waller and Dr. Gilligan's testimony on this.

17        The record is replete with Dr. Keyes, Dr. Gupta -- I

18   won't go into every one of them.  But Dr. Keyes remembered

19   80 percent of people who have used heroin started with

20   prescription opioids first.

21        Dr. Gupta talked about the clear pathway from

22   prescription drugs to fentanyl as a fact witness.

23        Again, Dr. Waller talked about the brain and the clear

24   connection between prescription opioid abuse and heroin

25   abuse.

1        Dr. McGuire -- you haven't heard much about him today.

2    Dr. McGuire also in his studies and research of the harms

3    associated with Cabell County as he put a dollar sign just

4    to demonstrate for Your Honor the harm that opioids has, has

5    put on the county and city, the high potential for abuse

6    which can lead users to substitute more lethal opioids

7    without accepted medical uses such as heroin or fentanyl.

8        Dr. Alexander we touched about and, again, Dr. Gilligan

9    and Dr. Murphy.  I don't know if we mentioned Dr. Murphy

10   yet, defendants' health economist expert, also testified if

11   you focus on abuse of prescription opioids and abuse of

12   heroin, they're probably closer to substitutes like Coke or

13   Pepsi.

14       Mr. Farrell touched on the abatement plan.  I'm just

15   going to touch on a couple things with this.  And -- but,

16   Your Honor, what we presented to you was well documented

17   within the medical literature best practices of bringing

18   together what is needed for the community.

19       Dr. Alexander specializes as an epidemiologist and

20   works in the abatement.  Each one of these have been

21   actually utilized within the community, not all of them,

22   some of them.  And we went through that in the, the

23   testimony and we'll have more in the findings of fact.

24       Sustainability is an issue.  Whether there is capacity

25   is an issue, and also just ensuring that we have the ability

1    for the funding to put these together.

2        There was some reference to the one epidemic and, and

3    do you treat a prescription epidemic or a heroin epidemic

4    any differently.  It's one epidemic and that's why we've

5    seen throughout this trial, throughout the witnesses there

6    the intertwining of the two of opioids on that too.

7        But each have testified, again Dr. Keyes and Dr.

8    Alexander and Chief Holbrook, that the epidemic is an opioid

9    epidemic, not one particular type of opioid or another.

10   It's an opioid epidemic.  It's had a direct result and a

11   predominant prescription drug threat in Appalachia.

12       Again, Dr. Alexander testified prescription opioids and

13   heroin and fentanyl are two sides of the same coin.

14       I think it's important for our, our abatement plan that

15   we're asking Your Honor the funding for it to demonstrate

16   that there's still an on-going crisis.  And the witnesses

17   both that Mr. Farrell mentioned and that came into this

18   courtroom and as documented in the documents, it's not going

19   away tomorrow.  It's going to take some time and we're still

20   in it.  It's a generational problem, so we will be dealing

21   with it for quite some time.

22       Mayor Williams testified, "We fight it every day."

23       Dr. Alexander testified about the multi-faceted plan

24   and treatment of opioid addiction is an important part of

25   it.  Mr. Farrell touched about this as well.  And we've seen

1    it through just the, the experts in the case that if you're

2    going to deal with the opioid addiction, you're going to

3    have to deal with the, the treatment and the other areas of

4    abatement that we're asking for on that.

5         You'll recall Dr. Waller, first witness, and he was

6    actually asked about MAT.  He actually has testified before

7    U.S. Congress on MAT and has actually written the, the

8    diagnostic book on medically assisted treatment.

9         He had a long conversation about it.  But he also

10   brought it back to the fact that the MAT is a -- evidence is

11   so strong.  It's been greater than half a century.  Hundreds

12   of thousands of publications have backed it up.

13        And it is a treatment for a community.  It's a

14   treatment for individuals.  It's a treatment that ensures

15   that the social networks and stabilize the communities.

16        We thought that was important to remind Your Honor

17   that, that early testimony in the first day as we get to the

18   last day that we're asking for an abatement plan on that

19   too.

20        But, again, Dr. Alexander testified about the reviewing

21   materials he's reviewed and speaking from the individuals,

22   there's still an existential threat to the county and city

23   and we need to scale up our programs.  We need new programs

24   and we need the funding to support it.

25        The cost of doing nothing is nothing.  If we don't

1    address it, we just get into more enormous social and

2    psychological and economic cost of inaction.

3         You heard, Your Honor -- just to, to remind you about

4    some of the sustainability.  We had witnesses on the stand

5    who talked about the various grants they get.  And, and I

6    think every one of our local witnesses talked about the, the

7    time that they take in getting grants to actually work

8    through a lot of these programs with that.  Most everything

9    is written out as grant money.  If you knew -- it is

10   reliable funding that we need.  Sustainability is what it's

11   looking for.  We can't do it all as piecemeal.  The experts

12   agreed grant money is not guaranteed.  Funding is unstable.

13        Mr. Farrell went over the abatement cost plan on that

14   too.  All necessary elements of the plan that Dr. Alexander

15   went through, his working with the community and working on

16   his -- looking at what are the best practices and what are

17   the known practices to alleviate an opioid crisis such as in

18   Huntington and Cabell County.

19        I think it's important that we get this program -- as

20   Jan Rader testified, addiction and substance use disorder is

21   something that people live through, live throughout their

22   lives.  We've taken the plan out to 15 years to accompany

23   that.  It's not an overnight thing that we can work through.

24   We need to take the time and it takes the funding to get to

25   that plan.

1          We saw it during the pandemic.  You heard from various

2     experts of the rising number of overdoses that happened and

3     the fragility of addiction.  And part of that is the ability

4     to have treatment available, have the resources available,

5     have the tools available for people who are addicted.

6          I showed this in, in opening, Your Honor, and I think

7     it's, it's a good way to, to wrap up my comments in addition

8     to what Mr. Farrell covered is that the addiction in Cabell

9     County and City of Huntington has been a community-wide

10    health problem.

11         Addiction of opioids and the other harms associated

12    with that has spread out the ripple effect in the community.

13         And I think it's important with this and we've talked

14    about -- Dr. Gilligan actually was presented with the fact

15    that for every one overdose, for every one death, there are

16    10 treatments of admissions for abuse.  This is from the CDC

17    that he testified about.  32 admissions emergency

18    department.  130 people die who abused -- people who abuse

19    are, are dependent and addicted.  And 825 non-medical users.

20         So it just goes to show that the fact that it's not an

21    individual issue.  It's a community-wide issue.  And I think

22    Your Honor has asked questions about this, why is this not

23    individual issues versus a community issue.

24         I think the evidence has been clear from our experts,

25    from our witnesses that the opioid epidemic has been a

1    community issue.  They have treated it as a community issue.

2    They've worked together as a community to deal with the

3    issues and look for Your Honor to empower them to do more

4    with that.

5         Your Honor, we submit our case to you to empower the

6    City of Huntington and Cabell County to work with the opioid

7    crisis that they have, to work together as they have in the

8    past, and award sustainable funding so that they can deal

9    with their opioid addiction.

10        We also submit to Your Honor that the county and city

11   have an infrastructure within the community to be able to do

12   what they need to do with sustainable funding, funding that

13   we believe that we have proven to your court that we have

14   the need, we have the means, at least to implement it, and

15   we've proven the liability for the responsibility of these

16   companies to fund a program for City of Huntington and

17   Cabell County.

18        Your Honor, thank you for your time.

19             THE COURT:  Thank you, Ms. Kearse.

20        Well, we're way ahead of schedule.  It's 20 till 12:00.

21        Can we come back at 1:00?  Is that too soon, Mr.

22   Nicholas?

23             MR. NICHOLAS:  Whatever is best for the Court.

24   That's perfectly fine.

25             THE COURT:  That will give you enough time to warm

```
1    up?

2              MR. NICHOLAS:  I think so.

3              THE COURT:  Okay.  Let's come back at 1:00.  We'll

4    be in recess until 1:00.

5        (Recess taken at 11:41 a.m.)

6              THE COURT:  Yes, ma'am?

7              MS. WICHT:  Good afternoon, Your Honor.

8              THE COURT:  Good afternoon.

9              MS. WICHT:  Before Mr. Nicholas goes, I wanted to

10   -- when we were last together two weeks ago, we had let you

11   know that there were a few deposition designations by the

12   defense that were still working their way through the

13   process.  We've completed that now.  And so, I just wanted

14   to formally, for the purposes of the record, let the Court

15   know that we've now submitted the deposition designations

16   for Darren Cox, Robert Niddle (phonetic), Michael Mapes, the

17   Cabell County Commission via its 30(b)(6) testimony of Beth

18   Thompson, and some additional designations by Mr. Gilberto

19   Conterro.

20             THE COURT:  Thank you, Ms. Wicht.

21             MS. WICHT:  Thank you.

22             THE COURT:  All right, sir.

23             MR. NICHOLAS:  Good afternoon, Your Honor.

24             THE COURT:  Good afternoon, Mr. Nicholas.

25             MR. NICHOLAS:  On behalf of AmerisourceBergen,
```

1    thank you for your consideration during this entire trial.

2    We are now ready to sum up and we look forward to doing so.

3    And I would start this way.

4        We have nothing but respect for the people of

5    Huntington and Cabell who we met during this trial who are

6    involved in attacking this crisis and turning it around.  It

7    was impressive.

8        But basically every witness in this case has confirmed

9    what really happened here.  Licensed physicians chose to

10   address the issue of pain in Huntington and Cabell County by

11   prescribing more opioid medication.  99-plus percent of them

12   did so in good faith, using their own medical judgment,

13   applying the medical standards of the day.

14       Licensed pharmacies dispensed the medicines that these

15   doctors prescribed.  The only thing to be said about the

16   distributors is that they did not second-guess these medical

17   judgments.  They did not subvert the standard of care.  They

18   did not countermand medical decisions and withhold medicine.

19       They weren't qualified to do that.  It wasn't their

20   place to do that.  The healthcare supply chain would have

21   been fractured had they done it.  And medicine would not

22   have gone where it needed to go.

23       With all that said, AmerisourceBergen did its job.  We

24   had a Suspicious Order Monitoring Program, a really good

25   one, which was described by our witnesses and unchallenged

 1    during the trial.

 2         Who in this trial actually suggested to the Court what

 3    AmerisourceBergen should have done but did not do?  No one.

 4         And let's be clear.  AmerisourceBergen reported

 5    suspicious orders.  We reported them around the country.  We

 6    reported them in West Virginia.  We reported them in Cabell

 7    County.  We reported them in the City of Huntington.  We

 8    also reported every single opioid shipment to the DEA

 9    contemporaneously.

10         Where was the evidence of unreasonable conduct by

11    AmerisourceBergen?  There was none.  And it's not like the

12    plaintiffs didn't have a full opportunity to put on a case.

13    They used six and a half weeks.  They offered historians,

14    data analysts, experts, government officials.  But as we

15    listened to all these witnesses, what stood out is that they

16    didn't have anything specific to say about

17    AmerisourceBergen.  All that they actually established was a

18    number of pills, volume.

19         The hole in the plaintiffs' case, direct causation,

20    simply was not addressed.  The plaintiffs ignored it.  They

21    continued to ignore it through their closings.  They relied

22    on volume, but they provided no context.

23         You know, the plaintiffs are fond of expressions like

24    pill spill, but the distributors did not -- it's not as if

25    the distributors backed a fleet of trucks up, you know, into

1    Huntington and dumped pills into the street.  They shipped

2    medicine to licensed pharmacies pursuant to lawful

3    prescriptions of an FDA approved medication written by

4    licensed doctors and the distribution numbers and the

5    prescription numbers lined up almost exactly 1:1 because

6    prescribing drove, drove distribution.

7         All of this has been a source of enormous frustration

8    and I'm speaking now especially for AmerisourceBergen, Your

9    Honor, whose people are so dedicated, whose determination to

10   do a good job has been so pronounced, and whose record

11   frankly reflects it, reflects that.  We've never even been

12   fined by the DEA.

13        There is, however, a kind of catharsis in having been

14   able to tell our story and expose the plaintiffs' case as

15   misguided, misplaced, and having failed for a lack of proof.

16        And with that, by way of introduction, now I will more

17   formally begin and I'd like to start with the standard.

18         Plaintiffs had to prove that AmerisourceBergen engaged

19   in unreasonable conduct that was a direct proximate cause of

20   the harm they have sought to establish in this case.  They

21   did not establish any unreasonable conduct by

22   AmerisourceBergen and they did not prove causation.

23        The plaintiffs have shown no bad conduct on the part of

24   AmerisourceBergen in Cabell County and the City of

25   Huntington.  Their fallback has been to suggest that there's

1    some kind of systemwide failure on AmerisourceBergen's part.

2    There was no evidence of that either.  So, I'm first going

3    to address the issue of conduct as it relates to Cabell and

4    Huntington and then as it relates to AmerisourceBergen's

5    overall systems.

6         But before I do that, I would like to re-introduce to

7    the Court the four AmerisourceBergen witnesses who

8    testified.  Chris Zimmerman, Steve Mays, David May and

9    Michael Perry all testified as of cross in plaintiffs' case.

10   And if the plaintiffs hadn't called them, I most certainly

11   would have.  They brought something that no one else did,

12   firsthand knowledge from 1998 to the present.

13        Mr. Farrell, I think the first thing he showed you, the

14   very first slide he showed you, was from his historian who

15   made the reference as to how important primary sources are.

16   These are the primary sources, these four witnesses.

17        They were able to testify about meetings they attended,

18   presentations they made, training that they personally did,

19   and interactions that they personally had with the DEA.

20   These were the most informative witnesses in the case.

21   Let's take them from left to right.

22        Chris Zimmerman, who has been with AmerisourceBergen

23   since the mid-1990s, is an industry pioneer and the

24   architect of the 1998 program that the company developed

25   with the DEA and that the DEA approved in writing.  He was

1    on stage with the DEA in 2007 and again in 2009 when

2    AmerisourceBergen's program was held out as the industry

3    standard.

4        Steve Mays.  Steve Mays is a longtime Diversion Control

5    employee with firsthand knowledge of the key events starting

6    in the early 2000s.  He trained DEA diversion investigators.

7    There was testimony in this case about the 2005 DEA

8    distributor initiatives when the DEA met with the different

9    distributors.

10       Mr. Mays is the only person who testified at trial who

11   actually attended these meetings.  Not Mr. Rannazzisi.  Not

12   anyone else.  Only Mr. Mays was there.  And he told the

13   Court what happened and it was not what the plaintiffs said

14   happened.

15       David May joined AmerisourceBergen after a

16   distinguished 30-year career with the DEA to head up

17   Diversion Control beginning in 2014.  He had an ironclad

18   grasp of AmerisourceBergen's program, how it worked, and why

19   it was effective.  He explained how the company leveraged

20   technology as the program evolved.

21       Mike Perry.  Michael Perry was AmerisourceBergen's

22   sales representative in Huntington and Cabell County.  He

23   was a resident of Huntington, a graduate of Marshall, and is

24   devoted, obviously devoted, to his community.  You may

25   recall that he testified with great enthusiasm.

1          What was most important about his testimony was his

2     knowledge and understanding of AmerisourceBergen's customer

3     base in Cabell and Huntington.  He regularly visited these

4     customers.  He was able to describe their locations, their

5     physical appearance, the people who worked there, the kind

6     of business they ran.  He testified about the absence of red

7     flags.  None of Mr. Perry's testimony was refuted.

8          And this leads to the first point.  The plaintiffs did

9     not establish any unreasonable conduct on the part of

10    AmerisourceBergen in Huntington or Cabell.

11         Excuse me.

12         Three important points right off the bat which, by now,

13    are well known to this court.  First, AmerisourceBergen only

14    distributed to licensed pharmacies in Cabell and Huntington.

15    This was confirmed by witnesses from both sides.

16         Second, AmerisourceBergen reported to the DEA every

17    shipment of prescription opioids that it sent to Cabell and

18    Huntington.  Every one.

19         Third, AmerisourceBergen reported suspicious orders for

20    its customers in Cabell County and Huntington.

21         Now, let's take a closer look at AmerisourceBergen's

22    distribution to the plaintiffs in Cabell and Huntington.  We

23    were a full -- a full line wholesale distributor into Cabell

24    and Huntington; meaning AmerisourceBergen distributed the

25    full range of prescription medications and other health

1    products, not just opioids.

2        And understanding that, it is important to look at the

3    overall shipments during the key years to compare the

4    shipments of opioids to the shipments of health medicines

5    overall into the community.

6        On this, on this, we were helped by the testimony of

7    Ted Martins, a Price Waterhouse partner.  He testified late

8    in the trial.  His testimony was brief, but it was extremely

9    interesting.  And here is what we learned:

10       This data depicts what we learned and I would draw

11   several takeaways from this data.  First of all, the overall

12   shipments of all prescription medications to this county was

13   extremely high, very high.

14       Dr. Gupta testified to this, as well.  He told us that

15   West Virginia ranked number one in the country for all

16   prescriptions per capita.  Number one in the country.

17       The next point from -- that we can draw from this chart

18   is this.  Opioids represented a very small percent of the

19   medications.  The opioids are the yellow line.  The overall

20   distribution is the blue line.

21       And the final point is that the shipment of opioids was

22   not out of line at all.  It didn't even keep pace with the

23   shipment of other medicines in, for example, the peak year,

24   which was 2009.

25       If the opioid shipments were disproportionate, the

bottom line, the yellow, would be getting closer to the top line, but it never did.  In fact, the top line moved further away from the bottom line during the crucial years. So, the idea that there was something untoward about the amount of opioids that were shipped into the county is completely undermined right here.  Right here.

Now, let's look at AmerisourceBergen's customers and what we heard about them at trial.  In our opening, I displayed this list of AmerisourceBergen customers in Cabell and Huntington.  Here is the list.  Let's go through it and let's start off with the customers that were not mentioned by the plaintiffs at all.  They're highlighted in yellow.

The plaintiffs had nothing to say, not a word about these AmerisourceBergen customers, and they appear to have no issue with them whatsoever.  These customers comprised a significant portion of our distribution into Huntington and Cabell and include two of the State's leading hospitals, St. Mary's and Cabell-Huntington.  These yellowed customers have gone unmentioned by the plaintiffs, so let's remove them from the list.

Now, let's next go to customers that were mentioned only briefly and only by data experts.  For this next group of customers, the only evidence that the plaintiffs introduced was the number of pills they received.  That was literally it.  And that was the second week of trial and

1   they never circled back.

2       The plaintiffs never proved oversupply to these

3   customers.  The lawyers inferred it, but no one in the trial

4   testified that our distribution to these customers was too

5   high.

6       And, to the contrary, here is what Dr. McCann said on

7   this very point.  Question, and you cannot tell this Court

8   how many prescription opioids should have been distributed

9   to Cabell County or the City of Huntington; correct?

10  Answer, correct.  You cannot say whether or not all the

11  charts you showed over the last day and a half show

12  oversupply or undersupply; correct?  Answer, correct.  And

13  no one else could either.  No one else could either.

14      Back to the list.  The plaintiffs have no evidence of

15  unreasonable conduct as to these pharmacies.  They avoid any

16  discussion of them at all.  Let's strike them off the list.

17      The plaintiffs only paid any attention at all during

18  this trial to four of AmerisourceBergen's 31 customers and

19  very little even as to those.  Let's focus on three of them,

20  two Walgreen's stores and Drug Emporium.

21      The only testimony about these stores was through their

22  expert, Lacey Keller.  The only testimony.  And as this

23  Court will recall, Ms. Keller focused on three prescribers,

24  Deleno Webb, Phillip Fisher and Gregory Chaney, when -- who

25  she tried to connect to AmerisourceBergen.  The evidence was

 1    thin to nonexistent.  This is the sum total of it.

 2        Now, this chart provides me with a jumping off point to

 3    address the top prescriber, bad doctor, whatever you want to

 4    call it point, once and for all.  What is it that the

 5    plaintiffs are actually saying here?  Because it's not

 6    entirely clear.

 7        What they seem to be doing is picking these doctors

 8    that they know later got in trouble and saying that because

 9    they were top prescribers at pharmacies we service, we

10    should have known something was wrong.  So, they're saying

11    we should have seen into the future.  That's number one.

12        But, also, they're taking the expression top prescriber

13    and making it automatically pejorative, but that's -- that's

14    ridiculous.  Look at this evidence.  Look at the top

15    prescribers at these pharmacies.  These -- these are the

16    pharmacies that the plaintiffs picked.  But when we forced

17    their expert to show the real numbers, the whole idea of

18    this fell apart on them.

19        These doctors prescribed less than one percent of the

20    medications at these pharmacies combined.  All three of

21    these doctors combined prescribed less than one percent.

22    Yet, the plaintiffs are acting as if this should have set

23    off alarm bells.  On what basis?

24        Clearly, there was no evidence of unreasonable conduct

25    here.  Let's strike the Walgreen's and Drug Emporium stores

1    from the list.

2             THE COURT:  By medications, are you referring to

3    opioids or all medications?  You said they prescribed less

4    than one percent.

5             MR. NICHOLAS:  Of all -- of all prescription -- of

6    all prescribed -- of all prescriptions.

7             THE COURT:  Okay.

8             MR. NICHOLAS:  The only pharmacy left standing is

9    SafeScript and I think it is correct to say, I think it's

10   correct to say, that we've heard more from the lawyers in

11   their opening and closing about SafeScript than we heard

12   testimony or evidence during the entire trial.

13   Nevertheless, I am happy to talk about SafeScript.

14   SafeScript was only one of our 31 customers.  It had its own

15   DEA registration and its own state license.

16        Here's the evidence that the plaintiffs offered.  They

17   offered volume of pills, the fact that AmerisourceBergen

18   granted a threshold request in October of 2011 when

19   SafeScript's purchases were at 86 percent controlled

20   substances, and they offered the fact that the owner was

21   arrested at a traffic stop and the pharmacy closed.  That

22   was their evidence.

23        Here is the evidence that the plaintiffs did not offer.

24   They offered no evidence that a single prescription pill

25   that AmerisourceBergen distributed was diverted.

1          They offered no evidence that the owner or the

2     pharmacist was ever prosecuted.

3          They offered no evidence that SafeScript ever failed a

4     Board of Pharmacy inspection.  And we heard testimony about

5     how often the Board of Pharmacy did its inspections.

6          We heard no evidence that the Board of Pharmacy took

7     any action.

8          We heard no evidence of any actual harm tied to

9     SafeScript.

10         We heard no testimony from any plaintiffs' witness who

11    knew anything about SafeScript.  Nothing.

12         We heard no evidence of any investigations or action

13    taken by the Huntington Police Department.

14         And on this point about the Huntington Police

15    Department, this Court admitted into evidence at least four

16    years' worth of Huntington Police Department's annual

17    reports, as well as numerous drug threat assessments.  Those

18    reports and assessments set forth the department's

19    accomplishments in detail, including drug arrests and

20    investigations.

21         There is not a single reference to SafeScript in any of

22    these documents.  And if SafeScript was an issue, if it was

23    an issue, it would have been in there.

24         And how do we know it?  We know it because when there

25    was a problem with a pharmacy in the community the

1    Huntington Police Department wrote about it.  Their 2014

2    Annual Report provides a ready example, A Plus Pharmacy,

3    which was not serviced by any distributor in this case.

4         This pharmacy really was a problem in the community,

5    but incredibly unsurprisingly, plaintiffs didn't talk about

6    it at all.  Didn't mention it.

7         Now, here is what AmerisourceBergen offered as to

8    SafeScript.  Every transaction down to the pill level was

9    reported to the DEA.  AmerisourceBergen reported suspicious

10   orders for SafeScript to the DEA.  And here they are.

11        AmerisourceBergen conducted due diligence reviews of

12   SafeScript.  Here are notes in our files in evidence in this

13   case describing a portion of our due diligence to

14   SafeScript.

15        SafeScript's volume of -- SafeScript's volume of

16   opioids went down every year from 2007 forward.  That runs

17   directly counter to everything that the plaintiffs are

18   implying about SafeScript, but there it is.  I believe the

19   blue is oxycodone.  The red is hydrocodone.

20        Now, Your Honor may recall that the plaintiffs tried to

21   make something of an issue out of a threshold increase in

22   2011.  This threshold, the threshold, in fact, moved up and

23   down over the years in response to the pharmacies' needs.

24        Now, the plaintiffs would have you believe that this

25   one threshold increase led to an influx of pills.  But what

1    actually happened?  SafeScript's volume of opioids went down

2    after the threshold increase.

3         Question, all I want to ask you is -- this is to Dr.

4    McCann, their expert -- is, this is August of 2011.  Just

5    from your analysis of the ARCOS data, after August, 2011,

6    SafeScript's purchasing for oxycodone actually went down,

7    correct?  Answer, this e-mail seems to have been effective.

8    Question, effective in lowering SafeScript's purchasing,

9    correct?  Answer, correct.  And the e-mail reference was an

10   e-mail from AmerisourceBergen.

11        Continuing on.  As soon as we learned there was a

12   problem with the owner, we terminated the relationship.

13   Most importantly was Mike Perry's firsthand account.  And

14   what did he say?  He said he visited at least every other

15   week.  He visited SafeScript, as he visited his other

16   customers.

17        He said SafeScript was licensed by the Board of

18   Pharmacy and the DEA.  He saw no lines.  He saw no people

19   loitering outside.  He saw no empty pill bottles or needles.

20   He saw no out-of-state license plates aside from the

21   Tri-State area license plates.  He had no concerns about his

22   contact, who was the Pharmacist in Charge, and he was aware

23   of a customer base that fit the profile of the pills that

24   were being shipped.

25        So, let's go back to our customer list to close the

1    loop on SafeScript.  It's one of 31 customers.  There is no

2    evidence of any diversion and there is no evidence of what

3    the plaintiffs are implying.

4        How is this the cornerstone of their -- a cornerstone

5    of their entire case?  SafeScript should come off the list.

6    And this should be the end of the case.  They did not prove

7    any unreasonable conduct in this jurisdiction, let alone

8    unreasonable conduct that caused any harm.

9        With zero evidence of unreasonable behavior by

10   AmerisourceBergen and Cabell or Huntington, the plaintiffs

11   have tried to put forth a secondary position, that our

12   system had, quote, "systemic", unquote, failures that

13   affected Cabell and Huntington in some way.

14       The huge problem with this, even leaving aside

15   causation for a minute, is that there was no proof of

16   systemic failures.  Let's begin at the beginning and look at

17   the legal requirements under the CSA.

18       The CSA asks four things of distributors.  The first is

19   physical security.  As long as controlled substances are in

20   the possession of a distributor, they must be kept under

21   lock and key and stored safely pursuant to very specific

22   physical requirements.

23       This is a big undertaking.  Mr. Zimmerman recited the

24   specifications for you in his testimony.  They were

25   extremely detailed.

1    And this Court heard no evidence from the plaintiffs

2    that we failed to meet the physical security requirements

3    whatsoever.  There is no evidence that opioids were diverted

4    while under our control.  That is undisputed.  We can check

5    that one off in green.

6    The second CSA requirement is license verification.

7    The plaintiffs have talked about customer due diligence and

8    Know Your Customer requirements.  We do those things, and I

9    will get to them in more detail in a minute, but let's look

10   at what the regulation requires.

11   The registrant shall make a good faith inquiry either

12   -- inquiry either with the administration or with the

13   appropriate state controlled substances registration agency,

14   if any, to determine that the person is registered to

15   possess the controlled substance.

16   This isn't a disputed issue in the case either.  The

17   plaintiffs' experts have acknowledged as much.  We can move

18   on.  We can move on.

19   But before I do, and so we can -- we can go back to

20   that one and we'll move on, but I do want to touch on the

21   issue of customer due diligence a little bit further right

22   now.

23   The plaintiffs have tried to suggest that we didn't do

24   sufficient due diligence on our customers.  They've provided

25   no support for that other than to say it, but we have

 1    discussed our due diligence in detail.  For example, it is

 2    in the record that we did investigations into nine of our

 3    customers in Cabell-Huntington and in many, many other

 4    pharmacies nationwide.  It's in the record that we have,

 5    over the years, developed all manners of data analytics that

 6    we use every time that an order is flagged for review that

 7    requires human personal review.  That's due diligence.

 8        It is in the record that Mr. Perry, as an example,

 9    walked into these pharmacies not once, but every couple of

10    weeks.  He knew what he was looking for and he kept his eye

11    out for red flags.  All of this is in the record.  All of

12    this is due diligence.

13        The plaintiffs have showed you nothing to counter this.

14    They just keep saying that we didn't do due diligence.  But

15    that's not true.

16        We introduced evidence of due diligence at a number of

17    pharmacies.  Here are two examples.  The -- and I'll read

18    them.  These are -- so, this is -- this is internal

19    communication reciting some of the due diligence that we did

20    and these are contemporaneous documents.

21        The account manager, Michael Perry, forwarded the CSRA

22    Form 590 and photographs.  Investigation does not indicate

23    any type of diversion.

24        And the dashboard on the right is the evidence that we

25    continued to -- we continued to review and analyze this

1    pharmacy routinely through 2015, which is when we stopped

2    doing the business with them.

3         The same is true -- and I just read to you from -- this

4    was the McCloud Family Pharmacy.

5         The same is true for Drug Emporium.  Same idea.  CSRA

6    initiated an investigation of Drug Emporium number 1.

7    Account manager Michael Perry completed CSRA Form 590.

8    There is no indication of diversion.  And, again, here the

9    dashboard from 2015 proving up the continued due diligence.

10        And just to -- and just -- just to pause here, we

11   introduced records of this nature during the course of this

12   trial.  I heard Mr. Farrell say we didn't keep records, but

13   we did keep records.

14        You heard about our due diligence from our witnesses,

15   each of whom described what we do with specificity and

16   detail of record and under oath.

17        So, back to the requirements under the CSRA.  We've

18   already shaded in license verification.  Good.

19        The third thing that's expected of distributors, the

20   third requirement, is ARCOS reporting.  The Court has heard

21   a lot of -- this Court has heard a lot about ARCOS reporting

22   and the fact that the distributors are required to report to

23   the DEA all shipments of prescription opioids to its

24   customers down to the individual transaction level.

25        We did that as confirmed by plaintiffs' expert, Craig

1    McCann.  Virtually perfect.  99.9 percent.  So, there's no

2    dispute about our -- meeting our ARCOS requirements either.

3         And the fourth requirement is to maintain a Suspicious

4    Order Monitoring Program.  This is the only subsection that

5    the plaintiffs have pointed to.  Let me read here.  The

6    plaintiff, the registrant, shall design and operate a system

7    to disclose to the registrant suspicious orders of

8    controlled substances.

9         The registrant shall inform the field division office

10   of the administration in his area of suspicious orders when

11   discovered by the registrants.  Suspicious orders include

12   orders of unusual size, orders of -- orders deviating

13   substantially from a normal pattern, and orders of unusual

14   frequency.

15        This is the only subsection that the plaintiffs have

16   pointed to.  It has not changed since 1971 when it was

17   enacted.

18        And I just want to pause on the language for a moment.

19   The first sentence says that the registrant shall design and

20   operate a system to disclose to the registrant suspicious

21   orders of controlled substances.  We did that.  That's not

22   in dispute.

23        The second sentence, the registrant shall inform the

24   Field Division Office of the administration in his area of

25   suspicious orders when discovered by the registrant.  We did

1    that and that isn't disputed either.  We reported suspicious

2    orders, including in Cabell and Huntington.

3        The third sentence reads suspicious orders include

4    orders of unusual size, orders deviating substantially from

5    a normal pattern, and orders of unusual frequency.  Those

6    terms have never been defined and they are subject to

7    different interpretations and factors, but one thing is

8    clear.  One thing is clear.

9        Once Mr. Rannazzisi took over in 2007, the attitude of

10   the DEA became this is for you to figure out.  We aren't

11   going to work with you and we will provide you no guidance.

12   This is on you.

13       Now, this is 2021.  At least since 2007, no one has

14   told AmerisourceBergen your design was wrong, or your

15   threshold should have been tweaked, or you should apply a

16   different definition of unusual frequency.  Even the

17   witnesses in this lawsuit haven't been able to say that.

18       With all the time and money poured into their experts

19   and all the scrutiny of our programs more than a decade

20   after the fact, if there was something actually wrong with

21   our system, they would have told you what it was.  They

22   didn't do that.

23       Our story from 1996 to today is a very strong one and

24   what it shows you, above all else, is that we're not the

25   company that they want to make you believe we are.  We cared

1    about these issues.  We tried to be pro-active at every

2    turn.

3        You met our witnesses, Your Honor.  They're clearly

4    invested in dealing with these issues the right way.  We all

5    heard their testimony over the course of many days.  They

6    were obviously presenting to you, to the best of their

7    ability, the events that happened and the whole history

8    here.  And all of the documents you've seen have

9    corroborated what they said.

10       Is there any doubt?  Is there really any doubt that

11   they were telling the truth?

12        So, now, let's look at what we've learned.  And the

13   easiest way to do this is to work with a timeline.  I've

14   resisted a timeline until now, but it's time for -- it's

15   time for a timeline.

16       In 1996, AmerisourceBergen approached the DEA about the

17   development of a new Suspicious Order Monitoring System.  We

18   approached them.  Technology was changing and we wanted to

19   stay ahead of the curve.

20       So, for two years, Chris Zimmerman and the DEA worked

21   together to develop and test the new Suspicious Order

22   Monitoring Program.  The objective was clear, to make the

23   program, the suspicious order information being sent to the

24   DEA, timely, useful and customizable at the field office

25   level.  The resulting program would flag orders being

1    processed at night that exceeded an agreed upon threshold

2    and automatically faxed a list of them to the local DEA

3    Field Offices in the morning.  To be clear here, the DEA

4    knew that suspicious orders were reported and were then

5    shipped.

6         Now, here is the letter approving our program.  We've

7    seen this several times.  I will, one more time, read from

8    it.  This is to grant approval of your request to implement

9    on a nationwide basis your newly developed system to

10   identify and report suspicious orders for controlled

11   substances and regulated chemicals, as required by federal

12   regulation.

13        DEA managers who have been involved with the testing of

14   the system have relayed their positive opinions regarding

15   its ability to provide information in a fashion which is not

16   only useful overall, but is also responsive to the needs of

17   the individual DEA Offices.

18        And the subject line says approve Suspicious Order

19   Monitoring Program.

20        Now, this could not be clearer and the fact that the

21   plaintiffs are continuing to deny that this was an approved

22   program is emblematic of their entire case.  They are trying

23   to rewrite history.  And they are doing that because they

24   know that this is a really, really bad fact for them, really

25   bad, because at least from 1998 to 2007, we were operating

1    this program with the DEA's express approval and

2    endorsement.

3         This program remained in effect until 2007 and a couple

4    of things happened during that nine-year period between 1998

5    and 2007 that are worth pointing out.

6         From 2001 through 2005, AmerisourceBergen trained the

7    individuals from the DEA who were responsible for

8    investigating diversion and enforcing the Controlled

9    Substances Act.  Steve Mays conducted this training and he

10   showed this Court a copy of the presentation, which included

11   training on the regulations.

12        So, contrary to the plaintiffs' assertion or suggestion

13   that we were somehow in violation of the CSA, the DEA turned

14   to us to train its people about the CEA (verbatim) and its

15   requirements.  Like so many other aspects of this case, Your

16   Honor, they're saying something, but they're not proving it,

17   and the evidence contradicts it.  It disproves it.

18        The other thing that happened during this time period

19   was the 2005 distributor initiative.  Multiple witnesses had

20   talked about these meetings between the individual

21   distributor defendants and the DEA, but Steve Mays was the

22   only witness who testified at trial who actually attended

23   these meetings and can talk about them firsthand.  Here is

24   what Mr. Mays said.

25        Question, and, broadly speaking, what did you

1    understand DEA's concerns to be that they raised to you

2    during this meeting?  Answer, it was exclusively about

3    internet pharmacy and the problems they were having with

4    internet pharmacies.

5        Question, now, do any of these three slides say that

6    the distributors should not ship an order that they deem to

7    be suspicious?  Answer, no, they do not.

8        Question, now, separate from the slides, Mr. Mays, did

9    anyone at the meeting tell you from the DEA that

10   AmerisourceBergen and distributors should not ship a

11   suspicious order?  Answer, no.

12       So, the meeting related to internet pharmacies, and

13   there was no mention at this meeting of changing the

14   practice to stop suspicious orders before they were shipped.

15   This testimony and the memo next to it, which is the memo

16   summarizing the meeting that was prepared by the DEA, are

17   consistent.  There is no reference in this letter to not

18   shipping suspicious orders.

