IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
```

BENCH TRIAL - VOLUME 40
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

JULY 28, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC 20004

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087

Court Reporter:                    Ayme Cochran, RMR, CRR
Court Reporter:                    Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

 1             PROCEEDINGS had before The Honorable David A.

 2    Faber, Senior Status Judge, United States District

 3    Court, Southern District of West Virginia, in

 4    Charleston, West Virginia, on July 28, 2021, at 9:00

 5    a.m., as follows:

 6             THE COURT:  Good morning.

 7         You may go forward, Ms. Mainigi, when you're ready.

 8             MS. MAINIGI:  Thank you, Your Honor.

 9         Your Honor, the plaintiffs put on a long case, but they

10    spent a long time on issues that were not in dispute.

11         Most of their witnesses talked about whether Cabell

12    County and Huntington have experienced an opioid epidemic.

13    But all three defendants told Your Honor from day one that

14    we're not disputing the opioid problem.

15         The question, rather, is whether the defendants engaged

16    in unreasonable conduct that caused harm in Cabell and

17    Huntington.

18         And over 32 trial days, the Court heard very little

19    about Cardinal Health's conduct.  Now, not counting the

20    McKesson and ABDC witnesses, plaintiffs called a total of 26

21    live witnesses.  Thirteen of them, Your Honor, were fact

22    witnesses.  Ten of those witnesses testified only about the

23    use of opioids or harms from drug addiction.  None of those

24    10 said a word about Cardinal Health.

25         The only live three fact witnesses that -- the only

1    three live fact witnesses that talked about Cardinal

2    Health's conduct were Mr. Rannazzisi, Michael Mone, and

3    Jesse Kave.  We will cover Mr. Rannazzisi's testimony in

4    detail later.  But he acknowledged that he doesn't know

5    anything about Cardinal Health since 2012.

6         And the testimony from Mr. Mone and Mr. Kave, the two

7    former Cardinal Health employees who testified, shows why

8    Cardinal Health's conduct was reasonable.

9         Now, Your Honor, there were also 13 expert witnesses.

10   And 10 of them also offered no opinions on Cardinal Health.

11        The three experts that did talk about us are the three

12   that you see lit up below.

13        Jakki Mohr said we engaged in marketing.  But she

14   didn't say any of our marketing was false or misleading or

15   improper in any way, or that we did anything wrong or caused

16   any harm.

17        Dr. McCann, as you know, just calculated what was

18   distributed into Cabell and Huntington and compared it to

19   other places.  He did not evaluate our conduct.

20        And then, of course, you've heard a lot about Mr.

21   Rafalski.  I'll come back to him.  But, essentially, he had

22   nothing to offer but *ipse dixit* conclusions without any

23   meaningful review of our systems or our procedures.

24        Now, plaintiffs during this entire trial did not

25   identify a single actual order that was suspicious that we

```
 1    shipped to a customer in Cabell or Huntington.  They gave

 2    the Court no specific evidence of our conduct to support a

 3    liability finding.

 4         And to the extent that they focused on us at all, Your

 5    Honor, it was about the overall volume of the prescription

 6    opioid orders that we shipped.  But volume does not equal

 7    wrongdoing.

 8         The evidence was overwhelming and uncontroverted.  What

 9    caused the increase in volume was the change in the standard

10    of care.  When the standard of care changed, doctors

11    prescribed more opioids to treat pain.  And the evidence

12    shows that they wrote those prescriptions in good faith.

13         Mr. Rannazzisi testified that 99 percent of doctors

14    were perfect.  And that's why the DEA increased the opioid

15    production quota year after year after year.  It decided the

16    increases were necessary to meet legitimate medical needs.

17         Now, Mr. Rannazzisi also told us he couldn't cut the

18    quota arbitrarily even if he thought some people were

19    abusing opioids because legitimate patients would be denied

20    their medication.

21         But that's what the plaintiffs are saying we should

22    have done.  They're coming here and saying that we should

23    have second-guessed the doctors and arbitrarily cut orders.

24         When you take Mr. Rafalski's now famous 90 percent

25    flagging number and you marry it up with the testimony that
```

```
 1   99 percent of doctors are perfect, those two just cannot
 2   come together, Your Honor.
 3        Now, Ms. Kearse when she spoke yesterday, she spoke in
 4   terms of over-supply.  And I think you asked her a question
 5   about that.
 6        On that issue, Mr. Rannazzisi himself admitted that
 7   supply does not drive demand.
 8             THE COURT:  There are economists that disagree
 9   with that.
10             MS. MAINIGI:  Excuse me, Your Honor?
11             THE COURT:  There are economists that would
12   disagree with that.
13             MS. MAINIGI:  There are economists that would
14   disagree with that.  But Mr. Rannazzisi was on the ground
15   and was increasing the quota year after year.  And he
16   testified supply does not drive demand, which I think is a
17   critical, critical point here.
18        And I think as Your Honor knows from having sat
19   through, very carefully through this trial, our view is that
20   the prescribing drives the demand.  And that demand is what
21   drives the supply.  And that determines the volume.
22        And as I said in the opening, Your Honor, distributors
23   are a mirror of what's happening in healthcare.  We reflect
24   it.  We don't drive it.
25        Now, plaintiffs did not just fail to put on evidence of
```

1  our conduct.  They ignored, in our view, the question of

2  causation.

3      At the end of this trial, there is no proof of a causal

4  link between Cardinal Health's conduct and the harms in

5  Cabell and Huntington.  All we have are Mr. Rafalski's

6  totally unsupported claims.  No one has tried to tie our

7  conduct to causing harm.

8      And no witness, even Mr. Rafalski, no witness has

9  accounted for the intermediate steps in the causal chain;

10  doctors prescribing, pharmacies dispensing, patients

11  diverting, and users misusing.  That wasn't discussed

12  yesterday or during trial.  And there's no witness that has

13  given the Court a basis to find that we were a direct cause.

14      So we're left with the failure of proof on every

15  dimension of plaintiffs' claim.  None of the evidence shows

16  Cardinal Health's conduct was unreasonable.  None of it

17  proves causation.

18      And on abatement, Your Honor, the relief that the

19  plaintiffs seek, it's not abatement.  It's not tethered to

20  the actual needs of Cabell and Huntington.  And it's not

21  tied to our conduct.

22      And this chart, Your Honor, will serve as a roadmap for

23  the issues that I intend to cover and the evidence that I

24  intend to bring to your attention.

25      So let me start with reasonableness.

1       I think where we're at, Your Honor, is that everyone

2    agrees that plaintiffs must prove that our conduct was

3    unreasonable.  So if the Court finds ultimately that our

4    conduct was reasonable, there is no liability here.

5       And here are some of the key facts that go into that

6    that are completely undisputed, Your Honor.  Cardinal Health

7    distributes only to pharmacies that are licensed by the

8    state and federal government.  And those pharmacies fill

9    prescriptions written by doctors who are also licensed by

10    the state and federal government.

11       The medications we distribute, as Your Honor knows, are

12    approved by the FDA and they're subject to quotas set by the

13    DEA.

14       Our West Virginia distribution center in Wheeling, the

15    only distribution center that has served Cabell and

16    Huntington, has been approved by the Board of Pharmacy and

17    has never been the subject of a DEA action.

18       There is no evidence of any of our many customers in

19    Cabell and Huntington diverting.  And there's no evidence in

20    all these days of trial of any specific order that we

21    shipped that we should not have shipped.

22       So how do plaintiffs get to unreasonable?  Well, as

23    Your Honor knows, the plaintiffs started their case by

24    saying that there was something unreasonable about all of

25    our Suspicious Order Monitoring Systems.  And we had days

1    and days and days of company witnesses.

2         But when that didn't pan out with the company

3    witnesses, their entire case became about volume, Your

4    Honor.  They doubled down on volume and volume alone.  They

5    argued yesterday, and they argued throughout this trial,

6    that the volume of prescription opioid orders we shipped was

7    inherently unreasonable.

8              THE COURT:  Is there some point at which the

9    number would be so great it would be unreasonable in and of

10   itself?

11             MS. MAINIGI:  I don't think volume alone can be

12   measured, Your Honor, because the volume has to be tethered

13   to something.  They have to provide the context for the

14   particular volume.

15        I think -- Mr. Nicholas went over -- let me give you an

16   example.  Mr. Nicholas went over this yesterday and I intend

17   to just cover it briefly today.

18        Dr. McCann and Ms. Keller both did different

19   calculations.  Dr. McCann did a calculation of distribution.

20   And -- excuse me.  Dr. McCann did a calculation of

21   distributions and Ms. Keller did a calculation related to

22   prescriptions.

23        And on cross-examination, Your Honor, she calculated

24   that the amount distributed into Cabell/Huntington in some

25   of these relevant years to the pill, to the pill matched up

```
1    with the prescriptions and the pills that were going out per

2    the prescriptions.

3        So I think in this case, Your Honor, when there is a

4    complete one-to-one match-up with the prescriptions that

5    were written on the one hand and the distributions that went

6    out from these three distributors on the other, that is

7    inherently reasonable.

8        And Mr. Rafalski, as I'll go over, Your Honor, backed

9    that up.  He said he wasn't aware of any order that was not

10   tied ultimately to a prescription.

11       And, in fact, Your Honor, this is a good time for me to

12   put up the testimony, one piece of testimony from Dr.

13   McCann.

14       Dr. McCann testified that prescriptions and

15   distributions are two sides of the same coin.  That was Dr.

16   McCann's testimony.  They're two sides of the same coin.

17   And, so, when those two sides --

18           THE COURT:  I'm sorry to interrupt you, but the

19   overflow room video is not working and we need to reboot it.

20   I'm sorry to interrupt you.

21           MS. MAINIGI:  No rush, Your Honor.  Should I wait

22   right here?

23       (Pause)

24           THE COURT:  Okay.  I guess we're ready to go.

25           MS. MAINIGI:  Okay.  Thank you, Your Honor.
```

1      So two sides of the same coin for distributions and

2   prescribing.

3      So if we want to understand the number of opioids that

4   were distributed in Cabell and Huntington, the real question

5   is why did the doctors write the number of prescriptions

6   that they wrote.

7      And the Court has heard testimony from the beginning of

8   this trial about that issue from both sides' witnesses.  And

9   I think you heard from Dr. Deer and Dr. Gilligan, for

10   example, that from the 1990s through the early 2010s, the

11   standard of care increasingly called for the use of opioids

12   to treat pain.  And doctors responded by doing that --

13   exactly that.

14      And Dr. Deer testified that increased prescribing was

15   entirely reasonable based on the information available at

16   the time.

17      So we've got two of the country's leading experts,

18   Dr. Tim Deer, who is from right here in Charleston, and

19   Dr. Chris Gilligan, who is from Harvard Medical School.

20      Dr. Deer was asked by West Virginia University to

21   actually draft the state's opioid prescribing guidelines.

22   And they both testified that the standard of care changed

23   starting in the mid 1990s to encourage greater use of

24   opioids.  And that trend continued until the last decade.

25   And that trend happened in West Virginia and it happened

1    nationally.

2           I'm going to put up, Your Honor, a chart that I used

3    with Dr. Deer.  This underlying chart, the blue and orange,

4    Your Honor, you may remember is the chart that Mr. Farrell

5    wheeled out in his opening and that he ultimately went over

6    with Dr. McCann.

7           And the blue and the orange bars are distributions of

8    oxycodone and hydrocodone in West Virginia.

9           And you can see that the distributions rose as the

10   standard of care evolved to encourage greater prescribing.

11   And then the distributions fell as the standard of care

12   evolved to prescribe fewer opioids.

13          And that makes sense because the distributors' role is

14   to ensure that medications are available for pharmacies to

15   fill legitimate prescriptions.  And that's exactly what

16   happened.  The distributions tracked the changing standard

17   of care.

18          Now, let me walk through the timeline, Your Honor, the

19   evolution of the standard of care.

20          Dr. Deer and Dr. Gilligan both explained that

21   prescribing opioids for chronic pain wasn't common in the

22   '80s and the early '90s.  Opioids were mainly used after

23   surgery or at the end of life.

24          In 1996 Purdue launched Oxycontin.  And around that

25   same time period, we saw the adoption of pain as the fifth

1    vital sign.  And that meant when a patient was treated at a

2    hospital or the V.A., they had to be asked their pain level.

3    And then doctors had to treat them to lower or eliminate

4    that pain.

5         And there were a lot of influential organizations that

6    embraced this idea at the time.  One of them was the

7    American Pain Society which was led by a prominent Johns

8    Hopkins physician.

9         Others in the community began to adopt this concept

10   pretty broadly.  And as I go through -- I'm not going to

11   pull out -- in the interest of time, Your Honor, I'm not

12   going to pull out documents to show you.  But I handed up to

13   the Court a binder of documents when we put Dr. Deer on.

14   And those -- that binder contains all of the documents that

15   are ultimately on this timeline.

16        So in 2000 the V.A. issued a pain as the fifth vital

17   sign tool kit.  And that instructed providers to evaluate

18   pain and initiate interventions to relieve it if it was

19   present at any level, any level.

20        And around that same time, hospitals started adopting

21   policies to treat the under-treatment of pain.

22        Now, we've heard a lot about the Joint Commission and

23   that's the body that accredits hospitals around the country.

24        Drs. Deer and Gilligan testified that in 2001 the Joint

25   Commission made pain as the fifth vital sign.  It made it

1    part of its accreditation standards.  And then we know, fast

2    forward, they ultimately got sued by the City of Huntington

3    for that reason.

4        Now, this change as part of the accreditation standards

5    required doctors to assess and address pain in every single

6    patient they saw in a hospital.  And, so, doctors responded,

7    as you would think they would respond, by prescribing more

8    opioids.

9        Mayor Williams got on the stand here at this trial and

10   testified that, yes, the City of Huntington sued the Joint

11   Commission because they thought pain as the fifth vital sign

12   caused the opioid epidemic.

13       Now, the DEA also helped change the standard of care.

14   In 2001 the DEA issued a joint statement with 21 health

15   organizations, including the AMA and The American Cancer

16   Society.  And that statement promoted pain relief.

17       The DEA said the under-treatment of pain was a serious

18   problem in the United States.  And it went on to say that

19   opioid medications are often the most effective way to treat

20   pain.  And they're the -- and most often, they're the only

21   treatment option that provides significant relief to

22   patients.

23       Now, while some of this stuff was happening nationally,

24   the same type of thing was happening in West Virginia, as we

25   know.

1          In 1997 -- and West Virginia was even a little bit

2     ahead of the curve.  In 1997 the State Board of Medicine put

3     out a statement telling doctors pain was under-treated.  And

4     it told doctors not to fear discipline for treating chronic

5     pain, chronic pain, not end of life pain, not cancer pain,

6     but chronic pain with opioid medication even in large doses.

7     And that "even in large doses" is a direct quote, Your

8     Honor.

9          So the next year in 1998 the State Legislature of West

10    Virginia made that statement official.  And they passed

11    something called the Intractable Pain Act.  And that act did

12    two major things.

13         First, it encouraged doctors to prescribe opioids more

14    freely.  And, second, it made clear that if they did,

15    disciplinary action would be limited.

16         Your Honor, if you don't mind, I'll just give you a

17    copy of the slides right now.  It might be easier to read

18    that.

19              THE COURT:  That would be great.  Thank you very

20    much.

21              MS. MAINIGI:  I think it's just a few pages in.  I

22    know it's a little tight on the chart.

23         So the Intractable Pain Act in 1998 encouraging doctors

24    to prescribe more opioids, and then making clear that if

25    they did, disciplinary actions would be limited.  And those

1    two actions in '97 and '98 helped to start shifting the

2    standard of care in West Virginia.

3        In 2001 the Board of Medicine in West Virginia issued a

4    joint policy statement on pain management at the end of

5    life.  And in that policy statement, they continued to

6    encourage the use of opioids for pain.  And they actually

7    said to doctors, "Don't shy away from prescribing opioids

8    just because they might be misused."

9        In 2005 the Board of Medicine again encouraged opioid

10   prescribing through another statement that went to doctors.

11   And that statement said under-treating pain --

12   under-treating pain constituted inappropriate treatment

13   which could expose a doctor to discipline.

14       So let's think about how quickly things changed.

15       In 1998 the Legislature felt they had to protect

16   doctors from getting in trouble for prescribing too many

17   opioids.  But by 2005 in West Virginia, the Board of

18   Medicine was telling doctors they could get in trouble for

19   not prescribing enough opioids.

20       Now, that same year in 2005 the state AG at the time

21   joined in.  And he and other Attorneys General wrote the DEA

22   to express their concern that there was too much focus on

23   anti-diversion and not enough focus on the treatment of

24   pain.

25       And Dr. Deer told us when he came to testify that that

 1    AG letter was reprinted in the Board of Medicine newsletter

 2    that went to every licensed doctor in the state.

 3        Now, West Virginia going into 2009 and 2010, West

 4    Virginia continued to promote opioids to treat pain.

 5        So in 2009, the Legislature actually amended the

 6    Intractable Pain Act, the one that was passed in 1998.  And

 7    they amended it to remove the word "intractable."

 8        Dr. Deer testified that this made it easier for doctors

 9    to prescribe opioids for patients with less severe pain, not

10    just intractable pain.  And they were able to prescribe for

11    less severe pain without a fear of consequence.

12        And in 2010 the Board of Medicine re-adopted the same

13    joint statement on pain management that it had put out in

14    2001.

15        Now, while all of these laws and policies were

16    changing, Dr. Deer explained to us that in the background of

17    all of this, continuing education for doctors also increased

18    opioid prescribing.

19        And I think that you've seen a few times, and I think

20    that you have a copy of, Your Honor, this book called

21    *Responsible Opioid Prescribing* by Dr. Fishman.  And this

22    book is important because it's, it's a key example of a book

23    that was handed out to doctors in West Virginia by the Board

24    of Medicine.  And the book essentially urges doctors to

25    prescribe opioids more liberally.  It was sent to every

1     doctor in West Virginia.

2          And the plaintiffs' own complaint said that

3     Dr. Fishman's book was a major reason that prescribing went

4     up in West Virginia.

5          And West Virginia wasn't alone.  There were a number of

6     states that actually sent that book out to doctors.  And I

7     think Your Honor even heard during trial an example of a

8     doctor who had to write a book report about Dr. Fishman's

9     book as part of a disciplinary action.

10          And Dr. Deer told us when he was here that the Board of

11     Medicine required doctors to watch a lecture by Dr. Fishman

12     in order to renew their licenses.

13          So Dr. Deer concluded that all of these laws, education

14     programs and policies, those resulted in the increased

15     opioid prescribing across the state.

16          Now, what he also testified to was that doctors who

17     were doing that prescribing were acting reasonably and

18     following the standard of care.  And he was asked that

19     question and he said, "I think at the time, the vast

20     majority of those doctors were acting within reasonable

21     medical standards and standard of care."

22          And you saw from the chart, Your Honor, that as

23     prescribing went up, distributions, of course, went up too.

24          So we come back to the timeline.  The standard of care

25     pendulum begins to shift around 2012 in West Virginia.  And

1    it starts to shift in the other direction.

2         And in that year, in 2012, the West Virginia

3    Legislature passed the Controlled Substances Monitoring

4    Program and Chronic Pain Clinic Licensing Act.  It's a

5    mouthful of an act.  And this act did two things also.

6         It required doctors to check a prescribing database to

7    spot doctor-shopping.  Now, why was that important?  Because

8    there were people that were going to multiple doctors

9    perhaps to get the same prescription.

10        So doctors now actually had to take -- had to check a

11   database that was available to them, not available to

12   distributors, but available to them as physicians to see if

13   anyone else, any other doctor had prescribed a controlled

14   substance to that same patient.  The act also required pain

15   clinics to have special licenses.

16        Now, in the last several years in particular, the

17   medical community, as well -- in West Virginia, as well as

18   the rest of the country, has moved towards more conservative

19   prescribing of opioids.

20        In 2016 the seminal event was that the CDC issued new

21   guidelines that recommended quantity and dosage limits for

22   prescribing opioids, actual limits on how much opioids one

23   could prescribe.

24        So West Virginia followed.  And later that year, a

25   panel of doctors that was led by Dr. Deer issued the SEMP

1    guidelines.  And the purpose of the SEMP guidelines was to

2    essentially translate the CDC guidelines into practical

3    advice for physicians in West Virginia.

4        Then in 2018 the -- the West Virginia Legislature took

5    even stronger action and they passed the West Virginia

6    Opioid Reduction Act which for the first time limited the

7    number of pills doctors could prescribe.

8        And, so, you see ultimately prescriptions falling.  And

9    as prescriptions fell, distributions fell.

10       What was striking about the issue of standard of care,

11   Your Honor, throughout this trial was how much of the

12   standard of care evidence actually came from the plaintiffs'

13   own witnesses long before we got to Dr. Gilligan and Dr.

14   Deer in our case.

15       So Dr. Werthammer was a plaintiffs' witness.  He's the

16   former Chief Medical Officer at Marshall Health.  And

17   Dr. Werthammer agreed that pain as the fifth vital sign led

18   to more liberal opioid prescribing.

19       Dr. Gupta, who was the Health Commissioner and

20   Secretary of the Board of Medicine, he testified that most

21   doctors in the state were prescribing in line with the

22   standard of care and trying to do the right thing.  And he

23   said that prescribing opioids to treat pain was their

24   education.  It was their understanding.  And it was their

25   culture.

 1          Dr. Corey Waller, who was the plaintiffs' very first
 2     witness who talked about molecules, he confirmed the
 3     standard of care change.  And he also said pain had to be
 4     treated, and the general gestalt in the medical community
 5     was that prescription opioids were the only way to do it.
 6          Even Dr. Katherine Keyes, plaintiffs' epidemiologist,
 7     she agreed that opioid prescribing rose from the late '90s
 8     until 2010.  And she said -- I'll read this out loud.
 9          "As I've said before, the doctor is making a
10     determination based on their understanding of the risks and
11     benefits of a particular opioid prescribing, which itself
12     has changed over time.  You know, certainly, the
13     recommendations for prescribing have changed quite a lot
14     over the last 10 years."
15          Now, Dr. Kevin Yingling who's local to Marshall, he
16     testified that he also came to believe that pain was
17     under-treated in the late 1990s.  And he said doctors were
18     urged to treat pain more aggressively.  He said he and other
19     local doctors prescribe more opioids in part because of pain
20     as the fifth vital sign.
21          And one of the other things he said, as you see at the
22     bottom, Your Honor, is distributors have never had an effect
23     on his prescribing behavior.
24          Now, he also told us, Your Honor, that there's a debate
25     in the medical community that's going on still today as to

whether opioid prescribing restrictions have now gone too far, whether they are too strict, and whether they are actually now hurting patients in real pain.

Now, Your Honor, to be clear, we do not think that Your Honor is tasked with deciding whether the standard of care for prescribing opioid medications in retrospect was right or wrong.  You don't have to decide that in our view.

But what the Court has to evaluate here is whether defendants' conduct, including their shipments over time, was reasonable in light of the standard of care and its impact on prescribing.

So whether it was right or wrong, there's no dispute about the change in the standard of care.  And there's no dispute that distributors played no role in that change. Not a single witness testified to that fact.

And what we know from Dr. Gilligan and others is that opioids, like all medications, have always carried risks. He testified that it was inevitable that with the prescribing of opioids comes some level of abuse and addiction, but that doctors must make the decision on how to strike that balance.

Now, I think some of this testimony got shown to you yesterday, Your Honor.  And, and the plaintiffs put it out there as something that somehow supports the idea of foreseeability.  But I, I think that they are missing the

1    point.

2         I think what this testimony supports is that doctors

3    have to make the decision on a patient-by-patient basis

4    whether the risks of opioids outweigh the benefits.  And the

5    distributors do not have the information or the medical

6    expertise to make that decision, and they should not ever be

7    put in the position of trying.

8         Distributors cannot unilaterally decide to stop

9    shipping an FDA approved medication simply because a certain

10   portion of the population may experience what is known as a

11   known risk.

12        Now, Mr. Rannazzisi even testified and agreed that

13   distributors have never been required to monitor prescribers

14   or prescribing practices.  He said we never required them to

15   look at what doctors were doing, questioning a doctor's

16   prescribing habits.

17        Speaking of the DEA, there's another important place

18   where the change in the standard of care was reflected, Your

19   Honor, and that's the DEA opioid quota.

20        So we put Dr. Deer's timeline back up.  This shows, as

21   I mentioned, the West Virginia distribution.  I think we

22   also showed you at some point during trial the DEA quota

23   chart.

24        And if we can put that up, the point that I want to

25   make, Your Honor, is that the quota trend line matches the

1   distribution trend line which, again, makes perfect sense

2   because the DEA sets the quota every year based on

3   legitimate medical needs.  That is how they are obligated to

4   set the quota, based on legitimate medical need.  And every

5   year, they've raised the quota because the standard of care

6   was changing.

7        Now, to his credit, Mr. Rannazzisi fully acknowledged

8   that he approved major quota increases.  And when Ms. Singer

9   asked him why he approved such large increases over his 10

10  years as the head of DEA enforcement, he said it was to

11  ensure that there was enough quota for patients.

12       So as more prescriptions were going out of pharmacies

13  and hospitals, the quota was increased by the DEA to meet

14  the patients' medical needs.

15       Now, stepping back, Your Honor, given where Cardinal

16  Health sits and their vantage point, the increasing orders

17  that Cardinal Health was receiving made perfect sense.

18       If Cardinal Health looked downstream, it saw what

19  everyone else was seeing; that doctors across the country

20  were prescribing more opioids.

21       And if it looked upstream, it saw that the DEA was

22  publicly saying that 99 percent of doctors are prescribing

23  opioids appropriately and the DEA was finding that

24  legitimate medical need was increasing year after year and

25  raising the quota.

 1          So there is absolutely no reason, Your Honor, why the

 2     increasing orders pursuant to the changing standard of care

 3     and the DEA quota, there's no reason why those orders should

 4     have been alarming to Cardinal Health.

 5          Now, the plaintiffs have focused on the

 6     Cabell/Huntington volume.  And they've said, well, maybe the

 7     standard of care explained what was happening nationally,

 8     but you can't explain the volume coming into Cabell and

 9     Huntington.  And I think they're wrong about that.

10          Now, before we unpack the reasons why and the evidence

11     that we saw at trial, I just want to remind Your Honor of

12     one thing.

13          And that is as Dr. McCann testified, going back as

14     early as 1998, DEA has published on its website the volume

15     of prescription opioids shipped down to the three-digit zip

16     codes.

17          So back to 1998, that data was available to anyone who

18     wanted it, including city and county officials.

19          But before this lawsuit was filed, no one, not the DEA,

20     not the State of West Virginia, not the plaintiffs, ever

21     said that the raw volume of opioids being shipped to Cabell

22     or Huntington was too high or that distributors should have

23     shipped fewer pills.

24          So let me turn to five pieces of evidence from trial

25     that inform specifically the volume shipped to Cabell County

1    and Huntington.

2         Now, the first one is the one that, that I went over

3    with Your Honor.  And I think taking a look at the chart,

4    one of the charts that Mr. Nicholas showed you yesterday,

5    this chart described the prescribing in Cabell/Huntington

6    from Ms. Keller lining up with the distributions from Dr.

7    McCann.

8         But if we keep going to the next slide, we see the

9    calculation that was actually done by Ms. Keller.  And I

10   think on cross Ms. Wicht asked her to do the math.  And

11   Dr. Keller got the math right when she did it on cross.

12        And what she calculated, that the prescriptions that

13   she had information on came to -- for 2006-2014 in Cabell

14   County, 141.2 pills per person, and that the distributions

15   that Dr. McCann had calculated came to 142.19 pills per

16   person.

17        I think, as Mr. Nicholas said yesterday, that number

18   right there, or those two numbers right there are absolutely

19   amazing in terms of how they match up basically to the pill.

20   And to her credit, Ms. Keller made that concession, that

21   they match up to the pill.

22        Now, what's also remarkable is this conclusion is

23   consistent with something Mr. Rafalski also said.

24        Mr. Rafalski's testimony was that he was not aware of

25   any pills, any pills shipped by McKesson, ABDC, or Cardinal

1     that ended up doing anything other than filling

2     prescriptions written by licensed prescribers.

3          The second piece of evidence that relates to Cabell and

4     Huntington.  The evidence was overwhelming at trial, Your

5     Honor, and I won't belabor it, that the prescribing that was

6     done nationally, but also in Cabell and Huntington, was done

7     in good faith, and virtually all the prescriptions were

8     legitimate.

9          So we've already seen Mr. Rannazzisi with the reference

10    to 99.5 percent of prescribers not over-prescribing.  And

11    we're familiar with this quote, but I want to remind the

12    Court that Dr. Rafalski -- or Mr. Rafalski also said the

13    same thing.  Mr. Rafalski also agreed that 99 percent of

14    doctors prescribe opioids for legitimate medical purposes.

15         Now, one piece of evidence we haven't seen that often

16    so far, Your Honor, is that in 2006 the DEA went so far as

17    to say in the Federal Register that, quote, nearly every

18    prescription issued by a physician in the United States is

19    for a legitimate medical purpose in the usual course of

20    professional practice.  And not a single witness disputed

21    that.

22         And as Your Honor knows, to the contrary, witness after

23    witness on the plaintiffs' side agreed that the vast

24    majority of doctors prescribed opioids in good faith based

25    on the information that they had at the time.

1        So, again, Dr. Waller said doctors who were prescribing

2    opioid medications for chronic non-cancer pain were acting

3    in good faith.  Even Dr. Keyes said the overwhelming

4    majority of doctors prescribed opioids to their patients in

5    good faith.  And then our local witnesses also agreed that

6    this was true in Cabell and Huntington.

7        So Dr. Yingling testified that the use of prescription

8    opioids in Cabell County is within the bounds of medically

9    accepted practice.

10        In Huntington Mayor Steve Williams said that he even

11    believed that the vast majority of doctors in Cabell County

12    and Huntington thought they were prescribing opioids

13    appropriately.  Another key piece of evidence, Your Honor,

14    that informed the volume in Cabell and Huntington.

15        Another way that you know that the volume shipped to

16    Cabell and Huntington was reasonable is because the

17    magnitude of the increase in distributions into Cabell and

18    Huntington over time was the same as the magnitude of the

19    increase in West Virginia, as well as the nation.

20        So to the extent that Cabell and Huntington ended at a

21    higher rate or at a higher number, Your Honor, that's

22    because they started higher.

23        So let me explain this slide.  So the far left slide,

24    Your Honor, shows distributions nationwide.  These are Dr.

25    McCann's charts, not our charts.  And the middle bottom

1      shows distributions in West Virginia.  And the far right

2      shows distributions in Cabell and Huntington.  And up top we

3      have the same nationwide -- the DEA quota chart we were just

4      looking at.

5           And what Dr. McCann showed us is that distributions in

6      Cabell and Huntington rose by the same factor as

7      distributions into West Virginia and nationally, and even by

8      the same factor as the DEA quota.

9           So let me show you his testimony.  Dr. McCann told us

10     that from 1997 to 2010 there is a ten-fold increase across

11     each of these charts, overall quota, West Virginia and

12     Cabell/Huntington.  Everybody increased at the same ten-fold

13     rate.

14          Well, if the trend is the same, why did Cabell and

15     Huntington end up higher on a per capita basis compared to

16     the nation or even West Virginia?

17          And the evidence shows it's because they started

18     higher.  Even in 1997, Your Honor, before any of the conduct

19     that plaintiffs allege was wrongful in this case, per capita

20     opioid distribution and, therefore, prescribing was already

21     higher in Cabell and Huntington than it was nationally or

22     statewide.

23          And that's because of the fourth piece of evidence,

24     Your Honor.  West Virginia and, in particular, Cabell and

25     Huntington, have higher rates of pain-causing conditions

1    and, therefore, higher rates of prescribing.  And that's

2    always been the case, or been the case for a significant

3    amount of time.

4         Now, Drs. Gupta and Deer, who know these populations

5    well, each testified about this.

6         So Dr. Gupta told us that West Virginia ranks number

7    one in the country in total prescriptions per capita.  So

8    not opioid prescriptions, but number one in the country in

9    total prescriptions per capita.  So West Virginia doctors

10   prescribe more medications overall.

11        As of 2016 -- this is from one of Dr. Gupta's

12   reports -- the average West Virginian received 20.8

13   prescriptions per year which was far higher than the

14   national average of 12.6 prescriptions per year.

15        And Dr. Gupta also testified that West Virginia has

16   higher rates of pain-causing conditions compared to other

17   parts of the country which leads to more opioid prescribing.

18        And he had a presentation that we went over with him

19   that showed West Virginia's higher rates of pain-causing

20   health conditions.

21        So West Virginia has ranked in the West Virginia charts

22   number one in the nation in arthritis, number one in

23   cardiovascular disease, number one in obesity, number one in

24   COPD, and number one in high blood pressure.

25        It's ranked number two in diabetes and number two in

 1    depression, and number three in cancer.

 2         Now, the additional part of the explanation for some of

 3    these numbers was provided to us by Dr. Deer.  West Virginia

 4    has an older population, he told us, which tends to suffer,

 5    of course, from more pain-causing conditions.

 6         And he also told us that West Virginians work in

 7    physically demanding jobs, more so than their counterparts

 8    in other states.  So there are more work-related injuries.

 9         And even Dr. Keyes agreed with that.  Dr. Keyes was

10    cross-examined on an article that she published before she

11    became an expert in this litigation on why people in rural

12    areas abuse opioids more.

13         And she said, like Dr. Deer, that rural populations are

14    older and have higher rates of chronic pain and injury.  And

15    that's why she would expect to see higher levels of opioid

16    prescribing in West Virginia than in other states.

17         We also heard from Dr. Deer and then Dr. James Hughes

18    on insurance providers, including Medicaid and Workers'

19    Comp.  And we've heard how those providers restricted

20    non-opioid pain treatment which led to patients staying on

21    opioids longer.

22         Dr. Hughes explained that West Virginia had unusually

23    limited coverage of, for example, chiropractors and physical

24    therapy, and that other states by contrast covered much more

25    and made it easier to get non-opioid alternatives.

1         And all of these reasons ultimately magnified why the

2    numbers in Cabell and Huntington were higher.  And if we

3    focus in just on Cabell and Huntington, I think we heard

4    testimony from Mayor Williams that in 2008 the CDC reported

5    that Huntington, unfortunately, had the worst health rating

6    of any city in America and had higher -- had the highest

7    rates of certain conditions relative to any other city in

8    America.  And Dr. -- Mayor Williams told us when he was here

9    testifying that all of that was true.

10        Another piece of evidence we heard from Dr. Yingling is

11   that people from neighboring counties actually come to

12   Huntington for medical care which helps to raise the

13   prescribing rates in the Huntington/Cabell area.

14        And Dr. Yingling called Huntington a hub of healthcare

15   and noted that it had several hospitals and healthcare

16   centers which, of course, one of them is the V.A.

17        Let me make one final point on the volume as it relates

18   to Cabell and Huntington, Your Honor.

19        The overall ratio of Cardinal Health controlled

20   substances shipments coming into Cabell and Huntington fit

21   perfectly with the DEA's expectations.  The ratio of

22   controlled substances to all medications shipped is a key

23   factor recognized by the DEA for distributors evaluating

24   pharmacies.

25        Mr. McDonald, our data expert, looked to statements

1    from the DEA that a distributor could expect controlled

2    substances to be anywhere from 5 to 20 percent, 5 to

3    20 percent of its shipments to pharmacies.

4         Mr. McDonald did the calculation.  And he calculated

5    that Cardinal's number for Cabell and Huntington was

6    14.9 percent, so well within the DEA expected range of 5 to

7    20 percent.  And opioids -- if we look just at opioids, they

8    were just 7 percent.

9         So Cardinal Health's opioids shipments to Cabell and

10   Huntington were completely reasonable given the total number

11   of prescriptions that doctors wrote for all medications.

12        To sum up on volume, Your Honor, the standard of care

13   for pain management changed drastically.  Doctors in West

14   Virginia and around the country prescribed opioids far more

15   often than they had in the early '90s.  And nearly all of

16   them did so in good faith.  And they could have been

17   disciplined if they hadn't.

18        West Virginia and Cabell County had higher than average

19   opioid prescribing rates, but they also had higher rates of

20   prescribing for all medications.  And that's because they

21   had some of the worst overall health statistics in the

22   country.

23        So controlled substances were not an unusually high

24   percentage of our distributions in Cabell County.  And over

25   the entire time span in question, Cabell County's rates of

1    opioid prescribing grew at exactly the national average.

2         The number of pills we distributed there was exactly

3    the number that doctors prescribed.  And not one word, Your

4    Honor, in the summary that I just gave you is disputed.

5         Plaintiffs have given the Court no basis whatsoever to

6    find that Cardinal's distribution volume in Cabell and

7    Huntington was unreasonable.

8         Now, that's volume, Your Honor.

9         Did the plaintiffs show that our systems, our

10   Suspicious Order Monitoring Systems allowed orders to be

11   filled there?

12         THE COURT:  Do you want to take a break,

13   Ms. Mainigi?

14         MS. MAINIGI:  Yes.  I think that would be

15   wonderful, Your Honor.

16         THE COURT:  Okay.  This looked like a time to do

17   it.

18         MS. MAINIGI:  This is a perfect time.  Thank you,

19   Your Honor.

20         THE COURT:  All right.  We'll be in recess for

21   about 10.

22         (Recess taken from 10:00 a.m. until 10:14 a.m.)

23         MS. MAINIGI:  Thank you for the break, Your Honor.

24         During the break, I was reminded by some of my smarter

25   colleagues of Dr. Murphy's testimony.  I think you had asked

1    or suggested that some economists might say supply affects

2    demand.  But I think you probably remember that Dr. Murphy

3    addressed that specific question --

4                 THE COURT:  He did.

5                 MS. MAINIGI:  -- for this industry.  And you

6    remember it better than I do, Your Honor.

7                 THE COURT:  I didn't ask him the question because

8    I didn't know how to pronounce Say Fa (phonetic).  I don't

9    know French so --

10                MS. MAINIGI:  Well, I can't pronounce it either,

11   Your Honor, unfortunately.  But I do, I do know now and have

12   been reminded that Dr. Murphy testified that in this

13   industry, the industry that we're in, our distribution does

14   not drive demand.

15        And, and the chief reason for that, obviously, is

16   because a patient cannot get a prescription without --

17   cannot get the medication without a prescription.  And that

18   was, I think, Dr. Murphy's testimony pretty clearly.

19        So, Your Honor, where I had -- I'm sorry, Your Honor.

20   Did you have another question?

21                THE COURT:  No.  You can go ahead.

22                MS. MAINIGI:  Thank you.

23        So let me shift over.  I know I said earlier that the,

24   the plaintiffs did not spend a lot of time on our systems,

25   our Suspicious Order Monitoring Systems.  But I do want to

1    outline for the Court some basics related to those systems.

2        So you can think of Cardinal Health system in basically

3    three eras.  And I think you heard a little bit about this

4    when Mr. Mone testified.

5        So you've got pre-2008.  You've got 2008 to 2012.  And

6    then you've got 2012 through the present.

7        And until 2008, the Cardinal system was led by a former

8    law enforcement officer named Steve Reardon.  And he had

9    been with the company since the 1980s.

10       And under Mr. Reardon's leadership, Cardinal Health

11   operated a Suspicious Order Monitoring System that was very

12   similar to the other programs around the country.  It had a

13   couple of components.  It had suspicious order reporting and

14   due diligence on the pharmacy customers.

15       And Cardinal sent monthly reports to the DEA called

16   Ingredient Limit Reports.  And those Ingredient Limit

17   Reports were based on a computer program that compared

18   customer purchases to pre-determined limits.

19       And if a customer's purchase exceeded the limit, then

20   their order went into the report.  And then the report

21   itself went to the DEA after the orders were shipped.

22       Now, there was another component that involved folks

23   called pickers and checkers.  And it was their job to also

24   identify excessive orders based on their own particular

25   experience in the distribution centers with customers.

1      And orders that they identified could be stopped right

2 there at the distribution center and reported to the DEA

3 before they were shipped.  So the distribution center could

4 stop orders it thought might be excessive or suspicious.

5      The key takeaway, Your Honor, I think for the pre-2008

6 system is that the DEA understood Cardinal's program and it

7 was completely consistent with what other distributors were

8 doing and the DEA expectations at the time.

9      So the Court has the depo designation, deposition

10 designation for Mr. Michael Mapes who was the DEA diversion

11 investigator.  And he testified about the submission of

12 these Ingredient Limit Reports.  Some companies called them

13 Excessive Purchase Reports.

14      And I think those were the reports that were part of

15 the ABDC system that Mr. Nicholas talked about yesterday.

16 And as Mr. Nicholas told you, the DEA expressly approved

17 ABDC's program which, like Cardinal Health's program,

18 reported suspicious orders after they had been shipped until

19 that 2008 forward time period.

20      Let me go ahead and just play the clip where Mr. Mapes

21 testified to that.

22      (A video clip was played as follows:)

23      "Was the submission of Excessive Purchase Reports in

24 your experience standard practice in the industry?

25      It was.

1          And in your experience, DEA viewed those reports as

2     compliant with the Controlled Substances Act?

3          Yeah.  I viewed those as compliant with the regulation

4     for suspicious orders."

5          (Video clip concluded)

6               MS. MAINIGI:  And I think that there is other such

7     testimony in the record as well.

8          But Mr. Mapes who had responsibility, along with Kyle

9     Wright, over several of the distributors, several of the

10    major distributors, certainly testified that he viewed the

11    process that was followed in the pre-2008 time period to be

12    consistent with the DEA expectations.

13         Now, I think, as Your Honor has heard in the first few

14    weeks of trial, toward the end of 2007 the DEA changed its

15    expectations about shipping suspicious orders and about

16    Suspicious Order Monitoring Systems as well.

17         And as Mr. Nicholas told you, AmerisourceBergen

18    developed a next generation monitoring program in response

19    to this new DEA guidance.  And ABDC and the DEA jointly

20    presented that program at an industry conference in

21    September of 2007.

22         The DEA used that presentation, as we heard, to tell

23    the industry what it wanted to see in monitoring programs

24    going forward.

25         And the biggest change, as you heard in the early weeks

1    of trial, was that the DEA from that point forward no longer

2    wanted distributors to ship suspicious orders.

3        And, so, when the DEA announced in September, 2007 that

4    it wanted ABDC's new system to be the model, Cardinal Health

5    complied.

6        Now, what I want to show Your Honor is an email,

7    September, 2000 email -- 2007 email from Mr. Reardon.  So

8    we're about to go through a transition period.  But

9    Mr. Reardon sent this email after the conference he had just

10   attended.

11       And, in fact, it says final summary of DEA meeting

12   dated 9/7/07.  The email itself is seven days later on

13   September 14th.

14       And among other things, Mr. Reardon tells his

15   colleagues back at Cardinal, "DEA is setting a new standard

16   with which we must comply."

17       And then he explains why.

18       And then he says also, "DEA referred to the ABC program

19   as the new industry standard.  I will be setting up a

20   meeting to initiate discussions on this topic in the near

21   future."

22       So Cardinal, after that point, set about revamping its

23   Suspicious Order Monitoring System to essentially echo what

24   it had seen in the presentation at the September, 2007

25   conference.

1    And in furtherance of that, in December, 2007, Cardinal

2    hired Michael Mone who Your Honor heard from live here at

3    trial.  Mr. Mone came in to supervise the anti-diversion

4    program and the on-going enhancement of that program.

5    And he was an important addition to the Cardinal team

6    because as Your Honor may recall, he was both a pharmacist

7    and a lawyer, and he had run a state Board of Pharmacy and

8    practiced in the state AG's office.

9    He had also -- while he had the other roles, he had

10   helped to create one of the first state prescription drug

11   monitoring programs in the country.

12   So when he came in and took over, Cardinal Health was

13   already in the process of implementing what it had learned

14   at the September, 2007 conference.  And he told us on the

15   stand about essentially the three components of the Cardinal

16   Health system.

17   The Know Your Customer component involved a detailed

18   evaluation and due diligence effort on new customers, as

19   well as on-going diligence of existing customers.  A new

20   customer approval was not automatic.  Cardinal Health

21   rejected some customers because of diversion concerns.

22   The second piece was electronic order monitoring.  And

23   as part of that piece, a customized threshold for each drug

24   family was set for each customer.  And the system now

25   automatically held orders over the threshold.

1       And then the held orders were evaluated by the

2  anti-diversion team which included several pharmacists.

3       Then when the investigation ceased, there were regular

4  site visits that were made to the customer by former police

5  and former investigators from the DEA, Medicaid, and Board

6  of Pharmacy.

7       And then there was an analytical -- an analytics team

8  that was also set up to create reports, evaluate thresholds,

9  re-examine thresholds.

10       So Cardinal moved quickly to get into place a new

11  system that essentially embraced the components that the DEA

12  said it wanted embraced.

13       And all of this information, Your Honor, is in the

14  standard operating procedures that Mr. Mone testified about.

15  And, again, just like in the prior time period, Cardinal

16  kept the DEA up-to-date on what it was doing.

17       So in 2009, as Mr. Mone testified, the chief of the

18  DEA's regulatory section was a woman named Barbara

19  Boockholdt.  And Mr. Mone told us early in 2009 he met with

20  her and her team in person for a full week.  And they

21  reviewed the company's updated system in detail.

22       Mr. Mone told us that he covered with her how

23  thresholds were set and identified and how the company was

24  handling suspicious orders.  And to the -- I think I heard

25  some reference yesterday from the plaintiffs about the

1    multiplier for thresholds.

2        To the extent that a multiplier was used as part of our

3    threshold setting system, the DEA was aware of it and did

4    not raise any concerns.

5        And Mr. Mone told us that at the end of the week, the

6    DEA didn't offer a single complaint or ask for a single

7    change.  And Mr. Mone stayed in touch with Ms. Boockholdt

8    after that and talked to her regularly about whatever

9    improvements the DEA was looking for from distributors.

10        Now, the DEA guidance that came out in a variety of

11    ways evolved again in the 2012 time period.  And the DEA

12    changed its focus in that time period to numbers; data

13    analytics and quantitative measurements.

14        And, so, Cardinal Health added new metrics to analyze

15    if pharmacy customers changed its threshold setting

16    procedure.  And because of the new focus, Cardinal brought

17    in someone that had that specific expertise, Todd Cameron

18    who has run our anti-diversion program since 2012.

19        Now, Mr. Cameron may not look familiar to you, Your

20    Honor.  The plaintiffs had asked us to make Mr. Cameron

21    available to testify in their case, and we did make him

22    available to testify.  He was here in Charleston waiting to

23    take the stand when plaintiffs let us know that they no

24    longer wanted to put him up ultimately as a witness.

25        The bottom line, Your Honor, is that the plaintiffs

1   have essentially presented no evidence and have no

2   complaints, as far as we have heard during this trial, about

3   Cardinal Health's program after 2012.  They didn't mention

4   it in opening, and they haven't mentioned it in closings

5   either.

6        So I'm not going to spend too much time on the 2012

7   system, but we'll cover the 2012 system in our findings of

8   fact ultimately so that Your Honor has a complete record.

9        But, essentially, the components of the system stayed

10  the same per the DEA guidance.  There was still a --

11       Matt, if we could put up that slide.

12       There was still a Know Your Customer component and

13  electronic order monitoring component and an investigation

14  component.  But the various types of criteria that were used

15  were certainly altered to comply with the expectations from

16  the DEA.

17       And Cardinal put together a committee also called a

18  Large Volume Tactical and Analytical Committee that included

19  anti-diversion professionals and senior Cardinal officials.

20  And its entire purpose was to review large orders from

21  customers as they came through.

22       And then the diligence files.  The diligence files in

23  evidence also show Cardinal Health continuing its practice

24  of regular site investigations and visits of its customers.

25       And as we'll state in our findings of fact, Your Honor,

1    Mr. Cameron has presented this program to the DEA several

2    times, the current program at -- as it has evolved.  And

3    there's no evidence that DEA has found any fault with that

4    program since 2012.

5        Now, what have plaintiffs chose to focus on then when

6    it comes to the SOMS system?  They haven't gone into the

7    specifics.  What they do is point occasionally to Cardinal's

8    2008 and 2012 Settlement Agreements.

9        But there is no connection, Your Honor, between those

10   agreements and West Virginia.  There is not evidence through

11   those agreements of any sort of systemic failure or any

12   unreasonable conduct related to Cabell County or Huntington.

13       Let me review those two agreements with you.

14       The 2008 DEA action had to do, Your Honor, with

15   shipments to internet pharmacies which are not at issue in

16   this case.

17       And it had to do with shipments to internet pharmacies

18   from our distribution centers in Texas, New Jersey,

19   Washington, and Florida.  And none of those distribution

20   centers shipped to Cabell/Huntington as Dr. McCann admitted

21   when he was on the stand.

22       The Wheeling distribution center is the only one that

23   shipped to Cabell and Huntington.  And it had never had a

24   DEA enforcement action.

25       The 2012 DEA action, Your Honor, had to do with just

1    four specific pharmacies, so not four distribution centers

2    even, but four specific pharmacies in Florida that were

3    served by our Lakeland, Florida, distribution center.

4         And before the DEA even took action, we had already

5    terminated two of those four pharmacies.  And to give you

6    some context, Your Honor, those are four pharmacy customers

7    out of our 29,000 pharmacy customers.

8         Now, what else did they do besides the settlement

9    agreements?  The plaintiffs continue to cite to Mr.

10   Rafalski.  Now, we already know -- in our view, he already

11   has a major *Daubert* problem and we've obviously briefed that

12   issue.

13        But even if Your Honor does not exclude his testimony,

14   his testimony is just not credible and far too generic and

15   unsupported to be the basis for this Court to find

16   unreasonableness.

17        So taking a look at what Mr. Rafalski actually did or

18   did not do, to be more precise, Mr. Rafalski admitted that

19   he didn't look at all the due diligence for the orders

20   flagged by his methodology.  Only some he said.  But we know

21   he didn't even look at the initial orders flagged under his

22   methodology to see if he could call them suspicious.

23        He conceded he had no idea how many of the orders he

24   flagged were investigated and cleared by Cardinal Health.

25   He doesn't know if we investigated 0 percent or 100 percent

1    of them.  And he didn't even try to figure it out.

2         He conceded, Your Honor, that he didn't know which

3    orders were actually suspicious and should have been

4    reported to the DEA, or if there were any of those orders at

5    all.  He had no idea whether there was any single suspicious

6    order that we did not report.

7         And he conceded he did not evaluate how many of his

8    flagged orders went to meet legitimate medical needs.  So he

9    also doesn't know which orders, if any, were actually

10   diverted.

11        He didn't do the work he needed to do, Your Honor, is

12   the basic bottom line.  And he didn't do that work for any

13   of the three distributors.

14        Now, just briefly on his methodology.  I think it can

15   be summed up pretty well with what's on the screen.  No

16   one's ever used them in the real world, his methodologies,

17   not the DEA or any distributor.  He made them up for this

18   litigation.

19        After making up six of them, he said there were four of

20   them he would not use.  And he conceded that there's a huge

21   number of other flagging systems that could also comply with

22   the law.

23        Now, when Mr. McDonald applied Mr. Rafalski's

24   90 percent methodology, his Methodology A, he testified that

25   Mr. Rafalski's Method A flagged 90 percent of anything.  So

1    any series of numbers, whether it's daily temperatures,

2    random rolls of the dice, and shipments of all kinds of

3    medications, his methodology was a one-size-fits-all

4    methodology.

5        And Mr. Rafalski conceded that he views these exact

6    same methodologies with equally astounding results in

7    litigation in Ohio and New York.  So there's nothing special

8    or different about his analysis in Cabell and Huntington.

9        Now, let me come back to due diligence because that's

10   something that the plaintiffs have tried to spend some time

11   on.  The only thing that the plaintiffs mentioned yesterday

12   about Cardinal Health, Your Honor, the only thing was a

13   reference to due diligence and Medicine Shoppe.  So I want

14   to spend a little bit of time going through that with you.

15       Mr. Rafalski admitted he obviously had not looked at

16   the due diligence files in their entirety.  And just to

17   remind Your Honor of the testimony from Mr. Mone, Mr. Mone

18   was asked about due diligence when he came to testify.

19       And as Mr. Mone testified, Cardinal Health did due

20   diligence on every order that hit a threshold and did

21   on-going due diligence on customers from Know Your Customer

22   as well as site investigation.

23       Now, Cardinal has 34 -- or during this time period had

24   34 customers in Cabell and Huntington.  And, again, at trial

25   and yesterday the plaintiffs have discussed essentially one,

1    Medicine Shoppe.

2         And I think they've essentially tried to allude that

3    there was no due diligence done for Medicine Shoppe.  But,

4    Your Honor, this right here is the due diligence file for

5    Medicine Shoppe that was produced to the plaintiffs.  And

6    this is P-42116 for the record.

7         This document has hundreds of pages of diligence all

8    the way back to the questionnaire that Medicine Shoppe

9    filled out back in 2008 when it became a customer of

10   Cardinal.

11        Another thing that this file contains is several

12   anti-diversion customer profiles.  So when an order hits a

13   threshold, Your Honor, Cardinal Health's anti-diversion team

14   reviews the information that's shown here -- type of

15   information that's shown here to determine whether to

16   release the order or to report the order as suspicious.

17        And the type of information that they analyze and look

18   at includes one of the things I mentioned earlier which is

19   the overall controlled substance percentage to the, to the

20   entire prescription percentage; the volume of particular

21   categories of drugs; the number of previous threshold events

22   that the customer has had, so basically their track record;

23   and then their overall purchase data by month for that drug

24   family.

25        In later periods under Mr. Cameron, for example, this

```
 1    type of data was enhanced and different types of analytics
 2    were used.  But there is multiple types of due diligence of
 3    this variety that is in the file.  So it is astounding that
 4    the one thing that the plaintiffs point to is an unexplained
 5    two-word phrase in an email that says "black hole."
 6         They didn't explain to you what that said or what that
 7    meant.  They didn't call the person at trial who wrote that
 8    email.  But what we do know about the Medicine Shoppe is
 9    that there is a long history of diligence on this customer.
10         Mr. Farrell told you yesterday that after the black
11    hole email, nothing happened.  That's wrong.
12         Right after that email, Cardinal Health immediately
13    followed up with a full site investigation.  And that's
14    documented in the file.  And Mr. Mone actually told us about
15    that at trial.  He said the black hole email was reviewed by
16    him.
17         The anti-diversion team reviewed this investigative
18    report, Your Honor, which is in the file and found no
19    evidence of diversion.
20         Other site visits at Medicine Shoppe confirmed the same
21    thing.  There was a full investigative visit in December of
22    that year and again in -- that was 2012, Your Honor.  So
23    they went back again that year.  And then there was also a
24    full investigative visit that's in the file for 2015 and
25    2016.  And each time, the investigators found no evidence of
```

1    diversion.

2         Now, we also heard from Jesse Kave who was Cardinal

3    Health's sales representative.  And he testified that he

4    monitored his customers for signs of diversion.  He called

5    on Medicine Shoppe for 12 years, and he lived only a half an

6    hour away from Medicine Shoppe.

7         He got to know the pharmacists there.  He found them to

8    be professional.  And he did not have concerns about

9    diversion which is a fact that he documented repeatedly.

10        Now, another witness that the plaintiffs didn't call

11   but had under subpoena during the entirety of their case

12   was, in fact, the representative from Medicine Shoppe.  So

13   we didn't get a chance to ultimately cross-examine that

14   person, but the, the plaintiffs had the opportunity to bring

15   that person in.

16        And as I stand here today, Your Honor, Medicine Shoppe

17   remains a licensed pharmacy in good standing with the State

18   of West Virginia as well as the DEA.

19        So, Your Honor, with respect to the Suspicious Order

20   Monitoring System, to the extent that the plaintiffs even

21   covered that type of information, there is just absolutely

22   no evidence that Cardinal Health acted unreasonably in that

23   context.

24        Let me shift over to causation, Your Honor.

25        The plaintiffs have to prove that they caused the

1    alleged harms, and here they cannot.

2         Now, as our briefing has covered with Your Honor,

3    causation has two components; but for causation and

4    proximate causation.  And our position is that the

5    plaintiffs have proven neither.

6         On the but for causation, or sometimes called cause in

7    fact prong, plaintiffs have to show that the alleged harms

8    would not have happened without Cardinal Health's alleged

9    misconduct.

10        So they had to prove here, Your Honor, that if Cardinal

11   Health had done something different, the problems in Cabell

12   and Huntington never would have happened.

13        When they filed their brief on causation this weekend,

14   they had no answer to the cause in fact argument that we

15   raised.  And they gave no answer to it in closing yesterday.

16   They didn't even mention but for cause.

17        The bottom line is that the same number of opioid

18   prescriptions would have been written and filled in Cabell

19   and Huntington even if Cardinal Health had not existed.

20        Doctors, as we know, decide how much to prescribe.  The

21   DEA decided how many opioids would be available for

22   dispensing.

23        Mr. McCann told us that there were 35 other

24   distributors doing business in Cabell County.  Our pharmacy

25   customers could have ordered from any of them.

1          Mr. Rafalski told us he didn't know of a single

2     instance where a distributor cut off the pharmacy and the

3     pharmacy didn't just switch to a new distributor.  Only the

4     DEA can cut off a pharmacy.

5          So on the evidence that's before the Court, Your Honor,

6     even if there had never been a Cardinal Health, doctors in

7     Cabell County would have written the exact same number of

8     prescriptions.  Pharmacies would have filled them.  They

9     would have ordered the exact same amount of medications from

10    distributors.  And distributors would have shipped them.

11         If the same thing would have happened in the absence of

12    our very existence, then by definition, there is no but for

13    causation.

14         Now, they say we should have done more due diligence.

15    But they have not shown you a single order that would have

16    or should have been rejected if we had done more due

17    diligence.

18         They say we should have sent more reports to the DEA.

19    But the evidence shows that the DEA didn't even act on the

20    reports we sent them already.  And, so, this is a basic

21    legal proposition, Your Honor.  And it's not a proposition

22    that is necessarily apparent in every case, but, but it is

23    apparent in this one.  They say we should have done certain

24    things we didn't do, but they haven't proven that if we had

25    done them that anything would have been different.  And if

1    they cannot prove that, there is no liability for causation

2    purposes.

3        Now let me shift over to proximate cause.  And let me

4    start with the standard for proximate cause.

5        Plaintiffs have to show the alleged harm is a direct

6    consequence of the alleged conduct.  And that's the test, as

7    Your Honor knows, that Judge Copenhaver applied last year

8    specifically in the context of the prescription opioid

9    litigation, the *JCAHO* case.  And as you know, he dismissed

10   the case on 12(b)(6) grounds for lack of proximate cause.

11       Now, with respect to the Copenhaver case, we will

12   address that case, Your Honor, more fully in our proposed

13   conclusions of law.  But one of the points that plaintiffs

14   focused on is foreseeability.  And foreseeability alone is

15   not enough.  It's one part of the analysis, but it's not the

16   entire analysis.

17       And West Virginia law is clear that the Court has to

18   find that the defendant is a direct, not a remote, cause.

19   And that's what Judge Copenhaver said in the *Joint*

20   *Commission* case.  And Judge Chambers said the same thing in

21   the *Teamsters* case from 2013.

22       Now, Your Honor asked yesterday how the *City of*

23   *Charleston* case is different from this one.  And we think

24   it's the same.  We don't view it to be different.

25       Mr. Majestro was asked a follow-up question on that or

 1    answered a follow-up question on that.  And Judge

 2    Copenhaver, to be clear, did not find that there would be

 3    proximate cause as it relates to distributors.  He didn't

 4    make any finding as it relates to distributors.

 5         But what he did say in a case about what caused the

 6    opioid epidemic was that the Joint Commission was too remote

 7    because of multiple actors in the chain, including criminal

 8    actors and doctors exercising their medical judgment.

 9         And if this trial has established anything, Your Honor,

10    it's that those facts are equally present here.

11         So after a full trial, plaintiffs have failed to prove

12    their basic theory of causation.

13         Coming back to what their theory is, their theory is

14    that Cardinal Health caused the volume of opioids that

15    entered Cabell and, therefore, caused the diversion and

16    misuse of the prescription opioids in Cabell and Huntington,

17    and ultimately caused the abuse of heroin and fentanyl in

18    this jurisdiction.

19         But they did not actually prove any of those things.

20    So if we start with volume, everything I said about volume

21    and reasonableness, Your Honor, applies equally to proximate

22    cause.

23         But there's no evidence that in any way Cardinal Health

24    caused the volume of prescription opioids that entered the

25    market.  As we've talked about, the volume comes from the

number of prescriptions doctors write and the upper limits
that the DEA imposes in the form of quota.  And Cardinal
Health has no control over either one of those.

And as we're thinking about it, it's worth remembering
what the plaintiffs claim about why the standard of care
ultimately changed.  And the plaintiffs in their complaint
don't say it was the distributors who changed the standard
of care.  They say it was manufacturer marketing.

So looking at the admissions that are in the
plaintiffs' complaint, the plaintiffs say manufacturer
marketing defendants' deceptive marketing caused prescribing
not only of their opioids, but of opioids as a class, to
skyrocket.

Mayor Williams agreed that it was the manufacturers'
deceptive marketing that caused, their word, caused the
prescribing of opioids to skyrocket.  And, of course, we
already know that the city also blamed, in addition to the
manufacturers, the Joint Commission for changing ultimately
the standard of care.

The city said that the Joint Commission teamed with
Purdue to cause the opioid crisis by pushing pain as the
fifth vital sign and increasing prescribing.  So that's
prescribing.

There's also no proof, Your Honor, that we caused
diversion or misuse.  And, again, there are just too many

1    links in the causal chain.

2         First, you've got to have a state and federally

3    licensed doctor prescribe the medication.  Then you've got

4    to have a state and federally licensed pharmacy dispense the

5    medication.  Then someone has to divert it.  And then

6    someone has to use it illegally.

7         So that prescribing link has nothing to do with us.  We

8    never see a prescription, Your Honor.  Our pharmacy

9    customers place bulk orders from us so they'll have an

10   inventory to fill prescriptions they expect patients will

11   bring to them in the future.

12        We have to way of knowing whether the medications in

13   those orders will go to terminal cancer patients or

14   post-surgical patients or injured coal miners.  That's up to

15   the doctors to decide.

16        Now, remember what Dr. Werthammer told us.  He had sent

17   an email to the Mayor and other leaders that said,

18   "Unfortunately --" and this is from 2016.  "Unfortunately,

19   it was not big pharma who wrote the prescriptions.  It was

20   me and my colleagues.  Joe."

21        And his colleague, Joseph Shapiro, Dr. Shapiro, who's

22   the Dean of Marshall's medical school, wrote right back.

23   "We had some help.  Pain as the fifth vital sign comes to

24   mind."

25        The medicine cabinet diversion that happens after the

1    medicine leaves the pharmacy isn't caused by anyone in the

2    DEA regulated supply chain.  Either the patient who gets the

3    medication -- the patient either sells it or gives it away.

4    And that's a crime.  Someone comes along and steals it,

5    either uses it or sells it, and that's a crime.  And,

6    finally, someone has to use the illegally diverted

7    medication, and that is also a crime.  And Cardinal Health

8    can't stop any of that from happening.

9         Now, even Mr. Rafalski agreed that medicine cabinet

10   diversion is the responsibility of the patient, not the

11   distributor who supplies the patient's pharmacy and has no

12   control.

13        Now, turning to illegal drugs, which has been a problem

14   in Cabell and Huntington for a significant number of years,

15   the plaintiffs have not proven we caused heroin and fentanyl

16   abuse.  Obviously, heroin and fentanyl, illicit fentanyl are

17   distributed by drug traffickers, not Cardinal Health.

18        And the idea of holding us liable for the criminal

19   conduct of drug dealers a decade after they last complained

20   about anything happening with our Suspicious Order

21   Monitoring Systems is completely and utterly remote.

22        Now, plaintiffs when they use the word "opioid" have

23   been imprecise to say the least.  They've used the term

24   broadly.  And they use it broadly generally to encompass

25   illegal drugs.

1       So take, for example, Ms. Kearse spoke yesterday about

2   the West Virginia outbreak report and featured that report

3   in her closing.  And that was one of Dr. Gupta's reports.

4       But that report, Your Honor, from 2016 was entirely

5   about the string of overdoses in Huntington from

6   fentanyl-laced heroin.  It had nothing to do with

7   prescription drugs.

8       Now, we heard testimony that Cabell County and

9   Huntington have had an enormous problem with illegal drug

10  traffickers.  And there's a lot of that in the record and I

11  imagine Mr. Hester will cover that.

12      But the city has admitted that the problem dates back

13  to at least 2002 and that relates to economic cuts that were

14  made in that time period.

15      Because of that knowledge and recognition about the

16  prevalence of illegal drugs in Cabell and Huntington and

17  those being the driving force behind substance abuse issues,

18  the plaintiffs have tried to fill the hole that they have on

19  causation with a gateway theory.  And that's the idea that

20  prescription opioid use causes the use of illegal opioids

21  like heroin and fentanyl.

22      In the first instance, Your Honor, gateway is

23  irrelevant to liability.  Gateway does not show that

24  Cardinal Health caused anyone to use heroin or fentanyl.

25  And even if there is a gateway effect from the use of FDA

 1    approved medication, the individual use of illegal drugs

 2    would be far too attenuated from our conduct and far too

 3    remote under the case law to establish liability.

 4         But just so that the record is straight on gateway and

 5    the evidence that the Court heard, I just want to cover a

 6    few points on the gateway theory.

 7         Your Honor has heard about the 80 percent number.  The

 8    80 percent figure that plaintiffs throw around, Your Honor,

 9    is about illegal misuse or non-medical use of prescription

10    opioids, not legal use.

11         So there's the Muhury study which says four out of five

12    heroin users previously used prescription opioids.  But as

13    Dr. Gilligan explained, the Muhury study, which is the

14    primary source that the plaintiffs point out, looked at

15    prescription opioid misuse, not medical use, and it's only

16    looking at people who use prescription opioids illegally.

17         Second, even among people who misuse prescription

18    opioids, the percentage who transition to heroin is very

19    low.  And Dr. Gilligan and Dr. Keyes testified that the vast

20    majority of people who misuse prescription opioids do not go

21    on to use heroin.  Only 3.6 percent of them do.

22         Third, the reality is that people who abuse drugs,

23    abuse lots of them, not just one kind, so illegal drugs

24    begets illegal drugs.  And the Muhury study showed almost

25    all illegal drug users have used a wide variety of drugs in

 1      their past.  And even Dr. Keyes agreed with that.

 2           Dr. Gilligan also agreed with that.  And if you look at

 3      his actual testimony on this issue, he said that people

 4      transition to heroin from all kind of drugs, cocaine, crack,

 5      marijuana and other drugs.

 6           Now, Dr. Murphy.  He said the research shows that some

 7      people are just simply prone to abuse drugs.  And that's

 8      certainly consistent with everyone's life experience.  They

 9      abuse whatever substance is available and often lots of

10      different ones.

11           And Dr. Waller told us, the addiction specialist, why

12      that happens.  He said that all addictive substances have

13      the same final common pathway in the brain and they all

14      affect dopamine.  So it's not a surprise that people with

15      addiction will abuse multiple substances.

16           It's not about a gateway from one drug to another.

17      It's an overall addiction problem, which is a point that

18      Dr. Judith Feinberg, plaintiffs' expert on IV drug use,

19      agreed to.  And she called it a polysubstance opioid

20      addiction problem.  And she said further that the real

21      problem of addiction lies in the social and economic fabric.

22           Stephanie Colston agreed.  And she says that the

23      country's not suffering from an opioid epidemic per se, but

24      from a crisis of polysubstance use and substance use

25      disorder.

 1          Here's the fourth thing about gateway.  The numbers

 2     show no link between prescription opioid distribution and

 3     illegal opioid overdose deaths.

 4          So Dr. Murphy showed you this scatter chart.  And

 5     literally the dots are all over the map.  There is no trend.

 6     He analyzed the data and said not only is there no causal

 7     relationship, there's not even a correlation.

 8          And he concluded that places, as an example, that have

 9     high shipments of prescription opioids did not necessarily

10     have higher death rates from illegal opioids.

11          So the gateway theory is both irrelevant to liability

12     and contradicted by the evidence.

13          Another piece of evidence, Your Honor, that there is no

14     causation here outside of this litigation is that the

15     plaintiff -- neither the plaintiff nor the state say that

16     the distributors caused the opioid problem.

17          So for the past 10 years, one committee after another

18     has studied this issue.  And they've written report after

19     report after report.  And there's a stack of those reports

20     in evidence at this point, Your Honor.  And not one of them

21     point to any misconduct by distributors as a cause of the

22     opioid epidemic.  And there are a number of reports that are

23     in the record right now.

24          So you've got the city's 2011 drug market intervention

25     report that blamed the problem on police budget cuts and the

1    influx of drug dealers.

2        And the city's 2015 strategic plan did the same thing.

3    It had a prevention prong that focused on illegal drug

4    dealers.

5        The 2016 Social Autopsy that we looked at with Dr.

6    Gupta, I think Mr. Farrell said that yesterday -- yesterday

7    said that it proves diversion.  But it says nothing about

8    distributors.  The report focused on doctors and their

9    prescribing.  And 2016, of course, was the year that the CDC

10   guidelines came out.

11       The city's 2017 strategic plan.  In the prevention

12   recommendation it focuses on drug dealers.

13       And the city's 2018 report to the National League of

14   Cities, that's the one that pointed to the poor health.  It

15   doesn't say anything about distributors.

16       And then Dr. Gupta's 2018 opioid response plan.  Like

17   Dr. Gupta's other reports, these recommendations focused on

18   prescribers.

19       To sum up on proximate cause, Your Honor, let me walk

20   through the causal chain and walk you through what the

21   theory would be.

22       So the plaintiffs' theory is that if a patient suffered

23   pain and a licensed doctor prescribed FDA approved opioids

24   for that pain and a licensed pharmacist dispensed them and

25   the patient had leftovers in the medicine cabinet and

1    someone got their hands on those leftovers and used them or

2    sold them and a tiny fraction of those people later used

3    heroin or fentanyl, which came either from a drug cartel in

4    Mexico or China or via a drug dealer from Detroit operating

5    in Huntington, that down the chain Cardinal Health should be

6    liable for filling a bulk order, a bulk order from the

7    licensed pharmacy.

8         It is much too attenuated, the chain of events, and is

9    a good reason that Judge Copenhaver invoked proximate cause

10   to dismiss the city's case against the Joint Commission.

11   And there's a good reason that Judge Chambers rejected -- or

12   adopted the proximate cause argument in that particular case

13   related to the Teamsters.

14        And Judge Chambers in that case cited a vast array of

15   intervening events, including also, just like Judge

16   Copenhaver, the intervening medical judgment of doctors.

17        Plaintiffs have no basis to distinguish those cases.

18   And now that we've heard the evidence, the absence of

19   proximate cause is even more glaring in this case.

20        Now, Your Honor, Mr. Hester is going to cover

21   abatement, so I only want to make one point on abatement.

22   And that's the threshold issue with respect to abatement.

23        And the briefing on this is, is in our papers.  But as

24   a threshold matter, Your Honor, a Federal Court sitting in

25   equity does not have the power to award equitable relief if

1    there is an adequate remedy at law.  And that's the rule

2    from the *Sonner* case.  More than 10 courts since 2020 have

3    followed that case.  And that by itself, Your Honor, is a

4    dispositive issue.

5         Now, in their brief filed Sunday, which I'm sure Your

6    Honor has not had a chance to read, the plaintiffs say that

7    the *Sonner* rule doesn't apply to them because they're

8    governmental plaintiffs.  And that's their main response.

9    But that is wrong.

10        The exception they cite for that proposition only

11   applies to sovereign governments like the United States or

12   the State of West Virginia, not cities or counties.  So

13   that's a critical issue, Your Honor, that, that we feel this

14   Court ought to take a look at.

15        Your Honor, there is a vast disconnect between the

16   evidence we've heard and what the plaintiffs say in this

17   case.  Huntington's efforts on the opioid problem have been

18   successful and it has cast itself as the City of Solutions.

19        And we've heard a lot of testimony about the financial

20   resources that are already available to the city and the

21   county, including Medicaid funding for treatment.  We've

22   heard about federal funding for substance abuse response.

23   And, of course, there are cases other than this one that

24   plaintiffs continue to pursue against manufacturers and

25   others.

1          But what matters in this courtroom is not any of that.

2    It matters what they have proven.  Not one actual order we

3    should have shipped has been proven in this courtroom.  They

4    have failed to prove that one actual customer should not

5    have been shipped to.

6          They have failed to prove that one actual customer was

7    diverting or that one actual customer has even been

8    disciplined or lost their license.

9          There's been no failure of due diligence.  There's not

10   one prescription that was written because of something

11   Cardinal Health did.  And prescriptions being written based

12   on the standard of care that the entire medical community

13   was following, including the State of West Virginia, cannot

14   be a basis for a finding of unreasonableness.

15         There's been a total failure of the plaintiffs' case on

16   every disputed issue, Your Honor, and it compels a finding

17   for the defense.

18         We are extremely grateful for the time and attention

19   you have given to us in this matter, Your Honor, and the

20   courtesies that you have given to all of us.  Thank you for

21   your time.

22              THE COURT:  Thank you.

23         It's 10 after 11:00.  When do you want to come back?

24         Mr. Hester, you don't want to start your argument now,

25   do you?

1          MR. HESTER:  Well, I'd rather not split it, Your

2     Honor.  And I can imagine it will make for a very late

3     lunch.  So I'm perfectly happy to come back whenever the

4     Court wants after a lunch break.

5          THE COURT:  I always consult Ms. Skinner on

6     important matters like this one.

7          How about 12:30?  Is that okay with everybody?  All

8     right.  I'll see you at 12:30.

9          MR. HESTER:  Thank you, Your Honor.

10        (Recess taken at 11:10 a.m.)

11        THE COURT:  You may proceed, Mr. Hester.

12        MR. HESTER:  Good afternoon, Your Honor.

13        THE COURT:  Good afternoon, sir.

14        MR. HESTER:  The plaintiffs' claim is foreclosed

15    by the law and it's unsupported by the record evidence.

16    This conclusion follows from five overarching points that

17    I'm going to briefly summarize and then I'll discuss in more

18    depth.

19        The first point is that the plaintiffs cannot establish

20    proximate causation here for two central reasons.  First,

21    the increased volume of prescription opioids in the

22    Cabell-Huntington community was driven by doctors' good

23    faith prescribing decisions based on prevailing standards of

24    care.

25        And, second, the plaintiffs' claimed harm in this case

```
1    is based overwhelmingly on diversion from the medicine
2    cabinet or people's homes after opioids are prescribed and
3    dispensed.  Distributors are not responsible for this
4    diversion and cannot control it, as the plaintiffs' own
5    expert admitted.
6         So these intervening decisions of doctors who determine
7    the volume of opioids and the intervening criminal acts of
8    multiple actors who diverted opioids after they were
9    prescribed defeats proximate causation on this record.
10        The second point.  The plaintiffs cannot establish a
11   public nuisance on this record where doctors were
12   prescribing medicines in good faith to treat an important
13   medical need and distributors had no ability to second-guess
14   those prescribing decisions.
15        The third point.  McKesson's shipments into
16   Cabell-Huntington did not cause harm and plaintiffs have no
17   evidence of improper conduct or diversion by any of
18   McKesson's customers in Cabell-Huntington.  Likewise, the
19   plaintiffs were not harmed by any issues relating to
20   suspicious order reporting because distributors always
21   blocked orders likely to be diverted and distributors
22   blocked all suspicious orders by no later than 2008.
23   Blocked orders cannot give rise to diversion.
24        Fourth point.  The current drug crisis in
25   Cabell-Huntington is a crisis of heroin and illicit fentanyl
```

abuse and the abuse of other illegal drugs.  The plaintiffs

cannot establish proximate causation between the

distribution of prescription opioids and subsequent harms

from illegal drugs such as heroin and illicit fentanyl.

And the fifth point, the plaintiffs' evidence

supporting their requested abatement remedy is entirely

flawed and cannot support their claim for relief.

We said in our opening, Your Honor, that our case does

not turn on denying the existence of an opioid epidemic, and

it does not, but the record establishes that the plaintiffs

have failed to prove their case in terms of causation, the

existence of a public nuisance, and remedy.  The case law,

therefore, forecloses their claim.

So, let me now turn to some of these issues in more

detail and I want to start with proximate causation.  The

requirement of a direct causal relationship between the

alleged wrongdoing and the claimed harm.

Mr. Farrell's verdict form that he discussed yesterday

never addressed this critical linkage between the

defendants' conduct and the claimed injury and, in

particular, the evidence reflects that proximate causation

is defeated here by the prescribing decisions of doctors and

the multiple criminal acts involved in diversion of opioids

after they're prescribed.

This is not a question of pointing blame at others.

 1   It's not a question of pointing fingers at others.  It's

 2   rather a fundamental legal bar to the plaintiffs' claim.

 3        The plaintiffs stake their case on the volume of

 4   prescription opioids that distributors shipped into

 5   Cabell-Huntington.  The Court heard about this yesterday in

 6   Mr. Farrell's closing, 81 million pills, and they want the

 7   Court to conclude that the volume of shipments standing

 8   alone are sufficient to hold defendants liable for the

 9   entire opioid crisis in Cabell-Huntington.

10        But Mr. Farrell went 90 minutes into his closing before

11   mentioning doctors and Ms. Kearse never even mentioned the

12   central role of doctors in prescribing these medicines.

13        Now, the Court has already heard some of this before in

14   the other two closings.  Not surprisingly, because these are

15   central issues in the case, but I want to build these

16   building blocks of the legal conclusions by pointing to some

17   of these critical facts that frame up the legal conclusion.

18        First of all, the evidence is conclusive and undisputed

19   that prescribing by doctors and other medical professionals

20   drove the volume of pills sold in Cabell-Huntington.

21        Dr. Gupta made the point very clearly in his opioid

22   response plan.  He said a critical factor fueling the

23   national opioid epidemic is the rapid rise in opioid

24   prescriptions.  And he noted that West Virginia has

25   experienced some of the highest rates of opioid prescribing

1    in the nation.

2         Dr. Keyes said that the high volume of opioid

3    prescriptions that doctors were writing became the

4    foundation for the overall expansion of opioid supply.

5         And Mr. Rafalski agreed when he was asked, there was no

6    other way for his charts to increase, no other way for that

7    hill to go up, for that hill to climb, without

8    prescriptions.

9         So, if the volume of prescription opioids was

10   excessive as the plaintiffs claim, this was the result of

11   medical judgments made by doctors and changes in the

12   standard of care, not actions taken by distributors.

13        Dr. Gupta made the point very clearly.  He said you'd

14   easily write several more days of prescriptions than you

15   would require.  He referred to a culture of attempting to

16   reduce pain from a scale of whatever to zero for every West

17   Virginian and he said that was the culture.  That was the

18   education.  That was the influence.  That was their

19   understanding.

20        Distributors responded to what doctors were

21   prescribing, but they did not decide the quantity of

22   prescription pills.  That was decided by doctors based on

23   medical judgment.

24        Dr. Murphy, the University of Chicago economist, made

25   the point very clearly.  He said the amount that doctors

1    distribute -- the amount that distributors distribute is

2    determined by the prescribing behavior and he said it's the

3    prescribing behavior that determines the amount.

4         And this responds to the point that the Court asked

5    about previously.  Could supply drive demand?  Not in this

6    industry.  Not in this industry where prescriptions are

7    needed in order for any pills to leave a pharmacy.  Clearly,

8    as Dr. Murphy said, demand by the doctors working together

9    with patients is what drove the level of volume.

10        Mr. Rannazzisi made this point very, very clearly.  He

11   said, no, supply is not what drives demand.  Supply is not

12   what drives demand.  That's one of the plaintiffs' own

13   experts.

14        And there was discussion previously today of the

15   calculations by Ms. Lacey Keller, who determined that the

16   average number of pills prescribed per person in Cabell

17   County from 2006 to 2014 were 141.2 pills per person.

18        Looking at the shipment data from Dr. McCann based on

19   ARCOS the shipment data showed 142 pills per person.  This

20   is conclusive evidence on the point that distributors only

21   shipped what doctors prescribed.  There's no other

22   explanation for this observation.  Clearly, distributors

23   were responding to the prescription behavior of doctors.

24        Now, the Court asked previously today how does one

25   decide on the reasonableness of a level of prescriptions?

1    Well, the reason -- or the reasonableness of the level of

2    shipments, it's set by the doctor prescribing.  Doctors made

3    the judgment as to how many pills were needed.  Distributors

4    were responding to those judgments.  That determines the

5    reasonableness in this marketplace.

6         The evidence is also conclusive that this prescribing

7    of opioids was overwhelmingly in good faith and the Court

8    has heard some of this already, but just to highlight it,

9    the DEA concluded nearly every prescription issued for

10   prescription opioids is for a, quote, "legitimate medical

11   purpose".  Mr. Rannazzisi and Mr. Rafalski both said that 99

12   percent of the doctors were prescribing legitimately and Dr.

13   Keyes said the overwhelming majority of doctors prescribed

14   in good faith.

15        Mayor Williams of the City of Huntington likewise --

16   likewise testified that the vast majority of doctors in

17   Cabell County and Huntington thought they were prescribing

18   opioids appropriately.

19        And, furthermore, Dr. Keyes testified that pill mill

20   doctors do not explain in any significant way the expansion

21   of opioid supply or harms.

22        Not a single witness in this case said the distributors

23   had anything to do with doctors' prescribing decisions or

24   with the changes in the standard of care that the Court has

25   heard about.  And the evidence is also conclusive and

overwhelming that distributors cannot second-guess these
good faith prescribing decisions by doctors.

This was stated very clearly by Mr. Rafalski and Mr.
Rannazzisi.  Mr. Rafalski said the DEA does not expect
distributors to second-guess prescribers and Mr. Rannazzisi
said a distributor cannot make the determination if a
controlled substance is medically necessary and he said
we've never asked a distributor to do that.

So, in hindsight, Your Honor, many in the medical
community now believe that doctors previously prescribed too
many pills, but doctors were asking under the then
prevailing standards of care as they evolved and the
decisions were for the doctors to make, not distributors.

So, let's turn to the second point.  We've just
discussed this first causal gap in the plaintiffs' evidence
based on doctor prescribing.  That is a core causal gap.

But there's a second one, as well.  A second causal gap
is that the harms created by diversion are caused by
multiple criminal acts after opioids are prescribed.  The
only evidence of diversion in this record is when unused
prescription opioids were diverted by family, or friends, or
were sold.

Again, Dr. Keyes made this point very clearly.  Quote,
"Pervasive over-prescribing resulted in unused prescribed
opioid medications diverted for monetary value, bartered, or

1  for no cost."

2      Stated, as well, very clearly again in the paper that's

3  in evidence by Dr. Compton, the Deputy Director of the

4  National Institute on Drug Abuse, where he said as a result

5  of these shifts in practice, referring to the shifts in

6  practice in prescribing behavior, quote, "unused pills

7  became increasingly available for diversion and misuse".

8  Unused pills, a key point.

9      And the plaintiffs make their same point, make the same

10  point, in their abatement brief that they filed just this

11  past weekend.  As the plaintiffs said, as the volume of

12  drugs increase, drugs will be kept in patient's homes where

13  they may be diverted.  This is the heart of the plaintiffs'

14  case that these unused prescription opioids led to harms as

15  the pills were diverted from medical use.

16      Dr. Gupta again made the point very clearly.  He said

17  so instead of three days of prescription, you write for

18  30 days.  That's a problem.  And he said that was a common

19  mistake in the medical profession.

20      So, in other words, doctors made good faith decisions

21  to prescribe opioids, but they prescribed too many pills

22  that were left over or not needed and then the unused pills

23  were diverted out of the medicine cabinet out of homes and

24  led to this pattern of abuse and addiction.  All of this

25  happens after the pills leave the pharmacy and are being

used or abused.

Dr. Keyes again said that when she was talking about exposure and supply, she was talking about opioids that are out in the community. That's the issue. They're out in the community. They've left the pharmacy. They've been dispensed. This is medicine cabinet diversion.

The pills have been prescribed by a doctor, dispensed by a pharmacy, and they're out in the community, and they're being diverted after the pills left the Closed System of Distribution, after they left the closed system.

There is no evidence in this record of pills leaving the pharmacy shelf without a prescription and the evidence confirms that distributors have no control over what happens to pills once they leave the pharmacy.

Mr. Rannazzisi -- I'm sorry. Mr. Rafalski said it very clearly. Distributors have no control over what happens at that point after the pills leave the pharmacy and, in particular, there's no way a distributor could control how many days of pills a doctor decides to write for a particular prescription.

Recall what Dr. Gupta said. They were writing for 30 days when only three were needed. The distributor couldn't possibly control for that, but that's the major source of the unused pills that were then diverted. Or a doctor's decision in the first place that a prescription

1    opioid is the appropriate treatment for a patient in pain.

2    Distributors don't control that.

3         So, in other words, what we're seeing is diversion that

4    occurs when distributors do their job exactly as they're

5    supposed to.  The doctor prescribes the pills and then the

6    patient sells, or gives them away, or the patient misuses

7    the pills after they're prescribed.

8         Mr. Rannazzisi said this very clearly.  He agreed the

9    distributor does what they're supposed to do.  The

10   distributor does what they're supposed to do and the pills

11   get sold, stolen, or given away.

12        So, medicine cabinet diversion is not something

13   distributors create and it's not something they control.

14   Medicine cabinet diversion involves intervening criminal

15   conduct of the people who divert the pills to illicit uses

16   and the people who illicitly use those pills without a

17   prescription.  This all happens outside the closed system

18   after the prescription opioids leave the pharmacy.

19        So, let's put these two points together.  Given the

20   undisputed and overwhelming evidence that prescribing

21   behavior drove the volume and given the undisputed and

22   overwhelming evidence that medicine cabinet diversion is

23   what caused the alleged harm, plaintiffs cannot establish

24   proximate causation.

25        The guiding legal standard is found in *City of*

1    *Charleston* and *Employer Teamsters*, two cases from this

2    district dismissing tort claims under West Virginia law for

3    lack of proximate causation.  As reflected in the quotations

4    on the slide here, those decisions establish that there must

5    be a direct relation between the claimed harm and the

6    wrongful conduct.  Both cases said the same thing, the

7    necessity of distinguishing the direct consequences in a

8    closed causal chain.

9         And, in particular, both decisions highlighted that

10   doctors intervening and prescribing decisions and medical

11   judgments defeated proximate causation under West Virginia

12   law.  And I want to highlight in particular this language

13   from both of these cases, *City of Charleston* saying, "No

14   injury would occur unless the physician proceeded to

15   unnecessarily prescribe opioid treatments."  That's Dr.

16   Gupta's point, prescribing 30 days when three days were

17   warranted.

18        And then *Employer Teamsters* which referred to the vast

19   array of intervening events including, quote, "the

20   independent medical judgment of doctors".

21        This record presents exactly the same issue, exactly

22   the same issue.  Dr. Keyes made the point explicitly.  She

23   said that without doctor prescribing there would be no

24   opioid crisis.  There would be no harm.  She said her view

25   is the opioid crisis would not have occurred if prescribing

opioids had not become standard practice.  Would not have
occurred.

*City of Charleston* found there could not be proximate
causation where, quote, "no injury would have occurred",
that's a quote from the case, without a doctor's
prescription and that's exactly what Dr. Keyes says in this
statement that's in the slide here.  Her testimony fits
precisely within the test established by *City of Charleston*.

Both decisions, both *City of Charleston* and *Employer
Teamsters*, also highlighted other intervening acts,
including, in particular, criminal conduct that defeated
proximate causation.  Both cases referred to many
intervening causes.  *City of Charleston* referred to
including criminal actions of third parties.

Again, this record presents exactly the same issue.
Exactly.  There would be no harm without medicine cabinet
diversion, as we've discussed, which involves multiple
criminal acts after the pills are prescribed and dispensed.
Diversion by family, friends, drug dealers, misuse, or
subsequent illegal drug use.

These acts of diversion are crimes and these multiple
criminal acts likewise defeat proximate causation under *City
of Charleston* and *Employer Teamsters*.  These cases set it
out very clearly.  It's the precise same issue.

Now, Mr. Majestro said yesterday that *City of*

1    *Charleston* distinguished distributors from the defendants in

2    that case.  And the defendant in that case, as the Court

3    will recall, was the Joint Commission, which is the

4    accrediting organization that developed the concept of pain

5    as the fifth vital sign.  We've heard a lot about that

6    through nine or ten weeks of evidence.

7        But all Judge Copenhaver said is that the Joint

8    Commission was even further removed in the causal change

9    than distributors.  He did not hold or suggest that

10   proximate causation exists as to distributors.  That wasn't

11   the issue that was before him.  He concluded that the Joint

12   Commission was further removed.

13       But the same independent actors, the same independent

14   actors whose intervening conduct defeated a showing of

15   proximate causation in the *City of Charleston;* namely,

16   doctors and criminal actors, also defeat proximate causation

17   here.  If anything, the Joint Commission had a far more

18   direct role than distributors in prescribing behavior

19   because, of course, the Joint Commission drove the

20   development of pain as the fifth vital sign.

21       The Court's heard extensive evidence on how important

22   that was in expanding the use of prescription opioids to

23   treat pain and distributors had nothing to do with that.

24   Yet, Judge Copenhaver said that was not enough to establish

25   proximate causation.

1    It also bears emphasis that *City of Charleston* was

2    decided on a motion to dismiss.  This Court now has the

3    benefit of a full record that demonstrates the absence of

4    proximate causation on the record that I've just summarized

5    for the Court.

6    Now, the plaintiffs have said in multiple briefs in

7    this case that proximate causation depends solely on

8    foreseeability, but that is not West Virginia law.

9    Remoteness is clearly a component, a component of proximate

10   causation, under West Virginia law.  Foreseeability is also

11   a component.  They're both elements of the test of proximate

12   causation.

13   And we see that very clearly in the *City of Charleston*

14   case which referred both to foreseeability and remoteness at

15   different passages in that opinion.  As the Court assessed

16   proximate causation, the Court looked at foreseeability.  It

17   then evaluated remoteness.  Both elements had to be

18   evaluated under West Virginia law.

19   And it bears emphasis that *City of Charleston* and

20   *Employer Teamsters* apply this remoteness standard to reject

21   West Virginia tort claims.  The plaintiffs have suggested

22   that these cases are not applying West Virginia law, but

23   that's just wrong.  They're applying the remoteness standard

24   found in West Virginia law and citing to West Virginia state

25   cases for that authority.

1        So, here, we have too many independent third-party

2   actors standing between the distributors' conduct and the

3   alleged harm.  Doctor prescribing, that by itself is enough

4   to defeat proximate causation, but we also have multiple

5   criminal acts thereafter involved in this medicine cabinet

6   diversion.

7        Now, plaintiffs have also blurred this issue of

8   causation by suggesting that joint and several liability

9   saves them on the issue of proximate causation, somehow that

10  that avoids the problem they face, but that's wrong for two

11  reasons.

12       First of all, joint and several liability does not

13  apply here.  The Court has previously held that the West

14  Virginia apportionment statute does not apply, but that's

15  not a holding that liability is joint and several.

16       And I put up on this slide the *Farley* case, a 1920 West

17  Virginia Supreme Court case that's been cited on a number of

18  occasions more recently, and the *Farley* case states the

19  general rule, that tortfeasors acting independently are not

20  jointly liable.

21       And it's notable to look at the facts of *Farley*.

22  *Farley* involved the pollution of a stream by multiple coal

23  companies and the West Virginia Supreme Court held that

24  because those coal companies were acting separately and

25  independently, they were not jointly liable even though

1    their alleged wrongful acts were quite similar and caused

2    similar injury.  In other words, all of the coal companies

3    were putting residue, coal residue, into the same stream at

4    around the same time but, nonetheless, because they were

5    acting independently, joint and several liability does not

6    apply, did not apply.

7         But even assuming that there's joint and several

8    liability, that does not answer the requirement to show

9    proximate causation.  It's a separate question from joint

10   and several liability and, as we've just discussed,

11   proximate causation defeats the plaintiffs' claims under the

12   holdings and the reasoning of *City of Charleston* and

13   *Employer Teamsters*.

14        These two cases of this district set the framework.

15   They answer the same legal issue.  They address the same

16   proximate causation issue now before the Court.

17             THE COURT:  Do you know what the subsequent

18   history of either one of those cases was?

19             MR. HESTER:  On *Employer Teamsters* and *City of*

20   *Charleston*, Your Honor?

21             THE COURT:  Yes.

22             MR. HESTER:  So, as I understand it, *City of*

23   *Charleston,* there is a motion to amend the pleadings that's

24   been pending for over a year, I believe, and in *Employer*

25   *Teamsters*, I believe there was no appeal.

                    THE COURT:  Okay.

                    MR. HESTER:  So, given this overwhelming evidence

that shipments were in response to doctors' prescribing

decisions, the plaintiffs cannot establish a public nuisance

and I want to underscore that.  They cannot establish a

public nuisance on this record.

        And the record evidence establishes that the FDA

approved prescription opioids for the treatment of pain with

specific labeling warnings that highlighted both the risks

and the benefits of these medicines.

        And the Court will recall the testimony of Dr.

Gilligan, who talked about black box warnings, noting that

that was important where the FDA saw a serious specific risk

that it wanted to cull out for doctors.  That's what the FDA

did.  They identified risks and benefits for doctors and

approved these drugs.

        We also have the clear evidence that the DEA

continually approved and expanded the quotas for these

medicines based on its assessment in consultation with the

FDA of the legitimate medical needs of the United States.

        And that's a very important point again, the DEA making

the judgment that the volume of prescription opioids in this

country should properly increase in order to meet the

medical needs of the United States and it did so in

consultation with the FDA.

1          Mr. Farrell said yesterday that a volume of pills could

2     be per se unreasonable.  That cannot be right.  The DEA sets

3     quotas.  The DEA permits the production and shipment of this

4     volume of pills.  It cannot possibly be correct to call that

5     volume of pills per se unreasonable when the DEA, the agency

6     charged with the responsibility, has decided that this

7     volume of pills is necessary to meet the legitimate medical

8     needs of the United States.

9          We've also heard quite a bit about the national medical

10    community that urged much greater attention to the

11    importance of treating pain over a 20-year period or more

12    and also urged much greater use of prescription opioids.

13         We've also heard extensive testimony and discussion

14    over the last two days about these standards issued by the

15    West Virginia Board of Medicine; again, highlighting that

16    doctors should be more attentive to treating pain and should

17    be using prescription opioids to treat pain.  This explicit

18    encouragement from the West Virginia Board of Medicine is

19    extremely important when we're talking about prescribing

20    practices in West Virginia.

21         And we've quoted on this slide the testimony from Dr.

22    Gupta who said, quote, "A doctor practicing in West Virginia

23    should seek to follow the guidelines and policy statements

24    that are issued by the Board of Medicine."  So, here we have

25    it, the Board of Medicine encouraging the use of opioids and

```
 1    Dr. Gupta saying doctors are expected to adhere to that
 2    guidance.
 3         So, when we put these points together we have the
 4    medical community and the key regulators, doctors, the Board
 5    of Medicine, FDA, DEA, the Joint Commission that accredits
 6    healthcare facilities, and others, they authorized, they
 7    directed, they encouraged the use of these medicines for
 8    treating pain.
 9         And even today, even after all this attention that's
10    been given to prescription opioids over the last decade or
11    more, opioids continue to be recommended and approved and
12    they're extensively prescribed even today for treating pain.
13         So, given the uncontroverted evidence of these
14    judgments by doctors, the medical community, and key
15    regulators, the record forecloses a public nuisance claim
16    against distributors for supplying the medicines that
17    doctors prescribed.
18         Under West Virginia law conduct which the public
19    convenience imperatively demands cannot be a public
20    nuisance.  That's the *Pope v. Edward M. Rude* case.
21         Put another way, under the Restatement formulation of a
22    public nuisance the distribution of a medicine to support
23    the medical needs of patients as determined by doctor
24    prescribing cannot be deemed an unreasonable interference
25    with a right common to the public.
```

1      So, under either formulation we submit that this

2  conduct cannot meet the standards for public nuisance.

3  Distribution of these medicines is a critical service needed

4  to support the medical judgments of doctors and to provide

5  pain medicine to their patients.

6      Mr. Rannazzisi made this important point very clearly.

7  He said he agreed that it's, quote, "vital that an adequate

8  and uninterrupted supply of pharmaceutical controlled

9  substances be available for effective patient care", a very

10  important statement that bears directly on this question of

11  a public nuisance.

12      We've already discussed the evidence that the

13  overwhelming majority of prescriptions were written in good

14  faith and that distributors only shipped what doctors

15  prescribed.  So, it follows that the overwhelming majority

16  of shipments were necessary, were necessary, to respond to

17  the good faith prescribing decisions of doctors.

18      Now, let's look at it the other way around.  The

19  implication that distributors of medical products should not

20  distribute medicines that doctors are prescribing has

21  profound and very risky implications.  It cannot be what

22  public nuisance law is intended to do.  It would force

23  distributors to second-guess doctors' prescribing decisions

24  and precisely what the evidence reflects they cannot do.

25      And, as Mr. Rannazzisi acknowledged, the public health

1     would be injured if distributors did not ship medicines that

2     doctors prescribed.  As he said, it's a public health

3     concern when pharmacies cannot dispense legitimate

4     pharmaceutical controlled substances.

5          The idea that this should be a public nuisance would

6     turn the law of public nuisance upside down.  It would

7     preclude or penalize legitimate activity taken in response

8     to legitimate medical judgments made in good faith under

9     prevailing standards of care.

10         This same theory of public nuisance could apply to the

11    Smithfield ham example that the Court raised during the Rule

12    52 arguments, a product with legitimate benefits and

13    legitimate uses that also has adverse health effects.  As

14    the Court noted, ham contributes to obesity.  At least some

15    people say it does.  And to public health problems.

16         But that is not a public nuisance claim because

17    virtually all products have risks alongside the benefits and

18    this is particularly true for medicines, which always have

19    risks and benefits.  That's what doctors weigh when they

20    prescribe them.  And that's what the regulators weigh when

21    they approve and permit products, medicinal products, to be

22    in the marketplace.

23         So, it was one thing for the plaintiffs to plead a

24    claim of public nuisance.  As the plaintiffs noted to the

25    Court, many courts have denied motions to dismiss public

1    nuisance claims and we understand that at the motion to

2    dismiss phase, but we now have a full evidentiary record,

3    the first one in the country involving distributors of

4    prescription opioids.  And the record we've just discussed

5    demonstrates why this cannot be a public nuisance.

6         Mr. Farrell said in the Rule 52 arguments that they

7    brought this public nuisance case, quote, "rather than

8    bringing 8,000 personal injury cases".  That demonstrates

9    precisely why this is not a proper public nuisance claim.

10   It's an amalgamation of potential personal injury cases,

11   each one of which would present its own unique factual

12   pattern.

13        And there's already a well-developed body of product

14   liability law that applies where individuals are injured or

15   claim injury from a product.  Public nuisance law does not

16   fit this sort of claim.

17        And we see that reflected very clearly in the Third

18   Restatement of Torts, which says that mass harms caused by

19   dangerous products are better addressed through the law of

20   product liability.

21             THE COURT:  Could the plaintiffs have brought a

22   class action on behalf of the -- of the 8,000 people who

23   were involved here?

24             MR. HESTER:  I would think so, Your Honor, subject

25   to resolution of any class action issues around commonality

1    and the like, but one could imagine that there still would

2    be a theory of common -- common injury or common factual and

3    legal issues that would suffuse that kind of a class action,

4    I would think.  I haven't looked at it that carefully.

5        But I think the point, is we have -- it's effectively a

6    products-related claim claiming injury and seeking treatment

7    for the injuries from the use of opioids.  It feels like a

8    classic concept of a products liability claim.

9            THE COURT:  I think about the asbestos cases and

10   there were thousands of cases, but there were individual

11   plaintiffs, if I remember that correctly.

12           MR. HESTER:  That's right, Your Honor, and that is

13   the way those cases were resolved.

14       And as the Restatement says, quote, "The common law of

15   public nuisance is an inept vehicle for these kinds of

16   products claims."

17       And we see this stated very clearly in this *State v.*

18   *Lead Industries* case, one of the -- one of the lead paint

19   cases in a very thoughtful decision issued by the Rhode

20   Island Supreme Court where the Court said, first, a public

21   right is more than an aggregate of private rights by a large

22   number of injured people.  And the Court also said that the

23   manufacture and distribution of products rarely, if ever,

24   causes a violation of a public right that would support a

25   public nuisance claim.

1          And this gets, Your Honor, to some of the cases that I

2     think you just alluded to.  Consistent with the reasoning

3     that we've just discussed, a wide range of cases, from lead

4     paint, to asbestos, to handguns, and many others, have

5     recognized that public nuisance does not apply to what is

6     essentially an amalgamation of personal injury claims.

7          And we've quoted some of the language here.

8          "Law of public nuisance never before has been applied

9     to products, however harmful."

10         "Nuisance would become a monster that would devour in

11    one gulp the entire law of tort."

12         "So broad and undefined that the presence of any

13    potentially dangerous instrumentality could be deemed to

14    threaten it" and so forth.

15         There are a lot of cases that follow this same line of

16    reasoning and that have recognized the inherent problems

17    presented when we are talking about applying public nuisance

18    to products.

19         The Smithfield ham example was a good one.  I think

20    medical products are even better.  Because they're

21    prescribed by doctors to meet a medical need, there's an

22    intervening judgment that these are important for a medical

23    purpose and that's -- should, in my view, be the paradigm of

24    a case that doesn't extend to product -- to a nuisance

25    theory.

1          Of course, any medicine, any prescription medicine, has

2     risks and benefits, but when doctors weigh the risks and

3     benefits and prescribe a medicine in good faith to treat

4     pain, the record demonstrates why it is vital that patients

5     have access to that medicine because the implication of a

6     nuisance theory here would be patients would have less

7     access to medicine that doctors are prescribing to treat

8     pain.

9          And the record demonstrates why it would be dangerous

10    and, in fact, entirely unworkable to suggest that

11    distributors should be placed in the position of

12    second-guessing the medical judgments of doctors by refusing

13    to ship what doctors are prescribing.

14         So, that gets us through public nuisance.  Let's turn

15    now to discuss the evidence of McKesson's distributions in

16    Cabell-Huntington.

17         This exposes another fundamental gap in the plaintiffs'

18    case against McKesson.  They have no evidence of diversion

19    by any of McKesson's customers in Cabell-Huntington.  They

20    have no evidence of any improper activity by any of

21    McKesson's customers in Cabell-Huntington.  They have no

22    evidence that any of McKesson's shipments into

23    Cabell-Huntington were improper or unlawful.  And they have

24    no evidence that any of McKesson's shipments into

25    Cabell-Huntington caused harm.

1          Now, the plaintiffs repeatedly mentioned 81 million

2     pills yesterday in their closings, but McKesson did not

3     distribute 81 million pills in Cabell-Huntington.  In fact,

4     if we look at the data, 76 percent of McKesson's

5     distributions in Cabell-Huntington went to the VA Hospital.

6          And the plaintiffs do not contest those shipments to

7     the VA.  In fact, they don't allege that the VA shipments

8     were excessive.  They excluded the VA shipments from their

9     analysis.  They presented no evidence of diversion from the

10    VA shipments.  No evidence of any harm from the VA

11    shipments.

12          THE COURT:  But there wasn't anything about the VA

13    situation that made the possibility for diversion there much

14    different than non-VA pills, was there?

15          MR. HESTER:  Well, it's -- the record is entirely

16    silent on it, Your Honor, and the plaintiffs certainly

17    presented no evidence of any diversion from VA shipments.

18          And the point I wanted to highlight here in particular,

19    two of the plaintiffs' experts explained they were not

20    looking at the VA.  So, Mr. -- Dr. McCann excluded the VA

21    summaries from his analysis.

22          But then, if you look at Mr. Rafalski's statement on

23    the right-hand side, he said the diversion is occurring at

24    the retail pharmacy level.  And so, it wouldn't have been,

25    as he said, prudent to include a hospital in the analysis.

```
 1           So, Mr. Rafalski almost pointed it the other way, Your
 2    Honor, saying that he didn't think it was appropriate to
 3    look at the VA shipments in evaluating diversion but,
 4    certainly, the plaintiffs presented no evidence at all, made
 5    no --
 6                THE COURT:  I'm puzzled by this.  It seems like,
 7    you know, you go into the hospital and you have surgery and
 8    they give you a bottle of pills to take home with you.  I
 9    don't see that as any different than picking them up at the
10    pharmacy.
11                MR. HESTER:  Well, I think our point, Your Honor,
12    is principally an entire lack of evidence and the plaintiffs
13    -- the plaintiffs, in fact, excluded the VA entirely from
14    their own analysis when they present a theory of diversion.
15           But putting aside the VA shipments, McKesson is only
16    the sixth largest distributor of prescription opioids into
17    Cabell-Huntington.
18           And putting aside the VA, McKesson shipped 5.5 million
19    pills into Cabell-Huntington from 2006 to 2014.
20           So, I have put up a slide here from Mr. -- Dr. McCann.
21    He said there were 36 distributors of prescription opioids
22    in Cabell-Huntington over this period.  There were five
23    companies that shipped more than McKesson.  That amounted to
24    close to 200 million MMEs of pills.  And, as he said, that's
25    not a dominicus amount.  So, in other words, there's a lot
```

1    of others that were distributing in Cabell-Huntington.

2        And so, McKesson's share if you remove the VA amounts

3    to six percent of the volume of shipments into

4    Cabell-Huntington putting aside the VA.  And if the

5    plaintiffs' entire theory is high volume it doesn't hold

6    water as to McKesson.

7        Now, plaintiffs blur this point by pointing to McKesson

8    shipments outside of Cabell-Huntington.  Their directed

9    verdict briefing names nine pharmacies served by McKesson

10   that are between 50 and 150 miles outside of Cabell County

11   and the red dots on this slide reflect it, quite a long way

12   away, and they just pointed to two pharmacies in

13   Cabell-Huntington in their briefing that were customers of

14   McKesson, I should say.

15       And as Dr. McCann testified, there is no evidence that

16   any patients from Huntington or Cabell ever visited any of

17   the nine pharmacies outside of Cabell-Huntington that the

18   plaintiffs had identified and we've quoted that on the

19   slide.  He did not identify any patients who went to any of

20   those pharmacies from Cabell-Huntington.

21       The plaintiffs also go even further outside Huntington

22   and Cabell to internet pharmacies that were operating in

23   Florida, but the evidence of diversion and drug trafficking

24   related to internet pharmacies is completely stale.

25   Congress barred internet pharmacies in 2008.  It's not been

1    happening for over a dozen years, as Mr. Rannazzisi

2    acknowledged.

3        And even as to the internet pharmacies operating prior

4    to 2008, there's no evidence that any distributor in this

5    case ever shipped to any internet pharmacy whose pills made

6    their way to Huntington or Cabell.  There is just no

7    evidence on this at all that links these internet pharmacies

8    to Huntington-Cabell, but perhaps the more important point

9    of all is it's more than a dozen years old and we're in a

10   forward-looking case.

11       So, in short, there's no evidence that links McKesson

12   shipments to these other pharmacies to any harms in

13   Cabell-Huntington and McKesson's small share in

14   Cabell-Huntington defeats causation.  These small shipments

15   cannot have been a substantial factor in plaintiffs' claim

16   that excessive volumes of opioids caused them harm.

17       The claims cannot properly rely on this talisman of 81

18   million pills as their core theory of liability without

19   grappling with the fact that McKesson had only a very, very

20   small share of that volume.  They can't have both sides of

21   this.

22       And McKesson, in fact, had only a few customers in

23   Cabell-Huntington and none were even mentioned in the

24   plaintiffs' closing.  As Mr. Ashworth, the sales rep who

25   serves Cabell-Huntington said, currently has three customers

1     in Cabell-Huntington and he had a couple of customers if he

2     went back to 2010.  And the plaintiffs have no evidence of

3     any wrongdoing in McKesson's sales to these customers or any

4     misconduct by its customers.

5          Mr. Rafalski said he was not offering any opinions

6     about whether diversion occurred at a pharmacy level in

7     Cabell-Huntington.

8          And Mr. Rannazzisi said he could not identify any

9     orders that he believes DEA should have blocked in

10    Cabell-Huntington but were not.

11         The only -- and to the contrary -- so there's no

12    evidence of misconduct and, to the contrary, the West

13    Virginia Board of Pharmacy concluded that Rite Aid, one of

14    McKesson's customers in Cabell-Huntington, dispenses

15    medications only for legitimate medical purpose and is a,

16    quote, "good pharmacy", in all caps, underlined, and with an

17    exclamation point, the Board of Pharmacy reviewing Rite Aid,

18    one of McKesson's customers, consistently finding it was

19    complying with the law and was a good pharmacy.

20         The only other record evidence of a McKesson customer

21    in Cabell-Huntington relates to Custom Script, which was the

22    twenty-sixth largest pharmacy in the community, and served

23    primarily oncology clinics and Hospice facilities.

24         Now, let's contrast that.  Let's contrast the lack of

25    evidence of any -- of any wrongdoing with the evidence of A+

1    Pharmacy.

2         The evidence reflects that Miami-Luken, a distributor

3    that's not in this case, supplied A+ Pharmacy, a bad

4    pharmacy that was shut down in Cabell-Huntington.  A+

5    Pharmacy was never supplied by any of these defendants.  A+

6    dispensed more than a half million prescription opioids and,

7    in 2014 alone, this represented 97 percent of the pills

8    seized by the Huntington Police Department.

9         Your Honor, if we wanted to find a case of actual

10   pharmacy-level diversion, actual wrongdoing, this would be

11   it.  This is what it looks like.  This is the kind of

12   evidence that the Court might have been anticipating when

13   the case began.  Yet, Miami-Luken is not even a defendant in

14   this case that alleges harm from the distribution of

15   opioids.

16        So, as we've discussed, the plaintiffs' case is based

17   on their claim that the volume of prescription opioids was

18   excessive.  That's the core.  That's the heart of what

19   they're claiming.

20        But the key players who contributed to this volume of

21   prescription opioids are not parties here.  Doctors who

22   prescribed the volume of pills.  Drug dealers who illegally

23   trafficked prescription opioids into the community.

24   Manufacturers who developed these prescription opioids and

25   then promoted the prescribing of these pills to doctors.

1    Pharmacies that dispensed prescription opioids in

2    Cabell-Huntington.

3         Three distributors, not defendants here, that accounted

4    for a larger volume of prescription opioids in

5    Cabell-Huntington than McKesson.  And Miami-Luken, of

6    course, which supplied A+ Pharmacy.

7         These are clear examples of missing parties that had a

8    much more direct role in the volumes at stake here and the

9    volumes that the plaintiffs relied upon, volumes that

10   plaintiffs claim their harm.

11        So, to sum up, there is no record evidence to support a

12   finding that McKesson was a substantial factor in causing

13   the opioid crisis in Cabell-Huntington, particularly where,

14   unlike Miami-Luken, there's no evidence of any issues with

15   any of the pharmacies McKesson served.

16        So, Your Honor, let me turn to a new subject.  The

17   plaintiffs claim the distributors' failure to report

18   suspicious orders proves causation, but they have no

19   evidence linking suspicious order reporting to diversion or

20   to any harms in Cabell-Huntington.  The evidence, in fact,

21   directly contradicts plaintiffs' theory that diversion was

22   caused by the defendants' failure to report suspicious

23   orders.

24        First of all, McKesson and the others always reported

25   all shipments to the ARCOS database.  These volumes were

known and fully available to the DEA.  And they were public,
always public, at the three-digit zip code level.

No federal or state regulator ever said that McKesson's
shipments were excessive or inappropriate.  No federal or
state regulator ever said that McKesson's shipments were
unreasonable.

The evidence also establishes that McKesson always
blocked orders that were likely to be diverted.  It was very
clear it was done before 2008 and after 2008.  Orders likely
to be diverted were always blocked.  And it's important to
emphasize that orders likely to be diverted are different
from suspicious orders.

I'm sure the Court has struggled a bit with the
language of this regulation, the classically vague
regulatory formulation defining a suspicious order as an
order of unusual size or frequency or deviating from a
normal pattern.

The record establishes that there are many benign,
completely neutral reasons that an order might vary in size
or frequency.  Mr. Rafalski said there were all kinds of
circumstances where an order can be of unusual size, pattern
or frequency and not be diverted.  He agreed with that
statement.

Now, before 2008, based on DEA's guidance and industry
practice, McKesson reported all suspicious orders, but only

1    blocked the orders that it believed were likely to be

2    diverted.

3        Mr. Rannazzisi testified that no distributor, no

4    distributor, was blocking all suspicious orders before 2008.

5    And we see this reflected clearly in the money case, *United*

6    *States v. $463,000-and-some* out of the Eastern District of

7    Michigan where the Court said that it was a standard

8    practice to file Suspicious Order Reports while continuing

9    to ship products and further said that practice had been

10   approved by the DEA.  This was based on testimony of DEA

11   witnesses.  And there was also testimony in that case that

12   DEA changed its policies around 2006 or '7.

13       We see the same point in the *Masters Pharmaceutical*

14   decision from the D. C. Circuit which similarly reflects

15   that the requirement not to ship suspicious orders was first

16   articulated in the *Southwood* decision, which was in 2007.

17       So, we see starting in 2008 McKesson blocked all

18   suspicious orders, but it reported less.  That was based on

19   specific guidance from DEA that it wanted fewer Suspicious

20   Order Reports, and it -- but it did want distributors to

21   block all suspicious orders.

22       Now, in 2008, McKesson reached a settlement agreement

23   with DEA that involved no admission of wrongdoing and, in

24   response, the DEA reviewed and passed McKesson's Suspicious

25   Order Monitoring Program.  McKesson told DEA that it would

1    be reporting fewer suspicious orders as DEA had requested.

2    DEA passed and raised no objection to that practice.

3         In 2017, McKesson entered into a second Settlement

4    Agreement with DEA.  This related to suspicious order

5    reporting before 2013 because McKesson changed its reporting

6    immediately after this issue first arose in 2013.  The only

7    admission, the only admission in that Settlement Agreement,

8    related to whether McKesson had sufficiently reported those

9    suspicious orders.

10        The 2017 settlement had no admission of any failure to

11   block.  There's a very important distinction between

12   reporting and blocking.  There was no admission of any

13   failure to block suspicious orders and there was no

14   admission of any diversion or any lack of sufficient due

15   diligence on customers or orders.

16        So, this second settlement reflected DEA's changing

17   guidance on the reporting of suspicious orders that it

18   wanted more.  There was a period of time when it wanted

19   less.  It then wanted more.  That was based -- that was

20   reflected in this settlement.

21        But, notably, the evidence also reflects that DEA did

22   nothing with these Suspicious Order Reports even when they

23   were received.  There was no action taken on any suspicious

24   orders.

25        Mr. Rafalski acknowledged that he couldn't point to any

1    action that DEA took on any suspicious order that McKesson,

2    Cardinal or ABDC made for Cabell County or Huntington.

3         Mr. Rannazzisi couldn't even say whether more than one

4    percent of suspicious orders had triggered an investigation

5    by DEA.

6         And, in fact, we see a recent Office of Inspector

7    General Report that's in the record that found an utter

8    failure by DEA to take any action in response to this

9    suspicious order reporting.  One finding was that the

10   suspicious order reporting database was seen within DEA as

11   a, quote, "joke" and that Field Division staff did not even

12   have access to this suspicious order reporting database

13   until 2017.

14        Another finding was that when they asked the Field

15   Division staff to find Suspicious Order Reports, they

16   couldn't even locate them.

17        So, this evidence reflects that it would not have

18   mattered if more suspicious orders had been reported.  DEA

19   was doing nothing with them even when they were reported.

20        Perhaps even more important, Your Honor, for purposes

21   of this forward-looking case, there is no evidence of any

22   failures to report suspicious orders after 2013.  So, here

23   we are in 2021 in a case that seeks a forward-looking remedy

24   over 15 years and the evidence establishes, first, that all

25   orders likely to be diverted have always been blocked.  All

1    orders likely to be diverted have always been blocked.  And

2    the evidence establishes that all suspicious orders have

3    been blocked since at least 2008; so, for more than a dozen

4    years.

5         There cannot be any harm or any diversion from orders

6    that were blocked and not shipped.  Mr. Rannazzisi

7    acknowledged this.  He agreed if the order is blocked the

8    medicine can't go downstream.  It makes sense.  If it's

9    blocked it can't get out to the public.  It can't be

10   diverted.

11        Mr. Rafalski said the same thing.  He agreed, if you

12   block an order, it would not lead to diversion.  He said

13   blocking the order -- he agreed, blocking the order is what

14   prevents diversion.

15        Now, Mr. Rafalski did suggest that more orders should

16   have been flagged and he came up with his own methodology

17   for flagging more suspicious orders.  And there's been quite

18   a bit of briefing to the Court on this.  I'll go through it

19   quickly.

20        The important point is his testimony cannot be

21   credited.  He used a methodology that was never used at the

22   DEA to identify suspicious orders and was created solely for

23   purposes of litigation.  He presented six methods for

24   detecting suspicious orders, but on the witness stand he

25   disclaimed four of them as not plausible.

1          He had no opinion about how many flagged orders should

2    have been reported to DEA.  He did not evaluate the medical

3    needs related to any harm from flagged orders.

4          He had a remarkably wide range of error, from

5    20 percent in one analysis to 97 percent in another,

6    shocking imprecision in methodology and his analysis was

7    incompatible with DEA's own estimate of only .1 percent of

8    orders being suspicious and diverted.

9          So -- and he also applied -- he applied his

10   no-due-diligence assumption without reviewing any orders and

11   I want to go back to that point in a little more detail.

12         What happened with Mr. Rafalski's methodology was a

13   highly artificial flagging of orders.  If the threshold was

14   exceeded in one month, his method assumed that all

15   subsequent orders were suspicious even if none exceeded the

16   threshold after that first month.

17         And the Court will recall these two charts, the one on

18   the left reflecting his assumption that every order after a

19   first month should have been flagged as suspicious when, in

20   fact, only one month's order exceeded the threshold, as

21   reflected in the right-hand side of this slide.

22         Mr. Rafalski based his methodology on an assumption

23   that no diligence was conducted on suspicious orders.  That

24   was an assumption he did not check and it was contradicted

25   by the record.  The record establishes that McKesson and

1    others systematically conducted diligence on blocked orders.

2    And Mr. Rafalski said in response to that point he couldn't

3    find evidence of this diligence a decade later when he did

4    his analysis.

5         But the evidence established that there was no

6    requirement to keep diligence records for a decade or more.

7    Generally speaking, the records retention was two years for

8    these diligence files, as reflected in the testimony of Mr.

9    Oriente and others.  So, the fact that Mr. Rafalski couldn't

10   find diligence files a decade later is not proof that the

11   diligence was not done and, to the contrary, the direct

12   evidence from those who were involved is that diligence was

13   done.  It was conducted for both customers and orders.  And

14   this evidence directly undermines the core premise and the

15   core assumption of Mr. Rafalski's flagging methodology.

16        Furthermore, even if Mr. Rafalski is right that more

17   orders should have been flagged as suspicious, an order,

18   whether it is suspicious or not, would sit on the shelf

19   harming no one unless a doctor writes a prescription and the

20   pills are dispensed.

21        And this is the point that Dr. Gupta made, Dr. Keyes

22   made.  They both agree pills don't leave the pharmacy

23   without a prescription.  I think we've established that

24   clearly in this record.

25        And this shows why the plaintiffs' theory of harm is

1    not based on suspicious order monitoring or reporting and I

2    want to underscore that.  Their theory of harm is not based

3    on suspicious order reporting.

4        Their theory of harm depends on prescriptions being

5    written.  The only harm that occurs is when doctors write

6    prescriptions and the pills are dispensed and out in the

7    community.

8        The question of whether more orders should have been

9    reported doesn't bear on the question of whether, in fact,

10   the pills get out into the community.  That is caused by

11   doctor prescribing.  This is made very clear in the

12   testimony of Mr. Rafalski, who agreed that not reporting

13   suspicious orders to DEA is not what causes diversion.

14       It also bears emphasis that the State of West Virginia

15   has repeatedly licensed McKesson to distribute prescription

16   opioids.  That reflects the State's own finding that

17   McKesson is operating in compliance with federal legal

18   requirements and is maintaining effective controls against

19   diversion.  That's the basis for the State of West

20   Virginia's authorizations.

21       And based on these determinations, the State of West

22   Virginia has approved McKesson 150 times since 2014 alone

23   and I would submit that ties back, Your Honor, to the public

24   nuisance point we discussed a bit ago.  The State needs

25   these distributors to operate, to provide medicines that

1    doctors are prescribing.

2         The Court need not resolve every detail of these

3    suspicious order reporting issues to conclude that they're

4    irrelevant to plaintiffs' claimed harm.  Failures to report

5    some suspicious orders, even if they happened, could not

6    have contributed to excessive volume and could not have

7    caused harm because the record establishes these orders were

8    blocked and never shipped.  Whether they were reported or

9    not, they were blocked.

10        And I want to highlight again the harm that the

11   plaintiffs claim in this case is from the volume of pills

12   dispensed by pharmacies that went into medicine cabinets and

13   ended up being misused, abused, or given away.  That harm

14   could not have occurred from orders that were blocked and

15   never shipped.  Whether or not more should have been

16   reported to DEA as suspicious, the point is, they were

17   blocked.  They didn't contribute to the volume that the

18   plaintiffs claim caused them harm.

19        I'm ready to turn to a new subject, Your Honor.  Should

20   we keep going?

21             THE COURT:  Yeah.  I think we probably need a

22   break here, Mr. Hester.

23             MR. HESTER:  All right, Your Honor.

24             THE COURT:  We will be in recess for ten minutes.

25        (Recess taken)

1          THE COURT:  You may proceed, Mr. Hester.

2          MR. HESTER:  Thank you for the short break, Your

3     Honor.

4          Before I move on to my next topic, I did want to go

5     back to one point.  I don't want to oversell the idea of

6     class actions for products cases.  I don't want to -- I

7     don't want to overstate the prospects for that.

8          I do think, perhaps as this litigation reflects, there

9     are ways to consolidate litigation through Bellwethers and

10    other mechanisms probably, in fairness, class actions

11    involving straight products liability claims have not been

12    certified so far as we know.  So, I checked with my

13    brethren, who know more about this than I do, but I just

14    didn't want to oversell to the Court that that was an easy

15    alternative.

16         I think it's probably complicated, but I think our real

17    point is it's not a public nuisance and there would be

18    consolidated frameworks by which that kind of litigation

19    could be handled, as we're seeing in this case.

20         So, let me turn along to my next subject, which is

21    illegal drug abuse.  I'm going to turn to what we see as a

22    different gap in the plaintiffs' evidence of causation

23    related to illegal drug abuse.

24         The evidence shows a 50 percent decline in opioid

25    prescribing since 2013.  The volume of prescription opioids

1    on which plaintiffs stake their case has declined

2    dramatically.

3         The Pill Mountain that Mr. Farrell highlighted in his

4    opening has really disappeared or fallen away.  And the

5    recent volumes that we see with prescribing are vastly lower

6    than Mr. Farrell's 81 million pills between 2006 and 2014.

7    If we moved it forward, we would see lower volumes.

8         And it's reflected here in the testimony from Dr.

9    Gupta, who said there's been a quite significant decline,

10   52 percent decline in prescribing between 2014 and 2019.

11        So, any crisis created by the volume of prescription

12   opioids ended years ago.  That's a highly significant point

13   in a case involving solely prospective relief.  Plaintiffs

14   have no evidence that today's level, today's level of opioid

15   prescribing, is excessive and they focused almost entirely

16   -- when they talk about prescription opioid shipments,

17   prescription opioid volumes, they're almost always relying

18   on evidence that's at least a decade old.

19        And there's been a lot of discussion in this case of

20   evidence as far back as 2007-2008 related to prescription

21   opioid volumes.  That has changed fundamentally.

22         So, the record establishes, in fact, that this is no

23   longer a prescription opioid crisis.  It has shifted.  As

24   Dr. Gilligan said, it has shifted to the abuse and misuse of

25   heroin and fentanyl and fentanyl analogues.  It's a crisis

1    of heroin and fentanyl abuse.

2        Sheriff Zerkle said the same thing.  Pills were very

3    prominent in 2007 to 2010.  As of 2017, he said the issue,

4    predominantly heroin.  He said now most of our Drug Unit

5    stuff is more toward the meth side now.

6        Mr. Lemley stated that the community had, quote, "moved

7    on from prescription opioids", progressed to heroin and

8    fentanyl and carfentanil.

9        And Dr. Smith's charts reflected the point and

10   illustrated the point very clearly that the issue in

11   Cabell-Huntington today is overdoses from heroin and illicit

12   fentanyl and we see this enormous spike in fentanyl

13   overdoses starting around 2014 and moving forward.

14       So, the plaintiffs pivot.  With the huge drop in

15   prescribing they pivot to blame distributors for this

16   illegal drug crisis, but there are several fundamental flaws

17   in the illegal drug theory.

18       First of all, this cannot possibly meet the proximate

19   causation requirements.  The plaintiffs' theory is that the

20   volume of prescription opioids led to later abuse of illegal

21   drugs, but as the Court is well aware and the record

22   reflects, illegal drugs are driven by drug cartels and drug

23   dealers, not the distributors of lawful medicines.

24       Very colorfully stated by Sheriff Zerkle, who talked

25   about when we arrest someone, there's someone in Detroit

1    saying saddle your horse.  You're going to Huntington.  The

2    police documents noting that Huntington has often been

3    referred to as Little Detroit.

4         Mayor Williams emphasized that Detroit drug dealers are

5    a significant cause of the opioid problem and he said

6    Detroit and other cities, yes.

7         And, of course, illegal actors took extensive action to

8    increase the market for heroin and illicit fentanyl.  Dr.

9    Gupta described they reduced the price of heroin.  They

10   increased the purity of heroin to unseen levels, more pure,

11   lower price.  They increased the supply of heroin.

12        And, as reflected in the report from Dr. Compton of the

13   National Institute on Drug Abuse, they sold heroin like

14   pizza, a pizza delivery-like way of marketing heroin to

15   potential suburban buyers who otherwise might have been

16   frightened to engage with the illicit drug trade.  That's

17   what's happened in recent years.

18        And, of course, licensed pharmaceutical distributors

19   had nothing to do with these decisions and with these

20   actions taken entirely by criminal actors.  So, this

21   criminal activity is a fundamental obstacle to the

22   plaintiffs' theory based on illegal drug use.

23        There was a nice discussion by Mr. -- Ms. Mainigi this

24   morning of the sequence.  We have prescription opioids

25   stolen or given away, a crime.  Prescription opioids being

1    misused for a non-medical purpose, a crime.  A person who

2    develops OUD as a consequence.  A person with OUD who

3    subsequently acquires illegal drugs, another crime.  Drug

4    traffickers or cartels who supply those illegal drugs,

5    another crime.

6        Now, the plaintiffs are simply wrong in suggesting that

7    illegal drugs are just, quote, "the other side of the coin

8    from prescription opioids", or that prescription opioids,

9    there was a colorful phrase yesterday in the closings are,

10   quote, "pharmaceutical grade heroin", kind of a shocking

11   assertion, I think.

12       To the contrary, heroin abuse is the result of

13   extensive criminal activity by Mexican drug cartels and

14   other illegal criminal organizations.  By drug dealers.  By

15   those who adulterate heroin with fentanyl.  And by those who

16   buy and abuse those illegal drugs.  That is a far cry from a

17   doctor prescribing an FDA approved medicine for the

18   treatment of a legitimate medical need.

19       *City of Charleston* again tells us the answer and

20   demonstrates that proximate causation cannot be established

21   as to this illegal drug activity.  Illegal drug use under

22   the *City of Charleston* test is unduly remote.  And we've put

23   the language up here on the slide where plaintiffs claims

24   rely on, quote, "various criminal actions by third parties".

25   The Court found that these were too many intervening causes,

1    including the criminal actions of third parties.

2         That's the exact same issue presented here in relation

3    to illegal drug use.  It's already been decided by the *City*

4    *of Charleston* decision.

5         Now, the plaintiffs try to bypass this issue of

6    proximate causation by arguing it was foreseeable that

7    prescription drug abuse would lead to later illegal drug

8    use, but that's not a correct statement of West Virginia

9    law, as we've previously discussed.  Remoteness and

10   foreseeability are both elements of proximate causation

11   under West Virginia law, as *City of Charleston* itself

12   reflects.

13        But even under the plaintiffs' foreseeability theory

14   there's no evidence that these harms were foreseeable.

15   There is no evidence that distributors should have foreseen

16   and expected that illegal drug cartels from Mexico and

17   elsewhere would flood the market with low price high purity

18   heroin or would adulterate the heroin supply with illicit

19   fentanyl.

20        There's no evidence that doctors prescribing medicine

21   in good faith foresaw illegal drug use.

22        There's no evidence that DEA foresaw illegal drug use

23   when it was continually increasing the quotas for

24   prescription opioids.

25        There's no evidence that FDA foresaw illegal drug use

1   when it approved prescription opioids for the treatment of

2   pain.

3        And there's no evidence that the West Virginia Board of

4   Medicine foresaw illegal drug use when it encouraged doctors

5   in West Virginia over and over again to be more attentive to

6   patients' pain and to use more prescription opioids.

7        The illegal drug crisis cannot have been foreseeable to

8   distributors when every aspect of the healthcare and

9   regulatory system in this country encouraged increased

10  prescribing without ever thinking it would lead to a

11  heroin-fentanyl crisis.

12       So, in short, proximate causation is a complete answer

13  to a claim of harms flowing from prescription opioids to

14  subsequent illegal drug use.  It fails on proximate

15  causation grounds under *City of Charleston*.

16       But there's also a second complete answer to

17  plaintiffs' illegal drug theory.  Plaintiffs, of course,

18  have asserted a direct causal gateway between prescription

19  opioids and later illegal drug use.  This does not stand up

20  to the evidence.

21       Plaintiffs rest their gateway theory on the evidence

22  that many heroin users previously abused prescription

23  opioids, but the plaintiffs do not have evidence

24  establishing that prior abuse of prescription opioids causes

25  -- causes later heroin abuse.

1    Rather, the evidence reflects that what we're measuring

2    here is a broader substance abuse problem, that heroin users

3    who previously abused prescription opioids in fact abused

4    many other drugs.

5    And the most powerful study on that is the one

6    reflecting that 80 percent of heroin users had previously

7    abused prescription opioids, something we've talked about

8    with the Court quite a bit, but that same study also found

9    that almost 100 percent of those heroin users had previously

10   abused other illegal drugs, reflecting this point.  It's a

11   substance abuse problem.  It's not a simple gateway, pills

12   to heroin.

13   Dr. Keyes acknowledged that heroin users have broader

14   substance abuse problems.  She noted the most common first

15   substance use is tobacco and alcohol.  Then there's a

16   progression to other drugs.

17   Dr. Gilligan described the same point, that it's a

18   broader substance abuse problem that we're seeing.

19   And this was summed up nicely and effectively in the

20   article from Dr. Compton, again, the Director -- Deputy

21   Director of the National Institute on Drug Abuse, who said

22   that "conclusions", quote, "about cause and effect between

23   prescription opioid abuse and later heroin abuse is

24   uncertain and that other factors explain this transition

25   from one to the other, including changes in the heroin

1  supply and the heroin market."

2  So, in short, the supposed gateway, the theory that

3  prescription opioid abuse causes, causes later heroin abuse,

4  is not supported by the evidence.  And the evidence of a

5  gateway is surely too thin, too thin to hold distributors

6  liable for the illegal drug activity of criminal actors in

7  drug cartels.

8  But I want to emphasize the Court need not resolve this

9  whole gateway issue to reject these illegal drug claims for

10  failure to proximate causation.  It's a much simpler way to

11  get to the answer because *City of Charleston* tells us the

12  answer.  They can't establish proximate causation where they

13  have all of these intervening acts of illegal actors in the

14  drug chain for illegal drugs.  We don't need to resolve the

15  gateway to reach the conclusion under *City of Charleston*.

16  Let me turn to my last topic, Your Honor, the abatement

17  remedy.  In our Rule 52 motion and argument we already

18  addressed the core legal and analytical flaws in the

19  abatement remedy.

20  And just to summarize briefly, almost the entire remedy

21  is for treatment and for harms related to opioid abuse.  The

22  remedy is not addressing the distributors' conduct but is

23  instead seeking payment for the treatment of opioid use and

24  addiction and related harms.

25  And in their closings yesterday, both Mr. Farrell and

 1    Ms. Kearse highlighted that the plaintiffs are seeking money

 2    predominantly for treatment of addiction as the core element

 3    of their remedy.  Yet, the plaintiffs waived any claim for

 4    damages, stated clearly in this slide on the board, and

 5    treatment costs are clearly damages arising from opioid

 6    addiction and abuse.

 7         In addition, and even more fundamentally, abatement,

 8    the purpose of abatement, is to address conduct giving rise

 9    to a nuisance, not the downstream harms caused by the

10    nuisance.  Here the claimed nuisance, as the plaintiffs have

11    articulated it, is the excessive distribution of the volume

12    of opioids.  Yet, the plaintiffs are not seeking any remedy

13    that's realistically tied to the level of distributions or

14    the volume of prescription opioids.  They're instead seeking

15    money for the harms caused by addiction and abuse.

16         Treatment of harms is not a proper abatement remedy.

17    That is not addressing the conduct said to give rise to the

18    nuisance.

19         Another flaw.  A huge part of the plaintiffs' remedy is

20    for future addiction for people who develop addiction years

21    into the future.  The Court will recall the question that

22    was put to Dr. Alexander about a child who is ten years old

23    as of 2021, has never used opioids, begins using opioids in

24    -- or begins abusing heroin in 2027 as a teenager and

25    develops OUD.  That person who develops OUD years into the

future from heroin abuse would be included within the scope
of the plaintiffs' remedy.

Yet, the plaintiffs have no evidence of any future
conduct, future conduct by defendants, that could make them
liable for this kind of future addiction.  And, in fact,
plaintiffs' abatement brief acknowledges this point.  They
say there will be new cases that are required to be abated,
quote, "whether or not they are the direct result of
defendants' conduct".

That's a fairly shocking concept, liability without
causation.  It's directly at odds with basic principles of
tort law to suggest that new cases could be subject to
abatement that these defendants have to pay for, whether or
not the result of defendants' conduct.

The remedy also includes people who were never exposed
to prescription opioids at all, another central flaw in
causation, the suggestion that somehow a person who has
never, ever been exposed to prescription opioids would be
entitled to be included within the scope of this abatement
remedy.  Defendants cannot be held liable for harms to
people who are never exposed to the products they
distribute.

Another flaw.  The remedy is clearly unreasonable.  The
City and the County do not administer or pay for these
services and would receive vast amounts of money for

1    programs in which they play no role.  So, today, the City

2    and the County in total devote $136,000.00 to opioid-related

3    projects and -- projects and programs.  That's based on the

4    testimony of Dr. Rufus.  And the plaintiffs are claiming

5    $2.5 billion dollars when they spend today $136,000.00 on

6    opioid-related programs.

7         And as reflected in particular in the fact -- in the

8    statement by the mayor, he said the City has never funded

9    opioid treatment and he said I never would expect the city

10   government to actually start running treatment programs.

11   Yet, more than $2 billion dollars, more than $2 billion

12   dollars of this remedy, is for treatment programs.  So, the

13   City would be receiving this vast amount of money for things

14   it does not do.

15        And, in fact, as the Court has heard, almost everyone

16   in West Virginia has health insurance which already covers

17   these treatment costs and health insurance is not grant

18   funding.  It's health insurance that already pays for the

19   treatment costs that make up the vast bulk of the

20   plaintiffs' abatement plan and there's no record evidence

21   that this health insurance funding is unstable or uncertain

22   into the future and there's no evidence in this record that

23   this funding that already exists is inadequate to provide

24   ongoing funding for the treatment programs for people in

25   Cabell-Huntington with addiction.

1          Now, plaintiffs have made the suggestion that it's no

2     issue that they don't run or pay for these programs today

3     because they want the Court to establish a, quote, "court

4     supervised trust fund" to pay for the programs that the City

5     and County do not fund or administer.

6          There is, first of all, no evidence in this record that

7     third parties need additional funds to provide the programs

8     to address the opioid crisis that they're already providing.

9     There's no evidence in this record.  It's silent on that

10    issue.  So, there is no evidence to support creating a fund

11    for programs that have never shown a need for more funding.

12         For instance, funding is not needed to pay for

13    treatment programs that Medicare and other insurance already

14    pay for.  And without evidence, there's no basis to

15    establish this fund.  There's no basis to establish a need

16    for a fund to support programs that are already running

17    without this funding.

18         But perhaps even more fundamentally, Your Honor, the

19    idea of this Court-supervised trust fund is unmoored from

20    tort law principles of causation.  It would suggest the

21    Court can create a fund that disburses money to parties that

22    have made no showing of any injury caused by the defendants.

23    There would be no mechanism by which that would happen.

24    These parties are not here and they would be receiving money

25    somehow out of this fund.

1          And the plaintiffs have also presented no evidence or

2     explanation as to how the fund would be administered or

3     overseen, who would be eligible for payments from the fund,

4     what the criteria would be for determining payments from the

5     fund, or what would happen with unused funds.

6          This is social policy.  It's not a tort principle.

7          But let's put to one side the flaws of this fund

8     proposal and the flaws that we already discussed in our Rule

9     52 motion.  Let's look at the record evidence.  The record

10    evidence demonstrated that Dr. Alexander's model is

11    unreliable and reflects a total failure of methodology.

12         First of all, the Court will recall the testimony of

13    Dr. O'Connell about the Resiliency Plan.  The Resiliency

14    Plan was developed by the community to assess what sort of

15    resources they needed as they looked ahead over a 40-year

16    period, what would they need to become healthy, as Dr.

17    O'Connell put it, and that Resiliency Plan directly

18    contradicts Dr. Alexander's estimate, for instance, that the

19    City and County need over $2 billion dollars in treatment

20    money as we look ahead.

21         And recall that Dr. O'Connell said that the premise of

22    this Resiliency Plan was to assume no budget, no limit, no

23    constraint on the funding.  What would you need?  Assume no

24    limits.  And that's -- and that's what the community came up

25    with.

1    So, let's look at what they did.  They came up with a

2    Resiliency Plan.  The first draft had treatment costs of

3    $23 million dollars.  Unspecified duration.

4    The next version of the plan, treatment costs of

5    $50 million dollars over 40 years.  Again, assuming no limit

6    on funding at all, that's the number that the community came

7    up with when they assessed what they were doing and what

8    they would need as they looked ahead.

9    That $50 million dollars continued through the

10   August 22 draft.  Continued into the September 3, 2019

11   draft, the last version that had numbers in it before those

12   were stripped out.

13   Let's look at what the abatement plan number has.

14   Instead of $50 million dollars over a 40-year window, which

15   is what the community said it needed, the abatement plan

16   shockingly comes up with a number for treatment of over $2

17   billion dollars over 15 years.  It just utterly impeaches

18   the credibility of this abatement plan.

19   And as reflected in what we see here, we see this huge

20   divergence between the Resiliency Plan and Dr. Alexander's

21   model.  We can see that the individual cost projections in

22   his model are completely inflated.

23   For an example, he comes up with a Syringe Services

24   Program number and his Syringe Services Program number as

25   calculated by Mr. Barrett was for a number of $12.6 million

1    dollars over a 15-year window and that would serve roughly

2    1,000 people.

3         Well, the plaintiffs had an expert, Dr. Feinberg, who

4    testified that she had actually run a Syringe Services

5    Program for $60,000.00 a year serving perhaps 1,400 or 1,500

6    people.  Now, note Dr. Feinberg's number was an annual

7    number.  So, multiply it by 15.  Still $900,000.00 compared

8    to $12 million.  It's just a shocking divergence from

9    reality in what we see in the Alexander model.

10        We see another example.  The treatment costs that Dr.

11   Alexander estimated failed to take account of the actual

12   duration of treatment that we see in the real world.

13        The TEDS data that was discussed during the trial is

14   the data compiled by the federal government that reflects

15   the actual duration of treatment and the TEDS data reflects

16   that the actual duration of outpatient treatment on average

17   is 71 days.

18        Well, Dr. Alexander assumed 365 days.  And he had other

19   categories of treatment where he similarly assumed very long

20   outpatient programs that would be much, much longer than

21   that 71-day number.

22        So, Dr. Rufus did the calculation.  If we just made

23   that one adjustment, 71 days instead of this unrealistic

24   out-of-touch assumption that Dr. Alexander made, we would

25   drop the treatment number in the Alexander plan by $1

1    billion dollars.  The fact that one assumption changes the

2    numbers by a billion dollars shows they are unreliable.

3         Now, the plaintiffs yesterday in their closing

4    suggested that the defendants somehow had, quote, "agreed"

5    that the proper treatment number, therefore, must be between

6    $600 million and $1.7 billion, the Rufus number versus the

7    Alexander number.  I think they missed the point entirely.

8         We've already discussed why the plaintiffs are not

9    entitled to recover anything for treatment.  Treatment is

10   for downstream harms caused by drug abuse.  It's not

11   properly abatement and the plaintiffs have waived any claim

12   for damages.

13        But the key point is, it just reflects a flaw of

14   methodology.  That's the reason that we're highlighting this

15   point.  When numbers swing a billion dollars from making an

16   assumption that simply reflects the reality of what's

17   happening in this country it raises fundamental questions

18   about the reliability of the model.  There's also clearly an

19   utter failure in the Alexander model to take any account of

20   the community activity that's already underway.

21        Now, the plaintiffs in their paper that they filed

22   over this past week said that the Alexander plan, quote,

23   "takes into account that current programs are insufficient".

24   That's simply not true and that's not what the evidence is

25   in this record.

1      Dr. Young said that it was beyond the scope of her

2  report to look at what is in Cabell County and she said

3  there are other experts who were doing that, not her.  Well,

4  in fact, no expert for the plaintiffs did that.

5      Dr. Alexander said he didn't do it.  He was asked did

6  you subtract out the level of services that are currently

7  being provided?  No, I did not.

8      Mr. Barrett said he didn't do it either.  He didn't

9  take any account of the programs that are currently being

10  offered in Cabell and Huntington and he said, no, and that's

11  not how Dr. Alexander developed his model.

12      The last witness in this case, Your Honor, at trial was

13  Ms. Colston, Stephanie Colston, who is an expert with

14  extensive experience in evaluating treatment programs and

15  abatement programs and she said -- she made the common sense

16  point, but I think it's powerful, that you've got to know

17  what you have before you allocate resources.  How can we

18  allocate $2.5 billion to a problem without knowing what the

19  community is already doing?

20      Sort of a stunning thought, as she said, if you don't

21  know whether the current resources are full or whether

22  they're empty or they have a waiting list, how could you do

23  -- how could you undertake the exercise?  As she said, I

24  don't see how you can evaluate need in a community without

25  it.

1        And, in fact, as the Court has heard, there is a

2   tremendous number of programs that are already operating in

3   the City and the County.  Sheriff Zerkle again colorfully

4   said what we've turned into is a, quote, "recovery

5   epicenter".

6        Dr. O'Connell described at some length the City of

7   Solutions document and all of the programs that are already

8   underway in the City and the County to address various

9   opioid-related issues.

10       And Mayor Williams was asked about the City of

11   Solutions document and the guide that was put in place to

12   explain Huntington's successes in the fights against opioids

13   and he said -- he was asked none of those programs is funded

14   from the budget of the City and he answered and they never

15   will be and never should be.  Fine.  But that really

16   undermines the premise of this entire abatement model.

17       There's another flaw in Dr. Alexander's methodology.

18   He deviated from his own methodology in a way that renders

19   his report unreliable.

20       The Court may recall that Dr. Alexander had submitted

21   the same kind of redress model in four different opioid

22   cases.  He developed what he calls an Apollo model, which is

23   an extensive model with dozens of variables, many dozens of

24   inputs of 25 or 40-page write-ups of how this model works

25   and operates and he also described that he did extensive

1    calibration and testing to make sure that the model was

2    accurate.  He submitted that in Ohio in March, 2019.

3         He submitted a comparable model in the Washington

4    litigation in January 20, 2021.  Again, an Apollo model.

5    Dozens of variables.  Many dozens of inputs.  Extensive

6    testing and calibration.

7         Same thing in Rhode Island in June, 2021.  His Apollo

8    model submitted again; extensive, extensive testing, dozens

9    of variables.

10        Well, what did he do here?  He submitted a model based

11   on the Jack Homer paper.  He didn't use his own model.  He

12   used the Jack Homer paper.  He had a one-sentence

13   description of what he did, a one-sentence description as

14   compared to this elaborate, extensive analysis of variables

15   and inputs.

16        He did no calibration or testing because, as he said,

17   it's not my model.  I couldn't test it.  Well, it just shows

18   a shocking deviation from his own methodology.  And there

19   was no explanation provided as to why he deviated from his

20   own methodology.

21        So, let's look a little bit more at the Homer paper.

22   Dr. Alexander said it was important to consider funding as

23   one is evaluating science.  The funding has to be considered

24   as one is interpreting the science.

25        He was unaware, he said, that the paper, the Homer

paper, was funded by two of the plaintiff law firms that are

representing the plaintiffs in this case.  Levin Papantonio

represents the City of Huntington.  Baron & Budd represents

the Cabell County Commission.  Those two law firms funded

this Homer paper which bizarrely Dr. Alexander used rather

than his own model.

Dr. Alexander also said that he'd never rely on someone

he didn't know when he's evaluating one of these scientific

papers.  "I typically do consider the background and

training of authors."  So, I asked him, "Do you know who

Jack Homer is?"  "No, I do not."  Pretty stunning.  Pretty

stunning in terms of how grossly he deviated from his own

methodology.  And these flaws of methodology undermine his

entire opinion.  They make it reliable -- unreliable and

unsound.

But let's put aside the unreliability of Dr.

Alexander's model.

Whoops.  Sorry, Your Honor.

(Pause)

Let's put aside the unreliability of Dr. Alexander's

model.  There's an even more fundamental flaw.  Dr.

Alexander asserted that the success of his model was it

would reduce opioid overdoses and overdose deaths by

50 percent over 15 years.  That's -- that's his benchmark

for putting in $2.5 billion in resources into a community of

1    90,000 people.  It would reduce overdoses and overdose

2    deaths by 50 percent over 15 years.

3        But that has already happened in -- in two years -- or

4    three years between 2017 and 2019 and it did not cost

5    $2.5 billion.  The County and the City have already achieved

6    the objective, the benchmark that Dr. Alexander articulated

7    as his success for his own model.  And the evidence reflects

8    that between 2017 and 2019 there's been a reduction in

9    opioid overdoses of 52 percent and overdose deaths of 46.7

10   percent.

11       This is further evidence that defeats any basis for

12   awarding of funds to achieve an objective that the community

13   has already achieved without these funds.  There's no basis.

14   When the City and the County are already achieving these

15   objectives, there's no basis for the award being sought.

16       And, finally, and perhaps even most significantly, the

17   plaintiffs have made no showing that the City or the County

18   even need this additional funds to address the opioid crisis

19   or to achieve their objectives.  It seems to have been

20   assumed, but there is no proof of that.

21       And, as we said, the City and the County are spending

22   on opioid-related issues $136,000.00 today.  And we see that

23   the City is running a budget surplus of $17 million, which

24   represents 25 percent of its budget.  And the County is also

25   running a surplus, although it's smaller.

1          Mayor Williams testified that he had no plans to

2     allocate any of that surplus to opioid-related issues.

3     There is no evidence of any additional funding needs to

4     address the opioid crisis when the City and the County are

5     not allocating any of their surplus to address the opioid

6     crisis.

7          Furthermore, at the state level there are unused funds

8     for opioids of roughly $80 million dollars, as Ms. Colston

9     testified.  Again, there is no evidence that the City and

10    the County have made any effort to seek any of those funds

11    for any purpose.

12         So, this is a complete absence of proof of any unmet

13    needs for opioid-related issues that would support an award

14    of funds to the City or the County, let alone a

15    court-administered trust fund in the billions of dollars.

16    There is no evidence that, in fact, the City and the County

17    need more money in order to address the opioid crisis.

18    They're doing a good job, but they have not made an

19    evidentiary showing of more need for more funding.

20         So, in short, the plaintiffs have failed to present the

21    Court with sufficient evidentiary bases to impose a remedy.

22    Their obligation, as the plaintiffs, is to provide the Court

23    sitting in equity with sufficient basis to exercise its

24    equitable discretion in deciding on a remedy.

25         The failures of their methodology mean that the Court

1    is left without a sufficient evidentiary basis to act.

2         Just as in a damages case, a plaintiff seeking

3    equitable relief must present evidence to support its claim

4    for that relief.  There's no such evidence here.

5         No evaluation of what's actually being done in the

6    community.  No evaluation of what more is needed.  A flawed

7    methodology based on a paper that was funded by the

8    plaintiffs' law firms and with obviously flawed assumptions

9    and estimates.

10        And virtually the entirety of the remedy being sought

11   is to address the effects of opioid abuse; yet, the

12   plaintiffs have waived damages in this case and are not

13   entitled in their abatement case to recover for downstream

14   harms from an alleged nuisance.

15        And virtually nothing in the proposed remedy is

16   addressed to the distributors' conduct or to anything

17   related to what the distributors have allegedly done to

18   create a nuisance.

19        The plaintiffs cannot properly throw all of this into

20   the Court's lap without sufficient evidence to guide its

21   decision making and expect the Court to figure this all out.

22   They've not done enough to come forward to the Court with a

23   framework to permit the Court to impose the sort of remedy

24   being sought.

25        So, there's simply no basis for the requested abatement

1    remedy in the record.  It's unsupported by the evidence and

2    it's demonstrably unreasonable at many different levels.  We

3    can tick off a lot of different levels where it's

4    unreasonable.

5        But the Court need not reach these questions of remedy

6    because the plaintiffs have not proven their case on the

7    merits.

8        And so, to return to where I began, the evidence

9    establishes clearly two points without contradiction.

10   Doctor prescribing drove the increased volumes of

11   prescription opioids and the plaintiffs' theory of harm is

12   based on medicine cabinet diversion which resulted not only

13   from prescribing decisions by doctors, but also from

14   multiple criminal acts that plaintiffs' experts themselves

15   recognized the distributors could not control and were not

16   responsible for controlling.

17       Given this overwhelming evidence, the plaintiffs cannot

18   establish proximate causation.  *City of Charleston* and

19   *Employer Teamsters* point the way.  They establish the

20   goalpost.  They establish the framework.  They decide the

21   same issue that is before the Court now.  They set the

22   framework for decision.

23       And those cases were decided on pretrial motions.  Here

24   we have a full evidentiary record that defeats a showing of

25   proximate causation, first, based on the intervening medical

1    judgments of doctors, a point that's culled out in both *City*

2    *of Charleston* and *Employer Teamsters* as a very substantial

3    factor defeating proximate causation.  Second, we have the

4    multiple intervening criminal actions of third parties

5    giving rise to medicine cabinet diversion.  *City of*

6    *Charleston* speaks directly to that.

7        The evidence also defeats a claim of public nuisance.

8    It cannot be a public nuisance to distribute a medicine that

9    doctors are prescribing in good faith for the treatment of

10    pain.  Under the *Pope* standard the medical community has

11    decided that the public interest, quote, "imperatively

12    demands these medicines".  Patients need them.

13        And under the Restatement formulation it cannot be an

14    unreasonable interference with a public right to supply

15    medicines that doctors are prescribing to treat patients.

16    Distributors could not second-guess those decisions and it

17    would be a perversion of the public nuisance law to suggest

18    they should have counteracted and disregarded the medical

19    judgments being made by doctors.

20        Public nuisance law would swallow the entire body of

21    tort law if the harms from doctors' good faith prescribing

22    of a medicine can be a public nuisance.

23        And public nuisance law would also override and swallow

24    the regulatory judgments made by the FDA, the DEA, and the

25    West Virginia Board of Medicine that encouraged and

1    facilitated the use of these medicines and that left the

2    weighing of benefits and risks of these medicines to doctors

3    and not distributors.  Now, surely the plaintiffs got past

4    pretrial motions on this point, but now we have a record

5    that demonstrates the reasons that this cannot be a public

6    nuisance.

7          So, I will conclude there, but I did want to conclude

8    by expressing our very deep appreciation to the Court for

9    its careful consideration of the evidence and for the many

10   courtesies it has shown to all of us in this courtroom

11   throughout this trial.  It has been a pleasure to be before

12   the Court and we are most grateful for the opportunity to

13   present our case.

14             THE COURT:  Thank you, sir.

15             MR. HESTER:  Thank you, Your Honor.

16             THE COURT:  Mr. Farrell, do you need some time to

17   get set up?

18             MR. FARRELL:  No, sir.

19             THE COURT:  Are you ready to go?

20             MR. FARRELL:  If they're finished, I'd like the

21   opportunity to retort.

22             THE COURT:  How much -- long do you think?

23             MR. FARRELL:  I think less than 30 minutes, Judge.

24             THE COURT:  Okay.  Then we'll press on, if you're

25   ready.

1          MR. FARRELL:  Over the past several hours it's

2    been difficult to sit by and listen to some of my

3    colleagues.  On behalf of the City of Huntington and the

4    Cabell County Commission, we take great offense at some of

5    the misrepresentations, we believe, of the record.

6          This is Day 40.  This is Day 40, appropriately so, and

7    I'm not going to go through every single one.  This isn't a

8    high school debate where we're trying to keep a scorecard of

9    points.  But there are a couple of individual points that I

10   do want to bring this Court's attention to.

11         First, we find it remarkable that throughout the three

12   closing arguments not a mention was made of the highest

13   court in the land who has commented upon the duty owed by

14   the distributors in *Masters Pharmaceutical*.  Not a word was

15   mentioned of the duty to maintain effective control.

16         The next point.  Supply driving demand.  It's not a

17   concept to be dismissed easily when we're talking about

18   opium.  We're talking about a controlled substance defined

19   by 21 U. S. C. 812, Subparagraph (2), Subparagraph (b).

20         We're talking about opium.  To pretend that the supply

21   of opium doesn't create addiction and demand totally ignores

22   the entire premise of why we've regulated this drug as a

23   controlled two substance.  It is a metastasized cancer in

24   our body politic and will continue to grow.

25         Opium has been around since the Byzantine era.  It has

1    toppled governments because it, by its very nature, is

2    addictive.  You can't get opioid addicts without a supply of

3    opium.

4        When you look at the *Direct Sales* case, Judge Faber,

5    when you look at the case and you read the volume was the

6    premise in *Direct Sales* and the United States Supreme Court

7    said that the volume of morphine sulfate sold by the

8    wholesaler to the dispensing physician, and I'm quoting at

9    319 U. S. at 712.  319 United States Reports at 712.  "The

10   primary effect is to create black markets for dope and

11   increase illegal demand and consumption."  In this instance,

12   the supply in part was fueling demand.

13       Next point.

14           THE COURT:  What were the facts in that case?

15           MR. FARRELL:  So, in that case, you had a

16   wholesale distributor that was selling morphine sulfate

17   tablets by mail order and, back then, to regulate the

18   industry you had to have, under the Harrison Narcotic Act,

19   you had to have a stamp book.

20       So, down in South Carolina, in a town of 2,000 people,

21   a Dr. Tate was ordering some 6,000 tablets a month.  And

22   there was an indictment of three individuals that had been

23   using these morphine sulfate tablets.

24       There was an indictment of the dispensing Doctor, Dr.

25   Tate, and there was an indictment of the wholesaler.  And

1    they got convicted.  The wholesaler was convicted of

2    criminal conspiracy and appealed it all the way to the

3    United States Supreme Court.

4         And when you look at -- and I had it written down.

5    When you look at -- well, I have it here in my hand, Judge.

6    Page 713.

7         And, actually, if I may I approach, I've highlighted

8    it.

9         At Page 713 of the case what you'll see is the defense

10   -- what you're reading is the standard of care defense that

11   you just heard for a day and a half.  In that case, the

12   wholesaler said wait a minute.  We were providing morphine

13   sulfate to a doctor that had prescribed it and he had a

14   stamp book.  And the United States Supreme Court says that

15   doesn't give you immunity, that just because a physician

16   prescribed it doesn't mean that what you weren't doing was

17   facilitating criminal diversion.

18        To be clear, Judge, the exact offense that's in the

19   paragraph I highlighted for you is what we just heard all

20   day today.  And it was not only insufficient defense in the

21   United States Supreme Court case but, respectfully, Judge,

22   it was an insufficient defense in closing argument up on the

23   sixth floor on May 28th of this year.  While this case was

24   pending they convicted a doctor for prescribing medicines.

25        The standard of care defense didn't work in this case

1    in 1943.  It didn't work upstairs.  And it shouldn't work

2    here.

3         Now, the next point.

4         THE COURT:  According to the scope note in the

5    case, it says that the seller not only knew the physician

6    was selling the drug illegally, but it intended to cooperate

7    with him.  So, that makes that case a little bit different

8    than this one, doesn't it?

9         MR. FARRELL:  Well, no, Judge, because when you

10   read the body of the case what the United States Supreme

11   Court said is that there was no actual agreement.  There was

12   no overt act of what you just said.  The United States

13   Supreme Court says that when you sell that much it infers

14   that you are acquiescing.

15        So, when you read the entire length of that opinion

16   what it suggests is that when you act over such a period of

17   time with such volume, you are deemed to act not only in

18   mind, but in hand, to further and facilitate the diversion

19   of controlled substances.

20        THE COURT:  That was in 1943.

21        MR. FARRELL:  Yes, sir.

22        THE COURT:  We didn't have the regulatory

23   framework that you have that applies here, correct?

24        MR. FARRELL:  That is correct.  That's why you'll

25   recall from Dr. Courtright, Dr. Courtright said is that, in

1    1970, we created one organic body of law and codified the

2    closed system.  This Harrison Narcotic Act was just the

3    infant of the more complex regulatory system we have today.

4        But the point of the matter is, is that there has been a

5    recognition in the United States for a significant period of

6    time that if we don't control narcotics then they will get

7    out into the black market.

8            THE COURT:  That's what the DEA is all about,

9    isn't it?

10           MR. FARRELL:  Yes, sir, it is, and that's why the

11   DEA has been attempting to implement the system designed by

12   Congress and the one part of the system the DEA has

13   consistently been arguing with the defendants about is their

14   role in the system.

15       So, the facts of this case, we may very well agree on a

16   lot of the facts.  We may very well agree that doctors were

17   writing too many prescriptions.  They should agree that

18   there are doctors that went to prison.

19       We all agree that if you -- if you make, sell,

20   distribute prescription opioids you have to be in the closed

21   system.  No one disputes the number 81 million.

22       The real dispute in this case is whether or not the

23   defendants, the distributors, have a duty to control supply.

24   Respectfully, Judge, if they have no duty to control supply,

25   they shouldn't even need a registration.  They should just

1    need delivery trucks.

2         They have a duty, they have a duty in supply, then

3    there is an abrogation of that in Huntington-Cabell County,

4    West Virginia.  And the reason I say that is because the

5    volume of pills that were sold is clearly unusual.  Clearly

6    deviating from the normal pattern.

7         So, I respect the fact that since 2005 Cardinal Health,

8    McKesson and AmerisourceBergen have steadfastly denied that

9    it is their responsibility to control the supply of

10   prescription opioids.  I respect the fact that that's their

11   position.

12        The DEA has on this record with Mr. Prevoznik testified

13   that they were in violation of their regulatory obligations.

14   The DEA told them so.  The DEA warned them.  Provided

15   notice.  Sanctioned them.  Sanctioned Cardinal Health twice,

16   the second time resulting in an acknowledgment of

17   wrongdoing.  Sanctioned McKesson twice, the second time with

18   McKesson acknowledging wrongdoing.  And that, nonetheless,

19   today in this courtroom the three companies are continuing

20   to say the same thing, it's not their duty.

21        What that tells me, Your Honor, is that if this happens

22   again, they would do it again.  If, in fact, it's true that

23   the only thing that they need is an order form from a

24   registered pharmacist and that's all they need, that's the

25   defense that was -- the exact defense rejected in the *Direct*

*Sales* case.

What's the purpose of a closed system if we're not going to try to regulate and keep the pills for legitimate medical needs?

I want to take a brief minute and make a comment about James Rafalski because he's a good man and I think his credibility has been disparaged by the defendants today.

What Mr. Rafalski's testimony is about is that assuming -- just assume for the fact that there is a duty for the defendants to monitor unusual patterns. Let's just assume they had that duty. The question then is what is unusual and, once you detect an unusual pattern, what do you do about it?

So, one of the reasons that I gave you the big, big wieldy charts is so that you could see in some absurd conclusion with hydrocodone pills that, at some point in time, there were, in month one, 180,000 hydrocodone pills sold to a pharmacy in Logan County.

Now, let's just take that for a minute. If, in one month, you sell 180,000 hydrocodone pills to a pharmacy in Logan, what is your immediate response? My immediate response is that's -- that's too many pills.

When I look at it and I see that the national average is 3,000, the state average is 3,700, if you're selling 180,000 to 1 pill (verbatim), there's a mistake. Something

1   should happen.

2        What Mr. Rafalski's testimony is and what his common

3   sense is that if you get an order for 180,000 pills,

4   somebody should probably stop and check and make sure that

5   this isn't a mistake because it seems like it's a clerical

6   mistake.

7        You shouldn't ship 180,000 pills to a pharmacy in

8   Logan.  And if you have a system that has some type of

9   safety valve, 180,000 should be enough to trigger the safety

10  valve.  And if the safety valve gets triggered what we

11  should not see is the next month another 170,000 pills.

12            THE COURT:  Well, what does a pharmacy in Logan

13  have to do -- a situation in Logan County have to do with

14  Cabell County and the City of Huntington?

15            MR. FARRELL:  Okay.  I -- I'm using the pharmacy

16  in Logan as an absurd spectrum to demonstrate why Mr.

17  Rafalski is being criticized here.  Mr. Rafalski is trying

18  to demonstrate that once a system --

19            THE COURT:  Well, you can't put an expert on the

20  stand in a case that's this important and expect him not to

21  be attacked, Mr. Farrell.

22            MR. FARRELL:  I -- I understand, Judge, but you

23  also, I would hope, allow me for the opportunity to defend

24  him.

25            THE COURT:  Well, you're doing a pretty good job.

```
 1    Go ahead.
 2              MR. FARRELL:  So, by applying these same metrics
 3    to Cabell County what we're attempting to demonstrate is
 4    that something unusual happened.
 5        Now, the final thing before I move into what ultimately
 6    I want to discuss is about the abatement plan and I'm going
 7    to -- I'm going to quote my co-counsel, Ms. Ann Kearse.
 8    This is the line that she gave me that I think perfectly
 9    captures what my heart is on this.
10        We shouldn't let the perfect be the enemy of the good.
11    And I think that sums up what this abatement plan is.  You
12    can poke holes in it.  You can criticize it.
13        But what you haven't seen, Judge, is an alternative
14    proposed by the defendants.  If you find them liable, they
15    have not put in an alternative plan.  All they have
16    attempted to do is convince you to award less money.
17        So, what I thought about before listening to the
18    comments, what I wanted to say to you, Judge Faber, before
19    we ended --
20        Will you bring up the slide?
21        So, I like to fish and I understand that you may have,
22    too.
23              THE COURT:  So do I, Mr. Farrell.
24              MR. FARRELL:  And so, this is not the Cranberry
25    River, but it very well could be if those were rhododendron
```

1    bushes that were hanging over.

2         And I lived with my wife Jackie up in Morgantown for a

3    period of time.  And what we used to do is we used to pop

4    over into Maryland and then straight down to a little town

5    called Barnum, West Virginia, which is on the south branch

6    of the south fork of the Potomac right at the tail waters of

7    the Jennings Randolph dam.

8              THE COURT:  I know it well, Mr. Farrell.

9              MR. FARRELL:  So, if we go to the next slide,

10   please.

11        What we would do, and this is how big of a nerd I was

12   about it, I would look at the output of the Jennings

13   Randolph dam and watch for subtle changes in the output.

14   And then I would watch to see with the rain and the output

15   how it had subtle changes in the gauge of the height and

16   what it did to water temperature because we were monitoring

17   these outputs because little subtle differences can make a

18   big thing.

19        That, to me, is what I hear when I hear the defendants

20   talk about their monitoring and the subtle changes in the

21   practice of medicine.  But this isn't what happened in

22   Huntington-Cabell County, West Virginia.  What happened was

23   something different.

24        That's what happened here.  The Upper Gauley.  I've

25   been to the Upper Gauley.  I've stood on those rocks.  I've

1    watched that water come out.

2         Judge, this isn't a subtle change in the behavior of

3    practices that happened as the sole cause.  This was a

4    blowout.  If we were to take the measurements at Barnum,

5    those fancy Corps of Engineers measurements, and we were to

6    measure what happened in Huntington-Cabell County, it

7    wouldn't look like those subtle changes in water level.  It

8    would look like this.  That's what -- that's what the water

9    levels would look like.

10        So, go to the next one, please.

11        So, here -- here's kind of the metaphor that I want to

12   draw about what the defendants are saying.  The defendants

13   are the dam and they're standing up on top of the bridge

14   there.  They're standing up above the water and they're

15   looking down.  And the volume of water that comes out is

16   under their control.

17        Now, this isn't an issue of the safety valve failed.

18   This volume of water here at the -- at the bottom, at the

19   bottom of Summersville Lake here, somebody turned it on.

20   It's not an accident.  They had to turn it open.

21        That's what's the difference here, Judge.  This isn't

22   that the distributors were just passengers on this event.

23   They -- they weren't, you know, standing by watching it.

24        What they are, they're active participants charged by

25   the United States Code and the Code of Federal Regulations

1    to be responsible for the control valve.  They're the ones

2    that are supposed to see not just the subtle changes in the

3    water levels, they're supposed to prevent the blowouts.

4         And that's what we had in this case, was we had a

5    blowout.  We had 81 million pills that came flooding into

6    our community and it wasn't by accident, Judge.  Somebody

7    delivered those pills here and it was the distributors.

8         Their argument that they were all prescriptions written

9    by doctors is insufficient to immunize them or a safe harbor

10   for their regulatory responsibilities.  If they don't want

11   to be responsible for controlling the volume of prescription

12   opioids, they should get out of the business.  The reason

13   they don't want to get out of the business is they don't

14   want to lose the bigger accounts.

15        This is a component of their job, to watch for, to

16   monitor -- design, monitor, and to block orders that are

17   suspicious.  And if the number of pills that came into

18   Huntington-Cabell County, West Virginia isn't suspicious, I

19   don't know what is.

20        The causation argument is best stated by Ms. Colston,

21   the very last witness in this case, and what she

22   acknowledged is we don't have to show that the dam operator

23   is the cause of the -- of the flood.  They only have to be a

24   substantial cause.

25        And if the defendants owe a duty, and if they breach

1    that duty, they are certainly a proximate cause.  And to

2    stand by and to say that it has nothing to do with them when

3    the community downstream from this got wiped out defies the

4    very nature of the closed system.

5        So, in closing --

6        You can take that down.

7        As a historian, you're going to know that there's a

8    very old story, one I'm fond of, and that old story has a

9    man who is walking down a road and he comes upon ten lepers.

10   And I've heard this story told, re-told, many times, but I

11   wanted to share with you a version that I overheard which

12   holds some weight and significance in my mind.

13       You see, we call the story -- we originally call the

14   story *The Ten Lepers,* but it was originally written in

15   Greek, and then translated to Latin, and then I heard it in

16   English.  And the Greek word is lepra (phonetic) and it's

17   not that this man walking on the street came upon ten

18   lepers.  The Greek word is that he came upon ten men with

19   leprosy.

20       You see, even in that old book, it recognized that

21   these were ten human souls that suffered from leprosy and

22   that leprosy didn't define them as lepers, it's what they

23   were suffering from.  And this distinction makes a lot of

24   difference in the mission that we have because we have human

25   souls that are suffering from addiction.

```
1            So, you see, I have not lost faith that we can cleanse

2      our community, Judge, but faith alone may be insufficient.

3      What we need to do is a lot of work.  And after four years,

4      my work is now done, and I -- I truly believe in my heart

5      that I have done all that I can and now we entrust this work

6      to your capable hands.  Magic or tragic, there will be a

7      reckoning.

8            Thank you for your time and patience.

9            THE COURT:  Thank you, Mr. Farrell.

10     I assume you want to submit revised proposed findings

11     and conclusions; is that right?

12           MR. MAJESTRO:  Yes, Your Honor.

13           MS. MAINIGI:  Yes, Your Honor.

14           MR. HESTER:  Yes, Your Honor.  That's the plan.

15           THE COURT:  How much time do you need to do that?

16      Get my instructions here.

17      (Pause)

18           THE COURT:  My advisor has offered the choice

19     between two and three weeks from today.

20           MR. MAJESTRO:  We would prefer three.  The other

21     -- the other question I have for my colleagues on the other

22     side of the aisle is whether they intend to file replies on

23     the Rule 50(c) motions?

24           MR. HESTER:  Yes, we do.

25           MR. MAJESTRO:  We would like to see those before
```

1    we file our final -- final proposed order.

2              MR. HESTER:  Your Honor, we needed a little time

3    to work both on the Rule 52 replies, as well as -- as well

4    as the findings.  Could we have two weeks from today to

5    submit the replies and three weeks from today to submit the

6    findings?

7              THE COURT:  Is that all right with you, Mr.

8    Majestro?

9              MR. MAJESTRO:  That works for us, yes.  Yes, sir.

10             THE COURT:  All right.  That's what we'll do.

11        All right.  Is there anything else before we adjourn?

12        I want to thank the lawyers for the character and

13   competence and the quality of your work.  It's made what

14   otherwise would have been a very unpleasant several weeks

15   much less so.

16        (Laughter)

17             THE COURT:  And I want to thank all of you for

18   your hard work and the way you've treated the Court.  I

19   appreciate it very much.

20        And I'll wait to see your submissions.

21             SIMULTANEOUS SPEAKERS:  Thank you, Your Honor.

22        (Trial adjourned at 2:55 p.m.)

23

24   CERTIFICATION:

25             I, Ayme A. Cochran, Official Court

1  Reporter, and I, Lisa A. Cook, Official Court Reporter,

2  certify that the foregoing is a correct transcript from

3  the record of proceedings in the matter of The City of

4  Huntington, et al., Plaintiffs vs. AmerisourceBergen

5  Drug Corporation, et al., Defendants, Civil Action No.

6  3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

7  reported on July 28, 2021.

8

9           S\Ayme A. Cochran            s\Lisa A. Cook

10             Reporter                    Reporter

11       July 28, 2021

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$12** [1] - 127:8
**$136,000.00** [3] - 123:2, 123:5, 133:22
**$17** [1] - 133:23
**$23** [1] - 126:3
**$50** [3] - 126:5, 126:9, 126:14
**$60,000.00** [1] - 127:5
**$600** [1] - 128:6
**$80** [1] - 134:8
**$900,000.00** [1] - 127:7

## '

**'7** [1] - 104:12
**'80s** [1] - 16:22
**'90s** [3] - 16:22, 25:7, 37:15
**'97** [1] - 20:1
**'98** [1] - 20:1

## 0

**0** [1] - 49:25
**00907** [2] - 2:5, 2:14

## 1

**1** [3] - 108:7, 127:25, 145:25
**1,000** [1] - 127:2
**1,400** [1] - 127:5
**1,500** [1] - 127:5
**1.7** [1] - 128:6
**10** [8] - 7:24, 8:10, 25:14, 28:9, 38:21, 65:17, 68:2, 69:23
**100** [2] - 49:25, 119:9
**1001** [2] - 4:6, 4:9
**1022** [1] - 3:5
**10:00** [1] - 38:22
**10:14** [1] - 38:22
**11:00** [1] - 69:23
**11:10** [1] - 70:10
**12** [1] - 54:5
**12(b)(6** [1] - 57:10
**12.6** [2] - 34:14, 126:25
**126** [1] - 3:5
**12:30** [2] - 70:7, 70:8
**13** [1] - 8:9
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:14
**14.9** [1] - 37:6
**141.2** [2] - 30:14, 75:17
**142** [1] - 75:19

**142.19** [1] - 30:15
**14th** [1] - 43:13
**15** [5] - 106:24, 126:17, 127:7, 132:24, 133:2
**15-year** [1] - 127:1
**150** [2] - 98:10, 110:22
**15910** [1] - 3:15
**1600** [1] - 3:15
**170,000** [1] - 146:11
**1717** [2] - 6:6, 6:13
**180,000** [6] - 145:17, 145:20, 145:25, 146:3, 146:7, 146:9
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1920** [1] - 85:16
**1943** [2] - 142:1, 142:20
**1970** [1] - 143:1
**1980s** [1] - 40:9
**1990s** [3] - 15:10, 15:23, 25:17
**1996** [1] - 16:24
**1997** [4] - 19:1, 19:2, 33:10, 33:18
**1998** [6] - 19:9, 19:23, 20:15, 21:6, 29:14, 29:17

## 2

**2** [5] - 123:11, 125:19, 126:16, 139:19
**2,000** [1] - 140:20
**2.5** [4] - 123:5, 129:18, 132:25, 133:5
**20** [5] - 37:2, 37:3, 37:7, 108:5, 131:4
**20-year** [1] - 88:11
**20.8** [1] - 34:12
**200** [1] - 97:24
**2000** [2] - 17:16, 43:7
**20001** [1] - 5:12
**20004** [2] - 4:7, 4:10
**20005** [3] - 4:19, 4:21, 5:5
**2001** [4] - 17:24, 18:14, 20:3, 21:14
**2002** [1] - 62:13
**2005** [4] - 20:9, 20:17, 20:20, 144:7
**2006** [3] - 31:16, 75:17, 97:19, 104:12, 113:6
**2006-2014** [1] - 30:13
**2007** [9] - 42:14, 42:21, 43:3, 43:7, 43:24, 44:1, 44:14, 104:16, 114:3

**2007-2008** [1] - 113:20
**2008** [17] - 36:4, 40:5, 40:7, 41:19, 48:8, 48:14, 52:9, 71:22, 98:25, 99:4, 103:9, 103:24, 104:4, 104:17, 104:22, 107:3
**2009** [4] - 21:3, 21:5, 45:17, 45:19
**2010** [6] - 21:3, 21:12, 25:8, 33:10, 100:2, 114:3
**2010s** [1] - 15:10
**2011** [1] - 65:24
**2012** [14] - 8:5, 22:25, 23:2, 40:5, 40:6, 46:11, 46:18, 47:3, 47:6, 47:7, 48:4, 48:8, 48:25, 53:22
**2013** [5] - 57:21, 105:5, 105:6, 106:22, 112:25
**2014** [7] - 75:17, 97:19, 101:7, 110:22, 113:6, 113:10, 114:13
**2015** [2] - 53:24, 66:2
**2016** [7] - 23:20, 34:11, 53:25, 60:18, 62:4, 66:5, 66:9
**2017** [7] - 66:11, 105:3, 105:10, 106:13, 114:3, 133:4, 133:8
**2018** [3] - 24:4, 66:13, 66:16
**2019** [5] - 113:10, 126:10, 131:2, 133:4, 133:8
**202** [2] - 2:4, 2:13
**2020** [1] - 68:2
**2021** [8] - 1:19, 7:4, 106:23, 121:23, 131:4, 131:7, 154:7, 154:11
**2027** [1] - 121:24
**21** [2] - 18:14, 139:19
**22** [1] - 126:10
**2216** [1] - 3:7
**25** [3] - 5:5, 130:24, 133:24
**25301** [3] - 2:8, 3:13, 4:24
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26** [1] - 7:20
**28** [7] - 1:19, 4:3, 4:12, 4:14, 7:4, 154:7,

154:11
**28th** [1] - 141:23
**29,000** [1] - 49:7
**29464** [3] - 4:4, 4:12, 4:15
**2:55** [1] - 153:22

## 3

**3** [1] - 126:10
**3,000** [1] - 145:24
**3,700** [1] - 145:24
**3.6** [1] - 63:21
**30** [4] - 78:18, 79:22, 81:16, 138:23
**3100** [2] - 6:5, 6:12
**316** [1] - 2:11
**319** [2] - 140:9
**32** [1] - 7:18
**32502** [1] - 2:11
**34** [2] - 51:23, 51:24
**35** [1] - 55:23
**36** [1] - 97:21
**365** [1] - 127:18
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 154:6
**3:17-cv-01665** [2] - 1:11, 154:6

## 4

**40** [4] - 1:16, 126:5, 139:6
**40-page** [1] - 130:24
**40-year** [2] - 125:15, 126:14
**401** [2] - 4:6, 4:9
**405** [1] - 2:7
**46.7** [1] - 133:9
**463,000-and-some** [1] - 104:6

## 5

**5** [3] - 37:2, 37:6
**5.5** [1] - 97:18
**50** [4] - 98:10, 112:24, 132:24, 133:2
**50(c** [1] - 152:23
**52** [7] - 91:12, 92:6, 113:10, 120:17, 125:9, 133:9, 153:3
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5

## 6

**6,000** [1] - 140:21

**154:11**

## 600

**600** [1] - 2:10
**6th** [1] - 3:5

## 7

**7** [1] - 37:8
**70130** [1] - 3:8
**707** [1] - 4:24
**71** [2] - 127:17, 127:23
**71-day** [1] - 127:21
**712** [2] - 140:9
**713** [2] - 141:6, 141:9
**716** [1] - 3:12
**725** [2] - 4:19, 4:21
**76** [1] - 96:4

## 8

**8,000** [2] - 92:8, 92:22
**80** [3] - 63:7, 63:8, 119:6
**801** [1] - 3:10
**81** [7] - 73:6, 96:1, 96:3, 99:17, 113:6, 143:21, 150:5
**812** [1] - 139:19
**850** [1] - 5:12

## 9

**9/7/07** [1] - 43:12
**90** [4] - 9:24, 50:24, 50:25, 73:10
**90,000** [1] - 133:1
**901** [1] - 4:23
**91436** [1] - 3:16
**97** [2] - 101:7, 108:5
**99** [5] - 9:13, 10:1, 28:22, 31:13, 76:11
**99.5** [1] - 31:10
**9:00** [1] - 7:4
**9th** [1] - 4:6

## A

**a.m** [4] - 7:5, 38:22, 70:10
**abated** [1] - 122:7
**abatement** [26] - 11:18, 11:19, 67:21, 67:22, 72:6, 78:10, 120:16, 120:19, 121:7, 121:8, 121:16, 122:6, 122:13, 122:19, 123:20, 126:13, 126:15, 126:18, 128:11, 129:15, 130:16, 135:13, 135:25, 147:6,

147:11
ABC [1] - 43:18
ABDC [5] - 7:20,
30:25, 41:15, 42:19,
106:2
ABDC's [2] - 41:17,
43:4
ability [1] - 71:13
able [1] - 21:10
abrogation [1] - 144:3
absence [4] - 56:11,
67:18, 84:3, 134:12
absolutely [1] - 29:1,
30:18, 54:21
absurd [2] - 145:15,
146:16
abuse [38] - 26:19,
35:12, 58:17, 61:16,
62:17, 63:22, 63:23,
64:7, 64:9, 64:15,
68:22, 72:1, 78:24,
112:21, 112:23,
113:24, 114:1,
114:20, 116:12,
116:16, 117:7,
118:24, 118:25,
119:2, 119:11,
119:14, 119:18,
119:23, 120:3,
120:21, 121:6,
121:15, 122:1,
128:10, 135:11
Abuse [3] - 78:4,
115:13, 119:21
abused [7] - 79:1,
111:13, 118:22,
119:3, 119:7, 119:10
abusing [2] - 9:19,
121:24
accepted [1] - 32:9
access [3] - 95:5,
95:7, 106:12
accident [2] - 149:20,
150:6
according [1] - 142:4
account [4] - 127:11,
128:19, 128:23,
129:9
accounted [2] - 11:9,
102:3
accounts [1] - 150:14
accreditation [2] -
18:1, 18:4
accrediting [1] - 83:4
accredits [2] - 17:23,
89:5
accurate [1] - 131:2
achieve [2] - 133:12,
133:19
achieved [2] - 133:5,

133:13
achieving [1] - 133:14
ACKERMAN [1] - 4:5
acknowledged [8] -
8:4, 28:7, 90:25,
99:2, 105:25, 107:7,
119:13, 150:22
acknowledges [1] -
122:6
acknowledging [1] -
144:18
acknowledgment [1] -
144:16
acquiescing [1] -
142:14
acquires [1] - 116:3
Act [8] - 19:11, 19:23,
21:6, 23:4, 24:6,
42:2, 140:18, 143:2
act [9] - 19:11, 23:5,
23:14, 56:19, 135:1,
142:12, 142:16,
142:17
acted [1] - 54:22
acting [6] - 22:17,
22:20, 32:2, 85:19,
85:24, 86:5
action [15] - 12:17,
19:15, 22:9, 24:5,
48:14, 48:24, 48:25,
49:4, 92:22, 92:25,
93:3, 105:23, 106:1,
106:8, 115:7
Action [4] - 1:4, 1:10,
154:5, 154:6
actions [10] - 19:25,
20:1, 74:12, 82:14,
112:6, 112:10,
115:20, 116:24,
117:1, 137:4
active [1] - 149:24
activity [7] - 91:7,
95:20, 115:21,
116:13, 116:21,
120:6, 128:10
actors [11] - 58:7,
58:8, 71:8, 83:13,
83:14, 83:16, 85:2,
115:7, 115:20,
120:6, 120:13
acts [11] - 71:7, 72:23,
77:19, 82:10, 82:18,
82:21, 82:22, 85:5,
86:1, 120:13, 136:14
actual [14] - 8:25,
11:20, 23:22, 64:3,
69:2, 69:4, 69:6,
69:7, 101:9, 101:10,
127:11, 127:15,
127:16, 142:11

added [1] - 46:14
addiction [18] - 7:23,
26:20, 64:11, 64:15,
64:17, 64:20, 64:21,
78:24, 120:24,
121:2, 121:6,
121:15, 121:20,
122:5, 123:25,
139:21, 151:25
addictive [2] - 64:12,
140:2
addicts [1] - 140:2
addition [3] - 44:5,
59:17, 121:7
additional [4] - 35:2,
124:7, 133:18, 134:3
address [11] - 18:5,
57:12, 86:15, 121:8,
124:8, 130:8,
133:18, 134:4,
134:5, 134:17,
135:11
addressed [5] - 39:3,
72:19, 92:19,
120:18, 135:16
addressing [2] -
120:22, 121:17
adequate [2] - 68:1,
90:7
adhere [1] - 89:1
adjourn [1] - 153:11
adjourned [1] - 153:22
adjustment [1] -
127:23
administer [2] -
122:24, 124:5
administered [2] -
125:2, 134:15
admission [6] -
104:23, 105:7,
105:10, 105:12,
105:14
admissions [1] - 59:9
admitted [6] - 10:6,
48:20, 49:18, 51:15,
62:12, 71:5
adopt [1] - 17:9
adopted [2] - 21:12,
67:12
adopting [1] - 17:20
adoption [1] - 16:25
adulterate [2] -
116:15, 117:18
adverse [1] - 91:13
advice [1] - 24:3
advisor [1] - 152:18
affect [1] - 64:14
affects [1] - 39:1
afternoon [2] - 70:12,
70:13

AG [2] - 20:20, 21:1
AG's [1] - 44:8
agency [1] - 88:5
aggregate [1] - 93:21
aggressively [1] -
25:18
ago [2] - 110:24,
113:12
agree [5] - 109:22,
143:15, 143:16,
143:17, 143:19
agreed [22] - 24:17,
25:7, 27:12, 31:13,
31:23, 32:5, 35:9,
59:14, 61:9, 64:1,
64:2, 64:19, 64:22,
74:5, 80:8, 90:7,
103:22, 107:7,
107:11, 107:13,
110:12, 128:4
agreement [2] -
104:22, 142:11
Agreement [2] -
105:4, 105:7
Agreements [1] - 48:8
agreements [4] -
48:10, 48:11, 48:13,
49:9
agrees [1] - 12:2
ahead [7] - 19:2,
39:21, 41:20,
125:15, 125:20,
126:8, 147:1
Aid [2] - 100:13,
100:17
aisle [1] - 152:22
al [4] - 1:7, 1:13,
154:4, 154:5
alarming [1] - 29:4
alcohol [1] - 119:15
Alexander [17] -
121:22, 127:9,
127:11, 127:18,
127:24, 127:25,
128:7, 128:19,
128:22, 129:5,
129:11, 130:20,
131:22, 132:5,
132:7, 132:22, 133:6
Alexander's [6] -
125:10, 125:18,
126:20, 130:17,
132:17, 132:20
allege [2] - 33:19, 96:7
alleged [10] - 55:1,
55:7, 55:8, 57:5,
57:6, 72:17, 80:23,
85:3, 86:1, 135:14
allegedly [1] - 135:17
alleges [1] - 101:14

allocate [3] - 129:17,
129:18, 134:2
allocating [1] - 134:5
allow [1] - 146:23
allowed [1] - 38:10
allude [1] - 52:2
alluded [1] - 94:2
almost [7] - 63:24,
97:1, 113:15,
113:17, 119:9,
120:20, 123:15
alone [9] - 13:4, 13:11,
22:5, 57:14, 73:8,
101:7, 110:22,
134:14, 152:2
alongside [1] - 91:17
altered [1] - 47:15
alternative [3] -
112:15, 147:13,
147:15
alternatives [1] -
35:25
AMA [1] - 18:15
amalgamation [1] -
92:10, 94:6
amazing [1] - 30:19
amend [1] - 86:23
amended [2] - 21:5,
21:7
America [2] - 36:6,
36:8
American [2] - 17:7,
18:15
AMERISOURCEBER
GEN [2] - 1:7, 1:13
AmerisourceBergen
[4] - 6:2, 42:17,
144:8, 154:4
amount [8] - 13:24,
34:3, 56:9, 74:25,
75:1, 75:3, 97:25,
123:13
amounted [1] - 97:23
amounts [2] - 98:2,
122:25
analogues [1] -
113:25
analysis [11] - 51:8,
57:15, 57:16, 96:9,
96:21, 96:25, 97:14,
108:5, 108:6, 109:4,
131:14
Analytical [1] - 47:18
analytical [2] - 45:7,
120:18
analytics [3] - 45:7,
46:13, 53:1
analyze [2] - 46:14,
52:17
analyzed [1] - 65:6

**ANDREW** [1] - 5:10
**Ann** [1] - 147:7
**ANNE** [1] - 4:2
**ANNIE** [1] - 4:11
**announced** [1] - 43:3
**annual** [1] - 127:6
**answer** [9] - 55:14, 55:15, 86:8, 86:15, 116:19, 118:12, 118:16, 120:11, 120:12
**answered** [2] - 58:1, 130:14
**ANTHONY** [1] - 2:6
**anti** [8] - 20:23, 44:3, 45:2, 46:18, 47:19, 52:12, 52:13, 53:17
**anti-diversion** [8] - 20:23, 44:3, 45:2, 46:18, 47:19, 52:12, 52:13, 53:17
**anticipating** [1] - 101:12
**Apollo** [3] - 130:22, 131:4, 131:7
**apparent** [2] - 56:22, 56:23
**appeal** [1] - 86:25
**appealed** [1] - 141:2
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**applied** [5] - 50:23, 57:7, 94:8, 108:9
**applies** [4] - 58:21, 68:11, 92:14, 142:23
**apply** [8] - 68:7, 84:20, 85:13, 85:14, 86:6, 91:10, 94:5
**applying** [4] - 84:22, 84:23, 94:17, 147:2
**apportionment** [1] - 85:14
**appreciate** [1] - 153:19
**appreciation** [1] - 138:8
**approach** [1] - 141:7
**appropriate** [2] - 80:1, 97:2
**appropriately** [4] - 28:23, 32:13, 76:18, 139:6
**approval** [1] - 44:20
**approve** [1] - 91:21
**approved** [16] - 12:12, 12:16, 27:9, 28:8, 28:9, 41:16, 63:1, 66:23, 87:8, 87:16, 87:18, 89:11,

104:10, 110:22, 116:17, 118:1
**arbitrarily** [2] - 9:18, 9:23
**Arch** [2] - 6:6, 6:13
**ARCOS** [2] - 75:19, 102:25
**area** [1] - 36:13
**areas** [1] - 35:12
**argued** [2] - 13:5
**arguing** [2] - 117:6, 143:13
**argument** [7] - 55:14, 67:12, 69:24, 120:17, 141:22, 150:8, 150:20
**arguments** [3] - 91:12, 92:6, 139:12
**arising** [1] - 121:5
**arose** [1] - 105:6
**array** [2] - 67:14, 81:19
**arrest** [1] - 114:25
**arthritis** [1] - 34:22
**article** [2] - 35:10, 119:20
**articulated** [3] - 104:16, 121:11, 133:6
**artificial** [1] - 108:13
**asbestos** [2] - 93:9, 94:4
**ASHLEY** [1] - 5:3
**Ashworth** [1] - 99:24
**aside** [5] - 97:15, 97:18, 98:4, 132:16, 132:20
**aspect** [1] - 118:8
**asserted** [2] - 118:18, 132:22
**assertion** [1] - 116:11
**assess** [2] - 18:5, 125:14
**assessed** [2] - 84:15, 126:7
**assessment** [1] - 87:19
**assume** [5] - 125:22, 125:23, 145:9, 145:10, 152:10
**assumed** [4] - 108:14, 127:18, 127:19, 133:20
**assuming** [3] - 86:7, 126:5, 145:8
**assumption** [8] - 108:10, 108:18, 108:22, 108:24, 109:15, 127:24, 128:1, 128:16

**assumptions** [1] - 135:8
**astounding** [2] - 51:6, 53:3
**AT** [1] - 1:2
**attacked** [1] - 146:21
**attempted** [1] - 147:16
**attempting** [3] - 74:15, 143:11, 147:3
**attended** [1] - 43:10
**attention** [5] - 11:24, 69:18, 88:10, 89:9, 139:10
**attentive** [2] - 88:16, 118:5
**attenuated** [2] - 63:2, 67:8
**Attorneys** [1] - 20:21
**August** [1] - 126:10
**authority** [1] - 84:25
**authorizations** [1] - 110:20
**authorized** [1] - 89:6
**authors** [1] - 132:10
**automatic** [1] - 44:20
**automatically** [1] - 44:25
**Autopsy** [1] - 66:5
**available** [14] - 15:15, 16:14, 23:11, 23:12, 29:17, 46:21, 46:22, 55:21, 64:9, 68:20, 78:7, 90:9, 103:1
**average** [8] - 34:12, 34:14, 37:18, 38:1, 75:16, 127:16, 145:23, 145:24
**Avin** [1] - 3:7
**avoids** [1] - 85:10
**award** [4] - 67:25, 133:15, 134:13, 147:16
**awarding** [1] - 133:12
**aware** [4] - 14:9, 30:24, 46:3, 114:21
**Ayme** [2] - 6:17, 153:25

**B**

**b)** [1] - 139:19
**backed** [1] - 14:8
**background** [2] - 21:16, 132:9
**bad** [1] - 101:3
**balance** [1] - 26:21
**bar** [1] - 73:2
**Barbara** [1] - 45:18
**Barnum** [2] - 148:5, 149:4

**Baron** [2] - 3:14, 132:3
**barred** [1] - 98:25
**Barrett** [2] - 126:25, 129:8
**bars** [1] - 16:7
**bartered** [1] - 77:25
**based** [29] - 15:15, 25:10, 28:2, 28:4, 31:24, 40:17, 40:24, 69:11, 70:23, 71:1, 74:22, 75:18, 77:16, 87:19, 101:16, 103:24, 104:10, 104:18, 105:19, 108:22, 110:1, 110:2, 110:21, 115:22, 123:3, 131:10, 135:7, 136:12, 136:25
**bases** [1] - 134:21
**basic** [4] - 50:12, 56:20, 58:12, 122:11
**basics** [1] - 40:1
**basis** [16] - 11:13, 27:3, 33:15, 38:5, 49:15, 67:17, 69:14, 110:19, 124:14, 124:15, 133:11, 133:13, 133:15, 134:23, 135:1, 135:25
**Baylen** [1] - 2:11
**bear** [1] - 110:9
**bears** [4] - 84:1, 84:19, 90:10, 110:14
**became** [5] - 13:3, 35:11, 52:9, 74:3, 78:7
**become** [3] - 82:1, 94:10, 125:16
**BEFORE** [1] - 1:17
**began** [3] - 17:9, 101:13, 136:8
**begets** [1] - 63:24
**beginning** [1] - 15:7
**begins** [3] - 22:25, 121:23, 121:24
**behalf** [2] - 92:22, 139:3
**behavior** [8] - 25:23, 75:2, 75:3, 75:23, 78:6, 80:21, 83:18, 149:2
**behind** [1] - 62:17
**belabor** [1] - 31:5
**believes** [1] - 100:9
**Bellwethers** [1] - 112:9
**below** [1] - 8:12
**BENCH** [1] - 1:16

**benchmark** [2] - 132:24, 133:6
**benefit** [1] - 84:3
**benefits** [10] - 25:11, 27:4, 87:10, 87:15, 91:12, 91:17, 91:19, 95:2, 95:3, 138:2
**benign** [1] - 103:18
**best** [1] - 150:20
**better** [3] - 39:6, 92:19, 94:20
**between** [20] - 11:4, 48:9, 65:2, 68:15, 72:2, 72:16, 72:19, 81:5, 85:2, 98:10, 105:11, 113:6, 113:10, 118:18, 119:22, 126:20, 128:5, 133:4, 133:8, 152:19
**beyond** [1] - 129:1
**big** [5] - 60:19, 145:14, 148:11, 148:18
**bigger** [1] - 150:14
**biggest** [1] - 42:25
**billion** [12] - 123:5, 123:11, 125:19, 126:17, 128:1, 128:2, 128:6, 128:15, 129:18, 132:25, 133:5
**billions** [1] - 134:15
**binder** [2] - 17:13, 17:14
**bit** [10] - 19:1, 40:3, 51:14, 88:9, 103:13, 107:18, 110:24, 119:8, 131:21, 142:7
**bizarrely** [1] - 132:5
**black** [6] - 53:5, 53:10, 53:15, 87:12, 140:10, 143:7
**blame** [2] - 72:25, 114:15
**blamed** [2] - 59:17, 65:25
**block** [5] - 104:21, 105:11, 105:13, 107:12, 150:16
**blocked** [19] - 71:21, 71:22, 71:23, 100:9, 103:8, 103:10, 104:1, 104:17, 106:25, 107:1, 107:3, 107:6, 107:7, 107:9, 109:1, 111:8, 111:9, 111:14, 111:17
**blocking** [4] - 104:4, 105:12, 107:13

**blocks** [1] - 73:16
**blood** [1] - 34:24
**blowout** [2] - 149:4, 150:5
**blowouts** [1] - 150:3
**blue** [2] - 16:3, 16:7
**blur** [1] - 98:7
**blurred** [1] - 85:7
**Blvd** [3] - 4:3, 4:12, 4:14
**Board** [21] - 12:16, 19:2, 20:3, 20:9, 20:17, 21:1, 21:12, 21:23, 22:10, 24:20, 44:7, 45:5, 88:15, 88:18, 88:24, 88:25, 89:4, 100:13, 100:17, 118:3, 137:25
**board** [1] - 121:4
**body** [6] - 17:23, 92:13, 137:20, 139:24, 142:10, 143:1
**Bonasso** [1] - 5:14
**Boockholdt** [2] - 45:19, 46:7
**book** [1] - 21:20, 21:22, 21:24, 22:3, 22:6, 22:8, 22:9, 140:19, 141:14, 151:20
**bottle** [1] - 97:8
**bottom** [7] - 25:22, 32:25, 46:25, 50:12, 55:17, 149:18, 149:19
**Boulevard** [1] - 3:15
**bounds** [1] - 32:8
**box** [1] - 87:12
**Box** [2] - 5:14, 6:8
**brain** [1] - 64:13
**branch** [1] - 148:5
**breach** [1] - 150:25
**break** [6] - 38:12, 38:23, 38:24, 70:4, 111:22, 112:2
**brethren** [1] - 112:13
**bridge** [1] - 149:13
**Bridgeside** [2] - 4:3, 4:12, 4:14
**brief** [5] - 55:13, 68:5, 78:10, 122:6, 145:5
**briefed** [1] - 49:11
**briefing** [5] - 55:2, 67:23, 98:9, 98:13, 107:18
**briefly** [4] - 13:17, 50:14, 70:17, 120:20
**briefs** [1] - 84:6

**bring** [5] - 11:24, 54:14, 60:11, 139:10, 147:20
**bringing** [1] - 92:8
**broad** [1] - 94:12
**broader** [3] - 119:2, 119:13, 119:18
**broadly** [3] - 17:10, 61:24
**brought** [3] - 46:16, 92:7, 92:21
**Budd** [2] - 3:14, 132:3
**budget** [5] - 65:25, 125:22, 130:14, 133:23, 133:24
**build** [1] - 73:15
**building** [1] - 73:16
**bulk** [4] - 60:9, 67:6, 123:19
**Burling** [1] - 5:11
**bushes** [1] - 148:1
**business** [3] - 55:24, 150:12, 150:13
**buy** [1] - 116:16
**buyers** [1] - 115:15
**bypass** [1] - 117:5
**Byzantine** [1] - 139:25

## C

**CA** [1] - 3:16
**CABELL** [1] - 1:10
**Cabell** [108] - 3:2, 7:11, 7:16, 8:18, 9:1, 11:5, 11:20, 12:15, 12:19, 15:4, 29:8, 29:21, 29:25, 30:13, 31:3, 31:6, 32:6, 32:8, 32:11, 32:14, 32:16, 32:17, 32:20, 33:2, 33:6, 33:14, 33:21, 33:24, 36:2, 36:3, 36:18, 36:20, 37:5, 37:9, 37:18, 37:24, 37:25, 38:6, 48:12, 48:23, 51:8, 51:24, 55:11, 55:18, 55:24, 56:7, 58:15, 58:16, 61:14, 62:8, 62:16, 70:22, 71:16, 71:18, 71:25, 73:5, 73:9, 73:20, 75:16, 76:17, 95:16, 95:19, 95:21, 95:23, 95:25, 96:3, 96:5, 97:17, 97:19, 97:22, 98:1, 98:4, 98:8, 98:10, 98:13, 98:16, 98:17, 98:20, 98:22, 99:6, 99:8, 99:13, 99:14,

99:23, 99:25, 100:1, 100:7, 100:10, 100:14, 100:21, 101:4, 102:2, 102:5, 102:13, 102:20, 106:2, 114:11, 123:25, 129:2, 129:10, 132:4, 139:4, 144:3, 146:14, 147:3, 148:22, 149:6, 150:18
**cabell** [1] - 2:2
**Cabell-Huntington** [39] - 70:22, 71:16, 71:18, 71:25, 73:5, 73:9, 73:20, 95:16, 95:19, 95:21, 95:23, 95:25, 96:3, 96:5, 97:17, 97:19, 97:22, 98:1, 98:4, 98:8, 98:13, 98:17, 98:20, 99:13, 99:14, 99:23, 99:25, 100:1, 100:7, 100:10, 100:14, 100:21, 101:4, 102:2, 102:5, 102:13, 102:20, 114:11, 123:25
**Cabell/Huntington** [5] - 13:24, 29:6, 30:5, 33:12, 48:20
**cabinet** [13] - 60:25, 61:9, 66:25, 71:2, 78:23, 79:6, 80:12, 80:14, 80:22, 82:16, 85:5, 136:12, 137:5
**cabinets** [1] - 111:12
**calculated** [6] - 8:17, 13:23, 30:12, 30:15, 37:4, 126:25
**calculation** [6] - 13:19, 13:20, 13:21, 30:9, 37:4, 127:22
**calculations** [2] - 13:19, 75:15
**calibration** [3] - 131:1, 131:6, 131:16
**CALLAS** [1] - 6:7
**Cameron** [5] - 46:17, 46:19, 46:20, 48:1, 52:25
**CAMPBELL** [1] - 6:14
**Cancer** [1] - 18:15
**cancer** [5] - 19:5, 32:2, 35:1, 60:13, 139:23
**cannot** [40] - 10:1, 27:8, 39:16, 39:17, 55:1, 57:1, 69:13,

70:19, 71:4, 71:10, 71:23, 72:2, 72:7, 77:1, 77:6, 80:23, 87:4, 87:5, 88:2, 88:4, 89:19, 89:24, 90:2, 90:21, 90:24, 91:3, 92:5, 99:15, 99:17, 107:5, 107:20, 114:18, 116:20, 118:7, 122:20, 135:19, 136:17, 137:8, 137:13, 138:5
**capable** [1] - 152:6
**capita** [4] - 33:15, 33:19, 34:7, 34:9
**Capitol** [1] - 2:7
**caps** [1] - 100:16
**captures** [1] - 147:9
**Cardinal** [64] - 4:16, 5:2, 7:19, 7:24, 8:1, 8:5, 8:7, 8:8, 8:10, 11:4, 11:16, 12:6, 28:15, 28:17, 28:18, 29:4, 30:25, 36:19, 37:9, 40:2, 40:7, 40:10, 40:15, 41:17, 43:4, 43:15, 43:22, 44:1, 44:5, 44:12, 44:15, 44:20, 45:10, 45:15, 46:14, 46:16, 47:3, 47:17, 47:19, 47:23, 49:24, 51:12, 51:19, 51:23, 52:10, 52:13, 53:12, 54:2, 54:22, 55:8, 55:10, 55:19, 56:6, 58:14, 58:23, 59:2, 61:7, 61:17, 62:24, 67:5, 69:11, 106:2, 144:7, 144:15
**Cardinal's** [4] - 37:5, 38:6, 41:6, 48:7
**cardiovascular** [1] - 34:23
**care** [38] - 9:10, 15:11, 15:22, 16:10, 16:11, 16:17, 16:19, 18:13, 20:2, 22:18, 22:21, 22:24, 24:10, 24:12, 24:22, 25:3, 26:5, 26:10, 26:13, 27:18, 28:5, 29:2, 29:7, 36:12, 37:12, 59:5, 59:8, 59:19, 69:12, 70:24, 74:12, 76:24, 77:12, 90:9, 91:9, 141:10, 141:25
**careful** [1] - 138:9
**carefully** [2] - 10:19,

93:4
**Carey** [1] - 4:23
**carfentanil** [1] - 114:8
**Carolina** [1] - 140:20
**carried** [1] - 26:17
**cartel** [1] - 67:3
**cartels** [5] - 114:22, 116:4, 116:13, 117:16, 120:7
**case** [91] - 7:9, 12:23, 13:3, 14:3, 24:14, 33:19, 34:2, 46:21, 48:16, 54:11, 56:22, 57:9, 57:10, 57:11, 57:12, 57:20, 57:21, 57:23, 58:5, 63:3, 67:10, 67:12, 67:14, 67:19, 68:2, 68:3, 68:17, 69:15, 70:25, 72:8, 72:11, 72:12, 73:3, 73:15, 76:22, 78:14, 82:5, 83:2, 84:7, 84:14, 85:16, 85:17, 85:18, 89:20, 92:7, 93:18, 94:24, 95:18, 99:5, 99:10, 101:3, 101:9, 101:13, 101:14, 101:16, 104:5, 104:11, 106:21, 106:23, 111:11, 112:19, 113:1, 113:13, 113:19, 129:12, 132:2, 135:2, 135:12, 135:13, 136:6, 138:13, 140:4, 140:5, 140:14, 140:15, 141:9, 141:11, 141:21, 141:23, 141:25, 142:5, 142:7, 143:12, 143:15, 143:22, 145:1, 146:20, 150:4, 150:21
**cases** [24] - 67:17, 68:23, 81:1, 81:6, 81:13, 82:12, 82:23, 84:22, 84:25, 86:14, 86:18, 92:10, 93:9, 93:10, 93:13, 93:19, 94:1, 94:3, 94:15, 112:6, 122:7, 122:12, 130:22, 136:23
**cases"** [1] - 92:8
**cast** [1] - 68:18
**categories** [2] - 52:21, 127:19

**causal** [12] - 11:3,
11:9, 60:1, 65:6,
66:20, 72:16, 77:15,
77:16, 77:17, 81:8,
83:8, 118:18
**causation** [58] - 11:2,
11:17, 54:24, 55:3,
55:4, 55:6, 55:13,
56:13, 57:1, 58:12,
62:19, 65:14, 70:20,
71:9, 72:2, 72:11,
72:15, 72:21, 80:24,
81:3, 81:11, 82:4,
82:12, 82:22, 83:10,
83:15, 83:16, 83:25,
84:4, 84:7, 84:10,
84:12, 84:16, 85:4,
85:8, 85:9, 86:9,
86:11, 86:16, 99:14,
102:18, 112:22,
114:19, 116:20,
117:6, 117:10,
118:12, 118:15,
120:10, 120:12,
122:11, 122:17,
124:20, 136:18,
136:25, 137:3,
150:20
**caused** [32] - 7:16,
8:15, 9:9, 18:12,
54:25, 58:5, 58:14,
58:15, 58:17, 58:24,
59:11, 59:15, 59:24,
61:1, 61:15, 62:24,
65:16, 77:18, 80:23,
86:1, 92:18, 95:25,
99:16, 102:22,
110:10, 111:7,
111:18, 121:9,
121:15, 124:22,
128:10
**causes** [9] - 62:20,
82:13, 93:24,
110:13, 116:25,
118:24, 118:25,
120:3
**causing** [6] - 11:7,
33:25, 34:16, 34:19,
35:5, 102:12
**CDC** [4] - 23:20, 24:2,
36:4, 66:9
**ceased** [2] - 45:3
**Center** [2] - 3:12, 5:11
**center** [6] - 12:14,
12:15, 41:2, 41:3,
48:22, 49:3
**centers** [5] - 36:16,
40:25, 48:18, 48:20,
49:1
**central** [4] - 70:20,

73:12, 73:15, 122:16
**certain** [3] - 27:9,
36:7, 56:23
**certainly** [7] - 25:12,
42:10, 47:15, 64:8,
96:16, 97:4, 151:1
**CERTIFICATION** [1] -
153:24
**certified** [1] - 112:12
**certify** [1] - 154:2
**chain** [5] - 11:9, 58:7,
60:1, 61:2, 66:20,
67:5, 67:8, 81:8,
120:14
**Chambers** [3] - 57:20,
67:11, 67:14
**chance** [2] - 54:13,
68:6
**change** [11] - 9:9,
18:4, 18:13, 25:3,
26:13, 26:14, 27:18,
42:25, 46:7, 83:8,
149:2
**changed** [14] - 9:10,
15:22, 20:14, 25:12,
25:13, 37:13, 42:14,
46:12, 46:15, 59:6,
59:7, 104:12, 105:5,
113:21
**changes** [9] - 74:11,
76:24, 119:25,
128:1, 148:13,
148:15, 148:20,
149:7, 150:2
**changing** [6] - 16:16,
21:16, 28:6, 29:2,
59:18, 105:16
**character** [1] - 153:12
**charged** [2] - 88:6,
149:24
**CHARLES** [1] - 3:11
**Charleston** [34] - 2:8,
3:13, 4:24, 5:15, 6:9,
7:4, 15:18, 46:22,
57:23, 81:1, 81:13,
82:3, 82:8, 82:9,
82:13, 82:23, 83:1,
83:15, 84:1, 84:13,
84:19, 86:12, 86:20,
86:23, 116:19,
116:22, 117:4,
117:11, 118:15,
120:11, 120:15,
136:18, 137:2, 137:6
**CHARLESTON** [2] -
1:2, 1:18
**chart** [11] - 11:22,
16:2, 16:3, 16:4,
19:22, 22:22, 27:23,
30:3, 30:5, 33:3,

65:4
**charts** [9] - 30:4,
32:25, 33:11, 34:21,
74:6, 108:17, 114:9,
145:15
**Chase** [1] - 4:23
**check** [4] - 23:6,
23:10, 108:24, 146:4
**checked** [1] - 112:12
**checkers** [1] - 40:23
**Chesterbrook** [1] -
6:15
**Chicago** [1] - 74:24
**Chief** [1] - 24:16
**chief** [2] - 39:15, 45:17
**child** [1] - 121:22
**China** [1] - 67:4
**chiropractors** [1] -
35:23
**choice** [1] - 152:18
**chose** [1] - 48:5
**Chris** [1] - 15:19
**Chronic** [1] - 23:4
**chronic** [6] - 16:21,
19:4, 19:5, 19:6,
32:2, 35:14
**Circuit** [1] - 104:14
**circumstances** [1] -
103:21
**cite** [2] - 49:9, 68:10
**cited** [2] - 67:14, 85:17
**Cities** [1] - 66:14
**cities** [2] - 68:12,
115:6
**citing** [1] - 84:24
**city** [8] - 29:18, 36:6,
36:7, 59:17, 59:20,
62:12, 68:20, 123:9
**City** [56] - 4:1, 5:11,
18:2, 18:10, 57:22,
68:18, 76:15, 80:25,
81:13, 82:3, 82:8,
82:9, 82:13, 82:22,
82:25, 83:15, 84:1,
84:13, 84:19, 86:12,
86:19, 86:22,
116:19, 116:22,
117:3, 117:11,
118:15, 120:11,
120:15, 122:24,
123:1, 123:8,
123:13, 124:4,
125:19, 130:3,
130:6, 130:8,
130:10, 130:14,
132:3, 133:5,
133:14, 133:17,
133:21, 133:23,
134:4, 134:9,
134:14, 134:16,

136:18, 137:1,
137:5, 139:3,
146:14, 154:3
**CITY** [1] - 1:4
**city's** [5] - 65:24, 66:2,
66:11, 66:13, 90:10
**Civil** [3] - 1:4, 154:5,
154:6
**civil** [1] - 1:10
**claim** [27] - 11:15,
59:5, 70:14, 72:7,
72:13, 73:2, 74:10,
89:15, 91:16, 91:24,
92:9, 92:15, 92:16,
93:6, 93:8, 93:25,
99:15, 101:17,
102:10, 102:17,
111:11, 111:18,
118:13, 121:3,
128:11, 135:3, 137:7
**claimed** [6] - 70:25,
72:17, 72:20, 81:5,
111:4, 121:10
**claiming** [3] - 93:6,
101:19, 123:4
**claims** [11] - 11:6,
81:2, 84:21, 86:11,
92:1, 93:16, 94:6,
99:17, 112:11,
116:23, 120:9
**class** [6] - 59:12,
92:22, 92:25, 93:3,
112:6, 112:10
**classic** [1] - 93:8
**classically** [1] -
103:14
**cleanse** [1] - 152:1
**clear** [10] - 19:14,
19:24, 26:4, 57:17,
58:2, 87:17, 102:7,
103:9, 110:11,
141:18
**cleared** [1] - 49:24
**clearly** [29] - 39:18,
73:21, 74:13, 74:25,
75:7, 75:10, 75:22,
77:3, 77:23, 78:2,
78:16, 79:16, 80:8,
82:24, 84:9, 84:13,
90:6, 92:17, 93:17,
104:5, 109:24,
114:10, 121:4,
121:5, 122:23,
128:18, 136:9, 144:5
**clerical** [1] - 146:5
**climb** [1] - 74:7
**Clinic** [1] - 23:4
**clinics** [2] - 23:15,
100:23
**clip** [3] - 41:20, 41:22,

42:5
**close** [1] - 97:24
**Closed** [1] - 79:9
**closed** [7] - 79:10,
80:17, 81:8, 143:2,
143:20, 145:2, 151:4
**closing** [5] - 55:15,
62:3, 73:6, 73:10,
99:24, 128:3,
139:12, 141:22,
151:5
**closings** [5] - 47:4,
73:14, 96:2, 116:9,
120:25
**co** [1] - 147:7
**co-counsel** [1] - 147:7
**coal** [5] - 60:14, 85:22,
85:24, 86:2, 86:3
**cocaine** [1] - 64:4
**Cochran** [3] - 6:17,
153:25, 154:9
**Code** [2] - 149:25
**code** [1] - 103:2
**codes** [1] - 29:16
**codified** [1] - 143:1
**coin** [4] - 14:15, 14:16,
15:1, 116:7
**colleague** [1] - 60:21
**colleagues** [5] -
38:25, 43:15, 60:20,
139:3, 152:21
**colorful** [1] - 116:9
**colorfully** [2] - 114:24,
130:3
**Colston** [5] - 64:22,
129:13, 134:8,
150:20
**coming** [4] - 9:22,
29:8, 36:20
**Coming** [1] - 58:13
**comment** [1] - 145:5
**commented** [1] -
139:13
**comments** [1] -
147:18
**COMMISSION** [1] -
1:10
**Commission** [18] -
2:2, 3:2, 17:22,
17:25, 18:11, 57:20,
58:6, 59:18, 59:20,
67:10, 83:3, 83:8,
83:12, 83:17, 83:19,
89:5, 132:4, 139:4
**Commissioner** [1] -
24:19
**committee** [2] - 47:17,
65:17
**Committee** [1] - 47:18
**common** [11] - 16:21,

64:13, 78:18, 89:25, 93:2, 93:14, 119:14, 129:15, 146:2
**commonality** [1] - 92:25
**community** [32] - 17:9, 23:17, 25:4, 25:25, 69:12, 70:22, 77:10, 79:4, 79:5, 79:8, 88:10, 89:4, 89:14, 100:22, 101:23, 110:7, 110:10, 114:6, 125:14, 125:24, 126:6, 126:15, 128:20, 129:19, 129:24, 132:25, 133:12, 135:6, 137:10, 150:6, 151:3, 152:2
**Comp** [1] - 35:19
**companies** [6] - 41:12, 85:23, 85:24, 86:2, 97:23, 144:19
**company** [4] - 13:1, 13:2, 40:9, 45:23
**company's** [1] - 45:21
**comparable** [1] - 131:3
**compared** [6] - 8:18, 33:15, 34:16, 40:17, 127:7, 131:14
**compels** [1] - 69:16
**competence** [1] - 153:13
**compiled** [1] - 127:14
**complained** [1] - 61:19
**complaint** [4] - 22:2, 46:6, 59:6, 59:10
**complaints** [1] - 47:2
**complete** [5] - 14:4, 47:8, 118:12, 118:16, 134:12
**completely** [7] - 12:6, 37:10, 41:7, 61:21, 98:24, 103:19, 126:22
**complex** [1] - 143:3
**compliance** [1] - 110:17
**compliant** [2] - 42:2, 42:3
**complicated** [1] - 112:16
**complied** [1] - 43:5
**comply** [3] - 43:16, 47:15, 50:21
**complying** [1] - 100:19

**component** [9] - 40:22, 44:17, 47:12, 47:13, 47:14, 84:9, 84:11, 150:15
**components** [5] - 40:13, 44:15, 45:11, 47:9, 55:3
**Compton** [3] - 78:3, 115:12, 119:20
**computer** [2] - 6:19, 40:17
**conceded** [5] - 49:23, 50:2, 50:7, 50:20, 51:5
**concept** [5] - 17:9, 83:4, 93:8, 122:10, 139:17
**concern** [2] - 20:22, 91:3
**concerns** [3] - 44:21, 46:4, 54:8
**concession** [1] - 30:20
**conclude** [4] - 73:7, 111:3, 138:7
**consolidate** [6] - 22:13, 42:5, 65:8, 76:9, 83:11, 100:13
**conclusion** [5] - 30:22, 70:16, 73:17, 120:15, 145:16
**conclusions** [5] - 8:22, 57:13, 73:16, 119:22, 152:11
**conclusive** [4] - 73:18, 75:20, 76:6, 76:25
**conditions** [5] - 33:25, 34:16, 34:20, 35:5, 36:7
**conduct** [35] - 7:16, 7:19, 8:2, 8:8, 8:19, 9:2, 11:1, 11:4, 11:7, 11:16, 11:21, 12:2, 12:4, 26:9, 33:18, 48:12, 57:6, 61:19, 63:2, 71:17, 72:20, 80:15, 81:6, 82:11, 83:14, 85:2, 89:18, 90:2, 120:22, 121:8, 121:17, 122:4, 122:14, 135:16
**conduct"** [1] - 122:9
**conducted** [3] - 108:23, 109:1, 109:13
**conference** [4] - 42:20, 43:9, 43:25, 44:14
**confirmed** [2] - 25:2,

53:20
**confirms** [1] - 79:13
**Congress** [2] - 98:25, 143:12
**connection** [1] - 48:9
**Connolly** [2] - 4:18, 5:4
**CONROY** [1] - 3:3
**consequence** [3] - 21:11, 57:6, 116:2
**consequences** [1] - 81:7
**conservative** [1] - 23:18
**consider** [2] - 131:22, 132:9
**consideration** [1] - 138:9
**considered** [1] - 131:23
**consistent** [5] - 30:23, 41:7, 42:12, 64:8, 94:2
**consistently** [2] - 100:18, 143:13
**consolidate** [1] - 112:9
**consolidated** [1] - 112:18
**conspiracy** [1] - 141:2
**constituted** [1] - 20:12
**constraint** [1] - 125:23
**consult** [1] - 70:5
**consultation** [2] - 87:19, 87:25
**consumption** [1] - 140:11
**contains** [2] - 17:14, 52:11
**contest** [1] - 96:6
**context** [4] - 13:13, 49:6, 54:23, 57:8
**continually** [2] - 87:18, 117:23
**continue** [4] - 49:9, 68:24, 89:11, 139:24
**continued** [5] - 15:24, 20:5, 21:4, 126:9, 126:10
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continuing** [4] - 21:17, 47:23, 100:8, 144:19
**contradicted** [2] - 65:12, 108:24
**contradiction** [1] - 136:9
**contradicts** [2] - 102:21, 125:18
**contrary** [5] - 31:22,

100:11, 100:12, 109:11, 116:12
**contrast** [3] - 35:24, 100:24
**contribute** [1] - 111:17
**contributed** [2] - 101:20, 111:6
**contributes** [1] - 91:14
**control** [17] - 59:3, 61:12, 71:4, 79:13, 79:16, 79:18, 79:23, 80:2, 80:13, 136:15, 139:15, 143:6, 143:23, 143:24, 144:9, 149:16, 150:1
**Controlled** [2] - 23:3, 42:2
**controlled** [12] - 23:13, 36:19, 36:22, 37:1, 37:23, 52:19, 77:7, 90:8, 91:4, 139:18, 139:23, 142:19
**controlling** [2] - 136:16, 150:11
**controls** [1] - 110:18
**convenience** [1] - 89:19
**convicted** [3] - 141:1, 141:24
**convince** [1] - 147:16
**Cook** [3] - 6:18, 154:1, 154:9
**cooperate** [1] - 142:6
**COPD** [1] - 34:24
**Copenhaver** [8] - 57:7, 57:11, 57:19, 58:2, 67:9, 67:16, 83:7, 83:24
**copy** [2] - 19:17, 21:20
**core** [7] - 77:16, 99:18, 101:18, 109:14, 109:15, 120:18, 121:2
**Corey** [1] - 25:1
**cORPORATION** [2] - 1:7, 1:13
**Corporation** [2] - 6:2, 154:5
**Corps** [1] - 149:5
**correct** [5] - 88:4, 117:8, 142:23, 142:24, 154:2
**correctly** [1] - 93:11
**correlation** [1] - 65:7
**cost** [3] - 78:1, 126:21, 133:4
**costs** [6] - 121:5,

123:17, 123:19, 126:2, 126:4, 127:10
**counsel** [1] - 147:7
**counteracted** [1] - 137:18
**counterparts** [1] - 35:7
**counties** [2] - 36:11, 68:12
**counting** [1] - 7:19
**country** [14] - 17:23, 23:18, 28:19, 34:7, 34:8, 34:17, 37:14, 37:22, 40:12, 44:11, 87:23, 92:3, 118:9, 128:17
**country's** [2] - 15:17, 64:23
**county** [2] - 29:18, 68:21
**COUNTY** [1] - 1:10
**County** [43] - 2:2, 3:2, 7:12, 29:25, 30:14, 32:8, 32:11, 37:18, 37:24, 48:12, 55:24, 56:7, 62:8, 75:17, 76:17, 98:10, 106:2, 122:24, 123:2, 124:5, 125:19, 129:2, 130:3, 130:8, 132:4, 133:5, 133:14, 133:17, 133:21, 133:24, 134:4, 134:10, 134:14, 134:16, 139:4, 144:3, 145:18, 146:13, 146:14, 147:3, 148:22, 149:6, 150:18
**County's** [1] - 37:25
**couple** [3] - 40:13, 100:1, 139:9
**course** [14] - 8:20, 22:23, 31:19, 35:5, 36:16, 59:16, 66:9, 68:23, 83:19, 95:1, 102:6, 115:7, 115:18, 118:17
**court** [3] - 124:3, 134:15, 139:13
**Court** [82] - 6:17, 6:18, 7:3, 7:18, 9:2, 11:13, 12:3, 15:7, 17:13, 26:8, 31:12, 38:5, 40:1, 41:9, 49:15, 56:5, 57:17, 63:5, 67:24, 68:14, 70:4, 73:5, 73:7, 73:13, 75:4, 75:24, 76:7,

76:24, 83:2, 84:2, 84:5, 84:15, 84:16, 85:13, 85:17, 85:23, 86:16, 87:11, 91:11, 91:14, 91:25, 93:20, 93:22, 101:12, 103:13, 104:7, 107:18, 108:17, 111:2, 112:14, 114:21, 116:25, 119:8, 120:8, 121:21, 123:15, 124:3, 124:19, 124:21, 125:12, 130:1, 130:20, 134:21, 134:22, 134:25, 135:21, 135:22, 135:23, 136:5, 136:21, 138:8, 138:12, 140:6, 141:3, 141:14, 141:21, 142:11, 142:13, 153:18, 153:25, 154:1

**COURT** [50] - 1:1, 1:17, 7:6, 10:8, 10:11, 13:8, 14:18, 14:24, 19:19, 38:12, 38:16, 38:20, 39:4, 39:7, 39:21, 69:22, 70:5, 70:11, 70:13, 86:17, 86:21, 87:1, 92:21, 93:9, 96:12, 97:6, 111:21, 111:24, 112:1, 138:14, 138:16, 138:19, 138:22, 138:24, 140:14, 142:4, 142:20, 142:22, 143:8, 146:12, 146:19, 146:25, 147:23, 148:8, 152:9, 152:15, 152:18, 153:7, 153:10, 153:17

**Court's** [3] - 83:21, 135:20, 139:10

**court-administered** [1] - 134:15

**Court-supervised** [1] - 124:19

**courtesies** [2] - 69:20, 138:10

**Courtright** [1] - 142:25

**courtroom** [4] - 69:1, 69:3, 138:10, 144:19

**courts** [2] - 68:2,

91:25

**cover** [7] - 8:3, 11:23, 13:17, 47:7, 62:11, 63:5, 67:20

**coverage** [1] - 35:23

**covered** [4] - 35:24, 45:22, 54:21, 55:2

**covers** [1] - 123:16

**Covington** [1] - 5:11

**crack** [1] - 64:4

**Cranberry** [1] - 147:24

**create** [7] - 44:10, 45:8, 80:13, 124:21, 135:18, 139:21, 140:10

**created** [4] - 77:18, 107:22, 113:11, 143:1

**creating** [1] - 124:10

**credibility** [2] - 126:18, 145:7

**credible** [1] - 49:14

**credit** [2] - 28:7, 30:20

**credited** [1] - 107:21

**crime** [7] - 61:4, 61:5, 61:7, 115:25, 116:1, 116:3, 116:5

**crimes** [1] - 82:21

**criminal** [23] - 58:7, 61:18, 71:7, 72:23, 77:19, 80:14, 82:11, 82:14, 82:18, 82:22, 83:16, 85:5, 115:20, 115:21, 116:13, 116:14, 116:24, 117:1, 120:6, 136:14, 137:4, 141:2, 141:17

**crisis** [19] - 59:21, 64:24, 71:24, 71:25, 73:9, 81:24, 81:25, 102:13, 113:11, 113:23, 113:25, 114:16, 118:7, 118:11, 124:8, 133:18, 134:4, 134:6, 134:17

**criteria** [2] - 47:14, 125:4

**critical** [7] - 10:17, 68:13, 72:19, 73:17, 73:22, 90:3

**criticize** [1] - 147:12

**criticized** [1] - 146:17

**cross** [3] - 13:23, 30:10, 30:11, 35:10, 54:13

**cross-examination** [1] - 13:23

**cross-examine** [1] -

54:13

**cross-examined** [1] - 35:10

**CRR** [2] - 6:17, 6:18

**cry** [1] - 116:16

**cull** [1] - 87:14

**culled** [1] - 137:1

**culture** [3] - 24:25, 74:15, 74:17

**current** [4] - 48:2, 71:24, 128:23, 129:21

**curve** [1] - 19:2

**Custom** [1] - 100:21

**customer** [13] - 9:1, 40:18, 44:20, 44:24, 45:4, 52:9, 52:12, 52:22, 53:9, 69:4, 69:6, 69:7, 100:20

**Customer** [3] - 44:17, 47:12, 51:21

**customer's** [1] - 40:19

**customers** [29] - 12:18, 40:14, 40:25, 44:18, 44:19, 44:21, 46:15, 47:21, 47:24, 49:6, 49:7, 51:21, 51:24, 54:4, 55:25, 60:9, 71:18, 95:19, 95:21, 98:13, 99:22, 99:25, 100:1, 100:3, 100:4, 100:14, 100:18, 105:15, 109:13

**customized** [1] - 44:23

**cut** [4] - 9:17, 9:23, 56:2, 56:4

**cuts** [2] - 62:13, 65:25

**D**

**daily** [1] - 51:1

**dam** [4] - 148:7, 148:13, 149:13, 150:22

**damages** [5] - 121:4, 121:5, 128:12, 135:2, 135:12

**dangerous** [2] - 92:19, 94:13, 95:9

**data** [12] - 29:17, 36:25, 46:12, 52:23, 53:1, 65:6, 75:18, 75:19, 96:4, 127:13, 127:14, 127:15

**database** [5] - 23:6, 23:11, 102:25, 106:10, 106:12

**date** [1] - 45:16

dated [1] - 43:12

**dates** [1] - 62:12

**Daubert** [1] - 49:11

**DAVID** [2] - 1:17, 4:5

**David** [1] - 7:1

**days** [17] - 7:18, 12:20, 12:25, 13:1, 43:12, 74:14, 78:17, 78:18, 79:19, 79:22, 81:16, 88:14, 127:17, 127:18, 127:23

**DC** [6] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12

**De** [2] - 2:4, 2:14

**DEA** [105] - 9:14, 12:13, 12:17, 18:13, 18:14, 18:17, 20:21, 27:17, 27:19, 27:22, 28:2, 28:10, 28:13, 28:21, 28:23, 29:3, 29:14, 29:19, 31:16, 33:3, 33:8, 36:23, 37:1, 37:6, 40:15, 40:21, 41:2, 41:6, 41:8, 41:10, 41:16, 42:1, 42:12, 42:14, 42:19, 42:22, 43:1, 43:3, 43:11, 43:15, 43:18, 45:5, 45:11, 45:16, 46:3, 46:6, 46:9, 46:10, 46:11, 47:10, 47:16, 48:1, 48:3, 48:14, 48:24, 48:25, 49:4, 50:4, 50:17, 54:18, 55:21, 56:4, 56:18, 56:19, 59:2, 61:2, 76:9, 77:4, 87:17, 87:21, 88:2, 88:3, 88:5, 89:5, 100:9, 103:1, 104:10, 104:12, 104:19, 104:23, 104:24, 104:25, 105:1, 105:2, 105:4, 105:21, 106:1, 106:5, 106:8, 106:10, 106:18, 107:22, 108:2, 110:13, 111:16, 117:22, 137:24, 143:8, 143:11, 143:12, 144:12, 144:14

**DEA's** [5] - 36:21, 45:18, 103:24, 105:16, 108:7

**dealer** [1] - 67:4

**dealers** [9] - 61:19, 66:1, 66:4, 66:12,

82:19, 101:22, 114:23, 115:4, 116:14

**Dean** [1] - 60:22

**death** [1] - 65:10

**deaths** [4] - 65:3, 132:23, 133:2, 133:9

**debate** [2] - 25:24, 139:8

**decade** [7] - 15:24, 61:19, 89:10, 109:3, 109:6, 109:10, 113:18

**December** [2] - 44:1, 53:21

**deceptive** [2] - 59:11, 59:15

**decide** [7] - 26:7, 27:8, 55:20, 60:15, 74:21, 75:25, 136:20

**decided** [8] - 9:15, 55:21, 74:22, 84:2, 88:6, 117:3, 136:23, 137:11

**decides** [1] - 79:19

**deciding** [2] - 26:5, 134:24

**decision** [10] - 26:20, 27:3, 27:6, 79:25, 93:19, 104:14, 104:16, 117:4, 135:21, 136:22

**decisions** [18] - 70:23, 71:6, 71:14, 72:22, 76:23, 77:2, 77:13, 78:20, 81:4, 81:9, 81:10, 82:9, 87:4, 90:17, 90:23, 115:19, 136:13, 137:16

**decline** [3] - 112:24, 113:9, 113:10

**declined** [1] - 113:1

**deemed** [3] - 89:24, 94:13, 142:17

**deep** [1] - 138:8

**Deer** [19] - 15:9, 15:14, 15:18, 15:20, 16:3, 16:20, 17:13, 17:24, 20:25, 21:8, 21:16, 22:10, 22:13, 23:25, 24:14, 34:4, 35:3, 35:13, 35:17

**Deer's** [1] - 27:20

**defeat** [3] - 82:22, 83:16, 85:4

**defeated** [4] - 72:22, 81:11, 82:11, 83:14

**defeating** [1] - 137:3

**defeats** [6] - 71:9,

86:11, 99:14, 133:11, 136:24, 137:7
**defend** [1] - 146:23
**Defendant** [4] - 4:16, 5:2, 5:7, 6:2
**defendant** [3] - 57:18, 83:2, 101:13
**Defendants** [3] - 1:8, 1:14, 154:5
**defendants** [20] - 7:13, 7:15, 73:8, 83:1, 101:5, 102:3, 122:4, 122:13, 122:20, 124:22, 128:4, 143:13, 143:23, 145:7, 145:10, 147:14, 148:19, 149:12, 150:25
**defendants'** [6] - 26:9, 59:11, 72:20, 102:22, 122:9, 122:14
**defense** [8] - 69:17, 141:9, 141:10, 141:20, 141:22, 141:25, 144:25
**defies** [1] - 151:3
**define** [1] - 151:22
**defined** [1] - 139:18
**defining** [1] - 103:15
**definition** [1] - 56:12
**delivered** [1] - 150:7
**delivery** [2] - 115:14, 144:1
**delivery-like** [1] - 115:14
**demand** [14] - 10:7, 10:16, 10:20, 39:2, 39:14, 75:5, 75:8, 75:11, 75:12, 139:16, 139:21, 140:11, 140:12
**demanding** [1] - 35:7
**demands** [2] - 89:19, 137:12
**demonstrably** [1] - 136:2
**demonstrate** [3] - 146:16, 146:18, 147:3
**demonstrated** [1] - 125:10
**demonstrates** [7] - 84:3, 92:5, 92:8, 95:4, 95:9, 116:20, 138:5
**denied** [3] - 9:19, 91:25, 144:8

**denying** [1] - 72:9
**Department** [1] - 101:8
**depo** [1] - 41:9
**deposition** [1] - 41:9
**depression** [1] - 35:1
**depth** [1] - 70:18
**Deputy** [2] - 78:3, 119:20
**described** [5] - 30:5, 115:9, 119:17, 130:6, 130:25
**description** [2] - 131:13
**design** [1] - 150:16
**designation** [2] - 41:9, 41:10
**designed** [1] - 143:11
**detail** [5] - 8:4, 45:21, 72:15, 108:11, 111:2
**detailed** [1] - 44:17
**detect** [1] - 145:12
**detecting** [1] - 107:24
**determination** [2] - 25:10, 77:6
**determinations** [1] - 110:21
**determine** [2] - 52:15, 71:6
**determined** [4] - 40:18, 75:2, 75:15, 89:23
**determines** [3] - 10:21, 75:3, 76:4
**determining** [1] - 125:4
**Detroit** [5] - 67:4, 114:25, 115:3, 115:4, 115:6
**develop** [1] - 121:20
**developed** [7] - 42:18, 83:4, 92:13, 101:24, 125:14, 129:11, 130:22
**development** [1] - 83:20
**develops** [3] - 116:2, 121:25
**deviated** [3] - 130:18, 131:19, 132:12
**deviating** [2] - 103:16, 144:6
**deviation** [1] - 131:18
**devote** [1] - 123:2
**devour** [1] - 94:10
**diabetes** [1] - 34:25
**dice** [1] - 51:2
**difference** [2] - 149:21, 151:24
**differences** [1] -

148:17
**different** [18] - 13:18, 51:8, 53:1, 55:11, 56:25, 57:23, 57:24, 64:10, 84:15, 96:14, 97:9, 103:11, 112:22, 130:21, 136:2, 136:3, 142:7, 148:23
**difficult** [1] - 139:2
**digit** [2] - 29:15, 103:2
**diligence** [30] - 40:14, 44:18, 44:19, 47:22, 49:19, 51:9, 51:13, 51:16, 51:18, 51:20, 51:21, 52:3, 52:4, 52:7, 53:2, 53:9, 56:14, 56:17, 69:9, 105:15, 108:10, 108:23, 109:1, 109:3, 109:6, 109:8, 109:10, 109:11, 109:12
**dimension** [1] - 11:15
**Direct** [3] - 140:4, 140:6, 144:25
**direct** [12] - 11:13, 19:7, 57:5, 57:18, 72:16, 81:5, 81:7, 83:18, 102:8, 109:11, 118:18, 122:8
**directed** [2] - 89:7, 98:8
**direction** [1] - 23:1
**directly** [6] - 90:10, 102:21, 109:14, 122:11, 125:17, 137:6
**Director** [3] - 78:3, 119:20, 119:21
**disagree** [3] - 10:8, 10:12, 10:14
**disappeared** [1] - 113:4
**disburses** [1] - 124:21
**disciplinary** [3] - 19:15, 19:25, 22:9
**discipline** [2] - 19:4, 20:13
**disciplined** [2] - 37:17, 69:8
**disclaimed** [1] - 107:25
**disconnect** [1] - 68:15
**discretion** [1] - 134:24
**discuss** [3] - 70:17, 95:15, 147:6
**discussed** [15] - 11:11, 51:25, 72:18,

77:15, 82:17, 86:10, 90:12, 92:4, 94:3, 101:16, 110:24, 117:9, 125:8, 127:13, 128:8
**discussion** [4] - 75:14, 88:13, 113:19, 115:23
**discussions** [1] - 43:20
**disease** [1] - 34:23
**dismiss** [4] - 67:10, 84:2, 91:25, 92:2
**dismissed** [2] - 57:9, 139:17
**dismissing** [1] - 81:2
**disorder** [1] - 64:25
**disparaged** [1] - 145:7
**dispense** [2] - 60:4, 91:3
**dispensed** [10] - 66:24, 71:3, 79:6, 79:7, 82:18, 101:6, 102:1, 109:20, 110:6, 111:12
**dispenses** [1] - 100:14
**dispensing** [4] - 11:10, 55:22, 140:8, 140:24
**dispositive** [1] - 68:4
**dispute** [4] - 7:10, 26:12, 26:14, 143:22
**disputed** [3] - 31:20, 38:4, 69:16
**disputes** [1] - 143:21
**disputing** [1] - 7:14
**disregarded** [1] - 137:18
**distinction** [2] - 105:11, 151:23
**distinguish** [1] - 67:17
**distinguished** [1] - 83:1
**distinguishing** [1] - 81:7
**distribute** [9] - 12:11, 75:1, 90:20, 96:3, 110:15, 122:22, 137:8, 143:20
**distributed** [5] - 8:18, 13:24, 15:4, 38:2, 61:17
**distributes** [1] - 12:7
**distributing** [1] - 98:1
**Distribution** [1] - 79:10
**distribution** [23] - 12:14, 12:15, 13:19, 27:21, 28:1, 33:20,

38:6, 39:13, 40:25, 41:2, 41:3, 48:18, 48:19, 48:22, 49:1, 49:3, 65:2, 72:3, 89:22, 90:3, 93:23, 101:14, 121:11
**distributions** [22] - 13:21, 14:5, 14:15, 15:1, 16:7, 16:9, 16:11, 16:16, 22:23, 24:9, 30:6, 30:14, 32:17, 32:24, 33:1, 33:2, 33:5, 33:7, 37:24, 95:15, 96:5, 121:13
**distributor** [17] - 37:1, 50:17, 56:2, 56:3, 61:11, 77:6, 77:8, 79:18, 79:22, 80:9, 80:10, 97:16, 99:4, 101:2, 104:3, 104:4, 140:16
**distributors** [75] - 10:22, 14:6, 23:12, 25:22, 26:14, 27:5, 27:13, 29:22, 36:23, 41:7, 42:9, 42:10, 43:2, 46:9, 50:13, 55:24, 56:10, 58:3, 58:4, 59:7, 65:16, 65:21, 66:8, 66:15, 71:3, 71:13, 71:20, 71:21, 73:4, 74:12, 74:20, 75:1, 75:20, 75:22, 76:3, 76:22, 77:1, 77:5, 77:13, 79:13, 79:16, 80:2, 80:4, 80:13, 83:1, 83:9, 83:10, 83:18, 83:23, 89:16, 90:14, 90:19, 90:23, 91:1, 92:3, 95:11, 97:21, 102:3, 104:20, 110:25, 114:15, 114:23, 115:18, 117:15, 118:8, 120:5, 135:17, 136:15, 137:16, 138:3, 139:14, 143:23, 149:22, 150:7
**Distributors** [1] - 27:8
**distributors'** [5] - 16:13, 85:2, 102:17, 120:22, 135:16
**district** [2] - 81:2, 86:14
**DISTRICT** [3] - 1:1, 1:1, 1:17
**District** [3] - 7:2, 7:3,

104:6
divergence [2] - 126:20, 127:8
diversion [58] - 20:23, 41:10, 44:3, 44:21, 45:2, 46:18, 47:19, 52:12, 52:13, 53:17, 53:19, 54:1, 54:4, 54:9, 58:15, 59:25, 60:25, 61:10, 66:7, 71:1, 71:4, 71:17, 71:23, 72:23, 77:18, 77:20, 78:7, 79:6, 80:3, 80:12, 80:14, 80:22, 82:17, 82:19, 82:21, 85:6, 95:18, 96:9, 96:13, 96:17, 96:23, 97:3, 97:14, 98:23, 100:6, 101:10, 102:19, 102:21, 105:14, 107:5, 107:12, 107:14, 110:13, 110:19, 136:12, 137:5, 141:17, 142:18
divert [2] - 60:5, 80:15
diverted [20] - 50:10, 61:6, 71:8, 71:21, 77:21, 77:25, 78:13, 78:15, 78:23, 79:9, 79:24, 103:8, 103:10, 103:11, 103:22, 104:2, 106:25, 107:1, 107:10, 108:8
diverting [3] - 11:11, 12:19, 69:7
Division [2] - 106:11, 106:15
dixit [1] - 8:22
Doctor [1] - 140:24
doctor [24] - 20:13, 21:2, 22:1, 22:8, 23:7, 23:13, 25:9, 60:3, 66:23, 76:2, 77:16, 79:7, 79:19, 80:5, 81:23, 85:3, 88:22, 89:23, 109:19, 110:11, 116:17, 136:10, 141:13, 141:24
doctor's [3] - 27:15, 79:25, 82:5
doctor-shopping [1] - 23:7
doctors [113] - 9:10, 9:13, 9:23, 10:1, 11:10, 12:9, 15:5, 15:12, 17:3, 18:5,

18:6, 19:3, 19:4, 19:13, 19:23, 20:7, 20:10, 20:16, 20:18, 21:8, 21:17, 21:23, 21:24, 22:6, 22:11, 22:16, 22:20, 23:6, 23:8, 23:10, 23:25, 24:7, 24:21, 25:17, 25:19, 26:20, 27:2, 27:15, 28:19, 28:22, 31:14, 31:24, 32:1, 32:4, 32:11, 34:9, 37:11, 38:3, 56:6, 58:8, 59:1, 60:15, 66:8, 67:16, 71:6, 71:11, 72:22, 73:11, 73:12, 73:19, 74:3, 74:11, 74:20, 74:22, 74:25, 75:8, 75:21, 75:23, 76:2, 76:12, 76:13, 76:16, 76:20, 77:2, 77:10, 77:11, 77:13, 78:20, 81:10, 83:16, 87:14, 87:15, 88:16, 89:1, 89:4, 89:14, 89:17, 90:4, 90:14, 90:17, 90:20, 91:2, 91:19, 94:21, 95:2, 95:7, 95:12, 95:13, 101:21, 101:25, 110:5, 111:1, 117:20, 118:4, 136:13, 137:1, 137:9, 137:15, 137:19, 138:2, 143:16, 143:18, 150:9
Doctors [2] - 37:13, 55:20
doctors" [1] - 81:20
doctors' [5] - 70:22, 76:23, 87:3, 90:23, 137:21
document [3] - 52:7, 130:7, 130:11
documented [2] - 53:14, 54:9
documents [4] - 17:12, 17:13, 17:14, 115:2
dollars [15] - 123:5, 123:11, 123:12, 125:19, 126:3, 126:5, 126:9, 126:14, 126:17, 127:1, 128:1, 128:2, 128:15, 134:8, 134:15
dominicus [1] - 97:25
done [18] - 9:22, 30:9,

31:6, 52:3, 55:11, 56:14, 56:16, 56:23, 56:25, 103:9, 109:11, 109:13, 135:5, 135:17, 135:22, 152:4, 152:5
dopamine [1] - 64:14
dope [1] - 140:10
dosage [1] - 23:21
doses [2] - 19:6, 19:7
dots [2] - 65:5, 98:11
doubled [1] - 13:4
Douglas [1] - 4:23
down [11] - 13:4, 29:15, 67:5, 91:6, 101:4, 140:20, 141:4, 148:4, 149:15, 151:6, 151:9
downstream [6] - 28:18, 107:8, 121:9, 128:10, 135:13, 151:3
dozen [3] - 99:1, 99:9, 107:3
dozens [5] - 130:23, 131:5, 131:8
Dr [145] - 8:17, 13:18, 13:19, 13:20, 14:12, 14:14, 14:15, 15:9, 15:14, 15:18, 15:19, 15:20, 16:3, 16:6, 16:20, 17:13, 20:25, 21:8, 21:16, 21:21, 22:3, 22:8, 22:10, 22:11, 22:13, 23:25, 24:13, 24:15, 24:17, 24:19, 25:1, 25:6, 25:15, 26:16, 27:20, 29:13, 30:6, 30:11, 30:15, 31:12, 32:1, 32:3, 32:7, 32:24, 33:5, 33:9, 34:6, 34:11, 34:15, 35:3, 35:9, 35:13, 35:17, 35:22, 36:8, 36:10, 36:14, 38:25, 39:2, 39:12, 39:18, 48:20, 60:16, 60:21, 62:3, 63:13, 63:19, 64:1, 64:2, 64:6, 64:11, 64:18, 65:4, 66:5, 66:16, 66:17, 73:21, 74:2, 74:13, 74:24, 75:8, 75:18, 76:12, 76:19, 77:23, 78:3, 78:16, 79:2, 79:21, 81:15, 81:22, 82:6, 87:11, 88:21, 89:1, 96:20, 97:20, 98:15, 109:21, 113:8,

113:24, 114:9, 115:8, 115:12, 119:13, 119:17, 119:20, 121:22, 123:4, 125:10, 125:13, 125:16, 125:18, 125:21, 126:20, 127:3, 127:6, 127:10, 127:18, 127:22, 127:24, 129:1, 129:5, 129:11, 130:6, 130:17, 130:20, 131:22, 132:5, 132:7, 132:16, 132:20, 132:21, 133:6, 140:21, 140:24, 142:25
draft [4] - 15:21, 126:2, 126:10, 126:11
dramatically [1] - 113:2
drastically [1] - 37:13
draw [1] - 149:12
drive [5] - 10:7, 10:16, 10:24, 39:14, 75:5
Drive [1] - 6:15
driven [2] - 70:22, 114:22
drives [4] - 10:20, 10:21, 75:11, 75:12
driving [2] - 62:17, 139:16
drop [1] - 114:14, 127:25
drove [5] - 73:20, 75:9, 80:21, 83:19, 136:10
Drs [2] - 17:24, 34:4
drug [54] - 7:23, 44:10, 44:23, 52:23, 61:17, 61:19, 62:9, 63:25, 64:16, 64:18, 65:24, 66:1, 66:3, 66:12, 67:3, 67:4, 71:24, 82:19, 82:20, 98:23, 101:22, 112:21, 112:23, 114:16, 114:17, 114:22, 115:4, 115:16, 115:22, 116:3, 116:13, 116:14, 116:21, 117:3, 117:7, 117:16, 117:21, 117:22, 117:25, 118:4, 118:7, 118:14, 118:17, 118:19,

120:6, 120:7, 120:9, 120:14, 128:10, 139:22, 142:6
DRUG [2] - 1:7, 1:13
Drug [6] - 6:2, 78:4, 114:4, 115:13, 119:21, 154:5
drugs [28] - 52:21, 61:13, 61:25, 62:7, 62:16, 63:1, 63:22, 63:23, 63:24, 63:25, 64:4, 64:5, 64:7, 72:1, 72:4, 78:12, 87:16, 114:21, 114:22, 116:3, 116:4, 116:7, 116:16, 119:4, 119:10, 119:16, 120:14
due [17] - 40:14, 44:18, 49:19, 51:9, 51:13, 51:16, 51:18, 51:19, 51:21, 52:3, 52:4, 53:2, 56:14, 56:16, 69:9, 105:14, 108:10
duration [4] - 126:3, 127:12, 127:15, 127:16
during [9] - 8:24, 11:12, 22:7, 27:22, 47:2, 51:23, 54:11, 91:11, 127:13
During [1] - 38:24
duty [11] - 139:13, 139:15, 143:23, 143:24, 144:2, 144:20, 145:9, 145:11, 150:25, 151:1

E

early [6] - 15:10, 16:22, 29:14, 37:15, 42:25, 45:19
easier [3] - 19:17, 21:8, 35:25
easily [2] - 74:14, 139:17
East [3] - 3:5, 3:12, 4:24
Eastern [1] - 104:6
easy [1] - 112:14
echo [1] - 43:23
economic [2] - 62:13, 64:21
economist [1] - 74:24
economists [4] - 10:8, 10:11, 10:13, 39:1

education [4] - 21:17, 22:13, 24:24, 74:18
Edward [1] - 89:20
effect [4] - 25:22, 62:25, 119:22, 140:10
effective [4] - 18:19, 90:9, 110:18, 139:15
effectively [2] - 93:5, 119:19
effects [2] - 91:13, 135:11
effort [2] - 44:18, 134:10
efforts [1] - 68:17
Eighth [1] - 3:10
either [9] - 39:10, 47:5, 59:3, 61:3, 61:5, 67:3, 86:18, 90:1, 129:8
Either [1] - 61:2
elaborate [1] - 131:14
electronic [2] - 44:22, 47:13
element [1] - 121:2
elements [3] - 84:11, 84:17, 117:10
eligible [1] - 125:3
eliminate [1] - 17:3
ELIZABETH [1] - 6:14
elsewhere [1] - 117:17
email [11] - 43:6, 43:7, 43:9, 43:12, 53:5, 53:8, 53:11, 53:12, 53:15, 60:17
embraced [3] - 17:6, 45:11, 45:12
emphasis [3] - 84:1, 84:19, 110:14
emphasize [2] - 103:11, 120:8
emphasized [1] - 115:4
employees [1] - 8:7
Employer [10] - 81:1, 81:18, 82:9, 82:23, 84:20, 86:13, 86:19, 86:24, 136:19, 137:2
empty [1] - 129:22
Encino [1] - 3:16
encompass [1] - 61:24
encourage [3] - 15:23, 16:10, 20:6
encouraged [6] - 19:13, 20:9, 89:7, 118:4, 118:9, 137:25
encouragement [1] - 88:18
encouraging [2] -

19:23, 88:25
end [7] - 11:3, 16:23, 19:5, 20:4, 33:15, 42:14, 46:5
ended [5] - 31:1, 32:20, 111:13, 113:12, 147:19
enemy [1] - 147:10
enforcement [3] - 28:10, 40:8, 48:24
engage [1] - 115:16
engaged [2] - 7:15, 8:13
Engineers [1] - 149:5
English [1] - 151:16
enhanced [1] - 53:1
enhancement [1] - 44:4
enormous [2] - 62:9, 114:12
ensure [2] - 16:14, 28:11
entered [3] - 58:15, 58:24, 105:3
entire [17] - 8:24, 13:3, 37:25, 47:20, 52:20, 57:16, 69:12, 73:9, 94:11, 97:12, 98:5, 120:20, 130:16, 132:14, 137:20, 139:22, 142:15
entirely [9] - 15:15, 62:4, 72:6, 95:10, 96:15, 97:13, 113:15, 115:20, 128:7
entirety [3] - 51:16, 54:11, 135:10
entitled [3] - 122:19, 128:9, 135:13
entrust [1] - 152:5
ENU [1] - 4:17
epicenter" [1] - 130:5
epidemic [7] - 7:12, 18:12, 58:6, 64:23, 65:22, 72:9, 73:23
epidemiologist [1] - 25:6
equal [1] - 9:6
equally [3] - 51:6, 58:10, 58:21
equitable [3] - 67:25, 134:24, 135:3
equity [2] - 67:25, 134:23
era [1] - 139:25
eras [1] - 40:3
error [1] - 108:4
essentially [11] - 8:21, 21:24, 24:2, 43:23,

44:15, 45:11, 47:1, 47:9, 51:25, 52:2, 94:6
establish [16] - 63:3, 70:19, 71:10, 72:2, 80:23, 81:4, 83:24, 87:4, 87:5, 120:12, 124:3, 124:15, 136:18, 136:19, 136:20
established [5] - 58:9, 82:8, 109:5, 109:23, 116:20
establishes [10] - 72:10, 87:7, 103:7, 103:18, 106:24, 107:2, 108:25, 111:7, 113:22, 136:9
establishing [1] - 118:24
estimate [2] - 108:7, 125:18
estimated [1] - 127:11
estimates [1] - 135:9
et [4] - 1:7, 1:13, 154:4, 154:5
evaluate [7] - 8:19, 17:17, 26:8, 45:8, 50:7, 108:2, 129:24
evaluated [3] - 45:1, 84:17, 84:18
evaluating [5] - 36:23, 97:3, 129:14, 131:23, 132:8
evaluation [3] - 44:18, 135:5, 135:6
event [2] - 23:20, 149:22
events [4] - 52:21, 67:8, 67:15, 81:19
evidence [134] - 9:2, 9:8, 9:11, 10:25, 11:15, 11:23, 12:18, 12:19, 24:12, 29:10, 29:24, 31:3, 31:4, 31:15, 32:13, 33:17, 33:23, 36:10, 47:1, 47:23, 48:3, 48:10, 53:19, 53:25, 54:22, 56:5, 56:19, 58:23, 63:5, 65:12, 65:13, 65:20, 67:18, 68:16, 70:15, 71:17, 72:5, 72:21, 73:18, 75:20, 76:6, 76:25, 77:15, 77:20, 78:3, 79:11, 79:12, 80:20, 80:22, 83:6, 83:21, 87:2, 87:7, 87:17, 89:13, 90:12, 90:24, 95:15,

95:18, 95:20, 95:22, 95:24, 96:9, 96:10, 96:17, 97:4, 97:12, 98:15, 98:23, 99:4, 99:7, 99:11, 100:2, 100:12, 100:20, 100:25, 101:2, 101:12, 102:11, 102:14, 102:19, 102:20, 103:7, 105:21, 106:17, 106:21, 106:24, 107:2, 109:3, 109:5, 109:12, 109:14, 112:22, 112:24, 113:14, 113:18, 113:20, 117:14, 117:15, 117:20, 117:22, 117:25, 118:3, 118:20, 118:21, 118:23, 119:1, 120:4, 122:3, 123:20, 123:22, 124:6, 124:9, 124:10, 124:14, 125:1, 125:9, 125:10, 128:24, 133:7, 133:11, 134:3, 134:9, 134:16, 135:3, 135:4, 135:20, 136:1, 136:8, 136:17, 137:7, 138:9
evidentiary [5] - 92:2, 134:19, 134:21, 135:1, 136:24
evolution [1] - 16:19
evolved [5] - 16:10, 16:12, 46:11, 48:2, 77:12
exact [6] - 51:5, 56:7, 56:9, 117:2, 141:18, 144:25
exactly [10] - 15:13, 16:15, 38:1, 38:2, 80:4, 81:21, 82:6, 82:15, 82:16
examination [1] - 13:23
examine [2] - 45:9, 54:13
examined [1] - 35:10
example [12] - 13:16, 15:10, 21:22, 22:7, 35:23, 52:25, 62:1, 65:8, 91:11, 94:19, 126:23, 127:10
examples [1] - 102:7
exceeded [4] - 40:19, 108:14, 108:15,

108:20
exception [1] - 68:10
excessive [2] - 40:24, 41:4, 74:10, 96:8, 99:16, 101:18, 103:4, 111:6, 113:15, 121:11
Excessive [2] - 41:13, 41:23
exclamation [1] - 100:17
exclude [1] - 49:13
excluded [3] - 96:8, 96:20, 97:13
excuse [1] - 13:20
Excuse [1] - 10:10
exercise [2] - 129:23, 134:23
exercising [1] - 58:8
existed [1] - 55:19
existence [3] - 56:12, 72:9, 72:12
existing [1] - 44:19
exists [2] - 83:10, 123:23
expanded [1] - 87:18
expanding [1] - 83:22
expansion [2] - 74:4, 76:20
expect [7] - 35:15, 37:1, 60:10, 77:4, 123:9, 135:21, 146:20
expectations [5] - 36:21, 41:8, 42:12, 42:15, 47:15
expected [3] - 37:6, 89:1, 117:16
experience [6] - 27:10, 40:25, 41:24, 42:1, 64:8, 129:14
experienced [2] - 7:12, 73:25
expert [9] - 8:9, 35:11, 36:25, 64:18, 71:5, 127:3, 129:4, 129:13, 146:19
expertise [2] - 27:6, 46:17
experts [6] - 8:11, 15:17, 75:13, 96:19, 129:3, 136:14
explain [6] - 29:8, 32:23, 53:6, 76:20, 119:24, 130:12
explained [6] - 16:20, 21:16, 29:7, 35:22, 63:13, 96:19
explains [1] - 43:17
explanation [4] - 35:2,

75:22, 125:2, 131:19
**explicit** [1] - 88:17
**explicitly** [1] - 81:22
**expose** [1] - 20:13
**exposed** [3] - 122:15, 122:18, 122:21
**exposes** [1] - 95:17
**exposure** [1] - 79:3
**express** [1] - 20:22
**expressing** [1] - 138:8
**expressly** [1] - 41:16
**extend** [1] - 94:24
**extensive** [11] - 83:21, 88:13, 115:7, 116:13, 129:14, 130:23, 130:25, 131:5, 131:8, 131:14
**extensively** [1] - 89:12
**extent** [4] - 9:4, 32:20, 46:2, 54:20
**extremely** [2] - 69:18, 88:19

## F

**Fa** [1] - 39:8
**FABER** [1] - 1:17
**Faber** [3] - 7:2, 140:4, 147:18
**fabric** [1] - 64:21
**face** [1] - 85:10
**facilitate** [1] - 142:18
**facilitated** [1] - 138:1
**facilitating** [1] - 141:17
**facilities** [2] - 89:6, 100:23
**fact** [36] - 7:21, 7:25, 8:1, 14:11, 26:15, 43:11, 47:8, 47:25, 54:9, 54:12, 55:7, 55:14, 95:10, 96:3, 96:7, 97:13, 99:19, 99:22, 102:20, 106:6, 108:20, 109:9, 110:9, 113:22, 119:3, 122:5, 123:7, 123:15, 128:1, 129:4, 130:1, 134:16, 144:7, 144:10, 144:22, 145:9
**factor** [7] - 33:6, 33:8, 36:23, 73:22, 99:15, 102:12, 137:3
**factors** [1] - 119:24
**facts** [7] - 12:5, 58:10, 73:17, 85:21, 140:14, 143:15,

143:16
**factual** [2] - 92:11, 93:2
**fail** [1] - 10:25
**failed** [7] - 58:11, 69:4, 69:6, 72:11, 127:11, 134:20, 149:17
**fails** [1] - 118:14
**failure** [12] - 11:14, 48:11, 69:9, 69:15, 102:17, 102:22, 105:10, 105:13, 106:8, 120:10, 125:11, 128:19
**failures** [3] - 106:22, 111:4, 134:25
**fairly** [1] - 122:10
**fairness** [1] - 112:10
**faith** [21] - 9:12, 31:7, 31:24, 32:3, 32:5, 37:16, 70:23, 71:12, 76:7, 76:14, 77:2, 78:20, 90:14, 90:17, 91:8, 95:3, 117:21, 137:9, 137:21, 152:1, 152:2
**fallen** [1] - 113:4
**falling** [1] - 24:8
**false** [1] - 8:14
**familiar** [2] - 31:11, 46:19
**family** [4] - 44:24, 52:24, 77:21, 82:19
**famous** [1] - 9:24
**fancy** [1] - 149:5
**far** [15] - 26:2, 31:16, 32:23, 33:1, 34:13, 37:14, 47:2, 49:14, 63:2, 83:17, 112:12, 113:20, 116:16
**Farley** [4] - 85:16, 85:18, 85:21, 85:22
**FARRELL** [15] - 2:3, 138:18, 138:20, 138:23, 139:1, 140:15, 142:9, 142:21, 142:24, 143:10, 146:15, 146:22, 147:2, 147:24, 148:9
**Farrell** [15] - 2:4, 2:13, 16:4, 53:10, 66:6, 73:10, 88:1, 92:6, 113:3, 120:25, 138:16, 146:21, 147:23, 148:8, 152:9
**Farrell's** [3] - 72:18, 73:6, 113:6
**fast** [1] - 18:1
**fault** [1] - 48:3

**FCRR** [1] - 6:18
**FDA** [13] - 12:12, 27:9, 62:25, 66:23, 87:7, 87:13, 87:14, 87:20, 87:25, 89:5, 116:17, 117:25, 137:24
**fear** [2] - 19:4, 21:11
**featured** [1] - 62:2
**Federal** [3] - 31:17, 67:24, 149:25
**federal** [7] - 12:8, 12:10, 68:22, 103:3, 103:4, 110:17, 127:14
**federally** [2] - 60:2, 60:4
**Feinberg** [2] - 64:18, 127:3
**Feinberg's** [1] - 127:6
**fell** [3] - 16:11, 24:9
**felt** [1] - 20:15
**fentanyl** [20] - 58:17, 61:15, 61:16, 62:6, 62:21, 62:24, 67:3, 71:25, 72:4, 113:25, 114:1, 114:8, 114:12, 115:8, 116:15, 117:19, 118:11
**fentanyl-laced** [1] - 62:6
**few** [5] - 19:21, 21:19, 42:13, 63:6, 99:22
**fewer** [4] - 16:12, 29:23, 104:19, 105:1
**Field** [2] - 106:11, 106:14
**fifth** [11] - 16:25, 17:16, 17:25, 18:11, 24:17, 25:20, 59:22, 60:23, 72:5, 83:5, 83:20
**fights** [1] - 130:12
**figure** [3] - 50:1, 63:8, 135:21
**file** [6] - 52:4, 52:11, 53:3, 53:14, 53:18, 53:24, 104:8, 152:22, 153:1
**filed** [5] - 29:19, 55:13, 68:5, 78:10, 128:21
**files** [5] - 47:22, 51:16, 109:8, 109:10
**fill** [4] - 12:8, 16:15, 60:10, 62:18
**filled** [4] - 38:11, 52:9, 55:18, 56:8
**filling** [2] - 31:1, 67:6
**final** [6] - 36:17, 43:11, 64:13, 147:5, 153:1

**finally** [2] - 61:6, 133:16
**financial** [1] - 68:19
**findings** [5] - 47:7, 47:25, 152:10, 153:4, 153:6
**fine** [1] - 130:15
**fingers** [1] - 73:1
**finished** [1] - 138:20
**Firm** [2] - 3:4, 3:7
**firms** [3] - 132:1, 132:4, 135:8
**first** [27] - 24:6, 25:1, 30:2, 42:13, 44:10, 62:22, 70:19, 70:20, 73:18, 77:15, 79:25, 85:12, 92:3, 93:20, 102:24, 104:15, 105:6, 106:24, 108:16, 108:19, 114:18, 119:14, 124:6, 125:12, 126:2, 136:25, 139:11
**First** [2] - 19:13, 60:2
**fish** [1] - 147:21
**Fishman** [2] - 21:21, 22:11
**Fishman's** [2] - 22:3, 22:8
**fit** [2] - 36:20, 92:16
**fits** [2] - 51:3, 82:7
**five** [4] - 29:24, 63:11, 70:16, 97:22
**FL** [1] - 2:11
**flagged** [10] - 49:20, 49:21, 49:24, 50:8, 50:25, 107:16, 108:1, 108:3, 108:19, 109:17
**flagging** [5] - 9:25, 50:21, 107:17, 108:13, 109:15
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flaw** [6] - 121:19, 122:16, 122:23, 128:13, 130:17, 132:21
**flawed** [3] - 72:7, 135:6, 135:8
**flaws** [5] - 114:16, 120:18, 125:7, 125:8, 132:13
**flood** [2] - 117:17, 150:23
**flooding** [1] - 150:5
**Floor** [1] - 3:5
**floor** [1] - 141:23
**Florida** [4] - 48:19,

49:2, 49:3, 98:23
**flowing** [1] - 118:13
**focus** [6] - 20:22, 20:23, 36:3, 46:12, 46:16, 48:5
**focused** [7] - 9:4, 29:5, 57:14, 66:3, 66:8, 66:17, 113:15
**focuses** [1] - 66:12
**fold** [2] - 33:10, 33:12
**folks** [1] - 40:22
**follow** [4] - 57:25, 58:1, 88:23, 94:15
**follow-up** [2] - 57:25, 58:1
**followed** [4] - 23:24, 42:11, 53:13, 68:3
**following** [2] - 22:18, 69:13
**follows** [4] - 7:5, 41:22, 70:16, 90:15
**fond** [1] - 151:8
**FOR** [1] - 1:1
**force** [2] - 62:17, 90:22
**foreclosed** [1] - 70:14
**forecloses** [2] - 72:13, 89:15
**foregoing** [1] - 154:2
**foresaw** [4] - 117:21, 117:22, 117:25, 118:4
**foreseeability** [1] - 26:25, 57:14, 84:8, 84:10, 84:14, 84:16, 117:10, 117:13
**foreseeable** [3] - 117:6, 117:14, 118:7
**foreseen** [1] - 117:15
**fork** [1] - 148:6
**form** [3] - 59:2, 72:18, 144:23
**former** [5] - 8:7, 24:16, 40:7, 45:4, 45:5
**formulation** [4] - 89:21, 90:1, 103:15, 137:13
**forth** [1] - 94:14
**forward** [11] - 7:7, 18:2, 41:19, 42:24, 43:1, 99:10, 106:21, 106:23, 113:7, 114:13, 135:22
**forward-looking** [3] - 99:10, 106:21, 106:23
**foundation** [1] - 74:4
**four** [10] - 49:1, 49:2, 49:5, 49:6, 50:19, 63:11, 107:25,

130:21, 152:3
**fourth** [3] - 33:23,
65:1, 71:24
**fraction** [1] - 67:2
**frame** [1] - 73:17
**framework** [5] - 86:14,
135:23, 136:20,
136:22, 142:23
**frameworks** [1] -
112:18
**freely** [1] - 19:14
**French** [1] - 39:9
**frequency** [3] -
103:16, 103:20,
103:22
**friends** [2] - 77:21,
82:19
**frightened** [1] -
115:16
**fueling** [2] - 73:22,
140:12
**full** [9] - 45:20, 53:13,
53:21, 53:24, 58:11,
84:3, 92:2, 129:21,
136:24
**Fuller** [2] - 2:4, 2:13
**FULLER** [1] - 2:12
**fully** [3] - 28:7, 57:12,
103:1
**fund** [13] - 124:4,
124:5, 124:10,
124:15, 124:16,
124:19, 124:21,
124:25, 125:2,
125:3, 125:5, 125:7,
134:15
**fundamental** [6] -
73:2, 95:17, 114:16,
115:21, 128:17,
132:21
**fundamentally** [3] -
113:21, 121:7,
124:18
**funded** [5] - 123:8,
130:13, 132:1,
132:4, 135:7
**funding** [15] - 68:21,
68:22, 123:18,
123:21, 123:23,
123:24, 124:11,
124:12, 124:17,
125:23, 126:6,
131:22, 131:23,
134:3, 134:19
**funds** [8] - 124:7,
125:5, 133:12,
133:13, 133:18,
134:7, 134:10,
134:14
**furtherance** [1] - 44:1

**furthermore** [3] -
76:19, 109:16, 134:7
**future** [9] - 43:21,
60:11, 121:20,
121:21, 122:1,
122:3, 122:4, 122:5,
123:22

## G

**gap** [5] - 77:15, 77:16,
77:17, 95:17, 112:22
**gateway** [15] - 62:19,
62:22, 62:25, 63:4,
63:6, 64:16, 65:1,
65:11, 118:18,
118:21, 119:11,
120:2, 120:5, 120:9,
120:15
**Gateway** [1] - 62:23
**gauge** [1] - 148:15
**Gauley** [2] - 148:24,
148:25
**general** [2] - 25:4,
85:19
**General** [2] - 20:21,
106:7
**generally** [2] - 61:24,
109:7
**generation** [1] - 42:18
**generic** [1] - 49:14
**gestalt** [1] - 25:4
**Gilligan** [12] - 15:9,
15:19, 16:20, 17:24,
24:13, 26:16, 63:13,
63:19, 64:2, 87:12,
113:24, 119:17
**given** [15] - 11:13,
28:15, 37:10, 38:5,
69:19, 69:20, 80:11,
80:19, 80:21, 87:2,
89:10, 89:13,
111:13, 115:25,
136:17
**glaring** [1] - 67:19
**goalpost** [1] - 136:20
**government** [4] - 12:8,
12:10, 123:10,
127:14
**governmental** [1] -
68:8
**governments** [2] -
68:11, 140:1
**grade** [1] - 116:10
**grant** [1] - 123:17
**grappling** [1] - 99:19
**grateful** [2] - 69:18,
138:12
**great** [3] - 13:9, 19:19,
139:4

**greater** [4] - 15:23,
16:10, 88:10, 88:12
**Greek** [3] - 151:15,
151:16, 151:18
**GRETCHEN** [1] - 6:7
**grew** [1] - 38:1
**grossly** [1] - 132:12
**ground** [1] - 10:14
**grounds** [2] - 57:10,
118:15
**grow** [1] - 139:24
**guess** [6] - 14:24,
71:13, 77:1, 77:5,
90:23, 137:16
**guessed** [1] - 9:23
**guessing** [1] - 95:12
**guidance** [7] - 42:19,
46:10, 47:10, 89:2,
103:24, 104:19,
105:17
**guide** [2] - 130:11,
135:20
**guidelines** [7] - 15:21,
23:21, 24:1, 24:2,
66:10, 88:23
**guiding** [1] - 80:25
**gulp** [1] - 94:11
**Gupta** [14] - 24:19,
34:4, 34:6, 34:15,
66:6, 73:21, 74:13,
78:16, 79:21, 88:22,
89:1, 109:21, 113:9,
115:9
**Gupta's** [5] - 34:11,
62:3, 66:16, 66:17,
81:16

## H

**habits** [1] - 27:16
**half** [3] - 54:5, 101:6,
141:11
**ham** [3] - 91:11, 91:14,
94:19
**hand** [5] - 14:5, 96:23,
108:21, 141:5,
142:18
**handed** [2] - 17:12,
21:23
**handguns** [1] - 94:4
**handled** [1] - 112:19
**handling** [1] - 45:24
**hands** [2] - 67:1,
152:6
**hanging** [1] - 148:1
**happy** [1] - 70:3
**harbor** [1] - 150:9
**hard** [1] - 153:18
**HARDIN** [1] - 5:3
**harm** [29] - 7:16, 8:16,

11:7, 57:5, 70:25,
71:16, 72:17, 80:23,
81:5, 81:14, 82:16,
85:3, 95:25, 96:10,
99:16, 101:14,
102:10, 107:5,
108:3, 109:25,
110:2, 110:4, 110:5,
111:4, 111:7,
111:10, 111:13,
111:18, 136:11
**harmed** [1] - 71:19
**harmful** [1] - 94:9
**harming** [1] - 109:19
**harms** [22] - 7:23,
11:4, 55:1, 55:7,
72:3, 76:21, 77:18,
78:14, 92:18, 99:12,
102:20, 117:14,
118:13, 120:21,
120:24, 121:9,
121:15, 121:16,
122:20, 128:10,
135:14, 137:21
**Harrison** [2] - 140:18,
143:2
**Harvard** [1] - 15:19
**Hawkins** [1] - 3:7
**head** [1] - 28:10
**health** [13] - 18:14,
34:20, 36:5, 37:21,
66:14, 90:25, 91:2,
91:13, 91:15,
123:16, 123:17,
123:18, 123:21
**Health** [40] - 4:16, 5:2,
7:24, 8:5, 8:7, 8:10,
12:6, 24:16, 24:19,
28:16, 28:17, 28:18,
29:4, 36:19, 40:2,
40:10, 43:4, 44:12,
44:16, 44:20, 46:14,
47:23, 49:24, 51:12,
51:19, 53:12, 54:22,
55:11, 55:19, 56:6,
58:14, 58:23, 59:3,
61:7, 61:17, 62:24,
67:5, 69:11, 144:7,
144:15
**Health's** [11] - 7:19,
8:2, 8:8, 11:4, 11:16,
37:9, 41:17, 47:3,
52:13, 54:3, 55:8
**healthcare** [5] - 10:23,
36:14, 36:15, 89:6,
118:8
**healthy** [1] - 125:16
**hear** [2] - 148:19
**heard** [39] - 7:18, 8:20,
15:7, 15:9, 17:22,

22:7, 35:17, 35:19,
36:3, 36:10, 40:3,
42:13, 42:22, 42:25,
44:2, 45:24, 47:2,
54:2, 62:8, 63:5,
63:7, 67:18, 68:16,
68:19, 68:22, 73:5,
73:13, 76:8, 76:25,
83:5, 83:21, 88:9,
88:13, 123:15,
130:1, 141:11,
141:19, 151:10,
151:15
**heart** [4] - 78:13,
101:18, 147:9, 152:4
**height** [1] - 148:15
**held** [5] - 44:25, 45:1,
85:13, 85:23, 122:20
**help** [1] - 60:23
**helped** [3] - 18:13,
20:1, 44:10
**helps** [1] - 36:12
**heroin** [43] - 58:17,
61:15, 61:16, 62:6,
62:21, 62:24, 63:12,
63:18, 63:21, 64:4,
67:3, 71:25, 72:4,
113:25, 114:1,
114:4, 114:7,
114:11, 115:8,
115:9, 115:10,
115:11, 115:13,
115:14, 116:10,
116:12, 116:15,
118:11, 118:11,
118:22, 118:25,
119:2, 119:6, 119:9,
119:12, 119:13,
119:23, 119:25,
120:1, 120:3,
121:24, 122:1
**heroin-fentanyl** [1] -
118:11
**HESTER** [18] - 5:9,
70:1, 70:9, 70:12,
70:14, 86:19, 86:22,
87:2, 92:24, 93:12,
96:15, 97:11,
111:23, 112:2,
138:15, 152:14,
152:24, 153:2
**Hester** [6] - 62:11,
67:20, 69:24, 70:11,
111:22, 112:1
**high** [8] - 29:22,
34:24, 37:23, 65:9,
74:2, 98:5, 117:17,
139:8
**higher** [18] - 32:21,
32:22, 33:15, 33:18,

33:21, 33:25, 34:1,
34:13, 34:16, 34:19,
35:14, 35:15, 36:2,
36:6, 37:18, 37:19,
65:10
**highest** [3] - 36:6,
73:25, 139:12
**highlight** [4] - 76:8,
81:12, 96:18, 111:10
**highlighted** [7] - 81:9,
82:10, 87:9, 113:3,
121:1, 141:7, 141:19
**highlighting** [2] -
88:15, 128:14
**highly** [2] - 108:13,
113:12
**hill** [2] - 74:7
**himself** [1] - 10:6
**hindsight** [1] - 77:9
**hired** [1] - 44:2
**historian** [1] - 151:7
**history** [2] - 53:9,
86:18
**hit** [1] - 51:20
**hits** [1] - 52:12
**hold** [4] - 73:8, 83:9,
98:5, 120:5
**holding** [2] - 61:18,
85:15
**holdings** [1] - 86:12
**holds** [1] - 151:12
**hole** [4] - 53:5, 53:11,
53:15, 62:18
**holes** [1] - 147:12
**home** [1] - 97:8
**Homer** [6] - 131:11,
131:12, 131:21,
131:25, 132:5,
132:11
**homes** [3] - 71:2,
78:12, 78:23
**Honor** [146] - 7:8, 7:9,
7:13, 7:21, 8:9, 9:5,
10:2, 10:10, 10:18,
10:22, 11:18, 11:22,
12:1, 12:6, 12:11,
12:23, 13:4, 13:12,
13:23, 14:3, 14:8,
14:11, 14:21, 14:25,
16:2, 16:4, 16:18,
17:11, 19:8, 19:16,
21:20, 22:7, 22:22,
24:11, 25:22, 25:24,
26:4, 26:5, 26:23,
27:19, 27:25, 28:15,
29:1, 29:11, 30:3,
31:5, 31:16, 31:22,
32:13, 32:21, 32:24,
33:18, 33:24, 36:18,
37:12, 38:4, 38:8,

38:15, 38:19, 38:23,
39:6, 39:11, 39:19,
41:5, 42:13, 43:6,
44:2, 44:6, 45:13,
46:20, 46:25, 47:8,
47:25, 48:9, 48:14,
48:25, 49:6, 49:13,
50:2, 50:11, 51:12,
51:17, 52:4, 52:13,
53:18, 53:22, 54:16,
54:19, 54:24, 55:2,
55:10, 56:5, 56:21,
57:7, 57:12, 57:22,
58:9, 58:21, 59:24,
60:8, 62:4, 62:22,
63:7, 63:8, 65:13,
65:20, 66:19, 67:20,
67:24, 68:3, 68:6,
68:13, 68:15, 69:16,
69:19, 70:2, 70:9,
70:12, 72:8, 77:9,
86:20, 92:24, 93:12,
94:1, 96:16, 97:2,
97:11, 101:9,
102:16, 106:20,
110:23, 111:19,
111:23, 112:3,
120:16, 124:18,
129:12, 132:18,
138:15, 144:21,
152:12, 152:13,
152:14, 153:2,
153:21
**HONORABLE** [1] -
1:17
**Honorable** [1] - 7:1
**hope** [1] - 146:23
**Hopkins** [1] - 17:8
**horse** [1] - 115:1
**Hospice** [1] - 100:23
**Hospital** [1] - 96:5
**hospital** [4] - 17:2,
18:6, 96:25, 97:7
**hospitals** [4] - 17:20,
17:23, 28:13, 36:15
**hour** [1] - 54:6
**hours** [1] - 139:1
**hub** [1] - 36:14
**huge** [4] - 50:20,
114:14, 121:19,
126:19
**Hughes** [2] - 35:17,
35:22
**human** [2] - 151:21,
151:24
**hundreds** [1] - 52:7
**Huntington** [110] -
3:10, 4:1, 7:12, 7:17,
8:18, 9:1, 11:5,
11:20, 12:16, 12:19,

15:4, 18:2, 18:10,
29:9, 29:22, 30:1,
31:4, 31:6, 32:6,
32:10, 32:12, 32:14,
32:16, 32:18, 32:20,
33:2, 33:6, 33:15,
33:21, 33:25, 36:2,
36:3, 36:5, 36:12,
36:14, 36:18, 36:20,
37:5, 37:10, 38:7,
48:12, 48:23, 51:8,
51:24, 55:12, 55:19,
58:16, 61:14, 62:5,
62:9, 62:16, 67:5,
70:22, 71:16, 71:18,
71:25, 73:5, 73:9,
73:20, 76:15, 76:17,
95:16, 95:19, 95:21,
95:23, 95:25, 96:3,
96:5, 97:17, 97:19,
97:22, 98:1, 98:4,
98:8, 98:13, 98:16,
98:17, 98:20, 98:21,
99:6, 99:8, 99:13,
99:14, 99:23, 99:25,
100:1, 100:7,
100:10, 100:14,
100:21, 101:4,
101:8, 102:2, 102:5,
102:13, 102:20,
106:2, 114:11,
115:1, 115:2,
123:25, 129:10,
132:3, 139:3, 144:3,
146:14, 148:22,
149:6, 150:18, 154:4
**HUNTINGTON** [1] -
1:4
**Huntington's** [2] -
68:17, 130:12
**Huntington-Cabell** [5]
- 99:8, 144:3,
148:22, 149:6,
150:18
**Huntington/Cabell** [1]
- 36:13
**hurting** [1] - 26:3
**hydrocodone** [4] -
16:8, 145:16,
145:17, 145:20

**!**

**idea** [9] - 17:6, 26:24,
49:23, 50:5, 61:18,
62:19, 91:5, 112:5,
124:19
**identified** [4] - 41:1,
45:23, 87:15, 98:18
**identify** [5] - 8:25,

40:24, 98:19, 100:8,
107:22
**ignored** [1] - 11:1
**ignores** [1] - 139:21
**illegal** [48] - 61:13,
61:25, 62:9, 62:16,
62:20, 63:1, 63:9,
63:23, 63:24, 63:25,
65:3, 65:10, 66:3,
72:1, 72:4, 82:20,
112:21, 112:23,
114:16, 114:17,
114:20, 114:22,
115:7, 115:22,
116:3, 116:4, 116:7,
116:14, 116:16,
116:21, 117:3,
117:7, 117:16,
117:21, 117:22,
117:25, 118:4,
118:7, 118:14,
118:17, 118:19,
119:10, 120:6,
120:9, 120:13,
120:14, 140:11
**illegally** [5] - 60:6,
61:6, 63:16, 101:22,
142:6
**illicit** [8] - 61:16,
71:25, 72:4, 80:15,
114:11, 115:8,
115:16, 117:18
**illicitly** [1] - 80:16
**illustrated** [1] - 114:10
**imagine** [3] - 62:11,
70:2, 93:1
**immediate** [2] -
145:21
**immediately** [2] -
53:12, 105:6
**immunity** [1] - 141:15
**immunize** [1] - 150:9
**impact** [1] - 26:11
**impeaches** [1] -
126:17
**imperatively** [2] -
89:19, 137:11
**implement** [1] -
143:11
**implementing** [1] -
44:13
**implication** [2] -
90:19, 95:5
**implications** [1] -
90:21
**importance** [1] - 88:11
**important** [20] - 21:22,
23:7, 27:17, 44:5,
70:6, 71:12, 83:21,
87:13, 87:21, 88:19,

90:6, 90:10, 94:22,
99:8, 103:10,
105:11, 106:20,
107:20, 131:22,
146:20
**impose** [2] - 134:21,
135:23
**imposes** [1] - 59:2
**imprecise** [1] - 61:23
**imprecision** [1] -
108:6
**improper** [4] - 8:15,
71:17, 95:20, 95:23
**improvements** [1] -
46:9
**IN** [2] - 1:1, 1:18
**inadequate** [1] -
123:23
**inappropriate** [2] -
20:12, 103:4
**include** [1] - 96:25
**included** [4] - 45:2,
47:18, 122:1, 122:19
**includes** [2] - 52:18,
122:15
**including** [13] - 18:15,
26:9, 29:18, 35:18,
58:7, 67:15, 68:21,
69:13, 81:19, 82:11,
82:14, 117:1, 119:25
**incompatible** [1] -
108:7
**increase** [9] - 9:9,
32:17, 32:19, 33:10,
74:6, 78:12, 87:23,
115:8, 140:11
**increased** [11] - 9:14,
15:14, 21:17, 22:14,
28:13, 33:12, 70:21,
115:10, 115:11,
118:9, 136:10
**increases** [3] - 9:16,
28:8, 28:9
**increasing** [6] - 10:15,
28:16, 28:24, 29:2,
59:22, 117:23
**increasingly** [2] -
15:11, 78:7
**independent** [4] -
81:20, 83:13, 85:1
**independently** [3] -
85:19, 85:25, 86:5
**indictment** [3] -
140:22, 140:24,
140:25
**individual** [4] - 63:1,
93:10, 126:21, 139:9
**individuals** [2] -
92:14, 140:22
**Industries** [1] - 93:18

**industry** [11] - 39:5, 39:13, 41:24, 42:20, 42:23, 43:19, 75:6, 103:24, 140:18
**inept** [1] - 93:15
**inevitable** [1] - 26:18
**infant** [1] - 143:3
**infers** [1] - 142:13
**inflated** [1] - 126:22
**influence** [1] - 74:18
**influential** [1] - 17:5
**influx** [1] - 66:1
**inform** [1] - 29:25
**information** [9] - 15:15, 27:5, 30:13, 31:25, 45:13, 52:14, 52:15, 52:17, 54:21
**informed** [1] - 32:14
**Ingredient** [3] - 40:16, 41:12
**inherent** [1] - 94:16
**inherently** [2] - 13:7, 14:7
**initial** [1] - 49:21
**initiate** [2] - 17:18, 43:20
**injured** [4] - 60:14, 91:1, 92:14, 93:22
**injuries** [2] - 35:8, 93:7
**injury** [12] - 35:14, 72:20, 81:14, 82:4, 86:2, 92:8, 92:10, 92:15, 93:2, 93:6, 94:6, 124:22
**inputs** [3] - 130:24, 131:5, 131:15
**Inspector** [1] - 106:6
**instance** [5] - 56:2, 62:22, 124:12, 125:18, 140:11
**instead** [5] - 78:17, 120:23, 121:14, 126:14, 127:23
**Institute** [3] - 78:4, 115:13, 119:21
**instructed** [1] - 17:17
**instructions** [1] - 152:16
**instrumentality** [1] - 94:13
**insufficient** [4] - 141:20, 141:22, 150:9, 152:2
**insufficient"** [1] - 128:23
**insurance** [6] - 35:18, 123:16, 123:17, 123:18, 123:21, 124:13

**intend** [4] - 11:23, 11:24, 13:16, 152:22
**intended** [2] - 90:22, 142:6
**interest** [2] - 17:11, 137:11
**interference** [2] - 89:24, 137:14
**intermediate** [1] - 11:9
**internet** [8] - 48:15, 48:17, 98:22, 98:24, 98:25, 99:3, 99:5, 99:7
**interpreting** [1] - 131:24
**interrupt** [2] - 14:18, 14:20
**intervening** [15] - 67:15, 67:16, 71:6, 71:7, 80:14, 81:10, 81:19, 82:10, 82:13, 83:14, 94:22, 116:25, 120:13, 136:25, 137:4
**intervention** [1] - 65:24
**interventions** [1] - 17:18
**Intractable** [3] - 19:11, 19:23, 21:6
**intractable** [2] - 21:7, 21:10
**inventory** [1] - 60:10
**investigated** [2] - 49:24, 49:25
**investigation** [5] - 45:3, 47:13, 51:22, 53:13, 106:4
**investigations** [1] - 47:24
**investigative** [3] - 53:17, 53:21, 53:24
**investigator** [1] - 41:11
**investigators** [2] - 45:5, 53:25
**invoked** [1] - 67:9
**involved** [8] - 40:22, 44:17, 72:23, 85:5, 85:22, 92:23, 104:23, 109:12
**involves** [2] - 80:14, 82:17
**involving** [3] - 92:3, 112:11, 113:13
**ipse** [1] - 8:22
**Irpino** [1] - 3:7
**irrelevant** [3] - 62:23, 65:11, 111:4
**ISIA** [1] - 5:4

**Island** [2] - 93:20, 131:7
**issue** [31] - 10:6, 15:8, 24:10, 48:15, 49:12, 64:3, 65:18, 67:22, 68:4, 68:13, 69:16, 79:4, 81:21, 81:22, 82:15, 82:24, 83:11, 85:7, 85:9, 86:15, 86:16, 105:6, 114:3, 114:10, 117:2, 117:5, 120:9, 124:2, 124:10, 136:21, 149:17
**issued** [10] - 17:16, 18:14, 20:3, 23:20, 23:25, 31:18, 76:9, 88:14, 88:24, 93:19
**issues** [14] - 7:10, 11:23, 62:17, 71:19, 72:14, 73:15, 92:25, 93:3, 102:14, 111:3, 130:9, 133:22, 134:2, 134:13
**itself** [8] - 13:10, 25:11, 40:21, 43:12, 68:3, 68:18, 85:3, 117:11
**IV** [1] - 64:18

**J**

**Jack** [3] - 131:11, 131:12, 132:11
**Jackie** [1] - 148:2
**Jackson** [1] - 6:8
**Jakki** [1] - 8:13
**James** [2] - 35:17, 145:6
**January** [1] - 131:4
**JASIEWICZ** [1] - 5:4
**JCAHO** [1] - 57:9
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:18
**Jennings** [2] - 148:7, 148:12
**Jersey** [1] - 48:18
**Jesse** [2] - 8:3, 54:2
**job** [5] - 40:23, 80:4, 134:18, 146:25, 150:15
**jobs** [1] - 35:7
**Joe** [1] - 60:20
**Johns** [1] - 17:7
**joined** [1] - 20:21
**joint** [9] - 18:14, 20:4, 21:13, 85:8, 85:12, 85:15, 86:5, 86:7, 86:9
**Joint** [14] - 17:22,

17:24, 18:10, 57:19, 58:6, 59:18, 59:20, 67:10, 83:3, 83:7, 83:11, 83:17, 83:19, 89:5
**jointly** [3] - 42:19, 85:20, 85:25
**joke** [1] - 106:11
**JOSEPH** [1] - 6:4
**Joseph** [1] - 60:21
**JR** [2] - 2:3, 2:12
**Juan** [2] - 2:5, 2:14
**Judge** [24] - 7:2, 57:7, 57:19, 57:20, 58:1, 67:9, 67:11, 67:14, 67:15, 83:7, 83:24, 138:23, 140:4, 141:5, 141:18, 141:21, 142:9, 143:24, 146:22, 147:13, 147:18, 149:21, 150:6, 152:2
**JUDGE** [1] - 1:17
**judge** [1] - 149:2
**judgment** [7] - 58:8, 67:16, 74:23, 76:3, 81:20, 87:22, 94:22
**judgments** [10] - 74:11, 76:4, 81:11, 89:14, 90:4, 91:8, 95:12, 137:1, 137:19, 137:24
**Judith** [1] - 64:18
**July** [3] - 7:4, 154:7, 154:11
**JULY** [1] - 1:19
**June** [1] - 131:7
**jurisdiction** [1] - 58:18

**K**

**Katherine** [1] - 25:6
**Kave** [3] - 8:3, 8:6, 54:2
**Kearse** [5] - 10:3, 62:1, 73:11, 121:1, 147:7
**KEARSE** [1] - 4:2
**keep** [5] - 30:8, 109:6, 111:20, 139:8, 145:3
**Keller** [7] - 13:18, 13:21, 30:6, 30:9, 30:11, 30:20, 75:15
**Kelly** [1] - 6:8
**kept** [2] - 45:16, 78:12
**Kessler** [1] - 4:23
**Kevin** [1] - 25:15
**key** [10] - 12:5, 21:22, 32:13, 36:22, 41:5, 78:8, 89:4, 89:14,

101:20, 128:13
**Keyes** [15] - 25:6, 32:3, 35:9, 63:19, 64:1, 74:2, 76:13, 76:19, 77:23, 79:2, 81:22, 82:6, 109:21, 119:13
**kind** [9] - 63:23, 64:4, 93:3, 101:11, 112:18, 116:10, 122:5, 130:21, 149:11
**kinds** [3] - 51:2, 93:15, 103:20
**kit** [1] - 17:17
**knowing** [2] - 60:12, 129:18
**knowledge** [1] - 62:15
**known** [3] - 27:10, 27:11, 103:1
**knows** [5] - 10:18, 12:11, 12:23, 31:22, 57:7
**KOUBA** [1] - 4:11
**Kyle** [1] - 42:8

**L**

**LA** [1] - 3:8
**labeling** [1] - 87:9
**laced** [1] - 62:6
**Lacey** [1] - 75:15
**lack** [5] - 57:10, 81:3, 97:12, 100:24, 105:14
**Lake** [1] - 149:19
**Lakeland** [1] - 49:3
**land** [1] - 139:13
**language** [4] - 81:12, 94:7, 103:14, 116:23
**Lanier** [1] - 3:4
**lap** [1] - 135:20
**Large** [1] - 47:18
**large** [5] - 19:6, 19:7, 28:9, 47:20, 93:21
**larger** [1] - 102:4
**largest** [2] - 97:16, 100:22
**last** [11] - 15:24, 23:16, 25:14, 57:7, 61:19, 88:14, 89:10, 120:16, 126:11, 129:12, 150:21
**late** [3] - 25:7, 25:17, 70:2
**Latin** [1] - 151:15
**Laughter** [1] - 153:16
**launched** [1] - 16:24
**LAURA** [1] - 5:10
**Law** [3] - 3:4, 3:7, 3:12

**law** [37] - 40:8, 50:22, 57:13, 57:17, 63:3, 68:1, 70:15, 72:12, 81:2, 81:12, 84:8, 84:10, 84:18, 84:22, 84:24, 89:18, 90:22, 91:6, 92:14, 92:15, 92:19, 93:14, 94:8, 94:11, 100:19, 117:9, 117:11, 122:12, 124:20, 132:1, 132:4, 135:8, 137:17, 137:20, 137:21, 137:23, 143:1
**lawful** [1] - 114:23
**laws** [2] - 21:15, 22:13
**lawsuit** [1] - 29:19
**lawyer** [1] - 44:7
**lawyers** [1] - 153:12
**lead** [6] - 93:18, 94:3, 107:12, 117:7, 118:10
**leaders** [1] - 60:17
**leadership** [1] - 40:10
**leading** [1] - 117:7
**leads** [1] - 34:17
**League** [1] - 66:13
**learned** [1] - 44:13
**least** [5] - 61:23, 62:13, 91:14, 107:3, 113:18
**leave** [6] - 75:7, 78:25, 79:14, 79:17, 80:18, 109:22
**leaves** [1] - 61:1
**leaving** [1] - 79:11
**lecture** [1] - 22:11
**led** [8] - 17:7, 23:25, 24:17, 35:20, 40:7, 78:14, 78:24, 114:20
**Lee** [1] - 3:12
**left** [9] - 11:14, 32:23, 78:22, 79:5, 79:9, 79:10, 108:18, 135:1, 138:1
**leftovers** [2] - 66:25, 67:1
**legal** [10] - 56:21, 63:10, 73:2, 73:16, 73:17, 80:25, 86:15, 93:3, 110:17, 120:18
**Legislature** [5] - 19:9, 20:15, 21:5, 23:3, 24:4
**legitimate** [21] - 9:16, 9:19, 16:15, 28:3, 28:4, 28:24, 31:8, 31:14, 31:19, 50:8, 76:10, 87:20, 88:7,

91:3, 91:7, 91:8, 91:12, 91:13, 100:15, 116:18, 145:3
**legitimately** [1] - 76:12
**Lemley** [1] - 114:6
**length** [2] - 130:6, 142:15
**Leon** [2] - 2:4, 2:14
**lepers** [3] - 151:9, 151:18, 151:22
**Lepers** [1] - 151:14
**lepra** [1] - 151:16
**leprosy** [3] - 151:19, 151:21, 151:22
**less** [8] - 21:9, 21:11, 95:6, 104:18, 105:19, 138:23, 147:16, 153:15
**letter** [1] - 21:1
**level** [17] - 17:2, 17:19, 26:19, 75:9, 75:25, 76:1, 96:24, 100:6, 101:10, 103:2, 113:14, 121:13, 129:6, 134:7, 149:7
**levels** [6] - 35:15, 115:10, 136:2, 136:3, 149:9, 150:3
**Levin** [2] - 2:10, 132:2
**LEYIMU** [1] - 4:13
**liability** [18] - 9:3, 12:4, 57:1, 62:23, 63:3, 65:11, 85:8, 85:12, 85:15, 86:5, 86:8, 86:10, 92:14, 92:20, 93:8, 99:18, 112:11, 122:10
**liable** [9] - 61:18, 67:6, 73:8, 85:20, 85:25, 120:6, 122:5, 122:20, 147:14
**liberal** [1] - 24:18
**liberally** [1] - 21:25
**license** [1] - 69:8
**licensed** [12] - 12:7, 12:9, 21:2, 31:2, 54:17, 60:3, 60:4, 66:23, 66:24, 67:7, 110:15, 115:18
**licenses** [2] - 22:12, 23:15
**Licensing** [1] - 23:4
**lies** [1] - 64:21
**life** [4] - 16:23, 19:5, 20:5, 64:8
**light** [1] - 26:10
**likely** [7] - 71:21, 103:8, 103:9,

103:11, 104:1, 106:25, 107:1
**likewise** [4] - 71:18, 76:15, 76:16, 82:22
**Limit** [3] - 40:16, 41:12
**limit** [3] - 40:19, 125:22, 126:5
**limited** [4] - 19:15, 19:25, 24:6, 35:23
**limits** [5] - 23:21, 23:22, 40:18, 59:1, 125:24
**LINDA** [1] - 4:8
**line** [8] - 24:21, 27:25, 28:1, 46:25, 50:12, 55:17, 94:15, 147:8
**lining** [1] - 30:6
**link** [3] - 11:4, 60:7, 65:2
**linkage** [1] - 72:19
**linking** [1] - 102:19
**links** [3] - 60:1, 99:7, 99:11
**Lisa** [2] - 6:18, 154:1
**list** [1] - 129:17
**listen** [1] - 139:2
**listening** [1] - 147:17
**lit** [1] - 8:12
**literally** [1] - 65:5
**litigation** [10] - 35:11, 50:18, 51:7, 57:9, 65:14, 107:23, 112:8, 112:9, 112:18, 131:4
**live** [4] - 7:21, 7:25, 8:1, 44:2
**lived** [2] - 54:5, 148:2
**LLC** [1] - 2:4
**local** [3] - 25:15, 25:19, 32:5
**locate** [1] - 106:16
**Logan** [8] - 6:5, 6:12, 145:18, 145:21, 146:8, 146:12, 146:13, 146:16
**look** [30] - 27:15, 30:3, 37:7, 46:19, 49:17, 49:19, 49:21, 52:17, 64:2, 68:14, 85:21, 90:18, 96:4, 96:22, 97:3, 125:9, 125:20, 126:1, 126:13, 129:2, 131:21, 140:4, 140:5, 141:4, 141:5, 145:23, 148:12, 149:7, 149:8, 149:9
**looked** [11] - 28:18, 28:21, 36:25, 38:16,

51:15, 63:14, 66:5, 84:16, 93:4, 125:15, 126:8
**looking** [10] - 33:4, 46:9, 59:9, 63:16, 75:18, 96:20, 99:10, 106:21, 106:23, 149:15
**looks** [1] - 101:11
**lose** [1] - 150:14
**lost** [2] - 69:8, 152:1
**loud** [1] - 25:8
**low** [2] - 63:19, 117:17
**lower** [4] - 17:3, 113:5, 113:7, 115:11
**Luken** [4] - 101:2, 101:13, 102:5, 102:14
**lunch** [2] - 70:3, 70:4

**M**

**Magazine** [1] - 3:7
**magic** [1] - 152:6
**magnified** [1] - 36:1
**magnitude** [2] - 32:17, 32:18
**MAHADY** [1] - 6:4
**mail** [1] - 140:17
**main** [1] - 68:8
**MAINIGI** [16] - 4:17, 7:8, 10:10, 10:13, 13:11, 14:21, 14:25, 19:21, 38:14, 38:18, 38:23, 39:5, 39:10, 39:22, 42:6, 152:13
**Mainigi** [3] - 7:7, 38:13, 115:23
**maintain** [1] - 139:15
**maintaining** [1] - 110:18
**MAJESTRO** [5] - 2:6, 152:12, 152:20, 152:25, 153:9
**Majestro** [4] - 2:6, 57:25, 82:25, 153:8
**major** [6] - 19:12, 22:3, 28:8, 42:10, 49:11, 79:23
**majority** [9] - 22:20, 31:24, 32:4, 32:11, 63:20, 76:13, 76:16, 90:13, 90:15
**man** [3] - 145:6, 151:9, 151:17
**management** [3] - 20:4, 21:13, 37:13
**manufacture** [1] - 93:23
**manufacturer** [2] -

59:8, 59:10
**manufacturers** [3] - 59:18, 68:24, 101:24
**manufacturers'** [1] - 59:14
**map** [1] - 65:5
**Mapes** [3] - 41:10, 41:20, 42:8
**March** [1] - 131:2
**marijuana** [1] - 64:5
**MARK** [1] - 3:14
**market** [6] - 58:25, 65:24, 115:8, 117:17, 120:1, 143:7
**marketing** [7] - 8:13, 8:14, 59:8, 59:11, 59:15, 115:14
**marketplace** [2] - 76:5, 91:22
**markets** [1] - 140:10
**marry** [1] - 9:25
**Marshall** [2] - 24:16, 25:15
**Marshall's** [1] - 60:22
**Maryland** [1] - 148:4
**mass** [1] - 92:18
**Masters** [2] - 104:13, 139:14
**match** [3] - 14:4, 30:19, 30:21
**match-up** [1] - 14:4
**matched** [1] - 13:25
**matches** [1] - 27:25
**math** [2] - 30:10, 30:11
**Matt** [1] - 47:11
**matter** [4] - 67:24, 69:19, 143:4, 154:3
**mattered** [1] - 106:18
**matters** [3] - 69:1, 69:2, 70:6
**mayor** [1] - 123:8
**Mayor** [10] - 18:9, 32:10, 36:4, 36:8, 59:14, 60:17, 76:15, 115:4, 130:10, 134:1
**McCann** [18] - 8:17, 13:18, 13:19, 13:20, 14:13, 14:14, 16:6, 29:13, 30:7, 30:15, 33:5, 33:9, 48:20, 55:23, 75:18, 96:20, 97:20, 98:15
**McCann's** [2] - 14:16, 32:25
**MCCLURE** [1] - 6:3
**McDonald** [3] - 36:25, 37:4, 50:23
**MCGINNESS** [1] - 4:2
**McKesson** [36] - 5:8,

7:20, 30:25, 95:18, 96:2, 97:15, 97:18, 97:23, 98:6, 98:7, 98:9, 98:14, 99:11, 99:19, 99:22, 100:20, 102:5, 102:12, 102:15, 102:24, 103:7, 103:25, 104:17, 104:22, 104:25, 105:3, 105:5, 105:8, 106:1, 108:25, 110:15, 110:17, 110:22, 144:8, 144:17, 144:18

**McKesson's** [16] - 71:15, 71:18, 95:15, 95:19, 95:21, 95:22, 95:24, 96:4, 98:2, 99:13, 100:3, 100:14, 100:18, 103:3, 103:5, 104:24

**mean** [2] - 134:25, 141:16

**meaningful** [1] - 8:23

**meant** [2] - 17:1, 53:7

**measure** [1] - 149:6

**measured** [1] - 13:12

**measurements** [3] - 46:13, 149:4, 149:5

**measuring** [1] - 119:1

**mechanical** [1] - 6:19

**mechanism** [1] - 124:23

**mechanisms** [1] - 112:10

**Medicaid** [3] - 35:18, 45:5, 68:21

**medical** [52] - 9:16, 22:21, 23:17, 25:4, 25:25, 27:5, 28:3, 28:4, 28:14, 28:24, 31:14, 31:19, 36:12, 50:8, 58:8, 60:22, 63:9, 63:15, 67:16, 69:12, 71:13, 73:19, 74:11, 74:23, 76:10, 77:9, 78:15, 78:19, 81:10, 81:20, 87:20, 87:24, 88:7, 88:9, 89:4, 89:14, 89:23, 90:4, 90:19, 91:8, 94:20, 94:21, 94:22, 95:12, 100:15, 108:2, 116:1, 116:18, 136:25, 137:10, 137:18, 145:4

**Medical** [2] - 15:19, 24:16

**medically** [2] - 32:8, 77:7

**Medicare** [1] - 124:13

**medication** [9] - 9:20, 19:6, 27:9, 39:17, 60:3, 60:5, 61:3, 61:7, 63:1

**medications** [15] - 12:11, 16:14, 18:19, 26:6, 26:17, 32:2, 34:10, 36:22, 37:11, 37:20, 51:3, 56:9, 60:12, 77:25, 100:15

**medicinal** [1] - 91:21

**medicine** [28] - 60:25, 61:1, 61:9, 66:25, 71:1, 78:23, 79:6, 80:12, 80:14, 80:22, 82:16, 85:5, 89:22, 90:5, 95:1, 95:3, 95:5, 95:7, 107:8, 111:12, 116:17, 117:20, 136:12, 137:5, 137:8, 137:22, 148:21

**Medicine** [27] - 19:2, 20:3, 20:9, 20:18, 21:1, 21:12, 21:24, 22:11, 24:20, 51:13, 52:1, 52:3, 52:5, 52:8, 53:8, 53:20, 54:5, 54:6, 54:12, 54:16, 88:15, 88:18, 88:24, 88:25, 89:5, 118:4, 137:25

**medicines** [16] - 71:12, 73:12, 87:10, 87:19, 89:7, 89:16, 90:3, 90:20, 91:1, 91:18, 110:25, 114:23, 137:15, 138:1, 138:2, 141:24

**medicines"** [1] - 137:12

**meet** [8] - 9:16, 28:13, 50:8, 87:23, 88:7, 90:2, 94:21, 114:18

**meeting** [2] - 43:11, 43:20

**men** [1] - 151:18

**mention** [3] - 47:3, 55:16, 139:12

**mentioned** [8] - 27:21, 47:4, 51:11, 52:18, 73:11, 96:1, 99:23, 139:15

**mentioning** [1] - 73:11

**merits** [1] - 136:7

**met** [1] - 45:19

**metaphor** [1] - 149:11

**metastasized** [1] - 139:23

**meth** [1] - 114:5

**Method** [1] - 50:25

**method** [1] - 108:14

**methodologies** [2] - 50:16, 51:6

**methodology** [22] - 49:20, 49:22, 50:14, 50:24, 51:3, 51:4, 107:16, 107:21, 108:6, 108:12, 108:22, 109:15, 125:11, 128:14, 130:17, 130:18, 131:18, 131:20, 132:13, 134:25, 135:7

**Methodology** [1] - 50:24

**methods** [1] - 107:23

**metrics** [2] - 46:14, 147:2

**Mexican** [1] - 116:13

**Mexico** [2] - 67:4, 117:16

**Miami** [4] - 101:2, 101:13, 102:5, 102:14

**Miami-Luken** [4] - 101:2, 101:13, 102:5, 102:14

**MICHAEL** [2] - 2:12, 3:9

**Michael** [3] - 8:2, 41:10, 44:2

**Michigan** [1] - 104:7

**mid** [1] - 15:23

**middle** [1] - 32:25

**might** [7] - 19:17, 20:8, 39:1, 41:4, 101:12, 103:19, 115:15

**MILDRED** [1] - 3:3

**miles** [1] - 98:10

**mill** [1] - 76:19

**million** [19] - 73:6, 96:1, 96:3, 97:18, 97:24, 99:18, 101:6, 113:6, 126:3, 126:5, 126:9, 126:14, 126:25, 127:8, 128:6, 133:23, 134:8, 143:21, 150:5

**mind** [4] - 19:16, 60:24, 142:18, 151:12

**miners** [1] - 60:14

**minute** [3] - 141:12, 145:5, 145:19

**minutes** [3] - 73:10, 111:24, 138:23

**mirror** [1] - 10:23

**misconduct** [4] - 55:9, 65:21, 100:4, 100:12

**misleading** [1] - 8:14

**misrepresentations** [1] - 139:5

**missed** [1] - 128:7

**missing** [2] - 26:25, 102:7

**mission** [1] - 151:24

**mistake** [4] - 78:19, 145:25, 146:5, 146:6

**misuse** [8] - 58:16, 59:25, 63:9, 63:15, 63:17, 63:20, 82:19, 113:24

**misuse"** [1] - 78:7

**misused** [3] - 20:8, 111:13, 116:1

**misuses** [1] - 80:6

**misusing** [1] - 11:11

**Mitchell** [1] - 2:10

**MMEs** [1] - 97:24

**model** [25] - 43:4, 125:10, 126:21, 126:22, 127:9, 128:18, 128:19, 129:11, 130:16, 130:21, 130:22, 130:23, 130:24, 131:1, 131:3, 131:4, 131:8, 131:10, 131:11, 131:17, 132:6, 132:17, 132:21, 132:22, 133:7

**Mohr** [1] - 8:13

**molecules** [1] - 25:2

**Mone** [15] - 8:2, 8:6, 40:4, 44:2, 44:3, 45:14, 45:17, 45:19, 45:22, 46:5, 46:7, 51:17, 51:19, 53:14

**monetary** [1] - 77:25

**money** [10] - 104:5, 121:1, 121:15, 122:25, 123:13, 124:21, 124:24, 125:20, 134:17, 147:16

**monitor** [4] - 27:13, 145:10, 150:16

**monitored** [1] - 54:4

**Monitoring** [10] - 12:25, 23:3, 38:10, 39:25, 40:11, 42:16, 43:23, 54:20, 61:21, 104:25

**monitoring** [8] - 42:18, 42:23, 44:11, 44:22, 47:13, 110:1, 148:16, 148:20

**monster** [1] - 94:10

**month** [8] - 52:23, 108:14, 108:16, 108:19, 140:21, 145:17, 145:20, 146:11

**month's** [1] - 108:20

**monthly** [1] - 40:15

**Morgantown** [1] - 148:2

**morning** [2] - 7:6, 115:24

**morphine** [4] - 140:7, 140:16, 140:23, 141:12

**Morris** [1] - 6:15

**most** [8] - 18:19, 18:20, 24:20, 114:4, 119:5, 119:14, 133:16, 138:12

**Most** [1] - 7:11

**motion** [5] - 84:2, 86:23, 92:1, 120:17, 125:9

**motions** [4] - 91:25, 136:23, 138:4, 152:23

**Motley** [5] - 4:3, 4:5, 4:8, 4:11, 4:14

**MOUGEY** [1] - 2:9

**Mountain** [1] - 113:3

**mouthful** [1] - 23:5

**move** [2] - 112:4, 147:5

**moved** [4] - 23:18, 45:10, 113:7, 114:6

**moving** [1] - 114:13

**MR** [48] - 2:3, 2:6, 2:9, 2:12, 3:9, 3:11, 3:14, 4:5, 4:22, 5:9, 5:10, 5:13, 6:4, 70:1, 70:9, 70:12, 70:14, 86:19, 86:22, 87:2, 92:24, 93:12, 96:15, 97:11, 111:23, 112:2, 138:15, 138:18, 138:20, 138:23, 139:1, 140:15, 142:9, 142:21, 142:24, 143:10, 146:15, 146:22, 147:2, 147:24, 148:9, 152:12, 152:14, 152:20, 152:24, 152:25, 153:2, 153:9

**MS** [30] - 3:3, 3:6, 4:2, 4:8, 4:11, 4:13, 4:17, 4:18, 4:20, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 7:8, 10:10, 10:13, 13:11, 14:21, 14:25, 19:21, 38:14, 38:18, 38:23, 39:5, 39:10, 39:22, 42:6, 152:13
**Mt** [3] - 4:4, 4:12, 4:15
**Muhury** [3] - 63:11, 63:13, 63:24
**multiple** [14] - 23:8, 53:2, 58:7, 64:15, 71:8, 72:23, 77:19, 82:17, 82:21, 84:6, 85:4, 85:22, 136:14, 137:4
**multiplier** [2] - 46:1, 46:2
**multiply** [1] - 127:7
**Murphy** [6] - 39:2, 39:12, 64:6, 65:4, 74:24, 75:8
**Murphy's** [2] - 38:25, 39:18
**must** [6] - 12:2, 26:20, 43:16, 81:4, 128:5, 135:3

# N

**named** [2] - 40:8, 45:18
**namely** [1] - 83:15
**names** [1] - 98:9
**Narcotic** [2] - 140:18, 143:2
**narcotics** [1] - 143:6
**nation** [4] - 32:19, 33:16, 34:22, 74:1
**national** [5] - 34:14, 38:1, 73:23, 88:9, 145:23
**National** [4] - 66:13, 78:4, 115:13, 119:21
**nationally** [6] - 16:1, 18:23, 29:7, 31:6, 33:7, 33:21
**nationwide** [2] - 32:24, 33:3
**nature** [2] - 140:1, 151:4
**near** [1] - 43:20
**nearly** [3] - 31:17, 37:15, 76:9
**necessarily** [1] - 56:22, 65:9
**necessary** [5] - 9:16, 77:7, 88:7, 90:16

**necessity** [1] - 81:7
**need** [30] - 14:19, 28:4, 28:24, 71:13, 94:21, 111:2, 111:21, 116:18, 120:8, 120:14, 124:7, 124:11, 124:15, 125:16, 125:19, 125:23, 126:8, 129:24, 133:18, 134:17, 134:19, 136:5, 137:12, 138:16, 143:25, 144:1, 144:23, 144:24, 152:3, 152:15
**needed** [11] - 50:11, 75:7, 76:3, 78:22, 79:22, 90:3, 124:12, 125:15, 126:15, 135:6, 153:2
**needs** [14] - 9:16, 11:20, 28:3, 28:14, 50:8, 87:20, 87:24, 88:8, 89:23, 108:3, 110:24, 134:3, 134:13, 145:4
**neighboring** [1] - 36:11
**nerd** [1] - 148:11
**neutral** [1] - 103:19
**never** [26] - 12:17, 25:22, 27:13, 27:14, 48:23, 55:12, 56:6, 60:8, 72:19, 73:11, 77:8, 94:8, 101:5, 107:21, 111:8, 111:15, 121:23, 122:15, 122:18, 122:21, 123:8, 123:9, 124:11, 130:14, 130:15, 132:7
**new** [15] - 23:20, 42:19, 43:4, 43:15, 43:19, 44:18, 44:19, 45:10, 46:14, 46:16, 56:3, 102:16, 111:19, 122:7, 122:12
**New** [4] - 3:5, 3:8, 48:18, 51:7
**newsletter** [1] - 21:1
**next** [12] - 19:9, 30:8, 42:18, 112:4, 112:20, 126:4, 139:16, 140:13, 142:3, 146:11, 148:9, 149:10
**nice** [1] - 115:23

**nicely** [1] - 119:19
**Nicholas** [7] - 13:15, 13:16, 30:4, 30:17, 41:15, 41:16, 42:17
**NICHOLAS** [1] - 6:11
**nine** [3] - 83:6, 98:9, 98:17
**Ninth** [1] - 4:9
**no-due-diligence** [1] - 108:10
**non** [6] - 32:2, 35:20, 35:25, 63:9, 96:14, 116:1
**non-cancer** [1] - 32:2
**non-medical** [2] - 63:9, 116:1
**non-opioid** [2] - 35:20, 35:25
**non-VA** [1] - 96:14
**None** [3] - 7:23, 11:15, 11:16
**none** [4] - 48:19, 99:23, 108:15, 130:13
**nonetheless** [2] - 86:4, 144:18
**normal** [2] - 103:17, 144:6
**notable** [1] - 85:21
**notably** [1] - 105:21
**note** [2] - 127:6, 142:4
**noted** [5] - 36:15, 73:24, 91:14, 91:24, 119:14
**nothing** [12] - 8:22, 51:7, 53:11, 60:7, 62:6, 66:7, 83:23, 105:22, 106:19, 115:19, 135:15, 151:2
**notice** [1] - 144:15
**noting** [2] - 87:12, 115:2
**nuisance** [43] - 71:11, 72:12, 87:4, 87:6, 89:15, 89:20, 89:22, 90:2, 90:11, 90:22, 91:5, 91:6, 91:10, 91:16, 91:24, 92:1, 92:5, 92:7, 92:9, 92:15, 93:15, 93:25, 94:5, 94:8, 94:17, 94:24, 95:6, 95:14, 110:24, 112:17, 121:9, 121:10, 121:18, 135:14, 135:18, 137:7, 137:8, 137:17, 137:20, 137:22, 137:23, 138:6

**Nuisance** [1] - 94:10
**number** [49] - 9:25, 13:9, 15:3, 15:5, 22:5, 24:7, 30:17, 32:21, 34:6, 34:8, 34:22, 34:23, 34:24, 34:25, 35:1, 37:5, 37:10, 38:2, 38:3, 50:21, 52:21, 55:17, 56:7, 59:1, 61:14, 63:7, 65:22, 75:16, 85:17, 93:22, 126:6, 126:13, 126:16, 126:24, 126:25, 127:6, 127:7, 127:21, 127:25, 128:5, 128:6, 128:7, 130:2, 143:21, 150:17
**numbers** [9] - 30:18, 35:3, 36:2, 46:12, 51:1, 65:1, 126:11, 128:2, 128:15
**NW** [6] - 4:6, 4:9, 4:19, 4:21, 5:5, 5:12
**NY** [1] - 3:5

# O

**O'Connell** [4] - 125:13, 125:17, 125:21, 130:6
**obesity** [2] - 34:23, 91:14
**objection** [1] - 105:2
**objective** [2] - 133:6, 133:12
**objectives** [2] - 133:15, 133:19
**obligated** [1] - 28:3
**obligation** [1] - 134:22
**obligations** [1] - 144:13
**observation** [1] - 75:22
**obstacle** [1] - 115:21
**obviously** [4] - 39:15, 49:11, 51:15, 135:8
**Obviously** [1] - 61:16
**occasionally** [1] - 48:7
**occasions** [1] - 85:18
**occur** [1] - 81:14
**occurred** [5] - 81:25, 82:2, 82:4, 100:6, 111:14
**occurring** [1] - 96:23
**occurs** [2] - 80:4, 110:5
**odds** [1] - 122:11
**OF** [2] - 1:1, 1:4

**offense** [2] - 139:4, 141:18
**offer** [2] - 8:22, 46:6
**offered** [3] - 8:10, 129:10, 152:18
**offering** [1] - 100:5
**Office** [1] - 106:6
**office** [1] - 44:8
**Officer** [1] - 24:16
**officer** [1] - 40:8
**official** [1] - 19:10
**Official** [2] - 153:25, 154:1
**officials** [2] - 29:18, 47:19
**often** [6] - 18:19, 18:20, 31:15, 37:15, 64:9, 115:2
**Ohio** [2] - 51:7, 131:2
**old** [6] - 99:9, 113:18, 121:22, 151:8, 151:20
**older** [2] - 35:4, 35:14
**on-going** [3] - 44:4, 44:19, 51:21
**once** [3] - 79:14, 145:12, 146:18
**oncology** [1] - 100:23
**one** [93] - 7:13, 11:6, 14:4, 14:5, 14:12, 21:6, 23:22, 25:21, 29:12, 29:19, 30:2, 30:4, 31:15, 34:7, 34:8, 34:11, 34:22, 34:23, 34:24, 36:16, 36:17, 38:3, 44:10, 48:22, 51:3, 51:25, 52:18, 53:4, 56:23, 57:13, 57:15, 57:23, 59:3, 62:3, 63:23, 64:6, 65:17, 65:20, 66:14, 67:21, 68:23, 69:2, 69:4, 69:6, 69:7, 69:10, 70:6, 75:12, 75:24, 77:17, 86:18, 91:23, 92:3, 92:11, 93:1, 93:18, 94:11, 94:19, 100:13, 100:18, 106:3, 106:9, 108:5, 108:14, 108:17, 108:20, 109:19, 112:5, 119:5, 119:25, 125:7, 127:23, 128:1, 131:12, 131:13, 131:23, 131:24, 132:8, 139:7, 142:8, 143:1, 143:12, 143:21, 145:14,

145:17, 145:19,
149:10, 151:8
**One** [2] - 5:11, 17:6
**one's** [1] - 50:16
**one-sentence** [2] -
131:12, 131:13
**one-size-fits-all** [1] -
51:3
**one-to-one** [1] - 14:4
**ones** [2] - 64:10, 150:1
**ongoing** [1] - 123:24
**open** [1] - 149:20
**opening** [5] - 10:22,
16:5, 47:4, 72:8,
113:4
**operate** [1] - 110:25
**operated** [1] - 40:11
**operates** [1] - 130:25
**operating** [6] - 45:14,
67:4, 98:22, 99:3,
110:17, 130:2
**operator** [1] - 150:22
**opinion** [4] - 84:15,
108:1, 132:14,
142:15
**opinions** [2] - 8:10,
100:5
**Opioid** [2] - 21:21,
24:6
**opioid** [86] - 7:12,
7:14, 9:6, 9:14, 13:6,
15:21, 18:12, 18:19,
19:6, 20:9, 21:18,
22:15, 24:18, 25:7,
25:11, 26:1, 26:6,
27:19, 32:2, 33:20,
34:8, 34:17, 35:15,
35:20, 35:25, 37:19,
38:1, 55:17, 57:8,
58:6, 59:21, 61:22,
62:20, 63:15, 64:19,
64:23, 65:2, 65:3,
65:16, 65:22, 66:16,
68:17, 72:9, 73:9,
73:21, 73:23, 73:25,
74:2, 74:4, 76:21,
77:25, 80:1, 81:15,
81:24, 81:25,
102:13, 112:24,
113:14, 113:16,
113:17, 113:21,
113:23, 115:5,
119:23, 120:3,
120:21, 120:23,
121:5, 123:2, 123:6,
123:9, 124:8, 130:9,
130:21, 132:23,
133:9, 133:18,
133:22, 134:2,
134:4, 134:5,

134:13, 134:17,
135:11, 140:2
**opioid-related** [6] -
123:2, 123:6, 130:9,
133:22, 134:2,
134:13
**opioids** [127] - 7:23,
9:11, 9:19, 15:3,
15:11, 15:24, 16:12,
16:21, 18:8, 19:13,
19:24, 20:6, 20:7,
20:17, 20:19, 21:4,
21:9, 21:25, 23:19,
23:22, 24:23, 25:5,
25:19, 26:17, 26:19,
27:4, 28:20, 28:23,
29:15, 29:21, 31:14,
31:24, 32:4, 32:8,
32:12, 35:12, 35:21,
37:7, 37:9, 37:14,
52:21, 58:14, 58:16,
58:24, 59:12, 59:16,
62:20, 63:10, 63:12,
63:16, 63:18, 63:20,
65:9, 65:10, 66:23,
70:21, 71:2, 71:7,
71:8, 72:3, 72:23,
73:4, 74:9, 76:7,
76:10, 76:18, 77:19,
77:21, 78:14, 78:21,
79:3, 80:18, 82:1,
83:22, 87:8, 87:22,
88:12, 88:17, 88:25,
89:10, 89:11, 92:4,
93:7, 97:16, 97:21,
99:16, 101:6,
101:15, 101:17,
101:21, 101:23,
101:24, 102:1,
102:4, 110:16,
112:25, 113:12,
114:7, 114:20,
115:24, 115:25,
116:8, 117:24,
118:1, 118:6,
118:13, 118:19,
118:23, 118:24,
119:3, 119:7,
121:12, 121:14,
121:23, 122:16,
122:18, 130:12,
134:8, 136:11,
143:20, 144:10,
150:12
**Opioids** [1] - 16:22
**opium** [5] - 139:18,
139:20, 139:21,
139:25, 140:3
**opportunity** [4] -
54:14, 138:12,

138:21, 146:23
**option** [1] - 18:21
**orange** [2] - 16:3, 16:7
**Order** [13] - 12:25,
38:10, 39:25, 40:11,
42:16, 43:23, 54:19,
61:20, 104:8,
104:20, 104:25,
105:22, 106:15
**order** [45] - 8:25,
12:20, 14:9, 22:12,
40:13, 40:20, 44:22,
47:13, 50:6, 51:20,
52:12, 52:16, 56:15,
67:6, 69:2, 71:20,
75:7, 87:23, 102:19,
103:15, 103:16,
103:19, 103:21,
105:4, 106:1, 106:9,
106:10, 106:12,
107:7, 107:12,
107:13, 108:18,
108:20, 109:17,
110:1, 110:3, 111:3,
134:17, 140:17,
144:23, 146:3, 153:1
**ordered** [2] - 55:25,
56:9
**ordering** [1] - 140:21
**orders** [77] - 9:6, 9:23,
13:6, 28:16, 29:2,
29:3, 38:10, 40:21,
40:24, 41:1, 41:4,
41:18, 42:4, 42:15,
43:2, 44:25, 45:1,
45:24, 47:20, 49:19,
49:21, 49:23, 50:3,
50:4, 50:8, 50:9,
60:9, 60:13, 71:21,
71:22, 71:23, 100:9,
102:18, 102:23,
103:8, 103:9,
103:11, 103:12,
103:25, 104:1,
104:4, 104:15,
104:18, 104:21,
105:1, 105:9,
105:13, 105:15,
105:17, 105:24,
106:4, 106:18,
106:22, 106:25,
107:1, 107:2, 107:5,
107:15, 107:17,
107:22, 107:24,
108:1, 108:3, 108:8,
108:10, 108:13,
108:15, 108:23,
109:1, 109:13,
109:17, 110:8,
110:13, 111:5,

111:7, 111:14,
150:16
**organic** [1] - 143:1
**organization** [1] - 83:4
**organizations** [3] -
17:5, 18:15, 116:14
**Oriente** [1] - 109:9
**originally** [2] - 151:13,
151:14
**Orleans** [1] - 3:8
**otherwise** [2] -
115:15, 153:14
**OUD** [4] - 116:2,
121:25
**ought** [1] - 68:14
**out-of-touch** [1] -
127:24
**outbreak** [1] - 62:2
**outline** [1] - 40:1
**outpatient** [2] -
127:16, 127:20
**output** [3] - 148:12,
148:13, 148:14
**outputs** [1] - 148:17
**outside** [6] - 65:14,
80:17, 98:8, 98:10,
98:17, 98:21
**outweigh** [2] - 27:4
**over-prescribing** [2] -
31:10, 77:24
**over-supply** [1] - 10:4
**overall** [9] - 9:5,
33:11, 34:10, 36:19,
37:21, 52:19, 52:23,
64:17, 74:4
**overarching** [1] -
70:16
**overdose** [4] - 65:3,
132:23, 133:1, 133:9
**overdoses** [6] - 62:5,
114:11, 114:13,
132:23, 133:1, 133:9
**overflow** [1] - 14:19
**overheard** [1] - 151:11
**override** [1] - 137:23
**overseen** [1] - 125:3
**oversell** [2] - 112:5,
112:14
**overstate** [1] - 112:7
**overt** [1] - 142:12
**overwhelming** [11] -
9:8, 31:4, 32:3,
76:13, 77:1, 80:20,
80:22, 87:2, 90:13,
90:15, 136:17
**overwhelmingly** [2] -
71:1, 76:7
**owe** [1] - 150:25
**owed** [1] - 139:13
**own** [17] - 22:2, 24:13,

40:24, 71:4, 75:12,
92:11, 97:14,
107:16, 108:17,
110:16, 130:18,
131:11, 131:18,
131:20, 132:6,
132:12, 133:7
**oxycodone** [1] - 16:8
**Oxycontin** [1] - 16:24

**P**

**P-1200** [1] - 2:7
**P-42116** [1] - 52:6
**p.m** [1] - 153:22
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**Page** [2] - 141:6,
141:9
**pages** [2] - 19:21, 52:7
**Pain** [6] - 17:7, 19:11,
19:23, 21:6, 23:4,
60:23
**pain** [67] - 9:11, 15:12,
16:21, 16:25, 17:2,
17:4, 17:16, 17:18,
17:21, 17:25, 18:5,
18:11, 18:16, 18:17,
18:20, 19:3, 19:5,
19:6, 20:4, 20:6,
20:11, 20:12, 20:24,
21:4, 21:9, 21:10,
21:11, 21:13, 23:14,
24:17, 24:23, 25:3,
25:16, 25:18, 25:19,
26:3, 32:2, 33:25,
34:16, 34:19, 35:5,
35:14, 35:20, 37:13,
59:21, 66:23, 66:24,
74:16, 80:1, 83:4,
83:20, 83:23, 87:8,
88:11, 88:16, 88:17,
89:8, 89:12, 90:5,
95:4, 95:8, 118:2,
118:6, 137:10
**pain-causing** [4] -
33:25, 34:16, 34:19,
35:5
**paint** [2] - 93:18, 94:4
**pan** [1] - 13:2
**panel** [1] - 23:25
**Papantonio** [2] - 2:10,
132:2
**paper** [9] - 78:2,
128:21, 131:11,
131:12, 131:21,
131:25, 132:1,
132:5, 135:7
**papers** [2] - 67:23,
132:9

**paradigm** [1] - 94:23
**paragraph** [1] - 141:19
**part** [12] - 18:1, 18:4, 22:9, 25:19, 35:2, 41:14, 44:23, 46:2, 57:15, 121:19, 140:12, 143:12
**participants** [1] - 149:24
**particular** [15] - 13:14, 23:16, 25:11, 33:24, 40:24, 52:20, 67:12, 72:21, 79:18, 79:20, 81:9, 81:12, 82:11, 96:18, 123:7
**particularly** [2] - 91:18, 102:13
**parties** [8] - 82:14, 101:21, 102:7, 117:1, 124:7, 124:21, 124:24, 137:4
**parties"** [1] - 116:24
**parts** [1] - 34:17
**party** [1] - 85:1
**passages** [1] - 84:15
**passed** [6] - 19:10, 21:6, 23:3, 24:5, 104:24, 105:2
**passengers** [1] - 149:22
**past** [6] - 64:1, 65:17, 78:11, 128:22, 138:3, 139:1
**pathway** [1] - 64:13
**patience** [1] - 152:8
**patient** [15] - 17:1, 18:6, 23:14, 27:3, 39:16, 61:2, 61:3, 61:10, 66:22, 66:25, 80:1, 80:6, 90:9
**patient's** [2] - 61:11, 78:12
**patient-by-patient** [1] - 27:3
**patients** [20] - 9:19, 11:10, 18:22, 21:9, 26:3, 28:11, 32:4, 35:20, 60:10, 60:13, 60:14, 75:9, 89:23, 90:5, 95:4, 95:6, 98:16, 98:19, 137:12, 137:15
**patients'** [2] - 28:14, 118:6
**pattern** [6] - 78:24, 92:12, 103:17, 103:21, 144:6, 145:12
**patterns** [1] - 145:10

**PAUL** [2] - 2:3, 5:9
**Pause** [3] - 14:23, 132:19, 152:17
**pay** [6] - 122:13, 122:24, 124:2, 124:4, 124:12, 124:14
**payment** [1] - 120:23
**payments** [2] - 125:3, 125:4
**pays** [1] - 123:18
**PEARL** [1] - 3:6
**penalize** [1] - 91:7
**pending** [2] - 86:24, 141:24
**pendulum** [1] - 22:25
**Pensacola** [1] - 2:11
**people** [25] - 9:18, 23:8, 35:11, 36:11, 63:16, 63:17, 63:20, 63:22, 64:3, 64:7, 64:14, 67:2, 80:15, 80:16, 91:15, 92:22, 93:22, 121:20, 122:15, 122:21, 123:24, 127:2, 127:6, 133:1, 140:20
**people's** [1] - 71:2
**per** [16] - 14:1, 30:14, 30:15, 33:15, 33:19, 34:7, 34:9, 34:13, 34:14, 47:10, 64:23, 75:16, 75:17, 75:19, 88:2, 88:5
**percent** [35] - 9:13, 9:24, 10:1, 28:22, 31:10, 31:13, 37:2, 37:3, 37:6, 37:7, 37:8, 49:25, 50:24, 50:25, 63:7, 63:8, 63:21, 76:12, 96:4, 98:3, 101:7, 106:4, 112:24, 113:10, 119:6, 119:9, 132:24, 133:2, 133:9, 133:10, 133:24
**percentage** [4] - 37:24, 52:19, 52:20, 63:18
**perfect** [6] - 9:14, 10:1, 28:1, 28:17, 38:18, 147:10
**perfectly** [3] - 36:21, 70:3, 147:8
**perhaps** [7] - 23:9, 99:8, 106:20, 112:8, 124:18, 127:5, 133:16

**period** [16] - 16:25, 41:19, 42:11, 43:8, 45:15, 46:11, 46:12, 51:23, 62:14, 88:11, 97:22, 105:18, 125:16, 142:16, 143:5, 148:3
**periods** [1] - 52:25
**permit** [2] - 91:21, 135:23
**permits** [1] - 88:3
**person** [13] - 30:14, 30:16, 45:20, 53:7, 54:14, 54:15, 75:16, 75:17, 75:19, 116:1, 116:2, 121:25, 122:17
**personal** [3] - 92:8, 92:10, 94:6
**Pervasive** [1] - 77:24
**perversion** [1] - 137:17
**PETER** [1] - 2:9
**pharma** [1] - 60:19
**pharmaceutical** [4] - 90:8, 91:4, 115:18, 116:10
**Pharmaceutical** [2] - 104:13, 139:14
**pharmacies** [26] - 11:10, 12:7, 12:8, 16:14, 28:12, 36:24, 37:3, 48:15, 48:17, 49:1, 49:2, 49:5, 91:3, 98:9, 98:12, 98:17, 98:20, 98:22, 98:24, 98:25, 99:3, 99:7, 99:12, 102:1, 102:15, 111:12
**Pharmacies** [1] - 56:8
**pharmacist** [3] - 44:6, 66:24, 144:24
**pharmacists** [2] - 45:2, 54:7
**pharmacy** [37] - 40:14, 46:15, 49:6, 49:7, 54:17, 55:24, 56:2, 56:3, 56:4, 60:4, 60:8, 61:1, 61:11, 67:7, 75:7, 78:25, 79:5, 79:8, 79:12, 79:14, 79:17, 80:18, 96:24, 97:10, 99:5, 100:6, 100:16, 100:19, 100:22, 101:4, 101:10, 109:22, 145:18, 145:20, 146:7, 146:12, 146:15
**Pharmacy** [9] - 12:16,

44:7, 45:6, 100:13, 100:17, 101:1, 101:3, 101:5, 102:6
**pharmacy-level** [1] - 101:10
**phase** [1] - 92:2
**Philadelphia** [2] - 6:6, 6:13
**phonetic** [1] - 151:16
**phonetic)** [1] - 39:8
**phrase** [2] - 53:5, 116:9
**physical** [1] - 35:23
**physically** [1] - 35:7
**physician** [6] - 17:8, 31:18, 81:14, 140:8, 141:15, 142:5
**physicians** [2] - 23:12, 24:3
**pickers** [1] - 40:23
**picking** [1] - 97:9
**piece** [9] - 14:12, 31:3, 31:15, 32:13, 33:23, 36:10, 44:22, 44:23, 65:13
**pieces** [1] - 29:24
**PIFKO** [1] - 3:14
**Pill** [1] - 113:3
**pill** [6] - 13:25, 30:19, 30:21, 76:19, 145:25
**pills** [71] - 14:1, 24:7, 29:23, 30:14, 30:15, 30:25, 38:2, 73:6, 73:20, 74:22, 75:7, 75:16, 75:17, 75:19, 76:3, 77:11, 78:6, 78:8, 78:15, 78:21, 78:22, 78:25, 79:7, 79:9, 79:11, 79:14, 79:17, 79:19, 79:24, 80:5, 80:7, 80:10, 80:15, 80:16, 82:18, 88:1, 88:4, 88:5, 88:7, 96:2, 96:3, 96:14, 97:8, 97:19, 97:24, 99:5, 99:18, 101:7, 101:22, 101:25, 109:20, 109:22, 110:6, 110:10, 111:11, 113:6, 114:2, 119:11, 144:5, 145:3, 145:16, 145:17, 145:20, 145:22, 146:3, 146:7, 146:11, 150:5, 150:7, 150:17
**pivot** [2] - 114:14, 114:15
**pizza** [2] - 115:14

**place** [5] - 27:17, 45:10, 60:9, 79:25, 130:11
**placed** [1] - 95:11
**places** [2] - 8:19, 65:8
**plaintiff** [4] - 65:15, 132:1, 135:2
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**plaintiffs** [112] - 7:9, 7:20, 8:24, 9:21, 10:25, 11:19, 12:2, 12:22, 12:23, 26:23, 29:5, 29:20, 33:19, 38:9, 39:24, 45:25, 46:20, 46:23, 46:25, 48:5, 49:9, 51:10, 51:11, 51:25, 52:5, 53:4, 54:10, 54:14, 54:20, 54:25, 55:5, 55:7, 57:13, 58:11, 59:5, 59:6, 59:10, 61:15, 61:22, 62:18, 63:8, 63:14, 68:6, 68:8, 68:16, 68:24, 70:19, 71:10, 71:16, 71:19, 72:1, 72:10, 73:3, 74:10, 78:9, 78:11, 80:23, 84:6, 84:21, 85:7, 87:4, 91:23, 91:24, 92:21, 93:11, 96:1, 96:6, 96:16, 97:4, 97:12, 97:13, 98:7, 98:18, 98:21, 100:2, 102:9, 102:10, 102:17, 111:11, 111:18, 113:1, 113:13, 114:14, 116:6, 116:23, 117:5, 118:17, 118:21, 118:23, 121:1, 121:3, 121:10, 121:12, 122:3, 123:4, 124:1, 125:1, 127:3, 128:3, 128:8, 128:11, 128:21, 129:4, 132:2, 133:17, 134:20, 134:22, 135:12, 135:19, 136:6, 136:17, 138:3
**Plaintiffs** [4] - 38:5, 57:5, 67:17, 154:4
**plaintiffs'** [41] - 11:15, 22:2, 24:12, 24:15, 25:1, 25:6, 31:23, 59:10, 64:18, 66:22, 69:15, 70:14, 70:25, 71:4, 72:5, 73:2,

75:12, 77:15, 78:13, 86:11, 95:17, 96:19, 98:5, 99:15, 99:24, 101:16, 102:21, 109:25, 111:4, 112:22, 114:19, 115:22, 117:13, 118:17, 121:19, 122:2, 122:6, 123:20, 135:8, 136:11, 136:14

**Plan** [6] - 125:13, 125:14, 125:17, 125:22, 126:2, 126:20

**plan** [15] - 66:2, 66:11, 66:16, 73:22, 123:20, 126:4, 126:13, 126:15, 126:18, 127:25, 128:22, 147:6, 147:11, 147:15, 152:14

**plans** [1] - 134:1

**plausible** [1] - 107:25

**play** [2] - 41:20, 123:1

**played** [2] - 26:14, 41:22

**players** [1] - 101:20

**plead** [1] - 91:23

**pleadings** [1] - 86:23

**Pleasant** [3] - 4:4, 4:12, 4:15

**pleasure** [1] - 138:11

**point** [72] - 10:17, 13:8, 27:1, 27:22, 27:24, 28:16, 36:17, 43:1, 43:22, 48:7, 53:4, 63:14, 64:17, 65:20, 65:21, 67:21, 70:19, 71:10, 71:15, 71:24, 72:5, 73:21, 74:13, 74:25, 75:4, 75:10, 75:20, 77:14, 77:23, 78:8, 78:9, 78:10, 78:16, 79:17, 81:16, 81:22, 87:21, 90:6, 93:5, 96:18, 97:11, 98:7, 99:8, 100:17, 104:13, 105:25, 107:20, 108:11, 109:2, 109:21, 110:24, 111:16, 112:5, 112:17, 113:12, 114:9, 114:10, 119:10, 119:17, 122:6, 128:7, 128:13, 128:15, 129:16, 136:19,

137:1, 138:4, 139:16, 140:13, 142:3, 143:4, 145:16

**pointed** [3] - 66:14, 97:1, 98:12

**pointing** [4] - 72:25, 73:1, 73:16, 98:7

**points** [8] - 57:13, 63:6, 70:16, 80:19, 89:3, 136:9, 139:9

**poke** [1] - 147:12

**police** [3] - 45:4, 65:25, 115:2

**Police** [1] - 101:8

**policies** [4] - 17:21, 21:15, 22:14, 104:12

**policy** [4] - 20:4, 20:5, 88:23, 125:6

**politic** [1] - 139:24

**pollution** [1] - 85:22

**polysubstance** [2] - 64:19, 64:24

**Ponc** [1] - 2:4

**Ponce** [1] - 2:14

**poor** [1] - 66:14

**pop** [1] - 148:3

**Pope** [2] - 89:20, 137:10

**population** [2] - 27:10, 35:4

**populations** [2] - 34:4, 35:13

**portion** [1] - 27:10

**position** [4] - 27:7, 55:4, 95:11, 144:11

**possibility** [1] - 96:13

**possibly** [3] - 79:23, 88:4, 114:18

**post** [1] - 60:14

**post-surgical** [1] - 60:14

**potential** [2] - 92:10, 115:15

**potentially** [1] - 94:13

**Potomac** [1] - 148:6

**Powell** [1] - 2:6

**power** [1] - 67:25

**powerful** [2] - 119:5, 129:16

**PR** [2] - 2:5, 2:14

**practical** [1] - 24:2

**practice** [12] - 31:20, 32:9, 41:24, 47:23, 78:5, 78:6, 82:1, 103:25, 104:8, 104:9, 105:2, 148:21

**practiced** [1] - 44:8

**practices** [3] - 27:14, 88:20, 149:3

**practicing** [1] - 88:22

**pre** [1] - 40:18

**pre-2008** [3] - 40:5, 41:5, 42:11

**pre-determined** [1] - 40:18

**precise** [2] - 49:18, 82:24

**precisely** [3] - 82:8, 90:24, 92:9

**preclude** [1] - 91:7

**predominantly** [2] - 114:4, 121:2

**prefer** [1] - 152:20

**premise** [5] - 109:14, 125:21, 130:16, 139:22, 140:6

**prescribe** [17] - 16:12, 19:13, 19:24, 21:9, 21:10, 21:25, 23:23, 24:7, 25:19, 31:14, 34:10, 55:20, 60:3, 78:21, 81:15, 91:20, 95:3

**prescribed** [28] - 9:11, 23:13, 31:24, 32:4, 37:14, 38:3, 66:23, 71:2, 71:9, 72:24, 75:16, 75:21, 76:13, 77:10, 77:19, 77:24, 78:21, 79:7, 80:7, 82:18, 89:12, 89:17, 90:15, 91:2, 94:21, 101:22, 141:13, 141:16

**prescribers** [5] - 27:13, 31:2, 31:10, 66:18, 77:5

**prescribes** [1] - 80:5

**prescribing** [105] - 10:20, 11:10, 15:2, 15:14, 15:21, 16:10, 16:21, 18:7, 20:7, 20:10, 20:16, 20:19, 21:18, 22:3, 22:15, 22:17, 22:23, 23:6, 23:19, 23:22, 24:18, 24:21, 24:23, 25:7, 25:11, 25:13, 25:23, 26:1, 26:6, 26:11, 26:19, 27:14, 27:16, 28:20, 28:22, 30:5, 31:5, 31:10, 32:1, 32:12, 33:20, 34:1, 34:17, 35:16, 36:13, 37:19, 37:20, 38:1, 59:11, 59:16, 59:22, 59:23, 60:7, 66:9, 70:23, 71:12, 71:14, 72:22, 73:12, 73:19, 73:25, 74:21, 75:2,

75:3, 76:2, 76:6, 76:12, 76:17, 76:23, 77:2, 77:16, 77:24, 78:6, 80:20, 81:10, 81:16, 81:23, 81:25, 83:18, 85:3, 87:3, 88:19, 89:24, 90:17, 90:20, 90:23, 95:7, 95:13, 101:25, 110:11, 111:1, 112:25, 113:5, 113:10, 113:15, 114:15, 116:17, 117:20, 118:10, 136:10, 136:13, 137:9, 137:15, 137:21, 141:24

**Prescribing** [1] - 21:21

**prescription** [95] - 9:5, 13:6, 14:10, 23:9, 25:5, 29:15, 31:18, 32:7, 39:16, 39:17, 44:10, 52:20, 57:8, 58:16, 58:24, 60:8, 62:7, 62:20, 63:9, 63:12, 63:15, 63:16, 63:17, 63:20, 65:2, 65:9, 69:10, 70:21, 72:3, 73:4, 74:9, 74:22, 75:23, 76:9, 76:10, 77:21, 78:14, 78:17, 79:12, 79:20, 79:25, 80:17, 80:18, 82:6, 83:22, 87:8, 87:22, 88:12, 88:17, 89:10, 92:4, 95:1, 97:16, 97:21, 101:6, 101:17, 101:21, 101:23, 101:24, 102:1, 102:4, 109:19, 109:23, 110:15, 112:25, 113:11, 113:16, 113:17, 113:20, 113:23, 114:7, 114:20, 115:24, 115:25, 116:8, 117:7, 117:24, 118:1, 118:6, 118:13, 118:18, 118:22, 118:24, 119:3, 119:7, 119:23, 120:3, 121:14, 122:16, 122:18, 136:11, 143:20, 144:10, 150:11

**prescriptions** [38] - 9:12, 12:9, 13:22, 14:1, 14:2, 14:4,

14:14, 15:5, 16:15, 24:8, 24:9, 28:12, 30:12, 31:2, 31:7, 34:7, 34:8, 34:9, 34:13, 34:14, 37:11, 55:18, 56:8, 59:1, 60:10, 60:19, 69:11, 73:24, 74:3, 74:8, 74:14, 75:6, 75:25, 90:13, 110:4, 110:6, 143:17, 150:8

**presence** [1] - 94:12

**present** [8] - 17:19, 40:6, 58:10, 92:11, 97:14, 134:20, 135:3, 138:13

**presentation** [3] - 34:18, 42:22, 43:24

**presented** [10] - 42:20, 47:1, 48:1, 94:17, 96:9, 96:17, 97:4, 107:23, 117:2, 125:1

**presents** [2] - 81:21, 82:15

**press** [1] - 138:24

**pressure** [1] - 34:24

**pretend** [1] - 139:20

**pretrial** [2] - 136:23, 138:4

**pretty** [6] - 17:10, 39:18, 50:15, 132:11, 146:25

**prevailing** [1] - 70:23, 77:12, 91:9

**prevalence** [1] - 62:16

**prevent** [1] - 150:3

**prevention** [2] - 66:3, 66:11

**prevents** [1] - 107:14

**previous** [1] - 52:21

**previously** [11] - 63:12, 75:5, 75:14, 75:24, 77:10, 85:13, 117:9, 118:22, 119:3, 119:6, 119:9

**Prevoznik** [1] - 144:12

**price** [3] - 115:9, 115:11, 117:17

**primarily** [1] - 100:23

**primary** [2] - 63:14, 140:10

**principally** [1] - 97:12

**principle** [1] - 125:6

**principles** [2] - 122:11, 124:20

**prison** [1] - 143:18

**private** [1] - 93:21

**problem** [19] - 7:14, 18:18, 49:11, 61:13,

62:9, 62:12, 64:17, 64:20, 64:21, 65:16, 65:25, 68:17, 78:18, 85:10, 115:5, 119:2, 119:11, 119:18, 129:18

**problems** [4] - 55:11, 91:15, 94:16, 119:14

**procedure** [1] - 46:16

**procedures** [2] - 8:23, 45:14

**proceed** [2] - 70:11, 112:1

**proceeded** [1] - 81:14

**Proceedings** [1] - 6:19

**proceedings** [1] - 154:3

**PROCEEDINGS** [1] - 7:1

**process** [2] - 42:11, 44:13

**Proctor** [1] - 2:10

**produced** [2] - 6:19, 52:5

**product** [5] - 91:12, 92:13, 92:15, 92:20, 94:24

**production** [2] - 9:15, 88:3

**products** [16] - 90:19, 91:17, 91:21, 92:19, 93:6, 93:8, 93:16, 93:23, 94:9, 94:18, 94:20, 104:9, 112:6, 112:11, 122:21

**products-related** [1] - 93:6

**profession** [1] - 78:19

**professional** [2] - 31:20, 54:8

**professionals** [2] - 47:19, 73:19

**profiles** [1] - 52:12

**profound** [1] - 90:21

**Program** [5] - 23:4, 104:25, 126:24, 127:5

**program** [14] - 40:17, 41:6, 41:17, 42:18, 42:20, 43:18, 44:4, 46:18, 47:3, 48:1, 48:2, 48:4

**programs** [24] - 22:14, 40:12, 42:23, 44:11, 123:1, 123:3, 123:6, 123:10, 123:12, 123:24, 124:2, 124:4, 124:7, 124:11, 124:13,

124:16, 127:20, 128:23, 129:9, 129:14, 129:15, 130:2, 130:7, 130:13

**progressed** [1] - 114:7

**progression** [1] - 119:16

**projections** [1] - 126:21

**projects** [2] - 123:3

**prominent** [2] - 17:7, 114:3

**promote** [1] - 21:4

**promoted** [2] - 18:16, 101:25

**prone** [1] - 64:7

**prong** [2] - 55:7, 66:3

**pronounce** [2] - 39:8, 39:10

**proof** [6] - 11:3, 11:14, 59:24, 109:10, 133:20, 134:12

**proper** [3] - 92:9, 121:16, 128:5

**properly** [4] - 87:23, 99:17, 128:11, 135:19

**proposal** [1] - 125:8

**proposed** [5] - 57:12, 135:15, 147:14, 152:10, 153:1

**proposition** [3] - 56:21, 68:10

**prospective** [1] - 113:13

**prospects** [1] - 112:7

**protect** [1] - 20:15

**prove** [9] - 12:2, 54:25, 55:10, 57:1, 58:11, 58:19, 69:4, 69:6, 72:11

**proven** [6] - 55:5, 56:24, 61:15, 69:2, 69:3, 136:6

**proves** [3] - 11:17, 66:7, 102:18

**provide** [6] - 13:13, 90:4, 110:25, 123:23, 124:7, 134:22

**provided** [4] - 35:3, 129:7, 131:19, 144:14

**providers** [3] - 17:17, 35:18, 35:19

**provides** [1] - 18:21

**providing** [2] - 124:8, 141:12

**proximate** [47] - 55:4, 57:3, 57:4, 57:10,

58:3, 58:21, 66:19, 67:9, 67:12, 67:19, 70:20, 71:9, 72:2, 72:15, 72:21, 80:24, 81:3, 81:11, 82:3, 82:12, 82:22, 83:10, 83:15, 83:16, 83:25, 84:4, 84:7, 84:9, 84:11, 84:16, 85:4, 85:9, 86:9, 86:11, 86:16, 114:18, 116:20, 117:6, 117:10, 118:12, 118:14, 120:10, 120:12, 136:18, 136:25, 137:3, 151:1

**prudent** [1] - 96:25

**public** [47] - 71:11, 72:12, 87:4, 87:6, 89:15, 89:18, 89:19, 89:22, 89:25, 90:2, 90:11, 90:22, 90:25, 91:2, 91:5, 91:6, 91:10, 91:15, 91:16, 91:24, 91:25, 92:5, 92:7, 92:9, 92:15, 93:15, 93:20, 93:24, 93:25, 94:5, 94:8, 94:17, 95:14, 103:1, 103:2, 107:9, 110:23, 112:17, 137:7, 137:8, 137:11, 137:14, 137:17, 137:20, 137:22, 137:23, 138:5

**publicly** [1] - 28:22

**published** [2] - 29:14, 35:10

**pull** [2] - 17:11, 17:12

**Purchase** [2] - 41:13, 41:23

**purchase** [2] - 40:19, 52:23

**purchases** [1] - 40:18

**Purdue** [2] - 16:24, 59:21

**pure** [1] - 115:10

**purity** [2] - 115:10, 117:17

**purpose** [9] - 24:1, 31:19, 47:20, 94:23, 100:15, 116:1, 121:8, 134:11, 145:2

**purpose"** [1] - 76:11

**purposes** [4] - 31:14, 57:2, 106:20, 107:23

**pursuant** [1] - 29:2

**pursue** [1] - 68:24

**pushing** [1] - 59:21

**put** [28] - 7:9, 10:25, 14:12, 16:2, 17:13, 19:2, 21:13, 26:23, 27:7, 27:20, 27:24, 46:24, 47:11, 47:17, 80:19, 85:16, 89:3, 89:21, 97:20, 116:22, 121:22, 125:7, 125:17, 130:11, 132:16, 132:20, 146:19, 147:15

**putting** [5] - 86:3, 97:15, 97:18, 98:4, 132:25

**puzzled** [1] - 97:6

**Q**

**quality** [1] - 153:13

**quantitative** [1] - 46:13

**quantity** [2] - 23:21, 74:21

**questioning** [1] - 27:15

**questionnaire** [1] - 52:8

**questions** [2] - 128:17, 136:5

**quickly** [3] - 20:14, 45:10, 107:19

**quite** [7] - 25:13, 86:1, 88:9, 98:11, 107:17, 113:9, 119:8

**quota** [18] - 9:15, 9:18, 10:15, 27:19, 27:22, 27:25, 28:2, 28:4, 28:5, 28:8, 28:11, 28:13, 28:25, 29:3, 33:3, 33:8, 33:11, 59:2

**quotas** [4] - 12:12, 87:18, 88:3, 117:23

**quotations** [1] - 81:3

**quote** [27] - 19:7, 31:11, 31:17, 76:10, 77:23, 78:6, 81:19, 82:4, 82:5, 88:22, 90:7, 92:7, 93:14, 100:16, 106:11, 114:6, 116:7, 116:10, 116:24, 119:22, 122:8, 124:3, 128:4, 128:22, 130:4, 137:11, 147:7

**quoted** [3] - 88:21, 94:7, 98:18

**quoting** [1] - 140:8

**R**

**Rafalski** [33] - 8:21, 11:8, 14:8, 30:23, 31:12, 31:13, 49:10, 49:17, 49:18, 51:5, 51:15, 56:1, 61:9, 74:5, 76:11, 77:3, 77:4, 79:15, 97:1, 100:5, 103:20, 105:25, 107:11, 107:15, 108:22, 109:2, 109:9, 109:16, 110:12, 145:6, 146:17

**Rafalski's** [10] - 9:24, 11:5, 30:24, 50:23, 50:25, 96:22, 108:12, 109:15, 145:8, 146:2

**Rafferty** [1] - 2:10

**rain** [1] - 148:14

**raise** [2] - 36:12, 46:4

**raised** [4] - 28:5, 55:15, 91:11, 105:2

**raises** [1] - 128:17

**raising** [1] - 28:25

**Randolph** [2] - 148:7, 148:13

**random** [1] - 51:2

**range** [3] - 37:6, 94:3, 108:4

**ranked** [2] - 34:21, 34:25

**ranks** [1] - 34:6

**Rannazzisi** [21] - 8:2, 9:13, 9:17, 10:6, 10:14, 27:12, 28:7, 31:9, 75:10, 76:11, 77:4, 77:5, 79:15, 80:8, 90:6, 90:25, 99:1, 100:8, 104:3, 106:3, 107:6

**Rannazzisi's** [1] - 8:3

**rapid** [1] - 73:23

**rarely** [1] - 93:23

**rate** [2] - 32:21, 33:13

**rates** [12] - 33:25, 34:1, 34:16, 34:19, 35:14, 36:7, 36:13, 37:19, 37:25, 65:10, 73:25

**rather** [6] - 7:15, 70:1, 73:2, 92:7, 119:1, 132:5

**rating** [1] - 36:5

**ratio** [2] - 36:19, 36:21

**raw** [1] - 29:2

**re** [3] - 21:12, 45:9, 151:10

re-adopted [1] - 21:12
re-examine [1] - 45:9
re-told [1] - 151:10
reach [2] - 120:15,
136:5
reached [1] - 104:22
read [6] - 19:17, 25:8,
68:6, 140:5, 142:10,
142:15
reading [1] - 141:10
ready [5] - 7:7, 14:24,
111:19, 138:19,
138:25
real [7] - 15:4, 26:3,
50:16, 64:20,
112:16, 127:12,
143:22
realistically [1] -
121:13
reality [3] - 63:22,
127:9, 128:16
really [2] - 113:4,
130:15
Reardon [4] - 40:8,
43:7, 43:9, 43:14
Reardon's [1] - 40:10
reason [11] - 18:3,
22:3, 29:1, 29:3,
39:15, 67:9, 67:11,
76:1, 128:14, 144:4,
150:12
reasonable [8] - 8:8,
12:4, 14:7, 15:15,
22:20, 26:10, 32:16,
37:10
reasonableness [5] -
11:25, 58:21, 75:25,
76:1, 76:5
reasonably [1] - 22:17
reasoning [3] - 86:12,
94:2, 94:16
reasons [7] - 29:10,
36:1, 70:20, 85:11,
103:19, 138:5,
145:14
reboot [1] - 14:19
receive [1] - 122:25
received [2] - 34:12,
105:23
receiving [3] - 28:17,
123:13, 124:24
recent [1] - 106:6,
113:5, 115:17
recently [1] - 85:18
recess [2] - 38:20,
111:24
Recess [3] - 38:22,
70:10, 111:25
reckoning [1] - 152:7
recognition [2] -

62:15, 143:5
recognized [5] -
36:23, 94:5, 94:16,
136:15, 151:20
recommendation [1] -
66:12
recommendations [2]
- 25:13, 66:17
recommended [2] -
23:21, 89:11
record [48] - 42:7,
47:8, 52:6, 52:22,
62:10, 63:4, 65:23,
70:15, 71:9, 71:11,
72:10, 77:20, 79:11,
81:21, 82:15, 84:3,
84:4, 87:6, 87:7,
89:15, 92:2, 92:4,
95:4, 95:9, 96:15,
100:20, 102:11,
103:18, 106:7,
108:25, 109:24,
111:7, 113:22,
114:21, 123:20,
123:22, 124:6,
124:9, 125:9,
128:25, 136:1,
136:24, 138:4,
139:5, 144:12, 154:3
recorded [1] - 6:19
records [2] - 109:6,
109:7
recover [2] - 128:9,
135:13
recovery [1] - 130:4
red [1] - 98:11
redress [1] - 130:21
reduce [3] - 76:16,
132:23, 133:1
reduced [1] - 115:9
reduction [1] - 133:8
Reduction [1] - 24:6
Reed [2] - 6:4, 6:11
reference [3] - 31:9,
45:25, 51:13
referred [7] - 43:18,
74:15, 81:18, 82:12,
82:13, 84:14, 115:3
referring [1] - 78:5
reflect [2] - 10:23,
98:11
reflected [13] - 27:18,
81:3, 92:17, 104:5,
105:16, 105:20,
108:21, 109:8,
113:8, 114:9,
115:12, 123:7,
126:19
reflecting [3] - 108:18,
119:6, 119:10

reflects [17] - 72:21,
90:24, 101:2,
104:14, 105:21,
106:17, 110:16,
112:8, 114:22,
117:12, 119:1,
125:11, 127:14,
127:15, 128:13,
128:16, 133:7
refusing [1] - 95:12
Register [1] - 31:17
registered [1] - 144:24
registration [1] -
143:25
regular [2] - 45:3,
47:24
regularly [1] - 46:8
regulate [2] - 140:17,
145:3
regulated [2] - 61:2,
139:22
regulation [2] - 42:3,
103:14
Regulations [1] -
149:25
regulator [2] - 103:3,
103:5
regulators [3] - 89:4,
89:15, 91:20
regulatory [8] - 45:18,
103:15, 118:9,
137:24, 142:22,
143:3, 144:13,
150:10
reject [2] - 84:20,
120:9
rejected [4] - 44:21,
56:16, 67:11, 144:25
related [21] - 13:21,
35:8, 40:1, 48:12,
67:13, 93:6, 98:24,
105:4, 105:8, 108:3,
112:23, 113:20,
120:21, 120:24,
123:2, 123:6, 130:9,
133:22, 134:2,
134:13, 135:17
relates [3] - 31:3,
36:17, 58:3, 58:4,
62:13, 100:21
relating [1] - 71:19
relation [2] - 81:5,
117:2
relationship [2] - 65:7,
72:16
relative [1] - 36:7
release [1] - 52:16
relevant [1] - 13:25
reliability [1] - 128:18
reliable [1] - 132:14

relied [1] - 102:9
relief [8] - 11:18,
18:16, 18:21, 67:25,
72:7, 113:13, 135:3,
135:4
relieve [1] - 17:18
rely [3] - 99:17,
116:24, 132:7
relying [1] - 113:17
remains [1] - 54:17
remarkable [2] -
30:22, 139:11
remarkably [1] - 108:4
remedy [24] - 68:1,
72:6, 72:12, 106:23,
120:17, 120:19,
120:20, 120:22,
121:3, 121:12,
121:16, 121:19,
122:2, 122:15,
122:20, 122:23,
123:12, 134:21,
134:24, 135:10,
135:15, 135:23,
136:1, 136:5
remember [5] - 16:4,
39:2, 39:6, 60:16,
93:11
remembering [1] -
59:4
remind [3] - 29:11,
31:11, 51:17
reminded [2] - 38:24,
39:12
remote [5] - 57:18,
58:6, 61:21, 63:3,
116:22
remoteness [6] - 84:9,
84:14, 84:17, 84:20,
84:23, 117:9
remove [2] - 21:7,
98:2
removed [2] - 83:8,
83:12
renders [1] - 130:18
renew [1] - 22:12
rep [1] - 99:24
repeatedly [2] - 54:9,
96:1, 110:15
replies [3] - 152:22,
153:3, 153:5
Report [1] - 106:7
report [22] - 22:8,
40:20, 50:6, 52:16,
53:18, 62:2, 62:4,
65:18, 65:19, 65:25,
66:8, 66:13, 102:17,
102:22, 106:22,
111:4, 115:12,
129:2, 130:19

reported [15] - 36:4,
41:2, 41:18, 50:4,
102:24, 103:25,
104:18, 105:8,
106:18, 106:19,
108:2, 110:9, 111:8,
111:16, 154:7
Reporter [6] - 6:17,
6:18, 154:1, 154:10
reporting [15] - 40:13,
71:20, 102:19,
105:1, 105:5,
105:12, 105:17,
106:9, 106:10,
106:12, 110:1,
110:3, 110:12, 111:3
reports [11] - 34:12,
40:15, 41:14, 42:1,
45:8, 56:18, 56:20,
62:3, 65:19, 65:22,
66:17
Reports [10] - 40:16,
40:17, 41:12, 41:13,
41:23, 104:8,
104:20, 105:22,
106:15, 140:9
representative [2] -
54:3, 54:12
represented [1] -
101:7
representing [1] -
132:2
represents [3] - 132:3,
133:24
reprinted [1] - 21:1
requested [3] - 72:6,
105:1, 135:25
require [1] - 74:15
required [7] - 18:5,
22:11, 23:6, 23:14,
27:13, 27:14, 122:7
requirement [4] -
72:16, 86:8, 104:15,
109:6
requirements [2] -
110:18, 114:19
research [1] - 64:6
residue [2] - 86:3
Resiliency [6] -
125:13, 125:17,
125:22, 126:2,
126:20
resolution [1] - 92:25
resolve [3] - 111:2,
120:8, 120:14
resolved [1] - 93:13
resources [5] - 68:20,
125:15, 129:17,
129:21, 132:25
respect [5] - 54:19,

57:11, 67:22, 144:7, 144:10
**respectfully** [2] - 141:21, 143:24
**respond** [2] - 18:7, 90:16
**responded** [3] - 15:12, 18:6, 74:20
**responding** [2] - 75:23, 76:4
**responds** [1] - 75:4
**response** [12] - 42:18, 66:16, 68:8, 68:22, 73:22, 87:3, 91:7, 104:24, 106:8, 109:2, 145:21, 145:22
**responsibilities** [1] - 150:10
**responsibility** [4] - 42:8, 61:10, 88:6, 144:9
**Responsible** [1] - 21:21
**responsible** [4] - 71:3, 136:16, 150:1, 150:11
**rest** [2] - 23:18, 118:21
**Restatement** [4] - 89:21, 92:18, 93:14, 137:13
**restricted** [1] - 35:19
**restrictions** [1] - 26:1
**result** [5] - 74:10, 78:4, 116:12, 122:8, 122:14
**resulted** [3] - 22:14, 77:24, 136:12
**resulting** [1] - 144:16
**results** [1] - 51:6
**retail** [1] - 96:24
**retention** [1] - 109:7
**retort** [1] - 138:21
**retrospect** [1] - 26:6
**return** [1] - 136:8
**revamping** [1] - 43:22
**review** [3] - 8:23, 47:20, 48:13
**reviewed** [4] - 45:21, 53:15, 53:17, 104:24
**reviewing** [2] - 100:17, 108:10
**reviews** [1] - 52:14
**revised** [1] - 152:10
**Rhode** [2] - 93:19, 131:7
**rhododendron** [1] - 147:25
**Rice** [5] - 4:3, 4:5, 4:8, 4:11, 4:14

**right-hand** [2] - 96:23, 108:21
**rights** [1] - 93:21
**rise** [5] - 71:23, 73:23, 121:8, 121:17, 137:5
**risk** [2] - 27:11, 87:13
**risks** [10] - 25:10, 26:17, 27:4, 87:9, 87:15, 91:17, 91:19, 95:2, 138:2
**risky** [1] - 90:21
**Rite** [2] - 100:13, 100:17
**River** [1] - 147:25
**RMR** [2] - 6:17, 6:18
**road** [1] - 151:9
**roadmap** [1] - 11:22
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**rocks** [1] - 148:25
**role** [7] - 16:13, 26:14, 73:12, 83:18, 102:8, 123:1, 143:14
**roles** [1] - 44:9
**rolls** [1] - 51:2
**room** [1] - 14:19
**rose** [3] - 16:9, 25:7, 33:6
**roughly** [2] - 127:1, 134:8
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**RUBY** [1] - 4:22
**Ruby** [1] - 4:23
**rude** [1] - 89:20
**Rufus** [3] - 123:4, 127:22, 128:6
**rule** [3] - 68:1, 68:7, 85:19
**Rule** [6] - 91:11, 92:6, 120:17, 125:8, 152:23, 153:3
**run** [4] - 44:7, 46:18, 124:2, 127:4
**running** [4] - 123:10, 124:16, 133:23, 133:25
**rural** [2] - 35:11, 35:13
**rush** [1] - 14:21

## S

**s\Ayme** [1] - 154:9
**s\Lisa** [1] - 154:9
**saddle** [1] - 115:1
**safe** [1] - 150:9
**safety** [4] - 146:9, 146:10, 149:17
**Sales** [3] - 140:4,

140:6, 145:1
**sales** [3] - 54:3, 99:24, 100:3
**SALGADO** [1] - 4:20
**San** [2] - 2:5, 2:14
**sanctioned** [3] - 144:15, 144:17
**sat** [1] - 10:18
**saves** [1] - 85:9
**saw** [7] - 16:25, 18:6, 22:22, 28:18, 28:21, 29:11, 87:13
**SC** [3] - 4:4, 4:12, 4:15
**scale** [1] - 74:16
**scatter** [1] - 65:4
**SCHMIDT** [1] - 5:9
**school** [2] - 60:22, 139:8
**School** [1] - 15:19
**science** [2] - 131:23, 131:24
**scientific** [1] - 132:8
**scope** [4] - 122:1, 122:19, 129:1, 142:4
**scorecard** [1] - 139:8
**screen** [1] - 50:15
**Script** [1] - 100:21
**se** [3] - 64:23, 88:2, 88:5
**second** [21] - 9:23, 19:14, 31:3, 44:22, 70:25, 71:10, 71:13, 77:1, 77:5, 77:14, 77:17, 90:23, 95:12, 105:3, 105:16, 118:16, 137:3, 137:16, 144:16, 144:17
**Second** [1] - 63:17
**second-guess** [5] - 71:13, 77:1, 77:5, 90:23, 137:16
**second-guessed** [1] - 9:23
**second-guessing** [1] - 95:12
**Secretary** [1] - 24:20
**section** [1] - 45:18
**see** [42] - 8:12, 16:9, 23:12, 24:8, 25:21, 30:8, 35:15, 42:23, 49:22, 60:8, 70:8, 84:13, 92:17, 93:17, 97:9, 104:5, 104:13, 104:17, 106:6, 112:21, 113:5, 113:7, 114:12, 126:19, 126:21, 127:9, 127:10, 127:12, 129:24,

133:22, 141:9, 145:15, 145:23, 146:11, 148:14, 150:2, 151:13, 151:20, 152:1, 152:25, 153:20
**seeing** [4] - 28:19, 80:3, 112:19, 119:18
**seek** [3] - 11:19, 88:23, 134:10
**seeking** [6] - 93:6, 120:23, 121:1, 121:12, 121:14, 135:2
**seeks** [1] - 106:23
**seized** [1] - 101:8
**sell** [3] - 142:13, 143:19, 145:20
**seller** [1] - 142:5
**selling** [3] - 140:16, 142:6, 145:24
**sells** [3] - 61:3, 61:5, 80:6
**seminal** [1] - 23:20
**SEMP** [2] - 23:25, 24:1
**SENIOR** [1] - 1:17
**senior** [1] - 47:19
**Senior** [1] - 7:2
**Sensabaugh** [1] - 5:14
**sense** [6] - 16:13, 28:1, 28:17, 107:8, 129:15, 146:3
**sent** [7] - 21:25, 22:6, 40:15, 43:9, 56:18, 56:20, 60:16
**sentence** [2] - 131:12, 131:13
**separate** [1] - 86:9
**separately** [1] - 85:24
**September** [7] - 42:21, 43:3, 43:7, 43:13, 43:24, 44:14, 126:10
**sequence** [1] - 115:24
**series** [1] - 51:1
**serious** [2] - 18:17, 87:13
**serve** [2] - 11:22, 127:1
**served** [5] - 12:15, 49:3, 98:9, 100:22, 102:15
**serves** [1] - 99:25
**service** [1] - 90:3
**Services** [3] - 126:23, 126:24, 127:4
**services** [2] - 122:25, 129:6
**serving** [1] - 127:5
**set** [11] - 12:12, 28:4, 43:22, 44:24, 45:8,

45:23, 76:2, 82:23, 86:14, 136:21, 138:17
**sets** [2] - 28:2, 88:2
**setting** [4] - 43:15, 43:19, 46:3, 46:15
**Settlement** [3] - 48:8, 105:3, 105:7
**settlement** [5] - 49:8, 104:22, 105:10, 105:16, 105:20
**seven** [1] - 43:12
**several** [17] - 23:16, 36:15, 42:9, 45:2, 48:1, 52:11, 74:14, 85:8, 85:12, 85:15, 86:5, 86:7, 86:10, 114:16, 139:1, 153:14
**severe** [2] - 21:9, 21:11
**SHANNON** [1] - 6:3
**Shapiro** [2] - 60:21
**share** [4] - 98:2, 99:13, 99:20, 151:11
**shelf** [2] - 79:12, 109:18
**Sheriff** [3] - 114:2, 114:24, 130:3
**shift** [5] - 22:25, 23:1, 39:23, 54:24, 57:3
**shifted** [2] - 113:23, 113:24
**shifting** [1] - 20:1
**shifts** [2] - 78:5
**ship** [6] - 43:2, 91:1, 95:13, 104:9, 104:15, 146:7
**shipment** [3] - 75:18, 75:19, 88:3
**shipments** [31] - 26:9, 36:20, 37:3, 37:9, 48:15, 48:17, 51:2, 65:9, 71:15, 73:7, 76:2, 87:3, 90:16, 95:22, 95:24, 96:6, 96:7, 96:8, 96:10, 96:11, 96:17, 97:3, 97:15, 98:3, 98:8, 99:12, 99:14, 102:25, 103:4, 103:5, 113:16
**shipped** [29] - 9:1, 9:6, 12:21, 13:6, 29:15, 29:21, 29:23, 29:25, 30:25, 32:15, 36:22, 40:21, 41:3, 41:18, 48:20, 48:23, 56:10, 69:3, 69:5, 73:4, 75:21, 90:14, 97:18,

97:23, 99:5, 107:6, 111:8, 111:15
**shipping** [2] - 27:9, 42:15
**shocking** [5] - 108:6, 116:10, 122:10, 127:8, 131:18
**shockingly** [1] - 126:16
**Shoppe** [11] - 51:13, 52:1, 52:3, 52:5, 52:8, 53:8, 53:20, 54:5, 54:6, 54:12, 54:16
**shopping** [1] - 23:7
**short** [5] - 99:11, 112:2, 118:12, 120:2, 134:20
**show** [11] - 17:12, 33:9, 38:9, 43:6, 47:23, 55:7, 57:5, 62:23, 65:2, 86:8, 150:22
**showed** [7] - 27:22, 30:4, 33:5, 34:19, 63:24, 65:4, 75:19
**showing** [5] - 83:14, 124:22, 133:17, 134:19, 136:24
**shown** [6] - 26:22, 52:14, 52:15, 56:15, 124:11, 138:10
**shows** [14] - 8:7, 9:12, 11:15, 27:20, 32:24, 33:1, 33:2, 33:17, 56:19, 64:6, 109:25, 112:24, 128:2, 131:17
**shut** [1] - 101:4
**shy** [1] - 20:7
**side** [7] - 31:23, 96:23, 108:21, 114:5, 116:7, 125:7, 152:22
**sides** [5] - 14:15, 14:16, 14:17, 15:1, 99:20
**sides'** [1] - 15:8
**sign** [10] - 17:1, 17:17, 17:25, 18:11, 24:17, 25:20, 59:22, 60:23, 83:5, 83:20
**significance** [1] - 151:12
**significant** [8] - 18:21, 34:2, 61:14, 76:20, 113:9, 113:12, 115:5, 143:5
**significantly** [1] - 133:16
**signs** [1] - 54:4

**silent** [2] - 96:16, 124:9
**similar** [3] - 40:12, 86:1, 86:2
**similarly** [2] - 104:14, 127:19
**simple** [1] - 119:11
**simpler** [1] - 120:10
**simply** [6] - 27:9, 64:17, 116:6, 128:16, 128:24, 135:25
**SIMULTANEOUS** [1] - 153:21
**Singer** [1] - 28:8
**SINGER** [1] - 4:8
**single** [1] - 8:25, 18:5, 26:15, 31:20, 46:6, 50:5, 56:1, 56:15, 76:22, 139:7
**sit** [2] - 109:18, 139:2
**site** [5] - 45:4, 47:24, 51:22, 53:13, 53:20
**sits** [1] - 28:16
**sitting** [2] - 67:24, 134:23
**situation** [2] - 96:13, 146:13
**six** [3] - 50:19, 98:3, 107:23
**sixth** [3] - 97:16, 100:22, 141:23
**size** [4] - 51:3, 103:16, 103:19, 103:21
**Skinner** [1] - 70:5
**skyrocket** [2] - 59:13, 59:16
**slide** [16] - 30:8, 32:23, 47:11, 81:4, 82:7, 85:16, 88:21, 97:20, 98:11, 98:19, 108:21, 116:23, 121:4, 147:20, 148:9
**slides** [1] - 19:17
**small** [3] - 99:13, 99:14, 99:20
**smaller** [1] - 133:25
**smarter** [1] - 38:24
**Smith** [2] - 6:4, 6:11
**Smith's** [1] - 114:9
**Smithfield** [2] - 91:11, 94:19
**social** [2] - 64:21, 125:6
**Social** [1] - 66:5
**Society** [2] - 17:7, 18:16
**sold** [8] - 67:2, 73:20, 77:22, 80:11, 115:13, 140:7, 144:5, 145:18

**sole** [1] - 149:3
**solely** [3] - 84:7, 107:22, 113:13
**Solutions** [3] - 68:18, 130:7, 130:11
**Someone** [1] - 61:4
**someone** [8] - 46:17, 60:5, 60:6, 61:6, 67:1, 114:25, 132:7
**sometimes** [1] - 55:6
**SOMS** [1] - 48:6
**Sonner** [2] - 68:2, 68:7
**sorry** [5] - 14:18, 14:20, 39:19, 79:15, 132:18
**sort** [5] - 48:11, 92:16, 125:14, 129:20, 135:23
**sought** [3] - 133:15, 135:10, 135:24
**souls** [2] - 151:21, 151:25
**source** [2] - 63:14, 79:24
**South** [2] - 2:11, 140:20
**south** [2] - 148:5, 148:6
**SOUTHERN** [1] - 1:1
**Southern** [1] - 7:3
**Southwood** [1] - 104:16
**sovereign** [1] - 68:11
**span** [1] - 37:25
**SPEAKERS** [1] - 153:21
**speaking** [1] - 109:7
**Speaking** [1] - 27:17
**speaks** [1] - 137:6
**special** [2] - 23:15, 51:7
**specialist** [1] - 64:11
**specific** [9] - 9:2, 12:20, 39:3, 46:17, 49:1, 49:2, 87:9, 87:13, 104:19
**specifically** [2] - 29:25, 57:8
**specifics** [1] - 48:7
**spectrum** [1] - 146:16
**spend** [5] - 39:24, 47:6, 51:10, 51:14, 123:5
**spending** [1] - 133:21
**spent** [1] - 7:10
**spike** [1] - 114:12
**split** [1] - 70:1
**spot** [1] - 23:7
**Square** [2] - 6:5, 6:12
**stack** [1] - 65:19

**staff** [2] - 106:11, 106:15
**stake** [3] - 73:3, 102:8, 113:1
**stale** [1] - 98:24
**stamp** [2] - 140:19, 141:14
**stand** [18] - 18:9, 44:15, 46:23, 48:21, 54:16, 107:24, 118:19, 146:20, 151:2
**standard** [44] - 9:9, 9:10, 15:11, 15:22, 16:10, 16:11, 16:16, 16:19, 18:13, 20:2, 22:18, 22:21, 22:24, 24:10, 24:12, 24:22, 25:3, 26:5, 26:10, 26:13, 27:18, 28:5, 29:2, 29:7, 37:12, 41:24, 43:15, 43:19, 45:14, 57:4, 59:5, 59:7, 59:19, 69:12, 74:12, 76:24, 80:25, 82:1, 84:20, 84:23, 104:7, 137:10, 141:10, 141:25
**standards** [8] - 18:1, 18:4, 22:21, 70:23, 77:12, 88:14, 90:2, 91:9
**standing** [6] - 54:17, 73:7, 85:2, 149:13, 149:14, 149:23
**STANNER** [1] - 5:10
**start** [7] - 11:25, 20:1, 57:4, 58:20, 69:24, 72:15, 123:10
**started** [4] - 12:23, 17:20, 32:22, 33:17
**starting** [3] - 15:23, 104:17, 114:13
**starts** [1] - 23:1
**State** [11] - 19:2, 19:9, 29:20, 54:17, 68:12, 69:13, 93:17, 110:14, 110:19, 110:21, 110:24
**state** [18] - 12:8, 12:10, 20:20, 21:2, 22:15, 24:21, 44:7, 44:8, 44:10, 47:25, 60:2, 60:4, 65:15, 84:24, 103:3, 103:5, 134:7, 145:24
**state's** [1] - 15:21
**State's** [1] - 110:16
**statement** [1] - 18:14, 18:16, 19:3, 19:10,

**20:4, 20:5, 20:10, 20:11, 21:13, 82:7, 90:10, 96:22, 103:23, 117:8, 123:8
**statements** [2] - 36:25, 88:23
**STATES** [2] - 1:1, 1:17
**States** [17] - 7:2, 18:18, 31:18, 68:11, 87:20, 87:24, 88:8, 104:6, 140:6, 140:9, 141:3, 141:14, 141:21, 142:10, 142:12, 143:5, 149:25
**states** [5] - 22:6, 35:8, 35:16, 35:24, 85:18
**statewide** [1] - 33:22
**statistics** [1] - 37:21
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**statute** [1] - 85:14
**stayed** [2] - 46:7, 47:9
**staying** [1] - 35:20
**steadfastly** [1] - 144:8
**steals** [1] - 61:4
**stenography** [1] - 6:19
**Stephanie** [2] - 64:22, 129:13
**stepping** [1] - 28:15
**steps** [1] - 11:9
**Steve** [2] - 32:10, 40:8
**STEVEN** [1] - 4:22
**still** [5] - 25:25, 47:10, 47:12, 93:1, 127:7
**stolen** [2] - 80:11, 115:25
**stood** [1] - 148:25
**stop** [4] - 27:8, 41:4, 61:8, 146:4
**stopped** [1] - 41:1
**story** [5] - 151:8, 151:10, 151:13, 151:14
**straight** [3] - 63:4, 112:11, 148:4
**strategic** [2] - 66:2, 66:11
**stream** [2] - 85:22, 86:3
**Street** [15] - 2:7, 2:11, 3:5, 3:7, 3:10, 3:12, 4:6, 4:9, 4:19, 4:21, 4:24, 5:5, 5:12, 6:6, 6:13
**street** [1] - 151:17
**strict** [1] - 26:2
**strike** [1] - 26:21
**striking** [1] - 24:10
**string** [1] - 62:5

**stripped** [1] - 126:12
**stronger** [1] - 24:5
**struggled** [1] - 103:13
**studied** [1] - 65:18
**study** [5] - 63:11, 63:13, 63:24, 119:5, 119:8
**stuff** [2] - 18:23, 114:5
**stunning** [3] - 129:20, 132:11, 132:12
**subject** [7] - 12:12, 12:17, 92:24, 102:16, 111:19, 112:20, 122:12
**submission** [2] - 41:11, 41:23
**submissions** [1] - 153:20
**submit** [5] - 90:1, 110:23, 152:10, 153:5
**submitted** [5] - 130:20, 131:2, 131:3, 131:8, 131:10
**Subparagraph** [2] - 139:19
**subpoena** [1] - 54:11
**subsequent** [5] - 72:3, 82:20, 86:17, 108:15, 118:14
**subsequently** [1] - 116:3
**substance** [14] - 23:14, 52:19, 62:17, 64:9, 64:24, 68:22, 77:7, 119:2, 119:11, 119:14, 119:15, 119:18, 139:18, 139:23
**substances** [9] - 36:20, 36:22, 37:2, 37:23, 64:12, 64:15, 90:9, 91:4, 142:19
**Substances** [2] - 23:3, 42:2
**substantial** [4] - 99:15, 102:12, 137:2, 150:24
**subtle** [7] - 148:13, 148:15, 148:17, 148:20, 149:2, 149:7, 150:2
**subtract** [1] - 129:6
**suburban** [1] - 115:15
**success** [2] - 132:22, 133:7
**successes** [1] - 130:12
**successful** [1] - 68:18
**sued** [2] - 18:2, 18:10

**suffer** [1] - 35:4
**suffered** [2] - 66:22, 151:21
**suffering** [3] - 64:23, 151:23, 151:25
**sufficient** [6] - 73:8, 105:14, 134:21, 134:23, 135:1, 135:20
**sufficiently** [1] - 105:8
**suffuse** [1] - 93:3
**suggest** [6] - 83:9, 95:10, 107:15, 122:12, 124:20, 137:17
**suggested** [3] - 39:1, 84:21, 128:4
**suggesting** [2] - 85:8, 116:6
**suggestion** [2] - 122:17, 124:1
**suggests** [1] - 142:16
**Suite** [5] - 2:4, 2:7, 2:10, 2:13, 3:15, 4:6, 4:9, 6:5, 6:12
**sulfate** [4] - 140:7, 140:16, 140:23, 141:13
**sum** [3] - 37:12, 66:19, 102:11
**summaries** [1] - 96:21
**summarize** [2] - 70:17, 120:20
**summarized** [1] - 84:4
**summary** [2] - 38:4, 43:11
**summed** [2] - 50:15, 119:19
**Summersville** [1] - 149:19
**sums** [1] - 147:11
**Sunday** [1] - 68:5
**supervise** [1] - 44:3
**supervised** [2] - 124:4, 124:19
**supplied** [3] - 101:3, 101:5, 102:6
**supplies** [1] - 61:11
**supply** [26] - 10:4, 10:7, 10:16, 10:21, 39:1, 61:2, 74:4, 75:5, 75:11, 76:21, 79:3, 90:8, 115:11, 116:4, 117:18, 120:1, 137:14, 139:16, 139:20, 140:2, 140:12, 143:23, 143:24, 144:2, 144:9
**supplying** [1] - 89:16

**support** [10] - 9:2, 72:7, 89:22, 90:4, 93:24, 102:11, 124:10, 124:16, 134:13, 135:3
**supported** [1] - 120:4
**supporting** [1] - 72:6
**supports** [2] - 26:24, 27:2
**supposed** [6] - 80:5, 80:9, 80:10, 120:2, 150:2, 150:3
**Supreme** [9] - 85:17, 85:23, 93:20, 140:6, 141:3, 141:14, 141:21, 142:10, 142:13
**surely** [2] - 120:5, 138:3
**surgery** [2] - 16:23, 97:7
**surgical** [1] - 60:14
**surplus** [4] - 133:23, 133:25, 134:2, 134:5
**surprise** [1] - 64:14
**surprisingly** [1] - 73:14
**suspicious** [55] - 8:25, 40:13, 41:4, 41:18, 42:4, 42:15, 43:2, 45:24, 49:22, 50:3, 50:5, 52:16, 71:20, 71:22, 102:18, 102:19, 102:22, 103:12, 103:15, 103:25, 104:4, 104:15, 104:18, 104:21, 105:1, 105:4, 105:9, 105:13, 105:17, 105:23, 106:1, 106:4, 106:9, 106:10, 106:12, 106:18, 106:22, 107:2, 107:17, 107:22, 107:24, 108:8, 108:15, 108:19, 108:23, 109:17, 109:18, 110:1, 110:3, 110:13, 111:3, 111:5, 111:16, 150:17, 150:18
**Suspicious** [13] - 12:25, 38:10, 39:25, 40:11, 42:16, 43:23, 54:19, 61:20, 104:8, 104:19, 104:24, 105:22, 106:15
**SUZANNE** [1] - 4:20

**swallow** [2] - 137:20, 137:23
**swing** [1] - 128:15
**switch** [1] - 56:3
**Syringe** [3] - 126:23, 126:24, 127:4
**system** [27] - 40:2, 40:7, 41:6, 41:15, 43:4, 44:16, 44:24, 45:11, 45:21, 46:3, 47:7, 47:9, 48:6, 79:10, 80:17, 118:9, 143:2, 143:3, 143:11, 143:12, 143:14, 143:21, 145:2, 146:8, 146:18, 151:4
**System** [4] - 40:11, 43:23, 54:20, 79:9
**systematically** [1] - 109:1
**systemic** [1] - 48:11
**Systems** [5] - 12:25, 38:10, 39:25, 42:16, 61:21
**systems** [5] - 8:23, 38:9, 39:24, 40:1, 50:21

**T**

**tablets** [3] - 140:17, 140:21, 140:23
**Tactical** [1] - 47:18
**tail** [1] - 148:6
**takeaway** [1] - 41:5
**talisman** [1] - 99:17
**tasked** [1] - 26:5
**Tate** [2] - 140:21, 140:25
**team** [6] - 44:5, 45:2, 45:7, 45:20, 52:13, 53:17
**teamed** [1] - 59:20
**Teamsters** [12] - 57:21, 67:13, 81:1, 81:18, 82:10, 82:23, 84:20, 86:13, 86:19, 86:25, 136:19, 137:2
**TEDS** [2] - 127:13, 127:15
**teenager** [1] - 121:24
**TEMITOPE** [1] - 4:13
**temperature** [1] - 148:16
**temperatures** [1] - 51:1
**Ten** [2] - 7:22, 151:14
**ten** [9] - 33:10, 33:12, 83:6, 111:24,

121:22, 151:9, 151:17, 151:18, 151:21
**ten-fold** [2] - 33:10, 33:12
**tends** [1] - 35:4
**Tenth** [1] - 5:12
**term** [1] - 61:23
**terminal** [1] - 60:13
**terminated** [1] - 49:5
**terms** [4] - 10:4, 30:19, 72:11, 132:12
**test** [5] - 57:6, 82:8, 84:11, 116:22, 131:17
**testified** [39] - 7:22, 8:7, 9:13, 10:16, 14:14, 15:14, 15:22, 17:24, 18:10, 21:8, 22:16, 24:20, 25:16, 26:15, 26:18, 27:12, 29:13, 32:7, 34:5, 34:15, 39:12, 40:4, 41:11, 41:21, 42:10, 45:14, 45:17, 50:24, 51:19, 54:3, 63:19, 76:16, 76:19, 98:15, 104:3, 127:4, 134:1, 134:9, 144:12
**testify** [4] - 20:25, 46:21, 46:22, 51:18
**testifying** [1] - 36:9
**testimony** [35] - 8:3, 8:6, 9:25, 14:12, 14:16, 15:7, 26:22, 27:2, 30:24, 33:9, 36:4, 38:25, 39:18, 42:7, 49:13, 49:14, 51:17, 62:8, 64:3, 68:19, 82:7, 87:11, 88:13, 88:21, 104:10, 104:11, 107:20, 109:8, 110:12, 113:8, 123:4, 125:12, 145:8, 146:2
**testing** [4] - 131:1, 131:6, 131:8, 131:16
**tethered** [2] - 11:19, 13:12
**Texas** [1] - 48:18
**THE** [52] - 1:1, 1:1, 1:4, 1:17, 7:6, 10:8, 10:11, 13:8, 14:18, 14:24, 19:19, 38:12, 38:16, 38:20, 39:4, 39:7, 39:21, 69:22, 70:5, 70:11, 70:13, 86:17, 86:21, 87:1, 92:21, 93:9, 96:12,

97:6, 111:21, 111:24, 112:1, 138:14, 138:16, 138:19, 138:22, 138:24, 140:14, 142:4, 142:20, 142:22, 143:8, 146:12, 146:19, 146:25, 147:23, 148:8, 152:9, 152:15, 152:18, 153:7, 153:10, 153:17

**themselves** [1] - 136:14

**theory** [27] - 58:12, 58:13, 62:19, 63:6, 65:11, 66:21, 66:22, 91:10, 93:2, 94:25, 95:6, 97:14, 98:5, 99:18, 102:21, 109:25, 110:2, 110:4, 114:17, 114:19, 115:22, 117:13, 118:17, 118:21, 120:2, 136:11

**therapy** [1] - 35:24

**thereafter** [1] - 85:5

**therefore** [5] - 33:20, 34:1, 58:15, 72:13, 128:5

**They've** [1] - 61:23

**they've** [7] - 28:5, 29:6, 52:2, 65:18, 79:5, 135:22

**thin** [2] - 120:5

**thinking** [2] - 59:4, 118:10

**Third** [2] - 63:22, 92:17

**third** [7] - 71:15, 82:14, 85:1, 116:24, 117:1, 124:7, 137:4

**third-party** [1] - 85:1

**Thirteen** [1] - 7:21

**Thomas** [1] - 2:10

**thoughtful** [1] - 93:19

**thousands** [1] - 93:10

**threaten** [1] - 94:14

**Three** [1] - 6:5

**three** [25] - 6:12, 7:13, 7:25, 8:1, 8:11, 14:6, 29:15, 35:1, 40:3, 44:15, 50:13, 78:17, 79:22, 81:16, 99:25, 102:3, 103:2, 133:4, 139:11, 140:22, 144:19, 152:19, 152:20, 153:5

**three-digit** [2] - 29:15, 103:2

**threshold** [12] - 44:23, 44:25, 46:3, 46:15, 51:20, 52:13, 52:21, 67:22, 67:24, 108:13, 108:16, 108:20

**thresholds** [4] - 45:8, 45:9, 45:23, 46:1

**throughout** [4] - 13:5, 24:11, 138:11, 139:11

**throw** [2] - 63:8, 135:19

**tick** [1] - 136:3

**tie** [1] - 11:6

**tied** [3] - 11:21, 14:10, 121:13

**ties** [1] - 110:23

**tight** [1] - 19:22

**Tim** [1] - 15:18

**timeline** [4] - 16:18, 17:15, 22:24, 27:20

**TIMOTHY** [1] - 5:9

**tiny** [1] - 67:2

**tobacco** [1] - 119:15

**today** [19] - 15:17, 25:25, 54:16, 75:14, 75:24, 89:9, 89:12, 114:11, 123:1, 123:5, 124:2, 133:22, 141:20, 143:3, 144:19, 145:7, 152:19, 153:4, 153:5

**today's** [2] - 113:14

**Todd** [1] - 46:17

**together** [5] - 10:2, 47:17, 75:8, 80:19, 89:3

**took** [5] - 24:4, 44:12, 49:4, 106:1, 115:7

**tool** [1] - 17:17

**top** [2] - 33:2, 149:13

**topic** [3] - 43:20, 112:4, 120:16

**toppled** [1] - 140:1

**tort** [7] - 81:2, 84:21, 94:11, 122:12, 124:20, 125:6, 137:21

**tortfeasors** [1] - 85:19

**Torts** [1] - 92:18

**total** [7] - 7:20, 34:7, 34:9, 37:10, 69:15, 123:2, 125:11

**totally** [1] - 11:6, 139:21

**touch** [2] - 46:7,

127:24

**toward** [2] - 42:14, 114:5

**towards** [1] - 23:18

**Tower** [2] - 3:4, 4:23

**town** [2] - 140:20, 148:4

**track** [1] - 52:22

**tracked** [1] - 16:16

**trade** [1] - 115:16

**trafficked** [1] - 101:23

**traffickers** [3] - 61:17, 62:10, 116:4

**trafficking** [1] - 98:23

**tragic** [1] - 152:6

**training** [1] - 132:10

**transcript** [2] - 6:19, 154:2

**transition** [4] - 43:8, 63:18, 64:4, 119:24

**translate** [1] - 24:2

**translated** [1] - 151:15

**treat** [14] - 9:11, 15:12, 17:3, 17:21, 18:19, 21:4, 24:23, 25:18, 71:12, 83:23, 88:17, 95:3, 95:7, 137:15

**treated** [5] - 17:1, 19:3, 25:4, 25:17, 153:18

**treating** [7] - 19:4, 20:11, 20:12, 88:11, 88:16, 89:8, 89:12

**treatment** [39] - 17:21, 18:17, 18:21, 20:12, 20:23, 35:20, 68:21, 80:1, 87:8, 93:6, 116:18, 118:1, 120:21, 120:23, 121:2, 121:5, 121:16, 123:9, 123:10, 123:12, 123:17, 123:19, 123:24, 124:13, 125:19, 126:2, 126:4, 126:16, 127:10, 127:12, 127:15, 127:16, 127:19, 127:25, 128:5, 128:9, 129:14, 137:9

**treatments** [1] - 81:15

**tremendous** [1] - 130:2

**trend** [6] - 15:24, 15:25, 27:25, 28:1, 33:14, 65:5

**trial** [27] - 7:18, 8:24, 10:19, 11:3, 11:12, 12:20, 13:5, 15:8,

18:9, 22:7, 24:11, 27:22, 29:11, 29:24, 31:4, 42:14, 43:1, 44:3, 47:2, 51:24, 53:7, 53:15, 58:9, 58:11, 127:13, 129:12, 138:11

**TRIAL** [1] - 1:16

**Trial** [1] - 153:22

**tried** [4] - 11:6, 51:10, 52:2, 62:18

**trigger** [1] - 146:9

**triggered** [2] - 106:4, 146:10

**trouble** [2] - 20:16, 20:18

**trucks** [1] - 144:1

**true** [5] - 32:6, 36:9, 91:18, 128:24, 144:22

**truly** [1] - 152:4

**trust** [3] - 124:4, 124:19, 134:15

**try** [3] - 50:1, 117:5, 145:3

**trying** [4] - 24:22, 27:7, 139:8, 146:17

**turn** [12] - 29:24, 72:9, 72:14, 77:14, 91:6, 95:14, 102:16, 111:19, 112:20, 112:21, 120:16, 149:20

**turned** [2] - 130:4, 149:19

**turning** [1] - 61:13

**Twelfth** [3] - 4:19, 4:21, 5:5

**twenty** [1] - 100:22

**twenty-sixth** [1] - 100:22

**twice** [2] - 144:15, 144:17

**two** [35] - 8:6, 10:1, 14:15, 14:16, 14:17, 15:1, 15:17, 19:12, 20:1, 23:5, 30:18, 34:25, 48:13, 49:5, 53:5, 55:3, 70:20, 73:14, 80:19, 81:1, 85:10, 86:14, 88:14, 96:19, 98:12, 108:17, 109:7, 132:1, 132:4, 133:3, 136:9, 139:23, 152:19, 153:4

**two-word** [1] - 53:5

**type** [6] - 18:24, 52:14, 52:17, 53:1, 54:21, 146:8

**types** [3] - 47:14, 53:1, 53:2

**typically** [1] - 132:9

---

**U**

---

**ultimately** [14] - 12:3, 14:10, 16:5, 17:15, 18:2, 24:8, 36:1, 46:24, 47:8, 54:13, 58:17, 59:6, 59:18, 147:5

**unaware** [1] - 131:25

**uncertain** [2] - 119:24, 123:21

**uncontroverted** [2] - 9:8, 89:13

**undefined** [1] - 94:12

**under** [31] - 17:21, 18:17, 19:3, 20:11, 20:12, 25:17, 40:10, 49:21, 52:25, 54:11, 63:3, 77:11, 81:2, 81:11, 82:22, 84:10, 84:18, 86:11, 89:18, 89:21, 90:1, 91:8, 116:21, 117:11, 117:13, 118:15, 120:15, 137:10, 137:13, 140:18, 149:16

**under-treated** [2] - 19:3, 25:17

**under-treating** [2] - 20:11, 20:12

**under-treatment** [2] - 17:21, 18:17

**underlined** [1] - 100:16

**underlying** [1] - 16:3

**undermine** [1] - 132:13

**undermines** [2] - 109:14, 130:16

**underscore** [2] - 87:5, 110:2

**understood** [1] - 41:6

**undertake** [1] - 129:23

**underway** [2] - 128:20, 130:8

**undisputed** [4] - 12:6, 73:18, 80:20, 80:21

**unduly** [1] - 116:22

**unexplained** [1] - 53:4

**Unfortunately** [2] - 60:18

**unfortunately** [2] - 36:5, 39:11

**unilaterally** [1] - 27:8

**uninterrupted** [1] -

90:8
**unique** [1] - 92:11
**Unit** [1] - 114:4
**United** [17] - 7:2, 18:18, 31:18, 68:11, 87:20, 87:24, 88:8, 104:5, 140:6, 140:9, 141:3, 141:14, 141:21, 142:10, 142:12, 143:5, 149:25
**UNITED** [2] - 1:1, 1:17
**University** [2] - 15:20, 74:24
**unlawful** [1] - 95:23
**unless** [2] - 81:14, 109:19
**unlike** [1] - 102:14
**unmet** [1] - 134:12
**unmoored** [1] - 124:19
**unnecessarily** [1] - 81:15
**unpack** [1] - 29:10
**unpleasant** [1] - 153:14
**unrealistic** [1] - 127:23
**unreasonable** [17] - 7:16, 11:16, 12:3, 12:22, 12:24, 13:7, 13:9, 38:7, 48:12, 88:2, 88:5, 89:24, 103:6, 122:23, 136:2, 136:4, 137:14
**unreasonableness** [2] - 49:16, 69:14
**unreasonably** [1] - 54:22
**unreliability** [2] - 132:16, 132:20
**unreliable** [4] - 125:11, 128:2, 130:19, 132:14
**unseen** [1] - 115:10
**unsound** [1] - 132:15
**unspecified** [1] - 126:3
**unstable** [1] - 123:21
**unsupported** [4] - 11:6, 49:15, 70:15, 136:1
**unused** [9] - 77:20, 77:24, 78:6, 78:8, 78:14, 78:22, 79:24, 125:5, 134:7
**unusual** [7] - 103:16, 103:21, 144:5, 145:10, 145:11, 145:12, 147:4

**unusually** [2] - 35:22, 37:23
**unworkable** [1] - 95:10
**up** [57] - 8:12, 9:25, 13:25, 14:4, 14:9, 14:12, 16:2, 17:12, 22:4, 22:23, 27:20, 27:24, 30:6, 30:19, 30:21, 31:1, 33:2, 33:15, 37:12, 43:19, 45:8, 45:16, 46:24, 47:11, 50:15, 50:17, 50:19, 53:13, 57:25, 58:1, 60:14, 66:19, 73:17, 74:7, 85:16, 97:9, 97:20, 102:11, 107:16, 111:13, 116:23, 118:19, 119:19, 123:19, 125:24, 126:1, 126:7, 126:16, 126:23, 138:17, 141:22, 147:11, 147:20, 148:2, 149:13, 149:14
**up-to-date** [1] - 45:16
**updated** [1] - 45:21
**Upper** [2] - 148:24, 148:25
**upper** [1] - 59:1
**ups** [1] - 130:24
**upside** [1] - 91:6
**upstairs** [1] - 142:1
**upstream** [1] - 28:21
**urged** [3] - 25:18, 88:10, 88:12
**urges** [1] - 21:24
**users** [4] - 11:11, 63:12, 63:25, 118:22, 119:2, 119:6, 119:9, 119:13
**uses** [3] - 61:5, 80:15, 91:13
**usual** [1] - 31:19
**utter** [2] - 106:7, 128:19
**utterly** [2] - 61:21, 126:17

**V**

**V.A** [3] - 17:2, 17:16, 36:16
**VA** [17] - 96:5, 96:7, 96:8, 96:10, 96:12, 96:14, 96:17, 96:20, 97:3, 97:13, 97:15, 97:18, 98:2, 98:4
**vague** [1] - 103:14

**value** [1] - 77:25
**valve** [5] - 146:9, 146:10, 149:17, 150:1
**vantage** [1] - 28:16
**variables** [4] - 130:23, 131:5, 131:9, 131:14
**variety** [3] - 46:10, 53:3, 63:25
**various** [3] - 47:14, 116:24, 130:8
**vary** [1] - 103:19
**vast** [11] - 22:19, 31:23, 32:11, 63:19, 67:14, 68:15, 76:16, 81:18, 122:25, 123:13, 123:19
**vastly** [1] - 113:5
**vehicle** [1] - 93:15
**Ventura** [1] - 3:15
**verbatim** [1] - 145:25
**verdict** [2] - 72:18, 98:9
**version** [3] - 126:4, 126:11, 151:11
**versus** [1] - 128:6
**via** [1] - 67:4
**Video** [1] - 42:5
**video** [2] - 14:19, 41:22
**view** [7] - 10:19, 11:1, 26:7, 49:10, 57:24, 81:24, 94:23
**viewed** [3] - 42:1, 42:3, 42:10
**views** [1] - 51:5
**violation** [2] - 93:24, 144:13
**Virginia** [81] - 4:24, 7:3, 7:4, 12:14, 15:20, 15:25, 16:8, 18:24, 19:1, 19:10, 20:2, 20:3, 20:17, 21:3, 21:4, 21:23, 22:1, 22:4, 22:5, 22:25, 23:2, 23:17, 23:24, 24:3, 24:4, 24:5, 27:21, 29:20, 32:19, 33:1, 33:7, 33:11, 33:16, 33:24, 34:6, 34:9, 34:15, 34:21, 35:3, 35:16, 35:22, 37:14, 37:18, 48:10, 54:18, 57:17, 62:2, 68:12, 69:13, 73:24, 81:2, 81:11, 84:8, 84:10, 84:18, 84:21, 84:22, 84:24, 85:14, 85:17, 85:23, 88:15, 88:18, 88:20,

88:22, 89:18, 100:13, 110:14, 110:22, 117:8, 117:11, 118:3, 118:5, 123:16, 137:25, 144:4, 148:5, 148:22, 150:18
**VIRGINIA** [2] - 1:1, 1:18
**Virginia's** [2] - 34:19, 110:20
**Virginian** [2] - 34:12, 74:17
**Virginians** [1] - 35:6
**virtually** [4] - 31:7, 91:17, 135:10, 135:15
**visit** [2] - 53:21, 53:24
**visited** [1] - 98:16
**visits** [3] - 45:4, 47:24, 53:20
**vital** [12] - 17:1, 17:16, 17:25, 18:11, 24:17, 25:20, 59:22, 60:23, 83:5, 83:20, 90:7, 95:4
**Volume** [1] - 47:18
**VOLUME** [1] - 1:16
**volume** [65] - 9:5, 9:6, 9:9, 10:21, 13:3, 13:4, 13:6, 13:11, 13:12, 13:14, 29:6, 29:8, 29:14, 29:21, 29:25, 32:14, 32:15, 36:17, 37:12, 38:6, 38:8, 52:20, 58:14, 58:20, 58:24, 58:25, 70:21, 71:7, 73:3, 73:7, 73:20, 74:2, 74:9, 75:9, 78:11, 80:21, 87:22, 88:1, 88:4, 88:5, 88:7, 98:3, 98:5, 99:20, 101:17, 101:20, 101:22, 102:4, 111:6, 111:11, 111:17, 112:25, 113:11, 114:20, 121:11, 121:14, 140:5, 140:7, 142:17, 144:5, 149:15, 149:18, 150:11
**volumes** [10] - 99:16, 102:8, 102:9, 102:25, 113:5, 113:7, 113:17, 113:21, 136:10
**vs** [1] - 154:4

**W**

**wait** [3] - 14:21, 141:12, 153:20
**waiting** [2] - 46:22, 129:22
**waived** [2] - 121:3, 128:11, 135:12
**WAKEFIELD** [1] - 5:13
**walk** [3] - 16:18, 66:19, 66:20
**walking** [2] - 151:9, 151:17
**Waller** [3] - 25:1, 32:1, 64:11
**wants** [1] - 70:4
**warned** [1] - 144:14
**warnings** [2] - 87:9, 87:12
**warranted** [1] - 81:17
**Washington** [8] - 4:7, 4:10, 4:19, 4:21, 5:5, 5:12, 48:19, 131:3
**watch** [4] - 22:11, 148:13, 148:14, 150:15
**watched** [1] - 149:1
**watching** [1] - 149:23
**water** [9] - 98:6, 148:16, 149:1, 149:7, 149:8, 149:14, 149:15, 149:18, 150:3
**waters** [1] - 148:6
**ways** [2] - 46:11, 112:9
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**website** [1] - 29:14
**week** [3] - 45:20, 46:5, 128:22
**weekend** [2] - 55:13, 78:11
**weeks** [7] - 42:14, 42:25, 83:6, 152:19, 153:4, 153:5, 153:14
**weigh** [3] - 91:19, 91:20, 95:2
**weighing** [1] - 138:2
**weight** [1] - 151:12
**well-developed** [1] - 92:13
**Werthammer** [3] - 24:15, 24:17, 60:16
**West** [85] - 7:3, 7:4, 12:14, 15:20, 15:25, 16:8, 18:24, 19:1, 19:9, 20:2, 20:3, 20:17, 21:3, 21:23, 22:1, 22:4, 22:5,

22:25, 23:2, 23:17, 23:24, 24:3, 24:4, 24:5, 27:21, 29:20, 32:19, 33:1, 33:7, 33:11, 33:16, 33:24, 34:6, 34:9, 34:12, 34:15, 34:19, 34:21, 35:3, 35:6, 35:16, 35:22, 37:13, 37:18, 48:10, 54:18, 57:17, 62:2, 68:12, 69:13, 73:24, 74:16, 81:2, 81:11, 84:8, 84:10, 84:18, 84:21, 84:22, 84:24, 85:13, 85:16, 85:23, 88:15, 88:18, 88:20, 88:22, 89:18, 100:12, 110:14, 110:19, 110:21, 117:8, 117:11, 118:3, 118:5, 123:16, 137:25, 144:4, 148:5, 148:22, 150:18
**WEST** [2] - 1:1, 1:18
**whatsoever** [1] - 38:5
**wheeled** [1] - 16:5
**Wheeling** [2] - 12:14, 48:22
**whole** [1] - 120:9
**wholesale** [1] - 140:16
**wholesaler** [4] - 140:8, 140:25, 141:1, 141:12
**whoops** [1] - 132:18
**WICHT** [1] - 4:18
**Wicht** [1] - 30:10
**wide** [3] - 63:25, 94:3, 108:4
**wieldy** [1] - 145:15
**wife** [1] - 148:2
**Williams** [11] - 4:18, 5:4, 18:9, 32:10, 36:4, 36:8, 59:14, 76:15, 115:4, 130:10, 134:1
**window** [2] - 126:14, 127:1
**wiped** [1] - 151:3
**witness** [15] - 11:8, 11:12, 24:15, 25:2, 26:15, 31:20, 31:22, 31:23, 46:24, 54:10, 76:22, 107:24, 129:12, 150:21
**witnesses** [14] - 7:11, 7:20, 7:21, 7:22, 7:25, 8:1, 8:9, 13:1, 13:3, 15:8, 24:13, 32:5, 104:11

**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**woman** [1] - 45:18
**wonderful** [1] - 38:15
**word** [9] - 7:24, 21:7, 38:3, 53:5, 59:15, 61:22, 139:14, 151:16, 151:18
**words** [4] - 78:20, 80:3, 86:2, 97:25
**work-related** [1] - 35:8
**Workers'** [1] - 35:18
**works** [2] - 130:24, 153:9
**world** [2] - 50:16, 127:12
**worst** [2] - 36:5, 37:21
**worth** [1] - 59:4
**Wright** [1] - 42:9
**write** [8] - 15:5, 22:8, 59:1, 74:14, 78:17, 79:19, 110:5, 130:24
**write-ups** [1] - 130:24
**writes** [1] - 109:19
**writing** [3] - 74:3, 79:21, 143:17
**written** [13] - 12:9, 14:5, 31:2, 55:18, 56:7, 65:18, 69:10, 69:11, 90:13, 110:5, 141:4, 150:8, 151:14
**wrongdoing** [8] - 9:7, 72:17, 100:3, 100:25, 101:10, 104:23, 144:17, 144:18
**wrongful** [3] - 33:19, 81:6, 86:1
**wrote** [7] - 9:12, 15:6, 20:21, 37:11, 53:7, 60:19, 60:22
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10, 3:13, 4:24, 5:15, 6:9

**Y**

**year** [22] - 9:15, 10:15, 19:9, 20:20, 23:2, 23:24, 28:2, 28:5, 28:24, 34:13, 34:14, 53:22, 53:23, 57:7, 66:9, 86:24, 127:5, 141:23
**years** [24] - 13:25, 23:16, 25:14, 28:10, 54:5, 61:14, 65:17, 99:1, 99:9, 106:24, 107:4, 109:7, 113:12, 115:17,

121:20, 121:22, 121:25, 126:5, 126:17, 132:24, 133:2, 133:3, 133:4, 152:3
**yesterday** [25] - 10:3, 11:12, 13:5, 13:16, 26:23, 30:4, 30:17, 41:15, 45:25, 51:11, 51:25, 53:10, 55:15, 57:22, 62:1, 66:6, 72:18, 73:5, 82:25, 88:1, 96:2, 116:9, 120:25, 128:3
**Yingling** [4] - 25:15, 32:7, 36:10, 36:14
**York** [2] - 3:5, 51:7
**Young** [1] - 129:1

**Z**

**Zerkle** [3] - 114:2, 114:24, 130:3
**zero** [1] - 74:16
**zip** [2] - 29:15, 103:2