Plaintiffs' Cross-Notice of Remote Deposition
and Non-Retained Expert Witness Disclosure of
Dr. Rahul Gupta

# Exhibit 2

Gupta Deposition
September 11, 2020

Page 1

1        IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2
3
   * * * * * * * * * * * * * * * * * * * * * *
4
   THE CITY OF HUNTINGTON,
5
             Plaintiff,
6
   vs.                              CIVIL ACTION
7                                NO. 3:17-01362
   AMERISOURCEBERGEN DRUG
8  CORPORATION, et al.,
9            Defendants.
10 _____
11 CABELL COUNTY COMMISSION,
12           Plaintiff,
13 vs.                              CIVIL ACTION
                                 NO. 3:17-01665
14 AMERISOURCEBERGEN DRUG
   CORPORATION, et al.,
15
             Defendants.
16
   * * * * * * * * * * * * * * * * * * * * * *
17
18
19        Videotaped and videoconference deposition
   of RAHUL GUPTA, M.D., taken by the Defendants under
20 the Federal Rules of Civil Procedure in the above-
   entitled action, pursuant to notice, before Teresa
21 S. Evans, a Registered Merit Reporter, all parties
   located remotely, on the 11th day of September,
22 2020.
23
24

```
                                               Page 2

 1                        APPEARANCES:
 2
     APPEARING FOR THE PLAINTIFFS:
 3
             Anne McGinness Kearse, Esquire
 4           Monique Christenson, Esquire
             MOTLEY RICE
 5           28 Bridgeside Boulevard
             Mt. Pleasant, SC  29464
 6
             Paul T. Farrell, Jr., Esquire
 7           FARRELL LAW
             422 Ninth Street
 8           3rd Floor
             Huntington, WV  25714-1180
 9
10   APPEARING FOR THE DEFENDANT CARDINAL HEALTH:
11            Jyoti Jindal, Esquire
             WILLIAMS & CONNOLLY
12           725 Twelfth Street, N.W.
             Washington, DC 20005
13
             Steven R. Ruby, Esquire
14            David R. Pogue, Esquire
              CAREY, DOUGLAS, KESSLER & RUBY
15            901 Chase Tower
              707 Virginia Street, East
16            Charleston, WV  25323
17
     APPEARING FOR THE DEFENDANT McKESSON CORPORATION:
18
             James A. Goold, Esquire
19           Nicole Antione, Esquire
             COVINGTON & BURLING
20           One City Center
             850 Tenth Street NW
21           Washington, DC  20001
22
23
24
```

Page 3

1                    APPEARANCES (Contd.)

2

   APPEARING FOR THE DEPONENT:

3

            Mark Colantonio, Esquire

4           Robert Fitzsimmons, Esquire

            FITZSIMMONS LAW FIRM

5           1609 Warwood Avenue

            Wheeling, WV  26003

6

7  ALSO PRESENT:

8             Adam Hager, Videographer

              Hunter Shkolnik, Esquire

9             Lauren Mahaney, Esquire

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1                EXAMINATION INDEX

2

3        BY MS. JINDAL                        9

         BY MR. COLANTONIO                  115

4        BY MS. KEARSE                      181

         BY MS. JINDAL                      188

5        BY MR. GOOLD                              328

         BY MS. JINDAL                      338

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 5

1                    EXHIBIT INDEX
2
3    Exhibit 1   Deposition transcript of Dr.        12
                 Gupta dated 8-16-16, State of WV
4                ex rel v. AmerisourceBergen, et
                 al., Circuit Court of Boone
5                County, WV, Civil Action No,
                 12-C-141
6
     Exhibit 4   E-mail from Haddy to Haddy and      299
7                others Re: WV HAN #128 Novel
                 Opiates dated 12-13-16 with
8                "Health Advisory #128 Novel
                 Opiates" attached
9
     Exhibit 5   E-mail from Massey to Kilkenney     295
10               Re: MMWR dated 5-27-17 with
                 "Public Health Investigation of
11               an Opioid Overdose Outbreak -
                 West Virginia, August 2016"
12               attached
13   Exhibit 14  E-mail from Gupta to Mock and       308
                 Taylor Re: Presentation dated
14               4-4-17 and E-mail from Richman
                 to Boggs Re: April 4th - MCMS
15               dated 3-29-17
                 (DHHR_FEDWV_0038760)
16
     Exhibit 15  "2017 Legislation and Substance     308
17               Use Disorder Epidemic: West
                 Virginia's Call to Action" by
18               Gupta dated 4-4-17
                 (DHHR_FEDWV_0038761)
19
     Exhibit 16  E-mail from Christy to Wagoner      303
20               and others Re: GUPTA DATA NEEDS
                 UPDATED - Social Worker
21               Conference (next week) dated
                 4-21-17 (DHHR_FEDWV_0047102)
22
     Exhibit 17  "West Virginia's Contemporary       303
23               Public Health Challenge: Drug
                 Overdose Deaths" by Gupta dated
24               4-29-17

Page 6

1              EXHIBIT INDEX (Contd.)
2

   Exhibit 20 E-mail chain between Gupta and      339
3              others Re: MEDIA REQUEST = Fatal
               overdose victims by county and
4              where they were from dated
               9-27-17 to 9-29-17
5

   Exhibit 37 E-mail chain between Melton,        246
6              Gupta and others Re: Overdose
               Death Investigations dated
7              3-26&27-18 with 2016 West
               Virginia Overdose Fatality
8              Analysis attached
               (DHHR_FEDWV_0317258-322)
9

   Exhibit 38 Gupta testimony before the House    254
10             Oversight and Government Reform
               Committee entitled "A
11             Sustainable Solution to the
               Evolving Opioid Crisis:
12             Revitalizing the Office of
               National Drug Control Policy"
13             dated 5-17-18
               (DHHR_FEDWV_0391628-651)
14

   Exhibit 45 E-mail from Dora to Gupta and       313
15             others Re: 2018.07.05 Final
               packet mailed to Judges re MAT
16             dated 7-5-18
               (DHHR_FEDWV_1148108-126)
17

   Exhibit 51 Resume of Rahul Gupta, MD, MPH,      60
18             MBA, FACP
               (WVSMA_FEDWV_00039036-091)
19

   Exhibit 54 "State of Health" presentation       99
20             by Rahul Gupta, MD, MPH, MBA,
               FACP dated 10-26-18
21             (CT2_RGupta000919-966)
22   Exhibit 56 "Notice of Plaintiffs'              23
               Preliminary Witness List," U.S.
23             Dist. Ct. Case No. 3:17-01362
               filed 6-3-20
24

```
 1              P R O C E E D I N G S
 2              VIDEO OPERATOR:  Good morning.  We are
 3   going on the record at 9:04 a.m. on September the
 4   11th, 2020.  Please note that microphones are
 5   sensitive and may pick up whispering, private
 6   conversations and cellular interference.  Please
 7   turn off all cell phones or place them away from
 8   the microphones as they can interfere with the
 9   deposition audio.
10              Audio and video recording will continue
11   to take place unless all parties agree to go off
12   the record.
13              This is Media Unit 1 of the video
14   recorded deposition of Rahul Gupta, M.D., taken by
15   counsel for the Defendants in the matter of City of
16   Huntington and Cabell County Commission versus
17   AmerisourceBergen Drug Corporation, et al, filed in
18   the United States District Court for the Southern
19   District of West Virginia, being Civil Action Nos.
20   3:17-01362 and 3:17-01665.
21              This deposition is being conducted
22   remotely via Zoom conferencing.  My name is Adam
23   Hager from the firm Veritext and I'm the
24   videographer.  The court reporter is Teresa Evans
```

Page 8

1    from the firm Veritext.

2              I am not authorized to administer an

3    oath; I'm not related to any party in this action;

4    nor am I financially interested in the outcome.

5              Counsel and all present in the room and

6    everyone attending remotely will now state their

7    appearances and affiliations for the record.

8              If there are any objections to

9    proceeding, please state them at the time of your

10   appearance, beginning with the noticing attorney.

11             MS. JINDAL:  Jyoti Jindal with

12   Williams & Connolly on behalf of Cardinal Health.

13             MR. RUBY:  And Steve Ruby and David

14   Pogue also for Cardinal Health.

15             MR. GOOLD:  James Goold, Covington

16   & Burling and Nicole Antonine from Covington

17   & Burling for McKesson Corp.

18             MR. FARRELL:  Paul Farrell, Jr. and

19   Anne Kearse for Plaintiffs.

20             MR. COLANTONIO:  Mark Colantonio, Bob

21   Fitzsimmons representing Doctor Gupta for purposes

22   of this deposition.

23             VIDEO OPERATOR:  If there are no

24   further appearances to be noted, would the court

Page 9

1    reporter please swear the witness?

2                    (The witness was sworn.)

3              VIDEO OPERATOR:  Please begin.

4              R A H U L   G U P T A , M. D.

5    was called as a witness by the Defendant, and

6    having been first duly sworn, testified as follows:

7                         EXAMINATION

8    BY MS. JINDAL:

9       Q.   Good morning, Doctor Gupta.  We met just a

10   little bit ago, but I'm going to introduce myself

11   again right now.  I am Jyoti Jindal and I am the

12   attorney for Cardinal Health, one of the defendants

13   in this lawsuit.

14             I understand that you are former State

15   Health Officer and Commissioner of the Bureau of

16   Public Health in West Virginia.

17             Before we get into your work for those

18   roles, I have a few preliminary questions.  Have

19   you ever testified under oath before?

20      A.   Yes.

21      Q.   How many times?

22      A.   I would say one time that I can recollect

23   in the last three years or so.  Prior to that, I

24   may have two to four times or two or three times.

Page 10

1   I do not have specific recollection.

2        Q.   And in the last -- before we get into the

3   most recent time you testified, those previous

4   times, was that at trial?

5        A.   Previous was a deposition.

6        Q.   Uh-huh.  The two to four times that you

7   mentioned before the most recent time, were those

8   at trial?

9        A.   They were depositions, and there was one

10   trial also.

11        Q.   Okay.  And was -- do you recall the nature

12   of those cases?

13        A.   The ones that I can recall right now

14   included my deposition in the Attorney General of

15   West Virginia versus AmerisourceBergen.  There was

16   one of plaintiffs against West Virginia-American

17   Water.

18             There was one that I was deposed for --

19   I believe it was related to Bayer a while back,

20   it's difficult to recognize -- remember.

21             And then there was maybe one or two

22   that would have related more of -- one, of a

23   personal nature, related to my spouse.

24        Q.   I see.  Of the ones that you mentioned

Page 11

1  regarding Bayer, what was the nature of your

2  testimony in that case, if you recall?  Just at a

3  high level.

4       A.   Public health.

5       Q.   Okay.  And was that also the case with the

6  water case that you mentioned?

7       A.   It was related to the 2014 West Virginia

8  water crisis.

9       Q.   Okay.  And were -- in both of those cases,

10 were you testifying on behalf of the plaintiffs or

11 defendants or neither party?

12      A.   Plaintiffs.

13      Q.   Were you an expert in those cases?

14      A.   I believe not.  Although in the West

15 Virginia water crisis, I was the local health

16 officer in charge of that, so I would not be clear

17 -- I would not be sure at this point whether I was

18 testifying on behalf of the plaintiffs or actually

19 I believe to be that my testimony was based on my

20 knowledge and dealings during the crisis more so

21 than being on behalf of one side or the other.

22      Q.   Uh-huh.  And you say you also testified in

23 the West Virginia case against AmerisourceBergen.

24 Was that in 2016, sir?

Page 12

1        A.    I believe so.

2        Q.    Okay.   Could you please open Exhibit 1?

3              GUPTA DEPOSITION EXHIBIT NO. 1

4                   (Deposition transcript of Dr. Gupta

5                   dated 8-16-16, State of WV ex rel v.

6                   AmerisourceBergen, et al., Circuit

7                   Court of Boone County, WV, Civil

8                   Action No, 12-C-141 was marked for

9                   identification purposes as Gupta

10                  Deposition Exhibit No. 1.

11                  MR. COLANTONIO:   Okay, go ahead.

12       Q.    Doctor Gupta, is this a transcript of your

13   2016 testimony in the West Virginia versus

14   AmerisourceBergen case?

15       A.    I can go through it.

16                  MR. COLANTONIO:   While the doctor is

17   going through that, I just want to note for the

18   record that this copy of the deposition does not

19   have a signed errata sheet, so I'm not sure if that

20   was ever done, but this one that's being offered is

21   not signed.

22       A.    So this seems in testimony familiar to --

23   and the time frame is familiar to my deposition.

24   However, I have not read through this deposition so

Page 13

1  I cannot ascertain to the validity of my responses

2  as of right now.

3     Q.   Sure.  I'm not asking you to determine the

4  validity of your responses, but do you have any

5  reason to doubt that it is not a true and accurate

6  copy of your testimony in that case?

7     A.   I do not believe I have had a chance to

8  review and correct any errors, so I would not be

9  able to provide that opinion at this time.

10    Q.   Okay.  All right.  You can go ahead and set

11 Exhibit 1 aside for now.

12         Do you -- so because you've testified

13 under oath before, I under -- I would expect that

14 you understand what that means.  Correct?

15    A.   Yes.

16    Q.   And so you know that it's the same oath

17 that you'd give if we were in a courtroom in front

18 of a judge?

19    A.   Yes.

20    Q.   And my questions today are about what you

21 know to the best of your ability, not about what

22 your lawyers know.  So -- or what they've told you.

23 And is there any reason why you may not be able to

24 testify accurately and fully today?

Page 14

1      A.   Not to my knowledge.

2      Q.   I'm going to do my best to make my

3   questions clear and presentable -- I'm sorry,

4   understandable.  Off to a great start here.

5           So if you ever need clarification or

6   you want me to rephrase my question, just let me

7   know.  Okay?

8      A.   Yes.

9      Q.   And as your lawyers may have already told

10  you, it's important that only one of us speak at a

11  time so that the court reporter can keep track of

12  everything.  I'll do my best not to start my next

13  question until you finish your answer, and please

14  just -- I ask that you wait until I finish my

15  question before you begin your answer.

16          Can we agree to do that?

17     A.   Yes.

18     Q.   And if I make a mistake in that regard and

19  cut you off, just let me know and we'll fix that.

20     A.   Understand.

21     Q.   You received a sealed box prior to the

22  start of this deposition.  Correct?

23          MR. COLANTONIO:  Well, the -- this is

24  --

Page 15

1      Q.   Your lawyer --

2           MR. COLANTONIO:   The attorneys

3   received -- his attorneys received a sealed box,

4   and we delivered them to the doctor here today.

5           MS. JINDAL:   Okay.

6      Q.   And that box, as you've already become

7   aware, contains documents that we're going to

8   review today.  Pursuant to the deposition protocol

9   in this case, you and your lawyer may not review

10  any of those documents until I ask you to do so.

11  Do you understand?

12     A.   Understood.

13     Q.   Doctor Gupta, what did you do to prepare

14  for this deposition?

15     A.   I had spoken to my attorneys to understand

16  what the deposition would be about.

17           I was also able to - on the request -

18  provide documentations that were requested in the

19  subpoena, so in that process, I was able to seek,

20  find, review and provide, including providing the

21  technological - including scanning, and copying and

22  other measures - to be able to provide that to you

23  and to my attorneys.

24     Q.   Thank you, Doctor.  You said you've met

1   with your attorneys -- I'm sorry, you said you

2   spoke to your attorneys.  How many times did you

3   speak to them?

4        A.   I spoke to my attorneys yesterday, and

5   there may have been a few other times for very

6   brief chats, for questions I may have had in the

7   past as well.

8        Q.   And who were those attorneys?

9        A.   That's Mark Colantonio, and yesterday I was

10  able to also speak with Bob Fitzsimmons.

11       Q.   Anyone else?

12       A.   No.

13       Q.   You said you met with them for a few short

14  times previously.  How long did you meet with them

15  yesterday?

16       A.   So I met with them yesterday for, I would

17  say, about approximately five to six hours, and

18  prior to that, I did not meet with them.  I had

19  brief phone calls.  And that was with Mark.

20       Q.   And approximately how long did those phone

21  calls last?

22       A.   They could last anywhere between five

23  seconds to 15 minutes, and that's a range.

24       Q.   And other than Mr. Colantonio and

1    Mr. Fitzsimmons, did you have any conversations

2    with the lawyers for either Cabell County or the

3    City of Huntington in this case?

4         A.   I did not.  However, I would like to

5    qualify that with the fact that I do recollect

6    receiving e-mails for contact -- this was a while

7    back, so I do not exactly know the time/dates.

8         Q.   Do you recall what those e-mails were

9    about?

10        A.   Some would be about establishing or

11   attempting to establish contact.

12        Q.   Did you respond to those e-mails?

13        A.   I may have on an occasion provided a

14   courteous response, but there was no - that I can

15   remember - conversations that continued beyond

16   that.

17        Q.   Okay.  And in your meeting yesterday with

18   Mr. Colantonio and Mr. Fitzsimmons, what did you do

19   to prepare?

20             MR. COLANTONIO:  Let me just object.

21   I think that that goes beyond the scope of what's

22   permissible and gets into attorney/client

23   privileged information, so unless you would give me

24   a good reason why he should answer, I'm going to

Page 18

1    instruct him not to answer.

2              MS. JINDAL:  Let me rephrase my

3    question.

4         Q.   During your preparation yesterday -- or

5    your meeting yesterday, did you review any

6    documents?

7         A.   No.

8         Q.   Have you read the Complaint in this case?

9         A.   I have not.

10        Q.   Do you know what the Complaint is?  I just

11   want to make sure you understand that question

12   fully.

13        A.   I understand broadly based on my prior

14   experience with depositions and being the

15   Commissioner as well as public reports what that

16   would be.  However, I've had not had an opportunity

17   to specifically read this particular Complaint.

18        Q.   Aside from your time with your attorney

19   yesterday, did you review any documents on your own

20   in preparing for this deposition?

21             MR. COLANTONIO:  Just to be clear, I

22   think he's already testified when the assimilated

23   documents, he had a chance to review the things

24   that we sent you all.  So I just wanted to make

Page 19

1   sure that -- he's already said that.

2            MS. JINDAL:   Right.   And I'm sorry, I

3   understood that as to be a review for

4   responsiveness and to satisfy -- you know, in

5   response to a subpoena.

6            I'm asking whether he reviewed any

7   documents specifically in preparation for this

8   deposition today.

9        A.   I will answer it as this:   I reviewed the

10   documents, including conducting the search for and

11   ensuring that those documents pertained to the

12   request that was made, and that included not just

13   review, but also making copies or scanning them in,

14   providing them to you.

15       Q.   And did any of those documents refresh your

16   recollection about the work you did as

17   Commissioner?

18       A.   Yes.

19       Q.   Which documents were those?

20       A.   The last time I reviewed those documents

21   was several weeks ago, so I would be happy to go

22   through them if I would be allowed to remember that

23   again.

24       Q.   Okay.   So you don't recall right now the

Page 20

1    documents -- is it fair to say that the documents

2    you produced in response to the subpoena refreshed

3    your recollection about your work as Commissioner?

4         A.    They may have.  I cannot say that at this

5    point without having to take another look at those

6    documents.

7         Q.    Did you review any deposition transcripts?

8         A.    I did not.

9         Q.    And outside of your meetings with your

10   attorneys, did you talk to anyone about the

11   substance of this deposition?

12        A.    No.

13        Q.    And in searching for documents in response

14   to the subpoena, what did you do?

15        A.    I'm sorry, could you repeat that, please?

16        Q.    Sure.  You testified that you were made

17   aware of the subpoena, that you collected

18   documents, you scanned and sent them to your

19   attorneys.  Is that right?

20        A.    Yes.

21        Q.    In terms of searching for the documents,

22   what did you do?

23        A.    I - to the best of my ability - searched my

24   personal files, my home in Virginia, my home in

Page 21

1  West Virginia, any of the aspects of files that may

2  be electronically stored, and did the best of my

3  ability to recollect and remember for any files or

4  documents as well as there were a number of

5  documents that I had to -- I did recollect, but I

6  did not have immediately with me, and there may

7  have been some that I had to search online to be

8  able to get in response to that and provide those.

9       Q.   The ones that you --

10           MS. JINDAL:  Strike that.

11      Q.   You understand, Doctor Gupta, that you're

12  being deposed in connection with an ongoing

13  litigation, right?

14      A.   Yes.

15      Q.   And who do you understand to be the

16  plaintiff in this case?

17      A.   My understanding is the plaintiffs is

18  Cabell County and the City of Huntington.

19      Q.   And who do you understand to be the

20  defendants?

21      A.   I understand the defendants represented

22  here today include Cardinal Health, McKesson, as

23  well as AmerisourceBergen.

24      Q.   And in your own words, what is the case

Page 22

1   about?

2        A.   I'm sorry, can you repeat that, please?

3        Q.   Sure.   What is your understanding of this

4   case?   What is it about?

5        A.   My understanding is that this case is

6   related to the number of overdose deaths and

7   generally the suffering and the carnage that has

8   occurred broadly in the state of West Virginia, but

9   narrowly in Cabell County and the City of

10  Huntington as a result of oversupply as well as the

11  over-availability of prescription opioids and the

12  consequences resulting from that.

13       Q.   And what is the basis of your

14  understanding?   How did you come to have that

15  understanding?

16       A.   As I had mentioned before, that including

17  my work as the Commissioner for the Bureau of

18  Public Health as well as the State's chief health

19  officer, having worked in this area, having read

20  the reports as well as public records and accounts

21  and have been deposed and involved in the workings

22  of the Department of Health and Human Resources of

23  West Virginia, is how I come about to have that

24  understanding.

Page 23

1      Q.   Okay.  And are you aware that your name was

2   disclosed in plaintiffs' preliminary witness list

3   that they filed on June 3rd, 2020?

4      A.   I am not aware.

5      Q.   Doctor Gupta, could you please open Exhibit

6   56?

7              MR. COLANTONIO:  I'm sorry, did you

8   say "56?"

9              MS. JINDAL:  56, yes.  I apologize.

10  We're going to be jumping around a bit today.

11             MR. COLANTONIO:  Let me just find it

12  here.  Hold on.  Okay.  56.

13         GUPTA DEPOSITION EXHIBIT NO. 56

14             ("Notice of Plaintiffs' Preliminary

15             Witness List," U.S. Dist. Ct. Case No.

16             3:17-01362 filed 6-3-20 was marked for

17             identification purposes as Gupta

18             Deposition Exhibit No. 56.)

19             MR. COLANTONIO:  Like some kind of a

20  game show.

21             THE DEPONENT:  Thank you.

22     A.   I have this in front of me.

23     Q.   Okay.  Doctor Gupta, this is --

24             MR. COLANTONIO:  Could you just hold

```
 1   for a second until I get my copy, please?

 2              Thanks.  Okay, go ahead.  I'm sorry.

 3              Go ahead.

 4              MS. JINDAL:  I'm sorry.  Are you

 5   ready?

 6              MR. COLANTONIO:  Yes.  Go ahead,

 7   please.  Thank you.

 8              MS. JINDAL:  Okay.

 9       Q.   Doctor, this is a filing filed by

10   plaintiffs in this action.  It is dated, as you can

11   see, at the very top in blue in the center, dated

12   June 3rd, '20, and it states here that "Plaintiffs

13   have identified the following individuals likely to

14   be called as witnesses at trial."

15              And if you turn to the second page, you

16   will see your name as No. 22.  Is that correct?

17       A.   That is correct.

18       Q.   And your testimony is you were not aware

19   that your name was going to be included on such a

20   list.

21       A.   This is -- my testimony is this is the

22   first time I'm actually seeing this.

23       Q.   Okay.  Setting aside the document, were you

24   aware that plaintiffs intended to call you as a
```

Page 25

1    witness at trial?

2                MR. COLANTONIO:  Objection, asked and

3    answered.

4        A.   As of this date that you mentioned, I was

5    not formally aware of that.

6        Q.   Did you become aware after that date?

7                MR. COLANTONIO:  He's aware now.

8        A.   I am aware.

9        Q.   When did you become aware, besides --

10   outside of today's conversation?

11       A.   Today is when I've been made aware that --

12   of the document that officially lists me as

13   plaintiff witness.

14       Q.   I'm not doing a good job of making my

15   question clear; I apologize.  Doctor Gupta, when --

16   did plaintiffs ever contact you about testifying on

17   their behalf at trial in this case?

18       A.   Yes.

19       Q.   When was that?

20       A.   I would have to go back for that.

21   Approximately about eight to twelve months.  And

22   with that, I want to say, Ms. Jindal, I'm not an

23   attorney, so I am -- I'm a physician, so I am not

24   often aware of that just a contact means I'm on a

 1   list somewhere.

 2            So I just want to make sure that you

 3   understand that my understanding of legal

 4   proceedings is very minuscule as opposed to the

 5   court and the system.

 6            MR. COLANTONIO:  And --

 7       Q.   Sure, absolutely.

 8            MR. COLANTONIO:  I don't mean to

 9   interrupt, but just so you're clear, he may be

10   confusing his involvement in the state case with

11   this case.  I'm not -- so I just want to be -- you

12   may want to question about that, because that may

13   explain his answers better.

14            But it's your deposition.

15            MS. JINDAL:  Thank you, I appreciate

16   that.  And I will get to that other case.

17            MR. RUBY:  Just -- Jyoti, just a

18   second.  Mark, when you say "the state case," you

19   mean the old AG case or the current --

20            MR. COLANTONIO:  No, I'm sorry, what I

21   meant was the MLP case.

22            MR. RUBY:  Okay.  I thought that's

23   what you meant.  I just wanted to make sure it was

24   clear.

Page 27

1              MR. COLANTONIO:  Yes.

2    BY MS. JINDAL:

3        Q.   And Doctor Gupta, have plaintiffs contacted

4    you -- attorneys for Cabell County and City of

5    Huntington, have any attorneys for those two

6    entities, contacted you about testifying in this

7    case, which is set to begin trial on October 19th,

8    2020?

9        A.   As I mentioned, that there may have been

10   e-mails in that time frame, as I mentioned, the

11   past eight to twelve months, that I may have

12   received and provided a courtesy response to that

13   -- that e-mail.

14              But beyond that, I have -- I do not

15   recollect having any phone conversations,

16   agreements with others with -- you know, with any

17   particular attorney, but I can -- I can provide you

18   the information that I do have on that -- on this

19   case.

20              I'm happy to do that.

21       Q.   Okay.  I just need to know what you know

22   today.  I will follow up as needed, Doctor.  Thank

23   you.

24              Did you agree in response to those

Page 28

1    e-mail inquiries to testify for plaintiffs in this

2    trial?

3        A.   I did not respond, as I mentioned, beyond

4    courtesy responses.  I can tell you that the --

5    meet -- at the time that all of this communication

6    was occurring, I did not also have the time to be

7    able to make decisions on that and so -- and I

8    would really like to know which attorneys we're

9    talking about, because once again, I don't want to

10   conflate with the -- you know, people who have been

11   -- who attempt to contact me, so I would love to

12   know the names who might be that we're talking

13   about here.

14       Q.   Sure.  Has Paul Farrell, Jr. contacted you

15   about testifying in the case brought on behalf of

16   Cabell County?

17       A.   Yes, and that may be the e-mail that I have

18   provided -- had provided a courtesy response to.

19       Q.   And do you currently intend to testify at

20   trial in this case?

21            MR. COLANTONIO:  Well, if he's

22   subpoenaed to testify at trial, then depending on

23   what the subpoena is -- I mean, he'll -- he'll, you

24   know, respond to that appropriately.

Page 29

1           But are you asking him if a lawyer for

2    the plaintiffs has asked him to appear voluntarily

3    or -- I'm --

4               I just want to make sure we're being

5    clear.

6               MS. JINDAL:  I am asking him:

7    Q.   Do you plan to testify at trial currently?

8    A.   I have not been asked to testify beyond my

9    appearance today for trial.

10              MS. KEARSE:  This is Anne Kearse.  Let

11   me just -- you know, Doctor Gupta is represented by

12   counsel, so our communications upon finding that

13   Doctor Gupta is represented by counsel have been

14   through counsel, so I just want to make that record

15   there too as well.

16              And there has not been some direct

17   contact once we realized he was represented by

18   counsel.

19              MR. FARRELL:  And this is Paul

20   Farrell.  Hey, Doctor Gupta, will you come testify

21   at our trial?

22              THE DEPONENT:  If I am available and

23   if I can, I would be able to do that.

24              MS. KEARSE:  Thank you, Doctor.

Page 30

1   BY MS. JINDAL:

2       Q.   All right, Doctor.  If you are called at

3   trial, what do you expect to testify about?

4               MR. COLANTONIO:  Object to the form.

5       A.   I would provide my expertise, my experience

6   and the knowledge that I have with respect to both

7   being a local health officer for Kanawha County,

8   Putnam County as well as the State's Health

9   Commissioner for Bureau of Public Health and the

10  state health officer.

11      Q.   And we did hear -- we did talk briefly

12  about another opioid litigation that's currently

13  going on, the state MLP case.  Do you have any

14  intend to testify currently -- do you have any

15  intention to testify in that case?

16              MR. COLANTONIO:  He -- he'll testify

17  in that case.

18      A.   My response would be very similar, because

19  if I am asked to, I would consider, subject to the

20  availability to do that.

21      Q.   And will the subject of your testimony be

22  the same, or different?

23              MR. COLANTONIO:  That hasn't been

24  determined yet.

Page 31

1      A.   As I am asked, I will be able to provide

2  that.

3      Q.   And Doctor Gupta, other than your

4  expertise, experience and knowledge in the -- in --

5  through your work at the local -- as a local health

6  officer for Putnam and Kanawha County Health

7  Departments as well as your work as State Health

8  Officer and Commissioner for Bureau of Public

9  Health, is there anything else that you expect to

10  testify about in this case?

11             MR. COLANTONIO:  Object to the form.

12      A.   I have certainly provided national

13  expertise and would be able - in a limited amount

14  of circumstances, subject to my expertise - to

15  provide national trend information.

16      Q.   When you say "national" --

17             MS. KEARSE:  This is Anne Kearse.  Let

18  me just say it again:  Doctor Gupta obviously has

19  extensive history in the state of West Virginia on

20  the opioid epidemic, and so he's being deposed

21  today for you to inquire about what he knows about

22  the public health hazards associated with opioids

23  and what it's done to the state.

24             So the fact that he may not know

Page 32

1    specifically what question we're going to ask him

2    at trial, to the extent he comes to trial, I think

3    that is an unfair question to ask him what he's

4    going to be asked.

5              He's got extensive knowledge about the

6    public health crisis in the state of West Virginia

7    that includes the City of Huntington and Cabell

8    County, so I would suggest you move on and just ask

9    him the questions about what he knows and what he

10   knows about the health epidemic.

11             MR. RUBY:  Anne, it's a fair question

12   -- let's not -- let's not have this speech making.

13   If he intends to testify, it's perfectly fair game,

14   and let's not have -- let's not have the speaking

15   objections, please.

16             MS. JINDAL:  Thank you, Steve.

17   BY MS. JINDAL:

18      Q.   Doctor Gupta, when you say "national

19   expertise," what do you mean?

20      A.   With regards to the opioid crisis and the

21   public health crisis resulting from the opioid

22   crisis.

23      Q.   Thank you, Doctor.  And any other subject

24   matter with regard to your testimony?

Page 33

1            MR. COLANTONIO:  He'll respond to

2    questions as asked.  I think that's -- go ahead,

3    Doctor, if you can have a magic ball and figure out

4    what they're going to ask you, go for it.

5        A.   I will be happy to respond to the questions

6    and know that my portfolio and I will keep

7    reiterating that was not exclusively limited to

8    opioids during my tenure, so I'm unable to answer

9    what I would testify to not knowing what the

10   questions will be.

11       Q.   I understand that, Doctor.  Have you been

12   retained as an expert - if you are familiar with

13   that specific term in the context of a legal case -

14   by plaintiffs in the -- in this case?

15            MR. COLANTONIO:  No.

16       Q.   Have you been retained -- I'm sorry.

17   Doctor Gupta, you can respond.

18       A.   No.

19            MR. COLANTONIO:  No, to the extent

20   that that involves a legal --

21       Q.   Thank you.  Have you --

22       A.   My response is "No," but with a caveat that

23   I am not really aware of what the legal meaning of

24   -- of this -- he says, what this question is.

Page 34

```
 1      Q.   Sure.  I guess have you been asked to --
 2             MR. COLANTONIO:  I'm sorry, I don't
 3   mean to interrupt, but just so we're clear, he's
 4   not been retained as an expert, but he has a volume
 5   and wealth of factual information about these
 6   issues, and he also is prepared to render opinions
 7   if asked about these issues.
 8             So while he's not retained as an
 9   expert, he's both a person who has facts and is
10   prepared to render opinions.
11      Q.   Doctor Gupta, are you -- have you been
12   asked to draft -- write any expert reports about
13   your work or experience or knowledge relating to
14   the opioid crisis in West Virginia?
15      A.   I have been asked to provide my opinion, my
16   -- using my knowledge, asked to -- what would it
17   take to solve the problem that we're facing.
18             MR. COLANTONIO:  And just so we're
19   clear, again, the doctor is not used to the
20   process, so just -- I'm going to put this on the
21   record.  He's been retained as a consultant in the
22   MLP case on the issue of maintenance at this point,
23   so I think he's speaking with that.
24             But just to be clear, he has
```

1  information and opinions about other issues, so if

2  he's asked the questions, he'll respond.

3      A.   I think one of the challenges for me is to

4  be able to differentiate between what case and what

5  specific legalities, so do let me know on that

6  aspect as you ask those questions.

7      Q.   I will, Doctor.  Your answer is perfectly

8  fine.  I understood what you meant.  Thank you.  I

9  just want to have one little clarifying question.

10  When you said, "solve the problem we're facing," do

11  you mean the opioid abuse problem in West Virginia?

12      A.   Yes.  And the public health ensuing crisis.

13      Q.   Thank you.  Doctor, do you have a general

14  understanding of the system of distribution for

15  prescription opioids?

16      A.   My role as the State Health Commissioner

17  and public health officer, I have a broad bird's

18  eye view of the understanding of the system of

19  distribution.

20      Q.   What is that understanding, sir?

21      A.   My understanding is that based on the quota

22  that's determined by the DEA, manufacturers are

23  able to produce the volume of those pills and then

24  the distributors are able to - as registrants of

Page 36

1    the DEA - able to provide that volume of pills to

2    other registrants in terms of pharmacies which then

3    fill the prescriptions that have been written by

4    licensed providers.

5        Q.   You mentioned DEA registrants.  Are you

6    familiar with that registration process?

7        A.   To the extent that I am a -- one of the

8    registrants of the DEA to prescribe scheduled

9    substances, I am familiar.

10       Q.   Doctor Gupta, what -- please describe your

11   experience registering as a DEA -- as a DEA

12   registrant authorized to prescribe Schedule II

13   controlled substances.

14       A.   So my initial registration was many moons

15   ago, so I can probably recollect that most of the

16   experience will be renewing my DEA registration,

17   which has to occur every two years.

18            That involves going through a process

19   at the very beginning, we go on the website, the

20   DEA; we enter our DEA number and a few specifics

21   like Social Security number and date of birth; and

22   it opens up a form.

23            You provide your specific information;

24   you acknowledge to being able to prescribe; and

1   then there are a few other questions that you have

2   to answer, you know, and then you pay the

3   appropriate fees unless you're waived, you work in

4   government, and that makes your registration.

5            I know this so well because as my

6   registration was expiring this month, I've just

7   done that last week.

8       Q.   You said that you have to provide specific

9   information on a form.  What kind of information do

10  you have to provide?

11      A.   It's all electronic.  You have to provide

12  your practice location, your mailing address, if

13  you are going to be prescribing or anticipate/plan

14  to prescribe Schedule II, III, IV substances.

15           You also have to attest that,

16  obviously, you have not have had a felony and other

17  offenses, asks you to testify to that.

18           So it's mostly details:  Street address

19  of your work, your mailing address, things of that

20  nature.

21      Q.   And when asked to describe your current

22  prescribing or plans to prescribe controlled

23  substances, how did you respond this month?

24      A.   There isn't a lot.  I just -- I believe --

1   my recollection is that there is a box that you

2   have to check or at least somewhere that you are

3   going to prescribe those substances, that you are

4   eligible to prescribe those substances.

5           There is also a place where you have to

6   provide your medical license information, including

7   the state, so those are some of the areas.

8       Q.   And that's all part of the renewal process,

9   correct?

10      A.   Yes.

11      Q.   As best as you can recall, what was the

12  initial registration process like?

13      A.   What I can recall, it was more extensive

14  than the renewal process, but that's the extent

15  that I can recall at this point.

16      Q.   And this is the process that all physicians

17  who want to or need to prescribe controlled

18  substances need to go through to be able to do so.

19  Is that correct?

20      A.   I would say all prescribers, because

21  prescribers may include physicians, but they may

22  not be exclusively physicians.

23      Q.   You're right, Doctor.  This is a process

24  that all prescribers need to go through to be able

1    to prescribe controlled substances in the United

2    States, correct?

3        A.   To my knowledge, yes.

4        Q.   And as you said earlier, this is also a

5    process that all pharmacies who dispense

6    prescription opioids also need to go through.

7    Correct?

8        A.   To my understanding, yes.

9        Q.   Right.  I understand you're not familiar

10   with the details of the process on -- from the

11   perspective of a pharmacy, but you do understand

12   that pharmacies also need to be registered with the

13   DEA to receive and dispense controlled substances?

14       A.   My understanding is that -- that all those

15   who are involved in the -- from a manufacturing, to

16   distribution, dispensing and writing prescriptions

17   have to be registrants of the DEA.

18       Q.   You said you learned about this process

19   through your work as a Commissioner for the Bureau

20   of Public Health.  Do you recall approximately when

21   you came to learn about this process?

22       A.   The process of being registered is

23   something that occurred way back when I was -- I

24   was going through finishing up my residency and

1  getting into clinical practice.  I could not tell

2  you exactly, but approximately -- I finished my

3  residency was in 1999, so that would have been

4  around the years based on my license, permitted

5  license, that I would have filled out that process.

6         So I would be aware of the DEA

7  registration process since that time.

8     Q.   I see.  Thank you.  I -- my question was

9  confusing.  We started by talking about the system

10  of distribution for controlled substances.  When

11  did you become generally aware of that system of

12  distribution?

13    A.   So it was -- it was more during my term as

14  the health commissioner and the state health

15  officer because I was engaged in addressing the

16  opioid crisis and the public health consequences

17  that I became more aware and became more in contact

18  with the Board of Medicine, the Board of Pharmacy

19  and the controlled substances monitoring program

20  and that was the time during which I came to know

21  much more about the process than I had previously.

22    Q.   And beyond the requirements for all of the

23  actors in the supply chain to be DEA registrants,

24  what else have you learned about the -- that

Page 41

1   process?

2        A.   I'm sorry, if you can ask me a more

3   specific question?  I'm not sure I can answer it

4   and address my four years of experience in one

5   question.

6        Q.   No, so I'm asking specifically with respect

7   to the system of distribution.  For example, are

8   you aware also that distributors are -- as you

9   said, through your work with the Board of Pharmacy,

10  that they're regulated by the West Virginia Board

11  of Pharmacy in West Virginia?  Is that correct?

12       A.   I'm sorry, can you repeat that, please?

13       Q.   Sure.  You said you learned more about the

14  system of distribution during your term as

15  Commissioner, correct?

16       A.   Yes.

17       Q.   And you said part of that learning came

18  from your work with the Board of Pharmacy.

19  Correct?

20       A.   Correct.

21       Q.   Could you describe in detail --

22            MS. JINDAL:  Strike that.

23       Q.   What did you learn from your work with the

24  Board of Pharmacy with respect to the system of

Page 42

1    distribution for controlled opioids?

2         A.   I do think, Ms. Jindal, you know, that this

3    is an area of process that you're meeting with the

4    Board, you're attending their meetings, providing

5    perspective and you're learning over time.

6              So it's very difficult for me to

7    outline that as one, two, three, four, five things.

8    But broadly speaking, I developed a better

9    understanding and a more improved understanding of

10   the process of distribution from the volume to the

11   prescribing and dispensing.

12             We worked closely both to understand

13   what was going well, what was not going well, what

14   were the components of the controlled substances

15   monitoring program; what were the obligations.

16             Also -- within the Bureau of Public

17   Health.  But also, what can we do more?  I mean,

18   part of my work was not just learning, but also

19   trying to and attempting to - oftentimes struggling

20   to - find solutions to a crisis that we did not

21   create.

22        Q.   You said one of the things that you learned

23   more about was the volume.  What do you mean by

24   that?

Page 43

1      A.   What I mean by "the volume" aspect is,

2   clearly by the time I became Commissioner, it was

3   becoming more relevant and more clear that there

4   was a volume issue when it came to the deaths and

5   the suffering on the streets.

6             What that meant was, the overwhelming

7   volume that was reaching the people of West

8   Virginia was plainly involved in the killing of

9   West Virginians almost every 12 hours around the

10  clock, and that became important to us, as well as

11  other sufferings that were occurring.

12     Q.   Volume of what?

13     A.   The volume of prescription opioid pills.

14     Q.   And what was the source of that volume?

15     A.   So the source of that volume clearly was

16  coming from -- through the manufacturers and

17  distributors into the state of West Virginia and

18  then through the pharmacies, being dispensed into

19  the hands of innocent public.

20     Q.   You said you also looked at what was going

21  well and what was not going well.  What did you

22  think was going well?

23     A.   Well, by the time I came into the office,

24  clearly we had passed some policies -- please mind

Page 44

1   you, that these are downstream efforts.  We were

2   drowning, and we were trying - struggling - to do

3   what we could do at a city, county and a state

4   level to help people survive.

5          So what we did was, we had passed

6   several pieces of legislation and policy that had

7   made its way into commonplace, which means that we

8   had by the time figuring out how to get physicians

9   trained into understanding how diversion occurs,

10  how they could prescribe more responsibly to

11  prevent that diversion.  Although they're trying to

12  help the people that they're working with, meaning

13  their patients.

14         We were looking at figuring out how to

15  provide the antidote called naloxone into the hands

16  of the public so they can actually get an

17  opportunity to live.

18         We were trying to figure out how to

19  control -- you know, provide limitations to the --

20  some of the bad docs, and how do we go after those

21  bad docs?

22         So there was a whole host of initial

23  work that was happening in terms of downstream

24  attempts to control what we could control, what was

Page 45

1   within our hands, our power, to be able to do, at a

2   cost that was overwhelming.

3              Because at the same time, we were

4   having more and more children going to foster care.

5   Our child welfare cost was rising at an enormous

6   rate that we were having difficulty to control,

7   controlling the budget for the state.

8              So we were at the edges of going

9   bankrupt as a state, and primarily the crisis was

10  being driven but through the volume that was coming

11  up upstream to us.

12             So those were some of the things that

13  we were attempting to do.  We were also trying to

14  do justice reform, criminal justice reform,

15  reininvestments into -- because what we found was a

16  significant proportion of people that were ending

17  up incarcerated had substance abuse problems, and

18  that was primarily the reason, and they were not

19  being helped by being incarcerated and being in

20  prison.

21             We were losing -- as I mentioned, every

22  12 hours, we were losing a working West Virginian,

23  never to come back again, so this was a

24  transgenerational crisis.

Page 46

1    Q.   Doctor, did your -- you said that you

2    focused on educating physicians about diversion and

3    how to prescribe more responsibly.  Did that help

4    address the volume issue you were talking about?

5    A.   So yes, in an incremental way.  We were

6    taking baby steps to a problem.  I would hasten

7    back to the dam was broke, our cities were being

8    flooded and now we were trying to put sandbags to

9    form some type of levy while people are dying

10   because of the flood.

11           That's literally what was happening in

12   West Virginia.

13   Q.   I see.  And then when you said that you

14   limited or tried to go after bad doctors, did that

15   also help with the volume issue?

16   A.   Again, in incremental ways, but right now,

17   having the hindsight, I don't know if it helped or

18   hurt more.

19   Q.   Why do you say that?

20   A.   I say that because every time we went after

21   bad doctors, we shut the operations down.  There

22   were some really legitimate and credible patients

23   that need -- also needed pain medications.  They

24   could not find other physicians and prescribers in

Page 47

1    the community.

2              There were some people who had

3    addiction to these things that could not find

4    addiction treatment facilities.  So what would

5    these people do?  That we learned again in

6    hindsight.

7              They would go and try to seek these

8    pills on the street.  And as we were attempting, in

9    our way, incrementally to reduce the supply on the

10   street through these actions, they were starting to

11   transition into the more readily available cheaper

12   and affordable street alternative, which was at the

13   time heroin, and other -- some of the other

14   injection drugs.

15      Q.   There's a lot there, Doctor, so I'm just

16   going to try and take it one at a time.

17              Let's go back to the -- you said that

18   these actions only helped curb the volume of

19   prescription opioids in an incremental way.  Did

20   you do anything --

21              MS. JINDAL:  Strike that.  Let me

22   rephrase my question.

23      Q.   Did you take any actions to regulate the

24   conduct of distributors?

Page 48

1                MR. COLANTONIO:  I'm sorry, object to

2      the form of the question.  Are you asking him as a

3      State Health Officer if he somehow can regulate

4      through the Controlled Substances Act the

5      distributors?

6                I'm not sure I understand your

7      question.

8                MS. JINDAL:  Sure.  Let me rephrase.

9      Q.    Doctor, as State Health Officer and as

10     Commissioner for the Bureau of Public Health, you

11     were in a position to propose legislation, correct?

12     A.    Yes.

13     Q.    And you were also on the Governor's Council

14     -- Advisory Council on Substance Abuse, correct?

15     A.    That's correct.

16     Q.    And these positions put you in a position

17     to offer suggestions for what could be done to

18     abate the opioid problem in West Virginia, correct?

19     A.    Yes.

20     Q.    And you also testified that you learned

21     about the system of distribution through your work

22     on these -- on these committees and in your

23     position as Commissioner for the Bureau of Public

24     Health, correct?

Page 49

1      A.    Yes.

2      Q.    At the end of all that, did you propose any

3   solution or regulation or law that was directed at

4   the conduct of wholesale distributors?

5      A.    As a result of all of the aspect of

6   questions that you've asked me, we did put a task

7   force together and did everything possible under

8   the sun under my authority in the state of West

9   Virginia that we could do to address this terrible

10   killer of a crisis that was happening.

11            And I'd be happy to talk to you about

12   that.

13      Q.    Okay.  Doctor, that was not my question.

14   Did you ever propose a course of action with

15   respect to the conduct of wholesale distributors

16   and geared at abating the opioid problem in West

17   Virginia?

18            MR. COLANTONIO:  Objection to the

19   form.

20            Go ahead, Doctor, if you can answer

21   that.

22      A.    I did not have -- as State Health Officer,

23   did not have the authority to propose and control

24   the Controlled Substance Act, a federal law, and as

Page 50

```
 1    part of the authority of state health commissioners

 2    all across the country, we have the ability to do

 3    what we can within our states and our communities,

 4    and that's exactly what I was attempting to do:

 5                  MR. RUBY:  I'm going to call a

 6    time-out here and just note for the record that the

 7    witness' answer is parroting the improper speaking

 8    objection in which his counsel coached him to give

 9    testimony as to the Controlled Substances Act, and

10    I'm going to ask counsel to refrain from speaking

11    objections to coach the witness as to how you'd

12    like him to answer.

13                  MR. COLANTONIO:  Well, that wasn't

14    intended as a speaking objection, Steve.  It was an

15    objection intended to be a proper objection, so

16    we'll move on and I'll object as I see fit, and you

17    can --

18                  MR. RUBY:  Well, no, no, the -- we

19    make objections to form.  We don't make an

20    objection and ask if the question is asking the

21    witness whether he had the authority do thus and

22    such under the Controlled Substances Act and then

23    invite him to testify - as he just did - that he

24    didn't have the authority to do thus and such under
```

Page 51

1   the Controlled Substances Act.

2              That's exactly what happened there,

3   and we're not going to -- we're not going to put up

4   with that as the day goes on.

5              MR. COLANTONIO:  Yeah.  Whatever.

6              MR. FITZSIMMON:  Steve, the witness

7   wants a break also.

8              MR. COLANTONIO:  Oh, okay.  Can we

9   take a break now for a few minutes?

10             MS. JINDAL:  I just have a couple more

11  questions, and then I think we can take a break if

12  that's okay.

13             MR. COLANTONIO:  Go ahead.

14  BY MS. JINDAL:

15     Q.   Doctor Gupta, through your work with the

16  Board of Pharmacy, are you aware that the Board of

17  Pharmacy licenses and regulates distributors in the

18  state of West Virginia?

19     A.   What I'm aware of is that the Board of

20  Pharmacy does have the ability and the authority to

21  provide the licensing and -- for the distributors,

22  yes.

23     Q.   And members of the Board of Pharmacy were

24  on the Governor's Advisory Council for Substance

Page 52

1    Abuse, correct?

2         A.   I do not recall that at the time.  I mean,

3    I think we can check the record on that.

4         Q.   Okay.  But you were able to call someone up

5    at the Board of Pharmacy if you wanted to while you

6    were Commissioner, correct?

7         A.   That would be reasonable.

8         Q.   Okay.  Did you ever call someone at the

9    Board of Pharmacy and ask them to look into the

10   conduct of wholesale distributors?

11        A.   I would have conversations all the time to

12   be asking the Board of Pharmacy to make sure that

13   they do everything they can under their authority

14   to help us reduce this crisis.

15              So the answer is yes.

16        Q.   And do you think the Board of Pharmacy has

17   done all it could to help abate the opioid problem

18   in West Virginia?

19              MR. COLANTONIO:  Object to the form.

20        A.   My knowledge and my interactions lead me to

21   believe with the small, minuscule sometimes staff

22   that they had that they did everything that they

23   potentially could to respond to the crisis.

24        Q.   And if they continued to license and renew

Page 53

1    the licenses of wholesale distributors --

2              MS. JINDAL:  Strike that.

3       Q.   Are you aware that the Board of Pharmacy,

4    like the DEA, requires renewal of licenses?

5       A.   I would assume so at this time to the best

6    of my knowledge that that would be the case, just

7    because I am a registrant of the DEA and I am

8    required to make sure that I renew my registration.

9    That would be the same mechanism for any of those.

10      Q.   And if you had a particular concern with

11   the conduct of wholesale distributors, you would

12   expect that Board of Pharmacy -- you would have

13   shared that concern with someone at the Board of

14   Pharmacy, correct?

15             MR. COLANTONIO:  Object to the form.

16      A.   Can you repeat that question?

17      Q.   Sure.  You said you asked the Board of

18   Pharmacy to do anything and everything within its

19   power to help abate the opioid problem in West

20   Virginia, correct?

21      A.   Yes.

22      Q.   And if you had any particular concern about

23   conduct of wholesale distributors, you would have

24   communicated that in those discussions, correct?

Page 54

1        A.    Just so you know, my previous statement

2    still holds, because I specifically requested to

3    the Board of Pharmacy and its leaders to do

4    everything in their power to help us stop the

5    killing of West Virginians by the hour, and that in

6    -- that wasn't exclusive of anyone.

7                 That was inclusive of every aspect that

8    they can do and turn over every case that they can.

9        Q.    Did you ever have any specific

10   conversations regarding the conduct of wholesale

11   distributors?

12       A.    I did not have specific conversations that

13   I can recollect at this time.  I can't recall

14   specific conversation, and please note this has

15   been several years ago.

16       Q.    Understood.

17                 MS. JINDAL:  I think we can go ahead

18   and take a break now.  Maybe about ten minutes,

19   Doctor?

20                 THE DEPONENT:  Sure.  Thank you.

21                 VIDEO OPERATOR:  Going off the record.

22   The time is 10:11 a.m.

23                 (A recess was taken after which the

24                 proceedings continued as follows:)

Page 55

1              VIDEO OPERATOR:  This begins Media

2     Unit 2 in the deposition of Rahul Gupta, M.D.  We

3     are back on the record.  The time is 10:26 a.m.

4     BY MS. JINDAL:

5         Q.   Doctor Gupta, you had -- had you heard of

6     Cardinal Health before you became Commissioner?

7         A.   I had not.

8         Q.   When did you first hear of Cardinal Health?

9         A.   I do not recall a specific date and time.

10    I would say somewhere in 2015, I would have heard

11    it, after joining in January my position.

12        Q.   In what context did you hear about Cardinal

13    Health?  How did you first learn of them?

14        A.   It's very difficult to recall for me at

15    this point in what context.  At this point, I think

16    it would have been around the opioid crisis as well

17    as, you know, what can we do to solve the crisis

18    and, you know, what's the mechanism --

19              It's my sort of practice to under --

20    when I -- when I go into a position, to understand

21    the -- both the entire history as well as where we

22    are we going with it and that sort of thing.  So it

23    would have been my attempt to better get a

24    comprehensive view of the crisis.

Page 56

1          Within my purview, I had about 130

2     different program lines with -- you know, sort of

3     mandate, statutory mandate to monitor the public

4     health and its consequences across the state of

5     West Virginia, and so this would have been my

6     attempt during that time to better get to

7     understand the most current and devastating public

8     health crisis that was eating up the state, and

9     that's what --

10          You know, in the process of

11     understanding and learning more -- more

12     comprehensively the crisis, I would have -- it

13     would have come to understand that -- I would have

14     come to understand that.

15     Q.   Have you ever had any professional

16     interactions with an employee of Cardinal Health?

17     A.   Not that I'm aware of.

18     Q.   And is the -- had you heard of McKesson

19     before you became -- McKesson Corporation before

20     you became Commissioner?

21     A.   No.

22     Q.   And when did you learn about McKesson

23     Corporation?

24     A.   I would say it would have been very similar

Page 57

1   to the details I provided about Cardinal Health.

2       Q.   And have you ever had any professional

3   interactions with an employee of McKesson?

4       A.   Not to my knowledge.

5       Q.   And is your answer equally applicable to

6   AmerisourceBergen Drug Corporation?

7       A.   I would say yes.

8       Q.   And just to be clear, that -- you mean that

9   you had not heard of AmerisourceBergen before you

10  came Commissioner?

11      A.   That's correct, to my ability to recall at

12  that time.

13      Q.   And as best as you can recall, you learned

14  about ABDC, AmerisourceBergen Drug Corporation,

15  after you became Commissioner while you were

16  learning more about the opioid problem in West

17  Virginia?

18      A.   That's to the extent that I can recall at

19  this time.

20      Q.   And as far as learning more about the

21  opioid problem after you became Commissioner, do

22  you -- just at a high level, what sort of sources

23  did you rely on?

24      A.   I relied on a number of nationally-known

Page 58

1    sources, state level sources, regulatory sources.
2    So that would be the reports that may be coming out
3    from the CDC, from other federal agencies.  It
4    would be media reports as well, both national,
5    state and local.
6              It would be talking to families
7    individually and -- because I was on the ground
8    dealing with the deaths literally every single day.
9              It would also be the state reports as
10   well as the data that we would be collecting as
11   well as monitoring and providing reports.
12             It would also be the chief medical
13   examiner's office that was under my purview, that
14   -- the challenge that we were going through to deal
15   with the death and destruction on a daily basis and
16   the challenges that we were having with resources.
17             It would be the legislature, West
18   Virginia legislature.  That would be -- you know,
19   some other -- other sources as well that I cannot
20   recall at this time.
21        Q.   And do you recall West Virginia's lawsuit
22   against wholesale distributors?
23        A.   I do not recall a lot of -- any significant
24   great detail at this time.

Page 59

1      Q.   But do you recall the fact that West

2   Virginia filed suit against Cardinal Health,

3   AmerisourceBergen and McKesson Corporation?

4      A.   At some point in my thinking back in my

5   time at -- as a Commissioner, I would have been

6   contacted by the general counsel of the -- my

7   parent agency - Department of Health and Human

8   Services - to both brief me as well as ask for work

9   in understanding better the opioid crisis and the

10  devastation it was causing in terms of these

11  programs we had, as well as then to -- to be

12  deposed subsequently.

13            That would be the context, now looking

14  back, that I would learn about that.

15     Q.   Did you ever have an opportunity to read

16  the Complaint in those cases?

17     A.   I do not recall.

18     Q.   Did you agree with West Virginia's decision

19  to file suit?

20            MR. COLANTONIO:  Object to form.

21     A.   I don't think I could provide you an

22  opinion there, because that was something that was

23  existing before my time.  I had no input into that

24  decision-making process.

Page 60

```
 1      Q.   I'm going to go ahead and switch gears now
 2  and talk to you a bit about your background.  Do
 3  you have an undergraduate degree?
 4      A.   I have a one-year bachelor of science.  So
 5  I do not have a full undergraduate degree.
 6      Q.   And where is that from?
 7      A.   That's from University of Delhi.
 8      Q.   And when was that?
 9      A.   That was 1987 to 1988.
10      Q.   And what did it focus on?
11      A.   It focused on biology.
12      Q.   So bachelor's of science in biology?
13      A.   Correct.
14      Q.   And you -- do you have any advanced
15  degrees?
16      A.   I do have a doctor of medicine degree.  I
17  have an additional master's of public health.  And
18  a master's of business administration.
19      Q.   Doctor Gupta, if I could ask you to open
20  Exhibit 51.
21           GUPTA DEPOSITION EXHIBIT NO. 51
22               (Resume of Rahul Gupta, MD, MPH, MBA,
23               FACP (WVSMA_FEDWV_00039036-091) was
24               marked for identification purposes as
```

Page 61

1          Gupta Deposition Exhibit No. 51.)

2                MS. KEARSE:  I'm sorry, what exhibit?

3                MS. JINDAL:  51.  5-1.

4       A.   I have it.

5       Q.   Doctor Gupta, are you familiar with this

6    document?  And I'll specify.  Are you familiar with

7    the attachment to this e-mail that was sent to you?

8       A.   Yes, it seems like it's my resume.

9       Q.   And was this your resume as of March 23rd,

10   2017?

11      A.   I'm going to check.

12      Q.   I'm just using the date of the e-mail,

13   Doctor.

14      A.   Yes, I see the date on the e-mail, and that

15   is the appropriate attachment that it should be.

16      Q.   And did you draft this resume?

17      A.   I would -- I would think so.

18      Q.   Doctor, if you turn to -- do you see in the

19   lower right-hand corner of each document, there are

20   two Bates stamp numbers?  They start with some

21   letters WVSMA here and then they end with a serial

22   number?

23      A.   Yes.

24      Q.   I'm going to ask you to focus on the top

Page 62

1   document when we review the documents.  And the top

2   number -- could you please turn to the page that

3   ends with 9042?

4                    MR. COLANTONIO:  9042.

5                    THE DEPONENT:  Yeah, I've got it.

6       Q.   I believe it's page 6 of your resume, if

7   that makes things easier.

8       A.   I see it.

9       Q.   Okay.  And you see the heading "Education"?

10      A.   Yes.

11      Q.   And does that accurately reflect the dates

12  and universities from which you have received those

13  advanced degrees that we just discussed?

14      A.   Yes.

15      Q.   And did you complete your residency

16  training at St. Joseph Hospital in Northwestern --

17  of Northwestern University in Chicago, Illinois?

18      A.   Yes.

19      Q.   And what did you complete your residency

20  in, Doctor?

21      A.   Internal medicine.

22      Q.   And do you have any special trainings or

23  certificates?

24      A.   I trained prior to my residency in

1   pulmonary medicine.  That's listed as "Chest

2   Diseases and Tuberculosis" with a two-year diploma,

3   and then I have had since then the special training

4   in public health as reflected here with an M.P.H.

5   degree from the University of Alabama-Birmingham,

6   and it was followed by a specialization in business

7   administration that is listed as the M.B.A. in

8   Information and Technology Management.

9        Q.   Aside from the subspecialty training of

10  chest disease and tuberculosis and your training in

11  internal medicine, have you had any other

12  specialized medical training?

13       A.   No.

14       Q.   And have you -- have you had any -- aside

15  from these trainings, do you participate in any

16  ongoing physician education?

17       A.   Yes.

18       Q.   And is that pursuant to any active licenses

19  that you currently have?

20       A.   Yes.

21       Q.   What are those currently active licenses?

22       A.   License to practice in the state of West

23  Virginia.

24       Q.   And have you principally practiced as -- in

Page 64

1    internal medicine since you completed your

2    residency?

3        A.   I have practiced in the areas of internal

4    medicine, primary care, family medicine, as well as

5    I had to also cover the emergency room on occasions

6    in the past.

7        Q.   And I'm going to try and save us some time.

8    Rather than -- does -- if we can, could you please

9    go through the various hospitals and clinics that

10   you've worked at over the years since you completed

11   your residency?

12       A.   I certainly can.  Would it be okay if I use

13   my listed Exhibit 51 as a reference?

14       Q.   Absolutely.

15       A.   Thank you.  Can you please clarify exactly

16   what aspects you want to cover -- want me to cover?

17       Q.   Sure.  Let me clarify the question.  On

18   page Bates stamped at the end, last four digits are

19   9039, page 3 of your resume --

20       A.   Yes.

21       Q.   -- after you completed your residency, did

22   you practice as a physician, as a primary care

23   physician, as Florala Medical Clinic in Alabama?

24       A.   Yes.

Page 65

1      Q.   And after -- and you were there for four

2   years?

3      A.   Yes.

4      Q.   And after you completed that, you became a

5   physician at the University of Alabama-Birmingham?

6      A.   Yes, in Huntsville, Alabama.

7      Q.   And what was your practice there?

8      A.   I was a primary hospitalist, academic

9   physician.  My position was assistant professor of

10   medicine for the school, and also did primary care.

11   So I was an internal medicine hospitalist and then

12   saw patients outpatient care as well and did

13   teaching of the residency program and the medical

14   school at UAB.

15      Q.   What courses did you teach there?

16      A.   I taught internal medicine, public health,

17   various aspects of internal medicine, as well as

18   preventive medicine and public health.

19      Q.   Did any of your courses focus on treatment

20   of pain?

21      A.   There was a broad focus on pharmacology of

22   compounds.  There was a daily focus in the hospital

23   rounds on treatment, including treatment for pain,

24   because we saw a range of patients admitted from

1    cancer and the end-of-life to all the way to, you

2    know, broken bones, head trauma, accidents,

3    neurosurgery, those type of patients.

4              So there was a various range of

5    patients that we would typically see for a

6    hospitalist, and so our education that I provided

7    to -- in realtime, along with the School of

8    Pharmacy, Auburn School of Pharmacy, was on a daily

9    basis that we discussed management of conditions,

10   including management of pain.

11       Q.   And in discussing the management of pain,

12   did you teach with respect to the prescribing of

13   prescription opioids?

14       A.   It's difficult for me to recall at this

15   time specifically what was taught, but I could say

16   that amongst the pharmacology and teaching would

17   have included the appropriate prescribing of

18   opioids and appropriate prescribing for antibiotics

19   and a number of other groups of medications.

20       Q.   And when you say "appropriate prescribing,"

21   what would you consider to be the appropriate

22   prescribing that you would have taught them?

23       A.   The appropriate prescribing would be one in

24   which we utilized opioids not as first line and not

Page 67

1    something for that is for everyone.  But we

2    actually made sure that these are treated as

3    serious medications, prescription medications,

4    potentially deadly medications, and they are

5    provided to patients when the -- there is an

6    appropriate indication for these medications.

7        Q.   And is that also what you taught with

8    respect to antibiotics use?

9        A.   Yes.  And in the antibiotic use, it would

10   be a little bit different.  We would focus on the

11   development of resistance to antibiotics, which was

12   also a major issue, and you would want to make

13   sure -- as an example, just like that, you know, a

14   very simple skin lesion with a little bit of

15   inflammation, you would not be automatically

16   jumping to prescribe opioids.

17            Same way if you had a cold, you would

18   not be jumping to prescribe an antibiotics.  Both

19   of the results are not good for medicine and

20   they're not good for certainly public health, and

21   they have both of these examples have deadly

22   consequences.

23       Q.   So your approach to prescribing of opioids

24   was similar -- was your general approach to

Page 68

1    prescription -- to prescribing any medicine.  Is

2    that fair to say?

3              MR. COLANTONIO:  Object to the form.

4         A.   My approach to prescriptions and care of

5    the patient was primarily not only driven by data

6    and science, but the oath we take to first do no

7    harm, and I happen to take that very seriously, and

8    I made sure that my residents and my medical

9    students and my pharmacy students and nursing

10   students were taught the same approach.

11        Q.   And after you left the Florala Medical

12   Clinic -- I'm sorry, after you left the University

13   of Alabama-Birmingham, you then taught at

14   Vanderbilt University; is that right?

15        A.   I was the primary faculty at Meharry

16   Medical College which is also at Nashville, with a

17   secondary appointment at Vanderbilt Medical Center.

18        Q.   And you were both practicing and teaching

19   in those places as well?

20        A.   Yes, I was practicing primarily at

21   Nashville General Hospital, downtown Nashville.  I

22   was both a hospitalist, very similarly placed, but

23   also a primary care and an outpatient physician in

24   a very inner city environment where we had a lot of

Page 69

1   African-American urban population with a little bit

2   of different set of challenges that was to consult.

3              We -- this was the only public hospital

4   in Nashville, surrounded by several private

5   hospitals, so the population was a little

6   different.  But I was still also teaching medical

7   students of the Meharry Medical College as well as

8   the internal medicine program residents and

9   typically involved in helping the residency program

10  become successful.

11      Q.   And did any of the courses there involve or

12  relate to management and treatment of pain and the

13  use of prescription opioids?

14      A.   So my teaching is very similar to what I

15  was doing in Huntsville.  It involved daily rounds

16  and hospitals when I was posted to the wards, so to

17  speak, and understanding and teaching students how

18  to properly manage various medical conditions,

19  including pain.

20              We also had an incarceration, like a

21  jail ward, on the top floor, which was very

22  similar, but it was important to have the students

23  and residents understand that the concepts of both

24  pain management as well as good medical management

Page 70

1   are not contradictory to each other.

2       Q.   So you didn't teach any specialized courses

3   concerning the management or treatment of pain?

4       A.   I don't -- I did not -- I did not teach any

5   specialized courses.

6       Q.   And then after your time in Tennessee, is

7   that when you moved to West Virginia in 2009?

8       A.   Yes.

9       Q.   And when you moved to West Virginia, what

10  were you doing?

11      A.   So when I moved to West Virginia, I became

12  the health officer for Kanawha/Charleston Health

13  Department.  That was a combined city/county health

14  department, the largest in the state, local health

15  department.

16            I was the local health officer,

17  physician director.  So my responsibility and

18  jurisdiction was Kanawha County.  And the

19  responsibility was amongst various aspects that

20  included everything from monitoring safe water to

21  air to making sure that there were clean indoor air

22  regulations, that people -- various programs of

23  health and prevention, while making sure that

24  restaurants were properly monitored for the food

Page 71

1    code, the sewage, the licensing of making sure

2    that, you know, there were proper sewage and air

3    conditioning and other things -- aspects.

4              Hotels, licensing, making sure that

5    they were properly done from a health aspect.

6              So I was responsible for all of those

7    public health aspects of the county.

8              I was also teaching at the same time.

9    I obtained as a -- I don't exactly remember -- I'd

10   have to go back to my resume and look at it as to

11   when, but a faculty appointment at West Virginia

12   University as well as University of Charleston.

13             I became a clinical teaching faculty at

14   the largest hospital in the state of West Virginia,

15   which is CAMC, and I was also volunteering at the

16   local charitable clinic called Health Right, West

17   Virginia Health Right.

18       Q.   What prompted you to pursue a career in

19   public health at that point?

20       A.   The primary driving force for me was as a

21   primary care physician in a town of about 850,

22   Florala, I was seeing a lot of challenges that were

23   primarily public health in nature.

24             I was also seeing at the same time that

Page 72

1   whereas I had a more traditional evidence-based

2   approach, I did have colleagues that were much more

3   liberal - who we know now as bad doctors, by the

4   way - in opioid prescribing.

5              But that wasn't the only piece.  It

6   was part of the conversation that prompted me to

7   seek a better understanding of our systems, our

8   health policy and our health care systems, and

9   that's the reason I got my master's in public

10  health after which --

11             Because during the same time, I would

12  consult with UAB, and I recognized that, you know,

13  a confirmation health approach as pretty decently

14  good as I was in clinical medicine, to understand

15  and just had mostly clinical teaching in the wards

16  and on the campus --

17             -- that I could have a larger impact in

18  addressing the more population aspect of crises and

19  challenges that we face, whether it's obesity, the

20  consequences of which, or other aspects.

21             And that was the primary driver for me

22  to be able to do good at a much larger upstream

23  level, just to be more impactful in addition to

24  individual level of care which I still felt was

Page 73

1    important to be grounded.

2                That was the reason that I continued to

3    donate my personal time to the charity clinic in

4    addition to understanding and working on policy and

5    other problematic aspects of public health.

6        Q.   I want to go to the beginning of your

7    answer there, Doctor.  You said you had some

8    colleagues at Florala Medical -- I don't recall the

9    name.

10               -- Florala Medical Clinic in Alabama

11   who you characterize as "bad doctors."

12               Could you describe more about what your

13   concern was there?

14               MR. COLANTONIO:  Object to the form.

15       A.   So you know, we're going to go back and I'm

16   going to talk about this, having the benefit of

17   doubt that we have today in 2020.  But when I was

18   there at the time in the year 2000, this was a time

19   when I -- this is the Town of Florala, as well as

20   my colleagues, were getting regular visits - if not

21   daily, certainly weekly, multiple visits - from

22   pharmaceutical representatives who were telling us

23   that, yeah, we should prescribe and adequately

24   treat pain.

Page 74

1            I was a front-line physician that was
2    managing not only a full-time clinic, but also the
3    emergency room of the local hospital every third
4    day by rotation, every third weekend by rotation.
5    So that was a lot of coverage.
6            And we were being bombarded at the time
7    with these messages that were coming to us.
8    Samples were being dropped.  And some of us took
9    the approach of being driven still by data and
10   evidence, whereas there were a few that did not.
11           And so those are the colleagues I talk
12   about, which we now know as bad doctors, that
13   perhaps at the time we hadn't recognized that they
14   had incentives to be able to writing prescriptions
15   -- did have patients come from far off, sometimes
16   hundreds of miles away, line up in the parking lot,
17   and having cash-only clinics.
18           These are not bad people; they were
19   just what we know now as bad doctors.  Not bad
20   human beings, but just bad prescribers.  And the
21   ones at least I know, I know they were trying to
22   help do the best they could for the training they
23   received and they were sold a bill of goods that
24   they felt that they were trying to help the

Page 75

1    patients.

2        Q.   Do you recall ever expressing any concern

3    about the lack of data and evidence-driven

4    prescribing?

5        A.   It's hard to go back 20 years or 15 years.

6    But yes, I generally -- and I say that because I

7    generally have a view of utilizing data and

8    evidence to drive -- drive my decisions, whether

9    it's in policy making or clinical care.

10            So I do remember being concerned about

11   this issue.  As I was concerned, to be honest, at

12   the time -- as an example, we were using -- this is

13   -- doesn't relate to opioids, but we were using a

14   lot of Celebrex and Vioxx.

15            These are jus -- you may or may not

16   remember these medications, but they were also

17   being consumed and used.  And I had done the review

18   of their initial studies, and that did show

19   casualties.  And I was skeptical about that too.

20   That some of the patients I was seeing were having

21   DVTs and they were having consequences.

22            So that's the level of detail that I

23   had happened to focus on. Many of my colleagues -

24   and most of my colleagues - did, but some did not.

Page 76

```
1    And so that's an example of where when all the
2    prescribers were being sold the bill of goods, most
3    decided to do the right thing and follow what they
4    were taught to follow in medical school, but just
5    follow the science.
6              And some fell victim to the message.
7    And as a result, now what we know became bad docs.
8        Q.   And when you say they "fell victim to the
9    message," are you referring to the messaging from
10   manufacturers about prescription opioids?
11       A.   I would overall generally say yes, and the
12   reason for that is that the representatives that
13   were coming to our offices did represent
14   manufacturers, and they had a product to sell,
15   bottom line.
16             But it was also other things which --
17   you know, physicians were asked to go on trips, to
18   take weekends to other type of lavish and
19   extravagant type of investments that were being
20   made.  I could not tell you who was making those
21   because I wasn't part of that.
22             But there were other aspects of this
23   too.
24       Q.   Do you recall ever a wholesale distributor
```

Page 77

1    approaching you about prescription opioids?

2         A.   As I testified earlier, I was -- I do not

3    recall any -- any wholesale distributors

4    approaching me.

5         Q.   Have you ever heard any of your colleagues

6    say they were approached by a wholesale

7    distributor?

8         A.   At this time, it would be hard for me to

9    recall that.

10        Q.   So you don't recall whether your colleagues

11   have ever said that they have been approached by a

12   wholesale distributor with respect to their

13   prescription opioids?

14        A.   I don't recall that.  I also don't recall

15   them telling me that they were approached by

16   manufacturers.  So that's the rationale, that I

17   just -- that is -- we talk more about patient care

18   as -- and as the standards began to change for

19   pain, we began to discuss and sort of in a

20   scientific way, discussed the basis of the

21   standards that were changing, not really how that

22   was being caused --

23                At the time.  I go back to this thing

24   -- it's very easy now in hindsight to look at this.

Page 78

1    But at the time that we were in, we were

2    prescribers and primary care physicians who's first

3    duty was actually to help our patients, because

4    that's where we were engaged mostly.  We were not

5    in policy making.

6              And we would discuss the standards and

7    how they're changing literally in realtime during

8    the 2000s.  That's what I do recall about that.

9    Q.   What do you recall about the change in

10   standards with respect to treatment of pain?  Or

11   the use of prescription opioids?

12   A.   I recall that the American Pain Society

13   promoted pain as being the fifth vital sign.  At

14   the time, I wasn't acutely aware that they were

15   being supported with financing by a pain

16   manufacturer or others.

17             I recall that at the time both the --

18   what we know as Joint Commission now - but JCAHO

19   then - came out with recommendations for utilizing

20   pain as a vital sign, pushed by the American Pain

21   Society.

22             As I would be in the hospital in

23   subsequent years, as a hospitalist, we would be

24   subject to the ten-point pain scale with the happy

Page 79

1    faces.  That was a consequence of that.

2              And that all sort of played into

3    changing the standard of pain as a fifth vital sign

4    when we did not go to that extent to change other

5    four vital signs at that time.

6              That's why it stood out, because we

7    took a subjective symptom and we turned it into a

8    vital sign without any of the data or research or

9    work that had gone into the other four vital signs.

10             So in that sense, for many of us - for

11   most of us, I would say - the standard of -- for

12   pain were changing and evolving around the 2000s

13   when I was practicing in Florala.

14        Q.   Doctor, going back to your resume, I want

15   to draw your attention to the -- page 4 of your

16   resume.  It ends with Bates Stamp No. 9040.

17        A.   I have it.

18        Q.   And I want you to focus on the bottom of

19   this resume, it says you were an associate

20   professor at the University of Charleston School of

21   Pharmacy starting in 2011.  How long did you teach

22   there?

23        A.   I believe I should be still faculty there,

24   but the last time would have been sometime before I

Page 80

1    left West Virginia.  That would be in 2018 that I

2    actually taught a class.  I could not recall an

3    exact month and time.

4              But that -- you know, I taught there.

5    I teach at -- I was a professor at Harvard as well,

6    as well as Johns Hopkins and West Virginia

7    University and Georgetown, so --

8       Q.   And just continue to focus at the

9    University of Charleston School of Pharmacy, I'm

10   going to just talk to you about that first bullet

11   point there.  You "Teach class on the role of

12   community pharmacist in addressing public health

13   challenges."

14             Did I read that correctly?

15      A.   Yes.

16      Q.   What do you mean by "community

17   pharmacists?"

18      A.   So community pharmacists have oaths to pure

19   -- and I'm not very well versed in the science of

20   this from a pharmacy standpoint but as opposed to a

21   retail pharmacy -- pharmacist or a wholesale

22   pharmacist.

23             Really relates back to the mom and pops

24   across the country, the pharmacists that are

Page 81

1    embedded in the community, that the role that they

2    have in ensuring that they're addressing whatever

3    the contemporary public health crisis or challenges

4    may be ongoing in their own communities.

5        Q.   And when you talk about the public health

6    challenges that could be going on in the community,

7    do you have any specifics in mind?

8        A.   Yes.  So I'll give you a couple examples.

9    One, the class really came across because when I

10   was in Florala, I would have oftentimes the person

11   who owned the Florala pharmacy call me and say,

12   "Hey, Doc, I've got two cases of diarrhea.  You

13   sure there's nothing going around, like a bug?"

14            So this was -- this was our community

15   way of being the sentinel providers and working

16   with each other to figure out challenges when the

17   robust system -- to become those sentinel providers

18   and detectors -- or these detectives.  That was one

19   example.

20            The other can clearly be -- at least

21   part of what I taught, the second example was:

22   Okay, if you're starting to see a lot of

23   prescriptions come in for opioids, that you really

24   have to question that as well.  And you could be

Page 82

1   that sentinel provider that could raise that

2   concern.

3       Q.   And do you talk about the role, I guess, as

4   a sentinel in -- for prescription opioids in the

5   class?

6       A.   Yes.

7       Q.   And what kinds of --

8            MS. JINDAL:  Strike that.

9       Q.   Let me put it this way.  You said there

10  were -- you know, you had a pharmacist who called

11  you about two cases of diarrhea.  In terms of

12  educating your students, what did you tell them

13  should generate or lead to a call to a physician

14  about prescription opioids?

15      A.   An example would be if they start -- you're

16  seeing a volume of prescriptions come from the same

17  place or same prescriber or a prescription that

18  doesn't look like -- it could have been fabricated,

19  then you make sure you conduct your due diligence,

20  your responsibility as a pharmacist - to these

21  students - that you ensure that you're not

22  dispensing any of these drugs that could

23  potentially harm your community members.

24            And remember -- I just want to add here

1   that these -- this is an example of the kind of

2   things we were doing that would potentially help

3   with downstream have some even a minute amount of

4   incremental impact to help the crisis that we had

5   not generated or we had not caused.

6        Q.   And do you believe there are pharmacists

7   who failed to fulfill the community pharmacist role

8   in West Virginia?

9        A.   I can only base my opinions on reports that

10   I would read like the public or anyone else.  I do

11   not have any data or knowledge beyond that.

12        Q.   Based on those reports, what is your

13   opinion?

14        A.   My opinion is that there was plenty of

15   blame to go around, and there was definitely, you

16   know, some pharmacies in West Virginia that could

17   have done a better job at conducting their own due

18   diligence.

19        Q.   Do you have any particular pharmacies in

20   mind?

21        A.   Not at this time.  I -- you know, I haven't

22   reviewed the data and everything.  This has been a

23   while back.

24        Q.   At one time, did you have any particular

Page 84

1    pharmacies in mind?

2         A.   I'm sure I did.   I do not recall at this

3    point.

4         Q.   Do you recall what you did once you learned

5    that there might be some specific pharmacies who

6    are failing to fulfill their community caretaking

7    role or maybe not conducting their due diligence?

8         A.   I am not sure if I was a physician -- if I

9    was in Florala and I was reading about a pharmacy

10   and kind of see -- I don't think I had the role or

11   the ability to influence that, unfortunately.

12              And that goes back to my answer about

13   why I decided to go to public health.

14        Q.   Sure.   I'm actually focused on pharmacies

15   in West Virginia.   So let's just stick to your time

16   in West Virginia from 2009 on.   Did you ever come

17   to believe that pharmacies in West Virginia were

18   not fulfilling their community caretaking role?

19        A.   So the time that I was the local health

20   officer from 2009 to the end of 2014 -- I'm trying

21   to recall if there were any times - and I can't -

22   within my jurisdiction that we had a problem and I

23   did not recognize those.

24              I don't remember that -- being aware at

Page 85

1    the time of that.

2        Q.   Okay.  And then while you were a

3    Commissioner or -- and on the Governor's Advisory

4    Council on Substance Abuse, were there any

5    particular pharmacies that were brought to your

6    attention as ones that were problematic or had

7    failed to fulfill their role as community care --

8    community pharmacists?

9              And again, focusing on West Virginia

10   pharmacies.

11       A.   So that wouldn't be brought to my attention

12   because that would be brought to the attention of

13   the Board of Pharmacy and I would not be made aware

14   of that, because those investigations would be

15   confidential in nature.

16             So that would be the reason that I

17   wouldn't be made aware of that.  My knowledge comes

18   still from the published reports at the time, as

19   I've stated earlier.

20       Q.   And did you refer any West Virginia

21   pharmacies to the Board of Pharmacy for

22   investigation?

23       A.   I would have no cause to investigate or

24   find any cause to report those pharmacies.  Back to

Page 86

1    my earlier assertion that, you know, in my contact

2    with the Board of Pharmacy, and being secretary of

3    the Board of Medicine as well as the State Health

4    Commissioner of Public Health and State Public

5    Health Officer, my singular message was - for the

6    Board of Pharmacy - do everything they can within

7    their power and within their jurisdiction to ensure

8    that they curb the supply that's coming out in the

9    state of West Virginia.

10        Q.   And if you ever heard a patient describe a

11   interaction with a pharmacist that you believed to

12   be problematic or not fulfilling his role of a

13   community pharmacist, would you have referred that

14   pharmacist or pharmacy to the Board of Pharmacy for

15   investigation?

16        A.   I would.  I just don't recall that -- you

17   know, specific instances.  But my --

18        Q.   Okay.  Thank you.

19        A.   -- practice is if I had, I would.

20        Q.   Okay, thank you.  I think we talked a

21   little bit about this already, but you agree that

22   there's a role for prescription opioids in the

23   treatment of pain.  Correct?

24        A.   I would agree with that.

Page 87

1      Q.   And including chronic pain?

2      A.   I would agree with that.

3      Q.   Is it fair to say then that a prescription

4   for opioids is not, in and of itself, illegitimate

5   or illegal?

6      A.   I'm not sure if I would agree with that.

7      Q.   You believe that there are some instances

8   in which -- let me clarify my question, and maybe

9   this will help.  A prescription for opioids written

10  by a DEA-registered and state-licensed medical

11  professional is not, in of itself, illegitimate,

12  correct?

13           MR. COLANTONIO:  Object to the form.

14     A.   The way I would respond to that question

15  would be that no prescription that becomes

16  illegitimate just because it's a prescription; in

17  fact, just the opposite is true.  However, it's the

18  intent with which the prescription is written as

19  well as the whom to which the prescription is

20  written and what purpose that is the essence of a

21  prescription writing process.

22     Q.   Okay.  So when a pharmacist receives a

23  prescription or --

24           MS. JINDAL:  Sorry, strike that.

Page 88

1       Q.   When a pharmacist has a patient come in

2   with a prescription for opioids, is it fair to say

3   that a pharmacist needs more information to make a

4   judgment about whether or not that prescription is

5   one that should be dispensed or filled?

6              MR. COLANTONIO:   Object to the form.

7       A.   They could.  I mean, if you could repeat

8   that question -- I'm trying my best to answer.

9       Q.   Sure.  I guess what I'm trying to say is:

10  We talked a little bit about it already.  You said

11  that when a pharmacist, for example, generally

12  might be concerned when he starts seeing too many

13  prescriptions from a prescriber or a facility for

14  prescription opioids or he might be concerned when

15  the patient who comes in through the door is

16  someone who is from far away.

17             What I'm trying to get at is:  That all

18  -- that information -- that kind of information is

19  not ascertainable from the prescription itself.

20  Correct?

21      A.   Just the face of the prescription, it

22  depends.  If it's an electronic prescription, that

23  can be ascertained through the required

24  interrogation of the prescription monitoring

Page 89

1    program.

2              So it just depends.  It doesn't have to

3    be a black or white answer.  It just depends.

4        Q.   Okay.  And are pharmacists in West Virginia

5    required to check the prescription monitoring

6    program before they fill a prescription for

7    opioids?

8        A.   Yes.  Now.

9        Q.   When did that become law?

10       A.   I believe the -- what West Virginia called

11   its Controlled Substance Monitoring Program - it's

12   the PDMP version - it's called the CSMP.  It was

13   established in 1995, and there were changes that

14   have been made over time.

15             The last one, I would say,

16   approximately around 2012 when they were -- when

17   they were able to do that, and I think during 2015.

18   I don't -- I can't exact -- I can't exactly tell

19   you when.  But we did work on that over my tenure

20   to require that.

21       Q.   And when you refer to that requirement, are

22   you referring to the requirement that pharmacists

23   are required to enter any information about

24   prescriptions that are dispensed within 24 hours of

Page 90

1    having dispensed them?

2       A.   Broadly, I believe so.  Again, I'm not a

3    pharmacist, and I do not own any pharmacies, so I

4    -- it's very hard for me to speak about the

5    regulations within the pharmacy world.  At least

6    I'm going to try to answer the best I can.

7       Q.   Sure.  So you could be mistaken that --

8    about whether pharmacists are required to check

9    that database before deciding whether to fill a

10   prescription for opioids?

11      A.   I have a reasonable degree of certainty

12   that they are required to do that.  Now, there

13   could be some that do not do that, and I cannot

14   vouch for those people.

15      Q.   Turning back to Exhibit 51, and staying on

16   that same page and focusing on the University of --

17   your work with the University of Charleston School

18   of Pharmacy.  The second bullet describes your

19   class on "expansion of the role of pharmacy under

20   the Patient Protection and Affordable Care Act."

21           Did that class involve any discussion

22   of prescription opioids?

23      A.   That one did not.  To my recollection.

24      Q.   So we've discussed your work with the

Page 91

1    Kanawha/Charleston Health Department from 2009 to

2    the end of 2014.  And then you became a

3    Commissioner starting in January 2015, correct?

4         A.   Yes.

5         Q.   Turning to the first page of your resume,

6    that describes - at a high level - some of the work

7    you did as the Commissioner and State Health

8    Officer for the Bureau of Public Health, correct?

9         A.   Yes.

10        Q.   Okay.  Turning to that second page, I just

11   want to focus on the last bullet of -- under that

12   heading of Commissioner and State Health Officer.

13   This states, "Serve as Secretary and Ex Officio

14   member of the West Virginia Board of Medicine where

15   along with the President, I am responsible as

16   signatory authority for all medical licensing,

17   disciplinary, and other actions of the Board."

18             Did I read that correctly?

19        A.   Yes.

20        Q.   How long did you serve as secretary of the

21   West Virginia Board of Medicine?

22        A.   So the service of this position is inherent

23   with the job of the Commissioner of the State

24   Public Officer through statute in West Virginia.

Page 92

1  So this is a position that comes along with being

2  the Commissioner and the State Health Officer.

3           So my tenure was the same.  The day I

4  joined as the Commissioner/State Health Officer, I

5  became the secretary and ex officio member.  The

6  day I left the prior position is the day I tendered

7  my resignation for this position as well.

8      Q.   Did you have any involvement with the Board

9  of Medicine before you became Commissioner?

10     A.   I was a licensee of the Board of Medicine

11 in West Virginia since 2009.

12     Q.   And do you recall the process for becoming

13 a licensee of the Board of Medicine?

14     A.   I can vaguely do my best to -- to tell you

15 that.

16     Q.   As best as you recall, please.

17     A.   So generally licensing requirements for

18 states require that you demonstrate a proficiency

19 in the practice of medicine, that you agree to the

20 medical practice act of that state, understand the

21 policy and procedures and read those.

22          You also have to demonstrate your

23 passing of whatever qualifications of the states

24 are for the minimum licensing requirements, which

Page 93

1    includes medical school, residency of some sort,

2    several years.  And then providing documents to

3    authenticate that, and as well as references.

4              Certain states, I believe, like West

5    Virginia have questionnaires around, you know,

6    child support, alimony and others.  There's

7    questionnaires around previous criminal acts

8    demonstrating that you must be in good standing.

9              Previous acts by other boards of

10   medicine that could be against your license or --

11             So there's a whole course of questions

12   including, as I mention, your acts and actions

13   against your DEA certificate or your state

14   certificates.

15             So it's a whole entire process that

16   takes anywhere from an average of two to twelve

17   months in any particular state given -- to be able

18   to obtain your license.  It's a long a tenuous

19   process.

20      Q.   And you said there are specific questions

21   directed at your DEA registration as part of that

22   process?

23      A.   I would like -- I recall that.  Please

24   don't hold me to it, but I believe that there are.

Page 94

1      Q.   And any other questions about prescriptions

2   -- prescribing of controlled substances?

3      A.   I don't recall that point.  But most of the

4   questions come -- emanate with the application

5   process tend to pretty much be in the statute of

6   rules of West Virginia Medical Practice Act for

7   licensing aspects.

8      Q.   Doctor, you said that you are currently

9   teaching at West Virginia University and Harvard

10  Schools of Public Health; is that correct?

11     A.   That's correct.

12     Q.   And what do you teach at those schools?

13     A.   So -- I'll start with Harvard because that

14  one particular class next week.  I'm a visiting

15  faculty and I teach risk communications, primarily

16  using the West Virginia water crisis as example,

17  but walk through the class.

18          We have anywhere between 60 or so

19  participants from all over the world.  It's an

20  executive education class that are mid to high

21  level, to be taken by experts from nuclear

22  propulsion labs to the eco labs of China to

23  Singapore, FDA, CDC, all of them.  And we basically

24  -- I'm part of the faculty that teaches them how to

Page 95

1    communicate risk in a time of crisis.

2        Q.   And do any of those classes involve

3    discussions of prescription opioids?

4        A.   My teaching part does not.  I cannot recall

5    if any of the -- because it's an interactive class

6    and the participants may have asked in the last

7    several years that I've been teaching the class

8    that could have been related to opioids, but I do

9    not specifically recall any of that.

10               In West Virginia University, I do

11   teach at the School of Public Health, grand rounds

12   generally, focused on public health issues.  That

13   does involve detailing the opioid crisis.

14               I'm someone who helped the process of

15   founding of the School of Public Health in West

16   Virginia University, so I feel vested in ensuring

17   that the school's graduates have a comprehensive

18   education, and it's the only School of Public

19   Health in the state in both public health, but also

20   specifically whatever the crises are ongoing in the

21   state, which has tended to be opioids for several

22   years now.

23       Q.   And does your focus in that class on --

24   I'll start again.

Page 96

1            You said you focus on the opioid --
2    detailing the opioid crisis in that class.  Does
3    your investigation include the causes of the opioid
4    epidemic?
5       A.   We have a discussion on the description of
6    charts and historical perspective.  We created -- I
7    ordered - as one of the first acts of being a
8    Commissioner - a historical perspective report that
9    - it's online available - of West Virginia's opioid
10   crisis from 2000 to 2015 data.
11           I take several pieces of information
12   from that report, that's a public report, done
13   under -- I believe, it was Governor Justice.  And I
14   use that as an example to talk about historical.
15   We talk about, obviously, all aspects/facets --
16   it's a pandemic -- it's an epidemic of epidemics.
17           We talk about all the consequences that
18   are happening.  And then we talk about things that
19   we're doing to solve.  The bottom line is, we do
20   talk about, you know, how we got here; but our
21   focus often is:  How do we fix this?
22           And we want, you know, in West Virginia
23   our students to understand that while we didn't
24   break it, we'll have to fix it.  And we're going to

Page 97

1    have to get together.

2              So whether it's the HIV outbreaks that

3    happened in Cabell County recently -- which is the

4    second-largest HIV outbreak in the nation's history

5    recently, in Vienna, or the Hepatitis A outbreak

6    that I personally dealt with during my tenure; or

7    the highest levels of Hepatitis C.

8              We have a record in our country being

9    first or second - compete with Kentucky oftentimes

10   - and the highest levels of -- historic high levels

11   of Hep B, which both transmitted through IV drug

12   use and other aspects.  15 -- 13 to 15 times the

13   national average.

14             We talk about those things.  We talk

15   about:  How do you solve these problems?  We talk

16   about how do we prevent, you know, 5 percent of the

17   babies that are born with neonatal abstinence

18   syndrome in this state, and that costs a million

19   dollars a baby.  And that's a billion dollars - if

20   you add the numbers - of an ongoing liability to

21   the state every single year.

22             I produced a white paper to -- to the

23   Senate finance chairman about that years ago.

24             So we talk about actual real issues,

Page 98

1   fighting this crisis on the ground, trying to stop

2   people from dying, trying to get people to enter

3   into treatment.

4           So you know, frankly enough, we have a

5   job to do when I teach, and I'm not -- I don't --

6   my job is really to figure out how to solve this

7   crisis with the tools we have.  Not the tools we

8   wanted or we could have.

9           But what we've got, we have to work

10  with to solve a really deadly problem.  And that's

11  where a lot of my focus and effort is, not really

12  on a daily basis playing the blame game.  That's

13  not what I focus on, frankly and honestly.

14          I could talk about it, but that's --

15  really honestly, that's not -- my focus has been to

16  solve the problem.

17     Q.   I appreciate that, Doctor.  And I'm going

18  to just ask you to focus on my questions and

19  limiting your answers to what I specifically ask.

20  It just will help us get through this a lot faster.

21          And so I'm going to repeat my question,

22  and I think I heard the answer, but is it accurate

23  to say that you do discuss the causes of -- or the

24  factors that led to the opioid problem in West

Page 99

1  Virginia or the extent of the opioid problem in

2  West Virginia?

3      A.   We do discuss and have a discussion around

4  the factors that mainly lead -- have led to the

5  opioid crisis and its consequences in West

6  Virginia.

7      Q.   And could you please turn to Exhibit 54?

8          GUPTA DEPOSITION EXHIBIT NO. 54

9              ("State of Health" presentation by

10             Rahul Gupta, MD, MPH, MBA, FACP dated

11             10-26-18 (CT2_RGupta000919-966) was

12             marked for identification purposes as

13             Gupta Deposition Exhibit No. 54.)

14             MR. COLANTONIO:  Is this a new one?

15             MS. JINDAL:  And I recognize I'm

16  introducing a topic that, you know, will go on for

17  a while.  I suggest we take a break at 12:00 -- I

18  recognize -- I think opposing counsel also want to

19  ask some questions, so why don't we continue until

20  12:00 o'clock, we can take a short break for lunch,

21  and then opposing counsel can ask their questions.

22             Does that sound fair?

23             MR. COLANTONIO:  That sounds fine.

24  That's fine.  Let me just --

Page 100

1     Q.   Doctor Gupta, are you okay with that?

2               MR. COLANTONIO:  She wants to know if

3    you're okay with that.

4     A.   I'm okay with that.

5               MR. COLANTONIO:  I'm sorry.  Let me

6    try to get this envelope open here.  I'm trying --

7    I don't want to mess this up, because I lose things

8    very easily, that what my wife says anyway --

9               Exhibit 54.  This is an opportunity to

10   -- okay.  Got it.

11    A.   Okay, we're there.

12    Q.   I apologize.  My computer's taking a little

13   bit so --

14               Doctor Gupta, are you familiar with

15   this document?

16    A.   These slides do look familiar, yes.

17    Q.   And I'm going to direct your attention to

18   the -- it's hard to see on the first page, but it's

19   a bit easier to see on the second page.  Do you see

20   how in the left -- bottom left corner, there's an

21   -- and it's vertical.  There's a similar sort of

22   serial number?

23    A.   Yes.

24    Q.   And I'll represent to you, these documents

1  were -- or this is one of the documents that your

2  counsel produced to us.  Is this something that you

3  collected and gave to your counsel?

4       A.   I would say so.  This looks very familiar

5  to some of the documents I had provided.

6       Q.   Okay.  And this is a presentation titled

7  "State of Health"?

8       A.   Yes.

9       Q.   And it's dated October 26, 2018?

10      A.   Yes.

11      Q.   And is this something you created?

12      A.   Yes, I would have created.  I may have used

13 the assistance of my employees at the Bureau to

14 create this.

15      Q.   Okay.  But they would have done so at your

16 direction, correct?

17      A.   Yes.

18      Q.   I would like you to turn to that first

19 slide of the presentation, and I'll tell you it's

20 the Bates stamp number that ends in 0920.

21      A.   Yes.

22      Q.   The second bullet on here discusses "the

23 worst public health crisis in recent American

24 history - the opioid epidemic - as a supply/demand

Page 102

```
 1    issue."
 2                Did I read that correctly?
 3         A.   Yes.
 4         Q.   And what do you mean by "supply/demand
 5    issue?"
 6         A.   So over the time -- as you see, the date is
 7    2018, and I was in the office January of 2015, and
 8    I'm, of course, living in West Virginia.  You could
 9    not escape this crisis even in 2009.
10                There have been various ways to discuss
11    the most impactful crisis in a generation in the
12    state, and I was always figuring out how can I talk
13    about this topic and issue -- everybody's
14    passionate about it.
15                But how can I explain and talk about it
16    in a way that I can get the most of the time --
17    make most of the time that I have the time, and
18    often -- often it's easier to talk about -- it's
19    very easy -- let me rephrase that.
20                It's very easy to become a passionate
21    supporter of one side or another side or one aspect
22    or blame folks.  What is important - and was
23    important for me; and still remains so - is to be
24    able to communicate in evidence-based,
```

Page 103

1    science-driven manner the complexities of the

2    challenges that we were dealing with in a simple

3    way.

4                 So the challenge for the Commissioner

5    is to distill down extremely complex issues that

6    are killing Americans in general and West

7    Virginians every 12 hours in a way that you can

8    make people understand - all audiences of all types

9    - in a matter of, you know, 30 minutes, 40 minutes,

10   the big points.

11                And this was my way of explaining in a

12   way as a demand/supply that people get it.

13        Q.   And did that discussion include a

14   explanation of essentially how the crisis came to

15   be, or the factors that led to the development of

16   the opioid epidemic?

17        A.   Not necessarily always.  Oftentimes, the

18   factors discussed was oftentimes the volume of pain

19   pills.  It wasn't - as I mentioned before -

20   necessarily a blame game that we did in public.  It

21   was more about, "Listen, we had this volume; here's

22   how much it evolved over time; here's how it

23   correlates with death and destruction; and then

24   here's what we're doing about it," which is the

Page 104

1    third bullet.

2       Q.    And if you could turn to Slide 30, which is

3    ending in Bates stamp number 0949.

4       A.    I'm here.

5       Q.    Does that reflect your discussion of a

6    supply-side driver?

7       A.    It's a blank slide.  It does say "Supply-

8    side drivers."

9       Q.    It does or it does not?

10      A.    It does.  It just says "Supply-side

11   drivers."  It's not a slide.

12      Q.    Right, I apologize.  But going from there

13   to Slide 35 which ends in Bates stamp number 0954,

14   does that reflect your completion discussion of the

15   supply-side drivers?

16             MR. COLANTONIO:  Object to form.

17      A.    I -- no, it doesn't.  That's a really easy

18   to answer, which is it does not.

19      Q.    Why not?

20      A.    Because this discussion doesn't talk about

21   all of the factors.  It uses the opioids, both in

22   West Virginia, changes that has happened to opioids

23   in West Virginia, as opposed to the country, as

24   well as one of the factors, and it --

Page 105

1          But it doesn't talk about the entire

2     demand/supply chain; it doesn't talk about

3     manufacturing; it doesn't talk about production; it

4     doesn't talk about quotas; it doesn't talk about

5     distribution; it doesn't talk about pharmacies; it

6     doesn't talk about dispensing; it doesn't talk

7     about the transition to heroin and fentanyl.

8          It doesn't talk about how the

9     transition has happened from prescription to

10    actively illegal and illegitimate drugs; it doesn't

11    talk about how the deaths transitioned to meth and

12    other stimulants in addition to depressants.

13         So there's a lot of facets to this.  As

14    I mentioned before, my job was to get people in a

15    simplified way to understand in a matter of 30 to

16    40 minutes.  So I could spend all day talking about

17    it but I wouldn't have anybody listening to me,

18    because they would all be gone.

19    Q.   Sure.  And I understand that this doesn't

20    reflect the full description of the opioid problem

21    in West Virginia or nationally.  What I'm asking

22    is:  Does this reflect your discussion of the

23    supply-side drivers, as you've written here, of the

24    opioid epidemic?

Page 106

```
 1            MR. COLANTONIO:  Object as asked and
 2    answered.
 3        A.   So that isn't -- I only answered the
 4    supply-side.  You know, all my previous answer
 5    includes that.  I did not talk about the
 6    consequences of HIV, Hep C.
 7                I only talked about the supply-side, so
 8    the entire -- the entirety of my answer includes
 9    the supply-side dynamics which I do not include in
10    the slide -- in the slides that I have here.
11        Q.   Okay.  So does this rep -- I think you used
12    the term "the big points."  Does this reflect your
13    understanding of "the big points" as far as supply-
14    side drivers go?
15            MR. COLANTONIO:  I'm sorry, object to
16    the form.  I'm sorry, I didn't hear what you said.
17    You said "big point" --
18            MS. JINDAL:  I'm sorry.  He testified
19    just a bit ago that his presentation here was the
20    --
21        Q.   So you said, Doctor:  "So the challenge for
22    the Commissioner is to distill down extremely
23    complex issues that are killing Americans in
24    general and West Virginians every 12 hours in a way
```

Page 107

1    that you can make people understand - all audiences

2    of all types - in a matter of, you know, 30

3    minutes, 40 minutes, the big points."

4              Does this reflect your understanding of

5    what the big points are when it comes to supply-

6    side drivers?

7        A.   No, I think my big points are the three

8    bullets that you see on page 2 of that

9    presentation.  Those are the big points.

10             So if you see, I don't have a list of

11   -- under Objectives, ten things.  It's like three

12   big points.  Update on state of health; discuss the

13   demand/supply issue.  But that -- the big points

14   doesn't relate to every slide or every aspect.  The

15   big --

16             So I could have objectives -- 20

17   objectives, but at the end of the day, I have to

18   have three big points.  Like here's what I'm gonna

19   talk about.  I'm going to talk about the demand

20   side here.  That doesn't mean that the supply issue

21   is also a big point that I have in slides or the

22   demand side.

23             I can tell you the same thing in demand

24   side, it doesn't include the big points.  There's a

Page 108

1    number of points, but that's not it.

2              So I refer to the big points as the

3    objectives of my talk.

4        Q.   I see.  So when you put this presentation

5    together, focusing again just on your -- the

6    supply-side drivers, you recognize that you

7    couldn't talk about everything under the sun,

8    correct?

9              MR. COLANTONIO:  Object to the form.

10       A.   Could you please repeat that, please?

11       Q.   Sure.  When you wanted to put together some

12   slides that explain the supply-side drivers of the

13   opioid epidemic, you knew that you couldn't spend

14   your entire 40-minute presentation on just that.

15   Correct?

16       A.   That would be reasonable.

17       Q.   And you wanted to focus on the most

18   significant take-away for your audience, correct?

19       A.   That's correct.  But I will ask if you look

20   at the top of Slide No. 30, the title is "Opioid

21   Epidemic - An Evolving Crisis."

22             So if you listen to me speak at the

23   time, I would caveat this particular slide with a

24   lot of things.  So I can say, you know, "This is an

Page 109

1    evolution and I don't want you to take away from

2    this that this is exclusively what I focused on

3    here.  There are other aspects."

4              So I can get a discussion out of the

5    public or whoever I'm presenting so we can have a

6    discussion.  So I wouldn't take what's on the

7    slides as the -- the entirety or as the most

8    important pieces.

9              They are very important parts of a

10   discussion.  I just want to make that clear.

11   Q.   When you were determining what to include

12   in this discussion of supply-side drivers, what

13   were the other things that you could have included

14   in this discussion but did not?

15   A.   So as I mentioned, I would -- I would

16   include -- "Let me explain to you how it works.

17   Let me explain to you where the quotas come from.

18   Let me explain to you the goal of everyone on the

19   supply chain side."  To the extent that I'm aware

20   of that.

21              But you know, I would also say, "This

22   is something that you should go look into, you

23   should learn more about, because these things all

24   relate back, you need to have a level of

Page 110

1    understanding about these things, because they do

2    impact whether" --

3              So I'm speaking to an audience of

4    physicians or residents, I will say, "This impacts

5    your prescribing."  If I was speaking to a lay

6    audience, I would say, "This impacts, you know,

7    your son who has died or your uncle who has died

8    and this is the reason this is the case."

9              So based on the audiences, I would be

10   able to relate this back to those audiences.  But

11   this would be part of that discussion, but it would

12   include a number of other factors, but those

13   factors would also be guided by the audience I was

14   speaking to.

15             So it's not a monogamous kind of

16   discussion each time.

17      Q.   And if you could just go through Slide 31

18   really quickly.  Slide 31 and 32 show the rate of

19   all the prescriptions in West Virginia compared to

20   the rest of the country, correct?

21      A.   Yes.

22      Q.   And this is not focused on opioid

23   prescriptions specifically, but all prescriptions?

24      A.   Yes.

Page 111

1      Q.   Okay.  And you've highlighted West Virginia

2   here on Slide 32 and Bates 0951, where West

3   Virginia ranks number one in its rate of

4   prescriptions.

5      A.   Yes.

6      Q.   Okay.  And that is the statistic as of

7   2016?

8      A.   The source for that is the QuintilesIMS

9   Xponent data of 2017.  That's actually referenced

10   at the bottom.

11      Q.   Okay.  I think I'm focusing on the title at

12   the top.  It says --

13      A.   Yes, that's 2016 data.

14      Q.   I'm sorry?

15      A.   Yes.  2016.

16      Q.   2016.  So West Virginia ranked number one

17   in the annual prescriptions per capita in 2016?

18      A.   According to this data, yes.

19      Q.   Okay.  And the next slide reflects the

20   decrease in opioid prescription rates specifically

21   from 2015 to 2016 in West Virginia, correct?

22      A.   Yes.

23      Q.   And West Virginia had the greatest decrease

24   at 15.6 percent, correct?

Page 112

1      A.    According to this data, yes.

2      Q.    Okay.  And this is, again, the

3   QuintilesIMS Xponent 2017 data for that report?

4      A.    Yes.

5      Q.    Do you have any reason to doubt the

6   accuracy of this data?

7      A.    I would not.

8      Q.    And Slide 34 and 35 - these end in Bates

9   Nos. 0953 and 0954 - these reflect the number of

10  opioid prescriptions that were filled per capita in

11  2017 -- in 2016, correct?

12     A.    Yes.

13     Q.    And meaning the number of prescriptions

14  that were written by DEA-registered and state-

15  licensed doctors and that were presented to a

16  DEA-registered and state-licensed pharmacy by a

17  patient, right?

18     A.    "Prescribers" is the correction I would

19  make.

20     Q.    I --

21     A.    But generally, yes.

22     Q.    Thank you.  I appreciate that.  And is it

23  fair to say that just looking at these slides, your

24  assessment of the supply-side factors that led to

1  the epidemic - at least the ones that you have the

2  most information on - is that prescribers wrote too

3  many prescriptions for opioids?

4       A.   Could you please restate that question?

5       Q.   Yes.  Let me put it this way:  Why do you

6  discuss the volume of prescriptions in West

7  Virginia and in the rest of the nation as part of

8  this presentation focusing on supply-side factors?

9       A.   Because the total volume that was available

10  had a direct relationship and a correlation with

11  the death and destruction that was happening

12  related to overall overdoses in the state of West

13  Virginia.

14       Q.   And when you say that the "total volume

15  that was available," do you mean the total volume

16  of prescriptions?

17       A.   "Prescription" is a surrogate for the

18  amount of pills that were flowing through in

19  communities across towns of West Virginia.

20       Q.   And the number of prescriptions are a

21  surrogate for the number of pills why, in your

22  opinion?

23       A.   Because that is probably the closest way

24  for a public health commissioner like me to be able

Page 114

1    to correlate.  I would not have access to the

2    actual data other than published reports, you know,

3    to the tune of what we found later to be 780

4    million or what have you pills.

5              We at the time - as I recollect -

6    weren't really aware of actual numbers, or we were

7    close to aware of that -- being aware of that, but

8    at the same time, prescriptions is the way to have

9    the pills out there.  I mean, there is appropriate

10   prescribing and there is inappropriate prescribing.

11             But at the end of the day, it is

12   through prescriptions that the flow of the pills

13   are gonna end up there and be diverted.

14   Q.   Okay, Doctor, I think we're almost at noon

15   now.  Why don't we go ahead and take that lunch

16   break for about, say, until 12:30 and then we can

17   come back and opposing counsel can take their -- do

18   their questioning?

19   A.   Okay.

20             MR. COLANTONIO:  Okay, thank you.

21             THE DEPONENT:  Thank you.

22             VIDEO OPERATOR:  Going off the record.

23   The time is 11:53 a.m.

24             (A recess was taken for lunch after

Page 115

1           which the proceedings continued as

2           follows:)

3           VIDEO OPERATOR:  Now begins Media Unit

4     3 in the deposition of Rahul Gupta, M.D.  We are

5     back on the record.  The time is 12:34 p.m.

6           MS. JINDAL:  And I'll just explain --

7     we are going to pass the witness to counsel for

8     Cabell County and City of Huntington for an

9     opportunity for them to ask their questions, and

10    then they will pass the witness back.

11          Go ahead.

12          MR. COLANTONIO:  Okay.  This is Mark

13    Colantonio, and I'm counsel for Doctor Gupta.  I

14    was actually going to ask Doctor Gupta questions

15    now if that's okay with everybody.

16          MS. JINDAL:  Sure.  I'm sorry.  I --

17    that's fine.

18          MR. COLANTONIO:  That's okay.

19          THE DEPONENT:  Do you want me to move

20    the camera --

21          MR. COLANTONIO:  No.  You know what.

22    This is a little bit awkward because we're doing

23    this Zoom, and I'm actually sitting beside Doctor

24    Gupta.  So --

Page 116

1                    EXAMINATION

2    BY MR. COLANTONIO:

3         Q.   Doctor, just because of the extraordinary

4    circumstances of this case in terms of the COVID

5    and everything, what I would suggest is just look

6    at the camera and what I will do is ask questions

7    from the side, and then if you don't understand or

8    need me to, you know, rephrase the question, just

9    tell me and I'll do that.  Okay?

10        A.   Okay.

11        Q.   All right.  So Doctor, what I'd like to do

12   in the next hour or so is kind of go through first

13   your background, training and experience a little

14   bit, and then go through -- you answered questions,

15   bits and pieces, of your knowledge of this problem.

16             And I want to go through it basically

17   from start to finish and what your views are and

18   what conclusions you have been able to reach

19   concerning what you've done in West Virginia and

20   hopefully to give us some ideas about or opinions

21   about how we might be able to potentially fix this

22   problem.  Okay?

23        A.   Yes.

24             MR. GOOLD:  Counsel, before you start,

Page 117

1    this is Jim Goold.  I represent -- Covington

2    Burling.  I represent McKesson.  I just want to

3    interpose a -- I'll call it a standing objection,

4    that as far as I know, the doctor -- the good

5    doctor is not a party, so he's not entitled to be

6    run through a direct examination by his personal

7    counsel.

8                I won't object to every question as we

9    go along, but I do want the record to have my

10   objection on it.  Thank you.

11               MR. COLANTONIO:  I understand, and you

12   can have that standing objection.  Okay?

13               MR. RUBY:  And Mark, this is Steve --

14   in a maybe related vein, just to make sure we are

15   clear on the record, you are also - in addition to

16   being counsel for Doctor Gupta here today - you are

17   counsel for Cabell County and the City of

18   Huntington in the cases before Judge Faber.

19               MR. COLANTONIO:  That's correct, we

20   are, and we have appeared as such. That's right.

21               MR. RUBY:  But your position is that

22   you are questioning Doctor Gupta today as his

23   counsel and not -- not on behalf of the plaintiffs

24   in the case?

1           MR. COLANTONIO:  Well, I would take

2     the position that we're questioning at this time on

3     behalf of both.

4           MS. KEARSE:  And this is Anne Kearse.

5     I'm appearing on behalf of the City of Huntington,

6     so -- if there's any issue with that.

7           MR. RUBY:  So you're -- Mark, you are

8     -- you're questioning as counsel for plaintiffs.

9           MR. COLANTONIO:  That is correct.

10          MR. GOOLD:  Well, but I believe you

11    introduced yourself as appearing as personal

12    counsel for the witness.

13          MR. COLANTONIO:  I have.  That's

14    right, I have.  I represent two -- at this point in

15    time, I represent the witness and I represent

16    Cabell County.  That's correct.

17          MR. GOOLD:  Well, we'll have to sort

18    this out later. Okay.

19          MR. COLANTONIO:  But no, I do.

20    There's no question that in this particular

21    instance, myself and Mr. Fitzsimmons represent both

22    Doctor Gupta as a witness in this case, and we have

23    - and still do - represent Huntington and Cabell

24    County in connection with the litigation.  That's

Page 119

1    correct.

2                  MR. GOOLD:  But he's not as -- has not

3    been designated an expert witness in Cabell/

4    Huntington.

5                  MR. COLANTONIO:  I don't -- I think

6    he's been designated as a nonretained expert, but I

7    haven't reviewed the pleadings.

8                  He's not a party; you're right about

9    that.  But he's not a -- I don't believe he's a

10   retained expert.  I believe he's a nonretained

11   person who may render opinions as a nonretained

12   expert.

13                 MR. GOOLD:  Okay, well, my objection

14   stands, but I don't like to get into a long

15   colloquial --

16                 (Phone ringing)

17                 MR. GOOLD:  It's noted.

18                 MR. COLANTONIO:  Understood.

19   BY MR. COLANTONIO:

20       Q.   All right, Doctor.  So quickly just going

21   through your educational background, you did retain

22   -- you did obtain your doctor's degree from the

23   University of Delhi.  Is that correct?

24       A.   Yes.

Page 120

1       Q.   And that's 1993?

2       A.   Yes.

3       Q.   And then you obtained a master's in public

4    health from the University of Alabama-Birmingham.

5    You testified to that, correct?

6       A.   Yes.

7       Q.   And you also obtained a master's in

8    business administration from the London School of

9    Business and Finance, true?

10      A.   Yes.

11      Q.   And then you have some teaching positions

12   that you've held through the years and even now; is

13   that correct?

14      A.   Yes.

15      Q.   You described some of these.  Let's go

16   through them briefly.  So you were an assistant

17   professor of medicine at the University of Alabama;

18   is that correct?

19      A.   Yes.

20      Q.   And also a clinical assistant professor of

21   medicine at Vanderbilt -- from 2007 to 2009?  Is

22   that true?

23      A.   Yes.

24      Q.   You also were assistant professor of

Page 121

1    medicine at Meharry Medical College in Nashville;

2    is that true, from 2007 to 2009?

3         A.   Yes.

4         Q.   You've held clinical teaching faculty

5    position at the West Virginia School of Osteopathic

6    Medicine in Charleston from 2010 to '14; is that

7    correct?

8         A.   Yes.

9         Q.   You are a -- were a clinical assistant

10   professor at the WVU School of Medicine in the

11   Charleston campus from 2010 to 2015; is that true?

12        A.   Yes.

13        Q.   You are an associate professor at the

14   University of Charleston School of Pharmacy from

15   2011 to now; is that correct?

16        A.   Yes.

17        Q.   And you are a visiting professor at the

18   Chan School of Public Health, Harvard University,

19   from 2015 to now.  Is that correct?

20        A.   Yes.

21        Q.   An adjunct professor of the Department of

22   Health Policy, Management and Leadership at the

23   public -- School of Public Health in West Virginia;

24   is that correct?

Page 122

1      A.    Yes.

2      Q.    And did I understand you to say that you

3   helped form that school or helped form that

4   program?

5      A.    Yes.  I helped both speak to the

6   legislature to find the funding as well as instill

7   the idea of the School of Public Health, the first

8   school in the state of West Virginia.

9      Q.    And you are board certified in internal

10  medicine; is that true?

11     A.    I am board certified as of 2019.  I have

12  passed the first part of the board exam in 2020.  I

13  let that certification lapse, again, because I was

14  busy with other things, but I intend to regain that

15  certification.  The second examination is in

16  October of this year.

17     Q.    And I've looked at your resume.  It appears

18  that you have approximately 123 or so peer-reviewed

19  articles you've published; is that correct?

20     A.    Yes.

21     Q.    And you've also appeared nationally on

22  various national television programs and different

23  programs related to opioids.  Is that true?

24     A.    Yes.

1      Q.   Can you give us some examples of that?

2      A.   Yes, so the PBS Nova did a documentary

3  called "Addiction" and I was one of the four --

4  three or four people that was featured, and the

5  work of West Virginia was featured in that

6  documentary.   That's an example.

7           Politico did a feature on the work that

8  was happening as well.  And we've had over the time

9  several number of both people recording, visiting

10  and sort of following the work that has been

11  happening in West Virginia.

12     Q.   All right.  And you've also served on

13  editorial boards of different entities; is that

14  correct?

15     A.   Yes.

16     Q.   You served as a peer review on several

17  entities; is that correct?

18     A.   Several medical journals and public health

19  articles, yes.

20     Q.   Have you also done some work for the CDC in

21  connection with opioids?

22     A.   Yes, I've worked very closely with CDC and

23  their physician and have had the director of the

24  CDC visit and he really made comments that he'd

Page 124

1   like to see the work that we had done replicated

2   across the country and other areas as well.

3            We've had also -- hosted the

4   then-secretary of HHS, Tom Price, as well as the

5   counsel to the president, you know, to demonstrate

6   and showcase what was happening in West Virginia

7   with Kellyanne Conway.

8       Q.   And I've heard this term before of social

9   autopsy.  Have you heard that term often?

10      A.   Yes.  We -- so we seeing the declines in

11  death about 10 to 15 to 20 percent each year during

12  my tenure from 2016 and prior to that to -- finally

13  in 2017, I asked -- one of the responsibility of

14  the Commissioner is to be able to produce reports.

15  So I asked my department to work at cross

16  structures in West Virginia - for example, the

17  Medicaid program, the EMS program, the Office of

18  Medical Examiner, the Board of Pharmacy, the Board

19  of Medicine - payors, to create a social autopsy.

20           What that meant was:  We went back to

21  all of the thousand or so deaths in 2016 from

22  overdose and we basically conducted - a simplistic

23  way to say it - a CSI-type of investigation.

24           So we up and did, we wanted to learn

Page 125

1    from the dead to help inform those who are living.

2              And one of the ways we did that is:  We

3    looked at every single death and we investigated

4    their past one year prior to death and understand

5    what happened, what led to them dying, and then we

6    cataloged that and published that report.

7              That report helped form -- helped us

8    form an opioid task force where we brought in

9    experts from Johns Hopkins, Marshall University,

10   West Virginia University, as I had helped create

11   the Office of Drug Control Policy under the

12   supervision of the State Health Office and

13   Commissioner at the time.

14             The drug czar that I hired who was the

15   former police chief of Huntington, West Virginia,

16   he led this task force that came up with

17   recommendations that then subsequently resulted in

18   two pieces of legislation - the Senate Bill 273 and

19   Senate Bill 272 in 2018 - one of which was called

20   the Opioid Reduction Act.

21             Now, back to the social autopsy, why we

22   ended up with the Senate -- two Senate bills

23   essentially passing unanimously for both parties

24   and being signed by the Governor is because of the

```
                                         Page 126
 1   findings, the evidence-based findings that we had
 2   from the social autopsy.
 3              We found that even then - in 2016 - a
 4   significant amount of people who were dying had
 5   filled their prescription within 30 days of their
 6   death.  We also found a significant type of people
 7   that were incarcerated and then released and then
 8   died, overdosed and died.
 9              We found that three out of those four
10   people that died tried to seek help before their
11   time of death within the last year.  We also found
12   that there wasn't sufficient amount of naloxone
13   that was being given to people to help them
14   survive.
15              There weren't enough facilities that
16   were available.  So those are the kind of things
17   that became important, and that was something that
18   was not only done in West Virginia, but subsequent
19   to that, we started receiving requests from states
20   and large cities all over the country, because they
21   wanted to repeat what we had done.
22              So we started providing temporary
23   assistance to, you know, a handful of states at the
24   time, but many more afterwards, and therefore the
```

1   CDC director obviously made that point to me

2   personally that he wants to see this happen for

3   other diseases as a way -- a new way to learn in

4   order to inform how to address the problems.

5        Q.   And when you mention you did this -- you

6   did this study about deaths and you said within 30

7   days of their death, they had a prescription, a

8   prescription for what?

9        A.   Prescription for a controlled substance.

10       Q.   And did those controlled substances include

11  opioids?

12       A.   Yes.

13       Q.   So you also obviously served as the chief

14  health officer in Kanawha County, State Health

15  Officer, correct?

16       A.   I was the local health officer for Kanawha

17  County prior to becoming the State Health Officer.

18       Q.   And Kanawha County is from '09 until what

19  year?

20       A.   December of '14.

21       Q.   In December of '14, you took the role as

22  the state chief officer and you kept that role

23  until 2018?

24       A.   January of 2015 to November of 2018.

1    Q.   And in your positions in West Virginia, did

2  you deal with the issues related to the opioid

3  problem on essentially a daily basis?

4    A.   Yes.

5    Q.   You've also served on some advisory

6  councils listed in your CV, and do any of those

7  specifically deal with - as you recall - opioids?

8    A.   The Governor's advisory council, as was

9  mentioned earlier, is one of the most prominent

10  ones that my position allowed me to sit on and this

11  had mostly the heads of the agencies within the

12  state of West Virginia that were working to attempt

13  to help create solutions to this crisis.

14    Q.   You now work for March of Dimes; is that

15  true?

16    A.   Yes.

17    Q.   What's your position?

18    A.   I'm the senior vice president and the chief

19  medical and health officer and interim chief

20  science officer of March of Dimes.

21    Q.   And what's the mission of the March of

22  dimes?

23    A.   It's to have healthy moms and strong

24  babies, so it's basically maternal and infant

Page 129

1    health.

2        Q.   And you mentioned your background and

3    experience in terms of primary care physician, you

4    did have some experience in Alabama and Tennessee;

5    is that correct?

6        A.   Yes.

7        Q.   And you were able to see firsthand from

8    that experience the -- as you describe, the change

9    in how opioids were being prescribed?

10       A.   Yes, I saw it -- I actually wanted to

11   mention it -- and I'll mention now -- the fact that

12   today is September 11th, and I could tell you, on

13   September 11th, 2001, I was in Florala, and I

14   believe on September 12th, 2001, as I came to my

15   office around 8:00 o'clock in the morning, my

16   secretary said, "Hey, there's two FBI agents

17   waiting for you in the waiting room."

18            And you can imagine.  I mean, it was a

19   very fearful time for everybody across the country.

20   And as they came into my office and started

21   talking, it became very clear -- this is, again, a

22   very rural town in the middle of nowhere literally.

23            And basically they brought with them a

24   fake prescription of someone that had managed to

Page 130

1    provide my signatures and they basically were doing

2    the due diligence investigation and it was for

3    opioids. Basically asking --

4              So this is something that I dealt with

5    firsthand, both from a suffering patient standpoint

6    to both, you know, having law enforcement agencies,

7    and work with them in a local capacity, to see the

8    carnage that was happening at the time.

9         Q.   All right.  So in your roles that you

10   served in West Virginia in dealing with this

11   problem, the opioid problem, did you -- did it

12   cause you to learn over the years, working there,

13   the number of prescriptions or pills delivered to

14   the state of West Virginia during the time you were

15   there?

16        A.   Yes.

17        Q.   How about the number of overdoses in West

18   Virginia during the time that you were there?

19        A.   Yes.  I was -- remained over the chief

20   medical examiner, I oversaw -- you know, I was

21   monitoring that.

22        Q.   How about the number of deaths that was

23   occurring in West Virginia and the addiction rates

24   in West Virginia?

Page 131

1      A.   So the deaths were so bad, now they hear on

2   the news, you know, that New York City has

3   air-conditioned trailers out there for pandemic.  I

4   can tell you we had those back in 2015.  We had

5   dead bodies that were accumulating at a rate that

6   we could not keep up at the medical examiner's

7   office.

8            So we had to get trailers that were air

9   conditioned, and when we sort of figure out what --

10  how do we say that, so we can keep the gracefulness

11  of dead bodies.  So we -- you know, we developed

12  names, mobile units, blank lines so that when we

13  explained to the public how we are doing it, we are

14  speaking in a graceful way so it doesn't look like

15  we are disrespecting the dead.

16           But the fact of the matter was, we were

17  putting bodies in trailers outside because we were

18  so overwhelmed with the number of bodies that were

19  coming in every single day.

20           Now, on one hand, that was happening.

21  That's carnal.

22           The second side of this was, you know,

23  our medical examiner offices inside Charleston had

24  bullet holes in it.  So that was the other

Page 132

1    consequence -- law enforcement consequence.  That

2    this was leading to drug wars and other aspects

3    within the town and our building was physically

4    being destroyed.  That was the safety.

5             And the third half aspect was that we

6    were not only having autopsies conducted as

7    accordance with law, but we were also monitoring

8    the number of drugs in decedents.

9             So we would send it off and we have

10   sophisticated labs -- better laboratories than the

11   office of the chief medical examiner, and we were

12   finding that there was an incline in the number of

13   drugs that were being found in the body of the

14   decedents, legal and illegal.  So they would have

15   between three and five substances being found.

16             That often included opioids; it could

17   include street drugs; it could include the

18   benzodiazepine group of drugs as well.

19   Q.   And so did you also learn from these

20   experiences the type of drugs that were being used

21   and abused and by people that were addicted to

22   these drugs?

23   A.   Yes, we had some of the best data in the

24   country because we were being very meticulous in

Page 133

1   the way we were doing things though we were lacking

2   a lot of resources.

3      Q.   And in your role -- roles you served in

4   West Virginia, did you become -- did you deal with

5   families yourself on a daily basis?

6      A.   Yes.  So I had a open door sort of method

7   to my office, so I would often get calls from

8   individual families.  I would go to funerals when I

9   could.  I would go to town halls, work off of

10  members of the legislature to hold town halls.

11          I would hear mothers talking about that

12  they'd rather their child stays in the jail just so

13  that they wouldn't die because they know that

14  they're gonna die if they get on the street.

15          So we heard a lot of heartbreaking

16  stories, first person, of families that were

17  suffering.  Oftentimes -- I mean I vividly remember

18  going to speak at the County Board of Education --

19  we had about 400 school teachers, at least, and I

20  asked the question when I'm speaking, I said, "How

21  many of you -- raise your hand if you've been

22  affected by the opioid crisis."

23          And not a single hand that did not go

24  up.  So this was a routine -- that was a rule, not

Page 134

1   an exception.  That any meeting I'd go to - whether

2   there was 100 people, 10 people, 1,000 people in

3   West Virginia - I would have -- see literally every

4   hand go up when you asked people, and they would

5   all have their own stories to tell.

6       Q.   And in your experience in West Virginia,

7   your roles as you've described, did you also have

8   occasion then to deal with -- identifying, as

9   you've described, and deal with this problem of

10  volume?

11      A.   We did.  We actually worked with the Board

12  of Pharmacy, so we got funded by the CDC.

13  Somewhere in 2015-16, it was the PDO grant, I

14  remember, prescription drug monitoring grant, that

15  we were then able to embed a person from the Board

16  of Pharmacy and pay for them, basically, to be able

17  to --

18              One of my initial problems was, other

19  than law enforcement, we didn't have access to the

20  data.

21              So it was very easy to say, how do we

22  fix it -- but the problem was that the law

23  enforcement and other people, I mean, the law did

24  not allow us free access to the data, and then it

                                                    Page 135

1    should not either allow anybody free access to very

2    sensitive data.

3              So one of the ways we were working with

4    it -- we were trying to work within the confines of

5    the law to make things happen to find solutions.

6    So we were able to embed an individual -- an

7    employee of the Board of Pharmacy, so that's when

8    we started to understand better the characteristics

9    of the dead.

10             That's when we did the social autopsy

11   and that's when we were getting a better idea of

12   what was happening.

13       Q.   And you also, is it true, firsthand dealt

14   with West Virginia's response to this epidemic and

15   problems and things were responsive to; is that

16   true?

17       A.   Yes, so we saw -- oversaw a HIV outbreak.

18   We saw a -- not only in Huntington subsequently,

19   but prior to that, we saw a outbreak of HIV in the

20   LGBT community in southern West Virginia.  And I

21   can tell you that was one of the most sensitive and

22   and difficult outbreaks to manage without having to

23   raise flags.

24             Because we knew -- I had seen in my

Page 136

1    experience in local hospitals where in our state in

2    West Virginia, just being outed as a gay person

3    could get you killed, to be honest.

4             So we had an outbreak that came -- had

5    to deal with, a very -- so we have to work with

6    dark web and other aspects.  We saw Hepatitis A

7    outbreak that was directly related to the opioid

8    crisis and the IV drug use that was happening,

9    which was large and started -- part of a

10   multi-state outbreak, but it got really ingrained.

11            But we had -- we continued to have the

12   highest levels of Hepatitis B and C also in

13   addition to other challenges.  We had from 83 to 85

14   percent of the foster care cases that were

15   happening - which is one of the largest budgets of

16   DHHR - was actually being attributed to, in one way

17   or the other, opioids, whether through the family

18   or otherwise.

19            But we were dealing with that, in

20   addition to the neonatal abstinence syndrome

21   tsunami that was coming in.

22       Q.   All right.  So do you believe from your

23   background trending experience - especially in West

24   Virginia - that you had a firsthand seat viewing

1   the causes and effects of this opioid problem in

2   West Virginia?

3        A.   Unfortunately, I did.  And I had to see

4   firsthand what was happening on a daily basis,

5   going to the practitioner, as somebody who lived in

6   the community, had children going to school in the

7   community and seeing those consequences as part of

8   being in the community, as well as being one that

9   was trusted to find solutions to this.

10       Q.   And that would include Cabell County, true?

11       A.   Yes.

12       Q.   And now, you mentioned the term in some

13   questioning before "upstream/downstream."  What do

14   you mean by that?

15       A.   So there are limitations to what states can

16   do, and that has to be recognized, and I certainly

17   did.

18            The upstream relates to things that are

19   not directly under our control.  That means it's

20   everywhere from having the quotas, enough to

21   manufacture, to be able to have the manufacturing

22   to be -- and to distribution.

23            Most people have something that -- if

24   we compare it to, it's like the dam.  There are

Page 138

1    aspects of that dam that are in place, and there's

2    rules and systems in place that generally are

3    governed by federal law in order to prevent

4    downstream effects.

5              But when that dam breaks, the problem

6    is the flooding of towns and cities and death and

7    destruction.  So the downstream effects that happen

8    because that is all of the things that we were

9    trying to do:  Incrementally address problems

10   through legislation, policy changes, you know,

11   doing everything we could in our power to bring

12   from social autopsy to finding ways to start Harm

13   Reduction clinics.

14             I was the first Commissioner to -- in

15   the first few months of my coming in, I helped fund

16   the first program in Cabell County, Harm Reduction

17   Program, that still exists today from state dollars

18   because we knew that was important.  So those are

19   the downstream pieces.

20             And a lot of times the downstream

21   pieces are just being reactive.  You're trying to

22   fix the problems because if not, people die or

23   suffer.  But the opportunities really to do

24   something, I believe, are much more being proactive

Page 139

1    at the upstream.

2         Q.   So based upon your experience you

3    described, your background, training and

4    experience, you believe that you possess a high

5    degree of understanding about addiction?

6         A.   I believe I possess a -- a pretty good

7    degree of understanding addiction.

8         Q.   And how it happens?

9         A.   Yes.

10        Q.   About what it does to the body?

11        A.   Yes.

12        Q.   About its consequences?

13        A.   Yes.

14        Q.   And about potential treatment of that?

15        A.   Yes.

16        Q.   Do you also believe that you possess a high

17   degree of understanding as to the opioid crisis/

18   epidemic in West Virginia?

19        A.   Yes.

20        Q.   As to its timeline?

21        A.   Yes.

22        Q.   As to its causes?

23        A.   Yes.

24        Q.   As to its consequences to the state of West

Page 140

1   Virginia, including Cabell County?

2        A.   Yes, having lived and seen it, yes.

3        Q.   And hopefully - this is maybe the most

4   important question - potentially how to fix it or

5   abate it?

6        A.   Yes.

7        Q.   All right.  So let's talk a little bit

8   about history and -- so go back to the 1990s, that

9   time frame.  You've described this before.  There

10  are legitimate reasons to prescribe opioids.  Is

11  that correct?

12       A.   I believe so.

13       Q.   And what is -- in your view, what are the

14  legitimate reasons to prescribe opioids?

15       A.   So I believe the legitimate reasons that

16  opiates have not really changed a lot since the

17  1990s.  And they can be chronic disabling pain

18  towards the end of life, especially unrelenting --

19  the pain that happens as a consequence of cancer,

20  some of those areas.

21              There are sometimes disabling arthritic

22  disease -- a number of arthritis processes through

23  which they are progressive, chronic and difficult

24  to deal with, those situations.

1           So there are a number of chronic

2    conditions in which -- these are two examples where

3    opioids should be the last resort, but they do

4    often become the last resort and it's very

5    important that we continue to have the ability and

6    availability to provide that.

7        Q.   All right.  And that --

8        A.   And --

9        Q.   I'm sorry.  Go ahead.

10       A.   Of course, I was going to say, acute pain,

11   oftentimes same way.  When fractures happen,

12   injuries happen, post-operative, other aspects.

13   There are places for opioids to be appropriate to

14   supply.

15       Q.   All right.  And post-operatively, acute

16   pain, would that be what you would consider

17   short-term, long-term or how would you --

18       A.   That would be short-term, and that may not

19   be a first choice.  Opiates may not be a first

20   choice to prescribe that, but they would be in the

21   process somewhere in there.

22       Q.   And is it true -- were you involved with an

23   act in West Virginia that talks about prescribing

24   opioids and the appropriate circumstances? Are you

Page 142

1   familiar with that?

2       A.   If you are referring to the Opioid

3   Reduction Act --

4       Q.   Yes.

5       A.   -- which is Senate Bill 273 in 2018 -- and

6   I know that because I helped draft that.

7       Q.   All right.  And would that bill contain

8   your views about opioids?

9       A.   So we drafted it.  We could get legislation

10  successfully passed with overwhelming support, and

11  it applied -- you really need, you know, all sides

12  to come together.

13          So one of the things that happened was

14  that it went through the process of negotiation and

15  agreeing.  So I met with the chairman of both the

16  House and -- House Health Committee and other

17  leaders, to make sure that it got to a place where

18  everybody was satisfied and agreed and did not

19  compromise the essence of both CDC guidelines as

20  well as good clinical practice.

21          So we ended up in passing that Act, was

22  a -- a reasonable effort to address the

23  contemporary crisis that we were facing.

24      Q.   Have you had a chance to examine statistics

1    concerning - as you described - the legitimate uses

2    for opioids?  Have you had a chance to examine

3    statistics that showed the need in the West

4    Virginia population for those legitimate needs, as

5    it existed back, let's say, in the 1990s?

6         A.   So part of the Commissioner's job is to be

7    a -- not only Commissioner with force, but be

8    monitoring those reports -- so yes, as time went on

9    in my tenure at the office, it was very important

10   for me to monitor:  What are the rates of obesity?

11   What are the rates of arthritis overall going on?

12   What's the rate of poor health condition?  What's

13   the rate of dental health?  What's the rate of, you

14   know, injuries that are happening overall?

15             So some of the reasons for which you

16   would provide opioids are the rates that we monitor

17   year after year.

18        Q.   All right.  And so you've heard the term

19   "baseline" before?

20        A.   Yes.

21        Q.   What -- in your view, would those

22   statistics, in your view, form sort of a baseline

23   for -- you could consider as a physician, as a

24   public health person experienced as a baseline for

Page 144

1    need of opioids back in the 1990s for West

2    Virginia?

3        A.   Yeah, I think that would be as a fair

4    assumption, not having absolute numbers and

5    absolute science behind it.  I think you could say

6    that whatever the prescriptions were happening

7    before the standards of care for pain changed could

8    be taken and construed fairly as a baseline, but

9    also understanding at the same time that some of

10   those dynamics also may involve a change.

11            For example, you know, cancer rates or

12   the mining jobs that may have required opioids

13   before, the changes in job -- actually should

14   change -- also parallel the need for opioids over

15   time.

16       Q.   Yeah.  So that gets to my next question,

17   which is:  Have you had a chance to look at whether

18   there were changes in those -- the rates or the

19   number of those categories of people that might

20   lead you to believe there was a need -- increased

21   need for opioids?

22       A.   So when I commissioned the report to look

23   at analytically the opioid crisis from a historical

24   context from 2000-2015 - again, that was the first

Page 145

1   report of its kind during this crisis - I don't

2   recollect at this point whether it made it in there

3   or not, but we did look at those numbers.

4           And, you know, we had found that, hey,

5   the cancer rates are actually going down over time.

6   We found that, for example, mining jobs went down.

7   I mean, that's kind of public knowledge.  So you

8   know, industry jobs that require hard labor and

9   other aspects, that was part of the job loss that

10  we were having.

11          We know that the mining injuries were

12  going down.  That was the -- you know, the mining

13  work.  We know that the -- you know, there was a

14  little rise in arthritis because there was a rise

15  in obesity, so to counter that.

16          There was some -- you know, one point

17  rise in arthritis.  There was additional people

18  that came into by the expansion of ACA that I was a

19  proponent of in 2010 to Governor Tomblin, and there

20  were some more people that were sick and needed

21  medication.

22          But that was a miniscule amount as

23  opposed to the people that had cancer or mining

24  injuries or other things, other prescriptions going

Page 146

1    down.

2           But as a minimum, it was a fair -- no

3    change.  But it could be that the need went a

4    little bit down actually over time.

5       Q.   So from that analysis, were you able to

6    form any conclusions about whether or not these

7    legitimate needs for opioids had changed from the

8    1990s to, let's say, 2016/2017 in West Virginia?

9       A.   Yes.  So the population loss happened

10   overall in West Virginia over that time, and as I

11   mentioned, the legitimate need - at best - was the

12   same, and most likely actually went down a little

13   bit.

14      Q.   And during that same time period, were you

15   able to discern from your -- the statistic you had

16   available and the work you did whether the volume

17   of opioid pills from the 1990s to 2000 to '16/'17

18   actually decreased?

19      A.   The volume clearly increased several fold,

20   several loss --

21      Q.   And do you have any statistics you can you

22   tell us -- you mentioned prescriptions and some

23   questioning for in terms of number of

24   prescriptions, the number of pills, give us an idea

Page 147

1    of the increase in volume that you found.

2        A.   You know, I think the most compelling is

3    the review of the work that I -- you know, I read,

4    which is -- it comes from Eric Eyre's work which is

5    about 780 million pills between the span of between

6    2006/'07 and 2012.  That would be in terms of

7    volume.

8            That would be the most emphatic to me

9    to look at.

10       Q.   And do you have anything for us to compare

11   that to to give us an idea of what would be -- how

12   big that measure is, that 700 and some million

13   pills, compared to something -- something else?

14       A.   So for a population of 2 million people,

15   approximately 1.8 million people, clearly that

16   would be significant.  In my presentation, I also

17   talk about, you know, overall the total volume in

18   the country was the total volume prescription per

19   person in 2006.

20           That was about 130 prescriptions per

21   100 people - men, women and child - in West

22   Virginia, and clearly the numbers -- I don't

23   remember right now, but the numbers are

24   significantly lower in the '90s.

Page 148

1      Q.    Now, you mention in some questions and

2    answers about change in the standard of care and

3    attitudes about opioids.  What I'd like you to do

4    now is, if you can -- do you first have an opinion

5    as to what you believe was the cause of the

6    dramatic increase in opioid pills delivered to

7    West Virginia within Cabell County from the late

8    1990s through the mid two thousand teens?

9      A.    So as I stated, the first inciting event

10   was the effort to change the standards of pain and

11   care for pain.  As we changed the standard of care

12   for pain in somewhere around late 1990s -- and

13   really, I think it was like Robert Wood Johnson

14   funded the work initially in 1997 that led to the

15   JCAHO having that changed standard and the Pain

16   Society working at the same time, the VA, federal

17   government had changed, and this extraordinary

18   effort was placed.

19             There was quote, you know, several

20   reasons for it that we were being detailed on.  One

21   was the more ethical, we have an obligation to

22   provide patients an absolute zero level of pain,

23   they have to come down from 10 to zero.

24             The other was, you know, you could be

Page 149

1    held liable if you don't do that, so it was the

2    most punitive aspects of it.

3                    And the third was, that there is no

4    addiction, no consequences and this was a really

5    good safe medication to buy and there's no

6    diversion.

7                    What was happening really during this

8    time was the message that was being sent to us -

9    now looking in retrospective back - was that, you

10   know, you have a set population that was going to

11   get the prescriptions in this context of changed

12   standard of care of pain.

13                   They were getting the prescriptions, so

14   you get a tooth pulled - and that numbers hasn't

15   changed over time - you know, and you get 30 days

16   of -- 30 days of liberal prescribing of an opioid.

17                   You may be using two pills or three

18   pills and then they go, you know, in your closet,

19   medicine cabinet.

20                   So what happens is:  If you used it for

21   more than three to five days, you have a high risk

22   of becoming addicted -- having addiction.  If you

23   used it for fewer days, then there's a high risk of

24   diversion right there.

Page 150

1          When that diversion started to happen,

2    and it became a norm in the community - meaning

3    your children or grandchildren or other people;

4    they were there, they got it - friends and

5    families, then that caused those people to become

6    addicted to these medications.

7          When that happened, then that diversion

8    led for those people to find ways to get those

9    prescriptions.  So they would then figure out all

10   of the inappropriate prescribing began or continued

11   and really got voluminous at that point.

12          So what then happens was:  These people

13   were pushing through doctor shopping; they were

14   pushing through -- come out of the woodwork in so

15   many ways.  There were lost prescriptions, you

16   know, getting and stealing from anywhere they can

17   steal from, and that just drove the volume -- that

18   continued to drive the volume.

19          And that volume continued to get

20   diverted.  So we got to a point where the

21   significant percentage of that volume that was

22   coming out was inappropriate, and the -- it

23   basically -- you know, the appropriate volume that

24   was appropriate at one point just dwarfed in front

Page 151

1    of the extremely high amount of inappropriate

2    volume, which is actually going towards diversion

3    in all of these cases literally, and that as a

4    result of that, the only way to get out of that was

5    to die.

6              So once you have addiction and we --

7    there were no -- an adequate amount of treatment

8    facilities, because that hasn't been identified as

9    an issue at the time, and the way you could get out

10   of addiction is by dying, by overdose and dying.

11             So that was the -- that was what was

12   happening at the time.

13      Q.   All right.  Let's talk a little bit about

14   addiction.  So how do you define "addiction"?

15   What's your working definition?

16      A.   So the way these medications -- I can just

17   broadly first of all say addiction is a process

18   that can be physical or physiological in nature

19   where your body gets used to whatever that

20   substance is and wants to have it -- desires it a

21   lot more.

22             Now, it can result in both a physical

23   addiction as well as a psychological addiction,

24   either or both.

                                          Page 152

1            Speaking of the opioids in specific,

2    when we take opioids, we have this very basic

3    foundational understanding of the brain.  There's

4    our inner brain or the fundamental places of the

5    brain, you know, there's stimulus that allow us to

6    survive.

7            What that means -- what I mean by that

8    is it exists in all animals.  You -- you feel

9    hungry, there's a reason you eat, because when you

10   eat, you feel good.

11           The reason you feel good is that

12   there's a release of this chemical called Dopamine.

13   So same way, when you're thirsty, you drink.  The

14   result of that drinking water is that your Dopamine

15   gets released and tells you -- that's a positive

16   reinforcement for you.

17           Same way with sexual activity.  So

18   there are a few things that are important to our

19   survival as human beings, or any animal.  The way

20   we get rewarded, the reward system, is by this

21   Dopamine release and it makes us feel good.

22           Now, these medications, seem to work

23   similarly.  But what they do is basically they

24   hijack that system.  And so in that hijacking, that

Page 153

1   inner brain that is causing the release of

2   Dopamine --

3            Initially the morphine - actually, or

4   opioid of any type - makes you release that

5   Dopamine, and you feel good.

6            After a while, it doesn't work as well.

7   And then you start to require an escalation of the

8   dose.  And so basically that inner brain, if it

9   doesn't get that, it asks your outer brain in some

10  way - it's a prefrontal cortex - to do things, to

11  change its behavior in ways in order to seek that

12  drug to supply it.

13           So after a while, it's not just about

14  getting high; it's actually about surviving and not

15  getting withdrawal symptoms.  So typically, if you

16  don't do it, the inner brain is going to punish

17  you.

18           And a person is fearful of that

19  punishment, so that inner brain sends messages to

20  the outer brain to say, "Hey, I need you to go and

21  engage in activity" - whether that's stealing,

22  prostitution, other aspects - "in order to feed me

23  the habit to continue with the drugs."

24           And that's why when we say it isn't an

Page 154

1   addiction, it's a disease, it's not a will -- it's

2   not something that people can will to do.  Maybe it

3   was a will the first couple of times; but

4   afterwards, it's not.  It truly is a disease,

5   because that inner brain basically hijacks the rest

6   of your brain and the rest of your body.

7        Q.   All right.  So is it fair to say - and you

8   tell me if I'm wrong about this - that when people

9   become addicted; when they're not able to get what

10  they can to fill the addiction that they -- the

11  brain tells them, "Go out and do anything you can

12  to fill that need."

13       A.   Yes.

14       Q.   And does that, in your opinion -- or do you

15  have an opinion whether that leads to things like

16  diversion and further abuse of drugs and adverse

17  consequences of addiction?

18       A.   So at that point, that person is not in

19  control of themselves.  Their inner brain has

20  hijacked the entire body.  At that point, this

21  monster inside is telling them to seek opioids in

22  one form, shape or other.

23            Whether it's for them to divert the

24  prescription pills; it's for them to fake a

Page 155

1   prescription; it's for them to go to the doctor and

2   lie in order to get their prescription; or it's for

3   them to go and harm themselves or their children -

4   which I have also seen - or their pets - which I

5   have also seen - and get those medications by hook

6   or by crook; or go on the street, if it's not

7   available, and get heroin or fentanyl-laced heroin.

8           It doesn't matter to them, the brain.

9   What matters to the brain is:  It needs that feed.

10  And that's basically the forces that are in play.

11      Q.   You mentioned "inappropriate prescriptions"

12  before and used that term.  And "inappropriate," do

13  you mean both diverted and unnecessary

14  prescriptions in your view?

15      A.   Yes.  So the one side of supply which is,

16  you know, when you make the standards of care

17  change, what basically happens is, you're

18  logorhythmically increasing the number of people

19  who become addicted, and as they are using more

20  prescriptions, they are also demanding and aquiring

21  more prescriptions.

22          So that's where the inappropriate

23  prescriptions lead to increased volume, and most of

24  that is diverted volume.

1           So basically that's the inappropriate

2   prescription, and it may have begun with being

3   unnecessary:  Like I said, 30 days prescription for

4   a tooth pulled.  But it eventually leads to

5   diversion.  And that diverted prescription leads to

6   more diverted prescriptions and more diversion of

7   pills.

8           So over time -- that's the reason you

9   saw progressive increase in deaths.  It wasn't in

10  2000 the system changed and in 2003 we have the

11  peak.  We start to increase because more and more

12  population over the time gets more and more

13  addiction and then so therefore they need more and

14  more prescriptions.

15     Q.   All right.  And so do you -- based on this

16  -- your opinions you form in this -- this crisis

17  and your work, if you were to take a hypothetical

18  year sometime in - I don't know, 2010, 2008 - and

19  look at the total volume of prescriptions or pills

20  in West Virginia, would you be able to have an

21  opinion as to how much of that total volume would

22  be what you call "inappropriate" versus

23  "appropriate?"

24     A.   So you would have to -- you could do that.

Page 157

1   What you would have to do is you would have to go

2   back to the baseline, and you have to make an

3   assumption here that, let's say, before 2000, the

4   amount of prescriptions --

5              If you have a relatively stable

6   population and relatively stable conditions for

7   which the opioid prescribing was done, you use that

8   as a baseline prior to the change in the standard

9   of practice -- standard of care for pain.

10             And then you start comparing it

11  throughout those years.  And you see the

12  prescriptions are going up, that means the pills

13  are increasing more in amount as well as in volume

14  as well as in the strength.  But the conditions

15  aren't changing and your population necessarily

16  isn't changing.

17             So that tells you how much of a

18  difference between the two is the diversion of

19  prescriptions -- and so that's how you get there.

20             If you ask me what that number would be

21  - I think that's what you're trying to ask - I

22  think it -- at best, that would be about 80 percent

23  of those prescriptions are diverted, at best.  It

24  could be more than that, clearly based on whatever

Page 158

1    the numbers are in 2000.  But that's what I would

2    say.

3        Q.   All right.  In terms of addiction -- you

4    talk about how it affects the brain.  In your back

5    -- based on your background, training and

6    experience, do you believe that the addiction's

7    effects on the body can be altered or --

8        A.   I'm sorry, could you repeat that?

9        Q.   Sure.  So in terms of -- you talk about one

10   of the effects of this crisis is the number of

11   addicted people, to the drugs.  Do you believe that

12   that addiction can be -- I don't want to use the

13   word "cured, fixed."

14             Can it be abated, can it be -- can that

15   problem be solved?

16       A.   So it could be solved basically two ways.

17   The one is the way we would -- we -- it's being

18   solved before anything, which is by death.  So that

19   would be the ultimate liberator.

20             And unfortunately, that's been

21   happening way too much in West Virginia.  In fact,

22   we have 33 percent above the next state year after

23   year.

24             The second way to do is - which I think

```
1    there's a very broad agreement of this - is to

2    actually have evidence-based programs that could

3    provide the FDA -- free medication that are FDA-

4    approved, some version of it -- and engage the

5    person but it's not just medicine.  It's actually

6    medicine, it's counseling; it's providing best

7    supportive lifelong care.

8              Because once a person becomes addicted

9    -- you know, it's like anything else, whether

10   you're addicted to -- in some ways, addicted to

11   food, addicted to tobacco, alcohol, others, you

12   need lifelong support.

13             So yes, you can.  And if you get

14   appropriate lifelong care, you have three out of

15   four people, we will be able to actually help them.

16             Now, how far do we fix them?  We just

17   don't know that.  There are some characteristics,

18   some people that might need treatment for a few

19   years and they may be able to get off.  Others may

20   need lifelong.  We don't know in science very well

21   with high level of confidence what drives some

22   people to get off --

23             Just like we don't know if you give ten

24   people opioids for four to five days, few -- some
```

Page 160

1    people become addicted and not others.  So there is
2    lot we don't know in science.
3        Q.   These medications, the treatment, how do
4    they work in terms of trying to fix the brain?
5        A.   So there's three FDA-approved medicines:
6    Methadone, Buprenorphine, Naloxone.  So the
7    methadone is a agonist.  So there's immune
8    receptors in the brain.  That's where the opioid
9    acts.  And they're acting in a different way.
10            So the methadone is an agonist, meaning
11   it goes and attaches to the receptor, pretty much,
12   stimulates it a little bit and keeps it occupied.
13            Buprenorphine is kind of a
14   agonist/antagonist.  So in some properties, it is
15   an agonist and does occupy it; in some properties,
16   it doesn't supp -- push a lot of the good feeling.
17   And then you combine with that naloxone, which is
18   an antagonist.
19            So basically the bottom line is they
20   occupy the same receptors and in occupying the same
21   receptors, the way people who have suffered through
22   addiction - having described it to me personally -
23   is that they say -- when they get into the
24   treatment, after a few days or weeks, we feel like

Page 161

1    the monster is off their head.

2                "Now when I go to my family, I can

3    actually have a conversation and remember it with

4    my family.  I can start to feel feelings.  I feel

5    I've come back from death.  I can watch television,

6    I can remember and I can understand what's

7    happening."

8                So that piece -- it allows these

9    medications allow you not to worry about just

10   seeking your next fix; it allows you to actually

11   get a job, have a purpose in life, rebuild your

12   community, rebuild your family and actually be able

13   to function.

14       Q.   All right.  So turning back to the

15   evolution of this opioid problem in West Virginia,

16   did you at some point see an evolution, a change,

17   from opioids to heroin?

18       A.   As I came in as the Commissioner in 2015, I

19   think that evolution was occurring.  I think we

20   were starting to see some of the laws that had been

21   taking place in 2012-2013 -- certainly Governor

22   Tomblin had initiated the Governor's Advisory

23   Committee on Substance Abuse and some of the

24   results were happening.

Page 162

1          So we had a sliver of hope at the time

2    that, "Listen, I think we're starting to see a

3    light at the end of the tunnel" in the sense that,

4    look, we're seeing slight reductions, and that's in

5    the presentation you saw where I showed from 2015

6    to 2016, we went down 15 percent.

7          So we were becoming very hopeful that

8    now perhaps the deaths will follow, meaning

9    reduction in deaths and suffering and other things.

10   Q.   I'm sorry, you said reduction -- reduction

11   in --

12   A.   Reduction in deaths.

13   Q.   I'm sorry, you said you saw a slight

14   reduction --

15   A.   Reduction in prescriptions.  So we started

16   to see from 2015 to 2016, about a 15 to 20 percent

17   reduction in opioid prescriptions.

18   Q.   Okay.

19   A.   And then we were hopeful that we would

20   start to see a reduction in deaths.  But we didn't.

21   And then we started to search that why that we're

22   seeing reduction in prescribing but we're not

23   seeing reduction in the deaths from overdose; we're

24   not seeing significant reduction in the substances

Page 163

1   of overdose people when they died.

2              And one of the elements that was

3   happening at the time that, again, now it's easier

4   -- a little bit more easier to recognize, is that

5   every time law enforcement would go and do a drug

6   bust of the bad docs, those people would end up on

7   the street that once were addicted to medication --

8   prescription medications, now would have to find --

9   seek and find an alternative, and they would go to

10  the street.

11             And then they started to use IV drugs,

12  heroin.  That was not the only reason it was

13  happening.  It was also because the supply of

14  prescription drugs from a diversion standpoint was

15  drying up a little bit.

16             So as the diverted drugs - opioid

17  prescription drugs - were drying up, then people

18  still needed that fix, as I explained the addiction

19  pathway.  That doesn't solve the problem.  We were

20  too naive to think just reducing the prescription

21  -- diversions would just cure the problem.

22             And what actually happened is the

23  opioid crisis began to evolve -- evolve into a

24  second crisis, which would then started to become

Page 164

1    this heroin crisis.  As we were dealing with that

2    current crisis within the first, a third crisis,

3    which is --

4                You know, everyone asking -- you know,

5    wanting to make most profit from its product, and

6    we saw the -- this happen, the phenomenon happen,

7    with -- where people were dealing heroin, frankly.

8    So they found -- they realized that they could get

9    a bigger profit if they were -- if they could cut

10   their heroin with another substance that could

11   still give the high or give the need that needs to

12   be fed to the people.

13               That was called fentanyl.  It was a

14   clandestine lab-produced fentanyl that's about 50

15   to 100 times more potent than morphine.  So they

16   would -- they began to cut the heroin with this

17   substance on the street.

18               The problem that became for people who

19   are addicted is:  A, they wouldn't know that; the

20   second, B, every time they inject themselves, not

21   only are they risking HIV or hepatitis or what have

22   you, but they're also basically playing Russian

23   roulette with their life, because they wouldn't

24   know if this is the time they were going to die/

Page 165

1    overdose.

2              This stuff was so potent that some of

3    our law enforcement officials, sometimes they

4    happened to inhale or touch it and they would be

5    overdosed.

6              So I saw a lot of people who had

7    addiction, they didn't want to die.  Neither did

8    the drug dealers want them to die.  So what they

9    started to do, as a cry out for help, they would

10   actually go to restaurants, they would go to gas

11   stations, they would go to malls in the bathrooms

12   and inject themselves just so they could be found

13   if they played the Russian roulette and the gun got

14   fired.

15             So we started to find dead bodies in

16   those places as a result of that.  So that's the

17   evolution.  That's when I came into the office and

18   I was seeing on literally on a daily basis.

19       Q.   So do you have an opinion based upon

20   everything you've done in your work in West

21   Virginia and your background, training and

22   experience as to whether or not the abuse of

23   heroin, fentanyl, methamphetamines and these

24   cocktail drugs that you saw in the 2014 to 2018

Page 166

1    time frame was a -- was caused by the original

2    opioid volume that you saw that resulted in these

3    addicted people.

4        A.   So for a majority of them.  There would

5    always be a small portion of people who will have

6    and seek, you know, various forms of addictive

7    substances.  That's been true for civilizations

8    over time.

9             But for the majority of them, there's

10   no doubt in my mind that there's a direct

11   correlation between the diverted prescription pills

12   and its evolution into street drugs in terms of

13   heroin, fentanyl, meth, you name it.

14       Q.   And when you say "a majority," are you able

15   to quantify that any further in terms of if you

16   take 100 percent as total, were you able to

17   quantify it any more specific than that?

18       A.   When I say "majority," I'm really talking

19   about 80 to 90 percent of the population that

20   actually suffered through this.  Because if you go

21   back and look at the overdose death rate numbers,

22   prior to this epidemic, it would be like that,

23   Counsel, to get that -- that's where I would go

24   back.

1          A small amount of people -- certainly

2     those, the noninvolved people - that would be a

3     general baseline - do not tend to be generally also

4     the population that dies.  They tend to be people

5     that would use one form of drug or the others - a

6     tiny population, proportion - that has existed, as

7     I said, through civilization, hundreds of years,

8     thousands of years.

9               But that is minuscule as compared to

10    what we're dealing with today.

11       Q.   And in terms of overdose deaths, you do

12    have knowledge from your work as to the number of

13    overdose deaths -- overdose deaths in West Virginia

14    from, let's say, 2004 until 2018 when you left.  Is

15    that true?

16       A.   Yes.  I mean, I'm trying to recall the -- I

17    mean, I can recall that in 2017, we finally passed

18    the 1,000 number, which was not only the -- one of

19    the highest rates ever, but it was consistently

20    about 33 percent higher than the second state --

21    and the second state varied.  Sometimes it was New

22    Hampshire, sometimes it was Ohio, sometimes it was

23    Pennsylvania.

24               But we could -- what didn't change was:

Page 168

1    We were high and there's a bunch of lots of states,

2    and then it was the next state in line.

3        Q.   And do you have an opinion as to whether

4    the increase in overdose deaths West Virginia saw

5    during that time was caused by the large volume of

6    opioid pills that originally was deposited or

7    delivered to West Virginia?

8        A.   I think there's no doubt for that.

9        Q.   Now, are NAS babies a causative issue in

10   terms of the opioid epidemic?

11       A.   Yes.

12       Q.   So what is an NAS baby?

13       A.   So NAS stands for neonatal abstinence

14   syndrome, also sometimes called NOWS, or neonatal

15   opioid withdrawal syndrome.  We try to

16   differentiate between opioids and other substances.

17            But in essence, it's a -- it's a

18   syndrome, it's a set of symptoms that could happen

19   in a baby as soon as they're born to a few hours or

20   days afterwards.

21            Those symptoms could include incessant

22   crying, not being able to be fed, being over

23   irritable.  They can have seizures.  They can have

24   diarrhea.

Page 169

1              And unfortunately, in the early part

2    especially of the crisis, they could die.  It is --

3    we saw that it was directly linked, and here's why:

4    As we saw the total amount of diverted drugs

5    increase, we also saw a similar increase in the

6    number of pregnant women that were taking these

7    diverted drugs.

8              The pregnant women are still part of

9    the same community, part of the same population.

10   They're no different.  So it would be an

11   extraordinary thing to think that they would behave

12   differently.

13             As they were also taking -- at one

14   point, one in four pregnant women were taking some

15   of these diverted medications.  As they do, they

16   become addicted, and as they develop the addiction,

17   and continue to feed their addiction, so is the

18   baby getting the same medications through the

19   placenta while the baby is in the womb.

20             So the baby's brain, now imagine, is

21   also being fed through the same mechanism.  This

22   developing new life inside the womb is also getting

23   the same line of feeding of opioids through the

24   bloodstream of the mother.

Page 170

1          So its brain is also -- not only not as

2   -- it's not -- it's supposed to be developing right

3   when it's not only -- we don't know a lot about how

4   it develops in the presence of opioids, but it's

5   developing the same time as being confounded by

6   these opioids.

7          So as the cord gets cut, meaning the

8   placenta gets cut and the baby gets delivered, that

9   baby goes into withdrawals.  It's literally the

10  equivalent of a withdrawal.  We know that because

11  we treat the withdrawals by various mechanisms, but

12  one of the mechanisms -- the pharmaceutical

13  mechanism to treat it, is through morphine.  Giving

14  the baby morphine.

15         I mean, it's one of the last resorts,

16  but that's one of the ways we do it.  So what we

17  don't know about neonatal abstinence syndrome yet -

18  because there's a lot of work going on - is:  These

19  are the immediate side effects.

20         We have also seen some associations

21  with birth defects, like heart defects, gastric

22  defects.  We also have had some literature that

23  shows there's defects in hearing, vision, other

24  aspects.

Page 171

1              Now, when I was speaking to schools,

2    officials, teachers, parents, oftentimes they would

3    tell me that in 2015, some of those babies that

4    were born in 2006, '07 would be then eight, nine,

5    ten years old and they're getting to a point and

6    they're --

7              What is happening to the babies now is:

8    These teachers would tell me that "We have these

9    kids," it's called -- you know, opioid babies, they

10   are now being -- "they are not able to control

11   their impulse.  They're not able to keep attention.

12   So they're having some version of attention deficit

13   disorder; they're having impulse control issues."

14             So because that's a problem and

15   teachers' job is to teach, they were referring to

16   the parents -- if there were parents.  Because in

17   often cases, these kids got moved around three,

18   four, five times a year in the school system.

19             And they were often within foster care

20   or the care of grandparents or great-grandparents

21   at times.  But then they ultimately end up in the

22   doctor's office, at a pediatrician, and the

23   pediatrician would diagnose them oftentimes -

24   erroneously or let's just say through symptoms -

Page 172

1   with ADD, and guess what happens then?

2              These kids get prescribed another

3   addictive potential drug called Adderall.

4              So then we basically -- we already know

5   that kids who are born with NAS have a high

6   predilection to get -- to become addicted in the

7   future.  And now through the system, we're actually

8   providing them the same drugs that they actually

9   have a further habit with.

10             So we're actually setting up these kids

11  to fail in life, and this is a huge problem in West

12  Virginia.  We're talking about 5 percent of the

13  entire population.  It's a huge number.  And then a

14  higher percentage perhaps in Cabell County and

15  Huntington.

16             So all these kids -- we don't even know

17  what the long-term consequences will be.  Will they

18  be able to adjust in society?  Will they be able to

19  have sustained social interaction and enjoy life

20  the same way as others?  We don't know that.

21             But we do know that there are some

22  short and long-term consequences of NAS.

23      Q.   Has anybody tried to -- you or anybody you

24  know tried to quantify the cost of the effects of

Page 173

1    NAS babies on a single NAS baby?

2        A.    So we were working very hard -- one of the

3    reasons that I am at March of Dimes today is

4    because of my work that I focused a lot of work on

5    this issue, and not only did we expand the

6    drug-free moms and babies program, but one of the

7    things we did was we tried -- again, downstream

8    work, incremental impact, but that's all we could

9    do at the time.

10            But one of the things that happened

11   was:  We figure, how can we prevent this?  And one

12   of the ways to prevent this is to offer in a

13   nonthreatening way women who have addiction, the

14   ability to have family planning.

15            And there is a women's prison, there

16   are jails, and these women are -- you know, are

17   cycling through and we offer it to men and women,

18   by the way, family planning.  It's not

19   gender-biased.

20            So we wanted to have funding beyond

21   Federal funding, because Federal funding for IUDs

22   and other things does not go for the prisons.  So

23   we wanted to make a case -- lay out a case to a

24   Republican legislature in West Virginia why it

Page 174

1    makes sense for us to think about family planning.

2                It's a tough issue.  It's a tough

3    issue.  So what we did was:  We did an analysis and

4    we provided a white paper to the Senate Finance

5    Chairman at the time, Craig Blair, which basically

6    laid out -- and we accounted for all the costs, the

7    ICU costs.

8                We laid out the costs of child welfare

9    costs, the development costs.  But do we know what

10   will happen long-term?

11               And that cost we calculated was a

12   little over a million dollars per baby.

13       Q.   Per NAS baby?

14       A.   Per NAS baby.  And for 5 percent -- we have

15   about 20,000 births in West Virginia approximately,

16   and 5 percent of that is about 1,000 babies, and

17   that would be about a billion dollars if we

18   multiply the math, a billion dollars per year, year

19   after year, that were incurring this future cost to

20   the state of West Virginia.

21               And when we went into that, I can tell

22   you, the only thing -- this is a very conservative

23   Senator from a very conservative part of West

24   Virginia, and his response was, "Here's the money.

Page 175

1   What can I do more for you to make sure that we

2   allow these women who have addiction to enter

3   treatment programs so when they do get pregnant,

4   they have a shot at life and their kids have a shot

5   at life."

6            And this came -- and we were, you know,

7   pleasantly surprised.  He came back to us year

8   after year to give us more money to appropriate

9   because it was a just cause.  So these are the type

10  of downstream impact things we were doing.

11      Q.   All right.  Now -- so you worked in West

12  Virginia from '09 to '18 and you've talked about

13  different efforts that were made, you've talked

14  about this problem in depth.  And I want you to

15  think back and I want you to see if you can answer

16  this question for me.

17            Do you believe in your heart of hearts

18  that you and everybody in West Virginia that you

19  were associated with - whether it's DHHR, PEIA,

20  other departments, legislature - did what you could

21  do with the resources you had to fight this problem

22  that, as you stated, you didn't create?

23      A.   Yes, I can tell you my entire time in West

24  Virginia, you know, some of the best people on

Page 176

1   earth that you will find, warm people wanting to

2   chip in and help give you, you know, a shirt from

3   their back, if they can.  If they're wearing a

4   shirt --

5             And they was -- everybody was in as a

6   team, had the best intentions with limited

7   resources, and we were struggling every day to help

8   do everything within the power of our state as well

9   as individuals, their capacity, to find those

10  solutions.

11            So we did everything possible.  We left

12  no corner unturned in order to find solutions.  But

13  once again, this seemed to have fallen short in our

14  expectations each time, because it's very difficult

15  - and very inefficient, to be honest - to provide

16  and spend that amount of money when this can be and

17  could have been prevented upstream.

18       Q.   Okay.  Now, you talk about -- a little bit

19  about this transition from opioids to heroin, and

20  what I'd like to do is ask you some more questions

21  about that.  In terms of heroin in connection with

22  the opioids, is there some chemical somewhere --

23  why would people take heroin as opposed to opioids?

24       A.   Well, basically heroin -- when you take

 1    street heroin, it breaks down into two compounds
 2    and both are active, and one of those is morphine.
 3    So heroin is basically nothing but a form of
 4    morphine.  It is the same chemical release.
 5    They're all related.  They work through the same
 6    receptors, and the body cannot tell one from the
 7    other.
 8              And so chemically speaking, you know,
 9    you could have synthetic opioids; you could have
10    semi-synthetic; you could have natural opioids.
11    But to the body that needs to feed the need, it's
12    the same compound.
13              And so chemically speaking, what you
14    write in the prescription pills, again it's the
15    same feed -- the feeding mechanism is the brain.
16    It does not discriminate.
17        Q.   Right.  So it's your opinion that heroin --
18    if someone went to heroin, that would satisfy the
19    need created by an opioid addiction?
20        A.   Absolutely.
21        Q.   All right.  In terms of the number of
22    opioid addicts that transitioned to heroin, is
23    there any way for us to quantify in terms of the
24    total number of people that would be moving to

Page 178

1   heroin -- how many of those people started out as

2   opioid-addicted people?

3        A.   I think what we have to do is -- I'll go

4   through the math a little bit here.  We know that

5   for every person who overdoses -- we're going to do

6   the math in reverse.

7              So every person who dies in overdose,

8   there's about 25 to 30 people that have what we

9   call nonfatal overdose.  Because we saw that in our

10  social autopsy, that people -- overdose is a cry

11  for help.  And we have 25 to 30 people.

12             For every fatal overdose, there's about

13  250 to 300 people that actually are suffering from

14  addiction, basically.  So if you look at the

15  numbers in West Virginia - there's 1,000 people

16  that have died of overdose, and obviously there's

17  anywhere from 250,000 to 300,000 people that are

18  suffering from addiction - and that addiction could

19  be -- the more you turn the pump off, the tap off,

20  from the diverted prescription pills, they're gonna

21  go to the street drugs available in terms of

22  heroin.

23             So it's a free-flow basically.  I don't

24  see a difference between if it's the diverted

Page 179

1    prescription opioids or it's the heroin, except

2    that they are able to die very quickly -- with the

3    contaminated heroin, the cut heroin.  So that's the

4    only way.

5         Q.   Is there a way to look at national

6    statistics that might help us glean more

7    information about that transition in terms of

8    heroin or opioids?

9         A.   Yeah, I think the -- what we have learned

10   over time is the more -- you know, you go -- again

11   -- this is not -- not meant to defend bad docs, but

12   it's meant to say we need to have better systems

13   downstream in order to manage the people who are

14   addicted when we do drug busts.

15            But, you know, the more we become

16   aggressive in drying up, the more people downstream

17   are going to convert into heroin and fentanyl

18   addiction, basically.

19        Q.   All right.  I'm going to transition a

20   little bit here to a different topic.  Can we take

21   a two-minute break?

22            MR. RUBY:  Hey, Mark, where are you on

23   time overall?

24            MR. COLANTONIO:  Another -- I can be

Page 180

1    done in 40 minutes?  Is that okay?

2              MR. RUBY:  40?

3              MR. COLANTONIO:  Yeah.  30?

4              MR. RUBY:  If you guys -- if you guys

5    were taking your own evidentiary depo of Doctor

6    Gupta, I wish you'd noticed it.

7              MR. COLANTONIO:  Okay, well -- let's

8    take a --

9              MR. ZIMMERMAN:  To answer your

10   question, Steve, 40 minutes.  Approximately 30-40,

11   try to get it done.

12             MR. COLANTONIO:  What time is it?

13             MR. GOOLD:  It is --

14             MR. ZIMMERMAN:  1:48.

15             MS. JINDAL:  1:48.

16             MR. COLANTONIO:  All right.  Let's

17   take a two-minute break and then we can talk about

18   it.  Is that okay?

19             MR. RUBY:  That's fine.

20             MR. COLANTONIO:  All right, thanks.

21             VIDEO OPERATOR:  Going off the record.

22   The time is 1:48 p.m.

23                  (A recess was taken after which the

24                  proceedings continued as follows:)

Page 181

1              VIDEO OPERATOR:  This begins Media
2    Unit 5 in the deposition of Rahul Gupta, M.D.  We
3    are back on the record.  The time is
4    2:00 o'clock p.m.
5              MR. GOOLD:  Let me just -- this is Jim
6    Goold for McKesson.  Let me just briefly reserve an
7    objection on the record for opinion testimony from
8    the witness while we check about the previous
9    designations of the witness which we will do off
10   the record at a later point.
11             MR. COLANTONIO:  Ready?
12             VIDEO OPERATOR:  Yes, please begin.
13   BY MR. COLANTONIO:
14      Q.   All right.  So Doctor, have all of the
15   opinions that you've rendered here in response to
16   my questions here today been rendered by you to a
17   reasonable degree of certainty, whether it's public
18   health certainty, medical certainty or certainty
19   within your field?
20      A.   Yes.
21             MR. COLANTONIO:  I have no further
22   questions.
23                       EXAMINATION
24   BY MS. KEARSE:

Page 182

1      Q.   Doctor Gupta, this is Anne Kearse with the

2  City of Huntington and Cabell County as well.  I

3  only want to follow up with a couple of things that

4  I believe you testified about today and just make

5  sure I've got the documents or the reports that you

6  issued correct.

7           MS. KEARSE:  Monique, can you pull up

8  the first -- August 17, 2017 document?  And I'll

9  mark this as, I guess, Plaintiff's No. 1 for the

10  purposes of this deposition.

11           PLAINTIFF'S EXHIBIT NO. 1

12             ("West Virginia Drug Overdose Deaths

13             Historical Overview dated August 17,

14             2017 was marked for identification

15             purposes as Plaintiff's Exhibit No.

16             1.)

17      Q.   Doctor Gupta, you testified today about  an

18  historical overview since 2001 to 2015 of drug

19  overdose deaths.  Is that correct?

20      A.   It's, I believe, 2000 to -- yeah, yeah,

21  that's -- thank you for that.  Yes.

22      Q.   Okay.  And that's -- and that's what -- I

23  just wanted to make sure for the record that

24  this --

Page 183

1           MS. KEARSE:  Monique, wait a second,

2    please.

3      Q.   -- that this document, cover page "West

4    Virginia Drug Overdoes Deaths Historical Overview

5    2001-2015" is a report that you were referring to

6    today.  Is that correct?

7      A.   That's correct.

8           MS. KEARSE:  And Monique, if you'll go

9    to the second page, just for the record.

10     Q.   This is a report that obviously your name

11   is on there, Doctor Gupta, as the Commissioner for

12   the Bureau of Public Health, the State Health

13   Officer.  Is that correct?

14     A.   That's correct.

15     Q.   And you were involved not only in working

16   on the analysis and reported here of this, but you

17   were doing this in the capacity of your role as

18   Commissioner of the Bureau for Public Health.  Is

19   that correct?

20     A.   Yes, I ordered the commission of this

21   report.

22               PLAINTIFF'S EXHIBIT NO. 2

23               ("2016 West Virginia Overdose Fatality

24               Analysis" was marked for

Page 184

1              identification purposes as Plaintiff's

2              Exhibit No. 2.)

3       Q.    And then Doctor Gupta, I believe also

4   Plaintiff's No. 2, in your capacity as the

5   Commissioner for the Bureau of Public Health, state

6   of West Virginia, I believe you also testified

7   about a 2016 overdose fatality analysis?

8       A.    Yes, and I have submitted that, I believe,

9   as part of the documents that I was requested to

10  provide.

11      Q.    Okay.

12              MS. KEARSE:   And just for the record,

13  Plaintiff's Exhibit No. 2, is this the report and

14  analysis that you were referring to in your

15  testimony earlier today titled "2016 West Virginia

16  Overdose Fatality Analysis"?

17      A.    Yes.

18              MS. KEARSE:   And Monique, if you'll go

19  to page No. 2 on that.

20      Q.    And that's also -- you appear on that as

21  the Commissioner for the Bureau of Public Health;

22  is that correct?

23      A.    Yes.

24      Q.    And in your -- both of these reports, these

Page 185

1    were reports either done at your direction and your

2    involvement and you're thoroughly familiar with the

3    -- with the conclusions and opinions issued in

4    those reports; is that correct?

5         A.   Yes.

6         Q.   And in addition to your testimony today,

7    you would be prepared to testify - if you do come

8    to trial - in regards to the analysis and results

9    contained in those reports.  Is that correct?

10        A.   Yes.

11             MS. KEARSE:  Thank you, Doctor Gupta.

12             THE DEPONENT:  Thank you.

13             MR. COLANTONIO:  Hey, Steve?

14             MR. RUBY:  Sorry, I was muted.  Yeah,

15   Mark.

16             MR. COLANTONIO:  So I just want --

17   think about this, the questions earlier about our

18   roles here and make sure we're clear about that.

19             So just to be clear, we have appeared

20   in this case in specific instances in deposition,

21   so our role in this case as counsel has been - at

22   this point, at least - limited to depositions, and

23   today we are appearing as counsel to Doctor Gupta

24   and -- his personal counsel.

Page 186

1            So that's our role today, as his

2      personal counsel.  And we have appeared in other

3      depositions for purposes of those depositions so

4      far.  That's been our role.

5                   MR. RUBY:  Okay.  And I don't want to

6      -- I have to -- we may have to think through all

7      the implications of it and we would certainly

8      preserve any -- any objection that might relate to

9      it.

10                  But Mark, just so I'm clear on your

11     position, does that amend your --

12                  MR. COLANTONIO:  Yes.

13                  MR. RUBY:  -- statement at the outset

14     of the questioning that you were questioning him on

15     behalf of the County --

16                  MR. COLANTONIO:  Yes.  We're

17     representing him today.  That's our role.

18                  MR. RUBY:  Okay, so the questioning --

19     and, again, I have to think through what the

20     significance is, if any.  But the evidence today

21     that you've conducted of Doctor Gupta, your behalf

22     is that it's now not on behalf of the County or the

23     City; is that right?

24                  MR. GOOLD:  It is what it is.

Page 187

1              MR.COLANTONIO:  Yea, we're

2    representing him personally.

3              MS. KEARSE:  But Steve, to the extent

4    then that any of the testimony that Doctor Gupta

5    has given is the testimony on -- that applies also

6    to the City of Huntington and Cabell County, Paul

7    Farrell and Anne Kearse are both here in that

8    capacity, as well as Mark Colantonio --

9              COURT REPORTER:  Anne, I'm having a

10   terrible time hearing -- Anne, I can hardly hear

11   you at all.  I don't know if the record is picking

12   you up but if you have a better way to get to a

13   phone or closer or something.

14             MS. KEARSE:  Okay.  All I was saying

15   to Mr. Ruby's comments that Dr. Gupta's testimony

16   today's is also applicable to the City of

17   Huntington and Cabell County, which is what this

18   case is being taken for.

19             MR. RUBY:  It's a depo in 1332, in the

20   Cabell and Huntington case.  And like I said, Anne,

21   I would have to think of what the significance of

22   it is.  I just wanted to make sure I understood

23   Mark's position clearly on the record.

24             MS. KEARSE:  Okay.  It's Friday.  You

Page 188

1    hear that?  Thank you, Doctor Gupta.

2              MS. JINDAL:  Okay, Anne, are you done?

3              MS. KEARSE:  Yes, I'm done.  So you

4    can keep going.

5                        EXAMINATION

6    BY MS. JINDAL:

7         Q.   Okay great.  Doctor Gupta, I'm just -- this

8    is Jyoti Jindal just for the record on behalf of

9    Cardinal Health.  I'm just going to ask you a quick

10   follow-up question to Ms. Kearse's questioning.

11             Are there any other documents that you

12   relied on in forming your opinions that you can

13   name right now?

14        A.   I don't remember if I submitted this to

15   you, but there was an order in my role as the

16   secretary of the Board of Medicine that had to do

17   with 2017 guidance to the physicians, orders on

18   prescribing or somewhat related to that, like the

19   practicing standards for opioids.

20             And that was 2017.  Because we

21   attempted to make sure that the 2016 CDC

22   recommendations were actually being followed in the

23   state of West Virginia.

24             So that may be another document.  I'm

Page 189

1   not sure right now that that was one of the ones

2   that was submitted or even I thought about it.

3          I don't have possession of it, but it

4   would be available somewhere online somewhere.

5      Q.   And that was an order issued by the Board

6   of Medicine which you signed as secretary for the

7   Board of Medicine?

8      A.   Yes.

9      Q.   And if you recall any other documents upon

10  which you relied or research upon which you relied

11  in the course of forming your opinions, I would

12  appreciate it if you could name those for me on the

13  record so we can follow up after this.

14     A.   Of course I will.

15     Q.   Thank you.  All right.  I am going to go

16  back a bit.  You talked a little bit about the DEA

17  quota.  What is that?

18     A.   It is my understanding that the DEA quota,

19  is the amount up to which manufacturer is able to

20  produce their particular drugs related to

21  controlled substances.

22     Q.   So it's the amount of controlled substances

23  that a manufacturer can make.  Is that right?

24     A.   It's the -- it's the amount of what -- it's

Page 190

1    the amount -- it's the limit basically -- to up to

2    which it can be.

3         Q.   I see.  And how is that limitation or quota

4    determined?

5         A.   That quota really goes back to really the

6    sales data.  So it's the amount of sales in the

7    previous year has been a -- sort of a guiding

8    principle, one of the guiding principles, for DEA

9    to determine what the quota for next year would be

10   for manufacturers and distributors.

11        Q.   And what are other guiding principles?

12        A.   That's the extent to which I understand.

13   I'm sure there are other frame works, but that's my

14   role in understanding this piece.

15        Q.   And DEA is the Drug Enforcement

16   Administration?

17        A.   Correct.

18        Q.   And that's a federal agency?

19        A.   Correct.

20        Q.   And aside from the DEA, who else is

21   involved in setting the quotas?

22        A.   To my knowledge, in addition to what I've

23   mentioned, I'm not aware of other actors.

24        Q.   Thank you.  Do you know what the quota was

Page 191

1    that was set by the DEA for controlled substances

2    in 1980?

3         A.   I could not tell you that.  I do not know.

4         Q.   Do you know it for prescription opioids in

5    particular in 1980?

6         A.   No.

7         Q.   What about just, let's say, oxycodone in

8    1980?

9         A.   No.

10        Q.   Okay.  Do you know what the DEA's quota was

11   for oxycodone in 1990?

12        A.   No.

13        Q.   What about 2000?

14        A.   No.

15        Q.   2010?

16        A.   No.

17        Q.   2020?

18             UNIDENTIFIED MALE:  Say that again?

19   Hello, can you hear me --

20             MS. JINDAL:  Can you hear me?

21             Someone needs to mute themselves, I

22   think.

23        Q.   Doctor Gupta, you talked about 1990, the

24   amount of prescriptions for -- that were sold --

Page 192

1    that were written in 1994, prescription opioids, as

2    providing a baseline for the need for prescription

3    opiates.  Is that a fair summary of what you

4    testified to?

5         A.   Your voice was a little muffled.  Could you

6    please repeat the question?

7         Q.   Sure.  Let me see if -- does this help?

8         A.   Yes.

9         Q.   Okay.  You talked about a baseline for

10   determining legitimate need for prescription

11   opioids, and you set that baseline as 1990, the

12   number of prescriptions in 1990.  Is that correct?

13        A.   I said 1990s, with an "s," so if you could

14   take a particular year prior to 2000.

15        Q.   So --

16        A.   Or the average of multiple years.

17        Q.   Okay.  So your baseline for determining the

18   legitimate need for prescription opioids is rooted

19   to the 19 -- the entire decade of 1990 -- to 1999.

20        A.   Well, no.  What I am saying is that you can

21   determine a -- determine the baseline need of a

22   community or a state for the need for opioids based

23   on a variety of -- you could either do a particular

24   year in the 1990s or you can take statistically an

Page 193

1    average of a few years and then look at that.

2              But that would be the closest prior to

3    2000 when the standards changed.

4        Q.   And do you know what the number of

5    prescriptions that were written for prescription

6    opioids in 1990 were?

7              MR. COLANTONIO:  I'm sorry, you said

8    "1990?"

9              MS. JINDAL:  Yes, 9-0.

10              MR. COLANTONIO:  1990.  Okay.

11       A.   I would not know off the top of my head

12    right now.

13       Q.   Okay.  In the course of determining that --

14    the decade immediately prior to the change in the

15    standard of care was the -- should be the baseline

16    or assumption, why did you come to that conclusion?

17       A.   Because if you take the decade prior to

18    that, that would be too far off of the population

19    demographic changes that would happen.

20              If you take the decade after that, that

21    would make no sense, because the distribution of

22    prescriptions, the diversion and the amount of

23    pills that flowed, we have enough of evidence that

24    we can all agree upon that that would not be

Page 194

1    applicable.

2                So the only reasonable conclusion would

3    be that you would look at the time prior.  This is

4    not something I would -- this is a very routine way

5    to do biostatistics, and you know, you know, in the

6    epidemiological world, this is not abnormal at all.

7                And then I say a number of years to

8    average, because sometimes there tends to be to

9    these trends and others that could provide you a

10   wrong number.  So that's why I would favor

11   potentially looking at an average year.  If the

12   numbers were flat for all ten years for the 1990s,

13   then you could take a particular year.

14               If the numbers went up and down, then

15   you could take an average of few years.  So the

16   idea is to get to a baseline within a reasonable

17   degree of certainty that you can make predictions

18   moving forward for.

19   Q.   And in making that baseline assumption, do

20   you -- you mentioned the changes in population.

21   Right?

22               For example, the migration and

23   immigration into and out of the state of Virginia.

24   Is that one of the things that you would have to

Page 195

1  control for, to make sure your baseline assumption

2  is accurate with, as you said, a reasonable degree

3  of certainty?

4          MR. COLANTONIO:  I'm sorry, I think

5  you said "Virginia."

6          MS. JINDAL:  West Virginia.

7      Q.   Sorry.  I'm from Virginia, so sometimes

8  I slip up --

9          MR. COLANTONIO:  We were one state at

10 one sometime.

11     A.   There could be a lot of factors.  One of

12 those -- so you have to account for all of the --

13 the both directions to being accurate.  So you have

14 to account for all of the variables potentially.

15 One of those variables would be the demographics.

16          The other variables would be the

17 movement in/out, in population loss.  Another

18 variable would be the need for legitimate

19 prescription.  That would be, for example, okay, in

20 an average -- what was the '90s average for mining

21 jobs, for example, or timber jobs as a industry,

22 for example, and then you look at.

23          So for example, if the mining jobs were

24 35,000 in, you know, 1996 - making this up - and

Page 196

1    they end up becoming 35,000 to 20,000 in 2006, you

2    have to account for that because those -- those are

3    the conditions - the ruggedness, the arthritic

4    condition and others - that actually can explain

5    and justify some of the opioid prescriptions used

6    even in the '90s.

7                    So what I'm saying is that a curve of

8    the '90s, the numbers, you could use that as a

9    baseline, but you may have to say, then moving

10   forward, we'll have to adjust that curve down or up

11   based on consideration of all these factors,

12   including cancer and some of the end-of-life

13   issues.

14       Q.   And in the change in the standard of care,

15   is it also possible that doctors are now meeting a

16   need that was previously unrecognized in terms of

17   treating pain?

18       A.   I am sorry, could you repeat -- I think I

19   understand.  I'm not sure I understand 100 percent.

20       Q.   Sure.  Before the standard of care changed,

21   as you said, in 2000, the focus on treating pain

22   was - I believe you said - limited to end-of-life

23   care, acute post-operative pain and injury-based

24   pain.  Is that correct?

Page 197

1      A.    No, there was multiple other recommendation

2   for use of opioids and other medications for pain.

3   It was not exclusively those areas.

4           When the standard of pain of care --

5   standard of care for pain changed, what we're

6   talking about is that we almost began to prioritize

7   the use of opioids over other alternatives, in

8   addition to expand the vocabulary or the areas in

9   which opioids could be used.

10     Q.    Right.  And so in terms of expanding or --

11  focusing on that last bit, expanding the areas in

12  which prescription opioids could be used, how did

13  that translate to the medical conditions for which

14  prescription opioids could be used now versus

15  before the standard of care changed?

16     A.    So if you look at various conditions, for

17  example, in West Virginia over time, we have

18  reduction in some of the cancer cases.  We have

19  certainly a reduction over time in mining injuries.

20  We have slight increases in arthritis.

21          We have slight increases in disability

22  or fair poor condition.  A lot of that is related

23  to obesity, and diabetes, high blood pressure.

24          So it's not going to be a clear bag one

Page 198

1    way or the other.  It will be a mixed bag.  We will

2    have to do that analysis, what I'm saying.  But I

3    would not suggest that for some reasons that the

4    doctors for the last 100 plus years were not doing

5    their job by undertreating pain.  I think that

6    would be a false conclusion to arrive at.

7        Q.   But it is possible that some doctors were

8    undertreating pain before 2000.  Is that poss -- is

9    is that fair to say?

10       A.   Anything is possible.  But it is very

11   difficult for me to agree that the state of West

12   Virginia needed 780 million pills coming into West

13   Virginia, a population of 1.8 million, to

14   sufficiently and adequately treat the pain of West

15   Virginians.

16       Q.   I'm going to refocus you on my question,

17   Doctor --

18              MS. JINDAL:  And move to strike that

19   answer as nonresponsive.

20       Q.   -- is it possible that doctors, before 2000

21   - some of them, at least - were undertreating pain

22   in West Virginia?

23              MR. COLANTONIO:  Objection.  Asked and

24   answered.

1     A.   I do not have evidence to suggest that.

2     Q.   And you said this is an analysis that needs

3  to be done.  So it's not something you have done.

4     A.   I have not --

5               MR. COLANTONIO:  Object to the form of

6  the question.

7               But go ahead, Doctor, if you understand

8  it.

9     A.   No, I did not conduct that specific

10  analysis as I have elicited here today.

11     Q.   And just to be clear, what you're saying is

12  that you have not done the analysis of determining

13  -- of controlling for all these other factors we

14  discussed - demographic, population size change,

15  legitimate need for pain - to determine what should

16  be the baseline assumption in determining the

17  legitimate need for pain.

18               MR. COLANTONIO:  Object to form.

19     A.   I have provided you a very high level of

20  certainty of my opinion without actually conducting

21  that analysis during my tenure as the State Health

22  Commissioner.

23     Q.   And so how -- I guess my question is:  How

24  are you certain in your opinion when you haven't

                                        Page 200

1    conducted the analysis that you -- that needs to be

2    conducted to come to that conclusion?

3         A.    Through my work, my experience, my detailed

4    analyses of each one of these individual factors,

5    and following these trends in my job on a daily

6    level.  That's how I accumulated the knowledge and

7    the expertise to be able to provide you an opinion

8    with a high level of certainty.

9         Q.    So I want to be clear.  The first part of

10   your answer seemed to point to anecdotal evidence

11   that you've seen in your field work.  Is that

12   correct?

13                  MR. COLANTONIO:  Object to the form.

14   Objection.

15        A.    No, that is not correct.

16        Q.    Okay.  So when you said that -- you said

17   that you have -- my question was:  "How are you

18   certain in your opinion about what is the accurate

19   baseline assumption for determining" -- and I'm

20   adding words here.  I understand.  I just want to

21   be clear.

22                  How are you certain in your opinion

23   that 1990 is the best decade for determining a

24   baseline assumption for the need for prescription

Page 201

1    opioids when you haven't conducted the analysis

2    that you say needs to be conducted to come to that

3    conclusion?

4              And you answered, "Through my work, my

5    experience, my detailed analyses of each one of

6    these individual factors and following these trends

7    in my job on a daily level."

8              And my question is:  When you said

9    "Through my work and my experience and my detailed

10   analyses," what do you mean?

11       A.   What I mean is, it is a 20 -- 25-plus years

12   of expertise and experience in the field with

13   highest levels of degrees that I have and working

14   within the population, that's where my opinion

15   comes from.

16             And just as an example, you don't need

17   to conduct a analysis of people on a plane, that

18   you throw some of those people without a parachute

19   and some with a parachute, just to figure out if

20   you need a parachute to come down.

21             Some of this is very much a common

22   sense analyses which I present to you.

23       Q.   What part of it is a common sense analyses?

24       A.   The fact that you look at the decade before

Page 202

1    in order to figure out what was the baseline of

2    prescriptions that would be legitimate and include

3    the criteria of requirements of pain that I've

4    elicited to you to look at how much of that in the

5    next forward decade that you would need the opioid

6    prescriptions for.

7        Q.    Okay.  So if I understand you correctly,

8    your opinion was that 1990s would be the best

9    decade, but you don't actually have a specific

10   baseline in mind.  You just think 1990s would be

11   the best decade to study to determine a baseline.

12   Is that correct?

13              MR. COLANTONIO:  Object to the form.

14       A.    No, I do have a specific timeline in mind,

15   and that's the 1990s.  There's a reason I didn't

16   compare with 1890s or 1860.  But the reason I say

17   "1990s" is because of those specific reasons that

18   conforms to my expertise, which is a very common

19   thing in the medical sphere.

20              When you don't have abject data, you

21   provide expert opinion.  That is not an abnormal

22   thing, and I am here providing you that my

23   expertise with -- both being a former Commissioner

24   of West Virginia as well as experience in this

Page 203

1    field through training, education and experience.

2        Q.    And I just -- maybe I'm -- I don't -- I

3    just want to make sure we're not speaking past each

4    other, Doctor.  That's all.  I understand that you

5    said 1990s is the best decade to determine a

6    baseline for legitimate need for prescription

7    opioids.  Is that correct?

8        A.    Yes.

9        Q.    Okay.  Do you have a specific number in

10   mind as to:  This is the number that is my baseline

11   for what -- these number of prescriptions represent

12   the legitimate need for prescription opioids in

13   2019 -- in 1990?

14             MR. COLANTONIO:  Object to the form of

15   the question.

16       Q.    100 prescriptions or 200 prescriptions?

17   That's what I'm trying to get at.

18       A.    I think I've already asserted that we would

19   need to look at that data, so for me to sit here

20   and guess that data would not be appropriate.

21       Q.    Okay.  And so all you've determined is the

22   decade to review to determine the baseline for

23   legitimate need.

24             MR. COLANTONIO:  Object to the form.

Page 204

1      A.   So I -- so I've mentioned the 1990s is the

2   decade, and what -- where you can get a peek of the

3   assessment, is start to look at some of my reports,

4   that you -- and the -- the counsel -- the

5   plaintiff's counsel have highlighted.

6           If you care to review that report, you

7   can see that I've done the analysis from the year

8   2001 onwards, and the year 2001 can give you a hint

9   as to what was happening in the late 1990s.

10          And that's where I formed the opinion

11   that 80 -- perhaps 80 to 90 percent of the volume

12   in the 2000s and onwards was being diverted and was

13   being used inappropriately, whether it was

14   unnecessary prescriptions or diverted

15   prescriptions.

16          So I keep answering the question.  The

17   bottom is, you need to look at the report I've

18   submitted.

19      Q.   Sure.  And if you look at that report, will

20   I find an analysis of the 1990s in there?

21      A.   How could you when the title says 2001 to

22   2015?

23      Q.   Okay.  Thank you.

24          I want to talk about some of the

1    demographic changes that you mentioned that would

2    need to be studied.  Is one of them the age of the

3    population?

4        A.   Yes.

5        Q.   And has West Virginia's average age of its

6    population grown over the last two decades?

7        A.   Yes.

8        Q.   Has it grown since the 1990s?

9        A.   Yes.

10       Q.   And is -- does West Virginia in fact have

11   one of the highest -- or I'm sorry, one of the

12   oldest populations in the state -- in the country?

13       A.   Yes.

14       Q.   And is another factor the number of adverse

15   childhood events that an individual is exposed to?

16   Is that something you would need to analyze to

17   determine -- strike that.

18            Doctor, we previously looked at Exhibit

19   54.  Could you go back to that exhibit?

20            MR. COLANTONIO:  You want me to pull

21   it up --

22            MS. JINDAL:  Yes, please.

23            MR. COLANTONIO:  Let me find it for

24   you.  I'm sorry, can you identify that for me?

Page 206

1   Because my envelopes -- I didn't put it back in.

2   Is that the --

3            MS. JINDAL:   That's the State of

4   Health presentation that was dated October 26,

5   2018.

6            MR. COLANTONIO:   He's got it.

7      A.   I have it.

8      Q.   And could you please turn to Slide 6 of

9   that presentation?   It's Bates stamped 0925, I

10  believe.

11     A.   I'm here.

12     Q.   And do these reflect some of the

13  demographics that you would need to study to

14  determine the legitimate -- the legitimate need for

15  prescription opioids --

16     A.   Yes.

17     Q.   -- in a particular state?

18     A.   Yes.

19     Q.   Okay.   And the first of these, the one we

20  just discussed, is the median age.   Is that right?

21     A.   Yes.

22     Q.   And does this identify that West Virginia

23  has the fourth-highest in the nation based on the

24  2016 U.S. Bureau of the Census America Community

Page 207

1   Progress?

2        A.   I think we just agreed to that.

3        Q.   Great, okay.  The next one is Medicaid,

4   correct?

5        A.   Yes.

6        Q.   And does this reflect the fact that 30

7   percent of West Virginia residents are served by

8   Medicaid?

9        A.   As of the date that's down there, yes.

10       Q.   And that date is March 2017, right?

11       A.   Yes.

12       Q.   And further to determine legitimate pain,

13   we'd also have to review the percent of the

14   population that is disabled.  Is that the third

15   factor that's there?

16            MR. COLANTONIO:  Just object to the

17   form of the question.

18       A.   Yeah, so --

19       Q.   I apologize.  I'll withdraw and ask again.

20   I want to be sure that my question is clear.  The

21   third factor -- the third demographic factor that

22   you've identified here is the percent of the

23   population that is disabled.  Is that right?

24            MR. COLANTONIO:  On this page.

1    A.   On this page, not to determine the need for
2  opioids.
3    Q.   But would you want to look at the rates of
4  disability to determine the need for prescription
5  opioids?
6    A.   Yes, but not necessarily the Medicaid
7  population.  I just want to be clear about that.
8    Q.   I see.  So you would not consider the
9  percentage of people who are on Medicaid in terms
10  of considering whether or not there's a legitimate
11  need for prescription opiates?
12    A.   Not necessarily.
13    Q.   I appreciate -- okay.  When you say "not
14  necessarily," could you explain?
15    A.   Yes.  So it can be in some states the
16  Medicaid population; in other states, it can be the
17  percentage of the Medicaid population.  Because
18  Medicaid is insurance status and no way are we
19  trying to say that people on Medicaid are more or
20  less likely to use opioids.
21         That's a political statement, and I
22  would like to -- I don't think that bears any
23  weightage or evidence behind it.
24    Q.   Okay.  Thank you for that clarification.

1              Going back to the third factor you've
2    identified here, disability, is that one that you
3    would measure to determine the legitimate need for
4    prescription opioids?
5         A.   Yes.
6         Q.   And does West Virginia have a disability
7    population of 18 percent compared to 12 percent of
8    the U.S. population?
9         A.   Yes.
10        Q.   And that's as of the March 2017 date,
11   correct?
12        A.   I -- the asterisk is --
13        Q.   Or --
14        A.   -- only for Medicaid.  So I would say at
15   the time of the presentation, those were probably
16   valid and most current data.
17        Q.   Okay, thank you.  And then going to the
18   next page, are these factors that you would
19   consider in determining the legitimate need for
20   prescription opioids?
21        A.   You know, some might be; some might not be.
22   So I wouldn't say necessarily.  There are some that
23   are missing, like you know -- so this -- these
24   slides, these two slides, were not meant to convey

Page 210

```
 1   the message, I think, what -- what we're trying to
 2   convey here.
 3        Q.   Sure.  I understand.  But when you say some
 4   of them would be something you would consider in
 5   determining legitimate need, which ones would those
 6   be?
 7        A.   I would use --
 8        Q.   Just focusing on the slide -- I'm sorry,
 9   Doctor.  Just focusing on the slide, there are
10   three factors, correct --
11        A.   Yes.
12        Q.   -- that are listed on this slide?  And one
13   of those -- the first is "Bachelor's degree or
14   higher"?
15             MR. COLANTONIO:  I'm sorry, I wanted
16   to make sure we're clear.  You said there's three
17   on the slide.  Are you referring to --
18             THE DEPONENT:  Flip over.
19             MR. COLANTONIO:  Well, it says, four,
20   five and six.  That's why I'm a little bit confused
21   because it indicates --
22             MS. JINDAL:  I see.
23             MR. COLANTONIO:  Not three, but --
24             MS. JINDAL:  I will ask again.
```

Page 211

1      Q.   I apologize, Doctor, I know we're moving a

2  little fast here.  On the Slide 7 which ends in

3  Bates 096, you identify additional demographic

4  factors that you have studied, correct?

5      A.   Yes.

6      Q.   And the fourth of these demographic factors

7  - or the one that's numbered No. 4 on this slide -

8  is the percentage of the population that has a

9  bachelor's degree or higher, correct?

10     A.   That is it, correct.

11     Q.   Okay.  And is that a factor that you would

12  consider in determining the legitimate need for

13  pain -- or legitimate need for prescription

14  opioids?

15     A.   Not necessarily.

16     Q.   Could you please explain your answer?

17     A.   Sure.  Because if -- if I was looking at

18  the legitimate needs for opioid prescription, I

19  would focus my attention on -- in addition to the

20  trend data from the 1990s, with actual conditions

21  that actually require people to use opioids as a

22  last resort, not necessarily the determinants of

23  their living meaning, you know, what's their

24  income, what's the degree, are they poor or not.

Page 212

1         I think those would be very

2  stigmatizing factors to figure out, and that would

3  not be the way I would recommend necessarily that

4  we go first and foremost.  I would be focused more

5  on health conditions at the end of the day, because

6  when we write people opioids -- at least when we're

7  supposed to write prescriptions -- legitimate

8  prescriptions for opioids, they have to be related

9  back to their health and medical conditions, not

10  the other way around.

11     Q.   Okay.  So just to be clear, you would -- I

12  think actually, you were clear.  I'm going to move

13  on.

14         The next one, is that the same true for

15  median household income, it's not the first thing

16  you would consider, but it's something you might

17  consider if you needed to?

18     A.   Yeah, again, these are the socially

19  determinant factors that I would generally not

20  prioritize in the consideration for the need for

21  pain medications overall, but also for need for

22  nonpharmaceutical options.

23         And so when I say -- when we talk about

24  opioids, I like to make sure that we're talking

1   about nonpharmaceutical options, pharmaceutical,

2   nonopioid options and opioid options.  So there's

3   these three categories, going backwards.

4           So that's -- those are the things that

5   I would look at.  But these are not the categories

6   I would look at beyond age and disability.

7       Q.   Okay.  So I'm a little confused now,

8   Doctor, because I thought we were talking about a

9   baseline assumption for the need for prescription

10  opioids.

11      A.   Uh-huh.

12      Q.   Were we not?

13      A.   Yes.  I can explain that if you would like

14  me to.

15      Q.   No.  What I'm trying to understand is,

16  Doctor, your -- when you said that you would look

17  at the 1990s as the decade for determining the

18  baseline for the need for prescription opioids, you

19  were talking -- when you said "Prescription opioids

20  there," you were talking about controlled

21  substances, correct?

22      A.   Yes.

23      Q.   Okay.  And so when I asked you if you would

24  consider the demographics listed on page 0926 of

Page 214

1    Exhibit 54, you were saying that these are some

2    that you may consider in terms of determining

3    social -- the social environment in the 1990s in

4    ultimately determining a real number for that

5    baseline.  Is that correct?

6              MR. COLANTONIO:  Object to the form.

7         A.   No.  And once again, I like to be clear and

8    consistent rather than have twisted way of getting

9    through, so if you don't mind, I'd like to clarify

10   once again, but I'd like to be very clear and

11   consistent about it, if that's okay.

12        Q.   Please.

13        A.   So what I basically said both to my

14   counsel, plaintiffs, and to you, is this:  That in

15   order to figure out what would be the appropriate

16   prescriptions or the legitimate credible

17   prescriptions for opioids today or in the last few

18   years, what you would have to see is you would have

19   to find a baseline.

20              The closest you can get to baseline is

21   within the decade, some formula for in the 1990s.

22   If that's a consistent prescribing, you could take

23   a particular year; if it's a up and down, then you

24   could do an average.

Page 215

1                Now, with that, when you took -- take a

2       number of other factors to determine that.  Those

3       factors include individual health factors of folks.

4       They may or may not include Medicaid status, for

5       the reason we mentioned.

6                They also include the -- what we know

7       now.  So that means that we cannot ignore the CDCs

8       evidence-based recommendations of 2016 that now say

9       that we do not use opioids as first line of

10      treatment.  To the point and to the extent that

11      that was being done in the 1990s, we need to

12      correct for that.

13               And that's where the thought comes in

14      that we have to look at those numbers and that we

15      have to look at, okay, if there was 100

16      prescriptions, you know, for 1,000 people, how many

17      of those would have been credibly reduced by using

18      nonpharmaceutical options, and then how many of

19      those would have been further reduced by using

20      nonopioid pharmaceutical options, and then we get

21      to the bottom line of, okay, how many would have

22      been okay to use for opioids.

23               So that's why I'm not -- I'm not coming

24      to you with a "I know the answer."  I'm giving you

Page 216

1    a range that I believe 80 to 90 percent.

2            But at the end of the day, if you do

3    the math, then we can know for certain.  But those

4    are the factors, the pillars of how -- what it

5    would take to make that determination.

6            But it may -- it may be 80 percent

7    diverted; it may be 90 percent diverted; it may be

8    99 percent diverted.

9            I cannot tell you that right now

10   sitting here.  But I can tell you the factor that

11   would take -- and again, I'm -- I'm working very

12   hard to be clear and consistent.

13       Q.   No, that was really helpful.  Thank you,

14   Doctor.  So again, this is an anal -- what we're

15   outlining here, what we're discussing here, is the

16   analysis and how it should be conducted, not what

17   your old analysis has been, correct?

18            MR. COLANTONIO:  Object to the form.

19       A.   No, I think I have a right to provide --

20   look, when the Governor of the State asks me --

21       Q.   Doctor --

22            MR. COLANTONIO:  Hold on.  Let him

23   finish his answer, please.

24       A.   When the Governor of the State, in my

Page 217

1  capacity as the State Health Commissioner, State

2  Health Officer, asks me, I don't go after every

3  question and say, "Governor, I can't answer you.

4  Let people die until I conduct an analysis."

5            We provide -- and the way the medicine

6  and public health works is we provide our best

7  estimate based on our experience and based on our

8  knowledge and training in order to move forward and

9  provide solutions.  And that's exactly what I'm

10  providing to you here.

11    Q.   Okay.  So your analysis that 80 to 90

12  percent of prescriptions were unnecessary in the --

13  I'm sorry, Doctor, I actually don't know if you

14  gave a range.

15            MS. JINDAL:  I'll strike all that.

16    Q.   Your analysis that 80 to 90 percent of

17  prescriptions were unnecessary, that is based on

18  your experience and you -- but not any particular

19  scientifically-rigorous analysis that you have

20  conducted.  Is that fair to say?

21            MR. COLANTONIO:  Object to the form of

22  the question.

23    A.   I don't think so.  Because if you look at

24  my report, you will find the rigorous scientific

Page 218

```
 1    analysis that was conducted and that gives you a

 2    very good cry tear I can't to build that off of

 3    from and to arrive at that estimate that I have

 4    provided.

 5         Q.   So you -- and just to be clear, when you

 6    say your report, you're referring to Plaintiff's

 7    Exhibit 1?

 8              MR. COLANTONIO:  Object to the form.

 9         Q.   Is that the historical overview?

10              MR. COLANTONIO:  Object to the form.

11         A.   I -- I'm referring to wherever the analysis

12    resides that I know of exists which is the

13    prescription -- prescription opioids overlaid with

14    the deaths and other substances.  That was --

15    wherever the form might be.  I'm happy to find it

16    for you and provide it for you, but that's what the

17    analysis was.

18              It might be in the report.  I have not

19    had a chance to review that report fully.

20              MS. JINDAL:  Mark, do you have a copy

21    of the report with you by any chance?

22              MR. COLANTONIO:  I'm sorry, I'm a

23    little confused myself.  Because I'm not sure what

24    you're referring to.  And I just don't -- I don't
```

Page 219

1   want to --

2              Well, I don't want to --

3              MR. FITZSIMMONS:  Didn't we make that

4   as an exhibit?

5              MR. COLANTONIO:  I don't want to make

6   any speaking objections, but I think maybe there's

7   a miscommunication going on.  I think what the

8   doctor is trying to tell you is he's done a lot of

9   reports and in those reports, he's got a lot of

10  information, some of which may or may not be

11  exhibits here, and if you want us to - after this

12  deposition or sometime - give you something that --

13             I mean, I don't know what to tell you.

14  It -- anyhow, I don't know what you're referring

15  to, so --

16             MS. JINDAL:  Okay.

17             MR. COLANTONIO:  That's as clear as I

18  can be.

19  BY MS. JINDAL:

20     Q.   Doctor Gupta, you don't know right now any

21  particular report that contains your opinion that

22  80 to 90 percent of prescription opioids were

23  illegitimate -- a prescription for opioids was

24  illegitimate?

Page 220

1          MR. COLANTONIO:  Objection to the form

2     of the question.

3               I'm sorry, I don't think he said that.

4     What he's saying is that the basis for his -- part

5     of the basis for what he's saying is in that

6     report, the data.  I think.

7               He's gonna speak for himself, and I

8     don't mean to interrupt.  Just trying to help.

9        A.   It's an opinion -- to answer the question,

10    it's an opinion that I'm providing to you based on

11    the question being asked to me, of me, and based on

12    my extensive work, knowledge, products created over

13    time as well as what exists nationally in terms of

14    the prescription opioids, the trend data as well as

15    the overdose data.

16              So that would be my answer.

17       Q.   And just to be clear, you haven't written

18    out this analyses that ultimately led to your

19    conclusion that 80 to 90 percent of prescriptions

20    for opioids were unnecessary anywhere.  Anywhere in

21    one place.  To be clear.

22       A.    I personally did not write down what I have

23    expressed to you as my expert opinion today.

24       Q.   One of the factors -- or one of the things

Page 221

1    you talked about, Doctor, was -- I want to go back

2    to your testimony, because I want to make sure I

3    get this right.

4            You said if you -- and this is in the

5    context of -- this was in response to plaintiff's

6    counsel's questions.  Plaintiff's counsel asked you

7    about the cause of the dramatic increase in opioid

8    pill prescriptions in West Virginia from the late

9    1990s to the mid two thousand teens.

10           And as part of that answer, you said,

11   "If you use it" - "it" referring to prescription

12   opioids - "for more than three to five days, you're

13   at a high risk of becoming addicted or having an

14   addiction."

15           And what is your basis for believing

16   that?

17           MR. COLANTONIO:  I'm just going to

18   maybe ask you to read the whole answer so he can

19   get the context.

20           MS. JINDAL:  Yeah.  The whole answer

21   is a very long one, but I can point you to it if --

22   if you can, but --

23           MR. COLANTONIO:  I don't have the --

24           MS. JINDAL:  Sure.  I'll read the

Page 222

1   whole answer.

2       Q.   "So as I stated, the first inciting event

3   was the effort to change the standards of pain and

4   care for pain.  As we changed the standard of care

5   for pain in somewhere around late 1990s -- and

6   really, I think it was like Robert Wood Johnson

7   funded the work initially in 1997 that led to the

8   JCAHO having that changed standard and the Cancer

9   Society work at the same time, the VA, the federal

10  government had changed, and this extraordinary

11  effort was placed.

12              There was quote 'several reasons for it

13  that we were getting details on.'  One was the more

14  ethical, we have an obligation to provide patients

15  an absolute zero level of pain, it had to come down

16  from 10 to zero.

17              The other was that you could be held

18  liable if you don't do that, so it was about

19  punitive actions.

20              And the third was, there is no

21  addiction, no consequence and this was a really

22  good safe medication and there was no --

23              What was happening really during this

24  time - now looking in retrospective in fact - was

                                                    Page 223

1    that, you know, you have a set population that was

2    going to get the prescriptions in this context of

3    changed standard of care of pain.

4              They were getting the prescriptions, so

5    you get a tooth pulled - and that numbers hasn't

6    changed over time - you know, anything you get 30

7    days of -- 30 days of liberal prescribing of an

8    opioid.

9              You may be using two pills or three

10   pills and they go, you know, in your closet,

11   medicine cabinet.

12             So what happens is:  If you used it for

13   more than three to five days, you have a high risk

14   of becoming addicted -- having addiction.  Use it

15   for a few days, then there's a high risk of

16   diversion right there."

17             And I'm going to stop reading there

18   because I just want to focus on that first sentence

19   right there, "If you use it for more than three to

20   five days, you have a high risk of becoming

21   addicted."

22             Now, there, were you referring to

23   someone with a prescription for opioids?

24        A.   So I just want to correct -- if I made the

Page 224

1    mistake, the Robert Wood Johnson work was

2    commissioned in 1997, I believe, just for details.

3            I was -- yes.  So to the answer, yes.

4    I was referring to someone who may have

5    appropriately or inappropriately been prescribed a

6    prescription for opioids.

7        Q.   Okay.  And you said "If someone is using

8    prescription opioids pursuant to their prescription

9    and they use it for more than three to five days,

10   you have a high risk of becoming addicted."

11           My question for you is:  Where does

12   that -- where does that number come from?  Where

13   does that understanding come from?

14       A.   So the higher risk as opposed to no risk of

15   becoming addicted after using three to five days is

16   well established in literature, and the most --

17   probably the best reference would be the CDC's

18   opioid guidelines of 2016, the opioid prescribing

19   guidelines.

20       Q.   And have you reviewed that literature

21   yourself?

22       A.   Yes.  The opioid -- CDC's opioid

23   guidelines, yes, I have.  I have not recently, so

24   I'm gonna have a little bit difficult time

Page 225

1    recalling every aspect of it right now.

2        Q.   And you haven't reviewed the underlying

3    study that the CDC cited?

4        A.   I do not recall right now.  I believe I

5    would have.  It was one of the basis for me to --

6    for the Opioid Reduction Act, Senate Bill 273,

7    where we agreed on limiting the initial

8    prescription to four days.

9              There was a -- a good discussion about

10   this, three to five days, within the physician

11   community, of the legislature and myself and

12   others, and we agreed upon four days.

13             So yes, I have.

14       Q.   And you said "use it for a few days and

15   then there's a high risk of diversion right there."

16             So I want to ask you:  Your -- when an

17   individual is prescribed opioids and they use them

18   for, let's say, two to three days and then leave

19   the remainder in their medicine cabinet, do the

20   prescription opioids sitting in the medicine

21   cabinet themselves induce addiction in others?

22             MR. COLANTONIO:  Object to the form.

23       A.   I'm sorry, I don't know -- I didn't

24   understand that question.

Page 226

1    Q.   Okay.  I'm talking about the pills in the

2  medicine cabinet that are, as you said, there's a

3  risk -- high risk of diversion right there.  Is

4  that accurate?

5              MR. COLANTONIO:  I'm sorry.  I object

6  to the form of the question.  I'm not sure of the

7  question.

8    A.   Could you repeat the question, please?

9    Q.   Sure.  Do prescription pills that are --

10  you said prescription pills in a medicine cabinet

11  form a high risk of diversion.  Why is that?

12    A.   I did not say that.

13    Q.   Okay.  Do prescription pills in a medicine

14  cabinet --

15              MS. JINDAL:  Let me strike that.

16    Q.   You know, it might be that my coff -- my

17  tea was too weak and I need some coffee.  So if we

18  can, can we just take a ten-minute break and then

19  I'll gather my notes and we'll come back?

20              MR. COLANTONIO:  Okay.

21              VIDEO OPERATOR:  Going off the record.

22  The time is 2:55 p.m.

23              (A recess was taken after which the

24              proceedings continued as follows:)

```
 1              VIDEO OPERATOR:  Now begins Media Unit
 2    6 in the deposition of Rahul Gupta, M.D.  We're
 3    back on the record.  The time is 3:10 p.m.
 4    BY MS. JINDAL:
 5         Q.   Doctor Gupta, you've been retained as an
 6    expert consultant for opioid litigation in West
 7    Virginia, correct?
 8         A.   I'm looking at -- because I've been asked
 9    for this deposition and --
10                   (A discussion was had off the record
11                    regarding the court reporter having
12                    been disconnected.)
13         A.   Could you -- could you repeat the question
14    please.
15         Q.   Dr. Gupta, not focusing on today's
16    deposition, you have been retained as an expert
17    consultant for opioid litigation in West Virginia,
18    correct?
19                   MR. COLANTONIO: In the MLP, yes.
20         Q.   Dr. Gupta, if you can answer?
21                   VIDEO OPERATOR:  Now begins Media Unit
22    6 in the deposition of Rahul Gupta, M.D.  We're
23    back on the record.  The time is 3:10 p.m.
24    BY MS. JINDAL:
```

1    Q.   Doctor Gupta, you've been retained as an

2  expert consultant for opioid litigation in West

3  Virginia, correct?

4    A.   I'm looking at -- because I've been asked

5  for this deposition and --

6              (A discussion was had off the record

7              regarding the court reporter having

8              been disconnected.)

9    A.   Could you -- could you repeat the question

10  please.

11    Q.   Dr. Gupta, not focusing on today's

12  deposition, you have been retained as an expert

13  consultant for opioid litigation in West Virginia,

14  correct?

15              MR. COLANTONIO: In the MLP, yes.

16    Q.   Dr. Gupta, if you can answer?

17              THE COURT REPORTER:  Are we back on

18  the record and I missed that piece. Did Adam put us

19  back on the record.

20              VIDEO OPERATOR:  We never went off the

21  record but we heard you when your phone audio cut

22  and so we just paused and we've been waiting.

23              THE COURT REPORTER:  Okay.  I'm sorry.

24    A.   So, yes for MLP and, yes.

Page 229

1      Q.   By Mr. Colantonio's firm?

2                MR. COLANTONIO:  Yes.  And Napoli

3    Shkolnik as well.

4      A.   Napoli Shkolnik.

5      Q.   In addition to Mr. Colantonio's firm?

6      A.   Yes.

7      Q.   And are you being paid for that work?

8      A.   I have received -- yes.

9      Q.   By the hour?

10     A.   Yes.

11     Q.   How much per hour?

12     A.   I believe it's $500.

13     Q.   And the opinions that you've expressed in

14   your testimony today, are those opinions that you

15   provided in the course of your expert consulting

16   for Mr. Colantonio's firm?

17               MR. COLANTONIO:  No, he has not.

18     A.   No.  It's -- I'm providing because I was

19   asked to be -- I was asked -- I was provided a

20   subpoena and I was asked to be deposed today.

21     Q.   Well, I'm not asking why you're testifying

22   today, sir.  I'm asking whether the opinions that

23   you have expressed today in your deposition

24   testimony are also ones that you've provided in the

Page 230

1   course of your consulting, expert consulting, for

2   Mr. Colantonio's firm.

3           MR. COLANTONIO:  So let me just place

4   an objection.  So this -- we are in state court in

5   West Virginia.  The state court in West Virginia,

6   as a consultant, I don't believe you're entitled to

7   obtain information about his opinions as a

8   consultant.

9           We've not yet identified trial experts.

10  And so if he does become a trial expert, at that

11  point you will be able to find that out.  But at

12  this point, he's a consultant, and so I want to

13  have a continuing objection about that, and I'm not

14  sure - given the overlay of this deposition in

15  federal court - how that would play out

16  procedurally, but I don't believe you're entitled

17  to inquire in state court in the litigation at this

18  point because he's a consultant, not identified as

19  a trial expert, testifying expert, yet so you can't

20  inquire into those areas.

21          MR. SHKOLNIK:  This is Hunter

22  Shkolnik.  I'm also on this deposition.  I'm

23  objecting because under the Federal Rules, 26, you

24  are not entitled to any information about a

Page 231

```
 1    retained consultant until they're a designated

 2    expert, and I'm directing him not to answer, and

 3    I'll make the motion in federal -- I'll go to

 4    federal court and argue that.

 5                    MR. RUBY:  He is a -- he has - and I

 6    did confirm this over the break - been designated

 7    as an expert in this case.

 8                    He's been evidently retained as a paid

 9    expert by counsel for the plaintiffs in this case,

10    and --

11                    MR. COLANTONIO:  No, no.  Hey, Steve,

12    that's not correct.  Let me make sure -- let me

13    tell you exactly what the -- what this is, okay,

14    just so we're clear.

15                    He has not -- he has been retained as a

16    paid expert consultant in the MLP case, okay?

17                    He has not been retained as an expert,

18    paid expert, or a retained expert in the federal

19    case.  As I understand it, he is a nonretained

20    expert in the federal case.

21                    He is a retained consultant in the

22    state MLP case, which I think Hunter is correct,

23    does not entitle you to get into what we're talking

24    about in the state case because he's a consultant
```

Page 232

1   at this point, not identified as trial testifying
2   expert.
3               But he's not -- he's not been retained
4   as a -- as a retained expert in the federal case.
5               MR. RUBY:  No, I understand the
6   distinction that's being attempted, but --
7               MR. COLANTONIO:  No, it's a fact.
8   That's a fact.  That's not being attempted.  That's
9   what it is.
10              MR. FITZSIMMONS:  Let me just put it
11  on the record, let's move on.  Come on.  Let's move
12  on, let's go.
13              MR. RUBY:  Well, I -- there's a --
14  there's a question -- the problem, Bob, is that
15  there's a question pending and Mr. Shkolnik has
16  instructed him not to answer.
17              MR. FITZSIMMONS:  Okay.  So that -- so
18  we can move on from there.
19              MR. RUBY:  No, I think we -- I'm
20  trying to work this out before we have to call
21  Judge Wilkes --
22              MR. COLANTONIO:  Let me make sure I'm
23  clear.  So it's a timing issue.  He was retained as
24  a consultant in the MLP case before you guys issued

Page 233

1   a subpoena, all right?  So, I mean, your subpoena

2   is with -- what brought him here, not nothing else

3   but your subpoena.

4              So I mean, it is what it is.  He

5   responded to subpoena, and so that's what brought

6   him here, nothing else.  And if you hadn't issued a

7   subpoena, we wouldn't be here and this wouldn't be

8   an issue.

9              MR. FITZSIMMONS:  Right.

10             MR. RUBY:  No, no, no, we're here and

11  we issued a subpoena because he -- because he was

12  on plaintiffs' initial list of witnesses, and as

13  has already been pointed out, he's disclosed as --

14             MR. FITZSIMMONS:  Whatever.

15             MR. RUBY:  -- he's disclosed as an

16  expert in this case, as a nonretained expert in

17  this case, and yet he's being paid under a retainer

18  agreement by counsel for the plaintiffs in this

19  case, and so --

20             MR. COLANTONIO:  He's not being paid

21  by -- in this case.  He's not being paid in this

22  case.  You can ask him that.

23             MS. KEARSE:  Just to be clear, it's

24  clear in our disclosure that he's an unretained

Page 234

1    expert.  While his testimony will be very factual

2    in nature, there could be information that may be

3    considered expert testimony based on his

4    experiences and his work, so that's why it's under

5    Rule 26(a)(2)(C) that we have disclosed him as an

6    unretained expert in addition to a witness with

7    knowledge in regards to the issues in the federal

8    case.

9                MR. RUBY:  And he's being paid in a

10   different case where he's a consultant for counsel

11   who are also counsel for plaintiffs in this case.

12   Is that correct?  Is that the position?

13               MR. COLANTONIO:  That's true. But it's

14   a different case.

15               MR. RUBY:  And the question --

16               MS. KEARSE:  I want to clarify it to

17   the -- I'm not -- I do not know in the MLP case on

18   behalf of my Motley Rice clients on what that

19   relationship is.  There may be some other cases

20   that have formerly retained him.

21               We are all in the MLP, but I, as

22   counsel for the City of Huntington, I just don't

23   think it would be correct to say that plaintiffs'

24   counsel, that is, the City of Huntington and Cabell

Page 235

1    County in this case, have retained him in the other

2    case.

3             That may be a down-the-road case and I

4    would have to talk with Mr. Colantonio about that

5    as well, just for clarity's sake on that.

6             MR. RUBY:  And I think the -- just so

7    we're all clear, I think the question that is

8    pending, the question that's on the floor, is

9    whether the opinions to which he's testified today

10   are opinions that he has provided in his retained

11   engagement in other West Virginia opioid

12   litigation.

13            MR. COLANTONIO:  Are we on the record

14   or off the record, by the way?

15            MR. RUBY:  We're on.

16            MR. COLANTONIO:  I'm sorry, on or off?

17            MR. RUBY:  I don't think anybody's

18   taken us off.  And we'd like to stay on for this

19   discussion.

20            MR. COLANTONIO:  Okay, that's fine.

21   Well, whatever, Bob.  Is there a question pending?

22            MR. RUBY:  Yes.

23            MR. FITZSIMMONS:  What's the question?

24            MR. RUBY:  Teresa, are you able to go

1   that far back?

2                   THE COURT REPORTER:  Sure.  Yes.

3                   "And the opinions that you have

4   expressed in your testimony today are those

5   opinions that you provided in the course of your

6   expert consulting for Mr. Colantonio's firm?"

7                   MR. COLANTONIO:  And I think at that

8   point -- Hunter, are you instructing him not to

9   answer?

10                  MR. FITZSIMMONS:  He is.

11                  MR. SHKOLNIK:  Yes, because first of

12  all he's not retained by any firms other than ours,

13  not Motley Rice or anybody else, and under the

14  federal rules, he does not have to be giving

15  answers as a retained consulting expert as to what

16  he's considered, done, his opinions or anything

17  along those lines.

18                  MR. RUBY:  And the problem --

19                  MR. SHKOLNIK:  And just so -- wait.

20  The problem is, the question specifically asks,

21  what did you do in the MLP case for my firm and the

22  Colantonio firm, and that's the inappropriate

23  question.

24                  If you rephrase the question, it may be

1    appropriate.

2                 MR. RUBY:  The question doesn't say

3    anything about the MLP; the question is about

4    Mr. Colantonio's firm, which is counsel for the

5    plaintiffs in the case in which this deposition is

6    being taken.

7                 MR. SHKOLNIK:  No, that's not the

8    question.  Read it back again.

9                 MS. KEARSE:  We clarified that.

10                MR. COLANTONIO:  The question was:

11   Did you provide these opinions in the other case in

12   which we retained him, and that's -- that's what

13   Hunter's saying.  That's the question.  You're

14   asking for whether or not --

15                MR. SHKOLNIK:  It's under the federal

16   rules of civil procedure.

17                MR. COLANTONIO:  -- in the other case.

18   That gets into the other case.

19                MR. RUBY:  And so -- well, if -- just

20   let me make sure I understand.  If your -- if your

21   position is that we can't ask whether he's provided

22   these opinions as part of his retained

23   engagement --

24                MR. COLANTONIO:  -- in the MLP --

```
                                          Page 238

 1              MR. FITZSIMMONS:  Why don't you just

 2      have, Steve -- have Jyoti answer the question

 3      again.  Let's go from there.

 4              MR. RUBY:  Jyoti, go ahead.

 5              MS. JINDAL:  Sure.

 6      BY MS. JINDAL:

 7         Q.   The opinions that you expressed in your

 8      testimony today, are those opinions that you

 9      provided in the course of your expert consulting

10      for Mr. Colantonio's firm?

11              MR. FITZSIMMONS:  Mark.

12              MR. COLANTONIO:  Hunter, are

13      you instructing him not to answer?  Is Hunter on

14      there?

15              MR. SHKOLNIK:  Yeah, I'm here.  That

16      question, is it something they gave to

17      Mr. Colantonio's firm, I think that's privileged.

18      We're his counsel for this deposition.

19              MR. RUBY:  Oh, come on.  He's your

20      expert and your client so everything you discuss

21      with him as an expert is privileged?

22              MR. SHKOLNIK:  Until he's a designated

23      expert in litigation, yes.

24              In our litigation.
```

1              MR. RUBY:  His relationship with your

2     firm, Hunter, I think is different from your

3     relationship with Mark's because you haven't

4     appeared as counsel for the plaintiffs in this

5     case, but the Fitzsimmons firm has, and he is a

6     disclosed expert in this case, in which Mark and

7     Bob are counsel for plaintiffs.

8              MS. KEARSE:  And I think I clarified

9     earlier, Mr. Colantonio has appeared, I believe,

10    his firm, on some depositions on there, but

11    Mr. Colantonio's firm does not represent the City

12    of Huntington.  No, they --

13             MR. RUBY:  They've noticed an

14    appearance for the City of Huntington.  I mean, you

15    can't notice an appearance for a specific

16    deposition and say "We're only representing you in

17    this deposition."

18             MS. KEARSE:  Well, there are certain

19    depositions in the ML -- in the MDL versus the MLP

20    that they've appeared, some third-party

21    depositions, and I understand on behalf of the

22    Prosecutor's Office in Cabell County.

23             MR. RUBY:  That was -- that's

24    different.  My understanding is they were

Page 240

1    representing the Prosecutor's Office there.  But

2    they filed -- they have appeared as counsel for

3    plaintiffs, Cabell County Commission and City of

4    Huntington, in this case.

5                    MR. FITZSIMMONS:  Hey, Steve, this is

6    Bob.  Do you mind if we just take a moment -- we'll

7    step out.  Do you mind if we actually talk to our

8    client at this point?  Because we're talking about

9    privilege here and it gets a little -- the

10   designation with Hunter --

11                   MR. RUBY:  Sure, that's fine.

12                   MR. FITZSIMMONS:  -- resolve this for

13   a second.

14                   MR. RUBY:  Yeah, let's go off the

15   record.

16                   MR. FITZSIMMONS:  Okay.

17                   VIDEO OPERATOR:  Going off the record.

18   The time is 3:25 p.m.

19                        (A recess was taken after which the

20                        proceedings continued as follows:)

21                   VIDEO OPERATOR:  Now begins Media Unit

22   7 in the deposition of Rahul Gupta, M.D.  We are

23   back on the record.  The time is 3:29 p.m.

24   BY MS. JINDAL:

Page 241

1       Q.   Doctor Gupta, the opinions that you

2   expressed in your testimony today, are those

3   opinions that you've provided in the course of your

4   expert consulting for Mr. Colantonio's firm?

5       A.   No.

6       Q.   And did Mr. Colantonio approach you to

7   serve as an expert consultant for opioid litigation

8   in West Virginia?

9       A.   No.

10      Q.   Apologies.  Did someone from

11  Mr. Colantonio's firm approach you to serve as an

12  expert consultant for opioid litigation in West

13  Virginia?

14      A.   No.

15      Q.   Who approached you to serve as an expert

16  consultant for opioid litigation in West Virginia?

17      A.   I am not sure that I -- I've been

18  approached to serve as expert consultant in West

19  Virginia.  I mean, I am sorry, I'm not a legal

20  person, as I said at the very beginning, so various

21  cases, I don't --

22      Q.   Let me try to make myself more clear.  Who

23  did you -- who first contacted you about serving as

24  an expert consultant for opioid litigation

Page 242

1   regarding the opioid crisis in West Virginia?

2       A.   I think I spoke with Hunter a bit back and

3   we had talked about, and I really -- you know, it's

4   been a long time, but I did not really have the

5   time for quite a bit to be able to do any work

6   beyond --

7               So we had a good discussion.  I

8   listened to him and said I will just, you know,

9   make a decision based on being available and time

10  and other things.

11              So that's basically where I think, you

12  know, my work or my agreements or talks have been,

13  with mostly Hunter.

14      Q.   And that's Mr. Hunter, the Hunter you're

15  referring to, that's of Hunter Shkolnik, the firm?

16      A.   Yes, Hunter Shkolnik.

17      Q.   The firm Hunter & Napolini, I believe -- or

18  I'm sorry, Shkolnik Napolini.

19              MR. GOOLD:  I believe it's Napoli.

20              MS. JINDAL:  Sorry, Napoli.  I

21  apologize.  You see it so many times on e-mails

22  that you don't actually read it after a while so --

23  BY MS. JINDAL:

24      Q.   Doctor, you were asked about a social

Page 243

1    autopsy; is that right?

2         A.   Yes.

3         Q.   And that refers to the 2016 fatality

4    overdose analysis that your team at the West

5    Virginia Bureau for Public Health conducted,

6    correct?

7         A.   Yes.

8         Q.   And the purpose of that study was to

9    identify causes of overdose deaths.  Correct?

10        A.   The purpose of the work was to understand

11   better the factors associated with people that

12   result in death, but the entire consequence of a

13   period of time by one year prior to their death, to

14   better understand their characteristics.

15        Q.   And was it all deaths or just opioid

16   deaths?

17        A.   This was all deaths from overdose in 2016

18   in the state of West Virginia.

19        Q.   So that includes prescription opioids, for

20   example?

21        A.   Yes.

22        Q.   It also includes heroin, for example?

23        A.   It could.

24        Q.   Does it also include overdose deaths where

                                        Page 244

1    methamphetamines was used?

2         A.   It could.

3         Q.   Almost every overdose death involves

4    multiple substances, correct?

5         A.   Not necessarily.

6         Q.   You're right.  I used the word -- sorry.

7              Doctor, if you could turn back to that

8    Exhibit 54.

9         A.   That's the presentation?

10        Q.   Yes.  State of Health on October 26, 2018.

11        A.   I have it.

12        Q.   Okay.  Could you please turn to Slide 17?

13   And that ends with Bates No. 0936.

14        A.   Yes.

15        Q.   Okay.  And does this slide reflect the fact

16   that most overdoses include multiple drugs?

17        A.   I'm reviewing it.

18             So the slide we're looking at really

19   involves the average number of drugs per fatal

20   overdose.  That is very different than the

21   statement that you provided me.  What this means is

22   that it could be out of 100, that one person could

23   have 100 substances and we could call it -- there's

24   -- and the other 99 would have a total of 100

Page 245

1   substances, and we could say, "Well, it's two

2   substances per person" because we added up and

3   divided by 100.

4           Or it could be that the other 100 could

5   have two each rather than having 100 substances in

6   one person.  So I don't think this slide provides

7   adequate evidence to make the claim as has been

8   stated.

9   Q.   Focusing just on the time period from 2001

10  to 2013 there, is there a general trend --

11          I'm sorry.  Focusing on the dark blue

12  box that's on that slide - it's written "2001" to

13  "2017 Percentage Difference:"  Plus "16.9%" -  does

14  that reflect an average trend upward in the number

15  of average drugs -- in the average number of drugs

16  involved per fatal overdose over that time period?

17  A.   Yes, from 2001 to 2017, if you look at the

18  numbers above the blue bar, you will see in 2001,

19  it says, "2.32."  And in 2017, you see it says

20  "2.79."  If you subtract the two and you get a

21  number and you divide it by 2.32 and multiply that

22  by 100, I believe you will arrive at the number of

23  16.9 percent.

24          Now, simplistically looking at that,

Page 246

1    we'll ignore the fact that these values peaked in

2    2012 and '13 and '14, and there have been a

3    crescendo effect.

4         Q.   And the average increase per year is

5    identified as 1 percent.  Am I reading that

6    correctly?

7         A.   You're reading that correctly.

8              Once again, that's 17 years and 17

9    percent, so the average becomes 1 percent per year.

10        Q.   Going back to the 2016 autopsy report that

11   you were discussing, did that report say anything

12   about wholesale distributors?

13        A.   I don't have the report in front of me.  I

14   did submit that, so I am not able to collect --

15   recollect that information right off -- right now,

16   without reviewing the report.

17        Q.   Sure.  I think it's Exhibit 37.

18             GUPTA DEPOSITION EXHIBIT NO. 37

19                  (E-mail chain between Melton, Gupta

20                  and others Re: Overdose Death

21                  Investigations dated 3-26&27-18 with

22                  2016 West Virginia Overdose Fatality

23                  Analysis attached

24                  (DHHR_FEDWV_0317258-322) was marked

Page 247

1             for identification purposes as Gupta

2             Deposition Exhibit No. 37.)

3        A.   It will take me a little bit of time to

4   review this.

5        Q.   And Doctor, you're welcome to review it at

6   your pace.  But I will represent to you that it

7   does not include the word "wholesale distributors"

8   in there.

9        A.   I will -- I will believe you at this point

10  and concede at that point without having to fully

11  review the report.

12       Q.   Sure.  You said that many people who died

13  of drug overdoses had filled prescriptions for

14  controlled substances in the 30 days before they

15  died?

16       A.   Yes.

17       Q.   And were those prescriptions written by a

18  physician?

19       A.   I would make an assumption that those

20  prescriptions were provided by prescribers.

21       Q.   I apologize.  You've always got me on that.

22  I appreciate it.

23            Were those prescriptions written by

24  prescribers?

Page 248

1    A.   I cannot be as certain of that - I can make

2    an assumption - but if there were any fraudulent

3    prescriptions, I could not -- I could not tell you

4    in a verified way.

5    Q.   So as far as assuming that the

6    prescriptions were written by prescribers and did

7    not include fraudulent prescribe -- prescriptions,

8    were the prescribers -- they would have been

9    licensed by the state of Virginia, correct?

10              MR. COLANTONIO:  Object to the form of

11   the question.

12   A.   It is possible, plausible, but not for

13   sure.  And the reason I say that is because what I

14   -- we found was that those decedents who went to

15   three or more pharmacies -- four or more

16   pharmacies, were 70 times -- I'm sorry, were 70

17   times more likely to have died.

18              What that means is -- so let me repeat

19   that.  So it says here, the decedents that were

20   more -- 70 more times likely to have a prescription

21   as four more pharmacies that died.

22              What that means is because we were

23   sharing data with CSMP with cross border states,

24   some could have obtained it in doctor shopping,

Page 249

1    diverted prescriptions from elsewhere, but the data

2    did come from CSMP.

3              I cannot validate whether they were

4    exclusively West Virginia prescriptions.

5        Q.   I see.  Would the prescribers have been

6    licensed by a state, if not West Virginia?

7        A.   I would hope so.

8        Q.   And they would have also have had to have

9    been registered with the DEA, correct?

10       A.   Similarly, I would hope so.

11       Q.   Okay.  And did you do any -- did you

12   identify any physicians who wrote those

13   prescriptions -- I'm sorry, any prescribers who

14   wrote those prescriptions without being licensed?

15       A.   Our study was -- and work was not intended

16   to study and look at the licensure aspects of

17   prescribers.

18       Q.   So the answer is no, you didn't review the

19   -- because you did not review the licensure of the

20   physicians in the database, you don't -- you did

21   not identify any who were not licensed.

22              MR. COLANTONIO:  Object to the form.

23       A.   It was not the purpose of the study that --

24   I already testified to the purpose of the study, so

Page 250

1   it does not -- the answer does not conform -- the
2   question does not conform to what I have already
3   stated.
4        Q.   You testified that you started to develop
5   an understanding of the overdose problem when you
6   got better access to the controlled substances
7   program -- monitoring program data.  Is that
8   correct?
9        A.   That would be accurate.
10       Q.   Wholesale distributors don't have access to
11  the data in the CSMP, correct?
12       A.   I have no knowledge to verify that.
13       Q.   You did testify that access to the CSMP is
14  regulated, correct?
15       A.   Correct.
16       Q.   And it's not something that anyone has
17  access to, right?
18            MR. COLANTONIO:  Object to the form.
19       A.   It is not something that's open as a public
20  database.  That's the way to answer it.
21       Q.   And in fact, you, as a Commissioner for the
22  Bureau of Public Health, did not have access to the
23  CSMP, correct?
24       A.   The Bureau of Public Health did

Page 251

1    subsequently have access to it.

2         Q.   At the time you started, you did not have

3    access, correct?

4         A.   I don't know that for sure.  The work --

5    when we did this work, we did have access to the

6    CSMP.  I cannot tell -- say for certainty that in

7    2015 I personally, as Commissioner, did or did not

8    have access to the CSMP for the purposes of what we

9    call fishing.

10              I am reasonably certain in my statement

11   that I did not have authority to go fishing inside

12   the database of the West Virginia's Controlled

13   Substances Monitoring Program.

14        Q.   And I suppose I'm referring to your

15   testimony earlier today, that you had to embed

16   somebody within the Board of Pharmacy to gain

17   access to the CSMP data, correct?

18        A.   We embedded Board of Pharmacy employee into

19   the Bureau for Public Health - that was in

20   accordance with the law at the time - to be able to

21   conduct public health surveillance activities, in

22   the due process of which we're able to access some

23   of the queries that we had.

24        Q.   So again, it was only a Board of Pharmacy

Page 252

1   employee who was able to access the CSMP data in

2   that?

3        A.   That would be accurate.

4        Q.   You testified also that the medical

5   examiner's office had bullet holes in it, correct?

6        A.   Correct.

7        Q.   Is it your testimony that those bullet

8   holes had something to do with opioids?

9             MR. COLANTONIO:   Object to the form.

10       A.   I wanted to -- before I answer that

11  question, I also want to say:   So in my capacity as

12  a licensed physician and a registered prescriber, I

13  did have access to CSMP to interrogate the CSMP if

14  I were to for a patient.

15            I did not have the authority to fish or

16  interrogate CSMP for those who are not my personal

17  patients.   I just wanted to add that.

18            The bullet holes were a result of

19  violence; oftentimes the violence was a result of

20  individuals who were under the influence of various

21  drugs; and oftentimes those drugs included opioids.

22       Q.   Do you know whether the individual who put

23  bullet holes in the medical examiner's office was

24  under the influence of opioids at the time?

Page 253

1      A.   I do not know who the individual was who
2   put the bullet holes in the Office of the Chief
3   Medical Examiner's office.
4      Q.   But do you know whether that individual --
5   without knowing their name, do you know whether
6   that individual was under the influence of opioids
7   at the time?
8      A.   If I do not know the identity of that
9   individual who shot through - whether it was a cop,
10   it was a criminal or somebody under the influence -
11   there's no way for me to make a judgment as to what
12   they were under the influence of.
13      Q.   The IV drug use problem that you mentioned,
14   that's related to the use of nonprescription drugs,
15   correct?
16      A.   Could you repeat that question, please?
17      Q.   Uh-huh.  You --
18           MS. JINDAL:  Ms. Evans, if you could
19   read it back.
20           THE COURT REPORTER:  "The IV drug use
21   problem that you mentioned, that's related to the
22   use of nonprescription drugs, correct?"
23      A.   The IV drug use problem was an evolution of
24   the prescription drug problem.

Page 254

1     Q.   And users -- individuals who inject these

2   drugs, they are -- IV use is primarily associated

3   with heroin.  Is that right?

4     A.   It could be used with heroin, although we

5   have seen that evolve into being cut with fentanyl

6   and other substances as well.

7     Q.   Someone who's just using prescription drugs

8   is unlikely to be using -- is unlikely to be

9   injecting that; is that right?

10         MS. KEARSE:  Object to form.

11    A.   Not necessarily.

12    Q.   Doctor, if you could turn to Exhibit 38.

13         GUPTA DEPOSITION EXHIBIT NO. 38

14            (Gupta testimony before the House

15            Oversight and Government Reform

16            Committee entitled "A Sustainable

17            Solution to the Evolving Opioid

18            Crisis:  Revitalizing the Office of

19            National Drug Control Policy" dated

20            5-17-18 (DHHR_FEDWV_0391628-651) was

21            marked for identification purposes as

22            Gupta Deposition Exhibit No. 38.)

23    A.   I have it.

24    Q.   And I know, Doctor, you're not on that

Page 255

1    cover e-mail.  I'd like you to focus on the

2    attachment that begins on page 1630 -- or the Bates

3    -- I'm sorry, the Bates, the last four numbers are

4    1630.

5        A.   I have it.

6        Q.   Okay.  And I point that out just to reflect

7    that this document that begins on Bates stamp

8    DHHR_FEDWV_0391630 is an attachment to the cover

9    e-mail dated December 20th, 2019 from Carolyn

10   Mullen to Christina Mullins.

11           Do you see that, Doctor?

12       A.   Yes.  No relation between the two Mullins.

13       Q.   Right.  And the document that ends with the

14   Bates stamp 1630, are you familiar with this?

15       A.   Yes.

16       Q.   What is it?

17       A.   It's my testimony to the House Oversight

18   and Government Reform Committee in Congress on May

19   17, 2018.

20       Q.   And did you give this testimony as a part

21   of a hearing titled "A Sustainable Solution to the

22   Evolving Opioid Crisis: Revitalizing the Office of

23   National Drug Control Policy?"

24       A.   Yes.

Page 256

1      Q.   Could you turn to page 3 of this testimony,

2    the Bates stamp that ends in 1632?

3      A.   Okay.

4      Q.   And I'm going to read from the penultimate

5    paragraph on this page.  It begins, "The opioid

6    crisis is evolving."  Do you see that?

7      A.   I see it.

8      Q.   Okay.  You write, "The opiate crisis is

9    evolving -- illicit fentanyl and other synthetic

10   opioids are the major driver of overdose deaths in

11   many parts of the country now.  While the opioid

12   crisis is not just a criminal justice issue, we

13   must support and strengthen the role of law

14   enforcement to address the supply of illicit

15   fentanyl, as well as other emerging illicit drugs.

16   Overdose deaths are increasingly being associated

17   with methamphetamine, indicating that a

18   comprehensive approach to all illicit substances,

19   that include law enforcement and health agencies,

20   is needed."

21           Did I read that correctly?

22     A.   Yes.

23     Q.   Do you still agree with the statement?

24     A.   I think in the context of my testimony,

Page 257

1   including the first two and a half pages, I do

2   agree with the statement.  At the time.

3       Q.   And the defendants in this case don't

4   distribute heroin, do they?

5       A.   Not to my knowledge.

6       Q.   And they don't distribute illicitly

7   manufactured fentanyl, do they?

8       A.   I have never received any reports of such.

9       Q.   And they don't distribute methamphetamine,

10  correct?

11      A.   I'm not sure about that one.

12      Q.   They don't distribute illicit

13  methamphetamine, correct?

14      A.   Excuse me.  Illicit methamphetamine could

15  be produced through some other pharmaceutical

16  products that are available over the counter, which

17  the distributors may be distributing that I'm not

18  aware of.

19      Q.   Okay.  But in this -- in the context of

20  your testimony here, were you referring to over-the

21  -- not over-the-counter, but were you referring to

22  controlled substances that are also stimulants?  Or

23  were you referring to illicit methamphetamine?

24      A.   I was referring to methamphetamine which

Page 258

1    tends to be illicit, but it can be developed from

2    licit drugs, as well as in factories in Mexico.

3              So it could be developed -- illicit

4    methamphetamine could be developed through licit or

5    illicit routes.

6         Q.   Are you aware of defendants in this case

7    developing licit methamphetamine?

8         A.   I'm aware of over-the-counter products,

9    pharmaceutical products, that can lead individuals

10   to generate methamphetamine -- methamphetamine, and

11   my depth of knowledge does not lead for me to know

12   one way or the other if the defendants were

13   distributors for those products.

14        Q.   You're referring to codeine, for example,

15   like Sudafed.

16        A.   Yes.

17        Q.   Okay.  So setting aside precursor chemicals

18   for methamphetamine, are you aware of wholesale

19   distributors distributing methamphetamine, the drug

20   itself, in the form to be used by someone for the

21   purposes of obtaining a high?

22        A.   Not that I'm aware of.

23        Q.   Thank you.  You testified that the change

24   in the standard of care for opioids started with a

Page 259

1    change in the standard of care for treatment of

2    pain, and you also mentioned that, for example, the

3    Joint Commission and the American Pain Society

4    promoted that change.

5              Is that correct?

6         A.   Yes.

7         Q.   What prompted that change?

8         A.   Are you asking me to hypothesize?

9         Q.   No.  As far as you know, what prompted the

10   change in the standard of care for treatment of

11   pain and prescription of opioids?  Prescribing of

12   opioids, excuse me.

13        A.   I think in the medical community, there's a

14   general consensus that the approval of OxyContin in

15   the few years prior to that was an -- a factor in

16   prompting that change.  But I'm not aware of any

17   specific indications for what prompted the change.

18        Q.   And are you aware of any evidence that

19   distributors played any role in that?

20        A.   No.

21        Q.   You testified that a significant part of

22   the volume that was coming in was inappropriate.

23   Correct?

24        A.   Could you please repeat?  I missed one

Page 260

1    word.

2         Q.   Uh-huh.   You testified earlier today that a

3    significant part of the volume that was coming in

4    was inappropriate.   Correct?

5         A.   I testified that the significant amount of

6    prescriptions that were being provided for opioids

7    were inappropriate.

8         Q.   In what way were they inappropriate?

9         A.   They were inappropriate because they were

10   either unnecessary or they were being diverted.   Or

11   they were unnecessary that led to diversion.

12        Q.   In taking the first set - you said the ones

13   that were unnecessary - did the prescribers who

14   wrote them know that those prescriptions were

15   unnecessary?

16        A.   It's hard for me to state that if every one

17   of those prescribers, whether they knew or did not

18   know.   That's where the context of change in

19   standards of care for pain come into play.

20             So if a dentist wrote someone a 30 days

21   of opioid prescription, that's clearly unnecessary.

22             If a 17-year-old kid got a football

23   ankle sprain and got three months of Lortabs,

24   that's clearly unnecessary.

Page 261

1           Whether the writer of that prescription

2    knew about that or not, I do not know for each one

3    of those prescribers across the United States or

4    for West Virginia or for Huntington, West Virginia.

5        Q.   So your categorization of them as

6    unnecessary is based on your retrospective review?

7        A.   Both retrospective and prospective, because

8    I was not one of those physicians when I was

9    practicing that was writing that volume of

10   prescriptions for those particular indications.

11       Q.   And did the physicians who wrote -- or the

12   prescribers who wrote these prescriptions that you

13   categorize as unnecessary, did they know that the

14   standard of care was wrong?

15            MR. COLANTONIO:  Object to the form of

16   the question.

17       A.   It's hard for me to say what they were

18   thinking and what they felt, how they felt about

19   this changing standard of care for pain.

20       Q.   Is that also your answer for the categories

21   that you said were unnecessary but led to

22   diversion?

23            MR. COLANTONIO:  Object to the form.

24       A.   Could you restate the question?

Page 262

1     Q.   Sure.  You identified three categories of

2   ways that you can identify prescriptions that were

3   inappropriate.  You said some were unnecessary;

4   some were diverted; and some were unnecessary that

5   led to diversion.

6              Correct?

7     A.   Yes.

8     Q.   So your perspective that you don't know

9   whether the prescribers who wrote the unnecessary

10  prescriptions, whether they knew that the

11  prescriptions were unnecessary or that they knew

12  that the standard of care was wrong, does that

13  equally apply to the ones that wrote unnecessary

14  prescriptions that led to diversion?

15             Let me -- let me maybe rephrase that a

16  little bit.  The prescribers who wrote

17  prescriptions that were unnecessary that led to

18  diversion, did they know that those prescriptions

19  were gonna be diverted at the time they wrote them?

20    A.   So I think they -- it's impossible to

21  categorize the entire prescribers in the United

22  States - or for that matter, West Virginia - in one

23  box.  I think the fact of the matter is, to be

24  frank and honest, that we had some bad docs and bad

                                                       Page 263

1    prescribers.  They clearly knew what they were

2    doing.

3              And we have others that were of the

4    category that they were taking a reasonable,

5    prudent approach as from evidence-based care.

6              And the third category that felt that

7    what they were doing what they could to help the

8    patients.

9              And in a change of standard of care

10   scenario, they felt that they could give more

11   prescriptions and they were being told these

12   prescriptions were safe and they are helpful and

13   they could get sued if they didn't do that, and

14   they were just trying to help people at the end --

15   bottom -- end of the day.

16             So I think we do have to start to look

17   at prescribers differently based on those

18   intentions.  So that was my answer.

19      Q.   And the prescribers who are just trying to

20   do the best by their patients, would you say that

21   they were prescribing those opioids in good faith?

22      A.   I would say in the environment of changed

23   standards of care for pain, they were prescribing

24   -- for some, it was in good faith and helping.  For

Page 264

1   others, it was making sure not getting sued or

2   being -- being regulated for the Board of Medicine

3   for the full management of pain.

4           And still others, they were ensuring

5   that - for example, in hospitals, when I was a

6   hospitalist - that you're making sure that if

7   people are -- you know, to the extent possible,

8   having adequate controlling of pain, but also then

9   there were colleagues of mine that were looking at

10  the pain scales, the happy faces, and ensuring that

11  everybody had a little nice sticker with a happy

12  face on them.

13      Q.   And is it your testimony that 80 percent or

14  more of the prescriptions that physicians wrote in

15  West Virginia were inappropriate?

16      A.   Over a period of time, yes.

17      Q.   What period of time is that?

18      A.   I would say you start to look at that from

19  2001, and clearly it starts to rise slowly.  In

20  about 2006, I think it was about 130 prescriptions

21  per 100 people - man, woman, child, infant - and

22  then, you know, peaking perhaps around 2012 and

23  then starting to decline.

24           So if you look at it over the period of

Page 265

1    time -- that period of time, that would be my

2    estimate.

3         Q.   So 2001 to 2012?

4         A.   I think it was with a -- with a gradual

5    rise.  Between 2006 and 2012, clearly.  That would

6    be my testimony.

7         Q.   I'm sorry, so I just want to be clear.  Is

8    it your testimony that 80 percent or more of the

9    prescriptions that physicians wrote during 2006 to

10   2012 were inappropriate?

11        A.   That would be my testimony.

12        Q.   Okay.  2006 to 2012.  Should pharmacies

13   have refused to fill those prescriptions?

14        A.   So the pharmacies, the distributors,

15   physicians, prescribers, everyone had a duty for

16   due diligence at the end of the day.

17             So everybody has a responsibility.

18   That's how our system is set up.  There's a

19   upstream responsibility which can actually prevent

20   and avoid a lot of the carnage downstream, and then

21   pharmacies are clearly part of the downstream

22   impact.  They also have a responsibility.  They

23   also have a level of impact.  So the answer is yes.

24        Q.   So your answer is yes, pharmacies should

Page 266

1    have refused to fill those prescriptions.

2              MR. COLANTONIO:  Object to form.

3         A.   The pharmacies should have conducted a due

4    diligence in filling any and all prescriptions,

5    just like the distributors should have as well.

6         Q.   All right.  And so is it your testimony

7    that distributors are presented with prescriptions?

8         A.   It's my testimony that the distributors are

9    part of the supply chain through which those

10   prescriptions are filled.

11        Q.   Is it -- are you saying the distributors

12   know what prescriptions are going to be filled when

13   they fill an order for prescription opioids placed

14   by a pharmacy?

15        A.   No.  What I'm saying is:  When hundreds of

16   millions of pills are being distributed across a

17   state with 1.8 million population, we should be

18   able to recognize that pattern clearly.

19             MS. JINDAL:  I'm going to move to

20   strike everything after "No" as nonresponsive.

21   Thank you.

22             MR. COLANTONIO:  Well --

23        Q.   Did you ever propose any action to reduce

24   the number of prescription opioids that a pharmacy

Page 267

```
 1    could order?
 2             MR. COLANTONIO:  Hold on a minute.
 3    That -- I just want to make a comment.  He
 4    responded to your question.  You may not like the
 5    answer, but you asked a question and he responded
 6    to it.
 7             Go ahead.
 8             MS. JINDAL:  Well, I'll leave that on
 9    the record and we can fight about it another day.
10        Q.   Did you ever propose any action to reduce
11    the number of prescription opioids that a pharmacy
12    could order?
13             MR. COLANTONIO:  Object to the form.
14        A.   I'm sorry, pharmacies are not ordering
15    prescriptions, so I don't understand the context of
16    the question --
17        Q.   I'm sorry, I may have missed a word in my
18    question.  Did you ever propose any action to
19    reduce the number of prescription opioids that a
20    pharmacy could order?
21             MR. COLANTONIO:  Object to the form of
22    the question.
23        A.   I once again do not understand the question
24    real well, so if you could rephrase it for me,
```

Page 268

1    please.

2        Q.   When a pharmacy -- how does a pharmacy get

3    prescription opioids?

4                MR. COLANTONIO:  Object to the form of

5    the question.

6        A.   My understanding is that the pharmacy would

7    make the request to the distributor to provide the

8    supplies.

9        Q.   And did you ever consider legislation or

10   action that would reduce the number of -- the

11   quantity of prescription opioids that a pharmacy

12   could request from a wholesale distributor at any

13   one time?

14               MR. COLANTONIO:  Object to the form of

15   the question.

16       A.   We did promulgate legislation that reduces

17   the amount of prescriptions including the initial

18   prescribing, which would lead to reduction in

19   pharmacies requesting supplies of opioids from

20   distributors.

21       Q.   I understand.  Separate and aside from what

22   you did with respect to what prescribers could

23   prescribe, did you ever propose any regulations

24   that would directly impact the number of

Page 269

1    prescriptions that a pharmacy could order --

2    prescription opioids that a pharmacy could order at

3    any one time?

4         A.   Our role to impact the amount of

5    prescriptions was by doing everything we could to

6    reduce the amount of prescriptions, and that's what

7    we did.  I still do not understand the question

8    that you're asking, so if you can restate that in

9    some other form, I'm happy to answer it.

10                 I just don't --

11        Q.   Sure.

12        A.   I'm not sure --

13        Q.   We agreed that a pharmacy has to place an

14   order or request prescription opioids from a

15   wholesale distributor before it obtains them.

16   Correct?

17        A.   Yes.

18        Q.   And let's say a pharmacy places an order

19   for 10,000 prescription opioids for the month of

20   July 2007.

21        A.   Yes.

22        Q.   Okay.  Did you ever consider telling all

23   pharmacies in West Virginia -- regulating all

24   pharmacies in West Virginia and saying, "You cannot

Page 270

1    order more than 5,000 prescription opioids for any

2    month in any year"?

3            MR. COLANTONIO:  Object to the form of

4    the question.

5        Q.   Is that -- does that make the question

6    clearer?

7        A.   Yeah.  There is something called the

8    Controlled Substances Act that already requires the

9    distributors and pharmacists to ensure that their

10   suspicious orders that are monitored, raised,

11   investigated, quarantined.

12           Why would we do that when there was

13   already existing federal law to prevent that?

14       Q.   There is also existing federal law about --

15           MS. JINDAL:  Strike that.

16       Q.   Prescribers are also regulated by federal

17   law with respect to their prescribing of controlled

18   substances, correct?

19       A.   Yes.

20       Q.   They also have to be regulated by DEA,

21   correct?

22       A.   Yes.

23       Q.   And yet you still passed law that regulated

24   their conduct within the state of West Virginia,

Page 271

1    correct?

2              MR. COLANTONIO:  Object to the form of

3    the question.

4        A.   Yes.

5        Q.   So why does the fact that there is federal

6    law that also regulates the conduct of pharmacies

7    impact your decision whether or not to propose any

8    legislation with -- that would amount -- that would

9    regulate pharmacies under West Virginia law?

10             MR. COLANTONIO:  Object to the form of

11   the question.

12       A.   The law that we passed with respect to what

13   you're stating had to do with standards of care.

14   This was -- it was to align ourselves with CDC

15   recommendations, following CDC recommendations and

16   guidelines that came out.

17             We wanted to make sure we were aligned

18   with that, and it's about people of West Virginia.

19   It's about making sure that the people and the

20   residents of West Virginia are getting the highest

21   standard of care, and that's what that related --

22   the law was related to.

23             We expect that -- to do that.  That's

24   our responsibility.  Now, let's be clear.  It is

Page 272

1    not our responsibility to ensure that there's

2    enforcement of the federal law.  That's not our

3    job.  That's your job.  That's your client's job.

4             And we did everything we could to make

5    sure that the standards of care for health, for

6    medicine, were being held to the highest standards

7    possible, and that includes the CDC guidelines.

8             Now, when it comes to maintaining

9    suspicious orders - and I'll call them suspicious

10   orders - and adhering to rules and laws that

11   already exist, we depend on this relationship for

12   the system to function that we are all doing our

13   own respective jobs.  And that clearly wasn't the

14   case here.

15   Q.   If you had limited the number of

16   prescription opioids that a pharmacy could order,

17   then there's a certain percentage of prescriptions

18   that they would not have been able to fill.

19   Correct?

20             MR. COLANTONIO:  Object to form.

21   A.   That would be inherently unfair to the

22   citizens of West Virginia, because if you

23   understand a rural state like West Virginia, you

24   would understand that oftentimes -- and you

Page 273

1    yourself mentioned that we have an aging

2    population.  You mentioned yourself that we have a

3    disabled population.  50 percent higher than the

4    rest of the country.

5              And the last thing we want them to be

6    doing is driving 80 miles because the quota for

7    some pharmacy has been filled.  So this is a

8    balancing act, and we -- we really need all actors

9    to be working in good faith, to be doing their part

10   of the work.

11             If we have -- if we had one fix to all

12   solutions, believe me, we would have done it.

13   Everything that we could have done was on the

14   table.

15             But what happens -- or maybe -- what

16   states in policy, we have to make sure that at the

17   end of the day, we're not hurting the people of

18   West Virginia more than what they're already being

19   hurt.

20             So this is the reason why it was

21   important for all of us to do it our own

22   respectives -- to take on our own due diligence and

23   do our jobs.

24             That's my response.

Page 274

1    Q.   And you're not aware of the Board of

2   Pharmacy taking any action against wholesale

3   distributors for not doing their jobs, correct?

4    A.   I'm not aware, right.

5    Q.   You testified that the majority of heroin

6   use in West Virginia was caused by prescription

7   opioid use.  Correct?

8    A.   I testified that -- yes.

9    Q.   Is your evidence for that -- let me

10   rephrase.  What is your evidence for that?

11    A.   So if you see the pattern over the years in

12   my report, you will see that as prescription drugs

13   and prescriptions for that have fallen over the

14   years because of the incremental actions that have

15   been taken at state level, we did not see a

16   proportionate fall in overdose deaths.

17           We certainly did not see a fall in the

18   number of people who were having nonfatal

19   overdoses, as well as those who were having

20   addiction.

21           And at the same time, you'll see the

22   chart, the graph that demonstrates an increasing

23   utilization of heroin as well as synthetic opioids.

24   That's indisputable.

Page 275

1     Q.   And that -- does that "use of prescription

2     opioids" refer to use pursuant to a doctor or

3     another prescriber's prescription, or does that

4     refer to nonmedical use as well?

5     A.   It refers to the amount of volume of pills

6     that were there.  As they begin to dry up because

7     of all the incremental steps and mechanisms that

8     were put into place - so at the end of the day,

9     it's all about volume - as the volume starts to

10    decrease, the tap starts to turn off, we should see

11    a proportional declines in addiction and overdose

12    if it was a simple chart like that.

13              And that's why I mentioned evolving

14    crisis, because this crisis may have begun with the

15    prescription opioids, but it certainly has

16    continued to evolve.

17    Q.   And that evolution includes nonopioid such

18    as methamphetamine, correct?

19    A.   It has been a recent phenomena, and it is a

20    part of the evolution, and it is not only in Cabell

21    County, Huntington or West Virginia.  This is a

22    national trend that we're seeing, yes.

23    Q.   Is it your testimony that the -- that users

24    who use prescription opioids also transition to

Page 276

1  methamphetamines because they used prescription

2  opioids?

3      A.   They can transition to methamphetamine.

4  They can transition to heroin.  They can transition

5  to a lot of things.  If you allow me, I would like

6  to provide you a real life example.

7            I mentioned prior that I volunteer at a

8  charity clinic.  One of the patients that I saw was

9  a 72-year-old grandmother, and this woman was on

10  opioids, prescriptions, for her shingles for a long

11  time.

12           And as we turned the policy and turned

13  the corner, her physician refused to give her any

14  further prescriptions for opioids.  So as a result,

15  she began to take heroin.

16           Now, when I talked to her - she's my

17  patient - and I said, "Hey, can I help you?  How

18  can I help you?"  Her response was, "Listen, I

19  completely trust my drug dealer."  This is what she

20  said, she said, "I completely trust my drug dealer.

21  Yet when I -- I don't do my drugs every day.  But

22  when I do, I do -- I take three syringes.  I take

23  the first, a small trial dose, to make sure I don't

24  die.

                                          Page 277

1              I take a little bit of higher dose,

2    inject, and if I'm still alive, then I take the

3    full bolus."  She's afraid because of the

4    contamination with fentanyl, illicit fentanyl.

5    She's taking heroin.  And she has addiction, and

6    she has other problems.

7              But when I offer her to get treatment,

8    she doesn't want to go because she says, "I have my

9    son that lives with me.  He drops me here at the

10   free clinic, but if I go to a mental health clinic,

11   he's gonna wonder what's wrong with me."

12             So unfortunately, this is not a

13   theoretical issue for me.  This is a reality.  I've

14   seen these patients firsthand when they have

15   transitioned from prescription opioids and the

16   stigma and the suffering and the addiction that

17   goes.

18             And it is not limited to this one group

19   of people; it's an entire community that's being

20   destroyed as a result of this in West Virginia.

21      Q.   Right.  And I'm just trying to understand

22   the -- the transition that happened there, is that

23   due to the desire to -- what you -- the phrase you

24   used earlier, I believe, was "to get the monster

Page 278

1   off your back."  Is that -- the transition to

2   another -- let me rephrase.

3           The transition to another drug, is that

4   fueled by the disease of addiction, or is that

5   fueled by the nature of the previous drug that was

6   used?

7       A.   It's primarily fueled by addiction.  The

8   person is now in the grips of a disease, which is

9   substance use disorder, and they've got this

10  disease because of diverted opioids, prescription

11  medications, and now this addiction has gotten

12  ahold of them and they need to find somewhat to

13  continue to fuel the habit.

14          And it's really not a habit; it's a

15  disease.  And that's what drives them going on to a

16  cheaper affordable street alternative, which causes

17  - as I mentioned before - a whole set of different

18  problems for us.

19      Q.   And as far as what drug they transition to,

20  it -- heroin is a cheap readily-available drug in

21  West Virginia.  Correct?

22      A.   Yes.  And to answer the question about

23  transition, you know, we initially saw the people

24  either would take suppressants like heroin or

Page 279

1  opioids, or stimulants.  But as this crisis has

2  evolved, the distinction has become without a

3  difference.

4            So we now see combinations on the

5  street that has combined stimulants and

6  depressants.  So there -- the fine line that

7  existed between people who took meth as opposed to

8  heroin has also been done away with.

9     Q.   So the fact that someone used prescription

10  drugs and they needed to find another drug to fuel

11  that addiction doesn't mean that they're more

12  likely to use heroin over methamphetamine over a

13  combination of the two or anything.  Correct?  Is

14  that what -- is that the trend you're describing?

15     A.   That's the trend.  That's the evolution,

16  and unfortunately for a brain that has -- is

17  suffering from addiction and has been hijacked,

18  something is better than nothing.  And nothing

19  could spell lots of pain and eventually could be

20  potentially fatal.

21            MR. COLANTONIO:  You okay?

22            THE DEPONENT:  I'm okay.

23     Q.   Sorry.  I'm just reviewing a document.

24  Have you ever looked at research that has

Page 280

```
 1    demonstrated a link between prescription opioids

 2    and illicit drugs like heroin?

 3        A.   Not recently.

 4        Q.   When -- the research that you have

 5    reviewed, do you know whether that research looked

 6    at users who had taken prescription opioids

 7    pursuant to a prescription?

 8              MR. COLANTONIO:  Object to the form.

 9        A.   So there's two -- the 2017 survey by

10    SAMHSA, it surveyed about 1.1 million people in the

11    country, and what they found was of the -- the

12    inappropriate diverted opioids, about a third of

13    those were actually prescribed by a physician; a

14    little over half of the people got it from friends

15    or family, which is all diversion; and the rest of

16    it was anywhere between stealing, buying, you know,

17    all of those aspects.

18              So that's at least what actual data

19    shows.

20        Q.   I guess what I'm asking, Doctor, is a

21    little bit different.  Focusing on the population

22    of people who have used prescription drugs pursuant

23    to a medically-necessary prescription that you

24    would qualify -- that you would qualify as a
```

Page 281

1  medically-necessary prescription, what percentage

2  of those people end up being addicted?  Do you

3  know?

4      A.   So if -- if somebody has cancer - I'm going

5  to put that in real terms - at the end-of-life

6  cancer and they're being given opioids for their

7  long-term pain control and they have, let's say,

8  six months to live because of terminal cancer, if

9  you're asking what percentage of those people end

10  up becoming addicted, I would answer first of all

11  for that person, who cares?

12           It's the quality of life at the end of

13  life that's important.

14           Second, I would say that there's -- you

15  can -- if you are -- you can and you could have

16  some addiction in a certain number of people, but

17  that's the precise reason why you have to make sure

18  the people who are legitimately receiving long-term

19  opioids for pain control is the right group of

20  people.

21           Because there could be people who might

22  need opioids for 10, 15 or 20 years.  But you want

23  to keep them functional.  If they end up developing

24  addiction, then you have to deal with that.

Page 282

1              So you know, I would say a certain

2    percentage can happen, but I think we significantly

3    lower that percentage if we actually follow

4    appropriate prescribing for legitimate pain.

5         Q.   And assuming appropriate prescribing, for

6    someone that's been --  for the population that has

7    been appropriately prescribed opioids for long-term

8    pain, do you know what percentage of that

9    population ends up being addicted to prescription

10   opioids?

11        A.   So first I'll say this:  No certain way to

12   know that what exact percentage will be.  But it is

13   possible for those people at certain percentage to

14   be, but at this point right now off the top of my

15   head, I couldn't tell you exactly what that

16   percentage would be.

17        Q.   Is it correct that the vast majority of

18   people who take prescription opioids do not become

19   addicted to them?

20        A.   Not necessarily.  And I like to say that

21   because there's a lot of underdiagnosis oftentimes

22   of addiction.

23              So you know, it goes back to my

24   previous answer.  We just don't know that exactly.

Page 283

1   But I think it would be -- it would not be accurate

2   to say that the vast majority of people that are

3   appropriately prescribed would never become

4   addicted to those medications.

5              That's the --

6       Q.   Are you aware --

7       A.   Go ahead.

8       Q.   No, I'm sorry, I didn't mean to cut you

9   off.

10      A.   I'm saying that's the previous position and

11  presumption under which the bill of goods was sold

12  in the early 2000s based on a, you know, two-or-

13  three-sentence letter to the Editor, New England

14  Journal of Medicine by Jane Porter, and that just

15  has not panned out to be true.

16      Q.   Are you aware, though, that research

17  actually demonstrates that?

18      A.   I'm not aware of that.

19      Q.   Have you ever looked for research on this

20  connection?

21      A.   Yes.

22      Q.   And what -- what research specifically have

23  you reviewed?

24      A.   Recently, I have not reviewed any

Page 284

1    particular research.  At the time, we did look at

2    some of these, but I would not be able to tell you

3    right now specifically which research I looked at.

4         Q.   You testified about the chemical similarity

5    between prescription opioids and heroin, correct?

6         A.   Yes.

7         Q.   And there's no chemical similarity between

8    opioids and methamphetamine, correct?

9         A.   There is no chemical similarity, that's

10   correct.

11        Q.   Earlier today, you testified that for every

12   fatal overdose, there are 25 to 30 people who are

13   using but are not overdosing.  Correct?

14        A.   I testified that for every fatal overdose,

15   there's 25 to 30 nonfatal overdoses.

16        Q.   I apologize.  And where did you get that

17   number?

18        A.   From literature.  I could not tell you

19   exactly right now which particular study.

20        Q.   You also said that for every fatal

21   overdose, there are 200 to 300 people who are

22   addicted.  Correct?

23        A.   (Nodded affirmatively).

24        Q.   Where did you get that number?

1      A.    From literature.

2      Q.    Do you know what analyses that literature

3   conducted to determine from fatal overdoses the

4   numbers that were nonfatal overdoses?

5      A.    I'm sorry, could you restate that, please?

6      Q.    Sure.  I know that you can't recall the

7   exact name of the literature you reviewed or a

8   particular study.  Do you recall what methodology

9   was used to determine that for every fatal

10   overdose, there are 200 to 300 people who are

11   addicted?

12      A.    I don't recall.  I'll be very happy to

13   provide you the references for each of these

14   statements.  I will add in addition to that that

15   this is no different than what we have seen in West

16   Virginia.

17            So if you look at the visitation rates

18   and one of the things that did happen as a

19   consequence of some of the legislation is there's a

20   dashboard that has been developed that actually

21   keeps tab in West Virginia of the overdoses coming

22   to the emergency room.

23            What we're seeing in real life

24   experience is very consistent with what we're

Page 286

1    seeing in literature and my research.  But we're

2    happy to provide you both of those as needed and

3    when needed.

4       Q.   I would appreciate that.

5                UNIDENTIFIED MALE:  Hello.

6                MS. JINDAL:  Yes?  I'm sorry, I

7    thought someone was trying to say something.

8       Q.   Doctor, why don't we take a ten-minute

9    break and then we'll reconvene.  Thank you.

10               MR. RUBY:  Hey, Adam, real quick

11   before we get off the record and before we break,

12   just in the interest of not spending another hour

13   pulling teeth on this:  Mark, I just wanted to make

14   sure we've got clarity on the nature of Doctor

15   Gupta's engagement with your firm.

16               Can we just stipulate among counsel

17   that the subject matter of Doctor Gupta's paid

18   expert work for your firm is the opioid problem in

19   West Virginia and move on from that?

20               MR. COLANTONIO:  Well, it's more

21   compli -- I don't think that says it.  But --

22   that's not -- that's not what happened.  We talked

23   about this.  You and I talked about this before the

24   deposition.

```
                                              Page 287
 1              I mean, I -- we retained him in the MLP
 2    and --
 3              MR. FITZSIMMONS:  We're still on the
 4    record.
 5              MR. COLANTONIO:  Are we on the record?
 6              MR. RUBY:  Yeah.
 7              MR. COLANTONIO:  We'll go off the
 8    record and talk about it.
 9              MR. RUBY:  No, no, I want to -- it's
10    fine.  We're going to have to keep going at this on
11    the record.
12              MR. COLANTONIO:  We can't agree to
13    that stipulation.  I don't think we can agree to
14    that stipulation.  The way you said it, Steve, I
15    don't think we can agree to it.
16              MR. RUBY:  I just -- I would like to
17    get on the record and we can either stipulate it --
18              MR. COLANTONIO:  Okay.  So what do you
19    want put on the record?  You want something -- us
20    to again tell you what his retaining arrangement
21    is with us?
22              MR. RUBY:  What's the subject matter
23    of his engagement?
24              MR. COLANTONIO:  Which engagement?
```

Page 288

1                 MR. RUBY:  His engagement with your

2       firm.

3                 MR. COLANTONIO:  Okay.  So we have --

4       we have engaged him as a consulting expert in the

5       MLP litigation.  Now, as far as the subject matter,

6       I'm not sure that's something -- I mean, he was

7       retained initially to talk about abatement.

8                 MR. RUBY:  Uh-huh.

9                 MR. COLANTONIO:  That's it.  That's

10      it.  We've not discussed with him in that case

11      anything else but abatement.

12                And then this subpoena came up, and --

13                MR. FITZSIMMONS:  Those subpoenas

14      aren't designated.

15                MR. COLANTONIO:  No, they're not.

16      designated.  They're not.  That was the scope of

17      his retention at that time, and eventually, when

18      you get into the deposition in that case, you'll

19      find that out.

20                The scope of his retention was just to

21      talk about abatement, and then the subpoena came

22      up.  He retained us as counsel, and we're here.

23      That's the truth.

24                MR. RUBY:  And has the scope of his --

Page 289

```
 1   his work in the -- in the other case expanded
 2   beyond abatement?
 3                 MR. COLANTONIO:  I can tell you that
 4   -- here's -- I think I told you this before the
 5   deposition.  I know we had this conversation a
 6   while back.
 7                 But what I told you, I think, was that
 8   since he retained us as counsel in this -- with
 9   respect to this deposition, we have not had any
10   discussions about the MLP case.  All our
11   discussions have been about this retention, this
12   deposition.
13                 And at that time, it was only
14   abatement.  That's all it was.  And he --
15                 MS. KEARSE:  And Steve, on behalf of
16   -- you know, we also have clients in the MLP, and
17   we have not disclosed expert witnesses, obviously,
18   and are just working through that, and I can
19   represent we have not had any discussions at all
20   with Doctor Gupta about retaining him as --
21                 MR. COLANTONIO:  It was only because
22   we had a mediation, so we -- that's -- that's where
23   that came about.
24                 MR. RUBY:  And I hope, at least, that
```

Page 290

1    you all can understand why we want to understand --

2                  MR. COLANTONIO:  I get it.  I

3    understand.  I'm trying to explain it.  But that's

4    -- what happened is:  We retained him sometime ago

5    - and I forget when it was; I don't remember -- it

6    was a while ago - in the MLP to talk about

7    abatement.  That was what we talked about, was

8    abatement.

9                  And in that -- in that retention -- and

10   we never had -- I mean, I'm not gonna get into --

11                 MR. FITZSIMMONS:  Quit talking about

12   it.

13                 MR. COLANTONIO:  It was about

14   abatement and that's it, and we haven't talked

15   about it since -- and that -- we haven't talked

16   about that case since he retained us in this case

17   about this deposition.  That's it.

18                 MR. RUBY:  Okay.  I mean, look, it's

19   an unusual arrangement to have counsel for a party

20   paying an expert in one of a set of parallel cases

21   and taking the position that he is a lay expert in

22   another closely-related parallel case.  That's why

23   I wanted to make sure --

24                 MR. COLANTONIO:  Yeah, and I --

Page 291

1          MS. KEARSE:  This is Anne.  I'm not

2   going to agree with your characterization about

3   that, but we can talk about it later.

4          MR. COLANTONIO:  Yeah.  I don't know

5   how unusual it is.  I'm -- it is what it is.  But

6   -- so there you have it.

7          MR. RUBY:  Okay.

8          MR. COLANTONIO:  Okay.

9          VIDEO OPERATOR:  We can go off the

10   record?  Okay.  Going off the record.  The time is

11   4:45 p.m.

12          (A recess was taken after which the

13          proceedings continued as follows:)

14          VIDEO OPERATOR:  Now begins Media Unit

15   8 in the deposition of Rahul Gupta, M.D.  We are

16   back on the record.  The time is 5:02 p.m.

17   BY MS. JINDAL:

18     Q.  We've talked today about diversion of

19   prescription opioids.  What do you qualify as

20   diversion?

21     A.  So diversion would be any medications that

22   are being used without being properly prescribed

23   and properly indicated.  So that would be -- and

24   they are unintended for the user.

Page 292

1          So any medications that are not being
2     used by the prescribe -- the patient who has been
3     prescribed those medications.
4          Q.   And if someone were --
5          A.   Go ahead.
6          Q.   I'm sorry.  Did I cut you off?
7          A.   No.
8          Q.   Someone who obtains and uses prescription
9     opioids that weren't prescribed to them, is that an
10    illegal act?
11         A.   Illegal act in the sense that do people get
12    jail for that?  I'm not sure I know a lot of people
13    that have been jailed in West Virginia because they
14    took their grandma's pain pill.
15         Q.   Right.  But the purpose of the -- the
16    purpose of state laws and federal laws regulating
17    the supply of distribution is to ensure that people
18    who are not prescribed prescription opioids do not
19    obtain them.  Correct?
20         A.   I think the purpose of -- for myself being
21    a licensed DEA to be able to prescribe, the
22    distributors being registrants, the pharmacy being
23    registrants, is for the primary purpose of ensuring
24    that we are - all of us - are responsible and

Page 293

1    accountable for our actions.

2             I think by calling it -- laying the

3    blame and the responsibility on the public is the

4    upside down way of looking at things.

5        Q.   If someone is in possession of prescription

6    opioids that were not prescribed to them, can they

7    be arrested for that?

8        A.   Sure.  People can be arrested for

9    jaywalking.  I mean, I -- I go back and I will

10   reassert that I think that is the upside down way

11   of looking at it, that let's go start arresting

12   people.

13            I'm not aware of in Kanawha County or

14   Cabell County or any other county that a single

15   elected prosecutor went ahead and arrested people

16   for using -- including children, for using somebody

17   else's prescription drugs.  But I'm not a lawyer.

18       Q.   Okay.  So setting aside whether they should

19   or should not be arrested, is it against the law to

20   possess prescription opioids that were not

21   prescribed to you?

22       A.   I would guess so.  I'm -- again, I'm not a

23   prosecutor or a lawyer; I'm a physician.

24       Q.   Someone who takes a prescription opioid

Page 294

1   from a family member's medicine cabinet, is that

2   diversion?

3       A.   Yes, someone who is not prescribed the --

4   that particular prescription or that particular

5   medication and then accesses -- someone accesses

6   that, of course, that would be part of that

7   diversion.

8       Q.   And can someone be arrested for doing that?

9       A.   Again, I couldn't tell you that, because

10  again, I'm not -- neither a prosecutor nor a

11  lawyer.

12            I tell my patients, when I would write

13  for them -- I would make sure my prescriptions are

14  prescribing appropriate, for legitimate pain, and I

15  would tell them to store it and just sufficient

16  quantities to relieve them.

17            Now, what happens after that or who's

18  legally responsible, that's something after --

19  that's up to law enforcement and prosecutors.

20      Q.   Do wholesale distributors have control over

21  an individual's medicine cabinet?

22            MR. COLANTONIO:   Object to the form.

23      A.   Wholesale distributors do not have the

24  physical control over people's medicine cabinets,

Page 295

1   no.

2        Q.    Doctor Gupta, could you turn to Exhibit 5?

3             GUPTA DEPOSITION EXHIBIT NO. 5

4                  (E-mail from Massey to Kilkenney Re:

5                  MMWR dated 5-27-17 with "Public Health

6                  Investigation of an Opioid Overdose

7                  Outbreak - West Virginia, August 2016"

8                  attached was marked for identification

9                  purposes as Gupta Deposition Exhibit

10                 No. 5.)

11       A.    I have it.

12       Q.    The first page is a cover e-mail from

13  Doctor Kilkenny, correct?

14       A.    It's from Doctor Massey to Doctor Kilkenny.

15       Q.    I'm sorry.  You're right.  I'll like you to

16  turn to the next page.

17       A.    Okay.

18       Q.    Are you familiar with this document?

19       A.    It's been a while, so it seems like one of

20  the manuscripts that would have been submitted as a

21  result of the outbreak in Cabell County, yes.

22       Q.    And the first page, that e-mail that you

23  were just looking at, does that refresh your memory

24  at all about what the attachment is?

Page 296

1     A.   Yes.

2     Q.   And are you one of the authors of the

3  attachment?

4     A.   Yes.  My memory is to the point that I

5  could see this to the extent that I see myself as

6  author at the time.

7     Q.   And does this report gather various data

8  and -- together to study the 20 opioid overdoses in

9  Huntington in August 2016?

10    A.   It's more than three years old.  I'd really

11 have to go through it to understand it and review

12 it.

13    Q.   Sure.  Just looking at that first page --

14 and I'll just help direct you for your review to

15 Bates stamp 8533.  That first paragraph reads, "On"

16 August 20 -- "August 15, 2016, the Mayor's Office

17 of Drug Control Policy in Huntington, West Virginia

18 notified the Cabell-Huntington Health Department

19 (CHHD), that several calls regarding opioid

20 overdose had been received by the Emergency Medical

21 System (EMS) during 3:00 p.m." to "8:00 p.m. that

22 day.  A public health investigation and response

23 conducted by the West Virginia Bureau of Public

24 Health (BPH) and CHHD identified 20 opiate overdose

Page 297

1    cases within a 53 hour period in Cabell County,

2    West Virginia; all cases included emergency

3    department (ED) encounters."

4              Did I read that correctly?

5         A.   Yes.

6         Q.   And it goes on.  "Concurrent" -- sorry.  In

7    the next paragraph, does this essentially describe

8    -- does this refresh your recollection that this

9    document describes the public health investigation

10   that occurred with respect to this opioid overdose

11   outbreak in Cabell County in 2016?

12             MS. KEARSE:  Counsel, this is Anne

13   Kearse, and I just -- this appears to be a draft.

14   I just wanted to put that on the record there.  I

15   don't think it's a final document that you're using

16   or going to show, but it's a just a draft of a

17   report.  So I just wanted to say that for the

18   record.

19        A.   Yeah, I am unable to at this point

20   recollect the accuracy of the report, and when I

21   look at this Page No. 1, it talks about several of

22   the medical reviewers have made revisions and

23   comments.

24             I do not see comments here attached.

Page 298

1    So -- I also do not see a final MMWR publication

2    that would have probably alluded to the actual

3    report rather than just a, you know, undone

4    preliminary manuscript that I have in front of me.

5              I don't know for what reason that would

6    not be available, but without -- without any

7    certainty, I'm -- unless I read the whole, it would

8    be difficult for me to talk about one of the

9    versions of the manuscript.

10             Because sometimes manuscripts do go

11   through several versions and final version is very

12   different than the initial version.  So I don't --

13   I don't want to misstate any -- any statements

14   here.

15      Q.   I appreciate that, Doctor.  I will

16   represent for the record that this is how it was

17   produced to us, so whether or not it's written

18   comments, that's how it was produced.

19             And I will also note that the cover

20   e-mail says it's a clean copy that is attached.

21             MS. KEARSE:  This didn't come from

22   Doctor Gupta's files.  I'm just noting that.

23             MR. FITZSIMMONS:  There's no question

24   pending.

Page 299

```
 1              MR. COLANTONIO:  Do you have a

 2   question?

 3        Q.   Setting aside the report, do you recall the

 4   2016 outbreak in Cabell County?

 5        A.   Only remotely at this point.

 6        Q.   Do you recall commissioning an analysis of

 7   the -- of that outbreak?

 8        A.   Yes.

 9        Q.   Could you please turn to Exhibit 4?

10              GUPTA DEPOSITION EXHIBIT NO. 4

11                   (E-mail from Haddy to Haddy and others

12                   Re: WV HAN #128 Novel Opiates dated

13                   12-13-16 with "Health Advisory #128

14                   Novel Opiates" attached was marked for

15                   identification purposes as Gupta

16                   Deposition Exhibit No. 4.)

17        A.   I have it.

18        Q.   All right.  I apologize.  My computer's

19   taking a second here.  Is this -- I'm not sure if

20   the cover e-mail is familiar to you, but the

21   attachment, the second page, is titled a health --

22   public "Health Advisory Number 128."  Do you see

23   that?

24        A.   Yes.
```

Page 300

1      Q.   And this advisory is dated from October of

2  2016, correct?

3      A.   It's dated December of -- 13, 2016.

4      Q.   I apologize.  I'm still waiting for it to

5  load.  December 13, 2016.  I'm going to read from

6  -- is this -- are you listed as an author of that

7  health advisory?

8      A.   Yes, the health advisories would normally

9  go out from the Commissioner, State Health Officer,

10 as a -- that the standard.

11     Q.   And this health advisory is titled "Novel

12 Opiates"?

13     A.   I see that.

14     Q.   And this is something that you would have

15 distributed "TO COMMUNITY HEALTH PROVIDERS,

16 HOSPITAL-BASED PHYSICIANS, INFECTION CONTROL

17 PREVENTIONISTS, LABORATORY DIRECTORS, AND OTHER

18 APPLICABLE PARTNERS"?

19     A.   Yes.

20     Q.   And you also directed that it be

21 distributed "TO ASSOCIATION MEMBERS, STAFF, ETC."?

22     A.   Yes.

23     Q.   Which association members and staff did you

24 mean?

1      A.   Local health department associations and

2   staff.

3      Q.   That first sentence says, "The West

4   Virginia DHHR/"Bureau of Public Health - "Office of

5   the Chief Medical Examiner (OCME) has detected

6   analog fentanyls that are contributing to overdose

7   deaths in West Virginia."

8           Did I read that correctly?

9      A.   Yes.

10     Q.   Any reason to dispute the accuracy of that

11  statement?

12     A.   Not that I know, at that time.

13     Q.   The next is "Multiple derivatives of

14  fentanyl are being detected in toxicology results

15  in West Virginia, as well as other states."  Did I

16  read that correctly?

17     A.   Yes.

18     Q.   And is there any reason to dispute that

19  statement?

20     A.   At the time, there would not be to my

21  understanding.

22     Q.   I'm sorry.  Do you mean that you don't have

23  a reason to dispute it now, or you don't have a --

24  you didn't have a reason to dispute it then when it

Page 302

1   was written?

2        A.   I would not have a reason to dispute it now

3   as of the events that were happening then.

4        Q.   Describe -- it goes on to describe a prior

5   health advisory that you issued, Health Advisory

6   #126, titled "Carfentanil responsible for West

7   Virginia overdose deaths."

8             Correct?

9        A.   I see that written here.

10       Q.   The next paragraph says that "The presence

11  of novel opioids in the illicit drug market cause

12  concern for increasing overdose death, even among

13  opioid-toleranced users.  Now, seven other analogs,

14  such as U-47700 (Pink or Pinky), Acetyl fentanyl,

15  Furanyl fentanyl, para-Fluoro(iso)butyrnl fentanyl,

16  Acryl fentanyl, and 3-Methyl fentanyl, in addition

17  to Carfentanil, are being detected in toxicology

18  results and linked to overdose deaths.  Emergency

19  departments visits for heroin overdoes with suspect

20  fentanyl laced analogs are an alarming new trend."

21             Is that correct?

22       A.   That's appropriate statement.

23       Q.   And you have no reason to dispute that

24  statement today?

Page 303

1      A.   I have no reason to dispute it today for

2   what it said at the time.

3      Q.   The next statement says "The preliminary

4   number of drug overdose" "in West Virginia reported

5   as of December 8th, 2016 totaled 624."  Correct?

6      A.   You missed the "deaths" part in there, but

7   --

8      Q.   I'm sorry.  Overdose deaths.  Did you ever

9   quantify the number of those deaths that were

10  attributed to fentanyl or a fentanyl analog?

11     A.   I cannot recollect at this time with this

12  information that I have in my hands.

13     Q.   Could you please turn to Exhibit 17?

14     A.   Okay.

15       GUPTA DEPOSITION EXHIBIT NOS. 16 and 17

16              (E-mail from Christy to Wagoner and

17              others Re: GUPTA DATA NEEDS UPDATED -

18              Social Worker Conference (next week)

19              dated 4-21-17 (DHHR_FEDWV_0047102) and

20              "West Virginia's Contemporary Public

21              Health Challenge: Drug Overdose

22              Deaths" by Gupta dated 4-29-17 were

23              marked for identification purposes as

24              Gupta Deposition Exhibit Nos. 16 and

1              17.)

2     Q.   And if you'd also look at Exhibit 16.

3              And I'll represent, Doctor, that

4     Exhibit 16 -- I'm sorry, 15, was produced as -- no,

5     I apologize.  I got that backwards.

6              Exhibit 14 is the cover e-mail to

7     Exhibit 15.

8              MR. COLANTONIO:  Would you like him to

9     --

10             MS. JINDAL:  So we're looking at

11    Exhibit 17 and Exhibit 16, sorry.

12    Q.   Yes, Exhibit 16 is a cover e-mail to

13    Exhibit 17.  I apologize.  It gets a little bit

14    more confusing with the native PowerPoints.

15             MR. COLANTONIO:  Okay.  So he's

16    looking at 16 and 17, is what you want him to do

17    now, right?

18             MS. JINDAL:  Yes.  And 16 is the cover

19    e-mail for Exhibit 17.

20             MR. COLANTONIO:  Okay, he's got those.

21    A.   I have it.

22    Q.   And Doctor Gupta, is Exhibit 16, does that

23    reflect a conversation among your staff concerning

24    your request for a presentation?

1    A.   Yes, Exhibit 16 reflects that my staff were

2  providing me with slides and PowerPointing those

3  slides for me to present at a presentation, at a

4  conference.

5    Q.   And if you could turn to Slide 35.

6    A.   I have it.

7    Q.   And Slide 35, is that -- is that a graph

8  document the presence of various drugs in overdose

9  deaths from 2001 to 2016 in West Virginia?

10    A.   Slide 35 is a trend analysis looking at

11  five prescription drugs of which most of the fifth

12  ones is fentanyl that is illicit and

13  nonprescriptions and it's comparing a trend of very

14  select group of opioids from 2001 to 2016.

15    Q.   Okay.  And with respect to that fentanyl

16  line, do you see that the increase for fentanyl has

17  gone up from just over 50 in 2014 to somewhere

18  between 150 and 200 in 2015 and well over 350 in

19  2016?

20    A.   Yes, that's consistent with my testimony

21  that in 2015, 2014, is the time I was starting to

22  see a transition happen from exclusively opioid --

23  or majority opioid prescriptions to street drugs.

24    Q.   And it's written here that the vast

Page 306

1    majority -- on the slide, that the "Vast majority

2    of fentanyl deaths are believed to be illicit."

3            Did I read that correctly?

4        A.   Yes.

5        Q.   And these graphs reflect the number of

6    deaths involving this particular drug, correct?

7        A.   Correct.

8        Q.   So just to be clear, there could be overlap

9    in these deaths in the sense that some of these

10   deaths could have involved both fentanyl and

11   oxycodone, for example?

12       A.   Correct.  And this is 2016 preliminary

13   data, just to make a point.

14       Q.   Yes.  The previous slide, Slide 34, looks

15   at major selected drugs, correct?

16       A.   It does look for overdose deaths in West

17   Virginia for the same period of time for certain

18   selected group of drugs.

19       Q.   And the title supplied is "Trend Analysis -

20   Major Selected Drugs," correct?

21       A.   Correct.

22       Q.   And this one also documents the right --

23   this one also documents heroin, correct?

24       A.   Yes.

Page 307

1    Q.   And is there a general trend in the

2    increase in heroin?

3    A.   Yes, the general trend and declines in

4    oxycodone and hydrocodone with a heroin increase

5    trends in heroin exists.

6    Q.   And it may be a little hard to see, but do

7    you also see the line for cocaine?

8    A.   I'm --

9    Q.   A --

10   A.   I think I found it.

11   Q.   And does it also show that cocaine -- there

12   have been deaths involving cocaine as going as far

13   back as 2001?

14   A.   I can try to follow the line of cocaine to

15   2001.  Yes.

16   Q.   And does that line show a general increase

17   in about 2014?

18   A.   I believe it does.

19   Q.   So since 2014, the incidence of heroin --

20   I'm sorry, cocaine in overdose deaths has grown in

21   West Virginia, correct?

22   A.   I would say along with other substances in

23   this chart, cocaine use also went up.  Deaths from

24   cocaine.

1      Q.   Does the -- could you please turn to

2    Exhibit 15?  And then also Exhibit 14?

3                MR. COLANTONIO:  14 and -- I'm sorry,

4    14 and 15?

5                MS. JINDAL:  Yes, please.

6        GUPTA DEPOSITION EXHIBIT NOS. 14 and 15

7                (E-mail from Gupta to Mock and Taylor

8                Re: Presentation dated 4-4-17 and

9                E-mail from Richman to Boggs Re: April

10               4th - MCMS dated 3-29-17

11               (DHHR_FEDWV_0038760) and "2017

12               Legislation and Substance Use Disorder

13               Epidemic: West Virginia's Call to

14               Action" by Gupta dated 4-4-17

15               (DHHR_FEDWV_0038761) was marked for

16               identification purposes as Gupta

17               Deposition Exhibit Nos. 14 and 15.)

18               MR. GOOLD:  What's the time with the

19    court reporter on the deposition and what time did

20    Mark take?

21               This is Jim Goold.  I'm going to have

22    about ten or fifteen minutes that I'm going to be

23    happy to start when I can.

24               What's the time with the court

Page 309

1    reporter on the time because --

2                    VIDEO OPERATOR:  This is the

3    videographer.  Give me one moment and I can give

4    you a total time.

5                    MR. GOOLD:  Okay, good.  Thank you.

6         Q.   Doctor, I would like you to look at Exhibit

7    14, which is the cover e-mail to which Exhibit 15

8    is attached.  Is Exhibit 14 a cover e-mail to you

9    from Allen Mock?

10        A.   Yes.

11        Q.   And Mr. Mock is the -- the chief medical

12   examiner for West Virginia, correct?

13        A.   Doctor Mock is the Chief Medical Examiner

14   of West Virginia, yes.

15        Q.   Doctor Mock, I apologize.  The PowerPoint

16   that you've attached is titled "2017 Legislation

17   and Substance Use Disorder Epidemic:  West

18   Virginia's Call to Action."  Correct?

19        A.   Yes.

20        Q.   And you authored this presentation?

21        A.   As you've seen in the previous exhibits, I

22   often do not personally author presentations as the

23   Commissioner.  I had staff that does that.

24        Q.   Did you commission this presentation?

Page 310

1          A.   I do not recollect at this time.  However,

2     I was requested -- the request was made for the

3     Commissioner to provide a presentation and

4     generally I would commission the development of

5     such a presentation and then appropriate -- myself,

6     with the appropriate staff availability to do the

7     presentation.

8                    VIDEO OPERATOR:  This is the

9     videographer.  We've been on the record for about 6

10    hours, 45 minutes total.

11                   MR. COLANTONIO:  Okay.

12                   MR. GOOLD:  Did you take out

13    Mr. Colantonio's examination in that?

14                   VIDEO OPERATOR:  I did not.  That's

15    just the total time.

16         Q.   And Doctor, if you could turn to Slide 26

17    of this presentation.  I'm sorry, Slide 27.

18         A.   Okay.  I have it.

19         Q.   And I apologize.  It's the nature of

20    working on a computer.  I was looking at my PDF

21    number versus the number in the lower right-hand

22    corner.  I do mean Slide 26 as indicated by the

23    number in the lower right-hand corner of the

24    presentation, so the slide that is titled, in

Page 311

1   quotes, "The Heroin Landscape."

2              Do you see that?

3       A.   Yes.

4       Q.   And it's written here, "Heroin use is part

5   of a larger substance abuse problem."  Correct?

6       A.   Yes.

7       Q.   Do you still agree with that statement?

8       A.   I would agree with that statement as it's

9   stated here.

10      Q.   And you've written here that nearly all

11  people who use heroin also use at least 1 other

12  drug.  Most use at least 3 other drugs."  Correct?

13      A.   That would be correct at the time this was

14  done.

15      Q.   Do you have any reason to believe it's not

16  correct now?

17      A.   I don't have the most current statistics to

18  be able to say whether this is or this is not

19  correct at this time.

20      Q.   And you've also written here that "People

21  who are addicted to ... Alcohol are 2" times "...

22  more likely to be addicted to heroin."  Correct?

23      A.   Yes.

24      Q.   And "People who are addicted to...

Page 312

1   Marijuana are 3" times "...more likely to be

2   addicted to heroin."

3        A.   Correct.

4        Q.   And "People who are addicted to...Cocaine

5   are 15" times "...more likely to be addicted to

6   heroin."

7        A.   That's what it says.

8        Q.   And "People who are addicted to...

9   Prescription opioid painkillers are 40" times

10  "...more likely to be addicted to heroin."

11  Correct?

12       A.   That's what it says.

13       Q.   And this doesn't define a causal

14  relationship between one drug and another drug,

15  correct?

16       A.   This is a very strong correlation, not

17  causal.

18            MR. COLANTONIO:  Let me just object to

19  the form of the question, as it's calling for a

20  legal --

21       Q.   Doctor, could you please turn to Exhibit

22  45?

23            GUPTA DEPOSITION EXHIBIT NO. 45

24            (E-mail from Dora to Gupta and others

```
                                                    Page 313

 1                 Re: 2018.07.05 Final packet mailed to

 2                 Judges re MAT dated 7-5-18

 3                 (DHHR_FEDWV_1148108-126) was marked

 4                 for identification purposes as Gupta

 5                 Deposition Exhibit No. 45.)

 6       A.   I have it.

 7       Q.   And this first page reflects an e-mail to

 8   you from -- from a Dora; is that right?

 9       A.   I can't see on the top who the e-mail is

10   from.  I can only see one single name, Dora.  I do

11   not recognize that name right away.

12       Q.   This e-mail's addressed to you as well as

13   secretary Bill Crouch of the DHHR, correct?

14       A.   That's what it seems like.

15       Q.   Do you have any reason to doubt that this

16   e-mail is not what it is?

17       A.   I just don't know Dora.  I mean, I don't

18   know who Dora is.

19       Q.   Sure.  Do you have any reason to doubt that

20   this was not an e-mail sent to you on Thursday,

21   July 5th, 2018?

22       A.   I'll take it as it is.

23       Q.   If you could turn to the second page, this

24   is ending -- this is Bates stamped
```

Page 314

1   DHHR_FEDWV_1148109.  Does this reflect a letter

2   from the West Virginia Department of Health and

3   Human Resources to the Honorable Anita Ashley, a

4   judge in West Virginia?

5       A.   It does seem to reflect as you stated.

6       Q.   And does this reflect -- this attachment in

7   total reflect a packet of information that was sent

8   to a judge regarding medication-assisted treatment?

9       A.   I would have to review the attachments to

10  the packet or to review -- just a second.

11          Upon a cursory review, it looks to me

12  like there's a letter to one judge in the front.

13  There seems to be an anonymous kind of "Your Honor"

14  letter from Secretary Crouch, and then I see a

15  letter to another judge from a different county.

16          So I'm not sure if this is all part of

17  the same packet.  It does seem to be going to

18  different places, the packet, including anonymous

19  people.

20      Q.   Okay.  Just focusing on that first letter,

21  the one that's ending in Bates stamp 8109, do you

22  see the part where it says, "Enclosed with this

23  communication are the following documents"?

24      A.   I see that here.

Page 315

1    Q.   Okay.  And the first describes -- that

2    first bullet describes "A letter from Bill J.

3    Crouch, DHHR Cabinet Secretary, directed to

4    Attendees of the Spring Circuit Judges Training

5    conducted May 2nd, 2018 in Morgantown, West

6    Virginia."

7            Did I read that correctly?

8    A.   I believe you did.

9    Q.   And the second bullet reflects "A letter

10   from Dr. Rahul Gupta, State Health Officer from

11   West Virginia DHHR Bureau of Public Health; and,

12   co-written with Doctor James Becker, DHHR Bureau of

13   Medical Services."  Did I read that correctly?

14   A.   Yes.

15   Q.   Does that refresh your recollection about

16   what the second document is, the second letter?

17   A.   My recollection is that that letter is not

18   to Judge Ashley; that's to Judge Tatterson here

19   that I see here, so I cannot verify the accuracy of

20   this packet.

21   Q.   You're saying that you doubt that the -- I

22   guess what I'm saying is:  The letter to Judge

23   Ashley describes communications that are being sent

24   to her, correct?

Page 316

1      A.   The first bullet looks to me a letter from

2   Bill J. Crouch, Cabinet Secretary, presented to the

3   Spring Circuit Judges Training conducted May 2nd,

4   2018 in Morgantown, West Virginia.

5           I do not see that.  All I see is a

6   letter -- the next document is a letter dated May

7   1st, not May 2nd.  So I'm confused as to where that

8   letter to the packet is.

9      Q.   Okay.  Well, I'll represent that this is

10   how the attachment was produced as part of this

11   e-mail and there have been no alterations made to

12   this attachment by us.  So if there were any typos

13   in this document, you know, I can't be -- I'm just

14   trying to tell you that I didn't create the typos

15   in this document.

16           I didn't create this document period.

17   This is how it was produced to us, and this is how

18   I'm presenting it to you.

19      A.   I'll take your word for it.

20      Q.   Okay, thank you.  I just want you to see

21   that -- the final bullet here is a white paper

22   entitled "Medication-assisted treatment-An

23   Evidence-based Pathway to Recovery in West

24   Virginia."

Page 317

1          Do you see that?

2     A.   Yes.

3     Q.   Okay.  Could you please turn to the --

4  sorry.  I've got to find the page myself.  It ends

5  with Bates stamp 8119?

6     A.   Yes.

7     Q.   Okay.  It's about halfway in the

8  presentation.  And do you see that it's titled

9  "Medication Assisted Treatment"?

10    A.   I do.

11    Q.   And the subtitle is "An evidence-based

12  pathway to recovery in West Virginia."

13    A.   I do see that.

14    Q.   And it's published on the West Virginia

15  Department of Health and Human Resources -- it's

16  letterhead -- it's got the stamp right there in the

17  upper left-hand corner, correct?

18    A.   I see that is submitted by a Rebecca Roth,

19  the Office Director of Policy, Research, Planning

20  and Compliance at the Bureau of --

21    Q.   And the date of --

22    A.   -- Behavioral Health and Health Facilities.

23    Q.   And the date of this document is May 20,

24  '18, correct?

Page 318

1      A.    That's what it seems like.

2      Q.    Could you please turn to the -- I believe

3   it's the fourth page of this document, is Bates

4   stamped 8123.

5      A.    Yes.

6      Q.    I'm going to read from the third paragraph

7   down under the heading "POLYSUBSTANCE USE AND MAT."

8   "In 2016" -- do you see where it says that?

9      A.    I see that.

10      Q.    It says, "In 2016, preliminary data

11   indicated that heroin-related and fentanyl-related

12   overdose deaths increased dramatically since 2014."

13   And it's cited as West Virginia Health Statistics

14   Center, Vital Statistics System.

15            It goes on to say, "Stimulant overdoses

16   are also on the rise; amphetamine or

17   methamphetamine-related, as well as cocaine-related

18   overdoes deaths increased significantly between

19   2004 and 2016."

20            Did I read that correctly?

21      A.    Yes.

22      Q.    Do you have any reason to dispute the

23   accuracy of those statements?

24      A.    I wouldn't, but I would want to review the

1  full report before I would make a statement,

2  because I don't know what the rest of the report is

3  about since I can't remember/recall that and it was

4  not authored by myself.

5      Q.   Do these statistics reflect the ones we

6  just looked at in the graph from your presentation?

7      A.   That would be accurate.

8      Q.   I'm going to turn to the next paragraph,

9  the one beginning "The focus on opioids."  Do you

10  see that?

11      A.   Yes.

12      Q.   "The focus on opioids does not in any way

13  diminish the need to address other substance use

14  disorders or mental health disorders nationally or

15  in West Virginia.  Prevalence of alcohol use

16  disorders (AUDs) has increased dramatically over

17  the last decade in multiple populations subgroups:

18  Women (83.7% increase); African-Americans (92.8%);

19  age 45-64 (81.5% increase); and age 65" plus

20  (106.7% increase); only high school education

21  (57.8% increase); individuals with incomes less

22  than $20,000 (65.9% increase)."

23              Did I read that correctly?

24      A.   I think so.

Page 320

1     Q.   Do you have any reason to doubt the

2  accuracy of those statistics?

3     A.   It's been quite awhile, so I -- I would

4  have to believe these statistics.  I have not

5  myself verified any of these statistics, at least

6  recently.

7     Q.   It goes on to say that "More than 1 in 4

8  (26.3%) of WV women reported smoking during

9  pregnancy, double the national rate of 13%, and 60%

10  of births in WV are to mothers with Medicaid. More

11  than 4,000 births in WV are to mothers with

12  substance use disorders.  Cannabis is the most

13  commonly used drug among pregnant women, at 11.63%

14  of pregnant mothers, and leads to 2.3 times greater

15  risk of still birth as well as poor cognitive

16  functioning."

17            Did I read that correctly?

18     A.   Yes.

19     Q.   And do you have any reason to doubt the

20  accuracy of this -- these statistics?

21     A.   At the time that was written, I -- I just

22  -- I have not done the verification of research

23  around this, but I would take it as for what it

24  states here at the time.

1      Q.    Could you turn back to Exhibit 38?

2            And again, this is your testimony in

3   front of the House Committee, correct?

4      A.    I have it, yes.

5      Q.    And this testimony is dated May 2018?

6      A.    It's actually May 17th, 2018.

7      Q.    Thank you.  Could you please turn to page 5

8   of this testimony?  The last four numbers of the

9   Bates stamp are 1634.

10     A.    Okay.

11     Q.    I'm going to read from the second full

12  paragraph down.  It says, "As the committee" -- do

13  you see that?

14     A.    I see that.

15     Q.    "As the Committee considers evidence-based

16  approaches to the opioid crisis specifically, I

17  strongly urge you to refrain from a narrow focus

18  on," in quotes, "'opioids.'  While the opioid

19  epidemic is a crisis of the moment, in many states

20  other drugs such as methamphetamine, cocaine, and

21  benzodiazepines, often in combination with opioids,

22  are the emerging predominant causes of substance

23  abuse and misuse among some populations.  This is

24  in addition to the long-standing challenge of

Page 322

1    alcohol misuse and addiction."

2              Did I read that correctly?

3        A.    Yes.

4        Q.    And is your testimony today consistent with

5    the statistics that we saw in the white paper that

6    we just reviewed?

7              MR. COLANTONIO:   Object to form.

8        A.    I think without any context whatsoever, I

9    cannot agree to it being consistent.

10       Q.    What greater context do you need, Doctor?

11       A.    I think you read me out of a paragraph from

12   one document and another paragraph of another

13   document and you're piecing together a theory

14   without providing any additional content or having

15   me the opportunity to actually address the context

16   of the previous document or this document.

17       Q.    Doctor, if you would like to go through the

18   white paper in greater detail, you're welcome to.

19   I -- there are sources listed at the back of that

20   document.  And I just -- you know, this is your

21   testimony.  I'm just trying to make sure -- make

22   sense of what you testified and why you might have

23   testified that way.

24             MR. COLANTONIO:   Okay.  Let him go

Page 323

1    through the report then, Doctor.  Take your time

2    and go through the report.

3                  Which report --

4                  THE DEPONENT:  The previous one.

5        A.   I feel like this is unfair to me as a

6    witness by having me read pieces and moving because

7    I feel I'm not getting adequate opportunity to be

8    able to provide context to the data without

9    reading.

10       Q.   Let me make this a little bit easier then,

11   Doctor.  The paragraph I just read from your

12   testimony --

13                 MR. COLANTONIO:  Hold on.  You wanted

14   -- I thought we were going to read the report.  You

15   want to read --

16                 THE DEPONENT:  The previous one.

17                 MS. JINDAL:  Let me just see if I can

18   try to ease the doctor's concerns, please.

19       Q.   The paragraph we just read from your

20   testimony, what was your basis for making those

21   statements?

22       A.   So the paragraph you just read and the

23   paragraph in the previous letters to the judges

24   that you took out, by itself, does not have a leg

Page 324

1    to stand on.  It's in the context of an opioid

2    crisis that has transitioned now killing West

3    Virginians from opioid prescription drugs to heroin

4    to cocaine, and we've established that as we went

5    through.

6              And now to take that out of context and

7    to act like opioid prescriptions have nothing to do

8    with it is unfair and not really in context, so I

9    take offense to that fact that we're taking pieces

10   and trying to cobble those together instead of

11   actually allowing a fair opportunity to be

12   explaining what actually happened in West Virginia.

13             So I -- that's the piece that I think

14   that is unfair.

15   Q.   Has alcohol use disorder been a long-term

16   -- long-standing challenge in West Virginia?

17   A.   Yes, an alcohol disorder within -- which I

18   will discuss as a very different challenge in many

19   of the states, and we've already talked about today

20   earlier how there will be always a level of

21   population where there will be addictive behaviors.

22             So now to take that out wouldn't be

23   fair because alcohol -- alcoholism and alcohol

24   challenge did not rise by thousands of percent over

Page 325

1    a decade.  Opiate prescription drugs and volume of

2    that did rise.

3              Alcohol did not contribute to killing

4    West Virginians in this way.  Opioid drugs did.  So

5    it would not be fair to blame alcohol for the sins

6    of the volumes that have called West Virginians.

7        Q.   And just to be clear, Doctor, I'm not

8    trying to do that.  I'm just trying to understand

9    the prevalence of alcohol use disorder in West

10   Virginia.  Would you agree --

11       A.   But you -- sorry.  If you are wanting to do

12   that, then we would be sharing data from CDC, from

13   behavior risk to factors surveyed on the prevalence

14   of binge drinking.  We would be in a way different

15   area right now than what we are doing picking and

16   choosing pieces to cobble together.

17              This is not the type or the veracity of

18   data, I'm -- you know, you can look up and you can

19   see the West Virginia alcohol use data.  I have the

20   surveys of those, and I can tell you this is not

21   where you go to look for that data.

22       Q.   So to be clear, you are not sure about the

23   accuracy of the data that is represented in this

24   publication that was published by the West Virginia

                                              Page 326

1   Department of Health and Human Resources while you

2   were Commissioner for the Bureau for Public Health?

3        A.   That is absolute misconstruing of my

4   statement.

5        Q.   Okay.  How am I misconstruing your

6   statement, Doctor?

7        A.   Because I am trying to provide you context

8   and you are misconstruing that to the letters and

9   the statements are false, which is just anything

10  but the truth.

11       Q.   Okay.  So if the statements regarding the

12  increase in alcohol use disorder in West Virginia

13  is accurate, then is it fair to say that your

14  testimony that alcohol use has been a long-standing

15  challenge in West Virginia is accurate as well?

16            MR. COLANTONIO:  Object to the form of

17  the question.

18       A.   In the last nine hours or so, you have not

19  provided me an iota of evidence that suggests the

20  claims you are making now.

21       Q.   To be clear, Doctor, I'm not making these

22  claims.  I'm just reading to you what is from the

23  document, asking whether this is in agreement with

24  your testimony in front of Congress.

```
                                            Page 327

 1              MR. COLANTONIO:  That is -- wait a

 2   minute.  That's not a question.  You want to ask

 3   him a question?

 4              MS. JINDAL:  I guess what I'm

 5   trying --

 6      Q.   My question is:  Did I read -- do you -- do

 7   you have any concern with how -- my accuracy of

 8   reading these statements into the record?

 9              MR. COLANTONIO:  Object to the form of

10   the question.

11      A.   I do have concerns that you have construed

12   the -- as an example, the last line, that "This is

13   in addition to longstanding challenge of misuse and

14   addiction" and you just made a statement about "the

15   rising evidence of alcohol use in West Virginia"

16   without providing me any evidence of such, and I do

17   have objections to the characterization of the use

18   of alcohol without any evidence -- and we're making

19   West Virginians seem like they're been doing

20   nothing but sitting on their toes and feet and just

21   drinking alcohol, and I think that's a very unfair

22   characterization of people of West Virginia.

23      Q.   And I want to be very clear that that is

24   not what I am trying to say.  I think you're being
```

Page 328

1   a little bit unfair right now.  But I think we

2   should just take a break for about five minutes.

3   Let's cool off.  And then we can reconvene.

4            MR. COLANTONIO:  Cool off?  All right,

5   we're going off for five.

6            VIDEO OPERATOR:  Going off the record.

7   The time is 5:56 p.m.

8            (A recess was taken after which the

9            proceedings continued as follows:)

10           VIDEO OPERATOR:  Now begins Media Unit

11  9 in the deposition of Rahul Gupta, M.D.  We are

12  back on the record.  The time is 6:01 p.m.

13           MS. JINDAL:  Doctor Gupta, I have no

14  more questions for you today, so I am going to pass

15  you as the witness.  Thank you.

16                    EXAMINATION

17  BY MR. GOOLD:

18     Q.  Doctor Gupta, my name is Jim Goold.  Good

19  afternoon.  I'll try to be as short as possible.

20  It really won't be very long, I promise.  Just some

21  follow up on a couple of things.

22           First, as Commissioner of Public Health

23  in West Virginia, you did understand that diversion

24  involved illegal acts.  Is that right?

Page 329

1      A.   Yes.

2      Q.   Okay.  And we talked earlier, there was

3  discussion about a report -- I believe it was

4  called the social autopsy report, and you mentioned

5  that you commissioned it.  Do you recall that just

6  generally?

7      A.   Yes.

8      Q.   I take it that you had the authority to

9  commission a report on any aspect of the opioid

10  crisis that you considered as something that was

11  important to study.

12      A.   I would have the authority within the

13  confines of the public health aspect of it to --

14  and at the same time, would be commissioning

15  opioids and this crisis wasn't the only thing that

16  was happening in West Virginia, so there was - as I

17  mentioned earlier - 130 different program lines we

18  were managing, so when I commission a report, I

19  have to balance of the use of taxpayer dollars and

20  resources with the necessity and importance and the

21  ability for us to make an impact and change.  I

22  would have to measure that.

23      Q.   Understood.  Thank you.  And looking at the

24  opioid crisis from a public health point of view --

Page 330

1    which was your perspective, right?

2        A.    Yes.

3        Q.    -- that would include understanding --

4    trying to understand the causes of the crisis,

5    correct?

6        A.    Correct.

7        Q.    Okay.  Did West Virginia ever do a study of

8    what substances people who had opioid overdoses had

9    consumed before they began using and misusing

10   opioids?

11       A.    I am not aware of such.

12       Q.    Just to be a little more specific, in case

13   it helps, for example, did West Virginia ever look

14   at the extent to which people who later had

15   problems with prescription opioids had first smoked

16   marijuana?

17       A.    I am not aware of that, but I will also

18   caveat this with a -- the issue that I saw and

19   experienced was that not everyone who received a

20   prescription necessarily was the only one that was

21   abusing the prescription.

22             The core behind diversion was:  There's

23   a lot of unsuspecting victims of this crisis that

24   were obtaining the pills, not necessarily through

Page 331

1    the doctor's office.

2              In fact, some of the data that I

3    highlighted today from SAMSHA demonstrates that.

4        Q.   Okay, thank you.  I understand that not

5    every person who later had a prescription opioid

6    problem first smoked marijuana, but you never

7    looked at or the state never looked at whether it

8    was 40 percent or 50 percent or 70 percent or 80

9    percent or whatever number it was?

10              Am I right about that?

11       A.   I think the closest understanding of what

12   happens to the opioid overdose deaths, you can find

13   in the social autopsy work, that's as close as

14   we've gotten to understanding the year before the

15   death of individuals who have died from overdose.

16       Q.   Thank you.  Just to make sure I've got it

17   right then, that's what you would point to as the

18   best source of data on the substance abuse history

19   of people who died of opioid overdoses.  Is that

20   right?

21       A.   For one year.  And I'm not aware -- to

22   directly answer your question, I'm personally not

23   aware of the data.  It may exist.  I'm not aware of

24   that.

Page 332

1    Q.   Okay.  And have you ever looked at the

2    literature for studies addressing that done by

3    doctors or scientists in the United States?

4    A.   I cannot recall now.  I'm sure I have in

5    the past, but I don't recall it now.

6    Q.   Do you recall any data on the extent to I

7    with amphetamine use precedes opioid --

8    prescription opioid misuse?  Any studies on that

9    question?

10   A.   I do not recall.

11   Q.   Okay.  Same thing about benzodiazepines.

12   A.   Correct.

13   Q.   Alcohol?  Same question.

14   A.   Correct.

15   Q.   And tobacco, same question.

16   A.   Correct.

17   Q.   Okay.  You also talked about Dopamine in

18   your examination by Mr. Colantonio.  Do you recall

19   that?  I'm just taking you back to that subject

20   generally.  Okay?

21   A.   Yes.

22   Q.   Am I right that the point that you were

23   making was that elevated levels of Dopamine in the

24   brain can be addictive?

Page 333

1        A.   No, and please let me clarify the point I

2    was making.  I'm sure I said very similar earlier

3    as well, which is:  Any substance, we can use

4    opioids, but you can also attach a number of other

5    substances.  It's also true for some foods; it's

6    also true for smoking and other things.

7                   A pathway -- the reward pathway is the

8    same, which is when you take the drug, it

9    stimulates the release of Dopamine or the continued

10   action of Dopamine that then tells the -- signals

11   the front part of your brain that you're happy,

12   you're satisfied, and that's the reward mechanism

13   that is fed by opioids and a lot of other

14   substances, as you just have mentioned.

15                  But as I stated to you, I'm not aware

16   of someone who's doing heroin or amphetamine now

17   wants to go back and use a prescription drug to

18   reap the same rewards.  In fact, we've seen exactly

19   the opposite.

20       Q.   Do you know what level of Dopamine is

21   required to trigger addiction?

22       A.   I am not aware of exact micro --

23   microlevels in the blood or in the brain at this

24   time.

Page 334

1      Q.   And you don't know how long or how much

2   exposure over time there needs to be to an elevated

3   level of Dopamine in order to trigger addiction.

4   Is that right?

5      A.   The time factor can vary within individuals

6   and human beings, and at some point, the -- there's

7   a need for higher escalation of dose, and then for

8   variable period of time - that varies within the

9   population and individuals - then there occurs more

10  escalation for the dose, because we build something

11  called tolerance.

12            And as tolerance gets built - which is

13  different from different -- for different people -

14  it requires a higher dose or strength of the

15  substance.

16     Q.   Do you know whether smoking tobacco leads

17  to an increased level of Dopamine in the brain?

18     A.   Tobacco's effects are more -- have to do

19  with nicotine, and it is -- so there's multiple

20  substances in tobacco.  There are many cancerous

21  substances, but most of the impacts of tobacco

22  comes from a substance known as nicotine which

23  breaks down into cordamine that actually stimulates

24  the heart, stimulates the -- your heart rate and

Page 335

1    breathing and others and also goes through your

2    brain as well, and similar type of pathways.

3        Q.   Okay.  Do you have any understanding as to

4    whether smoking tobacco leads - directly or

5    indirectly - to an increased level of Dopamine in

6    the brain?

7        A.   It could lead to increased levels.

8        Q.   Okay.  Do you know -- have a -- know any

9    data that emperically compares the level of

10   Dopamine from smoking tobacco to any particular

11   dose of an opioid?

12       A.   I'm not aware of such that I can recall

13   that data.

14       Q.   How about alcohol?  Do you have any

15   understanding as to whether drinking alcohol -

16   directly or indirectly - leads to an increase of

17   Dopamine in the brain?

18       A.   So alcohol can serve through various

19   pathways and different mechanisms, and for those

20   who become chronic alcoholics, that could be a

21   potential path with them.

22       Q.   And do you have any understanding as to

23   comparisons of Dopamine levels for alcohol or

24   alcoholism and opioids?

Page 336

1      A.   I'm not -- I cannot recall any data that

2   may compare that.

3      Q.   Okay.  Let me ask the same questions about

4   cocaine.  Do you have an understanding as to what

5   level of increased Dopamine cocaine leads to and as

6   compared to opioids?

7      A.   I'm not able to recall any emperical data

8   comparing cocaine and opioids.

9      Q.   A couple more.  Benzodiazepines?  Same

10   question.

11      A.   Same answer.

12      Q.   Okay.  How about behaviors, human behaviors

13   or activities?  Do you understand that there are

14   human behaviors or activities that cause increased

15   levels of Dopamine?

16      A.   So I want to just add that the suppressants

17   like benzodiazepine, alcohol, you know, one of the

18   things in the reward system that may or may not

19   function through the reward system Dopamine.

20   Behaviors certainly can.

21           So you could have addiction to food;

22   you could have addiction to other things, which the

23   pathways may be similar, although the receptors

24   where these things act are different.

1    Q.   And are you able to empirically compare the

2  effects of Dopamine from these activities to

3  effects of Dopamine from opioids?

4    A.   I think to the extent that we have learned

5  that there are different receptors on which each of

6  these and variety of these compounds and components

7  can act to activate Dopamine.  That's a

8  differentiating point.

9            For example, opioids act on

10  neuroreceptors to activate the system, and there

11  are various different receptors of different types.

12            To that extent, we do have the

13  knowledge of.

14    Q.   Are you an expert -- you consider yourself

15  an expert on this area of neurobiology?

16    A.   I'm not necessarily an expert in

17  neurobiology.  I am a internal medicine physician

18  with a long-term experience in both public health,

19  prevention and especially in opioids.

20    Q.   But you're not able to empirically compare

21  the effects of increased Dopamine from these other

22  activities to opioids.  Is that right?

23    A.   I am not a neurobiologist, and I cannot

24  recall the data at this point.

Page 338

1              MR. GOOLD:  Thank you.  I'm finished

2      as well.

3              MR. COLANTONIO:  Read and sign?

4              MR. RUBY:  So Adam --

5              MR. GOOLD:  Thank you, Doctor.

6              MR. RUBY:  Adam, if I'm right, we are

7      at about, I'd say, six hours and ten minutes on the

8      record if we exclude Colantonio's examination of

9      what has now been represented as a -- or what has

10     now been represented as a nonparty, I suppose,

11     deposition.

12             VIDEO OPERATOR:  Yes, that is very

13     close.

14             MR. RUBY:  Okay.  So we -- we do, I

15     think, have a few more minutes.  Jyoti, do you have

16     anything else you want to cover?  You're muted.

17             MS. JINDAL:  I had to think.  Doctor,

18     if you're patience for a few more questions, I do

19     have them.  But I appreciate it's been a long day.

20     So if you'll -- if you'll just bear with me, I

21     promise it will be fast.

22             THE DEPONENT:  Okay.

23                   EXAMINATION

24     BY MS. JINDAL:

1      Q.   Could you please turn to Exhibit 20?

2           MR. COLANTONIO:  I'm sorry, 20?

3           MS. JINDAL:  20, 2-0.

4           MR. COLANTONIO:  Okay.

5           GUPTA DEPOSITION EXHIBIT NO. 20

6                (E-mail chain between Gupta and others

7                Re: MEDIA REQUEST = Fatal overdose

8                victims by county and where they were

9                from dated 9-27-17 to 9-29-17 was

10                marked for identification purposes as

11                Gupta Deposition Exhibit No. 20.)

12     A.   I have it.

13     Q.   Doctor Gupta, are you familiar with this

14  document?

15     A.   I am not.  I am -- sounds like -- trying to

16  familiarize myself.

17     Q.   Just let me know when you're ready, Doctor.

18     A.   Okay.  I'm ready.

19     Q.   Is this an e-mail chain -- and I'll just

20  look at the top-most e-mail there.  Is that an

21  e-mail from Doctor Allen Mock?

22     A.   Yes, I see Doctor Allen Mock and a number

23  of people, including myself, who have been -- this

24  e-mail has been sent to and copied to several

Page 340

1    others.

2         Q.   Okay.  And this e-mail is dated September

3    29, 2017?

4         A.   Correct.

5         Q.   And does this e-mail chain reflect a

6    discussion of the number of non-Cabell County

7    residents who have a fatally overdosed in Cabell

8    County?

9         A.   It reflects a request from a reporter about

10   fatal overdose victims who have died in Cabell

11   County up to this point in that year.

12        Q.   And you're looking at the bottom of the

13   e-mail, and I'm just going to read it out loud.  It

14   says, "I'd like to request the county of residence

15   for each fatal overdose victim who died in Cabell

16   County up to this point in the year."  Correct?

17        A.   Yes.

18        Q.   And that reporter's e-mail is dated

19   September 27th, 2017, correct?

20        A.   Correct.

21        Q.   So the middle e-mail here from Gary

22   Thompson -- do you see that?

23        A.   Yes.

24        Q.   Who is Gary Thompson?

Page 341

1      A.   Gary Thompson, at the time, was the State

2   registrar.

3      Q.   And the e-mail directly below

4   Mr. Thompson's e-mail from Toby Wagoner, does he --

5   does Mr. Wagoner ask Gary or another individual

6   named Dan, Daniel Christy, to look into whether the

7   DHHR has this information?

8      A.   That's what it seems so -- to be.

9      Q.   And so does Mr. Gary Thompson's e-mail

10  respond to that with the information requested by

11  the reporter?

12     A.   It would seem so.

13     Q.   And does Mr. Thompson -- would you have any

14  reason to doubt the accuracy of the numbers that he

15  reports here?

16     A.   Yes, because these would be preliminary

17  numbers.  These would not be final numbers.  And

18  final numbers can often change.

19     Q.   Are those preliminary numbers the number of

20  overdoses?

21     A.   That's what it says in the -- that's what

22  it says here.

23     Q.   Okay.  But it's not preliminary in terms of

24  the identity of the county of residence or the

Page 342

1    individual who overdosed, correct?

2        A.    Not necessarily.  I mean, it could happen

3    that new information could come out and that

4    individual may actually be a resident of a

5    different county or a different county resident

6    could be a resident of Cabell County, so this is --

7    that's the reason when we produce data prematurely,

8    we say it's preliminary data, and until the data is

9    final, the data is not final.

10            And this does not seem to be anywhere

11   stated here that this is a final data.

12       Q.   Has DHHR ever published statistics like

13   these?

14            MR. COLANTONIO:  Object to form.

15       A.   We published -- I think all throughout the

16   day, we talked about overdose deaths.  We do

17   publish overdose deaths.  We publish overdose

18   deaths by the county of residence each year.

19       Q.   So this data breaking down the number of

20   deaths -- overdose deaths that were reported by

21   county of residence is available in a final form

22   elsewhere?

23       A.    I believe if you look at my report, you

24   might find it there, but the final report for

Page 343

1    overdose deaths by county of residence should be

2    available year after year in the standard format.

3                    MS. JINDAL:  Okay, Doctor.  I think

4    those were all the questions I have.  Thank you.

5                    THE DEPONENT:  Thank you.

6                    MR. FITZSIMMONS:  Read and sign.

7                    MR. COLANTONIO:  Anybody else?  All

8    right.  He'll read and sign.

9                    VIDEO OPERATOR:  We are off the record

10   at 6:23 p.m., and this concludes today's testimony

11   given by Rahul Gupta, M.D.  The total number of

12   Media Units used was nine and will be retained by

13   Veritext.

14                    (Having indicated he would like to

15                    read his deposition before filing,

16                    further this deponent saith not).

17

18

19                    --oOo--

20

21

22

23

24

Page 344

```
 1   STATE OF WEST VIRGINIA,
 2   COUNTY OF JACKSON, to wit;
 3
 4           I, Teresa S. Evans, a Notary Public within
     and for the County and State aforesaid, duly
 5   commissioned and qualified, do hereby certify that
     the foregoing deposition of RAHUL GUPTA, M.D. was
 6   duly taken by me and before me at the time and
     place and for the purpose specified in the caption
 7   hereof, the said witness having been by me first
     duly sworn.
 8
             I do further certify that the said
 9   deposition was correctly taken by me in shorthand
     notes, and that the same were accurately written
10   out in full and reduced to typewriting and that the
     witness did request to read his transcript.
11
             I further certify that I am neither
12   attorney or counsel for, nor related to or employed
     by, any of the parties to the action in which this
13   deposition is taken, and further that I am not a
     relative or employee of any attorney or counsel
14   employed by the parties or financially interested
     in the action and that the attached transcript
15   meets the requirements set forth within article
     twenty-seven, chapter forty-seven of the West
16   Virginia Code.
17           My commission expires October 25, 2020.
     Given under my hand this 15th day of September,
18
19
20   Teresa S. Evans
     RMR, CRR, RPR, WV-CCR
21
22
23
24
```

Page 345

1    STATE OF WEST VIRGINIA

2    COUNTY OF KANAWHA, to wit;

3        I, Teresa Evans, owner of Realtime Reporters,

4    LLC, do hereby certify that the attached deposition

5    transcript of RAHUL GUPTA, M.D. meets the

6    requirements set forth within article twenty-seven,

7    chapter forty-seven of the West Virginia Code to

8    the best of my ability.

9

10

        Given under my hand this 15th day of September,

11   2020.

12

13

14

15                    Given under my har

16

17                    Registered Professional
                 Reporter/Certified Realtime Reporter

18

19

20

21

22

23

24

```
                                                       Page 346
 1                     Veritext Legal Solutions
                          1100 Superior Ave
 2                            Suite 1820
                        Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4
       September 16, 2020
 5
       To: Mark Colantonio, Esquire
 6
       Case Name: City of Huntington v. Amerisourcebergen Drug Corporation
 7
       Veritext Reference Number: 4242146
 8
       Witness:  Rahul Gupta, M.D.      Deposition Date:  9/11/2020
 9
10     Dear Sir/Madam:
11
       Enclosed please find a deposition transcript.  Please have the witness
12
       review the transcript and note any changes or corrections on the
13
       included errata sheet, indicating the page, line number, change, and
14
       the reason for the change.  Have the witness' signature notarized and
15
       forward the completed page(s) back to us at the Production address
16     shown
17     above, or email to production-midwest@veritext.com.
18
       If the errata is not returned within thirty days of your receipt of
19
       this letter, the reading and signing will be deemed waived.
20
21     Sincerely,
22     Production Department
23
24     NO NOTARY REQUIRED IN CA
```

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
            ASSIGNMENT REFERENCE NO: 4242146
 3          CASE NAME: City of Huntington v. Amerisourcebergen Drug
       Corporation, et al.
            DATE OF DEPOSITION: 9/11/2020
 4          WITNESS' NAME: Rahul Gupta, M.D.
 5          In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
 6     my testimony or it has been read to me.
 7          I have made no changes to the testimony
       as transcribed by the court reporter.
 8

       _____        _____
 9     Date                    Rahul Gupta, M.D.
10          Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11     the referenced witness did personally appear
       and acknowledge that:
12
            They have read the transcript;
13          They signed the foregoing Sworn
                 Statement; and
14          Their execution of this Statement is of
                 their free act and deed.
15
            I have affixed my name and official seal
16
       this _____ day of_____, 20_____.
17
                      _____
18                    Notary Public
19                    _____
                      Commission Expiration Date
20
21
22
23
24
25
```

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
             ASSIGNMENT REFERENCE NO: 4242146
 3           CASE NAME: City of Huntington v. Amerisourcebergen Drug
      Corporation, et al.
             DATE OF DEPOSITION: 9/11/2020
 4           WITNESS' NAME: Rahul Gupta, M.D.
 5           In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7           I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).
 9           I request that these changes be entered
      as part of the record of my testimony.
10
             I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____        _____
      Date                    Rahul Gupta, M.D.
14
             Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17           They have read the transcript;
             They have listed all of their corrections
18               in the appended Errata Sheet;
             They signed the foregoing Sworn
19               Statement; and
             Their execution of this Statement is of
20               their free act and deed.
21           I have affixed my name and official seal
22    this _____ day of_____, 20_____.
23                            _____
                              Notary Public
24
                              _____
25                            Commission Expiration Date
```

Page 349

1                    ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS MIDWEST
2                 ASSIGNMENT NO: 4242146
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____        _____
20    Date                        Rahul Gupta, M.D.
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                      _____
                        Notary Public
24
                        _____
25                      Commission Expiration Date

**[& - 2.32.]**                                                                 Page 1

| & | | |
|---|---|---|
| **&**   2:11,14,19 8:12 8:16,17 242:17 | | |

**0**

**00039036-091**
  6:18 60:23
**0038760**   5:15
  308:11
**0038761**   5:18
  308:15
**0047102**   5:21
  303:19
**0317258-322**   6:8
  246:24
**0391628-651**   6:13
  254:20
**0391630**   255:8
**07**   147:6 171:4
**09**   127:18 175:12
**0920**   101:20
**0925**   206:9
**0926**   213:24
**0936**   244:13
**0949**   104:3
**0951**   111:2
**0953**   112:9
**0954**   104:13 112:9
**096**   211:3

**1**

**1**   5:3 7:13 12:2,3
  12:10 13:11 182:9
  182:11,16 218:7
  246:5,9 297:21
  311:11 320:7
**1,000**   134:2 167:18
  174:16 178:15
  215:16
**1.1**   280:10
**1.8**   147:15 198:13
  266:17

**10**   124:11 134:2
  148:23 222:16
  281:22
**10,000**   269:19
**10-26-18**   6:20
  99:11
**100**   134:2 147:21
  164:15 166:16
  196:19 198:4
  203:16 215:15
  244:22,23,24
  245:3,4,5,22
  264:21
**10538**   344:19
  345:16
**106.7**   319:20
**10:11**   54:22
**10:26**   55:3
**11.63**   320:13
**1100**   346:1
**1148108-126**   6:16
  313:3
**1148109**   314:1
**115**   4:3
**11:53**   114:23
**11th**   1:21 7:4
  129:12,13
**12**   5:3,5 12:8 43:9
  45:22 103:7
  106:24 209:7
**12-13-16**   5:7
  299:13
**123**   122:18
**126**   302:6
**128**   5:7,8 299:12
  299:13,22
**12:00**   99:17,20
**12:30**   114:16
**12:34**   115:5
**12th**   129:14

**13**   97:12 246:2
  300:3,5 320:9
**130**   56:1 147:20
  264:20 329:17
**1332**   187:19
**14**   5:13 121:6
  127:20,21 246:2
  304:6 308:2,3,4,6
  308:17 309:7,8
**141**   5:5 12:8
**15**   5:16 16:23 75:5
  97:12,12 124:11
  162:6,16 281:22
  296:16 304:4,7
  308:2,4,6,17 309:7
  312:5
**15.6**   111:24
**150**   305:18
**15th**   344:17
  345:10
**16**   5:19 146:17
  303:15,24 304:2,4
  304:11,12,16,18
  304:22 305:1
  346:4
**16.9**   245:13,23
**1609**   3:5
**1630**   255:2,4,14
**1632**   256:2
**1634**   321:9
**17**   5:22 146:17
  182:8,13 244:12
  246:8,8 255:19
  260:22 303:13,15
  304:1,11,13,16,19
**17th**   321:6
**18**   175:12 209:7
  317:24
**181**   4:4
**1820**   346:2

**1860**   202:16
**188**   4:4
**1890s**   202:16
**19**   192:19
**1980**   191:2,5,8
**1987**   60:9
**1988**   60:9
**1990**   191:11,23
  192:11,12,19
  193:6,8,10 200:23
  203:13
**1990s**   140:8,17
  143:5 144:1 146:8
  146:17 148:8,12
  192:13,24 194:12
  202:8,10,15,17
  203:5 204:1,9,20
  205:8 211:20
  213:17 214:3,21
  215:11 221:9
  222:5
**1993**   120:1
**1994**   192:1
**1995**   89:13
**1996**   195:24
**1997**   148:14 222:7
  224:2
**1999**   40:3 192:19
**19th**   27:7
**1:48**   180:14,15,22
**1st**   316:7

**2**

**2**   55:2 107:8
  147:14 183:22
  184:2,4,13,19
  234:5 311:21
**2-0**   339:3
**2.3**   320:14
**2.32**   245:21
**2.32.**   245:19

**[2.79. - 303]**

**2.79.** 245:20

**20** 6:2 24:12 75:5
107:16 124:11
162:16 201:11
281:22 296:8,16
296:24 317:23
339:1,2,3,5,11
347:16 348:22
349:22

**20,000** 174:15
196:1 319:22

**200** 203:16 284:21
285:10 305:18

**2000** 73:18 96:10
146:17 156:10
157:3 158:1
182:20 191:13
192:14 193:3
196:21 198:8,20

**2000-2015** 144:24

**20001** 2:21

**20005** 2:12

**2000s** 78:8 79:12
204:12 283:12

**2001** 129:13,14
182:18 204:8,8,21
245:9,12,17,18
264:19 265:3
305:9,14 307:13
307:15

**2001-2015** 183:5

**2003** 156:10

**2004** 167:14
318:19

**2006** 147:6,19
171:4 196:1
264:20 265:5,9,12

**2007** 120:21 121:2
269:20

**2008** 156:18

**2009** 70:7 84:16,20
91:1 92:11 102:9
120:21 121:2

**2010** 121:6,11
145:19 156:18
191:15

**2011** 79:21 121:15

**2012** 89:16 147:6
246:2 264:22
265:3,5,10,12

**2012-2013** 161:21

**2013** 245:10

**2014** 11:7 84:20
91:2 165:24
305:17,21 307:17
307:19 318:12

**2015** 55:10 89:17
91:3 96:10 102:7
111:21 121:11,19
127:24 131:4
161:18 162:5,16
171:3 182:18
204:22 251:7
305:18,21

**2015-16** 134:13

**2016** 5:11 6:7
11:24 12:13 111:7
111:13,15,16,17
111:21 112:11
124:12,21 126:3
162:6,16 183:23
184:7,15 188:21
206:24 215:8
224:18 243:3,17
246:10,22 295:7
296:9,16 297:11
299:4 300:2,3,5
303:5 305:9,14,19
306:12 318:8,10
318:19

**2016/2017** 146:8

**2017** 5:16 61:10
111:9 112:3,11
124:13 167:17
182:8,14 188:17
188:20 207:10
209:10 245:13,17
245:19 280:9
308:11 309:16
340:3,19

**2018** 80:1 101:9
102:7 125:19
127:23,24 142:5
165:24 167:14
206:5 244:10
255:19 313:21
315:5 316:4 321:5
321:6

**2018.07.05** 6:15
313:1

**2019** 122:11
203:13 255:9

**2020** 1:22 7:4 23:3
27:8 73:17 122:12
191:17 344:17,18
345:11 346:4

**20th** 255:9

**216-523-1313**
346:3

**22** 24:16

**23** 6:22

**23rd** 61:9

**24** 89:24

**246** 6:5

**25** 178:8,11 201:11
284:12,15 344:17

**250** 178:13

**250,000** 178:17

**25323** 2:16

**254** 6:9

**25714-1180** 2:8

**26** 101:9 206:4
230:23 234:5
244:10 310:16,22

**26.3** 320:8

**26003** 3:5

**27** 310:17

**272** 125:19

**273** 125:18 142:5
225:6

**27th** 340:19

**28** 2:5

**29** 340:3

**29464** 2:5

**295** 5:9

**299** 5:6

**2:00** 181:4

**2:55** 226:22

**2nd** 315:5 316:3,7

**3**

**3** 64:19 115:4
256:1 302:16
311:12 312:1

**3-26&27-18** 6:7
246:21

**3-29-17** 5:15
308:10

**30** 103:9 104:2
105:15 107:2
108:20 126:5
127:6 149:15,16
156:3 178:8,11
180:3 207:6 223:6
223:7 247:14
260:20 284:12,15

**30-40** 180:10

**300** 178:13 284:21
285:10

**300,000** 178:17

**303** 5:19,22

**308**   5:13,16
**31**   110:17,18
**313**   6:14
**32**   110:18 111:2
**328**   4:5
**33**   158:22 167:20
**338**   4:5
**339**   6:2
**34**   112:8 306:14
**35**   104:13 112:8
    305:5,7,10
**35,000**   195:24
    196:1
**350**   305:18
**37**   6:5 246:17,18
    247:2
**38**   6:9 254:12,13
    254:22 321:1
**3:00**   296:21
**3:10**   227:3,23
**3:17-01362**   1:7
    6:23 7:20 23:16
**3:17-01665**   1:13
    7:20
**3:25**   240:18
**3:29**   240:23
**3rd**   2:8 23:3 24:12

### 4

**4**   5:6 79:15 211:7
    299:9,10,16 320:7
**4,000**   320:11
**4-21-17**   5:21
    303:19
**4-29-17**   5:24
    303:22
**4-4-17**   5:14,18
    308:8,14
**40**   103:9 105:16
    107:3 108:14
    180:1,2,10 312:9
    331:8

**400**   133:19
**422**   2:7
**4242146**   346:7
    347:2 348:2 349:2
**44114**   346:2
**45**   6:14 310:10
    312:22,23 313:5
**45-64**   319:19
**47700**   302:14
**4:45**   291:11
**4th**   5:14 308:10

### 5

**5**   5:9 97:16 172:12
    174:14,16 181:2
    295:2,3,10 321:7
**5,000**   270:1
**5-1**   61:3
**5-17-18**   6:13
    254:20
**5-27-17**   5:10 295:5
**50**   164:14 273:3
    305:17 331:8
**500**   229:12
**51**   6:17 60:20,21
    61:1,3 64:13
    90:15
**53**   297:1
**54**   6:19 99:7,8,13
    100:9 205:19
    214:1 244:8
**56**   6:22 23:6,8,9,12
    23:13,18
**57.8**   319:21
**5:02**   291:16
**5:56**   328:7
**5th**   313:21

### 6

**6**   62:6 206:8 227:2
    227:22 310:9

**6-3-20**   6:23 23:16
**60**   6:17 94:18
    320:9
**624**   303:5
**65**   319:19
**65.9**   319:22
**6:01**   328:12
**6:23**   343:10

### 7

**7**   211:2 240:22
**7-5-18**   6:16 313:2
**70**   248:16,16,20
    331:8
**700**   147:12
**707**   2:15
**72**   276:9
**725**   2:12
**780**   114:3 147:5
    198:12

### 8

**8**   291:15
**8-16-16**   5:3 12:5
**80**   157:22 166:19
    204:11,11 216:1,6
    217:11,16 219:22
    220:19 264:13
    265:8 273:6 331:8
**81.5**   319:19
**8109**   314:21
**8119**   317:5
**8123**   318:4
**83**   136:13
**83.7**   319:18
**85**   136:13
**850**   2:20 71:21
**8533**   296:15
**8:00**   129:15
    296:21
**8th**   303:5

### 9

**9**   4:3 328:11
**9-0**   193:9
**9-27-17**   6:4 339:9
**9-29-17**   6:4 339:9
**9/11/2020**   346:8
    347:3 348:3
**90**   166:19 204:11
    216:1,7 217:11,16
    219:22 220:19
**901**   2:15
**9039**   64:19
**9040**   79:16
**9042**   62:3,4
**90s**   147:24 195:20
    196:6,8
**92.8**   319:18
**99**   6:19 216:8
    244:24
**9:04**   7:3

### a

**a.m.**   7:3 54:22
    55:3 114:23
**abate**   48:18 52:17
    53:19 140:5
**abated**   158:14
**abatement**   288:7
    288:11,21 289:2
    289:14 290:7,8,14
**abating**   49:16
**abdc**   57:14
**ability**   13:21 20:23
    21:3 50:2 51:20
    57:11 84:11 141:5
    173:14 329:21
    345:8
**abject**   202:20
**able**   13:9,23 15:17
    15:19,22 16:10
    21:8 28:7 29:23

31:1,13 35:4,23,24
36:1,24 38:18,24
45:1 52:4 72:22
74:14 89:17 93:17
102:24 110:10
113:24 116:18,21
124:14 129:7
134:15,16 135:6
137:21 146:5,15
154:9 156:20
159:15,19 161:12
166:14,16 168:22
171:10,11 172:18
172:18 179:2
189:19 200:7
230:11 235:24
242:5 246:14
251:20,22 252:1
266:18 272:18
284:2 292:21
311:18 323:8
336:7 337:1,20
**abnormal** 194:6
202:21
**absolute** 144:4,5
148:22 222:15
326:3
**absolutely** 26:7
64:14 177:20
**abstinence** 97:17
136:20 168:13
170:17
**abuse** 35:11 45:17
48:14 52:1 85:4
154:16 161:23
165:22 311:5
321:23 331:18
**abused** 132:21
**abusing** 330:21
**aca** 145:18

**academic** 65:8
**access** 114:1
134:19,24 135:1
250:6,10,13,17,22
251:1,3,5,8,17,22
252:1,13
**accesses** 294:5,5
**accidents** 66:2
**account** 195:12,14
196:2
**accountable** 293:1
**accounted** 174:6
**accounts** 22:20
**accumulated**
200:6
**accumulating**
131:5
**accuracy** 112:6
297:20 301:10
315:19 318:23
320:2,20 325:23
327:7 341:14
**accurate** 13:5
98:22 195:2,13
200:18 226:4
250:9 252:3 283:1
319:7 326:13,15
**accurately** 13:24
62:11 344:9
**acetyl** 302:14
**acknowledge**
36:24 347:11
348:16
**acryl** 302:16
**act** 48:4 49:24
50:9,22 51:1
90:20 92:20 94:6
125:20 141:23
142:3,21 225:6
270:8 273:8
292:10,11 324:7

336:24 337:7,9
347:14 348:20
**acting** 160:9
**action** 1:6,13,20
5:5,17 7:19 8:3
12:8 24:10 49:14
266:23 267:10,18
268:10 274:2
308:14 309:18
333:10 344:12,14
**actions** 47:10,18
47:23 91:17 93:12
222:19 274:14
293:1
**activate** 337:7,10
**active** 63:18,21
177:2
**actively** 105:10
**activities** 251:21
336:13,14 337:2
337:22
**activity** 152:17
153:21
**actors** 40:23
190:23 273:8
**acts** 93:7,9,12 96:7
160:9 328:24
**actual** 97:24 114:2
114:6 211:20
280:18 298:2
**acute** 141:10,15
196:23
**acutely** 78:14
**adam** 3:8 7:22
228:18 286:10
334:8,6
**add** 82:24 97:20
172:1 252:17
285:14 336:16
**added** 245:2

**adderall** 172:3
**addicted** 132:21
149:22 150:6
154:9 155:19
158:11 159:8,10
159:10,11 160:1
163:7 164:19
166:3 169:16
172:6 178:2
179:14 221:13
223:14,21 224:10
224:15 281:2,10
282:9,19 283:4
284:22 285:11
311:21,22,24
312:2,4,5,8,10
**addiction** 47:3,4
123:3 130:23
139:5,7 149:4,22
151:6,10,14,14,17
151:23,23 154:1
154:10,17 156:13
158:3,12 160:22
163:18 165:7
169:16,17 173:13
175:2 177:19
178:14,18,18
179:18 221:14
222:21 223:14
225:21 274:20
275:11 277:5,16
278:4,7,11 279:11
279:17 281:16,24
282:22 322:1
327:14 333:21
334:3 336:21,22
**addiction's** 158:6
**addictive** 166:6
172:3 324:21
332:24

**addicts** 177:22
**adding** 200:20
**addition** 72:23
  73:4 105:12
  117:15 136:13,20
  185:6 190:22
  197:8 211:19
  229:5 234:6
  285:14 302:16
  321:24 327:13
**additional** 60:17
  145:17 211:3
  322:14
**address** 37:12,18
  37:19 41:4 46:4
  49:9 127:4 138:9
  142:22 256:14
  319:13 322:15
  346:15
**addressed** 313:12
**addressing** 40:15
  72:18 80:12 81:2
  332:2
**adequate** 151:7
  245:7 264:8 323:7
**adequately** 73:23
  198:14
**adhering** 272:10
**adjunct** 121:21
**adjust** 172:18
  196:10
**administer** 8:2
**administration**
  60:18 63:7 120:8
  190:16
**admitted** 65:24
**advanced** 60:14
  62:13
**adverse** 154:16
  205:14

**advisories** 300:8
**advisory** 5:8 48:14
  51:24 85:3 128:5
  128:8 161:22
  299:13,22 300:1,7
  300:11 302:5,5
**affiliations** 8:7
**affirmatively**
  284:23
**affixed** 347:15
  348:21
**affordable** 47:12
  90:20 278:16
**aforesaid** 344:4
**afraid** 277:3
**african** 69:1
  319:18
**afternoon** 328:19
**ag** 26:19
**age** 205:2,5 206:20
  213:6 319:19,19
**agencies** 58:3
  128:11 130:6
  256:19
**agency** 59:7
  190:18
**agents** 129:16
**aggressive** 179:16
**aging** 273:1
**ago** 9:10 19:21
  36:15 54:15 97:23
  106:19 290:4,6
**agonist** 160:7,10
  160:14,15
**agree** 7:11 14:16
  27:24 59:18 86:21
  86:24 87:2,6
  92:19 193:24
  198:11 256:23
  257:2 287:12,13
  287:15 291:2

311:7,8 322:9
  325:10
**agreed** 142:18
  207:2 225:7,12
  269:13
**agreeing** 142:15
**agreement** 159:1
  233:18 326:23
**agreements** 27:16
  242:12
**ahead** 12:11 13:10
  24:2,3,6 33:2
  49:20 51:13 54:17
  60:1 114:15
  115:11 141:9
  199:7 238:4 267:7
  283:7 292:5
  293:15
**ahold** 278:12
**air** 70:21,21 71:2
  131:3,8
**al** 1:8,14 5:4 7:17
  12:6 347:3 348:3
**alabama** 63:5
  64:23 65:5,6
  68:13 73:10 120:4
  120:17 129:4
**alarming** 302:20
**alcohol** 159:11
  311:21 319:15
  322:1 324:15,17
  324:23,23 325:3,5
  325:9,19 326:12
  326:14 327:15,18
  327:21 332:13
  335:14,15,18,23
  336:17
**alcoholics** 335:20
**alcoholism** 324:23
  335:24

**align** 271:14
**aligned** 271:17
**alimony** 93:6
**alive** 277:2
**allen** 309:9 339:21
  339:22
**allow** 134:24
  135:1 152:5 161:9
  175:2 276:5
**allowed** 19:22
  128:10
**allowing** 324:11
**allows** 161:8,10
**alluded** 298:2
**alterations** 316:11
**altered** 158:7
**alternative** 47:12
  163:9 278:16
**alternatives** 197:7
**amend** 186:11
**america** 206:24
**american** 10:16
  69:1 78:12,20
  101:23 259:3
**americans** 103:6
  106:23 319:18
**amerisourceberg...**
  1:7,14 5:4 7:17
  10:15 11:23 12:6
  12:14 21:23 57:6
  57:9,14 59:3
  346:6 347:3 348:3
**amount** 31:13
  83:3 113:18 126:4
  126:12 145:22
  151:1,7 157:4,13
  167:1 169:4
  176:16 189:19,22
  189:24 190:1,6
  191:24 193:22
  260:5 268:17

269:4,6 271:8 275:5

**amphetamine** 318:16 332:7 333:16

**anal** 216:14

**analog** 301:6 303:10

**analogs** 302:13,20

**analyses** 200:4 201:5,10,22,23 220:18 285:2

**analysis** 6:8 146:5 174:3 183:16,24 184:7,14,16 185:8 198:2 199:2,10,12 199:21 200:1 201:1,17 204:7,20 216:16,17 217:4 217:11,16,19 218:1,11,17 243:4 246:23 299:6 305:10 306:19

**analytically** 144:23

**analyze** 205:16

**anecdotal** 200:10

**animal** 152:19

**animals** 152:8

**anita** 314:3

**ankle** 260:23

**anne** 2:3 8:19 29:10 31:17 32:11 118:4 182:1 187:7 187:9,10,20 188:2 291:1 297:12

**annual** 111:17

**anonymous** 314:13,18

**answer** 14:13,15 17:24 18:1 19:9

33:8 35:7 37:2 41:3 49:20 50:7 50:12 52:15 57:5 73:7 84:12 88:8 89:3 90:6 98:22 104:18 106:4,8 175:15 180:9 198:19 200:10 211:16 215:24 216:23 217:3 220:9,16 221:10 221:18,20 222:1 224:3 227:20 228:16 231:2 232:16 236:9 238:2,13 249:18 250:1,20 252:10 261:20 263:18 265:23,24 267:5 269:9 278:22 281:10 282:24 331:22 336:11

**answered** 25:3 106:2,3 116:14 198:24 201:4

**answering** 204:16

**answers** 26:13 98:19 148:2 236:15

**antagonist** 160:14 160:18

**antibiotic** 67:9

**antibiotics** 66:18 67:8,11,18

**anticipate** 37:13

**antidote** 44:15

**antione** 2:19

**antonine** 8:16

**anybody** 105:17 135:1 172:23,23 236:13 343:7

**anybody's** 235:17

**anyway** 100:8

**apologies** 241:10

**apologize** 23:9 25:15 100:12 104:12 207:19 211:1 242:21 247:21 284:16 299:18 300:4 304:5,13 309:15 310:19

**appear** 29:2 184:20 347:11 348:15

**appearance** 8:10 29:9 239:14,15

**appearances** 2:1 3:1 8:7,24

**appeared** 117:20 122:21 185:19 186:2 239:4,9,20 240:2

**appearing** 2:2,10 2:17 3:2 118:5,11 185:23

**appears** 122:17 297:13

**appended** 348:11 348:18

**applicable** 57:5 187:16 194:1 300:18

**application** 94:4

**applied** 142:11

**applies** 187:5

**apply** 262:13

**appointment** 68:17 71:11

**appreciate** 26:15 98:17 112:22 189:12 208:13

247:22 286:4 298:15 338:19

**approach** 67:23 67:24 68:4,10 72:2,13 74:9 241:6,11 256:18 263:5

**approached** 77:6 77:11,15 241:15 241:18

**approaches** 321:16

**approaching** 77:1 77:4

**appropriate** 37:3 61:15 66:17,18,20 66:21,23 67:6 114:9 141:13,24 150:23,24 156:23 159:14 175:8 203:20 214:15 237:1 282:4,5 294:14 302:22 310:5,6

**appropriately** 28:24 224:5 282:7 283:3

**approval** 259:14

**approved** 159:4 160:5

**approximately** 16:17,20 25:21 39:20 40:2 89:16 122:18 147:15 174:15 180:10

**april** 5:14 308:9

**aquiring** 155:20

**area** 22:19 42:3 325:15 337:15

**areas** 38:7 64:3 124:2 140:20

197:3,8,11 230:20
**argue** 231:4
**arrangement**
287:20 290:19
**arrested** 293:7,8
293:15,19 294:8
**arresting** 293:11
**arrive** 198:6 218:3
245:22
**arthritic** 140:21
196:3
**arthritis** 140:22
143:11 145:14,17
197:20
**article** 344:15
345:6
**articles** 122:19
123:19
**ascertain** 13:1
**ascertainable**
88:19
**ascertained** 88:23
**ashley** 314:3
315:18,23
**aside** 13:11 18:18
24:23 63:9,14
190:20 258:17
268:21 293:18
299:3
**asked** 25:2 29:2,8
30:19 31:1 32:4
33:2 34:1,7,12,15
34:16 35:2 37:21
49:6 53:17 76:17
95:6 106:1 124:13
124:15 133:20
134:4 198:23
213:23 220:11
221:6 227:8 228:4
229:19,19,20
242:24 267:5

**asking** 13:3 19:6
29:1,6 41:6 48:2
50:20 52:12
105:21 130:3
164:4 229:21,22
237:14 259:8
269:8 280:20
281:9 326:23
**asks** 37:17 153:9
216:20 217:2
236:20
**aspect** 35:6 43:1
49:5 54:7 71:5
72:18 102:21
107:14 132:5
225:1 329:9,13
**aspects** 21:1 64:16
65:17 70:19 71:3
71:7 72:20 73:5
76:22 94:7 96:15
97:12 109:3 132:2
136:6 138:1
141:12 145:9
149:2 153:22
170:24 249:16
280:17
**asserted** 203:18
**assertion** 86:1
**assessment** 112:24
204:3
**assignment** 347:2
348:2 349:2
**assimilated** 18:22
**assistance** 101:13
126:23
**assistant** 65:9
120:16,20,24
121:9
**assisted** 314:8
316:22 317:9

**associate** 79:19
121:13
**associated** 31:22
175:19 243:11
254:2 256:16
**association** 300:21
300:23
**associations**
170:20 301:1
**assume** 53:5
**assuming** 248:5
282:5
**assumption** 144:4
157:3 193:16
194:19 195:1
199:16 200:19,24
213:9 247:19
248:2
**asterisk** 209:12
**attach** 333:4
**attached** 5:8,12
6:8 246:23 295:8
297:24 298:20
299:14 309:8,16
344:14 345:4
348:7
**attaches** 160:11
**attachment** 61:7
61:15 255:2,8
295:24 296:3
299:21 314:6
316:10,12
**attachments** 314:9
**attempt** 28:11
55:23 56:6 128:12
**attempted** 188:21
232:6,8
**attempting** 17:11
42:19 45:13 47:8
50:4

**attempts** 44:24
**attendees** 315:4
**attending** 8:6 42:4
**attention** 79:15
85:6,11,12 100:17
171:11,12 211:19
**attest** 37:15
**attitudes** 148:3
**attorney** 8:10 9:12
10:14 17:22 18:18
25:23 27:17
344:12,13
**attorneys** 15:2,3
15:15,23 16:1,2,4
16:8 20:10,19
27:4,5 28:8
**attributed** 136:16
303:10
**auburn** 66:8
**audience** 108:18
110:3,6,13
**audiences** 103:8
107:1 110:9,10
**audio** 7:9,10
228:21
**auds** 319:16
**august** 5:11 182:8
182:13 295:7
296:9,16,16
**authenticate** 93:3
**author** 296:6
300:6 309:22
**authored** 309:20
319:4
**authority** 49:8,23
50:1,21,24 51:20
52:13 91:16
251:11 252:15
329:8,12
**authorize** 348:11

**authorized** 8:2
36:12
**authors** 296:2
**automatically**
67:15
**autopsies** 132:6
**autopsy** 124:9,19
125:21 126:2
135:10 138:12
178:10 243:1
246:10 329:4
331:13
**availability** 22:11
30:20 141:6 310:6
**available** 29:22
47:11 96:9 113:9
113:15 126:16
146:16 155:7
178:21 189:4
242:9 257:16
278:20 298:6
342:21 343:2
**ave** 346:1
**avenue** 3:5
**average** 93:16
97:13 192:16
193:1 194:8,11,15
195:20,20 205:5
214:24 244:19
245:14,15,15
246:4,9
**avoid** 265:20
**aware** 15:7 20:17
23:1,4 24:18,24
25:5,6,7,8,9,11,24
33:23 40:6,11,17
41:8 51:16,19
53:3 56:17 78:14
84:24 85:13,17
109:19 114:6,7,7
190:23 257:18

258:6,8,18,22
259:16,18 274:1,4
283:6,16,18
293:13 330:11,17
331:21,23,23
333:15,22 335:12
**awhile** 320:3
**awkward** 115:22

**b**

**b** 97:11 136:12
164:20
**babies** 97:17
128:24 168:9
171:3,7,9 173:1,6
174:16
**baby** 46:6 97:19
168:12,19 169:18
169:19 170:8,9,14
173:1 174:12,13
174:14
**baby's** 169:20
**bachelor** 60:4
**bachelor's** 60:12
210:13 211:9
**back** 10:19 17:7
25:20 39:23 45:23
46:7 47:17 55:3
59:4,14 71:10
73:15 75:5 77:23
79:14 80:23 83:23
84:12 85:24 90:15
109:24 110:10
114:17 115:5,10
124:20 125:21
131:4 140:8 143:5
144:1 149:9 157:2
158:4 161:5,14
166:21,24 175:7
175:15 176:3
181:3 189:16
190:5 205:19

206:1 209:1 212:9
221:1 226:19
227:3,23 228:17
228:19 236:1
237:8 240:23
242:2 244:7
246:10 253:19
278:1 282:23
289:6 291:16
293:9 307:13
321:1 322:19
328:12 332:19
333:17 346:15
**background** 60:2
116:13 119:21
129:2 136:23
139:3 158:5
165:21
**backwards** 213:3
304:5
**bad** 44:20,21
46:14,21 72:3
73:11 74:12,18,19
74:19,20 76:7
131:1 163:6
179:11 262:24,24
**bag** 197:24 198:1
**balance** 329:19
**balancing** 273:8
**ball** 33:3
**bankrupt** 45:9
**bar** 245:18
**base** 83:9
**based** 11:19 18:13
35:21 40:4 72:1
83:12 102:24
110:9 126:1 139:2
156:15 157:24
158:5 159:2
165:19 192:22
196:11,23 206:23

215:8 217:7,7,17
220:10,11 234:3
242:9 261:6 263:5
263:17 283:12
300:16 316:23
317:11 321:15
**baseline** 143:19,22
143:24 144:8
157:2,8 167:3
192:2,9,11,17,21
193:15 194:16,19
195:1 196:9
199:16 200:19,24
202:1,10,11 203:6
203:10,22 213:9
213:18 214:5,19
214:20
**basic** 152:2
**basically** 94:23
116:16 124:22
128:24 129:23
130:1,3 134:16
150:23 152:23
153:8 154:5
155:10,17 156:1
158:16 160:19
164:22 172:4
174:5 176:24
177:3 178:14,23
179:18 190:1
214:13 242:11
**basis** 22:13 58:15
66:9 77:20 98:12
128:3 133:5 137:4
165:18 220:4,5
221:15 225:5
323:20
**bates** 61:20 64:18
79:16 101:20
104:3,13 111:2
112:8 206:9 211:3

244:13 255:2,3,7
255:14 256:2
296:15 313:24
314:21 317:5
318:3 321:9
**bathrooms** 165:11
**bayer** 10:19 11:1
**bear** 338:20
**bears** 208:22
**becker** 315:12
**becoming** 43:3
92:12 127:17
149:22 162:7
196:1 221:13
223:14,20 224:10
224:15 281:10
**began** 77:18,19
150:10 163:23
164:16 197:6
276:15 330:9
**beginning** 8:10
36:19 73:6 241:20
319:9
**begins** 55:1 115:3
181:1 227:1,21
240:21 255:2,7
256:5 291:14
328:10
**begun** 156:2
275:14
**behalf** 8:12 11:10
11:18,21 25:17
28:15 117:23
118:3,5 186:15,21
186:22 188:8
234:18 239:21
289:15
**behave** 169:11
**behavior** 153:11
325:13

**behavioral** 317:22
**behaviors** 324:21
336:12,12,14,20
**beings** 74:20
152:19 334:6
**believe** 10:19
11:14,19 12:1
13:7 37:24 52:21
62:6 79:23 83:6
84:17 87:7 89:10
90:2 93:4,24
96:13 118:10
119:9,10 129:14
136:22 138:24
139:4,6,16 140:12
140:15 144:20
148:5 158:6,11
175:17 182:4,20
184:3,6,8 196:22
206:10 216:1
224:2 225:4
229:12 230:6,16
239:9 242:17,19
245:22 247:9
273:12 277:24
307:18 311:15
315:8 318:2 320:4
329:3 342:23
**believed** 86:11
306:2
**believing** 221:15
**benefit** 73:16
**benzodiazepine**
132:18 336:17
**benzodiazepines**
321:21 332:11
336:9
**best** 13:21 14:2,12
20:23 21:2 38:11
53:5 57:13 74:22
88:8 90:6 92:14

92:16 132:23
146:11 157:22,23
159:6 175:24
176:6 200:23
202:8,11 203:5
217:6 224:17
263:20 331:18
345:8
**better** 26:13 42:8
55:23 56:6 59:9
72:7 83:17 132:10
135:8,11 179:12
187:12 243:11,14
250:6 279:18
**beyond** 17:15,21
27:14 28:3 29:8
40:22 83:11
173:20 213:6
242:6 289:2
**biased** 173:19
**big** 103:10 106:12
106:13,17 107:3,5
107:7,9,12,13,15
107:18,21,24
108:2 147:12
**bigger** 164:9
**bill** 74:23 76:2
125:18,19 142:5,7
225:6 283:11
313:13 315:2
316:2
**billion** 97:19
174:17,18
**bills** 125:22
**binge** 325:14
**biology** 60:11,12
**biostatistics** 194:5
**bird's** 35:17
**birmingham** 63:5
65:5 68:13 120:4

**birth** 36:21 170:21
320:15
**births** 174:15
320:10,11
**bit** 9:10 23:10 60:2
67:10,14 69:1
86:21 88:10
100:13,19 106:19
115:22 116:14
140:7 146:4,13
151:13 160:12
163:4,15 176:18
178:4 179:20
189:16,16 197:11
210:20 224:24
242:2,5 247:3
262:16 277:1
280:21 304:13
323:10 328:1
**bits** 116:15
**black** 89:3
**blair** 174:5
**blame** 83:15 98:12
102:22 103:20
293:3 325:5
**blank** 104:7
131:12
**blood** 197:23
333:23
**bloodstream**
169:24
**blue** 24:11 245:11
245:18
**board** 40:18,18
41:9,10,18,24 42:4
51:16,16,19,23
52:5,9,12,16 53:3
53:12,13,17 54:3
85:13,21 86:2,3,6
86:14 91:14,17,21
92:8,10,13 122:9

122:11,12 124:18
124:18 133:18
134:11,15 135:7
188:16 189:5,7
251:16,18,24
264:2 274:1
**boards** 93:9
123:13
**bob** 8:20 16:10
232:14 235:21
239:7 240:6
**bodies** 131:5,11,17
131:18 165:15
**body** 132:13
139:10 151:19
154:6,20 158:7
177:6,11
**boggs** 5:14 308:9
**bolus** 277:3
**bombarded** 74:6
**bones** 66:2
**boone** 5:4 12:7
**border** 248:23
**born** 97:17 168:19
171:4 172:5
**bottom** 76:15
79:18 96:19
100:20 111:10
160:19 204:17
215:21 263:15
340:12
**boulevard** 2:5
**box** 14:21 15:3,6
38:1 245:12
262:23
**bph** 296:24
**brain** 152:3,4,5
153:1,8,9,16,19,20
154:5,6,11,19
155:8,9 158:4
160:4,8 169:20

170:1 177:15
279:16 332:24
333:11,23 334:17
335:2,6,17
**break** 51:7,9,11
54:18 96:24 99:17
99:20 114:16
179:21 180:17
226:18 231:6
286:9,11 328:2
**breaking** 342:19
**breaks** 138:5
177:1 334:23
**breathing** 335:1
**bridgeside** 2:5
**brief** 16:6,19 59:8
**briefly** 30:11
120:16 181:6
**bring** 138:11
**broad** 35:17 65:21
159:1
**broadly** 18:13
22:8 42:8 90:2
151:17
**broke** 46:7
**broken** 66:2
**brought** 28:15
85:5,11,12 125:8
129:23 233:2,5
**budget** 45:7
**budgets** 136:15
**bug** 81:13
**build** 218:2 334:10
**building** 132:3
**built** 334:12
**bullet** 80:10 90:18
91:11 101:22
104:1 131:24
252:5,7,18,23
253:2 315:2,9
316:1,21

**bullets** 107:8
**bunch** 168:1
**buprenorphine**
160:6,13
**bureau** 9:15 22:17
30:9 31:8 39:19
42:16 48:10,23
91:8 101:13
183:12,18 184:5
184:21 206:24
243:5 250:22,24
251:19 296:23
301:4 315:11,12
317:20 326:2
**burling** 2:19 8:16
8:17 117:2
**business** 60:18
63:6 120:8,9
**bust** 163:6
**busts** 179:14
**busy** 122:14
**butyrnl** 302:15
**buy** 149:5
**buying** 280:16

**c**

**c** 5:5 7:1 12:8 97:7
106:6 136:12
234:5
**ca** 346:24
**cabell** 1:11 7:16
17:2 21:18 22:9
27:4 28:16 32:7
97:3 115:8 117:17
118:16,23 119:3
137:10 138:16
140:1 148:7
172:14 182:2
187:6,17,20
234:24 239:22
240:3 275:20
293:14 295:21

296:18 297:1,11
299:4 340:6,7,10
340:15 342:6
**cabinet** 149:19
223:11 225:19,21
226:2,10,14 294:1
294:21 315:3
316:2
**cabinets** 294:24
**calculated** 174:11
**call** 5:17 24:24
50:5 52:4,8 81:11
82:13 117:3
156:22 178:9
232:20 244:23
251:9 272:9
308:13 309:18
**called** 9:5 24:14
30:2 44:15 71:16
82:10 89:10,12
123:3 125:19
152:12 164:13
168:14 171:9
172:3 270:7 325:6
329:4 334:11
**calling** 293:2
312:19
**calls** 16:19,21
133:7 296:19
**camc** 71:15
**camera** 115:20
116:6
**campus** 72:16
121:11
**cancer** 66:1
140:19 144:11
145:5,23 196:12
197:18 222:8
281:4,6,8
**cancerous** 334:20

cannabis   320:12
capacity   130:7
    176:9 183:17
    184:4 187:8 217:1
    252:11
capita   111:17
    112:10
caption   344:6
cardinal   2:10 8:12
    8:14 9:12 21:22
    55:6,8,12 56:16
    57:1 59:2 188:9
care   45:4 64:4,22
    65:10,12 68:4,23
    71:21 72:8,24
    75:9 77:17 78:2
    85:7 90:20 129:3
    136:14 144:7
    148:2,11,11
    149:12 155:16
    157:9 159:7,14
    171:19,20 193:15
    196:14,20,23
    197:4,5,15 204:6
    222:4,4 223:3
    258:24 259:1,10
    260:19 261:14,19
    262:12 263:5,9,23
    271:13,21 272:5
career   71:18
cares   281:11
caretaking   84:6
    84:18
carey   2:14
carfentanil   302:6
    302:17
carnage   22:7
    130:8 265:20
carnal   131:21
carolyn   255:9

case   6:23 11:2,5,6
    11:23 12:14 13:6
    15:9 17:3 18:8
    21:16,24 22:4,5
    23:15 25:17 26:10
    26:11,16,18,19,21
    27:7,19 28:15,20
    30:13,15,17 31:10
    33:13,14 34:22
    35:4 53:6 54:8
    110:8 116:4
    117:24 118:22
    173:23,23 185:20
    185:21 187:18,20
    231:7,9,16,19,20
    231:22,24 232:4
    232:24 233:16,17
    233:19,21,22
    234:8,10,11,14,17
    235:1,2,3 236:21
    237:5,11,17,18
    239:5,6 240:4
    257:3 258:6
    272:14 288:10,18
    289:1,10 290:16
    290:16,22 330:12
    346:6 347:3 348:3
cases   10:12 11:9
    11:13 59:16 81:12
    82:11 117:18
    136:14 151:3
    171:17 197:18
    234:19 241:21
    290:20 297:1,2
cash   74:17
casualties   75:19
cataloged   125:6
categories   144:19
    213:3,5 261:20
    262:1

categorization
    261:5
categorize   261:13
    262:21
category   263:4,6
causal   312:13,17
causative   168:9
cause   85:23,24
    130:12 148:5
    175:9 221:7
    302:11 336:14
caused   77:22 83:5
    150:5 166:1 168:5
    274:6
causes   96:3 98:23
    137:1 139:22
    243:9 278:16
    321:22 330:4
causing   59:10
    153:1
caveat   33:22
    108:23 330:18
ccr   344:20
cdc   58:3 94:23
    123:20,22,24
    127:1 134:12
    142:19 188:21
    225:3 271:14,15
    272:7 325:12
cdc's   224:17,22
cdcs   215:7
celebrex   75:14
cell   7:7
cellular   7:6
census   206:24
center   2:20 24:11
    68:17 318:14
certain   93:4
    199:24 200:18,22
    216:3 239:18
    248:1 251:10

categorization
    272:17 281:16
    282:1,11,13
    306:17
certainly   31:12
    64:12 67:20 73:21
    137:16 161:21
    167:1 186:7
    197:19 274:17
    275:15 336:20
certainty   90:11
    181:17,18,18,18
    194:17 195:3
    199:20 200:8
    251:6 298:7
certificate   93:13
    348:11
certificates   62:23
    93:14
certification
    122:13,15 347:1
    348:1
certified   122:9,11
    345:17
certify   344:5,8,11
    345:4
chain   6:2,5 40:23
    105:2 109:19
    246:19 266:9
    339:6,19 340:5
chairman   97:23
    142:15 174:5
challenge   5:23
    58:14 103:4
    106:21 303:21
    321:24 324:16,18
    324:24 326:15
    327:13
challenges   35:3
    58:16 69:2 71:22
    72:19 80:13 81:3
    81:6,16 103:2

136:13
chan  121:18
chance  13:7 18:23
  142:24 143:2
  144:17 218:19,21
change  77:18 78:9
  79:4 129:8 144:10
  144:14 146:3
  148:2,10 153:11
  155:17 157:8
  161:16 167:24
  193:14 196:14
  199:14 222:3
  258:23 259:1,4,7
  259:10,16,17
  260:18 263:9
  329:21 341:18
  346:13,14 348:8
  349:3
changed  140:16
  144:7 146:7
  148:11,15,17
  149:11,15 156:10
  193:3 196:20
  197:5,15 222:4,8
  222:10 223:3,6
  263:22
changes  89:13
  104:22 138:10
  144:13,18 193:19
  194:20 205:1
  346:12 347:7
  348:7,9
changing  77:21
  78:7 79:3,12
  157:15,16 261:19
chapter  344:15
  345:7
characteristics
  135:8 159:17
  243:14

characterization
  291:2 327:17,22
characterize  73:11
charge  11:16
charitable  71:16
charity  73:3 276:8
charleston  2:16
  70:12 71:12 79:20
  80:9 90:17 91:1
  121:6,11,14
  131:23
chart  274:22
  275:12 307:23
charts  96:6
chase  2:15
chats  16:6
cheap  278:20
cheaper  47:11
  278:16
check  38:2 52:3
  61:11 89:5 90:8
  181:8
chemical  152:12
  176:22 177:4
  284:4,7,9
chemically  177:8
  177:13
chemicals  258:17
chest  63:1,10
chhd  296:19,24
chicago  62:17
chief  22:18 58:12
  125:15 127:13,22
  128:18,19 130:19
  132:11 253:2
  301:5 309:11,13
child  45:5 93:6
  133:12 147:21
  174:8 264:21
childhood  205:15

children  45:4
  137:6 150:3 155:3
  293:16
china  94:22
chip  176:2
choice  141:19,20
choosing  325:16
christenson  2:4
christina  255:10
christy  5:19
  303:16 341:6
chronic  87:1
  140:17,23 141:1
  335:20
circuit  5:4 12:6
  315:4 316:3
circumstances
  31:14 116:4
  141:24
cited  225:3 318:13
cities  46:7 126:20
  138:6
citizens  272:22
city  1:4 2:20 7:15
  17:3 21:18 22:9
  27:4 32:7 44:3
  68:24 70:13 115:8
  117:17 118:5
  131:2 182:2
  186:23 187:6,16
  234:22,24 239:11
  239:14 240:3
  346:6 347:3 348:3
civil  1:6,13,20 5:5
  7:19 12:7 237:16
  347:5 348:5
civilization  167:7
civilizations  166:7
claim  245:7
claims  326:20,22

clandestine  164:14
clarification  14:5
  208:24
clarified  237:9
  239:8
clarify  64:15,17
  87:8 214:9 234:16
  333:1
clarifying  35:9
clarity  286:14
clarity's  235:5
class  80:2,11 81:9
  82:5 90:19,21
  94:14,17,20 95:5,7
  95:23 96:2
classes  95:2
clean  70:21 298:20
clear  11:16 14:3
  18:21 25:15 26:9
  26:24 29:5 34:3
  34:19,24 43:3
  57:8 109:10
  117:15 129:21
  185:18,19 186:10
  197:24 199:11
  200:9,21 207:20
  208:7 210:16
  212:11,12 214:7
  214:10 216:12
  218:5 219:17
  220:17,21 231:14
  232:23 233:23,24
  235:7 241:22
  265:7 271:24
  306:8 325:7,22
  326:21 327:23
clearer  270:6
clearly  43:2,15,24
  81:20 146:19
  147:15,22 157:24
  187:23 260:21,24

263:1 264:19
265:5,21 266:18
272:13
**cleveland**  346:2
**client**  17:22
238:20 240:8
**client's**  272:3
**clients**  234:18
289:16
**clinic**  64:23 68:12
71:16 73:3,10
74:2 276:8 277:10
277:10
**clinical**  40:1 71:13
72:14,15 75:9
120:20 121:4,9
142:20
**clinics**  64:9 74:17
138:13
**clock**  43:10
**close**  114:7 331:13
338:13
**closely**  42:12
123:22 290:22
**closer**  187:13
**closest**  113:23
193:2 214:20
331:11
**closet**  149:18
223:10
**coach**  50:11
**coached**  50:8
**cobble**  324:10
325:16
**cocaine**  307:7,11
307:12,14,20,23
307:24 312:4
318:17 321:20
324:4 336:4,5,8
**cocktail**  165:24

**code**  71:1 344:16
345:7
**codeine**  258:14
**coff**  226:16
**coffee**  226:17
**cognitive**  320:15
**colantonio**  3:3 4:3
8:20,20 12:11,16
14:23 15:2 16:9
16:24 17:18,20
18:21 23:7,11,19
23:24 24:6 25:2,7
26:6,8,20 27:1
28:21 30:4,16,23
31:11 33:1,15,19
34:2,18 48:1
49:18 50:13 51:5
51:8,13 52:19
53:15 59:20 62:4
68:3 73:14 87:13
88:6 99:14,23
100:2,5 104:16
106:1,15 108:9
114:20 115:12,13
115:18,21 116:2
117:11,19 118:1,9
118:13,19 119:5
119:18,19 179:24
180:3,7,12,16,20
181:11,13,21
185:13,16 186:12
186:16 187:8
193:7,10 195:4,9
198:23 199:5,18
200:13 202:13
203:14,24 205:20
205:23 206:6
207:16,24 210:15
210:19,23 214:6
216:18,22 217:21
218:8,10,22 219:5

219:17 220:1
221:17,23 225:22
226:5,20 227:19
228:15 229:2,17
230:3 231:11
232:7,22 233:20
234:13 235:4,13
235:16,20 236:7
236:22 237:10,17
237:24 238:12
239:9 241:6
248:10 249:22
250:18 252:9
261:15,23 266:2
266:22 267:2,13
267:21 268:4,14
270:3 271:2,10
272:20 279:21
280:8 286:20
287:5,7,12,18,24
288:3,9,15 289:3
289:21 290:2,13
290:24 291:4,8
294:22 299:1
304:8,15,20 308:3
310:11 312:18
322:7,24 323:13
326:16 327:1,9
328:4 332:18
338:3 339:2,4
342:14 343:7
346:5
**colantonio's**  229:1
229:5,16 230:2
236:6 237:4
238:10,17 239:11
241:4,11 310:13
338:8
**cold**  67:17
**colleagues**  72:2
73:8,20 74:11

75:23,24 77:5,10
264:9
**collect**  246:14
**collected**  20:17
101:3
**collecting**  58:10
**college**  68:16 69:7
121:1
**colloquial**  119:15
**combination**
279:13 321:21
**combinations**
279:4
**combine**  160:17
**combined**  70:13
279:5
**come**  22:14,23
29:20 45:23 56:13
56:14 74:15 81:23
82:16 84:16 88:1
94:4 109:17
114:17 142:12
148:23 150:14
161:5 185:7
193:16 200:2
201:2,20 222:15
224:12,13 226:19
232:11 238:19
249:2 260:19
298:21 342:3
**comes**  32:2 85:17
88:15 92:1 107:5
147:4 201:15
215:13 272:8
334:22
**coming**  43:16
45:10 58:2 74:7
76:13 86:8 131:19
136:21 138:15
150:22 198:12
215:23 259:22

260:3 285:21
**comment** 267:3
**comments** 123:24
187:15 297:23,24
298:18
**commission** 1:11
7:16 78:18 183:20
240:3 259:3
309:24 310:4
329:9,18 344:17
347:19 348:25
349:25
**commissioned**
144:22 224:2
329:5 344:5
**commissioner**
9:15 18:15 19:17
20:3 22:17 30:9
31:8 35:16 39:19
40:14 41:15 43:2
48:10,23 52:6
55:6 56:20 57:10
57:15,21 59:5
85:3 86:4 91:3,7
91:12,23 92:2,4,9
96:8 103:4 106:22
113:24 124:14
125:13 138:14
143:7 161:18
183:11,18 184:5
184:21 199:22
202:23 217:1
250:21 251:7
300:9 309:23
310:3 326:2
328:22
**commissioner's**
143:6
**commissioners**
50:1

**commissioning**
299:6 329:14
**committee** 6:10
142:16 161:23
254:16 255:18
321:3,12,15
**committees** 48:22
**common** 201:21
201:23 202:18
**commonly** 320:13
**commonplace**
44:7
**communicate** 95:1
102:24
**communicated**
53:24
**communication**
28:5 314:23
**communications**
29:12 94:15
315:23
**communities** 50:3
81:4 113:19
**community** 47:1
80:12,16,18 81:1,6
81:14 82:23 83:7
84:6,18 85:7,8
86:13 135:20
137:6,7,8 150:2
161:12 169:9
192:22 206:24
225:11 259:13
277:19 300:15
**compare** 137:24
147:10 202:16
336:2 337:1,20
**compared** 110:19
147:13 167:9
209:7 336:6
**compares** 335:9

**comparing** 157:10
305:13 336:8
**comparisons**
335:23
**compelling** 147:2
**compete** 97:9
**complaint** 18:8,10
18:17 59:16
**complete** 62:15,19
**completed** 64:1,10
64:21 65:4 346:15
**completely** 276:19
276:20
**completion** 104:14
**complex** 103:5
106:23
**complexities** 103:1
**compli** 286:21
**compliance**
317:20
**components** 42:14
337:6
**compound** 177:12
**compounds** 65:22
177:1 337:6
**comprehensive**
55:24 95:17
256:18
**comprehensively**
56:12
**compromise**
142:19
**computer** 310:20
**computer's** 100:12
299:18
**concede** 247:10
**concepts** 69:23
**concern** 53:10,13
53:22 73:13 75:2
82:2 302:12 327:7

**concerned** 75:10
75:11 88:12,14
**concerning** 70:3
116:19 143:1
304:23
**concerns** 323:18
327:11
**concludes** 343:10
**conclusion** 193:16
194:2 198:6 200:2
201:3 220:19
**conclusions**
116:18 146:6
185:3
**concurrent** 297:6
**condition** 143:12
196:4 197:22
**conditioned** 131:3
131:9
**conditioning** 71:3
**conditions** 66:9
69:18 141:2 157:6
157:14 196:3
197:13,16 211:20
212:5,9
**conduct** 47:24
49:4,15 52:10
53:11,23 54:10
82:19 199:9
201:17 217:4
251:21 270:24
271:6
**conducted** 7:21
124:22 132:6
186:21 200:1,2
201:1,2 216:16
217:20 218:1
243:5 266:3 285:3
296:23 315:5
316:3

**conducting** 19:10
83:17 84:7 199:20
**conference** 5:21
303:18 305:4
**conferencing** 7:22
**confidence** 159:21
**confidential** 85:15
**confines** 135:4
329:13
**confirm** 231:6
**confirmation**
72:13
**conflate** 28:10
**conform** 250:1,2
**conforms** 202:18
**confounded** 170:5
**confused** 210:20
213:7 218:23
316:7
**confusing** 26:10
40:9 304:14
**congress** 255:18
326:24
**connection** 21:12
118:24 123:21
176:21 283:20
**connolly** 2:11 8:12
**consensus** 259:14
**consequence** 79:1
132:1,1 140:19
222:21 243:12
285:19
**consequences**
22:12 40:16 56:4
67:22 72:20 75:21
96:17 99:5 106:6
137:7 139:12,24
149:4 154:17
172:17,22
**conservative**
174:22,23

**consider** 30:19
66:21 141:16
143:23 208:8
209:19 210:4
211:12 212:16,17
213:24 214:2
268:9 269:22
337:14
**consideration**
196:11 212:20
**considered** 234:3
236:16 329:10
**considering**
208:10
**considers** 321:15
**consistent** 214:8
214:11,22 216:12
285:24 305:20
322:4,9
**consistently**
167:19
**construed** 144:8
327:11
**consult** 69:2 72:12
**consultant** 34:21
227:6,17 228:2,13
230:6,8,12,18
231:1,16,21,24
232:24 234:10
241:7,12,16,18,24
**consulting** 229:15
230:1,1 236:6,15
238:9 241:4 288:4
**consumed** 75:17
330:9
**contact** 17:6,11
25:16,24 28:11
29:17 40:17 86:1
**contacted** 27:3,6
28:14 59:6 241:23

**contain** 142:7
**contained** 185:9
**contains** 15:7
219:21
**contaminated**
179:3
**contamination**
277:4
**contd** 3:1 6:1
**contemporary**
5:22 81:3 142:23
303:20
**content** 322:14
**context** 33:13
55:12,15 59:13
144:24 149:11
221:5,19 223:2
256:24 257:19
260:18 267:15
322:8,10,15 323:8
324:1,6,8 326:7
**continue** 7:10 80:8
99:19 141:5
153:23 169:17
278:13
**continued** 17:15
52:24 54:24 73:2
115:1 136:11
150:10,18,19
180:24 226:24
240:20 275:16
291:13 328:9
333:9
**continuing** 230:13
**contradictory**
70:1
**contribute** 325:3
**contributing**
301:6
**control** 6:12 44:19
44:24,24 45:6

49:23 125:11
137:19 154:19
171:10,13 195:1
254:19 255:23
281:7,19 294:20
294:24 296:17
300:16
**controlled** 36:13
37:22 38:17 39:1
39:13 40:10,19
42:1,14 48:4
49:24 50:9,22
51:1 89:11 94:2
127:9,10 189:21
189:22 191:1
213:20 247:14
250:6 251:12
257:22 270:8,17
**controlling** 45:7
199:13 264:8
**conversation**
25:10 54:14 72:6
161:3 289:5
304:23
**conversations** 7:6
17:1,15 27:15
52:11 54:10,12
**convert** 179:17
**convey** 209:24
210:2
**conway** 124:7
**cool** 328:3,4
**cop** 253:9
**copied** 339:24
**copies** 19:13
**copy** 12:18 13:6
24:1 218:20
298:20
**copying** 15:21
**cord** 170:7

cordamine 334:23
core 330:22
corner 61:19
  100:20 176:12
  276:13 310:22,23
  317:17
corp 8:17
corporation 1:8
  1:14 2:17 7:17
  56:19,23 57:6,14
  59:3 346:6 347:3
  348:3
correct 13:8,14
  14:22 24:16,17
  38:9,19 39:2,7
  41:11,15,19,20
  48:11,14,15,18,24
  52:1,6 53:14,20,24
  57:11 60:13 86:23
  87:12 88:20 91:3
  91:8 94:10,11
  101:16 108:8,15
  108:18,19 110:20
  111:21,24 112:11
  117:19 118:9,16
  119:1,23 120:5,13
  120:18 121:7,15
  121:19,24 122:19
  123:14,17 127:15
  129:5 140:11
  182:6,19 183:6,7
  183:13,14,19
  184:22 185:4,9
  190:17,19 192:12
  196:24 200:12,15
  202:12 203:7
  207:4 209:11
  210:10 211:4,9,10
  213:21 214:5
  215:12 216:17
  223:24 227:7,18

228:3,14 231:12
231:22 234:12,23
243:6,9 244:4
248:9 249:9 250:8
250:11,14,15,23
251:3,17 252:5,6
253:15,22 257:10
257:13 259:5,23
260:4 262:6
269:16 270:18,21
271:1 272:19
274:3,7 275:18
278:21 279:13
282:17 284:5,8,10
284:13,22 292:19
295:13 300:2
302:8,21 303:5
306:6,7,12,15,20
306:21,23 307:21
309:12,18 311:5
311:12,13,16,19
311:22 312:3,11
312:15 313:13
315:24 317:17,24
321:3 330:5,6
332:12,14,16
340:4,16,19,20
342:1
correction 112:18
corrections 346:12
  348:17
correctly 80:14
  91:18 102:2 202:7
  246:6,7 256:21
  297:4 301:8,16
  306:3 315:7,13
  318:20 319:23
  320:17 322:2
  344:9
correlate 114:1

correlates 103:23
correlation 113:10
  166:11 312:16
cortex 153:10
cost 45:2,5 172:24
  174:11,19
costs 97:18 174:6
  174:7,8,9,9
council 48:13,14
  51:24 85:4 128:8
councils 128:6
counsel 7:15 8:5
  29:12,13,14,18
  50:8,10 59:6
  99:18,21 101:2,3
  114:17 115:7,13
  116:24 117:7,16
  117:17,23 118:8
  118:12 124:5
  166:23 185:21,23
  185:24 186:2
  204:4,5 214:14
  221:6 231:9
  233:18 234:10,11
  234:22,24 237:4
  238:18 239:4,7
  240:2 286:16
  288:22 289:8
  290:19 297:12
  344:12,13
counsel's 221:6
counseling 159:6
counter 145:15
  257:16,21 258:8
country 50:2
  80:24 97:8 104:23
  110:20 124:2
  126:20 129:19
  132:24 147:18
  205:12 256:11
  273:4 280:11

county 1:11 5:5
  6:3 7:16 12:7 17:2
  21:18 22:9 27:4
  28:16 30:7,8 31:6
  32:8 44:3 70:13
  70:18 71:7 97:3
  115:8 117:17
  118:16,24 127:14
  127:17,18 133:18
  137:10 138:16
  140:1 148:7
  172:14 182:2
  186:15,22 187:6
  187:17 235:1
  239:22 240:3
  275:21 293:13,14
  293:14 295:21
  297:1,11 299:4
  314:15 339:8
  340:6,8,11,14,16
  341:24 342:5,5,6
  342:18,21 343:1
  344:2,4 345:2
  347:10 348:15
couple 51:10 81:8
  154:3 182:3
  328:21 336:9
course 49:14
  93:11 102:8
  141:10 189:11,14
  193:13 229:15
  230:1 236:5 238:9
  241:3 294:6
courses 65:15,19
  69:11 70:2,5
court 1:1 5:4 7:18
  7:24 8:24 12:7
  14:11 26:5 187:9
  227:11 228:7,17
  228:23 230:4,5,15
  230:17 231:4

236:2 253:20
308:19,24 347:7
**courteous** 17:14
**courtesy** 27:12
28:4,18
**courtroom** 13:17
**cover** 64:5,16,16
183:3 255:1,8
295:12 298:19
299:20 304:6,12
304:18 309:7,8
338:16
**coverage** 74:5
**covid** 116:4
**covington** 2:19
8:15,16 117:1
**craig** 174:5
**create** 42:21
101:14 124:19
125:10 128:13
175:22 316:14,16
**created** 96:6
101:11,12 177:19
220:12
**credible** 46:22
214:16
**credibly** 215:17
**crescendo** 246:3
**criminal** 45:14
93:7 253:10
256:12
**crises** 72:18 95:20
**crisis** 6:11 11:8,15
11:20 32:6,20,21
32:22 34:14 35:12
40:16 42:20 45:9
45:24 49:10 52:14
52:23 55:16,17,24
56:8,12 59:9 81:3
83:4 94:16 95:1
95:13 96:2,10

98:1,7 99:5
101:23 102:9,11
103:14 108:21
128:13 133:22
136:8 139:17
142:23 144:23
145:1 156:16
158:10 163:23,24
164:1,2,2 169:2
242:1 254:18
255:22 256:6,8,12
275:14,14 279:1
321:16,19 324:2
329:10,15,24
330:4,23
**criteria** 202:3
**crook** 155:6
**cross** 124:15
248:23
**crouch** 313:13
314:14 315:3
316:2
**crr** 344:20
**cry** 165:9 178:10
218:2
**crying** 168:22
**csi** 124:23
**csmp** 89:12 248:23
249:2 250:11,13
250:23 251:6,8,17
252:1,13,13,16
**ct** 6:23 23:15
**ct2** 6:21 99:11
**curb** 47:18 86:8
**cure** 163:21
**cured** 158:13
**current** 26:19
37:21 56:7 164:2
209:16 311:17
**currently** 28:19
29:7 30:12,14

63:19,21 94:8
**cursory** 314:11
**curve** 196:7,10
**cut** 14:19 164:9,16
170:7,8 179:3
228:21 254:5
283:8 292:6
**cv** 128:6
**cycling** 173:17
**czar** 125:14

**d**

**d** 7:1 9:4
**daily** 58:15 65:22
66:8 69:15 73:21
98:12 128:3 133:5
137:4 165:18
200:5 201:7
**dam** 46:7 137:24
138:1,5
**dan** 341:6
**daniel** 341:6
**dark** 136:6 245:11
**dashboard** 285:20
**data** 5:20 58:10
68:5 74:9 75:3,7
79:8 83:11,22
96:10 111:9,13,18
112:1,3,6 114:2
132:23 134:20,24
135:2 190:6
202:20 203:19,20
209:16 211:20
220:6,14,15
248:23 249:1
250:7,11 251:17
252:1 280:18
296:7 303:17
306:13 318:10
323:8 325:12,18
325:19,21,23
331:2,18,23 332:6

335:9,13 336:1,7
337:24 342:7,8,8,9
342:11,19
**database** 90:9
249:20 250:20
251:12
**date** 25:4,6 36:21
55:9 61:12,14
102:6 207:9,10
209:10 317:21,23
346:8 347:3,9,19
348:3,13,25
349:20,25
**dated** 5:3,7,10,13
5:15,18,21,23 6:4
6:6,13,16,20 12:5
24:10,11 99:10
101:9 182:13
206:4 246:21
254:19 255:9
295:5 299:12
300:1,3 303:19,22
308:8,10,14 313:2
316:6 321:5 339:9
340:2,18
**dates** 17:7 62:11
**david** 2:14 8:13
**day** 1:21 51:4 58:8
74:4 92:3,6,6
105:16 107:17
114:11 131:19
176:7 212:5 216:2
263:15 265:16
267:9 273:17
275:8 276:21
296:22 338:19
342:16 344:17
345:10 347:16
348:22 349:22
**days** 126:5 127:7
149:15,16,21,23

156:3 159:24
160:24 168:20
221:12 223:7,7,13
223:15,20 224:9
224:15 225:8,10
225:12,14,18
247:14 260:20
346:18
**dc** 2:12,21
**dea** 35:22 36:1,5,8
36:11,11,16,20,20
39:13,17 40:6,23
53:4,7 87:10
93:13,21 112:14
112:16 189:16,18
190:8,15,20 191:1
249:9 270:20
292:21
**dea's** 191:10
**dead** 125:1 131:5
131:11,15 135:9
165:15
**deadly** 67:4,21
98:10
**deal** 58:14 128:2,7
133:4 134:8,9
136:5 140:24
281:24
**dealer** 276:19,20
**dealers** 165:8
**dealing** 58:8 103:2
130:10 136:19
164:1,7 167:10
**dealings** 11:20
**dealt** 97:6 130:4
135:13
**dear** 346:10
**death** 6:6 58:15
103:23 113:11
124:11 125:3,4
126:6,11 127:7

138:6 158:18
161:5 166:21
243:12,13 244:3
246:20 302:12
331:15
**deaths** 5:23 22:6
43:4 58:8 105:11
124:21 127:6
130:22 131:1
156:9 162:8,9,12
162:20,23 167:11
167:13,13 168:4
182:12,19 183:4
218:14 243:9,15
243:16,17,24
256:10,16 274:16
301:7 302:7,18
303:6,8,9,22 305:9
306:2,6,9,10,16
307:12,20,23
318:12,18 331:12
342:16,17,18,20
342:20 343:1
**decade** 192:19
193:14,17,20
200:23 201:24
202:5,9,11 203:5
203:22 204:2
213:17 214:21
319:17 325:1
**decades** 205:6
**decedents** 132:8
132:14 248:14,19
**december** 127:20
127:21 255:9
300:3,5 303:5
**decently** 72:13
**decided** 76:3
84:13
**deciding** 90:9

**decision** 59:18,24
242:9 271:7
**decisions** 28:7
75:8
**decline** 264:23
**declines** 124:10
275:11 307:3
**decrease** 111:20
111:23 275:10
**decreased** 146:18
**deed** 347:14
348:20
**deemed** 346:19
**defects** 170:21,21
170:22,23
**defend** 179:11
**defendant** 2:10,17
9:5
**defendants** 1:9,15
1:19 7:15 9:12
11:11 21:20,21
257:3 258:6,12
**deficit** 171:12
**define** 151:14
312:13
**definitely** 83:15
**definition** 151:15
**degree** 60:3,5,16
63:5 90:11 119:22
139:5,7,17 181:17
194:17 195:2
210:13 211:9,24
**degrees** 60:15
62:13 201:13
**delhi** 60:7 119:23
**delivered** 15:4
130:13 148:6
168:7 170:8
**demand** 101:24
102:4 103:12
105:2 107:13,19

107:22,23
**demanding** 155:20
**demographic**
193:19 199:14
205:1 207:21
211:3,6
**demographics**
195:15 206:13
213:24
**demonstrate**
92:18,22 124:5
**demonstrated**
280:1
**demonstrates**
274:22 283:17
331:3
**demonstrating**
93:8
**dental** 143:13
**dentist** 260:20
**department** 22:22
59:7 70:13,14,15
91:1 121:21
124:15 296:18
297:3 301:1 314:2
317:15 326:1
346:22
**departments** 31:7
175:20 302:19
**depend** 272:11
**depending** 28:22
**depends** 88:22
89:2,3
**depo** 180:5 187:19
**deponent** 3:2
23:21 29:22 54:20
62:5 114:21
115:19 185:12
210:18 279:22
323:4,16 338:22
343:5,16

**deposed** 10:18
21:12 22:21 31:20
59:12 229:20
**deposited** 168:6
**deposition** 1:19
5:3 7:9,14,21 8:22
10:5,14 12:3,4,10
12:18,23,24 14:22
15:8,14,16 18:20
19:8 20:7,11
23:13,18 26:14
55:2 60:21 61:1
99:8,13 115:4
181:2 182:10
185:20 219:12
227:2,9,16,22
228:5,12 229:23
230:14,22 237:5
238:18 239:16,17
240:22 246:18
247:2 254:13,22
286:24 288:18
289:5,9,12 290:17
291:15 295:3,9
299:10,16 303:15
303:24 308:6,17
308:19 312:23
313:5 328:11
338:11 339:5,11
343:15 344:5,9,13
345:4 346:8,11
347:1,3 348:1,3
**depositions** 10:9
18:14 185:22
186:3,3 239:10,19
239:21
**depressants**
105:12 279:6
**depth** 175:14
258:11

**derivatives** 301:13
**describe** 36:10
37:21 41:21 73:12
86:10 129:8 297:7
302:4,4
**described** 120:15
134:7,9 139:3
140:9 143:1
160:22
**describes** 90:18
91:6 297:9 315:1
315:2,23
**describing** 279:14
**description** 96:5
105:20
**designated** 119:3
119:6 231:1,6
238:22 288:14,16
**designation**
240:10
**designations** 181:9
**desire** 277:23
**desires** 151:20
**destroyed** 132:4
277:20
**destruction** 58:15
103:23 113:11
138:7
**detail** 41:21 58:24
75:22 322:18
**detailed** 148:20
200:3 201:5,9
**detailing** 95:13
96:2
**details** 37:18
39:10 57:1 222:13
224:2
**detected** 301:5,14
302:17
**detectives** 81:18

**detectors** 81:18
**determinant**
212:19
**determinants**
211:22
**determination**
216:5
**determine** 13:3
190:9 192:21,21
199:15 202:11
203:5,22 205:17
206:14 207:12
208:1,4 209:3
215:2 285:3,9
**determined** 30:24
35:22 190:4
203:21
**determining**
109:11 192:10,17
193:13 199:12,16
200:19,23 209:19
210:5 211:12
213:17 214:2,4
**devastating** 56:7
**devastation** 59:10
**develop** 169:16
250:4
**developed** 42:8
131:11 258:1,3,4
285:20
**developing** 169:22
170:2,5 258:7
281:23
**development**
67:11 103:15
174:9 310:4
**develops** 170:4
**dhhr** 5:15,18,21
6:8,13,16 136:16
175:19 246:24
254:20 255:8

301:4 303:19
308:11,15 313:3
313:13 314:1
315:3,11,12 341:7
342:12
**diabetes** 197:23
**diagnose** 171:23
**diarrhea** 81:12
82:11 168:24
**die** 133:13,14
138:22 151:5
164:24 165:7,8
169:2 179:2 217:4
276:24
**died** 110:7,7 126:8
126:8,10 163:1
178:16 247:12,15
248:17,21 331:15
331:19 340:10,15
**dies** 167:4 178:7
**difference** 157:18
178:24 245:13
279:3
**different** 30:22
56:2 67:10 69:2,6
122:22 123:13
160:9 169:10
175:13 179:20
234:10,14 239:2
239:24 244:20
278:17 280:21
285:15 298:12
314:15,18 324:18
325:14 329:17
334:13,13,13
335:19 336:24
337:5,11,11 342:5
342:5
**differentiate** 35:4
168:16

**differentiating**
337:8
**differently** 169:12
263:17
**difficult** 10:20
42:6 55:14 66:14
135:22 140:23
176:14 198:11
224:24 298:8
**difficulty** 45:6
**digits** 64:18
**diligence** 82:19
83:18 84:7 130:2
265:16 266:4
273:22
**dimes** 128:14,20
128:22 173:3
**diminish** 319:13
**diploma** 63:2
**direct** 29:16
100:17 113:10
117:6 166:10
296:14
**directed** 49:3
93:21 300:20
315:3
**directing** 231:2
**direction** 101:16
185:1
**directions** 195:13
**directly** 136:7
137:19 169:3
268:24 331:22
335:4,16 341:3
**director** 70:17
123:23 127:1
317:19
**directors** 300:17
**disability** 197:21
208:4 209:2,6
213:6

**disabled** 207:14
207:23 273:3
**disabling** 140:17
140:21
**discern** 146:15
**disciplinary** 91:17
**disclosed** 23:2
233:13,15 234:5
239:6 289:17
**disclosure** 233:24
**disconnected**
227:12 228:8
**discriminate**
177:16
**discuss** 77:19 78:6
98:23 99:3 102:10
107:12 113:6
238:20 324:18
**discussed** 62:13
66:9 77:20 90:24
103:18 199:14
206:20 288:10
**discusses** 101:22
**discussing** 66:11
216:15 246:11
**discussion** 90:21
96:5 99:3 103:13
104:5,14,20
105:22 109:4,6,10
109:12,14 110:11
110:16 225:9
227:10 228:6
235:19 242:7
329:3 340:6
**discussions** 53:24
95:3 289:10,11,19
**disease** 63:10
140:22 154:1,4
278:4,8,10,15
**diseases** 63:2
127:3

**disorder** 5:17
171:13 278:9
308:12 309:17
324:15,17 325:9
326:12
**disorders** 319:14
319:14,16 320:12
**dispense** 39:5,13
**dispensed** 43:18
88:5 89:24 90:1
**dispensing** 39:16
42:11 82:22 105:6
**dispute** 301:10,18
301:23,24 302:2
302:23 303:1
318:22
**disrespecting**
131:15
**dist** 6:23 23:15
**distill** 103:5
106:22
**distinction** 232:6
279:2
**distribute** 257:4,6
257:9,12
**distributed** 266:16
300:15,21
**distributing**
257:17 258:19
**distribution** 35:14
35:19 39:16 40:10
40:12 41:7,14
42:1,10 48:21
105:5 137:22
193:21 292:17
**distributor** 76:24
77:7,12 268:7,12
269:15
**distributors** 35:24
41:8 43:17 47:24
48:5 49:4,15

51:17,21 52:10
53:1,11,23 54:11
58:22 77:3 190:10
246:12 247:7
250:10 257:17
258:13,19 259:19
265:14 266:5,7,8
266:11 268:20
270:9 274:3
292:22 294:20,23
**district** 1:1,1 7:18
7:19
**diversion** 44:9,11
46:2 149:6,24
150:1,7 151:2
154:16 156:5,6
157:18 163:14
193:22 223:16
225:15 226:3,11
260:11 261:22
262:5,14,18
280:15 291:18,20
291:21 294:2,7
328:23 330:22
**diversions** 163:21
**divert** 154:23
**diverted** 114:13
150:20 155:13,24
156:5,6 157:23
163:16 166:11
169:4,7,15 178:20
178:24 204:12,14
216:7,7,8 249:1
260:10 262:4,19
278:10 280:12
**divide** 245:21
**divided** 245:3
**doc** 81:12
**docs** 44:20,21 76:7
163:6 179:11
262:24

**doctor** 8:21 9:9
12:12,16 15:4,13
15:24 21:11 23:5
23:23 24:9 25:15
27:3,22 29:11,13
29:20,24 30:2
31:3,18 32:18,23
33:3,11,17 34:11
34:19 35:7,13
36:10 38:23 46:1
47:15 48:9 49:13
49:20 51:15 54:19
55:5 60:16,19
61:5,13,18 62:20
73:7 79:14 94:8
98:17 100:1,14
106:21 114:14
115:13,14,23
116:3,11 117:4,5
117:16,22 118:22
119:20 150:13
155:1 180:5
181:14 182:1,17
183:11 184:3
185:11,23 186:21
187:4 188:1,7
191:23 198:17
199:7 203:4
205:18 210:9
211:1 213:8,16
216:14,21 217:13
219:8,20 221:1
227:5 228:1 241:1
242:24 244:7
247:5 248:24
254:12,24 255:11
275:2 280:20
286:8,14,17
289:20 295:2,13
295:14,14 298:15
298:22 304:3,22

309:6,13,15
310:16 312:21
315:12 322:10,17
323:1,11 325:7
326:6,21 328:13
328:18 338:5,17
339:13,17,21,22
343:3
**doctor's** 119:22
171:22 323:18
331:1
**doctors** 46:14,21
72:3 73:11 74:12
74:19 112:15
196:15 198:4,7,20
332:3
**document** 24:23
25:12 61:6,19
62:1 100:15 182:8
183:3 188:24
255:7,13 279:23
295:18 297:9,15
305:8 315:16
316:6,13,15,16
317:23 318:3
322:12,13,16,16
322:20 326:23
339:14
**documentary**
123:2,6
**documentations**
15:18
**documents** 15:7
15:10 18:6,19,23
19:7,10,11,15,19
19:20 20:1,6,13
20:18,21 21:4,5
62:1 93:2 100:24
101:1,5 182:5
184:9 188:11
189:9 306:22,23

314:23
**doing** 25:14 69:15
70:10 83:2 96:19
103:24 115:22
130:1 131:13
133:1 138:11
175:10 183:17
198:4 263:2,7
269:5 272:12
273:6,9 274:3
294:8 325:15
327:19 333:16
**dollars** 97:19,19
138:17 174:12,17
174:18 329:19
**donate** 73:3
**door** 88:15 133:6
**dopamine** 152:12
152:14,21 153:2,5
332:17,23 333:9
333:10,20 334:3
334:17 335:5,10
335:17,23 336:5
336:15,19 337:2,3
337:7,21
**dora** 6:14 312:24
313:8,10,17,18
**dose** 153:8 276:23
277:1 334:7,10,14
335:11
**double** 320:9
**doubt** 13:5 73:17
112:5 166:10
168:8 313:15,19
315:21 320:1,19
341:14
**douglas** 2:14
**downstream** 44:1
44:23 83:3 137:13
138:4,7,19,20
173:7 175:10

179:13,16 265:20
265:21
**downtown** 68:21
**dr** 5:3 12:4 187:15
227:15,20 228:11
228:16 315:10
**draft** 34:12 61:16
142:6 297:13,16
**drafted** 142:9
**dramatic** 148:6
221:7
**dramatically**
318:12 319:16
**draw** 79:15
**drink** 152:13
**drinking** 152:14
325:14 327:21
335:15
**drive** 75:8,8
150:18
**driven** 45:10 68:5
74:9 75:3 103:1
**driver** 72:21 104:6
256:10
**drivers** 104:8,11
104:15 105:23
106:14 107:6
108:6,12 109:12
**drives** 159:21
278:15
**driving** 71:20
273:6
**dropped** 74:8
**drops** 277:9
**drove** 150:17
**drowning** 44:2
**drug** 1:7,14 5:23
6:12 7:17 57:6,14
97:11 125:11,14
132:2 134:14
136:8 153:12

163:5 165:8 167:5
172:3 173:6
179:14 182:12,18
183:4 190:15
247:13 253:13,20
253:23,24 254:19
255:23 258:19
276:19,20 278:3,5
278:19,20 279:10
296:17 302:11
303:4,21 306:6
311:12 312:14,14
320:13 333:8,17
346:6 347:3 348:3
**drugs** 47:14 82:22
105:10 132:8,13
132:17,18,20,22
153:23 154:16
158:11 163:11,14
163:16,17 165:24
166:12 169:4,7
172:8 178:21
189:20 244:16,19
245:15,15 252:21
252:21 253:14,22
254:2,7 256:15
258:2 274:12
276:21 279:10
280:2,22 293:17
305:8,11,23
306:15,18,20
311:12 321:20
324:3 325:1,4
**dry** 275:6
**drying** 163:15,17
179:16
**due** 82:19 83:17
84:7 130:2 251:22
265:16 266:3
273:22 277:23

**duly** 9:6 344:4,6,7
**duty** 78:3 265:15
**dvts** 75:21
**dwarfed** 150:24
**dying** 46:9 98:2
125:5 126:4
151:10,10
**dynamics** 106:9
144:10

**e**

**e** 5:6,9,13,14,19
6:2,5,14 7:1,1
17:6,8,12 27:10,13
28:1,17 61:7,12,14
242:21 246:19
255:1,9 295:4,12
295:22 298:20
299:11,20 303:16
304:6,12,19 308:7
308:9 309:7,8
312:24 313:7,9,12
313:16,20 316:11
339:6,19,20,21,24
340:2,5,13,18,21
341:3,4,9
**earlier** 39:4 77:2
85:19 86:1 128:9
184:15 185:17
239:9 251:15
260:2 277:24
284:11 324:20
329:2,17 333:2
**early** 169:1 283:12
**earth** 176:1
**ease** 323:18
**easier** 62:7 100:19
102:18 163:3,4
323:10
**easily** 100:8
**east** 2:15

**easy** 77:24 102:19
102:20 104:17
134:21
**eat** 152:9,10
**eating** 56:8
**eco** 94:22
**ed** 297:3
**edges** 45:8
**editor** 283:13
**editorial** 123:13
**educating** 46:2
82:12
**education** 62:9
63:16 66:6 94:20
95:18 133:18
203:1 319:20
**educational**
119:21
**effect** 246:3
**effects** 137:1 138:4
138:7 158:7,10
170:19 172:24
334:18 337:2,3,21
**effort** 98:11
142:22 148:10,18
222:3,11
**efforts** 44:1
175:13
**eight** 25:21 27:11
171:4
**either** 17:2 135:1
151:24 185:1
192:23 260:10
278:24 287:17
**elected** 293:15
**electronic** 37:11
88:22
**electronically** 21:2
**elements** 163:2
**elevated** 332:23
334:2

**elicited** 199:10
202:4
**eligible** 38:4
**else's** 293:17
**email** 346:17
**emanate** 94:4
**embed** 134:15
135:6 251:15
**embedded** 81:1
251:18
**emergency** 64:5
74:3 285:22
296:20 297:2
302:18
**emerging** 256:15
321:22
**emperical** 336:7
**emperically** 335:9
**emphatic** 147:8
**empirically** 337:1
337:20
**employed** 344:12
344:14
**employee** 56:16
57:3 135:7 251:18
252:1 344:13
**employees** 101:13
**ems** 124:17 296:21
**enclosed** 314:22
346:11
**encounters** 297:3
**ended** 125:22
142:21
**ends** 62:3 79:16
101:20 104:13
211:2 244:13
255:13 256:2
282:9 317:4
**enforcement**
130:6 132:1
134:19,23 163:5

165:3 190:15 256:14,19 272:2 294:19
engage 153:21 159:4
engaged 40:15 78:4 288:4
engagement 235:11 237:23 286:15 287:23,24 288:1
england 283:13
enjoy 172:19
enormous 45:5
ensuing 35:12
ensure 82:21 86:7 270:9 272:1 292:17
ensuring 19:11 81:2 95:16 264:4 264:10 292:23
enter 36:20 89:23 98:2 175:2
entered 348:9
entire 55:21 93:15 105:1 106:8 108:14 154:20 172:13 175:23 192:19 243:12 262:21 277:19 347:5 348:5
entirety 106:8 109:7
entities 27:6 123:13,17
entitle 231:23
entitled 1:20 6:10 117:5 230:6,16,24 254:16 316:22
envelope 100:6

envelopes 206:1
environment 68:24 214:3 263:22
epidemic 5:17 31:20 32:10 96:4 96:16 101:24 103:16 105:24 108:13,21 113:1 135:14 139:18 166:22 168:10 308:13 309:17 321:19
epidemics 96:16
epidemiological 194:6
equally 57:5 262:13
equivalent 170:10
eric 147:4
errata 12:19 346:13,18 348:7 348:10,18 349:1
erroneously 171:24
errors 13:8
escalation 153:7 334:7,10
escape 102:9
especially 136:23 140:18 169:2 337:19
esquire 2:3,4,6,11 2:13,14,18,19 3:3 3:4,8,9 346:5
essence 87:20 142:19 168:17
essentially 103:14 125:23 128:3 297:7

establish 17:11
established 89:13 224:16 324:4
establishing 17:10
estimate 217:7 218:3 265:2
et 1:8,14 5:4 7:17 12:6 347:3 348:3
ethical 148:21 222:14
evans 1:21 7:24 253:18 344:4,20 345:3
event 148:9 222:2
events 205:15 302:3
eventually 156:4 279:19 288:17
everybody 115:15 129:19 142:18 175:18 176:5 264:11 265:17
everybody's 102:13
evidence 72:1 74:10 75:3,8 102:24 126:1 159:2 186:20 193:23 199:1 200:10 208:23 215:8 245:7 259:18 263:5 274:9,10 316:23 317:11 321:15 326:19 327:15,16 327:18
evidentiary 180:5
evidently 231:8
evolution 109:1 161:15,16,19 165:17 166:12

253:23 275:17,20 279:15
evolve 163:23,23 254:5 275:16
evolved 103:22 279:2
evolving 6:11 79:12 108:21 254:17 255:22 256:6,9 275:13
ex 5:4 12:5 91:13 92:5
exact 80:3 89:18 282:12 285:7 333:22
exactly 17:7 40:2 50:4 51:2 64:15 71:9 89:18 217:9 231:13 282:15,24 284:19 333:18
exam 122:12
examination 4:1 9:7 116:1 117:6 122:15 181:23 188:5 310:13 328:16 332:18 338:8,23
examine 142:24 143:2
examiner 124:18 130:20 131:23 132:11 301:5 309:12,13
examiner's 58:13 131:6 252:5,23 253:3
example 41:7 67:13 75:12 76:1 81:19,21 82:15 83:1 88:11 94:16 96:14 123:6

**[example - fact]**                                                          Page 24

124:16 144:11
145:6 194:22
195:19,21,22,23
197:17 201:16
243:20,22 258:14
259:2 264:5 276:6
306:11 327:12
330:13 337:9
**examples** 67:21
81:8 123:1 141:2
**exception** 134:1
**exclude** 338:8
**exclusive** 54:6
**exclusively** 33:7
38:22 109:2 197:3
249:4 305:22
**excuse** 257:14
259:12
**executed** 348:10
**execution** 347:14
348:19
**executive** 94:20
**exhibit** 5:1,3,6,9
5:13,16,19,22 6:1
6:2,5,9,14,17,19
6:22 12:2,3,10
13:11 23:5,13,18
60:20,21 61:1,2
64:13 90:15 99:7
99:8,13 100:9
182:11,15 183:22
184:2,13 205:18
205:19 214:1
218:7 219:4 244:8
246:17,18 247:2
254:12,13,22
295:2,3,9 299:9,10
299:16 303:13,15
303:24 304:2,4,6,7
304:11,11,12,13
304:19,22 305:1

308:2,2,6,17 309:6
309:7,8 312:21,23
313:5 321:1 339:1
339:5,11
**exhibits** 219:11
309:21
**exist** 272:11
331:23
**existed** 143:5
167:6 279:7
**existing** 59:23
270:13,14
**exists** 138:17
152:8 218:12
220:13 307:5
**expand** 173:5
197:8
**expanded** 289:1
**expanding** 197:10
197:11
**expansion** 90:19
145:18
**expect** 13:13 30:3
31:9 53:12 271:23
**expectations**
176:14
**experience** 18:14
30:5 31:4 34:13
36:11,16 41:4
116:13 129:3,4,8
134:6 136:1,23
139:2,4 158:6
165:22 200:3
201:5,9,12 202:24
203:1 217:7,18
285:24 337:18
**experienced**
143:24 330:19
**experiences**
132:20 234:4

**expert** 11:13 33:12
34:4,9,12 119:3,6
119:10,12 202:21
220:23 227:6,16
228:2,12 229:15
230:1,10,19,19
231:2,7,9,16,17,18
231:18,20 232:2,4
233:16,16 234:1,3
234:6 236:6,15
238:9,20,21,23
239:6 241:4,7,12
241:15,18,24
286:18 288:4
289:17 290:20,21
337:14,15,16
**expertise** 30:5
31:4,13,14 32:19
200:7 201:12
202:18,23
**experts** 94:21
125:9 230:9
**expiration** 347:19
348:25 349:25
**expires** 344:17
**expiring** 37:6
**explain** 26:13
102:15 108:12
109:16,17,18
115:6 196:4
208:14 211:16
213:13 290:3
**explained** 131:13
163:18
**explaining** 103:11
324:12
**explanation**
103:14
**exposed** 205:15
**exposure** 334:2

**expressed** 220:23
229:13,23 236:4
238:7 241:2
**expressing** 75:2
**extensive** 31:19
32:5 38:13 220:12
**extent** 32:2 33:19
36:7 38:14 57:18
79:4 99:1 109:19
187:3 190:12
215:10 264:7
296:5 330:14
332:6 337:4,12
**extraordinary**
116:3 148:17
169:11 222:10
**extravagant** 76:19
**extremely** 103:5
106:22 151:1
**eye** 35:18
**eyre's** 147:4

**f**

**faber** 117:18
**fabricated** 82:18
**face** 72:19 88:21
264:12
**faces** 79:1 264:10
**facets** 96:15
105:13
**facilities** 47:4
126:15 151:8
317:22
**facility** 88:13
**facing** 34:17 35:10
142:23
**facp** 6:18,20 60:23
99:10
**fact** 17:5 31:24
59:1 87:17 129:11
131:16 158:21
201:24 205:10

207:6 222:24
232:7,8 244:15
246:1 250:21
262:23 271:5
279:9 324:9 331:2
333:18
**factor** 205:14
207:15,21,21
209:1 211:11
216:10 259:15
334:5
**factories** 258:2
**factors** 98:24 99:4
103:15,18 104:21
104:24 110:12,13
112:24 113:8
195:11 196:11
199:13 200:4
201:6 209:18
210:10 211:4,6
212:2,19 215:2,3,3
216:4 220:24
243:11 325:13
**facts** 34:9
**factual** 34:5 234:1
**faculty** 68:15
71:11,13 79:23
94:15,24 121:4
**fail** 172:11
**failed** 83:7 85:7
**failing** 84:6
**fair** 20:1 32:11,13
68:2 87:3 88:2
99:22 112:23
144:3 146:2 154:7
192:3 197:22
198:9 217:20
324:11,23 325:5
326:13
**fairly** 144:8

**faith** 263:21,24
273:9
**fake** 129:24
154:24
**fall** 274:16,17
**fallen** 176:13
274:13
**false** 198:6 326:9
**familiar** 12:22,23
33:12 36:6,9 39:9
61:5,6 100:14,16
101:4 142:1 185:2
255:14 295:18
299:20 339:13
**familiarize** 339:16
**families** 58:6
133:5,8,16 150:5
**family** 64:4 136:17
161:2,4,12 173:14
173:18 174:1
280:15 294:1
**far** 57:20 74:15
88:16 106:13
117:4 159:16
186:4 193:18
236:1 248:5 259:9
278:19 288:5
307:12
**farrell** 2:6,7 8:18
8:18 28:14 29:19
29:20 187:7
**fast** 211:2 338:21
**faster** 98:20
**fatal** 6:3 178:12
244:19 245:16
279:20 284:12,14
284:20 285:3,9
339:7 340:10,15
**fatality** 6:7 183:23
184:7,16 243:3
246:22

**fatally** 340:7
**favor** 194:10
**fbi** 129:16
**fda** 94:23 159:3,3
160:5
**fearful** 129:19
153:18
**feature** 123:7
**featured** 123:4,5
**fed** 164:12 168:22
169:21 333:13
**federal** 1:20 49:24
58:3 138:3 148:16
173:21,21 190:18
222:9 230:15,23
231:3,4,18,20
232:4 234:7
236:14 237:15
270:13,14,16
271:5 272:2
292:16
**fedwv** 5:15,18,21
6:8,13,16,18 60:23
246:24 254:20
255:8 303:19
308:11,15 313:3
314:1
**feed** 153:22 155:9
169:17 177:11,15
**feeding** 169:23
177:15
**feel** 95:16 152:8,10
152:11,21 153:5
160:24 161:4,4
323:5,7
**feeling** 160:16
**feelings** 161:4
**fees** 37:3
**feet** 327:20
**fell** 76:6,8

**felony** 37:16
**felt** 72:24 74:24
261:18,18 263:6
263:10
**fentanyl** 105:7
155:7 164:13,14
165:23 166:13
179:17 254:5
256:9,15 257:7
277:4,4 301:14
302:14,15,15,16
302:16,20 303:10
303:10 305:12,15
305:16 306:2,10
318:11
**fentanyls** 301:6
**fewer** 149:23
**field** 181:19
200:11 201:12
203:1
**fifteen** 308:22
**fifth** 78:13 79:3
305:11
**fight** 175:21 267:9
**fighting** 98:1
**figure** 33:3 44:18
81:16 98:6 131:9
150:9 173:11
201:19 202:1
212:2 214:15
**figuring** 44:8,14
102:12
**file** 59:19
**filed** 6:23 7:17
23:3,16 24:9 59:2
240:2
**files** 20:24 21:1,3
298:22
**filing** 24:9 343:15
**fill** 36:3 89:6 90:9
154:10,12 265:13

266:1,13 272:18
**filled** 40:5 88:5
  112:10 126:5
  247:13 266:10,12
  273:7
**filling** 266:4
**final** 6:15 297:15
  298:1,11 313:1
  316:21 341:17,18
  342:9,9,11,21,24
**finally** 124:12
  167:17
**finance** 97:23
  120:19 174:4
**financially** 8:4
  344:14
**financing** 78:15
**find** 15:20 23:11
  42:20 46:24 47:3
  85:24 122:6 135:5
  137:9 150:8 163:8
  163:9 165:15
  176:1,9,12 204:20
  205:23 214:19
  217:24 218:15
  230:11 278:12
  279:10 288:19
  317:4 331:12
  342:24 346:11
**finding** 29:12
  132:12 138:12
**findings** 126:1,1
**fine** 35:8 99:23,24
  115:17 180:19
  235:20 240:11
  279:6 287:10
**finish** 14:13,14
  116:17 216:23
**finished** 40:2
  338:1

**finishing** 39:24
**fired** 165:14
**firm** 3:4 7:23 8:1
  229:1,5,16 230:2
  236:6,21,22 237:4
  238:10,17 239:2,5
  239:10,11 241:4
  241:11 242:15,17
  286:15,18 288:2
**firms** 236:12
**first** 9:6 24:22
  55:8,13 66:24
  68:6 78:2 80:10
  91:5 96:7 97:9
  100:18 101:18
  116:12 122:7,12
  133:16 138:14,15
  138:16 141:19,19
  144:24 148:4,9
  151:17 154:3
  164:2 182:8 200:9
  206:19 210:13
  212:4,15 215:9
  222:2 223:18
  236:11 241:23
  257:1 260:12
  276:23 281:10
  282:11 295:12,22
  296:13,15 301:3
  313:7 314:20
  315:1,2 316:1
  328:22 330:15
  331:6 344:7
**firsthand** 129:7
  130:5 135:13
  136:24 137:4
  277:14
**fish** 252:15
**fishing** 251:9,11
**fit** 50:16

**fitzsimmon** 51:6
**fitzsimmons** 3:4,4
  8:21 16:10 17:1
  17:18 118:21
  219:3 232:10,17
  233:9,14 235:23
  236:10 238:1,11
  239:5 240:5,12,16
  287:3 288:13
  290:11 298:23
  343:6
**five** 16:17,22 42:7
  132:15 149:21
  159:24 171:18
  210:20 221:12
  223:13,20 224:9
  224:15 225:10
  305:11 328:2,5
**fix** 14:19 96:21,24
  116:21 134:22
  138:22 140:4
  159:16 160:4
  161:10 163:18
  273:11
**fixed** 158:13
**flags** 135:23
**flat** 194:12
**flip** 210:18
**flood** 46:10
**flooded** 46:8
**flooding** 138:6
**floor** 2:8 69:21
  235:8
**florala** 64:23
  68:11 71:22 73:8
  73:10,19 79:13
  81:10,11 84:9
  129:13
**flow** 114:12
  178:23

**flowed** 193:23
**flowing** 113:18
**fluoro** 302:15
**focus** 60:10 61:24
  65:19,21,22 67:10
  75:23 79:18 80:8
  91:11 95:23 96:1
  96:21 98:11,13,15
  98:18 108:17
  196:21 211:19
  223:18 255:1
  319:9,12 321:17
**focused** 46:2 60:11
  84:14 95:12 109:2
  110:22 173:4
  212:4
**focusing** 85:9
  90:16 108:5
  111:11 113:8
  197:11 210:8,9
  227:15 228:11
  245:9,11 280:21
  314:20
**fold** 146:19
**folks** 102:22 215:3
**follow** 27:22 76:3
  76:4,5 162:8
  182:3 188:10
  189:13 282:3
  307:14 328:21
**followed** 63:6
  188:22
**following** 24:13
  123:10 200:5
  201:6 271:15
  314:23
**follows** 9:6 54:24
  115:2 180:24
  226:24 240:20
  291:13 328:9

**[food - generate]**

**food** 70:24 159:11
336:21
**foods** 333:5
**football** 260:22
**force** 49:7 71:20
125:8,16 143:7
**forces** 155:10
**foregoing** 344:5
347:13 348:18
**foremost** 212:4
**forget** 290:5
**form** 30:4 31:11
36:22 37:9 46:9
48:2 49:19 50:19
52:19 53:15 59:20
68:3 73:14 87:13
88:6 104:16
106:16 108:9
122:3,3 125:7,8
143:22 146:6
154:22 156:16
167:5 177:3 199:5
199:18 200:13
202:13 203:14,24
207:17 214:6
216:18 217:21
218:8,10,15 220:1
225:22 226:6,11
248:10 249:22
250:18 252:9
254:10 258:20
261:15,23 266:2
267:13,21 268:4
268:14 269:9
270:3 271:2,10
272:20 280:8
294:22 312:19
322:7 326:16
327:9 342:14,21
**formally** 25:5

**format** 343:2
**formed** 204:10
**former** 9:14
125:15 202:23
**formerly** 234:20
**forming** 188:12
189:11
**forms** 166:6
**formula** 214:21
**forth** 344:15 345:6
**forty** 344:15 345:7
**forward** 194:18
196:10 202:5
217:8 346:15
**foster** 45:4 136:14
171:19
**found** 45:15 114:3
126:3,6,9,11
132:13,15 145:4,6
147:1 164:8
165:12 248:14
280:11 307:10
**foundational**
152:3
**founding** 95:15
**four** 9:24 10:6
41:4 42:7 64:18
65:1 79:5,9 123:3
123:4 126:9
159:15,24 169:14
171:18 210:19
225:8,12 248:15
248:21 255:3
321:8
**fourth** 206:23
211:6 318:3
**fractures** 141:11
**frame** 12:23 27:10
140:9 166:1
190:13

**frank** 262:24
**frankly** 98:4,13
164:7
**fraudulent** 248:2
248:7
**free** 134:24 135:1
159:3 173:6
178:23 277:10
347:14 348:20
**friday** 187:24
**friends** 150:4
280:14
**front** 13:17 23:22
74:1 150:24
246:13 298:4
314:12 321:3
326:24 333:11
**fuel** 278:13 279:10
**fueled** 278:4,5,7
**fulfill** 83:7 84:6
85:7
**fulfilling** 84:18
86:12
**full** 60:5 74:2
105:20 264:3
277:3 319:1
321:11 344:10
**fully** 13:24 18:12
218:19 247:10
**function** 161:13
272:12 336:19
**functional** 281:23
**functioning**
320:16
**fund** 138:15
**fundamental**
152:4
**funded** 134:12
148:14 222:7
**funding** 122:6
173:20,21,21

**funerals** 133:8
**furanyl** 302:15
**further** 8:24
154:16 166:15
172:9 181:21
207:12 215:19
276:14 343:16
344:8,11,13
**future** 172:7
174:19

**g**

**g** 7:1 9:4
**gain** 251:16
**game** 23:20 32:13
98:12 103:20
**gary** 340:21,24
341:1,5,9
**gas** 165:10
**gastric** 170:21
**gather** 226:19
296:7
**gay** 136:2
**geared** 49:16
**gears** 60:1
**gender** 173:19
**general** 10:14
35:13 59:6 67:24
68:21 103:6
106:24 167:3
245:10 259:14
307:1,3,16
**generally** 22:7
40:11 75:6,7
76:11 88:11 92:17
95:12 112:21
138:2 167:3
212:19 310:4
329:6 332:20
**generate** 82:13
258:10

generated  83:5
generation  102:11
georgetown  80:7
getting  40:1 73:20
  135:11 149:13
  150:16 153:14,15
  169:18,22 171:5
  214:8 222:13
  223:4 264:1
  271:20 323:7
give  13:17 17:23
  50:8 81:8 116:20
  123:1 146:24
  147:11 159:23
  164:11,11 175:8
  176:2 204:8
  219:12 255:20
  263:10 276:13
  309:3,3
given  93:17
  126:13 187:5
  230:14 281:6
  343:11 344:17
  345:10
gives  218:1
giving  170:13
  215:24 236:14
glean  179:6
go  7:11 12:11,15
  13:10 19:21 24:2
  24:3,6 25:20 33:2
  33:4 36:19 38:18
  38:24 39:6 44:20
  46:14 47:7,17
  49:20 51:13 54:17
  55:20 60:1 64:9
  71:10 73:6,15
  75:5 76:17 77:23
  79:4 83:15 84:13
  99:16 106:14
  109:22 110:17

114:15 115:11
116:12,14,16
117:9 120:15
133:8,9,23 134:1,4
140:8 141:9
149:18 153:20
154:11 155:1,3,6
157:1 161:2 163:5
163:9 165:10,10
165:11 166:20,23
173:22 178:3,21
179:10 183:8
184:18 189:15
199:7 205:19
212:4 217:2 221:1
223:10 231:3
232:12 235:24
238:3,4 240:14
251:11 267:7
277:8,10 283:7
287:7 291:9 292:5
293:9,11 296:11
298:10 300:9
322:17,24 323:2
325:21 333:17
goal  109:18
goes  17:21 51:4
  84:12 160:11
  170:9 190:5
  277:17 282:23
  297:6 302:4
  318:15 320:7
  335:1
going  7:3 9:10
  12:17 14:2 15:7
  17:24 23:10 24:19
  30:13 32:1,4 33:4
  34:20 36:18 37:13
  38:3 39:24 42:13
  42:13 43:20,21,22
  45:4,8 47:16 50:5

50:10 51:3,3
54:21 55:22 58:14
60:1 61:11,24
64:7 73:15,16
79:14 80:10 81:6
81:13 90:6 96:24
98:17,21 100:17
104:12 107:19
114:22 115:7,14
119:20 133:18
137:5,6 141:10
143:11 145:5,12
145:24 149:10
151:2 153:16
157:12 164:24
170:18 178:5
179:17,19 180:21
188:4,9 189:15
197:24 198:16
209:1,17 212:12
213:3 219:7
221:17 223:2,17
226:21 240:17
246:10 256:4
266:12,19 278:15
281:4 287:10,10
291:2,10 297:16
300:5 307:12
308:21,22 314:17
318:6 319:8
321:11 323:14
328:5,6,14 340:13
gonna  107:18
114:13 133:14
178:20 220:7
224:24 262:19
277:11 290:10
good  7:2 9:9 17:24
25:14 67:19,20
69:24 72:14,22
93:8 117:4 139:6

142:20 149:5
152:10,11,21
153:5 160:16
218:2 222:22
225:9 242:7
263:21,24 273:9
309:5 328:18
goods  74:23 76:2
283:11
goold  2:18 4:5
8:15,15 116:24
117:1 118:10,17
119:2,13,17
180:13 181:5,6
186:24 242:19
308:18,21 309:5
310:12 328:17,18
338:1,5
gotten  278:11
331:14
governed  138:3
government  6:10
37:4 148:17
222:10 254:15
255:18
governor  96:13
125:24 145:19
161:21 216:20,24
217:3
governor's  48:13
51:24 85:3 128:8
161:22
graceful  131:14
gracefulness
131:10
gradual  265:4
graduates  95:17
grand  95:11
grandchildren
150:3

grandma's 292:14
grandmother 276:9
grandparents 171:20,20
grant 134:13,14
graph 274:22 305:7 319:6
graphs 306:5
great 14:4 58:24 171:20 188:7 207:3
greater 320:14 322:10,18
greatest 111:23
grips 278:8
ground 58:7 98:1
grounded 73:1
group 132:18 277:18 281:19 305:14 306:18
groups 66:19
grown 205:6,8 307:20
guess 34:1 82:3 88:9 172:1 182:9 199:23 203:20 280:20 293:22 315:22 327:4
guidance 188:17
guided 110:13
guidelines 142:19 224:18,19,23 271:16 272:7
guiding 190:7,8,11
gun 165:13
gupta 1:19 5:3,13 5:18,20,23 6:2,6,9 6:14,17,20 7:14 8:21 9:9 12:3,4,9 12:12 15:13 21:11

23:5,13,17,23
25:15 27:3 29:11
29:13,20 31:3,18
32:18 33:17 34:11
36:10 51:15 55:2
55:5 60:19,21,22
61:1,5 99:8,10,13
100:1,14 115:4,13
115:14,24 117:16
117:22 118:22
180:6 181:2 182:1
182:17 183:11
184:3 185:11,23
186:21 187:4
188:1,7 191:23
219:20 227:2,5,15
227:20,22 228:1
228:11,16 240:22
241:1 246:18,19
247:1 254:13,14
254:22 289:20
291:15 295:2,3,9
299:10,15 303:15
303:17,22,24
304:22 308:6,7,14
308:16 312:23,24
313:4 315:10
328:11,13,18
339:5,6,11,13
343:11 344:5
345:5 346:8 347:4
347:9 348:4,13
349:20
gupta's 187:15 286:15,17 298:22
guys 180:4,4 232:24

**h**

h 9:4
habit 153:23 172:9 278:13,14

haddy 5:6,6 299:11,11
hager 3:8 7:23
half 132:5 257:1 280:14
halfway 317:7
halls 133:9,10
hampshire 167:22
han 5:7 299:12
hand 61:19 131:20 133:21,23 134:4 310:21,23 317:17 344:17 345:10
handful 126:23
hands 43:19 44:15 45:1 303:12
happen 68:7 127:2 135:5 138:7 141:11,12 150:1 164:6,6 168:18 174:10 193:19 282:2 285:18 305:22 342:2
happened 51:2 75:23 97:3 104:22 105:9 125:5 142:13 146:9 150:7 163:22 165:4 173:10 277:22 286:22 290:4 324:12
happening 44:23 46:11 49:10 96:18 113:11 123:8,11 124:6 130:8 131:20 135:12 136:8,15 137:4 143:14 144:6 149:7 151:12 158:21 161:7,24 163:3,13 171:7

204:9 222:23 302:3 329:16
happens 139:8 140:19 149:20 150:12 155:17 172:1 223:12 273:15 294:17 331:12
happy 19:21 27:20 33:5 49:11 78:24 218:15 264:10,11 269:9 285:12 286:2 308:23 333:11
hard 75:5 77:8 90:4 100:18 145:8 173:2 216:12 260:16 261:17 307:6
harm 68:7 82:23 138:12,16 155:3
harvard 80:5 94:9 94:13 121:18
hasten 46:6
hazards 31:22
he'll 28:23,23 30:16 33:1 35:2 343:8
head 66:2 161:1 193:11 282:15
heading 62:9 91:12 318:7
heads 128:11
health 2:10 5:8,10 5:23 6:19 8:12,14 9:12,15,16 11:4,15 21:22 22:18,18,22 30:7,8,9,10 31:5,6 31:7,9,22 32:6,10 32:21 35:12,16,17 39:20 40:14,14,16

42:17 48:3,9,10,24
49:22 50:1 55:6,8
55:13 56:4,8,16
57:1 59:2,7 60:17
63:4 65:16,18
67:20 70:12,12,13
70:14,16,23 71:5,7
71:16,17,19,23
72:8,8,10,13 73:5
80:12 81:3,5
84:13,19 86:3,4,5
91:1,7,8,12 92:2,4
94:10 95:11,12,15
95:19,19 99:9
101:7,23 107:12
113:24 120:4
121:18,22,23
122:7 123:18
125:12 127:14,14
127:16,17 128:19
129:1 142:16
143:12,13,24
181:18 183:12,12
183:18 184:5,21
188:9 199:21
206:4 212:5,9
215:3 217:1,2,6
243:5 244:10
250:22,24 251:19
251:21 256:19
272:5 277:10
295:5 296:18,22
296:24 297:9
299:13,21,22
300:7,8,9,11,15
301:1,4 302:5,5
303:21 314:2
315:10,11 317:15
317:22,22 318:13
319:14 326:1,2
328:22 329:13,24

337:18
**healthy** 128:23
**hear** 30:11 55:8,12
106:16 131:1
133:11 187:10
188:1 191:19,20
**heard** 55:5,10
56:18 57:9 77:5
86:10 98:22 124:8
124:9 133:15
143:18 228:21
**hearing** 170:23
187:10 255:21
**heart** 170:21
175:17 334:24,24
**heartbreaking**
133:15
**hearts** 175:17
**held** 120:12 121:4
149:1 222:17
272:6
**hello** 191:19 286:5
**help** 44:4,12 46:3
46:15 52:14,17
53:19 54:4 74:22
74:24 78:3 83:2,4
87:9 98:20 125:1
126:10,13 128:13
159:15 165:9
176:2,7 178:11
179:6 192:7 220:8
263:7,14 276:17
276:18 296:14
**helped** 45:19
46:17 47:18 95:14
122:3,3,5 125:7,7
125:10 138:15
142:6
**helpful** 216:13
263:12

**helping** 69:9
263:24
**helps** 330:13
**hep** 97:11 106:6
**hepatitis** 97:5,7
136:6,12 164:21
**hereof** 344:7
**heroin** 47:13
105:7 155:7,7
161:17 163:12
164:1,7,10,16
165:23 166:13
176:19,21,23,24
177:1,3,17,18,22
178:1,22 179:1,3,3
179:8,17 243:22
254:3,4 257:4
274:5,23 276:4,15
277:5 278:20,24
279:8,12 280:2
284:5 302:19
306:23 307:2,4,5
307:19 311:1,4,11
311:22 312:2,6,10
318:11 324:3
333:16
**hey** 29:20 81:12
129:16 145:4
153:20 179:22
185:13 231:11
240:5 276:17
286:10
**hhs** 124:4
**high** 11:3 57:22
91:6 94:20 97:10
139:4,16 149:21
149:23 151:1
153:14 159:21
164:11 168:1
172:5 197:23
199:19 200:8

221:13 223:13,15
223:20 224:10
225:15 226:3,11
258:21 319:20
**higher** 167:20
172:14 210:14
211:9 224:14
273:3 277:1 334:7
334:14
**highest** 97:7,10
136:12 167:19
201:13 205:11
206:23 271:20
272:6
**highlighted** 111:1
204:5 331:3
**hijack** 152:24
**hijacked** 154:20
279:17
**hijacking** 152:24
**hijacks** 154:5
**hindsight** 46:17
47:6 77:24
**hint** 204:8
**hired** 125:14
**historic** 97:10
**historical** 96:6,8
96:14 144:23
182:13,18 183:4
218:9
**history** 31:19
55:21 97:4 101:24
140:8 331:18
**hiv** 97:2,4 106:6
135:17,19 164:21
**hold** 23:12,24
93:24 133:10
216:22 267:2
323:13
**holds** 54:2

**holes** 131:24 252:5
252:8,18,23 253:2
**home** 20:24,24
**honest** 75:11
136:3 176:15
262:24
**honestly** 98:13,15
**honor** 314:13
**honorable** 314:3
**hook** 155:5
**hope** 162:1 249:7
249:10 289:24
**hopeful** 162:7,19
**hopefully** 116:20
140:3
**hopkins** 80:6
125:9
**hospital** 62:16
65:22 68:21 69:3
71:14 74:3 78:22
300:16
**hospitalist** 65:8,11
66:6 68:22 78:23
264:6
**hospitals** 64:9
69:5,16 136:1
264:5
**host** 44:22
**hosted** 124:3
**hotels** 71:4
**hour** 54:5 116:12
229:9,11 286:12
297:1
**hours** 16:17 43:9
45:22 89:24 103:7
106:24 168:19
310:10 326:18
338:7
**house** 6:9 142:16
142:16 254:14
255:17 321:3

**household** 212:15
**huge** 172:11,13
**huh** 10:6 11:22
213:11 253:17
260:2 288:8
**human** 22:22 59:7
74:20 152:19
314:3 317:15
326:1 334:6
336:12,14
**hundreds** 74:16
167:7 266:15
**hungry** 152:9
**hunter** 3:8 230:21
231:22 236:8
238:12,13 239:2
240:10 242:2,13
242:14,14,15,16
242:17
**hunter's** 237:13
**huntington** 1:4 2:8
7:16 17:3 21:18
22:10 27:5 32:7
115:8 117:18
118:5,23 119:4
125:15 135:18
172:15 182:2
187:6,17,20
234:22,24 239:12
239:14 240:4
261:4 275:21
296:9,17,18 346:6
347:3 348:3
**huntsville** 65:6
69:15
**hurt** 46:18 273:19
**hurting** 273:17
**hydrocodone**
307:4
**hypothesize** 259:8

**hypothetical**
156:17

**i**

**icu** 174:7
**idea** 122:7 135:11
146:24 147:11
194:16
**ideas** 116:20
**identification** 12:9
23:17 60:24 99:12
182:14 184:1
247:1 254:21
295:8 299:15
303:23 308:16
313:4 339:10
**identified** 24:13
151:8 207:22
209:2 230:9,18
232:1 246:5 262:1
296:24
**identify** 205:24
206:22 211:3
243:9 249:12,21
262:2
**identifying** 134:8
**identity** 253:8
341:24
**ignore** 215:7 246:1
**ii** 36:12 37:14
**iii** 37:14
**illegal** 87:5 105:10
132:14 292:10,11
328:24
**illegitimate** 87:4
87:11,16 105:10
219:23,24
**illicit** 256:9,14,15
256:18 257:12,14
257:23 258:1,3,5
277:4 280:2
302:11 305:12

306:2
**illicitly** 257:6
**illinois** 62:17
**imagine** 129:18
169:20
**immediate** 170:19
**immediately** 21:6
193:14
**immigration**
194:23
**immune** 160:7
**impact** 72:17 83:4
110:2 173:8
175:10 265:22,23
268:24 269:4
271:7 329:21
**impactful** 72:23
102:11
**impacts** 110:4,6
334:21
**implications** 186:7
**importance**
329:20
**important** 14:10
43:10 69:22 73:1
102:22,23 109:8,9
126:17 138:18
140:4 141:5 143:9
152:18 273:21
281:13 329:11
**impossible** 262:20
**improper** 50:7
**improved** 42:9
**impulse** 171:11,13
**inappropriate**
114:10 150:10,22
151:1 155:11,12
155:22 156:1,22
236:22 259:22
260:4,7,8,9 262:3
264:15 265:10

280:12
**inappropriately**
  204:13 224:5
**incarcerated**
  45:17,19 126:7
**incarceration**
  69:20
**incentives**  74:14
**incessant**  168:21
**incidence**  307:19
**inciting**  148:9
  222:2
**incline**  132:12
**include**  21:22
  38:21 96:3 103:13
  106:9 107:24
  109:11,16 110:12
  127:10 132:17,17
  137:10 168:21
  202:2 215:3,4,6
  243:24 244:16
  247:7 248:7
  256:19 330:3
**included**  10:14
  19:12 24:19 66:17
  70:20 109:13
  132:16 252:21
  297:2 346:13
**includes**  32:7 93:1
  106:5,8 243:19,22
  272:7 275:17
**including**  15:20,21
  19:10 22:16 38:6
  65:23 66:10 69:19
  87:1 93:12 140:1
  196:12 257:1
  268:17 293:16
  314:18 339:23
**inclusive**  54:7
**income**  211:24
  212:15

**incomes**  319:21
**incorporated**
  348:12
**increase**  147:1
  148:6 156:9,11
  168:4 169:5,5
  221:7 246:4
  305:16 307:2,4,16
  319:18,19,20,21
  319:22 326:12
  335:16
**increased**  144:20
  146:19 155:23
  318:12,18 319:16
  334:17 335:5,7
  336:5,14 337:21
**increases**  197:20
  197:21
**increasing**  155:18
  157:13 274:22
  302:12
**increasingly**
  256:16
**incremental**  46:5
  46:16 47:19 83:4
  173:8 274:14
  275:7
**incrementally**
  47:9 138:9
**incurring**  174:19
**index**  4:1 5:1 6:1
**indicated**  291:23
  310:22 318:11
  343:14
**indicates**  210:21
**indicating**  256:17
  346:13
**indication**  67:6
**indications**  259:17
  261:10

**indirectly**  335:5
  335:16
**indisputable**
  274:24
**individual**  72:24
  133:8 135:6 200:4
  201:6 205:15
  215:3 225:17
  252:22 253:1,4,6,9
  341:5 342:1,4
**individual's**
  294:21
**individually**  58:7
**individuals**  24:13
  176:9 252:20
  254:1 258:9
  319:21 331:15
  334:5,9
**indoor**  70:21
**induce**  225:21
**industry**  145:8
  195:21
**inefficient**  176:15
**infant**  128:24
  264:21
**infection**  300:16
**inflammation**
  67:15
**influence**  84:11
  252:20,24 253:6
  253:10,12
**inform**  125:1
  127:4
**information**  17:23
  27:18 31:15 34:5
  35:1 36:23 37:9,9
  38:6 63:8 88:3,18
  88:18 89:23 96:11
  113:2 179:7
  219:10 230:7,24
  234:2 246:15

**ingrained**  136:10
**inhale**  165:4
**inherent**  91:22
**inherently**  272:21
**initial**  36:14 38:12
  44:22 75:18
  134:18 225:7
  233:12 268:17
  298:12
**initially**  148:14
  153:3 222:7
  278:23 288:7
**initiated**  161:22
**inject**  164:20
  165:12 254:1
  277:2
**injecting**  254:9
**injection**  47:14
**injuries**  141:12
  143:14 145:11,24
  197:19
**injury**  196:23
**inner**  68:24 152:4
  153:1,8,16,19
  154:5,19
**innocent**  43:19
**input**  59:23
**inquire**  31:21
  230:17,20
**inquiries**  28:1
**inside**  131:23
  154:21 169:22
  251:11
**instance**  118:21
**instances**  86:17
  87:7 185:20
**instill**  122:6
**instruct**  18:1

303:12 314:7
  341:7,10 342:3

**instructed** 232:16
**instructing** 236:8
  238:13
**insurance** 208:18
**intend** 28:19 30:14
  122:14
**intended** 24:24
  50:14,15 249:15
**intends** 32:13
**intent** 87:18
**intention** 30:15
**intentions** 176:6
  263:18
**interaction** 86:11
  172:19
**interactions** 52:20
  56:16 57:3
**interactive** 95:5
**interest** 286:12
**interested** 8:4
  344:14
**interfere** 7:8
**interference** 7:6
**interim** 128:19
**internal** 62:21
  63:11 64:1,3
  65:11,16,17 69:8
  122:9 337:17
**interpose** 117:3
**interrogate** 252:13
  252:16
**interrogation**
  88:24
**interrupt** 26:9
  34:3 220:8
**introduce** 9:10
**introduced** 118:11
**introducing** 99:16
**investigate** 85:23
**investigated** 125:3
  270:11

**investigation** 5:10
  85:22 86:15 96:3
  124:23 130:2
  295:6 296:22
  297:9
**investigations** 6:6
  85:14 246:21
**investments** 76:19
**invite** 50:23
**involve** 69:11
  90:21 95:2,13
  144:10
**involved** 22:21
  39:15 43:8 69:9
  69:15 141:22
  183:15 190:21
  245:16 306:10
  328:24
**involvement** 26:10
  92:8 185:2
**involves** 33:20
  36:18 244:3,19
**involving** 306:6
  307:12
**iota** 326:19
**irritable** 168:23
**iso** 302:15
**issue** 34:22 43:4
  46:4,15 67:12
  75:11 102:1,5,13
  107:13,20 118:6
  151:9 168:9 173:5
  174:2,3 232:23
  233:8 256:12
  277:13 330:18
**issued** 182:6 185:3
  189:5 232:24
  233:6,11 302:5
**issues** 34:6,7 35:1
  95:12 97:24 103:5
  106:23 128:2

  171:13 196:13
  234:7
**iuds** 173:21
**iv** 37:14 97:11
  136:8 163:11
  253:13,20,23
  254:2

**j**

**j** 315:2 316:2
**jackson** 344:2
**jail** 69:21 133:12
  292:12
**jailed** 292:13
**jails** 173:16
**james** 2:18 8:15
  315:12
**jane** 283:14
**january** 55:11
  91:3 102:7 127:24
**jaywalking** 293:9
**jcaho** 78:18
  148:15 222:8
**jim** 117:1 181:5
  308:21 328:18
**jindal** 2:11 4:3,4,5
  8:11,11 9:8,11
  15:5 18:2 19:2
  21:10 23:9 24:4,8
  25:22 26:15 27:2
  29:6 30:1 32:16
  32:17 41:22 42:2
  47:21 48:8 51:10
  51:14 53:2 54:17
  55:4 61:3 82:8
  87:24 99:15
  106:18 115:6,16
  180:15 188:2,6,8
  191:20 193:9
  195:6 198:18
  205:22 206:3
  210:22,24 217:15

  218:20 219:16,19
  221:20,24 226:15
  227:4,24 238:5,6
  240:24 242:20,23
  253:18 266:19
  267:8 270:15
  286:6 291:17
  304:10,18 308:5
  323:17 327:4
  328:13 338:17,24
  339:3 343:3
**job** 25:14 83:17
  91:23 98:5,6
  105:14 143:6
  144:13 145:9
  161:11 171:15
  198:5 200:5 201:7
  272:3,3,3
**jobs** 144:12 145:6
  145:8 195:21,21
  195:23 272:13
  273:23 274:3
**johns** 80:6 125:9
**johnson** 148:13
  222:6 224:1
**joined** 92:4
**joining** 55:11
**joint** 78:18 259:3
**joseph** 62:16
**journal** 283:14
**journals** 123:18
**jr** 2:6 8:18 28:14
**judge** 13:18
  117:18 232:21
  314:4,8,12,15
  315:18,18,22
**judges** 6:15 313:2
  315:4 316:3
  323:23
**judgment** 88:4
  253:11

**july**  269:20 313:21
**jumping**  23:10
  67:16,18
**june**  23:3 24:12
**jurisdiction**  70:18
  84:22 86:7
**jus**  75:15
**justice**  45:14,14
  96:13 256:12
**justify**  196:5
**jyoti**  2:11 8:11
  9:11 26:17 188:8
  238:2,4 338:15

**k**

**kanawha**  30:7
  31:6 70:12,18
  91:1 127:14,16,18
  293:13 345:2
**kearse**  2:3 4:4
  8:19 29:10,10,24
  31:17,17 61:2
  118:4,4 181:24
  182:1,7 183:1,8
  184:12,18 185:11
  187:3,7,14,24
  188:3 233:23
  234:16 237:9
  239:8,18 254:10
  289:15 291:1
  297:12,13 298:21
**kearse's**  188:10
**keep**  14:11 33:6
  131:6,10 171:11
  188:4 204:16
  281:23 287:10
**keeps**  160:12
  285:21
**kellyanne**  124:7
**kentucky**  97:9
**kept**  127:22

**kessler**  2:14
**kid**  260:22
**kids**  171:9,17
  172:2,5,10,16
  175:4
**kilkenney**  5:9
  295:4
**kilkenny**  295:13
  295:14
**killed**  136:3
**killer**  49:10
**killing**  43:8 54:5
  103:6 106:23
  324:2 325:3
**kind**  23:19 37:9
  83:1 84:10 88:18
  110:15 116:12
  126:16 145:1,7
  160:13 314:13
**kinds**  82:7
**knew**  108:13
  135:24 138:18
  260:17 261:2
  262:10,11 263:1
**know**  13:16,21,22
  14:7,19 17:7
  18:10 19:4 27:16
  27:21,21 28:8,10
  28:12,24 29:11
  31:24 33:6 35:5
  37:2,5 40:20 42:2
  44:19 46:17 54:1
  55:17,18 56:2,10
  58:18 66:2 67:13
  71:2 72:3,12
  73:15 74:12,19,21
  74:21 76:7,17
  78:18 80:4 82:10
  83:16,21 86:1,17
  93:5 96:20,22
  97:16 98:4 99:16

100:2 103:9 106:4
107:2 108:24
109:21 110:6
114:2 115:21
116:8 117:4 124:5
126:23 130:6,20
131:2,11,22
133:13 138:10
142:6,11 143:14
144:11 145:4,8,11
145:12,13,13,16
147:2,3,17 148:19
148:24 149:10,15
149:18 150:16,23
152:5 155:16
156:18 159:9,17
159:20,23 160:2
164:4,4,19,24
166:6 170:3,10,17
171:9 172:4,16,20
172:21,24 173:16
174:9 175:6,24
176:2 177:8 178:4
179:10,15 187:11
190:24 191:3,4,10
193:4,11 194:5,5
195:24 209:21,23
211:1,23 215:6,16
215:24 216:3
217:13 218:12
219:13,14,20
223:1,6,10 225:23
226:16 234:17
242:3,8,12 251:4
252:22 253:1,4,5,8
254:24 258:11
259:9 260:14,18
261:2,13 262:8,18
264:7,22 266:12
278:23 280:5,16
281:3 282:1,8,12

282:23,24 283:12
285:2,6 289:5,16
291:4 292:12
298:3,5 301:12
313:17,18 316:13
319:2 322:20
325:18 333:20
334:1,16 335:8,8
336:17 339:17
**knowing**  33:9
  253:5
**knowledge**  11:20
  14:1 30:6 31:4
  32:5 34:13,16
  39:3 52:20 53:6
  57:4 83:11 85:17
  116:15 145:7
  167:12 190:22
  200:6 217:8
  220:12 234:7
  250:12 257:5
  258:11 337:13
**known**  57:24
  334:22
**knows**  31:21 32:9
  32:10

**l**

**l**  9:4
**lab**  164:14
**labor**  145:8
**laboratories**
  132:10
**laboratory**  300:17
**labs**  94:22,22
  132:10
**laced**  155:7 302:20
**lack**  75:3
**lacking**  133:1
**laid**  174:6,8
**landscape**  311:1

**lapse** 122:13
**large** 126:20 136:9
168:5
**larger** 72:17,22
311:5
**largest** 70:14
71:14 97:4 136:15
**late** 148:7,12
204:9 221:8 222:5
**lauren** 3:9
**lavish** 76:18
**law** 2:7 3:4 49:3
49:24 89:9 130:6
132:1,7 134:19,22
134:23 135:5
138:3 163:5 165:3
251:20 256:13,19
270:13,14,17,23
271:6,9,12,22
272:2 293:19
294:19
**laws** 161:20
272:10 292:16,16
**lawsuit** 9:13 58:21
**lawyer** 15:1,9 29:1
293:17,23 294:11
**lawyers** 13:22
14:9 17:2
**lay** 110:5 173:23
290:21
**laying** 293:2
**lead** 52:20 82:13
99:4 144:20
155:23 258:9,11
268:18 335:7
**leaders** 54:3
142:17
**leadership** 121:22
**leading** 132:2
**leads** 154:15 156:4
156:5 320:14

334:16 335:4,16
336:5
**learn** 39:21 41:23
55:13 56:22 59:14
109:23 124:24
127:3 130:12
132:19
**learned** 39:18
40:24 41:13 42:22
47:5 48:20 57:13
84:4 179:9 337:4
**learning** 41:17
42:5,18 56:11
57:16,20
**leave** 225:18 267:8
**led** 98:24 99:4
103:15 112:24
125:5,16 148:14
150:8 220:18
222:7 260:11
261:21 262:5,14
262:17
**left** 68:11,12 80:1
92:6 100:20,20
167:14 176:11
317:17
**leg** 323:24
**legal** 26:3 33:13,20
33:23 132:14
241:19 312:20
346:1 349:1
**legalities** 35:5
**legally** 294:18
**legislation** 5:16
44:6 48:11 125:18
138:10 142:9
268:9,16 271:8
285:19 308:12
309:16
**legislature** 58:17
58:18 122:6

133:10 173:24
175:20 225:11
**legitimate** 46:22
140:10,14,15
143:1,4 146:7,11
192:10,18 195:18
199:15,17 202:2
203:6,12,23
206:14,14 207:12
208:10 209:3,19
210:5 211:12,13
211:18 212:7
214:16 282:4
294:14
**legitimately**
281:18
**lesion** 67:14
**letter** 283:13
314:1,12,14,15,20
315:2,9,16,17,22
316:1,6,6,8 346:19
**letterhead** 317:16
**letters** 61:21
323:23 326:8
**level** 11:3 44:4
57:22 58:1 72:23
72:24 75:22 91:6
94:21 109:24
148:22 159:21
199:19 200:6,8
201:7 222:15
265:23 274:15
324:20 333:20
334:3,17 335:5,9
336:5
**levels** 97:7,10,10
136:12 201:13
332:23 335:7,23
336:15
**levy** 46:9

**lgbt** 135:20
**liability** 97:20
**liable** 149:1
222:18
**liberal** 72:3
149:16 223:7
**liberator** 158:19
**license** 38:6 40:4,5
52:24 63:22 93:10
93:18
**licensed** 36:4
87:10 112:15,16
248:9 249:6,14,21
252:12 292:21
**licensee** 92:10,13
**licenses** 51:17 53:1
53:4 63:18,21
**licensing** 51:21
71:1,4 91:16
92:17,24 94:7
**licensure** 249:16
249:19
**licit** 258:2,4,7
**lie** 155:2
**life** 66:1 140:18
161:11 164:23
169:22 172:11,19
175:4,5 196:12,22
276:6 281:5,12,13
285:23
**lifelong** 159:7,12
159:14,20
**light** 162:3
**limit** 190:1
**limitation** 190:3
**limitations** 44:19
137:15
**limited** 31:13 33:7
46:14 176:6
185:22 196:22
272:15 277:18

**limiting** 98:19
225:7
**line** 66:24 74:1,16
76:15 96:19
160:19 168:2
169:23 215:9,21
279:6 305:16
307:7,14,16
327:12 346:13
348:7 349:3
**lines** 56:2 131:12
236:17 329:17
**link** 280:1
**linked** 169:3
302:18
**list** 6:22 23:2,15
24:20 26:1 107:10
233:12
**listed** 63:1,7 64:13
128:6 210:12
213:24 300:6
322:19 348:7,17
**listen** 103:21
108:22 162:2
276:18
**listened** 242:8
**listening** 105:17
**listing** 348:7
**lists** 25:12
**literally** 46:11
58:8 78:7 129:22
134:3 151:3
165:18 170:9
**literature** 170:22
224:16,20 284:18
285:1,2,7 286:1
332:2
**litigation** 21:13
30:12 118:24
227:6,17 228:2,13
230:17 235:12

238:23,24 241:7
241:12,16,24
288:5
**little** 9:10 35:9
67:10,14 69:1,5
86:21 88:10
100:12 115:22
116:13 140:7
145:14 146:4,12
151:13 160:12
163:4,15 174:12
176:18 178:4
179:20 189:16
192:5 210:20
211:2 213:7
218:23 224:24
240:9 247:3
262:16 264:11
277:1 280:14,21
304:13 307:6
323:10 328:1
330:12
**live** 44:17 281:8
**lived** 137:5 140:2
**lives** 277:9
**living** 102:8 125:1
211:23
**llc** 345:4
**load** 300:5
**local** 11:15 30:7
31:5,5 58:5 70:14
70:16 71:16 74:3
84:19 127:16
130:7 136:1 301:1
**located** 1:21
**location** 37:12
**logorhythmically**
155:18
**london** 120:8
**long** 16:14,20
79:21 91:20 93:18

119:14 141:17
172:17,22 174:10
221:21 242:4
276:10 281:7,18
282:7 321:24
324:15,16 326:14
328:20 334:1
337:18 338:19
**longstanding**
327:13
**look** 20:5 52:9
71:10 77:24 82:18
100:16 108:19
109:22 116:5
131:14 144:17,22
145:3 147:9
156:19 162:4
166:21 178:14
179:5 193:1 194:3
195:22 197:16
201:24 202:4
203:19 204:3,17
204:19 208:3
213:5,6,16 215:14
215:15 216:20
217:23 245:17
249:16 263:16
264:18,24 284:1
285:17 290:18
297:21 304:2
306:16 309:6
325:18,21 330:13
339:20 341:6
342:23
**looked** 43:20
122:17 125:3
205:18 279:24
280:5 283:19
284:3 319:6 331:7
331:7 332:1

**looking** 44:14
59:13 112:23
149:9 194:11
211:17 222:24
227:8 228:4
244:18 245:24
264:9 293:4,11
295:23 296:13
304:10,16 305:10
310:20 329:23
340:12
**looks** 101:4 306:14
314:11 316:1
**lortabs** 260:23
**lose** 100:7
**losing** 45:21,22
**loss** 145:9 146:9
146:20 195:17
**lost** 150:15
**lot** 37:24 47:15
58:23 68:24 71:22
74:5,16 75:14
81:22 98:11,20
105:13 108:24
133:2,15 138:20
140:16 151:21
160:2,16 165:6
170:3,18 173:4
195:11 197:22
219:8,9 265:20
276:5 282:21
292:12 330:23
333:13
**lots** 168:1 279:19
**loud** 340:13
**love** 28:11
**lower** 61:19
147:24 282:3
310:21,23
**lunch** 99:20
114:15,24

| m |
|---|

**m**  9:4
**m.b.a.**  63:7
**m.d.**  1:19 7:14
  55:2 115:4 181:2
  227:2,22 240:22
  291:15 328:11
  343:11 344:5
  345:5 346:8 347:4
  347:9 348:4,13
  349:20
**m.p.h.**  63:4
**madam**  346:10
**magic**  33:3
**mahaney**  3:9
**mail**  5:6,9,13,14
  5:19 6:2,5,14
  27:13 28:1,17
  61:7,12,14 246:19
  255:1,9 295:4,12
  295:22 298:20
  299:11,20 303:16
  304:6,12,19 308:7
  308:9 309:7,8
  312:24 313:7,9,16
  313:20 316:11
  339:6,19,20,21,24
  340:2,5,13,18,21
  341:3,4,9
**mail's**  313:12
**mailed**  6:15 313:1
**mailing**  37:12,19
**mails**  17:6,8,12
  27:10 242:21
**maintaining**  272:8
**maintenance**
  34:22
**major**  67:12
  256:10 306:15,20
**majority**  166:4,9
  166:14,18 274:5

282:17 283:2
  305:23 306:1,1
**making**  19:13
  25:14 32:12 59:24
  70:21,23 71:1,4
  75:9 76:20 78:5
  194:19 195:24
  264:1,6 271:19
  323:20 326:20,21
  327:18 332:23
  333:2
**male**  191:18 286:5
**malls**  165:11
**man**  264:21
**manage**  69:18
  135:22 179:13
**managed**  129:24
**management**  63:8
  66:9,10,11 69:12
  69:24,24 70:3
  121:22 264:3
**managing**  74:2
  329:18
**mandate**  56:3,3
**manner**  103:1
**manufacture**
  137:21
**manufactured**
  257:7
**manufacturer**
  78:16 189:19,23
**manufacturers**
  35:22 43:16 76:10
  76:14 77:16
  190:10
**manufacturing**
  39:15 105:3
  137:21
**manuscript**  298:4
  298:9

**manuscripts**
  295:20 298:10
**march**  61:9
  128:14,20,21
  173:3 207:10
  209:10
**marijuana**  312:1
  330:16 331:6
**mark**  3:3 8:20
  16:9,19 26:18
  115:12 117:13
  118:7 179:22
  182:9 185:15
  186:10 187:8
  218:20 238:11
  239:6 286:13
  308:20 346:5
**mark's**  187:23
  239:3
**marked**  12:8
  23:16 60:24 99:12
  182:14 183:24
  246:24 254:21
  295:8 299:14
  303:23 308:15
  313:3 339:10
**market**  302:11
**marshall**  125:9
**massey**  5:9 295:4
  295:14
**master's**  60:17,18
  72:9 120:3,7
**mat**  6:15 313:2
  318:7
**maternal**  128:24
**math**  174:18 178:4
  178:6 216:3
**matter**  7:15 32:24
  103:9 105:15
  107:2 131:16
  155:8 262:22,23

286:17 287:22
  288:5
**matters**  155:9
**mayor's**  296:16
**mba**  6:18,20 60:22
  99:10
**mcginness**  2:3
**mckesson**  2:17
  8:17 21:22 56:18
  56:19,22 57:3
  59:3 117:2 181:6
**mcms**  5:14 308:10
**md**  6:17,20 60:22
  99:10
**mdl**  239:19
**mean**  26:8,19
  28:23 32:19 34:3
  35:11 42:17,23
  43:1 52:2 57:8
  80:16 88:7 102:4
  107:20 113:15
  114:9 129:18
  133:17 134:23
  137:14 145:7
  152:7 155:13
  167:16,17 170:15
  201:10,11 219:13
  220:8 233:1,4
  239:14 241:19
  279:11 283:8
  287:1 288:6
  290:10,18 293:9
  300:24 301:22
  310:22 313:17
  342:2
**meaning**  33:23
  44:12 112:13
  150:2 160:10
  162:8 170:7
  211:23

**means**   13:14 25:24
    44:7 137:19 152:7
    157:12 215:7
    244:21 248:18,22
**meant**   26:21,23
    35:8 43:6 124:20
    179:11,12 209:24
**measure**   147:12
    209:3 329:22
**measures**   15:22
**mechanism**   53:9
    55:18 169:21
    170:13 177:15
    333:12
**mechanisms**
    170:11,12 275:7
    335:19
**media**   6:3 7:13
    55:1 58:4 115:3
    181:1 227:1,21
    240:21 291:14
    328:10 339:7
    343:12
**median**   206:20
    212:15
**mediation**   289:22
**medicaid**   124:17
    207:3,8 208:6,9,16
    208:17,18,19
    209:14 215:4
    320:10
**medical**   38:6
    58:12 63:12 64:23
    65:13 68:8,11,16
    68:17 69:6,7,18,24
    73:8,10 76:4
    87:10 91:16 92:20
    93:1 94:6 121:1
    123:18 124:18
    128:19 130:20
    131:6,23 132:11

181:18 197:13
    202:19 212:9
    252:4,23 253:3
    259:13 296:20
    297:22 301:5
    309:11,13 315:13
**medically**   280:23
    281:1
**medication**   145:21
    149:5 159:3 163:7
    222:22 294:5
    314:8 316:22
    317:9
**medications**   46:23
    66:19 67:3,3,4,6
    75:16 150:6
    151:16 152:22
    155:5 160:3 161:9
    163:8 169:15,18
    197:2 212:21
    278:11 283:4
    291:21 292:1,3
**medicine**   40:18
    60:16 62:21 63:1
    63:11 64:1,4,4
    65:10,11,16,17,18
    67:19 68:1 69:8
    72:14 86:3 91:14
    91:21 92:9,10,13
    92:19 93:10
    120:17,21 121:1,6
    121:10 122:10
    124:19 149:19
    159:5,6 188:16
    189:6,7 217:5
    223:11 225:19,20
    226:2,10,13 264:2
    272:6 283:14
    294:1,21,24
    337:17

**medicines**   160:5
**meet**   16:14,18
    28:5
**meeting**   17:17
    18:5 42:3 134:1
    196:15
**meetings**   20:9
    42:4
**meets**   344:15
    345:5
**meharry**   68:15
    69:7 121:1
**melton**   6:5 246:19
**member**   91:14
    92:5
**member's**   294:1
**members**   51:23
    82:23 133:10
    300:21,23
**memory**   295:23
    296:4
**men**   147:21
    173:17
**mental**   277:10
    319:14
**mention**   93:12
    127:5 129:11,11
    148:1
**mentioned**   10:7,24
    11:6 22:16 25:4
    27:9,10 28:3 36:5
    45:21 103:19
    105:14 109:15
    128:9 129:2
    137:12 146:11,22
    155:11 190:23
    194:20 204:1
    205:1 215:5
    253:13,21 259:2
    273:1,2 275:13
    276:7 278:17

329:4,17 333:14
**merit**   1:21
**mess**   100:7
**message**   76:6,9
    86:5 149:8 210:1
**messages**   74:7
    153:19
**messaging**   76:9
**met**   9:9 15:24
    16:13,16 142:15
**meth**   105:11
    166:13 279:7
**methadone**   160:6
    160:7,10
**methamphetamine**
    256:17 257:9,13
    257:14,23,24
    258:4,7,10,10,18
    258:19 275:18
    276:3 279:12
    284:8 318:17
    321:20
**methamphetami...**
    165:23 244:1
    276:1
**method**   133:6
**methodology**
    285:8
**methyl**   302:16
**meticulous**   132:24
**mexico**   258:2
**micro**   333:22
**microlevels**
    333:23
**microphones**   7:4,8
**mid**   94:20 148:8
    221:9
**middle**   129:22
    340:21
**midwest**   346:17
    349:1

**migration** 194:22
**miles** 74:16 273:6
**million** 97:18
114:4 147:5,12,14
147:15 174:12
198:12,13 266:17
280:10
**millions** 266:16
**mind** 43:24 81:7
83:20 84:1 166:10
202:10,14 203:10
214:9 240:6,7
**mine** 264:9
**minimum** 92:24
146:2
**mining** 144:12
145:6,11,12,23
195:20,23 197:19
**miniscule** 145:22
**minuscule** 26:4
52:21 167:9
**minute** 83:3
108:14 179:21
180:17 226:18
267:2 286:8 327:2
**minutes** 16:23
51:9 54:18 103:9
103:9 105:16
107:3,3 180:1,10
308:22 310:10
328:2 338:7,15
**miscommunicati...**
219:7
**misconstruing**
326:3,5,8
**missed** 228:18
259:24 267:17
303:6
**missing** 209:23
**mission** 128:21

**misstate** 298:13
**mistake** 14:18
224:1
**mistaken** 90:7
**misuse** 321:23
322:1 327:13
332:8
**misusing** 330:9
**mixed** 198:1
**ml** 239:19
**mlp** 26:21 30:13
34:22 227:19
228:15,24 231:16
231:22 232:24
234:17,21 236:21
237:3,24 239:19
287:1 288:5
289:10,16 290:6
**mmwr** 5:10 295:5
298:1
**mobile** 131:12
**mock** 5:13 308:7
309:9,11,13,15
339:21,22
**mom** 80:23
**moment** 240:6
309:3 321:19
**moms** 128:23
173:6
**money** 174:24
175:8 176:16
**monique** 2:4 182:7
183:1,8 184:18
**monitor** 56:3
143:10,16
**monitored** 70:24
270:10
**monitoring** 40:19
42:15 58:11 70:20
88:24 89:5,11
130:21 132:7

134:14 143:8
250:7 251:13
**monogamous**
110:15
**monster** 154:21
161:1 277:24
**month** 37:6,23
80:3 269:19 270:2
**months** 25:21
27:11 93:17
138:15 260:23
281:8
**moons** 36:14
**morgantown**
315:5 316:4
**morning** 7:2 9:9
129:15
**morphine** 153:3
164:15 170:13,14
177:2,4
**mother** 169:24
**mothers** 133:11
320:10,11,14
**motion** 231:3
**motley** 2:4 234:18
236:13
**move** 32:8 50:16
115:19 198:18
212:12 217:8
232:11,11,18
266:19 286:19
**moved** 70:7,9,11
171:17
**movement** 195:17
**moving** 177:24
194:18 196:9
211:1 323:6
**mph** 6:17,20 60:22
99:10
**mr.colantonio**
187:1

**mt** 2:5
**muffled** 192:5
**mullen** 255:10
**mullins** 255:10,12
**multi** 136:10
**multiple** 73:21
192:16 197:1
244:4,16 301:13
319:17 334:19
**multiply** 174:18
245:21
**mute** 191:21
**muted** 185:14
338:16

**n**

**n** 7:1
**n.w.** 2:12
**naive** 163:20
**naloxone** 44:15
126:12 160:6,17
**name** 7:22 23:1
24:16,19 73:9
166:13 183:10
188:13 189:12
253:5 285:7
313:10,11 328:18
346:6 347:3,4,15
348:3,4,21
**named** 341:6
**names** 28:12
131:12
**napoli** 229:2,4
242:19,20
**napolini** 242:17,18
**narrow** 321:17
**narrowly** 22:9
**nas** 168:9,12,13
172:5,22 173:1,1
174:13,14
**nashville** 68:16,21
68:21 69:4 121:1

nation 113:7
206:23
nation's 97:4
national 6:12
31:12,15,16 32:18
58:4 97:13 122:22
179:5 254:19
255:23 275:22
320:9
nationally 57:24
105:21 122:21
220:13 319:14
native 304:14
natural 177:10
nature 10:11,23
11:1 37:20 71:23
85:15 151:18
234:2 278:5
286:14 310:19
nearly 311:10
necessarily 103:17
103:20 157:15
208:6,12,14
209:22 211:15,22
212:3 244:5
254:11 282:20
330:20,24 337:16
342:2
necessary 280:23
281:1
necessity 329:20
need 14:5 27:21
38:17,18,24 39:6
39:12 46:23
109:24 116:8
142:11 143:3
144:1,14,20,21
146:3,11 153:20
154:12 156:13
159:12,18,20
164:11 177:11,19

179:12 192:2,10
192:18,21,22
195:18 196:16
199:15,17 200:24
201:16,20 202:5
203:6,12,19,23
204:17 205:2,16
206:13,14 208:1,4
208:11 209:3,19
210:5 211:12,13
212:20,21 213:9
213:18 215:11
226:17 273:8
278:12 281:22
319:13 322:10
334:7
needed 27:22
46:23 145:20
163:18 198:12
212:17 256:20
279:10 286:2,3
needs 5:20 88:3
143:4 146:7 155:9
164:11 177:11
191:21 199:2
200:1 201:2
211:18 303:17
334:2
negotiation 142:14
neither 11:11
165:7 294:10
344:11
neonatal 97:17
136:20 168:13,14
170:17
neurobiologist
337:23
neurobiology
337:15,17
neuroreceptors
337:10

neurosurgery
66:3
never 45:23
228:20 257:8
283:3 290:10
331:6,7
new 99:14 127:3
131:2 167:21
169:22 283:13
302:20 342:3
news 131:2
nice 264:11
nicole 2:19 8:16
nicotine 334:19,22
nine 171:4 326:18
343:12
ninth 2:7
nodded 284:23
non 340:6
nonfatal 178:9
274:18 284:15
285:4
noninvolved 167:2
nonmedical 275:4
nonopioid 213:2
215:20 275:17
nonparty 338:10
nonpharmaceuti...
212:22 213:1
215:18
nonprescription
253:14,22
nonprescriptions
305:13
nonresponsive
198:19 266:20
nonretained 119:6
119:10,11 231:19
233:16
nonthreatening
173:13

noon 114:14
norm 150:2
normally 300:8
northwestern
62:16,17
nos 7:19 112:9
303:15,24 308:6
308:17
notarized 346:14
notary 344:4
346:24 347:10,18
348:15,23 349:23
note 7:4 12:17
50:6 54:14 298:19
346:12
noted 8:24 119:17
notes 226:19 344:9
notice 1:20 6:22
23:14 239:15
noticed 180:6
239:13
noticing 8:10
notified 296:18
noting 298:22
nova 123:2
novel 5:7,8 299:12
299:14 300:11
302:11
november 127:24
nows 168:14
nuclear 94:21
number 21:4 22:6
36:20,21 57:24
61:22 62:2 66:19
100:22 101:20
104:3,13 108:1
110:12 111:3,16
112:9,13 113:20
113:21 123:9
130:13,17,22
131:18 132:8,12

140:22 141:1
144:19 146:23,24
155:18 157:20
158:10 167:12,18
169:6 172:13
177:21,24 192:12
193:4 194:7,10
203:9,10,11
205:14 214:4
215:2 224:12
244:19 245:14,15
245:21,22 266:24
267:11,19 268:10
268:24 272:15
274:18 281:16
284:17,24 299:22
303:4,9 306:5
310:21,21,23
331:9 333:4
339:22 340:6
341:19 342:19
343:11 346:7,13
**numbered** 211:7
**numbers** 61:20
97:20 114:6 144:4
145:3 147:22,23
149:14 158:1
166:21 178:15
194:12,14 196:8
215:14 223:5
245:18 255:3
285:4 321:8
341:14,17,17,18
341:19 348:7
**nursing** 68:9
**nw** 2:20

**o**

**o** 7:1
**o'clock** 99:20
129:15 181:4

**oath** 8:3 9:19
13:13,16 68:6
**oaths** 80:18
**obesity** 72:19
143:10 145:15
197:23
**object** 17:20 30:4
31:11 48:1 50:16
52:19 53:15 59:20
68:3 73:14 87:13
88:6 104:16 106:1
106:15 108:9
117:8 199:5,18
200:13 202:13
203:14,24 207:16
214:6 216:18
217:21 218:8,10
225:22 226:5
248:10 249:22
250:18 252:9
254:10 261:15,23
266:2 267:13,21
268:4,14 270:3
271:2,10 272:20
280:8 294:22
312:18 322:7
326:16 327:9
342:14
**objecting** 230:23
**objection** 25:2
49:18 50:8,14,15
50:15,20 117:3,10
117:12 119:13
181:7 186:8
198:23 200:14
220:1 230:4,13
**objections** 8:8
32:15 50:11,19
219:6 327:17
**objectives** 107:11
107:16,17 108:3

**obligation** 148:21
222:14
**obligations** 42:15
**obtain** 93:18
119:22 230:7
292:19
**obtained** 71:9
120:3,7 248:24
**obtaining** 258:21
330:24
**obtains** 269:15
292:8
**obviously** 31:18
37:16 96:15 127:1
127:13 178:16
183:10 289:17
**occasion** 17:13
134:8
**occasions** 64:5
**occupied** 160:12
**occupy** 160:15,20
**occupying** 160:20
**occur** 36:17
**occurred** 22:8
39:23 297:10
**occurring** 28:6
43:11 130:23
161:19
**occurs** 44:9 334:9
**ocme** 301:5
**october** 27:7 101:9
122:16 206:4
244:10 300:1
344:17
**offense** 324:9
**offenses** 37:17
**offer** 48:17 173:12
173:17 277:7
**offered** 12:20
**office** 6:12 43:23
58:13 102:7

124:17 125:11,12
129:15,20 131:7
132:11 133:7
143:9 165:17
171:22 239:22
240:1 252:5,23
253:2,3 254:18
255:22 296:16
301:4 317:19
331:1
**officer** 9:15 11:16
22:19 30:7,10
31:6,8 35:17
40:15 48:3,9
49:22 70:12,16
84:20 86:5 91:8
91:12,24 92:2,4
127:14,15,16,17
127:22 128:19,20
183:13 217:2
300:9 315:10
**offices** 76:13
131:23
**official** 347:15
348:21
**officially** 25:12
**officials** 165:3
171:2
**officio** 91:13 92:5
**oftentimes** 42:19
81:10 97:9 103:17
103:18 133:17
141:11 171:2,23
252:19,21 272:24
282:21
**oh** 51:8 238:19
**ohio** 167:22 346:2
**okay** 10:11 11:5,9
12:2,11 13:10
14:7 15:5 17:17
19:24 23:1,12,23

24:2,8,23 26:22
27:21 49:13 51:8
51:12 52:4,8 62:9
64:12 81:22 85:2
86:18,20 87:22
89:4 91:10 100:1
100:3,4,10,11
101:6,15 106:11
111:1,6,11,19
112:2 114:14,19
114:20 115:12,15
115:18 116:9,10
116:22 117:12
118:18 119:13
162:18 176:18
180:1,7,18 182:22
184:11 186:5,18
187:14,24 188:2,7
191:10 192:9,17
193:10,13 195:19
200:16 202:7
203:9,21 204:23
206:19 207:3
208:13,24 209:17
211:11 212:11
213:7,23 214:11
215:15,21,22
217:11 219:16
224:7 226:1,13,20
228:23 231:13,16
232:17 235:20
240:16 244:12,15
249:11 255:6
256:3,8 257:19
258:17 265:12
269:22 279:21,22
287:18 288:3
290:18 291:7,8,10
293:18 295:17
303:14 304:15,20
305:15 309:5

310:11,18 314:20
315:1 316:9,20
317:3,7 321:10
322:24 326:5,11
329:2 330:7 331:4
332:1,11,17,20
335:3,8 336:3,12
338:14,22 339:4
339:18 340:2
341:23 343:3
**old**   26:19 171:5
216:17 260:22
276:9 296:10
**oldest**   205:12
**once**   28:9 29:17
84:4 151:6 159:8
163:7 176:13
214:7,10 246:8
267:23
**ones**   10:13,24 21:9
74:21 85:6 113:1
128:10 189:1
210:5 229:24
260:12 262:13
305:12 319:5
**ongoing**   21:12
63:16 81:4 95:20
97:20
**online**   21:7 96:9
189:4
**onwards**   204:8,12
**ooo**   343:19
**open**   12:2 23:5
60:19 100:6 133:6
250:19
**opens**   36:22
**operations**   46:21
**operative**   141:12
196:23
**operatively**
141:15

**operator**   7:2 8:23
9:3 54:21 55:1
114:22 115:3
180:21 181:1,12
226:21 227:1,21
228:20 240:17,21
291:9,14 309:2
310:8,14 328:6,10
338:12 343:9
**opiate**   256:8
296:24 325:1
**opiates**   5:7,8
140:16 141:19
192:3 208:11
299:12,14 300:12
**opinion**   13:9 34:15
59:22 83:13,14
113:22 148:4
154:14,15 156:21
165:19 168:3
177:17 181:7
199:20,24 200:7
200:18,22 201:14
202:8,21 204:10
219:21 220:9,10
220:23
**opinions**   34:6,10
35:1 83:9 116:20
119:11 156:16
181:15 185:3
188:12 189:11
229:13,14,22
230:7 235:9,10
236:3,5,16 237:11
237:22 238:7,8
241:1,3
**opioid**   5:11 6:11
30:12 31:20 32:20
32:21 34:14 35:11
40:16 43:13 48:18
49:16 52:17 53:19

55:16 57:16,21
59:9 72:4 95:13
96:1,2,3,9 98:24
99:1,5 101:24
103:16 105:20,24
108:13,20 110:22
111:20 112:10
125:8,20 128:2
130:11 133:22
136:7 137:1
139:17 142:2
144:23 146:17
148:6 149:16
153:4 157:7 160:8
161:15 162:17
163:16,23 166:2
168:6,10,15 171:9
177:19,22 178:2
196:5 202:5
211:18 213:2
221:7 223:8
224:18,18,22,22
225:6 227:6,17
228:2,13 235:11
241:7,12,16,24
242:1 243:15
254:17 255:22
256:5,11 260:21
274:7 286:18
293:24 295:6
296:8,19 297:10
302:13 305:22,23
312:9 321:16,18
324:1,3,7 325:4
329:9,24 330:8
331:5,12,19 332:7
332:8 335:11
**opioids**   22:11
31:22 33:8 35:15
39:6 42:1 47:19
66:13,18,24 67:16

67:23 69:13 75:13
76:10 77:1,13
78:11 81:23 82:4
82:14 86:22 87:4
87:9 88:2,14 89:7
90:10,22 95:3,8,21
104:21,22 113:3
122:23 123:21
127:11 128:7
129:9 130:3
132:16 136:17
140:10,14 141:3
141:13,24 142:8
143:2,16 144:1,12
144:14,21 146:7
148:3 152:1,2
154:21 159:24
161:17 168:16
169:23 170:4,6
176:19,22,23
177:9,10 179:1,8
188:19 191:4
192:1,11,18,22
193:6 197:2,7,9,12
197:14 201:1
203:7,12 206:15
208:2,5,20 209:4
209:20 211:14,21
212:6,8,24 213:10
213:18,19 214:17
215:9,22 218:13
219:22,23 220:14
220:20 221:12
223:23 224:6,8
225:17,20 243:19
252:8,21,24 253:6
256:10 258:24
259:11,12 260:6
263:21 266:13,24
267:11,19 268:3
268:11,19 269:2

269:14,19 270:1
272:16 274:23
275:2,15,24 276:2
276:10,14 277:15
278:10 279:1
280:1,6,12 281:6
281:19,22 282:7
282:10,18 284:5,8
291:19 292:9,18
293:6,20 302:11
305:14 319:9,12
321:18,21 329:15
330:10,15 333:4
333:13 335:24
336:6,8 337:3,9,19
337:22
**opportunities**
138:23
**opportunity** 18:16
44:17 59:15 100:9
115:9 322:15
323:7 324:11
**opposed** 26:4
80:20 104:23
145:23 176:23
224:14 279:7
**opposing** 99:18,21
114:17
**opposite** 87:17
333:19
**options** 212:22
213:1,2,2 215:18
215:20
**order** 127:4 138:3
153:11,22 155:2
176:12 179:13
188:15 189:5
202:1 214:15
217:8 266:13
267:1,12,20 269:1
269:2,14,18 270:1

272:16 334:3
**ordered** 96:7
183:20
**ordering** 267:14
**orders** 188:17
270:10 272:9,10
**original** 166:1
**originally** 168:6
**osteopathic** 121:5
**outbreak** 5:11
97:4,5 135:17,19
136:4,7,10 295:7
295:21 297:11
299:4,7
**outbreaks** 97:2
135:22
**outcome** 8:4
**outed** 136:2
**outer** 153:9,20
**outline** 42:7
**outlining** 216:15
**outpatient** 65:12
68:23
**outset** 186:13
**outside** 20:9 25:10
131:17
**overall** 76:11
113:12 143:11,14
146:10 147:17
179:23 212:21
**overdoes** 183:4
302:19 318:18
**overdose** 5:11,23
6:3,6,7 22:6
124:22 151:10
162:23 163:1
165:1 166:21
167:11,13,13
168:4 178:7,9,10
178:12,16 182:12
182:19 183:23

184:7,16 220:15
243:4,9,17,24
244:3,20 245:16
246:20,22 250:5
256:10,16 274:16
275:11 284:12,14
284:21 285:10
295:6 296:20,24
297:10 301:6
302:7,12,18 303:4
303:8,21 305:8
306:16 307:20
318:12 331:12,15
339:7 340:10,15
342:16,17,17,20
343:1
**overdosed** 126:8
165:5 340:7 342:1
**overdoses** 113:12
130:17 178:5
244:16 247:13
274:19 284:15
285:3,4,21 296:8
318:15 330:8
331:19 341:20
**overdosing** 284:13
**overlaid** 218:13
**overlap** 306:8
**overlay** 230:14
**oversaw** 130:20
135:17
**oversight** 6:10
254:15 255:17
**oversupply** 22:10
**overview** 182:13
182:18 183:4
218:9
**overwhelmed**
131:18
**overwhelming**
43:6 45:2 142:10

[owned - pdf]                                                                Page 44

owned  81:11
owner  345:3
oxycodone  191:7
  191:11 306:11
  307:4
oxycontin  259:14

**p**

p  7:1 9:4
p.m.  115:5 180:22
  181:4 226:22
  227:3,23 240:18
  240:23 291:11,16
  296:21,21 328:7
  328:12 343:10
pace  247:6
packet  6:15 313:1
  314:7,10,17,18
  315:20 316:8
page  24:15 62:2,6
  64:18,19 79:15
  90:16 91:5,10
  100:18,19 107:8
  183:3,9 184:19
  207:24 208:1
  209:18 213:24
  255:2 256:1,5
  295:12,16,22
  296:13 297:21
  299:21 313:7,23
  317:4 318:3 321:7
  346:13,15 348:7
  349:3
pages  257:1
paid  229:7 231:8
  231:16,18 233:17
  233:20,21 234:9
  286:17
pain  46:23 65:20
  65:23 66:10,11
  69:12,19,24 70:3
  73:24 77:19 78:10

78:12,13,15,20,20
78:24 79:3,12
86:23 87:1 103:18
140:17,19 141:10
141:16 144:7
148:10,11,12,15
148:22 149:12
157:9 196:17,21
196:23,24 197:2,4
197:5 198:5,8,14
198:21 199:15,17
202:3 207:12
211:13 212:21
222:3,4,5,15 223:3
259:2,3,11 260:19
261:19 263:23
264:3,8,10 279:19
281:7,19 282:4,8
292:14 294:14
painkillers  312:9
pandemic  96:16
  131:3
panned  283:15
paper  97:22 174:4
  316:21 322:5,18
para  302:15
parachute  201:18
  201:19,20
paragraph  256:5
  296:15 297:7
  302:10 318:6
  319:8 321:12
  322:11,12 323:11
  323:19,22,23
parallel  144:14
  290:20,22
parent  59:7
parents  171:2,16
  171:16
parking  74:16

parroting  50:7
part  38:8 41:17
  42:18 50:1 72:6
  76:21 81:21 93:21
  94:24 95:4 110:11
  113:7 122:12
  136:9 137:7 143:6
  145:9 169:1,8,9
  174:23 184:9
  200:9 201:23
  220:4 221:10
  237:22 255:20
  259:21 260:3
  265:21 266:9
  273:9 275:20
  294:6 303:6 311:4
  314:16,22 316:10
  333:11 348:9
participants  94:19
  95:6
participate  63:15
particular  18:17
  27:17 53:10,22
  83:19,24 85:5
  93:17 94:14
  108:23 118:20
  189:20 191:5
  192:14,23 194:13
  206:17 214:23
  217:18 219:21
  261:10 284:1,19
  285:8 294:4,4
  306:6 335:10
parties  1:21 7:11
  125:23 344:12,14
partners  300:18
parts  109:9 256:11
party  8:3 11:11
  117:5 119:8
  239:20 290:19

pass  115:7,10
  328:14
passed  43:24 44:5
  122:12 142:10
  167:17 270:23
  271:12
passing  92:23
  125:23 142:21
passionate  102:14
  102:20
path  335:21
pathway  163:19
  316:23 317:12
  333:7,7
pathways  335:2
  335:19 336:23
patience  338:18
patient  68:5 77:17
  86:10 88:1,15
  90:20 112:17
  130:5 252:14
  276:17 292:2
patients  44:13
  46:22 65:12,24
  66:3,5 67:5 74:15
  75:1,20 78:3
  148:22 222:14
  252:17 263:8,20
  276:8 277:14
  294:12
pattern  266:18
  274:11
paul  2:6 8:18
  28:14 29:19 187:6
paused  228:22
pay  37:2 134:16
paying  290:20
payors  124:19
pbs  123:2
pdf  310:20

**pdmp** 89:12
**pdo** 134:13
**peak** 156:11
**peaked** 246:1
**peaking** 264:22
**pediatrician**
  171:22,23
**peek** 204:2
**peer** 122:18
  123:16
**peia** 175:19
**pending** 232:15
  235:8,21 298:24
**pennsylvania**
  167:23
**penultimate** 256:4
**people** 28:10 43:7
  44:4,12 45:16
  46:9 47:2,5 70:22
  74:18 90:14 98:2
  98:2 103:8,12
  105:14 107:1
  123:4,9 126:4,6,10
  126:13 132:21
  134:2,2,2,4,23
  137:23 138:22
  144:19 145:17,20
  145:23 147:14,15
  147:21 150:3,5,8
  150:12 154:2,8
  155:18 158:11
  159:15,18,22,24
  160:1,21 163:1,6
  163:17 164:7,12
  164:18 165:6
  166:3,5 167:1,2,4
  175:24 176:1,23
  177:24 178:1,2,8
  178:10,11,13,15
  178:17 179:13,16
  201:17,18 208:9

208:19 211:21
  212:6 215:16
  217:4 243:11
  247:12 263:14
  264:7,21 271:18
  271:19 273:17
  274:18 277:19
  278:23 279:7
  280:10,14,22
  281:2,9,16,18,20
  281:21 282:13,18
  283:2 284:12,21
  285:10 292:11,12
  292:17 293:8,12
  293:15 311:11,20
  311:24 312:4,8
  314:19 327:22
  330:8,14 331:19
  334:13 339:23
**people's** 294:24
**percent** 97:16
  111:24 124:11
  136:14 157:22
  158:22 162:6,16
  166:16,19 167:20
  172:12 174:14,16
  196:19 204:11
  207:7,13,22 209:7
  209:7 216:1,6,7,8
  217:12,16 219:22
  220:19 245:23
  246:5,9,9 264:13
  265:8 273:3
  324:24 331:8,8,8,9
**percentage** 150:21
  172:14 208:9,17
  211:8 245:13
  272:17 281:1,9
  282:2,3,8,12,13,16
**perfectly** 32:13
  35:7

**period** 146:14
  243:13 245:9,16
  264:16,17,24
  265:1 297:1
  306:17 316:16
  334:8
**permissible** 17:22
**permitted** 40:4
**person** 34:9 81:10
  119:11 133:16
  134:15 136:2
  143:24 147:19
  153:18 154:18
  159:5,8 178:5,7
  241:20 244:22
  245:2,6 278:8
  281:11 331:5
**personal** 10:23
  20:24 73:3 117:6
  118:11 185:24
  186:2 252:16
**personally** 97:6
  127:2 160:22
  187:2 220:22
  251:7 309:22
  331:22 347:11
  348:15
**perspective** 39:11
  42:5 96:6,8 262:8
  330:1
**pertained** 19:11
**pets** 155:4
**pharmaceutical**
  73:22 170:12
  213:1 215:20
  257:15 258:9
**pharmacies** 36:2
  39:5,12 43:18
  83:16,19 84:1,5,14
  84:17 85:5,10,21
  85:24 90:3 105:5

248:15,16,21
  265:12,14,21,24
  266:3 267:14
  268:19 269:23,24
  271:6,9
**pharmacist** 80:12
  80:21,22 82:10,20
  83:7 86:11,13,14
  87:22 88:1,3,11
  90:3
**pharmacists** 80:17
  80:18,24 83:6
  85:8 89:4,22 90:8
  270:9
**pharmacology**
  65:21 66:16
**pharmacy** 39:11
  40:18 41:9,11,18
  41:24 51:16,17,20
  51:23 52:5,9,12,16
  53:3,12,14,18 54:3
  66:8,8 68:9 79:21
  80:9,20,21 81:11
  84:9 85:13,21
  86:2,6,14,14 90:5
  90:18,19 112:16
  121:14 124:18
  134:12,16 135:7
  251:16,18,24
  266:14,24 267:11
  267:20 268:2,2,6
  268:11 269:1,2,13
  269:18 272:16
  273:7 274:2
  292:22
**phenomena**
  275:19
**phenomenon**
  164:6
**phone** 16:19,20
  27:15 119:16

187:13 228:21
346:3
**phones** 7:7
**phrase** 277:23
**physical** 151:18,22
294:24
**physically** 132:3
**physician** 25:23
63:16 64:22,23
65:5,9 68:23
70:17 71:21 74:1
82:13 84:8 123:23
129:3 143:23
225:10 247:18
252:12 276:13
280:13 293:23
337:17
**physicians** 38:16
38:21,22 44:8
46:2,24 76:17
78:2 110:4 188:17
249:12,20 261:8
261:11 264:14
265:9,15 300:16
**physiological**
151:18
**pick** 7:5
**picking** 187:11
325:15
**piece** 72:5 161:8
190:14 228:18
324:13
**pieces** 44:6 96:11
109:8 116:15
125:18 138:19,21
323:6 324:9
325:16
**piecing** 322:13
**pill** 221:8 292:14
**pillars** 216:4

**pills** 35:23 36:1
43:13 47:8 103:19
113:18,21 114:4,9
114:12 130:13
146:17,24 147:5
147:13 148:6
149:17,18 154:24
156:7,19 157:12
166:11 168:6
177:14 178:20
193:23 198:12
223:9,10 226:1,9
226:10,13 266:16
275:5 330:24
**pink** 302:14
**pinky** 302:14
**place** 7:7,11 38:5
82:17 138:1,2
142:17 161:21
220:21 230:3
269:13 275:8
344:6
**placed** 68:22
148:18 222:11
266:13
**placenta** 169:19
170:8
**places** 68:19
141:13 152:4
165:16 269:18
314:18
**plainly** 43:8
**plaintiff** 1:5,12
21:16 25:13
**plaintiff's** 182:9
182:11,15 183:22
184:1,4,13 204:5
218:6 221:5,6
**plaintiffs** 2:2 6:22
8:19 10:16 11:10
11:12,18 21:17

23:2,14 24:10,12
24:24 25:16 27:3
28:1 29:2 33:14
117:23 118:8
214:14 231:9
233:12,18 234:11
234:23 237:5
239:4,7 240:3
**plan** 29:7 37:13
**plane** 201:17
**planning** 173:14
173:18 174:1
317:19
**plans** 37:22
**plausible** 248:12
**play** 155:10
230:15 260:19
**played** 79:2
165:13 259:19
**playing** 98:12
164:22
**pleadings** 119:7
**pleasant** 2:5
**pleasantly** 175:7
**please** 7:4,6 8:9
9:1,3 12:2 14:13
20:15 22:2 23:5
24:1,7 32:15
36:10 41:12 43:24
54:14 62:2 64:8
64:15 92:16 93:23
99:7 108:10,10
113:4 181:12
183:2 192:6
205:22 206:8
211:16 214:12
216:23 226:8
227:14 228:10
244:12 253:16
259:24 268:1
285:5 299:9

303:13 308:1,5
312:21 317:3
318:2 321:7
323:18 333:1
339:1 346:11,11
**plenty** 83:14
**plus** 198:4 201:11
245:13 319:19
**pogue** 2:14 8:14
**point** 11:17 20:5
34:22 38:15 55:15
55:15 59:4 71:19
78:24 80:11 84:3
94:3 106:17
107:21 118:16
127:1 145:2,16
150:11,20,24
154:18,20 161:16
169:14 171:5
181:10 185:22
200:10 215:10
221:21 230:11,12
230:18 232:1
236:8 240:8 247:9
247:10 255:6
282:14 296:4
297:19 299:5
306:13 329:24
331:17 332:22
333:1 334:6 337:8
337:24 340:11,16
**pointed** 233:13
**points** 103:10
106:12,13 107:3,5
107:7,9,12,13,18
107:24 108:1,2
**police** 125:15
**policies** 43:24
**policy** 6:12 44:6
72:8 73:4 75:9
78:5 92:21 121:22

125:11 138:10
254:19 255:23
273:16 276:12
296:17 317:19
**political**  208:21
**politico**  123:7
**polysubstance**
318:7
**poor**  143:12
197:22 211:24
320:15
**pops**  80:23
**population**  69:1,5
72:18 143:4 146:9
147:14 149:10
156:12 157:6,15
166:19 167:4,6
169:9 172:13
193:18 194:20
195:17 198:13
199:14 201:14
205:3,6 207:14,23
208:7,16,17 209:7
209:8 211:8 223:1
266:17 273:2,3
280:21 282:6,9
324:21 334:9
**populations**
205:12 319:17
321:23
**porter**  283:14
**portfolio**  33:6
**portion**  166:5
**position**  48:11,16
48:23 55:11,20
65:9 91:22 92:1,6
92:7 117:21 118:2
121:5 128:10,17
186:11 187:23
234:12 237:21
283:10 290:21

**positions**  48:16
120:11 128:1
**positive**  152:15
**poss**  198:8
**possess**  139:4,6,16
293:20
**possession**  189:3
293:5
**possible**  49:7
176:11 196:15
198:7,10,20
248:12 264:7
272:7 282:13
328:19
**post**  141:12,15
196:23
**posted**  69:16
**potent**  164:15
165:2
**potential**  139:14
172:3 335:21
**potentially**  52:23
67:4 82:23 83:2
116:21 140:4
194:11 195:14
279:20
**power**  45:1 53:19
54:4 86:7 138:11
176:8
**powerpoint**
309:15
**powerpointing**
305:2
**powerpoints**
304:14
**practice**  37:12
40:1 55:19 63:22
64:22 65:7 86:19
92:19,20 94:6
142:20 157:9

**practiced**  63:24
64:3
**practicing**  68:18
68:20 79:13
188:19 261:9
**practitioner**  137:5
**precedes**  332:7
**precise**  281:17
**precursor**  258:17
**predictions**  194:17
**predilection**  172:6
**predominant**
321:22
**prefrontal**  153:10
**pregnancy**  320:9
**pregnant**  169:6,8
169:14 175:3
320:13,14
**preliminary**  6:22
9:18 23:2,14
298:4 303:3
306:12 318:10
341:16,19,23
342:8
**prematurely**
342:7
**preparation**  18:4
19:7
**prepare**  15:13
17:19
**prepared**  34:6,10
185:7
**preparing**  18:20
**prescribe**  36:8,12
36:24 37:14,22
38:3,4,17 39:1
44:10 46:3 67:16
67:18 73:23
140:10,14 141:20
248:7 268:23
292:2,21

**prescribed**  129:9
172:2 224:5
225:17 280:13
282:7 283:3
291:22 292:3,9,18
293:6,21 294:3
**prescriber**  82:17
88:13 252:12
**prescriber's**  275:3
**prescribers**  38:20
38:21,24 46:24
74:20 76:2 78:2
112:18 113:2
247:20,24 248:6,8
249:5,13,17
260:13,17 261:3
261:12 262:9,16
262:21 263:1,17
263:19 265:15
268:22 270:16
**prescribing**  37:13
37:22 42:11 66:12
66:17,18,20,22,23
67:23 68:1 72:4
75:4 94:2 110:5
114:10,10 141:23
149:16 150:10
157:7 162:22
188:18 214:22
223:7 224:18
259:11 263:21,23
268:18 270:17
282:4,5 294:14
**prescription**  22:11
35:15 39:6 43:13
47:19 66:13 67:3
68:1 69:13 76:10
77:1,13 78:11
82:4,14,17 86:22
87:3,9,15,16,18,19
87:21,23 88:2,4,14

88:19,21,22,24
89:5,6 90:10,22
95:3 105:9 111:20
113:17 126:5
127:7,8,9 129:24
134:14 147:18
154:24 155:1,2
156:2,3,5 163:8,14
163:17,20 166:11
177:14 178:20
179:1 191:4 192:1
192:2,10,18 193:5
195:19 197:12,14
200:24 203:6,12
206:15 208:4,11
209:4,20 211:13
211:18 213:9,18
213:19 218:13,13
219:22,23 220:14
221:11 223:23
224:6,8,8 225:8,20
226:9,10,13
243:19 248:20
253:24 254:7
259:11 260:21
261:1 266:13,24
267:11,19 268:3
268:11 269:2,14
269:19 270:1
272:16 274:6,12
275:1,3,15,24
276:1 277:15
278:10 279:9
280:1,6,7,22,23
281:1 282:9,18
284:5 291:19
292:8,18 293:5,17
293:20,24 294:4
305:11 312:9
324:3 325:1
330:15,20,21

331:5 332:8
333:17
**prescriptions**  36:3
39:16 68:4 74:14
81:23 82:16 88:13
89:24 94:1 110:19
110:23,23 111:4
111:17 112:10,13
113:3,6,16,20
114:8,12 130:13
144:6 145:24
146:22,24 147:20
149:11,13 150:9
150:15 155:11,14
155:20,21,23
156:6,14,19 157:4
157:12,19,23
162:15,17 191:24
192:12 193:5,22
196:5 202:2,6
203:11,16,16
204:14,15 212:7,8
214:16,17 215:16
217:12,17 220:19
221:8 223:2,4
247:13,17,20,23
248:3,6,7 249:1,4
249:13,14 260:6
260:14 261:10,12
262:2,10,11,14,17
262:18 263:11,12
264:14,20 265:9
265:13 266:1,4,7
266:10,12 267:15
268:17 269:1,5,6
272:17 274:13
276:10,14 294:13
305:23 324:7
**presence**  170:4
302:10 305:8

**present**  3:7 8:5
201:22 305:3
**presentable**  14:3
**presentation**  5:13
6:19 99:9 101:6
101:19 106:19
107:9 108:4,14
113:8 147:16
162:5 206:4,9
209:15 244:9
304:24 305:3
308:8 309:20,24
310:3,5,7,17,24
317:8 319:6
**presentations**
309:22
**presented**  112:15
266:7 316:2
**presenting**  109:5
316:18
**preserve**  186:8
**president**  91:15
124:5 128:18
**pressure**  197:23
**presumption**
283:11
**pretty**  72:13 94:5
139:6 160:11
**prevalence**  319:15
325:9,13
**prevent**  44:11
97:16 138:3
173:11,12 265:19
270:13
**prevented**  176:17
**prevention**  70:23
337:19
**preventionists**
300:17
**preventive**  65:18

**previous**  10:3,5
54:1 93:7,9 106:4
181:8 190:7 278:5
282:24 283:10
306:14 309:21
322:16 323:4,16
323:23
**previously**  16:14
40:21 196:16
205:18
**price**  124:4
**primarily**  45:9,18
68:5,20 71:23
94:15 254:2 278:7
**primary**  64:4,22
65:8,10 68:15,23
71:20,21 72:21
78:2 129:3 292:23
**principally**  63:24
**principle**  190:8
**principles**  190:8
190:11
**prior**  9:23 14:21
16:18 18:13 62:24
92:6 124:12 125:4
127:17 135:19
157:8 166:22
192:14 193:2,14
193:17 194:3
243:13 259:15
276:7 302:4
**prioritize**  197:6
212:20
**prison**  45:20
173:15
**prisons**  173:22
**private**  7:5 69:4
**privilege**  240:9
**privileged**  17:23
238:17,21

proactive  138:24
probably  36:15
  113:23 209:15
  224:17 298:2
problem  34:17
  35:10,11 46:6
  48:18 49:16 52:17
  53:19 57:16,21
  84:22 98:10,16,24
  99:1 105:20
  116:15,22 128:3
  130:11,11 134:9
  134:22 137:1
  138:5 158:15
  161:15 163:19,21
  164:18 171:14
  172:11 175:14,21
  232:14 236:18,20
  250:5 253:13,21
  253:23,24 286:18
  311:5 331:6
problematic  73:5
  85:6 86:12
problems  45:17
  97:15 127:4
  134:18 135:15
  138:9,22 277:6
  278:18 330:15
procedurally
  230:16
procedure  1:20
  237:16 347:5
  348:5
procedures  92:21
proceeding  8:9
proceedings  26:4
  54:24 115:1
  180:24 226:24
  240:20 291:13
  328:9

process  15:19
  34:20 36:6,18
  38:8,12,14,16,23
  39:5,10,18,21,22
  40:5,7,21 41:1
  42:3,10 56:10
  59:24 87:21 92:12
  93:15,19,22 94:5
  95:14 141:21
  142:14 151:17
  251:22
processes  140:22
produce  35:23
  124:14 189:20
  342:7
produced  20:2
  97:22 101:2
  164:14 257:15
  298:17,18 304:4
  316:10,17
product  76:14
  164:5
production  105:3
  346:15,17,22
products  220:12
  257:16 258:8,9,13
professional  56:15
  57:2 87:11 345:17
professor  65:9
  79:20 80:5 120:17
  120:20,24 121:10
  121:13,17,21
proficiency  92:18
profit  164:5,9
program  40:19
  42:15 56:2 65:13
  69:8,9 89:1,6,11
  122:4 124:17,17
  138:16,17 173:6
  250:7,7 251:13
  329:17

programs  59:11
  70:22 122:22,23
  159:2 175:3
progress  207:1
progressive
  140:23 156:9
prominent  128:9
promise  328:20
  338:21
promoted  78:13
  259:4
prompted  71:18
  72:6 259:7,9,17
prompting  259:16
promulgate
  268:16
proper  50:15 71:2
properly  69:18
  70:24 71:5 291:22
  291:23
properties  160:14
  160:15
proponent  145:19
proportion  45:16
  167:6
proportional
  275:11
proportionate
  274:16
propose  48:11
  49:2,14,23 266:23
  267:10,18 268:23
  271:7
propulsion  94:22
prosecutor  293:15
  293:23 294:10
prosecutor's
  239:22 240:1
prosecutors
  294:19

prospective  261:7
prostitution
  153:22
protection  90:20
protocol  15:8
provide  13:9
  15:18,20,22 21:8
  27:17 30:5 31:1
  31:15 34:15 36:1
  36:23 37:8,10,11
  38:6 44:15,19
  51:21 59:21 130:1
  141:6 143:16
  148:22 159:3
  176:15 184:10
  194:9 200:7
  202:21 216:19
  217:5,6,9 218:16
  222:14 237:11
  268:7 276:6
  285:13 286:2
  310:3 323:8 326:7
provided  17:13
  27:12 28:18,18
  31:12 57:1 66:6
  67:5 101:5 174:4
  199:19 218:4
  229:15,19,24
  235:10 236:5
  237:21 238:9
  241:3 244:21
  247:20 260:6
  326:19
provider  82:1
providers  36:4
  81:15,17 300:15
provides  245:6
providing  15:20
  19:14 42:4 58:11
  93:2 126:22 159:6
  172:8 192:2

202:22 217:10
220:10 229:18
305:2 322:14
327:16
**prudent** 263:5
**psychological**
151:23
**public** 5:10,23
9:16 11:4 18:15
22:18,20 30:9
31:8,22 32:6,21
35:12,17 39:20
40:16 42:16 43:19
44:16 48:10,23
56:3,7 60:17 63:4
65:16,18 67:20
69:3 71:7,19,23
72:9 73:5 80:12
81:3,5 83:10
84:13 86:4,4 91:8
91:24 94:10 95:11
95:12,15,18,19
96:12 101:23
103:20 109:5
113:24 120:3
121:18,23,23
122:7 123:18
131:13 143:24
145:7 181:17
183:12,18 184:5
184:21 217:6
243:5 250:19,22
250:24 251:19,21
293:3 295:5
296:22,23 297:9
299:22 301:4
303:20 315:11
326:2 328:22
329:13,24 337:18
344:4 347:10,18
348:15,23 349:23

**publication** 298:1
325:24
**publish** 342:17,17
**published** 85:18
114:2 122:19
125:6 317:14
325:24 342:12,15
**pull** 182:7 205:20
**pulled** 149:14
156:4 223:5
**pulling** 286:13
**pulmonary** 63:1
**pump** 178:19
**punish** 153:16
**punishment**
153:19
**punitive** 149:2
222:19
**pure** 80:18
**purpose** 87:20
161:11 243:8,10
249:23,24 292:15
292:16,20,23
344:6
**purposes** 8:21
12:9 23:17 60:24
99:12 182:10,15
184:1 186:3 247:1
251:8 254:21
258:21 295:9
299:15 303:23
308:16 313:4
339:10
**pursuant** 1:20
15:8 63:18 224:8
275:2 280:7,22
**pursue** 71:18
**purview** 56:1
58:13
**push** 160:16

**pushed** 78:20
**pushing** 150:13,14
**put** 34:20 46:8
48:16 49:6 51:3
82:9 108:4,11
113:5 206:1
228:18 232:10
252:22 253:2
275:8 281:5
287:19 297:14
**putnam** 30:8 31:6
**putting** 131:17

## q

**qualifications**
92:23
**qualified** 344:5
**qualify** 17:5
280:24,24 291:19
**quality** 281:12
**quantify** 166:15
166:17 172:24
177:23 303:9
**quantities** 294:16
**quantity** 268:11
**quarantined**
270:11
**queries** 251:23
**question** 14:6,13
14:15 18:3,11
25:15 26:12 32:1
32:3,11 33:24
35:9 40:8 41:3,5
47:22 48:2,7
49:13 50:20 53:16
64:17 81:24 87:8
87:14 88:8 98:21
113:4 116:8 117:8
118:20 133:20
140:4 144:16
175:16 180:10
188:10 192:6

198:16 199:6,23
200:17 201:8
203:15 204:16
207:17,20 217:3
217:22 220:2,9,11
224:11 225:24
226:6,7,8 227:13
228:9 232:14,15
234:15 235:7,8,21
235:23 236:20,23
236:24 237:2,3,8
237:10,13 238:2
238:16 248:11
250:2 252:11
253:16 261:16,24
267:4,5,16,18,22
267:23 268:5,15
269:7 270:4,5
271:3,11 278:22
298:23 299:2
312:19 326:17
327:2,3,6,10
331:22 332:9,13
332:15 336:10
**questioning**
114:18 117:22
118:2,8 137:13
146:23 186:14,14
186:18 188:10
**questionnaires**
93:5,7
**questions** 9:18
13:20 14:3 16:6
32:9 33:2,5,10
35:2,6 37:1 49:6
51:11 93:11,20
94:1,4 98:18
99:19,21 115:9,14
116:6,14 148:1
176:20 181:16,22
185:17 221:6

328:14 336:3
338:18 343:4
**quick**  188:9
286:10
**quickly**  110:18
119:20 179:2
**quintilesims**  111:8
112:3
**quit**  290:11
**quite**  242:5 320:3
**quota**  35:21
189:17,18 190:3,5
190:9,24 191:10
273:6
**quotas**  105:4
109:17 137:20
190:21
**quote**  148:19
222:12
**quotes**  311:1
321:18

**r**

**r**  2:13,14 7:1 9:4
**rahul**  1:19 6:17,20
7:14 55:2 60:22
99:10 115:4 181:2
227:2,22 240:22
291:15 315:10
328:11 343:11
344:5 345:5 346:8
347:4,9 348:4,13
349:20
**raise**  82:1 133:21
135:23
**raised**  270:10
**range**  16:23 65:24
66:4 216:1 217:14
**ranked**  111:16
**ranks**  111:3
**rate**  45:6 110:18
111:3 131:5

143:12,13,13
166:21 320:9
334:24
**rates**  111:20
130:23 143:10,11
143:16 144:11,18
145:5 167:19
208:3 285:17
**rationale**  77:16
**reach**  116:18
**reaching**  43:7
**reactive**  138:21
**read**  12:24 18:8,17
22:19 59:15 80:14
83:10 91:18 92:21
102:2 147:3
221:18,24 237:8
242:22 253:19
256:4,21 297:4
298:7 300:5 301:8
301:16 306:3
315:7,13 318:6,20
319:23 320:17
321:11 322:2,11
323:6,11,14,15,19
323:22 327:6
338:3 340:13
343:6,8,15 344:10
347:5,6,12 348:5,6
348:17
**readily**  47:11
278:20
**reading**  84:9
223:17 246:5,7
323:9 326:22
327:8 346:19
**reads**  296:15
**ready**  24:5 181:11
339:17,18
**real**  97:24 214:4
267:24 276:6

281:5 285:23
286:10
**reality**  277:13
**realized**  29:17
164:8
**really**  28:8 33:23
46:22 77:21 80:23
81:9,23 98:6,10,11
98:15 104:17
110:18 114:6
123:24 136:10
138:23 140:16
142:11 148:13
149:4,7 150:11
166:18 190:5,5
216:13 222:6,21
222:23 242:3,4
244:18 273:8
278:14 296:10
324:8 328:20
**realtime**  66:7 78:7
345:3,17
**reap**  333:18
**reason**  13:5,23
17:24 45:18 72:9
73:2 76:12 85:16
110:8 112:5 152:9
152:11 156:8
163:12 202:15,16
215:5 248:13
273:20 281:17
298:5 301:10,18
301:23,24 302:2
302:23 303:1
311:15 313:15,19
318:22 320:1,19
341:14 342:7
346:14 348:8
349:3
**reasonable**  52:7
90:11 108:16

142:22 181:17
194:2,16 195:2
263:4
**reasonably**  251:10
**reasons**  140:10,14
140:15 143:15
148:20 173:3
198:3 202:17
222:12
**reassert**  293:10
**rebecca**  317:18
**rebuild**  161:11,12
**recall**  10:11,13
11:2 17:8 19:24
38:11,13,15 39:20
52:2 54:13 55:9
55:14 57:11,13,18
58:20,21,23 59:1
59:17 66:14 73:8
75:2 76:24 77:3,9
77:10,14,14 78:8,9
78:12,17 80:2
84:2,4,21 86:16
92:12,16 93:23
94:3 95:4,9 128:7
167:16,17 189:9
225:4 285:6,8,12
299:3,6 319:3
329:5 332:4,5,6,10
332:18 335:12
336:1,7 337:24
**recalling**  225:1
**receipt**  346:18
**receive**  39:13
**received**  14:21
15:3,2 27:12
62:12 74:23 229:8
257:8 296:20
330:19
**receives**  87:22

**receiving** 17:6
126:19 281:18
**receptor** 160:11
**receptors** 160:8,20
160:21 177:6
336:23 337:5,11
**recess** 54:23
114:24 180:23
226:23 240:19
291:12 328:8
**recognize** 10:20
84:23 99:15,18
108:6 163:4
266:18 313:11
**recognized** 72:12
74:13 137:16
**recollect** 9:22 17:5
21:3,5 27:15
36:15 54:13 114:5
145:2 246:15
297:20 303:11
310:1
**recollection** 10:1
19:16 20:3 38:1
90:23 297:8
315:15,17
**recommend** 212:3
**recommendation**
197:1
**recommendations**
78:19 125:17
188:22 215:8
271:15,15
**reconvene** 286:9
328:3
**record** 7:3,12 8:7
12:18 29:14 34:21
50:6 52:3 54:21
55:3 97:8 114:22
115:5 117:9,15
180:21 181:3,7,10

182:23 183:9
184:12 187:11,23
188:8 189:13
226:21 227:3,10
227:23 228:6,18
228:19,21 232:11
235:13,14 240:15
240:17,23 267:9
286:11 287:4,5,8
287:11,17,19
291:10,10,16
297:14,18 298:16
310:9 327:8 328:6
328:12 338:8
343:9 348:9
**recorded** 7:14
**recording** 7:10
123:9
**records** 22:20
**recovery** 316:23
317:12
**reduce** 47:9 52:14
266:23 267:10,19
268:10 269:6
**reduced** 215:17,19
344:10
**reduces** 268:16
**reducing** 163:20
**reduction** 125:20
138:13,16 142:3
162:9,10,10,12,14
162:15,17,20,22
162:23,24 197:18
197:19 225:6
268:18
**reductions** 162:4
**refer** 85:20 89:21
108:2 275:2,4
**reference** 64:13
224:17 346:7
347:2 348:2

**referenced** 111:9
347:11 348:15
**references** 93:3
285:13
**referred** 86:13
**referring** 76:9
89:22 142:2
171:15 183:5
184:14 210:17
218:6,11,24
219:14 221:11
223:22 224:4
242:15 251:14
257:20,21,23,24
258:14
**refers** 243:3 275:5
**reflect** 62:11 104:5
104:14 105:20,22
106:12 107:4
112:9 206:12
207:6 244:15
245:14 255:6
304:23 306:5
314:1,5,6,7 319:5
340:5
**reflected** 63:4
**reflects** 111:19
305:1 313:7 315:9
340:9
**refocus** 198:16
**reform** 6:10 45:14
45:14 254:15
255:18
**refrain** 50:10
321:17
**refresh** 19:15
295:23 297:8
315:15
**refreshed** 20:2
**refused** 265:13
266:1 276:13

**regain** 122:14
**regard** 14:18
32:24
**regarding** 11:1
54:10 227:11
228:7 242:1
296:19 314:8
326:11
**regards** 32:20
185:8 234:7
**registered** 1:21
39:12,22 87:10
112:14,16 249:9
252:12 345:17
**registering** 36:11
**registrant** 36:12
53:7
**registrants** 35:24
36:2,5,8 39:17
40:23 292:22,23
**registrar** 341:2
**registration** 36:6
36:14,16 37:4,6
38:12 40:7 53:8
93:21
**regular** 73:20
**regulate** 47:23
48:3 271:9
**regulated** 41:10
250:14 264:2
270:16,20,23
**regulates** 51:17
271:6
**regulating** 269:23
292:16
**regulation** 49:3
**regulations** 70:22
90:5 268:23
**regulatory** 58:1
**reinforcement**
152:16

**reininvestments**
45:15
**reiterating** 33:7
**rel** 5:4 12:5
**relate** 69:12 75:13
107:14 109:24
110:10 186:8
**related** 8:3 10:19
10:22,23 11:7
22:6 95:8 113:12
117:14 122:23
128:2 136:7 177:5
188:18 189:20
197:22 212:8
253:14,21 271:21
271:22 290:22
318:11,11,17,17
344:12
**relates** 80:23
137:18
**relating** 34:13
**relation** 255:12
**relationship**
113:10 234:19
239:1,3 272:11
312:14
**relative** 344:13
**relatively** 157:5,6
**release** 152:12,21
153:1,4 177:4
333:9
**released** 126:7
152:15
**relevant** 43:3
**relied** 57:24
188:12 189:10,10
**relieve** 294:16
**rely** 57:23
**remainder** 225:19
**remained** 130:19

**remains** 102:23
**remember** 10:20
17:15 19:22 21:3
71:9 75:10,16
82:24 84:24
133:17 134:14
147:23 161:3,6
188:14 290:5
319:3
**remotely** 1:21
7:22 8:6 299:5
**render** 34:6,10
119:11
**rendered** 181:15
181:16
**renew** 52:24 53:8
**renewal** 38:8,14
53:4
**renewing** 36:16
**rep** 106:11
**repeat** 20:15 22:2
41:12 53:16 88:7
98:21 108:10
126:21 158:8
192:6 196:18
226:8 227:13
228:9 248:18
253:16 259:24
**rephrase** 14:6
18:2 47:22 48:8
102:19 116:8
236:24 262:15
267:24 274:10
278:2
**replicated** 124:1
**report** 85:24 96:8
96:12,12 112:3
125:6,7 144:22
145:1 183:5,10,21
184:13 204:6,17
204:19 217:24

218:6,18,19,21
219:21 220:6
246:10,11,13,16
247:11 274:12
296:7 297:17,20
298:3 299:3 319:1
319:2 323:1,2,3,14
329:3,4,9,18
342:23,24
**reported** 183:16
303:4 320:8
342:20
**reporter** 1:21 7:24
9:1 14:11 187:9
227:11 228:7,17
228:23 236:2
253:20 308:19
309:1 340:9
341:11 345:17,17
347:7
**reporter's** 340:18
**reporters** 345:3
**reports** 18:15
22:20 34:12 58:2
58:4,9,11 83:9,12
85:18 114:2
124:14 143:8
182:5 184:24
185:1,4,9 204:3
219:9,9 257:8
341:15
**represent** 76:13
100:24 117:1,2
118:14,15,15,21
118:23 203:11
239:11 247:6
289:19 298:16
304:3 316:9
**representatives**
73:22 76:12

**represented** 21:21
29:11,13,17
325:23 338:9,10
**representing** 8:21
186:17 187:2
239:16 240:1
**republican** 173:24
**request** 6:3 15:17
19:12 268:7,12
269:14 304:24
310:2 339:7 340:9
340:14 344:10
348:9,11
**requested** 15:18
54:2 184:9 310:2
341:10
**requesting** 268:19
**requests** 126:19
**require** 89:20
92:18 145:8 153:7
211:21
**required** 53:8
88:23 89:5,23
90:8,12 144:12
333:21 346:24
**requirement**
89:21,22
**requirements**
40:22 92:17,24
202:3 344:15
345:6
**requires** 53:4
270:8 334:14
**research** 79:8
189:10 279:24
280:4,5 283:16,19
283:22 284:1,3
286:1 317:19
320:22
**reserve** 181:6

residence 340:14
341:24 342:18,21
343:1
residency 39:24
40:3 62:15,19,24
64:2,11,21 65:13
69:9 93:1
resident 342:4,5,6
residents 68:8
69:8,23 110:4
207:7 271:20
340:7
resides 218:12
resignation 92:7
resistance 67:11
resolve 240:12
resort 141:3,4
211:22
resorts 170:15
resources 22:22
58:16 133:2
175:21 176:7
314:3 317:15
326:1 329:20
respect 30:6 41:6
41:24 49:15 66:12
67:8 77:12 78:10
268:22 270:17
271:12 289:9
297:10 305:15
respective 272:13
respectives 273:22
respond 17:12
28:3,24 33:1,5,17
35:2 37:23 52:23
87:14 341:10
responded 233:5
267:4,5
response 17:14
19:5 20:2,13 21:8
27:12,24 28:18

30:18 33:22
135:14 174:24
181:15 221:5
273:24 276:18
296:22
responses 13:1,4
28:4
responsibility
70:17,19 82:20
124:13 265:17,19
265:22 271:24
272:1 293:3
responsible 71:6
91:15 292:24
294:18 302:6
responsibly 44:10
46:3
responsive 135:15
responsiveness
19:4
rest 110:20 113:7
154:5,6 273:4
280:15 319:2
restate 113:4
261:24 269:8
285:5
restaurants 70:24
165:10
result 22:10 49:5
76:7 151:4,22
152:14 165:16
243:12 252:18,19
276:14 277:20
295:21
resulted 125:17
166:2
resulting 22:12
32:21
results 67:19
161:24 185:8
301:14 302:18

resume 6:17 60:22
61:8,9,16 62:6
64:19 71:10 79:14
79:16,19 91:5
122:17
retail 80:21
retain 119:21
retained 33:12,16
34:4,8,21 119:10
227:5,16 228:1,12
231:1,8,15,17,18
231:21 232:3,4,23
234:20 235:1,10
236:12,15 237:12
237:22 287:1
288:7,22 289:8
290:4,16 343:12
retainer 233:17
retaining 287:20
289:20
retention 288:17
288:20 289:11
290:9
retrospective
149:9 222:24
261:6,7
returned 346:18
reverse 178:6
review 13:8 15:8,9
15:20 18:5,19,23
19:3,13 20:7 62:1
75:17 123:16
147:3 203:22
204:6 207:13
218:19 247:4,5,11
249:18,19 261:6
296:11,14 314:9
314:10,11 318:24
346:12 347:1
348:1

reviewed 19:6,9
19:20 83:22 119:7
122:18 224:20
225:2 280:5
283:23,24 285:7
322:6
reviewers 297:22
reviewing 244:17
246:16 279:23
revisions 297:22
revitalizing 6:12
254:18 255:22
reward 152:20
333:7,12 336:18
336:19
rewarded 152:20
rewards 333:18
rgupta000919-966
6:21 99:11
rice 2:4 234:18
236:13
richman 5:14
308:9
right 9:11 10:13
13:2,10 19:2,24
20:19 21:13 30:2
38:23 39:9 46:16
61:19 68:14 71:16
71:17 76:3 104:12
112:17 116:11
117:20 118:14
119:8,20 123:12
130:9 136:22
140:7 141:7,15
142:7 143:18
147:23 149:24
151:13 154:7
156:15 158:3
161:14 170:2
175:11 177:17,21
179:19 180:16,20

181:14 186:23
188:13 189:1,15
189:23 193:12
194:21 197:10
206:20 207:10,23
216:9,19 219:20
221:3 223:16,19
225:1,4,15 226:3
233:1,9 243:1
244:6 246:15,15
250:17 254:3,9
255:13 266:6
274:4 277:21
281:19 282:14
284:3,19 292:15
295:15 299:18
304:17 306:22
310:21,23 313:8
313:11 317:16
325:15 328:1,4,24
330:1 331:10,17
331:20 332:22
334:4 337:22
338:6 343:8
**rigorous** 217:19
  217:24
**ringing** 119:16
**rise** 145:14,14,17
  264:19 265:5
  318:16 324:24
  325:2
**rising** 45:5 327:15
**risk** 94:15 95:1
  149:21,23 221:13
  223:13,15,20
  224:10,14,14
  225:15 226:3,3,11
  320:15 325:13
**risking** 164:21
**rmr** 344:20

**road** 235:3
**robert** 3:4 148:13
  222:6 224:1
**robust** 81:17
**role** 35:16 80:11
  81:1 82:3 83:7
  84:7,10,18 85:7
  86:12,22 90:19
  127:21,22 133:3
  183:17 185:21
  186:1,4,17 188:15
  190:14 256:13
  259:19 269:4
**roles** 9:18 130:9
  133:3 134:7
  185:18
**room** 8:5 64:5
  74:3 129:17
  285:22
**rooted** 192:18
**rotation** 74:4,4
**roth** 317:18
**roulette** 164:23
  165:13
**rounds** 65:23
  69:15 95:11
**routes** 258:5
**routine** 133:24
  194:4
**rpr** 344:20
**ruby** 2:13,14 8:13
  8:13 26:17,22
  32:11 50:5,18
  117:13,21 118:7
  179:22 180:2,4,19
  185:14 186:5,13
  186:18 187:19
  231:5 232:5,13,19
  233:10,15 234:9
  234:15 235:6,15
  235:17,22,24

236:18 237:2,19
238:4,19 239:1,13
239:23 240:11,14
286:10 287:6,9,16
287:22 288:1,8,24
289:24 290:18
291:7 338:4,6,14
**ruby's** 187:15
**ruggedness** 196:3
**rule** 133:24 234:5
**rules** 1:20 94:6
  138:2 230:23
  236:14 237:16
  272:10 347:5
  348:5
**run** 117:6
**rural** 129:22
  272:23
**russian** 164:22
  165:13

---

**s**

**s** 1:21 7:1 192:13
  344:4,20 346:15
  348:8,8 349:3
**safe** 70:20 149:5
  222:22 263:12
**safety** 132:4
**saith** 343:16
**sake** 235:5
**sales** 190:6,6
**samhsa** 280:10
**samples** 74:8
**samsha** 331:3
**sandbags** 46:8
**satisfied** 142:18
  333:12
**satisfy** 19:4 177:18
**save** 64:7
**saw** 65:12,24
  129:10 135:17,18
  135:19 136:6

156:9 162:5,13
164:6 165:6,24
166:2 168:4 169:3
169:4,5 178:9
276:8 278:23
322:5 330:18
**saying** 187:14
  192:20 196:7
  198:2 199:11
  214:1 220:4,5
  237:13 266:11,15
  269:24 283:10
  315:21,22
**says** 33:24 79:19
  100:8 104:10
  111:12 204:21
  210:19 245:19,19
  248:19 277:8
  286:21 298:20
  301:3 302:10
  303:3 312:7,12
  314:22 318:8,10
  321:12 340:14
  341:21,22
**sc** 2:5
**scale** 78:24
**scales** 264:10
**scanned** 20:18
**scanning** 15:21
  19:13
**scenario** 263:10
**schedule** 36:12
  37:14
**scheduled** 36:8
**school** 65:10,14
  66:7,8 76:4 79:20
  80:9 90:17 93:1
  95:11,15,18 120:8
  121:5,10,14,18,23
  122:3,7,8 133:19
  137:6 171:18

319:20
school's  95:17
schools  94:10,12
  171:1
science  60:4,12
  68:6 76:5 80:19
  103:1 128:20
  144:5 159:20
  160:2
scientific  77:20
  217:24
scientifically
  217:19
scientists  332:3
scope  17:21
  288:16,20,24
seal  347:15 348:21
sealed  14:21 15:3
search  19:10 21:7
  162:21
searched  20:23
searching  20:13
  20:21
seat  136:24
second  24:1,15
  26:18 81:21 90:18
  91:10 97:4,9
  100:19 101:22
  122:15 131:22
  158:24 163:24
  164:20 167:20,21
  183:1,9 240:13
  281:14 299:19,21
  313:23 314:10
  315:9,16,16
  321:11
secondary  68:17
seconds  16:23
secretary  86:2
  91:13,20 92:5
  124:4 129:16

188:16 189:6
313:13 314:14
315:3 316:2
security  36:21
see  10:24 24:11,16
  40:8 46:13 50:16
  61:14,18 62:8,9
  66:5 81:22 84:10
  100:18,19,19
  102:6 107:8,10
  108:4 124:1 127:2
  129:7 130:7 134:3
  137:3 157:11
  161:16,20 162:2
  162:16,20 175:15
  178:24 190:3
  192:7 204:7 208:8
  210:22 214:18
  242:21 245:18,19
  249:5 255:11
  256:6,7 274:11,12
  274:15,17,21
  275:10 279:4
  296:5,5 297:24
  298:1 299:22
  300:13 302:9
  305:16,22 307:6,7
  311:2 313:9,10
  314:14,22,24
  315:19 316:5,5,20
  317:1,8,13,18
  318:8,9 319:10
  321:13,14 323:17
  325:19 339:22
  340:22
seeing  24:22 71:22
  71:24 75:20 82:16
  88:12 124:10
  137:7 162:4,22,23
  162:24 165:18
  275:22 285:23

286:1
seek  15:19 47:7
  72:7 126:10
  153:11 154:21
  163:9 166:6
seeking  161:10
seen  135:24 140:2
  155:4,5 170:20
  200:11 254:5
  277:14 285:15
  309:21 333:18
seizures  168:23
select  305:14
selected  306:15,18
  306:20
sell  76:14
semi  177:10
senate  97:23
  125:18,19,22,22
  142:5 174:4 225:6
senator  174:23
send  132:9
sends  153:19
senior  128:18
sense  79:10 162:3
  174:1 193:21
  201:22,23 292:11
  306:9 322:22
sensitive  7:5 135:2
  135:21
sent  18:24 20:18
  61:7 149:8 313:20
  314:7 315:23
  339:24
sentence  223:18
  283:13 301:3
sentinel  81:15,17
  82:1,4
separate  268:21
september  1:21
  7:3 129:12,13,14

340:2,19 344:17
  345:10 346:4
serial  61:21
  100:22
serious  67:3
seriously  68:7
serve  91:13,20
  241:7,11,15,18
  335:18
served  123:12,16
  127:13 128:5
  130:10 133:3
  207:7
service  91:22
services  59:8
  315:13
serving  241:23
set  13:10 27:7 69:2
  149:10 168:18
  191:1 192:11
  223:1 260:12
  265:18 278:17
  290:20 344:15
  345:6
setting  24:23
  172:10 190:21
  258:17 293:18
  299:3
seven  302:13
  344:15,15 345:6,7
sewage  71:1,2
sexual  152:17
shape  154:22
shared  53:13
sharing  248:23
  325:12
sheet  12:19 346:13
  348:7,10,18 349:1
shingles  276:10
shirt  176:2,4

**shkolnik** 3:8 229:3
229:4 230:21,22
232:15 236:11,19
237:7,15 238:15
238:22 242:15,16
242:18
**shopping** 150:13
248:24
**short** 16:13 99:20
141:17,18 172:22
176:13 328:19
**shorthand** 344:9
**shot** 175:4,4 253:9
**show** 23:20 75:18
110:18 297:16
307:11,16
**showcase** 124:6
**showed** 143:3
162:5
**shown** 346:16
**shows** 170:23
280:19
**shut** 46:21
**sick** 145:20
**side** 11:21 102:21
102:21 104:6,8,10
104:15 105:23
106:4,7,9,14 107:6
107:20,22,24
108:6,12 109:12
109:19 112:24
113:8 116:7
131:22 155:15
170:19
**sides** 142:11
**sign** 78:13,20 79:3
79:8 338:3 343:6
343:8
**signals** 333:10
**signatory** 91:16

**signature** 344:19
345:16 346:14
**signatures** 130:1
**signed** 12:19,21
125:24 189:6
347:13 348:18
**significance**
186:20 187:21
**significant** 45:16
58:23 108:18
126:4,6 147:16
150:21 162:24
259:21 260:3,5
**significantly**
147:24 282:2
318:18
**signing** 346:19
**signs** 79:5,9
**similar** 30:18
56:24 67:24 69:14
69:22 100:21
169:5 333:2 335:2
336:23
**similarity** 284:4,7
284:9
**similarly** 68:22
152:23 249:10
**simple** 67:14
103:2 275:12
**simplified** 105:15
**simplistic** 124:22
**simplistically**
245:24
**sincerely** 346:21
**singapore** 94:23
**single** 58:8 97:21
125:3 131:19
133:23 173:1
293:14 313:10
**singular** 86:5

**sins** 325:5
**sir** 11:24 35:20
229:22 346:10
**sit** 128:10 203:19
**sitting** 115:23
216:10 225:20
327:20
**situations** 140:24
**six** 16:17 210:20
281:8 338:7
**size** 199:14
**skeptical** 75:19
**skin** 67:14
**slide** 101:19 104:2
104:7,11,13
106:10 107:14
108:20,23 110:17
110:18 111:2,19
112:8 206:8 210:8
210:9,12,17 211:2
211:7 244:12,15
244:18 245:6,12
305:5,7,10 306:1
306:14,14 310:16
310:17,22,24
**slides** 100:16
106:10 107:21
108:12 109:7
112:23 209:24,24
305:2,3
**slight** 162:4,13
197:20,21
**slip** 195:8
**sliver** 162:1
**slowly** 264:19
**small** 52:21 166:5
167:1 276:23
**smoked** 330:15
331:6
**smoking** 320:8
333:6 334:16

335:4,10
**social** 5:20 36:21
124:8,19 125:21
126:2 135:10
138:12 172:19
178:10 214:3,3
242:24 303:18
329:4 331:13
**socially** 212:18
**society** 78:12,21
148:16 172:18
222:9 259:3
**sold** 74:23 76:2
191:24 283:11
**solution** 6:11 49:3
254:17 255:21
**solutions** 42:20
128:13 135:5
137:9 176:10,12
217:9 273:12
346:1 349:1
**solve** 34:17 35:10
55:17 96:19 97:15
98:6,10,16 163:19
**solved** 158:15,16
158:18
**somebody** 137:5
251:16 253:10
281:4 293:16
**somewhat** 188:18
278:12
**son** 110:7 277:9
**soon** 168:19
**sophisticated**
132:10
**sorry** 14:3 16:1
19:2 20:15 22:2
23:7 24:2,4 26:20
33:16 34:2 41:2
41:12 48:1 61:2
68:12 87:24 100:5

106:15,16,18
111:14 115:16
141:9 158:8
162:10,13 185:14
193:7 195:4,7
196:18 205:11,24
210:8,15 217:13
218:22 220:3
225:23 226:5
228:23 235:16
241:19 242:18,20
244:6 245:11
248:16 249:13
255:3 265:7
267:14,17 279:23
283:8 285:5 286:6
292:6 295:15
297:6 301:22
303:8 304:4,11
307:20 308:3
310:17 317:4
325:11 339:2
**sort** 55:19,22 56:2
57:22 77:19 79:2
93:1 100:21
118:17 123:10
131:9 133:6
143:22 190:7
**sound** 99:22
**sounds** 99:23
339:15
**source** 43:14,15
111:8 331:18
**sources** 57:22 58:1
58:1,1,19 322:19
**southern** 1:1 7:18
135:20
**span** 147:5
**speak** 14:10 16:3
16:10 69:17 90:4
108:22 122:5

133:18 220:7
**speaking** 32:14
34:23 42:8 50:7
50:10,14 110:3,5
110:14 131:14
133:20 152:1
171:1 177:8,13
203:3 219:6
**special** 62:22 63:3
**specialization** 63:6
**specialized** 63:12
70:2,5
**specific** 10:1 33:13
35:5 36:23 37:8
41:3 54:9,12,14
55:9 84:5 86:17
93:20 152:1
166:17 185:20
199:9 202:9,14,17
203:9 239:15
259:17 330:12
**specifically** 18:17
19:7 32:1 41:6
54:2 66:15 95:9
95:20 98:19
110:23 111:20
128:7 236:20
283:22 284:3
321:16
**specifics** 36:20
81:7
**specified** 344:6
**specify** 61:6
**speech** 32:12
**spell** 279:19
**spend** 105:16
108:13 176:16
**spending** 286:12
**sphere** 202:19
**spoke** 16:2,4 242:2

**spoken** 15:15
**spouse** 10:23
**sprain** 260:23
**spring** 315:4 316:3
**st** 62:16
**stable** 157:5,6
**staff** 52:21 300:21
300:23 301:2
304:23 305:1
309:23 310:6
**stamp** 61:20 79:16
101:20 104:3,13
255:7,14 256:2
296:15 314:21
317:5,16 321:9
**stamped** 64:18
206:9 313:24
318:4
**stand** 324:1
**standard** 79:3,11
148:2,11,15
149:12 157:8,9
193:15 196:14,20
197:4,5,15 222:4,8
223:3 258:24
259:1,10 261:14
261:19 262:12
263:9 271:21
300:10 343:2
**standards** 77:18
77:21 78:6,10
144:7 148:10
155:16 188:19
193:3 222:3
260:19 263:23
271:13 272:5,6
**standing** 93:8
117:3,12 321:24
324:16 326:14
**standpoint** 80:20
130:5 163:14

**stands** 119:14
168:13
**start** 14:4,12,22
61:20 82:15 94:13
95:24 116:17,24
138:12 153:7
156:11 157:10
161:4 162:20
204:3 263:16
264:18 293:11
308:23
**started** 40:9
126:19,22 129:20
135:8 136:9 150:1
162:15,21 163:11
163:24 165:9,15
178:1 250:4 251:2
258:24
**starting** 47:10
79:21 81:22 91:3
161:20 162:2
264:23 305:21
**starts** 88:12
264:19 275:9,10
**state** 5:3 6:19 8:6
8:9 9:14 12:5 22:8
26:10,18 30:10,13
31:7,19,23 32:6
35:16 38:7 40:14
43:17 44:3 45:7,9
48:3,9 49:8,22
50:1 51:18 56:4,8
58:1,5,9 63:22
70:14 71:14 86:3
86:4,9 87:10 91:7
91:12,23 92:2,4,20
93:13,17 95:19,21
97:18,21 99:9
101:7 102:12
107:12 112:14,16
113:12 122:8

125:12 127:14,17
127:22 128:12
130:14 136:1,10
138:17 139:24
158:22 167:20,21
168:2 174:20
176:8 183:12
184:5 188:23
192:22 194:23
195:9 198:11
199:21 205:12
206:3,17 216:20
216:24 217:1,1
230:4,5,17 231:22
231:24 243:18
244:10 248:9
249:6 260:16
266:17 270:24
272:23 274:15
292:16 300:9
315:10 331:7
341:1 344:1,4
345:1 347:10
348:15
**state's**  22:18 30:8
**stated**  85:19 148:9
175:22 222:2
245:8 250:3 311:9
314:5 333:15
342:11
**statement**  54:1
186:13 208:21
244:21 251:10
256:23 257:2
301:11,19 302:22
302:24 303:3
311:7,8 319:1
326:4,6 327:14
347:13,14 348:19
348:19

**statements**  285:14
298:13 318:23
323:21 326:9,11
327:8
**states**  1:1 7:18
24:12 39:2 50:3
91:13 92:18,23
93:4 126:19,23
137:15 168:1
208:15,16 248:23
261:3 262:22
273:16 301:15
320:24 321:19
324:19 332:3
**stating**  271:13
**stations**  165:11
**statistic**  111:6
146:15
**statistically**
192:24
**statistics**  142:24
143:3,22 146:21
179:6 311:17
318:13,14 319:5
320:2,4,5,20 322:5
342:12
**status**  208:18
215:4
**statute**  91:24 94:5
**statutory**  56:3
**stay**  235:18
**staying**  90:15
**stays**  133:12
**steal**  150:17
**stealing**  150:16
153:21 280:16
**step**  240:7
**steps**  46:6 275:7
**steve**  8:13 32:16
50:14 51:6 117:13
180:10 185:13

187:3 231:11
238:2 240:5
287:14 289:15
**steven**  2:13
**stick**  84:15
**sticker**  264:11
**stigma**  277:16
**stigmatizing**  212:2
**stimulant**  318:15
**stimulants**  105:12
257:22 279:1,5
**stimulates**  160:12
333:9 334:23,24
**stimulus**  152:5
**stipulate**  286:16
287:17
**stipulation**  287:13
287:14
**stood**  79:6
**stop**  54:4 98:1
223:17
**store**  294:15
**stored**  21:2
**stories**  133:16
134:5
**street**  2:7,12,15,20
37:18 47:8,10,12
132:17 133:14
155:6 163:7,10
164:17 166:12
177:1 178:21
278:16 279:5
305:23
**streets**  43:5
**strength**  157:14
334:14
**strengthen**  256:13
**strike**  21:10 41:22
47:21 53:2 82:8
87:24 198:18
205:17 217:15

226:15 266:20
270:15
**strong**  128:23
312:16
**strongly**  321:17
**structures**  124:16
**struggling**  42:19
44:2 176:7
**students**  68:9,9,10
69:7,17,22 82:12
82:21 96:23
**studied**  205:2
211:4
**studies**  75:18
332:2,8
**study**  127:6
202:11 206:13
225:3 243:8
249:15,16,23,24
284:19 285:8
296:8 329:11
330:7
**stuff**  165:2
**subgroups**  319:17
**subject**  30:19,21
31:14 32:23 78:24
286:17 287:22
288:5 332:19
**subjective**  79:7
**submit**  246:14
**submitted**  184:8
188:14 189:2
204:18 295:20
317:18
**subpoena**  15:19
19:5 20:2,14,17
28:23 229:20
233:1,1,3,5,7,11
288:12,21
**subpoenaed**  28:22

**subpoenas**  288:13
**subscribed**  347:10
  348:14 349:21
**subsequent**  78:23
  126:18
**subsequently**
  59:12 125:17
  135:18 251:1
**subspecialty**  63:9
**substance**  5:16
  20:11 45:17 48:14
  49:24 51:24 85:4
  89:11 127:9
  151:20 161:23
  164:10,17 278:9
  308:12 309:17
  311:5 319:13
  320:12 321:22
  331:18 333:3
  334:15,22
**substances**  36:9
  36:13 37:14,23
  38:3,4,18 39:1,13
  40:10,19 42:14
  48:4 50:9,22 51:1
  94:2 127:10
  132:15 162:24
  166:7 168:16
  189:21,22 191:1
  213:21 218:14
  244:4,23 245:1,2,5
  247:14 250:6
  251:13 254:6
  256:18 257:22
  270:8,18 307:22
  330:8 333:5,14
  334:20,21
**subtitle**  317:11
**subtract**  245:20
**successful**  69:10

**successfully**
  142:10
**sudafed**  258:15
**sued**  263:13 264:1
**suffer**  138:23
**suffered**  160:21
  166:20
**suffering**  22:7
  43:5 130:5 133:17
  162:9 178:13,18
  277:16 279:17
**sufferings**  43:11
**sufficient**  126:12
  294:15
**sufficiently**  198:14
**suggest**  32:8 99:17
  116:5 198:3 199:1
**suggestions**  48:17
**suggests**  326:19
**suit**  59:2,19
**suite**  346:2
**summary**  192:3
**sun**  49:8 108:7
**superior**  346:1
**supervision**
  125:12
**supp**  160:16
**supplied**  306:19
**supplies**  268:8,19
**supply**  40:23 47:9
  86:8 101:24 102:4
  103:12 104:6,7,10
  104:15 105:2,23
  106:4,7,9,13 107:5
  107:13,20 108:6
  108:12 109:12,19
  112:24 113:8
  141:14 153:12
  155:15 163:13
  256:14 266:9
  292:17

**support**  93:6
  142:10 159:12
  256:13
**supported**  78:15
**supporter**  102:21
**supportive**  159:7
**suppose**  251:14
  338:10
**supposed**  170:2
  212:7
**suppressants**
  278:24 336:16
**sure**  11:17 12:19
  13:3 18:11 19:1
  20:16 22:3 26:2,7
  26:23 28:14 29:4
  34:1 41:3,13 48:6
  48:8 52:12 53:8
  53:17 54:20 64:17
  67:2,13 68:8
  70:21,23 71:1,4
  81:13 82:19 84:2
  84:8,14 87:6 88:9
  90:7 105:19
  108:11 115:16
  117:14 142:17
  158:9 175:1 182:5
  182:23 185:18
  187:22 188:21
  189:1 190:13
  192:7 195:1
  196:19,20 203:3
  204:19 207:20
  210:3,16 211:17
  212:24 218:23
  221:2,24 226:6,9
  230:14 231:12
  232:22 236:2
  237:20 238:5
  240:11 241:17
  246:17 247:12

  248:13 251:4
  257:11 262:1
  264:1,6 269:11,12
  271:17,19 272:5
  273:16 276:23
  281:17 285:6
  286:14 288:6
  290:23 292:12
  293:8 294:13
  296:13 299:19
  313:19 314:16
  322:21 325:22
  331:16 332:4
  333:2
**surprised**  175:7
**surrogate**  113:17
  113:21
**surrounded**  69:4
**surveillance**
  251:21
**survey**  280:9
**surveyed**  280:10
  325:13
**surveys**  325:20
**survival**  152:19
**survive**  44:4
  126:14 152:6
**surviving**  153:14
**suspect**  302:19
**suspicious**  270:10
  272:9,9
**sustainable**  6:11
  254:16 255:21
**sustained**  172:19
**swear**  9:1
**switch**  60:1
**sworn**  9:2,6 344:7
  347:10,13 348:14
  348:18 349:21
**symptom**  79:7

**symptoms** 153:15
168:18,21 171:24
**syndrome** 97:18
136:20 168:14,15
168:18 170:17
**synthetic** 177:9,10
256:9 274:23
**syringes** 276:22
**system** 26:5 35:14
35:18 40:9,11
41:7,14,24 48:21
81:17 152:20,24
156:10 171:18
172:7 265:18
272:12 296:21
318:14 336:18,19
337:10
**systems** 72:7,8
138:2 179:12

**t**

**t** 2:6 9:4
**tab** 285:21
**table** 273:14
**take** 7:11 20:5
34:17 47:16,23
51:9,11 54:18
68:6,7 76:18
96:11 99:17,20
108:18 109:1,6
114:15,17 118:1
152:2 156:17
166:16 176:23,24
179:20 180:8,17
192:14,24 193:17
193:20 194:13,15
214:22 215:1
216:5,11 226:18
240:6 247:3
273:22 276:15,22
276:22 277:1,2
278:24 282:18

286:8 308:20
310:12 313:22
316:19 320:23
323:1 324:6,9,22
328:2 329:8 333:8
**taken** 1:19 7:14
54:23 94:21
114:24 144:8
180:23 187:18
226:23 235:18
237:6 240:19
274:15 280:6
291:12 328:8
344:6,9,13
**takes** 93:16 293:24
**talk** 20:10 30:11
49:11 60:2 73:16
74:11 77:17 80:10
81:5 82:3 96:14
96:15,17,18,20
97:14,14,15,24
98:14 102:12,15
102:18 104:20
105:1,2,3,4,5,6,6
105:8,11 106:5
107:19,19 108:3,7
140:7 147:17
151:13 158:4,9
176:18 180:17
204:24 212:23
235:4 240:7 287:8
288:7,21 290:6
291:3 298:8
**talked** 86:20 88:10
106:7 175:12,13
189:16 191:23
192:9 221:1 242:3
276:16 286:22,23
290:7,14,15
291:18 324:19
329:2 332:17

342:16
**talking** 28:9,12
40:9 46:4 58:6
105:16 129:21
133:11 166:18
172:12 197:6
212:24 213:8,19
213:20 226:1
231:23 240:8
290:11
**talks** 141:23
242:12 297:21
**tap** 178:19 275:10
**task** 49:6 125:8,16
**tatterson** 315:18
**taught** 65:16
66:15,22 67:7
68:10,13 76:4
80:2,4 81:21
**taxpayer** 329:19
**taylor** 5:13 308:7
**tea** 226:17
**teach** 65:15 66:12
70:2,4 79:21 80:5
80:11 94:12,15
95:11 98:5 171:15
**teachers** 133:19
171:2,8,15
**teaches** 94:24
**teaching** 65:13
66:16 68:18 69:6
69:14,17 71:8,13
72:15 94:9 95:4,7
120:11 121:4
**team** 176:6 243:4
**tear** 218:2
**technological**
15:21
**technology** 63:8
**teens** 148:8 221:9

**teeth** 286:13
**television** 122:22
161:5
**tell** 28:4 40:1
76:20 82:12 89:18
92:14 101:19
107:23 116:9
129:12 131:4
134:5 135:21
146:22 154:8
171:3,8 174:21
175:23 177:6
191:3 216:9,10
219:8,13 231:13
248:3 251:6
282:15 284:2,18
287:20 289:3
294:9,12,15
316:14 325:20
**telling** 73:22 77:15
154:21 269:22
**tells** 152:15 154:11
157:17 333:10
**temporary** 126:22
**ten** 54:18 78:24
107:11 159:23
171:5 194:12
226:18 286:8
308:22 338:7
**tend** 94:5 167:3,4
**tended** 95:21
**tendered** 92:6
**tends** 194:8 258:1
**tennessee** 70:6
129:4
**tenth** 2:20
**tenuous** 93:18
**tenure** 33:8 89:19
92:3 97:6 124:12
143:9 199:21

**teresa** 1:20 7:24
235:24 344:4,20
345:3
**term** 33:13 40:13
41:14 106:12
124:8,9 137:12
141:17,17,18
143:18 155:12
172:17,22 174:10
281:7,18 282:7
324:15 337:18
**terminal** 281:8
**terms** 20:21 36:2
44:23 59:10 82:11
116:4 129:3
146:23 147:6
158:3,9 160:4
166:12,15 167:11
168:10 176:21
177:21,23 178:21
179:7 196:16
197:10 208:9
214:2 220:13
281:5 341:23
**terrible** 49:9
187:10
**testified** 9:6,19
10:3 11:22 13:12
18:22 20:16 48:20
77:2 106:18 120:5
182:4,17 184:6
192:4 235:9
249:24 250:4
252:4 258:23
259:21 260:2,5
274:5,8 284:4,11
284:14 322:22,23
**testify** 13:24 28:1
28:19,22 29:7,8,20
30:3,14,15,16
31:10 32:13 33:9

37:17 50:23 185:7
250:13
**testifying** 11:10,18
25:16 27:6 28:15
229:21 230:19
232:1
**testimony** 6:9 11:2
11:19 12:13,22
13:6 24:18,21
30:21 32:24 50:9
181:7 184:15
185:6 187:4,5,15
221:2 229:14,24
234:1,3 236:4
238:8 241:2
251:15 252:7
254:14 255:17,20
256:1,24 257:20
264:13 265:6,8,11
266:6,8 275:23
305:20 321:2,5,8
322:4,21 323:12
323:20 326:14,24
343:10 347:6,7
348:6,9,12
**thank** 15:24 23:21
24:7 26:15 27:22
29:24 32:16,23
33:21 35:8,13
40:8 54:20 64:15
86:18,20 112:22
114:20,21 117:10
182:21 185:11,12
188:1 189:15
190:24 204:23
208:24 209:17
216:13 258:23
266:21 286:9
309:5 316:20
321:7 328:15
329:23 331:4,16

338:1,5 343:4,5
**thanks** 24:2
180:20
**theoretical** 277:13
**theory** 322:13
**thing** 55:22 76:3
77:23 107:23
169:11 174:22
202:19,22 212:15
273:5 329:15
332:11
**things** 18:23 37:19
42:7,22 45:12
47:3 62:7 71:3
76:16 83:2 96:18
97:14 100:7
107:11 108:24
109:13,23 110:1
122:14 126:16
133:1 135:5,15
137:18 138:8
142:13 145:24
152:18 153:10
154:15 162:9
173:7,10,22
175:10 182:3
194:24 213:4
220:24 242:10
276:5 285:18
293:4 328:21
333:6 336:18,22
336:24
**think** 17:21 18:22
32:2 33:2 34:23
35:3 42:2 43:22
51:11 52:3,16
54:17 55:15 59:21
61:17 84:10 86:20
89:17 98:22 99:18
106:11 107:7
111:11 114:14

119:5 144:3,5
147:2 148:13
157:21,22 158:24
161:19,19 162:2
163:20 168:8
169:11 174:1
175:15 178:3
179:9 185:17
186:6,19 187:21
191:22 195:4
196:18 198:5
202:10 203:18
207:2 208:22
210:1 212:1,12
216:19 217:23
219:6,7 220:3,6
222:6 231:22
232:19 234:23
235:6,7,17 236:7
238:17 239:2,8
242:2,11 245:6
246:17 256:24
259:13 262:20,23
263:16 264:20
265:4 282:2 283:1
286:21 287:13,15
289:4,7 292:20
293:2,10 297:15
307:10 319:24
322:8,11 324:13
327:21,24 328:1
331:11 337:4
338:15,17 342:15
343:3
**thinking** 59:4
261:18
**third** 74:3,4 104:1
132:5 149:3 164:2
207:14,21,21
209:1 222:20
239:20 263:6

280:12 318:6
**thirsty** 152:13
**thirty** 346:18
**thompson** 340:22
  340:24 341:1,13
**thompson's** 341:4
  341:9
**thoroughly** 185:2
**thought** 26:22
  189:2 213:8
  215:13 286:7
  323:14
**thousand** 124:21
  148:8 221:9
**thousands** 167:8
  324:24
**three** 9:23,24 42:7
  107:7,11,18 123:4
  126:9 132:15
  149:17,21 159:14
  160:5 171:17
  210:10,16,23
  213:3 221:12
  223:9,13,19 224:9
  224:15 225:10,18
  248:15 260:23
  262:1 276:22
  283:13 296:10
**throw** 201:18
**thursday** 313:20
**timber** 195:21
**time** 8:9 9:22 10:3
  10:7 12:23 13:9
  14:11 17:7 18:18
  19:20 24:22 27:10
  28:5,6 40:7,20
  42:5 43:2,23 44:8
  45:3 46:20 47:13
  47:16 50:6 52:2
  52:11 53:5 54:13
  54:22 55:3,9 56:6

57:12,19 58:20,24
59:5,23 64:7
66:15 70:6 71:8
71:24 72:11 73:3
73:18,18 74:2,6,13
75:12 77:8,23
78:1,14,17 79:5,24
80:3 83:21,24
84:15,19 85:1,18
89:14 95:1 102:6
102:16,17,17
103:22 108:23
110:16 114:5,8,23
115:5 118:2,15
123:8 125:13
126:11,24 129:19
130:8,14,18 140:9
143:8 144:9,15
145:5 146:4,10,14
148:16 149:8,15
151:9,12 156:8,12
162:1 163:3,5
164:20,24 166:1,8
168:5 170:5 173:9
174:5 175:23
176:14 179:10,23
180:12,22 181:3
187:10 194:3
197:17,19 209:15
220:13 222:9,24
223:6 224:24
226:22 227:3,23
240:18,23 242:4,5
242:9 243:13
245:9,16 247:3
251:2,20 252:24
253:7 257:2
262:19 264:16,17
265:1,1 268:13
269:3 274:21
276:11 284:1

288:17 289:13
291:10,16 296:6
301:12,20 303:2
303:11 305:21
306:17 308:18,19
308:24 309:1,4
310:1,15 311:13
311:19 320:21,24
323:1 328:7,12
329:14 333:24
334:2,5,8 341:1
344:6
**timeline** 139:20
  202:14
**times** 9:21,24,24
  10:4,6 16:2,5,14
  84:21 97:12
  138:20 154:3
  164:15 171:18,21
  242:21 248:16,17
  248:20 311:21
  312:1,5,9 320:14
**timing** 232:23
**tiny** 167:6
**title** 108:20 111:11
  204:21 306:19
**titled** 101:6 184:15
  255:21 299:21
  300:11 302:6
  309:16 310:24
  317:8
**tobacco** 159:11
  332:15 334:16,20
  334:21 335:4,10
**tobacco's** 334:18
**toby** 341:4
**today** 13:20,24
  15:4,8 19:8 21:22
  23:10 25:11 27:22
  29:9 31:21 73:17
  117:16,22 129:12

138:17 167:10
173:3 181:16
182:4,17 183:6
184:15 185:6,23
186:1,17,20
199:10 214:17
220:23 229:14,20
229:22,23 235:9
236:4 238:8 241:2
251:15 260:2
284:11 291:18
302:24 303:1
322:4 324:19
328:14 331:3
**today's** 25:10
  187:16 227:15
  228:11 343:10
**toes** 327:20
**told** 13:22 14:9
  263:11 289:4,7
**tolerance** 334:11
  334:12
**toleranced** 302:13
**tom** 124:4
**tomblin** 145:19
  161:22
**tools** 98:7,7
**tooth** 149:14 156:4
  223:5
**top** 24:11 61:24
  62:1 69:21 108:20
  111:12 193:11
  282:14 313:9
  339:20
**topic** 99:16 102:13
  179:20
**total** 113:9,14,15
  147:17,18 156:19
  156:21 166:16
  169:4 177:24
  244:24 309:4

310:10,15 314:7
343:11
**totaled** 303:5
**touch** 165:4
**tough** 174:2,2
**tower** 2:15
**town** 71:21 73:19
129:22 132:3
133:9,10
**towns** 113:19
138:6
**toxicology** 301:14
302:17
**track** 14:11
**traditional** 72:1
**trailers** 131:3,8,17
**trained** 44:9 62:24
**training** 62:16
63:3,9,10,12 74:22
116:13 139:3
158:5 165:21
203:1 217:8 315:4
316:3
**trainings** 62:22
63:15
**transcribed** 347:7
**transcript** 5:3
12:4,12 344:10,14
345:5 346:11,12
347:5,12 348:5,11
348:17
**transcripts** 20:7
**transgenerational**
45:24
**transition** 47:11
105:7,9 176:19
179:7,19 275:24
276:3,4,4 277:22
278:1,3,19,23
305:22

**transitioned**
105:11 177:22
277:15 324:2
**translate** 197:13
**transmitted** 97:11
**trauma** 66:2
**treat** 73:24 170:11
170:13 198:14
**treated** 67:2
**treating** 196:17,21
**treatment** 47:4
65:19,23,23 69:12
70:3 78:10 86:23
98:3 139:14 151:7
159:18 160:3,24
175:3 215:10
259:1,10 277:7
314:8 316:22
317:9
**trend** 31:15
211:20 220:14
245:10,14 275:22
279:14,15 302:20
305:10,13 306:19
307:1,3
**trending** 136:23
**trends** 194:9 200:5
201:6 307:5
**trial** 10:4,8,10
24:14 25:1,17
27:7 28:2,20,22
29:7,9,21 30:3
32:2,2 185:8
230:9,10,19 232:1
276:23
**tried** 46:14 126:10
172:23,24 173:7
**trigger** 333:21
334:3
**trips** 76:17

**true** 13:5 87:17
120:9,22 121:2,11
122:10,23 128:15
135:13,16 137:10
141:22 166:7
167:15 212:14
234:13 283:15
333:5,6
**truly** 154:4
**trust** 276:19,20
**trusted** 137:9
**truth** 288:23
326:10
**try** 47:7,16 64:7
90:6 100:6 168:15
180:11 241:22
307:14 323:18
328:19
**trying** 42:19 44:2
44:11,18 45:13
46:8 74:21,24
84:20 88:8,9,17
98:1,2 100:6
135:4 138:9,21
157:21 160:4
167:16 203:17
208:19 210:1
213:15 219:8
220:8 232:20
263:14,19 277:21
286:7 290:3
316:14 322:21
324:10 325:8,8
326:7 327:5,24
330:4 339:15
**tsunami** 136:21
**tuberculosis** 63:2
63:10
**tune** 114:3
**tunnel** 162:3

**turn** 7:7 24:15
54:8 61:18 62:2
99:7 101:18 104:2
178:19 206:8
244:7,12 254:12
256:1 275:10
295:2,16 299:9
303:13 305:5
308:1 310:16
312:21 313:23
317:3 318:2 319:8
321:1,7 339:1
**turned** 79:7
276:12,12
**turning** 90:15 91:5
91:10 161:14
**twelfth** 2:12
**twelve** 25:21 27:11
93:16
**twenty** 344:15
345:6
**twisted** 214:8
**two** 9:24,24 10:6
10:21 27:5 36:17
42:7 61:20 63:2
81:12 82:11 93:16
118:14 125:18,22
129:16 141:2
148:8 149:17
157:18 158:16
177:1 179:21
180:17 205:6
209:24 221:9
223:9 225:18
245:1,5,20 255:12
257:1 279:13
280:9 283:12
**type** 46:9 66:3
76:18,19 124:23
126:6 132:20
153:4 175:9

325:17 335:2
**types**   103:8 107:2
337:11
**typewriting**
344:10
**typically**   66:5 69:9
153:15
**typos**   316:12,14

**u**

**u**  9:4,4 302:14
**u.s.**   6:22 23:15
206:24 209:8
**uab**  65:14 72:12
**uh**  10:6 11:22
213:11 253:17
260:2 288:8
**ultimate**  158:19
**ultimately**  171:21
214:4 220:18
**unable**  33:8
297:19
**unanimously**
125:23
**uncle**  110:7
**underdiagnosis**
282:21
**undergraduate**
60:3,5
**underlying**  225:2
**understand**  9:14
13:14 14:20 15:11
15:15 18:11,13
21:11,15,19,21
26:3 33:11 39:9
39:11 42:12 48:6
55:20 56:7,13,14
69:23 72:14 92:20
96:23 103:8
105:15,19 107:1
116:7 117:11
122:2 125:4 135:8

161:6 190:12
196:19,19 199:7
200:20 202:7
203:4 210:3
213:15 225:24
231:19 232:5
237:20 239:21
243:10,14 267:15
267:23 268:21
269:7 272:23,24
277:21 290:1,1,3
296:11 325:8
328:23 330:4
331:4 336:13
**understandable**
14:4
**understanding**
21:17 22:3,5,14,15
22:24 26:3 35:14
35:18,20,21 39:8
39:14 42:9,9 44:9
56:11 59:9 69:17
72:7 73:4 106:13
107:4 110:1 139:5
139:7,17 144:9
152:3 189:18
190:14 224:13
239:24 250:5
268:6 301:21
330:3 331:11,14
335:3,15,22 336:4
**understood**  15:12
19:3 35:8 54:16
119:18 187:22
329:23
**undertreating**
198:5,8,21
**undone**  298:3
**unfair**  32:3 272:21
323:5 324:8,14
327:21 328:1

**unfortunately**
84:11 137:3
158:20 169:1
277:12 279:16
**unidentified**
191:18 286:5
**unintended**
291:24
**unit**  7:13 55:2
115:3 181:2 227:1
227:21 240:21
291:14 328:10
**united**  1:1 7:18
39:1 261:3 262:21
332:3
**units**  131:12
343:12
**universities**  62:12
**university**  60:7
62:17 63:5 65:5
68:12,14 71:12,12
79:20 80:7,9
90:16,17 94:9
95:10,16 119:23
120:4,17 121:14
121:18 125:9,10
**unnecessary**
155:13 156:3
204:14 217:12,17
220:20 260:10,11
260:13,15,21,24
261:6,13,21 262:3
262:4,9,11,13,17
**unrecognized**
196:16
**unrelenting**
140:18
**unretained**  233:24
234:6
**unsuspecting**
330:23

**unturned**  176:12
**unusual**  290:19
291:5
**update**  107:12
**updated**  5:20
303:17
**upper**  317:17
**upside**  293:4,10
**upstream**  45:11
72:22 137:13,18
139:1 176:17
265:19
**upward**  245:14
**urban**  69:1
**urge**  321:17
**use**  5:17 64:12
67:8,9 69:13
78:11 96:14 97:12
136:8 157:7
158:12 163:11
167:5 196:8 197:2
197:7 208:20
210:7 211:21
215:9,22 221:11
223:14,19 224:9
225:14,17 253:13
253:14,20,22,23
254:2 274:6,7
275:1,2,4,24 278:9
279:12 307:23
308:12 309:17
311:4,11,11,12
318:7 319:13,15
320:12 324:15
325:9,19 326:12
326:14 327:15,17
329:19 332:7
333:3,17
**user**  291:24
**users**  254:1 275:23
280:6 302:13

**uses**  104:21 143:1
292:8
**utilization**  274:23
**utilized**  66:24
**utilizing**  75:7
78:19

**v**

**v**  5:4 12:5 346:6
347:3 348:3
**va**  148:16 222:9
**vaguely**  92:14
**valid**  209:16
**validate**  249:3
**validity**  13:1,4
**values**  246:1
**vanderbilt**  68:14
68:17 120:21
**variable**  195:18
334:8
**variables**  195:14
195:15,16
**varied**  167:21
**varies**  334:8
**variety**  192:23
337:6
**various**  64:9 65:17
66:4 69:18 70:19
70:22 102:10
122:22 166:6
170:11 197:16
241:20 252:20
296:7 305:8
335:18 337:11
**vary**  334:5
**vast**  282:17 283:2
305:24 306:1
**vein**  117:14
**veracity**  325:17
**verification**
320:22

**verified**  248:4
320:5
**verify**  250:12
315:19
**veritext**  7:23 8:1
343:13 346:1,7
349:1
**veritext.com.**
346:17
**versed**  80:19
**version**  89:12
159:4 171:12
298:11,12
**versions**  298:9,11
**versus**  7:16 10:15
12:13 156:22
197:14 239:19
310:21
**vertical**  100:21
**vested**  95:16
**vice**  128:18
**victim**  76:6,8
340:15
**victims**  6:3 330:23
339:8 340:10
**video**  7:2,10,13
8:23 9:3 54:21
55:1 114:22 115:3
180:21 181:1,12
226:21 227:1,21
228:20 240:17,21
291:9,14 309:2
310:8,14 328:6,10
338:12 343:9
**videoconference**
1:19
**videographer**  3:8
7:24 309:3 310:9
**videotaped**  1:19
**vienna**  97:5

**view**  35:18 55:24
75:7 140:13
143:21,22 155:14
329:24
**viewing**  136:24
**views**  116:17
142:8
**violence**  252:19,19
**vioxx**  75:14
**virginia**  1:1 2:15
5:11 6:7 7:19 9:16
10:15,16 11:7,15
11:23 12:13 20:24
21:1 22:8,23
31:19 32:6 34:14
35:11 41:10,11
43:8,17 46:12
48:18 49:9,17
51:18 52:18 53:20
56:5 57:17 58:18
59:2 63:23 70:7,9
70:11 71:11,14,17
80:1,6 83:8,16
84:15,16,17 85:9
85:20 86:9 89:4
89:10 91:14,21,24
92:11 93:5 94:6,9
94:16 95:10,16
96:22 99:1,2,6
102:8 104:22,23
105:21 110:19
111:1,3,16,21,23
113:7,13,19
116:19 121:5,23
122:8 123:5,11
124:6,16 125:10
125:15 126:18
128:1,12 130:10
130:14,18,23,24
133:4 134:3,6
135:20 136:2,24

137:2 139:18
140:1 141:23
143:4 144:2 146:8
146:10 147:22
148:7 156:20
158:21 161:15
165:21 167:13
168:4,7 172:12
173:24 174:15,20
174:24 175:12,18
175:24 178:15
182:12 183:4,23
184:6,15 188:23
194:23 195:5,6,7
197:17 198:12,13
198:22 202:24
205:10 206:22
207:7 209:6 221:8
227:7,17 228:3,13
230:5,5 235:11
241:8,13,16,19
242:1 243:5,18
246:22 248:9
249:4,6 261:4,4
262:22 264:15
269:23,24 270:24
271:9,18,20
272:22,23 273:18
274:6 275:21
277:20 278:21
285:16,21 286:19
292:13 295:7
296:17,23 297:2
301:4,7,15 302:7
303:4 305:9
306:17 307:21
309:12,14 314:2,4
315:6,11 316:4,24
317:12,14 318:13
319:15 324:12,16
325:10,19,24

326:12,15 327:15
327:22 328:23
329:16 330:7,13
344:1,16 345:1,7
**virginia's**  5:17,22
58:21 59:18 96:9
135:14 205:5
251:12 303:20
308:13 309:18
**virginian**  45:22
**virginians**  43:9
54:5 103:7 106:24
198:15 324:3
325:4,6 327:19
**vision**  170:23
**visit**  123:24
**visitation**  285:17
**visiting**  94:14
121:17 123:9
**visits**  73:20,21
302:19
**vital**  78:13,20 79:3
79:5,8,9 318:14
**vividly**  133:17
**vocabulary**  197:8
**voice**  192:5
**volume**  34:4 35:23
36:1 42:10,23
43:1,4,7,12,13,14
43:15 45:10 46:4
46:15 47:18 82:16
103:18,21 113:6,9
113:14,15 134:10
146:16,19 147:1,7
147:17,18 150:17
150:18,19,21,23
151:2 155:23,24
156:19,21 157:13
166:2 168:5
204:11 259:22
260:3 261:9 275:5

275:9,9 325:1
**volumes**  325:6
**voluminous**
150:11
**voluntarily**  29:2
**volunteer**  276:7
**volunteering**
71:15
**vouch**  90:14
**vs**  1:6,13

## w

**wagoner**  5:19
303:16 341:4,5
**wait**  14:14 183:1
236:19 327:1
**waiting**  129:17,17
228:22 300:4
**waived**  37:3
346:19
**walk**  94:17
**want**  12:17 14:6
18:11 25:22 26:2
26:11,12 28:9
29:4,14 35:9
38:17 64:16,16
67:12 73:6 79:14
79:18 82:24 91:11
96:22 99:18 100:7
109:1,10 115:19
116:16 117:2,9
158:12 165:7,8
175:14,15 182:3
185:16 186:5
200:9,20 203:3
204:24 205:20
207:20 208:3,7
219:1,2,5,11 221:1
221:2 223:18,24
225:16 230:12
234:16 252:11
265:7 267:3 273:5

277:8 281:22
287:9,19,19 290:1
298:13 304:16
316:20 318:24
323:15 327:2,23
336:16 338:16
**wanted**  18:24
26:23 52:5 98:8
108:11,17 124:24
126:21 129:10
173:20,23 182:23
187:22 210:15
252:10,17 271:17
286:13 290:23
297:14,17 323:13
**wanting**  164:5
176:1 325:11
**wants**  51:7 100:2
127:2 151:20
333:17
**ward**  69:21
**wards**  69:16 72:15
**warm**  176:1
**wars**  132:2
**warwood**  3:5
**washington**  2:12
2:21
**watch**  161:5
**water**  10:17 11:6,8
11:15 70:20 94:16
152:14
**way**  39:23 44:7
46:5 47:9,19 66:1
67:17 72:4 77:20
81:15 82:9 87:14
102:16 103:3,7,11
103:12 105:15
106:24 113:5,23
114:8 124:23
127:3,3 131:14
133:1 136:16

141:11 151:4,9,16
152:13,17,19
153:10 158:17,21
158:24 160:9,21
172:20 173:13,18
177:23 179:4,5
187:12 194:4
198:1 208:18
212:3,10 214:8
217:5 235:14
248:4 250:20
253:11 258:12
260:8 282:11
287:14 293:4,10
319:12 322:23
325:4,14
**ways**  46:16 102:10
125:2 135:3
138:12 150:8,15
153:11 158:16
159:10 170:16
173:12 262:2
**we've**  90:24 98:9
123:8 124:3
228:22 230:9
286:14 288:10
291:18 310:9
324:4,19 331:14
333:18
**weak**  226:17
**wealth**  34:5
**wearing**  176:3
**web**  136:6
**website**  36:19
**week**  5:21 37:7
94:14 303:18
**weekend**  74:4
**weekends**  76:18
**weekly**  73:21
**weeks**  19:21
160:24

**weightage** 208:23
**welcome** 247:5
  322:18
**welfare** 45:5 174:8
**went** 46:20 124:20
  142:14 143:8
  145:6 146:3,12
  162:6 174:21
  177:18 194:14
  228:20 248:14
  293:15 307:23
  324:4
**west** 1:1 5:11,17
  5:22 6:7 7:19 9:16
  10:15,16 11:7,14
  11:23 12:13 21:1
  22:8,23 31:19
  32:6 34:14 35:11
  41:10,11 43:7,9,17
  45:22 46:12 48:18
  49:8,16 51:18
  52:18 53:19 54:5
  56:5 57:16 58:17
  58:21 59:1,18
  63:22 70:7,9,11
  71:11,14,16 80:1,6
  83:8,16 84:15,16
  84:17 85:9,20
  86:9 89:4,10
  91:14,21,24 92:11
  93:4 94:6,9,16
  95:10,15 96:9,22
  98:24 99:2,5
  102:8 103:6
  104:22,23 105:21
  106:24 110:19
  111:1,2,16,21,23
  113:6,12,19
  116:19 121:5,23
  122:8 123:5,11
  124:6,16 125:10

125:15 126:18
128:1,12 130:10
130:14,17,23,24
133:4 134:3,6
135:14,20 136:2
136:23 137:2
139:18,24 141:23
143:3 144:1 146:8
146:10 147:21
148:7 156:20
158:21 161:15
165:20 167:13
168:4,7 172:11
173:24 174:15,20
174:23 175:11,18
175:23 178:15
182:12 183:3,23
184:6,15 188:23
195:6 197:17
198:11,12,14,22
202:24 205:5,10
206:22 207:7
209:6 221:8 227:6
227:17 228:2,13
230:5,5 235:11
241:8,12,16,18
242:1 243:4,18
246:22 249:4,6
251:12 261:4,4
262:22 264:15
269:23,24 270:24
271:9,18,20
272:22,23 273:18
274:6 275:21
277:20 278:21
285:15,21 286:19
292:13 295:7
296:17,23 297:2
301:3,7,15 302:6
303:4,20 305:9
306:16 307:21

308:13 309:12,14
309:17 314:2,4
315:5,11 316:4,23
317:12,14 318:13
319:15 324:2,12
324:16 325:4,6,9
325:19,24 326:12
326:15 327:15,19
327:22 328:23
329:16 330:7,13
344:1,15 345:1,7
**whatsoever** 322:8
**wheeling** 3:5
**whispering** 7:5
**white** 89:3 97:22
  174:4 316:21
  322:5,18
**wholesale** 49:4,15
  52:10 53:1,11,23
  54:10 58:22 76:24
  77:3,6,12 80:21
  246:12 247:7
  250:10 258:18
  268:12 269:15
  274:2 294:20,23
**wife** 100:8
**wilkes** 232:21
**williams** 2:11 8:12
**wish** 180:6
**wit** 344:2 345:2
**withdraw** 207:19
**withdrawal**
  153:15 168:15
  170:10
**withdrawals**
  170:9,11
**witness** 6:22 9:1,2
  9:5 23:2,15 25:1
  25:13 50:7,11,21
  51:6 115:7,10
  118:12,15,22

119:3 181:8,9
234:6 323:6
328:15 344:7,10
346:8,11 347:1,4
347:11 348:1,4,15
**witnesses** 24:14
  233:12 289:17
**witness'** 346:14
**woman** 264:21
  276:9
**womb** 169:19,22
**women** 147:21
  169:6,8,14 173:13
  173:16,17 175:2
  319:18 320:8,13
**women's** 173:15
**wonder** 277:11
**wood** 148:13
  222:6 224:1
**woodwork** 150:14
**word** 158:13 244:6
  247:7 260:1
  267:17 316:19
**words** 21:24
  200:20
**work** 9:17 19:16
  20:3 22:17 31:5,7
  34:13 37:3,19
  39:19 41:9,18,23
  42:18 44:23 48:21
  51:15 59:8 79:9
  89:19 90:17,24
  91:6 98:9 123:5,7
  123:10,20 124:1
  124:15 128:14
  130:7 133:9 135:4
  136:5 145:13
  146:16 147:3,4
  148:14 152:22
  153:6 156:17
  160:4 165:20

167:12 170:18
173:4,4,8 177:5
200:3,11 201:4,9
220:12 222:7,9
224:1 229:7
232:20 234:4
242:5,12 243:10
249:15 251:4,5
273:10 286:18
289:1 331:13
**worked** 22:19
42:12 64:10
123:22 134:11
175:11
**worker** 5:20
303:18
**working** 44:12
45:22 73:4 81:15
128:12 130:12
135:3 148:16
151:15 173:2
183:15 201:13
216:11 273:9
289:18 310:20
**workings** 22:21
**works** 109:16
190:13 217:6
**world** 90:5 94:19
194:6
**worry** 161:9
**worst** 101:23
**write** 34:12 177:14
212:6,7 220:22
256:8 294:12
**writer** 261:1
**writing** 39:16
74:14 87:21 261:9
**written** 36:3 87:9
87:18,20 105:23
112:14 192:1
193:5 220:17

245:12 247:17,23
248:6 298:17
302:1,9 305:24
311:4,10,20
315:12 320:21
344:9
**wrong** 154:8
194:10 261:14
262:12 277:11
**wrote** 113:2
249:12,14 260:14
260:20 261:11,12
262:9,13,16,19
264:14 265:9
**wv** 2:8,16 3:5 5:3
5:5,7 12:5,7
299:12 320:8,10
320:11 344:20
**wvsma** 6:18 60:23
61:21
**wvu** 121:10

**x**

**xponent** 111:9
112:3

**y**

**yea** 187:1
**yeah** 51:5 62:5
73:23 144:3,16
179:9 180:3
182:20,20 185:14
207:18 212:18
221:20 238:15
240:14 270:7
287:6 290:24
291:4 297:19
**year** 60:4 63:2
73:18 97:21
122:16 124:11
125:4 126:11
127:19 143:17,17

156:18 158:22,23
171:18 174:18,18
174:19 175:7,8
190:7,9 192:14,24
194:11,13 204:7,8
214:23 243:13
246:4,9 260:22
270:2 276:9
331:14,21 340:11
340:16 342:18
343:2,2
**years** 9:23 36:17
40:4 41:4 54:15
64:10 65:2 75:5,5
78:23 93:2 95:7
95:22 97:23
120:12 130:12
157:11 159:19
167:7,8 171:5
192:16 193:1
194:7,12,15 198:4
201:11 214:18
246:8 259:15
274:11,14 281:22
296:10
**yesterday** 16:4,9
16:15,16 17:17
18:4,5,19
**york** 131:2

**z**

**zero** 148:22,23
222:15,16
**zimmerman** 180:9
180:14
**zoom** 7:22 115:23

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.