Plaintiffs' Cross-Notice of Remote Deposition
and Non-Retained Expert Witness Disclosure of
Dr. Rahul Gupta

# Exhibit 4

Plaintiffs' Supplemental Federal Rule Civil
Procedure 26(a)(2)(C) Disclosures
(Doc 1146-1)
*City of Huntington, et al. v. ABDC, et al.*
3:17-cv-01362, 3:17-cv-01655

Ex 1 – Plaintiffs' Supplemental Federal Rule Civil Procedure 26(a)(2)(C) Disclosures

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude Undisclosed Expert Testimony from Non-Retained Expert Witnesses

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CITY OF HUNTINGTON, | Civil Action No. 3:17-cv-01362 |
|         Plaintiff, | |
| v. | |
| AMERISOURCEBERGEN DRUG CORPORATION, *et al.*, | |
|         Defendants. | |
| CABELL COUNTY COMMISSION, | *Consolidated case:* Civil Action No. 3:17-01665 |
|         Plaintiff, | |
| v. | Hon. David A. Faber |
| AMERISOURCEBERGEN DRUG CORPORATION, *et al.*, | |
|         Defendants. | |

## PLAINTIFFS' SUPPLEMENTAL FEDERAL RULE CIVIL PROCEDURE 26(a)(2)(C) DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26, the City of Huntington and the Cabell County Commission, "Plaintiffs," hereby supplement their Federal Rule Civil Procedure 26(a)(2)(C) disclosures [*See* Dkt. 825]. As previously disclosed, the following witnesses are expected to testify as to their respective backgrounds, training and professional observations and experiences; these witnesses may offer both fact and expert testimony in accordance with the facts and opinions set forth in

their deposition testimony.[1]  By providing this supplemental disclosure, Plaintiffs do not concede that the summary of the testimony implicates opinions required to be disclosed under Rule 26(a)(2)(A) as opposed to opinions governed by Federal Rule of Evidence 701.[2]  The opinions are summarized as follows:

---

[1] These witnesses were initially disclosed on Plaintiffs' Preliminary Witness list filed on June 3, 2020 (Dkt. 503). Furthermore, the Defendants served subpoenas regarding all of these witnesses, either directly or through their employers. See e.g. Dkt. 340.1, 354.1, 449.1, 450.1, 903.1. Additionally, these witnesses were identified in the Plaintiffs' previous disclosures as witnesses that might be called as Fed. R. Civ. Pr. 26(a)(2)(C) witnesses. (See Dkt. 825 and 1055.1).

[2] Plaintiffs withdraw their identification of the following witness as Rule 26(a)(2)(C) witnesses: Hank Dial; Skip Holbrook; Robert Hansen, MS; Zachary Hansen, M.D.; Rocky Johnson; Scott Lemley; Jan Rader; Gordon Merry; Steve Murray; Connie Priddy; Chuck Zerkle; Allen Mock and Mitzi Payne.  Plaintiffs may call these witnesses as fact witnesses and may seek opinion testimony from them that falls within Federal Rule of Evidence 701.

## A.  DAVID G. CHAFFIN, JR., M.D., FACOG

Dr. David Chaffin is a professor of obstetrics and gynecology and the director of maternal fetal medicine at Marshall University School of Medicine.[3] Dr. Chaffin has noticed a marked increase in the opiate addition in the areas since he joined the staff of Marshall in 1998.[4] Dr. Chaffin will present evidence and provide testimony on the subject matter of opioid addiction, and the opioid epidemic in Cabell County and the City of Huntington, based on his personal knowledge and experience, and in conformance with the facts and opinions expressed during his deposition, as summarized below:

- The commonality of opiate addiction as co-morbidity in pregnancy[5];

- Subutex is a reasonable treatment of opiate addiction[6];

- Observable shift seen via Maternal Addiction Recovery Center ("MARC") program in 2012 from mothers addicted to opiate pills to 2020, from mothers addicted to heroin[7];

- Patients who successfully complete MARC at the time of delivery are more likely to remain in a Medicaid Assisted Treatment program for the duration of the time they remain in MARC treatment[8]; and

- Prolonged use of opioids leads to an increased risk of addiction.[9]

---

[3] *Id.* at 4. Dr. Chaffin is specially trained to provide treatment for high-risk pregnancies and has published on the prevalence of drug use among pregnant West Virginian patients. *Id.*

[4] Chaffin Depo. Tr. At 11:25-12:1, attached hereto as Ex. A.

[5] *Id.* at 103:3-19.

[6] *Id.* at 13:23-14:25.

[7] *Id.* at 94:14-23.

[8] *Id.* at 24:11-25:2.

[9] *Id.* at 93;16-25.

## B. Todd Davies, PhD

Todd Davies, PhD is an Associate Professor and the Associate Director of Research and Development for the Division of Addiction Sciences in the Department of Family and Community Health at Marshall University's Jones C. Edwards School of Medicine.[10] He previously managed the Marshall Clinical Research Center, a hub for clinical trial activity at Marshall.[11] Todd Davies will present evidence and provide testimony regarding the opioid epidemic in Cabell County and the City of Huntington, including the incidence of overdose deaths, opioid use disorder, and neonatal abstinence syndrome locally, based on his personal knowledge and experience, consistent with the facts and opinions expressed during his deposition and in his September 15, 2020 Declaration, as summarized below:

- Based on "OUD Population at a Glance", there are 7,627 individuals that have been diagnosed with OUD by the Cabell Huntington Hospital or Marshall Health Clinics, with addresses filtered to identify residents of Cabell County and the City of Huntington, based on a Marshall Health database that Dr. Davies has access to which identifies patients with an OUD diagnosis or who have failed multiple drug screens[12];

- The opioid crisis has led to a rise in intravenous drug use, violent crimes, compromised health, negative economic impacts, an increase in behavioral health issues, health problems, and impacts on jobs and families in Huntington/Cabell County[13];

- The local area's Appalachian setting affects the opioid epidemic[14];

---

[10] Davies Depo. Tr. at 6:22-7:2, attached as Ex. B.

[11] *Id.* at 12:5-22.

[12] *Id.* at 33:8-37:4, 108:23-119:5; Davies deposition, exhibit 11, "OUD Population at a Glance" (*see* Ex. B); and Declaration of Todd Davies, Ph.D. (*see* Ex. B).

[13] Ex. B., depo transcript at 50:17-52:4.

[14] *Id.* at 205:20-207:6.

- Huntington/Cabell County has experienced a dramatic increase in diseases related to drug use, such as endocarditis and hepatitis B and C, which are all known to increase with intravenous drug use[15];

- The number of opioid overdose deaths in Cabell County increased dramatically over time[16];

- NAS is a withdrawal syndrome that occurs shortly after birth due to the abrupt cessation of opioid delivery to the infant[17];

- The number of children born with NAS in the local area has increased dramatically, the rate of NAS births is higher than the national average, and NAS is a critical issue with the local opioid epidemic[18];

- NAS is related to harms such as physical and mental health problems in mothers[19];

- Whether prescribed by a physician or obtained illegally, opioid addiction is a serious public health issue, one which affects pregnant women and their infants[20];

- NAS babies require special care, including MAT, that goes beyond even what other NICU babies require[21];

- MAT is offered by local providers and is successful but needs to be expanded, along with a more robust behavioral health system[22];

- There is a need to rebuild social structures for individuals navigating through treatment and into long-term recovery in order to help them maintain their sobriety[23];

---

[15] *Id.* at 55:13-56: 21.

[16] *Id.* at 113:8-16, 121:11-127:16.

[17] *Id.* at 104:5-105:7.

[18] *Id.* at 73:4-89:12, 103:2-16.

[19] *Id.* at 89:20-98:22.

[20] *Id.* at 104:5-105:7.

[21] *Id.* at 102:14- 107:9.

[22] *Id.* at 38:1-41:10, 60:20-62:1, 63:24-68:9.

[23] *Id.* at 67:1-68:12.

- Successful recovery requires a social system which individuals can rely on support from sponsors alongside a community who promotes healthy behaviors to maintain any achieved progress[24];

- Gathering information and conducting research about the local opioid epidemic, including collecting data on OUD, overdoses, and NAS, is critical to understand the epidemic and respond to it actively and effectively;[25] and

- Dr. Davies is involved with current ongoing research on opioids and NAS in the local community.[26]

---

[24] *Id.* at 67:13-68:12.

[25] *See, e.g., id.* at 83:23-84:25.

[26] *Id.* at 154:18-162:2.

### C. Rahul Gupta, M.D., MPH, MBA, FACP

Dr. Rahul Gupta served as the commissioner and state health officer for West Virginia from 2015-2018.[27] Under his tenure and at his direction, Dr. Gupta ordered a number of reports, including a historical overview report tracking West Virginia's opioid crisis from 2000 to 2015 and a 2016 overdose fatality analysis in West Virginia.[28] Dr. Gupta will present evidence and provide testimony on the subject matter of opioid addiction, diversion, the nature of the opioid epidemic and its effects in Cabell County and the City of Huntington, based on his personal knowledge and experience, and in conformance with the facts and opinions expressed during his deposition, as summarized below:

- Opiate prescription drugs, their volume, and the consequential addiction and other diseases associated with OUD rose by thousands of percent over a decade[29];

- The amount of appropriate prescriptions was dwarfed by the amount of inappropriate prescriptions that were being diverted[30];

---

[27] *See* Dkt. 1055-1, at 6. Dr. Gupta is a practicing internist with 25 years of clinical experience. *Id.* Dr. Gupta has authored more than 125 peer-reviewed scientific publications in medicine and public health and served as a principal investigator for numerous well-known clinical trials. *Id.* Dr. Gupta is a national and global leader in transforming public health practice to advance health equity and create healthier communities. *Id.* at 7. In 2017, Dr. Gupta was named West Virginian of the Year for his work towards battling the opioid epidemic by the Pulitzer prize-winning Charleston Gazette-Mail. *Id.*

[28] Gupta Depo. Tr. at 96:6-10, attached as Ex. C. *See also id.* at 182:7-183:14 (introducing the West Virginia Drug Overdose Deaths Historical Overview 2001-2015 report as exhibit); *See id* at 183:22-184:17 (introducing the 2016 West Virginia Overdose Fatality Analysis report as exhibit).

[29] *Id.* at 324:17-325:2.

[30] *Id.* at 150:12-151:5.

- There is a direct correlation between diverted prescription pills and the transition to using street drugs such as heroin, fentanyl, methamphetamine, etc.[31];

- Once an addiction is formed, an individual struggling with addition will obtain the addictive substance by any means necessary, which often results in illegal activity and the use of illegal substances[32];

- The IV drug use problem in Cabell County and the City of Huntington is an evolution of the prescription drug problem[33];

- The HIV outbreak in Cabell County, as a result of IV drug use, is the second largest in the nation's history[34];

- In Cabell County and the City of Huntington, the consequences of the oversupply and over-availability of prescription opioids has led to overdose deaths, and, more generally, communal suffering and devastating carnage[35];

- The opioid epidemic has led to an increase in the number of children entering the foster care system, rapidly increasing child welfare costs to the state[36];

- The opioid epidemic is a transgenerational crisis[37];

- Because of the overwhelming number of overdose deaths in 2015, there was a need in West Virginia for air-conditioned trailers to house the bodies of those who had overdosed[38];

- Although there was a 15-20% reduction in opioid prescriptions in 2015 and 2016, there was no reduction in overdose deaths because the addiction had already been formed, and people with opioid use disorder

---

[31] *Id.* at 166:4-13.

[32] *Id.* at  105:1-18.

[33] *Id.* at 161:14-165:18.

[34] *Id.* at 97:2-13.

[35] *Id.* at 22:5-24.

[36] *Id.* at 45:3-11.

[37] *Id.* at 44:22-45:24.

[38] *Id.* at 131:1-21.

were turning to illicit, more lethal forms to feed their addictions that was initially formed by prescription opioids[39];

- The increase in overdose deaths in West Virginia during that time was caused by the large volume of opioid pills that were originally deposited or delivered to West Virginia[40];

- In 2016, a significant amount of the people who died from an overdose had filled a prescription within 30 days prior to their death[41];

- Of the people who were incarcerated, released and subsequently died, the majority died of an overdose[42];

- In 2016, it was found that those overdose decedents who went to three or more pharmacies to fill prescriptions were 70 times more likely to have died[43];

- Three out of the four people that died of an overdose in 2016 tried to seek help within the year before their time of death[44];

- NAS babies are a causative issue in terms of the opioid epidemic[45];

- The overwhelming volume that was reaching the people of West Virginia was plainly involved in the killing of West Virginians every 12 hours around the clock[46];

- Addiction tells people to seek opioids in one form, shape or other[47];

---

[39] *Id.* at 162:1-165:18.

[40] *Id.* at 167:24-168:8.

[41] *Id.* at 126:3-8.

[42] *Id.* at 126:3-14.

[43] *Id.* at 248:12-21.

[44] *Id.* at 126:9-14.

[45] *Id.* at 168:8-11.

[46] *Id.* at 43:6-11.

[47] *Id.* at 154:14-22.

- Chemically speaking, synthetic opioids, semi-synthetic opioids and prescription opioids work through the same receptors and feed the same need to the body[48];

- Children diagnosed with at birth have noticeable difficulties learning and paying attention[49]; and

- As children with NAS enter the classroom, there will be noticeable, interruptive and impulsive behavioral issues.[50]

## D. Michael Kilkenny, M.D., MS

Dr. Michael Kilkenny is Board Certified in Family Practice and has worked in academic, hospital, and private practice settings.[51] Dr. Kilkenny has 16 years of experience as a medical director in the Community Health Center system and is currently the Physician Director of the Cabell-Huntington Health Department, serving Cabell County and the city of Huntington, WV.[52] Dr. Kilkenny was instrumental in the development of West Virginia's first local health sponsored harm reduction and syringe exchange program in 2015.[53] He has also published various articles concerning opioid injection use in West Virginia.

Dr. Kilkenny will present evidence and provide testimony on the subject matter of opioid addiction and the opioid epidemic in Cabell County and the City of

---

[48] *Id.* at 176:18-177:19.

[49] *Id.* at 168:13- 172:22.

[50] *Id.* at 171:7-18.

[51] *See* 1055.1 at 11.

[52] *Id.*

[53] *Id.* Dr. Kilkenny currently serves on several advisory panels for the West Virginia Department of Health and Human Resources, Bureau for Public Health. *Id.* He is a member of the Harm Reduction Coalition and serves on the advisory panels for the Governor's Advisory Council on Substance Abuse, Prevention and Treatment. *Id.*

Huntington including testimony concerning health assessments and issues facing Cabell County and the City of Huntington as well as resource allocation needs for the improvement of health outcomes in the community. Such testimony will be provided based on his personal knowledge and experience, and in conformance with the facts and opinions expressed during his deposition, as summarized below:

- Opioids carry the risk of abuse, the risk of psychological addiction, and the potential to be chemically addictive;[54]

- The vast majority of injection drug users started as oral prescription drug users;[55]

- Intravenous Drug Injections is the primary cause of systemic and deep tissue infections, HIV risk, Hepatitis C risk and/or overdose deaths;[56]

- A failure of oversight and violation of laws regarding distribution contributed to Opioid epidemic in Cabell and Huntington;[57]

- Based on the data in Cabell County, from 2015-2017 overdose deaths rose;[58]

- Overdose deaths declined with the increase of naloxone distribution;[59] and

- There is still an opioid epidemic in Cabell County and the City of Huntington.[60]

---

[54] Kilkenny Depo at 99:4-99:6; 92:3-92:12, attached hereto as D.

[55] *Id.* at 75:14-75:16.

[56] *Id.* at 74:5-74:7.

[57] *Id.* at 119:16-119:21.

[58] *Id.* at 104:17-106:7.

[59] *Id.* at 104:17-106:7.

[60] *Id.* at 107:13-107:16.

## E. Christina Mullins, M.A.

Christina Mullins serves as the Commissioner for the West Virginia Department of Health and Human Resources ("DHHR"), Bureau for Behavioral Health.[61] Christina Mullins will present evidence and provide testimony on the subject matter of the opioid epidemic in Cabell County and the City of Huntington, including opioid addiction and deaths, and the impacts on the community, based on her personal knowledge and experience, and in conformance with the facts and opinions expressed during her deposition, as summarized below:

- The opioid crisis is on-going, and we may see a rise in overdose deaths yet again[62];

- Prescription opioids had a significant impact on the overdose deaths in the state of West Virginia[63];

- Every county and community in West Virginia has been impacted by the opioid crisis, and will be able to document some level of need[64];

- There is an increase in prescribers utilizing MAT as well as those seeking treatment generally at comprehensive mental health centers[65]; and

---

[61] *See* 1055.1 at 12-13. She previously served as the Director of DHHR's Office of Maternal, Child and Family Health and worked in a variety of maternal and child health programs. *Id.* In her nearly 20-year tenure with DHHR, Commissioner Mullins has worked to establish West Virginia's youth anti-tobacco campaign, collaborated with a multitude of partners to launch a surveillance system for neonatal abstinence syndrome, and co-authored the 2016 West Virginia Overdose Fatality Analysis. *Id.*

[62] Mullins Depo. Tr. at 142:11-143:2, attached as Ex. E.

[63] *Id.* at 154:9-12.

[64] *Id.* at 141:1-10.

[65] *Id.* at 76:21-78:11.

- Long term financial resources will be needed to deal with these public health crises (HIV, mental health issues, etc.) in the future.[66]

- The opioid crisis impacts the ability for family units to stay intact and the downstream consequences of infant separation and foster care involvement are concerning. [67]

- The devastation of the opioid epidemic in the community, including trauma associated with children losing their families of origin due to substance use disorder and other unknown consequences will impact generations of families; The community will have to continue dealing with the mental health trauma among other residual effects of this crisis. [68]

### F.  Lyn O'Connell, PhD

Dr. O'Connell assists with Marshall Health's and the City of Huntington's response to the substance use crisis through clinical services, grant writing, research and program development, implementation and oversight.[69] In 2018, Dr. O'Connell was appointed the Associate Director of Community Services in the Department of Family and Community Health's Division of Addiction Sciences at the Marshall University Joan C. Edwards School of Medicine and Marshall Health.[70] In this position, Dr. O'Connell provides leadership to efforts to address substance use, and its underlying causes, within the community.[71]

---

[66] *Id.* at 150:1-150:14.

[67] *Id*. at 145:17-146:7.

[68] Id. at 147:15-148:5.

[69] *See* 1055.1 at 13. She also works with the City of Huntington on the advisory board of the Compass Project to promote resiliency in first responders and as the primary investigator for the Huntington Quick Response Team ("QRT"). *Id.*

[70] *Id*.

[71] Dr. O'Connell also engages in teaching, research, and providing clinical services. *Id.* at 14. Dr. O'Connell previously served as the Clinical Director of the Marshall University Screening, Brief Intervention, and Referral to Treatment (SBIRT)

Dr. O'Connell will provide testimony regarding her extensive work within the community and with Marshall University as well as her work on the Resiliency plan and The City of Solutions. In addition, Dr. O'Connell will present evidence and provide testimony on the subject matter of the opioid epidemic in Cabell County and the City of Huntington, including opioid addiction, the negative effects on infants, barriers to recovery, and the effects of the epidemic on the community based on her personal knowledge and experience, and in conformance with the facts and opinions expressed during her deposition, as summarized below:

- In the City of Huntington and Cabell County, negative effects of infants who are born with substance exposure, diagnosed as either neonatal abstinence symptoms or neonatal withdrawal symptoms are evident[72];

- The necessary level of care and intervention for mothers overcoming SUD requires specific and tailored approaches[73];

- There are an overwhelming amount of barriers to women in recovery , including transportation, insurance costs, childcare, residential treatment and capacity[74];

- The opioid epidemic affects every individual who lives or works in the city and County and larger region as a result of the significant loss of human life, overdoses, the effect on the legal and housing system, health

---

program. *Id*. She is also a member of the Marshall Substance Use Recovery Coalition, Healthy Connections Coalition, and chair of the Cabell County Substance Abuse Prevention Partnership. *Id*. She serves as chair of the Prevention Empowerment Partnership with United Way of the River Cities Program and is a member of the Marshall Substance Use Recovery Coalition as well as co-chair of the Healthy Connections Coalition. *Id*. Dr. O'Connell also serves as a member of the Faith Community United Steering Committee and an Advisory Board Member of the Bloomberg Compass Project for addressing compassion fatigue as a result of the opioid crisis. *Id*.

[72] O'Connell Depo. Tr. at 278:13-279:6, attached as Ex F.

[73] *Id.* at 63:19-64:14; 278:13-279:2.

[74] *Id.* at 280: 18- 281:19.

care system, first responders, the education system and financial standing of individuals within the community[75]; and

- There is a very short window to actively engage an individual with a substance use disorder.[76]

**G. Stephen Petrany, M.D.**

Stephen M. Petrany, M.D., is the chairman of the department of family and community health at the Joan C. Edwards School of Medicine, where has been a professor in the department and full-time faculty member since 1989.[77] Heavily involved with Ebenezer Medical Outreach, Dr. Petrany currently serves as its medical director and on its board of directors.[78] Dr. Petrany will provide testimony concerning components of the Resiliency plan, including the various needs of the community, research, education and engagement.  He will also provide testimony with regard to opioid addiction in Cabell County and the City of Huntington and the relationship between prescription opioids and heroin use, based on his personal knowledge and experience, and in conformance with the facts and opinions expressed during his deposition, as summarized below:

- Many people who are now addicted to opioids turn to street drugs, such as heroin and others to satisfy their addiction; this often leads to overdose and death[79];

---

[75] *Id.* at 277:24-278:12.

[76] *Id.* at 281:5-14.

[77] *See* 1055.1 at 14.

[78] *Id.* at 15. He is also the co-director and co-developer of the Paul Wesley Ambrose Health Policy Residency Track, the nation's first health policy track within a family medicine residency program. *Id.*

[79] Petrany Depo Tr. at 173:17-174:15, attached as Ex. G.

- It takes communication and collaboration for a community to effectually address and epidemic of this magnitude[80]; and

- In responding to the opioid epidemic, community based and supported plans make for better programs and more effective solutions. [81]

### H. Kevin Yingling, RPh, M.D., FACP

Dr. Kevin Yingling is Chairman of the Board of Directors for Cabell Huntington Hospital and a member of the Board of Health for Cabell County.[82] Dr. Yingling has been a registered pharmacist since 1981 and a licensed physician since 1990.[83] Dr. Yingling will present evidence provide testimony on the subject matter of the opioid epidemic in Cabell County and the City of Huntington, including opioid addiction, diversion, the relationship between opioid use and illegal drug use, and the economic and community burden caused by the epidemic, based on his personal knowledge and experience, and in conformance with the facts and opinions expressed during his deposition, as summarized below:

- Opioids were diverted and used by individuals with opioid use disorder and for nonmedical use[84];

- There is biologic plausibility to the transference of addiction to opioids and opiates - synthetic or otherwise - that goes from an addiction to

---

[80] *Id.* at 74:-23-74:24.

[81] Id. at 126:2-128:7.

[82] *See* 1055.1 at 16.

[83] *Id.* He was founding dean of the Marshall University School of Pharmacy. Dr. Yingling is also an associate professor of medicine and pharmacology and served more than 10 years as chairman of the Department of Internal Medicine at the Joan C. Edwards School of Medicine. *Id.* Dr. Yingling is certified by the American Board of Internal Medicine. *Id.*

[84] Yingling Depo at 92:5-93:6, attached as Ex. H.

prescription opioids, to the use and abuse of other products such as heroin, fentanyl, carfentanil, etc.[85];

- The widespread availability of prescription opioids has led to the use of heroin and subsequent consequences from the burden addiction[86];

- Prescription opioid addiction and abuse is also a primary gateway for methamphetamine use in Cabell County[87];

- The loss of economic value to families, the tragedies, the psychosocial trauma, and other outcomes from the opioid epidemic will be borne out by this community for decades. This will be a generational burden for Cabell County and Huntington[88];

- There exists an economic and community burden for raising children who have been affected by the opioid epidemic. As a result of opioid, addiction, overdose and death, many children do not have families to raise them and will end up foster homes. As these children move into the primary education system, that burden will intensify[89]; and

- The addicted populations who are not in long-term recovery cause a great deal of the challenges for local law enforcement to face.[90]

---

[85] *Id.* at 148:21-149:6.

[86] *Id.* at 149:13-149:19.

[87] *Id.* at 150:11-150:15.

[88] *Id.* at 140:16-140:21.

[89] *Id.* at 141:9-141:18.

[90] *Id.* at 143:13-143:18.

Dated: October 30, 2020

Respectfully submitted,

**THE CITY OF HUNTINGTON**

**CABELL COUNTY COMMISSION**

/s/ *Anne McGinness Kearse*
Anne McGinness Kearse (WVSB No 12547)
Joseph F. Rice
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com

/s/ *Paul T. Farrell Jr.*
Paul T. Farrell, Jr. (WVSB Bar No. 7443)
**FARRELL LAW**
422 Ninth Street, 3rd Floor (25701)
PO Box 1180
Huntington, West Virginia 25714-1180
Mobile: 304-654-8281
paul@farrell.law

Linda Singer
David I. Ackerman
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-232-5504
Fax:  202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com

/s/ *Anthony J. Majestro*
Anthony J. Majestro (WVSB No. 5165)
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Charles R. "Rusty" Webb (WVSB No. 4782)
**The Webb Law Centre, PLLC**
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

Michael A. Woelfel (WVSB No. 4106)
**WOELFEL AND WOELFEL, LLP**
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

18

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

CITY OF HUNTINGTON,

              Plaintiff,

v.

AMERISOURCEBERGEN DRUG
CORPORATION, *et al.*,

          Defendants.

Civil Action No. 3:17-cv-01362

---

CABELL COUNTY COMMISSION,

          Plaintiff,

v.

AMERISOURCEBERGEN DRUG
CORPORATION, *et al.*,

          Defendants.

*Consolidated case:*
Civil Action No. 3:17-01665

Hon. David A. Faber

## CERTIFICATE OF SERVICE

I certify that on October 30, 2020, a copy of the **Certificate of Service** for

**Plaintiffs' Supplemental Federal Rule Civil Procedure 26(a)(2)(c)**

**Disclosures** was filed electronically. Notice of this filing will be sent to all parties

by operation of the Court's electronic filing system. Parties may access this filing

through the Court's system. Plaintiffs' Supplemental Federal Rule Civil Procedure

26(a)(2)(c) Disclosures will be served on all parties by email to:

Track2OpioidDefendants@ReedSmith.com and MDL2804Discovery@motleyrice.com.

*s/ Anthony J. Majestro*
Anthony J. Majestro (WVSB 5165)

Ex A – Deposition Excerpts of David G. Chaffin, Jr., M.D., dated 07/29/2020

Plaintiffs' Supplemental Federal Rule Civil Procedure 26(a)(2)(C) Disclosures

```
 1            UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF WEST VIRGINIA
 2
     THE CITY OF HUNTINGTON,      )
 3                                )
            Plaintiff,            )
 4                                )
     vs.                          )
 5                                )  Civil Action
     AMERISOURCEBERGEN DRUG       )  No. 3:17-01362
 6   CORPORATION, et al.,         )
                                  )
 7        Defendants.             )
     _____     )
 8                                )
     CABELL COUNTY COMMISSION,    )
 9                                )
            Plaintiff,            )
10                                )  Civil Action
     vs.                          )  No. 3:17-01665
11                                )
     AMERISOURCEBERGEN DRUG       )
12   CORPORATION, et al.,         )
                                  )
13        Defendants.             )
14
              WEDNESDAY, JULY 29, 2020
15
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16           CONFIDENTIALITY REVIEW
17                  - - -
18            Remote videotaped deposition of
     David G. Chaffin, Jr., M.D., held at the
19   location of the witness in Huntington, West
     Virginia, commencing at 9:10 a.m., on the
20   above date, before Carrie A. Campbell,
     Registered Diplomate Reporter and Certified
21   Realtime Reporter.
22
                    - - -
23
            GOLKOW LITIGATION SERVICES
24     877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
25
```

1    medicine in the Cabell-Huntington area, do

2    you have an opinion within a reasonable

3    degree of medical probability whether or not

4    there exists a public health crisis in

5    Cabell-Huntington in relationship to opioid

6    use?

7              MS. RUSSO:  Objection to form.

8    QUESTIONS BY MS. WILDE:

9         Q.    You can answer.

10             MR. JONES:  I'd like to briefly

11        interject with perhaps not so much of

12        an objection but an observation.

13             Dr. Chaffin is here as a fact

14        witness.  He's not a retained expert.

