Plaintiffs' Cross-Notice of Remote Deposition
and Non-Retained Expert Witness Disclosure of
Dr. Rahul Gupta

# Exhibit 5

## Gupta Trial Testimony

*City of Huntington, et al. v. ABDC, et al.*

3:17-cv-01362, 3:17-cv-01655

May 5, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :     Civil Action
                               :
            Plaintiff,         :     No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
                               :
CABELL COUNTY COMMISSION,      :     Civil Action
                               :
            Plaintiff,         :     No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 3
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

MAY 5, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Greene Ketchum Farrell Bailey & Tweel
P.O. Box 2389
Huntington, WV  25724

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MR. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087

Court Reporter:            Ayme Cochran, RMR, CRR
Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1    he's here and he's ready to go, okay?

 2              MR. FARRELL:  Thank you.

 3              THE COURT:  And we'll be in recess until that

 4    time.

 5         (Recess taken)

 6         (Proceedings resumed at 10:36 a.m. as follows:)

 7              MS. KEARSE:  Good morning, Your Honor.

 8         Your Honor, plaintiffs call Dr. Rahul Gupta.

 9              THE COURT:  Okay, Dr. Gupta, come up here and the

10    clerk will give you the oath, sir.

11              THE CLERK:  Would you please state your full name

12    for the record.

13              THE WITNESS:  My full name is Dr. Rahul Gupta.

14              THE CLERK:  Thank you.  Please raise your right

15    hand.

16    RAHUL GUPTA, PLAINTIFFS' WITNESS, SWORN

17              THE CLERK:  Thank you.  Please take a seat.

18                        DIRECT EXAMINATION

19    BY MS. KEARSE:

20    Q.   Good morning, Dr. Gupta.  Can you please introduce

21    yourself to the Court?

22    A.   Good morning.  My name is Rahul Gupta.  I'm currently

23    the Senior Vice President, Chief Medical Officer, and the

24    Chief, Interim Chief Science Officer at March of Dimes.

25    Q.   Dr. Gupta, can you tell the Court what prior capacities
```

1    you have served in in State of West Virginia?

2    **A.**    I have served from March of 2009 to December of 2014 as

3    the Physician Director, Local Health Officer, Executive

4    Director locally at the Kanawha-Charleston Health

5    Department.

6          And within that frame or portion, I also served as the

7    Executive Director and Health Officer for Putnam County

8    Health Department.

9          From January of 2015 to November of 2018 I served as

10   the Commissioner for the Bureau of Public Health, the

11   Department of Health and Human Resources for the State of

12   West Virginia, and the state's State Health Officer.

13   **Q.**    Did those positions involve public health?

14   **A.**    They both involved public health and they are written

15   into the statute of the State of West Virginia.

16   **Q.**    Dr. Gupta, is it safe to say you have a background in

17   public health?

18   **A.**    Yes.

19   **Q.**    Can you tell the Court a little bit about your

20   background specific to public health?

21   **A.**    My background in public health began with my medical

22   school curriculum.  That was at the beginning of -- or

23   August of 1988.  That went up to December of 1992.  That

24   included significant training rotations and the like in

25   preventive medicine and public health.

1          It was followed up by one year rotary internship from

2     January 1, 1993, to December 31st, 1993.  It also included

3     spending about three months in public health as a

4     practitioner.

5          It was followed by launching -- helping launch one of

6     the first, the first post-polio campaigns in Delhi where we

7     vaccinated over two million children with polio in one day

8     across Delhi which is now a city of 25 million people.  And

9     eventually those efforts expanded across the country in

10    India and led to the elimination of polio from a nation of

11    1.3 billion people 20 years later and was certified as such

12    by the international agencies.

13         That was followed by my residency in Chicago.  There

14    was significant emphasis on public health as part of

15    internal medicine residency training.

16         That led me to work in the rural parts of Alabama where

17    public health was intricately weaved into the work that I

18    was doing as a clinician in many respects I can go in-depth

19    into, which was followed by me not only becoming a

20    practitioner and a faculty at UAB, University of

21    Alabama-Birmingham, but also pursuing a degree, a Master's

22    of Public Health that included a variety of trainings and

23    aspects of formal training in public health, following which

24    I have continued to work in aspects of public health both in

25    Alabama and Tennessee prior to taking full-time positions in

1    2009 in West Virginia in public health.

2    **Q.**    Thank you, Doctor.  And in regards to this case, have

3    we asked you to appear to testify specific to your work in

4    West Virginia?

5    **A.**    Yes.

6    **Q.**    And specifically about your work as the Commissioner of

7    Public Health for the State of West Virginia?

8    **A.**    Yes.

9    **Q.**    And while you've been involved in your work in West

10   Virginia, have you taught about public health?

11   **A.**    Yes.

12   **Q.**    And can you tell the Court specific to West Virginia

13   matters as the Commissioner of Public Health, what have you

14   been involved in in teaching with regards to public health?

15   **A.**    The work I had done as a local health officer in

16   Kanawha-Charleston and Putnam County has also followed me in

17   my role as Commissioner.  What that means is during the

18   course of my public health career as Commissioner, State

19   Health Office for the State of West Virginia, I have taught

20   as faculty at Harvard TH Chan School of Public Health

21   regularly, as well as given lectures to John Hopkins

22   Bloomberg School of Public Health.

23        And some of those areas included the risk communication

24   in public health.  It included addressing chemical and other

25   types of disasters.  So the class that I would teach at

1    Harvard, for example, included 80 of the most experienced

2    professionals across the globe from China and from

3    Singapore, as well as from the FDA, from United States FDA,

4    United States Department of Agriculture, CDC, others that

5    were coming to the class to learn how to communicate,

6    whether it was a nuclear reactor, poor outcomes, or it was a

7    matter of other disasters in public health across the globe

8    that they would want to know what are the key elements of

9    communication, and this communication especially with

10   disasters.  Similarly, at Hopkins I taught specific case

11   studies.

12        In addition to that, I've taught classes and courses in

13   epidemiology, biostatistics at West Virginia University

14   School of Medicine as well as School of Public Health.

15        I have also held the Chair of the, position of the

16   Dean's Advisory Committee of the School of Public Health at

17   West Virginia University.

18        I've also taught classes at the UNC of Charleston

19   School of Pharmacy, as well as health seminars and events at

20   Marshall University, various number of public health, and

21   then given talks and lectures all over the country

22   indicating the challenges, as well as other aspects of

23   public health across West Virginia, as well as across the

24   nation and the globe.  And I also am speaking

25   internationally as well.

1    **Q.**   And, Doctor, have we asked you to appear today in

2    regards to your involvement in opioids within the State of

3    West Virginia?

4    **A.**   Yes.

5    **Q.**   And can you tell the Court what your understanding is,

6    at least today, what your involvement has been with regard

7    to opioids in West Virginia?

8    **A.**   Well, when I was put on the job by the Cabinet

9    Secretary, then Karen Bowling, as well as Governor Tomblin

10   in January of 2015, it was very clear to me that the

11   priority of the State of West Virginia to address, the top

12   priorities are opioids, opioids and opioids.

13   **Q.**   Doctor, I'll try to walk through that as well, but I

14   wanted to make sure we were talking about the subject matter

15   of the case today as well.

16        I think it's important -- we're talking about public

17   health, and we'll be talking about public health as it

18   pertains to the opioids with that too, but I think it would

19   help the Court to understand.  What is public health

20   generally speaking?

21   **A.**   So public health is fundamentally the art and science

22   of designing strategies, actions, aspects that help lead to

23   the prevention of disease, promotion of health, as well as

24   those strategies ultimately that would provide high quality

25   both prevention, surveillance, and treatment in terms of

1    addressing both the long-term contemporary -- long-term

2    public health problems as well as the most pressing

3    contemporary public health problems in a broad definition.

4    **Q.**   And I'm going to just for the court reporter say too --

5    we have someone taking this down as well.  So sometimes if

6    we can -- I'm guilty of that as well, talking fast.

7         What are some of the goals of public health?

8    **A.**   Well, clearly, in the prevention space, the goal is in

9    terms of preventing disease from happening in the first

10   place.

11        So prevention becomes key strategy.  So if you look at,

12   for example, 100 years in the United States from 1900 to

13   2000, an average person who was born in 1900 -- I'll

14   simplify it this way.  There was an average life expectancy

15   of 45 years if you were born in 1900.  In 2000 your average

16   life expectancy was about 75 years, give or take.

17        So the question is:  How did we in the United States

18   get 30 years of life expectancy in 100 years?  And that's

19   important to ask because, because this particular crisis,

20   our life expectancy is apt to go down for the first time in

21   the history of the country.

22        So when scientists, we look back, 25 of those 30 years

23   is because of public health interventions, things like DUI

24   laws, seat belt safety, clean water, sanitation,

25   immunizations.

1          Those are the kinds of things as opposed to specific,

2     the most fancy MRI machine or laser surgery, are responsible

3     for most of the progress and development in this country

4     from the aspect of public health.  But that goes, speaks to

5     the prevention aspects.

6          Now, within prevention, we try to do all levels of

7     prevention.  So there's obviously prevention of disease, but

8     then if someone ends up having a stroke, for example, or

9     having a substance use disorder, for example, they're

10    secondary and tertiary to that.  You have them -- prevent

11    them from having other diseases.  So that's prevention.

12         You also do a certain aspect, what we call

13    surveillance.  So that's monitoring of disease conditions

14    across the community.

15         In a doctor's office, you have a doctor and a patient.

16    In public health, your patient is the community.  And that

17    community can be, for a local health department, Kanawha

18    County or Putnam County.  In a state, it's the state.  In a

19    nation, it's the country.

20         So that's your community and you're the physician

21    basically as a public health expert.

22    Q.   So let me make sure I'm right.  So this is not an

23    individual issue.  This is a public health matter.  And if

24    you could tell me what the difference is because you do

25    treat patients as well.  What is the difference between an

1    individual versus a community-based public health?

2    **A.**    Certainly.  So what we have learned over the last 20,

3    30 years potentially is that only about 10 to 20 percent of

4    your health is defined by the individual doctor/patient,

5    within the four walls of the doctor's office or the

6    hospital.

7         Up to 80 to 90 percent of the health is defined by

8    factors beyond that, meaning where you're born, where you

9    live, where you learn, where you worship, where you work.

10   All those things are called social determinates of health.

11        And those are community factors that are -- apparently

12   turns out have more to do with public health and the health

13   of individuals and community than actually the clinical care

14   and the medical care you're getting.

15        That's actually what inspired me to enter public health

16   at a very young age in my career because there's a lot more

17   we can do by helping community health.  And each one is

18   important and significant, but public health is really about

19   the health of the community you're serving.

20        But the principles more or less remain the same because

21   you want to do diagnosis of the community.  You want to do

22   surveillance of these conditions.  And you want to do

23   treatment of that community.

24        So all of that from prevention, early intervention,

25   treatment, to recovery, all these aspects that you do for

1    individuals more or less you apply to a community setting.

2    **Q.**    Doctor, as your work as a public health official, how

3    do you know what is impacting a community from a public

4    health standpoint?

5    **A.**    So there's a number of things we do in terms of

6    intervention or surveillance activity in public health that

7    are consistent across the country.  I work with, you know,

8    49 other commissioners.

9        One of those things is conducting regular and routine

10   surveys.  So if you look at Americans' health rankings or

11   you look at, you know, all this data, where do you get those

12   data that CDC has?  That data comes from the work of the

13   state and local health departments that are conducted across

14   the country.

15       One of those are called BRFSS, Behavioral Risk

16   Surveillance Survey.  We do that and we submit that to the

17   CDC.  At that point, you know how many fruits and vegetables

18   people are eating and if people in southern West Virginia

19   are doing better or worse than northern West Virginia or

20   other places.

21       So those are the kinds of things.  That's one.  There's

22   another one called YRBS.  We do that in middle and high

23   school as well.  So these are types of surveillance

24   activity.

25       We also do disease specific surveillance and

1    monitoring.  For example, right now, you know, we would be

2    doing flu surveillance in flu season or the current

3    surveillance of COVID.

4        We, we also monitor the rates and produce reports at

5    the rates of diabetes, rates of heart disease, rates of

6    cancer, rates of arthritis across and historical things.

7    And, of course, rates of -- whatever is ailing the community

8    first and foremost, primarily what's killing and disabling

9    West Virginians.  We have an obligation to look at that not

10   in terms of just what's there, but in terms of the temporal

11   things that are happening so we can better diagnose that and

12   develop an intervention that are evidence-based and help the

13   community.

14   **Q.**   Doctor, do you do commission reports?

15   **A.**   Yes.

16   **Q.**   Do you present your findings?

17   **A.**   Yes.

18   **Q.**   And do you make them public?

19   **A.**   Yes.

20   **Q.**   And specifically in this matter to opioids with that,

21   can you -- as a Public Health Commissioner, can you tell the

22   Court specifically when a decision came about to focus on

23   opioids?  I think you mentioned earlier that's one of the

24   first things you did.

25   **A.**   Yeah.  The decision -- so before my time, I would give

1   a lot of credit to people part of my time because there's a

2   lot of work happening in West Virginia across the years

3   because there was a tsunami of deaths and suffering that was

4   beginning and continuing to happen in the state.

5        Not only that, it was above and beyond anything else we

6   had ever seen.  So I'll give you an example.

7        In 1999 the overdose death rate in West Virginia was

8   lower than the country's.  And, so, when we looked at that,

9   we said, well, that's --

10       MS. MAINIGI:  Objection Your Honor.

11       I apologize for interrupting, Dr. Gupta.

12       I object on the basis of foundation, Your Honor.  This

13  witness has testified he arrived in West Virginia in various

14  public health roles in 2009.

15       THE COURT:  Well, if you can lay a foundation for

16  how he knows, Ms. Kearse, I'll allow it.  Otherwise, the

17  objection is sustained.

18       MS. KEARSE:  Thank you, Your Honor.

19  BY MS. KEARSE:

20  Q.   Dr. Gupta, when you arrived to serve the State of

21  West Virginia as a Public Health Commissioner, what did

22  you do to have an understanding of what you just talked

23  about in regards to the public health matters relating

24  to opioids in West Virginia?

25       MS. MAINIGI:  And, Your Honor, just a further

1   objection which may just be a clarification of my prior

2   objection.  I believe Mr. -- Dr. Gupta started as the

3   Commissioner of Kanawha County.  And, so, I think his, his

4   knowledge base would be related to Kanawha County.  It was

5   not until 2015 he was the State Health Commissioner.

6           THE COURT:  Well, if you can lay a foundation for

7   him, Ms. Kearse.  Otherwise, I'll sustain the objection.

8           MS. KEARSE:  Right.

9   BY MS. KEARSE:

10  Q.   Specifically, Doctor, when you became the Public

11  Health Commissioner of the State of West Virginia, did

12  you -- as one of your first things you testified, you

13  started looking at opioids and the community health.  So

14  I want to ask you what did you do as a Public Health

15  Commissioner to identify a public issue with opioids?

16  A.   So, Your Honor, one of the first things that a

17  Commissioner does is because it began on January 1, 2015,

18  they don't just take the ball and run with it.  They have an

19  obligation to look at what's happened behind.

20          So the first thing I did was I commissioned a report

21  that looked at the historical trends of opioids from 2001 to

22  2015.  And that report studied what we were going through in

23  the State of West Virginia for the last 15 years.

24          THE COURT:  Do you still have an objection, Ms.

25  Mainigi?

```
 1              MS. MAINIGI:  Your Honor, I'm just waiting for the
 2    next question in terms of where it might go.
 3              THE COURT:  Okay.
 4    BY MS. KEARSE:
 5    Q.   We'll get to the report you mentioned, Dr. Gupta.
 6    Was that a report that you yourself commissioned?
 7    A.   Yes.
 8    Q.   And was that a report that you published?
 9    A.   Yes.
10    Q.   Made public?
11    A.   Yes.
12    Q.   Does that report specifically deal with opioid
13    addiction?
14    A.   It deals with the historical trends of opioids from
15    2001 to 2015.
16    Q.   And specifically -- let me ask you, can addiction be a
17    public health matter?
18    A.   Addiction is a public health matter.
19    Q.   And can you explain?  How is addiction a public health
20    matter, and specifically to opioids?
21    A.   Sure.  So, first of all, we have to look at the
22    numbers.  When I walked into the office, we were having
23    continuous year after year increase in deaths by double
24    digit percentage increases.
25         Whenever any condition is causing West Virginians to
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    die year after year by double percentage increase, that

2    issue becomes a public health matter, period.

3         So it happened to be in this case drug overdose deaths.

4    And drug overdose deaths, part of the reason -- or the

5    reason that the people were using drugs and dying of

6    overdose is because of the addiction.

7              MS. MAINIGI:  Objection, Your Honor.  I don't -- I

8    move to strike Mr. -- Dr. Gupta's testimony.  It's not -- we

9    haven't established him as having an opinion based on

10   causation here.  He's not reviewing the report and what the

11   report says.

12        I don't know how he is in a position coming in in

13   January -- in 2015 to testify as to what happened for the

14   prior 15 years.  He received that information based on facts

15   that were told to him by others.  And then what is in the

16   report itself would be hearsay, Your Honor.

17             THE COURT:  Well, as I indicated before, I think

18   the thing for me to do is to take his testimony.  You can

19   put your objections on the record and I'll try to sort it

20   all out later.  That was my previous ruling and I'm going to

21   stick with that for now.

22        The record will show your objection, Ms. Mainigi.

23             MS. MAINIGI:  Thank you, Your Honor.

24   BY MS. KEARSE:

25   Q.   Dr. Gupta, as a public health matter, do you look

1   backwards in order to move forward?

2   **A.**    Yes, Ms. Kearse, and I want to really make clear the

3   essential tenets of public health, Your Honor.

4        One of the important pieces of public health is without

5   understanding your community and what's going on, you are --

6   you cannot be effective in designing interventions to make,

7   make an impactful outcome.  And part of that understanding

8   your community is going back and seeing what's happened.

9        So this would be an important piece just like someone

10  would come -- a police person would come to the scene of

11  investigation and try to understand better.  That's our job

12  as public health experts; to come to a scene, understand

13  better, learn, look at the trends and data.  Without those

14  trends and data, public health does not exist.

15       So it's a critical and crucial and central tenet of

16  public health to look at the trends, understand the trends,

17  and move forward.  If you were to ever design an impactful

18  strategy, we cannot design one without understanding what's

19  going on in my community.  I just can't do that.

20  **Q.**   As Commissioner of Public Health, did you dedicate

21  significant time and resources to understand the scope and

22  investigate opioids in West Virginia?

23  **A.**   Yes.

24  **Q.**   And does that encompass Cabell County and City of

25  Huntington?

```
1    A.   Yes.

2            MS. KEARSE:  Your Honor, may I approach?

3            THE COURT:  Yes.

4    BY MS. KEARSE:

5    Q.   Dr. Gupta, you mentioned a report of 2001 to 2015.

6    I'm going to hand you what's marked as Exhibit 41213.

7            MS. KEARSE:  Your Honor, may I approach and

8    provide you a copy as well?

9            THE COURT:  Yes.  Thank you.

10   BY MS. KEARSE:

11   Q.   Doctor, this is the report you referenced a few

12   minutes ago about your investigation?

13   A.   Yes.

14   Q.   And, Doctor, did you -- I'm going to mark it 41213.

15   Was this report an investigation done in your capacity as

16   the Commissioner of Public Health for the State of West

17   Virginia?

18   A.   Yes.

19   Q.   And is this a, a report you both commissioned and were

20   personally involved in?

21   A.   Yes.

22   Q.   And was this report made public?

23   A.   Yes.

24   Q.   And does this report contain your various findings of

25   your investigations in the State of West Virginia with
```

1     opioids specifically?

2     **A.**   Yes.

3           MS. KEARSE:  And I've got this on the screen, Your

4     Honor.

5     BY MS. KEARSE:

6     **Q.**   Can you explain briefly then, Doctor, what is

7     detailed in here?  And I want to go over some of the

8     findings in here, but tell the Court about your

9     investigation and we'll go through the findings.

10    **A.**   So I'll start with Page 1.  And you can see at the

11    introduction it clearly states the tsunami of, of the deaths

12    that the country, as well as West Virginia, Cabell County

13    and City of Huntington were facing.  So it very clearly

14    states the opioid deaths continued to surge nationally in

15    2015, surpassing 30,000 for the first time.

16          So what we -- we start with talking about the deaths

17    with opioids, with fentanyl, with heroin that are right

18    there, including a quote from the then CDC Director, Tom

19    Frieden who said, "Prescription opioid misuse and use of

20    heroin and illicitly manufactured fentanyl are intertwined

21    and deeply troubling problems.  The epidemic of deaths

22    involving opioids continues to worsen," end quote.

23    **Q.**   Okay.  So, Dr. Gupta, I'm actually -- so the Court

24    knows where we are on that, the first page of this report

25    actually outlines some of your investigation of what has

1    been going on in regards to opioids?

2    **A.**    Yes.

3    **Q.**    And when you mentioned there the intertwining,

4    prescription opioid misuse and heroin and illicitly

5    manufactured fentanyl are intertwined and deeply troubling,

6    did you investigate that as part of your investigation as

7    the Commissioner of Public Health?

8    **A.**    Yes.  This -- the report was the first step in the

9    investigation.

10   **Q.**    And, Dr. Gupta, Figure 1, is this -- it's entitled "How

11   the Epidemic of Drug Overdose Deaths Rippled Across

12   America."  Is that part of your investigation that you did

13   in order to publish this 2001 and 2015 report?

14   **A.**    This is actually from a *New York Times* investigation.

15   But we found our numbers in West Virginia to be very

16   similar, so we put this out because this demonstrates -- the

17   importance of this picture is it demonstrates that all the

18   way through 2003, if you look at the first picture of the

19   United States, West Virginia was the canary in the coal

20   mine.

