Plaintiffs' Cross-Notice of Remote Deposition
and Non-Retained Expert Witness Disclosure of
Dr. Rahul Gupta

# Exhibit 6

## Gupta Trial Testimony

*City of Huntington, et al. v. ABDC, et al.*

3:17-cv-01362, 3:17-cv-01655

## May 6, 2021

```
               IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                         AT CHARLESTON


_____x
                              :
THE CITY OF HUNTINGTON,       :      Civil Action
                              :
           Plaintiff,         :      No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
           Defendants.  :
_____x
                              :
CABELL COUNTY COMMISSION,     :      Civil Action
                              :
           Plaintiff,         :      No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
           Defendants.  :
_____x



                 BENCH TRIAL - VOLUME 4
      BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
                  UNITED STATES DISTRICT COURT
                IN CHARLESTON, WEST VIRGINIA


                      MAY 6, 2021
```

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell Law
422 Ninth Street, 3rd Floor
P.O. Box 1180
Huntington, WV  25701

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MR. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

APPEARANCES (Continued):

For the Defendant,
AmerisourceBergen Drug Corporation:

MS. SHANNON E. MCCLURE
MR. JOSEPH J. MAHADY
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

MS. GRETCHEN M. CALLAS
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

APPEARANCES (Continued):

MR. ROBERT A. NICHOLAS
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

MS. ELIZABETH CAMPBELL
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1    ECF filing 1146-1 that contains the actual disclosures to

2    tender to the Court.

3              MS. MAINIGI:  Your Honor, this -- we were not

4    aware that this was going to be raised this morning.  We're

5    prepared to finish out the cross examination of Dr. Gupta.

6    What I would ask is we be allowed to finish that out and

7    then, certainly, if Mr. Farrell wants to continue discussing

8    this, we're happy to do that.

9              THE COURT:  Yes.  I think that's the proper way to

10   go, Mr. Farrell.  So, we'll finish with Dr. Gupta and we'll

11   then deal with this, if you have anything else.

12             MR. FARRELL:  Thank you.

13             THE COURT:  Dr. Gupta, are you in the courtroom?

14        You may resume the stand.  You're still under oath,

15   sir.

16             MS. MAINIGI:  May I proceed, Your Honor?  Your

17   Honor, may I proceed?

18             THE COURT:  Yes, please.

19             MS. MAINIGI:  Thank you.

20                **CONTINUED CROSS EXAMINATION**

21             **BY MS. MAINIGI:**

22   **Q.**   Good morning, Dr. Gupta.

23   **A.**   Good morning.

24        Good morning, Your Honor.

25   **Q.**   I think yesterday we looked at the 2016 West Virginia

1    Overdose Fatality Analysis.  Do you recall that?

2    **A.**    Yes.

3    **Q.**    If you could pull that up, I just double checked this

4    morning.  It still seems to be there.  Now, I'd like you to

5    turn to Page 58 of your Overdose Fatality Analysis, please,

6    sir.  And this is where the Summary of Key Recommendations

7    are, correct?

8    **A.**    Yes.

9    **Q.**    Now, do you recall when I asked you yesterday about

10   whether you made recommendations about distributors, you

11   testified that was because -- that you had not because

12   distributors are -- and I think you said something like not

13   within the purview of the Bureau of Public Health.  Do you

14   recall that yesterday afternoon?

15   **A.**    Yes.

16   **Q.**    You also testified that the Bureau of Public Health

17   does not regulate law enforcement or distributors.  Do you

18   recall saying that yesterday?

19   **A.**    Yes.

20   **Q.**    I just want to draw your attention to a couple of the

21   recommendations.  If we look at the sixth bullet down, sir.

22   The sixth bullet down --

23   **A.**    Yes.

24   **Q.**    -- states as follows:  "Corrections officials should

25   work with judges to assure naloxone availability, treatment

1    referral, and peer supports at release of incarceration."

2    Do you see that?

3    **A.**    Yes.

4    **Q.**    Now, the Department of Corrections is not within the

5    purview of the Bureau of Public Health, correct?

6    **A.**    Correct.

7    **Q.**    And the Bureau of Public Health does not regulate the

8    Department of Corrections, right?

9    **A.**    Correct.

10   **Q.**    And judges are not within the purview of the Bureau of

11   Public Health either, correct?

12   **A.**    Correct.

13   **Q.**    And the Bureau of Public Health does not regulate

14   judges, right?

15   **A.**    That's correct.  And I am happy to explain that

16   recommendation, if you would allow me to.

17   **Q.**    I don't think it's necessary right now, but thank you.

18   Let's look at number -- the third recommendation down.  And

19   that third recommendation is, "Enhance CSMP Advisory

20   Committee legislation to identify abnormal or unusual

21   prescribing and dispensing patterns and to permit sharing

22   this data with appropriate professional licensing boards and

23   other agencies."  Do you see that, sir?

24   **A.**    Yes.

25   **Q.**    Now, the Board of Pharmacy runs the CSMP, correct?

```
 1    A.    Correct.

 2    Q.    Not the Bureau of Public Health, correct?

 3    A.    That's not correct.

 4    Q.    The Board of Pharmacy is within the purview of the

 5    Bureau for Public Health?

 6    A.    That's not correct.

 7    Q.    Okay.  So, the Board of Pharmacy is not within the

 8    purview of the Bureau of Public Health, correct?

 9    A.    That's correct.

10    Q.    And the Bureau of Public Health does not regulate the

11    Board of Pharmacy?

12    A.    That's correct.

13    Q.    And the Bureau of Public Health does not regulate the

14    state legislature, I assume?

15    A.    That would be correct.

16    Q.    Now, you have made several recommendations to the

17    legislature about what it should do or should consider

18    doing; is that not true?

19    A.    That is true.  And, once again, I'm really happy to

20    explain the intricate relationships of agencies in the State

21    of West Virginia, including the Bureau of Public Health

22    relationship with the Board of Pharmacy --

23    Q.    Thank you, sir.

24    A.    -- and with Corrections.

25    Q.    Thank you.  I think one of the -- one of the
```

```
 1    contributions that I assume you are the most proud of from
 2    your time as State Commissioner is your involvement with the
 3    Opioid Reduction Act, right?
 4    A.   Yes.
 5    Q.   Now, coming back to the Board of Pharmacy, the Board of
 6    Pharmacy regulates distributors, right?
 7    A.   I have -- I have -- again, once again, I do not --
 8    Board of -- Bureau for Public Health does not regulate as
 9    you correctly outlined.  Board of Pharmacy, you would have
10    to ask Board of Pharmacy who they regulate and who they do
11    not.
12    Q.   Fair enough.  Now, coming back to your involvement,
13    from time to time, as you said, you get involved in
14    recommendations to the legislature, correct?
15    A.   Correct.
16    Q.   And that's from your purview originally -- well, from
17    recent -- most recently from your purview as the State
18    Commissioner of Health, correct?
19    A.   That's one of the ways.
20    Q.   And another way is that when you were the Health
21    Officer, the lead Health Officer at Kanawha-Charleston, you
22    also made some recommendations or were involved with
23    legislation, right?
24    A.   So, I sit -- I sat on about 30-plus boards.  Once
25    again, I'm happy to explain my involvement but, yes, that
```

1    would be correct, as well, but one of the several, several

2    other ways.

3    **Q.**   Okay.  You can set that report aside for now, Mr.

4    Gupta.

5         So, are you familiar with Senate Bill 437, Dr. Gupta?

6    **A.**   Ms. Mainigi, you would have to state the year and I

7    would have to look at it because the Senate Bill 437

8    potentially occurs in every legislative session in state

9    legislature.

10   **Q.**   That's a great point.  I apologize for that.  This is

11   Senate Bill from -- Senate Bill 437 from 2012.  And why

12   don't I get a copy to you of that so you can take a look at

13   it.

14              UNIDENTIFIED SPEAKER:  May I approach?

15              THE COURT:  Yes.

16              BY MS. MAINIGI:

17   **Q.**   Now, Dr. Gupta, while you are taking a look at that, I

18   will just note for you for the record that Senate Bill 437,

19   I think, is something that I saw on your CV and you noted it

20   as substance abuse legislation and you noted on your CV your

21   role as the following:  "Supported the Governor's Substance

22   Use Disorder initiative as social determinate of health

23   initiative, passed the legislature, and approved by Governor

24   Tomblin on 3/29/2012."  And I offer that to you just to jog

25   your memory on this.

1           Let me know when you're ready, Dr. Gupta.

2    **A.**   I have not had the opportunity to review this bill and

3    I have made my best attempt to take a very superficial look

4    at this, but I just want to say for the record again that

5    this is prior to my position as being the Bureau for Public

6    Health Commissioner.

7    **Q.**   Understood, Dr. Gupta.  I raise it as -- and I'm happy

8    to put your CV in front of you.  I don't think we need to,

9    though, unless you really want it, but your CV refers to

10   Senate Bill 437, as I mentioned, as substance abuse

11   legislation that in the role that you had in 2012 was --

12   which was as Kanawha-Charleston Health Officer, that you

13   supported the Governor's Substance Use Disorder initiative.

14   Do you agree with that?

15   **A.**   I would agree with that.  And I'm happy to look at

16   which portions of this.  I did not draft the bill.

17   **Q.**   Understood.  Understood.  I understand that.

18   **A.**   So, there are pieces that -- I think it would be unfair

19   to characterize supporting the entire bill and I am happy to

20   look at the pieces that were relevant to my position at the

21   time that I would have supported it.

22   **Q.**   Okay.  Fair enough.  Well, let me ask you a couple of

23   questions and you're obviously free to continue looking at

24   the bill.  Dr. Gupta, you're aware that Senate Bill 437

25   required continuing medical education for all prescribers of

1   controlled substances, correct?

2   **A.**   Yes, correct.

3   **Q.**   And the purpose of the continuing education was to

4   educate prescribers about when they should and should not

5   prescribe opioids, correct?

6   **A.**   Again, having said that, I have not reviewed the entire

7   bill.  The purpose of the legislation was to ensure that

8   prescribers had the appropriate training and understanding

9   what it takes in order to prescribe opioid prescriptions.

10  **Q.**   Thank you.  Another thing that Senate Bill 437 did in

11  2012 was it enhanced the use of the Controlled Substances

12  Monitoring Program, correct?

13  **A.**   If you say so.

14  **Q.**   Do you recall that it did?

15  **A.**   In my position as the local health officer of

16  Kanawha-Charleston Health Department, I had no role with the

17  Controlled Substance Monitoring Program.

18  **Q.**   You came to have a role with it as the State Health

19  Officer or no?

20  **A.**   Ms. Mainigi, I was trying to explain that, but you

21  denied my request to explain that just a minute ago.

22  **Q.**   Because the -- excuse me -- because the Board of

23  Pharmacy oversees the CSMP, correct?

24  **A.**   I will be very happy to explain my role as the

25  Commissioner for Public Health and involvement of the

1    Controlled Substance Monitoring Program and the Board of

2    Pharmacy, if I'm allowed to, in this court.

3    **Q.**   Well, let's just step back for a moment and let's

4    define it.  The CSMP, Dr. Gupta, the Controlled Substances

5    Monitoring Program, is essentially a database of all the

6    controlled substances prescriptions filled in the state,

7    right?

8    **A.**   In my role as Commissioner for Bureau for Public

9    Health, my understanding of the Controlled Substance

10   Monitoring Program was that it's a database of between

11   Schedule II and Schedule IV.  So, it does not have Schedule

12   I substances.  So, I just wanted to correct you on that.

13   **Q.**   And the CSMP, as it's known, is not open to the public,

14   correct?

15   **A.**   Controlled Substance Monitoring Program is not open to

16   the public.

17   **Q.**   And distributors don't have access to the CSMP,

18   correct?

19   **A.**   I do not have that information.

20   **Q.**   Okay.  So.  Coming back to SB-437, do you recall that

21   one of the things that SB-437 accomplished was to enhance

22   the use of the CSMP?

23   **A.**   I can explain to you, Ms. Mainigi, what my role was in

24   this legislation as we're speaking here as a local health

25   officer at the time.  I am not able to testify to exact --

1    every piece of this legislation because I did not have that

2    role, as I explained.

3    **Q.**   When you became the State Health Officer, obviously,

4    with the ownership for the whole state, you obviously had an

5    interest in the CSMP, right?

6    **A.**   Yes, and I would love to explain that to you, if you

7    allow me to.

8    **Q.**   Okay.  Well, we don't need to do that right now.  If

9    you could turn to -- if you look at the bottom numbers on

10   the lower right, DEF-WV-00027696, Dr. Gupta.

11   **A.**   I'm there.

12   **Q.**   And you'll see Article 9 relates to the Controlled

13   Substances Monitoring Program.  And why don't you just take

14   a moment and read that to yourself, sir.

15              MS. KEARSE:  Can you give me that page number

16   again?

17              MS. MAINIGI:  Sure.  It is bottom right, 00027696.

18              THE WITNESS:  I've been able to read Article 9,

19   Section 60(a)-9-3, subsections (a), (b), (c), numbers 1 and

20   2.

21              BY MS. MAINIGI:

22   **Q.**   Terrific.  And do you agree that one of the purposes of

23   SB-437 was to enhance the use of the CSMP?

24   **A.**   I would agree not being practically engaged in SB-437

25   on this matter.

1    **Q.**   And the continuing -- the CSMP, the enhancement of the

2    CSMP, that related to doctors, correct?

3    **A.**   Not only doctors.

4    **Q.**   Prescribers?

5    **A.**   Not only prescribers.

6    **Q.**   It certainly affected prescribers, correct?

7    **A.**   Not only prescribers.

8    **Q.**   And the medical education certainly affected

9    prescribers, correct?

10   **A.**   It did affect prescribers of Schedule II to Schedule IV

11   substances.

12   **Q.**   And were you aware that one of the other things that

13   SB-437 accomplished was that it established state regulation

14   of pain clinics and MAT programs?

15   **A.**   I was generally aware as a member of the public.  I did

16   not have a specific role in this particular legislation with

17   relation to that.

18   **Q.**   And the regulation that pain clinics and MAT programs

19   also related to doctors, correct?

20   **A.**   In my role as local health officer, I could not tell

21   you that at this time.

22   **Q.**   And are you aware that Senate Bill 437 did not impose

23   new regulatory requirements on distributors?

24   **A.**   I am not aware.

25   **Q.**   Are you aware it didn't impose any new licensing

1    requirements on distributors?

2    **A.**   I am not aware.

3    **Q.**   Are you aware that it didn't impose any new reporting

4    requirements to the Board of Pharmacy?

5    **A.**   I'm not sure.  If you can repeat the question in

6    regards to Board of Pharmacy.

7    **Q.**   Are you aware that it did not impose new reporting

8    requirements for distributors to the Board of Pharmacy?

9    **A.**   I'm not aware.

10   **Q.**   Are you aware that Senate Bill 437 did not limit the

11   volume of opioids that a pharmacy could purchase?

12   **A.**   I am not aware of that.

13   **Q.**   Now, you can set that aside, sir.

14        Let me come back to the Controlled Substances

15   Monitoring Program for a moment.  Before 2016, is it fair to

16   say prescribers were not required to utilize the CSMP?

17   **A.**   I could not give you an opinion on that.

18   **Q.**   Okay.  As State Health Officer you don't have knowledge

19   -- you didn't have knowledge in that period of time

20   regarding the CSMP?

21   **A.**   I came into the office in 2015 and I can provide you

22   information and knowledge as to my role with the CSMP, as

23   well as Board of Pharmacy, and I can also provide you my

24   role as a practitioner.  I can also provide you information

25   on my role as a Secretary of the Board of Medicine and the

1    relationship to the Board of Pharmacy and CSMP.  So, I'm

2    happy to provide the Court all of that information if -- if

3    it desires so.

4    **Q.**   Okay.  Thank you, Dr. Gupta.  Let me just ask you

5    again, in your role as State Health Officer, were you

6    familiar with the CSMP?

7    **A.**   Yes.

8    **Q.**   And are you familiar with the fact that prior to 2016,

9    prescribers were not required to register with the CSMP?

10   **A.**   I do not exactly remember that, recall that.  I would

11   -- I would say that the guidelines prior were more

12   voluntary.  That's the way I would characterize that.

13   **Q.**   And while you were State Health Officer, obviously with

14   a great concern about opioids and other controlled

15   substances, do you recall that in 2016 Senate Bill 454 which

16   related to the CSMP was signed into law by Governor Tomblin?

17   **A.**   I do recall that.

18   **Q.**   And you supported this legislation, correct?

19   **A.**   That would be accurate.

20   **Q.**   And that bill made it a requirement that all physicians

21   who prescribed controlled substances had to register with

22   the West Virginia CSMP, correct?

23   **A.**   Once again, I would love to see the bill before I can

24   assert to that statement.

25   **Q.**   Is that what you generally recall about the bill,

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    however?

2    **A.**   I would -- I recall legislation requiring registration

3    of prescribers of Schedule II to IV with the State's

4    Controlled Substance Monitoring Program around that time

5    period.

6    **Q.**   And do you recall that the number of prescriber

7    registrants nearly doubled as a result of this legislation?

8    **A.**   I do not have factual knowledge to that fact at this

9    time.

10   **Q.**   Do you recall that Senate Bill 454 also required

11   prescribers to check a patient's history before prescribing

12   an opioid?

13   **A.**   Around that time, the legislation would have required,

14   along with registration, to also ensure that physicians were

15   looking to see if there are more than one pharmacy or more

16   than one prescriber, actually, for Controlled Substance

17   Monitoring Program.

18   **Q.**   So, prior to Senate Bill 454, physicians were not

19   required to check the patient's prescription history before

20   writing an opioid prescription, correct?

21   **A.**   I believe the appropriate statement of that would be

22   that physicians were able to voluntarily do that, but they

23   were not required by state law.

24   **Q.**   And one of the things, a requirement to check the

25   patient's prescription history accomplished, was prescribers

```
 1    could now see, since they were required to do it, if a

 2    patient had filled prescriptions at multiple pharmacies,

 3    right?

 4              MR. FARRELL:  Objection, Your Honor.

 5              THE COURT:  Basis?

 6              MR. FARRELL:  She's asking a witness about the

 7    purpose of a law.

 8              MS. MAINIGI:  Your Honor, I'm not asking him about

 9    the purpose of the law.  I'm asking --

10              THE COURT:  You're asking what the law said,

11    right?

12              MS. MAINIGI:  Correct, Your Honor.

13              THE COURT:  Overruled.  Go ahead.  You can answer

14    it.

15              THE WITNESS:  Thank you, Your Honor.  I'm not able

16    to answer accurately and factually to your question.

17              BY MS. MAINIGI:

18    Q.   Okay.  Let me put Senate Bill 454 in front of you, Dr.

19    Gupta.  I'm sorry I failed to do that.  Senate Bill 454, for

20    the record, is DEF-WV-03015 and, Dr. Gupta, you're welcome

21    to read any page you want, but I'll draw your attention to

22    one of the last pages, Page 25 in the bottom right.  And I

23    think the section is entitled, sir -- it's Section 60A-9-5a

24    and it's entitled "Practitioner Requirements to Access

25    Database and Conduct Annual Search of the Database; Required
```

1    Rulemaking."

2         Let me know when you're ready, Dr. Gupta.

3    **A.**   I'm here on the page.

4    **Q.**   And let me just -- I'm not sure I have that much more,

5    Dr. Gupta, on this, but I just wanted to confirm that the

6    record is clear Senate Bill 454 required prescribers to

7    check a patient's history before prescribing an opioid,

8    correct?

9    **A.**   I am trying to look for that particular language before

10   I can answer your question.  It says, "Upon initially

11   prescribing or dispensing any pain-relieving controlled

12   substance for a patient and at least annually thereafter

13   should be -- should the practitioner or dispenser continue

14   to treat the patient with controlled substances, all persons

15   with prescriptive or dispensing authority and in possession

16   of a valid Drug Enforcement Administration registration

17   identification number and, who are licensed by the Board of

18   Medicine as set forth in Article III, Chapter 30 of this

19   code, the Board of Registered Professional Nurses as set

20   forth in Article 7, Chapter 30 of this code."  It goes on to

21   say, basically, according to that.

22   **Q.**   Thank you, Dr. Gupta.  Now, you're not aware that this

23   bill provided distributors with access to the CSMP, correct?

24   **A.**   Once again, I have not thoroughly studied the bill.  I

25   cannot provide that answer to you.

```
 1    Q.   You can set that aside, sir.

 2         Now, in 2016, Dr. Gupta, while you were State Health

 3    Commissioner, you are aware that the CDC issued guidelines

 4    for prescribing opioids for chronic pain, correct?

 5    A.   Yes.

 6    Q.   Okay.  And after the CDC guidelines came out, you are

 7    aware that West Virginia convened an expert panel to issue

 8    new pain management guidelines, correct?

 9    A.   Correct.

10    Q.   And you were a member -- and those were called the SEMP

11    guidelines; is that right?

12    A.   I would recall that at this point, yes.

13    Q.   The -- and SEMP stands for Safe and Effective

14    Management of Pain Guidelines; does that sound right?

15    A.   That would sound accurate to my recollection, but I

16    don't have the guidelines in front of me right now, so I am

17    not sure.

18    Q.   Okay.  Let me get those for you, please.  And, Dr.

19    Gupta, I probably won't spend that much time on these, but

20    do you agree that the SEMP -- that the -- excuse me -- the

21    expert panel that issued the new pain management guidelines,

22    that those guidelines were called the Safe and Effective

23    Management of Pain Guidelines?

24    A.   I'm sorry.  What's the question?

25    Q.   Do you agree that the guidelines were called the Safe
```

1    and Effective Management of Pain Guidelines?

2    **A.**   Yes.

3    **Q.**   And those were issued in 2016, correct?

4    **A.**   That's the date on this document.

5    **Q.**   And if you turn to Page 4 of the document, sir, that

6    document, that page of the document, lists the members of

7    the panel, correct?

8    **A.**   That's correct.

9    **Q.**   And you were on that panel, as you said, correct?

10   **A.**   That's correct.

11   **Q.**   And the panel was chaired by Dr. Timothy Deer, correct?

12   **A.**   Correct.

13   **Q.**   And the panel issued guidance to prescribers and

14   dispensers as an expansion to the CDC Chronic Pain Opioid

15   Guidelines, correct?

16   **A.**   I wouldn't describe it like that.

17   **Q.**   If you could take a look at Page 4, sir, do you see the

18   first sentence in the first full paragraph?

19   **A.**   I do.

20   **Q.**   And that sentence reads, "This overall pain management

21   guidance is intended for both prescribers and dispensers as

22   an expansion to the 2016 CDC Chronic Pain Opioid

23   Guidelines."  Is that what it says?

24   **A.**   It says that.

25   **Q.**   Now, these guidelines ultimately came to be endorsed by

1    multiple health professional organizations in West Virginia,

2    correct?

3    **A.**    There are several.   Multiple would be correct, but I

4    can -- I am happy to explain the context of it, if you would

5    like me to.

6    **Q.**    Do you recall that the West Virginia State Medical

7    Association endorsed these guidelines?

8    **A.**    I'm going to go through and see which ones.   I don't

9    see it listed in my quick browsing.

10    **Q.**    Okay.   Let me come back to the sentence for a moment.

11    A prescriber is someone who prescribes opioids, right?

12    **A.**    Not necessarily.   A prescriber can prescribe many more

13    pharmaceutical compounds, non-pharmaceutical compounds, in

14    addition to opioids.

