# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>       Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>       Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>       Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.,<br><br>       Defendants. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
FOR JUDGMENT ON PARTIAL FINDINGS REGARDING ABATEMENT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 2

I.   EQUITABLE ABATEMENT DOES NOT INCLUDE RECOVERY OF COSTS
     FOR THE DOWNSTREAM EFFECTS OF THE ALLEGED NUISANCE. .................... 2

II.  PLAINTIFFS MAY NOT RECOVER FOR FUTURE TREATMENT COSTS. ............ 10

III. PLAINTIFFS' ABATEMENT PLAN IS FUNDAMENTALLY FLAWED. ................... 11

     A.   Plaintiffs' Plan Lacks Fit and Would Result in an Improper Windfall
          Recovery. ........................................................................................................ 12

     B.   The Establishment of a Court-Supervised Trust Fund Does Not Cure the
          Fatal Defects In Plaintiffs' Requested Relief. ......................................................... 14

     C.   Joint and Several Liability Does Not Apply, Nor Would It Cure the Fatal
          Defects In Plaintiffs' Requested Relief. ................................................................. 15

CONCLUSION .............................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*State ex rel. AmerisourceBergen Drug Corp. v. Moats,*
  859 S.E.2d 374 (W. Va. 2021)........................................................................................5

*Bansbach v. Harbin,*
  229 W. Va. 287, 728 S.E.2d 533 (2012)........................................................................6

*Burch v. Nedpower Mount Storm, LLC,*
  220 W. Va. 443, 647 S.E.2d 879 (2007)....................................................................4, 6

*Duff v. Morgantown Energy Assocs.,*
  187 W.Va. 712, 421 S.E.2d 253 (1992)..............................................................4, 6, 11

*Edmonds v. Compagnie Generale Transatlantique,*
  443 U.S. 256 (1979)....................................................................................................16

*Farley v. Crystal Coal & Coke Co.,*
  85 W. Va. 595, 102 S.E. 265 (1920)............................................................................16

*Grant Thornton, LLP v. FDIC,*
  694 F. Supp. 2d 506 (S.D. W. Va. 2010)......................................................................17

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944)....................................................................................................17

*Hendricks v. Stalnaker,*
  181 W. Va. 31, 380 S.E.2d 198 (1989)..........................................................................4

*Ilosky v. Michelin Tire Corp.,*
  172 W. Va. 435, 307 S.E.2d 603 (1983)................................................................12, 13

*Jaffee v. United States,*
  592 F.2d 712 (3d Cir. 1979)..........................................................................................9

*Kenney v. Liston,*
  233 W. Va. 620, 760 S.E.2d 434 (2014)......................................................................13

*Landis v. Hearthmark, LLC,*
  232 W. Va. 64, 750 S.E.2d 280 (2013)........................................................................17

*Martin v. Williams,*
  141 W. Va. 595, 93 S.E.2d 835 (1956)..........................................................................3

*McMechen v. Hitchman-Glendale Consol. Coal Co.,*
  88 W. Va. 633, 107 S.E. 480 (1921)....................................................................8, 9, 17

*Modular Bldg. Consultants of W. Va., Inc. v. Poerio, Inc.*,
    235 W. Va. 474, 774 S.E.2d 555 (2015)................................................................17

*People v. ConAgra Grocery Prods. Co.*,
    227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017)......................................................6, 7

*Pope v. Edward M. Rude Carrier Corp.*,
    138 W. Va. 218, 75 S.E.2d 584 (1953)..................................................................2

*Rhodes v. E.I. du Pont de Nemours & Co.*,
    636 F.3d 88 (4th Cir. 2011) ...................................................................................2

*Russell v. Nostrand Athletic Club*,
    212 A.D. 543, 209 N.Y.S. 76 (App. Div. 1925) ...................................................3

*State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*,
    200 W. Va. 221, 488 S.E.2d 901 (1997).....................................................2, 4, 7, 8

*Szedlock v. Tenet*,
    139 F. Supp. 2d 725 (E.D. Va. 2001) .............................................................13, 15

*West v. Nat'l Mines Corp.*,
    168 W. Va. 578, 285 S.E.2d 670 (1981)..............................................................16

**Statutes and Regulations**

W. Va. Code § 18-2-13 ......................................................................................14

**Other Authorities**

Dobbs, Law of Remedies (2d ed. 1993) ......................................................................9

Dobbs et al., The Law of Torts (2d ed. sup. 2020) ......................................................9

Restatement (Second) of Torts (Am. Law Inst. 1979)................................................17

## INTRODUCTION

Plaintiffs' opposition entirely fails to overcome the arguments made in Defendants' opening brief.

*First*, Plaintiffs' opposition rests on the flawed premise that the "nuisance" to be "abated" is the nebulous concept of the entire "opioid crisis."  Plaintiffs are wrong.  Both the case law and fundamental principles of tort law make clear that an actionable nuisance involves conduct, not harms flowing from that conduct, and that abatement consists, at most, of eliminating that conduct. Because Plaintiffs do not even attempt to argue that their requested remedy addresses Defendants' allegedly actionable conduct, they have failed entirely to establish their entitlement to abatement relief.

