**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>     Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION, et al.,<br><br>     Defendants. | Civil Action No. 3:17-01362 |
| CABELL COUNTY COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION, et al.,<br><br>     Defendants. | Civil Action No. 3:17-01665 |

**CARDINAL HEALTH'S REPLY IN SUPPORT OF
<u>MOTION FOR JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

ARGUMENT ..................................................................................................................... 3

I.  PLAINTIFFS FAILED TO PROVE CAUSE-IN-FACT ............................................ 3

II.  PLAINTIFFS FAILED TO PROVE THAT CARDINAL HEALTH ACTED
     UNREASONABLY ................................................................................................. 5

     A.  Volume Alone Does Not Prove Unreasonable Conduct. .......................... 8

     B.  Cardinal Health Designed and Operated a Reasonable System for
         Monitoring Pharmacy Orders ................................................................... 12

         1.  Pre-2007 ........................................................................................ 12

         2.  2007–2012 ..................................................................................... 14

         3.  Post-2012 ....................................................................................... 18

III.  PLAINTIFFS ARE NOT ENTITLED TO THE ABATEMENT REMEDY THEY
      SEEK ................................................................................................................... 20

      A.  Plaintiffs Have an Adequate Remedy at Law ......................................... 20

      B.  Plaintiffs Have Not Established a Legal Entitlement to Equitable
          *Monetary* Relief ..................................................................................... 24

      C.  Plaintiffs Have Not Matched the Equitable Remedy to the Alleged Wrong ........ 28

CONCLUSION ................................................................................................................. 32

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adams v. Cole Haan LLC*, 2020 WL 5648605 (C.D. Cal. Sept. 3, 2020) ...................................22

*Alvarado v. Wal-Mart Associates, Inc.*, 2020 WL 6526372 (C.D. Cal. August 7, 2020)..............22

*Barth v. Firestone Tire and Rubber Co.*, 661 F. Supp. 193 (N.D. Cal. 1987)..............................24

*City of Charleston v. Joint Comm'n*, 473 F. Supp. 3d 596 (S.D. W. Va. 2020).........................31

*Day v. NLO, Inc.*, 144 F.R.D. 330 (S.D. Ohio 1992)..................................................................25

*Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1 ........................................................24, 25, 27

*Employer Teamsters-Local Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463 (S.D. W. Va. 2013) .............................................................31

*Environmental Defense Fund, Inc. v. Lamphier*, 714 F.2d 331 (4th Cir. 1983)..........................21

*Gibson v. Jaguar Land Rover N. Am., LLC*, 2020 WL 5492990 (C.D. Cal. Sept. 9, 2020)..........22

*Heredia v. Sunrise Senior Living LLC*, 2021 WL 819159 (C.D. Cal. Feb. 10, 2021)..................22

*Huynh v. Quora, Inc.*, 2020 WL 7495097 (N.D. Cal. Dec. 21, 2020)..........................................22

*In re: MacBook Keyboard Litig.*, 2020 WL 6047253 (N.D. Cal. Oct. 13, 2020).........................22

*IntegrityMessageBoards.com v. Facebook, Inc.*, 2020 WL 6544411 (N.D. Cal. Nov. 6, 2020) ......................................................................................................................................22

*Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425 (4th Cir. 2003) ..................28

*Masters Pharmaceutical, Inc. v. Drug Enforcement Admin.*, 861 F.3d 206 (D.C. Cir. 2017) ................................................................................................................................15, 16

*Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) ........................................................28

*Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010).................................................................28

*Schertz v. Ford Motor Co.*, 2020 WL 5919731 (C.D. Cal. July 27, 2020)...................................22

*Shafer v. United States*, 229 F.2d 124 (4th Cir. 1956).................................................................20

*Sharma v. Volkswagen AG*, 2021 WL 912271 (N.D. Cal. March 9, 2021) ..................................22

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ..............................................22

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971)................................28

*United States v. $463,497.22*, 853 F. Supp. 2d 675 (E.D. Mich. 2012) ........................13

*United States v. W.T. Grant*, 345 U.S. 629 (1953) ........................................21

*Williams v. Apple, Inc.*, 2020 WL 6743911 (N.D. Cal. Nov. 17, 2020).......................22

*Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993) ...............................25

## STATE CASES

*Hark v. Mountain Fork Lumber Co.*, 127 W. Va. 586 (1945).....................................19

*Martin v. Williams*, 93 S.E.2d 835 (W. Va. 1956).............................................19

*McMechen v. Hitchman-Glendale Consol. Coal Co.*, 107 S.E. 480 (W.Va. 1921).......................29

*Sharon Steel Corp. v. City of Fairmont*, 175 W. Va. 479 (1985) ...................................19

*Sitzes v. Anchor Motor Freight, Inc.*, 289 S.E.2d 679 (W.Va. 1982) ...........................29

## OTHER AUTHORITIES

21 CFR 1301.74(b) ..........................................................................14

Controlled Substances Act......................................................................13, 20

Federal Resource Conservation and Recovery Act ..................................................21

Federal Rule of Civil Procedure 52(c) ........................................................1, 10, 32

Notice of Proposed Rulemaking - Suspicious Orders of Controlled Substances, 85 Fed. Reg. 69282 ........................................................................15

Restatement (Second) of Torts § 821B ..........................................................19

RICO ..........................................................................22, 23

At the close of Plaintiffs' case, Cardinal Health moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 52(c) because Plaintiffs failed to prove every element of their public nuisance claim.  Dkt. 1446, 1453 ("Mot.").  Plaintiffs' opposition brief, Dkt. 1472 ("Opp.")—and their closing arguments—confirm that lack of evidence.

First, Plaintiffs failed in their case even to address cause-in-fact (or but-for cause), much less to prove it.  They compound that failure in their Rule 52(c) opposition.  They do not meet the issue head-on, only mentioning the issue in **two footnotes** of their separate opposition on proximate causation (Dkt. 1469) ("Causation Opposition"), in neither of which do they contest that they presented no evidence that, had Cardinal Health done different or more due diligence, reported more orders as suspicious to DEA, or terminated any customers, there would have been fewer prescription opioid pills distributed in Cabell/Huntington or fewer opioid-related harms. In short, the record contains **no evidence** of cause-in-fact, and all the record evidence is to the contrary.

Second, regarding the reasonableness of Cardinal Health's conduct, Plaintiffs rely on their discredited and unreliable expert, James Rafalski, and make several criticisms of Cardinal Health's suspicious order monitoring systems that Rafalski never mentioned.  But they do not, and cannot, dispute that there is **no evidence** that Cardinal Health (i) approved a customer it should not have or failed to terminate one it should have; (ii) shipped prescription opioids to anyone outside the closed system of distribution; (iii) diverted any prescription opioids by theft or loss; or (iv) distributed prescription opioids to a pharmacy customer that dispensed them to someone without a doctor's prescription.  Plaintiffs' reliance on volume alone to prove unreasonableness also has no support in the record because the evidence is overwhelming and undisputed that Cardinal Health shipped only the amount of prescription opioids written by

Cabell/Huntington doctors, who were prescribing in accordance with the prevailing standard of care and acting in good faith.

Third, regarding the flawed legal underpinning of the proposed abatement remedy, Plaintiffs continue to misunderstand what a federal court can and cannot do as a matter of equity jurisdiction.  Plaintiffs argue that, as governmental entities, they do not need to show they lack an adequate remedy at law.  But that exception exists for the benefit of the United States (and perhaps sovereign state governments), not all governmental entities, and, even for the United States, only when it is authorized by statute to seek a prohibitory injunction to stop ongoing wrongful conduct.  Plaintiffs do not dispute that they seek solely monetary relief, but they mistakenly liken their case to court-supervised, medical monitoring funds.  This case is nothing like those because (i) medical monitoring plaintiffs have not yet suffered any manifest injury and consequently lack an adequate remedy at law and (ii) Plaintiffs have never before proposed, and presented no evidence regarding, the kind of elaborate, court-supervised program approved in medical-monitoring cases.  And as for tailoring the remedy to the wrong, Plaintiffs do not even pretend to do that.  They expressly admit that their plan covers harms whether or not they are the direct result of Defendants' conduct.

The case has now concluded, and the failures of Plaintiffs' proof are clear.  The Court should grant judgment in Cardinal Health's favor.[1]

---

[1]  Cardinal Health joins the reply briefs filed by McKesson Corp. on the issues of proximate causation and abatement.  Cardinal Health also joins Part II of the reply brief of Amerisource Bergen, each to be filed contemporaneously herewith.

