# TAB 2

```
               IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT CHARLESTON


_____x
                               :
THE CITY OF HUNTINGTON,        :       Civil Action
                               :
             Plaintiff,        :       No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
             Defendants.       :
_____x
                               :
CABELL COUNTY COMMISSION,      :       Civil Action
                               :
             Plaintiff,        :       No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
             Defendants.       :
_____x



                 BENCH TRIAL - VOLUME 35
      BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
               UNITED STATES DISTRICT COURT
                IN CHARLESTON, WEST VIRGINIA


                     JULY 7, 2021
```

1    opioid prescribing?

2    **A.**    Yes.  It was looking at people prescribing improperly

3    for no medical reason and fraud.

4            MS. MAINIGI:  Your Honor, at this time, I would

5    like to tender Dr. Deer as an expert in pain management and

6    the standard of care for pain management.

7            THE COURT:  Any objection?

8        Hearing none, the Court finds Dr. Deer to be an expert

9    in pain management and the standard of care for pain

10   management.

11           MS. MAINIGI:  Thank you, Your Honor.

12           BY MS. MAINIGI:

13   **Q.**    Dr. Deer, in your experience, who is it that makes the

14   decision to write a prescription for an opioid medication to

15   a patient?

16   **A.**    It would be the physician or clinical practice person,

17   which may be a nurse practitioner in some instances.

18   **Q.**    And, in your opinion, is it appropriate to prescribe

19   opioids for pain management in various instances?

20   **A.**    In the correct patient, it can be very appropriate.

21   **Q.**    Now, let's turn to the basis for your expert opinion.

22   At a high level, what is the question you were asked to look

23   at and answer in this case?

24   **A.**    So, I was asked to look at the standard of care in West

25   Virginia from my arrival here in 1994 until 2021 and how it

1   changed regarding opioid prescribing and really what

2   happened in West Virginia.

3   **Q.**   And were you -- you were focused specifically on West

4   Virginia across the board?

5   **A.**   That's correct.

6   **Q.**   Okay.  And are you also familiar with what was

7   happening nationally at the same time?

8   **A.**   As I testified earlier, I'm very involved in national

9   societies, so I do know the national, really, overview.

10   And, also, I know a lot of the folks nationally who were

11   giving lectures on proper opioid prescribing back in those

12   days who we may talk about later.

13   **Q.**   So, how did you go about answering the question that

14   you were charged with?

15   **A.**   Well, so --

16   **Q.**   What did you do?

17   **A.**   First of all, you know, I've been here a long time.  I

18   don't feel as old as I am, but that's how life goes.  So,

19   I've been here a long time.  And so, I have my personal

20   experience, you know, treating well over a hundred thousand

21   patients over the years.

22        But, also, you know, I have looked at what happened

23   with, you know, policies around the state legislature, what

24   happened with societies, which we have members of societies

25   in West Virginia, what happened with the education of

```
 1    doctors.  So, I looked at all of those factors and I think

 2    it really gives a good insight, in my opinion, of what

 3    happened here and what's going on today.

 4    Q.   And were you able to form an opinion, Dr. Deer, with

 5    reasonable degree of certainty about how the standard of

 6    care for the use of opioid medications and the treatment of

 7    pain changed between the early 90s through today?

 8    A.   I felt very confident that I have a very good

 9    impression of how it changed from 1994 until 2021.

10              MS. MAINIGI:  Matt, if we could put up the next

11    slide, please.

12              BY MS. MAINIGI:

13    Q.   Dr. Deer, did you help us prepare this demonstrative

14    which provides an overview of where you're going with your

15    opinions?

16    A.   I did.

17    Q.   So, tell us at a high level, what is your opinion?

18    A.   Well, so, at a high level, there's -- in my career

19    there's been three main phases in West Virginia.  There was

20    the initial when I first got here and right before I got

21    here there was a liberalization of prescribing of opioids

22    for basically anyone who complained of pain around the

23    state.  And then, that went on until around 2010.

24    Q.   And it started about when?

25    A.   Probably in the late 80s as legislation and articles
```

1       started to appear in national and international literature

2       that it was a human right to be treated for pain.  So,

3       probably late 80s.  And then, in the early 90s, we saw more

4       prescribing.  And then, around 1996, it changed

5       dramatically.

6   **Q.**    And why did it change dramatically in '96?

7   **A.**    Because new drugs came along that were really said to

8       be less addictive and, certainly, most physicians believed

9       that to be true.

10  **Q.**    And are you referring specifically to Oxy, which is

11      manufactured by Purdue?

12  **A.**    The primary drug was OxyContin.  I mean, MS Contin and

13      thera-gesic patches were also in that group, but OxyContin

14      was the primary drug that was going to be the wonder drug,

15      if you will.  We all believed that to be probably the case

16      based on the marketing and research at the company who

17      developed that drug.

18  **Q.**    Now, so, in this first phase, which you said went until

19      about 2010; is that right?

20  **A.**    I can -- again, that's a number I can live with.

21      Certainly, some of those lines are blurry of what exact

22      years that may be.

23  **Q.**    So, did you see then the standard of care evolve

24      towards prescribing more opioids?

25  **A.**    Oh, absolutely.  You know, as a referral-only practice,

1    you know, we would get -- you know, if you get a patient

2    sent to you from Oceana on ten pills a day and you take over

3    their care, you know, that's 300 pills a month.  That's 360

4    pills a year for one patient.  You can't just take them off

5    that day, right?  You have to make adjustments and you have

6    to try other things.  So, we would get those patients, you

7    know, and, certainly, we would have to find solutions for

8    them because, obviously, that's -- I never felt that was

9    going to be an appropriate long-term dose for the patients.

10   So, we saw that from -- really, as the 90s progressed, we

11   saw more and more of that, all the way -- and we'd get

12   people off, 80-85 percent of people either off or reduced by

13   half.  But then, new patients would come in.  So, the funnel

14   kept filling up.  So, I saw it firsthand every day of my

15   practice.

16   **Q.**   So, let me pause on one thing.  You mentioned -- we

17   spoke just a moment ago about Purdue.  Did you personally

18   have any professional interactions with Purdue during this

19   time period, this first phase?

20   **A.**   I did.  So, Purdue Frederick was a company that

21   presented research that OxyContin was less addictive and

22   long-term solution for chronic people who needed opioids.

23   They also sponsored several county societies.  So, for CAMC,

24   for Thomas, for St. Francis.

25        I would go out to Roane County, for example, or Raleigh

1    County, or Huntington to give ground rounds and they would

2    have a sponsor for the event.  And so, they would both give

3    the honorary to the speaker, which was $500 or a $1,000.00.

4    They would also sponsor the event itself.  And so, I did

5    work in that capacity and --

6    **Q.**   Did there come a time when you decided to stop doing

7    work for Purdue?

8    **A.**   Well, so, you know, I -- from 1996, when they came out

9    until probably the early part of 2000, I really felt that

10   the teaching around the country that long-term opioids were

11   better than short-term was correct until I started seeing

12   more and more of what was going on with the drug OxyContin.

13       And when I gave a lecture -- just to be clear, when I

14   gave a lecture they were sponsoring a program on, I always

15   talk about the same thing.  I talk about procedures as a way

16   to spare people from opioids when possible.  So, I would

17   talk about that and I wouldn't use their slides.  And so,

18   that was an issue with them a bit.

19   **Q.**   Did something happen in the early '00s that caused you

20   to stop even participating in anything they sponsored?

