# TAB 4

```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON

_____x
                              :
THE CITY OF HUNTINGTON,       :    Civil Action
                              :
            Plaintiff,        :    No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
            Defendants.       :
_____x
                              :
CABELL COUNTY COMMISSION,     :    Civil Action
                              :
            Plaintiff,        :    No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
            Defendants.       :
_____x


             BENCH TRIAL - VOLUME 4
 BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
           UNITED STATES DISTRICT COURT
            IN CHARLESTON, WEST VIRGINIA


                  MAY 6, 2021
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1  **Q.** Let me ask you to look just a little further down on
2  this same page. It's in "Discussion and Recommendations."
3  And there you say in the first sentence, "The most
4  promising approaches to opioid prescribing combine education
5  and tools for all prescribers with an enhanced enforcement
6  for the relatively few prescribers who are violating
7  standards of care."
8  Do you see that?
9  **A.** I do.
10 **Q.** And I think this is exactly what we were talking about,
11 Dr. Gupta, but let me just confirm it.
12 When you talk about a promising approach to address
13 opioid prescribing is education and tools for all
14 prescribers, that was to address the problem of the good
15 doctor who was writing for too many days; correct?
16 **A.** Correct, and, and also make sure that the bad doctors
17 were understanding that these tools and other things were
18 available as well.
19 **Q.** Exactly. So for all doctors, the point was educate
20 them more that if you've got a kid with a high school knee
21 injury, don't send him home with 30 days of pills. Send him
22 home with a fewer number of days of pills. Correct?
23 **A.** We believe if we can help educate doctors and other
24 prescribers and provide those tools, especially in terms of
25 the best knowledge in opioid prescribing, it would help make

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1	a dent in the entire volume problem.
2	     And then we'd be left with the bad doctors and we would
3	have to obviously -- the second statement, part of the
4	statement says "enhance enforcement."  It would help us get
5	better control over the bad doctors.
6	**Q.**   But let's keep focusing on the good doctors.  I haven't
7	asked you about the bad doctors.  But on the good doctors,
8	you've actually seen this play out, haven't you, that this
9	thinking that you have has led to a significant reduction in
10	opioid prescribing levels in West Virginia because doctors
11	become better educated.  Correct?
12	**A.**   I would say amongst a number of other factors.
13	Clearly, the education, the tools have been helpful in
14	reducing and changing the culture of, of writing large
15	prescriptions, high dose for long periods.
16	**Q.**   Let's talk about the second half.  There's a reference
17	to enhanced enforcement for the relatively few prescribers
18	who are violating standards of care.  Do you see that?
19	**A.**   Yes.
20	**Q.**   So when you say there are relatively few prescribers
21	who are violating the standards of care, your point is most
22	prescribers thought they were doing the right thing with the
23	standard of care at the time and there were relatively few
24	who weren't?
25	**A.**   Yeah.  There were more prescribers trying to do the

1 right thing than those who weren't, meaning in West Virginia
2 there were more good doctors than bad doctors at any one
3 point in time.
4 **Q.** Most of the doctors thought they were doing the right
5 thing. As you said, they were sending somebody home trying
6 to treat their pain. They thought they were doing the right
7 thing, but they were giving too many pills.
8 **A.** Their intent was to help their patient because that was
9 the culture. That was the education. That was the
10 influence. That was their understanding.
11 **Q.** And, and you and others in the State of West Virginia
12 have worked on changing that culture of prescribing behavior
13 to tighten it up; correct?
14 **A.** We have tried to do our best.
15 **Q.** But -- again, at the end of the day, you ultimately
16 have to rely on the good judgment and thoughtful approach of
17 individual doctors to get prescribing under control;
18 correct?
19 **A.** Yes, but there's a number of factors that influences
20 that judgment.
21 One of those things we did in Bureau of Public Health
22 was we began something called counter-detailing. This is,
23 this is our folks going to doctors' officers and providing
24 them this education and tools, knowing there was already
25 detailing happening that was telling them the other way