# TAB 7

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                         AT CHARLESTON

_____x
                              :
THE CITY OF HUNTINGTON,       :       Civil Action
                              :
              Plaintiff,      :       No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
              Defendants.     :
_____x
                              :
CABELL COUNTY COMMISSION,     :       Civil Action
                              :
              Plaintiff,      :       No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
              Defendants.     :
_____x


                   BENCH TRIAL - VOLUME 26
     BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
               UNITED STATES DISTRICT COURT
                IN CHARLESTON, WEST VIRGINIA


                       JUNE 14, 2021
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    majority who make prescriptions based on the information
2    that they have.
3    **Q.**   Well, let me ask it again just to be clear.  Your view
4    is that the overwhelming majority of doctors prescribe
5    opioids to their patients in good faith, correct?
6    **A.**   Yes.  I -- I think that that is true.  They base it on
7    the decision -- the information that they have.
8    **Q.**   And starting in the late 1990s up through around 2010,
9    doctors increased their prescribing of opioids, correct?
10   **A.**   Yes.
11   **Q.**   And you wrote in your report at Page 23, if you want to
12   look at it, but I'll quote it to you.  I think it will sound
13   familiar to you.  "Pervasive over-prescribing resulted in
14   unused prescription opioid medicines diverted for monetary
15   value, bartered or for no cost among family and individuals
16   in a shared social network."  Do you want me to point you to
17   that passage?
18   **A.**   Yes, if you don't mind.  I'm on Page 23.
19   **Q.**   Yes.  So, it's at Page 23 of your report.  Let me see
20   if I can find it.  It's in the middle of the page, Dr.
21   Keyes.  There's a -- there's a bolded sentence.
22   **A.**   I -- yes.  It's at the top of my Page 23.  Maybe we
23   have different versions.
24   **Q.**   Oh, yes. Yes.  You're right.  Absolutely.  At the top,
25   the sentence that -- and there's a sentence that's bolded

1   determine that in 90 percent of those cases there were
2   unused medicines left after the person used them for
3   treating pain?
4   **A.**   That's right.
5   **Q.**   And that's a judgment being made by the doctor about
6   how many pills to include in that prescription for the
7   surgery, treatment of the pain following surgery, correct?
8   **A.**   That's right.
9   **Q.**   And so, this could happen quite often, correct, that
10  there might a circumstance where a prescription is written
11  and a doctor writes too many pills for that given
12  prescription, correct?
13  **A.**   Yes.
14  **Q.**   And the physician, in the good faith exercise of
15  judgment, decides to prescribe an opioid to meet a
16  particular need for a particular kind of pain, correct?
17  **A.**   Can you state the question again?
18  **Q.**   Yes.  So, you could have a circumstance, I take it
19  there's many circumstances where a doctor could make a
20  legitimate good faith decision to prescribe opioids to deal
21  with a particular kind of pain, correct?
22  **A.**   As I've said before, the doctor is making a
23  determination based on their understanding of the risks and
24  benefits of a particular opioid prescribing, which itself
25  has changed over time.  You know, certainly, the

1     of the foundational ones.
2     **Q.**   And one of the foundational ones in particular for the
3     expansion of opioid-related harm was the level of
4     prescribing by doctors, correct?
5     **A.**   The level of prescribing by doctors certainly
6     contributed to the availability of opioids in the community.
7     So, I would say that that is a true statement, but it is not
8     exclusive of other sources of prescription opioids, as I've
9     outlined and we've discussed.
10    **Q.**   But let me -- let me be clear on it.  Just let me ask
11    it one more time.  You agree that the high volume of opioid
12    prescriptions became the foundation for the overall
13    expansion in the opioid supply and opioid-related harm,
14    correct?
15    **A.**   Yes.  I believe I've written that before, but in
16    context, I would just say it's a foundation.
17    **Q.**   Yes.  So, your answer is yes to my question?
18    **A.**   Yes.
19    **Q.**   And then, your view is that the opioid crisis would not
20    have occurred if prescribing opioids had not become standard
21    practice in managing acute and chronic pain, correct?
22    **A.**   That's right.
23    **Q.**   Distributors did not ship more pills than doctors
24    prescribed, correct?
25    **A.**   I haven't evaluated the distributor shipments, so I