# TAB 13a

```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                           AT CHARLESTON


_____x
                              :
THE CITY OF HUNTINGTON,       :      Civil Action
                              :
            Plaintiff,        :      No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
            Defendants.  :
_____x
                              :
CABELL COUNTY COMMISSION,     :      Civil Action
                              :
            Plaintiff,        :      No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
            Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 21
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


JUNE 7, 2021

```
1    idea that he can come in and make allegations about

2    suspicious orders and not even answer the Court's basic

3    question of whether they did anything about it, that's not

4    fair to us.

5              THE COURT:  Well, I'm confused and I probably

6    shouldn't stick my nose in this that deeply, but I'm

7    confused.  The witness testified about the lack of person

8    power and resources to do these investigations.

9         And then if I understood you correctly, you said you

10   followed up on all the suspicious order reports.  How did

11   you rationalize those two propositions, --

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  -- Mr. Rannazzisi?

14             THE WITNESS:  We did follow up on suspicious

15   orders.  But understand the volume of suspicious orders that

16   should come in is not a huge quantity of orders.  It

17   shouldn't be like boxes of orders.  It should be a very

18   specific order that outlines why it's suspicious, what

19   triggered the suspicion, what triggered the order, what's

20   the historical ordering pattern.  And then we would follow

21   up.

22        But, but we're not talking about 100, 1,000 orders.

23   We're talking about specific suspicious orders.  And that,

24   that -- I can't go over every order.  But if you do

25   suspicious orders appropriately and correctly, you're not
```

1    going to get 1,000 suspicious orders coming into a, to DEA

2    in one day.

3        What you will get is suspicious orders go into the

4    offices that if they're done appropriately, the agents could

5    use -- agents and investigators can use that to build cases.

6            MR. SCHMIDT:  And, Your Honor, our objection still

7    stands.  He did not answer Your Honor's question, which is:

8    Do you follow up on all of them?  I think by design he

9    didn't answer that question.

10       If we're not allowed to ask him about the details of

11   individual suspicious orders, particularly the relevant ones

12   in this community, whatever his Goldilocks standard is for

13   just the right amount of suspicious orders, then we can't

14   fairly examine him.  The testimony should be stricken.

15           MR. NICHOLAS:  I think just to -- I agree and I

16   would only add that it is a contested issue as to whether

17   the DEA did do anything with suspicious orders.  I mean, we

18   don't agree, and we're challenging that statement.

19       And if we don't have the ability to, to hear the

20   witness testify about it, we -- it's like we're on ice

21   without ice skates or something.  We don't have any footing.

22   We can't deal with it.

23           THE COURT:  Let me make sure I understand the

24   issue here.

25       The question was probing the, the policies of DEA with