# **TAB 19**

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                       AT CHARLESTON


_____x
                                :
THE CITY OF HUNTINGTON,         :        Civil Action
                                :
              Plaintiff,        :        No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.  :
_____x
                                :
CABELL COUNTY COMMISSION,       :        Civil Action
                                :
              Plaintiff,        :        No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
              Defendants.  :
_____x
```

               BENCH TRIAL - VOLUME 34
   BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
               UNITED STATES DISTRICT COURT
               IN CHARLESTON, WEST VIRGINIA


                     JULY 2, 2021

1    **A.**    Not -- not that comes to mind immediately, no.

2    **Q.**    And then, real quick, you mentioned the Chair of Pain

3    Medicine.  In part of your administrative role or your

4    oversight of physicians, do you monitor the prescribing

5    practices of those doctors?

6    **A.**    Yes, I do.

7            MR. FARRELL:  No objection and no further

8    questions.

9            THE COURT:  The Court finds that Dr. Gilligan is

10    an expert in the field of pain management and the risks and

11    benefits of prescription opioids.

12        Just curious, what was your Cambridge college?

13            THE WITNESS:  Jesus.

14            THE COURT:  Okay.

15            BY MR. SCHMIDT:

16    **Q.**    So, Dr. Gilligan, I'd like to ask you about the

17    condition of pain and then ask you about prescription

18    opioids as a treatment for pain.  Let's start with the pain

19    first.  Could you tell us just at a high level from your

20    experience how pain impacts the patients you see and why

21    it's important to treat pain?

22    **A.**    So, we see patients who their pain is at the level that

23    they're coming to go see a pain specialist.  And many of our

24    patients have chronic pain conditions.  And for a lot of

25    those patients it's -- their pain is severe, so just their

1    level of suffering is severe.

2         But also very, very important is that, in many cases,

3    they can't work or they can't work the way they want to.  As

4    I mentioned before, they can't take care of their family the

5    way they want to.  They can't participate in the community,

6    socialize, exercise, et cetera.  And so, not only do they

7    have the suffering from the pain, but they have essentially

8    -- we talk about their life being taken away from them by

9    the pain and by the limitation in function from the pain.

10        So, frankly, some of these cases are -- if you're

11   sitting in the room with a patient are very, very brutal.

12   **Q.**   Have you seen over the course of your career the impact

13   that pain directly has upon patients who suffer from it,

14   particularly chronic pain?

15   **A.**   Yes.  I would say on a daily basis when we're -- where

16   we're in clinic I see that.

17   **Q.**   Are you familiar with published data on trying to

18   quantify the costs and the number of people affected by

19   pain, including chronic pain?

20   **A.**   Yes, I am.

21   **Q.**   I'd like to ask you about some of that data, if I may.

22   I'm going to show you a document that the Court has seen

23   before, but is not in evidence, MCWV-1170.

24             MR. SCHMIDT:  May I approach, Your Honor?

25             THE COURT:  Yes.

1          MR. SCHMIDT:  And I apologize.  I feel like I came

2     back and the big documents came back.

3          THE COURT:  We cleaned out the documents while you

4     were gone, Mr. Schmidt.

5          MR. SCHMIDT:  I know.  I'm sorry.

6          BY MR. SCHMIDT:

7     **Q.**   And so we know what we're looking at, Dr. Gilligan, if

8     we go to the second page of this document, it's titled --

9     and we can actually put it up on the screen.

10          MR. SCHMIDT:  Can you switch that?

11          BY MR. SCHMIDT:

12    **Q.**   It's entitled Relieving Pain in America.  And then,

13    about halfway down, it says it's from the Institute of

14    Medicine.  And if we go to the next page, the third page of

15    the document using the numbers in the lower left corner, we

16    can see near the bottom that it's from 2011.  Are you

17    familiar with this document from the Institute of Medicine

18    and this report, Relieving Pain in America, from 2011?

19    **A.**   Yes, I am.

20    **Q.**   What is the Institute of Medicine?

21    **A.**   So, the Institute of Medicine is a, frankly, very well

22    regarded group of physicians who have been recognized as

23    leaders and then they will be tasked by the government with

24    writing reports on certain topics that are important to the

25    health of Americans.

1          MR. SCHMIDT:  On that basis, I'm going to move

2    this into evidence as a public report, but if there's an

3    objection, I can lay a little more foundation.

4          THE COURT:  Is there any objection?

5          MR. FARRELL:  No, Your Honor.

6          THE COURT:  It's admitted.

7          MR. SCHMIDT:  Okay.  Thank you for that.

8          BY MR. SCHMIDT:

9    **Q.**   Just in terms of this specific report, do you have an

10   understanding of how this report came to be?

11   **A.**   Well, I think it was the government recognizing that

12   this is a topic that was very important to the health of

13   Americans and a need for data on the scope of the problem,

14   the state of treatments, et cetera, what were the unmet

15   needs in the areas that needed more research and they

16   brought together a group of experts in the field, as well as

17   patient representatives or others.

18   **Q.**   All right.  Let's look at Page 38 of this report, if we

19   could.  And, again, I'm going to be using the numbers in the

20   bottom left corner, which differ from the numbers in the

21   actual document.  And we have it up on the screen.  I'm

22   going to read to you the last paragraph that carries over

23   onto Page 39 and ask you to comment on it.

24        It says pain is a universal experience but unique to

25   each individual.  Is that something you see in your medical

1    practice?

2    **A.**    Yes, it is.

3    **Q.**    It then says across the lifespan, pain - acute and

4    chronic - and let me just pause right there.  We're well

5    into this trial.  I don't know if we've ever defined for the

6    Court what acute and chronic is from a pain management

7    doctor.  Can you tell us what the difference between acute

8    and chronic pain is?

9    **A.**    Sure.  So, a couple of things.  One is the time frame.

10   We typically talk about pain that's acute lasting 6 or 12

11   weeks; if pain is chronic, being longer than that, certainly

12   longer than 12 weeks.

13        There's also a distinction because acute pain is most

14   commonly associated something such as an injury.  Someone

15   breaks their arm, there's actually a helpful signal in that.

16   If I -- if I break my arm and it hurts, it's telling me not

17   to move it, and there's some value in that.

18        Chronic pain is, almost by definition, more than

19   12 weeks and often is not, at that point, serving a useful

20   function.  So, if I break my arm and twelve weeks later it's

21   been set, but it's still hurting severely, that's actually

22   not giving useful information, but there's suffering and

23   there's loss of function.

24   **Q.**    So, to go back to the start of the sentence, it says

25   across the lifespan pain, acute and chronic, is one of the

```
 1    most frequent reasons for physician visits, among the most

 2    common reasons for taking medications, and a major cause of

 3    work disability.

 4        Have you seen all three of those things in your

 5    practice in terms of pain as one of the most frequent

 6    reasons people see doctors, one of the most frequent reasons

 7    they take medicine, and one of the major causes of not being

 8    able to work?

 9    A.   Yes.  I have seen all three of those.

10    Q.   All right.  Let's jump ahead, if we could, to Page 47,

11    please.  And there's a box there if we make it a little

12    larger that says pain by the numbers.  And I want to just

13    walk through a couple pieces of data reported in this

14    report.  The first piece of data reported says 100 million,

15    approximate number of U. S. adults with common chronic pain

16    conditions.  Do you see that?

17    A.   I do.

18    Q.   Have you seen similar estimates of the number of

19    Americans who have chronic pain conditions?

20    A.   Yes, I have.

21    Q.   And I just want to differentiate between types of

22    chronic pain conditions.  Is cancer pain a chronic pain

23    condition?

24    A.   Cancer pain can also be a chronic pain condition.  We

25    talk about chronic pain related to cancer and then chronic
```

1    non-cancer pain is one of the ways that we divide things.

2    Q.    In terms of chronic cancer pain, can you characterize

3    that at all for the Court?  Describe that pain.

4    A.    So, chronic cancer pain, we do think of as a distinct

5    topic.  In many instances, somebody may have advanced cancer

6    and they're going to have -- many of those patients will

7    have severe pain, but they also may have -- they,

8    unfortunately, have a limited life expectancy, frankly.  For

9    those patients opioids are typically going to be really one

10   of the foundations of how we're going to treat the pain.

11   For most of those patients, opioids will play a central role

12   in how we're going to treat that pain.

13   Q.    And you mentioned non-cancer chronic pain.  Could you

14   tell us some of the conditions that cause non-cancer chronic

15   pain and characterize the relative severity of those?

16   A.    So, for non-cancer chronic pain things like severe

17   low-back pain or neck pain, severe hip or knee pain

18   associated with arthritis and, actually, a whole host of

19   things.  Some of the autoimmune conditions, rheumatoid

20   arthritis, Crohn's disease, et cetera.  Chronic migraines.

21   And the list would go on.

22   Q.    Okay.  Just rounding out the questions that I was

23   asking you about this number, this is 2011, 100 million.

24   From your experience, has this number of adults in the U. S.

25   with common chronic pain conditions increased over time or

1    decreased over time?

2    **A.**    I think that it's increased over time due to a few

3    things.  One, the population has grown.  It's gotten so much

4    older.  Our population has gotten somewhat heavier and

5    weight is associated with knee and hip arthritis, et cetera.

6    So, I think that, overall, it has grown somewhat.

7    **Q.**    Let's go to the next line and this is actually the

8    statistic we heard about with another expert, 560 to 635

9    billion conservative estimate of the annual cost of chronic

10    pain in America.  Are you familiar -- have you seen

11    estimates like that in the literature in terms of trying to

12    estimate the economic consequences of chronic pain just on a

13    yearly basis?

14    **A.**    Yes, I have.

15    **Q.**    And are they consistent with this number which is north

16    of a half trillion?

17    **A.**    Yes.

18    **Q.**    If we then look at the -- let's skip the next bullet

19    which talks about state and federal government expenditures.

20    There's a number of percentages that run down here talking

21    about different pain conditions.  Could you just walk

22    through the numbers there that you think are meaningful for

23    us to hear about?

24    **A.**    Sure.  So, I would look at the fourth bullet point for

25    women after having a baby and look for -- at that

1    percentage.  10 percent have persistent pain at one year.  I

2    think that's significant.

3         I think, for the next bullet point, the patients who

4    have undergone surgery, specifically, the third dash there,

5    that 2 to 10 percent of these patients have chronic

6    postoperative pain that's severe.  And what's important

7    there is that it's chronic.  That's not right after surgery.

8    That's after they would have been expected to heal up, so to

9    speak.

10        I think the bullet point just below that, 5 percent of

11   the portion of American women 18 to 65 who have headache 15

12   or more days per month, I think that's quite significant.

13        And I think the second to last bullet point, the

14   percentage per U. S. nursing home residents, I would look at

15   the second dash there, that 17 percent have substantial

16   daily pain.

17   **Q.**   A few more questions about this document.

18             MR. SCHMIDT:  Could we go up to Page 162, please?

19             BY MR. SCHMIDT:

20   **Q.**   And if we look here, there's a paragraph -- there's a

21   sub-header that says Patient Access to Opioids.  Do you see

22   that?

23   **A.**   I do.

24   **Q.**   And it states in this 2011 Institute of Medicine

25   publication a reasonable degree of access to pain medication

1    - such as the stepped approach of the World Health

2    Organization's pain relief ladder for cancer - has been

3    considered a human right under international law since the

4    1961 adoption of the U. N. Single Convention on Narcotic

5    Drugs.  Do you see that?

6    **A.**    I do.

7    **Q.**    And is that -- is that consistent with your perspective

8    in terms of how the medical field views having prescription

9    opioids for appropriate cases?

10   **A.**    It -- yes, it is.

11   **Q.**    And then, if we go to the next paragraph, please, it

12   says in the United States, many pain experts agree that

13   physicians should prescribe opioids when necessary

14   regardless of outside pressure as an exercise of their moral

15   and ethical obligations to treat pain.  Do you see that?

16   **A.**    I do.

17   **Q.**    Is that something you see within the course of your

18   career, that view among many physicians, that you should

19   prescribe prescription opioids where appropriate when

20   necessary as part of a moral and ethical obligation to their

21   patients?

22   **A.**    Yes, it is.

23   **Q.**    All right.  Let's shift gears a little bit.  I want to

24   now talk about treatments for pain and I'm going to touch on

25   prescription opioids in a minute, but before I do, I want to

```
 1    talk about nonprescription opioid treatments for pain.  Are
 2    there treatments for pain that don't involve any kind of
 3    medicine?
 4    A.    Yes, there are.  Examples would be physical therapy.
 5    Not involving medicine would include different
 6    interventions, things like acupuncture, chiropractic
 7    manipulation.  There's some psychological treatments, things
 8    such as teaching patients relaxation techniques, biofeedback
 9    et cetera.  So, short answer, there are.
10    Q.    Do those types of treatments have limitations in terms
11    of addressing pain?
12    A.    They do.  There are some patients who are very much
13    benefited by them and, frankly, with those patients one
14    would likely be stopping there.  And then there are other
15    patients who you try each and every one of those that seems
16    appropriate for their case and, unfortunately, it doesn't
17    work.  It doesn't give them relief.  It doesn't return their
18    function.
19    Q.    When it comes to prescription medicines or just
20    medicines generally, before I turn to opioids, are there
21    other kinds of medicines that can be used to treat pain
22    other than prescription opioids?
23    A.    Yes, there are.  We use common anti-inflammatory
24    medications, Advil, Motrin, Aleve, things in that class.
25    So, nonsteroidal anti-inflammatories.  We use muscle
```

1      relaxants.

2          There are groups of medications that are not opioids

3      that we use specifically to treat nerve pain.  Those are

4      medications such as Neurontin.  So, by trade name,

5      Neurontin, and Lyrica, and Cymbalta.

6          And then there's a whole host that are topical things

7      we have patients put on -- on the -- the Lidocaine patch,

8      for example.

9      Q.   Are there limitations to those kinds of treatments?

10     A.   Yes.  Similar to what we just talked about, there are

11     some patients who get excellent relief from them and,

12     perhaps in many of those cases, one would stop there again.

13         There are other patients who don't get relief or can't

14     tolerate side effects.  And then there are some patients

15     where there's a risk so you can't use those medications,

16     where it would be too dangerous to use those medications

17     given that person's specific medical history, accompanying

18     conditions, other medications they take.

19     Q.   And I want to just pick up on an idea you alluded to.

20     You mentioned risks for some patients for those medications'

21     side effects.  Do those medications carry their own distinct

22     risks that you have to take into account when deciding

23     whether to use them?

24     A.   Yes.  Those medications have their own risks that you

25     have to take into account and, frankly, essentially every

1    medication that a doctor prescribes has risks and benefits

2    and the job is to look at the individual patient in front of

3    you, take into account all of the information you have

4    available, weigh the risks and benefits of essentially any

5    medication that you're going to prescribe for that patient.

6    **Q.**    Okay.  So, I want to -- I want to turn from those

7    nonprescription opioid treatments to prescription opioids

8    and pick up on that concept that you were just talking about

9    in terms of benefits and risks and weighing those.  In your

10   opinion, are there patients for whom the benefits of

11   prescription opioids outweigh the risks?

12   **A.**    Yes, there are.

13   **Q.**    And can you talk about why that is?

14   **A.**    So, when we're weighing the risks and benefits of

15   opioid medications, a few things.  One, we can get some

16   information about how high risk a given patient is for

17   developing addiction.  If someone is at high risk for

18   developing addiction, they have a history of substance

19   abuse, they have a history of major untreated psychiatric

20   conditions such as bipolar, strong family history of

21   substance abuse, et cetera, would be at higher risk of

22   addiction.

23        There are other folks who we can identify as being very

24   low risk and there are other factors that come into it,

25   which is what's the patient's condition, the severity of it,

1    to what extent can non-opioid treatments get that patient

2    pain relief and return to function, and then to what extent

3    are those safe for that given patient.  So, there's a whole

4    host of things that come into that risk benefit.

5    **Q.**    That view you just expressed to us about the benefits

6    outweighing the risks for certain patients, do you

7    understand that to be the consensus of the medical community

8    when it comes to prescription opioids?

9    **A.**    Yes, I do.

10   **Q.**    Do you have an understanding as to whether that

11   consensus is reflected in the fact of FDA approval of

12   prescription medicines?

13   **A.**    Yes.  I think that the FDA approval of those

14   medications reflects a consensus that for certain patients,

15   for selected patients' judicious use, the benefits outweigh

16   the risks.

17   **Q.**    I would like to talk a little bit more about, first,

18   the risks of prescription opioids and then some of the

19   benefits.  And to do that I want to use as an illustration

20   point something referred to as a label for a prescription

21   medicine or the prescribing information.  Are you familiar

22   with that document for different prescription medicines, the

23   label, or the prescribing information?

24   **A.**    Yes, I am.  We also call it the package insert

25   sometimes.

