**Designation Run Report**

# Prevoznik 05060915

_____

**Prevoznik, Thomas 04-17-2019**
**Prevoznik, Thomas 04-18-2019**
**Prevoznik, Thomas 05-17-2019**

_____

**Defendants' Counter Designations  01:19:52**

_____

**Total Time  01:19:52**



| | V1-Prevoznik 05060915 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| 56:8 - 56:24 | **Prevoznik, Thomas 04-17-2019 (00:01:00)** | V1.1 |

56:8   Q. To your understanding, what
56:9 are the uses of the ARCOS data?
56:10   A. Well, it was originally for
56:11 UN reporting, so it was -- it's used for
56:12 UN reporting.  It's used for quotas.
56:13 It's used to show trends.  It's used in
56:14 our investigations, you know,
56:15 administrative, civil, criminal.  It
56:16 supports investigations.  We share it
56:17 with other federal agencies or state
56:18 agency, law enforcement, regulatory
56:19 agencies as well that are all, you know,
56:20 working to combat the diversion of
56:21 controlled substances.  So it's working
56:22 with them in corroboration on
56:23 investigations.  So it's used in various
56:24 means.

| 75:7 - 75:13 | **Prevoznik, Thomas 04-17-2019 (00:00:18)** | V1.2 |

75:7   Q. With respect to the
75:8 distributor initiative, is it fair to say
75:9 the early years of the distributor
75:10 initiative, the individuals that attended
75:11 the distributor meetings were Kyle Wright
75:12 and Michael Mapes?
75:13   A. Yes.

| 75:17 - 76:8 | **Prevoznik, Thomas 04-17-2019 (00:00:48)** | V1.3 |

75:17   Q. And then in -- who were the
75:18 individuals from the DEA that were
75:19 primarily attending the distributor
75:20 briefings in the '08, '09, and '10 time
75:21 period?
75:22   A. It would still be Kyle, Kyle
75:23 Wright.  Lisa Sullivan.  Dave White.  And
75:24 then Lenny Levin.  Lenny Levin.
76:1   Q. In that time period, you
76:2 were still in the field offices or
76:3 training, so you would not have attended
76:4 any of the distributor briefings
76:5 personally --

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

76:6  A. Correct.

76:7  Q. -- Mr. Prevoznik?

76:8  A. Correct.

82:1 - 83:20   **Prevoznik, Thomas 04-17-2019 (00:01:45)**   **V1.4**

82:1  Q. You were a -- you were also

82:2 a diversion investigator from

82:3 February '91 to September of 2001,

82:4 correct?

82:5  A. Correct.

82:6  Q. And was your role from

82:7 February '91 to September 2001 the same

82:8 as you have generally described it from

82:9 when you were a diversion investigator in

82:10 2006 to 2008?

82:11  A. Correct.

82:12  Q. Now, for part of that time

82:13 period, as a diversion investigator, did

82:14 you receive and review excessive purchase

82:15 reports?

82:16  A. Excessive purchase reports?

82:17  Q. Yes.

82:18  A. Yes.

82:19  Q. And describe for me what an

82:20 excessive purchase report is.

82:21  A. An excessive purchase

82:22 report, it's an after -- it's a

82:23 transaction that has already occurred.

82:24 So it's sales data that it -- that was

83:1 provided by the registrants.  So we would

83:2 review it when it came in.

83:3 Again, we would separate it

83:4 by AORs.  If -- you know, if I'm in

83:5 Philadelphia, and I had stuff in New

83:6 Jersey, I would separate and send New

83:7 Jersey theirs.  And if we had Pittsburgh

83:8 stuff we would send Pittsburgh their

83:9 stuff.  Maryland got their stuff.  So we

83:10 would review that.

83:11  Q. And the excessive purchase

83:12 reports were coming in primarily from

| Page/Line | Source | ID |
|---|---|---|

**V1-Prevoznik 05060915**

83:13 distributors?
83:14  A. Yeah, primarily.
83:15  Q. And did you -- and so you
83:16 investigated excessive purchase reports
83:17 when they came in?
83:18  A. Yeah, we would review them.
83:19 And then we would take action if we
83:20 deemed it necessary.

**85:9 - 85:14    Prevoznik, Thomas 04-17-2019 (00:00:15)    V1.5**

85:9 Is it fair to say that the
85:10 excessive purchase reports continued to
85:11 be received by field offices till
85:12 sometime in the 2008 time period?
85:13  A. Yeah.  We would still get
85:14 them.

**94:2 - 94:7    Prevoznik, Thomas 04-17-2019 (00:00:12)    V1.6**

94:2  Q. So -- well, let me -- let me
94:3 ask it this -- when do you recall the DEA
94:4 first began receiving excessive purchase
94:5 reports?
94:6  A. I remember them when I first
94:7 got into Philadelphia in 1991.

**117:7 - 117:11    Prevoznik, Thomas 04-17-2019 (00:00:14)    V1.7**

117:7  Q. The DEA today does not
117:8 necessarily endorse or bless a particular
117:9 system for suspicious order reporting,
117:10 correct?
117:11  A. Correct.

**121:15 - 121:19    Prevoznik, Thomas 04-17-2019 (00:00:14)    V1.8**

121:15  Q. Now, as you've described,
121:16 did the -- the DEA understood that the
121:17 excessive purchase reports listed orders
121:18 that had already been shipped, correct?
121:19  A. Correct.

**122:1 - 122:12    Prevoznik, Thomas 04-17-2019 (00:00:39)    V1.9**

122:1  Q. Okay.  And are you familiar
122:2 with the fact that the December 2007
122:3 Rannazzisi letter advised the industry
122:4 that they should no longer submit
122:5 excessive order reports?

| Page/Line | Source | ID |
|---|---|---|

**V1-Prevoznik 05060915**

122:6   A. Yes.
122:7   Q. Prior to 2007, did the
122:8 administration, the DEA administration,
122:9 issue any guidance to the industry
122:10 stating that excessive order reports
122:11 should not be submitted?
122:12   A. I am not aware of any.

**126:18 - 126:22**   **Prevoznik, Thomas 04-17-2019 (00:00:08)**   **V1.10**

126:18   Q. We've already established
126:19 that prior to 2007 you're not aware of
126:20 the DEA saying, no more excessive
126:21 purchase reports, right?
126:22   A. Right.  Correct.

**127:7 - 127:12**   **Prevoznik, Thomas 04-17-2019 (00:00:14)**   **V1.11**

127:7   Q. And the DEA was aware that
127:8 there were, in fact, being routinely
127:9 submitted by distributors excessive
127:10 purchase reports on a regular basis,
127:11 right?
127:12   A. We were aware.

**130:13 - 131:23**   **Prevoznik, Thomas 04-17-2019 (00:01:30)**   **V1.12**

130:13   Q. So as part of the audit
130:14 process, operating systems that are
130:15 designed to review suspicious orders are
130:16 reviewed by the DEA?
130:17   A. Well, it's not just the
130:18 schedule.  I mean it could be a
130:19 pre-registration, somebody is coming on
130:20 and they have -- we have to go through
130:21 the whole public interest of, you know,
130:22 what do you have in place to operate and
130:23 detect a system.  So it's not just a
130:24 schedule investigation.  There are
131:1 schedule investigations that we follow
131:2 up, and we do that as well.  So it comes
131:3 in -- it comes in various times that
131:4 we're going to review somebody's
131:5 operating system, whether we're on
131:6 schedule investigation, or whether we're
131:7 doing an investigation on a pharmacy or

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |

131:8 something like that, where we're going to
131:9 look at how many SORs were submitted or
131:10 not submitted, or we're going to look at
131:11 the ARCOS data, how much did they buy.
131:12 We're going to look at
131:13 various things to make the determination
131:14 on what is going on.
131:15   Q. And if either in the
131:16 pre-registration process or in the audit
131:17 process the DEA determines that a
131:18 registrant's system is not adequately
131:19 detecting suspicious orders, is that
131:20 something that is conveyed to the
131:21 registrant?
131:22   A. Yeah, we -- we would tell
131:23 them, you need to add something.

**134:2 - 134:9**    **Prevoznik, Thomas 04-17-2019 (00:00:17)**                   **V1.13**

134:2   Q. Exhibit 5 is a December 27,                              D106.1.2
134:3 2007, letter written by Joseph Rannazzisi                     D106.2.1
134:4 on behalf of the DEA to registrants,
134:5 correct?
134:6   A. Correct.
134:7   Q. And this letter was sent
134:8 industrywide; is that right?
134:9   A. Correct.

**136:17 - 137:2**    **Prevoznik, Thomas 04-17-2019 (00:00:36)**                  **V1.14**

136:17   Q. Prior to December 27th,                                 D106.1.2
136:18 2007, the date of this Rannazzisi letter,
136:19 had the agency issued any written
136:20 guidance to the industry stating that
136:21 excessive purchase reports did not comply
136:22 with the requirements the industry had
136:23 under 21 C.F.R. Section 1301.74?
136:24   A. I'm not aware.
137:1   Q. Now, the DEA also says in                                D106.1.1
137:2 the last sentence of the second

**137:3 - 137:10**    **Prevoznik, Thomas 04-17-2019 (00:00:20)**                  **V1.15**

137:3 paragraph, "Past communications with DEA,
137:4 whether implicit or explicit, that could
137:5 be construed as approval of a particular

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

137:6 system for reporting suspicious orders,
137:7 should no longer be taken to mean that
137:8 DEA approves a specific system."
137:9 Do you see that?
137:10  A. Yes.

clear

| 143:1 - 143:7 | **Prevoznik, Thomas 04-17-2019 (00:00:16)** | **V1.16** |

143:1  Q. Is it fair to say that in
143:2 time periods prior to 2008, there were
143:3 communications that the DEA had with
143:4 certain registrants, whether implicit or
143:5 explicit, that could be construed as
143:6 approval of a particular system for
143:7 reporting suspicious orders?

| 143:12 - 143:12 | **Prevoznik, Thomas 04-17-2019 (00:00:01)** | **V1.17** |

143:12 THE WITNESS:  Yes.

| 157:18 - 157:20 | **Prevoznik, Thomas 04-17-2019 (00:00:08)** | **V1.18** |

157:18  Q. Now, you referenced internet
157:19 pharmacies becoming a big problem at some
157:20 point in time, correct?

| 157:23 - 158:3 | **Prevoznik, Thomas 04-17-2019 (00:00:19)** | **V1.19** |

157:23 THE WITNESS:  Correct.
157:24 BY MS. MAINIGI:
158:1  Q. And did the advent of
158:2 internet pharmacies bring about a greater
158:3 problem with controlled substances?

| 158:6 - 158:9 | **Prevoznik, Thomas 04-17-2019 (00:00:06)** | **V1.20** |

158:6 THE WITNESS:  I believe what
158:7 I said, it went from a
158:8 local/regional issue to a national
158:9 issue.

| 158:10 - 158:21 | **Prevoznik, Thomas 04-17-2019 (00:00:30)** | **V1.21** |

158:10 BY MS. MAINIGI:
158:11  Q. The internet pharmacy
158:12 problem caused the DEA, or prompted the
158:13 DEA to launch the internet distributor
158:14 initiative in late 2005, correct?
158:15  A. Yes.
158:16  Q. And the purpose of the
158:17 initiative was to educate DEA registrants
158:18 regarding their obligations and possible

| V1-Prevoznik 05060915 | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

158:19 role in supplying internet pharmacies; is
158:20 that right?
158:21  A. Yes.

162:23 - 164:14   **Prevoznik, Thomas 04-17-2019 (00:01:37)**                    **V1.22**

162:23  Q. In terms of the trends and
162:24 the emphasis, you said you're still doing
163:1 distributor initiative meetings through
163:2 today, right?
163:3  A. I don't know if we have any
163:4 today.  But we've done some recently,
163:5 yes.
163:6  Q. Okay.  The more recent ones,
163:7 where is the focus and where is the
163:8 trends?
163:9  A. Well, I think what we've
163:10 been showing, and as it's been reported,
163:11 we're seeing a decline in the number of
163:12 opioid prescriptions.  We've seen
163:13 increase in amphetamines and
163:14 methylplenidate.  We're seeing -- the one
163:15 opioid we still see an increase in is
163:16 Suboxone, buprenorphine, for drug
163:17 treatment.  We're seeing a little bit of
163:18 shift of the drugs.
163:19  Q. So the trends and the
163:20 problem areas are unfortunately always
163:21 changing and shifting.  Is that fair?
163:22  A. Well, there tends to be a
163:23 shift, yeah.
163:24  Q. And the DEA does its best to
164:1 try to identify the changes and the
164:2 shifts in the trends, correct?
164:3  A. Well, I mean, the data --
164:4 the data shows that, so it's not DEA
164:5 doing it.  You know, there's been a lot
164:6 of hard work by a lot -- a lot of
164:7 different people, including the industry.
164:8 So...
164:9  Q. The data from the industry
164:10 helps everyone identify the shifts in the

| Page/Line | Source | ID |
|---|---|---|
| | V1-Prevoznik 05060915 | |

164:11 trends, correct?

164:12   A. Yeah.

164:13   Q. Including the DEA?

164:14   A. Yeah.  Yes.

**167:5 - 167:12**   **Prevoznik, Thomas 04-17-2019 (00:00:18)**   **V1.23**

167:5   Q. Did the Controlled

167:6 Substances Act contain any language that

167:7 states whether or not a distributor could

167:8 ship a suspicious order?

167:9   A. It doesn't say specifically

167:10 that.  It does say that it needs to be --

167:11 it has to maintain -- maintain effective

167:12 control against diversion.

**170:19 - 170:24**   **Prevoznik, Thomas 04-17-2019 (00:00:18)**   **V1.24**

170:19   Q. Are you generally aware from

170:20 all the people that you talked to at the

170:21 DEA, are you generally aware as the DEA,

170:22 that in the '07-'08 time period, there

170:23 was confusion in the industry as to the

170:24 meaning of the do-not-ship policy?

**171:3 - 172:5**   **Prevoznik, Thomas 04-17-2019 (00:01:05)**   **V1.25**

171:3 THE WITNESS:  For the people

171:4 I talked to?  I'm just trying to

171:5 remember what we -- what we talked

171:6 about.

171:7 It was -- from my

171:8 recollection of talking to the

171:9 folks was that again it was a

171:10 business decision on whether to

171:11 ship or not ship.  That we, DEA

171:12 were not going to direct a

171:13 registrant don't ship or not ship

171:14 at that time.

171:15 BY MS. MAINIGI:

171:16   Q. In 2008?

