**Designation Run Report**

# Gray, John - Plaintiffs' Submission

_____

**Gray, John 07-30-2020**

_____

**Plaintiffs Affirmative Designations  03:30:34**

**Defense Completeness Counters  00:03:47**

**Plaintiffs Counter Counters  00:00:40**

**Total Time  03:35:01**



ID:JG02

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

JG02-Gray, John - Plaintiffs' Submission

| Page/Line | Source | ID |
|---|---|---|
| 19:6 - 20:23 | **Gray, John 07-30-2020 (00:01:27)** | JG02.1 |

19:6  Q. Good morning, Mr. Gray.  My
19:7 name is Eric Kennedy.  I represent the
19:8 plaintiffs, various cities and counties
19:9 across the country, most specifically, Cabell
19:10 County in West Virginia and the City of
19:11 Huntington in West Virginia.
19:12 Could you please state your
19:13 full name for the record, sir?
19:14   A. John Mitchell Gray, G-R-A-Y.
19:15   Q. And you are the former
19:16 president and CEO of the HDA; would that be
19:17 correct?
19:18   A. That is correct.
19:19   Q. And can you tell us, what does
19:20 the HDA stand for, what does that stand for?
19:21   A. Healthcare Distribution
19:22 Alliance.
19:23   Q. The HDA was formally known as
19:24 the HDMA; is that true?
19:25   A. Correct.
20:1   Q. And can you tell us what HDMA
20:2 stood for?
20:3   A. Healthcare Distribution
20:4 Management Association.
20:5   Q. In the course of my
20:6 questioning, if I reference HDA or I talk
20:7 about HDMA, you'll understand we are talking
20:8 about the same thing?
20:9   A. Right, right.  Same thing.
20:10   Q. When did you become the
20:11 president and CEO of the HDA?
20:12   A. April 2004.
20:13   Q. And how long were you the
20:14 president?
20:15   A. Until May of 2020.
20:16   Q. You are a lawyer?
20:17   A. Correct.
20:18   Q. You have a master's of business
20:19 in addition to that?

| JG02-Gray, John - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | | |
| --- | --- | --- |
| | 20:20   A. Correct. | |
| | 20:21   Q. And can you tell me how many | |
| | 20:22 lawyers from the HDA are here participating | |
| | 20:23 in this proceeding today?  Do you know? | |
| 21:8 - 21:16 | **Gray, John 07-30-2020 (00:00:14)** | **JG02.2** |
| | 21:8   A. Just Liz Gallenagh. | |
| | 21:9 BY MR. KENNEDY: | |
| | 21:10   Q. And outside attorneys | |
| | 21:11 representing you today would be | |
| | 21:12 Mr. Weinstein; is that correct? | |
| | 21:13   A. Correct. | |
| | 21:14   Q. And did you meet with them in | |
| | 21:15 preparation for your deposition? | |
| | 21:16   A. We did. | |
| 21:22 - 22:23 | **Gray, John 07-30-2020 (00:01:01)** | **JG02.3** |
| | 21:22   Q. Now, the HDA or the HDMA is the | |
| | 21:23 industry trade organization for primary | |
| | 21:24 distributors; would that be accurate, sir? | |
| | 21:25   A. Primary, yes. | |
| | 22:1   Q. And the HDA is funded by its | |
| | 22:2 members? | |
| | 22:3   A. Both manufacturers and | |
| | 22:4 distributors. | |
| | 22:5   Q. Members, correct? | |
| | 22:6   A. Correct. | |
| | 22:7   Q. And the mission and the | |
| | 22:8 priorities of the HDA would be driven by its | |
| | 22:9 members, true? | |
| | 22:10   A. Correct. | |
| | 22:11   Q. Cardinal, McKesson, | |
| | 22:12 AmerisourceBergen are members? | |
| | 22:13   A. They are. | |
| | 22:14   Q. And if I look at the documents, | |
| | 22:15 I hear often in this litigation, they are | |
| | 22:16 often referred to as the Big Three.  Are you | |
| | 22:17 familiar with that reference? | |
| | 22:18   A. It's an industrywide | |
| | 22:19 expression. | |
| | 22:20   Q. And they are called the Big | |
| | 22:21 Three because collectively, individually, | |

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 22:22 they are the three largest distributors of | |
| | 22:23 opioids into the American communities. | |
| 23:2 - 23:15 | **Gray, John 07-30-2020 (00:00:26)** | JG02.4 |
| | 23:2   A. No, that's not accurate. | |
| | 23:3 BY MR. KENNEDY: | |
| | 23:4   Q. They're not the three largest | |
| | 23:5 distributors of opioids? | |
| | 23:6   A. I don't know about the opioids, | |
| | 23:7 but they're the three largest distributors of | |
| | 23:8 all pharmaceuticals in the United States. | |
| | 23:9   Q. And do you understand, sir, | |
| | 23:10 that they distribute -- by the mid teens, by | |
| | 23:11 2014, '15, '16, they probably distributed | |
| | 23:12 close to 90% of the opioids into this | |
| | 23:13 country. | |
| | 23:14 Do you understand that to be | |
| | 23:15 true? | |
| 23:18 - 24:14 | **Gray, John 07-30-2020 (00:00:45)** | JG02.5 |
| | 23:18   A. Yeah, I've read that in the | |
| | 23:19 media accounts. | |
| | 23:20 BY MR. KENNEDY: | |
| | 23:21   Q. Now, the HDA and the HDMA has | |
| | 23:22 an executive committee, does it not? | |
| | 23:23   A. It does. | |
| | 23:24   Q. A seven-person, seven-member | |
| | 23:25 executive committee? | |
| | 24:1   A. That's correct. | |
| | 24:2   Q. And McKesson, Cardinal, | |
| | 24:3 AmerisourceBergen each have a guaranteed | |
| | 24:4 position on the executive committee based | |
| | 24:5 upon their financial contribution share; is | |
| | 24:6 that true? | |
| | 24:7   A. No, not that I'm aware of. | |
| | 24:8 When I came on board they had permanent | |
| | 24:9 seats, and the decision behind that was | |
| | 24:10 before me.  I don't know what the metric, if | |
| | 24:11 there was one at all. | |
| | 24:12   Q. They have permanent | |
| | 24:13 positions on -- | |
| | 24:14   A. They have permanent seats. | |

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| 24:22 - 25:11 | **Gray, John 07-30-2020 (00:00:28)** | JG02.6 |

24:22   Q. Only distributors sit on the
24:23 executive committee, true?
24:24   A. Only distributors.
24:25   Q. And McKesson, Cardinal and
25:1 AmerisourceBergen have permanent positions on
25:2 the executive committee?
25:3   A. That's correct.
25:4   Q. Now, the executive committee,
25:5 can we agree, is the primary decision-maker
25:6 at the HDMA or the HDA?
25:7   A. For certain things.
25:8   Q. Well, they approve
25:9 expenditures, do they not?
25:10   A. They run -- they approve the
25:11 budget.

| 26:12 - 26:19 | **Gray, John 07-30-2020 (00:00:17)** | JG02.7 |

26:12   Q. The executive committee
26:13 determined your salary, did they not?
26:14   A. They do.  It's part of the
26:15 budget.
26:16   Q. Let's -- I'm going to pull
26:17 Exhibit 64 if we could, just so we can better
26:18 understand the authority of the executive
26:19 committee.

| 27:2 - 28:5 | **Gray, John 07-30-2020 (00:00:54)** | JG02.8 |

27:2   Q. Exhibit 64 -- do you see the
27:3 top of that?  This says Healthcare
27:4 Distribution Management Association Bylaws.
27:5 Do you see that?
27:6   A. Yeah, I do.
27:7   Q. And I think this is for 2011,
27:8 right?
27:9   A. I don't know.  I don't see a
27:10 date on it.
27:11   Q. Well, go to page Bates
27:12 number 519, if you would.
27:13   A. Oh.
27:14   Q. That's the last page, 519.
27:15   A. Okay.

| Page/Line | Source | ID |
|---|---|---|

**JG02-Gray, John - Plaintiffs' Submission**

27:16  Q. Do you see that, updated
27:17 June 5, 2011?
27:18  A. Okay.  That's the date on the
27:19 back, okay.
27:20  Q. You're familiar with the bylaws
27:21 of the organization that you were the
27:22 president and the CEO of, true?
27:23  A. Uh-huh, correct.
27:24  Q. Go to page 7.
27:25  A. Okay.
28:1  Q. The board only met twice a
28:2 year, correct?
28:3  A. The board met twice a year.
28:4  Q. So go to -- I'm sorry --
28:5 page 12, the Bates 512.

| 28:14 - 30:22 | **Gray, John 07-30-2020 (00:02:19)** | **JG02.9** |
|---|---|---|

28:14  Q. You see the section Executive
28:15 Committee?
28:16  A. Correct.
28:17  Q. Go down to (c).
28:18  A. Uh-huh.
28:19  Q. Does (c) state:  Except as
28:20 provided in Article V, Section 5; Article VI,
28:21 Section 4; Article VIII, Section 3,
28:22 et cetera, et cetera; or otherwise provided
28:23 by resolution of the Board of Directors, in
28:24 the interim between meetings of the Board of
28:25 Directors, the Executive Committee shall
29:1 possess all of the powers and the authority
29:2 of the Board.
29:3 Did I read that right?
29:4  A. That is correct.
29:5  Q. Subject only to subsequent
29:6 reporting of its action to the Board of
29:7 Directors at the latter's next meeting.
29:8 Correct?
29:9  A. That's right.
29:10  Q. The board meets twice a year,
29:11 every six months, true?
29:12  A. It met in June and October.

| Page/Line | Source | ID |
|---|---|---|

**JG02-Gray, John - Plaintiffs' Submission**

29:13   Q. To continue, your bylaws state:
29:14 Such power -- again, we're talking about the
29:15 board of the executive committee.  Such power
29:16 and authority shall include, but not be
29:17 limited to, approval of the annual budget of
29:18 the association, setting the terms and
29:19 conditions of the employment of the president
29:20 and CEO.
29:21 And that was you, correct?
29:22   A. Correct.
29:23   Q. Including hiring and retention?
29:24   A. Right.
29:25   Q. And the execution of the
30:1 priorities, policies and positions of the
30:2 association as identified and developed by
30:3 the board of directors.
30:4   A. Correct.
30:5   Q. That was the power of the
30:6 executive committee, correct?
30:7   A. Correct.
30:8   Q. And Cardinal, McKesson and
30:9 AmerisourceBergen all held permanent
30:10 positions on the executive committee, true?
30:11   A. That's correct.
30:12   Q. Let's talk about money.
30:13 McKesson, Cardinal and AmerisourceBergen each
30:14 paid over $1 million a year in dues to the
30:15 HDA, true?
30:16   A. Beginning -- whew.  That didn't
30:17 begin until 2000 and -- possibly 2007, 2008.
30:18   Q. So from 2008 on, with some
30:19 annual increases, each of the Big Three was
30:20 paying in dues over a million dollars a
30:21 year, true?
30:22   A. True.

**31:16 - 33:24**   **Gray, John 07-30-2020 (00:02:37)**                                    **JG02.292**

31:16   Q. The Big Three contributed to
31:17 the political action committee, did they not,
31:18 of the HDA?
31:19   A. They did.  They did.

| Page/Line | Source | ID |
|---|---|---|

31:20   Q. In addition to that, they also
31:21 would fund special projects that you folks
31:22 carried out at the HDA, would they not?
31:23   A. I don't recall any particular
31:24 study they or any one of them funded the
31:25 entirety of it.  There might have been other
32:1 companies involved.
32:2   Q. Let me use an example.  You
32:3 know the Reservoir PR firm, do you not, sir?
32:4   A. Correct.
32:5   Q. They came on board in 2016 to
32:6 help the HDA with public relations, and we'll
32:7 talk about that in some detail, but they came
32:8 on in 2016.  And do you recall that the Big
32:9 Three, McKesson, Cardinal and
32:10 AmerisourceBergen, each funded the hiring of
32:11 that PR firm to the tune of over $1.2 million
32:12 each?
32:13 Do you remember that, sir?
32:14   A. And all the individual members
32:15 paid assessments relative to the sizes of
32:16 their companies, yes.
32:17   Q. Absolutely, sir.
32:18 The Big Three each paid over
32:19 a million dollars, and the next-closest
32:20 contribution among your members was $50,000,
32:21 20 times less than the Big Three.  Do you
32:22 recall that, sir?
32:23   A. Not -- not that number, I do
32:24 not.
32:25   Q. Can we agree, sir, without the
33:1 money of the Big Three, the HDMA would not
33:2 exist in its present form, true?
33:3   A. Well, I don't believe you can
33:4 say that's absolutely true.
33:5   Q. All right.  Can we agree that
33:6 you certainly wouldn't make your current
33:7 budget or your budget in 2019 or '18 or '17
33:8 or '15, you never would make those budgets
33:9 without the money of the Big Three, true?

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

33:10   A. Again, I would say not
33:11 necessarily.
33:12   Q. It was 40% of your budget,
33:13 right?
33:14   A. At the time, but that was based
33:15 on the relative relationship of the other
33:16 members, including the manufacturers.
33:17   Q. Sir, in addition -- let's kind
33:18 of hone down to what the HDA is all about.
33:19 In addition to you representing the
33:20 priorities of your members, with respect to
33:21 the Big Three, McKesson, Cardinal,
33:22 AmerisourceBergen, the Big Three used the HDA
33:23 to do and to say what they couldn't or
33:24 wouldn't do and say, correct?

**34:4 - 34:7**      **Gray, John 07-30-2020 (00:00:09)**      **JG02.11**

34:4   A. I -- it's not correct.
34:5   Q. All right.  Let me -- let's
34:6 look at something.  I'm going to look at --
34:7 pull out Exhibit 52, if you would, sir.

**34:14 - 34:16**      **Gray, John 07-30-2020 (00:00:08)**      **JG02.12**

34:14   Q. This is an e-mail.  Take a look
34:15 at the top, the "from" and the "to" and the
34:16 attachments.  This is an e-mail --

**34:20 - 34:22**      **Gray, John 07-30-2020 (00:00:03)**      **JG02.13**

34:20 THE WITNESS:  Yeah, I've not
34:21 seen this.  Obviously, I don't know
34:22 this one.

**36:12 - 37:18**      **Gray, John 07-30-2020 (00:00:56)**      **JG02.14**

36:12 MR. KENNEDY:  Are we ready?
36:13 THE WITNESS:  Go ahead.
36:14 BY MR. KENNEDY:
36:15   Q. All right.  Mr. Gray, you see
36:16 that this is an e-mail from Gabriel
36:17 Weissman --
36:18   A. Uh-huh.
36:19   Q. -- at AmerisourceBergen.
36:20 Do you see that at the top?
36:21   A. I do.
36:22   Q. Do you know Gabriel Weissman?

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

36:23   A. Just in passing.

36:24   Q. This is from January of 2018.

36:25 Do you see that?

37:1   A. Right.

37:2   Q. It's to another person from

37:3 AmerisourceBergen?

37:4   A. Correct.

37:5   Q. And the subject, background on

37:6 Washington Post letter.  There's a review of

37:7 a letter that you were sending to the

37:8 Washington Post to complain about their

37:9 reporting of the opioid distributors.

37:10 Do you remember that letter,

37:11 sir?

37:12   A. Correct.

37:13   Q. And the letter is attached, and

37:14 Mr. Gabriel has reviewed the letter as a

37:15 member of the executive committee.  So as a

37:16 member of the executive committee, he's

37:17 reviewing your letter you sent to the

37:18 Washington Post, right?

**37:19 - 38:4**   **Gray, John 07-30-2020 (00:00:22)**   **JG02.291**

37:19   A. The letter isn't attached.  I

37:20 don't have the letter.

37:21   Q. Now, let's look at the first

37:22 paragraph.  If we can go down to the third

37:23 line of the sentence that starts with "A

37:24 draft of the letter is attached," all right?

37:25 You see that?  A draft of the letter is

38:1 attached.

38:2   A. It isn't.  It isn't, but okay.

38:3   Q. You see that?

38:4   A. I see it.

**38:7 - 38:22**   **Gray, John 07-30-2020 (00:00:44)**   **JG02.15**

38:7 THE WITNESS:  Yep.

38:8 BY MR. KENNEDY:

38:9   Q. Mr. Weissman from

38:10 AmerisourceBergen, after reviewing the letter

38:11 to the Washington Post that you are sending,

38:12 he states:  A draft of the letter is

| Page/Line | Source | ID |
|---|---|---|

38:13 attached.  I've provided some high-level
38:14 feedback, but intentionally tried to avoid
38:15 line editing of HDA materials as I believe
38:16 the strength of a trade association on topics
38:17 like this is that they are able to say the
38:18 things we can't/won't, and I typically try
38:19 not to put us in a position to, quote, "sign
38:20 off" on the more aggressive materials.
38:21 That was his statement.
38:22   A. Okay.

**39:14 - 39:21**    **Gray, John 07-30-2020 (00:00:18)**    **JG02.16**

39:14   Q. Let's start over.  What
39:15 AmerisourceBergen is saying here is they want
39:16 to be able to direct what the HDA does, they
39:17 want to be able to review such things like
39:18 this letter, and then they want to be able to
39:19 deny any involvement.
39:20 That's what he's getting at,
39:21 correct?

**39:24 - 40:20**    **Gray, John 07-30-2020 (00:01:00)**    **JG02.17**

39:24   A. No, that's not correct.  That
39:25 is a complete misunderstanding of the role of
40:1 any trade association in Washington, D.C.
40:2 representing any industry.  And that is not
40:3 the main motivation behind any of this, but
40:4 that is, generally speaking, a function of
40:5 the trade association is to be the voice of
40:6 all its members, and whether I'm in, you
40:7 know, pharma, National Restaurant
40:8 Association, AARP or whatever, and this is --
40:9 this is merely a statement basically of
40:10 common practice in Washington trade
40:11 organizations, and it's not that one company
40:12 weighs in more than another.
40:13 BY MR. KENNEDY:
40:14   Q. So what you mean is the common
40:15 practice there in Washington, D.C. where
40:16 you're sitting today is, quote, as he says,
40:17 "the strength of a trade association on
40:18 topics like this is that they are able to say

| Page/Line | Source | ID |
|---|---|---|
| | 40:19 the things we can't and won't."  That's your | |
| | 40:20 strength, sir? | |
| 40:23 - 40:23 | **Gray, John 07-30-2020 (00:00:00)** | **JG02.18** |
| | 40:23   A. Yeah. | |
| 40:24 - 41:2 | **Gray, John 07-30-2020 (00:00:11)** | **JG02.19** |
| | 40:24 BY MR. KENNEDY: | |
| | 40:25   Q. Okay.  And McKesson and | |
| | 41:1 Cardinal, along with AmerisourceBergen, | |
| | 41:2 recognized that strength, did they not, sir? | |
| 41:5 - 43:19 | **Gray, John 07-30-2020 (00:02:53)** | **JG02.20** |
| | 41:5   A. Whether they did or didn't, I | |
| | 41:6 really never spoke to them about it.  I don't | |
| | 41:7 know. | |
| | 41:8 BY MR. KENNEDY: | |
| | 41:9   Q. Let's look at 2005 to 2007, all | |
| | 41:10 right?  You came in 2004. | |
| | 41:11   A. Right. | |
| | 41:12   Q. Let's look at the period of '05 | |
| | 41:13 to '07, all right? | |
| | 41:14   A. Yep. | |
| | 41:15   Q. You were the CEO and the | |
| | 41:16 president of the HDMA at that point, true? | |
| | 41:17   A. Yes. | |
| | 41:18   Q. And you recall in 2005 the DEA | |
| | 41:19 launched what it called the Distributor | |
| | 41:20 Initiative.  Do you remember that? | |
| | 41:21   A. I actually thought it was | |
| | 41:22 later.  I don't know the exact date. | |
| | 41:23   Q. All right.  The Distributor | |
| | 41:24 Initiative involved the DEA actually going | |
| | 41:25 down and sitting down with each of the | |
| | 42:1 distributors in person to talk about the | |
| | 42:2 diversion of opioids into our communities and | |
| | 42:3 talk about the DEA expectations of the | |
| | 42:4 distributors with respect to stopping | |
| | 42:5 diversion. | |
| | 42:6 Do you recall that, sir? | |
| | 42:7   A. Not in that timeline and not to | |
| | 42:8 that degree of specificity. | |
| | 42:9   Q. Well, you certainly know that | |

JG02-Gray, John - Plaintiffs' Submission

| Page/Line | Source | ID |
|---|---|---|

42:10 in 2005 -- in 2005 each of the Big Three sat
42:11 down with the DEA to talk about the diversion
42:12 and the DEA expectations of McKesson and
42:13 Cardinal and AmerisourceBergen.
42:14 Do you recall that?
42:15   A. I had no access to that
42:16 information.
42:17   Q. In 2006, a year into this
42:18 initiative, sir, do you recollect that the
42:19 DEA -- (audio malfunction) -- and increased
42:20 its enforcement actions against certain
42:21 distributors in the '06-07 time frame?
42:22   A. No.
42:23   Q. Do you recall that in this time
42:24 frame, the DEA actually brought enforcement
42:25 actions against McKesson, Cardinal and
43:1 AmerisourceBergen?
43:2   A. Not in that time frame, I don't
43:3 recall that.
43:4   Q. Do you remember in 2007, sir,
43:5 that at the direction of your distributors,
43:6 the HDA made the DEA its top priority?
43:7   A. No.  It might have been a
43:8 priority, but not necessarily -- not the only
43:9 priority, and certainly at that time,
43:10 probably my recollection would be not the top
43:11 priority at all.
43:12   Q. Well, sir, I'm very clear in my
43:13 question.
43:14 Top, number one priority
43:15 beginning in '07 was the DEA, true?  Top
43:16 priority.
43:17   A. I cannot recall if it was the
43:18 top priority.
43:19   Q. Let's look at Exhibit 40.

| 43:25 - 46:10 | **Gray, John 07-30-2020 (00:02:54)** | JG02.21 |

43:25   Q. And when I say top, I mean
44:1 number one, all right?
44:2   A. I hear you.
44:3   Q. Exhibit 40 is an e-mail by you,

| Page/Line | Source | ID |
|---|---|---|

44:4 October 30, 2007.

44:5   A. Uh-huh.

44:6   Q. Your name, John Gray, and you

44:7 are sending it to Paul Julian.  Who is Paul

44:8 Julian?

44:9   A. Paul Julian was the group

44:10 president of McKesson, distribution company.

44:11   Q. 2007, you say in your e-mail:

44:12 Paul:  I hope your McKesson board meeting

44:13 went well.  The HDMA board meeting was very

44:14 good.  The budget was approved with very

44:15 little discussion.  Everyone was pleased with

44:16 the balanced budget and no dues increases for

44:17 2008.

44:18 Now, here's what's important.

44:19 You state:  The DEA issue concerning the

44:20 recent surge in DEA enforcement around

44:21 suspicious orders and methadone was moved to

44:22 the top of the HDMA priority list -- issue

44:23 list.

44:24 Do you see that?

44:25   A. I do.

45:1   Q. It was at the top of your

45:2 priority list.  That's the truth as you

45:3 stated back in 2007, sir, true?

45:4   A. No, because you're

45:5 misunderstanding what that meant.  We had a

45:6 dashboard with three letters, A, B and C, and

45:7 before that, I believe the DEA issues were a

45:8 B level priority along with a good 10 or 15

45:9 other issues.  It was then moved up to the A

45:10 list of issues, such as federal preemption on

45:11 pedigree, on deficit reduction, retail survey

45:12 price.  It was one of a myriad of issues that

45:13 we considered priority issues for the

45:14 association.  But to say it was the top

45:15 priority issue is a complete

45:16 mischaracterization of what was actually

45:17 being said.

45:18   Q. Sir, I understand.  Eric

| JG02-Gray, John - Plaintiffs' Submission | |  |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 45:19 Kennedy sitting over here isn't saying -- | |
| | 45:20   A. I understand. | |
| | 45:21   Q. -- moved to the top of the HDMA | |
| | 45:22 priority list.  Those are your words, sir. | |
| | 45:23 Did I read that accurately, where you say | |
| | 45:24 that the DEA was moved to the top of the HDMA | |
| | 45:25 priority issue list?  Did I read that right, | |
| | 46:1 your words? | |
| | 46:2   A. The words are absolutely | |
| | 46:3 correct.  The statement of it is the top, | |
| | 46:4 along with multiple others, but I didn't | |
| | 46:5 repeat all the other issues. | |
| | 46:6   Q. More specifically, sir, the DEA | |
| | 46:7 in your words, top of the priority list, what | |
| | 46:8 was at the top of the priority list was the | |
| | 46:9 DEA and its enforcement actions against the | |
| | 46:10 distributors, correct? | |
| 46:13 - 46:13 | **Gray, John 07-30-2020 (00:00:00)** | JG02.22 |
| | 46:13   A. No. | |
| 46:16 - 47:2 | **Gray, John 07-30-2020 (00:00:45)** | JG02.23 |
| | 46:16   Q. Well, let me ask you:  You say | |
| | 46:17 here in your e-mail that you were talking | |
| | 46:18 about the surge, a recent surge in DEA | |
| | 46:19 enforcement.  Is that what it says? | |
| | 46:20   A. Yes. | |
| | 46:21   Q. Are those your words?  Yes? | |
| | 46:22 Those are your words? | |
| | 46:23   A. Right. | |
| | 46:24   Q. Now, despite the DEA moving to | |
| | 46:25 the top of this priority list, in 2012, the | |
| | 47:1 HDA had to increase or double its efforts | |
| | 47:2 with respect to the DEA, did it not, in 2012? | |
| 47:6 - 47:7 | **Gray, John 07-30-2020 (00:00:03)** | JG02.24 |
| | 47:6   Q. Do you recall that, sir, 2012, | |
| | 47:7 a special year? | |
| 47:9 - 47:15 | **Gray, John 07-30-2020 (00:00:13)** | JG02.25 |
| | 47:9   A. Say that again.  What did we do | |
| | 47:10 in 2012? | |
| | 47:11 BY MR. KENNEDY: | |
| | 47:12   Q. 2012, you folks had to sit down | |

| | | |
|---|---|---|
| **JG02-Gray, John - Plaintiffs' Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

47:13 and increase your focus and your efforts with

47:14 respect to the DEA and its enforcement

47:15 actions.

**47:19 - 49:6**   **Gray, John 07-30-2020 (00:01:23)**   **JG02.26**

47:19   A. No, not specifically.  I mean,

47:20 it was always -- we were always -- by 2012 we

47:21 were working that issue on a variety of

47:22 levels.  Was it more than 2011 or less than

47:23 2013, I couldn't recall.

47:24 BY MR. KENNEDY:

47:25   Q. All right.  2012, Cardinal had

48:1 its registration suspended in February by the

48:2 DEA with respect to certain of its

48:3 distribution centers.  Do you recall that,

48:4 sir, one of the Big Three?

48:5   A. I think it was one of its

48:6 distribution centers, correct?

48:7   Q. Taken away in 2012, Cardinal,

48:8 right?

48:9   A. Yes.

48:10   Q. Do you recall that in 2012

48:11 McKesson got a series of subpoenas from the

48:12 DEA with respect to documents and records in

48:13 2012; that was happening to another member of

48:14 the Big Three in 2012?

48:15   A. Yeah, I don't -- I do not

48:16 recall that.  At this time I don't recall

48:17 that.

48:18   Q. Do you recall in 2012 CVS and

48:19 Walgreens, both of them, they got

48:20 registrations suspended by the DEA --

48:21   A. Well, the CVS one I remember.

48:22   Q. Do you remember in 2012 the

48:23 Attorney General for the state of

48:24 West Virginia filed a lawsuit against 14

48:25 distributors, 11 of them were members of the

49:1 HDA?  Do you recall that?

49:2   A. That's -- I recall that.

49:3   Q. 2012 was a big year at the HDA.

49:4 They had to, at the direction of the

| Page/Line | Source | ID |
|---|---|---|
| 49:9 - 49:18 | 49:5 executive committee, begin to focus even more<br>49:6 on the DEA, true?<br>**Gray, John 07-30-2020 (00:00:23)**<br>49:9   A. You know, I would hesitate to<br>49:10 just say we were doing it more or less.  We<br>49:11 were doing it.<br>49:12 BY MR. KENNEDY:<br>49:13   Q. Sir, in 2012, the HDA on behalf<br>49:14 of its members was so concerned about the DEA<br>49:15 that you personally organized a meeting with<br>49:16 a Washington, D.C. law firm, Williams &<br>49:17 Connolly.  Do you remember organizing that<br>49:18 meeting, sir? | JG02.27 |
| 49:21 - 50:7 | **Gray, John 07-30-2020 (00:00:22)**<br>49:21   A. Which firm did we do?<br>49:22 BY MR. KENNEDY:<br>49:23   Q. Williams & Connolly --<br>49:24   A. Williams & Connolly?<br>49:25   Q. Yes, sir.<br>50:1   A. Yep.<br>50:2   Q. You organized a meeting, sir,<br>50:3 in 2012 with this Washington, D.C. law firm<br>50:4 to try to figure out what to do with the DEA<br>50:5 and its enforcement of the law against<br>50:6 distributors.  That's why that meeting was<br>50:7 put together, true? | JG02.28 |
| 50:19 - 50:22 | **Gray, John 07-30-2020 (00:00:09)**<br>50:19 THE WITNESS:  Well, that was my<br>50:20 next question.  It was an<br>50:21 attorney-client relationship.  I don't<br>50:22 feel I should answer any of that. | JG02.29 |
| 50:25 - 51:1 | **Gray, John 07-30-2020 (00:00:01)**<br>50:25 MR. KENNEDY:  Let's look at<br>51:1 Exhibit 2.  Let's look at Exhibit 2, | JG02.30 |
| 51:10 - 53:20 | **Gray, John 07-30-2020 (00:02:30)**<br>51:10   Q. Because in 2012, McKesson,<br>51:11 Cardinal and AmerisourceBergen said you<br>51:12 needed to do something about the<br>51:13 distributors, and so you organized a special<br>51:14 meeting in Washington, D.C. -- | JG02.31 |

**JG02-Gray, John - Plaintiffs' Submission**

| Page/Line | Source | ID |
|-----------|--------|----|

51:15   A. Yes.

51:16   Q. -- with this law firm, true?

51:17   A. Right.  That's -- that's what

51:18 you just referred to, correct.

51:19   Q. Okay.  Absolutely.  Let's look

51:20 at Exhibit 2.  This is an e-mail from you,

51:21 John Gray, is it not, sir?

51:22   A. Let me see.  Let me

51:23 double-check.  To -- looks like to the entire

51:24 executive committee, all seven members,

51:25 right.

52:1   Q. All seven members including the

52:2 Big Three, true?

52:3   A. And -- right, and copied to our

52:4 counsel, our outside counsel.

52:5   Q. You state, sir, here in

52:6 April 2012:  Gentlemen:  After our last

52:7 telephone conference call on April 6, HDA met

52:8 with legal counsel, Bob Barnett and Richard

52:9 Cooper of Williams & Connolly in

52:10 Washington, D.C.  Both attorneys were very

52:11 helpful several years ago in initializing our

52:12 original meetings with the DEA after the

52:13 first outbreak of ISOs.

52:14 ISOs are immediate suspension

52:15 orders, right?

52:16   A. Correct.

52:17   Q. Those are enforcement actions

52:18 by the DEA, correct?

52:19   A. Correct.

52:20   Q. Given their experience and

52:21 knowledge of the political and legal aspects

52:22 of dealing with DEA, we updated them on the

52:23 industry's recent concerns with DEA's latest

52:24 efforts -- the DEA's latest efforts, those

52:25 are efforts to enforce the law against

53:1 distributors, correct?

53:2   A. Its latest efforts to

53:3 thwart what they considered to be drug

53:4 diversion.

| Page/Line | Source | ID |
|---|---|---|

53:5   Q. Absolutely.

53:6 Recent concerns with DEA's

53:7 latest efforts to thwart drug diversion and

53:8 abuse.  Attached is a brief summary of our

53:9 discussion and conclusions with several

53:10 possible courses of action HDMA could take.

53:11 The entire list of ideas is not necessarily

53:12 mutually exclusive, but does represent a wide

53:13 range of potential actions the association

53:14 and the industry may consider in an effort to

53:15 alter the present direction DEA is taking

53:16 with respect to suspicious order monitoring.

53:17 Sir, the direction the DEA was

53:18 taking, the direction you're talking about

53:19 are actions brought by the DEA against

53:20 distributors to enforce the law, true?

**53:23 - 56:23**    **Gray, John 07-30-2020 (00:03:10)**    **JG02.32**

53:23   A. It was directions to enforce

53:24 their interpretation of the Controlled

53:25 Substances Act.

54:1 BY MR. KENNEDY:

54:2   Q. Absolutely.  And the purpose of

54:3 this meeting was to look for a strategy to,

54:4 as you say, quote, alter the direction of the

54:5 DEA.  That was the purpose of the meeting, to

54:6 alter the DEA's direction.  Is that what it

54:7 says?

54:8   A. Yeah, that's what it says.

54:9   Q. Attached is a memo of that

54:10 meeting.  If you'll turn to the next page.

54:11   A. Yep.

54:12   Q. And this is a memo, if you look

54:13 at the top, you sent this memo to your

54:14 executive committee, true?

54:15   A. Yeah, looks like it.

54:16   Q. Potential -- yes?  Correct?

54:17   A. Yes.

54:18   Q. It says:  Potential approaches

54:19 to addressing DEA enforcement issues.

54:20 Do you see that?

| Page/Line | Source | ID |
|---|---|---|

54:21   A. Uh-huh.

54:22   Q. First paragraph, you state:

54:23 April 13, HDMA staff and legal counsel met

54:24 with Bob Barnett and Rich Cooper from the law

54:25 firm of Williams & Connolly.  The purpose of

55:1 the meeting was to discuss potential

55:2 strategies for addressing DEA-related issues.

55:3 This memo provides an overview of the meeting

55:4 and the proposed recommendations moving

55:5 forward.

55:6 Next paragraph, you state --

55:7 again, you went to Williams & Connolly

55:8 because you respected them as lawyers and

55:9 their advice and their knowledge on this

55:10 particular topic, true?

55:11   A. Yeah, well --

55:12   Q. That's why you went to them.

