**Designation Run Report**

# Kelly, Patrick - Plaintiffs' Submission

_____

**Kelly, Patrick 05-10-2019**
_____

**Plaintiffs Affirmative Designations  01:11:55**

**Defense Completeness Counters  00:03:53**

**Total Time  01:15:48**



| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| 31:10 - 31:15 | **Kelly, Patrick 05-10-2019 (00:00:11)** | PK03.1 |
| | 31:10   Q. Okay.  So you understand | |
| | 31:11 that you're here in your individual | |
| | 31:12 capacity but you're also here as the | |
| | 31:13 official representative of HDA with | |
| | 31:14 respect to certain topics, correct? | |
| | 31:15   A. I understand that, yes. | |
| 36:6 - 37:1 | **Kelly, Patrick 05-10-2019 (00:00:35)** | PK03.2 |
| | 36:6   Q. Okay.  Who is Anita Ducca? | |
| | 36:7   A. Anita Ducca is the senior | |
| | 36:8 vice president of regulatory affairs for | |
| | 36:9 Healthcare Distribution Alliance. | |
| | 36:10   Q. She reports to you? | |
| | 36:11   A. She does. | |
| | 36:12   Q. How long have you been with | |
| | 36:13 the HDA? | |
| | 36:14   A. I joined in January of 2011. | |
| | 36:15   Q. The HDA is an organization | |
| | 36:16 that acts on behalf of its members, | |
| | 36:17 correct? | |
| | 36:18   A. That's correct. | |
| | 36:19   Q. Your members include the, | |
| | 36:20 what we refer to in the case as the big | |
| | 36:21 three distributors, Cardinal Health, | |
| | 36:22 AmerisourceBergen, and McKesson; is that | |
| | 36:23 correct? | |
| | 36:24   A. In addition to -- in | |
| | 37:1 addition to 29 other companies, yes. | |
| 38:20 - 39:12 | **Kelly, Patrick 05-10-2019 (00:00:23)** | PK03.3 |
| | 38:20   Q. Okay.  You have a board, | |
| | 38:21 correct? | |
| | 38:22   A. We do. | |
| | 38:23   Q. The board membership always | |
| | 38:24 includes members from the big three, | |
| | 39:1 AmerisourceBergen, McKesson, and Cardinal | |
| | 39:2 Health, correct? | |
| | 39:3   A. In addition to the 29 other | |
| | 39:4 members, yes. | |
| | 39:5   Q. Okay.  But the board always | |
| | 39:6 has somebody from those companies on it? | |

| | | |
|---|---|---|
| **PK03-Kelly, Patrick - Plaintiffs' Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

39:7   A. That's correct.
39:8   Q. And then there's an
39:9 executive committee as well, correct?
39:10   A. That is correct.
39:11   Q. And what's the makeup of the
39:12 executive committee?

**39:16 - 40:3**   **Kelly, Patrick 05-10-2019 (00:00:22)**   **PK03.4**

39:16 THE WITNESS:  The executive
39:17 committee is seven members, three
39:18 members from the big three,
39:19 AmerisourceBergen, McKesson, and
39:20 Cardinal have a standing position
39:21 on the executive committee.
39:22 And then there are four
39:23 other positions that are other
39:24 member companies that filter
40:1 through kind of as -- as positions
40:2 become available, retirement, and
40:3 companies move on.

**40:5 - 40:8**   **Kelly, Patrick 05-10-2019 (00:00:05)**   **PK03.5**

40:5   Q. The HDA doesn't take any
40:6 action without the approval of either the
40:7 executive committee or its board,
40:8 correct?

**40:11 - 40:21**   **Kelly, Patrick 05-10-2019 (00:00:17)**   **PK03.6**

40:11 THE WITNESS:  Again, it
40:12 depends -- it depends on what you
40:13 mean by action.  I mean, there are
40:14 certain things that rise to the
40:15 level of the board that require
40:16 their approval of expenditures, et
40:17 cetera.  But there are day-to-day
40:18 operations that do not require
40:19 approval of the board that we
40:20 undertake on behalf of the
40:21 membership.

**42:17 - 42:21**   **Kelly, Patrick 05-10-2019 (00:00:12)**   **PK03.7**

42:17   Q. How about engaging with
42:18 members of Congress, is HDA going to
42:19 reach out to members of Congress without

| Page/Line | Source | ID |
|---|---|---|
| | PK03-Kelly, Patrick - Plaintiffs' Submission | |

| Page/Line | Source | ID |
|---|---|---|
| | 42:20 approval from the board or the executive | |
| | 42:21 committee? | |
| 42:24 - 43:19 | **Kelly, Patrick 05-10-2019 (00:00:34)** | **PK03.8** |
| | 42:24 THE WITNESS:  We engage | |
| | 43:1 with, I mean, members of Congress | |
| | 43:2 on a weekly basis through a | |
| | 43:3 variety of fronts depending on | |
| | 43:4 committee hearings or fundraisers | |
| | 43:5 that we attend from our political | |
| | 43:6 action committee. | |
| | 43:7 And again, all of those | |
| | 43:8 are -- we communicate those to the | |
| | 43:9 board, but they are not decisions | |
| | 43:10 that need to be made by the board | |
| | 43:11 before HDA staff engage. | |
| | 43:12 BY MR. PIFKO: | |
| | 43:13  Q. Okay.  So then that was | |
| | 43:14 going to be my other question.  When you | |
| | 43:15 do communicate and interact with federal | |
| | 43:16 agencies or state agencies or members of | |
| | 43:17 Congress or any elected officials, you | |
| | 43:18 always report back to either the board or | |
| | 43:19 the executive committee, correct? | |
| 43:22 - 44:3 | **Kelly, Patrick 05-10-2019 (00:00:05)** | **PK03.9** |
| | 43:22 THE WITNESS:  If it's -- if | |
| | 43:23 it's relevant for board | |
| | 43:24 consideration, yes. | |
| | 44:1 BY MR. PIFKO: | |
| | 44:2  Q. Or the executive committee? | |
| | 44:3  A. Or the executive committee. | |
| 44:4 - 44:9 | **Kelly, Patrick 05-10-2019 (00:00:16)** | **PK03.10** |
| | 44:4  Q. So going back to Exhibit 2. | |
| | 44:5 You -- Ms. Ducca says that "per your | |
| | 44:6 request, attached is a chronology of | |
| | 44:7 interactions with the DEA." | |
| | 44:8 Do you see that? | |
| | 44:9  A. I do. | |
| 44:10 - 44:16 | **Kelly, Patrick 05-10-2019 (00:00:16)** | **PK03.162** |
| | 44:10  Q. You requested that she put | |
| | 44:11 together a chronology of HDA/DEA | |

| Page/Line | Source | ID |
|---|---|---|

44:12 interactions in 2016?
44:13  A. I don't know that I
44:14 requested that she put it together.  I
44:15 know that she had been basically
44:16 compiling the interactions.

**44:17 - 44:24**  **Kelly, Patrick 05-10-2019 (00:00:08)**  PK03.11

44:17  Q. Okay.  So she had been
44:18 compiling them contemporaneously with as
44:19 they occurred?
44:20  A. Right.
44:21  Q. And then you asked her at
44:22 this point for a copy of what she had
44:23 prepared?
44:24  A. Yes.

**45:1 - 45:7**  **Kelly, Patrick 05-10-2019 (00:00:13)**  PK03.163

45:1  Q. The -- what follows after
45:2 the cover e-mail, this chronology, this
45:3 is accurate to the best of your
45:4 knowledge?
45:5  A. To the best of my knowledge,
45:6 yes.  Some of it does take place before I
45:7 joined the organization.

**45:8 - 45:10**  **Kelly, Patrick 05-10-2019 (00:00:02)**  PK03.12

45:8  Q. But you're familiar with
45:9 these events?
45:10  A. I am.

**45:16 - 45:24**  **Kelly, Patrick 05-10-2019 (00:00:12)**  PK03.13

45:16  Q. Okay.  We're going to be
45:17 talking about several of these, starting,
45:18 as I talked about with Topic 4, the
45:19 industry compliance guidelines.  You're
45:20 familiar with those?
45:21  A. I am.
45:22  Q. And you're familiar with the
45:23 history of those?
45:24  A. Yes.

**49:22 - 50:1**  **Kelly, Patrick 05-10-2019 (00:00:04)**  PK03.14

49:22  Q. Okay.  And you believe this
49:23 chronology is true and correct?
49:24  A. To the best of my knowledge,

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

50:1 yes.

| 50:2 - 50:3 | **Kelly, Patrick 05-10-2019 (00:00:02)** | **PK03.15** |

50:2   Q. I'm handing you what's been
50:3 marked as Exhibit 3.

| 50:8 - 50:13 | **Kelly, Patrick 05-10-2019 (00:00:21)** | **PK03.16** |

50:8   Q. It's an e-mail from Pam
50:9 Ritter at the HDA dated Wednesday, May
50:10 30th, 2007, to a whole host members of
50:11 the pharmaceutical industry.  It's
50:12 Bates-labeled HSI_MDL_00620224 through
50:13 228.

| 50:17 - 50:18 | **Kelly, Patrick 05-10-2019 (00:00:02)** | **PK03.164** |

50:17   Q. Take a moment to review that
50:18 and let me know when you're ready.

| 50:19 - 51:10 | **Kelly, Patrick 05-10-2019 (00:00:23)** | **PK03.175** |

50:19 Do you know who Pam Ritter
50:20 is?
50:21   A. Yes.
50:22   Q. Who is Pam Ritter?
50:23   A. Pam Ritter was the
50:24 administrative assistant for the
51:1 department -- the government affairs
51:2 department at HDA.
51:3   Q. Okay.  What's the government
51:4 affairs department?
51:5   A. The government affairs
51:6 department is the department that I run
51:7 within the organization.  It is the
51:8 department that houses our regulatory
51:9 affairs, federal government affairs, and
51:10 state government affairs teams.

| 50:22 - 51:10 | **Kelly, Patrick 05-10-2019 (00:00:19)** | **PK03.17** |

50:22   Q. Who is Pam Ritter?
50:23   A. Pam Ritter was the
50:24 administrative assistant for the
51:1 department -- the government affairs
51:2 department at HDA.
51:3   Q. Okay.  What's the government
51:4 affairs department?
51:5   A. The government affairs

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

51:6 department is the department that I run
51:7 within the organization.  It is the
51:8 department that houses our regulatory
51:9 affairs, federal government affairs, and
51:10 state government affairs teams.

51:18 - 51:24     **Kelly, Patrick 05-10-2019 (00:00:06)**     PK03.18

51:18   Q. you're
51:19 obviously are familiar with something
51:20 called the regulatory affairs committee?
51:21   A. I am, yes.
51:22   Q. That's a committee that's
51:23 within your purview?
51:24   A. Yes, it is.

52:4 - 52:13     **Kelly, Patrick 05-10-2019 (00:00:12)**     PK03.19

52:4   Q. But that -- at all
52:5 times, that includes AmerisourceBergen,
52:6 McKesson and Cardinal Health, correct?
52:7   A. If they are able to
52:8 participate, yes.
52:9   Q. Okay.  But they're standing
52:10 members of that committee?
52:11   A. They -- yeah, as are the
52:12 rest of the members of the association,
52:13 yes.

53:7 - 54:2     **Kelly, Patrick 05-10-2019 (00:00:52)**     PK03.20

53:7   Q. Okay.  And it says the
53:8 purpose of the call is -- I'm going to
53:9 quote here, it says, "At the May 17th --
53:10 which is 2007.  "At the May 17th
53:11 executive committee, there was a
53:12 discussion about recent DEA activities to
53:13 involve wholesale distributors in efforts
53:14 to prevent diversion."
53:15 Do you see that?
53:16   A. I do.
53:17   Q. Did I read that correctly?
53:18   A. Yes.
53:19   Q. Okay.  And as a result of
53:20 what HDA is calling recent DEA activities
53:21 to involve wholesale distributors in

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

53:22 efforts to prevent diversion, the
53:23 executive committee requested that HDA
53:24 become involved and come up with some
54:1 strategies to interact with DEA, correct?
54:2  A. Yes.

| Page/Line | Source | ID |
|---|---|---|
| 66:13 - 66:18 | **Kelly, Patrick 05-10-2019 (00:00:16)** | PK03.165 |

66:13  Q. I'm handing you what's
66:14 marked as Exhibit 5.  It is a single-page
66:15 e-mail.  It's Bates-labeled
66:16 HDA_MDL_000213427.  Take a minute to
66:17 review it and let me know when you're
66:18 ready.

| Page/Line | Source | ID |
|---|---|---|
| 66:19 - 66:19 | **Kelly, Patrick 05-10-2019 (00:00:01)** | PK03.176 |

66:19  A. Okay.

| Page/Line | Source | ID |
|---|---|---|
| 66:20 - 68:1 | **Kelly, Patrick 05-10-2019 (00:00:56)** | PK03.21 |

66:20  Q. There's two e-mails in here,
66:21 only really one of substance.  The
66:22 substantive e-mail is from John Gray
66:23 to -- is it Paul Julian dated Tuesday,
66:24 October 30th, 2007, and then John Gray
67:1 forwards that to Scott Melville.
67:2 Do you see that?
67:3  A. I do.
67:4  Q. And the subject is HDMA
67:5 board meeting.
67:6 Do you see that?
67:7  A. Yes.
67:8  Q. Okay.  Who's John Gray?
67:9  A. John Gray is the president
67:10 and CEO of HDA.
67:11  Q. To your knowledge, how long
67:12 has he been in that role?
67:13  A. Since 2004 I believe, maybe
67:14 '3.
67:15  Q. So at this time, he was
67:16 president and CEO of HDA?
67:17  A. HDMA at the time, yes.
67:18  Q. Okay.  And do you know who
67:19 Paul Julian is?
67:20  A. Paul Julian was the board

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  |  |
|---|---|---|
|  | 67:21 member that was tasked to basically |  |
|  | 67:22 represent McKesson on the HDA Board of |  |
|  | 67:23 Directors. |  |
|  | 67:24   Q. Okay.  And then John Gray |  |
|  | 68:1 forwards this exchange to Scott Melville. |  |
| 68:7 - 70:5 | **Kelly, Patrick 05-10-2019 (00:01:08)** | PK03.22 |
|  | 68:7   Q. Who is he? |  |
|  | 68:8   A. Scott Melville was the |  |
|  | 68:9 former head of the government affairs |  |
|  | 68:10 department at HDA. |  |
|  | 68:11   Q. Is Scott Melville still |  |
|  | 68:12 there? |  |
|  | 68:13   A. He is not. |  |
|  | 68:14   Q. So did you take over his |  |
|  | 68:15 position? |  |
|  | 68:16   A. I did. |  |
|  | 68:17   Q. And Anita Ducca reported to |  |
|  | 68:18 him at this time? |  |
|  | 68:19   A. She did. |  |
|  | 68:20   Q. So John Gray writes to Paul. |  |
|  | 68:21 He says, among other things, if you are |  |
|  | 68:22 -- are you there? |  |
|  | 68:23   A. I am. |  |
|  | 68:24   Q. "The DEA issue concerning |  |
|  | 69:1 the recent surge in DEA enforcement |  |
|  | 69:2 around suspicious orders and methadone |  |
|  | 69:3 was moved to the top of the HDMA priority |  |
|  | 69:4 list." |  |
|  | 69:5 Do you see that? |  |
|  | 69:6   A. I do. |  |
|  | 69:7   Q. Do you agree that the DEA |  |
|  | 69:8 issue concerning what they call -- he |  |
|  | 69:9 calls a recent surge in enforcement |  |
|  | 69:10 around suspicious order was a top |  |
|  | 69:11 priority of the HDMA at the time? |  |
|  | 69:12   A. I do. |  |
|  | 69:13   Q. He says, "The board wants |  |
|  | 69:14 the association" -- that means the HDA, |  |
|  | 69:15 correct? |  |
|  | 69:16   A. Yes. |  |

| Page/Line | Source | ID |
|---|---|---|

PK03-Kelly, Patrick - Plaintiffs' Submission

69:17   Q. -- "to quickly develop a
69:18 plan to deal with and work with the DEA
69:19 as necessary."
69:20 Do you see that?
69:21   A. I do.
69:22   Q. So there was discussions to
69:23 develop a plan to deal with the DEA at
69:24 this time, correct?
70:1   A. Yes.
70:2   Q. In response to this recent
70:3 surge in enforcement around suspicious
70:4 orders, correct?
70:5   A. Yes.

