**Designation Run Report**

# Brantley, Eric - Plaintiff and Defense Combined Submission

---

**Brantley, Eric 11-27-2018**

---

| | |
|---|---|
| **Plaintiffs Affirmative Designations  00:22:25** | |
| **Defense Counter Designations  00:37:01** | |
| **Defense Completeness Counters  00:01:17** | |

**Total Time  01:00:43**



ID:EB04

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 15:20 - 15:21 | **Brantley, Eric 11-27-2018 (00:00:03)** | **EB04.1** |
| | 15:20   Q. Sir, state your name, please. | |
| | 15:21   A. Eric Brantley. | |
| 18:15 - 18:24 | **Brantley, Eric 11-27-2018 (00:00:33)** | **EB04.2** |
| | 18:15   Q. Sir, you -- you were a -- you were in | |
| | 18:16 charge of regulatory -- regulatory is one of your | |
| | 18:17 responsibilities with Cardinal; is that correct? | |
| | 18:18   A. I worked in the quality and regulatory | |
| | 18:19 affairs department. | |
| | 18:20   Q. And -- and with you was a fellow named | |
| | 18:21 Reardon; is that right? | |
| | 18:22   A. Steve Reardon was my boss. | |
| | 18:23   Q. And how many years was he your boss? | |
| | 18:24   A. I would say 2005 to 2008, maybe. | |
| 18:25 - 19:7 | **Brantley, Eric 11-27-2018 (00:00:18)** | **EB04.3** |
| | 18:25   Q. And did you have a system when you worked | |
| | 19:1 with Mr. Reardon where you would actually -- you'd | |
| | 19:2 have a suspicious order that you would have in-house, | |
| | 19:3 and then you would ship the product, even after being | |
| | 19:4 notified that it might be suspicious? | |
| | 19:5 Do you recall ever doing that, | |
| | 19:6 Mr. Brantley? | |
| | 19:7   A. No. | |
| 19:8 - 20:1 | **Brantley, Eric 11-27-2018 (00:00:46)** | **EB04.4** |
| | 19:8   Q. Okay.  And do you have any idea that the | |
| | 19:9 company was carrying on a monitoring system where | |
| | 19:10 they would identify and report potentially suspicious | |
| | 19:11 excessive purchases of controlled substances after | |
| | 19:12 the substances were shipped? | |
| | 19:13 Had anybody ever told you that that was | |
| | 19:14 going on with Cardinal? | |
| | 19:15   A. We had ingredient limit reports that | |
| | 19:16 were -- that were ran every month and submitted to | |
| | 19:17 the DEA.  And those ingredient limit reports were the | |
| | 19:18 potentially suspicious orders -- | |
| | 19:19   Q. Okay -- | |
| | 19:20   A. -- and I reviewed those reports. | |
| | 19:21   Q. Yeah, you reviewed them, and after you | |
| | 19:22 reviewed them, you would ship anyway; is that | |
| | 19:23 correct? | |

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

19:24   A. I would review the reports, and I would
19:25 conduct investigations of any downstream -- any
20:1 pharmacies that I needed to investigate.

20:2 - 21:8   **Brantley, Eric 11-27-2018 (00:00:59)**   EB04.5

20:2   Q. And --
20:3   A. And I would conduct a site visit of those
20:4 pharmacies.
20:5   Q. And my question is, sir, there were times
20:6 when you, Brantley, saw suspicious orders and decided
20:7 to ship the orders anyway.  That's a yes-or-no
20:8 question.
20:9   A. That is incorrect.
20:10   Q. Okay.  So what -- what system did you use
20:11 before you would ship?
20:12   A. My job was to review the ingredient limit
20:13 reports on a monthly basis, and if I noticed any
20:14 pharmacies that I wanted to further investigate, I
20:15 would contact those pharmacies and I would conduct a
20:16 site visit.  If those pharmacies were deemed
20:17 suspicious, they were shut off from controlled
20:18 substances, and they were reported to -- to Kyle
20:19 Wright at the DEA.
20:20   Q. And so --
20:21   A. That was my job.
20:22   Q. That was your job?
20:23   A. Yes.
20:24   Q. And you feel like you carried your job out
20:25 appropriately?
21:1   A. Yes.
21:2   Q. Were you there -- what were the years that
21:3 you were in charge of that job?
21:4   A. I was never in charge of the -- the job.
21:5 But I was at the corporate office -- from 2005 till
21:6 about 2008, I had responsibility for reviewing the
21:7 ingredient limit reports and conducting
21:8 investigations.

22:23 - 22:25   **Brantley, Eric 11-27-2018 (00:00:03)**   EB04.6

22:23   Q. Okay.  So today -- and you're no longer
22:24 with Cardinal; is that correct?
22:25   A. No, I'm not.

| Page/Line | Source | ID |
|---|---|---|
| | **EB04-Brantley, Eric - Plaintiff and Defense Combined Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 24:3 - 24:4 | **Brantley, Eric 11-27-2018 (00:00:03)**<br>24:3 MR. PAPANTONIO:  Okay.  Put up<br>24:4 document 4195. | **EB04.7** |
| 24:5 - 24:8 | **Brantley, Eric 11-27-2018 (00:00:02)**<br>24:5 MS. MOORE:  This will be<br>24:6 Cardinal-Brantley 2.<br>24:7 (Cardinal-Brantley 2 was marked for<br>24:8 identification.) | **EB04.8** |
| 24:21 - 27:3 | **Brantley, Eric 11-27-2018 (00:02:06)**<br>24:21   Q. Who is -- who is Steve<br>24:22 Reardon?<br>24:23   A. Steve Reardon was my boss at the time.<br>24:24   Q. And you see your name on there -- you see,<br>24:25 Mr. Brantley, where it says "To Brantley"?<br>25:1   A. Yes.<br>25:2   Q. And who is McPherson?<br>25:3   A. I don't know what her position was at the<br>25:4 time, but she was in the quality and regulatory<br>25:5 affairs department, I believe.<br>25:6   Q. Do you recognize everybody on the -- on<br>25:7 the line where it says "To"?<br>25:8   A. No.<br>25:9   Q. Who don't you recognize?<br>25:10   A. Al M-o-h-n, Mohn, Mohn.<br>25:11   Q. You don't recognize Al Mohn; you never had<br>25:12 any contact with Al Mohn?<br>25:13   A. I don't remember that name.<br>25:14   Q. All right.  Let's read this first<br>25:15 paragraph.<br>25:16 It says:  "HDMA met with DEA officials<br>25:17 last Friday, September 7th, to discuss the agency's<br>25:18 current policy positions on suspicious orders."<br>25:19 Did you know that that meeting had taken<br>25:20 place?<br>25:21   A. No.<br>25:22   Q. Okay.  And in your review before you came<br>25:23 in here today, did any -- did you -- you weren't<br>25:24 shown this document, I take it?<br>25:25   A. This particular --<br>26:1   Q. Yes. | **EB04.9** |

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

26:2  A. -- e-mail?

26:3  Q. Right.

26:4  A. This is my first time seeing this e-mail.

26:5  Q. But it's got your name on it?

26:6  A. It does.

26:7  Q. Okay.  And it says:  "A summary

26:8 highlighting the key points made during the meeting

26:9 are attached for your review."

26:10 It says:  "DEA is setting a new standard

26:11 with which we must comply.  This is all coming about

26:12 as a result of the problem with Internet pharmacies

26:13 and controlled substance diversion."

26:14 Now, you -- you had some -- part of your

26:15 job was to be involved with Internet pharmacies,

26:16 wasn't it?

26:17  A. Part my job was to try to identify

26:18 potential Internet activity from the ingredient limit

26:19 reports and investigate, yes.

26:20 MR. PAPANTONIO:  All right.  So would you

26:21 underline "Internet pharmacies" for me there,

26:22 Evan?

26:23 BY MR. PAPANTONIO:

26:24  Q. And it says:  "Controlled substance

26:25 diversion."

27:1 That was your job, wasn't it?  To -- to be

27:2 involved with controlling the substance diversion of

27:3 narcotics, correct?

| 27:6 - 27:13 | **Brantley, Eric 11-27-2018 (00:00:16)** | **EB04.10** |

27:6 BY MR. PAPANTONIO:

27:7  Q. Is that true?

27:8  A. My job was to review ingredient limit

27:9 reports and search for pharmacies that needed further

27:10 investigation and shut those pharmacies off if deemed

27:11 necessary and report that to the DEA.

27:12  Q. And that's controlling substance abuse of

27:13 narcotics, true?

| 27:15 - 27:22 | **Brantley, Eric 11-27-2018 (00:00:16)** | **EB04.11** |

27:15 BY MR. PAPANTONIO:

27:16  Q. That's -- part of your goal was to stop

27:17 diversion of narcotics; yes or no?

| Page/Line | Source | ID |
|---|---|---|

EB04-Brantley, Eric - Plaintiff and Defense Combined Submission

27:18  A. Part of our job was to help to prevent
27:19 diversion through the -- potential Internet
27:20 pharmacies, as well as the physical security in the
27:21 distribution centers and the cage and the vault and
27:22 everything else.

**28:21 - 29:1**  **Brantley, Eric 11-27-2018 (00:00:20)**  EB04.12

28:21  Q. Okay.  So now this goes on.  It says:
28:22 "Recently they suspended an ABC registration and used
28:23 the suspension to get them to implement a complex and
28:24 onerous suspicious order monitoring program that
28:25 meets the requirement, meets the criteria spelled out
29:1 in HDMA."

**36:7 - 36:17**  **Brantley, Eric 11-27-2018 (00:00:31)**  EB04.13

36:7 So we picked up with -- "Recently they
36:8 suspended an ABC registration and used the suspension
36:9 to get them to implement a complex and onerous
36:10 suspicious order monitoring."
36:11 Would you underline "complex" and
36:12 "onerous"?  We're going to come back to those
36:13 words.
36:14 ". . . complex and onerous suspicious
36:15 order monitoring program that meets the criteria
36:16 spelled out in the HDMA meeting summary."
36:17 Tell the jury what the "HDMA" is.

