**Designation Run Report**

# Reardon, Steve - Plaintiff and Defense Combined Submission

---

**Reardon, Steve 11-30-2018**

---

**Plaintiffs Affirmative Designations  00:45:51**

**Defense Counter Designations  00:29:28**

**Plaintiff Counter Counters  00:00:52**

**Total Time  01:16:11**



ID:SR05

| Page/Line | Source | ID |
|---|---|---|
| | **SR05-Reardon, Steve - Plaintiff and Defense Combined Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 134:19 - 135:6 | **Reardon, Steve 11-30-2018 (00:00:45)** | SR05.1 |

134:19  Q. Tell us your job after that.
134:20  A. Transitioning from 2007?
134:21  Q. Uh-huh.
134:22  A. 2007, I moved away from anti-diversion and
134:23 strictly focused on regulatory compliance,
134:24 facilitating compliance in the distribution
135:1 centers, regulations tied to DEA, Boards of
135:2 Pharmacy, FDA, Department of Transportation,
135:3 creating policies, procedures, to facilitate that
135:4 compliance primarily tied to DEA physical
135:5 security, DEA recordkeeping, procedural security
135:6 around how to handle controlled substances.

| Page/Line | Source | ID |
|---|---|---|
| 410:4 - 410:22 | **Reardon, Steve 11-30-2018 (00:00:53)** | SR05.2 |

410:4  Q. Mr. Reardon, I'm Mike Fuller.  I'm going
410:5 to be taking over for Mr. Papantonio for a little
410:6 bit.  Okay?
410:7  A. Okay.
410:8  Q. Tell me, when did you start in the
410:9 anti-diversion division at Cardinal?
410:10  A. Well, I started with Cardinal in January
410:11 of -- June of 1988.
410:12  Q. Correct.
410:13  A. So at that particular point in time, I
410:14 worked in the Peabody distribution center.  It
410:15 wasn't a corporate role.
410:16  Q. Okay.
410:17  A. As the company grew, the role expanded and
410:18 we started to centralize activities, and I would
410:19 say we were really going full ahead on that
410:20 starting early '90s.
410:21  Q. So what was your title again from 2005 to
410:22 2007?

| Page/Line | Source | ID |
|---|---|---|
| 411:1 - 411:4 | **Reardon, Steve 11-30-2018 (00:00:12)** | SR05.3 |

411:1  A. Vice president quality and regulatory
411:2 affairs.
411:3  Q. And how far back did that title go?
411:4  A. I believe I got that title in 2005.

| Page/Line | Source | ID |
|---|---|---|
| 412:14 - 412:15 | **Reardon, Steve 11-30-2018 (00:00:05)** | SR05.4 |

412:14 MR. FULLER:  This is going to be

| SR05-Reardon, Steve - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

412:20 - 413:15

412:15 entered as Plaintiffs' Exhibit 30, for the record.
**Reardon, Steve 11-30-2018 (00:00:50)**
412:20   Q. And if you'll turn to page 7, I think that
412:21 is the September 27, 2007 letter.
412:22 Do you see that there?
412:23   A. I have it.
412:24   Q. Now, earlier you looked at the December
413:1 2007 letter with Mr. Papantonio, correct?
413:2   A. Correct.
413:3   Q. Now let's look at this letter as well.
413:4 You see it starts out much the same as the
413:5 December 2007 letter did.
413:6 "This letter is being sent to every
413:7 commercial entity in the United States registered
413:8 with the Drug Enforcement Administration, DEA, to
413:9 distribute controlled substances.  The purpose of
413:10 this letter is to reiterate the responsibilities
413:11 of controlled substance distributors in view of
413:12 the prescription drug abuse problem our nation is
413:13 currently facing."
413:14 You agree that during 2007 we were facing
413:15 an opioid epidemic, right?

**SR05.5**

413:17 - 414:14

**Reardon, Steve 11-30-2018 (00:00:47)**
413:17   A. Based on the statement here, yes.
413:18 BY MR. FULLER:
413:19   Q. Well, not based on the statement here.
413:20 Based on your own knowledge.
413:21 You were in regulatory related to opioids
413:22 in 2006, correct?
413:23   A. Yes.
413:24   Q. You were aware of what was going on in our
414:1 society and the epidemic that this country was in
414:2 the middle of, weren't you?
414:3   A. I was aware that there's opioid abuse.
414:4   Q. Now let's continue.
414:5 It says, in the next paragraph,
414:6 "Background:  As each of you know" -- excuse me.
414:7 "As each of you is undoubtedly aware, the abuse of
414:8 nonmedical use of controlled prescription drugs is
414:9 a serious and growing health problem in this

**SR05.6**

| Page/Line | Source | ID |
|---|---|---|

SR05-Reardon, Steve - Plaintiff and Defense Combined Submission

414:10 country."
414:11 And it cites to the National Institute on
414:12 Drug Abuse & Research report.
414:13 Do you see that there as well?
414:14   A. I do.

415:9 - 415:19   **Reardon, Steve 11-30-2018 (00:00:28)**   SR05.7

415:9   Q. Let's go down just a little bit here where
415:10 it says "If the closed system is to function
415:11 properly as Congress envisioned, distributors must
415:12 be vigilant in deciding whether a perspective
415:13 customer can be trusted to deliver controlled
415:14 substances only for lawful purposes."
415:15 And you agree with that, correct?
415:16 If the closed system is going to work the
415:17 way it was designed, you must be vigilant as a
415:18 wholesale distributor, Cardinal must be vigilant
415:19 in the drugs it sends out?

415:21 - 416:20   **Reardon, Steve 11-30-2018 (00:01:01)**   SR05.8

415:21   A. It's a valid statement.
415:22 BY MR. FULLER:
415:23   Q. Turn to the next page.  This is where
415:24 Rannazzisi sets out some of your obligations,
416:1 right?
416:2 You remember this?
416:3 If you go down to the third paragraph on
416:4 the page, he states that "Statutory factor -- the
416:5 statutory factors DEA must consider in deciding
416:6 whether to revoke a distributor's registration are
416:7 set forth in 21 USC 823(e)."
416:8 Are you familiar with that code section,
416:9 that rule, that safety rule?
416:10   A. No.
416:11   Q. "Listed among other factors that the duty
416:12 of the distributor is to maintain effective
416:13 controls against diversion of controlled
416:14 substances"?
416:15   A. I'm familiar with the regulations.
416:16   Q. And you are aware that you are required to
416:17 have a system that maintained effective controls
416:18 against diversion of controlled substances and to

| Page/Line | Source | ID |
|---|---|---|
| | SR05-Reardon, Steve - Plaintiff and Defense Combined Submission | |

| Page/Line | Source | ID |
|---|---|---|
| | 416:19 other legitimate medical scientific and industrial | |
| | 416:20 channels, correct? | |
| 416:22 - 417:22 | **Reardon, Steve 11-30-2018 (00:01:02)** | **SR05.9** |
| | 416:22   A. I understand that we needed to design and | |
| | 416:23 operate a system to identify and -- | |
| | 416:24 BY MR. FULLER: | |
| | 417:1   Q. Suspicious orders? | |
| | 417:2   A. Suspicious orders. | |
| | 417:3   Q. Well, those are two separate requirements, | |
| | 417:4 are they not? | |
| | 417:5 So here, Mr. Rannazzisi is talking about | |
| | 417:6 21 USC 823, which is an United States code. | |
| | 417:7 That's what USC stands for, right? | |
| | 417:8   A. Yes. | |
| | 417:9   Q. And then if you look down further on the | |
| | 417:10 page, he's then talking about 21 CFR Code of | |
| | 417:11 Federal Regulation 1301.74(b), which is your | |
| | 417:12 suspicious orders requirement, isn't it? | |
| | 417:13   A. Correct. | |
| | 417:14   Q. And then what does he say in the next | |
| | 417:15 sentence?  Read that to us.  "It bears emphasis." | |
| | 417:16   A. "It bears emphasis that the foregoing | |
| | 417:17 reporting requirement is in addition to and not in | |
| | 417:18 lieu of the general requirement under 21 USC | |
| | 417:19 823(e) that a distributor maintain effective | |
| | 417:20 controls against diversion." | |
| | 417:21   Q. So as a distributor, you take on a dual | |
| | 417:22 requirement; isn't that right? | |
| 417:24 - 418:4 | **Reardon, Steve 11-30-2018 (00:00:04)** | **SR05.10** |
| | 417:24   A. That's what it appears, based on the | |
| | 418:1 letter. | |
| | 418:2 BY MR. FULLER: | |
| | 418:3   Q. And you didn't know that before today; is | |
| | 418:4 that right? | |
| 418:5 - 418:8 | **Reardon, Steve 11-30-2018 (00:00:07)** | **SR05.145** |
| | 418:5   A. My focus was on the regulation. | |
| | 418:6   Q. You were focusing on the suspicious order | |
| | 418:7 requirements, right? | |
| | 418:8   A. Right. | |
| 419:16 - 420:13 | **Reardon, Steve 11-30-2018 (00:00:51)** | **SR05.11** |

SR05-Reardon, Steve - Plaintiff and Defense Combined Submission

| Page/Line | Source | ID |
|---|---|---|
| | 419:16  Q. So you would agree that we have two | |
| | 419:17 separate requirements, based on Mr. Rannazzisi's | |
| | 419:18 letter, right? | |
| | 419:19   A. That's what it appears to be. | |
| | 419:20   Q. Do you disagree with that? | |
| | 419:21   A. No.  I'm going by the letter that -- | |
| | 419:22   Q. And this is a letter you read back in | |
| | 419:23 2006? | |
| | 419:24   A. Yes. | |
| | 420:1   Q. And if you had any questions, you could | |
| | 420:2 have called the DEA about it, right? | |
| | 420:3   A. Yes. | |
| | 420:4   Q. So then it then says "Thus, in addition to | |
| | 420:5 reporting all suspicious orders, a distributor has | |
| | 420:6 a statutory responsibility to exercise due care to | |
| | 420:7 avoid filling suspicious orders that might be | |
| | 420:8 diverted into other legitimate medical, | |
| | 420:9 scientific, or industrial channels;" doesn't it? | |
| | 420:10   A. Yes. | |
| | 420:11   Q. And that's what's known as the shipping | |
| | 420:12 requirement or not shipping requirement, isn't | |
| | 420:13 it? | |
| 420:15 - 421:7 | **Reardon, Steve 11-30-2018 (00:00:32)** | SR05.12 |
| | 420:15   A. Well, yes. | |
| | 420:16 BY MR. FULLER: | |
| | 420:17   Q. Well, let me ask you, when you say a | |
| | 420:18 suspicious order and you have to report suspicious | |
| | 420:19 orders, suspicious of what?  Potential diversion, | |
| | 420:20 correct? | |
| | 420:21   A. Yes, it would be an order of unusual size, | |
| | 420:22 pattern, or frequency that would make it | |
| | 420:23 suspicious. | |
| | 420:24   Q. But when we're talking about suspicious, | |
| | 421:1 what we're trying to do is prevent diversion, | |
| | 421:2 isn't it? | |
| | 421:3   A. Yes. | |
| | 421:4   Q. So if we have an order that we've | |
| | 421:5 determined is suspicious, we wouldn't want to give | |
| | 421:6 it to the people we think are placing the | |
| | 421:7 suspicious order, would we? | |

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

421:10 - 421:14 · **Reardon, Steve 11-30-2018 (00:00:10)** · SR05.13
421:10  Q. That wouldn't make sense?
421:11  A. No.
421:12  Q. We would want to do whatever due diligence
421:13 we need to do to confirm that it is not a
421:14 suspicious order before we ship it, correct?

421:16 - 421:16 · **Reardon, Steve 11-30-2018 (00:00:01)** · SR05.14
421:16  A. Correct.

421:18 - 422:16 · **Reardon, Steve 11-30-2018 (00:01:01)** · SR05.15
421:18  Q. Now, let's talk a little bit more about
421:19 these ingredient limit reports.  And I've heard
421:20 you say several times today that these ingredient
421:21 limit reports were approved by the DEA.
421:22 Tell the jury who at the DEA approved
421:23 these ingredient limit reports.
421:24  A. I believe there's a letter out there by
422:1 Thomas Gitchel.
422:2  Q. Thomas who?
422:3  A. Gitchel.
422:4  Q. Can you help me out with the spelling of
422:5 that last name?
422:6  A. G-i-t-c-h-e-l.
422:7  Q. And when was that letter sent?
422:8  A. It was around 1990.
422:9  Q. And in 1990, you believe some letter is
422:10 out there that exists that says it's okay to
422:11 provide the ingredient limit reports?
422:12  A. There was a collaboration between the DEA
422:13 and the trade association to develop the report.
422:14  Q. You don't happen to have a copy of that
422:15 letter, do you?
422:16  A. I do not.

423:14 - 423:15 · **Reardon, Steve 11-30-2018 (00:00:05)** · SR05.16
423:14 MR. FULLER:  So these
423:15 ingredient limit reports -- let me see 3756.

423:17 - 423:18 · **Reardon, Steve 11-30-2018** · SR05.17
423:17 This is going to be Plaintiffs' Exhibit
423:18 31.

