## Designation Run Report

# Boggs, Gary - Plaintiff's Submission

---

**Boggs, Gary 01-17-2019**

---

| | |
|---|---|
| **Plaintiffs Affirmative Designations  00:47:16** | |
| **Plaintiffs Counters  00:06:33** | |
| **Plaintiff Counter Counters  00:00:48** | |
| **Defense Completeness Counters  00:13:21** | |

**Total Time  01:07:59**



ID:GB09

| GB09-Boggs, Gary - Plaintiff's Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| 17:01 - 17:04 | **Boggs, Gary 01-17-2019 (00:00:06)** | GB09.1 |
| | 17:1　Q. Good morning, Mr. Boggs. | |
| | 17:2　A. Good morning. | |
| | 17:3　Q. Please tell us your full name. | |
| | 17:4　A. Gary Lee Boggs. | |
| 18:08 - 18:22 | **Boggs, Gary 01-17-2019 (00:00:44)** | GB09.2 |
| | 18:8　Q. Okay.  What is your current position | |
| | 18:9 with McKesson? | |
| | 18:10　A. I am Vice President of Regulatory | |
| | 18:11 Affairs and Compliance. | |
| | 18:12　Q. And how long have you had that position? | |
| | 18:13　A. Since August of last year. | |
| | 18:14　Q. And can you tell me what your job | |
| | 18:15 responsibilities are or a description of what -- | |
| | 18:16 what you do, what your role is? | |
| | 18:17　A. Sure.  I'm responsible for overseeing | |
| | 18:18 the controlled substance monitoring program at | |
| | 18:19 McKesson for the independent small, medium chain | |
| | 18:20 pharmacies, hospitals, veterans, government | |
| | 18:21 accounts, and overseeing a team that implements | |
| | 18:22 that program across the United States. | |
| 19:03 - 20:02 | **Boggs, Gary 01-17-2019 (00:01:11)** | GB09.3 |
| | 19:3　Q. And prior to the current position that | |
| | 19:4 you hold, what position did you have at McKesson? | |
| | 19:5　A. I was a senior director of Regulatory | |
| | 19:6 Affairs for the East region. | |
| | 19:7　Q. And over what period of time did you | |
| | 19:8 hold that position? | |
| | 19:9　A. From late November of 2013 until August | |
| | 19:10 of 2018. | |
| | 19:11　Q. And is that when you started with | |
| | 19:12 McKesson, in late 2013? | |
| | 19:13　A. In late November 2013, yes. | |
| | 19:14　Q. And what was your job responsibility as | |
| | 19:15 senior director of Regulatory Affairs for the East | |
| | 19:16 region? | |
| | 19:17　A. It's similar to what it is now, except I | |
| | 19:18 covered only half of the United States, the | |
| | 19:19 eastern half of the United States. | |
| | 19:20　Q. Would I understand your job | |

| Page/Line | Source | ID |
|---|---|---|
| | GB09-Boggs, Gary - Plaintiff's Submission | |

| Page/Line | Source | ID |
|---|---|---|
| | 19:21 responsibility to have been, for the entire time | |
| | 19:22 that you've been with McKesson, to see to it that | |
| | 19:23 McKesson complies with the federal laws and | |
| | 19:24 regulations which exist in an effort to prevent | |
| | 20:1 the diversion of controlled substances outside of | |
| | 20:2 the legal framework or legal channels? | |
| 20:04 - 22:18 | **Boggs, Gary 01-17-2019 (00:03:17)** | GB09.4 |
| | 20:4 THE WITNESS:  I believe that that's part | |
| | 20:5 of the responsibilities, yes. | |
| | 20:6 BY MR. HAWAL: | |
| | 20:7   Q. As I understand it, before you joined | |
| | 20:8 McKesson in 2013, you were an employee of the Drug | |
| | 20:9 Enforcement Administration, the DEA? | |
| | 20:10   A. I was. | |
| | 20:11   Q. All right.  Over what period of time | |
| | 20:12 were you with the DEA? | |
| | 20:13   A. From approximately June of 1985 until | |
| | 20:14 the end of June 2012. | |
| | 20:15   Q. And starting in June of 1985, I'm going | |
| | 20:16 to ask you to take us through what positions you | |
| | 20:17 held with the DEA.  Can you tell us what your | |
| | 20:18 position was when you first started and what your | |
| | 20:19 responsibilities were? | |
| | 20:20   A. Sure, I'd be happy to. | |
| | 20:21 I became a special agent with the Drug | |
| | 20:22 Enforcement Administration in 1985, was | |
| | 20:23 transferred from Orlando, Florida, to Detroit.  I | |
| | 20:24 was a special agent in the Detroit office until | |
| | 21:1 about March of 1999, when I was promoted to a | |
| | 21:2 group supervisor in Detroit.  I -- | |
| | 21:3   Q. Excuse me, if I can interrupt for a | |
| | 21:4 minute. | |
| | 21:5 Up through March of 1999, did you have | |
| | 21:6 any responsibilities in dealing with manufacturers | |
| | 21:7 or distributors of controlled substances? | |
| | 21:8   A. Not very much, no.  Very little. | |
| | 21:9   Q. So you stopped at March of 1999.  Can | |
| | 21:10 you continue and take us forward with your | |
| | 21:11 positions with the DEA. | |
| | 21:12   A. Sure.  I was a group supervisor | |

| Page/Line | Source | ID |
|---|---|---|

21:13 beginning around March of 1999.  I oversaw as a
21:14 group supervisor two or three different units.
21:15 Then I was a unit chief, also in Detroit, over the
21:16 special services section.
21:17 I was then transferred to headquarters
21:18 here in the District in 2003.  I was a unit chief
21:19 in the Office of Special Intelligence.  Was then
21:20 promoted in January of 2006 to be the executive
21:21 assistant in the Office of Diversion Control, and
21:22 I held that position until I retired from the DEA
21:23 in June of 2012.
21:24   Q. All right.  And as executive assistant
22:1 in the division of -- what -- what was that again?
22:2 What --
22:3   A. At the time it was called the Office of
22:4 Diversion Control.  It's now the Diversion Control
22:5 Division.
22:6   Q. And what were your responsibilities in
22:7 that position?
22:8   A. My responsibilities were, I would sort
22:9 of say like a chief of staff to the person
22:10 overseeing that section.  We had day-to-day
22:11 responsibilities for the implementation of the
22:12 regulatory aspect of the Controlled Substances
22:13 Act, overseeing the DEA registrants that were
22:14 authorized to handle controlled substances.
22:15 That's essentially it.
22:16   Q. And the DEA registrants that you're
22:17 referring to would be wholesalers like McKesson?
22:18   A. That's one example of them.

**25:01 - 26:15**  **Boggs, Gary 01-17-2019 (00:02:01)**          **GB09.5**

25:1   Q. Mr. Boggs, before we went off the
25:2 record, I believe that you mentioned that you
25:3 joined DEA's Office of Diversion Control in
25:4 January of 2006; is that correct?
25:5   A. That's correct, yes.
25:6   Q. And were you -- in that position, were
25:7 you responsible for interacting with wholesalers
25:8 and manufacturers of controlled substances?
25:9   A. I was.

| Page/Line | Source | ID |
|---|---|---|
| | **GB09-Boggs, Gary - Plaintiff's Submission** | |

25:10   Q. And was part of your job responsibility
25:11 to ensure that they were complying with the
25:12 Controlled Substances Act and federal laws and
25:13 regulations relating to controlled substances?
25:14   A. It was.
25:15   Q. All right.  And was your direct
25:16 supervisor Mr. Rannazzisi?
25:17   A. He was.
25:18   Q. And how long was he your direct
25:19 supervisor?
25:20   A. The entire -- from 2000 -- January 2006
25:21 till I retired in June of 2012.
25:22   Q. Before you became an employee of
25:23 McKesson in late 2013, was there a period of time
25:24 that you were a consultant for McKesson?
26:1   A. I consulted for McKesson just for a
26:2 couple of times prior to becoming an employee of
26:3 McKesson, yes.
26:4   Q. And over what period of time did that
26:5 occur?
26:6   A. It would have been, I believe, around
26:7 the summer of 2013, on and off a couple of times.
26:8   Q. And what did -- what was your role --
26:9 what did you -- what were you doing or what were
26:10 you asked to do as a consultant for McKesson?
26:11   A. I was asked to look at the Regulatory
26:12 Affairs program that they had.  I was asked to
26:13 provide some training.  I was asked to speak at a
26:14 couple of different conferences that McKesson had
26:15 put on for other folks outside of McKesson.

**34:19 - 35:04**   **Boggs, Gary 01-17-2019 (00:00:34)**                                    **GB09.6**

34:19   Q. What is your understanding as to when
34:20 the opioid crisis was first appreciated in the
34:21 United States?
34:22   A. I believe that it began approximately
34:23 three decades ago.
34:24   Q. And is it your understanding that the
35:1 opioid crisis since that time has consistently
35:2 worsened in terms of its effect on individuals as
35:3 well as communities and governmental entities in

| Page/Line | Source | ID |
|---|---|---|
| | 35:4 the United States? | |
| 35:06 - 35:07 | **Boggs, Gary 01-17-2019 (00:00:03)** | **GB09.7** |
| | 35:6 THE WITNESS:  I believe that that is an | |
| | 35:7 accurate representation. | |
| 39:24 - 40:04 | **Boggs, Gary 01-17-2019 (00:00:15)** | **GB09.8** |
| | 39:24   Q. Now, since you've joined McKesson, did | |
| | 40:1 you know that distributors must be vigilant in | |
| | 40:2 deciding whether a prospective customer can be | |
| | 40:3 trusted to deliver controlled substances only for | |
| | 40:4 lawful purposes? | |
| 40:06 - 40:12 | **Boggs, Gary 01-17-2019 (00:00:15)** | **GB09.9** |
| | 40:6 THE WITNESS:  I can't speak for all | |
| | 40:7 distributors.  For -- for McKesson, I understand | |
| | 40:8 that we have an obligation to maintain control. | |
| | 40:9 BY MR. HAWAL: | |
| | 40:10   Q. And do you understand that that | |
| | 40:11 responsibility is critical? | |
| | 40:12   A. I understand that -- | |
| 40:14 - 40:15 | **Boggs, Gary 01-17-2019 (00:00:02)** | **GB09.10** |
| | 40:14 THE WITNESS:  -- it's very important, | |
| | 40:15 yes. | |
| 42:14 - 42:22 | **Boggs, Gary 01-17-2019 (00:00:33)** | **GB09.11** |
| | 42:14   Q. Well, let's assume for the sake of my | |
| | 42:15 question that a distributor fails to report | |
| | 42:16 suspicious orders or block orders that are | |
| | 42:17 suspicious and delivers them to a customer. | |
| | 42:18 Do you believe, based upon your current | |
| | 42:19 understanding of federal laws, regulations and how | |
| | 42:20 the distribution of controlled substances work, | |
| | 42:21 that just one distributor that facilitates | |
| | 42:22 diversion can cause enormous harm? | |
| 43:01 - 43:08 | **Boggs, Gary 01-17-2019 (00:00:19)** | **GB09.12** |
| | 43:1 THE WITNESS:  I think the first part of | |
| | 43:2 your statement was about failure to report a | |
| | 43:3 suspicious order.  That's a reporting requirement. | |
| | 43:4 And it -- you may be assuming that that order was | |
| | 43:5 shipped and maybe it wasn't shipped. | |
| | 43:6 The other second part of that is | |
| | 43:7 assuming that even if it was shipped, that it | |
| | 43:8 somehow may or may not have been diverted. | |

