**Designation Run Report**

# Boggs, Gary - Merged PComp DC 5-27-21 430p

**Boggs, Gary 01-17-2019**

**Defendants' Counters  00:25:02**

**Plaintiffs' Completeness  00:00:08**

**Total Time  00:25:09**



ID:VM10a

| Page/Line | Source | ID |
|---|---|---|
| | VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p | |
| 353:03 - 355:09 | **Boggs, Gary 01-17-2019 (00:02:55)** | VM10a.4 |

353:3   Q. Mr. Boggs, good evening.
353:4   A. Good evening.
353:5   Q. I want to ask you briefly about your
353:6 career before McKesson.  How long did you work at
353:7 the DEA?
353:8   A. Probably a little over 27 years.
353:9   Q. Okay.  And why did you decide to leave
353:10 your position at the DEA?
353:11   A. As a special agent for the government,
353:12 they have mandatory retirement at age 57.  There
353:13 are some exceptions that you can get a waiver,
353:14 which I was given a waiver for one year.  I worked
353:15 for about six or so months into that waiver, and
353:16 then I decided that I wanted to retire and spend
353:17 more time with my grandchildren and my daughter.
353:18   Q. And how long were you retired before you
353:19 started to work again?
353:20   A. I retired the end of June of 2012.  I
353:21 started doing some consulting probably around the
353:22 summer of 2013.
353:23   Q. And before you were at the DEA, what was
353:24 your job before that?
354:1   A. Before the DEA, I was a deputy sheriff
354:2 in Orange County, Florida, for about eight and a
354:3 half years.
354:4   Q. What did you do before that?
354:5   A. College student.
354:6   Q. Mr. Boggs, I want to ask you some
354:7 questions about diversion.  What is diversion?
354:8   A. Diversion is the act of taking
354:9 pharmaceutical controlled substances out of the
354:10 closed system of distribution or from legitimate
354:11 channels, patients, and then moving them into --
354:12 outside of that for abuse.
354:13   Q. And at McKesson, is it your
354:14 responsibility to prevent diversion?
354:15   A. Well, we can certainly present --
354:16 prevent -- try to prevent some of diversion.  We
354:17 certainly are not able to prevent all diversion.

| | VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p | |
|---|---|---|
| Page/Line | Source | ID |

| Page/Line | Source | ID |
|---|---|---|
| | 354:18   Q. Well, why can't you prevent all | |
| | 354:19 diversion? | |
| | 354:20   A. Diversion can occur at different levels | |
| | 354:21 outside of the distribution's control.  Diversion | |
| | 354:22 can occur at a pharmacy by an employee pilfering | |
| | 354:23 it.  It can occur by a pharmacy being burglarized | |
| | 354:24 or robbed.  Diversion can occur even after | |
| | 355:1 controlled substances have left with a legitimate | |
| | 355:2 patient and are sitting in a medicine cabinet of | |
| | 355:3 someone's home, and someone steals them out of | |
| | 355:4 that medicine cabinet, that's diversion.  We | |
| | 355:5 certainly can't control that. | |
| | 355:6   Q. Everything you just described is a | |
| | 355:7 crime.  Is that -- is there diversion other than | |
| | 355:8 crime? | |
| | 355:9   A. No, diversion -- | |
| 355:11 - 355:11 | **Boggs, Gary 01-17-2019 (00:00:02)** | **VM10a.5** |
| | 355:11 THE WITNESS:  Diversion is a crime. | |
| 355:19 - 355:22 | **Boggs, Gary 01-17-2019 (00:00:07)** | **VM10a.6** |
| | 355:19   Q. Is diversion crime? | |
| | 355:20   A. In my opinion, it is, yes. | |
| | 355:21   Q. Is it always a crime? | |
| | 355:22   A. Yes. | |
| 356:14 - 356:22 | **Boggs, Gary 01-17-2019 (00:00:31)** | **VM10a.7** |
| | 356:14   Q. And can you describe, what is a | |
| | 356:15 diversion trend? | |
| | 356:16   A. There's different types of schemes that | |
| | 356:17 can occur that would cause a -- what I would | |
| | 356:18 consider a trend.  We've -- we've seen diversion | |
| | 356:19 trends, such as rogue internet pharmacies, be a | |
| | 356:20 diversion trend.  It's a massive criminal scheme. | |
| | 356:21 We've seen pill mills in Florida.  That's a | |
| | 356:22 diversion trend and is a criminal scheme. | |
| 357:05 - 360:23 | **Boggs, Gary 01-17-2019 (00:04:35)** | **VM10a.8** |
| | 357:5   Q. Okay.  Is that -- is that a diversion | |
| | 357:6 trend that you're particularly focused on now? | |
| | 357:7   A. We try to focus on anything within our | |
| | 357:8 ability to prevent diversion, and we see some pain | |
| | 357:9 management clinics that are rogue.  We see some | |
| | 357:10 specifically bad doctors.  They're -- they're | |

VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p

| Page/Line | Source | ID |
|---|---|---|

357:11 certainly not in the same context as what we knew
357:12 like the Florida pill mills to be, they're nothing
357:13 like that at all.
357:14   Q. Okay.  What are diversion trends that
357:15 are occurring -- that have been occurring since
357:16 your time at McKesson?
357:17   A. Well, first, they're vastly different
357:18 than before.  They're looking at the pharmacies
357:19 where the pharmacists or their staff may not be
357:20 exercising appropriate due diligence.  That can be
357:21 one -- one area that we look at.  We certainly
357:22 still continue security measures around our
357:23 facility.
357:24   Q. Well, what -- what do you do to keep
358:1 abreast of diversion trends?
358:2   A. I read anything on the internet that I
358:3 can identify as diversion trends.  I read the
358:4 National Survey on Drug Use and Health.  I read
358:5 the DEA's annual report that they would put out on
358:6 their website on drug -- the national drug trend.
358:7 We attend conferences such as the National
358:8 Association of Drug Diversion Investigator
358:9 conferences, the National Association of State
358:10 Controlled Substance Authority, associations -- we
358:11 attend those conferences.  We attend other
358:12 conferences where DEA might be a keynote speaker
358:13 or break- -- have presentations at breakout
358:14 groups.
358:15   Q. What if a doctor writes a large
358:16 prescription, is that diversion?
358:17   A. It can be.  It may not be.  The mere
358:18 fact that it's large in and of itself doesn't mean
358:19 that it's diversion.  For the -- part of the
358:20 opioid epidemic has been fueled by
358:21 overprescribing.  That's not illegal prescribing
358:22 but it's overprescribing.
358:23   Q. Can you explain what the difference --
358:24 you just used two different terms,
359:1 "overprescribing" and "illegal prescribing."  Can
359:2 you explain what you mean by those?