19       Steve Mays also testified about the steps

20   AmerisourceBergen took after the meeting.  Mr. Mays, can you

21   briefly describe this new investigative program that you

22   initiated -- in response to DEA's internet pharmacy

23   initiative?  Yes.  It was, again, based on the discussion

24   that I had with the DEA in the August meeting.  We put

25   together a policy and a procedure on how these

1    investigations were being conducted, identified the sources

2    that would prompt one of these investigations, mainly the

3    review of the possible excessive Suspicious Order Report.

4        Also, if we got a notification from DEA that they were

5    concerned about a customer, or if they took action against a

6    customer, that would prompt one of these investigations.

7        And, also, if we were notified by a distribution of

8    concerns or someone from the sales team, any of those three

9    areas would prompt one of these investigations.  This is

10   pretty detailed testimony.  And I even put in, you know,

11   specific procedures that had to be followed on each one to

12   make sure that we were consistent in how we conducted them.

13       This brings us to 2007, when the DEA issued an

14   Immediate Suspension Order for AmerisourceBergen's Orlando,

15   Florida facility.  As Your Honor has heard, this came as a

16   complete surprise.  And that's what Mr. Zimmerman told you

17   when he testified.

18       We went to the 2005 meeting, he said.  We implemented a

19   new policy.  We opened up additional investigations.  We had

20   open dialogue with the Orlando DEA Office.

21       In 2006, they submitted us a list of questionable

22   pharmacies.  We investigated them.  We shut some down.  We

23   denied others from opening.  This is in 2006.

24       And then, you know, to get the immediate suspension

25   orders as we're working with the local DEA Offices was a

1    shock without any notice of any issues going on in Florida.

2         Mr. Zimmerman went on to explain that the suspension

3    order was related to four internet customers, three of which

4    we had already cut off as customers.

5         Now, there are a few key points about the suspension

6    order that were made very clear during the course of the

7    trial.

8         First, the Orlando distribution center did not service

9    West Virginia or Cabell.

10        Second, the suspension was limited in both scope and

11   duration.

12        Third, there was no admission of liability.

13        Fourth, there was no fine.

14        And, fifth, we began daily reporting of controlled

15   substance sales, which we continue to do to this day.

16        And AmerisourceBergen and DEA worked together to design

17   a new program that would become the new industry standard.

18        I want to pause here, first all, to take a sip of

19   water.

20             THE COURT:  You tell me when you need a break, Mr.

21   Nicholas.

22             MR. NICHOLAS:  I'm okay.  You tell me if you need

23   a break.

24             THE COURT:  Don't worry.  I will.

25             MR. NICHOLAS:  I would like to pause here to

 1    address an issue that came to be known in the litigation as

 2    do not ship.  I have alluded to this already, but let's put

 3    it to rest.

 4        You will recall that AmerisourceBergen stopped shipping

 5    suspicious orders in 2007.  The other distributors stopped

 6    in that same general time frame.  In this litigation, in the

 7    litigation generally and in this case specifically, the

 8    plaintiffs have argued vehemently at times, at least for

 9    awhile, that the distributors had never been allowed to ship

10    orders that had been reported as suspicious, that the

11    regulations and the DEA forbade it.  In the face of the

12    following evidence, Your Honor, this position became totally

13    untenable and insupportable.

14        First of all, the shipping requirement does not appear

15    in the regulation.

16        Second, Chris Zimmerman, who was developing, testing,

17    and getting the Suspicious Order Monitoring System approved

18    by the DEA during this period testified that there was no

19    such requirement and explained why the distributors were

20    continuing to ship.

21        So, is it correct -- my question now, under this new

22    approved program, was AmerisourceBergen required to hold and

23    not ship?  Answer, no.  So, is it correct that the DEA

24    approved the 1998 program that included reporting suspicious

25    orders after shipping them?  Answer, yes.

1    Question, now, why would you ship orders that were

2    suspicious?  Answer, again, we reported our orders that we

3    felt were suspicious, but we would ship the -- we shipped

4    the order not to impact patient care and the supply channel.

5    This point about not disrupting the supply channel is

6    extremely important because every order that's blocked is an

7    order that isn't going to get to a patient for whom it was

8    prescribed.  But, in any event, Chris Zimmerman isn't alone

9    in his position that there was not a no ship requirement.

10    Let's look at what Thomas Prevoznik from the DEA had to

11    say.  Now, we saw a lot of clips from Mr. Prevoznik in Mr.

12    Farrell's closing, so I'm happy to be able to show you this

13    one.

14    Okay.  Mr. Prevoznik, the DEA approved for

15    implementation nationwide a Suspicious Order Monitoring

16    System that reported suspicious orders to the DEA on a daily

17    basis after the report -- after the orders had already been

18    shipped, correct?  Answer, yes.

19    Also, Your Honor may remember taking judicial notice of

20    what's been referred to as the money case in federal court

21    in Michigan where DEA officials absolutely acknowledged that

22    there was not a no-ship requirement.  I'll read from just --

23    five sentences or a few sentences.

24    The opinion states, in all events, Wright, that's Kyle

25    Wright of the DEA, testified that the DEA was aware that it

1    was standard practice in the industry to file Suspicious

2    Order Reports while continuing to ship products and that

3    practice -- and that practice had been approved by the DEA.

4         Wright's supervisor, Michael Mapes, told distributors

5    that the DEA's pharmaceutical -- at the DEA's pharmaceutical

6    conference on September 11th, 2007 that the DEA's new

7    interpretation of the suspicious order regulation was that

8    distributors should suspend shipments if they routinely

9    report suspicious orders when reasonably they are destined

10   for the illicit market.  Mapes informed Wright of that

11   policy interpretation, as well.  And then, finally, of

12   course, that is all the regulation requires.

13        So, based on the evidence, it does not appear that

14   there was ever a basis for pursuing this theory which is so

15   directly contradicted by the record.  Maybe the plaintiffs

16   have dropped it.  It wasn't mentioned in Mr. Farrell's

17   closing.  They should drop it, if they haven't.

18        And we can now return to the timeline where

19   AmerisourceBergen had its license in Orlando restored and

20   developed a new national program to detect and report

21   suspicious orders.  Steve Mays testified about the

22   development of the new program in 2007 and his interactions

23   with the DEA.  The DEA liked the program that

24   AmerisourceBergen developed so much that they decided to

25   show it off to the industry a few months later.

1          In September, 2007, Mr. Zimmerman was asked to present

2     the new program to the DEA's distributor initiative

3     conference.  To this day, the DEA's website describes the

4     presentation that Mr. Zimmerman gave with Mike Mapes, then

5     Chief of the DEA's Regulatory Section, by his side.

6          And what did Mike Mapes think of AmerisourceBergen's

7     program in 2007?  We asked him at his deposition.  This is

8     very, very powerful testimony, I believe.  I would submit.

9          After you -- after you reviewed the new changed program

10    that AmerisourceBergen had developed, you attended the

11    DEA-sponsored pharmaceutical industry conference in Houston,

12    Texas, in September of 2007.  Do you recall that?  Yes, I

13    do.  And that was a DEA Diversion Control Division-sponsored

14    conference?  It was.

15         Did you have an understanding that Chris Zimmerman was

16    asked to present at this conference because you and the DEA

17    thought that AmerisourceBergen's new system, the changed

18    system, was appropriate and would be good to share with

19    others in the industry?  Yes.  That was my understanding of

20    why he was asked to be part of that.

21         Do you believe -- was it your understanding that it was

22    expected by the DEA, to your understanding, to serve as a

23    new standard?  It is my understanding that

24    AmerisourceBergen's system was an example of a system that

25    contained the type of information that we were looking for.

```
 1              THE COURT:  Excuse me.  Go ahead.

 2              MR. NICHOLAS:  Question.  Last question, last

 3    answer.  And was compliant with the Controlled Substances

 4    Act?  Answer, yes.

 5         There is no better evidence that AmerisourceBergen's

 6    program was compliant than the words of the person at the

 7    DEA whose job it was to keep a sharp eye on these

 8    distributors and their programs.

 9         In keeping in line with that, we were asked to present

10    again in 2009 a similar presentation.  Here it is.

11         In 2014, AmerisourceBergen hired David May, 30 years

12    with the DEA, to head up its Diversion Control Team.  His

13    presentation to this Court of the main features of

14    AmerisourceBergen's program was unchallenged and it was

15    impressive.

16         Here are some of the things, a few of the things, that

17    Mr. May talked about in a lot more detail than this slide

18    shows:  The leveraging of technological advancements to aid

19    human review.  The refinement of analytics in addressing

20    customer orders.  The expansion of our Diversion Control

21    Team to include investigators, pharmacists, other law

22    enforcement.

23         And to give you just one concrete example, just one of

24    what I'm talking about, you saw the dashboards during Mr.

25    Mays' -- Mr. Mays' testimony.  The sole purpose of these
```

1    dashboards is to make sure that human reviewers have all of

2    the information they need to make good decisions.

3        These reviewers are not just stamping "approved" on

4    these orders.  They're assessing a great deal of information

5    about the customer and about making decisions and they're

6    making decisions in accordance therewith.

7        The reason I'm dwelling on this, this is all due

8    diligence.  That's what this is.  This is diligence.  And

9    the company was doing whatever it could to stay on the

10   cutting edge of technology and analytics.

11       If the plaintiffs' claim is that we don't care about

12   diversion, that does not hold water.  It's clear that we've

13   gone above and beyond to advance and update our Diversion

14   Control system.

15       If they're attacking the concept of thresholds, which

16   we and all the distributors use as our method to flag

17   orders, we didn't hear that criticism from any of the

18   witnesses at trial and no one suggested another way to do

19   this.  They didn't say what the threshold should be.  They

20   didn't say how it should be calculated.

21       If they're attacking our use of a multiplier, which is

22   also something that all distributors use in connection with

23   setting the threshold, none of their -- none of the

24   plaintiffs' witnesses said to you the multiplier we used was

25   wrong.  And none of them suggested what they thought the

1    multiplier should have been.

2         Because these are difficult, complex decisions,

3    especially with no guidance, especially with no guidance

4    from the DEA, but the DEA knew what we were using all along.

5    They signed off on it.  They signed off on it in 1998.  And

6    they signed off on it again in 2007.

7         They have put on no evidence that anyone other than the

8    attorneys have an issue with how we calculated thresholds or

9    the multiplier.

10        To seal off this point, there is nothing else to put on

11   this timeline.  No shutdowns.  No suspensions.  No fines.

12        Your Honor, I can keep going, but since I think I'm the

13   only person going this afternoon, if you wouldn't mind, if

14   we could take just a five-minute break?

15             THE COURT:  Yes, that would be fine.  I've already

16   told Ms. Mainigi she wouldn't have to argue today.

17             MS. MAINIGI:  Now, Your Honor --

18             THE COURT:  So, we've got a bad time.  I've done

19   some bad time management, but I'm stuck with it.

20        We'll be in recess for about ten minutes.

21             MS. MAINIGI:  I appreciate you keeping the deal,

22   Your Honor.

23        (Recess taken)

24        (Proceedings resumed at 2:08 p.m. as follows:)

25             THE COURT:  All right, sir, you may proceed.

1            MR. NICHOLAS:  Thank you, Your Honor.

2       In the face of all of this positive and favorable

3  information about AmerisourceBergen's system and how it

4  operated in real life, the plaintiffs have mounted no actual

5  challenge.  No one addressed the specifics of our program at

6  all.  No one disputed a word that Mr. May, Mr. Mays, or

7  Mr. Zimmerman said.  No one challenged any of their

8  recollections of meetings or events.

9       Instead, the plaintiffs limited their case on conduct

10 to their two supposed star witnesses, the expert James

11 Rafalski and the former head of Diversion Control at DEA,

12 Joseph Rannazzisi.

13      Okay.  A few observations about the testimony of Mr.

14 Rafalski.  I am not really going to talk about the fatal

15 infirmities with his supposed methodology.  That has been

16 well briefed to Your Honor.  And I know you're still

17 considering those issues and consider -- in connection with

18 the *Daubert* motion, *Daubert* challenge.  But I will say this

19 much.

20      This expert looked at you and everyone with a straight

21 face and he testified that these distributors should have

22 blocked 90 percent of the opioid medications to Cabell and

23 Huntington during all of the years in issue.  That was

24 outrageous and it was preposterous.

25      It was outrageous because it would have had the absurd

1    and heartless effect of depriving almost everyone in the
2    county and in the city from medicine to treat their pain as
3    prescribed by doctors.
4         It was preposterous because it assumed that almost all
5    of the doctors in the county and in the city didn't know
6    what they were doing or had bad intentions.
7         Mr. Rafalski should be afforded no credibility.  His
8    testimony should be disregarded.  And the fact that the
9    plaintiffs plowed ahead with his testimony, testimony of
10   that nature undermines their credibility.
11        Consider what the plaintiffs promised as to how Mr.
12   Rafalski was going to prove out their case and then compare
13   it to what he did and did not do.
14        Recall Mr. Farrell's promise because it was, it was
15   colorful.  He made a huge deal about how he was going to do
16   it.  He said that Mr. Rafalski was going to develop and
17   present what he called a case file -- those were his words,
18   Mr. Farrell's words -- that would catalogue
19   AmerisourceBergen's conduct, a case file that he would bring
20   to Your Honor and give to you proverbially, and that he was
21   going to march that case file into court and show it to you,
22   a case file about our failings.
23        Well, where was the case file?  As to
24   AmerisourceBergen's customers in Cabell County and the City
25   of Huntington, he did not mention a single one.  And he

1    admitted that he offers no opinions about whether diversion

2    occurred at the pharmacy level, no opinions.

3         As to the thresholds used by AmerisourceBergen to flag

4    potential suspicious orders, he testified that there is not

5    one, quote, particular golden rule on what the trigger

6    should be, unquote, but then proceeded to flag an

7    astronomical percentage of the orders that AmerisourceBergen

8    shipped into Cabell and Huntington.

9         Yet, he did not even look at the orders he flagged or

10   that he was challenging, not even the initial order that

11   triggered the thousands of orders that followed.  He

12   couldn't be bothered to look at it or testify about it.

13        As to the one thing that he did offer an opinion on,

14   the one thing, due diligence, he simply offered a completely

15   empty conclusion without identifying the tiniest sliver, the

16   tiniest morsel of evidence about it.

17        This was their big moment.  Okay?  This was their --

18   this was what they were building to.  After all of the

19   build-up about Mr. Rafalski, there was this key question by

20   Mr. Farrell to Mr. Rafalski about due diligence:

21        Question:  "And have you gone through the customer

22   files and the documents produced by AmerisourceBergen,

23   McKesson, and Cardinal Health?"

24        "I have, Your Honor."

25        "And have you found sufficient evidence in this

1    record -- in the record to dispel the suspicion of any of

2    these orders that, that were or should have been flagged?"

3         "I have not, Your Honor."

4         And that, that was the sum total of Mr. Rafalski's

5    discussion of due diligence.  That is the case file that he

6    came in here with.  That's it.  That is it.

7         Now, here's what he did not come in with.  He didn't

8    come in with testimony about what AmerisourceBergen's due

9    diligence files contained.  He didn't come here with

10   criticisms of any shortcomings, examples of things that were

11   missing.

12        How much in the files themselves?  He said he reviewed

13   them.  But he didn't tell you a single thing that was wrong

14   with AmerisourceBergen's due diligence.

15        So that was Mr. Rafalski, one of two star witnesses for

16   the plaintiffs.

17        And the other star witness was Mr. Rannazzisi, Joseph

18   Rannazzisi, the former head of Diversion Control for the

19   DEA.

20        He actually wound up testifying quite favorably about

21   AmerisourceBergen.  He corroborated our evidence.  And he

22   was actually careful not to criticize us.

23        For example, he acknowledged that he was briefed on the

24   fact that AmerisourceBergen took actions after the 2005

25   distributor initiative.

1      Question:  "And, so, can you agree with me that

2  AmerisourceBergen took affirmative steps in line with DEA's

3  suggestions coming out of that meeting?"

4      Answer:  "I was told that you had altered or changed or

5  modified how you were looking at suspicious orders, yes."

6      He confirmed we never paid a fine.

7      "In fact, to your knowledge, AmerisourceBergen has

8  never paid a fine to the DEA; is that correct?"

9      Answer:  "As far as I know, we've never had a fine from

10  AmerisourceBergen."

11      And he confirmed that there were no subsequent

12  enforcement actions after the Orlando settlement in 2007.

13      "Mr. Rannazzisi, did DEA bring additional actions

14  against AmerisourceBergen during your tenure as Deputy

15  Assistant Administrator?"

16      "I don't recall any additional actions against

17  AmerisourceBergen."

18      So the two witnesses that plaintiffs said would

19  establish unreasonable conduct on the part of

20  AmerisourceBergen did not.

21      And as we return at last to the regulation and the

22  supply -- and, and we consider the supply chain and the

23  history and we take stock, here is what we see:  Compliance

24  with the CSA.

25      So what is left of Ameri -- so let me, let me take a

1    beat here.

2         What is left of plaintiffs' case?  Volume.  It's

3    volume.  But there is a perfectly rational explanation as

4    told almost entirely during this trial, during this trial

5    through the plaintiffs' own experts.

6         The plaintiffs' six-week presentation of evidence

7    boiled down to this one thing:  Volume.  All that they have

8    done is to suggest that the -- is to suggest that the number

9    of opioid pills shipped to Cabell and Huntington was too

10   high.

11        They basically asked you to draw an inference that the

12   distributors should have known this and in some ill-defined

13   way, they should have shipped fewer pills.

14        Why the distributors should have been expected to

15   conclude this based on bulk orders they were receiving from

16   licensed pharmacies who were filling lawful prescriptions is

17   left unexplained.

18        And how distributors could have responsibly cut their

19   shipment down without -- their shipments down without

20   disrupting the doctor/patient relationship, the role of the

21   pharmacy, or the supply chain overall is unexplained.

22        Remember, distributors don't see individual

23   prescriptions.  They don't see -- they don't see patient

24   information.  They don't communicate with doctors.  They're

25   shipping orders in bulk.  They're shipping orders in bulk.

1    If they were to cut off supply, a random subset, a

2  random subset of patients with opioid prescriptions that

3  were written by well-intentioned doctors would not get their

4  medicine.  Patients on Hospice, patients with cancer,

5  patients with debilitating pain, those are examples of

6  people who may not get their medicine -- who wouldn't get

7  their medicine.  This just makes no sense.

8    Besides, volume has been well explained in this trial

9  by many, many witnesses, including the plaintiffs'

10 witnesses.

11    First, prescribing drove volume.  If there is one thing

12 in this case that pretty much every witness from both sides

13 has said and agreed upon by now, it is that the distributors

14 didn't determine volume.  Doctors determined volume.

15    Second, there are clear identifiable reasons why

16 prescribing increased.  We're not one of them.  There is an

17 overwhelming amount of evidence from this trial about the

18 increase in prescribing of opioids in Cabell County and the

19 City of Huntington, as well as in West Virginia, and as well

20 as in the United States.

21    And the reasons for this are no secret and have been

22 extensively addressed by a number of experts, as well as

23 most other witnesses.  The standard of care for the

24 treatment of pain changed over time.

25    That is why, that is why witness after witness has told

1   you that 99 and a half percent of these doctors were

2   prescribing in good faith.  They were following the standard

3   of care.  And here are all of the plaintiffs' witnesses who

4   told you that.

5        Third, the plaintiffs' data experts drove these points

6   home.  They drove them home.  Plainly, the change in the

7   standard of care increased opioid prescribing which in turn

8   increased opioid distribution.

9        The plaintiffs have harped on the fact that the average

10  distribution of opioids in Cabell and Huntington was higher

11  than the West Virginia and national average.  That's solely

12  because prescribing was higher in the state -- was higher

13  than the state and higher than the national average.

14       Start with -- so let's just look at the data and let's

15  look at what their witnesses say.  Start with the trends.

16  Okay?

17       Plaintiffs' expert Lacey Keller looked at prescribing

18  in Cabell/Huntington.  And their expert, Dr. McCann, looked

19  at distribution in Cabell/Huntington.  And the trends

20  matched.

21       Question:  "So the chart that shows prescriptions and

22  the chart that shows distributions generally follow the same

23  pattern; correct?"

24       "Yes."

25       And then check out this quote:

1       Question:  "Okay.  And the fact that prescribing in

2   Cabell County peaked in 2009 is entirely consistent with

3   your countless opinions that distribution peaked in 2009;

4   correct?"

5       "Correct.  That's what I say.  They're two sides of the

6   same coin."

7       Now go to the numbers.  Down to the person, the numbers

8   matched.

9       "Now, do you have any quarrel, Ms. Keller, with the

10   observation that your per capita prescription analysis and

11   Dr. McCann's per capita distribution analysis come within

12   one pill of each other over this nine-year period?"

13       "That's what the math is, yeah."

14       Question:  "That's what the math shows.  So the IQVIA

15   prescription data and the ARCOS distribution data get us to

16   the same place; correct?"

17       Answer:  "Again, they're two different sides of -- one

18   is shipments and one is prescriptions, but they -- for that

19   time period, we both arrive at about the same number of

20   pills per person."

21       She's understating it when she says "about," "about the

22   same number."

23       They -- it is actually amazing when you think about it.

24   These two experts worked separately with two different

25   datasets.  One looked at prescribing and one looked at

1    distribution and they arrived at the exact same number.

2    Prescribing equaled volume.  It was the same thing.

3         There was no denying this, and no one denied it.  And

4    there was no other explanation for the increase in

5    distribution other than increased prescribing.

6         What also came clear from the evidence is that the

7    plaintiffs did not and could not demonstrate over-supply.

8    Over-supply would mean our distribution exceeded

9    prescriptions, but that didn't happen.

10        And plaintiffs never said how many pills we should have

11   shipped.  They've not even tried to approximate the number.

12   Have they offered any evidence, for example, that we should

13   have shipped 10 percent fewer pills?  That we should have

14   shipped 20 percent fewer pills?  No, they have not because

15   they can't.  They can't.

16        They know perfectly well -- they know that behind each

17   pill was a prescription written by a doctor in this

18   community based on the doctor's medical judgment that

19   neither the plaintiffs nor -- neither the plaintiffs'

20   lawyers nor their experts were going to challenge.  They

21   just weren't.  And they didn't.

22        The last point about volume is this.  Distributors

23   should not second-guess prescribers.  It's dangerous to do

24   that.  The consequences of doing so are dangerous.  It is

25   not the distributors' role to second-guess doctors.

1    Question to Mr. Rannazzisi -- to Mr. Rafalski:

2    "There's no determination -- no requirement in the

3    regulations that distributors have to affirmatively

4    determine that prescribing decisions are legitimate, is

5    there?"

6    Answer:  "I'd agree with that."

7    Question to Mr. Rannazzisi:  "And a distributor cannot

8    make the determination if a controlled substance is

9    medically necessary for a particular patient; correct?"

10   Answer:  "Yes.  And we've never asked a distributor to

11   do that."

12   There are real patient access risks in arbitrarily

13   cutting supply.  Here's what Mr. Rafalski said:

14   "Okay."  Question to him:  "Okay.  If you impose

15   arbitrary limits, you might impact diversion, but you might

16   also keep it from people who need it; correct?"

17   Answer:  "That's, that's my point, yes, sir."

18   Question:  "That would be a concern for the

19   distributors too.  If they arbitrarily imposed limits on

20   prescription opioids, that could also prescribe [sic]

21   medication from people who needed it.  True?"

22   And then, "Is what I said true?"

23   Answer:  "Yeah, it's true."

24   This next quote, this one I want to -- I need to dwell

25   on just for a minute.

1     "So, Mr. Rannazzisi --"

2     He was being questioned about the quota.

3     "So, Mr. Rannazzisi, as the opioid epidemic and opioid

4  diversion grew, why didn't DEA lower quota?"

5     Answer:  "You can't just lower quota.  It, it doesn't

6  work that way.  And I know people have said this over and

7  over again.  Quota -- it's a scientific and mathematical

8  exercise to ensure that there's enough drug in the system.

9  I always think of it this way.  If you have 100 people and

10  all of those people are trying to get oxycodone and some of

11  them are, are drug-seekers who shouldn't have it and some of

12  them are legitimate patients that need it, maybe they're in

13  palliative care, maybe they're chronic pain, but they need

14  that drug, the quota is established so they will get the

15  drug.  But if I come in and say, you know what, I'm just

16  going to cut it by 20 percent, then that's 20 percent less

17  but that patient, the patient population and those

18  drug-seekers are competing for now 20 percent less.  And

19  that's how shortages occur."

20     "And you had --"

21     Question:  "And you had the concern that if you

22  arbitrarily cut the level of the quota, that could have

23  negative consequences for real-life patients; correct?"

24     Answer:  "Yes, that's correct."

25     Now, I do need to take a beat here and let the irony of

1    this statement by Mr. Rannazzisi sink in.

2         This may be the most frustrating testimony in the

3    entire case because, because this is a perfect statement of

4    our position as well, and it's what we've been saying all

5    along.

6         If we arbitrarily limit the supply, people who need

7    their medication will not receive it.  They will be without

8    it.  We have to be very careful when blocking shipments

9    because we have no way of knowing or controlling who would

10   have access to the limited supply and who would be left

11   empty-handed.

12        Those are the exact same things that Mr. Rannazzisi is

13   saying here in this statement.  And the reason we're so

14   frustrated is because it's perfectly fine when Mr.

15   Rannazzisi explains this to justify why he continued to

16   raise the quota in the midst of the opioid crisis, yet the

17   plaintiffs are unwilling to apply that exact same logic to

18   the position we're in.

19        The plaintiffs want to rely on this erroneous

20   over-simplification that the way to lower volume is to

21   simply not ship opioids in spite of the fact that they're

22   being shipped in response to legal, legitimate orders.

23        To borrow the words of Mr. Rannazzisi, it doesn't work

24   that way.  It doesn't work that way.

25        Even assuming that the plaintiffs proved unreasonable

1    conduct, they still have to prove that the unreasonable

2    conduct was a direct cause of the harm.  They did not do so.

3    They did not prove proximate cause.

4        I want to go back to the supply chain to show you just

5    how far removed AmerisourceBergen is from the alleged harm,

6    and also to highlight how many significant intervening

7    causes exist between the unproven, unreasonable conduct and

8    the alleged harm.

9        AmerisourceBergen is here.  Once AmerisourceBergen

10   distributes the medication to its customers, it has no

11   visibility.  There's the customers, pharmacy, hospital and

12   so forth.  It has no visibility as to what happens after

13   that point.

14       And, most importantly, it never knows the identity,

15   medical condition, or medical history of the patient.  The

16   alleged harm that we're talking about is over -- way over

17   here.

18       Now, we discussed this already, but it is worth

19   repeating now.  The plaintiffs did not prove diversion at

20   any point between AmerisourceBergen and its customers, nor

21   did they prove diversion at the pharmacy level.

22       The plaintiffs focus entirely on downstream diversion.

23   There's just no causation here and there are countless

24   intervening causes.

25       First and foremost, there is -- fundamentally, okay,

1    there's the prescribing relationship between the individual

2    doctor and the individual patient.

3         We had no role into that.  We have no insight into

4    that.  We have no sight line there.  We're not in a position

5    to second-guess the decision made by that doctor for that

6    patient.  And it was not our responsibility to do so.  We

7    also played no role in influencing whether the doctor would

8    prescribe an opioid.

9         Others clearly did; the Joint Commission, the West

10   Virginia Board of Medicine, Purdue Pharma.  In fact, it's

11   the plaintiffs themselves, the plaintiffs who blame the

12   Joint Commission.  It's the plaintiffs who blame Purdue.

13        Even if we were to stop right here, there's no

14   proximate cause.  But to get to the harm alleged here, the

15   plaintiffs had to prove a lot more because the alleged harm

16   is not at the patient level.  It's way out here.  It's very

17   downstream.

18        And when we talk about downstream diversion, this is

19   what it is.  It's medicine cabinet diversion which, which

20   accounts for the overwhelming source of diverted opioids.

21   It's drug trafficking organizations from Detroit, Akron,

22   Columbus.  It's heroin and fentanyl originating from Mexico,

23   from China.

24        All of these things are illegal acts, including the

25   medicine cabinet diversion, quite honestly.  All of these

1    things are illegal acts.  Diversion by definition is illegal

2    conduct.  Illegal acts break the causal change.  And

3    AmerisourceBergen should not be financially responsible for

4    harm it did not cause.

5         The bridge is too far, way too far to try and connect

6    AmerisourceBergen to the alleged harm.  They didn't prove

7    direct proximate cause.

8         Now, the last thing I want to talk about, Your Honor,

9    and I'm going to do it briefly, is abatement.

10        I never, I never like talking about damages in a case

11   where I don't think there's any liability.  And for that

12   reason, I'm, I'm reluctant to talk about it here.  But I'm

13   going to say a few words.

14        First of all, the plaintiffs have framed this as if

15   it's a public nuisance case where they are seeking equitable

16   relief in the form of abatement.  But let's be super clear

17   about this.  They want a check.  They're asking for a check.

18        And I'd say that they're asking for a blank check, but

19   that's not technically true.  They're asking for a check for

20   two and a half -- $2.5 billion which might as well be a

21   blank check.

22        And Dr. Alexander didn't bother to tell us what it is

23   that the plaintiffs would actually do with the money, did

24   he.  He didn't.

25        First, Dr. Alexander's abatement plan does not suggest

1    a single change to the way AmerisourceBergen does business,

2    to its diversion control efforts, to its Suspicious Order

3    Monitoring Program System, to its compliance practice, or to

4    anything else.  His recommendations have nothing to do with

5    distributors' activities.

6        Second, Dr. Alexander is asking for a check for two and

7    a half billion dollars to address the needs of a specific

8    city and a specific county where he couldn't be bothered to

9    take into account the programs that Huntington and Cabell

10   already have in place.  Programs -- good programs have been

11   in place for years and we have heard ample testimony about

12   these programs.

13       He did no analysis of budgets or staffing.  He did no

14   analysis of occupancy rates and the wait list for admission.

15   He did no analysis of the number of people served on a

16   yearly basis.  He did zero analysis of the impact of these

17   programs on the city and county budgets.  And he did no

18   analysis of the existing and likely funding sources for

19   these programs.

20       I mean, it's unclear why those things aren't reflected

21   in his plan.  He did mention some of them, so we know he was

22   aware of them.

23       One might conclude -- one might conclude that it's

24   inconvenient for purposes of this lawsuit that Huntington

25   and Cabell have well-constructed programs that are working,

```
1    even though in real life that's obviously a good, a really

2    good thing.

3         And, finally, just as a reminder, but a reminder of

4    something significant, the city and the county don't pay for

5    the things that they are requesting in their abatement plan.

6    And on top of that, they're operating at a surplus of

7    millions of dollars.

8         We respect what Huntington and Cabell have accomplished

9    in dealing with this crisis.  But it is not equitable relief

10   for these plaintiffs to be handed a check for two and a half

11   billion dollars for services that they don't pay for.

12        Your Honor, I feel like I've been talking for a pretty

13   long time.  And I know you're going to hear from the other

14   defendants as well.

15        I do want to say this to the Court.  This case could

16   not be more important to AmerisourceBergen.  We hope that in

17   this courtroom we have been able to convey how strongly we

18   feel and believe that we are not liable.  And we look

19   forward to your decision.  And we appreciate your

20   consideration.

21        Thank you very much, Your Honor.

22             THE COURT:  Thank you, Mr. Nicholas.

23        Well, I guess we'll come back at 9:00 in the morning

24   and we'll hear from the other two defendants.  And then

25   we'll hear -- we'll take a break for lunch and hear from the
```

1    plaintiffs in rebuttal.  See you then.