15        To my knowledge, he's not been

16        compensated as an expert of any

17        testimony.

18             So I would direct him to answer

19        this question and the line of

20        questions to the extent that he has

21        personal knowledge of the facts.

22             MS. WILDE:  Yes.  And if I

23        didn't make that clear, that is what I

24        want, Dr. Chaffin.

25             THE WITNESS:  Okay.  Has there

Highly Confidential - Subject to Further Confidentiality Review

1    been a marked increase in opiate

2    addiction since I joined the staff in

3    1998?  And the answer is yes.

4  QUESTIONS BY MS. WILDE:

5    Q.    And if you can, Dr. Chaffin,

6  tell me a little bit about that.

7    When and what have you

8  observed?

9    A.    That's kind of broad.  I'm not

10  sure what you're asking.

11    Q.    Sure.

12    You said that you had noticed a

13  marked increase of opioid use and addiction.

14    When would you say that you

15  began to notice, if you can pinpoint -- and

16  if you can't, just give me a broad, general

17  time frame.  When did you start to see this

18  or make these observations?

19    A.    When I joined and probably the

20  first four years of my tenure at Marshall, I

21  would have between two and four patients in a

22  methadone program per year.

23    And then early 2000s, we

24  started to see an increase in the frequency,

25  and it has been a steady increase since that

Highly Confidential - Subject to Further Confidentiality Review

1  time.

2      Q.    Do you still, Doctor -- again,

3  based on your observations of the area, is

4  there still an increase?  Has it plateaued?

5  It has it begun to decrease?  Have you made

6  any observations regarding that?

7      A.    I have to qualify when I

8  started a formal medication-assisted therapy

9  program in 2012, and probably for four years

10  after that there was still a steady increase.

11          I started the program because

12  there was nobody else taking care of pregnant

13  patients with opiate addiction.  Now there

14  are multiple, many providers.

15          And so what I can tell you, my

16  observation is that in my practice, the

17  number of people I have in my practice, has

18  plateaued or slightly decreased.  But I don't

19  know what that means about the area

20  incidence, because I no longer take care of

21  everybody that has an opiate addiction, which

22  I did at one time.

23      Q.    In 2012, what was happening in

24  Cabell-Huntington such that you felt the

25  necessity to open medication --

1    methadone-assisted treatment?

2        A.    It had become quite clear that

3    Subutex was a very reasonable treatment for

4    opiate addiction.  There were no Subutex

5    programs available to pregnant patients.

6    Everybody that got pregnant was removed from

7    whatever Subutex program they was in.  So I

8    was not able to find other people to take

9    care of Subutex patients, and so I started

10   that program.

11       Q.    And obviously there was a

12   medical need for it in the community at this

13   point?

14       A.    There were.  We ran a steady

15   census of 35 to 40 patients at all times for

16   the first, oh, I don't know, six or eight

17   years.

18       Q.    And just to jump back a little

19   bit, and that's in comparison to the two to

20   four, I believe you said, when you first

21   started there in 1998?

22       A.    Yes.  Two to four per year,

23   total.  And so realize that 30 -- 35 to 40

24   patients was -- they would deliver; we'd

25   immediately fill the program back.

 1    MARC would ask.

 2              Since that time, it has been

 3    less an important aspect.  And so for the

 4    last seven years or so or six years, five to

 5    six years, we haven't -- we haven't pursued

 6    how they got started.

 7        Q.     And this is just a -- my own

 8    edification.  Does it matter for purposes of

 9    treatment?

10        A.     No.

11        Q.     All right.  Do these programs

12    work?  Does MARC work?

13        A.     You have to define what "work"

14    means.

15              So if you ask do we have less

16    use of street drugs and risky behavior, the

17    answer is yes.

18              If somebody is -- comes through

19    the MARC, is successful in the MARC, the baby

20    is born with Subutex on board, the withdrawal

21    period, the time needed to treat, is shorter.

22              Patients who successfully

23    complete MARC at the time of delivery are

24    more likely to remain in a medication-

25    assisted treatment program for the duration

1    of the time that I know about, which is six

2    weeks postpartum.

3         Q.    Are there programs for the --

4    after the six weeks postpartum that you're

5    familiar with, that for the --

6         A.    Yes.

7         Q.    Yeah.

8              Tell me about those, please.

9         A.    So Cabell-Huntington runs one

10   for patients postpartum as well as patients

11   who come in unattached and not on any other

12   program.  And it runs -- I think it's

13   100 days postpartum.  And then, of course,

14   there's PROACT.

15        Q.    Do you know the name of the

16   first one, the 100 days postpartum?

17        A.    Yeah, but you're going to ask

18   me what the acronym means, and I can't

19   remember.  But we call it the MOMS program.

20        Q.    Okay.  Again, and it's --

21   you're going to tell me it's according to how

22   I define successful, so let me ask you,

23   Dr. Chaffin:  Based on your experience and

24   your observations, are those programs

25   successful?  Are they reducing the harm to

Highly Confidential - Subject to Further Confidentiality Review

1  pills came from.  You don't know if those

2  pills were from a prescription or from the

3  street or from a friend's drug cabinet,

4  correct?

5       A.     Correct.

6       Q.     And there's also opioids that

7  are completely street drugs, like heroin,

8  correct?

9       A.     Correct.

10      Q.     And you agree that as a

11 physician who prescribes opioids, that there

12 are benefits and risks that you weigh when

13 making a determination whether or not to

14 write an individual prescription?

15      A.     Yes.

16      Q.     And are you aware of the risks

17 associated with opioid use?

18      A.     Yes.

19      Q.     And what are those risks?

20      A.     Obviously everybody has a

21 potential for allergic reaction.  There's

22 oversedation and problems associated with

23 that.  There's a risk of overdose with

24 respiratory depression and, with prolonged

25 lose, the risk of addiction.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      And you believe that opioids

2    continue to have a legitimate medical use

3    today?

4       A.      Yes.

5       Q.      And you believe that opioids

6    can be safe and effective treatment for

7    long-term pain if a patient takes it in

8    accordance with a doctor's prescription?

9       A.      Yes.

10      Q.      Did you say yes?

11      A.      Yes.

12      Q.      Okay.  Sorry, you dropped off a

13   little bit.

14              What is your understanding of

15   the opioids that are being used in Cabell

16   County today?

17      A.      I can't speak for the county.

18   In my practice, 90 percent of the patients

19   are abusing heroin.  Of the opiate use

20   patients.

21      Q.      And then in 2012, 90 percent of

22   your patients were addicted to opioid pills?

23      A.      Correct.

24      Q.      And we don't know the source of

25   those opioid pills?

```
 1     Bates 193, part of your biographical sketch.
 2          A.      Uh-huh.
 3          Q.      Would you have written this
 4     document?
 5          A.      I did.
 6          Q.      Okay.  So it was accurate at
 7     the time you drafted it?
 8          A.      Yes.
 9          Q.      And so this would have been in
10     2017.  Would you have made sure that the
11     personal statement was accurate as of 2017?
12          A.      Yes.
13          Q.      And so it says here, "Over the
14     last seven to eight years, West Virginia has
15     been dealing with an ever-accelerating
16     epidemic of opiate use disorder, and opiate
17     addiction has become the single-most common
18     comorbidity in pregnancy."
19          A.      Correct.
20          Q.      Did I read that correctly?
21          A.      Yes.
22          Q.      And then "in the hospital where
23     I practice" --
24                  And that's Cabell Huntington
25     Hospital?
```

Ex B – Deposition Excerpts of Todd Davies, Ph.D., dated 07/28/2020

Plaintiffs' Supplemental Federal Rule Civil Procedure 26(a)(2)(C) Disclosures

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF WEST VIRGINIA
 2

 3     CITY OF HUNTINGTON,
       WEST VIRGINIA,
 4
           Plaintiff,
 5
        vs.                       CASE NO. 3:17-cv-01362
 6
       AMERISOURCEBERGEN DRUG
 7     CORPORATION, et al.,
 8        Defendants.
       _____
 9     CABELL COUNTY COMMISSION,
10        Plaintiff,
11     vs.                        CASE NO. 3:17-cv-01665
12     AMERISOURCEBERGEN DRUG
       CORPORATION, et al.,
13
           Defendants.
14     _____
15       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW
16            WITNESS:  TODD DAVIES, Ph.D.
17     _____
18            The remote videotaped deposition of
19     Todd Davies, Ph.D. was remotely taken before
20     Janine N. Leroux, Stenographic Court Reporter on
21     Tuesday, July 28, 2020, commencing at the
22     approximate hour of 8:14 a.m.  Said deposition
23     was taken for purposes of discovery, for use at
24     trial, or for such other purpose under the Federal
25     Rules of Civil Procedure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE COURT REPORTER:  Thank you.

 2      THEREUPON:

 3                  TODD DAVIES, Ph.D.,

 4      the witness, after being first duly sworn, was

 5      examined and testified as follows:

 6                  DIRECT EXAMINATION

 7      BY MR. BURNETT:

 8           Q      All right.  Good morning, Dr. Davies.

 9           A      Good morning.

10           Q      So my name is David Burnett.  I'm

11      appearing from Motley Rice on behalf of the

12      Plaintiffs in this litigation.  Thank you for

13      appearing under strange circumstances.

14                  This is my first time doing a remote

15      deposition, but I think we've worked out the

16      kinks, so hopefully this will all go smoothly.  So

17      we appreciate you being here, taking the time and

18      appearing remotely.

19                  Could you start by telling us your

20      name, your full name and your current professional

21      position?

22           A      My name is Todd Davies.  I'm an

23      Associate Professor and the Associate Director of

24      Research and Development in the Division of

25      Addiction Sciences and the Department of Family
```

1    and Community Health at Marshall University's Joan

2    C. Edwards School of Medicine.

3         Q      Thank you.

4                Now, just briefly, I assume Joel told

5    you about this, but just to run through very

6    quickly a few background points.  You understand

7    that you are under oath today?

8         A      I do understand that.

9         Q      Okay.  Are you represented by counsel

10   today?

11        A      I am.  That's Mr. Jones.

12        Q      Who is your -- who is your counsel?

13        A      Mr. Jones.

14        Q      Okay.  Have you been deposed before?

15        A      No, sir.

16        Q      Okay.  Well, we'll work together to

17   make this as smooth as possible.

18               So you understand that you need to

19   respond verbally, not by nodding your head, so

20   that the court reporter can record your words as

21   you speak them, correct?

22        A      That makes sense, yes.

23        Q      Okay.  And if you need a break, just

24   let me know.  We can take a break whenever you

25   need it, just not while a question is pending.

 1    a minute if you need to to review this language.

 2        A    Okay.

 3        Q    Did you -- did you write this language?

 4        A    Did I write it?  I did write it.

 5        Q    Okay.  So is that -- is that a fair

 6    description of what your role was as Director of

 7    Research and -- Director of Research, Development

 8    and Translation?

 9        A    Yes.  Yeah.

10        Q    Okay.  And you have had that role until

11    a year and a half ago?

12        A    Yes, sir.

13        Q    And when did you start that role?

14        A    I started that role April 2013.

15        Q    Okay.  Is that when you joined

16    Marshall?

17        A    Yes, sir.

18        Q    Okay.  So the first -- the first

19    sentence says, "I direct and manage the Marshall

20    Clinical Research Center, a newly developed hub

21    for clinical trial activity at Marshall."  Do you

22    see that?

23        A    I do.

24        Q    When was that research center created?

25        A    Well, I -- I and Todd Gress created it

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2        A    Well, that's what they hired me for, so

3    I would hope so.

4        Q    Yeah.  Okay.

5            So you -- you've mentioned some terms,

6    so I'd like to ask you what is your definition of

7    those terms just so we're all on the same page.

8    What is opioid use disorder?

9        A    So -- well opioid -- so opioid use

10   disorder, I don't have the DSM-5 in front of me,

11   but it's a specific disease diagnosis that

12   involves use of opiates, dependence and then

13   there's cravings on top of that.  I don't remember

14   the exact definition based on the DSM-5.  That's

15   probably the better place to get that definition.

16   But when I say opioid use disorder, I'm talking

17   about specific diagnoses.

18           The same in substance use disorder,

19   right?  There's a specific diagnosis, there's a --

20   there's a --

21           THE COURT REPORTER:  Can you slow down a

22       little bit?  You're kind of getting me off

23       track here.

24           THE WITNESS:  Oh, I'm sorry.

25           THE COURT REPORTER:  Sorry.  I've got to

```
 1              write it down, and it's rough sometimes.

 2              Thank you.

 3                   THE WITNESS:  Okay.  I'll slow down.

 4                   THE COURT REPORTER:  Thanks.

 5         A     So -- so opioid use disorder, substance

 6     use disorder, anything where it says use disorder,

 7     those are specific diagnoses, and they have -- and

 8     they have a definition of those.

 9                   We do -- when we do research and we

10     pull somebody's information out of the medical

11     record, if I say they have opioid use disorder,

12     that means they have a specific diagnosis of

13     opioid use disorder, unless I otherwise define it,

14     right, within our -- within our -- our graphs or

15     whatever we are doing.

16                   So when we look at opioid use disorder,

17          we may say, we're going to count, in this

18          case opioid use disorder, as specific

19          diagnosis of opioid use disorder, and we may

20          include in that likely opioid use disorder in

21          which they have, you know, a number of failed

22          or non-compliant drug screens without the --

23          without a prescription of an opiate.

24                   So it -- it depends project-to-project,

25          but when I say opioid use disorder, generally
```

 1          I mean the specifically diagnosed opioid use

 2          disorder.

 3          Q      Okay.  What is the difference between

 4     opioid use disorder and substance use disorder?

 5          A      Well, opioid use disorder is a

 6     substance use disorder, so it's just a specific --

 7     we're just specifically designing -- defining the

 8     chemical of dependency.

 9          Q      So substance use disorder is broader,

10     correct?

11          A      Yes.

12          Q      So substance use disorder, could that

13     involve any substance that is misused?

14          A      Technically, yes.

15          Q      And opioid use disorder, would that

16     involve both prescription and illicit opioids?

17          A      Yes.

18          Q      You referred to a diagnosis for opioid

19     use disorder.  How is -- how is that diagnosed?

20          A      There are specific criteria in -- in

21     the DSM-5 code.  It can be diagnosed by a

22     physician, or it can be diagnosed by an

23     appropriate licensed psychologist or therapist.

24          Q      Do you know generally what criteria

25     they -- they look at -- look at for such a

```
 1    diagnosis?

 2         A     I'm not a clinician, so I'm not going

 3    to say.  You're going to have to ask them.

 4         Q     Okay.  That's fine.

 5               You referred to likely diagnosis

 6    through failed drug tests.  Can you explain that

 7    further?

 8         A     Well, some -- a lot of times we do that

 9    to try and look at, you know, what -- who may be

10    missed in -- in the population.  So if -- if we

11    don't -- if we think maybe there's -- the

12    population is being under-diagnosed, then we'll

13    look at criteria that would trigger a -- a

14    diagnosis based on specific criteria.  So people

15    who have numerous failed opioid drug screens but

16    they -- they don't have a prescription for an

17    opiate, clearly, there's a -- there's a misuse

18    issue.

19               And then when you look at multiple

20    steps, that means they are at high risk for opioid

21    use disorder although they have not been

22    specifically diagnosed with that.

23         Q     So is it fair to say that the number of

24    people that have been diagnosed with opioid use

25    disorder is smaller than the total number of
```

1    people that have opioid use disorder?

2         A    Based on the data that we've seen and,

3    you know, the data that I looked at, I think

4    that's likely.

5         Q    And that's because not everyone is

6    diagnosed by a doctor or a clinician?

7         A    Not everyone is -- not everyone is

8    diagnosed by the appropriate licensed

9    professional.

10        Q    Right.  Okay.  You referred to neonatal

11   abstinence syndrome, what is -- what is that?

12        A    So neonatal abstinence syndrome is a

13   withdrawal symptomology from -- in newborn

14   neonates that have been prenatally exposed, so

15   they have been exposed to some sort of neuroactive

16   substance in utero.

17             Typically, it's associated with -- with

18   opiates, although that has been sort of

19   reclassified into neonatal opiate withdrawal

20   syndrome, NOWS, but it's -- it's that

21   symptomology, it's that withdrawal symptomology,

22   where the neonate shows dependence on a drug

23   and whatever neuroactive substance and is then --

24   demonstrates withdrawal symptoms.

25        Q    Okay.  Thank you.

```
 1                   And you referred to MAT, or medically

 2      assisted treatment I believe is -- is the term, is

 3      that right?

 4           A     Medication-assisted treatment.

 5           Q     Right.  What is medication-assisted

 6      treatment?

 7           A     So when you -- when you -- when folks

 8      are treated with addictions, so we look at the

 9      treatment, and the treatment is the psychosocial,

10      it's -- it's the cognitive behavioral therapy.

11      It's the, you know, recreation of healthy social

12      systems.  It's all of the behavior -- you know,

13      opioid use disorder, substance use disorder are

14      behavioral health issues.  And so it's that

15      behavioral health portion is the treatment.

16                   Now, some folks have trouble

17      stabilizing their dopamine system.  So if you

18      don't have a healthy dopamine system, then it --

19      it's hard to be receptive to cognitive behavioral

20      therapy.  There's the high -- you know, high level

21      of relapse for -- for those individuals, and so

22      what you have is either methadone or buprenorphine

23      is used.  They're opiates.  They're -- methadone

24      is an agonist/antagonist.  Buprenorphine is a

25      partial agonist/partial antagonist.  Or you have
```

 1     Vivitrol, which is an antagonist opioid therapy,

 2     that you use to help stabilize these patients in

 3     terms of their dopamine system, so the cognitive

 4     behavioral therapy is more effective.

 5         Q     Okay.  So to summarize then, MAT is one

 6     way of addressing opioid use disorder?

 7         A     It's a pharmacologically-assisted

 8     treatment for opioid use disorder.

 9         Q     Right.  In your opinion, is MAT

10     effective in treating opioid use disorder?

11         A     Well -- and, you know -- yeah.

12             MR. JONES:  Before you move on, this

13         isn't necessarily an objection but an

14         observation.  You know, Dr. Davies is here as

15         a fact witness.  He's not a retained expert.

16             MR. BURNETT:  Yeah.  Yeah.

17             MR. JONES:  He's not here to opine on

18         expert matters for trial purpose.  So --

19             MR. BURNETT:  Sure.  That's fair.

20             MR. JONES:  -- if you can, let's try and

21         just keep it to fact matters to the best --

22         the best of our ability.

23             MR. BURNETT:  That's fair.  Yep.

24     BY MR. BURNETT:

25         Q     Dr. Davies, are you familiar with local

Highly Confidential - Subject to Further Confidentiality Review

1    MET resources in the Cabell Huntington area?

2        A    I am fairly familiar, yes.

3        Q    Just, you know, broadly speaking,

4    what -- what are -- what are the main avenues to

5    obtain MAT locally?

6        A    Well, you've got PROACT, which is

7    the -- which is a collaboration between Marshall

8    Health and Valley Health where you get a

9    buprenorphine MAT.  There's the Huntington

10   Comprehensive Treatment Center where you can get

11   methadone or a buprenorphine MAT.  I think both of

12   them provide some Vivitrol.  There's -- there's a

13   couple of other agencies.

14            Recovery Point has just opened a

15   behavioral health center where they provide

16   Vivitrol-based medications, just the treatment.

17   Those are the primary sources.

18            Prestera Center, we can't forget them.

19   They're a licensed behavioral health center in --

20   in the community.  They provide I think all three

21   MAT depending on -- on the -- on the sources.

22   Although their specialty is really the compound

23   issues where people have multiple behavioral

24   health issues.

25       Q    Okay.  And based on your understanding,

1    is it fair to say that those outlets need more

2    resources so they are able to provide more care to

3    more people?

4        A    Well, I mean I'm not in their books,

5    but they all say they do.

6        Q    Right.  Okay.  So in addition to

7    providing MAT, do those outlets also provide

8    counseling and other forms of therapy?

9        A    Of course.  I mean that's -- you can't

10   have MAT without counseling.

11       Q    Right.  Okay.  Is it your view that

12   there is an opioids epidemic in the Cabell

13   Huntington area currently?

14            MS. RUSSO:  Objection to form.

15            THE WITNESS:  I don't know, what is

16       that?

17            MR. JONES:  Defense counsel objected to

18       the form of the question, but you can answer

19       the question.

20            THE WITNESS:  Okay.  Sorry.

21       A    I just -- well, I mean it -- you have

22   to -- first, you have to define what -- what

23   epidemic is, right?

24       Q    Sure.

25       A    Is there a -- is there a -- a higher

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A      I do see it.

 2          Q      Is that consistent with your

 3    understanding of the local situation with regard

 4    to opioids?

 5              MS. RUSSO:  Objection to form.

 6          A      Okay.  So -- I mean but that's --

 7    that's my understanding, but my understanding

 8    comes from the same sources that are cited in

 9    this -- in this publication.

10          Q      Sure.  Okay.

11              THE COURT REPORTER:  Mr. Burnett, could

12          you read a little slower when you're reading,

13          please.

14              MR. BURNETT:  Yes, will do.

15              THE COURT REPORTER:  Thanks.

16    BY MR. BURNETT:

17          Q      The next paragraph starts:  "This

18    crisis, however, goes beyond overdoses."  It

19    continues:  "The devastation from the opioid

20    crisis extends to rising violent crimes,

21    compromised health and negative economic impacts.

22    About 10 percent or 12,000 residents of Cabell

23    County, West Virginia, where Huntington and

24    Amazon's customer service center is located, are

25          intravenous drug users."  Do you see that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    language?

 2        A     I do.

 3        Q     And is that all consistent with your

 4    understanding as well?

 5        A     I think that's -- it's an accurate

 6    estimate, as accurate as you can get about the

 7    number of intravenous drug users and -- and

 8    clearly opioid use disorder and -- and substance

 9    use disorder does -- I mean is -- is fairly

10    well-known to create increase in crimes, increase

11    in violent crimes, increase in -- in associated

12    health issues.

13        Q     Okay.  What are those associated health

14    issues that are associated with opioid use

15    disorder?

16        A     Well, there's -- there's an increase in

17    behavioral health issues that's been pretty well

18    laid -- laid out in -- in the literature.  We're

19    still unclear what percentage of the population

20    started with behavioral health issues and then

21    became more severe with substance use and how many

22    of them with behavioral health issues were created

23    due to the substance use.  That's -- that's really

24    unclear.  I don't think anybody has -- has vetted

25    that out very well.  It's one of those things we'd
```

 1       like to know.

 2              There's -- with intravenous drug use,

 3       obviously, there's -- there's a lot involved in

 4       things like endocarditis and -- and infections.

 5       There are nutritional issues, nutritional

 6       deprivation that happens with opioid use disorder.

 7              And that's -- and then you have the

 8       behavioral aspects of it where you can have loss

 9       of job, loss of family.  You know, we all depend

10       very much on our social structure.  Our -- our

11       cognitive abilities are dependent on dopamine

12       function in the prefrontal cortex, and all of that

13       is inhibited, so it creates a bit of a cascade

14       effect in -- in terms of their personal lives.

15       And so just a matter of -- of the families

16       breaking up and increased anxiety, increased

17       depression, increased number of poor health

18       behaviors, poor eating habits, all of that stems

19       and is -- and is -- is pretty well-known to be

20       potentiated through opioid use -- or opioid

21       misuse, I should say.

22       Q     Okay.  So all of those behavioral and

23       medical problems you just described arise from

24       opioid use disorder?

25       A     Depends on what you mean by arise.

1    addiction, typically opioid addiction.

2        Q    I didn't ask this earlier, but how long

3    have you lived in the area?

4        A    Since April of 2013.

5        Q    Okay.  Do you live in Cabell County?

6        A    I do not.

7        Q    Where do you live?

8        A    I live in Lawrence County, Ohio, which

9    is an adjacent county.

10       Q    Okay.  Fair to say you spend a lot of

11   time in the City of Huntington and Cabell County?

12       A    That's fair to say, yeah.

13       Q    Okay.  All right.  So turning back to

14   the -- the document, the end of the paragraph that

15   we were looking at says, "The community has

16   experienced a dramatic increase in diseases

17   related to drug use, such as bloodstream

18   infections and Hepatitis C resulting in a

19   healthcare community which struggles just to keep

20   up with the volume of patient care."

21            "The Centers for Disease Control has

22   also identified the area as at-risk for Hepatitis

23   C and HIV outbreaks due to the opioid crisis with

24   the second highest rate of Hepatitis C infections

25   and highest rate of new Hepatitis B infections in

Highly Confidential - Subject to Further Confidentiality Review

1     the nation."

2          A     Uh-huh (affirmative).

3          Q     Do you see that language?

4          A     I do see that language.

5          Q     And is that consistent with your

6     understanding?

7          A     The data is very supportive of that

8     statement.

9          Q     So it's fair to say that hepatitis and

10    HIV -- well, or at least Hepatitis C and

11    Hepatitis B, those infection rates are -- are on

12    the extreme high end nationally, correct?

13         A     I believe that to be accurate.  I

14    haven't looked at the Hep C numbers in a --

15    probably six months or so.  But, yeah, that's -- I

16    mean from what I know, that's very accurate.

17         Q     Okay.  And those numbers are related to

18    intravenous drug use, correct?

19         A     Hep C transmission, Hep B transmission,

20    HIV transmission are all known to increase with

21    intravenous drug use.  Uh-huh (affirmative).

22         Q     Okay.  The next paragraph refers to:

23    "Newborns suffering from neonatal abstinence

24    syndrome, to children thrown into foster care, to

25    adolescents and young adults increasingly turning

Highly Confidential - Subject to Further Confidentiality Review

1        A       Well, primarily, from what I

2    understand, from what I've been told directly from

3    people who are working in CPS and people who are

4    working specifically in Child and Family, the

5    primary reason for the children being moved into

6    the foster care system is neglect associated with

7    substance use disorder.

8        Q       And you said that opioid use disorder

9    is a subset of substance use disorder, correct?

10       A       It's -- it's primarily.  I mean when we

11   look at the data and we look across the agencies

12   where we collect data, the majority of individuals

13   with substance use disorder are in fact opioid use

14   disorder.

15       Q       Okay.

16       A       And then we had a lot of polysubstance.

17   SO even those who started with amphetamine use

18   disorder now have both amphetamine use disorder

19   and opioid use disorder and vice versa.

20       Q       Okay.  So a -- a lot of children that

21   go into foster care, you're saying that's because

22   there is neglect related to opioid use disorder?

23       A       That's true.

24       Q       Okay.  And for some of those children,

25   their parents have also passed away from opioid

 1    overdoses, correct?

 2        A      Some of them.  I -- I can't tell you

 3    what percentage.

 4        Q      Sure.  And for some of them, their

 5    parents may be incarcerated related to their

 6    opioid use, correct?

 7        A      They may -- they may have died of

 8    overdose.  They may be incarcerated.  They may

 9    just not be emotionally available, right?

10    They may -- they may just be neglectful because

11    they're more -- they're consumed within that

12    opioid use disorder and within those -- those

13    cravings, and they haven't been able to -- we

14    haven't been able to get them into a treatment

15    program yet where they can start rebuilding their

16    life.

17        Q      Okay.  And that's because those

18    treatment programs are -- are all fully booked up?

19        A      Oh, every time we build a new treatment

20    program, it fills up so...

21        Q      So there is -- there is -- there is

22    more demand for treatment locally than there are

23    facilities to -- to address it?

24        A      We are -- we are in the process of --

25    of measuring that exact thing, but preliminarily,

1     I would say, yes, for sure.

2         Q     Okay.

3               THE VIDEOGRAPHER:  Sorry for the

4         interruption.  This is the videographer.  Can

5         we take a break real quick?

6               MR. BURNETT:  Yeah.  We've been --

7               THE VIDEOGRAPHER:  I just want to

8         address --

9               MR. BURNETT:  We've been going an hour

10        and a half so this -- we can -- you know, if

11        everyone wants, we can take a five or

12        ten-minute break.

13              MS. RUSSO:  Okay.

14              THE VIDEOGRAPHER:  Going off the record.

15        The time is 9:29 a.m.

16              (Thereupon, a break was taken.)

17              THE VIDEOGRAPHER:  We're back on the

18        record at 9:51 a.m.

19              MR. BURNETT:  Moniq̇́ue, can you bring

20        back the document, the PROACT document that we

21        were just looking at?