21       So because it began in West Virginia in 2003 -- and you

22   can see the entire country literally began after that to

23   burn from opioids.  So this is the overdose deaths across

24   the country in a span of 2003 to 2014.  And you can see all

25   the red that's spread from West Virginia and some parts of

```
 1    the West Coast across the entire country is, is -- pretty

 2    much explains the problem in a snapshot.

 3                MR. HESTER:  May I object, Your Honor, --

 4                THE COURT:  Yes.

 5                MR. HESTER:  -- and move to strike the witness's

 6    last answer on the basis that he's simply reporting on

 7    hearsay taken out of the New York Times.

 8                MS. KEARSE:  Your Honor, I think he testified that

 9    he did this in his capacity as an investigation.

10                MR. HESTER:  Well, it's sourced, Your Honor, out

11    of the New York Times.  So the witness is reporting on

12    something that's stated in the New York Times.  It's

13    hearsay.

14                MS. KEARSE:  Your Honor, I believe he's

15    testified --

16                THE COURT:  Can you respond to that?

17                MS. KEARSE:  Yes.  He's testified -- and I can ask

18    other questions on that.  He testified he went back when he

19    studied the origins of the opioid epidemic to understand how

20    it's impacted West Virginia.

21        Is that correct?

22                THE WITNESS:  Yeah.  What I'm saying is this

23    report has the name of Governor Justice on it and this was

24    done as a government report.

25                THE COURT:  Just a minute.
```

1        Mr. Hester.

2            MR. HESTER:  Your Honor, I simply want to make

3    clear we understand that Dr. Gupta's name is on the report,

4    but he can't recite hearsay within the report as a statement

5    of fact.  He's -- it's hearsay within the report.  So this

6    is an example I think.  It's sourced out of the newspaper.

7            MS. KEARSE:  Your Honor, this is a published

8    government report on behalf of the State of West Virginia

9    that Dr. Gupta commissioned and was personally involved in

10   and collected information specific to the investigation that

11   he's testifying about now.

12           THE COURT:  What about the hearsay within hearsay?

13   The public records exception might get you over the first

14   hurdle, but what about the fact that the *New York Times*

15   report is itself hearsay?

16           MS. KEARSE:  I believe the *New York Times* report

17   is sill a public record.  It's a public newspaper that has

18   put this information out.  And it's sourced -- I can ask --

19   BY MS. KEARSE:

20   **Q.**   Do you know what the sources are for these?

21   **A.**   We put it in here because we verified this to be

22   accurate in our sources.

23           THE COURT:  I'm going to allow him to testify,

24   Mr. Hester.  Your objection will be preserved for the record

25   loud and clear and we'll see where this goes.

67

```
 1              MR. HESTER:  Thank you, Your Honor.
 2    BY MS. KEARSE:
 3    Q.   Dr. Gupta, I'm going to get to the specifics on
 4    here, but did your report investigate going backwards
 5    the origins of the opioid epidemic?
 6    A.   It did.
 7    Q.   And did you report that in this report that is a public
 8    record on behalf of the State of West Virginia?
 9    A.   Yes.
10    Q.   Did you look into the overdose rates in West Virginia
11    specifically in this report?
12    A.   We did.
13    Q.   And if you can tell the Court -- the report is titled
14    2001 to 2015.  What was involved in your investigation
15    that -- we'll go through your findings -- that allowed you
16    to issue a report on the West Virginia drug overdose deaths
17    historical overview from 2001 to 2015, if you can explain
18    what the investigation entailed?
19    A.   So we, we -- the Health Statistics Center, which is
20    within the Bureau of Public Health, maintains the birth,
21    death, marriage, other vital records at the state's place
22    where all the vital records are held.
23         We utilized the, the Health Statistics Center data,
24    matched it up with the Office of the Chief Medical Examiner.
25    In West Virginia we have a centralized Chief Medical
```

```
 1    Examiner's Office, so we were able to see both the deaths

 2    and verify the overdose deaths from the Health Statistics

 3    Center with the Office of the Chief Medical Examiner, as

 4    well as verify the details of all those deaths in terms of

 5    what they were from going all the way back to 2001 in the

 6    Office of the Chief Medical Examiner.

 7         So it entailed pulling a number of aspects of data from

 8    both of those.  And then there was some other information

 9    that was made available from the DHHR's Bureau for

10    Behavioral Health and Health Facilities that was also part

11    of the epidemiological profile.

12    Q.   As part of this report and your understanding of the

13    epidemic in West Virginia, did you conduct town halls as

14    well?

15    A.   It was not part of this report, what we did at town

16    halls.

17    Q.   Okay.  Dr. Gupta, in relation to Figure No. 2, can you

18    tell the Court what Figure No. 2 represents and is it

19    similar to what you just testified about?  I want to make

20    sure we're clear on the overdose --

21         MS. MAINIGI:  Objection, Your Honor.

22         Your Honor, I have a relevance objection here.  This

23    entire report and this specific question relates to West

24    Virginia.  Our case is obviously about Cabell County and

25    Huntington.
```

1          I think it would be improper for this witness to be

2     introducing testimony via this report or otherwise about

3     West Virginia at large without any specific focus on Cabell

4     and Huntington.

5          I also don't think the proper foundation has been laid

6     at this point in time for Dr. Gupta to testify about the

7     report.  He keeps referring to "we" and so forth.  He has

8     not told us what he specifically did with respect to any of

9     the data and analysis that underlies the report.

10               THE COURT:  Ms. Kearse, do you want to reply to

11    that?

12               MS. KEARSE:  Sure.  Your Honor, Dr. Gupta -- may I

13    ask a follow-up question with Dr. Gupta or specifically to

14    Your Honor with that?

15               THE COURT:  Let me --

16               MS. KEARSE:  I think I can clarify that particular

17    question about --

18               THE COURT:  Well, let's address the objection that

19    it covers a broader geographical area than the area in this

20    trial.

21               MS. KEARSE:  Yes, Your Honor.

22          This deals with the State of West Virginia, but it's

23    also relevant to his testimony about the City of Huntington

24    and Cabell County.

25          And specifically within the report there are sections

1    that are specific to Cabell County and City of Huntington

2    and various graphs through here about the overdose rates and

3    other statistical information he put together.  I can go

4    over the -- there are several figures that are specific to

5    Cabell County.

6              THE COURT:  Well, I think the whole view of the

7    whole situation in West Virginia is relevant to what

8    happened in, in Cabell and Huntington.  It's helpful

9    background at least for that, and I'll overrule that

10   objection.

11       Now, what about the fact that you haven't laid a proper

12   foundation for this?

13             MS. KEARSE:  I believe I have, Your Honor, but

14   I'll go through it again as well.

15   BY MS. KEARSE:

16   **Q.**   So I believe we've identified Exhibit Number 41213.

17   And this is an investigation that you have conducted as

18   the Commissioner of Public Health.

19       Can you explain to the Court your specific involvement

20   in both commissioning this report and putting this as a

21   public document?

22   **A.**   So, Your Honor, the term "Commissioner" comes from the,

23   first and foremost, ability to be able to commission

24   reports.  So that was my first and foremost job is to be

25   able to analyze a problem as the commissioned state health

1    officer of the State of West Virginia, and then be able to
2    commission the relevant reports that I needed as tools in my
3    toolbox in order to start addressing the problem.
4        So this report which I oversaw, I, I designed, created
5    the methodology, helped create the methodology and
6    obviously, you know, asked my staff and other experts to
7    create.  I commissioned this report in my capacity as the
8    Commissioner of the Bureau of Public Health.
9            THE COURT:  So this report was authorized by
10   appropriate authorities and you -- because of the
11   authorization, you had a duty to do this investigation and
12   make this report.  Is that correct?
13           THE WITNESS:  Yes, Your Honor, I authorized the
14   report.  I commissioned the report.  And I supervised the
15   report.  I developed the methodology for the report.  I
16   coordinated the individual offices within the Bureau of
17   Public Health and outside of the Bureau of Public Health to
18   ensure that all of the conditions were met in order for this
19   work to be done.
20       I also authorized the resources that were needed, Your
21   Honor, in a government agency as the chief fiscal officer of
22   this large agency.  I have responsibility to ensure that we
23   were using our resources appropriately.  This report
24   required resources and I was the authorizing authority of
25   resources for this report.

1            THE COURT:  Okay.  And what office did you occupy

2    while you were making this report?  Tell me that again.

3    You've already said it but --

4            THE WITNESS:  Yes, Your Honor.  I was the

5    Commissioner for the Bureau of Public Health, State Health

6    Officer.

7            THE COURT:  And you made this report pursuant to

8    your duties attendant to that office?

9            THE WITNESS:  Yes, Your Honor.

10           THE COURT:  Overruled.  I'm going to admit it.

11           MS. KEARSE:  Your Honor, I've put it on the

12    screen.  The cover page is within there as well that shows

13    Dr. Gupta in his position as the Commissioner for the Bureau

14    of Public Health, State Health Officer on that.

15    BY MS. KEARSE:

16    **Q.**   Dr. Gupta, can you tell the Court your specific

17    steps that you took in issuing this report?  And then

18    we'll go through some of the findings of this report.

19    **A.**   Sure.  So one of the first things, Your Honor, as I had

20    mentioned, in January of 2015 coming into the office where

21    we were seeing these deaths rise continuously, we wanted to

22    understand and get a better assessment of what's happening

23    in the State of West Virginia with regard to drug overdose

24    deaths.  We had to have a better comprehensive

25    understanding.  I had a mandate from both the Cabinet

1    Secretary and the Governor at the time to be able to do

2    this.

3        So I, you know, authorized and commissioned and put the

4    adequate resources, both in human capital as well as

5    financial resources, office, taxpayers of the State of West

6    Virginia to create this report.

7    **Q.**   And does this report, then, reflect your findings of

8    that investigation?

9    **A.**   It does.

10   **Q.**   And does this report go in detail into various subject

11   matters that relate to opioid overdoses and addiction?

12   **A.**   It does it in a more comprehensive manner that it had

13   been prior available.

14   **Q.**   And can you tell the Court some of your specific

15   findings in regards to your review, your historical review

16   from 2001 from 2015?

17   **A.**   Yes.  So one of the striking things we found was, Your

18   Honor, that compared from 2001 to 2014, that was the

19   duration of this report for this purpose, the drug -- the

20   West Virginia drug overdose deaths spiked not just high, but

21   several folds higher than the United States average.

22       So, for example, there were in 2001 6.8 Americans per

23   100,000 dying of overdose deaths in the United States.  And

24   there were 11.5 West Virginians dying for the same

25   conditions.  That's about twice as much.

1        Now, by 2014, the 6.8 Americans went to 14.7.  But for

2   West Virginia, the 11.5 number went to 35.  So we had

3   five -- I'm sorry.  We had more than twice -- about two and

4   a half times increase.

5        If you look at the rate of increase, it's much -- the

6   slope is much steeper in West Virginia than was happening

7   for the rest of the country.  We were the ground zero at the

8   time during these years.

9        Now, the other thing we found compellingly interesting

10  is with each decedent, we do autopsy.  We also conduct the

11  number of controlled substances in their body.

12       And what we found in Figure 2, as you can see, for each

13  year the controlled substances --

14  Q.   I'll put Figure 2 up for the Court.

15  A.   What we can see is they're using an average of 2.3

16  controlled substances or substances in their body.  And it

17  went up all the way to three and a half.  That means not

18  only were they dying from overdose, but they were doing a

19  lot of combination drugs as well.

20       So that's between Figure 2 and Figure 3.  I can

21  continue to go on if you like me to.

22  Q.   Let me, let me -- so as part of your investigation, did

23  you seek to find the reasons why you were having overdose

24  deaths and -- from your report?

25  A.   So, clearly, if, if you look at Table 1, Table 1 is on

1    Page 8 at the bottom.  It starts to look at -- and, you

2    know, we have one of the most effective Chief Medical

3    Examiner's offices in the nation.

4         And one of the things you'll see here is from 2001 to

5    2015 across and from top to bottom is the drugs that they're

6    dying of.

7         So you can see at the end in 2015, for example, from

8    hydrocodone there were 113 deaths.  From oxycodone there

9    were 182 deaths.  From fentanyl there were 180 deaths.  From

10   heroin there were 201 deaths.  But, remember, these were

11   overlaps.  So if you add them all up, they will not just

12   add -- you know, there could be more or less.

13        But what we find is basically if you look at the total

14   record, at least one opioid at the bottom, the last, the

15   bottom row, there is at least one opioid.

16        So there were 636.  And there was 554 in 2014.  So if

17   you -- there were a total of 638 deaths in 2015 that had at

18   least one opioid in the system.

19   Q.   And it looks like a total of 6,001, at least one opioid

20   from that time period from 2001 to 2015?

21   A.   Yes.  So six -- over 6,000.  So 6,001 West Virginians

22   perished which had -- between 2001 and '15 which had at

23   least one opioid in their system.

24   Q.   And why is that important, Doctor, to your

25   investigation?

1   **A.**   That's --

2         MS. MAINIGI:  Objection, Your Honor.  I think we

3   went down this road as it relates to causation.  This

4   report, Your Honor, does not draw any conclusions related to

5   causation or conclusions about how things got where they

6   got.

7       But I do not think that that Dr. Gupta is going to

8   testify as to any causation issues involved here based on

9   the report at least.

10         THE COURT:  Well, you're not asking him about

11   causation now, are you?

12         MS. KEARSE:  Not now, Your Honor, no.  I'm asking

13   him for the specific findings of this report.

14         THE COURT:  I don't understand the objection.

15         MS. MAINIGI:  Your Honor, there was a question a

16   couple of questions ago that was leading into causation, so

17   it seemed like we were headed back in that direction.  So

18   perhaps my objection is a question early, Your Honor, but I

19   continue forward with the objection.

20         THE COURT:  All right.  Overruled and we'll see

21   where it goes.  I'll probably hear it again.

22       Go ahead, Ms. Kearse.

23   BY MS. KEARSE:

24   **Q.**   Dr. Gupta, you mentioned Figure 3 to the Court as

25   well.  I just wanted to make sure you had the

1    opportunity -- you mentioned it there.  But can you

2    explain your reference to Figure 3 in regards to your

3    investigation and the importance to your findings?

4    **A.**   Yes, Your Honor.  I think the Figure 3 when we look at

5    this, the blue line is West Virginians being perished

6    because of overdose deaths, and the red line is the United

7    States.

8         What is the most striking is in those years between

9    2001 and 2014 did we not only keep up with the rate of

10   Americans perishing because of overdose deaths and historic

11   high levels, but we super-succeeded those numbers.

12        So we here in West Virginia were drowning in these

13   deaths as opposed to the rest of the country.  We were

14   ground zero.

15   **Q.**   Dr. Gupta, when you went through your investigation,

16   did you also look for various other types of information or

17   what the data was -- what was the data reflecting in other

18   areas in regards to your review from the 2001 and 2015 data?

19   **A.**   So there was some, across the time period, some, some

20   really clear data that is -- that's disturbing, truly

21   disturbing beyond this.

22        Your Honor, one of the things that was very disturbing

23   was that the majority of West Virginians that were perishing

24   because of this were actually the working age West

25   Virginians.  They were between the ages of 25 and 54.

1          So as opposed to -- you know, you would expect a

2     different age group.  These were the hard-working West

3     Virginians that were being impacted in the prime of their

4     life and they were the ones that were dying.  So that was,

5     to us, quite impactful.

6     Q.    Doctor, did you also look into the county level data to

7     issue some of your findings in this report?

8     A.    Yes.  So we looked at especially the highest level of

9     counties that were being negatively impacted through the

10    deaths.  And clearly beyond Kanawha, Cabell was the one that

11    had suffered the most deaths in that -- from opioid related

12    overdoses in the State of West Virginia between 2001 and

13    2015.

14    Q.    Does Figure 7 reflect that finding?

15    A.    It does.

16    Q.    And can you tell this Court -- let me go back to Figure

17    6 on this report.  Is that, is that what we just looked at

18    in regards to the death certificates and the 6,001 drug

19    overdose deaths?

20          THE COURT:  Now you're talking about total deaths?

21    Because those two counties have the highest population, I

22    think, of any county in the state.  Right?

23          THE WITNESS:  Your Honor, actually, Berkeley

24    probably has one, but Berkeley was also amongst that.  So

25    the total deaths would be those, yes, Your Honor.

1            THE COURT:  So the size of the community would

2      impact the total number of deaths obviously.

3            THE WITNESS:  Yes, Your Honor.  And within, Your

4      Honor, various counties, of course, from Cabell to south

5      West Virginia, southern West Virginia, the rate was a lot

6      higher per capita of deaths than it was some of the other

7      northern and eastern panhandle.

8            THE COURT:  That was my next question.  Thank you.

9      BY MS. KEARSE:

10     **Q.**   I'm going back to Figure No. 7.  And would you just

11     explain that?

12     **A.**   That's exactly -- so what we're seeing here is Kanawha

13     County 713 deaths from 2001 to 2015 because of opioid

14     related overdoses.

15            Then the next one on there is obviously Cabell County

16     and then -- well, it's -- yeah, Cabell County.  And then,

17     obviously, we see a lot more happening in both southern West

18     Virginia.  And the one in Berkeley County is primarily, of

19     course, the population factor comes in as well.

20     **Q.**   And, Dr. Gupta, you mentioned you, you looked into the,

21     the age range.  And I just want to reflect on Figure No. 8.

22     Is that your -- reflective of your testimony about looking

23     at the age in regards to your findings in these studies?

24     **A.**   Yeah.  And, and really that was, as I mentioned, one of

25     the heartbreaking aspects of this particular epidemic in the

1    State of West Virginia is the, the type -- the people that

2    are being consumed by it is the average working age West

3    Virginians in the prime of their life.  So we're talking

4    about between 25 and 54 years of age, especially between 35

5    and 54 years of age that perished and the highest numbers.

6    **Q.**   And it also reflects all ages, as well, as dying from

7    overdose?

8    **A.**   It does.  And this is the kind of data that gives us

9    both information from a public health perspective, but also

10   starts to distinguish this from perhaps previous epidemics

11   or previous aspects.

12        So, you know, we look at historic trends.  We look at

13   current trends.  And we can predict what -- is there a

14   relationship previous and current trends or not.  So this

15   type of information was -- had a lot of importance to it.

16   **Q.**   Doctor, did you also look into some specific types of

17   drugs within your investigation, specifically oxycodone,

18   hydrocodone?

19   **A.**   Yes.  That's in Table 1 as we just went over that.

20   **Q.**   And if you'll turn to Figure 12 -- we'll start with

21   Figure No. 11.

22   **A.**   Uh-huh, yes.

23   **Q.**   Can you tell the Court in regards to your findings in

24   your investigation, what's the significance of Figure 11?

25   **A.**   In Figure 11 we looked at the oxycodone related

1    overdose deaths, specifically by age in the State of West

2    Virginia from 2012 to 2015.  The total number of people that

3    died was about 765.

4         Of those people, we build a spread according to age.

5    And, once again, what we see is the most number of people in

6    age group was 45 to 54 years of age that died followed by 35

7    to 44 year range.  And that pretty much matched up with the

8    entire spectrum as well.

9    **Q.**    Figure 12 is a reflection of that data as well?

10   **A.**    Yes.  The above figure was who and this is where.

11   **Q.**    Okay.

12   **A.**    And this figure clearly shows Kanawha County and Cabell

13   County numbers as well.

14   **Q.**    And, and why was the investigation -- why did you

15   include oxycodone related overdose deaths in your report?

16   **A.**    So if you go back to Table 1, you will see that

17   oxycodone and heroin and fentanyl are the most common types

18   found in people dying.  So you can see clearly when you look

19   at fentanyl that's often mixed up with heroin, those

20   numbers, as well as oxycodone, they are amongst the numbers

21   that have the -- we found to be highest in people dying.

22        So it's important that we start to do a little deep

23   dive into ones that you're finding the highest numbers of

24   versus low numbers of.

25        So you'll see we've done the same deep dive for heroin.

1    We've also done, you know -- so then you -- this is public

2    health.  So one of the first things you do is you find where

3    the most of the deaths are happening and you start to hone

4    down on those deaths.

5    **Q.**   And are you referring to the -- I'm going to point to

6    Figures 13 and 14 regarding the heroin related overdose

7    deaths.  Is this what you're referring to?

8    **A.**   Yes, I am.

9    **Q.**   And can you explain to the Court what Figure 13, heroin

10   related overdose deaths, what the significance of that is in

11   your investigation?

12   **A.**   So because we found heroin to be a major, major player

13   in the deaths of West Virginians, we also wanted to know how

14   is it trending over the years.  It was very important for us

15   to look at the trends.  And that's why we go back

16   historically.

17       So what we found, according to Figure 13, is basically

18   if you look at that, the blue box is the total of heroin

19   related overdose deaths in West Virginia between 2001 and

20   2015.  The orange is men and, and yellow is women.

21       What you can clearly see is it started to spike quite

22   significantly from 2012 onward.  So 2012 we had 67 deaths

23   from heroin predominantly.  And in 2013 they just spiked

24   several fold.

25       And that was important for us to know because we want

```
 1    to know when the State of West Virginia and similarly

 2    situated Cabell County and City of Huntington started to see

 3    the onslaught of the heroin come into versus not.

 4    Q.   So these are the facts that you're finding and then

 5    we'll deal with the why later.  But is this leading up to

 6    the finding what you're doing as to then why it's happening?

 7    A.   Yes, for --

 8              MS. MAINIGI:  Objection, Your Honor.

 9              THE COURT:  Just a minute.

10              MS. MAINIGI:  Objection, Your Honor, leading.

11    Ms. Kearse is testifying.

12              MS. KEARSE:  We can come back to that, Your Honor.

13              THE COURT:  You can rephrase your question.  I'll

14    sustain the objection.

15              MS. KEARSE:  Yes, Your Honor.

16    BY MS. KEARSE:

17    Q.   Is Figure 14 a follow-up from Figure 13 in regards

18    to the heroin related overdose deaths?

19    A.   So Figure 13 that we had up before signified a very

20    important transition from 2012 to 2013.  That was the

21    sentinel time, the sentinel time where we saw a spike in

22    heroin deaths.  And that's the significance of that.

23         Now, Figure 14 starts to talk about again from who to

24    where.  And you can start to see now again Kanawha and

25    Cabell, with a significant predominance in Cabell compared
```

1   to Kanawha, of heroin related overdose deaths in West

2   Virginia from 2011 to 2015.  Remember, these are 2011 to

3   2015.

4        In the bottom actually you can see the number of the

5   total deaths.  So Berkeley, Cabell, and Kanawha County we

6   had about 631 deaths.

7   **Q.**   Did you also go a little deeper and look into specific

8   zip codes and areas within your reports in Figure 15?  15

9   and 16, if you can explain the significance of those

10  findings to this Court.

11  **A.**   So I mentioned why it was important in previous Figure

12  13, that transition from 2012 to 2013.  Now with a very

13  similar pattern, we're now starting to hone down between

14  2012 and '15.  So we start to focus, focus, focus until we

15  get there.

16       So now we've found that a-ha.  We have that a-ha moment

17  that something happened from 2012 to 2013 in the State of

18  West Virginia where suddenly the heroin deaths started to

19  spike and we wanted to understand that better.

20       What is that that happened?  How closely can we get to

21  understand what happened using the public health tools?

22       And that's where we go to Figure 15 and Figure -- and

23  try to see that from a zip code standpoint.  This is

24  exclusively from 2012 to '15.  And we can see the red means

25  that obviously there are more heroin overdose deaths in that

1    zip code.