15    **Q.**    Fair enough.   And a dispenser is someone like a

16    pharmacist who dispenses drugs?

17    **A.**    Dispenser in medicine could be a lot of people beyond

18    pharmacy.

19    **Q.**    Okay.   Now, in 2018, I think we talked about this

20    yesterday.   You also -- you can set that aside, sir.

21        You also helped draft Senate Bill 273; is that correct,

22    which it came to be known as the Opioid Reduction Act?

23    **A.**    That's correct.   I'm much more familiar with that one.

24    **Q.**    And you viewed the Opioid Reduction Act as a reasonable

25    effort to address the contemporary crisis that we were

```
1    facing, correct?

2    A.    That would be accurate.

3    Q.    And the Opioid Reduction Act imposed new limits on

4    opioid prescriptions; is that right?

5    A.    As a state level effort, yes.

6    Q.    And, for example, it limited prescriptions for minors

7    to three days, correct?

8    A.    I would love to see that, once again, in front of me

9    because I do not recall every section of the Senate Bill 273

10   sitting right here.

11   Q.    But you recall as a general matter that there were days

12   supply limitations imposed on opioids as part of the Opioid

13   Reduction Act?

14   A.    I recall as a general matter the attempt of the Opioid

15   Reduction Act was to follow good science, good evidence, and

16   create guidelines based on that in legislation.

17   Q.    And what that involved in part was setting days supply

18   of limitations on the prescription of opioids, correct?

19   A.    What that involved in part was following CDC guidelines

20   and transitioning those evidence-based guidelines into

21   legislation that included limitation of initial

22   prescriptions to -- for prescribers.

23   Q.    So, for example, do you recall that it allowed for a

24   seven-day prescription if the medical purpose said that it

25   supported it in the record?
```

1    A.    So, once again, I would love to see that in front of me

2    because we had debated back and forth three days, four days

3    with different committees and it was a matter of

4    negotiation.  So, but I do recall that for initial

5    prescribing, I believe it was about four days and, for some

6    other reasons, it was seven days.  So, there were variations

7    in that within the legislation.

8    Q.    And there was limitations imposed on dentists, also,

9    correct?

10   A.    That would be accurate.

11   Q.    Because some dentists -- dentists were allowed to

12   prescribe opioids after certain dental procedures, correct?

13   A.    You've asked me why it was a limitation on dentists.

14   My answer is there were limitations on prescribers for

15   controlled substances beyond physicians because there was

16   such a volume that was being provided and prescribed by and

17   in communities that was -- that included prescriptions from

18   dentists and other providers, as well.

19   Q.    And do you recall that there was a three-day limitation

20   for dentists?

21   A.    I don't recall the exact limitation of every profession

22   in the bill at this time while I'm sitting here.

23   Q.    Do you recall it was around three days?

24   A.    Three to seven days, three to five days is usually the

25   evidence-based best practice for initial prescribing.  So,

1    that would be the area, but if I saw the legislation, I

2    would be able to tell you more definitively.

3    **Q.**   And prior to this Opioid Reduction Act, a dentist could

4    have prescribed a 30-day supply of opioids, correct?

5    **A.**   Certainly.

6    **Q.**   And, to your knowledge, the Opioid Reduction Act did

7    not contain any new requirements for distributors, correct?

8    **A.**   I do not have that stationed in front of me to say that

9    at this point.

10   **Q.**   And, to your knowledge, the Opioid Reduction Act did

11   not impose limits on the distributions of opioids to

12   pharmacies, correct?

13   **A.**   Could you please repeat that again?

14   **Q.**   Sure.  To your knowledge, the Opioid Reduction Act did

15   not impose limitations on the distributions of opioids to

16   pharmacies?

17   **A.**   I -- I cannot recall for or against that.

18   **Q.**   Now, one of the things you said yesterday, Dr. Gupta,

19   when you were being asked questions by Ms. Kearse was where

20   West Virginia ranks compared to the country is -- was

21   important for you to know as the State Health Commissioner,

22   correct?

23   **A.**   Correct.

24   **Q.**   Let me put another exhibit in front of you.

25          MS. MAINIGI:  Could I have DEF-WV-00747, State of

1    Health presentation?

2            BY MS. MAINIGI:

3    **Q.**   Now, Dr. Gupta, this is a PowerPoint presentation that

4    you put together in August, 2018 entitled "Public Health in

5    West Virginia:  Brief History and Current State of Health,"

6    correct?

7    **A.**   That's what it states, correct.

8    **Q.**   And this particular report happens to have your name on

9    the front, correct?

10   **A.**   This one does.  This presentation does, as well.

11   **Q.**   And was this a presentation that you made to others in

12   the State of West Virginia?

13   **A.**   This was a presentation and it states on the report I

14   made on August 6th, 2018 to the sanitarian training.

15   **Q.**   If you could turn to Page 38 of your report, Dr. Gupta.

16   **A.**   I'm here.

17   **Q.**   Now, at Slide 38, there's a chart comparing annual

18   prescription per capita in 2016 across all the states; is

19   that right?

20   **A.**   That's correct.

21   **Q.**   And where does West Virginia rank?

22   **A.**   It's highlighted as ranking number one.

23   **Q.**   Okay.  And what does the number 20.8 mean?

24   **A.**   That means 20.8 prescriptions per 100 -- per --

25   actually, per person, per capita.

1    **Q.**   And that means West Virginia ranked number one in total

2    prescriptions at that point in time, correct?

3    **A.**   That's correct.

4    **Q.**   And that's not just opioid prescriptions.  This is all

5    prescriptions, correct?

6    **A.**   That's correct.

7              THE COURT:  Does that mean 20 prescriptions for

8    every person in the state at that time?

9              THE WITNESS:  Yes, Your Honor.

10             THE COURT:  Is that what that means?

11             THE WITNESS:  Yes, Your Honor.

12             BY MS. MAINIGI:

13   **Q.**   Now, if you could take a look at Page 68 -- oh, excuse

14   me.  Not 68.  Let me back up.

15        I believe you have testified before, Dr. Gupta, that

16   West Virginia has a higher than average incidence of people

17   in circumstances that lead to pain, like manual labor jobs,

18   correct?

19             MR. FARRELL:  Excuse me, Your Honor.  Can we have

20   a date and page reference to his prior testimony?

21             THE COURT:  Yes.  Yes

22             MS. MAINIGI:  Sure.  Let's go ahead and put Dr.

23   Gupta's 2016 deposition up at Page 68, Lines 6 through 15.

24             MR. FARRELL:  Objection, Your Honor, unless we

25   intend to do cross examination by showing cross examination.

1          MS. MAINIGI:  Well, you asked for a citation, so I

2     thought I'd put it up.  Do you not want me to put it up?

3          THE COURT:  Do you want it down, Mr. Farrell?

4          MR. FARRELL:  No.  I'm just curious as to whether

5     or not we're going to be allowed to show cross examination

6     to witnesses before we actually cross examine them.  I'm

7     okay with that.

8          MS. MAINIGI:  I thought you asked for a citation,

9     so I thought I'd put it up because you might not have it

10    handy.

11         THE COURT:  Well, I'm going to let -- I'm going to

12    allow this.  We need to get through this.  Go ahead, please.

13         MS. MAINIGI:  Yes, Your Honor.

14      Let's go ahead and put it up, Matt, please.

15         BY MS. MAINIGI:

16    Q.   And in your 2016 deposition, you were asked, Doctor

17    Gupta, How would you characterize the rate of legitimate

18    pain in West Virginia", and you responded at that point in

19    time, "I would characterize it by the following.  There's

20    reason to believe, certainly, that because of the mining and

21    number of other labor activities that West Virginians have -

22    traditionally have had a lot of laborious work in the

23    industry and, as a result, that one can argue that

24    historically that could be higher levels of pain related to

25    the work in those industries."  Do you recall testifying in

```
 1    that manner?
 2    A.    Ms. Mainigi, I do not have in front of me this
 3    deposition from five years ago and you're going to have to
 4    allow me to explain those statements if you expect me to
 5    answer questions related to these statements.
 6    Q.    Okay.  Let me turn first, before we come back to that,
 7    to Slide 27 of your presentation.  Now, this slide lists
 8    West Virginia morbidity indicators, correct?
 9    A.    This slide lists West Virginia morbidity indicators as
10    per the Behavior Risk Factor Surveillance System of 2016 as
11    reported by Health Statistics Center at DHHR.
12    Q.    West Virginia ranks number one in arthritis; is that
13    correct?
14    A.    That's correct.
15    Q.    And can you explain to me what that means?
16    A.    Thank you for the opportunity.  Arthritis is a
17    condition one can develop from a lot of reasons and we --
18    the ranking of arthritis in the nation is important where
19    West Virginia ranks, but the trend data is equally
20    important.  For example, we have seen a mere two percentage
21    point of increase in arthritis over more than a decade in
22    West Virginia.
23          So, while it ranks number one, it has always been close
24    to number one.  So, there was not a tsunami of increase in
25    the cases of arthritis in the period of time we're talking
```

1    about.

2    **Q.**   Dr. Gupta, let's take a look at the number there.  38.9

3    percent is the West Virginia prevalence of arthritis in

4    2016?

5    **A.**   Yes.

6    **Q.**   And the country was at 25.3 percent --

7    **A.**   Yes.

8    **Q.**   -- on average?  Okay.  Poor health limitations, where

9    did West Virginia rank?

10   **A.**   Once again, in 2016, it ranked --

11   **Q.**   Dr. Gupta --

12   **A.**   I'm answering your question.

13   **Q.**   Okay.  Where did West Virginia rank in 2016?

14   **A.**   It ranked number one at 23.6 percent for that

15   particular year.

16   **Q.**   Okay.  And for cardiovascular disease, where did West

17   Virginia rank in the country?

18   **A.**   For 2016, it ranked at 14.6 percent, number one, which

19   has been consistent over the years, without a significant

20   change over the years.

21   **Q.**   And, Dr. Gupta, I'd appreciate it if you would just

22   answer the question.  Where did West Virginia rank for COPD

23   in 2016 according to your chart?

24   **A.**   One.

25   **Q.**   And where did West Virginia rank in hypertension

1   according to your chart in 2016?

2   **A.**   One.

3   **Q.**   And where did West Virginia rank for diabetes in 2016

4   according to your chart?

5   **A.**   Two.

6   **Q.**   And where did West Virginia rank for depression in 2016

7   according to your chart?

8   **A.**   Two.

9   **Q.**   And where did West Virginia rank in 2016 for cancer

10  according to your chart?

11  **A.**   Three.

12  **Q.**   And all of the conditions I just described, Dr. Gupta,

13  all of those conditions could result in pain for the

14  individuals who suffer from them, correct?

15  **A.**   Not necessarily.  And I'm happy to explain that again,

16  if you would like me to.

17  **Q.**   Thank you.  Now, let's turn to Page 24 of your

18  presentation.  This page is entitled "West Virginia

19  Demographics", correct?

20  **A.**   Correct.

21  **Q.**   And the median age for West Virginians in 2016 was the

22  fourth highest in the nation based on census data, correct?

23  **A.**   That's what it says.

24  **Q.**   This page also notes that West Virginia had a higher

25  than average disabled population, correct?

```
 1    A.   It states there was -- 18 percent report being
 2    disabled.
 3    Q.   And turning to Page --
 4              MS. MAINIGI:  Actually, why don't we go ahead and
 5    take that down.
 6              BY MS. MAINIGI:
 7    Q.   Thank you, Dr. Gupta.
 8         Dr. Gupta, you are an expert for the plaintiffs in the
 9    MLP opioid cases, correct?
10    A.   Correct.
11    Q.   And you are an expert in abatement?
12    A.   Correct.
13    Q.   And you get paid $500.00 an hour; is that correct?
14    A.   As I mentioned in my deposition, I don't exactly recall
15    the exact hourly rate.
16    Q.   Is that approximately how much you get paid an hour?
17    A.   Could be plus, minus.
18    Q.   And you were originally retained by Mr. Colantonio in
19    this case?
20    A.   I do not -- that would not be accurate.
21    Q.   Who were you originally retained by?
22    A.   That was Natalie Shkolnik.
23    Q.   And are you retained by Mr. Colantonio in this case?
24    A.   As my personal attorney capacity.  He's functioning as
25    my personal attorney on this.
```

1           MS. KEARSE:  Can I get clarification of what, Your

2    Honor, just -- what case?  When you say "this case"?

3           MS. MAINIGI:  I apologize.  That was unclear.  I

4    will clarify.

5           BY MS. MAINIGI:

6    **Q.**   In -- Mr. Colantonio is serving as your personal

7    attorney in this matter that you're testifying --

8    **A.**   Yes.

9    **Q.**   -- here for today?

10   **A.**   Yes.

11   **Q.**   Okay.  Is Mr. Colantonio also your attorney in the MLP

12   cases?

13   **A.**   Natalie Shkolnik is the attorney that I'm dealing with

14   in the MLP case.

15   **Q.**   Now, Mr. Colantonio is here today in the courtroom,

16   right?

17   **A.**   Correct.

18   **Q.**   Okay.  And Mr. Colantonio, did he take part of your

19   deposition when you were deposed by us in this matter?

20   **A.**   There was two depositions.  Could you please clarify

21   which one?

22   **Q.**   Let me clarify for you.

23   **A.**   You're confusing me.

24   **Q.**   That's a fair point.  That's a fair point.  So, in

25   2020, you were deposed in this matter, correct?

```
 1    A.    There was one deposition in September of 2020, correct.

 2    Q.    And at that deposition in September of 2020, you were

 3    deposed by the defendants in this case, correct?

 4    A.    Correct.

 5    Q.    And you were also deposed by Mr. Colantonio in that

 6    case, correct?

 7    A.    I was asked questions by Mr. Colantonio at that

 8    deposition, yes.

 9    Q.    Okay.  And are you aware that Mr. Colantonio is also

10    counsel to Cabell County and City of Huntington in this

11    matter?

12            MR. FARRELL:  Objection.  Lack of foundation.

13            THE COURT:  Overruled.

14            BY MS. MAINIGI:

15    A.    I'm not aware of that, actually.

16    Q.    Now, do you recall what year you were first retained as

17    an expert?  Was it 2019?

18    A.    It would be close to that.

19    Q.    Now, do you recall speaking at a plaintiffs counsel

20    conference in 2018 in Fort Lauderdale, Florida?

21    A.    If you could tell me more specifics about it, I used to

22    travel a lot in my role as the Commissioner for Bureau for

23    Public Health, so I'm happy to recall that, the details.

24    Q.    Sure.  Let's go ahead and put that up on the screen and

25    see if it jogs your memory.  We can back up to the Opioid
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    Crisis Summit, July 21st-22nd, 2018.  Do you recall speaking

2    at this conference called the Opioid Crisis Summit,

3    July 21st-22nd in 2018?

4    **A.**   I would have traveled there in my capacity as the

5    Commissioner of Bureau for Public Health.  Again, my

6    schedule travels.

7    **Q.**   Are you aware that the purpose of this conference was

8    explaining to plaintiffs firms how to make money in mass

9    tort cases?

10   **A.**   No.

11   **Q.**   But your testimony is you traveled there as the

12   Commissioner of Public Health?

13   **A.**   My testimony is that I was asked to speak specifically

14   about the opioid crisis in West Virginia to -- to this

15   meeting and in that role I was traveling to many

16   conferences, including the American Automobile Association

17   and, you know, a number of other organizations that were not

18   pure public health.  That was the role I was -- and this was

19   in that role.

20   **Q.**   Now, if we look at the second page of this --

21           MS. MAINIGI:  Matt, if we we could turn to the

22   next page.

23           BY MS. MAINIGI:

24   **Q.**   Were you aware that people paid $1,495.00 to attend

25   this conference?

1   A.   No, I was not aware.

2   Q.   Were you aware that the purpose of the conference was

3   to teach plaintiffs lawyers how to file more opioid cases?

4   A.   No, Ms. Mainigi.  My role as Commissioner for Bureau

5   for Public Health is to go speak and talk about the public

6   health impact of the opioid crisis in West Virginia.  When I

7   get invited, I will go speak and explain what is happening

8   in order to advance the knowledge and understanding of all

9   types of people from the country and I do not go back to

10  figure out who is paying what and who is there.  I just --

11  that's not what I did in my role.

12          MS. MAINIGI:  If we could turn to the agenda of

13  events, please, Matt.  Next page, please.  If we could go to

14  the next page, please.  Okay.  Maybe you can blow that up a

15  little bit, Matt.

16          BY MS. MAINIGI:

17  Q.   And so, do you see your name here as one of the

18  speakers, Dr. Gupta?

19  A.   This is the first time I've seen this, so I'm happy, if

20  you have paperwork, to look at that because I have never

21  seen this particular agenda before, but I do see my name

22  there.

23  Q.   Okay.  And do you see that at the bottom of this page

24  it says as follows:  "Attorneys in attendance will be given

25  specific information regarding the signing of both entity

1    and individual cases, regarding case criteria, damage models

2    and estimated time frames for settlement"?  Do you see that?

3    **A.**   I see it, but this is my first time seeing it.

4    **Q.**   So, is it your testimony you weren't aware that the

5    purpose of the conference was to educate plaintiffs

6    attorneys to bring opioid cases?

7    **A.**   I was absolutely not aware of that.

8            MS. MAINIGI:  I have no further questions.  Thank

9    you, Dr. Gupta.

10           MR. FARRELL:  Judge, before Ms. Mainigi retires,

11   can we get a copy of the demonstrative that was just --

12           MS. MAINIGI:  I'm happy to provide a copy.

13   Actually, for housekeeping purposes, Your Honor, it may be

14   simpler if I -- if Mr. Hester is going next, if I provide a

15   list -- we provide a list together at the end of the

16   exhibits we'd like to move into evidence.  Would that --

17           THE COURT:  Is that all right with you, Mr.

18   Farrell?

19           MS. MAINIGI:  Just to save time.

20           MR. FARRELL:  I'd like do it now.  I'd like to

21   make a record, as well.

22           MS. MAINIGI:  Sure.  Sure.  Absolutely.

23      Your Honor, I'd like to move Senate Bill 437 into the

24   record.  That is DEF-WV-03105.

25           THE COURT:  Any objection?

1               MS. KEARSE:  No objection, Your Honor.

2               THE COURT:  It's admitted.

3             **DEFENSE EXHIBIT DEF-WV-03105 ADMITTED**

4               MS. MAINIGI:  I'd like to move Senate Bill 454

5     into the record.  That is DEF-WV-03015.

6               THE COURT:  Any objection?

7               MS. KEARSE:  No objection, Your Honor.

8               THE COURT:  Admitted.

9             **DEFENSE EXHIBIT DEF-WV-03015 ADMITTED**

10              MS. MAINIGI:  I'd like to move the 2016 SEMP

11    Guidelines into the record.  That is DEF-WV-03036.

12              MS. KEARSE:  No objection, Your Honor.

13              THE COURT:  Admitted.

14            **DEFENSE EXHIBIT DEF-WV-03036**

15              MS. MAINIGI:  I'd like to move into the record

16    DEF-WV-00747, which is the Public Health in West Virginia

17    Brief History and Current State of Health.

18              MS. KEARSE:  No objection.

19              THE COURT:  Admitted.

20            **DEFENSE EXHIBIT DEF-WV-00747 ADMITTED**

21              MS. MAINIGI:  And I believe that's it, Your Honor.

22    Thank you.

23              THE COURT:  Thank you.

24              MR. FARRELL:  I'm sorry.  Did we get the CLE

25    program admitted?

1          MS. MAINIGI:  He didn't recognize it, so I didn't

2    move it into the record, but I'm happy to move it into the

3    the record, if you would like.

4          THE COURT:  Do you want it in, Mr. Farrell?

5          MR. FARRELL:  I just want a copy, is all I would

6    like.

7          MS. MAINIGI:  We'll get him a copy right here and,

8    Your Honor, could I go ahead and just ask that that also be

9    moved into the record, that agenda?

10          THE COURT:  Is there any objection?

11          MR. FARRELL:  None.

12          THE COURT:  It's admitted.

13          MS. KEARSE:  Can I object?

14          COURTROOM DEPUTY CLERK:  Judge, we need a number,

15    an exhibit number.

16          THE COURT:  We need exhibit numbers.

17          MS. MAINIGI:  Yes, Your Honor.

18          THE COURT:  Can you give those to the clerk so she

19    can keep her record straight?

20          MS. MAINIGI:  Oh, 861.  That sounds more like it.

21    So, Opioid Crisis Summit, July 21st-22nd, 2018 is

22    Exhibit 861.

23                    **DEFENSE EXHIBIT 861 ADMITTED**

24          MR. HESTER:  Your Honor, should I go ahead now or

25    do you want to take a break?

```
 1            THE COURT:  Well, it's only 10:00.  Let's press
 2   on, Mr. Hester, if you're ready.
 3            MR. HESTER:  We'll press on.  All right.  Just
 4   take us a minute, Your Honor, to get set up.
 5                      CROSS EXAMINATION
 6            BY MR. HESTER:
 7   Q.   Good morning, Dr. Gupta.
 8   A.   Good morning.
 9   Q.   My name is Timothy Hester.  I represent McKesson.
10        Dr. Gupta, I want to begin just by asking a couple of
11   threshold questions where I think we can have pretty ready
12   agreement.  Do you agree with me that licensed doctors and
13   other healthcare providers in West Virginia are responsible
14   for making prescribing decisions?
15   A.   Yes.
16   Q.   And so, the number of prescriptions written in
17   Huntington and Cabell County for prescription opioids would
18   be based on the decisions made by doctors and other
19   prescribers, correct?
20   A.   The number of prescriptions that would -- would be
21   going to pharmacies would be coming out of offices of
22   healthcare providers.
23   Q.   So, based on the judgment of healthcare providers,
24   doctors, and other prescribers, correct?
25   A.   I would say they were the ones writing the
```

1    prescriptions.

2    **Q.**    And so, they were the ones making the decision to write

3    the prescriptions, correct?

4    **A.**    That would be accurate.

5    **Q.**    And so, you also agree and understand that an opioid

6    pill cannot leave a pharmacy lawfully unless a prescriber

7    decides to write a prescription and the pharmacist decides

8    to dispense it, correct?

9    **A.**    That would be accurate.

10   **Q.**    So, the number of prescriptions written in Huntington

11   and Cabell determines the amount of legal opioid pills that

12   would have been dispensed in the community, correct?

13   **A.**    That would not be correct.

14   **Q.**    The pills can't leave the pharmacy shelf unless

15   prescriptions are written for them, correct?

16   **A.**    That's correct.

17   **Q.**    And so, the total volume of prescriptions would be

18   total volume of pills that would be -- would reflect the

19   total volume of pills that could leave the pharmacy,

20   correct?

21   **A.**    That's correct.

22   **Q.**    Let me ask you to return a bit to the discussion you

23   just had with Ms. Mainigi relating to pain needs in West

24   Virginia.  Do you agree that West Virginia historically has

25   had a very significant proportion of its population engaged

1    in labor-intensive jobs such as mining?

2    **A.**    That would be correct.

3    **Q.**    And are those labor intensive jobs a factor that have

4    tended to drive higher levels of pain needs in this state?

5    **A.**    I would characterize it a different way, so I could not

6    exactly agree with that characterization.

7    **Q.**    You understand that heavy manual labor jobs tend to

8    create over time higher needs for pain in a given

9    population?

10   **A.**    I do not understand the term "higher needs for pain".

11   **Q.**    Let me ask to -- let me put up on the screen the 2016

12   deposition pages, Page 68 Line 6 to 15, please.  And, Dr.

13   Gupta --

14          MS. KEARSE:  Your Honor, I'm going to -- is this

15   impeachment?  I don't know that he's actually set a

16   foundation.

17          MR. HESTER:  I think the witness said he didn't --

18   wouldn't characterize the question the way I asked him and

19   this is meant to respond to that.

20          MS. KEARSE:  And I think --

21          THE COURT:  He hasn't identified the document and

22   related it to this witness, is that what you're saying?

23          MS. KEARSE:  Yeah.  I think he was about to

24   explain his answer with that and so, I don't think this is

25   proper impeachment.