*Second*, Plaintiffs make the demonstrably incorrect statement that Defendants are responsible for treatment and services for individuals who develop opioid use disorder for the first time in the future because "[t]here will be new cases that are required to be abated, whether or not they are the direct result of Defendants' conduct."  Opp. (Dkt. No. 1470) at 40.  This argument rests on the similarly faulty premise that the opioid epidemic will "independently cause[] new addicts."  *Id.*  Aside from raising clear issues of proximate causation, basic tort law principles preclude recovery for harm Defendants did not cause.

*Third,* Plaintiffs have failed to overcome the critical flaw in their proposed plan: that it would result in an improper windfall because it seeks billions of dollars to fund services that Plaintiffs have never paid for and will never pay for, does not take into account any of the substantial ongoing efforts already underway in Cabell/Huntington to remedy opioid addiction and abuse, and is not tied in any way to Defendants' conduct.  Plaintiffs' newfound suggestion that abatement funds will be placed in a "court supervised trust fund" does not remedy those flaws, nor does Plaintiffs' failed attempt to invoke joint and several liability.

Accordingly, Plaintiffs have entirely failed to prove entitlement to any remedy, and judgment under Rule 52(c) is warranted.[1]

## ARGUMENT

### I.   EQUITABLE ABATEMENT DOES NOT INCLUDE RECOVERY OF COSTS FOR THE DOWNSTREAM EFFECTS OF THE ALLEGED NUISANCE.

Plaintiffs contend that the "nuisance" at issue here is the nebulous concept of the "opioid crisis," not Defendants' allegedly actionable conduct—and that Plaintiffs therefore are entitled to equitably abate the "opioid epidemic" in its entirety. *See* Opp. at 23–25. Plaintiffs are wrong on both counts. Abatement here could consist of, at most, enjoining Defendants' allegedly wrongful conduct or eliminating the alleged "excessive" volume of pills created by that conduct. Because Plaintiffs do not seek such relief, their abatement claim fails.

***First***, West Virginia case law establishes that a nuisance consists of ***conduct***. As explained in Defendants' opening brief, *see* Br. at 9–10, a public nuisance is "the ***doing of or the failure to do something*** that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public."[2] *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 245 n.28, 488 S.E.2d 901, 925 n.28 (1997); *see also Pope v. Edward M. Rude Carrier Corp.*, 138 W. Va. 218, 226, 75 S.E.2d 584, 589 (1953) (explaining that "[p]ublic nuisances always arise out of unlawful ***acts***" and evaluating the defendant's conduct to assess whether the transportation of explosives was a nuisance); *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011) (applying West Virginia law and

---

[1] Plaintiffs' opposition also includes responses to Cardinal Health's Motion for Judgment, Dkt. No. 1453. To avoid burdening the Court, Defendants do not address in this paper the points made by Plaintiffs in response only to the separate Motion for Judgment filed by Cardinal Health.

[2] All emphases are added unless otherwise noted.

2

explaining that a "public nuisance is created" when "a defendant's ***conduct*** 'unlawfully operates to hurt or inconvenience an indefinite number of persons'" (quoting *Duff v. Morgantown Energy Assocs.*, 187 W.Va. 712, 421 S.E.2d 253, 257 (1992))).  This conclusion necessarily flows from the fundamental principle of tort law that "[a] tort is ***conduct*** that amounts to a legal wrong and that causes harm."  Dobbs et al., The Law of Torts § 1 (2d ed. sup. 2020).

Plaintiffs ignore this and instead place great weight on language from some decisions stating that an "act or condition" may be a nuisance.  *See* Opp. at 23–24 (quoting *Martin v. Williams*, 141 W. Va. 595, 611, 93 S.E.2d 835, 844 (1956)).  Plaintiffs rely on this language of a "condition" to argue that the nuisance is the resulting *harm*—here, allegedly, the entirety of the opioid crisis—and not the actionable conduct.  Opp. at 23–24.  But *Martin v. Williams*, the case on which Plaintiffs rely, in fact demonstrates (consistent with the long line of authority discussed above) that a nuisance is conduct, not the harms caused by that conduct.  There, the court held that the operation of a used car lot in a residential neighborhood was a nuisance, and in that context stated that a "condition is a nuisance when it clearly appears that enjoyment of property is materially lessened, and physical comfort of persons in their homes is materially interfered with thereby."  *Martin*, 93 S.E.2d at 844.  The "condition" creating the nuisance and the "condition" subject to abatement was the defendant's conduct—the operation of its business.  *See id.* ("[T]he carrying on of such business in such locality becomes a nuisance.").[3]  The other cases Plaintiffs

---

[3] The case *Martin* cites for the proposition that "[a] condition is a nuisance," *Russell v. Nostrand Athletic Club*, was itself an action "to enjoin the defendant, Nostrand Athletic Club, Inc., from ***maintaining and operating*** an open air arena for boxing exhibitions."  212 A.D. 543, 544, 209 N.Y.S. 76, 76 (App. Div. 1925), *aff'd as modified*, 240 N.Y. 681, 148 N.E. 756 (1925).  The court referred to the operation of a boxing ring as a "condition," but the analysis was the same—whether the defendant's conduct constituted a nuisance.  *See id.* at 78 (holding that "the conditions shown do constitute a nuisance and that the plaintiffs are entitled to have these exhibitions or fights stopped, at least in the nighttime").

cite that use the terminology of a "condition" are the same:  in each, the court defined the nuisance at issue as the actionable conduct.  *See, e.g.*, *Burch v. Nedpower Mount Storm, LLC*, 220 W. Va. 443, 450, 647 S.E.2d 879, 886 (2007) ("[N]uisance is the unreasonable, unusual, or unnatural ***use*** of one's property so that it substantially impairs the right of another to peacefully enjoy his or her property."); *Hendricks v. Stalnaker*, 181 W. Va. 31, 36, 380 S.E.2d 198, 203 (1989) ("We find that the evidence presented clearly does not demonstrate that the water well is an unreasonable ***use*** of land and, therefore, does not constitute a private nuisance."); *Duff*, 421 S.E.2d at 262 (explaining that "[i]t does not clearly appear from the record that ***conducting the proposed trucking*** in this locality will be unreasonable or that it is reasonably certain to cause serious harm" but that "the proposed trucking may constitute a public nuisance once it is operational" (citation omitted)).