## ARGUMENT

### I.     PLAINTIFFS FAILED TO PROVE CAUSE-IN-FACT

The most basic requirement for proving causation is to prove cause-in-fact:  that had the defendant acted differently, the harm would not have occurred.  Plaintiffs stake their entire case on the volume of prescription opioid pills that Cardinal Health shipped to Cabell/Huntington pharmacies, but they have no evidence that, had Cardinal Health shipped fewer pills—either from conducting more or different due diligence or some other reason—either (i) the overall volume of prescription opioids shipped to Cabell/Huntington would have been less or that (ii) the opioid-related harms that their witnesses testified about would not have occurred.  Mot. 24–37. That failure of proof is fatal to their case.

Plaintiffs do not dispute that they must prove cause-in-fact, but they ignored this aspect of causation during the trial, offering no documentary evidence and no witness who even addressed the question.  They completely ignored it during closing arguments, and they all but ignored it in their Causation Opposition.  Plaintiffs responded to Cardinal Health's argument in just two footnotes of their 57-page Causation Opposition.  Causation Opp. at nn. 1, 9.

First, they admit that they have no evidence that, had Cardinal Health done more or different due diligence, it would have found any reason to block and report any additional orders from its 37 Cabell/Huntington customers as suspicious.  *See* Mot. 26–32.  This admission is fundamental.  Pharmacy orders that merely reflected prescriptions written in conformity with the prevailing standard of care were not suspicious, and Cardinal Health had no reason to block or report them.  Thus, if more or better due diligence would only have revealed such prescriptions, then Cardinal Health's supposed failure to conduct reasonable due diligence was not the cause-in-fact of any harm:  more or better due diligence simply would not have made any difference to the volume of opioids distributed to Cabell/Huntington pharmacies by the company.  Plaintiffs

3

say only that because "Defendants had a legal duty to stop flagged orders and only ship them if investigation cleared them, which they did not do, this failure caused the harms *regardless of what any investigations might have shown* because those investigations were not done and the shipments therefore could not be made." Causation Opp. at 44 n.9.[2]  In other words, Plaintiffs claim that Cardinal Health did not do the due diligence required, so it does not matter what the due diligence would have showed because it did not do the due diligence.  This circular argument, which only begs the question of what due diligence would have revealed, should be considered an admission that Plaintiffs lack this basic proof.

Second, in response to Cardinal Health's argument that there is no record evidence that, had it reported more orders to the DEA, the DEA would have taken effective action to investigate or discipline the prescribing doctor or ordering pharmacy, such that the doctor would have prescribed, or the pharmacy would have dispensed, fewer prescription opioids, Mot. 32–37, Plaintiffs say that Cardinal Health is "blam[ing]" the DEA for not "catch[ing]" it violating the law.  Causation Opp. at 7 n.1.  Plaintiffs miss the point.  Cardinal Health's argument had nothing to do with blaming the DEA for falling down on the job.  The point is that the evidence showed that the DEA, like the medical community writ large, believed that prescribing opioids for long-term treatment was appropriate and, therefore, 99.5% of doctors were prescribing appropriately. The DEA knew contemporaneously the volume of opioids distributed to Cabell/Huntington (and each pharmacy in the area) and was not alarmed—because it believed at the time 99.5% of doctors were prescribing appropriately.  Plaintiffs have presented no evidence that, had Cardinal Health acted differently—had it reported more orders—it would have led to a reduction in the volume of prescription opioids in Cabell/Huntington or a reduction in any harms.

---

[2]   All emphases herein are added unless otherwise noted.

Neither footnote addressed the further failure of proof—the lack of evidence that, had Cardinal Health even gone so far as to cut off all 37 of its pharmacy customers in Cabell/Huntington (something there is no basis for doing in the record), those pharmacies would have dispensed fewer pills.  Mot. 32.  The only evidence in the record is that there were at least 35 other distributors that competed for business in the region and that, as Rafalski acknowledged, a pharmacy can always find another wholesale supplier.  *Id.*

That is it—two footnotes that make unsupported, unreasoned lawyer argument.  Plaintiffs do not cite any *evidence* at all—because they cannot.  Indeed, all the evidence in the record establishes that Plaintiffs cannot establish cause-in-fact.  Because Plaintiffs failed to prove that had Cardinal Health:

- conducted more or different due diligence, it would have had reason to block more orders;

- blocked more orders, the pharmacy customers would not have obtained the prescription opioids from other distributors; or

- reported more orders as suspicious, the DEA would have undertaken any enforcement activity that would have reduced the volume of opioids prescribed in Cabell/Huntington

they failed to prove cause-in-fact, and the Court should grant judgment in Cardinal Health's favor.

## II.    PLAINTIFFS FAILED TO PROVE THAT CARDINAL HEALTH ACTED UNREASONABLY

Plaintiffs do not dispute that:

- Cardinal Health distributed prescription opioids only to its 37 customers in Cabell/Huntington and that each was licensed by the state and federal governments;

- Those pharmacies filled prescriptions written by doctors who were also licensed by the state and federal governments;

- The medications Cardinal Health distributed were approved by the FDA and subject to quotas set by the DEA;

- Cardinal Health's West Virginia distribution center has always been approved by the Board of Pharmacy and has never been the subject of a DEA action;

Mot. 4.  And Plaintiffs do not dispute that there is no evidence that:

- Any of Cardinal Health's pharmacy customers in Cabell/Huntington were diverting prescription opioids;

- Any specific order Cardinal Health shipped was "suspicious" and should not have been shipped;

- Cardinal Health shipped to customers that it should not have approved in the first place or later should have terminated;

- Any of Cardinal Health's Cabell/Huntington customers dispensed any medication pursuant to a prescription that was not written for a legitimate medical purpose.

*Id.*  On these facts alone, it is evident that Plaintiffs did not prove that Cardinal Health acted unreasonably at any time in distributing prescription opioids to its Cabell/Huntington pharmacy customers.

Plaintiffs assert in response that the volume of opioids that Cardinal Health shipped was facially unreasonable.  Opp. 29.  That again is lawyer argument, not evidence.  Other than Rafalski's *ipse dixit*, implausible opinion, Plaintiffs presented no evidence that Cardinal Health's overall shipments to its Cabell/Huntington pharmacies were unreasonable.  Nor could there be such evidence given that shipments of prescription opioids by Cardinal Health and all distributors to Cabell/Huntington matched ***to the pill*** the amount of pills prescribed by licensed Cabell/Huntington doctors,[3] and where, moreover, the DEA was at all times aware of the total volume shipped to Cabell/Huntington and neither informed Cardinal Health that the volume it was shipping was unreasonable nor took steps to limit the overall quota or to curtail prescribing, dispensing, or distribution in Cabell/Huntington.  Mot. 33–34.

---

[3]   6/15 Tr. at 214:19–23.

Plaintiffs' fallback position is a half-hearted criticism of Cardinal Health's suspicious order monitoring system ("SOMS").  But Plaintiffs presented no evidence of failures with regard specifically to any of Cardinal Health's 37 Cabell/Huntington customers.  Rafalski's ***only*** criticism of Cardinal Health's system was his claim that it did not do adequate due diligence on its customers, but he admitted he did not look at all the diligence files (just some), and he offered no criticisms of Cardinal Health's handling of any particular order at any particular pharmacy. Mot. 15.[4]  Plaintiffs now defend Rafalski's failure to testify about "specific suspicious orders" as "not necessary" because his opinions were about "systemic failure[s]."  Opp. 36.  But if the failure was systemic, then Plaintiffs would have been able to highlight examples from Cabell/Huntington, the alleged epicenter of the epidemic.  They did not.  Instead they rely entirely on issues related to internet pharmacies serviced by distribution centers far outside of West Virginia and that do not service Cabell/Huntington (the evidence at trial was that internet pharmacies were never an issue in Cabell/Huntington) and one distribution center and four pharmacies in Florida.  By definition, issues at a handful of pharmacies out of 29,000 nationwide cannot establish "systemic" failures.[5]

---

[4]   Given the extensive briefing and argument the Court has already received on the unreliability of Rafalski's flagging methodologies, *see* Mot. 6–19, Dkt. 1386, 1398, 1405, Cardinal Health will not repeat those arguments again here, other than to note that Plaintiffs' continued defense—without citation to the record—of Rafalski's methods as "availab[le] and accept[ed]" and their denial that Rafalski himself disavowed four of the six methodologies, Opp. 7 and n.30, is contradicted by Rafalski's own sworn testimony.  Mot. 7; 5/26 Tr. at 236:12–15, 242:1–5 (admitting that "[t]here's no general acceptance" for his methods).