21   **A.**   It did.  Two things happened.  I actually heard some of

22   their speakers talk about you could give people with alcohol

23   addiction their drug and it wouldn't be a problem.  I felt

24   that was totally crazy.  Every -- every bit of information

25   says that's wrong.

```
 1          And then, Dr. Haddox, who was their Medical Director,
 2     talked a lot about, you know, that no one was really
 3     addicted, they were undertreated, you give them more and
 4     more.  And I heard him -- we were speaking together at
 5     Embassy Suites at a meeting put on by the State Medical
 6     Association.  I was speaking on procedures, he was speaking
 7     on opioids, and I really felt that was bad information to
 8     give physicians.  So, we had a real break in our thought
 9     processes.
10     Q.   Now, after you had this experience with Purdue, did you
11     stop prescribing opioids?
12     A.   No.  I think opioids -- again, it's a complicated
13     issue.  When we get referrals on a patient that's been on an
14     opioid for three years and they say it's helping them and
15     their urine screen is good and they've been compliant with
16     their family doctor, you can't easily just take them off
17     their opioid.  You have to find a solution to help them.
18          Most people that get to see us want to get off of
19     opioids.  That's why they often request from the family
20     physician, I want to go see Dr. Kim or Dr. Deer, one of my
21     colleagues.  And so, we then come up with a strategy, a
22     plan.
23          Many of those people, for example, have never been to
24     physical therapy.  Something that simple.  We have a
25     physical therapy department.  Many of those people had a,
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    you know, a joint problem that we can easily burn the joint

2    and help them, but they've never been offered that.  So, a

3    lot of times, it was just the family physician didn't know

4    what options existed.  And so -- so, we didn't quit

5    prescribing opioids in general and, in fact, we didn't quit

6    prescribing Oxycodone in patients who were on it already,

7    but we did try to find other solutions and I no longer

8    believed the comment that it wasn't addictive because I

9    started seeing some people have an addiction in the

10   community.

11   **Q.**   Now, let's shift over to your second phase.  So, you've

12   got the first phase.  And describe to me what you saw

13   happening in this 2010 to 2015 time period with the second

14   phase.

15   **A.**   Well, so, you know, we started seeing more discussion

16   about the problem, you know, and I think it became -- people

17   started pushing back a bit.  We had -- and we'll talk in

18   more detail, but we had everyone saying you have to up the

19   dose.  You have to treat the patient with opioids.  You have

20   to look at the fifth vital sign and make sure they are

21   treated properly.

22        And then, in 2010 or so, we starting seeing people like

23   myself pushing back and saying I'm not sure that's right.

24   We need to look at it carefully.

25        And, in 2012, the West Virginia Legislature asked for

1    advice from myself and others and they created the West

2    Virginia act that made pain clinics be certified.  And what

3    I mean by that is, if someone gave more than 51 percent of

4    their patients a controlled substance, they fell under that

5    legislation even if they were a family doctor because, at

6    that time, you could be a family physician calling yourself

7    a pain clinic giving people opioids all day long, right?

8    That was appropriate under the rules before 2012 in West

9    Virginia.

10        In 2012, that legislation said you have to meet certain

11   criteria to be treating pain chronically.  And I think that

12   was a big step forward in '12.  It wasn't enough probably to

13   change the standard of care, we'll talk more about that

14   later, but it helped.

15   **Q.**   Let's talk about the third phase then, 2015 through --

16   through the present.  Describe for us what was happening

17   particularly in West Virginia during that phase.

18   **A.**   So, in '15 to '21, I think, again, we've seen a really

19   good change in West Virginia, I think, and it goes back to

20   several factors.  One is the CDC came out with guidelines

21   and while it's a national thing, local physicians in West

22   Virginia -- and, again, they were -- they were written

23   originally for primary care and family practice.

24        People who had given people high dose opioids for years

25   read the CDC guidelines.  15 morphine equivalents should be

1    what the goal is, or less.  98 at the most unless someone is

2    end of life.  And that really made people change their

3    prescribing some, not all, but it helped.

4        Then the SEMP guidelines came out in '16 and we

5    published those.  That helped because then they had a way to

6    enforce or adjudicate the CDC guidelines in their practice.

7        And then, thirdly, and I think probably most

8    importantly for me because if you watch my prescribing

9    taking people over in this '10, '11, which was up here

10   because I got those people coming to me that way versus '18

11   and now through '21.

12       We saw the 2018 legislation in West Virginia about

13   limiting prescribing, which was the best thing that's

14   happened to our state, in my opinion, as far as this issue

15   goes, really limit how much family physicians gave patients

16   before they sent them to see me.

17       So, now, most patients sent to see us, unless they're

18   cancer patients on minimal or no opioid.  So, that

19   conservatism phase, I think, has been very -- in my opinion,

20   very good for the people in West Virginia.

21   **Q.**   So, in addition to your own practice, did you see a

22   change in this later third time period in prescribing trends

23   in West Virginia?

24   **A.**   Oh, absolutely.  I think if you look at the West

25   Virginia data from the last few years overall, hydrocodone

1   and oxycodone both are way down as prescribed for patients.

2   Also, many family physicians from all over the state,

3   really, that '18 law scared them a bit because they had been

4   prescribing in ways that were not anywhere remotely familiar

5   to the '18 law.  So, I had phone calls from probably, you

6   know, a third of the family physicians in West Virginia

7   asking me what they should do.  And so, that was good

8   because, in the past, I didn't get those phone calls.  So, I

9   think that was a good thing.

10  **Q.**   And so, it sounds like you've also changed or adjusted

11  your own opioid prescribing in the last several years?

12  **A.**   Oh.  Absolutely.  So, you know, to give you an example,

13  in 2005, when we received a patient on high dose OxyContin

14  and, again, they had no signs of addiction, their drug -- we

15  screen everybody with a drug screen from the day we meet

16  them.  The drug screen was good.  The Board of Pharmacy was

17  good, but they were on this high dose.  We would have to

18  figure out how to get them off that drug and do other

19  things, right, make -- sometimes, it took a long time

20  because the patient had really bad problems.  Sometimes, it

21  took a long time because of insurance approval of

22  procedures.

23      For example, Medicaid would not approve procedures, but

24  they would approve the drug.  So, it really -- we take

25  Medicaid or practices that do take Medicaid.  So, we saw all

1    that going on and sometimes it would take us three or

2    four years to get someone down below the 15 morphine

3    equivalence or off the medication.

4        And then, 2020, if I'd get 100 patients in a month,

5    maybe two or three will be on opioids.

6        So, I mean, I can't tell you the difference.  It's

7    amazing.  You can see it in my numbers, for example,

8    because, again, remember, we take only referred patients.

9    So, we only see you if your doctor has already treated you

10   for at least three to six months.

11       So, I think it's been striking to me what those three

12   things we just talked about, the CDC, SEMP and the state

13   legislation did to improve that.

14   **Q.**   So, let's come back for a moment and define standard of

15   care.  Can you tell the Court what you mean when you use

16   that phrase?

17   **A.**   So, standard of care means what a reasonable doctor

18   would do within their field of medicine in a situation and

19   that's the standard of care.

20   **Q.**   And are standards of care typically written down or

21   formalized?

22   **A.**   Some are written down.  For example, guidelines that we

23   write for devices, if it says give antibiotics before

24   surgery, if we don't do that and the person gets an

25   infection, you're going to probably be in trouble.  So,

1    that's a written standard of care.

2         Some aren't written; they're understood.  For example,

3    you know, I just read a book on the Spanish Flu and Johns

4    Hopkins in those days, they would bleed you for Spanish Flu

5    and that was standard of care.  Didn't work very well in

6    1918.  But today, if you did that, you would lose your

7    license.  So, I mean, standard of changes based on, you

8    know, common knowledge.  Everyone decided that was a bad

9    idea.  So, that's not written down, but it doesn't need to

10   be.

11   **Q.**   So, the standard of care is not static?  It can be

12   dynamic?

13   **A.**   It's usually dynamic in most things.  There are certain

14   rules that I think that always stay the same, but in many

15   areas of care, it changes based on new evidence or research

16   and that's why research is so important.

17   **Q.**   And are prescribers expected to prescribe medications

18   consistent with whatever the then existing standard of care

19   is?

20   **A.**   I don't know about the word expected, but I think

21   physicians do follow the standard of care.  So, if you're

22   told you're undertreating people and, again, back in that

23   first phase, I was often called to M&M conferences at

24   hospitals to give my opinion was the doctor undertreating

25   someone because a complaint would come in.

1        So, if you're told that you're undertreating people,

2   you get more likely to treat people with opioids.  If you're

3   told you're overtreating people, you tend to back off.  So,

4   I think they do change with -- I think doctors do change

5   their prescribing habits based on the standard of care.

6   **Q.**   And to your -- it sounds like this is what you're

7   alluding to.  To your experience, can there be consequences

8   for prescribers if they don't follow the existing standard

9   of care?

10  **A.**   Sometimes.  I mean, there are people that I see

11  patients from who I think did a terrible job with the

12  standard of care, but nothing happened to them because the

13  patient had no harm.  But other people may lose their

14  license.

15       And you asked me about the federal prosecutors I've

16  worked with in the past and people have lost licenses and

17  gone to jail for prescribing without a medical reason or

18  they can lose their Board of Medicine license or they can

19  get sued in civil court for malpractice.

20  **Q.**   So, Dr. Deer, who has access to the information needed

21  to determine whether a prescriber is prescribing consistent

22  with the standard of care?

23  **A.**   Well, I would -- I will give you my best answer and it

24  may be not totally correct.  I think the Board of Pharmacy,

25  the DEA and, eventually, the Board of Medicine if it's given

1    to them.

2    **Q.**   And in your experience, Dr. Deer, do wholesale

3    distributors have access to information that would allow

4    them to determine whether a particular doctor is prescribing

5    within the standard of care?

6    **A.**   Not in my --

7                MR. FITZSIMMONS:  Objection.

8                THE WITNESS:  I'm sorry, sir.

9                MR. FITZSIMMONS:  I need to object.  I believe

10   it's outside the scope of the qualification for the standard

11   of care.  We're now bringing in acts of the distributorship

12   which, according to the report, is limited not to -- does

13   not include the distributorship conduct whatsoever.

14               THE COURT:  Well, overruled.  I'm going to let him

15   answer, if he knows, from his own personal knowledge.

16               THE WITNESS:  I don't have any knowledge of any

17   distributor involvement in that based on my personal

18   experience.

19               BY MS. MAINIGI:

20   **Q.**   So, I want to focus back on the standard of care for

21   pain management.

22               THE COURT:  I think I should sustain the objection

23   in view of his last answer, Ms. Mainigi.  You go ahead.

24               MS. MAINIGI:  Thank you, Your Honor.

25               BY MS. MAINIGI:

1   **Q.**   When did you see the standard of care begin to change?

2   **A.**   That's a complicated question.  Could you rephrase

3   that?  I'm not sure I understand.

4   **Q.**   Yeah.  No, that is -- that is not a good question.

5        So, for example, when you were in medical school, was

6   it the standard for physicians to routinely prescribe opioid

7   medications for chronic pain?

8   **A.**   So, when I was at WVU, you know, we didn't have any

9   lectures on pain at all and that was pretty common.  Now,

10  I'm working with some people at Hopkins to make a good

11  curriculum for medical schools.  And the only thing I saw

12  with opioids there was a doctor named Dr. Moss (phonetic),

13  who was Head of Palliative Care.  And that was really all I

14  saw opioid-wise when I was a medical student.  I would see

15  people after surgery get opioids, usually Tylox or Percocet.

16  And so, that was about it in med school.

17  **Q.**   And so, did you come by the mid-90s to know of a

18  concept called pain as the fifth vital sign?

19  **A.**   So, when I was leaving UVA coming here, I was starting

20  to see at UVA people on a lot of pills a day, short-acting

21  pills.  And so, I was starting to see a change a little bit

22  in the early '90s, but it wasn't to the point it got to much

23  later.

24       So, when I came to West Virginia, I started hearing

25  about the fifth vital sign as I went to society meetings and

1   Joint Commission and things of that nature.  So, that became

2   a term that was really propagated around the United States.

3        You know, you have your blood pressure.  You have a

4   pulse.  You have your respiratory rate.  You have your

5   temperature.  That's what most -- you know, I have a

6   daughter who is a nurse.  That's what most nurses would

7   check in the hospital.

8        And then, it was added to the Veterans Administration,

9   which I know there's one down in Huntington, as well as the

10  Joint Commission accredited hospitals, a fifth vital sign,

11  which was pain assessment and treatment.

12  **Q.**   And so, pain as the fifth vital sign, that meant that

13  that was something like blood pressure that actually got

14  asked about at the hospital or tested?

15  **A.**   Once that became accepted as an important factor, it

16  was required.  You know, when you asked me earlier about

17  CAMC, one of the reasons I became Medical Director of CAMC

18  of Pain, they had to meet the Joint Commission requirements

19  as pain for the fifth vital sign.  It meant that every

20  patient that walks in the hospital, inpatient or outpatient,

21  or to the VA, had to ask the pain level and follow that

22  throughout the care and then make adjustments to the pain

23  and get the pain below a five out of ten.

24  **Q.**   And so, were there several organizations that promoted

25  pain as the fifth vital sign?

1    **A.**    There were several.  I think the biggest was American

2    Pain Society, which was a society dealing with mostly

3    non-interventional pain.

4    **Q.**    And have you ever been a member of the American Pain

5    Society?

6    **A.**    I was.  I joined that society, like many other

7    societies, early on, never played any leadership role there

8    in any fashion because they were more non-interventional,

9    but they had a journal called Pain, which was the highest

10   rated journal in our field for many years, and we published

11   an article on stimulation of the spine there in 2015 that's

12   a landmark article.

13   **Q.**    And, at the time, did you view the American Pain

14   Society as a respected organization?

15   **A.**    They had some of the more experienced doctors in the

16   field, mostly non-interventional, but some of the more

17   well-published doctors.  So, yes, they were well respected

18   back in those days.

19          MS. MAINIGI:  Your Honor, I'd like to put up on

20   the screen DEF-WV-02395.

21       Matt, if you could put that up, please.

22          BY MS. MAINIGI:

23   **Q.**    Do you recognize, Dr. Deer, this document from the

24   American Pain Society?

25   **A.**    I do.  It was widely seen around our field.

1    **Q.**   Okay.  And can you describe it?  What is it?

2    **A.**   So, this is a document by the society, American Pain

3    Society, from 1995, right after I got to West Virginia and

4    the year after.  And then, it's a statement from the --

5    presidential address from Dr. James Campbell, who I know

6    well from Johns Hopkins.  He was from the Department of

7    Neurosurgery there and he was giving the keynote address and

8    he called for this change and then their board agreed with

9    him and made a push to make that important.

10   **Q.**   So, James Campbell was the Head of the American Pain

11   Society at the time?

12   **A.**   Yes, he was.

13   **Q.**   And he was -- he practiced at Johns Hopkins?

14   **A.**   He still does.  I had a call with him about an

15   experiment in the spinal fluid a few months ago, but he

16   still -- but he doesn't see patients any longer.  He does

17   research only now, I think.

18   **Q.**   So, if you could --

19          MS. MAINIGI:  Matt, if we could highlight the

20   statement from Dr. Campbell at the top.

21          BY MS. MAINIGI:

22   **Q.**   If you could read that out loud, please?

23   **A.**   I'll try my best.  That's a long way from me.

24   **Q.**   And I'm sorry, Dr. Deer.  You have a binder in front of

25   you.

1    **A.**    Oh, okay.  I think I can do it.

2    **Q.**    Okay.

3    **A.**    It's not on, but I'll try my best to read that from

4    here.  I feel like I'm at the Department of Motor Vehicles.

5    **Q.**    You're at the opthamologist.

6    **A.**    Vital signs are taken seriously.  If pain were assessed

7    with the same zeal as other vital signs are, it would have a

8    much better chance of being treated properly.  We need to

9    train doctors and nurses to treat pain as a vital sign.

10   Quality care means that pain is measured and treated.  Dr.

11   Campbell.

12   **Q.**    You did a good job with that.  Thank you.

13   **A.**    Thanks.  I can't go any smaller than that from this

14   distance, please.

15   **Q.**    Now, is it not up on your screen, Dr. Deer?

16   **A.**    No.  There's nothing up on my screen.

17   **Q.**    Oh, okay.

18   **A.**    It's dark.

19   **Q.**    The binder in front of you -- well, next time, we'll

20   turn to the binder.

21   **A.**    Oh, thank you.

22   **Q.**    So, this document was in '95 and then OxyContin came

23   out in 1996; is that right?

24   **A.**    Not exactly.  OxyContin, I believe, was actually

25   approved in '95.  I think '96 was when Purdue Frederick

1    started to market OxyContin as a product, but I think it was

2    approved in '95, if I remember correctly.

3    **Q.**   Now, in your opinion, did these messages from Dr.

4    Campbell and the American Pain Society affect the medical

5    community?

6    **A.**   Oh, they were -- they were hugely impactful [sic] and

7    people made changes immediately to their practice because of

8    this fifth vital sign.

9    **Q.**   How do you know that?

10   **A.**   I lived through it.  Everybody admitted to the hospital

11   had to be treated -- to go home like, for example, if you

12   had your knee replaced, at that time, Dave Santrock was

13   doing a lot of knee replacements at my hospital, one of my

14   dear friends.  And so, he would replace your knee and before

15   you'd go home Day 2 or 3, but after this came about, you

16   couldn't go home unless your pain was down to a 4.

17        So, most doctors, I mean, there are people like me.  I

18   can go do a nerve block.  I can do a femoral nerve block to

19   help your knee pain and you might go home.

20        But most doctors don't do that type of procedure.  So,

21   they would give you, you know, pills because they had to get

22   you below 4.  So, when people left the hospital, they had a

23   month's pills and they went back to their family doctor.

24   And then, many times, they stayed on their pills because

25   they've got chronic knee pain even though they had the

 1    replacement.  So, that really changed greatly anybody that

 2    went to the hospital for any reason, including outpatient

 3    treatment, how they were treating them.

 4             MS. MAINIGI:  Your Honor, I would like to move to

 5    admit 02395 into evidence.

 6             THE COURT:  Any objection?

 7             MR. FITZSIMMONS:  No objection.

 8             THE COURT:  It's admitted.

 9             By MS. MAINIGI:

10    Q.   I'm going to ask you -- and let's let you turn in your

11    binder, Dr. Deer --

12    A.   I have the screen now.

13    Q.   -- if that's helpful.  Oh, you have the screen now?

14    Okay.

15             MS. MAINIGI:  Matt, if you could put on the screen

16    DEF-WV-03074, it should be the next document in the binder.

17             BY MS. MAINIGI:

18    Q.   Now, this is a document from the VA entitled Pain as

19    the Fifth Vital Sign Tool Kit.  Are you familiar with this

20    document?

21    A.   Yes, I am.

22    Q.   And what's the date on the document, just so we can

23    place it?

24    A.   October 2000.

25    Q.   Now, let's turn to Page 13, if you could, of the

1    document, and there's a section there, Section 4, called The

2    Pain Screening Process.  Could you read that section,

3    please?

4    **A.**   Be happy to.  Pain as the fifth vital sign is a

5    strategy for promoting increased attention to unrecognized

6    and undertreated pain among patients receiving care in the

7    Veterans Hospital Administration healthcare system.  The

8    strategy calls for a routine screening, where patients are

9    asked whether they are experiencing pain and are then asked

10   to rate the intensity of their pain using the 0 to 10

11   numeric rating scale on which 0 equals no pain while 10

12   represents the worst possible pain.  The number reported by

13   each patient is the pain score and should be documented in

14   the medical record.  The presence of pain at any level

15   serves as a cue to the provider to conduct additional

16   assessment and to initiate interventions designed to promote

17   pain relief, as clinically indicated.

18   **Q.**   So, is this document from the VA an example of an

19   organization promoting the under -- promoting the fact that

20   pain is undertreated and should be dealt with?

21   **A.**   That's correct.

22           MS. MAINIGI:  Your Honor, at this time, I would

23   like to move for the admission of 03074 into evidence.

24           THE COURT:  Any objection?

25           MR. FITZSIMMONS:  No objection, Your Honor.

1            THE COURT:  It's admitted.

2            By MS. MAINIGI:

3    **Q.**   Now, that was the VA.  Are you aware if during this

4    time period, Dr. Deer, hospitals also began to adopt

5    policies to address the undertreatment of pain?

6    **A.**   So, most hospitals that anyone in this room will go to,

7    hopefully, are accredited because that's important that they

8    meet standards.  Joint Commission adopted the fifth vital

9    sign as one of those standards of approval of your hospital

10   facility or outpatient surgery center.

11   **Q.**   And let me ask you to turn -- well, you can look at the

12   screen, if you'd prefer, but it is -- the document is

13   WV-2693 in the binder.  Should be the next tab.  It's the

14   Joint Commission pain standards which have already been

15   admitted for a limited purpose under Dr. Gilligan.  Are

16   these, in fact, the Joint Commission pain standards?

17   **A.**   Those are that document, yes, ma'am.

18   **Q.**   And those are from 2001?

19   **A.**   Correct.

20   **Q.**   And do you have an opinion, Dr. Deer, as to what impact

21   this guidance, along with the APS guidance and the VA

22   guidance, had on the standard of care for prescribing

23   opioids during this time period?

24   **A.**   I feel it greatly shifted, in my experience, the

25   standard of care towards more opioid prescribing for anyone

1    admitted to any hospital.

2    **Q.**   Now, this guidance doesn't expressly tell doctors to

3    prescribe more opioids, does it?

4    **A.**   It does not.

5    **Q.**   So, why did it change the standard of care?

6    **A.**   Because, you know, there's an old saying if you have a

7    hammer that looks like a nail in medicine where you do the

8    same thing for everyone.  So, if you went to see in a

9    hospital that had someone who could do a shoulder block

10   after shoulder surgery, you may get that.  It may help your

11   shoulder pain to get you home.  We do a lot of those today

12   in 2021.

13       But if you didn't have someone to do a block if you had

14   a shoulder replacement or a rotator cuff repair, that's

15   quite painful.  So, to get you out of the hospital, you

16   know, originally, it said pain below 5, but as you saw in

17   that thing I just read, it said any pain at all.  If you

18   complain of pain, many physicians who are good physicians,

19   who didn't -- wasn't trying to cause harm, gave the person

20   opioids in the hospital by IV and then shifted to pills to

21   let them go home because, otherwise, they couldn't meet the

22   standard -- the Joint Commission standards.

23   **Q.**   And this change in the standard of care during this

24   time period, was that consistent with the practice you saw

25   at hospitals in West Virginia?

1    **A.**   Oh, absolutely.

2    **Q.**   And, to your knowledge, did this pain as the fifth

3    vital sign concept affect prescribing by doctors outside of

4    the VA and outside of hospitals, as well?

5    **A.**   I think it did because, again, when those patients went

6    back to their home, then they often had been taking opioids

7    successfully, giving them pain relief.  The family doctor

8    would often keep them on that medication.

9    **Q.**   Now, were prescribers at the time who prescribed more

10   opioids in accordance with that changing standard of care,

11   were they, in your opinion, acting reasonably in light of

12   the information available to them at the time?

13   **A.**   Based on their knowledge base and their options, they

14   were, based on the information.

15   **Q.**   Now, are you aware of whether wholesale distributors

16   had any involvement in any of these documents?

17           MR. FITZSIMMONS:  Judge, I'm going to object.  I

18   thought we already established that it's (unintelligible) --

19           COURT REPORTER:  I'm sorry, sir.  I'm having

20   trouble hearing you.  Is your mic on?

21           MR. FITZSIMMONS:  I'm sorry.  Is my mic on?

22           COURT REPORTER:  I don't think so.

23           MR. FITZSIMMONS:  It's not.  I'm sorry.  I

24   apologize.

25       I thought we already objected once as to the area of a