```
1              MR. SCHMIDT:  May I approach, Your Honor?

2              THE COURT:  Yes.

3              BY MR. SCHMIDT:

4    Q.   Doctor, I've handed you what we've marked as MCWV-1197,

5    which is a label for prescription medicine, and I will

6    apologize to all concerned in advance.  We seem to have

7    found the smallest print copy possible of this document.

8    Fortunately, Mr. Reynolds can blow it up on the screen for

9    us.

10         If we could start in the upper left corner just to make

11   it large, it says Percocet (oxycodone and acetaminophen

12   tablets) C-II, controlled substance II, Schedule II,

13   prescription only.  Do you see that?

14   A.   I do.

15   Q.   Are you familiar with -- from your work with this label

16   for Percocet, a prescription opioid?

17   A.   Yes, I am.

18   Q.   And just before we look a little bit at the contents of

19   this, what do you understand to be the purpose of a document

20   like this, the label, and who do you understand it to be

21   written for?

22   A.   So, my understanding is that the purpose of the label

23   is in part for clinicians to tell them what's the

24   indication, which of the medications be -- what is it

25   indicated for, what's -- what are some of the risks of the
```

41

```
 1    medication, something about the pharmacology, the contents
 2    of the medication.
 3         Specific things.  You know, what you should do if the
 4    patient has, for example, reduced kidney function with that
 5    medication or interactions with other medications.
 6         And then there's also some information that's directed
 7    to patients and to their families in this.
 8    Q.   This version of the label has -- it says right below
 9    the title we were looking at, it says revised July, 2018.
10    Do you see that?
11    A.   I do.
12    Q.   Do you have an understanding as to whether the label
13    for a given medicine is regularly and periodically updated
14    over time as new information becomes available?
15    A.   My understanding is that they are, yes.
16    Q.   And I want to pick up on something you were telling us
17    about in terms of some the information.  If we look at
18    this label, we see here there's a black box warning.  And
19    then, if we scroll down below that past the black box
20    warning, please, it looks like there are different sections,
21    including some of the ones you mentioned.
22         We see something called the description of the
23    medication.  Then, if we go to the next column, we see
24    pharmacokinetics, metabolism and elimination, something you
25    mentioned, indications and usage, contraindications,
```

```
1    warnings, et cetera.

2         And before diving into just a few of those sections, do

3    you have an understanding that what we're seeing here is

4    written according to a specified format in terms of these

5    different sections and what's supposed to appear, the types

6    of information that are supposed to appear in those

7    different sections?

8              MR. FARRELL:  Objection, Your Honor.  I'm not

9    quite sure that the doctor has been identified as an expert

10   in labeling.

11             MR. SCHMIDT:  I think it's something he deals with

12   every day.  If it's necessary, I can lay more of a

13   foundation but --

14             THE COURT:  It seems to me that the labeling is

15   well within his field of expertise that I qualified him in.

16   So, I'm going to overrule the objection.

17             MR. FARRELL:  Just to preserve for the record, I

18   don't have any problem with him testifying what's in the

19   label.  What I have an objection to is I believe the

20   question of -- is what is his understanding of what the FDA

21   requires to be in the label.

22             BY MR. SCHMIDT:

23   Q.   So --

24             THE COURT:  I'm going to allow it.  Overruled.

25             BY MR. SCHMIDT:
```

1    **Q.**   Dr. Gilligan, from -- I'm not going to ask you -- we

2    haven't asked you to come here as an FDA expert, have we?

3    **A.**   You have not, no.

4    **Q.**   I'm going to ask you just some questions about this

5    label from your perspective as a physician.  As a physician,

6    do you have occasion to consult with labels for a range of

7    different medicines and gather information from them?

8    **A.**   Yes, I do.

9    **Q.**   Does that require you to have basic information about

10   how they're formatted, at a high level, what goes into them?

11   **A.**   Yes, it does.

12   **Q.**   And so, when you look at different labels, do you see

13   that they have a specified format across different

14   medications with some of these sections we've been talking

15   about, warnings, indications, contraindications, and

16   specified information in those sections?

17   **A.**   Yes.  This is the typical type content and layout.

18   **Q.**   And you heard reference to the FDA.  Do you know

19   whether these labels are FDA approved?

20   **A.**   Yes, they are.

21   **Q.**   Is that relevant to you in your medical practice?

22   **A.**   It's relevant to us because the information is useful

23   when you're prescribing these, you know, for all of the type

24   of topics that we've talked about.  It informs your decision

25   to prescribe or not, and how to prescribe, what dose to

1    prescribe, et cetera, and it's -- it is important to us that

2    this language has been approved by FDA in terms of feeling

3    comfortable relying on it.

4    **Q.**    Do you have the understanding that the companies that

5    manufacture these medicines are responsible for the contents

6    of these labels?

7    **A.**    Yes.  My understanding is that -- and my experience,

8    actually, is that there's a discussion between the company

9    and the FDA about what will be -- what will be agreed to go

10   into the label.

11   **Q.**    And from your experience when this label sets forth the

12   -- well, let me just ask you a question.  Without getting

13   into the substance here, what do you understand the

14   indications to tell you as a doctor?

15   **A.**    So, it tells you what condition FDA has approved the

16   medication for use for.

17   **Q.**    And then, obviously, what do you understand the

18   warnings to tell you?

19   **A.**    That they want to make it quite clear to you what the

20   potential risks of the medication in question is, what the

21   medication -- what the specific identified risks of

22   whichever medication it may be are so that you know them and

23   can put them into that risk benefit balance that we talked

24   about.

25   **Q.**    In terms of determining the substance of what this

1    label says, including who the medication might be

2    appropriate for, what the warnings that doctors need to

3    understand are, from your experience, do you know of any

4    role that wholesale distributors play in this content?

5    **A.**    No.  My understanding is they play no role in that.

6    **Q.**    All right.  So, let's look at the specific language.

7    And if we could go back to the first page to the black box

8    warning just to try to facilitate the structure here.  It

9    says WARNING:, colon, in all caps, and then it lists a

10   series of conditions, addiction, abuse, and misuse.

11        And then it talks about a risk evaluation, mitigation

12   and strategy.  And it looks like those conditions then

13   repeat with a little bit more information further down.  Do

14   you see that?

15   **A.**    I do.

16   **Q.**    And so, I want to start with the warning about

17   addiction, abuse and misuse.  Could you tell us what those

18   terms mean?

19   **A.**    So, addiction is when a patient develops a compulsive

20   self-destructive craving to use -- essentially an out of

21   control use of -- of a substance and, in this case,

22   oxycodone.  There are many substances, of course, that

23   people can get addicted to.  So, it's a compulsive, and out

24   of control, and self-destructive use of a substance is

25   addiction.

```
1              THE COURT:  Just a minute.

2         Mr. Ackerman?

3              MR. ACKERMAN:  Your Honor, if I may, this document

4    is not in evidence, I don't believe, unless I missed

5    something.  And so, I have an objection to displaying it on

6    the board.

7              MR. SCHMIDT:  We'll move it into evidence, Your

8    Honor.

9              THE COURT:  Any objection to it being admitted,

10   Mr. Ackerman?

11             MR. ACKERMAN:  Hearsay.

12             MR. SCHMIDT:  I think, at a minimum, it can come

13   in for the limited purpose of effect on doctors.  It's

14   MCWV-1157.

15             THE COURT:  I'll admit it for the limited purpose.

16        This is helpful to the Court and I -- I think that the

17   limit -- it's permissible for the limited purpose.

18        Go ahead, Mr. Schmidt.

19             BY MR. SCHMIDT:

20   Q.   I think you had told us what addiction is.  Can you

21   tell us what abuse and misuse are?

22   A.   Sure.  So, abuse and misuse, on the other hand, are

23   just taking the medication, we'd say, for a non-medical use;

24   in other words, taking the medication for the sake of

25   euphoria or whatever, whatever it may be, but not taking it
```

1    for a medical use to get -- to get pain relief.  But someone

2    who is abusing or misusing a drug might be addicted, but

3    they also might not be addicted.  They might just be abusing

4    and misusing it without having -- without -- being addicted.

5    **Q.**    Under that heading it says Percocet exposes patients

6    and other users to the risks of opioid addiction, abuse, and

7    misuse, which can lead to overdose and death.  Can you tell

8    us just at a high level what that's communicating to

9    doctors?

10   **A.**    So, it's being very -- very clear to the doctors that

11   whether a patient develop -- if patients develop an

12   addiction or if they abuse or misuse the medication that

13   these medications can cause an overdose and that an overdose

14   can be deadly.  And so, they are making that very starkly

15   clear.

16   **Q.**    It continues to say assess each patient's risk prior to

17   prescribing Percocet and monitor all patients regularly for

18   the development of these behaviors and conditions.  (See

19   warnings).  Do you see that?

20   **A.**    I do.

21   **Q.**    Can you tell us what that's counseling doctors to do?

22   **A.**    So, that's counseling doctors to do some of the things

23   that we talked about before of -- we call it opioid risk

24   stratification, of looking at all of the information that

25   you have about the patient in front of you; in many cases,

1    using their validated questionnaires that can help you to do

2    risk stratification so to make sure best informed

3    determination, is this patient high risk, medium risk or low

4    risk for addiction abuse and misuse if the doctor prescribes

5    opioid pain medications.

6    **Q.**   And this reference here to see warnings, let's go back,

7    if we could, to the second column to that section we saw

8    briefly that says warnings.  Is this a reference to further

9    information about addiction abuse and misuse?

10   **A.**   Yes.  It's expanding on that topic essentially.

11   **Q.**   I want to go back to the black box warning, if we

12   could, and look at one more section.  If we scroll down a

13   little bit there's also a heading on Neonatal Opioid

14   Withdrawal Syndrome.  And then it has warnings about that

15   again with a cross-reference to the warnings section for

16   further information.  Do you see that?

17   **A.**   I do.

18   **Q.**   We've heard in court about a condition called NAS.  Is

19   that related to this condition?

20   **A.**   Yes.  It's essentially another way of saying -- saying

21   that same thing essentially.

22   **Q.**   And if we go back up to the abuse, addiction and misuse

23   -- addiction abuse and misuse section, just to reemphasize

24   the point, in your experience, do these types of warnings

25   change over time and often become more developed over time?

1    **A.**    Yes.  In my experience, they do change over time and

2    they do have a tendency to become more developed, yes.

3    **Q.**    In terms of these warnings we're focusing on now,

4    addiction, abuse and misuse, have you always understood

5    those to be a serious risk of opioid abuse throughout your

6    career and your medical training?

7    **A.**    Yes, I have.

8    **Q.**    And do you understand that to be a broad understanding

9    within the medical field?

10   **A.**    Yes, I do understand it to be a broad understanding

11   throughout the field of medicine.

12   **Q.**    Does that knowledge of the risk of addiction, abuse,

13   misuse impact how you prescribe opioids?

14   **A.**    Yes, very much so, because it's -- again, with opioid

15   prescribing or all medications it boils down to largely risk

16   versus benefit and, as a key risk, that's a very significant

17   factor in your decision to prescribe or not and, if you do

18   prescribe, what to prescribe, how much to prescribe, how

19   long to prescribe, et cetera.

20   **Q.**    Can addiction be an extremely serious condition?

21   **A.**    Addiction can be a fatal condition.

22   **Q.**    Does the risk in your experience and from your

23   understanding of the science vary across patients you might

24   see?

25   **A.**    I'm sorry.  Can you repeat the question, please?

1    **Q.**   Yes.  I'm sorry.  Does the risk from your experience

2    vary across the range of patients you see, the risk of

3    addiction and abuse and misuse?

4    **A.**   Yes.  The risk of addiction, abuse and misuse varies

5    quite significantly across patients.

6    **Q.**   And can you give us a little more information as to how

7    that's so?

8    **A.**   Sure.  So, we talked already about that there are

9    validated risk stratification questionnaires that you can

10   use with patients.  There are also characteristics.  And

11   those are some of the things we talked about of a personal

12   history of substance abuse, a family history of substance

13   abuse, a major psychiatric condition, such as Bipolar

14   Disorder, ADHD.

15        There are also some just demographic factors, age,

16   gender can play into it, so that you can -- you can say not

17   with perfect accuracy, but with very meaningful information

18   one patient is very at high risk.  One patient is medium

19   risk.  And one patient is low risk.  And you can even

20   identify somebody who might be very, very low risk.

21   **Q.**   And in your experience in your career, you've kind of

22   touched on steps you take with your patients to try to weigh

23   that risk and benefit on an individual patient basis.

24   Taking those steps, can you comment on how common -- how

25   common that you've seen addiction in the patients you treat