171:17   A. So -- I'm sorry, 2 -- no,

171:18 that was prior to that.  Because in -- in

171:19 '7 that's when it came out that --

171:20   Q. So in '7 it was clear that

171:21 you were now directing registrants do not

| Page/Line | Source | ID |
|---|---|---|

**V1-Prevoznik 05060915**

171:22 ship?
171:23   A. Right.  Because of --
171:24 because of the internet.
172:1   Q. And prior to 2 --
172:2 December 2007 it was a business decision
172:3 by each registrant recognizing what their
172:4 own obligations were?
172:5   A. Correct.

| 175:7 - 175:20 | **Prevoznik, Thomas 04-17-2019 (00:00:36)** | **V1.26** |

175:7   Q. Okay.  So in '05, '06 and
175:8 '07, as I understand it from Mr. Wright's
175:9 testimony, he and Mr. Mapes primarily
175:10 handled the distributor initiative
175:11 briefings, correct?
175:12   A. Correct.
175:13   Q. And you have talked to
175:14 neither Mr. Wright nor Mr. Mapes,
175:15 correct?
175:16   A. Correct.
175:17   Q. So you don't know sitting
175:18 here today what Mr. Mapes or Mr. Wright
175:19 said or heard in those distributor
175:20 initiative briefings, correct?

| 175:23 - 175:23 | **Prevoznik, Thomas 04-17-2019 (00:00:01)** | **V1.27** |

175:23 THE WITNESS:  No.

| 177:15 - 178:5 | **Prevoznik, Thomas 04-17-2019 (00:00:48)** | **V1.28** |

177:15   Q. After this Rannazzisi
177:16 letter, the December 2007 Rannazzisi
177:17 letter, did DEA provide any guidance to
177:18 registrants as to how to design or
177:19 implement their suspicious order
177:20 monitoring systems?
177:21   A. Well, yeah, with the MOAs
177:22 that we -- and settlements that we got
177:23 with them.
177:24   Q. And in the MOA meetings, you
178:1 provided guidance as to what your
178:2 expectations were as to the suspicious
178:3 order monitoring systems going forward,
178:4 correct?

| V1-Prevoznik 05060915 | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | 178:5  A. That's where we -- yes. | |
| 178:19 - 178:23 | **Prevoznik, Thomas 04-17-2019 (00:00:19)** | **V1.29** |
| | 178:19   Q. So essentially there was no | |
| | 178:20 industrywide guidance that was provided | |
| | 178:21 in 2008 or forward as to how to design or | |
| | 178:22 implement suspicious order monitoring | |
| | 178:23 systems, true? | |
| 179:2 - 179:3 | **Prevoznik, Thomas 04-17-2019 (00:00:03)** | **V1.30** |
| | 179:2 THE WITNESS:  Nationwide, | |
| | 179:3 correct. | |
| 179:22 - 180:11 | **Prevoznik, Thomas 04-17-2019 (00:00:30)** | **V1.31** |
| | 179:22   Q. Now, does the DEA agree that | |
| | 179:23 there's more than one way to design and | |
| | 179:24 operate a system that can identify and | |
| | 180:1 report suspicious orders? | |
| | 180:2   A. Yes. | |
| | 180:3   Q. And there's no single | |
| | 180:4 feature that makes a suspicious order | |
| | 180:5 monitoring system compliant, correct? | |
| | 180:6   A. Correct. | |
| | 180:7   Q. And the DEA leaves it up to | |
| | 180:8 the registrant to design a system that | |
| | 180:9 works with its own business model and | |
| | 180:10 customer base, correct? | |
| | 180:11   A. Correct. | |
| 182:12 - 182:15 | **Prevoznik, Thomas 04-17-2019 (00:00:13)** | **V1.32** |
| | 182:12   Q. Is the review -- is it fair | |
| | 182:13 to say then that the identification of | |
| | 182:14 suspicious orders can be a subjective | |
| | 182:15 process? | |
| 182:18 - 183:5 | **Prevoznik, Thomas 04-17-2019 (00:00:22)** | **V1.33** |
| | 182:18 THE WITNESS:  What do you | |
| | 182:19 mean by "subjective"? | |
| | 182:20 BY MS. MAINIGI: | |
| | 182:21   Q. Well, do you understand the | |
| | 182:22 meaning of the word "subjective"? | |
| | 182:23   A. I'm asking you in terms of | |
| | 182:24 this, what do you mean by subjective? | |
| | 183:1   Q. Well, what I mean is that | |
| | 183:2 you and I looking at the same data, | |

| V1-Prevoznik 05060915 | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | 183:3 sometimes, not always, may come to<br>183:4 different conclusions, as to whether an<br>183:5 order is suspicious.  Is that possible? | |
| 183:12 - 183:15 | **Prevoznik, Thomas 04-17-2019 (00:00:12)**<br>183:12   A. That is possible.<br>183:13   Q. And so, therefore, the<br>183:14 identification of suspicious orders is a<br>183:15 somewhat subjective process? | **V1.34** |
| 183:18 - 183:22 | **Prevoznik, Thomas 04-17-2019 (00:00:10)**<br>183:18 THE WITNESS:  I mean, when<br>183:19 it comes down to a suspicious<br>183:20 orders, what is triggering may --<br>183:21 it's the whole point of the<br>183:22 suspicious order is to identify -- | **V1.35** |
| 185:1 - 185:2 | **Prevoznik, Thomas 04-17-2019 (00:00:01)**<br>185:1 THE WITNESS:  Yeah, it can<br>185:2 be subjective. | **V1.36** |
| 190:18 - 190:24 | **Prevoznik, Thomas 04-17-2019 (00:00:25)**<br>190:18 Did DEA understand that in<br>190:19 the aftermath of Mr. Rannazzisi's<br>190:20 December 27, 2007, letter, that<br>190:21 distributors took actions that resulted<br>190:22 in a number of complaints by pharmacies<br>190:23 that distributors were acting<br>190:24 precipitously? | **V1.37** |
| 191:3 - 191:15 | **Prevoznik, Thomas 04-17-2019 (00:00:32)**<br>191:3 THE WITNESS:  We -- we heard<br>191:4 complaints.<br>191:5 BY MS. MAINIGI:<br>191:6   Q. Complaints from whom?<br>191:7   A. From -- it could be<br>191:8 pharmacies.  It could be -- it could be<br>191:9 patients saying I can't get my meds.<br>191:10   Q. And so there were complaints<br>191:11 from pharmacies, kind of the variety we<br>191:12 see in Exhibit 6, basically saying<br>191:13 distributors are taking actions that are<br>191:14 unfair to the pharmacies as a result of<br>191:15 Mr. Rannazzisi's letter, true? | **V1.38**<br><br><br><br>D1894.3<br>D1894.3.1<br><br>clear |
| 191:18 - 192:10 | **Prevoznik, Thomas 04-17-2019 (00:00:27)** | **V1.39** |

| | V1-Prevoznik 05060915 | |
|---|---|---|

| Page/Line | Source | ID |
|---|---|---|

191:18 THE WITNESS:  I'm not sure
191:19 that it's just the letter, because
191:20 this was also the time that we
191:21 started getting into settlement
191:22 agreements with the industry as
191:23 well.  So it wasn't just the
191:24 letter.  It was...
192:1 BY MS. MAINIGI:
192:2   Q. But there was -- I'm sorry.
192:3   A. No.  Go ahead.
192:4   Q. But there was -- and so
192:5 there were complaints from pharmacies to
192:6 the DEA, correct?
192:7   A. Correct.
192:8   Q. And there were complaints
192:9 from patients to the DEA also, correct?
192:10   A. Yeah.

**194:8 - 194:10**     **Prevoznik, Thomas 04-17-2019 (00:00:12)**     **V1.40**

194:8   Q. So was the perception of
194:9 some in the market that the distributors
194:10 had overreacted to what DEA was saying?

**194:13 - 195:21**     **Prevoznik, Thomas 04-17-2019 (00:01:04)**     **V1.41**

194:13 THE WITNESS:  I -- I don't
194:14 know what the wholesalers were
194:15 thinking.  I -- if -- I mean, I
194:16 know from my own experience with
194:17 the -- with the pharmacy diversion
194:18 awareness conferences where we had
194:19 pharmacists coming up and saying
194:20 hey, they are putting thresholds
194:21 on, they are cutting us off, this
194:22 is affecting patient care.  And
194:23 they said well, DEA sets the
194:24 threshold.  And we said, no,
195:1 that's not true, we did not set
195:2 the thresholds.  The industry sets
195:3 the thresholds.
195:4 That was an eye-opener for
195:5 them, because they were being
195:6 told -- somebody was telling them

| V1-Prevoznik 05060915 | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

|  | 195:7 the DEA set thresholds.  We don't | |
|  | 195:8 set thresholds on that -- on that | |
|  | 195:9 part, with -- in regards to that. | |
|  | 195:10 So, pushing back, you know, | |
|  | 195:11 and then you get -- then we -- we | |
|  | 195:12 take action against pharmacists, | |
|  | 195:13 you have a similar situation with | |
|  | 195:14 a pharmacist saying oh, the DEA | |
|  | 195:15 said we're not allowed to fill | |
|  | 195:16 these prescriptions.  DEA does | |
|  | 195:17 not -- does not regulate the | |
|  | 195:18 practice of medicine.  And, | |
|  | 195:19 those -- you know, that's the | |
|  | 195:20 pharmacist's decision whether to | |
|  | 195:21 fill the prescription or not. | |
| 196:15 - 197:2 | **Prevoznik, Thomas 04-17-2019 (00:00:28)** | **V1.42** |
|  | 196:15  Q. And so the collective | |
|  | 196:16 actions of DEA, including the Rannazzisi | |
|  | 196:17 letter, including the settlements and so | |
|  | 196:18 forth in 2007, you noticed an increase in | |
|  | 196:19 complaints from pharmacists from seasoned | |
|  | 196:20 patients in 2008, for example? | |
|  | 196:21  A. Yes. | |
|  | 196:22  Q. It was not DEA's intention | |
|  | 196:23 to interfere with patients' ability to | |
|  | 196:24 fill legitimate prescriptions for | |
|  | 197:1 controlled substances, correct? | |
|  | 197:2  A. Correct. | |
| 212:1 - 212:8 | **Prevoznik, Thomas 04-17-2019 (00:00:18)** | **V1.43** |
|  | 212:1  Q. Today, does the regulation | |
|  | 212:2 explicitly reference knowing your | |
|  | 212:3 customer? | |
|  | 212:4  A. No. | |
|  | 212:5  Q. Has DEA ever approved or | |
|  | 212:6 endorsed any specific methodology to be | |
|  | 212:7 used by manufacturers or distributors to | |
|  | 212:8 know their customers? | |
| 212:11 - 212:17 | **Prevoznik, Thomas 04-17-2019 (00:00:14)** | **V1.44** |
|  | 212:11 THE WITNESS:  Can you please | |
|  | 212:12 repeat? | |

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

212:13 BY MS. MAINIGI:
212:14   Q. Sure.  Has DEA ever approved
212:15 or endorsed any specific methodology to
212:16 be used by manufacturers or distributors
212:17 to know their customer?

**212:20 - 212:20**  **Prevoznik, Thomas 04-17-2019 (00:00:01)**   **V1.45**

212:20 THE WITNESS:  No.

**216:4 - 216:10**  **Prevoznik, Thomas 04-17-2019 (00:00:14)**   **V1.46**

216:4 To your knowledge the DEA
216:5 has not issued any best practices
216:6 regarding what methodology to use to know
216:7 your customer to distributors and
216:8 manufacturers in the controlled
216:9 substances context?
216:10   A. Correct.

**219:21 - 220:1**  **Prevoznik, Thomas 04-17-2019 (00:00:12)**   **V1.47**

219:21   Q. So the DEA has in fact
219:22 issued written guidance on knowing your
219:23 customer in the chemical context,
219:24 correct?
220:1   A. Correct.

**220:5 - 220:10**  **Prevoznik, Thomas 04-17-2019 (00:00:12)**   **V1.48**

220:5 BY MS. MAINIGI:
220:6   Q. The DEA has not issued
220:7 written guidance elaborating on best
220:8 practices or methodology for knowing your
220:9 customer in the controlled substances
220:10 context, correct?

**220:13 - 220:16**  **Prevoznik, Thomas 04-17-2019 (00:00:03)**   **V1.49**

220:13 THE WITNESS:  I believe --
220:14 BY MS. MAINIGI:
220:15   Q. I think that's a yes or no?
220:16   A. Correct, correct, correct.

**231:9 - 231:12**  **Prevoznik, Thomas 04-17-2019 (00:00:09)**   **V1.50**

231:9   Q. Is it fair to say that the
231:10 general view of DEA is that the
231:11 distributors would like to be in
231:12 compliance?

**231:17 - 231:24**  **Prevoznik, Thomas 04-17-2019 (00:00:13)**   **V1.51**

231:17 THE WITNESS:  Yes.  Yes, I

| Page/Line | Source | ID |
|---|---|---|

**V1-Prevoznik 05060915**

231:18 believe they do.
231:19 BY MS. MAINIGI:
231:20   Q. And certainly as you are
231:21 aware, from time to time, they have
231:22 reached out to the DEA seeking
231:23 clarification and further guidance,
231:24 correct?

**232:3 - 232:6**   **Prevoznik, Thomas 04-17-2019 (00:00:04)**   **V1.52**

232:3 THE WITNESS:  I'm not -- I'm
232:4 not sure of what specific topics,
232:5 if you have a specific topic in
232:6 mind.  But yes, they do reach out.

**232:22 - 233:19**   **Prevoznik, Thomas 04-17-2019 (00:00:48)**   **V1.53**

232:22 In that 2008 to 2013 time
232:23 period that we've focused on, is it fair
232:24 to say that when registrants such as
233:1 distributors and their trade associations
233:2 have reached out to seek clarification,
233:3 that sometimes DEA has not been able to
233:4 provide clarification?
233:5   A. So in this time frame is
233:6 2008 to 2013?
233:7   Q. Correct.
233:8   A. Which was the time when we
233:9 were investigating and litigating?  Yeah,
233:10 that -- we -- we did not talk at that
233:11 point.
233:12   Q. You did not talk to
233:13 distributors in the 2008 to 2013 time
233:14 period generally?
233:15   A. Well, yeah, I mean up until
233:16 2010 we were doing the distributor
233:17 initiative.  And then we stopped that for
233:18 a period because of the litigations and
233:19 the investigations going on.

**235:2 - 235:9**   **Prevoznik, Thomas 04-17-2019 (00:00:15)**   **V1.54**

235:2   Q. Since 2017, has the DEA
235:3 provided distributors with any additional
235:4 guidance on suspicious order
235:5 monitoring --

| Page/Line | Source | ID |
|---|---|---|
| | V1-Prevoznik 05060915 | |

235:6  A. I don't --

235:7  Q. Written guidance.

235:8  A. Not written guidance that

235:9 I'm aware of.

**235:10 - 235:14**  **Prevoznik, Thomas 04-17-2019 (00:00:16)**  **V1.55**

235:10  Q. There was some discussion in

235:11 the last several years of a modification

235:12 to the suspicious order regulation,

235:13 correct?

235:14  A. Correct.

**262:24 - 263:3**  **Prevoznik, Thomas 04-17-2019 (00:00:07)**  **V1.56**

262:24  Q. And DEA is aware that the

263:1 distributors programs, they set a monthly

263:2 threshold for a customer's controlled

263:3 substances purchases?

**263:6 - 263:12**  **Prevoznik, Thomas 04-17-2019 (00:00:10)**  **V1.57**

263:6 THE WITNESS:  To my

263:7 knowledge, yes.