55:13   A. For a variety of reasons,

55:14 because they understood the Washington

55:15 situation in terms of dealing with the media

55:16 and dealing with the DEA themselves.  It was

55:17 a variety of --

55:18   Q. Absolutely.  Right.  You

55:19 respected them as lawyers.  You respected

55:20 their opinion --

55:21   A. Correct.

55:22   Q. -- and special information and

55:23 knowledge about these issues with the DEA,

55:24 correct?  That's why you went?

55:25   A. Okay.

56:1 Q. The next paragraph you state:

56:2 Mr. Barnett and Mr. Cooper felt that new

56:3 litigation to specifically address our

56:4 concerns with DEA was highly unlikely to be

56:5 successful due to limited momentum in that

56:6 direction.  Moreover, elected officials tend

56:7 to steer away from controversy during an

56:8 election year.

56:9 Here's what's important, what

56:10 your lawyers told you:  They, meaning your

| Page/Line | Source | ID |
|---|---|---|

**JG02-Gray, John - Plaintiffs' Submission**

56:11 lawyers that you set this meeting up with,
56:12 they felt that we may be better off averting
56:13 DEA actions by taking even stronger
56:14 compliance measures.
56:15 Is that what they told you?
56:16   A. You know, if I wrote that at
56:17 the time, it must have been my impression.
56:18 It is -- now, I can't specifically recall.
56:19   Q. You want to avert DEA actions.
56:20 They said maybe your distributors should take
56:21 even stronger compliance measures.  That's
56:22 what you wrote?
56:23   A. Okay.

| 57:2 - 57:8 | **Gray, John 07-30-2020 (00:00:18)** | **JG02.33** |
|---|---|---|

57:2   Q. I mean, sir, it was pretty
57:3 simple advice, wasn't it?  They were kind of
57:4 saying to you and the distributors:  If you
57:5 want to stop getting arrested for robbing
57:6 banks, maybe you ought to just stop robbing
57:7 banks.  Pretty straightforward, simple,
57:8 commonsense advice from your lawyers, right?

| 57:12 - 57:25 | **Gray, John 07-30-2020 (00:00:32)** | **JG02.34** |
|---|---|---|

57:12   Q. Correct?
57:13   A. I mean, that's your
57:14 interpretation.  That's fine.  That's your
57:15 interpretation.  Okay.
57:16   Q. Let me ask you this.  We're
57:17 going to talk about this a lot today.
57:18 Instead of taking your lawyers' advice to
57:19 work with the distributors to become more
57:20 compliant with the law, instead of taking
57:21 that advice, what the HDA decided to do
57:22 instead was launch a public relations
57:23 program; isn't that what happened, sir, back
57:24 in 2012?
57:25   A. No, that is not --

| 58:6 - 58:13 | **Gray, John 07-30-2020 (00:00:27)** | **JG02.35** |
|---|---|---|

58:6   Q. Sir, let me be real clear:
58:7 Instead of deciding to become more compliant
58:8 with the law, as your lawyers recommended,

| Page/Line | Source | ID |
|---|---|---|
| | 58:9 the HDMA decided to launch a public relations | |
| | 58:10 program to try to convince people that the | |
| | 58:11 distributors were becoming more compliant | |
| | 58:12 with the law; isn't that exactly what | |
| | 58:13 happened starting -- | |
| 58:17 - 58:17 | **Gray, John 07-30-2020 (00:00:00)** | JG02.36 |
| | 58:17   Q. -- in 2012? | |
| 58:21 - 58:22 | **Gray, John 07-30-2020 (00:00:03)** | JG02.37 |
| | 58:21   Q. Isn't that exactly what | |
| | 58:22 happened starting in 2012, sir? | |
| 58:24 - 60:5 | **Gray, John 07-30-2020 (00:01:13)** | JG02.38 |
| | 58:24   A. There are several things in | |
| | 58:25 2012.  Public relations was one of them. | |
| | 59:1 These lists of the items in the rest of the | |
| | 59:2 memo were actions that the distributors were | |
| | 59:3 considering taking to do their own -- | |
| | 59:4 essentially, set up their own ARCOS database, | |
| | 59:5 their own thresholds because we had tried and | |
| | 59:6 failed extensively over five years to get the | |
| | 59:7 DEA to rule-make around defining the concepts | |
| | 59:8 and the contours of suspicious order. | |
| | 59:9 And so the -- one of their | |
| | 59:10 suggestions was maybe you need to just do | |
| | 59:11 your own and self-police since DEA wasn't | |
| | 59:12 going to do that.  That's the gist of all | |
| | 59:13 this.  And then public relations was also one | |
| | 59:14 other element of it. | |
| | 59:15 BY MR. KENNEDY: | |
| | 59:16   Q. One other element?  Is that | |
| | 59:17 your statement, sir.  One other element? | |
| | 59:18   A. Yeah, in addition to the | |
| | 59:19 consideration or all these particular tactics | |
| | 59:20 which were considered. | |
| | 59:21   Q. Let's take a look at your | |
| | 59:22 statement.  Let's move forward and look at | |
| | 59:23 the decision on the part of your executive | |
| | 59:24 committee, on the part of your counsel, on | |
| | 59:25 the part of your board of directors -- | |
| | 60:1   A. Uh-huh. | |
| | 60:2   Q. -- to move forward with public | |

JG02-Gray, John - Plaintiffs' Submission

| Page/Line | Source | ID |
|---|---|---|

**JG02-Gray, John - Plaintiffs' Submission**

60:3 relations instead of putting its money into
60:4 becoming more compliant.  Let's take a look
60:5 at that.

| 60:9 - 60:10 | **Gray, John 07-30-2020 (00:00:02)** | **JG02.39** |

60:9   Q. Let's start with Exhibit 17, if
60:10 you could.

| 60:16 - 61:19 | **Gray, John 07-30-2020 (00:00:52)** | **JG02.40** |

60:16   Q. Exhibit 17, these are the
60:17 minutes from the Government and Public Policy
60:18 Council meeting, correct?
60:19   A. Let me just see a minute.
60:20 Which date?  September 2012.  Okay.
60:21   Q. This is September 18th, 2012,
60:22 correct?
60:23   A. Yeah.
60:24   Q. And the Government and Public
60:25 Policy Council, that is a council of the
61:1 HDMA, true?
61:2   A. It is.
61:3   Q. And the minutes -- we're going
61:4 to talk about a lot of minutes, but the
61:5 minutes to the executive committee meetings,
61:6 the board of directors --
61:7   A. Yeah.
61:8   Q. -- the minutes were kept in the
61:9 ordinary course of business of the HDA; would
61:10 that be true?
61:11   A. They were.
61:12   Q. And they were usually put
61:13 together by folks with firsthand knowledge of
61:14 what happened at the meeting because they
61:15 were present at the meeting.  Would that be
61:16 customarily true with respect to the minutes
61:17 that we would look at?
61:18   A. Outside counsel did these
61:19 minutes.

| 61:25 - 62:23 | **Gray, John 07-30-2020 (00:00:47)** | **JG02.41** |

61:25   Q. They -- the counsel that put
62:1 these together, some of these, they would
62:2 have firsthand knowledge of what occurred at

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

62:3 the meetings, true?
62:4   A. Well, if they were in the room,
62:5 they did, sure.
62:6   Q. Okay.  And go to the next page,
62:7 if you would, 77 down in the corner.
62:8   A. 7 --
62:9   Q. Government and Public Policy
62:10 Council.  If we look at that, you've got
62:11 members of McKesson there and Cardinal's on
62:12 that council, McKesson's got another person
62:13 on that council.  AmerisourceBergen has
62:14 someone on the council.  They have a second
62:15 person on the council.
62:16   A. Uh-huh.
62:17   Q. Cardinal has a second person on
62:18 the council, correct?
62:19   A. Correct.
62:20   Q. The Big Three is well
62:21 represented on the Government Public Policy
62:22 Council, true?
62:23   A. And our independents are too.

| | | |
|---|---|---|
| 62:24 - 63:3 | **Gray, John 07-30-2020 (00:00:13)** | **JG02.42** |

62:24   Q. And if we go to page 79, it
62:25 looks like you were present at that meeting,
63:1 true?  79, do you see that?
63:2   A. Looks like I was.
63:3   Q. Go to page 88, if you would.

| | | |
|---|---|---|
| 63:4 - 65:25 | **Gray, John 07-30-2020 (00:02:38)** | **JG02.43** |

63:4 Do you see the heading Controlled Substances
63:5 Regulatory Issues within the minutes of this
63:6 meeting?
63:7   A. Yeah.
63:8   Q. That heading, and we're going
63:9 to start with the first paragraph:  Anita
63:10 Ducca, she's from the HDA, true?
63:11   A. Correct.
63:12   Q. What was her position?
63:13   A. She was vice president of
63:14 regulatory affairs.
63:15   Q. She had been there -- how long

| Page/Line | Source | ID |
|---|---|---|

63:16 was she there during your tenure?

63:17   A. She was there all the time

63:18 during my tenure, but when she started, I

63:19 don't know.

63:20   Q. So she is competent, qualified,

63:21 experienced; would that be right?

63:22   A. Well, I didn't work with her

63:23 day to day, but those who worked with her,

63:24 her reviews spoke for themselves.

63:25   Q. And Ms. Ducca states:

64:1 Ms. Ducca presented to the GPPC -- that's the

64:2 Government Public Policy Council, right?

64:3   A. Yep.

64:4   Q. -- and the SBDC regarding

64:5 regulatory pathways for further engagement

64:6 with DEA.

64:7   A. Right.

64:8   Q. There continues to be intense

64:9 DEA scrutiny of wholesale distributors'

64:10 activities and industry would benefit from

64:11 greater clarity from the agency.  Options for

64:12 further engaging DEA to demonstrate wholesale

64:13 distributors' limited role in diversion and

64:14 abuse of controlled substances include.

64:15 Now, we've got six different

64:16 options, and these are the options that

64:17 appeared in the memo from your lawyers in

64:18 D.C., true?

64:19   A. Correct.  Correct.

64:20   Q. Option number one, petitioning

64:21 DEA for changes to rules.

64:22 So that was a thought, we'll

64:23 petition the DEA and they'll clarify the

64:24 rules and that might help distributors become

64:25 more compliant, correct?

65:1   A. That was the -- that was what

65:2 the -- that's what we had been doing.  Yeah,

65:3 that was an ongoing strategy.

65:4   Q. Okay.  Updating the ICG.

65:5 That's the industry compliance guidelines

| Page/Line | Source | ID |
|---|---|---|

65:6 that you folks created in '08, correct?

65:7   A. Correct.

65:8   Q. And there was the thought,

65:9 maybe we'll update those and that could help

65:10 distributors become more compliant?

65:11   A. Well, we -- the problem with

65:12 the ICGs is we didn't know if the DEA agreed

65:13 with them or not agreed with them.

65:14   Q. I didn't ask that, sir.  I

65:15 didn't ask that.

65:16   A. Well, I'm telling you that.

65:17   Q. Next -- we're going to talk in

65:18 depth about the ICGs.

65:19   A. Okay.

65:20   Q. The next, which you mentioned,

65:21 maybe we could collect ARCOS data and kind of

65:22 create our own ARCOS-like database, correct?

65:23   A. That was -- yes.

65:24   Q. You also said another

65:25 possibility mentioned by your lawyers was

**66:1 - 67:4**   **Gray, John 07-30-2020 (00:01:05)**   **JG02.44**

66:1 obtaining distributor access to PDMP data.

66:2   A. Right.

66:3   Q. And that would be drug

66:4 monitoring programs, correct?

66:5   A. Correct.

66:6   Q. And that is data that

66:7 physicians and pharmacists send into a

66:8 statewide database where they have

66:9 information about what type of opioids are

66:10 being prescribed, what type of prescriptions

66:11 are being dispensed, correct?

66:12   A. Yes.

66:13   Q. That was recommended.

66:14 Next recommendation, studying

66:15 and establishing a customer

66:16 algorithm/threshold.  And that was something

66:17 that was discussed with respect to thresholds

66:18 as they relate to suspicious order

66:19 monitoring, true?

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

JG02-Gray, John - Plaintiffs' Submission

66:20   A. I believe so.

66:21   Q. And the final possibility for,

66:22 again, increasing compliance, was retaining a

66:23 third party to conduct an audit, and that

66:24 would be an audit of the internal suspicious

66:25 order monitoring policies and procedures of

67:1 distributors.  Let's get a third party to

67:2 come in and see if they're doing a good job.

67:3 That was something else that was proposed,

67:4 true?

**67:7 - 69:1**   **Gray, John 07-30-2020 (00:01:45)**   **JG02.45**

67:7   A. Yeah, I don't recall that one

67:8 specifically, but it's written here.

67:9 BY MR. KENNEDY:

67:10   Q. And the fact of the matter is

67:11 we've got six proposals here, sir, and this

67:12 council, this HDMA council discussed them --

67:13   A. Uh-huh.

67:14   Q. -- and decided not to pursue at

67:15 this point any of the suggestions, true?

67:16 That's what this document says.

67:17   A. I don't recall without going

67:18 through this and reading the ending.  I don't

67:19 know.

67:20   Q. Let's look at the next

67:21 sentence.

67:22   A. I know they were discussed.

67:23   Q. Let's look at the next

67:24 sentence:  Discussion ensued.  GPPC/SBDC

67:25 members recognized that any such effort would

68:1 be significantly multi-faceted, with a

68:2 regulatory, legislative and communications

68:3 strategy.

68:4 Turn the page, if you would; up

68:5 top sentence -- here's the recommendation of

68:6 this council, sir:  Members recommended

68:7 tabling further discussion of this proposed

68:8 initiative until the board meets and

68:9 discusses the proposed public relations

68:10 strategy.

JG02-Gray, John - Plaintiffs' Submission

| Page/Line | Source | ID |
|---|---|---|
| | 68:11 Do you remember that | |
| | 68:12 recommendation of this committee, sir? | |
| | 68:13   A. Not specifically, but yes, go | |
| | 68:14 ahead. | |
| | 68:15   Q. Is that what the minutes say? | |
| | 68:16 Is that what the minutes say, sir? | |
| | 68:17   A. Yes, it is, but I -- I don't | |
| | 68:18 necessarily have to recall that, but if | |
| | 68:19 that's -- that is what the minutes say. | |
| | 68:20   Q. Let's look at what the board of | |
| | 68:21 directors decides about whether we're going | |
| | 68:22 to get more compliant as our lawyers | |
| | 68:23 recommended or we're just going to launch a | |
| | 68:24 PR program to tell people we're more | |
| | 68:25 compliant.  Let's look at what your board | |
| | 69:1 said.  Exhibit 19. | |
| 69:2 - 69:6 | **Gray, John 07-30-2020 (00:00:01)** | JG02.46 |
| | 69:2 (Whereupon, Deposition Exhibit | |
| | 69:3 Gray-19, 10/1/12 HDMA Meeting Minutes, | |
| | 69:4 HDA_MDL_000088238 - HDA_MDL_000088244, | |
| | 69:5 was marked for identification.) | |
| | 69:6 BY MR. KENNEDY: | |
| 69:7 - 69:23 | **Gray, John 07-30-2020 (00:00:33)** | JG02.47 |
| | 69:7   Q. These are the board of | |
| | 69:8 directors minutes -- | |
| | 69:9   A. Yep. | |
| | 69:10   Q. -- October 1, 2012. | |
| | 69:11   A. Uh-huh. | |
| | 69:12   Q. The board of directors -- the | |
| | 69:13 meeting was held at the Ritz-Carlton Palm | |
| | 69:14 Beach.  Do you recollect going down to Palm | |
| | 69:15 Beach to the Ritz-Carlton? | |
| | 69:16   A. Yep. | |
| | 69:17   Q. McKesson, Cardinal, | |
| | 69:18 AmerisourceBergen all had representatives on | |
| | 69:19 the board, did they not? | |
| | 69:20   A. And all the members were on the | |
| | 69:21 board, correct. | |
| | 69:22   Q. Go to page 41 down in the | |
| | 69:23 bottom corner.  Dot, dot, dot, 41. | |

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

69:24 - 72:14    **Gray, John 07-30-2020 (00:02:51)**    JG02.293

69:24  A. Okay.

69:25  Q. And you see Controlled

70:1 Substances down at the bottom?  We're going

70:2 to look at that.

70:3  A. Uh-huh.

70:4  Q. In your minutes, your minutes

70:5 state Mr. Kelly, HDMA senior vice president,

70:6 government affairs, reported on recent

70:7 developments regarding controlled substances

70:8 diversion and abuse.  HDA has convened a

70:9 Controlled Substances Task Force --

70:10  A. Correct.

70:11  Q. -- which includes elements from

70:12 the legislative, regulatory and public

70:13 relations arenas.  The GPPC -- that's the

70:14 council we just talked about from the HDMA,

70:15 right?

70:16  A. Yep.

70:17  Q. The GPPC supported development

70:18 of a public relations strategy, working with

70:19 an outside firm, to augment legislative and

70:20 regulatory initiatives.

70:21 Do you see that?

70:22  A. Yes.

70:23  Q. Go to the next page, 42.

70:24 Second sentence starts with Mr. Parker.

70:25 Mr. Parker discussed the

71:1 current state of play and the support of the

71:2 Controlled Substances Task Force to engage a

71:3 public relations firm to assist with the

71:4 campaign to better educate the public and

71:5 decision-makers as to what pharmaceutical

71:6 distributors do.  The focus -- this is

71:7 important because we're going to talk about

71:8 this in a minute.

71:9 The focus will be on who we are

71:10 and what we do to deliver lifesaving medicine

71:11 and prevent controlled substance diversion

71:12 and abuse.

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

71:13 You have a presentation
71:14 thereafter by two public relations firms and
71:15 then see where it says Action down below?
71:16   A. Yes.
71:17   Q. Do you see where it says
71:18 Action?
71:19   A. Yep.
71:20   Q. So this is what your board is
71:21 deciding.  That's what action means.  This is
71:22 what we're deciding, this is what we're going
71:23 to do, this is our course, true?  That's what
71:24 action means?
71:25   A. Okay.
72:1   Q. The board decides:  On motion
72:2 duly made and seconded, the board approved
72:3 retaining APCO to assist with the public
72:4 relations initiative, with the budget and
72:5 details to be worked out by the executive
72:6 committee and staff.
72:7 That's what was decided.  That
72:8 was the action taken, true?
72:9   A. Yeah, at that meeting, correct.
72:10   Q. So the decision is made at this
72:11 point in time to hire a PR firm to tell
72:12 people what the distributors are doing to,
72:13 quote, prevent diversion and abuse.  That's
72:14 why they were hired, true?

| 72:17 - 72:24 | **Gray, John 07-30-2020 (00:00:18)** | JG02.48 |

72:17   A. What was the last part of that
72:18 question?  That's what the what?
72:19 BY MR. KENNEDY:
72:20   Q. The focus -- your minutes say
72:21 the focus of this PR firm is going to tell
72:22 people what distributors do to, quote,
72:23 prevent controlled substance diversion and
72:24 abuse.  That was the focus of the PR.

| 73:2 - 73:15 | **Gray, John 07-30-2020 (00:00:21)** | JG02.49 |

73:2   A. Wait, I'm not seeing that
73:3 sentence in the material.  Where is it?
73:4 BY MR. KENNEDY:

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

73:5   Q. It's highlighted -- look at the
73:6 screen.
73:7   A. Yeah, that's what I --
73:8   Q. Do you see that?
73:9   A. Okay.  Yeah.
73:10   Q. That was the focus -- that's
73:11 the focus of the PR campaign at this point in
73:12 time as determined by your board of
73:13 directors.  Is that what the minutes say,
73:14 sir?
73:15   A. That is what it says.

**73:20 - 73:22   Gray, John 07-30-2020 (00:00:10)**                    **JG02.50**

73:20   Q. So the GPPC, the Government
73:21 Public Policy Council, and now the board,
73:22 have said let's do public relations, true?

**74:2 - 74:2   Gray, John 07-30-2020 (00:00:01)**                        **JG02.51**

74:2   Q. True?

**74:4 - 74:17   Gray, John 07-30-2020 (00:00:39)**                      **JG02.52**

74:4   A. Insofar as paragraph -- it
74:5 describes what was discussed in
74:6 paragraph (a), but there are many more things
74:7 discussed beyond that in regarding --
74:8 BY MR. KENNEDY:
74:9   Q. Sir, your lawyer said if you
74:10 want to get the DEA off the back of the
74:11 distributors with respect to enforcing the
74:12 law, your lawyers in Washington, D.C. said
74:13 get more compliant with the law, and the
74:14 board says let's launch a PR program with the
74:15 focus on telling people what we do to prevent
74:16 diversion.  That's the decision made by your
74:17 board in 2012.  Is that what it says, sir?

**74:20 - 76:1   Gray, John 07-30-2020 (00:01:25)**                      **JG02.53**

74:20   A. Yeah, I mean, you've now
74:21 combined two different documents to make that
74:22 conclusion, but individually, this page says
74:23 what it says.  Page 6 or page 88 -- 8242.
74:24 BY MR. KENNEDY:
74:25   Q. Moving down to the bottom of
75:1 the page, if you would, down at the bottom of

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

75:2 page 42.  Do you see where it says Ms. Anita
75:3 Ducca?
75:4  A. Yes.  Yeah.
75:5  Q. She says -- again, she's the VP
75:6 of regulatory affairs.  Ms. Anita Ducca, HDMA
75:7 vice president, regulatory affairs, discussed
75:8 regulatory activities including the
75:9 possibility of petitioning DEA to clarify its
75:10 regulatory requirements for suspicious order
75:11 monitoring.
75:12 That was one of the things that
75:13 your lawyer said you'd like to do, correct?
75:14  A. Correct.
75:15  Q. The next sentence in your
75:16 minutes:  Discussion ensued.  Next page:  And
75:17 the board decided to pursue the public
75:18 relations initiative prior to deciding on the
75:19 desirability of filing a petition with the
75:20 DEA.
75:21 Do you see that?
75:22  A. Right.
75:23  Q. If they petition, they'd have
75:24 to become more compliant, but your board is
75:25 saying let's look to PR first.  Is that what
76:1 your minutes tell us?

| | | |
|---|---|---|
| 76:4 - 76:4 | **Gray, John 07-30-2020 (00:00:00)** | **JG02.54** |

76:4  A. No.

| 76:5 - 76:7 | **Gray, John 07-30-2020 (00:00:03)** | **JG02.55** |

76:5 BY MR. KENNEDY:
76:6  Q. Did I read that correctly, sir?
76:7 Did I read that correctly?

| 76:10 - 77:19 | **Gray, John 07-30-2020 (00:01:11)** | **JG02.56** |

76:10  A. You're reading -- you're
76:11 reading it, but it's far more nuanced than
76:12 that.  We had been after DEA since 2006 to
76:13 actually explain suspicious orders more
76:14 carefully and do rule monitoring, and it was
76:15 decided that because DEA had ignored us for
76:16 six years that, you know what, we had to fix
76:17 the -- fix some of the public relations

| | | |
|---|---|---|
| **JG02-Gray, John - Plaintiffs' Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

76:18 issues before going back to that well, again.
76:19 So you can't read these things
76:20 out of context.  Well, you can, and you are,
76:21 but that's fine.
76:22 BY MR. KENNEDY:
76:23   Q. Did the HDMA ever file a formal
76:24 petition, ever file a formal petition --
76:25   A. You'd have to ask -- I really
77:1 don't recall.
77:2   Q. You don't recall?
77:3   A. No, but I remember
77:4 conversations with DEA when the staff -- we
77:5 would meet with DEA routinely --
77:6   Q. We're going to talk about that.
77:7   A. -- and we asked them that
77:8 regularly, and I believe --
77:9   Q. We're going to talk --
77:10   A. I believe there were documents,
77:11 but off the top of my head, it's been
77:12 14 years, I don't recall.
77:13   Q. Sir, the fact of the matter is
77:14 the HDA never filed a formal petition --
77:15   A. Well --
77:16   Q. -- that asked the DEA to amend
77:17 the regulations with respect to suspicious
77:18 order monitoring.  That is the truth,
77:19 correct?

| 77:22 - 77:22 | **Gray, John 07-30-2020 (00:00:01)** | JG02.57 |

77:22   A. I don't know if that's correct.

| 77:25 - 78:22 | **Gray, John 07-30-2020 (00:00:47)** | JG02.58 |

77:25   Q. No?  At least at this point in
78:1 time the board is saying let's not do that,
78:2 let's do PR.  That's what the minutes say,
78:3 correct?
78:4   A. The minutes say:  Discussion
78:5 ensued and the board decided to pursue the
78:6 public relations initiative prior to deciding
78:7 the desirability of filing a petition.
78:8 That's what is written.
78:9   Q. Thank you.

| JG02-Gray, John - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

|  | 78:10 Let's look at the public | |
|  | 78:11 relations program then that gets launched. | |
|  | 78:12 You hired APCO?  You recall APCO, the public | |
|  | 78:13 relations firm, do you not? | |
|  | 78:14   A. I do. | |
|  | 78:15   Q. Do you recall that in 2012 you | |
|  | 78:16 gave a quarter of a million dollars to APCO | |
|  | 78:17 to begin this public relations program? | |
|  | 78:18   A. I don't recall the exact | |
|  | 78:19 number. | |
|  | 78:20   Q. Do you recall the next year, | |
|  | 78:21 2013, you gave them another quarter of | |
|  | 78:22 a million dollars for the campaign? | |
| 79:2 - 81:5 | **Gray, John 07-30-2020 (00:02:10)** | **JG02.59** |
|  | 79:2   A. Budget-wise, I don't recall | |
|  | 79:3 specifics. | |
|  | 79:4 BY MR. KENNEDY: | |
|  | 79:5   Q. 2014, do you remember hiring | |
|  | 79:6 another PR firm, GMMB, in '14.  Do you recall | |
|  | 79:7 that, sir? | |
|  | 79:8   A. Correct. | |
|  | 79:9   Q. Do you recall in 2016 you hired | |
|  | 79:10 another PR firm, Reservoir? | |
|  | 79:11   A. Yes, because Reservoir was the | |
|  | 79:12 successor of APCO.  The gentleman left APCO, | |
|  | 79:13 became his own firm.  So he just took the | |
|  | 79:14 business with him.  We didn't hire a third | |
|  | 79:15 firm. | |
|  | 79:16   Q. In addition to public relations | |
|  | 79:17 firms, would the HDA also hire third-party | |
|  | 79:18 lobbyist organizations? | |
|  | 79:19   A. Yes. | |
|  | 79:20   Q. And you used the lobbyist | |
|  | 79:21 organizations to lobby not only the federal | |
|  | 79:22 government, but you also utilized separate | |
|  | 79:23 lobbyist firms to lobby in state governments. | |
|  | 79:24 Would that be accurate? | |
|  | 79:25   A. In certain states. | |
|  | 80:1   Q. How many times have you | |
|  | 80:2 testified in front of Congress on behalf of | |

| Page/Line | Source | ID |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |

80:3 the HDMA?

80:4   A. How many times did I testify

80:5 when?

80:6   Q. In your career, how many times

80:7 have you presented to Congress, sir, or the

80:8 Senate?

80:9   A. Probably 10 or 12 times at

80:10 least.

80:11   Q. Sir, the message, the public

80:12 relations message to Congress, to the Senate,

80:13 to state legislatures, to governors, to the

80:14 media, was that the distributors were

80:15 committed, were committed to stopping

80:16 diversion and abuse and addiction.  That was

80:17 the message, true?

80:18   A. I have to go back and look at

80:19 all those.  It's been many years since I

80:20 looked through all those proposals.  And most

80:21 of these proposal items were never used.

80:22   Q. I'm not talking about the --

80:23 sir, I'm not talking about proposals.  I'm

80:24 talking the actual message at the end of the

80:25 day, the message that you're delivering to

81:1 Congress and the Senate and state

81:2 legislatures and the governors and the media

81:3 is that the distributors are committed to

81:4 stopping diversion, abuse and addiction.

81:5 That was the message.

| 81:9 - 81:9 | **Gray, John 07-30-2020 (00:00:01)** | JG02.60 |

81:9   Q. True?

| 81:11 - 82:1 | **Gray, John 07-30-2020 (00:00:37)** | JG02.61 |

81:11   A. I think it was part of a larger

81:12 message, yes.

81:13 BY MR. KENNEDY:

81:14   Q. And, in fact, when you

81:15 testified in 2012, that is the exact message

81:16 that you delivered to Congress in 2012, true?

81:17   A. Yeah, I don't know.  I haven't

81:18 read those testimonies in years.

81:19   Q. 2012, 2014, 2017, the message

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

81:20 that you were delivering to Congress then was
81:21 that these distributors are committed, true?
81:22   A. Again, I have to go back and go
81:23 through all those to know.  I don't know off
81:24 the top of my head, no.
81:25   Q. Let's look at Exhibit 47, if we
82:1 could, please.

**82:8 - 84:12**  **Gray, John 07-30-2020 (00:02:10)**                          **JG02.62**

82:8   A. Okay.
82:9 BY MR. KENNEDY:
82:10   Q. And is this statement from John
82:11 M. Gray, that's you, right?
82:12   A. Yeah, that's me.
82:13   Q. President and CEO, HDMA, and
82:14 this is your statement to a subcommittee of
82:15 Congress, true?
82:16   A. Yep, Mary Bono.
82:17   Q. March 1, 2012.  March 1, 2012.
82:18   A. Okay.
82:19   Q. Page 79, if you would, the very
82:20 next page.
82:21   A. Yep.
82:22   Q. The third paragraph down starts
82:23 with "Our industry."
82:24   A. Uh-huh.
82:25   Q. And you state:  Our industry's
83:1 primary mission is to operate the safest and
83:2 most secure and efficient supply chain in the
83:3 world.  As part of this mission, the
83:4 pharmaceutical industry -- distribution
83:5 industry is committed to addressing the
83:6 serious national problem of prescription drug
83:7 abuse and being part of the solution.
83:8   A. Correct.
83:9   Q. Correct?
83:10   A. Yeah, right.  It's always been
83:11 a focus, is that we thought we could play a
83:12 role in helping solve the problem.
83:13   Q. And that's the consistent
83:14 message?

| Page/Line | Source | ID |
|---|---|---|
| | JG02-Gray, John - Plaintiffs' Submission | |

83:15   A. Uh-huh.
83:16   Q. The industry -- the industries,
83:17 the distributors, including
83:18 AmerisourceBergen, Cardinal, they are
83:19 committed -- they are committed to this issue
83:20 and this problem.  It's part of their
83:21 mission, right?
83:22   A. Yeah.  I mean, as far as what
83:23 that statement says, that is a common
83:24 statement.
83:25   Q. And you also -- besides, you
84:1 know, you testifying to Congress and the
84:2 Senate, in addition to the media
84:3 presentations, internally the HDA would
84:4 create what you folks called talking points.
84:5 Do you recall that?
84:6   A. Talking points for what?
84:7   Q. Talking points for, again,
84:8 talking points for pushing your public
84:9 relations message that you are committed,
84:10 that the industry is committed, it's part of
84:11 their mission to stop diversion, abuse and
84:12 addiction.

| Page/Line | Source | ID |
|---|---|---|
| 84:18 - 84:24 | **Gray, John 07-30-2020 (00:00:12)** | **JG02.63** |

84:18   A. And the answer is:  If you have
84:19 examples, let's take a look at them.  Then I
84:20 can say yes or no, but I don't know off the
84:21 top of my head.
84:22 BY MR. KENNEDY:
84:23   Q. Well, you recall the concept of
84:24 talking points at the HDA, do you not?

| Page/Line | Source | ID |
|---|---|---|
| 85:2 - 85:2 | **Gray, John 07-30-2020 (00:00:00)** | **JG02.64** |

85:2   A. Oh, yeah.

| Page/Line | Source | ID |
|---|---|---|
| 85:3 - 85:5 | **Gray, John 07-30-2020 (00:00:02)** | **JG02.65** |

85:3 BY MR. KENNEDY:
85:4   Q. Look at Exhibit 36, if you
85:5 would.

| Page/Line | Source | ID |
|---|---|---|
| 85:10 - 85:10 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.66** |

85:10   A. 36.  Okay.

| Page/Line | Source | ID |
|---|---|---|
| 85:11 - 86:14 | **Gray, John 07-30-2020 (00:01:03)** | **JG02.67** |

| Page/Line | Source | ID |
|---|---|---|
| | JG02-Gray, John - Plaintiffs' Submission | |

85:11 BY MR. KENNEDY:

85:12   Q. Do you have that in front of

85:13 you?

85:14   A. I've got it, yeah.

85:15   Q. Look at the bottom e-mail.

85:16 There's a bottom e-mail from Pat Kelly,

85:17 again, over to one of the Big Three, over to

85:18 AmerisourceBergen.

85:19 Do you see that?  And this is

85:20 2016.

85:21   A. Uh-huh.

85:22   Q. The subject is industry talking

85:23 points.  Pat Kelly at HDA states:  Not sure

85:24 my previous e-mail got through from my phone.

85:25 Hopefully the attached Word document is

86:1 accessible.

86:2   A. Right.

86:3   Q. As agreed upon by the companies

86:4 that crafted these talking points, this is

86:5 not a public document and is not intended to

86:6 be a leave-behind.  These are simply

86:7 agreed-upon talking points to be used by

86:8 staff in settings where we are called upon to

86:9 explain the role of distributors.

86:10 And then we have some talking

86:11 points.

86:12   A. Okay.

86:13   Q. And if you -- if you'll go to

86:14 99, down in the bottom right-hand corner.

**87:2 - 87:19**       **Gray, John 07-30-2020 (00:00:41)**       JG02.68

87:2   Q. Bates 99.  I'm under Industry

87:3 Actions.

87:4   A. Oh, okay.  I'm sorry.  I didn't

87:5 see that heading up there.  Yep, okay.

87:6   Q. It states, as a talking point:

87:7 As pharmaceutical distributors, we take our

87:8 role in the pharmaceutical supply chain

87:9 seriously.

87:10 Next paragraph:  We go to great

87:11 lengths to eliminate diversion within our

| | | |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |
| **Page/Line** | **Source** | **ID** |

87:12 part of the supply chain.

87:13 And that's consistent with the

87:14 public relations message we've been talking

87:15 about that the distributors are committed,

87:16 it's part of their mission to stop diversion,

87:17 correct?