**72:14 - 72:23**   **Kelly, Patrick 05-10-2019 (00:00:51)**   **PK03.23**

72:14   Q. I'm handing you what's been
72:15 marked as Exhibit 6.  Exhibit 6 is a
72:16 PowerPoint presentation Bates-labeled
72:17 HDA_MDL_000143030 through 043 or 143043.
72:18 According to the metadata,
72:19 which is attached on the first page of
72:20 this document, it was last modified
72:21 December 10th, 2007, and the file name
72:22 was slide for -- "Slides for Packaging
72:23 Call, 12/10/2007."

**73:7 - 73:9**   **Kelly, Patrick 05-10-2019 (00:00:05)**   **PK03.24**

73:7   Q. Are you familiar with the
73:8 format of these slides?  Is that the HDMA
73:9 logo on the bottom?

**73:12 - 73:21**   **Kelly, Patrick 05-10-2019 (00:00:16)**   **PK03.25**

73:12 THE WITNESS:  I -- I am --
73:13 yes, that is a common slide format
73:14 that we have used.
73:15 BY MR. PIFKO:
73:16   Q. And when you have these
73:17 conference calls, sometimes they have
73:18 webinars or you share the PowerPoint
73:19 presentations with people and you go
73:20 through them when you have a call?
73:21   A. Sometimes.

**74:14 - 75:18**   **Kelly, Patrick 05-10-2019 (00:00:44)**   **PK03.26**

| | PK03-Kelly, Patrick - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

74:14   Q. This was produced by HDMA,
74:15 do you have any reason to dispute the
74:16 authenticity of this document?
74:17   A. I do not.
74:18   Q. The first slide here says,
74:19 "Tomorrow's Outcome?"
74:20 Do you see that?
74:21   A. Yes.
74:22   Q. "What are the impacts on our
74:23 members?"
74:24 Do you see that?
75:1   A. I do.
75:2   Q. "Can we identify common
75:3 themes and problems?"
75:4 Do you see that?
75:5   A. I do.
75:6   Q. And then it says, "Should
75:7 we," and it's got some bullet points.
75:8 Do you see that?
75:9   A. Yes.
75:10   Q. One of them is, "Challenge
75:11 the DEA."
75:12 Do you see that?
75:13   A. Yes.
75:14   Q. At this time in late 2007 in
75:15 response to this surge in enforcement
75:16 activity, one of the strategies HDMA and
75:17 its members were considering was to
75:18 challenge the DEA, correct?

| 75:21 - 77:3 | **Kelly, Patrick 05-10-2019 (00:00:45)** | PK03.27 |

75:21 THE WITNESS:  Yes.
75:22 BY MR. PIFKO:
75:23   Q. It says on the next page,
75:24 "DEA will be here to describe their
76:1 expectations."
76:2 Do you see that?
76:3   A. I do.
76:4   Q. And it -- it gives some
76:5 examples of what HDA understands their
76:6 expectations to be at this time.

**PK03-Kelly, Patrick - Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

76:7 Do you see that?

76:8   A. Yes.

76:9   Q. "Know your customer better,"

76:10 correct?

76:11   A. That's what it says.

76:12   Q. "Have processes/controls in

76:13 place to detect suspicious orders,"

76:14 correct?

76:15   A. Yes.

76:16   Q. "Stop 'suspicious' order

76:17 sales" -- underlined -- "before

76:18 shipment."

76:19 Do you see that?

76:20   A. Yes.

76:21   Q. That's correct?

76:22   A. Yes.

76:23   Q. "Less interested in reports

76:24 after shipment."

77:1 Do you see that?

77:2   A. Yes.  That's what it says,

77:3 yes.

**77:4 - 77:18**   **Kelly, Patrick 05-10-2019 (00:00:33)**   **PK03.177**

77:4   Q. Turn to the third page of

77:5 the document, of the -- the slides.  So

77:6 it's technically the fourth page of the

77:7 document.  "Suspicious orders - policy

77:8 questions" is the heading of the slide.

77:9 Do you see that?

77:10   A. I do.

77:11   Q. Halfway down the slide it

77:12 says, "Should we support DEA's efforts?"

77:13 Do you see that?

77:14   A. Yes.

77:15   Q. So there are some questions

77:16 about whether HDMA and its members were

77:17 going to support DEA's efforts, correct?

77:18   A. Yes.

**78:1 - 78:20**   **Kelly, Patrick 05-10-2019 (00:00:32)**   **PK03.28**

78:1   Q. One of the bullet points is,

78:2 "Develop business practices," which is --

| Page/Line | Source | ID |
|---|---|---|
| | PK03-Kelly, Patrick - Plaintiffs' Submission | |

78:3 business practices is in quote.

78:4 Do you see that?

78:5   A. I do.

78:6   Q. Do you now understand what

78:7 that refers to?

78:8   A. I -- I think what it led to,

78:9 yes.

78:10   Q. The industry compliance

78:11 guidelines, correct?

78:12   A. Yes.

78:13   Q. And then it says,

78:14 "Alternatively do we want to challenge

78:15 DEA's expectations?"

78:16 Do you see that?

78:17   A. Yes.

78:18   Q. And that was something else

78:19 HDMA and its members were considering at

78:20 this time, correct?

| 78:22 - 79:13 | **Kelly, Patrick 05-10-2019 (00:00:18)** | **PK03.29** |

78:22 THE WITNESS:  Again, I think

78:23 there was a variety of

78:24 considerations going on at the

79:1 time, yes.

79:2 BY MR. PIFKO:

79:3   Q. But this was one of them,

79:4 correct?

79:5   A. According to this, yes.

79:6   Q. Again, it says, "What are

79:7 our legal options?"

79:8 Do you see that?

79:9   A. I do.

79:10   Q. So there were some

79:11 evaluations of what legal strategies can

79:12 be employed to challenge the DEA's

79:13 expectations?

| 79:16 - 79:18 | **Kelly, Patrick 05-10-2019 (00:00:03)** | **PK03.30** |

79:16 THE WITNESS:  Again, I think

79:17 those considerations were being

79:18 discussed.

| 82:2 - 82:10 | **Kelly, Patrick 05-10-2019 (00:00:39)** | **PK03.31** |

**PK03-Kelly, Patrick - Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|
| | 82:2   Q. I'm handing you a single | |
| | 82:3 page e-mail from Ms. Ducca marked as | |
| | 82:4 Exhibit 8.  It's Bates-labeled | |
| | 82:5 CAH_MDL2804_012489160. | |
| | 82:6 It's from Ms. Ducca dated | |
| | 82:7 October 28, 2011, to Cardinal Health's | |
| | 82:8 Robert Giacalone. | |
| | 82:9   A. Giacalone. | |
| | 82:10   Q. Giacalone. | |
| 82:15 - 83:7 | **Kelly, Patrick 05-10-2019 (00:00:32)** | PK03.32 |
| | 82:15   Q. So in it, Ms. Ducca is | |
| | 82:16 explaining the history of some of the | |
| | 82:17 negotiations and discussions regarding | |
| | 82:18 the industry compliance guidelines, | |
| | 82:19 correct? | |
| | 82:20   A. Yes. | |
| | 82:21   Q. Okay.  And you could see | |
| | 82:22 from the e-mail there are several | |
| | 82:23 attachments, if you look on the header. | |
| | 82:24   A. I see that. | |
| | 83:1   Q. Okay.  And then she says, | |
| | 83:2 there's there -- there were three | |
| | 83:3 meetings with DEA on the ICG guidelines, | |
| | 83:4 one, April 15, 2008, one June 4, 2008, | |
| | 83:5 one in September 2008. | |
| | 83:6 Do you see that? | |
| | 83:7   A. I do. | |
| 84:15 - 84:21 | **Kelly, Patrick 05-10-2019 (00:00:11)** | PK03.34 |
| | 84:15   Q. And then she says, "Also | |
| | 84:16 included is a summary of a meeting HDMA | |
| | 84:17 had with DEA in September of '07 just to | |
| | 84:18 ask them what was going on with their | |
| | 84:19 meetings with distributors." | |
| | 84:20 Do you see that? | |
| | 84:21   A. I do. | |
| 85:2 - 85:8 | **Kelly, Patrick 05-10-2019 (00:00:30)** | PK03.35 |
| | 85:2   Q. I'm going to hand you some | |
| | 85:3 of the attachments, starting with her | |
| | 85:4 summary of the September 7th, 2007, | |
| | 85:5 meeting with DEA.  Exhibit 9. | |

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 85:6 This is a two-page document, | |
| | 85:7 Exhibit 9, Bates-labeled | |
| | 85:8 CAH_MDL2804_02489199 through 200. | |
| 85:12 - 85:20 | **Kelly, Patrick 05-10-2019 (00:00:18)** | PK03.36 |
| | 85:12   Q. This was the meeting that | |
| | 85:13 was held in response to the request that | |
| | 85:14 HDA made on July 25th, 2007, correct? | |
| | 85:15 This is a summary of that meeting, | |
| | 85:16 correct? | |
| | 85:17   A. I believe so, yes. | |
| | 85:18   Q. Which is referred to in | |
| | 85:19 Exhibit 7, right?  That's the letter. | |
| | 85:20   A. Yes. | |
| 86:5 - 86:13 | **Kelly, Patrick 05-10-2019 (00:00:19)** | PK03.37 |
| | 86:5   Q. So this meeting included, | |
| | 86:6 from HDMA, Scott Melville, Anita Ducca, | |
| | 86:7 and David Durkin, who's outside counsel | |
| | 86:8 for HDA, correct? | |
| | 86:9   A. Correct. | |
| | 86:10   Q. And DEA attendees included | |
| | 86:11 Mark Caverly, Cathy Gallagher, Mike | |
| | 86:12 Mapes, and Lisa Sullivan, correct? | |
| | 86:13   A. Correct. | |
| 86:22 - 87:6 | **Kelly, Patrick 05-10-2019 (00:00:21)** | PK03.38 |
| | 86:22   Q. In her summary section on | |
| | 86:23 the first page -- so one of the things | |
| | 86:24 that HDA requested in the July 25th, | |
| | 87:1 2007, letter, Exhibit 7, was to | |
| | 87:2 understand the -- what we called the | |
| | 87:3 distributor initiative.  And there is | |
| | 87:4 some discussion here that Mike Mapes | |
| | 87:5 provided about that. | |
| | 87:6 Do you see that? | |
| 87:9 - 91:15 | **Kelly, Patrick 05-10-2019 (00:02:58)** | PK03.39 |
| | 87:9 THE WITNESS:  Yes. | |
| | 87:10 BY MR. PIFKO: | |
| | 87:11   Q. Okay.  So the summary that | |
| | 87:12 Ms. Ducca prepared says that, "Mr. Mapes | |
| | 87:13 noted that DEA had met with approximately | |
| | 87:14 15 to 20 wholesale distributors one on | |

| Page/Line | Source | ID |
|---|---|---|

PK03-Kelly, Patrick - Plaintiffs' Submission

87:15 one.  They had prioritized who to meet
87:16 with on a combination of wholesale
87:17 distributor sales volume and tracing back
87:18 to where they felt the source of products
87:19 for illicit internet pharmacies were
87:20 located."
87:21 Do you see that?
87:22   A. I do.
87:23   Q. Do you have any reason to
87:24 dispute that that's what DEA told HDMA
88:1 during this meeting?
88:2   A. I do not.
88:3   Q. Then she says, key takeaways
88:4 from the meetings are -- from the meeting
88:5 were, first bullet point, "DEA's policy
88:6 was to expect more than just reporting
88:7 suspicious orders."
88:8 Do you see that?
88:9   A. I do.
88:10   Q. Second bullet point, "Simply
88:11 complying with the 'suspicious orders'
88:12 regulatory requirement does not mean, in
88:13 the agency's view, that the registrant is
88:14 making" -- "maintaining an effective
88:15 program to detect and prevention
88:16 diversion."
88:17 Do you see that?
88:18   A. I do.
88:19   Q. Did I read that correctly?
88:20   A. You did.
88:21   Q. Third bullet point, "DEA
88:22 indicated that they did not have the
88:23 resources to inspect every pharmacy;
88:24 therefore, it was important for the
89:1 distributor to 'know their customers.'"
89:2 Do you see that?
89:3   A. I do.
89:4   Q. Do you have an -- any reason
89:5 to dispute that these were key takeaways
89:6 from the meeting?

| Page/Line | Source | ID |
|---|---|---|

89:7   A. I do not.

89:8   Q. Then she has under her

89:9 heading additional points DEA made

89:10 included.

89:11 Do you see that?

89:12   A. Yes.

89:13   Q. The second one says, "DEA

89:14 provided examples of what a

89:15 distributor" -- "a wholesale distributor

89:16 should do to 'know their customers' and

89:17 what to look for."

89:18 Do you see that?

89:19   A. I do.

89:20   Q. Do you have any reason to

89:21 dispute that DEA during this meeting

89:22 provided examples of what distributors

89:23 should do to know their customers?

89:24   A. I do not.

90:1   Q. Going to the second page,

90:2 second-to-last bullet point at the top of

90:3 that page, "DEA also indicated that they

90:4 were not going to make a decision for the

90:5 wholesale distributor as to when an order

90:6 was suspicious."

90:7 Do you see that?

90:8   A. I do.

90:9   Q. "They feel this is up to the

90:10 distributor."

90:11 Do you see that?

90:12   A. I do.

90:13   Q. Do you have any reason to

90:14 dispute that this is what DEA told HDMA

90:15 during this meeting?

90:16   A. I do not.