**36:19 - 36:25**  **Brantley, Eric 11-27-2018 (00:00:16)**  EB04.14

36:19 THE WITNESS:  HDMA is a -- an agency
36:20 comprised of pharmaceutical distributors.
36:21 BY MR. PAPANTONIO:
36:22  Q. And your company was part of the HDMA,
36:23 true?  Cardinal was part of the HDMA?
36:24  A. Cardinal Health, I believe, was part of
36:25 HDMA, yes.

**38:20 - 40:6**  **Brantley, Eric 11-27-2018 (00:01:27)**  EB04.15

38:20 Then it goes on to say:  "ABC presented
38:21 their program at the DEA industry conference this
38:22 week that I attended, and I have attached a copy of
38:23 the presentation."
38:24 Now, you see Steve Reardon sent that to
38:25 you, didn't he?
39:1  A. Yes.

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

39:2  Q. All right.  And he sent it back in 2007,
39:3 true?  September 2007, right?
39:4  A. Yes.
39:5  Q. And it says -- goes on to say,
39:6 "Suspicious" -- let me read it.  It says:  "A complex
39:7 and onerous" -- pick up from there:
39:8 ". . . complex and onerous suspicious
39:9 order monitoring program that meets the criteria
39:10 spelled out by the HDMA meeting summary.  ABC
39:11 presented their program at the DEA industry
39:12 conference this week."
39:13 Were you there when they presented that?
39:14  A. No, I was not.
39:15  Q. And -- "And I attended, and I have a copy
39:16 attached to the presentation."
39:17 So you didn't attend, but Steve Reardon
39:18 did, correct?
39:19  A. Apparently.  That's what he says, yes.
39:20  Q. Yeah.  It says:  "DEA referred to the ABC
39:21 program as the new industry standard."
39:22 MR. PAPANTONIO:  Underline that term, "the
39:23 new industry standard."
39:24 BY MR. PAPANTONIO:
39:25  Q. Sir, you know what a -- you've -- you've
40:1 worked with industry standards, both with -- well,
40:2 with Cardinal, industry standards with Kinray,
40:3 industry standards with Purdue, I take it?  You've
40:4 worked with industry standards with all three of
40:5 those companies, right?
40:6  A. Yes.

| 40:8 - 41:3 | **Brantley, Eric 11-27-2018 (00:00:46)** | **EB04.16** |

40:8 BY MR. PAPANTONIO:
40:9  Q. How many years have you been working with
40:10 industry standards within the distribution of
40:11 narcotics?
40:12  A. Well, an industry standard is -- is what,
40:13 exactly?  I mean, an industry standard is what one
40:14 company may be doing.
40:15  Q. Okay.  And it says:  "The DEA referred to
40:16 the ABC program as the new industry standard."

| Page/Line | Source | ID |
|---|---|---|
| | 40:17 Do you see that? | |
| | 40:18  A. Yes. | |
| | 40:19  Q. All right.  It says:  "I will be setting | |
| | 40:20 up a meeting to initiate discussions on this topic in | |
| | 40:21 the near future." | |
| | 40:22 Did you attend that meeting where there | |
| | 40:23 were discussions about the industry standards for | |
| | 40:24 narcotics? | |
| | 40:25  A. I don't recall if I was present at -- | |
| | 41:1  Q. That's fair enough.  That was a long time | |
| | 41:2 ago, wasn't it? | |
| | 41:3  A. Yes. | |
| 41:11 - 41:17 | **Brantley, Eric 11-27-2018 (00:00:22)** | **EB04.17** |
| | 41:11  Q. It says:  "Additionally, I am aware that | |
| | 41:12 MKC is in ongoing negotiations with DEA relating to | |
| | 41:13 order to show cause." | |
| | 41:14 Do you know who "MCK" is? | |
| | 41:15  A. I will take that to mean McKesson. | |
| | 41:16  Q. Okay.  And you worked with McKesson; you | |
| | 41:17 were familiar with their business.  True? | |
| 41:19 - 41:20 | **Brantley, Eric 11-27-2018 (00:00:00)** | **EB04.18** |
| | 41:19 BY MR. PAPANTONIO: | |
| | 41:20  Q. What they did? | |
| 41:22 - 42:8 | **Brantley, Eric 11-27-2018 (00:00:18)** | **EB04.19** |
| | 41:22 BY MR. PAPANTONIO: | |
| | 41:23  Q. Or you didn't? | |
| | 41:24  A. I knew -- I knew that they were a | |
| | 41:25 wholesale distributor.  I did not know the details of | |
| | 42:1 their business, no. | |
| | 42:2  Q. They were a competitor of yours, weren't | |
| | 42:3 they? | |
| | 42:4  A. They were another wholesale distributor, | |
| | 42:5 just like Cardinal Health. | |
| | 42:6  Q. It says "an order to show cause."  What is | |
| | 42:7 "an order to show cause"?  You've -- you've dealt | |
| | 42:8 with those before, haven't you? | |
| 42:11 - 42:16 | **Brantley, Eric 11-27-2018 (00:00:08)** | **EB04.20** |
| | 42:11 THE WITNESS:  I have not dealt directly | |
| | 42:12 with an order to show cause. | |
| | 42:13 BY MR. PAPANTONIO: | |

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | |
| --- | --- |

| Page/Line | Source | ID |
| --- | --- | --- |

42:14   Q. Do you know what one is?  I mean, you've
42:15 worked around regulatory long enough to know what an
42:16 "order to show cause" is?

**42:19 - 42:25**  **Brantley, Eric 11-27-2018 (00:00:16)**  **EB04.21**

42:19 THE WITNESS:  I have a general idea.
42:20 BY MR. PAPANTONIO:
42:21   Q. Tell me what you think it is.
42:22   A. I -- I think an order to show cause in
42:23 this case is if DEA has allegations against a
42:24 registrant, it gives the registrant an opportunity to
42:25 answer to those allegations.

**46:9 - 46:13**  **Brantley, Eric 11-27-2018 (00:00:15)**  **EB04.22**

46:9   Q. Oh, okay.  Well, who do you recall
46:10 suspensions of?
46:11   A. I recall that at some point, there were
46:12 suspensions of DEA registrations for Cardinal Health.
46:13   Q. Explain to the jury what that means.

**46:16 - 46:22**  **Brantley, Eric 11-27-2018 (00:00:13)**  **EB04.23**

46:16 BY MR. PAPANTONIO:
46:17   Q. Explain to the jury what you just -- what
46:18 you just said.  Break it down for the jury right now
46:19 so they understand, before we go through this
46:20 deposition, what you recall about suspensions, before
46:21 I start asking you questions about it.  Tell the
46:22 jury.

**46:24 - 47:17**  **Brantley, Eric 11-27-2018 (00:00:48)**  **EB04.24**

46:24 THE WITNESS:  I do not remember the time
46:25 frame.  But there were allegations -- it was
47:1 alleged -- I don't remember the details around
47:2 shipments to customers.
47:3 I remember that during the course of my
47:4 job, identifying pharmacies, shutting those
47:5 pharmacies off from receiving controlled
47:6 substances, and reporting those pharmacies to
47:7 the DEA.  And then at some point, I remember
47:8 those same pharmacies being a part of whatever
47:9 the documents were around the -- the suspension,
47:10 pharmacies that we had shut off 12 to 18 months
47:11 prior.
47:12 BY MR. PAPANTONIO:

| | | |
|---|---|---|
| **EB04-Brantley, Eric - Plaintiff and Defense Combined Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

47:13  Q. We'll show you documents, and we'll -- the
47:14 jury will be able to see what you cut off and when.
47:15 But we'll -- we'll leave that for the jury to look
47:16 at, but let me go ahead with what this says right
47:17 here.

**47:20 - 50:4**  **Brantley, Eric 11-27-2018 (00:02:41)**  **EB04.25**

47:20 BY MR. PAPANTONIO:
47:21  Q. Let me ask you a question.  It says:  "I
47:22 think it would be safe to assume that the DEA will
47:23 use this opportunity to get MCK to implement an
47:24 ABC-like program."
47:25 Who is "ABC"?  Do you know?
48:1  A. I would take ABC to be AmerisourceBergen.
48:2  Q. Okay.  It says:  "Also at the industry
48:3 meeting, the H.D. Smith director of regulatory
48:4 compliance was pulled aside and told that the DEA has
48:5 concern with some of their customers and to schedule
48:6 a meeting with DEA in D.C. to discuss that he should
48:7 bring his IT people with him."
48:8 See that?
48:9  A. Yes.
48:10  Q. Okay.  And then this last paragraph, it
48:11 says -- put a box around this, if you can, because
48:12 this is where we're going to be spending some time.
48:13 It says:  "We need to be proactive and
48:14 implement a program that we develop that will satisfy
48:15 DEA expectations, and this is not -- and is not
48:16 dictated to us by the Agency pursuant to regulatory
48:17 actions.  The ABC program is not customer friendly
48:18 and results in delayed filing and delivery of
48:19 controlled substances -- substance orders to the
48:20 customer."
48:21 Do you see that?  You see where I read
48:22 that?  You got --
48:23  A. Yes.
48:24  Q. You got this letter, didn't you?
48:25  A. My name is on the address list, yes.
49:1  Q. And then if you'll go to the next page,
49:2 let's take a look at what the -- actually let's go
49:3 right -- go to page 4, and we'll -- we'll just review

| Page/Line | Source | ID |
|---|---|---|
| | EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | |

49:4 what the ABC -- the new program for ABC was.  Page 4.
49:5 You see that?  Looks like this
49:6 (indicating).
49:7   A. Yes.
49:8   Q. Okay.  So AmerisourceBergen, which is the
49:9 company that we're talking about here, their
49:10 programs, it says:  "Drug Enforcement Administration
49:11 Pharmaceutical Industry Conference."
49:12 You see that?  September 11th, 2007?
49:13   A. Yes.
49:14   Q. And if you'll go to -- if you will go then
49:15 to the bottom of that page, it says:  "Regulatory
49:16 responsibility.  Title 21 of code -- of the Code of
49:17 Federal Regulations," and it gives 1301.71.
49:18 "All applicants and registrants shall
49:19 provide effective controls and procedures to guard
49:20 against theft and diversion of a controlled
49:21 substance."
49:22 Right?  See that?
49:23   A. Yes.
49:24   Q. And you knew that -- you knew about that
49:25 statute, didn't you?  When you were working, you knew
50:1 about the statute, right?
50:2   A. At the time that I was responsible for
50:3 reviewing the ingredient limit reports and
50:4 identifying pharmacies, yes.

| Page/Line | Source | ID |
|---|---|---|
| 59:11 - 59:19 | **Brantley, Eric 11-27-2018 (00:00:17)** | **EB04.26** |

59:11 BY MR. PAPANTONIO:
59:12   Q. Your testimony, Mr. Brantley, is at the
59:13 time, that your company was reporting suspicious
59:14 orders, right?
59:15   A. We generate ingredient limit reports, and
59:16 we submitted those reports to the DEA every month.
59:17   Q. So you're reporting suspicious orders,
59:18 according to what your testimony is here today?  Is
59:19 that a yes or a no?

| Page/Line | Source | ID |
|---|---|---|
| 59:22 - 59:23 | **Brantley, Eric 11-27-2018 (00:00:04)** | **EB04.27** |

59:22 THE WITNESS:  We filed ingredient limit
59:23 reports with the DEA every month.

| Page/Line | Source | ID |
|---|---|---|
| 65:4 - 65:20 | **Brantley, Eric 11-27-2018 (00:00:38)** | **EB04.100** |

| Page/Line | Source | ID |
|---|---|---|

EB04-Brantley, Eric - Plaintiff and Defense Combined Submission

65:4   Q. I mean, in good faith -- you really
65:5 believed there was a suspicious order program in
65:6 place when you left the company; is that your
65:7 testimony?
65:8   A. There was a suspicious order program in
65:9 place while I was at the company.  And there is a
65:10 suspicious order in -- in place at the company, yes.
65:11   Q. You thought that?
65:12   A. I knew that because I worked on the
65:13 program.
65:14 My job was to identify such orders by
65:15 reviewing the ingredient limit reports, and in
65:16 addition, to go above and beyond, to go out and
65:17 conduct a site visit of that customer and shut that
65:18 customer off from controlled substances, and then
65:19 report not a suspicious order, but a customer to the
65:20 DEA.

**150:19 - 151:6     Brantley, Eric 11-27-2018 (00:00:25)**                    **EB04.28**

150:19   Q. And you were the guy in corporate that was
150:20 reviewing these orders, weren't you?
150:21   A. I was an individual at the corporate
150:22 office that was reviewing ingredient limit reports on
150:23 a monthly basis.
150:24   Q. And there were only two more of you,
150:25 weren't there?
151:1   A. At the corporate level?
151:2   Q. Yeah.
151:3   A. As far as the team that I managed, yes.
151:4   Q. And this is -- and these drugs are going
151:5 out, these narcotic drugs are going out all over the
151:6 country, aren't they?

**151:9 - 151:18     Brantley, Eric 11-27-2018 (00:00:15)**                    **EB04.29**

151:9 THE WITNESS:  During a certain time frame,
151:10 during a certain time frame, there were two or
151:11 three of us, from 2005 until, again, 2007-8 time
151:12 frame.
151:13 BY MR. PAPANTONIO:
151:14   Q. There were --
151:15   A. And then there were others added.  But
151:16 during that time frame, yes, there were two or three.

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 151:17   Q. At corporate level? | |
|  | 151:18   A. At the corporate level. | |
| 176:19 - 176:22 | **Brantley, Eric 11-27-2018 (00:00:12)** | **EB04.102** |
|  | 176:19   Q. Well, what was your job in 2005? | |
|  | 176:20   A. As I've stated several times, my -- my job | |
|  | 176:21 was to review ingredient limit reports, conduct | |
|  | 176:22 investigations, and report those to the DEA. | |
| 360:19 - 361:3 | **Brantley, Eric 11-27-2018 (00:00:22)** | **EB04.30** |
|  | 360:19   Q. Mr. Brantley, you've been speaking with | |
|  | 360:20 Mr. Papantonio for quite some time.  I wanted just to | |
|  | 360:21 follow up on a few things and cover a few new areas; | |
|  | 360:22 I'm going to try not to repeat anything.  Okay? | |
|  | 360:23   A. Okay. | |
|  | 360:24   Q. So the two or three people that also | |
|  | 360:25 filled your role from '05 to '07, who were they? | |
|  | 361:1   A. Tim Dunham. | |
|  | 361:2   Q. Okay. | |
|  | 361:3   A. And Nick Rausch. | |
| 363:17 - 363:23 | **Brantley, Eric 11-27-2018 (00:00:15)** | **EB04.31** |
|  | 363:17   Q. You mentioned several times that the | |
|  | 363:18 system that was in place was this reviewing | |
|  | 363:19 ingredient limit reports, correct, is what you would | |
|  | 363:20 do? | |
|  | 363:21   A. Yes. | |
|  | 363:22   Q. And you did that manually; is that right? | |
|  | 363:23   A. Yes. | |
| 364:14 - 365:12 | **Brantley, Eric 11-27-2018 (00:00:55)** | **EB04.32** |
|  | 364:14   Q. This will be Plaintiffs' Exhibit | |
|  | 364:15 Number 24. | |
|  | 364:16 And you see this e-mail, it starts off | |
|  | 364:17 from Mr. Kurtz, Bob Kurtz: | |
|  | 364:18 Do you know who Bob Kurtz is? | |
|  | 364:19   A. I do not.  I think I've heard that name | |
|  | 364:20 before, but I don't remember who he was. | |
|  | 364:21   Q. Operations manager down in Lakeland, | |
|  | 364:22 Florida; does that sound familiar? | |
|  | 364:23   A. Again, I've heard the name before, but -- | |
|  | 364:24   Q. Fair enough. | |
|  | 364:25   A. -- that still does not put it into | |
|  | 365:1 context. | |

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

365:2   Q. And he's sending it to Rafael Varela; do
365:3 you know Mr. Varela?
365:4   A. I have heard that name as well.
365:5   Q. If you scan down a little bit lower on the
365:6 e-mail, Mr. Varela is the compliance and QA manager
365:7 for Cardinal Health, Lakeland, Florida.
365:8 Do you see that?
365:9   A. Yes.
365:10   Q. Okay.  And it starts off -- now let's go
365:11 through the time frame.  I apologize.  December 5th,
365:12 2007.

**365:16 - 366:10**   **Brantley, Eric 11-27-2018 (00:00:54)**   EB04.33

365:16   Q. December 5th, 2007.  It's right about the
365:17 time that these immediate suspension orders are
365:18 coming out, correct?
365:19   A. I don't remember the dates.
365:20 November 28th, 2007, was -- seems like to be the
365:21 first one, yes.
365:22   Q. Okay.  So right about that time, and this
365:23 e-mail is in response, because it says "More
365:24 information on DEA suspension."
365:25 Do you see that there?
366:1   A. Yes.
366:2   Q. And then it says:  "Just some thoughts on
366:3 Auburn, Washington, incident that concern me."
366:4 It says -- and if we skip down to the next
366:5 paragraph:  "The manual process we perform now with
366:6 the discovery of suspected excessive purchases being
366:7 left up to the keyer notifying myself or the picker,
366:8 double-checker, QCer questioning the amount being
366:9 processed seems to leave ample opportunity for
366:10 failure."

**366:14 - 366:16**   **Brantley, Eric 11-27-2018 (00:00:07)**   EB04.34

366:14   Q. "Ample opportunity for failure."  It's
366:15 clearly a concern being voiced by the people in
366:16 Lakeland, right?

**366:18 - 366:22**   **Brantley, Eric 11-27-2018 (00:00:13)**   EB04.35

366:18 THE WITNESS:  This is a concern being
366:19 stated by Bob Kurtz.
366:20 BY MR. FULLER:

| Page/Line | Source | ID |
|---|---|---|

**EB04-Brantley, Eric - Plaintiff and Defense Combined Submission**

| Page/Line | Source | ID |
|---|---|---|
| 367:8 - 367:19 | 366:21   Q. And if you look back at 4230, what's the<br>366:22 date of the immediate suspension order for Lakeland?<br>**Brantley, Eric 11-27-2018 (00:00:33)**<br>367:8   Q. Same day that e-mail is sent, isn't it?<br>367:9   A. December 5th, 2007.  December 5th, 2007.<br>367:10 Yes.<br>367:11   Q. They say:  "A system-generated flag would<br>367:12 be a more complete, thorough method for<br>367:13 determining" -- or excuse me -- "of determining<br>367:14 spikes or excessive quantities than we are currently<br>367:15 performing."<br>367:16 Did I read that correctly?<br>367:17   A. Yes.<br>367:18   Q. And during that time frame, there was no<br>367:19 automated system for generating flags, was there? | EB04.36 |
| 367:21 - 367:23 | **Brantley, Eric 11-27-2018 (00:00:04)**<br>367:21 THE WITNESS:  To my knowledge, the system<br>367:22 was reviewing the ingredient limit reports that<br>367:23 I was doing then. | EB04.37 |
| 367:25 - 368:6 | **Brantley, Eric 11-27-2018 (00:00:15)**<br>367:25   Q. You had the monthly reports that you were<br>368:1 sending off, and then you had pickers and checkers<br>368:2 looking for excessive orders in the building, right?<br>368:3   A. Yes.  That report was a computer-generated<br>368:4 report.<br>368:5   Q. Right.  But there was no red flags that<br>368:6 got flagged, correct? | EB04.38 |
| 368:10 - 368:18 | **Brantley, Eric 11-27-2018 (00:00:19)**<br>368:10   A. Every -- every entity that appeared on<br>368:11 that ingredient limit report had reached the<br>368:12 threshold requirement.<br>368:13   Q. Exceeded the threshold, correct?<br>368:14   A. Exceeded the threshold for -- reached or<br>368:15 exceeded the threshold for that substance.<br>368:16   Q. And those reports came out well after<br>368:17 those products were shipped, after the pills were out<br>368:18 on the street, right? | EB04.39 |
| 368:20 - 368:20 | **Brantley, Eric 11-27-2018 (00:00:01)**<br>368:20 THE WITNESS:  Those were monthly reports. | EB04.40 |
| 368:22 - 368:23 | **Brantley, Eric 11-27-2018 (00:00:03)** | EB04.41 |

| | EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  |  |
|---|---|---|
| | 368:22  Q. And the report came out after the pills | |
| | 368:23 were already on the street, didn't they? | |
| 368:25 - 369:1 | **Brantley, Eric 11-27-2018 (00:00:03)** | **EB04.42** |
| | 368:25 THE WITNESS:  The report was generated | |
| | 369:1 after the shipments had shipped. | |
| 369:3 - 369:11 | **Brantley, Eric 11-27-2018 (00:00:26)** | **EB04.43** |
| | 369:3  Q. It says:  "As you know, I've investigated | |
| | 369:4 many accounts, tracked their ordering history and | |
| | 369:5 reached out for guidance and directions.  But without | |
| | 369:6 someone bringing a suspected excessive quantity order | |
| | 369:7 to our attention, many, many more could be going out | |
| | 369:8 the door under our noses." | |
| | 369:9 And as Mr. Papantonio showed you earlier, | |
| | 369:10 that was the problem.  All the pills were going out | |
| | 369:11 the door; no one was stopping them, wasn't it? | |
| 369:13 - 369:15 | **Brantley, Eric 11-27-2018 (00:00:09)** | **EB04.44** |
| | 369:13 THE WITNESS:  Well, the cage vault | |
| | 369:14 personnel did have the ability to identify and | |
| | 369:15 order at time of picking and report that order. | |
| 369:17 - 369:25 | **Brantley, Eric 11-27-2018 (00:00:12)** | **EB04.45** |
| | 369:17  Q. Well, in order to do that, they would have | |
| | 369:18 to know what they're picking. | |
| | 369:19 You would agree with that, wouldn't you? | |
| | 369:20  A. Based on their knowledge. | |
| | 369:21  Q. They would have to to know what they're | |
| | 369:22 picking to be able to -- | |
| | 369:23  A. They would have to know what's in front of | |
| | 369:24 them, what they are picking. | |
| | 369:25  Q. Absolutely. | |
| 370:3 - 370:4 | **Brantley, Eric 11-27-2018 (00:00:02)** | **EB04.46** |
| | 370:3  Q. And if they don't, they can't do their | |
| | 370:4 job, can they? | |
| 370:6 - 370:7 | **Brantley, Eric 11-27-2018 (00:00:01)** | **EB04.47** |
| | 370:6 THE WITNESS:  If they don't know what | |
| | 370:7 they're picking? | |
| 370:10 - 370:14 | **Brantley, Eric 11-27-2018 (00:00:08)** | **EB04.48** |
| | 370:10  A. If they don't know what they're picking, | |
| | 370:11 are you saying they can't do their job?  They can | |
| | 370:12 still pick and ship orders, right? | |
| | 370:13  Q. They can pick and ship orders, but they | |

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 370:16 - 370:24 | 370:14 can't pick out the excessive orders, right?<br>**Brantley, Eric 11-27-2018 (00:00:14)**<br>370:16 THE WITNESS:  If they don't know what<br>370:17 they're picking -- I'm just trying to<br>370:18 understand.  If they don't know what they're<br>370:19 picking, they can --<br>370:20 BY MR. FULLER:<br>370:21   Q. If they don't know it's a Control II, or<br>370:22 what type of product it is that they're picking, they<br>370:23 can't do their job to bring it to someone's<br>370:24 attention, can they? | EB04.49 |
| 371:1 - 371:3 | **Brantley, Eric 11-27-2018 (00:00:06)**<br>371:1 THE WITNESS:  Well, if you don't know what<br>371:2 you're picking, then you can't identify it, yes,<br>371:3 true. | EB04.50 |
| 371:6 - 371:12 | **Brantley, Eric 11-27-2018 (00:00:19)**<br>371:6 And then it says, "I wonder, could a<br>371:7 similar situation happen in Lakeland and management<br>371:8 be questioned why wasn't this discovered?"<br>371:9 Do you see that there?<br>371:10   A. Yes.<br>371:11   Q. It happens the same day the immediate<br>371:12 suspension order is issued for Lakeland, doesn't it? | EB04.51 |
| 371:14 - 371:15 | **Brantley, Eric 11-27-2018 (00:00:04)**<br>371:14 THE WITNESS:  Yes, we did verify that the<br>371:15 two dates match the December 5th, yes. | EB04.52 |
| 371:17 - 372:8 | **Brantley, Eric 11-27-2018 (00:00:40)**<br>371:17   Q. Pickers and checkers.<br>371:18 Do you know Mr. Baranski?<br>371:19   A. I do not.<br>371:20   Q. He was the director of operations -- is<br>371:21 the director of operations for the Wheeling facility.<br>371:22 You know the Wheeling distribution center in West<br>371:23 Virginia?<br>371:24   A. I'm familiar with the Wheeling facility.<br>371:25   Q. That also serviced not only West Virginia<br>372:1 but portions of Ohio as well, correct?<br>372:2   A. I don't remember.  I know that -- I'm sure<br>372:3 they service West Virginia.  It's possible they could<br>372:4 have serviced -- I just don't remember. | EB04.53 |

| Page/Line | Source | ID |
|---|---|---|
| | EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | |

372:5   Q. Well, let's see what Mr. Baranski had to
372:6 say about the picker's knowledge on what they were
372:7 picking.  Okay?  He would be the one to ask, you
372:8 would agree, correct?

**372:11 - 372:12**   **Brantley, Eric 11-27-2018 (00:00:02)**   EB04.54

372:11   Q. He's the director of operations for that
372:12 facility?

**372:15 - 372:25**   **Brantley, Eric 11-27-2018 (00:00:17)**   EB04.55

372:15 THE WITNESS:  I can't say that he would be
372:16 the one to ask, I mean, at that level, but --
372:17 BY MR. FULLER:
372:18   Q. He's the one that runs the building,
372:19 right?
372:20   A. He has oversight of the -- he's the
372:21 director of operations of the facility.
372:22   Q. He's the head honcho, as far as that
372:23 building, correct?
372:24   A. He is the highest-ranking person at that
372:25 facility.

**373:4 - 373:24**   **Brantley, Eric 11-27-2018 (00:00:45)**   EB04.56

373:4 "Q Now, when we're going to pick up
373:5 the product -- and let's deal with the
373:6 controls.
373:7 "A Sure.
373:8 "Q If you have -- and I guess this
373:9 depends on how you get the order.  If
373:10 I'm going to pick up the same substances
373:11 both in a brand name and in a generic,
373:12 how do I know which to grab, if I'm the
373:13 picker?
373:14 "A The unit tells them what
373:15 location to go to.
373:16 "Q And would the order have
373:17 specified whether it was picking up a
373:18 generic -- you know, something made by a
373:19 particular manufacturer versus a
373:20 generic?
373:21 "A We teach our people to pick from
373:22 location to tote.  I don't even care if
373:23 they know the product.  I want them to

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 373:24 know location to tote. | |
| 374:3 - 374:15 | **Brantley, Eric 11-27-2018 (00:00:27)** | **EB04.57** |
| | 374:3   Q. So according to Mr. Baranski, they're | |
| | 374:4 picking by location only.  He doesn't even care if | |
| | 374:5 they know the product.  Right?  That's what he | |
| | 374:6 testified to, correct? | |
| | 374:7   A. He stated that he doesn't care whether | |
| | 374:8 they know the product.  That does not mean that the | |
| | 374:9 person picking does not know what the product is.  He | |
| | 374:10 expressed his opinion. | |
| | 374:11   Q. Sure.  And according to him, the one over | |
| | 374:12 the Wheeling distribution center, he doesn't even | |
| | 374:13 care if they know the product:  Pick from location to | |
| | 374:14 tote. | |
| | 374:15 That's what he testified to, correct? | |
| 374:17 - 374:18 | **Brantley, Eric 11-27-2018 (00:00:01)** | **EB04.58** |
| | 374:17 THE WITNESS:  That is the statement that | |
| | 374:18 he made. | |
| 374:20 - 374:23 | **Brantley, Eric 11-27-2018 (00:00:15)** | **EB04.59** |
| | 374:20   Q. Okay.  Now, we looked at that MOU just for | |
| | 374:21 a second.  Are you aware whether Cardinal did do an | |
| | 374:22 18-month lookback over its distributions? | |
| | 374:23   A. I don't know. | |
| 396:20 - 396:23 | **Brantley, Eric 11-27-2018 (00:00:12)** | **EB04.90** |
| | 396:20   Q. And you, as you testified earlier, | |
| | 396:21 you reported customers to the DEA, not suspicious | |
| | 396:22 orders, correct? | |
| | 396:23   A. I reported customers. | |
| 517:25 - 522:12 | **Brantley, Eric 11-27-2018 (00:05:05)** | **EB04.61** |
| | 517:25   Q. Good afternoon, Mr. Brantley. | |
| | 518:1   A. Good afternoon. | |
| | 518:2   Q. My name's Steven Pyser, and I represent | |
| | 518:3 Cardinal Health. | |
| | 518:4 Can you introduce yourself to the jury. | |
| | 518:5   A. Yes.  My name is Eric Brantley. | |
| | 518:6   Q. Where did you grow up, Mr. Brantley? | |
| | 518:7   A. Flint, Michigan. | |
| | 518:8   Q. And did there come a time when you went to | |
| | 518:9 work as an employee of Cardinal Health? | |
| | 518:10   A. Yes. | |