423:24 - 424:14 · **Reardon, Steve 11-30-2018 (00:00:32)** · SR05.18
423:24  Q. Have you seen this type of document

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

| Page/Line | Source | ID |
|---|---|---|
| | 424:1 before?  It appears to be an ingredient limit | |
| | 424:2 report, correct? | |
| | 424:3   A. Not in this format, but yes. | |
| | 424:4   Q. It is an ingredient limit report? | |
| | 424:5   A. Yes. | |
| | 424:6   Q. And this is something Cardinal kept in the | |
| | 424:7 normal course of business; is that right? | |
| | 424:8   A. Yes. | |
| | 424:9   Q. And I'll represent to you that Cardinal's | |
| | 424:10 produced this to the plaintiffs in this case, | |
| | 424:11 amongst other ingredient limit reports, some of | |
| | 424:12 them going back to 2005.  We should have, at least | |
| | 424:13 according to your testimony, ingredient limit | |
| | 424:14 reports going back prior to that; is that right? | |
| 424:17 - 425:2 | **Reardon, Steve 11-30-2018 (00:00:22)** | **SR05.19** |
| | 424:17   A. It was implemented '94, '95. | |
| | 424:18 BY MR. FULLER: | |
| | 424:19   Q. So you believe ingredient limit reports | |
| | 424:20 started being created by Cardinal in 1994 or '95. | |
| | 424:21 Correct? | |
| | 424:22   A. Correct. | |
| | 424:23   Q. And it's your understanding that these | |
| | 424:24 documents were provided to the DEA; isn't that | |
| | 425:1 true? | |
| | 425:2   A. Correct, on a monthly basis. | |
| 425:15 - 425:18 | **Reardon, Steve 11-30-2018 (00:00:06)** | **SR05.20** |
| | 425:15   Q. These, again, were kept in the normal | |
| | 425:16 course of business at Cardinal and provided to the | |
| | 425:17 DEA; is that correct? | |
| | 425:18   A. Correct. | |
| 426:12 - 427:7 | **Reardon, Steve 11-30-2018 (00:00:49)** | **SR05.21** |
| | 426:12   Q. But this document is inclusive of, at | |
| | 426:13 least out of the Wheeling distribution center, | |
| | 426:14 right you see that at the top? | |
| | 426:15   A. Yes. | |
| | 426:16   Q. Out of the Wheeling distribution center | |
| | 426:17 for July of 2007, if this report was run | |
| | 426:18 accurately and produced to us in the format that | |
| | 426:19 Cardinal kept it in, this would be how many ever | |
| | 426:20 pages are here, I'm saying there's 535, whatever | |

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

426:21 the page count is, this is all suspicious orders,
426:22 right?
426:23   A. Based on the criteria that the DEA agreed
426:24 to.
427:1   Q. Based on whatever.  These are all
427:2 suspicious orders under your CFR reporting
427:3 requirement, correct?
427:4   A. Correct.
427:5   Q. And Cardinal shipped all these orders out
427:6 into our communities across the country, didn't
427:7 they?

**427:9 - 429:20**   **Reardon, Steve 11-30-2018 (00:02:37)**     **SR05.22**

427:9   A. It may have been some that were caught at
427:10 the distribution center and investigated.
427:11 BY MR. FULLER:
427:12   Q. Well, this report isn't generated until
427:13 the end of the month, right?
427:14   A. But it's a two-step process.
427:15   Q. I understand, but just listen to my
427:16 question.
427:17 This report isn't generated until the end
427:18 of month, correct?
427:19   A. Correct.
427:20   Q. And any shipments that have gone, have
427:21 long gone out because it's usually 24-hour
427:22 turnaround, correct?
427:23   A. Correct.
427:24   Q. So if you look, there's, actually, I
428:1 think, a run date of August 5, 2007 on here,
428:2 right?
428:3   A. Yes.
428:4   Q. So these orders were gone by the time this
428:5 report was printed.  You agree?
428:6   A. Correct.
428:7   Q. We'll come back to that document in just a
428:8 minute, but you're talking about the second part
428:9 of this process.
428:10 The second part of this process is for
428:11 pickers and checkers to pick up on excessive
428:12 orders in the distribution centers; is that true?

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

428:13  A. Correct.
428:14  Q. And pickers and checkers are the people
428:15 filling the orders at the distribution facilities,
428:16 right?
428:17  A. Correct.
428:18  Q. And if a picker and checker finds an order
428:19 that exceeds some sort of internal limit, then
428:20 they are to pull that order and report that
428:21 specific order as suspicious; isn't that right?
428:22  A. They're required to -- not necessarily a
428:23 limit.  If something they see based on their
428:24 experience with the customer or other customers,
429:1 they can pull the order and do further
429:2 investigation and contact the DEA.
429:3  Q. And how long was this system in place,
429:4 these ingredient limit reports and the picker and
429:5 checkers?  That system was in place from back in
429:6 the '90s?
429:7  A. Early '90s until --
429:8  Q. About 2007, right?
429:9  A. Correct.  However, the order-filler
429:10 process at least still existed when I retired.
429:11  Q. And when you mean the order-filler
429:12 process, you're talking about the pickers and
429:13 checkers?
429:14  A. Correct.
429:15 MR. FULLER:  So let's go to 4924.
429:16 This is going to be plaintiffs' exhibit -- I'm
429:17 sorry, did I say for the record, Plaintiffs'
429:18 Exhibit 31 is going to be P-3756.
429:19 Plaintiffs' Exhibit 32 is going to be
429:20 4924.

| 430:2 - 430:4 | **Reardon, Steve 11-30-2018 (00:00:12)** | **SR05.23** |

430:2  Q. Now, this is a manual that Mr. Brantley
430:3 was just shown the other day when he was being
430:4 deposed.  And let's go to page 144.

| 430:5 - 431:19 | **Reardon, Steve 11-30-2018 (00:01:38)** | **SR05.24** |

430:5 144 is required reports to DEA, correct?
430:6  A. Correct.
430:7  Q. And that's the system you were talking

| Page/Line | Source | ID |
|---|---|---|

SR05-Reardon, Steve - Plaintiff and Defense Combined Submission

430:8 about, isn't it?

430:9   A. It would fall under this section.

430:10   Q. If you turn to page 146, you see halfway

430:11 down the page, three-quarters down the page,

430:12 "Suspicious orders"?

430:13   A. Yes.

430:14   Q. Now, suspicious orders, this requirement

430:15 is fulfilling our Code of Federal Regulations

430:16 1301.74(b), correct?

430:17   A. Correct.

430:18   Q. We also have the obligation under the US

430:19 Code to have an adequate system to prevent

430:20 diversion as well, right?

430:21   A. Correct.

430:22   Q. Okay.  So this is filling part of our

430:23 obligation.

430:24 And if you look there, "Establishing

431:1 suspicious orders criteria."  Do you see that?

431:2   A. Yes.

431:3   Q. And the first sentence says "Wholesaler

431:4 should establish a written criteria of what

431:5 constitutes a suspicious order."

431:6 Did I read that correctly?

431:7   A. Yes.

431:8   Q. So where is the written criteria for

431:9 suspicious orders that Cardinal had?

431:10   A. The criteria is part of the ingredient

431:11 limit report and the document that goes with it.

431:12   Q. I want to know the written criteria.

431:13 Where is the written criteria?

431:14   A. Yes, written criteria, there's a document

431:15 that has the written criteria that the trade

431:16 association and the DEA agreed to.

431:17   Q. Turn to page 271 of the same document.

431:18 You can look on the big screen or you can try to

431:19 find that page, either way, Mr. Reardon.

**431:20 - 432:4**   **Reardon, Steve 11-30-2018 (00:00:17)**   **SR05.146**

431:20 Is that the document you're referring to?

431:21   A. No.

431:22   Q. What other document are you referring; to?

| Page/Line | Source | ID |
|---|---|---|

431:23 Do you know?

431:24   A. Again, it was a document that the trade

432:1 association had.

432:2   Q. The HDMA?

432:3   A. Yes, it was NWDA at the time.

432:4   Q. NWDA.

| | | |
|---|---|---|
| 432:5 - 432:15 | **Reardon, Steve 11-30-2018 (00:00:26)** | SR05.147 |

432:5 All right.  This is in this manual,

432:6 obviously?

432:7   A. Yes.

432:8   Q. It has a suspicious order reporting system

432:9 of 1998.  Do you see that?

432:10   A. Yes.

432:11   Q. Have you seen this document before?

432:12   A. Yes.

432:13   Q. Is it your understanding, is that how the

432:14 limit amounts were created in the audit -- or

432:15 excuse me -- the ingredient limit reports?

| | | |
|---|---|---|
| 432:17 - 433:5 | **Reardon, Steve 11-30-2018 (00:00:21)** | SR05.25 |

432:17   A. Not the ingredient limit reports.

432:18 BY MR. FULLER:

432:19   Q. What was this used for?  Do you know?

432:20   A. I believe this was used for List 1

432:21 chemicals.

432:22   Q. So this applies only to List 1 chemicals

432:23 is your understanding?

432:24   A. Yes.

433:1   Q. And, therefore, not controlled substances,

433:2 unless they include list 1 chemicals, right?

433:3   A. Yes.

433:4   Q. All right.  Great.  If you turn to page

433:5 266 in this document.  266, "Excess Purchase,

| | | |
|---|---|---|
| 433:6 - 434:17 | **Reardon, Steve 11-30-2018 (00:01:21)** | SR05.26 |

433:6 Schedule II."

433:7 Do you see that?

433:8   A. Yes.

433:9   Q. This is the system we were talking about

433:10 earlier with pickers and checkers, right?

433:11   A. Yes.

433:12   Q. So if we have pickers and checkers, if you

| | | |
|---|---|---|
| **SR05-Reardon, Steve - Plaintiff and Defense Combined Submission** | | |
| **Page/Line** | **Source** | **ID** |

433:13 look down there near the bottom, we have three
433:14 categories of oxycodone.
433:15 Do you see that?
433:16   A. Yes.
433:17   Q. And we have limits.  We have -- it applies
433:18 to all strengths, correct?
433:19   A. Correct.
433:20   Q. We have hospital limits, then we have
433:21 retail limits.  Right?
433:22   A. Right.
433:23   Q. And the retail limits apply to both chain
433:24 and nonchain pharmacies, don't they?
434:1   A. Yes.
434:2   Q. And then based on the policy and procedure
434:3 we were looking at earlier -- again, going back to
434:4 page -- now it's on page 147 -- this is the second
434:5 part of the system you were describing earlier,
434:6 correct?
434:7   A. Correct.
434:8   Q. And it says "Second, on a daily basis,
434:9 cage-involved personnel should be policing and
434:10 identifying individual orders that appear
434:11 excessive."
434:12 Do you see that?
434:13   A. Yes.
434:14   Q. "Policing and identifying."
434:15 Do you know if these persons that were
434:16 hired to police on behalf of Cardinal had any DEA
434:17 background?

| | | |
|---|---|---|
| 434:19 - 435:1 | **Reardon, Steve 11-30-2018 (00:00:10)** | **SR05.27** |

434:19   A. They went through training.
434:20 BY MR. FULLER:
434:21   Q. What kind of training did they go through?
434:22   A. Controlled substance training.  This is
434:23 actually a training manual that we're looking at.
434:24   Q. And this trained them how to pick and
435:1 check?

| | | |
|---|---|---|
| 435:3 - 435:11 | **Reardon, Steve 11-30-2018 (00:00:18)** | **SR05.28** |

435:3   A. Oh, no, no, no, no.  No.  They were
435:4 trained through the ops teams how to pick, pack,

| Page/Line | Source | ID |
|---|---|---|
| | SR05-Reardon, Steve - Plaintiff and Defense Combined Submission | |

435:5 and ship.
435:6 BY MR. FULLER:
435:7   Q. And pick, packing, and shipping -- they
435:8 have to know what they're picking before they can
435:9 point out an excessive order, right, because if
435:10 they don't know what substance they're picking,
435:11 then it doesn't do them any good, does it?

**435:13 - 435:13**   **Reardon, Steve 11-30-2018 (00:00:01)**   **SR05.29**

435:13   A. Correct.

**437:20 - 438:9**   **Reardon, Steve 11-30-2018 (00:00:35)**   **SR05.30**

437:20   Q. Well, let's look at what's supposed to
437:21 happen.
437:22 It says, if the -- on the second, on a
437:23 daily basis, we have the individuals policing and
437:24 identifying individual orders that appear
438:1 excessive in relation to what other customers are
438:2 buying and/or customers are -- excuse me -- and/or
438:3 customer's purchase history.  In these situations,
438:4 the DEA should be notified.
438:5 So if we have an excessive order that's
438:6 picked up on, they exceed one of these parameters
438:7 in our sheet or they just think it's excessive, we
438:8 have to notify the DEA, according to our own
438:9 policies and procedures, correct?

**438:11 - 438:24**   **Reardon, Steve 11-30-2018 (00:00:34)**   **SR05.31**

438:11   A. After investigating to see if they believe
438:12 the order is legitimate.
438:13 BY MR. FULLER:
438:14   Q. Where does it say "after investigating"?
438:15 Does it say "after investigating" on this
438:16 policy?  And if it does, you tell me.
438:17   A. (Witness reviews document.)
438:18 I don't see it.
438:19   Q. It doesn't, does it?
438:20   A. No.
438:21   Q. It says "In these situations where we have
438:22 an excessive -- identified an excessive order, the
438:23 DEA should be notified, if possible before the
438:24 order is shipped," right?