| | | |
|---|---|---|
| **GB09-Boggs, Gary - Plaintiff's Submission** | | |
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
|---|---|---|
| 69:16 - 69:18 | **Boggs, Gary 01-17-2019 (00:00:10)** | **GB09.13** |
| | 69:16   Q. other than just reporting | |
| | 69:17 suspicious orders, what other obligations does a | |
| | 69:18 distributor have such as McKesson? | |
| 69:22 - 70:11 | **Boggs, Gary 01-17-2019 (00:00:33)** | **GB09.14** |
| | 69:22 THE WITNESS:  A distributor has a | |
| | 69:23 responsibility to maintain security over those | |
| | 69:24 controlled substances that are maintained in our | |
| | 70:1 warehouses, and we do that through cages and | |
| | 70:2 vaults and security cameras, and all of those | |
| | 70:3 kinds of things, while those things are in our | |
| | 70:4 possession. | |
| | 70:5 BY MR. HAWAL: | |
| | 70:6   Q. Well, we're talking about reporting | |
| | 70:7 suspicious orders. | |
| | 70:8 What other -- in the context of this | |
| | 70:9 statement, what other responsibilities does a | |
| | 70:10 distributor have which is not relieved simply by | |
| | 70:11 reporting suspicious orders? | |
| 70:14 - 70:22 | **Boggs, Gary 01-17-2019 (00:00:11)** | **GB09.15** |
| | 70:14 THE WITNESS:  Well, what the -- what | |
| | 70:15 you're asking me about is the -- maintaining | |
| | 70:16 effective controls against diversion, and part of | |
| | 70:17 that is the security while they're in our | |
| | 70:18 possession. | |
| | 70:19 BY MR. HAWAL: | |
| | 70:20   Q. Well -- | |
| | 70:21   A. That's maintaining effective controls | |
| | 70:22 against diversion. | |
| 71:02 - 71:05 | **Boggs, Gary 01-17-2019 (00:00:15)** | **GB09.16** |
| | 71:2 What other responsibilities does a | |
| | 71:3 distributor like McKesson have beyond simply | |
| | 71:4 reporting a suspicious order as it relates to | |
| | 71:5 suspicious orders? | |
| 71:08 - 71:19 | **Boggs, Gary 01-17-2019 (00:00:34)** | **GB09.17** |
| | 71:8 THE WITNESS:  Well, there's two | |
| | 71:9 different obligations that we have.  Under the -- | |
| | 71:10 as you're asking me about suspicious orders, our | |
| | 71:11 obligation under the regulation is to design and | |
| | 71:12 operate a system to identify suspicious orders, | |

| Page/Line | Source | ID |
|---|---|---|

GB09-Boggs, Gary - Plaintiff's Submission

71:13 and then report those to the DEA.  That's the
71:14 regulation for suspicious orders.
71:15 BY MR. HAWAL:
71:16   Q. Well, does that obligation also require
71:17 McKesson to not ship a suspicious order unless
71:18 it's determined through due diligence that it is
71:19 unlikely to be diverted into illicit channels?

**71:21 - 71:23**    **Boggs, Gary 01-17-2019 (00:00:06)**    **GB09.18**

71:21 THE WITNESS:  I'm not aware
71:22 anywhere in the regulation it says not to ship.
71:23 It says to identify and report suspicious orders.

**87:05 - 87:08**    **Boggs, Gary 01-17-2019 (00:00:21)**    **GB09.19**

87:5 Since you've come to McKesson, did you
87:6 ever learn from the DEA that McKesson could
87:7 delegate to its customers the legal obligations to
87:8 prevent diversion of controlled substances?

**87:10 - 88:18**    **Boggs, Gary 01-17-2019 (00:01:19)**    **GB09.20**

87:10 THE WITNESS:  I'm not sure I understand
87:11 your question.
87:12 BY MR. HAWAL:
87:13   Q. Well, we've talked about all the legal
87:14 obligations that a company like McKesson has as a
87:15 distributor to put in place a system to prevent
87:16 the diversion of controlled substances, right?
87:17   A. That's correct.
87:18   Q. Have you ever been told by the DEA that
87:19 McKesson could delegate that legal obligation to
87:20 its pharmacy customers?
87:21   A. It -- the pharmacy customers have their
87:22 own regulatory obligations to maintain effective
87:23 controls against diversion.
87:24   Q. So does -- does McKesson delegate its
88:1 obligations under the Controlled Substances Act to
88:2 customers?
88:3   A. Not to my knowledge.
88:4   Q. I mean, it's McKesson's obligation, and
88:5 it's a non-delegable obligation, true?
88:6   A. Well, all registrants have various
88:7 obligations.  So, you know, it's not just
88:8 McKesson's obligation and nobody else's.

| Page/Line | Source | ID |
|---|---|---|
| | GB09-Boggs, Gary - Plaintiff's Submission | |

88:9  Q. I under- --
88:10  A. Other registrants have obligations as
88:11 well.
88:12  Q. I understand.  But my question relates
88:13 to the obligations of a distributor like McKesson.
88:14 It has certain legal obligations, correct?
88:15  A. That's correct.
88:16  Q. You agree with me that McKesson cannot
88:17 delegate its obligations to a customer?
88:18  A. I agree.

**94:17 - 94:19  Boggs, Gary 01-17-2019 (00:00:08)**   **GB09.21**

94:17  Q. And do you agree that the law requires
94:18 that suspicious orders that are blocked should not
94:19 be shipped to the customer?

**95:01 - 95:08  Boggs, Gary 01-17-2019 (00:00:22)**   **GB09.22**

95:1 THE WITNESS:  I don't know that there's
95:2 anything in the law that there's a requirement to
95:3 not ship that -- that.  It says to identify and
95:4 report suspicious orders.
95:5 BY MR. HAWAL:
95:6  Q. So is it your position that a suspicious
95:7 order that is identified and reported can be
95:8 shipped or should be shipped?

**95:11 - 95:12  Boggs, Gary 01-17-2019 (00:00:04)**   **GB09.23**

95:11 THE WITNESS:  Under our program, we
95:12 block the order and don't ship it.

**95:14 - 95:22  Boggs, Gary 01-17-2019 (00:00:28)**   **GB09.177**

95:14  Q. All right.  And why do you do that?
95:15  A. Because we have -- we -- that is the way
95:16 we have structured our program.  There have been
95:17 recent court rulings that if you operate a
95:18 different type of a program to involve
95:19 decision-making to ship that, it requires some
95:20 additional due diligence before you can ship that.
95:21 We choose a more conservative approach in the way
95:22 we operate our program.

**95:24 - 96:02  Boggs, Gary 01-17-2019 (00:00:11)**   **GB09.24**

95:24  Q. you do that in order to
96:1 effectively exercise your responsibility to avoid
96:2 diversion, true?

**GB09-Boggs, Gary - Plaintiff's Submission**

| Page/Line | Source | ID |
|---|---|---|
| 96:04 - 96:21 | **Boggs, Gary 01-17-2019 (00:00:51)** | **GB09.25** |

96:4 THE WITNESS:  Well, I think, first of
96:5 all, you have to understand that a suspicious
96:6 order does not equal a suspicious customer.  It's
96:7 important to understand that -- that orders that
96:8 are simply of unusual size or deviate
96:9 substantially from a normal pattern or -- or
96:10 frequency are simply that.  Without further
96:11 knowing more about the customer, you don't know
96:12 whether or not that suspicious order is destined
96:13 for diversion or not.  And we know from our
96:14 experience, more likely than not that that's not
96:15 the case.
96:16 So to focus on a suspicious order is
96:17 actually misplaced.  If you really want to know
96:18 whether or not diversion may or may not occur, you
96:19 need to know the customer.  And so part of our
96:20 program is extensive due diligence so that we know
96:21 our customer.

| Page/Line | Source | ID |
|---|---|---|
| 97:14 - 97:17 | **Boggs, Gary 01-17-2019 (00:00:10)** | **GB09.26** |

97:14   Q. I understand that there are all sorts of
97:15 possibilities, but the fact of the matter is that
97:16 suspicious orders can lead you to a suspicious
97:17 customer, true?

| Page/Line | Source | ID |
|---|---|---|
| 97:20 - 98:02 | **Boggs, Gary 01-17-2019 (00:00:09)** | **GB09.27** |

97:20 THE WITNESS:  Without knowing more about
97:21 the customer, no.
97:22 BY MR. HAWAL:
97:23   Q. Well --
97:24   A. There is an assumption that a suspicious
98:1 order equals a suspicious customer, and that's
98:2 very misplaced from my experience.

| Page/Line | Source | ID |
|---|---|---|
| 127:18 - 128:03 | **Boggs, Gary 01-17-2019 (00:00:39)** | **GB09.28** |

127:18   Q. Mr. Boggs, I've handed you what has been
127:19 marked as Plaintiffs' Exhibit 9, bearing Bates
127:20 stamp MCK-AGMS-0060000880.
127:21 It is a PowerPoint presentation, "State
127:22 of Prescription Drug Abuse," with McKesson's name
127:23 at the top, and your name and the term "Olive
127:24 Branch."

| Page/Line | Source | ID |
|---|---|---|

128:1 Do you recall this PowerPoint
128:2 presentation?
128:3   A. I do.

**128:16 - 129:03    Boggs, Gary 01-17-2019 (00:00:34)**    **GB09.29**

128:16   Q. And this was prepared -- what does
128:17 "Olive Branch" mean?
128:18   A. Olive Branch is where the McKesson's
128:19 national redistribution center is.  It's Olive
128:20 Branch, Mississippi.
128:21   Q. Okay.  And this would have been prepared
128:22 after you left the DEA?
128:23   A. It would.
128:24   Q. Did it contain information that you
129:1 would have learned or become aware of when you
129:2 worked for the DEA?
129:3   A. It did.  It does.

**129:24 - 130:20    Boggs, Gary 01-17-2019 (00:01:07)**    **GB09.30**

129:24   Q. And when was it presented and -- and
130:1 where?
130:2   A. It was presented at the national
130:3 redistribution center, McKesson's national
130:4 redistribution center in Olive Branch,
130:5 Mississippi.  It would have been probably sometime
130:6 in the summer of 2013.
130:7   Q. And this was when you were retained to
130:8 be a consultant for McKesson?
130:9   A. It was.
130:10   Q. And who was in attendance for you to
130:11 present this to?
130:12   A. The individuals that were part of
130:13 McKesson's Regulatory Affairs program were in
130:14 attendance.  There were representatives at the
130:15 distribution center leadership team, such as a
130:16 distribution center manager or a distribution
130:17 center director of operations from across the
130:18 country were in attendance.  Don Walker was in
130:19 attendance.  There were several other individuals.
130:20 I don't recall every single one of them.

**131:05 - 131:15    Boggs, Gary 01-17-2019 (00:00:35)**    **GB09.31**

131:5   Q. Well, I assume that when you were making

| Page/Line | Source | ID |
|---|---|---|

GB09-Boggs, Gary - Plaintiff's Submission

131:6 this presentation to McKesson, you were intending
131:7 to provide accurate information, true, as you
131:8 understood it?
131:9   A. Absolutely.
131:10   Q. Okay.  And the title of the -- on the
131:11 next page is "The Impact of Effective Compliance:
131:12 Protecting America from Prescription Drug
131:13 Diversion."
131:14 Is that a title that you created?
131:15   A. It is.

**133:09 - 133:14   Boggs, Gary 01-17-2019 (00:00:21)**   GB09.32

133:9 BY MR. HAWAL:
133:10   Q. And then the next page you have a chart
133:11 or graph depicting rising opioid deaths, sales,
133:12 and treatment admissions from 1999 to 2010.
133:13 Correct?
133:14   A. I do.

**134:05 - 134:09   Boggs, Gary 01-17-2019 (00:00:20)**   GB09.33

134:5   Q. So are you saying that you do not agree
134:6 that as greater amounts of opioid pills are
134:7 diverted into the illicit marketplace, that the
134:8 probability is that the number of addictions and
134:9 deaths will increase?