Defendants' Counters        Plaintiffs' Completeness

| Page/Line | Source | ID |
|---|---|---|

VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p

359:3   A. Sure.  Illegal prescribing would be when
359:4 a doctor would be complicit in a scheme that they
359:5 know the patient doesn't need it, the patient is
359:6 paying in cash, the doctor writes a prescription
359:7 for a patient they've never seen before or
359:8 examined before.  The doctor meets -- meets
359:9 someone in a parking lot and writes a prescription
359:10 in exchange for money.  Those would be illegal
359:11 prescriptions.
359:12 Overprescribing, on the other hand,
359:13 might be a situation where a doctor has a
359:14 legitimate patient, has a legitimate need for the
359:15 drugs, but instead of writing that prescription
359:16 for, say, 15 days, they write it for 30 days.
359:17 It's a perfectly legitimate prescription but it's
359:18 overprescribing.  It's prescribing more than what
359:19 that patient would need.
359:20   Q. Can you give a -- can you give the jury
359:21 an example of a prescription that might be
359:22 overprescription -- that might be an
359:23 overprescription without being diversion?
359:24   A. Sure.  You might have a patient go to a
360:1 dentist and have a tooth -- tooth extraction, and
360:2 the patient needs the medication for maybe a
360:3 couple of days, but the doctor writes it for
360:4 30 days.  That's overprescribing.
360:5   Q. So does the -- does McKesson's
360:6 compliance program target overprescribing, as
360:7 you've just described it?
360:8   A. It -- it can't.
360:9   Q. Why not?
360:10   A. We don't see the prescription.  We're
360:11 prohibited by law under HIPAA from knowing
360:12 anything about the patient or any consultation
360:13 between the patient and the doctor, and we don't
360:14 have access to prescription -- the prescription
360:15 itself.
360:16   Q. You were asked some questions earlier
360:17 today about towns that received larger volumes of
360:18 pills relative to their population.  Do you

| Page/Line | Source | ID |
|---|---|---|
| | **VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p** | |
| | 360:19 remember some of those questions? | |
| | 360:20   A. I do. | |
| | 360:21   Q. Do you know if those numbers are the | |
| | 360:22 result of diversion or of overprescribing? | |
| | 360:23   A. I don't. | |
| 361:02 - 361:05 | **Boggs, Gary 01-17-2019 (00:00:08)** | VM10a.9 |
| | 361:2   Q. If -- if you know, do you -- do you know | |
| | 361:3 if those numbers are the result of prescribing -- | |
| | 361:4 overprescribing or diversion? | |
| | 361:5   A. It could be a combination of both. | |
| 361:06 - 361:11 | **Boggs, Gary 01-17-2019 (00:00:17)** | VM10a.10 |
| | 361:6   Q. Are you able to say with any specificity | |
| | 361:7 how much overprescribing is part of the problem | |
| | 361:8 versus diversion? | |
| | 361:9   A. I -- it would be my experience that a -- | |
| | 361:10 a very large percentage of opioids that are out | |
| | 361:11 there are -- are through overprescribing. | |
| 361:14 - 362:02 | **Boggs, Gary 01-17-2019 (00:00:37)** | VM10a.11 |
| | 361:14   Q. While at McKesson, has your role | |
| | 361:15 included responsibility for submitting suspicious | |
| | 361:16 order reports? | |
| | 361:17   A. It has. | |
| | 361:18   Q. What is a suspicious order? | |
| | 361:19   A. A suspicious order would be an order | |
| | 361:20 placed by the customer that is -- has been deemed | |
| | 361:21 as an order of unusual size, an order that | |
| | 361:22 deviated substantially from a normal pattern or | |
| | 361:23 frequent -- unusual frequency. | |
| | 361:24   Q. Are you able to estimate roughly how | |
| | 362:1 many orders McKesson gets of unusual size, pattern | |
| | 362:2 or frequency in a given month? | |
| 362:04 - 362:04 | **Boggs, Gary 01-17-2019 (00:00:01)** | VM10a.12 |
| | 362:4 THE WITNESS:  Probably thousands. | |
| 362:06 - 362:09 | **Boggs, Gary 01-17-2019 (00:00:07)** | VM10a.13 |
| | 362:6   Q. Mr. Boggs, I'll rephrase. | |
| | 362:7 Mr. Boggs, do you know how many | |
| | 362:8 suspicious orders McKesson reports to the DEA in a | |
| | 362:9 typical month? | |
| 362:11 - 365:11 | **Boggs, Gary 01-17-2019 (00:03:11)** | VM10a.14 |
| | 362:11 THE WITNESS:  Thousands. | |