2         (Trial recessed at 2:40 p.m.)

```
1        CERTIFICATION:

2               I, Ayme A. Cochran, Official Court

3    Reporter, and I, Lisa A. Cook, Official Court Reporter,

4    certify that the foregoing is a correct transcript from

5    the record of proceedings in the matter of The City of

6    Huntington, et al., Plaintiffs vs. AmerisourceBergen

7    Drug Corporation, et al., Defendants, Civil Action No.

8    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9    reported on July 27, 2021.

10

11           S\Ayme A. Cochran          s\Lisa A. Cook

12              Reporter                   Reporter

13        _

14

15        July 27, 2021.

16

17

18

19

20

21

22

23

24

25
```

**'**
**-**

**'07** [2] - 36:19, 37:16
**'Hey** [1] - 83:25

# 0

**00907** [2] - 2:5, 2:14

# 1

**1** [10] - 15:3, 16:16, 18:8, 21:14, 31:9, 31:13, 38:17, 86:15, 113:6
**1,002** [1] - 78:13
**1,151** [1] - 19:8
**1,773** [1] - 69:16
**1.7** [3] - 49:8, 49:12, 49:16
**10** [4] - 24:23, 74:21, 93:16, 138:13
**10,000** [3] - 37:17, 37:18, 37:20
**100** [1] - 140:9
**1001** [2] - 4:6, 4:9
**1022** [1] - 3:5
**10:45** [1] - 57:5
**110** [2] - 36:1, 36:8
**11:41** [1] - 95:5
**11th** [1] - 124:6
**12** [1] - 63:21
**12(b)(6** [2] - 14:23, 21:24
**126** [1] - 3:5
**12:00** [1] - 94:20
**130** [2] - 56:6, 93:18
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**14** [1] - 78:12
**15** [2] - 21:2, 92:22
**152** [1] - 55:11
**153** [1] - 55:23
**154** [1] - 55:24
**15910** [1] - 3:15
**16** [1] - 78:12
**16.6** [1] - 78:17
**160** [1] - 86:15
**1600** [1] - 3:15
**171** [1] - 56:4
**1717** [2] - 6:6, 6:13
**178** [3] - 24:19, 56:1, 56:8
**179** [1] - 48:14
**180** [1] - 48:15
**181** [1] - 26:2
**186** [1] - 79:4
**18th** [1] - 25:5
**19** [3] - 26:2, 31:12, 77:21

**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1943** [1] - 43:5
**1945** [1] - 16:6
**1960** [1] - 15:10
**1970** [1] - 22:7
**1971** [1] - 114:16
**1979** [1] - 78:10
**1983** [1] - 28:15
**1988** [1] - 29:10
**1994** [1] - 67:9
**1996** [2] - 115:23, 116:16
**1998** [6] - 99:12, 99:24, 117:25, 118:4, 122:24, 128:5
**1999** [2] - 77:21, 78:10
**1:00** [3] - 94:21, 95:3, 95:4
**1:1** [1] - 98:5
**1st** [1] - 10:21

# 2

**2** [7] - 16:16, 23:12, 24:8, 24:9, 24:19, 38:17, 40:14
**2,500** [1] - 19:16
**2-b** [1] - 49:8
**2.5** [1] - 144:20
**20** [7] - 26:2, 69:24, 94:20, 138:14, 140:16, 140:18
**2000** [3] - 77:18, 77:22, 78:9
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21, 5:5
**2000s** [1] - 100:6
**2001** [7] - 78:11, 78:13, 78:16, 78:18, 80:17, 81:11, 118:6
**2005** [6] - 42:15, 100:7, 118:6, 118:19, 120:18, 132:24
**2006** [6] - 31:9, 78:22, 78:25, 79:3, 120:21, 120:23
**2007** [16] - 100:1, 108:16, 115:9, 115:13, 117:25, 118:3, 118:5, 120:13, 122:5, 124:6, 124:22, 125:1, 125:7, 125:12, 128:6, 133:12
**2008** [3] - 78:21, 79:2,

79:10
**2009** [5] - 100:1, 102:24, 126:10, 137:2, 137:3
**2010** [2] - 20:2, 69:16
**2011** [5] - 68:20, 106:18, 108:22, 109:4, 109:5
**2012** [4] - 40:2, 41:4, 68:24, 69:15
**2013** [1] - 72:21
**2014** [7] - 36:20, 70:16, 71:12, 73:8, 100:17, 108:1, 126:11
**2015** [7] - 18:18, 73:8, 80:17, 81:11, 81:23, 113:1, 113:9
**2016** [10] - 16:4, 26:24, 27:11, 48:22, 78:11, 78:13, 79:10, 82:8, 82:10, 82:17
**2017** [4] - 15:17, 74:13, 74:20, 78:18
**2018** [4] - 10:19, 10:21, 14:2, 78:16
**2019** [4] - 14:3, 23:20, 25:5, 86:17
**202** [2] - 2:4, 2:13
**2020** [1] - 18:18
**2021** [5] - 1:19, 7:4, 115:13, 148:9, 148:15
**21** [2] - 24:19, 79:6
**213.9** [1] - 78:17
**218** [2] - 31:11, 38:7
**219** [1] - 31:12
**2216** [1] - 3:7
**24** [1] - 83:24
**25** [2] - 5:5, 69:24
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**275** [1] - 79:7
**28** [8] - 4:3, 4:12, 4:14, 8:21, 48:14, 82:11, 82:18, 82:24
**29464** [3] - 4:4, 4:12, 4:15
**295** [2] - 79:4, 79:7
**2:08** [1] - 128:24
**2:40** [1] - 147:2

# 3

**3** [7] - 16:16, 17:9,

24:11, 25:9, 27:12, 38:18, 49:22
**30** [3] - 68:7, 69:23, 126:11
**30(b)(6** [7] - 10:16, 10:19, 11:21, 12:12, 30:4, 38:5, 95:17
**30-year** [1] - 100:16
**31** [3] - 104:18, 106:14, 110:1
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**319** [1] - 43:3
**31st** [2] - 10:19, 14:2
**32** [2] - 56:5, 93:17
**32502** [1] - 2:11
**330** [1] - 36:4
**34** [3] - 26:1, 48:14
**38** [2] - 8:20, 56:17
**3843** [1] - 5:14
**39** [1] - 1:16
**3:17-cv-01362** [2] - 1:5, 148:8
**3:17-cv-01665** [2] - 1:11, 148:8

# 4

**4** [5] - 24:19, 27:18, 31:12, 48:15, 49:24
**40** [1] - 8:20
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**41527** [1] - 71:3
**44765** [1] - 37:6
**45,000** [1] - 37:23

# 5

**5** [2] - 31:17, 32:9
**5,000** [2] - 37:10, 37:11
**5-a** [1] - 33:18
**5-b** [1] - 33:20
**5-c** [1] - 38:10
**5-d** [1] - 38:10
**5-e** [1] - 39:16
**5-f** [1] - 42:6
**51** [1] - 53:21
**553** [1] - 6:8
**56** [2] - 3:4, 14:23
**56th** [1] - 3:5
**590** [2] - 112:22, 113:7

# 6

**6** [2] - 46:3, 47:24
**6,000** [1] - 81:22
**6,494** [1] - 18:21
**600** [1] - 2:10

**62(c)** [1] - 14:23
**63** [2] - 79:5, 79:6
**641** [1] - 25:5
**643** [1] - 25:6
**644** [2] - 49:12, 49:15
**644-million** [1] - 49:12
**6th** [1] - 3:5

# 7

**7** [1] - 47:25
**70-year-olds** [1] - 66:2
**70130** [1] - 3:8
**707** [1] - 4:24
**716** [1] - 3:12
**72** [1] - 83:24
**725** [2] - 4:19, 4:21
**76** [1] - 78:10
**78** [1] - 63:21

# 8

**8** [2] - 31:11, 49:3
**8,200** [1] - 20:3
**80** [5] - 32:2, 56:2, 69:23, 87:4, 88:19
**801** [2] - 3:10, 22:9
**802(1** [1] - 22:17
**81** [11] - 9:7, 9:13, 28:24, 29:2, 29:17, 29:19, 29:24, 32:4, 48:21, 51:1, 51:22
**825** [2] - 56:6, 93:19
**830** [1] - 26:24
**850** [1] - 5:12
**86** [1] - 106:19
**88** [2] - 63:8, 63:18

# 9

**90** [3] - 78:14, 86:17, 129:22
**90,000** [1] - 20:3
**901** [1] - 4:23
**91436** [1] - 3:16
**93** [1] - 79:7
**95** [1] - 64:14
**99** [1] - 136:1
**99-plus** [1] - 96:11
**99.9** [1] - 114:1
**9:00** [2] - 7:4, 146:23
**9th** [1] - 4:6

# A

**a.m** [3] - 7:4, 57:5, 95:5
**abatable** [2] - 48:1, 48:3
**abatement** [18] - 49:3,

49:5, 58:23, 60:4, 62:5, 70:14, 84:12, 87:21, 89:14, 89:20, 90:14, 91:4, 91:18, 92:13, 144:9, 144:16, 144:25, 146:5
**ability** [4] - 89:25, 93:3, 116:7, 117:15
**able** [11] - 11:15, 27:4, 75:17, 76:13, 94:11, 98:14, 99:17, 101:4, 115:17, 123:12, 146:17
**absence** [1] - 101:6
**absolutely** [2] - 57:11, 123:21
**Abstinence** [2] - 19:17, 75:5
**absurd** [1] - 129:25
**abundance** [1] - 68:2
**abundant** [1] - 66:25
**abuse** [24] - 12:7, 12:16, 16:22, 24:24, 29:6, 46:24, 56:6, 67:3, 69:7, 69:18, 69:22, 71:10, 71:14, 72:14, 72:16, 72:20, 87:5, 88:24, 88:25, 89:5, 89:11, 93:16, 93:18
**abused** [2] - 46:22, 93:18
**abusing** [2] - 55:20, 55:25
**accept** [2] - 12:15, 52:10
**acceptable** [1] - 36:2
**accepted** [2] - 14:16, 89:7
**access** [2] - 139:12, 141:10
**accessibility** [1] - 60:19
**accessible** [1] - 56:9
**accompany** [1] - 92:22
**accomplished** [2] - 75:16, 146:8
**accomplishment** [1] - 45:21
**accomplishments** [1] - 107:19
**accordance** [1] - 127:6
**account** [5] - 36:16, 109:13, 112:21, 113:7, 145:9
**accountable** [1] - 12:6
**accounts** [1] - 143:20

**accurate** [1] - 38:15
**ACKERMAN** [1] - 4:5
**acknowledge** [3] - 20:7, 23:6, 76:24
**acknowledged** [4] - 17:14, 111:17, 123:21, 132:23
**acknowledges** [1] - 16:5
**acquiesces** [1] - 45:20
**acquiring** [1] - 86:16
**act** [1] - 16:19
**Act** [10] - 13:10, 22:18, 27:24, 28:3, 28:5, 28:10, 30:19, 51:7, 118:9, 126:4
**acting** [2] - 85:1, 105:22
**Action** [4] - 1:4, 1:10, 148:7, 148:8
**action** [6] - 17:3, 17:5, 58:21, 107:7, 107:12, 120:5
**actionable** [1] - 31:22
**actions** [6] - 35:12, 61:21, 132:24, 133:12, 133:13, 133:16
**active** [1] - 116:1
**activities** [1] - 145:5
**actors** [3] - 52:23, 53:1, 53:2
**acts** [3] - 143:24, 144:1, 144:2
**actual** [2] - 107:8, 129:4
**Adams** [1] - 40:8
**add** [1] - 57:21
**addict** [2] - 22:16, 22:18
**addicted** [7] - 22:22, 24:21, 70:5, 74:21, 87:12, 93:5, 93:19
**Addiction** [2] - 62:8, 93:11
**addiction** [46] - 16:22, 29:6, 50:18, 55:2, 61:11, 62:6, 62:9, 62:15, 62:16, 62:20, 64:7, 65:5, 65:13, 65:23, 66:7, 70:13, 71:6, 72:25, 73:4, 73:15, 73:24, 74:11, 75:3, 75:13, 76:10, 76:11, 76:16, 77:19, 80:5, 81:2, 81:21, 83:5, 84:10, 85:9, 85:13, 85:15, 85:18, 86:11, 87:22, 90:24, 91:2, 92:20, 93:3,

93:8, 94:9
**addictions** [2] - 69:17, 69:21
**adding** [1] - 69:10
**addition** [8] - 58:17, 59:9, 62:18, 68:12, 69:6, 83:2, 88:7, 93:7
**additional** [6] - 68:11, 85:12, 95:18, 120:19, 133:13, 133:16
**address** [10] - 18:1, 54:11, 60:5, 65:13, 66:2, 92:1, 96:10, 99:3, 105:3, 122:1, 145:7
**addressed** [5] - 15:6, 80:24, 97:20, 129:5, 135:22
**addresses** [1] - 15:4
**addressing** [3] - 48:17, 61:25, 126:19
**adequately** [1] - 58:14
**adjective** [1] - 44:13
**adjectives** [1] - 33:18
**administration** [3] - 111:12, 114:10, 114:24
**administrative** [1] - 35:12
**Administrator** [2] - 11:20, 133:15
**admission** [2] - 121:12, 145:14
**admissions** [4] - 18:13, 56:5, 93:16, 93:17
**admitted** [3] - 87:10, 107:15, 131:1
**advance** [1] - 127:13
**advancements** [1] - 126:18
**adverse** [1] - 51:23
**advice** [1] - 30:10
**advocate** [1] - 60:7
**affect** [1] - 70:8
**affected** [4] - 65:2, 65:8, 85:15, 110:13
**affirmatively** [1] - 139:3
**afforded** [1] - 130:7
**afternoon** [6] - 7:14, 95:7, 95:8, 95:23, 95:24, 128:13
**agencies** [2] - 70:12, 70:13
**agency** [1] - 111:13
**aggressive** [1] - 73:4
**ago** [3] - 53:8, 56:17,

95:10
**agree** [11] - 11:9, 13:13, 13:17, 13:22, 23:16, 30:6, 30:7, 31:12, 31:23, 133:1, 139:6
**agreed** [4] - 48:13, 92:12, 117:1, 135:13
**agreements** [1] - 15:19
**agrees** [1] - 48:15
**ahead** [5] - 11:17, 94:20, 116:19, 126:1, 130:9
**aid** [1] - 126:18
**aimed** [1] - 74:24
**Akron** [1] - 143:21
**al** [4] - 1:7, 1:13, 148:6, 148:7
**alarm** [8] - 34:22, 36:6, 36:10, 36:24, 37:22, 37:24, 105:23
**alcohol** [1] - 67:11
**alcoholic** [1] - 67:12
**Alexander** [12] - 48:4, 87:14, 87:20, 89:8, 89:19, 90:8, 90:12, 90:23, 91:20, 92:14, 144:22, 145:6
**Alexander's** [1] - 144:25
**algorithm** [3] - 34:16, 34:17, 37:18
**algorithms** [2] - 34:19, 34:21
**alike** [1] - 15:9
**alleged** [7] - 16:20, 142:5, 142:8, 142:16, 143:14, 143:15, 144:6
**alleging** [1] - 29:8
**alleviate** [1] - 92:17
**allocate** [1] - 54:6
**allow** [1] - 11:5
**allowed** [2] - 39:2, 122:9
**alluded** [1] - 122:2
**almost** [7] - 10:3, 20:3, 77:20, 98:5, 130:1, 130:4, 134:4
**alone** [6] - 32:23, 33:19, 69:15, 78:12, 110:7, 123:8
**altered** [1] - 133:4
**alternatives** [2] - 71:14, 71:21
**amazing** [1] - 137:23
**Ameri** [1] - 133:25
**America** [5] - 12:16, 25:6, 29:2, 35:6,

47:5
**American** [1] - 22:14
**AmerisourceBergen** [69] - 6:2, 7:13, 23:5, 30:23, 31:2, 36:18, 36:19, 37:12, 39:23, 95:25, 96:23, 97:3, 97:4, 97:11, 97:17, 98:8, 98:18, 98:22, 98:24, 99:7, 99:22, 100:15, 101:10, 101:13, 101:16, 101:19, 101:24, 103:9, 103:14, 104:25, 106:17, 106:25, 108:7, 108:9, 108:11, 109:10, 110:10, 115:14, 116:16, 118:6, 119:10, 119:20, 121:16, 122:4, 122:22, 124:19, 124:24, 125:10, 126:11, 131:3, 131:7, 131:22, 132:21, 132:24, 133:2, 133:7, 133:10, 133:14, 133:17, 133:20, 142:5, 142:9, 142:20, 144:3, 144:6, 145:1, 146:16, 148:6
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**AmerisourceBergen' s** [20] - 99:1, 99:4, 100:2, 100:18, 100:21, 101:2, 101:21, 103:7, 104:18, 120:14, 125:6, 125:17, 125:24, 126:5, 126:14, 129:3, 130:19, 130:24, 132:8, 132:14
**amount** [5] - 10:8, 26:3, 67:24, 103:5, 135:17
**ample** [3] - 42:12, 68:10, 145:11
**analgesics** [3] - 26:4, 71:17, 79:8
**analogy** [3] - 35:22, 35:24, 47:10
**analysis** [10] - 54:3, 84:22, 109:5, 137:10, 137:11, 145:13, 145:14, 145:15, 145:16,

145:18
**analyst** [1] - 65:19
**analysts** [1] - 97:14
**analytics** [3] - 112:5, 126:19, 127:10
**analyze** [1] - 112:25
**ANDREW** [1] - 5:10
**angry** [1] - 50:15
**Anne** [1] - 56:23
**ANNE** [1] - 4:2
**ANNIE** [1] - 4:11
**Annual** [1] - 108:2
**annual** [2] - 68:20, 107:16
**anomaly** [1] - 38:21
**answer** [23] - 12:19, 13:2, 21:20, 31:11, 32:23, 32:24, 42:12, 46:2, 53:16, 53:17, 104:10, 104:12, 109:7, 109:9, 119:2, 119:7, 119:11, 122:23, 122:25, 123:2, 123:18, 126:3, 126:4
**Answer** [9] - 133:4, 133:9, 137:17, 139:6, 139:10, 139:17, 139:23, 140:5, 140:24
**answers** [2] - 13:7, 23:12
**ANTHONY** [1] - 2:6
**anticipate** [2] - 29:13, 58:1
**apart** [1] - 105:18
**apartment** [1] - 64:19
**Appalachia** [3] - 72:14, 80:2, 90:11
**apparent** [1] - 68:1
**appeal** [3] - 43:24, 44:16
**appear** [3] - 103:14, 122:14, 124:13
**appearance** [1] - 101:5
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appeared** [2] - 41:12, 59:10
**applied** [1] - 35:5
**apply** [7] - 34:6, 34:7, 34:9, 34:16, 55:17, 115:15, 141:17
**applying** [2] - 34:14, 96:13
**appreciate** [2] - 128:21, 146:19
**approach** [1] - 43:9

**approached** [2] - 116:16, 116:18
**appropriate** [3] - 49:15, 111:13, 125:18
**approval** [2] - 117:8, 118:1
**approve** [1] - 117:18
**approved** [9] - 98:3, 99:25, 117:21, 122:17, 122:22, 122:24, 123:14, 124:3, 127:3
**approving** [2] - 52:5, 117:6
**approximate** [1] - 138:11
**April** [2] - 14:3, 25:5
**apt** [1] - 44:14
**arbitrarily** [4] - 139:12, 139:19, 140:22, 141:6
**arbitrary** [1] - 139:15
**Arch** [2] - 6:6, 6:13
**arching** [1] - 82:2
**architect** [1] - 99:24
**ARCOS** [5] - 109:5, 113:20, 113:21, 114:2, 137:15
**area** [9] - 46:20, 47:4, 47:10, 70:21, 71:16, 73:15, 109:21, 114:10, 114:24
**Areas** [1] - 75:2
**areas** [6] - 41:16, 74:17, 74:25, 82:20, 91:3, 120:9
**argue** [4] - 14:13, 29:25, 38:2, 128:16
**argued** [2] - 39:16, 122:8
**arguing** [4] - 39:7, 39:8, 46:7, 50:9
**argument** [13] - 7:11, 7:13, 21:25, 28:14, 29:7, 38:6, 38:24, 39:1, 39:2, 40:10, 44:8, 52:19, 57:10
**arguments** [5] - 40:17, 50:2, 51:21, 57:15, 59:16
**arrest** [1] - 41:14
**arrested** [1] - 106:21
**arrests** [1] - 107:19
**arrive** [1] - 137:19
**arrived** [1] - 138:1
**art** [1] - 61:20
**article** [7] - 23:20, 40:19, 40:20, 44:25, 78:19, 78:21, 79:25

**ASHLEY** [1] - 5:3
**aside** [2] - 109:20, 110:14
**aspect** [2] - 28:7, 51:11
**aspects** [3] - 49:5, 61:21, 118:15
**assemble** [1] - 8:22
**assertion** [1] - 118:12
**assessing** [1] - 127:4
**assessments** [3] - 69:6, 107:17, 107:18
**assignment** [1] - 44:5
**assistance** [1] - 84:2
**Assistant** [2] - 11:19, 133:15
**assisted** [2] - 84:11, 91:8
**Associate** [1] - 66:4
**associated** [6] - 71:2, 71:19, 79:5, 80:19, 89:3, 93:11
**association** [1] - 87:17
**assume** [1] - 25:12
**assumed** [1] - 130:4
**assuming** [1] - 141:25
**astronomical** [2] - 33:15, 131:7
**AT** [1] - 1:2
**attacking** [3] - 96:6, 127:15, 127:21
**attempted** [3] - 34:5, 34:7, 34:9
**attended** [4] - 99:17, 100:11, 118:22, 125:10
**attention** [13] - 15:11, 15:17, 16:17, 21:20, 27:23, 40:5, 40:6, 42:20, 43:12, 47:3, 51:2, 104:17
**attitude** [1] - 115:9
**attorney** [1] - 44:6
**attorneys** [1] - 128:8
**August** [6] - 10:21, 82:10, 109:4, 109:5, 119:24
**Australian** [1] - 18:25
**author** [1] - 8:13
**automatically** [2] - 105:13, 117:2
**autopsy** [4] - 26:15, 48:21, 78:24, 82:17
**Autopsy** [2] - 79:10, 79:11
**availability** [3] - 48:18, 72:14, 72:16
**available** [3] - 8:19, 93:4, 93:5

**average** [7] - 37:10, 38:17, 38:18, 136:9, 136:11, 136:13
**Avin** [1] - 3:7
**avoid** [2] - 31:10, 104:15
**award** [1] - 94:8
**aware** [5] - 15:18, 58:3, 109:22, 123:25, 145:22
**awhile** [2] - 53:8, 122:9
**Ayme** [2] - 6:17, 148:2

**B**

**babies** [2] - 19:11, 19:16
**backed** [2] - 91:12, 97:25
**background** [1] - 10:15
**backup** [1] - 54:12
**backwards** [1] - 27:2
**bad** [8] - 52:3, 98:23, 105:3, 117:24, 117:25, 128:18, 128:19, 130:6
**bag** [1] - 62:25
**barely** [1] - 9:21
**Baron** [1] - 3:14
**base** [2] - 101:3, 109:23
**baseball** [1] - 10:3
**based** [10] - 8:17, 45:2, 48:20, 48:25, 61:14, 71:11, 119:23, 124:13, 134:15, 138:18
**basement** [1] - 36:1
**basic** [4] - 8:24, 25:10, 25:12, 67:4
**basis** [6] - 45:8, 105:23, 117:9, 123:17, 124:14, 145:16
**bat** [1] - 101:12
**Baylen** [1] - 2:11
**beat** [2] - 134:1, 140:25
**became** [6] - 68:1, 80:3, 81:13, 83:18, 115:10, 122:12
**become** [2] - 24:21, 121:17
**becomes** [1] - 62:13
**BEFORE** [1] - 1:17
**began** [6] - 8:9, 22:7, 55:24, 67:2, 83:14, 121:14

**begin** [4] - 9:1, 34:24, 98:17, 110:16
**beginning** [2] - 100:17, 110:16
**begins** [1] - 57:7
**behalf** [9] - 8:5, 17:3, 17:8, 17:9, 56:21, 58:16, 74:8, 95:25
**behavior** [1] - 110:9
**behind** [1] - 138:16
**belabor** [2] - 26:6, 39:21, 55:8
**believes** [1] - 18:10
**bells** [3] - 34:22, 36:7, 105:23
**BENCH** [1] - 1:16
**bench** [1] - 59:10
**best** [7] - 42:19, 45:22, 75:12, 89:17, 92:16, 94:23, 116:6
**Beth** [1] - 95:17
**better** [3] - 22:11, 81:17, 126:5
**between** [14] - 9:23, 16:23, 18:18, 19:12, 49:15, 49:17, 55:1, 78:18, 88:24, 118:4, 118:20, 142:7, 142:20, 143:1
**beyond** [1] - 127:13
**big** [4] - 38:13, 38:16, 110:23, 131:17
**billion** [3] - 49:8, 49:13, 49:16, 144:20, 145:7, 146:11
**bit** [6] - 10:15, 61:17, 62:21, 81:11, 85:4, 111:21
**black** [5] - 35:15, 41:7, 42:4, 45:25, 51:12
**blame** [3] - 52:2, 143:11, 143:12
**blank** [3] - 33:7, 144:18, 144:21
**block** [3] - 40:6, 40:7, 40:8
**blocked** [2] - 123:6, 129:22
**blocking** [1] - 141:8
**blood** [2] - 75:6, 86:25
**blood-borne** [2] - 75:6, 86:25
**Bloomberg** [1] - 48:10
**blowups** [1] - 38:15
**blue** [2] - 102:20, 108:19
**Blvd** [3] - 4:3, 4:12, 4:14
**board** [1] - 38:13

**Board** [8] - 52:4, 52:5, 66:5, 107:4, 107:5, 107:6, 109:17, 143:10
**Bob** [1] - 28:15
**bodies** [1] - 67:15
**body** [1] - 27:25
**boiled** [1] - 134:7
**Bonasso** [1] - 5:14
**book** [3] - 43:5, 91:8
**books** [1] - 8:13
**Boone** [1] - 53:6
**Boots** [1] - 69:24
**boots** [4] - 48:6, 68:10, 72:19, 77:11
**born** [1] - 19:16
**borne** [2] - 75:6, 86:25
**borrow** [1] - 141:23
**borrowed** [1] - 43:7
**bother** [1] - 144:22
**bothered** [2] - 131:12, 145:8
**bottles** [2] - 67:21, 109:19
**bottom** [4] - 20:14, 20:15, 103:1, 105:3
**Boulevard** [1] - 3:15
**bounced** [1] - 28:8
**boundaries** [1] - 63:22
**Box** [3] - 5:14, 6:8, 50:24
**boxes** [1] - 14:18
**brain** [2] - 54:25, 88:23
**breaches** [1] - 67:5
**break** [10] - 7:11, 9:2, 50:1, 56:23, 57:3, 121:20, 121:23, 128:14, 144:2, 146:25
**breakdown** [1] - 24:17
**brethren** [1] - 15:18
**Breyer** [1] - 30:16
**bridge** [1] - 144:5
**Bridgeside** [3] - 4:3, 4:12, 4:14
**brief** [1] - 102:8
**briefed** [3] - 16:24, 129:16, 132:23
**briefing** [2] - 14:23, 31:21
**briefly** [3] - 103:22, 119:21, 144:9
**Brigham** [1] - 23:10
**bring** [11] - 14:3, 15:25, 17:3, 17:5, 17:7, 40:5, 40:6, 53:8, 75:21, 130:19, 133:13
**bringing** [1] - 89:17

**brings** [1] - 120:13
**broad** [1] - 62:1
**broadly** [1] - 118:25
**brother** [1] - 16:3
**brought** [10] - 9:16, 17:8, 20:13, 53:21, 58:21, 62:25, 77:13, 78:20, 91:10, 99:11
**bubbling** [1] - 67:6
**bucket** [1] - 54:3
**Budd** [1] - 3:14
**budgets** [2] - 145:13, 145:17
**build** [2] - 9:3, 131:19
**build-up** [1] - 131:19
**building** [1] - 131:18
**built** [1] - 14:3
**bulk** [3] - 134:15, 134:25
**bunch** [1] - 52:2
**burden** [6] - 17:19, 18:11, 51:19, 51:20, 54:4, 54:8
**Burling** [1] - 5:11
**bury** [1] - 76:24
**business** [5] - 8:7, 41:10, 101:6, 113:2, 145:1
**button** [1] - 37:2
**buy** [2] - 52:18, 52:21
**buyer** [2] - 44:24, 45:9

## C

**CA** [1] - 3:16
**CABELL** [1] - 1:10
**Cabell** [93] - 3:2, 8:5, 9:19, 9:22, 18:9, 18:21, 19:3, 19:7, 19:15, 20:1, 22:21, 27:16, 38:20, 39:3, 40:1, 42:9, 47:6, 56:21, 58:20, 59:3, 59:7, 59:21, 60:3, 60:9, 62:17, 62:20, 65:16, 66:12, 66:21, 68:14, 69:13, 72:2, 74:22, 76:5, 76:17, 78:11, 78:14, 78:17, 79:22, 80:12, 80:15, 81:20, 81:22, 82:9, 82:13, 82:17, 83:11, 84:24, 85:19, 85:25, 86:6, 86:17, 86:20, 86:25, 87:9, 89:3, 92:18, 93:8, 94:6, 94:17, 95:17, 96:5, 96:10, 97:6, 98:24, 99:3, 100:22, 101:3, 101:10, 101:14,

101:17, 101:20, 101:22, 101:23, 103:9, 103:17, 103:18, 104:9, 110:10, 110:13, 112:3, 115:2, 121:9, 129:22, 130:24, 131:8, 134:9, 135:18, 136:10, 137:2, 145:9, 145:25, 146:8
**cabell** [1] - 2:2
**Cabell-Huntington** [2] - 103:18, 112:3
**Cabell/Huntington** [3] - 66:6, 136:18, 136:19
**cabinet** [2] - 143:19, 143:25
**Cady's** [1] - 47:21
**calculated** [2] - 127:20, 128:8
**CALLAS** [1] - 6:7
**callous** [1] - 40:14
**CAMPBELL** [1] - 6:14
**cancer** [1] - 135:4
**cannot** [3] - 104:7, 104:10, 139:7
**capacity** [5] - 10:20, 10:22, 44:22, 45:6, 89:24
**capita** [4] - 47:6, 102:16, 137:10, 137:11
**Capitol** [1] - 2:7
**card** [1] - 10:3
**Cardinal** [8] - 4:16, 5:2, 7:14, 41:3, 41:6, 41:23, 42:3, 131:23
**Cardozo** [1] - 29:22
**care** [15] - 19:18, 28:21, 50:3, 51:4, 83:3, 84:9, 85:17, 85:22, 96:17, 123:4, 127:11, 135:23, 136:3, 136:7, 140:13
**cared** [1] - 115:25
**career** [1] - 100:16
**careful** [2] - 132:22, 141:8
**Carey** [1] - 4:23
**carnage** [1] - 64:9
**Carolina** [2] - 43:24, 64:25
**carry** [4] - 17:19, 62:3, 63:18, 76:13
**cars** [1] - 63:19
**carve** [1] - 56:13
**case** [85] - 8:12, 8:15, 9:5, 9:12, 10:14,

10:17, 14:2, 14:6, 15:9, 15:12, 15:15, 15:25, 16:4, 16:20, 17:9, 20:10, 22:8, 22:11, 25:11, 27:8, 30:18, 32:1, 34:8, 34:10, 34:21, 38:7, 39:10, 42:12, 42:15, 42:18, 42:20, 43:23, 44:10, 45:1, 45:10, 45:13, 45:16, 45:24, 51:17, 52:8, 52:15, 52:19, 53:3, 53:19, 53:20, 53:21, 53:23, 53:24, 54:5, 54:20, 54:22, 70:14, 91:1, 94:5, 96:8, 97:12, 97:19, 98:14, 98:20, 99:9, 99:20, 100:7, 108:3, 108:13, 110:5, 110:6, 111:16, 117:22, 118:15, 122:7, 123:20, 129:9, 130:12, 130:17, 130:19, 130:21, 130:22, 130:23, 132:5, 134:2, 135:12, 141:3, 144:10, 144:15, 146:15
**cases** [9] - 15:8, 15:18, 17:7, 50:11, 53:6, 53:21, 70:23, 78:10, 86:16
**catalogue** [1] - 130:18
**categories** [1] - 49:7
**Category** [2] - 49:22, 49:24
**catharsis** [1] - 98:13
**caught** [1] - 15:17
**causal** [7] - 12:2, 47:18, 47:19, 47:22, 47:23, 87:17, 144:2
**causation** [9] - 10:14, 24:13, 44:20, 45:22, 46:4, 97:19, 98:22, 110:15, 142:23
**caused** [3] - 80:12, 84:19, 110:8
**causes** [3] - 52:25, 142:7, 142:24
**causing** [2] - 62:11, 79:9
**CDC** [2] - 77:17, 93:16
**CEA** [1] - 118:14
**census** [1] - 20:2
**Center** [2] - 3:12, 5:11
**center** [2] - 35:5, 121:8

**century** [1] - 91:11
**CEOs** [1] - 50:15
**certainly** [3] - 57:22, 78:5, 99:10
**certificates** [1] - 79:1
**CERTIFICATION** [1] - 148:1
**certify** [1] - 148:4
**CFR** [1] - 28:10
**chain** [6] - 10:23, 41:1, 96:20, 133:22, 134:21, 142:4
**chair** [1] - 11:24, 12:11
**Chairman** [1] - 66:5
**challenge** [3] - 129:5, 129:18, 138:20
**challenged** [1] - 129:7
**challenging** [1] - 131:10
**chambers** [2] - 14:13, 38:15
**Chambers** [1] - 16:3
**chance** [2] - 16:25, 86:15
**Chaney** [1] - 104:24
**change** [6] - 32:9, 51:3, 67:8, 136:6, 144:2, 145:1
**changed** [5] - 114:16, 125:9, 125:17, 133:4, 135:24
**changes** [1] - 37:22
**changing** [2] - 116:18, 119:13
**channel** [2] - 123:4, 123:5
**charge** [1] - 39:25
**Charge** [1] - 109:22
**CHARLES** [1] - 3:11
**Charleston** [8] - 2:8, 3:13, 4:24, 5:15, 6:9, 7:3, 52:19, 53:14
**CHARLESTON** [2] - 1:2, 1:18
**chart** [5] - 81:19, 102:17, 105:2, 136:21, 136:22
**charts** [2] - 37:7, 104:11
**Chase** [1] - 4:23
**cheaper** [2] - 71:13, 71:21
**check** [14] - 18:14, 21:14, 25:9, 33:18, 111:4, 136:25, 144:17, 144:18, 144:19, 144:21, 145:6, 146:10
**checks** [1] - 14:18

**chemicals** [1] - 117:11
**Chesterbrook** [1] - 6:15
**Chief** [22] - 63:8, 63:12, 64:12, 64:23, 65:6, 65:7, 65:15, 66:14, 67:9, 67:17, 70:16, 70:24, 71:5, 71:25, 72:18, 72:23, 73:2, 73:22, 90:8, 125:5
**child** [3] - 87:4, 87:17, 87:24
**children** [7] - 19:16, 19:18, 75:8, 85:22, 87:3, 87:7
**China** [1] - 143:23
**chose** [2] - 76:23, 96:9
**Chris** [8] - 23:4, 30:22, 99:8, 99:22, 116:20, 122:16, 123:8, 125:15
**chronic** [2] - 23:13, 140:13
**circled** [1] - 104:1
**Circuit** [6] - 15:20, 38:7, 43:25, 44:1, 44:13, 44:15
**circumstances** [1] - 12:22
**cite** [1] - 17:13
**cited** [2] - 16:7, 35:11
**cites** [2] - 16:4, 88:5
**citizens** [1] - 80:13
**City** [42] - 4:1, 5:11, 21:8, 21:11, 44:6, 52:19, 53:13, 56:24, 58:16, 58:20, 59:2, 59:7, 59:8, 59:20, 60:3, 60:9, 62:24, 65:20, 66:11, 66:14, 66:21, 68:13, 69:14, 70:19, 72:1, 75:23, 76:6, 76:17, 82:9, 82:12, 84:24, 85:19, 85:25, 93:9, 94:6, 94:16, 97:7, 98:24, 104:9, 130:24, 135:19, 148:5
**CITY** [1] - 1:4
**city** [18] - 17:4, 20:17, 44:5, 65:1, 65:24, 71:15, 73:18, 75:10, 81:22, 87:13, 89:5, 91:22, 94:10, 130:2, 130:5, 145:8, 145:17, 146:4
**Civil** [4] - 1:4, 58:4, 148:7, 148:8
**civil** [2] - 1:10, 28:17

**claim** [1] - 127:11
**claims** [3] - 52:9, 53:19, 54:8
**classified** [1] - 20:4
**classmates** [2] - 63:25, 65:18
**clean** [1] - 26:17
**clear** [19] - 15:21, 32:15, 44:8, 61:11, 70:2, 88:21, 88:23, 93:24, 97:4, 105:6, 115:8, 116:22, 117:3, 121:6, 127:12, 135:15, 138:6, 144:16
**clearer** [1] - 117:20
**clearly** [3] - 105:24, 116:3, 143:9
**clerk** [1] - 43:6
**clerks** [2] - 43:15, 59:11
**Cleveland** [1] - 30:15
**clientele** [1] - 63:17
**clients** [1] - 81:7
**clinic** [1] - 41:10
**clinical** [1] - 23:24
**clinicians** [1] - 23:15
**clip** [2] - 11:25, 13:5
**clips** [4] - 10:10, 10:13, 60:23, 123:11
**close** [1] - 109:25
**closed** [5] - 12:17, 24:18, 28:1, 67:6, 106:21
**closely** [1] - 76:17
**closer** [3] - 89:12, 101:21, 103:1
**closing** [9] - 40:11, 42:7, 48:16, 57:9, 57:16, 57:21, 106:11, 123:12, 124:17
**closings** [2] - 11:12, 97:21
**Cochran** [3] - 6:17, 148:2, 148:11
**Code** [2] - 22:9, 22:17
**coin** [2] - 90:13, 137:6
**Coke** [1] - 89:12
**collaborate** [1] - 77:4
**collaboration** [2] - 70:11, 77:4
**colleague** [2] - 10:20, 56:23
**colleagues** [4] - 18:5, 27:3, 33:22, 42:17
**College** [1] - 43:7
**colloquy** [1] - 44:14
**color** [1] - 65:4
**colorful** [1] - 130:15

**colors** [1] - 9:2
**colossal** [1] - 33:13
**Colston** [2] - 47:16
**Columbia** [5] - 19:23, 46:11, 46:17, 46:18, 64:25
**Columbus** [2] - 39:24, 143:22
**column** [3] - 38:17, 38:18
**combined** [2] - 105:20, 105:21
**comforting** [1] - 64:4
**coming** [9] - 15:14, 75:19, 76:5, 77:2, 77:7, 80:6, 82:3, 86:17, 133:3
**comment** [1] - 22:24
**commentary** [1] - 17:1
**comments** [5] - 27:21, 52:7, 56:20, 56:22, 93:7
**COMMISSION** [1] - 1:10
**Commission** [7] - 2:2, 3:2, 17:4, 53:20, 95:17, 143:9, 143:12
**commissioned** [1] - 81:16
**Commissioner** [1] - 26:9
**commissioner** [1] - 81:13
**commitment** [1] - 74:16
**common** [3] - 25:10, 25:11, 67:4
**commonly** [1] - 71:16
**communicate** [1] - 134:24
**communication** [1] - 112:19
**communities** [8] - 59:25, 60:14, 67:7, 69:9, 74:7, 79:9, 83:20, 91:15
**community** [92] - 8:23, 9:7, 15:22, 17:2, 19:19, 21:9, 28:24, 29:3, 29:18, 29:20, 48:5, 49:2, 49:20, 49:23, 51:1, 51:22, 58:18, 59:2, 60:1, 60:6, 60:8, 60:20, 61:4, 61:10, 61:14, 61:15, 63:11, 63:14, 63:20, 64:1, 64:3, 64:7, 65:16, 65:22, 66:3, 66:8, 66:10, 66:17, 67:2,

68:3, 68:19, 68:22, 69:9, 69:20, 70:2, 71:2, 72:25, 73:4, 73:8, 73:12, 73:13, 73:21, 74:5, 74:8, 74:9, 75:2, 75:17, 75:18, 75:23, 76:10, 76:18, 76:19, 76:22, 76:23, 81:2, 83:11, 83:19, 84:6, 84:13, 85:7, 85:14, 87:17, 88:1, 89:18, 89:21, 91:13, 92:15, 93:9, 93:12, 93:21, 93:23, 94:1, 94:2, 94:11, 100:24, 102:5, 107:25, 108:4, 138:18
**community's** [1] - 74:9
**community-wide** [1] - 93:9, 93:21
**companies** [3] - 46:12, 58:22, 94:16
**companies'** [1] - 35:11
**Company** [1] - 16:5
**company** [6] - 31:6, 34:17, 99:24, 100:19, 115:25, 127:9
**compare** [2] - 102:3, 130:12
**compared** [2] - 69:24, 71:22
**competing** [1] - 140:18
**competitor** [1] - 41:13
**compilation** [1] - 37:5
**complete** [1] - 120:16
**completed** [2] - 95:13, 113:7
**completely** [3] - 51:6, 103:6, 131:14
**complex** [1] - 128:2
**complexity** [1] - 23:23
**compliance** [3] - 10:22, 39:25, 145:3
**Compliance** [1] - 133:23
**compliant** [2] - 126:3, 126:6
**comply** [2] - 13:14, 13:16
**components** [1] - 15:1
**comprised** [1] - 103:15
**Compton** [2] - 23:20, 79:25
**computer** [1] - 6:19