22    BY MR. BURNETT:

23        Q     And I want to direct your attention,

24    Dr. Davies, to the top of Page 3.

25        A     All right.

```
 1        Q    So the first full sentence -- first

 2   full paragraph there next to the table -- or next

 3   to the image refers to, quote -- well, it says,

 4   quote:  "The opioid epidemic is costing the

 5   State's economy an estimated 8.8 billion a year

 6   and 12 percent of the gross domestic product - a

 7   number that is more than double that of any other

 8   state.  This equates to $4,793 per resident."  Do

 9   you see that language?

10        A    I do.

11        Q    Is that consistent with your

12   understanding that the opioid epidemic has had a

13   serious economic impact on the State?

14             MS. RUSSO:  Objection to form.

15             MR. JONES:  I'm going to object to

16        the -- I'm going to object to the form of the

17        question as well.

18        A    Yeah.  I'm -- I'm not a health

19   economist so -- you know, economies are

20   multilayered things, so I think it would be better

21   if you asked that question to somebody who does

22   that for a living.

23        Q    Sure.  Understood.

24             Let's turn to Page 4, and the second

25   full paragraph begins with the word, "One," and it
```

```
 1    says:  "One treatment method that has found

 2    success, however, is the utilization of

 3    medication-assisted treatment, or MAT, which

 4    combined with traditional and targeted therapies

 5    has shown positive results."  Do you see that

 6    language?

 7         A    I do see that language.

 8         Q    Okay.  And then just skipping ahead one

 9    more quote, at the bottom of that page, third line

10    from the bottom it says:  "In addition, there is a

11    considerable unmet demand for medication-assisted

12    treatment - a critical gap in treatment delivery."

13    Do you see that language?

14         A    Yes.

15         Q    Okay.  Is that consistent with what you

16    were saying before about unmet demand for MAT

17    locally?

18              MR. JONES:  I'm going to object to the

19         form of that question.

20         A    Here's the thing about -- about

21    treatment, right?  So there are -- there are

22    different approaches that work for different

23    people.

24         Q    Yeah.

25         A    And MAT works for some people,
```

```
 1     abstinence-based works better for some people.

 2              There's -- there's -- it depends on

 3     what you mean by "success."  Would -- with more

 4     MAT, do we get more people in treatment?  Based on

 5     our experience here, based on what the data has

 6     shown us, yes.  We're getting -- we get more

 7     people into treatment using MAT.  But there's a --

 8     there's an extended cost beyond that, the -- the

 9     therapy.  Once -- once you've run your course and

10     once you start somebody on buprenorphine, they are

11     on buprenorphine typically, you know, on average,

12     somewhere between two to five years.  And then

13     after that two to five years, there has to be --

14     you have to continue that treatment.

15              But when we say MAT treatment, we're

16     not just talking about putting more -- putting

17     more of these medications and making them

18     available.  That's part of it, yes, but you also

19     need more therapists.

20              There's a -- there's a huge lack in the

21     number of behavioral health professionals, and

22     when you look at the pay lines of -- of Medicaid,

23     it's hard to attract and keep people here to do

24     those jobs and to build that -- to build the

25     infrastructure that really creates a robust
```

 1    behavioral health situation.

 2              So medication-assisted is -- is part of

 3    it.  It requires a lot of counseling and

 4    behavioral health treatment, but then you have the

 5    whole social system development.  I mean you've

 6    got -- you -- you have a community here that is

 7    dependent very largely on its family interactions.

 8    Those family interactions have become unhealthy

 9    because of this, you know, because of the -- the

10    situation, and so you have to -- you're talking

11    about rebuilding social structures.

12              It -- it -- yes.  Medication-assisted

13    treatment, does it need to be expanded?  Probably

14    a little bit.  But all of the stuff that comes

15    with it, all of the behavioral health system, all

16    the social system building, that is a far more

17    severe deficit when it comes to the -- the needs

18    of the community in terms of addressing this

19    widespread opioid use disorder and getting it to a

20    point where the community is healthy again.

21        Q    Okay.  So when you say, you know,

22    there's a severe deficit with regard to the

23    behavioral health system and the social system,

24    can you give examples of how that deficit

25    manifests?

```
 1           A      Well, I mean for every -- for every
 2      physician -- like, well, just take MAT -- MAT for
 3      an example because that's where we started with.
 4      For every 15-minute physician visit one day a
 5      week, you have several hours of therapy that need
 6      to happen, right?  And the -- the reimbursement
 7      rates for behavioral health for that hour are much
 8      lower than what you would see for that 15-minute
 9      physician visit, but -- but it's
10      medication-assisted treatment, right?  So
11      treatment is actually the counseling.  The
12      treatment is the behavioral health issue.
13              When you look at the long-term effects,
14      you know, the people who are able to get through
15      treatment and into recovery and then finally to a
16      point where they can self -- you know, where they
17      can be active members of the community again and
18      they can self-manage their disease state, as we've
19      established earlier, then that requires rebuilding
20      their social structures, and so they need a social
21      system that is healthy, and they need people they
22      can rely on.  They need sponsors.  They need to be
23      able to put healthy individuals around them again.
24      And -- and that gets to the point of where they
25      are -- as I said before when you look at it
```

Highly Confidential - Subject to Further Confidentiality Review

 1    neuro-biologically, where they're making decisions

 2    back in their prefrontal cortex.  They have a

 3    healthy dopamine system functioning, and that

 4    takes -- that takes time, that takes a lot of

 5    support, not only at the -- at the small social

 6    system level but at a community level so that

 7    those individuals then can be supported throughout

 8    their entire journey into recovery and then into a

 9    point of self-management of care.

10         Q     So when you talked about the brain just

11    there, you're talking about the effects of opioid

12    use disorder medically on people's brains?

13         A     Yes.

14         Q     Okay.  So those medical effects on

15    people arising from opioid use disorder lead to

16    all these other social problems?

17         A     Well, they're clearly -- they're

18    clearly linked.  I mean the literature is -- is

19    fairly comprehensive on that.

20         Q     And opioid use disorder, I believe you

21    said, affects not only those people that are

22    directly -- that have opioid use disorder but the

23    whole community, right?

24         A     Once -- once it gets to the -- once you

25    get to a level where every family -- and, again,

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Exhibit 5.

 2                   MR. BURNETT:  Okay.

 3                   (EXHIBITS 4 AND 5 WERE MARKED.)

 4                   MR. BURNETT:  Okay.  So Exhibit 4 is a

 5              one-page cover page.  It just says, "This

 6              document produced natively."  The Bates number

 7              on that is Marshall-Health-2227.

 8                   And then Tab -- Exhibit 5 is the native

 9              version of that document.

10         BY MR. BURNETT:

11              Q    So, Dr. Davies, what this means is that

12         in the production that was made by Marshall

13         Health, we received the PDF and then attached to

14         it was the spreadsheet.

15              A    Okay.

16              Q    Do you have those two pages in front of

17         you?

18              A    I have, yeah, the -- the document

19         produced natively and then the print-out of the

20         Excel sheet, yes.

21              Q    Right.  Okay.  All right.  So just

22         focusing on the -- the Excel spreadsheet, do you

23         recognize this document?

24              A    Yes.

25              Q    What is it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A     This is a -- these are the -- the

 2     number of -- and each -- well each column is a

 3     little bit different, but exposed, NAS children

 4     numbers from Cabell Huntington Hospital that was

 5     assembled by -- by me and my staff.

 6          Q     Okay.  So you and your staff prepared

 7     this document?

 8          A     Yes.

 9          Q     And all of the data in this comes from

10     Cabell Huntington Hospital?

11          A     Yes.

12          Q     Okay.  So there's no data from

13     St. Mary's hospital here?

14          A     There's no data from St. Mary's

15     hospital.  We don't have access to that.  They

16     see -- they see less prenatally-exposed babies.  I

17     know that.

18                They are also kids born at

19     King's Daughters across the river in -- in

20     Kentucky from -- you know, from the area and --

21     and even some will all of the way go out -- go out

22     to Southern -- Southern Ohio Medical Center in

23     Scioto County, Ohio.

24                But by -- by and large, Cabell has the

25     largest number of NAS or prenatally-exposed
```

1    births.

2         Q    Okay.  So you referred to King's

3    Daughters in Kentucky and other medical facilities

4    in Southern Ohio.

5         A    Uh-huh (affirmative).

6         Q    So you're saying some -- some people

7    that live in Cabell County or the City of

8    Huntington seek medical care in those other states

9    or those other hospitals?

10        A    Yes.

11        Q    Okay.  So this -- this spreadsheet then

12   doesn't show the full number of babies born with

13   NAS of mothers that live in Cabell or Huntington,

14   correct?

15        A    That is correct.

16        Q    Okay.  And so if we added in the

17   numbers from St. Mary's, that would increase these

18   numbers, right?

19        A    They would.

20        Q    And if we added in the numbers from

21   women that live in Cabell or Huntington but went

22   to another hospital outside of Cabell or

23   Huntington, the NAS numbers would also increase,

24   right?

25        A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q      Okay.  In the columns -- if you look in

 2     the upper left in parenthesis the titles of the

 3     columns say:  "Huntington Area."  Do you see that?

 4          A      Right.

 5          Q      And then in the three columns below

 6     that it says in parenthesis:  "All CHH."  Do you

 7     see that?

 8          A      Yes.

 9          Q      What is that distinction there?

10          A      So when it says Huntington area, what

11     that is -- those individuals during the birth

12     visit reported a residency within Huntington and

13     Cabell County.

14                 On all births -- that's all of the

15     births that have come to -- to Cabell Huntington

16     Hospital, this is -- it's a regional hospital.  So

17     even though those -- those individuals, those moms

18     and their babies don't necessarily live in Cabell

19     County, they may live in Lawrence County, Ohio,

20     they may live in Logan County, they may live in --

21     you know, further out in Wayne County, they still

22     come here for -- to give birth because this is

23     the -- the largest hospital, the best equipped to

24     deal with neonatal abstinence syndrome.

25          Q      Largest hospital and best equipped,
```

 1    what, in the Tri-State area?

 2         A    In the -- in the Tri-State area, yeah.

 3    But it's -- it goes beyond that.  I mean we

 4    have -- we have moms drive up from McDowell County

 5    just to give birth here because of -- in order to

 6    get better care for their -- their baby when

 7    they're, like I said, prenatally exposed.

 8              And many of those are moms that are

 9    usually in a -- a program when they are pregnant,

10    so they at a better place when they give birth to

11    make that decision.

12         Q    Okay.  Where is McDowell County?

13         A    McDowell County is about -- well, about

14    three-hours south if you -- if you drive.  It's

15    the very --

16         Q    Is that in West Virginia?

17         A    -- southern tip of West Virginia.

18         Q    Okay.  All right.  So the numbers --

19         A    We're talking about 300 miles.

20         Q    Okay.  Understood.

21              So the numbers in the upper left

22    columns, the first row that say "Huntington Area,"

23    those are a subset of the numbers for all CHH?

24         A    Say that again.  You broke up a little

25    bit.

```
 1          Q     Sure.  The numbers in the top row of

 2     the spread -- of tables, upper left, that say

 3     "Huntington Area" --

 4          A     Uh-huh (affirmative).

 5          Q     -- those Huntington area numbers are a

 6     subset of all the CHH numbers directly below them,

 7     right?

 8          A     Yes.

 9          Q     Okay.  How did you compile this data?

10          A     We have a -- we have a data warehouse

11     where we can -- we can pull data from the -- this

12     data comes directly from the -- Cabell's

13     electronic health record via data warehouse, and

14     we pull things from the back end, reassemble it in

15     the data warehouse, validate the data and then

16     produce these results.

17          Q     Okay.  So is the data coming from the

18     hospital?

19          A     The data is coming from the hospital.

20     It's coming -- it's pulled from the hospital's

21     electronic health record.

22          Q     Okay.  So in other words, when a woman

23     comes in and is diagnosed -- well, when a woman

24     comes in and their baby is diagnosed with NAS,

25     that's recorded in the hospital system somehow?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A      Yes.

 2         Q      And then you get a copy of that, of the

 3    hospital's electronic records?

 4         A      Yes.  That's the short version.

 5         Q      Right.  Well, or -- so the hospital

 6    records go into the data warehouse, and then you

 7    get the data from that warehouse?

 8         A      Yes.

 9         Q      Okay.  And that's all reliable data

10    then, correct?

11         A      Yeah.  This is probably more reliable

12    data because what we do, we go through a

13    validation process with -- when it goes into the

14    data warehouse, we do a validation process.  So

15    that the queries from the EHR will pull it

16    directly.  We'll take a statistical subset.  We'll

17    actually go in and read the record to make sure

18    it's accurate.

19         Q      Okay.  And that validation process, is

20    that something that is done in data gathering like

21    this in other contexts?

22         A      It should.  Whether it's actually done

23    is -- is a -- you know, if I don't do it, then I

24    can't tell you whether or not it's done.  It's

25    supposed to be.
```

1    Q    Okay.  And that validation process,

2    you've used that prior to this, correct?

3    A    Yeah.  That's our standard operating

4    procedure.

5    Q    And is that standard within academia or

6    a standard within Marshall?

7    A    It should be.

8    Q    Okay.  All right.  So if we look at the

9    top row, the Huntington area numbers, you've said

10   that's for babies with NAS where the mother lives

11   in Cabell or Huntington?

12   A    At the birth visit, yes.

13   Q    And the birth visit is after the

14   baby -- baby is born?

15   A    Well, it's -- it's the visit in which

16   the birth happens, right?  So when mom comes in

17   and -- and she's -- and she's given the CPT code

18   of live birth, right?  That means that at some

19   time once mom was put in the hospital, she gave

20   birth, that's the birth visit.

21   Q    Okay.  The top left table says:

22   "Exposed Births," and the one next to it says:

23   "NAS births."  Do you see that?

24   A    Yes.

25   Q    What is the difference between exposed

```
 1    births and NAS births?

 2        A    Okay.  So exposed birth means -- so the

 3    definition of NAS in West Virginia is proof of

 4    prenatal exposure and symptomatic of withdrawal.

 5    And different -- different physicians will -- will

 6    diagnose differently, right?  So they're just -- I

 7    mean it's their prerogative as -- as physicians,

 8    so they'll diagnose NAS based on, you know, their

 9    interpretation of that West Virginia law.

10            That law did not take -- and that

11    definition did not take effect until 2015, I

12    think.  So -- it may have been 2014.

13            So what we record here is exposed

14    because we really don't know if the baby does not

15    exhibit withdrawal symptoms and it was exposed, we

16    still don't really know whether or not there are

17    long-term detrimental effects.  So that's --

18    that's something we're trying to study right now.

19            So if they were exposed, that means

20    there is proof of prenatal exposure to a

21    neuroactive substance.  So the -- that neuroactive

22    substance primarily -- it's primarily opiates,

23    the -- the baby has been exposed to it.  So we

24    don't know long-term whether or not they're going

25    to be cognitive or developmental delays just based
```

1    on exposure, whether or not they have withdrawal

2    symptoms.

3           So then on the NAS column is they have

4    had prenatal exposure, so those babies will be

5    encompassed in the exposed numbers, and they have

6    been symptomatic in terms of their withdrawal.

7           MR. BURNETT:  Hold on.  Let me -- let me

8        just interrupt.

9           Moniqúe, can you please -- yeah,

10       thanks.  That was another screen that came

11       up.

12       Q     Okay.  So -- so exposed births means

13   there's proof of prenatal exposure, and NAS means

14   there was proof of prenatal exposure plus

15   withdrawal symptoms?

16       A     In the neonate, yes.

17       Q     Right.  Okay.  And NAS Births is a

18   subset of exposed births?

19       A     Yes.

20       Q     And is it possible that all of the

21   births that are exposed could have NAS?

22       A     Well, by definition, no, they have to

23   be diagnosed, right?  If they are not diagnosed,

24   then they, by definition, don't have NAS.  But you

25   have to remember, NAS is a withdrawal -- it's

Highly Confidential - Subject to Further Confidentiality Review

 1    neonatal abstinence syndrome.  So when the -- the

 2    birth happens, they -- the baby then abstains from

 3    the prenatal exposure and has withdrawal symptoms.

 4              It is possible that the detrimental

 5    effects that we associate -- the long-term

 6    detrimental effects that we associate with NAS, we

 7    don't know how much exposure creates those

 8    cognitive and behavioral delays that have -- that

 9    are in the literature.

10              So it is very possible that babies that

11    are exposed but do not show withdrawal symptoms

12    will still have those long-term detrimental

13    effects in terms of cognitive and behavioral

14    delays.

15              Plus, it clearly means that there is

16    some sort of -- you know, that mom took or was --

17    you know, exposed the baby to neuroactive

18    substances while she was pregnant.

19              So in terms of opioid use or -- or

20    substance use, then that clearly happened in the

21    exposed neonates whether or not they had

22    withdrawal symptoms.

23       Q    Okay.  And this general topic of

24    exposed births and NAS births, that's -- that's

25    part of the research that you and Marshall more

Highly Confidential - Subject to Further Confidentiality Review

1    broadly are conducting right now, correct?

2         A     Yes.

3         Q     And is that also the subject of ongoing

4    grant applications?

5         A     Yes.

6         Q     Okay.

7         A     It's a critical question.  I mean we

8    don't -- and we need to know what -- how much of

9    the exposure causes it, how much is a social

10   determinant.  If we're going to -- if we're going

11   to repair this thing, we have to have that

12   research done.

13        Q     Right.  So in -- in order to understand

14   how to address this problem of NAS and exposed

15   births, you need to have data as a foundation of

16   that work, is that fair to say?

17        A     Yes.

18        Q     Okay.  And you're in the process of

19   collecting and evaluating that data?

20        A     Yes.

21        Q     Okay.  And what that data shows helps

22   shape what sort of medical or social remedies

23   might be best-suited to addressing this problem

24   with NAS and exposed births, right?

25        A     Oh, it's critical, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q     Okay.  So if we compare the columns

 2    that says:  "NAS Births (Huntington Area)" and the

 3    one to right where says:  "All Births (Huntington

 4    Area)," then that shows for each year from 2010 to

 5    2020 how many children were born at

 6    Cabell Huntington Hospital where the mother was

 7    from Huntington or Cabell at the time of the birth

 8    visit, how many of them were diagnosed with NAS

 9    versus the total number of births during that

10    time, correct?

11        A     That is correct.

12        Q     Okay.  So if you look at 2014 under NAS

13    births it says 108, and then under all births for

14    2014 it says 1,000.  Do you see that?

15        A     Yes.

16        Q     So just doing the rough math, that

17    means that in 2014 more than 10 percent of births

18    in this category were NAS births?

19        A     Were diagnosed NAS births.

20        Q     Right.

21        A     And then -- and then, what, over 20 --

22    20 percent were proven to be exposed.

23        Q     And with that, you're comparing the 223

24    number in the exposed births column to the 1,000

25    number in all births column?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A      Yes.

 2        Q      Okay.  And then for 2015 under exposed

 3   births it says 204, for NAS births it says 109 and

 4   all births it says 959.  Do you see that?

 5        A      Yes.

 6        Q      So that means that in 2015, again, more

 7   than 10 percent of births were NAS births and more

 8   than 20 percent were exposed births, is that

 9   right?

10        A      Yes.

11        Q      Okay.  And then for 2016, 225 exposed

12   births, 98 NAS births and 908 total births.  Do

13   you see that?

14        A      Yes.

15        Q      And, again, percentage-wise that means

16   that exposed births were more than 20 percent of

17   total births, and NAS births were more than

18   10 percent of total births, correct?

19        A      That's what that means, yep.

20        Q      Those numbers are higher than national

21   averages, right?

22        A      Yes, by a significant amount.

23        Q      Do you know how significant?

24        A      I think the national -- the estimates

25   for national average are -- are somewhere
```

Highly Confidential - Subject to Further Confidentiality Review

1    between -- somewhere about a little bit lower than

2    3 percent the last time I checked.

3          Q    Okay.  Those -- the 3 percent, is -- is

4    that current in 2020, or what year would that be

5    for, do you know?

6          A    I don't think we have a current number.

7    I don't -- I don't think that -- I don't think

8    there's 2020 current data available for the

9    nationwide -- nationwide --

10         Q    So the 3 percent that you referred

11   to --

12         A    -- not that I know of.

13         Q    -- do you have a -- like a ballpark of

14   what year that would be for?

15         A    That number is probably from 2014.

16         Q    Okay.  So that would mean that in 2014,

17   the local rate of NAS was three times the national

18   average, at least?

19         A    For diagnosed NAS, yeah.

20         Q    And NAS, again, goes back to the

21   mother's opioid use during pregnancy, right?

22         A    Well, you -- you need an exposure,

23   right, an in utero exposure, and then the baby

24   would have to be symptomatic.

25         Q    Right.  The exposure, are we primarily

Highly Confidential - Subject to Further Confidentiality Review

1     referring to opioids?

2          A      Primarily.

3          Q      Okay.  In small type, in the upper

4     left, it says:  "91 percent of exposed births are

5     a match with the mother."  Do you know what that

6     means?

7          A      Yeah.  EHRs are not designed to match

8     patients.  So in our -- in the Cabell EHR, the

9     mother's and the baby's records aren't naturally

10    matched, and so we've had to do it -- build an --

11    build algorithms and -- and do the matching within

12    the data warehouse.

13             And so at the time that this was

14    produced, that was our success rate in terms of

15    91 percent of baby's records that were exposed

16    were matched with their mother's record in the --

17    in the data warehouse.

18         Q      You referred to EHR, does that mean

19    electronic health record?

20         A      Yes.

21         Q      Okay.  And looking to the right of the

22    column -- of the tables that we were talking

23    about, upper right, there's one heading that says:

24    "Exposed Births with Positive Maternal Opioid UDS

25    up to 36 weeks before birth."  Do you see that?

```
 1        A      Uh-huh (affirmative).

 2        Q      What does UDS refer to?

 3        A      A urine drug screen.

 4        Q      What is that?

 5        A      That is a -- a urine -- a drug

 6   toxicology that is taken at -- from -- from mom

 7   through her urine.

 8        Q      And is that how opioids are tested for?

 9        A      That's one way they are tested for.

10        Q      Okay.  Is that how Cabell Huntington

11   Hospital tests for opioids, do you know?

12        A      Typically, yes.

13        Q      Okay.  All right.  And you can set that

14   document aside, and if you could open Envelope 14.

15               MR. BURNETT:  And, Moniqúe, if you could

16        call this up, and I believe this will be

17        Exhibit 6.

18               (EXHIBIT 6 WAS MARKED.)

19   BY MR. BURNETT:

20        Q      Okay.  So this is a copy of an article

21   called:  "History of postpartum depression as a

22   contributor to the severity of NAS."  It appears

23   to be from a journal called Addictive Behaviors.

24        A      Uh-huh (affirmative).

25        Q      Volume 89, Pages 78 to 84.  Do you --
```

Highly Confidential - Subject to Further Confidentiality Review

1       do you have this document in front of you?

2              A       I do.

3              Q       And my printed copy is missing every

4       other page, but the electronic copy that we're

5       also looking at here on the screen share, that has

6       every page.

7              A       Okay.

8              Q       Do you recognize this document?

9              A       I do.

10             Q       Okay.  What is it?

11             A       This is a -- a publication that my

12      research team produced.

13             Q       Okay.  And you see your name listed at

14      the top as one of the authors?

15             A       I am the senior author.

16             Q       Okay.  And the other names listed here,

17      they are your co-authors?

18             A       The other -- yes.

19             Q       Okay.  And when you say senior author,

20      did you write this document?

21             A       My student -- I mean my student did

22      the -- I'm primarily responsible for the data

23      collection, the writing, all of the -- all of the

24      document, but my -- my student did the first

25      draft.

```
 1          Q      Okay.  And when you say you're

 2    responsible for the data, so if we turn to

 3    Page 80, there's -- there's a bunch of data and

 4    some tables, Table 1 and Table 2.  Do you see

 5    that?

 6          A      Yes.

 7          Q      Is that data that you or your team

 8    collected?

 9          A      That is, yep.

10          Q      Okay.  Feel free to look at the

11    document if you need to refresh yourself, but what

12    was the -- what was the subject of this article?

13    What was this article about?

14          A      So one of the things that we -- we try

15    to look at with neonatal abstinence syndrome,

16    we're trying to find additional risk factors that

17    -- that will tell us whether or not a baby is

18    going to withdrawal severely or not.

19                 So if when we look at mom's --

20    especially if we look at mom's -- we like to look

21    at them in the MAP program because they're all

22    getting about the same amount of opiate -- same

23    level of opiate exposures, and some babies have

24    withdrawal symptoms and some don't, and -- even

25    though they've all clearly been exposed.  And so
```

1    we're trying -- we were looking for

2    characteristics that would help to tell us whether

3    or not these -- these neonates would withdrawal.

4            So in -- so what this paper is, is --

5    what we identified is that if mom had a history of

6    postpartum depression -- now, obviously, if the

7    mom is pregnant, we can't use, you know,

8    postpartum depression as a risk factor because it

9    doesn't develop until, you know, by definition,

10   postpartum.  So but a history of postpartum

11   depression, when women have -- have had postpartum

12   depression initially, typically, they will have it

13   in subsequent pregnancies.

14           And what this paper does is it

15   identifies, looks at the different measures of NAS

16   severity, and what we -- what we're able to show

17   is that a history of postpartum depression is

18   indeed a risk factor that the exposed neonate will

19   withdrawal more severely.

20      Q    Okay.  So this study of comparing

21   postpartum depression with NAS or looking at the

22   interaction of those two issues, that's -- that's

23   a subset of your broader NAS research?

24      A    Yes.

25      Q    Okay.  If you go back to the first page

```
 1      under the Abstract paragraph -- in the Abstract

 2      paragraph, the third sentence says:  "We studied

 3      109 pregnant women in medication-assisted

 4      treatment and their neonates to determine if

 5      psychiatric conditions co-occurring with substance

 6      use disorder contributed to the severity of

 7      neonatal withdrawal."  Do you see that?

 8           A     Yes.

 9           Q     Okay.  And if you turn back to Page 80,

10      Table 1, it says:  "Table 1, Cohort demographics,"

11      and then "Maternal characteristics," it says:

12      "N = 109."  Does that refer to the 109 women that

13      were in the study?

14           A     Yes.

15           Q     Okay.  And then below that a few lines

16      down it says:  "Hepatitis C - no."

17                 No refers to number, right?

18           A     It does.

19           Q     And then it says: "68."  Do you see

20      that?

21           A     Yes.

22           Q     So that means that 68 out of -- out of

23      109 women in this study had Hepatitis C?

24           A     Yes.

25           Q     That's a very high number, correct?
```

```
 1        A     It's a --

 2              MR. JONES:  I object.  I object to the

 3        form of that question.

 4              MR. BURNETT:  I'm sorry.  I didn't hear

 5        the objection.

 6              MR. JONES:  I object to the -- just the

 7        form of the question.

 8              MR. BURNETT:  Okay.

 9        A     It is -- I mean it's descriptive of

10   this population.

11        Q     What do you mean?

12        A     That -- I mean 68 of those women had --

13   had Hep C.  That's fairly typical levels we see

14   with -- with MAT population in through looking at

15   this study and others.

16        Q     And these women, because they were

17   receiving medication-assisted treatment, they all

18   had some form of substance use disorder, right?

19        A     Specifically, because they were in

20   MAT -- they were in a buprenorphine MAT program,

21   these women specifically had opioid use disorder.

22        Q     Okay.  And you're saying that rates of

23   Hepatitis C, like these rates, are typical among

24   people in medication-assisted treatment?

25        A     When we look at -- when we've looked at
```

 1    populations -- you know, within my group, when

 2    we've specifically looked at our -- our

 3    populations and looked at the Hep C rates, these

 4    are the numbers that we typically see within our

 5    MAT programs.

 6        Q    Okay.  If you look down a little bit

 7    further it says:  "Maternal psychiatric diagnoses

 8    number greater than one comorbid psychiatric

 9    diagnoses," and it says:  "35."  Do you see that?

10        A    Yeah.  That does not include substance

11    use disorder if you -- so a substance use disorder

12    is automatically a -- a behavioral health disorder

13    so...

14        Q    Okay.  And then below that there are

15    numbers for bipolar disorder, depressive disorder,

16    generalized anxiety disorder, posttraumatic stress

17    disorder, postpartum depression.  Do you see

18    those?

19        A    Yes.  Yes.

20        Q    Are those all examples of maternal

21    psychiatric diagnoses?

22        A    I would say this is a -- that this is a

23    fair sampling of the -- of this population.

24        Q    So these sorts of psychiatric disorders

25    are -- are common within this population?

Highly Confidential - Subject to Further Confidentiality Review

1        A      Based on -- based on our -- our

2     samplings, yes.

3        Q      Okay.  And then you see the bottom of

4     that table it says:  "State of residence:

5     West Virginia, 75.  Kentucky, 16.  Ohio, 18."  Do

6     you see those numbers?

7        A      Uh-huh (affirmative).  Yes.

8        Q      So that shows that for this demo --

9     this -- this study of 109 women, the majority were

10    from West Virginia, right?

11       A      Yes.

12       Q      Do you happen to know how many were

13    from Cabell County or Huntington?

14       A      I do not know.

15       Q      Okay.  If you look --

16       A      They were all treated in Cabell County.

17       Q      Okay.  They were treated with MAT in

18    Cabell County?

19       A      Yes.

20       Q      Okay.  And those treatment locations,

21    those could have been hospitals as well as other

22    MAT outlets?

23       A      No.  This -- specifically this

24    population was either treated at the MARC program

25    at Marshall or -- and Valley's MAT program over in

```
 1    their Highlawn facility, both within in

 2    Huntington.

 3         Q     Okay.  What is the MARC program?

 4         A     It's the Maternal Addiction Recovery

 5    and Care program.  It's a -- it's a program from

 6    Marshall's OB-GYN department specifically for

 7    pregnant women who have opiate use disorder.