2    Q.    And Figure 16, Dr. Gupta, what is the importance of

3    Figure 16?

4    A.    So this is once again the county level distribution of

5    heroin related overdose deaths in West Virginia.  So this

6    again goes back to 2001 to 2015.

7          And, so, if you look at the 2001 to 2015 in Cabell

8    County from heroin, those are -- that number is 163.

9          But if you look at from 2011 to 2015, Figure 14, that

10   number is 142.  So that 142, so that means that there were

11   only 21 deaths from heroin that happened between 2001 and

12   2011 in Cabell County.

13   Q.    Figure 17.  That's specific to 2015?

14   A.    Yes.  So the reason that is specific to, to 2015 and

15   the only red county there in that whole map of the State of

16   West Virginia is Cabell.  And the reason it's red is because

17   it is above -- the rate there is above and beyond anything

18   imaginable that we can see.

19         So we're seeing in 2015 it really shot up in Cabell

20   County.  But others were becoming orange too.  So you can

21   see almost what's coming.  It's coming.  You can see it.  It

22   hit Cabell.  It's going to hit other places.

23   Q.    And I want to talk about some other data points there

24   that are specific to Cabell County.  I'd like to point your

25   attention to Figure 22.  And if you can explain to the Court

1    what is significant about your findings from the

2    investigations in regard to Figure 22, county level

3    distribution of fentanyl related overdose deaths in West

4    Virginia.

5    **A.**   So the Figure 22 now talks about the other piece we

6    had.  Remember in Table 1 we saw overdose deaths happening

7    from heroin predominantly, fentanyl, and oxycodone.  And now

8    we want to understand the pattern of those deaths over the

9    years.

10        So we've talked about oxycodone.  We've talked about

11   heroin.  Now we're talking about fentanyl related deaths.

12        So fentanyl, as the Court is well aware, is, is often

13   times not used solely and easier, but it's used to cut

14   heroin.  And it is something that the person that is using

15   it often is not aware that their heroin may have been cut.

16   And it's basically Russian roulette every time you use

17   heroin.  You might make it, you might not make it because of

18   fentanyl.

19        So one of the things we found in Figure 22 is we looked

20   at the fentanyl related overdose deaths in West Virginia

21   from 2001 to 2015.  We found that the fentanyl related

22   deaths are happening again predominantly in Kanawha County

23   and Cabell County.

24   **Q.**   And I'll finish up with Figure No. 23.  Is that again

25   going back to the, the "where"?

1    **A.**    Yeah.  So in Figure 23 is clearly that 41.3 percent of

2    fentanyl related deaths were happening in Cabell County.  So

3    of those happening, a majority of those were happening in

4    Cabell County as opposed to other, other counties.

5    **Q.**    So, Doctor, I want to make clear -- and if there's

6    anything else within this report you think is significant to

7    your testimony, I certainly don't want to cut it off.  I

8    think we've covered a lot of ground with this report.  And I

9    want to just ask a question.  Again, why did you do this

10   report and investigation?

11   **A.**    Your Honor, this was -- this report -- as we went

12   through, you can understand.  Once, once I come in and I

13   have this report and I understand it, it helps me understand

14   better and make sure that we're putting resources where they

15   need to be put in order to, you know, address this tsunami

16   and this flood.

17         So our communities when I came into the office were

18   being flooded by deaths, flooded by prescriptions, flooded

19   by other aspects we didn't even know about.  I -- it was

20   very important for me to be able to do my job that I

21   understood better what was happening in those communities

22   and where it was happening more and where it was about to

23   happen.

24         So the, the strategy that I would adopt and gage what

25   was happening now is going to be quite different from the

1    strategy that I work to prevent the next one from happening.

2         So it helps -- it informs me.  It informs my office.

3    It informs the State of West Virginia, the Governor of West

4    Virginia as to where we need to go next.  And it helps us

5    inform the feds actually as to what's happening in West

6    Virginia.

7         So we're part of the large system and it helps us do

8    our, sort of play our role in order to address the issue.

9    **Q.**   And after this report, what did you do?  What did you

10   do with this data?

11   **A.**   So, you know, obviously no one report is ever all

12   inclusive of all information.  So this report was very

13   important.  Now we've got dead people.  They're still dead.

14        So the next thing for us to do was:  Why is this

15   happening and what are the relationships?  We wanted to

16   understand better and learn from our dead so we can help the

17   living.

18        And one of the things that happened when I came in 2015

19   and in 2016 I began to see there's like literally a

20   20 percent increase in deaths.

21        So imagine yourself, Your Honor, sitting in the

22   Commissioner's position and people are dying on the streets.

23   Not only are they dying, but we're getting double digit

24   increases every, ever year.  And the country's focus is on

25   you to be able to do something about it.

1        And that was the position I was in and a lot of my

2   colleagues were in in the State of West Virginia.  So we had

3   to do things more creative, more innovative, things that

4   haven't been done before anywhere in the country in that

5   way.

6        So one of the things I did was I commissioned a Social

7   Autopsy report to understand better and learn from people

8   who had already died.  If we had -- if we do not -- we could

9   not help people, then we've got to understand from the

10  deaths so we can learn better and implement better

11  strategies in the future.

12       So I commissioned a report.  One of the things I did

13  was commissioned a report called Social Autopsy.

14  **Q.**    Okay.  We're going to get to that and I'm going -- I

15  want to finish out this report and then -- did your

16  investigation also highlight some other issues that you need

17  to address from a public health standpoint, and specifically

18  looking at Page 24?

19  **A.**    Yeah.  So one thing that was very clear becoming to us,

20  we talked about addiction as a public health issue.  What

21  happens with addiction is not just the individual as opposed

22  to somebody getting pneumonia or a worker's injury.

23       So we, we have a lot of coal mines in West Virginia and

24  it's important for us to understand that.  We have a lot

25  of -- historically, there are tragedies that happen.  When

1    that happens, our communities come together and, and we

2    mourn.  That's what happens.  But at the end of the day,

3    that family is who's affected the most.

4         That's not the case with addiction.  With addiction

5    what happens is the individual, it's their health.  It's

6    their family.  It's their neighbors.  It's their community.

7    It's the economics of the community.  And it's everything

8    that happens.

9         The one thing we found out was -- what was important

10   for us was that we were seeing a lot more of these pills in

11   schools.  So what was happening was there's a free-flow of

12   the, the, the pills in elementary and middle and high

13   schools.

14        We knew that this was an issue that we had to address

15   in schools, an issue we have to address at work, issues that

16   we have to address in jobs, issue we have to address in

17   communities, no matter where you look.

18        So we started to work with various aspects of partners

19   and started developing partnerships.  I came in and one of

20   the first things I had to do was start to develop

21   relationships with our education, our Department of Military

22   Affairs and Public Safety, Board of Pharmacy, you know,

23   other aspects of DHHR.  All of these people or agencies was

24   important.

25        The other thing that was happening was, especially with

```
 1    heroin and fentanyl we talked about, as opposed to popping a

 2    pill, you inject heroin.  When you inject heroin, you share

 3    needles.  When you share needles, then you also share

 4    diseases.  Some of these are deadly diseases like HIV,

 5    Hepatitis B, Hepatitis C.

 6         So one of the fears I had in 2015 is if we are, and we

 7    were, seeing this increasing rates of heroin and fentanyl

 8    use and transition, then we're also going to be seeing a lot

 9    more cases of HIV, a lot more cases of hepatitis.  And

10    that's really troubling because now we're going to another

11    phase of this illness where people are going to be left with

12    not only a really difficult to treat life-long disease, but

13    the potential to spread it to other people easily.

14    Q.   And, Dr. Gupta, in your role as Commissioner of Public

15    Health, did you look into those matters as well?

16    A.   Yes.

17              MS. KEARSE:  Your Honor, I'd like to go ahead and

18    switch to another document, but go ahead and move this into

19    evidence.

20              THE COURT:  Yes.

21              MS. MAINIGI:  Your Honor, I object.  The report is

22    hearsay within hearsay.  And I also have a relevance

23    objection based on geographic scope.

24              THE COURT:  What is this?

25              MS. KEARSE:  Your Honor, I'm just moving this into
```

```
 1    evidence.

 2              THE COURT:  Moving this report into evidence?

 3              MS. KEARSE:  Yes, yes.  It's the document we just

 4    talked about with respect to Cabell County and Huntington.

 5              THE COURT:  I thought I already admitted it.  It's

 6    admitted.

 7         Your objection is preserved for the record, Ms.

 8    Mainigi.

 9              MS. MAINIGI:  Thank you, Your Honor.

10    BY MS. KEARSE:

11    Q.   Dr. Gupta, you just referred to something as a

12    Social Autopsy, but I want to be specific in what you're

13    referring to so that we can look at that report.  Can

14    you tell the Court specifically -- let me get the

15    document.

16              MS. KEARSE:  Your Honor, may I approach?

17              THE COURT:  Yes, you may.

18    BY MS. KEARSE:

19    Q.   Dr. Gupta, I'm handing you what we've marked as

20    Exhibit Number 44211.  Can you identify that document

21    for the Court?

22    A.   Me?

23    Q.   Yes, sir.

24    A.   This is the 2016 West Virginia Overdose Fatality

25    Analysis otherwise known as the Social Autopsy report.
```

```
 1    Q.   And, Dr. Gupta, did you perform -- let me go ahead and
 2    put -- on the second page of this report you're serving as
 3    the Commissioner of Public Health for the State of West
 4    Virginia?
 5    A.   Yes.
 6    Q.   And did you conduct and authorize an investigation and
 7    submit your findings in this 2016 West Virginia Overdose
 8    Fatality Analysis?
 9    A.   Yes.
10    Q.   And is this a document and now is a public record?
11    A.   Yes.
12    Q.   And this document details your findings and your
13    investigation?
14    A.   Yes.
15    Q.   Can you explain to the Court what was involved in your
16    investigation into this report titled 2016 West Virginia
17    Overdose Fatality Analysis?  And start with the "why" and
18    "how" --
19    A.   Yes.
20    Q.   -- it was done.
21    A.   So as I mentioned, Your Honor, we were seeing rises in
22    overdose deaths.  We were seeing that there was much more
23    use of heroin and fentanyl.  We were seeing the declining
24    number of prescriptions and opioids.  We wanted to know why.
25    We really wanted to understand that why is it happening that
```

1    these deaths are increasing in number and can we understand

2    better.

3         Now, to understand better, we had to understand people

4    who have perished.  So we took all of the deaths of 2016

5    that had happened in the State of West Virginia, especially

6    the residents of West Virginia.  And I asked the leaders

7    across the State of West Virginia, the government, because I

8    was the State Health Officer in addition to being the

9    Commissioner, I said, "We need to come together.  We need to

10   solve this problem to understand better why people are

11   dying."

12        So we -- I asked people from the Board of Pharmacy.  I

13   asked people from the Office of Chief Medical Examiner.  I

14   asked people to come from State Medicaid, State Bureau of

15   Behavioral Health that took all the medications into

16   treatment programs, Department of Military Affairs and

17   Public Safety, Controlled Substances Monitoring Program.

18   And there may have been others, the EMS office, the

19   Emergency Medical Services office.

20        I said, "We all have to solve this problem.  We have to

21   take a scientific approach, an evidence-based approach using

22   sound and accepted methodologies to understand what's going

23   on."

24        And, so, you can see a list on the next page is the

25   leaders across -- I, I designed a methodology.  Here's what

1    we're going to do and here's how we're going to do it, and

2    commissioned this particular report, and also brought in CDC

3    by the way.

4         And this report was funded as it says here.  It was

5    funded by the West Virginia and Injury Prevention Program,

6    Department of Health and Human Resources, and with a

7    cooperative agreement with the Federal Government through

8    the United States Centers for Disease Control and

9    Prevention.  So this is where the resources came from to

10   build this report.

11        And, and we went on a journey with all of these

12   partners, all these experts with a collective well over 300

13   years of public health expertise.  And many of those are

14   career people with Ph.D.s and Master's in public health

15   experiences to understand, analyze, determine, and inform.

16   **Q.**   At your direction and your involvement, did you provide

17   an Executive Summary and your findings of your analysis and

18   investigation in regards to the, the 2016 death certificates

19   that you mentioned?

20   **A.**   Yes.  So during this report, clearly I was very engaged

21   with the, with the analysis of the work, of the, of the

22   description analysis understanding of this work.  And there

23   is an Executive Summary that is provided on Page 4 of the

24   report.

25   **Q.**   And we'll go into this report in a little bit more

1    detail probably after lunch, but I wanted to highlight for

2    the Court some of your key findings in regards to this

3    report.

4         Can you tell the Court what your key findings, based on

5    your investigation and your submitting this report to the

6    public record in the State of West Virginia?

7              MS. MAINIGI:  Your Honor, objection.  I have the

8    same objections to this report as I did the prior report,

9    Your Honor, with respect to relevance, hearsay.

10        And then I also don't think a proper foundation has

11   been laid.  It does not appear that Dr. Gupta, if you look

12   at page, the third page of the report, was really involved

13   in the preparation of the report.  He does not seem to have

14   been the person who wrote the Executive Summary either.

15        So relevance, foundation, and hearsay.

16             THE COURT:  Do you want to respond, Ms. Kearse?

17             MS. KEARSE:  Yes.  I think Dr. Gupta has

18   testified -- we can go into much more detail -- as the

19   Public Health Commissioner of the State of West Virginia, he

20   not only commissioned this report pursuant to statute there,

21   but was very involved in this report.

22        And I'll, I could ask additional questions and the

23   significance of this report in your work as public health.

24        He's testified both in deposition several times and to

25   the defendants as well on this issue with that.  But it is

1    an investigation led by Dr. Gupta authorized by statute and

2    relevant to the issues before this Court on the

3    fact-findings and the additional information both in the

4    State of West Virginia and specific to Cabell County and

5    Huntington.

6             THE COURT:  Who wrote the Executive Summary in the

7    report?

8             THE WITNESS:  The, the team wrote the Executive

9    Summary with, with obviously clear direction from me.  And

10   we had weekly meetings on this report for the longest

11   duration that this report was on-going.

12            THE COURT:  Overruled.

13            MS. MAINIGI:  Thank you, Your Honor.

14   BY MS. KEARSE:

15   Q.   Dr. Gupta, have you -- in addition to making this a

16   public document, have you also presented to various

17   communities and -- in -- both nationally and to West

18   Virginia regarding your findings in this report?

19   A.   Yes, I have presented myself.  This has not only been

20   presented scores of times or many times by myself in

21   meetings, national, local, state meetings, but also it is

22   something that has been replicated by a number of state

23   health departments and local jurisdictions all across the

24   country since.

25            So this is methodology, procedures.  We have provided

98

1    technical assistance to many, many jurisdictions across the

2    country to be -- to help them be able to replicate this work

3    for their own jurisdictions.

4    **Q.**   I'd like to just go through a couple of your, your

5    summary of findings and the importance of that.

6         If you'll start with bullet number 1, "The majority of

7    81 percent of overdose decedents interacted with at least

8    one of the health systems in this report."

9         What is the importance of that -- of your -- let me --

10   I'm going to back up to make sure we lay a foundation.

11        What were some of the, the key data sources that you

12   looked at and why?  I think you mentioned a number of them.

13   But why was it important to involve various other

14   departments in looking at other data?

15   **A.**   So, Your Honor, one of the key problems in government

16   per se is data pieces of different agencies, and they don't

17   talk to each other and it's a problem.

18        So what I did was encouraged people to have Mutual Use

19   Agreements, MUAs.  I said, "We're going to do this whether

20   you guys like it or not, and we're going to do this with an

21   MUA and I don't want a bureaucratic process stopping it."

22        So we executed MUAs with all of these agencies I

23   mentioned.  So the death certificate is put at one agency.

24   The cause of death is somewhere else, the medical examiners.

25        If somebody sought behavioral health treatment, that's

1      with the treatment providers and that has to be obtained.

2           If someone filled their prescriptions for oxycodone,

3      that's the Controlled Substance Monitoring Program with the

4      Board of Pharmacy.  That's a different place it's at.  I

5      embedded a person from the Board of Pharmacy into my agency.

6           So we utilized all of the tools and instruments that

7      were available to us, the State of West Virginia, to be able

8      to create the conditions in which this difficult work of all

9      different government agencies talking to each other could

10     happen.

11          We had an MUA with the Department of Safety -- Military

12     Affairs and Public Safety because we wanted to get all the

13     incarceration data because I wanted to know if people who

14     were released, did they die of opioid overdose; and if they

15     did, when did they die.

16          I wanted to know -- so what we did was -- so just

17     imagine CSI.  We looked at -- we took every death.  830 West

18     Virginians had died.  We created -- there was a dashboard.

19     Literally there was a board, a white chalkboard in our

20     offices.

21          We went through every one of these individuals.  We

22     treated them with grace, with respect.  We talked to their

23     family members, each one of them, dialed them up.  And we

24     said, "Tell us more.  Tell us, are they married?  Did they

25     have education?  How far was the education?"

1          Imagine, Your Honor, talking to the family after

2     they've had a deceased individual.  But we wanted to create

3     that so we could understand better who they lived with, how

4     often did they work, what kind of education they had, were

5     they married or not, what kind of situation.  We created

6     their life 12 months before death.  And that creation of

7     life allowed us to learn.

8          So all of these results are really every single

9     individual, not, not, not -- so what happens, Your Honor,

10    the other thing is people talk about studies.  So if you

11    have 1,000 deaths, researchers will -- they will do a

12    sampling.  They'll take 100 deaths and they'll sample and

13    try to extrapolate to 1,000 people.  That is a sampling.

14         And you talk about methodology.  Then you talk about

15    the P value and all those things.  This is the highest level

16    of the study you can do when you study the entire

17    population.  There is no sample because often researchers

18    look it up.  They want to know how much grant do I have?  Do

19    I have a grant to do 100 people or 50 people or 200?

20         We had the State of West Virginia resources, but we

21    didn't sample this population.  We took 100 percent of

22    everybody who died who this was the entire community.  So

23    this is a gold standard study.  There is no higher standard

24    of this in science.

25         So we took everybody and we studied their life 12

```
 1   months before they died.  And these findings are reporting
 2   what we found of their life.  And we, we, of course, wanted
 3   to learn that.
 4   Q.   Thank you.
 5        MS. KEARSE:  Your Honor, I'm going to go through a
 6   number of the findings.  I don't know if this is a good time
 7   to break.  It's two minutes until 12, but I thought maybe
 8   this would be --
 9        THE COURT:  Yeah.  Let's quit until 2:00.  We'll
10   be in recess until 2:00.
11        You can step down during the break, Dr. Gupta.  We're
12   not going to make you sit there for two hours.
13        THE WITNESS:  Thank you, Your Honor.
14        (Recess taken at 12:00 p.m.)
15   Insert
16
17        THE COURT:  Dr. Gupta, if you're here, you can
18   resume the witness stand and you're still under oath, sir.
19        All right, Ms. Kearse.
20        MS. KEARSE:  Good afternoon, Your Honor.
21        Good afternoon, Dr. Gupta.
22        BY MS. KEARSE:
23   Q.   Dr. Gupta, if you'll recall, we left off talking about
24   what you've called the Social Autopsy Report.
25   A.   Yes.
```

1    Q.   Okay.  And I was about to do a deep dive into that, but

2    you gave some -- some overview of that and one of the first

3    things I want to make sure is that anything that's -- that

4    you, as the Commissioner of Public Health of West Virginia,

5    in regards to the 2016 West Virginia overdose fatality

6    analysis, that pertains to both West Virginia and also

7    encompasses Cabell County and City of Huntington in your

8    work?

9    A.   Yes.

10   Q.   And I believe -- and I wanted to cover all the ground

11   with, too, but you've covered how did it come about.  And I

12   believe you covered the purpose of the investigation.  And I

13   want to talk about some of your findings, generally

14   speaking.

15           MS. KEARSE:  I've lost my water.  Thank you.

16           BY MS. KEARSE:

17   Q.   Dr. Gupta, were there some -- were there some general

18   findings related to opiate addiction in West Virginia that

19   you reported in your report?

20   A.   Yes.  And I just want to like mention this, that part

21   of this report, not only did I direct and supervise it and

22   had a day-to-day involvement, daily involvement in it, but

23   to seek the assistance of CDC, the Commissioner has to make

24   a request.  So, I was intricately involved in making a

25   formal request to the CDC to help us get some more resources

1    on this particular analysis.  So, that was another aspect

2    that was important, to -- to make sure that we the best

3    epidemiologists, the best scientists, the best minds in the

4    nation working on that analysis.

5    **Q.**   And, Doctor, what do you -- what do you mean by you had

6    to get the CDC involved?

7    **A.**   So, whenever we conduct an analysis, especially one

8    that is, you know, being in this wave, we want to make sure

9    that our methodology, the design of the study, the findings,

10   the implications of those findings, all that work is

11   informed by the best practices, informed by the best

12   science, and informed by the best minds in the country and

13   that's -- we have a mechanism where the Commissioner can

14   request assistance from the CDC and, if it is able to and

15   available, CDC will provide that technical assistance

16   support.

17        So, what that means is, we get people on CDC's budget

18   that fly into Charleston, stay in hotel for the duration of

19   the time, and work with us every single day, including

20   weekends, to make sure that the work that is happening here

21   is impeccable, is evidence based, and is sound in nature

22   from a scientific aspect.

23   **Q.**   Thank you, Doctor.  So, sort of some of the general

24   findings first and then we'll dig down a little bit.  Can

25   you tell the Court generally what were some of the findings

1    specific to opioid addiction in West Virginia that would

2    encompass Cabell County and City of Huntington?

3    A.    Sure.  So, Page 6, I'm going to start with a summary of

4    key findings, but before I get to that Page 6, you know, the

5    way this was done, as I mentioned before, it was to look at

6    all of the West Virginia residents.  Again, look at all the

7    deaths in West Virginia residents from overdoses that

8    happened from the year 2016 knowing that the total number of

9    deaths are probably an underestimate.

10        So, you might say, well, how is it an underestimate?

11   Because --

12   Q.    Doctor, how is it an underestimate?

13   A.    Because it takes months for data to come in.  For

14   example, at the -- on December 31st, 2016, we will not have

15   a complete understanding of all the deaths that happened in

16   2016 because some of the lab work, some of the drugs that

17   are in the system, may take three or four months to come

18   back in our labs.  So, it takes awhile for that.

19        Now, the reason that's important is we could not wait.

20   We did not want to wait.  This was a matter of urgent

21   crisis.  So, we said we need to move ahead with this right

22   now and move, although this is not a complete report of all

23   the deaths.  We expected more deaths that would be coming in

24   in 2016 but, at that time, what we had was good enough for

25   us to start moving forward.