```
1              THE COURT:  Overruled.  I'm going to let him go
2     ahead.  This is cross examination.  We need to give Mr.
3     Hester some latitude here.
4          So, go ahead, sir.
5              BY MR. HESTER:
6     Q.   Dr. Gupta, you were deposed in 2016 in this litigation.
7     Do you remember this?
8     A.   I remember being deposed.  I do not remember signing an
9     errata statement to review this deposition and correct it to
10    the accuracy of my deposition.  So, I cannot speak to this
11    because I have not signed an errata statement and I have not
12    reviewed the deposition.
13             MR. HESTER:  Well, Your Honor, if the witness --
14    if the witness didn't sign an errata statement, it's been
15    waived by now.
16             THE COURT:  Well, is this -- is this the testimony
17    you gave in this deposition?
18             THE WITNESS:  Your Honor, I was -- I did not -- I
19    was deposed.  I never signed an errata statement, so I have
20    never had an opportunity to go back and review my deposition
21    of 2016.
22             THE COURT:  Well, I understand that, but if you
23    testified under oath and this is your testimony, then I
24    think this is fair game.
25         Go ahead, Mr. Hester.
```

```
 1            BY MR. HESTER:

 2    Q.    Dr. Gupta, you were under oath when you gave this

 3    testimony, correct?

 4    A.    Yes.

 5    Q.    And the testimony, the question was, "Has, or how would

 6    you characterize the rate of -- let me use the words

 7    legitimate pain in West Virginia."  Do you see that

 8    question?

 9    A.    Yes.

10    Q.    And your answer was, "I would characterize it by the

11    following.  There's reason to believe, certainly, that

12    because of the, the mining and number of other labor

13    activities, that West Virginians have, traditionally have

14    had a lot of laborious work in the industry.  And, as a

15    result, that one can argue that, historically, that could be

16    higher levels of pain related to the work in those

17    industries."  You gave that answer, correct?

18    A.    Yes, sir, and that's very different than the question

19    you asked me previously about pain needs.

20    Q.    I was asking you, Dr. Gupta, this question.  The

21    laborious work done by many people in this state, mining,

22    heavy labor, that's a factor that can lead to higher levels

23    of pain need, correct?

24    A.    Correct.

25    Q.    Okay, thank you.  Let me ask you, also, do you
```

```
1   understand that West Virginia has a relatively aged

2   population?

3   A.   It has one of the more aged populations in the nation

4   as a state.

5   Q.   And that's another factor that can lead to higher pain

6   needs for a population, correct?

7   A.   Mr. Hester, you keep saying "pain needs" and there's a

8   big difference between words, between "pain needs" and

9   "levels of pain".  I would -- either you could correct it or

10  I could keep having problems.

11  Q.   Okay.  So, maybe we'll go -- we'll try to get on the

12  same wavelength.

13  A.   Please.

14  Q.   That -- and more aged population tends to have higher

15  levels of pain, correct?

16  A.   This is the way I would characterize it.  As we age,

17  one could have pain levels that could be higher, generally

18  speaking, than when you are very young.

19  Q.   I think we're communicating.  I understand.  I hope.  I

20  know what you're talking about.

21       And I think with Ms. Mainigi, you also noted that there

22  is a higher level of disability among the population in West

23  Virginia than compared to the nation, correct?

24  A.   The percent of disability rates in West Virginia are

25  higher than the average U. S. percentage rates.
```

1    **Q.**   And people who are disabled in the aggregate may have

2    higher levels of pain; is that correct?

3    **A.**   That's correct.

4    **Q.**   And you also talked with Ms. Mainigi about the fact

5    that there's higher levels of obesity in West Virginia

6    compared to the country as a whole; is that correct?

7    **A.**   That's correct.

8    **Q.**   And obesity is another factor that can lead to higher

9    levels of pain; is that correct?

10   **A.**   Not necessarily, but from obesity, if you end up having

11   neuropathy, or disability, or arthritis, that may be a

12   reason that you're suffering from pain, but just by itself,

13   obesity, being obese, many of us are here, shouldn't be

14   causing us pain.

15          MR. HESTER:  Let me ask to put up on the screen

16   from the 2016 deposition of Dr. Gupta Page 69, Lines 20-24.

17          BY MR. HESTER:

18   **Q.**   Dr. Gupta, you were under oath again in this

19   deposition, correct?

20   **A.**   Correct.

21   **Q.**   Let me read the question that was asked to you in that

22   deposition.  "Obesity can cause pain of various types,

23   right?"  And your answer was, "It certainly could."  And

24   then the next question, "Chronic pain, constant pain?"  Your

25   answer, "It could."  Do you see that?

1   **A.**   Yes, sir.  My testimony today is a very consistent

2   explanation with this testimony at that time.

3   **Q.**   But the point is, if somebody -- if there is a level of

4   obesity in a population, that can create greater strains on

5   the skeletal structure of the body, can lead to higher

6   levels of pain, correct?

7   **A.**   Can I characterize this way?  Just -- I just -- I'm

8   just trying to explain, which is in its black and white way,

9   no, but obesity tends to change our body structure over time

10  and we call that potentially sometimes arthritis.  Other

11  cases, obesity could lead to cancer.  In other cases, it

12  could lead to diabetes, which could lead to neuropathy.  So,

13  these are factors, but just pure simple being obese if I'm

14  overweight right now does not cause pain for just itself.

15  **Q.**   So, other factors come out of obesity that lead to

16  higher levels of pain; is that your point?

17  **A.**   That potentially could, just like I said in 2016.

18  **Q.**   And you also mentioned arthritis as another factor for

19  the health of this population in West Virginia, that West

20  Virginia has the highest level of arthritis in the country,

21  correct?

22  **A.**   That's correct.

23  **Q.**   And arthritis is often associated with pain; is that

24  correct?

25  **A.**   That's very correct.

54

1    Q.   The West Virginia Board of Medicine oversees the

2    practice of medicine in the State of West Virginia, correct?

3    A.   It sees it for MDs, for podiatrists, and for physician

4    assistants.  Not for all practitioners.

5    Q.   So, let's focus on the ones that the West Virginia

6    Board of Medicine regulates and the regulation of the West

7    Virginia Board of Medicine, for instance, would extend to

8    general care practitioners, family doctors, primary care

9    physicians, correct?

10   A.   As long as you had an MD, as opposed to a DO, which

11   have their own Board for DOs.

12   Q.   So, the Board of Medicine of West Virginia would be

13   regulating doctors in the state and would issue their

14   licenses to practice medicine; is that correct?

15   A.   For the ones that have MD, yes.

16   Q.   And you're aware that the Board of Medicine from time

17   to time issues guidelines or policy statements that it

18   circulates to doctors in West Virginia?

19   A.   Yes.

20   Q.   And the Board of Medicine over time has issued policy

21   statements relating to the use of opioids in the treatment

22   of pain; is that correct?

23   A.   Yes.

24   Q.   And a doctor practicing in West Virginia should be

25   familiar with the guidelines and policy statements that were

```
 1    issued by the Board of Medicine; is that correct?
 2    A.    That would be correct.
 3    Q.    And a doctor practicing in West Virginia should seek to
 4    follow the guidelines and policy statements that are issued
 5    by the Board of Medicine; is that correct?
 6    A.    You are correct.
 7    Q.    And are you also aware that the Board of Medicine
 8    issues quarterly newsletters to all licensed physicians and
 9    physician's assistants in the State of West Virginia from
10    time to time?
11    A.    I'm peripherally aware to the point it comes to my
12    e-mail inbox.
13    Q.    You probably receive them.
14    A.    Yes.  It doesn't mean I read them, though, always.
15    Q.    Yes.  Let me ask you to look at a document I'm going to
16    show you.
17              MR. HESTER:  May I approach, Your Honor?
18              THE COURT:  Yes.
19              BY MR. HESTER:
20    Q.    Dr. Gupta, I've shown you a document that's marked as
21    Defendant's Exhibit 3616.  It's a quarterly newsletter from
22    the West Virginia Board of Medicine from 2009, early 2009 or
23    I guess -- I'm sorry -- late -- late October, October, 2008
24    and December, 2008.  Have you seen this before?
25    A.    No, sir, primarily because I wasn't in state in
```

1    December -- on October of 2008.  I had not moved in until

2    March of 2009.

3    **Q.**   Let me ask you to look at this, the sixth page of the

4    document.  Do you see at the bottom of the page there is a

5    heading "Responsible Opioid Prescribing, A Physician's

6    Guide, now available for online purchase"?  Do you see that?

7    **A.**   I see that.

8    **Q.**   And there's a reference, if you look down into the next

9    paragraph of the document, that it says in the Spring of

10   2008, the Board of Medicine was able to distribute a book to

11   every licensed physician and physician's assistant in West

12   Virginia, and it's a book written by Scott Fishman.  I'm

13   paraphrasing, Dr. Gupta.  Do you see that paragraph?

14   **A.**   I see that paragraph.

15   **Q.**   And I really wanted to use this as a jog for your

16   memory to see if you remember.  Do you remember that the

17   West Virginia Board of Medicine distributed this book by Dr.

18   Fishman on responsible opioid prescribing?

19   **A.**   Absolutely not, sir, because I wasn't in state and I

20   wasn't licensed at the time, so I would not have received

21   this newsletter, and I would never have read this prior to

22   you showing it to me.

23   **Q.**   And so, you have never in your -- in your subsequent

24   work in the state, you hadn't heard about this being

25   distributed, the book being distributed?

1    **A.**   Not to my recollection at this time, but I can

2    certainly not -- I do not remember seeing this document ever

3    before.

4    **Q.**   All right.  Thank you.

5       Dr. Gupta, am I correct that in recent years there has

6    been an effort to educate doctors in West Virginia to think

7    more carefully about their prescribing of opioids?

8    **A.**   That would be correct.

9    **Q.**   And that's something that you've been involved in,

10   correct?

11   **A.**   That would be correct.

12   **Q.**   And, for instance, in the 2012-13 time frame, West

13   Virginia established mandatory training for all prescribers

14   on opioid prescribing; is that right?

15   **A.**   I think we discussed it this morning.

16   **Q.**   And before that time there was no such mandatory

17   training; is that correct?

18   **A.**   That's correct.

19   **Q.**   And I take it over time with more training, more

20   knowledge, better use of the databases that you've discussed

21   earlier today, that doctors in West Virginia in this current

22   time frame are, in fact, writing fewer prescriptions for

23   opioids; is that right?

24   **A.**   That would be correct.  Yes, sir, that would be

25   correct.  And, again, to the context of the training,

1      legislature, Board of Medicine tend to usually do

2      reactionary work, so this was a reaction to the challenge we

3      were facing.

4      **Q.**   So, there has been a significant decline in the levels

5      of opioid prescribing in recent years, correct?

6      **A.**   Yes.

7      **Q.**   Is it correct to say it's roughly a 50% decline in

8      opioid prescribing over the last decade?

9      **A.**   If we speak specifically about West Virginia, I think

10     there has been quite significant decline.  In fact, between

11     2014 and 2019, in my estimate, there was about 52% decline.

12     **Q.**   In the levels of prescribing of opioids?

13     **A.**   Opioid prescribing.

14     **Q.**   Let me ask you to look at another document that you've

15     discussed before but we haven't gotten it into the record

16     yet.

17             MR. HESTER:  May I approach, Your Honor?

18             BY MR. HESTER:

19     **Q.**   Dr. Gupta, I've handed you Defendant's Exhibit 2523.

20     On the front page, it's headed "CDC Guideline For

21     Prescribing Opioids For Chronic Pain, United States, 2016."

22     Dr. Gupta, I take it you've seen this document before?

23     **A.**   Yes, sir.

24     **Q.**   And these are the CDC guidelines that you discussed in

25     your testimony over the last two days, correct?

1    **A.**    That's accurate.

2    **Q.**    And the CDC published these guidelines in March, 2016?

3    **A.**    That's correct.

4    **Q.**    And I -- the way you spoke about them, I assume this is

5    true, but I'll ask you anyway.  I assume you've read these

6    guidelines, correct?

7    **A.**    It's been awhile since my last review, but yes.

8    **Q.**    And these are the guidelines that you referred to in

9    your testimony yesterday when you mentioned the CDC

10   guidelines, correct?

11   **A.**    For chronic pain, 2016, yes.

12   **Q.**    And if you look at Page 2 of these guidelines and, Dr.

13   Gupta, I should explain.  There's a lot of numbers on these

14   documents because we're in litigation here.  But why don't

15   you work off of the printed number that's really the number

16   of the document, the number that the CDC put on it.  So.

17   There's a number 2 there you can see.  We can work off of

18   that, okay?

19        And you can -- let me point you to the right-hand

20   column on Page 2.  The beginning of the first full paragraph

21   that says, "This guideline provides recommendations for the

22   prescribing of opioid pain medication by primary care

23   clinicians for chronic pain, I.e., pain conditions that

24   typically last more than three months."  Do you see that?

25   **A.**    I do.

```
1    Q.   And is that your understanding of what this document
2    was about, that it was to provide guidelines for the
3    prescribing of opioids by primary care clinicians?
4    A.   My understanding was these guidelines were primarily
5    directed at primary care physicians and for chronic pain for
6    opioids, the role of opioids.
7              MR. HESTER:  Your Honor, I move that Defendant's
8    Exhibit 2523 be admitted into evidence.
9              THE COURT:  Is there any objection?
10             MR. FARRELL:  I'm sorry.  Are we talking about --
11             MS. KEARSE:  The CDC guidelines.
12             MR. FARRELL:  No objection.
13             MS. KEARSE:  No objection.
14             THE COURT:  It's admitted.
15                    DEFENSE EXHIBIT 2523 ADMITTED
16             BY MR. HESTER:
17   Q.   Let me ask you to look, Dr. Gupta, at Page 1 of the
18   document.  And I wanted to point you to the left-hand column
19   at the end of the first paragraph under background.  And
20   there's this last phrase that says the CDC refers to the,
21   quote, "lack of consensus among clinicians on how to use
22   opioid pain medication."  Do you see that?
23   A.   I am seeing this as a part of a full sentence.
24   Q.   Yes, yes, yes.  I mean, feel free to look at the whole
25   sentence.  I just wanted to ask you about that phrase.
```

1    **A.**    I read the sentence.

2    **Q.**    Yes.  And when the CDC refers here to a lack of

3    consensus among clinicians on how to use opioid pain

4    medication, when it wrote these guidelines in 2016, that was

5    a correct statement, right?

6    **A.**    A lack of consensus among physicians is very different

7    than the science and data behind the evidence to support use

8    of opioids for chronic pain.  I would have to go back and

9    see their reference because there's one reference here that

10   says in parentheses, too, and I would have to see what type

11   of evidence are they referring to when they make that claim.

12   **Q.**    So, you don't know whether it's true or not when they

13   refer to a lack of consensus among clinicians about how to

14   use --

15   **A.**    So, it's not about black and white, I know or I don't

16   believe it or not.  It is about evidence.  If there is a

17   certain amount of evidence that I can put my weight behind,

18   then I would agree with the statement.  If it's referring to

19   one meaning, then I would have trouble agreeing with that.

20   **Q.**    It refers -- if you look at Footnote 2, it refers to

21   the Palouse article or epidemiological study.  Have you

22   looked at that Palouse article before?

23   **A.**    I haven't recently and I would have to look at that

24   before I can -- because, again, that's a statement based on

25   a reference and I would have to evaluate the reference for

```
1   its legitimacy, credibility, as well as validity and

2   science, before I can agree to that.

3   Q.   Maybe we can back up a little bit.  When the CDC issues

4   a guideline like this, it's issuing the guideline for the

5   medical community to provide its base of knowledge on how it

6   views the situation at a point in time, correct?

7   A.   That would be correct.

8   Q.   So, this --

9            THE COURT:  Mr. Hester, when you get to a stopping

10  point, we need to switch out the court reporters and it

11  would be a good time to take a break.

12           MR. HESTER:  Yes.  I'm happy to stop now, Your

13  Honor, if that's good for you.

14           THE COURT:  Let's be in recess for about ten

15  minutes.

16       (Recess taken)

17  BY MR. HESTER:

18  Q.   Dr. Gupta, right before we broke I was asking you

19  the point that the CDC when it issues a guideline like

20  this is providing its view to the medical community on

21  where the state of knowledge lies; correct?

22  A.   This is how I would characterize it.  Once CDC issues a

23  guideline on any matter, they're using the best possible

24  available science and data to put together it into a

25  recommendation which are voluntary in nature.
```

1    **Q.**   And the purpose of the CDC guidelines is to inform the

2    medical community based on the work that the CDC puts in to

3    develop that insight and guidance?

4    **A.**   Medical community, the public at large because these

5    are public guidelines, they're not secretive guidelines, to

6    the entire nation.

7    **Q.**   And, so, for instance, to reflect that point, if you

8    look at Page 3 of the document, at the top of the right-hand

9    column it says, "The guideline is intended to inform

10   clinicians who are considering prescribing opioid pain

11   medication for painful conditions that have or become

12   chronic."

13        Do you see that?

14   **A.**   I see that.

15   **Q.**   So it reflects the point I think you're making that the

16   CDC develops guidelines like this to provide information to

17   clinicians who are considering the prescribing of opioids;

18   correct?

19   **A.**   That's correct.

20   **Q.**   So when the CDC said at Page 1, going back to where we

21   were before the break, when it says there's a lack of

22   consensus among clinicians on how to use opioid pain

23   medication, that's the CDC's view based on its study and

24   evaluation of the current state of the science; correct?

25   **A.**   Not really, sir.  That's background introduction.  So

64

```
 1    what they're saying is here's what exists in literature
 2    right now.  It would be hard to pin that to CDC because what
 3    they're providing you as a nation is here's where we are
 4    today.  And they are regurgitating whatever they find.  It's
 5    not -- background is not somebody's view particularly.
 6    Q.   Okay.  Let me turn you then -- maybe I can make that
 7    sharper and make the point a little more clearer if we turn
 8    to Page 2.
 9         At the top of the left-hand column there's a sentence
10    that begins -- it's the second or third full sentence on the
11    left-hand column.  It begins, "However, it is hard to
12    estimate the number of persons who could potentially benefit
13    from opioid pain medication long-term."
14         Do you see that?
15    A.   I see that.
16    Q.   And I take it that's the CDC's judgment based on what
17    they've looked at.  They concluded it was hard to estimate
18    the number of persons who could potentially benefit from
19    long-term care?
20    A.   That statement would, if you were to characterize it,
21    would mean that CDC does not have a really good estimate of
22    the -- amongst all the people that are suffering from
23    chronic pain as to in what percentage of people you could or
24    could not have benefit from chronic long-term opioid care.
25    Q.   And they go on to say, "Evidence supports short-term
```

1    efficacy of opioids for reducing pain and improving function

2    in non-cancer, nociceptive, and neuropathic pain in

3    randomized clinical trials lasting primarily less than 12

4    weeks."  Correct?

5    **A.**   That's a statement along with two references.

6    Reference does not intend, in parentheses, to cite the

7    evidence.

8    **Q.**   So there the CDC was concluding that there was evidence

9    of short-term efficacy of opioids for treating chronic

10   non-cancer pain in durations of less than 12 weeks; correct?

11   **A.**   Durations of less than 12 weeks would not be chronic

12   non-cancer pain.  You mentioned chronic non-cancer pain.

13   What they're saying is that -- and I want to read that

14   because it's important.

15       "The efficacy -- short-term efficacy of opioids for

16   reducing pain and improving function in non-cancer,

17   nociceptive, and neuropathic pain."  So they're also saying

18   not all pain, but these two types of pain in randomized

19   clinical trials.  That's less than 12 weeks.

20   **Q.**   And nociceptive means what?

21   **A.**   What it means where actually you have receptors that

22   actually could react to it.  And neuropathic, obviously

23   we've talked about from the nerve involvement and things

24   like that.

25   **Q.**   So those two phrases together, nociceptive and

1    neuropathic pain, that's a broad category of pain; correct?

2    **A.**    Those are two reasons, particular reasons that

3    clinicians might find an opportunity at some level of their

4    management of that patient to prescribe for short-term the

5    pain.  And they go on to state when the opioid should be

6    prescribed.

7    **Q.**    So here the CDC finds that there is evidence to support

8    short-term efficacy of opioids for treatment of these

9    categories of pain in durations of less than 12 weeks;

10   correct?

11   **A.**    They do that.  And the rest of the report, sir, they

12   say it's not first line.  It's -- so that's a, that's a

13   statement and it's weighted as a statement only.  It's not a

14   finding.  It's a statement, a regurgitation of two studies.

15   **Q.**    Based on their review of all of the scientific evidence

16   that was available at the time; correct?

17   **A.**    I would generally say so.  They would have studied it.

18   **Q.**    And then the next sentence goes on to say, "However,

19   few studies have been conducted to rigorously assess the

20   long-term benefits of opioids for chronic pain."  And then

21   in parentheses they say "pain lasting more than three

22   months."

23        Do you see that?

24   **A.**    Yes.

25   **Q.**    So, again, here the CDC was reporting that the state of

1    the knowledge at the time based on its review reflected that

2    there were few studies reflecting in a rigorous way the

3    long-term benefit?

4    **A.**    Yes.

5    **Q.**    And then I put that together with the statement up

6    above where they say, "It's hard to estimate the number of

7    persons who could benefit from opioid medication long-term."

8         So putting those together, the CDC was saying there's

9    just not enough science yet to decide what the answer is for

10   long-term pain treatment with opioids; correct?

11   **A.**    This is the way I would characterize it.  What they

12   were saying is that the data on long-term benefits of opioid

13   use is there, but it is not entirely sufficient.  And,

14   therefore, these guidelines and that gap would help

15   providers fill that gap in terms of recommendations.

16   **Q.**    So the CDC was saying there is some data suggesting

17   benefits for long-term pain but it's not clear enough?

18   **A.**    They're not really saying that in that statement.

19   **Q.**    But it -- okay.  I'll get to it another way.  I think

20   we can get to this point another way.

21        When -- let me point you to Page 2 again, the

22   right-hand column toward the bottom just before "rationale,"

23   Dr. Gupta.

24        You see there's a sentence -- it's the third sentence I

25   think from the bottom of that paragraph before "rationale."

1    It begins, "Clinical decision-making should be based on a

2    relationship between the clinician and patient, and an

3    understanding of the patient's clinical situation,

4    functioning, and life context."

5         Do you see that?

6    A.   Yes.

7    Q.   And here the CDC was saying ultimately the decision on

8    using opioids for chronic pain treatment should be entrusted

9    to the decision of a doctor acting in concert with the

10   patient; correct?

11   A.   That's broadly correct.

12   Q.   And they go on at the end of that paragraph to say,

13   "Clinicians should consider the circumstances and unique

14   needs of each patient when providing care."

15        Do you see that?

16   A.   I do see that.

17   Q.   So the point the CDC was making there is that judgments

18   about whether or not to prescribe opioids for individual

19   patients should be made by the individual doctor taking

20   account of all of the patient circumstances; correct?

21   A.   What they were trying to say was these guidelines are

22   voluntary to help physicians make better, more informed

23   decisions while they're managing their individual patients

24   in a doctor/patient, physician/patient relationship.

25   Q.   And another way to put that might be the decision

1    ultimately had to be the doctor in consultation with the

2    patient on whether or not to use opioids for chronic --

3    **A.**   That's --

4    **Q.**   -- pain?

5    **A.**   That's true.  The decision -- it has to be informed by

6    the best available science and, and it cannot be exclusively

7    by the doctor and the patient without any knowledge of the

8    current science and recommendation that exists nationally.

9    **Q.**   And that was the purpose for which they issued these

10   guidelines; correct?

11   **A.**   Yes, sir.

12   **Q.**   And then if, if we go to Page 17 of the document --

13   **A.**   Yes, sir.

14   **Q.**   -- and I think we're on the same page here, Dr. Gupta,

15   but I just wanted to make sure.  There's a heading at the

16   right -- at the left-hand side that says "Determining When

17   to Initiate or Continue Opioids for Chronic Pain."

18       Do you see that heading?

19   **A.**   I do.

20   **Q.**   And, so, here the CDC in these guidelines was not

21   apprising clinicians that they should not use opioids for

22   chronic pain; correct?

23   **A.**   That would be a reasonable conclusion.

24   **Q.**   The CDC, in fact, was contemplating that clinicians

25   armed with this evidence could decide properly to initiate

```
 1    opioid treatment for chronic long-term non-cancer pain;

 2    correct?