To be sure, there might be circumstances (particularly in the environmental context) where a "condition" is deemed a nuisance if it is functionally equivalent to the actionable conduct.  *Kermit Lumber* is illustrative.  There, the relevant conduct was the depositing of arsenic "on the Kermit Lumber business site in amounts above the regulatory limits," which then "flow[ed] into the Tug Fork River."  488 S.E.2d at 925.  To the extent the nuisance was conceived of as a "condition," the condition was the excessive arsenic deposited in the soil, which remained even after the defendants' conduct had ceased.  *See id.*  And it was those contaminants the Court held could be removed or "abated" in order to eliminate the nuisance.  *Id.* at 925 n.29.  On those facts, this abatement in effect reversed the actionable conduct that gave rise to the nuisance.

Applying the same *Kermit Lumber* framework here, even assuming that Defendants distributed an "excessive" number of pills (they did not), the remedy of abatement would be limited to stopping further distribution of "excessive" pills and, perhaps, recovering "excessive" pills from the community (comparable to *Kermit Lumber*'s requirement to remove excessive arsenic from

4

the soil).  But under Plaintiffs' untenable and overbroad view, the nuisance in *Kermit Lumber* would have been the adverse health effects resulting from the arsenic contamination, and not the deposits of contaminants.  That overly broad conception of nuisance would completely eliminate the settled proposition that a nuisance is defined by conduct, not its adverse effects.

The fact that Plaintiffs' proposed definition of the nuisance—the opioid crisis as a whole— consists almost entirely of harms caused by non-parties, such as the trafficking or use of illegal opioids, or the diversion of prescription opioids by family, friends and drug dealers, only demonstrates why the nuisance must be based on Defendants' conduct, not the nebulous concept of "the opioid crisis."  Plaintiffs can and do argue that illegal drug use and trafficking, opioid abuse and diversion, and the myriad harms that may flow from those acts are injuries ***caused*** by the alleged over-shipment of prescription opioids.  But this only demonstrates that these are harms allegedly flowing from the nuisance, and are ***not*** the nuisance itself.

***Second***, the case law makes equally clear that the remedy of abatement is limited to stopping the nuisance—*i.e.*, eliminating the actionable conduct.  As explained in Defendants' opening brief, equitable abatement has historically been limited to an injunction designed to eliminate the allegedly tortious conduct or, in certain environmental nuisance cases, an injunction to remove the contaminant from the environment.  *See* Br. at 11.  That is because, "[u]nder the traditional definition of abatement, nuisance claims seek court intervention to ***require one party to stop doing something*** that affects another. . . . Examples of ***conduct that may be enjoined*** include merry-go-rounds, and loud singing, talking, dancing, and opening and shutting doors." *State ex rel. AmerisourceBergen Drug Corp. v. Moats*, 859 S.E.2d 374, 389–90 (W. Va. 2021) (Armstead, J., concurring in part) (internal citations omitted).  Thus, where a plaintiff has

successfully proven that conduct is a nuisance, a court may "abate the ***activity***." *Burch*, 647 S.E.2d at 891.[4]

Yet Plaintiffs seek, under the guise of abatement, to have Defendants pay for (1) the future medical treatment of people with opioid use disorder ("OUD") in Cabell/Huntington, and (2) other remediation programs directed to combatting the downstream effects of OUD and addiction, such as vocational training, treatment for infants born with neonatal abstinence syndrome, and treatment for IV drug users who develop blood-borne diseases (even though Defendants undisputedly do not distribute the illicit, injectable opioids that cause blood-borne diseases). Plaintiffs suggest this is proper because abatement extends to the "resulting harmful conditions caused by Defendants' conduct." Opp. at 25. In support, Plaintiffs rely on *People v. ConAgra Grocery Prods. Co.* for the proposition that "[a]n abatement order is an equitable remedy," and "[a]n equitable remedy's sole purpose is to ***eliminate the hazard*** that is causing prospective harm to the plaintiff." 227 Cal. Rptr. 3d 499, 569 (Cal. Ct. App. 2017); Opp. at 28.[5]

But *ConAgra*, far from supporting Plaintiffs' position, demonstrates that the "hazard" subject to abatement is the defendant's conduct, ***not*** the harm that allegedly flows from that conduct. In *ConAgra*, the plaintiffs alleged that the defendants' improper marketing and sale of

---

[4] Plaintiffs contend that West Virginia courts' historical practice of limiting abatement to injunctions is "unremarkable" because those cases did not address "limits" on the remedy of abatement. Opp. at 26–27. Plaintiffs miss the point: abatement has historically been invoked only for injunctions ***because*** it is for ***cessation of conduct***. *See, e.g.*, *Duff*, 421 S.E.2d at 258 (noting that "courts generally grant injunctions to abate existing nuisances"). Those cases did not need to address the limits of abatement because they correctly characterized the remedy for harms caused by the nuisance ***as damages***. *See, e.g.*, *Bansbach v. Harbin*, 229 W. Va. 287, 290, 728 S.E.2d 533, 536 (2012) (requesting injunctive relief, characterized as abatement, ***and*** monetary damages); *see also* Br. at 11 n.20 (collecting cases).