[5]   *See* Mot. 22.  The first DEA enforcement action, in 2008, involved shipments to internet pharmacies from four distribution centers, located in Washington, Florida, New Jersey, and Texas.  5/20 Tr. at 165:20–167:1.  The second action, in 2012, involved one distribution center and four pharmacy customers in Florida—two of which Cardinal Health had terminated as customers before DEA issued its immediate suspension order.  *Id.* at 228:6–13; 229:24–239:1.  The Wheeling, West Virginia distribution center—the distribution center that ships to Cabell/Huntington pharmacies—was not involved in either one.

### A.    Volume Alone Does Not Prove Unreasonable Conduct.

Plaintiffs assert that the amount of prescription opioids that Cardinal Health shipped to Cabell/Huntington "was, in and of itself, unreasonable and could not be explained by changes in the standard of care for treating pain."  Opp. 1.  They also assert—without record citation—that the "excessive distribution was the direct result of Cardinal's failures to detect, investigate, and halt suspicious orders in order to prevent diversion."  *Id.* at 16.  But the uncontroverted evidence is that shipments to Cabell/Huntington pharmacies by all distributors, including Cardinal Health, matched to the pill the amount of pills prescribed by licensed Cabell/Huntington doctors.[6]  Thus, the volume of Cardinal Health's shipments is ***fully explained*** by the prevailing standard of care for prescribing opioids and is not tied to any failures of Cardinal Health's SOMS.  After all, as Joseph Rannazzisi, the former head of DEA's Office of Diversion Control, admitted:  demand (prescriptions) drives supply (shipments), not the other way around.[7]  Plaintiffs' own witnesses admitted that Cardinal Health has no obligation, and no expertise, to second-guess the prescribing of doctors, and Rannazzisi's testimony establishes why Cardinal Health could not just refuse to fill orders for legitimate prescriptions—because legitimate patients would be

---

[6]    *See supra* n. 3.

[7]    6/9 Tr. at 87:23–88:1, 89:11–13; *see also* 5/11 Tr. at 134:24–135:3 (Dr. McCann testimony that prescribing and distribution volumes are "two sides of the same coin."); 6/14 Tr. at 82:10–22 (Dr. Keyes testimony that the increased volume of opioid prescriptions became "*the foundation* for the overall expansion in the opioid supply and opioid-related harm," and that "the opioid crisis *would not have occurred*" if doctors had not increased their prescribing); *see also* 7/8 Tr. at 66:22–67:11 (Dr. Murphy) ("Q:  And so, in relation in particular to the distribution of prescription opioids and the sale of prescription opioids, is there a particular driver of demand that you've identified?  A:  Yeah.  As I said a bit ago, I think prescriptions—if you wanted to think about market like this and what's going to determine the quantity, it's going to be the prescribing behavior.  Q:  And why is that?  A:  Well, because in order to sell a prescription, legitimate prescription, or a legal prescription in this marketplace, you have to have a prescription.  This is not like you go down to the grocery store and say, you know, oh, I see there's a stack of doughnuts.  I'll buy some doughnuts. That's not how this works.").

denied their medication.  Mot. 10, 27, 28.  And even if Cardinal Health could second-guess

doctors, it had no reason to.  The DEA was publicly reporting to Congress that 99.5% of all

doctors prescribe perfectly.  *Id.* at 9, 28.  Huntington Mayor Steve Williams agreed that local

doctors were acting in good faith in prescribing opioids,[8] and multiple other Plaintiffs' witnesses

agreed that the standard of care for prescribing opioids changed nationally and in West Virginia

and that doctors who increased their prescribing in the 1990s and 2000s were engaged in

legitimate prescribing, Mot. 9.  The say-so of Plaintiffs' counsel that "[t]he vast volume of

opioids Cardinal supplied to pharmacies in Cabell/Huntington should have put it on notice that it

was not supplying a legitimate market for the drugs" is not evidence—indeed, is at odds with the

undisputed evidence.  Opp. 16, 30.[9]

Distributors proved that the standard of care changed, and did so through Plaintiffs' own

witnesses.  Mot. 7–9, 29–31; Dkt. 1450 at 4, 17–20.  In fact, every Plaintiffs' witness who was

asked about the standard of care acknowledged the change.[10]  Long before he testified in court

---

[8]  6/30 Tr. at 82:11–14.

[9]  5/26 Tr. at 242:15–20 ("Q:  You get the prescription, that goes up, and then the distribution goes up, correct?  A:  That's correct.  *No other way* for those charts to increase without prescriptions.  Q:  No other way, right?  A:  That's correct.").

[10]  5/4 Tr. at 94:9–20 (Dr. Waller acknowledging that there was a "sea change" in opioid medication prescribing that began in the mid-1990s and "hit its peak between 2010 and 2012"); 5/6 Tr. at 92:20–94:10 (Dr. Gupta testifying that, when the standard of care changed and prescribing of opioids increased, "[m]ost of the doctors thought they were doing the right thing" by prescribing more opioids "to treat their [patients'] pain": it was their "culture," their "education," and their "understanding"); 5/21 Tr. at 27:10–16 (Dr. Werthammer agreeing that, when "pain was considered to be the fifth vital sign," "opioids [were] prescribed more liberally than they were" previously); 6/14 Tr. at 71:8–10, 75:22–76 (Dr. Keyes agreeing that "starting in the late 1990s up through around 2010, doctors increased their prescribing of opioids," and since then "the recommendations for prescribing have changed quite a lot over the last ten years"); 6/16 Tr. at 182:16–20 (Dr. Yingling agreeing that "the addition of pain as the fifth vital sign and the smiley face/happy face diagram shown to patients had the effect of increasing net prescribing of pain medications"); 6/17 Tr. at 168:7–169:1 (Dr. Feinberg agreeing that "pain as the fifth vital sign" was "promoted by institutions such as JCAHO," and "if you were working for a hospital . . . that had adopted

for Plaintiffs, one of their witnesses, Dr. Joseph Werthammer, agreed that doctors were the cause of the increased prescriptions, not "big pharma."  Mot. 30.  This evidence refutes Plaintiffs' argument and warrants granting the motion for judgment.

In Defendants' case,[11] Drs. Gilligan and Deer—two of the country's leading experts on pain management—testified regarding the evolution of the standard of care for prescribing opioids,[12] and Dr. Deer used the following demonstrative to show how guidance from the medical community and regulators, including the DEA and State of West Virginia, directly explains the increase in prescribing and opioid shipments between 1997 and 2010.[13]

---

these new ways of thinking about opioid medications . . . then I think you would have felt pressure to abide by those new regulations or new recommendations").; 6/28 Tr. at 42:8–24, 44:17–24 (Dr. Alexander testifying that opioid prescribing increased because opioids were "used as a first-line and as routine therapy for chronic pain," and that "CDC and some professional societies now warn clinicians to avoid prescribing [opioids] for common chronic pain conditions").

[11]   Federal Rule of Civil Procedure 52(c) permits the Court to decline to render any judgment until the close of the evidence, an option the Court has chosen to exercise.  Cardinal Health therefore includes references herein to evidence that was admitted at trial after it filed its Rule 52(c) motion.

[12]   7/2 Tr. at 26:16–54:6, 66:23–129:25, 138:1–147:15; 7/7 Tr. at 37:13–132:6.

[13]   7/7 Tr. at 62:9–14; 100:6–16.



Whether it was reasonable for doctors to prescribe that many opioids to Cabell/Huntington residents is not at issue in this trial.  The medical community debate over that continues, according to Plaintiff's witness Dr. Yingling.[14]  The question for this Court is whether Cardinal Health acted unreasonably in shipping prescription opioids to fill orders placed by its 37 pharmacy customers.  Plaintiffs provided no basis on which the Court could find that Cardinal Health acted unreasonably.  It did not have any role to play in changing the standard of care, and it has no ability to second guess doctors' prescribing.  Dkt. 1450 at 21–22; Mot. 27.  Rannazzisi admitted that DEA has never required distributors to police doctors.  Mot. 27.  The evidence shows only that Cardinal Health did its job—it shipped exactly the amount of pills ordered to fill prescriptions written by Cabell/Huntington doctors.  No more and no less.  Its conduct therefore was reasonable, and Plaintiffs did not prove otherwise.