```
 1    distributorship's action and this is -- I believe Your Honor
 2    sustained that objection and this question is specific,
 3    trying to elicit now distributorship conduct by this
 4    witness, who has already testified he knows nothing about
 5    that.
 6              THE COURT:  Well, I'm going to let him answer the
 7    question if he can.  The reason I sustained the last
 8    objection was that he said he didn't -- he didn't know.
 9              MR. FITZSIMMONS:  That's correct, Judge.  That's
10    why I'm objecting again.
11              THE COURT:  That's --
12              MR. FITZSIMMONS:  And unless he changes his
13    testimony --
14              THE COURT:  I'll reserve my ruling and let you
15    question him a little further, Ms. Mainigi.
16              MS. MAINIGI:  Thank you, Your Honor.
17              BY MS. MAINIGI:
18    Q.   Do you remember the question, Dr. Deer?
19    A.   Please repeat it.
20    Q.   Absolutely.  Do you have -- are you aware of any
21    distributor involvement in any of these documents that we've
22    been talking about, the Joint Commission, the VA tool kit?
23    A.   I have no knowledge of any distributor roles or
24    actions.
25              THE COURT:  I'll overrule the objection, Mr.
```

1    Fitzsimmons.

2              BY MS. MAINIGI:

3    **Q.**   Now, at the same time --

4              THE COURT:   The question went to what he

5    personally knew and he said he didn't have any knowledge and

6    I think the answer was appropriately admitted.

7              MR. FITZSIMMONS:   Thank you, Your Honor.

8              BY MS. MAINIGI:

9    **Q.**   Dr. Deer, around the same time that the Joint

10   Commission issued its standards in 2001, did the DEA issue a

11   statement related to the treatment of pain?

12   **A.**   They did.

13   **Q.**   Okay.

14             MS. MAINIGI:   I'm going to ask, Matt, that we put

15   on the screen MCWV-01522, which is already admitted for

16   limited purpose under Dr. Gilligan.

17             BY MS. MAINIGI:

18   **Q.**   And, Dr. Deer, is this a statement that you were

19   referring to?

20   **A.**   It is.

21   **Q.**   And this statement from the DEA, as well as 21 health

22   organizations in 2001, is this statement consistent with the

23   standard of care that you just testified about?

24   **A.**   That is one of the components physicians looked at for

25   their decision making.

1   **Q.**   Now, Dr. Deer, I think you helped us prepare another

2   slide that identified some of the key developments in West

3   Virginia and nationally related to the changing standard of

4   care from the 1990s through the present; do you recall that?

5   **A.**   I do recall that, yes.

6   **Q.**   Okay.

7        MS. MAINIGI:  Your Honor, I'm going to put a

8   demonstrative on the screen and let me explain to you what

9   it is.

10       Matt, if you could put -- put it up there.

11       What this is, Your Honor, is Dr. McCann -- this was an

12   admitted exhibit under Dr. McCann.  It was, I think, a 1006

13   summary charge that Your Honor admitted.  For the record,

14   it's P-44711_0009 and what it shows, according to Dr.

15   McCann, is the distribution of oxycodone and hydrocodone by

16   all distributors from 1997 to 2019.

17       BY MS. MAINIGI:

18   **Q.**   Does this chart look familiar to you, Dr. Deer?

19   **A.**   Yes, it does.

20   **Q.**   Okay.  So, we just talked about a few major events that

21   occurred.  You just testified about the launch of OxyContin

22   and introduction of pain as the fifth vital sign in 1996; is

23   that correct?

24   **A.**   That's correct.

25       MS. MAINIGI:  So, Matt, let's add that to our

1    chart.

2              BY MS. MAINIGI:

3    Q.   And then, you also testified about the VA's adoption of

4    pain as the fifth vital sign in 2000 and the Joint

5    Commission's adoption in 2001; is that correct?

6    A.   That's correct.

7              MS. MAINIGI:  So, let's add those to the chart.

8              BY MS. MAINIGI:

9    Q.   And then, you just testified right now about the DEA

10   statement promoting pain relief?

11   A.   That's correct.

12             MS. MAINIGI:  And let's add that to the chart.

13             BY MS. MAINIGI:

14   Q.   So, let's shift over to what was happening in West

15   Virginia in this time period.  Let's take a look at

16   WV-01219, which is an admitted document.  It was admitted

17   during Dr. Waller's testimony.  What -- what is this

18   document, Dr. Deer?

19   A.   This is a Board of Medicine statement clarifying the

20   use of opioids for the treatment of chronic non-malignant

21   pain.

22   Q.   And I think if we turn to Page 2, we'll see the date on

23   this document.  What is that date?

24   A.   July 14th, 1997.

25             MS. MAINIGI:  And let's go back to the first page

1    and let's take a look at the second paragraph, Matt, if you

2    could highlight that.

3            BY MS. MAINIGI:

4    **Q.**    And if you could read that to us, Dr. Deer?

5    **A.**    Happy to.  The purpose of this statement is to clarify

6    the Board of Medicine's position on the appropriate use of

7    opioids for patients with chronic non-malignant pain so that

8    these patients will receive quality pain management and so

9    that their physicians will not fear legal consequences,

10   including disciplinary action by the board, when they

11   prescribe opioids in a manner described in this statement.

12   It should be understood that the board recognizes that

13   opioids are appropriate treatment for chronic non-malignant

14   patient in selected patients.

15   **Q.**    So, first, let's just define chronic non-malignant

16   pain.  What is that?

17   **A.**    So, chronic pain is pain that lasts -- and it's been

18   defined different ways, but pain that lasts more than

19   12 weeks.  Some people define that as chronic pain.  Others

20   have described chronic pain as pain that lasts longer than

21   you would expect tissue healing to occur.

22           So, for example, if you have a trauma to your leg, you

23   would expect it to get better over time and it doesn't.  And

24   you still have nerve abnormalities.  So, that's two

25   definitions that are widely used.

1    **Q.**   And non-malignant pain would mean non-cancer pain

2    basically?

3    **A.**   Correct.  That means your pain is not cancer-related

4    pain.

5    **Q.**   So, before this time period, let's say before 1997,

6    were doctors generally prescribing opioid medications for

7    chronic non-malignant pain in their ordinary practice?

8    **A.**   They were, but not -- not very often and not very high

9    doses.  They were using short-acting drugs like Percocet,

10   Tylox, Dermabond.  You know, and they were -- they were

11   afraid to go to higher doses because of fear of the Board of

12   Medicine taking their license if they gave too much

13   medication in those early days.

14   **Q.**   So, what do you take from this statement issued by the

15   Board of Medicine in 1997?  What's your interpretation of

16   that?

17   **A.**   Well, I think it goes back to what was going on in the

18   country we've talked about a little bit.  The fifth vital

19   sign came out, as far as recommendation from APS.  Doctors

20   were starting to think that pain was a right.  The World

21   Health Organization had said that it was right for cancer

22   pain.  Then that was then transferred over to non-cancer

23   pain.  And I think the Board of Medicine in West Virginia,

24   getting advice from doctors, we all thought that, you know,

25   longer-acting drugs may be better and safer.  And from

1    people like the Federation of State Medical Boards that they

2    should be allowed treatment of pain because they thought it

3    was undertreated and undertreatment became -- became a big

4    fear then of doctors after this type of statement came out.

5    **Q.**   Well, let's take a look at the fourth paragraph in this

6    document on the first page.

7            MS. MAINIGI:  Matt, if you could blow that up.

8            BY MS. MAINIGI:

9    **Q.**   So, that paragraph reads a physician need not fear

10   disciplinary action by the board if complete documentation

11   of prescribing of opioids in chronic non-malignant pain,

12   even in large doses, is contained in the medical records.

13   What do you take from that statement?

14   **A.**   I take from this that, you know, this is one of the

15   things we talked about earlier.  When I would get someone to

16   come in and see me after three years of pain treatment on a

17   really high dose, I think doctors felt comfortable just

18   going up on the dose rather than referring them to a

19   specialist.  So, this is, I think, very -- a very common

20   practice of, you know, upping the dose until someone got

21   better or got a side effect.

22   **Q.**   So, at the bottom of the first page there is a

23   suggested references section, and there are two articles

24   that are listed as references.  Are you familiar with those

25   articles?

1    **A.**   I'm very familiar with both those articles.

2    **Q.**   And can you just summarize for me at a high level what

3    your understanding is of the point of those articles?

4    **A.**   So, the Portenoy article is famous, famous in our

5    field, because Russell Portenoy, a neurologist in New York,

6    he had treated cancer patients for many years.  He said that

7    you should keep upping your dose until you get the effect,

8    which would be --

9           MR. FITZSIMMONS:  Judge, I'm going to object.

10   He's setting forth what the author of an article meant,

11   which is hearsay, and I don't see any foundation for him to

12   be doing that at this point.  So, this is improper.

13          THE COURT:  I will sustain that one, Ms. Mainigi.

14          MR. FITZSIMMONS:  Thank you, Judge.

15          MS. MAINIGI:  Your Honor, he -- well, I can

16   establish some foundation.

17          THE COURT:  All right.  Go ahead.

18          BY MS. MAINIGI:

19    **Q.**   Dr. Deer, are you familiar with the Russell Portenoy

20   article?

21    **A.**   I know the article well and the physician pretty well.

22    **Q.**   And was it a seminal article in the treatment of pain

23   during this time period?

24    **A.**   It was.

25    **Q.**   Was it widely read and distributed?

1    **A.**    It was.

2    **Q.**    And did the West Virginia Board of Medicine cite it as

3    a suggested reference to physicians in West Virginia?

4    **A.**    They did.

5              MS. MAINIGI:  Your Honor, I think I've established

6    foundation.  And I think this would fall under 703.  The

7    question that I would come back to, with your permission to

8    pose to Dr. Deer is, could he describe at a high level the

9    gist of what Dr. Portenoy was saying in his article.

10             THE COURT:  I don't think 703 makes it admissible.

11   He can -- he can refer to it as the basis of his opinion.

12   Can you get around it under one of the exceptions to the

13   hearsay rule?

14             MS. MAINIGI:  Your Honor, I think we really just

15   need it for notice.  We're not going for the truth of the

16   matter.  We just -- it was notice to the medical and

17   healthcare community about what the standard of care was at

18   the time.

19             THE COURT:  Which exhibit are we talking about

20   here?  I've lost my place.

21             MS. MAINIGI:  Oh, Your Honor, it's in your binder.

22             MR. FITZSIMMONS:  1219.

23             THE COURT:  What's the number, the exhibit?

24             MS. MAINIGI:  1219, Your Honor, in the binder, and

25   you'll see it's a --

```
 1                THE COURT:  Well, hasn't it already been admitted?

 2                MS. MAINIGI:  The document -- let me just double

 3      check.  This document has been admitted.  I'm just asking

 4      him about the suggested references that the Board of

 5      Medicine tells doctors in West Virginia to go look at.  The

 6      other point of that -- the other hearsay --

 7                THE COURT:  Just a minute.

 8                MS. MAINIGI:  Yes, Your Honor.

 9                THE COURT:  Mr. Fitzsimmons?

10                MR. FITZSIMMONS:  Judge, this is a footnote and

11      she's now asking this witness to tell us what's in the

12      article.  It's hearsay at its greatest.