```
 1    with prescription opioids?
 2    A.    So, for the patients who I have initiated the opioids,
 3    I have not seen a patient who has developed addiction.  I
 4    have treated patients who were referred to me by other
 5    physicians who were on opioids who have developed addiction
 6    and misuse and abuse.
 7              MR. SCHMIDT:  And I apologize.  May I approach,
 8    Your Honor?
 9              THE COURT:  Yes.
10              MR. SCHMIDT:  I've been sitting up here drinking.
11    I don't know if this is your water.  Oh, it is?  Okay.  I'll
12    give you one more just in case.
13              THE WITNESS:  Thank you.
14              BY MR. SCHMIDT:
15    Q.    Just to go back to that last answer you gave me about
16    how rare it is in your practice, how do you know that's true
17    in terms of how do you know you're not seeing addiction that
18    you just don't hear about?
19    A.    So, that certainly could be possible, but we're the
20    largest healthcare system in Massachusetts and we have one
21    single computerized medical record where we can see all of
22    the tests, all of the notes, et cetera.
23         And so -- and if a patient does develop a problem with
24    addiction, it's highly, highly likely that over time they
25    will have an encounter with the healthcare system related to
```

1     that.  And since we're the biggest healthcare system in

2     Massachusetts and have a single computer record that we see

3     and that we monitor our patients, we see them monthly if

4     they're on opioids, we follow urine toxicology, et cetera.

5     We monitor them closely.

6          I think it would be extremely unlikely that one of my

7     patients would develop addiction and that I would not be

8     aware of it.

9     Q.   I want to just finish up with some questions about this

10    prescribing information, this label, and then dive into one

11    specific aspect of abuse and misuse with you.  I've been

12    referring to this as a black box warning.  Do you know what

13    that is from your medical practice?

14    A.   Yes.  From a doctor's point of view a black box warning

15    is -- not all medications have a black box warning and the

16    FDA puts on the label of certain medications a black box

17    warning when they feel there's a specific serious risk that

18    they want doctors to be particularly aware of, so they put a

19    black box around it.

20         We know to look for that, to take it seriously, and

21    they typically put it, in my experience, at the front of the

22    label, again, to emphasize it to clinicians.

23    Q.   One more question on this label.  If we go to the

24    second to last column, or third to last column, I apologize,

25    it says medication guide.  Percocet.  And then it's got an

1    explanation of what Percocet is that reads a little more

2    common sense than the language we were looking at before.

3    Can you tell us what a medication guide is, to your

4    understanding, what it's intended for?

5    **A.**    So, a medication guide is aimed at the patient or the

6    patient's family members; whereas, the other portion was

7    aimed at clinicians, doctors, et cetera, the medication

8    guide is aimed in more -- in simpler language.  So, aimed at

9    the patient, or the patient's family members, or associates.

10   **Q.**    And just focusing on these two bullets, it says

11   Percocet is, and then, one, a strong prescription pain

12   medicine that contains an opioid narcotic that is used to

13   manage pain severe enough to require an opioid analgesic and

14   for which treatments are inadequate and when other pain

15   treatments such as non-opioid pain medicines do not treat

16   your pain well enough or you cannot tolerate them.

17        Is that talking about where the medicine is supposed to

18   be used?

19   **A.**    That's exactly what it's doing, yes.

20   **Q.**    It then says an opioid pain medicine that can put you

21   at risk for overdose and death.  Even if you take your dose

22   correctly as prescribed, you are at risk for opioid

23   addiction, abuse and misuse that can lead to death.  Do you

24   see that?

25   **A.**    I do.

**Q.**   And, again, just recognizing that these documents change over time, is it your understanding that that's what this medication guide now tells patients?

**A.**   That is my understanding, yes.

**Q.**   All right.  That's what I wanted to cover with you on that document.

I want to switch gears a little bit and pick up on a concept that we've heard about, we've sometimes heard referred to as gateway.  In your experience, are there patients you know of or individuals you know of who have misused prescription opioids at one point in time and then later misused heroin?

**A.**   Yes, there are.

**Q.**   Can you comment on how common that is in patients you have treated?

**A.**   So, that's been -- that's been quite rare in patients I've treated.  For example, that has not happened a single time in a patient where I -- that I'm aware of in a patient that I initiated opioids, but I have seen it happen in patients who I have been involved in the treatment where other -- other physicians had initiated the opioids.

**Q.**   Are you aware of scientific literature that speaks to that question and tries to analyze that question?

**A.**   Yes, I am.

**Q.**   I want to show you one article on that as an example,

1   used heroin, who had previously misused prescription

2   opioids, whether if you took away that prescription --

3   misuse of prescription opioids, but still had the other

4   factors, the 98.9 percent who are abusing illegal drugs and

5   then the other factors you just alluded to, whether that

6   would change the heroin rates, do you know?

7   **A.**   You can't say.

8   **Q.**   And why is that?

9   **A.**   Because even if you took away the misuse and abuse of

10  the prescription opioids, all of those other risk factors,

11  there are folks who already are engaged, 98.9 percent of

12  them, in use abuse, misuse of illicit substances.  So, by

13  definition, they're engaged in that and would be at risk of

14  additional substance abuse, including heroin abuse and

15  misuse.

16  **Q.**   Can you say looking at this data whether this is a

17  problem that's isolated to the misuse of prescription

18  opioids, as opposed to a broader substance abuse problem?

19  **A.**   So, it's a broader substance abuse problem where, in

20  some patients or in some individual's case there is misuse

21  and abuse of prescription opioids, but it's a broader

22  substance abuse problem.

23  **Q.**   Let's conclude with that topic.  I want to go back to

24  what we were talking about in terms of benefit and risk.

25  We've spent a lot of time talking about risk, pretty serious

1    risk.  Given those risks of prescription opioids, why is it

2    that doctors still use prescription opioids?

3    **A.**   So, the reason that doctors still use prescription

4    opioids despite those risks that we've talked about, which

5    are significant, is that they're our most potent pain

6    medications and there are some cases where patients have

7    severe disabling pain that we can't treat successfully

8    and/or safely with non-opioid treatments.

9         And so, there's some patients where it clearly does add

10   up in terms of risk benefit to treat them with the opioids

11   and, as we talked about before, there's some patients where

12   those risks we can identify as being substantially lower for

13   that patient.  So, in the end, that risk benefit does fall

14   squarely on using opioids to treat that patient's case.

15   **Q.**   You talked earlier about your clinical research, your

16   scientific research.  Have there been efforts in the

17   scientific community over time to come up with alternatives

18   to prescription opioids that would be as effective at

19   treating pain without having these risks we've been talking

20   about?

21   **A.**   Yes.  Identifying a very powerful non-opioid pain

22   medication that's safe and has no risk of addiction has

23   essentially been a holy grail of our field.

24   **Q.**   Have pain management found that holy grail?

25   **A.**   Not -- not yet.

```
 1    Q.    Okay.  Let me talk about data for a little bit on

 2    prescription opioids.  Are you familiar --

 3             THE COURT:  Is this a good place to stop?  It's

 4    about break time, Mr. Schmidt.

 5             MR. SCHMIDT:  Sure.  Yeah.  Yeah.

 6             THE COURT:  Let's be in recess for about ten

 7    minutes.

 8         You can step down, Dr. Gilligan.

 9             THE WITNESS:  Thank you, Your Honor.

10        (Recess taken)

11        (Proceedings resumed at 10:37 as follows:)

12             THE COURT:  When you're ready, Mr. Schmidt.

13             MR. SCHMIDT:  Thank you, Your Honor.

14    BY MR. SCHMIDT:

15    Q.    Dr. Gilligan, I want to pick up with where we were

16    by talking about the benefits of these medicines.

17         You talked a little bit about the search for

18    alternatives.  And I wanted to talk to you a little bit

19    about, in broad terms your understanding of the data

20    regarding these medicines.

21         Are you aware of studies showing that opioids are

22    effective for treating acute pain?

23    A.    Yes, I am.

24    Q.    And what -- can you speak to what the data shows in

25    terms of using prescription opioids to treat chronic pain?
```

1    **A.**   So for chronic pain, the data with chronic opioid

2    therapy is, frankly, more mixed.   There are studies that

3    show that if you use chronic opioid therapy for non-cancer

4    pain cross a population in the study, in some studies that

5    you don't see an improvement in function, or even a subset

6    is you don't see an improvement in pain.   Some show

7    improvement.   Some don't.   And the studies show high rates

8    of harm, of adverse effects from chronic opioid therapy for

9    non-cancer pain.

10   **Q.**   So does that mean that doctors today never use

11   prescription opioids for chronic non-cancer pain?

12   **A.**   No, it does not.

13   **Q.**   So can you explain that -- can you reconcile that for

14   us?   Why are doctors using it if the study data is mixed?

15   **A.**   So if the study data is showing across a population in

16   a study you're not seeing an improvement in function, in

17   some cases in pain in many of those studies, but there are

18   certain individual patients who do do very well.

19        So it's the difference between an individual patient if

20   you select someone who has low risk for developing problems

21   with addiction who has a condition that you're being very

22   selective, the indication for using it for that condition is

23   really quite strong and the benefit, or the potential

24   benefit for that patient is quite high.   It's the difference

25   between there are some individual patients who do very well

1    versus what you see when you look at a population in a study

2    on average.

3    Q.   Do you understand that view you just expressed that

4    there are individual patients for whom prescription opioids

5    are appropriate for chronic non-cancer pain, do you

6    understand that view to be the consensus of the medical

7    community?

8    A.   Yes, I do.

9    Q.   For example, are you familiar with CDC guidelines that

10   have come out in the last several years regarding the use of

11   prescription opioids in chronic non-cancer pain?

12   A.   Yes, I am.

13   Q.   And do they allow for or recognize that for some

14   patients using prescription opioids for chronic non-cancer

15   pain is appropriate?

16   A.   They do.  They spell out what are the circumstances

17   where it would be appropriate to do it.  They spell out how

18   to do it judiciously and cautiously.  They spell out

19   guidance on what types of doses to use, et cetera, how to

20   monitor patients.

21        But the whole point of those guidelines implicit in

22   them is that they are giving you guidance on when and how to

23   appropriately use opioid pain medications for chronic

24   non-cancer pain.

25   Q.   Dr. Gilligan, there's been discussion in the case

1    about -- a little bit of discussion in the case about

2    prescribing levels of opioids in the United States versus

3    other countries.

4         Do you have experience in your medical practice with

5    use of prescription opioids in countries where they're much

6    more restricted and conservative in using prescription

7    opioids?

8    **A.**   I do.

9    **Q.**   Can you tell us about that experience?

10   **A.**   Sure.  So in one of my roles at the Brigham is that I'm

11   the Medical Director for an affiliation that we have with a

12   cancer hospital in China.  And in China, the use of opioids

13   for cancer pain and for non-cancer pain is far, far more

14   conservative than it is in the United States.

15   **Q.**   And how do you see that play out in your experience in

16   terms of patient care?

17   **A.**   So there are some patients who we see there who --

18   their pain is -- could be safely and much more effectively

19   controlled if opioids were used in their cases and in the

20   way that we would use it; in other words, cautiously

21   judiciously but appropriately.

22        We see some patients who in our judgment are, for

23   example, dying of cancer and suffering from very, very

24   severe pain that we think could be more effectively and

25   safely treated with opioids.

1    **Q.**   We've been talking about the risks and benefits of

2    opioid medications.  Do you have a view as to who in the

3    healthcare system is best situated to counsel patients on

4    those benefits, on those risks?

5    **A.**   I do.

6    **Q.**   Who is that?

7    **A.**   I think clinicians, principally doctors, because our

8    education is to have abundant knowledge about the conditions

9    and the medications and their risks and the potential

10   benefits.

11         Our training is training us to make those judgments,

12   how to take in that information and take it in, weigh in,

13   you know, what's high quality information, what's low

14   quality information that you should tend to discount, et

15   cetera.

16         And then for these controlled substance prescription

17   medications, that's the, the authority that we get when we

18   get DEA certification, medical license, controlled substance

19   certificate, et cetera, that is both giving us that

20   authority to make a prescribing decision.

21         And the accompanying oversight bodies in our field are

22   also there for in case a physician stops prescribing

23   appropriately.  And that can be at the level of the

24   hospital, at the Board of Registration of Medicine, could be

25   the DEA pulling somebody's certificate, et cetera.

1        So everything about our education, training, role,

2    authority, and then responsibility and monitoring is, is

3    matched to our role in making those decisions.

4    **Q.**   I want to pull out some of those points you just walked

5    us through in a little more detail if I could.

6        Let me start with, with the first part of what you said

7    for us.  In terms of access to medical records, access to

8    the patient, is, is there anyone or entity in the healthcare

9    system that has more visibility to the patient than the

10   doctor or other clinicians who's treating them?

11   **A.**   No, there isn't because we're the one who's in the exam

12   room.  We're taking the patient's complete relevant medical

13   history and demographic history, et cetera.  We're examining

14   the patient.  We're looking at the results of any relevant

15   test, X-rays, MRIs, lab tests, et cetera.  The other -- at

16   least I can't think of another party that has that level of

17   information specific to that patient.

18   **Q.**   Uh-huh.

19   **A.**   And these decisions are all about the individual

20   details of that individual patient's case.  That's the

21   essence of, of making those decisions appropriately and

22   correctly in individual cases.

23   **Q.**   As a physician, are you bound by both legal

24   responsibilities regarding your patient and ethical

25   responsibilities?

1    **A.**   Yes, we are.

2    **Q.**   And do you have a view whether it would further those

3    legal and ethical responsibilities if you were caring for

4    your patients and making judgments for your patients other

5    participants in the healthcare system like distributors were

6    second-guessing those judgments?

7    **A.**   I, I don't think that that would be helpful for our

8    patients.  I don't think that would be helpful for society.

9    I do not think that that would help to make the decisions be

10   done more appropriately.

11   **Q.**   You, you talked about some consequences in your answer

12   a few moments ago for doctors who don't practice within

13   those standards.  You were talking about including losing

14   their ability to practice, maybe going to jail.  And we've

15   heard some examples of that.

16        But short of losing a license or criminal action, are

17   there other controls in your experience that apply to

18   doctors who are inappropriately prescribing?

19   **A.**   Yes, there are.

20   **Q.**   Can you tell us about some of those?

21   **A.**   So when we have concerns within our healthcare system

22   about a physician's prescribing, we'll step in and we'll

23   monitor that physician's prescribing.  We will, for example,

24   pull 25 charts per month from that patient, that physician's

25   patients and review those records and look at the records

1   and say were the prescribing decisions in each of those

2   cases made appropriately or not.

3        We'll do didactic education sessions sometimes one on

4   one with that physician and other things along those lines.

5   **Q.**   And you just in giving that answer referred to yourself

6   in the first person plural.  Have you been involved in that

7   kind of review of other physicians' prescribing practices so

8   you can make judgments about whether it's appropriate or

9   inappropriate?

10  **A.**   Yes, I have.

11  **Q.**   Is that something you're able to do just by looking at

12  prescribing records and prescribing levels or, or do you

13  need more patient information?

14  **A.**   When I do that and when we do that in general, we need

15  the patient level information because you can't determine if

16  a given prescribing decision was appropriate or not unless

17  you get the relevant information; in other words, what was

18  the patient's history, what were the findings on exam, what

19  did the tests show, what other therapies were tried, et

20  cetera, to make that determination about that case.

21  **Q.**   Okay.  Does making that determination require you to

22  exercise medical judgment based on your medical training?

23  **A.**   Yes, it does.

24  **Q.**   I'm going to turn to our last topic.  It's a larger

25  topic.  It might take us close to lunch or just shy of

1    lunch.  And it's, it's a concept that we've heard referred

2    to as standard of care.  Is that a concept you're familiar

3    with in medical practice?

4    **A.**   Yes, it is.

5    **Q.**   Can you tell us what that means in terms of medical

6    practice?

7    **A.**   So standard of care in medical practice means the

8    quality of care, the thoroughness, the safety of care that

9    doctors expect to maintain in his or her fields.  Sometimes

10   there's a geographic component to it, you know, in

11   practicing in your field and in the area where you practice,

12   what you would be expected to do.  And that can apply to

13   anything.  That can apply to the -- what you should be

14   expected to have done if somebody came in with a potential

15   heart attack.

16   **Q.**   I want to focus on prescription opioids.  Are you aware

17   of whether the standard of care regarding prescription

18   opioids has changed over the past several decades?

19   **A.**   Yes, it has.

20   **Q.**   And at a high level can you walk us through that

21   change?

22   **A.**   So in the period around the 1990s in particular, a

23   little bit in there, 1980s as well, there was an emphasis on

24   the concept that we were under-treating pain in this country

25   and that we were placing too much emphasis -- that we were

1    exaggerating, would have been the argument, the potential

2    risks of opioids, that we were under-utilizing them and we

3    were leaving too many patients with pain that could have

4    slash should have been treated with opioids.

5         Then as prescribing went up by about certainly I think

6    roughly the mid 2000s, there was much more awareness of the

7    adverse effects and the argument that perhaps we were

8    prescribing too many opioids as opposed to too few, and that

9    we were -- that we should put more emphasis on the potential

10   risks of the medication.

11        Then around 2011 prescribing in the country peaked and

12   started to go down.  And since then, there's been

13   significant emphasis on the, the risks of these medications,

14   potential risks, the fact that there are some patients with

15   chronic non-cancer pain, for example, who don't get

16   significant benefit where -- while there are some people who

17   do.

18        And, so, an emphasis on still using the medications but

19   being more conservative about them as part of the standard

20   of care.

21   Q.   Okay.  We, we've heard evidence in this case about

22   prescribing rates in Cabell County, West Virginia.  And I

23   want to just ask you if that's consistent with what you just

24   told us.

25        The evidence is prescribing rates increased in the late

1    '90s up until a peak in about, between 2010, 2012, that

2    range, and then have gone back down.  Is that consistent

3    with those changes in the standard of care that you told us

4    about?

5    **A.**   Yes, it is.

6    **Q.**   Is it consistent with your understanding of national

7    prescribing trends in terms of increasing from the '90s up

8    until sometime in the 2010, 2012 window and then coming back

9    down?

10   **A.**   It is.

11   **Q.**   All right.  I'd like to show you some documents

12   relevant to the standard of care issue and the changes in

13   the standard of care that you talk about in your report.

14        Let me start, if I could, with MC-WV-1135.

15             MR. SCHMIDT:  May I approach, Your Honor?

16             THE COURT:  Yes.

17             MR. SCHMIDT:  Thank you.

18   BY MR. SCHMIDT:

19   **Q.**   And just to orient us, this is a publication from

20   the New England Journal of Medicine.  Are you familiar

21   with that publication?

22   **A.**   Yes, I am.

23   **Q.**   It's dated January 14, 1982.  Can you just characterize

24   for us the role that the New England Journal of Medicine

25   plays in the practice of medicine?

1   **A.**   It's, it's one of the most respected medical journals

2   that there is.

3   **Q.**   And if we look a little further down, there's an

4   editorial called "The Quality of Mercy."  Do you see that?

5   **A.**   I do.

6   **Q.**   Are you familiar -- have you, have you read that

7   editorial that's actually attached there?

8   **A.**   I have.

9   **Q.**   If we go to Page 3 of the document -- we've skipped the

10  full journal but just focused on this editorial.  It's

11  written by someone named Marcia Angell.  Do you know if she

12  had a role at the New England Journal of Medicine at this

13  time?

14  **A.**   Yes.  She was a Deputy Editor at the New England

15  Journal at this time.

16          MR. SCHMIDT:  Your Honor, we'd move this document,

17  MC-WV-1135, into evidence.

18          MR. FARRELL:  Judge, this is a medical article,

19  medical literature, and I don't know that it's appropriate

20  to admit it into the record as evidence.  And to the extent

21  that it's being offered for notice or some other reason, I

22  just don't think it's appropriate from the historical

23  rulings this Court has made about admitting medical

24  literature.

25          MR. SCHMIDT:  Your Honor, just to be --