263:8 BY MR. EPPICH:

263:9  Q. And DEA never instructed

263:10 distributors to set a monthly threshold

263:11 at a specific level, did they?

263:12  A. No.

**303:19 - 304:1**  **Prevoznik, Thomas 04-17-2019 (00:00:13)**  **V1.58**

303:19  Q. You would agree with me that

303:20 the statute itself does not contain the

303:21 express instruction that a registrant

303:22 should hold an order and not ship it if

303:23 it determines it to be suspicious,

303:24 correct?

304:1  A. Correct.

**306:1 - 306:4**  **Prevoznik, Thomas 04-17-2019 (00:00:09)**  **V1.59**

306:1 Does every order that's

306:2 unusually large necessarily lead to

306:3 diversion?

306:4  A. I have no idea.

**306:7 - 306:8**  **Prevoznik, Thomas 04-17-2019 (00:00:04)**  **V1.60**

306:7 THE WITNESS:  I have no idea

306:8 what you mean by unusually large.

**307:18 - 307:22**  **Prevoznik, Thomas 04-17-2019 (00:00:14)**  **V1.61**

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |

307:18   Q. Okay.  I do -- I do want to
307:19 get back to my original question though,
307:20 which was, is an order that is unusually
307:21 large, does that order necessarily lead
307:22 to diversion?

**308:1 - 308:5**   **Prevoznik, Thomas 04-17-2019 (00:00:08)**   **V1.62**

308:1 THE WITNESS:  It may or
308:2 may -- it may or may not.
308:3 BY MR. O'CONNOR:
308:4   Q. Would the same be true of an
308:5 unusually frequent order?

**308:8 - 308:13**   **Prevoznik, Thomas 04-17-2019 (00:00:05)**   **V1.63**

308:8 THE WITNESS:  Correct.  It
308:9 may or may not.
308:10 BY MR. O'CONNOR:
308:11   Q. And the same would be true
308:12 of an order that deviates substantially
308:13 from the normal pattern?

**308:16 - 308:17**   **Prevoznik, Thomas 04-17-2019 (00:00:01)**   **V1.64**

308:16 THE WITNESS:  Correct.  It
308:17 may or may not.

**309:4 - 309:6**   **Prevoznik, Thomas 04-17-2019 (00:00:04)**   **V1.65**

309:4   Q. Not every suspicious order
309:5 leads to diversion, correct?
309:6   A. Correct.

**317:10 - 318:7**   **Prevoznik, Thomas 04-17-2019 (00:00:53)**   **V1.66**

317:10   Q. All right.  I'd like to go
317:11 back to Exhibit 4, which you should still
317:12 have a copy of.
317:13   A. Which one is that?
317:14   Q. Exhibit 4.                                    D107.1
317:15   A. Got it.
317:16   Q. And do you recognize this
317:17 document?
317:18   A. Yes.
317:19   Q. What -- what is it?
317:20   A. It's the report to the U.S.                  D107.1.1
317:21 Attorney General regarding the suspicious
317:22 orders task force under the Comprehensive
317:23 Methamphetamine -- Methamphetamine

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 317:24 Control Act of 1996. | |
| | 318:1  Q. Okay.  I'm going to direct | |
| | 318:2 your attention to the page that ends in | |
| | 318:3 2212.  It's towards the beginning. | D107.6 |
| | 318:4  A. I'm sorry.  What was the | |
| | 318:5 last number? | |
| | 318:6  Q. 2212. | |
| | 318:7  A. Okay. | |
| 318:8 - 319:21 | **Prevoznik, Thomas 04-17-2019 (00:01:31)** | **V1.67** |
| | 318:8  Q. And specifically, the first | |
| | 318:9 full paragraph that begins, "The task | D107.6.1 |
| | 318:10 force concluded that a single listing of | |
| | 318:11 meaningful numerical parameters would be | |
| | 318:12 difficult for the majority of registrants | |
| | 318:13 which do not have highly automated | |
| | 318:14 computer systems" -- "computer ordering | |
| | 318:15 and tracking systems, the indicators | |
| | 318:16 contained in Appendix A" -- exhibit -- | |
| | 318:17 and it's hard to read -- "represent | |
| | 318:18 expanded guidance to be considered." | |
| | 318:19 Then it continues.  "For | D107.6.2 |
| | 318:20 the" -- "For the segments of industry who | |
| | 318:21 have highly automated ordering and | |
| | 318:22 tracking systems, the task force | |
| | 318:23 recommends a system which starts with | |
| | 318:24 quantifiable parameters which track | |
| | 319:1 frequency of orders, deviation from prior | |
| | 319:2 orders, and size of orders.  See Appendix | |
| | 319:3 A, Exhibit 2." | |
| | 319:4 When this document talks | D107.6.3 |
| | 319:5 about recommending a system, they are | |
| | 319:6 talking about a suspicious order | |
| | 319:7 monitoring system, correct? | |
| | 319:8  A. Right.  For chemicals, List | |
| | 319:9 1 chemicals. | |
| | 319:10  Q. Okay.  But it is a | |
| | 319:11 suspicious order monitoring system, | |
| | 319:12 agree? | |
| | 319:13  A. Yes. | |
| | 319:14  Q. Okay.  And it says, "See | |

| | V1-Prevoznik 05060915 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

319:15 Exhibit" -- I'm sorry.  Strike that.
319:16 It says, "See Appendix A,                                    D107.6.4
319:17 Exhibit 2."
319:18 Let's turn there.
319:19   A. Okay.
319:20   Q. And I can tell you the
319:21 number at the bottom ends in 2247.                           D107.41

319:22 - 320:20  **Prevoznik, Thomas 04-17-2019 (00:00:50)**        **V1.68**

319:22   A. Okay.  2247?
319:23   Q. 2247.
319:24   A. Okay.
320:1   Q. So that sentence referring
320:2 to suspicious order monitoring refers to
320:3 this exhibit.
320:4 Could you please read the
320:5 first five lines starting with,
320:6 "Exhibit 2."                                                   D107.41.1
320:7   A. Under terms and definition
320:8 or above?
320:9   Q. Above.
320:10   A. "Suspicious order reporting
320:11 system of 1998 for use in automated
320:12 tracking systems.  The current
320:13 calculation being used for List 1
320:14 chemicals and Schedule II through V
320:15 controlled substances."
320:16   Q. Okay.  So according to that
320:17 title, the calculation that's discussed
320:18 in this exhibit is being used for
320:19 Schedule II through V controlled
320:20 substances, correct?

320:22 - 321:13  **Prevoznik, Thomas 04-17-2019 (00:00:49)**        **V1.69**

320:22 THE WITNESS:  That's what it
320:23 says.  Yes, that's what it says.
320:24 BY MR. O'CONNOR:
321:1   Q. And looking down to Number
321:2 4, where it says "Note:"  Could you                            D107.41.2
321:3 please read that sentence?
321:4   A. "Note:  Factor equals 3 for
321:5 C-II and C-III controlled substances

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

321:6 containing List 1 chemicals and eight for
321:7 C-III and V" -- I don't know what --
321:8 "controlled substances and noncontrolled
321:9 OTC product containing List 1 chemical
321:10 items."
321:11   Q. So this document again is
321:12 discussing controlled substances, not
321:13 just list chemicals, correct?

**321:16 - 322:18**   **Prevoznik, Thomas 04-17-2019 (00:01:13)**   **V1.70**

321:16 BY MR. O'CONNOR:
321:17   Q. You can answer the question.
321:18   A. Yes.  It's talking about
321:19 both.  It's listed -- controlled
321:20 substances with listed chemical,
321:21 controlled substances and noncontrolled.
321:22   Q. Okay.  Take a look at Item
321:23 5.  Could you please read that paragraph.   D107.41.3
321:24   A. Sure.  "At the end of each
322:1 month, a report will be transmitted to
322:2 DEA, separate reports for List 1
322:3 chemicals and Schedules II through V
322:4 controlled substances.  Of all purchases
322:5 of List 1 chemicals and/or C-II through V
322:6 controlled substances and
322:7 List-1-containing OTC items by any
322:8 customers, any customer whose purchase
322:9 quantities exceed the parameters above,
322:10 any two consecutive months or in three,
322:11 if any, moving six-month period."
322:12   Q. So this document, labeled
322:13 Exhibit 2 to the suspicious order task
322:14 force report is discussing a system that
322:15 pertains to controlled substances,
322:16 correct?
322:17   A. Yes.  That's what it's   clear
322:18 talking about.

**326:6 - 326:17**   **Prevoznik, Thomas 04-17-2019 (00:00:34)**   **V1.71**

326:6   Q. Okay.  Let's talk for a
326:7 minute about ARCOS.
326:8 Generally speaking, what

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

326:9 sorts of information does ARCOS contain?
326:10   A. ARCOS contains the
326:11 manufacturers and distributors that are
326:12 to report all transactions for
326:13 Schedule I, Schedule II, Schedule III
326:14 narcotics, and GHB, and manufacturers
326:15 also have reported -- additional
326:16 reporting requirements for some
326:17 psychotropics.

326:24 - 327:4   **Prevoznik, Thomas 04-17-2019 (00:00:13)**   **V1.72**

326:24   Q. Would ARCOS contain all the
327:1 distributions of prescription opioids
327:2 from distributors to pharmacies or other
327:3 retail outlets?
327:4   A. For those items, yes.

327:17 - 328:7   **Prevoznik, Thomas 04-17-2019 (00:00:30)**   **V1.73**

327:17   Q. Okay.  Through ARCOS, can
327:18 DEA see the type of medication that's
327:19 being purchased?
327:20   A. Well, it's in there by NDC
327:21 number.
327:22   Q. Okay.  And the NDC number
327:23 would -- would allow the DEA to determine
327:24 which product we are talking about?
328:1   A. Correct.
328:2   Q. So whether that was a -- the
328:3 DEA would know whether it was a oxycodone
328:4 5-milligram tablet, for example?
328:5   A. Correct.
328:6   Q. That level of detail?
328:7   A. Yes.

329:3 - 329:19   **Prevoznik, Thomas 04-17-2019 (00:00:44)**   **V1.74**

329:3 And through ARCOS, DEA can
329:4 see each and every bottle of opioids
329:5 that's transferred from a distributor to
329:6 a pharmacy for example, correct?
329:7   A. Correct.
329:8   Q. And they'll know the
329:9 location of that pharmacy?
329:10   A. Correct.

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

329:11   Q. Do they have the address for
329:12 the pharmacy?
329:13   A. Yes.  It's linked to the DEA
329:14 registration.
329:15   Q. Okay.  So through ARCOS, the
329:16 DEA has precise information about how
329:17 much of certain products is being shipped
329:18 to which geographic areas, correct?
329:19   A. Correct.

334:13 - 335:16   **Prevoznik, Thomas 04-17-2019 (00:01:10)**   **V1.75**

334:13   Q. Okay.  Getting back to the
334:14 analysis of the ARCOS data.  Is there a
334:15 particular unit within DEA that's charged
334:16 with analyzing ARCOS data?
334:17   A. So there's actually two
334:18 units.  There's the input side.  They
334:19 actually deal with the down -- you know,
334:20 upload from the registrants so there's
334:21 constant communication with them whether
334:22 regarding errors or, you know, trying to
334:23 fix some of the data that was submitted.
334:24 We don't change the data.
335:1 It's always the registrant has -- changes
335:2 the data.  We don't -- we don't change
335:3 it.
335:4 And then the output side
335:5 would be the targeting group.  So there's
335:6 QCs on the input side and there's also
335:7 QCs on the out -- output side.
335:8   Q. With respect to the
335:9 targeting group, what sort of analysis
335:10 does it perform on the ARCOS data?
335:11   A. Trends.  They support case
335:12 investigations, doing charts, graphs.
335:13 They'll -- they can show the comparison
335:14 of what the national average is, what the
335:15 state average and compare that with the
335:16 registrant itself.

337:4 - 337:10   **Prevoznik, Thomas 04-17-2019 (00:00:19)**   **V1.76**

337:4   Q. Does the DEA use ARCOS data

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

337:5 to generate leads for investigations?

337:6  A. It can be.

337:7  Q. Without getting into any

337:8 details, can you think of occasions where

337:9 an analysis of ARCOS data led the DEA to

337:10 initiate an investigation?

| 337:13 - 337:14 | **Prevoznik, Thomas 04-17-2019 (00:00:02)** | **V1.77** |

337:13 THE WITNESS:  So I could say

337:14 yes.

| 362:15 - 362:23 | **Prevoznik, Thomas 04-17-2019 (00:00:21)** | **V1.78** |

362:15  Q. But other than the two

362:16 letters from Mr. Rannazzisi, DEA did not

362:17 send any letters to registrants regarding

362:18 their obligation under the suspicious

362:19 order monitoring program, correct?

362:20  A. Written letters, correct.

362:21  Q. And DEA did not post any

362:22 guidance with respect to suspicious order

362:23 monitoring on its website, did it?

| 363:2 - 364:3 | **Prevoznik, Thomas 04-17-2019 (00:01:20)** | **V1.79** |

363:2 THE WITNESS:  That's

363:3 correct.

363:4 BY MR. O'CONNOR:

363:5  Q. And DEA did not engage in

363:6 notice-and-comment rulemaking to provide

363:7 further guidance on suspicious order

363:8 monitoring to registrants, correct?

363:9  A. I am not -- I'm not in the

363:10 reg drafting section.  So I don't know if

363:11 they -- the letter that we saw earlier

363:12 today, I'm not sure if that was --

363:13  Q. But since 1974 --

363:14  A. -- in there.

363:15  Q. I'm sorry.

363:16 But since 1974, DEA has not

363:17 promulgated any regulation providing

363:18 further guidance to registrants on the

363:19 supposed obligation to monitor and report

363:20 suspicious orders, correct?

363:21  A. Correct.