87:18   A. Uh-huh.

87:19   Q. Those are your talking points.

| 87:20 - 88:2 | **Gray, John 07-30-2020 (00:00:25)** | **JG02.294** |

87:20 Now, the firm that you hired,

87:21 the PR firm, APCO, they put together your

87:22 public relations messages in one document for

87:23 you folks in 2013.  Do you recall that?

87:24   A. Not specifically, no, but if we

87:25 have them, we'll look at it.

88:1   Q. Well, do you recall the Crisis

88:2 Playbook?  Look at Exhibit 28.

| 88:9 - 90:19 | **Gray, John 07-30-2020 (00:02:22)** | **JG02.69** |

88:9   A. Crisis Playbook?  I don't

88:10 recall the Crisis Playbook.

88:11 BY MR. KENNEDY:

88:12   Q. This is an e-mail from you in

88:13 2013, 4/25/13.  John Gray, that's you up at

88:14 the top, right?

88:15   A. Yeah.

88:16   Q. Sending this out to -- looks

88:17 like to HDMA Government and Public Policy

88:18 Council.

88:19 Do you see that?

88:20   A. Yeah, I got it.

88:21   Q. McKesson, Cardinal and

88:22 AmerisourceBergen are part of that council?

88:23 I think we've already established that,

88:24 right?

88:25   A. Yeah.

89:1   Q. You state:  A component of

89:2 HDMA's engagement with APCO, the public

89:3 relations firm, has involved analyzing the

89:4 risks and opportunities facing the industry,

89:5 mapping the industry's stakeholders and

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

89:6 preparing response protocols for use in the
89:7 event of a crisis.
89:8 Attached to this note is the
89:9 culmination of those efforts, a Crisis
89:10 Playbook --
89:11   A. Uh-huh.
89:12   Q. -- that serves as an
89:13 interactive guide to crisis communications.
89:14 The playbook includes response procedures,
89:15 best practices and the names and contact
89:16 information of a cross-functional task force
89:17 that has the authority to act quickly and
89:18 decisively in response to critical
89:19 reputational and crisis issues.  While
89:20 development -- while developed primarily for
89:21 HDMA, the document can also serve as a tool
89:22 for members -- which are distributors,
89:23 correct?
89:24   A. Uh-huh.
89:25   Q. Correct?
90:1   A. Correct.  Yeah.
90:2   Q. -- particularly as you may face
90:3 scrutiny from the media as well as the
90:4 legislators and regulators in the coming
90:5 months on a range of issues, including
90:6 prescription drug abuse and diversion.
90:7 This is the Crisis Playbook,
90:8 right?  They tell you three or four times,
90:9 this is in the event of crisis, correct?
90:10   A. This is -- yeah, it's APCO's
90:11 work, yeah.
90:12   Q. And so we're clear, the crisis
90:13 they're talking about here, this isn't the
90:14 opioid crisis killing thousands of Americans
90:15 a year, correct?  They're talking about the
90:16 crisis if a distributor happens to get sued
90:17 by a municipality or a distributor has an
90:18 enforcement action brought against them by
90:19 the DEA.  That's the crisis --

| 90:22 - 92:6 | **Gray, John 07-30-2020 (00:01:28)** | **JG02.70** |

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

90:22   A. No, I -- no, I don't agree with
90:23 that at all.  Actually, when they said
90:24 crisis, they meant the entire -- the entire
90:25 span of it, not just DEA, but the whole
91:1 opioid crisis situation.  Because the program
91:2 is way more than just simply about DEA and
91:3 enforcement or lack of enforcement.  It's
91:4 also about resolving the problems of opioid
91:5 addiction and treatment.
91:6 BY MR. KENNEDY:
91:7   Q. Well, this -- this says here --
91:8   A. It's a broad --
91:9   Q. We're going to look at this
91:10 document, and there's nothing in it about any
91:11 way to decrease diversion.  There's nothing
91:12 in here on anything with respect to programs
91:13 to treat the folks that are addicted.
91:14 There's nothing in here about what you folks
91:15 should do with respect to abuse.  They're
91:16 just telling people how to, quote, act
91:17 quickly and decisively in response to
91:18 critical reputational issues.  That's what
91:19 this is all about.  Go look.
91:20   A. Okay.  My recollection on this
91:21 document was that it was the straw dog that
91:22 we threw out to see what it would look like.
91:23 It actually -- I would say almost all of it
91:24 was never implemented after August of 2013,
91:25 and then what migrated out of that to when
92:1 this gentleman left APCO, became Reservoir,
92:2 was the program they had been currently
92:3 operating under, which included the major
92:4 section on the Allied Against Opioid Abuse
92:5 program, and that actually is the bulk of
92:6 that program.

**92:9 - 93:12**  **Gray, John 07-30-2020 (00:00:58)**      JG02.71

92:9   A. So this document was just a
92:10 straw dog.  It was never implemented in this
92:11 form to this degree.  As I say, we stood down
92:12 in August of that year.

| Page/Line | Source | ID |
|---|---|---|

92:13 BY MR. KENNEDY:

92:14   Q. We already looked at who it was

92:15 sent to.  Turn to the next page.  Let's look

92:16 at the cover page of the Crisis Playbook.

92:17   A. Yeah.

92:18   Q. And they describe it as an

92:19 interactive guide to crisis communication,

92:20 right?

92:21   A. Yes.

92:22   Q. Look at the next page.  This is

92:23 crisis quick reference information.

92:24   A. Yeah.

92:25   Q. This is the crisis -- again,

93:1 we're going to -- they outline the crisis

93:2 that they're talking about in the back, and

93:3 we'll take a look, but core crisis team, and

93:4 you're number one.

93:5 Do you see that?

93:6   A. Correct.

93:7   Q. They even give them your cell

93:8 number.

93:9   A. Yeah.

93:10   Q. If a distributor gets sued or

93:11 the DEA brings an enforcement action, they

93:12 can reach you on your cell number, right?

**93:15 - 94:22**   **Gray, John 07-30-2020 (00:01:20)**   **JG02.72**

93:15   A. I have no idea.  See, this team

93:16 was never formed.  It never went beyond this

93:17 piece of paper, and I have no idea what went

93:18 on in APCO's mind as far as putting this

93:19 together.  I was -- you know, that was -- I

93:20 have no clue.

93:21 BY MR. KENNEDY:

93:22   Q. Sir, by this point in time, you

93:23 had paid APCO -- you don't know what's going

93:24 on in their mind, but at this point in

93:25 time --

94:1   A. Correct.

94:2   Q. -- the HDA had paid them a half

94:3 a million dollars to put together this

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 94:4 document, true?  A half million? |  |
|  | 94:5   A. No, I don't think that's true. |  |
|  | 94:6 I don't think it's all that money.  That was |  |
|  | 94:7 just only a portion, because the program was |  |
|  | 94:8 much more than this document.  But the |  |
|  | 94:9 program never got initiated, so not all the |  |
|  | 94:10 money spent was spent on this. |  |
|  | 94:11   Q. Sir, one at a time.  We're |  |
|  | 94:12 going to talk about the other program, but |  |
|  | 94:13 right now we're going to talk about this |  |
|  | 94:14 document. |  |
|  | 94:15 Go to page 76. |  |
|  | 94:16   A. 7 -- what number again? |  |
|  | 94:17   Q. 76, down in the bottom |  |
|  | 94:18 right-hand corner. |  |
|  | 94:19   A. I have 749.  760? |  |
|  | 94:20   Q. 776. |  |
|  | 94:21   A. What the hell is that?  77 -- |  |
|  | 94:22 oh, 776, way back here.  Hold on.  Hold on. |  |
| 94:23 - 96:14 | **Gray, John 07-30-2020 (00:01:46)** | **JG02.73** |
|  | 94:23 Okay. |  |
|  | 94:24   Q. Now, look at -- over in the |  |
|  | 94:25 right-hand column up at the top -- first, |  |
|  | 95:1 this is Scenario 2.  So they're giving |  |
|  | 95:2 different crisis scenarios, and this is |  |
|  | 95:3 Scenario 2, Diversion Lawsuit.  So this is |  |
|  | 95:4 under the circumstances where one of your |  |
|  | 95:5 distributors gets sued, correct?  Diversion |  |
|  | 95:6 Lawsuit?  And if you'll look -- |  |
|  | 95:7   A. I -- go ahead. |  |
|  | 95:8   Q. -- over in the top right.  Look |  |
|  | 95:9 over on the top right, if you would. |  |
|  | 95:10   A. I see it. |  |
|  | 95:11   Q. And this is the tough questions |  |
|  | 95:12 that a distributor might be asked, and your |  |
|  | 95:13 PR firm is telling them how to answer the |  |
|  | 95:14 tough questions -- questions that might come |  |
|  | 95:15 from somebody during a lawsuit:  Isn't it |  |
|  | 95:16 true that these large publicly traded |  |
|  | 95:17 companies are making millions of dollars from |  |

| JG02-Gray, John - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

95:18 diversion of prescription drugs, question
95:19 mark?  Shouldn't patient safety be put before
95:20 profits?
95:21 And your PR firm is saying,
95:22 hey, if you get asked that question,
95:23 Mr. Distributor, you've got to answer:
95:24 Patient safety is put before profits.
95:25 That's the recommended answer,
96:1 true?
96:2   A. That's what this -- that's what
96:3 this says.  Correct.
96:4   Q. So kind of summing up the PR
96:5 program that comes in place in 2012, we've
96:6 looked at it.  The PR program is going to
96:7 include statements and representations and
96:8 the message that distributors are, number
96:9 one, committed to stopping diversion; number
96:10 two, it's part of their mission.  And with
96:11 respect to this Crisis Handbook, part of the
96:12 message is we are always -- as a distributor,
96:13 we are always putting safety over profits,
96:14 correct?  All --

| 96:18 - 96:18 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.74** |

96:18   Q. -- messages that you remember?

| 96:21 - 96:24 | **Gray, John 07-30-2020 (00:00:07)** | **JG02.75** |

96:21   A. Yeah, I'm not going to put a
96:22 conclusion on that because you're mixing
96:23 apples and oranges through all this.  So
96:24 these documents say what they say.

| 97:15 - 97:21 | **Gray, John 07-30-2020 (00:00:26)** | **JG02.76** |

97:15   Q. What I want to look at, I want
97:16 to look at how this PR message -- I want to
97:17 look at how this PR message lined up with
97:18 reality and what the distributors were
97:19 actually doing.  Can we do that?
97:20   A. It's your deposition.  Go
97:21 ahead.

| 98:10 - 99:6 | **Gray, John 07-30-2020 (00:00:51)** | **JG02.77** |

98:10   Q. Mr. Gray, when we took a break,
98:11 I was about to ask you and starting to look

JG02-Gray, John - Plaintiffs' Submission

| Page/Line | Source | ID |
|---|---|---|

98:12 into the idea of how the public relations
98:13 program matched up with what actually was
98:14 going on in reality, right?  So let's take a
98:15 look at that.
98:16   A. Okay.
98:17   Q. There was a congressional
98:18 hearing in March of 2012.  I think we already
98:19 talked about that.  You appeared at that
98:20 hearing, true?
98:21   A. True.
98:22   Q. And the title of the
98:23 congressional hearing was Prescription Drug
98:24 Diversion:  Combatting the Scourge.  Do you
98:25 recall that, kind of a colorful title?
99:1   A. No.  Not specifically, no.
99:2   Q. Okay.  After this hearing,
99:3 Congress sent the HDA a series of questions,
99:4 and that's not uncommon for Congress to do
99:5 that, true?
99:6   A. Yeah, that's usual routine.

**99:13 - 100:10**     **Gray, John 07-30-2020 (00:00:50)**     **JG02.78**

99:13   Q. Well, you folks took the
99:14 questions, the written questions from
99:15 Congress.
99:16   A. Yeah.
99:17   Q. The HDA formulated answers to
99:18 those questions, and then they were mailed
99:19 back to Congress?
99:20   A. Correct.
99:21   Q. All right.  And the answers
99:22 that were formulated by the HDA staff, those
99:23 were reviewed by the regulatory affairs
99:24 committee and the federal government affairs
99:25 committee.  Would that be the common course,
100:1 when you are proving written answers to
100:2 Congress?
100:3   A. It would depend upon the topic.
100:4 It may be in that case those were probably
100:5 the two most relevant groups.
100:6   Q. And McKesson, Cardinal and

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 100:7 AmerisourceBergen sit on those committees, | |
| | 100:8 true? | |
| | 100:9   A. I believe they did. | |
| | 100:10   Q. Let's look at Exhibit 10. | |
| 100:16 - 104:2 | **Gray, John 07-30-2020 (00:03:33)** | JG02.79 |
| | 100:16   Q. We're going to look at those | |
| | 100:17 questions and those answers from Congress. | |
| | 100:18   A. 10.  10, 10, 10, 10.  Okay. | |
| | 100:19   Q. All right.  This is April 6, | |
| | 100:20 2012. | |
| | 100:21   A. Yeah. | |
| | 100:22   Q. And addressed to The Honorable | |
| | 100:23 Mary Bono Mack in Congress? | |
| | 100:24   A. Yeah. | |
| | 100:25   Q. And this is a letter from you, | |
| | 101:1 and it says:  Dear Chairwoman Bono Mack. | |
| | 101:2 Thank you for the opportunity to testify | |
| | 101:3 before the Subcommittee on Commerce, | |
| | 101:4 Manufacturing and Trade on March 1st, 2012 at | |
| | 101:5 the hearing entitled Prescription Drug | |
| | 101:6 Diversion:  Combatting the Scourge. | |
| | 101:7 And then you tell her that you | |
| | 101:8 are attaching the HDA responses to the | |
| | 101:9 congressional questions, right? | |
| | 101:10   A. Correct. | |
| | 101:11   Q. Go to page 82 at the bottom. | |
| | 101:12   A. What page?  I'm sorry.  Which | |
| | 101:13 page? | |
| | 101:14   Q. Eight-two.  Eight-two, down at | |
| | 101:15 the bottom. | |
| | 101:16   A. Oh, 82, the next page.  Okay. | |
| | 101:17 Right. | |
| | 101:18   Q. One of the questions that they | |
| | 101:19 asked, and their question is in the bold, and | |
| | 101:20 then the HDA answer is below.  They ask:  Are | |
| | 101:21 there other red flags that distributors look | |
| | 101:22 for in their anti-diversion efforts? | |
| | 101:23 That was the question, right? | |
| | 101:24   A. Correct. | |
| | 101:25   Q. And then you state, consistent | |

| Page/Line | Source | ID |
|---|---|---|

102:1 with the PR message:  Distributors take their

102:2 anti-diversion efforts extremely seriously

102:3 and focusing on quantities alone is

102:4 not sufficient -- is not sufficient to

102:5 identify potentially suspicious orders.

102:6 Consistent with everything

102:7 we've talked about, that's the message,

102:8 distributors are taking it seriously,

102:9 correct?

102:10  A. Yeah.

102:11  Q. Now, look down at the next

102:12 paragraph.  We're going to talk about that

102:13 entire paragraph.

102:14 You next -- the HDA next states

102:15 to Congress:  As part of their efforts -- and

102:16 that's the distributors -- as part of their

102:17 efforts to monitor for suspicious orders,

102:18 distributors may also ask for other

102:19 information that may either justify

102:20 particular customer ordering patterns or

102:21 indicate possible diversion.  Number one, you

102:22 state things that distributors are looking

102:23 for, such as the percentage of controlled

102:24 substance purchases as compared to

102:25 noncontrolled substances.  Secondly, the

103:1 variety and type of controlled substances

103:2 purchased.  Third, the percentage of sales

103:3 reimbursed by insurance compared to cash

103:4 sales, and four, or the location of a

103:5 customer relative to other healthcare

103:6 entities such as hospitals or long-term care

103:7 facilities that would explain particular

103:8 ordering patterns.

103:9 That was your statement,

103:10 written statement to Congress, true?

103:11  A. Yeah, these were -- these were

103:12 the statements prepared by staff, correct.

103:13  Q. And sent to Congress, true?

103:14  A. They were sent to Mary Bono's

103:15 office.

| Page/Line | Source | ID |
|---|---|---|

103:16   Q. And these were reviewed by the
103:17 regulatory affairs committee, they were
103:18 reviewed by the federal government affairs
103:19 committee, and Cardinal, AmerisourceBergen
103:20 and McKesson all sit on those committees,
103:21 correct?
103:22   A. I don't -- I mean, unless you
103:23 have something here that says those are the
103:24 committees that did it, I, you know, would
103:25 have to question whether they were.  The only
104:1 committees that looked at it, I don't know
104:2 from this.

**104:16 - 104:19**   **Gray, John 07-30-2020 (00:00:05)**   **JG02.80**

104:16   Q. Well, you know what, look at
104:17 Exhibit 9.  9 might be bigger and easier and
104:18 it accomplishes the same thing.
104:19   A. Okay.

**104:24 - 106:20**   **Gray, John 07-30-2020 (00:01:46)**   **JG02.81**

104:24   Q. Look at Exhibit 9.  That's a
104:25 little bit easier.
105:1   A. Final draft.
105:2 BY MR. KENNEDY:
105:3   Q. Final draft, QFR responses,
105:4 4/5/12.
105:5 Do you see that?
105:6   A. Yeah.  Yeah.
105:7   Q. It says To: Regulatory Affairs
105:8 Committee and Federal Government Affairs
105:9 Committee.
105:10 Thank you all for your input
105:11 and comments that we received on the draft
105:12 responses to the questions for the record.
105:13 Do you see that?
105:14   A. My -- it's from Kristen Freitas
105:15 to Kristen Freitas.
105:16   Q. You see To:  Regulatory
105:17 Affairs --
105:18   A. Oh, God, I'm not even looking
105:19 at the header.  My apologies.  Yes, I see
105:20 that at the top.  Yeah, okay.

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

105:21   Q. Those two committees reviewed
105:22 these answers.  Can we agree on that?
105:23   A. Yeah, I -- based on this, you
105:24 would think they did, yes.
105:25   Q. And McKesson, AmerisourceBergen
106:1 and Cardinal sat on those committees, did
106:2 they not?
106:3   A. I believe they did.  You'd have
106:4 to check the rosters and who was in
106:5 attendance.  I don't know.
106:6   Q. So you make the statement about
106:7 four different items the distributors looked
106:8 to in evaluating orders from pharmacies.
106:9   A. Correct.
106:10   Q. The statement is made to
106:11 Congress.  We just read through those four
106:12 items.
106:13   A. Uh-huh.
106:14   Q. Let's look at McKesson first,
106:15 all right?
106:16 Despite your statement to
106:17 Congress that distributors compare controlled
106:18 substance percentages to noncontrolled
106:19 substances in evaluating pharmacies, despite
106:20 that statement --

| | | |
|---|---|---|
| 106:25 - 107:3 | **Gray, John 07-30-2020 (00:00:13)** | **JG02.82** |

106:25   Q. Despite that statement to
107:1 Congress, McKesson was not monitoring
107:2 suspicious orders and looking at the
107:3 percentage of controlled substances, true?

| | | |
|---|---|---|
| 107:11 - 108:22 | **Gray, John 07-30-2020 (00:01:18)** | **JG02.83** |

107:11   A. I cannot make any comments on
107:12 individual companies, never had access to
107:13 what they did or didn't do, and it would
107:14 be -- it just -- I have no insight into how
107:15 these companies did what they did on
107:16 suspicious ordering, none.
107:17 BY MR. KENNEDY:
107:18   Q. Sir, I -- so your answer is you
107:19 don't know?

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

107:20   A. I don't know, no.
107:21   Q. Did you sign the letter that
107:22 was sent to Congress with these answers, sir?
107:23   A. But I don't know if McKesson
107:24 does -- I don't know what individual
107:25 companies do.  These are all voluntary
108:1 guidelines.
108:2   Q. Sir, my question is --
108:3   A. And I don't know what the
108:4 companies do, so I don't have that
108:5 information.
108:6   Q. My question is real simple.
108:7 Did you sign the letter that went to
108:8 Congress?
108:9   A. Well, my answer is real simple:
108:10 I don't know whether McKesson in particular
108:11 did or didn't do this.  That would be for
108:12 McKesson to answer that question.  We --
108:13   Q. Well, let me ask you, sir.  I
108:14 understand, and I suppose that's my point.
108:15 This would be for McKesson to answer.
108:16 So when McKesson is sitting on
108:17 the committees that reviewed these answers,
108:18 knows and understands that that answer is not
108:19 truthful with respect to how they conduct
108:20 their business, did they tell you or anybody
108:21 else at the HDA that it was not true with
108:22 respect to McKesson?  Did they tell you?

| 109:1 - 110:1 | **Gray, John 07-30-2020 (00:00:55)** | JG02.84 |

109:1   A. Yeah, I mean, look, this is
109:2 what was represented to us.  This is what we
109:3 sent in.  Again, what individual companies
109:4 do, that's part and parcel of the way
109:5 association -- individual companies make
109:6 their own decisions, and I can't sit here and
109:7 say they do or they don't do it.
109:8 BY MR. KENNEDY:
109:9   Q. Sir, McKesson was the largest
109:10 distributor of opioids in the United
109:11 States --

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

109:12  A. That's fine.  That may be true.
109:13  Q. -- correct?
109:14  A. That's numbers.  I don't know
109:15 if that's true either, frankly.  I've never
109:16 seen those numbers specifically by the
109:17 company.
109:18  Q. Well, by this point in the
109:19 trial that will be into evidence, sir.  It's
109:20 not a dispute in this case.
109:21 My point is this:  Are you
109:22 telling us that the largest distributor of
109:23 opioids in this country who reviewed these
109:24 answers never told you that this particular
109:25 answer was untrue with respect to their
110:1 company?  Did they tell you that, yes or no?

**110:4 - 110:15    Gray, John 07-30-2020 (00:00:22)**                                    **JG02.85**

110:4  A. I can't -- and I can't tell you
110:5 whether they did or they didn't.
110:6 BY MR. KENNEDY:
110:7  Q. All right.  Let's look at
110:8 AmerisourceBergen with respect to this first
110:9 response to Congress.
110:10 Did you know and understand
110:11 that AmerisourceBergen, the third-largest
110:12 distributor in this country, they did not
110:13 monitor orders by looking at this controlled
110:14 versus noncontrolled percentage?  Did they
110:15 tell you that?

**110:18 - 111:2    Gray, John 07-30-2020 (00:00:18)**                                      **JG02.86**

110:18  A. I have no knowledge of what --
110:19 their day-to-day monitoring activities over
110:20 the many warehouses they have.  I do not
110:21 know.
110:22 BY MR. KENNEDY:
110:23  Q. Well, we can agree with this,
110:24 sir, that sitting on this committee,
110:25 reviewing those answers, they would have
111:1 known that this answer was not true with
111:2 respect to how their company did business.

**111:8 - 112:12    Gray, John 07-30-2020 (00:01:08)**                                     **JG02.87**

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 111:8   A. I wasn't the person in the |  |
|  | 111:9 company on the committee, so I don't know |  |
|  | 111:10 what their state of mind was when they were |  |
|  | 111:11 in the committee meeting. |  |
|  | 111:12 BY MR. KENNEDY: |  |
|  | 111:13   Q. Did you understand that if we |  |
|  | 111:14 put McKesson and AmerisourceBergen together, |  |
|  | 111:15 they distribute more than half of the opioids |  |
|  | 111:16 in this country? |  |
|  | 111:17 Do you understand that? |  |
|  | 111:18   A. You know, no, not particularly. |  |
|  | 111:19 I mean, I know what I have read in the paper, |  |
|  | 111:20 that's it, and I don't know whether those |  |
|  | 111:21 accusations are correct or not. |  |
|  | 111:22   Q. Well, let me ask this:  Before |  |
|  | 111:23 you sent these answers to Congress, sir, did |  |
|  | 111:24 anybody, did you or anybody on your staff |  |
|  | 111:25 say, you know what, we'd better ask -- we'd |  |
|  | 112:1 better ask McKesson, we'd better ask |  |
|  | 112:2 AmerisourceBergen whether these answers are |  |
|  | 112:3 true before we send them over to Congress? |  |
|  | 112:4 Did anybody ask them that? |  |
|  | 112:5   A. I'd have to ask my staff who |  |
|  | 112:6 did the meeting.  I do not know whether they |  |
|  | 112:7 did or didn't. |  |
|  | 112:8   Q. The next thing you told |  |
|  | 112:9 Congress, sir, was that distributors were |  |
|  | 112:10 looking at the type and variety of controlled |  |
|  | 112:11 substances that a pharmacy was purchasing |  |
|  | 112:12 when they were evaluating pharmacies. |  |
| 112:16 - 112:19 | **Gray, John 07-30-2020 (00:00:09)** | **JG02.88** |
|  | 112:16   Q. My question is the same thing: |  |
|  | 112:17 Did you know that McKesson and |  |
|  | 112:18 AmerisourceBergen were not doing this in |  |
|  | 112:19 2012? |  |
| 112:22 - 113:4 | **Gray, John 07-30-2020 (00:00:14)** | **JG02.89** |
|  | 112:22   A. as a trade |  |
|  | 112:23 association, we have no insight into what |  |
|  | 112:24 goes on day to day inside our companies. |  |
|  | 112:25 It's -- that's the company's business. |  |

| Page/Line | Source | ID |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 113:7 - 113:18 | 113:1 BY MR. KENNEDY:<br>113:2  Q. But yet you have no problem<br>113:3 sending representations and writing to<br>113:4 Congress; is that what you're telling us?<br>**Gray, John 07-30-2020 (00:00:24)**<br>113:7  A. We -- yeah, for what we knew at<br>113:8 the time, we believed these to be accurate<br>113:9 statements of what the companies supported<br>113:10 and did.<br>113:11 BY MR. KENNEDY:<br>113:12  Q. McKesson and AmerisourceBergen<br>113:13 sitting on both of those committees,<br>113:14 reviewing these answers, they would have<br>113:15 known the answers with respect to their<br>113:16 companies were not true as it relates to this<br>113:17 second item of due diligence, right?  They<br>113:18 would have known it wasn't true. | JG02.90 |
| 113:21 - 113:22 | **Gray, John 07-30-2020 (00:00:00)**<br>113:21   A. And again, it goes<br>113:22 back to -- | JG02.91 |
| 113:24 - 114:2 | **Gray, John 07-30-2020 (00:00:07)**<br>113:24  A. -- the individuals from those<br>113:25 companies who were on those committees.<br>114:1 That's a question that you would have to ask<br>114:2 them. | JG02.92 |
| 115:11 - 115:21 | **Gray, John 07-30-2020 (00:00:24)**<br>115:11  Q. I'll ask you the<br>115:12 question.<br>115:13 Did you know at the time that<br>115:14 you sent these answers to Congress that<br>115:15 neither McKesson or AmerisourceBergen were<br>115:16 looking at the percentage of sales reimbursed<br>115:17 by insurance compared to cash sales?  Did you<br>115:18 know that these two companies were not doing<br>115:19 that?<br>115:20  A. No.  Again, we have no<br>115:21 knowledge what they do day to day. | JG02.93 |
| 115:24 - 116:10 | **Gray, John 07-30-2020 (00:00:34)**<br>115:24  Q. Finally, sir, you represented<br>115:25 to Congress that distributors monitor | JG02.94 |

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 116:1 suspicious orders by considering the |  |
|  | 116:2 locations of healthcare entities such as |  |
|  | 116:3 hospitals and nursing homes. |  |
|  | 116:4 Did you know that at the time |  |
|  | 116:5 these answers were sent, that was not true |  |
|  | 116:6 with respect to McKesson, the largest |  |
|  | 116:7 distributor in the country, and that was not |  |
|  | 116:8 true with respect to AmerisourceBergen, the |  |
|  | 116:9 third-largest distributor in the country, did |  |
|  | 116:10 you -- |  |
| 116:20 - 117:1 | **Gray, John 07-30-2020 (00:00:19)** | JG02.95 |
|  | 116:20   A. And again, HDA or HDMA would |  |
|  | 116:21 not know whether that was true or not true. |  |
|  | 116:22 BY MR. KENNEDY: |  |
|  | 116:23   Q. Exactly.  HDA wouldn't know, |  |
|  | 116:24 but McKesson and AmerisourceBergen, who are |  |
|  | 116:25 sitting on those two committees, reviewing |  |
|  | 117:1 these answers, they know it ain't true. |  |
| 117:5 - 117:6 | **Gray, John 07-30-2020 (00:00:02)** | JG02.96 |
|  | 117:5   Q. Right, sir?  They know it's not |  |
|  | 117:6 true. |  |
| 117:8 - 118:9 | **Gray, John 07-30-2020 (00:00:56)** | JG02.97 |
|  | 117:8   A. No.  You have to ask them that |  |
|  | 117:9 question.  I'm not the guy to answer that |  |
|  | 117:10 one. |  |
|  | 117:11 BY MR. KENNEDY: |  |
|  | 117:12   Q. You attached -- look at that |  |
|  | 117:13 last sentence here.  You attached the HDMA |  |
|  | 117:14 ICGs to your answers. |  |
|  | 117:15 Do you see that? |  |
|  | 117:16   A. Yep.  Yep. |  |
|  | 117:17   Q. You thought those were so |  |
|  | 117:18 important that you would attach them to your |  |
|  | 117:19 answers to Congress.  Is that what happened? |  |
|  | 117:20   A. I don't know if it was because |  |
|  | 117:21 they were so important, but they might have |  |
|  | 117:22 spoken to -- the content of those might have |  |
|  | 117:23 spoken to some of these issues.  How |  |
|  | 117:24 important is a decision for someone else to |  |
|  | 117:25 make it.  We thought it would be helpful. |  |

| Page/Line | Source | ID |
|---|---|---|
| | 118:1   Q. The ICGs were the industry | |
| | 118:2 compliance guidelines that the HDA created in | |
| | 118:3 2008, right? | |
| | 118:4   A. I think that's about the right | |
| | 118:5 time. | |
| | 118:6   Q. They were the guidelines to | |
| | 118:7 help distributors create their own internal | |
| | 118:8 guidelines and policies with respect to | |
| | 118:9 suspicious order monitoring, true? | |
| 118:12 - 118:12 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.98** |
| | 118:12   A. That's the idea. | |
| 118:17 - 118:19 | **Gray, John 07-30-2020 (00:00:07)** | **JG02.99** |
| | 118:17   Q. When you attached these, did | |
| | 118:18 you tell Congress that they were not | |
| | 118:19 mandatory for distributors to follow them? | |
| 118:22 - 119:4 | **Gray, John 07-30-2020 (00:00:18)** | **JG02.100** |
| | 118:22   A. Well, yeah, HDA, as a trade | |
| | 118:23 association, cannot issue mandatory | |
| | 118:24 guidelines.  That's an antitrust problem. | |
| | 118:25 All guidelines issued by all associations are | |
| | 119:1 strictly voluntary.  They're there to help | |
| | 119:2 the members should the members choose to | |
| | 119:3 adopt them or use them.  But they are all | |
| | 119:4 voluntary guidelines. | |
| 119:11 - 119:12 | **Gray, John 07-30-2020 (00:00:03)** | **JG02.101** |
| | 119:11   Q. My question is:  Did you tell | |
| | 119:12 Congress these were not mandatory? | |
| 119:18 - 119:25 | **Gray, John 07-30-2020 (00:00:18)** | **JG02.102** |
| | 119:18   A. I don't -- I do not know the | |
| | 119:19 answer to that question. | |
| | 119:20   Q. And when you sent these and | |
| | 119:21 attached these guidelines, did you tell | |
| | 119:22 Congress that neither McKesson nor | |
| | 119:23 AmerisourceBergen were complying with these | |
| | 119:24 guidelines?  Did you tell them that? | |
| | 119:25   A. We wouldn't know that. | |
| 120:5 - 120:8 | **Gray, John 07-30-2020 (00:00:06)** | **JG02.103** |
| | 120:5   Q. Were these guidelines ever | |
| | 120:6 updated after 2008? | |
| | 120:7   A. I believe they were updated one | |

| Page/Line | Source | ID |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |

120:8 time.

| Page/Line | Source | ID |
|---|---|---|
| 120:9 - 120:14 | **Gray, John 07-30-2020 (00:00:17)** | **JG02.104** |

120:9   Q. Sir, the fact of the matter is
120:10 the HDA pulled these guidelines from its
120:11 website in 2013 because the DEA was using the
120:12 guidelines to hold distributors accountable
120:13 for their failures to monitor suspicious
120:14 orders.  You pulled them from your website.

| 120:17 - 120:17 | **Gray, John 07-30-2020 (00:00:00)** | **JG02.105** |

120:17   A. Yes.

| 120:18 - 120:20 | **Gray, John 07-30-2020 (00:00:02)** | **JG02.106** |

120:18 BY MR. KENNEDY:
120:19   Q. You pulled them?
120:20   A. Yes.

| 120:21 - 122:16 | **Gray, John 07-30-2020 (00:01:49)** | **JG02.107** |

120:21   Q. Go to page 84.  Again, we're
120:22 still on the answers that you sent to
120:23 Congress.  Go to page 84.
120:24   A. Okay.
120:25   Q. Congress asks you:  Do you have
121:1 any idea how frequently your members -- that
121:2 would be distributors -- make such reports?
121:3 They're talking about suspicious order
121:4 reports, true?
121:5   A. Well, let's read the rest of
121:6 it.  HDMA members report suspicious orders
121:7 directly to DEA.  Okay.  So the second part
121:8 of that answers the question.  Yes.
121:9   Q. So they asked -- Congress
121:10 asked, do you have any idea how frequently
121:11 your members, distributors, make such
121:12 reports, and they're talking about suspicious
121:13 order reports, true?
121:14   A. Right.
121:15   Q. And --
121:16   A. Yes.
121:17   Q. And they asked you about
121:18 frequency, and your answer is:  HDMA does not
121:19 track this information.  HDMA members report
121:20 suspicious orders directly to the DEA.

| | | |
|---|---|---|
| **JG02-Gray, John - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

121:21 Was that your answer?

121:22   A. That's our answer.

121:23   Q. So they ask you how frequently,

121:24 and you don't give them any kind of answer.

121:25 You just say it's not something we know, the

122:1 distributors report that to the DEA, true?

122:2   A. Well, if you do not track the

122:3 information, you don't know how frequently

122:4 it's reported.