90:17   Q. Last bullet point.  "DEA

90:18 suggested that distributors should check

90:19 on the pharmacies' prescribing

90:20 physicians.  They pointed to some states

90:21 having online systems by which a

90:22 distributor could check to see if a

| | PK03-Kelly, Patrick - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

90:23 prescribing physician had a valid DEA
90:24 registration.  DEA suggested that
91:1 distributors ask who the doctors are that
91:2 are prescribing, where the pharmacy is
91:3 geographically with respect to its
91:4 prescribing doctors, and the patient
91:5 population."
91:6 Do you see that?
91:7   A. I do.
91:8   Q. Any reason to dispute that
91:9 that's something that DEA told HDMA
91:10 during this meeting?
91:11   A. I do not.
91:12   Q. And per the normal practice,
91:13 HDMA would have communicated this
91:14 information back to its members after the
91:15 meeting occurred, correct?

| 91:18 - 91:18 | **Kelly, Patrick 05-10-2019 (00:00:01)** | **PK03.40** |

91:18 THE WITNESS:  Correct.

| 91:23 - 91:24 | **Kelly, Patrick 05-10-2019 (00:00:03)** | **PK03.166** |

91:23   Q. I'm handing you what's
91:24 marked as Exhibit 10.  For the record,

| 92:1 - 92:2 | **Kelly, Patrick 05-10-2019 (00:00:19)** | **PK03.178** |

92:1 it's a multiple-page document
92:2 Bates-labeled HDA_MDL_000151104 through

| 92:3 - 92:5 | **Kelly, Patrick 05-10-2019 (00:00:03)** | **PK03.179** |

92:3 151118.  Take a minute to review
92:4 Exhibit 10 and let me know when you're
92:5 ready.

| 92:17 - 93:6 | **Kelly, Patrick 05-10-2019 (00:00:29)** | **PK03.41** |

92:17   Q. So as we discussed when we
92:18 looked at Exhibit 3, in response to what
92:19 HDMA told its members was a recent DEA
92:20 activities to involve wholesale
92:21 distributors in efforts to prevent
92:22 diversion, HDMA and its members were
92:23 discussing putting together some best
92:24 practices or guidelines concerning
93:1 suspicious orders, correct?
93:2   A. Correct.

| Page/Line | Source | ID |
|---|---|---|

**PK03-Kelly, Patrick - Plaintiffs' Submission**

93:3   Q. And ultimately HDMA and its
93:4 members decided to move forward with that
93:5 project, correct?
93:6   A. Correct.

| 108:20 - 109:1 | **Kelly, Patrick 05-10-2019 (00:00:27)** | PK03.42 |

108:20   Q. I'm handing you what's
108:21 marked as Exhibit 11.  For the record,
108:22 it's a document, a few pages long, with
108:23 the heading "NWDA Suspicious Order
108:24 Monitoring System."  It's Bates-labeled
109:1 CAH_MDL2804_02201910 through 1916.

| 109:11 - 109:16 | **Kelly, Patrick 05-10-2019 (00:00:12)** | PK03.43 |

109:11 So as we know from the other
109:12 e-mails and discussion on this best
109:13 practices guidelines issue, the HDA's
109:14 predecessor had some sort of other
109:15 suspicious order monitoring guidelines,
109:16 correct?

| 109:23 - 110:1 | **Kelly, Patrick 05-10-2019 (00:00:03)** | PK03.44 |

109:23 THE WITNESS:  Again, I've
109:24 not seen this before.  But I will
110:1 take you at your word, yes.

| 110:15 - 110:22 | **Kelly, Patrick 05-10-2019 (00:00:14)** | PK03.45 |

110:15   Q. My question is, you agree
110:16 there were previous guidelines.  She
110:17 makes reference to it in the scope of
110:18 work here, correct?
110:19   A. She did make -- I agree she
110:20 did make a reference to it.  And this is
110:21 an example of those guidelines, I
110:22 imagine.  Yes.

| 110:23 - 110:24 | **Kelly, Patrick 05-10-2019 (00:00:02)** | PK03.167 |

110:23   Q. To your knowledge, these are
110:24 dated around the '80s?

| 111:3 - 111:17 | **Kelly, Patrick 05-10-2019 (00:00:30)** | PK03.180 |

111:3 THE WITNESS:  I have -- I
111:4 have no idea when these are dated.
111:5 BY MR. PIFKO:
111:6   Q. Okay.  Did you discuss
111:7 these, or any prior HDA or its

| | | |
|---|---|---|
| **PK03-Kelly, Patrick - Plaintiffs' Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

111:8 predecessor entity guidelines in
111:9 preparing for depositions with anybody?
111:10   A. I have not seen this
111:11 document before.
111:12   Q. Did you undertake any effort
111:13 to familiarize yourself with HDA's prior
111:14 suspicious order guidelines in connection
111:15 with preparing for this deposition?
111:16   A. Other than the ICGs, no,
111:17 nothing.

**111:18 - 112:3    Kelly, Patrick 05-10-2019 (00:00:17)**    PK03.46
111:18   Q. NWDA is a predecessor name
111:19 for HDA correct?
111:20   A. That's correct.
111:21   Q. National Wholesale
111:22 Druggists' Association, correct?
111:23   A. Correct.
111:24   Q. Okay.  Do you have any
112:1 reason to dispute that these are
112:2 guidelines put out on suspicious order
112:3 monitoring, put out by the NWDA?

**112:6 - 112:7    Kelly, Patrick 05-10-2019 (00:00:02)**    PK03.47
112:6 THE WITNESS:  I have no
112:7 reason to dispute that.

**114:14 - 115:12    Kelly, Patrick 05-10-2019 (00:00:45)**    PK03.48
114:14   Q. Are you aware that your
114:15 website currently states that the NWA was
114:16 renamed the Healthcare Distribution
114:17 Management Association in 2001?
114:18   A. I am.
114:19   Q. Okay.  So if these are from
114:20 the NWDA, they would have to be prior to
114:21 that date for sure, correct?
114:22   A. Yes.
114:23   Q. It's got a Section 2,
114:24 "Definition Of Suspicious Orders."  It
115:1 says, "Suspicious orders include orders
115:2 of unusual size, orders deviating
115:3 substantially from a normal pattern, and
115:4 orders of unusual frequency."

| | | |
|---|---|---|
| **PK03-Kelly, Patrick - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

115:5 Do you see that?
115:6  A. Yes.
115:7  Q. Is that consistent with what
115:8 your understanding of what is stated in
115:9 the regulations about the definition of
115:10 suspicious order?
115:11   A. That is all that is stated
115:12 in -- in the regulations, yes.

**115:23 - 116:3**   **Kelly, Patrick 05-10-2019 (00:00:06)**   **PK03.49**
115:23   Q. It says, "Single orders of
115:24 unusual size or deviation must be
116:1 reported immediately."
116:2 Do you see that?
116:3  A. I do.

**116:15 - 117:6**   **Kelly, Patrick 05-10-2019 (00:00:24)**   **PK03.50**
116:15   Q. Okay.  Then it says here,
116:16 "The submission of a monthly printout of
116:17 after-the-fact sales will not relieve a
116:18 registrant from the responsibility of
116:19 reporting these single excessive or
116:20 suspicious orders."
116:21 Did I read that correctly?
116:22   A. You did.
116:23   Q. Then it says, "DEA has
116:24 interpreted 'orders'" -- the word orders
117:1 is in quotes -- "to mean prior to
117:2 shipment."
117:3 Do you see that?
117:4   A. I do.
117:5   Q. Did I read that correctly?
117:6   A. You did.

**117:7 - 117:9**   **Kelly, Patrick 05-10-2019 (00:00:08)**   **PK03.168**
117:7   Q. So do you understand this to
117:8 be saying that an order has to be
117:9 identified before shipping it?

**117:13 - 117:23**   **Kelly, Patrick 05-10-2019 (00:00:17)**   **PK03.193**
117:13 THE WITNESS:  Again, I see
117:14 what it says here on paper.  But
117:15 again I'm not an attorney.  I'm
117:16 not exactly sure what the practice

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 117:17 would require. | |
|  | 117:18 BY MR. PIFKO: | |
|  | 117:19   Q. Okay.  All I'm asking you is | |
|  | 117:20 what you understand this document to be | |
|  | 117:21 saying.  You understand it to be saying | |
|  | 117:22 that an order needs to be identified and | |
|  | 117:23 reported prior to shipment. | |
| 118:3 - 118:9 | **Kelly, Patrick 05-10-2019 (00:00:05)** | **PK03.192** |
|  | 118:3 THE WITNESS:  I -- I can | |
|  | 118:4 read what -- what the document | |
|  | 118:5 says, yes. | |
|  | 118:6 BY MR. PIFKO: | |
|  | 118:7   Q. Is that -- is that what your | |
|  | 118:8 understanding of the document is?  That's | |
|  | 118:9 all I'm asking. | |
| 118:15 - 119:1 | **Kelly, Patrick 05-10-2019 (00:00:11)** | **PK03.191** |
|  | 118:15 THE WITNESS:  Again, the | |
|  | 118:16 document says what it says and I | |
|  | 118:17 can read what it says. | |
|  | 118:18 BY MR. PIFKO: | |
|  | 118:19   Q. Okay.  But you have English | |
|  | 118:20 comprehension.  You understand when you | |
|  | 118:21 read something, right? | |
|  | 118:22   A. I -- I do have English | |
|  | 118:23 comprehension. | |
|  | 118:24   Q. Okay.  So all I'm asking you | |
|  | 119:1 is what you understand this to be saying. | |
| 119:4 - 119:7 | **Kelly, Patrick 05-10-2019 (00:00:04)** | **PK03.190** |
|  | 119:4 THE WITNESS:  I understand | |
|  | 119:5 it says, verbatim, DEA has | |
|  | 119:6 interpreted orders to mean prior | |
|  | 119:7 to shipment. | |
| 119:9 - 119:13 | **Kelly, Patrick 05-10-2019 (00:00:09)** | **PK03.51** |
|  | 119:9   Q. Okay.  And so do you | |
|  | 119:10 understand that to mean in the context of | |
|  | 119:11 this other language in the paragraph | |
|  | 119:12 here, that that means an order has to be | |
|  | 119:13 reported prior to being shipped? | |
| 119:17 - 119:19 | **Kelly, Patrick 05-10-2019 (00:00:03)** | **PK03.52** |
|  | 119:17 THE WITNESS:  Again, that's | |

| Page/Line | Source | ID |
|---|---|---|

**PK03-Kelly, Patrick - Plaintiffs' Submission**

119:18 what it says.  That's what I would
119:19 understand it to mean.

**186:8 - 186:11**   **Kelly, Patrick 05-10-2019 (00:00:32)**   **PK03.53**

186:8   Q. I'm handing you what's
186:9 marked as Exhibit 19.  This is another
186:10 e-mail from Ms. Ducca Bates-labeled
186:11 HDA_MDL_000148603 to 148633.

**190:11 - 191:2**   **Kelly, Patrick 05-10-2019 (00:00:31)**   **PK03.54**

190:11   Q. Okay.  And so one of the
190:12 things in the first paragraph, it says,
190:13 is that, at the bottom of that first full
190:14 paragraph, it's talking about these
190:15 guidelines.  It says, "They have been
190:16 prepared in recognition of the growing
190:17 problem of misuse of controlled
190:18 substances and the key role distributors
190:19 play within the prescription drug supply
190:20 chain."
190:21 Did I read that correctly?
190:22   A. You did.
190:23   Q. Okay.  And so is that
190:24 consistent with what your understanding
191:1 of the background of how these were
191:2 prepared?

**191:5 - 191:11**   **Kelly, Patrick 05-10-2019 (00:00:12)**   **PK03.55**

191:5 THE WITNESS:  Yes, that's
191:6 what I understand it to be.
191:7 BY MR. PIFKO:
191:8   Q. And HDMA and its members
191:9 recognized that there was a growing
191:10 problem of misuse of controlled
191:11 substances at this time?

**191:14 - 191:15**   **Kelly, Patrick 05-10-2019 (00:00:02)**   **PK03.56**

191:14 THE WITNESS:  That's what we
191:15 stated here in this introduction.

**192:1 - 192:16**   **Kelly, Patrick 05-10-2019 (00:00:28)**   **PK03.57**

192:1   Q. And then in the next
192:2 paragraph it says, "While drug wholesale
192:3 distributors, like all nongovernmental
192:4 entities, do not have investigative

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

192:5 powers and resources to guarantee that
192:6 certain products will not reach illicit
192:7 or illegal markets, they are uniquely
192:8 situated to perform due diligence in
192:9 order to help support the security of the
192:10 controlled substances distribution
192:11 system."
192:12 Did I read that correctly?
192:13   A. You did.
192:14   Q. That was another thing that
192:15 HDA and its members recognized at this
192:16 time, correct?

**192:19 - 193:18**  **Kelly, Patrick 05-10-2019 (00:00:41)**  **PK03.58**

192:19 THE WITNESS:  And included
192:20 it in this introduction, yes.
192:21 BY MR. PIFKO:
192:22   Q. It then says, "Rigorous" --
192:23 in the next paragraph, "Rigorous due
192:24 diligence can aid in providing a greater
193:1 level of assurance that those who
193:2 purchase controlled substances from
193:3 wholesale distributors intend them to be
193:4 used for legitimate and legally
193:5 acceptable patient needs."
193:6 Did I read that correctly?
193:7   A. You did.
193:8   Q. "In other words, with such
193:9 due diligence, it is possible to reduce
193:10 the probability that controlled
193:11 substances will reach locations within
193:12 the supply chain for which they are not
193:13 intended."
193:14 Did I read that correctly?
193:15   A. You did.
193:16   Q. And so HDMA and its members
193:17 recognized this to be true at this time
193:18 as well, correct?

**193:21 - 193:23**  **Kelly, Patrick 05-10-2019 (00:00:02)**  **PK03.59**

193:21 THE WITNESS:  It's what's
193:22 stipulated here in this

| | PK03-Kelly, Patrick - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 193:23 introduction, yes. | |
| 215:9 - 215:19 | **Kelly, Patrick 05-10-2019 (00:00:52)** | **PK03.60** |
| | 215:9   Q. I'm handing you what's | |
| | 215:10 marked as Exhibit 22.  It's an e-mail | |
| | 215:11 from HDA's Kristen Freitas dated | |
| | 215:12 Thursday, March 20, 2008.  Due to some | |
| | 215:13 sort of way the document was produced, | |
| | 215:14 there's a lot of gibberish and blank | |
| | 215:15 pages, but the substance can be distilled | |
| | 215:16 down to four pages. | |
| | 215:17 But for the record, it's | |
| | 215:18 Bates-labeled ANDA_OPIOIDS_MDL_0000157358 | |
| | 215:19 to 157473. | |
| 216:5 - 217:8 | **Kelly, Patrick 05-10-2019 (00:00:40)** | **PK03.61** |
| | 216:5   Q. So my first question is, who | |
| | 216:6 is Kristen Freitas? | |
| | 216:7   A. Kristen Freitas is currently | |
| | 216:8 now the vice president of federal | |
| | 216:9 government affairs for HDA, then HDMA. | |
| | 216:10 She was then probably a manager or a | |
| | 216:11 director. | |
| | 216:12   Q. It says here on her | |
| | 216:13 signature on the second page, associate | |
| | 216:14 director. | |
| | 216:15   A. Associate director. | |
| | 216:16   Q. What's federal government | |
| | 216:17 affairs do? | |
| | 216:18   A. Federal government affairs | |
| | 216:19 is tasked primarily with the interface | |
| | 216:20 with Congress.  The HDA segment of the | |
| | 216:21 government affairs department that deals | |
| | 216:22 directly with Congress, anything that | |
| | 216:23 happens on the Hill. | |
| | 216:24   Q. Is that a -- something | |
| | 217:1 that's under your purview in your current | |
| | 217:2 position? | |
| | 217:3   A. It is. | |
| | 217:4   Q. Okay.  So Kristen Freitas | |
| | 217:5 reports to you? | |
| | 217:6   A. Up through me, yes.  I'm the | |