| Page/Line | Source | ID |
|---|---|---|

518:11   Q. When was that, approximately?
518:12   A. I started with Bentley Trading in
518:13 January 2000, and that company was acquired by
518:14 Cardinal Health in 2002.
518:15   Q. And how long did you work at Cardinal
518:16 Health?
518:17   A. I left Cardinal Health 2013; I want to say
518:18 October, September.
518:19   Q. So 2002 --
518:20   A. 2013.
518:21   Q. -- to roughly 2013; we're talking about
518:22 11 years, roughly?
518:23   A. Yes.
518:24   Q. During your -- your 11 years, can you
518:25 describe from your perspective Cardinal Health's role
519:1 in the health care distribution system in the United
519:2 States?
519:3   A. Yes.  As a distributor, Cardinal purchases
519:4 prescription drugs, including controlled substances,
519:5 from the manufacturer and distributes those to final
519:6 dispensers:  Pharmacies, chain pharmacies, hospitals,
519:7 DOD, VA.  Things like that.
519:8   Q. There's been a lot of discussion about
519:9 controlled substances.
519:10 Is Cardinal Health's role broader than
519:11 just controlled substances?
519:12   A. Yes.  Controlled substances represent a
519:13 relatively small percentage of overall with Cardinal
519:14 distributes.  They distribute over-the-counter
519:15 products, all prescription drugs, everything down
519:16 from toothpaste and toothbrushes.
519:17   Q. And in addition to the many things that go
519:18 to a hospital or a pharmacy, does Cardinal Health
519:19 also have a medical side unrelated to
519:20 pharmaceuticals?
519:21   A. Yes.  So pharmaceutical distribution is
519:22 just one part of Cardinal Health.  There is a medical
519:23 side that has distribution centers across the
519:24 country, and various organizations that the company
519:25 owns.

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

520:1   Q. In your experience, does -- does Cardinal
520:2 Health ever interact directly with patients?
520:3   A. No.
520:4   Q. Does Cardinal Health ever interact
520:5 directly with doctors?
520:6   A. No.
520:7   Q. So if you could, starting around 2002,
520:8 describe -- actually, strike that.
520:9 Was there a point in time when your job at
520:10 Cardinal Health focused on anti-diversion efforts?
520:11   A. Yes.
520:12   Q. About when was that?
520:13   A. 2005.  Time frame 2005 till late 2007 or
520:14 early 2008, somewhere around in there.
520:15   Q. And could you describe in your own words
520:16 what types of things you did as an employee for
520:17 Cardinal Health working on anti-diversion issues?
520:18 What were your main responsibilities?
520:19   A. My main responsibilities were reviewing
520:20 ingredient limit reports on a monthly basis, and I
520:21 would conduct investigations as necessary on
520:22 pharmacies, and I would report those pharmacies to
520:23 the DEA -- report those pharmacies to the DEA.
520:24   Q. When you say "conduct investigations,"
520:25 were there times when you went out and visited
521:1 pharmacies?
521:2   A. They would be site visits, yes.  I would
521:3 go out and visit the pharmacy and -- and ask
521:4 questions and see what was going on.  Do an
521:5 investigation.
521:6   Q. You mentioned ingredient limit reports, or
521:7 ILRs.  What is an ingredient limit report?
521:8   A. An ingredient limit report is -- is based
521:9 on a formula to identify a formula provided by DEA to
521:10 identify a certain limit or a threshold, as you will.
521:11 And so the report would generate for any customer
521:12 that exceeded that threshold.  And then that report
521:13 was sent to DEA every month.
521:14   Q. And do you know where the criteria came
521:15 from for Cardinal Health to develop its ingredient

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

521:16 limit reports?

521:17   A. Yes.  It came from the DEA.

521:18   Q. In your job, were you at the Dublin center

521:19 for Cardinal Health, the corporate offices?

521:20   A. Yes, I was in Dublin, Ohio, at corporate.

521:21   Q. How did you receive the ingredient limit

521:22 reports that you reviewed?

521:23   A. They came via mail, or like a UPS-type

521:24 service.

521:25   Q. And do you know if anyone else other than

522:1 yourself received identical ingredient limit reports

522:2 from the various distribution centers of Cardinal

522:3 Health?

522:4   A. The distribution centers generate their

522:5 report.  Someone there reviewed the report.  The

522:6 report was sent to the DEA from the distribution

522:7 center, and then I reviewed the reports along with

522:8 members of the team.

522:9   Q. So the ingredient limit reports that you

522:10 would be reviewing, DEA would have that full report;

522:11 is that fair?

522:12   A. Yes.

**522:15 - 526:8**    **Brantley, Eric 11-27-2018 (00:04:54)**                    **EB04.62**

522:15 BY MR. PYSER:

522:16   Q. Do you know whether anyone at DEA also

522:17 received ingredient limit reports?

522:18   A. The ingredient limit reports were sent to

522:19 the DEA on a monthly basis.

522:20   Q. You talked a little bit about site visits

522:21 and additional work you did beyond just reviewing the

522:22 ingredient limit reports.  It -- were there times

522:23 when you made decisions as a result of site visits?

522:24   A. Yes.  If -- if during a site visit it was

522:25 deemed that they were doing, for instance,

523:1 Internet -- they were associated with an Internet

523:2 pharmacy, then I would make a recommendation to

523:3 discontinue business with that -- or discontinue

523:4 controlled substance shipments with that pharmacy and

523:5 then report that pharmacy to Kyle Wright at the DEA.

523:6   Q. And to your knowledge, when you made a

| Page/Line | Source | ID |
|---|---|---|

523:7 decision to discontinue business with a pharmacy, did
523:8 Cardinal Health follow that recommendation?
523:9 A. Yes.
523:10 Q. And when you reported a pharmacy to the
523:11 DEA, who did you send that information to?
523:12 A. I sent the -- an e-mail to Kyle Wright at
523:13 DEA headquarters.
523:14 Q. Who -- who is Kyle Wright?
523:15 A. I don't remember his exact title, but I
523:16 believe he may have been over the e-commerce section.
523:17 But he was where registrants submitted such reports
523:18 to the DEA.
523:19 Q. Was it your understanding that the purpose
523:20 of sending ingredient limit reports to DEA was to
523:21 comply with the DEA regulations for suspicious-order
523:22 reporting?
523:23 A. Yes.
523:24 Q. So why did you conduct site visits and
523:25 investigations of customers on top of the ingredient
524:1 limit reports?
524:2 A. That was over and above the requirement.
524:3 The requirement was to report the suspicious orders,
524:4 and then based on the report I saw, I would actually
524:5 go out and investigate the pharmacies to actually
524:6 report those pharmacies to the DEA as well, in
524:7 addition to orders.
524:8 Q. Let's take a look at a document.
524:9 I'm showing you a document that's been
524:10 marked Exhibit 34 in this deposition. It's a new
524:11 exhibit.
524:12 (Cardinal-Brantley 34 was marked for
524:13 identification.)
524:14 BY MR. PYSER:
524:15 Q. Just so we can see it, I'll put it in
524:16 front of Exhibit 34, up on the Elmo.
524:17 What is Exhibit 34?
524:18 A. This is the Cardinal Health DEA compliance
524:19 manual.
524:20 Q. And if you look at the -- the table of
524:21 contents, does it cover several different areas of

| Page/Line | Source | ID |
|---|---|---|

EB04-Brantley, Eric - Plaintiff and Defense Combined Submission

524:22 DEA compliance?  It's a thick document, a couple
524:23 hundred pages.
524:24   A. Yes.
524:25   Q. And if you look at Section 7 of the DEA
525:1 compliance manual, is that section titled "Required
525:2 Reports to DEA"?
525:3   A. Section 7?
525:4   Q. If you turn to Bates page ending 898 --
525:5   A. Oh, yes.
525:6   Q. -- of the table of contents.
525:7   A. I see it.  I see it.
525:8   Q. So let's go together to Section 7.
525:9 And I'll give you the Bates number, which
525:10 is going to be the number in the bottom right corner.
525:11 It's going to be Bates ending 937.
525:12 And to your recollection, was this DEA
525:13 compliance manual in effect during the time that you
525:14 worked at Cardinal Health?
525:15   A. Yes.
525:16   Q. Okay.  And specifically during the time
525:17 period 2005 through '07 or '08, when you were working
525:18 the anti-diversion area?
525:19   A. Yes.
525:20   Q. So if you look at Section 7-1, the
525:21 required reports to DEA, the first report mentioned
525:22 is ARCOS.
525:23 Can you tell me what an ARCOS report is?
525:24   A. Yes.  The ARCOS report is -- is a report
525:25 of all movement of ARCOS-reportable controlled
526:1 substances, the Schedule II controlled substances,
526:2 all movement.  Those reports were sent to the DEA
526:3 every month.
526:4   Q. So it's a report received by DEA about
526:5 every movement of every controlled substance; is that
526:6 a fair kind of shorthand for ARCOS?
526:7   A. Yes, of all the ARCOS reportable
526:8 controlled substances, yes.