**439:2 - 440:6**   **Reardon, Steve 11-30-2018 (00:01:02)**   **SR05.32**

| Page/Line | Source | ID |
|---|---|---|

SR05-Reardon, Steve - Plaintiff and Defense Combined Submission

439:2   A. Yes.
439:3 BY MR. FULLER:
439:4   Q. That's what Cardinal says is its
439:5 obligation in trying to comply with the
439:6 regulations, right?
439:7   A. It's what it states.
439:8   Q. You don't disagree with that, do you?
439:9   A. I can't disagree with what it states.
439:10   Q. It's a policy and procedure of the
439:11 company, isn't it?  You agree with that,
439:12 correct?
439:13   A. Correct.
439:14   Q. And they should be held to comply with
439:15 their own policies and procedures, shouldn't they?
439:16   A. Yes.
439:17   Q. Then it goes on to say that "And a copy of
439:18 such order should be maintained in the division's"
439:19 -- meaning whatever distribution center, right?
439:20   A. Yes.
439:21   Q. -- "the division's suspicious order file,
439:22 along with a regulatory agency contact form, see
439:23 Form No. 1, notifying of any specific instructions
439:24 from the DEA."
440:1 Did I read that correctly?
440:2   A. Yes.
440:3   Q. So not only are we providing it to the
440:4 DEA, but we should be able to go to that
440:5 distribution center and find all these suspicious
440:6 order forms, whatever the form is, correct?

**440:8 - 441:5    Reardon, Steve 11-30-2018 (00:01:14)    SR05.33**

440:8   A. Correct, they should be on file.
440:9 BY MR. FULLER:
440:10   Q. So, for example, and to save you -- let me
440:11 ask you first, the ingredient limit reports, do
440:12 you know how the ingredient limit was determined?
440:13   A. I don't know specifically.  I do know that
440:14 it was based on family of drugs.
440:15   Q. Right.
440:16   A. Assigned a certain base code for all those
440:17 drugs, and they were looked at cumulatively.

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

440:18   Q. It was based on the quantity of the active
440:19 ingredient, correct?
440:20   A. Correct.
440:21   Q. Not dosage units or not pills?
440:22   A. Correct.
440:23   Q. And then there's also a multiplier in
440:24 there, isn't there?
441:1   A. There is a multiplier.
441:2   Q. And if you look at 3556 and you turn to
441:3 page 18.
441:4   A. Did you say 3756?
441:5   Q. Yes, sir.  That big monster.  Yes, sir.

**441:7 - 441:9** — **Reardon, Steve 11-30-2018 (00:00:03)** — SR05.34

441:7 BY MR. FULLER:
441:8   Q. If you just want to look at the top and go
441:9 to 18.

**441:10 - 441:11** — **Reardon, Steve 11-30-2018 (00:00:07)** — SR05.35

441:10   A. Got it.
441:11   Q. Do you see there -- is there an indicator

**441:12 - 442:1** — **Reardon, Steve 11-30-2018 (00:00:32)** — SR05.148

441:12 of a -- so this is an ingredient limit report for
441:13 non-ARCOS reports.
441:14 Do you see the factor used section?
441:15   A. Yes.
441:16   Q. That's the multiplier that's used,
441:17 correct?
441:18   A. Yes.
441:19   Q. And for non-ARCOS reportables, it's eight.
441:20 Is that what it indicates?
441:21   A. Yes.
441:22   Q. Do you know what it was for reportables?
441:23   A. Two or three.  I can't remember
441:24 specifically.
442:1   Q. Would it surprise you if it was four?

**442:3 - 442:18** — **Reardon, Steve 11-30-2018 (00:00:45)** — SR05.36

442:3   A. That doesn't sound --
442:4 BY MR. FULLER:
442:5   Q. Doesn't sound right?
442:6   A. It doesn't -- it's not what I recall.  It
442:7 was the factors given to the program by the DEA.

| | SR05-Reardon, Steve - Plaintiff and Defense Combined Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 442:8   Q. Well, if we look back at that report we | |
|  | 442:9 went to, it gives the factors of three for C-IIs | |
|  | 442:10 and IIIs and eight for noncontrols, right? | |
|  | 442:11   A. Correct. | |
|  | 442:12   Q. So we know there's a factor.  So basically | |
|  | 442:13 what the limit is that's set is an average, and | |
|  | 442:14 then we multiply it by whatever the factor is, | |
|  | 442:15 correct? | |
|  | 442:16   A. That's my understanding of how it works. | |
|  | 442:17   Q. Okay.  So everything that is listed in | |
|  | 442:18 this report exceeded that limit? | |
| 442:20 - 442:21 | **Reardon, Steve 11-30-2018 (00:00:00)** | **SR05.37** |
|  | 442:20 BY MR. FULLER: | |
|  | 442:21   Q. Correct? | |
| 442:24 - 443:14 | **Reardon, Steve 11-30-2018 (00:00:31)** | **SR05.38** |
|  | 442:24   A. Correct. | |
|  | 443:1 BY MR. FULLER: | |
|  | 443:2   Q. So -- and we can roll through the report, | |
|  | 443:3 but let's see if my understanding is right. | |
|  | 443:4 So whatever pharmacies are listed and | |
|  | 443:5 whatever drug base codes are separated into, it | |
|  | 443:6 will give us a calculation, list all the orders, | |
|  | 443:7 right, for the month? | |
|  | 443:8   A. Right, right. | |
|  | 443:9   Q. And at the bottom, it gives us what the | |
|  | 443:10 customer ordered and what the limit was, correct? | |
|  | 443:11   A. Correct. | |
|  | 443:12   Q. And the only way you make it into this | |
|  | 443:13 report is if you exceed the limit? | |
|  | 443:14   A. Correct. | |
| 444:7 - 444:23 | **Reardon, Steve 11-30-2018 (00:00:45)** | **SR05.39** |
|  | 444:7   Q. So this is Ohio CVS store, LLC, 322.  I'll | |
|  | 444:8 represent it's a store in Cleveland, Ohio, where | |
|  | 444:9 our track one cases are, cases that we're getting | |
|  | 444:10 ready for trial on, okay? | |
|  | 444:11   A. Uh-huh. | |
|  | 444:12   Q. And if you look there, we have | |
|  | 444:13 hydrocodone -- or excuse me, oxycodone | |
|  | 444:14 hydrochloride limit.  And it gives limits for the | |
|  | 444:15 different months and you see that they're | |

| Page/Line | Source | ID |
|---|---|---|

444:16 increasing through that time frame, right?  And
444:17 that's the active ingredient limit, right not the
444:18 pill count, correct?
444:19  A. Correct.
444:20  Q. And then we see the oxycodone -- excuse
444:21 me.  Yes, the oxycodone totals for those
444:22 respective months that we pulled out of the
444:23 reports, 361, 483, 600 -- excuse me, 461, right?

**446:12 - 446:17    Reardon, Steve 11-30-2018 (00:00:13)    SR05.40**

446:12  Q. So we're not looking at the average.
446:13 We're looking at three or four, whatever the
446:14 factor is, standard deviations above the average,
446:15 and then they're still exceeding it by 200
446:16 percent.  Would that cause any concern to you as a
446:17 regulator?

**446:19 - 447:11    Reardon, Steve 11-30-2018 (00:00:38)    SR05.41**

446:19  A. I can only speak to the report and the
446:20 report was developed and approved by the DEA.  I
446:21 didn't determine the factors.
446:22 BY MR. FULLER:
446:23  Q. I'm not saying you did, okay.  But the
446:24 factors keep changing.  As far as the
447:1 hydrochloride limit, those numbers are changing,
447:2 right --
447:3  A. Yes.
447:4  Q. -- at least according to the PowerPoint,
447:5 correct?
447:6  A. Yes.
447:7  Q. Okay.  But the fact that you have a
447:8 limiter that's a multiple of the average and then
447:9 you have customers exceeding it by 200 percent,
447:10 that doesn't cause you some concern as a
447:11 regulator --

**447:13 - 447:15    Reardon, Steve 11-30-2018 (00:00:03)    SR05.42**

447:13 BY MR. FULLER:
447:14  Q. -- at least, hey, why are we exceeding it
447:15 by 200 percent, right?

**447:17 - 448:1    Reardon, Steve 11-30-2018 (00:00:17)    SR05.43**

447:17  A. Makes sense.
447:18 BY MR. FULLER:

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

447:19  Q. And certainly, like you mentioned earlier,
447:20 you can go do some due diligence, but you would
447:21 want to see that due diligence documented to
447:22 justify why we're still shipping such an excessive
447:23 number to these particularly this pharmacy,
447:24 correct?
448:1  A. Correct.

**449:21 - 450:13     Reardon, Steve 11-30-2018 (00:00:44)     SR05.149**

449:21  Q. And we talked to Mr. Brantley.  He
449:22 was one of reviewers, right?
449:23  A. Correct.
449:24  Q. And he testified the same as you, that
450:1 these were all constituted of suspicious orders,
450:2 but we believed our obligation was just to send in
450:3 the orders, right?
450:4  A. Based on the letter from the DEA.
450:5  Q. From, according to you, 1990?
450:6  A. In that time frame.
450:7  Q. Okay.  Now, maybe that satisfies our
450:8 suspicious orders requirement, correct?  That's
450:9 the Code of Federal Regulations, 130 whatever?
450:10  A. Correct.
450:11  Q. But as you recognized when you looked at
450:12 the Rannazzisi letter, we have the 21 USC 7823
450:13 requirement as well, don't we?

**450:15 - 450:23     Reardon, Steve 11-30-2018 (00:00:28)     SR05.150**

450:15  A. Yes.
450:16 BY MR. FULLER:
450:17  Q. And according to that, again,
450:18 Mr. Rannazzisi told all of you back in 2006 it
450:19 bears emphasis that the foregoing reporting
450:20 requirement is in addition to and not in lieu of
450:21 the general requirement under 21 USC 823(e), that
450:22 a distributor must maintain effective controls
450:23 against diversion, right?

**451:1 - 451:1     Reardon, Steve 11-30-2018 (00:00:00)     SR05.46**

451:1  A. Right.

**451:15 - 451:20     Reardon, Steve 11-30-2018 (00:00:15)     SR05.47**

451:15 You've already testified earlier that if
451:16 we're maintaining effective controls against

| Page/Line | Source | ID |
|---|---|---|
| | **SR05-Reardon, Steve - Plaintiff and Defense Combined Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| | 451:17 diversion, we're not just going to ship suspicious | |
| | 451:18 orders, because suspicious orders are orders that | |
| | 451:19 we have a concern that may be diverted, whether | |
| | 451:20 it's based on size, pattern or frequency, correct? | |
| 451:22 - 452:4 | **Reardon, Steve 11-30-2018 (00:00:15)** | **SR05.48** |
| | 451:22  A. Correct.  And we did that with our | |
| | 451:23 employees. | |
| | 451:24 BY MR. FULLER: | |
| | 452:1  Q. You -- you've explained that process.  And | |
| | 452:2 if we're shipping suspicious orders, we need to do | |
| | 452:3 some sort of due diligence to make sure that it's | |
| | 452:4 okay still to ship them? | |
| 452:7 - 452:7 | **Reardon, Steve 11-30-2018 (00:00:00)** | **SR05.49** |
| | 452:7  Q. Right? | |
| 452:10 - 452:22 | **Reardon, Steve 11-30-2018 (00:00:25)** | **SR05.50** |
| | 452:10  A. That's what the review of the report did. | |
| | 452:11 BY MR. FULLER: | |
| | 452:12  Q. Well, let's talk about that because we're | |
| | 452:13 not reviewing the report until the pills have | |
| | 452:14 already gone, correct? | |
| | 452:15  A. Correct. | |
| | 452:16  Q. So Mr. Papantonio has shown you earlier | |
| | 452:17 the amount, that the tens, if not hundreds of | |
| | 452:18 thousands, of pills that were being ordered by | |
| | 452:19 some of these pharmacies every month. | |
| | 452:20 But by the time we're reviewing the | |
| | 452:21 report, those pills are already gone and out on | |
| | 452:22 the street, aren't they? | |
| 452:24 - 453:4 | **Reardon, Steve 11-30-2018 (00:00:08)** | **SR05.51** |
| | 452:24  A. Correct. | |
| | 453:1 BY MR. FULLER: | |
| | 453:2  Q. It's not an effective system to prevent | |
| | 453:3 diversion if we've already sent out the pills, and | |
| | 453:4 then we're reviewing the report, is it? | |
| 453:6 - 453:11 | **Reardon, Steve 11-30-2018 (00:00:14)** | **SR05.52** |
| | 453:6  A. It could be suspect; we could prevent it. | |
| | 453:7 BY MR. FULLER: | |
| | 453:8  Q. You would agree, right, that if we're | |
| | 453:9 having concerns about a pharmacy, we need to | |
| | 453:10 justify those concerns so it's safe to send those | |

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

| Page/Line | Source | ID |
|---|---|---|
| 453:14 - 453:18 | 453:11 pills before we send them, correct?<br>**Reardon, Steve 11-30-2018 (00:00:11)**<br>453:14   A. Again, that's what we did for the process<br>453:15 with our employees.<br>453:16 BY MR. FULLER:<br>453:17   Q. We're relying on pickers and checkers?<br>453:18   A. That was the second step of the process. | SR05.53 |
| 454:5 - 454:18 | **Reardon, Steve 11-30-2018 (00:00:39)**<br>454:5   Q. So what I also did, Mr. Reardon, is I took<br>454:6 the ingredient limit report and I went through it<br>454:7 based on what you've testified earlier is<br>454:8 excessive purchase Schedule II, all right.<br>454:9 And you see down there at the bottom, the<br>454:10 different types of oxys.  It's either 1,200<br>454:11 tablets, 500 tablets or 600 tablets, which is the<br>454:12 limit?<br>454:13   A. Yes.<br>454:14   Q. And according to the company's own<br>454:15 policies and procedures, according to Cardinal's<br>454:16 policies and procedures, if we exceed those limits<br>454:17 on a single order, we need to try to notify the<br>454:18 DEA before it's shipped, correct? | SR05.54 |
| 454:20 - 454:23 | **Reardon, Steve 11-30-2018 (00:00:03)**<br>454:20   A. Correct.<br>454:21 BY MR. FULLER:<br>454:22   Q. We need to report it as a suspicious<br>454:23 order, right? | SR05.55 |
| 455:1 - 455:12 | **Reardon, Steve 11-30-2018 (00:00:25)**<br>455:1   A. If warranted.<br>455:2 BY MR. FULLER:<br>455:3   Q. Well, again, let's look at the policy and<br>455:4 procedure.  Does the policy and procedure say "if<br>455:5 warranted"?  You show me in that -- that's Page<br>455:6 147.  Let's go back to that.  Does it say in there<br>455:7 "if warranted"?<br>455:8   A. (Witness reviews document.)<br>455:9 It does not.<br>455:10   Q. Okay.  So we should reporting it, correct,<br>455:11 as a suspicious order if they exceed these<br>455:12 limits? | SR05.56 |

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

| Page/Line | Source | ID |
|---|---|---|
| 455:14 - 456:20 | **Reardon, Steve 11-30-2018 (00:01:13)** | SR05.57 |

455:14 BY MR. FULLER:

455:15   Q. Right?