**134:22 - 134:24   Boggs, Gary 01-17-2019 (00:00:07)**   GB09.34

134:22 THE WITNESS:  I -- I think there is a
134:23 correlation between diversion and -- and
134:24 associated problems with diversion.

**135:02 - 135:05   Boggs, Gary 01-17-2019 (00:00:15)**   GB09.35

135:2   Q. Well, true.  And the greater the amount
135:3 of diversion, the greater the likelihood is of
135:4 ensuing harm, such as addiction and death.  True?
135:5   A. I believe that's a fair statement, yes.

**135:06 - 135:08   Boggs, Gary 01-17-2019 (00:00:11)**   GB09.36

135:6   Q. What was the source of this information
135:7 used to create this graph or chart?
135:8   A. I -- I don't recall.

**136:02 - 136:04   Boggs, Gary 01-17-2019 (00:00:16)**   GB09.37

136:2   Q. And you have a slide, and,
136:3 unfortunately -- well, let me reference the Bates
136:4 number, 892, where you have a graph -- well, you

| GB09-Boggs, Gary - Plaintiff's Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| 136:05 - 136:13 | **Boggs, Gary 01-17-2019 (00:00:28)** | GB09.38 |

136:5 have photograph depicting what can happen when the
136:6 types of checks and balances are not followed,
136:7 correct, and you have a collapsing building?
136:8   A. That's what's on the slide, yes.
136:9   Q. Are you trying to emphasize how
136:10 important it is for distributors like McKesson to
136:11 strictly follow their legal obligations under the
136:12 Controlled Substances Act and the federal
136:13 regulations relating to controlled substances?

| 136:17 - 137:13 | **Boggs, Gary 01-17-2019 (00:00:58)** | GB09.39 |

136:17 THE WITNESS:  What I'm trying to depict
136:18 here is, is all of the members within the closed
136:19 system of distribution, which would include
136:20 distributors, but it's not just isolated to them.
136:21 It's for all of them, all the --
136:22 BY MR. HAWAL:
136:23   Q. Including --
136:24   A. -- responsible --
137:1   Q. Including manufacturers of opioids,
137:2 right?
137:3   A. And pharmacists -- or pharmacies and
137:4 pharmacists and doctors.
137:5   Q. On page 897, you reference "Florida pill
137:6 mills, resulting oxy spills."
137:7 Was there a particular problem in
137:8 Florida in the late 2000s, including 2009 and
137:9 2010, as it related to large quantities of opioids
137:10 being diverted into the illicit marketplace?
137:11   A. There was a significant diversion scheme
137:12 related to pain -- rogue pain clinics or what were
137:13 often referred to as pill mills.

| 139:07 - 139:07 | **Boggs, Gary 01-17-2019 (00:00:07)** | GB09.40 |

139:7   Q. And then on page 903, you have a slide

| 139:08 - 139:20 | **Boggs, Gary 01-17-2019 (00:00:35)** | GB09.41 |

139:8 that references:  "A national epidemic:  More than
139:9 45 people die per day from prescription opioids."
139:10 And then you have some statistics.
139:11 And then you have the last sentence:
139:12 "Economic impact to America, $57 billion per

| | GB09-Boggs, Gary - Plaintiff's Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

139:13 year."
139:14 Do you recall where you obtained that
139:15 data?
139:16   A. I believe there was a study published
139:17 that was publicly available on the internet that I
139:18 obtained that from.  I don't recall the -- the
139:19 exact study, but I recall obtaining it off of the
139:20 internet.

**141:05 - 141:22**   **Boggs, Gary 01-17-2019 (00:01:02)**   **GB09.42**

141:5   Q. The next slide says:  "Are we
141:6 contributing to the problem," question mark.
141:7 Are you -- you're referring to
141:8 distributors, right?
141:9   A. I am.
141:10   Q. And you're referencing problems that you
141:11 have seen as to what a distributor -- what certain
141:12 distributors have been doing to contribute to the
141:13 opioid crisis, correct?
141:14   A. The bullets that are in here are focused
141:15 specifically on a diversion scheme, and in this
141:16 case it would have been a pill mill or rogue pain
141:17 clinic.  But that -- that was the focus of -- of
141:18 this particular slide and what some of the bullets
141:19 might be associated with that.
141:20   Q. Well, a pill mill is not going to get
141:21 pills unless it gets them directly from a
141:22 distributor or manufacturer, correct?

**141:24 - 142:07**   **Boggs, Gary 01-17-2019 (00:00:26)**   **GB09.43**

141:24 THE WITNESS:  Generally speaking, that's
142:1 true.
142:2 BY MR. HAWAL:
142:3   Q. Yeah.  And are you trying to emphasize
142:4 that part of the problem that was occurring with
142:5 certain pill mills is that distributors were
142:6 shipping controlled substances in exorbitant
142:7 amounts as one factor?

**142:09 - 142:22**   **Boggs, Gary 01-17-2019 (00:00:51)**   **GB09.44**

142:9 THE WITNESS:  I believe it was more of
142:10 in terms of a specific or cumulative amounts that
142:11 would be going to a single location over a period

| Page/Line | Source | ID |
|---|---|---|

**GB09-Boggs, Gary - Plaintiff's Submission**

142:12 of time.
142:13 BY MR. HAWAL:
142:14   Q. I mean, for example, if a small
142:15 community in a given state that has, you know, 600
142:16 adults -- you know, a population of 600 adults and
142:17 is getting hundreds of thousands of opioid pills
142:18 provided to one pharmacy in such a small
142:19 community, that would indicate to you an example
142:20 of an exorbitant amount of pills going to a
142:21 potentially suspicious customer.  Fair?
142:22   A. It could be, yes.

**143:21 - 143:24**   **Boggs, Gary 01-17-2019 (00:00:16)**   **GB09.45**

143:21   Q. Well, what other than harm would result
143:22 from an exorbitant amount of pills being shipped
143:23 to a given community where there's a known
143:24 epicenter of diversion?

**144:02 - 144:23**   **Boggs, Gary 01-17-2019 (00:00:58)**   **GB09.46**

144:2 THE WITNESS:  I mean there can be
144:3 certain situations where an exorbitant amount is
144:4 totally legitimate.  I mean on its face,
144:5 exorbitant amount is a red flag.  It doesn't
144:6 necessarily mean where you can jump to the
144:7 conclusion an exorbitant amount automatically is
144:8 diversion.
144:9 BY MR. HAWAL:
144:10   Q. I'm not -- I'm not saying automatically,
144:11 but generally speaking, would you agree that an
144:12 exorbitant amount going to a small community that
144:13 is also in the epicenter of diversion, that that
144:14 would be consistent with a greater degree of harm?
144:15   A. I think it requires a greater -- you
144:16 know, more diligence to determine what's going on
144:17 and what the factors are there, and maybe it's
144:18 diversion or maybe there's a legitimate reason.
144:19   Q. Well, are you -- are you -- did you
144:20 create this slide because you knew that this had
144:21 been happening?
144:22   A. I created this slide because of the
144:23 rogue pill mills in Florida.

**144:24 - 145:04**   **Boggs, Gary 01-17-2019 (00:00:17)**   **GB09.178**

| GB09-Boggs, Gary - Plaintiff's Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

144:24   Q. So you knew that this was happening,
145:1 exorbitant amounts of -- of opioids were being
145:2 provided to certain customers by distributors in
145:3 areas that were known to be epicenters of
145:4 diversion.  True?

**145:06 - 145:07**   **Boggs, Gary 01-17-2019 (00:00:03)**   **GB09.179**

145:6 THE WITNESS:  For the pill mill, yes,
145:7 that was the purpose of the slide.

**145:09 - 145:13**   **Boggs, Gary 01-17-2019 (00:00:14)**   **GB09.47**

145:9   Q. And each of these factors would be a
145:10 potential red flag that a distributor should be
145:11 looking at.  Correct?
145:12   A. They are -- they are red flags that you
145:13 should look at, yes.

**145:14 - 145:17**   **Boggs, Gary 01-17-2019 (00:00:14)**   **GB09.48**

145:14   Q. And these would be red flags that would
145:15 not have been first known in 2013, but would have
145:16 been red flags that distributors should have been
145:17 aware of for many years.  True?

**145:19 - 146:03**   **Boggs, Gary 01-17-2019 (00:00:31)**   **GB09.49**

145:19 THE WITNESS:  I don't know that that's
145:20 necessarily the case.  We're -- we're talking
145:21 about a couple of significant diversion schemes
145:22 that occurred at a period of time that have
145:23 never -- never happened before in this country.
145:24 So the red flags sometimes are very specific to
146:1 that criminal scheme that may not be applicable to
146:2 other types of schemes or other day-to-day
146:3 operations of regular pharmacies or practitioners.

**146:05 - 146:09**   **Boggs, Gary 01-17-2019 (00:00:21)**   **GB09.50**

146:5   Q. Well, sir, if a -- if a distributor in
146:6 2005 was aware that these red flags were occurring
146:7 in a given community or related to a given
146:8 customer, should these have been red flags in 2005
146:9 as well as they were in 2013?

**146:14 - 146:17**   **Boggs, Gary 01-17-2019 (00:00:11)**   **GB09.51**

146:14 THE WITNESS:  I think that they are red
146:15 flags, yes.
146:16 BY MR. HAWAL:
146:17   Q. Now, going to slide 907.  "Communication

| Page/Line | Source | ID |
|---|---|---|
| | **GB09-Boggs, Gary - Plaintiff's Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 146:18 - 146:21 | **Boggs, Gary 01-17-2019 (00:00:26)** | GB09.52 |
| | 146:18 Advanced Warnings."  These are bullet points that | |
| | 146:19 indicate how distributors should have been aware | |
| | 146:20 of their obligations to prevent diversion. | |
| | 146:21 Correct? | |
| 146:23 - 147:16 | **Boggs, Gary 01-17-2019 (00:00:51)** | GB09.53 |
| | 146:23 THE WITNESS:  These -- these are some | |
| | 146:24 indicate -- or some examples of where information | |
| | 147:1 was available to distributors, yes. | |
| | 147:2 BY MR. HAWAL: | |
| | 147:3   Q. And the next slide refers to ARCOS data. | |
| | 147:4 What were you intending to communicate with that | |
| | 147:5 slide? | |
| | 147:6   A. That we need to as a distributor look at | |
| | 147:7 the data, the ARCOS data, and look as -- at that | |
| | 147:8 and whether or not there's any indication in there | |
| | 147:9 that we need to follow up on. | |
| | 147:10   Q. And when you reference -- when you're | |
| | 147:11 referring to ARCOS data, you're referring to data | |
| | 147:12 that distributors have relating to the quantity of | |
| | 147:13 different opioids that are being distributed to | |
| | 147:14 given customers? | |
| | 147:15   A. Specific -- ARCOS data specific to that | |
| | 147:16 distributor. | |
| 147:17 - 147:20 | **Boggs, Gary 01-17-2019 (00:00:03)** | GB09.54 |
| | 147:17   Q. Yes. | |
| | 147:18   A. It's not all-encompassing -- | |
| | 147:19   Q. Right. | |
| | 147:20   A. -- of what is going to a customer. | |
| 147:21 - 148:01 | **Boggs, Gary 01-17-2019 (00:00:20)** | GB09.55 |
| | 147:21   Q. I mean, for example, McKesson has | |
| | 147:22 information in its data or its -- in its system | |
| | 147:23 which identifies over time how many pills -- | |
| | 147:24 individual pills of a given opioid were | |
| | 148:1 distributed to a given customer.  True? | |
| 148:03 - 148:10 | **Boggs, Gary 01-17-2019 (00:00:26)** | GB09.56 |
| | 148:3 THE WITNESS:  That McKesson distributed, | |
| | 148:4 yes. | |
| | 148:5 BY MR. HAWAL: | |
| | 148:6   Q. Right.  And early warning sign for an | |

| GB09-Boggs, Gary - Plaintiff's Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

148:7 emerging trend would reflect -- would reflect your
148:8 message to McKesson as to the importance of
148:9 looking at the quantity of controlled substances
148:10 that are being supplied to given customers, right?