| Page/Line | Source | ID |
|---|---|---|

VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p

362:12 BY MR. STANNER:
362:13   Q. So does that mean that the customers who
362:14 place those suspicious orders are suspicious
362:15 customers?
362:16   A. Absolutely not.
362:17   Q. If a customer places a suspicious order,
362:18 does that mean the order is probably for some
362:19 illegal purpose?
362:20   A. Without knowing more about the customer
362:21 or more information, absolutely not.
362:22   Q. If a customer places a suspicious order,
362:23 does that mean that order is likely to be
362:24 diverted?
363:1   A. It does not.
363:2   Q. Well, if the orders are suspicious
363:3 orders, why doesn't that make the customers
363:4 suspicious?
363:5   A. I think that suspicion in this
363:6 particular context is not the type of suspicion
363:7 that -- in the way you and I might use the context
363:8 of suspicious.  That's the term under the
363:9 regulation as to what it's called.  But the order
363:10 is simply identified as an order of unusual size,
363:11 an order that deviates substantially from a normal
363:12 pattern or unusual frequency.
363:13   Q. So if you don't consider those orders
363:14 suspicious in the normal -- in the lay sense of
363:15 the term, why do you report them?
363:16   A. Because we have a regulatory obligation
363:17 to identify and report those orders that are
363:18 deemed under that three criteria.
363:19   Q. So can you give me an example of how a
363:20 legitimate pharmacy might place an order that you
363:21 would flag as suspicious, and yet not consider to
363:22 be suspicious in the lay sense?
363:23   A. You could have an order come in,
363:24 they're -- someone didn't put the correct amount
364:1 that they wanted.  They fat fingered a number in
364:2 there and made a -- made an error, and they're
364:3 trying to order actually more than what they

| Page/Line | Source | ID |
|---|---|---|
| | VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p | |
| | 364:4 really intended to.  But because that order was | |
| | 364:5 placed with us, that would be deemed as an order | |
| | 364:6 of unusual size and reported as suspicious. | |
| | 364:7 You may have a situation where a | |
| | 364:8 customer has an increase in demand a particular | |
| | 364:9 month and they've run out of supply, and when they | |
| | 364:10 place an order, it exceeds their threshold, so it | |
| | 364:11 might be unusual size. | |
| | 364:12   Q. Can you -- can you give us an example of | |
| | 364:13 how a typical customer orders with McKesson for | |
| | 364:14 controlled substances? | |
| | 364:15   A. Many of them order electronically | |
| | 364:16 through CSOS, the Controlled Substances Ordering | |
| | 364:17 System.  It's an electronic ordering system. | |
| | 364:18   Q. And how often do they place orders?  A | |
| | 364:19 typical customer, how often does a typical | |
| | 364:20 customer place an order? | |
| | 364:21   A. They may place orders daily.  They | |
| | 364:22 may -- for a particular product, say, for example, | |
| | 364:23 hydrocodone, they may order a thousand count | |
| | 364:24 bottle today, and then they don't place any orders | |
| | 365:1 for hydrocodone over the next couple of days or a | |
| | 365:2 week or so until they need to replenish their | |
| | 365:3 stock. | |
| | 365:4   Q. But would -- would that order of a | |
| | 365:5 thousand strike you as a suspicious order? | |
| | 365:6   A. Not at all. | |
| | 365:7   Q. If that customer -- you just said the | |
| | 365:8 customer might not order -- can you give me an | |
| | 365:9 example of how that customer's ordering pattern | |
| | 365:10 might play out over, say, ten days? | |
| | 365:11   A. Again -- | |
| 365:13 - 369:20 | **Boggs, Gary 01-17-2019 (00:04:34)** | VM10a.15 |
| | 365:13 THE WITNESS:  -- they may not order for | |
| | 365:14 a couple of days.  They may order every day.  They | |
| | 365:15 may have an automatic order -- ordering system in | |
| | 365:16 place that places the order repeatedly. | |
| | 365:17 There's a variety of different ways in | |
| | 365:18 which they would -- would order, and they may not | |
| | 365:19 -- they don't all order in the same fashion. | |