**concept** [2] - 24:14, 127:15
**concepts** [1] - 35:23
**concern** [4] - 23:15, 50:13, 139:18, 140:21
**concerned** [1] - 120:5
**concerns** [3] - 109:21, 119:1, 120:8
**conclude** [4] - 56:20, 134:15, 145:23
**concluded** [4] - 13:4, 13:25, 68:13, 80:10
**conclusion** [5] - 39:10, 79:13, 79:16, 80:14, 131:15
**conclusions** [1] - 33:3
**conclusive** [1] - 79:18
**concrete** [1] - 126:23
**condition** [4] - 16:19, 16:20, 62:11, 142:15
**conduct** [35] - 12:5, 12:13, 28:8, 28:9, 28:12, 28:18, 28:19, 28:23, 31:18, 31:22, 31:23, 32:14, 39:17, 39:18, 39:19, 42:10, 45:25, 56:12, 97:10, 98:19, 98:21, 98:23, 99:3, 101:9, 104:15, 105:24, 110:7, 110:8, 129:9, 130:19, 133:19, 142:1, 142:2, 142:7, 144:2
**conducted** [5] - 41:17, 108:11, 118:9, 120:1, 120:12
**conference** [5] - 124:6, 125:3, 125:11, 125:14, 125:16
**confirm** [1] - 84:23
**confirmed** [5] - 96:8, 101:15, 113:25, 133:6, 133:11
**conflicts** [1] - 30:22
**Congress** [5] - 22:6, 50:15, 50:16, 51:2, 91:7
**conjecture** [1] - 29:4
**connect** [2] - 104:25, 144:5
**connection** [5] - 51:14, 65:9, 88:24, 127:22, 129:17
**connections** [1] - 12:2
**Connie** [3] - 18:19, 64:10, 64:14
**Connolly** [2] - 4:18,

5:4
**CONROY** [1] - 3:3
**consensus** [1] - 84:18
**consequence** [1] -
29:19
**consequences** [6] -
24:24, 50:24, 51:24,
74:11, 138:24,
140:23
**consider** [3] - 35:19,
129:17, 133:22
**Consider** [1] - 130:11
**consideration** [3] -
60:11, 96:1, 146:20
**considering** [1] -
129:17
**consistent** [8] - 30:10,
30:14, 30:15, 30:16,
30:17, 119:17,
120:12, 137:2
**consistently** [3] -
46:18, 86:19, 88:10
**conspiracy** [1] - 45:2
**constructed** [1] -
145:25
**consumption** [1] -
46:1
**contact** [2] - 27:1,
109:22
**contacted** [2] - 82:13,
82:14
**contained** [2] -
125:25, 132:9
**contains** [1] - 25:17
**contemporaneous** [1]
- 112:20
**contemporaneously**
[1] - 97:9
**contemporary** [1] -
62:1
**Conterro** [1] - 95:19
**context** [3] - 28:22,
44:8, 97:22
**contingency** [3] -
52:15, 52:16, 54:10
**continue** [5] - 11:15,
71:12, 72:15, 79:19,
121:15
**continued** [6] - 74:15,
97:21, 112:25,
113:9, 141:15
**Continued** [5] - 3:1,
5:1, 5:6, 6:1, 6:10
**continues** [4] - 28:16,
50:12, 71:15, 71:17
**continuing** [4] -
109:11, 117:21,
122:20, 124:2
**continuum** [2] - 83:3,
84:9

**contradicted** [1] -
124:15
**contradicts** [1] -
118:17
**contrary** [2] - 104:6,
118:12
**contributed** [2] - 69:2,
70:22
**contributing** [1] -
46:15
**Control** [14] - 11:20,
65:21, 73:10, 74:15,
74:24, 76:9, 100:4,
100:17, 125:13,
126:12, 126:20,
127:14, 129:11,
132:18
**control** [5] - 27:20,
32:22, 33:13, 111:4,
145:2
**Controlled** [10] -
13:10, 22:18, 27:24,
28:3, 28:4, 28:10,
30:19, 51:7, 118:8,
126:3
**controlled** [11] -
22:13, 71:10,
106:19, 110:19,
111:13, 111:15,
114:8, 114:21,
117:10, 121:14,
139:8
**controlling** [2] - 15:9,
141:9
**controls** [2] - 23:3,
59:24
**Convention** [1] - 63:3
**conversation** [1] -
91:9
**convey** [1] - 146:17
**conviction** [1] - 45:1
**Cook** [3] - 6:18, 148:3,
148:11
**Copenhaver** [2] -
52:18, 53:18
**copies** [2] - 21:2,
38:13
**copy** [1] - 118:10
**core** [3] - 66:7, 70:14
**Corey** [1] - 54:20
**corner** [2] - 14:16,
67:12
**cornerstone** [2] -
110:4
**cornerstones** [2] -
76:12, 83:19
**corporate** [4] - 12:12,
35:4, 41:19, 41:25
**Corporation** [5] - 6:2,
12:10, 12:15, 12:25,

148:7
**cORPORATION** [2] -
1:7, 1:13
**correct** [27] - 7:17,
7:18, 13:15, 31:14,
40:9, 47:20, 104:9,
104:10, 104:12,
106:9, 106:10,
109:7, 109:9,
122:21, 122:23,
123:18, 133:8,
136:23, 137:4,
137:16, 139:9,
139:16, 140:23,
140:24, 148:4
**Correct** [1] - 137:5
**corrected** [1] - 40:13
**correctly** [2] - 52:24,
53:3
**corroborated** [2] -
116:9, 132:21
**cost** [6] - 69:9, 71:19,
71:22, 91:25, 92:2,
92:13
**costs** [3] - 12:6, 12:16,
12:21
**counter** [2] - 108:17,
112:13
**countermand** [1] -
96:18
**counties** [2] - 53:21,
74:22
**countless** [2] - 137:3,
142:23
**country** [7] - 19:5,
27:9, 32:7, 48:10,
97:5, 102:15, 102:16
**county** [19] - 20:16,
38:18, 67:25, 73:18,
75:10, 78:15, 81:22,
82:13, 87:13, 89:5,
91:22, 94:10,
102:12, 103:5,
130:2, 130:5, 145:8,
145:17, 146:4
**COUNTY** [1] - 1:10
**County** [69] - 2:2, 3:2,
8:5, 9:19, 9:22, 17:4,
18:9, 18:21, 19:3,
19:7, 19:15, 20:1,
21:8, 22:21, 27:16,
38:20, 39:3, 40:1,
42:9, 47:7, 53:22,
53:23, 56:21, 58:20,
59:3, 59:7, 59:21,
60:3, 60:9, 65:16,
66:12, 66:21, 68:14,
69:13, 72:2, 76:5,
76:17, 78:11, 78:14,
78:17, 79:22, 81:20,

81:22, 82:9, 82:13,
82:18, 84:24, 85:19,
85:25, 86:6, 86:17,
86:20, 86:25, 87:9,
89:3, 92:18, 93:9,
94:6, 94:17, 95:17,
96:10, 97:7, 98:24,
100:22, 101:20,
104:9, 130:24,
135:18, 137:2
**couple** [14] - 14:25,
16:17, 27:21, 28:13,
33:10, 33:24, 42:21,
55:9, 59:14, 77:10,
82:7, 89:15, 112:9,
118:3
**course** [6] - 11:11,
24:4, 113:11, 116:5,
121:6, 124:12
**Court** [34] - 6:17, 6:18,
7:2, 20:23, 21:19,
21:25, 24:4, 27:14,
30:4, 31:22, 32:3,
38:7, 43:3, 45:4,
45:18, 45:24, 61:17,
84:17, 94:23, 95:14,
97:2, 99:7, 100:13,
104:7, 104:23,
107:15, 111:1,
113:20, 113:21,
118:10, 126:13,
146:15, 148:2, 148:3
**court** [11] - 9:13, 12:4,
13:8, 14:13, 14:19,
32:10, 44:16, 94:13,
101:13, 123:20,
130:21
**COURT** [47] - 1:1,
1:17, 7:5, 7:7, 7:21,
8:1, 8:3, 11:4, 11:8,
11:13, 11:17, 14:19,
16:10, 16:14, 42:23,
43:10, 43:19, 44:3,
52:18, 52:23, 53:7,
53:25, 57:2, 57:25,
58:5, 58:8, 58:10,
58:13, 63:4, 80:21,
94:19, 94:25, 95:3,
95:6, 95:8, 95:20,
95:22, 95:24, 106:2,
106:7, 121:20,
121:24, 126:1,
128:15, 128:18,
128:25, 146:22
**Court's** [1] - 60:11
**Courtright** [8] - 8:11,
25:16, 25:21, 27:23,
50:5, 50:10
**courtroom** [6] - 22:4,
25:16, 45:12, 60:10,

90:18, 146:17
**courts** [2] - 17:14,
33:8
**covered** [1] - 93:8
**Covington** [1] - 5:11
**Cox** [1] - 95:16
**Craig** [2] - 37:7,
113:25
**create** [6] - 18:13,
45:25, 49:18, 66:22,
77:5, 80:22
**created** [5] - 28:19,
71:23, 81:2, 83:16,
87:21
**creating** [1] - 27:25
**credibility** [2] - 130:7,
130:10
**credible** [1] - 51:24
**crime** [6] - 65:19,
70:3, 70:9, 71:3,
71:9, 75:14
**criminal** [1] - 45:1
**crisis** [21] - 15:22,
23:22, 24:6, 59:6,
59:8, 60:5, 61:15,
62:17, 69:13, 73:13,
73:14, 74:16, 80:4,
80:6, 86:24, 90:16,
92:17, 94:7, 96:6,
141:16, 146:9
**criticism** [1] - 127:17
**criticisms** [1] - 132:10
**criticize** [1] - 132:22
**cross** [5] - 26:18,
52:9, 54:8, 80:1,
99:9
**cross-claims** [2] -
52:9, 54:8
**cross-examination** [1]
- 80:1
**cross-examined** [1] -
26:18
**CRR** [2] - 6:17, 6:18
**crucial** [1] - 103:3
**CSA** [5] - 110:17,
110:18, 111:6,
118:13, 133:24
**CSRA** [4] - 112:21,
113:5, 113:7, 113:17
**CSX** [1] - 16:4
**culture** [1] - 71:2
**cumulative** [1] - 18:4
**current** [1] - 36:23
**curve** [1] - 116:19
**Customer** [1] - 111:8
**customer** [10] - 101:2,
109:23, 109:25,
111:7, 111:21,
120:5, 120:6,
126:20, 127:5,

131:21
**customers** [26] - 36:24, 101:4, 101:20, 103:7, 103:9, 103:11, 103:14, 103:15, 103:18, 103:21, 103:23, 104:3, 104:4, 104:18, 106:14, 109:16, 110:1, 111:24, 112:3, 113:24, 121:3, 121:4, 130:24, 142:10, 142:11, 142:20
**customizable** [1] - 116:24
**cut** [7] - 14:20, 66:7, 121:4, 134:18, 135:1, 140:16, 140:22
**cuts** [4] - 64:17, 64:20, 64:21
**cutting** [2] - 127:10, 139:13
**Cuyahoga** [1] - 53:22
**cycle** [5] - 50:7, 50:23, 83:4, 87:22

**D**

**daggone** [1] - 52:6
**daily** [2] - 121:14, 123:16
**damages** [2] - 17:4, 144:10
**dangerous** [4] - 24:24, 25:8, 138:23, 138:24
**dangerously** [1] - 36:5
**Darren** [1] - 95:16
**dashboard** [2] - 112:24, 113:9
**dashboards** [2] - 126:24, 127:1
**data** [29] - 9:14, 37:3, 65:20, 73:25, 74:1, 74:2, 74:19, 75:9, 75:13, 77:15, 77:16, 77:17, 77:18, 78:9, 79:12, 83:2, 84:8, 88:11, 97:14, 102:10, 102:11, 103:22, 109:5, 112:5, 136:5, 136:14, 137:15
**datasets** [1] - 137:25
**date** [1] - 37:8
**Daubert** [2] - 129:18
**David** [6] - 7:1, 8:11, 25:16, 99:8, 100:15,

126:11
**DAVID** [2] - 1:17, 4:5
**days** [9] - 8:20, 11:23, 11:24, 14:15, 56:17, 67:13, 76:15, 82:7, 116:5
**DC** [7] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12, 38:7
**De** [2] - 2:4, 2:14
**DEA** [85] - 11:20, 11:21, 12:14, 13:9, 13:13, 13:17, 13:19, 13:22, 22:24, 24:25, 25:4, 30:4, 30:5, 30:13, 30:14, 35:15, 35:16, 38:5, 40:3, 41:12, 41:14, 42:2, 45:17, 52:6, 61:3, 97:8, 98:12, 99:19, 99:25, 100:1, 100:6, 100:7, 100:8, 100:16, 101:16, 106:15, 108:9, 108:10, 109:18, 113:23, 115:10, 116:16, 116:20, 116:24, 117:2, 117:3, 117:13, 117:17, 118:7, 118:13, 118:21, 119:9, 119:16, 119:24, 120:4, 120:13, 120:20, 120:25, 121:16, 122:11, 122:18, 122:23, 123:10, 123:14, 123:16, 123:21, 123:25, 124:3, 124:23, 125:11, 125:13, 125:16, 125:22, 126:7, 126:12, 128:4, 129:11, 132:19, 133:8, 133:13, 140:4
**DEA's** [11] - 31:13, 118:1, 119:1, 119:22, 124:5, 124:6, 125:2, 125:3, 125:5, 133:2
**DEA-sponsored** [2] - 125:11
**dead** [1] - 81:18
**deadly** [1] - 15:21
**deal** [14] - 40:9, 40:12, 50:21, 73:23, 75:12, 75:25, 83:5, 91:2, 91:3, 94:2, 94:8, 127:4, 128:21,

130:15
**dealing** [5] - 48:6, 77:8, 90:20, 116:4, 146:9
**Dean** [2] - 43:17
**Dear** [1] - 24:22
**death** [6] - 55:2, 56:4, 67:10, 79:1, 82:11, 93:15
**deaths** [17] - 40:22, 56:2, 67:14, 69:3, 69:5, 78:11, 78:13, 78:15, 78:17, 78:22, 79:3, 79:4, 79:20, 80:15, 80:18, 81:23, 82:4
**debate** [3] - 9:25, 31:21, 49:10
**debilitating** [1] - 135:5
**decade** [1] - 115:19
**decide** [1] - 15:14
**decided** [1] - 124:24
**decimated** [1] - 71:6
**decision** [2] - 143:5, 146:19
**decisions** [7] - 14:11, 96:18, 127:2, 127:5, 127:6, 128:2, 139:4
**declared** [1] - 24:6
**dedicated** [1] - 98:9
**deem** [1] - 119:6
**defect** [1] - 34:23
**Defendant** [4] - 4:16, 5:2, 5:7, 6:2
**defendant** [2] - 35:16, 35:20
**defendant's** [1] - 20:25
**Defendants** [3] - 1:8, 1:14, 148:7
**defendants** [44] - 11:23, 18:20, 20:7, 21:24, 24:23, 27:20, 28:9, 28:22, 30:11, 31:16, 31:19, 31:23, 32:1, 32:21, 33:12, 33:20, 34:1, 34:13, 35:2, 35:14, 36:14, 37:15, 38:2, 38:23, 39:16, 40:11, 40:16, 40:17, 42:7, 42:10, 42:15, 45:16, 46:5, 50:2, 50:9, 52:16, 53:19, 54:4, 54:5, 56:11, 67:3, 118:21, 146:14, 146:24
**defendants'** [8] - 23:19, 29:12, 30:7, 38:24, 49:11, 57:15, 59:23, 89:10

**defense** [7] - 30:18, 38:8, 39:6, 46:6, 50:22, 51:15, 95:12
**defenses** [1] - 45:11
**defer** [1] - 53:15
**define** [1] - 12:21
**defined** [3] - 16:21, 115:6, 134:12
**defines** [1] - 29:21
**definition** [6] - 15:8, 22:16, 22:17, 62:2, 115:16, 144:1
**definitive** [1] - 21:20
**definitively** [4] - 16:21, 21:13, 24:9, 26:13
**degree** [1] - 65:9
**degrees** [1] - 36:4
**Deleno** [1] - 104:24
**demand** [5] - 46:1, 66:23, 71:19, 80:22, 80:23
**demands** [1] - 72:16
**demo** [1] - 77:25
**demographics** [1] - 66:1
**demonstrate** [5] - 34:20, 51:12, 89:4, 90:15, 138:7
**demonstrated** [1] - 59:20
**demonstrates** [2] - 33:12, 60:13
**denied** [3] - 21:25, 120:23, 138:3
**dentists'** [1] - 63:17
**deny** [1] - 117:21
**denying** [1] - 138:3
**Department** [6] - 66:6, 68:20, 83:22, 107:13, 107:15, 108:1
**department** [2] - 56:5, 82:14, 93:18
**Department's** [1] - 107:16
**department's** [1] - 107:18
**dependence** [2] - 80:6, 85:2
**dependent** [2] - 56:6, 93:19
**depicts** [1] - 102:10
**deposed** [2] - 10:17, 11:23
**deposition** [9] - 10:19, 10:21, 25:11, 30:4, 30:20, 60:25, 95:11, 95:15, 125:7
**depositions** [1] - 10:7

**depriving** [1] - 130:1
**Deputy** [2] - 11:19, 133:14
**describe** [2] - 101:4, 119:21
**described** [2] - 96:25, 113:15
**describes** [1] - 125:3
**describing** [1] - 108:13
**design** [6] - 33:20, 34:23, 114:6, 114:19, 115:14, 121:16
**designated** [2] - 10:16, 11:21, 12:12
**designations** [4] - 60:25, 95:11, 95:15, 95:18
**designed** [3] - 36:23, 39:12, 48:25
**designee** [3] - 10:16, 11:21, 12:12
**designing** [1] - 61:21
**designs** [1] - 35:19
**desk** [1] - 38:16
**destined** [1] - 124:9
**detail** [12] - 9:16, 19:6, 20:21, 71:1, 71:3, 73:17, 82:5, 107:19, 111:9, 112:1, 113:16, 126:17
**detailed** [3] - 59:17, 110:25, 120:10
**detect** [1] - 124:20
**detected** [1] - 82:3
**determination** [3] - 98:9, 139:2, 139:8
**determine** [4] - 27:4, 111:14, 135:14, 139:4
**determined** [1] - 135:14
**detriment** [1] - 22:25
**detrimental** [2] - 13:19, 22:13
**Detroit** [1] - 143:21
**devastating** [2] - 23:7, 69:12
**develop** [3] - 75:7, 116:21, 130:16
**developed** [8] - 69:17, 69:21, 99:24, 112:5, 117:9, 124:20, 124:24, 125:10
**developing** [1] - 122:16
**development** [2] - 116:17, 124:22
**deviating** [2] - 114:12,

115:4
**deviation** [1] - 34:3
**devoted** [2] - 100:24
**diagnosed** [1] - 19:16
**diagnostic** [1] - 91:8
**dialogue** [1] - 120:20
**die** [4] - 24:21, 62:12, 82:23, 93:18
**died** [2] - 27:5, 48:22
**dies** [1] - 85:20
**difference** [7] - 14:10, 44:23, 45:4, 48:3, 49:1, 49:19, 55:1
**different** [14] - 12:22, 14:9, 19:21, 20:13, 37:6, 52:20, 77:16, 85:11, 85:12, 100:8, 115:7, 115:16, 137:17, 137:24
**differently** [1] - 90:4
**difficult** [2] - 66:2, 128:2
**diligence** [27] - 31:10, 37:2, 37:4, 37:13, 37:20, 38:1, 38:3, 108:11, 108:13, 111:7, 111:21, 111:24, 112:1, 112:7, 112:12, 112:14, 112:16, 112:19, 113:9, 113:14, 127:8, 131:14, 131:20, 132:5, 132:9, 132:14
**dipped** [1] - 20:2
**direct** [10] - 15:11, 29:25, 42:14, 72:12, 72:21, 90:10, 97:19, 98:19, 142:2, 144:7
**Direct** [4] - 42:13, 43:4, 43:23, 45:12
**directly** [4] - 35:18, 70:4, 108:17, 124:15
**dirt** [1] - 64:19
**discharged** [1] - 83:23
**disclose** [2] - 114:7, 114:20
**discovered** [2] - 114:11, 114:25
**discovery** [1] - 34:5
**discriminating** [1] - 66:19
**discussed** [2] - 112:1, 142:18
**discussion** [3] - 104:16, 119:23, 132:5
**disease** [5] - 61:22, 66:19, 86:3, 86:7, 86:25

**diseases** [1] - 86:13
**dismount** [1] - 49:25
**Disorder** [6] - 19:20, 19:25, 20:5, 48:16, 48:19, 49:9
**disorder** [4] - 84:15, 84:18, 84:21, 92:20
**dispel** [1] - 132:1
**dispensed** [2] - 67:25, 96:14
**dispenser** [2] - 44:9, 45:3
**displaced** [1] - 85:21
**displayed** [1] - 103:9
**disproportionate** [1] - 102:25
**disproves** [1] - 118:17
**dispute** [7] - 9:21, 21:16, 27:15, 46:5, 66:9, 114:2, 114:22
**disputed** [3] - 111:16, 115:1, 129:6
**disputing** [1] - 20:10
**disregard** [1] - 42:8
**disregarded** [1] - 130:8
**disrupt** [2] - 11:11, 87:22
**disrupting** [2] - 123:5, 134:20
**distilling** [1] - 8:24
**distinction** [1] - 16:23
**distinguished** [2] - 53:22, 100:16
**distributed** [7] - 9:7, 33:11, 68:2, 101:14, 101:24, 104:8, 106:25
**distributes** [1] - 142:10
**distributing** [2] - 28:23, 72:10
**distribution** [21] - 22:12, 29:24, 35:5, 72:20, 98:4, 98:6, 101:22, 102:20, 103:16, 104:4, 120:7, 121:8, 136:8, 136:10, 136:19, 137:3, 137:11, 137:15, 138:1, 138:5, 138:8
**distributions** [1] - 136:22
**distributor** [13] - 12:5, 24:25, 42:16, 100:8, 101:23, 108:3, 102:10, 118:19, 118:21, 125:2, 132:25, 139:7,

139:10
**Distributors** [1] - 138:22
**distributors** [30] - 12:8, 28:23, 51:9, 51:13, 52:8, 96:16, 97:24, 97:25, 100:9, 110:18, 113:19, 113:22, 119:6, 119:10, 122:5, 122:9, 122:19, 124:4, 124:8, 126:8, 127:16, 127:22, 129:21, 134:12, 134:14, 134:18, 134:22, 135:13, 139:3, 139:19
**distributors'** [2] - 138:25, 145:5
**District** [2] - 7:2, 7:3
**DISTRICT** [3] - 1:1, 1:1, 1:17
**Diversion** [10] - 11:20, 100:4, 100:17, 125:13, 126:12, 126:20, 127:13, 129:11, 132:18, 144:1
**diversion** [56] - 12:9, 12:18, 13:11, 13:13, 13:16, 13:19, 13:23, 24:11, 24:15, 24:18, 25:1, 25:6, 25:7, 25:13, 26:3, 26:13, 27:12, 27:15, 28:1, 28:4, 28:5, 31:3, 32:22, 46:24, 59:24, 60:22, 61:5, 66:22, 66:24, 67:5, 68:22, 68:25, 69:7, 71:10, 71:14, 72:1, 72:3, 79:5, 100:6, 110:2, 112:23, 113:8, 118:8, 127:12, 131:1, 139:15, 140:4, 142:19, 142:21, 142:22, 143:18, 143:19, 143:25, 145:2
**divert** [1] - 75:3
**diverted** [7] - 24:20, 46:21, 68:8, 71:16, 106:25, 111:3, 143:20
**Diverted** [1] - 66:20
**divide** [1] - 19:12
**divisible** [1] - 54:7
**division** [2] - 39:24, 114:9
**Division** [3] - 11:20,

114:24, 125:13
**Division-sponsored** [1] - 125:13
**Doctor** [1] - 88:14
**doctor** [8] - 44:12, 72:10, 79:7, 105:3, 138:17, 143:2, 143:5, 143:7
**doctor's** [1] - 138:18
**doctor-shopping** [1] - 79:7
**doctor/patient** [1] - 134:20
**doctors** [15] - 52:3, 53:11, 72:7, 96:15, 98:4, 105:7, 105:19, 105:21, 130:3, 130:5, 134:24, 135:3, 136:1, 138:25
**Doctors** [1] - 135:14
**doctors'** [1] - 63:17
**document** [5] - 19:6, 21:6, 36:19, 70:25, 80:8
**documented** [3] - 20:22, 89:16, 90:18
**documents** [14] - 21:1, 23:18, 35:12, 59:9, 59:13, 59:14, 59:18, 68:11, 76:2, 90:18, 107:22, 112:20, 116:8, 131:22
**dollar** [2] - 64:20, 89:3
**dollars** [4] - 69:23, 145:7, 146:7, 146:11
**done** [17] - 14:2, 17:6, 17:7, 32:8, 34:5, 38:11, 42:20, 42:22, 45:15, 51:16, 54:4, 56:16, 76:8, 96:21, 97:3, 128:18, 134:8
**dope** [1] - 45:25
**dosage** [1] - 69:24
**double** [1] - 62:12
**doubt** [3] - 39:11, 116:10
**Douglas** [1] - 4:23
**dovetails** [1] - 28:14
**Down** [1] - 137:7
**down** [27] - 7:23, 8:24, 9:4, 14:16, 16:9, 17:17, 20:2, 21:14, 33:23, 37:18, 37:21, 40:3, 41:21, 58:18, 64:25, 85:10, 87:23, 108:8, 108:16, 108:23, 109:1, 109:6, 113:24, 120:22, 134:7,

134:19
**downstream** [3] - 142:22, 143:17, 143:18
**Dr** [107] - 8:11, 18:24, 19:9, 19:22, 21:5, 23:9, 23:19, 25:15, 25:21, 25:25, 26:9, 26:21, 27:23, 44:8, 46:16, 46:17, 46:18, 46:19, 47:9, 47:16, 48:4, 48:15, 48:21, 49:10, 50:5, 50:10, 55:3, 55:4, 55:7, 55:8, 55:19, 61:1, 61:7, 61:8, 61:11, 61:16, 62:18, 64:8, 66:4, 77:13, 77:14, 78:9, 78:19, 78:24, 79:12, 80:1, 80:9, 80:17, 81:9, 81:13, 82:8, 82:14, 82:16, 84:16, 84:21, 85:8, 85:23, 86:2, 86:3, 86:23, 87:2, 87:14, 87:15, 87:19, 87:20, 88:7, 88:8, 88:10, 88:16, 88:17, 88:18, 88:21, 88:23, 89:1, 89:2, 89:8, 89:9, 89:19, 90:7, 90:12, 90:23, 91:5, 91:20, 92:14, 93:14, 102:14, 104:6, 109:3, 136:18, 137:11, 144:22, 144:25, 145:6
**drafts** [1] - 76:4
**dramatic** [1] - 78:2
**draw** [8] - 9:6, 16:17, 18:7, 21:19, 27:22, 102:10, 102:17, 134:11
**drew** [1] - 9:5
**drill** [1] - 58:18
**drilled** [1] - 85:10
**Drive** [1] - 6:15
**driving** [5] - 24:15, 60:18, 62:16, 81:21, 82:2
**drop** [2] - 45:14, 124:17
**dropped** [1] - 124:16
**drove** [5] - 98:6, 135:11, 136:5, 136:6
**drowning** [2] - 47:12, 47:13
**Drug** [11] - 6:2, 65:21, 73:10, 74:14, 74:24, 76:9, 104:20,

105:25, 113:5,
113:6, 148:7
**DRUG** [2] - 1:7, 1:13
**drug** [35] - 12:7, 12:16,
22:19, 27:24, 40:21,
41:10, 48:22, 68:5,
70:4, 70:7, 70:11,
71:2, 71:24, 72:13,
72:15, 72:22, 75:3,
75:9, 76:11, 78:7,
78:10, 78:11, 79:20,
80:18, 81:23, 82:4,
90:11, 107:17,
107:19, 140:8,
140:11, 140:14,
140:15, 140:18,
143:21
**drug-seekers** [2] -
140:11, 140:18
**drugs** [17] - 44:21,
62:14, 68:8, 69:8,
70:6, 71:11, 71:15,
71:23, 72:11, 72:17,
81:25, 86:11, 86:14,
86:18, 88:12, 88:22
**due** [29] - 31:10, 37:2,
37:4, 37:13, 37:20,
38:1, 38:3, 69:17,
69:21, 69:22,
108:11, 108:13,
111:7, 111:21,
111:24, 112:1,
112:7, 112:12,
112:14, 112:16,
112:19, 113:9,
113:14, 127:7,
131:14, 131:20,
132:5, 132:8, 132:14
**dump** [1] - 29:2
**dumped** [1] - 98:1
**dumping** [3] - 29:17,
29:19, 51:22
**duration** [1] - 121:11
**during** [22] - 42:15,
65:6, 78:4, 93:1,
96:1, 96:5, 97:1,
102:3, 103:3,
104:17, 106:12,
113:11, 118:4,
118:18, 119:2,
121:6, 122:18,
126:24, 129:23,
133:14, 134:4
**duty** [8] - 17:10, 27:20,
28:20, 29:5, 29:21,
30:3, 31:1, 31:16
**dwell** [2] - 14:24,
139:24
**dwelling** [1] - 127:7
**dying** [4] - 26:22,

62:14, 78:5, 84:3

---

## E

**e-mail** [6] - 40:19,
40:23, 41:6, 109:7,
109:9, 109:10
**early** [3] - 67:13,
91:17, 100:6
**easiest** [1] - 116:13
**East** [3] - 3:5, 3:12,
4:24
**easy** [1] - 86:9
**economic** [2] - 85:20,
92:2
**economist** [2] - 49:6,
89:10
**edge** [1] - 127:10
**educate** [1] - 61:17
**education** [1] - 70:13
**effect** [9] - 22:14,
45:23, 45:25, 55:5,
64:5, 64:6, 93:12,
118:3, 130:1
**effective** [9] - 23:3,
27:20, 32:22, 33:12,
33:21, 59:24,
100:19, 109:7, 109:8
**efforts** [6] - 65:12,
70:11, 74:15, 74:25,
75:9, 145:2
**eight** [5] - 11:24,
17:24, 17:25, 20:20,
36:10
**eight-hour** [1] - 11:24
**Eighth** [1] - 3:10
**either** [12] - 9:11,
51:20, 56:11, 57:22,
99:2, 104:13,
111:11, 111:12,
111:16, 114:2, 115:1
**elements** [5] - 14:6,
15:2, 17:17, 17:21,
92:14
**ELIZABETH** - 6:14
**Elliott** [1] - 44:2
**emblematic** [1] -
117:22
**emergence** [1] - 71:13
**emergency** [4] - 24:7,
56:5, 85:16, 93:17
**emerging** [3] - 68:21,
68:22, 68:24
**emphasis** [2] - 8:18,
27:22
**employability** [1] -
69:12
**employee** [1] - 100:5
**Emporium** [4] -
104:20, 105:25,

113:5, 113:6
**empower** [2] - 94:3,
94:5
**empty** [3] - 109:19,
131:15, 141:11
**empty-handed** [1] -
141:11
**enables** [1] - 13:16
**enacted** [1] - 114:17
**Encino** [1] - 3:16
**encompassed** [1] -
74:4
**end** [5] - 27:23, 47:12,
55:15, 65:1, 110:6
**endanger** [1] - 22:20
**endeavored** [1] - 8:20
**endocarditis** [1] -
86:22
**endorsement** [1] -
118:2
**ends** [1] - 77:7
**energy** [1] - 26:7
**enforcement** [11] -
59:5, 69:10, 70:7,
70:12, 71:24, 73:14,
74:6, 74:18, 75:1,
126:22, 133:12
**enforcing** [1] - 118:8
**engage** [1] - 48:1
**engaged** [3] - 28:23,
31:23, 98:18
**engages** [2] - 12:5,
28:18
**enormous** [4] - 25:1,
66:23, 92:1, 98:7
**ensure** [2] - 84:9,
140:8
**ensures** [1] - 91:14
**ensuring** [1] - 89:25
**enter** [2] - 13:23, 75:4
**entered** [6] - 9:14,
18:19, 23:19, 24:1,
24:5, 31:21
**entertain** [1] - 27:19
**enthusiasm** [1] -
100:25
**entire** [13] - 10:8, 18:2,
36:5, 52:1, 55:4,
57:16, 65:24, 66:3,
96:1, 106:12, 110:5,
117:22, 141:3
**entirely** [4] - 105:6,
134:4, 137:2, 142:22
**ENU** [1] - 4:17
**epicenters** [1] - 80:3
**epidemic** [53] - 9:9,
9:21, 16:20, 18:9,
19:8, 20:8, 21:10,
21:13, 21:21, 23:6,
23:14, 23:21, 24:2,

24:13, 24:15, 27:16,
29:8, 46:14, 47:19,
47:25, 48:3, 50:7,
51:11, 51:13, 51:15,
52:1, 54:12, 54:15,
56:18, 59:22, 62:19,
65:1, 66:18, 69:8,
74:23, 75:25, 76:25,
77:8, 78:8, 84:7,
87:3, 87:6, 87:21,
90:2, 90:3, 90:4,
90:8, 90:9, 90:10,
93:25, 140:3
**epidemics** [1] - 25:19
**epidemiological** [3] -
68:13, 80:10, 87:15
**epidemiologist** [4] -
18:25, 19:22, 77:14,
89:19
**epidemiology** [2] -
55:6, 84:23
**equal** [1] - 9:11
**equaled** [1] - 138:2
**equation** [1] - 9:20
**equitable** [2] - 144:15,
146:9
**Eric** [1] - 50:14
**erroneous** [1] - 141:19
**especially** [4] - 72:2,
98:8, 128:3
**essence** [4] - 9:4,
14:8, 18:13, 27:1
**establish** [6] - 48:2,
77:5, 98:20, 98:21,
101:9, 133:19
**established** [11] -
14:5, 17:22, 18:20,
26:13, 32:23, 51:20,
55:5, 56:16, 57:14,
97:17, 140:14
**establishes** [1] -
47:24
**establishing** [1] - 22:5
**estimated** [1] - 19:24
**estimates** [1] - 19:14
**et** [4] - 1:7, 1:13,
148:6, 148:7
**event** [2] - 67:3, 123:8
**events** [5] - 36:21,
100:5, 116:7,
123:24, 129:8
**eventually** [2] - 25:2,
43:8
**everywhere** [2] -
63:15, 63:19
**evidence** [70] - 10:2,
11:10, 17:18, 18:3,
18:6, 18:15, 18:17,
20:11, 20:15, 21:10,
25:17, 26:11, 27:8,

27:14, 33:5, 38:9,
39:20, 42:12, 48:5,
48:25, 59:19, 60:12,
62:4, 66:25, 68:10,
72:9, 79:6, 79:18,
81:5, 85:5, 91:10,
93:24, 97:10, 99:2,
103:23, 104:14,
104:25, 105:14,
105:24, 106:12,
106:16, 106:22,
106:23, 106:24,
107:1, 107:3, 107:6,
107:8, 107:12,
107:15, 108:12,
110:2, 110:9, 111:1,
111:3, 112:16,
112:24, 118:17,
122:12, 124:13,
126:5, 128:7,
131:16, 131:25,
132:21, 134:6,
135:17, 138:6,
138:12
**evidence-based** [1] -
48:25
**evolved** [1] - 100:20
**exact** [4] - 15:7, 138:1,
141:12, 141:17
**exactly** [1] - 98:5
**exam** [1] - 47:21
**examination** [1] - 80:1
**examined** [1] - 26:18
**example** [9] - 49:20,
102:23, 108:2,
112:1, 112:8,
125:24, 126:23,
132:23, 138:12
**examples** [4] - 68:7,
112:17, 132:10,
135:5
**exceeded** [2] - 117:1,
138:8
**excess** [1] - 37:19
**excessive** [1] - 120:3
**exclude** [2] - 11:1,
54:15
**exclusively** [1] - 119:2
**excuse** [2] - 101:11,
126:1
**exercise** [2] - 28:21,
140:8
**exhaust** [1] - 10:8
**exhaustive** [1] - 15:8
**Exhibit** [1] - 71:3
**exhibits** [3] - 18:19,
35:17, 59:11
**exist** [1] - 142:7
**existential** [1] - 91:22
**existing** [1] - 145:18