 8         Q     Okay.  Bottom of Table 1, lower left, a

 9    couple of lines up it refers to numbers for

10    heroin, prescription opiates and methadone.  Do

11    you see those numbers?

12         A     Yep.

13         Q     So the numbers are 45, 59 and 3

14    respectively.  And so that is the number of babies

15    that were exposed to those drugs during the

16    mother's pregnancy?

17         A     Yes.  Some obviously were exposed to

18    more than one.

19         Q     So that shows that out of 109 women, 45

20    of them had used heroin during pregnancy?

21         A     Yes.

22         Q     And 59 of them had used a prescription

23    opiate during pregnancy?

24         A     Yes.

25         Q     And 3 had used methadone during
```

Highly Confidential - Subject to Further Confidentiality Review

1     pregnancy?

2          A     Yes.

3          Q     Okay.  And those numbers could overlap,

4     right?  A -- a mother could use both heroin and a

5     prescription opiate?

6          A     Yes.

7          Q     Okay.  Skipping over to Table 2, about

8     halfway down there's a characteristic called "Day

9     of life methadone treatment began - days."  Do you

10    see that?

11         A     Yes.

12         Q     Okay.  And under female it says:  "2.4

13    plus or minus 1.5."  Under male it says: "1.9 plus

14    or minus 1.4."  Do you see that?

15         A     Right.  Uh-huh (affirmative).

16         Q     Is that the day of the NAS baby's birth

17    when they are put on methadone treatment on

18    average?

19         A     For this group, yes.  So the females

20    who are on average, you know, halfway through

21    their -- their third day of life, and the males

22    within their -- within their second day of life.

23         Q     Is -- is methadone the most common

24    treatment for NAS in babies?

25         A     At our hospital.

```
 1     that we looked at in Table 1 a few minutes ago?

 2          A     Yes.

 3          Q     Okay.  You can set that aside.  Let's

 4     open Tab 13.

 5               MR. BURNETT:  And this will be

 6          Exhibit 7.  So, Moniqúe, you can obviously

 7          close this document.

 8               (EXHIBIT 7 WAS MARKED.)

 9               MR. BURNETT:  And, again, my paper copy

10          is missing every other page.  The electronic

11          version that Moniqúe just called up has every

12          page.

13     BY MR. BURNETT:

14          Q     I'm just going to refer you to the

15     first page.  So Exhibit 7 is an article from the

16     Journal of Pediatric Health Care, Volume 33,

17     No. 1.  The title is:  'Novel Withdrawal Symptoms

18     of a Neonate Prenatally Exposed to a Fentanyl

19     Analog'.  Do you see that?

20          A     I do.

21          Q     Is this an article that you

22     co-authored?

23          A     I am the senior author.

24          Q     Okay.  And in the introduction I just

25     want to point you to some language there.  A
```

1     couple lines down there's a sentence that begins:

2     "The increase in the incidence of NAS that has

3     followed the opioid epidemic is especially evident

4     in the state of West Virginia.  The Centers for

5     Disease Control and Prevention reported that in

6     2013, West Virginia had the highest rate of babies

7     born with NAS at 33.4 per 1,000 live births."  Do

8     you see that language?

9          A     Uh-huh (affirmative).  Yes.

10         Q     When it says the highest rate, that's

11    the highest rate nationally among states?

12         A     Yes.

13         Q     Is that consistent with your

14    understanding that West Virginia had the highest

15    rate of NAS nationwide?

16         A     Yes.

17         Q     Does West Virginia still have the

18    highest rate of NAS to your knowledge?

19         A     I don't -- I don't think I have seen

20    data more -- more recent data than -- than what's

21    displayed here.

22         Q     Okay.  You can set that aside.  Let's

23    open Tab 15, please.

24               MR. BURNETT:  This will be Exhibit 8.

25               (EXHIBIT 8 WAS MARKED.)

```
 1    BY MR. BURNETT:

 2         Q     Okay.  Do you have that in front of

 3    you, paper copy?

 4         A     I do.

 5         Q     Okay.  So Exhibit 8 is an article in

 6    the Journal of Pediatrics & Child Health Care,

 7    titled:  "Polydrug Abuse and Fetal Exposure:  A

 8    Review."  And you see that you were listed as one

 9    of the authors?

10         A     Again, I'm a senior author.

11         Q     Senior author, yes.

12               In the introduction, the second

13    paragraph, it says:  "Whether prescribed by a

14    physician or obtained illegally, opioid addiction

15    is a cumbersome public health issue, one which

16    affects pregnant women and their infants by proxy.

17    Opioids cross the placenta very rapidly, creating

18    a drug equilibrium between fetus and mother, and

19    this equilibrium has the potential to affect the

20    developing fetus in many ways.  One of the most

21    common effects of intrauterine exposure to opioids

22    is Neonatal Abstinence Syndrome, a withdrawal

23    syndrome that occurs shortly after birth due to

24    the abrupt cessation of opioid delivery to the

25    infant."  Do you see that language?
```

1      A      I do.

2      Q      Is that consistent with what we have

3      been discussing in terms of the -- you know, the

4      definition of NAS?

5      A      Yeah.  Well, clearly, I -- you know,

6      I'm the senior author on the paper.  I agree with

7      that statement completely.

8      Q      Okay.  Just one more, Tab 16.  So you

9      can close this one.  Let's open up Tab 16,

10     Envelope 16.

11            MR. BURNETT:  We'll mark this Exhibit 9.

12            (EXHIBIT 9 WAS MARKED.)

13     BY MR. BURNETT:

14     Q      This is an article from the Journal of

15     Perinatology titled:  "A management strategy that

16     reduce NICU admissions and decreases charges from

17     the front line of the neonatal abstinence syndrome

18     epidemic." Are you the lead author on this

19     article?

20     A      I am the senior author.

21     Q      I'm sorry, yeah, senior officer,

22     okay -- senior author.

23     A      Uh-huh (affirmative).

24     Q      I want to direct your attention to the

25     second page in the section titled: 'Systems of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Care' -- or 'System of Care'.  And I won't read it

 2    because it's a long paragraph, but you can read

 3    it.  It says that your institution opened a

 4    neonatal therapeutic unit, and then it describes

 5    what sort of services are operated by that NTU

 6    characterized by low-light and low-noise and

 7    rockers who were specially trained to hold and

 8    rock the neonates when appropriate.  Do you see

 9    that language?

10        A     I do.

11        Q     And does that language reflect the fact

12    that -- that babies with NAS require special care

13    that goes beyond even what other NICU babies

14    require?

15        A     It's different.  It's very different

16    from what NICU babies require.  The -- the

17    low-light -- the -- so -- so one of the things

18    that happens when individuals withdrawal is they

19    become hypersensitive to their -- to their

20    environment.  Everything becomes loud and, you

21    know, lights and -- and noises affect the neonates

22    pretty strongly.  And so the NICU is a place

23    designed for babies with respiratory issues,

24    cardiac issues, and so it's loud and there's a lot

25    of noisy machines, ventilators, things like that.
```

1    And so that's really -- the typical area where you

2    would take care of a neonate that was having

3    issues is the NICU, was -- was thought by our

4    clinicians to be unsuitable for NAS treatment, and

5    so the NTU was established.

6          Q    All right.  So -- right.  So babies

7    with NAS require different specialized care?

8          A    Uh-huh (affirmative).

9          Q    Okay.

10         A    And this -- the architects of the NTU

11   were Sean Loudin, Joe Werthammer and -- and

12   Sara Murray, all who were co-authors on this

13   paper.

14         Q    Okay.  Understood.  We can set that

15   document aside.

16              Now, if you could -- if you could turn

17   to Tab 7 or Envelope 7.

18         A    Uh-huh (affirmative).  Okay.

19         Q    Well, let's wait until it's called up

20   electronically so everyone can see it.

21         A    Oh, I can't hear you.

22         Q    Can you hear me?  Can you hear me,

23   Dr. Davies?

24              THE VIDEOGRAPHER:  He's still connected

25              to audio.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BURNETT:  Joel, can you hear me?

 2                    MR. JONES:  Can you hear us?

 3                    Can you hear us?

 4                    MR. BURNETT:  I can hear you, yes.  I

 5          can hear both of you.

 6                    MR. JONES:  Okay.  I see your mouth

 7          moving, but I don't hear anything.

 8                    MR. BURNETT:  Okay.  Can you still not

 9          hear me?  How about now?

10                    THE VIDEOGRAPHER:  We can still hear

11          you.

12                    MR. BURNETT:  I can hear you.

13                    THE WITNESS:  Oh, there you are.  Oh,

14          okay.

15                    MR. BURNETT:  Joel, can you hear me?

16                    MR. JONES:  Yes.  Thank you.

17                    THE WITNESS:  We got it fixed.

18                    MR. BURNETT:  Ms. Russo, I assume you

19          can hear me as well?

20                    MS. RUSSO:  I can.

21                    MR. BURNETT:  Okay.  All right.  So this

22          is -- I believe this is Exhibit 10.

23                    (EXHIBIT 10 WAS MARKED.)

24                    THE WITNESS:  Okay.

25
```

```
 1      BY MR. BURNETT:

 2           Q      Do you recognize this document?

 3                  MS. KEARSE:  Will you repeat your

 4           question?

 5                  MR. BURNETT:  Yeah.

 6      BY MR. BURNETT:

 7           Q      Dr. Davies, do you recognize this

 8      document?

 9           A      Yes.  This is a data visualization put

10      together by my team.

11           Q      Okay.  So the heading on this, it says:

12      'Opioid Use Disorder Over Time'.  To the right it

13      says:  "Presented by Marshall Health."  Bottom

14      right corner it says:  "Marshall-Health-2240" is

15      the Bates number.

16           A      Yes.  It's -- it's presented by

17      Marshall Health, but this is data primarily -- you

18      can see from -- from both Cabell, the -- the image

19      on the -- the graph on the right is strictly

20      Cabell.  "Overdose Deaths Over Time" that is

21      from -- that's Cabell County data I believe.

22                  And then the "New Diagnoses Per

23      Quarter" is both Cabell and Marshall data, so

24      that's sort of a subset of the population, the

25      number of new diagnoses of opioid use disorder, so
```

Highly Confidential - Subject to Further Confidentiality Review

1    that's -- that's the incidents.

2         Q    Okay.  Just stepping back a minute, you

3    said this is a data visualization put together by

4    your team.  Can you expand on that?

5         A    Well, this uses a -- a program called

6    Tableau.  And basically, we take -- we take the

7    data from the warehouse, and then we create a

8    graph so that you can -- you can visualize the

9    data so it's not just a bunch of tables but

10   actually a -- a graphic representation of -- of

11   the data that's described.

12        Q    So this -- this -- these graphs are

13   generated from data that is in the possession of

14   you or your team?

15        A    Yes.  Or we have access to the data.

16        Q    I'm sorry, say that again?

17        A    Or -- or it's data we have access to,

18   so we have a -- we have an agreement with Cabell

19   that allows us to access their data, but it's

20   still -- still very clearly theirs.

21        Q    And when you say Cabell, do you mean

22   Cabell Huntington Hospital?

23        A    Meaning Cabell Huntington Hospital,

24   yes.

25        Q    Okay.  And when you refer to your team,

```
 1      is that the Division of Addiction Sciences or --

 2      or some other team?

 3           A      That's specifically my -- my research

 4      team, that's -- that's my students and -- and my

 5      people that work specifically on a -- on my -- on

 6      my research projects.

 7           Q      Okay.  So as part of your research

 8      projects, you and your team gather and evaluate

 9      data, is that fair to say?

10           A      That is fair to say.

11           Q      And I believe you said earlier, the

12      subjects of -- of that data include opioid --

13      opioid use disorder and NAS?

14           A      Yes.

15           Q      Okay.  The way this data is presented

16      here, does that come from a website?

17           A      Did it come from a website?  No.

18           Q      It comes from your own internal data?

19           A      Yes.

20           Q      Yeah.

21           A      It comes from a -- from our data

22      warehouse.

23           Q      Okay.  And, again, you said in the

24      upper left the -- or the graph for OD deaths over

25      time, you said that came from Cabell Huntington
```

```
 1    Hospital?

 2        A      The graph for -- no.  The graph from

 3    overdose deaths over time, that is from the State

 4    Medical Examiner's Office.

 5        Q      Okay.

 6        A      But it's -- it's individuals in Cabell

 7    County, so it's the same as the State data.

 8        Q      Okay.  All right.  So it's -- it's

 9    Cabell County, not Cabell Huntington Hospital?

10        A      That graph, yes.  Correct.

11        Q      Okay.  And tell me again what the

12    sources are for the graph in the lower left that

13    says:  "New Diagnoses Per Quarter Per Year."

14        A      New Diagnoses Per Quarter Per Year are

15    dia -- are new incidents of opioid use disorder

16    diagnosed at either Cabell Huntington Hospital or

17    at Marshall Health clinics.

18        Q      Okay.  Marshall Health clinics means

19    health clinics affiliated with Marshall --

20        A      Yes.

21        Q      -- that are part of Marshall Health?

22        A      That are part of Marshall Health.

23        Q      Okay.  And then tell me again where the

24    data in the -- the bar chart on the right comes

25    from.
```

 1       A     That -- that data is emergency

 2   department visits that had opiates associated with

 3   them from Cabell Huntington Hospital.

 4       Q     Okay.  So -- so not from St. Mary's or

 5   any other hospital other than Cabell Huntington

 6   Hospital?

 7       A     No, no.

 8       Q     Okay.  Now, if we look in the upper

 9   left at opioid overdose -- or, sorry, OD deaths

10   over time, does that refer to only overdose deaths

11   related to opioids?

12       A     Yes.

13       Q     Okay.  And that shows that from 2010 to

14   2017 the number of opioid overdose deaths in

15   Cabell County went from 498 to 873, right?

16       A     Yes.

17       Q     And there's a decrease for 2018.  Is

18   that because data is still being collected for

19   2018?

20       A     No, it's not because of that.  But

21   there are -- it's hard to say why exactly, the

22   decrease, but there have been very significant

23   harm-reduction programs and (inaudible)

24   distribution that happened in 2017 that very much

25   could be affecting the over -- lowering the

1      overdose numbers in 2018.

2              There has been a fairly significant

3      community response to try and lower the overdose

4      death rate --

5          Q      Uh-huh (affirmative).

6          A      -- to try and keep people alive and get

7      the treatment.  So we don't know for sure that

8      that is -- that it's causative, but it is

9      corollary.

10         Q      Okay.  The chart below that, New

11     Diagnoses Per Quarter Per Year, that shows a steep

12     increase over time from 35 unique patients

13     diagnosed to 414 in 2019, is that right?

14         A      Yes.

15         Q      And that's patients -- unique patients

16     with new diagnoses of opioid use disorder at

17     Cabell Huntington Hospital or Marshall Health

18     clinics, right?

19         A      Yes.

20         Q      So it shows that between 2010 and 2019

21     the number of people with new diagnoses of opioid

22     use disorder went up by a factor of more than ten?

23         A      Uh-huh (affirmative).

24         Q      Okay.  And on the right the bar chart

25     titled:  'CHH ED Visits By Drug', that shows a

```
 1    steep increase in emergency department visits

 2    related to opioids between 2010 and later years,

 3    is that right?

 4         A     Yes.

 5         Q     Okay.  You can set that aside.

 6               MR. BURNETT:  Can we open Tab 9, please,

 7         Envelope 9, and this will be Exhibit 11.

 8               (EXHIBIT 11 WAS MARKED.)

 9    BY MR. BURNETT:

10         Q     Do you have that in front of you?

11         A     I do.

12         Q     Okay.  So this is a document

13    Bates-stamped Marshall-Health-2242 titled: "'OUD

14    Population At a Glance', Presented by Marshall

15    Health."  Do you see that?

16         A     I see it.

17         Q     Okay.  Does this come from the same

18    data source as the prior exhibit?

19         A     It does.

20         Q     So this comes from data maintained by

21    your team at Marshall?

22         A     It comes from data that we have access

23    to.

24         Q     What -- what is the original source of

25    this data, if you know?
```

1          A      This data, again, is Cabell Huntington

2     Hospital and Marshall Health clinics.

3          Q      Okay.  Does it include places that

4     provide MAT, such as Valley Health and Prestera?

5          A      This does not.

6          Q      Okay.  So the -- the OUD population

7     counts here would be higher if you included those

8     additional sources, is that right?

9          A      Yeah.  This is clearly a subset of

10    the -- of the whole OUD population in -- in Cabell

11    County in Huntington.

12         Q      Okay.  Can you tell what year these

13    numbers are from?

14         A      I believe these are 2019 numbers -- no,

15    these are -- these are current, so these would be

16    current patients.  These are current patients so

17    -- and so by definition, a current patient is --

18    is anybody who has had a visit within the last

19    three years.

20         Q      Okay.  And --

21         A      At the time that we -- at the time that

22    we took this.

23         Q      Okay.  Do you know what time this was

24    taken as of?

25         A      I don't remember.  I think it was -- it

Highly Confidential - Subject to Further Confidentiality Review

1    was either -- it was sometime early 2020, I

2    believe.  I think it was -- it was early in the

3    year this year.

4         Q     Okay.

5         A     I think first quarter 2020 is when it

6    -- sometime in there.

7         Q     Okay.

8         A     It was before COVID, that's all I

9    remember.

10        Q     Understood.  Upper left it says:

11   "Count of Individual SUD Diagnoses for OUD."

12        A     Uh-huh (affirmative).

13        Q     And then it says:  "Total OUD

14   Population, 7,627."  Do you see that?

15        A     Yes.

16        Q     So what does that number represent?

17        A     That number represents the number of

18   individual patients within the system who have

19   been diagnosed with opioid use disorder.

20        Q     Okay.  From Cabell Huntington Hospital

21   and all Marshall clinics, right?

22        A     Yes.

23        Q     Do you have a sense of how much that

24   number would grow if you included other sources of

25   data such as Prestera and Valley Health?

```
 1        A     It's hard to say because the

 2   hospital -- it -- it -- you know, a lot of those

 3   patients will also be patients in the hospital.

 4   Whether or not their opiate use disorder is on

 5   record at the hospital, it's -- it's hard to say.

 6   It depends on what they come in for.

 7             Clearly, this is a -- this is a subset

 8   of the population.  I don't think I could -- I

 9   could tell you accurately the size of the subset.

10        Q     And the geographic area that this is

11   drawn from, is this just Cabell County?

12        A     This is -- this is Cabell County and

13   Huntington and the City of Huntington.  So some of

14   those -- I think one small section of the area

15   includes -- it was actually Wayne County, but it's

16   encompassed within the City of Huntington.

17        Q     Right.  Okay.  So out of the total

18   population of the City of Huntington and Cabell

19   County as of earlier this year, almost 8,000

20   people had OUD diagnoses?

21        A     Yes.

22        Q     And actually that number is

23   undercounted because of the other sources that we

24   talked about?

25        A     Yes.
```

1    Q    Okay.  And then so next to Total OUD

2    Population it lists opioids, and that number is

3    the same, 7,627.  That's because every one with

4    OUD has taken opioids, is that fair?

5    A    Yes.

6    Q    And then to the right it lists:

7    Alcohol, cannabinoids, sedatives and other

8    categories of drugs, right?

9    A    Right.  So -- so obvious -- so when it

10   says opioids -- opioids, that's individuals with

11   opioid use disorder.  If it says alcohol, those

12   are individuals with alcohol use disorder in

13   addition to the opioid use disorder.  Where it

14   says cannabinoids, that is cannabinoid use

15   disorder in -- in addition to the opioid use

16   disorder --

17   Q    Uh-huh (affirmative).

18   A    -- and so on.

19   Q    Okay.  So there's overlap, you know,

20   with opioids and other substances sometimes?

21   A    Most of the time.

22   Q    Most of the time.  Okay.  Then below

23   that there is two tables, one -- well, it says:

24   "OUD Co-Conditions," and then there's a table

25   called "Psychiatric" and a table called

 1     opioid use diagnoses of individuals with opioid

 2     use disorder.

 3          Q     And that's because the people who are

 4     using -- who are misusing opiates come from all

 5     age ranges?

 6          A     They do.

 7          Q     Okay.  All right.  You can set that

 8     aside.

 9               MR. BURNETT:  Let's open Tab 6, Envelope

10          6, which is will be Exhibit 12.

11               (EXHIBIT 12 WAS MARKED.)

12     BY MR. BURNETT:

13          Q     Do you have that in front of you?

14          A     I do.

15          Q     Okay.  So this is a one-page document

16     Bates-stamped Marshall-Health-2239.  The title is:

17     'West Virginia Overdose Deaths'.  Do you recognize

18     this document?

19          A     Yes.

20          Q     What is it?

21          A     This is a data visualization, just like

22     the others, that we developed from data that we

23     received from the medical examiner's office on

24     overdose deaths.

25          Q     Okay.  Does it come from the same

 1    database as the exhibits that we were just looking

 2    at?

 3         A     It was put in the same database, yes --

 4         Q     Okay.

 5         A     -- but the source -- where those

 6    sources were, the electronic health records, this

 7    source is the medical examiner's office.

 8         Q     And that's the State Medical Examiner?

 9         A     Yes.

10         Q     Okay.  I -- I've sometimes heard

11    reference to vital statistics.  Is -- is this data

12    from vital statistics?

13         A     Well, the -- all of the State -- the

14    State agencies will distribute their data through

15    the vital statistics office, so the vital

16    statistics is the State Department that assembles

17    data from various State agencies.  So the

18    originating office is the Office of the Medical

19    Examiner's Office, but their data is then sent to

20    Vital Statistics who then distributes it out to us

21    and others.

22         Q     Okay.  And this data is reliable

23    because it's coming directly from the medical

24    examiner's office?

25         A     Yes.

1     Q     Okay.  Unfortunately, the charts on the

2     right, we can't tell what colors correspond to

3     which.  Do you happen to know which lines

4     correspond to Cabell by any chance?

5     A     If I remember correctly, the top line

6     is Cabell on all of these graphs.

7     Q     So the highest numbers here are from

8     Cabell?

9     A     I -- I believe so if I'm remembering

10    correctly.  Let's see -- Putnam, Wayne -- oh,

11    yeah, those are all Cabell.  All the highest ones

12    are Cabell.

13          The only -- the only county that would

14    rival Cabell would be Kanawha, and they're not

15    presented on this visualization.  So, yeah, the

16    top line is Cabell on all of these.

17    Q     Okay.  So does that mean that, you

18    know, at least among these five counties listed

19    here, Cabell had the highest number of overdose

20    deaths for each of these five drugs?

21    A     That had those drugs within the

22    toxicology, right.  So those drugs were discovered

23    in the toxicology within overdose deaths.

24    Q     Yeah.  Okay.  So for fentanyl it shows

25    that between 2014 and 2017 that the numbers went

```
 1      from almost 0 to roughly 150 overdose deaths where

 2      fentanyl was found in the toxicology, right?

 3          A      Yes.

 4          Q      Okay.  And for heroin, at the bottom,

 5      it shows that for Cabell the numbers went from

 6      almost 0 in 2010 to over 50 in 2017, right?

 7          A      Yes.

 8          Q      Okay.  And then you look -- if you look

 9      upper left, there's a chart titled:  'Age of Death

10      (2010 to 2016)'.

11          A      Uh-huh (affirmative).

12          Q      Do you see that?

13          A      I do.

14          Q      And that shows a range of deaths that

15      go from 0 to 89, right?

16          A      Yes.

17          Q      And the majority are between 20 and 60

18      or so, right?

19          A      Yeah.  Between 20 and 60.  That's a

20      fairly wide range.

21          Q      Right.  So that's showing there's a

22      wide range of the ages at which people have died

23      of overdose in West Virginia?

24          A      That's what the data says.

25          Q      And is this -- are those deaths
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    specific to opioids?

 2         A    I -- I would have to look at the data,

 3    but opioids is always going to be a major cause.

 4    The other drugs that we're -- where you see --

 5    when you go through this data individually, the

 6    synthetic marijuana can cause an overdose death.

 7              But by and large if there's not an

 8    opiate associated where you might get an overdose,

 9    you're not likely to get death.  So the vast --

10    and I'm going on -- I'm going on memory here, but

11    there are very few of these overdose deaths that

12    are in this dataset that I can remember that do

13    not have an opiate associated with it.

14         Q    And those opiate overdose deaths, those

15    include both prescription and illicit opioids,

16    right?

17         A    Yes.

18         Q    And sometimes people have both

19    prescription and illicit opioids in their system

20    in the toxicology report, right?

21         A    That is an accurate statement.

22         Q    And when I refer to illicit, what is

23    your understanding of that term?

24         A    Well, I -- I'm assuming you use it --

25    you're using it like most where illicit -- illicit
```

 1    substances are -- are non-prescribed opiates, but

 2    primarily I think you probably mean injection

 3    drugs.

 4         Q     And what are those drugs?

 5         A     So -- well, just a lot of drugs are

 6    injected, right?  So typically you think heroin.

 7    Heroin disappeared from -- from this area for a

 8    while.  People thought they were buying heroin and

 9    they were really getting fentanyl, so it's

10    fentanyl, heroin.  But a lot of the prescription

11    drugs, even buprenorphine, methadone, Oxycontin,

12    will be crushed and injected as well.

13              So illicit would -- you know, to me

14    means it was obtained without a prescription by

15    anybody.  And then of course opiate misuse would

16    be any misuse of -- of a drug, including ones that

17    were originally prescribed for somebody.

18         Q     Okay.  And the -- the charts that we

19    looked at on the right side of this document show

20    a sharp increase in fentanyl and heroin overdose

21    deaths in recent years, is that a fair summary?

22         A     That is a fair summary.  You know,

23    the -- you know, in talking to people by and large

24    before 2010, what I hear directly from patients

25    who have been around a long time, who have

```
 1    suffered through opioid use disorder, primarily

 2    people who are now sponsors or they are -- they

 3    are in the recovery area, they said before 2010 it

 4    was mostly as they say pills.  They weren't

 5    specific.  And then after that, we have seen a

 6    huge switch to the injection drug use.

 7         Q    And when you say pills, are you

 8    referring to prescription opioids?

 9         A    I'm -- I'm merely saying what I was

10    told.  When they say pills, they mean opiates in a

11    pill form.

12         Q    Right.  So they -- they may or may not

13    be pursuant to a prescription?

14         A    I have no -- I have no way to verify

15    that.

16         Q    Sure.  Okay.

17              MR. BURNETT:  All right.  You can set

18         that document aside.

19              THE VIDEOGRAPHER:  Counsel, I'm sorry to

20         interrupt.  If you're moving onto another

21         document, can we take a short break so I can

22         change my media tape?

23              MR. BURNETT:  Sure.  And I was -- I was

24         about to say, I -- I believe I have just one

25         more document, so I'm almost done.
```

```
 1                  There are, throughout the time,

 2       various, you know, physicians and -- and, you

 3       know, social workers who participate in -- in

 4       child health, (inaudible) three, those kind of

 5       groups all -- all have participated in Healthy

 6       Connections.

 7           Q     So Healthy Connections was an

 8       organization that was geared towards providing and

 9       addressing children's health issues?

10           A     Right, specifically around NAS.

11       Because, you know, we have them in the hospital,

12       and then we -- and then you sort of lose track of

13       them.  And so it was -- it was a way to start

14       creating -- bringing organizations together so

15       that we could have a more continuous flow in terms

16       of -- of helping these children and their

17       families.

18           Q     You had mentioned that your ability to

19       participate in something like Healthy Connections

20       is limited because of your availability, you're so

21       busy.  What's taking up the majority of your time

22       in your current role at Marshall Health?