1      And so, it was about, you know, all the deaths of West

2   Virginia residents and we conducted the analysis, as I

3   explained to the Court prior to the break.

4   **Q.**   All right.  I think you've covered the -- just the very

5   beginning of the executive summary.  The purpose of the

6   report, do you see that?  I want to make sure I asked you

7   about that.  You mentioned the executive summary that you

8   oversaw?

9   **A.**   Yes.  So, we recognize that -- so, West Virginia -- the

10   statement here is West Virginia continues to lead the nation

11   in overdose deaths per capita.

12      Your Honor, I want to make a case here.  West Virginia

13   didn't lead and there's a number two and a number three

14   state.  West Virginia consistently stayed at high levels,

15   which is 33% deaths per capita more than the second state

16   line.  Sometime -- some years that was new Hampshire, some

17   years that was Ohio, but the point is, we were here

18   (indicating), and there's a big gap, and then the second and

19   third and fourth state in the nation.  So, when I say West

20   Virginia leads, what I mean, leads by a lot.

21   **Q.**   And the second sentence, "This takes a significant toll

22   on individuals, families and communities and government

23   resources."  Was that your -- one of your key findings?

24   **A.**   We -- that sentence, because the entire government of

25   West Virginia was dealing in one manner or another with the

1    consequences of addiction, consequences of this crisis.  So,

2    the deaths are the tip of an iceberg and we were dealing

3    with the rest of the iceberg, as well.  As tragic as the

4    deaths were, they were only a piece of the entire puzzle.

5    **Q.**   And what do you mean by that?

6    **A.**   What I mean by that is that the fatal overdoses, or

7    overdose deaths, we call them, does not do justice to

8    understanding the entire crisis that was occurring as a

9    consequence of addiction and continues to occur in the State

10   of West Virginia.

11        What I mean by that, also, is for every fatal overdose,

12   you have tens of non-fatal overdose, meaning these people

13   that are coming to emergency rooms and we were not having

14   enough resources, what we call -- we call it treat them and

15   street them.  That means these people would come with

16   overdose to the emergency room.  We would give them the

17   immediate treatment that we could at the time to save their

18   life, mostly naloxone, an antidote, and that we would, you

19   know, not have the ability to have beds or other resources

20   to connect them to.

21        There are also people in the community that we would

22   call and we would have units run over.  These are EMS units.

23   EMS agency is also under the purview of the Commissioner of

24   Bureau of Public Health and a lot of times these -- a lot of

25   -- in West Virginia, a lot of these EMS and first responder

```
1   communities are voluntary community, voluntary agencies.
2        So, they're having to figure out how to take this
3   magnitude of calls and deal with it when they're not getting
4   any outside funding.  And, oftentimes, they would go to the
5   person that -- and respond, answer the call.  They would get
6   the naloxone.  The person wakes up, refuses to go to the
7   hospital, walks away or is upset, and these people have no
8   way to be reimbursed, not for the call, or for the naloxone,
9   or that service.  So, non-fatal overdoses.
10       Then we had the third of substance use disorder --
11            MS. MAINIGI:  Objection, Your Honor.  I move to
12  strike most of Dr. Gupta's answer unless there can be a
13  foundation established.  I mean that, certainly, what he
14  just testified to is not in his report by my understanding.
15  I don't know what his basis is, but if his basis is what
16  others have told him, obviously, that's objectionable.  If
17  he witnessed it on the ground himself, I think that's
18  another story, but if he's going to diverge into other
19  pieces of testimony beyond this report at this point, I
20  think we have to establish a foundation.
21            THE COURT:  I will sustain the objection.
22       Dr. Gupta, you need to answer the precise question.  I
23  know you've got a lot to say, and a lot on your mind, and we
24  appreciate that, but you just need to listen and answer the
25  precise question, if you can, sir.
```

1          THE WITNESS:  Yes, Your Honor.

2          MS. KEARSE:  Yes.  We'll work on that.

3          BY MS. KEARSE:

4     **Q.**   And, to be fair, I think we were talking about the

5     significant untold individuals, families, communities and

6     government resources, but we can come back to some of those

7     things later with that, but I would ask one follow-up

8     question.

9          You did mention naloxone and that's a term I don't know

10    that we've heard too much about.  We've talked about it in

11    our opening statements.  Can you tell the Court, what is

12    naloxone?

13    **A.**   Naloxone is also, Your Honor, known as Narcan commonly.

14    It's an antidote.  It works to reverse someone who is

15    overdosing with an opioid and can be given through nose,

16    through injection, through IV.  So, it's one of those

17    immediate -- it's lifesaving.  It makes you come back to

18    life and then you can put it -- it's not the treatment, but

19    it's a rescue medication.

20    **Q.**   And the third sentence there, "The purpose of this

21    report is to study West Virginia overdoses deaths, to

22    identify opportunities for intervention in the twelve months

23    prior to death."  So, I want to understand, what does that

24    statement mean, "twelve months prior", and what do you mean

25    by "intervention"?

1    **A.**    So, we believe that if we study somebody's life

2    twelve months prior to dying, we may find clues as to how we

3    can in the future plan strategies that would help save those

4    lives.

5    **Q.**    And, as part of that, I'm not going to go through every

6    sentence.  I went through three of them on that.  So, going

7    now to your findings and going into more detail, but were

8    there some overarching findings that related to opioid

9    addiction that you found and reported in your investigation?

10   **A.**    So, on Page 6 of the Summary of Key Findings is the --

11   is the -- is the key findings.  And I'll go over these.

12         First one is that the majority, that's 81 percent or 4

13   out of five overdose decedents, did interact with at least

14   one of the health systems that we found.  So, we found that

15   these weren't people on the street homeless that nobody

16   cared for, what that means.  This means that these were

17   people, human beings, that actually were interacting with

18   the healthcare system, whether they were coming in for

19   emergency room care, getting the naloxone through EMS,

20   getting treatment in substance use centers, or filling a

21   prescription for controlled substances.  But these were

22   individuals that, four out of five individuals within

23   twelve months of their death had, in some way or the other,

24   interacted with the healthcare system.

25   **Q.**    And can you explain?  What do you mean "interacted"?

1    Was that for treatment or was -- what?  Can you explain

2    that?

3    **A.**   So, it could be all of that.  So, if someone went and

4    filled a prescription for OxyContin, that's an interaction.

5    If somebody went and get their treatment for substance use

6    disorder, that's an interaction.  Somebody got overdose, but

7    didn't die at, you know, three times, four times, two times,

8    but within twelve months before they finally died, that was

9    a cry out for help and that was an interaction.

10   **Q.**   I want to focus on numbers -- the next two bullet

11   points, specifically about your looking at the prescription

12   records between the -- before the time of death and then

13   when you did your social autopsy.  Can you tell us what that

14   key finding is?  And we'll go into a little bit more detail

15   of what that means.

16   **A.**   So, this is one of the most important key findings,

17   this work.  It shows that 33% or about a third of the

18   decedents tested positive for a controlled substance, but we

19   could not find a record of prescription time of death.  That

20   clearly is the most compelling indication of the large

21   volume flowing of controlled substances in the community and

22   obviously --

23         MS. MAINIGI:  Objection, Your Honor.  Objection.

24   There's no foundation for that.  I see what his opinion is

25   and, certainly, he can explain his opinion, but he's trying

1    to explain what the cause was of his finding.

2            THE COURT:  Sustained.

3            BY MS. KEARSE:

4    **Q.**   Okay, Doctor, so I want you -- one of your key findings

5    was bullet number 2?

6    **A.**   Yes.

7    **Q.**   Okay.  And can you read that for the Court?

8    **A.**   33% of decedents tested positive for a controlled

9    substance, but had no record of prescription at their time

10   of death, indicating diversion of a controlled substance

11   prescription.

12   **Q.**   And was there a significance to -- let's do the two

13   together and then I want to ask you a question.  Bullet

14   point number 3 on Summary of Key Findings?

15   **A.**   91% of all decedents had a documented history within

16   the Controlled Substance Monitoring Program.  In the 30 days

17   prior to death, nearly half, 49%, of female decedents filled

18   a controlled substance prescription in the 30 days prior to

19   death, as compared to 36% of males.

20   **Q.**   And does the report go in detail about these findings

21   to allow you to summarize them here?

22   **A.**   Yes.

23   **Q.**   What was the significance of the finding about the

24   prescription -- the prescriptions prior to their time of

25   death?

1    **A.**   The significance of the third bullet point really,

2    having prescriptions prior to the time of death, means that

3    nine out of ten decedents filled a prescription within the

4    12 months of their death, but in 30 days before their death,

5    almost half of all females and 36% of all males actually

6    also filled their prescription before their death, 30 days

7    before their death.

8    **Q.**   And when you talk about the fact that this indicated

9    diversion, what do you mean about -- what does that mean?

10   **A.**   So, if I have controlled substances in my possession

11   but I don't have a prescription and there's no documentation

12   of me getting a prescription, going to a doctor, filling a

13   prescription at the pharmacy, that means one thing; I got it

14   through illegitimate means.  And that's what we call

15   diversion.

16   **Q.**   I don't want to have to go through every one of the key

17   findings on there, too, but I want to look at bullet point

18   -- the next bullet point between -- the next two and we'll

19   do that and we'll go into the depths of the report.  Key

20   finding number 4?

21   **A.**   Decedents were three times more likely to have three or

22   more prescribers as compared to overall Controlled Substance

23   Monitoring Program population for 2016, 9% versus 3%.

24   Decedents were more than 70 times more likely to have

25   prescriptions at four or more pharmacies compared to the

1   overall Controlled Substance Monitoring Program population

2   for 2016.  That's 7% versus .1%.

3   **Q.**   What's the significance of that finding?

4   **A.**   Significance is that it's very clear from the findings

5   and it's compelling evidence that if you were going to more

6   than one prescriber, or three or more prescribers, in this

7   case, you are much more likely to die because of drug

8   overdose.  If you were going to four or more pharmacies, you

9   are 70 times more likely to die of a drug overdose.

10  **Q.**   And the next 1, 71% of all decedents?

11  **A.**   71% of all decedents utilized Emergency Medical

12  Services within the 12 months prior to their death.

13  Regardless of the type of EMS run, only 31% of the decedents

14  had naloxone administration documented in their EMS record.

15  **Q.**   And what was the significance of that finding, Doctor?

16  **A.**   Significance of that is how a community and a state --

17  certainly, Cabell County and City of Huntington are

18  struggling with --

19          MS. MAINIGI:  Objection, Your Honor.  That -- this

20  is also outside the scope.  There's no foundation for that.

21  If he wants to say what -- what this particular finding,

22  which he's read out loud and it's plainly clear what it

23  means, but what the implications are about communities

24  struggling, I don't see that in part of this report and I

25  think there's no foundation for him testifying about that.

1          THE COURT:  I'll overrule the objection.  He's

2     explaining the data and I'll -- I won't let you go very far

3     with this, but right now, the objection is overruled.

4          THE WITNESS:  So, can I -- so, what that means is

5     only 31% of decedents got naloxone, meaning 100% died of

6     drug overdose and they should have all gotten naloxone, but

7     only three out of ten people actually got naloxone.

8       Now, what I mean is community may not have resources to

9     purchase naloxone.  They may not have training to administer

10    naloxone.  And there could be many other factors.  They may

11    have stigma, there may be that they --

12          MS. MAINIGI:  Objection, Your Honor.

13          THE COURT:  Well, I will sustain the objection and

14    strike the --

15          MS. KEARSE:  The last.

16          THE COURT:  The answer about the conclusion about

17    the community and the lack of resources.

18          BY MS. KEARSE:

19    **Q.**  But, Dr. Gupta, but this is one of your key findings

20    and the purpose of your report is for intervention.  So, in

21    regards to intervention with that, what does that tell you

22    about the intervention and key finding pertaining to the

23    purpose of the report?

24    **A.**  The entire report, you're asking me?

25    **Q.**  Yes.  We read about the purpose of the report was to

```
 1    look at 12 months for intervention, so is there a specific

 2    intervention that this key finding refers to?

 3              MS. MAINIGI:  Objection, Your Honor.  I think

 4    that's beyond the scope of the report.  I don't see -- and I

 5    could be wrong about this, but I'm not aware of a section on

 6    interventions that specifically relate.  Perhaps, if Ms.

 7    Kearse wants to draw our attention to it, we can turn to it.

 8              MS. KEARSE:  Your Honor, I'm referring back to the

 9    very beginning.  We talked about the whole reason for this

10    report is the fact that the purpose of this report is to

11    study West Virginia overdose deaths and identify

12    opportunities for intervention in the 12 months prior to

13    death.  This is one of his key findings.

14              THE COURT:  I'll let him answer that.  Overruled.

15              THE WITNESS:  So, on Page 58, there are clear

16    summary of key recommendations of the report.  I'm happy to

17    read those out, if you would like me to.

18              BY MS. KEARSE:

19    Q.   Okay.  So, these -- and to be clear, what we've gone to

20    then is Page 58, which you're tying together the Summary of

21    Key Findings to the Summary of Key Recommendations, okay?

22    Is there a particular part of that that you are referring to

23    in regard --

24    A.   So -- so, the key recommendations are a result of the

25    findings.
```

1    **Q.**   And we're talking specifically about naloxone, so I'm

2    going to get there, but I just want to tie this.  Is there a

3    specific recommendation that dealt with the bullet point

4    that there was only 31% of the people who overdosed who got

5    naloxone?

6    **A.**   So, the finding -- the -- if you start to go from the

7    bottom up, you can see one of the second last findings is

8    prescribers who've considered offering naloxone for

9    individuals at increased risk for opioid overdose.  It also

10   says that corrections officials should work with judges to

11   assure naloxone availability, treatment referral and support

12   at release of incarceration.

13        And the last bullet is EMS responders and the public

14   may benefit from education regarding overdose signs and

15   symptoms.  This education should include information

16   specific to individuals older than 65 years to increase a

17   chance that someone will call Emergency Services and that

18   appropriate administration of naloxone is offered.

19   **Q.**   And that's referring back to your key finding regarding

20   that only 31% of people had naloxone?

21   **A.**   Correct.

22   **Q.**   Is this a matter of saving lives?

23             MR. HESTER:  Objection.  Leading.

24             THE COURT:  Sustained.

25             BY MS. KEARSE:

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    Q.   Is this in response then to the fact that -- well,

2    strike that.  I think we've made the point.  I want to go to

3    the other bullet points with that, as well, and we'll come

4    back with that.  Let me put the nail on the head with this.

5    Why is this important regarding -- to have naloxone

6    available as an intervention to people who overdose?

7              MS. MAINIGI:  Objection.  Again, Your Honor, it's

8    outside the scope.  I think he's covered it already in one

9    of his answers, so it's asked and answered, as well, but

10   there's no foundation for why he would be explaining the why

11   here.  He's explaining the findings.  He's explaining the

12   recommendations.  That's all well and good, but why I don't

13   think is something within his purview as a fact witness or

14   even as a hybrid.

15             MS. KEARSE:  Your Honor, I believe the whole point

16   of this is what the intervention did and finding --

17   researching for this social autopsy on why this happened and

18   how we're going to prevent it from happening in the future,

19   the intervention, and that's why they -- Judge, as to the

20   naloxone, I just want to make sure we were clear on where we

21   were on that.

22             THE COURT:  Well, I'll overrule the objection, but

23   you're getting in pretty -- well, go ahead for now.

24             MS. KEARSE:  And I want to move on from this

25   moment, Judge.  I just want to make sure we're complete.

```
 1                 THE WITNESS:  So, Your Honor, one of the things we
 2     did when we learned this, as we were getting about a million
 3     dollars of SAMHSA funds for naloxone in the State of West
 4     Virginia, and we put that million dollars to purchase
 5     naloxone.
 6                 MR. HESTER:  Objection, Your Honor.  I'm not sure
 7     there was a question pending.
 8                 THE COURT:  I'm not sure.  I will sustain the
 9     objection.  Strike that answer.
10          That was out in left field, Ms. Kearse.
11                 MS. KEARSE:  Okay.  And I don't know.  I -- now I
12     forget what the question was.
13                 THE COURT:  Well, you need to answer the
14     questions, Dr. Gupta, as best you can.
15                 MS. KEARSE:  Yeah.  Yeah.
16                 THE WITNESS:  Yes, sir.
17                 MS. KEARSE:  We'll move on from that.  I honestly
18     don't remember the question that was pending, but I think
19     we've made -- we've talked about naloxone with that, too.
20                 BY MS. KEARSE:
21     Q.   All right.  So, I want to go to some other key findings
22     that are actually within the report on here, as well, and on
23     Page 8, I just want to make sure that this is when you're
24     working -- when we're working with the purpose of this and
25     what you're finding and so that we're clear on why the
```

```
 1   report is being done and what you're finding in that, can
 2   you just tell me why this part is in this report, overdose
 3   trends in West Virginia, and why it was significant to your
 4   social autopsy?
 5            THE COURT:  Well, he's already testified about
 6   this, hasn't he?
 7            MS. MAINIGI:  He has, Your Honor.
 8            MS. KEARSE:  Okay.
 9            THE COURT:  I think this is cumulative.
10            MS. KEARSE:  Okay.  All right.
11            BY MS. KEARSE:
12   Q.   On page -- on Page 9, I'm not going to go over Page 9.
13   You actually go back into this.  The overdose and historic
14   review from 2001 and 2015 and this, I believe you already
15   testified, is a follow-up to that.  On Page 10, 2.3.3 --
16            MS. MAINIGI:  Your Honor, just one objection.  I
17   apologize for continuing to interrupt.  Ms. Kearse just
18   continues trying to summarize what is happening here and
19   that's just improper in the course of a direct exam.
20            THE COURT:  Sustained.
21            MS. KEARSE:  Okay.
22            BY MS. KEARSE:
23   Q.   Based on your findings, was there a -- certain types of
24   controlled substances in this report that you were
25   predominantly referring to?
```

1    **A.**    For the entire report?

2    **Q.**    Yes.

3    **A.**    So, yes.

4    **Q.**    And can you explain?

5    **A.**    It was opioids and benzos.

6    **Q.**    And within your report did you also look into the

7    various individuals, including pregnant women and mothers,

8    in regards to their taking of subscription -- or their death

9    records on there, as well?

10   **A.**    Yes.

11   **Q.**    And can you tell the Court, in regards to maternal drug

12   use, what your study found with that social autopsy?

13   **A.**    So, we found -- if it's related to this social autopsy,

14   we found that through the analysis of West Virginia's

15   maternal mortality, which includes any death within a year

16   of giving birth, we identified 18 maternal deaths in 2016 of

17   which 44% either had a documented substance abuse problem or

18   died from an overdose.

19   **Q.**    And why was that important to your intervention purpose

20   of the social autopsy?

21          MS. MAINIGI:   Objection, foundation.

22          THE COURT:   Yeah.   He -- I'm going to let him

23   testify about his conclusions, but when he -- he goes into

24   the explanations you're asking him to do, it seems to me

25   like Ms. Mainigi is correct and the questions are improper.

121

```
 1              MS. KEARSE:  Okay.  Well, I can back it up, Your
 2     Honor.
 3              BY MS. KEARSE:
 4     Q.   How did you come to that conclusion?
 5              THE COURT:  I think that question is okay.
 6              MS. KEARSE:  Okay.
 7              BY MS. KEARSE:
 8     Q.   How did you come --
 9              MS. MAINIGI:  I think it is a different question,
10     Your Honor.  As long as the answer is not the same, I think,
11     is what we'll find out.
12              THE COURT:  Well --
13              THE WITNESS:  Could you repeat the question,
14     please?
15              BY MS. KEARSE:
16     Q.   What was the question?  I think -- I think we're -- if
17     I have it right, we were talking about the findings you had
18     regarding maternal drug use and I was referring specifically
19     to the statement that you just read.  And I just want to say
20     what -- how did you come to that conclusion?  So, what we're
21     asking for is, in your social autopsy and the work that you
22     explained you did, what was it that led you to be able to
23     make these conclusions?
24              MR. HESTER:  Object as leading, Your Honor.  I
25     think she's coaching the witness in the --
```

122

```
1              BY MS. KEARSE:
2      Q.   How did you make the conclusion?
3              THE COURT:  Well, you have to do a little bit of
4      leading just to get to the meat of the subject, so I'll
5      overrule that one, but do you understand the question, Dr.
6      Gupta?
7              THE WITNESS:  Your Honor, I'm a bit confused.  I
8      would love direction just to stick to the overdose fatality
9      analysis or be here as a Commissioner as Public Health, my
10     role.
11             THE COURT:  Well, you can testify -- and, counsel,
12     correct me if I'm wrong, but you can testify as to what you
13     did, and what your conclusions were, and what the basis of
14     those were, but the editorializing about the implications
15     and so forth is -- I think Ms. Mainigi is correct and --
16         I keep mispronouncing your name.
17             MS. MAINIGI:  No.  I think you got it right, Your
18     Honor.
19             THE COURT:  Okay.
20             THE WITNESS:  I understand, Your Honor.
21             THE COURT:  I think you understand.
22             THE WITNESS:  Yes.
23             BY MS. KEARSE:
24     Q.   So, I'm asking, what is the basis then of that finding?
25     A.   So, Ms. Kearse, we had done studies as Commissioner for
```

123

1    Bureau of Public Health.  We found that 5% of the babies --

2            MS. MAINIGI:  Objection, Your Honor, foundation.

3    These studies appear to be outside this report that we're

4    talking about.  Perhaps we can get a clarification.

5            THE COURT:  Well, is this the only report?  Is

6    this related to his report?

7            MS. KEARSE:  I have no -- I'm asking the doctor.

8    I don't know if it's specifically in here or if there was a

9    basis for that because I want to make sure it's -- as part

10   of the social autopsy, I want to know the basis of his

11   opinion so we can --

12           THE WITNESS:  So, social autopsy was done on human

13   beings, and there were men, and there were women, and women

14   were pregnant and, when pregnant, it is very important to

15   understand what the characteristics is because we were

16   seeing rise in maternal mortality because of opioid

17   overdose.  That's the basis.  We were also seeing other

18   trends that were impacting moms and babies.

19       That's the basis.  And it's written in the report.  So,

20   it's on Page 11, top.  If you read it, it's in there.  So,

21   it says findings from October 1, 2016 to September 30th,

22   2017 indicate that 14%, that's 2,691 infants, 14%,

23   experienced intrauterine substance exposure and 1,023

24   infants, that's 5% percent of all births in West Virginia,

25   but 5% were diagnosed with NAS.