 3    A.   The CDC was saying that there are several

 4    non-pharmacological options as well as non-opioid

 5    pharmacological options available at the behest of the

 6    doctor prior to jumping to opioids for the use of chronic

 7    pain.  And that's kind of what the message here is.  But not

 8    to say that they should not use it.

 9    Q.   Shouldn't -- yeah, that's -- I understand that the CDC

10    was giving guidance to clinicians that they should think

11    about other options too for the treatment of chronic

12    non-cancer pain; correct?

13    A.   Correct.

14    Q.   But the CDC was contemplating that it was appropriate

15    for clinicians armed with sufficient knowledge and

16    information to prescribe prescription opioids for chronic

17    non-cancer pain; correct?

18    A.   The CDC was saying that in certain positions, it is

19    appropriate with certain factors to -- for utilizing opioid

20    therapy for chronic pain.

21    Q.   And that judgment would be left to the doctors armed

22    with knowledge the CDC was providing and in consultation

23    with their patients; correct?

24    A.   That judgment would -- physicians with these specific

25    tools and information and science that the CDC was providing
```

1   to, to be able to provide the best, most current care to

2   their patient.

3   **Q.**   And the CDC guidelines did not suggest any limits on

4   using opioids for the treatment of acute pain; correct?

5   **A.**   These guidelines were not intended to focus on acute

6   pain.

7   **Q.**   And the CDC has never issued guidelines trying to limit

8   or add to the base of knowledge around the treatment of

9   acute pain with prescription opioids; correct?

10  **A.**   There's been a lot of discussions.  To my knowledge, no

11  such guidelines have been forthcoming.

12  **Q.**   And, so, to date, the CDC has not issued any guidance

13  to clinicians to suggest restricting the use of prescription

14  opioids for treating acute pain; correct?

15  **A.**   I'm not aware of any.

16  **Q.**   And when we speak about acute pain, we're speaking

17  generally of pain that lasts three months or less; correct?

18  **A.**   When we're speaking of acute pain in the duration

19  aspect, you might -- you're correct.  But also in an

20  individual specific person aspect, we're talking about when

21  you have broken bones, when you have operations and surgery.

22       So there are circumstances which you need it for --

23  certainly you need it, but definitely you need it for much,

24  much, much less than three months.

25  **Q.**   And -- but just to make sure we're communicating with

1    each other, Dr. Gupta, the CDC has never issued a statement

2    saying you should not use prescription opioids as a first

3    line of treatment for acute pain?

4    A.    I'm not aware of any such statements.

5    Q.    It's also correct, Dr. Gupta, that the CDC did not say

6    in these guidelines that prescription opioids should never

7    be used during pregnancy; correct?  I can point you to a

8    page so you don't have to guess.

9    A.    Please point me to the page.

10   Q.    Let's go to Page 26.  This, this stood out at me, Dr.

11   Gupta, because of the discussion yesterday around NAS

12   babies.  And I wanted to ask you about the discussion.  It's

13   at the bottom of the right-hand column on pregnant women.

14   Do you see that?

15   A.    I see that.

16   Q.    And there's a sentence -- it's the third sentence down

17   under that heading where the CDC says, "Importantly, in some

18   cases, opioid use during pregnancy leads to neonatal opioid

19   withdrawal syndrome."

20         Do you see that?

21   A.    I see that.

22   Q.    And that's what you were discussing yesterday, this

23   problem of withdrawal symptoms for a child or a baby that's

24   exposed in utero to opioids; correct?

25   A.    Yes.  We were discussing the, the additional risks to a

1    pregnant mother in addition to an average non-pregnant

2    individual of which -- one of which was NAS.

3    **Q.**   But here in the next sentence the CDC recognizes that

4    clinicians and patients together could decide to initiate

5    opioid therapy for chronic pain during pregnancy; correct?

6    **A.**   That's correct.

7    **Q.**   So the CDC here was saying you need to weigh risks and

8    benefits in initiating opioid therapy for chronic pain even

9    during the time a woman is pregnant; correct?

10   **A.**   The CDC is saying that there may be extraordinary

11   circumstances in which chronic opioid therapy might be

12   needed in pregnancy.  However, it is even a higher risk than

13   an average person.  You should really have a discussion and

14   understand the science behind it before you do that.

15   **Q.**   And the point I wanted to make is, and it's notable,

16   the CDC did not issue a recommendation saying you should

17   never use opioids while a woman is pregnant?

18   **A.**   That's correct.

19   **Q.**   And, again, the CDC was leaving the judgment of whether

20   to use opioids to the decision made jointly by a doctor in

21   consultation with the patient; correct?

22   **A.**   Correct, in the context of providing all the cautions

23   and evidence and knowledge that they could to the

24   clinicians.

25   **Q.**   And that was what the CDC was trying to do here was to

```
1    flag this issue around the risks of NAS that could be

2    associated with using opioids during pregnancy?

3    A.   Yes, amongst other poor outcomes of pregnancy as well.

4    Q.   Dr. Gupta, let me ask you to look at a document that I

5    think you'll recognize.

6         Dr. Gupta, I've handed you Defendant's Exhibit 2556.

7    It's headed "State of West Virginia Board of Medicine Policy

8    on Chronic Use of Opioid Analgesics."

9         I take it you've seen this document before?

10   A.   Yes.

11   Q.   And it bears your signature; correct?

12   A.   It does.

13   Q.   And you were involved in developing this policy on the

14   chronic use of opioid analgesics?

15   A.   I was the Secretary of the Board of Medicine as part of

16   my role as the Commissioner of the Bureau of Public Health.

17   Q.   And, so, as part of that function, you were involved in

18   evaluating whether this made sense as a policy statement for

19   the State of West Virginia?

20   A.   Yes.

21   Q.   And the policy statement was intended to apprise

22   doctors and others involved in prescribing opioids on

23   standards which apply to the use of opioids in the State of

24   West Virginia?

25   A.   It was -- yes, it was Board of Medicine's role that we
```

```
1     were trying to address this.

2              MR. HESTER:  Your Honor, I would move Defendant's

3     Exhibit 2556 into evidence.

4              THE COURT:  Is there any objection?

5              MS. KEARSE:  No objection, Your Honor.

6              THE COURT:  It's admitted.

7     BY MR. HESTER:

8     Q.   And just to make it totally clear, this was adopted

9     on September 11, 2017; correct, Dr. Gupta?

10    A.   Yes.

11    Q.   And is this the most recent statement that's been

12    issued by the Board of Medicine concerning opioid

13    prescribing for chronic pain?

14    A.   I would not be able to attest to this.  I've been out

15    of the system since November of 2018.

16    Q.   You're not aware of any other guidelines that have been

17    issued?

18    A.   There may be some during the COVID period as part of

19    that, but I'm generally not aware of any other guidelines.

20    Q.   And these guidelines apply only to the use of opioids

21    for treating chronic non-cancer pain; is that correct?

22    A.   Let me remind myself.

23         (Pause)

24         Yes.

25    Q.   And the guidelines were intended to provide guidance to
```

1    the doctors of West Virginia and others who prescribe

2    opioids on the standards they should follow when using

3    prescription opioids to treat chronic non-cancer pain; is

4    that correct?

5    **A.**    That would be correct.

6    **Q.**    And the guidelines do not preclude the use of opioids

7    for long-term treatment of chronic non-cancer pain; correct?

8    **A.**    Correct.

9    **Q.**    And the guidelines recognize that doctors can properly

10   make the decision to institute or commence opioid treatment

11   for chronic non-cancer pain if they follow the procedures

12   outlined in the guidelines; correct?

13   **A.**    When it's appropriate, the doctors can do that, yes.

14   **Q.**    And let me point you in particular to Page 8 of the

15   document.  And, again, we can use the numbers on the, on the

16   document itself, not the production numbers.

17        And I wanted to point you, Dr. Gupta, in particular to

18   the first sentence under "Informed Consent and Treatment

19   Agreement."

20        And it reads, "The decision to initiate chronic opioid

21   therapy is a shared decision between the clinician and the

22   patient."

23        Do you see that?

24   **A.**    Yes.

25   **Q.**    And, so, again, here it reflects advice from the Board

77

1    of Medicine that doctors should make the decision about

2    whether to prescribe opioids for chronic non-cancer pain in

3    consultation with the patient; correct?

4    **A.**    The statement reflects a shared decision between the

5    clinician and the patient.

6    **Q.**    And it reflects that the judgment ultimately about

7    whether to prescribe an opioid for any given patient should

8    be made as a consequence of that shared decision between

9    doctor and patient; correct?

10   **A.**    It's a shared decision, that's correct.

11   **Q.**    Let me point you to Page 2 of the document, Dr. Gupta.

12        There's -- it's in the second paragraph on that page.

13   There's a phrase -- and I'm going to read a phrase, but we

14   can look at the whole sentence if you want to, but I want to

15   focus on a phrase.  It's the last phrase of that middle

16   paragraph.

17        It says, "The guidelines recognize the responsibility

18   of clinicians to view pain management as essential to

19   quality of medical practice and to the quality of life for

20   patients who suffer from pain."

21        Do you see that?

22   **A.**    I see that.

23   **Q.**    So here the Board of Medicine is giving guidance to

24   doctors and other prescribers in the State of West Virginia

25   that they should view pain management as essential to the

1    quality of medical practice; correct?

2    **A.**    The guidelines are saying -- and I'll just repeat the

3    beginning of it because it's very important in the context

4    of the sentence that these guidelines do not encourage the

5    prescribing of opioids over other pharmacological and

6    non-pharmacological means of treatment but, rather, the

7    guidelines recognize the responsibility of clinicians to

8    view pain management as essential to quality of their

9    practice and the quality of life for patients who suffer

10    from pain.

11    **Q.**    So -- right.  Okay.  Thank you.  So, in other words,

12    the point is the guidelines were not espousing that one form

13    of pain treatment should be favored over another, but they

14    were highlighting that pain treatment is essential to the

15    practice of medicine; correct?

16    **A.**    I would alter that a little bit.  What the guidelines

17    are espousing is one form of treatment should be favored

18    over the other which is non-pharmacological and

19    pharmacological non-opioid treatment should be favored over

20    opioid treatment.  Yet, the importance of managing and

21    addressing pain in a patient is also important.

22    **Q.**    The guidelines also recognize that, in fact, doctors

23    armed with the proper knowledge could, in fact, properly

24    decide to initiate opioid treatment for chronic non-cancer

25    pain; correct?

1    **A.**   The guidelines acknowledge that opioids are one of the

2    arrows in the quiver that should be taken out but not the

3    first arrow that should be taken out.

4    **Q.**   And -- let's follow your metaphor.  That's the first

5    time -- when these guidelines were issued in 2017 it's

6    correct that this is the first time there was a statement by

7    the Board of Medicine that prescription opioids should not

8    be the first arrow in the quiver?

9    **A.**   To my knowledge.  My tenure was between 2015 and 2018

10   on the Board.  And I, I -- to my knowledge and recollection,

11   that was the first time following CDC guidelines that these

12   guidelines were issued.

13   **Q.**   So these guidelines were really a follow-on or were

14   inspired by the CDC guidelines that we've already looked at;

15   correct?

16   **A.**   Yes.

17   **Q.**   The guidelines also make it clear that they're not

18   intended for the treatment of acute pain, management of pain

19   in the perioperative setting, emergency care, cancer related

20   pain or palliative care, end of life care; correct?

21   **A.**   If you could point me to the page.

22   **Q.**   Sorry, my apologies.  It was the next paragraph down.

23   I had meant to point you there, Dr. Gupta.  I forgot.

24   **A.**   That's what it says, yes.

25   **Q.**   So, in other words, the guidelines that were issued by

1    the Board of Medicine in 2017 only focused on using

2    prescription opioids for chronic non-cancer pain treatment;

3    correct?

4    **A.**   Correct, because that's where the most volume of the

5    prescriptions were coming from.

6    **Q.**   The, the guidelines were not intended to affect the

7    decisions that doctors were making in other settings in

8    using prescription opioids; correct?

9    **A.**   The guidelines were intended generally to inform the

10   decisions the doctors were making over all the context of

11   opioids, but they were not specific to acute pain and other

12   settings as you've highlighted.

13   **Q.**   And, and, so, the Board of Medicine has never issued

14   guidelines to doctors in West Virginia suggesting any limits

15   on the use of prescription opioids for the treatment of pain

16   in settings outside chronic non-cancer pain; correct?

17   **A.**   The Senate Bill 273 which the Board of Medicine of West

18   Virginia and all the prescribing, boards of prescribers are

19   required to follow the state law.  So that term -- I would

20   say that to the extent that the Senate Bill 273 requires

21   that certain prescription narrowing of that, that, that has

22   happened.  But beyond that, the Board of Medicine has not,

23   in my knowledge and memory, has issued any such other

24   guidelines.

25   **Q.**   So there was not an intention through these guidelines

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    to alter doctors' practices in relation to the use of pain

 2    outside chronic non-cancer pain; correct?

 3  A.    That would be accurate.

 4  Q.    Let me ask you to look at -- do you have the exhibit

 5    from your direct examination up there, Dr. Gupta?

 6  A.    Yes.

 7  Q.    So I wanted to have you look back at Plaintiffs'

 8    Exhibit 44223.

 9  A.    I have it.

10  Q.    And this is the January, 2018, Opioid Response Plan

11    that you commissioned; correct?

12  A.    Correct.

13  Q.    And I'd like to review some passages from this document

14    which you didn't have a chance to discuss yesterday with

15    Ms. Kearse.

16        Let me ask you to look at Page 4, Dr. Gupta.

17  A.    I'm here.

18  Q.    And it states -- and I wanted to point you to the

19    middle of the, middle of the paragraph under "Background."

20    I'm trying to find it.  Okay.

21        The second sentence begins, "Initially, the overdose

22    death increases were driven by pharmaceuticals, first

23    methadone, which was prescribed for pain, and then

24    oxycodone, hydrocodone, and oxymorphone."

25        Do you see that?
```

```
 1   A.   Yes, I do.

 2   Q.   And then if you go two sentences down, it says, "In

 3   2012 just as prescriptions for opioids were beginning to

 4   decline, a major shift from pharmaceuticals to illicit drugs

 5   began."

 6        Do you see that?

 7   A.   I see that.

 8   Q.   That's a true statement; correct?

 9   A.   That's a true statement in the context of the other

10   statements that are also listed there.

11   Q.   And then the, the next sentence reads, "The shift began

12   with heroin in 2012 and then shifted to fentanyl and

13   fentanyl analogues alone or in combination starting in

14   2014."

15        Do you see that?

16   A.   I see that.

17   Q.   And that's a true statement; correct?

18   A.   That would be accurate.

19   Q.   And the reference there to fentanyl and fentanyl

20   analogues are two illicit analogues that were being used by

21   drug dealers; correct?

22   A.   The reference for both heroin, fentanyl, and fentanyl

23   analogues alone or in combination is for non-prescriber

24   drugs.

25   Q.   Or what we might call illicit drugs or illegal drugs?
```

1   **A.**    Drugs that were not prescribed.

2   **Q.**    I was just trying to make sure we were on the right

3   phraseology.  These are illicit fentanyl or fentanyl

4   analogues; correct?

5   **A.**    Yes.

6   **Q.**    And I guess we can see that -- I could have answered

7   may own question with the next sentence.  "The fentanyl

8   driving the unprecedented increase in deaths is illicitly

9   sourced and generally not of pharmaceutical origin."

10          Do you see that?

11   **A.**    Yes, I see that.

12   **Q.**    And that's the point you just made; correct?  These

13   were, these were illicitly sourced fentanyl derivations;

14   correct?

15   **A.**    That's exactly why I said non-prescriber drugs there,

16   yeah.  That was my point.

17   **Q.**    And, so, that's a true statement, that the fentanyl

18   driving the unprecedented increases in deaths was illicitly

19   sourced; correct?

20   **A.**    Yes, that's a true statement in the context of most of

21   the time when people die from fentanyl, which is, I'm sure

22   the Court has heard, much more potent, is in combination

23   with heroin.  It's not the heroin but the fentanyl that

24   kills them.  That's my point.

25   **Q.**    And the point you're making there, Dr. Gupta, is that

84

```
1    drug dealers often will spike or adulterate heroin with
2    fentanyl; correct?
3    A.    Yeah, they call it on the street cut, cut the heroin
4    with fentanyl.  So they could, they could be less -- it
5    could be cheaper to them.  They can make more money off of
6    it.
7    Q.    Cheaper because the fentanyl is cheaper than the
8    heroin.  And, so, if they adulterate the heroin with
9    fentanyl, it's cheaper for the drug dealer?
10   A.    So the fentanyl is a lot more potent, so you have to
11   use much more smaller amounts and you have to use heroin in
12   it.  So if you cut it with fentanyl, you can save a lot of
13   cost of heroin.  So that's exactly right.
14   Q.    And the, and the fentanyl is, is typically -- the
15   illicit fentanyl in the country now is typically sourced out
16   of China and illegally smuggled to the U.S.  Is that your
17   understanding?
18   A.    My understanding is there are foreign nations that are
19   responsible for, for fentanyl in this country.
20   Q.    And then, and then often times users may not even be
21   aware that a drug dealer has cut or adulterated the heroin
22   with fentanyl.  The drug dealer might be doing that to save
23   cost without even telling the user.  Correct?
24   A.    That's the tragedy of all of those deaths as well.
25   Q.    Let me ask you to turn to Page 7 of the document.  I
```

1    wanted to point you toward the bottom of that page under

2    "Data and Evidence."

3    **A.**    Okay.

4    **Q.**    There's a first sentence that reads, "A critical factor

5    fueling the national opioid epidemic is the rapid rise in

6    opioid prescriptions for pain."

7         Do you see that?

8    **A.**    Yes.

9    **Q.**    And that's a true statement; correct?

10   **A.**    Correct.

11   **Q.**    And those are the decisions on opioid prescriptions

12   that we've discussed before that were being made by doctors;

13   correct?

14   **A.**    The meaning of the statement is the total volume in

15   communities resulting from these prescriptions is resulting

16   in a lot of spreading or diversion of that, those

17   prescriptions and pills across populations that did not

18   intend to take those medications or they were not prescribed

19   for.  So that's the meaning of that.

20   **Q.**    But the, but the first point is when it refers here to

21   prescriptions, these are prescriptions being written by

22   doctors; correct?

23   **A.**    That, that would be the -- these, these pills that are

24   out there legitimately or illegitimately are coming out of

25   pharmacies from prescriptions that are coming out of offices

1    of prescribers.

2    Q.    And then I think this is the point you were just

3    making, Dr. Gupta.  Let's look at the top of Page 8.  It

4    says, "Excessive prescribing can lead to substance use

5    disorders directly, as the risk of developing such a

6    disorder increases with higher doses for longer durations,

7    or indirectly, as extra pills are provided to or stolen by

8    others."

9         I think that's the point you were just making; correct?

10   A.    Yes, that's exactly the point I was making.

11   Q.    And, so, let's, let's break that down into two halves.

12        First, it refers to excessive prescribing that leads to

13   substance use disorders directly.  That's somebody taking

14   pills under a doctor's instruction who over time develop a

15   substance use disorder because they've taken it for too long

16   or in too high a dose; correct?

17   A.    So the prescribing of this could happen because of good

18   doctors and bad doctors.  And when bad doctors keep

19   prescribing high doses for a long time to people

20   unnecessarily, for that first part of the discussion,

21   substance use disorder can develop in those people as well.

22   Q.    And there can also be circumstances where a good doctor

23   is trying to make good decisions but mistakenly leads

24   somebody into a substance use disorder because they've given

25   them too high a dose for too long; correct?

1    **A.**   That would be much rarer as opposed to a pill mill

2    situation where a lot of bad doctors can produce a lot of

3    prescriptions in a short amount of time.  And that could

4    overflow in volume to a lot of people, including their

5    patients.  And they could -- all of them could end up

6    becoming -- suffering from substance use disorder.

7    **Q.**   When, when you use this phrase "directly" here, you

8    mean people who are getting prescription opioids via a

9    prescription and using them, they're prescribed pills,

10   correct, whether by a legitimate doctor or a bad doctor?

11   **A.**   Correct.

12   **Q.**   Then "indirectly." I want to take the second half of

13   the reference here.  You refer to "indirectly."  And it --

14   again, to put it in context, excessive prescribing leads

15   indirectly to problems as extra pills are provided to or

16   stolen by others.

17        And the point you're making there is the doctor might

18   have a legitimate reason to prescribe a certain number of

19   pills, but prescribes many more, gives too many pills and

20   they end up in the medicine cabinet and get stolen or sold

21   or borrowed by somebody else.  Correct?

22   **A.**   Yeah.  I can explain this really because I've lived

23   this.

24        So you could have good doctors.  You could have bad

25   doctors.  The good doctors could prescribe adequate

1    prescriptions or more than adequate prescriptions.

2         And in a good doctor case, which is less common, but if

3    you prescribe for a tooth pull 30 days worth of opioids at a

4    dentist, then those -- 29 days of that opioid is going to

5    sit in your closet.  And your kids are going to get their

6    hands on it or somebody else is going to get their hands on

7    it.

8         The bad doctors are writing regularly and habitually a

9    large amount of prescriptions regardless of condition.  And

10   those are primarily going to -- for people who don't need

11   them and were not prescribed.

12   **Q.**   But either way, they're coming from a doctor, either a

13   good doctor who's writing a prescription and including too

14   many pills in that prescription or a bad doctor who's

15   willy-nilly sending out pills by prescription; right?

16   **A.**   That's correct.

17   **Q.**   And, so, let's focus on the good doctor.  So the good

18   doctor who extracts -- well, I guess it's not going to be a

19   doctor.  A dentist who extracts a tooth or a good doctor who

20   treats somebody who's got an ankle sprain and they give 30

21   days of pills when two days were necessary, those were

22   judgments being made by the doctors, correct, about how many

23   pills were warranted?