[5] As explained in Cardinal Health's Motion for Judgment, Dkt. No. 1453, *ConAgra* is inapplicable because federal law controls federal equitable remedies, *see* Dkt. No. 1453 at 52—a point Plaintiffs did not contest at oral argument or in their opposition. *See generally* Opp.

6

lead paint for use in homes constituted a public nuisance. *ConAgra Grocery Prod. Co.*, 227 Cal. Rptr. 3d at 529. The evidence reflected that lead paint used in homes resulted in lead poisoning and caused developmental and health defects, including brain damage in exposed children. *Id.* at 514–16. After finding a public nuisance under California law, the court ordered the nuisance abated. *Id.* at 569. Importantly, the abatement consisted of ***removing the lead paint*** from the homes, ***not*** medical or other treatment for harms resulting from exposure to the lead paint. *Id.* As the court stated, "the abatement account would be utilized ***not to recompense anyone for accrued harm*** but solely to pay for the prospective removal of the hazards defendants had created"—*i.e.*, removal of the lead paint. *Id.* at 569. The abatement remedy thus was tied to reversing the defendants' conduct in promoting lead paint for use in homes (comparable to the remedy of removal of excessive levels of arsenic in *Kermit Lumber*); it did not include any provision for medical treatment or other costs to address harms caused by exposure to lead paint. Plaintiffs thus are simply wrong in suggesting that abatement can properly extend to rectifying downstream harms caused by an alleged nuisance.

As explained in Defendants' opening brief, Plaintiffs' error is best demonstrated by a simple analogy. If a defendant wrongfully dumps pollutants into a lake, the dumping may constitute a public nuisance. A court could, as part of an abatement remedy, enjoin the defendant from the conduct—*i.e.*, dumping further pollutants. The court could even order the defendant to reverse or eliminate the offending conduct by removing the previously dumped pollutants from the lake. But what a court may not do, as an abatement remedy, is to order payment for harms and adverse effects caused by the nuisance—such as paying for future medical treatment for people who drink from the lake. Plaintiffs have no answer to this point, and both *Kermit Lumber* and

*ConAgra* clearly reflect this distinction between conduct giving rise to a nuisance and the harms caused by a nuisance.

Abatement in this case extends no further.  Thus, like in *Kermit Lumber* and *ConAgra*, abatement here could, at most, consist of an injunction to stop the flow of excessive pills into Cabell/Huntington and/or the removal of excessive pills from the community.

***Third, and finally,*** it is abundantly clear that Plaintiffs' remedial plan addresses downstream effects of opioid abuse and addiction, not Defendants' allegedly wrongful conduct. That relief would constitute damages, not abatement.

Plaintiffs do not contest that the remedy they seek is not limited to eliminating Defendants' allegedly wrongful conduct, nor do they contest that virtually the entirety of their requested relief consists of remedies for downstream effects of opioid abuse.  They effectively concede this point, noting that the abatement remedy seeks to rectify "the ***going forward harms*** resulting from the opioid epidemic."  Opp. at 13.

But the distinction between "abatement of nuisances and recovery of damages for injuries occasioned by wrongful acts, constituting nuisances," is both "apparent" and "vast."  *McMechen v. Hitchman-Glendale Consol. Coal Co.*, 88 W. Va. 633, 107 S.E. 480, 482 (1921).  Plaintiffs' requested remedy clearly falls in the latter category.  Plaintiffs' proposed plan consists almost entirely of payment for precisely the sort of injuries and harms that sound in damages.  As Plaintiffs explain, "[t]he Plan addresses overdoses, opioid addiction, and other health problems," Opp. at 5, including medical treatment for individuals who develop HIV as a result of intravenous drug use, grief counseling for individuals who lose a loved one to an overdose, and housing for individuals who become homeless as a result of their drug use.  *See* 6/28 Tr. (Alexander) at 47:1–5, 141:14–143:9, 143:16–145:8.  Dr. Alexander himself characterized many of these programs as "treat[ing]

some of the ***collateral or downstream harms*** that have occurred because of addiction."  6/28 Tr. (Alexander) at 47:1–5.  And costs for medical treatment are the quintessential example of "damages for injuries occasioned by wrongful acts."  *McMechen*, 107 S.E. at 482; *see also, e.g.*, *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir. 1979) (explaining that "the request for prompt medical examinations and all medical care and necessary treatment, in fact, is a claim for money damages" and "a traditional form of damages in tort compensation for medical expenses to be incurred in the future").[6]

Thus, it is clear that the proposed abatement plan is addressed to compensating Plaintiffs for "the cost[s] of eliminating the nuisance ***effects*****,**" which constitutes damages.  Dobbs, 1 Law of Remedies § 5.7(3) (2d ed. 1993).[7]  This is not a proper abatement remedy.  Under West Virginia law, the Court may not award as abatement monetary relief designed to remediate the alleged downstream effects of opioid addiction and abuse.  And Plaintiffs do not dispute that they have waived any claim for damages, which bars them from seeking a remedy based on addiction treatment and other harms arising from opioid abuse and addiction.  *See* Br. at 7–8.