---

[14]   6/16 Tr. at 218:12–219:7.

###### B. Cardinal Health Designed and Operated a Reasonable System for Monitoring Pharmacy Orders

Plaintiffs also argue that Cardinal Health acted unreasonably because there were "key deficiencies" in Cardinal Health's SOMS. Opp. 31. But given that they presented no evidence (i) that the overall volume shipped under the system was unreasonable, (ii) of any particular order Cardinal Health shipped but should not have, (iii) that Cardinal Health should have refused to onboard or later cut off any particular customer, and (iv) any pharmacy customer was diverting opioids, much less that Cardinal Health knew that, their lawyer-driven criticisms are insufficient to prove unreasonableness. And because they presented no evidence that Cardinal Health or any of its Cabell/Huntington pharmacy customers diverted opioids to someone not authorized to possess them, Plaintiffs certainly have no evidence that Cardinal "fail[ed] to control the supply chain for the dangerous drugs it was distributing." Opp. 1.

###### 1. Pre-2007

In their Opposition, Plaintiffs assert that Cardinal Health's pre-2007 system was faulty because it used Ingredient Limit Reports ("ILRs") after shipping; Cardinal Health failed to do adequate due diligence; and the Quality and Regulatory Affairs ("QRA") department was understaffed and undertrained. Opp. 3–4. But James Rafalski, the only Plaintiffs' witness to testify specifically about Cardinal Health's systems, never mentioned, much less criticized, the staffing or training of the QRA department.[15] And although Rafalski testified at length about the

---

[15] Plaintiffs assert that Cardinal Health's own witnesses testified that they were short-staffed, but Plaintiffs mischaracterize the testimony. Plaintiffs cite the testimony of Cardinal Health's then-head of anti-diversion Steve Reardon, senior vice president of independent sales Steve Lawrence, and Reardon's successor, Michael Moné, that the QRA department operated with insufficient resources, but none of them said that. Reardon acknowledged that the QRA department only had three people reviewing ILRs prior to 2007, Reardon Dep. Tr. 469–70, but he also testified that there were additional personnel in Cardinal Health's distribution centers that had responsibilities related to suspicious order monitoring, *id.* at 465:4–466:1. Lawrence's testimony concerned a particular email in 2008, and he testified

use of ILRs, he did not opine that there was anything wrong with the general use of those reports or with how Cardinal Health established limits for its customers.  Mot. 11.  In fact, the only evidence in the record is that Cardinal Health's use of ILRs was standard in the industry and that DEA approved the use of those post-shipping reports.  *Id.* 11–12.  Testimony from DEA diversion investigator, Michael Mapes, confirms this:

> Q:     ***Was the submission of excessive purchase reports, in your experience, standard practice in the industry?***
>
> A:     ***It was***. …
>
> Q:     And in your experience, DEA reviewed those reports as compliant with the Controlled Substances Act?
>
> A:     Yeah, ***I viewed those as compliant with the regulation for suspicious orders***.[16]

Plaintiffs' continued insistence that these after-the-fact reports were violative of the CSA, and that DEA did not approve Amerisource Bergen's (ABDC) very similar use of these types of reports, Opp. 21–22, is flatly contradicted by this testimony, the testimony of DEA agent Kyle Wright in *United States v. $463,497.22*, 853 F. Supp. 2d 675 (E.D. Mich. 2012) (during which Rafalski himself was present), Mot. 12, and the express words written on the page of the ABDC approval letter from DEA.[17]

---

that there was a "backlog" in reviewing Know Your Customer forms at that particular moment in time, and, as a result, the department secured additional time to review the forms. Lawrence Dep. Tr. 200:1–200:24.  Moné testified that, when he took over the department in 2008, he identified "areas for continuous improvement," including adding more staff members to the department, but he did not testify that the department was "insufficient" under Steve Reardon.  5/20 Tr. at 51–52.  And even if there were evidence that the department could have used more people before 2008, there is no evidence that any short staffing led to unreasonable conduct by Cardinal Health.

[16]   Mapes Dep. Tr. 91:19–92:15; 92:2–25.  Mapes used the term "excessive purchase reports" to refer to what Cardinal Health called "ingredient limit reports."  *See id.* 95:8–95:19; 95:25–96:11 ("excessive purchase reports" refers to reports of "sales that had already happened").

[17]   AM-WV-02658.

Plaintiffs also erroneously assert that "[p]rior to 2008, there is no evidence that Cardinal performed any due diligence on the thousands of orders identified in ILRs before they were shipped to Cardinal's customers."  Opp. 8–9.  To the contrary, the evidence shows that Cardinal Health distribution center personnel did, as a matter of course, evaluate orders before they were shipped to customers and that they were encouraged to investigate orders that appeared excessive and notify DEA "before the order [wa]s shipped."[18]  Furthermore, Cardinal Health performed additional due diligence on orders after they were shipped and reported on ILRs, including through site visits, "over and above the requirement" to report suspicious orders.[19]

### 2.   2007–2012

The three criticisms that Plaintiffs offer of the next-generation SOMS that Cardinal Health put in place in 2008 under the leadership of Michael Moné was that (1) Cardinal Health did not put that system into place sooner, Opp. 23; (2) it set its customer thresholds too high and regularly permitted customers to exceed those thresholds, Opp. 5–6, 10, 31, and (3) Cardinal Health failed to conduct adequate due diligence on its customers, Opp. 9–16, 32.  Again, however, of the three, Rafalski mentioned only the third—due diligence.  He did not fault the timing of Cardinal Health's implementation of the new regime under Michael Moné,[20] and no

---

[18]   CAH-WV-00580.00046 (Cardinal Health "DEA Compliance Manual" outlining the company's process for complying with 21 CFR 1301.74(b)); *see also* Reardon Dep. Tr. 428:7–429:14.  Plaintiffs assert that "[t]here is no evidence that Cardinal Health ever identified a single excessive purchase report for any customer serviced by the Wheeling, West Virginia distribution center," referring to the reports made by distribution center personnel prior to shipment, not ILRs.  Opp. 4.  Given the passage of time, the fact that no such reports for Wheeling from before 2008 were produced in a case in which discovery was conducted in 2020 proves nothing.  And the evidence is undisputed that the DEA never brought any action against Cardinal Health concerning the Wheeling distribution center.

[19]   Brantley Dep. Tr. 523:19–524:7.

[20]   As discussed above, the evidence shows that DEA knew and approved reporting, then shipping, suspicious orders and that was the accepted practice in the industry for 30 years and did not change its policy on halting shipment of suspicious orders until 2007.  Mot. 11–12; P-

14

witness offered any critique of how Cardinal Health set thresholds, including the thresholds set for Cardinal Health's 37 pharmacy customers in Cabell/Huntington. All the record evidence supports the reasonableness of Cardinal's threshold-setting policies and establishes that the policy was shared with DEA, who offered no criticisms of the policy. Mot. 14 n.44.

As for his due diligence criticism, Rafalski admitted that he did not review all of Cardinal Health's due diligence files, just "some." His primary basis for his opinion that Cardinal Health did not do adequate due diligence is the absence of files from before 2012. Opp. 9. But, as Cardinal pointed out in its opening brief, the fact that, in 2019, Cardinal Health did not have due diligence files for all customers from the time period 1996 to 2012 proves nothing. Mot. 16. There is no requirement to retain due diligence files, as Rafalski acknowledged,[21] and Rafalski's inference that no due diligence was ever done simply because the company did not retain centralized due diligence records for 25 years is not supported.[22] To the contrary, Moné testified that his team investigated every order that exceeded that pharmacy's threshold. Mot. 17.

---

69; Reardon Dep. Tr. 529:17–530:6. In addition, Plaintiffs' assertion, without citation to law or evidence, that the "no-shipping duty is not a later addition to the CSA or the regulations, but part and parcel of the original enactment," Opp. 35, is contradicted by new proposed rulemaking in 2020 to add a "no ship" requirement to the CSA. No amendment to add such a requirement would be necessary if it were already part of the CSA or implementing regulations. Plaintiffs have requested, and Defendants do not object, that the Court take judicial notice of this proposed rule-making. *See* Dkt. 1434, Ex. 5 (Notice of Proposed Rulemaking - Suspicious Orders of Controlled Substances, 85 Fed. Reg. 69282 (Dep't of Just. Nov. 2, 2020)).