13                THE COURT:  I will sustain the objection, Ms.

14      Mainigi.

15                MR. FITZSIMMONS:  Thank you, Your Honor.

16                MS. MAINIGI:  Your Honor, if I might just --

17                THE COURT:  He can -- he can refer to it as the

18      basis of his opinion, but I don't think he can get into the

19      substance of the -- of the article.  I'll sustain the

20      objection.

21                MS. MAINIGI:  Okay.  Thank you, Your Honor.

22                BY MS. MAINIGI:

23      Q.   Was this article from Dr. Portenoy, Dr. Deer, an

24      article that physicians during this time period could have

25      reasonably relied upon?
```

1    **A.**    Many did.

2    **Q.**    And could you elaborate on that, please?

3    **A.**    Many physicians adopted the philosophy that you upped

4    the dose of opioids until someone got better, their pain

5    below a 3 or a 4, or they had a side effect.  And there was

6    no ceiling, was what Dr. Portenoy always stated in his

7    lectures and things around the country.  And so, you should

8    keep going up even to a thousand milligrams a day without

9    any fear of any problems in a patient.  That was his

10   teaching and the article's gist.

11   **Q.**    And how about the second article, is this an article

12   you're also familiar with, The Use of Opioids for the

13   Treatment of Chronic Pain:  A Consensus Statement?

14   **A.**    I am.

15   **Q.**    And was that an article that was relied upon, to your

16   knowledge, by doctors in West Virginia in their prescribing?

17   **A.**    I believe that it was.

18   **Q.**    And in what direction did that article take them, as

19   far as prescribing?

20   **A.**    Just for the Court's knowledge, these two societies, I

21   was members of both.  They were the two largest pain

22   societies in the country at the time.  They had a lot of, I

23   would say, older non-interventional physicians writing these

24   statements who were opioid experts and they both -- they

25   recommended that patients be treated with opioids, again, to

1    proper doses without side effects.

2    **Q.**   So, did this Position Statement from the Board of

3    Medicine in West Virginia, did that get distributed to

4    physicians in West Virginia?

5    **A.**   It did.  I think all physicians in West Virginia

6    received that board policy.

7    **Q.**   Okay.  If I could ask you to turn to the next document,

8    which is WV-03003, can you identify this document for us,

9    please, Dr. Deer?

10   **A.**   Yes.  We now receive our Board of Medicine newsletters

11   via e-mail, but this was -- they used to mail this to all

12   the doctors licensed in West Virginia every quarter or this

13   was one for a year, it looks like, from January to December,

14   but it would come to all licensed physicians in West

15   Virginia.

16   **Q.**   So, this went to all licensed physicians?

17   **A.**   I believe so, yes.

18   **Q.**   Okay.  And if you turn to Page 6 of the document, which

19   is the very last page, at the top of that page, on the

20   right, it says board issues statement on the use of opioids

21   for the treatment of chronic non-malignant pain.  To your

22   knowledge, was that the statement we were just looking at?

23   **A.**   Yes, it was.

24   **Q.**   Okay.  And could you go ahead and read this, the rest

25   of this statement, please?

1    **A.**   Certainly.

2            MR. FITZSIMMONS:  Judge, I'm going to object to

3    having him read the news information into the record at this

4    point.

5            MS. MAINIGI:  Your Honor, I can go ahead and move

6    this document into evidence.  So, why don't I go ahead and

7    do that.  And it would come under the ancient document

8    exception, Your Honor.  Documents like this, also, this

9    newsletter, were actually admitted through Dr. Waller.

10           THE COURT:  Any objection?

11           MR. FITZSIMMONS:  I don't know what the date was,

12   Judge, on that.

13           THE COURT:  This is '97.  December of '97.

14   January --

15           MR. FITZSIMMONS:  It doesn't make the date then, I

16   don't believe.

17           MS. MAINIGI:  It does.  January '98 is the cutoff.

18           MR. FITZSIMMONS:  If it's January of -- if it is,

19   it is.

20           THE COURT:  Well, let me look.  Statement in a

21   document that was prepared before January 1st, 1998 and

22   whose authenticity is established.  It's admitted.

23           MS. MAINIGI:  Thank you, Your Honor.

24           BY MS. MAINIGI:

25   **Q.**   So, Dr. Deer, could you just read that statement from

1    the board, please?

2    **A.**    The Board's ad hoc committee on Americans with

3    disabilities had several meetings with interested parties on

4    the issue of pain management.  At the July, 1997 meeting,

5    the full board approved the committee's Position Statement

6    on the use of opioids for the treatment of chronic

7    non-malignant pain.  In September, 1997, the board mailed

8    its Position Statement to all physicians currently holding

9    an active medical license in the State of West Virginia.  If

10   you are interested in receiving a copy of this Position

11   Statement, please contact the board.

12   **Q.**   Thank you, Dr. Deer.

13          MS. MAINIGI:  Matt, let's go back to our chart.

14          THE COURT:  Just a minute.  Just so the record

15   will be clear, I admitted the exhibit, DEF-WV-03003, under

16   the ancient documents records exception to the hearsay rule,

17   which is found in 803(16).

18          MS. MAINIGI:  Thank you, Your Honor.

19          BY MS. MAINIGI:

20   **Q.**   Dr. Deer, would you add the West Virginia Board of

21   Medicine statement from 1997 to this chart?

22   **A.**   Oh, absolutely.  It changed people's perceptions.

23          MS. MAINIGI:  Matt, if we could go ahead and add

24   it, please.  Oh, it's there.  Sorry.

25          BY MS. MAINIGI:

1    **Q.**   Dr. Deer --

2                MS. MAINIGI:  Actually, Your Honor, would now be a

3    good time for a break before I turn to another document?

4                THE COURT:  Yes, I think it would be.

5          You can step down during the break, Dr. Deer.

6                THE WITNESS:  Thank you, sir.

7                THE COURT:  We'll be in recess for about ten

8    minutes.

9          (Recess taken)

10         (Proceedings resumed at 10:38 a.m. as follows:)

11               MS. MAINIGI:  Your Honor, I apologize.  The

12   witness will be right out of the men's room.

13               THE COURT:  That's all right.  We usually check to

14   see if everybody is back, but this time we didn't do that.

15         (Pause)

16         Thank you, Dr. Deer.

17   BY MS. MAINIGI:

18   **Q.**   All right, Dr. Deer, we left off in '97 in West

19   Virginia.  Do you recall from 1998 something called the

20   Intractable Pain Act in West Virginia?

21   **A.**   I recall it well.

22               MS. MAINIGI:  I'm going to ask, Matt, if you could

23   put up on the screen 03106.  And that is also in the binder.

24   BY MS. MAINIGI:

25   **Q.**   What was the Intractable Pain Act?  Let's start

1    with that, Dr. Deer.

2    **A.**    So it was an act that talked about prescribing

3    medication for patients who had intractable pain.

4    **Q.**    And what is intractable pain?  What's that definition?

5    **A.**    So intractable means that reasonable attempts have been

6    made to treat someone's pain.  For example, I have an

7    overuse injury of my tendon in my ankle right now.  And, so,

8    if I got to physical therapy, it didn't help me.  If I had

9    injections, it didn't help me.  If a medication didn't help

10   me, that would be intractable pain.  It doesn't go away with

11   normal treatment.

12   **Q.**    Is it similar to chronic pain?

13   **A.**    Well, it can be chronic pain.  So you can have chronic

14   pain -- let's say, for example, you're a lawyer and you sit

15   all day and your back hurts and it hurts you all the time,

16   that's chronic pain.  But it may not be intractable because

17   you go home, you stretch, you get in the hot tub, you feel

18   fine.  Right?  So it's chronic pain but not intractable.

19        Intractable means it's so severe that you just can't

20   get rid of it and it affects your life, your, your psyche,

21   and everything about you.  It becomes part of you almost.

22            MS. MAINIGI:  Your Honor, this document that is

23   03106, which is the Intractable Pain Act from the West

24   Virginia legislature, I'd ask the Court to take judicial

25   notice of this document.

```
 1                THE COURT:  Any objection?
 2                MR. FITZSIMMONS:  No objection, Your Honor.
 3                THE COURT:  It's judicially noticed and admitted.
 4                MS. MAINIGI:  Thank you, Your Honor.
 5      BY MS. MAINIGI:
 6      Q.   So taking a look at the, the document where it
 7      starts with at the top "An act," could you read that,
 8      please, Dr. Deer?
 9      A.   Yes.  "An act to amend Chapter 30 of the Code of West
10      Virginia, one thousand nine hundred thirty-one, as amended
11      by adding thereto a new article, designated Article 3(a),
12      relating to limiting disciplinary actions against certain
13      health professionals prescribing, administering, or
14      dispensing controlled substances in the management of
15      intractable pain."
16      Q.   So this -- the concept that's reflected in this act,
17      Dr. Deer, was that consistent with the '97 Board of Medicine
18      Physician Statement that we looked at earlier?
19      A.   It was very consistent with what the Board of Medicine
20      had said a year earlier.
21      Q.   And what was the goal here, to your understanding?
22      A.   I think the goal was really intended to be a good goal
23      to, to treat people who needed treatment.  So I think the
24      intent was, was, was, you know, at the time reasonable and
25      felt to be a need.
```

```
 1   Q.   And if we look at the bottom of the first page going on
 2   to the second page, starting with "a physician shall not --"
 3           MS. MAINIGI:  And, Matt, why don't we go ahead and
 4   highlight the relevant provisions there.  The highlighted
 5   portion I think would be Number 2.
 6   BY MS. MAINIGI:
 7   Q.   So Number 2 refers to disciplinary sanctions --
 8   that a physician would not be subject to disciplinary
 9   sanctions by the state if the physician prescribed,
10   administered, or dispensed pain-relieving controlled
11   substances for the purpose of alleviating or controlling
12   intractable pain when, in the case of intractable pain
13   involving a patient who is not dying, the physician
14   discharges his or her professional obligation to relieve
15   the patient's intractable pain even though the dosage
16   exceeds the average dosage of a pain-relieving
17   controlled substance, if the physician can demonstrate
18   by reference to an accepted guideline that his or her
19   practice substantially complied with that accepted
20   guideline.
21           What do you take that to mean?
22   A.   Well, I think it was telling physicians that if someone
23   had chronic pain that was non-cancerous, they still should
24   be treated like a cancer patient basically with higher doses
25   without fear of retribution against the doctor and if they
```

1    documented why they were doing it in their chart.

2    **Q.**   And would you say that -- we just looked at that Board

3    of Medicine statement from '97 which had references to the

4    Portnoy article and others.  Do you recall that?

5    **A.**   I do.

6    **Q.**   And would you say that an article like that was an

7    accepted guideline or reference for physicians at the time?

8    **A.**   It became an accepted standard.

9    **Q.**   Now, if we take a look at the last sentence there,

10   still under Number 2, it says evidence of non-compliance

11   with an accepted guideline is not sufficient alone to

12   support disciplinary or criminal action.

13        How do you take that sentence?

14   **A.**   Well, --

15        MR. FITZSIMMONS:  Judge, I'd like to lodge an

16   objection.  This is a doctor who's now providing us with

17   legal opinions of legislation.  It's outside the scope of

18   his expertise --

19        MS. MAINIGI:  Your Honor, Dr. Deer discussed --

20        MR. FITZSIMMONS:  -- as the question was phrased.

21        MS. MAINIGI:  I'm sorry.

22        MR. FITZSIMMONS:  As the question was phrased.

23        MS. MAINIGI:  I can rephrase, Your Honor, but Dr.

24   Deer discussed the Intractable Pain Act.

25        THE COURT:  I'll sustain the objection.  You can

1    try another way, Ms. Mainigi.

2              MS. MAINIGI:  Sure.

3    BY MS. MAINIGI:

4    **Q.**   To your understanding, Dr. Deer, -- well, let's

5    step back.  Did you look at the 1998 Intractable Pain

6    Act as part of formulating your expert opinion?

7    **A.**   I did.

8    **Q.**   And did you have an understanding of the Intractable

9    Pain Act in the time period in which this act was passed in

10   the course of your normal practice?

11   **A.**   I did.

12   **Q.**   And you went back and reviewed the Intractable Pain Act

13   as part of putting your report together?

14   **A.**   That's correct.

15   **Q.**   And you've relied on the Intractable Pain Act in

16   formulating your opinions?

17   **A.**   One of the things I relied on.

18   **Q.**   This last sentence that, that we've referred to, did

19   you form an impression in the course of formulating your

20   opinions as to what you understood that last sentence to

21   mean?

22   **A.**   The last sentence, in my opinion, means that the doctor

23   didn't have to follow the guidelines, whatever the

24   guidelines were, and still may not get in any trouble

25   because I think the board was saying the guidelines had not

1    caught up with current treatment standard of care.  This was

2    how I took it at the time.

3    **Q.**   Do you understand -- do you have an understanding of

4    what motivated the passage of the Intractable Pain Act?

5    **A.**   I think many factors including, you know, the, the

6    overall thought process throughout West Virginia and the

7    country that patients had the right to be treated for

8    chronic pain.  And intractable pain, which was severer pain,

9    was the highlight of that focus.

10   **Q.**   Let's go back to your chart, Dr. Deer.  Should we go

11   ahead and add the Intractable Pain Act to your chart?

12   **A.**   I think it is a factor.

13   **Q.**   Now, let me show you next from West Virginia in 2001

14   something called the Joint Policy Statement on Pain

15   Management at the End of Life.  And that is 02413.

16       What was this Joint Policy Statement?  Let's start with

17   this.  Who was issuing this Joint Policy Statement?

18   **A.**   It was the West Virginia Boards of Examiners of

19   Registered Professional Nurses, Medicine, Osteopathy, and

20   Pharmacy.

21   **Q.**   And is there a date on the document that we see?

22   **A.**   I don't see the date.

23   **Q.**   I think if you turn to --

24   **A.**   There we go.

25   **Q.**   -- the last page.

1    **A.**    January through March.  It was approved January through

2    March of 2001.

3    **Q.**    And is this a statement you were familiar with at the

4    time the statement came out?

5    **A.**    Yes, it was.

6    **Q.**    And is this a statement that you reviewed again in the

7    course of formulating your opinions here today?

8    **A.**    Yes, I did.

9           MS. MAINIGI:  Your Honor, at this time I'd like to

10   move to admit 02413 into evidence.

11          THE COURT:  Is there any objection?

12          MR. FITZSIMMONS:  No objection, Your Honor.

13          THE COURT:  It's admitted.

14   BY MS. MAINIGI:

15   **Q.**    So let's take a look at a few portions of this

16   policy statement from the various boards in West

17   Virginia.

18        If we turn to the second page, there is a heading

19   entitled "Management of Pain."

20        Now, I'm going to ask you to focus on the highlighted

21   sections.  What do the highlighted portions of this document

22   tell doctors about the role of opioids in pain management?

23   **A.**    Well, it tells them, first of all, you have to assess

24   whether someone is in pain, which I think is smart.  You

25   should always do that.  You need to treat it promptly.

1        And then, and then it goes from there to the need to

2   recognize if someone becomes tolerant.

3        And for the Court, tolerance means you need more of

4   anything to get the same effect.  That's tolerance.

5        And physically dependent, which means that if you quit

6   taking something, you have symptoms of withdrawal.  And that

7   that happens with every opioid patient over time, and that

8   that has nothing to do with addiction which is abnormal

9   behavior to get a drug.

10       THE COURT:  Doctor, let me ask you a question.

11       What's the difference between physical dependence and

12   addiction?

13       THE WITNESS:  So physical dependence means if

14   you're taking a medication -- like say, for example, someone

15   who took Xanax at bedtime for anxiety and they quit taking

16   the medication and they had a seizure or they felt sweaty

17   and felt bad, that's physical dependence.  The body is used

18   to that.  The receptors are full of that drug.  And when the

19   drug is gone, they, they feel the physical effects of it.

20       They're not -- once they get through that, that phase,

21   they don't crave the drug.  So that means they were

22   dependent upon it physically, but they didn't have an

23   abnormal craving unrelated to a medical issue.

24       If they're addicted to Xanax like, unfortunately, many

25   high school students have become, they take it for reasons