```
 1              MR. ACKERMAN:  Your Honor, may I add --

 2              THE COURT:  Yes.

 3              MR. ACKERMAN:  -- to my colleague's statement?

 4         To the extent that defendants are relying on 803(18) as

 5    the exception to the hearsay in the document, that exception

 6    does not permit the admission of statements in a learned

 7    treatise, but only permits that a statement in a learned

 8    treatise may be read into evidence but not received as an

 9    exhibit.

10              MR. SCHMIDT:  Your Honor, just to orient the

11    Court, what we're actually moving it in under is 803(16),

12    16, statements in ancient documents, which I find that

13    expression a little hurtful.  It's a statement in a document

14    that was prepared before January 1st, 1998, which this was,

15    and whose authenticity is established.  And this is a

16    self-authenticating document under Rule 902(6).

17              MR. FARRELL:  Judge, I vehemently object to the

18    reference of the year 1998 as being ancient.

19              MR. SCHMIDT:  I join.

20              THE COURT:  Well, you've got a point, Mr. Farrell.

21              MR. FARRELL:  So, in general, Judge, I know this

22    article.  We've talked about this article.  I understand the

23    article.  I support the article.  I know the New England

24    Journal of Medicine is a leading text.  And I also know the

25    point Mr. Schmidt is going to make.
```

```
 1          I'm simply saying that we haven't been admitting

 2     medical learned treatises into the record, but we have

 3     liberally been using them and referencing them with experts

 4     throughout this trial.

 5          So I have no problem with referencing it or talking

 6     about it.  I'm looking forward to the testimony.  I just --

 7     I don't want to start the, the onslaught of admitting

 8     medical literature as learned treatises or antiquities into

 9     the record.

10             MR. SCHMIDT:  I think the difference here is the

11     clear exception in Subsection (16).  It's, it's pretty black

12     and white.

13             THE COURT:  Well, --

14             MR. FARRELL:  Perhaps, Judge, if it was offered

15     for the limited purpose of notice or limited purpose,

16     something other than a learned treatise because if we're

17     going to start admitting learned treatises, I have a book of

18     learned treatises and articles that we wish we would have

19     admitted during our case-in-chief.

20             MR. SCHMIDT:  I think if they can come in under

21     803(16), they could do that.  It's a pretty specific rule.

22             THE COURT:  It's certainly admissible under

23     803(18) but it can't be admitted if -- we'd have to have him

24     read it if we did that.

25             MR. ACKERMAN:  And, Your Honor, the part that
```

```
 1    troubles me, and I will be frank with you that I never

 2    looked into this, is how 803(16) could work to obviate what

 3    appears to be a more applicable exception in 803(18).

 4              MR. SCHMIDT:  By its language, a statement in a

 5    document that was prepared before January 1st, 1998, and the

 6    authenticity is established.

 7              THE COURT:  Well, it comes within the literal

 8    reading of (16), doesn't it, Mr. Ackerman?

 9              MR. ACKERMAN:  I think it does, Your Honor.  I

10    don't dispute that.

11              THE COURT:  I'm going to admit it under 803(16) --

12    BY MR. SCHMIDT:

13    Q.   So let's --

14              THE COURT:  -- for the truth of the matter

15    asserted.

16    BY MR. SCHMIDT:

17    Q.   Let's look at Page 2, please, of this publication,

18    "The Quality of Mercy."  You'll see that up there at the

19    top.  And I just want to read a couple lines to you.

20         It says, "Few things that a doctor does are more

21    important than relieving pain."

22         Let me pause there.  Is that a view you agree with

23    based on your medical practice?

24    A.   Yes, it is.

25    Q.   "Yet, the treatment of severe pain in hospitalized
```

```
 1   patients is regularly and systematically inadequate."
 2         Do you see that?
 3   A.   I do.
 4   Q.   And we're back in 1982 at this point in time.  Was this
 5   a view that started to be expressed in the medical
 6   literature at this point in time?
 7              MR. FARRELL:  I'm going to make an objection,
 8   Judge.  If we're going to admit this, then we should admit
 9   it for what it is.  This isn't medical literature.  I
10   believe this is an editorial.
11              MR. SCHMIDT:  I'll rephrase.
12   BY MR. SCHMIDT:
13   Q.   Is that a view that started to be expressed in the
14   medical community through various sources at this point
15   in time, that the treatment of severe pain in
16   hospitalized patients is regularly and systematically
17   inadequate?
18              THE COURT:  Overruled.  I'll let him answer that
19   question.
20              THE WITNESS:  Yes, it is.
21   BY MR. SCHMIDT:
22   Q.   It goes on to say -- it quotes some data.  And then
23   in the sentence after quoting that data it says, "This
24   is not for want of tools.  It is generally agreed that
25   most pain, no matter how severe, can be effectively
```

1    relieved by narcotic analgesics."

2        Do you see that?

3    **A.**    I do.

4    **Q.**    And, again, are you familiar with the point that there

5    started to be a movement in the medical profession to do

6    more to treat pain and recognized opioid analgesics as part

7    of that?

8    **A.**    Yes.

9    **Q.**    And, so, where I'm going to go with this --

10       MR. SCHMIDT:  And I'm going to pass out the

11   completed version that we sent last night.  We, we have

12   given counsel a demonstrative we're going to use.  We'll

13   print out a copy, but you should have it from last night.

14   And we'll give out more when we're done.  We're going to

15   build it with some of these articles.

16       Can we go to that please?  I'm just going to track some

17   of these sources up on a board that we're going to see.  And

18   I'm going to make a confession right at the outset.  We had

19   trouble figuring out our timeline at the bottom.

20       So you'll see there's just years here along the bottom

21   and it's not to scale.  We start with the '80s and then jump

22   all the way to the '90s and then kind of slow down a little

23   bit in the '90s.

24       But if you'll bear with me with that, I'm going to put

25   some of these up on the board.

1          So can we start by putting this article up on the

2     board?

3     BY MR. SCHMIDT:

4     **Q.**    Is that that quote we were just looking at from the

5     New England Journal of Medicine about, "It is generally

6     agreed that most pain, no matter how severe, can be

7     effectively relieved by narcotic analgesics"?

8     **A.**    It is, yes.

9     **Q.**    All right.  Let's go back to the article itself.  We'll

10    come back to this board as we look at other publications and

11    documents.

12         If we scroll down into the next paragraph, it says,

13    "One consideration that limits the use of narcotics is the

14    possibility of a variety of side effects."

15         And then it lists several including drowsiness,

16    constipation, urinary retention and, most serious,

17    respiratory depression.

18         "A more important factor is a disproportionate

19    sometimes irrational fear on the part of the medical

20    profession and the public alike that patients will become

21    addicted."

22         Do you see that?

23    **A.**    I do.

24    **Q.**    And are you familiar with that view being expressed by

25    doctors at this point in time going forward that there might

1   be a disproportionate, sometimes irrational fear, on the

2   part of the medical profession and the public that patients

3   will become addicted?

4   **A.**   Yes, that was one of the views that was being put forth

5   at that time.

6   **Q.**   And let me just jump to the end of this article, if I

7   could, back to the author.  I asked you earlier about Marcia

8   Angell.  Is she someone who has standing in the medical

9   profession?

10  **A.**   Yes.  Dr. Angell was, was very respected.

11  **Q.**   Did she have a reputation one way or another in terms

12  of her attitude towards drug companies and manufacturers?

13  **A.**   Yes.  She was well-known as really a fierce critic of

14  the for-profit pharmaceutical companies.

15  **Q.**   Okay.  Let's look at some other things that -- if we

16  could look at that paragraph you pulled up.  It states, "It

17  is instructive to contrast the very low incidence of

18  important side effects with the very high incidence of

19  inadequate pain relief.  I can't think of any other area of

20  medicine, in medicine in which such an extravagant concern

21  for side effects so drastically limits treatment.  We are

22  used to a closer balance between risks and benefits."

23       Do you see that?

24  **A.**   I do.

25  **Q.**   And can you just comment on that statement,

1    particularly this statement at the end about risk and

2    benefits?

3    **A.**   So Dr. Angell is making the point that we discussed

4    before that -- which was a point that was made at this time

5    period that the perception was we're not -- we weren't

6    treating pain aggressively enough and we were exaggerating

7    our understanding of the risks.

8         And, therefore, by definition then that would get your

9    risk benefit calculation off if you accept that argument.

10   **Q.**   And then let's just go to the end of, of this article.

11        "Pain is soul destroying.  No patient should have to

12   endure intense pain unnecessarily.  The quality of mercy is

13   essential to the practice of medicine; here, of all places,

14   it should not be strained."

15        Do you see that?

16   **A.**   I do.

17   **Q.**   And how does that fit with your experience in pain

18   treatment and pain management?

19   **A.**   I think actually she wrote that very, very well.  I

20   think pain is soul destroying.  I think that you wouldn't

21   want to see a pain -- a patient having to endure intense

22   pain unnecessarily.  And I think that the quality of mercy

23   is essential to the practice of medicine.

24   **Q.**   We've, we've walked through a series of statements in

25   this editorial.  Is it meaningful if an editor at the New

```
 1    England Journal of Medicine makes statements like this to

 2    the medical profession?