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

363:22  Q. With respect to suspicious
363:23 order monitoring, does DEA agree that
363:24 providing registrants with clear guidance
364:1 is important?
364:2   A. I think clear guidance is
364:3 very important.

| 392:4 - 392:6 | **Prevoznik, Thomas 04-17-2019 (00:00:05)** | **V1.80** |

392:4  Q. All right.  DEA agrees that
392:5 chronic pain is a serious problem for
392:6 many Americans, true?

| 392:9 - 392:17 | **Prevoznik, Thomas 04-17-2019 (00:00:14)** | **V1.81** |

392:9 THE WITNESS:  Yeah, people
392:10 have back pain.
392:11 BY MR. STEPHENS:
392:12   Q. And DEA also agrees that
392:13 it's crucial for physicians who are
392:14 engaged in legitimate pain treatment not
392:15 to be discouraged from providing proper
392:16 medication to patients as medically
392:17 justified?

| 392:21 - 393:3 | **Prevoznik, Thomas 04-17-2019 (00:00:10)** | **V1.82** |

392:21 THE WITNESS:  Yes.
392:22 BY MR. STEPHENS:
392:23   Q. Okay.  And DEA agrees that
392:24 opioids, properly prescribed by DEA
393:1 registered medical doctors, are an
393:2 appropriate medication for many
393:3 Americans?

| 393:8 - 393:14 | **Prevoznik, Thomas 04-17-2019 (00:00:11)** | **V1.83** |

393:8 THE WITNESS:  Yes.
393:9 BY MR. STEPHENS:
393:10   Q. DEA also agrees that there's
393:11 a legitimate medical need under Title 21
393:12 U.S.C. 801 for prescription opioids to
393:13 treat pain in patients in the United
393:14 States?

| 393:17 - 393:18 | **Prevoznik, Thomas 04-17-2019 (00:00:02)** | **V1.84** |

393:17 THE WITNESS:  For a
393:18 legitimate medical purpose, yes.

| 394:8 - 394:16 | **Prevoznik, Thomas 04-17-2019 (00:00:21)** | **V1.85** |

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 394:8   Q. Okay.  And DEA also agrees |  |
|  | 394:9 that prescription opioids are necessary |  |
|  | 394:10 to maintain the general welfare of |  |
|  | 394:11 American people who need them? |  |
|  | 394:12   A. Correct. |  |
|  | 394:13   Q. Patients who are properly |  |
|  | 394:14 prescribed opioid medications should be |  |
|  | 394:15 able to obtain their medications from a |  |
|  | 394:16 pharmacy? |  |
| 395:4 - 395:4 | **Prevoznik, Thomas 04-17-2019 (00:00:01)** | **V1.86** |
|  | 395:4 THE WITNESS:  Yes. |  |
| 396:19 - 397:4 | **Prevoznik, Thomas 04-17-2019 (00:00:17)** | **V1.87** |
|  | 396:19   Q. Like manufacturers and |  |
|  | 396:20 distributors, DEA also considers doctors |  |
|  | 396:21 who prescribe opioids to their patients |  |
|  | 396:22 to be registrants? |  |
|  | 396:23   A. Correct. |  |
|  | 396:24   Q. Okay.  The prescribing |  |
|  | 397:1 doctors have an obligation under the |  |
|  | 397:2 Controlled Substances Act to prescribe |  |
|  | 397:3 opioids responsibly so the controlled |  |
|  | 397:4 substances will not be diverted, true? |  |
| 397:6 - 397:6 | **Prevoznik, Thomas 04-17-2019 (00:00:03)** | **V1.88** |
|  | 397:6 THE WITNESS:  Yes. |  |
| 398:2 - 398:11 | **Prevoznik, Thomas 04-17-2019 (00:00:18)** | **V1.89** |
|  | 398:2   Q. Okay.  But prescribers, not |  |
|  | 398:3 manufacturers, distributors, or |  |
|  | 398:4 pharmacists are required to have medical |  |
|  | 398:5 degrees, right? |  |
|  | 398:6   A. That's correct. |  |
|  | 398:7   Q. Okay.  And the physicians, |  |
|  | 398:8 not manufacturers, distributors, or |  |
|  | 398:9 pharmacists, are licensed to practice |  |
|  | 398:10 medicine, right? |  |
|  | 398:11   A. Correct. |  |
| 401:5 - 401:9 | **Prevoznik, Thomas 04-17-2019 (00:00:09)** | **V1.90** |
|  | 401:5   Q. As to prescription |  |
|  | 401:6 opioids, DEA believes that the |  |
|  | 401:7 overwhelming majority of prescribing in |  |
|  | 401:8 America is conducted responsibly? |  |

| | V1-Prevoznik 05060915 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 401:9   A. Yes, correct. |  |
| 402:4 - 402:7 | **Prevoznik, Thomas 04-17-2019 (00:00:13)** | **V1.91** |
|  | 402:4   Q. The transcript is dated |  |
|  | 402:5 April 29, 2014.  It's a subcommittee |  |
|  | 402:6 hearing on oversight investigations by |  |
|  | 402:7 the Committee of Energy and Commerce. |  |
| 402:16 - 403:19 | **Prevoznik, Thomas 04-17-2019 (00:00:54)** | **V1.92** |
|  | 402:16   Q. Page 76, Mr. Prevoznik.  And |  |
|  | 402:17 we're looking at, like, the |  |
|  | 402:18 second-to-last paragraph where |  |
|  | 402:19 Mr. Rannazzisi is talking. |  |
|  | 402:20 Do you see that? |  |
|  | 402:21   A. Mm-hmm. |  |
|  | 402:22   Q. And there's a question from |  |
|  | 402:23 a Mr. Burgess ahead of that, correct? |  |
|  | 402:24 Do you see that? |  |
|  | 403:1   A. Yes. |  |
|  | 403:2   Q. Okay.  And Mr. Burgess says |  |
|  | 403:3 something to the effect that |  |
|  | 403:4 Mr. Rannazzisi seems to imply that we are |  |
|  | 403:5 overprescribing.  Mr. Rannazzisi then |  |
|  | 403:6 responds and says, "I think that if you |  |
|  | 403:7 are talking about 99.5 percent of the |  |
|  | 403:8 prescribers, no, they are not |  |
|  | 403:9 overprescribing.  But our focus is in |  |
|  | 403:10 rogue pain clinics and rogue doctors who |  |
|  | 403:11 are overprescribing." |  |
|  | 403:12 Did I read that accurately? |  |
|  | 403:13   A. Yes. |  |
|  | 403:14   Q. Okay.  So my question for |  |
|  | 403:15 you, the initial question was, DEA has |  |
|  | 403:16 publicly stated that 99.5 percent of the |  |
|  | 403:17 prescribers are not overprescribing, |  |
|  | 403:18 correct? |  |
|  | 403:19   A. Correct. |  |
| 436:22 - 437:4 | **Prevoznik, Thomas 04-18-2019 (00:00:19)** | **V1.93** |
|  | 436:22   Q. Okay.  Now, more recently, |  |
|  | 436:23 in 2018, Mr. Patterson testified in front |  |
|  | 436:24 of Congress that 99.9 percent of doctors |  |
|  | 437:1 are all trying to do right by their |  |

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

437:2 patients.  Are you familiar with that?

437:3   A. Could I see the testimony?

437:4   Q. Sure.

437:5 - 438:16   **Prevoznik, Thomas 04-18-2019 (00:01:16)**                    **V1.94**

437:5 (Document marked for

437:6 identification as Exhibit

437:7 DEA-Prevoznik-15.)

437:8 BY MR. STEPHENS:

437:9   Q. Mr. Prevoznik, I marked as

437:10 Exhibit Number 15 a hearing dated May 8,

437:11 2018, entitled "Challenges and Solutions

437:12 in the Opioid Crisis" before the

437:13 Committee of the Judiciary, House of

437:14 Representatives.  I would direct you to

437:15 Page 32.

437:16 If you look at the top of

437:17 32, there's a paragraph that indicates

437:18 that Mr. Patterson is talking.

437:19   A. Correct.

437:20   Q. Do you see that?

437:21   A. Yes.

437:22   Q. Now, Robert Patterson in

437:23 2018 was the director -- I'm sorry, the

437:24 administrator of DEA?

438:1   A. Acting administrator.

438:2   Q. Acting administrator.

438:3   A. Right.

438:4   Q. It's the number one position

438:5 at DEA?

438:6   A. Correct.

438:7   Q. Okay.  So here Mr. Patterson

438:8 was asked a question, and in part of his

438:9 response he says, "But I go back to the

438:10 fact that I look at the vast majority of

438:11 doctors, 99.99 percent are all trying to

438:12 do right by their patients."

438:13 Do you see that?

438:14   A. Correct.

438:15   Q. Did I read that accurately?

438:16   A. Yes.

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |
| 442:20 - 442:21 | **Prevoznik, Thomas 04-18-2019 (00:00:08)** | **V1.95** |
| | 442:20   Q. In 2014, Mr. Rannazzisi | |
| | 442:21 estimated 99.5 percent, right? | |
| 443:3 - 443:3 | **Prevoznik, Thomas 04-18-2019 (00:00:00)** | **V1.96** |
| | 443:3 THE WITNESS:  Correct. | |
| 443:5 - 443:9 | **Prevoznik, Thomas 04-18-2019 (00:00:08)** | **V1.97** |
| | 443:5   Q. That's one-half of one | |
| | 443:6 percent, right? | |
| | 443:7   A. Correct. | |
| | 443:8   Q. 2018, Mr. Patterson said | |
| | 443:9 99.99 percent. | |
| 443:12 - 443:14 | **Prevoznik, Thomas 04-18-2019 (00:00:02)** | **V1.98** |
| | 443:12 BY MR. STEPHENS: | |
| | 443:13   Q. That's one-tenth of 1 | |
| | 443:14 percent, right? | |
| 443:17 - 443:18 | **Prevoznik, Thomas 04-18-2019 (00:00:01)** | **V1.99** |
| | 443:17 You can answer again. | |
| | 443:18 THE WITNESS:  Correct. | |
| 462:20 - 463:2 | **Prevoznik, Thomas 04-18-2019 (00:00:16)** | **V1.100** |
| | 462:20   Q. If DEA headquarters does not | |
| | 462:21 clearly communicate its interpretation of | |
| | 462:22 the regulations and statutes related to | |
| | 462:23 the suspicious order monitoring programs | |
| | 462:24 to DEA's field offices, the field offices | |
| | 463:1 may give inaccurate information to | |
| | 463:2 registrants? | |
| 463:6 - 463:18 | **Prevoznik, Thomas 04-18-2019 (00:00:21)** | **V1.101** |
| | 463:6 THE WITNESS:  I don't -- I | |
| | 463:7 don't know specifically what every | |
| | 463:8 field office has provided that | |
| | 463:9 guidance and oftentimes when there | |
| | 463:10 is a question regarding that, we | |
| | 463:11 will -- the field is instructed to | |
| | 463:12 have the registrant reach out to | |
| | 463:13 headquarters for an official | |
| | 463:14 review. | |
| | 463:15 BY MR. STEPHENS: | |
| | 463:16   Q. Okay. | |
| | 463:17   A. So the official review would | |
| | 463:18 come from the headquarters side. | |

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |

| Page/Line | Source | ID |
|---|---|---|
| 464:15 - 465:7 | **Prevoznik, Thomas 04-18-2019 (00:00:39)** | V1.102 |

464:15   Q. All right.  So let's now
464:16 talk about communications between DEA and
464:17 the registrants.  All right?
464:18   A. Yes.
464:19   Q. Okay.  Agree that at some
464:20 point after -- well, let me strike that
464:21 and start over.
464:22 Mr. Rannazzisi ran the
464:23 diversion control group from 2006 to
464:24 about 2015, right?
465:1   A. Yes.  That sounds about
465:2 right.
465:3   Q. Okay.  After Mr. Rannazzisi
465:4 left DEA in 2015, DEA's leadership
465:5 recognized that it needed to make some
465:6 important changes to improve how DEA
465:7 communicated with registrants, true?

| Page/Line | Source | ID |
|---|---|---|
| 465:12 - 466:15 | **Prevoznik, Thomas 04-18-2019 (00:00:51)** | V1.103 |

465:12 THE WITNESS:  I mean, yeah,
465:13 yeah.
465:14 BY MR. STEPHENS:
465:15   Q. DEA's leadership after
465:16 Mr. Rannazzisi left DEA in 2015 wanted to
465:17 increase collaboration with registrants
465:18 to decrease diversion, correct?
465:19   A. Correct.
465:20   Q. DEA's current leadership has
465:21 acknowledged that it needs to do better
465:22 in its efforts to collaborate with
465:23 manufacturers, distributors, and retail
465:24 chain pharmacies, true?
466:1   A. I believe we all need to do
466:2 it.
466:3   Q. Okay.
466:4   A. Not just one.  It's --
466:5 everybody has to be involved.
466:6   Q. My question is maybe a
466:7 little bit different than your answer.
466:8 So let me restate it.

| | V1-Prevoznik 05060915 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

466:9  A. Sure.

466:10  Q. DEA's current leadership has

466:11 acknowledged that it needs to do better

466:12 in its efforts to collaborate with

466:13 manufacturers, distributors and retail

466:14 chain pharmacies?

466:15  A. Correct.

**469:9 - 469:18    Prevoznik, Thomas 04-18-2019 (00:00:21)**    **V1.104**

469:9  Q. Okay.  And would you agree

469:10 that current leadership at DEA is now

469:11 willing to collaborate with registrants

469:12 who can help DEA reduce diversion?

469:13  A. Yes.

469:14  Q. Fair to say that DEA's

469:15 current leadership understands that

469:16 treating potential good faith

469:17 collaborators as adversaries is not an

469:18 effective way to reduce diversion?

**469:21 - 469:21    Prevoznik, Thomas 04-18-2019 (00:00:03)**    **V1.105**

469:21 THE WITNESS:  Correct.

**492:4 - 492:6    Prevoznik, Thomas 04-18-2019 (00:00:09)**    **V1.106**

492:4 Like internet pharmacies,

492:5 DEA -- DEA would agree that not all pain

492:6 clinics diverted controlled substances?

**492:9 - 492:16    Prevoznik, Thomas 04-18-2019 (00:00:12)**    **V1.107**

492:9 THE WITNESS:  Correct.

492:10 BY MR. STEPHENS:

492:11  Q. Okay.  There was some good

492:12 pain clinics who operated within the

492:13 boundaries of the law and there were some

492:14 rogue pain clinics that operated outside

492:15 the boundaries of the law.

492:16 Is that fair?

**492:20 - 492:20    Prevoznik, Thomas 04-18-2019 (00:00:00)**    **V1.108**

492:20 THE WITNESS:  Yes.