122:5   Q. Well, again, did you ask the

122:6 distributors?  Did you ask McKesson, hey, how

122:7 frequently do you report suspicious orders?

122:8   A. No.

122:9   Q. The answer is -- did you ask

122:10 McKesson?

122:11   A. No, because they can ask the

122:12 companies themselves.  It's not HDA's place

122:13 to answer specific operational questions for

122:14 each member company.  They're free to do that

122:15 at their own choosing, but it's not

122:16 appropriate for the association to do that.

**122:17 - 122:19**    **Gray, John 07-30-2020 (00:00:07)**    **JG02.108**

122:17   Q. McKesson reviewed these

122:18 answers.  Didn't they say to the HDA, you

122:19 know, here's what we're reporting?

**122:24 - 123:7**    **Gray, John 07-30-2020 (00:00:19)**    **JG02.109**

122:24   A. Yeah, I mean, McKesson has

122:25 every right not to tell HDA what they're

123:1 doing, and they're free to do their own for

123:2 whatever competitive reasons they have that

123:3 they may not want other companies to know

123:4 what they do versus what they do.  So it's

123:5 inappropriate for the HDA to be the sender of

123:6 that kind of information transfer.  We do not

123:7 do it.

**123:9 - 123:17**    **Gray, John 07-30-2020 (00:00:29)**    **JG02.110**

123:9   Q. Okay.  You've got McKesson,

123:10 largest distributor in the country.  They're

123:11 reviewing your answers where you say, well, I

123:12 don't know how many orders get reported, and

| Page/Line | Source | ID |
|---|---|---|

123:13 yet you understand that between 2006 and
123:14 2012, McKesson did not report a single -- not
123:15 even one suspicious order to the DEA in the
123:16 entire state of West Virginia for seven
123:17 years?

**123:23 - 123:24**   **Gray, John 07-30-2020 (00:00:03)**     JG02.111

123:23   Q. Did McKesson tell you that
123:24 before you sent these answers back?

**124:2 - 124:18**   **Gray, John 07-30-2020 (00:00:42)**     JG02.112

124:2   A. And it's not my place to ask
124:3 them.  That is McKesson's business, and if
124:4 they wish to disclose that information, they
124:5 have every right to, but it's not appropriate
124:6 for a trade organization representing
124:7 competitors to share information about what
124:8 each company does.  That's basic association
124:9 law.
124:10 BY MR. KENNEDY:
124:11   Q. We're going to look at some
124:12 later documents, sir.  When McKesson finally
124:13 does start reporting in August of 2013, and
124:14 they ask you about how many orders are being
124:15 reported, when they are actually reporting,
124:16 you have no trouble telling Congress then,
124:17 right?
124:18   A. Say that again.  You cut out.

**124:23 - 125:2**   **Gray, John 07-30-2020 (00:00:15)**     JG02.113

124:23 In 2017, when McKesson now is
124:24 reporting orders, Congress asks you how many
124:25 orders are being reported, you have no
125:1 problem at that time telling Congress what's
125:2 being reported.

**125:3 - 125:10**   **Gray, John 07-30-2020 (00:00:14)**     JG02.295

125:3   A. Numbers that are reported?
125:4   Q. You're not allowed, but you do.
125:5   A. Well, I'm not aware and I don't
125:6 recall that, so if you've got it, we'll look
125:7 at it.
125:8   Q. Let's look at Exhibit 4.
125:9 Exhibit 4 is the big bound exhibit,

| Page/Line | Source | ID |
|---|---|---|

125:10 separately.

125:18 - 127:10    **Gray, John 07-30-2020 (00:01:44)**    **JG02.114**

125:18   Q. Do you have that in front of

125:19 you?

125:20   A. Yes, I see it.

125:21   Q. Do you remember this hearing?

125:22   A. Yes.

125:23   Q. This was an extensive hearing

125:24 in front of Congress that focused on

125:25 West Virginia.

126:1 Do you remember that?

126:2   A. Okay.

126:3   Q. They took testimony from

126:4 different employees of McKesson and Cardinal

126:5 and AmerisourceBergen and HD Smith.  They

126:6 collected thousands of documents from all the

126:7 companies, and they had an extensive hearing,

126:8 and then they put together I think this

126:9 300-page report.

126:10 Do you remember this, sir?

126:11   A. Very generally, yes.

126:12   Q. Great.  Go to page 373, Bates.

126:13   A. 373.  Okay.

126:14   Q. Look at the top paragraph on

126:15 373.

126:16   A. Yeah.

126:17   Q. One second.  We're waiting

126:18 for -- up top.

126:19   A. I've got it here.

126:20   Q. The second sentence says:

126:21 Between '06 and '12.

126:22 Do you see that sentence?

126:23   A. Yes.

126:24   Q. It says:  Between 2006 and

126:25 2012, the years in which McKesson did not

127:1 submit any suspicious order reports to the

127:2 DEA, the company shipped more than

127:3 162.6 million doses of hydrocodone and

127:4 oxycodone to pharmacies in West Virginia.

127:5   A. Correct.

| Page/Line | Source | ID |
|---|---|---|
| | 127:6   Q. 162 million doses, and not one | |
| | 127:7 single suspicious order report over seven | |
| | 127:8 years.  And my question is:  When McKesson | |
| | 127:9 reviewed your answers going to Congress, did | |
| | 127:10 they tell you this? | |
| 127:13 - 127:14 | **Gray, John 07-30-2020 (00:00:03)** | JG02.115 |
| | 127:13   A. I -- I can't recall.  I | |
| | 127:14 wouldn't know.  I don't know. | |
| 127:15 - 128:3 | **Gray, John 07-30-2020 (00:00:37)** | JG02.296 |
| | 127:15 BY MR. KENNEDY: | |
| | 127:16   Q. In addition to telling Congress | |
| | 127:17 about this suspicious order reporting, you | |
| | 127:18 also told the Wall Street Journal that | |
| | 127:19 distributors were reporting suspicious | |
| | 127:20 orders, didn't you? | |
| | 127:21 Do you recall that, sir? | |
| | 127:22   A. I'd have to see the article. | |
| | 127:23 It's been a long time. | |
| | 127:24   Q. Look at 43. | |
| | 127:25   A. Which one? | |
| | 128:1   Q. 43. | |
| | 128:2   A. That's the other book.  43. | |
| | 128:3 43.  Okay. | |
| 128:9 - 129:5 | **Gray, John 07-30-2020 (00:00:45)** | JG02.116 |
| | 128:9   Q. The Wall Street Journal, | |
| | 128:10 March 8th, 2013, John Gray, president and CEO | |
| | 128:11 down at the bottom? | |
| | 128:12   A. Uh-huh. | |
| | 128:13   Q. Look at the last paragraph. | |
| | 128:14   A. Yep. | |
| | 128:15   Q. You state to the Wall Street | |
| | 128:16 Journal:  We remain committed -- and we would | |
| | 128:17 be the distributors and the HDA, right? | |
| | 128:18   A. Right. | |
| | 128:19   Q. We remain committed to playing | |
| | 128:20 our part by monitoring and reporting | |
| | 128:21 suspicious orders of prescription medicines. | |
| | 128:22 Do you see that statement? | |
| | 128:23   A. I see it. | |
| | 128:24   Q. At the time you sent this to | |

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 128:25 the Wall Street Journal, you understand | |
|  | 129:1 McKesson still -- it's been more than seven | |
|  | 129:2 years, still has not reported a single | |
|  | 129:3 suspicious order in the entire state of | |
|  | 129:4 West Virginia? | |
|  | 129:5 Did you understand that? | |
| 129:9 - 129:11 | **Gray, John 07-30-2020 (00:00:03)** | **JG02.117** |
|  | 129:9   Q. Did you know that when you said | |
|  | 129:10 this to the Wall Street Journal? | |
|  | 129:11   A. No, we did not know that. | |
| 129:15 - 129:18 | **Gray, John 07-30-2020 (00:00:08)** | **JG02.118** |
|  | 129:15   Q. McKesson, the largest | |
|  | 129:16 distributor in the world, sits on your | |
|  | 129:17 executive committee, and they probably | |
|  | 129:18 reviewed this letter, right? | |
| 129:21 - 130:1 | **Gray, John 07-30-2020 (00:00:08)** | **JG02.119** |
|  | 129:21   A. I can't say whether they did or | |
|  | 129:22 they didn't. | |
|  | 129:23 BY MR. KENNEDY: | |
|  | 129:24   Q. Well, if they did, they would | |
|  | 129:25 have known it wasn't true with respect to | |
|  | 130:1 their company, correct? | |
| 130:4 - 130:14 | **Gray, John 07-30-2020 (00:00:25)** | **JG02.120** |
|  | 130:4   A. No, not necessarily correct. | |
|  | 130:5 BY MR. KENNEDY: | |
|  | 130:6   Q. All right.  Let's move on.  And | |
|  | 130:7 again, we're trying to look at the public | |
|  | 130:8 relations representations about the industry | |
|  | 130:9 being committed, it's part of their mission, | |
|  | 130:10 they take diversion seriously.  That's what | |
|  | 130:11 we're doing, you understand that?  We're | |
|  | 130:12 trying to look at reality versus public | |
|  | 130:13 relations. | |
|  | 130:14 Do you understand that? | |
| 130:17 - 132:22 | **Gray, John 07-30-2020 (00:02:06)** | **JG02.121** |
|  | 130:17   A. Yeah, I mean, that's -- I don't | |
|  | 130:18 know what there is to understand.  It's just | |
|  | 130:19 your statement is what it is. | |
|  | 130:20 BY MR. KENNEDY: | |
|  | 130:21   Q. All right.  Let's go to 2012. | |

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

130:22 That's when APCO, the public relations firm,
130:23 gets hired.  So at the same time that APCO
130:24 gets hired --
130:25   A. I'm sorry, where are you, what
131:1 exhibit?
131:2   Q. We're in 2012.  No exhibit,
131:3 sir.
131:4   A. Oh, okay.
131:5   Q. 2012, about the same time that
131:6 APCO, the PR firm, gets hired --
131:7   A. Yeah.
131:8   Q. -- the HDA begins to have
131:9 discussions with the RAND Corporation about a
131:10 study.  Do you recall the RAND Corporation?
131:11   A. Correct.  I do.
131:12   Q. RAND Corporation, that's not a
131:13 PR firm, right?
131:14   A. No, I don't believe so.
131:15   Q. They're a respected worldwide
131:16 research organization, true?
131:17   A. I -- you know, maybe they are.
131:18 Maybe they aren't.  I don't know for sure.
131:19   Q. The study that RAND was
131:20 proposing to the HDA, that was not a PR
131:21 campaign; that was an actual study to look
131:22 for some answers, true?
131:23   A. Oh, gosh.  I haven't seen the
131:24 proposal for that in however many years it
131:25 was, eight, nine years ago.  I don't know
132:1 exactly what we asked for.
132:2   Q. It wasn't a PR thing.  We
132:3 can --
132:4   A. Well, no, that's your opinion.
132:5 I -- I don't know.
132:6   Q. You don't recall that they
132:7 wanted you folks to fund a study that would
132:8 actually look for solutions and answers to
132:9 this -- to the real crisis, the opioid
132:10 epidemic.  That's what they wanted to do with
132:11 you folks.

| Page/Line | Source | ID |
|---|---|---|

132:12 Do you remember that?
132:13   A. No.  I remember we talked with
132:14 them, but I do not remember the specifics of
132:15 what was going to be the scope and the
132:16 direction of the study.  Because we didn't do
132:17 it, and so it just disappeared.
132:18   Q. They wanted to look for answers
132:19 to maybe find solutions and answers to save
132:20 lives.  I mean, again, we'll talk about the
132:21 specifics, but that was the general thrust of
132:22 what they wanted to do.  It was not PR.

**133:2 - 133:9**    **Gray, John 07-30-2020 (00:00:21)**    **JG02.122**

133:2   Q. Correct?
133:3   A. I don't know.
133:4   Q. Well, you do remember -- you do
133:5 remember that the HDA decided not to fund the
133:6 RAND study.  Do you recall that?
133:7   A. Correct.
133:8   Q. Let's look at some detail.
133:9 35 -- or, excuse me, Exhibit 25, sir.

**133:15 - 134:23**    **Gray, John 07-30-2020 (00:01:22)**    **JG02.123**

133:15   A. 25.  25.  25.  Let's see.
133:16 Where is it?  Okay.
133:17 BY MR. KENNEDY:
133:18   Q. Exhibit 25 is an e-mail from
133:19 you, true, out to some folks at Cardinal?
133:20   A. That looks -- yeah, correct.
133:21   Q. And also to Jeff Eller at
133:22 PS Strategies.  What is PS Strategies?
133:23   A. Yeah, that's a good question.
133:24 I do not know.
133:25   Q. This is an e-mail from you
134:1 July 11, 2012 over to Cardinal, right?
134:2   A. Yes, Connie Woodburn.
134:3   Q. Updated RAND proposal is the
134:4 subject?
134:5   A. Yeah.
134:6   Q. Look at page 21, so maybe this
134:7 will refresh your recollection.  21 down at
134:8 the bottom.

| Page/Line | Source | ID |
|---|---|---|

134:9   A. Yeah.

134:10   Q. You see Advisory Panel?

134:11   A. Yes.

134:12   Q. This is outlining the study

134:13 that RAND is proposing, and it says:  Another

134:14 important aspect of the project is the

134:15 organizing of an expert advisory panel, both

134:16 to provide primary input on a range of

134:17 questions related to drug abuse and

134:18 diversion, and to review and strengthen the

134:19 eventual product -- eventual product, our

134:20 research.

134:21 Do you see that?

134:22   A. Let's see.  Let me go down --

134:23 what line is that?  Oh, you have it.  Okay.

| 134:24 - 136:25 | **Gray, John 07-30-2020 (00:02:15)** | **JG02.297** |

134:24   Q. You see that?

134:25   A. Yeah.

135:1   Q. It's not a PR -- they're not

135:2 talking about doing a PR thing.  We can agree

135:3 on that, sir?

135:4   A. No, I'm not going to agree on

135:5 that for sure, because I don't know where

135:6 this study was going to go, how it was going

135:7 to be used.

135:8   Q. Talking about setting up an

135:9 expert advisory panel to provide primary

135:10 input on a range of questions related to drug

135:11 abuse and diversion.

135:12 Do you see that?

135:13   A. Yeah.  Yes.

135:14   Q. Let's look at your e-mail.  So

135:15 you send the e-mail out, and you attach the

135:16 RAND proposal, and you're sending it over to

135:17 Cardinal, right?

135:18   A. Right.

135:19   Q. And you state:  Connie and

135:20 Jeff:  Attached is the latest RAND proposal.

135:21 I think they are still a bit squishy about

135:22 the million-dollar-plus funding.  Seems they

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

135:23 expect us to provide most of it.  Also, their
135:24 timeline is longer than I thought it would
135:25 be.
136:1 Now, this is important:  In any
136:2 event, I am sitting on this until we hear
136:3 from the attorneys with respect to the
136:4 West Virginia litigation to determine what
136:5 role HDMA can or cannot play in that effort.
136:6   A. Correct.
136:7   Q. We will have to decide whether
136:8 or not the RAND initiative will be too little
136:9 too late and whether or not it helps or
136:10 hinders the West Virginia matter.
136:11 Furthermore, will HDMA's
136:12 resources be better applied to a much larger
136:13 PR effort concerning both West Virginia and
136:14 the rest of the states' attorneys generals to
136:15 prevent the West Virginia litigation from
136:16 spreading to other jurisdictions?
136:17 Is that what you said to the
136:18 Cardinal folks?
136:19   A. That's what it looks like.
136:20 That document speaks for itself.
136:21   Q. So, sir, you're questioning
136:22 whether to fund the study that might find
136:23 answers, might save lives, you're questioning
136:24 that because it might hurt Cardinal's
136:25 position in a lawsuit?  Is that what you're

| 137:1 - 137:1 | **Gray, John 07-30-2020 (00:00:01)** | JG02.298 |

137:1 suggesting?

| 137:5 - 137:24 | **Gray, John 07-30-2020 (00:00:46)** | JG02.124 |

137:5   Q. Is that what you're saying?
137:6   A. No.  No, we're not saying that
137:7 at all.  That -- that wasn't the point of
137:8 this memo.  This was simply about, first of
137:9 all, the million-dollar funding which was an
137:10 issue because we didn't have that million
137:11 dollars at the time.  Secondly was, this was
137:12 a bit late in -- we thought it might be a bit
137:13 late in the game and the study would be of

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

137:14 little value to anybody.

137:15 And again, at that point in

137:16 time, ethics counsels for all the members,

137:17 all 11 of them, you know, weren't sure what

137:18 role they thought that the association should

137:19 or shouldn't play in West Virginia.

137:20   Q. Does this say we're going to

137:21 sit on this to determine, quote, whether or

137:22 not it helps or hinders the West Virginia

137:23 matter?  Is that your statement, sir?

137:24   A. Yes.

**138:5 - 138:23**   **Gray, John 07-30-2020 (00:00:42)**   JG02.125

138:5   Q. You state here that you're

138:6 concerned that this research study will

138:7 happen, they'll come up with answers, and it

138:8 might look like too little too late, and

138:9 that's going to hurt in West Virginia.  Is

138:10 that what you state here, sir, too little too

138:11 late?

138:12   A. No, it says we'll have to

138:13 decide whether or not the initiative will be

138:14 too little too late or helps or hinders as to

138:15 whether or not it's just, you know, either

138:16 not the right information or whatever and

138:17 it's just not going to be helpful in order to

138:18 state the case of the members in their issues

138:19 with West Virginia.

138:20   Q. I think you indicate -- you

138:21 kind of finish this off by saying, you know,

138:22 let's look at this, but maybe we'll just do

138:23 public relations, correct?

**139:1 - 140:4**   **Gray, John 07-30-2020 (00:00:58)**   JG02.126

139:1   A. Yeah, whether or not it was

139:2 just -- rather than going through all of the

139:3 effort to gather all this information,

139:4 whether to just go in and change the dialogue

139:5 about the mischaracterization of the members

139:6 being pill mills and they're not -- it was an

139:7 assumption that the manufacturers -- the

139:8 wholesalers made the drugs and whether we

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

139:9 ought to just go in and correct that record.

139:10 BY MR. KENNEDY:

139:11   Q. Sir, you didn't fund the RAND

139:12 study, and --

139:13   A. No, we didn't.

139:14   Q. What did you say to me as to

139:15 why you didn't fund the RAND study, this

139:16 research project?  Why did you not fund it?

139:17   A. Well, because it was not clear

139:18 whether it was going to be useful.  It was

139:19 too little too late because their timeline

139:20 was too long and we thought by the time it

139:21 would come out, the litigation would have

139:22 moved on and it would be irrelevant.

139:23   Q. Sir, this is 2012 when you

139:24 state this, right?

139:25   A. Correct.

140:1   Q. Too little too late in 2012?

140:2 Do you know how many more people died in

140:3 West Virginia after 2012?

140:4   A. This was --

| 140:7 - 140:8 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.127** |

140:7   A. -- strictly with respect to the

140:8 trials.

| 140:11 - 140:16 | **Gray, John 07-30-2020 (00:00:14)** | **JG02.128** |

140:11   Q. But this was a study to look

140:12 for answers and solutions to the opioid

140:13 epidemic.  And you're concerned about how it

140:14 might affect a trial when these folks wanted

140:15 to find answers and solutions to the

140:16 epidemic, correct?

| 140:19 - 141:7 | **Gray, John 07-30-2020 (00:00:26)** | **JG02.129** |

140:19   A. No.  No, that's not correct.

140:20 That's an overstatement, overbroad.

140:21 BY MR. KENNEDY:

140:22   Q. Okay.  And again, why did you

140:23 say you decided not to move forward with

140:24 this?

140:25   A. I mean, best as I can recall, a

141:1 lot of it was money and a lot of it was the

| Page/Line | Source | ID |
|---|---|---|

141:2 timing and, yeah, priority of what issues
141:3 would be most effective in helping the
141:4 members with the problems they had in
141:5 West Virginia.
141:6   Q. Look at Exhibit 26, if you
141:7 would.

**141:13 - 142:8**  **Gray, John 07-30-2020 (00:00:48)**  **JG02.130**

141:13   Q. Let's look at why you didn't go
141:14 forward.  Exhibit 26, this is an e-mail from
141:15 you, is it not?
141:16   A. Yes, it is.
141:17   Q. And this is sent over to
141:18 Mr. Paul Julian at McKesson.  Who is Paul
141:19 Julian?
141:20   A. Again, group vice president --
141:21 a group president of distribution.
141:22   Q. Subject, RAND study?
141:23   A. Yes.
141:24   Q. Here's what you state to
141:25 McKesson:  Do you have a few moments over the
142:1 next several days to talk about the proposal
142:2 from RAND to study the drug diversion
142:3 problem.
142:4 This ain't PR; they want to
142:5 study the drug diversion problem.
142:6   A. Uh-huh.
142:7   Q. Is that correct, sir?  Is that
142:8 what it says, drug diversion problem?

**142:11 - 145:21**  **Gray, John 07-30-2020 (00:03:44)**  **JG02.131**

142:11   A. That's what it says.
142:12 BY MR. KENNEDY:
142:13   Q. All right.  Let me start over:
142:14 Do you have a few moments over the next
142:15 several days to talk about the proposal from
142:16 RAND to study the drug diversion problem and
142:17 possible alternative approaches for the
142:18 government to take dealing with the issue?
142:19   A. Uh-huh.
142:20   Q. The executive committee agreed
142:21 to fund the study during our last call on

| Page/Line | Source | ID |
|---|---|---|

142:22 June 2 teleconference with the belief that an

142:23 independent assessment -- independent

142:24 assessment of this problem will provide HDMA

142:25 and its members with a useful tool to argue

143:1 for alternative approaches to the current DEA

143:2 strategy of choking off the distribution

143:3 community in the hopes of stopping drug

143:4 diversion.  I believe you had already left

143:5 the call by the time this issue was

143:6 discussed.

143:7 Now, you state, sir:  The next

143:8 step was to get a formal contract from RAND

143:9 detailing the work, scope and development of

143:10 the report.

143:11 And then you state:  Upon

143:12 reviewing their draft contract, we became

143:13 concerned about the ironclad language with

143:14 respect to the publication of the study and

143:15 our ability to control content.  I think the

143:16 key here is when we can stop the report from

143:17 being published, assuming it reaches

143:18 conclusions not favorable to our industry.

143:19 Our outside counsel is currently evaluating

143:20 this situation.  I would like to have your

143:21 thoughts about this effort since we have not

143:22 yet committed to anything.

143:23 I see the possible value -- let

143:24 me go back and read that again:  I see the

143:25 possible value in a study like this if we can

144:1 prevent final publication of a study

144:2 unfavorable to our purposes; however, it also

144:3 falls in the old adage of never ask a

144:4 question you do not already know the answer

144:5 to.

144:6 Was that your e-mail to

144:7 McKesson, sir?

144:8   A. I'm sorry?

144:9   Q. Was that your e-mail to

144:10 McKesson?

144:11   A. That's the e-mail.

| Page/Line | Source | ID |
|---|---|---|

144:12   Q. Number one, if the distributors
144:13 control the content, then it's not an
144:14 independent study as they were proposing,
144:15 true?
144:16   A. You have to know -- mean by
144:17 control the content.  That's pretty standard
144:18 for trade association reports, whether you're
144:19 dealing with McKinsey, KPMG, Pricewaterhouse,
144:20 it's the ability of the associations to,
144:21 before final publication, to review and do
144:22 edits, whether they be major, minor, and then
144:23 you negotiate the edits with the consultant.
144:24 That's standard -- standard association
144:25 contracting process.
145:1   Q. Well, this negotiation with
145:2 RAND was your negotiation that you wanted to
145:3 be able to hide or bury the study if you
145:4 didn't like the results, true?
145:5   A. And we do that -- we do that
145:6 with all our studies, the -- if we get to the
145:7 point we don't find it's useful or helpful or
145:8 it misrepresents, then we want to be able to
145:9 push back on the consultants and say, look,
145:10 this is not accurate, not fair, whatever.
145:11 And that's, again, standard procedure we've
145:12 done with all our -- all our studies about
145:13 any subject.
145:14   Q. Sir, then let me just back up
145:15 so I can be real clear for the record.  You
145:16 said it's your standard practice at the HDA
145:17 to insist that you have the right to bury the
145:18 study if you don't like the results.  That
145:19 was my question, and is your answer that was
145:20 your standard procedure?  Is that your
145:21 answer, sir?

| | | |
|---|---|---|
| 145:24 - 146:2 | **Gray, John 07-30-2020** | JG02.132 |

145:24   A. It -- yeah.
145:25 ///
146:1 BY MR. KENNEDY:
146:2   Q. Yes or no, is that your answer?

| Page/Line | Source | ID |
|---|---|---|

**JG02-Gray, John - Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|
| 146:7 - 146:18 | **Gray, John 07-30-2020 (00:00:30)** | JG02.133 |

146:7   A. I've answered it, I mean --
146:8 BY MR. KENNEDY:
146:9   Q. You finished off this e-mail by
146:10 saying -- you reference this old adage.
146:11   A. Yeah.
146:12   Q. Never ask a question you do not
146:13 already know the answer to.  And do you mean
146:14 never ask somebody if you're following the
146:15 law unless you know -- unless you know in
146:16 advance they're going to answer, yes, you're
146:17 following the law?  Is that what you meant by
146:18 that?

| 146:21 - 147:9 | **Gray, John 07-30-2020 (00:00:31)** | JG02.134 |

146:21   A. Yeah.  No, it just means, you
146:22 know, until you have all the facts, make sure
146:23 you know what you're doing.
146:24 BY MR. KENNEDY:
146:25   Q. And, sir, I think you told us a
147:1 couple minutes ago that you didn't go forward
147:2 with the RAND study for a variety of
147:3 different reasons, but --
147:4   A. Correct.
147:5   Q. -- the fact is, you didn't fund
147:6 this study because RAND refused to allow you
147:7 to bury the results if you didn't like them,
147:8 and that's why it didn't go forward, true?
147:9   A. No.

| 147:12 - 147:13 | **Gray, John 07-30-2020 (00:00:01)** | JG02.135 |

147:12   A. It didn't go forward for
147:13 multiple reasons.

| 147:19 - 148:22 | **Gray, John 07-30-2020 (00:01:03)** | JG02.136 |

147:19   Q. Let's move on.
147:20   A. There were multiple reasons,
147:21 multiple reasons for that failure.
147:22   Q. Let's move on.  Partnership for
147:23 Drug Free America, they were another
147:24 organization that came to you, and they
147:25 wanted to do a study to look for answers and
148:1 solutions to the epidemic in this country to

| JG02-Gray, John - Plaintiffs' Submission |
|---|

| Page/Line | Source | ID |
|---|---|---|
| | 148:2 save lives. | |
| | 148:3 Do you remember that, sir? | |
| | 148:4   A. You know, I really don't recall | |
| | 148:5 we ever got -- I mean, that's the Partnership | |
| | 148:6 for Drug Free?  That's what it's called? | |
| | 148:7   Q. Yes, sir. | |
| | 148:8   A. Yeah, I -- you know, we | |
| | 148:9 certainly, I certainly met with them, but I | |
| | 148:10 don't recall exactly what we met about. | |
| | 148:11 Unless it's documented somewhere, I don't | |
| | 148:12 recall... | |
| | 148:13   Q. This may -- this may help you | |
| | 148:14 with your memory.  Do you remember they | |
| | 148:15 talked about putting together a blue ribbon | |
| | 148:16 panel to study abuse, addiction and | |
| | 148:17 diversion?  Quote, blue ribbon panel, they | |
| | 148:18 wanted to put together? | |
| | 148:19   A. Okay. | |
| | 148:20   Q. Do you recall that? | |
| | 148:21   A. No.  I definitely don't.  Nope. | |
| | 148:22   Q. Look at Exhibit 21. | |
| 149:2 - 149:15 | **Gray, John 07-30-2020 (00:00:29)** | JG02.137 |
| | 149:2   A. Okay. | |
| | 149:3 BY MR. KENNEDY: | |
| | 149:4   Q. And you're copied on this | |
| | 149:5 e-mail, are you not? | |
| | 149:6   A. Yep. | |
| | 149:7   Q. It's 2012. | |
| | 149:8 Can we just back up a second? | |
| | 149:9 This is just a second. | |
| | 149:10   A. Yeah. | |
| | 149:11   Q. We're talking about RAND and | |
| | 149:12 this indication that maybe it was too late, | |
| | 149:13 and just so we can get an agreement, 2012, | |
| | 149:14 it's not too late to save lives in | |
| | 149:15 West Virginia in 2012, is it? | |
| 149:19 - 149:21 | **Gray, John 07-30-2020 (00:00:06)** | JG02.138 |
| | 149:19   Q. It wasn't too late to save | |
| | 149:20 lives from overdoses -- | |
| | 149:21   A. Yeah, I -- | |

| Page/Line | Source | ID |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 149:25 - 150:1 | **Gray, John 07-30-2020 (00:00:04)** | JG02.139 |

149:25   Q. -- in 2012.  That's -- would

150:1 that be true?  Can we just agree on that?

| 150:5 - 152:9 | **Gray, John 07-30-2020 (00:01:55)** | JG02.140 |

150:5   Q. Sir, can we agree to that?

150:6   A. No, I'm not going to agree to

150:7 that necessarily, no.

150:8   Q. All right.

150:9   A. It's much more nuanced than

150:10 that.

150:11   Q. Let's look at a second proposal

150:12 to look for solutions.  This one came from

150:13 Drug Free America.  We have an e-mail from

150:14 Marcia Taylor at Drug Free to you.

150:15 Do you see that?

150:16   A. Yeah, I do.

150:17   Q. It's in 2012.

150:18 Do you see that?

150:19   A. Yeah, I see it.  Yep.

150:20   Q. You'll see under Membership

150:21 Panel, that paragraph starts with "As we

150:22 discussed."

150:23   A. Yeah.

150:24   Q. She said to you:  As we

150:25 discussed, a blue ribbon panel to examine the

151:1 supply chain needs to be high profile in

151:2 order to be effective.  The partnership

151:3 envisions having two cochairs, one

151:4 Republican, one Democrat, to lead the effort.

151:5 Ideally, both would have strong law

151:6 enforcement credentials and excellent

151:7 reputations.  The two individuals that we

151:8 have in mind are Larry Thompson, Deputy

151:9 Attorney General in the Bush Administration

151:10 under John Ashcroft and, until recently,

151:11 general counsel of Pepsi, and Phil Heymann,

151:12 Deputy Attorney General in the Clinton

151:13 Administration and currently a professor at

151:14 Harvard Law School.  To round out the panel

151:15 we believe we need several different

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 151:16 perspectives represented. |  |
|  | 151:17 Then they talk about a doctor, |  |
|  | 151:18 an addiction specialist, a business expert, |  |
|  | 151:19 pharmacist, hospital administrator and a |  |
|  | 151:20 former DEA personnel. |  |
|  | 151:21 Do you see that? |  |
|  | 151:22   A. Yes. |  |
|  | 151:23   Q. So they're talking |  |
|  | 151:24 about getting the HDMA to fund clearly what |  |
|  | 151:25 they describe as a high-profile panel, true? |  |
|  | 152:1   A. I don't know if they were |  |
|  | 152:2 asking -- were they asking us to fund it |  |
|  | 152:3 completely? |  |
|  | 152:4   Q. They were asking you to fund it |  |
|  | 152:5 in the tune of $200,000, which your executive |  |
|  | 152:6 committee agreed upon and then withdrew their |  |
|  | 152:7 funding. |  |
|  | 152:8 Do you recall that? |  |
|  | 152:9   A. Okay. |  |
| 152:12 - 153:2 | **Gray, John 07-30-2020 (00:00:35)** | **JG02.141** |
|  | 152:12   A. I don't actually -- no, I |  |
|  | 152:13 really don't recall. |  |
|  | 152:14 THE WITNESS:  Sorry. |  |
|  | 152:15 BY MR. KENNEDY: |  |
|  | 152:16   Q. Again, from based upon this |  |
|  | 152:17 e-mail, what they're talking about is a high |  |
|  | 152:18 profile, what they consider to be a blue |  |
|  | 152:19 ribbon panel.  We can agree on that?  Yes? |  |
|  | 152:20   A. Yes, that's a correct |  |
|  | 152:21 statement. |  |
|  | 152:22   Q. This proposal was sent to the |  |
|  | 152:23 executive committee.  Do you remember that, |  |
|  | 152:24 sir? |  |
|  | 152:25   A. Actually, honestly no.  I don't |  |
|  | 153:1 remember.  I don't recall. |  |
|  | 153:2   Q. Let's look at Exhibit 24. |  |
| 153:3 - 153:3 | **Gray, John 07-30-2020 (00:00:02)** | **JG02.142** |
|  | 153:3   A. Let's go to that. |  |
| 153:9 - 154:15 | **Gray, John 07-30-2020 (00:01:13)** | **JG02.143** |
|  | 153:9   Q. Exhibit 24, these are the |  |

| Page/Line | Source | ID |
|---|---|---|

**JG02-Gray, John - Plaintiffs' Submission**

153:10 minutes from the executive committee

153:11 meeting --

153:12   A. Yep.

153:13   Q. -- down in San Antonio Hill

153:14 Country, San Antonio Hill Country, June --

153:15   A. Correct.

153:16   Q. -- 10th, 2012.  And if you'll

153:17 go to page 35.

153:18   A. Yep.

153:19   Q. Last sentence -- last sentence

153:20 under Prescription Drug Abuse, Diversion and

153:21 DEA starts with President Gray.

153:22 Do you see that?

153:23   A. Yes.

153:24   Q. It says:  President Gray

153:25 reported that the $200,000 previously

154:1 approved by the executive committee to work

154:2 with the Partnership for a Drug Free America

154:3 likely will be applied instead to other

154:4 DEA-related activities and he will keep them

154:5 posted.

154:6 Do you see that, sir?

154:7   A. I do.

154:8   Q. You decided not to fund this

154:9 proposal?

154:10   A. So it appears.

154:11   Q. The RAND study was going to

154:12 look for answers.  You did not fund that.

154:13 The Partnership for Drug Free America

154:14 proposal study wanted to look for answers.