| Page/Line | Source | ID |
|---|---|---|
| | 217:7 head of the department.  She reports | |
| | 217:8 directly to our general counsel. | |
| 217:22 - 218:5 | **Kelly, Patrick 05-10-2019 (00:00:17)** | PK03.62 |
| | 217:22  Q. This is a furtherance of the | |
| | 217:23 overall strategy that we talked about | |
| | 217:24 that was starting to be implemented in | |
| | 218:1 Exhibit 3, which derives from the | |
| | 218:2 executive committee's concerns about | |
| | 218:3 recent DEA activities to involve | |
| | 218:4 wholesale distributors in efforts to | |
| | 218:5 prevent diversion.  Do you agree? | |
| 218:8 - 218:10 | **Kelly, Patrick 05-10-2019 (00:00:03)** | PK03.63 |
| | 218:8 THE WITNESS:  That should -- | |
| | 218:9 yes.  I would agree it is part of | |
| | 218:10 that process. | |
| 218:12 - 219:7 | **Kelly, Patrick 05-10-2019 (00:00:44)** | PK03.64 |
| | 218:12  Q. Okay.  So then she says | |
| | 218:13 here, "DEA - as we discussed on the | |
| | 218:14 federal government affairs committee call | |
| | 218:15 on Monday, HDMA staff have developed a | |
| | 218:16 confidential draft political strategy to | |
| | 218:17 address some of the issues related to DEA | |
| | 218:18 and suspicious orders.  As the document | |
| | 218:19 states, many of the tactics and messaging | |
| | 218:20 hinge on the outcome of the DEA meeting | |
| | 218:21 where we will" -- "we will present our | |
| | 218:22 recommended industry compliance | |
| | 218:23 guideline." | |
| | 218:24 Did I read that correctly? | |
| | 219:1  A. You did. | |
| | 219:2  Q. Okay.  So it was understood | |
| | 219:3 within HDA and its members that, | |
| | 219:4 depending on this meeting where the | |
| | 219:5 guidelines were shared with the DEA, that | |
| | 219:6 would shape how further strategies were | |
| | 219:7 implemented, agree? | |
| 219:10 - 219:11 | **Kelly, Patrick 05-10-2019 (00:00:01)** | PK03.65 |
| | 219:10 THE WITNESS:  I would agree, | |
| | 219:11 yes. | |
| 219:13 - 221:20 | **Kelly, Patrick 05-10-2019 (00:01:59)** | PK03.66 |

| Page/Line | Source | ID |
|---|---|---|

PK03-Kelly, Patrick - Plaintiffs' Submission

219:13   Q. So then we see, if you go to
219:14 157380, there's a discussion of various
219:15 tactics that are going to be part of "the
219:16 HDMA Hill DEA strategy."
219:17 Do you see that?
219:18   A. I do.
219:19   Q. Okay.  Tactic Number 1 is,
219:20 "Complete and present recommended
219:21 industry compliance guidelines to DEA
219:22 general counsel."
219:23 Do you see that?
219:24   A. Yes.
220:1   Q. Okay.  You agree that's the
220:2 first tactic mentioned here?
220:3   A. That is, yes.
220:4   Q. And then it says, "Status:
220:5 Request to be made the week of
220:6 March 17th."
220:7 Agree?
220:8   A. That's what it says, yes.
220:9   Q. And like we just saw in the
220:10 prior department, "The discussion and
220:11 outcome of this meeting will be critical
220:12 in driving all further tactics and
220:13 messaging."
220:14 Agree?
220:15   A. That's what it says, yes.
220:16   Q. Then it says, "Brief House
220:17 appropriation subcommittee members who
220:18 participated in the March 12th DEA budget
220:19 justification hearing.  Seek questions to
220:20 be asked for the record."
220:21 Do you see that?
220:22   A. Yes.
220:23   Q. Do you have an understanding
220:24 about what that was about?
221:1   A. Again, I think it had to do
221:2 with, and the timing of this would have
221:3 been -- if this is after the -- the
221:4 hearing.  This was on March 20th.

| PK03-Kelly, Patrick - Plaintiffs' Submission |
| --- |

| Page/Line | Source | ID |
| --- | --- | --- |

221:5 Again, I think it was
221:6 basically when FDA or DEA on an annual
221:7 basis goes before the appropriation
221:8 committee to discuss their budget, that
221:9 if there were concerns or questions about
221:10 their perspective on our guidelines or
221:11 their suspicious order monitoring
221:12 tactics, that we provide some feedback to
221:13 the appropriation members so they could
221:14 ask for further clarification from the
221:15 administrator while she was there
221:16 testifying.
221:17   Q. Okay.  And so you drafted,
221:18 on behalf of your members, potential
221:19 questions to be asked by members of
221:20 Congress to ask the DEA, correct?

**221:23 - 221:24**   **Kelly, Patrick 05-10-2019 (00:00:01)**     PK03.67

221:23 THE WITNESS:  That's what I
221:24 understand these to be, yes.

**222:5 - 223:4**   **Kelly, Patrick 05-10-2019 (00:00:43)**     PK03.68

222:5   Q. Tactic 3 is, "Brief
222:6 Senate appropriation subcommittee members
222:7 in advance of DEA budget justification
222:8 hearing.  Seek commitment to ask
222:9 questions of DEA administrator."
222:10 Do you see that?
222:11   A. Yes.
222:12   Q. Do you have an understanding
222:13 what that's about?
222:14   A. Again, similar to what was
222:15 done on the House side.  But again maybe
222:16 those questions were developed for the
222:17 Senate side, because it appears that this
222:18 e-mail was sent after the 3/12
222:19 appropriations committee.
222:20   Q. Okay.  So these questions
222:21 are for senators to ask the DEA?
222:22   A. I would deduce that
222:23 that's -- yes, that's the process.
222:24   Q. And that's a common tactic

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 223:1 that you use in the organization, is to | |
| | 223:2 draft questions for senators or members | |
| | 223:3 of Congress to ask DEA if you have | |
| | 223:4 concerns? | |
| 223:7 - 223:19 | **Kelly, Patrick 05-10-2019 (00:00:18)** | PK03.69 |
| | 223:7 THE WITNESS:  That is a | |
| | 223:8 common practice for a lot of | |
| | 223:9 associations that interact with | |
| | 223:10 regulatory authorities. | |
| | 223:11 BY MR. PIFKO: | |
| | 223:12   Q. Including HDA? | |
| | 223:13   A. In this instance including | |
| | 223:14 HDA. | |
| | 223:15   Q. And so when it says, "Brief | |
| | 223:16 senate appropriation subcommittees in | |
| | 223:17 advance of the hearing," there's also | |
| | 223:18 one-on-one meetings that occur with the | |
| | 223:19 senators in advance of the hearing? | |
| 223:22 - 224:7 | **Kelly, Patrick 05-10-2019 (00:00:12)** | PK03.70 |
| | 223:22 THE WITNESS:  I would | |
| | 223:23 imagine these are primarily | |
| | 223:24 meetings with staff, | |
| | 224:1 staff-to-staff meetings.  Seldom | |
| | 224:2 to the member representatives | |
| | 224:3 participate in those meetings.  So | |
| | 224:4 these are staff briefings. | |
| | 224:5 BY MR. PIFKO: | |
| | 224:6   Q. That's where the questions | |
| | 224:7 are provided? | |
| 224:10 - 225:3 | **Kelly, Patrick 05-10-2019 (00:00:27)** | PK03.71 |
| | 224:10 THE WITNESS:  Again, that's | |
| | 224:11 where I -- if they were provided, | |
| | 224:12 again, I don't know what was | |
| | 224:13 provided.  This was looking at a | |
| | 224:14 draft document of some kind.  I am | |
| | 224:15 not sure which specific questions | |
| | 224:16 were provided or if any of the | |
| | 224:17 questions were provided. | |
| | 224:18 BY MR. PIFKO: | |
| | 224:19   Q. Okay.  But in your ordinary | |

| Page/Line | Source | ID |
|---|---|---|
| | PK03-Kelly, Patrick - Plaintiffs' Submission | |

224:20 practice as part of your lobbying
224:21 efforts, that's how questions would be
224:22 provided, you would have your staff
224:23 members meet with lawmakers' staff
224:24 members and that's when you would discuss
225:1 your views and provide potential
225:2 questions?
225:3   A. Correct.

**225:8 - 225:19**  **Kelly, Patrick 05-10-2019 (00:00:25)**  PK03.72

225:8   Q. Go a few more tactics down.
225:9 Number 6, it says, "Educate and seek
225:10 advocates for HDMA among pain community
225:11 who will assist in delivering our message
225:12 to Hill."
225:13 Do you see that?
225:14   A. I do.
225:15   Q. So you were going to, as
225:16 part of this effort, you were going to
225:17 also enlist others in the pain community
225:18 to communicate your message to lawmakers;
225:19 that's correct?

**225:22 - 225:23**  **Kelly, Patrick 05-10-2019 (00:00:01)**  PK03.73

225:22 THE WITNESS:  That's what
225:23 this indicates.

**226:1 - 226:16**  **Kelly, Patrick 05-10-2019 (00:00:28)**  PK03.74

226:1   Q. And then it says, "Status,
226:2 HDMA joined and briefed the Pain Care
226:3 Forum, an informal coalition of
226:4 pharmaceutical companies and patient
226:5 advocacy groups focusing on pain
226:6 management issues and will follow up upon
226:7 release of our industry compliance
226:8 guidelines."
226:9 Did I read that correctly?
226:10   A. You did.
226:11   Q. Okay.  And so that confirms
226:12 HDMA did join the Pain Care Forum,
226:13 correct?
226:14   A. Yes.  In 2008.
226:15   Q. And you briefed them on

| Page/Line | Source | ID |
|---|---|---|

**PK03-Kelly, Patrick - Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|
| 226:19 - 227:3 | 226:16 these issues, correct?<br>**Kelly, Patrick 05-10-2019 (00:00:11)**<br>226:19 THE WITNESS:  Again, this<br>226:20 seems to indicate that we briefed<br>226:21 them that we were developing the<br>226:22 industry compliance guidelines<br>226:23 just to give them a heads-up.  And<br>226:24 we were indicating to this, we<br>227:1 would share our final document<br>227:2 when it was developed and<br>227:3 released. | PK03.75 |
| 227:24 - 228:19 | **Kelly, Patrick 05-10-2019 (00:00:36)**<br>227:24   Q. And then Number 8 says,<br>228:1 "Identify high-level congressional<br>228:2 'champion' who will request a meeting<br>228:3 with DEA to discuss concerns with current<br>228:4 tactics."<br>228:5 Do you see that?<br>228:6   A. I do.<br>228:7   Q. Do you have an understanding<br>228:8 about what that's about?<br>228:9   A. Again, what it says.  So<br>228:10 probably ask a member of Congress,<br>228:11 possibly a high-level senior ranking<br>228:12 official or a ranking member in their<br>228:13 party to request a meeting with DEA,<br>228:14 possibly a committee chairman of some<br>228:15 kind, a relevant committee.<br>228:16   Q. And so at this time HDMA and<br>228:17 its members were concerned with the<br>228:18 enforcement tactics being used by the<br>228:19 DEA, correct? | PK03.76 |
| 228:22 - 229:10 | **Kelly, Patrick 05-10-2019 (00:00:22)**<br>228:22 THE WITNESS:  I think -- I<br>228:23 think there was concern about the<br>228:24 lack of clarity and basically what<br>229:1 we were trying to basically convey<br>229:2 in some of the questions that were<br>229:3 put together.  So we were -- yeah,<br>229:4 we were seeking greater clarity | PK03.77 |

| | PK03-Kelly, Patrick - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

229:5 from the agency and it was not
229:6 forthcoming, and so we were
229:7 requesting that our congressional
229:8 colleagues possibly request a
229:9 meeting so we could convey those
229:10 concerns.

**229:11 - 229:14**    **Kelly, Patrick 05-10-2019 (00:00:03)**    PK03.181

229:11 BY MR. PIFKO:
229:12   Q. When I handed you this
229:13 document, you read it in its entirety,
229:14 correct?

**229:21 - 231:1**    **Kelly, Patrick 05-10-2019 (00:01:05)**    PK03.78

229:21   Q. You read the questions --
229:22 potential Hill questions for DEA, right?
229:23   A. I did, yes.
229:24   Q. Okay.  And so the thrust of
230:1 the questions, you know, goes at the end
230:2 here.  It says, if you look on 157382,
230:3 "Isn't your initiative overly broad and
230:4 not focused specifically enough on rogue
230:5 pharmacies, which in fact make up a
230:6 miniscule percentage of any legitimate
230:7 wholesaler's business?"
230:8 And then it says, "Clearly,
230:9 if a customer is known to be diverting
230:10 prescription drugs and the wholesale
230:11 distributor continues to supply that
230:12 customer, a violation of their registrant
230:13 responsibilities as has occurred.  But my
230:14 concern here is that your expectations go
230:15 to a much higher level, asking the
230:16 wholesaler in essence to be your
230:17 investigator.  I don't think that's
230:18 appropriate.  It seems to me at the end
230:19 of the day that prescription drug abuse
230:20 is caused by inappropriate prescribing
230:21 and inappropriate dispensing, neither of
230:22 which wholesalers are authorized or
230:23 capable of regulating or enforcing."
230:24 Do you see that?

| Page/Line | Source | ID |
|---|---|---|
| | PK03-Kelly, Patrick - Plaintiffs' Submission | |

231:1   A. I do.

| 231:8 - 231:12 | **Kelly, Patrick 05-10-2019 (00:00:06)** | PK03.79 |

231:8   Q. But at this stage it's a
231:9 potential question for some lawmaker to
231:10 ask the DEA, correct?
231:11   A. That's -- yes.  That's the
231:12 context for this.

| 231:17 - 231:19 | **Kelly, Patrick 05-10-2019 (00:00:12)** | PK03.80 |

231:17   Q. I'm handing you what's
231:18 marked Exhibit 23.  If you recall,
231:19 earlier on in Exhibit 8, there was an

| 231:20 - 232:5 | **Kelly, Patrick 05-10-2019 (00:00:24)** | PK03.194 |

231:20 e-mail from Anita Ducca that attached
231:21 some of her draft summaries of the
231:22 various meetings and events that occurred
231:23 in connection with the industry
231:24 compliance guidelines and meetings with
232:1 the DEA.  And this is -- Exhibit 23, is
232:2 one of those attachments.  She said, if
232:3 you recall, these were draft summaries of
232:4 her meetings.
232:5   A. Yes.

| 232:13 - 232:17 | **Kelly, Patrick 05-10-2019 (00:00:08)** | PK03.81 |

232:13   Q. So this is a summary of the
232:14 first meeting that HDA had with DEA
232:15 concerning the industry compliance
232:16 guidelines, correct?
232:17   A. That's correct.