526:9 - 526:19   **Brantley, Eric 11-27-2018 (00:00:44)**   **EB04.91**

526:9   Q. Now, if you -- were there any other
526:10 reports that went to DEA?

| Page/Line | Source | ID |
|---|---|---|
| | 526:11  A. Yes.  The ARCOS report, the biannual | |
| | 526:12 report, there was end-of-year inventory taken, the | |
| | 526:13 ingredient limit reports every month. | |
| | 526:14  Q. Pausing on the ARCOS reports for a minute, | |
| | 526:15 in a situation where a hospital or a pharmacy ordered | |
| | 526:16 controlled substances from more than one distributor, | |
| | 526:17 would the distributors necessarily know that that | |
| | 526:18 hospital or that pharmacy received controlled | |
| | 526:19 substances from multiple sources? | |
| 526:24 - 527:7 | **Brantley, Eric 11-27-2018 (00:00:26)** | **EB04.63** |
| | 526:24  A. No. | |
| | 526:25  Q. When you were at Cardinal Health, were you | |
| | 527:1 aware of what distributions a hospital or a pharmacy | |
| | 527:2 might have received from other distributors, not | |
| | 527:3 Cardinal Health? | |
| | 527:4  A. No. | |
| | 527:5  Q. To your knowledge, were ARCOS reports | |
| | 527:6 submitted by all distributors? | |
| | 527:7  A. Yes.  All registrants. | |
| 527:20 - 527:22 | **Brantley, Eric 11-27-2018 (00:00:10)** | **EB04.64** |
| | 527:20 What's your understanding of what ARCOS | |
| | 527:21 contains when you put together all of the ARCOS | |
| | 527:22 submissions from all the distributors? | |
| 527:24 - 529:4 | **Brantley, Eric 11-27-2018 (00:01:28)** | **EB04.65** |
| | 527:24 THE WITNESS:  It would have data from all | |
| | 527:25 of the DEA registrants; for instance, the | |
| | 528:1 wholesalers and all of the purchases and the | |
| | 528:2 shipments of those controlled substances to | |
| | 528:3 other DEA registrants.  The complete picture. | |
| | 528:4 You could see all of the drugs that a pharmacy, | |
| | 528:5 for instance, was purchasing from every source | |
| | 528:6 and all of the sales from the wholesaler to | |
| | 528:7 pharmacies.  It was a complete picture of all | |
| | 528:8 the transactions of those controlled substances. | |
| | 528:9 BY MR. PYSER: | |
| | 528:10  Q. Just to be clear, did Cardinal Health have | |
| | 528:11 access to that information? | |
| | 528:12  A. No. | |
| | 528:13  Q. Did DEA have access to that? | |
| | 528:14  A. Yes. | |

| Page/Line | Source | ID |
|---|---|---|

EB04-Brantley, Eric - Plaintiff and Defense Combined Submission

528:15   Q. Turning the page to 7-3, there's a section
528:16 titled "Suspicious Orders."
528:17 Do you see that?
528:18   A. Yes.
528:19   Q. And under it is listed 21 CFR 1301.74(b).
528:20 Do you see that?
528:21   A. Yes.
528:22   Q. What is that, 21 CFR 1301.74(b)?
528:23   A. That's the regulation for suspicious
528:24 orders.  It's -- states that registrant is
528:25 responsible for implementing, designing a -- a system
529:1 to identify suspicious orders and report those to the
529:2 DEA.  And further goes on to say that a suspicious
529:3 order is an order of unusual size, frequency, that
529:4 deviates substantially from a normal order pattern.

**529:8 - 530:1**   **Brantley, Eric 11-27-2018 (00:00:44)**   **EB04.66**

529:8 In the compliance manual for Cardinal
529:9 Health, under "Suspicious Orders," can you read the
529:10 first sentence?
529:11   A. "Wholesalers are" -- are you meaning the
529:12 first sentence under "Suspicious Orders"?
529:13   Q. Correct, yes.
529:14   A. "Wholesalers are responsible for designing
529:15 and operating a system that would disclose to the
529:16 wholesaler suspicious orders."
529:17   Q. Did Cardinal Health have such a system in
529:18 2005, when you began your work in anti-diversion?
529:19   A. Yes.
529:20   Q. When you came into your role in 2005, was
529:21 that system already up and running?
529:22   A. Yes.
529:23   Q. In fact, if you look at the date of this
529:24 document, in the bottom left, you see that it's
529:25 April 5th, 2000?
530:1   A. Yes.

**530:2 - 530:25**   **Brantley, Eric 11-27-2018 (00:01:21)**   **EB04.92**

530:2   Q. The next bold heading is "Establishing
530:3 Suspicious Order Criteria."
530:4 Do you see that?
530:5   A. Yes.

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

530:6   Q. And if you turn the page to page 7-4, you
530:7 see at the top of that page, it states, quote:
530:8 "Complying with 21 CFR 1301.74(b) is a two-step
530:9 process"?
530:10  A. Yes.
530:11  Q. Can you describe for me in your own words
530:12 what the two-step process that's discussed in
530:13 Cardinal Health's compliance manual are?
530:14  A. Yes.  The ingredient limit reports that
530:15 are done are sent to the DEA every month, as well as
530:16 the cage vault personnel had the ability to identify
530:17 anything that they deemed to be suspicious and
530:18 reported that as well.
530:19  Q. The -- the first description in the manual
530:20 says, "First, each Cardinal division submits to DEA
530:21 on a monthly basis an ingredient limit report,
530:22 Exhibit M."
530:23 I'd like to direct your attention to
530:24 Exhibit M in this document, which is Bates page
530:25 ending 4157, if you turn there with me.

**531:1 - 532:12**     **Brantley, Eric 11-27-2018 (00:01:59)**     **EB04.93**

531:1 Is this an example of an ingredient limit
531:2 report?
531:3  A. Yes.
531:4  Q. It's a little bit hard to read on the
531:5 screen, but if you could help us out a little bit,
531:6 can you tell us what's in this document; what's in
531:7 this report that's sent to DEA?
531:8  A. This is a report of the customers, along
531:9 with the date -- date of the transactions and the
531:10 drug, and the amount in -- in grams, what was ordered
531:11 of that controlled substance for the month.  And it
531:12 lists what the ingredient limit was and what the
531:13 total was for that drug.
531:14  Q. Zooming in a little bit here, it gives the
531:15 customer name at the top, you mentioned, correct?
531:16  A. Yes.
531:17  Q. And then it provides the ingredient you
531:18 mentioned, right?
531:19  A. Yes.

| Page/Line | Source | ID |
|---|---|---|

**EB04-Brantley, Eric - Plaintiff and Defense Combined Submission**

531:20   Q. And then it speaks to specific orders
531:21 underneath, and those are sent to the DEA, right?
531:22   A. Yes.
531:23   Q. And then all the way on the right side of
531:24 the page gives some additional information, a
531:25 customer total and ingredient limit.
532:1 Can you explain for us what those are?
532:2   A. Yes.  The ingredient limit is the -- the
532:3 limit that was calculated using a formula received
532:4 from DEA, and then the customer total is what that
532:5 customer ordered that month.
532:6   Q. I recognize this is just an example from
532:7 Cardinal Health's compliance manual, but was similar
532:8 information provided in each ingredient limit report
532:9 sent to the DEA during the time you were reviewing
532:10 ingredient limit reports?
532:11   A. Yes.
532:12   Q. You can go back to page 7-4.  And 7-4,

**532:13 - 533:18**     **Brantley, Eric 11-27-2018 (00:01:26)**     **EB04.94**

532:13 after it discusses Exhibit M, goes on to state:
532:14 "This report is based on a computer program which
532:15 monitors controlled substance purchases for a month
532:16 and compares these purchases to predetermined
532:17 averages or limits, and if a customer's purchase
532:18 quantities exceed the established parameters, the
532:19 customer's activity is printed on the report."
532:20 Is this an accurate description of the
532:21 ingredient limit report as you understood it?
532:22   A. Yes.
532:23   Q. Fair description of how it worked during
532:24 your time?
532:25   A. Yes.
533:1   Q. And these parameters that are used for the
533:2 computer program, the established parameters that are
533:3 discussed, where did they come from?
533:4   A. They came from DEA.
533:5   Q. A little bit further down, it discusses
533:6 the second piece of Cardinal Health's two-step
533:7 process to comply with 1301.74(b).
533:8 And can you read for me in the next

| Page/Line | Source | ID |
|---|---|---|

**EB04-Brantley, Eric - Plaintiff and Defense Combined Submission**

533:9 paragraph the sentence beginning "Second"?
533:10   A. "Second, on a daily basis, cage and vault
533:11 personnel should be policing and identifying
533:12 individual orders that appear excessive in relation
533:13 to what other customers are buying and/or the
533:14 customer's purchase history."
533:15   Q. All right.
533:16   A. Read the entire paragraph, or just that?
533:17   Q. That's good.
533:18   A. Okay.

| | | |
|---|---|---|
| 533:25 - 538:25 | **Brantley, Eric 11-27-2018 (00:05:30)** | EB04.67 |

533:25   Q. In your experience, are there pickers and
534:1 packers in Cardinal facilities for items other than
534:2 controlled substances?
534:3   A. Yes.  So there are pickers and packers in
534:4 the general warehouse, and then there are separate
534:5 pickers and packers in the controlled substance cage,
534:6 and then separate packers in the vault -- separate
534:7 pickers and packers in a vault.
534:8   Q. Is it true that the vast majority of
534:9 products that Cardinal ships have nothing to do with
534:10 controlled substances or opioids?
534:11   A. That is correct.
534:12   Q. In your experience, the folks who get
534:13 selected to work in the cage area or the vault area,
534:14 where Cardinal Health stores opioid medications, are
534:15 they the best of the best of Cardinal's warehouse
534:16 employees?
534:17   A. Yes.  They are the crhme de la crhme, as I
534:18 call them.  The -- the best ones are selected to work
534:19 in the cage and vault area.
534:20   Q. So in your experience, would a reference
534:21 to pickers and packers just putting things in totes,
534:22 would that necessarily apply to cage and vault
534:23 employees, or would that be something different?
534:24   A. No, the cage and vault pick process was --
534:25 was different.  There were other -- there were
535:1 additional checks and balances on picking orders in
535:2 the -- the cage and vault.  It was -- it was
535:3 different than how it was done in the general

| Page/Line | Source | ID |
|---|---|---|

535:4 warehouse.

535:5   Q. In the event that through this second

535:6 process, someone in the distribution center

535:7 identified an issue, whose responsibility was it to

535:8 alert DEA of such an issue?

535:9   A. That person would notify their supervisor,

535:10 and then someone at the division would notify DEA of

535:11 the suspicious order.

535:12   Q. So -- so would that potentially come

535:13 straight from a distribution center, not necessarily

535:14 through corporate?

535:15   A. That would come straight from the

535:16 distribution center.

535:17   Q. Have you ever heard of the DEA's Internet

535:18 pharmacy initiative?

535:19   A. Yes.

535:20   Q. Okay.  What is it?