455:16   A. Based on what's written.

455:17   Q. And we should also be sticking a copy of

455:18 the suspicious order report, as well as the

455:19 communication form with the DEA, in our suspicious

455:20 order file that's maintained at the distribution

455:21 center, correct?

455:22   A. That's what the policy requires.

455:23   Q. And that's the policy you were trying to

455:24 enforce at Cardinal, right?

456:1   A. Correct.

456:2   Q. When you were over and you saw all those

456:3 distribution centers that you oversaw across the

456:4 entire country -- and let's be clear.  This is a

456:5 systemic approach, right?  And by that, I mean

456:6 you're applying the same systems to the entire

456:7 country from Washington state all the way down to

456:8 Florida, correct?

456:9   A. It was the same system.

456:10   Q. And you expected it to be implemented the

456:11 same way in all your distribution centers; is that

456:12 fair?

456:13   A. That's fair.

456:14   Q. And you were trying to ensure that

456:15 everybody was trained on the system and that it

456:16 was being operated in the same form or fashion,

456:17 whether it was in Lakeland, Florida, Wheeling,

456:18 West Virginia, or -- I think it's Valencia,

456:19 California, right?

456:20   A. Correct.

| | | |
|---|---|---|
| 457:8 - 457:13 | **Reardon, Steve 11-30-2018 (00:00:11)** | SR05.58 |

457:8   Q. All right.  Mr. Reardon -- oh, yes, I

457:9 know.  I turned those a certain way.

457:10   A. I got it.

457:11   Q. I think that's Page 33 or 34?

457:12   A. Yes, 33.

457:13   Q. And if you look halfway down that page --

| | | |
|---|---|---|
| 457:14 - 457:15 | **Reardon, Steve 11-30-2018 (00:00:09)** | SR05.59 |

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

| Page/Line | Source | ID |
|---|---|---|
| 457:16 - 458:3 | 457:14 so this is 3756.<br>457:15 If you go to Page 33.  So I believe this<br>**Reardon, Steve 11-30-2018 (00:00:30)**<br>457:16 is actually a control section, is that right, for<br>457:17 ARCOS report and ingredient limit report?<br>457:18 Do you see that?<br>457:19   A. Yes.<br>457:20   Q. What's the factor when dealing with<br>457:21 controls used in the ingredient limit report from<br>457:22 2007 July?<br>457:23   A. Looks like it's for hospitals and managed<br>457:24 care and the factor is four.  The report breaks it<br>458:1 out by --<br>458:2   Q. It does, but the retail section is just<br>458:3 the same? | SR05.60 |
| 458:5 - 458:7 | **Reardon, Steve 11-30-2018 (00:00:12)**<br>458:5 MR. FULLER:  All right.  So for the<br>458:6 record, I'm going to also enter 3827 as Exhibit<br>458:7 34.  And 3828 as Exhibit 35. | SR05.151 |
| 458:16 - 459:12 | **Reardon, Steve 11-30-2018 (00:00:46)**<br>458:16   Q. And Exhibit 34, if you look at that,<br>458:17 Mr. Reardon, is October of 2007, the ingredient<br>458:18 limit report; is that right?<br>458:19   A. Yes.<br>458:20   Q. And Exhibit 35 is December of 2007; is<br>458:21 that correct?<br>458:22   A. Yes.<br>458:23   Q. And these are both, again, documents that<br>458:24 Cardinal keeps in the normal course of business.<br>459:1 Is that your understanding?<br>459:2   A. Yes.<br>459:3   Q. And these are documents that you and your<br>459:4 staff relied on to do your due diligence or your<br>459:5 regulatory function at Cardinal Health?<br>459:6   A. Correct.<br>459:7   Q. Is this the type of documents or the<br>459:8 actual documents or the form of documents that<br>459:9 would have been reviewed by Eric Brantley and his<br>459:10 team and also submitted to the DEA during this<br>459:11 time frame? | SR05.152 |

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

| Page/Line | Source | ID |
|---|---|---|
| | 459:12   A. Correct. | |
| 464:4 - 464:20 | **Reardon, Steve 11-30-2018 (00:00:46)** | **SR05.63** |
| | 464:4   Q. And during the time that you were | |
| | 464:5 overseeing the whole regulatory division -- I | |
| | 464:6 think you testified repeatedly to Mr. Papantonio | |
| | 464:7 about the number of employees -- you tried to push | |
| | 464:8 for more employees, didn't you? | |
| | 464:9 You tried to push for more financial | |
| | 464:10 support, more budgetary support, because you felt | |
| | 464:11 what you were given was not enough to get the job | |
| | 464:12 done right, didn't you? | |
| | 464:13   A. It's needing additional resources based on | |
| | 464:14 the direction we wanted to go in, and I requested | |
| | 464:15 additional head count. | |
| | 464:16   Q. Well, the direction we wanted to go in is | |
| | 464:17 to do a good job monitoring for suspicious orders | |
| | 464:18 and preventing any potential diversion.  That's | |
| | 464:19 the direction you wanted to go in, right? | |
| | 464:20   A. Correct. | |
| 464:21 - 464:23 | **Reardon, Steve 11-30-2018 (00:00:05)** | **SR05.64** |
| | 464:21   Q. When you asked for additional resources to | |
| | 464:22 go that direction, you weren't given everything | |
| | 464:23 you were asked for, were you? | |
| 465:1 - 465:2 | **Reardon, Steve 11-30-2018 (00:00:08)** | **SR05.65** |
| | 465:1   A. I believe I requested for two head count | |
| | 465:2 and ultimately got two head count. | |
| 465:3 - 465:11 | **Reardon, Steve 11-30-2018 (00:00:19)** | **SR05.66** |
| | 465:3 BY MR. FULLER: | |
| | 465:4   Q. So you took your three people to five | |
| | 465:5 people, right? | |
| | 465:6   A. Right. | |
| | 465:7   Q. So you're monitoring the entire country | |
| | 465:8 for suspicious orders with five people -- | |
| | 465:9   A. No. | |
| | 465:10   Q. -- an upgrade from three people, | |
| | 465:11 correct? | |
| 465:13 - 465:18 | **Reardon, Steve 11-30-2018 (00:00:06)** | **SR05.67** |
| | 465:13   A. Additionally, there were people in the | |
| | 465:14 distribution centers that had -- operations had | |
| | 465:15 responsibility. | |

| Page/Line | Source | ID |
|---|---|---|
| | 465:16 BY MR. FULLER: | |
| | 465:17   Q. Right.  There were some people in the | |
| | 465:18 distribution center -- | |
| 465:21 - 466:5 | **Reardon, Steve 11-30-2018 (00:00:14)** | **SR05.68** |
| | 465:21 BY MR. FULLER: | |
| | 465:22   Q. Go ahead, if you're not done. | |
| | 465:23   A. That had responsibility for reviewing | |
| | 465:24 ingredient limit reports and then working in the | |
| | 466:1 cage and the vault. | |
| | 466:2   Q. And the jury's already heard about some of | |
| | 466:3 those.  They weren't full-time -- they didn't get | |
| | 466:4 full-time people there until Mr. Hartman came | |
| | 466:5 along, correct? | |
| 466:8 - 466:11 | **Reardon, Steve 11-30-2018 (00:00:08)** | **SR05.69** |
| | 466:8   Q. And when Mr. Hartman came along, he | |
| | 466:9 actually revamped the whole system and got -- and | |
| | 466:10 more than doubled the employees you had, didn't | |
| | 466:11 he? | |
| 466:13 - 466:17 | **Reardon, Steve 11-30-2018 (00:00:12)** | **SR05.70** |
| | 466:13   A. What occurred was, people in the | |
| | 466:14 distribution centers that were tasked with | |
| | 466:15 compliance responsibilities moved over and changed | |
| | 466:16 in the reporting structure, reporting up through | |
| | 466:17 my organization. | |
| 466:18 - 466:22 | **Reardon, Steve 11-30-2018 (00:00:10)** | **SR05.71** |
| | 466:18 BY MR. FULLER: | |
| | 466:19   Q. And he got full-time personnel at each of | |
| | 466:20 the distribution centers, something you didn't | |
| | 466:21 have the benefit of, right? | |
| | 466:22   A. I did not. | |
| 469:20 - 470:3 | **Reardon, Steve 11-30-2018 (00:00:16)** | **SR05.72** |
| | 469:20   Q. You had three people sitting in corporate | |
| | 469:21 headquarters looking at this document.  And that's | |
| | 469:22 just from one distribution center, right? | |
| | 469:23   A. Correct. | |
| | 469:24   Q. This was done for all 20-some-odd | |
| | 470:1 distribution centers, so this times 27.  Nobody | |
| | 470:2 can investigate all those with three people.  We | |
| | 470:3 can agree on that, can't we -- | |
| 470:5 - 470:14 | **Reardon, Steve 11-30-2018 (00:00:17)** | **SR05.73** |

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

470:5 BY MR. FULLER:
470:6   Q. -- at least not investigate them the way
470:7 they should be investigated, correct?
470:8   A. I guess.
470:9   Q. Don't guess.  You used to be a law
470:10 enforcement officer.  I used to be a prosecute
470:11 other.
470:12 You and I both know there's no way to do a
470:13 proper investigation of all these with three
470:14 people, correct?

**470:16 - 470:19   Reardon, Steve 11-30-2018 (00:00:05)**    SR05.74

470:16   A. I agree.
470:17 BY MR. FULLER:
470:18   Q. At least not to the standard you want to
470:19 do it, correct?

**470:21 - 470:21   Reardon, Steve 11-30-2018 (00:00:01)**    SR05.75

470:21   A. Correct.

**473:10 - 473:10   Reardon, Steve 11-30-2018 (00:00:02)**    SR05.153

473:10   Q. Let's do the pill comparison, please.  So

**473:11 - 473:15   Reardon, Steve 11-30-2018 (00:00:15)**    SR05.77

473:11 during the time frame that you were there, part of
473:12 your job was to look for -- we talked about
473:13 suspicious orders and to look for patterns,
473:14 right?
473:15   A. Correct.

**473:16 - 473:17   Reardon, Steve 11-30-2018 (00:00:04)**    SR05.154

473:16   Q. Did you -- well, you testified earlier you
473:17 didn't look at any pill counts, correct?

**473:19 - 474:21   Reardon, Steve 11-30-2018 (00:00:56)**    SR05.78

473:19   A. I did not personally.
473:20 BY MR. FULLER:
473:21   Q. Well, let's start.  So Ohio is -- I mean,
473:22 you know where Ohio is.  You were based in
473:23 Columbus or the Columbus area, correct?
473:24   A. Correct.
474:1   Q. Illinois is two states over.  Are you
474:2 aware that the states are similarly situated?  I
474:3 mean, Illinois has about a million more people
474:4 than Ohio.  Are you aware of that?
474:5   A. No.

| Page/Line | Source | ID |
|---|---|---|

474:6  Q. Both considered midwest states.  Can we
474:7 agree on that?
474:8  A. Yes.
474:9  Q. And it's a neighboring state.  It's got
474:10 some unimportant state in between the two of them,
474:11 right?
474:12  A. Yes.
474:13  Q. Kidding.  They're geographically similar.
474:14 They're similar in size and, based on my
474:15 representations, about the same population, right?
474:16  A. Yes.
474:17  Q. And if we're looking at pills distribution
474:18 across the entire country, we can say safely
474:19 there's probably not -- or shouldn't be a
474:20 significant difference between Ohio and Illinois,
474:21 fair enough?

**474:24 - 475:4**    **Reardon, Steve 11-30-2018 (00:00:07)**    **SR05.79**

474:24  A. I wouldn't know enough about it to --
475:1 BY MR. FULLER:
475:2  Q. If we saw a significant difference, it
475:3 might be something we would want to look into,
475:4 correct?