148:12 - 148:12   **Boggs, Gary 01-17-2019 (00:00:01)**    **GB09.57**

148:12 THE WITNESS:  That's correct.

148:13 - 148:23   **Boggs, Gary 01-17-2019 (00:00:55)**    **GB09.58**

148:13 BY MR. HAWAL:
148:14   Q. And then on slide 920, you have a slide
148:15 that's identified "Detecting Suspicious Orders,"
148:16 and I assume that you were informing the McKesson
148:17 employees that were at the presentation that it's
148:18 important to look at red flags.  Correct?
148:19   A. That's correct.
148:20   Q. And not only have employees be vigilant
148:21 about individual customers, but also listening to
148:22 those employees when they identify signs that are
148:23 suspicious for diversion?

149:01 - 149:05   **Boggs, Gary 01-17-2019 (00:00:11)**    **GB09.59**

149:1 THE WITNESS:  That's correct.
149:2 BY MR. HAWAL:
149:3   Q. And that would be part of the onboarding
149:4 process when a new customer is coming to McKesson
149:5 for the first time?

149:07 - 149:12   **Boggs, Gary 01-17-2019 (00:00:15)**    **GB09.60**

149:7 THE WITNESS:  That's correct.
149:8 BY MR. HAWAL:
149:9   Q. And periodically visiting individual
149:10 pharmacies to try and determine whether they are
149:11 legitimate or whether they are involved in
149:12 diversion?

149:14 - 150:05   **Boggs, Gary 01-17-2019 (00:00:46)**    **GB09.61**

149:14 THE WITNESS:  That's correct.
149:15 BY MR. HAWAL:
149:16   Q. And what do you mean by, "Do not rely
149:17 solely on thresholds or algorithms as a shortcut
149:18 to detect suspicious orders"?
149:19   A. I mean that we need to conduct
149:20 additional -- or conduct due -- due diligence, I'm
149:21 sorry, of our customers, making sure that we

| GB09-Boggs, Gary - Plaintiff's Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

149:22 understand what they're doing, whether or not they
149:23 give us reason to believe that they're going to
149:24 fulfill their regulatory obligations.
150:1   Q. And that -- that part of it would be
150:2 that if a customer, for example, wants to increase
150:3 their threshold, that requires some due diligence
150:4 on the part of McKesson before the threshold is
150:5 increased, correct?

**150:07 - 150:11    Boggs, Gary 01-17-2019 (00:00:09)    GB09.62**

150:7 THE WITNESS:  Generally speaking, yes, I
150:8 would agree with that.
150:9 BY MR. HAWAL:
150:10   Q. And that should have been occurring how
150:11 far back at a company like McKesson?

**150:13 - 150:21    Boggs, Gary 01-17-2019 (00:00:25)    GB09.63**

150:13 THE WITNESS:  Thresholds were not
150:14 necessarily something that was an industry
150:15 practice until probably 2006, '7 time frame.  So
150:16 around that time frame, I guess.
150:17 BY MR. HAWAL:
150:18   Q. Well, it could have been an industry
150:19 practice earlier than that.  There's nothing
150:20 unique about setting thresholds that coincides
150:21 with 2006 and 2007.  True?

**150:23 - 151:01    Boggs, Gary 01-17-2019 (00:00:06)    GB09.64**

150:23 THE WITNESS:  It -- it's one methodology
150:24 to identify and report suspicious orders.  There
151:1 may be others.

**179:11 - 180:10    Boggs, Gary 01-17-2019 (00:01:10)    GB09.65**

179:11   Q. So is it your position that McKesson has
179:12 not contributed to the opioid epidemic?
179:13   A. Well, I think -- first of all, I
179:14 believe, and I know McKesson believes, that the
179:15 opioid epidemic is a significant problem in this
179:16 country, and it's a problem that's evolved over
179:17 several years or several decades.  It's a -- the
179:18 deaths associated with it are horrific.  The
179:19 employees in McKesson are not immune from it.  The
179:20 family members at McKesson are not immune from it,
179:21 and that's why we take our regulatory obligations

| Page/Line | Source | ID |
|---|---|---|
| | GB09-Boggs, Gary - Plaintiff's Submission | |

179:22 seriously.
179:23 We do significant security procedures at
179:24 each and every one of our facilities to make sure
180:1 that we maintain effective controls.  Because we
180:2 have large volumes of controlled substances in
180:3 those facilities, we have alarm systems, cameras,
180:4 cages, concrete vaults.  We make sure that they're
180:5 secure while they are in our possession.
180:6 When we pass them on downstream to our
180:7 customers, we make sure that we conduct a due
180:8 diligence as best that we can to know our
180:9 customers.  Does that mean we contributed to the
180:10 opioid epidemic?  I don't agree with that.

**196:21 - 197:11**          **Boggs, Gary 01-17-2019 (00:00:45)**          **GB09.66**

196:21   Q. Mr. Boggs, I'm going to hand you what
196:22 has been marked as Plaintiffs' Exhibit 14.
196:23 Did you make a presentation to the West
196:24 Virginia Attorney General on September 1st, 2015,
197:1 on behalf of McKesson?
197:2   A. I did.
197:3   Q. And who else accompanied you from
197:4 McKesson, if anyone?
197:5   A. From McKesson, I don't believe there was
197:6 anybody else.
197:7   Q. And who initiated the presentation?  In
197:8 other words, how did it come about?  Was it at --
197:9 at your suggestion or at McKesson's suggestion or
197:10 the West Virginia Attorney General's suggestion?
197:11   A. I --

**197:14 - 198:04**          **Boggs, Gary 01-17-2019 (00:00:44)**          **GB09.67**

197:14 THE WITNESS:  I believe it was at the
197:15 request of McKesson through their counsel to the
197:16 Attorney General's Office.
197:17 BY MR. HAWAL:
197:18   Q. And what did you understand the purpose
197:19 of this presentation to be?
197:20   A. Was to provide the Attorney General and
197:21 his staff who might be in attendance what McKesson
197:22 was doing on our Controlled Substance Monitoring
197:23 Program and the efforts that were taken to conduct

| Page/Line | Source | ID |
|---|---|---|

197:24 due diligence on our customers.

198:1   Q. Was it, in essence, an effort by

198:2 McKesson to tout the due diligence program that it

198:3 had in place to address the opioid crisis in West

198:4 Virginia?

**198:07 - 198:10**   **Boggs, Gary 01-17-2019 (00:00:09)**   **GB09.68**

198:7 THE WITNESS:  I think it was an effort

198:8 to inform the Attorney General on the efforts that

198:9 McKesson was taking in that particular state as

198:10 well as other states.

**201:17 - 202:06**   **Boggs, Gary 01-17-2019 (00:00:58)**   **GB09.69**

201:17   Q. I'm going to refer you to slide 8 of

201:18 this PowerPoint presentation that you made to the

201:19 Attorney General of the State of West Virginia.  I

201:20 should mention that the Bates number for this

201:21 slide is MCKMDL00695070.

201:22 This was a slide that you prepared?

201:23   A. It is.

201:24   Q. And does this provide information as to

202:1 what steps McKesson had in place in an effort to

202:2 prevent opioid diversion?

202:3   A. It does.

202:4   Q. Are these steps that you implemented as

202:5 a part of your efforts to improve McKesson's

202:6 diversion control of opioid pills?

**202:09 - 202:10**   **Boggs, Gary 01-17-2019 (00:00:02)**   **GB09.70**

202:9 THE WITNESS:  Mine and others since I've

202:10 been at McKesson, yes.

**202:12 - 203:13**   **Boggs, Gary 01-17-2019 (00:01:11)**   **GB09.71**

202:12   Q. And who -- who else would have

202:13 implemented or created these changes?

202:14   A. Several folks within the Regulatory

202:15 Affairs program.  Input from counsel, input from

202:16 analytical folks.

202:17   Q. And over what period of time were these

202:18 steps taken?

202:19   A. We continue to evolve our program on

202:20 a --

202:21   Q. Well --

202:22   A. -- continuously.

| Page/Line | Source | ID |
|---|---|---|
| | 202:23   Q. -- this was dated September 1st, 2015. | |
| | 202:24 When did this program begin at McKesson of | |
| | 203:1 strengthening its CSMP program as you describe in | |
| | 203:2 this slide? | |
| | 203:3   A. As we spoke earlier today, there was a | |
| | 203:4 Lifestyle Drug Monitoring Program that started | |
| | 203:5 around 2018 that evolved into the Controlled | |
| | 203:6 Substance Monitoring Program in -- around 2008. | |
| | 203:7 And we continued to -- we've continued to evolve | |
| | 203:8 our program -- | |
| | 203:9   Q. I'm not interested in past evolution. | |
| | 203:10 I'm interested in what you've done since you | |
| | 203:11 joined McKesson in 2013. | |
| | 203:12 Is that depicted here on this slide 8? | |
| | 203:13   A. It is. | |
| 203:14 - 204:14 | **Boggs, Gary 01-17-2019 (00:01:23)** | **GB09.72** |
| | 203:14   Q. All right.  One of the things that you | |
| | 203:15 did was you established strong governance? | |
| | 203:16   A. We did. | |
| | 203:17   Q. What's that mean? | |
| | 203:18   A. We have a national governance committee | |
| | 203:19 made up of senior executives within McKesson that | |
| | 203:20 are provided briefings and overviews on our | |
| | 203:21 program, some of the different issues that might | |
| | 203:22 be impacting our program or our customers as it | |
| | 203:23 relates to controlled substances. | |
| | 203:24 We have what we call the Regulatory | |
| | 204:1 Affairs operating committee, which is made up of | |
| | 204:2 senior executives within the regulatory program, | |
| | 204:3 myself, my boss, my colleagues at my level.  We | |
| | 204:4 oversee policies and procedures and overview that. | |
| | 204:5 Those are some examples of the governance. | |
| | 204:6   Q. And was this something that was started | |
| | 204:7 in 2014 or 2015, or can you tell us when it was | |
| | 204:8 started? | |
| | 204:9   A. I believe sometime around 2014. | |
| | 204:10   Q. All right.  And the purpose of that is | |
| | 204:11 to provide diligent oversight over McKesson's | |
| | 204:12 obligations to conform to the federal laws and | |
| | 204:13 regulations relating to maintaining effective | |

| Page/Line | Source | ID |
|---|---|---|
| | GB09-Boggs, Gary - Plaintiff's Submission | |

204:14 controls to prevent diversion?

| 204:16 - 204:16 | **Boggs, Gary 01-17-2019 (00:00:01)** | **GB09.73** |

204:16 THE WITNESS:  It is -- it is.

| 204:18 - 204:19 | **Boggs, Gary 01-17-2019 (00:00:05)** | **GB09.74** |

204:18   Q. And this could have been implemented in
204:19 2005?

| 204:23 - 205:05 | **Boggs, Gary 01-17-2019 (00:00:11)** | **GB09.75** |

204:23   A. I don't -- I don't know that there
204:24 wasn't governance at that point in time.  It may
205:1 not have been called the same thing or whatever,
205:2 or whether or not there was senior executives
205:3 overseeing or not, I -- I don't know.
205:4   Q. I didn't ask you whether you knew
205:5 whether that existed.

| 205:06 - 205:08 | **Boggs, Gary 01-17-2019 (00:00:09)** | **GB09.76** |

205:6 My question is, would that be something
205:7 that would be feasible to have been created at a
205:8 company like McKesson in 2005, for example?

| 205:10 - 205:16 | **Boggs, Gary 01-17-2019 (00:00:09)** | **GB09.77** |

205:10 THE WITNESS:  I'm not sure that it
205:11 wasn't done --
205:12 BY MR. HAWAL:
205:13   Q. I didn't ask you -- I'm asking you if it
205:14 was feasible to have created such a program if it
205:15 hadn't been in place.
205:16   A. If it did --

| 205:18 - 205:18 | **Boggs, Gary 01-17-2019 (00:00:00)** | **GB09.78** |

205:18 THE WITNESS:  -- yes.