Defendants' Counters        Plaintiffs' Completeness

VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p

| Page/Line | Source | ID |
|---|---|---|

365:20 BY MR. STANNER:
365:21   Q. So if a customer orders in the way that
365:22 you just described, is that an unusual pattern or
365:23 frequency?
365:24   A. It may be an unusual frequency.  It
366:1 could be, yes.
366:2   Q. Does that give you -- so -- so what
366:3 would you do if a customer ordered in that way?
366:4   A. We would -- if it triggered a suspicious
366:5 order, that order would be blocked, it would not
366:6 be shipped, and that order would be reported to
366:7 the DEA.
366:8   Q. Is it possible that a customer might be
366:9 suspicious without ever placing a, quote/unquote,
366:10 suspicious order under the regulation?
366:11   A. Yes.
366:12   Q. Can you give me an example of how that
366:13 might happen?
366:14   A. We may see the -- a customer's -- what
366:15 they are actually ordering may be isolated to a
366:16 particular product or a particular strength of a
366:17 product, and they're not ordering necessarily
366:18 anything else, but yet the orders that they are
366:19 placing are not unusual size, frequency or
366:20 pattern.  Something like that might be a red flag
366:21 that would cause us to go out and look at that
366:22 customer and determine what's going on at that
366:23 customer.
366:24   Q. So if you were to find a customer that
367:1 was suspicious but had no history of suspicious
367:2 orders, what would you do?
367:3   A. We would -- depending upon the facts and
367:4 circumstances, we might do an onsite visit and
367:5 talk to the owner or the pharmacist in charge
367:6 there.  We might get updated dispensing data from
367:7 the pharmacy on what they're actually dispensing
367:8 in total and review that from -- from the customer
367:9 to see if there's anything else that we need to be
367:10 concerned about, make some additional inquiries of
367:11 the customer as to what -- what's going on at

VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p

| Page/Line | Source | ID |
|---|---|---|

367:12 their facility.
367:13   Q. Would you -- would you consider
367:14 terminating a customer that had never placed a
367:15 suspicious order?
367:16   A. Many of the customers that we have
367:17 terminated may or may not have -- the reason for
367:18 the termination would not necessarily be that they
367:19 had or hadn't placed a suspicious order.
367:20   Q. In your position, do you ever review
367:21 reports of suspicious orders?
367:22   A. I receive them on a regular basis, and
367:23 from time to time during the week, I will -- I
367:24 will look at those reports, yes.
368:1   Q. Why do you look at the reports?
368:2   A. To see if there's anything in there that
368:3 I should be concerned about, or if there's
368:4 anything -- if a customer ordered an extremely
368:5 large volume of something that would have been
368:6 a -- not a typical order, I would be able to see
368:7 that, and maybe decide that someone from our team
368:8 needed to do some additional due diligence.
368:9   Q. How often do you look at a suspicious
368:10 order report and make a determination that
368:11 something -- some additional diligence is
368:12 warranted?
368:13   A. I look at them probably every day, every
368:14 other day.  I mean, I look at them very
368:15 frequently, but rarely do I find anything that --
368:16 of concern in those.
368:17   Q. Does that mean that you rarely have
368:18 concerns about your customers, or -- is that what
368:19 you're saying, you rarely have concerns about your
368:20 customers?
368:21   A. No, it means that rarely do I find any
368:22 of those orders to be concerning.  We do other due
368:23 diligence of our customers that that due
368:24 diligence -- because we're looking and knowing our
369:1 customer and conducting the due diligence of our
369:2 customer, that we find additional red flags that
369:3 are not borne out in a suspicious order report.