**expand** [1] - 75:6
**expansion** [2] - 84:25, 126:20
**expect** [1] - 56:4
**expected** [3] - 113:19, 125:22, 134:14
**expenditures** [1] - 17:6
**expensive** [1] - 56:9
**experience** [2] - 35:23, 70:7
**experienced** [1] - 41:9
**expert** [25] - 20:13, 20:25, 34:9, 46:10, 48:10, 48:13, 49:11, 53:10, 54:21, 60:16, 69:19, 78:20, 79:23, 80:8, 87:15, 89:10, 104:22, 105:17, 109:4, 113:25, 129:10, 129:20, 136:17, 136:18
**experts** [24] - 20:24, 34:16, 61:3, 68:13, 77:9, 78:7, 81:6, 85:9, 85:12, 86:1, 88:2, 91:1, 92:11, 93:2, 93:24, 97:14, 103:22, 111:17, 115:18, 134:5, 135:22, 136:5, 137:24, 138:20
**explain** [2] - 26:20, 121:2
**explained** [4] - 62:19, 100:19, 122:19, 135:8
**explains** [1] - 141:15
**explanation** [2] - 134:3, 138:4
**explode** [2] - 71:7
**exploring** [1] - 50:17
**expose** [1] - 98:14
**exposure** [6] - 55:12, 60:17, 61:9, 80:11, 84:21, 87:16
**exposures** [1] - 84:19
**express** [1] - 118:1
**expression** [2] - 105:12
**expressions** [1] - 97:23
**extensively** [2] - 81:19, 135:22
**extent** [1] - 61:4
**extrapolate** [1] - 19:1
**extrapolating** [1] - 27:9
**extremely** [4] - 102:8, 102:13, 110:25,

123:6
**eye** [2] - 112:10, 126:7
**eyes** [1] - 16:17
**eyewitness** [1] - 68:12
**Eyre's** [1] - 50:14

---

## F

**Faber** [2] - 7:1, 25:20
**FABER** [1] - 1:17
**fabric** [2] - 66:7, 85:7
**face** [6] - 32:4, 52:11, 71:2, 122:11, 129:2, 129:21
**faceted** [1] - 90:23
**facilitate** [2] - 25:1, 25:2
**facilities** [1] - 69:11
**facility** [1] - 120:15
**facing** [2] - 74:23, 87:13
**fact** [42] - 14:10, 14:15, 24:3, 25:24, 28:6, 29:4, 30:21, 33:1, 34:15, 35:8, 44:5, 44:22, 45:7, 45:12, 52:25, 59:16, 60:13, 64:7, 66:16, 68:4, 75:20, 85:23, 88:22, 89:23, 91:10, 93:14, 93:20, 103:2, 106:17, 106:20, 108:22, 113:22, 115:20, 117:20, 117:24, 130:8, 132:24, 133:7, 136:9, 137:1, 141:21, 143:10
**factor** [13] - 9:8, 24:12, 25:18, 25:23, 27:13, 27:15, 46:13, 46:15, 47:18, 47:19, 47:22, 47:23, 80:15
**factors** [1] - 115:7
**facts** [8] - 8:22, 9:10, 9:23, 14:5, 15:9, 17:22, 20:6, 33:2
**Facts** [1] - 40:7
**factual** [2] - 22:5, 31:15
**fail** [3] - 13:14, 32:21, 33:20
**failed** [4] - 29:7, 98:15, 107:3, 111:2
**failings** [1] - 130:22
**failure** [5] - 13:16, 23:2, 33:12, 38:22, 99:1
**failures** [4] - 35:13, 59:23, 110:12,

110:16
**faith** [3] - 96:12, 111:11, 186:12
**fallback** [1] - 98:25
**familiar** [1] - 73:19
**families** [5] - 41:10, 64:4, 66:18, 69:13, 85:21
**family** [3] - 65:10, 65:18, 87:3
**Family** [1] - 113:4
**famous** [1] - 43:15
**fan** [1] - 10:4
**far** [6] - 16:14, 58:13, 133:9, 142:5, 144:5
**FARRELL** [20] - 2:3, 7:25, 8:2, 8:4, 11:18, 13:5, 14:1, 14:22, 16:11, 16:16, 43:1, 43:11, 43:22, 44:4, 52:21, 53:4, 53:10, 53:15, 54:1, 58:3
**Farrell** [31] - 2:4, 2:13, 7:21, 8:3, 11:15, 11:17, 16:15, 42:24, 57:8, 58:17, 58:25, 59:15, 60:16, 60:23, 61:7, 66:13, 74:19, 77:9, 79:25, 81:9, 84:15, 88:3, 88:15, 89:14, 90:17, 90:25, 92:13, 93:8, 99:13, 113:12, 131:20
**Farrell's** [5] - 57:13, 123:12, 124:16, 130:14, 130:18
**fashion** [1] - 117:15
**fatal** [1] - 129:14
**fatalities** [2] - 19:3, 19:7
**fault** [2] - 52:13, 54:6
**favor** [1] - 32:16
**favorable** [1] - 129:2
**favorably** [1] - 132:20
**favorite** [1] - 42:6
**faxed** [1] - 117:2
**FCRR** [1] - 6:18
**FDA** [2] - 52:5, 98:3
**features** [1] - 126:13
**federal** [6] - 9:15, 13:10, 13:14, 17:14, 117:11, 123:20
**Federal** [1] - 32:11
**feedback** [1] - 43:1
**Feinberg** [4] - 86:2, 86:3, 86:23
**fell** [1] - 105:18
**fellow** [3] - 39:25, 40:24, 43:16
**felt** [2] - 73:3, 123:3

**fentanyl** [6] - 54:17, 80:7, 88:22, 89:7, 90:13, 143:22
**fentanyl-related** [1] - 54:17
**few** [13] - 8:6, 15:18, 33:23, 56:22, 59:18, 70:21, 95:11, 121:5, 123:23, 124:25, 126:16, 129:13, 144:13
**fewer** [4] - 79:8, 134:13, 138:13, 138:14
**field** [2] - 114:9, 116:24
**Field** [2] - 114:24, 117:3
**fifth** [1] - 121:14
**fight** [1] - 90:22
**figure** [2] - 26:21, 115:10
**file** [9] - 18:13, 52:9, 124:1, 130:17, 130:19, 130:21, 130:22, 130:23, 132:5
**filed** [1] - 21:24
**files** [5] - 77:15, 108:12, 131:22, 132:9, 132:12
**fill** [1] - 33:6
**filling** [2] - 22:24, 134:16
**final** [3] - 19:20, 26:5, 102:21
**finally** [5] - 23:25, 35:14, 41:3, 124:11, 146:3
**financial** [1] - 65:12
**financially** [1] - 144:3
**finder** [1] - 14:10
**findings** [7] - 17:23, 18:4, 33:1, 33:2, 59:16, 81:20, 89:23
**fine** [9] - 16:14, 57:21, 94:24, 121:13, 128:15, 133:6, 133:8, 133:9, 141:14
**fined** [1] - 98:12
**fines** [1] - 128:11
**fire** [2] - 36:24, 37:24
**Fire** [1] - 67:9
**firefighter** [1] - 67:9
**firefighters** [3] - 63:8, 63:12, 63:18
**Firefighters** [1] - 63:2
**firemen** [1] - 63:4
**Firm** [2] - 3:4, 3:7
**First** [4] - 135:11,

142:25, 144:14, 144:25
**first** [48] - 8:10, 9:3, 10:17, 10:18, 12:3, 15:6, 16:1, 16:25, 20:21, 21:1, 22:6, 22:7, 22:8, 22:9, 22:17, 24:22, 25:11, 27:8, 42:22, 44:21, 45:6, 51:15, 54:19, 54:20, 59:6, 60:24, 61:6, 62:23, 63:12, 67:8, 68:25, 81:15, 83:21, 88:20, 91:5, 91:17, 99:2, 99:13, 99:14, 101:8, 101:13, 102:11, 110:18, 114:19, 121:8, 121:18, 122:14
**first-hand** [1] - 59:6
**firsthand** [4] - 99:12, 100:5, 109:13, 118:23
**Fisher** [1] - 104:24
**fit** [1] - 109:23
**fits** [1] - 15:8
**Fitzsimmons** [1] - 28:16
**five** [11] - 12:1, 13:6, 25:4, 36:9, 55:24, 63:24, 82:10, 123:23, 128:14
**five-minute** [1] - 128:14
**five-year-old** [1] - 63:24
**FL** [1] - 2:11
**flag** [5] - 35:21, 116:25, 127:16, 131:3, 131:6
**flagged** [5] - 36:15, 36:22, 112:6, 131:9, 132:2
**flags** [3] - 35:15, 101:7, 112:11
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**fleet** [1] - 97:25
**flooded** [1] - 67:23
**floodgates** [1] - 47:13
**flooding** [2] - 47:10
**Floor** [1] - 3:5
**floor** [1] - 64:19
**Florida** [2] - 120:15, 121:15
**flow** [1] - 36:21
**fly** [1] - 30:2
**focus** [6] - 26:8, 63:11, 74:17, 89:11,

104:19, 142:22
**focused** [6] - 61:13, 65:5, 70:13, 79:22, 82:21, 104:23
**folks** [2] - 69:19, 83:11
**follow** [5] - 52:10, 59:16, 83:9, 83:10, 136:22
**followed** [4] - 55:3, 66:1, 120:11, 131:11
**following** [3] - 10:21, 122:12, 136:2
**follows** [6] - 7:4, 12:4, 13:8, 17:15, 57:5, 128:24
**fond** [1] - 97:23
**footing** [4] - 15:10, 15:12, 15:13, 15:24
**FOR** [1] - 1:1
**forbade** [1] - 122:11
**force** [6] - 60:18, 62:16, 69:12, 78:7, 81:21, 82:2
**forced** [1] - 105:16
**foregoing** [1] - 148:4
**foremost** [1] - 142:25
**foreseeability** [1] - 28:2
**foreseeable** [8] - 13:13, 25:24, 40:18, 50:8, 50:22, 50:23, 51:22, 67:3
**Fork** [1] - 16:5
**Form** [2] - 112:22, 113:7
**form** [2] - 17:21, 144:16
**formally** [2] - 95:14, 98:17
**format** [1] - 26:19
**Former** [1] - 24:5
**former** [3] - 44:5, 129:11, 132:18
**formula** [2] - 9:5, 77:3
**forth** [3] - 107:18, 110:11, 142:12
**forward** [6] - 66:14, 76:5, 83:15, 96:2, 108:16, 146:19
**forward-looking** [1] - 76:5
**forwarded** [1] - 112:21
**forwarding** [1] - 40:24
**foster** [1] - 85:22
**fought** [1] - 9:15
**foundation** [7] - 72:18, 75:16, 75:22, 75:23, 75:24, 76:19, 76:22
**founded** [1] - 61:18

**four** [12] - 7:10, 20:13, 49:5, 53:23, 55:24, 63:23, 99:7, 99:16, 104:18, 107:15, 110:18, 121:3
**fours** [1] - 53:24
**Fourth** [5] - 15:20, 43:25, 44:1, 44:13, 44:15
**fourth** [2] - 114:3, 121:13
**fractured** [1] - 96:21
**fragility** [1] - 93:3
**frame** [2] - 9:3, 122:6
**framed** [2] - 30:9, 144:14
**framework** [4] - 17:18, 18:1, 44:19, 75:17
**Francisco** [1] - 30:16
**frankly** [2] - 46:18, 98:11
**freeze** [1] - 36:15
**frequency** [4] - 34:3, 114:14, 115:5, 115:16
**Friday** [2] - 64:2, 64:23
**friend** [2] - 28:15, 65:10
**friends** [2] - 64:1, 65:18
**front** [2] - 10:9, 26:7
**frustrated** [1] - 141:14
**frustrating** [1] - 141:2
**frustration** [1] - 98:7
**fueling** [4] - 24:12, 24:15, 46:13, 65:5
**full** [4] - 97:12, 101:23, 101:25
**Fuller** [2] - 2:4, 2:13
**FULLER** [1] - 2:12
**fun** [2] - 42:17, 59:12
**function** [1] - 54:23
**fund** [1] - 94:16
**fundamental** [1] - 8:24
**fundamentally** [2] - 61:20, 142:25
**funding** [11] - 48:8, 56:19, 90:1, 90:15, 91:24, 92:10, 92:24, 94:8, 94:12, 145:18
**Funding** [1] - 92:12
**furthermore** [1] - 37:21
**future** [4] - 36:23, 76:13, 83:8, 105:11

## G

**gateway** [2] - 54:14,

55:5
**gathered** [3] - 74:1, 74:20, 75:13
**gathering** [4] - 65:20, 68:5, 83:2, 88:10
**gender** [1] - 64:20
**general** [10] - 16:2, 17:9, 22:14, 23:15, 24:13, 29:13, 29:16, 33:24, 42:8, 122:6
**generally** [4] - 66:1, 83:21, 122:7, 136:22
**generational** [1] - 90:20
**gentleman** [1] - 11:24
**geographical** [1] - 65:22
**Gilberto** [1] - 95:18
**Gilligan** [10] - 23:9, 25:25, 46:16, 46:17, 48:15, 55:7, 55:8, 55:19, 89:8, 93:14
**Gilligan's** [1] - 88:16
**given** [5] - 42:15, 50:16
**globally** [1] - 12:25
**goal** [1] - 54:18
**gold** [1] - 19:4
**golden** [1] - 131:5
**Goodwin** [1] - 15:17
**Gordon** [1] - 18:24
**government** [4] - 9:15, 17:5, 23:15, 97:14
**governments** [1] - 50:25
**grabbed** [2] - 47:2, 55:9
**grade** [1] - 29:3
**graduate** [1] - 100:23
**grandparent** [1] - 87:24
**grant** [3] - 92:9, 92:12, 117:8
**granted** [1] - 106:18
**grants** [3] - 48:7, 92:5, 92:7
**grasp** [1] - 100:18
**great** [8] - 24:2, 40:9, 40:12, 40:16, 58:15, 84:22, 100:25, 127:4
**greater** [3] - 55:14, 80:6, 91:11
**greatest** [1] - 71:1
**green** [1] - 111:5
**Gregory** [2] - 29:11, 104:24
**GRETCHEN** [1] - 6:7
**grew** [2] - 72:20, 140:4
**ground** [9] - 15:22, 41:25, 48:6, 59:6,

68:10, 69:19, 69:25, 72:19, 77:11
**groundwork** [1] - 76:21
**group** [2] - 19:17, 103:22
**grow** [1] - 50:12
**growing** [3] - 69:1, 70:18
**growth** [4] - 41:9, 41:16, 41:18, 42:4
**guaranteed** [1] - 92:12
**guess** [5] - 25:15, 31:17, 39:18, 96:16, 138:23, 138:25, 143:5, 146:23
**guidance** [3] - 115:11, 128:3
**Gupta** [25] - 21:5, 23:9, 26:9, 26:21, 47:9, 48:21, 61:7, 61:8, 61:11, 61:16, 62:18, 64:8, 78:25, 80:17, 81:9, 81:13, 82:8, 82:14, 82:16, 88:10, 88:17, 88:21, 102:14
**guy** [1] - 45:14

## H

**habit** [1] - 70:6
**habitually** [1] - 22:19
**half** [9] - 26:12, 79:8, 91:11, 97:13, 104:11, 136:1, 144:20, 145:7, 146:10
**Hall** [1] - 79:2
**hand** [6] - 9:20, 14:16, 43:2, 45:20, 53:8, 59:6
**handed** [2] - 141:11, 146:10
**happy** [2] - 106:13, 123:12
**hard** [2] - 54:14, 86:9
**HARDIN** [1] - 5:3
**Harless** [1] - 15:10
**harm** [27] - 25:1, 28:20, 28:21, 29:5, 29:8, 29:13, 29:16, 40:18, 44:22, 45:7, 52:17, 54:12, 66:10, 79:9, 89:4, 98:20, 107:8, 110:8, 142:2, 142:5, 142:8, 142:16, 143:14, 143:15, 144:4, 144:6
**Harm** [1] - 23:25

**harmed** [2] - 59:23, 66:17
**harms** [19] - 29:24, 40:16, 44:20, 46:6, 46:14, 58:19, 63:11, 65:22, 66:7, 85:4, 85:8, 85:13, 86:7, 86:12, 87:3, 87:7, 87:18, 89:2, 93:11
**harped** [1] - 136:9
**Harrison** [2] - 45:14, 45:15
**Hart** [1] - 16:5
**Hartle** [5] - 10:12, 10:15, 11:1, 12:3, 25:10
**Harvard** [5] - 23:10, 25:25, 46:17, 48:13, 48:14
**hate** [1] - 10:24
**Hawkins** [1] - 3:7
**head** [4] - 100:16, 126:12, 129:11, 132:18
**headquarter** [1] - 35:4
**heads** [1] - 76:24
**Health** [11] - 4:16, 5:2, 23:20, 26:10, 41:3, 41:6, 42:3, 48:11, 66:6, 83:22, 131:23
**health** [40] - 13:20, 20:18, 21:22, 22:1, 22:14, 22:20, 22:25, 23:7, 23:23, 24:3, 24:6, 25:8, 42:8, 59:5, 59:25, 60:13, 61:9, 61:12, 61:13, 61:17, 61:18, 61:20, 61:22, 61:25, 62:1, 62:7, 62:8, 62:9, 62:13, 64:7, 64:8, 69:13, 70:1, 82:13, 86:24, 87:18, 89:10, 93:10, 101:25, 102:4
**Health's** [1] - 41:23
**healthcare** [5] - 21:9, 48:23, 84:6, 84:8, 96:20
**hear** [5] - 127:17, 146:13, 146:24, 146:25
**heard** [45] - 19:21, 20:9, 38:6, 48:5, 57:7, 57:8, 58:25, 59:19, 60:10, 61:1, 64:23, 65:15, 72:23, 72:24, 73:6, 73:22, 76:3, 78:6, 78:7, 78:24, 80:9, 83:17, 87:2, 87:19, 88:14,

89:1, 92:3, 93:1,
103:8, 106:10,
106:11, 107:4,
107:6, 107:8,
107:10, 107:12,
111:1, 113:12,
113:14, 113:20,
113:21, 116:5,
120:15, 145:11
**hearing** [3] - 16:14,
58:13, 74:10
**heart** [1] - 10:13
**heartless** [1] - 130:1
**heavy** [2] - 18:16, 68:2
**held** [6] - 12:6, 31:8,
39:17, 52:25, 56:22,
100:2
**help** [7] - 27:2, 56:18,
61:21, 74:9, 75:4,
81:18, 83:25
**helped** [2] - 66:24,
102:6
**hepatitis** [3] - 85:14,
86:20, 86:22
**heroin** [47] - 15:21,
24:2, 29:3, 29:18,
40:15, 40:17, 40:21,
40:25, 47:1, 54:16,
55:1, 55:12, 55:13,
55:18, 55:21, 55:22,
55:24, 56:3, 56:9,
67:2, 68:3, 69:2,
69:18, 69:22, 69:24,
70:19, 70:21, 71:14,
71:21, 71:22, 72:14,
72:18, 72:20, 77:25,
78:5, 80:7, 88:6,
88:7, 88:9, 88:19,
88:24, 89:7, 89:12,
90:3, 90:13, 143:22
**Hester** [1] - 11:5
**HESTER** [3] - 5:9,
7:20, 10:24
**high** [9] - 44:16,
61:23, 72:15, 85:1,
89:5, 102:13, 104:5,
134:10
**high-potency** [1] -
85:1
**higher** [6] - 36:8,
86:21, 136:10,
136:12, 136:13
**highlight** [5] - 21:19,
59:18, 82:6, 85:10,
142:6
**highlighted** [2] -
43:13, 103:12
**himself** [1] - 19:2
**hired** [2] - 34:17,
126:11

**historian** [2] - 8:16,
99:14
**historians** [1] - 97:13
**historic** [1] - 8:15
**historical** [5] - 21:4,
25:17, 25:24, 28:5,
50:6
**historically** [2] -
79:24, 80:2
**history** [6] - 27:3,
67:4, 116:7, 117:23,
133:23, 142:15
**hit** [2] - 10:4, 10:5
**hits** [1] - 37:2
**HIV** [1] - 86:16
**Holbrook** [12] - 64:23,
64:24, 65:6, 67:17,
68:18, 70:16, 70:24,
71:5, 71:25, 72:18,
88:14, 90:8
**hold** [3] - 36:23,
122:22, 127:12
**hole** [5] - 33:23, 41:7,
42:4, 51:12, 97:19
**holes** [1] - 34:19
**home** [4] - 10:5,
43:20, 136:6
**homes** [1] - 64:20
**honestly** [1] - 143:25
**honor** [1] - 8:4
**Honor** [84] - 7:6, 7:18,
7:19, 10:24, 11:7,
11:14, 25:9, 31:14,
38:13, 53:16, 57:6,
57:8, 58:7, 58:9,
58:16, 58:21, 58:25,
59:9, 59:19, 59:20,
60:7, 60:23, 62:3,
62:16, 62:19, 62:22,
63:7, 64:2, 66:9,
66:25, 68:16, 70:15,
71:3, 72:12, 72:23,
73:6, 73:11, 75:10,
76:2, 78:20, 79:13,
79:21, 80:25, 81:8,
81:12, 81:25, 83:7,
83:17, 85:11, 87:8,
87:18, 88:1, 88:4,
89:4, 89:16, 90:15,
91:16, 92:3, 93:6,
93:22, 94:3, 94:5,
94:10, 94:18, 95:7,
95:23, 98:9, 108:20,
116:3, 118:16,
120:15, 122:12,
123:19, 128:12,
128:17, 128:22,
129:1, 129:16,
130:20, 131:24,
132:3, 144:8,

146:12, 146:21
**HONORABLE** [1] -
1:17
**Honorable** [1] - 7:1
**hook** [1] - 54:11
**hope** [4] - 33:4, 59:13,
77:7, 146:16
**hoping** [3] - 26:17,
43:4, 48:1
**Hopkins** [1] - 48:10
**Hospice** [1] - 135:4
**Hospital** [1] - 23:10
**hospital** [2] - 83:23,
142:11
**hospitalization** [1] -
85:17
**hospitals** [1] - 103:17
**hot** [6] - 35:24, 35:25,
36:2, 36:3, 36:5,
36:7
**hour** [2] - 7:13, 11:24
**hours** [8] - 7:10, 7:12,
7:14, 7:15, 74:5,
74:10, 82:10, 83:24
**Houston** [1] - 125:11
**HPD** [6] - 68:6, 68:7,
68:18, 68:20, 69:6,
70:3
**huge** [2] - 110:14,
130:15
**human** [3] - 112:7,
126:19, 127:1
**hundred** [7] - 9:8,
18:22, 28:25, 29:4,
32:5, 51:23, 78:18
**Hundreds** [1] - 91:11
**hundreds** [1] - 74:4
**Huntington** [98] -
3:10, 4:1, 9:19, 9:22,
16:4, 18:9, 18:21,
19:3, 19:7, 19:15,
20:1, 20:11, 22:21,
27:16, 30:4, 40:1,
41:5, 42:9, 44:6,
47:6, 56:25, 58:16,
58:20, 59:2, 59:7,
59:8, 59:20, 60:3,
60:10, 62:17, 62:20,
62:25, 64:24, 65:10,
65:16, 65:20, 66:12,
66:21, 67:23, 68:14,
68:20, 69:14, 70:20,
71:12, 72:2, 72:20,
72:22, 74:22, 76:17,
80:12, 80:16, 82:9,
82:13, 83:12, 84:24,
85:19, 85:25, 92:18,
93:9, 94:6, 94:16,
96:5, 96:10, 97:7,
98:1, 98:25, 99:4,

100:22, 100:23,
101:3, 101:10,
101:14, 101:18,
101:20, 101:22,
101:24, 103:10,
103:16, 103:18,
104:9, 107:13,
107:14, 107:16,
108:1, 110:10,
110:13, 112:3,
115:2, 129:23,
130:25, 131:8,
134:9, 135:19,
136:10, 145:9,
145:24, 146:8, 148:6
**HUNTINGTON** [1] -
1:4
**Huntington-Cabell**
[13] - 9:19, 9:22,
18:9, 18:21, 19:3,
19:7, 19:15, 20:1,
22:21, 27:16, 38:20,
40:1, 47:6
**hydrocodone** [5] -
39:14, 55:1, 67:22,
71:18, 108:19

**I**

**idea** [4] - 84:2, 103:4,
105:17, 113:5
**identical** [2] - 53:23,
54:25
**identifiable** [1] -
135:15
**identified** [3] - 26:23,
41:3, 120:1
**identify** [4] - 24:14,
34:3, 75:11, 117:10
**identifying** [1] -
131:15
**identity** [1] - 142:14
**ignore** [1] - 97:21
**ignored** [1] - 97:20
**ill** [1] - 134:12
**ill-defined** [1] - 134:12
**illegal** [9] - 22:12,
46:1, 66:22, 68:22,
68:25, 80:22,
143:24, 144:1
**Illegal** [1] - 144:2
**illicit** [5] - 48:18,
79:24, 80:2, 80:7,
124:10
**illicitly** [1] - 24:20
**illustrate** [1] - 32:25
**image** [1] - 51:13
**imagine** [2] - 59:11,
86:10
**immediate** [1] -

120:24
**Immediate** [1] -
120:14
**immediately** [1] -
39:22
**imminent** [1] - 23:3
**immune** [2] - 39:19,
63:20
**impact** [6] - 23:7,
67:6, 75:14, 123:4,
139:15, 145:16
**implement** [3] - 60:4,
94:14, 117:8
**implementation** [1] -
123:15
**implemented** [2] -
87:12, 120:18
**implying** [2] - 108:18,
110:3
**importance** [1] - 21:18
**important** [24] - 26:6,
35:2, 35:8, 48:20,
60:9, 62:3, 64:6,
69:12, 70:25, 77:24,
78:6, 79:19, 81:17,
90:14, 90:24, 91:16,
92:19, 93:13, 99:15,
101:1, 101:12,
102:2, 123:6, 146:16
**importantly** [4] - 30:9,
66:17, 109:13,
142:14
**impose** [1] - 139:14
**imposed** [2] - 31:2,
139:19
**impressive** [2] - 96:7,
126:15
**improper** [2] - 26:3,
57:12
**improve** [1] - 74:25
**IN** [2] - 1:1, 1:18
**inaction** [1] - 92:2
**incapable** [1] - 15:7
**incidence** [4] - 46:23,
50:11, 55:13, 75:5
**include** [8] - 59:2,
59:3, 70:11, 103:17,
114:11, 115:3,
126:21
**included** [3] - 28:1,
118:10, 122:24
**includes** [1] - 59:1
**including** [8] - 20:25,
41:2, 57:10, 87:18,
107:19, 115:2,
135:9, 143:24
**inconceivable** [1] -
44:15
**inconvenient** [1] -
145:24

**incorrect** [1] - 39:1
**increase** [9] - 46:1,
50:11, 50:17, 62:12,
108:21, 108:25,
109:2, 135:18, 138:4
**increased** [8] - 69:15,
80:11, 80:12, 87:4,
135:16, 136:7,
136:8, 138:5
**Increased** [1] - 87:15
**increases** [1] - 85:2
**increasing** [3] - 21:18,
87:6, 88:9
**incredible** [1] - 67:18
**incredibly** [1] - 108:5
**indicate** [1] - 112:22
**indicated** [1] - 59:15
**indication** [1] - 113:8
**individual** [11] - 10:22,
17:8, 22:19, 93:21,
93:23, 113:24,
117:17, 118:20,
134:22, 143:1, 143:2
**individuals** [7] - 17:2,
27:4, 49:24, 70:5,
91:14, 91:21, 118:7
**indivisible** [2] - 52:17,
54:12
**industry** [7] - 99:23,
100:2, 121:17,
124:1, 124:25,
125:11, 125:19
**infections** [2] - 85:14,
86:20
**infectious** [3] - 86:3,
86:7, 86:12
**inference** [1] - 134:11
**inferred** [1] - 104:3
**infiltrated** [1] - 66:21
**infirmities** [1] - 129:15
**influencing** [1] - 143:7
**influx** [4] - 70:21,
75:13, 80:6, 108:25
**inform** [2] - 114:9,
114:23
**information** [9] -
41:18, 68:5, 116:23,
117:15, 125:25,
127:2, 127:4, 129:3,
134:24
**informative** [1] - 99:20
**informed** [1] - 124:10
**infrastructure** [5] -
49:2, 73:20, 76:12,
76:20, 94:11
**inherent** [2] - 44:21,
45:6
**initial** [1] - 131:10
**initiate** [1] - 46:25
**initiated** [1] - 113:6,

119:22
**initiative** [5] - 42:16,
118:19, 119:23,
125:2, 132:25
**initiatives** [2] - 70:8,
100:8
**inject** [3] - 86:14,
86:15, 86:18
**injected** [1] - 86:11
**injury** [1] - 29:7
**inquiry** [2] - 111:11,
111:12
**insert** [1] - 44:14
**insight** [1] - 143:3
**inspection** [1] - 107:4
**inspections** [1] -
107:5
**instances** [1] - 46:25
**instead** [2] - 10:9,
38:12
**Instead** [1] - 129:9
**Institute** [1] - 23:20
**institutions** [1] - 59:4
**instruction** [1] - 15:3
**instructions** [1] -
14:14
**insupportable** [1] -
122:13
**intends** [1] - 57:9
**intention** [2] - 17:20,
17:23
**intentional** [1] - 42:11
**intentionally** [1] - 42:8
**intentioned** [1] - 135:3
**intentions** [1] - 130:6
**interacted** [1] - 48:23
**interactions** [3] -
12:13, 99:19, 124:22
**interesting** [2] - 34:12,
102:9
**interfered** [1] - 60:1
**interference** [3] -
21:22, 32:19, 61:14
**intergenerational** [1] -
87:22
**internal** [1] - 112:18
**internally** [1] - 37:22
**International** [1] -
63:2
**internet** [5] - 119:3,
119:4, 119:12,
119:22, 121:3
**interpretation** [2] -
124:7, 124:11
**interpretations** [1] -
115:7
**interrogatories** [1] -
32:10
**interruptions** [1] -
11:16

**intertwining** [3] - 67:2,
88:6, 90:6
**intervening** [3] -
51:17, 142:6, 142:24
**interventions** [2] -
83:11, 87:11
**interview** [1] - 82:24
**introduce** [1] - 99:6
**introduced** [3] -
103:24, 112:16,
113:11
**introduction** [1] -
98:16
**invariably** [1] - 87:23
**invested** [1] - 116:4
**investigated** [2] -
70:3, 120:22
**investigating** [1] -
118:8
**investigation** [4] -
72:3, 78:21, 112:22,
113:6
**investigations** [8] -
107:12, 107:20,
112:2, 120:1, 120:2,
120:6, 120:19, 120:19
**investigative** [1] -
119:21
**investigators** [2] -
100:6, 126:21
**involve** [1] - 87:5
**involved** [2] - 96:6,
117:13
**IQVIA** [1] - 137:14
**ironclad** [1] - 100:17
**irony** [1] - 140:25
**Irpino** [1] - 3:7
**irresponsibly** [1] -
72:11
**ISIA** [1] - 5:4
**issue** [20] - 62:12,
69:9, 89:24, 89:25,
93:21, 93:23, 94:1,
96:10, 99:3, 103:15,
107:22, 107:23,
108:21, 111:16,
111:21, 122:1,
128:8, 129:23
**issued** [1] - 120:13
**issues** [10] - 73:19,
73:24, 75:11, 88:1,
93:23, 94:3, 116:1,
116:4, 121:1, 129:17
**items** [1] - 36:24
**itself** [1] - 22:6

**J**

**Jackson** [1] - 6:8
**JAMA** [1] - 78:21

**James** [1] - 129:10
**Jan** [6] - 62:24, 63:1,
64:11, 67:20, 75:20,
92:20
**JASIEWICZ** [1] - 5:4
**JCHO** [2] - 54:2, 54:3
**Jean** [1] - 43:16
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:18
**jeopardized** [1] - 66:8
**Jim** [1] - 34:9
**job** [6] - 30:24, 30:25,
40:2, 96:23, 98:10,
126:7
**Joe** [7] - 19:9, 23:1,
23:9, 24:17, 24:22,
31:8, 35:10
**John** [2] - 40:8
**Johns** [1] - 48:10
**join** [1] - 73:5
**joined** [1] - 100:15
**joins** [1] - 45:20
**joint** [1] - 52:13
**Joint** [3] - 53:20,
143:9, 143:12
**Joseph** [2] - 129:12,
132:17
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**judge** [4] - 32:3,
33:25, 48:3, 56:10
**JUDGE** [1] - 1:17
**Judge** [33] - 7:2, 8:2,
9:23, 14:1, 14:8,
15:17, 16:3, 16:9,
24:13, 25:20, 28:22,
30:13, 30:15, 30:16,
32:12, 33:16, 34:11,
36:17, 42:19, 44:1,
48:20, 48:24, 50:22,
51:5, 51:10, 52:7,
52:10, 52:18, 53:18,
54:19, 56:15, 56:20,
58:3
**judges** [1] - 43:25
**judgment** [3] - 84:4,
96:12, 138:18
**judgments** [1] - 96:17
**judicial** [2] - 18:12,
123:19
**July** [6] - 7:4, 10:19,
14:2, 37:16, 148:9,
148:15
**JULY** [1] - 1:19
**jumping** [1] - 105:2
**jumps** [1] - 39:22
**jurisdiction** [1] - 110:7
**jury** [4] - 14:9, 14:14,
15:3, 27:19

**Justice** [1] - 29:22
**justification** [1] -
37:20
**justified** [1] - 37:14
**justify** [1] - 141:15

**K**

**Katherine** [1] - 19:22
**KEARSE** [6] - 4:2,
58:9, 58:11, 58:15,
63:6, 80:25
**Kearse** [6] - 56:23,
57:7, 57:22, 58:8,
80:21, 94:19
**keep** [12] - 7:24, 7:25,
38:3, 38:4, 49:23,
102:22, 112:14,
113:12, 113:13,
126:7, 128:12,
139:16
**keeping** [2] - 126:9,
128:21
**Keller** [4] - 104:22,
104:23, 136:17,
137:9
**Kelly** [1] - 6:8
**kept** [2] - 110:20,
112:10
**Kerri** [1] - 55:3
**Kessler** [1] - 4:23
**key** [9] - 14:25, 16:18,
74:15, 74:25, 100:5,
102:3, 110:21,
121:5, 131:19
**Keyes** [14] - 19:22,
46:19, 55:3, 55:4,
61:1, 80:9, 84:16,
84:21, 87:14, 87:15,
88:8, 88:17, 88:18,
90:7
**kilograms** [1] - 56:2
**kind** [7] - 28:7, 28:14,
31:21, 85:10, 98:13,
99:1, 101:5
**kittens** [1] - 63:5
**knit** [1] - 65:16
**knowing** [5] - 12:11,
12:12, 12:13, 29:12,
141:9
**knowledge** [8] -
41:16, 44:24, 45:4,
45:8, 99:12, 100:5,
101:2, 133:7
**known** [8] - 29:13,
29:16, 55:6, 92:17,
101:13, 105:10,
122:1, 134:12
**knows** [2] - 45:19,
142:14

**KOUBA** [1] - 4:11
**kudos** [1] - 18:5
**Kyle** [1] - 123:24

## L

**LA** [1] - 3:8
**Lacey** [2] - 104:22, 136:17
**lack** [1] - 98:15
**laid** [6] - 72:17, 75:16, 75:22, 75:23, 75:24, 85:8
**land** [1] - 49:17
**language** [1] - 114:18
**Lanier** [1] - 3:4
**lapel** [1] - 58:12
**large** [3] - 46:20, 47:4, 50:11
**largest** [1] - 49:7
**last** [14] - 8:20, 15:11, 24:4, 47:15, 52:18, 91:18, 95:10, 104:11, 126:2, 133:21, 138:22, 144:8
**late** [3] - 7:12, 7:15, 102:7
**laughter** [1] - 42:25
**Laughter** [2] - 14:21, 43:21
**laundry** [1] - 11:22
**LAURA** [1] - 5:10
**Law** [4] - 3:4, 3:7, 3:12, 43:7
**law** [22] - 13:14, 14:23, 16:1, 16:7, 28:1, 29:10, 32:18, 33:3, 34:2, 43:15, 52:9, 59:4, 59:11, 67:4, 69:10, 70:12, 73:14, 74:6, 74:18, 75:1, 126:21
**lawful** [2] - 98:2, 134:16
**lawsuit** [2] - 115:17, 145:24
**lawyer** [1] - 40:17
**lawyers** [10] - 10:1, 14:20, 20:9, 20:11, 33:2, 39:5, 40:16, 104:3, 106:10, 138:20
**lead** [5] - 7:22, 46:25, 55:12, 61:21, 89:6
**leaders** [1] - 21:9
**leading** [3] - 46:24, 48:9, 103:17
**leads** [5] - 28:5, 49:3, 50:19, 77:4, 101:8