23           A     Research.  You know, trying to --

24       trying to put all of these disparate -- you know,

25       had this -- had this lawsuit happened in -- you
```

1    know, in the -- in two years or three years, I

2    probably could have given everybody a lot -- a lot

3    more intricate data, but we're in the process of

4    building a -- a data system where we're actually

5    connecting all of these pieces together so we can

6    give real answers, but it takes time and it's

7    expensive.

8            And we have -- we have -- you know,

9    less -- we don't have the resources we necessarily

10    need to build a system like this, so but it --

11    we're doing it anyway.

12            You know plus we have -- I have a

13    number of basic research projects where we're

14    looking at data.  We're doing prospective

15    research.  We're recruiting patients, which has

16    been largely on hold.

17            Plus, I'm in -- we're in the process of

18    doing an evaluation of -- of the Cabell County

19    response for the CDC that -- to find out what's

20    really working and what's -- what could be

21    replicated for other communities.

22        Q    Okay.  A little bit of follow-up on --

23    on that since that's a lot of information.  You

24    said you're working with the CDC, or you're

25    providing a response to the CDC what's working in

 1    Cabell County.  Is that --

 2         A      Uh-huh (affirmative).

 3         Q      -- as it respects the care and

 4    treatment of NAS children?

 5         A      Well, that's -- that's for -- for

 6    addiction across the board, including NAS.

 7         Q      So what other data or response are you

 8    providing to the CDC?

 9         A      Well, we're in -- we're still in the

10    progress of collecting that data.

11         Q      What data are you collecting?

12         A      Well, we're collecting qualitative

13    data, doing -- doing interviews, doing surveys.

14    Plus we're putting together this data system so we

15    can pull quantitative data to look at, if we've

16    been effective at getting more people into

17    treatment and reducing overdoses, but we won't

18    have that data collected for another six months.

19         Q      And you said that you're working on

20    this process data system.  What -- what are the

21    data points you're looking to fill in for this

22    large process data system?

23         A      Well, we want to be able to -- to look

24    at the community as a whole, right?  So we have

25    disparate systems like most -- like most

Highly Confidential - Subject to Further Confidentiality Review

1    communities do.

2            And so each system has a number of

3    patients, but we want to identify the right number

4    of patients, who needs help, are they getting to

5    the right -- are they getting to the right kind of

6    -- you know, I talked about earlier today

7    different people have different success levels

8    with different treatment modalities.  And so we

9    want to identify the risk factors that tell us

10   which treatment modalities are -- are likely to be

11   most effective so that instead of somebody going

12   into treatments four or five, six, eight times,

13   it's -- it's maybe two or three.

14           We want to make sure we're optimizing

15   our -- our system.  So if we're going to increase

16   the number of available beds, we want to make sure

17   we're using those -- all the beds effectively.  It

18   looks like we are, but it's -- because everything

19   is full all the time.  But to really be able to

20   tell what our -- what our capacity is -- is

21   necessary, you have got to -- you have to do this

22   kind of work.  It just -- it takes a long time,

23   and it's very expensive to do.

24      Q    And is one of the data points you're

25   collecting the specific opioids that community

 1    members are using?

 2         A     Not yet.  I mean it's -- it's just a

 3    matter of -- we haven't gotten that far.  Will it

 4    be at some point?  Yes, but we haven't gotten that

 5    far yet.

 6         Q     Do you have a process in place by which

 7    to collect the specific opioids that members of

 8    the community are using, or you have not developed

 9    the process yet to collect that data?

10         A     So we're -- we're building that process

11    now.

12         Q     So what's the state of the process?

13         A     It's more than just a process.  It's --

14    what's that?

15         Q     What's the state of the process, or

16    what's the current plan in order to capture that

17    data?

18         A     Well, the -- the idea is -- is to feed

19    the disparate systems into a -- into a single data

20    warehouse in a way that protects individual

21    patient information.  So we're building the

22    system, and we're building it -- you know, we have

23    to build it piece by piece, but we all -- you

24    know, I've only got one -- I've only got one data

25    architect so it just -- eventually, we'll get to

```
 1    all of those pieces, but it will take a while.
 2         Q    Is the -- the thought or the current
 3    plan to take this information if it's contained in
 4    medical records or get it from other sources?
 5         A    Both.
 6         Q    And what other sources would be
 7    available to you to determine the specific types
 8    of opioids that members of the community are
 9    using?
10         A    Well, there's a lot of records.
11    There's a lot of self-report records in various
12    agencies where they do, you know, social
13    determinant surveys and interviews on -- on
14    intakes.  There's -- there's criminal justice data
15    points.  There are data points in -- in various
16    agencies in -- in workforce areas that do drug
17    tests.  There are, of course, the, you know,
18    Prescription Drug Monitoring Program.
19              But we have to link it to individual
20    patients.  We have to do it in a way that protects
21    the patient's identity to make sure we're -- we're
22    compliant with HIPAA and HITECH and, you know,
23    42 CFR Part 2, plus -- plus the West Virginia
24    laws.
25              So it's -- it's a tricky process.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      We've figured out a way to do it.  It's just a

 2      matter of going through the -- doing the work now.

 3          Q      And have you created documents that

 4      address the way to collect this data?

 5          A      Well, each -- each data point is going

 6      to be the -- the document -- I mean, yes, but each

 7      data point is going to be different.  It's going

 8      to have different documentation depending on what

 9      we are doing.

10          Q      And is there someone -- you had

11      mentioned that it's very difficult to take the

12      order monitoring programs and the individual

13      medical records and correlate specific

14      prescriptions to patients.  Is there anyone on

15      your team who's qualified to do that currently?

16          A      It's not a matter -- it's not a matter

17      of are -- are we qualified to do it.  It's a

18      matter of having the -- having enough personnel to

19      be able to do all that work.

20          Q      Do you currently have enough personnel

21      to do all of that work?

22          A      Oh, not even close.

23          Q      How many -- how many people do you

24      think you need?

25          A      Ideally, I would -- I would -- I would
```

```
 1    probably -- to do all the work we would probably

 2    want a team of 10 or 12.

 3        Q    And how large is your team right now?

 4        A    Me and one other person.

 5        Q    You also said you've had to halt basic

 6    research projects.  Have you suspended those

 7    because of COVID-19 and the epidemic?

 8        A    Yeah.  Yeah.  We can't -- we can't

 9    recruit patients right now because -- because of

10    the COVID pandemic.  It's hard enough getting a --

11    you know, letting the clinicians do their part and

12    having the telemedicine and keeping -- keeping

13    these -- this particular population engaged.

14        Q    And what types of patient populations

15    were you looking to engage with for these research

16    projects?

17        A    Well, we have two ongoing research

18    projects where we were recruiting patients that we

19    were in the process of recruiting when we halted.

20    One -- one has -- recruits men in an

21    abstinence-based program, the other one is

22    pregnant women and their -- and their child.

23        Q    And, I'm sorry, I missed the first

24    org -- the first group of patients that you're

25    recruiting or enrolling.
```

```
 1        A      They're -- they're men in an

 2     abstinence-based program.

 3        Q      I know you were asked if you've ever

 4     been deposed before.  Have you ever testified in a

 5     trial?

 6        A      Nope.

 7        Q      Have you ever been a party to a

 8     lawsuit?

 9        A      Not that I'm aware of.

10        Q      Have you had a conversation with anyone

11     who is not your lawyer representing you here today

12     on behalf of Marshall Health whether you would

13     testify in the trial, to the extent this lawsuit

14     culminated in a trial?

15        A      No.

16        Q      I believe your attorney has received

17     some documents from my office on behalf of

18     AmerisourceBergen Drug Corporation, and there

19     should be a document identified as Tab 28, which

20     is the Third Amended Complaint in this matter.

21             MR. JONES:  Let's pause for a minute.  I

22        need to grab that -- grab that box for him.

23             THE WITNESS:  Okay.  He's going

24        to -- we've got to pause for a minute while

25        Joel grabs that box.
```

```
 1     you just described in your answer in terms of any

 2     correlation or cause and effect or relationship

 3     between mental health disorders and opioid use?

 4          A     I don't think that data exists.  That's

 5     going to have to be prospective studies to -- to

 6     determine that.

 7          Q     And is that one of the --

 8          A     Everything else is --

 9          Q     One of the list of data points --

10          A     I'm sorry.  Go ahead.

11          Q     Is that one of the lists of data

12     points that you would like to review that you've

13     put into this -- the future programs for your

14     department?

15          A     Yeah, absolutely.  But I -- I think,

16     like I said, that's going to have to be

17     prospective research where we actually design a

18     protocol and -- and move -- move completely

19     forward with it.

20          Q     Have you started to design the

21     protocol?

22          A     That one, no, not yet.  It's on my --

23     it's on my list.  I have a very long list.

24                There's a lot that needs to be done

25     here in terms of research.  There's just --
```

1    there's just so much that needs to be done, and --

2    and we can't rely on other communities to do it

3    because there are some cultural things that are --

4    are unique here so...

5         Q    What cultural issues are unique to --

6         A    Well, there are cultural issues that

7    are unique in everywhere, right?  So any time you

8    have a best practice, you can't just take that

9    best practice and use it somewhere else.  You have

10   to take it and use it and develop it and then

11   track those measures to make sure it functions.

12        We have a community here -- in

13   Appalachia everything is -- is separated, right?

14   Cabell County and Huntington is -- is fairly flat,

15   but you're still -- you're still dealing with an

16   Appalachian culture.

17        And -- and so there's -- there was a

18   lot of things that was protective about that

19   culture in terms of the family dynamic and strong

20   family ties.  But once addiction has now seeped

21   into so many families, a lot of that has broken

22   down, so our natural resistant systems have -- are

23   not functioning right now, so there has to be a

24   rebuild of all of that.

25        And so as we develop treatments, and as

1    we develop -- adopt new best practices, we have to

2    track how those changes in -- in the -- in the

3    social structure is going to be maintained.

4    Because that social structure that the -- the

5    individual social systems in that social structure

6    within the community is a huge part of recovery.

7        Q    We had talked earlier about the various

8    risks that you were aware with the use opioids,

9    whether it's abuse of opioids, physical dependence

10   or addiction.  When did you first become aware of

11   the risks associated with the use of opioids?

12       A    With the risk associated with -- with

13   opioids?  I mean that's -- I mean, you know,

14   obviously I have had neurobiology courses as I was

15   getting my, you know -- as I was going through

16   school.  And -- and addiction, particularly

17   addiction to opiates, is always part of that

18   because it's a -- it's a, you know, a pretty

19   dynamic system.

20            But in terms of what we were doing

21   here, I mean I've known -- I've known about

22   addiction my whole life.  But it's a matter of

23   really getting in and -- and -- and studying it in

24   a very comprehensive way starting with -- you

25   know, in 2013 when I started looking at the NAS

# OUD Population At a Glance

 presented by **Marshall Health**

**Year(s) of OUD Diagnosis**

(Multiple values)

## Count of Individual SUD Diagnoses for OUD

| Total OUD Population | Opioids | Alcohol | Cannabinoids | Sedatives, Hypnotics Or Anxiolytics | Cocaine | Hallucinogens | Inhalants | Other Stimulants | Tobacco |
|---|---|---|---|---|---|---|---|---|---|
| 7,627 | 7,627 | 971 | 1,228 | 544 | 648 | 16 | 942 | 1,307 | 2,390 |



**OUD Co-Conditions**

| Psychiatric | Anxiety & Phobic Disorde. | 3,139 |
|---|---|---|
| | Depression | 2,152 |
| | Bipolar Disorder | 726 |
| | Other Mood Disorders | 103 |
| | Eating Disorders | 120 |
| | Schizophrenia and Delusi. | 108 |
| | Personality Disorders | 79 |
| | Psychotic Disorders | 29 |
| | Dissociative Disorder | 18 |
| | Conduct Disorder | 12 |
| | Impulse Disorders | 2 |
| Clinical | Body Pain | 4,892 |
| | Accidents & Unspecified I. | 3,232 |
| | Hepatitis C | 2,657 |
| | Neoplasms | 1,285 |
| | Accidental Drug Poisoning | 1,180 |
| | Endocarditis | 613 |
| | Burns | 453 |
| | Assault | 401 |
| | Surgery | 217 |
| | Chlamydia | 115 |
| | HIV | 108 |
| | HPV | 65 |
| | Gonorrhea | 28 |

**Patient Density by Location OUD**

© 2020 Mapbox © OpenStreetMap

**Age at OUD Diagnosis**

**Sex OUD**

M 3,263

F 4,364

MarshallHealth-00002242



EXHIBIT JL
11
Todd Davies
7/28/20
PENGAD 800-631-6989

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

THE CITY OF HUNTINGTON,
     Plaintiff,

v.                                    Civil Action No. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, *et al.*
     Defendants.

---

CABELL COUNTY COMMISSION,
     Plaintiff,

v.                                    Civil Action No. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, *et al.*
     Defendants.

## DECLARATION OF TODD DAVIES, Ph.D.

1.     I am an Associate Professor and the Associate Director of Research and Development in the Division of Addiction Sciences and the Department of Family and Community Health at Marshall University's Joan C. Edwards School of Medicine.

2.     I was deposed in this litigation on July 28, 2020.  This declaration supplements and clarifies my testimony.

3.     Exhibit 11 of my deposition is a one-page document entitled "OUD Population at a Glance," Bates-stamped MarshallHealth-00002242.  It is a screenshot printout from a Marshall Health database of electronic health records that I have access to, as described on pages 109-11 and 115 of my deposition transcript.  I created the screenshot.

4.     Marshall Health's electronic health records identify patients' place of residence, among other data.

1

5.      Exhibit 11 shows data only for residents of Cabell County and the City of Huntington, including the two Huntington zip codes in Wayne County.  I filtered the Marshall Health database at Plaintiffs' request, in response to Plaintiffs' subpoena, to show data only for residents of that specific geographic area.

6.      The map in Exhibit 11, "Patient Density by Location OUD," shows the same geographic area (Cabell County and the City of Huntington) corresponding to the data in the exhibit.  The native version of Exhibit 11, attached as Exhibit A to this Declaration, shows the geographic area more clearly.

7.      I described Exhibit 11 accurately in my deposition when I testified that it is drawn from the population of Cabell County and the City of Huntington, including the part of Huntington in Wayne County.  See pages 117-18 of my transcript.

8.      The figure in the upper left of Exhibit 11, "Total OUD Population," listing 7,627, represents the total number of current, unique patients diagnosed by Cabell Huntington Hospital or Marshall Health clinics with opioid use disorder, among the residents of Cabell County and the City of Huntington (including the two Huntington zip codes in Wayne County).  See pages 114-18 of my deposition transcript.  As stated in my deposition, it shows that "out of the total population of the City of Huntington and Cabell County as of earlier this year, almost 8,000 people had OUD diagnoses." *Id.* p. 118.  The data comes from the Marshall Health database.

9.      Exhibit 13 to my deposition is a 25-page document entitled "Marshall MAT-LINK Project Application," Bates-stamped MarshallHealth-00000693-717.  It is a grant application that I drafted, as described on pages 129-30 of my transcript.

10.     The second page of Exhibit 13 states that "There are 7,581 unique individuals diagnosed with opioid use disorder (OUD) in our system with an additional 8,137 unique

2

individuals with multiple failed drug screens without a diagnosis or opioid prescription." The
population counts in this sentence are not drawn from the population of Cabell County and the
City of Huntington, nor from the entire patient population of Marshall Health's catchment area.
The population at issue is instead tied to the target population of the grant application.

11.     The parties should rely on Exhibit 11, not Exhibit 13, for the correct number of
current, unique patients diagnosed by Cabell Huntington Hospital or Marshall Health clinics with
opioid use disorder, among the residents of Cabell County and the City of Huntington (including
the two Huntington zip codes in Wayne County), as listed in Marshall Health's electronic health
records.

12.     Page 2 of Exhibit 13 refers to a roughly 1:1 ratio of unique individuals in
Marshall Health's system diagnosed with opioid use disorder, compared to unique individuals
with multiple failed drug screens without a diagnosis or opioid prescription (7,581 to 8,137), for
the population at issue in the exhibit.  Based on my experience, the Marshall Health database
would likely show a similar 1:1 ratio for residents of Cabell County and the City of
Huntington.  I would therefore estimate that roughly 8,000 current patients have failed multiple
drug screening tests for the population described in Exhibit 11.  In my deposition, I accurately
testified that individuals with multiple failed drug screens without a diagnosis or opioid
prescription are likely to have opioid use disorder.  See pages 34-36 and 131-32 of my
transcript.

13.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


Executed on September 15, 2020


Todd Davies, Ph.D.

# Exhibit A

# OUD Population At a Glance

presented by  Marshall Health

**Year(s) of OUD Diagnosis**

(Multiple values)

**Count of Individual SUD Diagnoses for OUD**

| Total OUD Population | Opioids | Alcohol | Cannabinoids | Sedatives, Hypnotics Or Anxiolytics | Cocaine | Hallucinogens | Inhalants | Other Stimulants | Tobacco |
|---|---|---|---|---|---|---|---|---|---|
| 7,627 | 7,627 | 971 | 1,228 | 544 | 648 | 16 | 942 | 1,307 | 2,390 |

**OUD Co-Conditions**

| | | |
|---|---|---|
| Psychiatric | Anxiety & Phobic Disorde.. | 3,139 |
| | Depression | 2,152 |
| | Bipolar Disorder | 720 |
| | Other Mood Disorders | 183 |
| | Eating Disorders | 120 |
| | Schizophrenia and Delusi.. | 108 |
| | Personality Disorders | 79 |
| | Psychotic Disorders | 25 |
| | Dissociative Disorder | 18 |
| | Conduct Disorder | 12 |
| | Impulse Disorders | 2 |
| Clinical | Body Pain | 4,892 |
| | Accidents & Unspecified I.. | 3,232 |
| | Hepatitis C | 2,657 |
| | Neoplasms | 1,289 |
| | Accidental Drug Poisoning | 1,180 |
| | Endocarditis | 613 |
| | Burns | 453 |
| | Assault | 401 |
| | Surgery | 217 |
| | Chlamydia | 115 |
| | HIV | 106 |
| | HPV | 65 |
| | Gonorrhea | 28 |

**Patient Density by Location OUD**



© 2020 Mapbox © OpenStreetMap

**Age at OUD Diagnosis**

**Sex OUD**

M 3,263

F 4,364

Ex C – Deposition Excerpts of Rahul Gupta, M.D., dated 09/11/2020

Plaintiffs' Supplemental Federal Rule Civil Procedure 26(a)(2)(C) Disclosures

```
                                              Page 1

 1         IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2

 3

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 4

    THE CITY OF HUNTINGTON,
 5

                Plaintiff,
 6

    vs.                                CIVIL ACTION
 7                                  NO. 3:17-01362

    AMERISOURCEBERGEN DRUG
 8  CORPORATION, et al.,
 9           Defendants.
10  _____
11  CABELL COUNTY COMMISSION,
12           Plaintiff,
13  vs.                                CIVIL ACTION
                                    NO. 3:17-01665
14  AMERISOURCEBERGEN DRUG
    CORPORATION, et al.,
15
                Defendants.
16
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
17

18

19           Videotaped and videoconference deposition
    of RAHUL GUPTA, M.D., taken by the Defendants under
20  the Federal Rules of Civil Procedure in the above-
    entitled action, pursuant to notice, before Teresa
21  S. Evans, a Registered Merit Reporter, all parties
    located remotely, on the 11th day of September,
22  2020.