124

1    **Q.**   All right, Doctor.  And NAS is a -- it may be a new

2    term for the trial with that.  Can you -- so, I want to go

3    back as we talked about within your report there are bases

4    for these findings and you refer to Page 11.  And I want to

5    make sure we have an understanding definitionally.  What is

6    NAS?

7    **A.**   Your Honor, I would be happy to explain that.

8              THE COURT:  Yes, please.

9              THE WITNESS:  So, NAS stands for Neonatal

10   Abstinence Syndrome.  When opioids are involved, it is also

11   called Neonatal Opioid Withdrawal Syndrome.  It is when a

12   baby is born and, within hours to days, it goes under

13   intense withdrawals that is signified by incessant crying,

14   their inability -- not eating, high fevers, can have

15   seizures and can die.  That's called NAS.  And that happens

16   because a baby is undergoing withdrawals because the mother

17   was using substances.  That's NAS.

18             BY MS. KEARSE:

19   **Q.**   And as part of your findings and purpose of the report,

20   were there interventions that you have in your findings or

21   within the body of your report or study?

22   **A.**   Ms. Kearse, there's a different study that we did that

23   shows that.  It's listed the way it is in this report.  So

24   --

25   **Q.**   Okay.  We can get to that then.

1    **A.**    Yeah.

2    **Q.**    In that report, that, too.

3            MS. KEARSE:  I'll move on through some of these I

4    know we've covered already.  I'm skipping through some of

5    them, Your Honor.

6            BY MS. KEARSE:

7    **Q.**   Dr. Gupta, on Page 51, there's another finding that I

8    would like to draw your attention to and this is 4.10.3.

9    And as part of the purpose of the social autopsy for

10   intervention, I would like to talk about the finding at

11   4.10.3, Other Controlled Substance Program Monitoring

12   Program Findings; specifically, medication-assisted

13   treatment and MAT.  In regards to your social autopsy, what

14   is -- if you could explain to the Court the finding and the

15   basis for this finding.

16   **A.**   So --

17   **Q.**   If you can read it to the Court first so we can

18   understand what it is.

19   **A.**    Okay.  So, 4.10.3 says, "Other Controlled Substance

20   Program Monitoring Program Findings:  Medication Assisted

21   Treatment (MAT).  According to the SAMHSA, MAT is the use of

22   medications in combination with counseling and behavioral

23   therapies for the treatment of substance use disorders.  A

24   combination of medication and behavioral therapies is

25   effective in the treatment of substance use disorders and

1    can help some people to sustain recovery."

2        And that goes on to say, "17,815, that's 3%, people

3    have an MAT prescription documented in the Controlled

4    Substance Monitoring Program as compared to 58 or 7% percent

5    of the decedents.  This report was unable to document the

6    utilization of counseling and behavioral therapy for this

7    group."

8    **Q.**   And what was the significance of that finding?

9            MS. MAINIGI:  Objection, Your Honor, foundation

10   and relevance.

11           BY MS. KEARSE:

12   **Q.**   So, what is the --

13           MS. MAINIGI:  Excuse me.  I'm sorry.  Foundation

14   and relevance here, Your Honor.  This seems to be abatement

15   testimony.  That is not an area in which, even as a hybrid

16   witness, Dr. Gupta was offered.  My concern is coming in

17   part from the fact, Your Honor, that we do know Dr. Gupta,

18   as he testified in his deposition, is a paid expert for the

19   MLP plaintiffs.  He is not a paid expert -- and the topic is

20   abatement in that case that he is a paid expert, but he is

21   not a paid expert here on abatement.  And so, I'm not sure

22   what the relevance is to this testimony.

23           THE COURT:  Well, the question wasn't what was the

24   significance of that finding.  You're basically asking him

25   for an expert opinion, aren't you?

```
 1          MS. KEARSE:  Well, as to the basis -- it's within
 2   the report, Your Honor, as to what is the --
 3          THE COURT:  Well, you can ask him what the basis
 4   for it was, but the significance, isn't that what you're
 5   objecting to?
 6          MS. MAINIGI:  It is, Your Honor, and I'm not sure
 7   what the relevance -- I realize he's -- he, you know,
 8   oversaw the report, commissioned the report, but as to why
 9   this part of the report is relevant, and especially relevant
10   for Dr. Gupta to be testifying about, I have an objection to
11   that.  But I'm worried we are encroaching into expert
12   testimony where he was not disclosed.
13          MS. KEARSE:  And, Your Honor, if I can bring that
14   back, I do believe there will be cross examination.
15          THE COURT:  Well, I've sustained the objection.
16   You can -- you make another try at it.
17          MS. KEARSE:  Okay.
18          BY MS. KEARSE:
19   Q.   Can you tell me what the basis of these findings were
20   in relation to the Social Autopsy Report whose purpose is to
21   find -- identify opportunities for intervention?
22   A.   So, the statement clearly states that the standard of
23   care is MAT.  That's per SAMHSA.  And only 7% of the
24   decedents were receiving.  So, if these decedents, they
25   died, they died because of drug overdose and the treatment
```

1    of substance abuse disorder is MAT for this type of drug

2    overdose and only 7% of decedents were receiving MAT

3    according to the Controlled Substance Monitoring Program.

4    **Q.**   Now, you mentioned you had the -- at the very end, you

5    had discussion and recommendations and, as part of your work

6    with the overdose fatality analysis and for its purpose for

7    intervention and your key findings, you made discussion and

8    recommendations?

9    **A.**   Yes.

10   **Q.**   Okay.  And I would like to just go over those with the

11   Court on the various recommendations.  And I'll go back to

12   -- you have referred me, Dr. Gupta, to the key -- I don't

13   want to repeat where we are.  You've got the Summary of Key

14   Recommendations and then you have a section on discussion

15   and recommendations.  So, I don't want to go over both.

16   We'll just do the summary of recommendations.

17   **A.**   I -- if --

18   **Q.**   All right.

19   **A.**   Is that a question?

20   **Q.**   All right.  So, I'd like to -- to wrap this social

21   autopsy, you made your findings, your key findings, you had

22   the basis for those findings.  I'm asking you what were the

23   recommendations that came out of this report based on your

24   work?

25          MR. HESTER:  Object to the form of the question,

129

1    Your Honor.  It's leading.

2           THE COURT:  Well, okay.  Overruled.  I'm going to

3    let him testify as to -- well, you go ahead and ask the

4    question.

5           MS. KEARSE:  Okay.

6           BY MS. KEARSE:

7    Q.   Did you make -- did -- with your Social Autopsy Report,

8    which is the 2016 West Virginia Overdose Fatality Analysis,

9    did the investigation make recommendations regarding the

10   social autopsy?

11   A.   Yes, they did, and they begin on Page 56.

12   Q.   Okay.  Can you highlight for the Court your

13   recommendations that stem from your investigation of this

14   report?

15   A.   My -- the discussion and recommendations stated in this

16   report begin on page 56.  I will read the beginning of that.

17   "Substance abuse in West Virginia is devastating

18   communities."

19          MS. MAINIGI:  Objection, Your Honor.  I don't --

20   this is just serving as a vehicle to read entire paragraphs

21   of the report that are potentially incendiary and I don't

22   understand to what end and what purpose other than to read

23   them into the record.

24          THE COURT:  Well, he can say what his

25   recommendations were and how he came to the conclusion that

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
1    that's an appropriate recommendation.

2         And that's about it, Dr. Gupta.  You're editorializing

3    about the problem and where you were led to by this is

4    outside the scope of what -- of your testimony here that's

5    proper and within those limits.

6              MS. KEARSE:  Yes.  That's what I've asked, Your

7    Honor.

8              BY MS. KEARSE:

9    Q.   If you can tell the Court what your recommendations

10   were based on your investigation and submitting the 2016

11   West Virginia Overdose Fatality Analysis as the Commissioner

12   of Public Health for the State of West Virginia?

13   A.   So, I'll start -- would you like to have the Summary of

14   Key Recommendations because I began to read the

15   recommendations and I was asked not to.

16             THE COURT:  Well, I can read them, so he doesn't

17   have to read them.

18             MS. KEARSE:  Okay.  That's fair, Your Honor.

19             THE COURT:  You can ask him about them and --

20             MS. KEARSE:  Okay.

21             BY MS. KEARSE:

22   Q.   Without going into the detail of reading with that, can

23   you give -- highlight for us what are the recommendations or

24   the key recommendations that came from this report for

25   intervention?
```

```
 1    A.   Yes.  So, one of the recommendations is that every

 2    entity in healthcare that's interfacing with individuals at

 3    high risk for overdose must be prepared to offer screening,

 4    referral and/or treatment to prevent overdose death and give

 5    people a chance to recover.

 6         Another recommendation was have prescribers run a

 7    Controlled Substance Monitoring Program Report on each

 8    patient by either prescribing any Schedule II drugs,

 9    opioids, benzos.  Exceptions may be the terminally ill

10    cancer patients.

11         Another recommendation was to enhance Controlled

12    Substance Monitoring Program Advisory Committee legislation

13    to identify abnormal or unusual prescribing and dispensing

14    patterns and to permit sharing this data with appropriate

15    professional licensing boards and other agencies.

16         Another recommendation was to develop Controlled

17    Substance Monitoring Program policies and procedures for

18    pro-active reports to alert prescribers about the increased

19    risk of overdose and potential misuse or diversion for those

20    individuals known to the Controlled Substance Monitoring

21    Program.

22         This is in addition to all healthcare professionals who

23    would benefit from continuing education opportunities that

24    help them to identify risk factors for overdose deaths and

25    retain individuals in substance abuse treatment.  And I
```

132

1      mentioned already to the Court the last three.

2              THE COURT:  And you came to the conclusion that

3      these were desirable things to be done based upon your

4      investigation, and your experience, and the things you put

5      in your report; is that right?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  These were conclusions that you drew

8      based upon the investigation that you told us about that led

9      to the report; is that -- is that accurate?

10             THE WITNESS:  Yes, Your Honor, to the extent that

11     we could do anything about it.

12             THE COURT:  And I'm leading him all around the

13     courtroom, Mr. Hester.

14             MR. HESTER:  I wasn't going to object, Your Honor.

15             BY MS. KEARSE:

16     **Q.**   Dr. Gupta, as a Public Health Commissioner and in

17     dealing with both this report and your work with opioids in

18     general, did you follow up on these recommendations, your

19     office?

20     **A.**   Yes.

21     **Q.**   I want to turn to -- and we'll get back to some of the

22     overarching things and totality of some of the things there,

23     but I want to turn to another report of yours and,

24     specifically, I want to ask you, have you worked with

25     members of the Cabell-Huntington community in regards to

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

133

1    opioid overdoses?

2    **A.**    Yes.

3    **Q.**    And, in particular, was there a certain event in time

4    that you dealt with overdoses for the -- with the

5    Cabell-Huntington community?

6    **A.**    Yes.

7    **Q.**    And I'd like to -- I'll go a little bit further back

8    and show you the document.  Were you involved in an overdose

9    -- in August of 2016 -- analysis?

10   **A.**    Of Huntington, yes.

11   **Q.**    And can you tell the Court briefly about that and what

12   your involvement was with the City of Huntington as it

13   relates to specifically opioid-related overdoses?

14   **A.**    Yes.  So, Your Honor, what had happened was there was a

15   multiple number of overdoses within a matter of hours in the

16   City of Huntington.  It became national news.

17        We, from an EMS standpoint and other standpoints, we

18   responded as a state.  Subsequent to that, the Health Office

19   of the Cabell-Huntington Health Department reached out to me

20   and asked if we could provide the technical assistance and

21   support to conduct a full analysis to understand better what

22   that -- what was that event.

23        So, we worked very closely with the Cabell-Huntington

24   Health Department and the resources from the local City of

25   Huntington, Cabell County and State of West Virginia to

1    conduct that analysis.

2    **Q.**   And did you issue a report in regards to that analysis?

3    **A.**   We did.

4         MS. KEARSE:  And does this have an exhibit number?

5    Your Honor, may I approach the witness?

6         THE COURT:  Yes, you may.

7         BY MS. KEARSE:

8    **Q.**   I'm showing you exhibit number P-4114a and ask if you

9    can identify that document for the Court?

10   **A.**   This is Outbreak Report, Opiate-Related Overdose --

11   Huntington, West Virginia, August 2016.

12   **Q.**   Now, Dr. Gupta, as a -- was this report done under your

13   role as the Public Health Commissioner for the State of West

14   Virginia?

15   **A.**   Yes.  It was commissioned by me, directed by me, and

16   supervised by me, and conducted.

17   **Q.**   And how did it -- and you mentioned there was obviously

18   a drug overdose, but how did your Office of Public Health

19   become involved in working with Cabell County, with the

20   Mayor's Office, Drug Policy and Control, and the hospital

21   and Health Department?

22   **A.**   So, we routinely work with all of our counties across

23   the State of West Virginia, all 55, as Bureau of Public

24   Health and its various agencies, and especially on matters

25   of outbreaks and matters of public health concern.  We then

```
 1    create teams that work to provide both technical and
 2    otherwise resource assistance to local community.  So, this
 3    is -- this report is one of the examples of such type of
 4    partnership.
 5    Q.   And do you include your objectives in this report in
 6    the executive summary?
 7    A.   Yes.
 8    Q.   And to reiterate, this is a report and, if you look at
 9    the first paragraph, but I want to --I want to talk about
10    what you did and how you went about doing the investigation
11    objectives.
12    A.   So, Your Honor, one of the things that often happens
13    with these events is they're put some way in media and facts
14    may be a little different.  So, the purpose of this report
15    primarily is to find out the facts.  It was fact finding and
16    it was also to understand better so we can once again
17    understand, connect, improve our ability to respond to these
18    types of deaths.  I could read out the objectives if you
19    would like me to.
20    Q.   Yes.  I just -- you don't have to read it or you can --
21    you can summarize what the objectives are and then, I want
22    to know what you did to do the analysis.
23    A.   So --
24         MS. MAINIGI:  Objection, Your Honor.  I apologize.
25    Ms. Kearse keeps referring to "you".  We know that Dr. Gupta
```

1    did not actually conduct the report or do the work on the

2    report.  It was Joel Massey, MD who did.  I understand Dr.

3    Gupta directed him, but I don't want the record to be

4    unclear as to Dr. Gupta's role.

5              THE COURT:  Okay.  I will sustain that objection.

6              BY MS. KEARSE:  Okay.  So --

7              THE COURT:  You can ask your questions a little

8    more precise on that.

9              BY MS. KEARSE:

10   **Q.**   Dr. Gupta, in your position as the Public Health

11   Officer of the State of West Virginia, you actually

12   commissioned this report?

13   **A.**   I commissioned, supervised, directed and had day-to-day

14   supervision of this work of the report.

15   **Q.**   And this report, if I -- if I say that I won't use the

16   word "you", but as the Office of Public Health for the State

17   of West Virginia issued this report; specifically, the

18   Department of Health and Human Resources for the Bureau of

19   Public Health?

20   **A.**   Ms. Kearse, I'm under oath.  I'm going to be really

21   honest.  I did issue this report.  This is under me.  So, I

22   will not mischaracterize that statement.  It was my report.

23   I issued it.

24   **Q.**   So, I can use "you".  All right.  So -- and so, I would

25   like to go over just some general findings with this and so,

1    if you can tell the Court what was involved in your analysis

2    and how you went about doing it with -- what you did and how

3    you did it.

4    **A.**    Sure.  So, what we conducted was an investigation, or I

5    conducted an investigation, that partnered with the West

6    Virginia Poison Control Center, the West Virginia Office of

7    Emergency Services, Police and Fire Departments in Cabell

8    County, as well as the Cabell County Health Department,

9    Cabell-Huntington Health Department.

10          We, first of all, analyzed what happened.  We found

11   that there was a 53-hour period over which there were

12   multiple overdoses that occurred.  We wanted to understand

13   what happened, so we worked with the local hospitals to get

14   all the patient encounters, all of that data and during that

15   time period to separate out the ones that had gone -- the

16   overdoses versus everybody else that came in.

17          We found that there were about 20 people that had come

18   in that had records that met the case definitions.

19          So, one of the first things we had to do, Your Honor,

20   was to develop a case definition.  That's the first element

21   of a public health outbreak.  You've got to figure out what

22   your case definition is.  When will you have a cutoff that

23   came?  When will you have a cutoff on the other end?  That

24   case definition was never developed before this episode.

25               MR. HESTER:  Objection to the narrative, Your

1    Honor.  I don't think he's responding to Ms. Kearse's

2    question.

3                THE COURT:  Well, overruled.  I think he's

4    explaining the background for what he did.  I'll overrule

5    that objection.

6          Go ahead, Dr. Gupta.

7                THE WITNESS:  Yes, Your Honor.  So, we -- first

8    thing was to develop a case definition within the confines

9    of which we will determine these people to be in.  And so,

10   we turned out that there were about 20 people that met that

11   case definition for this particular outbreak.

12         Then we looked at where they lived, what kind of

13   services they came to, and what was provided to them

14   basically in the hospitals.

15         And I am going to refer a little bit to the report

16   because it has been awhile that I have reviewed this.

17               BY MS. KEARSE:

18   Q.   Let me ask you this, Doctor.  As part of your

19   investigation, did you also look into public health

20   interventions in regards to this incident?

21   A.   We did.

22   Q.   And did you have findings in regards to areas for

23   potential public health intervention in regards -- I'm

24   specifically looking at Page 2.

25   A.   So, one of the things we found was that it was

1    important to have an actual real data system to be able to

2    act.  This was our first instance of such a thing in the

3    State of West Virginia.  So, we wanted to make sure that the

4    recommendation reflects having a system that monitors

5    overdoses.

6         The second was the continuum of care for overdoses.

7    So, one of the things that happened, as I mentioned before,

8    the treat them and street them, that often, these people

9    from overdose were let go from the emergency room.  This was

10   an opportunity.  This goes back to the social autopsy work,

11   that we had an opportunity to provide help that was not

12   there.

13        So, it was important for us to develop a system that we

14   can actually capture and help these people, knowing that the

15   outcome would be poor otherwise.

16        And, lastly, was the community level intervention that

17   focused on education and other -- other interventions at a

18   community level.

19   **Q.**   And did you share these results and these interventions

20   and your analysis with members of the Cabell-Huntington

21   community?

22   **A.**   Yes.

23   **Q.**   And did you follow up on these interventions with

24   various community folks within Cabell-Huntington?

25   **A.**   Yes.  So, we began to think, okay, how do we work on

1    these recommendations moving forward?  So one of the things

2    we created at that point was called Quick Response Teams, or

3    QRTs.  QRTs are generally a team of a first responder, a

4    social worker and someone from the Health Department.

5         So, if someone in a hospital comes in and is discharged

6    home, within the next 24 to 72 hours, a QRT will go back to

7    that point and ask them, hey, would you like to -- what --

8    what are all the things we can help you with?  Can we offer

9    you treatment?  Can we offer you naloxone?  Can we offer you

10   any other assistance?

11        The idea here was to prevent these people were dying

12   and overdosing and offering them, in a non-judgemental way,

13   treatment.

14   **Q.**   And you worked specifically with folks from the

15   Huntington community to get that started?

16   **A.**   Yes.

17   **Q.**   Doctor, is there any other key findings from this

18   report that go into the intervention and forward-looking

19   prevention?  And let me -- let me ask it a different way.

20        Similar to the other -- the Social Autopsy Report, is

21   this something of another type of autopsy from --

22   **A.**   Yes.

23             MS. MAINIGI:  Objection, leading.

24             BY MS. KEARSE:

25   **Q.**   And within your findings, did you also -- in your

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    investigation, did you make recommendations based on your

 2    investigation?

 3    A.   Sorry.  Recommendations to whom?

 4    Q.   Within the report itself?  Are the recommendations in

 5    the report?

 6    A.   Yes.  Page 13 onwards has recommendations specific to

 7    the -- this particular outbreak.

 8    Q.   And if we go to just the very top of the

 9    recommendations, is this -- I'm not going to have you read

10    them all, but are these the recommendations?  And we'll go

11    over them.  Generally speaking, opioid overdose is a public

12    health crisis in Cabell County.  Was that your finding?

13             MS. MAINIGI:  Objection, Your Honor.  I think

14    we're going down the same road we were at about 15 minutes

15    ago.  This is just Ms. Kearse testifying about something she

16    would like to quote later somewhere, but it's -- Dr. Gupta

17    has already reviewed his recommendations, I thought, from

18    Page 2 or 3 of the report.  I don't know why we're doing it

19    again other than to read additional passages into the

20    record.

21             THE COURT:  Well, these are the recommendations

22    from this report and he made other recommendations based on

23    the other report, didn't he?

24             MS. KEARSE:  Yes, Your Honor.  He touched on a

25    couple things in this report already.
```

```
 1                THE COURT:  And they probably overlap to some
 2     extent.
 3                MS. KEARSE:  They might and that's why I'm going
 4     to follow up, if we can -- just general speaking.
 5                THE COURT:  Overruled.  I'm going to let him go
 6     down this path a little ways.
 7                MS. KEARSE:  And, Your Honor, or --
 8                BY MS. KEARSE:
 9     Q.   Dr. Gupta, this is specific to Cabell County; is that
10     correct?
11     A.   Yes.
12     Q.   And did you make some findings specific to Cabell
13     County on what they were dealing with in regards to the
14     opioid crisis?
15     A.   Yes.
16     Q.   And what was that?
17     A.   There were -- the outbreak highlighted three potential
18     interventions that included surveillance, healthcare system
19     response and community response.  And there are
20     recommendations within each category specific.
21     Q.   And that's within the body of your recommendations?
22     A.   Yes.
23     Q.   And did you make a finding that the opioid overdoses of
24     health crisis in Cabell County --
25                MS. MAINIGI:  Objection, Your Honor, leading and
```

1   testifying.

2           THE COURT:  Sustained.

3           MS. KEARSE:  Let the report speak for itself.

4           BY MS. KEARSE:

5   **Q.**   Did you make a -- did you make a finding in regards to

6   the extent of the problems in Cabell County?

7   **A.**   We were very clear in stating that opioid overdose is a

8   public health crisis in Cabell County.

9           MS. KEARSE:  Your Honor, I would like to -- I

10  don't think I put this, the prior exhibit in, and I'll do

11  some cleanup at the end of the examination, but I would

12  offer this Document 4114a into evidence.

13          THE COURT:  Is there any objection to 411?

14          MS. MAINIGI:  Your Honor, I'll stand on my prior

15  objections to the report.

16          THE COURT:  I'm going to -- I'm going to admit it.

17              **PLAINTIFF EXHIBIT P-41114a ADMITTED**

18          MS. KEARSE:  And, Your Honor, just for the record,

19  so I'll formally admit Exhibit 44211, which was the 2016

20  West Virginia Overdose Fatality that we spent a good amount

21  of time on.