24   **A.**   So the good doctor who writes a thirty-day prescription

25   to a high school football injury, a kid for 30 days who

1    didn't need it is someone who's writing that, that decision

2    is being made in context with the doctor and the patient

3    together.

4         However, it's influenced by a lot of other factors like

5    ultimately the judgment and decision is made by the doctor,

6    but the influence of that goes beyond just the physician,

7    just -- or just the prescriber.

8    **Q.**   But the point I wanted to make is there, there was a

9    standard clinical practice for a number of years in West

10   Virginia and elsewhere to write prescriptions with too many

11   days of pills; correct?

12   **A.**   I don't know if it was standard practice but, yes, the

13   culture was of -- typically would be that if you got a, you

14   know, a kid got a football injury or a tooth pulled, you

15   would easily write several more days of prescriptions than

16   you would require or evidence would suggest that you would

17   need.

18   **Q.**   And, so, -- and, and that's the point made here in this

19   document, extra pills.  When you refer there to "extra,"

20   you're talking about pills that weren't needed to treat the

21   pain for which they were prescribed; right?

22   **A.**   So, so any pills that are used for any purpose other

23   than specifically for reasons are all illegitimate pills.

24   And that's part of the diversion.

25   **Q.**   But you could have a good doctor who writes a perfectly

```
 1    legitimate prescription for a knee sprain, but writes for

 2    too many days; correct?

 3    A.    Correct.  And all of those extra days are illegitimate

 4    prescriptions and illegitimate dose and leads to diversion.

 5    Q.    Yeah.  Maybe it's just this word "legitimate" or

 6    "illegitimate," but it's a, it's a medical judgment that's

 7    appropriate.  The doctor might appropriately decide somebody

 8    needed some pain pills for a knee sprain, but the doctor

 9    gave too many days in that prescription; correct?

10    A.    Yeah.  It's, it's, it is possible.  It's probable for a

11    good doctor to make a good sound judgment for the need of

12    opioids, but make a mistake on the duration of the need of

13    opioids.

14         So instead of three days, you write for 30 days, that's

15    a problem.  And not everybody who does that is necessarily a

16    bad doctor or bad prescriber.  That's what was happening.

17    Q.    That was a common mistake in the medical profession;

18    correct?

19    A.    It was.  It was a behavior.  It was a culture.

20    Q.    It was a culture of writing too many days of pills for

21    a given need; correct?

22    A.    A culture of attempting to reduce pain from a scale of

23    whatever to zero for every American, every West Virginian

24    that they could possibly do.

25    Q.    But I'm focusing particularly on this point about the
```

1    culture of writing more days than was needed.  If the kid

2    has a high school knee sprain, the kid's not going to need

3    30 days of pills, but the doctors were often writing 30 days

4    of pills; correct?

5    **A.**   So, Mr. Hester, you have to look for the intent behind

6    that.  What's the intent of a good physician?  Physicians

7    don't go through medical school, residency, Board of

8    Medicine, license to hurt their patients.

9        So the intent here was because the belief was you have

10   to bring the patient down from whatever level to zero.  So

11   intent was good for good doctors.  Yet, because of that

12   intent, they perhaps wrote for longer than they should have

13   written for.

14   **Q.**   And now what we ended up with is a whole series of

15   these.  We take all those prescriptions that were written by

16   all these doctors that were for too many days, and what we

17   end up with in the aggregate is a lot of pills that are in

18   medicine cabinets or drawers of people's homes and they end

19   up then out in the community; correct?

20   **A.**   So all of these prescriptions -- and, and I go back to

21   the pill mills and bad doctors because that's where the

22   volume is.  It's going on and they were all going to the

23   pharmacy and they were all being brought in and they were

24   dispensed and that's exactly where they end up as you

25   stated.

1    **Q.**   Let me ask you to look just a little further down on

2    this same page.  It's in "Discussion and Recommendations."

3        And there you say in the first sentence, "The most

4    promising approaches to opioid prescribing combine education

5    and tools for all prescribers with an enhanced enforcement

6    for the relatively few prescribers who are violating

7    standards of care."

8        Do you see that?

9    **A.**   I do.

10    **Q.**   And I think this is exactly what we were talking about,

11    Dr. Gupta, but let me just confirm it.

12        When you talk about a promising approach to address

13    opioid prescribing is education and tools for all

14    prescribers, that was to address the problem of the good

15    doctor who was writing for too many days; correct?

16    **A.**   Correct, and, and also make sure that the bad doctors

17    were understanding that these tools and other things were

18    available as well.

19    **Q.**   Exactly.  So for all doctors, the point was educate

20    them more that if you've got a kid with a high school knee

21    injury, don't send him home with 30 days of pills.  Send him

22    home with a fewer number of days of pills.  Correct?

23    **A.**   We believe if we can help educate doctors and other

24    prescribers and provide those tools, especially in terms of

25    the best knowledge in opioid prescribing, it would help make

1    a dent in the entire volume problem.

2        And then we'd be left with the bad doctors and we would

3    have to obviously -- the second statement, part of the

4    statement says "enhance enforcement."  It would help us get

5    better control over the bad doctors.

6    **Q.**   But let's keep focusing on the good doctors.  I haven't

7    asked you about the bad doctors.  But on the good doctors,

8    you've actually seen this play out, haven't you, that this

9    thinking that you have has led to a significant reduction in

10   opioid prescribing levels in West Virginia because doctors

11   become better educated.  Correct?

12   **A.**   I would say amongst a number of other factors.

13   Clearly, the education, the tools have been helpful in

14   reducing and changing the culture of, of writing large

15   prescriptions, high dose for long periods.

16   **Q.**   Let's talk about the second half.  There's a reference

17   to enhanced enforcement for the relatively few prescribers

18   who are violating standards of care.  Do you see that?

19   **A.**   Yes.

20   **Q.**   So when you say there are relatively few prescribers

21   who are violating the standards of care, your point is most

22   prescribers thought they were doing the right thing with the

23   standard of care at the time and there were relatively few

24   who weren't?

25   **A.**   Yeah.  There were more prescribers trying to do the

1    right thing than those who weren't, meaning in West Virginia

2    there were more good doctors than bad doctors at any one

3    point in time.

4    **Q.**   Most of the doctors thought they were doing the right

5    thing.  As you said, they were sending somebody home trying

6    to treat their pain.  They thought they were doing the right

7    thing, but they were giving too many pills.

8    **A.**   Their intent was to help their patient because that was

9    the culture.  That was the education.  That was the

10   influence.  That was their understanding.

11   **Q.**   And, and you and others in the State of West Virginia

12   have worked on changing that culture of prescribing behavior

13   to tighten it up; correct?

14   **A.**   We have tried to do our best.

15   **Q.**   But -- again, at the end of the day, you ultimately

16   have to rely on the good judgment and thoughtful approach of

17   individual doctors to get prescribing under control;

18   correct?

19   **A.**   Yes, but there's a number of factors that influences

20   that judgment.

21        One of those things we did in Bureau of Public Health

22   was we began something called counter-detailing.  This is,

23   this is our folks going to doctors' officers and providing

24   them this education and tools, knowing there was already

25   detailing happening that was telling them the other way

1    around for years.

2         So one of the things we would do is academic detailing.

3    So instead of pharmaceutical detailing, we were doing

4    academic detailing.  That's actually a term.  And we were

5    doing that because this was part of the education, as we

6    discussed, to get those doctors to understand the science,

7    the evidence.  It was a tool they need to be able to more

8    judiciously prescribe opioids.

9    **Q.**   That was a statewide program you ran?

10   **A.**   Yes.

11   **Q.**   And did it help?

12   **A.**   We believed so.

13   **Q.**   And the way it helped was doctors then had more

14   knowledge about imposing reasonable limits on how many days

15   of prescriptions they would write?

16   **A.**   We were sharing the best practices, science that was

17   available with doctors attempting to get them to take the

18   best possible care of their patients with, within safety and

19   efficacy, safety from opioids and understanding addiction

20   but, at the same time, understanding that here are all these

21   non-pharmaceutical options.  Here are all the pharmaceutical

22   non-opioid options.  And then you think about opioids.

23   **Q.**   And then going back to the relatively few, the other

24   side of the coin, the relatively few prescribers who were

25   violating the standards of care, it's only been a handful of

1    really bad doctors in this state who drove a lot of volume;

2    correct?

3    **A.**    There have been shut-downs of these pain pills, but

4    they had a tremendous lot of volume that was going through.

5    And those shut-downs, as I've stated before, has led to a

6    lot of that transition of people from pills to heroin.

7    **Q.**    I wanted to ask you just about the shut-downs, though.

8    How many were shut down?

9    **A.**    I don't have an exact number.  I do know that there

10   have been several.

11        But one other important thing also I want to mention is

12   because we're a border state, we're not a state by itself,

13   we have other states.  And when those shut-downs happened,

14   the people that live in West Virginia, it affects people

15   because some of our people have been not only within state

16   but they were going out-of-state to get these.  So the

17   shut-down affects not just the ones in West Virginia but

18   also in contiguous states.

19   **Q.**    So it needs to be a multi-state process to deal with

20   issues of the opioid crisis?

21   **A.**    It is certainly a national crisis, as we discussed.

22   West Virginia is at ground zero.

23   **Q.**    The -- you said it's -- you're only aware of a handful

24   of doctors who are violating the standards of care?

25   **A.**    I don't have exact numbers, but what I would say to you

```
 1    is, is there's a faction of doctors who we disciplined at

 2    the Board of Medicine.  There's another set of doctors

 3    who -- and businesses with pill mills were shut down

 4    legally.

 5         And when that information comes to our knowledge, both

 6    at the Board of Pharmacy as well as the Board of Medicine,

 7    we do take action.

 8    Q.   And, and can you think of any in recent years or is

 9    this back more in time?

10    A.   I don't have any in recent years to speak of.

11    Q.   Most of what you're talking about with shutting down

12    doctors was back a number of years; correct?

13    A.   During my tenure is when I'm talking about.

14    Q.   All right.  Let me ask you, Dr. Gupta, to look at

15    Plaintiffs' Exhibit 41913.  This was the White Paper, the

16    Need for Harm Reduction Programs in West Virginia.  Do you

17    have that one?

18    A.   Yes, sir.

19    Q.   I, I have just a few simple questions on this.  You'll

20    recall discussing this document yesterday with Ms. Kearse?

21    A.   Yes.

22    Q.   And this Harm Reduction Program is one that's focused

23    on persons who inject drugs; right?

24    A.   Yes.

25    Q.   And, so, I wanted to make sure we knew where, where the
```

1    focus is for a program like this on harm reduction.

2        So it's -- this is exclusively dealing with people who

3    inject drugs?

4    **A.**   Yes.

5    **Q.**   And, so, that would include heroin users or people who

6    are abusing prescription opioids by crushing them and

7    injecting them?

8    **A.**   Yes, or, or meth or other substances.  The idea here of

9    a Harm Reduction Program is to, you know, set up several

10   strategies that I mentioned yesterday.

11       One of those were to provide people clean, free

12   syringes so they are not at risk of spreading infectious

13   diseases.

14       Another one is to make sure they screen for hepatitis

15   and HIV.  Another one is to give them immunizations, the

16   shots, so they don't develop disease.  Another one is family

17   planning.  And another important one is make sure that

18   people are connected to help to get treatment.

19   **Q.**   But, but in particular, I wanted to say that in

20   relation to anybody who's using prescription opioids, these

21   would be people misusing prescription opioids who would be

22   covered by this program; correct?

23   **A.**   In the context of what we discussed, these are the

24   people who were illegitimately using prescriptions or using

25   non-prescribed medications.

99

1    **Q.**   Because they would be -- for instance, with a

2    prescription opioid, they would be crushing or otherwise

3    turning it into a powder that they could then inject;

4    correct?

5    **A.**   Yes, sir.  And that would be illegitimate use of

6    prescription pills.

7    **Q.**   Let me ask you to look at your 2016 Overdose Fatality

8    Analysis.  It's Plaintiffs' Exhibit 44211.  Do you have that

9    one in your stack?

10   **A.**   Yes, I do.

11   **Q.**   Let me ask you to look at Page 8, please.

12   **A.**   I'm here.

13   **Q.**   And there's a sentence -- you may have talked about

14   this yesterday.  I'm not sure.  But there's a sentence that

15   says -- under "Overdose Trends in West Virginia" about four

16   sentences down, it says, "Approximately 705 (85 percent) of

17   the overdose deaths that occurred in West Virginia were

18   opioid related."

19        Do you see that?

20   **A.**   I see that.

21   **Q.**   And I just wanted to clarify as a matter of

22   phraseology, when you refer in this paper to opioids, you're

23   talking about heroin, illicit fentanyl, prescription opioids

24   that are being misused.  That's all within this opioid

25   phraseology.  Correct?

1    **A.**   Correct.

2    **Q.**   If you could look at the next page, Page 9.  And,

3    again, I think this is, this is easy given what we've

4    discussed, but I just wanted to make it clear.

5         There's a paragraph that begins, "Since 2014 the

6    percent of overdose deaths in West Virginia involving

7    fentanyl or fentanyl analogues has increased tremendously

8    from nine percent of overdose deaths involving fentanyl or

9    fentanyl analogues to 41 percent of overdose deaths in

10   2016."

11        Do you see that?

12   **A.**   I see that.

13   **Q.**   And that's a correct statement?

14   **A.**   That's a statement -- correct statement, and it's in

15   the context of we're finding most that fentanyl or fentanyl

16   analogues as part of heroin, which that trend, as we

17   discussed, went from 2012 to 2013.  So just to add, the 2012

18   to 2013 trend, heroin, and then from 2014 we started to see

19   fentanyl come into it.

20   **Q.**   And this is the illicit fentanyl we've been discussing

21   that's used to cut or adulterate heroin?

22   **A.**   Yes.

23   **Q.**   And then further down in that same paragraph there's a

24   reference to a cluster of non-fatal overdoses that occurred

25   in August, 2016, in Cabell County.  Do you see that?

1    **A.**   I see that, yes.

2    **Q.**   And that's the, that's the cluster investigation that

3    you discussed yesterday with Ms. Kearse; right?

4    **A.**   Yes.

5    **Q.**   And here it indicates that there was evidence that a

6    high-potency synthetic opioid had entered the local illicit

7    drug supply and contributed to these overdoses; correct?

8    **A.**   Yes, carfentanil, which we also know as elephant

9    tranquilizer.  That was one.

10   **Q.**   So that's the, that's the -- fentanyl or carfentanil,

11   that was the drug that led to that cluster of overdoses in

12   August, 2016?

13   **A.**   That three cases out of the total of 20 cases in that

14   one particular overdose.

15   **Q.**   Well, in the prior sentence it says a high-potency

16   synthetic opioid had entered the drug supply contributing to

17   20 persons overdosing within a 53-hour period.  Do you see

18   that?

19   **A.**   I do see that.  And following that it says three cases

20   were positive for carfentanil.  So what we could find was

21   three cases out of 20.

22   **Q.**   But then the rest, the rest of that cluster was

23   attributed to some other high-potency synthetic opioid;

24   correct?

25   **A.**   Yes, and that fentanyl is included in that.

1    **Q.**   So the carfentanil is even more potent.  It's used to

2    tranquilize elephants?

3    **A.**   Yes.  And we put that three people there because

4    pleasantly we were kind of surprised that they didn't die

5    because carfentanil, you don't live to tell about it

6    generally.

7    **Q.**   It says here in the paper it's estimated to be 10,000

8    times more potent than morphine; is that correct?

9    **A.**   That's correct.

10   **Q.**   And, so, carfentanil is being used by drug dealers to

11   adulterate heroin?

12   **A.**   We have seen evidence in spotty places.  It's rare, but

13   we are seeing elephant tranquilizers at occasional places

14   show up.

15   **Q.**   Let me ask you to look at Page 10 of the document,

16   please.  This is discussing maternal drug use and Neonatal

17   Abstinence Syndrome.  Do you see that, that section?

18   **A.**   Yes.

19   **Q.**   And we, we've talked about this a little bit already in

20   relation to the CDC guidelines.  But I wanted to make clear

21   how NAS occurs.  And, again, as we were discussing, NAS is

22   something that afflicts a baby who's exposed to opioids in

23   utero; correct?

24   **A.**   Yes.

25   **Q.**   And am I right, Dr. Gupta, that there's two ways that

1    that could happen?  One way is a doctor prescribes opioids

2    for a medical purpose during a woman's pregnancy; correct?

3    **A.**    Yes.

4    **Q.**    The other way is a woman is misusing prescription

5    opioids for a non-medical purpose not under doctor's

6    instructions during pregnancy; correct?

7    **A.**    That's one of the, one of the second ways and -- yes.

8    **Q.**    Those are the only two ways that NAS would occur;

9    correct?  Either the doctor has instructed that opioids be

10   used, even though the woman is pregnant, or the woman is

11   misusing opioids during pregnancy?

12   **A.**    With relation to prescription drugs, yes.

13   **Q.**    So that -- there's no other way that NAS occurs.  The

14   baby has to be in utero during the time the woman is using

15   the prescription opioids; correct?

16   **A.**    In relation to prescription opioids, that's correct.

17   **Q.**    And in relation to illegal drugs, it sounds like you're

18   drawing a distinction.  You're suggesting that NAS could

19   occur for a baby through an illegal drug even if the woman

20   isn't using the illegal drug during pregnancy?

21   **A.**    Certainly, NAS is basically a withdrawal.  What the

22   baby -- so when the cord is cut, you separate the baby from

23   the mom.  And just like an adult, if you were to stop

24   somebody who was using substances every day, they would

25   undergo withdrawal because of the dependency.  So does the

1    poor baby.

2        And, so, that withdrawal can happen if the mother was

3    using prescription opioids, if the mother was using

4    illegitimately prescription opioids, or the mother was using

5    illicit opioids, knowing that heroin is also an opioid.

6    **Q.**   Right.  So, so the point is when we see a baby with

7    NAS, that NAS could have resulted from the mother using

8    heroin during pregnancy; correct?

9    **A.**   Technically you're correct.  But what we saw in West

10   Virginia was that the increased use of prescription opioids

11   were not exclusively to non-pregnant people.

12       So with increased use of West Virginians for opioids,

13   we also saw a parallel increase in pregnant people with

14   opioids as well.  So we saw that trend happen.

15   **Q.**   And, again, just to make it clear, the NAS would occur,

16   that increase would occur either because the woman was

17   misusing prescription opioids during pregnancy or a doctor

18   had told the woman to use prescription opioids during

19   pregnancy.  That's the way it happens.

20   **A.**   Or illicitly or a combination of all of those, so two

21   more things on there.

22   **Q.**   And, of course, when a baby has NAS, we don't know

23   where the mom sourced the opioid.  We don't know whether it

24   was an illegal heroin.  We don't know if it was an illicitly

25   trafficked prescription opioid.  We don't know where it came

1    from.  We just know the baby has been exposed to an opioid.

2    **A.**    We know because we are able to then match that mother

3    with the Controlled Substance Monitoring Program and see

4    what she was prescribed.  So we are able to tell that.

5    **Q.**    But there will be -- there's a number of cases, I take

6    it, that you've seen where the baby has NAS but the mother

7    was not prescribed an opioid during pregnancy?

8    **A.**    That would be the part of the diversion of those

9    prescriptions or illicit use, but that does exist.

10   **Q.**    And is the percentage of, of babies with NAS more

11   attributable to women who have been told by a doctor to use

12   a prescription opioid during pregnancy or to women who are

13   misusing prescription opioids that have been diverted?

14   **A.**    So as you mentioned that only a certain percentage of

15   women that are using substances will the kids of theirs

16   develop NAS.

17        What we found is about 14.7 percent of women had a

18   positive uterine test for a controlled substance.  And, of

19   course, only five percent developed NAS.

20        So NAS is one that's not a one-to-one relationship with

21   use.  But -- so it's very hard to say that this percentage

22   is because of that because what we do see is overall, the

23   number of pregnant people using prescriptions, whether

24   legitimately or illegitimately, went up relatively

25   proportionally to the general population.

1    Q.    Your, your expectation is that most of the NAS that

2    you've seen would be the consequence of misuse of

3    prescription opioids by women who are pregnant?

4    A.    Use or misuse.

5    Q.    It would have to be one or the other; correct?

6    A.    In most cases.

7    Q.    Let me ask you to look at Page 33 of this document,

8    please.  And I wanted to point you, Dr. Gupta, to Figure 20

9    at the top of Page 33.  This shows drug category by decedent

10   age group.  Do you see that?

11   A.    I see that.

12   Q.    And, so, where we -- if we look -- let's just focus on

13   a column.  Let's look at the 25-to-34-year-old column.  And

14   it shows that the illicit use is the blue bar, the one at

15   the bottom.  And then there's an Rx only and then there's a

16   multi-category.  Do you see that?

17   A.    Yes.

18   Q.    And, so, when it says "illicit only," that would mean

19   that these were decedents who only had an illicit drug in

20   their system at the time of death?

21   A.    That's correct.

22   Q.    And that would be heroin or fentanyl or some other

23   illicit drug; correct?

24   A.    Correct.

25   Q.    And then the Rx only, that would, that would be

1    referring to somebody who had a prescription opioid in their

2    body at the time of death; correct?

3    **A.**   That would be correct.

4    **Q.**   But we would not know from looking at the decedent, we

5    wouldn't know whether they sourced that from a drug

6    trafficker, whether they had taken that prescription opioid

7    out of somebody else's medicine cabinet, or bought it on the

8    street.  We wouldn't know.  All we can tell is that they

9    have a prescription opioid in their system; correct?

10   **A.**   That's correct except that at the beginning of the

11   report I think somewhere we said in the decedents, I think

12   it was 36 percent, but almost a third of decedents had

13   prescription drugs in their system but didn't have a

14   prescription for it.  So we do have a broad understanding of

15   diversion.

16   **Q.**   But, but somebody could have a prescription for

17   prescription opioids but might have overdosed by buying a

18   whole bunch of additional opioids on the street; correct?

19   **A.**   That's possible.

20   **Q.**   So you can't really tell from whether somebody has a

21   prescription whether they -- if they, if they took 20

22   prescription opioids and died, they might have gotten 19 of

23   those on the street and one from a doctor.  Correct?  You

24   just can't tell.

25   **A.**   Yeah.  And that kind of goes back to the behavior and

1    the pattern.  The pattern is that those individuals would

2    have a likelihood of using, you know, the doctor's

3    prescription, the street prescription, and multiple other

4    things.

5    **Q.**   And, so, the point is we can't tell from looking at

6    when it says Rx only here, this small little orange bar in

7    the middle, we can't tell whether that's, in fact, a

8    legitimate prescribed opioid that led to a death and, in

9    fact, the likelihood would be it's misused opioids.

10   Correct?

11   **A.**   It, it could be, but there's no way to prove one from

12   the other, as you stated.

13   **Q.**   And then the, the gray bar at the top, that's

14   multi-category.  That means it's, it's multiple, different

15   kinds of drugs.  And as you pointed out yesterday, the

16   average is over three different drugs that are found in

17   decedents at the time of death; correct?

18   **A.**   Correct.  And that could include, once again, the Rx.

19   So that could include prescribed drugs as well.

20   **Q.**   So if we add it up, I, I tried to figure this out.  It

21   looks to be 95 percent in that 25 to 34 age group.  95

22   percent either had multiple drugs in their system at the

23   time of death or only illicit.  Correct?