---

[6] Plaintiffs attempt to side-step this by suggesting that "future harms" can be only lost revenue or property damages.  Opp. at 14.  But principles of damages are far broader than those two categories, and clearly encompass the many aspects of Plaintiffs' abatement plan that seek to treat opioid addiction and to address related harms associated with addiction.  *See, e.g.*, 6/28 Tr. (Alexander) at 59:18–24 (explaining that the "recovery" category of his plan includes "programs and services that aren't focused" "directly on treating individuals with active addiction, but nevertheless will allow for those individuals to flourish and for the community as a whole to regain its former livelihood and standing").

[7] Plaintiffs try to blur this point by arguing that the West Virginia Mass Litigation Panel ("MLP"), "characterized similar claims as equitable in the state court opioid litigation."  Opp. at 14.  But the MLP Order cited by Plaintiffs simply reiterates that "[d]amages, whether future or past, are focused on compensation for an injury," whereas "[a]batement is to ***rectify the nuisance itself***."  Opp. at 14 n.71 (quoting *In re Opioid Litig.*, No. 19-C-9000 (W. Va. Cir. Ct., Kanawha Cty. July 29, 2020), ¶¶ 13–14).

9

## II.  PLAINTIFFS MAY NOT RECOVER FOR FUTURE TREATMENT COSTS.

Plaintiffs do not deny that the proposed abatement plan consists of treatment and other services for Cabell/Huntington residents who are not now addicted to opioids but who may, according to Plaintiffs, become addicted at some point in the future. *See* Opp. at 37–40.  Nor do they deny that Dr. Caleb Alexander, Plaintiffs' proffered abatement expert, does not know what portion of the people treated or otherwise served by his proposed plan will develop addiction in the future based on future drug abuse.

Instead, Plaintiffs take issue with the 84% remission rate testified to by their own expert, Dr. Corey Waller.  They suggest that it has some infirmity because it is the rate he "achieved in his practice," rather than the 70% remission rate reflected in the academic literature.  Opp. at 38 & n.155 (citing 5/4 Tr. (Waller) at 216:6–15).  But under either remission rate, it is clear that all, or nearly all, of the current OUD population assumed by Dr. Alexander could be treated in just four years' time.[8]  *See* Br. at 16.  Indeed, even assuming that some portion of the population relapses or stays in treatment after remission, as Plaintiffs argue, it is clear that a large portion of the people encompassed within Dr. Alexander's plan would be people who newly develop OUD at some point in the future.  *See* Br. at 15–17.  Plaintiffs mount no serious challenge to that basic fact.

Plaintiffs also do not contest that they presented no evidence of any future conduct by Defendants, let alone future conduct that is wrongful and will proximately cause future addiction

---

[8] Dr. Alexander's starting OUD population is 7,882 people, and he assumes that roughly 3,000 of those people will be treated annually for OUD.  6/28 Tr. (Alexander) at 156:17–21.  If the remission rate is 84%, as Dr. Waller testified, all of the current OUD population could be treated in just four years' time (3,000 x 0.84 x 4 = 10,080).  *See* Br. at 16.  The same conclusion would follow if the remission rate is 70%, as Plaintiffs claim—all of the current OUD population could be treated in just four years' time (3,000 x 0.70 x 4 = 8,400).

of residents in the Cabell/Huntington community.  Accordingly, Plaintiffs have no evidence of any future nuisance that would support an abatement remedy for this speculative future population. *See* Br. at 17.  Indeed, they have no evidence of a current nuisance—they presented no evidence, or even argument, of defects in Defendants' suspicious order monitoring systems since 2012. Their only rejoinder to this is to argue that the opioid epidemic will "independently cause[] new addicts," and therefore "[t]here will be new cases that are required to be abated, whether or not they are the direct result of Defendants' conduct."  Opp. at 40.  But the case law establishes that Plaintiffs must meet a "heavy burden" to prove that prospective harm "is reasonably certain to result from the proposed [conduct]."  *Duff*, 421 S.E.2d at 262.  Accordingly, under basic principles of tort law and proximate causation, Defendants cannot be held liable for or be obliged to remedy future injuries that are not "the direct result of Defendants' conduct."

Finally, Plaintiffs incorrectly assert that it is Defendants' "burden to convince the Court what portion of this harm is proper to allocate elsewhere," Opp. at 41 & n.166.  This argument misses the point.  Plaintiffs seek recovery for future harms with absolutely no evidence of any future conduct by Defendants that gives rise to those harms.  They have a complete failure of proof that would entitle them to a remedy for future harms unmoored from Defendants' conduct.  And they have waived any damages claim for past harms.  *See* Br. at 7–8.

### III.    PLAINTIFFS' ABATEMENT PLAN IS FUNDAMENTALLY FLAWED.

Plaintiffs' proposed plan suffers from another critical flaw:  it would result in an improper windfall because it seeks billions of dollars to fund services that Plaintiffs have never paid for and will never pay for, does not take into account any of the substantial ongoing efforts in Cabell/Huntington to remedy opioid addiction and abuse, and is not tied in any way to Defendants' alleged actionable conduct.  Plaintiffs' proposal (advanced for the first time in their opposition)

11

that the abatement money will be placed in a "court supervised trust fund," Opp. at 37, does not remedy these flaws, nor does Plaintiffs' failed attempt to invoke joint and several liability.