[21] 5/26 Tr. at 269–70.

[22] Plaintiffs claim that the D.C. Circuit rejected this argument in *Masters Pharmaceutical, Inc. v. Drug Enforcement Admin.*, 861 F.3d 206 (D.C. Cir. 2017). Not true. In that case, the D.C. Circuit found that "[r]ecords were absent, despite Masters' representation to DEA that '[d]ocumentation on all orders held for review and their disposition are *permanently retained*," which gave rise to an inference that the records never existed in the first place. *Id.* at 218. Cardinal Health has made the opposite representation in this case. It does not permanently retain centralized due diligence files and instead had a two-year document retention policy for paper files. Mot. 16. Nor did *Masters* involve the lengthy passage of

15

Rafalski did not identify any specific Cabell/Huntington pharmacies for which he claimed that Cardinal Health did inadequate due diligence, yet Plaintiffs now identify nine pharmacies for which it claims Cardinal Health has no or insufficiently documented due diligence.  It is not surprising, however, that Rafalski did not believe those nine merited any mention because Plaintiffs acknowledge that Cardinal Health repeatedly reported (and therefore blocked shipment of) suspicious orders from five of those pharmacies.  Opp. 11–12.  Plaintiffs cite no evidence that those pharmacies placed additional orders that Cardinal Health should have reported and blocked, but did not.  As for the other four pharmacies, Plaintiffs presented no evidence that they placed any suspicious orders that Cardinal Health failed to report.

Plaintiffs discuss only one of those pharmacies in any detail—the one and only pharmacy customer of Cardinal Health's that they discussed at trial:  Medicine Shoppe.  The centralized due diligence file for Medicine Shoppe contains hundreds of pages of diligence, all the way back to the questionnaire Medicine Shoppe filled out when it first became a customer in 2008.[23] Plaintiffs also erroneously claim that "Cardinal Health repeatedly identified suspicious orders of

---

time at issue here.  That case involved an August 2013 order to show cause concerning conduct dating back only four years, to April 2009.  *Masters*, 861 F.3d at 214, 223.

[23]  P-42116.  As the Court may recall, counsel for Cardinal Health printed the diligence file and held it up during closing arguments.  In addition, the company's "due diligence" is documented in at least three databases other than the centralized due diligence files that Rafalski testified about.  Cardinal Health uses a database called Anti-Diversion Centralization (ADC) to analyze a customer's held orders (those that trigger the threshold and require additional review before shipping).  That review includes analysis of the customer class of trade, the drug family at issue, and recent decisions and actions taken for that customer.  P-14290_00825.  The ADC database includes information on each held order, including the order size, customer accrual information, and customer threshold.  Cardinal Health also analyzes customer ordering patterns through Tableau, a data visualization tool.  P-14290_00825, 00884.  Lastly, Cardinal Health maintains unannounced surveillance site visits in a database called Winwatcher.  7/9 Tr. at 81:11–14.  There is no evidence that Rafalski reviewed any of these additional data sources before opining that Cardinal Health failed to do adequate due diligence or retain due diligence records.

opioids placed by Medicine Shoppe, shipped the orders and intentionally failed to report those orders to the DEA," citing P-14294 and P-42071.  Opp. 13.  But P-14294 is an extract from Cardinal Health's database of **held** orders, not **suspicious** orders.[24]  The fact that many more orders were temporarily held than reported as suspicious to DEA is not evidence that Cardinal Health failed to report suspicious orders.[25]  To the contrary, it is entirely consistent with Cardinal Health having performed diligence on those orders and determined that they were not suspicious. This is also consistent with Rannazzisi's testimony that "the volume of suspicious orders that come in [to DEA] is not a huge quantity of orders" when done correctly.[26]

Plaintiffs further contend that Cardinal Health delayed in performing a site visit for Medicine Shoppe after QRA requested a site visit to determine the risk of diversion.  Opp. 13. But when Cardinal Health did conduct a full site visit in August 2012—within two months after a QRA pharmacist identified Medicine Shoppe as a customer warranting a site visit—the site investigator found no evidence of diversion.[27]  The site visit report included explanations for the pharmacy's increased purchases of oxycodone, including that "prescribers in the area prefer oxycodone 15 mg and 30 mg strengths for pain management" and "the pain management population consists of a high number of coal miners and truckers with job related injuries."[28]  It

---

[24]  Columns X and Y of P-14294 make clear that these are records of "threshold events," not suspicious order reports.

[25]  Nor is the absence of information in Cardinal Health's centralized due diligence file about certain orders—such as the 33 suspicious orders reported for Medicine Shoppe in September 2012, Opp. 15—evidence that those orders were not investigated.  As noted above, the results of analysts' review of those orders may be contained in one of several Cardinal Health databases rather than in the centralized due diligence file.

[26]  6/7 Tr. 219:5–220:5.

[27]  CAH-WV-00770; 5/20 Tr. at 215–16.

[28]  CAH-WV-00770 at Section 2.  Plaintiffs also mischaracterize the testimony of Cardinal Health's sales representative, Jesse Kave.  Kave did not testify that Medicine Shoppe's percentage of oxycodone dispensed for 15 and 30 mg formulations was a "red flag."  To the

also concluded that the pharmacist-in-charge understood his corresponding responsibility, only filled controlled substance scripts for local residents and local prescribers, and took advantage of the State's prescription monitoring program to ensure that patients filling controlled substance scripts did not appear to be engaged in diversion.[29]

The only people who testified at trial with any knowledge of Medicine Shoppe were Michael Moné and Jesse Kave, the Cardinal Health sales representative who called on Medicine Shoppe for 12 years. Kave testified that he knew the pharmacists there[30] and found them to be professional and that he never witnessed signs of diversion at Medicine Shoppe.[31] Plaintiffs presented no contrary evidence.

### 3. Post-2012

In its opening brief, Cardinal Health noted that Plaintiffs put on no evidence of Cardinal Health's conduct after 2012 and there is no evidentiary basis for a finding that Cardinal Health acted unreasonably at any time in the last nine years. Plaintiffs continue to ignore the post-2012 time period in their Opposition, other than to note certain shipping volumes during that time. Plaintiffs therefore tacitly concede that there is no evidence of unreasonable conduct by Cardinal Health since 2012.

For this reason, Plaintiffs' nuisance claims are time-barred. Mot. 69–71. Plaintiffs assert that Cardinal Health shipped "too many" pills into Cabell/Huntington, causing the opioid

---

contrary, he stated not once but twice that he could not answer whether that percentage would be red flag because he did not "have all of the information" sitting on the stand a decade later. 5/21 Tr. at 92.

[29] CAH-WV-007700 at Section 5.

[30] Plaintiffs had the pharmacist-in-charge at Medicine Shoppe under subpoena during the entire trial, but never called her to testify.

[31] 5/21 Tr. at 107–08.

epidemic, but because there is no evidence that Cardinal Health unreasonably interfered with a right common to the general public after 2012, there is no evidence of a continuing nuisance. Plaintiffs respond that the "nuisance" is the "opioid epidemic" and that West Virginia courts have long recognized that a "condition," and not just conduct, can be a legal nuisance.  Dkt. 1470 at 23–24, 30.  Plaintiffs are wrong.  A collection of injuries alone, such as the amorphous "opioid epidemic," cannot be a nuisance independent of a defendant's conduct.

While West Virginia nuisance cases occasionally refer to the term "condition," those cases do not suggest that a condition unmoored from a defendant's conduct can constitute a nuisance.  For example, *Martin v. Williams*, 93 S.E.2d 835 (W. Va. 1956), the primary case relied upon by Plaintiffs, Dkt. 1470 at 23–24, concerned whether the defendants' operation of a used car lot was a nuisance and whether the business could be enjoined as a result.  The court referenced the word "condition," but the nuisance was the conduct in operating the business, and the Court did not use the word "condition" to describe some other path to a nuisance divorced from the defendant's operation of the business.  93 S.E.2d at 844.  Similarly, *Sharon Steel Corp. v. City of Fairmont*, 175 W. Va. 479, 482 (1985), involved a legal challenge to a city ordinance prohibiting the "activity" of "permanently dispos[ing] or attempt[ing] to permanently dispose of hazardous waste within the City."  And in *Hark v. Mountain Fork Lumber Co.*, 127 W. Va. 586, 589 (1945), the plaintiffs sought an injunction to enjoin the defendant's operation of a tramway on their land.  None of those cases involves declaring a set of conditions as a nuisance.