```
 1    other than anxiety.  They take it for reasons like to get

 2    high.

 3         And when they, when they quit taking it, they crave it.

 4    They're not -- because they're in withdrawal.  They crave it

 5    because they need it psychologically.  And they would steal,

 6    rob, break into your house, do whatever they can do to get

 7    the drug.

 8              THE COURT:  Thank you, sir.

 9              THE WITNESS:  Yes.

10    BY MS. MAINIGI:

11    Q.   And, so, the, the last sentence that's highlighted,

12    what do you take that to mean, Dr. Deer?

13    A.   Let me read it first to refresh myself.

14         (Pause)

15         So it's saying that governmental policies that were

16    intended for -- to stop diversion of drugs should not

17    interfere with the doctor prescribing medications at the end

18    of life.

19         So, therefore, you would maybe prescribe medicines you

20    wouldn't normally prescribe in that patient because they're

21    in a terminal condition either at their home or in a

22    hospice.

23    Q.   Okay.  Now I'm going to ask you to take a look at

24    another policy statement, this time just from the West

25    Virginia Board of Medicine related to the use of opioids in
```

1    treating other types of pain.  This is from 2005.  So it is

2    MC-WV-1218.  This document was already admitted under Dr.

3    Waller.

4         So this policy statement, Dr. Deer, does this -- does

5    it limit itself to a particular circumstance, the policy for

6    the use of controlled substances for the treatment of pain?

7    **A.**    I believe this policy was about non-cancer pain as well

8    as cancer pain.

9    **Q.**    And who issued this policy statement?

10   **A.**    The Board of Medicine.

11   **Q.**    Was this -- I'm sorry.

12   **A.**    In West Virginia.

13   **Q.**    Would this policy statement have been distributed to

14   doctors in West Virginia?

15   **A.**    Yes.  If you had a license to practice medicine here,

16   whether you lived here or outside the State of West

17   Virginia, you would have received this newsletter.

18   **Q.**    So if we take a look at the first page and the last

19   sentence of the first paragraph, what types of pain

20   treatment did the board define as inappropriate treatment of

21   pain?

22   **A.**    So this, this board recommendation told doctors that if

23   you had a patient complain of pain and you didn't treat

24   their pain or if you didn't treat them enough, if you were

25   under-treating their pain, or if you over-treated their

1    pain, or if you offered them ineffective treatment that you

2    kept doing over and over again, all of those were forms of

3    inappropriate treatment.

4    **Q.**   And if you look at the last paragraph on the first

5    page, and I think the last sentence that starts with "as

6    such," so the, the inappropriate treatment of pain included

7    under-treatment; is that correct?

8    **A.**   That's correct.

9    **Q.**   And, so, what do you take from this last sentence about

10   board action?

11   **A.**   So in '97 we talked about the board saying you can give

12   more medication without fear if you document the select

13   patient.  And here the board said if you under-treat with

14   opioids, basically you would be investigated.  And it led to

15   many complaints at that time against doctors for

16   under-treatment of pain.

17   **Q.**   In your experience here in West Virginia during this

18   time period, was this a real concern for physicians being

19   investigated for the under-treatment of pain?

20   **A.**   It was for some, I mean certainly not for all, but it

21   was for some.  In fact, I was, as I said earlier, asked

22   sometimes to comment in a hospital about someone

23   under-treating someone and to review a chart and give an

24   opinion.

25   **Q.**   Now, let's flip over to the second page, Dr. Deer,

1    please, and that first sentence at the top of that page.

2    What do you understand the board to be saying there?

3    **A.**   That the board recognized that opioids, controlled

4    substances, may be essential to treat both acute pain, so

5    when you break your leg or fall off a scaffolding; after

6    surgery, so when you have your appendix removed; chronic

7    pain, which we've defined, whether due to cancer or

8    non-cancer origins.

9    **Q.**   So the board was saying that opioids were essentially

10   appropriate for the treatment of all kinds of pain?

11   **A.**   It was basically a reinforcement of the 1997 statement

12   expanding a bit to include all types of pain.

13          MS. MAINIGI:  Now, Matt, if we can come back to

14   the chart.

15   BY MR. FITZSIMMONS:

16   **Q.**   Dr. Deer, can we go ahead and add this 2005 Board

17   of Medicine policy statement to the chart?

18   **A.**   I believe that we would, yes.

19   **Q.**   Now, we've been focusing on actions from the Board of

20   Medicine and other boards from West Virginia from '97, 2001,

21   and 2005.

22          To your understanding and knowledge, was West Virginia

23   the only Board of Medicine in the country that was issuing

24   guidelines and policies like this at the time?

25   **A.**   No, not at all.

1   **Q.**   What did you understand was happening in the rest of

2   the country?

3   **A.**   Well, so there was a, a group called the Federation of

4   State Medical Boards that gave advice to medical boards

5   around the country.  And many of those boards adopted those

6   recommendations.  So I think West Virginia was, along with

7   many other boards, creating the same types of policies.

8   **Q.**   And the guidelines from the Federation of State Medical

9   Boards just -- those also have an impact on physician

10  prescribing in West Virginia?

11  **A.**   They do in West Virginia for sure because certainly

12  some of the, some of the materials that the Federation of

13  State Medical Boards published were given to West Virginia

14  physicians.

15  **Q.**   And how do you know that?

16  **A.**   Because I received a copy of the book Dr. Fishman wrote

17  as part of that process of Federation of State Medical

18  Boards.

19  **Q.**   And we'll come back to Dr. Fishman's book in a second.

20        Now, in the binder, then, I think, just for the purpose

21  of the record, I think the Federation model guidelines were

22  covered with Dr. Gilligan who was here on Friday.  So we're

23  going to skip over those with you.  But those are, for the

24  purpose of the record, 02937 and 03605.

25        So let's stick with the West Virginia Board of Medicine

```
1    in 2005.  And I'm going to ask you to look at 3010.  And

2    it's another West Virginia Board of Medicine quarterly

3    newsletter.

4         And I'm going to ask you to turn to Page 5 of this

5    newsletter, please.

6         Page 5 of this newsletter is a letter to the head of

7    the DEA from, among other Attorney Generals, the Attorney

8    General of the State of West Virginia, Darrel McGraw.  There

9    are multiple Attorney Generals that sent a letter to the

10   head of the DEA.

11        Have you had a chance to review this letter?

12   A.   Yes, I have.

13   Q.   What is your understanding of the gist of the letter?

14   A.   Well, so they write a letter to Ms. Tandy who I had the

15   chance to meet.  She was the Director of the DEA under

16   President Bush.

17             MR. FITZSIMMONS:  Judge, I'm going to lodge an

18   objection as to him interpreting the Attorney General's

19   letter as to what it means to him.

20             MS. MAINIGI:  Your Honor, I think it was notice to

21   him and other doctors in West Virginia because the letter

22   was published in the Board of Medicine newsletter which went

23   to all licensed physicians in West Virginia.  They received

24   the newsletter and had an opportunity to review the letter

25   that the AG sent to the DEA and interpret the meaning of the
```

1     letter.

2              THE COURT:  Can't he testify as to what -- his

3     understanding of what the, what the letter meant to him,

4     Mr. Fitzsimmons?

5              MR. FITZSIMMONS:  It's hearsay, Judge, for him to

6     get up here and interpret that this is -- it's hearsay.

7     It's an out-of-court declaration that's being offered at

8     this time.  She said notice but it's for the truth as to

9     what's in there.

10             MS. MAINIGI:  Your Honor, --

11             MR. FITZSIMMONS:  It's improper.

12             MS. MAINIGI:  I'm sorry.  Go ahead.

13             MR. FITZSIMMONS:  I think that's totally improper,

14    Your Honor.

15             MS. MAINIGI:  Your Honor, it is not offered for

16    the truth of the statement at this point.  It is purely

17    offered as notice, as many of these documents were that came

18    in through Dr. Gilligan and many other experts here, of

19    notice to the healthcare community of what was happening in,

20    in the world, essentially, in their location with respect to

21    the standard of care.

22        I also think under 902(5) this newsletter is a

23    publication that's issued by a public authority and is

24    self-authenticating.  So I think the authenticity is

25    established.  But hearsay -- this is being offered purely

1    for notice, Your Honor.  And it is also expert reliance

2    materials, Your Honor.

3             THE COURT:  Well, 902 just authenticates it.  It

4    doesn't get around the hearsay problem if I understand it.

5             MS. MAINIGI:  No.  And on the hearsay issue, Your

6    Honor, it's just notice to the healthcare community.  And it

7    is part of the reliance materials that Dr. Deer relied upon.

8             THE COURT:  Well, I'll let him testify as to what

9    it is and who it was sent to if he knows.  Beyond that, I'll

10   sustain the objection.

11   BY MS. MAINIGI:

12   **Q.**  Dr. Deer, what is your understanding of the gist of

13   the letter from the Attorney General of West Virginia to

14   the head of the DEA?

15   **A.**  So --

16            MR. FITZSIMMONS:  I'm going to object.  I think

17   that's the same exact question I objected to.

18            THE COURT:  Yeah.  I'll sustain the objection to

19   that question.

20            MS. MAINIGI:  Your Honor, then I misunderstood

21   what you were going to let him testify to.  Could you repeat

22   that, please?

23            THE COURT:  Well, maybe I made myself unclear.

24   But I think he can testify as to what it is and who it was

25   sent to and that's about it, what his understanding of the

```
 1    purpose of it was.

 2              MS. MAINIGI:  Thank you, Your Honor.

 3              THE COURT:  But don't get into the substance

 4    because I think the substance is hearsay.

 5              MS. MAINIGI:  Okay.  Thank you, Your Honor, for

 6    that clarification.

 7    BY MS. MAINIGI:

 8    Q.   Dr. Deer, could you tell us what your understanding

 9    was of the purpose of the letter?

10    A.   Yes.  The purpose was to communicate to the DEA

11    concerns of the Attorney Generals around the country about

12    opioid prescribing and limitations therefore.

13    Q.   And, specifically, what about opioid prescribing and

14    limitations?

15    A.   That was a concern.  They felt the state had the same

16    responsibility to oversee it and the federal government was

17    overseeing it, and there was communication about who should

18    be overseeing it.

19    Q.   And the -- did the Attorneys General express a view as

20    to what the DEA should be doing?

21    A.   They felt that the shift was more towards

22    anti-diversion and it should be more towards treatment.

23    Q.   Thank you.  Let's see.

24              MS. MAINIGI:  Your Honor, at this time I would

25    like to move for the admission of 3010 into evidence.
```

```
1              THE COURT:  Which one is that?

2              MS. MAINIGI:  It's the newsletter that we've been

3    talking about, Your Honor, and the --

4              THE COURT:  I've got that.

5         Do you have any objection to that, Mr. Fitzsimmons?

6              MR. FITZSIMMONS:  Judge, I believe you sustained

7    the objection I had previously made.

8              THE COURT:  Well, I think I did.

9              MS. MAINIGI:  The objection was sustained, Your

10   Honor, as I understood it, as to the question.  But news

11   letters like this were actually introduced into evidence

12   with Dr. Waller, for example, as well as several other

13   witnesses and --

14             THE COURT:  Well, it comes in for the limited

15   purpose of notice but not for the truth.  Is that right?

16             MS. MAINIGI:  That's correct.

17             THE COURT:  Well, I'll admit it for the limited

18   purpose.