 3    A.   Yes.  This is a -- the New England Journal of Medicine,

 4    as we've discussed, is one of the most respected medical

 5    journals.  Dr. Angell was a very well-known and respected

 6    figure.  And, so, a statement like this has a significant

 7    impact on, on physicians.

 8    Q.   I'd like to approach with another document, if I may,

 9    Defense West Virginia 3699.  I've given you a copy of a

10    document entitled Cancer Pain Relief.  And below the heading

11    you see a crest and it says it's from the World Health

12    Organization in Geneva.  Do you see that?

13    A.   I do.

14    Q.   And then if we just flip ahead to the third page, it

15    again repeats the title, Cancer Pain Relief, World Health

16    Organization, 1986.  Are you familiar -- are you familiar

17    with this document I've just handed you?

18    A.   Yes, I am.

19    Q.   Can you comment on the significance of this document in

20    pain management?

21    A.   So this document was very, was very significant because

22    it's the document where the World Health Organization

23    introduced their cancer pain treatment letter which became

24    very well-known throughout medicine and, and had a very

25    significant influence on the practice of treating pain
```

1    across fields of medicine.

2              MR. SCHMIDT:  Your Honor, we move into evidence

3    Defense West Virginia 3699 under the ancient documents

4    exception.

5              MR. ACKERMAN:  I'd renew our objection, Your

6    Honor.  I would just note that the Advisory Committee Note,

7    which Ms. Kearse has helpfully provided me, to Rule 803(16)

8    references letters, records, contracts, maps, and

9    certificates.

10      So I think -- again, it's our position that the ancient

11   document exception was not intended to apply to learned

12   treatises which are referenced in another section.

13             MR. SCHMIDT:  The language, just for the record,

14   that's being referenced is, "Wigmore further states that the

15   ancient document technique of authentication is universally

16   conceded to apply to all sorts of documents."  And then it

17   says "including the examples listed."

18             MR. RUBY:  And, Your Honor, I know Mr. Schmidt

19   doesn't need my help, but with respect to Mr. Ackerman's

20   reference to the term "record," there are definitions, of

21   course, in the Rules of Evidence.

22      And in Rule 101(b)(4) record is defined to include a

23   memorandum or report which certainly would include this

24   document.

25             THE COURT:  I'm going to admit it.  It's admitted.

1    West Virginia 3699 is admitted.

2    BY MR. SCHMIDT:

3    Q.   So let's look at what was important about this

4    document.  And I'd like to, again, using the numbers in

5    the bottom left corner of the page, if we can go to Page

6    10, please.  And there's a heading "Nature of Cancer

7    Pain."  I'm actually going to look at the paragraph

8    right above that.

9         So now we're up to 1986.  This tells us numerous

10   published reports indicate that cancer pain is often not

11   treated adequately.

12        Again, is that consistent with some of these

13   discussions from this time period now up to 1986 about doing

14   more to treat pain; in this case, cancer pain?

15   A.   Yes, it is.

16   Q.   "An analysis of 11 reports covering nearly 2,000

17   patients in developed countries," and they emphasize that,

18   "suggests that 50 to 80 percent of patients did not have

19   satisfactory relief.  Many patients with advanced cancer and

20   moderate to severe pain are not given sufficient analgesic

21   medication to control their discomfort."

22        Are you familiar with that kind of data from this time

23   period showing that patients who had cancer pain weren't

24   given satisfactory relief?

25   A.   Yes, I am.

1    Q.   It says, "They are restricted to a weak opioid (e.g.

2    codeine) or a stronger drug is given on demand instead of

3    being given at appropriate regular intervals by the clock."

4         Then they talk about developing countries and that data

5    there.

6         And then the final sentence says, "It seems certain,

7    however, that most patients do not receive adequate therapy

8    because of legal and other constraints on access to drugs

9    and notably to the strong opioids."

10        Do you see that?

11   A.   I do.

12   Q.   And, again, was that a sentiment that was being

13   expressed at this time that legal and other constraints on

14   prescription opioids were depriving patients of effective

15   pain relief?

16   A.   Yes.  A constraint such as that and exaggeration of

17   concerns that we talked about from other, that was on other

18   documents were leading clinicians to under-use and --

19   under-use opioid pain medications and to under-treat pain.

20        And, essentially, the argument at that time was that

21   they -- clinicians were typically getting the risk benefits

22   wrong and not treating pain aggressively enough, not using

23   opioid pain medications enough.

24   Q.   Let's go to Page 50, if we could, of this document.  It

25   says, "Reasons for inadequate control of cancer pain."

1          And if you look at the -- I suppose it's the last

2     sentence here, it refers to a misconception by doctors,

3     nurses, and patients to the effect that physical dependence

4     and psychological dependence are interchangeable terms has

5     led to the under-use of opioid analgesics."

6          Do you see that?

7     **A.**   I do.

8     **Q.**   Is it meaningful when the World Health Organization is

9     making a statement like that about under-use of opioid

10    analgesics?

11    **A.**   Yes, it's very meaningful.

12    **Q.**   Okay.  Let's go to the board, if we could, and we'll

13    just add that quote under use of opioid analgesics, 1986.

14         Why is it meaningful that the World Health

15    Organization, WHO, is saying what with reference to cancer

16    pain?

17    **A.**   Because doctors know the World Health Organization.

18    You would be hard-pressed to find a doctor who doesn't know

19    the World Health Organization.  And when they make a

20    statement that's that clear saying that we're under-treating

21    cancer pain and we should use opioids more often, more

22    aggressively to, frankly, do a better job of treating cancer

23    pain, that's a, that's a powerful statement coming from an

24    organization of that stature.

25    **Q.**   Okay.  Let's go back to the document.  I want to jump

```
 1    ahead now to Page 20.
 2         And we see a heading on the side, on the page that says
 3    "Drug Therapy."  Do you see that?
 4    A.   I do.
 5    Q.   It says, "The use of analgesic drugs is the mainstay of
 6    cancer pain management."
 7         Does that remain true to this day?
 8    A.   That remains true to, to this day, yes.
 9    Q.   It says, "When used correctly, analgesics are effective
10    in a high percentage of patients.  A three-step analgesic
11    ladder is suggested (see diagram opposite)."
12         And then if we look at Page 21 -- let's just cull up
13    this diagram that they're referencing.
14         Are you familiar with this diagram?
15    A.   Yes, I am.
16    Q.   Have you heard it sometimes referred to as a pain
17    ladder?
18    A.   Yes, that's what we commonly refer to it as, the World
19    Health Organization pain ladder.
20    Q.   Can you just walk us through -- I see one, two, three
21    and then references to different types of pain and
22    treatments.  Can you walk us through what this pain ladder
23    is communicating?
24    A.   So it's communicating to doctors and other clinicians
25    that when you encounter a patient with cancer pain, you
```

1    start with a non-opioid and associated adjuvant medication.

2    If that gives the patient relief, you are typically going to

3    stop there.  If it doesn't, you go up to the next level, the

4    next rung.

5         And if pain is persisting or increasing, at that point

6    it's recommending that you start a weak opioid plus those

7    non-opioids plus those adjuvant medications.  Again, if that

8    works, you're typically going to stop there.

9         But that if the pain persists or increases, you will

10   then go up another rung.  And now you'll go to strong

11   opioids, as well as those non-opioid medications and

12   adjuvants.

13        And you can see at the top that your goal is to achieve

14   for that patient freedom from cancer pain.

15   **Q.**   And picking up on that goal, freedom from cancer pain,

16   did there come a time where the concepts reflecting this

17   ladder, stepping up based on the pain and what worked and

18   didn't work, were applied more broadly in the medical

19   profession in cancer pain?

20   **A.**   Yes.  Over time the same -- this had an influence, of

21   course, on cancer pain.  But also it started to have an

22   influence on treatment of pain including non-cancer pain.

23   **Q.**   Okay.  Let's go back to the timeline, if we could, and

24   again recognizing this is horribly not to scale.  But in

25   1995 you put Oxycontin on there.

1      Are you familiar with the FDA's approval of Oxycontin

2   in 1995?

3   **A.**   Yes, I am.

4   **Q.**   Do you have an understanding as a clinician why it was

5   approved?

6   **A.**   My understanding it that it was approved in line with

7   the same approach of trying to have more, more therapies

8   available, more long-acting opioids available to use to

9   treat cancer pain and non-cancer pain to give clinicians

10  more ways to treat pain.

11  **Q.**   Do you have an understanding as to whether during that

12  broad time period we're talking about, '80s, '90s, as the

13  medical profession was talking about pain more and opioid

14  analgesics more, the FDA approved several opioids during

15  that time interval?

16  **A.**   That is correct.

17  **Q.**   Do you know of any role that distributors play in the

18  approval of prescription opioids?

19  **A.**   I'm not aware of any role that distributors play in the

20  approval of opioids.

21        MR. FARRELL:   Judge, if I may, since we're using a

22  demonstrative, I don't believe the question has been asked

23  to establish the date or the distinction between approved

24  and launched or sold.

25  BY MR. SCHMIDT:

1    **Q.**   Do you know when Oxycontin was approved?

2    **A.**   It was approved in 1995.

3          THE COURT:  Does that take care of your objection,

4    Mr. Farrell?

5          MR. FARRELL:  Sort of.  I also wanted to -- I'll

6    clean it up on cross.

7          THE COURT:  Okay.  I'll overrule the objection.  I

8    think, yeah, it's a matter for cross.

9       Go ahead, Mr. Schmidt.

10   BY MR. SCHMIDT:

11   **Q.**   Okay.  I want to ask you about state medical

12   boards.  Are you familiar with state medical boards?

13   **A.**   Yes, I am.

14   **Q.**   Do they play a role in, when we talk about standard of

15   care, in setting the standard of care?

16   **A.**   They do.

17   **Q.**   What role do they play?

18   **A.**   So for a doctor to practice, you need your license from

19   your state medical board.  And if you were practicing

20   inappropriately, for example, they would be the folks who

21   could pull your license.

22       So, therefore, as, as a doctor, one tends to pay

23   attention to what the state medical board is calling for in

24   terms of appropriate practice.

25   **Q.**   Okay.  Did there come a time where state medical boards

1    began to take steps to support broader opioid prescribing?

2    **A.**   Yes, there did.

3    **Q.**   As part of your work in this case -- and we've got an

4    expert coming next week who's going to dive into this more,

5    so I'm just going to touch this at a very high level.

6         But as part of your work in this case, did you track

7    whether some of these changes in the standard of care

8    tracked into guidance documents from the West Virginia Board

9    of Medicine?

10   **A.**   Yes, I did.

11        MR. FARRELL:  Judge, I'm going to place an

12   objection on the record.  As indicated in my *voir dire*, this

13   witness is certainly an expert in the national standard of

14   care, but is not licensed in West Virginia, does not

15   practice in West Virginia, and has no basis in fact to make

16   any comments about the West Virginia Board of Medicine.

17        MR. SCHMIDT:  And, Your Honor, I think the fact

18   that he has general pain management experience, general

19   opioid experience makes him eminently qualified to look at

20   West Virginia Board of Medicine documents and comment on

21   whether they're consistent with --

22        THE COURT:  I agree.  I think his expertise has

23   been established to the point where I think he's qualified

24   to look at the West Virginia materials and pass an opinion

25   on -- based on those.  Overruled.

1          MR. SCHMIDT:  And I will be brief with this.  May

2     I approach, Your Honor?

3          THE COURT:  Yes.

4          MR. SCHMIDT:  Thank you, Your Honor.

5     BY MR. SCHMIDT:

6     Q.   So just to orient us to what we're looking at,

7     we've put it up on the screen, MC-WV-01219 which is in

8     evidence.  It's from the State of West Virginia, West

9     Virginia Board of Medicine.  And if we look at the

10    second page at the end, we see it was adopted by the

11    West Virginia Board of Medicine in 1997.  Do you see

12    that, Dr. Gilligan?

13    A.   Yes, I do.

14         MR. ACKERMAN:  Your Honor, I just want to note

15    that the document, while in evidence, was admitted for a

16    limited purpose, make that clear.

17         MR. SCHMIDT:  I don't recall if that's correct or

18    not.  But if that's true, we don't take issue with that.  I

19    didn't have that recollection, but I'm not -- I didn't look

20    at that.

21    BY MR. SCHMIDT:

22    Q.   So let's go to the second paragraph of this.  It

23    says, "The purpose of this statement is to clarify the

24    Board of Medicine's position on the appropriate use of

25    opioids for patients with chronic non-malignant pain."

```
 1          Let me pause there.  What is chronic non-malignant
 2    pain?
 3    A.    So chronic non-malignant pain is chronic non-cancer
 4    pain.
 5    Q.    Okay.  "Clarifying those standards show that these
 6    patients will receive quality pain management and so that
 7    their physicians will not fear legal consequences, including
 8    disciplinary action by the board, when they prescribe
 9    opioids in a manner described in this document.  It should
10    be understood that the board recognizes that opioids are
11    appropriate treatment for chronic non-malignant pain in
12    selected patients."
13          Do you see that?
14    A.    I do.
15    Q.    Is this consistent with this change in national
16    standards that you've been telling us about at this time in
17    the 1997 time period?
18    A.    Yes, it is.
19    Q.    All right.  Let's go two lines -- two paragraphs down.
20    You talked about the role that state medical boards play in
21    discipline.  Do you remember telling us about that just a
22    moment ago?
23    A.    I do.
24    Q.    It says, "A physician need not fear disciplinary action
25    by the board if complete documentation of prescribing of
```

1    opioids in chronic non-malignant non-cancer pain even in

2    large doses is contained in the medical records."

3        Do you see that?

4    **A.**   I do.

5    **Q.**   And if we can go back to the timeline and put that

6    quote on the timeline under 1997.

7        Just in general terms, what's the import of a statement

8    like that from a, from a State Board of Medicine?

9    **A.**   So for a doctor, that's a clear message.  It's very

10   clearly written saying that if you prescribe opioids even in

11   large doses for non-cancer pain -- and there is a reference

12   that you're going to have to have complete documentation.

13   You're going to have to justify your decision to do that in

14   your medical record which would be for a doctor expected.

15   That in that case, you need not fear disciplinary action.

16       And that's -- that would typically be quite significant

17   to a physician because disciplinary action from a medical

18   board could mean losing your medical license and not being

19   able to practice medicine, for example.

20   **Q.**   Are you familiar with something called the Federation

21   of State Medical Boards?

22   **A.**   Yes, I am.

23   **Q.**   Could you tell us what the Federation of State Medical

24   Boards is?

25   **A.**   So it's a group that tends to write guidelines and

```
 1    documents for -- that are then frequently adopted by medical

 2    boards in the different states.