**528:4 - 528:12    Prevoznik, Thomas 04-18-2019 (00:00:22)**    **V1.109**

528:4  Q. If a deputy administrator

528:5 who ran division control from 2006 to

528:6 2015 was concerned that suspicious order

528:7 report leads were being ignored by the

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |

|  |  |  |
|---|---|---|
| | 528:8 field divisions, he could have assembled | |
| | 528:9 a team of DEA's diversion investigators, | |
| | 528:10 placed that squad at DEA headquarters | |
| | 528:11 under his command to pursue those leads, | |
| | 528:12 right? | |
| 528:17 - 528:19 | **Prevoznik, Thomas 04-18-2019 (00:00:04)** | **V1.110** |
| | 528:17 THE WITNESS:  So he could | |
| | 528:18 have done that.  He didn't do it. | |
| | 528:19 And we still haven't done it. | |
| 558:8 - 558:13 | **Prevoznik, Thomas 04-18-2019 (00:00:14)** | **V1.111** |
| | 558:8  Q. Between 2006 and 2015 under | |
| | 558:9 Mr. Rannazzisi's leadership, did DEA have | |
| | 558:10 a published policy that ensured that | |
| | 558:11 someone at DEA would investigate every | |
| | 558:12 suspicious order report that DEA | |
| | 558:13 received? | |
| 558:16 - 558:17 | **Prevoznik, Thomas 04-18-2019 (00:00:01)** | **V1.112** |
| | 558:16 THE WITNESS:  Not that I'm | |
| | 558:17 aware of. | |
| 897:10 - 897:14 | **Prevoznik, Thomas 05-17-2019 (00:00:15)** | **V1.113** |
| | 897:10  Q. Okay.  And I want to make sure | |
| | 897:11 that your testimony is clear.  When you say | |
| | 897:12 whether a suspicious order is subjective, do | |
| | 897:13 you mean that it varies from case to case, or | |
| | 897:14 it depends on who's looking at it? | |
| 897:17 - 897:23 | **Prevoznik, Thomas 05-17-2019 (00:00:12)** | **V1.114** |
| | 897:17 THE WITNESS:  Both, really.  It | |
| | 897:18 depends who's looking at it and | |
| | 897:19 what system do they have that's | |
| | 897:20 triggering the suspicious order.  So | |
| | 897:21 it's whatever that registrant | |
| | 897:22 designed, which is specific to that | |
| | 897:23 registration. | |
| 1060:22 - 1061:1 | **Prevoznik, Thomas 05-17-2019 (00:00:11)** | **V1.115** |
| | 1060:22 QUESTIONS BY MR. MAHADY: | |
| | 1060:23  Q. Mr. Prevoznik, good afternoon. | |
| | 1060:24 My name is Joe Mahady.  I, along with my | |
| | 1060:25 colleague, Robert Nicholas, are counsel for | |
| | 1061:1 AmerisourceBergen in this litigation. | |
| 1070:8 - 1070:9 | **Prevoznik, Thomas 05-17-2019 (00:00:05)** | **V1.116** |

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  | A2658.1 |
|---|---|---|
|  | 1070:8   Q.  Okay.  I'm going to mark this |  |
|  | 1070:9 as Prevoznik 22. |  |
| 1071:14 - 1071:25 | **Prevoznik, Thomas 05-17-2019 (00:00:20)** | **V1.117** |
|  | 1071:14   Q.  Mr. Prevoznik, this morning |  |
|  | 1071:15 Mr. Farrell asked you questions about |  |
|  | 1071:16 documents that bear a US DEA Bates number, |  |
|  | 1071:17 correct? |  |
|  | 1071:18   A.  Yes. |  |
|  | 1071:19   Q.  All right.  And those are |  |
|  | 1071:20 documents that the DEA has produced, correct? |  |
|  | 1071:21   A.  Correct. |  |
|  | 1071:22   Q.  Okay.  And these were documents |  |
|  | 1071:23 that were in the custody and control of the |  |
|  | 1071:24 DEA, correct? |  |
|  | 1071:25   A.  Yes. |  |
| 1074:6 - 1075:22 | **Prevoznik, Thomas 05-17-2019 (00:01:51)** | **V1.118** |
|  | 1074:6   Q.  Mr. Prevoznik, can you please |  |
|  | 1074:7 direct your attention to the bottom of this |  |
|  | 1074:8 document? |  |
|  | 1074:9   A.  Yes. |  |
|  | 1074:10   Q.  And before we get there, I'm |  |
|  | 1074:11 sorry, this document is dated what? |  |
|  | 1074:12   A.  July 23, 1998. | A2658.1.2 |
|  | 1074:13   Q.  And this document was sent to, | A2658.1.3 |
|  | 1074:14 while the name is redacted, the regulatory |  |
|  | 1074:15 compliance and security services of Bergen |  |
|  | 1074:16 Brunswig Corporation; is that correct? |  |
|  | 1074:17   A.  Correct. |  |
|  | 1074:18   Q.  And it's signed, or stamped, by | A2658.1.4 |
|  | 1074:19 Patricia M. Good, chief liaison and policy |  |
|  | 1074:20 section; is that right? |  |
|  | 1074:21   A.  Yes. |  |
|  | 1074:22   Q.  Okay.  Can you direct your |  |
|  | 1074:23 attention to the bottom of the page below the |  |
|  | 1074:24 section that has been redacted, and can you |  |
|  | 1074:25 please read for me the subject line? |  |
|  | 1075:1   A. "Approved suspicious order | A2658.1.5 |
|  | 1075:2 monitoring system." |  |
|  | 1075:3   Q.  Okay.  Now, if you can please |  |
|  | 1075:4 read to me for the record the first sentence | A2658.1.6 |

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 1075:5 of the letter after "dear." | |
| | 1075:6   A. "This is to grant approval of | |
| | 1075:7 your request to implement on a nationwide | |
| | 1075:8 basis your newly developed system to identify | |
| | 1075:9 and report suspicious orders for controlled | |
| | 1075:10 substances and regulated chemicals." | |
| | 1075:11   Q. Okay.  Can you -- so as | |
| | 1075:12 required by the federal regulations, correct? | |
| | 1075:13   A. Oh, I'm sorry, yes. | |
| | 1075:14   Q. Okay.  Can you read the next | |
| | 1075:15 sentence, please? | A2658.1.7 |
| | 1075:16   A. "DEA managers who have been | |
| | 1075:17 involved with the testing of the system have | |
| | 1075:18 relied -- have relayed their positive | |
| | 1075:19 opinions regarding its ability to provide | |
| | 1075:20 information in a fashion which is not only | |
| | 1075:21 useful overall but is also responsive to the | |
| | 1075:22 needs of individual DEA offices." | |
| 1079:17 - 1079:18 | **Prevoznik, Thomas 05-17-2019 (00:00:11)** | **V1.119** |
| | 1079:17   Q. Okay.  I'm going to mark the | |
| | 1079:18 next document as Prevoznik 23. | A781.9 |
| 1085:9 - 1088:13 | **Prevoznik, Thomas 05-17-2019 (00:03:00)** | **V1.120** |
| | 1085:9   Q. Mr. Prevoznik, can you please | |
| | 1085:10 read the first paragraph of this letter -- | |
| | 1085:11 before we get there. | |
| | 1085:12 Thomas Gitchel.  Thomas Gitchel | A781.9.1 |
| | 1085:13 is identified as the chief liaison and policy | |
| | 1085:14 section of the DEA, correct? | |
| | 1085:15   A. Correct. | |
| | 1085:16   Q. And he held that position in | |
| | 1085:17 1996? | |
| | 1085:18   A. Yes. | |
| | 1085:19   Q. Now, if a registrant has | |
| | 1085:20 questions about the regulation or the DEA's | |
| | 1085:21 interpretation of the regulations, those | |
| | 1085:22 questions are directed to the liaison and | |
| | 1085:23 policy section of the DEA, correct? | |
| | 1085:24   A. Correct. | |
| | 1085:25   Q. And is the chief the | |
| | 1086:1 highest-ranking member of that section? | |

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |

1086:2  A. Yes.

1086:3  Q. Okay.  This letter dated

1086:4 September 30, 1996, to Thomas Gitchel was

1086:5 sent by Chris Zimmerman of Bergen Brunswig.

1086:6 Do you know Chris Zimmerman?

1086:7  A. I know the name.

1086:8  Q. Okay.

1086:9  A. I don't know if we've ever met.

1086:10  Q. Okay.  I want to start -- and

1086:11 I'll actually read the first paragraph for      A781.9.2

1086:12 purposes of time.

1086:13 "The purposes of this letter is

1086:14 to introduce the Drug Enforcement

1086:15 Administration to an innovative new system

1086:16 under development by Bergen Brunswig Drug

1086:17 Company to monitor and report customer orders

1086:18 of controlled substances which fit the

1086:19 suspicious order criteria outlined in 21 CFR

1086:20 1301.74(b)."

1086:21 Did I read that correctly?

1086:22  A. Yes.

1086:23  Q. Okay.  And that is the section

1086:24 that we've been discussing today, right?

1086:25  A. Yes.

1087:1  Q. Okay.  And that's the section

1087:2 that governs the reporting of suspicious

1087:3 orders?

1087:4  A. Yes.

1087:5  Q. Okay.  Beginning with the next      A781.9.3

1087:6 sentence, "By way of background, as you know,

1087:7 BBDC participated in the development of a

1087:8 model excessive purchase report now in use by

1087:9 many distributor registrants."

1087:10 Were you aware that there was a

1087:11 model excessive purchase report that was

1087:12 being used by the registrants?

1087:13  A. A model?  Yes.

1087:14  Q. Okay.  It says, "As used by      A781.9.4

1087:15 BBDC, the excessive purchase report lists

1087:16 total customer purchases for the reported

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
|---|---|---|
| | 1087:17 month which exceed predetermined multiples of | |
| | 1087:18 the average monthly purchase of BBDC's total | |
| | 1087:19 customer base." | |
| | 1087:20 Did I read that correctly? | |
| | 1087:21   A. Yes. | |
| | 1087:22   Q. Okay.  So in describing the | |
| | 1087:23 model excessive purchase report, it refers to | |
| | 1087:24 customer purchases, correct? | |
| | 1087:25   A. Yes. | |
| | 1088:1   Q. And a monthly report, correct? | |
| | 1088:2   A. Correct. | |
| | 1088:3   Q. Okay.  And it goes on to say at | |
| | 1088:4 the end of that paragraph, "This report is | A781.9.5 |
| | 1088:5 produced in hard copy form monthly and is | |
| | 1088:6 sent via certified mail to each DEA field | |
| | 1088:7 office having responsibility for the | |
| | 1088:8 reporting BBDC locations." | |
| | 1088:9 Did I read that correctly? | |
| | 1088:10   A. Yes, you did. | |
| | 1088:11   Q. And is that your understanding | |
| | 1088:12 of how it worked? | |
| | 1088:13   A. Yes. | |
| 1088:20 - 1090:1 | **Prevoznik, Thomas 05-17-2019 (00:01:21)** | V1.121 |
| | 1088:20   Q. Next paragraph.  "While | A781.9.6 |
| | 1088:21 feedback from DEA users over the years has | |
| | 1088:22 generally confirmed our belief that the | |
| | 1088:23 report standing alone is a useful law | |
| | 1088:24 enforcement tool, BBDC suspicious order | |
| | 1088:25 compliance program also involves the | |
| | 1089:1 telephonic reporting of customer orders to | |
| | 1089:2 DEA." | |
| | 1089:3 Now, is it your understanding | |
| | 1089:4 that DEA users did consider the excess | |
| | 1089:5 purchase reports to be a useful law | |
| | 1089:6 enforcement tool? | |
| | 1089:7   A. Yes. | |
| | 1089:8   Q. Okay.  And is it your | |
| | 1089:9 understanding that distributors like Bergen | |
| | 1089:10 Brunswig also placed telephonic report -- | |
| | 1089:11 also performed telephonic reporting to the | |

| V1-Prevoznik 05060915 | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

|  | 1089:12 DEA for suspicious orders in the '90s? | |
|  | 1089:13  A. Yes, that's my understanding. | |
|  | 1089:14  Q. Okay.  And it goes on to say | A781.9.7 |
|  | 1089:15 that "in an average year, BBDC logs over | |
|  | 1089:16 12,000 telephone calls to DEA field offices | |
|  | 1089:17 nationwide to quarterly customer orders of | |
|  | 1089:18 controlled substances which it believes could | |
|  | 1089:19 fit the suspicious order criteria set forth | |
|  | 1089:20 in 1301.74(b)." | |
|  | 1089:21 Did I read that correctly? | |
|  | 1089:22  A. Yes. | |
|  | 1089:23  Q. And you have no reason to | |
|  | 1089:24 dispute the fact stated here that Bergen | |
|  | 1089:25 Brunswig was placing 12,000 calls to DEA | |
|  | 1090:1 field offices a year, do you? | |
| 1090:4 - 1090:4 | **Prevoznik, Thomas 05-17-2019 (00:00:01)** | **V1.122** |
|  | 1090:4 THE WITNESS:  No, I don't. | |
| 1092:24 - 1093:2 | **Prevoznik, Thomas 05-17-2019 (00:00:13)** | **V1.123** |
|  | 1092:24  Q. So just to go back. | |
|  | 1092:25 DEA field offices could provide | |
|  | 1093:1 guidance to registrants about the suspicious | |
|  | 1093:2 order reporting requirements, correct? | |
| 1093:4 - 1093:16 | **Prevoznik, Thomas 05-17-2019 (00:00:33)** | **V1.124** |
|  | 1093:4 THE WITNESS:  Yes. | |
|  | 1093:5 QUESTIONS BY MR. MAHADY: | |
|  | 1093:6  Q. Okay.  And the DEA's | |
|  | 1093:7 expectation would be that the registrants | |
|  | 1093:8 listened to the guidance they were receiving | |
|  | 1093:9 from the field offices, correct? | |
|  | 1093:10  A. Yes. | |
|  | 1093:11  Q. Okay.  And if a DEA field | |
|  | 1093:12 office told to -- advised a registrant to | |
|  | 1093:13 report a suspicious order in one form versus | |
|  | 1093:14 another, they should listen to that DEA field | |
|  | 1093:15 office, correct? | |
|  | 1093:16  A. Yes. | |
| 1093:19 - 1094:1 | **Prevoznik, Thomas 05-17-2019 (00:00:19)** | **V1.125** |
|  | 1093:19  Q. Now, the next sentence there, | A781.10.1 |
|  | 1093:20 it says, "Some offices have diplomatically | |
|  | 1093:21 attempted to offer guidance as to the types | |

| V1-Prevoznik 05060915 | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

|  | 1093:22 of orders that their offices would deem | |
|  | 1093:23 reportable in an effort to limit the number | |
|  | 1093:24 of telephone contacts." | |
|  | 1093:25 Did I read that correctly? | |
|  | 1094:1  A. Yes. | |
| 1094:2 - 1094:5 | **Prevoznik, Thomas 05-17-2019 (00:00:15)** | **V1.126** |
|  | 1094:2  Q. Are you aware that some DEA | |
|  | 1094:3 field offices in the '90s were trying to | |
|  | 1094:4 limit the number of suspicious orders being | |
|  | 1094:5 reported telephonically by the registrants? | |
| 1094:11 - 1094:15 | **Prevoznik, Thomas 05-17-2019 (00:00:05)** | **V1.127** |
|  | 1094:11 THE WITNESS:  I'm not | |
|  | 1094:12 personally aware of that. | |
|  | 1094:13 QUESTIONS BY MR. MAHADY: | |
|  | 1094:14  Q. Okay.  But you have no reason | |
|  | 1094:15 to dispute the accuracy of that statement? | |
| 1094:19 - 1094:19 | **Prevoznik, Thomas 05-17-2019 (00:00:01)** | **V1.128** |
|  | 1094:19 THE WITNESS:  I don't. | |
| 1095:1 - 1096:13 | **Prevoznik, Thomas 05-17-2019 (00:01:22)** | **V1.129** |
|  | 1095:1  Q. Okay.  "Against this backdrop, | A781.10.2 |
|  | 1095:2 BBDC set to work on the development of a | |
|  | 1095:3 suspicious order reporting system that would | |
|  | 1095:4 provide better quality information to DEA in | |
|  | 1095:5 a more efficient manner." | |
|  | 1095:6 Did I read that correctly? | |
|  | 1095:7  A. Yes. | |
|  | 1095:8  Q. And you would agree with me | |
|  | 1095:9 that that's a laudable goal to have for a | |
|  | 1095:10 registrant? | |
|  | 1095:11  A. A lot of what? | |
|  | 1095:12  Q. That's something that a | |
|  | 1095:13 registrant should strive to do, is to provide | |
|  | 1095:14 better quality information to the DEA? | |
|  | 1095:15  A. Yes. | |
|  | 1095:16  Q. Okay.  Now, I'm going to read | |
|  | 1095:17 the next paragraph, which describes the plan. | A781.10.3 |
|  | 1095:18 "Our plan involves the creation | |
|  | 1095:19 of a computer program that compares a | |
|  | 1095:20 customer's controlled substance orders | |
|  | 1095:21 expressed in metric units of the active | |

| | V1-Prevoznik 05060915 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

1095:22 ingredient against a standard representing an
1095:23 average of the customer's prior four months
1095:24 of orders.  Customers whose order exceed by a
1095:25 specified percentage their prior four-month
1096:1 average order history would be printed on a
1096:2 summary report."
1096:3 Did I read that correctly?
1096:4   A. Yes.
1096:5   Q. Okay.  "BBDC's mainframe

**A781.10.4**

1096:6 computer in Orange, California, would
1096:7 automatically fax this report simultaneously
1096:8 to each respective DEA field office daily in
1096:9 the early a.m. hours after the distribution
1096:10 center has completed order processing
1096:11 activities."
1096:12 Did I read that correctly?
1096:13   A. Yes.