154:15 That also was not funded, true?

| 154:18 - 154:18 | **Gray, John 07-30-2020 (00:00:00)** | **JG02.144** |

154:18   A. That's true.

| 154:21 - 155:20 | **Gray, John 07-30-2020 (00:01:17)** | **JG02.145** |

154:21   Q. And when you said in these

154:22 minutes that the money was going to go to

154:23 other DEA activities, that money, that

154:24 $200,000, went to APCO two months later at

154:25 the direction of the executive committee.

155:1 Do you recall that, sir?

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

155:2   A. No, I do not.

155:3   Q. To put it in context, at this

155:4 point in time, while the HDA is deciding not

155:5 to fund RAND and deciding not to fund the

155:6 study by a Drug Free America, your PR message

155:7 to Congress, to the Senate, to the state

155:8 legislatures, to the media is that the

155:9 distributors are committed, it's part of

155:10 their mission to combat abuse, diversion and

155:11 addiction.  That's all going on at the same

155:12 time, correct?

155:13   A. Well, based on --

155:14   Q. 2012?

155:15   A. -- what you read in the

155:16 testimony statement, that stands for itself.

155:17   Q. Let's go to West Virginia.

155:18 Let's look at how committed the HDA and the

155:19 industry -- the distributors were to stopping

155:20 diversion.  Let's go to West Virginia.

**155:21 - 156:19**        **Gray, John 07-30-2020 (00:00:50)**        **JG02.299**

155:21 The West Virginia AG in 2012, I

155:22 think we agreed, filed a lawsuit against

155:23 various distributors, true?

155:24   A. True.

155:25   Q. In 2015 that lawsuit had

156:1 progressed, true?

156:2   A. I can't really recall the

156:3 timelines on that.

156:4   Q. Well, you recall the timeline

156:5 that by 2015 the legal and the public

156:6 relations problems in West Virginia got so

156:7 bad that your distributors said you need to

156:8 do something in West Virginia, we can't

156:9 ignore it any longer.

156:10 Do you remember that in 2015,

156:11 sir?

156:12   A. No, that wasn't the nature of

156:13 the conversation at all.  But that's...

156:14   Q. We're going to look at the

156:15 conversation, all right?  Sir, by 2015, the

| Page/Line | Source | ID |
|---|---|---|

**JG02-Gray, John - Plaintiffs' Submission**

156:16 media was reporting that your distributors
156:17 were pouring millions of opioids into
156:18 West Virginia.  That's what the media was
156:19 saying in 2015, true?

**156:21 - 158:1**   **Gray, John 07-30-2020 (00:01:08)**   **JG02.146**

156:21   A. If that's what the media said,
156:22 but whether it's true or not, another matter.
156:23 BY MR. KENNEDY:
156:24   Q. Senator Manchin from
156:25 West Virginia, in 2015, he demanded that the
157:1 distributors make public the numbers of the
157:2 opioids that they were pumping into
157:3 West Virginia.  He was demanding that in
157:4 2015.
157:5 Do you recall that?
157:6   A. No, I don't.
157:7   Q. Do you recall, sir, that by
157:8 2015 there were more deaths per capita in
157:9 West Virginia from prescription drug
157:10 overdoses than any other state in the country
157:11 by 2015?
157:12   A. I've heard that statistic.  I
157:13 couldn't relate it to one year or another.
157:14   Q. Things got so bad from a PR
157:15 standpoint and a legal standpoint in
157:16 West Virginia that your members, your
157:17 distributors, demanded that something be done
157:18 in West Virginia.
157:19 Do you recall that, the
157:20 executive committee, something's got to be
157:21 done in West Virginia.  Do you recall that in
157:22 2015?
157:23   A. Not specifically, but could
157:24 have been.
157:25   Q. 31.  Go to 31, if you would,
158:1 please.

**158:7 - 160:8**   **Gray, John 07-30-2020 (00:02:13)**   **JG02.147**

158:7   Q. Executive committee minutes
158:8 from June 7, 2015, true?
158:9   A. Yeah.

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

158:10   Q. Go to page 96.

158:11   A. Yep.  II(B).

158:12   Q. Yep, II(B), West Virginia

158:13 Litigation (Executive Committee Meeting

158:14 Materials), and then some materials were

158:15 attached.

158:16 Do you see that?

158:17   A. Right.

158:18   Q. And then it states:

158:19 Mr. Gray -- that's you -- and John Parker,

158:20 HDMA senior vice president, communications,

158:21 provided background on litigation in

158:22 West Virginia filed in 2012 against 13

158:23 distributors, 11 of whom are HDMA members.

158:24 Right?

158:25   A. That's what it says.

159:1   Q. Now, go to the last sentence

159:2 that starts way over on the right with

159:3 Ms. Janet Goss.

159:4 Do you see that?

159:5   A. Uh-huh.

159:6   Q. Ms. Janet Goss, GMMB -- that's

159:7 a public relations firm, right?

159:8   A. That's our firm.

159:9   Q. She discussed how HDMA could

159:10 engage the media to the industry's benefit,

159:11 including a three-level strategy.  Following

159:12 discussion, there was general agreement that

159:13 HDMA needs to engage the media.  Toward that

159:14 end, HDMA staff and GMMB will redefine Level

159:15 1, taking a strong and visible role in the

159:16 passage of S.483; engaging in proactive and

159:17 reactive media outreach with other

159:18 stakeholders in West Virginia to offer deep

159:19 background briefings, and Level 2 -- and this

159:20 is what I want to focus on.  This is what was

159:21 being proposed for West Virginia.

159:22 Level 2, convening a

159:23 public/private summit to address relevant

159:24 issues with key stakeholders and reaching out

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

159:25 to Senator Manchin and staff.

160:1 Do you see that?

160:2   A. Yep.  Yep.

160:3   Q. So part of what's being

160:4 proposed in West Virginia isn't just public

160:5 relations.  They're also talking about

160:6 convening a public/private summit to address

160:7 the issues.

160:8   A. Uh-huh.

**160:9 - 160:22**  **Gray, John 07-30-2020 (00:00:45)**   **JG02.300**

160:9   Q. And, sir, by July of 2015, the

160:10 HDA formed what it called, quote, the HDMA

160:11 West Virginia Task Force.

160:12 Do you recall that, the

160:13 executive committee formed a task force

160:14 absolutely and directly focusing on

160:15 West Virginia.  Do you see that?  Do you

160:16 remember that?

160:17   A. I remember that.

160:18   Q. The first meeting of this

160:19 West Virginia Task Force was scheduled for

160:20 August of 2015.  Do you recollect that?

160:21   A. Not specifically, no.

160:22   Q. Give me Exhibit 34.

**161:5 - 166:24**  **Gray, John 07-30-2020 (00:05:47)**   **JG02.148**

161:5   Q. 34 is an e-mail from John

161:6 Parker to required attendees, and there's a

161:7 whole lot of people from McKesson, Cardinal

161:8 and AmerisourceBergen on this e-mail chain.

161:9 Can we agree?

161:10   A. Uh-huh.

161:11   Q. You're in the chain?

161:12   A. Smith Drug, HD Smith Drug,

161:13 yeah, a number of --

161:14   Q. That's not what I asked you,

161:15 sir.

161:16   A. A number of firms.

161:17   Q. Actually, you've got

161:18 AmerisourceBergen, McKesson, Cardinal,

161:19 Cardinal, McKesson, Cardinal, McKesson,

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

161:20 AmerisourceBergen, AmerisourceBergen,

161:21 McKesson, AmerisourceBergen,

161:22 AmerisourceBergen, Cardinal, McKesson,

161:23 AmerisourceBergen.

161:24 So they're well represented on

161:25 this West Virginia Task Force, are they not?

162:1   A. Yeah.  Smith Drug, HD Smith,

162:2 they're both well represented.

162:3   Q. Subject:  HDMA West Virginia

162:4 Task Force call scheduled for August 7, 2015,

162:5 true?

162:6   A. Okay.

162:7   Q. The first sentence:  We are

162:8 looking forward to our call on Friday

162:9 afternoon.  And attached to this is a

162:10 PowerPoint to help the West Virginia Task

162:11 Force in their first meeting.

162:12 Do you see that?

162:13   A. Yeah.

162:14   Q. Go to page 74, if you would.

162:15   A. Okay.

162:16   Q. Turning the Tide in

162:17 West Virginia?

162:18   A. Yeah.

162:19   Q. That's the caption, the title?

162:20   A. Yes.  Okay.

162:21   Q. Go to page 81, if you would.

162:22   A. Sure.  81, okay.

162:23   Q. This is recommended strategy

162:24 for the West Virginia Task Force, true?

162:25   A. Let's look at it first.

163:1   Q. Does the title say Recommended

163:2 Strategy?

163:3   A. I'm reading it.  I'm reading

163:4 it.  Hold on.

163:5   Q. So is my answer yes, the title

163:6 says Recommended Strategy?

163:7   A. No, the answer is I'm reading

163:8 it.  Just a moment.  Okay.

163:9   Q. Recommended Strategy, the last

| Page/Line | Source | ID |
|-----------|--------|-----|

**JG02-Gray, John - Plaintiffs' Submission**

163:10 bullet point -- remember, I said I wanted to
163:11 focus on this one.  The last bullet point is:
163:12 Convene a closed-door summit.  Hold a
163:13 closed-door summit to address the problem
163:14 with key stakeholders.
163:15 That was part of the strategy,
163:16 true?
163:17   A. That's what it says.
163:18   Q. Go to page 89, if you would.
163:19 We get a little more detail on this
163:20 closed-door summit and what was --
163:21   A. Okay.  89.  Wait a minute.
163:22 Wait a minute.  I'm missing something here.
163:23 Page 4 of that.  Okay.
163:24   Q. See number 5 where it says:
163:25 Convene a summit?
164:1   A. Correct.
164:2   Q. And does it state HDMA can show
164:3 proactive leadership and help change public
164:4 attention on prescription drug abuse by
164:5 convening a summit to address the problem
164:6 with key stakeholders.  The summit would --
164:7 Then look to (d).  You see
164:8 (d) --
164:9   A. Yeah.
164:10   Q. -- in the list of what the
164:11 summit was going to do?  It says this summit
164:12 being proposed:  Address three main topics or
164:13 answer three main questions determined by
164:14 HDMA and/or other stakeholders on what needs
164:15 to be done to better prevent abuse and
164:16 diversion.
164:17 Is that what it says, sir?
164:18   A. Correct.
164:19   Q. This summit that was being
164:20 proposed in West Virginia, it was going to
164:21 look for solutions, for answers, true?
164:22   A. Well, I mean, it -- this -- (d)
164:23 speaks for itself.
164:24   Q. All right.  That was being

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

164:25 proposed.  So the first meeting scheduled --

165:1 first meeting is scheduled for August 7th.

165:2   A. Uh-huh.

165:3   Q. And this plan, this proposal to

165:4 convene a summit that was going to look for

165:5 answers, that was never carried out, true?

165:6 Just like RAND, just like Drug Free.

165:7   A. Correct.

165:8   Q. This proposal to convene a

165:9 summit to look for answers to problems of

165:10 diversion and abuse in West Virginia never

165:11 happened, true?

165:12   A. It did not happen.

165:13   Q. In fact, the very first meeting

165:14 of the West Virginia Task Force scheduled for

165:15 August 7, 2015, the very first meeting was

165:16 canceled, true?

165:17   A. That's correct.

165:18   Q. In fact --

165:19   A. I'm not sure it was ever

165:20 scheduled, but okay, whatever.

165:21   Q. It was canceled on one-day's

165:22 notice, right?

165:23   A. I don't think so.  I think it

165:24 was like 30 days' notice.  In my recollection

165:25 it was 30 days, but --

166:1   Q. 30 days?

166:2   A. Yeah, the meeting didn't

166:3 happen.

166:4   Q. In fact, this West Virginia

166:5 Task Force was disbanded even before its very

166:6 first meeting, true?

166:7   A. You know, I don't remember if

166:8 it was disbanded at all.  I mean, elements of

166:9 it -- I don't know.  I don't remember the

166:10 exact process that went on around then.  I

166:11 don't recall.

166:12   Q. Sir, the fact of the matter is

166:13 the first meeting was canceled the day before

166:14 it ever happened.  The task force was

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

166:15 disbanded --

166:16   A. Well, I will -- we'll agree to

166:17 disagree about the day before unless you have

166:18 a date telling me that.  But I don't recall.

166:19 I thought it was canceled long before that.

166:20   Q. Sir, this West Virginia Task

166:21 Force was disbanded, never mentioned again,

166:22 West Virginia and its problems completely and

166:23 totally went away, was never mentioned

166:24 again --

**167:3 - 167:4**   **Gray, John 07-30-2020 (00:00:01)**                    JG02.149

167:3   Q. Is that your understanding,

167:4 sir?

**167:7 - 167:16**   **Gray, John 07-30-2020 (00:00:27)**                  JG02.150

167:7   A. Well, I think it's an

167:8 overstatement to say never mentioned again.

167:9 But that's just my recollection.

167:10 BY MR. KENNEDY:

167:11   Q. And the plan -- the plan to

167:12 convene a summit to look for answers in

167:13 West Virginia never occurred.

167:14   A. The summit never occurred.  We

167:15 took other tactics.

167:16   Q. Look at Exhibit 35.

**167:22 - 168:24**   **Gray, John 07-30-2020 (00:00:57)**              JG02.151

167:22   Q. This is an e-mail from John

167:23 Parker --

167:24   A. Okay.  There it is.  There's

167:25 your day before.

168:1   Q. You have an e-mail from John

168:2 parker to you, December 19, 2017.

168:3 Do you see that?

168:4   A. Correct.

168:5   Q. Second paragraph starts with

168:6 "The West Virginia Task Force."

168:7 Do you see that?

168:8   A. Yep.  Yep.

168:9   Q. Does it state:  The

168:10 West Virginia Task Force I created with GMMB

168:11 in the summer of 2015 was disbanded --

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 168:12   A. Yep. | |
| | 168:13   Q. -- the day before its first | |
| | 168:14 meeting in August due to, quote, | |
| | 168:15 discoverability issues raised by a member. | |
| | 168:16   A. Right. | |
| | 168:17   Q. The status of the effort was | |
| | 168:18 never raised at the 2015 board meeting and | |
| | 168:19 never resurrected in concept again. | |
| | 168:20 Did I read that correctly?  Did | |
| | 168:21 I read that correctly? | |
| | 168:22   A. Yeah, that's what it says. | |
| | 168:23   Q. The problems in West Virginia | |
| | 168:24 didn't go away, did they, sir, after 2012? | |
| 169:2 - 169:2 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.152** |
| | 169:2   A. You know, I can't comment -- | |
| 169:5 - 169:11 | **Gray, John 07-30-2020 (00:00:16)** | **JG02.153** |
| | 169:5   A. Yeah, I can't comment on that. | |
| | 169:6 BY MR. KENNEDY: | |
| | 169:7   Q. Sir, let's put this in context. | |
| | 169:8 Let's put it in context.  People in | |
| | 169:9 West Virginia are suffering more than any | |
| | 169:10 other state in the country from this opioid | |
| | 169:11 epidemic in 2012, right? | |
| 169:14 - 169:15 | **Gray, John 07-30-2020 (00:00:03)** | **JG02.154** |
| | 169:14   A. Yeah, that's a conclusion I | |
| | 169:15 can't reach.  But go ahead. | |
| 170:6 - 170:9 | **Gray, John 07-30-2020 (00:00:12)** | **JG02.155** |
| | 170:6   Q. the plan to | |
| | 170:7 actually do something in West Virginia was | |
| | 170:8 terminated because somebody was worried that | |
| | 170:9 someone might find out what they were doing? | |
| 170:14 - 171:20 | **Gray, John 07-30-2020 (00:01:17)** | **JG02.156** |
| | 170:14   A. My recollection is trial | |
| | 170:15 counsels for a number of the members felt | |
| | 170:16 that there was no way to maintain privilege | |
| | 170:17 and communications in doing any of this | |
| | 170:18 effort, and it was the outside trial | |
| | 170:19 counsels, in my recollection, that said | |
| | 170:20 please don't do this. | |
| | 170:21   Q. Sir -- | |

| Page/Line | Source | ID |
|---|---|---|
| | JG02-Gray, John - Plaintiffs' Submission | |

170:22   A. Because they were in settlement
170:23 negotiations at the time with the State.
170:24 That was my -- that's what I understood to be
170:25 the situation.
171:1   Q. Do you remember when we looked
171:2 back and we talked about it earlier, we
171:3 talked about the Crisis Playbook, where your
171:4 PR firm said, hey, if anybody ever asks, make
171:5 sure you tell them that the distributors
171:6 always put safety over money?  Do you
171:7 remember that, sir, we talked about that?
171:8   A. No, not really.
171:9   Q. Always put safety over money.
171:10 So what we have here -- and
171:11 again, you can correct me if I'm wrong, but
171:12 the RAND study that was going to look for
171:13 answers and save lives never went forward,
171:14 the partnership study that was going to look
171:15 for answers to try to save lives was never
171:16 funded, and now the task force summit in
171:17 West Virginia is canceled the day before it's
171:18 supposed to get off the ground because you're
171:19 worried about a lawsuit?
171:20   A. No.

**171:25 - 172:6**   **Gray, John 07-30-2020 (00:00:19)**                 **JG02.157**

171:25   Q. Let me ask you, sir.  Is
172:1 that -- is that how you describe an industry
172:2 that is committed, that it's part of their
172:3 mission, that always puts safety over money?
172:4 Is that how you would describe the industry
172:5 that --
172:6   A. No.

**172:10 - 173:4**   **Gray, John 07-30-2020 (00:01:05)**                 **JG02.158**

172:10   Q. Let's look at legislation.
172:11 Let's look at legislation and see the
172:12 industry's commitment to stopping diversion
172:13 and abuse.  We'll talk about the whys, but I
172:14 just want to nail some things down.
172:15 Rescheduling HCPs, hydrocodone
172:16 combination products, the legislation to

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

172:17 reschedule it from Schedule III to II?
172:18   A. Correct.
172:19   Q. And the HDMA, in its lobbying
172:20 efforts, they opposed that legislation, true?
172:21   A. We didn't oppose it.  We wanted
172:22 an extended time to comply.
172:23   Q. Sir, let me back up a second.
172:24 Extended time to comply, you agree, do you
172:25 not, that HCP, hydrocodone products, you
173:1 would agree with me they were debilitating?
173:2 That category, that opioid was debilitating
173:3 to our communities.
173:4 You agree with that, don't you?

**173:7 - 173:11**   **Gray, John 07-30-2020 (00:00:08)**   **JG02.159**

173:7   A. Yeah, I'm not a pharmacist.  I
173:8 really don't know.
173:9 BY MR. KENNEDY:
173:10   Q. Look at Exhibit 48, if you
173:11 would.

**173:12 - 173:16**   **Gray, John 07-30-2020**   **JG02.160**

173:12 (Whereupon, Deposition Exhibit
173:13 Gray-48, 11/14/13 HDMA Letter to
173:14 Woodcock, ABDCMDL06395949 -
173:15 ABDCMDL06395953, was marked for
173:16 identification.)

**173:17 - 175:13**   **Gray, John 07-30-2020 (00:02:01)**   **JG02.161**

173:17   A. Yeah.
173:18 BY MR. KENNEDY:
173:19   Q. You got 48?
173:20   A. I'm on it.  Janet Woodcock.
173:21   Q. This is a letter by you.
173:22   A. Right.
173:23   Q. November 14, 2013, a letter by
173:24 you to Congress.  Go to page 52.
173:25   A. Okay.
174:1   Q. The second paragraph under the
174:2 bolded "Impact."
174:3   A. Yeah.
174:4   Q. Second paragraph -- I know
174:5 you're not a pharmacist, but do you tell

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

174:6 Congress:  HDMA does not dispute the
174:7 debilitating effects of diversion and abuse
174:8 of hydrocodone combination products?  Is that
174:9 your statement, sir?
174:10   A. Well, it's a statement of the
174:11 organization, of the members.  It's not my --
174:12 necessarily my personal statement, but it
174:13 reflects what was conveyed and what the
174:14 message was they wanted to put in the letter
174:15 to the FDA.
174:16   Q. Sir, what did you say -- did
174:17 you tell me that the HDA did not oppose the
174:18 rescheduling legislation of hydrocodone
174:19 products?  Did you say that?
174:20   A. No, what I said is we asked for
174:21 an extended time because the issue for our
174:22 members, particularly our smaller members,
174:23 was that there are only three vault companies
174:24 in the United States, and the vaults required
174:25 to hold the extra volume of product beyond
175:1 the cage system they currently operated, it
175:2 would probably take two -- minimally,
175:3 24 months to even get the vaults into these
175:4 warehouses so they could comply.  And we're
175:5 asking for extra time to comply.
175:6   Q. Answer my question, sir:  The
175:7 HDMA opposed the legislation --
175:8   A. I honestly can't remember
175:9 whether we opposed it out of the block or
175:10 not.  But our suggestion was -- if they
175:11 wanted to do this rescheduling, to give the
175:12 companies time because limited product
175:13 available to create the vault space.

| 175:17 - 175:18 | **Gray, John 07-30-2020 (00:00:03)** | **JG02.162** |

175:17   Q. Sir, look at Exhibit 24, if you
175:18 would, please.

| 175:19 - 175:21 | **Gray, John 07-30-2020 (00:00:07)** | **JG02.301** |

175:19   A. Yep.
175:20   Q. These are executive committee
175:21 meetings -- minutes from June 10, 2012.

| Page/Line | Source | ID |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 175:22 - 176:19 | **Gray, John 07-30-2020 (00:00:49)** | JG02.302 |

175:22   A. Okay.

175:23   Q. Go to page 35, please.

175:24   A. Yeah.

175:25   Q. And second paragraph starting

176:1 with Mr. Kelly.

176:2   A. Yep.

176:3   Q. Mr. Kelly reported that

176:4 controlled substance-related matters that

176:5 have played a prominent role in PDUFA process

176:6 include Senator Manchin's language to

176:7 reschedule hydrocodone combination products

176:8 from Schedule III to Schedule II.

176:9   A. Uh-huh.

176:10   Q. HDMA is opposing the amendment.

176:11 Do you see that, sir?

176:12   A. Correct.

176:13   Q. Does that refresh your

176:14 recollection?

176:15   A. Yeah.  I mean, I think

176:16 initially we said, look, we can't do this

176:17 physically, so we opposed it.  We can't do it

176:18 physically in the time the amendment

176:19 required, which was --

| Page/Line | Source | ID |
|---|---|---|
| 177:4 - 177:7 | **Gray, John 07-30-2020 (00:00:12)** | JG02.163 |

177:4   Q. HDA was opposing legislation to

177:5 reschedule a drug that your organization has

177:6 admitted was debilitating to our communities.

177:7 That's what was going on, correct?

| Page/Line | Source | ID |
|---|---|---|
| 177:13 - 177:13 | **Gray, John 07-30-2020 (00:00:01)** | JG02.164 |

177:13   Q. Is that correct, sir?

| Page/Line | Source | ID |
|---|---|---|
| 177:15 - 177:19 | **Gray, John 07-30-2020 (00:00:10)** | JG02.165 |

177:15   A. Well, I disagree with the word

177:16 "admitted," but it was in the letter.

177:17 BY MR. KENNEDY:

177:18   Q. Is this what you call -- is

177:19 this what you call putting safety over money?

| Page/Line | Source | ID |
|---|---|---|
| 177:24 - 178:25 | **Gray, John 07-30-2020 (00:01:05)** | JG02.166 |

177:24   A. Yeah, I'm not making value

177:25 judgments on that kind of comment.

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

178:1 BY MR. KENNEDY:

178:2  Q. All right.  Let's talk about

178:3 disposal legislation.  Disposal legislation,

178:4 that was legislation set up by the various

178:5 states whereby they would set up programs for

178:6 people to be able to dispose or return opioid

178:7 medications that they did not need to use.

178:8 That's what that legislation was all about,

178:9 true?

178:10  A. Very broadly speaking.

178:11  Q. All right.  And you recall that

178:12 the HDA supported that type legislation, but

178:13 only if the distributors did not have to pay

178:14 for the disposal programs.

178:15 Do you recall that?

178:16  A. Not specifically, no.  But I

178:17 remember we worked that issue hard, yep.

178:18  Q. You worked that issue hard so

178:19 that the distributors would not have to pay

178:20 for these disposal --

178:21  A. No.  So we could figure out

178:22 what was the most practical logistical way to

178:23 do it, and that was an issue with the

178:24 pharmacies in particular.

178:25  Q. Give me Exhibit 57.

**179:1 - 179:8** · **Gray, John 07-30-2020 (00:00:01)** · **JG02.167**

179:1 (Whereupon, Deposition Exhibit

179:2 Gray-57, HDMA Federal Legislation

179:3 Priorities Related to Prescription

179:4 Drug Abuse, HDA_MDL_000145737 -

179:5 HDA_MDL_000145740, was marked for

179:6 identification.)

179:7  A. Okay.

179:8 BY MR. KENNEDY:

**179:9 - 180:6** · **Gray, John 07-30-2020 (00:00:47)** · **JG02.168**

179:9  Q. Do you see 57?  This is

179:10 basically a summary prepared by the HDA with

179:11 respect to legislative issues.

179:12 Do you see that?

179:13  A. Yeah.  This -- yep.

| Page/Line | Source | ID |
|---|---|---|

179:14   Q. Drug Disposal on the left.  Do
179:15 you see that?
179:16   A. Uh-huh.
179:17   Q. Over to the right, HDMA
179:18 Recommendations/Policy Considerations column.
179:19 Do you see that?
179:20   A. Yes.
179:21   Q. Second paragraph -- and again,
179:22 you supported this, but second paragraph:
179:23 The issue of who pays for these disposal
179:24 programs remains.  HDMA currently opposes
179:25 efforts to require wholesalers to pay for
180:1 these programs.
180:2 Do you see that?
180:3   A. Correct.
180:4   Q. So you were all for these very
180:5 important programs as long as you didn't have
180:6 to pay for them, true?

| 180:9 - 180:9 | **Gray, John 07-30-2020 (00:00:00)** | **JG02.169** |

180:9   A. No, we were all -- yeah, we

| 180:10 - 180:20 | **Gray, John 07-30-2020 (00:00:22)** | **JG02.170** |

180:10 supported the program, but unfortunately, the
180:11 programs being recommended were all
180:12 wholesaler based, and yet, the pharmacies are
180:13 the ones that were going to have to do the
180:14 collecting of the drugs, and the
180:15 manufacturing is -- there's three other
180:16 groups in the supply chain that should have
180:17 been involved, and the question from our
180:18 perspective was if we're going to be
180:19 involved, everybody else should be involved
180:20 because it is a supply chain, after all.

| 181:2 - 182:3 | **Gray, John 07-30-2020 (00:01:02)** | **JG02.171** |

181:2   Q. Sir, tax legislation.  You
181:3 recall that West Virginia, 20 or more other
181:4 states proposed taxes, taxes on the sale of
181:5 opioids that would have impacted -- that
181:6 would have impacted distributors because they
181:7 would have to pay the tax.
181:8 Do you recall those pieces of

| Page/Line | Source | ID |
|---|---|---|

181:9 legislation?

181:10   A. Well, yes, but not your

181:11 characterization.

181:12   Q. The money from the tax was

181:13 going to go to treatment to people that were

181:14 addicted, true?

181:15   A. I don't think it was true in

181:16 every state.  Some of them were talking about

181:17 general fund money.

181:18   Q. Okay.  Can we agree that you

181:19 opposed the tax legislation in every state?

181:20   A. Eh, I'm not sure.  I'm not sure

181:21 that's accurate.

181:22   Q. In the vast majority of states

181:23 you opposed --

181:24   A. Well, whatever.

181:25   Q. True?

182:1   A. There were -- there were states

182:2 we opposed it.  There were states we worked

182:3 with compromise.

**182:18 - 183:4      Gray, John 07-30-2020 (00:00:24)**                    JG02.172

182:18   Q. All right.  Mr. Gray, we were

182:19 talking about the -- about legislation, state

182:20 and federal, and the HDA position with

182:21 respect to legislation.

182:22 But let me briefly talk about

182:23 the Marino-Blackburn legislation, federal

182:24 legislation.  I'm certain you are familiar

182:25 with that.

183:1   A. Yep.

183:2   Q. The HDMA played a significant

183:3 role in getting that legislation passed.

183:4 Would that be true?

**183:7 - 184:18      Gray, John 07-30-2020 (00:01:27)**                    JG02.173

183:7   A. True.

183:8 BY MR. KENNEDY:

183:9   Q. Yes, sir?

183:10   A. I said true.

183:11   Q. All right.  I'm sorry.  In

183:12 fact, you folks hired a third-party outside

| Page/Line | Source | ID |
|---|---|---|
| | | |

183:13 lobbyist group to work directly on that
183:14 legislation, did you not?
183:15   A. Well, we have a number of them.
183:16 I don't know if they're hired just for that,
183:17 but they might have worked on it, I'm sure.
183:18   Q. Do you remember interviewing
183:19 different lobbyist organizations and trying
183:20 to find the lobbyist group that had the
183:21 strongest relationship with Congressman
183:22 Marino?
183:23   A. Well, I didn't personally.  My
183:24 staff may have.
183:25   Q. When originally drafted, the
184:1 Marino legislation had a provision that
184:2 required pharmacists to undergo background
184:3 checks and drug tests.  Do you remember that,
184:4 that piece of the legislation, as originally
184:5 drafted?
184:6   A. No.
184:7   Q. Do you recall the HDMA working
184:8 on behalf of chain pharmacies, national chain
184:9 pharmacies, to have that removed from that
184:10 legislation?
184:11   A. I do not.
184:12   Q. And can you agree with me that
184:13 it probably wasn't a bad idea, considering
184:14 what was going on in the United States at
184:15 that point in time, probably wasn't a bad
184:16 idea to have pharmacists required to have
184:17 background checks and drug tests?  Not a bad
184:18 idea?

**184:21 - 185:1**      **Gray, John 07-30-2020 (00:00:08)**      **JG02.174**

184:21   A. I don't have an opinion --
184:22 Jesus.  No, I don't -- I don't have an
184:23 opinion.
184:24 BY MR. KENNEDY:
184:25   Q. Pull up -- I'm sorry.  Pull up
185:1 E-75 if you would.

**185:6 - 185:9**      **Gray, John 07-30-2020 (00:00:01)**      **JG02.175**

185:6 (Whereupon, Deposition Exhibit

| | | |
|---|---|---|
| JG02-Gray, John - Plaintiffs' Submission | | |
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
|---|---|---|
| 185:10 - 187:6 | 185:7 Gray-75, E-mail(s), ADBCMDL00277567,<br>185:8 was marked for identification.)<br>185:9 BY MR. KENNEDY:<br>**Gray, John 07-30-2020 (00:01:50)**<br>185:10   Q. Okay.  We're looking at the<br>185:11 second e-mail down from Kristen Freitas.<br>185:12   A. Yeah, Freitas.<br>185:13   Q. She's from the HDMA; is that<br>185:14 right?<br>185:15   A. Yes.<br>185:16   Q. And she sent an e-mail to Rita<br>185:17 Norton, right?  And Rita Norton, do you know<br>185:18 who she was?<br>185:19   A. Yes, she was the head of<br>185:20 government affairs for AmerisourceBergen.<br>185:21   Q. Okay.  First e-mail is below<br>185:22 that, one minute before.<br>185:23 Do you see that?<br>185:24   A. Yeah.<br>185:25   Q. And again, now we have Rita<br>186:1 Norton from AmerisourceBergen to the HDA,<br>186:2 right?<br>186:3   A. Yeah.<br>186:4   Q. And she says:  Thanks, Kristen.<br>186:5 Do we know if NCPA and NACDS concerns were<br>186:6 addressed?<br>186:7 NCPA is the National Community<br>186:8 Pharmacist Association, right?<br>186:9   A. Correct.<br>186:10   Q. And NACDS is the National<br>186:11 Association of Chain Drug Stores, correct?<br>186:12   A. Correct.<br>186:13   Q. The HDA answers this inquiry<br>186:14 from AmerisourceBergen, and Freitas from the<br>186:15 HDA says:  I spoke with NCPA -- that's the<br>186:16 pharmacy organization.<br>186:17   A. Uh-huh.<br>186:18   Q. And I spoke to NACDS -- that's<br>186:19 the national chain pharmacy organization --<br>186:20 last week. | JG02.176 |

| JG02-Gray, John - Plaintiffs' Submission |
|---|

| Page/Line | Source | ID |
|---|---|---|
| | 186:21   A. Uh-huh. | |
| | 186:22   Q. And they were pleased with the | |
| | 186:23 most recent draft, that being last week's | |
| | 186:24 draft, because it exempts pharmacists from | |
| | 186:25 the background check and drug testing | |
| | 187:1 requirements.  I will circle back with them | |
| | 187:2 today and keep them posted. | |
| | 187:3 Do you remember these efforts | |
| | 187:4 on behalf of the HDA and on behalf of the | |
| | 187:5 pharmacists? | |
| | 187:6   A. No, I don't. | |
| 187:14 - 189:4 | **Gray, John 07-30-2020 (00:01:19)** | JG02.177 |
| | 187:14   Q. Now, along the lines of how | |
| | 187:15 committed distributors were to stopping | |
| | 187:16 diversion, I want to talk to you a little bit | |
| | 187:17 about the Masters Pharmaceuticals case. | |
| | 187:18 You're certainly familiar with that case, are | |
| | 187:19 you not? | |
| | 187:20   A. Somewhat.  It's been a long | |
| | 187:21 time since I've gone through any of that, but | |
| | 187:22 I remember at the time when it happened. | |
| | 187:23   Q. Well, you recall that the DEA | |
| | 187:24 brought an enforcement action against Masters | |
| | 187:25 Pharmaceuticals, correct? | |
| | 188:1   A. Correct. | |
| | 188:2   Q. It ended up in the court | |
| | 188:3 system, true? | |
| | 188:4   A. True. | |
| | 188:5   Q. Master's appealed to the United | |
| | 188:6 States Court of Appeals in the District of | |
| | 188:7 Columbia, and the HDMA wrote an amicus brief | |
| | 188:8 in that case. | |
| | 188:9 Do you recall that? | |
| | 188:10   A. I do. | |
| | 188:11   Q. And, in fact, the decision and | |
| | 188:12 a review of the amicus brief was done by the | |
| | 188:13 executive committee, which would have been | |
| | 188:14 standard at the time, true? | |
| | 188:15   A. Yeah, the board and the | |
| | 188:16 executive committee probably would have both | |

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

188:17 seen it.
188:18   Q. And certainly you saw it, true?
188:19   A. Yeah.
188:20   Q. You're a lawyer?
188:21   A. Yeah.
188:22   Q. True?  All right.
188:23 I'm going to look at some of
188:24 the things that the HDA represented to this
188:25 Court of Appeals in Washington, D.C.  Again,
189:1 within the framework -- within the framework
189:2 of the PR program that you folks are
189:3 committed to stopping diversion, all right?
189:4 Can we look at that?

| 189:13 - 189:13 | **Gray, John 07-30-2020 (00:00:02)** | **JG02.178** |

189:13   Q. Exhibit 59, sir.

| 189:14 - 189:19 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.179** |

189:14 (Whereupon, Deposition Exhibit
189:15 Gray-59, E-mail(s) w/Attached Masters
189:16 Pharmaceuticals Amicus Brief,
189:17 HDA_MDL_000162206 - HDA_MDL_000162249,
189:18 was marked for identification.)
189:19 BY MR. KENNEDY:

| 189:20 - 190:14 | **Gray, John 07-30-2020 (00:00:43)** | **JG02.180** |

189:20   Q. This is an e-mail attached to
189:21 the final version of the brief, true, and
189:22 it's being sent to you?
189:23   A. No.
189:24   Q. Is that right?
189:25   A. It wasn't sent to me.  It was
190:1 sent to Ruth Miller.
190:2   Q. Does it say down below,
190:3 Elizabeth Gallenagh and then to John Gray?
190:4   A. Oh, the very bottom one.  Yeah,
190:5 yeah, sorry.
190:6   Q. All right.  Go to the next
190:7 page, 07.
190:8   A. Yeah.
190:9   Q. And this is the cover page of
190:10 the amicus brief filed by the HDA.
190:11   A. Uh-huh.

| Page/Line | Source | ID |
|---|---|---|

**JG02-Gray, John - Plaintiffs' Submission**

190:15 - 191:10

190:12  Q. Go to page 38.  Lets start with
190:13 page 38 and see what the HDA is telling the
190:14 Court of Appeals.  The first sentence on
**Gray, John 07-30-2020 (00:00:55)**                    JG02.181
190:15 page 38 --
190:16   A. Uh-huh.
190:17   Q. -- the HDA writes to the Court:
190:18 The practical infeasibility of requiring
190:19 distributors to investigate and halt
190:20 suspicious orders underscores the importance
190:21 of ensuring that the DEA has complied with
190:22 the APA before attempting to impose such
190:23 duties.
190:24   A. Uh-huh.
190:25   Q. Practical infeasibility of
191:1 requiring distributors to investigate and
191:2 halt suspicious orders.
191:3 Sir, this brief is 2016.
191:4   A. Uh-huh.
191:5   Q. We already went over this.  In
191:6 2012 you provided written answers to Congress
191:7 telling them that that is exactly what the
191:8 distributors are doing; they're investigating
191:9 and stopping orders.
191:10   A. Uh-huh.