| 232:21 - 233:9 | **Kelly, Patrick 05-10-2019 (00:00:25)** | PK03.82 |

232:21   Q. And in addition to HDMA
232:22 members, it also identifies Richard
232:23 Cooper from Williams & Connolly as an
232:24 attendee and David Durkin from Olsson
233:1 Frank law firm as well?
233:2   A. It does, yes.
233:3   Q. And who is Robert Barnett,
233:4 is he -- is he from Williams & Connolly
233:5 as well?
233:6   A. Yes.
233:7   Q. Okay.  They were outside

| | PK03-Kelly, Patrick - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 233:8 counsel to HDA at this time? |  |
|  | 233:9  A. Yes. |  |
| 233:16 - 234:12 | **Kelly, Patrick 05-10-2019 (00:00:48)** | PK03.83 |
|  | 233:16  Q. So Ms. Ducca has a meeting |  |
|  | 233:17 summary here.  So it appears that Bob |  |
|  | 233:18 Barnett and Rich Cooper led the |  |
|  | 233:19 introductory remarks in the meeting, |  |
|  | 233:20 agree? |  |
|  | 233:21  A. Yes.  They led off. |  |
|  | 233:22  Q. Okay.  So, Bob explained the |  |
|  | 233:23 purpose of the meeting.  He explained -- |  |
|  | 233:24 I'm reading from the document -- "the |  |
|  | 234:1 serious concerns among HDMA members |  |
|  | 234:2 regarding DEA's recent actions regarding |  |
|  | 234:3 suspicious orders.  When HDMA first |  |
|  | 234:4 contacted Williams & Connolly regarding |  |
|  | 234:5 possibly challenging DEA, Bob and Rich |  |
|  | 234:6 Cooper recommended an alternative that |  |
|  | 234:7 was based on his prior experience with |  |
|  | 234:8 other clients in similar positions." |  |
|  | 234:9 Do you see that? |  |
|  | 234:10  A. I do. |  |
|  | 234:11  Q. Did I read that correctly? |  |
|  | 234:12  A. You did. |  |
| 234:23 - 235:13 | **Kelly, Patrick 05-10-2019 (00:00:30)** | PK03.84 |
|  | 234:23  Q. And so Williams & Connolly |  |
|  | 234:24 recommended that, instead of challenging |  |
|  | 235:1 the DEA, that the distributors develop a |  |
|  | 235:2 set of business practices of their own |  |
|  | 235:3 or, as this says, "a type of standard as |  |
|  | 235:4 a better approach to show DEA to the |  |
|  | 235:5 outside world what is intended" -- "that |  |
|  | 235:6 they intend to be part of the solution |  |
|  | 235:7 rather than problem"; is that correct? |  |
|  | 235:8  A. That's correct.  Those were |  |
|  | 235:9 his words, yes. |  |
|  | 235:10  Q. And that's what he told DEA |  |
|  | 235:11 at this meeting? |  |
|  | 235:12  A. I will take it at face value |  |
|  | 235:13 that that's what was explained, yes. |  |

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
| --- | --- | --- |
| 235:14 - 235:21 | **Kelly, Patrick 05-10-2019 (00:00:18)**<br><br>235:14   Q. Other points that Bob<br>235:15 Barnett made were that "HDMA hoped that<br>235:16 DEA would find the guidelines acceptable<br>235:17 as a voluntary 'consent decree,' and we<br>235:18 hoped to receive some form of imprimatur<br>235:19 from you."<br>235:20 Agree?<br>235:21   A. That's what it says, yes. | PK03.85 |
| 235:22 - 236:6 | **Kelly, Patrick 05-10-2019 (00:00:17)**<br><br>235:22   Q. It's noted here, Bob also<br>235:23 told DEA, "These guidelines have been<br>235:24 adopted and approved by HDMA's board."<br>236:1 Agree?<br>236:2   A. Which bullet point are you<br>236:3 on?<br>236:4   Q. Second to last on the first<br>236:5 page.<br>236:6   A. Yes. | PK03.195 |
| 236:7 - 236:10 | **Kelly, Patrick 05-10-2019 (00:00:08)**<br><br>236:7   Q. But then it was explained<br>236:8 that HDMA and its board were open to<br>236:9 suggestions from the DEA, correct?<br>236:10   A. That's correct. | PK03.169 |
| 236:17 - 237:7 | **Kelly, Patrick 05-10-2019 (00:00:34)**<br><br>236:17   Q. So -- then, we're going to<br>236:18 the second page here.  So it says, "After<br>236:19 Bob's introductory discussion, he turned<br>236:20 the meeting over to Richard Cooper from<br>236:21 Williams & Connolly."<br>236:22 Agree?<br>236:23   A. Yes.<br>236:24   Q. Okay.  And so Rich is the<br>237:1 one who had this previous experience with<br>237:2 the FDA where they developed standards<br>237:3 that were voluntary and eventually became<br>237:4 standard practice among the medical<br>237:5 research community, and this idea of the<br>237:6 industry compliance guidelines was born<br>237:7 out of that, agree? | PK03.87 |

**PK03-Kelly, Patrick - Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

237:10 - 237:15

**Kelly, Patrick 05-10-2019 (00:00:05)**   PK03.183

237:10 THE WITNESS:  I think that's

237:11 what's being implied here, yes.

237:12 BY MR. PIFKO:

237:13   Q. And that's what was told to

237:14 DEA in connection with this meeting,

237:15 correct?

237:18 - 237:20

**Kelly, Patrick 05-10-2019 (00:00:03)**   PK03.182

237:18 THE WITNESS:  That's --

237:19 again, that's what it -- seems to

237:20 be stipulated here, yes.

237:22 - 239:6

**Kelly, Patrick 05-10-2019 (00:00:56)**   PK03.89

237:22   Q. So a key point, according to

237:23 Anita's notes is that Rich Cooper from

237:24 Williams & Connolly made, was that "an

238:1 order and question will be stopped until

238:2 there was an assessment and found that

238:3 the order was not suspicious."

238:4 Agree?

238:5   A. Where --

238:6   Q. Second paragraph, full

238:7 paragraph of Page 2.

238:8   A. Okay.  Yes.  I see that,

238:9 yes.

238:10   Q. And so then, DEA had a

238:11 question about "what exactly are you

238:12 stopping when you stop the order?"

238:13   A. Okay.

238:14   Q. And that's some discussion

238:15 about that.

238:16 Do you see that?

238:17   A. Yes.

238:18   Q. And so then, Rich Cooper

238:19 told DEA that "the guidelines indicated

238:20 that the entire order of the specific

238:21 product that triggered the threshold

238:22 should be held and not released."

238:23 Do you see that?

238:24   A. Yes.

239:1   Q. And then he also said, "The

| Page/Line | Source | ID |
|---|---|---|
| | 239:2 guidelines expected that the entire order | |
| | 239:3 for the drug product in question would be | |
| | 239:4 held, even if part of it came under a | |
| | 239:5 threshold." | |
| | 239:6 Do you see that? | |
| 239:9 - 239:10 | **Kelly, Patrick 05-10-2019 (00:00:01)** | PK03.196 |
| | 239:9 THE WITNESS:  Yes.  Last | |
| | 239:10 sentence. | |
| 240:8 - 240:11 | **Kelly, Patrick 05-10-2019 (00:00:06)** | PK03.92 |
| | 240:8   Q. So then the meeting was | |
| | 240:9 handed over to Scott Melville, your -- | |
| | 240:10 your predecessor, agree? | |
| | 240:11   A. Yes. | |
| 241:5 - 241:12 | **Kelly, Patrick 05-10-2019 (00:00:19)** | PK03.93 |
| | 241:5   Q. And Scott also told DEA that | |
| | 241:6 "HDA would discuss, explain and encourage | |
| | 241:7 acceptance of the guidelines by other | |
| | 241:8 trade associations, including | |
| | 241:9 manufacturing and pharmacy groups." | |
| | 241:10 That's the second bullet | |
| | 241:11 point on the page? | |
| | 241:12   A. Yes, yes, yes, yes, yes. | |
| 241:13 - 241:19 | **Kelly, Patrick 05-10-2019 (00:00:17)** | PK03.189 |
| | 241:13   Q. So you agree, a key message | |
| | 241:14 that Scott was communicating to DEA here | |
| | 241:15 was that HDA was going to work to make | |
| | 241:16 sure its members and other participants | |
| | 241:17 in the supply chain in the pharmaceutical | |
| | 241:18 industry would implement these | |
| | 241:19 guidelines, correct? | |
| 241:22 - 242:8 | **Kelly, Patrick 05-10-2019 (00:00:18)** | PK03.185 |
| | 241:22 THE WITNESS:  I think we -- | |
| | 241:23 we meant to basically educate the | |
| | 241:24 rest, that they were available. | |
| | 242:1 Again, we are not a | |
| | 242:2 standards agency, we are not a | |
| | 242:3 regulatory authority.  We can't | |
| | 242:4 basically make any entity comply | |
| | 242:5 with the guidelines.  We were just | |
| | 242:6 going to educate as many folks as | |

| Page/Line | Source | ID |
|---|---|---|
| PK03-Kelly, Patrick - Plaintiffs' Submission | | |

242:7 we could about their existence and
242:8 make them available.

| 242:10 - 242:12 | **Kelly, Patrick 05-10-2019 (00:00:04)** | **PK03.95** |

242:10  Q. But you told DEA that you
242:11 wanted to help your members implement the
242:12 guidelines, correct?

| 242:15 - 242:17 | **Kelly, Patrick 05-10-2019 (00:00:02)** | **PK03.96** |

242:15 THE WITNESS:  That's -- yes,
242:16 that's what it -- that's what it
242:17 says here, yes.

| 248:9 - 248:11 | **Kelly, Patrick 05-10-2019 (00:00:06)** | **PK03.97** |

248:9  Q. To your knowledge, did any
248:10 distributor implement the industry
248:11 compliance guidelines?

| 248:14 - 249:10 | **Kelly, Patrick 05-10-2019 (00:00:33)** | **PK03.98** |

248:14 THE WITNESS:  Again, I don't
248:15 know.  They were -- they were
248:16 guidelines.  Many of the
248:17 companies, from what I understand,
248:18 already had various processes in
248:19 place.  These guidelines were
248:20 developed to better inform them
248:21 about expectations within the DEA.
248:22 And if they -- they could beg and
248:23 borrow, and again it was meant to
248:24 be kind of something that could be
249:1 applicable to various size
249:2 companies and able to adapt.
249:3 So again I don't know if
249:4 anybody adopted the entire
249:5 document verbatim or not.  And we
249:6 didn't ask.
249:7 BY MR. PIFKO:
249:8  Q. You don't know if anybody
249:9 adopted parts of the document either,
249:10 correct?

| 249:13 - 249:13 | **Kelly, Patrick 05-10-2019 (00:00:00)** | **PK03.99** |

249:13 THE WITNESS:  We don't.

| 249:15 - 249:19 | **Kelly, Patrick 05-10-2019 (00:00:10)** | **PK03.100** |

249:15  Q. So sitting here today, you

| Page/Line | Source | ID |
|---|---|---|

249:16 don't know, and at no time does HDMA know
249:17 if any members or other distributors
249:18 adopted all or part of the industry
249:19 compliance guidelines, correct?

| 249:22 - 249:23 | **Kelly, Patrick 05-10-2019 (00:00:01)** | PK03.101 |

249:22 THE WITNESS:  I don't know,
249:23 nor did we ask.

| 249:24 - 250:5 | **Kelly, Patrick 05-10-2019 (00:00:08)** | PK03.170 |

249:24 stated before, we are not a
250:1 regulatory authority; we are not a
250:2 standard-setting body.  We are
250:3 simply doing our best to inform
250:4 our members about existing
250:5 policies.

| 251:7 - 251:13 | **Kelly, Patrick 05-10-2019 (00:00:15)** | PK03.102 |

251:7   Q. Okay.  And just to be
251:8 clear -- I think you had the answer, but
251:9 I don't think we have a clear record.
251:10 To your knowledge, no
251:11 distributor, manufacturer, or pharmacy
251:12 has ever implemented the guidelines or
251:13 any portion of the guidelines, correct?

| 251:16 - 252:3 | **Kelly, Patrick 05-10-2019 (00:00:19)** | PK03.103 |

251:16 THE WITNESS:  Again, I think
251:17 every distributor member has their
251:18 own compliance guidelines that are
251:19 basically developed and put in
251:20 place for their company, their
251:21 specific customer base, et cetera.
251:22 I don't know that anybody kind of
251:23 copied the industry compliance
251:24 guidelines and made it part of
252:1 their own protocols and
252:2 procedures.  I don't know.  Nor
252:3 did we ask.

| 263:20 - 264:3 | **Kelly, Patrick 05-10-2019 (00:00:37)** | PK03.104 |

263:20   Q. I'm handing you what's
263:21 marked as Exhibit 26.  These are
263:22 Ms. Ducca's notes from the second meeting
263:23 with DEA on suspicious orders which was

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | 263:24 attached to Exhibit 8, I believe. | |
| | 264:1 For the record, it's | |
| | 264:2 Bates-labeled CAH_MDL2804_02489191 | |
| | 264:3 through 196. | |
| 264:9 - 264:23 | **Kelly, Patrick 05-10-2019 (00:00:32)** | PK03.105 |
| | 264:9   Q. So these are Ms. Ducca's | |
| | 264:10 notes of the second meeting with DEA, | |
| | 264:11 correct? | |
| | 264:12   A. Yes. | |
| | 264:13   Q. And if you recall, from the | |
| | 264:14 notes from the first meeting, one of the | |
| | 264:15 comments was that they welcomed DEA's | |
| | 264:16 input on the draft that had been shared | |
| | 264:17 at the prior meeting, agree? | |
| | 264:18   A. Yes. | |
| | 264:19   Q. And so then, this is DEA | |
| | 264:20 providing its comments on the industry | |
| | 264:21 compliance guidelines that had been | |
| | 264:22 provided to them at the prior meeting, | |
| | 264:23 agree? | |
| 265:2 - 265:2 | **Kelly, Patrick 05-10-2019 (00:00:01)** | PK03.106 |
| | 265:2 THE WITNESS:  Yes. | |
| 265:4 - 266:9 | **Kelly, Patrick 05-10-2019 (00:01:18)** | PK03.107 |
| | 265:4   Q. And it's got the attendees | |
| | 265:5 here from DEA, it includes Linden Barber, | |
| | 265:6 Cathy Gallagher, Robert Gleason, agree? | |
| | 265:7   A. Yes. | |
| | 265:8   Q. And then from HDMA, we've | |
| | 265:9 got Ms. Ducca, Scott Melville.  And | |
| | 265:10 you've got outside counsel, Robert | |
| | 265:11 Burnett, Richard Cooper, and David | |
| | 265:12 Durkin, agree? | |
| | 265:13   A. Yes. | |
| | 265:14   Q. Okay.  So they just go | |
| | 265:15 through the draft guidelines that were | |
| | 265:16 provided to them, which are the ones that | |
| | 265:17 were in Exhibit 21. | |
| | 265:18 So then, it goes through | |
| | 265:19 page by page providing thoughts and | |
| | 265:20 comments DEA has, agree? | |

| Page/Line | Source | ID |
|---|---|---|

PK03-Kelly, Patrick - Plaintiffs' Submission

265:21   A. Yes, that's what these notes
265:22 do.
265:23   Q. That's what's reflected in
265:24 Exhibit 26, correct?
266:1   A. Yes.
266:2   Q. Okay.  So one comment DEA
266:3 has is that, "It's recommended that you
266:4 add into the outline that once an order
266:5 is determined to be suspicious, it
266:6 shouldn't be shipped.  DEA understood
266:7 that it was in the body of the
266:8 guidelines, but they wanted to see it
266:9 upfront in the outline as well."  Agreed?