535:21   A. It's guidance that they issued in relation

535:22 to identifying potential suspicious orders through

535:23 Internet pharmacies.

535:24   Q. And who asked you to undertake the

535:25 Internet pharmacy initiative?

536:1   A. My boss, Steve Reardon.

536:2   Q. What was Mr. Reardon's role at Cardinal

536:3 Health?

536:4   A. At the time, I believe he was director of

536:5 quality and regulatory affairs.

536:6   Q. And we're in kind of the 2005-2006 time

536:7 frame, right?

536:8   A. Yes.

536:9   Q. Do you know Mr. Reardon's background

536:10 before he came to work at Cardinal Health as director

536:11 of quality and regulatory affairs?

536:12   A. I actually believe he was a police

536:13 officer.

536:14   Q. Do you know where he was a police officer?

536:15   A. I believe the Boston area.

536:16   Q. As part of the Internet pharmacy

536:17 initiative, what -- what did you do to help comply

536:18 with the Internet pharmacy initiative?

| Page/Line | Source | ID |
|---|---|---|

EB04-Brantley, Eric - Plaintiff and Defense Combined Submission

536:19   A. My role was, in addition to the
536:20 distribution centers submitting the report to DEA
536:21 every month, I would also review the reports, and I
536:22 would identify pharmacies that would need further
536:23 investigation, and I would conduct an investigation
536:24 and a site visit.  And based on those findings, I
536:25 would recommend -- make a recommendation to
537:1 discontinue shipment of controlled substances to
537:2 those pharmacies and report those pharmacies to the
537:3 DEA.
537:4   Q. I'd like to direct your attention to an
537:5 exhibit you looked at earlier; it should be right in
537:6 front of you.  It's marked as Brantley Exhibit 4.
537:7 Do you have that one?
537:8   A. Yes.
537:9   Q. And this was a settlement release
537:10 agreement and administrative memorandum of agreement.
537:11 Do you remember discussing that document
537:12 earlier today?
537:13   A. Yes.
537:14   Q. Is it true that on the first page of
537:15 Exhibit 4, it states that Cardinal has 27 separate
537:16 distribution facilities?
537:17   A. Yes.
537:18   Q. And are the distribution facilities --
537:19 generally; I know there's some unique ones -- but
537:20 generally speaking, do the distribution facilities
537:21 cover particular geographic areas?
537:22   A. Yes.
537:23   Q. To your knowledge, was there ever a
537:24 suspension order of any of the facilities that
537:25 shipped to the Northern Ohio area?
538:1   A. No.
538:2   Q. A little bit more on Exhibit 4.  You spent
538:3 a fair bit of time talking about allegations that the
538:4 DEA -- the DEA had made.
538:5 To your knowledge, did DEA ever prove its
538:6 allegations?
538:7   A. No.
538:8   Q. In fact, there -- there was a piece that

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

538:9 was skipped over earlier when you were discussing
538:10 this document with counsel.  On page 2, there's a
538:11 section that counsel for the Plaintiffs didn't read
538:12 that begins, "No admission or concession."
538:13 Do you see that section?
538:14  A. Yes.
538:15   Q. And does it say:  "This agreement is
538:16 neither an admission by Cardinal of liability or of
538:17 the veracity of any allegation made by DEA in the
538:18 orders to show cause."
538:19 See that?
538:20  A. Yes.
538:21   Q. Did I read it correctly?
538:22  A. Yes.
538:23   Q. Is that consistent with your understanding
538:24 of this document?
538:25  A. Yes.

| 542:14 - 542:16 | **Brantley, Eric 11-27-2018 (00:00:09)** | **EB04.68** |

542:14   Q. Is it the case that every entity that
542:15 receives any controlled substance from Cardinal
542:16 Health has to have a DEA license?

| 542:18 - 542:22 | **Brantley, Eric 11-27-2018 (00:00:10)** | **EB04.69** |

542:18 THE WITNESS:  Yes.
542:19 BY MR. PYSER:
542:20   Q. Does Cardinal Health ship to anyone who
542:21 does not have a DEA license?
542:22   A. Not a controlled substance, no.

| 543:1 - 543:3 | **Brantley, Eric 11-27-2018 (00:00:05)** | **EB04.70** |

543:1 To your knowledge, has Cardinal Health
543:2 ever distributed to a drug cartel?
543:3  A. No.

| 544:12 - 544:21 | **Brantley, Eric 11-27-2018 (00:00:26)** | **EB04.71** |

544:12   Q. Were there times when you reported a
544:13 customer to DEA because you believed they might be
544:14 involved in Internet pharmacy activity?
544:15  A. Yes.
544:16   Q. And what did Cardinal Health do when it
544:17 came to believe that a customer might be involved in
544:18 Internet activity?
544:19  A. We discontinued shipments of controlled

| Page/Line | Source | ID |
|---|---|---|
| | 544:20 substances to that customer and reported that<br>544:21 customer to the DEA. | |
| 546:13 - 546:20 | **Brantley, Eric 11-27-2018 (00:00:19)**<br>546:13  Q. Were there ever times when you personally<br>546:14 had to call a customer and tell them they would no<br>546:15 longer be eligible to receive controlled substances<br>546:16 from Cardinal Health?<br>546:17  A. Yes.<br>546:18  Q. To the extent that you can remember now,<br>546:19 ten years later, can you describe a little bit about<br>546:20 those phone calls? | **EB04.72** |
| 546:23 - 547:4 | **Brantley, Eric 11-27-2018 (00:00:15)**<br>546:23 THE WITNESS:  I don't remember the exact<br>546:24 details, but they would be -- I would call the<br>546:25 customer and let them know that they were being<br>547:1 shut off from receiving controlled substances.<br>547:2 BY MR. PYSER:<br>547:3  Q. And when you made those calls, were the<br>547:4 pharmacists sometimes angry with you? | **EB04.73** |
| 547:6 - 547:8 | **Brantley, Eric 11-27-2018 (00:00:04)**<br>547:6 THE WITNESS:  Yes.<br>547:7 BY MR. PYSER:<br>547:8  Q. Why?  Did they tell you? | **EB04.74** |
| 547:11 - 548:11 | **Brantley, Eric 11-27-2018 (00:01:08)**<br>547:11 THE WITNESS:  Because they would not be<br>547:12 receiving controlled substances from Cardinal<br>547:13 Health any longer.<br>547:14 BY MR. PYSER:<br>547:15  Q. And these pharmacies that we're talking<br>547:16 about that Cardinal Health was refusing to ship to,<br>547:17 do you know, typically, did they still have a valid<br>547:18 DEA license?<br>547:19  A. Yes.<br>547:20  Q. In addition to your work in<br>547:21 anti-diversion, did you also do training of other<br>547:22 Cardinal Health employees?<br>547:23  A. Yes.<br>547:24  Q. Can you tell me a little bit about what<br>547:25 types of training you did?<br>548:1  A. I did training with members of senior | **EB04.75** |

| Page/Line | Source | ID |
|---|---|---|

EB04-Brantley, Eric - Plaintiff and Defense Combined Submission

548:2 management, and I did training with the sales force,
548:3 and I did training with members of my team.
548:4   Q. And just generally speaking, what was the
548:5 subject matter that you would train other people at
548:6 Cardinal Health on?
548:7   A. On our Internet or anti-diversion policy.
548:8   Q. And were those policies, talking about the
548:9 2005, '6, '7 time period, were those policies during
548:10 that time period consistent with what you understood
548:11 DEA wanted?

**548:14 - 548:23**   **Brantley, Eric 11-27-2018 (00:00:29)**   **EB04.76**

548:14 THE WITNESS:  Yes.
548:15 BY MR. PYSER:
548:16   Q. Were the policies that Cardinal Health had
548:17 back in 2006 consistent with the guidance that you
548:18 received from DEA?
548:19   A. Yes.
548:20   Q. How did you come to the conclusion that
548:21 Cardinal's policies back in this time period were
548:22 consistent with the guidance you received from DEA?
548:23   A. Kyle Wright with DEA told us.

**549:1 - 549:3**   **Brantley, Eric 11-27-2018 (00:00:04)**   **EB04.79**

549:1 BY MR. PYSER:
549:2   Q. What did Mr. Wright tell you about
549:3 Cardinal Health's policies?

**549:10 - 549:12**   **Brantley, Eric 11-27-2018 (00:00:11)**   **EB04.80**

549:10   A. He said that we're doing the right things,
549:11 and we're going in the right directions, and that we
549:12 had a -- a good program.

**549:15 - 549:21**   **Brantley, Eric 11-27-2018 (00:00:17)**   **EB04.82**

549:15 BY MR. PYSER:
549:16   Q. Did you have a -- a strong working
549:17 relationship with Mr. Wright in DEA?
549:18   A. Yes.
549:19   Q. Did Kyle Wright from DEA ever tell you
549:20 that Cardinal Health's anti-diversion program was
549:21 deficient in any way?