**475:6 - 475:14**    **Reardon, Steve 11-30-2018 (00:00:20)**    **SR05.80**

475:6  A. May raise a question to say why.
475:7 BY MR. FULLER:
475:8  Q. Let me ask.  You're a cop, worked the
475:9 street, right, here in Boston, correct?
475:10  A. Outside of Boston.
475:11  Q. Outside of Boston.  If you were driving
475:12 doing your patrol and you see something suspicious
475:13 going on, you're going to take initiative and
475:14 investigate it, aren't you?

**475:16 - 476:21**    **Reardon, Steve 11-30-2018 (00:01:15)**    **SR05.81**

475:16  A. Yes.
475:17 BY MR. FULLER:
475:18  Q. May not be that there is anything with it.
475:19 There may not be any laws being broken, but until
475:20 you do your investigation you're not going to know
475:21 that, are you?
475:22  A. Correct.

| Page/Line | Source | ID |
|---|---|---|

SR05-Reardon, Steve - Plaintiff and Defense Combined Submission

475:23   Q. I mean, I don't want to insult you, but
475:24 let's go back.  I prosecuted a ton of DUIs.  You
476:1 may see somebody weaving on the road.  Well,
476:2 doesn't mean they're drunk, does it?
476:3   A. Not necessarily.
476:4   Q. But it's an indicator, hey, there may be
476:5 something going on.  It could be a health concern.
476:6 It could be that they're texting and driving at
476:7 least now probably, not when you were a cop not,
476:8 when I was a prosecutor.  But that's the type of
476:9 thing you would want to investigate to see what
476:10 the issue is, correct?
476:11   A. Correct.
476:12   Q. So let's look at the comparison between
476:13 Illinois and Ohio.  Let's go for 2006.  4.9
476:14 million -- and this is just oxycodone, okay?  You
476:15 understand?
476:16   A. Yes.
476:17   Q. Okay.  4.9 million dosage units, pills,
476:18 into Illinois.  67 million pills into Ohio in the
476:19 same year.  This is just Cardinal alone.  That
476:20 causes you some concern, doesn't it,
476:21 Mr. Reardon?

| 476:23 - 477:19 | **Reardon, Steve 11-30-2018 (00:00:39)** | SR05.82 |

476:23   A. It would --
476:24 BY MR. FULLER:
477:1   Q. Now --
477:2   A. -- warrant a further look.
477:3   Q. Exactly.  We're not saying that there's
477:4 anything nefarious going on yet, but we're not
477:5 going to know unless we investigate, are we?
477:6   A. Correct.
477:7   Q. And we both know Cardinal had this
477:8 information.  This is your sales data.  And I say
477:9 yours.  I mean the royal you and Cardinal,
477:10 correct?
477:11   A. Correct.
477:12   Q. Somebody could have had this information
477:13 pulled, right?
477:14   A. (Witness nodding.)

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

477:15   Q. In 2006, you've already told us -- Mr.
477:16 Hartman has already testified, as well as others,
477:17 that we are in the middle of an opioid crisis, we
477:18 should be doing comparisons like this.  Would you
477:19 agree with that?

**477:21 - 478:10**   **Reardon, Steve 11-30-2018 (00:00:39)**   **SR05.83**

477:21   A. It would make sense.
477:22 BY MR. FULLER:
477:23   Q. So let's go to 2007.  5.9 million in
477:24 Illinois.  72 million in Ohio.  Again, huge
478:1 disparity.
478:2 MR. FULLER:  Let's keep going, Gina.
478:3 BY MR. FULLER:
478:4   Q. 2008, 2009, 2010, 2011, 2012.  Let's stop
478:5 there for a second.
478:6 2012, 10 million pills into Illinois, 100
478:7 million pills into the state of Ohio with a
478:8 million less people.  This pattern causes you
478:9 concern, sitting here today, doesn't it,
478:10 Mr. Reardon?

**478:12 - 478:12**   **Reardon, Steve 11-30-2018 (00:00:03)**   **SR05.84**

478:12   A. It raises the question of why.

**479:15 - 479:18**   **Reardon, Steve 11-30-2018 (00:00:09)**   **SR05.85**

479:15   Q. I mean, you would agree with me, would you
479:16 not, that it shouldn't take a lawsuit against
479:17 Cardinal before it would look into something like
479:18 this going on in its company, correct?

**479:20 - 481:3**   **Reardon, Steve 11-30-2018 (00:01:26)**   **SR05.86**

479:20   A. Correct.
479:21 BY MR. FULLER:
479:22   Q. So there we have it, 798 million dosage
479:23 units for that time frame into a population of
479:24 11.7 million for Ohio.  Only 76 million with a
480:1 million more people, 12.8, correct?
480:2   A. Correct.
480:3   Q. I mean, sitting here today, you didn't
480:4 know this before today, right?
480:5   A. No.
480:6   Q. No one shared this with you?  No one
480:7 pulled the numbers for you even back when you were

| Page/Line | Source | ID |
|---|---|---|

SR05-Reardon, Steve - Plaintiff and Defense Combined Submission

480:8 there at Cardinal, correct?

480:9   A. Correct.

480:10   Q. I mean, do you find that shocking, that

480:11 disparity?  I mean, it's ten times the amount of

480:12 pills.

480:13   A. I -- I still think you need to dig deeper,

480:14 customers.

480:15   Q. Now, we also know -- and the jury will

480:16 have heard by now -- that back in 2003 the GOA,

480:17 Government Office of Accounting, did a report,

480:18 OxyContin and its abuse and -- abuse and addiction

480:19 or something like that and they found that opioid

480:20 epidemic was hitting certain states more than

480:21 others.  That would also be something that

480:22 Cardinal would want to be aware of.  Can we agree

480:23 with that?

480:24   A. I think so.

481:1   Q. I mean, let's go back to our -- again, our

481:2 investigative days.  You want to gather all the

481:3 information you can, correct --

**481:5 - 482:2**   **Reardon, Steve 11-30-2018 (00:00:52)**   **SR05.87**

481:5   A. Correct.

481:6 BY MR. FULLER:

481:7   Q. -- particularly when you're one that has

481:8 been entitled, been privileged with the ability to

481:9 operate in this closed system.  Cardinal -- no one

481:10 forced this licensing, this registrant status, on

481:11 Cardinal, did they?

481:12   A. No.

481:13   Q. Cardinal went out and wanted to get into

481:14 this business so they could distribute and make

481:15 money, correct?

481:16   A. Correct.

481:17   Q. But they took on an obligation when they

481:18 did that.  We've looked at that.  Based on

481:19 Rannazzisi's letters, they took on obligations to

481:20 ensure to do the best job they could to keep our

481:21 community safe, right?

481:22   A. Correct.

481:23   Q. And doing an analysis of this kind of

| Page/Line | Source | ID |
|---|---|---|
| | 481:24 data, this disparity between Illinois and Ohio, is | |
| | 482:1 part of what follows within that obligation, | |
| | 482:2 doesn't it? | |
| 482:4 - 482:11 | **Reardon, Steve 11-30-2018 (00:00:11)** | **SR05.88** |
| | 482:4   A. It would warrant a look to see why the | |
| | 482:5 disparity -- the digger. | |
| | 482:6 BY MR. FULLER: | |
| | 482:7   Q. Like you said -- | |
| | 482:8   A. Deeper down. | |
| | 482:9   Q. -- deeper dig down.  Sitting here today, | |
| | 482:10 you don't know of anybody at Cardinal that | |
| | 482:11 bothered to do that you, do? | |
| 482:13 - 482:13 | **Reardon, Steve 11-30-2018 (00:00:01)** | **SR05.89** |
| | 482:13   A. I have no knowledge. | |
| 484:2 - 484:9 | **Reardon, Steve 11-30-2018 (00:00:21)** | **SR05.90** |
| | 484:2 BY MR. FULLER: | |
| | 484:3   Q. Let me ask you.  Back on the street doing | |
| | 484:4 our investigations, are we going to wait to get to | |
| | 484:5 that extreme before we start our investigation? | |
| | 484:6 Or as soon as we see this disparity, we're going | |
| | 484:7 to start investigation right away? | |
| | 484:8   A. I would think you would at least want to | |
| | 484:9 look in and do a deeper dive and understand why. | |
| 484:18 - 484:22 | **Reardon, Steve 11-30-2018 (00:00:11)** | **SR05.91** |
| | 484:18   Q. Right away, correct?  We're not going to | |
| | 484:19 wait four, five, six years down the road, are we, | |
| | 484:20 not if we're doing what the law requires us to do, | |
| | 484:21 correct, Mr. Reardon? | |
| | 484:22   A. It would make sense. | |
| 485:1 - 485:17 | **Reardon, Steve 11-30-2018 (00:00:34)** | **SR05.92** |
| | 485:1   Q. Let's go to West Virginia.  Now, West | |
| | 485:2 Virginia is another state over from Ohio, right, | |
| | 485:3 going east?  You're aware of West Virginia is -- | |
| | 485:4   A. Correct. | |
| | 485:5   Q. -- a much smaller state though, right? | |
| | 485:6   A. I... | |
| | 485:7   Q. I'll tell you.  You'll see.  1.8 million | |
| | 485:8 people compared to the 12.8 of Illinois.  You | |
| | 485:9 would expect to see more pills going into Illinois | |
| | 485:10 than West Virginia, all things being equal, | |

| Page/Line | Source | ID |
|---|---|---|
| | 485:11 correct? | |
| | 485:12   A. Possibly. | |
| | 485:13   Q. I mean, seven times smaller? | |
| | 485:14   A. Again, depends. | |
| | 485:15   Q. It depends on whether we're dumping pills | |
| | 485:16 into a state or we're complying with our | |
| | 485:17 regulatory requirements, right? | |
| 485:19 - 486:7 | **Reardon, Steve 11-30-2018 (00:00:45)** | **SR05.93** |
| | 485:19   A. It depends on the number of pharmacies, | |
| | 485:20 customer type. | |
| | 485:21 BY MR. FULLER: | |
| | 485:22   Q. Let's look at it.  2006, 4.9 million pills | |
| | 485:23 into Illinois again.  Same number, 10.5 million | |
| | 485:24 into West Virginia. | |
| | 486:1 2007, let's keep going, 2008, 2009, 2010, | |
| | 486:2 '11, '12, all the way to '14.  Let's do the total. | |
| | 486:3 Population of 12.8 in Illinois, only 1.8 | |
| | 486:4 in West Virginia, 7 times the difference and yet | |
| | 486:5 you've got almost double the pills.  Someone at | |
| | 486:6 Cardinal should have picked up on this as well, | |
| | 486:7 correct? | |
| 486:10 - 486:17 | **Reardon, Steve 11-30-2018 (00:00:18)** | **SR05.94** |
| | 486:10   Q. Right? | |
| | 486:11   A. If they had the info. | |
| | 486:12   Q. This is Cardinal's numbers.  Cardinal had | |
| | 486:13 the info, right?  I mean, come on.  Cardinal's | |
| | 486:14 making these sales.  You know that Cardinal tracks | |
| | 486:15 where its making sales.  You know they do track | |
| | 486:16 where they're making sales, don't you? | |
| | 486:17   A. They would. | |
| 489:8 - 489:11 | **Reardon, Steve 11-30-2018 (00:00:07)** | **SR05.95** |
| | 489:8   Q. Can we agree that between what | |
| | 489:9 Mr. Papantonio and myself have shown you today, | |
| | 489:10 there was a lot going on that you didn't know | |
| | 489:11 about? | |
| 489:14 - 489:16 | **Reardon, Steve 11-30-2018 (00:00:10)** | **SR05.96** |
| | 489:14   Q. That there is additional diligence that | |
| | 489:15 you would have done had somebody brought some of | |
| | 489:16 these facts to your attention, correct? | |
| 489:19 - 489:23 | **Reardon, Steve 11-30-2018 (00:00:05)** | **SR05.97** |

SR05-Reardon, Steve - Plaintiff and Defense Combined Submission

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

489:19  A. I would look into it.
489:20 BY MR. FULLER:
489:21   Q. You would have done an investigation,
489:22 right?  That's what looking into it is, isn't
489:23 it?

**490:1 - 490:7**    **Reardon, Steve 11-30-2018 (00:00:16)**    **SR05.98**

490:1   A. Correct.
490:2 BY MR. FULLER:
490:3   Q. You want to look and see why is this
490:4 happening.  And here's the shocking thing.  The
490:5 people within Cardinal -- there are people within
490:6 Cardinal that had this information.  You can't
490:7 deny that, can you?

**490:9 - 490:13**    **Reardon, Steve 11-30-2018 (00:00:05)**    **SR05.99**

490:9   A. I can't deny it.  I just don't know for
490:10 sure, but --
490:11 BY MR. FULLER:
490:12   Q. It's their sales data?
490:13   A. I would assume that's sales data, yeah.

**490:20 - 490:21**    **Reardon, Steve 11-30-2018 (00:00:01)**    **SR05.100**

490:20   Q. And no one ever brought this to your
490:21 attention?

**490:23 - 490:23**    **Reardon, Steve 11-30-2018 (00:00:01)**    **SR05.101**

490:23   A. Not that, no.

**491:1 - 491:5**    **Reardon, Steve 11-30-2018 (00:00:18)**    **SR05.102**

491:1   Q. Did they ever bring any other problems
491:2 with diversion to your attention?
491:3   A. Yeah, there were times we would get calls
491:4 from distribution centers or something Eric would
491:5 raise.