| 205:20 - 205:22 | **Boggs, Gary 01-17-2019 (00:00:02)** | **GB09.79** |

205:20   Q. If it --
205:21 THE REPORTER:  Excuse me.  We're talking
205:22 at the same time.

| 205:24 - 206:10 | **Boggs, Gary 01-17-2019 (00:00:26)** | **GB09.80** |

205:24   Q. In 2000, would it be feasible?
206:1   A. Yes.
206:2   Q. The next thing you mention is a larger
206:3 and experienced regulatory team.  What does that
206:4 mean?
206:5   A. We expanded the number of people on our
206:6 team.  We brought in different experience,

**GB09-Boggs, Gary - Plaintiff's Submission**

| Page/Line | Source | ID |
|---|---|---|
| | 206:7 expertise and skill sets to our team as we evolved 206:8 our program. 206:9   Q. And that would have been feasible in 206:10 2000 and in 2005? | |
| 206:12 - 207:02 | **Boggs, Gary 01-17-2019 (00:00:39)** 206:12 THE WITNESS:  I believe it could have 206:13 been, yes. 206:14 BY MR. HAWAL: 206:15   Q. Why did you create a larger and more 206:16 experienced regulatory team after you came on 206:17 board to McKesson? 206:18   A. Our -- our program and the policies and 206:19 procedures and the due diligence reviews that we 206:20 conduct on our customers expanded and was more 206:21 in-depth.  It required a larger team to do that. 206:22   Q. Okay.  The next point you made to the 206:23 Attorney General was oversight and strong 206:24 leadership by senior diversion experts. 207:1 Anything particularly stand out as far 207:2 as what change was made in that regard? | GB09.81 |
| 207:04 - 207:08 | **Boggs, Gary 01-17-2019 (00:00:07)** 207:4 THE WITNESS:  Nothing stands out about 207:5 that, no. 207:6 BY MR. HAWAL: 207:7   Q. That's something that could have been 207:8 done in 2000 and 2005, true? | GB09.82 |
| 207:10 - 208:04 | **Boggs, Gary 01-17-2019 (00:00:58)** 207:10 THE WITNESS:  That's true. 207:11 BY MR. HAWAL: 207:12   Q. The next thing you mention is a 207:13 comprehensive diligence of new and existing 207:14 customers.  Right? 207:15   A. Yes. 207:16   Q. And what -- what did that -- what does 207:17 that mean?  How -- how was that changed from what 207:18 it had been to now you have a comprehensive 207:19 diligence of new and existing customers? 207:20   A. We do a more in-depth review of the 207:21 customers in terms of expanded questions that we 207:22 ask the customers.  More frequent -- at -- more | GB09.83 |

| | | |
|---|---|---|
| **GB09-Boggs, Gary - Plaintiff's Submission** | | |
| **Page/Line** | **Source** | **ID** |

207:23 frequently we ask them to provide data to us to
207:24 help us review that customer.  We conduct some
208:1 more open source datasets to look at anything that
208:2 may be on the internet or OIG database to look
208:3 into that, whether or not any sanctions have been
208:4 there.  We leverage various other data sources.

**208:05 - 208:06**   **Boggs, Gary 01-17-2019 (00:00:04)**   **GB09.84**

208:5   Q. And that's again something that could
208:6 have been done in 2000, 2005?

**208:08 - 208:12**   **Boggs, Gary 01-17-2019 (00:00:12)**   **GB09.85**

208:8 THE WITNESS:  Actually, some of that may
208:9 not have been available back then.  Some of the
208:10 dataset or data things, they may not have been
208:11 available.  We use software that's available today
208:12 that wasn't available back then.

**208:14 - 208:17**   **Boggs, Gary 01-17-2019 (00:00:11)**   **GB09.86**

208:14   Q. Well, in a general sense, the more
208:15 comprehensive diligence of new and existing
208:16 customers is something that could have been done
208:17 in multiple different ways.  True?

**208:19 - 209:06**   **Boggs, Gary 01-17-2019 (00:00:22)**   **GB09.87**

208:19 THE WITNESS:  It could be.  It's just
208:20 what we use today, some of the tools that are
208:21 available to us today to do that were not
208:22 available, you know, 20 years ago.
208:23 BY MR. HAWAL:
208:24   Q. And then you go on to say now you have a
209:1 rigorous threshold change request approval
209:2 process, right?
209:3   A. That's correct.
209:4   Q. And how -- how has it changed to become
209:5 a rigorous threshold change request approval
209:6 process?

**209:09 - 209:22**   **Boggs, Gary 01-17-2019 (00:00:30)**   **GB09.88**

209:9 THE WITNESS:  What we do is we take the
209:10 opportunity of a threshold change request to not
209:11 just look at the request but to refresh the due
209:12 diligence review of that customer, to review the
209:13 licensure of the staff at, say, a pharmacy, the
209:14 pharmacists and the technicians to see whether or

| Page/Line | Source | ID |
|---|---|---|
| | 209:15 not they have any disciplinary action that may | |
| | 209:16 have occurred since the first time we did that. | |
| | 209:17 So those are -- those are some of the things that | |
| | 209:18 we do. | |
| | 209:19 BY MR. HAWAL: | |
| | 209:20   Q. Again, something that could have been | |
| | 209:21 done in 2000 and 2005, right? | |
| | 209:22   A. That's correct. | |
| 210:07 - 210:16 | **Boggs, Gary 01-17-2019 (00:00:32)** | **GB09.89** |
| | 210:7   Q. A rigorous threshold change request | |
| | 210:8 approval process would encompass making sure that | |
| | 210:9 the customer has legitimate business reasons for | |
| | 210:10 requesting a threshold increase? | |
| | 210:11   A. That would be part of it, yes. | |
| | 210:12   Q. And in fact, as you know from your work | |
| | 210:13 at McKesson, that is something that was supposed | |
| | 210:14 to have been done at McKesson before a threshold | |
| | 210:15 change increase was made going back to 2007, 2006 | |
| | 210:16 time frame, true? | |
| 210:18 - 210:22 | **Boggs, Gary 01-17-2019 (00:00:05)** | **GB09.90** |
| | 210:18 THE WITNESS:  I don't know if it wasn't | |
| | 210:19 done back then or not. | |
| | 210:20 BY MR. HAWAL: | |
| | 210:21   Q. I didn't ask you that, sir.  Was it | |
| | 210:22 supposed to have been done? | |
| 210:24 - 211:01 | **Boggs, Gary 01-17-2019 (00:00:04)** | **GB09.91** |
| | 210:24 THE WITNESS:  It was part of the review | |
| | 211:1 process, yes. | |
| 211:03 - 212:07 | **Boggs, Gary 01-17-2019 (00:01:26)** | **GB09.92** |
| | 211:3   Q. And sophisticated analytical tools, | |
| | 211:4 you're talking about the algorithms that we | |
| | 211:5 briefly touched on before there? | |
| | 211:6   A. Not in that context, no. | |
| | 211:7   Q. All right.  What is the sophisticated | |
| | 211:8 analytical tools?  What are you referring to | |
| | 211:9 there? | |
| | 211:10   A. We leverage a software system, and this | |
| | 211:11 is an example of one that's available today that | |
| | 211:12 wasn't available before, is Tableau software where | |
| | 211:13 it's a very powerful tool, and we put data by | |

| Page/Line | Source | ID |
|---|---|---|

211:14 purchasing history from our customers in it, and
211:15 it's able to provide some analytical --
211:16   Q. Well, give me an example, if you would,
211:17 please.  Here you say you put in your customers'
211:18 purchase history or information.  What -- what
211:19 kind of information is generated to you that you
211:20 find to be useful for diversion control from that
211:21 program?
211:22   A. It allows us to graphically look at
211:23 purchases of a particular base code over a trend
211:24 over a month period -- or months to see if there's
212:1 any trend in that.  It shows percentages of
212:2 non-controlled purchases to controlled purchases,
212:3 different analytical things like that.
212:4   Q. That's -- that's information that could
212:5 have been generated and analyzed back in 2000 and
212:6 2005, perhaps not with the same software but in
212:7 some fashion, true?

| 212:09 - 212:11 | **Boggs, Gary 01-17-2019 (00:00:05)** | **GB09.93** |

212:9 THE WITNESS:  Probably in some fashion,
212:10 just not with the robust ability that -- as that
212:11 software affords us.

| 212:20 - 213:10 | **Boggs, Gary 01-17-2019 (00:00:40)** | **GB09.94** |

212:20   Q. And then you say:  "Improved education
212:21 and training."  Right?
212:22   A. Yes.
212:23   Q. And improved education and training
212:24 about diversion control and effective mechanisms
213:1 to look for it and -- and deal with it?
213:2   A. This is probably a little bit more
213:3 all-encompassing.  It's internal training and
213:4 education, it's external training and education.
213:5 We provide training and education to our customers
213:6 about trends, about other evolving regulations
213:7 that might -- might be evolved within that would
213:8 impact our program or their ability --
213:9   Q. And that -- that could have been done in
213:10 2000 and 2005, true?

| 213:12 - 213:12 | **Boggs, Gary 01-17-2019 (00:00:01)** | **GB09.95** |

213:12 THE WITNESS:  That's true.

| Page/Line | Source | ID |
|---|---|---|
| | **GB09-Boggs, Gary - Plaintiff's Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 213:18 - 214:05 | **Boggs, Gary 01-17-2019 (00:00:41)** | **GB09.96** |
| | 213:18   Q. Slide 28 identifies under the heading of | |
| | 213:19 "Purpose and General Guidance," "McKesson has a | |
| | 213:20 legal obligation to provide effective controls to | |
| | 213:21 guard against theft and diversion of controlled | |
| | 213:22 substances, and to design and operate a system to | |
| | 213:23 identify suspicious orders of controlled | |
| | 213:24 substances.  As part of McKesson's Controlled | |
| | 214:1 Substance Monitoring Program (CSMP), McKesson | |
| | 214:2 conducts regulatory investigative assessments of | |
| | 214:3 its customers." | |
| | 214:4 That is an obligation that has existed | |
| | 214:5 with McKesson going back to 1970.  True? | |
| 214:07 - 214:20 | **Boggs, Gary 01-17-2019 (00:00:41)** | **GB09.97** |
| | 214:7 THE WITNESS:  That's true. | |
| | 214:8 BY MR. HAWAL: | |
| | 214:9   Q. And then you say:  "Assessments" -- the | |
| | 214:10 last paragraph -- "Assessments are regulatory in | |
| | 214:11 nature and should not be influenced by the | |
| | 214:12 customer's overall sales volume, profitability or | |
| | 214:13 strategic importance to the company."  Right? | |
| | 214:14   A. That's correct. | |
| | 214:15   Q. In other words, large chains that | |
| | 214:16 provide McKesson with billions of dollars in -- in | |
| | 214:17 sales and profits should not be afforded any | |
| | 214:18 additional latitude than one would expect of a | |
| | 214:19 small retail pharmacy in terms of diversion | |
| | 214:20 control issues. | |
| 214:22 - 214:23 | **Boggs, Gary 01-17-2019 (00:00:01)** | **GB09.98** |
| | 214:22 BY MR. HAWAL: | |
| | 214:23   Q. Fair? | |
| 215:02 - 215:18 | **Boggs, Gary 01-17-2019 (00:00:47)** | **GB09.99** |
| | 215:2 THE WITNESS:  That -- that's correct. | |
| | 215:3 BY MR. HAWAL: | |
| | 215:4   Q. And then to the right, you have: | |
| | 215:5 "Thorough customer diligence review is completed | |
| | 215:6 for new customer onboarding, threshold change | |
| | 215:7 requests, proactive reviews, and event triggers -- | |
| | 215:8 triggered reviews.  Every diligence review is | |
| | 215:9 documented.  Reports kept in customer due | |