Defendants' Counters    Plaintiffs' Completeness

| Page/Line | Source | ID |
|---|---|---|
| | VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p | |
| | 369:4   Q. So -- so is the suspicious order report<br>369:5 that you get every day, do you consider that a<br>369:6 useful tool for detecting potential diversion?<br>369:7   A. I do not.<br>369:8   Q. What other tools do you consider useful<br>369:9 in detecting diversion?<br>369:10   A. The tools that we use are things like we<br>369:11 get detailed questionnaires completed by the<br>369:12 customer that might -- depending upon their<br>369:13 responses to the questions in there, may be of a<br>369:14 concern and help us identify something.  Asking<br>369:15 the customer to provide dispensing data to us, and<br>369:16 we look at that dispensing data, and that would<br>369:17 provide some additional information.  Looking at<br>369:18 purchase history of that customer.  Looking on the<br>369:19 Board of Pharmacy website for sanctions for that<br>369:20 customer provides us useful information. | |
| 375:02 - 376:04 | **Boggs, Gary 01-17-2019 (00:01:18)**<br>375:2   Q. So if -- if this report is -- does not<br>375:3 trigger diligence of these customers, what does<br>375:4 trigger diligence of these customers?<br>375:5   A. What triggers diligence within McKesson<br>375:6 in our Controlled Substance Monitoring Program, it<br>375:7 starts with determining whether or not McKesson --<br>375:8 a prospective new customer, whether or not we feel<br>375:9 comfortable enough with that new customer's<br>375:10 business model and their due diligence themselves<br>375:11 and their corresponding responsibility, whether or<br>375:12 not we will initially ship to them in the first<br>375:13 place.  And that doesn't always happen.  Some we<br>375:14 deny onboarding them as a customer for controlled<br>375:15 substances.<br>375:16 The other things that may come up is if<br>375:17 a customer asked for a threshold change request to<br>375:18 increase their base codes for a particular<br>375:19 product, under our program, not only do we<br>375:20 evaluate the merits of the inquiries, but we take<br>375:21 that opportunity to refresh our due diligence of<br>375:22 the customer each and every time.<br>375:23 We also have situations such as what we | VM10a.16 |

| Page/Line | Source | ID |
|---|---|---|
| | VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p | |
| | 375:24 call an event trigger.  If we receive a subpoena | |
| | 376:1 from a government agency or an inquiry from a | |
| | 376:2 government agency, that would trigger another | |
| | 376:3 due -- that would trigger a due diligence review | |
| | 376:4 of that customer. | |
| 377:13 - 377:18 | **Boggs, Gary 01-17-2019 (00:00:14)** | VM10a.17 |
| | 377:13   Q. Okay.  So you were asked a number of | |
| | 377:14 questions earlier -- well, let me just ask, | |
| | 377:15 Mr. Boggs, are you aware that for some period of | |
| | 377:16 time McKesson stopped making automated suspicious | |
| | 377:17 order reports like this one to the Drug | |
| | 377:18 Enforcement Administration? | |
| 377:23 - 379:15 | **Boggs, Gary 01-17-2019 (00:01:36)** | VM10a.18 |
| | 377:23 THE WITNESS:  Well, since my time at | |
| | 377:24 McKesson, I know that they did not make some | |
| | 378:1 reports at that -- during periods of time. | |
| | 378:2 BY MR. STANNER: | |
| | 378:3   Q. And do you believe that the failure to | |
| | 378:4 report contributed to the opioid crisis? | |
| | 378:5   A. I don't, because the order may very well | |
| | 378:6 have been blocked and not shipped.  It doesn't | |
| | 378:7 mean it was reported or not reported, but the | |
| | 378:8 order may have been blocked, and McKesson was | |
| | 378:9 blocking orders for quite some time. | |
| | 378:10   Q. Okay.  How long have you been at | |
| | 378:11 McKesson now, Mr. Boggs? | |
| | 378:12   A. A little over five years. | |
| | 378:13   Q. Have you seen anything in your time at | |
| | 378:14 McKesson to make you think that McKesson is | |
| | 378:15 responsible for the opioid crisis? | |
| | 378:16   A. I have not. | |
| | 378:17   Q. Do you think that McKesson takes its -- | |
| | 378:18 its obligations -- its regulatory obligations | |
| | 378:19 seriously? | |
| | 378:20   A. I do.  In fact, if I didn't think they | |
| | 378:21 did, I wouldn't work for them. | |
| | 378:22   Q. Well, when you went to work for them, | |
| | 378:23 did you have -- was it -- was it your impression | |
| | 378:24 that they took the regulatory obligations | |
| | 379:1 seriously then? | |