**leakage** [1] - 31:4
**learn** [2] - 76:8, 76:10
**learned** [4] - 102:9, 102:10, 109:11, 116:12
**least** [8] - 22:1, 82:21, 94:14, 107:15, 109:14, 115:13, 117:25, 122:8
**leave** [1] - 43:6
**leaving** [1] - 110:14
**led** [2] - 85:2, 108:25
**Lee** [1] - 3:12
**left** [11] - 9:23, 14:16, 20:14, 20:16, 65:10, 99:21, 106:8, 133:25, 134:2, 134:17, 141:10
**left-hand** [1] - 14:16
**legal** [11] - 14:11, 21:23, 22:3, 27:19, 30:17, 32:9, 45:19, 48:17, 53:10, 110:17, 141:22
**legalese** [1] - 81:5
**legitimate** [5] - 44:12, 72:6, 139:4, 140:12, 141:22
**LeMaster** [1] - 28:15
**Lemley** [6] - 65:14, 65:19, 68:4, 68:18, 72:24, 73:25
**length** [1] - 84:22
**Leon** [2] - 2:4, 2:14
**less** [11] - 9:8, 18:22, 28:24, 32:4, 51:23, 56:9, 105:19, 105:21, 106:3, 140:16, 140:18
**lethal** [2] - 24:24, 89:6
**letter** [5] - 31:9, 31:13, 70:17, 117:6, 119:17
**letters** [1] - 24:22
**level** [13] - 28:8, 36:2, 37:22, 39:19, 73:4, 77:6, 108:8, 113:24, 116:25, 131:2, 140:22, 142:21, 143:16
**levels** [2] - 72:15, 72:25
**leveraged** [1] - 100:19
**leveraging** [1] - 126:18
**Levin** [1] - 2:10
**LEYIMU** [1] - 4:13
**liability** [7] - 52:13, 53:1, 53:2, 54:11, 94:15, 121:12, 144:11

**liable** [2] - 39:17, 146:18
**library** [1] - 43:7
**license** [7] - 41:12, 106:15, 109:20, 109:21, 111:6, 113:18, 124:19
**licensed** [7] - 96:9, 96:14, 98:2, 98:4, 101:14, 109:17, 134:16
**life** [9] - 50:7, 50:23, 64:24, 65:3, 85:19, 85:21, 129:4, 140:23, 146:1
**life-long** [1] - 64:24
**lifelong** [1] - 85:24
**light** [1] - 59:14
**likely** [3] - 29:14, 47:3, 145:18
**likewise** [1] - 79:23
**Lily's** [1] - 19:13
**limit** [1] - 141:6
**limited** [6] - 57:13, 57:14, 77:23, 121:10, 129:9, 141:10
**limits** [2] - 139:15, 139:19
**LINDA** [1] - 4:8
**line** [18] - 35:7, 37:11, 64:17, 64:21, 72:4, 78:1, 101:23, 102:19, 102:20, 102:22, 103:1, 103:2, 103:3, 117:18, 126:9, 133:2, 143:4
**Line** [2] - 31:12, 48:15
**lined** [1] - 98:5
**Lines** [4] - 24:19, 26:2, 31:12, 48:14
**lines** [2] - 54:25, 109:18
**link** [1] - 9:23
**Lisa** [2] - 6:18, 148:3
**list** [13] - 11:22, 17:18, 103:9, 103:10, 103:20, 104:14, 104:16, 106:1, 109:25, 110:5, 117:2, 120:21, 145:14
**listened** [1] - 97:15
**literally** [1] - 103:25
**literature** [3] - 23:18, 79:16, 89:17
**litigation** [2] - 122:1, 122:6, 122:7
**live** [6] - 8:21, 10:7,

23:1, 56:25, 92:21
**lived** [1] - 65:4
**lives** [3] - 19:19, 49:19, 92:22
**living** [4] - 19:15, 76:25, 81:18, 82:22
**LLC** [1] - 2:4
**loan** [1] - 42:22
**local** [4] - 62:18, 92:6, 117:2, 120:25
**locations** [1] - 101:4
**lock** [1] - 110:21
**Lockbourne** [1] - 39:24
**locked** [1] - 37:1
**Logan** [2] - 6:5, 6:12
**logic** [3] - 25:10, 25:12, 141:17
**loitering** [1] - 109:19
**long-acting** [1] - 85:1
**long-term** [2] - 61:25, 85:17
**longtime** [1] - 100:4
**look** [41] - 16:1, 20:14, 22:16, 31:25, 33:25, 34:2, 35:10, 35:17, 37:3, 37:5, 37:9, 37:21, 38:16, 39:8, 39:9, 39:11, 40:4, 41:23, 41:24, 41:25, 42:13, 63:23, 73:25, 77:15, 86:1, 94:3, 96:2, 101:21, 102:2, 103:7, 105:14, 110:16, 111:9, 116:12, 123:10, 131:9, 131:12, 136:14, 136:15, 146:18
**looked** [13] - 22:8, 27:10, 72:9, 74:1, 78:22, 79:3, 79:21, 129:20, 136:17, 136:18, 137:25
**looking** [10] - 22:7, 73:13, 76:5, 79:16, 87:14, 92:11, 92:16, 112:10, 125:25, 133:5
**loop** [1] - 110:1
**loss** [2] - 85:19, 85:21
**lost** [2] - 19:8, 65:11
**Louis** [1] - 43:17
**loved** [3] - 65:11, 65:13, 85:20
**lower** [5] - 69:23, 71:22, 140:4, 140:5, 141:20
**lowering** [1] - 109:8
**Lumber** [1] - 16:5

**lunch** [3] - 7:12, 7:16, 146:25
**Lyn** [4] - 76:3, 76:14, 76:15

## M

**ma'am** [1] - 95:6
**Magazine** [1] - 3:7
**magnitude** [1] - 23:13
**MAHADY** [1] - 6:4
**mail** [4] - 40:19, 40:23, 41:6, 109:7, 109:9, 109:10
**main** [2] - 54:18, 126:13
**MAINIGI** [6] - 4:17, 7:18, 57:6, 58:7, 128:17, 128:21
**Mainigi** [2] - 58:6, 128:16
**maintain** [6] - 23:2, 27:20, 32:21, 33:12, 59:23, 114:3
**MAJESTRO** [6] - 2:6, 11:7, 11:9, 11:14, 53:13, 53:16
**Majestro** [7] - 2:6, 11:8, 11:13, 49:14, 53:10, 53:15, 81:4
**majority** [2] - 55:11, 70:3
**Mallet** [1] - 29:22
**Mallinckrodt** [1] - 34:10
**man** [2] - 29:11, 44:1
**management** [1] - 128:19
**manager** [2] - 112:21, 113:7
**managers** [1] - 117:13
**manners** [1] - 112:5
**manufacturers** [1] - 52:3
**Mapes** [5] - 95:16, 124:4, 124:10, 125:4, 125:6
**march** [1] - 130:21
**MARK** [1] - 3:14
**mark** [1] - 21:15
**market** [3] - 13:23, 72:18, 124:10
**markets** [2] - 45:25, 66:22
**Marshall** [4] - 59:4, 66:4, 76:15, 100:23
**Martins** [1] - 102:7
**Mary's** [1] - 103:18
**massive** [2] - 33:11, 66:23

**Masters** [3] - 30:14, 34:8, 38:6

**MAT** [3] - 91:6, 91:7, 91:10

**matched** [2] - 136:20, 137:8

**materials** [1] - 91:21

**math** [2] - 137:13, 137:14

**mathematical** [1] - 140:7

**matrices** [2] - 38:10, 38:11

**matrix** [2] - 34:14, 41:23

**matrixes** [1] - 33:25

**matter** [14] - 34:12, 34:20, 44:5, 52:12, 61:11, 62:7, 62:8, 62:9, 62:13, 64:8, 65:3, 67:4, 85:11, 148:5

**matters** [1] - 86:8

**mattress** [1] - 64:19

**mayor** [1] - 21:11

**Mayor** [9] - 66:14, 68:1, 70:17, 71:1, 72:23, 73:2, 75:15, 77:1, 90:22

**Mayor's** [5] - 65:20, 73:9, 74:14, 74:24, 76:9

**Mays** [14] - 36:18, 99:8, 100:4, 100:10, 100:12, 118:9, 118:21, 118:24, 119:8, 119:19, 119:20, 124:21, 129:6

**Mays'** [2] - 126:25

**McCann** [4] - 104:6, 109:4, 114:1, 136:18

**McCann's** [2] - 37:7, 137:11

**McCloud** [1] - 113:4

**MCCLURE** [1] - 6:3

**MCGINNESS** [1] - 4:2

**McGuire** [2] - 89:1, 89:2

**McKesson** [7] - 5:8, 7:15, 10:16, 12:10, 12:14, 12:25, 131:23

**MDL** [1] - 30:15

**mean** [2] - 138:8, 145:20

**meaning** [1] - 101:24

**means** [6] - 22:18, 31:3, 35:3, 37:17, 70:6, 94:14

**measure** [1] - 28:11

**measured** [1] - 31:24

**measuring** [1] - 28:9

**mechanical** [1] - 6:19

**medic** [1] - 62:25

**Medical** [1] - 25:25

**medical** [19] - 23:18, 50:20, 55:14, 55:20, 55:22, 56:6, 73:15, 74:6, 78:19, 89:7, 89:17, 93:19, 96:12, 96:13, 96:16, 96:18, 138:18, 142:15

**medically** [1] - 84:11, 91:8, 139:9

**medication** [7] - 69:18, 69:22, 96:11, 98:3, 139:21, 141:7, 142:10

**medications** [11] - 46:20, 47:4, 68:23, 68:25, 101:25, 102:12, 102:19, 105:20, 106:2, 106:3, 129:22

**Medicine** [5] - 41:5, 41:15, 41:22, 52:5, 143:10

**medicine** [9] - 96:18, 96:21, 98:2, 130:2, 135:4, 135:6, 135:7, 143:19, 143:25

**medicines** [3] - 96:14, 102:4, 102:23

**meet** [3] - 14:5, 54:8, 111:2

**meeting** [10] - 114:2, 119:2, 119:9, 119:12, 119:13, 119:16, 119:20, 119:24, 120:18, 133:3

**meetings** [7] - 50:17, 74:4, 99:17, 100:11, 118:20, 118:23, 129:8

**members** [4] - 59:2, 59:3, 64:3, 73:21

**memo** [2] - 19:15

**men** [1] - 64:3

**mention** [5] - 57:8, 108:6, 119:13, 130:25, 145:21

**mentioned** [7] - 8:6, 74:19, 89:9, 90:17, 103:11, 103:21, 124:16

**met** [3] - 96:5, 100:8, 116:3

**meth** [1] - 40:25

**methadone** [1] - 71:18

**method** [1] - 127:16

**methodology** [3] - 19:24, 34:17, 129:15

**Mexico** [1] - 143:22

**mic** [2] - 7:23, 16:12

**MICHAEL** [2] - 2:12, 3:9

**Michael** [7] - 41:2, 95:16, 99:9, 100:21, 112:21, 113:7, 124:4

**Michigan** [1] - 123:21

**mics** [1] - 58:11

**mid-1990s** [1] - 99:23

**middle** [1] - 7:11

**midst** [2] - 59:21, 141:16

**might** [6] - 40:3, 139:15, 144:20, 145:23

**Mike** [4] - 100:21, 109:13, 125:4, 125:6

**MILDRED** [1] - 3:3

**milestones** [1] - 73:7

**million** [12] - 9:7, 9:13, 28:24, 29:2, 29:17, 29:19, 29:24, 32:2, 32:4, 51:1, 51:22, 64:20

**million-dollar** [1] - 64:20

**millions** [1] - 146:7

**mind** [5] - 7:24, 45:20, 77:3, 86:23, 128:13

**minute** [5] - 57:3, 110:15, 111:9, 128:14, 139:25

**minutes** [2] - 33:23, 128:20

**misguided** [1] - 98:15

**misplaced** [1] - 98:15

**missing** [3] - 36:5, 83:3, 132:11

**mission** [1] - 75:15

**missions** [1] - 73:23

**misuse** [2] - 46:24, 55:15

**misused** [1] - 46:21

**Mitchell** [1] - 2:10

**MLP** [1] - 52:10

**Moats** [1] - 52:10

**modified** [2] - 14:17, 133:5

**Mole** [1] - 42:2

**molecular** [1] - 88:8

**molecule** [3] - 29:20, 54:24, 54:25

**moment** [2] - 114:18, 131:17

**money** [7] - 65:4, 92:9, 92:12, 115:18,

123:20, 144:23

**monitor** [1] - 40:25

**Monitoring** [9] - 33:21, 96:24, 114:4, 116:17, 116:22, 117:19, 122:17, 123:15, 145:3

**month** [8] - 36:12, 37:9, 37:19, 37:23, 38:19

**months** [1] - 124:25

**moonshot** [1] - 48:4

**morals** [1] - 22:20

**morbidity** [3] - 16:22, 23:22, 29:6

**morning** [9] - 7:5, 7:6, 7:15, 8:2, 8:3, 58:9, 58:10, 117:3, 146:23

**morphine** [3] - 44:11, 50:18, 54:24

**Morris** [1] - 6:15

**morsel** [1] - 131:16

**mortality** [4] - 16:22, 23:22, 29:6, 80:12

**Most** [3] - 67:10, 70:5, 92:8

**most** [18] - 9:24, 16:7, 28:16, 62:1, 68:21, 69:12, 70:25, 71:12, 71:16, 77:24, 99:10, 99:20, 101:1, 109:13, 135:23, 141:2, 142:14

**mothers** [1] - 85:15

**motion** [2] - 10:25, 129:18

**Motley** [5] - 4:3, 4:5, 4:8, 4:11, 4:14

**MOUGEY** [1] - 2:9

**Mountain** [1] - 16:5

**mountain** [1] - 59:11

**mountainous** [1] - 33:14

**mountains** [1] - 33:14

**mounted** [1] - 129:4

**mouth** [2] - 13:1, 13:2

**move** [5] - 40:25, 62:5, 111:17, 111:18, 111:20

**moved** [2] - 103:2, 108:22

**moving** [2] - 83:15, 84:7

**MR** [50] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:14, 4:5, 4:22, 5:9, 5:10, 5:13, 6:4, 7:19, 7:20, 7:25, 8:2, 8:4, 10:24, 11:7, 11:9, 11:14, 11:18, 13:5, 14:1,

14:22, 16:11, 16:16, 43:1, 43:11, 43:22, 44:4, 52:21, 53:4, 53:10, 53:13, 53:15, 53:16, 54:1, 58:3, 94:23, 95:2, 95:23, 95:25, 106:5, 106:8, 121:22, 121:25, 126:2, 129:1

**MS** [28] - 3:3, 3:6, 4:2, 4:8, 4:11, 4:13, 4:17, 4:18, 4:20, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 7:18, 57:6, 58:7, 58:9, 58:11, 58:15, 63:6, 80:25, 95:7, 95:9, 95:21, 128:17, 128:21

**Mt** [3] - 4:4, 4:12, 4:15

**multi** [1] - 90:23

**multi-faceted** [1] - 90:23

**multiple** [2] - 72:7, 118:19

**multiplier** [6] - 35:21, 36:6, 127:21, 127:24, 128:1, 128:9

**Murphy** [2] - 89:9

**must** [2] - 70:11, 110:20

### N

**naloxone** [3] - 63:18, 63:19, 84:2

**name** [3] - 44:1, 44:2, 73:2

**named** [1] - 43:17

**Narcan** [1] - 63:1

**narcotic** [5] - 22:19, 44:21, 45:5, 45:15, 71:17

**narcotics** [1] - 28:2

**NAS** [1] - 87:18

**Nate** [2] - 12:3, 25:10

**Nathan** [3] - 10:12, 10:15, 11:1

**nation** [3] - 49:20, 69:4, 80:20

**National** [1] - 23:20

**national** [6] - 20:15, 37:10, 38:17, 124:20, 136:11, 136:13

**nationwide** [4] - 35:3, 112:4, 117:9, 123:15

**nature** [8] - 16:2, 23:13, 29:13, 29:16, 45:5, 65:22, 113:11, 130:10

**near** [1] - 47:7
**necessary** [4] - 35:1, 83:18, 92:14, 139:9
**need** [30] - 10:25, 11:2, 42:13, 49:11, 49:12, 49:23, 56:19, 70:6, 73:5, 82:14, 84:7, 87:11, 87:21, 91:23, 91:24, 92:10, 92:24, 94:12, 94:14, 121:20, 121:22, 127:2, 139:16, 139:24, 140:12, 140:13, 140:25, 141:6
**needed** [4] - 82:21, 89:18, 96:22, 139:21
**needles** [1] - 109:19
**needs** [6] - 57:13, 76:20, 83:19, 108:23, 117:16, 145:7
**negative** [1] - 140:23
**neglected** [1] - 85:21
**negligence** [1] - 28:11
**neighbor** [1] - 65:10
**neighborhoods** [1] - 66:18
**neonatal** [1] - 19:12
**Neonatal** [4] - 19:13, 19:17, 75:5, 87:18
**neonatologist** [1] - 19:10
**networks** [1] - 91:15
**neuroscience** [1] - 54:22
**never** [15] - 14:19, 98:11, 103:2, 104:1, 104:2, 115:6, 122:9, 133:6, 133:8, 133:9, 138:10, 139:10, 142:14, 144:10
**nevertheless** [1] - 106:13
**new** [24] - 35:23, 35:24, 41:10, 41:11, 50:11, 50:22, 74:13, 80:4, 86:16, 91:23, 116:17, 116:21, 119:21, 120:19, 121:17, 122:21, 124:6, 124:20, 124:22, 125:2, 125:9, 125:17, 125:23
**New** [3] - 3:5, 3:8, 77:14
**newly** [1] - 117:9
**newsletter** [1] - 40:24
**newspaper** [1] - 50:13

**newspapers** [1] - 51:3
**next** [10] - 17:12, 31:17, 36:11, 41:13, 73:1, 102:17, 103:21, 103:22, 119:15, 139:24
**nice** [1] - 11:24
**NICHOLAS** [12] - 6:11, 7:19, 94:23, 95:2, 95:23, 95:25, 106:5, 106:8, 121:22, 121:25, 126:2, 129:1
**Nicholas** [5] - 94:22, 95:9, 95:24, 121:21, 146:22
**NICU** [1] - 19:13
**Niddle** [1] - 95:16
**night** [2] - 43:20, 117:1
**nine** [3] - 112:2, 118:4, 137:12
**nine-year** [2] - 118:4, 137:12
**Ninth** [1] - 4:9
**no-ship** [1] - 123:22
**nobody** [2] - 20:10, 27:14
**Nobody** [1] - 63:20
**non** [8] - 41:15, 55:14, 55:20, 55:22, 56:6, 66:19, 84:4, 93:19
**non-discriminating** [1] - 66:19
**non-judgment** [1] - 84:4
**non-medical** [5] - 55:14, 55:20, 55:22, 56:6, 93:19
**non-pharmacist** [1] - 41:15
**none** [5] - 97:11, 101:7, 127:23, 127:25
**nonetheless** [3] - 22:4, 31:14, 54:2
**nonexistent** [1] - 105:1
**normal** [3] - 34:4, 114:13, 115:5
**normally** [1] - 14:12
**Northcott** [1] - 44:2
**notable** [1] - 43:15
**notably** [1] - 18:4
**note** [1] - 22:7
**noted** [2] - 53:20, 57:20
**notes** [1] - 108:12
**nothing** [10] - 41:12, 42:5, 91:25, 96:4, 103:13, 107:11,

112:13, 128:10, 145:4
**notice** [7] - 9:18, 18:12, 36:7, 39:23, 58:5, 121:1, 123:19
**notification** [1] - 120:4
**notified** [1] - 120:7
**NTU** [1] - 19:13
**nuisance** [17] - 15:6, 15:7, 15:15, 15:25, 16:8, 16:19, 16:24, 32:18, 39:18, 58:22, 58:24, 60:2, 60:5, 60:18, 61:14, 144:15
**number** [56] - 8:25, 9:13, 15:3, 16:23, 17:9, 18:8, 19:3, 19:24, 21:3, 21:14, 23:12, 24:8, 24:9, 24:11, 25:9, 27:12, 27:18, 31:9, 31:17, 40:14, 46:20, 47:4, 47:24, 47:25, 49:3, 49:6, 49:10, 49:15, 50:11, 52:7, 59:1, 64:12, 70:18, 70:19, 80:18, 80:19, 82:25, 85:8, 85:9, 87:5, 93:2, 97:18, 102:15, 102:16, 103:24, 105:11, 112:16, 113:6, 134:8, 135:22, 137:19, 137:22, 138:1, 138:11, 145:15
**numbers** [12] - 19:2, 26:11, 35:7, 35:17, 38:25, 39:1, 39:14, 98:4, 98:5, 105:17, 137:7
**numerous** [3] - 59:15, 74:7, 107:17
**NW** [6] - 4:6, 4:9, 4:19, 4:21, 5:5, 5:12
**NY** [1] - 3:5

## O

**O'Connell** [2] - 76:3, 76:14
**oak** [1] - 38:16
**oath** [1] - 113:16
**obeyed** [1] - 29:22
**object** [2] - 10:24, 57:20
**objecting** [1] - 57:23
**objection** [1] - 11:5
**objections** [1] - 11:10
**objective** [1] - 116:22
**obligation** [2] - 34:1,

36:15
**obscene** [1] - 33:15
**observation** [1] - 137:10
**observations** [2] - 8:7, 129:13
**observed** [1] - 85:24
**obstacle** [2] - 22:3, 45:19
**obvious** [1] - 84:20
**obviously** [7] - 57:18, 57:20, 57:21, 85:20, 100:24, 116:6, 146:1
**occasional** [2] - 67:10
**occupancy** [1] - 145:14
**occur** [1] - 140:19
**occurred** [3] - 18:21, 38:9, 131:2
**occurring** [3] - 66:24, 67:5, 71:20
**October** [1] - 106:18
**OF** [2] - 1:1, 1:4
**offenses** [1] - 70:3
**offer** [5] - 84:1, 84:2, 106:23, 131:13
**offered** [11] - 21:10, 97:13, 106:16, 106:17, 106:20, 106:24, 107:1, 107:3, 108:7, 131:14, 138:12
**offering** [1] - 84:4
**offers** [1] - 131:1
**office** [3] - 21:5, 114:9, 116:24
**Office** [7] - 65:21, 73:9, 74:14, 74:24, 76:9, 114:24, 120:20
**officer** [1] - 67:14
**offices** [2] - 63:17
**Offices** [3] - 117:3, 117:17, 120:25
**Official** [2] - 148:2, 148:3
**official** [1] - 17:10
**officials** [3] - 59:5, 97:14, 123:21
**offsprings** [1] - 85:15
**often** [3] - 42:18, 50:20, 107:5
**Oftentimes** [1] - 72:2
**OIG** [1] - 21:1
**old** [5] - 14:15, 42:18, 63:21, 63:24, 65:25
**on-going** [1] - 90:16
**Once** [1] - 142:9
**once** [7] - 36:14, 36:22, 36:24, 75:4, 105:4, 112:9, 115:9

**one** [116] - 9:12, 10:18, 15:5, 18:20, 19:10, 20:21, 21:5, 24:2, 24:25, 26:5, 27:25, 28:18, 30:6, 30:21, 32:17, 33:16, 33:25, 35:22, 37:7, 39:5, 39:14, 39:21, 43:16, 43:20, 43:25, 51:11, 52:7, 53:2, 54:7, 55:20, 55:23, 56:17, 58:23, 60:24, 61:6, 63:10, 65:1, 65:8, 65:11, 65:13, 66:13, 70:19, 72:6, 73:23, 78:18, 80:18, 80:19, 81:5, 81:10, 82:6, 82:11, 83:1, 83:6, 83:15, 84:17, 85:20, 88:18, 89:20, 90:2, 90:4, 90:9, 92:6, 93:15, 96:25, 97:3, 99:11, 101:18, 102:15, 102:16, 104:3, 104:13, 105:11, 105:19, 105:21, 106:4, 106:14, 108:25, 110:1, 111:5, 111:20, 115:7, 115:8, 115:13, 115:23, 117:7, 120:2, 120:6, 120:9, 120:11, 123:13, 126:23, 127:18, 129:5, 129:6, 129:7, 130:25, 131:5, 131:13, 131:14, 132:15, 134:7, 135:11, 135:16, 137:12, 137:17, 137:18, 137:25, 138:3, 139:24, 145:23
**One** [3] - 5:11, 137:25, 145:23
**ones** [1] - 52:8
**Opana** [1] - 68:7
**open** [5] - 12:4, 13:8, 47:13, 50:23, 120:20
**opened** [1] - 120:19
**opening** [6] - 8:10, 68:16, 93:6, 103:8, 106:11, 120:23
**operate** [3] - 33:20, 114:6, 114:20
**operated** [1] - 129:4
**operating** [3] - 39:12, 117:25, 146:6
**Opiate** [1] - 48:19

**opiates** [1] - 80:19
**opinion** [9] - 43:13, 46:11, 46:15, 49:16, 52:24, 53:7, 86:24, 123:24, 131:13
**opinions** [6] - 15:19, 43:14, 117:14, 131:1, 131:2, 137:3
**Opioid** [8] - 19:20, 19:25, 20:5, 48:16, 49:9, 61:11, 80:14, 84:15
**opioid** [121] - 9:9, 9:21, 15:22, 16:20, 18:8, 19:8, 20:8, 21:10, 21:12, 21:21, 23:6, 23:14, 23:21, 24:2, 24:6, 24:12, 24:15, 25:19, 26:3, 26:22, 27:15, 29:8, 46:13, 47:4, 47:19, 47:25, 50:7, 51:11, 51:13, 51:15, 52:1, 54:11, 54:15, 55:12, 55:15, 56:17, 59:6, 59:8, 59:21, 60:4, 61:15, 62:16, 62:17, 62:19, 64:15, 65:1, 65:23, 68:2, 69:17, 69:21, 71:11, 74:11, 74:16, 75:13, 75:25, 76:10, 77:8, 78:8, 78:12, 78:13, 78:16, 79:7, 79:24, 80:3, 80:4, 80:11, 81:21, 81:24, 84:7, 84:18, 86:25, 87:3, 87:6, 87:12, 87:21, 88:24, 90:8, 90:9, 90:10, 90:24, 91:2, 92:17, 93:25, 94:6, 94:9, 96:11, 97:8, 102:25, 129:22, 134:9, 135:2, 136:7, 136:8, 140:3, 141:16, 143:8
**opioid-based** [1] - 71:11
**opioid-related** [6] - 64:15, 78:12, 78:13, 78:16, 81:24, 86:18
**opioids** [70] - 8:13, 24:11, 24:16, 24:20, 27:6, 27:13, 28:24, 29:17, 32:5, 33:11, 40:18, 47:18, 48:17, 48:18, 48:22, 55:18, 55:21, 55:23, 55:25, 56:3, 60:18, 61:9, 62:10, 66:20, 66:22,

67:25, 68:8, 71:20, 72:11, 72:17, 74:22, 78:2, 78:3, 79:9, 79:15, 79:18, 80:5, 82:3, 84:19, 84:21, 85:1, 85:13, 87:5, 87:11, 87:16, 88:20, 89:4, 89:6, 89:11, 90:6, 90:12, 93:11, 101:17, 102:1, 102:4, 102:18, 102:19, 102:21, 103:5, 104:8, 106:3, 108:16, 109:1, 111:3, 113:23, 135:18, 136:10, 139:20, 141:21, 143:20
**opium** [1] - 50:24
**opportunity** [3] - 57:18, 71:20, 97:12
**opposite** [1] - 46:7
**Order** [12] - 33:21, 96:24, 114:4, 116:17, 116:21, 117:18, 120:3, 120:14, 122:17, 123:15, 124:2, 145:2
**order** [17] - 31:20, 31:22, 33:4, 36:22, 74:8, 87:12, 112:6, 116:23, 119:6, 119:11, 121:3, 121:6, 123:4, 123:6, 123:7, 124:7, 131:10
**orders** [50] - 22:24, 31:11, 34:3, 35:21, 36:23, 97:5, 101:19, 108:10, 114:7, 114:10, 114:11, 114:12, 114:13, 114:21, 114:25, 115:2, 115:3, 115:4, 115:5, 116:25, 117:4, 117:10, 119:14, 119:18, 120:25, 122:5, 122:10, 122:25, 123:1, 123:2, 123:16, 123:17, 124:9, 124:21, 126:20, 127:4, 127:17, 131:4, 131:7, 131:9, 131:11, 132:2, 133:5, 134:15, 134:25, 141:22
**ordinary** [1] - 29:11
**organic** [1] - 27:25
**organizations** [1] -

143:21
**Oriente** [1] - 41:2
**original** [2] - 43:2, 43:5
**originating** [1] - 143:22
**Orlando** [5] - 120:14, 120:20, 121:8, 124:19, 133:12
**Orleans** [1] - 3:8
**OUD** [2] - 56:8, 87:10
**out-of-state** [1] - 109:20
**outbreak** [1] - 82:8
**outcome** [4] - 54:24, 77:6, 85:21
**outcomes** [1] - 55:2
**outline** [1] - 50:9
**outlined** [1] - 71:1
**outlining** [1] - 74:14
**outpatient** [1] - 75:7
**outrageous** [2] - 129:24, 129:25
**outside** [2] - 39:3, 109:19
**over-arching** [1] - 82:2
**over-simplification** [1] - 141:20
**over-supply** [5] - 60:19, 80:14, 80:22, 81:1, 138:7
**Over-supply** [1] - 138:8
**overall** [7] - 99:5, 102:3, 102:5, 102:11, 102:19, 117:16, 134:21
**overburdening** [1] - 69:10
**overdose** [22] - 19:6, 24:21, 26:23, 27:10, 48:22, 55:2, 62:14, 64:4, 64:16, 67:10, 69:3, 69:5, 70:22, 79:3, 79:4, 79:20, 80:15, 80:18, 81:23, 82:4, 83:4, 93:15
**overdosed** [1] - 83:4
**overdoses** [18] - 18:21, 26:22, 63:13, 63:20, 63:21, 63:25, 64:12, 64:15, 64:22, 67:20, 71:8, 72:25, 77:18, 77:22, 82:11, 82:18, 83:20, 93:2
**overdosing** [1] - 84:3
**overflow** [1] - 85:16
**overlaid** [1] - 48:9
**overlook** [1] - 40:9

**overlooked** [1] - 40:12
**overnight** [1] - 92:23
**overprescription** [1] - 48:17
**oversees** [1] - 63:8
**oversupply** [4] - 46:5, 47:18, 104:2, 104:12
**overview** [1] - 21:4
**overwhelming** [6] - 33:5, 67:24, 69:11, 87:5, 135:17, 143:20
**owe** [2] - 27:20, 31:16
**own** [16] - 15:10, 15:12, 17:3, 17:4, 17:6, 20:25, 33:10, 34:6, 34:14, 49:11, 73:3, 79:17, 96:12, 106:14, 106:15, 134:5
**owner** [4] - 41:15, 106:20, 107:1, 109:12
**oxycodone** [10] - 39:15, 55:1, 67:21, 68:23, 69:1, 69:15, 71:17, 108:19, 109:6, 140:10
**Oxycontin** [1] - 68:6
**oxymorphone** [1] - 68:23, 69:1

---

**P**

**P-1200** [1] - 2:7
**P-16690** [1] - 40:20
**P-2803(8** [1] - 41:4
**P-32** [1] - 24:23
**P-44211** [1] - 26:20
**p.m** [2] - 128:24, 147:2
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**pace** [1] - 102:22
**page** [4] - 7:9, 20:23, 35:7, 56:8
**Page** [14] - 24:19, 24:23, 25:5, 26:1, 31:11, 31:12, 38:7, 48:14, 48:15, 55:11, 55:23, 55:24, 56:4
**paid** [3] - 104:17, 133:6, 133:8
**pain** [10] - 41:10, 47:4, 68:23, 68:25, 71:11, 96:10, 130:2, 135:5, 135:24, 140:13
**painstaking** [1] - 9:16
**palliative** [1] - 140:13
**Palsgraf** [1] - 29:23
**pandemic** [1] - 93:1
**Pandora's** [1] - 50:23

**panel** [1] - 43:25
**Papantonio** [1] - 2:10
**paper** [1] - 38:15
**papers** [1] - 50:16
**parent** [1] - 87:24
**park** [1] - 63:18
**parse** [1] - 12:23
**part** [20] - 12:17, 15:11, 26:16, 39:8, 39:9, 45:6, 47:2, 57:9, 57:10, 57:16, 70:14, 81:1, 90:24, 93:3, 98:23, 99:1, 101:9, 125:20, 133:19
**partial** [1] - 12:15
**partially** [1] - 13:3
**particular** [7] - 41:4, 53:19, 54:13, 79:19, 90:9, 131:5, 139:9
**particularly** [2] - 68:17, 71:11
**partner** [1] - 102:7
**partners** [1] - 76:22
**partnership** [1] - 73:20
**partnerships** [4] - 75:22, 77:1, 77:4, 77:5
**passage** [2] - 31:9, 31:10
**passed** [1] - 87:23
**past** [5] - 8:17, 12:13, 70:21, 94:8
**path** [1] - 48:16
**pathogens** [1] - 75:6
**pathway** [2] - 60:15, 88:21
**patience** [1] - 35:1
**patient** [12] - 63:24, 123:4, 123:7, 134:23, 139:9, 139:12, 140:17, 142:15, 143:2, 143:6, 143:16
**Patients** [1] - 135:4
**patients** [8] - 48:19, 85:16, 85:17, 135:2, 135:4, 135:5, 140:12, 140:23
**pattern** [4] - 34:4, 114:13, 115:5, 136:23
**patterns** [1] - 34:21
**Paul** [1] - 43:16
**PAUL** [2] - 2:3, 5:9
**pause** [4] - 113:10, 114:18, 121:18, 121:25
**pay** [2] - 146:4, 146:11

**peak** [1] - 102:23
**peaked** [2] - 137:2, 137:3
**PEARL** [1] - 3:6
**pediatrician** [1] - 41:11
**PEIA** [1] - 52:5
**pejorative** [2] - 39:4, 105:13
**pending** [1] - 10:25
**Pensacola** [1] - 2:11
**People** [1] - 65:5
**people** [58] - 9:1, 9:8, 18:23, 19:24, 22:15, 24:21, 26:22, 28:25, 32:5, 36:7, 41:1, 41:21, 41:24, 48:5, 48:22, 49:2, 49:25, 52:2, 55:17, 55:21, 56:2, 56:6, 59:5, 62:14, 65:2, 67:18, 69:17, 69:21, 73:5, 74:7, 74:10, 75:3, 78:5, 82:22, 82:24, 84:3, 86:14, 86:18, 88:19, 92:21, 93:5, 93:18, 96:4, 98:9, 101:5, 109:18, 118:14, 135:6, 139:16, 139:21, 140:6, 140:9, 140:10, 141:6, 145:15
**people's** [1] - 51:2
**Pepsi** [1] - 89:13
**per** [7] - 32:6, 47:6, 78:10, 102:16, 137:10, 137:11, 137:20
**perceived** [1] - 29:21
**percent** [31] - 20:4, 22:21, 48:21, 55:20, 55:23, 56:2, 64:14, 69:16, 74:21, 78:14, 78:17, 79:5, 79:6, 79:7, 86:17, 87:4, 88:19, 96:11, 102:18, 105:19, 105:21, 106:4, 106:19, 114:1, 129:22, 136:1, 138:13, 138:14, 140:16, 140:18
**percentage** [4] - 27:5, 62:12, 87:7, 131:7
**percentages** [1] - 12:23
**percolating** [1] - 74:2
**percolation** [1] - 77:12
**perfect** [3] - 40:10,