23

24
```

Page 22

1   about?

2        A.   I'm sorry, can you repeat that, please?

3        Q.   Sure.  What is your understanding of this

4   case?  What is it about?

5        A.   My understanding is that this case is

6   related to the number of overdose deaths and

7   generally the suffering and the carnage that has

8   occurred broadly in the state of West Virginia, but

9   narrowly in Cabell County and the City of

10  Huntington as a result of oversupply as well as the

11  over-availability of prescription opioids and the

12  consequences resulting from that.

13       Q.   And what is the basis of your

14  understanding?  How did you come to have that

15  understanding?

16       A.   As I had mentioned before, that including

17  my work as the Commissioner for the Bureau of

18  Public Health as well as the State's chief health

19  officer, having worked in this area, having read

20  the reports as well as public records and accounts

21  and have been deposed and involved in the workings

22  of the Department of Health and Human Resources of

23  West Virginia, is how I come about to have that

24  understanding.

Page 43

1      A.   What I mean by "the volume" aspect is,

2  clearly by the time I became Commissioner, it was

3  becoming more relevant and more clear that there

4  was a volume issue when it came to the deaths and

5  the suffering on the streets.

6           What that meant was, the overwhelming

7  volume that was reaching the people of West

8  Virginia was plainly involved in the killing of

9  West Virginians almost every 12 hours around the

10 clock, and that became important to us, as well as

11 other sufferings that were occurring.

12     Q.   Volume of what?

13     A.   The volume of prescription opioid pills.

14     Q.   And what was the source of that volume?

15     A.   So the source of that volume clearly was

16 coming from -- through the manufacturers and

17 distributors into the state of West Virginia and

18 then through the pharmacies, being dispensed into

19 the hands of innocent public.

20     Q.   You said you also looked at what was going

21 well and what was not going well.  What did you

22 think was going well?

23     A.   Well, by the time I came into the office,

24 clearly we had passed some policies -- please mind

Page 44

1    you, that these are downstream efforts.  We were

2    drowning, and we were trying - struggling - to do

3    what we could do at a city, county and a state

4    level to help people survive.

5              So what we did was, we had passed

6    several pieces of legislation and policy that had

7    made its way into commonplace, which means that we

8    had by the time figuring out how to get physicians

9    trained into understanding how diversion occurs,

10   how they could prescribe more responsibly to

11   prevent that diversion.  Although they're trying to

12   help the people that they're working with, meaning

13   their patients.

14             We were looking at figuring out how to

15   provide the antidote called naloxone into the hands

16   of the public so they can actually get an

17   opportunity to live.

18             We were trying to figure out how to

19   control -- you know, provide limitations to the --

20   some of the bad docs, and how do we go after those

21   bad docs?

22             So there was a whole host of initial

23   work that was happening in terms of downstream

24   attempts to control what we could control, what was

Page 45

1   within our hands, our power, to be able to do, at a

2   cost that was overwhelming.

3            Because at the same time, we were

4   having more and more children going to foster care.

5   Our child welfare cost was rising at an enormous

6   rate that we were having difficulty to control,

7   controlling the budget for the state.

8            So we were at the edges of going

9   bankrupt as a state, and primarily the crisis was

10  being driven but through the volume that was coming

11  up upstream to us.

12           So those were some of the things that

13  we were attempting to do.  We were also trying to

14  do justice reform, criminal justice reform,

15  reininvestments into -- because what we found was a

16  significant proportion of people that were ending

17  up incarcerated had substance abuse problems, and

18  that was primarily the reason, and they were not

19  being helped by being incarcerated and being in

20  prison.

21           We were losing -- as I mentioned, every

22  12 hours, we were losing a working West Virginian,

23  never to come back again, so this was a

24  transgenerational crisis.

1          You said you focus on the opioid --

2     detailing the opioid crisis in that class.  Does

3     your investigation include the causes of the opioid

4     epidemic?

5     A.   We have a discussion on the description of

6     charts and historical perspective.  We created -- I

7     ordered - as one of the first acts of being a

8     Commissioner - a historical perspective report that

9     - it's online available - of West Virginia's opioid

10    crisis from 2000 to 2015 data.

11          I take several pieces of information

12    from that report, that's a public report, done

13    under -- I believe, it was Governor Justice.  And I

14    use that as an example to talk about historical.

15    We talk about, obviously, all aspects/facets --

16    it's a pandemic -- it's an epidemic of epidemics.

17          We talk about all the consequences that

18    are happening.  And then we talk about things that

19    we're doing to solve.  The bottom line is, we do

20    talk about, you know, how we got here; but our

21    focus often is:  How do we fix this?

22          And we want, you know, in West Virginia

23    our students to understand that while we didn't

24    break it, we'll have to fix it.  And we're going to

Page 97

1    have to get together.

2              So whether it's the HIV outbreaks that

3    happened in Cabell County recently -- which is the

4    second-largest HIV outbreak in the nation's history

5    recently, in Vienna, or the Hepatitis A outbreak

6    that I personally dealt with during my tenure; or

7    the highest levels of Hepatitis C.

8              We have a record in our country being

9    first or second - compete with Kentucky oftentimes

10   - and the highest levels of -- historic high levels

11   of Hep B, which both transmitted through IV drug

12   use and other aspects.  15 -- 13 to 15 times the

13   national average.

14             We talk about those things.  We talk

15   about:  How do you solve these problems?  We talk

16   about how do we prevent, you know, 5 percent of the

17   babies that are born with neonatal abstinence

18   syndrome in this state, and that costs a million

19   dollars a baby.  And that's a billion dollars - if

20   you add the numbers - of an ongoing liability to

21   the state every single year.

22             I produced a white paper to -- to the

23   Senate finance chairman about that years ago.

24             So we talk about actual real issues,

1          But it doesn't talk about the entire

2     demand/supply chain; it doesn't talk about

3     manufacturing; it doesn't talk about production; it

4     doesn't talk about quotas; it doesn't talk about

5     distribution; it doesn't talk about pharmacies; it

6     doesn't talk about dispensing; it doesn't talk

7     about the transition to heroin and fentanyl.

8          It doesn't talk about how the

9     transition has happened from prescription to

10    actively illegal and illegitimate drugs; it doesn't

11    talk about how the deaths transitioned to meth and

12    other stimulants in addition to depressants.

13          So there's a lot of facets to this.  As

14    I mentioned before, my job was to get people in a

15    simplified way to understand in a matter of 30 to

16    40 minutes.  So I could spend all day talking about

17    it but I wouldn't have anybody listening to me,

18    because they would all be gone.

19     Q.   Sure.  And I understand that this doesn't

20    reflect the full description of the opioid problem

21    in West Virginia or nationally.  What I'm asking

22    is:  Does this reflect your discussion of the

23    supply-side drivers, as you've written here, of the

24    opioid epidemic?

Page 126

1    findings, the evidence-based findings that we had

2    from the social autopsy.

3              We found that even then - in 2016 - a

4    significant amount of people who were dying had

5    filled their prescription within 30 days of their

6    death.  We also found a significant type of people

7    that were incarcerated and then released and then

8    died, overdosed and died.

9              We found that three out of those four

10   people that died tried to seek help before their

11   time of death within the last year.  We also found

12   that there wasn't sufficient amount of naloxone

13   that was being given to people to help them

14   survive.

15             There weren't enough facilities that

16   were available.  So those are the kind of things

17   that became important, and that was something that

18   was not only done in West Virginia, but subsequent

19   to that, we started receiving requests from states

20   and large cities all over the country, because they

21   wanted to repeat what we had done.

22             So we started providing temporary

23   assistance to, you know, a handful of states at the

24   time, but many more afterwards, and therefore the

Page 131

1      A.   So the deaths were so bad, now they hear on

2   the news, you know, that New York City has

3   air-conditioned trailers out there for pandemic.  I

4   can tell you we had those back in 2015.  We had

5   dead bodies that were accumulating at a rate that

6   we could not keep up at the medical examiner's

7   office.

8              So we had to get trailers that were air

9   conditioned, and when we sort of figure out what --

10  how do we say that, so we can keep the gracefulness

11  of dead bodies.  So we -- you know, we developed

12  names, mobile units, blank lines so that when we

13  explained to the public how we are doing it, we are

14  speaking in a graceful way so it doesn't look like

15  we are disrespecting the dead.

16             But the fact of the matter was, we were

17  putting bodies in trailers outside because we were

18  so overwhelmed with the number of bodies that were

19  coming in every single day.

20             Now, on one hand, that was happening.

21  That's carnal.

22             The second side of this was, you know,

23  our medical examiner offices inside Charleston had

24  bullet holes in it.  So that was the other

 1            When that diversion started to happen,

 2     and it became a norm in the community - meaning

 3     your children or grandchildren or other people;

 4     they were there, they got it - friends and

 5     families, then that caused those people to become

 6     addicted to these medications.

 7            When that happened, then that diversion

 8     led for those people to find ways to get those

 9     prescriptions.  So they would then figure out all

10     of the inappropriate prescribing began or continued

11     and really got voluminous at that point.

12            So what then happens was:  These people

13     were pushing through doctor shopping; they were

14     pushing through -- come out of the woodwork in so

15     many ways.  There were lost prescriptions, you

16     know, getting and stealing from anywhere they can

17     steal from, and that just drove the volume -- that

18     continued to drive the volume.

19            And that volume continued to get

20     diverted.  So we got to a point where the

21     significant percentage of that volume that was

22     coming out was inappropriate, and the -- it

23     basically -- you know, the appropriate volume that

24     was appropriate at one point just dwarfed in front

1   of the extremely high amount of inappropriate

2   volume, which is actually going towards diversion

3   in all of these cases literally, and that as a

4   result of that, the only way to get out of that was

5   to die.

6           So once you have addiction and we --

7   there were no -- an adequate amount of treatment

8   facilities, because that hasn't been identified as

9   an issue at the time, and the way you could get out

10  of addiction is by dying, by overdose and dying.

11          So that was the -- that was what was

12  happening at the time.

13  Q.  All right.  Let's talk a little bit about

14  addiction.  So how do you define "addiction"?

15  What's your working definition?

16  A.  So the way these medications -- I can just

17  broadly first of all say addiction is a process

18  that can be physical or physiological in nature

19  where your body gets used to whatever that

20  substance is and wants to have it -- desires it a

21  lot more.

22          Now, it can result in both a physical

23  addiction as well as a psychological addiction,

24  either or both.

Page 152

1            Speaking of the opioids in specific,

2     when we take opioids, we have this very basic

3     foundational understanding of the brain.  There's

4     our inner brain or the fundamental places of the

5     brain, you know, there's stimulus that allow us to

6     survive.

7            What that means -- what I mean by that

8     is it exists in all animals.  You -- you feel

9     hungry, there's a reason you eat, because when you

10    eat, you feel good.

11           The reason you feel good is that

12    there's a release of this chemical called Dopamine.

13    So same way, when you're thirsty, you drink.  The

14    result of that drinking water is that your Dopamine

15    gets released and tells you -- that's a positive

16    reinforcement for you.

17           Same way with sexual activity.  So

18    there are a few things that are important to our

19    survival as human beings, or any animal.  The way

20    we get rewarded, the reward system, is by this

21    Dopamine release and it makes us feel good.

22           Now, these medications, seem to work

23    similarly.  But what they do is basically they

24    hijack that system.  And so in that hijacking, that

Page 153

1    inner brain that is causing the release of

2    Dopamine --

3                Initially the morphine - actually, or

4    opioid of any type - makes you release that

5    Dopamine, and you feel good.

6                After a while, it doesn't work as well.

7    And then you start to require an escalation of the

8    dose.  And so basically that inner brain, if it

9    doesn't get that, it asks your outer brain in some

10   way - it's a prefrontal cortex - to do things, to

11   change its behavior in ways in order to seek that

12   drug to supply it.

13               So after a while, it's not just about

14   getting high; it's actually about surviving and not

15   getting withdrawal symptoms.  So typically, if you

16   don't do it, the inner brain is going to punish

17   you.

18               And a person is fearful of that

19   punishment, so that inner brain sends messages to

20   the outer brain to say, "Hey, I need you to go and

21   engage in activity" - whether that's stealing,

22   prostitution, other aspects - "in order to feed me

23   the habit to continue with the drugs."

24               And that's why when we say it isn't an

Page 154

1   addiction, it's a disease, it's not a will -- it's

2   not something that people can will to do.  Maybe it

3   was a will the first couple of times; but

4   afterwards, it's not.  It truly is a disease,

5   because that inner brain basically hijacks the rest

6   of your brain and the rest of your body.

7        Q.   All right.  So is it fair to say - and you

8   tell me if I'm wrong about this - that when people

9   become addicted; when they're not able to get what

10  they can to fill the addiction that they -- the

11  brain tells them, "Go out and do anything you can

12  to fill that need."

13       A.   Yes.

14       Q.   And does that, in your opinion -- or do you

15  have an opinion whether that leads to things like

16  diversion and further abuse of drugs and adverse

17  consequences of addiction?

18       A.   So at that point, that person is not in

19  control of themselves.  Their inner brain has

20  hijacked the entire body.  At that point, this

21  monster inside is telling them to seek opioids in

22  one form, shape or other.

23            Whether it's for them to divert the

24  prescription pills; it's for them to fake a

Page 161

1    the monster is off their head.

2              "Now when I go to my family, I can

3    actually have a conversation and remember it with

4    my family.  I can start to feel feelings.  I feel

5    I've come back from death.  I can watch television,

6    I can remember and I can understand what's

7    happening."

8              So that piece -- it allows these

9    medications allow you not to worry about just

10   seeking your next fix; it allows you to actually

11   get a job, have a purpose in life, rebuild your

12   community, rebuild your family and actually be able

13   to function.

14      Q.   All right.  So turning back to the

15   evolution of this opioid problem in West Virginia,

16   did you at some point see an evolution, a change,

17   from opioids to heroin?

18      A.   As I came in as the Commissioner in 2015, I

19   think that evolution was occurring.  I think we

20   were starting to see some of the laws that had been

21   taking place in 2012-2013 -- certainly Governor

22   Tomblin had initiated the Governor's Advisory

23   Committee on Substance Abuse and some of the

24   results were happening.

Page 162

1              So we had a sliver of hope at the time

2    that, "Listen, I think we're starting to see a

3    light at the end of the tunnel" in the sense that,

4    look, we're seeing slight reductions, and that's in

5    the presentation you saw where I showed from 2015

6    to 2016, we went down 15 percent.

7              So we were becoming very hopeful that

8    now perhaps the deaths will follow, meaning

9    reduction in deaths and suffering and other things.

10        Q.   I'm sorry, you said reduction -- reduction

11   in --

12        A.   Reduction in deaths.

13        Q.   I'm sorry, you said you saw a slight

14   reduction --

15        A.   Reduction in prescriptions.  So we started

16   to see from 2015 to 2016, about a 15 to 20 percent

17   reduction in opioid prescriptions.

18        Q.   Okay.

19        A.   And then we were hopeful that we would

20   start to see a reduction in deaths.  But we didn't.

21   And then we started to search that why that we're

22   seeing reduction in prescribing but we're not

23   seeing reduction in the deaths from overdose; we're

24   not seeing significant reduction in the substances

Page 163

 1   of overdose people when they died.

 2              And one of the elements that was

 3   happening at the time that, again, now it's easier

 4   -- a little bit more easier to recognize, is that

 5   every time law enforcement would go and do a drug

 6   bust of the bad docs, those people would end up on

 7   the street that once were addicted to medication --

 8   prescription medications, now would have to find --

 9   seek and find an alternative, and they would go to

10   the street.

11              And then they started to use IV drugs,

12   heroin.  That was not the only reason it was

13   happening.  It was also because the supply of

14   prescription drugs from a diversion standpoint was

15   drying up a little bit.

16              So as the diverted drugs - opioid

17   prescription drugs - were drying up, then people

18   still needed that fix, as I explained the addiction

19   pathway.  That doesn't solve the problem.  We were

20   too naive to think just reducing the prescription

21   -- diversions would just cure the problem.

22              And what actually happened is the

23   opioid crisis began to evolve -- evolve into a

24   second crisis, which would then started to become

Page 164

1    this heroin crisis.  As we were dealing with that

2    current crisis within the first, a third crisis,

3    which is --

4              You know, everyone asking -- you know,

5    wanting to make most profit from its product, and

6    we saw the -- this happen, the phenomenon happen,

7    with -- where people were dealing heroin, frankly.

8    So they found -- they realized that they could get

9    a bigger profit if they were -- if they could cut

10   their heroin with another substance that could

11   still give the high or give the need that needs to

12   be fed to the people.

13             That was called fentanyl.  It was a

14   clandestine lab-produced fentanyl that's about 50

15   to 100 times more potent than morphine.  So they

16   would -- they began to cut the heroin with this

17   substance on the street.

18             The problem that became for people who

19   are addicted is:  A, they wouldn't know that; the

20   second, B, every time they inject themselves, not

21   only are they risking HIV or hepatitis or what have

22   you, but they're also basically playing Russian

23   roulette with their life, because they wouldn't

24   know if this is the time they were going to die/

Page 165

1    overdose.

2            This stuff was so potent that some of

3    our law enforcement officials, sometimes they

4    happened to inhale or touch it and they would be

5    overdosed.

6            So I saw a lot of people who had

7    addiction, they didn't want to die.  Neither did

8    the drug dealers want them to die.  So what they

9    started to do, as a cry out for help, they would

10   actually go to restaurants, they would go to gas

11   stations, they would go to malls in the bathrooms

12   and inject themselves just so they could be found

13   if they played the Russian roulette and the gun got

14   fired.

15           So we started to find dead bodies in

16   those places as a result of that.  So that's the

17   evolution.  That's when I came into the office and

18   I was seeing on literally on a daily basis.

19       Q.   So do you have an opinion based upon

20   everything you've done in your work in West

21   Virginia and your background, training and

22   experience as to whether or not the abuse of

23   heroin, fentanyl, methamphetamines and these

24   cocktail drugs that you saw in the 2014 to 2018

 1   time frame was a -- was caused by the original

 2   opioid volume that you saw that resulted in these

 3   addicted people.

 4       A.   So for a majority of them.  There would

 5   always be a small portion of people who will have

 6   and seek, you know, various forms of addictive

 7   substances.  That's been true for civilizations

 8   over time.

 9             But for the majority of them, there's

10   no doubt in my mind that there's a direct

11   correlation between the diverted prescription pills

12   and its evolution into street drugs in terms of

13   heroin, fentanyl, meth, you name it.

14       Q.   And when you say "a majority," are you able

15   to quantify that any further in terms of if you

16   take 100 percent as total, were you able to

17   quantify it any more specific than that?

18       A.   When I say "majority," I'm really talking

19   about 80 to 90 percent of the population that

20   actually suffered through this.  Because if you go

21   back and look at the overdose death rate numbers,

22   prior to this epidemic, it would be like that,

23   Counsel, to get that -- that's where I would go

24   back.

Page 167

1          A small amount of people -- certainly

2     those, the noninvolved people - that would be a

3     general baseline - do not tend to be generally also

4     the population that dies.  They tend to be people

5     that would use one form of drug or the others - a

6     tiny population, proportion - that has existed, as

7     I said, through civilization, hundreds of years,

8     thousands of years.

9               But that is minuscule as compared to

10    what we're dealing with today.

11       Q.   And in terms of overdose deaths, you do

12    have knowledge from your work as to the number of

13    overdose deaths -- overdose deaths in West Virginia

14    from, let's say, 2004 until 2018 when you left.  Is

15    that true?

16       A.   Yes.  I mean, I'm trying to recall the -- I

17    mean, I can recall that in 2017, we finally passed

18    the 1,000 number, which was not only the -- one of

19    the highest rates ever, but it was consistently

20    about 33 percent higher than the second state --

21    and the second state varied.  Sometimes it was New

22    Hampshire, sometimes it was Ohio, sometimes it was

23    Pennsylvania.

24               But we could -- what didn't change was:

1  We were high and there's a bunch of lots of states,

2  and then it was the next state in line.

3      Q.   And do you have an opinion as to whether

4  the increase in overdose deaths West Virginia saw

5  during that time was caused by the large volume of

6  opioid pills that originally was deposited or

7  delivered to West Virginia?

8      A.   I think there's no doubt for that.

9      Q.   Now, are NAS babies a causative issue in

10  terms of the opioid epidemic?

11      A.   Yes.

12      Q.   So what is an NAS baby?

13      A.   So NAS stands for neonatal abstinence

14  syndrome, also sometimes called NOWS, or neonatal

15  opioid withdrawal syndrome.  We try to

16  differentiate between opioids and other substances.

17          But in essence, it's a -- it's a

18  syndrome, it's a set of symptoms that could happen

19  in a baby as soon as they're born to a few hours or

20  days afterwards.

21          Those symptoms could include incessant

22  crying, not being able to be fed, being over

23  irritable.  They can have seizures.  They can have

24  diarrhea.

Page 169

1            And unfortunately, in the early part

2    especially of the crisis, they could die.  It is --

3    we saw that it was directly linked, and here's why:

4    As we saw the total amount of diverted drugs

5    increase, we also saw a similar increase in the

6    number of pregnant women that were taking these

7    diverted drugs.

8            The pregnant women are still part of

9    the same community, part of the same population.

10   They're no different.  So it would be an

11   extraordinary thing to think that they would behave

12   differently.

13           As they were also taking -- at one

14   point, one in four pregnant women were taking some

15   of these diverted medications.  As they do, they

16   become addicted, and as they develop the addiction,

17   and continue to feed their addiction, so is the

18   baby getting the same medications through the

19   placenta while the baby is in the womb.

20           So the baby's brain, now imagine, is

21   also being fed through the same mechanism.  This

22   developing new life inside the womb is also getting

23   the same line of feeding of opioids through the

24   bloodstream of the mother.

Page 170

1          So its brain is also -- not only not as

2     -- it's not -- it's supposed to be developing right

3     when it's not only -- we don't know a lot about how

4     it develops in the presence of opioids, but it's

5     developing the same time as being confounded by

6     these opioids.

7          So as the cord gets cut, meaning the

8     placenta gets cut and the baby gets delivered, that

9     baby goes into withdrawals.  It's literally the

10    equivalent of a withdrawal.  We know that because

11    we treat the withdrawals by various mechanisms, but

12    one of the mechanisms -- the pharmaceutical

13    mechanism to treat it, is through morphine.  Giving

14    the baby morphine.

15         I mean, it's one of the last resorts,

16    but that's one of the ways we do it.  So what we

17    don't know about neonatal abstinence syndrome yet -

18    because there's a lot of work going on - is:  These

19    are the immediate side effects.

20         We have also seen some associations

21    with birth defects, like heart defects, gastric

22    defects.  We also have had some literature that

23    shows there's defects in hearing, vision, other

24    aspects.

1          Now, when I was speaking to schools,

2   officials, teachers, parents, oftentimes they would

3   tell me that in 2015, some of those babies that

4   were born in 2006, '07 would be then eight, nine,

5   ten years old and they're getting to a point and

6   they're --

7          What is happening to the babies now is:

8   These teachers would tell me that "We have these

9   kids," it's called -- you know, opioid babies, they

10  are now being -- "they are not able to control

11  their impulse.  They're not able to keep attention.

12  So they're having some version of attention deficit

13  disorder; they're having impulse control issues."

14          So because that's a problem and

15  teachers' job is to teach, they were referring to

16  the parents -- if there were parents.  Because in

17  often cases, these kids got moved around three,

18  four, five times a year in the school system.

19          And they were often within foster care

20  or the care of grandparents or great-grandparents

21  at times.  But then they ultimately end up in the

22  doctor's office, at a pediatrician, and the

23  pediatrician would diagnose them oftentimes -

24  erroneously or let's just say through symptoms -

1   with ADD, and guess what happens then?

2              These kids get prescribed another

3   addictive potential drug called Adderall.

4              So then we basically -- we already know

5   that kids who are born with NAS have a high

6   predilection to get -- to become addicted in the

7   future.  And now through the system, we're actually

8   providing them the same drugs that they actually

9   have a further habit with.

10             So we're actually setting up these kids

11  to fail in life, and this is a huge problem in West

12  Virginia.  We're talking about 5 percent of the

13  entire population.  It's a huge number.  And then a

14  higher percentage perhaps in Cabell County and

15  Huntington.

16             So all these kids -- we don't even know

17  what the long-term consequences will be.  Will they

18  be able to adjust in society?  Will they be able to

19  have sustained social interaction and enjoy life

20  the same way as others?  We don't know that.

21             But we do know that there are some

22  short and long-term consequences of NAS.

23      Q.   Has anybody tried to -- you or anybody you

24  know tried to quantify the cost of the effects of

Page 176

```
 1   earth that you will find, warm people wanting to
 2   chip in and help give you, you know, a shirt from
 3   their back, if they can.  If they're wearing a
 4   shirt --
 5             And they was -- everybody was in as a
 6   team, had the best intentions with limited
 7   resources, and we were struggling every day to help
 8   do everything within the power of our state as well
 9   as individuals, their capacity, to find those
10   solutions.
11             So we did everything possible.  We left
12   no corner unturned in order to find solutions.  But
13   once again, this seemed to have fallen short in our
14   expectations each time, because it's very difficult
15   - and very inefficient, to be honest - to provide
16   and spend that amount of money when this can be and
17   could have been prevented upstream.
18        Q.   Okay.  Now, you talk about -- a little bit
19   about this transition from opioids to heroin, and
20   what I'd like to do is ask you some more questions
21   about that.  In terms of heroin in connection with
22   the opioids, is there some chemical somewhere --
23   why would people take heroin as opposed to opioids?
24        A.   Well, basically heroin -- when you take
```

Page 177

1  street heroin, it breaks down into two compounds

2  and both are active, and one of those is morphine.

3  So heroin is basically nothing but a form of

4  morphine.  It is the same chemical release.

5  They're all related.  They work through the same

6  receptors, and the body cannot tell one from the

7  other.

8           And so chemically speaking, you know,

9  you could have synthetic opioids; you could have

10 semi-synthetic; you could have natural opioids.

11 But to the body that needs to feed the need, it's

12 the same compound.

13          And so chemically speaking, what you

14 write in the prescription pills, again it's the

15 same feed -- the feeding mechanism is the brain.

16 It does not discriminate.

17    Q.   Right.  So it's your opinion that heroin --

18 if someone went to heroin, that would satisfy the

19 need created by an opioid addiction?

20    A.   Absolutely.

21    Q.   All right.  In terms of the number of

22 opioid addicts that transitioned to heroin, is

23 there any way for us to quantify in terms of the

24 total number of people that would be moving to

Page 182

```
 1      Q.   Doctor Gupta, this is Anne Kearse with the
 2   City of Huntington and Cabell County as well.  I
 3   only want to follow up with a couple of things that
 4   I believe you testified about today and just make
 5   sure I've got the documents or the reports that you
 6   issued correct.
 7             MS. KEARSE:  Monique, can you pull up
 8   the first -- August 17, 2017 document?  And I'll
 9   mark this as, I guess, Plaintiff's No. 1 for the
10   purposes of this deposition.
11             PLAINTIFF'S EXHIBIT NO. 1
12                ("West Virginia Drug Overdose Deaths
13                 Historical Overview dated August 17,
14                 2017 was marked for identification
15                 purposes as Plaintiff's Exhibit No.
16                 1.)
17      Q.   Doctor Gupta, you testified today about  an
18   historical overview since 2001 to 2015 of drug
19   overdose deaths.  Is that correct?
20      A.   It's, I believe, 2000 to -- yeah, yeah,
21   that's -- thank you for that.  Yes.
22      Q.   Okay.  And that's -- and that's what -- I
23   just wanted to make sure for the record that
24   this --
```

Page 183

1          MS. KEARSE:  Monique, wait a second,

2     please.

3      Q.   -- that this document, cover page "West

4     Virginia Drug Overdoes Deaths Historical Overview

5     2001-2015" is a report that you were referring to

6     today.  Is that correct?

7      A.   That's correct.

8          MS. KEARSE:  And Monique, if you'll go

9     to the second page, just for the record.

10     Q.   This is a report that obviously your name

11     is on there, Doctor Gupta, as the Commissioner for

12     the Bureau of Public Health, the State Health

13     Officer.  Is that correct?

14     A.   That's correct.

15     Q.   And you were involved not only in working

16     on the analysis and reported here of this, but you

17     were doing this in the capacity of your role as

18     Commissioner of the Bureau for Public Health.  Is

19     that correct?

20     A.   Yes, I ordered the commission of this

21     report.

22          PLAINTIFF'S EXHIBIT NO. 2

23          ("2016 West Virginia Overdose Fatality

24          Analysis" was marked for

Page 184

1              identification purposes as Plaintiff's
2              Exhibit No. 2.)
3      Q.   And then Doctor Gupta, I believe also
4    Plaintiff's No. 2, in your capacity as the
5    Commissioner for the Bureau of Public Health, state
6    of West Virginia, I believe you also testified
7    about a 2016 overdose fatality analysis?
8      A.   Yes, and I have submitted that, I believe,
9    as part of the documents that I was requested to
10   provide.
11     Q.   Okay.
12              MS. KEARSE:  And just for the record,
13   Plaintiff's Exhibit No. 2, is this the report and
14   analysis that you were referring to in your
15   testimony earlier today titled "2016 West Virginia
16   Overdose Fatality Analysis"?
17     A.   Yes.
18              MS. KEARSE:  And Monique, if you'll go
19   to page No. 2 on that.
20     Q.   And that's also -- you appear on that as
21   the Commissioner for the Bureau of Public Health;
22   is that correct?
23     A.   Yes.
24     Q.   And in your -- both of these reports, these

1      A.    I cannot be as certain of that - I can make

2   an assumption - but if there were any fraudulent

3   prescriptions, I could not -- I could not tell you

4   in a verified way.

5      Q.    So as far as assuming that the

6   prescriptions were written by prescribers and did

7   not include fraudulent prescribe -- prescriptions,

8   were the prescribers -- they would have been

9   licensed by the state of Virginia, correct?

10             MR. COLANTONIO:   Object to the form of

11   the question.

12      A.    It is possible, plausible, but not for

13   sure.  And the reason I say that is because what I

14   -- we found was that those decedents who went to

15   three or more pharmacies -- four or more

16   pharmacies, were 70 times -- I'm sorry, were 70

17   times more likely to have died.

18             What that means is -- so let me repeat

19   that.  So it says here, the decedents that were

20   more -- 70 more times likely to have a prescription

21   as four more pharmacies that died.

22             What that means is because we were

23   sharing data with CSMP with cross border states,

24   some could have obtained it in doctor shopping,

 1    to stand on.  It's in the context of an opioid

 2    crisis that has transitioned now killing West

 3    Virginians from opioid prescription drugs to heroin

 4    to cocaine, and we've established that as we went

 5    through.

 6              And now to take that out of context and

 7    to act like opioid prescriptions have nothing to do

 8    with it is unfair and not really in context, so I

 9    take offense to that fact that we're taking pieces

10    and trying to cobble those together instead of

11    actually allowing a fair opportunity to be

12    explaining what actually happened in West Virginia.

13              So I -- that's the piece that I think

14    that is unfair.

15        Q.   Has alcohol use disorder been a long-term

16    -- long-standing challenge in West Virginia?

17        A.   Yes, an alcohol disorder within -- which I

18    will discuss as a very different challenge in many

19    of the states, and we've already talked about today

20    earlier how there will be always a level of

21    population where there will be addictive behaviors.

22              So now to take that out wouldn't be

23    fair because alcohol -- alcoholism and alcohol

24    challenge did not rise by thousands of percent over

Page 325

1    a decade.  Opiate prescription drugs and volume of
2    that did rise.
3              Alcohol did not contribute to killing
4    West Virginians in this way.  Opioid drugs did.  So
5    it would not be fair to blame alcohol for the sins
6    of the volumes that have called West Virginians.
7        Q.   And just to be clear, Doctor, I'm not
8    trying to do that.  I'm just trying to understand
9    the prevalence of alcohol use disorder in West
10   Virginia.  Would you agree --
11       A.   But you -- sorry.  If you are wanting to do
12   that, then we would be sharing data from CDC, from
13   behavior risk to factors surveyed on the prevalence
14   of binge drinking.  We would be in a way different
15   area right now than what we are doing picking and
16   choosing pieces to cobble together.
17             This is not the type or the veracity of
18   data, I'm -- you know, you can look up and you can
19   see the West Virginia alcohol use data.  I have the
20   surveys of those, and I can tell you this is not
21   where you go to look for that data.
22       Q.   So to be clear, you are not sure about the
23   accuracy of the data that is represented in this
24   publication that was published by the West Virginia

Ex D – Deposition Excerpts of Michael Kilkenny, M.D., dated 07/21/2020

Plaintiffs' Supplemental Federal Rule Civil Procedure 26(a)(2)(C) Disclosures

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3
 4    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 5    THE CITY OF HUNTINGTON,
 6              Plaintiff,
 7    vs.                                    CIVIL ACTION
                                             NO. 3:17-01362
 8    AMERISOURCEBERGEN DRUG
      CORPORATION, et al.,
 9
               Defendants.
10

11    _____

      CABELL COUNTY COMMISSION,
12
               Plaintiff,
13
      vs.                                    CIVIL ACTION
14                                           NO. 3:17-01665
      AMERISOURCEBERGEN DRUG
15    CORPORATION, et al.,
16              Defendants.
17    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
18
19
               Videotaped and videoconference deposition of
20    DR. MICHAEL KILKENNY taken by the Defendants under the
      Federal Rules of Civil Procedure in the above-entitled
21    action, pursuant to notice, before Teresa L. Harvey, a
      West Virginia notary public and Registered Diplomate
22    Reporter, the witness appearing via videoconference from
      Charleston, West Virginia, on the 21st day of July,
23    2020.
24
```

Page 74

1  to that.
2      Q.  How about at present?  At present day, which
3  poses a bigger problem?
4      A.  Which -- I suppose it depends on what you're
5  calling a problem.  The driver for -- for systemic and
6  deep tissue infections, or HIV risk, or hepatitis C
7  risk, or overdose deaths would be injection drug use.
8      Q.  Okay.  Just as a relative percentage of the
9  clients you serve or the people you interact with, what
10  percentage of people at present — you know, ballpark —
11  have their primary drug of choice as an oral opioid
12  versus an injectable opioid like heroin?
13      A.  That's a good question.  I might ask that to
14  be more specific, but perhaps my concepts of that might
15  be more specific than your concepts of it.
16      Q.  Well, give me -- give me your concepts, and
17  then later in the deposition maybe we'll look at a few
18  documents, some surveys where people report their
19  primary drug of choice.  But if you can just give it to
20  me broadly in your concepts, I'd be curious to hear it.
21      A.  In my concepts, I deal almost exclusively with
22  injection drug users.  And I know that the injection
23  drug users use oral and injection drugs.  And I have
24  some knowledge of general classes of that use, but I

Page 75

1  don't -- I don't have any great focus on oral drug use.
2      Q.  Why do you have no great focus on oral drug
3  use?  Why is that the case?
4      A.  My focus is on preventing the complications of
5  injection drug use.
6      Q.  Is there anybody at the health department that
7  has their primary focus on oral drug use?
8      A.  We have a general focus on oral drug use as a
9  relationship to injection drug use, but no, we don't
10  focus on the oral drug use.
11      Q.  And what is your understanding of the
12  relationship between oral drug use and injection drug
13  use?
14      A.  It is my understanding that the vast majority
15  of people who are injection drug users started as oral
16  drug users.
17      Q.  What is the basis for that understanding?
18      A.  That would be direct interview among people
19  who inject drugs.
20      Q.  Is there anyplace where you -- or the health
21  department saves or stores that information?  And I'll
22  just represent to you, because I've not seen it.  What I
23  have seen with the Harm Reduction Program is you don't
24  use names, so there's not a lot of individual data

Page 76

1  tracked.  And I never saw in some of that data you track
2  looking at whether somebody was a previous opioid user.
3  So do you know if there's any reports you guys have or
4  any datasets that would house the information that you
5  just described?
6      A.  We have information from interview on when
7  people started using drugs and when people started
8  injecting drugs, and that is -- and so we know that
9  interval.
10      Q.  Do you -- do you document these interviews
11  anywhere, compile that broader set of data from the
12  interviews, to come up with certain percentages or
13  anything like that?  Or are you just referencing sort of
14  informal communications that you know about when folks
15  come in, say, to your Harm Reduction Program, needle
16  exchanges?
17      A.  No.  We have some of that information based on
18  a survey that we have used, what we would consider an
19  intake data sheet, among our Harm Reduction Program
20  participants.  But we also have data from -- that's been
21  published with some regard to that, probably not as
22  specific as the date of first use and the delay to the
23  injection.  That might be in one of our publications.
24      Q.  Okay.  Do you know, to the best of your

Page 77

1  ability, the name of -- you mentioned intake data
2  sheets -- the name of a document -- like if I needed to
3  find the document that shows what you were just
4  describing, the questionnaires or the surveys where
5  folks are asked about current IV drug users or asked
6  about previous opioid use?
7          Do you know the name of that sort of
8  report or document?
9      A.  You should probably have the -- the intake
10  documents.  I would -- I would think that you would have
11  the Harm Reduction intake forms.
12      Q.  So it would have to be for each individual
13  person who came in, like each individual intake form
14  would have that information?  Or is that aggregated into
15  a broader report that covers various folks, like all
16  comers, I guess?
17      A.  You're asking me -- my mind is -- because I
18  don't have a specific knowledge of the individual
19  questions like I used to, but I know that we -- another
20  place you would find that data reported, there was a --
21  there were two reports put out, probably one in 2016 and
22  one in 2017, summarizing that data.  And they were
23  presented to the Board of Health, so they would be
24  public, and they include -- I'm pretty sure they include

20 (Pages 74 - 77)

Page 90

1 regulations governing distributors?
2    A.  I came to have some understanding of the
3 regulations during the 2015 to 2017-18 type of time
4 frame.  I did not have an understanding -- I would say
5 I didn't have that understanding prior to 2015, at the
6 distributor level.
7          Now, I was aware of places that were
8 operating that were prescribing, I would say, probably
9 too liberally to be legitimate, and that some pharmacies
10 were distributing that, and that there were
11 arrangements.
12    Q.  Do you know the names of any of the particular
13 places of business or pharmacies, any details you can
14 add about who those may have been and when they
15 operated?
16    A.  I am aware of -- I'm not sure whether I should
17 say I have firsthand knowledge.  I have observational
18 knowledge, and these sites have been named and
19 prosecuted.
20    Q.  Do you recall the names of the sites?
21    A.  Well, the most particular one that I can
22 recall is the Justice Medical Center in Kermit, West
23 Virginia.  And the pharmacy, it was my understanding
24 they had a relationship with them to fill those

Page 91

1 prescriptions.
2    Q.  How far is Kermit from Cabell County?  I
3 should probably know, but I don't.
4    A.  I'd say, when I drove it, it was 55 miles.  I
5 think I'm remembering that.  Well, that was -- that was
6 to Credo.  It may be a little bit more to Huntington.
7 Sixty miles.
8    Q.  Okay.  Do you have any basis to believe that
9 pills dispensed from the pharmacy that was servicing
10 Justice Medical Center ended up back in Cabell County or
11 Huntington?
12    A.  I have no firsthand knowledge of that.
13    Q.  Does the Cabell-Huntington Health Department
14 have any access to the Controlled Substance Monitoring
15 Program in West Virginia to track opioid use trends over
16 time?
17    A.  At the -- at the population level, we do not.
18    Q.  I just want to ask about some risks of opioid
19 medications and focusing on the time when you graduated
20 medical school.  Were you aware that opioids carry with
21 them the risk of abuse?
22    A.  Yes.
23    Q.  Were you aware at the time you graduated
24 medical school that opioids carried with them the risk

Page 92

1 of physical dependence?
2    A.  Yes.
3    Q.  Were you aware at that time that opioids
4 carried with them the risk of psychological addiction?
5    A.  Yes.
6    Q.  When you first prescribed an opioid
7 medication, were you aware that this medication had a
8 potential to be addictive?
9    A.  Yes.
10    Q.  Were you taught in medical school that opioids
11 had the propensity to be addictive?
12    A.  Yes.
13    Q.  There are -- let me just ask a little bit more
14 about your opioid prescribing.  Do you know when the
15 last time you prescribed an opioid was?  Even roughly.
16    A.  Did you ask a question?
17    Q.  Yeah.  I'm sorry.  Do you know when the last
18 time you prescribed an opioid was?
19    A.  Oh, I'm sorry.  That would probably have been
20 2015.
21    Q.  Okay.  And how often in 2015 did you prescribe
22 opioids?  Was it a common class of medication you
23 prescribed?  Infrequent?  How would you characterize
24 your prescribing?