22          MS. MAINIGI:  Same objections, Your Honor.

23          THE COURT:  Same objection?  All right.  It's

24  admitted.

25              **PLAINTIFF EXHIBIT P-44211 ADMITTED**

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1           BY MS. KEARSE:

 2    Q.   Dr. Gupta, in your role as a Public Health Commissioner

 3    of West Virginia during this time, did you continue in

 4    commissioning reports that were specific to opioids in West

 5    Virginia that would include the Cabell-Huntington

 6    communities?

 7    A.   Yes.

 8    Q.   And can you -- if you can tell us what those reports

 9    are, we may go through a couple of others there, but I'm

10    hoping we can fast track this and we're not here all day,

11    but I'd like to just know, what other interest did you have

12    in actually doing further investigations in regards to these

13    issues?

14    A.   In 2015, we had done the historical analysis to see the

15    trend data.  We had our suspicions about the trends.  Those

16    suspicions were confirmed in the Social Autopsy Report.

17    Then, when we started to see the challenges of outbreaks of

18    HIV, hepatitis, it was very important for us to characterize

19    diseases, also.  So, those were some of the reports

20    additionally that I commissioned, directed, supervised.

21    That included the HIV and STD report, included Hepatitis

22    Profile Report for the State of West Virginia.

23    Q.   What were the suspicions that you had that led you to

24    these reports?

25           MS. MAINIGI:  Objection, Your Honor, foundation.
```

```
 1    I don't think this can be a vehicle for just letting in his
 2    free-flowing thoughts.
 3              MS. KEARSE:  Well, that's why I was asking him for
 4    the basis of --
 5              THE COURT:  Overruled.  You can answer.
 6              THE WITNESS:  The basis for commissioning these
 7    reports were that we were seeing -- I'm -- I'm going to back
 8    up a little bit, Your Honor.  Every time there's an outbreak
 9    of, let's say, hepatitis C, what we do is call it contact
10    tracing.  We find out who that positive lab is from, that
11    hospital or provider, and then we get the address and we go
12    back to the person.
13         Then we talk to them.  Who all have you been
14    interacting with?  It's an exponential process just like
15    we're doing for COVID with contact tracing.
16         We began to conduct these interviews and we were
17    finding information that was significantly concerning to us
18    during those interviews that led us to do this report.
19              BY MS. KEARSE:
20    Q.   And I'm going to -- so that we're clear on the reports,
21    were there a number of reports -- and I'm not going to go
22    into detail with these if we can -- if I can at least make
23    these some general --
24              MS. KEARSE:  Your Honor, may I approach?
25              THE COURT:  Yes.
```

```
 1              BY MS. KEARSE:

 2     Q.   Dr. Gupta, I'm handing you three documents, and I would

 3     like you to identify them, and then we'll just skim over

 4     them in as brief detail as possible.  So, P-44277 (sic) is

 5     titled the West Virginia Viral Hepatitis Epidemiologic

 6     Profile 2017 and P-41904, Hepatitis B and Hepatitis C

 7     Infection in West Virginia, April 2018, and P-41901.  HIV

 8     Epidemiologic Profile West Virginia, 2017 and ask if those

 9     are the reports, and there may be more, but those are all

10     that I have regarding the subject matter you just testified

11     about?

12     A.   These are.

13     Q.   And, Dr. Gupta, similarly with the other reports, were

14     these commissioned by you in your capacity as the Public

15     Health Commissioner of the State of West Virginia pursuant

16     to statute?

17     A.   Yes.  They were commissioned by me, supervised by me

18     and directed by me, all three of these reports.

19     Q.   And I handed you three different reports and I'm going

20     to ask you some questions.  If there's something that is --

21     I've got to distinguish, let me know, but I want to ask you

22     what you did as part of your investigations that led you to

23     these reports?

24     A.   So, when we were interviewing individuals on the ground

25     suffering from hepatitis B, hepatitis C, HIV, we asked a lot
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    of questions.  The questions we asked is why?  How did you

2    get this?  Who else is involved?  And one of the things we

3    were seeing is a lot of those are happening because of the

4    IV drug use of those individuals.

5        So, we wanted to understand both the rising case load

6    in West Virginia, but also, the trend analysis over time

7    because this was becoming more clear that it's related to

8    the IV drug use of individuals.

9    **Q.**   And where did you get the data that you obtained in

10   these reports?  Can you tell the Court how you went about,

11   in addition to talking with the data that that's provided

12   and that will be before His Honor?

13   **A.**   So, in every state, including West Virginia, is the --

14   is the -- is where all of the data for all of these

15   infections is kept.  So, that data for any outbreak comes

16   back to the Bureau for Public Health.  So, if there's an

17   outbreak in McDowell County, we're going to get people in

18   McDowell County to work with the local Health Department in

19   McDowell County.  And once we figure out how large the

20   outbreak is, how many people involved, that all gets

21   submitted into a database at Bureau of Public Health.  And

22   then that gets annually submitted to the CDC.

23       And that's when you see some of the numbers come out at

24   CDC.  They're not the CDC's numbers.  Those are actually

25   West Virginia's numbers being fed to CDC and then, they go

1    to the media after that.

2    Q.    And in regards to your methodology and collecting the

3    data, did you issue your findings specific to various

4    outbreaks within the state?

5    A.    We conduct well over 200 outbreak investigations in the

6    state every single year.  Most of these are protected by

7    state law from disclosure because they have individual

8    protected health information in them.

9    Q.    Were you able to take the overarching data and have an

10   understanding of what the various -- the wheres, we talked

11   earlier we saw some of the maps, where this was occurring

12   within the state?

13          MS. MAINIGI:  Objection, Your Honor.  I'm having

14   trouble following.  My objection is on foundation grounds,

15   but I don't know what the where or the what is here and,

16   therefore, I am having a challenge with foundation.

17          MS. KEARSE:  Okay.  I'll briefly go through.

18   Let's start with 41904.

19          THE COURT:  I'll sustain the objection and give

20   you an opportunity to clarify.

21          MS. KEARSE:  I will be -- I was probably trying to

22   fast forward some things, but I'll do them very quickly,

23   quickly there for Your Honor's foundation.

24          BY MS. KEARSE:

25   Q.    41904 is the hepatitis B and hepatitis C infection in

```
 1    West Virginia, 2016 Surveillance Summary, and it's dated
 2    April, 2018.
 3    A.    Yes.
 4    Q.    And to make sure we're clear on the specific reports,
 5    does the methodology just described generally conform to
 6    what you did in regards to the 2016 Surveillance Summary
 7    that was published in 2018?
 8    A.    This report is in accordance with a particular West
 9    Virginia Communicable Disease Rule, 64 CSR 7, that is within
10    the state statute.  So, this is -- the report is in
11    compliance with the state statute and the methodology is
12    well-accepted methodology that it utilized by State
13    Departments all across the country.
14    Q.    And is this also a public document?
15    A.    It is.
16    Q.    And my page when I -- when I was asking about the
17    wheres, I'll -- turn to Page 6.  And did you do analysis --
18    or Page 5.  Did you look at the geographical distributions
19    of your findings within that?
20    A.    Yes.
21    Q.    And did you go -- did you specifically look county to
22    county that you just testified, but specific to this report,
23    did you also include Cabell County in your analysis?
24    A.    Yes.
25    Q.    And is that reflected in Table 2 of this report?
```

1    **A.**    Yes.

2    **Q.**    And did you identify various counties that had various

3    numbers of the -- regarding the disease and outbreak?

4    **A.**    For hepatitis B and C, yes.

5    **Q.**    Okay.  And just so we're clear, what was the purpose of

6    doing this investigation?

7    **A.**    First of all, it is very important for the State to

8    know what's its caseload of these diseases, what is -- how

9    many outbreaks these diseases have had, what are the

10   treatments available and where for people to get to and, if

11   there is an insufficiency of that, then it is the

12   responsibility of the Commissioner to ensure that there are

13   proper treatments available.  And then -- so it's what and

14   it's where, where are they happening.

15        And, lastly, where do we rank compared to the country.

16   So, looking at -- again, we don't rely on that, but it's

17   very important for us to know where are we on the spectrum?

18   Are we the worst in the country?  Are we the best in the

19   country?  Because the measurement tools we're using, it's

20   important to know if they're working or not.

21   **Q.**    And within this report, did you also include your

22   conclusions or as on behalf of the State of West Virginia

23   Department of Public Health, did you also provide

24   conclusions to your analysis?

25   **A.**    Yes.

1    **Q.**    And if I need to lay the foundation for each report,

2    I'll just quickly go through the West Virginia Viral

3    Hepatitis Epidemiological Profile 2017, Exhibit 44227, and,

4    Dr. Gupta, I'll ask, was this report also commissioned by

5    you?

6    **A.**    It was commissioned, supervised and directed by me.

7    **Q.**    Okay.  And under statute for the West Virginia -- for

8    the State of West Virginia?

9    **A.**    Yes.  This was a part of the responsibility and the

10   mandate that was in the -- rests in the Office of the

11   Commissioner.

12   **Q.**    Okay.  And specific to viral hepatitis within your

13   report, did you also look at the demographics in West

14   Virginia?

15   **A.**    Yes.

16   **Q.**    And did you also include analysis through the various

17   counties within the State of West Virginia?

18   **A.**    Yes.

19   **Q.**    And would that include Cabell-Huntington community?

20   **A.**    Yes.

21   **Q.**    Can you provide the Court some -- just your -- a

22   summary of your overall findings in regards to your study

23   and investigation and significance of that?

24   **A.**    Sure.  So, Your Honor, on Page 11 under the hepatitis B

25   surveillance, there's a map on the top and that map shows

1    the U. S. incidence of hepatitis B between the years of 2007

2    and '16.  And you can look at that and it's 1.1, Your Honor.

3        You can look at the West Virginia's rates.  It's 14.5.

4    So, literally, it's fourteen-fold higher rates in West

5    Virginia and they -- you can see where as the national rates

6    have stayed steady and maybe have come down from 2007, we

7    began to jump from somewhere between 2010 and '11 and we've

8    had a steep rise.

9        If you look at Page -- Your Honor, Page 13, top map for

10   hepatitis C now instead of B, both of these are transmitted

11   through various -- we can talk about it later, but you can

12   see here, for US, it's .8 from 2007 to '16 and for West

13   Virginia, it's 7.1 and that's, again, several-fold.  That's

14   about nine times the national average.  And you can still

15   see that it began to go up in 2010, but really spiked in

16   2015.

17   Q.   And just briefly with -- what is the significance from

18   a public health perspective of having a population with

19   viral hepatitis?

20   A.   So, hepatitis C is a lifelong disease, Your Honor.

21   Oftentimes, people get it, there's association with IV drug

22   use, sexual activities, as well as somewhat with alcohol and

23   it's very expensive to treat.  That's the significance and

24   it may not go away.  So, it's about -- it's expensive to

25   treat.  Hepatitis B is the same type and same mechanism of

```
1    transfer and it can stay.  And long-term.  Hepatitis C is

2    very closely related to liver cancer.  So, there's a high

3    risk of liver cancer in long-term if you got it.

4    Q.    And just want to make sure we're tying things together

5    as you -- as we go through these.  What was the significance

6    in regards to opioid use that you were finding hepatitis,

7    viral hepatitis, and hepatitis B and C?

8              MS. MAINIGI:  Objection, Your Honor, foundation.

9    This is another causation question that there is absolutely

10   no basis to have this witness testify to.  If it's in some

11   report, I'd like to be referred to it.

12             THE COURT:  Yes.

13             BY MS. KEARSE:

14   Q.    Well, let me ask you this, Doctor.

15             THE COURT:  I'll sustain the objection.

16             BY MS. KEARSE:

17   Q.    Within these reports, do you have a base -- do you --

18   do you describe the basis for doing these studies and

19   investigations?

20   A.    Yes.

21             MS. MAINIGI:  Same -- same objection, Your Honor,

22   in terms of where -- where we're going.

23             THE COURT:  Overruled.  You can answer that one,

24   if you can.

25             BY MS. KEARSE:
```

1    **Q.**   Well, can you tell me which report we're specifically

2    on now?

3    **A.**   On Page 12, the same report, the bottom graph that is

4    titled Risk Factors Reported in Acute Confirmed Hepatitis B

5    Cases, 2012 to 2016.

6    **Q.**   Let me just make sure where we're --

7    **A.**   Yes.

8    **Q.**   Page 12 --

9             THE COURT:  The question was, do you have a basis

10   for doing the studies in the investigations?  Can you answer

11   that question?

12            THE WITNESS:  Yes, I did, Your Honor.  I can

13   repeat that, Your Honor.

14            THE COURT:  Well, it seems to me your answer

15   wasn't responsive to the question, but maybe I --

16            THE WITNESS:  I can repeat that, Your Honor.

17            THE COURT:  Go ahead.  Take another stab at it.

18            THE WITNESS:  When we were conducting individual

19   outbreak investigations of hepatitis B and C, we were

20   getting information on individual interviews that they were

21   using a lot of IV drugs and that made us -- it was important

22   for us to then start to understand for the entire state what

23   was the role of IV drug as opposed to other things in

24   causation of hepatitis B and C.

25            THE COURT:  Okay.  You answered the question.

```
 1    Thank you.

 2            THE WITNESS:  Thank you, sir.

 3            BY MS. KEARSE:

 4    Q.   And I think I was asking what your findings were then,

 5    as well.

 6    A.   So, Page 12, at the bottom, you can see the risk

 7    factors reported in acute confirmed hepatitis B cases and

 8    left top-hand corner says injection drug use, that blue

 9    line, and you can see the blue line has gone way up above

10    anything else that has happened.  And that confirmed our

11    suspicions that it was the IV drug use that was driving the

12    increased rates of hepatitis B in this particular slide.

13    Q.   I just want to make sure I've just laid the foundation

14    for these three documents.  Instead of trying to move

15    quickly through them, I just want to lay the third one that

16    we identified, that you identified, was that HIV

17    Epidemiologic Profile, 2017, P-41901, and just for --

18    particularly for our foundation purposes as a Public Health

19    Commissioner for the State of West Virginia, did you

20    actually conduct this investigation, as well, at your

21    direction?

22    A.   I conducted -- I directed, commissioned and supervised

23    this study, as well.

24    Q.   And, briefly, can you provide for the Court how you

25    went about conducting this investigation?
```

1    **A.**    This investigation was conducted very -- with a lot of

2    the same rationale previously, but there's one very

3    important rationale in addition to that.  We had one of the

4    largest outbreaks in the history of the United States in

5    Scott County, Indiana.

6        Following that outbreak in Indiana, the CDC had

7    commissioned a study to look at where are the most likely

8    counties and majority of those counties within our area were

9    in West Virginia.

10       So, they had raised all kinds of red flags to us as

11   West Virginia.  You need to be keeping a close eye on HIV in

12   your state because you have the highest likelihood in the

13   nation of having an outbreak.

14       We wanted to make sure that we have all the data, all

15   the surveillance, all the epidemiological profile that we

16   could have to understand that and prevent outbreaks in the

17   future.

18   **Q.**    And in line with your role as a Public Health

19   Commissioner, did you make findings and recommendations in

20   this report, as well?

21   **A.**    Yes.

22   **Q.**    And is there -- without going into any detail there, is

23   there anything specific to treatment or prevention in

24   regards to HIV?

25            MS. MAINIGI:  Objection, Your Honor, foundation.

```
 1     If we could go to a particular page, that would be helpful.
 2            THE COURT:  Well, are you asking him what
 3     recommendation, if any, he made with regard to this?
 4            MS. KEARSE:  Yes.
 5            THE COURT:  He can answer that.  Overruled.
 6            THE WITNESS:  Yes, Your Honor.
 7        Your Honor, I'm going to -- I'm just going through it
 8     so I can -- I can find it.
 9            BY MS. KEARSE:
10     Q.  I can direct you to where I'm going to ask the
11     questions specific to any recommendations that injection
12     drug use and HIV in regards to your findings and it begins
13     on Page 51.  I know there's a lot of other issues within the
14     report.  And I'll start with does it -- at Page 51, with
15     injection drug use and HIV, does that section include your
16     investigation and analysis?
17     A.  Yes.  The Page 52 also includes the study of the CDC
18     that I referred to a moment earlier, a map of how many
19     counties in green are at very high risk, very similar to
20     Scott County of having outbreak.  This was provided to us by
21     CDC.
22            MS. KEARSE:  And, again, just for our foundation
23     purposes, I offer these exhibits into evidence, if we've
24     satisfied the foundation.
25            MS. MAINIGI:  Your Honor, I am making the same
```

```
 1    objections as the prior reports.

 2              THE COURT:  Overruled.  I'm going to admit them.

 3              MS. KEARSE:  Okay.

 4              THE COURT:  They're all three admitted.

 5         PLAINTIFF EXHIBITS P-41901, 41904 & 44227 ADMITTED

 6              MS. KEARSE:  So, that's P-41901, 41904 and 44227.

 7              BY MS. KEARSE:

 8    Q.   And just to be clear, Doctor, those analyses, even in

 9    the last report I just showed you, also involves the

10    Huntington and Cabell communities?

11    A.   Yes.

12              THE COURT:  Is this a good place to take a break,

13    Ms. Kearse?

14              MS. KEARSE:  Yeah.  Maybe we'll fast forward now.

15              THE COURT:  15 minutes.

16              MS. KEARSE:  Thank you, Your Honor.

17         (Recess taken)

18              THE COURT:  Dr. Gupta, you can resume the

19    witness stand, sir.

20    BY MS. KEARSE:

21    Q.   I'm going to wind this up.  I just want to do a

22    couple follow-ups.

23         I'm going to -- you've got Exhibit Number 41901 in

24    front of you?

25    A.   Yes.
```

1    **Q.**   And I want to specifically ask you a question about

2    your finding on Page 51.

3        And specifically on Page 51 I want to ask you, did your

4    investigation reveal sufficient facts to determine whether

5    or not there is a relationship between prescription opioids

6    and heroin?

7            MS. MAINIGI:  Objection, Your Honor, foundation.

8    I think that -- it appears that they're trying to backdoor

9    into gateway and we have an objection on foundation.  And we

10   don't think that there's a correlation that you can draw

11   here vis-à-vis this report.

12           MS. KEARSE:  Your Honor, that's why I asked him

13   the question if there is.  He didn't say "yes" or "no" yet.

14   So --

15           MS. MAINIGI:  But, Your Honor, --

16           THE COURT:  I'm going to let him answer.  I'm

17   going to overrule the objection and let him answer and I'll

18   have to sort this out after the fact.  And we have a number

19   of problems I'm going to deal with such as the hearsay

20   within hearsay and so forth.

21       Go ahead, Ms. Mainigi.  I got it right, didn't I?

22           MS. MAINIGI:  You got it.  Thank you, Your Honor.

23       Here's the problem, Your Honor, with the, with the

24   gateway issue.

25       I took his deposition, Dr. Gupta's deposition a few

```
 1    weeks ago.  And he told us at that deposition that the basis

 2    for his gateway opinion was the Cicero report which is a

 3    report that a bunch of experts in this case on both sides

 4    are going to come testify about.

 5            MS. KEARSE:  Your Honor, that's for cross

 6    examination.

 7            THE COURT:  Wait a minute.  You can't both talk at

 8    once.

 9            MS. MAINIGI:  He didn't say that it was based on

10    various studies and so forth that he had done.  So I'm just

11    concerned that we're going to really muddy the record.  And

12    I know Your Honor is going to sort it out later.

13        But if Your Honor -- I would ask that Your Honor

14    reconsider it.  And if you don't reconsider it, I'd at least

15    like a very careful and complete foundation to be laid by

16    Ms. Kearse as to why he would have a basis for a gateway

17    opinion here.

18            THE COURT:  Well, I think that's a good suggestion

19    and I'll overrule the objection subject to you doing that,

20    Ms. Kearse.

21    BY MS. KEARSE:

22    Q.   Dr. Gupta, did your investigation reveal sufficient

23    facts to determine whether or not there is a

24    relationship between prescription opioids and heroin?

25    A.   Yes.
```

1    **Q.**   And can you explain that to the Court on what your

2    findings, led you to those findings?  Well, let me ask you

3    this.  You had sufficient facts to determine that.  Can you

4    tell me what facts and then whether or not you found a

5    relationship?

6    **A.**   Absolutely.  So there's three buckets, Your Honor, of

7    these facts that we have to rely on to make the statement

8    that's made in the report here.

9         The first of it is the fact that we saw in the Social

10   Autopsy that confirmed our findings that people that were

11   interacting with the Controlled Substances Monitoring

12   Program were much more at 12 months and much fewer at 30

13   days.  That 30 days, that meant that people are -- were

14   transitioning from prescription opioids to IV heroin, the

15   most cheaper alternative.

16        Second set of facts was the fact that we were

17   conducting the investigations, what we call contact tracing

18   for people suffering from HIV, hepatitis.  We were

19   consistently gathering data that was showing the use of the

20   prescriptions.  And now because the supply has reduced, they

21   had to transition to seek drugs, predominantly heroin.

22        And the third piece is that we were seeing a lot of

23   crack down on pill mills in West Virginia.  And when that

24   was happening, what we saw as, as Bureau of Public Health,

25   State Health Department was every time a pill mill got shut

1    down, we saw three things come out of it.  More people went

2    to the emergency room for their medication because they

3    can't find a doctor to prescribe it.  They overdosed and

4    died.  And some of them went to the alternative treatment on

5    the street which was cheaper and much more readily

6    available.

7         So the studies that are there in the national space,

8    they are consistent with my findings.  I have said this and

9    I'll keep saying it.  What we established in West Virginia

10   was for West Virginia.  What the national studies were

11   establishing was actually for whatever that area was.

12        But there was a significant amount of consistency and

13   there's not an iota of doubt, not in West Virginia nor in

14   those studies, that that's the fact.  That's what's

15   happening.

16             MS. MAINIGI:  Your Honor, --

17        Go ahead, Mr. Hester.

18             MR. HESTER:  Well, Your Honor, I was going to say

19   that, that there's nothing in this report that supports what

20   Dr. Gupta just said.  He's just gone way beyond this, this

21   report.