24   **A.**   That's what it about seems like.

25   **Q.**   Let me ask you to go to your Historical Overview, the

```
 1    Plaintiffs' Exhibit 41213, please.  I just have a few

 2    questions on this, Dr. Gupta.

 3         If you could look at Page 3 of this document.  And this

 4    shows the drug overdose maps that you discussed with

 5    Ms. Kearse yesterday; right?

 6    A.   Yes.

 7    Q.   These maps are not limited to prescription opioids;

 8    correct?

 9    A.   These are not limited to prescription opioids, correct.

10    Q.   So these are, these are, in fact, all drug overdoses

11    from any kind of drug; correct?  Cocaine, methamphetamine,

12    prescription opioids, heroin, fentanyl, all of them are

13    included; correct?

14    A.   Correct.

15    Q.   And they would certainly include people who have

16    overdosed on heroin or carfentanil or anything else;

17    correct?

18    A.   Correct.  And that's why it's important to understand

19    the trends over time, not one particular area, but over time

20    what happened because some of these things transition from

21    one to the other.

22    Q.   The, the -- let me ask you to look at Page 3 in the

23    first paragraph.

24    A.   Page 3?

25    Q.   Yes, same page.  We don't have to move.  And there's a
```

1    sentence that says, "In 2015 there were 5,000 opioid deaths

2    attributed to powerful synthetic opiates (fentanyl) creating

3    an increase of 75 percent from 2014."

4         Do you see that?

5    **A.**    Yes.

6    **Q.**    And that's what we've been discussing.  That's

7    typically going to be an adulterated heroin that's been

8    adulterated with fentanyl; correct?

9    **A.**    Correct.  And, and this is at a national level that

10   we're reading out.  And what we're seeing is the very same

11   thing we've been talking about.  In 2012, 2013, a trigger

12   happened to heroin.  And in 2014 almost we had started to

13   see increases in contamination of that heroin with the

14   synthetic opioid called fentanyl which is much more potent,

15   much more deadly.

16   **Q.**    And is it your understanding that the spike in heroin

17   that you started seeing in 2012, 2013, one factor in that

18   spike was that there was an increased purity and a reduction

19   in price of heroin in West Virginia?

20   **A.**    You said increased purity and reduction in price?

21   **Q.**    Both.

22   **A.**    So in any market in illicit, the price depends on

23   demand.  So, so the point becomes that demand and supply are

24   very important factors.  So the purity is obviously

25   controlled beyond those elements.  But the price is usually

```
 1    dependent on what the demand is.
 2    Q.   But I wanted to ask you specifically, are you aware
 3    that in 2012, 2013 there was a, an increase in the purity of
 4    heroin in West Virginia?
 5    A.   I'm not aware that there was -- specifically in that
 6    year it was much more pure than previously, but I'm aware
 7    generally around that period that there was purity,
 8    increased purities of heroin.
 9    Q.   And, and were you also aware that the increased purity
10    was accompanied by a reduction in price in heroin in West
11    Virginia?  Were you aware of that?
12    A.   By the fact we were seeing people transition to cheaper
13    alternatives readily available, we surmised that it is much
14    cheaper at the time, heroin is, as opposed to --
15    Q.   I was asking about the price of heroin.
16    A.   Yes, yes.
17    Q.   You knew the price of heroin had declined?
18    A.   I wasn't aware acutely that the price in 2012, '13 had
19    declined.  I'm not aware of that specifically.  I'm aware
20    generally.
21    Q.   Generally that the price of heroin had gone down?
22    A.   Generally, price is affordable as opposed to purchasing
23    prescription pills on the market.
24              MR. HESTER:  Move to strike, Your Honor.  I just
25    asked the witness about the price of heroin.
```

```
 1              THE COURT:  Just try to answer the precise

 2    question, Dr. Gupta.

 3    BY MR. HESTER:

 4    Q.   So you're aware that the price of heroin has been

 5    reduced while the purity of heroin has increased in West

 6    Virginia over the last number of years?

 7    A.   Yes.

 8    Q.   Let me ask you to turn to Page 5 of this document,

 9    please, Dr. Gupta.  And, and this is a chart I believe you

10    discussed yesterday with Ms. Kearse, Figure 3.  Do you see

11    that?

12    A.   Yes.

13    Q.   And I wanted to confirm again, just like the CDC maps

14    we were looking at on Page 3, this is not limited to

15    overdoses of opioids; correct?

16    A.   Correct.

17    Q.   It includes overdoses from all drugs?

18    A.   Correct.

19    Q.   And that would include illegal drugs such as heroin and

20    illicit fentanyl as we've been discussing?

21    A.   Correct.

22    Q.   And then let me ask you to look at Figure 8, Page 7.

23    This is another table you discussed with Ms. Kearse

24    yesterday; right?

25    A.   Yes.
```

1    **Q.**   And this again is, is relating to all drug overdoses in

2    West Virginia.  It's not confined to opioid overdoses.

3    Correct?

4    **A.**   This particular figure is.

5    **Q.**   It's headed "Total Drug Overdose Deaths by Range."

6    This is not -- this is all drug overdoses; correct?

7    **A.**   Yeah, this particular one is, yes.

8    **Q.**   Okay.  Thank you.  That's what I thought.  I just

9    wanted to confirm.  So it includes deaths from cocaine,

10   methamphetamine, other drug overdoses aside from opioids?

11   **A.**   Yes.

12   **Q.**   And it would also include heroin and illicit fentanyl

13   overdoses; correct?

14   **A.**   This would include all overdose deaths, this particular

15   one.

16   **Q.**   Let me ask you to look at Figure 11 which is I think on

17   Page 10.  So this one is headed "Oxycodone Related Overdose

18   Death."  Do you see that?

19   **A.**   Yes.

20   **Q.**   And this would include people who at the time of death

21   had multiple drugs in their system, one of which was

22   oxycodone; correct?

23   **A.**   This particular figure talks about only oxycodone

24   related overdose deaths.

25   **Q.**   Well, is it sourced, is it sourced from the table from

```
 1    the same West Virginia death certificates you've discussed

 2    previously in the report?

 3    A.   Let me look at that.

 4         (Pause)

 5         So you would have to add up the years for oxycodone,

 6    2012, 2013, 2014 and 2015.  So I'm going to do that to make

 7    sure those are right.

 8    Q.   Let me make sure I know what you're doing.  Are you

 9    looking at Table 1, the oxycodone line in Table 1?

10    A.   Yes.  And we should be able to add the four years from

11    2012 to 2015.  That number should come to 755.  And if

12    that's the case, then that's appropriate.

13    Q.   But I'm not saying it's appropriate or inappropriate.

14    I just wanted to make sure we knew what we were looking at.

15         The Table 1 where people who have oxycodone in their

16    system at the time of death, they could also have other

17    drugs in their system at the time of death; correct?

18    A.   They potentially could, but these are the opioids

19    recorded on the West Virginia death certificates for those

20    individuals.

21    Q.   No, but look at the paragraph above Table 1 explains

22    that --

23    A.   Yes.

24    Q.   This reflects people who might have multiple drugs in

25    their system at the time of death.  And it lists oxycodone
```

1    if that was one of the drugs in their system.  Correct?

2    **A.**   Yes, they could.  My response is they could, but it

3    does not mean they did always.

4    **Q.**   But the point I'm trying to get to is that Figure 11

5    where you're showing these deaths by age range, that's going

6    to include people who had other drugs in their system,

7    heroin, fentanyl, as well as prescription opioids at the

8    time of death.  It includes those numbers.

9    **A.**   So, so I just, for the Court's understanding, when we

10   state on death certificates this particular oxycodone as

11   opposed to heroin, it is a clinical judgment of the Office

12   of the Chief Medical Examiner that the cause of death was

13   oxycodone.  Now, --

14          MR. HESTER:  Move to strike, Your Honor.  That's

15   not responsive to my question.

16          MR. FARRELL:  Your Honor, if I may.

17          THE COURT:  Mr. Farrell.

18          MR. FARRELL:  I think it was exactly responsive,

19   Your Honor.

20          THE COURT:  Well, I think he was explaining his

21   answer.  I'm going to let him go ahead.

22          THE WITNESS:  So just trying to explain, so the

23   Chief Medical Examiner in the state has to make a decision

24   ultimately what is the responsible cause on the death

25   certificate because it has its own consequences.

```
 1        So those are the causes.  These people can have -- they

 2   could have other substances found.

 3        So when we take that and look at the oxycodone for

 4   the -- from 2012 to 2015, that's what you're seeing on

 5   Figure 11.

 6        So to answer your question, theoretically they could.

 7   I'm not opposing that at all.  But the predominant cause of

 8   death are these substances, the oxycodone.

 9   BY MR. HESTER:

10   Q.   Well, let me look -- let me ask you to look at Page

11   8.  At the top of the page above Table 1 there's a

12   sentence that reads, "Due to the fact that most drug

13   overdose deaths involve multiple substances,

14   (polypharmacy) any individual death may involve multiple

15   types of drugs."

16        Do you see that?

17   A.   That's accurate.

18   Q.   And you agree with that; correct?

19   A.   Yes.

20   Q.   And then in the table there's a specific point made

21   that the bottom number doesn't add up to the, to the --

22   because you could have multiple drugs in somebody's system

23   at the time of their death; correct?

24   A.   Yes, Mr. Hester.  We still have to at the end of the

25   day make a decision:  What killed the person.  You can have
```

1    three things, four things, but you still have to figure out

2    what caused the ultimate death.  And this is what this is.

3    **Q.**   The -- so you could have an individual who had heroin,

4    oxycodone, and fentanyl in their system at the time of death

5    and there, there's a chemical comparability to those;

6    correct?

7    **A.**   Correct.

8    **Q.**   And you have testified previously, I believe, that it's

9    difficult to, to tell which drug is which because they break

10   down in the same ways in the body; correct?

11   **A.**   What I'm -- so what I'm -- my response is this.  That

12   for the Chief Medical Office to decide -- Chief Medical

13   Examiner's Office to decide it's oxycodone, if someone had

14   in their system codeine, oxycodone, and tramadol, when you

15   use three different drugs, they would be able to tell.

16        The reason that's important is then you can judge the

17   patterns over the years; what drugs are causing death in

18   2011, what drugs are causing death in '12, '13.  So if we --

19   if we attributed every drug in the system to all deaths, we

20   would never be able to examine and understand better what

21   are the trend lines in the state of deaths.  So this is,

22   this is the fundamental principle.

23   **Q.**   My question was a little different.  My question was I

24   believe you've testified previously that when heroin,

25   oxycodone are in somebody's system, they, they decompose or

```
1    they interact in the body in the same way and it's difficult
2    to separate one from the other; correct?
3    A.   Yes.
4    Q.   So, so you could have somebody and these numbers could
5    include somebody who's got heroin in their system and
6    oxycodone in their system and fentanyl in their system and
7    they're all opioids, but they're -- and it's very difficult
8    to separate the three because they, they have the same rough
9    chemical composition; correct?
10   A.   So, Mr. Hester, for the benefit of the Court, can I
11   just explain in a non-technical way what happens in a death?
12   Q.   No, I need you to answer my question.
13            THE COURT:  Just answer his specific question,
14   please.
15            THE WITNESS:  It's possible.
16   BY MR. HESTER:
17   Q.   And when we're looking at these, at this bar chart
18   on Figure 11, we, of course, don't know --
19            THE COURT:  It's a little after noon, Mr. Hester,
20   so whenever you, you're ready to get to a point where you
21   want to stop.
22            MR. HESTER:  I had I think two or three more
23   questions, Your Honor, and then I can stop --
24            THE COURT:  Go ahead.
25            MR. HESTER:  -- and have a nice lunch.  I'll just
```

```
 1     take three or so minutes.

 2                 THE COURT:  Okay.

 3     BY MR. HESTER:

 4     Q.   When you say that it -- when we look at this bar

 5     chart, Figure 11, we don't know whether these deaths

 6     were from people who misused oxycodone.  We don't know

 7     where they got the oxycodone that's listed here in this

 8     bar chart; correct?

 9     A.   We would not be able to tell that.

10     Q.   Okay.  One more question, or one more set of questions.

11          On Exhibit P-44227, this is the Viral Hepatitis

12     Epidemiological Profile.

13     A.   I have it.

14     Q.   I want to just point you to Page 6 on this document,

15     please.

16     A.   Yes.

17     Q.   I'm sorry.  It's Page -- yes, on Page 6.

18                 MR. HESTER:  Your Honor, I should probably stop

19     because I'm not as well organized on this document as I

20     should be and I can just clean this up.

21                 THE COURT:  All right.  We'll be in recess until

22     2:00.

23          And I hate to make you come back, Dr. Gupta.

24                 THE WITNESS:  It's okay, Your Honor.  Thank you.

25                 MR. HESTER:  Thank you, Your Honor.
```

```
 1              MS. KEARSE:  Your Honor, I think for timing

 2    purposes, we'll have about maybe 30 minutes.  I'm going to

 3    have some questions.  Mr. Farrell may have a couple

 4    questions, but just so the Court's timing.  But what I've

 5    got is 30 minutes of redirect and we should be done this

 6    afternoon, Your Honor.

 7              THE COURT:  Well, you're going to cross-examine,

 8    too, are you not?

 9              MS. CALLAS:  Yes, we are, Your Honor.

10              MS. KEARSE:  I'm sorry.  Nevermind.

11              MS. CALLAS:  That's all right.

12              THE COURT:  All right.  I'll see everybody at

13    2:00.

14         (Recess taken at 12:06 p.m.)

15              THE COURT:  You have some more questions, Mr.

16    Hester?

17              MR. HESTER:  Just a few, Your Honor.  Just a few.

18              THE COURT:  Okay.

19              BY MR. HESTER:

20    Q.   Good afternoon, Dr. Gupta.

21    A.   Good afternoon.

22    Q.   I just have a few questions.  We spoke this morning

23    about NAS.  Do you recall that discussion generally?

24    A.   Yes.

25    Q.   And I just wanted to clarify one thing.  Am I -- it's
```

1    correct that a number of different kinds of drugs can cause

2    NAS; is that right?

3    **A.**   Correct.

4    **Q.**   And that includes heroin and illicit Fentanyl?

5    **A.**   Correct.

6    **Q.**   Cocaine?

7    **A.**   It may be.

8    **Q.**   Barbiturates?

9    **A.**   I do not have a lot of experience with data on that,

10   but potentially.

11   **Q.**   Antidepressants can also cause NAS?

12   **A.**   I do not -- I'm not aware of specific data to that at

13   this point.

14   **Q.**   But definitely heroin and Fentanyl could -- could be

15   sources of NAS?

16   **A.**   Certainly could be.

17   **Q.**   Let me ask you, Dr. Gupta, to turn to Exhibit 44227,

18   the document we were on just before lunch when I was having

19   trouble finding my way.  Let me ask you to look at Page 6,

20   please.  And under the executive summary in the first

21   paragraph, I wanted to point you to the next to the last

22   sentence.  It says, "The most common risk factors reported

23   among cases of hepatitis B and C are drug misuse, both

24   injection use and non-injection use."  Do you see that?

25   **A.**   I see that.

```
 1    Q.    Is that a correct statement?

 2    A.    That's -- evidence points to that, yes, sir.

 3    Q.    So, that drug misuse is the most common factor or cause

 4    of hepatitis B and C?

 5    A.    For new cases in West Virginia, yes, sir.

 6    Q.    And let me ask you to look at Page 12 of the document,

 7    please, and I wanted to point you to the bottom of the page.

 8    Do you have it there?

 9    A.    Yes, sir.

10    Q.    The bottom of the page, there's a chart, and this is a

11    chart headed "Risk Factors Reported in Acute Confirmed

12    Hepatitis B Cases, 2012-16", correct?

13    A.    Correct.

14    Q.    And the leading risk factor is injection drug use; is

15    that right?

16    A.    Yes.

17    Q.    And so, injection drug use would include use of heroin

18    and Fentanyl?

19    A.    Yes.

20    Q.    And it would include misuse of prescription opioids

21    that have been crushed and then injected; is that right?

22    A.    It could be.

23    Q.    And what other forms of injection drug use are there?

24    A.    It could be -- the others probably close to it would be

25    some version of meth.
```

1    **Q.**   Meth injected by --

2    **A.**   Methamphetamine could also -- could also be injected.

3         MR. HESTER:  Okay, thank you.  Those are all the

4    questions I have, Dr. Gupta.

5       Your Honor, one housekeeping point.  I did want to move

6    into evidence Defendant's Exhibit 3616, the West Virginia

7    Board of Medicine Quarterly Newsletter.

8         THE COURT:  Is there any objection to that?

9         MR. FARRELL:  No objection, Your Honor.

10        THE COURT:  It's admitted.

11              **DEFENSE EXHIBIT 3616 ADMITTED**

12        MR. HESTER:  Thank you.

13      Thank you, Your Honor.

14        MS. CALLAS:  Good afternoon, Your Honor.

15      Good afternoon, Dr. Gupta.  My name is Gretchen Callas.

16   I represent AmerisourceBergen.

17      I may wait one moment while I have a tech person come

18   in.  His name is Richie.  He should be here shortly.

19        THE WITNESS:  Certainly.

20        MS. CALLAS:  But I promise just to have a few

21   questions for you.

22        THE WITNESS:  Sure.

23      (Pause)

24        MR. FARRELL:  Your Honor, while we're filling dead

25   space, I'd like the record to reflect that Ms. Gretchen

```
 1    Callas was my mentor on the Law Review at West Virginia

 2    University in 1996, now that it's placed in the permanent

 3    record.

 4            MS. CALLAS:  I have to move to strike, Your Honor,

 5    all of that.

 6            THE COURT:  Farrell always finds a way to tell me

 7    that he was on Law Review.  I've got it.

 8        (Laughter)

 9            MS. CALLAS:  At my expense, no less.

10        All right.  Are we ready?  I hope.

11            THE COURT:  Technology, we're imprisoned by it,

12    aren't we?

13            MS. CALLAS:  Yes, that's true.

14                        CROSS EXAMINATION

15            BY MS. CALLAS:

16    Q.   Okay.  Dr. Gupta, we've spent a good bit of time over

17    the past two days talking about the Controlled Substances

18    Monitoring Program and I do want to ask you a few more

19    detailed questions about that, sir.  You, in your role as

20    the Commissioner for the Bureau of Public Health, mentioned

21    that program in a number of reports; is that correct?

22    A.   Yes.

23    Q.   And you believed it was an important tool to use as we

24    dealt with overdose death rates; is that right?

25    A.   Yes, as well as the overall volume of prescriptions out
```

1    there.

2    **Q.**    There were a number of specific key recommendations you

3    had in some of your reports that related to the CSMP; is

4    that right?

5    **A.**    That would be accurate.

6    **Q.**    And in your role as the Commissioner for the Bureau of

7    Health, you gained some understanding of what West

8    Virginia's system could and could not do; is that right?

9    **A.**    That would be correct.

10   **Q.**    And you were familiar with the fact that each year,

11   beginning in about 2012, the Board of Pharmacy did publish

12   an Annual Report regarding the CSMP.  Were you aware of that

13   report, sir?

14   **A.**    I am aware generally that the reports are published.

15   **Q.**    Okay.  So, I'm going to have Defendant's Exhibit 2904.

16          MS. CALLAS:  May I approach, Your Honor?

17          THE COURT:  Yes.

18          MS. CALLAS:  Thank you.

19          BY MS. CALLAS:

20   **Q.**    So, Dr. Gupta, take a moment just to look that over.

21   I'll represent to you this is the 2014 Annual Report of the

22   West Virginia Board of Pharmacy related to the West Virginia

23   Controlled Substances Monitoring Program.  It would have

24   been published around the time you took office as the

25   Commissioner of the Bureau of Public Health; that is, it

```
 1    looked back at the entire year of 2014.  Is this the type of

 2    document you may have used as you studied the issues in West

 3    Virginia related to opioid use and abuse?

 4    A.   This would certainly be one of the several documents we

 5    would consider looking at.

 6              MS. CALLAS:  Okay.  I would move the admission of

 7    Defendant's 2904.

 8              THE COURT:  Any objection?

 9              MS. KEARSE:  No objection.

10              THE COURT:  It's admitted.

11                   DEFENSE EXHIBIT 2904 ADMITTED

12              BY MS. CALLAS:

13    Q.   Okay.  Let's start, Dr. Gupta, by looking at the very

14    first sentence of the Executive Summary.  This report is

15    actually required by West Virginia statute 60A-9-5(j).  Do

16    you see that?

17    A.   Yes.

18    Q.   Okay.  If you proceed down through that paragraph,

19    you'll see that this report will recommend legislation to

20    enhance the CSMP in an attempt to reduce the quantity of

21    pharmaceutical controlled substances obtained by individuals

22    attempting to engage in fraud and deceit.  Do you see that

23    language, sir?

24    A.   I read that.

25    Q.   And do you understand that was one of the objectives of
```

```
1     the CSMP system, to reduce fraud and deceit?

2     A.   Sitting here, I couldn't tell you exact objectives of

3     the establishment of CSMP.  I do read this and I believe

4     this was a genuine effort on this part for this purpose.

5     Q.   Okay.  At the bottom of this first page, you'll see a

6     description of the history of the CSMP.  Do you see that,

7     sir?

8     A.   I see it.

9     Q.   The West Virginia Controlled Substances Monitoring Act

10    was implemented in 1995 to track only Schedule II controlled

11    substances.  Do you see that?

12    A.   Yes.

13    Q.   Okay.  Further in the paragraph, it indicates that the

14    CSMP was modified in 2002 by a legislative act that

15    encouraged -- an initiative to encourage safer prescribing

16    of all controlled substances in Schedules II, III and IV, to

17    reduce their abuse and limit the diversion of those

18    substances within the state; is that right?

19    A.   That's correct.

20    Q.   So, we expanded our CSMP in 2002 to include both

21    Schedule II, III and IV substances, right?

22    A.   That would be accurate.

23    Q.   Okay.  The next page, at the top, the last sentence of

24    the first paragraph indicates that in December of 2004, the

25    Board of Pharmacy implemented further changes to the CSMP to
```

1    eliminate the third party data collection and to permit both

2    direct reporting and direct access via an internet-based

3    program.  Do you see that?

4    **A.**   I see.  I read that.

5    **Q.**   And am I correct, sir, that when we talk about

6    reporting, we're talking about dispensers of controlled

7    substances, such as pharmacies?  They would report to the

8    CSMP; is that right?

9    **A.**   I could speak to my knowledge from 2015 to 2018 and

10   ongoing as a licensee for the State of West Virginia for

11   medicine.  If I was to prescribe a controlled substance,

12   Schedule II to IV, I would have to obviously register with

13   CSMP and then obviously utilize that to look at.

14   **Q.**   Okay.  But do you understand as your role as

15   Commissioner for the Bureau of Health that pharmacists had

16   an obligation to report what they were dispensing to the

17   CSMP?  And I can rephrase that question, if you would like.

18   **A.**   As the Commissioner, I did not have oversight of either

19   the CSMP, or Board of Pharmacy, or the pharmacies.  So, a

20   it's little difficult for me to really talk to the fact

21   matters of other organizations.  I can speak to what was a

22   role of the Board of Pharmacy and CSMP with the Bureau of

23   Public Health, but it's hard for me to talk about what the

24   role of Board of Pharmacy's regulations of pharmacies was.