### A. Plaintiffs' Plan Lacks Fit and Would Result in an Improper Windfall Recovery.

Plaintiffs admit that the abatement plan does not account for the existing services provided in Huntington and Cabell. *See* Opp. at 35–36; *see also, e.g.*, 6/28 Tr. (Alexander) at 96:18–22 ("Q. Now, Dr. Alexander, in estimating the level of services required, did you subtract out the level of services that are currently being provided in the City of Huntington and Cabell County? A. No, I did not."). Nor do they contest that Plaintiffs have not and will not pay for or provide these services. *See* Opp. at 36.

Instead, Plaintiffs contend that because "current funding" provided by third parties to other third-party programs that Plaintiffs do not run is "unstable," Plaintiffs should be awarded billions of dollars for programs they do not run or fund. *Id.* at 36. But that is the point: whether or not that funding is "unstable"—and the evidence shows it is not[9]—Plaintiffs do not provide those programs or the funding.[10] Accordingly, paying billions of dollars to Plaintiffs for these programs would result in a windfall.

Plaintiffs attempt to sidestep this critical defect by invoking the collateral source rule. Opp. at 36. That argument fails for three independent reasons. First, the collateral source rule applies only to awards for damages, not to requests for equitable abatement. *See, e.g.*, *Ilosky v. Michelin*

---

[9] *See, e.g.*, 7/12 Tr. (Colston) at 134:1–5 (testifying that West Virginia has approximately $80 million in unspent federal funds for opioid abuse programs); *id.* at 99:1–12 (Medicaid is a stable source of funding that is not grant-based).

[10] Nor is the plan "conservative," as Plaintiffs claim. Opp. at 35. As Defendants demonstrated, changing a single data input from Dr. Alexander's plan—replacing his unsupported 365-day treatment estimate with treatment duration data from SAMHSA—results in a prediction of ***over one billion dollars less*** than Dr. Alexander's plan. 7/12 Tr. (Rufus) at 46:22–47:1.

*Tire Corp.*, 172 W. Va. 435, 438, 307 S.E.2d 603, 606 (1983) ("The collateral source rule excludes payments from other sources to plaintiffs from being used to reduce ***damage awards*** imposed upon culpable defendants."); *Kenney v. Liston*, 233 W. Va. 620, 626, 760 S.E.2d 434, 440 (2014) (same). As this Court has recognized, "[a]t least one district court in this circuit has limited the full force of the collateral source rule's effect in determining a remedy of an equitable nature," Mem. Op. & Order (Dkt. No. 1281), at 5, because "equitable principles require an appropriate offset to ensure that plaintiff is only made whole and is not awarded a windfall." *See Szedlock v. Tenet*, 139 F. Supp. 2d 725, 736 (E.D. Va. 2001), *aff'd*, 61 F. App'x 88 (4th Cir. 2003).

Second, the collateral source rule is not implicated because the payments at issue are not payments from "other sources ***to plaintiffs***," *Ilosky*, 307 S.E.2d at 606—rather, they are payments from non-parties to other non-parties to perform services that Plaintiffs do not, and admittedly will not, perform or pay for. *See, e.g.*, 6/30 Tr. (Williams) at 143:24–144:1 (Mayor Williams testifying that he "never would expect the city government to actually start running treatment programs or funding treatment programs").

And third, Plaintiffs' invocation of the collateral source rule misses the point. Plaintiffs request funding to "abate" the nuisance, and abatement is complete once the nuisance has been eliminated. Thus, the provision of programs and funding by non-parties is relevant to the question of what ***additional*** resources are necessary for the nuisance to be fully abated. *See* Mem. Op. & Order (Dkt. No. 1281), at 6 ("To the extent the Court determines this scope [of abatement] is narrowed by other programs already in place in [Cabell and Huntington], and/or additional sources of funding that may exist, the Court can exercise its equitable powers to deviate from the full costs of abatement to a more just and appropriate amount." (quoting *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4043938, at *3 (N.D. Ohio Aug. 26, 2019))).

13

**B.      The Establishment of a Court-Supervised Trust Fund Does Not Cure the Fatal Defects In Plaintiffs' Requested Relief.**

Plaintiffs' suggestion that the Court establish a "court supervised trust fund" to pay for programs the City and the County do not fund or administer is no answer to these fundamental flaws. Opp. at 37. First, there is no evidence (and Plaintiffs do not cite evidence) establishing that third parties need additional funds to run the many programs that are already in place in Cabell/Huntington to address the opioid crisis. On the contrary, there is ample record evidence that funding for the largest elements of the abatement plan—namely medical treatment and foster and adoption services[11]—is both sufficient and readily available.[12] Second, creating a "court supervised trust fund" to disburse funds to non-parties that have made no showing of any injury caused by Defendants for programs not run or funded by Plaintiffs would be contrary to fundamental principles of tort causation and injury. Further, disbursing funds to non-parties that are controlled by the State of West Virginia—for example, Marshall University,[13] one of the programs specifically identified by Plaintiffs to receive these funds, Opp. at 18—would result in a

---

[11] *See* 6/29 Tr. (Barrett) at 180:17–181:23 (agreeing that treatment for opioid use disorder, treatment for complications attributable to the epidemic, services for families and children, and services for pregnant women and infants with neonatal abstinence syndrome account for $2.3 billion of the proposed abatement plan).