Thus, West Virginia case law and the Restatement (Second) of Torts § 821B make clear that any legal nuisance is the unreasonable conduct of the defendant.  Because Plaintiffs presented no evidence of ongoing nuisance conduct within one year of filing their lawsuits, their claims are time-barred.  Mot. 69–71.

19

*     *     *

The Court should grant judgment to Cardinal Health because there is no evidence, or certainly insufficient evidence, that Cardinal Health acted unreasonably.

## III.   PLAINTIFFS ARE NOT ENTITLED TO THE ABATEMENT REMEDY THEY SEEK

Even if Plaintiffs had proven liability against Cardinal Health (they have not), they are not entitled to the abatement remedy they seek for three reasons:

### A.   Plaintiffs Have an Adequate Remedy at Law

Plaintiffs do not dispute that they seek equitable relief, and only equitable relief.[32]  Nor do Plaintiffs dispute that, as a matter of federal equity jurisdiction, they cannot obtain equitable relief unless they lack an adequate remedy at law.  Instead, Plaintiffs contend that, as "governmental plaintiffs," they are held to a different standard and need not show that they lack an adequate legal remedy.[33]  Plaintiffs are wrong for two reasons.

First, the cases cited by Plaintiffs concern **the United States**, not any and every governmental entity.  In *Shafer v. United States*, 229 F.2d 124, 128 (4th Cir. 1956), the seminal decision in which the Fourth Circuit exempted the United States from showing it lacked an adequate legal remedy, the court explained that "[t]he United States … is not bound to conform with the requirements of private litigation when it seeks the aid of the courts to give effect to the policy of Congress as manifested in a statute."  Plaintiffs are not the United States, and federal law precludes the City and County from seeking to enforce the federal Controlled Substances

---

[32]   *See* Dkt. 1470 ("Abatement Opp.") at 13 ("Plaintiffs' Abatement Plan Sounds in Equity and Cannot be Characterized as Damages").

[33]   *Id*. at 18 ("claims for equitable relief by governmental plaintiffs are held to a different standard than claims brought by private parties").

Act.[34]  Similarly, in *Environmental Defense Fund, Inc. v. Lamphier*, 714 F.2d 331, 337 (4th Cir. 1983), the real plaintiff was the United States because the nominal plaintiffs (the Environmental Defense Fund and Chesapeake Bay Foundation) sued as private attorneys general, as provided for by the citizen-suit provision of the federal Resource Conservation and Recovery Act, and therefore stood in the United States' shoes.[35]  When the court said that "the law of injunctions differs with respect to governmental plaintiffs," it went on in the next sentence to clarify that the law differs "[w]here the plaintiff is a ***sovereign***."[36]  The United States is sovereign, and, for certain purposes, so are the States.  But cities and counties are not sovereign.  They are creatures of the State, and the exemption recognized by *Shafer* and *Lamphier* does not apply to them.

Second, the exemption does not apply because the reason "the law of injunctions differs with respect to government plaintiffs" (even assuming "governmental plaintiffs" includes cities and counties) is that "[t]he purpose of an injunction [authorized by statute] is ***to restrain defendants' further violations of the law***."  *United States v. Articles of Drug* (cited by Plaintiffs), *citing United States v. W.T. Grant*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations.").  But Plaintiffs are not seeking an injunction to restrain future violations of any statute by Cardinal Health—or to restrain any conduct.  The only "injunction" they are seeking is one to pay money.

---

[34]  *See* AmerisourceBergen Corporation's Mem. in Support of Motion for Judgment Under Rule 52(c) Based on Plaintiffs' Failure to Prove Culpable Conduct, Dkt. 1452 at 38–40.

[35]  In that capacity, moreover, the Environmental Defense Fund and Chesapeake Bay Foundation were precluded from pursuing any private remedy.  714 F.2d at 337 & n.4.

[36]  *Id.*

Accordingly, the rule set forth in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839 (9th Cir. 2020)—a case with uncannily similar facts—applies here:  Plaintiffs must prove that they lacked an adequate legal remedy.[37]

Is there an adequate remedy at law for Plaintiffs' alleged harm?  Plaintiffs alleged in every iteration of their Complaint that there is.  Plaintiffs argue now that "[t]he Abatement Plan … is forward looking and does not seek recovery of any past expenditures."[38]  But the issue is not what the Plan seeks, but whether an adequate legal remedy exists.  It does, both for past and future costs of addiction treatment and related services.  Pursuant to both their nuisance and negligence claims, for example, Plaintiffs alleged that they "have suffered and ***will continue to*** suffer ***economic damages***" for the costs of providing addiction treatment and related medical services.  *Compare* TAC ¶ 1437 ("As a direct and proximate result of Defendants' tortious conduct and ***the public nuisance*** created by Defendants, Plaintiffs have suffered and will continue to suffer economic damages, including … significant expenses for … health, … rehabilitation, and other services") *with* ¶ 1548 ("As a direct and proximate result of Defendants' ***negligence and/or negligence per se***, Plaintiffs have suffered and will continue to suffer economic damages, including … significant expenses for … health, … rehabilitation, and other services").  Similarly, Plaintiffs' RICO claim sought the "[c]osts for providing healthcare and

---

[37]  District courts have cited and applied the rule in *Sonner* a dozen times since August 2020.  *See Sharma v. Volkswagen AG*,  2021 WL 912271 (N.D. Cal. March 9, 2021); *Heredia v. Sunrise Senior Living LLC*, 2021 WL 819159 (C.D. Cal. Feb. 10, 2021); *Huynh v. Quora, Inc.*, 2020 WL 7495097 (N.D. Cal. Dec. 21, 2020); *Williams v. Apple, Inc.*, 2020 WL 6743911 (N.D. Cal. Nov. 17, 2020); *IntegrityMessageBoards.com v. Facebook, Inc.*, 2020 WL 6544411 (N.D. Cal. Nov. 6, 2020); *In re: MacBook Keyboard Litig.*, 2020 WL 6047253 (N.D. Cal. Oct. 13, 2020); *Gibson v. Jaguar Land Rover N. Am., LLC*, 2020 WL 5492990 (C.D. Cal. Sept. 9, 2020); *Adams v. Cole Haan LLC*, 2020 WL 5648605 (C.D. Cal. Sept. 3, 2020); *Alvarado v. Wal-Mart Associates, Inc.*, 2020 WL 6526372 (C.D. Cal. August 7, 2020); *Schertz v. Ford Motor Co.*, 2020 WL 5919731 (C.D. Cal. July 27, 2020).

[38]  Abatement Opp. 21.

medical care, additional therapeutic, … and other treatments for patients suffering from opioid-related addiction and disease;" "costs for providing mental-health services, treatment, counseling, rehabilitation services;" and "costs for providing treatment of infants born with opioid-related medical conditions"). *Id*. at ¶ 1475. Note the wording:  the RICO claim sought costs "for providing" treatment going forward. Had Plaintiffs sought only recovery of past costs, the Complaint would have spoken of the costs incurred "for having provided" treatment.[39]

Plaintiffs, of course, later disclaimed recovery of damages for strategic reasons—to secure early remand from the MDL proceedings and a bench trial—but they have never disclaimed the legal position that, pursuant to their nuisance, negligence, and RICO claims, they are entitled to recover as damages the past ***and future*** costs of providing addiction treatment and related services for Cabell/Huntington residents. Indeed, where personal injuries like addiction are concerned, it is axiomatic that a damages claim includes both past and future medical expenses.[40] Thus, Plaintiffs fail to explain why they lack an adequate remedy at law for the Abatement Plan's $2 billion in addiction treatment, which is nothing other than ***future damages*** for the costs of treating past addiction.[41]

---

[39]  Plaintiffs' opposition neither comes to grips with (i) the Complaint's allegations of an adequate remedy at law (ii) nor the holdings of the MDL court, the MLP, or trial courts around the country that city and county plaintiffs have asserted valid damages claims (iii) nor the fact that the State of West Virginia settled for $75 million virtually identical damages claims against Defendants.