19             MS. MAINIGI:  Thank you, Your Honor.

20   BY MS. MAINIGI:

21   Q.   So we talked earlier about the 1998 Intractable

22   Pain Act.  Do you recall that, Dr. Deer?

23   A.   I do.

24   Q.   And do you recall that in 2009 the West Virginia

25   legislature amended the Intractable Pain Act?
```

1    **A.**   I do.

2    **Q.**   Let me ask you to take a look at 3067 which is the 2009

3    Management of Pain Act.  Are you familiar with that act, Dr.

4    Deer?

5    **A.**   Yes, I am.

6    **Q.**   And did you rely on that act in the course of forming

7    your opinions here today?

8    **A.**   I did.

9    **Q.**   And were you familiar with the act at the time it was

10   passed in 2009?

11   **A.**   I was.

12        MS. MAINIGI:  Your Honor, I'd like the Court -- to

13   ask the Court to take judicial notice of 03067.

14        THE COURT:  Any objection?

15        MR. FARRELL:  Not to you taking judicial notice,

16   Judge.

17      I would like to place on the record, aside from the

18   examination of this witness, that the subject of some of

19   these questions was the subject of motions *in limine* and

20   *Daubert* motions by the defendants prior to trial.

21      And, in fact, you struck one of our expert witnesses

22   from the DEA who was going to testify about the Controlled

23   Substances Act.

24      So I would just like to note my continued objection to

25   witnesses in this court being served as legal experts.

1          MS. MAINIGI:  Your Honor, --

2          THE COURT:  Well, --

3          MS. MAINIGI:  -- we don't agree with that

4    statement.  This is a -- this is a standard of care expert.

5    And these acts in West Virginia obviously served the purpose

6    of modifying the standard of care for West Virginia

7    physicians, of which Dr. Deer is one.

8          THE COURT:  The 03067 is judicially noticed and

9    admitted.

10   BY MS. MAINIGI:

11   **Q.**  Dr. Deer, if you'd take a look at the top of that

12   document that references the act.  It says "an act" and

13   then it goes on to describe it.

14        Can you just basically explain to us what your

15   understanding is of what the legislature did here?

16        MR. FITZSIMMONS:  Judge, I'm going to object to

17   him giving legal opinions as to the legislature.

18        MS. MAINIGI:  Your Honor, he's doing this from his

19   point of view as an expert on standard of care and a West

20   Virginia treating physician who had to at the time interpret

21   what the legislature was doing vis-à-vis this act.

22        THE COURT:  I'll overrule the objection.  I think

23   he can refer to it as a basis for his expert opinion.  Go

24   ahead.

25        THE WITNESS:  They took the word "intractable" out

1    of the previous legislation.  We updated it with the word --

2    just chronic pain.  So they made it easier to treat patients

3    who didn't have severe pain.

4    BY MS. MAINIGI:

5    **Q.**    Was the '98 legislation related or limited to

6    intractable pain?

7    **A.**    That's correct.

8    **Q.**    And this 2009 legislation was amended to apply to all

9    pain?

10   **A.**    They took the word "intractable" out of this

11   legislation.

12           THE COURT:  Yeah.  I think this is admissible.

13   He's -- his testimony is the course of the changes of the

14   standard of care over time and I think that his testimony

15   here is relevant to that.  So the objection is overruled.

16           MS. MAINIGI:  Thank you, Your Honor.

17       And just for the purpose of the record, to respond to

18   Mr. Farrell's objection further, I'll just note for the

19   record that, as we know, there were a number of company

20   witnesses that were called by the plaintiffs to come and

21   testify in this matter.

22       And the plaintiffs, in the course of all of that

23   testimony, elicited a number of -- posed a number of

24   questions and elicited testimony about those individual lay

25   person witnesses' understanding of DEA regulations as well

1    as the CSA.

2    BY MS. MAINIGI:

3    **Q.**   You can put that document away, Dr. Deer.

4         And let's take a look at another joint statement issued

5    in 2010.  And that is 2414.

6         We had earlier looked at a 2001 joint statement on pain

7    management from a number of boards in West Virginia; right?

8    **A.**   Correct.

9    **Q.**   Okay.  And in 2010 there seems to be a reissuance of

10   the 2001 joint statement.  If you go to Page 4 of 2414, what

11   is the date of the adoption?

12   **A.**   March 12, 2001, initially but re-adopted May 10th,

13   2010.

14   **Q.**   And are you familiar with this 2010 joint policy

15   statement, the re-adoption of the 2001 statement?

16   **A.**   Yes, I am.

17   **Q.**   To your understanding, did this re-adoption encourage

18   or discourage prescribing of opioids?

19   **A.**   It encouraged prescribing of opioids.

20        MS. MAINIGI:  Your Honor, just, just as the

21   earlier joint policy statement was admitted, I'd like to

22   move for the admission of 2414, please.

23        THE COURT:  Any objection to this one?

24        MR. FITZSIMMONS:  No objection, Judge.

25        THE COURT:  It's admitted.

```
 1   BY MS. MAINIGI:

 2   Q.   Let's go back to our chart, Dr. Deer.  And in your

 3   chart would you add the 2009 Management of Pain Act as

 4   well as the 2010 joint policy statement?

 5   A.   I would.

 6   Q.   So, Dr. Deer, we've looked at a number of, of

 7   statements and policies and acts from West Virginia.  Do you

 8   have an opinion on the relationship between the standard of

 9   care for prescribing opioids for the treatment of pain and

10   all of the West Virginia laws and policies that we've been

11   discussing?

12   A.   I think there's no doubt that the things on our graph

13   to the board changed the standard of care in West Virginia.

14   Q.   In what manner?

15   A.   It led to increased opioid prescribing around the

16   state.

17   Q.   And do you have an opinion on whether West Virginia

18   prescribers, in fact, prescribed opioid medications more

19   freely in accordance with the guidance that was issued by

20   the various bodies in West Virginia?

21   A.   I felt certain they did.  And I saw it personally in

22   the referral base that we have.  As those acts became law,

23   we saw patients getting sent to us with more and more

24   opioids.

25   Q.   And do you have an opinion on whether doctors who in
```

1    accordance with this guidance issued in West Virginia, those

2    doctors who more freely prescribed opioid medications to

3    their patients, were they acting reasonably based on the

4    information available to them at the time?

5    **A.**   I think at the time, the vast majority of those doctors

6    were acting within reasonable medical standards and standard

7    of care.

8    **Q.**   And does that include the doctors who formed your

9    referral base, so the family doctors that referred patients

10   to you at the time?

11   **A.**   I would say that the family doctors referred to me and

12   followed along those guides and treated patients with

13   high-dose opioids sometimes for many years before they sent

14   someone to see me because that was the tools they understood

15   at that time.

16   **Q.**   Now, you, you referenced Dr. Fishman earlier.  And one

17   thing we've not discussed yet is physician education.

18        Do you have an opinion as to whether physician

19   education played a role in the standard of care for pain

20   treatment?

21   **A.**   So physician education -- and it's something called

22   continuing -- for the Court, continuing medical education is

23   something we all have to do to keep our license updated.

24        So every physician has to undergo continuing education.

25   And part of that required education in West Virginia became

1   education on pain.  So it definitely made an impact overall

2   as we got near 2010.

3   Q.   Now, did Dr. Fishman teach at various continuing

4   medical education events in West Virginia, to your

5   knowledge?

6   A.   He taught in person at a state medical association

7   sponsored seminar on pain.  And he also taught via video

8   because every doctor in West Virginia at one point had to

9   watch his lecture to recertify their license.

10  Q.   And are you familiar with Dr. Fishman's book,

11  Responsible Opioid Prescribing?

12  A.   I am.

13          MS. MAINIGI:  And I believe, Your Honor, just for

14  the purpose of the record, this book was admitted during Dr.

15  Waller's testimony and is 02111.

16  BY MS. MAINIGI:

17  Q.   Was this book disseminated to doctors in West

18  Virginia?

19  A.   It was.

20  Q.   And did the West Virginia -- in addition to inviting

21  Dr. Fishman to come speak in West Virginia, did the West

22  Virginia Board of Medicine promote Dr. Fishman's teachings

23  in both -- essentially into early 2010?

24  A.   At that time, based on my recollection, in order to

25  renew yourself, you had to receive a lecture from

1    Dr. Fishman on opioid prescribing, a lecture from me on

2    procedures.  I think there was a third lecture.  I can't

3    remember what that was.  I think it was three hours of CME

4    and I can't recall the third lecture.  But you had to go

5    on-line and watch that or go to an in-person event.

6    **Q.**   And do you have an opinion on the impact that, that the

7    CMEs that Dr. Fishman and others were involved with, what

8    impact that had on doctors in West Virginia regarding the

9    prescribing of opioids?

10   **A.**   CME impacts your -- based on the evidence provided by

11   the speaker.  So, you know, I think any CME that's well done

12   is going to be impactful based on the evidence that that

13   person chooses to present.

14   **Q.**   And, again, doctors who prescribed in accordance with

15   the standard of care articulated at these CMEs and in

16   Dr. Fishman's book, in your opinion were they acting

17   reasonably in light of the information available to them at

18   the time?

19   **A.**   At the time of that decision-making process from the

20   physician, yes.

21   **Q.**   Now, I want to shift over to demographics in West

22   Virginia, Dr. Deer.

23        Do you have an opinion on whether demographics in West

24   Virginia had an effect at which -- had an effect on the rate

25   at which opioids were prescribed by West Virginia

1    physicians?

2    **A.**   I believe that it had a large impact on prescribing in

3    West Virginia versus other places.

4    **Q.**   And did you assist us in preparing a slide that

5    summarized those factors?

6    **A.**   I did.

7            MS. MAINIGI:  Matt, if we could put that on the

8    screen, please.

9    BY MS. MAINIGI:

10   **Q.**   Were these the factors you noted in your report and

11   on the slide?

12   **A.**   I think those are all the factors but one.

13   **Q.**   Well, let's go through the, the factors.

14        What do you mean that higher rates of chronic pain had

15   an effect on higher opioid prescribing in West Virginia?

16   **A.**   If you look at the demographic data, West Virginians

17   have more arthritis than any other state I believe.  We

18   have -- I think we're third in obesity, and obesity has been

19   linked very closely to chronic pain.

20        For example, if you gain four pounds -- if you gain

21   one pound, it puts four pounds of weight on your spine and

22   your knees and your hips.  So it's important.

23        We also have a higher rate of chronic pain among

24   smokers with vascular disease.

25        So there are many factors that leads to our chronic

```
 1    pain rate being higher.  We'll get to some of other ones
 2    over the next three bullet points we have here.
 3    Q.   And -- well, let's, let's move to the second.  Tell me
 4    about the older population in West Virginia and how that
 5    contributes to higher opioid prescribing.
 6    A.   Well, we're on average four years older than other
 7    states.  We have young people like Mike there that's leaving
 8    the state for jobs and old people staying.  And we have a
 9    death rate that's greater than the birth rate so -- less
10    than the birth rate.
11         So we're, we're older.  We're getting older.  And if
12    you look at data, the older population has a higher risk of
13    chronic pain diseases.
14    Q.   And then your, your third example is that there are
15    more injuries with more workers in physically demanding jobs
16    in West Virginia which also leads to higher opioid
17    prescribing.  Explain that.
18    A.   Well, we're a tough group of people in West Virginia,
19    you know.  And back in the days from '94 to probably about
20    2008, we had a lot of coal miners being injured.  We don't
21    have as many now, unfortunately for jobs.  But we also had
22    timbering and plants and construction.
23         So we have a, we have a blue collar work force that
24    works really hard.  And if you look at the data on that,
25    they get injured more than physicians and attorneys get
```

```
 1    injured and need treatment.  And many times they were

 2    treated with opioids.

 3    Q.   And the last factor you list is insurance policies.

 4    Can you explain what you mean by that?

 5    A.   Well, again, many physicians that are specialists don't

 6    accept West Virginia Medicaid.  I do.  I grew up with not

 7    much money, so I always feel it's my need to take care of

 8    everyone.

 9         And a lot of times we can't get approval for innovative

10    therapies because of the budget of Medicaid, and other

11    insurers too, Workers' Compensation, you know, public

12    employees.  Sometimes it's limited to what you can do and I

13    think that sometimes led to a denial of referral to a

14    specialist, whether it be a pain specialist or a

15    neurosurgeon.  And that, that patient stayed in the primary

16    care specialist's office on medication.  So I think all

17    these factors played a role.

18    Q.   And, so, how did that translate into West Virginia --

19    West Virginia residents perhaps having a higher rate of

20    opioid prescribing?

21    A.   I think all those factors together led the primary care

22    specialists particularly to start people on opioids.  And

23    then they stayed on those medications sometimes for life

24    once they were on them.