 3    Q.    Okay.  Are you familiar with publications that the

 4    Federation of State Medical Boards has issued over time

 5    regarding prescription opioids?

 6    A.    Yes, I am.

 7              MR. SCHMIDT:  May I approach, Your Honor?

 8              THE COURT:  Yes.

 9    BY MR. SCHMIDT:

10    Q.    I've given you what I've marked as Defense West

11    Virginia 2937.  If you look at the top of it -- well,

12    actually, let's look at the second line -- the third

13    line, smaller print.

14         Do you see in that sentence there's a reference to the

15    Federation of State Medical Boards, and it's dated May,

16    1998.  Do you see that?

17    A.    I do.

18    Q.    And it says, "Model guidelines for the use of

19    controlled substances for the treatment of pain."

20         Are you familiar with this document?

21    A.    Yes, I am.

22    Q.    At a high level, can you give us an overview of, of

23    what this document is?

24    A.    So it's a document written by the Federation of State

25    Medical Boards spelling out their, their guidelines for the
```

1   appropriate use of controlled substances to treat pain.

2        And then this is the, the -- this sort of document --

3   indeed, this one was -- the sort of document that many state

4   medical boards would then adopt as their, as their

5   guideline.

6             MR. SCHMIDT:  Your Honor, we missed the ancient

7   records exception by a few months for this document, so I'll

8   take up Mr. Farrell's invitation to move it in just for the

9   limited purpose of notice, Defense West Virginia 2937.

10             THE COURT:  Is there any objection?

11             MR. FARRELL:  No, Your Honor.

12             THE COURT:  It's admitted for the limited purpose.

13  BY MR. SCHMIDT:

14  **Q.**   Let's look at some of the language in this

15  document.

16        First of all, if you go to the third paragraph, please,

17  it states, "The board recognizes that controlled substances,

18  including opioid analgesics, may be essential in the

19  treatment of acute pain due to trauma or surgery and chronic

20  pain whether due to cancer or non-cancer origins."

21        Are you familiar with that statement from the

22  Federation of State Medical Boards in 1998?

23  **A.**   Yes, I am.

24  **Q.**   And if we go over to the timeline and put that on a

25  timeline, 1998, can you comment on the significance, if any,

1    of the Federation of State Medical Boards issuing this

2    broader statement including the specific recognition that

3    opioid analgesics may be essential for acute pain due to

4    trauma or surgery and chronic pain whether due to cancer or

5    non-cancer?

6    **A.**    So it's part of the same change over time and

7    encouraging increase in the -- essentially increase in the

8    aggressive treatment of pain with the, the, this concept

9    that we've been perhaps under-treating pain.

10        And it's significant that they're spelling out not just

11   acute pain and not just chronic pain due to cancer, but also

12   including chronic pain due to non-cancer origins.

13   **Q.**    And do you understand this to be consistent with the

14   standard of care regarding prescription opioids as it was

15   developing in this time period?

16   **A.**    Yes, I do.

17   **Q.**    Let's go back to the article itself, please, Defense

18   West Virginia 2937.  And if we go back to that third

19   paragraph, I just want to cull out some other language at

20   the end.

21        "Physicians should recognize that tolerance and

22   physical dependence are normal consequences of sustained use

23   of opioid analgesics and are not synonymous with addiction."

24        Can you explain to us what you understand the

25   Federation of State Medical Boards to be saying with that

1    statement?

2    **A.**    So what they're spelling out for physicians is -- and I

3    agree with them, by the way -- if, if you prescribe a

4    significant dose of opioids to any patient over a

5    significant time period, that patient will become physically

6    dependent.

7         So if you were to abruptly stop those opioids from one

8    day to the next, that patient would have a physical

9    withdrawal and would be sick.  But that's not being

10   addicted.  That's just a physical dependence that happens to

11   everybody.  In fact, it happens to every mammal if you give

12   a significant dose over a significant time.

13        Similarly, the tolerance is that if you give a

14   significant dose over a significant time, the medication

15   will have less effect.  The patient will become tolerant.

16   And, again, that's a normal physiologic thing that will

17   happen to everybody with a sufficient dose over a sufficient

18   time, whereas addiction is something that's a psychological

19   phenomenon, compulsive use cravings, that does not happen to

20   everybody.  It happens to a relatively small percentage of

21   patients.  When it does happen, it can be absolutely

22   devastating, so as to not confuse the patient developing

23   physical dependence or physical tolerance with a patient

24   developing addiction.

25   **Q.**    And I'd like to go to the next stop on the timeline.

1    Before I do, we've been focusing on some seminal

2    publications relevant to the standard of care question.

3         Do you have an understanding as to whether there was a

4    much broader discussion occurring regarding standard of care

5    that these are leading examples of?

6    **A.**   These are examples of the evolution of that standard of

7    care, but they reflect a broad discussion across pain

8    medicine, and actually medicine in general, about what's the

9    appropriate way for us to treat pain and what's the

10   appropriate way for us to use opioid pain medications to

11   treat pain.

12             MR. SCHMIDT:  May I approach, Your Honor?

13             THE COURT:  Yes.

14   BY MR. SCHMIDT:

15   **Q.**   I've passed you a document AM-WV-2693.  It says

16   "Joint Commission on Accreditation of Healthcare

17   Organizations Pain Standards for 2001."  Are you

18   familiar with this document?

19   **A.**   Yes, I am.

20   **Q.**   Are you familiar with the entity that issued this

21   document, the Joint Commission on Accreditation of

22   Healthcare Organizations?

23   **A.**   Yes, I am.  We, we call it by the acronym JCAHO.

24   **Q.**   And what role, if any, do they play in the medical

25   profession?

1    **A.**    So JCAHO is the body that accredits hospitals and they

2    accredit other healthcare organizations.  And that

3    accreditation is very important to us to continue to be able

4    to operate our hospitals.  An accredited hospital has

5    implications for reimbursement, et cetera.  So their

6    accreditation is extremely important to us.

7    **Q.**    And these are, are pain standards for 2001.  What, if

8    anything, is the significance of this accreditation on

9    issuing pain standards, or any kind of standards for that

10   matter?

11   **A.**    So the significance of any standards that JCAHO issues

12   is that they come and inspect us on a regular basis.  Often

13   it's a surprise inspection that you don't know of ahead of

14   time where they arrive.  And they inspect whether we're

15   meeting their standards for pain treatment or for keeping

16   the operating rooms sterile, clean enough, or many other

17   things.

18        And it's very, very important to us to maintain our

19   accreditation, and very important for us not to have

20   findings where we're not meeting their standards beyond how

21   we treat pain or other things.

22   **Q.**    Okay.  In terms of these specific pain standards, do

23   you know whether they are influential in the practice of

24   medicine?

25   **A.**    Yes, I do.