1097:4 - 1097:20  **Prevoznik, Thomas 05-17-2019 (00:00:53)**   **V1.130**
**A781.10.5**

1097:4   Q. "When DEA offices open each
1097:5 day, the summary report would be waiting for
1097:6 their review.  DEA offices could also elect
1097:7 to receive a month-end version of this report
1097:8 via US mail.  The summary report would show
1097:9 the customer name, address, DEA number, item
1097:10 description, NDC number, order date, active
1097:11 ingredient volume ordered, active ingredient
1097:12 shipped and customer allowance, i.e., average
1097:13 of customer's prior four-month orders."
1097:14 Did I read that correctly?
1097:15   A. Yes.
1097:16   Q. Now, what's contemplated here
1097:17 in the summary report that would be faxed
1097:18 daily to the DEA, so the DEA field offices
1097:19 would have it in the morning, included active
1097:20 ingredient shipped, correct?

1097:23 - 1097:24  **Prevoznik, Thomas 05-17-2019 (00:00:01)**   **V1.131**

1097:23 THE WITNESS:  It's what it
1097:24 says.

1098:5 - 1098:9  **Prevoznik, Thomas 05-17-2019 (00:00:08)**   **V1.132**

1098:5   Q. Correct.

| | V1-Prevoznik 05060915 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
|---|---|---|
| | 1098:6 So these would be suspicious | |
| | 1098:7 orders that were reported to the DEA after | |
| | 1098:8 they had already been shipped, right? | |
| | 1098:9  A. Right. | |
| 1099:8 - 1099:11 | **Prevoznik, Thomas 05-17-2019 (00:00:10)** | **V1.133** |
| | 1099:8  Q. Okay.  But Bergen Brunswig is | |
| | 1099:9 specifically saying, "We're going to report | |
| | 1099:10 suspicious orders after they had already been | |
| | 1099:11 shipped," correct? | |
| 1099:17 - 1099:20 | **Prevoznik, Thomas 05-17-2019 (00:00:05)** | **V1.134** |
| | 1099:17  Q. That's what they're proposing | |
| | 1099:18 to implement.  That's all I'm trying to ask | |
| | 1099:19 you based off of this document. | |
| | 1099:20  A. Right, and -- | |
| 1100:1 - 1101:21 | **Prevoznik, Thomas 05-17-2019 (00:01:46)** | **V1.135** |
| | 1100:1  Q. Okay.  And your answer was | |
| | 1100:2 "right," that's your understanding of what | |
| | 1100:3 they're proposing? | |
| | 1100:4  A. That's my understanding of it, | |
| | 1100:5 yes. | |
| | 1100:6  Q. Okay.  Next page.  "Our intent | A781.11.1 |
| | 1100:7 is to receive DEA's permission to replace our | |
| | 1100:8 current manner of daily suspicious order | |
| | 1100:9 reporting with the daily electronic facsimile | |
| | 1100:10 report," correct? | |
| | 1100:11  A. Yes. | |
| | 1100:12  Q. Okay.  "We would like to have | A781.11.2 |
| | 1100:13 DEA input on the final product because DEA | |
| | 1100:14 will be the primary users.  One suggestion | |
| | 1100:15 would be to coordinate with one of your field | |
| | 1100:16 offices, perhaps the Los Angeles office, to | |
| | 1100:17 meet with our project development team." | |
| | 1100:18 Did I read that correctly? | |
| | 1100:19  A. Yes. | |
| | 1100:20  Q. Okay.  It goes on to | A781.11.3 |
| | 1100:21 say, "While your field office could beta test | |
| | 1100:22 the report and provide us with input on | |
| | 1100:23 aesthetics and content, there are some key | |
| | 1100:24 questions that DEA would need to provide | |
| | 1100:25 input on before the report is finalized.  One | |

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

1101:1 question would be the assigned -- assignment
1101:2 of the percentage value that a customer's
1101:3 order would have to exceed before that order
1101:4 would appear on the report."
1101:5 Did I read that correctly?
1101:6   A. Yes.
1101:7   Q. Okay.  And then it goes on to
1101:8 say, "Tom, we are excited about the                    *A781.11.4*
1101:9 opportunity to make constructive changes in
1101:10 our suspicious order reporting system.  By
1101:11 working in a partnership with your office, we
1101:12 can perhaps lead the way to developing a new
1101:13 system that everyone feels good about."
1101:14 Did I read that correctly?
1101:15   A. Yes.
1101:16   Q. Okay.  And as the
1101:17 representative from the DEA, was it your
1101:18 understanding that Bergen Brunswig in 1996
1101:19 was trying to work with the DEA as part of a
1101:20 partnership to develop a system that everyone
1101:21 could feel good about?

| 1101:25 - 1102:4 | **Prevoznik, Thomas 05-17-2019 (00:00:05)** | **V1.136** |

1101:25 THE WITNESS:  Yes, that's what
1102:1 it appears to be.                                          *clear*
1102:2 (Prevoznik Exhibit 26 marked
1102:3 for identification.)
1102:4 QUESTIONS BY MR. MAHADY:

| 1102:5 - 1102:6 | **Prevoznik, Thomas 05-17-2019 (00:00:05)** | **V1.137** |

1102:5   Q. Okay.  I'm going to mark P,
1102:6 Prevoznik 24 [sic].                                        *D1922.1*

| 1102:7 - 1102:15 | **Prevoznik, Thomas 05-17-2019 (00:00:28)** | **V1.138** |

1102:7 Okay.  And there is a back.
1102:8   A. Okay.  Thank you.
1102:9   Q. Okay.  Again, this document has
1102:10 a US DEA Bates number; is that correct?         *D1922.1.1*
1102:11   A. Yes.
1102:12   Q. All right.  So this document
1102:13 was in the possession, custody and control of
1102:14 the United States DEA, correct?
1102:15   A. Correct.

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |

| Page/Line | Source | ID |
|---|---|---|
| 1102:22 - 1102:24 | **Prevoznik, Thomas 05-17-2019 (00:00:10)** | **V1.139** |
| | 1102:22  Q. This document is dated | |
| | 1102:23 October 29, 1996, right? | D1922.1.2 |
| | 1102:24  A. It looks like 1996. | |
| 1103:4 - 1103:23 | **Prevoznik, Thomas 05-17-2019 (00:00:47)** | **V1.140** |
| | 1103:4  Q. Okay.  And that's just under | |
| | 1103:5 one month after Mr. Zimmerman sent his letter | |
| | 1103:6 describing the proposed program to Thomas | |
| | 1103:7 Gitchel; is that right? | |
| | 1103:8  A. Yes. | |
| | 1103:9  Q. Okay.  And in the first | D1922.1.3 |
| | 1103:10 paragraph of this letter which is sent to | |
| | 1103:11 Bergen Brunswig from Mr. Gitchel, he said | |
| | 1103:12 that "reference is made to your recent letter | |
| | 1103:13 in which you requested that Bergen Brunswig | |
| | 1103:14 be permitted to replace its current | |
| | 1103:15 telephonic reporting of suspicious orders | |
| | 1103:16 with a daily report transmitted by | |
| | 1103:17 facsimile." | |
| | 1103:18 Did I read that correctly? | |
| | 1103:19  A. Yes. | |
| | 1103:20  Q. Okay.  So the DEA understood | |
| | 1103:21 that Bergen Brunswig was trying to replace | |
| | 1103:22 its daily suspicious order reporting with | |
| | 1103:23 this summary fax, right? | |
| 1104:1 - 1104:6 | **Prevoznik, Thomas 05-17-2019 (00:00:11)** | **V1.141** |
| | 1104:1 THE WITNESS:  It looks like -- | |
| | 1104:2 yes, so that's what it looks like, but | |
| | 1104:3 it -- because it's a daily report of | |
| | 1104:4 sales that have been commenced, it | |
| | 1104:5 would be the excessive purchase | |
| | 1104:6 reports. | |
| 1105:4 - 1105:7 | **Prevoznik, Thomas 05-17-2019 (00:00:09)** | **V1.142** |
| | 1105:4  Q. But at least Bergen Brunswig | |
| | 1105:5 was saying to the DEA these are suspicious | |
| | 1105:6 orders that we're reporting, correct? | |
| | 1105:7  A. That's what it says, yes. | |
| 1107:12 - 1108:12 | **Prevoznik, Thomas 05-17-2019 (00:01:01)** | **V1.143** |
| | 1107:12  Q. Let's look at the DEA's | |
| | 1107:13 response.  This is from the DEA.  "Reference | |

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

1107:14 is made to your recent letter in which you
1107:15 requested that Bergen Brunswig be permitted
1107:16 to replace its current telephonic reporting
1107:17 of suspicious orders with a daily report
1107:18 transmitted by facsimile."
1107:19 Okay?  So the DEA is saying
1107:20 your request is to report your daily
1107:21 suspicious order reporting, correct?
1107:22  A. Correct.
1107:23  Q. Okay.  The DEA goes on to say,
1107:24 "We have reviewed your proposal and feel that      D1922.1.4
1107:25 it could be a viable alternative to the
1108:1 current system.  It is our understanding that
1108:2 a computer program has been created that can
1108:3 compare a customer's controlled substances
1108:4 orders to an average of the customer's order
1108:5 for the prior four months.  Customer orders
1108:6 that exceed their four-month average order
1108:7 history by an as-yet unspecified percentage
1108:8 would be shown on a summary report that would
1108:9 be sent to the appropriate DEA field office
1108:10 on a daily basis."
1108:11 Did I read that correctly?
1108:12  A. Yes.

1109:6 - 1109:14    **Prevoznik, Thomas 05-17-2019 (00:00:19)**      **V1.144**
D1922.1.5
1109:6  Q. "As proposed, the summary
1109:7 report would include the customer's name,
1109:8 address and DEA number, a description of the
1109:9 item ordered, the NDC number, date ordered,
1109:10 active ingredient volume ordered and shipped,
1109:11 and the customer's allowance on average -- or
1109:12 average order."
1109:13 Did I read that correctly?
1109:14  A. Yes.

1109:24 - 1110:7    **Prevoznik, Thomas 05-17-2019 (00:00:21)**      **V1.145**

1109:24  Q. Okay.  Now, do you see anywhere
1109:25 in the first two paragraphs where the DEA      D1922.1.6
1110:1 clarifies that what you are proposing Bergen
1110:2 Brunswig is an excessive purchase reporting
1110:3 system, not a suspicious order reporting

| | V1-Prevoznik 05060915 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

1110:4 system?

1110:5   A. No, I don't.

1110:6   Q. Okay.  They -- the DEA says      D1922.1.8

1110:7 suspicious order, right?

**1110:11 - 1110:15   Prevoznik, Thomas 05-17-2019 (00:00:07)**      **V1.146**

1110:11   Q. The first sentence.

1110:12   A. Yes, it's reference to your

1110:13 letter.

1110:14   Q. Suspicious order?

1110:15   A. Yeah.

**1112:23 - 1113:10   Prevoznik, Thomas 05-17-2019 (00:00:25)**      **V1.147**

1112:23   Q. Okay.  Now, the next -- the

1112:24 third paragraph.  "We note that unlike the      D1922.1.7

1112:25 program that generates Bergen Brunswig's

1113:1 monthly suspicious order report, the new

1113:2 program will compare the customer's order to

1113:3 his or her previous orders rather than to

1113:4 orders placed by other customers."

1113:5 Did I read that correctly?

1113:6   A. Yes.

1113:7   Q. Now, the DEA is the one

1113:8 referring to the monthly report as a

1113:9 suspicious order report, correct?      clear

1113:10   A. Yes.

**1117:16 - 1117:21   Prevoznik, Thomas 05-17-2019 (00:00:13)**      **V1.148**

1117:16   Q. Tom Gitchel, okay, he's the one

1117:17 that wrote this letter, right?

1117:18   A. Yes.

1117:19   Q. And at least to Tom Gitchel,

1117:20 Bergen Brunswig's monthly report was a

1117:21 suspicious order report?

**1117:24 - 1118:10   Prevoznik, Thomas 05-17-2019 (00:00:22)**      **V1.149**

1117:24 THE WITNESS:  I'm not sure what

1117:25 Tom -- yeah.

1118:1 QUESTIONS BY MR. MAHADY:

1118:2   Q. But Tom refers to it as a

1118:3 monthly suspicious order report, correct?

1118:4   A. Right.

1118:5   Q. All right.  And at least to Tom

1118:6 Gitchel, his understanding of what was being

| Page/Line | Source | ID |
|---|---|---|

**V1-Prevoznik 05060915**

1118:7 proposed is a daily fax of suspicious orders
1118:8 that would include, among other information,
1118:9 the amount that was shipped, correct?
1118:10   A. Correct.

1119:9 - 1119:20 | **Prevoznik, Thomas 05-17-2019 (00:00:24)** | **V1.150**

1119:9 Tom Gitchel was the chief
1119:10 liaison -- the chief of the liaison and
1119:11 policy section, right?
1119:12   A. Yes.
1119:13   Q. He's not some low-level DEA
1119:14 employee, right?
1119:15   A. No.
1119:16   Q. He's pretty high up?
1119:17   A. Yes.
1119:18   Q. Okay.  And his section was the
1119:19 one that was responsible for interpreting the
1119:20 regulations, correct?

1119:24 - 1119:24 | **Prevoznik, Thomas 05-17-2019 (00:00:01)** | **V1.151**

1119:24 THE WITNESS:  Yes.

1122:12 - 1122:13 | **Prevoznik, Thomas 05-17-2019 (00:00:04)** | **V1.152**
| | A781.4

1122:12   Q. I would like to mark Prevoznik
1122:13 25.