191:14 - 191:15      **Gray, John 07-30-2020 (00:00:05)**              JG02.182
191:14   Q. And now you're telling the
191:15 Court of Appeals it's not feasible for them

191:16 - 191:16      **Gray, John 07-30-2020 (00:00:00)**              JG02.303
191:16 to do that.

191:22 - 192:17      **Gray, John 07-30-2020 (00:00:51)**              JG02.183
191:22   Q. Is that what you're telling the
191:23 Court of Appeals, it is not feasible for
191:24 distributors to investigate and halt
191:25 suspicious orders?  Is that what's written
192:1 here?
192:2   A. The infeasibility side of that,
192:3 to my recollection, dealt with not
192:4 necessarily the reporting.  It was elements
192:5 within those activities that the DEA were

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

192:6 beginning to focus on that were becoming
192:7 problematic for wholesalers.  And you'd have
192:8 to speak to an operations person to get the
192:9 nuance on that.
192:10  Q. Well, the Court of Appeals
192:11 doesn't get to talk to an operations person
192:12 to get the nuance.  They're just reading what
192:13 you're telling them.  And you're telling them
192:14 here that it's not feasible for distributors
192:15 to investigate and stop.  And that's contrary
192:16 to what you testified to to Congress in 2012,
192:17 2014 and 2017, true?

**192:20 - 193:19    Gray, John 07-30-2020 (00:00:55)**                    **JG02.184**

192:20   A. Well, that statement right
192:21 there is not the guts of what the appeal was
192:22 about, which was specific to some activities
192:23 within the administrative law concept
192:24 process, and, you know, the real issue here
192:25 is the ad law issues, because that's why the
193:1 industry felt it had to -- not necessarily to
193:2 be supportive of Masters, but to be
193:3 supportive of the proper administrative
193:4 procedures.
193:5 And they felt that those had
193:6 been ignored by the DEA in the Masters case
193:7 in particular, the details of which are
193:8 beyond me now, but it was a big deal at the
193:9 time.
193:10 BY MR. KENNEDY:
193:11   Q. Let's see -- well, sir, I know
193:12 that that was the main focus, and we'll talk
193:13 about the main focus, but you're not
193:14 suggesting that as a lawyer and a party to a
193:15 lawsuit, you only have to be forthright and
193:16 honest on the main focus of the brief, but
193:17 you're allowed to kind of play around the
193:18 edges on stuff that's not the main focus?
193:19 That's not what you're saying, are you?

**194:2 - 194:3    Gray, John 07-30-2020 (00:00:01)**                    **JG02.185**

194:2   Q. That's not what you're saying,

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 194:3 is it? |  |
| 194:5 - 194:10 | **Gray, John 07-30-2020 (00:00:08)** | JG02.186 |
|  | 194:5   A. No, I'm not saying anything one |  |
|  | 194:6 way or the other. |  |
|  | 194:7 BY MR. KENNEDY: |  |
|  | 194:8   Q. All right.  Go to page 40. |  |
|  | 194:9 Let's see what you next represented to the |  |
|  | 194:10 Court in this brief.  Page 40.  Page 40 down |  |
| 194:11 - 194:22 | **Gray, John 07-30-2020 (00:00:44)** | JG02.304 |
|  | 194:11 at the bottom, it starts with "Accordingly." |  |
|  | 194:12 It says:  Accordingly -- do you see that at |  |
|  | 194:13 the bottom? |  |
|  | 194:14   A. Oh, the very bottom? |  |
|  | 194:15   Q. Yeah.  You say:  Accordingly, |  |
|  | 194:16 DEA's regulations had sensibly imposed a duty |  |
|  | 194:17 on distributors simply to report suspicious |  |
|  | 194:18 orders, but left it to the DEA and its agents |  |
|  | 194:19 to investigate and halt suspicious orders. |  |
|  | 194:20 Are you suggesting here, sir, |  |
|  | 194:21 that the DEA has the job of investigating and |  |
|  | 194:22 halting suspicious orders? |  |
| 195:7 - 195:24 | **Gray, John 07-30-2020 (00:00:42)** | JG02.187 |
|  | 195:7   A. Yeah, DEA -- where are we? |  |
|  | 195:8 Okay.  Well, in fact, the second half of that |  |
|  | 195:9 sentence is exactly what was going on. |  |
|  | 195:10 BY MR. KENNEDY: |  |
|  | 195:11   Q. Right.  The DEA is the one |  |
|  | 195:12 that's supposed to investigate and stop the |  |
|  | 195:13 orders.  The distributors are supposed to |  |
|  | 195:14 just report them.  Is that what you're |  |
|  | 195:15 saying? |  |
|  | 195:16   A. That was the understanding at |  |
|  | 195:17 the time. |  |
|  | 195:18   Q. Well, sir, didn't the DEA -- |  |
|  | 195:19 didn't the DEA tell you folks, I think nine |  |
|  | 195:20 years before this, that they could not |  |
|  | 195:21 possibly investigate all the pharmacies in |  |
|  | 195:22 this country, that they needed the help of |  |
|  | 195:23 the distributors? |  |
|  | 195:24 Didn't they tell you that? |  |

| Page/Line | Source | ID |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 196:2 - 196:6 | **Gray, John 07-30-2020 (00:00:06)** | JG02.188 |
| | 196:2   A. I never heard those words out | |
| | 196:3 of anybody at DEA. | |
| | 196:4 BY MR. KENNEDY: | |
| | 196:5   Q. Well, let's look at Exhibit 54, | |
| | 196:6 if you would, sir. | |
| 196:7 - 196:12 | **Gray, John 07-30-2020 (00:00:00)** | JG02.189 |
| | 196:7 (Whereupon, Deposition Exhibit | |
| | 196:8 Gray-54, 9/7/07 Summary of DEA-HDMA | |
| | 196:9 Meeting, HDA_MDL_000139396 - | |
| | 196:10 HDA_MDL_000139397, was marked for | |
| | 196:11 identification.) | |
| | 196:12 BY MR. KENNEDY: | |
| 196:13 - 197:25 | **Gray, John 07-30-2020 (00:01:25)** | JG02.190 |
| | 196:13   Q. Do you have 54? | |
| | 196:14   A. I have it. | |
| | 196:15   Q. This is a summary of the DEA | |
| | 196:16 HDMA meeting on suspicious orders. | |
| | 196:17 Do you see that? | |
| | 196:18   A. Uh-huh.  Yeah, I see it, yep. | |
| | 196:19   Q. This is a meeting with the DEA, | |
| | 196:20 the HDMA on September 7th, 2007.  This is | |
| | 196:21 nine years before that statement -- | |
| | 196:22   A. Uh-huh. | |
| | 196:23   Q. -- in the amicus brief. | |
| | 196:24   A. Yep. | |
| | 196:25   Q. Key takeaways.  Do you see | |
| | 197:1 where it says key takeaways from the meeting? | |
| | 197:2   A. Uh-huh.  Uh-huh. | |
| | 197:3   Q. Go down to bullet point three. | |
| | 197:4 You said you never heard this, but here's | |
| | 197:5 bullet point three of this meeting, in-person | |
| | 197:6 meeting:  DEA indicated that they did not | |
| | 197:7 have the resources to inspect every pharmacy; | |
| | 197:8 therefore, it was important for the | |
| | 197:9 distributor to know their customers. | |
| | 197:10 Did I read that right? | |
| | 197:11   A. Yep.  You did. | |
| | 197:12   Q. 40,000 -- 40,000 pharmacies in | |
| | 197:13 this country, sir, correct? | |

| Page/Line | Source | ID |
|---|---|---|
| | 197:14   A. I -- gosh, I think that's a --<br>197:15 on the short side.<br>197:16   Q. What the DEA is saying to the<br>197:17 distributors, to you at the HDA, we need<br>197:18 help, we can't do this, correct?<br>197:19   A. Uh-huh.<br>197:20   Q. And at the same time you're<br>197:21 writing this in this brief, the PR message is<br>197:22 that, hey, us distributors, we're committed,<br>197:23 but now you're telling the Court of Appeals<br>197:24 it's not our job, this is the DEA's job,<br>197:25 after they told you they can't do it, right? | |
| 198:3 - 198:23 | **Gray, John 07-30-2020 (00:00:48)**<br>198:3   A. That -- that was an issue<br>198:4 from -- I wasn't at this meeting, but that<br>198:5 was an issue from that point on, is who was<br>198:6 supposed to do what, and in questions<br>198:7 submitted to them, what have you, DEA would<br>198:8 never -- would never sit down with the<br>198:9 industry and talk that through because that<br>198:10 getting to know customers, some of their<br>198:11 recommendations that I did hear were really<br>198:12 inappropriate for the wholesalers to engage<br>198:13 in.<br>198:14 BY MR. KENNEDY:<br>198:15   Q. Sir, at the point in time when<br>198:16 you write this brief -- and this is in your<br>198:17 own public relations material.  You have an<br>198:18 understanding at the point in time you're<br>198:19 writing this brief and making this statement<br>198:20 there were more people dying from overdoses<br>198:21 from prescription drugs than heroin and<br>198:22 cocaine combined at this point in time?  Did<br>198:23 you realize that? | JG02.191 |
| 199:2 - 199:8 | **Gray, John 07-30-2020 (00:00:15)**<br>199:2   Q. Did you realize that, sir?<br>199:3   A. I can't say I did or I didn't.<br>199:4   Q. Nine years before you wrote<br>199:5 this brief, the DEA had a personal meeting<br>199:6 with you folks and said we can't do the job | JG02.192 |

| Page/Line | Source | ID |
|---|---|---|
| 199:11 - 200:2 | 199:7 ourselves.  There's too many pharmacies.<br>199:8 They told you that, did they not?<br>**Gray, John 07-30-2020 (00:00:44)**<br>199:11   A. Again, I wasn't in the room<br>199:12 when these comments were made, so I don't<br>199:13 know if this is exactly how they pressed it.<br>199:14 The only thing I heard was that they expected<br>199:15 truck drivers, which are commercial truck<br>199:16 drivers, to sit in parking lots and watch<br>199:17 customers going into a pharmacy.  That's the<br>199:18 only thing I heard.<br>199:19 BY MR. KENNEDY:<br>199:20   Q. Sir, you folks -- you, your<br>199:21 executive committee, your board, McKesson,<br>199:22 Cardinal, AmerisourceBergen, you folks wrote<br>199:23 this amicus brief because it was your<br>199:24 intention and it was your expectation that<br>199:25 the Court in Masters was going to stop the<br>200:1 enforcement actions by the DEA.  That was<br>200:2 your expectation, was it not, sir? | JG02.193 |
| 200:5 - 200:5 | **Gray, John 07-30-2020 (00:00:01)**<br>200:5   A. No, the expectation was -- | JG02.194 |
| 200:6 - 200:15 | **Gray, John 07-30-2020 (00:00:23)**<br>200:6 yeah, the expectation was on a particular<br>200:7 point of administrative law, which I couldn't<br>200:8 get into with you right now, but I do<br>200:9 remember at the time it was a specific issue,<br>200:10 and that's what it was all about.  It had<br>200:11 nothing to do with Masters, per se.  It had<br>200:12 nothing to do with even the DEA.  It was an<br>200:13 interpretation of administrative law.<br>200:14 BY MR. KENNEDY:<br>200:15   Q. Look at Exhibit 55. | JG02.195 |
| 200:16 - 200:19 | **Gray, John 07-30-2020 (00:00:02)**<br>200:16 (Whereupon, Deposition Exhibit<br>200:17 Gray-55, E-mail(s), HDA_MDL_000088021-<br>200:18 HDA_MDL_000088025, was marked for<br>200:19 identification.) | JG02.196 |
| 200:20 - 202:14 | **Gray, John 07-30-2020 (00:01:39)**<br>200:20   A. 55.  Okay. | JG02.197 |

JG02-Gray, John - Plaintiffs' Submission

| Page/Line | Source | ID |
|---|---|---|

200:21 BY MR. KENNEDY:

200:22   Q. This is 55.  You see the second

200:23 e-mail down where -- this is the e-mail from

200:24 you to Pat Kelly.

200:25   A. Uh-huh.  Yep.

201:1   Q. Three lines down in your -- Pat

201:2 Kelly -- who is Pat Kelly?

201:3   A. My head of government affairs,

201:4 senior VP.

201:5   Q. Sentence that starts with "Was

201:6 talking with."  Do you see that sentence,

201:7 "Was talking with" --

201:8   A. Uh-huh.

201:9   Q. -- about three lines down in

201:10 the middle?

201:11   A. Wait a minute.  Was talking --

201:12 wait a minute.  Now, I'm not finding that

201:13 one.  Do you have it highlighted?  Yeah, you

201:14 do.

201:15   Q. Was talking with --

201:16 Do you see that?

201:17   A. Okay, yeah.

201:18   Q. You tell Mr. Kelly in January

201:19 of 2017:  Was talking with Giacomin.  Who is

201:20 Giacomin?

201:21   A. He was our chairman.

201:22   Q. Of the HDA?

201:23   A. Yes.

201:24   Q. Was talking with Giacomin last

201:25 night.  We were talking about Masters.

202:1 That's the Masters case, right?

202:2   A. Correct.

202:3   Q. Then you state:  I think the

202:4 Masters case will stymie the DEA in pursuing

202:5 much enforcement since that outcome will

202:6 really dictate how the DEA can enforce.

202:7 Is that what you stated, sir?

202:8   A. Right.  That's what it says.

202:9   Q. And that was the intention of

202:10 the HDA all along, starting with the PR

| Page/Line | Source | ID |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |

202:11 program back in 2012, let's stymie
202:12 enforcement actions by the DEA.  And you
202:13 finally thought you had with the Masters
202:14 case, did you not?

**202:17 - 202:21**    **Gray, John 07-30-2020 (00:00:06)**    **JG02.198**

202:17  A. That's your -- oh, I'm sorry.
202:18 That's your opinion, your interpretation.
202:19 It's not ours.
202:20 BY MR. KENNEDY:
202:21  Q. Those are your words.

**202:25 - 202:25**    **Gray, John 07-30-2020 (00:00:02)**    **JG02.199**

202:25  Q. Stymied.  Correct, sir?

**203:5 - 203:21**    **Gray, John 07-30-2020 (00:00:59)**    **JG02.200**

203:5  Q. I'm going to go back to tax for
203:6 a second.  We talked about some specific
203:7 legislative provisions, but I want to talk in
203:8 a general -- in a general sense, I suppose
203:9 the bottom line with respect to legislation.
203:10 It simply was the HDA's policy
203:11 to oppose any legislation that might
203:12 negatively affect its distributors.  That was
203:13 the policy across the board, was it not, sir?
203:14  A. I don't know -- well, across
203:15 the board, no.  There are other reasons that
203:16 we did what we did on certain pieces of
203:17 legislation.  It wasn't necessarily always in
203:18 the interest of members -- I mean, that's too
203:19 broad.
203:20  Q. I'm going to give you
203:21 Exhibit 49.  If you can take a look at that.

**204:2 - 205:20**    **Gray, John 07-30-2020 (00:01:44)**    **JG02.201**

204:2  A. 49.  49.  Yep.
204:3 BY MR. KENNEDY:
204:4  Q. You see this title is HDMA
204:5 Organizational Goals for 2013?
204:6  A. Yep, uh-huh.
204:7  Q. So these are the goals of your
204:8 entire organization.  What, you would
204:9 articulate these each year?
204:10  A. Each year.

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 204:11   Q. Go to page 44. |  |
|  | 204:12   A. Okay. |  |
|  | 204:13   Q. Look at that, the legislative |  |
|  | 204:14 goal for the year. |  |
|  | 204:15   A. Uh-huh. |  |
|  | 204:16   Q. Paragraph 3 or 4 down starts |  |
|  | 204:17 with "While Potentially." |  |
|  | 204:18 Do you see that? |  |
|  | 204:19   A. Yes. |  |
|  | 204:20   Q. Does it state:  While |  |
|  | 204:21 potentially harmful legislation on the LIFO, |  |
|  | 204:22 drug safety/shortage and controlled |  |
|  | 204:23 substances did not pass during this session |  |
|  | 204:24 of Congress, we fully expect the issues to |  |
|  | 204:25 remain active into the next season.  HDMA |  |
|  | 205:1 will continue to oppose any legislation that |  |
|  | 205:2 negatively impacts pharmaceutical |  |
|  | 205:3 distribution. |  |
|  | 205:4 That was the policy across the |  |
|  | 205:5 board, was it not, sir? |  |
|  | 205:6   A. That was a statement in 2013. |  |
|  | 205:7   Q. And, sir, in addition to |  |
|  | 205:8 opposing legislation that might negatively |  |
|  | 205:9 impact distributors, in addition to that, you |  |
|  | 205:10 folks never supported legislation relating to |  |
|  | 205:11 opioid abuse, right, where -- |  |
|  | 205:12   A. No.  No, not -- |  |
|  | 205:13   Q. -- you told them we're not |  |
|  | 205:14 going to support legislation at the state |  |
|  | 205:15 level that in any way supports the fight |  |
|  | 205:16 against abuse.  That was also a situation and |  |
|  | 205:17 a policy, true? |  |
|  | 205:18   A. No, not true. |  |
|  | 205:19   Q. Let's look at Exhibit 50, if |  |
|  | 205:20 you would. |  |
| 205:21 - 205:25 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.202** |
|  | 205:21 (Whereupon, Deposition Exhibit |  |
|  | 205:22 Gray-50, E-mail(s) w/Attached |  |
|  | 205:23 Memorandum In Support, |  |
|  | 205:24 HDA_MDL_000214979 - HDA_MDL_000214982, |  |

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  |  |
|---|---|---|
| | 205:25 was marked for identification.) | |
| 206:2 - 208:1 | **Gray, John 07-30-2020 (00:02:08)** | JG02.203 |

206:2   Q. This is from 2017.

206:3   A. Uh-huh.

206:4   Q. That's important.  This is

206:5 2017.

206:6   A. Sure.

206:7   Q. The bottom e-mail is -- the

206:8 bottom e-mail is the first in time, and it's

206:9 from Beth Mitchell of AmerisourceBergen, and

206:10 she is writing this to Matthew DiLoreto, all

206:11 right?

206:12   A. All right.

206:13   Q. She says:  Hi, Matt.  Have you

206:14 been able to find anything, question mark,

206:15 any state bills or approaches we have been

206:16 able to say yes, we support this as an effort

206:17 to address opioid abuse?

206:18 Go up, and Matthew answers,

206:19 right?

206:20   A. Uh-huh.

206:21   Q. Matthew is the VP of state

206:22 government affairs at the HDA, so he's got a

206:23 significant position, true?

206:24   A. Yes.

206:25   Q. And he says:  Beth -- and this

207:1 is 2017 -- sorry for the delay on this

207:2 project but I was really hoping to find

207:3 something.  No one can reference any blanket

207:4 letter of support that we have issued on

207:5 opioid abuse issues in the past outside of

207:6 our support for CARA at the federal level.

207:7 Between you and I, I totally agree that we

207:8 need to begin openly supporting some measures

207:9 rather than always opposing.  We were going

207:10 to support the governor's opioid abuse

207:11 package in Connecticut, but it moved before

207:12 we could even get a letter out.

207:13 Bottom line is I talked to both

207:14 Patrick -- and that would be Pat Kelly,

| Page/Line | Source | ID |
|---|---|---|
| | JG02-Gray, John - Plaintiffs' Submission | |

|  |  |  |
|---|---|---|
| | 207:15 right? | |
| | 207:16   A. Correct. | |
| | 207:17   Q. -- and Liz, and they cannot | |
| | 207:18 recall any time that we openly and publicly | |
| | 207:19 supported an opioid abuse prevention measure. | |
| | 207:20 Signed Matthew DiLoreto, vice president, | |
| | 207:21 state government affairs, Healthcare | |
| | 207:22 Distribution Alliance, sir. | |
| | 207:23 Did I read that right? | |
| | 207:24   A. You've read the memo correctly. | |
| | 207:25   Q. All right.  I'm sorry to go | |
| | 208:1 back to taxes. | |
| 208:2 - 209:1 | **Gray, John 07-30-2020 (00:01:00)** | JG02.305 |
| | 208:2 Now, we've talked a lot about | |
| | 208:3 this first PR message.  The first PR message | |
| | 208:4 is let's talk about how committed the | |
| | 208:5 industry is to stopping abuse and addiction | |
| | 208:6 and diversion, but, sir, there was a second | |
| | 208:7 message, was there not?  You folks formulated | |
| | 208:8 a second public relations message back in | |
| | 208:9 2013 and 2012, did you not? | |
| | 208:10   A. I don't know. | |
| | 208:11   Q. You don't remember the second | |
| | 208:12 message? | |
| | 208:13   A. No, not off the top of my head | |
| | 208:14 here, I don't. | |
| | 208:15   Q. Well, APCO, that was the PR | |
| | 208:16 firm hired in 2012. | |
| | 208:17   A. Yeah. | |
| | 208:18   Q. We talked about that, right? | |
| | 208:19 And the very first thing that | |
| | 208:20 you folks paid APCO to do, you paid them to | |
| | 208:21 go out and do a survey to determine which | |
| | 208:22 messages were most effective. | |
| | 208:23 Do you recall that? | |
| | 208:24   A. Very generally. | |
| | 208:25   Q. Let's look at the survey | |
| | 209:1 results, Exhibit 63, if you have that. | |
| 209:2 - 209:7 | **Gray, John 07-30-2020 (00:00:01)** | JG02.204 |
| | 209:2 (Whereupon, Deposition Exhibit | |

| Page/Line | Source | ID |
|---|---|---|
| | 209:3 Gray-63, APCO HDMA Message, | |
| | 209:4 Development Research, Summary of | |
| | 209:5 Qualitative Findings, | |
| | 209:6 HDA_MDL_000024908 - HDA_MDL_000024928, | |
| | 209:7 was marked for identification.) | |
| 209:22 - 211:12 | **Gray, John 07-30-2020 (00:01:25)** | JG02.205 |

**JG02-Gray, John - Plaintiffs' Submission**

209:22   Q. All right.  Can you see it on
209:23 your screen, sir?
209:24   A. Got it.
209:25   Q. All right.  It says APCO.
210:1 That's your public relations firm?
210:2   A. What year?  2013?  At that
210:3 time, yes.
210:4   Q. All right.  And it says HDMA
210:5 Message Development Research that they did
210:6 for you.  You remember that?
210:7   A. Uh-huh.
210:8   Q. Go to the next page, the very
210:9 next page.  I'm sorry, go to page 10.
210:10 This is the survey that they
210:11 did.  Remember, we talked about this is the
210:12 first thing you paid them to do is a survey?
210:13   A. Yeah.
210:14   Q. Let's see which messages are
210:15 ringing true with folks.
210:16 Up at the top:  This document
210:17 summarizes findings from the qualitative
210:18 focus groups and in-depth interview portion
210:19 of the HDMA message development research
210:20 program.
210:21 So that's what this document
210:22 is, right?
210:23   A. That's what it says.
210:24   Q. You go down to the bottom then
210:25 and you can see some of the folks that they
211:1 talked to to get feedback on which messages
211:2 were effective.  They talked to opinion
211:3 leaders, pharmacists, policy influencers, law
211:4 enforcement, including some folks from
211:5 West Virginia, do you see there down at the

| Page/Line | Source | ID |
|---|---|---|
| | JG02-Gray, John - Plaintiffs' Submission | |

211:6 bottom, West Virginia?
211:7   A. Oh, yeah, way at the bottom.
211:8 Okay.
211:9   Q. They did focus groups, they did
211:10 in-depth interviews just to see which
211:11 messages are effective.
211:12 So go to page 26.  Up at the

**211:13 - 213:20**   **Gray, John 07-30-2020 (00:02:41)**   **JG02.306**

211:13 top it says Industry Messages.
211:14 Do you see that?
211:15   A. Yeah.  Yeah.  Got it.
211:16   Q. And they say:  Respondents --
211:17 that's the people that they interviewed,
211:18 right?  Correct?
211:19   A. It's -- I suppose.
211:20   Q. Okay.  Respondents were
211:21 presented with a series of messages drafted
211:22 by HDMA in response to recent events in
211:23 Florida and West Virginia.
211:24 Go to the next paragraph.  It
211:25 starts with "A clear."  It states:  A clear
212:1 message that is delivered through the
212:2 existing messages is that the industry has
212:3 limited access to data from DEA.  And,
212:4 importantly, without such access, respondents
212:5 are sympathetic to HDMA and the industry and
212:6 question how distributors can be held
212:7 responsible for diversion.  Described as an
212:8 information shortage by a policy influence,
212:9 the messages have the effect of seeding doubt
212:10 about regulatories -- regulators/enforcers.
212:11 Do you see that?
212:12   A. Got it.
212:13   Q. Regulators and enforcers,
212:14 they're talking about the DEA, right?
212:15   A. No, I don't know.
212:16   Q. You don't know?
212:17   A. Could be FDA.  Could be police.
212:18 Could be state and local law enforcement.
212:19 Could be any of the above.

| Page/Line | Source | ID |
|---|---|---|

212:20   Q. Okay.  Could be the DEA?

212:21   A. Could be.

212:22   Q. So the message that the DEA

212:23 wasn't providing information in the data, at

212:24 least your PR people say that's -- that's

212:25 effective.  That message works, correct?

213:1   A. That's the conclusion it

213:2 appears to have reached.

213:3   Q. Your PR people say that this

213:4 message is effective in making people, quote,

213:5 question how distributors can be held

213:6 responsible for diversion.  That's what your

213:7 PR folks told you, right?

213:8   A. That's what this document says.

213:9   Q. In fact, the message is so

213:10 effective that they tell you that this

213:11 message has the effect in that it seeds

213:12 doubt.  It seeds doubt about regulators and

213:13 enforcers, right?

213:14   A. Uh-huh.

213:15   Q. That's what this survey was

213:16 telling you folks at the HDA, true?

213:17   A. That's what it says.

213:18   Q. So what you folks did was take

213:19 the results from this survey and turn it into

213:20 a PR program, true?

**213:24 - 217:17**       **Gray, John 07-30-2020 (00:03:57)**       **JG02.206**

213:24   Q. True?  Right, sir?

213:25   A. I -- you know what, we're -- I

214:1 don't recall exactly the timeline.

214:2   Q. All right.  Well, here's a

214:3 little timeline.  That's the exact message

214:4 that you gave to Congress in 2012 when you

214:5 testified --

214:6   A. Yeah.

214:7   Q. -- in 2014 --

214:8   A. No.

214:9   Q. -- when you testified and in

214:10 2017 you testified.  The DEA isn't giving us

214:11 the information, they are not communicating,

| Page/Line | Source | ID |
|---|---|---|

214:12 and therefore, you can't hold us responsible.

214:13 That's the message that you delivered

214:14 personally in '12, '14 and '17, true?

214:15   A. Where did the document go?  It

214:16 just vanished.

214:17 Possibly words to that effect,

214:18 yeah.  I don't know.

214:19   Q. And, sir, you wrote that in

214:20 your amicus briefs in the Cardinal case, the

214:21 Masters case, the West Virginia Supreme Court

214:22 case --

214:23   A. Well, I haven't seen that

214:24 language in those cases.  We haven't gone

214:25 over those.

215:1   Q. Sir, that's the message that

215:2 you gave to the Wall Street Journal and other

215:3 media outlets, we're not getting the

215:4 information from the DEA, correct?

215:5   A. I can't tell whether it's

215:6 correct or not.

215:7   Q. Let's look at the Wall Street

215:8 Journal, what you wrote to them.  Exhibit 43,

215:9 please.

215:10   A. Yep.

215:11   Q. Look at the second paragraph

215:12 that's -- again, this is your letter in 23 --

215:13 or excuse me, 2013 to the Wall Street

215:14 Journal, right?

215:15   A. Uh-huh.  Uh-huh.  Uh-huh.

215:16   Q. And the sentence, second

215:17 paragraph three lines up starts with "Like

215:18 FedEx."  You see that?

215:19   A. I see it.

215:20   Q. It says:  Like FedEx and UPS,

215:21 national and regional primary distributors

215:22 face the predicament of being held

215:23 accountable for policing prescription drug

215:24 diversion with incomplete information and

215:25 inadequate guidance from federal authorities.

216:1 Did you write that to the Wall

| Page/Line | Source | ID |
|---|---|---|

216:2 Street Journal, sir?

216:3   A. Looks like I did.

216:4   Q. And your talking points, your

216:5 media talking points, we discussed those

216:6 earlier.  Do you remember that, media talking

216:7 points?  You're familiar with that, true?

216:8   A. May or may not have been in

216:9 there, but for the sake -- go ahead.

216:10   Q. Well, let's look at 36,

216:11 Exhibit 36.

216:12   A. Okay.  Where's 36?

216:13   Q. 36, we've already gone through

216:14 this.

216:15   A. Yeah.

216:16   Q. Go to page -- go to 400,

216:17 page 400 of your media talking points.

216:18   A. Okay.  Good.

216:19   Q. And For Background Use Only, do

216:20 you see that heading at the bottom?

216:21   A. Uh-huh.  Uh-huh.

216:22   Q. You're talking about 2006 to

216:23 2015 time frame.  Go to bullet point two.

216:24 And that's a talking point for media, for

216:25 Congress, for the Senate, for state

217:1 legislations.

217:2 Do you state:  During this same

217:3 time period, '06 to '15, the DEA refused to

217:4 respond to legitimate compliance questions

217:5 from distributors, did not issue any guidance

217:6 or rulemaking, and refused to meet with

217:7 industry to clarify its interpretation of the

217:8 compliance rules?

217:9 That was a talking point, was

217:10 it not?

217:11   A. Yep.  It was.

217:12   Q. And, sir, that talking point,

217:13 that talking point, the DEA refused to talk

217:14 to you about expectations of distributors,

217:15 that they refused to meet with you, that was

217:16 not accurate; that was just a talking point,

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
|---|---|---|
| 217:20 - 219:3 | 217:17 but that wasn't accurate, true?<br>**Gray, John 07-30-2020 (00:01:12)**<br>217:20   A. Well, in my experience<br>217:21 personally, that is not true.  They canceled<br>217:22 two meetings I was supposed to go to.<br>217:23 Mr. Rannazzisi refused to meet with me to<br>217:24 even talk these things through.  But we used<br>217:25 to have regular meetings with the DEA prior<br>218:1 to 2006, and once Mr. Rannazzisi came on, we<br>218:2 had had a longstanding relationship with them<br>218:3 going back to the 1980s, and by 19- -- by<br>218:4 2006, '7, our meetings were all canceled and<br>218:5 we submitted questions for guidance and never<br>218:6 got responses.<br>218:7 And that's when this whole<br>218:8 thing launched with DEA not -- not willing to<br>218:9 work with us as registrants and provide<br>218:10 legislative and rulemaking guidance around<br>218:11 some of the specific actions they were<br>218:12 requesting we take.<br>218:13 BY MR. KENNEDY:<br>218:14   Q. Are you all done, sir?<br>218:15   A. That's it.<br>218:16   Q. All right.  Give me G-1,<br>218:17 please.  This is a graphic.  Let's take a<br>218:18 look at this.<br>218:19   A. What's G1?<br>218:20   Q. You see this?<br>218:21   A. Yeah.<br>218:22   Q. This is a graphic.<br>218:23   A. Yep.<br>218:24   Q. This is an outline.  This is an<br>218:25 outline of all the meetings that --<br>219:1   A. Yep.<br>219:2   Q. -- you said -- I guess you said<br>219:3 never occurred, and let's go through these. | JG02.207 |
| 219:7 - 219:12 | **Gray, John 07-30-2020 (00:00:10)**<br>219:7   Q. Pick up Exhibit 13, if you<br>219:8 would, sir.  I'm not going to put Exhibit 13<br>219:9 up, but I want you to look at Exhibit 13, | JG02.208 |

| Page/Line | Source | ID |
|---|---|---|

**JG02-Gray, John - Plaintiffs' Submission**

219:10 because it will -- maybe it will help you
219:11 remember with respect to some of these
219:12 meetings.