**266:15 - 267:11**   **Kelly, Patrick 05-10-2019 (00:00:54)**   **PK03.108**

266:15   Q. Page 3.
266:16   A. Page 3, I'm sorry.
266:17   Q. No I'm on the first page of
266:18 Exhibit 26.  But I'm looking at the
266:19 comment from Page 3.
266:20   A. Oh, I'm sorry.  Okay, yes.
266:21   Q. DEA is just emphasizing that
266:22 the -- if an order is suspicious, it
266:23 shouldn't be shipped.  They want that up
266:24 in the front in the outline, even though
267:1 it's in the body of the document, agreed?
267:2   A. That's what this notes says,
267:3 yes.
267:4   Q. The comment for Page 4, Item
267:5 1B is saying that for a questionnaire
267:6 that might be to a distributor's
267:7 customer, DEA wants the industry to be
267:8 aware that even if you obtain a signed
267:9 document, that's not going to be a
267:10 defense; distributors have to do more to
267:11 identify the legitimacy, agree?

**267:14 - 267:17**   **Kelly, Patrick 05-10-2019 (00:00:11)**   **PK03.109**

267:14 THE WITNESS:  Yes, that's
267:15 what it says.
267:16 BY MR. PIFKO:
267:17   Q. Turning to the second page.

| Page/Line | Source | ID |
|---|---|---|

**PK03-Kelly, Patrick - Plaintiffs' Submission**

| | | |
|---|---|---|
| 267:22 - 268:2 | **Kelly, Patrick 05-10-2019 (00:00:13)** | **PK03.110** |

267:22 It says,
267:23 "Several times they" -- which is DEA,
267:24 "they said that the procedures" --
268:1 "procedures used by members should be
268:2 robust and adaptable," agree?

| | | |
|---|---|---|
| 268:5 - 268:6 | **Kelly, Patrick 05-10-2019 (00:00:01)** | **PK03.111** |

268:5 THE WITNESS:  That's what it
268:6 says.

| | | |
|---|---|---|
| 268:8 - 270:13 | **Kelly, Patrick 05-10-2019 (00:01:42)** | **PK03.112** |

268:8   Q. Okay.  And then the longer
268:9 comment here for Section 2, monitoring on
268:10 suspicious orders, the second paragraph
268:11 here, it says, "DEA seemed to think that
268:12 thresholds focus primarily on volumes and
268:13 they expressed the view that an exclusive
268:14 or even principal focus on volumes is
268:15 inadequate."
268:16 Do you see that?
268:17   A. I do.
268:18   Q. Do you agree that that's
268:19 what DEA told HDMA during this meeting?
268:20   A. I have no reason to doubt
268:21 what's written here.
268:22   Q. Okay.  And that's what's
268:23 written here, correct?
268:24   A. That's what's written here.
269:1   Q. "They also want the initial
269:2 screen of orders to focus on A, patterns
269:3 of ordering, comparing the present order
269:4 to, one, past orders from the same
269:5 customer including whether the frequency
269:6 of orders is suspicious; two, orders from
269:7 similar customers; and, three, orders
269:8 from other establishments of the same
269:9 type in the locale or region."  Agree?
269:10   A. That's what it says.
269:11   Q. Okay.  And then they also
269:12 want the initial screens of orders to
269:13 focus on combination of controlled

| | | |
|---|---|---|
| **PK03-Kelly, Patrick - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

269:14 substances ordered, agree?
269:15   A. That's what it says, yes.
269:16   Q. Then going to the third
269:17 page, at the top, another comment that
269:18 DEA made here, it says, was that the term
269:19 "order of interest" did not have legal
269:20 standing.
269:21 Do you see that?
269:22   A. I do.
269:23   Q. Okay.  And that was
269:24 something that DEA conveyed at this
270:1 meeting, correct?
270:2   A. Again, I'll take it from
270:3 this, yes, that they did that.
270:4   Q. And then it says, "DEA
270:5 emphasized that orders should not remain
270:6 in the orders of interest category for
270:7 lengthy periods."
270:8 Do you see that?
270:9   A. Yes.
270:10   Q. "They should be investigated
270:11 expeditiously and promptly resolved as
270:12 either suspicious or not suspicious."
270:13 Agree?

| Page/Line | Source | ID |
|---|---|---|
| 270:16 - 270:17 | **Kelly, Patrick 05-10-2019 (00:00:01)** | PK03.113 |

270:16 THE WITNESS:  That's what it
270:17 says, yes.

| Page/Line | Source | ID |
|---|---|---|
| 270:19 - 270:24 | **Kelly, Patrick 05-10-2019 (00:00:09)** | PK03.171 |

270:19   Q. Okay.  Then there's some
270:20 comments about the language about
270:21 thresholds that was in the draft industry
270:22 compliance guidelines.
270:23 Do you see that section?
270:24   A. I do.

| Page/Line | Source | ID |
|---|---|---|
| 270:19 - 272:19 | **Kelly, Patrick 05-10-2019 (00:01:28)** | PK03.114 |

270:19   Q. Okay.  Then there's some
270:20 comments about the language about
270:21 thresholds that was in the draft industry
270:22 compliance guidelines.
270:23 Do you see that section?

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

270:24   A. I do.

271:1   Q. Okay.  So the first is that,

271:2 "DEA thought it might be interpreted to

271:3 mean excessive volumes only.  And then

271:4 HDMA responded that their intent was to

271:5 be broader and to include frequency as a

271:6 factor."

271:7 Do you see that?

271:8   A. I do.

271:9   Q. Okay.  "DEA asked HDA to

271:10 expand the explanation of thresholds,"

271:11 agreed?

271:12   A. That's what it says, yes.

271:13   Q. And then, "DEA asked that

271:14 the industry compliance guidelines say

271:15 the drug or drugs that cause an order to

271:16 be an order of interest should not be

271:17 shipped where the order is an order of

271:18 interest."

271:19 Do you see that?

271:20   A. I do.

271:21   Q. Okay.  You agree that that

271:22 was something that the DEA conveyed at

271:23 this meeting?

271:24   A. Again, I have no reason to

272:1 doubt what was stated here on this paper.

272:2   Q. And then finally, it says,

272:3 "DEA suggested that we delete the second

272:4 paragraph under C, develop thresholds to

272:5 identify orders of interest."

272:6 Do you see that?

272:7   A. I do.

272:8   Q. It says, "DEA has backed

272:9 away from the standard of three times the

272:10 monthly overage order for Schedule II and

272:11 ARCOS-reportable Schedule III products.

272:12 DEA suggested that we substitute a

272:13 paragraph based on more recent DEA

272:14 guidance."

272:15 Do you see that?

| Page/Line | Source | ID |
|---|---|---|
| | 272:16  A. I do. | |
| | 272:17  Q. So you understood that DEA | |
| | 272:18 was communicating here not to use the | |
| | 272:19 three times multiplier, correct? | |
| 272:22 - 272:23 | **Kelly, Patrick 05-10-2019 (00:00:02)** | PK03.115 |
| | 272:22 THE WITNESS:  That seems to | |
| | 272:23 be what this indicates, yes. | |
| 274:1 - 274:15 | **Kelly, Patrick 05-10-2019 (00:00:23)** | PK03.116 |
| | 274:1  Q. Okay.  And then we go to the | |
| | 274:2 section on Page 8 in the guidelines, | |
| | 274:3 "Stop shipments of an order of interest." | |
| | 274:4 Do you see that? | |
| | 274:5  A. I do. | |
| | 274:6  Q. And then it says, "DEA asked | |
| | 274:7 us to reemphasize that an order should | |
| | 274:8 not be shipped" -- and it's underlined -- | |
| | 274:9 "if there was reason to believe there was | |
| | 274:10 a problem." | |
| | 274:11 Do you see that? | |
| | 274:12  A. I do. | |
| | 274:13  Q. So DEA made that point | |
| | 274:14 again, correct? | |
| | 274:15  A. Yes. | |
| 277:12 - 277:24 | **Kelly, Patrick 05-10-2019 (00:00:27)** | PK03.117 |
| | 277:12  Q. I want to go to the last | |
| | 277:13 page of this document.  The comment from | |
| | 277:14 Page 11, "DEA asked us to emphasize that | |
| | 277:15 suspicious order must be reported to DEA | |
| | 277:16 whether the wholesaler ships or not, and | |
| | 277:17 to emphasize that timeliness of notice is | |
| | 277:18 very important." | |
| | 277:19 Do you see that? | |
| | 277:20  A. I do. | |
| | 277:21  Q. Do you agree that that was | |
| | 277:22 something communicated during this | |
| | 277:23 meeting? | |
| | 277:24  A. I do. | |
| 279:2 - 279:12 | **Kelly, Patrick 05-10-2019 (00:00:17)** | PK03.118 |
| | 279:2  Q. And then there's additional | |
| | 279:3 comments that DEA raised that are | |

| | | |
|---|---|---|
| **PK03-Kelly, Patrick - Plaintiffs' Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

279:4 provided in bullet points here at the
279:5 end.  Agree?
279:6   A. I see them.
279:7   Q. Five of them?
279:8   A. Yes.
279:9   Q. One is yet another comment
279:10 that if an order is -- there's concerns
279:11 or questions, it shouldn't be shipped,
279:12 agree?

**279:15 - 281:3**   **Kelly, Patrick 05-10-2019 (00:01:00)**                                        **PK03.119**

279:15 THE WITNESS:  The first
279:16 bullet point?
279:17 BY MR. PIFKO:
279:18   Q. Yeah.  That's what it says?
279:19   A. That's what it says.
279:20   Q. They want reports on all
279:21 orders, even if it's not shipped?
279:22   A. On all suspicious orders.
279:23 Yes.  Bullet Point 2.
279:24   Q. Again, a comment about
280:1 timeliness in Bullet 3, agree?
280:2   A. Yes.
280:3   Q. And then 4, it says, "DEA
280:4 wants reports of suspicious orders even
280:5 if there is some question about the
280:6 dispenser status as a customer.  For
280:7 example, if during a background check of
280:8 a potential customer, the customer
280:9 indicates that they might be placing
280:10 orders that could be suspicious, DEA
280:11 wants to know, even if the pharmacy in
280:12 question does not become a customer."
280:13 Agree, that's what it says?
280:14   A. That's what it says, yes.
280:15   Q. So you understood that DEA
280:16 communicated that as well during this
280:17 meeting?
280:18   A. Again, I have no reason to
280:19 doubt what's written here.
280:20   Q. Okay.  We know these

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

|  | 280:21 comments were shared with Cardinal, | |
|  | 280:22 because we have the e-mail. | |
|  | 280:23 To your knowledge, in the | |
|  | 280:24 ordinary course of HDA's processes and | |
|  | 281:1 procedures, these would -- these would | |
|  | 281:2 have been shared with other members as | |
|  | 281:3 well, correct? | |
| 281:8 - 281:13 | **Kelly, Patrick 05-10-2019 (00:00:09)** | **PK03.172** |
|  | 281:8 THE WITNESS:  Again, I can't | |
|  | 281:9 say for certain.  This is labeled | |
|  | 281:10 as a draft.  I'm not sure if it | |
|  | 281:11 was sent to the RAC or another | |
|  | 281:12 group, until -- again, all I have | |
|  | 281:13 is the form in front of me so... | |
| 281:14 - 281:19 | **Kelly, Patrick 05-10-2019 (00:00:06)** | **PK03.120** |
|  | 281:14 I would -- I would imagine | |
|  | 281:15 so, that usually we sent -- we're | |
|  | 281:16 usually in the habit of | |
|  | 281:17 summarizing those meetings and | |
|  | 281:18 sending them out to the regulatory | |
|  | 281:19 affairs committee. | |
| 282:17 - 282:19 | **Kelly, Patrick 05-10-2019 (00:00:07)** | **PK03.121** |
|  | 282:17  Q. Okay.  So HDA certainly | |
|  | 282:18 would have shared the views of DEA to its | |
|  | 282:19 members after this meeting, agree? | |
| 282:22 - 282:24 | **Kelly, Patrick 05-10-2019 (00:00:03)** | **PK03.173** |
|  | 282:22 THE WITNESS:  Again, I don't | |
|  | 282:23 doubt that they did.  I just -- | |
|  | 282:24 I'm looking at a draft document. | |
| 283:1 - 283:5 | **Kelly, Patrick 05-10-2019 (00:00:08)** | **PK03.122** |
|  | 283:1 So again, I don't doubt that | |
|  | 283:2 this was finalized and the edits | |
|  | 283:3 made here were incorporated and a | |
|  | 283:4 final document was submitted to | |
|  | 283:5 the regulatory affairs committee. | |
| 284:1 - 284:2 | **Kelly, Patrick 05-10-2019 (00:00:03)** | **PK03.123** |
|  | 284:1  Q. I'm handing you what's | |
|  | 284:2 marked as Exhibit 27. | |
| 284:8 - 284:9 | **Kelly, Patrick 05-10-2019 (00:00:03)** | **PK03.124** |
|  | 284:8 this is the | |

| Page/Line | Source | ID |
|---|---|---|
| | PK03-Kelly, Patrick - Plaintiffs' Submission | |

| Page/Line | Source | ID |
|---|---|---|
| | 284:9 final guidelines, correct? | |
| 284:12 - 284:14 | **Kelly, Patrick 05-10-2019 (00:00:14)** | **PK03.125** |
| | 284:12 For the record, Exhibit 27 | |
| | 284:13 is a document Bates-labeled | |
| | 284:14 HDA_MDL_00218651 through 218665. | |
| 284:15 - 284:17 | **Kelly, Patrick 05-10-2019 (00:00:04)** | **PK03.186** |
| | 284:15   A. Yes, I would agree that this | |
| | 284:16 is the final version of the industry | |
| | 284:17 compliance guidelines. | |
| 287:15 - 287:23 | **Kelly, Patrick 05-10-2019 (00:00:38)** | **PK03.126** |
| | 287:15   Q. Handing you what's been | |
| | 287:16 marked as Exhibit 29.  For the record, | |
| | 287:17 Exhibit 29 is a webinar slide | |
| | 287:18 presentation dated Friday, November 14th, | |
| | 287:19 2008.  The title "Industry Compliance | |
| | 287:20 Guidelines.  Reporting Suspicious Orders | |
| | 287:21 and Preventing Diversion of Controlled | |
| | 287:22 Substances."  It's Bates-labeled | |
| | 287:23 HDA_MDL_000145918 through 145968. | |
| 288:4 - 288:15 | **Kelly, Patrick 05-10-2019 (00:00:21)** | **PK03.127** |
| | 288:4   Q. So you recall in the first | |
| | 288:5 meeting with DEA about the industry | |
| | 288:6 compliance guidelines on April 15, 2008, | |
| | 288:7 one of the thing HDA told DEA that it was | |
| | 288:8 going to engage in an educational | |
| | 288:9 outreach concerning the guidelines, | |
| | 288:10 correct? | |
| | 288:11   A. Correct. | |
| | 288:12   Q. Okay.  Do you understand | |
| | 288:13 that to be a part of the educational | |
| | 288:14 outreach? | |
| | 288:15   A. I do, yes. | |
| 289:10 - 289:16 | **Kelly, Patrick 05-10-2019 (00:00:15)** | **PK03.128** |
| | 289:10   Q. So it's HDA's practice to | |
| | 289:11 provide webinars to core distributor | |
| | 289:12 members, correct? | |
| | 289:13   A. Yes. | |
| | 289:14   Q. And this is a webinar dated | |
| | 289:15 Friday, February (sic) 14, 2008, agreed? | |
| | 289:16   A. Yes. | |