**550:3 - 550:4**   **Brantley, Eric 11-27-2018 (00:00:01)**   **EB04.84**

550:3 THE WITNESS:  No.
550:4 BY MR. PYSER:

| EB04-Brantley, Eric - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 550:7 - 550:14 | **Brantley, Eric 11-27-2018 (00:00:22)** | **EB04.77** |
| | 550:7 Did you receive any suggestions or | |
| | 550:8 critiques from DEA, from Mr. Wright in particular, on | |
| | 550:9 Cardinal Health's system? | |
| | 550:10   A. No. | |
| | 550:11   Q. If back in 2006 or '7, Mr. Wright or | |
| | 550:12 someone else at DEA had offered suggestions to | |
| | 550:13 Cardinal Health on its suspicious-order monitoring or | |
| | 550:14 reporting system, what would you have done? | |
| 550:21 - 550:22 | **Brantley, Eric 11-27-2018 (00:00:02)** | **EB04.78** |
| | 550:21   A. We would have implemented those | |
| | 550:22 suggestions. | |
| 550:23 - 551:11 | **Brantley, Eric 11-27-2018 (00:00:33)** | **EB04.95** |
| | 550:23   Q. I'm showing you a document entitled | |
| | 550:24 Exhibit 35. | |
| | 550:25 (Cardinal-Brantley 35 was marked for | |
| | 551:1 identification.) | |
| | 551:2 BY MR. PYSER: | |
| | 551:3   Q. Do you recognize this document? | |
| | 551:4   A. Yes. | |
| | 551:5   Q. What is it? | |
| | 551:6   A. It's an e-mail from my boss, Steve | |
| | 551:7 Reardon, of a summary of a conversation that we had | |
| | 551:8 with Kyle Wright. | |
| | 551:9   Q. Okay.  And the -- the time period of that | |
| | 551:10 call was on April 2007; is that right? | |
| | 551:11   A. Yes. | |
| 551:18 - 552:8 | **Brantley, Eric 11-27-2018 (00:00:30)** | **EB04.81** |
| | 551:18 BY MR. PYSER: | |
| | 551:19   Q. Direct your attention to the sentence that | |
| | 551:20 begins:  "The purpose of the call was to confirm we | |
| | 551:21 have the appropriate program and processes in place. | |
| | 551:22 Ask if there is anything else we should be doing, | |
| | 551:23 reiterate our willingness to work with the agency on | |
| | 551:24 this issue, and to extend an offer to meet with the | |
| | 551:25 agency to further discuss the details of our | |
| | 552:1 program." | |
| | 552:2 Do you see that language? | |
| | 552:3   A. Yes. | |
| | 552:4   Q. Based on your recollection, is that an | |

| Page/Line | Source | ID |
|---|---|---|

**EB04-Brantley, Eric - Plaintiff and Defense Combined Submission**

552:5 accurate description of the call?

552:6   A.  Yes.

552:7   Q.  If you look at the first bullet point, can

552:8 you read that out loud?

552:12 - 552:18   **Brantley, Eric 11-27-2018 (00:00:11)**   EB04.83

552:12 THE WITNESS:  He thinks we are doing the

552:13 right things, heading in the right direction.

552:14 BY MR. PYSER:

552:15   Q.  And that statement, that was described by

552:16 Mr. Reardon as the key feedback from Kyle.

552:17 Do you see that?

552:18   A.  Yes.

552:22 - 553:6   **Brantley, Eric 11-27-2018 (00:00:25)**   EB04.85

552:22 BY MR. PYSER:

552:23   Q.  And did Cardinal Health incorporate this

552:24 information that it learned from Mr. Wright into its

552:25 anti-diversion programs?

553:1   A.  Yes.

553:2   Q.  What impact did those statements have on

553:3 you?

553:4   A.  They made me feel that we had a good

553:5 program in place, and as he said, we were heading in

553:6 the right direction.  We were doing the right thing.

553:10 - 553:18   **Brantley, Eric 11-27-2018 (00:00:14)**   EB04.86

553:10 BY MR. PYSER:

553:11   Q.  And the next bullet is, quote:  "Stated

553:12 that Eric, who manages their program centrally in

553:13 Dublin, has established an excellent working

553:14 relationship with his office."

553:15 Do you see that statement?

553:16   A.  Yes.

553:17   Q.  Do you agree with that statement?

553:18   A.  Yes.

553:19 - 554:2   **Brantley, Eric 11-27-2018 (00:00:30)**   EB04.98

553:19   Q.  If you go to the next page in Exhibit -- I

553:20 believe we're -- we're at 35 -- is there a letter

553:21 attached?

553:22   A.  Yes.

553:23   Q.  Is it a letter you wrote?

553:24   A.  Yes.

| Page/Line | Source | ID |
|---|---|---|

**EB04-Brantley, Eric - Plaintiff and Defense Combined Submission**

553:25   Q. And who did you send the letter to?

554:1   A. Jan Hamilton, with the DEA in the Miami

554:2 field division in Miami, Florida.

554:3 - 556:13   **Brantley, Eric 11-27-2018 (00:02:51)**   EB04.97

554:3   Q. And there's some discussion in the letter

554:4 about information that had been provided back and

554:5 forth with DEA, in the first two paragraphs.

554:6 Do you see those paragraphs?

554:7   A. Yes.

554:8   Q. And I want to direct your attention to the

554:9 third paragraph, about ten lines down.  It begins:

554:10 "As mentioned above."

554:11 You see that language?

554:12   A. Yes.

554:13   Q. And it reads:  "As mentioned above, all of

554:14 the Internet pharmacy accounts listed below have been

554:15 terminated as customers for controlled substances.

554:16 In addition, prior to this action on our part, DEA

554:17 had been notified by us of excessive purchases of

554:18 controlled substances via ingredient limit reports

554:19 for these accounts in advance of our decision.

554:20 Rather than wait upon a response from DEA, Cardinal

554:21 Health initiated the following actions as described

554:22 below.  That being the case, we believe that our

554:23 program is in accordance with DEA's expectations, and

554:24 we continue to improve it and add resources to it.

554:25 For example, we added an additional head count in

555:1 February 2007."

555:2 Did I read that correctly?

555:3   A. Yes.

555:4   Q. Did you personally agree with the

555:5 conclusion in this letter that Cardinal's program was

555:6 in accordance with DEA's expectations?

555:7   A. Yes.

555:8 (Cardinal-Brantley 36 was marked for

555:9 identification.)

555:10 BY MR. PYSER:

555:11   Q. Showing you a document that's been marked

555:12 as Exhibit 36.

555:13 What is Exhibit 36?

| Page/Line | Source | ID |
|---|---|---|

**EB04-Brantley, Eric - Plaintiff and Defense Combined Submission**

555:14  A. This is an e-mail from -- from Kyle Wright
555:15 that he was sent to wholesale with the -- listed
555:16 pharmacies that wholesalers had -- had discontinued
555:17 business with and notified DEA of that action.
555:18  Q. Okay.  Did you receive e-mails like this
555:19 from Mr. Wright?
555:20  A. Yes.
555:21  Q. What would you typically do when you
555:22 received an e-mail like this from Mr. Wright, letting
555:23 you know that a wholesaler -- not necessarily
555:24 Cardinal Health, but some wholesaler -- had
555:25 discontinued distribution of controlled substances to
556:1 particular pharmacies or hospitals?
556:2  A. I would review the list to see if there
556:3 were any current Cardinal Health customers, and if
556:4 so, I would look into those customers; I would
556:5 conduct an investigation of those customers if they
556:6 were on the list.
556:7  Q. Okay.  And were there times when a
556:8 customer appeared on the list and Cardinal Health
556:9 subsequently refused to do business with them?
556:10  A. Yes.
556:11  Q. And the pharmacies on this list, are they
556:12 pharmacies that necessarily lost their DEA license?
556:13  A. No.

**556:20 - 557:10**    **Brantley, Eric 11-27-2018 (00:00:41)**    **EB04.87**

556:20 BY MR. PYSER:
556:21  Q. Do you know whether or not the pharmacies
556:22 that are on this list as having been cut off by a
556:23 distributor still had their DEA license or not?
556:24  A. Yes.
556:25  Q. Did they have DEA licenses, typically,
557:1 still?
557:2  A. Yes.
557:3  Q. Did there come a time when -- well, first
557:4 of all, let me ask:  Did you receive e-mails like
557:5 this periodically from Mr. Wright?
557:6  A. Yes.
557:7  Q. Did there come a time when DEA and Kyle
557:8 Wright stopped sending e-mails like the one we just

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

557:9 saw?
557:10  A. Yes.

557:17 - 557:20      **Brantley, Eric 11-27-2018 (00:00:06)**      **EB04.88**

557:17  Q. But to your knowledge, DEA just stopped
557:18 providing this information to distributors.
557:19 You know that, right?
557:20  A. Yes.

557:24 - 559:15      **Brantley, Eric 11-27-2018 (00:02:07)**      **EB04.89**

557:24 BY MR. PYSER:
557:25  Q. Did you continue to receive this
558:1 information from DEA, or did it stop at some point?
558:2  A. It stopped at some point.
558:3  Q. Around 2010, did you begin work at a
558:4 Cardinal Health facility near Atlanta?
558:5  A. Yes.  2009, I started work at the
558:6 McDonough, Georgia, distribution center.
558:7  Q. And in your role at the McDonough,
558:8 Georgia, distribution center, did you have
558:9 responsibilities related to the physical security of
558:10 medications that were at that facility?
558:11  A. Yes.  I was a compliance officer, so my
558:12 role was to conduct audits and assure compliance with
558:13 DEA, FDA, PDMA, OSHA, DOT regulations.
558:14  Q. Can you in your experience compare the
558:15 specificity of regulations for DEA guidance on
558:16 physical security of handling medications versus
558:17 anti-diversion?
558:18  A. Yes.  So the anti-diversion regulation is
558:19 21 CFR 1301.74(b), which states that the registrant
558:20 shall have a system in place to identify suspicious
558:21 orders and report those orders.  And it defines those
558:22 orders as orders of unusual size, frequency, or that
558:23 deviate substantially from a normal pattern.
558:24 As far as the regulations around physical
558:25 security, they were very detailed.  They went into
559:1 the thickness of the vault walls, the type of
559:2 security system, the monitoring, the -- the testing,
559:3 the cage itself, the space between the cage and the
559:4 locking mechanism.  And it spelled out in detail a
559:5 thorough list of things to follow.

| Page/Line | Source | ID |
|---|---|---|

559:6   Q. In your time at McDonough, and generally
559:7 at Cardinal Health, were distribution centers
559:8 regularly inspected by DEA?
559:9   A. Yes.  There was a cyclical inspection
559:10 generally every two to three years or so.
559:11   Q. In your experience at Cardinal Health for
559:12 over ten years, did you ever see Cardinal Health ship
559:13 an order that you believed would be diverted?
559:14   A. No.
559:15 MR. PYSER:  No further questions.

Plaintiffs Affirmative Designations = 00:22:25
Defense Counter Designations = 00:37:01
Defense Completeness Counters = 00:01:17
**Total Time = 01:00:43**