**491:9 - 492:1**    **Reardon, Steve 11-30-2018 (00:00:45)**    **SR05.103**

491:9   Q. So do Choice Pharmacy.  We looked at that
491:10 a little while.  Do you remember that?  It's one
491:11 of the pharmacies in the Cuyahoga, Summit County
491:12 area?
491:13   A. Right.
491:14 MR. PYSER:  Is this an exhibit or
491:15 just a demonstrative --
491:16 MR. FULLER:  This is demonstrative.
491:17 BY MR. FULLER:

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

| Page/Line | Source | ID |
|---|---|---|
| | 491:18   Q. And what I did is I pulled out of the | |
| | 491:19 ingredient limit report items that exceeded your | |
| | 491:20 limiter numbers.  And if you see the amount | |
| | 491:21 ordered versus the amount in excess, so for | |
| | 491:22 example, on July 2 of 2007, for -- New Choice they | |
| | 491:23 ordered oxycodone, APAP, 6,000 pills, right? | |
| | 491:24 Well, we know the limit is 1,200 from what | |
| | 492:1 we saw earlier, correct? | |
| 492:3 - 492:18 | **Reardon, Steve 11-30-2018 (00:00:31)** | **SR05.104** |
| | 492:3   A. Are you talking about the dosage limit | |
| | 492:4 charts? | |
| | 492:5 BY MR. FULLER: | |
| | 492:6   Q. Yes, sir. | |
| | 492:7   A. So that's -- that's those dosage limit | |
| | 492:8 charts are just to assist in the cage vault | |
| | 492:9 process and the order filling process -- | |
| | 492:10   Q. Right. | |
| | 492:11   A. -- to cause an order filler to look | |
| | 492:12 further at the order. | |
| | 492:13   Q. Well, order filler -- you're talking about | |
| | 492:14 pickers, right? | |
| | 492:15   A. Pickers. | |
| | 492:16   Q. How does is picker -- a picker is not | |
| | 492:17 going to do due diligence on the facility or the | |
| | 492:18 pharmacy, correct? | |
| 492:20 - 493:10 | **Reardon, Steve 11-30-2018 (00:00:41)** | **SR05.105** |
| | 492:20   A. No, but they have the ability based on | |
| | 492:21 experience with the customer and -- ability to | |
| | 492:22 look at customer purchase patterns through their | |
| | 492:23 access to the ordering system. | |
| | 492:24 BY MR. FULLER: | |
| | 493:1   Q. But these are limited numbers that, | |
| | 493:2 according to the policy and procedure, were there | |
| | 493:3 to help the pickers for excessive orders, correct? | |
| | 493:4 I mean, that's the title of the document, is | |
| | 493:5 Excessive Orders for Schedule II, isn't it? | |
| | 493:6   A. To help them flag orders that they may | |
| | 493:7 possibly have to look at. | |
| | 493:8   Q. And any that were excessive -- and again, | |
| | 493:9 the name of the document is Excessive Orders for | |

| Page/Line | Source | ID |
|---|---|---|
| | **SR05-Reardon, Steve - Plaintiff and Defense Combined Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 493:12 - 493:16 | 493:10 Schedule II, right?<br>**Reardon, Steve 11-30-2018 (00:00:07)**<br>493:12   A. Right.<br>493:13 BY MR. FULLER:<br>493:14   Q. And so if they set off a trigger, we need<br>493:15 to see some sort of documentation related to that,<br>493:16 correct? | SR05.106 |
| 493:18 - 494:5 | **Reardon, Steve 11-30-2018 (00:00:24)**<br>493:18   A. Correct.<br>493:19 BY MR. FULLER:<br>493:20   Q. Okay.  So we should see, in the due<br>493:21 diligence file for New Choice Pharmacy, when it<br>493:22 orders 6,000 pills and the limiter is at 1,200,<br>493:23 it's an extra 4,800 pills, if I'm doing my math<br>493:24 correctly, right?<br>494:1   A. Right.<br>494:2   Q. And we should see something in the due<br>494:3 diligence file related to that order either<br>494:4 justifying it or we should see the report to the<br>494:5 DEA, correct? | SR05.107 |
| 494:8 - 494:15 | **Reardon, Steve 11-30-2018 (00:00:20)**<br>494:8   A. I would expect that that would be the<br>494:9 practice.<br>494:10 BY MR. FULLER:<br>494:11   Q. And on July 3, when they ordered the same<br>494:12 thing, another 4,000 pills, we should see the same<br>494:13 thing in the due diligence file or a suspicious<br>494:14 order report in the distribution center suspicious<br>494:15 order report folder, correct? | SR05.108 |
| 494:17 - 494:18 | **Reardon, Steve 11-30-2018 (00:00:02)**<br>494:17   A. I would expect that that would be the<br>494:18 practice. | SR05.109 |
| 496:19 - 496:24 | **Reardon, Steve 11-30-2018 (00:00:15)**<br>496:19   Q. And that was the same practice.  Whether<br>496:20 it was out at the Wheeling center, the Lakeland<br>496:21 center, the Valencia center, wherever else they<br>496:22 had distribution centers, that was the same<br>496:23 practice everywhere, right, correct?<br>496:24   A. Correct. | SR05.110 |
| 497:10 - 497:13 | **Reardon, Steve 11-30-2018 (00:00:05)** | SR05.111 |

| Page/Line | Source | ID |
|---|---|---|
| | 497:10 MR. PYSER:  Good afternoon, | |
| | 497:11 Mr. Reardon.  My name's Steven Pyser.  I represent | |
| | 497:12 Cardinal.  I have a few questions for you here | |
| | 497:13 today. | |
| 498:2 - 499:8 | **Reardon, Steve 11-30-2018 (00:01:14)** | SR05.112 |
| | 498:2   Q. Mr. Reardon, can you please introduce | |
| | 498:3 yourself to the jury? | |
| | 498:4   A. Steve Reardon. | |
| | 498:5   Q. Where are you from originally, | |
| | 498:6 Mr. Reardon? | |
| | 498:7   A. Originally from Massachusetts. | |
| | 498:8   Q. Come a time when you started work at | |
| | 498:9 Cardinal Health? | |
| | 498:10   A. Yes. | |
| | 498:11   Q. When was that? | |
| | 498:12   A. June of 1988. | |
| | 498:13   Q. How long were you with Cardinal Health? | |
| | 498:14   A. Ant about 28 years. | |
| | 498:15   Q. So 1988 through roughly 2016? | |
| | 498:16   A. March of 2016. | |
| | 498:17   Q. Are you retired now? | |
| | 498:18   A. I am retired. | |
| | 498:19   Q. Prior to joining Cardinal Health, what did | |
| | 498:20 you do? | |
| | 498:21   A. I was in law enforcement. | |
| | 498:22   Q. From your perspective, having been | |
| | 498:23 employed at Cardinal Health for roughly 28 years, | |
| | 498:24 can you describe what Cardinal Health's role is in | |
| | 499:1 the healthcare distribution system? | |
| | 499:2   A. Yes.  Cardinal purchases prescription drug | |
| | 499:3 products from duly-licensed manufacturers and | |
| | 499:4 distributes those prescription drug products to | |
| | 499:5 duly-licensed hospitals, hospital pharmacies, | |
| | 499:6 independent retail pharmacies, chain pharmacies, | |
| | 499:7 long-term care facilities, managed care, VA at one | |
| | 499:8 time. | |
| 499:15 - 500:23 | **Reardon, Steve 11-30-2018 (00:01:18)** | SR05.113 |
| | 499:15   Q. What types of products does Cardinal | |
| | 499:16 Health ship? | |
| | 499:17   A. Prescription drug products, | |

| Page/Line | Source | ID |
|---|---|---|

SR05-Reardon, Steve - Plaintiff and Defense Combined Submission

499:18 over-the-counter products, hospital supply
499:19 products, OTC products.
499:20   Q. Does Cardinal Health ever interact
499:21 directly with patients?
499:22   A. No.
499:23   Q. How about doctors?
499:24   A. No.
500:1   Q. What was your first job at Cardinal?
500:2   A. First job at Cardinal when I got hired in
500:3 June of '88 was as a security and compliance
500:4 manager at the Peabody distribution center.
500:5   Q. And did there come a point in time when
500:6 you left Peabody and had a job that focused on
500:7 anti-diversion across a larger part of Cardinal
500:8 Health?
500:9   A. Yes.
500:10   Q. When was that?
500:11   A. I moved to corporate in Dublin in December
500:12 of '94.
500:13   Q. And from that time until roughly 2007, was
500:14 your work in anti-diversion?
500:15   A. Anti-diversion in addition to overall
500:16 regulatory compliance.
500:17   Q. In addition to the people who were your
500:18 direct reports, working for you when you were
500:19 working in anti-diversion, were there other
500:20 Cardinal Health employees who also worked
500:21 anti-diversion on issues?
500:22   A. Yes.  People in the distribution centers
500:23 had responsibilities around anti-diversion.

| 501:20 - 502:6 | **Reardon, Steve 11-30-2018 (00:00:22)** | **SR05.114** |

501:20   Q. You were asked a lot of questions earlier
501:21 today about issues related to anti-diversion after
501:22 2007.  Had you transitioned to a role within the
501:23 company outside of the anti-diversion work after
501:24 2007?
502:1   A. Yes.
502:2   Q. Were there other people charged by
502:3 Cardinal Health with ensuring Cardinal Health met
502:4 its regulatory obligations with regard to

| Page/Line | Source | ID |
|---|---|---|
| | 502:5 anti-diversion after 2007? | |
| | 502:6   A. Yes. | |
| 503:18 - 503:22 | **Reardon, Steve 11-30-2018 (00:00:07)** | **SR05.115** |
| | 503:18   Q. During the time that you were in charge of | |
| | 503:19 anti-diversion efforts at Cardinal Health, did you | |
| | 503:20 have the resources necessary to perform your | |
| | 503:21 work? | |
| | 503:22   A. Yes. | |
| 503:23 - 504:16 | **Reardon, Steve 11-30-2018 (00:00:51)** | **SR05.155** |
| | 503:23   Q. Showing you the DEA compliance manual that | |
| | 503:24 was marked earlier today as Exhibit 32, do you | |
| | 504:1 recall that document? | |
| | 504:2   A. Yes. | |
| | 504:3   Q. And what is it? | |
| | 504:4   A. It was the manual in place outlining our | |
| | 504:5 policy and processes related to DEA. | |
| | 504:6   Q. Was it in effect during the time you were | |
| | 504:7 working in anti-diversion? | |
| | 504:8   A. Yes. | |
| | 504:9   Q. Does it discuss suspicious order | |
| | 504:10 monitoring and suspicious order reporting? | |
| | 504:11   A. Yes. | |
| | 504:12   Q. I'd like to direct your attention to the | |
| | 504:13 page -- it has Bates page, so I'm going to use the | |
| | 504:14 bottom right pages. | |
| | 504:15   A. Okay. | |
| | 504:16   Q. It ends with 937, Page 7-1.  Does it begin | |
| 504:17 - 507:3 | **Reardon, Steve 11-30-2018 (00:02:50)** | **SR05.156** |
| | 504:17 by discussing ARCOS reports? | |
| | 504:18   A. Yes. | |
| | 504:19   Q. What are ARCOS reports? | |
| | 504:20   A. So registrants are required -- at least | |
| | 504:21 distributors and manufacturers are required to | |
| | 504:22 report ARCOS to the DEA ARCOS unit.  We reported | |
| | 504:23 it on a monthly basis. | |
| | 504:24 It's all transactions of Schedule II | |
| | 505:1 controlled substances and some ARCOS reportables | |
| | 505:2 that are in Schedule III. | |
| | 505:3 So there's daily reporting, and then you | |
| | 505:4 have to submit an annual inventory of all your | |

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

| Page/Line | Source | ID |
|---|---|---|

505:5 controlled substances.  And then if there's a
505:6 newly -- a new ARCOS reportable controlled
505:7 substances, you have to report initial inventory.
505:8   Q. So beyond ARCOS reports, there was also
505:9 some discussion of other reporting that was done
505:10 for suspicious orders.  Do you recall that?
505:11   A. Yes.
505:12   Q. The beginning of Cardinal Health's manual
505:13 where it references 21 CFR 130.74 (b), it states,
505:14 "Wholesalers are responsible for designing and
505:15 operating a system that will disclose to the
505:16 wholesalers suspicious orders."
505:17 Do you see that?
505:18   A. Yes.
505:19   Q. Did Cardinal Health have such a system?
505:20   A. Yes.
505:21   Q. In fact, this document, it is dated in the
505:22 bottom left April 5, 2000, right?
505:23   A. Correct.
505:24   Q. Were there similar manuals before that
506:1 date?
506:2   A. Yes.  That's a revision date.
506:3   Q. Were there similar manuals after that
506:4 date?
506:5   A. Yes.
506:6   Q. And next states that "The wholesaler
506:7 informs the DEA field office in that area of all
506:8 suspicious orders."
506:9 Is that something that Cardinal Health
506:10 did?
506:11   A. Yes.
506:12   Q. On the next page, Page 7-4, there's a
506:13 discussion of how Cardinal Health complies with
506:14 1301.74 (b).
506:15 Do you see that?
506:16   A. Yes.
506:17   Q. And it's described as a two-step
506:18 process?
506:19   A. Yes.
506:20   Q. Can you tell me what the two steps are?

| SR05-Reardon, Steve - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

506:21   A. So step one is the submission of the
506:22 ingredient limit report to the local DEA field
506:23 office on a monthly basis.
506:24   Q. And if you turn with me to Exhibit M which
507:1 is -- let's see.  Using the page in the bottom --
507:2 excuse me, in the top right, it's Page 263.  This
507:3 may be a little bit hard to read on the Elmo.