| Page/Line | Source | ID |
|---|---|---|
| | 215:10 diligence files." | |
| | 215:11 Those are the steps that your company | |
| | 215:12 takes or should take with regard to performing due | |
| | 215:13 diligence reviews of customers? | |
| | 215:14   A. They're steps that we take in our | |
| | 215:15 program. | |
| | 215:16   Q. How long has it been the practice of | |
| | 215:17 McKesson to document diligent -- due diligence | |
| | 215:18 reviews of customers? | |
| 215:20 - 216:02 | **Boggs, Gary 01-17-2019 (00:00:13)** | **GB09.100** |
| | 215:20 THE WITNESS:  I believe there was | |
| | 215:21 documentation before I came. | |
| | 215:22 BY MR. HAWAL: | |
| | 215:23   Q. Is it your understanding that that was | |
| | 215:24 something that should have been done -- that was | |
| | 216:1 done or should have been done going back to 2005, | |
| | 216:2 for example? | |
| 216:04 - 216:10 | **Boggs, Gary 01-17-2019 (00:00:12)** | **GB09.101** |
| | 216:4 THE WITNESS:  I -- it could -- should | |
| | 216:5 have been documented, yes. | |
| | 216:6 BY MR. HAWAL: | |
| | 216:7   Q. And then you have "Reports kept in | |
| | 216:8 customer due diligence files," that would likewise | |
| | 216:9 be something that should have been done going back | |
| | 216:10 to 2005? | |
| 216:12 - 216:13 | **Boggs, Gary 01-17-2019 (00:00:01)** | **GB09.102** |
| | 216:12 BY MR. HAWAL: | |
| | 216:13   Q. At least? | |
| 216:15 - 216:18 | **Boggs, Gary 01-17-2019 (00:00:10)** | **GB09.103** |
| | 216:15 THE WITNESS:  I would agree with that, | |
| | 216:16 yes. | |
| | 216:17 BY MR. HAWAL: | |
| | 216:18   Q. Let's go to slide 38. | |
| 216:19 - 216:23 | **Boggs, Gary 01-17-2019 (00:00:16)** | **GB09.104** |
| | 216:19 The last bullet point says:  "Orders | |
| | 216:20 that exceed monthly threshold are blocked and not | |
| | 216:21 shipped to the customer." | |
| | 216:22 When was that process or policy | |
| | 216:23 implemented at McKesson? | |
| 217:01 - 217:05 | **Boggs, Gary 01-17-2019 (00:00:10)** | **GB09.105** |

**GB09-Boggs, Gary - Plaintiff's Submission**

| GB09-Boggs, Gary - Plaintiff's Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 217:1 THE WITNESS:  I assume they were | |
| | 217:2 blocking shipments before I came to the company. | |
| | 217:3 BY MR. HAWAL: | |
| | 217:4  Q. Again, something that you would have | |
| | 217:5 expected to be done back to 2005, at least? | |
| 217:07 - 217:14 | **Boggs, Gary 01-17-2019 (00:00:18)** | **GB09.106** |
| | 217:7 THE WITNESS:  As far as I know, it was | |
| | 217:8 being done then, yeah. | |
| | 217:9 BY MR. HAWAL: | |
| | 217:10  Q. Yeah.  When you say "it was being done," | |
| | 217:11 have you gone back to make sure that every | |
| | 217:12 threshold -- every order that exceeded the monthly | |
| | 217:13 threshold that was blocked was not shipped to the | |
| | 217:14 customer? | |
| 217:17 - 217:20 | **Boggs, Gary 01-17-2019 (00:00:04)** | **GB09.107** |
| | 217:17 BY MR. HAWAL: | |
| | 217:18  Q. Have you gone back to make that | |
| | 217:19 determination? | |
| | 217:20  A. I did -- I have not. | |
| 223:09 - 223:12 | **Boggs, Gary 01-17-2019 (00:00:11)** | **GB09.108** |
| | 223:9  Q. Have you or anyone else at McKesson made | |
| | 223:10 any effort to compare how many due diligence files | |
| | 223:11 or investigations exist before 2014 in comparison | |
| | 223:12 to how many should exist? | |
| 223:14 - 223:20 | **Boggs, Gary 01-17-2019 (00:00:29)** | **GB09.109** |
| | 223:14 THE WITNESS:  I've not conducted that, | |
| | 223:15 and I'm not aware that anyone else has. | |
| | 223:16 BY MR. HAWAL: | |
| | 223:17  Q. Have you or anyone else at McKesson gone | |
| | 223:18 back to determine how many threshold increases | |
| | 223:19 done by McKesson did not have a legitimate | |
| | 223:20 business justification or diligence documentation? | |
| 223:22 - 223:23 | **Boggs, Gary 01-17-2019 (00:00:04)** | **GB09.110** |
| | 223:22 THE WITNESS:  I have not done that, and | |
| | 223:23 I'm not aware of anyone else doing it. | |
| 225:04 - 225:07 | **Boggs, Gary 01-17-2019 (00:00:10)** | **GB09.111** |
| | 225:4  Q. And do you agree that McKesson takes | |
| | 225:5 great care in setting thresholds, or should? | |
| | 225:6  A. I -- McKesson does take great care in | |
| | 225:7 setting thresholds. | |

| Page/Line | Source | ID |
|---|---|---|

**GB09-Boggs, Gary - Plaintiff's Submission**

| Page/Line | Source | ID |
|---|---|---|
| 259:07 - 259:09 | **Boggs, Gary 01-17-2019 (00:00:18)** | **GB09.112** |
| | 259:7   Q. Mr. Boggs, I'm going to hand you what we | |
| | 259:8 previously marked at your earlier deposition as | |
| | 259:9 Exhibit 6, MCKMDL00407451. | |
| 259:12 - 259:14 | **Boggs, Gary 01-17-2019 (00:00:06)** | **GB09.113** |
| | 259:12 BY MR. HAWAL: | |
| | 259:13   Q. And we're going to mark it as Exhibit 28 | |
| | 259:14 for your deposition today. | |
| 259:17 - 259:20 | **Boggs, Gary 01-17-2019 (00:00:08)** | **GB09.114** |
| | 259:17 BY MR. HAWAL: | |
| | 259:18   Q. You're familiar with the term | |
| | 259:19 "diversion," "drug diversion"? | |
| | 259:20   A. I am. | |
| 259:23 - 260:08 | **Boggs, Gary 01-17-2019 (00:00:32)** | **GB09.115** |
| | 259:23 Are you familiar with the term "drug | |
| | 259:24 migration" as it relates to diversion? | |
| | 260:1   A. I am. | |
| | 260:2   Q. In other words, drugs that find their | |
| | 260:3 way into the illegal distribution system in a | |
| | 260:4 given community will not remain in that community; | |
| | 260:5 they will -- some of those drugs will migrate to | |
| | 260:6 adjacent communities and even different states. | |
| | 260:7 Is that a fair statement as to what drug migration | |
| | 260:8 refers to? | |
| 260:10 - 260:10 | **Boggs, Gary 01-17-2019 (00:00:01)** | **GB09.116** |
| | 260:10 THE WITNESS:  I agree with that. | |
| 260:23 - 261:08 | **Boggs, Gary 01-17-2019 (00:00:38)** | **GB09.117** |
| | 260:23   Q. on page 465 of the -- this | |
| | 260:24 is a PowerPoint that you created; is that correct? | |
| | 261:1   A. I believe so, yes. | |
| | 261:2   Q. And on page 465 of this PowerPoint, | |
| | 261:3 there is a map of the United States, and the title | |
| | 261:4 is "Drug Diversion Migration Out of Florida," and | |
| | 261:5 it has a series of arrows. | |
| | 261:6 Is that intended to show where drugs | |
| | 261:7 that were being diverted in Florida were finding | |
| | 261:8 their way to different parts of the country? | |
| 261:10 - 261:22 | **Boggs, Gary 01-17-2019 (00:00:36)** | **GB09.118** |
| | 261:10 THE WITNESS:  What this is depicting is | |
| | 261:11 the criminal schemes of pill mills in Florida, and | |

| Page/Line | Source | ID |
|---|---|---|

261:12 where those that were complicit in that criminal
261:13 scheme would -- would take those, you know, out of
261:14 Florida and into other locations throughout the
261:15 United States.
261:16 BY MR. HAWAL:
261:17   Q. And sell them in communities in Georgia,
261:18 Tennessee, Kentucky, Ohio, and Missouri?
261:19   A. That could be.
261:20   Q. And I take it this was based upon
261:21 information that you either researched or had
261:22 knowledge about?

**262:01 - 262:01**   **Boggs, Gary 01-17-2019 (00:00:01)**   **GB09.119**

262:1 THE WITNESS:  It is.

**262:04 - 262:12**   **Boggs, Gary 01-17-2019 (00:00:36)**   **GB09.120**

262:4 BY MR. HAWAL:
262:5   Q. The last exhibit I'm going to have
262:6 marked and ask you about is Exhibit No. 29.
262:7 And although it is an Insys document and
262:8 the Bates number is INSYS_MDL006972647, it is a
262:9 communication from John Bonner, director of
262:10 Product Management, Branded Rx, at McKesson Drug
262:11 in San Francisco.
262:12 Do you know John Bonner?

**262:13 - 262:17**   **Boggs, Gary 01-17-2019 (00:00:18)**   **GB09.121**

262:13   A. I -- I do not.
262:14   Q. In any event, Mr. Bonner apparently,
262:15 according to the first sentence of his e-mail,
262:16 says:  "The enemy here is the DEA."  You see that?
262:17   A. I do.

**263:06 - 263:09**   **Boggs, Gary 01-17-2019 (00:00:13)**   **GB09.122**

263:6   Q. Does it trouble you as a former DEA
263:7 agent that certain employees of McKesson -- or at
263:8 least this employee of McKesson considers DEA the
263:9 enemy?

**263:11 - 263:11**   **Boggs, Gary 01-17-2019 (00:00:01)**   **GB09.123**

263:11 THE WITNESS:  It does.