| Page/Line | Source | ID |
|---|---|---|
| | VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p | |
| | 379:2   A. It was my understanding that they -- I<br>379:3 mean they hired me.  That was an example that they<br>379:4 were taking their regulatory obligations<br>379:5 seriously.  People that I had talked to during the<br>379:6 consulting periods of time, I was -- the<br>379:7 impression I had was that McKesson took the<br>379:8 regulatory obligations seriously.<br>379:9   Q. When you say the people that you -- took<br>379:10 their regulatory obligations seriously, who -- who<br>379:11 do you have in mind?  Did you -- did you ever<br>379:12 meet, for example, Don Walker?<br>379:13   A. I did.<br>379:14   Q. What were your impressions of Don<br>379:15 Walker? | |
| 379:17 - 380:16 | **Boggs, Gary 01-17-2019 (00:01:07)**<br>379:17 THE WITNESS:  That he was attempting to<br>379:18 do the right thing and he took his regulatory<br>379:19 obligations seriously.  He hired me for<br>379:20 consulting, and then ultimately hired me in the<br>379:21 role that I'm in now.<br>379:22 BY MR. STANNER:<br>379:23   Q. Have you ever seen anything in your time<br>379:24 at McKesson that makes you think that McKesson<br>380:1 would prioritize profits over following the law?<br>380:2   A. I have not.<br>380:3   Q. In your time at McKesson, have you ever<br>380:4 suggested terminating a customer and had the<br>380:5 company push back on that?<br>380:6   A. I have not.  They -- I have unilateral<br>380:7 authority to terminate a customer regardless of<br>380:8 any financial gain or loss to the company or<br>380:9 financial gain or loss to the -- to the customer.<br>380:10 And since I've been at McKesson, our program has<br>380:11 probably stopped shipping to 250-some-odd<br>380:12 customers.<br>380:13   Q. You -- you were asked some questions<br>380:14 earlier about McKesson's algorithm.  How long did<br>380:15 it take to develop McKesson's current algorithm<br>380:16 for thresholds? | VM10a.19 |
| 380:19 - 381:11 | **Boggs, Gary 01-17-2019 (00:00:52)** | VM10a.20 |

| | VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |
| | 380:19 THE WITNESS:  It's taken years. | |
| | 380:20 BY MR. STANNER: | |
| | 380:21   Q. Can you be more specific? | |
| | 380:22   A. We've -- I believe it was probably | |
| | 380:23 sometime in either late 2014 or early 2015, or | |
| | 380:24 whatever, when we engaged the Analysis Group, an | |
| | 381:1 outside third party, to come in and conduct a | |
| | 381:2 review of the data.  We met with them numerous | |
| | 381:3 times.  Continue to meet with them.  We | |
| | 381:4 established some initial algorithms, recognized | |
| | 381:5 that there needed to be some modifications, | |
| | 381:6 continued to tweak and adjust those modifications. | |
| | 381:7 And we are still in -- looking at that for | |
| | 381:8 different segments within the company.  It's taken | |
| | 381:9 years. | |
| | 381:10   Q. Why -- why does it take years to develop | |
| | 381:11 an algorithm like that? | |
| 381:14 - 383:04 | **Boggs, Gary 01-17-2019 (00:01:56)** | VM10a.21 |
| | 381:14   Q. Mr. Boggs, did you personally -- were | |
| | 381:15 you personally involved in working with the team | |
| | 381:16 to build the algorithm? | |
| | 381:17   A. I was. | |
| | 381:18   Q. Okay.  Why did it take years to develop? | |
| | 381:19   A. Even though you can have statistically | |
| | 381:20 sound or recognized within the mathematical | |
| | 381:21 community of sound, acceptable practice of | |
| | 381:22 methodologies, those methodologies are not one | |
| | 381:23 size fits all.  You have various different markets | |
| | 381:24 or different customers.  You have hospitals, you | |
| | 382:1 have practitioners, you have long-term care | |
| | 382:2 facilities, you have -- all of those are very | |
| | 382:3 different from one another.  And so when you try | |
| | 382:4 to establish that and come up with a methodology | |
| | 382:5 or threshold algorithms, it's very challenging. | |
| | 382:6 It's also -- we see differences around | |
| | 382:7 the United States, different -- different | |
| | 382:8 prescribing patterns by the doctors in and around | |
| | 382:9 the States, so it's -- it's very difficult to do. | |
| | 382:10   Q. So, I want you to just focus | |
| | 382:11 specifically on retail pharmacies, not -- not | |