114:1, 141:3
**perfectly** [4] - 94:24, 134:3, 138:16, 141:14
**perhaps** [6] - 20:9, 21:23, 27:22, 37:24, 45:22, 48:1
**period** [9] - 24:3, 62:13, 78:3, 78:4, 118:4, 118:18, 122:18, 137:12, 137:19
**permission** [2] - 10:10, 39:15
**permutation** [1] - 32:9
**perpetuated** [1] - 70:5
**Perry** [6] - 99:9, 100:21, 112:8, 112:21, 113:7
**Perry's** [2] - 101:7, 109:13
**person** [12] - 8:16, 24:7, 41:6, 64:16, 64:22, 65:8, 100:10, 111:14, 126:6, 128:13, 137:7, 137:20
**personal** [6] - 8:6, 8:8, 49:16, 56:22, 57:10, 112:7
**personally** [2] - 99:18, 99:19
**persons** [1] - 80:4
**perspective** [6] - 15:1, 20:15, 20:16, 20:17, 22:1
**persuasive** [1] - 65:24
**pertinent** [1] - 117:5
**pervasive** [2] - 64:1, 71:2
**PETER** [1] - 2:9
**Pharma** [1] - 143:10
**pharmaceutical** [7] - 29:3, 71:10, 71:23, 79:5, 124:5, 125:11
**Pharmaceutical** [3] - 30:14, 34:8, 38:7
**pharmaceuticals** [1] - 71:16
**pharmacies** [21] - 10:23, 30:24, 31:7, 38:19, 52:4, 72:7, 96:14, 98:2, 101:14, 104:15, 105:9, 105:15, 105:16, 105:20, 112:4, 112:9, 112:17, 119:4, 119:12, 120:22, 134:16
**pharmacies'** [1] -

108:23
**Pharmacist** [1] - 109:22
**pharmacist** [3] - 41:15, 72:10, 107:2
**pharmacists** [1] - 126:21
**Pharmacy** [8] - 37:8, 52:5, 107:4, 107:5, 107:6, 108:2, 109:18, 113:4
**pharmacy** [16] - 37:12, 41:4, 41:9, 45:17, 72:4, 106:8, 106:21, 107:25, 108:4, 113:1, 119:3, 119:22, 131:2, 134:21, 142:11, 142:21
**Philadelphia** [2] - 6:6, 6:13
**Phillip** [1] - 104:24
**phonetic** [1] - 95:16
**photographs** [1] - 112:22
**phrases** [1] - 33:9
**physical** [4] - 101:5, 110:19, 110:22, 111:2
**physician** [1] - 44:9
**physicians** [2] - 50:17, 96:9
**picked** [2] - 43:19, 105:16
**pickens** [1] - 29:22
**picking** [1] - 105:7
**picture** [1] - 52:24
**pie** [1] - 54:13
**piece** [7] - 14:7, 19:20, 26:18, 30:17, 48:7, 53:5, 54:13
**piecemeal** [1] - 92:11
**pieces** [4] - 9:1, 16:1, 39:20, 51:12
**PIFKO** [1] - 3:14
**pill** [9] - 67:21, 69:23, 71:7, 97:24, 106:24, 108:8, 109:19, 137:12, 138:17
**pillar** [1] - 76:18
**pills** [54] - 9:7, 13:22, 25:12, 29:3, 29:17, 29:19, 29:24, 31:2, 31:6, 32:1, 32:2, 32:4, 32:7, 37:17, 37:18, 37:23, 42:1, 45:2, 45:8, 45:23, 51:1, 51:22, 59:25, 60:20, 60:21, 66:20, 66:23, 67:1, 67:19,

67:24, 68:2, 68:8, 68:9, 72:5, 77:12, 78:8, 80:22, 81:1, 81:3, 88:6, 88:9, 97:18, 98:1, 103:24, 106:17, 108:25, 109:23, 134:9, 134:13, 137:20, 138:10, 138:13, 138:14
**pioneer** [1] - 99:23
**Place** [1] - 19:13
**place** [9] - 19:5, 47:5, 57:2, 73:20, 96:20, 137:16, 145:10, 145:11
**placed** [1] - 85:22
**places** [2] - 19:21, 65:17
**Plainly** [1] - 136:6
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**plaintiff** [1] - 114:6
**Plaintiffs** [2] - 65:14, 148:6
**plaintiffs** [63] - 7:10, 11:22, 18:20, 61:16, 97:12, 97:20, 97:23, 98:18, 98:23, 99:10, 100:13, 101:8, 101:22, 103:12, 103:13, 103:19, 103:23, 104:2, 104:14, 104:17, 105:5, 105:16, 105:22, 106:16, 106:23, 108:5, 108:17, 108:20, 108:24, 110:3, 110:10, 111:1, 111:7, 111:23, 112:13, 114:5, 114:15, 117:21, 122:8, 124:15, 129:4, 129:9, 130:9, 130:11, 132:16, 133:18, 136:9, 138:7, 138:10, 138:19, 141:17, 141:19, 141:25, 142:19, 142:22, 143:11, 143:12, 143:15, 144:14, 144:23, 146:10, 147:1
**Plaintiffs'** [1] - 136:17
**plaintiffs'** [18] - 7:16, 30:6, 97:19, 98:14, 99:9, 107:10, 111:17, 113:25,

118:12, 127:11, 127:24, 134:2, 134:5, 134:6, 135:9, 136:3, 136:5, 138:19
**plan** [28] - 48:11, 49:4, 49:5, 52:15, 52:16, 54:12, 60:4, 62:5, 70:14, 73:22, 74:4, 74:8, 74:14, 76:4, 90:14, 90:23, 91:18, 92:13, 92:14, 92:22, 92:25, 144:25, 145:21, 146:5
**Plan** [2] - 21:8, 23:25
**plans** [5] - 74:12, 75:11, 75:16, 75:18, 76:13
**plates** [2] - 109:20, 109:21
**play** [2] - 79:19
**played** [5] - 12:4, 13:8, 60:23, 60:24, 143:7
**playing** [1] - 42:2
**plea** [1] - 15:19
**Pleasant** [3] - 4:4, 4:12, 4:15
**plenty** [1] - 14:23
**plowed** [1] - 130:9
**plummeting** [1] - 40:21
**Plus** [1] - 108:2
**poignant** [2] - 8:14, 47:12
**point** [33] - 10:25, 11:3, 14:25, 26:5, 28:13, 28:17, 33:16, 34:25, 35:19, 35:20, 36:13, 39:21, 43:22, 43:23, 48:24, 55:8, 55:16, 57:19, 83:16, 83:24, 101:8, 102:17, 102:21, 104:7, 105:2, 105:4, 107:14, 123:5, 128:10, 138:22, 139:17, 142:13, 142:20
**pointed** [2] - 114:5, 114:16
**pointing** [1] - 118:5
**points** [5] - 44:17, 44:18, 101:12, 121:5, 136:5
**poisoning** [2] - 78:11, 78:16
**poke** [1] - 34:19
**police** [3] - 30:24, 63:19, 67:14
**Police** [6] - 65:7,

68:20, 107:13, 107:14, 107:16, 108:1
**Policy** [5] - 65:21, 73:10, 74:15, 74:24, 76:9
**policy** [7] - 8:14, 27:25, 35:4, 36:19, 119:25, 120:19, 124:11
**Pollak** [1] - 43:17
**Polster** [1] - 30:15
**Ponc** [1] - 2:4
**Ponce** [1] - 2:14
**Pope** [1] - 40:8
**population** [10] - 9:18, 18:22, 20:2, 22:22, 55:20, 69:10, 74:21, 80:4, 87:13, 140:17
**portion** [5] - 42:7, 45:10, 74:19, 103:16, 108:13
**pose** [1] - 71:15
**position** [10] - 13:9, 29:12, 31:13, 47:17, 110:11, 122:12, 123:9, 141:4, 141:18, 143:4
**positioned** [1] - 60:4
**positions** [4] - 30:7, 30:8, 30:13, 30:18
**positive** [3] - 87:17, 117:14, 129:2
**positively** [1] - 70:8
**possess** [1] - 111:15
**possession** [4] - 31:3, 67:18, 72:5, 110:20
**possible** [2] - 45:21, 120:3
**possibly** [1] - 44:10
**potency** [1] - 85:1
**potential** [4] - 25:13, 60:22, 89:5, 131:4
**potentially** [1] - 24:24
**poured** [1] - 115:18
**Powell** [1] - 2:6
**powerful** [4] - 68:23, 68:25, 84:25, 125:8
**PR** [2] - 2:5, 2:14
**practice** [7] - 28:17, 44:12, 119:14, 124:1, 124:3, 145:3
**practices** [3] - 89:17, 92:16, 92:17
**pray** [1] - 33:4
**precedent** [1] - 17:15
**precisely** [1] - 30:21
**predictable** [1] - 51:7
**predominant** [2] - 72:22, 90:11

**predominantly** [1] - 88:13
**preempted** [1] - 53:1
**preference** [1] - 72:16
**pregnant** [2] - 85:15, 87:9
**premise** [1] - 9:10
**prepared** [1] - 119:16
**preposterous** [2] - 129:24, 130:4
**prescribe** [2] - 139:20, 143:8
**prescribed** [10] - 46:20, 47:5, 79:8, 96:15, 105:19, 105:21, 106:3, 106:6, 123:8, 130:3
**prescriber** [2] - 105:3, 105:12
**prescribers** [4] - 104:23, 105:9, 105:15, 138:23
**prescribing** [15] - 41:11, 96:11, 98:6, 135:11, 135:16, 135:18, 136:2, 136:7, 136:12, 136:17, 137:1, 137:25, 138:5, 139:4, 143:1
**Prescribing** [1] - 138:2
**prescription** [81] - 12:7, 12:16, 24:11, 24:16, 24:20, 27:6, 27:7, 27:13, 28:2, 28:24, 29:17, 32:5, 33:11, 40:18, 40:21, 47:18, 55:12, 55:14, 55:18, 55:21, 55:22, 55:25, 56:3, 59:24, 60:17, 60:20, 61:9, 66:20, 67:19, 67:24, 68:8, 68:9, 69:5, 69:8, 69:18, 69:22, 69:23, 71:15, 71:20, 72:5, 72:6, 72:10, 72:13, 72:15, 72:17, 72:22, 78:2, 78:3, 78:8, 79:9, 79:15, 79:18, 80:4, 80:5, 80:11, 81:3, 85:1, 85:2, 87:10, 87:16, 88:6, 88:9, 88:20, 88:22, 88:24, 89:11, 90:3, 90:11, 90:12, 98:5, 101:17, 101:25, 102:12, 104:8, 106:5, 106:24, 113:23,

137:10, 137:15, 138:17, 139:20
**prescriptions** [11] - 47:6, 88:11, 98:3, 102:16, 106:6, 134:16, 134:23, 135:2, 136:21, 137:18, 138:9
**Presence** [1] - 66:20
**present** [10] - 8:21, 10:10, 15:21, 20:6, 79:14, 99:12, 125:1, 125:16, 126:9, 130:17
**presentation** [5] - 118:10, 125:4, 126:10, 126:13, 134:6
**presentations** [1] - 99:18
**presented** [7] - 18:18, 20:15, 33:5, 60:12, 81:2, 89:16, 93:14
**presenting** [1] - 116:6
**presently** [1] - 18:8
**preserve** [2] - 11:2
**preserved** [1] - 11:11
**President** [3] - 23:5, 24:5, 30:23
**pressing** [1] - 62:1
**pretty** [3] - 120:10, 135:12, 146:12
**prevalence** [1] - 55:13
**prevalent** [1] - 68:21
**prevent** [9] - 13:11, 28:1, 28:4, 28:21, 29:5, 32:22, 59:24, 75:5, 84:3
**preventing** [2] - 12:9, 12:18
**Prevention** [1] - 74:17
**prevention** [3] - 61:22, 61:24, 74:25
**Prevosnick** [1] - 13:6
**Prevosnik** [1] - 11:19
**Prevoznik** [5] - 10:12, 22:23, 23:10, 123:11, 123:14
**price** [2] - 69:23, 71:23
**Price** [1] - 102:7
**Priddy** [4] - 18:19, 64:10, 64:14, 64:16
**primarily** [1] - 72:17
**primary** [7] - 8:17, 8:18, 25:17, 45:23, 45:24, 99:15, 99:16
**primed** [1] - 80:5
**principles** [2] - 8:25, 61:18

**prison** [1] - 69:10
**private** [2] - 16:24, 17:5
**Prize** [1] - 50:14
**pro** [1] - 116:1
**pro-active** [1] - 116:1
**problem** [15] - 20:11, 36:13, 49:21, 50:21, 65:11, 65:13, 71:24, 73:3, 78:1, 90:20, 93:10, 107:25, 108:4, 109:12, 110:14
**problems** [5] - 24:3, 61:25, 62:1, 76:24, 119:3
**Procedure** [1] - 58:4
**procedure** [1] - 119:25
**procedures** [1] - 120:11
**proceed** [1] - 128:25
**proceeded** [1] - 131:6
**Proceedings** [3] - 6:19, 57:5, 128:24
**proceedings** [1] - 148:5
**PROCEEDINGS** [1] - 7:1
**process** [1] - 95:13
**processed** [2] - 9:16, 117:1
**Proctor** [1] - 2:10
**produced** [2] - 6:19, 131:22
**products** [2] - 102:1, 124:2
**profession** [1] - 50:20
**professional** [2] - 50:17, 86:24
**Professor** [2] - 47:21, 66:4
**proffer** [1] - 32:3
**profile** [1] - 109:23
**profoundly** [1] - 65:8
**program** [27] - 34:24, 49:1, 92:19, 94:16, 99:24, 100:2, 100:18, 100:20, 116:23, 116:25, 117:6, 117:22, 118:1, 118:3, 119:21, 121:17, 122:22, 122:24, 124:20, 124:22, 124:23, 125:2, 125:7, 125:9, 126:6, 126:14, 129:5
**Program** [5] - 96:24, 114:4, 116:22, 117:19, 145:3

**programs** [17] - 48:12, 49:18, 73:17, 75:6, 75:8, 75:24, 91:23, 92:8, 115:19, 126:8, 145:9, 145:10, 145:12, 145:17, 145:19, 145:25
**Programs** [1] - 145:10
**prohibition** [1] - 52:11
**prominent** [1] - 72:13
**promise** [1] - 130:14
**promised** [2] - 56:16, 130:11
**promotion** [1] - 61:22
**prompt** [3] - 120:2, 120:6, 120:9
**pronounced** [1] - 98:10
**proof** [6] - 44:24, 46:8, 51:20, 54:8, 98:15, 110:15
**proper** [2] - 17:10, 18:1
**property** [3] - 70:3, 70:8, 71:9
**proposed** [1] - 62:5
**proposing** [1] - 56:10
**prosecuted** [1] - 107:2
**prove** [14] - 18:11, 32:15, 46:9, 47:22, 98:18, 98:22, 110:6, 130:12, 142:1, 142:3, 142:19, 142:21, 143:15, 144:6
**proved** [2] - 104:2, 141:25
**proven** [2] - 94:13, 94:15
**proverbially** [1] - 130:20
**provide** [8] - 44:19, 48:12, 61:23, 68:11, 74:13, 85:11, 115:11, 117:15
**provided** [3] - 41:19, 97:22, 111:24
**providers** [1] - 21:9
**provides** [3] - 45:7, 105:2, 108:2
**proving** [2] - 113:9, 118:16
**provision** [1] - 22:9
**proximate** [4] - 98:19, 142:3, 143:14, 144:7
**psychological** [1] - 92:2
**Public** [3] - 26:10, 48:11, 61:20
**public** [59] - 8:13,

13:20, 15:6, 15:7, 15:15, 15:25, 16:7, 16:19, 16:23, 17:9, 17:10, 20:18, 20:19, 21:22, 22:1, 22:2, 22:20, 22:25, 23:3, 23:7, 23:15, 23:23, 24:3, 24:6, 25:8, 32:18, 39:17, 42:9, 49:22, 50:12, 58:22, 58:23, 59:5, 59:25, 60:2, 60:5, 60:18, 61:8, 61:12, 61:13, 61:14, 61:17, 61:18, 61:25, 62:1, 62:7, 62:8, 62:9, 62:13, 64:8, 69:13, 70:1, 81:13, 86:24, 144:15
**publications** [1] - 91:12
**published** [2] - 26:10, 86:6
**Pulitzer** [1] - 50:14
**pulled** [3] - 36:17, 44:17
**purchases** [1] - 106:19
**purchasing** [2] - 109:6, 109:8
**Purdue** [2] - 143:10, 143:12
**purpose** [5] - 13:9, 28:3, 74:12, 74:13, 126:25
**purposes** [2] - 95:14, 145:24
**pursuant** [2] - 98:2, 110:21
**pursuing** [1] - 124:14
**put** [39] - 13:1, 14:7, 14:16, 18:15, 21:12, 22:23, 26:7, 26:10, 27:13, 35:7, 35:16, 37:4, 38:18, 38:22, 40:14, 43:3, 44:7, 46:8, 46:11, 48:4, 55:4, 56:21, 60:12, 73:7, 74:8, 75:11, 89:3, 89:5, 90:1, 97:12, 110:11, 119:24, 120:10, 122:2, 128:7, 128:10
**putting** [1] - 68:19
**puzzle** [5] - 8:25, 9:1, 14:7, 17:18, 51:12

**Q**

**QRA** [1] - 41:11

**QRT** [3] - 64:11, 83:16, 83:24
**QRTs** [1] - 83:21
**qualified** [2] - 54:21, 96:19
**quality** [1] - 61:23
**quantity** [3] - 44:11, 44:23, 66:23
**quarrel** [1] - 137:9
**questionable** [1] - 120:21
**questioned** [1] - 140:2
**questions** [16] - 11:25, 12:1, 13:6, 15:4, 17:24, 20:20, 21:17, 25:4, 25:5, 25:21, 30:9, 32:13, 32:17, 46:2, 93:22
**Quick** [2] - 83:17, 83:18
**quick** [1] - 53:17
**quickly** [2] - 84:16, 85:5
**quite** [3] - 90:21, 132:20, 143:25
**quota** [6] - 140:2, 140:4, 140:5, 140:14, 140:22, 141:16
**Quota** [1] - 140:7
**quote** [7] - 44:7, 44:21, 55:15, 110:12, 131:5, 136:25, 139:24
**quotes** [1] - 55:9

**R**

**rabbit** [1] - 33:23
**race** [3] - 64:21, 65:25, 66:11
**Rader** [13] - 62:24, 63:1, 63:8, 63:12, 64:11, 64:12, 65:15, 67:9, 67:20, 72:24, 73:22, 75:20, 92:20
**Rafalski** [11] - 34:10, 129:11, 129:14, 130:7, 130:12, 130:16, 131:19, 131:20, 132:15, 139:1, 139:13
**Rafalski's** [1] - 132:4
**Rafferty** [2] - 2:10, 10:20
**Rahul** [1] - 81:9
**raided** [1] - 41:14
**rain** [1] - 43:19
**raise** [3] - 10:25, 16:12, 141:16

**raised** [8] - 11:10, 15:5, 37:25, 45:11, 45:12, 46:7, 57:24, 119:1
**raising** [2] - 37:22, 57:23
**ran** [1] - 101:6
**random** [2] - 135:1, 135:2
**range** [3] - 36:5, 37:8, 101:25
**rank** [1] - 47:7
**ranked** [1] - 102:15
**Rannazzisi** [18] - 23:1, 24:17, 31:13, 35:10, 100:11, 115:9, 129:12, 132:17, 132:18, 133:13, 139:1, 139:7, 140:1, 140:3, 141:1, 141:12, 141:15, 141:23
**Rannazzisi's** [2] - 24:22, 31:8
**rate** [1] - 78:16
**rates** [2] - 55:13, 145:14
**rather** [4] - 7:10, 17:7, 76:25
**rational** [1] - 134:3
**ravaged** [1] - 60:20
**re** [5] - 36:11, 37:2, 50:8, 75:4, 99:6
**re-enter** [1] - 75:4
**re-introduce** [1] - 99:6
**re-set** [2] - 36:11, 37:2
**re-visit** [1] - 50:8
**reach** [2] - 39:10, 48:25
**reached** [1] - 65:12
**reaction** [3] - 50:13, 50:19
**read** [21] - 23:11, 25:3, 26:19, 31:9, 31:10, 40:20, 41:7, 42:20, 42:24, 43:4, 44:7, 45:10, 53:2, 55:10, 83:7, 112:17, 113:3, 114:5, 117:7, 123:22
**reading** [1] - 79:16
**reads** [1] - 115:3
**ready** [2] - 96:2, 108:2
**real** [9] - 94:9, 105:17, 129:4, 139:12, 140:23, 146:1
**real-life** [1] - 140:23
**realize** [1] - 28:19
**realizes** [1] - 28:19
**really** [15] - 14:9, 16:25, 65:2, 65:7,

74:2, 75:18, 96:9, 96:24, 108:4, 116:10, 117:24, 129:14, 146:1
**Really** [1] - 64:17
**reason** [8] - 28:3, 35:2, 40:18, 44:17, 62:13, 127:7, 141:13, 144:12
**reasonable** [2] - 24:7, 28:21
**reasonableness** [1] - 31:24
**reasonably** [3] - 29:21, 67:3, 124:9
**reasons** [3] - 57:17, 135:15, 135:21
**rebut** [1] - 34:13
**rebuttal** [5] - 7:12, 7:16, 57:13, 57:25, 147:1
**rebutting** [1] - 57:14
**receive** [1] - 141:7
**received** [1] - 103:24
**receiving** [1] - 134:15
**recess** [2] - 95:4, 128:20
**Recess** [3] - 57:4, 95:5, 128:23
**recessed** [1] - 147:2
**recited** [1] - 110:23
**reciting** [1] - 112:19
**reckless** [4] - 39:17, 39:18, 39:19, 42:11
**recollections** [1] - 129:8
**recommendations** [3] - 83:15, 84:5, 145:4
**recommended** [1] - 83:2
**record** [49] - 11:2, 11:4, 14:3, 14:4, 16:21, 17:22, 18:14, 18:15, 20:22, 21:12, 22:5, 23:19, 24:9, 24:14, 25:5, 25:17, 26:19, 28:6, 30:12, 31:15, 31:25, 35:9, 35:11, 36:10, 36:14, 37:16, 41:7, 46:11, 47:23, 55:4, 55:10, 56:16, 60:11, 60:19, 83:7, 88:4, 88:17, 95:14, 98:10, 112:2, 112:4, 112:8, 112:11, 113:16, 124:15, 132:1, 148:5
**recorded** [1] - 6:19
**Recording** [2] - 12:4, 13:4, 13:8, 13:25

**records** [6] - 38:3, 38:4, 82:23, 113:11, 113:12, 113:13
**recovery** [5] - 60:15, 74:18, 75:1, 75:4, 75:7
**red** [4] - 78:1, 101:6, 108:19, 112:11
**reduce** [2] - 75:4, 75:9
**reduced** [1] - 88:12
**reducing** [1] - 48:18
**Reduction** [1] - 23:25
**reduction** [1] - 70:11
**Reed** [2] - 6:4, 6:11
**reference** [9] - 15:16, 16:7, 22:6, 30:3, 90:2, 99:15, 107:21, 109:9, 119:17
**referenced** [2] - 24:4, 79:25
**references** [3] - 20:23, 21:3, 23:21
**referred** [2] - 61:7, 123:20
**referring** [1] - 106:2
**refinement** [1] - 126:19
**reflected** [1] - 145:20
**reflects** [2] - 98:11
**reform** [2] - 50:20, 51:3
**reformed** [1] - 27:24
**refresh** [1] - 62:21
**refuted** [5] - 25:22, 27:24, 28:5, 51:5, 101:7
**regard** [1] - 83:20
**regarding** [3] - 30:19, 86:7, 117:14
**region** [2] - 38:23, 69:8
**registered** [1] - 111:14
**Registrant** [1] - 24:22
**registrant** [8] - 111:11, 114:6, 114:7, 114:9, 114:19, 114:20, 114:23, 114:25
**registrants** [2] - 13:14, 114:11
**registration** [4] - 24:25, 45:17, 106:15, 111:13
**regularly** [1] - 101:3
**regulated** [1] - 117:11
**regulation** [6] - 111:10, 117:12, 122:15, 124:7, 124:12, 133:21
**regulations** [4] - 13:10, 118:11,

122:11, 139:3
**Regulatory** [1] - 125:5
**regulatory** [2] - 10:22,
   39:25
**reiterating** [1] - 66:16
**rejected** [2] - 14:17,
   38:8
**rejection** [1] - 52:11
**related** [24] - 29:8,
   29:23, 40:15, 40:17,
   44:20, 46:6, 46:14,
   54:17, 64:15, 66:6,
   70:4, 78:12, 78:13,
   78:14, 78:16, 81:24,
   85:4, 85:8, 85:13,
   86:18, 87:1, 87:4,
   119:12, 121:3
**relates** [2] - 99:3, 99:4
**relationship** [3] -
   109:12, 134:20,
   143:1
**relayed** [1] - 117:14
**reliable** [1] - 92:10
**relied** [1] - 97:21
**relief** [2] - 144:16,
   146:9
**relievers** [1] - 71:11
**reluctant** [1] - 144:12
**rely** [1] - 141:19
**remained** [1] - 118:3
**remand** [2] - 53:5,
   53:11
**remark** [1] - 47:12
**remedy** [1] - 58:23
**Remember** [1] -
   134:22
**remember** [15] - 8:15,
   43:14, 56:1, 61:6,
   62:24, 64:10, 68:15,
   70:16, 70:24, 76:14,
   77:13, 77:16, 85:6,
   86:2, 123:19
**remembered** [1] -
   88:18
**remind** [5] - 28:16,
   81:11, 84:17, 91:16,
   92:3
**reminder** [2] - 146:3
**reminds** [1] - 47:21
**remote** [5] - 29:9,
   29:18, 29:24, 54:1,
   56:11
**remoteness** [2] -
   28:14, 51:21
**remove** [1] - 103:19
**removed** [1] - 142:5
**repeat** [1] - 25:4
**repeated** [2] - 30:12,
   84:19
**repeatedly** [1] - 37:13,

37:25
**repeating** [1] - 142:19
**replete** [2] - 30:12,
   88:17
**report** [12] - 68:21,
   70:25, 74:13, 80:18,
   81:10, 81:12, 82:6,
   113:22, 117:10,
   123:17, 124:9,
   124:20
**Report** [3] - 21:2,
   108:2, 120:3
**reported** [18] - 55:14,
   74:20, 97:4, 97:5,
   97:6, 97:7, 97:8,
   101:16, 101:19,
   108:9, 115:1, 117:4,
   122:10, 123:2,
   123:16, 148:9
**Reporter** [6] - 6:17,
   6:18, 148:3, 148:12
**reporter** [1] - 14:13
**reporting** [4] - 113:20,
   113:21, 121:14,
   122:24
**Reports** [2] - 43:3,
   124:2
**reports** [11] - 26:10,
   26:12, 68:15, 68:19,
   69:7, 70:2, 73:6,
   79:17, 82:1, 107:17,
   107:18
**representative** [2] -
   12:12, 100:22
**represented** [1] -
   102:18
**representing** [2] -
   29:22, 78:14
**repudiated** [1] - 30:20
**request** [3] - 23:19,
   106:18, 117:8
**requesting** [1] - 146:5
**requests** [2] - 41:18,
   42:3
**require** [1] - 48:17
**required** [5] - 38:4,
   44:24, 113:22,
   117:11, 122:22
**requirement** [8] -
   111:6, 113:20,
   114:3, 122:14,
   122:19, 123:9,
   123:22, 139:2
**requirements** [7] -
   110:17, 110:22,
   111:2, 111:8,
   113:17, 114:2,
   118:15
**requires** [3] - 111:10,
   112:7, 124:12

**rescue** [1] - 63:4
**research** [2] - 80:10,
   89:2
**resent** [1] - 67:15
**reserve** [1] - 8:6
**reserving** [1] - 7:12
**resident** [3] - 64:24,
   85:24, 100:23
**residents** [1] - 20:4
**Resiliency** [1] - 21:8
**resiliency** [2] - 76:3,
   76:4
**resisted** [1] - 116:14
**resources** [1] - 93:4
**respect** [4] - 39:5,
   53:18, 96:4, 146:8
**respectfully** [1] - 14:1
**respond** [2] - 57:18,
   74:3
**responders** [3] -
   63:13, 67:8, 83:21
**responding** [1] -
   73:13
**Response** [2] - 83:18
**response** [9] - 23:24,
   60:5, 84:6, 84:7,
   84:9, 84:14, 108:23,
   119:22, 141:22
**responsibility** [5] -
   12:8, 12:15, 56:13,
   94:15, 143:6
**responsible** [10] -
   12:18, 12:20, 29:9,
   31:5, 52:1, 54:16,
   56:12, 56:14, 118:7,
   144:3
**responsibly** [1] -
   134:18
**responsive** [1] -
   117:16
**rest** [4] - 19:18, 21:17,
   39:11, 122:3
**Restatement** [2] -
   17:12, 17:15
**restaurants** [1] - 63:16
**restored** [1] - 124:19
**restricted** [2] - 44:23,
   45:7
**result** [4] - 29:14,
   54:10, 72:21, 90:10
**resulted** [1] - 41:14
**resulting** [1] - 116:25
**results** [3] - 13:23,
   72:13, 82:3
**resumed** [2] - 57:5,
   128:24
**return** [4] - 43:8,
   47:14, 124:18,
   133:21
**review** [6] - 10:11,

112:6, 112:7,
   112:25, 120:3,
   126:19
**reviewed** [3] - 91:21,
   125:9, 132:12
**reviewers** [2] - 127:1,
   127:3
**reviewing** [2] - 77:17,
   91:20
**reviews** [1] - 108:11
**revive** [1] - 63:24
**rewrite** [1] - 117:23
**Rice** [5] - 4:3, 4:5, 4:8,
   4:11, 4:14
**ride** [1] - 43:20
**ridiculous** [1] - 105:14
**rights** [1] - 17:11
**ripple** [1] - 64:5, 64:6,
   93:12
**rise** [7] - 24:12, 25:18,
   46:13, 60:2, 69:2,
   70:22, 78:3
**rises** [1] - 39:19
**rising** [3] - 40:22,
   72:25, 93:2
**risk** [2] - 28:20, 29:21
**risks** [1] - 139:12
**RMR** [2] - 6:17, 6:18
**Robert** [1] - 95:16
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**Robertson** [1] - 28:15
**role** [5] - 79:19,
   134:20, 138:25,
   143:3, 143:7
**rooms** [1] - 85:16
**routinely** [2] - 113:1,
   124:8
**Roxy** [1] - 68:7
**RPR** [1] - 6:18
**RPR-RMR-CRR-**
**FCRR** [1] - 6:18
**Ruby** [1] - 4:23
**RUBY** [1] - 4:22
**Rufus** [1] - 49:10
**ruin** [1] - 65:12
**rule** [2] - 34:9, 131:5
**Rules** [2] - 32:11, 58:3
**rules** [2] - 34:6, 34:7
**ruling** [1] - 30:17
**run** [1] - 10:5
**runs** [1] - 108:16
**Rutledge** [2] - 43:13,
   43:14

**S**

**s\Ayme** [1] - 148:11
**s\Lisa** [1] - 148:11
**sadness** [1] - 85:20

**safe** [1] - 49:23
**safely** [1] - 110:21
**SafeScript** [23] - 37:8,
   37:16, 40:2, 41:20,
   41:22, 106:9,
   106:11, 106:13,
   106:14, 107:3,
   107:9, 107:11,
   107:21, 107:22,
   108:8, 108:10,
   108:12, 108:14,
   108:18, 109:15,
   109:17, 110:1, 110:5
**SafeScript's** [6] -
   106:19, 108:15,
   109:1, 109:6, 109:8
**safety** [17] - 13:20,
   20:19, 21:22, 22:20,
   22:25, 23:3, 23:8,
   23:24, 25:8, 36:3,
   42:8, 49:22, 60:1,
   60:13, 61:13, 61:19,
   70:1
**sales** [4] - 40:21,
   100:22, 120:8,
   121:15
**Sales** [5] - 42:14, 43:4,
   43:23, 45:12
**SALGADO** [1] - 4:20
**San** [3] - 2:5, 2:14,
   30:16
**sanctioned** [1] - 35:16
**sand** [1] - 76:24
**sat** [2] - 11:24, 64:18
**satisfy** [1] - 80:23
**save** [3] - 49:19, 57:9,
   57:16
**saw** [19] - 40:11, 65:6,
   67:10, 71:5, 71:6,
   71:7, 74:12, 76:4,
   77:22, 78:2, 80:13,
   93:1, 109:18,
   109:19, 109:20,
   123:11, 126:24
**SC** [3] - 4:4, 4:12, 4:15
**scale** [1] - 91:23
**scaled** [1] - 85:2
**scenes** [1] - 67:21
**schedule** [2] - 7:7,
   94:20
**SCHMIDT** [1] - 5:9
**School** [2] - 25:25,
   48:10
**science** [2] - 61:20,
   67:4
**scientific** [1] - 140:7
**scope** [1] - 121:10
**score** [1] - 10:3
**Scott** [6] - 65:14,
   65:19, 68:4, 68:18,

72:24, 73:25
**scrutiny** [1] - 115:19
**se** [1] - 32:6
**seal** [1] - 128:10
**search** [2] - 41:12, 79:12
**second** [22] - 8:12, 11:18, 13:5, 21:21, 26:16, 43:11, 45:10, 50:6, 51:9, 51:25, 69:1, 69:4, 96:16, 101:16, 103:25, 111:6, 114:23, 121:10, 122:16, 138:23, 138:25, 143:5
**Second** [4] - 17:12, 17:15, 135:15, 145:6
**second-guess** [4] - 96:16, 138:23, 138:25, 143:5
**secondary** [2] - 8:18, 110:11
**secret** [1] - 135:21
**Section** [2] - 49:8, 125:5
**section** [2] - 17:12, 49:8
**security** [2] - 110:19, 111:2
**see** [27] - 14:2, 17:2, 21:17, 37:19, 39:2, 41:24, 43:1, 43:12, 45:6, 50:5, 67:14, 72:9, 74:2, 75:21, 77:18, 77:22, 78:1, 78:6, 81:25, 133:23, 134:22, 134:23
**See** [2] - 40:9, 147:1
**seeing** [14] - 55:18, 61:4, 65:17, 65:18, 67:8, 67:17, 67:20, 69:19, 69:20, 70:18, 71:9, 72:1, 77:11
**seek** [1] - 88:12
**seekers** [2] - 140:11, 140:18
**seeking** [1] - 144:15
**seem** [1] - 105:7
**sees** [1] - 79:14
**seizures** [5] - 68:6, 68:7, 69:15, 71:7, 71:8
**seldom** [1] - 15:9
**selling** [1] - 32:4
**seminal** [1] - 27:8
**sending** [1] - 42:3
**SENIOR** [1] - 1:17
**Senior** [3] - 7:2, 23:5,

30:23
**Sensabaugh** [1] - 5:14
**sense** [4] - 25:10, 25:12, 67:4, 135:7
**sent** [2] - 101:17, 116:23
**sentence** [4] - 41:13, 114:19, 114:23, 115:3
**sentences** [4] - 16:6, 16:16, 123:23
**separate** [2] - 54:17, 119:8
**separately** [1] - 137:24
**separating** [1] - 9:2
**separation** [1] - 65:9
**September** [3] - 124:6, 125:1, 125:12
**sequence** [1] - 36:20
**series** [3] - 26:10, 34:1, 34:2
**Serious** [1] - 73:4
**serious** [2] - 23:14, 71:12
**serve** [1] - 125:22
**served** [1] - 145:15
**service** [2] - 105:9, 121:8
**serviced** [1] - 108:3
**services** [2] - 76:16, 146:11
**set** [7] - 36:1, 36:3, 36:7, 36:11, 37:2, 105:22, 107:18
**setting** [1] - 127:23
**settlement** [1] - 133:12
**seven** [1] - 36:9
**sever** [3] - 51:14, 52:16, 54:13
**several** [5] - 19:21, 52:13, 57:8, 102:11, 117:7
**severed** [1] - 53:12
**severity** [1] - 23:13
**Sewell** [1] - 29:10
**shaded** [1] - 113:18
**shall** [5] - 111:11, 114:6, 114:9, 114:19, 114:23
**SHANNON** [1] - 6:3
**share** [2] - 56:12, 125:18
**sharp** [1] - 126:7
**shed** [1] - 59:13
**sheer** [1] - 33:13
**Sheriff** [2] - 67:13, 67:23
**shift** [1] - 56:8

**shining** [1] - 49:20
**ship** [12] - 119:6, 119:10, 122:2, 122:9, 122:20, 122:23, 123:1, 123:3, 123:9, 123:22, 124:2, 141:21
**shipment** [5] - 97:8, 101:17, 102:21, 102:23, 134:19
**shipments** [11] - 36:25, 102:3, 102:4, 102:12, 102:25, 113:23, 124:8, 134:19, 137:18, 141:8
**shipped** [18] - 36:11, 37:12, 44:11, 66:23, 98:1, 103:5, 109:24, 117:5, 119:14, 123:3, 123:18, 131:8, 134:9, 134:13, 138:11, 138:13, 138:14, 141:22
**shipping** [6] - 119:18, 122:4, 122:14, 122:25, 134:25
**shock** [1] - 121:1
**Shoppe** [3] - 41:5, 41:15, 41:22
**shopping** [1] - 79:7
**short** [3] - 10:13, 11:25, 14:20
**shortages** [1] - 140:19
**shortcomings** [1] - 132:10
**show** [23] - 11:4, 11:19, 17:21, 32:7, 36:9, 38:21, 44:24, 51:19, 54:7, 61:14, 66:24, 68:16, 73:11, 73:18, 75:13, 77:25, 93:20, 104:11, 105:17, 123:12, 124:25, 130:21, 142:4
**showed** [17] - 35:14, 58:25, 63:1, 66:13, 78:20, 79:4, 79:6, 79:7, 85:6, 88:15, 93:6, 99:13, 99:14, 104:11, 112:13, 118:10
**showing** [2] - 34:13, 88:11
**shown** [1] - 98:23
**shows** [5] - 115:24, 126:18, 136:21,