Page 93

1    A.  I would call it -- well, it was less than half
2 the time, but certainly less frequent.
3    Q.  Did you say it was frequent?
4    A.  I probably wrote a prescription every day, but
5 not to the majority of my patients.
6    Q.  Understood.  What opioid medications were you
7 prescribing in 2015?
8    A.  In 2015, we were prescribing -- we were
9 prescribing oxycodone, usually as Percocet.  We were
10 prescribing hydrocodone, codeine.  I think that Darvocet
11 -- I think Darvocet was off the market by then.
12    Q.  How about any extended-release opioids like
13 OxyContin or one of those -- one of those
14 not-immediate-release variants?
15    A.  Say again.
16    Q.  Sure.
17    A.  Long acting?
18    Q.  Correct.
19    A.  Yes.  Okay.  Yeah.  I was -- I was also a
20 hospice provider in 20 -- I'm not sure exactly when that
21 contract ended.  It might have been early 2015.  But
22 certainly 2014, I was prescribing long-acting morphine,
23 long-acting oxycodone, and even methadone.
24    Q.  How about outside of the hospice setting, in

24 (Pages 90 - 93)

Page 98

1    A.  -- I think that's probably consistent with the
2  late '90s.
3    Q.   The marketing you just described, what -- what
4  group or what sorts of entities were responsible for
5  that marketing?
6    A.   Well, my only experience with that would have
7  been the OxyContin marketing that was occurring.
8    Q.   So marketing by a pharmaceutical company; is
9  that fair?
10   A.   That's correct.
11   Q.   And what was the result of the marketing, as
12 you saw it in your own experience?
13   A.   I think that we saw direct increases in
14 prescribing, and we certainly began to doubt our
15 understanding of the condition of addiction, and we
16 began to reassess that, but I'm not sure we reassessed
17 it properly.
18   Q.   So in -- describe that to me, what you mean by
19 "we began to doubt."  What sorts of doubts did you have
20 and when did the doubts creep in?  Just explain that a
21 bit more, if you can.
22   A.   I think that we understood -- while we would
23 have disputed pain as a vital sign, we would recognize
24 that pain was a driver in seeking medical care and that

Page 99

1  it was under-treated or underappreciated by the
2  providers.  So I began -- I think that we began to look
3  at things differently, and that would be a positive
4  outcome.  The negative would be, and this would be from
5  my own experience, in beginning to doubt the training
6  that I received that this drug was addictive, then
7  believing what has probably been proven to be a faulty
8  conclusion from research, underestimating the addictive
9  nature of this class of drugs.  And when we
10 underestimated its addictiveness, we made an error.
11   Q.   And the "we" in that is prescribers in
12 general?
13   A.   Yes.  I'm speaking certainly for myself, but
14 other like-minded physicians that drew those
15 conclusions.
16   Q.   And those conclusions you just described in
17 that answer about doubting what you had learned
18 previously about the addictive nature of the drugs, and
19 that these drugs could be used more broadly, did any
20 distributor -- any of the defendants in this case play
21 any role in changing the way you viewed opioid
22 medication when you compare the time you were in medical
23 school to the time you were discussing with the drug
24 reps coming in and providing the different messaging

Page 100

1  about the drugs?
2    A.   I'm not familiar with the role of distributors
3  in that so I -- I have no firsthand knowledge of any
4  distributor being involved in that.
5    Q.   Do you have any knowledge of heroin use within
6  Cabell County dating back prior to your tenure with the
7  department?
8         And what I'm trying to get at is, you
9  know, for example, New York City, there's a major heroin
10 problem in the '60s and '70s.  Millions of people using
11 heroin.  Do you know if there is any historical heroin
12 use in Cabell County that happened before the current
13 issue with heroin that's part of this current opioid
14 epidemic?
15   A.   Yes, I do know that it was used and that --
16 and I know that from treating people with complications
17 of its use dating back into the 1980s.
18   Q.   Do you know at what levels heroin -- excuse
19 me, heroin was used in the 1980s compared to present
20 day?
21   A.   I do not.
22   Q.   Do you know whether there was a time period
23 where the heroin use from the '80s subsided and it was
24 no longer an issue?

Page 101

1    A.   If you're talking about Cabell County, I don't
2  know.
3    Q.   So was there always some period of heroin use
4  in Cabell County?  Well, let me back up.
5         OxyContin, the medication you described
6  of folks coming in to detail you about it in the 1990s,
7  wasn't on the market in 1980.  Is that correct?
8    A.   That's correct.
9    Q.   But there was still some underlying problem
10 with heroin use in Cabell County, despite the absence of
11 OxyContin.  Is that correct?
12   A.   There was heroin use.  There was injection
13 drug use prior to OxyContin.
14   Q.   And do you know if there was any cyclical
15 nature in that intravenous drug use, whether there was a
16 period of time where the rate was higher or it dipped
17 down and got better, anything like that, historically
18 speaking, prior to OxyContin?
19   A.   I don't know any data from Cabell County that,
20 you know, gives an indication of that.  But there has
21 been national data published, and I believe that's what
22 you're speaking about.
23   Q.   Yeah, well, do you know what that national
24 data says about the rates of heroin use over time, even

26 (Pages 98 - 101)

Page 102

1 dating back prior to OxyContin's introduction to the
2 market?
3    A.   I do believe that it has cyclical
4 characteristics, but I can't cite them.
5    Q.   And do you know what steps were put into place
6 that put heroin use on a downward trajectory during the
7 time period prior to OxyContin's introduction to the
8 market?
9         What public health interventions took
10 place to tamp down heroin use?
11   A.   Prior to OxyContin, I am aware that harm
12 reduction practices started, probably around the early
13 '90s, or around maybe as far back as the late '80s.
14 That was largely driven by attempts to reduce HIV, I
15 believe.
16   Q.   What are the illegal opioids right now that
17 are contributing in any way to the opioid epidemic
18 within Cabell County?
19   A.   What are the legal opioids?
20   Q.   No, no, no.  Just any opioids.  Any opioids
21 that are contributing in any way to the current problem
22 within Cabell County.
23   A.   I can tell you what we know about the drugs
24 that are being used by the injection drug users in

Page 103

1 Cabell County, to -- at least to some extent, how we --
2 what would you like to know about that?
3    Q.   Sir, I would just like to know what -- what --
4 what drugs are they, in particular?  And I'll just ask
5 you about, in particular, heroin, fentanyl, carfentanil
6 are the three that I was curious about whether you
7 believed they are currently contributing to
8 opioid-related issues in the county?
9    A.   Currently?
10   Q.   Yes.
11   A.   Yeah, I don't know how much carfentanil there
12 is now.  There's still fentanyl.  There's some heroin.
13   Q.   When you say "some heroin," has heroin use
14 declined recently?
15   A.   It's my understanding that it has.  It may be
16 increasing again.  There was a time, probably in 2016,
17 2017, that heroin was difficult to obtain in its pure
18 form.  It was either adulterated with fentanyl, or
19 actually was only fentanyl.  And carfentanil really had
20 its appearance in 2016, and it may still actually -- I
21 actually haven't looked at the -- at the toxicology data
22 on that for 2019.  Although I have gotten a set of it, I
23 haven't looked at it in any great detail.
24   Q.   What -- what steps has your health department

Page 104

1 taken to address illegal fentanyl?
2    A.   Illegal fentanyl?
3    Q.   Yes.
4    A.   We have the Harm Reduction.  We've educated
5 about illegal fentanyl.  We have also put out public
6 education regarding illegal fentanyl.  We have worked
7 pretty diligently to attempt to get -- to encourage
8 people who are using -- well, who are injecting drugs to
9 stop injecting drugs and to receive treatment for their
10 substance use disorder.  We've been very active in that.
11   Q.   And has it been successful?
12   A.   That would be a better question for
13 epidemiologists for a time from now to really fully
14 evaluate that, but I'm going to say yes.
15   Q.   And why do you say yes?  Why do you believe
16 that your intervention has been successful?
17   A.   Well, we're looking at overdose data in
18 particular as an indicator of success, and we see that
19 in Cabell County, from 2015 to 2017, overdose deaths
20 rose, but from 2017 through 2019, they have declined
21 significantly.  And that trend had not been observed in
22 all West Virginia counties.  In particular, there are
23 some other counties that are reasonably similarly sized
24 that do not have the programs in place, and we've seen

Page 105

1 their levels remain constant.
2    Q.   When you say "decline significantly," what
3 does that -- what does that term "significantly" mean?
4    A.   A decrease of 25 to 40 percent.
5    Q.   And this success was achieved prior to, or I
6 guess -- let me back up.  The plan we talked about
7 earlier that you met with attorneys to discuss, the
8 success that the health department had in dealing with
9 fentanyl abuse, that was -- that was done without
10 anything that's in that plan.  Is that fair to say?
11   A.   I think that that's fair to say.  Look, what
12 we planned and what we made, because I served on that
13 committee, is we made -- I'm trying to think of the
14 word.  I blocked on it right now.  I'm sorry to have
15 lost that word.  But in any -- in any epidemic or
16 natural disaster, you have an intervention phase and
17 then you have a -- a rebuilding phase after all the --
18   Q.   The resiliency Plan?
19   A.   The Resiliency Plan.  And you have a
20 resiliency plan that should be created for any event,
21 whether that would be Hurricane Katrina in New Orleans,
22 it would be appropriate for the planners to make a
23 resiliency plan of how you rebuild after that, develop a
24 budget and start making the -- setting up the programs.

27 (Pages 102 - 105)

Page 106

1      So, as we have seen in Cabell County,
2  this decline, which we believe to be the result of a
3  comprehensive set of interventions, including increasing
4  the capacity for treatment of opioid use disorder, Harm
5  Reduction plays a role.  Our naloxone distribution plays
6  a role.  A lot of different agencies played roles in
7  this comprehensive plan.
8      Once we see that numbers are coming down
9  and we perceive that we have dealt with the maximum
10  effects, it's appropriate to build a resiliency plan.
11  And so that's what we built in that -- in that program.
12      Q.  So you said, "When we perceive we've dealt
13  with the maximum effects."
14      Do you believe you're at that point now?
15      A.  Yes, I believe so.
16      Q.  What does that mean, exactly?
17      A.  I think it would be -- I hope to God that we
18  have seen the worst of the overdose deaths.
19      Q.  So you're coming down the slope from overdose
20  deaths; correct?
21      A.  And we are doing that in a sustained fashion
22  consistent with the efforts that we put into it.  So
23  that's why I feel like we're having that effect.  Again,
24  that will be -- as you mentioned earlier, the cyclical

Page 107

1  natures of things, it's easy for people who are involved
2  to overestimate their influence.  Later on, better
3  statistical public health analysis can be undertaken and
4  -- and those root-cause-effect type of issues can be
5  better described.
6      Q.  Have you -- do you know now what the rate of
7  overdose is presently of heroin?
8      A.  I do not.
9      Q.  Do you know how it compares to the rate of
10  overdose prior to the introduction of OxyContin, you
11  know, back in the previous heroin epidemics?
12      A.  I do not.
13      Q.  When did your -- let me ask you this:  Do you
14  believe there is still presently an opioid epidemic
15  within Cabell County?
16      A.  Yes.
17      Q.  So when you said you have reached maximum
18  effect, what does that mean?  Is it -- is it achievable
19  to completely eliminate the opioid epidemic?
20      A.  I'm not sure that we can eliminate the
21  disease, but we can reduce the numbers of cases; we can
22  reduce the harms associated with the -- with the use.
23      Q.  And is that what you're saying, you think
24  we've reached the maximum level of effect you're going

Page 108

1  to have in that department?
2      A.  I probably meant to say that we've reached the
3  maximum harm that it -- the indication of the worst time
4  when the most people were injured and died, we believe
5  that that might be passed.
6      Q.  I understand.  So you view that sort of the
7  worst is behind you, in other words?
8      A.  I hope so.  I thought I saw that before, but
9  ...
10      Q.  When did you think you saw that before?
11      A.  I thought I saw that in early 2016.  That was
12  before fentanyl became the primary drug and carfentanil
13  was introduced.
14      Q.  And fentanyl, carfentanil are more potent than
15  heroin; correct?
16      A.  They are.
17      Q.  And fentanyl and carfentanil were leading to
18  overdoses for people who, you know, would take heroin
19  and then have fentanyl and their respiratory system
20  couldn't deal with it.  Is that -- is that accurate?
21      A.  They died of overdoses at a higher rate
22  because of the more potent, and then also because of
23  shifts that fentanyl is injected more frequently than
24  heroin, and then the introduction of the injection of

Page 109

1  methamphetamine, which can be injected even more
2  frequently than that.
3      More frequent injections leads to more
4  blood-borne pathogen transmission due to needle sharing.
5  So not only overdose deaths but also the increase -- or
6  the outbreak that we had in HIV all associated with
7  injection drug use and tied to changes and the evolution
8  of the opioid epidemic.
9      Q.  We're going to talk about the Resiliency Plan
10  later, but I wanted to follow up on something.  You
11  mentioned that, you know, after a disaster like Katrina,
12  for example, it's appropriate to draft a resiliency
13  plan.  Did you review any other existing resiliency
14  plans before sending out the draft of the plans for
15  Cabell?
16      A.  I reviewed the concepts of it to be included
17  in our Resiliency Plan, but I'm not the author of the
18  Resiliency Plan, so ...
19      Q.  Who is the author?
20      A.  The School of Medicine, the -- I always mess
21  up their name, but Division of Addiction Sciences.  I
22  would say specifically, Dr. Petrany is the author.
23      Q.  Okay.  Up at Marshall?
24      A.  At Marshall University.

28 (Pages 106 - 109)

Page 118

1 contributing factor to the opioid epidemic in Cabell and
2 Huntington?
3    A.  I would say that's true, yes.
4    Q.  How about the existence of pain as the fifth
5 vital sign?  Is that something that you saw increase --
6 lead to an increase in prescribing of opioid
7 medications?
8    A.  I think that's a harder question, but as we
9 look at -- if I'm looking at that from a public health
10 lens and that it would be a policy that increased one
11 thing or decreased another, I would say that it
12 contributed, yes.
13    Q.  Are there any other contributing factors to
14 the opioid epidemic?  Or -- strike that.
15       Is there anything else, any other factors
16 that we haven't discussed, that you believe contributed
17 to the opioid epidemic in Cabell or Huntington, such
18 that you would testify at trial?
19    A.  You can ask me things that I have better
20 firsthand knowledge of.  You did not ask me about any
21 role of the DEA, or the FDA, or oversight issues that I
22 don't have a really good firsthand knowledge of, but one
23 would have to suspect that there are other factors that
24 I really couldn't say I know one way or the other.

Page 119

1    Q.  So, to state it differently, other than what
2 we've discussed already in this deposition, you are not
3 going to testify that there are other factors that
4 contributed to the opioid epidemic in Cabell or
5 Huntington; is that correct?
6    A.  I would have to say that there is the
7 possibilities that someone else would ask me another
8 question that I would -- I would say that there are
9 other factors that we -- that -- I would say that what
10 we have discussed is probably not an exclusive list --
11    Q.  Okay.
12    A.  -- as to factors that contribute.
13    Q.  I'm just trying to get from you what you
14 believe the list is, the exclusive list.  So what other
15 -- you mentioned the DEA.
16    A.  I would not be surprised to learn that -- that
17 oversight and violation of other laws contributed --
18 that a failure of oversight and the violation of the
19 laws regarding distribution contributed.  I am not an
20 expert on that, but I would not be surprised to hear
21 that.
22    Q.  Okay.  So you don't have any firsthand
23 knowledge, for example, of whether or not the
24 distributor defendants in this case engaged in any

Page 120

1 violation of any duty, such that they are a contributing
2 factor to the opioid epidemic?  Is that fair?
3    A.  It would be fair for me to say that I don't
4 have firsthand knowledge of that.  That is not my
5 jurisdiction.
6    Q.  Okay.  Do you recall a period of time or an
7 event, say, in August of 2016 where there were 27 heroin
8 overdoses in four hours in Cabell?
9    A.  You're talking about August 16th?
10    Q.  Eighteenth, I believe, maybe.  Or maybe the
11 article is dated the 18th.  Let me pull it up.  I'll
12 pull it up as an exhibit, if you hold on a minute.
13    A.  I'm being coy.  I do remember that event.
14    Q.  I knew you would.  And as soon as I doubted
15 you on the date, I said, I'd better clam up, because I
16 bet he knows better than I do.
17    A.  I know where I was when I got the call.
18    Q.  So that event that happened in August of
19 2016 --
20    A.  Now, we had published on that event, so there
21 is public knowledge of what we learned from that
22 investigation.
23    Q.  And you were quoted in one article, and I'll
24 just -- I'll mark this as an exhibit.

Page 121

1       It's Tab 232 for you, Doctor.
2       KILKENNY DEPOSITION EXHIBIT 2
3       [A CNN Health article dated August 18,
4       2016, was marked for identification
5       purposes as Deposition Exhibit 2.]
6    A.  I've got the article open.
7    Q.  Yeah, it should have a big "CNN."
8    A.  I'm not specifically familiar with this, so
9 I'll be reading it.
10    Q.  Sure.  Sure.  And what I want to draw your
11 attention to is on the fourth page, you're quoted as
12 saying:  "I can't speak directly to this case, but we
13 have been preparing for heroin laced with elephant
14 tranquilizers, which is the latest thing communities
15 close to us are dealing with."
16       THE DEPONENT:  Okay.  Yeah.
17    Q.  Is that -- what is an elephant tranquilizer?
18 Is that carfentanil?
19    A.  That's carfentanil.
20    Q.  And is carfentanil the product that was
21 present in the heroin that led to this mass overdose
22 event?
23    A.  Yes, it was.  And I didn't know that at that
24 time.

31 (Pages 118 - 121)

Ex E – Deposition Excerpts of Christina Mullins, dated 07/14/2020

Plaintiffs' Supplemental Federal Rule Civil Procedure 26(a)(2)(C) Disclosures

```
                                              Page 1

 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3
 4     * * * * * * * * * * * * * * * * * * * * * * * * *
 5     THE CITY OF HUNTINGTON,
 6            Plaintiff,
 7     vs.                            CIVIL ACTION
                                      NO. 3:17-01362
 8     AMERISOURCEBERGEN DRUG
       CORPORATION, et al.,
 9
              Defendants.
10
       _____
11
       CABELL COUNTY COMMISSION,
12
              Plaintiff,
13                                    CIVIL ACTION
                                      NO. 3:17-01665
14
       AMERISOURCEBERGEN DRUG CORPORATION, et al.,
15
              Defendants.
16
       * * * * * * * * * * * * * * * * * * * * * * * * *
17
18
              Videotaped and videoconference
19        deposition of CHRISTINA MULLINS taken by
          the Defendants under the Federal Rules of
20        Civil Procedure in the above-entitled
          action, pursuant to notice, before
21        Teresa L. Harvey, a Registered Diplomate
          Reporter and West Virginia notary public,
22        the witness appearing via videoconference
          from Charleston, West Virginia, on the
23        14th day of July, 2020.
24
```

Page 76

1   5 minutes.  And they can pick any one of the witnesses

2   that they want to choose.

3        Q.   Okay.  All right.  So this was the written

4   statement submitted.  This is just, I guess,

5   seven months ago, thereabouts, to the day, January 14,

6   2020.  And this was submitted by you to the committee?

7        A.   Yes.

8        Q.   Okay.  And subcommittee.  Okay.

9             Well, if you could turn to Page 2, in the

10  first paragraph you state that:  "The resources provided

11  by both the state and federal governments have allowed

12  West Virginia to transform the state's response to the

13  opioid crisis."

14             Do you still feel that is true?

15       A.   Yeah.  There is a lot of evidence to support

16  that we've been able -- we've accomplished a lot,

17  despite the circumstances.

18       Q.   Okay.  Can you -- we may end up going into

19  some of the details here, and I'll try not to be too

20  repetitive, but can you just explain to me now what --

21  you say that you've accomplished a lot.  Can you explain

22  to me what you've accomplished?

23       A.   Sure.  We have been able -- so, one of the big

24  things to stick out was there was 197 residential

1    treatment beds a few years ago.  That's all that we had

2    in the entire state.  Medicaid did not pay for

3    residential treatment.  The State of West Virginia

4    invested other drug settlement funds into an account

5    called the Ryan Brown account.  That money was divvied

6    out, and now we have, not just because of that

7    investment but because of statewide interest and because

8    of Medicaid's changes in payment, we have -- and I don't

9    have the exact number, but it's around 850 residential

10   treatment beds now as opposed to just 197, so that

11   really does expand access.

12               We've been able to increase the number of

13   prescribers for medication-assisted treatment by quite a

14   bit.

15               We've distributed over 10,000 doses of

16   naloxone to local health departments.

17               As you -- we've discussed earlier, the

18   number of opioid prescriptions in West Virginia has

19   decreased.  We have really been able to also increase

20   the number of treatment programs for women and children

21   so that mothers and babies -- so that treatment can

22   start with prenatal care and families be followed one to

23   two years post-delivery.

24               We also have residential treatment

1  programs for mothers and babies now where moms can enter

2  treatment and with their -- and keep their children with

3  them and avoid foster care.

4            We have also established neonatal

5  abstinence centers in West Virginia.  We have two of

6  those, I believe.  So just the scope of -- of the work

7  that's been done, the number of Quick Response Teams

8  that have been added to the state, the number of

9  treatment programs, the infrastructure that we've been

10  able to build has really changed the system of care for

11  West Virginia.

12       Q.   Okay.  Yeah, I believe you even say -- this is

13  at the -- it's really the last full sentence on the page

14  where you have stated some of the numbers that you've

15  just testified to.  You state that:  With the

16  Government's help -- this is in the fourth paragraph

17  down, the paragraph that starts with "It's no secret."

18  I believe it's the second -- third sentence you say:

19  "With your help, West Virginia has reduced overdose

20  deaths for the first time in 10 years.  Opioid

21  prescriptions have decreased by 48 percent.  Opioid

22  doses have decreased by 50 percent.  Naloxone

23  prescribing has increased by 208 percent.  And

24  additionally, we have distributed over 10,000 doses of

 1      Q.   Okay.  On Page 7 -- I'm sorry, on page --

 2   yeah, on Page 7, second full paragraph down, I want to

 3   make sure this is just as of this year.  You made note

 4   that, quote:  "Every county and community in West

 5   Virginia has been impacted by the opioid crisis, with

 6   all able to document some level of need."

 7               As we sit here today, is that a fair

 8   point that every community within the state of West

 9   Virginia has suffered at the hands of an opioid crisis?

10      A.   Yes.

11      Q.   And Commissioner Mullins, you testified today

12   about some of the programs that have been put in place

13   in response to the crisis.  Is that correct?

14      A.   Yes, I did.

15      Q.   Would you agree with me that, as we sit here

16   today, there's still a lot to do to address the current

17   opioid crisis?

18      A.   There is still a lot of work to do.  We still

19   have people who need to access treatment.  We have

20   children and families who are impacted by the crisis and

21   we have kids that we want to make sure don't follow that

22   same path of addiction.

23      Q.   So, as we sit here today, we have not

24   eradicated the opioid crisis in our communities?

Page 142

1      A.   No.   We still have people needing treatment.

2    We still have people experiencing fatal overdoses and

3    nonfatal overdoses.

4      Q.   So it would be fair to say we still have a

5    large population in our communities who are addicted to

6    opioids?

7      A.   We still have people who are addicted to

8    opioids.  I don't -- without data in front of me, I

9    would be reluctant to add the descriptor.

10     Q.   That's fair.  That's fair.

11          And Commissioner Mullins, you testified

12   that there was some optimism that overdose deaths were

13   going down in 2018.  You're still concerned about a rise

14   of opioid death rates as we sit here today in 2020?

15     A.   I'm even concerned about what the data is

16   going to show in 2019, and then again into '20, given

17   the pandemic and what we're seeing across the nation.

18     Q.   And is part of that reason, although overdoses

19   were going down, the fact that you may have overdoses in

20   2019 or 2020 is because there are people addicted to

21   opioids?

22     A.   Yes.  And I am worried about changes in what

23   is available on the market as well, the fentanyl being

24   available in cross -- in different drugs and the

Page 143

1    different things that are happening on the street level

2    concerns me greatly.

3         Q.   Commissioner Mullins, you testified about the

4    distributions of naloxone have increased by 208 percent

5    and, to date, as of that testimony, you had distributed

6    over 10,000 doses of naloxone to local health

7    departments.

8                   Do you recall that?

9         A.   Yes.

10        Q.   What is naloxone?

11        A.   Naloxone is an overdose reversal drug that

12   when someone is experiencing an opioid overdose it can

13   be administered to reopen their airways and so they can

14   get treatment.  Or, sometimes, it will completely

15   reverse it but they refuse transport for treatment.

16        Q.   It's a lifesaving treatment for someone that

17   overdoses?

18        A.   Yes.

19        Q.   And is it safe to say that communities are

20   still facing overdoses and that naloxone is preventing

21   them from dying?

22        A.   In some cases, yes.  We've really increased --

23   even over the last three months, tried to increase the

24   amount of naloxone available in communities.

1        A.    Yes, that was the highest rate as of the date

2     of this testimony, yes.

3        Q.    And those rates are still increasing, even

4     though there have been programs in place; is that

5     correct?

6        A.    In 2018, the rate went down to 52, 53, I don't

7     remember, but it dropped a little bit, which is why I

8     felt a little bit more optimistic going into -- in the

9     data, we saw a little more optimism.  It had decreased a

10    little bit for the 2018 death rate.  About 2017 was the

11    highest recorded at that time.  We will see -- we're

12    very interested and watchful for the 2019 data that

13    should be released in the next few months.