22        On the face of the report, the only thing that's stated

23   in relation to this gateway issue is a citation to a study,

24   a nationwide study.  So as to that, there's a hearsay

25   problem.

```
 1          But what Dr. Gupta has just said is a completely new

 2    set of opinions we've never heard before.

 3               MS. MAINIGI:  Your Honor, --

 4               MS. KEARSE:  Your Honor, I can lay a further

 5    foundation on that.

 6               THE COURT:  Ms. Mainigi, go ahead.

 7               MS. MAINIGI:  I'm sorry.  Dr. Gupta -- just to add

 8    a couple of things to what Mr. Hester said, Dr. Gupta just

 9    said there's no iota of doubt.  I mean, that, that can't

10    possibly be an opinion he's allowed to offer here because

11    there's just no support for it.

12          The reference to pill mills is one of his three pieces

13    of support.  We haven't seen any study that he did on pill

14    mills, any conclusion he even reviewed or commissioned or

15    authorized on pill mills, let alone -- what the standard is

16    is that he has to be a percipient witness with personal

17    knowledge and observation, not facts supplied by others.

18          That was the Downey case that Your Honor cited in his

19    opinion related to Dr. Gupta.

20          And, and furthermore, I think Your Honor found that Dr.

21    Gupta's testimony in this case is limited to his involvement

22    in the events giving rise to this litigation.

23          And we have gone report after report the entirety of

24    the late morning and the afternoon and we have not come

25    across any of these opinions until now.  When all the
```

1    reports are put away, now is when they're going to try to

2    create some sort of link.

3         But the Social Autopsy report -- we spent an hour on

4    the Social Autopsy report.  So where was gateway in the

5    Social Autopsy report?

6         Contact tracing, HIV.  We just looked at three reports

7    that related to that area.  We didn't even see the reference

8    to contact tracing in those reports.  How is that now linked

9    to gateway?

10        This -- I, I recognize, Your Honor, this is a bench

11   trial.  But to let in Dr. Gupta's views on gateway when

12   there's no support in any of his reports, he told us he had

13   the ability to commission reports on whatever he wanted.

14   Why didn't he commission a report on gateway?

15        We've got experts coming from the plaintiffs' side.

16   We've got experts coming from the defense side.  There will

17   be plenty of people to speak to gateway.  Dr. Gupta

18   shouldn't be allowed to give us his untested views on

19   gateway.

20             THE COURT:  Is there anything in his report about

21   the gateway theory?

22             MS. KEARSE:  Your Honor, this, this report, as

23   he's testified, started back in 2001 with his review of the

24   2001 and 2015, the Social Autopsy report, the further

25   outbreaks in Cabell County regarding this.  And it's the

1    totality of taking those reports specific to the issues of

2    the Office of Public Health in West Virginia regards to his

3    number one, two, and three that he looked at was opioids and

4    how the opioids has affected West Virginia.

5        He has more than sufficiently laid the foundation on

6    these and can testify specifically as to what he observed,

7    what he investigated, and what he did in his official

8    capacity, and what he's presented to the public on these

9    issues there.

10       And he was deposed on these issues and, and discussed

11   these as well.  I think there's cross-examination to, to

12   investigate those.  But I think Dr. Gupta is well equipped

13   to do that and I think we can -- you know, if there's more

14   factual things there.

15       But that was my question, was there a factual basis

16   without his work as a Public Health Commissioner to make

17   that -- to determine whether or not there was a relationship

18   between prescription opioids and heroin.

19           MS. MAINIGI:  Your Honor, one final point.  I

20   apologize.  There's the reference to the cross-examination.

21       You allowed a further deposition of Dr. Gupta for this

22   very purpose, to avoid surprise at trial.  And that is the

23   right thing to do given that we -- that he was going to be

24   allowed to testify.

25       We asked him, Your Honor, what were his bases for his

1    gateway opinions.  He testified about the reports, the

2    national reports he referred to.  He did not say, "These are

3    the three additional buckets of facts that I have in my own

4    personal purview."

5         He did not do those because if he had, if he had given

6    us the answer several weeks ago that he gave us today for

7    the very first time, obviously we would have followed up

8    with it right then and there and been prepared to deal with

9    it here.  But this is just surprise and ambush in terms of

10   trying to sneak in gateway.

11              THE COURT:  Okay, Ms. Kearse, you get the last

12   shot.

13              MS. KEARSE:  Your Honor, they took four more hours

14   of his deposition and he laid out a lot of other information

15   based on facts.  And I simply asked the doctor if there's

16   data in the reports that support this.

17        And what we did was walk through these meticulously in

18   order for us to lay the facts and lay a foundation for his

19   work and investigation and observations as the chief of the

20   public health of the State of West Virginia on seeing what

21   the data was showing and what the facts were in order to

22   determine whether there's a relationship between

23   prescription opioids and heroin.  And he was deposed on a

24   number of those issues there and has always been consistent

25   in his views on that.

1          THE COURT:  But he didn't touch on this in his

2    deposition?

3          MS. KEARSE:  Yes, he did, Your Honor.

4          THE COURT:  Did you ask him about it?

5          MS. MAINIGI:  I did, Your Honor.  I asked him what

6    the bases were for his gateway opinion, and he referred me

7    to the Cicero national study.

8        If Your Honor was -- what I would suggest, Your Honor,

9    is if you'd like to just see some quick briefing on that and

10   hold on this question, we're happy to provide something on

11   it.  And maybe Ms. Kearse can move to a different area.

12         MS. KEARSE:  Well, Your Honor, I had simply asked

13   if the information is in the report.

14         THE COURT:  Well, I think the thing to do is for

15   me to hear what he has to say.  And in all likelihood, I'm

16   not going to consider it.  But since this is a bench trial

17   and I want to make a complete record, but do it in just a

18   few questions and get it over with and I'll reserve ruling

19   on the objection.  But I want to hear what he has to say.

20   BY MS. KEARSE:

21   Q.   Is there data in your report, in addition to the

22   facts you just explained, that goes to this issue of

23   whether or not there is sufficient facts to determine,

24   or data to determine whether or not there is a

25   relationship between prescription opioids and heroin?

1    **A.**   Your Honor, if I'm allowed to, since this is a

2    significant issue, I would like to have the ability to

3    explain the whole thing because there is some information

4    here that is being mischaracterized in terms of the

5    deposition.

6              MR. HESTER:  I object to that.  The question was:

7    "Is there data in your report?"  I think the witness should

8    answer the -- sorry.  I think the witness should answer the

9    question.

10             THE COURT:  Yeah.  Answer the specific question,

11   Dr. Gupta, please.

12             THE WITNESS:  Yes, Your Honor.

13        Page 50 of the Social Autopsy report specifically

14   states that -- I'll read it and then I'll explain it also.

15        "In fact, at 12 months, 56 percent of decedents had

16   filled an opioid prescription and 37 percent of decedents

17   had filled a benzodiazepine prescription.  By 30 days prior

18   to death, the percentage of decedents with an opioid

19   prescription had decreased to 25 percent which was the same

20   percent of decedents with a benzodiazepine prescription."

21        What that means, Your Honor, is those people were

22   filling prescriptions at four months before their death,

23   56 percent, only 25 percent had filled at 30 days.

24        So that means that the significance, about half of

25   those people quit filling prescriptions for controlled

```
1    substances by the time they got to 30 days before their

2    death.

3         Well, if they quit filling prescriptions, what did they

4    die of?  They died of heroin and fentanyl.  That is a very

5    clear pathway from prescription drugs to fentanyl and

6    heroin.  It cannot be more clear.

7              THE COURT:  Okay.  Move on to something else.

8    BY MS. KEARSE:

9    Q.   Two more things and we'll be done.

10        Doctor, in regards to your work with various cities and

11   counties, including the Cabell-Huntington community, have

12   you worked on harm reduction?

13   A.   Yes.

14   Q.   And specific to a lot of the reports we just talked

15   about, the Outbreak 2016, can you explain for the, the Court

16   what is harm reduction?

17   A.   Harm reduction is a set of practices based in evidence

18   aimed at preventing further harm as a consequence of

19   substance use.  But it could be applied to tobacco.  So, for

20   example, when people go from smoking to vaping, that is

21   sometimes considered harm reduction.

22        The idea here for substance use disorder and people who

23   are suffering from substance use disorder is they might be

24   ready to get into treatment day one because, again, going

25   from addiction is a different concept.
```

```
1        So what we are trying to do is get them into screening

2   for diseases like HIV and hepatitis, give them clean

3   syringes so they cannot share syringes, get them naloxone,

4   offer them counseling and treatment, get them family

5   planning services, a set of services that actually helps to,

6   while they may or may not be ready for treatment directly,

7   but continue to engage the healthcare system in a

8   non-judgmental manner for these individuals so they can in

9   the long term understand and get engaged into treatment.

10  Q.   And as a follow-up there, did you actually -- are you

11  familiar with the White Paper on harm reduction?

12  A.   I am familiar with the White Paper that I commissioned

13  as Commissioner.

14            MS. KEARSE:  Your Honor, may I approach?

15            THE COURT:  Yes.

16  BY MS. KEARSE:

17  Q.   I'm going to show you, Dr. Gupta, Exhibit 41913 and

18  ask if that's -- in your position as the Commissioner of

19  the Public Health for the State of West Virginia, did

20  you authorize this White Paper entitled "The Need For

21  Harm Reduction Programs in West Virginia, West Virginia

22  Department of Health and Human Services, Bureau for

23  Public Health" November 6, 2017?

24  A.   Yes.

25  Q.   And I'll simply ask for foundation purposes for the
```

1    admission of this document.

2        Can you tell the Court what your involvement was as the

3    Commissioner of Public Health in directing this White Paper

4    to be written?

5    **A.**   Harm reduction services prior to my tenure was not

6    something that was happening in West Virginia.  So I, I

7    initially began to launch the first -- help fund the first

8    program for harm reduction in Cabell-Huntington Health

9    Department, and subsequently utilized the best knowledge and

10   evidence available to create a White Paper that would help

11   advance the need for such practices and programs in the

12   State of West Virginia, especially following the CDC report

13   that showed that the State of West Virginia is at a very

14   high risk for outbreak of HIV.

15            MS. KEARSE:  Your Honor, I'm not going to go

16   through this report, but I would just submit the report for

17   admission based on Dr. Gupta's testimony.

18            THE COURT:  Any objection to the admission of this

19   report?

20            MS. MAINIGI:  Your Honor, the same objection to

21   the prior reports.

22            THE COURT:  I'll admit it.  I'm admitting it under

23   Rule 803(8) of the rules of evidence.

24   BY MS. KEARSE:

25   **Q.**   Dr. Gupta, as a follow-up with the various reports

1    that you have testified about today, did you take these

2    reports and provide a response and, and almost from

3    looking at the various interventions that could be dealt

4    with in regards to the opioid issues outlined in your

5    reports?

6    **A.**   Yes.

7              MS. KEARSE:  Your Honor, may I approach?

8              THE COURT:  Yes.

9    BY MS. KEARSE:

10   **Q.**   Dr. Gupta, is this a document that you, that you

11   authored?

12   **A.**   Yes.  It's got my signature on it.

13   **Q.**   And can you tell the Court what this is, what that

14   document is?

15   **A.**   This is a letter to the Governor.  And a copy of the

16   letter goes to the Senate, President, Speaker of the House,

17   and the Cabinet Secretary which basically states to them

18   that we have the state of -- in an effort to fight the

19   public health crisis of the highest order, we have developed

20   an opioid response plan for the State of West Virginia.  We

21   attached a plan and, and asked for implementing these

22   recommendations.

23   **Q.**   And what was your role in this report?

24   **A.**   I created -- directed it.  I created it.  I supervised

25   it.  And I commissioned it.

1    **Q.**    And it was published in your official capacity?

2    **A.**    Yes.

3    **Q.**    And does it validate your findings?

4    **A.**    Yes.

5    **Q.**    And did you endorse its recommendations?

6    **A.**    Yes.  Similar to all of these reports, they go through

7    clearance process where I review them, each one of these

8    reports before going, becoming final and going to the next

9    step.  So I did the same thing with this report as well.

10   **Q.**    And they're based on sound public health methodology?

11   **A.**    Yes.

12   **Q.**    And can you briefly tell the Court what your findings

13   were and recommendations?

14   **A.**    So these findings -- my job was to send this report on

15   to the Governor.  But these findings resulted from bringing

16   a, a Task Force together.

17         And what that meant was while we were receiving the

18   Overdose Fatality Analysis results, Social Autopsy, we put

19   together under the auspices of the Office of Control Policy

20   a, a group of members that included John Hopkins School

21   of -- Bloomberg School of Public Health, Marshall

22   University, West Virginia University, and Office of Control

23   Policy.

24         And these are groups, they had public meetings with,

25   with well over 100 attendees in Charleston that included

1    congressional delegation staff and comments from them,

2    comments from substance use disorder sufferers, substance --

3    comments from treatment providers.

4        We matched this in-person activity with an ability for

5    West Virginians to provide comments to our proposal.  We

6    received almost 500 comments from the public.  We put the

7    data, all these comments, everything into the public

8    limelight.  We created this report.

9        So these recommendations are just not recommendations,

10   but they are vetted through the people of West Virginia.

11   And these recommendations are categorized into six

12   categories.

13       Would you like me to go through these?

14   **Q.**    Just very briefly.  I think that Your Honor will have

15   it.  We'll move it into evidence, but just briefly.

16   **A.**    There's categories of prevention, early intervention,

17   treatment, overdose reversal, supportive families, and

18   recovery.  There's 12 recommendations across those six

19   categories.

20            MS. KEARSE:  Your Honor, I move Exhibit 44223 into

21   evidence.

22            THE COURT:  Any objection?

23            MS. MAINIGI:  Same objections, Your Honor.

24            THE COURT:  All right.  It's admitted.

25   BY MS. KEARSE:

1    Q.   I want to just -- we are just about there.  I want

2    to just make clear one or two things with -- before we

3    sit down.

4         Before we sit down with that, I'd like to just do one

5    follow-up on Exhibit 41213 which was the West Virginia Drug

6    Overdose Death Historical Overview 2001 to 2015.  So we're

7    going full circle to close the circle and sit down.

8         And I want to -- we talked earlier about Figure 1, and

9    I just wanted to follow up on that.

10        Is there a reason -- well, let me back up one second.

11   Is there a reason why this report starts in 2001?

12   A.   Yes.

13   Q.   Okay.  And why did it not start until 2001?

14   A.   I -- so in my, in my Bureau, we have the records all

15   the way 100 years.  When I looked at that, what I found was

16   in 1999 West Virginia's overdose death rate was below the

17   United States' death rate.

18        In 2001 is the first time we crossed the United States'

19   overdose death rates and we've never stopped since then.

20   That's why I went to 2001 as opposed to 2000 or 1999.  It

21   was a time when West Virginia's overdose death rates were

22   below the U.S. death rates.

23   Q.   And I wanted to -- I had my notes.  You may have said

24   this, but I wanted to make this clear.

25        Did you validate Figure 1 from other sources other than

1    the *New York Times* before publishing this report?

2    **A.**    Your Honor, I want to explain this a little bit.  I

3    said "yes" before.

4         This data in the *New York Times* comes from CDC.  CDC

5    data comes from my organization.  So we provided the data,

6    Bureau of Public Health, to the CDC which then provided it

7    to the *New York Times* to publish it.

8         So when I say I validated it, it's my data, nobody

9    else's data.

10             MS. MAINIGI:  Your Honor, I object and move to

11   strike that answer.  I don't think that's a group that

12   provides national data.

13             THE COURT:  Well, overruled.

14        Go ahead, Ms. Kearse.

15   BY MS. KEARSE:

16   **Q.**    Doctor, did you provide this data?

17   **A.**    We provided data for West Virginia.  I did not mean

18   national.  I meant specific to West Virginia.  And you can

19   see West Virginia, as I mentioned, in 2003 was lighted up

20   when the rest of the country was not.

21   **Q.**    And specific to this, to this, the figure itself, you

22   validated it with the CDC data?

23   **A.**    Yes.  And CDC national data is available for anyone to

24   look at and validate, and we did that.  We would not put a

25   figure in as state government of West Virginia if we could

1    not validate that.

2    **Q.**    And when we started back early in the day, you referred

3    to your findings as -- and we've referenced the canary in

4    the coal mine.  What did you mean by that in regards to

5    these reports?

6              MS. MAINIGI:  Objection, Your Honor.

7              MS. KEARSE:  I'm just asking for clarification,

8    Your Honor.

9              THE COURT:  Overruled.  You can answer it.

10             THE WITNESS:  Thank you, Your Honor.

11        Your Honor, what I meant was back in 2003, we could see

12   this, that this is happening in West Virginia.  And we saw

13   what happened over the years and --

14             MS. MAINIGI:  Objection, Your Honor.  Dr. Gupta

15   was not in West Virginia in 2003.  He should not be allowed

16   to provide this answer.  He testified at the beginning that

17   he moved to West Virginia in 2009.

18             MS. KEARSE:  Your Honor, I believe he testified

19   that he spent his first time here going back from 2001 to

20   2015 in order to do his work and do what he was commissioned

21   to do, to lead the State of West Virginia in public health

22   and specifically --

23             THE COURT:  Well, I'll sustain the objection.  We

24   need to wrap this up.  And we all know what a canary in the

25   coal mine was and I think I can draw the right conclusion

```
 1    from that.
 2            MS. KEARSE:  Okay, good.  I know some people may
 3    not know that, Your Honor, but --
 4         Thank you, Dr. Gupta.
 5         Appreciate it, Your Honor.
 6            THE COURT:  If the canary died, that meant there
 7    was methane in the mine.  Right?
 8            MS. KEARSE:  Yep, Your Honor.
 9            THE COURT:  I'm educating these people who aren't
10    West Virginians.
11            MS. KEARSE:  That's right.  That's why I said some
12    may not understand what that meant.  Thank you, Your Honor.
13            MS. MAINIGI:  Your Honor, could we have a few
14    minutes to transition?
15            THE COURT:  Yes.  We'll be in recess.  Can you do
16    it in five?
17            MS. MAINIGI:  Yes, Your Honor.
18         (Recess taken from 4:15 p.m. until 4:22 p.m.)
19            THE COURT:  Is Dr. Gupta in the courtroom?  Here
20    he comes.
21            MS. MAINIGI:  Is it okay to proceed, Your Honor?
22            THE COURT:  Yes, you may.
23            MS. MAINIGI:  Thank you, Your Honor.
24                         CROSS EXAMINATION
25    BY MS. MAINIGI:
```

1    **Q.**   Good afternoon, Dr. Gupta.

2    **A.**   Good afternoon.

3    **Q.**   Dr. Gupta, I'm hoping you still have in front of you

4    the report that's entitled the 2016 West Virginia Overdose

5    Fatality Analysis.

6    **A.**   Got it.

7    **Q.**   Now, Page 6 of that report, Dr. Gupta, presents the

8    summary of your key findings; correct?

9    **A.**   Correct.

10   **Q.**   And distributors are not mentioned anywhere in your key

11   findings; correct?

12   **A.**   Correct.

13   **Q.**   Page 10 of the report, let's turn to that.  Now, Page

14   10 of the report --

15        Why don't you go ahead and put that up, Page 10,

16   P-44211.

17        Page 10 of the report mentions this concept of

18   polypharmacy; is that right, Dr. Gupta?

19   **A.**   That's correct.

20   **Q.**   And it says specifically, "Deaths related to drug

21   overdose are often preceded by substance misuse, substance

22   use disorder, and addiction.  Increasingly, polypharmacy,

23   the use of multiple drugs, is observed among overdose

24   decedents in West Virginia."

25        Do you see that?

1    **A.**    That's a repetition of what we discussed already during

2    the day.  If you remember the 2001 to 2015, you're just

3    repeating it but, yes.

4    **Q.**    Okay.  So you're familiar obviously with the term

5    "polypharmacy."

6    **A.**    That's what it says.

7    **Q.**    And your conclusion was, in this particular part of the

8    report, that among the 830 West Virginians that were

9    included in this report who died from overdose in 2016,

10   86 percent had multiple drugs in their system at the time of

11   death; correct?

12   **A.**    That's my conclusion.

13   **Q.**    Now, at Page 58 of the report is the summary of your

14   key recommendations; is that right?

15   **A.**    It's only the summary.

16   **Q.**    I'm sorry.  You said it's only the summary?

17   **A.**    As I said before to Ms. Kearse, this is not the entire

18   recommendation.  It's just the summary.

19   **Q.**    That's the summary of your key recommendations.  Okay.

20   And the purpose of your report, or one purpose of your

21   report, as I understand it, is to create a reproducible

22   model for state actions to address the opioid epidemic;

23   right?

24   **A.**    I'd have to go back to the Executive Summary and read

25   through it again.  Give me one second.

```
 1          (Pause)

 2          The purpose of this report is to study West Virginia's

 3     overdose deaths to identify opportunities for intervention

 4     in the 12 months prior to death.

 5     Q.   Will you take a look on Page 6 onto Page 7 of your

 6     report where I think the purpose of the report is described.

 7     Do you see that?  Just let me know when you get there.

 8     A.   I'm there.

 9     Q.   Okay.  So the middle paragraph at the bottom of Page 6

10     says, "The purpose of this work is to --" and then it lists

11     several factors; correct?

12     A.   Correct.

13     Q.   Okay.  If we turn the page to Page 7, could you read

14     out loud Number 3, what the third purpose of the report is?

15     A.   I would like to read out the whole thing if you don't

16     mind.

17     Q.   I would like you to read out Number 3, please.

18     A.   Your Honor, --

19          THE COURT:  You have to answer her question, Dr.

20     Gupta.

21     A.   To create a reproducible model for state action to

22     address the opioid epidemic.

23     BY MS. MAINIGI:

24     Q.   Okay.  So one of your purposes in this report that

25     you commissioned, directed, and personally supervised
```

182

```
 1    was to create a reproducible model for state actions to

 2    address the opioid epidemic; correct?

 3    A.   Correct.

 4    Q.   Okay.  So coming back to the recommendations, Page 58,

 5    please.

 6    A.   I'm here.

 7    Q.   So your report lists eight recommendations to address

 8    the opioid problem; correct?

 9    A.   Correct.

10    Q.   The report does not propose new licensing requirements

11    for wholesale distributors; correct?

12    A.   That's correct.  But, at the same time, it does not

13    propose --

14    Q.   Dr. Gupta, I'm looking for a "yes" or a "no," sir.

15           THE COURT:  Answer her question.

16    BY MS. MAINIGI:

17    Q.   Dr. Gupta, does -- is it fair to say, or correct to

18    say your report in your summary of key recommendations,

19    it doesn't propose new reporting requirements to the

20    Board of Pharmacy or the DEA for wholesale distributors,

21    does it?

22    A.   No, because that's not in the purview of the Bureau.

23    Q.   Dr. Gupta, your key recommendations do not include any

24    recommendations for new physical security requirements for

25    wholesale distributors, do they?
```

1    **A.**    No, because it's not within the purview of the Bureau

2    of Public Health.

3    **Q.**    Dr. Gupta, your key recommendations didn't propose

4    limits on how many doses of prescription opioids should be

5    distributed by wholesale distributors; correct?