25   **Q.**   Okay.  But as a physician, you do understand that by

1    2004, physicians in West Virginia had direct access via an

2    internet-based program if they wanted to check or register

3    with the CSMP?

4    **A.**   Once again, not having come to the state before 2009, I

5    can definitely read the document and say it, but I did not

6    have fact or knowledge of that.

7    **Q.**   Okay.  Let's look down the page a little further.

8    Under the heading "West Virginia's Controlled Substance

9    Monitoring Program Description and Reporting", it indicates

10   that this is a central repository maintained by the West

11   Virginia Board of Pharmacy for collected data related to the

12   prescription and dispensing of all Schedule II, III and IV

13   controlled substances.  Is that your understanding, sir?

14   **A.**   That -- that is.

15   **Q.**   And you'll see there's a list, a bullet point list,

16   right below that paragraph that begins with "name of

17   prescribing practitioner".  Do you see that list, sir?

18   **A.**   I see the list.

19   **Q.**   Okay.  And this is information that is collected and

20   housed in this West Virginia CSMP; is that your

21   understanding?

22   **A.**   That's my understanding.

23   **Q.**   Okay.  So that a prescriber who accesses the system

24   should be able to see his or her name as the prescribing

25   practitioner, their address, DEA number.  There is available

1    in this database the date the prescription was filled or

2    dispensed.  There is in this database the number of refills

3    authorized by the prescription, the source of payment, the

4    patient's name, address and date of birth, the name,

5    national drug control number, quantity and strength of the

6    controlled substance dispensed.  Do you see that?

7    **A.**    I do see that.

8    **Q.**    That's quite a bit of helpful information; would you

9    agree?

10   **A.**    That would be helpful.

11   **Q.**    And all of this information had been collected in West

12   Virginia from pharmacists and was available to physicians

13   for a long time; would you agree?

14   **A.**    I could not testify in my position as either the

15   Commissioner or the State Health Officer as to the facts of

16   that matter.

17   **Q.**    If you'll go down one more paragraph as required by

18   West Virginia Code 60A-9-5, you'll see there, sir, a list of

19   those who have access to all of this information.  Do you

20   see that description?

21   **A.**    I'm trying to read through it.  Which paragraph?  Which

22   sentence is that?

23   **Q.**    It starts with, "As required by West Virginia Code,

24   information contained in this central repository is

25   confidential."  Do you understand that to be true?

1    **A.**    Yes.

2    **Q.**    Okay.  And that's because it's -- it is protected

3    healthcare information, is it not?

4    **A.**    Correct.

5    **Q.**    Patient's name, date of birth, their doctor and their

6    medications; is that right?

7    **A.**    Right.

8    **Q.**    Okay.  So, this is not public information housed in the

9    CSMP and it indicates in this paragraph the information is

10   open to inspections only by, and then there's a list

11   specifically, inspectors and agents of the Board of

12   Pharmacy, correct?

13   **A.**    That's correct.  And if you would like me to, I can

14   help the Court understand really what it meant, just

15   information I can share.  I'm happy to.

16   **Q.**    Yes.  If you have information about who can access this

17   CSMP, I would be interested to hear that.

18   **A.**    Yes.  So, these individuals, my understanding is, could

19   access on a case-by-base basis, but what they could not do

20   is what we call fishing.  They could not go out and start

21   looking for cases random.

22   **Q.**    And that is actually something that was changed

23   slightly in 2012, was it not, with the enactment of the

24   Senate Bill 437?

25   **A.**    We could go back and look at that, but my understanding

```
 1    when I came into the office in 2015, you still could not do

 2    fishing.

 3    Q.   Okay.  Well, let's look.  So, we'll leave this document

 4    for a moment or two and let's go to Defendant's

 5    Exhibit 3105, which is the Senate Bill 437.

 6              THE COURT:  Would the DEA have access to that

 7    information?

 8              MS. CALLAS:  I think they are likely to be

 9    identified in that paragraph, Your Honor, as specific law

10    enforcement members.

11              BY MS. CALLAS:

12    Q.   Okay, Dr. Gupta, let's look at -- it is identified in

13    the lower left corner as a 16 in Defendant's 3105.

14    Actually, let's go to 18.  So, toward the back of that

15    exhibit, lower left side, you'll see 3105.00018.

16    A.   I see it.

17    Q.   And I'll direct you to the middle of the page.

18              MS. CALLAS:  I don't know.  Do we have this

19    document?  Okay, thank you.

20              BY MS. CALLAS:

21    Q.   You'll see a 3.  "The Board shall establish an Advisory

22    Committee to develop, implement and recommend parameters to

23    be used in identifying abnormal and unusual usage patterns

24    of patients in this state."  Do you see that language?

25    A.   I see it.
```

```
 1    Q.   Okay.  So, this is the creation in this bill of an
 2    Advisory Committee and if we go down to B toward the bottom
 3    of that same page, it also states that, "The Board of
 4    Pharmacy shall create a West Virginia Controlled Substances
 5    Monitoring Program Database Review Committee of
 6    individuals", and then they're described there.  Do you see
 7    that?
 8    A.   One second.  Yes, I see it.
 9    Q.   Okay.  Is it your understanding, Dr. Gupta, that this
10    was a newly created committee that could do, in some ways,
11    what you just described as using the data in the Controlled
12    Substances Monitoring Program?
13    A.   So, if I can expand.
14    Q.   Yes, please.
15    A.   The fishing piece was still not allowed, meaning if you
16    had Jane Doe taking prescriptions, you cannot go and follow
17    up with Jane Doe because this was a very sensitive matter
18    that could be of use for many other purposes.  So, what you
19    could do with this new created Advisory Committee is perhaps
20    look at who are the top physicians who may be having more
21    associated overdose deaths or things like that.  So, there
22    was some purpose, but it was not an end-all be-all.
23    Q.   Would you agree, Dr. Gupta, that until this law was
24    enacted in West Virginia in July of 2012, we could not use
25    the data sitting in the CSMP to identify the top ten
```

1    prescribers in West Virginia?

2    **A.**    That would be accurate.

3    **Q.**    Okay.  We could not use this data to identify patients

4    who were seeing multiple doctors or visiting multiple

5    pharmacies with multiple prescriptions?

6    **A.**    You technically could by -- and so, if I was a

7    physician prior to this legislation and if I went in and I

8    saw my patient had gone to other places, then I technically

9    could see that, but what you -- one cannot do before and

10   cannot do after this legislation is target individuals

11   through this fishing piece.  So, that could not be done.

12   **Q.**    I am going to suggest we go back and look at the 2014

13   Annual Report one more time because it does discuss the

14   Committee.  So, if we go to the last -- or the next page.

15   One more page.

16        So, we'll see right in the middle of that page a

17   paragraph that begins, "As created by Senate Bill 437",

18   which we were just looking at, "the Controlled Substances

19   Monitoring Program Advisory Committee and the Controlled

20   Substances Monitoring Program Database Review Committee have

21   been actively trying to address substance abuse issues in

22   the state through use of the CSMP"; is that correct?

23   **A.**    That's accurate.

24   **Q.**    And you understood in your role as the Commissioner

25   they were attempting to use the CSMP for that purpose?

1    **A.**    I understood and we partnered with them.

2    **Q.**    If we go down one paragraph, "The Database Review

3    Committee evaluates those who have been identified as

4    outliers to decide appropriate action.  Individuals that

5    have been classified as patients, prescribers or dispensers

6    that warrant additional scrutiny are being pursued in a

7    number of ways."  So, that's what you and I were just

8    discussing; is that right?

9    **A.**    Correct.

10   **Q.**    And so, this was ongoing in 2014 but, as you've

11   testified, none of this could happen prior to 2012; is that

12   right?

13   **A.**    That would be accurate.

14   **Q.**    Okay.  The next sentence, "Thousands of letters have

15   been sent to practitioners concerning patients visiting

16   large numbers of prescribers and getting prescriptions."  Do

17   you see that?

18   **A.**    Yes.

19   **Q.**    So, were you aware that the Board of Pharmacy was

20   sending out thousands of letters to West Virginia doctors

21   about their patients?

22   **A.**    We certainly had discussed that with Board of Pharmacy

23   so, yes.

24   **Q.**    And one of the reasons that the Board of Pharmacy had

25   to send out thousands of letters to doctors was because the

1    doctors were not accessing the information available to them

2    on the CSMP; is that right?

3    **A.**   Can I explain that?

4    **Q.**   Sure.

5    **A.**   So, doctors practice culture behavior is not easy to

6    change and we have to deploy all the tools that are -- in

7    our ability to do that.  And the thought behind this was to,

8    once again, look at the high prescribers and then begin to

9    nudge those prescribers and remind them of their both

10   obligation to their patients, as well as obligation to law.

11   **Q.**   Now, my understanding of these letters was also to let

12   a doctor know when they had a patient who was seeing not

13   only this doctor, but perhaps up to ten, or more than ten

14   other doctors for controlled substance prescriptions; is

15   that right?

16   **A.**   I don't recall the contents of the letter but,

17   certainly, as we found in our social autopsy, if you were

18   seeing more practitioners, more pharmacies, you were so many

19   more times likely to die.  So, this is very consistent with

20   that, to tell doctors that you have maybe patients -- that

21   you have a high volume of patients.  I don't exactly

22   remember if it was also -- because that would be divulging

23   other information to patients, so I don't exactly remember

24   that.

25   **Q.**   Let's talk a little bit about the usage by West

1    Virginia doctors of this system.  It was an on-line system

2    beginning in 2004.  I'm going to ask you, Doctor, to look

3    for Exhibit 3036, which was introduced earlier today.  It's

4    the West Virginia Expert Pain Management Panel Guidelines.

5    Do you see that?

6    **A.**   Yes.

7    **Q.**   On Page 9 of that, those guidelines, you'll see a

8    reference to the Controlled Substances Monitoring Programs

9    and the description of those programs.  "The Prescription

10   Drug Monitoring Programs, PDMPs, also known as Controlled

11   Substance Monitoring Programs, CSMPs, must be fully utilized

12   to reach their potential in controlling prescription drug

13   abuse and diversion."  Do you agree with that statement?

14   **A.**   Yes.

15   **Q.**   "However, in the majority of the 49 states with

16   operational PDMPs, participation by prescribers and

17   dispensers is voluntary with utilization rates well below

18   50%."  Is that right?

19   **A.**   It's written there.  It must be accurate.

20   **Q.**   Okay.  Do you know what percentage of West Virginia

21   physicians are registered to use our Controlled Substance

22   Monitoring Program?

23   **A.**   I could not tell you right now.

24   **Q.**   Before we leave this document, Dr. Gupta, I would like

25   you to turn back to Page 4 and I would just like to ask you

1    somewhat randomly about Dr. Ahmet Ozturk.  Do you see his

2    name below your name on the panel member list?

3    **A.**   I do see it.

4    **Q.**   Do you know Dr. Ozturk?

5    **A.**   I do not.

6    **Q.**   Okay, but he is a -- it suggests a physician at

7    Marshall University who was a participant on this expert

8    panel?

9    **A.**   I see his name.

10   **Q.**   Okay.  So, let's go back to physicians and physician

11   usage of the CSMP.  It's correct, if I am a physician and I

12   am writing a prescription for a controlled substance, I

13   could utilize this West Virginia database to see if my

14   patient is receiving this same prescription from anyone

15   else; is that right?

16   **A.**   That's right and that's the best practice.

17   **Q.**   Okay.  Now, doctors in West Virginia needed to be

18   encouraged to register for the CSMP; is that right?

19   **A.**   Correct.

20   **Q.**   In fact, they had to be forced to do so in 2016 by law?

21   **A.**   There was legislation requiring that, yes.

22   **Q.**   And we talked about that a little bit earlier.  It's

23   Exhibit 3015.  And I am going to ask you to look at a

24   particular page in that exhibit.  It's the very last page.

25   So, I think you were asked earlier about whether doctors

```
1   were required in West Virginia to register and we concluded

2   after reviewing this document that they were not required to

3   until 2016; is that right?

4   A.   I believe so.

5   Q.   Okay.  In fact, practitioner -- "Any practitioner who

6   fails to register with the West Virginia Controlled

7   Substance Monitoring Program and obtain and maintain online

8   or other electronic access", this is paragraph F., "to the

9   program will be fined $1,000.00."  Do you see that?

10  A.   I see that.

11  Q.   So, there was actually a penalty attached to failure to

12  register and maintain your online access?

13  A.   Yes.  That made me register.

14  Q.   Okay.  I have one other Board of Pharmacy Annual

15  Report, the Controlled Substances Monitoring Program 2016

16  Annual Report.  So, we're going to jump ahead two years and

17  we'll look at that.

18         MS. CALLAS:  May I approach?

19         THE COURT:  Yes.

20         MS. CALLAS:  Thank you.

21         BY MS. CALLAS:

22  Q.   So, Dr. Gupta, it's now two years after the last report

23  we looked at.  This is the 2016 Annual Report of the

24  Controlled Substances Monitoring Program and, particularly,

25  I'd like to direct your attention to Page 4 of this
```

140

1    document, which is entitled "CSMP Dispensing Statistics".

2    **A.**    Yes.

3    **Q.**    It does indicate in the very first sentence that,

4    "Overall dosage unit dispensing numbers have declined over

5    the last several years", and that would be specific to

6    controlled substances, correct?

7    **A.**    Correct.

8    **Q.**    And not -- not other medications.

9         I'm actually on the wrong page.  I apologize.  I was

10   getting onto a different topic.  It's the page before.

11   That's what I wanted to look at.

12        So, Page 3.  Sorry about that.

13        This page has a chart and a bar graph and the first --

14   the chart actually indicates active users of the CSMP for

15   2014.  Do you see that?

16   **A.**    I see the table.

17   **Q.**    Okay.  And I think what I would like you to notice is

18   if we look at the number of prescribers who are indicated to

19   be active users of our Controlled Substances Monitoring

20   Program in 2014, we had 2,537?

21   **A.**    Yes.

22   **Q.**    And, by 2016, we had almost tripled that number, not

23   quite; certainly doubled that number to 6,618; is that

24   right?

25   **A.**    Yes.

1    **Q.**   So, we had 4,000 more physicians or prescribers using

2    the CSMP over a two-year period?

3    **A.**   Correct.

4    **Q.**   Okay.  At the bottom of the page we have the number of

5    user queries, so those are usage basically of the system;

6    would you agree?

7    **A.**   Yes.

8    **Q.**   And we can see over time going back to 2008 how many

9    more queries we have by prescribers of our system.

10   **A.**   Yes.

11   **Q.**   Okay.  And you would agree this is all a positive

12   improvement?

13   **A.**   Certainly.

14   **Q.**   Okay.  But the fact of the matter is that even in 2008

15   when we had, oh, what, 300,000 queries, as opposed to nearly

16   a million, in 2008, this system was still in place and was

17   available for physicians to be using; is that right?

18   **A.**   As I testified prior, it was available in a voluntary

19   capacity.

20   **Q.**   Now, there's no reason to believe there's anybody but

21   physicians that could access this in a regular user

22   capacity; is that right?

23   **A.**   Can I expand on that, please?

24   **Q.**   Of course.

25   **A.**   So, there is some ability for Advanced Practice

1   Registered Nurses to prescribe, as well.  So -- and for even

2   physicians, it's usually the staff that does it.  And so, in

3   the answer can anybody else, it's usually the staff was

4   doing the query, but there's nothing beyond their office or

5   any prescriber for that who is licensed to prescribe.

6   **Q.**   Okay.  Thank you, Dr. Gupta.

7        Okay.  Let's switch gears and then we'll wrap up.  The

8   Board of Medicine, you've testified that you served as the

9   Secretary of the Board of Medicine for approximately four

10  years; does that sound right?

11  **A.**   Yes, Ms. Callas.

12  **Q.**   And the Board of Medicine for those doctors that are

13  MDs in the State of West Virginia is both a regulatory body,

14  the licensing body, and they also conduct investigations; is

15  that your understanding?

16  **A.**   Yes.  And educational body, as well, I think we can

17  agree on.

18  **Q.**   Okay.  The Board of Medicine decides and can

19  investigate whether a physician has engaged in the improper

20  practices of medicine; is that right?

21  **A.**   If they are violating the -- what we have called the

22  West Virginia Medical Practice Act, then there could be

23  complaint lodged.  There's a formal procedure and a Board

24  does not itself make that decision and go and pick doctors.

25  There has to be a formal complaint launched according to

1    clearly the statute.  And then, that complaint could be

2    investigated through the Board of Medicine's investigators.

3    And there is a Complaint Committee to which the complaint

4    goes through.  So, it is an entire process that has -- that

5    has elements to it.

6    Q.   Okay.  Well, let's break that down a little bit.  That

7    was helpful.  So, if -- if there is no complaint, the Board

8    of Medicine does not just initiate an investigation of a

9    doctor on its own; is that right?

10   A.   That's correct.

11   Q.   And if the Board of Medicine were to receive

12   information from, let's say, this CSMP Review Committee,

13   then here are your top five prescribers, that is not a basis

14   to initiate an investigation, is it?

15   A.   That's correct.

16   Q.   Okay.  So, we need a complaint about a prescriber to

17   initiate an investigation of that doctor's prescribing

18   practices?

19   A.   A formal complaint has to be filed in accordance with

20   the law regulating the Board of Medicine.

21   Q.   And, as the Secretary of the Board of Medicine, you

22   were at times involved in that investigation process to the

23   extent there might be a consent order that was issued?

24   A.   So, I can talk about my role.  I was not a member of

25   the Complaint Committee, but I was the Secretary of Board.

1    I definitely -- the orders, consent orders, were signed by

2    myself, the Board President, and there were rare occasions

3    in which the President, the Vice President would be

4    conflicted in making that decision in which I would chair

5    the Committee to make the decision on that particular

6    physician specifically.

7                THE COURT:  Where did the complaints come from

8    typically?

9                THE WITNESS:  Your Honor, they could come from

10   individuals like patients.  They can come from a pharmacy.

11   They could come from -- the State Health Commissioner can

12   file a complaint if a physician -- so, and all of those

13   things have happened, but anybody, any member of the public,

14   can file a complaint.

15               BY MS. CALLAS:

16   Q.   Now --

17               THE COURT:  Okay.  So, if I knew there was a

18   pharmacy downtown and I -- that was writing these

19   prescriptions and basically running a pain clinic, I could

20   file a complaint and it would be investigated?

21               THE WITNESS:  Yes, Your Honor.  If anyone would

22   file -- it's an on-line system, as well, anonymous.  It's

23   held anonymous by law and anyone can file a complaint if

24   they know anything about any wrongdoings of any physician

25   licensed under the Board and they would initiate the

```
 1    complaint and investigate it.

 2              BY MS. CALLAS:

 3    Q.   Now, those complaints are confidential; is that right?

 4    A.   Anonymous and confidential.

 5    Q.   Okay.  So, I cannot, as a member of the public, do a

 6    search for a doctor to see if he is subject to a complaint?

 7    A.   So, I've just explained that.  So, a complaint is

 8    filed.  The first thing that happens, anonymously, the

 9    complaint goes to the Complaint Committee.  Oftentimes, it

10    can be adjudicated without further investigation, depending

11    on the merits of the case.

12        Other cases, it is investigated.  Should a cause be

13    found to take it to the Discipline Committee and make a

14    discipline, only when the found discipline is voted upon by

15    the Board does it go public and goes in the permanent record

16    of the physician and is public, publically available.

17    Q.   So, the complaint and the investigation process; that

18    is prior to a decision, is all confidential or shielded from

19    public view; is that right?

20    A.   Until the final decision is made.  At that point, all

21    of that becomes public, a matter of public.

22    Q.   I'm going to ask to use an example.  There is a doctor

23    by the name of Deleno Webb.  Does that name ring a bell to

24    you?

25    A.   It does not.
```

1    Q.   Okay.  I have a document that might refresh your

2    recollection.  Your signature is on it.

3              MS. CALLAS:  So, I would ask to approach the

4    witness with that document.

5         Would you like to see this, Your Honor?  I don't --

6    it's not an exhibit.  It's just to refresh his recollection.

7              THE COURT:  Do you remember now, Dr. Gupta?

8              THE WITNESS:  Your Honor, West Virginia is only

9    one of a very rare few states in the country where the

10   President of the Board and the Secretary have to physically,

11   by ink, sign every license in the State of West Virginia.

12   So, I signed way more of these type things than I can

13   remember.  I do, I'm trying to recollect.

14             THE COURT:  Do you remember at all?

15             THE WITNESS:  I remember -- I remember the case.

16   I'd have to go through the whole thing to remember it, but I

17   do remember the case.

18             THE COURT:  Well, when you've refreshed him.  You

19   need to take the document.

20             MS. CALLAS:  I -- you're right.  You're right.

21        Let me take that back.

22        I wasn't sure if you were going to let me get away with

23   that.

24             BY MS. CALLAS:

25   Q.   Okay.  Dr. Gupta, do you recall that the West Virginia

1    Board of Medicine received a complaint about Dr. Deleno Webb

2    in or about the June of 2014 time frame?

3    **A.**   I do not recall.

4    **Q.**   Okay.  Do you recall that Dr. Deleno Webb had a

5    complaint at some point in time related to the prescribing

6    of controlled substances?

7    **A.**   Consequent to what I just viewed, I -- I -- there seems

8    to be -- obviously there, but I do not recall that.

9    **Q.**   Do you recall that there was an investigation that the

10   Board of Medicine did engage in over a period of time

11   related to this doctor?

12   **A.**   I do not recall beyond what I just saw.

13   **Q.**   Okay.  Do you recall that there was some action taken

14   by the Board after that investigation?

15   **A.**   Once again, beyond what I just reviewed, I do not

16   recall.

17   **Q.**   So, it sounds like you don't really recall the

18   specifics of this doctor's case, or do you?

19   **A.**   I do not.

20   **Q.**   Okay.  Okay.  Well, I appreciate you making the

21   attempt, nonetheless.  I think we have established though,

22   assuming there was an investigation of this particular

23   doctor, or any other doctor related to allegations of

24   improper prescribing, the complaint and the investigation

25   would be kept confidential and there would be no notice

1    provided to pharmacists, pharmacies or patients that this

2    was an ongoing investigation; is that right?

3    **A.**    I think that's correct.  An ongoing investigation of

4    the Board of Medicine in West Virginia is not subject to

5    publicity, and media reports, and reports to other people.

6    **Q.**    And while this doctor, or any other doctor is subject

7    to an investigation for improper prescribing, they can

8    continue to prescribe; is that right?

9    **A.**    I can explain.

10   **Q.**    Okay.

11   **A.**    So, there are remedies in the law that they -- that's a

12   decision of the Board.  There are remedies that include

13   seeking an immediate injunction that can make us if that's

14   where the determination is.  And in other circumstances, the

15   -- if it's not an immediate recognized threat to the public,

16   then they can continue to do their work until such a time a

17   finding is found.

18          MS. CALLAS:  Thank you, Dr. Gupta.  That's all the

19   questions I have.