[12] *See, e.g.*, 7/12 Tr. (Colston) at 134:1–5 (testifying that West Virginia has approximately $80 million in unspent federal funds for opioid abuse programs); *id.* at 99:1–12 (Medicaid is a stable source of funding that is not grant-based); 6/16 Tr. (Young) at 97:16–20, 97:23–98:1, 98:2–8, 98:9–15 (agreeing that Medicaid pays for 86% of neonatal abstinence syndrome treatment for infants, and the majority of treatment for pregnant women with substance use disorder in West Virginia); 6/28 Tr. (Alexander) at 127:9–12, 127:15–17 (OUD treatment and medication-assisted treatment costs are reimbursed by Medicaid and private insurance); 6/28 Tr. (Alexander) at 144:8–11 (agreeing that the State of West Virginia runs foster care services); 6/16 Tr. (Young) at 35:6, 35:18–21 (testifying that the State of West Virginia provides and pays for child-welfare services).

[13] *See, e.g.*, W. Va. Code § 18-2-13d ("[T]he state educational institution located at Huntington, West Virginia, previously known as Marshall College shall, after the effective date of this section, be known as Marshall University, . . . and this university shall remain under the supervision and control of the state board of education.").

double windfall for the State, which has already received its own settlement funds for claims on this precise issue. *See* DEF-WV-02150 (settlement agreement between the State of West Virginia and McKesson Corporation); DEF-WV-02151 (settlement agreement between the State of West Virginia and AmerisourceBergen Drug Corporation); DEF-WV-02152 (settlement agreement between the State of West Virginia and Cardinal Health). Such a windfall would offend "equitable principles" that require that *Plaintiffs* be made whole and no more. *Szedlock*, 139 F. Supp. 2d at 736.

Plaintiffs have also presented no evidence or explanation as to how the fund would be administered or overseen, who would be eligible for payments from the fund, how eligibility would be determined, or what would happen with unused funds. What Plaintiffs propose is social policy, not a tort remedy, and it does not cure the fatal defects in their proposed abatement plan.

### C.   Joint and Several Liability Does Not Apply, Nor Would It Cure the Fatal Defects In Plaintiffs' Requested Relief.

As explained above and in Defendants' opening brief, Plaintiffs' proposed abatement plan is not tied in any way to Defendants' alleged actionable conduct and, among other things, "would provide services and treatment to individuals who ***never took prescription opioids***."   6/28 Tr. (Alexander) at 119:17–120:1. In response to these points—neither of which Plaintiffs seriously dispute—Plaintiffs attempt to invoke the doctrine of joint and several liability as a catch-all. Plaintiffs are mistaken on the law and the facts.

As an initial matter, the doctrine of joint and several liability does not answer the issue raised by Defendants, which is not the apportionment of liability among Defendants, but rather that the components of Dr. Alexander's plan manifestly lack any connection to the allegedly wrongful conduct that Plaintiffs seek to abate. *See generally* Br. at 24–26. That fatal flaw is not addressed by joint and several liability because joint and several liability is implicated only once

15

there has been a determination that the Defendants proximately caused the injury at issue via their conduct.

Regardless, West Virginia law makes clear that joint and several liability does not apply in this case.  As the Supreme Court of West Virginia explained, "[t]wo or more tort-feasors acting independently, without concert, collusion, or pursuit of a common design, in the perpetration of like wrongful acts at the same time, working like injury to the same subject, are not jointly liable for injury subsequently resulting to any person from combination of the consequences of such wrongful acts by the operation of natural causes."  Syl. Pt. 1, *Farley v. Crystal Coal & Coke Co.*, 85 W. Va. 595, 595, 102 S.E. 265, 265 (1920); *id.* (holding that, absent concerted action, different coal mining companies cannot be held jointly and severally liable for pollution of a river into which they all discharged); *accord West v. Nat'l Mines Corp.*, 168 W. Va. 578, 589, 285 S.E.2d 670, 678 (1981).  Plaintiffs put forth no evidence whatsoever that Defendants conspired with each other or with others—particularly criminal drug trafficking organizations—who caused a portion of Plaintiffs' alleged injury.  Each Defendant is therefore "liable ***only*** for the consequences of [its] own wrong," if any.  *Farley*, 102 S.E. at 268.

Joint and several liability is also inapplicable where, as here, the harm is capable of apportionment. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 n.8 (1979) (joint and several liability "principles, of course, are inapplicable where the injury is divisible and the causation of each part can be separately assigned to each tortfeasor" (citing Restatement (Second) of Torts §§ 433A(1) & 881)).  Contrary to Plaintiffs' assertion that "public nuisance by its nature is a condition that typically is indivisible and for which liability cannot be apportioned," Opp. at 33, "[a]s a practical matter, many nuisances are capable of apportionment among two or more persons who contribute to them, because a reasonable basis can be found for dividing the

harm done on the basis of the extent of the contribution of each party."  Restatement (Second) of Torts § 840E cmt. b (Am. Law Inst. 1979).[14]  Indeed, as this Court has recognized, "that the magnitude of each indivisible component part" of a Plaintiffs' harm "cannot be determined with precision" does not mean that the injury is not susceptible to apportionment, because only a "reasonable basis" is required.  *Grant Thornton, LLP v. FDIC*, 694 F. Supp. 2d 506, 525 (S.D. W. Va. 2010) (Faber, J.), *reversed on other grounds*, 435 F. App'x 188, 525 (4th Cir. 2011).  Where such a reasonable basis exists, "each person contributing to the nuisance is subject to liability only for his own contribution"; "[h]e is not liable for that of others."  Restatement (Second) of Torts § 840E cmt. b (1979).  Thus, joint and several liability does not apply.[15]