[40]  Dobbs, Law of Remedies (3d ed.) § 8.1(3) ("*General Rule*:  The value of medical and related treatment reasonably necessary to minimize or alleviate injury itself or the pain or disability that results from it are almost always recoverable as items of damages …. In the same way, plaintiff is entitled to recover the value of treatment or care likely to be reasonably necessary in the future.").

[41]  To the extent that the Abatement Plan proposes treatment for persons who will become addicted in the future, the Plan is legally infirm for a different reason—namely, that the "remedy" is not connected to Cardinal Health's allegedly wrongful conduct, which ended before the lawsuit was filed (according to the evidence at trial). *See supra* Part II.B.3.

Plaintiffs argue that federal courts have recognized medical monitoring claims, which are equitable in nature and involve future medical costs.  But they are wrong that the "Abatement Plan here is analogous to these medical monitoring funds."[42]  First, the precondition for such claims is that the plaintiff lacks an adequate remedy at law, as the cases cited by Plaintiffs make clear.[43]  Second, the plaintiffs in medical monitoring cases could not be more different than the Cabell/Huntington residents for whom Plaintiffs seek $2 billion in addiction treatment and related services.  Medical monitoring plaintiffs have been exposed to a risk, but do not have any manifest physical injury and therefore cannot recover damages.  *See Barth,* 661 F. Supp. at 196 ("The Complaint does not allege any symptom of injury which can be clinically diagnosed at this time.") (cited by Plaintiffs).  Addicted Cabell/Huntington residents, in contrast, do have a manifest injury, and Plaintiffs are seeking monies, not for diagnosis of possible injury, but for the treatment of those manifest injuries.  Such monies constitute a legal remedy, and, therefore, the Court cannot award the $2 billion Plaintiffs seek for addiction treatment.

## B.    Plaintiffs Have Not Established a Legal Entitlement to Equitable *Monetary* Relief

Plaintiffs seek equitable relief that is beyond the power of the Court to grant, not only because a federal court cannot provide equitable relief unless the plaintiff has established that it lacks an adequate remedy at law (*see* Part III.A, as regards the $2 billion in treatment costs), but

---

[42]   Abatement Opp. 22.

[43]   *See Barth v. Firestone Tire and Rubber Co.*, 661 F. Supp. 193, 204–205 (N.D. Cal. 1987) ("The Complaint alleged that the putative class members have no adequate remedy at law …."); *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 6 ("Monetary damages, plaintiffs claim, do not provide meaningful relief.  Class members could not purchase the monitoring regime on their own even if they received a lump sum award."); *id*. at 26 ("Plaintiffs' injuries are not adequately compensable by monetary damages.").

also because a federal court cannot award monetary relief except adjunct to injunctive relief, which Plaintiffs do not seek.

Plaintiffs do not dispute that they seek monetary relief, and only monetary relief.  They do not dispute the line of authority running from *Guaranty Trust Co. v. York* to *Porter v. Warner Holding Co.* to *Mertens v. Hewitt Associates* that defines traditional equitable remedies and permits a federal court in the exercise of equitable jurisdiction to award monetary relief only when it is incidental to an injunction or other traditional equitable remedy (like restitution or disgorgement).  And they do not dispute that none of the cases they have previously cited as precedent are, in fact, precedent for purely monetary relief.[44]

So what do Plaintiffs say now?  For the first time, they state that the Abatement Plan entails a ***court-supervised*** fund, and they cite as precedent medical monitoring cases.[45]  It is well to consider, however, just what those cases involve.  The injunctions that create court-supervised funds involve far more than merely holding the monies in the court's registry, for plaintiffs to draw on as if writing a check.  In *Day v. NLO, Inc.*, 144 F.R.D. 330, 336 (S.D. Ohio 1992), the principal case relief on by Plaintiffs, the court spoke of an "elaborate medical monitoring program of [the court's] own, managed by court-appointed trustees, pursuant to which a plaintiffs is monitored by particular physicians and the medical data produced utilized for group studies."  Likewise, in *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 713 (D. Ariz. 1993), the court stated that "[p]laintiffs seek to implement a court-supervised program requiring ongoing, elaborate medical monitoring."  And in *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 22

---

[44]   *See* Mot. 52–55.

[45]   Abatement Opp. 16 ("To the contrary, courts across the country have found that a federal court order creating a court-supervised fund, most commonly in the context of medical monitoring cases, is a proper exercise of equitable jurisdiction ….").

(D. Mass. 2010), the court observed that the remedy sought by plaintiffs "is nearly identical to the injunctive program described by *Day*"—i.e., "an elaborate medical monitoring program of [the court's] own, managed by court-appointed trustees, pursuant to which the plaintiffs is monitored by particular physicians and the medical data produced utilized for group studies." But (i) the Complaint does not seek such a fund, (ii) Plaintiffs' Opposition to Defendants' summary judgment motion regarding abatement said nothing about a court-supervised fund,[46] and (iii) the Plan itself, as set forth in detail in Dr. Alexander's report says nothing about court supervision or the mechanics of such supervision, (iv) nor did Dr. Alexander testify about court supervision or the mechanics of such.

What little Plaintiffs' counsel had to say about the Plan in closing argument confirmed that Plaintiffs really seek nothing more than payment of the $2.6 billion, not payment subject to court supervision, with court-appointed trustees and court-established criteria for funding and accountability:

> Sustainability is an issue.  Whether there is capacity is an issue, and also just ensuring that we have the ability for the funding to put these together.
>
> I think it's important for … our abatement plan that we're asking Your Honor the funding for it to demonstrate that there's still an on-going crisis.
>
> We need new programs and we need the funding to support it.
>
> [I]t is reliable funding we need.
>
> We've taken the plan out to 15 years to accompany [*sic*] that. … We need to take the time and it takes the funding to get to that plan.
>
> [W]e submit our case to you to empower the City of Huntington and Cabell County to work with the opioid crisis that they have, …

---

[46]   *See* Dkt. 1083.

and award sustainable funding so they can deal with their opioid addiction.[47]

Dr. Alexander describes dozens of programs that are part of his Plan. If Plaintiffs were truly seeking to implement the Plan by way of a court-supervised injunction—as other courts have implemented desegregation plans or plans to ensure constitutional conditions of confinement in prisons and mental health institutions—then the Court (itself or through trustees or monitors) would have to decide (i) which programs should be funded (ii) in what amounts (iii) for how long and (iv) with what requirements for reporting and accountability. And any unspent funds would be returned to Defendants.[48] But, of course, neither Dr. Alexander nor Plaintiffs' counsel has ever described the implementation of the Plan as subject to supervision by anyone other than the City and County. What Plaintiffs' counsel said in closing argument was that "the City of Huntington and Cabell County are well positioned to implement an opioid abatement plan and a response to the public nuisance …."[49]

Given the evidence at trial, an ongoing court-supervised fund would be problematic. The evidence was that the federal government and State of West Virginia operate and/or fund a number of existing treatment programs and related services. If the Plan really involved elaborate court supervision, as in the medical monitoring cases cited by Plaintiffs, then the Court is being called upon either (i) to create and oversee a remedial plan that parallels and substantially duplicates the federal and state-funded programs already in place or, in effect, (ii) to take-over those programs.

---

[47]  7/27 Tr. at 89–90, 91, 92, 94.

[48]  As the case cited by Plaintiffs recognizes, when there is a "fund" supervised by the court, "[f]unds not used for [the intended] purpose are returned to the defendant." *Donovan*, 268 F.R.D. at 25. There is no provision for that in Plaintiffs' Plan.

[49]  *Id.* at 60.

Plaintiffs have ever only spoken in the past of "funding" their Plan, by paying them.  The claim in the Abatement Opposition that they are seeking a court-supervised, medical-monitoring-like program that can be characterized as injunctive relief is an afterthought—and an inapt afterthought, at that.  It remains true that Plaintiffs cannot cite any case, much less an established line of authority, in which a federal court has done what Plaintiffs ask this Court to do.