25    Q.   Thank you, Dr. Deer.  We can take that down.
```

1        Now, we spent a long time on your first phase.  Let's

2   shift over to the second phase of the standard of care that

3   you mentioned earlier in your overview.

4        Just remind us briefly what the second phase is.

5   **A.**   So I think in 2010 we started seeing a real peak in

6   people on high doses of opioids in the state.  I know that

7   personally because they were sent to see me and I accepted

8   them as patients.  So it got pretty bad.

9        And we also had a need to I think determine what a pain

10  clinic was.  So around 2011 we started seeing changes to try

11  to turn the situation back towards therapies other than

12  opioids.

13  **Q.**   And I think you referred to the second phase as

14  balancing.  Explain that to us.

15  **A.**   Well, I think the pendulum has swung so far to the

16  pro-opioid side by physicians' prescribing habits that it

17  became very, very difficult to understand what to do with

18  some of these patients who still were in severe pain despite

19  high-dose opioids.

20       So there was a movement by I think several parties to

21  try to figure out ways to allow treatment but be more

22  balanced and try to think of ways to use other therapies

23  other than opioids.  So -- and to control better how those

24  were prescribed.

25  **Q.**   Now, in 2012 there was legislation passed called the

```
 1    CSMP and Chronic Pain Clinic Licensing Act.  Are you
 2    familiar with that legislation?
 3    A.   Yes, I am.
 4    Q.   Okay.  And did you tell us earlier that you served on a
 5    committee related to the CSMP?
 6    A.   I did.
 7    Q.   And was that a committee associated with this
 8    legislation?
 9    A.   It was.
10    Q.   Let me ask you to take a look at 03105.
11         MS. MAINIGI:  And for the purpose of the record,
12    this is Senate Bill 437 which was actually admitted during
13    Dr. Gupta's testimony.
14    BY MS. MAINIGI:
15    Q.   Now, did this law impose new requirements on
16    doctors?
17    A.   It did.
18    Q.   If you take a look at Page 19 of the act, do you see
19    the heading -- and 19, just for everybody's benefit, I'm
20    going by the page numbers on the lower left.
21         MS. MAINIGI:  And if we could focus on the very
22    bottom of Page 19, Matt.
23    BY MS. MAINIGI:
24    Q.   So is one of the things this act did, Dr. Deer, did
25    it require doctors to check the Controlled Substances
```

1    Monitoring Program before prescribing opioids to certain

2    patients?

3    **A.**    It did.

4    **Q.**    And did that requirement exist before this law was

5    passed?

6    **A.**    There was no requirement before this law was passed.

7    **Q.**    And what did that help with if a doctor was consulting

8    and, and by law was told to consult the CSMP before

9    prescribing opioids?

10   **A.**    I think it really helped with doctor-shopping, if you

11   will, because if they were receiving medication from other

12   doctors and the doctor had to check that data bank, they saw

13   that before they prescribed a controlled substance.  So it

14   helped with the issue if patients went to multiple doctors

15   for the same type of drug.

16   **Q.**    So did that mean, as a hypothetical, a patient who went

17   to see three different physicians and got controlled

18   substances prescriptions from all three physicians, that

19   that patient may not be able to do that anymore since these

20   doctors were required to check the CSMP?

21   **A.**    Well, it certainly -- the first person may not have

22   seen it, but the next two should have seen it if it was

23   reported by the pharmacy who filled the prescription to the

24   pharmacy board.

25   **Q.**    And the act did a couple of other things too.

1          If you turn to the prior page, Page 18 at the very

2     bottom, there's a reference at the bottom to the Review

3     Committee making determinations on a case by case basis on

4     specific unusual prescribing or dispensing patterns

5     indicated by outliers in the system for abnormal or unusual

6     usage patterns of controlled substances.

7          What is your understanding of what this act required in

8     this regard?

9     **A.**   It required the Board of Pharmacy to create a committee

10     to look at abnormal prescribing by doctors.

11     **Q.**   And what was the committee looking for?

12     **A.**   People that were outliers and the amount of medicine to

13     individuals, as well as people who were prescribing to --

14     you know, people that were actually in the same family.

15     They were looking at people who had deaths.  The medical

16     examiner was part of this committee.  So if there was a

17     death and there was a high prescriber with a lot of death

18     rates, those sort of issues.

19     **Q.**   And what would -- would there be contact made with some

20     of the doctors who were reviewed?  What would happen?

21     **A.**   So, as I said earlier, Mr. Goff ran that committee that

22     I was on.  So we reviewed every two months all the data.  So

23     if a doctor had a death and they were prescribing a

24     controlled substance to that patient, they received a letter

25     from our committee that they needed to review their

1    prescribing habits.

2         We didn't say they caused their death, but it certainly

3    let them know that we were aware of the death and we wanted

4    them to look.  And, of course, some doctors received

5    multiple of those letters, you know.  And, certainly, that

6    was a big issue for the Board of Pharmacy Oversight

7    Committee.

8         Then they looked at were people prescribing multiple

9    classes of drugs to the same person because that can also be

10   an issue.

11        And then people that had more than five doctors

12   prescribing to them, all those doctors received a letter

13   from this committee saying that you have a patient -- they

14   should have seen it themselves from the Board of Pharmacy

15   check.  But they got a letter saying you have a patient

16   who's seeing more than three physicians for a controlled

17   substance and they were asked to review their chart.

18        So it was all informational to them initially what was

19   going on in their practice in case they were in need of

20   education.

21   **Q.**   And, so, the CSMP, coming back to that database for a

22   moment, the CSMP database was accessible by physicians; is

23   that right?

24   **A.**   Every time you see a patient, you could access that

25   with your password of what the patient had received from

1    other physicians and from yourself.

2    **Q.**    But the general public could not access the CSMP?

3    **A.**    I think that would be a HIPAA violation for the general

4    public to access what a patient was given.

5    **Q.**    And the third thing this act did -- I think you

6    referred to it earlier, Dr. Deer -- is there were provisions

7    in the act related to pain management clinics.  Do you

8    recall that?

9    **A.**    I do.

10    **Q.**    And what do you understand the act to include with

11    respect to pain management clinics?

12    **A.**    So there were people who were family doctors calling

13    themselves a pain clinic who had no training.  And if they

14    were prescribing more than 51 percent of their patients a

15    controlled substance, then they would fall under this act.

16          And what that led to -- and, again, I remember the

17    committee that helped draft this law.  They would go out and

18    be certified then.  And they had many things they had to

19    meet as a criteria.  It was really a way to get better

20    control of some of these centers that were really not doing

21    the right types of therapy for patients.

22    **Q.**    So was there a licensing requirement and an inspection

23    requirement?

24    **A.**    If you had over 51 percent of your patients on a

25    controlled substance, that was true.  If you didn't meet

1    that criteria, you were excluded from that.  But physicians

2    who had more than 51 percent of their patients receiving a

3    controlled substance were inspected and were either licensed

4    or told to desist in their treatment.

5    **Q.**   So these three elements of the 2012 act, to your

6    understanding, what was the intended effect of these new

7    requirements?

8    **A.**   It was to, I believe, to look at the prescribing habits

9    of physicians to try to get a handle on who actually was

10   treating pain in a more exact fashion and a more appropriate

11   way.  So that was kind of the main gist of this act I

12   believe.

13   **Q.**   And was there -- now, this act, did it limit in any way

14   the amount of opioids a physician could prescribe?

15   **A.**   It didn't limit the amount at all.  It was a first

16   step, though, I think toward the balancing as I talked

17   about.

18        So, you know, in '11 the secession began.  In '12 this

19   happened.  That was the first step.  It was a good step

20   towards improving things.  It still didn't limit the doses

21   that people could prescribe to patients without looking at

22   other options.

23             MS. MAINIGI:  Matt, if we could put our chart back

24   up.

25   BY MS. MAINIGI:

1    **Q.**   And, Dr. Deer, should we add this 2012 legislation

2    to your chart?

3    **A.**   I would.

4    **Q.**   Now, third phase of the standard of care that you

5    referenced, you said that was approximately 2015 to today.

6    Can you just again briefly describe that phase for us?

7    **A.**   So I think this is the most important phase as far as a

8    solution to this issue.  It's the phase where we had a

9    number of parties trying to better define the balance of

10   prescribing versus abuse and addiction.  So -- and who would

11   really be proper in looking at, again, updates on evidence

12   of what really actually worked instead of the conservatism

13   of opioid prescribing which has been impactful to the

14   standard of care, and I think it resulted in that downward

15   curve.  I know that from looking at this curve also in my

16   own experience.

17   **Q.**   So we've mentioned a couple of times the 2015 CDC

18   guidelines.  Those are at 02523.  Those have been admitted

19   through Dr. Gupta.

20        If you could take a look at those, are those, in fact,

21   the 2016 CDC guidelines?

22   **A.**   Those are the CDC guidelines from 2016.

23   **Q.**   And did these guidelines make recommendations about how

24   doctors should limit the quantity of opioid medications they

25   prescribe to patients?

1    **A.**   It talked about both quantity and dose.

2    **Q.**   To your understanding, were these the first guidelines

3    from the federal government that told doctors they should

4    carefully reassess evidence of individual benefits and risks

5    when increasing dosage above daily thresholds?

6    **A.**   I believe that it is.

7    **Q.**   And were they the first federal guidelines that told

8    doctors treating acute pain that they could generally limit

9    prescriptions to a several-day supply, I think a three-day

10   supply?

11   **A.**   I believe that it was.

12   **Q.**   And I think you testified earlier that your committee

13   put together the SEMP guidelines partly in reaction to the

14   CDC guidelines coming out.  Is that fair?

15   **A.**   The CDC gave West Virginia a grant to create that

16   committee to -- you know, this is a guideline but it doesn't

17   really tell a primary care doctor what to do for example.

18        This was intended -- it says in this guideline for

19   primary care, although I feel like it applies to everyone

20   because it's good guidance.  I think the CDC did a very good

21   job.  Some people haven't liked this guidance, thought it

22   was too restricting.  But I think it was very good.

23        And, so, the SEMP guidelines then were really created

24   to give a play book to doctors in West Virginia on, okay, if

25   you're going to do what the CDC says, how do you achieve

1    that?

2        So I think that was meant to be really a supplement to

3    CDC for our state particularly.  And a few other states

4    adopted our SEMP guidelines as well.  I know Arizona did.

5    There are pain societies and others.

6    **Q.**   And, and I -- just for your benefit, if you need them,

7    Dr. Deer, the SEMP guidelines are at the very front of your

8    binder and they are 3036 and are admitted.  They were also

9    released in 2016; right?

10   **A.**   That's right.  I believe this was -- March was the CDC

11   and I think the SEMP was October I believe.

12   **Q.**   And did the CDC and SEMP guidelines encourage doctors

13   to caution basically now when prescribing opioids?

14   **A.**   I think the CDC gave doctors a play book on amounts and

15   dosing.  And I think SEMP gave doctors a play book on what

16   to do instead of opioids when possible.

17   **Q.**   And to your knowledge, do doctors in West Virginia rely

18   on both the CDC guidelines from 2016 as well as the SEMP

19   guidelines from 2016?

20   **A.**   I think it had a major impact on prescribing.

21   **Q.**   And how do you know that?

22   **A.**   Because, again, like I said earlier, back from '97 to

23   2015 or '16 I was receiving patients on more and more

24   controlled substances referred to me and my partners.  And

25   we would spend time trying to find solutions.

1     And after these two documents came out, we started to

2     see a decline in that.  The amounts were less.  The doses

3     were less.  So -- and people were sending patients earlier

4     to see us.  They didn't wait five years after back surgery.

5     They waited three months after back surgery.

6     So I saw a shift in both the amount of drugs and the

7     time line of when people got sent to see us.  But, again, it

8     was after these two, two major pieces of information were

9     given to physicians.

10    **Q.**   And, so, is it your opinion, Dr. Deer, that the 2016

11    CDC guidelines as well as the SEMP guidelines had a role in

12    changing the standard of care in West Virginia?

13    **A.**   I think they had major positive impacts in changing the

14    standard of care in West Virginia.

15           MS. MAINIGI:  So let's come back to our chart,

16    Matt.

17    BY MS. MAINIGI:

18    **Q.**   And, Dr. Deer, should we add the CDC guidance as

19    well as the SEMP guidelines to your chart?

20    **A.**   Absolutely.

21    **Q.**   Now, following on 2016 as we see distributions going

22    down in that time period, did the West Virginia legislature

23    pass any other legislation related to opioid prescribing?

24    **A.**   In 2018 the West Virginia legislature passed new

25    legislation.

```
 1    Q.   And what was that called?

 2    A.   I don't remember the name exactly of the bill, but it

 3    was a bill about really proper prescribing of opioids.

 4    Q.   And just -- I will ask you to take a look at 3054.  And

 5    does that refresh your recollection as to what it was

 6    called?

 7    A.   It does, the Opioid Reduction Act.  It seemed too

 8    obvious to be the real name of the bill, but I think that

 9    was it.

10         MS. MAINIGI:  Your Honor, I ask the Court to take

11    judicial notice of the Opioid Reduction Act, 3054.