```
1    Q.   How so -- or how were they if at all?
2    A.   So they were influential because they set standards for
3    measuring pain as the fifth vital sign --
4    Q.   Uh-huh.
5    A.   -- which was extremely important because if you think
6    of vital signs, the name, the name says a lot; heart rate,
7    blood pressure, et cetera, key things.  And to then add pain
8    as a fifth vital sign was a very clear message of how
9    important JCAHO felt measuring pain and, by implication,
10   treating pain was and so, therefore, the expectation that
11   hospitals who are going to be inspected by JCAHO would,
12   would meet those sort of standards.
13   Q.   I'd like to look at what exactly this document says on
14   that.
15        MR. SCHMIDT:  Before I do, we move this document
16   into evidence for the limited purpose of notice, AM-WV-2693.
17        MR. ACKERMAN:  One thing, Your Honor -- we tried
18   to point this out last night in our objections.  It appears
19   that the back there's a different document that's appended
20   to it.  So you've got ten pages that all appear to be the
21   same document, and then there's something else.
22        THE COURT:  Beginning on page --
23        MR. ACKERMAN:  Page 11 at the bottom it looks like
24   something that is Page 13 of a separate document.
25        MR. SCHMIDT:  I think the cover of the document
```

1    answers that in the second paragraph.  It refers to the new

2    pain standards and some examples are pulled out of the six

3    chapters in which they appear in these six manuals and are

4    shown below for your information.

5         So it's, it's an attachment to the original document

6    that's referenced in the second paragraph on the first page.

7              THE COURT:  Yeah.  The paragraph on the first page

8    appears to embrace the parts that you're concerned about,

9    does it not?

10             MR. ACKERMAN:  I think when it says examples are

11   shown below, it's talking about the content of the document.

12             MR. SCHMIDT:  This document has been on the

13   exhibit list for a long, long time.  It's one of the central

14   documents in the case.  I actually moved it into evidence as

15   an adoptive admission because it's subject to a --

16             THE COURT:  I'm going to admit it for the limited

17   purpose, Mr. Ackerman.  You can object -- do you want the

18   record to show your objection?

19             MR. ACKERMAN:  I think it's on the record, Your

20   Honor.

21             THE COURT:  All right.  It will do so.

22   BY MR. SCHMIDT:

23   Q.  Let's go to Page 12 of this document if we could.

24   It's the number in the middle this time at the bottom.

25   And it says "Standard" at the top.

1          And, actually, just before I do, just to make the

2     record complete, Dr. Gilligan, could you look back with me

3     at the first page of the document.

4          The second paragraph says, "The new pain standards and

5     some examples are pulled out of the six chapters in which

6     they appear in these six manuals and are shown below for

7     your information."

8          Do you see that?

9     **A.**   I do.

10    **Q.**   Let's go to Page 11.  Remembering those, those words

11    from the first page about standards and manuals -- I'm

12    sorry, Page 12, please.

13         You see at the top there's a reference to a manual, the

14    Comprehensive Accreditation Manual for Hospitals:   The

15    Official Handbook.  Do you see that?

16    **A.**   I do.

17    **Q.**   And then below that there's a reference to "Standard."

18    Do you see that?

19    **A.**   I do.

20    **Q.**   The standard is patients have the right to appropriate

21    assessment and management of pain.  Do you see that?

22    **A.**   I do.

23    **Q.**   And then it looks like the way this document works is

24    it explains that standard.  And it says, "Pain can be a

25    common part of the patient experience.  Unrelieved pain has

1    adverse physical and psychological effects.  The patient's

2    right to pain management is respected and supported.  The

3    healthcare organization plans, supports, and coordinates

4    activities and resources to assure the pain of all patients

5    is recognized and addressed appropriately."

6         Do you see that?

7    **A.**   I do.

8    **Q.**   And what, if anything, is the import of this being part

9    of an accreditation manual and standard set of that manual

10   in JCAHO?

11   **A.**   So it's of substantial import again because we are

12   accredited by JCAHO and because it's very, very important to

13   us to maintain our accreditation, and very important for our

14   accreditation inspections not to have findings where we're

15   deficient.  So in a set of standards like this, that has a

16   big effect on, on us running the hospital.

17   **Q.**   Let's go back to the page we were looking at, please,

18   if you could pull that back up, 2693, AM-WV-2693, Page 12.

19        And while we're pulling that up, we can look at our

20   hard copy documents just in the interest of time.

21        Do you see there's a heading below the standard below

22   the explanation of the intent of the standard that says

23   "examples of implementation"?  Do you see that?

24   **A.**   I do.

25   **Q.**   And do you see the references, what you were telling us

 1   earlier, it says, "Pain is considered a fifth vital sign in

 2   the hospital's care of patients.  Pain intensity ratings are

 3   recorded during the admission assessment along with

 4   temperature, pulse, respiration and blood pressure."

 5        Do you see that?

 6   **A.**   I do.

 7   **Q.**   And was that a significant consideration in the

 8   standard of care in medicine at this time?

 9   **A.**   That was a significant consideration again because the,

10   the other vital signs have been around for -- temperature,

11   pulse, respiration, blood pressure have been vital signs

12   that are critical to assessing patients.

13        And, so, to add pain as a fifth vital sign was a very

14   clear message about the great importance of measuring pain

15   and, by implication, of treating pain.

16   **Q.**   Okay.  And you see that as, as Item Number 1 under

17   examples.  And let's just go to the board and put that up on

18   the board.

19        We're now to 2001.  Pain is considered the fifth vital

20   sign.

21        Can we go back to the second example, AM-WV-2693.

22   "Every patient is asked a screening question regarding pain

23   on admission."

24        And then let's just jump down to Number 4.  "The

25   following statement on pain management is posted in all

1    patient care areas (patient rooms, clinic rooms, waiting

2    rooms, et cetera).  Statement on pain management:  All

3    patients have a right to pain relief."

4        Could you comment on the impact of some of these

5    examples that were given on how to implement this policy in

6    terms of every patient being asked a screening question

7    about pain, public postings that we've probably all seen,

8    all patients have a right to pain relief.

9    **A.**   So where every patient is asked a screening question

10   about pain on admission, then you're getting a measurement

11   of pain by JCAHO guidance on every patient.  And that's

12   extremely likely to have an effect that you'll now be doing

13   more to treat patients' pain.

14       If the measurement is very high, the likelihood that

15   doctors and nurses will then do something to try to treat it

16   is, I think, a borne out conclusion.  And also having the

17   statement posted in all patient care areas per JCAHO

18   recommendations, per JCAHO standard setting saying all

19   patients have a right to pain relief is, is a very clear

20   statement that if a patient has severe pain, there's a

21   strong implication that doctors and nurses should, in the

22   appropriate fashion one would hope, treat, treat their pain.

23   **Q.**   Let's go to the next item on the timeline.

24           MR. SCHMIDT:  May I approach, Your Honor?

25           THE COURT:  Yes.

1    BY MR. SCHMIDT:

2    **Q.**   I've given you MC-WV-1522 which is titled "A Joint

3    Statement from 21 Health Organizations and the Drug

4    Enforcement Administration."

5         And then if you look on the right, it appears that it

6    lists the different organizations.  Do you see that?

7    **A.**   I do.

8    **Q.**   And one of them is -- the sixth one down is the

9    American Medical Association.  Do you see that?

10   **A.**   I do.

11   **Q.**   What is the import, if anything, of receiving a

12   statement from the American Medical Association?

13   **A.**   The American Medical Association is the biggest

14   organization representing doctors in America.  So it's

15   significant when they're endorsing a statement.

16   **Q.**   If you scroll down, this was in the title, but do you

17   see the reference to the Drug Enforcement Administration

18   being listed?

19   **A.**   I do.

20   **Q.**   And it's on the right there, yeah.  And then if we go

21   back to what this joint statement addresses, it states,

22   "Promoting pain relief and preventing abuse of pain

23   medications, a critical balancing act."

24        Do you see that?

25   **A.**   I do.

114

1    **Q.**   Is there -- what significance, if any, does a statement

2    from the DEA on balancing pain relief and preventing abuse

3    to pain medications carry?

4    **A.**   So it's significant because the Drug Enforcement

5    Agency, of course, part of what they're, what they will do

6    is look at inappropriate use of medications and be an

7    enforcement agency.

8         So when they're endorsing promoting pain relief while

9    getting the -- while preventing abuse, that's significant

10   because the doctor who would be -- might be scared to

11   prescribe opioids for fear of getting in trouble with

12   enforcement agencies would take -- would tend to take quite

13   seriously a message from the Drug Enforcement Agency

14   endorsing these medications to treat pain in many

15   situations.

16             MR. SCHMIDT:  I'll move into evidence MC-WV-1522

17   for the limited purpose of notice.

18             THE COURT:  Any objection?

19             MR. ACKERMAN:  For the limited purpose, no

20   objection.

21             THE COURT:  Let me make clear it's notice to, to

22   whom for what?

23             MR. SCHMIDT:  Notice to the medical and healthcare

24   community regarding the contents --

25             THE COURT:  Regarding the changing standards of

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1     the abuse of opioids?

2               MR. SCHMIDT:  Yes, Your Honor.

3               MR. FARRELL:  I've got an objection to that.  I

4     think it's notice to the defendants, not notice to --

5     there's no relevance to the notice to the community.

6               MR. SCHMIDT:  It's a publication from, among other

7     sources, the American Medical Association and the branch of

8     the federal government that regulates all doctors who

9     prescribe prescription opioids.  We're talking about

10    standard of care.  I think it is relevant to notice to

11    doctors.

12              THE COURT:  I think it is too, Mr. Farrell.  It

13    shows the -- it doesn't come in for the truth of the matter

14    asserted.  It comes in to show notice to the medical

15    profession of the changing standards of the use of opioids.

16    Isn't that the purpose it's offered, Mr. Schmidt?

17              MR. SCHMIDT:  Yes.  I think we actually could move

18    it in as a public record.

19              MR. FARRELL:  Okay.

20              THE COURT:  I'll admit it for the limited purpose.

21       Do you want to object, Mr. Farrell?

22              MR. FARRELL:  No.  I guess I'm just a little

23    confused, but that's okay.

24    BY MR. SCHMIDT:

25    Q.   So let's look at what this statement says.  If we

1    look -- there's a line, looks like the third paragraph

2    down, "This consensus statement is necessary based on

3    the following facts."  And then it lists a series of

4    facts.  I'm going to focus on the first two.  Do you see

5    that?

6    **A.**   I do.

7    **Q.**   The first fact, according to this document, that

8    necessitates this consensus statement is that, quote,

9    "Under-treatment of pain is a serious problem in the United

10   States, including pain among patients with chronic

11   conditions and those who are critically ill or near death.

12   Effective pain management is an integral and important part

13   of the quality of medical care and pain should be treated

14   aggressively."

15        Do you see that language?

16   **A.**   Yes, I do.

17   **Q.**   Again, does this reflect the standard of care this time

18   from the entire American Medical Association and the DEA

19   about the needs, in the words of this document, to not

20   simply recognize the problem with under-treatment of pain,

21   but that pain should be treated aggressively?

22   **A.**   Yes, this is part of that changing standard of care.

23   **Q.**   Let's look at the next bullet.  It says, "For many

24   patients opioid analgesics, when used as recommended by

25   established pain management guidelines --" do you see that

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    language?

2    **A.**    I do.

3    **Q.**    And what do you understand that reference to mean,

4    established pain management guidelines?

5    **A.**    Things like the guidance from the Federation of State

6    Medical Boards and other similar guidelines.

7    **Q.**    "For many patients, opioid analgesics, when used as

8    recommended, are the most effective way to treat their pain

9    and often the only treatment option that provides

10   significant relief."  And did I read that correctly?

11   **A.**    Yes, you did.

12   **Q.**    If we switch over to our board and put that on the

13   board, is that significant when the DEA and the AMA are

14   coming out with a statement saying that it's important to

15   treat pain and they're often the only treatment option that

16   provides significant relief?

17   **A.**    Yes, it's important, again the AMA being the biggest

18   organization representing doctors in the U.S. and the DEA

19   being the Drug Enforcement Agency.

20   **Q.**    Okay.  Can we go back to the original document, please,

21   MC-WV-1522.  And do you still have that in front of you?

22        I think we're having some technical problems.  While

23   we're doing that, I'm going to ask you about one other

24   paragraph in here.  It's the third paragraph in the document

25   right before that discussion of the consensus statement

1    being necessary based on the following facts.

2        Do you see where it says, "Preventing drug abuse is an

3    important societal goal but there's consensus by law

4    enforcement agencies, healthcare practitioners, and patient

5    advocates alike that that concern should not hinder a

6    patient's ability to receive the care they need and

7    deserve."

8        Do you see that language?

9    **A.**    I do.

10   **Q.**    Do you have an understanding that there was that

11   consensus described here at this point in time by law

12   enforcement, by healthcare practitioners, by patient

13   advocates that concerns about abuse were important, but they

14   shouldn't hinder a patient's ability to receive the care

15   they need?

16   **A.**    Yes.  My understanding is that that was the consensus

17   view at that time.

18   **Q.**    The FSMB continued to issue guidelines over time?

19   **A.**    Yes, they did.

20   **Q.**    Let's take a look at the next set of guidelines, if I

21   may just have one second, Your Honor.

22               THE COURT:  Yes.

23               MR. SCHMIDT:  May I approach?

24               THE COURT:  Yes.

25   BY MR. SCHMIDT:

1    **Q.**   I've handed you what I've marked as Defense West

2    Virginia 3605.  And let's put it up on the screen just

3    in terms of what we're looking at.  It says "Model

4    Policy for the Use of Controlled Substances, Federation

5    of State Medical Boards."  And then there's a reference

6    to May, 2004.  Do you see that?

7    **A.**   I do.

8    **Q.**   Is this an update on those Federation of State Medical

9    Board standards now from 2004?

10   **A.**   That's correct.

11          MR. SCHMIDT:  We'd move this into evidence for the

12   limited purpose of notice as described before, Your Honor.

13          THE COURT:  Any objection?

14      (No Response)

15          THE COURT:  Hearing none, it's admitted.

16   BY MR. SCHMIDT:

17   **Q.**   If we look in the second paragraph, it states,

18   "Since adoption in April 1998 --"

19      Is that a reference to the earlier guidelines we looked

20   at?

21   **A.**   Yes, it is.

22   **Q.**   "-- the model guidelines for the use of controlled

23   substances for the treatment of pain have been widely

24   distributed to state medical boards, medical professional

25   organizations, other healthcare regulatory boards, patient

1     advocacy groups, pharmaceutical companies, state and federal

2     regulatory agencies, and practicing physicians and other

3     healthcare providers.  The model guidelines have been

4     endorsed by the American Academy of Pain Medicine, the Drug

5     Enforcement Administration, the American Pain Society, and

6     the National Association of State Controlled Substances

7     Authorities."

8          Do you have that understanding that their model

9     guidelines were endorsed by various organizations, including

10    the DEA?

11    **A.**   Yes, that is my understanding.

12    **Q.**   Let's go to the next paragraph, please.

13         It states, "Notwithstanding progress to date in

14    establishing state pain policies recognizing the legitimate

15    uses of opioid analgesics, there is a significant body of

16    evidence suggesting that both acute and chronic pain

17    continue to be under-treated."

18         Do you see that?

19    **A.**   I do.

20    **Q.**   So just to orient us, we're now in 2004.  Are you aware

21    that prescription levels had actually started increasing by

22    this point in time?

23    **A.**   Yes, I am aware they had.

24    **Q.**   Was the Federation of State Medical Boards telling

25    doctors they could still do more to treat acute and chronic

1    pain?

2    **A.**   Yes, I think that's a fair statement of what they're,

3    of what they're saying.

4    **Q.**   Let's go to Page 3.  Actually, let's just put that

5    statement, if we could, up on the board.

6         We're now to 2004.  Recognizing that they continued --

7    let's go back to Defense West Virginia 3605 at the bottom of

8    Page 2, last sentence, or second to last sentence.

9         It says, "Appropriate pain management is the treating

10   physician's responsibility.  As such, the board will

11   consider the inappropriate treatment of pain to be a

12   departure from standards of practice and will investigate

13   such allegations, recognizing that some types of pain cannot

14   be completely relieved, and taking into account whether the

15   treatment is appropriate for the diagnosis."

16        What's the import of the Federation of State Medical

17   Boards proposing that the medical standard will involve the

18   board considering inappropriate treatment of pain to be a

19   departure from standards of practice and will investigate?

20   **A.**   So what the Federation of State Medical Boards is

21   telling doctors there is that if you do not adequately treat

22   patients' pain, you will have failed to meet the standards

23   of care, or standard of practice care they use.

24        And, again, where medical boards are the bodies that

25   grant you your license and can take your license away, a

1    recommendation of that sort from the Federation of State

2    Medical Boards has a significant influence on doctors.

3    **Q.**   Next sentence repeats or says something similar.

4         Can you cull that out, the next sentence on Page 3?

5         "The board recognizes that controlled substances,

6    including opioid analgesics, may be essential in the

7    treatment of acute pain due to trauma or surgery and chronic

8    pain, whether due to cancer or non-cancer origins."

9         Is that a similar statement about the role of

10   prescription opioids that we saw in the earlier document?

11   **A.**   Yes, it's very similar.  And, again, it specifically

12   calls out chronic non-cancer origin in addition to acute

13   pain and cancer pain.

14   **Q.**   Okay.  Let's go to the next document on our timeline.

15   I want to just illustrate whether this tracked through into

16   West Virginia standards with a document in evidence.

17             MR. SCHMIDT:  May I approach, Your Honor?

18             THE COURT:  Yes.  I don't think you moved 3065

19   into evidence.  Do you want to do that?

20             MR. SCHMIDT:  Yes, I would for the limited purpose

21   of notice, Your Honor.

22             THE COURT:  All right.  Is there any objection?

23             MR. ACKERMAN:  Not for the limited purpose.

24             THE COURT:  All right.  It's admitted for the

25   limited purpose.

```
 1              MR. SCHMIDT:  Thank you, Your Honor.

 2      BY MR. SCHMIDT:

 3      Q.   So if we put MC-WV-1218 up on the screen, do you

 4      see that this is a West Virginia Board of Medicine

 5      quarterly newsletter from January, 2005?

 6      A.   I do.

 7      Q.   And just two quick points on this.

 8           If we can scroll down, please, to the first paragraph.

 9           Remember in that earlier document there was a reference

10      to the inappropriate treatment of pain?

11      A.   I do.

12      Q.   Do you see that defined here in this last sentence for

13      the purposes of this policy, the inappropriate treatment of

14      pain includes non-treatment, under-treatment,

15      over-treatment, and the continued use of ineffective

16      treatments?

17      A.   I, I see that.

18      Q.   And then I just want to look down at the bottom of this

19      page.  Do you remember me reading you that language from the

20      FSMB document about the board will consider the

21      inappropriate treatment of pain to be a departure from

22      standards?

23      A.   I do.

24      Q.   Do you see that same language here adopted by the State

25      of West Virginia, "The board will consider the inappropriate
```

124

1   treatment of pain to be a departure from standards of

2   practice and will investigate such allegations."

3       Is that guided by the Federation of State Medical

4   Boards?

5   **A.**   That would be my understanding because it's verbatim

6   from what we saw in the FSMB.

7   **Q.**   And if we go to the next page, please, do you see a

8   similar statement from the West Virginia Board of Medicine

9   right at the top recognizing that opioids may be essential

10  in the treatment of acute pain due to trauma or surgery and

11  chronic pain whether due to cancer or non-cancer?

12  **A.**   I see that.

13  **Q.**   And let's, let's put that up on the board if we could.

14      The Court has heard evidence about a book by a Dr.

15  Fishman and I'm not going to -- it's in evidence.  The Court

16  has a copy.  I'm not going to spend a lot of time on it.  It

17  was actually mailed to every doctor in West Virginia called

18  "Responsible Opioid Prescribing."  Are you familiar with

19  that Dr. Fishman book?

20  **A.**   Yes, I'm familiar with the book.

21  **Q.**   And if we -- let's put up on the screen MC-WV-2111 and

22  go to Page 15 of the document.

23      I want to just highlight some language the Court has

24  seen.

25      "Patients should not be denied opioid medications

```
 1   except in light of clear evidence that such medications are

 2   harmful to the patient."

 3        Do you see that?

 4   A.   I do.

 5             MR. SCHMIDT:  Mr. Reynolds, can you put that up on

 6   our board?

 7   BY MR. SCHMIDT:

 8   Q.   We're now to 2008 and the corresponding

 9   transmission of this to all doctors in West Virginia.

10             MR. SCHMIDT:  And if we go back to the book itself

11   and cull out that first bullet that was on Page 15.  Then

12   can you also cull out the third bullet.  Is it possible to

13   get both of them together?

14   BY MR. SCHMIDT:

15   Q.   I read you the first one.  The third one says,

16   "Physicians have a responsibility to minimize the

17   potential for the abuse and diversion of controlled

18   substances."