1122:14 - 1122:24 | **Prevoznik, Thomas 05-17-2019 (00:00:24)** | **V1.153**

1122:14 (Prevoznik Exhibit 25 marked
1122:15 for identification.)
1122:16 QUESTIONS BY MR. MAHADY:
1122:17   Q. For the record, while the
1122:18 witness has an opportunity to read the
1122:19 document, the Bates number is
1122:20 ABDCMDL00269350.
1122:21 It's a letter from Chris                 | | A781.5.1
1122:22 Zimmerman to Thomas Gitchel, chief liaison
1122:23 and policy section, US DEA, December 30,  | | A781.4.1
1122:24 1997.

1127:13 - 1127:16 | **Prevoznik, Thomas 05-17-2019 (00:00:17)** | **V1.154**

1127:13   Q. Okay.  Based off of this
1127:14 document, Bergen Brunswig Drug Corporation
1127:15 developed this suspicious order reporting
1127:16 system in '96 to '98 with the DEA?

1127:19 - 1128:3 | **Prevoznik, Thomas 05-17-2019 (00:00:21)** | **V1.155**

| Page/Line | Source | ID |
|---|---|---|

**V1-Prevoznik 05060915**

1127:19 THE WITNESS:  From the various
1127:20 letters that you've given me, Bergen
1127:21 Brunswig came with a system that they
1127:22 wanted to show us, asked us for our
1127:23 input.  So they showed us the design
1127:24 of what they were -- the design of the
1127:25 system that they were proposing to put
1128:1 nationwide.
1128:2 So we provided input.  We                                    clear
1128:3 tested it with them.  So, yes.

**1129:6 - 1129:8**     **Prevoznik, Thomas 05-17-2019 (00:00:12)**     **V1.156**
1129:6  Q.  Okay.  And in designing it, the
1129:7 DEA provided input on the design, correct?
1129:8  A. Yes.

**1129:12 - 1129:13**     **Prevoznik, Thomas 05-17-2019 (00:00:04)**     **V1.157**
1129:12  Q. And the DEA tested the program,
1129:13 correct?

**1129:15 - 1129:20**     **Prevoznik, Thomas 05-17-2019 (00:00:09)**     **V1.158**
1129:15 THE WITNESS:  Yes.
1129:16 QUESTIONS BY MR. MAHADY:
1129:17  Q. And the DEA, based off of this
1129:18 document, was very pleased with how the
1129:19 suspicious order monitoring program was being
1129:20 run, correct?

**1129:23 - 1129:24**     **Prevoznik, Thomas 05-17-2019 (00:00:01)**     **V1.159**
1129:23 THE WITNESS:  That's what it
1129:24 appears from the letter.

**1134:20 - 1134:23**     **Prevoznik, Thomas 05-17-2019 (00:00:13)**     **V1.160**
1134:20  Q. Now, we've seen at least two
1134:21 responses from DEA about the program.
1134:22 They're approving a suspicious order
1134:23 monitoring system, right?

**1135:2 - 1135:10**     **Prevoznik, Thomas 05-17-2019 (00:00:14)**     **V1.161**
1135:2 THE WITNESS:  They're approving
1135:3 the system -- they're approving the
1135:4 implementation of the system that
1135:5 Bergen Brunswig designed.  That's what
1135:6 they're approving.
1135:7 QUESTIONS BY MR. MAHADY:
1135:8  Q. Okay.  We can go back to

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 1135:9 Prevoznik 22, please. | A2658.1 |
|  | 1135:10  A. 22. | |
| 1135:11 - 1136:7 | **Prevoznik, Thomas 05-17-2019 (00:01:08)** | V1.162 |
|  | 1135:11   Q. Mr. Prevoznik, we've already | |
|  | 1135:12 looked at this document, but now that we've | |
|  | 1135:13 reviewed what the program consisted of, I | |
|  | 1135:14 just want to ask a couple follow-up | |
|  | 1135:15 questions. | |
|  | 1135:16 First sentence of this document | A781.1.1 - A2658.1.6 |
|  | 1135:17 from Patricia Good, chief liaison and policy | |
|  | 1135:18 section, states, "This is to grant approval | |
|  | 1135:19 of your request to implement on a nationwide | |
|  | 1135:20 basis your newly developed system to identify | |
|  | 1135:21 and report suspicious orders for controlled | |
|  | 1135:22 substances and regulated chemicals as | |
|  | 1135:23 required by federal regulation." | |
|  | 1135:24 Correct? | |
|  | 1135:25  A. Correct, that's what it says. | clear |
|  | 1136:1   Q. And the subject of this | |
|  | 1136:2 document that was drafted by the DEA, within | |
|  | 1136:3 the possession, custody and control of the | |
|  | 1136:4 DEA and produced in [sic] the DEA in this | |
|  | 1136:5 litigation, is "approved suspicious order | |
|  | 1136:6 monitoring system"; is that correct? | |
|  | 1136:7  A. Yes, that's what it says. | |
| 1139:10 - 1139:16 | **Prevoznik, Thomas 05-17-2019 (00:00:26)** | V1.163 |
|  | 1139:10   Q. Okay.  Mr. Prevoznik, the DEA | |
|  | 1139:11 approved for implementation nationwide a | |
|  | 1139:12 suspicious order monitoring system that | |
|  | 1139:13 reported suspicious orders to the DEA on a | |
|  | 1139:14 daily basis after the report -- after the | |
|  | 1139:15 orders had already been shipped, correct? | |
|  | 1139:16  A. Yes. | |
| 1140:12 - 1140:16 | **Prevoznik, Thomas 05-17-2019 (00:00:12)** | V1.164 |
|  | 1140:12   Q. Do you recall taking the | |
|  | 1140:13 training classes to the Bergen Brunswig, | |
|  | 1140:14 AmerisourceBergen distribution centers in | |
|  | 1140:15 Richmond, Virginia? | |
|  | 1140:16  A. Yes. | |
| 1144:12 - 1144:14 | **Prevoznik, Thomas 05-17-2019 (00:00:05)** | V1.165 |

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |
| | 1144:12  Q. And that was valuable -- that | |
| | 1144:13 was, in fact, a valuable experience for your | |
| | 1144:14 diversion investigator trainees? | |
| 1144:16 - 1144:16 | **Prevoznik, Thomas 05-17-2019 (00:00:01)** | **V1.166** |
| | 1144:16 THE WITNESS:  Yes. | |
| 1144:18 - 1144:21 | **Prevoznik, Thomas 05-17-2019 (00:00:05)** | **V1.167** |
| | 1144:18  Q. Okay.  And AmerisourceBergen | |
| | 1144:19 partnered with you to provide that training, | |
| | 1144:20 right? | |
| | 1144:21  A. Yes. | |
| 1146:7 - 1146:9 | **Prevoznik, Thomas 05-17-2019 (00:00:08)** | **V1.168** |
| | 1146:7 Do you recall DEA awarded | |
| | 1146:8 AmerisourceBergen a certificate of | |
| | 1146:9 appreciation in 2004? | |
| 1146:11 - 1146:14 | **Prevoznik, Thomas 05-17-2019 (00:00:03)** | **V1.169** |
| | 1146:11 THE WITNESS:  Yes. | |
| | 1146:12 QUESTIONS BY MR. MAHADY: | |
| | 1146:13  Q. Okay.  And they were deserving | |
| | 1146:14 of that recognition? | |
| 1146:16 - 1146:16 | **Prevoznik, Thomas 05-17-2019 (00:00:01)** | **V1.170** |
| | 1146:16 THE WITNESS:  Yes. | |
| 1146:20 - 1146:24 | **Prevoznik, Thomas 05-17-2019 (00:00:21)** | **V1.171** |
| | 1146:20 Now, fortunately for you, I do | |
| | 1146:21 want to revisit P22, which is the DEA | |
| | 1146:22 memorandum summarizing the distributor | |
| | 1146:23 initiative conference presentation with | |
| | 1146:24 AmerisourceBergen. | |
| 1149:14 - 1149:21 | **Prevoznik, Thomas 05-17-2019 (00:00:25)** | **V1.172** |
| | 1149:14  Q. Okay.  So at this meeting, the | |
| | 1149:15 DEA represented to Mr. Steve Mays of | |
| | 1149:16 AmerisourceBergen that if the DEA identified | |
| | 1149:17 a highly suspicious pharmacy to which | |
| | 1149:18 AmerisourceBergen was the wholesaler, it | |
| | 1149:19 would notify AmerisourceBergen via e-mail of | |
| | 1149:20 that pharmacy, correct? | |
| | 1149:21  A. That's what it says. | |
| 1151:5 - 1151:14 | **Prevoznik, Thomas 05-17-2019 (00:00:33)** | **V1.173** |
| | 1151:5  Q. This one-and-a-half-page | |
| | 1151:6 summary of the meeting prepared by DEA about | |
| | 1151:7 the DEA's meeting with AmerisourceBergen, | |

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 1151:8 does it say in here, in this summary, | |
|  | 1151:9 anywhere, that the DEA advised | |
|  | 1151:10 AmerisourceBergen that it should not ship | |
|  | 1151:11 orders that it reports as suspicious in | |
|  | 1151:12 the -- I'm not talking about the | |
|  | 1151:13 presentation, we'll get to that in a second, | |
|  | 1151:14 but in the summary itself. | |
| 1151:15 - 1151:15 | **Prevoznik, Thomas 05-17-2019 (00:00:02)** | **V1.174** |
|  | 1151:15   A. No. | |
| 1157:15 - 1157:18 | **Prevoznik, Thomas 05-17-2019 (00:00:14)** | **V1.175** |
|  | 1157:15   Q. Okay.  And the system that was | |
|  | 1157:16 designed, that the DEA approved to implement, | |
|  | 1157:17 using your words, had after-the-fact | |
|  | 1157:18 reporting, correct? | |
| 1157:21 - 1157:21 | **Prevoznik, Thomas 05-17-2019 (00:00:01)** | **V1.176** |
|  | 1157:21 THE WITNESS:  Yes. | |
| 1167:16 - 1168:13 | **Prevoznik, Thomas 05-17-2019 (00:00:54)** | **V1.177** |
|  | 1167:16   Q. Earlier today Ms. Singer showed | |
|  | 1167:17 you Diversion Investigator Manuals, correct? | |
|  | 1167:18   A. Yes. | |
|  | 1167:19   Q. You don't have to take them | |
|  | 1167:20 out. | |
|  | 1167:21   A. Okay. | |
|  | 1167:22   Q. I don't think so. | |
|  | 1167:23 Diversion Investigator Manuals, | |
|  | 1167:24 those are internal DEA documents, right? | |
|  | 1167:25   A. Yes. | |
|  | 1168:1   Q. Okay.  And what's contained in | |
|  | 1168:2 the Diversion Investigator Manuals is not | |
|  | 1168:3 shared with the public, correct? | |
|  | 1168:4   A. Correct. | |
|  | 1168:5   Q. Okay.  And so a registrant | |
|  | 1168:6 can't just go online and look up the DEA's | |
|  | 1168:7 Diversion Investigator Manuals from 1990, | |
|  | 1168:8 correct? | |
|  | 1168:9   A. Correct. | |
|  | 1168:10   Q. Okay.  And so when those | |
|  | 1168:11 Diversion Investigator Manuals were in | |
|  | 1168:12 effect, AmerisourceBergen did not have a copy | |
|  | 1168:13 of that manual, right? | |

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |

| Page/Line | Source | ID |
|---|---|---|
| 1168:16 - 1168:17 | **Prevoznik, Thomas 05-17-2019 (00:00:01)** | **V1.178** |
| | 1168:16 THE WITNESS:  Not to my | |
| | 1168:17 knowledge. | |
| 1205:1 - 1205:15 | **Prevoznik, Thomas 05-17-2019 (00:00:31)** | **V1.179** |
| | 1205:1   Q. And you were a diversion | |
| | 1205:2 investigator until 2001? | |
| | 1205:3   A. Well, I still think I am. | |
| | 1205:4   Q. That's right. | |
| | 1205:5   A. Still have the same job series. | |
| | 1205:6   Q. Your primary duty was as a | |
| | 1205:7 diversion investigator until 2001? | |
| | 1205:8   A. Yes. | |
| | 1205:9   Q. And in that situation, you were | |
| | 1205:10 out in the field offices? | |
| | 1205:11   A. Yes. | |
| | 1205:12   Q. Okay.  And you joined the | |
| | 1205:13 Office of Diversion Control at headquarters | |
| | 1205:14 in May 2012? | |
| | 1205:15   A. I believe it was April. | |
| 1206:6 - 1206:7 | **Prevoznik, Thomas 05-17-2019 (00:00:05)** | **V1.180** |
| | 1206:6 Now, not every order of unusual | |
| | 1206:7 size is indicative of diversion, correct? | |
| 1206:10 - 1206:14 | **Prevoznik, Thomas 05-17-2019 (00:00:07)** | **V1.181** |
| | 1206:10 THE WITNESS:  Correct. | |
| | 1206:11 QUESTIONS BY MS. MAINIGI: | |
| | 1206:12   Q. There could be legitimate | |
| | 1206:13 reasons for a pharmacy to place an order of | |
| | 1206:14 unusual size, correct? | |
| 1206:17 - 1206:20 | **Prevoznik, Thomas 05-17-2019 (00:00:07)** | **V1.182** |
| | 1206:17 THE WITNESS:  Correct. | |
| | 1206:18 QUESTIONS BY MS. MAINIGI: | |
| | 1206:19   Q. Can you think of any examples | |
| | 1206:20 that come to mind for that, Mr. Prevoznik? | |
| 1206:23 - 1207:1 | **Prevoznik, Thomas 05-17-2019 (00:00:07)** | **V1.183** |
| | 1206:23 THE WITNESS:  For which one? | |
| | 1206:24 QUESTIONS BY MS. MAINIGI: | |
| | 1206:25   Q. Why a pharmacy may place a | |
| | 1207:1 larger than usual order. | |
| 1207:6 - 1207:13 | **Prevoznik, Thomas 05-17-2019 (00:00:24)** | **V1.184** |
| | 1207:6 THE WITNESS:  It could be a new | |