219:13 - 219:16 **Gray, John 07-30-2020 (00:00:01)** JG02.209
219:13 (Whereupon, Deposition Exhibit
219:14 Gray-13, E-mail(s),
219:15 HDA_MDL_000160845 - HDA_MDL_000160846,
219:16 was marked for identification.)

219:18 - 224:19 **Gray, John 07-30-2020 (00:04:48)** JG02.210
219:18   Q. Do you have 13 in front of you?
219:19   A. Not yet.  Okay.  Got it.
219:20   Q. DEA Communications and
219:21 Meetings.  We already talked about the fact
219:22 that in '05, as part of the Distributor
219:23 Initiative, the DEA met with McKesson,
219:24 Cardinal and AmerisourceBergen and other
219:25 distributors to talk about their
220:1 expectations.
220:2   A. Uh-huh.
220:3   Q. Correct?  We've talked about
220:4 that.
220:5 You're certainly familiar with
220:6 the three specific letters that the DEA sent
220:7 out to every distributor outlining
220:8 expectations, correct?
220:9   A. Well, I think there were two,
220:10 but that's -- okay.
220:11   Q. First one went on 9/27/06.  You
220:12 don't disagree with the date on that letter,
220:13 do you?
220:14   A. Yeah, I don't have it in front
220:15 of me, so whatever.
220:16   Q. Second letter --
220:17   A. I can't make a decision on
220:18 that.
220:19   Q. All right.  Do you have any
220:20 disagreement that a second letter was sent by
220:21 the DEA to all distributors on 2/7/07?
220:22   A. I know a second letter was
220:23 sent.

| | JG02-Gray, John - Plaintiffs' Submission | |
| --- | --- | --- |
| Page/Line | Source | ID |

220:24   Q. All right.  And then on
220:25 September 7th, '07, the DEA came to the HDA
221:1 and they made a presentation to you folks so
221:2 you could see the Distributor Initiative
221:3 presentation that already had been made to
221:4 the distributors.
221:5 Do you remember that meeting,
221:6 sir?
221:7   A. Yeah, that was the meeting
221:8 we've talked about earlier.
221:9   Q. All right.  Next, 10/16/07, a
221:10 full-day meeting between the DEA and the
221:11 HDMA, full-day meeting, true?
221:12   A. Uh-huh.
221:13   Q. 13 distributors were present?
221:14   A. Yeah, I don't remember, but
221:15 obviously it happened based on this document.
221:16   Q. And then -- and that's in
221:17 accordance with the memo you have in front of
221:18 you, true?
221:19   A. Correct.
221:20   Q. And then December 27 of '07,
221:21 the DEA sent another letter to distributors
221:22 outlining their expectations with respect to
221:23 diversion control, true?
221:24   A. I don't know.  I don't -- where
221:25 are you seeing that?
222:1   Q. That's the third letter that's
222:2 sent.  You're not familiar with the third
222:3 letter sent by the distributors [sic]?
222:4   A. No.
222:5   Q. Excuse me, by the DEA.
222:6   A. Right, I am not.  I don't
222:7 recall it.
222:8   Q. And then, sir, the HDA had
222:9 three separate meetings with the DEA, 4/08,
222:10 6/08, 9/08, to discuss the industry
222:11 compliance guidelines related to suspicious
222:12 order monitoring, three separate meetings
222:13 with your organization, true?

| Page/Line | Source | ID |
|---|---|---|

222:14   A. Correct, in '08.  If that's
222:15 what the document says.
222:16   Q. That's what your memo says.
222:17 And then in '08, are you familiar with the
222:18 fact that in 2008 when McKesson, Cardinal and
222:19 AmerisourceBergen formulated their own
222:20 compliance guidelines, each of them met with
222:21 the DEA separately to review those
222:22 guidelines?  Did you know about that?
222:23   A. Boy, it's been a while.  Can't
222:24 recall.
222:25   Q. 2/4/09, the DEA met with the
223:1 HDMA and distributors.  Are you familiar with
223:2 that?
223:3   A. Same category, I just can't
223:4 recall that meeting.  The memo indicates it.
223:5   Q. It is on the memo in front of
223:6 you?
223:7   A. Yes.
223:8   Q. 16 DEA agents came to that, 16
223:9 DEA staff members came to that meeting, did
223:10 they not?
223:11   A. I wasn't at it.  I don't know.
223:12   Q. What does it indicate on the
223:13 memo in front of you from the HDMA, sir?  16
223:14 DEA staff there?
223:15   A. Staff, yes.
223:16   Q. Then on 12/7/10, the DEA and
223:17 the HDMA had another meeting about suspicious
223:18 order monitoring, true?
223:19   A. Well, it says so.
223:20   Q. On 12/19/11, the DEA and the
223:21 HDA had another meeting to talk about
223:22 suspicious order monitoring, did they not?
223:23   A. Well, it says so here too.
223:24   Q. And from 2010 to 2013, the DEA
223:25 did presentations at the annual HDMA
224:1 management conference, did they not?
224:2   A. I don't know if it was
224:3 consecutive years.  They didn't always make

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 224:4 it.  Sometimes they canceled.  But they did | |
|  | 224:5 come down to that meeting.  They would send | |
|  | 224:6 one person and they would do a 20-minute | |
|  | 224:7 presentation and that was it. | |
|  | 224:8   Q. In addition to these meetings | |
|  | 224:9 and these letters that we've talked about, | |
|  | 224:10 the DEA also held educational conferences, | |
|  | 224:11 did they not? | |
|  | 224:12   A. I do not know that. | |
|  | 224:13   Q. The HDA would attend those | |
|  | 224:14 conferences, would they not? | |
|  | 224:15   A. Yeah, I'm -- I don't know. | |
|  | 224:16   Q. You don't know? | |
|  | 224:17   A. Maybe staff did.  Maybe they | |
|  | 224:18 didn't.  I don't know. | |
|  | 224:19   Q. Well, let's look at Exhibit 37. | |

| 224:20 - 224:24 | **Gray, John 07-30-2020 (00:00:01)** | JG02.211 |
|  | 224:20 (Whereupon, Deposition Exhibit | |
|  | 224:21 Gray-37, E-mail(s) w/Attached | |
|  | 224:22 Suggested Questions, ADBCMDL00362931 - | |
|  | 224:23 ADBCMDL00362934, was marked for | |
|  | 224:24 identification.) | |

| 225:2 - 226:18 | **Gray, John 07-30-2020 (00:01:40)** | JG02.212 |
|  | 225:2   Q. This is from Anita Ducca from | |
|  | 225:3 the HDA. | |
|  | 225:4   A. Uh-huh. | |
|  | 225:5   Q. This is 2009, correct? | |
|  | 225:6   A. Yes.  Yes. | |
|  | 225:7   Q. She's sending this out to the | |
|  | 225:8 members of the regulatory affairs committee, | |
|  | 225:9 and McKesson, Cardinal, AmerisourceBergen | |
|  | 225:10 have representatives, true? | |
|  | 225:11   A. That's -- let's see, yeah, | |
|  | 225:12 regulatory affairs update to -- that's weird. | |
|  | 225:13 Yeah, RAC members, sure. | |
|  | 225:14   Q. All right.  Then go down to DEA | |
|  | 225:15 Pharmaceutical Industry Conference. | |
|  | 225:16   A. Okay. | |
|  | 225:17   Q. Last sentence:  DEA provided a | |
|  | 225:18 list of questions that they suggest | |

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

225:19 wholesalers ask of their customers prior to
225:20 shipping controlled substances.  The list is
225:21 attached.
225:22   A. Okay.
225:23   Q. So this is going out to
225:24 McKesson, Cardinal and AmerisourceBergen from
225:25 the HDA just in case they didn't go to the
226:1 conference themselves, right?
226:2   A. That's your conclusion.  It
226:3 could be.  Could not be.  Who knows?
226:4   Q. And if you look at the
226:5 attachment, she's providing to your members
226:6 the list of questions that the DEA is
226:7 suggesting the distributors ought to ask
226:8 pharmacists before they ship them drugs,
226:9 right?
226:10   A. Uh-huh.
226:11   Q. And then this even goes up
226:12 on -- this goes up on the HDA website so if a
226:13 distributor -- let's say McKesson decides not
226:14 to go to the DEA conference, they could get
226:15 this -- if they don't go to the conference,
226:16 they can get this from Ms. Ducca and the HDA
226:17 or they can just look at your website and get
226:18 this information, right?

| | | |
|---|---|---|
| 226:21 - 227:7 | **Gray, John 07-30-2020 (00:00:26)** | **JG02.213** |

226:21   A. Yes.  Whether -- whether it was
226:22 or wasn't on our website, I don't know, but
226:23 if it was on the website, you could access
226:24 it.
226:25 ///
227:1 BY MR. KENNEDY:
227:2   Q. And, sir, in addition to the
227:3 conferences and the letters and the meetings,
227:4 if a distributor wanted to write or e-mail or
227:5 call the DEA regional office or the national
227:6 office, they could do that too and ask
227:7 questions, could they not?

| | | |
|---|---|---|
| 227:10 - 228:4 | **Gray, John 07-30-2020 (00:00:37)** | **JG02.214** |

227:10   A. I have no idea what the members

| Page/Line | Source | ID |
|---|---|---|
| | 227:11 did day to day, like that. | |
| | 227:12 BY MR. KENNEDY: | |
| | 227:13   Q. Well, sir, you -- you're | |
| | 227:14 familiar with the Government Accountability | |
| | 227:15 Office that looked into the DEA and | |
| | 227:16 distributors and this problem that we have in | |
| | 227:17 our country with diversion and abuse?  You're | |
| | 227:18 familiar with that study that they did, sir? | |
| | 227:19   A. Well, there might have been one | |
| | 227:20 or two.  I'm not sure which one we're talking | |
| | 227:21 about. | |
| | 227:22   Q. I'm talking about the 2015 | |
| | 227:23 study that you and the HDA sent to | |
| | 227:24 reporters -- | |
| | 227:25   A. Okay. | |
| | 228:1   Q. -- cited to Congress, put on | |
| | 228:2 your website.  Do you remember that? | |
| | 228:3   A. That study, I remember. | |
| | 228:4   Q. Look at Exhibit 14. | |
| 228:10 - 228:22 | **Gray, John 07-30-2020 (00:00:22)** | **JG02.215** |
| | 228:10   A. There we go.  Yep. | |
| | 228:11 BY MR. KENNEDY: | |
| | 228:12   Q. June 15, GAO Prescription | |
| | 228:13 Drugs. | |
| | 228:14   A. Yep. | |
| | 228:15   Q. Do you see that? | |
| | 228:16   A. Yep. | |
| | 228:17   Q. Go to page 96.  And you folks | |
| | 228:18 participated in this study, and the | |
| | 228:19 distributors participated in this study, did | |
| | 228:20 they not? | |
| | 228:21   A. I don't know if the members did | |
| | 228:22 or not. | |
| 229:11 - 230:21 | **Gray, John 07-30-2020 (00:01:43)** | **JG02.216** |
| | 229:11   Q. 30796. | |
| | 229:12   A. Oh, 30796.  Okay.  Found it. | |
| | 229:13   Q. Got it? | |
| | 229:14   A. Okay.  Good. | |
| | 229:15   Q. This is from the GAO study. | |
| | 229:16 They talked to distributors.  Halfway down, | |

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

229:17 the sentence that starts with Distributors.

229:18 Do you see that?

229:19   A. Uh-huh.

229:20   Q. It says:  Distributors that

229:21 communicated with DEA field offices about

229:22 their roles and responsibilities under the

229:23 Controlled Substances Act were particularly

229:24 satisfied.  We estimate that 92% of the

229:25 distributors found the field office staff

230:1 very or moderately helpful.

230:2 Did I read that correct?

230:3   A. You did.

230:4   Q. And, sir, in looking through

230:5 your communications with Congress, with the

230:6 media, with the Senate, you folks site this

230:7 study on multiple occasions.  You even mailed

230:8 it to reporters.

230:9 Do you recall that?

230:10   A. Not in particular I don't, but

230:11 I don't.

230:12   Q. Let me see.  When you quote

230:13 this study, you never mention the fact that

230:14 92% of the distributors that communicated

230:15 with the DEA were, quote, moderately to

230:16 very -- found them to be moderately to very

230:17 helpful.  You never quote that statistic in

230:18 the public relations campaign that the DEA

230:19 was not providing guidance.  You never cite

230:20 that.

230:21 And do you know why?

| 230:24 - 231:16 | **Gray, John 07-30-2020 (00:00:50)** | JG02.217 |

230:24   A. No, I don't know what you're

230:25 saying is absolutely true or not.  So I

231:1 don't -- wouldn't know why.

231:2 BY MR. KENNEDY:

231:3   Q. Sir, do you know this study

231:4 also found that 26 distributors said that

231:5 they talked to the DEA at least once a month?

231:6 Do you recall that?

231:7   A. No.  Not surprised.  Possible.

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

231:8   Q. Now, in fairness, you folks
231:9 cite this study because the GAO does conclude
231:10 that the DEA could communicate better with
231:11 the distributors.  In all fairness, they did
231:12 find that and you folks cite that constantly.
231:13 That was the finding that you
231:14 folks cite, the GAO conclusion that the DEA
231:15 could have communicated better with
231:16 distributors.  Remember that?

**231:19 - 231:19**   **Gray, John 07-30-2020 (00:00:01)**   JG02.218
231:19   A. I've heard generally.

**231:22 - 232:11**   **Gray, John 07-30-2020 (00:00:37)**   JG02.219
231:22   Q. Sir, though, can we agree,
231:23 though -- can we agree that the question
231:24 isn't whether the DEA could have communicated
231:25 better.  Isn't the real question, isn't the
232:1 real question whether or not the DEA failed
232:2 to communicate something that caused the
232:3 distributors to ship opioids that they
232:4 shouldn't have shipped?
232:5 I mean, that's the real
232:6 question; not whether they could communicate
232:7 better, but did they fail to communicate
232:8 something that caused the distributors to
232:9 ship something they shouldn't have been
232:10 shipping.  That's the real question, isn't
232:11 it?

**232:17 - 232:19**   **Gray, John 07-30-2020 (00:00:02)**   JG02.220
232:17   Q. Do you agree, sir, that's the
232:18 real question?
232:19   A. No, I don't.

**232:23 - 233:5**   **Gray, John 07-30-2020 (00:00:25)**   JG02.221
232:23   Q. Let's look at that question.
232:24 Let's look at McKesson.  Look at Exhibit 4
232:25 again.  Exhibit 4 is the congressional study
233:1 report from --
233:2   A. Oh, 4.
233:3   Q. -- 2018.  We've looked at it
233:4 before.
233:5   A. Yep.  Yep.

| | | |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
|---|---|---|
| 233:14 - 234:6 | **Gray, John 07-30-2020 (00:01:06)** | JG02.222 |

233:14  Q. Okay.  Go to 417, if you would.

233:15 Do you see the finding on 417?

233:16  A. Yes, yep.

233:17  Q. Congressional Finding:  At

233:18 various times during a ten-year period,

233:19 McKesson shipped more than 8.29 million doses

233:20 of opioids to two commonly owned pharmacies,

233:21 located just three miles apart in rural

233:22 West Virginia.

233:23 And my question to you -- and

233:24 you understand, these -- my question to you

233:25 is:  What did the DEA fail to tell

234:1 McKesson -- what did they fail to communicate

234:2 to McKesson that caused McKesson to believe

234:3 that shipping millions of pills to two

234:4 pharmacies three miles apart was okay?  What

234:5 did they fail to communicate that led them to

234:6 believe that this was okay?

| Page/Line | Source | ID |
|---|---|---|
| 234:11 - 235:7 | **Gray, John 07-30-2020 (00:01:04)** | JG02.223 |

234:11  A. Well, again, as stated earlier,

234:12 that's a question for McKesson, not for the

234:13 trade organization.  We don't have insight

234:14 into any of their processes or any members'

234:15 processes to what they do, how they do it and

234:16 why they do it.  So to look at this and offer

234:17 an opinion is inappropriate.

234:18 BY MR. KENNEDY:

234:19  Q. Well, sir, but again, maybe

234:20 that's right, but all of your marketing

234:21 materials -- all your marketing materials and

234:22 your PR materials and your testimony to

234:23 Congress is saying that the DEA isn't giving

234:24 some sort of information to folks like

234:25 McKesson that's causing them to ship all of

235:1 these pills.

235:2 And so my question is:  What --

235:3 what did the DEA fail to tell McKesson that

235:4 led them to believe that it's okay to send

235:5 8.3 million doses of opioids to two

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 235:6 pharmacies that are just three miles apart? | |
| | 235:7 What did the DEA fail to tell them? | |
| 235:10 - 237:19 | **Gray, John 07-30-2020 (00:02:40)** | **JG02.224** |
| | 235:10   A. Yeah, the DEA -- who knows, but | |
| | 235:11 that's a question for -- that the McKesson | |
| | 235:12 folks should answer, should they so choose | |
| | 235:13 to, but it's not something a trade | |
| | 235:14 organization can answer. | |
| | 235:15 BY MR. KENNEDY: | |
| | 235:16   Q. Look at 16.  Look at | |
| | 235:17 Exhibit 16. | |
| | 235:18 (Whereupon, Deposition Exhibit | |
| | 235:19 Gray-16, 12/5/07 DEA Order to Show | |
| | 235:20 Cause to Cardinal, | |
| | 235:21 CAH_MDL2804_02466022 - | |
| | 235:22 CAH_MDL2804_02466025, was marked for | |
| | 235:23 identification.) | |
| | 235:24   A. Okay.  Okay. | |
| | 235:25 /// | |
| | 236:1 BY MR. KENNEDY: | |
| | 236:2   Q. And again, we're trying to | |
| | 236:3 figure out what the DEA failed to tell these | |
| | 236:4 distributors that led them to ship what they | |
| | 236:5 shipped. | |
| | 236:6 So look at this from Cardinal. | |
| | 236:7 This is an order to show cause and immediate | |
| | 236:8 suspension of registration sent to Cardinal | |
| | 236:9 in '07, correct? | |
| | 236:10   A. That's what -- yes, that's what | |
| | 236:11 the document says. | |
| | 236:12   Q. Go to page 24, if you would. | |
| | 236:13   A. Got it. | |
| | 236:14   Q. Are you on 24?  And I'm looking | |
| | 236:15 at the third paragraph, (d). | |
| | 236:16   A. (d), yeah. | |
| | 236:17   Q. It says on (d) -- and this is | |
| | 236:18 with respect to Cardinal, and this is the DEA | |
| | 236:19 and their order with respect to Cardinal, | |
| | 236:20 says:  On September 1, 2006, Eric Brantley, | |
| | 236:21 manager of quality and regulatory affairs for | |

| Page/Line | Source | ID |
|---|---|---|

236:22 the respondent -- that's Cardinal -- sent an
236:23 e-mail to the DEA's e-commerce section
236:24 stating that the respondent, Cardinal, had
236:25 discontinued its sales of controlled
237:1 substances to 13 suspected Internet
237:2 pharmacies.  Included in respondent's,
237:3 Cardinal's, report, of discontinued accounts
237:4 was the aforementioned RKR Holdings, Inc.  On
237:5 that same date, respondent, Cardinal,
237:6 distributed 200 dosage units of combination
237:7 hydrocodone products to RKR.  From
237:8 September 1, 2006 to January 31, 2007,
237:9 respondent, Cardinal, distributed 393,600
237:10 dosage units of combination hydrocodone
237:11 products to RKR.
237:12 And I suppose my question is
237:13 the same:  What did the DEA fail to
237:14 communicate to Cardinal that led them to
237:15 believe that it was okay to ship almost
237:16 400,000 dosages of opioids to a pharmacy that
237:17 Cardinal told the DEA they weren't going to
237:18 ship to them anymore?  I mean, where's the
237:19 failure of the DEA to communicate?

**237:22 - 238:10**　**Gray, John 07-30-2020 (00:00:31)**　　　**JG02.225**

237:22   A. And my answer is the same as it
237:23 was with McKesson, I can't get in Eric
237:24 Brantley's head.  I don't know Eric Brantley.
237:25 I don't know the context of what he reported,
238:1 and -- or all this reference to discontinued
238:2 accounts, et cetera.  That is not in the
238:3 purview of the Healthcare Distribution
238:4 Association.
238:5 BY MR. KENNEDY:
238:6   Q. Let's look at AmerisourceBergen
238:7 and see what maybe the DEA failed to
238:8 communicate them -- to them that led to their
238:9 shipment of opioids.  Go back to Exhibit 4,
238:10 if you would.

**239:22 - 240:18**　**Gray, John 07-30-2020 (00:01:06)**　　　**JG02.226**

239:22   A. It's just page 160.  Just use

| | JG02-Gray, John - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

239:23 the report page.  It's a lot easier.  Here it

239:24 is, hold on.  There we go.  Perfect.  Got it.

239:25   Q. Let's look at the congressional

240:1 finding.  AmerisourceBergen's due diligence

240:2 documents for Westside Pharmacy included a

240:3 list of six pain doctors.  Two of the doctors

240:4 were located a four-hour and an

240:5 11-and-a-half-hour-round-trip drive from the

240:6 pharmacy respectively.  Five of the six

240:7 doctors have either been subsequently

240:8 convicted of or indicted on criminal charges

240:9 related to their controlled substance

240:10 prescribing, or are currently under federal

240:11 investigation.

240:12 My question is:  Do you think

240:13 that the DEA needed to tell AmerisourceBergen

240:14 that there was something suspicious about a

240:15 pharmacy filling prescriptions from a doctor

240:16 whose office was an 11-and-a-half-hour trip

240:17 from the pharmacy?  Do you think they needed

240:18 to tell them that?

| 240:21 - 240:25 | **Gray, John 07-30-2020 (00:00:13)** | **JG02.227** |

240:21   A. And again, yeah, I can't get

240:22 into the head of the companies or the DEA or

240:23 these pharmacies or -- so the circumstances

240:24 around this were not something we would have

240:25 information on or...

| 241:20 - 241:23 | **Gray, John 07-30-2020 (00:00:09)** | **JG02.228** |

241:20   Q. Mr. Gray, I don't have paper

241:21 exhibits for my Exhibit 78, but I just want

241:22 to do some quick housekeeping.  Can we pull

241:23 up Exhibit 78 on the screen, please.

| 242:6 - 243:3 | **Gray, John 07-30-2020 (00:00:54)** | **JG02.229** |

242:6   Q. This is an October 27, 2010

242:7 letter to CVS Caremark.

242:8 Do you see that?

242:9   A. Right.

242:10   Q. And look at the second page.

242:11   A. Yeah.

242:12   Q. And the third-to-last

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

242:13 paragraph?
242:14   A. Yeah.
242:15   Q. You see where it says:  For
242:16 your reference, I've included materials that
242:17 address Allied member dues for 2011.
242:18 Do you see that?
242:19   A. Correct.  Yeah, I see it.
242:20   Q. And you enclosed dues to CVS.
242:21 CVS was a member of the HDA, were they not?
242:22   A. Yeah, evidently.  I -- I
242:23 actually forgot that.  That must have been --
242:24 I don't know if it was more than a year and
242:25 then they dropped out.  I don't know what --
243:1 I can't recall the length of their stay.
243:2   Q. All right.  Now, here's another
243:3 letter in 2012, Exhibit 79.

**243:4 - 243:8**   **Gray, John 07-30-2020 (00:00:01)**   JG02.230
243:4 (Whereupon, Deposition Exhibit
243:5 Gray-79, 11/14/12 HDMA Letter to
243:6 CVS Caremark, CVS-MDLT1-000099569 -
243:7 CVS-MDLT1-000099570, was marked for
243:8 identification.)

**243:10 - 246:23**   **Gray, John 07-30-2020 (00:03:38)**   JG02.231
243:10   Q. And that's, again, to
243:11 CVS Caremark.
243:12 Do you see that?
243:13   A. Oh, yeah.  Yep.
243:14   Q. And if you look at the second
243:15 page, again, you enclose their 2013 dues
243:16 invoice.
243:17 Do you see that?
243:18   A. Yeah.  Yeah.
243:19   Q. So we know they were at least
243:20 members from 2010 to 2013, true?
243:21   A. So it appears.
243:22   Q. Yeah.  And possibly longer; we
243:23 would have to look?
243:24   A. Yeah.  I really don't know.
243:25 They -- yeah.  Can't recall.
244:1   Q. All right.  Let's go back to

| Page/Line | Source | ID |
|---|---|---|

244:2 what we were talking about.  We were talking

244:3 about the public relations message that the

244:4 DEA was not providing the information that

244:5 distributors needed to do their job, and in

244:6 specific, I want to talk about the ARCOS

244:7 data, all right?

244:8   A. Okay.

244:9   Q. The DEA maintained a database

244:10 called the ARCOS database, correct?

244:11   A. Correct.

244:12   Q. And that was a compilation of

244:13 data that the distributors would provide to

244:14 them with respect to what they were

244:15 distributing to pharmacies across the

244:16 country, true?

244:17   A. That was the theory behind it.

244:18 I never actually saw it, but yes, that was --

244:19 I think that was the intent.

244:20   Q. And the distributors did not

244:21 have access to the ARCOS database; is that

244:22 true?

244:23   A. That's true.

244:24   Q. You folks at the HDMA requested

244:25 it, but it was never provided by the DEA,

245:1 true?

245:2   A. Not until President Trump

245:3 signed a law where they gave out partial

245:4 information a year and a half ago.

245:5   Q. Now, this refusal of the DEA to

245:6 provide you with the ARCOS database, that was

245:7 something that was utilized in the public

245:8 relations program very consistently, was it

245:9 not?

245:10   A. I seem to recall that.

245:11   Q. And you folks told Congress,

245:12 you told the Senate, you told the media,

245:13 legislatures, that because you didn't get the

245:14 ARCOS database, because the distributors did

245:15 not have the ARCOS database, they could never

245:16 see the full picture of exactly what a

| | | |
|---|---|---|
| **JG02-Gray, John - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

245:17 pharmacy was purchasing from distributors,
245:18 true?
245:19   A. That's what was explained to me
245:20 and to the organization.
245:21   Q. And the point being that the
245:22 distributor can only see what they are
245:23 distributing to a pharmacy, but they are
245:24 unable to see if that pharmacy is actually
245:25 purchasing from other folks, true?
246:1   A. Right.
246:2   Q. That was the complaint -- that
246:3 was the PR message, true?
246:4   A. I can't comment on that.  It
246:5 was in the PR message.  Whether it was all
246:6 the time, I don't know.
246:7   Q. Well, it was in your testimony
246:8 to Congress in 2012, '14 and '17?
246:9   A. Sure.
246:10   Q. And again, the basic complaint
246:11 of the HDMA was that without the ARCOS data,
246:12 a distributor only knows what they are
246:13 selling to a pharmacy; that's the basic
246:14 complaint?
246:15   A. Um...
246:16   Q. My question is:  Isn't it
246:17 really, though, a fact that when the DEA
246:18 would bring enforcement actions against any
246:19 one of the Big Three distributors, the ARCOS
246:20 data and the full picture of what a pharmacy
246:21 was actually buying, that was usually
246:22 irrelevant, wasn't it?  The full picture was
246:23 irrelevant.

| | | |
|---|---|---|
| 247:1 - 247:2 | **Gray, John 07-30-2020 (00:00:02)** | **JG02.232** |

247:1   A. I've never been in one of those
247:2 investigations --

| | | |
|---|---|---|
| 247:8 - 247:19 | **Gray, John 07-30-2020 (00:00:26)** | **JG02.233** |

247:8   Q. Well, sir -- go ahead.
247:9   A. No, I -- I've never been
247:10 involved in those investigations.  I don't
247:11 know.

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

247:12  Q. Well, let me ask you a
247:13 different way.
247:14 This excuse that a distributor
247:15 didn't know if a pharmacy was purchasing
247:16 opioids from another distributor, that's in
247:17 your PR message.  That's really just an
247:18 attempt to distract away from the real
247:19 issues, isn't it?

247:23 - 247:24 **Gray, John 07-30-2020 (00:00:02)**  JG02.234

247:23  Q. That's really all that ever
247:24 was?

248:2 - 248:2 **Gray, John 07-30-2020 (00:00:00)**  JG02.235

248:2  A. No, I disagree.

248:3 - 248:5 **Gray, John 07-30-2020 (00:00:04)**  JG02.236

248:3 BY MR. KENNEDY:
248:4  Q. Let's look at Exhibit 3.  Look
248:5 at Exhibit 3, if you would.

248:6 - 248:9 **Gray, John 07-30-2020 (00:00:00)**  JG02.237

248:6 (Whereupon, Deposition Exhibit
248:7 Gray-3, E-mail(s), HDA_MDL_000087707 -
248:8 HDA_MDL_000087710, was marked for
248:9 identification.)

248:12 - 250:4 **Gray, John 07-30-2020 (00:02:04)**  JG02.238

248:12  Q. This is an e-mail from you in
248:13 2012 to John Parker.  He's also an employee
248:14 at the HDA, true?
248:15  A. Correct.
248:16  Q. And the subject is Wall Street
248:17 Journal story, true?
248:18  A. Let's see.  Does it -- yeah,
248:19 WSJ, yep.
248:20  Q. Well, let's start at -- I'm
248:21 sorry.  From a chronological order, start at
248:22 the bottom e-mail first.  That's what happens
248:23 first.
248:24  A. Yeah, that's the --
248:25  Q. Okay.  So you have John Parker
249:1 sending an e-mail to you and he's talking
249:2 about the Wall Street Journal story, and he
249:3 says -- he says:  Below -- and he's saying

| | | |
|---|---|---|
| | JG02-Gray, John - Plaintiffs' Submission | |
| **Page/Line** | **Source** | **ID** |

249:4 this to you:  Below is the Wall Street
249:5 Journal story.  They did not use our
249:6 statement.  ABC declined to comment and
249:7 McKesson is quoted, along the lines of our
249:8 statement.  True or not, DEA's data grab your
249:9 attention, quote, shipped enough oxycodone to
249:10 Sanford to give 59 of the pills to every man,
249:11 woman and child.  It is interesting to see
249:12 how the executive committee reacts.
249:13 And then you respond to him in
249:14 the e-mail above, you respond by saying:  Not
249:15 a real balanced story.  Surprising bias in
249:16 favor of DEA.
249:17   A. Uh-huh.
249:18   Q. Clearly most of this content
249:19 came from DEA and not Cardinal.  What he
249:20 misses -- and you're talking about the
249:21 reporter -- what he misses, even assuming his
249:22 numbers are accurate, is that Cardinal knows
249:23 what they deliver but have no idea what other
249:24 distributors are selling into the pharmacy.
249:25 So the doses go way up beyond Cardinal
250:1 deliveries.
250:2 Sir, and with all due respect,
250:3 it wasn't what the reporter was missing.
250:4 Sir, it's what you were missing, right?

**250:8 - 250:13**       **Gray, John 07-30-2020 (00:00:22)**       **JG02.239**

250:8   Q. It's not what the reporter is
250:9 missing; it's what you were missing.  Because
250:10 if -- if Cardinal knows that they're shipping
250:11 enough opioids so that every man, woman and
250:12 child is going to get 59 pills, what more
250:13 does Cardinal need to know, right?

**250:16 - 251:6**       **Gray, John 07-30-2020 (00:00:35)**       **JG02.240**

250:16   A. Wrong.
250:17 BY MR. KENNEDY:
250:18   Q. It's what you were missing.
250:19   A. I don't know where the reporter
250:20 got this data.  He doesn't cite any
250:21 particular source of information, and my

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 250:22 statement above reflects what we understood | |
| | 250:23 to be the nature of the difficulty. | |
| | 250:24 That's -- that's all I can say about this. | |
| | 250:25 It's -- it is what it is. | |
| | 251:1 BY MR. KENNEDY: | |
| | 251:2  Q. Sir, this is real simple:  If | |
| | 251:3 Cardinal knows they are shipping enough | |
| | 251:4 opioids to give 59 pills to every man, woman | |
| | 251:5 and child, isn't that all by itself bad | |
| | 251:6 enough, right? | |
| 251:16 - 252:3 | **Gray, John 07-30-2020 (00:00:30)** | JG02.241 |
| | 251:16  A. I'm not prepared to say what | |
| | 251:17 Cardinal knows or doesn't know.  That's up to | |
| | 251:18 Cardinal.  So they may disagree with this | |
| | 251:19 statement, and -- and that's the way it is. | |
| | 251:20 Again, the reporter does not cite how or why | |
| | 251:21 they came to this conclusion. | |
| | 251:22 BY MR. KENNEDY: | |
| | 251:23  Q. Well, can we agree that if | |
| | 251:24 Cardinal is shipping enough to give 59 pills | |
| | 251:25 to every man, woman and child, that the whole | |
| | 252:1 picture of what others might be distributing | |
| | 252:2 can only be worse, right?  It can only be | |
| | 252:3 worse. | |
| 252:7 - 252:8 | **Gray, John 07-30-2020 (00:00:02)** | JG02.242 |
| | 252:7  Q. Do you agree with that, it can | |
| | 252:8 only -- | |
| 252:11 - 252:11 | **Gray, John 07-30-2020 (00:00:00)** | JG02.243 |
| | 252:11  A. No. | |
| 252:13 - 252:19 | **Gray, John 07-30-2020 (00:00:18)** | JG02.244 |
| | 252:13  Q. Look at Exhibit 4 again, if you | |
| | 252:14 would.  We'll go by the big numbering that | |
| | 252:15 Congress put on it, all right? | |
| | 252:16  A. All right. | |
| | 252:17  Q. This is the congressional | |
| | 252:18 report.  Go to their numbering 125. | |
| | 252:19  A. 125, gotcha. | |
| 252:23 - 253:21 | **Gray, John 07-30-2020 (00:01:17)** | JG02.245 |
| | 252:23  Q. All right.  Now, go to the | |
| | 252:24 second paragraph that starts with McKesson. | |

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

252:25   A. Uh-huh.