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |
| 291:5 - 291:16 | **Kelly, Patrick 05-10-2019 (00:00:35)** | **PK03.129** |
| | 291:5   Q. Okay.  It says prescription | |
| | 291:6 drug abuse.  And it talks about increase | |
| | 291:7 in prescribing for pain, nonmedical | |
| | 291:8 prescription drug use is up 80 percent | |
| | 291:9 from 2000.  Am I reading that correct? | |
| | 291:10   A. That's what -- yes. | |
| | 291:11   Q. And there is some discussion | |
| | 291:12 about the "Dear Registrant" Rannazzisi | |
| | 291:13 letters.  Some of this we've seen in the | |
| | 291:14 other presentations, agree?  Such as the | |
| | 291:15 October 31, 2008, one?  Or I'm sorry, | |
| | 291:16 January 31, 2008, one? | |
| 291:19 - 291:19 | **Kelly, Patrick 05-10-2019 (00:00:01)** | **PK03.197** |
| | 291:19 THE WITNESS:  Yes. | |
| 291:21 - 291:24 | **Kelly, Patrick 05-10-2019 (00:00:10)** | **PK03.130** |
| | 291:21   Q. Then you go to Slide 15.  It | |
| | 291:22 tells you the purpose of the industry | |
| | 291:23 compliance guidelines and the DEA | |
| | 291:24 communications, agree? | |
| 292:3 - 292:3 | **Kelly, Patrick 05-10-2019 (00:00:01)** | **PK03.131** |
| | 292:3 THE WITNESS:  Yes. | |
| 292:5 - 292:8 | **Kelly, Patrick 05-10-2019 (00:00:07)** | **PK03.132** |
| | 292:5   Q. So, the purpose -- one of | |
| | 292:6 the purposes is to head off further | |
| | 292:7 enforcement of regulatory action, agree? | |
| | 292:8   A. That's what it states. | |
| 292:9 - 292:16 | **Kelly, Patrick 05-10-2019 (00:00:10)** | **PK03.174** |
| | 292:9   Q. One of them is to | |
| | 292:10 demonstrate our members' commitment. | |
| | 292:11 Do you see that? | |
| | 292:12   A. Yes. | |
| | 292:13   Q. Another one says to see | |
| | 292:14 distributors as part of the solution. | |
| | 292:15 Do you see that? | |
| | 292:16   A. Yes. | |
| 295:4 - 295:8 | **Kelly, Patrick 05-10-2019 (00:00:21)** | **PK03.133** |
| | 295:4   Q. I'm handing you what's | |
| | 295:5 marked Exhibit 30.  It's an e-mail, | |
| | 295:6 two-page e-mail with an attachment, | |

| Page/Line | Source | ID |
|---|---|---|
| | **PK03-Kelly, Patrick - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 295:13 - 296:2 | 295:7 one-page attachment, Bates-labeled<br>295:8 HDA_MDL_000080421 through 423.<br>**Kelly, Patrick 05-10-2019 (00:00:25)**<br>295:13   Q. Are you familiar with this<br>295:14 discussion; you were at HDA at this time,<br>295:15 correct?<br>295:16   A. I was at HDA at this time,<br>295:17 yes.  I am not familiar with this<br>295:18 particular e-mail, but I understand the<br>295:19 correspondence between the communications<br>295:20 department and -- and Anita Ducca.<br>295:21   Q. Okay.  So Farah Qureshi, am<br>295:22 I -- am I saying that right?<br>295:23   A. Yes.<br>295:24   Q. She's a communications<br>296:1 manager?<br>296:2   A. Yes. | PK03.134 |
| 296:17 - 296:22 | **Kelly, Patrick 05-10-2019 (00:00:11)**<br>296:17   Q. Okay.  So Farrah's job is to<br>296:18 draft materials that will be on HDA's<br>296:19 website?<br>296:20   A. Yes.  And kind of, you know,<br>296:21 position them and pretty them up for the<br>296:22 website. | PK03.135 |
| 297:7 - 298:22 | **Kelly, Patrick 05-10-2019 (00:01:18)**<br>297:7   Q. And then Anita Ducca<br>297:8 provides some comments in this e-mail<br>297:9 dated Wednesday June 12, 2013.  Agree?<br>297:10   A. Yes.<br>297:11   Q. And then she actually<br>297:12 attaches the redline that's -- and the<br>297:13 redline is what is the second page,<br>297:14 agree?<br>297:15   A. Yes, it appears so.<br>297:16   Q. Okay.  So one of Anita's<br>297:17 comments is, she says, "Although there<br>297:18 are some examples of what our members do,<br>297:19 I'm hesitant to include anything like<br>297:20 that."<br>297:21 You see that in the third | PK03.136 |

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

297:22 paragraph?
297:23   A. Yes.
297:24   Q. And then she says, "Not all
298:1 our members are doing what HD Smith
298:2 does."
298:3 Do you see that?
298:4   A. Yes.
298:5   Q. "If DEA sees this, which
298:6 they are likely to at some point, they
298:7 may question why all our members aren't
298:8 doing it."
298:9 Do you see that?
298:10   A. Yes.
298:11   Q. "Sort of like how they took
298:12 our ICG and included it in their legal
298:13 filing against Walgreens Distribution
298:14 Center, claiming that there was an
298:15 industry standard that Walgreens should
298:16 have known about and been following."
298:17 Do you see that?
298:18   A. I do.
298:19   Q. There were some frustration
298:20 at HDA that DEA had cited the industry
298:21 compliance guidelines as an industry
298:22 standard and used them against Walgreens?

| 299:1 - 299:10 | **Kelly, Patrick 05-10-2019 (00:00:18)** | PK03.137 |

299:1 THE WITNESS:  I don't know
299:2 that there was frustration.  I
299:3 think we were -- we were slightly
299:4 concerned that a document that was
299:5 voluntary guidelines was cited in
299:6 a -- in a proceeding by DEA
299:7 against a non-HD member or non --
299:8 at that point still HDMA or HDA at
299:9 that point.  So that was the
299:10 concern.

| 300:5 - 300:7 | **Kelly, Patrick 05-10-2019 (00:00:16)** | PK03.138 |

300:5 Exhibit 31 is Bates-labeled
300:6 HDA_MDL_000155930 through 155946.
300:7 MR. WEINSTEIN:  47 actually.

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |
| 301:1 - 301:6 | **Kelly, Patrick 05-10-2019 (00:00:10)** | PK03.139 |
| | 301:1   Q. Do you have any reason to | |
| | 301:2 dispute that the statements in here are | |
| | 301:3 accurate with respect to discussions at | |
| | 301:4 the board meetings? | |
| | 301:5   A. No, I have no reason to | |
| | 301:6 dispute that. | |
| 302:13 - 302:15 | **Kelly, Patrick 05-10-2019 (00:00:22)** | PK03.140 |
| | 302:13   Q. Handing you what's marked as | |
| | 302:14 Exhibit 32.  It's a two-page document | |
| | 302:15 Bates-labeled HDA_MDL_00081415 and 416. | |
| 302:19 - 303:7 | **Kelly, Patrick 05-10-2019 (00:00:33)** | PK03.141 |
| | 302:19   Q. I just wanted to direct your | |
| | 302:20 attention to second paragraph on the | |
| | 302:21 first page. | |
| | 302:22 "The regulatory affairs | |
| | 302:23 committee and federal government affairs | |
| | 302:24 committee told its members that there was | |
| | 303:1 some consideration about updating the | |
| | 303:2 guidelines, but ultimately it was decided | |
| | 303:3 that they would be replaced with a | |
| | 303:4 statement to the effect that the industry | |
| | 303:5 is very committed to compliance." | |
| | 303:6 And there was a draft that | |
| | 303:7 was exchanged with members, agree? | |
| 303:10 - 303:19 | **Kelly, Patrick 05-10-2019 (00:00:19)** | PK03.142 |
| | 303:10 THE WITNESS:  Yes, that's | |
| | 303:11 what this says. | |
| | 303:12 BY MR. PIFKO: | |
| | 303:13   Q. And that's what happened? | |
| | 303:14   A. I don't recall exactly what | |
| | 303:15 the process was between the ICGs coming | |
| | 303:16 down and a statement going up in its | |
| | 303:17 stead.  But again, I have no reason to | |
| | 303:18 doubt that this process described here is | |
| | 303:19 accurate. | |
| 315:7 - 315:8 | **Kelly, Patrick 05-10-2019 (00:00:02)** | PK03.143 |
| | 315:7   Q. Handing you what's marked as | |
| | 315:8 Exhibit 34. | |
| 316:9 - 316:16 | **Kelly, Patrick 05-10-2019 (00:00:24)** | PK03.144 |

| Page/Line | Source | ID |
|---|---|---|

**PK03-Kelly, Patrick - Plaintiffs' Submission**

316:9 Exhibit 34 is an e-mail from John Gray
316:10 dated Friday, April 20, 2012, to Ken
316:11 Couch, Dale Smith, David Neu, Paul
316:12 Julian, Mike Kaufmann, David Moody and
316:13 Ted Scherr, copying Richard Frank from
316:14 HDA's outside counsel.
316:15 Agree?
316:16  A. Yes.

**316:20 - 316:23**  **Kelly, Patrick 05-10-2019 (00:00:10)**   **PK03.145**
316:20 So at this executive
316:21 committee conference call, there was
316:22 concerns raised by the members again
316:23 about DEA's enforcement activity.  Agree?

**317:2 - 317:14**  **Kelly, Patrick 05-10-2019 (00:00:22)**   **PK03.146**
317:2 THE WITNESS:  Yes.
317:3 BY MR. PIFKO:
317:4  Q. And so then, there was a
317:5 decision that they needed to plot a
317:6 course going forward as it says in
317:7 Exhibit 31, agree?
317:8  A. Yes, that's what it says.
317:9  Q. Okay.  So after that call,
317:10 John Gray says here that he met with
317:11 legal counsel Bob Barnett and Richard
317:12 Cooper from Williams & Connolly in
317:13 Washington DC, agreed?
317:14  A. Yes.

**319:2 - 319:22**  **Kelly, Patrick 05-10-2019 (00:01:01)**   **PK03.147**
319:2  Q. And then the attached, the
319:3 following three pages of Exhibit 34 is
319:4 this document that says, according to the
319:5 e-mail, it's, "DEA options memorandum,
319:6 J. Gray edits," do you see that on the
319:7 first page?  On the header of the e-mail,
319:8 that's what the attached document is?
319:9  A. Yes, yes, yes, yes, yes.
319:10  Q. So then it's a memo from
319:11 Mr. Gray to the HDMA executive committee
319:12 dated April 20, 2012.  Agree?
319:13  A. Yes.

| Page/Line | Source | ID |
|---|---|---|

**PK03-Kelly, Patrick - Plaintiffs' Submission**

319:14  Q. And who is on the executive
319:15 committee at this time?
319:16   A. At this time it is Ken Couch
319:17 from Smith Drug, Dale Smith from
319:18 HD Smith, Dave Neu from
319:19 AmerisourceBergen, Paul Julian from
319:20 McKesson, Mike Kaufmann from Cardinal,
319:21 David Moody from North Carolina Mutual
319:22 and Ted Scherr from Dakota Drug.

323:4 - 323:22    **Kelly, Patrick 05-10-2019 (00:00:38)**          PK03.148

323:4   Q. Okay.  So another thing
323:5 Mr. Gray writes in this memo is that
323:6 "Paul Barnett and Rich Cooper from
323:7 Williams & Connolly felt that the
323:8 industry may be better off asserting DEA
323:9 actions by taking even stronger
323:10 compliance measures."
323:11 Do you see that?
323:12   A. Yes.
323:13   Q. Did I read that correctly?
323:14   A. You did.
323:15   Q. Were you part of these
323:16 discussions?
323:17   A. I was in this meeting at
323:18 Williams & Connolly, yes.
323:19   Q. Okay.  And so one of the
323:20 recommendations they said is that HDA's
323:21 members could avert action by improving
323:22 their compliance systems?

324:1 - 324:14    **Kelly, Patrick 05-10-2019 (00:00:13)**          PK03.149

324:1 THE WITNESS:  That's -- I
324:2 mean, it says that they felt they
324:3 were better off averting DEA
324:4 actions by taking even stronger
324:5 compliance measures.  That's
324:6 what's written in the memo.
324:7 BY MR. PIFKO:
324:8   Q. And that's what was
324:9 discussed at the meeting?  You said you
324:10 were there?

| Page/Line | Source | ID |
|---|---|---|

324:11   A. I was there, yes.

324:12   Q. And that's consistent with

324:13 what was discussed there?

324:14   A. Yes.

**326:10 - 327:11**   **Kelly, Patrick 05-10-2019 (00:00:48)**   PK03.150

326:10   Q. Okay.  Another potential

326:11 action, again going to Page 2 of the

326:12 notes, is, "Seek guidance from a

326:13 well-respected public relations firm to

326:14 improve industry image."

326:15 This was something else that

326:16 was considered?

326:17   A. Yes.

326:18   Q. Did you ever move forward

326:19 with that option?

326:20   A. We did.

326:21   Q. And who did you retain?

326:22   A. Processwise, after this

326:23 meeting, we've been through -- we've been

326:24 engaged with several public relations

327:1 firm.  But I think this one led to an

327:2 initial engagement with APCO.

327:3   Q. And they developed the

327:4 crisis playbook, right?

327:5   A. That -- yes, that was their

327:6 development, yes.  I don't know if that's

327:7 the specific name of it.  But it was --

327:8   Q. But you're familiar with

327:9 that document?

327:10   A. Yes, that they developed,

327:11 yes.

**413:23 - 414:1**   **Kelly, Patrick 05-10-2019 (00:00:05)**   PK03.198

413:23   Q. I'm going to turn your

413:24 attention back to Exhibit 1, the subpoena

414:1 with the topics.  Are you there?

**414:2 - 418:12**   **Kelly, Patrick 05-10-2019 (00:03:13)**   PK03.187

414:2   A. I am.

414:3   Q. Okay.  Topic Number 3 is

414:4 your lobbying activities related to the

414:5 manufacture, marketing, advertising and

| Page/Line | Source | ID |
|---|---|---|

414:6 distribution of opioids or opioid

414:7 products.

414:8 Do you see that?

414:9   A. I do.

414:10   Q. Do you understand yourself

414:11 to be -- have been designated to talk

414:12 about that topic here today?

414:13   A. I do.

414:14   Q. We talked about Topic 4

414:15 already.

414:16 Topic Number 5:  Your

414:17 advocacy or legal support for any

414:18 defendant, including but not limited to,

414:19 amicus curiae briefs or any -- or other

414:20 legal documents prepared by you in

414:21 support of any defendant.

414:22 Do you see that?

414:23   A. I do.

414:24   Q. Do you understand yourself

415:1 to be designated to talk on that topic

415:2 today?

415:3   A. I do.

415:4   Q. Topic Number 6:  The nature,

415:5 scope and identity of any conferences,

415:6 seminars or webinars you have sponsored,

415:7 promoted or organized where the duty to

415:8 prevent diversion and identify and report

415:9 suspicious orders was included among the

415:10 topics of discussion.

415:11 Do you see that?

415:12   A. I do.

415:13   Q. Do you understand yourself

415:14 to be designated to talk on that topic

415:15 today?

415:16   A. I do.