**507:4 - 508:5**   **Reardon, Steve 11-30-2018 (00:01:21)**   **SR05.157**

507:4   A. Got it.
507:5   Q. Can you tell me what each ingredient limit
507:6 report for each customers tells the DEA when you
507:7 submit it?
507:8   A. So each report will show customer name,
507:9 DEA number, and then it will go through each
507:10 family of a controlled substance that's identified
507:11 by a base code.  All the families are lumped
507:12 together.
507:13 It will show the quantity the customer
507:14 ordered.  It will show the item -- the active
507:15 ingredient in grams, then total grams purchased,
507:16 and then it will add all of that up for a given
507:17 month and compare that to the ingredient limit
507:18 within the report.
507:19 And if the customer exceeds that
507:20 ingredient limit, they'll show up on the report.
507:21   Q. Where did the parameters that were used
507:22 for the ingredient limit report -- where did those
507:23 come from?
507:24   A. They were developed between the trade
508:1 association and WDA at the time and the DEA.
508:2   Q. During your time running anti-diversion
508:3 programs at Cardinal Health, did you believe DEA
508:4 was aware of Cardinal Health's process to monitor
508:5 and report suspicious orders?

**508:7 - 508:7**   **Reardon, Steve 11-30-2018 (00:00:01)**   **SR05.116**

508:7   A. Yes.

**508:8 - 508:12**   **Reardon, Steve 11-30-2018 (00:00:09)**   **SR05.140**

508:8 BY MR. PYSER:
508:9   Q. Did you ever come to an understanding of
508:10 whether or not DEA was aware of Cardinal Health's

| Page/Line | Source | ID |
|---|---|---|
| | 508:11 process for reporting suspicious orders including | |
| | 508:12 ingredient limit reports? | |
| 508:14 - 508:20 | **Reardon, Steve 11-30-2018 (00:00:11)** | **SR05.117** |
| | 508:14   A. Yes.  The reports were submitted to them | |
| | 508:15 on a monthly basis.  And during cyclic | |
| | 508:16 inspections, they were looked at as part of | |
| | 508:17 inspection. | |
| | 508:18 BY MR. PYSER: | |
| | 508:19   Q. What did it mean to you to know that DEA | |
| | 508:20 was aware of this information? | |
| 508:22 - 509:8 | **Reardon, Steve 11-30-2018 (00:00:23)** | **SR05.118** |
| | 508:22   A. It allowed me to believe that we were in | |
| | 508:23 compliance with the requirements based on the | |
| | 508:24 processes we had in place. | |
| | 509:1 BY MR. PYSER: | |
| | 509:2   Q. Where did you believe that DEA was aware | |
| | 509:3 of these forms? | |
| | 509:4   A. First of all, they approved the report and | |
| | 509:5 we were submitting the report to them.  And they | |
| | 509:6 were expecting us on a regular basis and we never | |
| | 509:7 had any observations or issues related to what we | |
| | 509:8 were doing. | |
| 509:9 - 509:23 | **Reardon, Steve 11-30-2018 (00:00:34)** | **SR05.119** |
| | 509:9   Q. You were shown, earlier today, some | |
| | 509:10 exhibits that referenced specific pharmacies | |
| | 509:11 including Ohio CVS and Brook Park, Overholt's | |
| | 509:12 pharmacy and a pharmacy call New Choice.  Do you | |
| | 509:13 recall -- | |
| | 509:14   A. Yes. | |
| | 509:15   Q. -- do you recall that exhibit? | |
| | 509:16   A. Yes. | |
| | 509:17   Q. And plaintiff's counsel showed you that | |
| | 509:18 exhibit and it was based off ingredient limit | |
| | 509:19 reports.  Do you recall that? | |
| | 509:20   A. Yes. | |
| | 509:21   Q. Each of -- each piece of the information | |
| | 509:22 that was in that exhibit, would that have also | |
| | 509:23 been submitted to DEA? | |
| 510:2 - 510:7 | **Reardon, Steve 11-30-2018 (00:00:07)** | **SR05.142** |
| | 510:2   A. Yes. | |

| Page/Line | Source | ID |
|---|---|---|
| | 510:3 BY MR. PYSER:<br>510:4   Q. Just to be clear about who's submitting it<br>510:5 to the DEA, that is something Cardinal Health,<br>510:6 your employer, would have submitted the DEA?<br>510:7   A. Yes. | |
| 510:11 - 510:22 | **Reardon, Steve 11-30-2018 (00:00:18)**<br>510:11   Q. To your knowledge, did DEA take action<br>510:12 against any of those pharmacies?<br>510:13   A. Yes.<br>510:14   Q. Which ones?<br>510:15   A. Of the --<br>510:16   Q. I'm sorry.<br>510:17   A. Of the --<br>510:18   Q. To be clear, I'm talking about Ohio CVS,<br>510:19 Brook Park, Overholt's pharmacy, or New Choice<br>510:20 Pharmacy.  Did DEA takes action against any of<br>510:21 those three?<br>510:22   A. No. | SR05.120 |
| 511:8 - 512:24 | **Reardon, Steve 11-30-2018 (00:01:50)**<br>511:8   Q. Did DEA conduct inspections of Cardinal<br>511:9 Health distribution centers?<br>511:10   A. Yes.<br>511:11   Q. And when they did so, do you know whether<br>511:12 or not they reviewed Cardinal Health's processes<br>511:13 for suspicious order monitoring and reporting?<br>511:14   A. That would have been part of the process,<br>511:15 part of the cyclic inspection.<br>511:16   Q. To your knowledge, from the late '80s when<br>511:17 you joined Cardinal Health until you transitioned<br>511:18 roles in 2007, did DEA ever state that the<br>511:19 processes in place for Cardinal Health for<br>511:20 monitoring and reporting suspicious orders were<br>511:21 inadequate?<br>511:22   A. No.<br>511:23   Q. We also talked a little bit about a second<br>511:24 way, during your testimony earlier today, that<br>512:1 Cardinal Health complied with 21 CFR 1301.74(b).<br>512:2 Can be describe that for me?<br>512:3   A. Yes.  Employees who worked in the cage<br>512:4 involved -- that filled orders were tasked with | SR05.121 |

| Page/Line | Source | ID |
|---|---|---|

512:5 monitoring the auto process, and if there was
512:6 anything that they identified based on their
512:7 knowledge of customers, like customers, and
512:8 they -- they had the obligation and the ability to
512:9 pull that order and hold that order.
512:10   Q. You were also asked about Exhibit P in the
512:11 DEA compliance manual.  You can just look at it on
512:12 the screen.
512:13   A. Yes.
512:14   Q. Do you recall some questions on that?
512:15   A. Yes.
512:16   Q. Is every order above the limit in Exhibit
512:17 P, the poster that's up in the cage and vault --
512:18 is that necessarily a suspicious order?
512:19   A. No.
512:20   Q. In the event that someone working in the
512:21 cage and vault saw an order above the posted limit
512:22 but did not think it was of unusual size,
512:23 frequency or pattern, what would Cardinal Health's
512:24 policies have expected them to do?

**513:3 - 514:22**     **Reardon, Steve 11-30-2018 (00:02:10)**     **SR05.141**

513:3   A. They would process the order and allow it
513:4 to be shipped.
513:5 BY MR. PYSER:
513:6   Q. Were there times when Cardinal Health
513:7 sought guidance from DEA as to what to do next on
513:8 an order that had been flagged as an order of
513:9 interest?
513:10   A. Yes.
513:11   Q. How did that work?
513:12   A. Local distribution center would contact
513:13 the local DEA office.
513:14   Q. Now, the process may be different today,
513:15 but back, say, in 2007, how did the process work
513:16 for filling orders of a controlled substances for
513:17 say a hospital in the cage and vault?
513:18   A. Well, depending on the product -- so if
513:19 it's a Schedule II product, DEA form 222 comes in
513:20 and that's reviewed by the order entry person to
513:21 make sure that it's filled out completely and

| Page/Line | Source | ID |
|-----------|--------|-----|
| | SR05-Reardon, Steve - Plaintiff and Defense Combined Submission | |

513:22 according to the regulations.
513:23 And if there are no alterations, it's
513:24 signed and dated.  And if it looks okay per the
514:1 regulation, then the order is entered and
514:2 processed.  The order picker will pick, compare
514:3 what they're picking to the 222, and then record
514:4 on Cardinal's copy what was -- the quantity
514:5 shipped and the date shipped, and then there's
514:6 also a green copy of that that goes into the DEA.
514:7 The customer kept a blue copy.  And once
514:8 they received the product, they received the
514:9 quantity shipped and the date, and record the date
514:10 received.
514:11   Q. So all those steps are done for each form
514:12 222.  That's the order form; is that right?
514:13   A. Correct.
514:14   Q. And were there procedures for the folks
514:15 working, say, in the vault where the Schedule II
514:16 medications are kept to describe order filling and
514:17 quality control?
514:18   A. Yes.
514:19   Q. I just showed you on the screen here,
514:20 Section 13-2.  Are those the processes for order
514:21 filling and quality control?
514:22   A. Yes.

| Page/Line | Source | ID |
|-----------|--------|-----|
| 514:23 - 515:24 | **Reardon, Steve 11-30-2018 (00:01:00)** | **SR05.143** |

514:23   Q. Were you in periodic contact with DEA
514:24 throughout the time period you worked in
515:1 anti-diversion?
515:2   A. Yes.
515:3   Q. Did DEA ever ask you for different reports
515:4 than the ones you were providing?
515:5   A. No.
515:6   Q. Was part of your job to make sure that DEA
515:7 received reports consistent with the regulations
515:8 and guidance?
515:9   A. Yes.
515:10   Q. Do you believe you accomplished that
515:11 goal?
515:12   A. Yes.

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

515:13   Q. Have you ever heard of DEA's Internet
515:14 pharmacy initiative?
515:15   A. Yes.
515:16   Q. What is it?
515:17   A. The initiative, DEA had met with different
515:18 distributors and explained to them that Internet
515:19 pharmacies were becoming a growing problem and
515:20 asked for wholesaler assistance in monitoring that
515:21 activity.
515:22 They did a presentation for us, gave us a
515:23 take-away binder, and identified certain items
515:24 that an Internet pharmacy may purchase.

**516:8 - 516:24**   **Reardon, Steve 11-30-2018 (00:00:41)**   **SR05.122**

516:8 Did DEA inform you of any accreditations
516:9 that were available for Internet pharmacies?
516:10   A. Yes.  There's is an accreditation through
516:11 the National Association of Boards of Pharmacy.
516:12   Q. And do some pharmacies have that
516:13 accreditation?
516:14   A. Yes.
516:15   Q. You were asked by plaintiffs' counsel
516:16 whether Cardinal Health shipped to Internet
516:17 pharmacies.  Did Cardinal Health ship to any
516:18 pharmacy that wasn't licensed by the DEA?
516:19   A. No.
516:20   Q. If Cardinal Health learned that any
516:21 Internet pharmacy that was a customer of it was
516:22 dispensing improperly, did it cut that customer
516:23 off and report it to DEA?
516:24   A. Yes.

**517:1 - 520:2**   **Reardon, Steve 11-30-2018 (00:02:39)**   **SR05.123**

517:1
517:2 (Exhibit No. 38 marked for
517:3 identification.)
517:4
517:5 BY MR. PYSER:
517:6   Q. I'm showing you a document that's been
517:7 marked as Exhibit 38.  Do you recognize it?
517:8   A. Yes.
517:9   Q. Is it a true and accurate copy of the

| Page/Line | Source | ID |
|---|---|---|

517:10 presentation given to you by DEA on August 22
517:11 2005?
517:12   A. (Witness reviews document.)
517:13 Yes.
517:14   Q. Is this some of the guidance that you
517:15 received from DEA?
517:16   A. Yes.
517:17   Q. What did you do in response to receipt of
517:18 this exhibit?
517:19   A. I went back to the office and immediately
517:20 started developing a process and program to
517:21 monitor Internet pharmacy activity.
517:22   Q. And in doing that, did you work with
517:23 someone named Eric Brantley?
517:24   A. Yes.
518:1   Q. And what were Mr. -- what was Mr.
518:2 Brantley's role?
518:3   A. Mr. Brantley's role was to review the
518:4 ingredient limit reports, identify any customers
518:5 whose ordering was out of line, to then to conduct
518:6 a due diligence visit inspection of that pharmacy.
518:7   Q. You spoke with -- strike that.
518:8 Would Mr. Brantley report the results of
518:9 any of his investigations to you?
518:10   A. Yes.
518:11   Q. You spoke to counsel for the plaintiffs
518:12 about whether it was possible for Mr. Brantley's
518:13 team to investigate every suspicious orders.  Do
518:14 you remember that?
518:15   A. Yes.
518:16   Q. After -- and when we're talking about
518:17 suspicious orders, just to be clear, are those
518:18 orders that were already reported to DEA?
518:19   A. Yes.
518:20   Q. And in Mr. Brantley's process, did he and
518:21 his team make decisions about what suspicious
518:22 orders that had been reported to DEA posed a risk
518:23 and warranted further investigation?
518:24   A. Yes.
519:1   Q. Did you rely on Mr. Brantley and his team