**263:13 - 263:19**   **Boggs, Gary 01-17-2019 (00:00:24)**   **GB09.124**

263:13   Q. Has that been some experience that
263:14 you've come to understand, that certain
263:15 manufacturers and distributors have considered the

| Page/Line | Source | ID |
|---|---|---|
| | 263:16 DEA the enemy because of administrative | |
| | 263:17 proceedings that the DEA has decided -- and the | |
| | 263:18 Department of Justice has decided to bring for | |
| | 263:19 violations of the Controlled Substances Act? | |
| 264:02 - 264:04 | **Boggs, Gary 01-17-2019 (00:00:04)** | GB09.125 |
| | 264:2 THE WITNESS:  This is -- since I've been | |
| | 264:3 at McKesson, this is the first time I've seen | |
| | 264:4 anything like -- like this. | |
| 266:13 - 266:18 | **Boggs, Gary 01-17-2019 (00:00:10)** | GB09.126 |
| | 266:13  Q. Mr. Boggs, good afternoon.  My name is | |
| | 266:14 Troy Rafferty.  I'm representing the plaintiffs in | |
| | 266:15 this case along with Mr. Hawal.  I'm going to ask | |
| | 266:16 you some additional questions here for a bit, | |
| | 266:17 okay? | |
| | 266:18  A. Sure. | |
| 267:02 - 267:10 | **Boggs, Gary 01-17-2019 (00:00:26)** | GB09.127 |
| | 267:2  Q. You were just being asked some questions | |
| | 267:3 about a bill that was passed in 2016 by Mr. Hawal. | |
| | 267:4 Are you familiar with that? | |
| | 267:5  A. I am. | |
| | 267:6  Q. In fact, you have been of the opinion | |
| | 267:7 for several years, dating back even to your time | |
| | 267:8 at the DEA, that the distributors of opioids and | |
| | 267:9 narcotics had basically blown off the DEA. | |
| | 267:10 Correct? | |
| 267:12 - 267:13 | **Boggs, Gary 01-17-2019 (00:00:04)** | GB09.128 |
| | 267:12 THE WITNESS:  I don't know if I would | |
| | 267:13 necessarily characterize it that in its entirety. | |
| 268:08 - 269:23 | **Boggs, Gary 01-17-2019 (00:01:43)** | GB09.129 |
| | 268:8  Q. Two -- 1.2033.  And this is | |
| | 268:9 Bates-numbered MCKMDL00661483. | |
| | 268:10 I'm going to direct your attention to | |
| | 268:11 the middle e-mail.  That's the one I'm going to | |
| | 268:12 ask you about, Mr. Boggs. | |
| | 268:13 Do you know who Ann Berkey is? | |
| | 268:14  A. She used to be employed by McKesson.  I | |
| | 268:15 don't believe she's any longer employed by | |
| | 268:16 McKesson. | |
| | 268:17  Q. You had conversations with her in the | |
| | 268:18 past about your time at the DEA and your | |

| Page/Line | Source | ID |
|---|---|---|

GB09-Boggs, Gary - Plaintiff's Submission

268:19 impressions of the -- of the interaction between
268:20 the distributors and DEA, correct?
268:21   A. I don't know that I had multiple
268:22 conversations with her.  I -- I recall a
268:23 conversation.
268:24   Q. Okay.  Well, let's take a look at what
269:1 Ms. Berkey says here in this e-mail dated April 8,
269:2 2014.  You were at -- at McKesson at that time,
269:3 correct?
269:4   A. I was.
269:5   Q. And here it says -- she's sending it to
269:6 several people, and she says:  "A couple of
269:7 updates since my message yesterday on this.  I met
269:8 today with Gary Boggs, the new senior director of
269:9 Regulatory Affairs for U.S. pharma for the East,
269:10 of the Mississippi River that is, who is based in
269:11 Livonia.  He is a former top official with the
269:12 DEA, and we talked extensively about this bill,
269:13 the hearing, ways we can work with the Agency, et
269:14 cetera.  He outlined in some detail the processes
269:15 that DEA has had in place for years to collaborate
269:16 with wholesalers and the way in which our
269:17 industry, CAH especially, has blown them off, to
269:18 the point that the DEA is now hammering all of
269:19 us."
269:20 Do you see that?
269:21   A. I do.
269:22   Q. Do you recall that conversation with
269:23 Ms. Berkey?

| 270:01 - 270:01 | **Boggs, Gary 01-17-2019 (00:00:01)** | GB09.130 |

270:1 THE WITNESS:  Just in general, yes.

| 270:03 - 270:05 | **Boggs, Gary 01-17-2019 (00:00:04)** | GB09.131 |

270:3   Q. In general?  Do you recall making that
270:4 statement?
270:5   A. I don't believe that's a quote.

| 270:16 - 270:18 | **Boggs, Gary 01-17-2019 (00:00:07)** | GB09.132 |

270:16   A. Not that I recall in that context.  We
270:17 discussed the situation, we discussed different
270:18 things about that and --

| 270:19 - 271:05 | **Boggs, Gary 01-17-2019 (00:00:23)** | GB09.133 |

| Page/Line | Source | ID |
|---|---|---|

270:19  Q. Well, "CAH especially," that's Cardinal
270:20 Health, correct?
270:21  A. That's correct.
270:22  Q. Okay.  And a distributor of narcotics
270:23 just like McKesson, right?
270:24  A. That's correct.
271:1  Q. Okay.  And, in fact, it says here that
271:2 you outlined in some detail the processes that the
271:3 DEA has had in place for years to collaborate with
271:4 wholesalers.  Do you see that?
271:5  A. I do.

**271:20 - 272:03**  **Boggs, Gary 01-17-2019 (00:00:21)**  **GB09.134**

271:20  Q. So you were -- at least in 2014, you
271:21 were sharing information from your time at DEA
271:22 with employees of McKesson.  True?
271:23  A. In -- in generalities, yes.
271:24  Q. Okay.  Including how -- how the DEA had
272:1 processes in place to collaborate with the
272:2 wholesalers, correct?
272:3  A. That's correct.

**272:10 - 272:12**  **Boggs, Gary 01-17-2019 (00:00:07)**  **GB09.135**

272:10  Q. All right.  Are you familiar with DU45
272:11 reports, Mr. Boggs?
272:12  A. Yes, a little bit.  Yes.

**277:09 - 277:10**  **Boggs, Gary 01-17-2019 (00:00:05)**  **GB09.136**

277:9  Q. And have you heard the DU45 referred to
277:10 as excessive purchase reports?

**277:12 - 277:12**  **Boggs, Gary 01-17-2019 (00:00:01)**  **GB09.137**

277:12 THE WITNESS:  I have.

**278:12 - 278:15**  **Boggs, Gary 01-17-2019 (00:00:08)**  **GB09.138**

278:12  Q. And is it your -- was it your under- --
278:13 is it your understanding that these DU45s were
278:14 actually suspicious -- were suspicious order
278:15 reports?

**278:17 - 278:19**  **Boggs, Gary 01-17-2019 (00:00:04)**  **GB09.139**

278:17 THE WITNESS:  It's my understanding
278:18 that's what McKesson was submitting, yes,
278:19 suspicious order reports.

**278:21 - 278:22**  **Boggs, Gary 01-17-2019 (00:00:03)**  **GB09.140**

278:21  Q. And that was the DU45?

| | | |
|---|---|---|
| **GB09-Boggs, Gary - Plaintiff's Submission** | | |
| **Page/Line** | **Source** | **ID** |

278:22   A. Yes.

| 281:03 - 281:07 | **Boggs, Gary 01-17-2019 (00:00:10)** | **GB09.141** |

281:3   Q. Well, do you know if McKesson still
281:4 submits DU45 reports to the DEA?
281:5   A. We submit suspicious order reports to
281:6 the DEA, and we submit ARCOS reports to the DEA.
281:7 That's what we submit.

| 291:07 - 291:14 | **Boggs, Gary 01-17-2019 (00:00:18)** | **GB09.142** |

291:7   Q. And you would agree that simply -- for
291:8 example, today, if you were just submitting this
291:9 report that showed that sales went over a
291:10 particular threshold and nothing more, and no due
291:11 diligence was done and there were no omit reports
291:12 or no blocked orders, that wouldn't be satisfying
291:13 your obligations under the Controlled Substances
291:14 Act, correct?

| 291:16 - 291:20 | **Boggs, Gary 01-17-2019 (00:00:07)** | **GB09.143** |

291:16 THE WITNESS:  It depends on which
291:17 obligation you're referring to.
291:18 BY MR. RAFFERTY:
291:19   Q. The obligation to effect -- to maintain
291:20 effective controls against diversion.

| 291:22 - 291:23 | **Boggs, Gary 01-17-2019 (00:00:02)** | **GB09.144** |

291:22 THE WITNESS:  I would agree with that
291:23 statement, yes.

| 293:03 - 293:07 | **Boggs, Gary 01-17-2019 (00:00:12)** | **GB09.145** |

293:3   Q. Now, you -- you agree with me that not
293:4 only must -- speaking of today, while you're here
293:5 at -- since you've been at McKesson, you would
293:6 agree that you have an obligation not to just
293:7 report but also to block suspicious orders --

| 293:10 - 293:12 | **Boggs, Gary 01-17-2019 (00:00:06)** | **GB09.146** |

293:10   Q. -- and then perform due diligence on
293:11 those to determine whether or not they're likely
293:12 to be diverted to illegal uses, correct?

| 293:17 - 293:23 | **Boggs, Gary 01-17-2019 (00:00:07)** | **GB09.147** |

293:17 THE WITNESS:  A regulatory obligation?
293:18 BY MR. RAFFERTY:
293:19   Q. Yes.
293:20   A. No, I don't agree with that at all.

| GB09-Boggs, Gary - Plaintiff's Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

293:21  Q. You don't agree with that.
293:22  A. I don't know anywhere in the regulation
293:23 that that's a requirement.

321:17 - 321:23    **Boggs, Gary 01-17-2019 (00:00:16)**    GB09.148
321:17  Q. Okay.  So looking at 1433 -- I'm sorry,
321:18 looking at Exhibit 38, this is a letter from the
321:19 Department of Justice to the DEA dated
321:20 November 4th, 2014.
321:21 Do you see that?
321:22  A. I believe it's from the Drug Enforcement
321:23 Administration, but, yes, I see that.

322:04 - 322:12    **Boggs, Gary 01-17-2019 (00:00:33)**    GB09.149
322:4  Q. Okay.  And in fact, if we look at this,
322:5 and we look at the -- it says -- if we look at
322:6 page .2, it says:  "We remain" -- the third full
322:7 paragraph, sir.
322:8 "That having been said, we remain
322:9 concerned that McKesson fails to appreciate the
322:10 serious and systemic nature of the CSA-related
322:11 problems that DEA has observed in its several
322:12 investigations into your client's operations."

323:14 - 324:18    **Boggs, Gary 01-17-2019 (00:01:05)**    GB09.150
323:14 THE WITNESS:  I see that.
323:15 BY MR. RAFFERTY:
323:16  Q. Okay.  In fact, it looks at McKesson
323:17 Aurora.  It says:  "Lacked a functional suspicious
323:18 order reporting system for approximately five
323:19 years," in that last full paragraph on page 2.
323:20 It says:  "McKesson Aurora reported a
323:21 total of 16 orders as suspicious (in one batch,
323:22 occurring in one quarter, related to one recently
323:23 terminated pharmacy), while it processed a total
323:24 of 1.6 million orders for controlled substances
324:1 from 2008 through 2012."
324:2 Do you see that?
324:3  A. I do.
324:4  Q. And then if we go to the next page:
324:5 "McKesson's distribution center in Livonia
324:6 reported no suspicious" -- it says at the top --
324:7 "reported no suspicious orders for approximately

| GB09-Boggs, Gary - Plaintiff's Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 324:8 five years after McKesson's settlement with the | |
|  | 324:9 DOJ." | |
|  | 324:10 You know that was in 2008, correct, the | |
|  | 324:11 settlement? | |
|  | 324:12   A. I do. | |
|  | 324:13   Q. Okay.  So there's five years. | |
|  | 324:14 And then it goes on in the next full | |
|  | 324:15 paragraph:  "Washington Court House, Ohio.  Here | |
|  | 324:16 again, McKesson did not report any orders as | |
|  | 324:17 suspicious for years after the settlement with DOJ | |
|  | 324:18 and DEA."  Do you see that? | |
| 324:20 - 324:20 | **Boggs, Gary 01-17-2019 (00:00:01)** | **GB09.151** |
|  | 324:20 THE WITNESS:  I do. | |
| 324:22 - 325:13 | **Boggs, Gary 01-17-2019 (00:00:37)** | **GB09.152** |
|  | 324:22   Q. And then going on to McKesson's | |
|  | 324:23 Lakeland, the next paragraph on page 4, McKesson's | |
|  | 324:24 distribution system, it says:  "Once again, in | |
|  | 325:1 derogation of its responsibilities under the CSA | |
|  | 325:2 and the 2008 MOA, McKesson Lakeland failed to | |
|  | 325:3 report suspicious orders to the DEA for a | |
|  | 325:4 five-year period." | |
|  | 325:5 Do you see that? | |
|  | 325:6   A. I do. | |
|  | 325:7   Q. And then going down, McKesson in | |
|  | 325:8 Methume -- Methuen, Massachusetts, in the next | |
|  | 325:9 paragraph:  "As with other distribution centers | |
|  | 325:10 McKesson operated, McKesson failed to report any | |
|  | 325:11 suspicious orders from May 2008 through November | |
|  | 325:12 2013."  Do you see that? | |
|  | 325:13   A. I do. | |
| 326:04 - 326:08 | **Boggs, Gary 01-17-2019 (00:00:10)** | **GB09.153** |
|  | 326:4   Q. According to that document.  That | |
|  | 326:5 would -- that would basic- -- that would indicate | |
|  | 326:6 a systemic and nationwide failure on McKesson's | |
|  | 326:7 part during that time period.  You would agree | |
|  | 326:8 with that, right? | |
| 326:11 - 326:12 | **Boggs, Gary 01-17-2019 (00:00:04)** | **GB09.154** |
|  | 326:11 THE WITNESS:  It's an issue that needed | |
|  | 326:12 to be addressed, yes. | |
| 387:23 - 389:01 | **Boggs, Gary 01-17-2019 (00:01:17)** | **GB09.155** |

| Page/Line | Source | ID |
|---|---|---|
| | **GB09-Boggs, Gary - Plaintiff's Submission** | |