| Page/Line | Source | ID |
|---|---|---|
| | VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p | |
| | 382:12 necessarily hospitals.  I take your point.  Not | |
| | 382:13 necessarily hospitals. | |
| | 382:14 Focusing just on pharmacies, why not | |
| | 382:15 just set a threshold of 8,000 or 20,000 or 50,000? | |
| | 382:16   A. Because there's various -- different | |
| | 382:17 businesses require different quantities to meet | |
| | 382:18 their legitimate patients.  You have some | |
| | 382:19 customers also that are part of a buying group, | |
| | 382:20 and they self-warehouse, and so they might | |
| | 382:21 purchase certain products through their | |
| | 382:22 self-warehouse, but then they purchase some from | |
| | 382:23 McKesson. | |
| | 382:24 Some customers obviously are sound | |
| | 383:1 business folks.  They shop around.  They purchase | |
| | 383:2 some stuff from one distributor; they purchase | |
| | 383:3 some stuff from another distributor. | |
| | 383:4 So those are just some examples. | |
| 384:22 - 385:21 | **Boggs, Gary 01-17-2019 (00:01:02)** | VM10a.22 |
| | 384:22   Q. Do you conduct site visits as part of | |
| | 384:23 your diligence program? | |
| | 384:24   A. That is part of our due diligence | |
| | 385:1 program, yes. | |
| | 385:2   Q. Is it an important part of the program? | |
| | 385:3   A. It's -- it's a component of it.  It -- | |
| | 385:4 it can be important, but it's a -- it's a | |
| | 385:5 component of the program. | |
| | 385:6   Q. Would you say it's the most important | |
| | 385:7 component in your diligence program? | |
| | 385:8   A. No. | |
| | 385:9   Q. Why not? | |
| | 385:10   A. We can identify red flags sometimes | |
| | 385:11 through statistical analysis or we can ask the | |
| | 385:12 customer to provide us dispensing data.  Our | |
| | 385:13 review may find that there is a board sanction | |
| | 385:14 from the Board of Pharmacy that we can do online. | |
| | 385:15 We don't need to do a site visit to -- to obtain | |
| | 385:16 that.  In fact, a site visit we wouldn't be able | |
| | 385:17 to get that. | |
| | 385:18 We may find something on the internet | |
| | 385:19 that -- that would cause us concern.  There's | |

Defendants' Counters    Plaintiffs' Completeness

**VM10a-Boggs, Gary - Merged PComp DC 5-27-21 430p**

| Page/Line | Source | ID |
|---|---|---|
| | 385:20 other ways and tools in which we use to exercise | |
| | 385:21 our due diligence. | |

Defendants' Counters = 00:25:02
Plaintiffs' Completeness = 00:00:08
**Total Time = 00:25:09**