136:22, 137:14
**shut** [4] - 37:18, 40:3, 41:21, 120:22
**shutdowns** [1] - 128:11
**sic** [3] - 62:25, 67:11, 139:20
**side** [6] - 9:11, 9:23, 9:24, 22:7, 39:14, 125:5
**sides** [8] - 11:10, 18:6, 33:2, 90:13, 101:15, 135:12, 137:5, 137:17
**sight** [1] - 143:4
**Sigman** [1] - 16:4
**sign** [2] - 9:11, 89:3
**signature** [3] - 40:6, 40:7, 40:8
**signed** [3] - 128:5, 128:6
**significant** [13] - 21:22, 26:3, 27:5, 41:9, 41:12, 41:16, 69:2, 70:22, 71:22, 71:23, 103:16, 142:6, 146:4
**significantly** [3] - 55:13, 60:1, 72:21
**similar** [3] - 65:14, 79:3, 126:10
**simple** [2] - 9:5, 77:3
**simplification** [1] - 141:20
**simply** [4] - 40:15, 97:20, 131:14, 141:21
**Simply** [1] - 60:12
**SIMULTANEOUS** [1] - 7:6
**SINGER** [1] - 4:8
**single** [12] - 10:5, 26:23, 27:10, 35:5, 48:6, 58:21, 97:8, 106:24, 107:21, 130:25, 132:13, 145:1
**sink** [1] - 141:1
**sip** [1] - 121:18
**sit** [3] - 18:2, 21:13, 64:19
**site** [1] - 41:17
**sitting** [2] - 12:11, 44:4
**situated** [1] - 76:23
**situation** [1] - 52:20
**six** [10] - 32:12, 32:13, 32:15, 32:17, 36:9, 41:17, 46:2, 63:8, 97:13, 134:6

**six-week** [1] - 134:6
**size** [3] - 34:3, 114:12, 115:4
**skin** [1] - 65:4
**Skip** [2] - 68:18, 88:14
**slide** [5] - 37:5, 77:24, 77:25, 99:14, 126:17
**slides** [2] - 119:5, 119:8
**sliver** [2] - 56:13, 131:15
**slowly** [1] - 14:3
**small** [4] - 44:12, 56:13, 65:16, 102:18
**small-knit** [1] - 65:16
**Smith** [11] - 6:4, 6:11, 18:24, 18:25, 77:13, 77:14, 78:9, 78:19, 79:12
**soared** [1] - 78:17
**social** [7] - 26:15, 48:20, 78:24, 82:16, 83:22, 91:15, 92:1
**Social** [1] - 79:10
**societal** [3] - 12:6, 12:15, 12:21
**society** [1] - 75:4
**socioeconomic** [3] - 64:17, 64:21, 66:11
**sold** [4] - 32:1, 41:25, 45:2, 46:12
**sole** [1] - 126:25
**solely** [1] - 136:11
**solid** [1] - 76:21
**Solutions** [4] - 21:11, 66:15, 75:23, 76:7
**solutions** [1] - 76:11
**someone** [8] - 46:25, 67:11, 83:3, 83:22, 83:23, 84:10, 86:10, 120:8
**sometimes** [7] - 9:3, 10:1, 14:14, 42:17, 63:23, 86:8, 86:9
**somewhere** [4] - 20:3, 37:10, 37:11, 49:15
**soon** [2] - 94:21, 109:11
**sorry** [1] - 11:8
**sought** [1] - 98:20
**souls** [1] - 9:18
**source** [2] - 98:7, 143:20
**sources** [7] - 8:18, 25:17, 99:15, 99:16, 120:1, 145:18
**South** [3] - 2:11, 43:24, 64:25
**southern** [1] - 86:4
**Southern** [1] - 7:2

SOUTHERN [1] - 1:1
SPEAKERS [1] - 7:6
speaking [4] - 74:10, 91:21, 98:8, 118:25
special [4] - 32:10, 32:11, 32:12, 49:24
specialist [1] - 86:3
specializes [1] - 89:19
specific [8] - 11:22, 46:4, 82:17, 97:16, 110:21, 120:11, 145:7, 145:8
Specifically [1] - 80:25
specifically [12] - 20:24, 23:6, 23:21, 53:20, 53:22, 62:9, 71:25, 81:20, 84:11, 86:4, 86:5, 122:7
specifications [1] - 110:24
specificity [1] - 113:15
specifics [1] - 129:5
speeches [1] - 50:15
spend [4] - 14:24, 33:23, 38:10, 82:7
spent [5] - 9:24, 22:4, 31:18, 74:10, 77:14
spill [1] - 97:24
spite [1] - 141:21
sponsored [2] - 125:11, 125:13
spread [2] - 75:6, 93:12
Square [2] - 6:5, 6:12
St [1] - 103:17
stabilize [1] - 91:15
staffing [1] - 145:13
stage [1] - 100:1
staged [1] - 21:18
staggering [1] - 33:14
stake [1] - 60:14
stakeholders' [1] - 75:9
stamp [2] - 45:14, 45:15
stamping [1] - 127:3
stand [6] - 9:12, 15:13, 20:10, 41:2, 76:15, 92:4
standard [12] - 19:4, 50:3, 51:3, 96:17, 98:17, 100:3, 121:17, 124:1, 125:23, 135:23, 136:2, 136:7
standards [1] - 96:13
standing [6] - 15:24, 17:2, 17:8, 31:20, 76:21, 106:8

standpoint [1] - 65:25
stands [3] - 15:9, 15:12, 52:10
STANNER [1] - 5:10
star [3] - 129:10, 132:15, 132:17
Start [2] - 136:14, 136:15
start [10] - 8:9, 9:10, 15:3, 34:25, 60:17, 72:3, 77:5, 96:3, 98:17, 103:11
started [8] - 19:11, 55:17, 55:21, 56:3, 67:20, 88:19
starting [3] - 20:14, 73:8, 100:5
starts [1] - 50:10
state [10] - 14:19, 17:14, 20:16, 32:10, 38:18, 106:15, 109:20, 111:13, 136:12, 136:13
State [6] - 24:1, 26:24, 52:4, 53:6, 81:13, 109:21
State's [1] - 103:17
statement [10] - 22:10, 23:11, 23:16, 33:6, 45:22, 48:16, 57:16, 141:1, 141:3, 141:13
statements [5] - 30:12, 57:10, 57:11, 57:22, 84:18
states [2] - 86:20, 123:24
STATES [2] - 1:1, 1:17
States [3] - 7:2, 23:14, 24:5, 25:19, 27:17, 27:25, 42:14, 43:2, 45:3, 45:18, 45:24, 135:20
statewide [1] - 79:22
stations [1] - 63:8
statistically [1] - 47:3
STATUS [1] - 1:17
Status [1] - 7:2
statutes [2] - 50:4, 50:21
stay [2] - 116:19, 127:9
stenography [1] - 6:19
step [4] - 16:9, 29:1, 56:24, 61:2
steps [2] - 119:19, 133:2
Steve [8] - 36:17, 99:8, 100:4, 118:9, 118:21, 119:19, 124:21

STEVEN [1] - 4:22
Stevens [1] - 43:16
stick [2] - 28:9, 38:15
still [15] - 12:22, 18:10, 30:3, 58:11, 59:21, 63:4, 70:18, 77:8, 86:21, 90:16, 90:19, 91:22, 95:12, 129:16, 142:1
stimulant [1] - 41:10
stimulants [1] - 41:11
stock [1] - 133:23
stood [1] - 97:15
stop [4] - 72:4, 106:21, 119:14, 143:13
stopped [3] - 113:1, 122:4, 122:5
stored [1] - 110:21
stores [3] - 104:20, 104:21, 105:25
stories [1] - 50:14
story [5] - 8:17, 8:22, 50:14, 98:14, 115:23
straight [1] - 129:20
strain [1] - 85:18
strategic [6] - 73:22, 74:4, 74:12, 74:14, 75:11, 75:16
strategies [2] - 61:21, 61:23
streamline [1] - 75:8
Street [15] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:19, 4:21, 4:24, 5:5, 5:12, 6:6, 6:13
street [1] - 98:1
strike [2] - 104:16, 105:25
string [3] - 17:13, 40:20, 40:23
strong [2] - 91:11, 115:23
strongly [1] - 146:17
struck [1] - 10:6
structure [2] - 54:23, 88:8
stubborn [1] - 40:7
stuck [2] - 54:14, 128:19
studied [4] - 19:2, 59:8, 86:6, 88:2
studies [6] - 68:13, 79:4, 80:10, 82:2, 87:15, 89:2
study [9] - 19:2, 78:22, 79:2, 80:13, 81:16, 81:17, 82:17, 83:8
stuff [2] - 27:22, 52:6

stunning [1] - 77:21
subject [4] - 85:11, 86:8, 115:6, 117:18
submit [7] - 14:15, 20:23, 39:9, 59:19, 94:5, 94:10, 125:8
submitted [4] - 10:11, 21:1, 95:15, 120:21
submitting [1] - 41:17
subpoenaed [1] - 9:14
subsection [2] - 114:4, 114:15
subsequent [4] - 67:15, 80:7, 82:12, 133:11
subset [3] - 27:9, 135:1, 135:2
substance [5] - 87:4, 92:20, 111:15, 121:15, 139:8
substances [7] - 22:13, 106:20, 110:19, 111:13, 114:8, 114:21, 117:11
Substances [10] - 13:10, 22:18, 27:24, 28:3, 28:5, 28:10, 30:19, 51:7, 118:9, 126:3
substantial [11] - 9:8, 22:13, 24:12, 25:18, 25:23, 27:13, 27:15, 46:13, 46:15, 52:12, 80:15
substantially [2] - 114:13, 115:4
substitute [1] - 89:6
substitutes [1] - 89:12
subvert [1] - 96:17
successes [1] - 70:7
suffered [1] - 29:14
suffering [4] - 19:25, 20:5, 56:8, 85:18
sufficient [6] - 14:5, 27:14, 32:18, 37:3, 111:24, 131:25
suggest [5] - 98:25, 111:23, 134:8, 144:25
suggested [3] - 97:2, 127:18, 127:25
suggesting [3] - 34:11, 51:5, 74:15
suggestion [1] - 118:12
suggestions [1] - 133:3
Suite [9] - 2:4, 2:7, 2:10, 2:13, 3:15, 4:6,

4:9, 6:5, 6:12
sum [3] - 96:2, 105:1, 132:4
summarize [1] - 15:1
summarizing [1] - 119:16
summation [2] - 14:8, 50:2
Summit [1] - 53:23
super [1] - 144:16
superseding [1] - 51:18
supervisor [1] - 124:4
supplier [1] - 45:19
supply [24] - 25:18, 25:23, 60:19, 71:19, 80:11, 80:14, 80:22, 81:1, 84:25, 87:16, 88:12, 96:20, 123:4, 123:5, 133:22, 134:21, 135:1, 138:7, 138:8, 139:13, 141:6, 141:10, 142:4
support [7] - 17:22, 22:5, 32:8, 70:6, 85:18, 91:24, 111:25
supporting [3] - 39:10, 49:24, 68:12
supportive [1] - 32:14
supports [1] - 31:15
supposed [3] - 37:1, 129:10, 129:15
Supreme [4] - 43:3, 45:3, 45:18, 45:24
surface [1] - 67:6
surplus [1] - 146:6
surprise [1] - 120:16
surveillance [3] - 61:24, 84:6, 84:8
suspend [1] - 124:8
Suspension [1] - 120:14
suspension [4] - 120:24, 121:2, 121:5, 121:10
suspensions [1] - 128:11
suspicion [1] - 132:1
suspicious [31] - 22:24, 31:11, 35:21, 97:5, 101:19, 108:9, 114:7, 114:10, 114:11, 114:20, 114:25, 115:1, 115:3, 116:23, 117:4, 117:10, 119:7, 119:11, 119:14, 119:18, 122:5, 122:10,

122:24, 123:2,
123:3, 123:16,
124:7, 124:9,
124:21, 131:4, 133:5
**Suspicious** [11] -
33:21, 96:24, 114:3,
116:17, 116:21,
117:18, 120:3,
122:17, 123:15,
124:1, 145:2
**Sustainability** [2] -
89:24, 92:10
**sustainability** [1] -
92:4
**sustainable** [2] - 94:8,
94:12
**SUZANNE** [1] - 4:20
**syllabus** [1] - 28:17
**syllogism** [1] - 12:1
**Syndrome** [2] - 19:17,
75:5
**synonym** [1] - 33:10
**System** [5] - 33:21,
116:17, 122:17,
123:16, 145:3
**system** [26] - 12:17,
24:18, 27:6, 28:1,
35:5, 36:14, 36:22,
36:23, 36:25, 39:11,
48:23, 67:6, 84:6,
110:12, 114:6,
114:20, 115:21,
117:9, 117:14,
125:17, 125:18,
125:24, 127:14,
129:3, 140:8
**systemic** [5] - 35:3,
35:13, 38:22,
110:12, 110:16
**systems** [3] - 35:2,
85:18, 99:5
**systemwide** [1] - 99:1

**T**

**tab** [1] - 43:3
**tactic** [1] - 77:6
**tag** [1] - 54:24
**takeaways** [1] -
102:11
**talks** [1] - 84:11
**tank** [3] - 35:25, 36:7
**tank's** [1] - 36:3
**Tate** [1] - 44:9
**team** [3] - 64:18,
83:21, 120:8
**Team** [2] - 126:12,
126:21
**teams** [1] - 33:1
**Teams** [1] - 83:18

**technical** [3] - 26:6,
26:18, 46:6
**technically** [1] -
144:19
**technological** [1] -
126:18
**technology** [3] -
100:20, 116:18,
127:10
**Ted** [1] - 102:7
**teenagers** [1] - 66:2
**TEMITOPE** [1] - 4:13
**temporarily** [1] - 7:24
**ten** [5] - 20:4, 22:21,
56:5, 57:3, 128:20
**ten-minute** [1] - 57:3
**Tenth** [1] - 5:12
**tenure** [1] - 133:14
**term** [3] - 15:7, 61:25,
85:17
**terminated** [1] -
109:12
**terms** [4] - 23:22,
30:9, 61:24, 115:6
**test** [3] - 29:11, 116:21
**tested** [1] - 35:1
**testified** [75] - 9:12,
19:14, 20:19, 24:17,
25:16, 26:2, 27:23,
30:23, 31:1, 31:5,
36:18, 38:5, 46:18,
48:4, 48:14, 50:6,
50:16, 54:21, 54:23,
64:2, 64:4, 64:8,
64:9, 64:10, 64:14,
64:16, 65:6, 66:6,
67:11, 67:17, 67:20,
67:23, 68:1, 68:4,
71:5, 73:2, 75:15,
77:1, 77:2, 78:9,
79:12, 81:8, 81:19,
83:6, 84:13, 86:14,
86:23, 87:9, 88:8,
88:10, 89:10, 90:7,
90:12, 90:22, 90:23,
91:6, 91:20, 92:20,
93:17, 99:8, 99:9,
100:10, 100:25,
101:6, 102:7,
102:14, 104:4,
118:22, 119:19,
120:17, 122:18,
123:25, 124:21,
129:21, 131:4
**testify** [4] - 23:2, 82:8,
99:17, 131:12
**testifying** [3] - 70:16,
70:24, 132:20
**testimony** [54] - 11:1,
18:18, 22:23, 23:1,

25:21, 25:22, 26:1,
26:16, 35:10, 35:12,
51:6, 55:9, 60:8,
60:10, 60:16, 63:10,
65:15, 68:11, 68:12,
69:20, 76:3, 77:20,
80:9, 81:7, 83:17,
85:12, 88:7, 88:16,
89:23, 91:17, 95:17,
100:7, 101:1, 101:7,
102:6, 102:8,
104:21, 104:22,
106:12, 107:4,
107:10, 110:24,
116:5, 119:15,
120:10, 125:8,
126:25, 129:13,
130:8, 130:9, 132:8,
141:2, 145:11
**testing** [2] - 117:13,
122:16
**Texas** [1] - 125:12
**THE** [49] - 1:1, 1:1,
1:4, 1:17, 7:5, 7:7,
7:21, 8:1, 8:3, 11:4,
11:8, 11:13, 11:17,
14:19, 16:10, 16:14,
42:23, 43:10, 43:19,
44:3, 52:18, 52:23,
53:7, 53:25, 57:2,
57:25, 58:5, 58:8,
58:10, 58:13, 63:4,
80:21, 94:19, 94:25,
95:3, 95:6, 95:8,
95:20, 95:22, 95:24,
106:2, 106:7,
121:20, 121:24,
126:1, 128:15,
128:18, 128:25,
146:22
**theft** [1] - 70:5
**theme** [1] - 47:14
**themes** [1] - 9:3
**themselves** [3] - 20:7,
132:12, 143:11
**theory** [3] - 25:24,
54:14, 124:14
**Therapeutic** [1] -
19:13
**therapy** [1] - 84:12
**there'll** [1] - 21:16
**thereafter** [1] - 28:18
**Therefore** [1] - 70:7
**therewith** [1] - 127:6
**They've** [5] - 59:23,
94:2, 138:11
**they've** [9] - 21:12,
38:6, 46:6, 51:6,
51:15, 51:17, 51:19,
54:14, 111:24

**thin** [1] - 105:1
**thinking** [1] - 32:25
**third** [6] - 60:24,
101:19, 113:19,
113:20, 115:3,
121:12
**Third** [1] - 136:5
**Thomas** [4] - 2:10,
11:19, 13:5, 123:10
**Thompson** [1] - 95:18
**thousand** [8] - 9:8,
18:23, 28:25, 29:4,
32:5, 51:23, 78:18
**thousands** [3] - 74:5,
91:12, 131:11
**threat** [12] - 23:3,
68:22, 69:6, 70:19,
71:1, 71:12, 71:15,
71:22, 72:22, 90:11,
91:22, 107:17
**threatened** [2] - 28:21,
29:5
**threats** [3] - 68:21,
68:24, 72:12
**Three** [2] - 6:5, 74:17
**three** [31] - 6:12, 9:10,
11:23, 16:6, 16:16,
18:19, 35:11, 35:20,
36:6, 36:8, 37:11,
38:11, 39:20, 43:25,
44:17, 44:18, 46:12,
58:22, 74:25, 76:15,
82:20, 84:5, 86:20,
101:12, 104:19,
104:23, 105:20,
119:5, 120:8, 121:3
**three-times** [2] -
35:20, 36:6
**threshold** [15] - 37:6,
37:16, 37:17, 37:21,
37:25, 106:18,
108:21, 108:22,
108:25, 109:2,
115:15, 117:1,
127:19, 127:23
**thresholds** [4] - 37:15,
127:15, 128:8, 131:3
**throes** [2] - 84:10,
86:10
**throughout** [16] -
8:20, 18:5, 20:9,
62:20, 63:13, 65:15,
65:24, 66:10, 66:11,
66:16, 66:25, 81:21,
90:5, 92:21
**throw** [1] - 51:17
**tick** [1] - 17:17
**tied** [1] - 107:8
**timeline** [3] - 116:13,
116:14, 116:15,

**124:18, 128:11
**timely** [1] - 116:24
**TIMOTHY** [1] - 5:9
**tiniest** [2] - 131:15,
131:16
**tip** [1] - 72:3
**tired** [1] - 37:24
**today** [26] - 7:10, 8:4,
8:7, 12:11, 17:23,
19:14, 21:12, 34:18,
56:20, 57:15, 57:24,
58:17, 58:23, 59:13,
59:18, 60:7, 60:9,
60:23, 61:8, 63:2,
76:6, 77:8, 87:13,
89:1, 115:23, 128:16
**today's** [1] - 42:7
**together** [26] - 14:7,
21:9, 48:7, 53:5,
58:20, 73:5, 73:8,
73:19, 74:8, 75:2,
75:11, 75:17, 75:19,
75:22, 75:24, 76:5,
77:2, 77:7, 89:18,
90:1, 94:2, 94:7,
95:10, 116:21,
119:25, 121:16
**Tom** [1] - 10:12
**tomorrow** [12] - 7:14,
8:6, 8:7, 47:14,
56:22, 57:1, 57:15,
57:17, 57:23, 58:1,
76:6, 90:19
**took** [13] - 10:19,
10:21, 41:2, 80:13,
84:22, 85:23, 85:25,
107:6, 115:9,
119:20, 120:5,
132:24, 133:2
**tools** [1] - 93:5
**top** [13] - 20:16, 20:17,
41:1, 47:8, 48:9,
86:19, 103:1, 103:2,
105:3, 105:9,
105:12, 105:14,
146:6
**topics** [1] - 11:22
**toppled** [1] - 50:25
**Tort** [1] - 17:12
**tort** [1] - 47:21
**torts** [1] - 17:16
**total** [2] - 105:1, 132:4
**totally** [1] - 122:12
**totals** [1] - 69:16
**touch** [5] - 37:9,
81:10, 88:3, 89:15,
111:20
**touched** [7] - 65:11,
81:9, 84:15, 88:3,
89:8, 89:14, 90:25

towards [1] - 62:5
Tower [2] - 3:4, 4:23
town [4] - 32:4, 41:13, 44:12, 71:5
trace [1] - 27:3
tracing [1] - 27:1
trade [3] - 70:4, 79:24, 80:3
traffic [2] - 72:4, 106:21
trafficking [2] - 75:9, 143:21
tragic [1] - 69:9
train [1] - 118:14
trained [2] - 100:6, 118:6
training [3] - 99:18, 118:9, 118:11
transaction [2] - 38:9, 108:8, 113:24
transactions [3] - 34:1, 34:2, 38:19
transcript [3] - 6:19, 20:22, 148:4
transition [2] - 78:6, 88:5
transitioned [1] - 88:12
transportation [1] - 31:6
treat [2] - 90:3, 130:2
treated [1] - 94:1
treating [1] - 49:8
treatment [27] - 48:12, 48:19, 48:25, 49:18, 56:5, 61:24, 69:11, 70:8, 70:13, 74:17, 75:1, 75:3, 75:7, 84:1, 84:4, 84:10, 84:12, 87:10, 90:24, 91:3, 91:8, 91:13, 91:14, 93:4, 135:24
treatments [1] - 93:16
trees [1] - 63:5
tremendous [1] - 84:25
trend [1] - 72:13
trends [4] - 70:9, 77:18, 136:15, 136:19
Tri [1] - 109:21
Tri-State [1] - 109:21
Trial [1] - 147:2
TRIAL [1] - 1:16
trial [33] - 8:10, 8:20, 9:24, 11:1, 14:9, 18:5, 50:6, 56:17, 61:12, 66:16, 67:1, 84:13, 85:3, 90:5, 96:1, 96:5, 97:1,

97:2, 100:10, 102:8, 103:8, 103:25, 104:3, 104:18, 106:12, 113:12, 118:22, 121:7, 127:18, 134:4, 135:8, 135:17
tried [7] - 15:6, 104:25, 108:20, 110:11, 111:23, 116:1, 138:11
tries [1] - 8:17
trigger [3] - 36:4, 39:12, 131:5
triggered [3] - 36:25, 37:23, 131:11
tripped [1] - 37:24
tripping [1] - 105:8
Troy [1] - 10:20
trucks [1] - 97:25
true [12] - 8:17, 8:22, 18:10, 33:6, 38:15, 46:8, 112:15, 113:3, 113:5, 139:22, 139:23, 144:19
True [1] - 139:21
trust [1] - 77:6
truth [1] - 116:11
try [13] - 16:12, 35:22, 35:23, 42:19, 43:11, 48:7, 51:10, 51:12, 51:14, 52:16, 54:13, 75:12, 144:5
trying [8] - 48:2, 48:24, 49:18, 54:15, 54:17, 117:22, 140:10
tsunami [1] - 32:7
turn [4] - 69:18, 69:22, 116:2, 136:7
turned [1] - 118:13
turning [1] - 96:6
tweaked [1] - 115:15
Twelfth [3] - 4:19, 4:21, 5:5
two [44] - 7:12, 7:13, 7:14, 7:15, 10:11, 10:12, 14:6, 15:25, 16:23, 18:19, 23:18, 30:5, 30:7, 37:6, 43:15, 49:17, 52:7, 54:6, 68:24, 70:17, 74:12, 74:14, 76:2, 77:16, 82:11, 86:19, 90:6, 90:13, 95:10, 103:17, 104:20, 112:17, 116:20, 129:10, 132:15, 133:18, 137:5, 137:17, 137:24,

144:20, 145:6, 146:10, 146:24
two-hour [1] - 7:13
two-year [1] - 74:14
type [4] - 80:5, 90:9, 112:23, 125:25
types [1] - 77:16
typical [2] - 64:16, 64:22
typically [2] - 27:18, 67:22

U

U.S [1] - 91:7
ultimately [3] - 33:3, 49:17, 61:23
un-refuted [4] - 25:22, 27:24, 28:5, 51:5
unchallenged [2] - 96:25, 126:14
unclear [1] - 145:20
uncommonly [1] - 87:23
undeniably [1] - 47:23
under [15] - 28:20, 29:5, 30:3, 32:18, 33:18, 34:2, 36:15, 38:5, 47:21, 110:17, 110:20, 111:4, 113:16, 113:17, 122:21
undermined [1] - 103:6
undermines [1] - 130:10
undermining [1] - 69:11
underscored [1] - 23:23
understating [1] - 137:21
understood [1] - 52:24
undersupply [1] - 104:12
undertaking [1] - 110:23
underused [1] - 28:17
undisputed [11] - 9:11, 9:17, 9:19, 18:16, 24:10, 31:25, 35:9, 36:14, 60:21, 85:3, 111:4
unexplained [2] - 134:17, 134:21
uninterrupted [1] - 25:22
uniquely [1] - 76:23
unit [2] - 19:12, 69:24

Unit [1] - 19:13
United [13] - 7:2, 23:14, 24:5, 25:19, 27:17, 27:25, 42:14, 43:2, 45:3, 45:18, 45:24, 135:20
UNITED [2] - 1:1, 1:17
University [3] - 19:1, 66:5, 76:16
unlawful [1] - 12:5
unlawfully [3] - 13:22, 44:25, 45:9
unless [3] - 36:4, 39:18, 39:19
unmentioned [1] - 103:19
unproven [1] - 142:7
unquote [2] - 110:12, 131:6
unreasonable [20] - 28:20, 31:19, 32:6, 32:14, 32:19, 33:17, 42:11, 97:10, 98:19, 98:21, 101:9, 104:15, 105:24, 110:7, 110:8, 110:9, 133:19, 141:25, 142:1, 142:7
unreasonably [1] - 32:21
unstable [1] - 92:12
unsurprisingly [1] - 108:5
untenable [1] - 122:13
untoward [1] - 103:4
unusual [6] - 34:3, 114:12, 114:13, 115:4, 115:5, 115:16
unwilling [1] - 141:17
up [43] - 7:25, 9:5, 9:6, 9:12, 10:9, 20:10, 25:7, 26:7, 31:8, 32:11, 33:9, 34:13, 36:4, 36:9, 37:23, 43:19, 44:16, 47:7, 50:5, 52:21, 55:3, 56:24, 71:8, 71:9, 77:7, 83:9, 83:10, 91:12, 91:23, 93:7, 95:1, 96:2, 97:25, 98:5, 100:16, 108:22, 113:9, 120:19, 126:12, 131:19, 132:20
update [1] - 127:13
useful [2] - 116:24, 117:16
users [4] - 55:24, 56:7, 89:6, 93:19
uses [3] - 22:19,

24:25, 89:7
utilize [2] - 44:24, 45:9
utilized [1] - 89:21

V

validate [2] - 41:18, 42:4
value [1] - 52:11
valve [1] - 36:3
varied [1] - 65:25
various [11] - 33:8, 59:4, 73:6, 76:4, 79:12, 83:11, 86:22, 88:1, 92:5, 93:1
vast [2] - 55:11, 70:2
vehemently [1] - 122:8
Ventura [1] - 3:15
venture [1] - 9:20
verbatim [1] - 118:14
verbatim) [1] - 63:24
verdict [3] - 17:20, 32:11, 32:12
verification [2] - 111:6, 113:18
versus [2] - 56:2, 93:23
vetted [1] - 41:11
via [1] - 95:17
Vice [2] - 23:5, 30:23
victims [1] - 64:4
video [5] - 8:21, 10:7, 10:10, 13:5, 60:25
view [1] - 80:21
vindicate [1] - 17:11
violation [2] - 28:4, 118:13
VIRGINIA [2] - 1:1, 1:18
Virginia [46] - 4:24, 7:3, 8:5, 9:22, 15:22, 16:7, 17:15, 18:9, 18:22, 19:1, 19:4, 19:7, 19:15, 20:1, 21:7, 22:21, 24:1, 26:14, 26:24, 27:10, 27:16, 29:10, 33:14, 38:20, 40:1, 41:5, 44:4, 47:7, 52:4, 53:6, 69:4, 78:10, 78:23, 79:20, 80:19, 81:14, 81:23, 86:5, 86:19, 97:6, 102:15, 121:9, 135:19, 136:11, 143:10
Virginians [1] - 62:11
virtually [1] - 114:1
visibility [2] - 142:11, 142:12

**visit** [2] - 41:17, 50:8
**visited** [4] - 101:3, 109:14, 109:15
**visits** [1] - 56:5
**voice** [4] - 7:25, 16:12, 56:24, 60:7
**Volume** [6] - 24:19, 26:1, 31:11, 43:3, 134:2, 134:7
**volume** [34] - 25:6, 32:1, 32:23, 33:11, 33:13, 33:14, 33:19, 34:21, 35:7, 37:9, 39:7, 41:24, 44:15, 45:2, 45:8, 45:23, 46:12, 67:18, 88:9, 97:18, 97:22, 106:17, 108:15, 109:1, 134:3, 135:8, 135:11, 135:14, 138:2, 138:22, 141:20
**VOLUME** [1] - 1:16
**voluminous** [1] - 18:6
**vs** [1] - 148:6

**W**

**wait** [1] - 145:14
**WAKEFIELD** [1] - 5:13
**Walgreen's** [2] - 104:20, 105:25
**walk** [4] - 17:21, 26:8, 30:21, 32:19
**walked** [4] - 19:23, 26:12, 36:20, 112:9
**walks** [1] - 65:2
**Waller** [5] - 54:20, 80:1, 88:16, 88:23, 91:5
**Waller's** [1] - 88:7
**wants** [1] - 57:21
**warehouse** [2] - 31:4, 31:7
**warm** [1] - 94:25
**warned** [1] - 35:15
**Washington** [6] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12
**watching** [1] - 63:24
**water** [10] - 35:25, 36:2, 36:3, 36:5, 36:7, 36:8, 36:9, 121:19, 127:12
**Waterhouse** [1] - 102:7
**Wayne** [1] - 74:22
**ways** [2] - 14:20, 87:11
**WEBB** [1] - 3:11

**Webb** [2] - 3:12, 104:24
**website** [1] - 125:3
**weeds** [1] - 33:22
**week** [4] - 62:23, 103:25, 109:15, 134:6
**weeks** [4] - 61:6, 95:10, 97:13, 112:10
**weight** [1] - 18:16
**welfare** [4] - 22:14, 22:20, 60:14, 87:4
**well-constructed** [1] - 145:25
**well-founded** [1] - 61:18
**well-intentioned** [1] - 135:3
**Werthammer** [4] - 19:9, 19:10, 23:9, 87:19
**WEST** [2] - 1:1, 1:18
**West** [46] - 7:3, 8:5, 9:22, 15:22, 16:7, 17:14, 18:9, 18:21, 19:1, 19:3, 19:7, 19:15, 20:1, 21:7, 22:21, 24:1, 26:14, 26:24, 27:10, 27:16, 29:10, 33:14, 38:20, 40:1, 41:5, 44:4, 47:7, 52:4, 53:6, 62:11, 69:4, 78:10, 78:22, 79:20, 80:19, 81:14, 81:23, 86:5, 86:19, 97:6, 102:15, 121:9, 135:19, 136:11, 143:9
**Whack** [1] - 42:2
**whatsoever** [2] - 103:15, 111:3
**whole** [5] - 17:13, 37:4, 51:11, 105:17, 116:7
**wholesale** [2] - 12:5, 101:23
**wholesaler** [3] - 44:11, 45:3, 45:13
**WICHT** [4] - 4:18, 95:7, 95:9, 95:21
**Wicht** [1] - 95:20
**wide** [2] - 93:9, 93:21
**widespread** [5] - 62:20, 63:11, 64:9, 65:22, 66:10
**Wiley** [2] - 43:13, 43:14
**Williams** [7] - 4:18, 5:4, 68:1, 73:2, 75:15, 77:1, 90:22

**Williams's** [1] - 66:14
**willing** [1] - 49:2
**winning** [1] - 50:14
**withdrawn** [1] - 14:17
**withhold** [1] - 96:18
**witness** [8] - 8:11, 8:12, 10:2, 10:3, 10:4, 10:5, 10:6, 10:17, 11:18, 34:9, 47:15, 54:19, 62:18, 85:24, 88:22, 91:5, 96:8, 107:10, 118:22, 132:17, 135:12, 135:25
**witnessed** [2] - 59:6, 86:5
**witnesses** [46] - 8:10, 8:21, 10:7, 10:11, 10:12, 14:6, 20:12, 20:13, 20:18, 23:4, 34:15, 59:1, 59:9, 61:12, 62:22, 68:17, 78:7, 80:24, 81:7, 87:25, 90:5, 90:16, 92:4, 92:6, 93:25, 96:25, 97:15, 99:7, 99:16, 99:20, 101:15, 113:14, 115:17, 116:3, 118:19, 127:18, 127:24, 129:10, 132:15, 133:18, 135:9, 135:10, 135:23, 136:3, 136:15
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**women** [2] - 75:8, 87:9
**Women's** [1] - 23:10
**word** [5] - 25:2, 33:16, 44:13, 103:13, 129:6
**words** [7] - 13:1, 33:8, 126:6, 130:17, 130:18, 141:23, 144:13
**worker** [1] - 83:22
**workers** [2] - 56:19, 63:16
**Workman** [1] - 15:10
**works** [3] - 48:8, 77:3, 89:20
**worry** [1] - 121:24
**worth** [4] - 49:12, 107:16, 118:5, 142:18
**wound** [1] - 132:20
**wrap** [1] - 93:7
**Wright** [3] - 123:24, 123:25, 124:10
**Wright's** [1] - 124:4

**writ** [1] - 52:11
**write** [2] - 33:4, 43:14
**writing** [1] - 99:25
**written** [8] - 22:10, 31:22, 51:8, 91:7, 92:9, 98:3, 135:3, 138:17
**wrote** [6] - 8:13, 43:13, 46:10, 53:7, 70:25, 108:1
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10, 3:13, 4:24, 5:15, 6:9
**WVU** [4] - 43:7, 59:4, 77:14, 86:3

**X**

**XXIII** [1] - 40:8

**Y**

**Yale** [1] - 43:17
**year** [12] - 9:15, 24:4, 26:24, 62:12, 63:24, 74:14, 77:22, 78:10, 102:23, 108:16, 118:4, 137:12
**yearly** [1] - 145:16
**years** [15] - 62:24, 67:15, 67:16, 70:17, 70:22, 80:7, 92:22, 102:3, 103:3, 108:23, 112:5, 116:20, 126:11, 129:23, 145:11
**years'** [1] - 107:16
**yellow** [2] - 19:19, 103:1, 103:12
**yellowed** [1] - 103:18
**Yingling** [3] - 66:4, 85:8, 85:23
**York** [1] - 3:5
**Young** [2] - 87:2
**young** [4] - 19:16, 19:17, 63:21, 65:25
**yourself** [2] - 38:16, 40:20

**Z**

**Zealand** [1] - 77:14
**Zerkle** [2] - 67:13, 67:23
**zero** [3] - 15:23, 110:9, 145:16
**Zimmerman** [14] - 23:4, 30:22, 99:8, 99:22, 110:23, 116:20, 120:16,

121:2, 122:16, 123:8, 125:1, 125:4, 125:15, 129:7