14       Q.    And you also note that the loss of life is not

15    the only impact of the crisis?

16       A.    Correct.

17       Q.    And I think you did testify that other things

18    within the communities greatly impact the communities

19    because of the opioid crisis, such as NAS?

20       A.    Yes.  We're very concerned about the impacts

21    to children and families, particularly for women who are

22    pregnant and with a substance use disorder and/or may

23    be, you know, in a relationship with someone with a

24    substance use disorder.  It affects that family's

1  ability -- may affect that family's ability to stay

2  together.  And we know that kids do better, families do

3  better, when they're together.  So we really worry about

4  infants being separated from their parents in that first

5  year of life, and then the subsequent downstream

6  consequences of foster care involvement and just that

7  breaking apart of that family unit.

8      Q.  And in your testimony you also note that the

9  NAS -- West Virginia led the nation in NAS.  Is that

10  correct?

11      A.  Yes.

12      Q.  And in regards when you just testified about

13  foster care, you testified that foster care placement in

14  West Virginia has risen 4,129 children from

15  September 2011 to 6,895 in September 2019, an increase

16  of 67 percent; is that correct?

17      A.  Yes.

18      Q.  And then you also mention that, in addition to

19  loss of life and impact of families, the State has also

20  seen an increase in infectious diseases.

21          Do you recall that?

22      A.  I do.

23      Q.  And is that still today you're seeing the

24  opioid crisis include infectious diseases, including

1    hepatitis A and other diseases?

2        A.   Yes.

3        Q.   And all these impacts to the crisis still

4    continue today, one way or the other, throughout the

5    state of West Virginia?

6        A.   We are still seeing these impacts, yes.  With

7    the caveat that, you know, as today COVID is changing

8    things somewhat with some of the data.  I do expect some

9    of the data to change a little bit as a result of the

10   pandemic, so, not these -- these things are still

11   happening in communities.  Overdoses are still

12   happening.  There's still infectious diseases in the

13   communities as a result of us sharing needles and other

14   behaviors associated with drug use.

15       Q.   And Commissioner Mullins, even though the

16   death rate may fluctuate, the communities are still

17   faced with the devastation caused by the opioid

18   epidemic?

19       A.   We are going to be facing this for quite a

20   while.  And children that have lost their families of

21   origin because of substance use disorder, the trauma

22   that will happen as a result of that.  We don't know

23   quite fully the consequences of any or some of the other

24   things that we could be facing down the road as a result

Page 148

1    of this.  It's going to impact generations of families.

2    And even if we could cure all of the addiction, we're

3    still going to be dealing with the mental health trauma

4    and some of the other things that are going to be

5    residual effects of the crisis.

6        Q.   And would it be fair to say it's going to mean

7    additional sources of funding and dollars in order to

8    deal with these public health crises in the future?

9        A.   It's likely going to need resources and I -- I

10   am concerned about financial resources long-term,

11   because, as I noted earlier, and I don't know what the

12   grant profiles are going to look like in 3 years,

13   5 years, 10 years down the road.

14             But we're also going to need humans who

15   can participate in these workforces and be able to

16   provide the supporting services, too.  So it's -- it's a

17   little bit of a -- there's a two-prong problem, from my

18   view.

19       Q.   And I thank you, Commissioner Mullins.  I

20   wanted to make sure in the testimony you weren't

21   suggesting that the state of West Virginia has enough

22   money to eradicate the opioid public health crisis as it

23   exists today.  Is that fair?

24       A.   No, my testimony indicated that, for the first

1      Q.   And I think what I understand what you're

2   saying is that there is a key concerning that the grants

3   will soon to be limited in time and sustainability in

4   order to deal with future issues as a result of the

5   opioid crisis?

6      A.   Yes.  I see this as a long-term concern.

7   We're going to need to make long-term investments.  As

8   I -- you know, recovery relapse is a part of what we

9   expect, so just because someone is in recovery right now

10  and today is no guarantee that they might not relapse

11  tomorrow or down the road.  And so we have to plan to

12  have those resources available in the future to be able

13  to support people and to continue to support them

14  through -- through recovery.

15     Q.   And Commissioner, in addition to this, the

16  State is doing what they can to help with the opioid

17  crisis.  Cities and communities have their own

18  obligations and assessments of what they need to do for

19  their adjusting to the opioid crisis.  Is that fair?

20     A.   Can you please repeat that?  I'm sorry.

21     Q.   Okay.  I'll change it a different way.

22  Although the State's been assisting various communities

23  in their opioid crises, the communities themselves still

24  are dealing with a crisis that they need to fund and

Page 154

1    Q.   And without going through the whole report, is

2    it fair to say that the report does include an executive

3    summary, a summary of key findings, and then the

4    analysis that you and your colleagues put together for

5    this report?

6    A.   It does.  That's the executive summary, and

7    then we went through lots of tables and descriptions of

8    tables.

9    Q.   Would it be fair to say that the prescription

10   opioids had a significant impact on the overdose deaths

11   in the state of West Virginia from your analysis?

12   A.   Yes, they did.

13        MS. KEARSE:  Commissioner, I have no

14   further questions.  I appreciate your spending the day

15   with us today.

16        MR. GARY:  I have no further questions,

17   just with the caveat that I expressed earlier there was

18   some information that we discussed that we will be

19   looking into.  We reserve the right to ask some

20   follow-up questions.

21        MR. FRANKS:  This is Ray Franks for

22   Cardinal.  This deposition was cross noticed in the MDL,

23   most recently by Plaintiffs' Cross Notice of Deposition

24   No. 2, filed July 10, 2020.  In light of that, Cardinal

Ex F – Deposition Excerpts of Lyn O'Connell, Ph.D., dated 07/31/2020

Plaintiffs' Supplemental Federal Rule Civil Procedure 26(a)(2)(C) Disclosures

```
                                          Page 1

1           IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2

3

       * * * * * * * * * * * * * * * * * * * * * * *
4

   THE CITY OF HUNTINGTON,
5

               Plaintiff,
6

   vs.                                 CIVIL ACTION
7                                      NO. 3:17-01362

   AMERISOURCEBERGEN DRUG
8  CORPORATION, et al.,
9           Defendants.
   _____
10

   CABELL COUNTY COMMISSION,
11

               Plaintiff,
12

   vs.                                 CIVIL ACTION
13                                     NO. 3:17-01665

   AMERISOURCEBERGEN DRUG
14 CORPORATION, et al.,
15          Defendants.
16     * * * * * * * * * * * * * * * * * * * * * * *
17

18

           Videotaped and videoconference deposition
19 of LYN O'CONNELL taken by the Defendants under the
   Federal Rules of Civil Procedure in the above-
20 entitled action, pursuant to notice, before Teresa
   S. Evans, a Registered Merit Reporter, all parties
21 located remotely, on the 31st day of July, 2020.
22

23

24
```

1    Quality Insights to support Healthy Connections.

2                    Oh, the MOMS grant.  we have -- we are

3    the implementation Institute for CMS, which is the

4    center for Medicaid services, for the state MOMS

5    grant, Maternal Opioid Model which is to extend the

6    fourth quarter of -- fourth trimester to engage --

7    continue to engage women in treatment the year

8    after delivery with substance use.

9         Q.   Any idea how much that is a year?

10        A.   Not enough.  The total award is a couple

11   million, but it's mostly to the health centers

12   around the state.

13        Q.   Okay.  Are some of those health centers in

14   Cabell or Huntington?

15        A.   Yes.

16        Q.   Do you know which ones?

17        A.   Cabell-Huntington Hospital, Valley Health

18   System and our project of Healthy Connections.

19        Q.   Okay.  What's -- can you just tell me what

20   Healthy Connections is real quick?

21        A.   Healthy Connections is a collaboration of

22   about 20 organizations that started as a

23   community-based organization to address the gap and

24   needs of pregnant women with substance use

 1    disorders as they often fall through the treatment

 2    gap because they don't rise to a particular level

 3    of intervention and care but they are, obviously,

 4    struggling at a very high rate, and then cause

 5    intergenerational struggles, and so we --

 6              Approximately 20 organizations came

 7    together, all of whom work with that population, to

 8    develop a model of intervention, which is our

 9    family navigators and our certified peer recovery

10    coach who comes alongside mom and family either

11    prior to delivery or post-delivery and provides

12    emotional and therapeutic support and helps connect

13    them to other types of services that they might

14    need.

15       Q.   Okay.  And Healthy Connections operates

16    within Cabell County?

17       A.   It does.  It was a purely community-based

18    organization until 2018 when the steering committee

19    voted to allow it to move in-house for -- into

20    Marshall Health.

21       Q.   Okay.  I know we went through a lot of

22    numbers.  But if you could estimate for me

23    approximately like how much -- well, let me back

24    up.

1    implementation, grant writing, development and to a

2    much smaller degree, the research component.

3         Q.    And that work involves individuals and

4    families struggling from substance use disorders

5    and addiction, including opioid addiction?

6         A.    Yes.

7         Q.    And based on your collective experiences

8    again within the community and the professional

9    work that you've been working with in the community

10   and your observations, I'd like to ask a couple of

11   questions.  Is there an opioid-related public

12   health epidemic in the City of Huntington and

13   Cabell County?

14              MR. JONES:  I'll object to the form of

15   the question.

16        A.    In my personal experience, the current data

17   that is released indicates that we have an opioid

18   crisis in Cabell County and the City of Huntington.

19        Q.    And Doctor O'Connell, how would you

20   characterize the impact of the opioid crisis or

21   epidemic on Cabell County and the City of

22   Huntington?

23        A.    Could you clarify the question?

24        Q.    In your experiences and your professional

1    work, how would you describe the opioid crisis in

2    the City of Huntington and Cabell County?

3        A.   I would say that it affects every

4    individual who lives or works in the city and

5    County and larger region as a result of the

6    significant loss of human life, the obvious

7    overdoses that occur, unfortunately, in public, the

8    effect on the legal and housing system, the

9    overwhelming effect on the health care system and

10   first responders, the effect on the education

11   system and the impact it has on the financial

12   standing of individuals within the community.

13       Q.   Are there effects particularly on the

14   families of children born exposed to opioids?

15       A.   Yes.  We see with -- in my professional

16   experience at Project Hope, I see the negative

17   effects of infants who are born with substance

18   exposure either diagnosed as neonatal abstinence

19   symptoms or neonatal withdrawal symptoms, and we

20   experience the necessary level of care that is to

21   help mom overcome her substance use, care

22   appropriately for that child and the level of

23   intervention that is necessary just even in the

24   short window that we work with them professionally

1    at a program like Project Hope or through Healthy

2    Connections.

3        Q.    Has it been fair to say that the opioid

4    addiction has greatly impacted children and

5    families and their ability to stay together?

6        A.    Yes.

7        Q.    And how has -- you and within your work at

8    Marshall and with your work with the various

9    organizations that you mentioned today, what is

10   part of the goals of your programs in regards to

11   family and children matters?

12       A.    Our work within Project Hope and Healthy

13   Connections and other services that touch children

14   and families specifically is to work on

15   reunification when at all possible, to reduce the

16   significant burden that has been placed on the

17   foster and adoption system and Child Protective

18   Services and to try and promote both a safe and

19   healthy reunification for that family, which we

20   know in the research is often best, and also our

21   work is to often try and support that family in the

22   potentially the lowest level of care necessary for

23   them to both survive and thrive.

24       Q.    And Doctor O'Connell, through your work

Page 280

```
 1    within the City of Huntington and Cabell County,

 2    have you seen and experienced members of your

 3    community facing addiction and their struggles to

 4    work through their addictions to attempt to lead a

 5    normal, healthy life?

 6                MR. RUBY:  Object to the form.

 7        A.   Yes, that's something -- yes, that's

 8    something that I'm familiar with.

 9        Q.   And can you just tell us a little bit about

10    that, knowing that we could be here a long time

11    with that.  But your -- from your overview and the

12    impact on persons addicted to prescription opioids

13    and resulting addictions to other opioids, what are

14    the things that you've witnessed and experienced in

15    attempts to work professionally to address?

16                MR. RUBY:  Object to the form.

17                MR. MAHADY:  Object to the form.

18        A.   I would state that we -- our experience has

19    been to attempt to -- that we see the negative

20    effects of individuals who lose their lives as a

21    result of an opioid overdose and the effects of the

22    lack of Narcan or some other life-saving

23    intervention.

24                We see individuals who cannot get out
```

Page 281

1    of the cycle of addiction because of, you know, the

2    -- how addictive the chemical brain response is to

3    the substance that they're on and therefore the

4    difficulty in engaging them in effective treatment.

5            We see lack of access to treatment when

6    an individual with a substance use disorder wants

7    it, because we know we have a very short window to

8    actively engage that person before they go out and,

9    you know, unfortunately play a game of Russian

10   roulette with the substance that they're using, and

11   then we work to try and ensure that they have

12   immediate and appropriate access to treatment of

13   the necessary level of care with the lowest

14   barriers.

15           And unfortunately, we know there to be

16   an overwhelming amount of barriers, including

17   transportation, insurance costs, child care, what

18   to do with their child if they go into residential,

19   wait lists and capacity overall.

20   Q.   And Doctor O'Connell, I've sometimes heard

21   and I think within speaking to many members of the

22   community and obviously reading various writings

23   about the community, there's been a

24   characterization that the impact of the opioid

Ex G – Deposition Excerpts of Stephen Petrany, M.D., dated 08/06/2020

Plaintiffs' Supplemental Federal Rule Civil Procedure 26(a)(2)(C) Disclosures

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

2

3

    * * * * * * * * * * * * * * * * * * * * * * *

4

THE CITY OF HUNTINGTON,

5

               Plaintiff,

6

vs.                                    CIVIL ACTION

7                                    NO. 3:17-01362

AMERISOURCEBERGEN DRUG

8  CORPORATION, et al.,

9             Defendants.

10 _____

11 CABELL COUNTY COMMISSION,

12             Plaintiff,

13 vs.                                    CIVIL ACTION
                                       NO. 3:17-01665

14 AMERISOURCEBERGEN DRUG
   CORPORATION, et al.,

15

               Defendants.

16

    * * * * * * * * * * * * * * * * * * * * * * *

17

18

19         Videotaped and videoconference deposition
   of DR. STEPHEN PETRANY taken by the Defendants

20 under the Federal Rules of Civil Procedure in the
   above-entitled action, pursuant to notice, before

21 Teresa S. Evans, a Registered Merit Reporter,
   everyone located remotely, on the 6th day of

22 August, 2020.

23

24

Page 74

1    there is some evidence, some real evidence, that

2    things are actually getting worse again.

3         Q.    With respect --

4         A.    Going in the wrong direction.

5         Q.    With respect to 2018, which is the time

6    period that Doctor Gilbert's citing here, does 41

7    percent seem like a reasonable number to you?

8         A.    I think I recall that number as being what

9    was being stated at the time publicly.

10        Q.    And there are some -- in the next

11   paragraph, there's a list of bullet points that

12   includes some of the components of Doctor Gilbert's

13   proposal.  And I believe that some of these are

14   similar to what ultimately was included in the

15   Resiliency Plan.  The first one is "the building of

16   a comprehensive research and treatment center."

17        A.    Uh-huh.

18        Q.    Does that appear to be similar in concept

19   to the Addiction Sciences Institute that was

20   ultimately included in the plan?

21        A.    Depends what you mean by "similar."

22   There's not -- the Resiliency Plan does not call

23   for a treatment center.  Yes, research; yes,

24   education; yes, community engagement.  But

Page 126

1      Q.   What was his input?

2      A.   Before the meetings, I met with some

3   individuals individually.  I thought it might not

4   be easy for them to make it to the meetings, but

5   also their input, I thought, was important for the

6   team.

7           Among those five or six people that I

8   met before we had our first meeting to get their

9   input and to get their insight was Doctor Gilbert.

10  I sat and met with him for about maybe a half hour,

11  45 minutes to get his thoughts on and contributions

12  to the plan.

13     Q.   And what were his contributions?

14     A.   Well, it -- I don't have notes from that --

15  from that meeting with me.  So I cannot outline

16  specifically what they were.

17     Q.   Did you take notes --

18     A.   I probably took some notes, but I don't

19  know that I kept them.  I'm sure I didn't unless

20  you have them, because all my notes, you have.  But

21  I don't recall whether I still have them or not.

22  So you would know better.

23     Q.   Do --

24     A.   The main thing I recall from his meeting

1   was his understanding that it needed to be a

2   community-based and supported plan, and he thought

3   that, of course, from his perspective, that

4   Marshall University needed to be a major element in

5   terms of being involved in any solutions.

6       Q.   Why did he feel that it needed to be

7   community-based and supported?

8       A.   Why?  I don't know.  You'll have to ask

9   him.

10      Q.   Did you agree with that?

11      A.   Yes.

12      Q.   Why?

13      A.   Because that makes for better programs and

14  more effective solutions.

15      Q.   Was it important to the Resiliency Plan

16  process that it was community-based and supported?

17      A.   It was to me.

18      Q.   And do you think that the community-based

19  process used in the Resiliency Plan in fact made

20  for better programs and more effective solutions?

21      A.   Ask the question again.  I'm sorry.

22      Q.   Do you think that the community-based

23  process used in the Resiliency Plan in fact made

24  for better programs and more effective solutions?

Page 128

1        A.    It made for a better plan, yes.

2        Q.    The plan wouldn't have been as good, in

3    your opinion, if you hadn't used the

4    community-based process that you did; is that

5    correct?

6        A.    Yes, and that's why I approached it from

7    that direction.

8        Q.    Let me ask you to open Exhibit 27A.

9            PETRANY DEPOSITION EXHIBIT NO. 27A

10                  (E-mail from Maiolo to Petrany and

11                  various other recipients Re: Updated

12                  Resiliency Plan Draft dated 7-26-19

13                  with Resiliency Plan Framework

14                  attached (MARSHALL_FEDWV_00065554-579)

15                  was marked for identification purposes

16                  as Petrany Deposition Exhibit No.

17                  27A.)

18        A.    All right.

19        Q.    Do you recognize this document?

20        A.    Do I recognize it?  Do I remember it?  No,

21    but I will read it.

22                Okay.

23        Q.    You've had a chance to read it now?

24        A.    Yes.

1  whether or not these patients that are addicted to

2  opioids began at the outset with prescription

3  opioids?

4      A.   I have a relatively small practice, and it

5  would be hard for me to extrapolate from that with

6  regard to that particular question in my personal

7  practice.

8            Given my other responsibilities as

9  chair and educator, my practice is -- is rather

10 small.

11     Q.   So based upon your overall experience with

12 your responsibilities, do you have an opinion as to

13 whether or not prescription opioids are a gateway

14 to the initiation of heroin use?

15     A.   They are for some.

16     Q.   All right.  Tell me about that.

17     A.   Well, I mean, the -- what we've discussed

18 already.  At times -- I mean, when -- with the

19 overprescription of opioids to patients and then

20 the legislative tightening down of the

21 circumstances under which opioids could be

22 prescribed, many people who are now addicted to

23 opioids turn to street drugs - heroin and others -

24 to satisfy their addiction.

Page 174

1         That often leads to overdose and death.

2      Q.   So when somebody is addicted to

3   prescription opioids and then is seeking to fill

4   that void, why is it that they go to heroin and not

5   tobacco or alcohol or ginger snaps?

6      A.   Because none of those satisfy the

7   physiological need and craving that is experienced

8   with withdrawal from opioids.

9      Q.   So why does heroin respond to the

10  withdrawal symptoms of prescription opioids?

11     A.   Well, it's an opioid, so it -- it satisfies

12  the need for an opioid.  I can't say specifically

13  why heroin.  I am told -- I -- you know, I -- my

14  understanding is that it was relatively inexpensive

15  on the streets and available, I guess.

16     Q.   Based upon your experience and roles in our

17  community, do you believe that addiction to opioids

18  is presently a public health crisis in Huntington/

19  Cabell County, West Virginia?

20     A.   I certainly think it's a public health

21  problem, yes.

22     Q.   What about abuse of opioids?

23     A.   I'm sorry, what's the distinction between

24  that and what you said before?

Ex H – Deposition Excerpts of Kevin Yingling, dated 07/24/2020

Plaintiffs' Supplemental Federal Rule Civil Procedure 26(a)(2)(C) Disclosures

```
                                             Page 1

 1         IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2

 3

     * * * * * * * * * * * * * * * * * * * * * *
 4

   THE CITY OF HUNTINGTON,
 5

               Plaintiff,
 6

   vs.                                CIVIL ACTION
 7                                  NO. 3:17-01362

   AMERISOURCEBERGEN DRUG
 8 CORPORATION, et al.,
 9         Defendants.
10 _____
11 CABELL COUNTY COMMISSION,
12         Plaintiff,
13 vs.                             CIVIL ACTION
                                 NO. 3:17-01665
14 AMERISOURCEBERGEN DRUG
   CORPORATION, et al.,
15
               Defendants.
16
     * * * * * * * * * * * * * * * * * * * * *
17

18

19         Videotaped and videoconference deposition
   of KEVIN YINGLING taken by the Defendants under the
20 Federal Rules of Civil Procedure in the above-
   entitled action, pursuant to notice, before Teresa
21 S. Evans, a Registered Merit Reporter, all parties
   being located remotely, on the 24th day of July,
22 2020.

23

24
```

Page 92

1   Hall, speaking about overdoses in West Virginia.

2            And you know, that's in the -- that's

3   in the '04/'05 -- I believe, '04, '05, '06

4   time frame.  And you know, give me a little grace,

5   but you can scoot that timeline a little forward, a

6   little backwards.  Around in that time.

7            And then what references that back to

8   me, is I remember an article comes out -- I believe

9   it's in the Journal of the American Medical

10  Association - and specifically references West

11  Virginia and specifically references Doctor Hall,

12  who had been talking to us at these summits and

13  identifying that patients are overdosing, and of

14  course, as the coroner, they died, and they had

15  prescription drug overdoses.

16           So it's in this time frame that I'm --

17  my mind is completely harkened to the understanding

18  that there is a significant amount of medications

19  which are being used in the nonmedical use and

20  abuse.  Somewhere in that time frame, that's what

21  strikes me.

22           That prescription opioids for

23  nonmedical use.  Now, you know, forgive me for

24  being completely naive -- I'm not.  But you know,

Page 93

1   here I am thinking about how I practice, how I

2   teach at the medical school, what we teach

3   residents and physicians, how it's properly done,

4   and the concept that people are overdosing on

5   prescription medications and they never even had a

6   prescription.

7            Now, that strikes me in the mid 2000s.

8   I probably shared that kind of thing.  That -- plus

9   reminds me, there's something else I shared in

10  there -- I don't know.

11           That gets me to that pivot point of

12  2010.  After that, I probably shared as a physician

13  -- now I'm moving from my responsibilities as an

14  academic physician organizing -- you know,

15  organizational leadership of a department and

16  physicians and pulmonologists and cardiologists and

17  all that.  I'm moving from that, away from that

18  towards the Dean of the medical school, still

19  attending --

20           And now what is then brought to my

21  attention -- and again, another inflection point

22  just for my own personal career.  How it fits for

23  the timeline of everything else, I can't

24  particularly place for you.

Page 140

1           That challenge, of decreasing harm to

2    that addicted population, is enormous and has been

3    the focus of the health department for several

4    years and the reason for starting the Harm

5    Reduction Program which is syringe-based, and a

6    multitude of other services.

7                Adding to that the naloxone program.

8                That brings me to the significant

9    burden of overdoses, nonfatal and fatal, in Cabell

10   County.  That is a significant burden.  If we speak

11   to the side, at least my brief summary on the side

12   of opioid-related -- the nonmedical use of opioids

13   related to dying, is the tragedies to families, to

14   parents, to spouses, to siblings, to children from

15   that.

16               The loss of economic value to that

17   family, the tragedies, the psychosocial trauma,

18   outcomes from that that will be borne out by this

19   community for decades.

20               This will be generational for sure that

21   that burden is upon this community.

22               When it comes to opioid -- nonmedical

23   use opioid mortal -- I mean, morbidity, in addition

24   to the things I've just spoken about there, we have

Page 141

1   all the concerns about the treatment of pregnant

2   mothers who are -- have addiction as a disease,

3   their children, the neonatal absence syndrome

4   burden that comes from that population.

5           The care of those women and their

6   children after delivery.  The -- and to put some

7   touch points on that, that would be the Lily's

8   Place and other organizations.

9           But in addition to that, is:  What is

10  going to be the economic and community burden of

11  raising up those children, some of whom don't have

12  families to raise them, some of whom will be in

13  foster homes and the burden upon foster care.

14          What will be the outcome of those

15  students who, in utero, were exposed to medications

16  of abuse?  And what's the burden as they move into

17  the health -- into the primary education system?

18  And all of those concerns.

19          That, clearly, is part of this as I see

20  it.

21          Another burden would be:  How do we

22  organize properly platforms that would allow

23  individuals to move into long-term recovery?  How

24  do we maintain them in long-term recovery?  How are

Page 143

1   numerous patients that are in that category of

2   which this community is burdened in one way or

3   another, many of them not having even coverage for

4   the medical care that they're receiving.

5              What do we do when they transition out

6   of that hospital?  What do we do to get them back

7   in long-term recovery?

8              Those are all part of what I see as the

9   burdens of addiction.

10             So I see children, mothers, families,

11  individuals in the -- and afflictions of their

12  diseases.

13             I see the burden of the addicted

14  population who are not in long-term recovery, the

15  challenges that are faced by law enforcement and

16  how that's managed and how that's an extreme

17  economic burden and personnel burden upon law

18  enforcement in this county.

19             I don't know.  Counsel, I could

20  probably go on.  I don't know if I've answered your

21  question.

22     Q.   Yeah.  I'm attempting, as a layperson, to

23  get my arms around all of that which you've said.

24  And one of the things that we'll be trying to use

Page 148

1    personal experience and my experiences in the

2    community around the time of late two thousand --

3    I'll take 2005 to 2010 or '11, my understanding is

4    for reasons that I cannot completely define, there

5    is a flood - that's my word, a flood - of opioid

6    medications available to any number of peoples

7    within any numbers of communities within Cabell

8    County and Huntington.

9              And it is my understanding based on the

10   literature and my exposure and interaction with

11   people like the Huntington Police Department and

12   people like Mr. Johnson to understand that around

13   the same time that there was that unfortunate

14   setting, heroin was introduced into this community.

15             And in fact, it would be my -- I would

16   hold the understanding from the medical literature

17   that the uptick in the use of heroin - not just in

18   this community, but in general - began during the

19   late two thousand -- 2008, '09, '10, and continued

20   rapidly as we move from '10, '11, '12, '13 and '14.

21             I believe that there is a clear

22   biologic plausibility, a clear biologic

23   plausibility, to the transference of addiction to

24   opioids and opiates - synthetic or otherwise - a

Page 149

1   biologic plausibility that goes from my addiction

2   to what originated as the nonmedical use of

3   opioids, prescription opioids, to the use and abuse

4   of other products, which would be the Schedule I

5   nonmedical use of heroin, fentanyl, carfentanil,

6   etc.

7            So in my mind, there -- I hold the

8   opinion that there's a clear linkage between those

9   two, and I support that from my experience, from my

10  reading of the medical literature and from my

11  experiences within the organizations that I've

12  served.

13           That leads to me -- leads me to

14  understand that but for the setting, the situation

15  of this enormous amount -- in a sense, unrestricted

16  pool of what I would have considered to be

17  prescription opioids, but for that, I can't see why

18  there would have been the use of heroin and the

19  subsequent consequences of the burden -- and the

20  burden of addiction and all the things that I've

21  already articulated.

22      Q.   So let me see if I can get a clean question

23  and answer so that I can cite it in my response to

24  summary judgment motions.

1           Do you believe there is a direct causal

2   relationship between prescription opioid addiction

3   and abuse and the initiation of heroin use?

4           MR. SALIMBENE:  Object to form.

5       A.   Yes.

6       Q.   Do you believe that prescription opioid

7   addiction and abuse is a primary gateway to heroin

8   use?

9           MR. SALIMBENE:  Object to the form.

10      A.   Yes.

11      Q.   Do you believe that prescription opioid

12  addiction and abuse is also a primary gateway for

13  methamphetamine use?

14          MR. SALIMBENE:  Object to form.

15      A.   Yes.

16      Q.   So --

17          MR. FARRELL:  That's all I've got.

18  Thanks, Doc.

19          MR. SALIMBENE:  My turn again, Paul?

20          MR. FARRELL:  Yep, he's all yours.

21          MR. SALIMBENE:  Okay, thank you.  And

22  thank you for sticking to the 30 minutes.  I

23  appreciate that.

24                     EXAMINATION