6    **A.**    No, because it's not in the purview of the Bureau of

7    Public Health.

8    **Q.**    Your summary of key recommendations doesn't propose

9    sharing information from law enforcement or regulators with

10   distributors, does it, Dr. Gupta?

11   **A.**    No.  The Bureau of Public Health does not regulate law

12   enforcement or distributors.

13   **Q.**    And your key recommendations don't propose really

14   anything about distributors' conduct at all; correct?

15   **A.**    No, correct, because the Bureau of Public Health does

16   not regulate distributors.

17   **Q.**    There are no recommendations here related to

18   distributors; correct?

19   **A.**    Correct, because the Bureau of Public Health does not

20   regulate the conduct of distributors.

21   **Q.**    You can set that report aside, Dr. Gupta.  If you could

22   pull back out your 2018 outbreak report, sir.

23             MR. FARRELL:  Counsel, could you give me the

24   number?

25             MS. MAINIGI:  I think it's P-4114-A.

1    BY MS. MAINIGI:

2    **Q.**   Dr. Gupta, this was the report that related to a

3    specific cluster of outbreaks that occurred on

4    August 15th, 2016; is that right?

5    **A.**   Yes.

6    **Q.**   And there was also a public safety investigation that

7    went on in addition to the public health investigation;

8    correct?

9    **A.**   I do not recall that part.

10   **Q.**   Okay.  Are you aware that a comprehensive toxicology

11   analysis was performed in connection with this incident?

12   **A.**    It should have been.  Again, I don't 100 percent

13   recall, but I'm pretty certain it would have been.

14   **Q.**   Are you aware that the toxicology testing identified

15   fentanyl in many of the victims?

16          MR. FARRELL:  Objection, Your Honor, outside the

17   scope of the report that he was restricted to.

18          THE COURT:  Overruled.  You can answer the

19   question, Dr. Gupta.

20          THE WITNESS:  If it's here, it's there.  If it's

21   not here, then I wasn't -- that wasn't something I recall at

22   this point.

23   BY MS. MAINIGI:

24   **Q.**   Okay.  This was another report that you

25   commissioned, directed, and personally supervised;

```
 1   right?

 2   A.    Yes.

 3   Q.    Now, you're aware that this report is referring to

 4   illegally manufactured fentanyl; correct?

 5   A.    I'm sorry, you'll have to point me where that is.

 6   Q.    Did you review this report before you came to testify?

 7   A.    I have not recently reviewed this report.

 8   Q.    Now, I assume you're aware that illegally manufactured

 9   fentanyl does not come from Cardinal Health or ABDC or

10   McKesson; correct?

11   A.    That's an assumption.  I mean, I would assume that, but

12   I'm not going to make an assumption like that.

13   Q.    Are you familiar with a fentanyl analogue called -- and

14   I may mispronounce it so you can correct me -- carfentanil?

15   A.    I am.

16   Q.    How do you pronounce that?

17   A.    Carfentanil.

18   Q.    Carfentanil?

19   A.    Just like it's spelled.

20   Q.    Okay.  And you're aware that carfentanil does not come

21   from Cardinal Health, ABDC, or McKesson; correct?

22   A.    Ms. Mainigi, one of the reasons I'm very familiar with

23   spelling and speaking carfentanil is because I see that a

24   lot.  Now, I'm not aware --

25   Q.    Dr. Gupta, --
```

1    **A.**   But to answer -- if you let me, I'll answer you.  But

2    I'm not aware that distributors are distributing that, the

3    ones you're talking about.

4    **Q.**   Are you aware, Dr. Gupta, that, in fact, a resident of

5    Akron, Ohio, was convicted of heroin, fentanyl, and

6    carfentanil distribution in connection with this incident

7    that is the subject matter of your report?

8    **A.**   Not being a law enforcement individual, no.

9    **Q.**   Now, this report which you haven't read recently, this

10   report doesn't connect any distributor to this outbreak;

11   correct?

12   **A.**   Distributor conduct was not at the point of

13   investigation of this report.

14   **Q.**   We can set that report aside.  Let's jump over to the

15   2018 Opioid Response Plan, please.

16   **A.**   Got it.

17          MR. FARRELL:  Counsel, could we get a number?

18          MS. MAINIGI:  Yes.  Give me one second.  A lot of

19   reports that we went over.  I believe it is P-44223.

20   BY MS. MAINIGI:

21   **Q.**   2018 was your last year as Commissioner; is that

22   right?

23   **A.**   Yes.

24   **Q.**   And you made a plan for harm reduction, as you

25   testified; correct?

187

```
1    A.    Amongst several other things, yes.

2    Q.    You created it, directed it, and oversaw it; correct?

3    A.    Yes.

4    Q.    And then you testified you reviewed every step of it;

5    right?

6    A.    I supervised, directed, commissioned.

7    Q.    And I think you testified that you based your response

8    plan on the best knowledge available; correct?

9    A.    Correct.

10   Q.    Vetted through the people of West Virginia; right?

11   A.    Yes.

12   Q.    And it was your office's plan for what to do about the

13   opioid problem; correct?

14   A.    It was, it was a plan that was set through the Office

15   of Drug Control Policy.  But, of course, I was intricately

16   involved as I testified earlier.

17   Q.    Turning to Page 2 of the report, you have, as I think

18   you testified earlier, 12 steps of recommendations; correct?

19   A.    Yes.

20   Q.    Starting at the bottom of Page 2 and going on to Page

21   3; right?

22   A.    4 also I think, Page 4.

23   Q.    Now -- right.  The 12 go onto Page 4 also.  So in this

24   set of recommendations, which you entitled The Opioid

25   Response Plan for the State of West Virginia, you didn't
```

1    recommend any new licensing requirements for distributors;

2    correct?

3    A.   I had no authority to recommend that so, no, I did not.

4    Q.   You didn't propose any new reporting requirements for

5    distributors; correct?

6    A.   I had no authority to -- for distributors' conduct so,

7    no, I did not.

8    Q.   You didn't propose any new physical security

9    requirements for distributors; correct?

10   A.   I did not have any authority over distributors'

11   conduct, so I did not, no.

12   Q.   And you didn't propose any limits on the number of

13   doses of the opioids that could be distributed; correct?

14   A.   That's not correct.

15   Q.   Can you point me to the specific number, please, on

16   your recommendations?

17   A.   If you look at -- under "Prevention" on Page 1, Number

18   1 and Number 2.

19   Q.   "West Virginia should expand the authority of medical

20   professional boards and public health officials to address

21   inappropriate prescribing of pain medications."

22        Is that what you're referring to?

23   A.   That's exactly one of the two.

24   Q.   And doctors and other medical professionals prescribe

25   pain medications in West Virginia; correct?

1    **A.**    Correct.

2    **Q.**    And you were seeking to get the boards that regulate

3    those medical professionals, doctors and medical

4    professionals to get those doctors to prescribe less;

5    correct?

6    **A.**    Correct.

7         Your Honor, there's a lot of -- can I please explain at

8    some point?

9    **Q.**    Dr. Gupta, that answers my particular question.

10         THE COURT:  I'm going to let him explain his

11    answer.

12         Go ahead.

13         THE WITNESS:  One of the problems that was

14    happening, we had upstream issues and we were drowning.  It

15    was flooding.  One of the challenges we had is we would try

16    to put sandbags.  This report is the equivalent of putting

17    sandbags when your house is flooding.

18         So what happened was that all this volume that came

19    into the State of West Virginia, we had no control over.

20    What we could do, we were doing to the best of our ability,

21    the best of our care.  We were doing that.

22         So all these questions I'm answering as you like me to,

23    but the fact of the matter is we were drowning and we didn't

24    open the floodgates.

25    BY MS. MAINIGI:

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    Q.    Thank you, Dr. Gupta.  Number 2 is another

 2    recommendation you referenced; correct?

 3    A.    Yes.

 4    Q.    Okay.  "West Virginia should limit the duration of

 5    initial opioid prescriptions."  Is that right?

 6    A.    Yes.

 7    Q.    And there was a recommendation that resulted perhaps in

 8    part in the Opioid Reduction Act; is that right?

 9    A.    Yes, it's an attempt to reduce the volume, the flood,

10    reduce the water, sandbag.

11    Q.    And, so, with -- we'll go over the Opioid Reduction Act

12    a little bit later.  But with the Opioid Reduction Act and

13    this recommendation, once again you were seeking to train

14    and limit medical professionals in their prescription of

15    opioid medications; correct?

16    A.    Yes.

17    Q.    And, so, one of your recommendations was to give the

18    medical boards and public health officials more authority to

19    address inappropriate prescribing as you call it; correct?

20    A.    That was another sandbag, yes.

21    Q.    And the other recommendation was to limit the duration

22    of initial opioid prescriptions; right?

23    A.    Yes, another sandbag.

24    Q.    And this report in particular said that what was

25    driving the unprecedented increase in overdose deaths was
```

```
 1    illegally sourced fentanyl; correct?

 2    A.    Could you point me to where you're reading from,

 3    please?

 4    Q.    Let's turn to Page 4, middle paragraph, middle large

 5    paragraph about two-thirds of the way down.  "The fentanyl

 6    driving the unprecedented increase in deaths is illegally

 7    sourced and generally not of pharmaceutical origin."

 8         Do you see that?

 9    A.    I see that, Ms. Mainigi.  I would, I would -- that's

10    not a complete statement.  The complete statement is on top

11    of the Executive Summary which says, "Driving this public

12    health crisis is the opioid epidemic, a dual challenge

13    involving both prescribed opioids such as oxycodone and

14    illicit opioids including heroin and fentanyl."  That's a

15    complete statement.

16    Q.    Go ahead and set that one aside, Dr. Gupta.

17         Let's turn to your 2001 to 2015 West Virginia Drug

18    Overdose Death Historical Overview, please.  That is

19    P-41213.

20    A.    Okay.

21    Q.    Now, if you could turn to Page 4, this is another

22    report I think you testified that you commissioned, oversaw,

23    so forth; correct?

24    A.    Yes.

25    Q.    Okay.  So Page 4, the penultimate paragraph that begins
```

1    with "Prior to 2012," do you see that?  I'm going to let you

2    find it first.

3    A.    Which number paragraph is that?

4    Q.    We'll go ahead and highlight it.  "Prior to 2012" is

5    the sentence we're going to highlight.

6    A.    I can see that now.

7    Q.    Okay.  So that sentence reads, "Prior to 2012, drug

8    overdose deaths were predominantly due to prescription drugs

9    such as methadone and oxycodone being used for non-medical

10   purposes."

11       You agree with that statement; correct?

12   A.    I agree with that statement and the following

13   statement.

14   Q.    Now, isn't it correct, Dr. Gupta, that this report

15   focuses on drug overdose deaths from many drugs, not just

16   opioids?

17   A.    It focuses on the deaths of individuals, Ms. Mainigi,

18   West Virginians and what, what all is in that.

19   Q.    And the focus of the report, therefore, is not just on

20   opioids but also cocaine, meth, tranquilizers, benzos,

21   stimulants; --

22   A.    The focus --

23   Q.    -- correct?

24   A.    The focus of the report is on whatever is killing West

25   Virginians.

1    **Q.**    And those were -- some of the drugs I listed were some

2    of the drugs killing West Virginians; correct?

3    **A.**    That's correct.

4    **Q.**    And when it relates to prescription drugs, if you take

5    a look at the bottom of Page 5, do you see the paragraph

6    that begins with, "The remainder of this drug overdose

7    report will focus on 15 years of West Virginia data for the

8    following drugs."  And then it goes on to list a number of

9    drugs.  Do you see that?

10   **A.**    Ms. Mainigi, you're not allowing me to answer the full

11   sentence.  So I would like to --

12   **Q.**    Dr. Gupta, please just get to -- please get to this

13   part of the transcript.  You obviously had an opportunity to

14   discuss other parts of it.  I'd like to draw your attention

15   to this paragraph.  Are you there?

16   **A.**    I'm here.

17   **Q.**    Okay.  So we see a reference to the same drugs that we

18   were just talking about; right?  It's a wide variety of

19   drugs that are described in this paragraph?

20   **A.**    In the context -- I don't know what the context is or

21   what you're asking me the question, so I cannot answer that.

22   **Q.**    Okay.  Do you see a reference once again to

23   prescription-type medications?  Do you see that?

24   **A.**    I do not see only prescription-type medications.

25   **Q.**    Do you see a reference to prescription-type

1    medications?

2    **A.**   I see cocaine, methamphetamine, and prescription-type

3    medications.

4    **Q.**   And do you see that it says "prescription-type

5    medications that are used for non-medical purposes, i.e."

6    and then it provides examples.  Do you see that?

7    **A.**   I see that.

8    **Q.**   Now, are you aware that this report also says that most

9    drug overdose deaths involve multiple substances?

10   **A.**   I've been asked about three times that and I've said

11   "yes."

12   **Q.**   I think that was a different report that said that;

13   correct?

14   **A.**   You're repeating everything in the morning, but that's

15   fine.

16   **Q.**   And that's called polypharmacy, the multiple --

17   **A.**   We just went over that.  Yes, ma'am.

18   **Q.**   And what that means is any individual death may involve

19   multiple types of drugs; right?

20   **A.**   Your Honor, can I explain that again?

21            THE COURT:  Yes, you can explain your answer.

22            THE WITNESS:  So we go back to the issue of people

23   suffering from substance abuse disorder and addiction.  When

24   somebody is suffering from addiction, they're going to get

25   oxycodone one minute.  They're going to try to find heroin

1    the next minute.  And they're always searching for something

2    that they can get that's affordable quickly and available.

3         In that case, if they're dying because of one

4    substance, we do tend to find other substances because it's

5    not that they're taking it for the treatment, but it's

6    because the volume is so much those drugs in the system and

7    out in the community that they're getting and seeking

8    whatever they can find.  And that's the reason we're having

9    polypharmacy.  That's my answer.

10   **Q.**   If you could turn to Page 8, Dr. Gupta.

11   **A.**   Yes.

12   **Q.**   Perfect.  And I think that top paragraph, it states --

13   it talks about polypharmacy, and then it states, "As such,

14   overdose deaths presented that involve one particular drug

15   are rarely mutually exclusive from other overdose deaths."

16        Do you see that statement?

17   **A.**   Yes, I see that statement.

18   **Q.**   And I assume that's a statement you agree with in this

19   report that you commissioned?

20   **A.**   I think that statement proves the so-called gateway

21   theory that we've been talking about.

22            MS. MAINIGI:  Your Honor, I move to strike as

23   nonresponsive.

24            THE COURT:  All right.  Motion is granted.

25   BY MS. MAINIGI:

1    **Q.**   Turn to Page 24, please, Dr. Gupta, same report.

2    **A.**   I'm here.

3    **Q.**   I'm not quite there.  Okay.  I think this was where you

4    talked about the recommendations when Ms. Kearse was asking

5    you questions about this report; correct?

6    **A.**   I have to go back and look at what the recommendation

7    section is.

8    **Q.**   What I'm looking at on Page 24 is that middle paragraph

9    that starts with, "What next steps can be taken to make a

10   difference with these troubling problems?"

11   **A.**   Yeah.  This is not a recommendation.  This is quotes

12   from the former West Virginia Governor.

13   **Q.**   Okay.  I do believe we can go back later and

14   double-check, but I do believe as I heard Ms. Kearse ask you

15   about this section of the report, I wrote it down.  You

16   characterized these as some of your recommendations.  Is

17   that not right?  These weren't your recommendations?

18   **A.**   She asked me for the ones in the paragraph above,

19   Ms. Mainigi, and I'm happy to repeat all that.  I'm happy to

20   really.  But this is not what she referred to.

21   **Q.**   Okay.  With respect to your recommendations here, I

22   take it you agree that there are no recommendations related

23   to wholesale distributors?

24   **A.**   This report was not designed to look at recommendations

25   for wholesale distributors.

1    **Q.**   So that's correct that there were no recommendations --

2    **A.**   There were no recommendations.

3    **Q.**   -- for wholesale distributors?

4    **A.**   Yes.

5    **Q.**   And, in fact, the report doesn't even mention

6    distributors, does it?

7    **A.**   The report was not designed to look at the wholesale

8    distributors' conduct.

9    **Q.**   And this is a report that you commissioned and it's

10   entitled "West Virginia Drug Overdose Deaths Historical

11   Overview 2001 to 2015."  Correct?

12   **A.**   Yes.

13   **Q.**   Now, there's a reference on that Page 24 to CDC

14   guidelines.  Do you see that?

15   **A.**   I see that.

16   **Q.**   Okay.  And the CDC guidelines that are referenced there

17   were guidelines that came out around this time period when

18   you had put this report together that made recommendations

19   to limit the prescribing of opioids; correct?

20   **A.**   I think that's not the proper characterization of the

21   CDC guidelines.  I can provide you more context to that.

22   Would you like me to?

23   **Q.**   No, thank you.  But would you say that the CDC

24   guidelines did result in recommendations being put out that

25   attempted to limit the supply of prescription opioids that

```
 1   doctors were prescribing?

 2   A.   Ms. Mainigi, there are multiple safety guidelines, if

 3   you allow me to explain.  I'm just trying to help, help you

 4   and others understand what those were.

 5        So CDC guidelines were issued I believe in March of

 6   2016 that dealt for the first time in the history of this

 7   country with the proper prescribing of opioids for chronic

 8   pain.  And those are the ones I believe you're referring to.

 9   And in West Virginia Governor Tomblin was the first one in

10   the country to adopt the CDC guidelines.

11   Q.   So they were recommendations to doctors -- the CDC made

12   recommendations to doctors about the prescribing of opioids

13   for chronic pain; correct?

14   A.   These guidelines were about the evidence and the

15   science around chronic pain which didn't exist.  So all of

16   these pain pills that were there, the CDC guidelines were an

17   attempt to put in science, what science exists behind

18   providing opioids for chronic pain and what doesn't.  And

19   they didn't find much.

20   Q.   Dr. Gupta, your report on Hepatitis B and Hepatitis C

21   infection in West Virginia, if you could pull that up,

22   please, sir.

23   A.   I have it.

24   Q.   Okay.  Is it fair to say, then, that you would not have

25   made any recommendations related to distributors in this
```

1     report either?

2     **A.**     We were not looking to distributors in this report.

3     **Q.**     And the same question for your Vital Hepatitis

4     Epidemiologic Profile 2017, P-44227.  You didn't make any

5     recommendations related to distributors in this report

6     either?

7     **A.**     The distributors' conduct was not being validated

8     through this report.

9     **Q.**     And the White Paper that you wrote, the need for harm

10    reduction programs in West Virginia, November 6th, 2017, Dr.

11    Gupta, that doesn't mention distributors either; correct?

12    **A.**     Similarly, the White Paper was another sandbag in

13    addition to all these reports.  But it was not intended to

14    be a document to evaluate the conduct of the distributors.

15    **Q.**     And then your HIV Epidemiologic Profile West Virginia

16    2017, P-41901, that also does not mention distributors;

17    correct?

18    **A.**     This was another sandbag in the flood, but not intended

19    to aim -- take aim at the distributors' conduct.

20            MS. MAINIGI:  Your Honor, I do have more.  It

21    might be helpful for us to break now for the evening and

22    then I can get my act together overnight and shorten this.

23            THE COURT:  Sounds like a sound suggestion to me,

24    Ms. Mainigi.

25            MR. FARRELL:  Judge, if I may.

```
1              THE COURT:  Yes.

2              MR. FARRELL:  We can do this outside the presence

3     of the witness, but there are two reasons.

4          One is for other reasons Dr. Gupta needs to get on the

5     road.  So if we have some remote -- if there's some short

6     period of time that is required to finish today, the

7     plaintiffs are willing to stay late.

8          But, nonetheless, if we are going to come back tomorrow

9     since you are taking all of the video evidence in chambers,

10    we'd also kind of like to get an idea of how much more cross

11    is left so we can plan witnesses for tomorrow.

12             MS. MAINIGI:  Well, I can certainly let the

13    plaintiffs know this evening, Your Honor, especially after I

14    consult with co-counsel who I don't know right now how much

15    they may have.  And how much they have might be dependent on

16    what I tell them I have.

17         And, so, I do think it's going to warrant a

18    conversation amongst us all.  I think we will obviously try

19    to be as expeditious as possible and try to get Dr. Gupta

20    out as quickly as we, as we certainly can.  But I'm happy to

21    give Mr. Farrell a call this evening and give him some plan.

22             THE COURT:  Do you have plans now for when you're

23    going to leave and so forth?  I know you have a situation

24    that requires you --

25             THE WITNESS:  Yes.  The, the plans I had last
```

1    night changed as you're aware, Your Honor, and I would like

2    to leave as quickly as possible.

3           THE COURT:  Well, we need to finish your testimony

4    and that may take some time.  And there's not much I can do

5    about that, Dr. Gupta.  I'm sorry.

6           THE WITNESS:  I'll make myself available to Your

7    Honor.

8           THE COURT:  All right.

9           MS. MAINIGI:  Your Honor, you have our pledge that

10   we will move as quickly as we can and shorten what we can.

11   And I do think the evening will allow us to do that.  I

12   think we'll do our best and get Dr. Gupta out of here.

13          THE COURT:  Well, let's all come back at 9:00 in

14   the morning.

15      We'll get you out of here as soon as we can, Dr. Gupta.

16          MS. MAINIGI:  Your Honor, I just want to ensure

17   for the record -- and I know Dr. Gupta knows this.  There's

18   a wider group of plaintiffs involved in this litigation, but

19   I just want to ensure that Dr. Gupta obviously won't be

20   speaking to plaintiffs' counsel in this case, but won't

21   speak to the MLP plaintiffs' counsel either for whom he's an

22   expert tonight.

23          THE COURT:  So you want me to instruct him not to

24   talk to anybody about his testimony?

25          MS. MAINIGI:  Yes, Your Honor.

```
 1              THE COURT:  You're instructed not to discuss your

 2    testimony with anyone during the time you're here and on the

 3    witness stand, Dr. Gupta.

 4              THE WITNESS:  Yes, Your Honor.

 5              THE COURT:  All right.  We'll be in recess until

 6    9:00 tomorrow morning.

 7         (Trial recessed at 4:58 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        CERTIFICATION:

 2                 I, Ayme A. Cochran, Official Court

 3     Reporter, and I, Lisa A. Cook, Official Court Reporter,

 4     certify that the foregoing is a correct transcript from

 5     the record of proceedings in the matter of The City of

 6     Huntington, et al., Plaintiffs vs. AmerisourceBergen

 7     Drug Corporation, et al., Defendants, Civil Action No.

 8     3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

 9     reported on May 5, 2021.

10

11           S\Ayme A. Cochran          s\Lisa A. Cook

12              Reporter                    Reporter

13        _

14

15           May 5, 2021

16              Date

17

18

19

20

21

22

23

24

25
```