20          THE COURT:  Is there any redirect, Ms. Kearse?

21          MS. KEARSE:  Briefly, Your Honor.  I think Mr.

22   Farrell may have a couple after me.

23                    **REDIRECT EXAMINATION**

24          **BY MS. KEARSE:**

25   **Q.**    Good afternoon, Mr. Gupta.  I just have a couple of

```
 1    things I want to follow up on.  You were shown again the

 2    West Virginia Drug Overdose Deaths and Historical Overview,

 3    41213, and I just want to go to Page 5.

 4              MS. KEARSE:  Is this working, Gina?  I can use the

 5    ELMO.

 6              BY MS. KEARSE:

 7    Q.   And you were shown on the top of Page 5 --

 8              MS. KEARSE:  Go to Figure 3 first.

 9              BY MS. KEARSE:

10    Q.   Do you recall that?

11    A.   I do.

12    Q.   Okay.  And you were being asked about other drugs.

13              MS. KEARSE:  I want to go down to the bottom of

14    that paragraph, Gina.

15              BY MS. KEARSE:

16    Q.   The number -- if you can read this on that same page

17    that you were being asked about drug overdoses and the drugs

18    used?

19    A.   The last sentence -- last sentence of the first

20    paragraph here, it says, "The number one cause of drug

21    overdose deaths was associated opiates, making West Virginia

22    number one in the nation."

23    Q.   And that was in relation to the report that you did; is

24    that right?

25    A.   That was a -- that was part of the report.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   And I want to go quickly to the 2016 document,

2    Exhibit 03036.  This was the West Virginia Expert Pain

3    Management Panel.  You just actually reviewed it.

4              MS. KEARSE:  And, Gina, if we could put the cover

5    page on that.

6              BY MS. KEARSE:

7    **Q.**   So you know which one, do you have that in front of

8    you?  Okay.  And this is the one that had you listed there.

9    I want to go to the first page on that document, Page 3,

10   actually.  In the middle of Paragraph 2, can you read that

11   to the Court, Dr. Gupta?  "Approximately", do you see that

12   section?

13   **A.**   I see it now.  "Approximately 2 million Americans live

14   with prescription opioid abuse or dependence.  That's per

15   SAMHSA, 2013.

16   **Q.**   And the next sentence?

17   **A.**   "About 75 percent of opioid addiction patients" -- I'm

18   sorry.  "About 75 percent of opioid addiction disease

19   patients switch to heroin as a cheaper opioid source."

20   That's SAMHSA, 2013.

21   **Q.**   And that was part of the Executive Summary of that

22   Panel Report?

23   **A.**   Yes.

24             MS. KEARSE:  Thank you, Doctor.  No more

25   questions.  I was quick today.  Mr. Farrell may have a

```
1    couple.

2              MR. FARRELL:  With permission?

3              THE COURT:  Yes.  Go ahead.  I assume there's no

4    objection to the double teaming here?

5              MR. FARRELL:  I would like to refer to it as

6    double dipping, Your Honor.  They get to triple dip, we only

7    get to double dip.

8              THE COURT:  Okay.

9              MR. FARRELL:  I promise I'll make it entertaining,

10   if not brief.

11                      REDIRECT EXAMINATION

12              BY MR. FARRELL:

13   Q.   The first thing I'd like to do is with reference to the

14   demonstrative on Dr. Deleno Webb, despite the fact that you

15   don't recall this particular one, your name is on this

16   document, is it not?

17   A.   It is.

18   Q.   And it's in your official capacity as the Secretary to

19   the West Virginia Board of Medicine?

20   A.   It is.

21   Q.   And when you reviewed this document, what is the action

22   taking place?  I'm sorry.  I think the copy was taken away

23   from him.

24              THE COURT:  Well, she used it to refresh his

25   recollection and that's the right way to do it.
```

152

```
 1              MS. CALLAS:  Yes, and I'll object to the extent

 2      you're using something that's not really an exhibit.  It was

 3      used to refresh his recollection.  It did not work.

 4              BY MR. FARRELL:

 5      Q.   The document that was attempted to be used to refresh

 6      your recollection, I would like to show you as a potential

 7      exhibit to identify it.

 8              MR. FARRELL:  May I approach, Your Honor?

 9              MS. CALLAS:  Well, let me object because it's not

10      an exhibit.  It is not identified by either party in this

11      case as an exhibit for its use at trial.

12              THE COURT:  Mr. Hester, did you want to say

13      something?

14              MR. HESTER:  I'm with Ms. Callas.  I agree, Your

15      Honor, it wasn't -- it didn't refresh the witness's

16      recollection.

17              THE COURT:  Yes.  I'm not going to let you do

18      this, Mr. Farrell.  Where are you going with this?

19              MR. FARRELL:  Well, this is a consent decree

20      surrendering a medical license from a doctor who was

21      prescribing in Huntington, Cabell County, West Virginia at

22      pharmacies that the distributor supplied.  So, I'd like to

23      begin creating a record with a surrendered license that

24      you'll see his name throughout their documents in Weeks 3

25      and 4.
```

```
1                THE COURT:  Well, I'm not going to let you do it
2       now.  You can do it later if you can get it in.
3                MR. FARRELL:  The only problem, Judge, is that I
4       don't know if there's anybody else whose signature is on
5       here that I can get other than Dr. Gupta.
6                THE COURT:  Well --
7                MR. FARRELL:  If he can authenticate it, then it's
8       a simple --
9                THE COURT:  And the purpose of it is to show that
10      this was a doctor who was prescribing opioids in Cabell
11      County, or Huntington, or wherever?
12               MR. FARRELL:  Yes, Your Honor, to such extent that
13      he lost his -- he surrendered his license to Dr. Gupta.
14               THE COURT:  Okay.  And what does it show?  What's
15      --
16               MR. FARRELL:  What we intend to show --
17               THE COURT:  I mean what is the ultimate purpose of
18      this?
19               MR. FARRELL:  The ultimate purpose of this is that
20      the volume of pills that were coming into Cabell County were
21      responsible to, in part, the bad doctors that McKesson spent
22      most of this morning discussing.  I've got one here.
23               THE COURT:  Well, I'm going to let you do it.
24      I'll allow it.  Go ahead.
25               MR. FARRELL:  May I approach?
```

```
 1              THE COURT:  The objection is overruled.

 2              MS. CALLAS:  Your Honor --

 3              THE COURT:  Do you want to put anything on the

 4   record, Ms. Callas?

 5              MS. CALLAS:  Well, my only comment, Your Honor, is

 6   that if I had been permitted and, of course, I did not seek

 7   to introduce the document because it was not on an exhibit

 8   list of either party, or any of the parties, I would have

 9   asked more questions about it.  So, perhaps if Mr. Farrell

10   is going to go into much detail, if I have any additional

11   questions, one or two at the end, I would request the right

12   to recross.

13              THE COURT:  Well, go ahead.  He can authenticate

14   it, if he can, and I'll conditionally admit it and then make

15   up my mind whether I'm going to really consider it or not.

16              MR. FARRELL:  Okay.  And to be fair, I will yield

17   the floor to Ms. Callas, if she would like to --

18              THE COURT:  Just do it.

19              BY MR. FARRELL:

20   Q.   Dr. Gupta, what is this document?

21   A.   This is a consent order by the West Virginia Board of

22   Medicine.

23   Q.   And is your signature on the document?

24   A.   Yes.

25   Q.   In what capacity?
```

1    **A.**    In the capacity of the Secretary of the Board of

2    Medicine.

3    **Q.**    And what does your signature indicate by affixing it to

4    this document?

5    **A.**    It indicates an official order in my capacity

6    representing the West Virginia Board of Medicine.

7    **Q.**    So, is this a formal action taken by the West Virginia

8    Board of Medicine?

9    **A.**    Yes.

10   **Q.**    And is this your signature endorsing or validating this

11   action?

12   **A.**    Yes.

13   **Q.**    And is this a document that is created in the usual

14   course of the licensing of physicians in the State of West

15   Virginia through the West Virginia Board of Medicine?

16   **A.**    Created in the course of disciplining of licensing in

17   the State of West Virginia through the West Virginia Board

18   of Medicine.

19            MR. FARRELL:  Judge, at this time, I would have

20   the document marked as an exhibit and entered into the

21   record.

22            THE COURT:  Do you have an exhibit number for it?

23            MR. FARRELL:  I did.  Can we -- can I make one up?

24            MR. HESTER:  Your Honor, simply to preserve the

25   record, we do note our objection to this.  It wasn't on

```
 1    either parties' exhibit list.

 2              MR. FARRELL:  We'll mark it at P-9999.

 3              THE COURT:  Okay.

 4              MR. FARRELL:  Thank you.

 5              THE COURT:  My deputy gets very upset with me if I

 6    don't make you put numbers on the exhibits.

 7              MR. FARRELL:  Yes, Your Honor.

 8              THE COURT:  She's got to keep track of all this.

 9              MR. FARRELL:  Yes, Your Honor.

10              BY MR. FARRELL:

11    Q.   Dr. Gupta, I think I have five categories of follow-up

12    from cross.  The first is document P-44211, which was the

13    social autopsy.

14    A.   I have it.

15    Q.   And the questions that you were asked related to a

16    correlation between prescription opioids and illicit opioids

17    resulting in death.  So, let me ask you initially this.

18    Through your research and in your role with the -- as the

19    State's health officer, have you been able to identify a

20    direct correlation -- let me get the words right.  Have you

21    been able to identify a direct correlation between diverted

22    prescription pills and the transition to using street drugs,

23    such as heroin, Fentanyl or methamphetamine?

24              MS. MAINIGI:  Objection, Your Honor.  This is the

25    same discussion we had yesterday.  Mr. Farrell is now just
```

```
1    trying to gateway -- back-door the gateway discussion.

2              THE COURT:  Sustained.

3              MR. FARRELL:  Judge, if I can beg your indulgence

4    for a moment, the reason I'm not trying to go in through the

5    back door, I'm trying to go in through the front door, this

6    was literally disclosed by the plaintiffs.

7              THE COURT:  Well, you're trying to get an opinion

8    from him about the gateway point, aren't you?

9              MR. FARRELL:  Yes, because we disclosed it.  Yes,

10   that's exactly what I'm attempting to do since we disclosed

11   it.  This isn't a sandbag or a last minute attack.  This

12   literally was disclosed by us last year, October.

13             THE COURT:  Ms. Mainigi, go ahead, please.

14             MS. MAINIGI:  Yes.  Your Honor, I'd rely primarily

15   on the argument I made to Your Honor yesterday, which is

16   that this is covered under -- Your Honor said he was going

17   to reserve ruling on this and I think, yesterday, we had

18   argument on it back and forth, including from Mr. Farrell.

19   This falls under *Downey v. Bob's Discount Furniture.*

20             COURT REPORTER:  I'm sorry.  Can you speak into

21   the mic?  Is it on?

22             MS. MAINIGI:  Oh, you know what?  I'm so sorry.

23   It was not on.  I apologize.

24             COURT REPORTER:  It's okay.

25             MS. MAINIGI:  This falls, Your Honor, into *Downey*
```

1    *v. Bob's Discount Furniture Holdings,* which is a case Your

2    Honor cited.  Dr. Gupta was never -- Ms. Kearse with Dr.

3    Gupta was never able to lay a foundation for the gateway.

4    Dr. Gupta, in his capacity, would not be in a position to

5    have -- to be a percipient witness, personal knowledge and

6    observations, as opposed to facts supplied by others, which

7    is what he is operating under.

8        He was allowed to testify as to hybrid opinions if his

9    -- his hybrid opinions are limited to his involvement in the

10   events giving rise to this litigation.  Dr. Gupta does not

11   have that information.  He relied on studies, as he

12   testified at his deposition for the gateway theory.

13                MR. HESTER:  Your Honor -- I'm sorry, Your Honor.

14                THE COURT:  All right.  That's all right.  You go

15   ahead.

16                MR. HESTER:  Sorry, Your Honor.  I didn't mean to

17   interrupt.

18                THE COURT:  That's all right.

19                MR. HESTER:  I was going to add, as well, I

20   believe this is beyond the scope of our cross.

21                MS. MAINIGI:  That is -- that's correct.

22                THE COURT:  Well, I think that's right.  I'm going

23   to let you mark it, and we'll put it in the record, and you

24   can ask -- you've already had him identify it, but I'm not

25   going to let you go down the path of questioning him about

1    the gateway theory because -- for the reasons counsel have

2    so articulately placed on the record.  So, that's where you

3    are, Mr. Farrell.

4              MR. FARRELL:  I understand, Judge, and I also

5    understand that you don't care for people arguing with your

6    rulings.  And so, the plaintiffs believe we've made

7    appropriate disclosures and disagree with the positions

8    taken by the defendants and I'll move on.

9              THE COURT:  Well, you can argue with me to the

10   extent of placing your objections on the record and the

11   reasons for them, period.

12             MR. FARRELL:  Yes.

13             THE COURT:  And you've done that and I thank you.

14             MR. FARRELL:  Thank you, Judge.

15             THE COURT:  Okay.

16             BY MR. FARRELL:

17   Q.   Dr. Gupta, you just spent some time talking about the

18   CSMP as a tool that you use in your role in public health.

19   In general, aside from the CSMP, where else would a person

20   in public health be able to find data regarding physician

21   prescribing patterns?

22   A.   There are several other sources that folks in my

23   position --

24   Q.   So, let's start with direct sources.  Where is the most

25   district source to get information on where doctors'

1    prescriptions are being filled?

2    **A.**    The -- if you're asking the sources available to me as

3    Commissioner, State Health Officer, those direct sources

4    could be -- there are CDC sources that provide us that, but

5    there's also -- we used to use Quintiles IMS data.  That is

6    something that I think one of the counsel today, this

7    morning, showed a graph at 20.8 prescriptions.  That's where

8    that comes from.

9    **Q.**    That's a good point.  I think that's Exhibit --

10   DEF-WV-747.  Can we pull it up, please?  So, one of the

11   exhibits that you were asked about was the number of

12   prescriptions per person and I wanted to follow up with

13   that, as well.

14              MR. FARRELL:  I think it is Page 38.  There it is.

15        No.  Can you go to Page 38 first?  The next page.

16   Yeah.  Back up one.  There we go.

17              BY MR. FARRELL:

18   **Q.**    So, can you in more detail describe what does this

19   factor mean, "RX per capita"?  Can you explain for the Court

20   what that means?

21   **A.**    This means the total number of prescriptions for all

22   prescription-level medications in -- by state per person,

23   man, woman, baby, child, by State for the year of 2016.

24   **Q.**    And is this the type of data that you would rely upon

25   in the field of public health when exercising your duties?

```
 1    A.    Yes.  Clearly, I would be presenting on it, so yes.

 2    Q.    And not just in public health, but does the CDC rely

 3    upon this data when attempting to reach positions on

 4    physician prescribing trends or patterns.

 5              MS. MAINIGI:  Objection, foundation, Your Honor.

 6    This witness is not in a position to know what the CDC is

 7    relying on.

 8              THE COURT:  Sustained.

 9              BY MR. FARRELL:

10    Q.    You mentioned earlier --

11              MR. FARRELL:  Okay, that's fair.

12        I would like to have blown up the bottom right-hand

13    corner.

14              BY MR. FARRELL:

15    Q.    In this exhibit that you published that the defendants

16    entered into evidence, did you rely upon Quintiles Xponent

17    2017 data when creating this document?

18    A.    Yes.

19    Q.    Go to the next slide, please.  Again, this is another

20    data point from the document entered into evidence by the

21    defendants.  Is this data point, does it rely upon Quintiles

22    IMS Xponent data?

23              MS. MAINIGI:  Objection, outside the scope of the

24    direct -- of the cross examination.

25              THE COURT:  Well, I'm going to sustain the
```

```
 1    objection.  This is getting pretty far --

 2             MR. FARRELL:  Well, then I'll get right to the

 3    point.

 4             THE COURT:  Good.

 5             BY MR. FARRELL:

 6    Q.   Is Quintiles IMS Xponent, is that now known as IQVIA?

 7    A.   Yes.

 8    Q.   And is IQVIA data part of the data that you rely upon

 9    in the field of public health when identifying prescriber

10    trends of prescriptions, including opioids?

11             MS. MAINIGI:  Objection, Your Honor, outside of

12    the scope of the cross examination.

13             THE COURT:  Sustained.

14             BY MR. FARRELL:

15    Q.   The data that's down here that says Quintiles IMS

16    Xponent, is this the type of data that you relied upon, and

17    specifically relied upon, when creating this --

18             THE COURT:  That's the same question.  Mr.

19    Farrell.

20             MR. FARRELL:  Judge, I'm struggling to understand

21    how the defendants --

22             THE COURT:  Well, I'm -- I'm sorry.  I didn't mean

23    to interrupt you.  Go ahead.

24             MR. FARRELL:  I'm struggling to understand how the

25    defendants can spend the better part of today challenging
```

1    the data sources of this witness and then, when I point out

2    what the data sources are, their objections get sustained.

3    I apologize.

4              THE COURT:  Well, I've made a ruling.  Go ahead.

5    This is plowing ground that we've been over and over, I

6    believe.

7              MR. FARRELL:  Well, now -- and I believe you

8    offered me the opportunity to lay the foundation through

9    other means.

10             THE COURT:  Well, I did, but I -- I'm not sure

11   this is the proper way to do it at this point in the trial.

12             BY MR. FARRELL:

13   **Q.**   Now, there are a number of questions that were asked of

14   you during direct regarding why opioids are at a higher

15   prescription rate in West Virginia than other states.  In

16   your role as a public health officer, have you seen any

17   indication that obesity, say, is a driving factor in higher

18   opioid rates?

19   **A.**   Can I explain that further?

20   **Q.**   Sure.

21   **A.**   Shortly.  So, I had mentioned this morning it's not

22   just obesity.  It's the consequences of obesity.  It's what

23   happens because of that.  It's how much disability you have

24   from obesity.  It's how much arthritis you get from obesity.

25             So, if you start to look at the data from arthritis,

1    for example, from, you know, 2003 to 2017, you will see

2    there's two points increase in arthritis.

3         If you similarly look -- start to look at the data of

4    mortality from obesity, thinking if you're about to die,

5    you're going to have need for pain because of neuropathy and

6    other complications of diabetes.

7         You see that a mortality rate from obesity, Your Honor,

8    went down over the years.  They didn't go up.  Similarly,

9    the chronic conditions, the other things you will see, a

10   disability or any level of impairment from obesity, if

11   you'll look at that over the -- from 2000 to 2010, those

12   levels went down, didn't go up.

13        Another factor is cancer that can happen from obesity.

14   If you look at the West Virginia cancer rates, we went --

15   and not just cancer rates because, if you get a little spot

16   on the skin cancer, you don't need opioids for that.  It's

17   the cancers that kill you because, end of life, that's what

18   you use opioids for.  Those numbers went down 18 percent,

19   cancer morality, between 2000 and 2010, I believe.  So, the

20   numbers actually were trending in the opposite direction.

21   Q.   What about age?  Is the fact that West Virginia has an

22   older population a justification for a higher rate of a

23   prescribing of opioids?

24             MS. MAINIGI:  Objection, foundation.  He's not

25   here as a prescribing doctor, Your Honor.

```
 1              THE COURT:  Sustained.

 2              BY MR. FARRELL:

 3    Q.   Are you familiar with -- in the field of public health

 4    whether or not age is a factor in the prescribing of

 5    opioids?

 6    A.   Yes.

 7    Q.   Please explain.

 8    A.   As I testified earlier, the older one goes, there is

 9    more likely of having conditions that lead you to have

10    chronic pain, things like arthritis, things like cancer.

11    So, there are conditions which cause you to have an

12    appropriate management of pain.

13         They could be no medication.  They could be

14    non-pharmaceutical intervention for pain.  It could be

15    pharmaceutical intervention for pain.  A non-opioid.  And

16    there could be opioid interventions for chronic pain, as

17    well.  Given all of these options but, clearly, when you're

18    older, the needs for pain management is a lot more than you

19    are younger.

20    Q.   Thank you.  Final question.  In the Exhibit P-41213

21    there was a discussion about the scope of your historical

22    analysis and the testimony was that you had used the

23    reference point of 2001 and you were asked on cross

24    examination, or it was elicited earlier, that you looked

25    back to 1999 and your testimony was that, in '99, West
```

1    Virginia was below the national average.

2         My question is, can you quantify from 1999, based on

3    your recollection, where West Virginia fell within the

4    national average?

5              MS. MAINIGI:  Objection, Your Honor, foundation.

6              THE COURT:  I'm going to let him answer that one.

7    Overruled.

8         Answer it if you can.

9              THE WITNESS:  Yes, sir.  In 1999, according to the

10   data of the Health Sciences Center, Health Statistics Center

11   in West Virginia, our rate for overdose death rate was 4.1

12   per hundred thousand people.  The national rate at the time

13   was six per 100,000 people.  So, our rate in West Virginia,

14   overdose death rate, was lower significantly than the

15   national rate and that flipped in 2001.  And, by 2017-2018,

16   it was all the way up to 57 -- 52 to 57 deaths, depending on

17   which area you're looking at.

18             THE COURT:  Hasn't he already testified to all

19   this?

20             MR. FARRELL:  Sir, he did not quantify the 1999

21   numbers.

22             THE COURT:  All right.

23             MR. FARRELL:  And I believe he did quantify the

24   current ones.  He just didn't quantify 1999.

25        That's all the questions I have, Judge.  Thank you.

1          MS. MAINIGI:  No recross, Your Honor.

2          THE COURT:  Mr. Hester, do you have anything?

3          MR. HESTER:  I have one question, Your Honor, and

4    I will be very brief.

5                    **RECROSS EXAMINATION**

6          **BY MR. HESTER:**

7    **Q.**   Dr. Gupta, just one question for you.  Ms. Kearse asked

8    you to look at Plaintiff's Exhibit 41213.  This is the

9    Historical Overview of Drug Overdose Deaths, 2001 to '15.

10   And Ms. Kearse pointed you to Page 5 and asked you to read

11   into the record the sentence that the number one cause of

12   drug overdose deaths was associated with opiates.  Do you

13   recall that?

14   **A.**   Yes.

15   **Q.**   And the reference opiates there includes illegal drugs,

16   illegal heroin, illicit Fentanyl.  It's not prescription

17   opioids; it's all opiates, correct?

18   **A.**   Opiates, particularly, are naturally synthesized.  That

19   would include several of the nonsynthetic, natural

20   so-called, opioids.  That would include illicit, as well.

21   **Q.**   So, include heroin?

22   **A.**   Yes.

23   **Q.**   And would include Fentanyl that's laced into heroin,

24   correct?

25   **A.**   To the point that -- Fentanyl, I'm not -- I have not

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1     known Fentanyl to be a naturally occurring opioid, so I

 2     would include Fentanyl in that.

 3              MR. HESTER:  Okay, thank you.  That's all the

 4     questions I have.

 5         Thank you, Your Honor.

 6              THE COURT:  Ms. Callas, do you have anything?

 7              MS. CALLAS:  No, Your Honor.  Thank you.

 8              THE COURT:  May Dr. Gupta be excused?

 9              MS. MAINIGI:  Yes, Your Honor.

10              THE COURT:  Thank you, sir, very much, and we

11     appreciate your indulgence with us.  And I know you've got

12     things you need to deal with and I wish you the best.  And

13     thank you, sir, very much for being here.  Appreciate it.

14              THE WITNESS:  Thank you, Your Honor.

15              THE COURT:  You're free to go.

16              THE WITNESS:  Thank you.

17              MR. FARRELL:  Judge, may we have five minutes to

18     make a witness change?

19              THE COURT:  Yes.  Let's be in recess for five

20     minutes.

21         (Recess taken)

22              MS. CALLAS:  Your Honor, I have one housekeeping

23     matter.  If I might move the admission of Defendant's

24     Exhibit 2906.  It was the 2016 Annual Report.

25              MS. KEARSE:  No objection.
```