Thus, although there may be "one" opioid epidemic from a public policy perspective, tort law is tied to conduct and causation, not public policy.  Plaintiffs seek to lump together under the "opioid crisis" label myriad distinct injuries, with myriad distinct causes, that do not constitute a single injury at all.  Indeed, Plaintiffs concede that "[t]here will be new cases that are required to be abated, whether or not they are the direct result of Defendants' conduct."  Opp. at 40.  Joint and several liability simply does not apply.  At a minimum, the harms flowing from prescription opioid

---

[14] Plaintiffs rely on *McMechen*, 107 S.E. at 482, for the proposition that nuisances are indivisible because "a nuisance, considered in all of its aspects and elements, may be an entire thing."  *Id.*  But the Court in that case was discussing the "jurisdiction in courts of equity to enjoin, in one suit, all who participate in the diversion of the waters of a stream, or pollution thereof."  *Id.* at 482–83.  When the remedy is "a temporary injunction restraining and inhibiting the defendants from doing certain acts," *id.* at 481, it makes sense that the remedy—an injunction against conduct rather than payment for harms—is indivisible.

[15] Moreover, the "essence of equity jurisdiction" is the power of the court "to mould each decree to the necessities of the particular case."  *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).  Thus, to the extent that the Court is called upon to craft an equitable remedy, equity and fairness require the Court to consider whether and to what extent Plaintiffs' injury was caused by factors other than Defendants' culpable conduct.  *See, e.g.*, *Modular Bldg. Consultants of W. Va., Inc. v. Poerio, Inc.*, 235 W. Va. 474, 485, 774 S.E.2d 555, 566 (2015) (requiring apportionment for reasons of "simple fairness"); *Landis v. Hearthmark, LLC*, 232 W. Va. 64, 75, 750 S.E.2d 280, 291 (2013) (requiring apportionment to non-party "[b]ased upon equitable principles of fairness").

17

abuse, on the one hand, and the use of illicit non-prescription opioids, on the other hand, are plainly distinct injuries that cannot be viewed as arising from "one" nuisance for purposes of tort law.

## CONCLUSION

For the foregoing reasons and as addressed in Defendants' opening motion, Plaintiffs have failed to prove their entitlement to any abatement relief, and Defendants are entitled to judgment under Rule 52(c).

Dated: August 11, 2021                    Respectfully Submitted,

                                          ***McKesson Corporation***
                                          By Counsel:

                                          <u>/s/ Timothy C. Hester</u>
                                          Timothy C. Hester
                                          Christian J. Pistilli
                                          Laura Flahive Wu
                                          Andrew P. Stanner
                                          COVINGTON & BURLING LLP
                                          One CityCenter
                                          850 Tenth Street NW
                                          Washington, DC 20001
                                          Tel: (202) 662-5324
                                          thester@cov.com
                                          cpistilli@cov.com
                                          lflahivewu@cov.com
                                          astanner@cov.com

                                          <u>/s/ Paul W. Schmidt</u>
                                          Paul W. Schmidt
                                          COVINGTON & BURLING LLP
                                          The New York Times Building
                                          620 Eighth Avenue
                                          New York, New York
                                          Tel: (212) 841-1000
                                          pschmidt@cov.com

                                          <u>/s/ Jeffrey M. Wakefield</u>
                                          Jeffrey M. Wakefield (WVSB #3894)
                                          jwakefield@flahertylegal.com
                                          Jason L. Holliday (WVSB #12749)
                                          jholliday@flahertylegal.com
                                          FLAHERTY SENSABAUGH BONASSO PLLC
                                          P.O. Box. 3843
                                          Charleston, WV 25338-3843
                                          Telephone: (304) 345-0200

                                          ***AmerisourceBergen Drug Corporation***
                                          By Counsel:

                                          <u>/s/ Gretchen M. Callas</u>
                                          Gretchen M. Callas (WVSB #7136)
                                          JACKSON KELLY PLLC
                                          Post Office Box 553

Charleston, West Virginia 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
nicholas@reedsmith.com
smcclure@reedsmith.com

**Cardinal Health, Inc.**
By Counsel:

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Jennifer G. Wicht
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW Washington,
DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard@wc.com
jwicht@wc.com
ahardin@wc.com

Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
Raymond S. Franks II (WVSB No.
6523)
David R. Pogue (WVSB No. 10806)
CAREY DOUGLAS KESSLER &
RUBY PLLC
901 Chase Tower, 707 Virginia
Street, East
P.O. Box 913
Charleston, WV 25323

20

Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
drpogue@cdkrlaw.com
rsfranks@cdkrlaw.com

21

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on this 11th day of August, 2021, the foregoing "REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS REGARDING ABATEMENT" was served using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

_/s/ Timothy C. Hester_
Timothy C. Hester (DC 370707)