### C.     Plaintiffs Have Not Matched the Equitable Remedy to the Alleged Wrong

In their Abatement Opposition, Plaintiffs simply ignore the fundamental principle of equity that the remedy must be narrowly tailored to fit the wrong.  *Mayor of Baltimore v. Azar*, 973 F.3d 258, 293 (4th Cir. 2020) (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971)) ("As with any equity case, the nature of the violation determines the scope of the remedy."); *Ostergren v. Cuccinelli*, 615 F.3d 263, 289 (4th Cir. 2010) (noting both that "a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation" and that "a remedy must be narrowly tailored"); *Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003) ("[a]n injunction should be carefully addressed to the circumstances of the case" and "should not go beyond the extent of the established violation").  Plaintiffs cite Michigan and District of Columbia state-court decisions for the principle that "courts find 'broad equitable authority to abate [a] nuisance.'" Abatement Opp. at 26.  Even assuming the relevance of that authority, the principle that courts have "broad equitable authority" is not at odds with the principle that such authority must be exercised so as narrowly to tailor the remedy to the defendant's wrong.

It is incontrovertible that Plaintiffs' Abatement Plan does not do that.  Indeed, Plaintiffs do not claim that it does.  Theirs is a plan "to alleviate the opioid epidemic" in all its

dimensions,[50] regardless of what Cardinal Health did or did not do, when Cardinal Health did it

or for how long.  Plaintiffs seem to think that narrowly tailoring the remedy to the defendant's

misconduct has something to do with joint and several liability, but they are wrong for three

reasons.

First, joint and several liability is a rule applicable, if at all, only with respect to *damages*.

It is irrelevant here, where Plaintiffs do not seek damages.  The cases cited by Plaintiffs do not

even involve joint and several liability.  *McMechen v. Hitchman-Glendale Consol. Coal Co.*, 107

S.E. 480 (W.Va. 1921), involved the proper joinder of defendants, not joint and several liability.

The Supreme Court held that Courts in equity have jurisdiction "***to enjoin in one suit*** all who

participate in the … pollution" of the stream.  *Id.* at 483.  Here, of course, Plaintiffs are not

seeking to enjoin Cardinal Health to prevent injury.[51]  So, too, *Sitzes v. Anchor Motor Freight,*

*Inc.*, 289 S.E.2d 679, 681 (W.Va. 1982), did not involve joint and several liability, but two very

different questions certified by the federal court—whether the abolition of interspousal immunity

applied retroactively and the effect of comparative negligence on right to contribution.  When the

Court referred to joint and several liability, it did so as a rule applicable to damages.[52]

---

[50]   Abatement Opp. 28.

[51]   When the Court in *McMechen* spoke of suing in equity to enjoin the defendants, it said that
they "could be enjoined *by way of prevention* of the contemplated injury."  107 S.E. at 482.
Insofar as the plaintiffs could recover damages incidental to the granting of injunctive relief,
the Court held that such an award could be "either joint[] or several[], according to the legal
liability."  *Id*. at 483 (having cited *Farley v. Crystal Coal & Coke Co.*, which held that the
several defendants were not jointly and severally liable).

[52]   *See* 289 S.E.2d at 684 ("A plaintiff may elect to sue any and all of those responsible for his
injuries *and collect damages* from whomever is able to pay …."); *id*. at 685 ("The basic
purpose of the joint and several liability rule is to permit the injured party to select and
collect *the full amount of his damages* against one or more joint tortfeasors."); *id*. (As among
tortfeasors, "[i]t is thought to be fairer to require [tortfeasors] to respond *in damages* based
on their degrees."); *id*. at 687 ("The old common law rule enabled the plaintiff to sue one of

Second, joint and several liability has to do with apportioning fault among the named defendants.  It has nothing to do with ***non-parties***, like doctors, the Joint Commission, or illegal drug dealers.  As for parties, like the Manufacturing Defendants, that have been severed for purposes of the trial, Plaintiffs presented no evidence that Cardinal Health acted in concert with them to deceive doctors.  Accordingly, where the Plan provides for individual tutorials to re-educate doctors about the proper prescribing of opioids, however, it is describing a remedy for the Manufacturers' deceptive marketing to doctors, not any wrongful conduct of Cardinal Health.

Third, joint and several liability has nothing to do with ***future*** wrongs.  Even if Defendants were jointly and severally liable for their past allegedly wrongful conduct,[53] a narrowly-tailored remedy would provide addiction treatment only for those Cabell/Huntington residents who became addicted by reason of that past conduct.  There is no legal principle (and Plaintiffs cite none)[54] by which Cardinal Health can be held responsible to remedy a harm that may occur in the future, years after any wrongful conduct ceased.  Yet some substantial part of the Plan—and perhaps the greater part—concerns the prevention of future addiction and, where prevention fails, the treatment of future addicts, no matter that (i) Cardinal Health's wrongful conduct did not cause their addiction, (ii) their addiction is not to prescription opioids, and (iii) their addiction need not even have occurred in West Virginia.[55]

---

several joint tortfeasors and hold him responsible *for the entire damages claim*, even though other joint tortfeasors had contributed to the damages.").

[53]  Plaintiffs presented no evidence that Cardinal Health acted unreasonably after 2012.  *See* Part II.B.3, *supra*.

[54]  Plaintiffs "cite" a metaphor, not a legal principle.  Abatement Opp. 34 n.142 ("the opioid epidemic caused by Defendants is a contagion in the community that is a cause of new addictions") (citing in support testimony by Alexander that says nothing about "contagion").

[55]  A Kentucky resident who first uses heroin in 2030 and becomes addicted could drive to West Virginia and receive treatment here under Plaintiffs' Plan.

Just as joint and several liability is not an answer to the objection that the Plan would require Cardinal Health to provide remedies for the wrongs of others and for future harm not caused by its conduct, so foreseeability is not an answer to the objection that the Plan would require Cardinal Health to pay for remedies far removed from its alleged "over-supply" of prescription opioids.[56]  If Plaintiffs seriously contend that it was foreseeable that, in distributing prescription opioids solely to licensed pharmacies to fill prescriptions written by doctors, 99.5% of whom were prescribing according to the prevailing standard of care, (i) patients would divert the pills (ii) to persons who would misuse them and become addicted, (iii) then subsequently turn to heroin, (iv) which would come to be supplied by traffickers who would lace it with potent fentanyl, (v) creating a risk of overdose that (vi) would lead to the Abatement Plan's proposal that addicts be supplied with test strips to determine the purity of their heroin, then Plaintiffs are stretching the concept of foreseeability far beyond the bounds of West Virginia law.  *See Employer Teamsters-Local Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 475 (S.D. W. Va. 2013); *City of Charleston v. Joint Comm'n*, 473 F. Supp. 3d 596, 628 (S.D. W. Va. 2020).

As for the further objection that components of the Abatement Plan would require Cardinal Health to pay for eradicating the root causes of drug addiction—causes that pre-dated Cardinal Health's conduct and will long post-date it—Plaintiffs say nothing.

For Plaintiffs, in sum, causation is an inconvenience.  They cannot be bothered to prove that Cardinal Health's conduct was a cause-in-fact of their harm, nor that there is any direct connection between that conduct and the many remedies that make up their Abatement Plan.  It

---

[56]   Abatement Opp. 41 ("Defendants do not even attempt to argue that the need for any of these programs were not foreseeable").

is enough for Plaintiffs that "[t]here will be new cases [in the future] that are required to be abated," and "whether or not they are the direct result of Defendants' conduct" is no matter to them.  Abatement Opp. 40.  But just as well-established principles mean that a federal court (i) cannot award equitable relief in the absence of an adequate remedy at law and (ii) cannot award monetary relief alone in equity, those principles also require that any equitable remedy be narrowly tailored to the defendant's wrongful conduct. The Abatement Plan is heedless of those principles.

## CONCLUSION

For these reasons and those given in Cardinal Health's opening memorandum, Dkt. 1453, as well as those in Distributors' joint Rule 52 memoranda, Dkt. 1450, 1451, the Court should enter judgment for Cardinal Health.

Dated:  August 11, 2021

Respectfully submitted,

**CARDINAL HEALTH, INC.**

*/s/ Steven R. Ruby*
Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
drpogue@cdkrlaw.com
rsfranks@cdkrlaw.com

and

*/s/ Ashley W. Hardin*
Enu Mainigi
F. Lane Heard III
Jennifer G. Wicht
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
emainigi@wc.com
lheard @wc.com
jwicht@wc.com
ahardin@wc.com

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on this 11th day of August, 2021, the foregoing **"CARDINAL HEALTH'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT"** was served using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Steve Ruby*
Steven R. Ruby (WVSB #10752)