12         THE COURT:  Any objection?

13         MR. FITZSIMMONS:  No objection.

14         THE COURT:  It's noticed and admitted.

15    BY MS. MAINIGI:

16    Q.   Now, if you turn to Page 3 of this document, I

17    think it's 16-54-4.  And under Subsection (e) --

18         MS. MAINIGI:  If we could blow that up, Matt.

19    BY MS. MAINIGI:

20    Q.   And that section is entitled "Opioid Prescription

21    Limitations."  And can you describe to us what (e) says?

22    A.   Yes.  It really says -- it gives a guidance for

23    doctors.  ER, four days of opioids for an injury; no more

24    than four days if you're in an outpatient setting with

25    Schedule II opioids, no more than four-day supply.
```

1       And if you decided that someone should be treated for

2   pain, no more than a three-day supply as an outpatient.  And

3   then dentists and optometrists could only -- could not issue

4   more than a three-day supply after surgery.

5       And then lastly, as you've highlighted here, a

6   practitioner other than a dentist or optometrist could only

7   give a seven-day supply, the lowest effective dose which in

8   the medical judgment of practitioner would be best in the

9   course of treatment for his or her condition.

10      So it really limited when someone come to you

11  complaining of pain how much medication you could give

12  either emergently, acutely, or after a procedure, for

13  example.

14  **Q.**  And was -- to your knowledge, was this type of

15  legislation being passed in other states as well?

16  **A.**  It was.

17  **Q.**  So let me ask you to look a bit further down on Page 3

18  at (g).  Did that provision, Dr. Deer, limit doctors to

19  prescribing only a thirty-day supply of opioids with two

20  more thirty-day refills if that doctor checked the CSMP

21  database?

22  **A.**  That's correct.  It required them to give only that

23  first month.  And then they could give two additional

24  prescriptions after that.  And they had to check along that

25  time the data bank to see if they were getting other

 1   prescriptions.

 2   **Q.**   And was this the first time the state had imposed an

 3   objective limit on how many opioid medications doctors could

 4   prescribe?

 5   **A.**   Yes, because there were doctors who would previously

 6   write three months of prescriptions for someone in high

 7   doses and say, "See me in three months," and send them home

 8   with that.  And that was not uncommon, particularly in

 9   southern West Virginia.

10        So this said you can't do that.  You have to reassess

11   the patient, make sure they still need the prescription.  So

12   I think this was a very helpful piece of legislation.

13   **Q.**   And if you turn to Page 5 under 16-54-5, subsequent

14   prescriptions and limitations, do you see that the act

15   required doctors to inform patients about alternatives to

16   opioid medications and the risks associated with opioid

17   medications before prescribing them?

18   **A.**   Yes.  I think both those were very important.  The risk

19   had to be at least noted that this could be addictive and

20   could cause side effects.  But also they had to tell them

21   other alternatives, whether it be injections, devices,

22   physical therapy.  Before this act, they never had to

23   mention anything but medication to the patient.

24   **Q.**   So to your understanding, what was the intended effect

25   of this legislation on inappropriate opioid prescribing?

1    **A.**   I think the CDC was helpful, but it didn't go far

2    enough as far as some of the problems we've seen.  And I

3    think this lent doctors some guidance on how to do a better

4    job of really prescribing more judiciously initially because

5    as I said earlier, once someone chronically has been on a

6    medication, it's very difficult to reduce it or limit it.

7         So this is looking at the initiation of opioid

8    therapies somewhat and I think that's where my advice has

9    been for some time.

10              MS. MAINIGI:  Matt, if we could go back to the

11   chart.

12   BY MS. MAINIGI:

13   **Q.**   Should we add the 2018 West Virginia Opioid

14   Reduction Act?

15   **A.**   It is a major factor in changing the standard of care

16   in West Virginia in a positive light.

17   **Q.**   So these recent laws from 2012 -- and guidelines from

18   2012, 2016 and 2018, have they together resulted in a change

19   of the standard of care in West Virginia?

20   **A.**   I think the data shows there's no doubt about that.

21   **Q.**   And did any of those requirements exist before 2011?

22   **A.**   No.  I think the '12 act was written based on what we

23   were seeing before '12.  And there was no act before that

24   that limited prescribing or anything else to do with

25   opioids.

1    **Q.**   In your opinion, Dr. Deer, do doctors in West Virginia

2    today have the information that they need to make good

3    decisions about prescribing opioids?

4              MR. FITZSIMMONS:  Judge, I'm going to object to

5    him testifying globally as to all doctors.  As to

6    anesthesiologists or people involved in his specialty, which

7    he's certainly recognized as a specialist in pain medicine,

8    I believe he can testify.  But for him to get in here and

9    talk about what gynecologists, obstetricians, pulmonologists

10   and other doctors in the medical profession, I think it's

11   far in excess of his expertise.

12             MS. MAINIGI:  Your Honor --

13             THE COURT:  The question was in his opinion as an

14   expert do doctors in West Virginia today have the

15   information that they need to make good decisions.

16       I'm going to overrule the objection and allow him to

17   answer that.  Now, the issues you raised I think would be

18   appropriate for cross-examination, but I'm going to overrule

19   the objection to that question.

20             MR. FITZSIMMONS:  Your Honor, may I put one more

21   thing on the record?  I apologize.

22             THE COURT:  Yes, you may, absolutely.

23             MR. FITZSIMMONS:  In West Virginia as an expert

24   you have to be an expert and qualify within the specialty

25   actually that you practice.  And you have to practice so

1    much of that time.

2         He's already testified he's not a primary care

3    physician, doesn't practice in primary care.  All of his

4    practice is referral care.

5         So he would not qualify -- could not qualify as an

6    expert in West Virginia to testify as an expert in anything

7    other than anesthesiology or pain management.

8              THE COURT:  Well, your objection will be preserved

9    for the record, Mr. Fitzsimmons.  But he is an expert in

10   pain management and I think this generally goes to that

11   subject.  But your objection is shown on the record.

12        Go ahead, Ms. Mainigi.

13             MS. MAINIGI:  Thank you, Your Honor.

14   BY MS. MAINIGI:

15   **Q.**   Dr. Deer, are you aware whether there have, in

16   fact, been a decrease in prescriptions for opioid

17   medications in West Virginia since 2011?

18   **A.**   Yes.  There's been a major decrease in prescribing of

19   controlled substances, particularly Schedule IIs.

20   **Q.**   I'm going to ask you to turn to 850, the last document

21   in the binder.  Can you identify what this document is?

22   **A.**   I was waiting for you to show it up on the screen.

23   It's a West Virginia Board of Pharmacy Controlled Substance

24   Annual Report from 2018 which I believe might be the last

25   year recommending that, right around that time.

1    **Q.**   And are you familiar with this report?

2    **A.**   I'm very familiar with it.

3    **Q.**   Is this report made available publicly to your

4    knowledge?

5    **A.**   I think that it is.

6            MS. MAINIGI:  Matt, if we could put that up on the

7    screen.

8            THE WITNESS:  There we go.

9    BY MS. MAINIGI:

10   **Q.**   Now, is the purpose of this report to outline the

11   activities of the Board of Pharmacy in administering the

12   CSMP?

13   **A.**   Yes.

14           MS. MAINIGI:  Your Honor, I would like to move for

15   the admission of 00850.

16           THE COURT:  Any objection?

17           MR. FITZSIMMONS:  No objection, Judge.

18           THE COURT:  It's admitted.

19   BY MS. MAINIGI:

20   **Q.**   If you could turn to Page 4 of the document,

21   please.  Now, what does in 2018 the West Virginia Board

22   of Pharmacy say has been the change in dispensing of

23   hydrocodone and oxycodone since 2011?

24   **A.**   Want me to read that portion?

25           It says that the opioids, Schedule II, hydrocodone and

1    oxycodone, have seen the most significant drop in numbers

2    with a combined decrease of over 61 million doses since 2011

3    and 18 million dose increase last year alone going up to

4    2018.  So that's in Figure 5.

5    **Q.**   And, so, if we take a look at Figure 5 -- let's go to

6    that -- which I think is on the next page.  And that's

7    entitled "West Virginia Opioid Drug Doses Dispensed."

8         So what does this chart show about the trend in

9    dispensing hydrocodone and oxycodone?

10   **A.**   I think it shows what we've talked about from the 2018

11   law, 2016 CDC, and 2016 SEMP, that the opioid prescribing

12   for hydrocodone and oxycodone, the market has been reduced.

13        It also shows that buprenorphine has gone up some.  And

14   that before was used only for abuse as a drug for addiction.

15   But now it's been approved for pain in low doses and it's

16   thought to be less addictive because it's an antagonist,

17   which for the Court means it actually has both pain

18   reduction and opioid abuse reduction properties.

19        This mimmicks exactly -- if we go to 2011 to '18, this

20   mimmicks exactly what we've seen.  In 2011 we probably

21   reached our peak of receiving maybe 50 to 100 patients a

22   month that came to see us on high-dose opioids which we'd

23   have to take over and try to manage.

24        And now in 2018 we're seeing very few people come to

25   see us on high-dose opioids at all, which means we're going

1    to have a better chance of helping them.  And it's gotten

2    even less so I believe in the last year.  We're seeing even

3    less and less.

4         So I think this mirrors what I've seen personally in

5    our practice as a referral for most of southern West

6    Virginia.  It shows that those three things that we talked

7    about have been successful, I believe, in changing the

8    standard of care towards a more judicial approach to opioid

9    prescribing.

10   **Q.**   And the three things we talked about, can you explain

11   what you mean by that?

12   **A.**   Yeah.  The three things we talked about was the 2018

13   legislation which we talked about a moment ago; the SEMP

14   guidelines which are the play book for West Virginia

15   doctors; and the CDC guidance which gave us dosing

16   recommendations.

17   **Q.**   And what about the 2012 legislation?

18   **A.**   The 2012 legislation helped us, I believe, to really

19   establish what a pain clinic was because there were people

20   calling themselves pain clinics who had no training, no

21   expertise, no ability to do multi-modal therapies where you

22   have physical therapy and other therapies available.

23        And I think it also gave some notice that you had to go

24   back and check the Board of Pharmacy records.  It also

25   established the Board of Pharmacy committee which I think

1    really was -- in fact, some of the people that were

2    prescribing haphazardly were found to be noted in that

3    committee's findings.

4    **Q.**   And let me come back to your practice which you said is

5    an exclusively referral practice; right?

6    **A.**   Correct.

7    **Q.**   And is it family physicians primarily that are

8    referring to you?

9    **A.**   Well, so, if you look at our data from referral

10   sources, we get referrals from everyone, you know, from

11   surgeons who operate on someone's spine, from thoracic

12   surgeons who have taken out a tumor from your lung, from

13   urologists with prostate cancer, gynecologists with pelvic

14   pain.

15       But the vast majority of our patients come from the

16   family physician, probably 90 percent.  Those other

17   specialties make up, each of them, a percent or two, maybe

18   80 percent family practice I would say.

19       I think we're talking about the non-cancer population.

20   The cancer population is a whole different bucket.  Those

21   are mostly from the oncologists, but sometimes from

22   radiation oncologists, sometimes from family physicians.

23   **Q.**   So from your practice, which is other physicians

24   referring to you, do you have a pretty good sense of the

25   prescribing patterns of other types of physicians in West

1    Virginia?

2    **A.**    I think as you look at the report we've been talking

3    about, the 2018 report, Figure 3 shows the controlled

4    substances doses dispensed.  That's a mirror image of what

5    I've seen because as we saw that peak on that graph in 2012,

6    that's when I saw my peak.

7        Everybody that came to me almost from southern West

8    Virginia was on 100 milligrams of morphine equivalents a day

9    or more.  And we, we would then take that patient and try to

10   do a spinal cord pacemaker or an ablation, reduce their

11   doses.

12       And we were successful.  But every time we got rid of

13   some of those opioid burdens, there was a new sieve of

14   people coming in who were on the same dosage.  Right?  So we

15   kept seeing it get refilled.

16       After 2015-'16 it started to decrease.  After '18, the

17   legislation we talked about.  Most people that come to see

18   me now are on no opioids or very little except for my cancer

19   patients.

20       The reason that's important -- I just published a new

21   study with the Mayo Clinic on combined patient population.

22   We showed our devices work better in lower dose with no

23   opioids.  So our chances are better now than they were

24   before of helping you.

25       So I think we've seen a real shift and I've seen it

1    personally in my own prescribing habits because I take over

2    what I can.

3    **Q.**   Okay.  So just to summarize now what we've been talking

4    about for the last few hours, Dr. Deer, in your opinion, has

5    the standard of care for the prescription of opioids changed

6    over time?

7    **A.**   It's been quite a journey and it's changed dramatically

8    over time in different directions.

9    **Q.**   And has that changing standard of care affected the

10   rate at which doctors prescribe opioids in West Virginia

11   over time?

12   **A.**   I think the data shows that it has.  That's my personal

13   experience.

14   **Q.**   And in your opinion, do physicians affect the standard

15   of care?

16   **A.**   Well, physicians determine the standard of care, if you

17   will, because we, we hold each other accountable for what

18   we're doing and we learn from each other.  Sometimes we

19   learn things that later prove to be untrue based on new

20   research and development.

21        So that's why the standard of care changes.  I may have

22   an opinion in 1997 that in 2015 you see that was incorrect

23   looking backward.  So it changes based on new information.

24   That's why research is so important and that's why, you

25   know, a big part of my practice is research and development.

1    **Q.**   Did the DEA affect the standard of care?

2    **A.**   I think it did.  I think the local DEA people I know

3    are wonderful people and very good, but nationally the

4    policies that Ms. Tandy and others --

5            MR. FITZSIMMONS:  Judge, I'm going to object to

6    him testifying about policies of the DEA.

7            THE COURT:  Sustained.

8            MR. FITZSIMMONS:  I don't think he's qualified.

9    BY MS. MAINIGI:

10   **Q.**   Did the VA affect the standard of care?

11   **A.**   Yes.  The VA policies on fifth vital sign affected

12   standard of care.

13   **Q.**   And did the Joint Commission affect the standard of

14   care?

15   **A.**   Joint Commission definitely affected the standard of

16   care.

17   **Q.**   And I think you've already answered this, but did West

18   Virginia's legislature affect the standard of care?

19   **A.**   Legislation definitely affected the standard of care.

20   **Q.**   And did West Virginia's Board of Medicine affect the

21   standard of care?

22   **A.**   Board of Medicine certainly helps determine the

23   standard of care.

24   **Q.**   In your opinion, based on your experience and your

25   understanding, did wholesale distributors have any affect on

1    the rate at which doctors in West Virginia prescribed

2    opioids?

3              MR. FITZSIMMONS:  Judge, this is the third time, I

4    think, that I've objected.  He's been designated not to

5    testify -- he doesn't know anything about distributors.

6              THE COURT:  Well, you'll have to lay a basis for

7    it, Ms. Mainigi.  I think the question is objectionable as

8    it stands.

9              MS. MAINIGI:  Okay, Your Honor.  I'll just

10   withdraw the question for now.

11   BY MS. MAINIGI:

12   **Q.**  Dr. Deer, in terms of your own practice, explain to

13   us how your practice is a mirror on what's happened in

14   West Virginia.

15   **A.**  Well, I believe that, you know, when we -- when you

16   take patients off the street because they requested seeing

17   you or you get a family doctor or you are a specialist, you

18   will get patients based on who's heard about your practice

19   or how you market or advertise your practice.

20        As a referral only practice, we actually receive

21   patients that, again, throughout the State of West Virginia

22   and they're sent to see us already undergoing certain

23   treatments.

24        As we talked about earlier, you know, 10 years ago

25   everyone was on high-dose opioids.  Now we're seeing other

```
 1    things being tried.  So I think it goes to show you that

 2    West Virginia, greatest state in America in my opinion -- I

 3    know you're not from here -- we've made a good effort to

 4    change things as a whole and we've evolved.  Hopefully we'll

 5    continue to evolve for the better and we'll continue to make

 6    progress.

 7    Q.   Thank you, Dr. Deer.

 8         MS. MAINIGI:  I have no further questions, Your

 9    Honor.  I'd like to go ahead and mark the timeline as

10    Cardinal Demonstrative Number 2 and provide a copy to the

11    Court.

12         THE COURT:  You may do so.  And it's five till

13    12:00.  Let's adjourn until 2:00 rather than start your

14    cross-examination, Mr. Fitzsimmons.  Is that okay with you?

15         MR. FITZSIMMONS:  That's good with me, Judge.

16         THE COURT:  Okay.

17    We have to ask you to come back at 2:00, Dr. Deer.

18         THE WITNESS:  Yes, sir.  Thank you, sir.

19         THE COURT:  We'll see everybody at 2:00.

20         MS. MAINIGI:  Thank you, Your Honor.

21    (Recess taken at 11:55 a.m.)

22         THE COURT:  If you'll resume the witness stand,

23    Dr. Deer.

24         THE WITNESS:  Thank you, sir.

25         THE COURT:  All right, sir.  You may proceed.
```