19        Do you see that?

20   A.   I do.

21   Q.   Do you understand this book that was sent to every West

22   Virginia doctor to be in line with standard of care at this

23   time in terms of when opioids should be prescribed and

24   having a responsibility to minimize the potential for abuse

25   and diversion?
```

1   **A.**   Yes.  I think it was a clear message that on the one

2   hand doctors should appropriately use opioids to treat

3   patients' pain, but that also doctors have a responsibility

4   to think beyond just the patient in front of them to think

5   about the potential for abuse and diversion of those

6   medications.

7   **Q.**   Okay.  How do you mesh those two statements?

8   **A.**   I mesh those two in terms of the same sort of balancing

9   that I think is characteristic in many areas of the practice

10  of medicine, and certainly in this area of prescribing

11  opioid medications that you're talking about, you're talking

12  about significant potential benefits, but you're also

13  talking about significant potential risks, and that the

14  doctor is -- as part of his or her job is supposed to think

15  through those, that risk benefit and weigh it as

16  appropriately as he or she can with the information

17  available to them.

18  **Q.**   Two more documents on this timeline if I could.

19          MR. SCHMIDT:  May I approach, Your Honor?

20          THE COURT:  Yes.

21  BY MR. SCHMIDT:

22  **Q.**   And I'll try to do these as quickly as possible.

23      The first document is Defense West Virginia 1944 which

24  is not in evidence.  The second document is Defense West

25  Virginia 1935 which is in evidence.

1          My question to you is simply if you -- Defense West

2     Virginia 1944 is dated --

3               MR. ACKERMAN:  Your Honor, --

4               MR. SCHMIDT:  -- 2005.

5               MR. ACKERMAN:  We have an objection to the use of

6     Defense West Virginia 1944 because the document did not

7     appear on the expert's materials considered list.

8               MR. SCHMIDT:  It does not.  That is correct.  It's

9     substantively identical in terms of what I'm asking him

10    about to the later version of the document that does.

11              MR. ACKERMAN:  Your Honor, I think we went through

12    this with some of our experts that materials that weren't in

13    the report you're not allowed to ask about.

14              THE COURT:  Well, I'll sustain the objection.  You

15    can use it as a basis to ask him a question if you want to,

16    Mr. Schmidt.

17    BY MR. SCHMIDT:

18    **Q.**   Okay.  Let's start with Defense West Virginia 1935,

19    Page 2.  Do you recognize this is from September 9th,

20    2013, from the State of West Virginia policy on the use

21    of opioid analgesics?

22    **A.**   I do.

23    **Q.**   If you look a little further up, do you see that in

24    this one they're actually clear that they took it from these

25    Federation of State Medical Board documents we've been

1    talking about?

2    **A.**    I see that.

3    **Q.**    And in the interest of time, I will go to the third

4    page of this document.  And do you see in the third

5    paragraph, the first sentence references again the statement

6    about opioid analgesics are useful and can be essential in

7    the various range of pain treatments that we've talked

8    about, acute pain, chronic pain, whether due to cancer or

9    non-cancer causes?

10   **A.**    I see that.

11   **Q.**    And if we go to the two paragraphs down, patients

12   (verbatim) should not fear disciplinary action from the

13   board for ordering, prescribing, dispensing or administering

14   controlled substances, including opioid analgesics, for a

15   legitimate medical purpose in the course of professional

16   practice when current best clinical practices are met.

17        Do you see that?

18   **A.**    I do.

19   **Q.**    And then if we look at the next sentence, they define

20   when use of opioids is for a legitimate medical purpose.

21   And they say if it's based on sound clinical judgment and

22   current best clinical practices, is appropriately documented

23   and is of demonstrable benefit to the patient.  Do you see

24   that?

25   **A.**    I do.

1    Q.    What's the import of a State Board of Medicine telling

2    doctors in that state, statements like this about

3    appropriate use of, of prescription opioids?

4    A.    The importance of it is that the State Medical Board is

5    giving physicians here a fairly clear message that they

6    would not be -- they shouldn't fear disciplinary action by

7    the board as long as they practice meeting the standards of

8    appropriate care.  And, so, that they shouldn't let that

9    fear of potential discipline stop them from using opioid

10   pain medications in an appropriate fashion.

11   Q.    Do you see similar statements -- let's go to the board.

12   Let's put up the two documents we just used, Defense West

13   Virginia 1944 from 2010 and Defense West Virginia 1935 from

14   2013 on the board.  Do you see similar statements in between

15   2005 and 2013?

16   A.    I did.

17   Q.    Okay.

18         MR. SCHMIDT:  Your Honor, may I pass up a copy of

19   this for demonstrative purposes?  Plaintiffs' counsel

20   already has it.

21         THE COURT:  Yes.

22         MR. ACKERMAN:  Of what?

23         MR. SCHMIDT:  Of the completed time line.

24         MR. ACKERMAN:  Oh, okay.

25         MR. SCHMIDT:  Thank you.

```
 1    Q.   Good afternoon, Dr. Gilligan.  I'll pick up where

 2    we left off.  We walked through --

 3              MR. SCHMIDT:  And, and could we just put up the

 4    timeline just to orient us very quickly, McKesson

 5    Demonstrative 11, if that's possible?

 6    BY MR. SCHMIDT:

 7    Q.   So we walked through these various statements from

 8    the national groups, West Virginia Board of Medicine,

 9    took us up until 2013 with the West Virginia Board of

10    Medicine, repeated a statement about prescription

11    opioids being essential in certain instances in the

12    treatment of acute pain and certain types of chronic

13    pain.

14         Since that time, has the standard of care for

15    prescription opioids continued to evolve?

16    A.   Yes, it has.

17    Q.   And, and how has that impacted prescribing rates in the

18    time period since we were walking through?

19    A.   So in the time period since what we walked through, it

20    has gotten more conservative.

21    Q.   Uh-huh.

22    A.   And accompanying that, prescribing rates have gone

23    down.

24    Q.   From your perspective, has that been driven by the

25    medical profession?
```

139

**A.**   Yes.

**Q.**   And if you could characterize the state of prescribing today, how would you characterize that in terms of prescription opioids?

**A.**   So it's significantly more conservative than the mind-set in many of the years, or in the years shown there, certainly many of the years shown there, with more awareness of the potential ill effects, adverse effects from medications, risks of the medications for patients, a greater weighting on that, and also with more skepticism about the benefits.

Again, you know, some patients do well, but a rise in awareness that many patients won't benefit from them so, therefore, a shifting of the risk benefit.

**Q.**   Okay.  Mindful of what you just said, are prescription opioids still prescribed today for acute pain, just more narrower perhaps?

**A.**   Yes, they are.

**Q.**   Are they still prescribed for cancer pain?

**A.**   Yes, they are.

**Q.**   And, again, mindful of what you told us about the science on non-cancer chronic pain and what you said just now, are they still prescribed in certain instances for non-cancer chronic pain?

**A.**   Yes.

1    **Q.**   I'd like to show you a document on some of these points

2    we've been talking about just now in terms of current

3    standards.

4              MR. SCHMIDT:  May I approach, Your Honor?

5              THE COURT:  Yes, you may.

6    BY MR. SCHMIDT:

7    **Q.**   And just to orient us as to what we're looking at,

8    this is Defense West Virginia 2527.  If we look at the

9    top of the document, we see the AMA logo, the date

10   June 16th, 2020.  And it looks like it's written to the

11   Chief Medical Officer of the U.S. Centers for Disease

12   Control and Prevention.  Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   Are you familiar with this letter from the AMA?

15   **A.**   Yes, I am.

16             MR. SCHMIDT:  Your Honor, we move this into

17   evidence for the limited purpose of notice.

18             THE COURT:  Any objection?

19             MR. FARRELL:  Yes, Your Honor.  I'm not quite sure

20   how an expert witness is able to lay the foundation for a

21   document written by somebody else and sent to a third party

22   about a subject matter that he was not involved in with the

23   drafting or writing of this letter.  Sure, he can testify to

24   it all he wants, but this isn't a vehicle to be entering

25   into the record.

```
 1              THE COURT:  Can you lay a little better
 2    foundation, Mr. Schmidt?
 3              MR. SCHMIDT:  Yeah, yeah, I'll do my best.
 4    BY MR. SCHMIDT:
 5    Q.    First of all, do you understand this to be a
 6    private letter that we somehow obtained or a public
 7    letter?
 8    A.    I understand it to be a public letter.
 9    Q.    Do you understand this document to be publicly
10    available to members of the medical profession?
11    A.    Yes, I do.
12    Q.    And in terms of -- if we look at the first sentence of
13    this document, it says it's on behalf of the American
14    Medical Association and our physicians and medical student
15    members.  Do you see that?
16    A.    I do.
17    Q.    When the AMA is writing on behalf of themselves and
18    their physician medical student members, who is that?
19    A.    Well, the AMA, as we discussed, is the biggest
20    association of doctors in the U.S.
21    Q.    And after they say that they're writing on behalf of
22    themselves and the physicians and medical student members,
23    they say the AMA appreciates the opportunity to --
24              MR. FARRELL:  Objection, Your Honor.  I didn't
25    make my first objection just to provide the opportunity to
```

```
 1    read it into the record.
 2              MR. SCHMIDT:  I'm trying to lay the foundation as
 3    to what the document is and why --
 4              THE COURT:  I'm satisfied with the foundation he's
 5    laid so far.
 6         Mr. Ackerman.
 7              MR. ACKERMAN:  Yeah.  I am curious as to Mr. -- or
 8    counsel offered the document for purposes of notice.  My
 9    question is notice of what to whom?
10              MR. SCHMIDT:  Notice of the consensus in the
11    medical profession to doctors who are being spoken for on --
12    in this letter and to the healthcare system.
13              THE COURT:  I'm going to admit it for the limited
14    purpose.  We need to get through Dr. Gilligan here.
15              MR. SCHMIDT:  Okay.
16              THE COURT:  Go ahead, Mr. Schmidt.
17              MR. SCHMIDT:  Thank you, Your Honor.
18    BY MR. SCHMIDT:
19    Q.   I'll jump past -- well, actually, just to finish
20    this sentence, do you see that there's reference --
21    they're saying they appreciate the opportunity to review
22    and comment on the Centers for Disease Control and
23    Prevention guidelines for prescribing opioids for
24    chronic pain originally published in 2016.
25    A.   I see that.
```

1    **Q.**   Do you remember this morning you and I touched on those

2    CDC guidelines?

3    **A.**   Yes, I do.

4    **Q.**   Could you just remind us of the effect of those CDC

5    guidelines?

6    **A.**   So the CDC guidelines laid out numerous steps

7    recommending essentially that doctors should be more

8    conservative, more cautious in their prescribing of chronic

9    opioid therapy for non-cancer pain.

10   **Q.**   Okay.  Go to Page 3 of the document, please, down at

11   the bottom.  Do you see there's reference to AMA Task

12   Forces?

13   **A.**   Yes, I do.

14   **Q.**   "The Task Forces further affirm that some patients with

15   acute or chronic pain can benefit from taking prescription

16   opioid analgesics at doses that may be greater than

17   guidelines or thresholds put forward by federal agencies."

18   And then it lists other bodies.  Do you see that?

19   **A.**   I do.

20        MR. FARRELL:  Objection, Your Honor.  Again, this

21   is a letter by a third party written to another third party

22   that's being read into the record by a fourth party.  If Dr.

23   Gilligan wants to testify what he believes to be the

24   standard of care, we have no objection.  He's well

25   qualified.  But neither Deborah Dowell nor James Madara have

```
 1    been called into this courtroom.
 2              THE COURT:  Mr. Ackerman.
 3              MR. ACKERMAN:  Yeah.  I would add that I don't
 4    think reading this, this sentence is consistent with
 5    admitting the document for a limited purpose.  If it's a
 6    limited purpose of notice, that's fine, but --
 7              THE COURT:  Well, I'll sustain the objection.  But
 8    you can ask him the questions without reference to the
 9    document, Mr. Schmidt.
10    BY MR. SCHMIDT:
11    Q.  Do you, do you --
12              MR. SCHMIDT:  Where I was going, Your Honor --
13              THE COURT:  If I understand it.
14              MR. SCHMIDT:  Yeah.  What I was going to ask him
15    was does he understand this to be the standard of care.
16    BY MR. SCHMIDT:
17    Q.  So do you understand the standard of care in the
18    medical profession to reflect that patients with acute
19    or chronic pain, some patients can benefit from taking
20    prescription opioids at doses that may still be greater
21    than guidelines or thresholds set by the Federal
22    Government or other agencies?
23    A.  Yes, I do understand that to be the consensus within
24    the standard of care.
25    Q.  And last question about this document.  If we go to the
```

```
 1    first page, in the last paragraph on the first page there's
 2    language about the nation no longer having a prescription
 3    opioid-driven epidemic.  What we're now facing is a
 4    different --
 5                MR. ACKERMAN:  Objection.
 6                THE COURT:  You're doing the same thing that I
 7    sustained the objection to.
 8    BY MR. SCHMIDT:
 9    Q.   Do you have an understanding, sir, as to whether --
10                MR. ACKERMAN:  I'd ask that the portion that we
11    just objected to be taken off the screen.
12                MR. SCHMIDT:  It's off the screen.
13    BY MR. SCHMIDT:
14    Q.   Do you have an understanding as to whether the
15    nature of, of drug abuse involving opioid products has
16    shifted from prescription drugs to illegal heroin and
17    fentanyl over the past decade?
18    A.   Yes, I do.
19    Q.   And what, what is that understanding?
20    A.   That it has shifted in that way, that it has shifted
21    from abuse and misuse of prescription opioids to abuse and
22    misuse of heroin and fentanyl and fentanyl analogues that
23    are illicit fentanyl, not, not pharmaceutical fentanyl.
24    Q.   Just a few questions to round out our, our time
25    together.
```

1          As a prescribing physician covering the time period

2    we've been talking about, including the increase in

3    prescriptions and then the decrease in prescriptions, do you

4    have an opinion as a prescribing physician as to which

5    healthcare decision-makers in the healthcare process drove

6    those changes in prescribing in both directions?

7    **A.**    Yes, I do.

8    **Q.**    What is that?

9    **A.**    Physicians and other prescribing clinicians.

10   **Q.**    And from your experience, when we were at the peak or

11   moving up to the peak or coming back down, do you have an

12   understanding as to whether that prescribing was driven by

13   good faith medical decisions?

14   **A.**    Yes.  I think the great majority of the

15   over-prescribing was well-intentioned.  The majority of

16   opioid prescribing during much of that period, or perhaps

17   all of that period was by primary care physicians.

18         And, so, I think there was a great majority of cases of

19   well-intentioned clinicians trying to follow what they

20   understood, or in some cases what they had been told, was

21   the right way to treat patients.

22   **Q.**    Do you have a view as to whether distributors drove

23   prescribing decisions by doctors in terms of their

24   understanding of risks and benefits?

25   **A.**    I do.

```
1    Q.   What's that opinion?
2    A.   I don't think distributors had an influence on doctors'
3    prescribing decisions.
4    Q.   As someone who's had occasion to prescribe medication
5    and prescription opioids throughout your career, have you
6    ever done so based on interactions with a pharmaceutical
7    distributor?
8    A.   No, I have not.
9    Q.   In your experience, do distributors -- your experience
10   in the real world dealing with other doctors, do
11   distributors play a role that's meaningful in determining
12   how many prescriptions for opioids or any other product get
13   written in a given point in time?
14   A.   No, they do not.
15   Q.   That's all I have, Dr. Gilligan.  Thank you.
16            THE COURT:  All right.  You may cross-examine.
17                        CROSS EXAMINATION
18   BY MR. FARRELL:
19   Q.   Good afternoon.  I introduced myself earlier.  I'm
20   Paul Farrell on behalf of the County Commission and City
21   of Huntington plaintiffs in this case.
22       I want to take this opportunity to use your expertise
23   to maybe crystalize or clarify some of the concepts that
24   we've talked about over the past several weeks.
25       We've inartfully used a phrase of a gateway effect.  Is
```