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |

|  |  |  |
|---|---|---|
| | 1207:7 hospital opened, a new clinic opened. | |
| | 1207:8  A. new hospice center could have | |
| | 1207:9 opened.  Any one of those. | |
| | 1207:10 QUESTIONS BY MS. MAINIGI: | |
| | 1207:11  Q. And, Mr. Prevoznik, not every | |
| | 1207:12 order of unusual frequency is indicative of | |
| | 1207:13 diversion, correct? | |
| 1207:16 - 1207:20 | **Prevoznik, Thomas 05-17-2019 (00:00:06)** | **V1.185** |
| | 1207:16 THE WITNESS:  Correct. | |
| | 1207:17 QUESTIONS BY MS. MAINIGI: | |
| | 1207:18  Q. There could be legitimate | |
| | 1207:19 reasons for an order of unusual frequency, | |
| | 1207:20 true? | |
| 1207:23 - 1208:2 | **Prevoznik, Thomas 05-17-2019 (00:00:10)** | **V1.186** |
| | 1207:23 THE WITNESS:  True. | |
| | 1207:24 QUESTIONS BY MS. MAINIGI: | |
| | 1207:25  Q. Can you think of some examples | |
| | 1208:1 as to why a pharmacy may place an order that | |
| | 1208:2 is of unusual frequency? | |
| 1208:7 - 1208:13 | **Prevoznik, Thomas 05-17-2019 (00:00:17)** | **V1.187** |
| | 1208:7 THE WITNESS:  Again, it could | |
| | 1208:8 be a new customer base, prescriber, a | |
| | 1208:9 new doctor's office opened. | |
| | 1208:10 That probably would be for a | |
| | 1208:11 period of time, and then it would not | |
| | 1208:12 keep going and going.  It would level | |
| | 1208:13 out at some point. | |
| 1208:21 - 1208:24 | **Prevoznik, Thomas 05-17-2019 (00:00:07)** | **V1.188** |
| | 1208:21  Q. Now, Mr. Prevoznik, not every | |
| | 1208:22 order that deviates substantially from a | |
| | 1208:23 normal ordering pattern is indicative of | |
| | 1208:24 diversion, correct? | |
| 1209:2 - 1209:7 | **Prevoznik, Thomas 05-17-2019 (00:00:11)** | **V1.189** |
| | 1209:2 THE WITNESS:  Correct. | |
| | 1209:3 QUESTIONS BY MS. MAINIGI: | |
| | 1209:4  Q. And could there be legitimate | |
| | 1209:5 reasons for an ordering pattern that is | |
| | 1209:6 abnormal in some manner? | |
| | 1209:7  A. Yeah, there could be. | |
| 1212:13 - 1212:16 | **Prevoznik, Thomas 05-17-2019 (00:00:12)** | **V1.190** |

| | V1-Prevoznik 05060915 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 1212:13   Q. And I believe that you | |
| | 1212:14 indicated that there was not any sort of | |
| | 1212:15 requirement by the DEA of the maintenance of | |
| | 1212:16 due diligence files, correct? | |
| 1212:19 - 1212:19 | **Prevoznik, Thomas 05-17-2019 (00:00:02)** | **V1.191** |
| | 1212:19 THE WITNESS:  Yes. | |
| 1213:21 - 1213:24 | **Prevoznik, Thomas 05-17-2019 (00:00:10)** | **V1.192** |
| | 1213:21 Are there -- are you aware of | |
| | 1213:22 DEA ever issuing any guidelines specific to | |
| | 1213:23 due diligence that describe how due diligence | |
| | 1213:24 should be conducted? | |
| 1214:2 - 1214:3 | **Prevoznik, Thomas 05-17-2019 (00:00:03)** | **V1.193** |
| | 1214:2 THE WITNESS:  No, not -- it's | |
| | 1214:3 the statute and the regulation. | |
| 1215:24 - 1216:2 | **Prevoznik, Thomas 05-17-2019 (00:00:11)** | **V1.194** |
| | 1215:24   Q. So has the DEA ever issued any | |
| | 1215:25 guidance, Mr. Prevoznik, that serves as a | |
| | 1216:1 checklist, for example, of everything that | |
| | 1216:2 would go into effective controls? | |
| 1216:5 - 1216:12 | **Prevoznik, Thomas 05-17-2019 (00:00:19)** | **V1.195** |
| | 1216:5 THE WITNESS:  Not to my | |
| | 1216:6 knowledge. | |
| | 1216:7 QUESTIONS BY MS. MAINIGI: | |
| | 1216:8   Q. Coming back to the concept of | |
| | 1216:9 due diligence, the DEA has not issued any | |
| | 1216:10 guidance specifying how long a registrant | |
| | 1216:11 must hold on to due diligence, correct? | |
| | 1216:12   A. Correct. | |
| 1218:17 - 1218:23 | **Prevoznik, Thomas 05-17-2019 (00:00:19)** | **V1.196** |
| | 1218:17   Q. The DEA has certainly never | |
| | 1218:18 issued any sort of guidance indicating that | |
| | 1218:19 registrants must hold on to due diligence | |
| | 1218:20 files for 15 years, correct? | |
| | 1218:21   A. Yes.  The only guidance I know | |
| | 1218:22 is it's two years, two years for | |
| | 1218:23 recordkeeping for the registrant. | |
| 1219:1 - 1219:10 | **Prevoznik, Thomas 05-17-2019 (00:00:19)** | **V1.197** |
| | 1219:1   Q. But there's no requirement that | |
| | 1219:2 a due diligence file even be maintained, | |
| | 1219:3 correct? | |

| Page/Line | Source | ID |
|---|---|---|
| | **V1-Prevoznik 05060915** | |

1219:4   A. Correct.
1219:5   Q. So the two-year rule does not
1219:6 apply to any due diligence files, per se,
1219:7 correct?
1219:8   A. Correct.  I was just pointing
1219:9 out that within the regs, there is records
1219:10 for a two-year period.

**1220:20 - 1220:23**   **Prevoznik, Thomas 05-17-2019 (00:00:09)**   **V1.198**

1220:20   Q. Is there any sort of
1220:21 requirement, either by the DEA or by the
1220:22 registrant, to hold on to an actual
1220:23 suspicious order being reported to the DEA?

**1221:1 - 1221:1**   **Prevoznik, Thomas 05-17-2019 (00:00:02)**   **V1.199**

1221:1 THE WITNESS:  No.

**1221:2 - 1221:7**   **Prevoznik, Thomas 05-17-2019 (00:00:18)**   **V1.200**

1221:2 QUESTIONS BY MS. MAINIGI:
1221:3   Q. Has the DEA issued any sort of
1221:4 guidance indicating how long a suspicious
1221:5 order that's been reported must be
1221:6 maintained?
1221:7   A. No.

**1223:11 - 1223:14**   **Prevoznik, Thomas 05-17-2019 (00:00:09)**   **V1.201**

1223:11   Q. And is it fair to say not every
1223:12 suspicious order that is reported to a
1223:13 regional office actually results in some sort
1223:14 of investigation?

**1223:17 - 1223:17**   **Prevoznik, Thomas 05-17-2019 (00:00:00)**   **V1.202**

1223:17 THE WITNESS:  Yes.

**1232:21 - 1233:1**   **Prevoznik, Thomas 05-17-2019 (00:00:18)**   **V1.203**

1232:21   Q. Now, has DEA ever issued any
1232:22 sort of guidance or pronouncement essentially
1232:23 saying that you must -- as a distributor in
1232:24 that circumstance, you must terminate all
1232:25 future controlled substance sales to a
1233:1 customer if you report an order to the DEA?

**1233:5 - 1233:25**   **Prevoznik, Thomas 05-17-2019 (00:00:36)**   **V1.204**

1233:5 THE WITNESS:  Well, it depends
1233:6 what they're -- what are they sending
1233:7 as the order.  What is the order that
1233:8 they're saying is suspicious, correct?

| | V1-Prevoznik 05060915 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

1233:9 QUESTIONS BY MS. MAINIGI:

1233:10   Q. Well, the distributor reports a

1233:11 suspicious order for customer X.

1233:12   A. Of what?

1233:13   Q. Of controlled substances.

1233:14   A. So they're reporting the entire

1233:15 order as being suspicious?

1233:16   Q. Correct.

1233:17 That's what they're obligated

1233:18 to do, correct?  Right?

1233:19   A. Correct.

1233:20   Q. Okay.  So they report a

1233:21 suspicious order to the DEA for customer X.

1233:22 Customer X may have other

1233:23 orders that are pending down the line.

1233:24 Should the distributor cut off all orders to

1233:25 customer X?

**1234:20 - 1235:3**    **Prevoznik, Thomas 05-17-2019 (00:00:21)**     **V1.205**

1234:20   A. So that registrant has made the

1234:21 decision -- has -- from their system they've

1234:22 deemed it a suspicious order.  So they should

1234:23 not ship until -- if they choose to, if they

1234:24 want to alleviate that suspicion.  If they

1234:25 choose not to, then they shouldn't ship.

1235:1 But if they choose to, then it

1235:2 becomes they need to look into it further to

1235:3 alleviate that suspicion.

**1236:2 - 1236:4**    **Prevoznik, Thomas 05-17-2019 (00:00:03)**     **V1.206**

1236:2   Q. Okay.  But they could choose to

1236:3 ship it if they wanted to.  That's a business

1236:4 judgment, right?

**1236:7 - 1236:9**    **Prevoznik, Thomas 05-17-2019 (00:00:03)**     **V1.207**

1236:7 THE WITNESS:  They could ship

1236:8 it if they -- yeah, it's a business

1236:9 decision.

**1238:6 - 1238:11**    **Prevoznik, Thomas 05-17-2019 (00:00:14)**     **V1.208**

1238:6   Q. Are they required to hold the

1238:7 other orders that they don't view to be

1238:8 suspicious, or is it okay for the distributor

1238:9 in that instance to exercise their business

| V1-Prevoznik 05060915 | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | | |
| --- | --- | --- |
| | 1238:10 judgment and send those nonsuspicious orders | |
| | 1238:11 out? | |
| 1238:14 - 1238:20 | **Prevoznik, Thomas 05-17-2019 (00:00:13)** | **V1.209** |
| | 1238:14 THE WITNESS: Yes. | |
| | 1238:15 QUESTIONS BY MS. MAINIGI: | |
| | 1238:16 Q. Yes what? | |
| | 1238:17 A. They can. | |
| | 1238:18 Q. Okay. They can ship those | |
| | 1238:19 other orders out? | |
| | 1238:20 A. Yes. | |
| 1239:18 - 1240:4 | **Prevoznik, Thomas 05-17-2019 (00:00:37)** | **V1.210** |
| | 1239:18 Is it fair to say that DEA has | |
| | 1239:19 no internal policy defining the circumstances | |
| | 1239:20 under which a distributor is required to | |
| | 1239:21 terminate the distribution of controlled | |
| | 1239:22 substances to a pharmacy? | |
| | 1239:23 A. Yes. | |
| | 1239:24 Q. Now, do you recall being asked | |
| | 1239:25 last time a number of questions about the | |
| | 1240:1 NWDA suspicious order monitoring system? And | |
| | 1240:2 we may have even looked at it today. | |
| | 1240:3 Do you remember that? | |
| | 1240:4 A. Yes. | |
| 1242:7 - 1242:17 | **Prevoznik, Thomas 05-17-2019 (00:00:23)** | **V1.211** |
| | 1242:7 Q. So if we take a look at page 1 | D1923.2 |
| | 1242:8 of the NWDA document, Mr. Prevoznik -- | |
| | 1242:9 A. Yes. | |
| | 1242:10 Q. -- second paragraph under | D1923.2.1 |
| | 1242:11 background, could you read that out loud? | |
| | 1242:12 A. "The National Wholesale | |
| | 1242:13 Druggists' Association voluntarily began | |
| | 1242:14 working with the Department of Justice, Drug | |
| | 1242:15 Enforcement Administration, in establishing | |
| | 1242:16 controls clearly aimed at reducing or | |
| | 1242:17 eliminating illegal product distribution." | |
| 1252:2 - 1253:14 | **Prevoznik, Thomas 05-17-2019 (00:01:23)** | **V1.212** |
| | 1252:2 Q. Okay. So we just went over | |
| | 1252:3 this system that the DEA obviously had input | |
| | 1252:4 into that included two components, right? | |
| | 1252:5 A. Yes. | |

| V1-Prevoznik 05060915 | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

1252:6   Q. And the two components -- what
1252:7 was the first component?
1252:8   A. It was the after sales.
1252:9   Q. Okay.  So the excessive
1252:10 purchase, right?
1252:11   A. Yes.
1252:12   Q. What was the second component?
1252:13   A. The -- let me check.  The
1252:14 suspicious orders.
1252:15   Q. Right.
1252:16 So those are the two components
1252:17 of the NWDA system, right?
1252:18   A. Yes.
1252:19   Q. And the sentences that he's got
1252:20 after the one I asked you to read, he's
1252:21 essentially saying, doing the first doesn't
1252:22 relieve you of the obligation to do the
1252:23 second, right?
1252:24   A. Correct.
1252:25   Q. Okay.  So read that sentence to
1253:1 me again that begins with "this system."                    D1923.12.1
1253:2   A. "This system, as proposed, will
1253:3 meet the reporting requirements of 21 CFR
1253:4 1301.74."
1253:5   Q. And what is 1301.74(b) of 21
1253:6 CFR?
1253:7   A. Suspicious orders.
1253:8   Q. Okay.  So Mr. Gitchel, who's
1253:9 acting chief of diversion operations, is
1253:10 saying in this letter that this two-component
1253:11 system that we've been discussing, as
1253:12 proposed, will meet the reporting
1253:13 requirements of suspicious orders, correct?
1253:14   A. That's what it says.

1253:19 - 1253:23   **Prevoznik, Thomas 05-17-2019 (00:00:29)**          **V1.213**

1253:19   Q. A distributor, Mr. Prevoznik,
1253:20 who in that time period followed this system
1253:21 that NWDA proposed, their system, at least,
1253:22 would be in compliance with 21 CFR
1253:23 1301.74(b), correct?

| | V1-Prevoznik 05060915 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 1254:1 - 1254:7 | **Prevoznik, Thomas 05-17-2019 (00:00:26)** | **V1.214** |
| | 1254:1 THE WITNESS:  Yes, but this | |
| | 1254:2 date is 1984.  You've been asking me | |
| | 1254:3 1996 to 2006, so -- so, yeah, 1984. | clear |
| | 1254:4 QUESTIONS BY MS. MAINIGI: | |
| | 1254:5   Q. Do you -- are you aware of any | |
| | 1254:6 communication by Mr. Gitchel subsequently | |
| | 1254:7 that overruled his statements? | |
| 1254:9 - 1254:16 | **Prevoznik, Thomas 05-17-2019 (00:00:20)** | **V1.215** |
| | 1254:9 THE WITNESS:  Not to my | |
| | 1254:10 knowledge. | |
| | 1254:11 QUESTIONS BY MS. MAINIGI: | |
| | 1254:12   Q. Now, in this letter that | |
| | 1254:13 Mr. Gitchel wrote, he doesn't say anything | |
| | 1254:14 about halting shipment of excessive or | |
| | 1254:15 suspicious orders, right? | |
| | 1254:16   A. No. | |
| 1261:3 - 1261:15 | **Prevoznik, Thomas 05-17-2019 (00:00:30)** | **V1.216** |
| | 1261:3 Do you recall from the time | |
| | 1261:4 period of about 2007 to 2013, DEA did not | |
| | 1261:5 want to sit down with HDMA to provide them | |
| | 1261:6 with guidance or guidelines related to an | |
| | 1261:7 adequate suspicious order monitoring system? | |
| | 1261:8   A. Yes. | |
| | 1261:9   Q. "Yes" meaning they did not want | |
| | 1261:10 to sit down with HDMA? | |
| | 1261:11   A. Right. | |
| | 1261:12   Q. Whereas in the late '90s, we | |
| | 1261:13 saw that they were willing to sit down with | |
| | 1261:14 HDMA, right? | |
| | 1261:15   A. Correct. | |

Defendants' Counter Designations = 01:19:52

**Total Time = 01:19:52**

**Documents Shown**
A2658
A781
D106

| Page/Line | Source | ID |
|---|---|---|
| D107 | | |
| D1894 | | |
| D1922 | | |
| D1923 | | |