253:1   Q. It says:  McKesson began its

253:2 business relationship with Sav-Rite Pharmacy

253:3 hereinafter Sav-Rite No. 1, in February of

253:4 2006, at the latest.  Sav-Rite No. 1 was

253:5 located in Kermit, West Virginia, which had a

253:6 population of 406 in the 2010 census.

253:7 According to data provided by McKesson and as

253:8 illustrated in the chart below, between

253:9 February 2006 and November 2007, McKesson

253:10 supplied Sav-Rite No. 1 with more than

253:11 5.66 million doses of hydrocodone and

253:12 oxycodone.

253:13 Do you see that?

253:14   A. Yeah.

253:15   Q. And my question is this:  Can

253:16 we agree that if McKesson knows that they are

253:17 shipping 5.6 million pills to a single

253:18 pharmacy, then -- then for them to conclude

253:19 that something might be suspicious here, they

253:20 don't need to know what anybody else is

253:21 shipping to that pharmacy, true?

**253:25 - 254:17**          **Gray, John 07-30-2020 (00:00:38)**                     **JG02.246**

253:25   Q. Can we agree with that?

254:1   A. No, not true.  Again, I can't

254:2 get into the head of McKesson.  It's not my

254:3 place.  And McKesson knows what McKesson

254:4 knows, and that's a question, you know, to

254:5 take up at a later date with other parties.

254:6   Q. Well, sir, you keep saying if

254:7 McKesson knows.  But --

254:8   A. I don't know what McKesson

254:9 doesn't know and knows.  I'm not part and

254:10 parcel to their internal operations.

254:11   Q. Well, you would agree with me

254:12 that McKesson certainly has a responsibility

254:13 to know and understand what they shipped to a

254:14 pharmacy, right?

254:15   A. Look, I'm not making any

254:16 judgments on what McKesson does or doesn't

| Page/Line | Source | ID |
|---|---|---|

**JG02-Gray, John - Plaintiffs' Submission**

| | 254:17 do.  That's for McKesson's decisions. | |
| 254:21 - 255:4 | **Gray, John 07-30-2020 (00:00:24)** | **JG02.247** |
| | 254:21   Q. Well, let's -- let me go back | |
| | 254:22 then.  But you can't make any judgments about | |
| | 254:23 McKesson, but the HDA is the one that is | |
| | 254:24 sending out all of the public relations | |
| | 254:25 messages saying that the distributors can't | |
| | 255:1 do their jobs in preventing diversion because | |
| | 255:2 they don't have the ARCOS data.  You're the | |
| | 255:3 one saying that, correct? | |
| | 255:4   A. Correct. | |
| 255:8 - 255:22 | **Gray, John 07-30-2020 (00:00:43)** | **JG02.248** |
| | 255:8   Q. As late as 2017, in | |
| | 255:9 a letter to Congress, you tell Congress that | |
| | 255:10 distributors do not know -- | |
| | 255:11   A. Where are we? | |
| | 255:12   Q. I'll pull an exhibit up. | |
| | 255:13   A. Okay. | |
| | 255:14   Q. You told Congress -- HDA | |
| | 255:15 Congress -- told Congress as late as -- as | |
| | 255:16 late as 2017 that the distributors do not | |
| | 255:17 know whether a pharmacy is purchasing from | |
| | 255:18 other distributors. | |
| | 255:19 Do you remember telling | |
| | 255:20 Congress that? | |
| | 255:21   A. Not specifically, but... | |
| | 255:22   Q. Look at Exhibit 5. | |
| 255:23 - 256:2 | **Gray, John 07-30-2020 (00:00:00)** | **JG02.249** |
| | 255:23 (Whereupon, Deposition Exhibit | |
| | 255:24 Gray-5, 11/28/17 HDA Letter to | |
| | 255:25 McCaskill, HDA_MDL_000000129 - | |
| | 256:1 HDA_MDL_000000132, was marked for | |
| | 256:2 identification.) | |
| 256:4 - 256:5 | **Gray, John 07-30-2020 (00:00:06)** | **JG02.250** |
| | 256:4   Q. Okay.  Do you have that? | |
| | 256:5   A. Yep, I do right here. | |
| 256:6 - 257:5 | **Gray, John 07-30-2020 (00:00:54)** | **JG02.307** |
| | 256:6   Q. Look to the very next page -- | |
| | 256:7 and again, this is your letter to Congress -- | |
| | 256:8   A. Uh-huh.  Uh-huh. | |

| Page/Line | Source | ID |
|---|---|---|
| | JG02-Gray, John - Plaintiffs' Submission | |

256:9   Q. -- specifically to the Senate
256:10 in 2017.  Look at the next page, one, two,
256:11 three, the fourth paragraph down,
256:12 three-quarters of the way down starts with
256:13 "Distributors are only aware of."
256:14   A. Wait a minute.
256:15   Q. You can -- maybe if you look up
256:16 on the screen it will be easier.
256:17   A. Oh, 2.  Oh, you're on page 2.
256:18 Gotcha.  Okay.
256:19   Q. You write to Congress -- do you
256:20 write to Congress:  Distributors are only
256:21 aware of the amount that their company has
256:22 shipped?
256:23 Do you see that?  Is that what
256:24 you state?
256:25   A. Yeah, that's correct.
257:1   Q. You say:  Only the DEA has the
257:2 complete picture.  Correct?
257:3   A. That's correct.
257:4   Q. And when you told Congress
257:5 that, sir, that was simply not true.

| 257:9 - 257:9 | **Gray, John 07-30-2020 (00:00:00)** | **JG02.251** |

257:9   Q. Right?

| 257:13 - 257:13 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.252** |

257:13   Q. That was not true?

| 257:16 - 257:20 | **Gray, John 07-30-2020 (00:00:10)** | **JG02.253** |

257:16   A. No, we did not know that to be
257:17 not true.
257:18 BY MR. KENNEDY:
257:19   Q. Your talking points, look at
257:20 Exhibit 29.

| 257:21 - 257:25 | **Gray, John 07-30-2020 (00:00:02)** | **JG02.254** |

257:21 (Whereupon, Deposition Exhibit
257:22 Gray-29, 10/17/16 HDA Talking Points
257:23 on Resources on Prescription Drug
257:24 Abuse, HDA_MDL_000032191 -
257:25 HDA_MDL_000032203, was marked for

| 258:2 - 258:15 | **Gray, John 07-30-2020 (00:00:36)** | **JG02.255** |

258:2   A. Uh-huh.  Yep.  Got it.

| Page/Line | Source | ID |
|---|---|---|
| | 258:3 BY MR. KENNEDY: | |
| | 258:4   Q. Go to page 93 of your talking | |
| | 258:5 points -- | |
| | 258:6   A. Okay. | |
| | 258:7   Q. -- under General Prescription | |
| | 258:8 Abuse, bullet point down, number five. | |
| | 258:9   A. Yep. | |
| | 258:10   Q. Does it state:  Each | |
| | 258:11 distributor is only aware of the product it | |
| | 258:12 ships?  Is that what it says? | |
| | 258:13   A. Right. | |
| | 258:14   Q. That talking point was untrue, | |
| | 258:15 was it not? | |
| 258:18 - 259:2 | **Gray, John 07-30-2020 (00:00:23)** | **JG02.256** |
| | 258:18   A. From HDA's perspective, that | |
| | 258:19 talking point was what we understood to be | |
| | 258:20 the situation in the marketplace. | |
| | 258:21 BY MR. KENNEDY: | |
| | 258:22   Q. And, sir, the HDA even | |
| | 258:23 represented to the Supreme Court of | |
| | 258:24 West Virginia that the pharmacies did not | |
| | 258:25 know what other distributors were shipping, | |
| | 259:1 that only the DEA knew.  Let's look at | |
| | 259:2 Exhibit 30. | |
| 259:3 - 259:7 | **Gray, John 07-30-2020 (00:00:00)** | **JG02.257** |
| | 259:3 (Whereupon, Deposition Exhibit | |
| | 259:4 Gray-30, HDMA Amerisource Bergen | |
| | 259:5 Amicus Brief, HDA_MDL_000081296 - | |
| | 259:6 HDA_MDL_000081319, was marked for | |
| | 259:7 identification.) | |
| 259:8 - 260:22 | **Gray, John 07-30-2020 (00:01:37)** | **JG02.258** |
| | 259:8   A. Yep. | |
| | 259:9 BY MR. KENNEDY: | |
| | 259:10   Q. Do you see that, State of | |
| | 259:11 West Virginia, Supreme Court of Appeals? | |
| | 259:12   A. Yep.  Yes.  Yes. | |
| | 259:13   Q. Halfway down it says:  Amicus | |
| | 259:14 Curiae Brief of Healthcare Distribution | |
| | 259:15 Management Association, right? | |
| | 259:16   A. And the Wholesale Distributors | |

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

259:17 Association, correct.

259:18   Q. All right.  Go to page 000 --

259:19 or just 06.

259:20   A. 06.  Okay.

259:21   Q. Up at the top, first couple of

259:22 sentences, again, very strongly you make the

259:23 representation on behalf of the HDA:  An

259:24 individual wholesale distributor has no

259:25 visibility at all --

260:1   A. Uh-huh.

260:2   Q. -- into what other entities its

260:3 customer may be purchasing from and how much

260:4 product the customer is purchasing.

260:5 That's your statement to the

260:6 Supreme Court of West Virginia on behalf of

260:7 the HDA, true?

260:8   A. True.

260:9   Q. You next state:  A single

260:10 distributor has no way of knowing if it's a

260:11 pharmacy's sole supplier of controlled

260:12 prescription drugs or if that pharmacy is

260:13 purchasing controlled prescription drugs from

260:14 any number of other wholesale distributors.

260:15 And that was your statement,

260:16 sir, true?

260:17   A. Well, that's what the -- that's

260:18 what it says.

260:19   Q. And that statement is untrue,

260:20 just like the statement that you gave to

260:21 Congress, just like the statement in your

260:22 talking points.  It's simply not true.

| 260:25 - 260:25 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.259** |

260:25   Q. Can we agree?

| 261:3 - 261:20 | **Gray, John 07-30-2020 (00:00:49)** | **JG02.260** |

261:3   A. No, we don't agree, because

261:4 that's what we believed to be the case.

261:5 BY MR. KENNEDY:

261:6   Q. Well, believing something and

261:7 having it be true sometimes are different

261:8 concepts, right?  Correct?

| Page/Line | Source | ID |
|---|---|---|

| | JG02-Gray, John - Plaintiffs' Submission | |

261:9   A. You know, I'm not playing moral
261:10 equivalency games and games like that.  No, I
261:11 have no comment on that.
261:12   Q. Go to Exhibit 4.  Exhibit 4 --
261:13 again, this is the report from Congress in
261:14 2018.
261:15   A. Right.  Exhibit 4.  Jesus, I
261:16 keep thinking that's in a separate book.
261:17 Okay.  2018.
261:18   Q. Go to page 112 of Congress'
261:19 numbering system.
261:20   A. All right.  Hold on.

**262:1 - 262:8**  **Gray, John 07-30-2020 (00:00:18)**   JG02.261

262:1   A. Yep.
262:2   Q. Congressional Finding:
262:3 Distributors can obtain dispensing data from
262:4 pharmacies that show the total -- the total
262:5 volume of controlled substances dispensed by
262:6 a pharmacy.
262:7 Do you see that?
262:8   A. I see it.

**262:20 - 262:20**  **Gray, John 07-30-2020 (00:00:02)**   JG02.262

262:20   Q. Simple math, Mr. Gray, correct?

**262:22 - 262:24**  **Gray, John 07-30-2020 (00:00:08)**   JG02.263

262:22   A. Wait a minute.  Now I'm reading
262:23 the preliminary -- the preceding pages to
262:24 understand this.

**262:25 - 263:24**  **Gray, John 07-30-2020 (00:00:58)**   JG02.289

262:25 (Document review.)
263:1   A. Yeah, I'm not prepared to
263:2 comment on this conclusion in this report
263:3 because that -- it goes against what we as an
263:4 organization understood to be the situation,
263:5 and I'm not so sure -- you'd have to ask the
263:6 companies how useful the information is or
263:7 isn't.
263:8 BY MR. KENNEDY:
263:9   Q. Well, look at page -- look at
263:10 page 114, two pages later.
263:11   A. Uh-huh.

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

263:12  Q. Two pages later, third
263:13 paragraph down starting with
263:14 "AmerisourceBergen."
263:15 Do you see that?
263:16  A. I see it.
263:17  Q. AmerisourceBergen later told
263:18 the committee, quote, ABDC collects patient
263:19 deidentified dispensing reports on an
263:20 as-needed basis to allow it to investigate
263:21 and mitigate concerns about possible
263:22 suspicious behavior by a customer.
263:23 So AmerisourceBergen is
263:24 collecting the dispensing data, correct?

**264:2 - 264:23** — **Gray, John 07-30-2020 (00:00:45)** — **JG02.264**

264:2  A. Yeah.
264:3 BY MR. KENNEDY:
264:4  Q. Is that correct?
264:5  A. It just says -- I don't know
264:6 whether that's correct or not, but that's
264:7 what it says.
264:8  Q. Go to page 248 -- excuse me,
264:9 116, two pages later.  Let's look at
264:10 Cardinal, see whether they were collecting
264:11 dispensing data that tells them the total
264:12 volume that a pharmacy is dispensing and
264:13 selling.
264:14 The indented second paragraph
264:15 states:  As part of its comprehensive
264:16 anti-diversion program, Cardinal Health
264:17 periodically requests and receives aggregate
264:18 dispensing data and the total number of
264:19 prescriptions filled for both controlled and
264:20 noncontrolled substances from prospective and
264:21 existing pharmacy customers.
264:22 So Cardinal was collecting it,
264:23 right?

**265:5 - 265:7** — **Gray, John 07-30-2020 (00:00:05)** — **JG02.265**

265:5  A. That's what it says.
265:6 BY MR. KENNEDY:
265:7  Q. Is that correct, sir?

| Page/Line | Source | ID |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 265:10 - 265:15 | **Gray, John 07-30-2020 (00:00:09)** | JG02.266 |
| | 265:10   A. I have no idea.  It's just what | |
| | 265:11 it says. | |
| | 265:12 BY MR. KENNEDY: | |
| | 265:13   Q. That's a congressional finding | |
| | 265:14 based upon what Cardinal told Congress, true? | |
| | 265:15   A. Okay. | |
| 265:19 - 266:2 | **Gray, John 07-30-2020 (00:00:27)** | JG02.267 |
| | 265:19   Q. Sir, my point being:  The PR | |
| | 265:20 program, the statements to Congress in 2012, | |
| | 265:21 2014, 2017, to the media, to the | |
| | 265:22 West Virginia Court that the distributors | |
| | 265:23 somehow didn't have the whole picture, they | |
| | 265:24 didn't know whether or not a pharmacy was | |
| | 265:25 buying from another distributor, that simply | |
| | 266:1 was not true based upon what we see in these | |
| | 266:2 congressional findings.  It wasn't true. | |
| 266:6 - 266:7 | **Gray, John 07-30-2020 (00:00:03)** | JG02.268 |
| | 266:6   Q. Isn't that true, sir, based | |
| | 266:7 upon what we just looked at? | |
| 266:10 - 267:2 | **Gray, John 07-30-2020 (00:00:48)** | JG02.269 |
| | 266:10   A. No, I can't say whether it's | |
| | 266:11 true or not because just months later, I | |
| | 266:12 believe, from this, the President signed into | |
| | 266:13 a law requiring DEA to disclose ARCOS data in | |
| | 266:14 a limited form, and there was a great push by | |
| | 266:15 others in the industry to get that done, and | |
| | 266:16 so if this is -- this is as comprehensive as | |
| | 266:17 you seem to suggest it wants to be, then you | |
| | 266:18 have to question why they even bothered to | |
| | 266:19 pass the legislation that the President | |
| | 266:20 signed in August, I believe, of 2018 whereby | |
| | 266:21 DEA would agree to release data in a -- sort | |
| | 266:22 of a re-collected form without the names of | |
| | 266:23 the distributor. | |
| | 266:24 So I can only say on this, | |
| | 266:25 there's obviously disagreements in the | |
| | 267:1 industry as to what is and what isn't | |
| | 267:2 available for information. | |
| 267:11 - 267:19 | **Gray, John 07-30-2020 (00:00:28)** | JG02.270 |

| JG02-Gray, John - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 267:11  Q. Let's go a step further. | |
|  | 267:12 Not only did the Big Three know | |
|  | 267:13 that they were collecting dispensing data, | |
|  | 267:14 but you, you, John Gray, you also knew that | |
|  | 267:15 they were collecting dispensing data.  You'd | |
|  | 267:16 known it since 2012, didn't you? | |
|  | 267:17  A. Nope, I did not. | |
|  | 267:18  Q. Look at Exhibit 74, if you | |
|  | 267:19 would, sir. | |
| 267:20 - 267:23 | **Gray, John 07-30-2020 (00:00:05)** | **JG02.271** |
|  | 267:20 (Whereupon, Deposition Exhibit | |
|  | 267:21 Gray-74, E-mail(s), | |
|  | 267:22 HDA_MDL_000215984 - HDA_MDL_000215986, | |
|  | 267:23 was marked for identification.) | |
| 267:24 - 269:15 | **Gray, John 07-30-2020 (00:01:23)** | **JG02.272** |
|  | 267:24  A. Sure.  74.  All right. | |
|  | 267:25 /// | |
|  | 268:1 BY MR. KENNEDY: | |
|  | 268:2  Q. Start all the way at the | |
|  | 268:3 bottom.  That's the first e-mail in time, all | |
|  | 268:4 the way at the bottom of the first page.  You | |
|  | 268:5 see it says John Gray to David Moody -- | |
|  | 268:6  A. Correct. | |
|  | 268:7  Q. -- all the way at the bottom. | |
|  | 268:8 This is your e-mail -- | |
|  | 268:9  A. Uh-huh. | |
|  | 268:10  Q. -- that you're sending out to | |
|  | 268:11 the executive committee.  Go to the next | |
|  | 268:12 page, and you can see that you're sending | |
|  | 268:13 this out to the executive committee. | |
|  | 268:14  A. Right.  Right. | |
|  | 268:15  Q. And it's 3/4/2012. | |
|  | 268:16 Do you see that? | |
|  | 268:17  A. Uh-huh. | |
|  | 268:18  Q. And e-mailing -- you're | |
|  | 268:19 forwarding them the HDMA amicus brief for the | |
|  | 268:20 Cardinal case, correct? | |
|  | 268:21  A. Uh-huh.  Yes. | |
|  | 268:22  Q. And I'm not going to read that | |
|  | 268:23 long e-mail, but you're asking them to review | |

| Page/Line | Source | ID |
|---|---|---|

268:24 the amicus brief.  If you want to peruse
268:25 that, you're asking the executive committee
269:1 to review the amicus brief before it gets
269:2 filed with the Court.
269:3 Do you see that?
269:4   A. I see it.
269:5   Q. And at the bottom it says:
269:6 Please let me know as soon as possible
269:7 whether or not you support filing this brief.
269:8 Do you see that?  Maybe -- it's
269:9 the final paragraph.  You see that?
269:10   A. Yeah, got it.
269:11   Q. So you're asking the executive
269:12 committee to review the Cardinal amicus brief
269:13 that the HDA has paid to have written, and
269:14 you're saying take a look at it and see if
269:15 this is okay for us to file.

| 269:20 - 269:20 | **Gray, John 07-30-2020 (00:00:01)** | JG02.273 |

269:20   Q. -- go back to the first page,

| 269:21 - 272:17 | **Gray, John 07-30-2020 (00:02:38)** | JG02.308 |

269:21 go back -- go back to the first page now.
269:22   A. Right.
269:23   Q. And you'll see now the response
269:24 from Dale Smith of HD Smith, starts with --
269:25 it's March 5, 2012, Dale Smith is writing you
270:1 back.
270:2   A. Uh-huh.
270:3   Q. Because he's reviewed the
270:4 Cardinal amicus brief.
270:5   A. Uh-huh.
270:6   Q. And he's writing you back with
270:7 his comments, and so he states:  John:  As
270:8 you know, I believe HDMA should be a strong
270:9 voice for HDMA members with the DEA.  The
270:10 brief details wholesalers' inability to gain
270:11 insight into the practitioner prescribing and
270:12 pharmacy dispensing practices due to HIPAA
270:13 issues.
270:14   A. Uh-huh.
270:15   Q. This -- this -- he's talking

| Page/Line | Source | ID |
|---|---|---|

270:16 about your brief.  This is not altogether

270:17 true.

270:18   A. Uh-huh.

270:19   Q. We have been using dispensing

270:20 information to assist us in making informed

270:21 decisions regarding our customers.

270:22   A. Correct.

270:23   Q. We have been able to obtain

270:24 this information without patient identifiable

270:25 information.  When we have been unable to, we

271:1 do not access the information.  We have also

271:2 been using a third party that signs a HIPAA

271:3 business agreement with the pharmacy,

271:4 extracts the information we need, and then

271:5 gives it to us without the patient

271:6 information.

271:7 And then he says:  This does

271:8 not need to be included in the brief.  So he

271:9 told you that they're getting dispensing data

271:10 here in 2012, right?

271:11   A. Uh-huh.  Uh-huh.  Yes, sir.

271:12   Q. He tells you that what you

271:13 wrote in the brief isn't altogether true,

271:14 correct?

271:15   A. Well, that's Dale's opinion.

271:16   Q. Right up top you say:  Dale,

271:17 thank you for your insight.

271:18 Correct?

271:19   A. Correct.

271:20   Q. He tells you that part of this

271:21 brief isn't true because they're getting

271:22 dispensing data.  He tells you not only is it

271:23 not true, it doesn't need to be in the brief.

271:24 And then when we look at the final brief, the

271:25 part that he said was untrue was never

272:1 removed, right?  It was never removed, true?

272:2 And I've got Exhibit --

272:3   A. I have to go in -- I'd have to

272:4 go in and read the brief, but if it's in

272:5 there, it's in there.  If it's not, then it's

| Page/Line | Source | ID |
|---|---|---|

272:6 not.

272:7 MR. KENNEDY:  Exhibit 72 and 73

272:8 are the draft and the final version,

272:9 if you folks ever want to review

272:10 those --

272:11 THE WITNESS: Okay.

272:12 MR. KENNEDY:  -- and if you can

272:13 tell me that you somehow removed what

272:14 he told you wasn't true, I would stand

272:15 corrected, but we've read it quite a

272:16 few times.

272:17 THE WITNESS:  Okay.

**272:18 - 273:2    Gray, John 07-30-2020 (00:00:26)**                     JG02.311

272:18 BY MR. KENNEDY:

272:19   Q. Now, we're talking about --

272:20 still talking about this ARCOS data.  You

272:21 folks continuously represented in the PR that

272:22 you weren't getting the ARCOS data, and you

272:23 would represent to Congress and to the media

272:24 and others that the ARCOS data was critical.

272:25 Do you recall that?  That was

273:1 your word, ARCOS data is critical.

273:2   A. Okay.

**273:3 - 274:15    Gray, John 07-30-2020 (00:01:35)**                     JG02.310

273:3   Q. In fact, as late as 2017, you

273:4 told Congress or the Senate that it was

273:5 critical.  We'll go to Exhibit 5 again, if

273:6 you can pull that up.

273:7   A. Uh-huh.  Where is it?  Hold on.

273:8 Yeah.  Here we are.  Okay.

273:9   Q. This is your 2017 letter --

273:10   A. Uh-huh.

273:11   Q. -- to the Senate?

273:12   A. Uh-huh.

273:13   Q. Look at the second page, if you

273:14 would.  Fourth paragraph down, three-quarters

273:15 of the way down the paragraph the sentence

273:16 starts with "Distributors."

273:17   A. Okay.

273:18   Q. And you state to the Senate:

JG02-Gray, John - Plaintiffs' Submission

| | | |
|---|---|---|
| | JG02-Gray, John - Plaintiffs' Submission | |

| Page/Line | Source | ID |
|---|---|---|

273:19 Distributors are only aware of the amount
273:20 that their company has shipped.  Only DEA,
273:21 through its ARCOS database, has the complete
273:22 picture of the totality of distributors
273:23 serving an individual customer.  To date,
273:24 distributors still do not have access to this
273:25 critical data.
274:1 Is that what you told the
274:2 Senate?
274:3   A. It's right here, whatever you
274:4 read.
274:5   Q. And that was consistent with
274:6 your message, that the ARCOS data was
274:7 critical?
274:8   A. Uh-huh.
274:9   Q. And this is a 2017 letter?
274:10   A. Correct.
274:11   Q. And the truth is, sir, the HDA
274:12 and the distributors didn't even know whether
274:13 they wanted the ARCOS data, true?  They
274:14 didn't even know whether they wanted it.
274:15 This was just public relations.

| 274:20 - 274:22 | **Gray, John 07-30-2020 (00:00:06)** | **JG02.274** |
|---|---|---|

274:20   Q. True?
274:21   A. Not true.  Not true.
274:22   Q. Let's look at Exhibit 6.

| 275:2 - 275:15 | **Gray, John 07-30-2020 (00:00:25)** | **JG02.275** |
|---|---|---|

275:2   Q. This is an e-mail from Anita
275:3 Ducca to Pat Kelly --
275:4   A. Correct.
275:5   Q. -- on June 21, 2016.  This is
275:6 almost a year before you tell Congress how
275:7 critical ARCOS is.
275:8   A. Uh-huh.
275:9   Q. Anita Ducca, again, tell us her
275:10 title.
275:11   A. Vice president, regulatory
275:12 affairs.
275:13   Q. And she's been at the HDA for
275:14 as long as you were there?

| Page/Line | Source | ID |
|---|---|---|
| | JG02-Gray, John - Plaintiffs' Submission | |

275:15  A. Yes.

| | | |
|---|---|---|
| 275:24 - 275:25 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.276** |

275:24   Q. All right.  She says, again:  I
275:25 found the cover letter and the meeting

| | | |
|---|---|---|
| 276:1 - 277:3 | **Gray, John 07-30-2020 (00:01:15)** | **JG02.277** |

276:1 summary that we sent to Michelle L. with the
276:2 first set of questions to her in 2011.
276:3 And then she states:  Also, I
276:4 don't know if you want to add this, given
276:5 some of the sensitivities about whether or
276:6 not we truly want ARCOS data shared after
276:7 all.
276:8 Again, she says about whether
276:9 or not we truly want ARCOS data shared after
276:10 all, parentheses.
276:11   A. Uh-huh.
276:12   Q. If we got it -- if we got it,
276:13 what would we do with it, question mark?
276:14   A. Uh-huh.  Uh-huh.
276:15   Q. That's what Anita Ducca wrote
276:16 in 2016, right?
276:17   A. Yeah.
276:18   Q. This is a year before you told
276:19 Congress how critical this was, true?
276:20   A. Uh-huh.  Well, yeah, presuming.
276:21 I don't have it in front of me
276:22 chronology-wise, probably, if it's '16-17,
276:23 yeah.  Yes.
276:24   Q. Let me finish.  Let me finish
276:25 here and put what we talked about in some
277:1 context, all right?
277:2 Look at Exhibit 45, if you
277:3 would.

| | | |
|---|---|---|
| 277:9 - 278:3 | **Gray, John 07-30-2020 (00:00:44)** | **JG02.278** |

277:9   Q. Do you have that in front of
277:10 you?
277:11   A. I do.
277:12   Q. This is a fact sheet created by
277:13 the HDMA, true?
277:14   A. I haven't seen this in years.

| Page/Line | Source | ID |
|---|---|---|

JG02-Gray, John - Plaintiffs' Submission

277:15 I suspect that is true.

277:16   Q. Down at the bottom you see

277:17 healthcaredistributors.org, HDMA?

277:18   A. Uh-huh.

277:19   Q. 2013, do you see that?

277:20   A. Yeah.  Well, wait a minute,

277:21 right, copyright 2013.

277:22   Q. So this would appear on your

277:23 website; is that right?

277:24   A. I'm not sure whether this was a

277:25 printed piece or something put on the web.  I

278:1 don't know.

278:2   Q. Go to page point, point, point

278:3 59.

**278:4 - 279:3    Gray, John 07-30-2020 (00:00:59)**                    JG02.312

278:4   A. Okay.  Here we go.  Yep, I have

278:5 it.

278:6   Q. This is your publication.  This

278:7 says National Epidemic: Prescription Drug

278:8 Abuse.

278:9 Do you see that?

278:10   A. Uh-huh.

278:11   Q. And it says:  The Centers for

278:12 Disease Control and Prevention reports that

278:13 one person dies every 19 minutes in the

278:14 United States --

278:15   A. Uh-huh.

278:16   Q. -- from prescription drug

278:17 abuse.

278:18   A. Uh-huh.

278:19   Q. This is 2013.

278:20 Do you see that?

278:21   A. Uh-huh.

278:22   Q. So for context purposes, when

278:23 the HDA decided to launch a PR program

278:24 instead of becoming more compliant with the

278:25 law, they knew that one American was dying

279:1 every 19 minutes from an overdose of a

279:2 prescription drug, right?  They knew it at

279:3 that time.

| Page/Line | Source | ID |
|---|---|---|
| | **JG02-Gray, John - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 279:6 - 279:6 | **Gray, John 07-30-2020 (00:00:00)** | **JG02.279** |
| | 279:6   A. I don't know -- | |
| 279:9 - 279:9 | **Gray, John 07-30-2020 (00:00:02)** | **JG02.280** |
| | 279:9   Q. Correct?  They knew it? | |
| 279:12 - 279:16 | **Gray, John 07-30-2020 (00:00:06)** | **JG02.281** |
| | 279:12   A. I -- you know, I don't know if | |
| | 279:13 they knew it. | |
| | 279:14 BY MR. KENNEDY: | |
| | 279:15   Q. It's in their fact sheet, isn't | |
| | 279:16 it? | |
| 279:19 - 280:3 | **Gray, John 07-30-2020 (00:00:22)** | **JG02.282** |
| | 279:19   A. Sure, but that doesn't mean | |
| | 279:20 they read it. | |
| | 279:21 BY MR. KENNEDY: | |
| | 279:22   Q. And when the HDA decided not to | |
| | 279:23 fund the RAND study in 2013, the study that | |
| | 279:24 was proposed to look for answers to save | |
| | 279:25 lives, when they decided not to fund that | |
| | 280:1 study in 2013, they knew that one American | |
| | 280:2 was dying every 19 minutes from an overdose | |
| | 280:3 of an opioid, correct? | |
| 280:6 - 280:6 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.283** |
| | 280:6   A. Yeah, that's not correct. | |
| 280:7 - 280:16 | **Gray, John 07-30-2020 (00:00:25)** | **JG02.290** |
| | 280:7 Yeah, not correct. | |
| | 280:8 BY MR. KENNEDY: | |
| | 280:9   Q. Not correct? | |
| | 280:10 And when the HDA decided not to | |
| | 280:11 fund -- not to fund the partnership study | |
| | 280:12 with the blue ribbon panel to look for | |
| | 280:13 answers to abuse and addiction, when they | |
| | 280:14 decided not to fund that study in 2013, they | |
| | 280:15 knew one American was dying every 19 minutes, | |
| | 280:16 correct? | |
| 280:19 - 280:25 | **Gray, John 07-30-2020 (00:00:20)** | **JG02.284** |
| | 280:19   A. I don't -- yeah, I don't know. | |
| | 280:20 BY MR. KENNEDY: | |
| | 280:21   Q. And when the HDA decided to | |
| | 280:22 disband -- to disband the West Virginia Task | |
| | 280:23 Force and not do the summit to look for | |

| Page/Line | Source | ID |
|---|---|---|
| | 280:24 answers in West Virginia, they knew about | |
| | 280:25 this statistic, correct -- | |
| 281:4 - 281:4 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.285** |
| | 281:4   Q. -- every 19 minutes? | |
| 281:8 - 281:8 | **Gray, John 07-30-2020 (00:00:01)** | **JG02.286** |
| | 281:8   Q. They knew it -- | |
| 281:12 - 281:20 | **Gray, John 07-30-2020 (00:00:29)** | **JG02.287** |
| | 281:12   Q. -- is that correct? | |
| | 281:13   A. That's not necessarily correct. | |
| | 281:14   Q. And when the HDA opposed | |
| | 281:15 legislation with respect to HCPs and taxes | |
| | 281:16 and return programs in 2012 and 2013 and 2014 | |
| | 281:17 and 2015, they knew about the statistic, they | |
| | 281:18 knew about the fact that in this country one | |
| | 281:19 person was dying every 19 minutes from an | |
| | 281:20 overdose of prescription drugs, true? | |
| 281:23 - 281:25 | **Gray, John 07-30-2020 (00:00:06)** | **JG02.288** |
| | 281:23   A. I can't speak for what they | |
| | 281:24 knew.  I can show you what we put out. | |
| | 281:25 /// | |
| 282:1 - 282:12 | **Gray, John 07-30-2020 (00:00:31)** | **JG02.314** |
| | 282:1 BY MR. KENNEDY: | |
| | 282:2   Q. Sir, let me ask you this:  In | |
| | 282:3 September of 2013, the HDA held meetings at | |
| | 282:4 the Greenbriar in West Virginia? | |
| | 282:5   A. Uh-huh. | |
| | 282:6   Q. Do you know how many pills the | |
| | 282:7 Big Three distributed in West Virginia while | |
| | 282:8 you were at that meeting?  Did you know it? | |
| | 282:9   A. I can't recall whether I knew | |
| | 282:10 or not. | |
| | 282:11 MR. KENNEDY:  I've got nothing | |
| | 282:12 further.  Thank you, Mr. Gray. | |

Plaintiffs Affirmative Designations = 03:30:34
Defense Completeness Counters = 00:03:47
Plaintiffs Counter Counters = 00:00:40
**Total Time = 03:35:01**