415:17   Q. Topic Number 7:

415:18 Communications with the DEA or any state

415:19 or federal government agency regarding

415:20 the diversion or suspicious orders of

415:21 opioids or opioid products, including but

| Page/Line | Source | ID |
|---|---|---|

415:22 not limited to, the attendance,

415:23 participation in, presentations given by

415:24 the DEA at your conferences, seminars, or

416:1 webinars regarding advice, direction,

416:2 guidance or instruction regarding the

416:3 duty to prevent diversion and identify

416:4 and report suspicious orders.

416:5 Do you understand yourself

416:6 to be designated to talk on that topic

416:7 today?

416:8   A. I do.

416:9   Q. Topic Number 8:  Any

416:10 communications efforts, activities,

416:11 initiatives or work performed by you

416:12 regarding quotas set by the DEA,

416:13 including increases to or maintenance of

416:14 the quotas.

416:15 Do you understand yourself

416:16 to be designated to talk on that topic

416:17 today?

416:18   A. Yes.

416:19   Q. The scope -- Topic

416:20 Number 12:  The scope and nature of any

416:21 discussions of any council, committee,

416:22 task force or working group of the HDA

416:23 concerning opioids.

416:24 Do you see that?

417:1   A. I do.

417:2   Q. Do you understand yourself

417:3 to be designated to talk on that topic

417:4 today?

417:5   A. I do.

417:6   Q. Topic Number 13:  The scope

417:7 and nature of any discussions of any

417:8 council, committee, task force, or

417:9 working group of the HDA concerning

417:10 diversion of controlled substances.

417:11 Do you see that?

417:12   A. I do.

417:13   Q. Do you understand yourself

| | | |
|---|---|---|
| **PK03-Kelly, Patrick - Plaintiffs' Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

417:14 to be designated to talk on that topic

417:15 today?

417:16   A. I do.

417:17   Q. What did you do to prepare

417:18 to testify on those topics?

417:19   A. I met with counsel several

417:20 days in the last couple days and then

417:21 previously when we thought this was going

417:22 to be scheduled earlier, or later in

417:23 2018.  So probably four or five meetings

417:24 with counsel and staff.

418:1   Q. Okay.  I was going to ask

418:2 you.  Besides counsel, did you meet with

418:3 any staff members?

418:4   A. I did.  I met with Anita

418:5 Ducca primarily to understand the period

418:6 of time I was not at HDA.

418:7   Q. And did she provide any

418:8 documents to you?

418:9   A. Other than the documents

418:10 that were produced.

418:11   Q. So she provided documents to

418:12 you that were produced?

| 418:15 - 418:15 | **Kelly, Patrick 05-10-2019 (00:00:00)** | PK03.199 |

418:15 THE WITNESS:  No.  Counsel

| 418:16 - 420:1 | **Kelly, Patrick 05-10-2019 (00:00:52)** | PK03.200 |

418:16 provided the documents.

418:17 BY MR. PIFKO:

418:18   Q. Okay.  So when you

418:19 understood you were going to be

418:20 designated to come speak for the HDA at

418:21 this deposition, counsel provided you

418:22 with documents that had been produced in

418:23 the litigation?

418:24   A. That's correct.

419:1   Q. Okay.  And when you met with

419:2 Ms. Ducca, did we go over any of those

419:3 documents?

419:4   A. We did.  Did you review the

419:5   Q. Okay.  Did you review the

| Page/Line | Source | ID |
|---|---|---|
| | 419:6 documents on your own time without | |
| | 419:7 anybody? | |
| | 419:8   A. I did not. | |
| | 419:9   Q. Okay.  Who else besides | |
| | 419:10 Ms. Ducca from the staff did you meet | |
| | 419:11 with? | |
| | 419:12   A. Our general counsel | |
| | 419:13 participated in the meetings as well. | |
| | 419:14   Q. Okay.  Anyone else? | |
| | 419:15   A. No. | |
| | 419:16   Q. About how many hours did you | |
| | 419:17 meet with Ms. Ducca? | |
| | 419:18   A. Over the course, probably | |
| | 419:19 eight -- between eight and ten hours. | |
| | 419:20   Q. And you felt, based on those | |
| | 419:21 discussions and the review of documents, | |
| | 419:22 that you had adequate understanding to | |
| | 419:23 testify on those topics I just read to | |
| | 419:24 you? | |
| | 420:1   A. I do. | |
| 420:15 - 420:24 | **Kelly, Patrick 05-10-2019 (00:00:33)** | **PK03.152** |
| | 420:15   Q. Handing you what's marked as | |
| | 420:16 Exhibit 51. | **HDA-KELLY-51.1** |
| | 420:17 And while you are looking -- | |
| | 420:18 go ahead and take your time to look at | **HDA-KELLY-51.1.1** |
| | 420:19 that, but then I also want you to pull | |
| | 420:20 out Exhibit 11 which goes with | |
| | 420:21 Exhibit 51. | |
| | 420:22 For the record, Exhibit 51 | |
| | 420:23 is a three-page document Bates-labeled | |
| | 420:24 CAH_MDL2804_02201918 through 1920. | |
| 421:6 - 422:2 | **Kelly, Patrick 05-10-2019 (00:00:51)** | **PK03.153** |
| | 421:6   Q. So you recall, when I showed | |
| | 421:7 you Document 11 and I asked you if you | |
| | 421:8 had an understanding about the date of | |
| | 421:9 when the National Wholesale Druggists' | |
| | 421:10 Association suspicious order monitoring | |
| | 421:11 system, which is Exhibit 11, what the | |
| | 421:12 date of that document was, do you recall | |
| | 421:13 that discussion? | |

| Page/Line | Source | ID |
|---|---|---|
| | 421:14   A. I recall that discussion, | |
| | 421:15 yes. | |
| | 421:16   Q. Okay.  Well, Exhibit 51 is a | |
| | 421:17 series of letters from the DEA concerning | |
| | 421:18 the National Wholesale Druggists' | |
| | 421:19 Association's suspicious order monitoring | |
| | 421:20 system.  And if you see, the first page | |
| | 421:21 of Exhibit 51 is stamped April 27, 1984. | HDA-KELLY-51.1.2 |
| | 421:22 Do you see that? | |
| | 421:23   A. I do. | |
| | 421:24   Q. Does that refresh your | |
| | 422:1 recollection that Exhibit 11 is from | |
| | 422:2 approximately in the early '80s? | |
| 422:5 - 424:23 | **Kelly, Patrick 05-10-2019 (00:02:12)** | PK03.154 |
| | 422:5 THE WITNESS:  I will -- | |
| | 422:6 again, I have not seen either of | |
| | 422:7 these documents.  I will take it | |
| | 422:8 at face value that that was when | |
| | 422:9 this document was prepared. | |
| | 422:10 BY MR. PIFKO: | |
| | 422:11   Q. Okay.  Well, Exhibit 51 is a | |
| | 422:12 letter from Thomas Gitchel, acting chief | HDA-KELLY-51.2.1 |
| | 422:13 diversion operations section of the DEA, | |
| | 422:14 correct? | |
| | 422:15   A. Yes. | |
| | 422:16   Q. And it's dated April 27, | HDA-KELLY-51.1.2 |
| | 422:17 1984, correct? | |
| | 422:18   A. Yes. | |
| | 422:19   Q. And it's to Ronald J. | HDA-KELLY-51.1.3 |
| | 422:20 Streck, vice president of government | |
| | 422:21 affairs, National Wholesale Druggists' | |
| | 422:22 Association. | |
| | 422:23 That's a predecessor entity | |
| | 422:24 of HDA, correct? | |
| | 423:1   A. That's correct. | |
| | 423:2   Q. Do you know who Mr. Streck | |
| | 423:3 is? | |
| | 423:4   A. Mr. Streck became at one | |
| | 423:5 point the CEO of the NWDA. | |
| | 423:6   Q. Okay.  Do you know around | |

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

423:7 the time that was?

423:8   A. I do not know when he --

423:9 Mr. Gray did succeed him as the CEO.

423:10   Q. Okay.  Mr. Gray was

423:11 immediately after him?

423:12   A. Immediately after him, yes.

423:13   Q. Okay.  So this document

423:14 says, the second full paragraph, "The

423:15 NWDA's draft format for suspicious order

423:16 monitoring system provides an excellent

423:17 framework for distributor" --

423:18 "distributor registrants to design and

423:19 operate a system to disclose to

423:20 registrants suspicious orders of

423:21 controlled substances."

423:22 Do you see that?

423:23   A. I do.

**HDA-KELLY-51.1.4**

423:24   Q. And it says, "Draft format

424:1 for a suspicious order monitoring

424:2 system."  And Exhibit 11 says,

424:3 "Suspicious order monitoring system,"

424:4 correct?

**HDA-KELLY-11.1.1**

424:5   A. It does.

424:6   Q. Okay.  Then on the bottom of

424:7 that same paragraph, Mr. Gitchel says in

424:8 the letter to Mr. Streck, "As previously

424:9 discussed, an after-the-fact computer

424:10 printout of sales data does not relieve a

424:11 registrant of its responsibility to

424:12 report excessive or suspicious orders

424:13 when discovered."

424:14 Do you see that?

**HDA-KELLY-51.1.5**

424:15   A. I do.

424:16   Q. And then he says, "I'm

424:17 enclosing a copy of your draft with my

424:18 pen and ink changes."

424:19 Do you see that?

**HDA-KELLY-51.1.6**

424:20   A. I do.

424:21   Q. Do you agree -- any reason

424:22 to dispute that the NWDA received this

| Page/Line | Source | ID |
|---|---|---|
| | **PK03-Kelly, Patrick - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| | 424:23 document? | |
| 425:2 - 425:7 | **Kelly, Patrick 05-10-2019 (00:00:07)** | PK03.155 |
| | 425:2 THE WITNESS:  No reason to | |
| | 425:3 dispute that they received a pen | |
| | 425:4 and ink draft marked-up version. | |
| | 425:5 BY MR. PIFKO: | |
| | 425:6   Q. And this letter from DEA, | |
| | 425:7 correct? | |
| 425:10 - 425:16 | **Kelly, Patrick 05-10-2019 (00:00:16)** | PK03.156 |
| | 425:10 THE WITNESS:  No reason to | |
| | 425:11 dispute that. | |
| | 425:12 BY MR. PIFKO: | |
| | 425:13   Q. Based on your understanding | |
| | 425:14 of the HDA and as a designee under Rule | |
| | 425:15 30(b)(6), do you believe this would have | |
| | 425:16 been provided to HDA's members? | |
| 425:19 - 428:2 | **Kelly, Patrick 05-10-2019 (00:01:55)** | PK03.157 |
| | 425:19 THE WITNESS:  Again, I don't | |
| | 425:20 know what capabilities were back | |
| | 425:21 in 1984.  I would imagine it was | |
| | 425:22 reported at some point to HDA | |
| | 425:23 members. | |
| | 425:24 BY MR. PIFKO: | |
| | 426:1   Q. Okay.  In the first | |
| | 426:2 paragraph -- | |
| | 426:3   A. Or NWDA members. | |
| | 426:4   Q. In the first paragraph he | HDA-KELLY-51.1.7 |
| | 426:5 says, "I want to thank" -- "I want to | |
| | 426:6 take this opportunity to thank you, | |
| | 426:7 Mr. Streck, and then Mr. David Prins, | |
| | 426:8 from Twin City Wholesale, and Mr. Robert | |
| | 426:9 Bone from Bergen Brunswig for meeting | |
| | 426:10 with David Walkup and me on April 13, | |
| | 426:11 1984." | |
| | 426:12 Do you see that? | |
| | 426:13   A. I do. | |
| | 426:14   Q. So based on this, it appears | |
| | 426:15 some of the members in addition to | |
| | 426:16 Mr. Streck met with the DEA about the | |
| | 426:17 suspicious order monitoring system, | |

| Page/Line | Source | ID |
|---|---|---|

**PK03-Kelly, Patrick - Plaintiffs' Submission**

426:18 correct?

426:19   A. It would appear so, yes.

426:20   Q. Then the third page of

426:21 Exhibit 51 is another letter to

426:22 Mr. Streck from Thomas Gitchel.

426:23 Do you see that?

426:24   A. I do.

427:1   Q. And it appears to be dated

427:2 May 16, 1984.

427:3 Do you see that?

427:4   A. I do.

427:5   Q. In the letter from

427:6 Mr. Gitchel, he says at the bottom of the

427:7 first full paragraph, "However, I want to

427:8 make it clear that the submission of

427:9 monthly printout of after-the-fact sales

427:10 will not relieve a registrant from the

427:11 responsibility of reporting excessive or

427:12 suspicious orders.  DEA has interpreted

427:13 orders to mean prior to shipment."

427:14 Do you see that?

427:15   A. I do.

427:16   Q. And that's consistent with

427:17 the language that we discussed on Page

427:18 seven of Exhibit 11 where it says, "DEA

427:19 has interpreted orders to mean prior to

427:20 shipment."

427:21 Do you see that?

427:22   A. I do.

427:23   Q. Do you agree that it's --

427:24 this DEA letter from 1984 is consistent

428:1 with that language in the NWDA's

428:2 suspicious order monitoring system?

**428:5 - 428:10    Kelly, Patrick 05-10-2019 (00:00:12)**

428:5 THE WITNESS:  It appears to

428:6 be the same statement, yes.

428:7 BY MR. PIFKO:

428:8   Q. Do you believe that this May

428:9 16th, 1984 letter would have been shared

428:10 with the NWDA's members?

HDA-KELLY-51.3

HDA-KELLY-51.3.1

HDA-KELLY-51.3.2

PK03.158

clear

| PK03-Kelly, Patrick - Plaintiffs' Submission | | |
| --- | --- | --- |
| Page/Line | Source | ID |

| | | |
| --- | --- | --- |
| 428:13 - 428:22 | **Kelly, Patrick 05-10-2019 (00:00:17)** | **PK03.159** |
| | 428:13 THE WITNESS:  Again, I can't | |
| | 428:14 say for certain.  I would imagine | |
| | 428:15 that it was.  As correspondence | |
| | 428:16 like this would technically be | |
| | 428:17 shared with the membership. | |
| | 428:18 BY MR. PIFKO: | |
| | 428:19   Q. And again, because HDA and | |
| | 428:20 its predecessor entities would act on | |
| | 428:21 behalf of the members, not for its own | |
| | 428:22 interest, correct? | |
| 429:1 - 429:3 | **Kelly, Patrick 05-10-2019 (00:00:03)** | **PK03.160** |
| | 429:1 THE WITNESS:  Most -- yes, | |
| | 429:2 as most trade associations do, on | |
| | 429:3 behalf of their members. | |
| 441:7 - 441:19 | **Kelly, Patrick 05-10-2019 (00:00:20)** | **PK03.161** |
| | 441:7   Q. And I believe you testified | |
| | 441:8 earlier that the -- the regulatory | |
| | 441:9 affairs committee created the -- HDA's | |
| | 441:10 industry compliance guidelines; is that | |
| | 441:11 correct? | |
| | 441:12   A. That's -- that's correct. | |
| | 441:13   Q. The industry compliance | |
| | 441:14 guidelines are guidelines for | |
| | 441:15 distributors; is that right? | |
| | 441:16   A. That's correct. | |
| | 441:17   Q. They are not meant to be | |
| | 441:18 implemented by manufacturers? | |
| | 441:19   A. That is correct. | |

Plaintiffs Affirmative Designations = 01:11:55
Defense Completeness Counters = 00:03:53
**Total Time = 01:15:48**

**Documents Shown**
HDA-KELLY-11
HDA-KELLY-51