| SR05-Reardon, Steve - Plaintiff and Defense Combined Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 519:2 to make the decisions as to what reviews were | |
| | 519:3 necessary and what was done? | |
| | 519:4   A. Yes. | |
| | 519:5   Q. Sitting here today, are you aware of any | |
| | 519:6 investigation that should have been done but | |
| | 519:7 wasn't? | |
| | 519:8   A. No. | |
| | 519:9   Q. In the event that an investigation by Mr. | |
| | 519:10 Brantley determined that a pharmacy posted an | |
| | 519:11 unreasonable risk of diversion, what would | |
| | 519:12 happen? | |
| | 519:13   A. Customer would be terminated and DEA | |
| | 519:14 notified. | |
| | 519:15   Q. And when we're talking about notifying | |
| | 519:16 DEA, was there a particular person at DEA who | |
| | 519:17 received some of Cardinal Health's | |
| | 519:18 notifications? | |
| | 519:19   A. Yes. | |
| | 519:20   Q. Who is that? | |
| | 519:21   A. That would be Kyle Wright. | |
| | 519:22   Q. Did you have conversations with Mr. Wright | |
| | 519:23 about Cardinal Health's system? | |
| | 519:24   A. Yes. | |
| | 520:1   Q. Did Mr. Wright express support of Cardinal | |
| | 520:2 Health's program in 2006? | |
| 520:5 - 520:8 | **Reardon, Steve 11-30-2018 (00:00:05)** | **SR05.124** |
| | 520:5   A. Yes. | |
| | 520:6 BY MR. PYSER: | |
| | 520:7   Q. What did Mr. Wright tell you about | |
| | 520:8 Cardinal Health's program around 2006? | |
| 520:11 - 520:13 | **Reardon, Steve 11-30-2018 (00:00:07)** | **SR05.125** |
| | 520:11   A. He said we were heading in the right | |
| | 520:12 direction and that Eric Brantley had established a | |
| | 520:13 great working relationship with him. | |
| 520:19 - 520:22 | **Reardon, Steve 11-30-2018 (00:00:04)** | **SR05.160** |
| | 520:19   Q. Did Mr. Wright ever tell you that Cardinal | |
| | 520:20 Health's anti-diversion program was deficient in | |
| | 520:21 any way? | |
| | 520:22   A. No. | |
| 521:11 - 521:14 | **Reardon, Steve 11-30-2018 (00:00:04)** | **SR05.127** |

| Page/Line | Source | ID |
|---|---|---|
| 521:15 - 522:11 | 521:11   Q. Did Mr. Wright ever tell you that Cardinal<br>521:12 Health's anti-diversion program was deficient in<br>521:13 any way?<br>521:14   A. No.<br>**Reardon, Steve 11-30-2018 (00:00:54)**<br>521:15<br>521:16 (Exhibit No. 39 marked for<br>521:17 identification.)<br>521:18<br>521:19 BY MR. PYSER:<br>521:20   Q. Showing you what's been marked as Exhibit<br>521:21 39, can you tell me what it is?<br>521:22   A. This would be my handwritten notes<br>521:23 documenting my conversation with Kyle Wright.<br>521:24   Q. Do you remember why you called Mr. Wright?<br>522:1   A. Yes.  I became aware of what occurred with<br>522:2 AmerisourceBergen and its relationship to Internet<br>522:3 pharmacy.  And I wanted to speak with Kyle, that<br>522:4 it was Eric Brantley and myself that contacted<br>522:5 Kyle, just to make sure that we were doing the<br>522:6 right thing.<br>522:7   Q. Explain to the jury what you remember<br>522:8 about that call.<br>522:9   A. Essentially, contacted Kyle, just<br>522:10 explained to him why we were calling, and asked<br>522:11 him are we okay with what we're doing. | SR05.144 |
| 523:3 - 523:6 | **Reardon, Steve 11-30-2018 (00:00:14)**<br>523:3   Q. Finish your answer, please, sir.<br>523:4   A. So we wanted to know if what we were doing<br>523:5 was the right process.  He responded that we were<br>523:6 heading in the right direction. | SR05.128 |
| 524:2 - 524:4 | **Reardon, Steve 11-30-2018 (00:00:05)**<br>524:2   Q. You can finish.<br>524:3   A. So he thinks -- he said he thought we were<br>524:4 doing the right thing. | SR05.129 |
| 524:7 - 524:13 | **Reardon, Steve 11-30-2018 (00:00:27)**<br>524:7   A. Gave us some guidance about if there was<br>524:8 any suspicion on a customer, just walk away, offer<br>524:9 to meet with us, said his -- the decision on ABC<br>524:10 was not made by his office, shared with us a | SR05.130 |

SR05-Reardon, Steve - Plaintiff and Defense Combined Submission

| Page/Line | Source | ID |
|---|---|---|
| | 524:11 little bit about pain management clinics, and that | |
| | 524:12 if we ever came across anything, to let him know | |
| | 524:13 and just to document everything we were doing. | |
| 524:16 - 525:14 | **Reardon, Steve 11-30-2018 (00:00:40)** | **SR05.131** |
| | 524:16 BY MR. PYSER: | |
| | 524:17   Q. Showing you what's been marked as Exhibit | |
| | 524:18 40. | |
| | 524:19 | |
| | 524:20 (Exhibit No. 40 marked for | |
| | 524:21 identification.) | |
| | 524:22 | |
| | 524:23 BY MR. PYSER: | |
| | 524:24   Q. Do you recognize Exhibit 40? | |
| | 525:1   A. Yes. | |
| | 525:2   Q. Is this an e-mail you wrote based on your | |
| | 525:3 call with Mr. Wright? | |
| | 525:4   A. Yes. | |
| | 525:5   Q. Does the e-mail accurately describe the | |
| | 525:6 content of that phone call? | |
| | 525:7   A. Yes. | |
| | 525:8   Q. And was it written the day after the call? | |
| | 525:9   A. Yes. | |
| | 525:10   Q. If you look at the first bullet point, | |
| | 525:11 does it state that -- well, let's go right above | |
| | 525:12 that first -- "Key feedback from Kyle included," | |
| | 525:13 do you see that? | |
| | 525:14   A. Yes. | |
| 525:17 - 525:20 | **Reardon, Steve 11-30-2018 (00:00:04)** | **SR05.132** |
| | 525:17   Q. And under that, does it say, "He thinks we | |
| | 525:18 are doing the right things and heading in the | |
| | 525:19 right direction"? | |
| | 525:20   A. Yes. | |
| 525:24 - 526:11 | **Reardon, Steve 11-30-2018 (00:00:33)** | **SR05.133** |
| | 525:24   Q. Do you recall, in 2006 and 2007, a series | |
| | 526:1 of letters from DEA to all distributors? | |
| | 526:2   A. Yes. | |
| | 526:3   Q. You were asked about some of those letters | |
| | 526:4 earlier today by Mr. Fuller? | |
| | 526:5   A. Yes. | |
| | 526:6   Q. From your perspective, was Cardinal Health | |

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

| Page/Line | Source | ID |
|---|---|---|

526:7 in compliance with all of the guidance in
526:8 Mr. Rannazzisi's September 27, 2006 letter?
526:9  A. Yes.
526:10  Q. As part of that letter -- I believe it's
526:11 Exhibit 30.

526:12 - 528:3    **Reardon, Steve 11-30-2018 (00:01:48)**    SR05.158

526:12 In Exhibit 30, Mr. Rannazzisi wrote that
526:13 "DEA recognized that the overwhelming majority of
526:14 registered distributors act lawfully and take
526:15 appropriate measures to prevent diversion.
526:16 I think we're on the wrong page.  I draw
526:17 your attention here -- it's exhibit, so I can't
526:18 highlight it, but the second paragraph.   Do
526:19 you see where it says "DEA recognizes the
526:20 overwhelming majority" --
526:21  A. Yes.
526:22  Q. -- "of registered distributors act
526:23 lawfully and take appropriate measures to prevent
526:24 diversion"?
527:1  A. Yes.
527:2  Q. Did you believe Cardinal was among those
527:3 distributors that was acting lawfully and taking
527:4 appropriate measures?
527:5  A. Yes.
527:6  Q. Why?
527:7  A. A couple of reasons.  Based on the fact
527:8 that we were using a report that DEA approved,
527:9 submitting it to them as required, having it
527:10 reviewed during cyclic inspections with no
527:11 negative findings, the process we put in place in
527:12 our cage and vault, and then the steps we took
527:13 after our meeting with the DEA around Internet
527:14 pharmacy.
527:15  Q. Now, there's also -- as part of Exhibit 30
527:16 on Page 9, there's a list of circumstances that
527:17 may be indicative of diversion.
527:18 Was Cardinal Health using those
527:19 suggestions from the DEA to look for circumstances
527:20 that might be indicative of diversion?
527:21  A. Yes.

| Page/Line | Source | ID |
|---|---|---|

**SR05-Reardon, Steve - Plaintiff and Defense Combined Submission**

527:22  Q. In your view, was there a time when DEA
527:23 guidance regarding shipment of suspicious orders
527:24 changed?
528:1  A. Yes.
528:2  Q. Approximately when was that?
528:3  A. September 2007.

**528:4 - 529:6**  **Reardon, Steve 11-30-2018 (00:01:12)**  **SR05.134**

528:4  Q. I'm showing you what's been marked as
528:5 Exhibit 41.
528:6
528:7 (Exhibit No. 41 marked for
528:8 identification.)
528:9
528:10 BY MR. PYSER:
528:11  Q. Can you tell me what Exhibit 41 is?
528:12  A. This is the presentation given at the drug
528:13 enforcement industry conference by
528:14 AmerisourceBergen.
528:15  Q. And there's some handwriting on Exhibit 41
528:16 throughout the exhibit.  Can you tell us whose
528:17 handwriting that is?
528:18  A. That's mine.
528:19  Q. Tell the jury what you remember about the
528:20 presentation.
528:21  A. That essentially this was going to be the
528:22 new standard for the industry with respect to how
528:23 suspicious orders were monitored, reported and
528:24 handled.
529:1  Q. And did you subsequently draft an e-mail
529:2 to others in anti-diversion as a result of what
529:3 you had seen at that industry conference?
529:4  A. Yes.
529:5  Q. In exhibit -- and excuse me, and is that
529:6 e-mail Exhibit 42?

**529:7 - 530:6**  **Reardon, Steve 11-30-2018 (00:00:52)**  **SR05.159**

529:7
529:8 (Exhibit No. 42 marked for
529:9 identification.)
529:10
529:11 (Witness reviews document.)

| | | |
|---|---|---|
| **SR05-Reardon, Steve - Plaintiff and Defense Combined Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

529:12 BY MR. PYSER:
529:13   Q. Is the e-mail you wrote Exhibit 42?
529:14   A. Yes.
529:15   Q. And you wrote "DEA is setting a new
529:16 standard, which we must comply."
529:17 What did you mean by "a new standard"?
529:18   A. It was a change in the way that -- moving
529:19 away from the ingredient limit report and there
529:20 was -- the biggest thing that came out to me here
529:21 was they were clear-cut that -- do not ship.
529:22   Q. And was that new to you?
529:23   A. That was new to me.
529:24   Q. And what steps did Cardinal Health take
530:1 after the presentation by AmerisourceBergen and
530:2 DEA?
530:3   A. Well, immediately upon return to the -- to
530:4 our corporate office, we started pulling together
530:5 the appropriate team to start developing a new
530:6 program.

**530:7 - 531:1**     **Reardon, Steve 11-30-2018 (00:00:40)**     **SR05.135**

530:7   Q. Earlier, when you were being asked
530:8 questions by plaintiffs, you were shown some
530:9 differences between Ohio and Illinois.
530:10 Do you remember that?
530:11   A. Yes.
530:12   Q. Would every one of the pills, every piece
530:13 of medication that was in that chart, have been
530:14 reported to DEA through the ARCOS system?
530:15   A. Yes.
530:16   Q. And to your knowledge, would every
530:17 prescription that was filled in either Ohio or
530:18 Illinois or West Virginia, or any other state for
530:19 that matter, would that have required a doctor's
530:20 prescription?
530:21   A. Yes.
530:22   Q. And for every prescription and pill
530:23 dispensed, would there have had to have been a
530:24 pharmacist with the corresponding responsibility
531:1 who made a decision to dispense that medication?

**531:3 - 531:3**     **Reardon, Steve 11-30-2018 (00:00:01)**     **SR05.137**

| | | |
|---|---|---|
| **SR05-Reardon, Steve - Plaintiff and Defense Combined Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

531:3   A. Yes.

| 532:4 - 532:17 | **Reardon, Steve 11-30-2018 (00:00:29)** | **SR05.138** |

532:4   Q. Approximately how many distribution
532:5 facilities does Cardinal Health have?

532:6   A. They could have -- I mean approximately in
532:7 the mid twenties.

532:8   Q. Do the distribution centers for Cardinal
532:9 Health distribute to specific geographic areas?

532:10   A. Yes.

532:11   Q. To your knowledge, was there ever a
532:12 suspension order for any facility that shipped to
532:13 northern Ohio?

532:14   A. No.

532:15   Q. Was there ever a suspension order to any
532:16 facility that shipped to West Virginia?

532:17   A. No.

| 534:9 - 534:14 | **Reardon, Steve 11-30-2018 (00:00:10)** | **SR05.139** |

534:9   Q. Mr. Reardon, in your experience at
534:10 Cardinal Health over 25 years, did you ever see
534:11 Cardinal Health ship an order that you believed
534:12 would be diverted?

534:13   A. No.

534:14 MR. PYSER:  No further questions.

Plaintiffs Affirmative Designations = 00:45:51
Defense Counter Designations = 00:29:28
Plaintiff Counter Counters = 00:00:52
**Total Time = 01:16:11**