387:23 Well, I heard you say that a company
387:24 like McKesson cannot prevent all diversion.  Is
388:1 that -- is that correct?
388:2   A. That's correct.
388:3   Q. Would you agree, though, that
388:4 wholesalers like McKesson can play an important
388:5 role in preventing diversion?
388:6   A. I would.
388:7   Q. Now, you were asked, and I believe you
388:8 testified, that since you've been at McKesson,
388:9 you've never seen anything to suggest that -- that
388:10 McKesson contributed to the opioid epidemic.
388:11 Is that a fair statement of what you
388:12 testified to?
388:13   A. It is.
388:14   Q. I want to take you back to Exhibit 38.
388:15 MR. HAWAL:  If Evan can bring it up.
388:16 BY MR. HAWAL:
388:17   Q. Which is the November 4th, 2014 letter
388:18 from the DEA to Geoffrey Hobart of Covington &
388:19 Burling.  Do you recall that Mr. Rafferty asked
388:20 you about this letter?
388:21   A. I believe so, yes.
388:22   Q. In fact, Covington & Burling is the law
388:23 firm that represents McKesson and has its counsel
388:24 seated directly to your left representing you in
389:1 this deposition?

| 389:03 - 389:13 | **Boggs, Gary 01-17-2019 (00:00:35)** | **GB09.156** |

389:3 THE WITNESS:  That's correct.
389:4 BY MR. HAWAL:
389:5   Q. And according to this DEA letter, in the
389:6 first paragraph it says:  "As a result of
389:7 McKesson's failure to maintain effective controls
389:8 against diversion of particular controlled
389:9 substances and to design and operate a system to
389:10 disclose to the registrants suspicious orders of
389:11 controlled substances," that this administrative
389:12 action was being taken against McKesson.
389:13 That's the conclusion of the DEA?

| 389:15 - 390:02 | **Boggs, Gary 01-17-2019 (00:00:25)** | **GB09.157** |

| Page/Line | Source | ID |
|---|---|---|

GB09-Boggs, Gary - Plaintiff's Submission

389:15 THE WITNESS:  I believe that's the case,
389:16 yes.
389:17 BY MR. HAWAL:
389:18   Q. And you disagree with that?
389:19   A. With what?
389:20   Q. That McKesson had failed to maintain
389:21 effective controls against diversion of particular
389:22 controlled substances and failed to design and
389:23 operate a system to disclose to the registrant
389:24 suspicious orders of controlled substances.  Do
390:1 you disagree with that?
390:2   A. I don't, no.

**392:15 - 393:05**  **Boggs, Gary 01-17-2019 (00:00:41)**  **GB09.158**

392:15   Q. And then in the second -- next paragraph
392:16 down, it says:  "McKesson's systemic failures were
392:17 also evident at its distribution center in
392:18 Washington Court House where McKesson did not
392:19 report any orders as suspicious for years after
392:20 the 2008 settlement with DOJ and DEA.  McKesson's
392:21 regional director of Regulatory Affairs told DEA
392:22 investigators that he did not know what a
392:23 suspicious order was."
392:24 Did I read that correctly?
393:1   A. You did.
393:2   Q. Does that concern you that a regional
393:3 director of Regulatory Affairs would have told the
393:4 DEA that he does not know what a suspicious order
393:5 was?

**393:07 - 393:11**  **Boggs, Gary 01-17-2019 (00:00:04)**  **GB09.159**

393:7 THE WITNESS:  That would cause me a
393:8 concern, yes.
393:9 BY MR. HAWAL:
393:10   Q. That's -- that would be incomprehensible
393:11 to you, wouldn't it?

**393:13 - 393:24**  **Boggs, Gary 01-17-2019 (00:00:29)**  **GB09.160**

393:13 THE WITNESS:  It would be something of
393:14 concern, yes.
393:15 BY MR. HAWAL:
393:16   Q. All right.  And then if we go farther
393:17 down, it says:  "McKesson WCH," Washington Court

| Page/Line | Source | ID |
|---|---|---|

393:18 House, "did not report anything suspicious about
393:19 Community Drug of Manchester, Kentucky, a pharmacy
393:20 located in a town of less than 1,000 adult
393:21 residents, ordering 20,000 to almost 50,000 dosage
393:22 units of oxycodone products on a monthly basis in
393:23 2011."
393:24 Another concern?

**394:02 - 394:14**      **Boggs, Gary 01-17-2019 (00:00:33)**      **GB09.161**

394:2 THE WITNESS:  It would be a concern,
394:3 yes.
394:4 BY MR. HAWAL:
394:5  Q. And then it goes on to say:  "Even after
394:6 McKesson Washington Court House was aware that
394:7 this pharmacy was under investigation, it
394:8 continued to supply it with controlled substances
394:9 while apologizing for having to reduce thresholds
394:10 and promising to," quote, "bump up," close quote,
394:11 "those thresholds as soon as they could justify
394:12 doing so."
394:13 Sir, is that an incomprehensible concern
394:14 as you sit here and see that?

**394:16 - 394:17**      **Boggs, Gary 01-17-2019 (00:00:02)**      **GB09.162**

394:16 THE WITNESS:  It's definitely a concern,
394:17 yes.

**395:03 - 395:08**      **Boggs, Gary 01-17-2019 (00:00:18)**      **GB09.163**

395:3  Q. And what would be the -- what would be
395:4 the legitimate business rationale for bumping up
395:5 thresholds as soon as they could justify doing so
395:6 in the face of what is stated here?  Can you come
395:7 up with one?
395:8  A. Not off --

**395:11 - 395:12**      **Boggs, Gary 01-17-2019 (00:00:03)**      **GB09.164**

395:11  Q. I'm sorry, I didn't hear you.
395:12  A. Not off the top of my head, I can't, no.

**396:11 - 396:16**      **Boggs, Gary 01-17-2019 (00:00:21)**      **GB09.165**

396:11  Q. You're aware, as we discussed earlier,
396:12 that McKesson ended up paying a $150 million fine
396:13 or penalty as a result of these types of
396:14 administrative proceedings that were initiated
396:15 against it by the Department of Justice and the

| Page/Line | Source | ID |
|---|---|---|
| | 396:16 DEA -- | |
| 396:19 - 396:19 | **Boggs, Gary 01-17-2019 (00:00:00)** | **GB09.166** |
| | 396:19   Q. -- right? | |
| 396:21 - 397:02 | **Boggs, Gary 01-17-2019 (00:00:11)** | **GB09.167** |
| | 396:21 THE WITNESS:  The $150 million fine | |
| | 396:22 would be associated for not reporting suspicious | |
| | 396:23 orders. | |
| | 396:24 BY MR. HAWAL: | |
| | 397:1   Q. And that's exactly what it wasn't doing | |
| | 397:2 in these examples, right? | |
| 397:04 - 397:09 | **Boggs, Gary 01-17-2019 (00:00:08)** | **GB09.168** |
| | 397:4 THE WITNESS:  According to the document, | |
| | 397:5 that's correct, yes. | |
| | 397:6 BY MR. HAWAL: | |
| | 397:7   Q. Which you have no basis to refute as you | |
| | 397:8 sit here today, right? | |
| | 397:9   A. I do not. | |
| 404:01 - 404:04 | **Boggs, Gary 01-17-2019 (00:00:07)** | **GB09.169** |
| | 404:1   Q. Did you say that suspicious order | |
| | 404:2 reports are not useful to you? | |
| | 404:3   A. I have not found them to be particularly | |
| | 404:4 useful. | |
| 404:15 - 404:18 | **Boggs, Gary 01-17-2019 (00:00:15)** | **GB09.170** |
| | 404:15   Q. Well, you can certainly answer the fact | |
| | 404:16 that Mr. Rannazzisi, by virtue of the letters that | |
| | 404:17 he wrote, he considered suspicious order reports | |
| | 404:18 important and valuable, true? | |
| 404:21 - 404:22 | **Boggs, Gary 01-17-2019 (00:00:05)** | **GB09.171** |
| | 404:21   Q. By virtue of what he put in the letters | |
| | 404:22 that you saw, Exhibit 1 and Exhibit 2 or 3. | |
| 404:24 - 405:04 | **Boggs, Gary 01-17-2019 (00:00:07)** | **GB09.172** |
| | 404:24 THE WITNESS:  I -- I understand what was | |
| | 405:1 in the letters in terms of what he thought about | |
| | 405:2 it, and I would suggest -- | |
| | 405:3 BY MR. HAWAL: | |
| | 405:4   Q. It spoke -- spoke for itself. | |
| 405:07 - 405:12 | **Boggs, Gary 01-17-2019 (00:00:09)** | **GB09.173** |
| | 405:7 THE WITNESS:  Yeah.  I would suggest if | |
| | 405:8 you want to know what he was thinking about that, | |
| | 405:9 you might have to ask him. | |

GB09-Boggs, Gary - Plaintiff's Submission

| GB09-Boggs, Gary - Plaintiff's Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 405:10 BY MR. HAWAL: | |
|  | 405:11   Q. Well, it's evident from the letters that | |
|  | 405:12 he wrote what he was thinking, true? | |
| 405:14 - 405:22 | **Boggs, Gary 01-17-2019 (00:00:15)** | **GB09.174** |
|  | 405:14 THE WITNESS:  I -- I will take the | |
|  | 405:15 letter at face value, yes. | |
|  | 405:16 BY MR. HAWAL: | |
|  | 405:17   Q. And he was your supervisor, correct? | |
|  | 405:18   A. He was. | |
|  | 405:19   Q. He was the head of the Department of | |
|  | 405:20 Diversion Control at the DEA the entire time you | |
|  | 405:21 were in that department, true? | |
|  | 405:22   A. He was. | |
| 407:02 - 407:10 | **Boggs, Gary 01-17-2019 (00:00:26)** | **GB09.175** |
|  | 407:2   Q. Well, since you've left the DEA, has -- | |
|  | 407:3 has Mr. Rannazzisi or any other DEA representative | |
|  | 407:4 sent McKesson a letter saying, We don't want your | |
|  | 407:5 suspicious order reports, they're of no value to | |
|  | 407:6 us?  Has that ever happened? | |
|  | 407:7   A. I'm not familiar with any letters that | |
|  | 407:8 have that, no. | |
|  | 407:9   Q. If those letters did go to the -- to | |
|  | 407:10 McKesson, you would know about it, wouldn't you? | |
| 407:14 - 407:15 | **Boggs, Gary 01-17-2019 (00:00:02)** | **GB09.176** |
|  | 407:14   Q. Wouldn't you? | |
|  | 407:15   A. I would hope so, yes. | |

Plaintiffs Affirmative Designations = 00:47:16
Plaintiffs Counters = 00:06:33
Plaintiff Counter Counters = 00:00:48
Defense Completeness Counters = 00:13:21
**Total Time = 01:07:59**