**Designation Run Report**

# Hillliard, Gary - Plaintiffs' Submission

_____

**Hilliard, Gary 01-10-2019**
_____

**Plaintiffs Affirmative Designations  01:21:19**

**Plaintiffs Counters  00:01:13**

**Defense Counter Designations  00:00:19**

**Defense Completeness Counters  00:18:05**

**Total Time  01:40:55**



ID:GH07

| Page/Line | Source | ID |
|---|---|---|
| | **GH07-Hillliard, Gary - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 14:08 - 14:12 | **Hilliard, Gary 01-10-2019 (00:00:04)** | GH07.1 |
| | 14:8   Q. Good morning. | |
| | 14:9   A. Good morning. | |
| | 14:10   Q. Can I get your full name, | |
| | 14:11 please? | |
| | 14:12   A. Gary Lawrence Hilliard. | |
| 17:06 - 18:01 | **Hilliard, Gary 01-10-2019 (00:00:38)** | GH07.2 |
| | 17:6   Q. Okay.  Now, the time from 1997 | |
| | 17:7 to 2016 while you were at McKesson, during | |
| | 17:8 that entire span, were you a director of | |
| | 17:9 regulatory affairs? | |
| | 17:10   A. I started as a manager of | |
| | 17:11 regulatory affairs. | |
| | 17:12   Q. Okay.  So tell me what time | |
| | 17:13 period you were the manager. | |
| | 17:14   A. It was approximately a year, so | |
| | 17:15 approximately '97-98. | |
| | 17:16   Q. Okay. | |
| | 17:17   A. I don't remember the exact time | |
| | 17:18 frame. | |
| | 17:19   Q. That approximation is good | |
| | 17:20 enough.  So approximately 1998 you take over | |
| | 17:21 as director of regulatory affairs.  Do you | |
| | 17:22 hold that position until 2016 when you leave? | |
| | 17:23   A. That's correct. | |
| | 17:24   Q. Okay.  Do you know what month | |
| | 17:25 in 2016 you left? | |
| | 18:1   A. July, I believe. | |
| 18:02 - 19:09 | **Hilliard, Gary 01-10-2019 (00:01:46)** | GH07.3 |
| | 18:2   Q. Okay.  So give me a sense, | |
| | 18:3 while you were at McKesson working at | |
| | 18:4 director of regulatory affairs, what your | |
| | 18:5 general job responsibilities were. | |
| | 18:6   A. My role changed over the years, | |
| | 18:7 but as I started, I had responsibility for | |
| | 18:8 DEA compliance for our pharma distribution | |
| | 18:9 centers within the U.S.  I was over 30 | |
| | 18:10 facilities, I don't recall exactly, but... | |
| | 18:11 so that entailed things such as the | |
| | 18:12 management of the SOP, the audit, ARCOS, loss | |

**GH07-Hillliard, Gary - Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|
| | 18:13 and theft, any issue resolution; I would | |
| | 18:14 assist with fiscal DEA audits, also with | |
| | 18:15 corrective actions if there were any | |
| | 18:16 corrective actions with that; the suspicious | |
| | 18:17 order program that was in place at the time. | |
| | 18:18  Q. Okay. | |
| | 18:19  A. And then additionally I also | |
| | 18:20 had responsibility for HAZMAT, hazardous | |
| | 18:21 materials.  I also had responsibility for EPA | |
| | 18:22 environmental issues, waste disposal.  I also | |
| | 18:23 had responsibility for DEA registrations, | |
| | 18:24 state licensure.  I was also active with the | |
| | 18:25 industry association with NWDA on working | |
| | 19:1 committees for both federal and state. | |
| | 19:2  Q. Is that the -- I'm sorry, go | |
| | 19:3 ahead.  Keep going. | |
| | 19:4  A. And did some work on the OSHA | |
| | 19:5 side as well for safety. | |
| | 19:6  Q. Okay. | |
| | 19:7  A. Also, I had responsibility for | |
| | 19:8 FDA actions for -- as it related to our | |
| | 19:9 operations. | |

| Page/Line | Source | ID |
|---|---|---|
| 19:14 - 21:07 | **Hilliard, Gary 01-10-2019 (00:01:41)** | GH07.4 |
| | 19:14  Q. A few follow-up | |
| | 19:15 questions for you on a couple of these points | |
| | 19:16 you gave me.  You said you were responsible | |
| | 19:17 for the SOP.  What SOP are you referring to? | |
| | 19:18  A. Section 55 is what we referred | |
| | 19:19 it to when we started.  It was already in | |
| | 19:20 place when I arrived at McKesson, and follow | |
| | 19:21 up on that until a migration took place, | |
| | 19:22 changes took place in the 2006 time frame. | |
| | 19:23  Q. Okay.  Because you guys went | |
| | 19:24 from Section 55 to approximately 2007, you go | |
| | 19:25 to the LDMP, the Lifestyle Drug Management | |
| | 20:1 Program?  True? | |
| | 20:2  A. True. | |
| | 20:3  Q. Okay.  And then in | |
| | 20:4 approximately 2008, you go to the Controlled | |
| | 20:5 Substances Monitoring Program, otherwise | |

| | GH07-Hillliard, Gary - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

20:6 known as the CSMP.  True?
20:7   A. True.
20:8   Q. Okay.  So did you have
20:9 responsibility for -- let's do one by one.
20:10 So the Section 55 component, you had
20:11 responsibility for Section 55 in what
20:12 respect?
20:13   A. Updates and adherence for our
20:14 operations to the policy.
20:15   Q. For what period of time did you
20:16 have that responsibility?
20:17   A. From '97 till 2006.
20:18   Q. Okay.  Let's talk about the
20:19 LDMP.  Did you have any responsibility
20:20 related to the LDMP?
20:21   A. I helped create that LDMP
20:22 process.
20:23   Q. Okay.  So after it was created,
20:24 what was your responsibility in relationship
20:25 to that program?
21:1   A. I worked with our team to
21:2 ensure compliance with that program and to
21:3 develop it.
21:4   Q. Okay.  What about the CSMP?
21:5 What involvement did you have with the CSMP?
21:6   A. I also helped write that SOP as
21:7 well.

**29:11 - 29:15**   **Hilliard, Gary 01-10-2019 (00:00:13)**   **GH07.5**

29:11 So from 1997 to 2007, would you
29:12 have had responsibility for compliance with
29:13 the Controlled Substances Act as it pertained
29:14 to all of McKesson's distribution centers?
29:15   A. That would be correct.

**29:16 - 30:01**   **Hilliard, Gary 01-10-2019 (00:00:23)**   **GH07.6**

29:16   Q. Okay.  And, now, in 2008, as I
29:17 understand it, there were some additional
29:18 people added to McKesson's regulatory team.
29:19 Is that true?
29:20   A. That's correct.
29:21   Q. Okay.  And so when that change

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
| --- | --- | --- |
| Page/Line | Source | ID |

29:22 occurred and additional people were added, as
29:23 I understand it, you would then have not been
29:24 responsible for all of those distribution
29:25 centers when it pertains to Controlled
30:1 Substance Act compliance.  True?

**30:04 - 30:08**   **Hilliard, Gary 01-10-2019 (00:00:15)**   **GH07.7**

30:4  A. There were regional directors
30:5 and I did not have a region.  So the regional
30:6 directors specifically worked with the new
30:7 programs that were being developed, whereas I
30:8 worked on other operational aspects.

**33:13 - 33:21**   **Hilliard, Gary 01-10-2019 (00:00:21)**   **GH07.8**

33:13   Q. Did you ever have any
33:14 discussions with any of your colleagues at
33:15 McKesson about a potential opioid epidemic in
33:16 this country?
33:17   A. Not that I recall in that
33:18 frame -- of that terminology.
33:19   Q. Okay.  Any other sort of
33:20 terminology that you would utilize that you
33:21 did have such a discussion?

**33:24 - 34:17**   **Hilliard, Gary 01-10-2019 (00:01:06)**   **GH07.9**

33:24   A. There were presentations that
33:25 we saw for training after some of the
34:1 communications took place between McKesson
34:2 headquarters and DEA headquarters.
34:3 QUESTIONS BY MR. BOGLE:
34:4   Q. Okay.  Do you recall what
34:5 presentations you received in that regard?
34:6   A. There was a DEA conference
34:7 where they had a presentation and they were
34:8 talking about the levels of opioids that were
34:9 being used out -- illegitimately.  I don't
34:10 recall the exact details of it, but they had
34:11 a presentation --
34:12   Q. Okay.
34:13   A. -- at a national conference.
34:14   Q. Okay.  Would that have been a
34:15 conference you attended in 2007?
34:16   A. I don't recall the exact date

**GH07-Hillliard, Gary - Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|
| | 34:17 of that conference. | |
| 34:18 - 34:21 | **Hilliard, Gary 01-10-2019 (00:00:09)** | **GH07.10** |
| | 34:18  Q. Okay.  Did you ever have any | |
| | 34:19 personal concern while you were at McKesson | |
| | 34:20 that there was an opioid epidemic ongoing? | |
| | 34:21  A. No, I didn't. | |
| 49:24 - 50:01 | **Hilliard, Gary 01-10-2019 (00:00:07)** | **GH07.11** |
| | 49:24  Q. Okay.  Do you have an | |
| | 49:25 understanding as to why the CSMP blocked | |
| | 50:1 suspicious orders? | |
| 50:05 - 50:05 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.12** |
| | 50:5  Q. Why that was a component of it? | |
| 50:08 - 50:09 | **Hilliard, Gary 01-10-2019 (00:00:03)** | **GH07.13** |
| | 50:8  A. A guidance document provided by | |
| | 50:9 Rannazzisi. | |
| 50:11 - 50:12 | **Hilliard, Gary 01-10-2019 (00:00:04)** | **GH07.14** |
| | 50:11  Q. And do you recall when you | |
| | 50:12 first saw that guidance document? | |
| 50:15 - 50:15 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.15** |
| | 50:15  A. Approximately 2006. | |
| 50:17 - 50:21 | **Hilliard, Gary 01-10-2019 (00:00:12)** | **GH07.16** |
| | 50:17  Q. Okay.  And so prior to | |
| | 50:18 receiving that document in approximately | |
| | 50:19 2006, it was your personal belief that there | |
| | 50:20 was no responsibility for McKesson to block | |
| | 50:21 suspicious orders.  Is that true? | |
| 50:24 - 50:25 | **Hilliard, Gary 01-10-2019 (00:00:03)** | **GH07.17** |
| | 50:24  A. It was not a requirement of the | |
| | 50:25 CSA. | |
| 51:02 - 51:06 | **Hilliard, Gary 01-10-2019 (00:00:14)** | **GH07.18** |
| | 51:2  Q. Okay.  And so if I'm | |
| | 51:3 understanding your testimony correctly, prior | |
| | 51:4 to the implementation of the CSMP in 2008, it | |
| | 51:5 was not McKesson's policy to block suspicious | |
| | 51:6 orders.  Is that true? | |
| 51:09 - 51:10 | **Hilliard, Gary 01-10-2019 (00:00:04)** | **GH07.19** |
| | 51:9  A. Blocking of the orders was not | |
| | 51:10 a requirement under the CSA. | |
| 53:04 - 53:06 | **Hilliard, Gary 01-10-2019 (00:00:14)** | **GH07.20** |
| | 53:4  Q. Okay.  I'm going to hand you | |

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 53:5 what I'm marking as Exhibit 3, which is | |
| | 53:6 1.1464, and that's MCKMDL00478906. | |
| 53:10 - 53:22 | **Hilliard, Gary 01-10-2019 (00:00:20)** | **GH07.21** |
| | 53:10   Q. And you see this is a letter | |
| | 53:11 from the U.S. Department of Justice Drug | |
| | 53:12 Enforcement Administration dated | |
| | 53:13 September 27, 2006. | |
| | 53:14 Do you see that? | |
| | 53:15   A. I see that. | |
| | 53:16   Q. Is this the guidance document | |
| | 53:17 from Mr. Rannazzisi that you were referring | |
| | 53:18 to a minute ago? | |
| | 53:19   A. Yes, it is. | |
| | 53:20   Q. Okay.  So you've seen this | |
| | 53:21 document before.  True? | |
| | 53:22   A. Yes. | |
| 60:20 - 61:06 | **Hilliard, Gary 01-10-2019 (00:00:25)** | **GH07.22** |
| | 60:20   Q. Okay.  It goes on and says: | |
| | 60:21 Thus, in addition to reporting all suspicious | |
| | 60:22 orders, a distributor has a statutory | |
| | 60:23 responsibility to exercise due diligence to | |
| | 60:24 avoid filling suspicious orders that might be | |
| | 60:25 diverted into other than legitimate medical, | |
| | 61:1 scientific, and industrial channels. | |
| | 61:2 Do you see that? | |
| | 61:3   A. I see that. | |
| | 61:4   Q. Okay.  And that's referring to | |
| | 61:5 the requirement to block suspicious orders | |
| | 61:6 when they're detected, right? | |
| 61:09 - 61:09 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.23** |
| | 61:9   A. I'm not sure. | |
| 62:03 - 62:09 | **Hilliard, Gary 01-10-2019 (00:00:15)** | **GH07.24** |
| | 62:3   Q. Okay.  That would have fallen | |
| | 62:4 within your purview, though.  If the DEA's | |
| | 62:5 view is that this is part of McKesson's | |
| | 62:6 responsibilities under the Controlled | |
| | 62:7 Substances Act in 2006 time frame, that would | |
| | 62:8 have been within your purview of your | |
| | 62:9 responsibilities, right? | |
| 62:12 - 63:02 | **Hilliard, Gary 01-10-2019 (00:00:37)** | **GH07.25** |

**GH07-Hillliard, Gary - Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

62:12  A. I don't recall.

62:13 QUESTIONS BY MR. BOGLE:

62:14  Q. Okay.  I think we talked about

62:15 earlier in the deposition that compliance

62:16 with the Controlled Substances Act would have

62:17 been part of your responsibilities in this

62:18 time frame, right?

62:19  A. That's correct.

62:20  Q. Okay.  So if the DEA --

62:21 Mr. Rannazzisi from the DEA is indicating

62:22 here that there's a requirement here, a

62:23 regulatory requirement, to avoid filling

62:24 suspicious orders of controlled substances,

62:25 would that not have fallen within your

63:1 purview to make sure that McKesson complied

63:2 with that portion of the regulations?

**63:05 - 63:19     Hilliard, Gary 01-10-2019 (00:00:37)          GH07.26**

63:5  A. We worked within the

63:6 requirements of CSA, and based on the

63:7 guidance document, we developed the LDMP

63:8 program, then into the CSMP program that did

63:9 block the orders.

63:10 QUESTIONS BY MR. BOGLE:

63:11  Q. Well, LDMP did not have a

63:12 blocking mechanism to it, did it?

63:13  A. No.

63:14  Q. Okay.  So I guess what I'm

63:15 trying to understand is if you didn't

63:16 understand what was meant by this sentence

63:17 from Mr. Rannazzisi's letter, how could you

63:18 properly develop a program to address what

63:19 he's asking you to do?

**63:22 - 64:05     Hilliard, Gary 01-10-2019 (00:00:23)          GH07.27**

63:22  A. I don't recall the

63:23 circumstances that took place.

63:24 QUESTIONS BY MR. BOGLE:

63:25  Q. Okay.  But I guess what I'm

64:1 asking you is, if you were unclear as to what

64:2 Mr. Rannazzisi was saying here about avoiding

64:3 filling suspicious orders, how could you

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| Page/Line | Source | ID |

| | 64:4 design a regulatory program to meet this | |
| | 64:5 demand? | |
| 64:09 - 65:02 | **Hilliard, Gary 01-10-2019 (00:00:46)** | **GH07.28** |
| | 64:9  A. I don't -- I don't recall. | |
| | 64:10 QUESTIONS BY MR. BOGLE: | |
| | 64:11  Q. Okay.  The next paragraph down | |
| | 64:12 says:  In a similar vein, given the | |
| | 64:13 requirement under Section 823(e) that a | |
| | 64:14 distributor maintain effective controls | |
| | 64:15 against diversion, a distributor may not | |
| | 64:16 simply rely on the fact that the person | |
| | 64:17 placing the suspicious order is a DEA | |
| | 64:18 registrant and turn a blind eye to the | |
| | 64:19 suspicious circumstances.  Again, to maintain | |
| | 64:20 effective controls against diversion as | |
| | 64:21 Section 823(e) requires, the distributor | |
| | 64:22 should exercise due care in confirming the | |
| | 64:23 legitimacy of all orders prior to filling. | |
| | 64:24 Do you see that? | |
| | 64:25  A. Yes, I see that. | |
| | 65:1  Q. The last sentence I just read | |
| | 65:2 there, what do you understand that to mean? | |
| 65:05 - 65:05 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.29** |
| | 65:5  A. I'm not sure what it means. | |
| 66:04 - 66:17 | **Hilliard, Gary 01-10-2019 (00:00:29)** | **GH07.30** |
| | 66:4  Q. Okay.  But we can agree that | |
| | 66:5 you did perform regulatory compliance, | |
| | 66:6 including for the Controlled Substances Act | |
| | 66:7 for McKesson, all the way up until about two | |
| | 66:8 years ago, right? | |
| | 66:9  A. That's correct. | |
| | 66:10  Q. Okay.  And we can also agree | |
| | 66:11 this is a letter that you would have read in | |
| | 66:12 your course of employment at McKesson, right? | |
| | 66:13  A. That's correct. | |
| | 66:14  Q. Did you follow up with anyone | |
| | 66:15 at DEA about any of -- anything in this | |
| | 66:16 letter that you were unclear on? | |
| | 66:17  A. Not that I recall. | |
| 66:23 - 67:03 | **Hilliard, Gary 01-10-2019 (00:00:13)** | **GH07.31** |

| Page/Line | Source | ID |
|---|---|---|
| | 66:23   Q. But I think you said earlier | |
| | 66:24 that upon reading this letter, the takeaway | |
| | 66:25 from McKesson was that the company needed to | |
| | 67:1 start blocking suspicious orders of | |
| | 67:2 controlled substances when they were | |
| | 67:3 detected.  True? | |
| 67:06 - 67:08 | **Hilliard, Gary 01-10-2019 (00:00:06)** | **GH07.32** |
| | 67:6   A. I said that this is when we | |
| | 67:7 started developing the new CSMP program which | |
| | 67:8 blocked the orders. | |
| 67:10 - 67:12 | **Hilliard, Gary 01-10-2019 (00:00:07)** | **GH07.33** |
| | 67:10   Q. Right.  So this was the impetus | |
| | 67:11 for creating a program that would block | |
| | 67:12 suspicious orders, right? | |
| 67:15 - 67:17 | **Hilliard, Gary 01-10-2019 (00:00:08)** | **GH07.34** |
| | 67:15   A. I don't recall the details | |
| | 67:16 around what preempted the development, but | |
| | 67:17 this is about the same time frame. | |
| 67:19 - 68:07 | **Hilliard, Gary 01-10-2019 (00:00:35)** | **GH07.35** |
| | 67:19   Q. Okay.  I think you said earlier | |
| | 67:20 it was this guidance letter that did prompt | |
| | 67:21 the creation of the blocking mechanism in the | |
| | 67:22 CSMP. | |
| | 67:23 Did I misunderstand you there? | |
| | 67:24   A. As I recall, this was about the | |
| | 67:25 same time frame and this is when we started | |
| | 68:1 the development of the CSMP. | |
| | 68:2   Q. Okay.  But the actual CSMP | |
| | 68:3 itself did not go into effect until | |
| | 68:4 approximately May 2008, right? | |
| | 68:5   A. That sounds about correct. | |
| | 68:6   Q. Okay.  So just shy of two years | |
| | 68:7 after this letter, correct? | |
| 68:10 - 68:10 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.36** |
| | 68:10   A. That is the date listed. | |
| 79:17 - 79:19 | **Hilliard, Gary 01-10-2019 (00:00:15)** | **GH07.37** |
| | 79:17   Q. Okay.  I'm going to hand you | |
| | 79:18 what I'm marking as Exhibit 4, which is | |
| | 79:19 1.1946, and that's MCKMDL00496859. | |
| 79:20 - 80:20 | **Hilliard, Gary 01-10-2019 (00:00:45)** | **GH07.38** |

At the top, centered: **GH07-Hillliard, Gary - Plaintiffs' Submission**

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

79:20 There you go, sir.

79:21 (McKesson-Hilliard Exhibit 4

79:22 was marked for identification.)

79:23 QUESTIONS BY MR. BOGLE:

79:24  Q. Okay.  And just to generally

79:25 orient ourselves here, Mr. Hilliard, you see

80:1 in Exhibit 4 we've got a memorandum from the

80:2 FDA -- I'm sorry, the DEA, Mr. Mapes at the

80:3 DEA to Mr. Rannazzisi at the DEA, and also

80:4 attached is some PowerPoint slides, right?

80:5  A. Yes, that's correct.

80:6  Q. Okay.  And just looking here,

80:7 the subject of this memorandum says "Internet

80:8 Presentation with McKesson Corp. on

80:9 September 1, 2005."

80:10 Do you see that?

80:11  A. Yes, I see that.

80:12  Q. Okay.  And then in the first

80:13 paragraph it notes who was present, and you

80:14 would agree with me that you're listed as one

80:15 of the people that was present for this

80:16 meeting, right?

80:17  A. I am listed.

80:18  Q. Okay.  And you were present,

80:19 right?

80:20  A. That's correct.

| | | |
|---|---|---|
| 81:19 - 82:21 | **Hilliard, Gary 01-10-2019 (00:00:53)** | **GH07.39** |

81:19  Q. Okay.  It says:  After the

81:20 presentation, Mr. Mapes presented to

81:21 representatives of McKesson Corp. specific

81:22 customers of McKesson Corp., who have ordered

81:23 substantial quantities of hydrocodone

81:24 products.  These specific customers of

81:25 McKesson Corp. were:  And then it lists

82:1 United Prescription Services and Ninth Avenue

82:2 Pharmacy.

82:3 Do you see that?

82:4  A. Yes, I see that.

82:5  Q. And so as this letter

82:6 indicates, those were two pharmacies that

| Page/Line | Source | ID |
|---|---|---|

82:7 were called out and discussed during this
82:8 meeting, right?
82:9   A. Yes, that's correct.
82:10   Q. Okay.  Then it continues:
82:11 Mr. Mapes finalized the presentation by
82:12 advising the representatives of McKesson
82:13 Corp. that they needed to thoroughly review
82:14 the materials which had been presented to
82:15 them and review in depth the purchasing
82:16 patterns and quantities of their customers.
82:17 Representatives of McKesson Corp.
82:18 acknowledged understanding of the material
82:19 presented.
82:20 Do you see that?
82:21   A. Yes, I see that.

**83:07 - 83:13     Hilliard, Gary 01-10-2019 (00:00:17)          GH07.40**

83:7   Q. Okay.  Do you recall leaving
83:8 this meeting personally feeling that you
83:9 didn't understand what was presented to you?
83:10   A. I recall getting a new
83:11 understanding for the trend of internet
83:12 pharmacies based on the presentation they
83:13 provided.

**83:14 - 83:18     Hilliard, Gary 01-10-2019 (00:00:10)          GH07.41**

83:14   Q. Okay.  You said "new
83:15 understanding of the trend with internet
83:16 pharmacies."  Is internet pharmacy something
83:17 that was on McKesson's radar from a
83:18 regulatory perspective prior to this meeting?

**83:21 - 84:22     Hilliard, Gary 01-10-2019 (00:01:01)          GH07.42**

83:21   A. Not that I recall.
83:22 QUESTIONS BY MR. BOGLE:
83:23   Q. Okay.  I want to look at a
83:24 couple of slides in the presentation.  So if
83:25 you go first to the third page of the
84:1 document, .3, you see there the first slide
84:2 is "Internet Pharmacy Data, Meeting with
84:3 McKesson Corporation, DEA Headquarters,
84:4 September 1, 2005."
84:5 Do you see that?

| | | |
|---|---|---|
| **GH07-Hillliard, Gary - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

84:6   A. Yes, I see that.
84:7   Q. Okay.  And then if you go to
84:8 page .4, there's a slide that says "Issues to
84:9 Consider."
84:10 Do you see where I'm at?
84:11   A. Yes, I do.
84:12   Q. Okay.  The first bullet point
84:13 says "Frequency of Orders."  The second
84:14 bullet point says "size of Orders."  The
84:15 third bullet point says "Range of Products
84:16 Purchased."  The fourth bullet point says
84:17 "Payment Method."  The fifth says "Pharmacy
84:18 Location."  The sixth says "% Controlled vs.
84:19 % Noncontrolled."  And the last says
84:20 "Customer pick up at distributor."
84:21 Do you see that?
84:22   A. Yes, I see that.

**87:13 - 88:06**     **Hilliard, Gary 01-10-2019 (00:00:46)**     GH07.43

87:13   Q. Okay.  Well, let me ask you
87:14 this way:  During 2005, McKesson certainly
87:15 could run a report showing what controlled
87:16 substances it had sold to a customer, right?
87:17   A. Correct.
87:18   Q. Track the transactions, right?
87:19   A. Correct.
87:20   Q. Okay.  It could also run a
87:21 report showing the noncontrolled substances
87:22 it sold to any customer, right?
87:23   A. Correct.
87:24   Q. Okay.  Because it tracked those
87:25 transactions as well, right?
88:1   A. Correct.
88:2   Q. Okay.  In 2005, what mechanism
88:3 did McKesson utilize to evaluate the
88:4 frequency of the order -- controlled
88:5 substances orders to determine whether they
88:6 were suspicious?

**88:09 - 88:15**     **Hilliard, Gary 01-10-2019 (00:00:23)**     GH07.44

88:9   A. I don't recall how frequency
88:10 was determined.

| Page/Line | Source | ID |
|---|---|---|
| | 88:11 QUESTIONS BY MR. BOGLE: | |
| | 88:12   Q. Okay.  Are you aware -- let's | |
| | 88:13 just say from 1998 to 2007 -- of any reports | |
| | 88:14 that were run examining frequency of orders | |
| | 88:15 for controlled substances at McKesson? | |
| 88:18 - 88:25 | **Hilliard, Gary 01-10-2019 (00:00:28)** | GH07.45 |
| | 88:18   A. The DU45 suspicious order | |
| | 88:19 report ran nightly and monthly, provided to | |
| | 88:20 the DEA.  I don't recall that it had -- it | |
| | 88:21 showed from day to day the transactions that | |
| | 88:22 occurred, the sales that occurred. | |
| | 88:23 As far as a "frequency" aspect | |
| | 88:24 of it, I don't know how that would have | |
| | 88:25 frequency to it, so I'm not sure. | |
| 89:02 - 89:09 | **Hilliard, Gary 01-10-2019 (00:00:16)** | GH07.46 |
| | 89:2   Q. Okay.  Well, the DU45 report -- | |
| | 89:3 and we'll talk about this a little more | |
| | 89:4 later -- but the DU45 report was a volume | |
| | 89:5 report meaning that a customer for a | |
| | 89:6 controlled substance didn't appear on that | |
| | 89:7 report until they ordered three times the | |
| | 89:8 monthly average for that controlled | |
| | 89:9 substance, right? | |
| 89:12 - 89:12 | **Hilliard, Gary 01-10-2019 (00:00:01)** | GH07.47 |
| | 89:12   A. That's correct. | |
| 89:13 - 89:16 | **Hilliard, Gary 01-10-2019 (00:00:05)** | GH07.48 |
| | 89:13 QUESTIONS BY MR. BOGLE: | |
| | 89:14   Q. So that's more of a volume | |
| | 89:15 report, right?  When you reach a certain | |
| | 89:16 volume, you get on that report. | |
| 89:20 - 89:20 | **Hilliard, Gary 01-10-2019 (00:00:00)** | GH07.49 |
| | 89:20   Q. True? | |
| 89:21 - 90:03 | **Hilliard, Gary 01-10-2019 (00:00:20)** | GH07.50 |
| | 89:21   A. Once you exceed a certain | |
| | 89:22 threshold under the three-time factor, then | |
| | 89:23 you'll show up on that report. | |
| | 89:24   Q. Right.  And so the DU45 | |
| | 89:25 specifically didn't have any mechanism to it | |
| | 90:1 that pulled an order on to it as being on the | |
| | 90:2 report strictly based on frequency alone, did | |

GH07-Hillliard, Gary - Plaintiffs' Submission

| | GH07-Hillliard, Gary - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

90:3 it?

| 90:06 - 90:07 | **Hilliard, Gary 01-10-2019 (00:00:03)** | **GH07.51** |

90:6   A. I don't recall a frequency
90:7 basis.

| 91:01 - 91:05 | **Hilliard, Gary 01-10-2019 (00:00:11)** | **GH07.52** |

91:1   Q. Okay.  And you knew in 2005
91:2 that that was part of McKesson's obligations
91:3 were to report suspicious orders of
91:4 controlled substances when they were -- to
91:5 the DEA when they were discovered, right?

| 91:08 - 91:11 | **Hilliard, Gary 01-10-2019 (00:00:16)** | **GH07.53** |

91:8   A. We provided the suspicious
91:9 order reports to the DEA, again, nightly as
91:10 well as monthly, so that they had the report
91:11 for their review.

| 92:04 - 92:08 | **Hilliard, Gary 01-10-2019 (00:00:10)** | **GH07.54** |

92:4   Q. My question was simply:  You
92:5 did have an understanding as of 2005 that
92:6 there was an obligation for McKesson to
92:7 report suspicious orders to the DEA when they
92:8 were discovered.  True?

| 92:12 - 92:14 | **Hilliard, Gary 01-10-2019 (00:00:05)** | **GH07.55** |

92:12   A. We submitted the reports to the
92:13 DEA for the controlled substance suspicious
92:14 order reports.

| 92:16 - 92:24 | **Hilliard, Gary 01-10-2019 (00:00:28)** | **GH07.56** |

92:16   Q. Okay.  And why would you do
92:17 that, then?
92:18   A. That was the agreed reporting
92:19 mechanism for the suspicious order that was
92:20 created from the Suspicious Order Task Force
92:21 that DEA had agreed was the methodology.
92:22   Q. What time period are you
92:23 referring to?
92:24   A. Approximately '95.

| 95:24 - 96:13 | **Hilliard, Gary 01-10-2019 (00:00:22)** | **GH07.57** |

95:24   Q. So let's go to page .10 then.
95:25 There's another slide on suspicious orders at
96:1 the top there.
96:2 Do you see that?

| | | |
|---|---|---|
| **GH07-Hillliard, Gary - Plaintiffs' Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

96:3   A. I see that.
96:4   Q. That bullet point says:
96:5 Reporting a suspicious order to DEA does
96:6 NOT -- and "not" is in all caps -- relieve
96:7 the distributor of the responsibility to
96:8 maintain effective controls against
96:9 diversion.
96:10 Do you see that?
96:11   A. I see that.
96:12   Q. What did you understand that to
96:13 mean when that was presented to you in 2005?

**96:14 - 97:10**   **Hilliard, Gary 01-10-2019 (00:01:07)**   **GH07.58**

96:14   A. We had other controls around
96:15 ensuring -- to prevent against diversion, and
96:16 so we had to ensure that we had other
96:17 controls, you know, that kept a controlled
96:18 substance within the legitimate registration.
96:19   Q. When you say "other controls,"
96:20 you're talking about other controls other
96:21 than just reporting the suspicious order,
96:22 right?
96:23   A. Correct.
96:24   Q. Okay.  What were those controls
96:25 in 2005?
97:1   A. We only serviced DEA-registered
97:2 facilities and also state-licensed
97:3 facilities.  Some states required a
97:4 controlled substance license, so there was
97:5 license validation checks that would take
97:6 place.  Also D&B creditworthiness aspects for
97:7 them.
97:8 We also had delivery systems
97:9 that -- couriers that delivered only to these
97:10 registered locations.  We supplied ARCOS

**97:11 - 97:20**   **Hilliard, Gary 01-10-2019 (00:00:45)**   **GH07.59**

97:11 records to the DEA monthly on all of our
97:12 transactions so that DEA had that as well.
97:13 We reported loss and thefts, as required.
97:14 We had security vaults and
97:15 cages within our facilities to comply with

| | | |
|---|---|---|
| **GH07-Hillliard, Gary - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

97:16 the security requirements for protecting the
97:17 controlled substances; numerous paperwork
97:18 requirements, including the 222 forms for the
97:19 transactions for Schedule IIs.  There were
97:20 many different other controls.

**97:21 - 97:23**   **Hilliard, Gary 01-10-2019 (00:00:04)**          GH07.60

97:21   Q. Those controls in 2005 would
97:22 not have included blocking orders as we
97:23 talked about before, right?

**98:02 - 98:02**   **Hilliard, Gary 01-10-2019 (00:00:01)**          GH07.61

98:2   Q. Blocking suspicious orders.

**98:05 - 98:10**   **Hilliard, Gary 01-10-2019 (00:00:08)**          GH07.62

98:5   A. Blocking suspicious orders took
98:6 place in the CSMP program.
98:7 QUESTIONS BY MR. BOGLE:
98:8   Q. Right.  So in 2005, that would
98:9 not have been in place, right?
98:10   A. That was not in place in 2005.

**98:11 - 98:17**   **Hilliard, Gary 01-10-2019 (00:00:12)**          GH07.63

98:11   Q. All right.  The second slide
98:12 here on that page, the second bullet point
98:13 says:  Distributor must determine which
98:14 orders are suspicious and make a sales
98:15 decision.
98:16 Do you see that?
98:17   A. I see that.

**98:18 - 98:24**   **Hilliard, Gary 01-10-2019 (00:00:16)**          GH07.64

98:18   Q. Okay.  Okay.  Let's go to
98:19 page .14.  You see there's a summary slide
98:20 there at the bottom, and the last bullet
98:21 point says:  Not limited to Internet
98:22 pharmacies.
98:23 Do you see that?
98:24   A. Yes, I see that.

**106:08 - 106:12**   **Hilliard, Gary 01-10-2019 (00:00:11)**          GH07.65

106:8 During this presentation in
106:9 September 2005 that you were present for, was
106:10 there anything about that presentation that
106:11 you thought was unclear as far as what the
106:12 DEA was asking of you guys?

| | GH07-Hillliard, Gary - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 106:15 - 106:15 | **Hilliard, Gary 01-10-2019 (00:00:02)** | GH07.66 |
| | 106:15   A. Not that I recall. | |
| 106:16 - 106:21 | **Hilliard, Gary 01-10-2019 (00:00:09)** | GH07.67 |
| | 106:16 QUESTIONS BY MR. BOGLE: | |
| | 106:17   Q. Okay.  But you do recall a | |
| | 106:18 meeting just a couple months thereafter where | |
| | 106:19 the DEA made pretty clear that they felt you | |
| | 106:20 didn't take them very seriously in that | |
| | 106:21 meeting, right? | |
| 106:24 - 107:02 | **Hilliard, Gary 01-10-2019 (00:00:12)** | GH07.68 |
| | 106:24   A. We did attend a meeting a | |
| | 106:25 couple of months thereafter for which | |
| | 107:1 Rannazzisi came in and wanted to do a | |
| | 107:2 show-cause. | |
| 107:11 - 107:15 | **Hilliard, Gary 01-10-2019 (00:00:12)** | GH07.69 |
| | 107:11   Q. Okay.  I'm going to hand you | |
| | 107:12 what I'm marking as Exhibit 5, which is | |
| | 107:13 1.1789, and that's MCKMDL00496876. | |
| | 107:14 (McKesson-Hilliard Exhibit 5 | |
| | 107:15 was marked for identification.) | |
| 107:16 - 109:10 | **Hilliard, Gary 01-10-2019 (00:01:33)** | GH07.70 |
| | 107:16 QUESTIONS BY MR. BOGLE: | |
| | 107:17   Q. Okay.  Looking at Exhibit 5 | |
| | 107:18 here, this is another memorandum, the subject | |
| | 107:19 being a Meeting Between the Office of | |
| | 107:20 Diversion Control and McKesson Corp. on | |
| | 107:21 January 3, 2006. | |
| | 107:22 Do you see that? | |
| | 107:23   A. Yes, I see that. | |
| | 107:24   Q. Okay.  And the second | |
| | 107:25 paragraph, I'm not going to read off all the | |
| | 108:1 attendees, but I just want to confirm you see | |
| | 108:2 your name there as being one of the | |
| | 108:3 attendees, right? | |
| | 108:4   A. That's correct. | |
| | 108:5   Q. And that's true, right, you | |
| | 108:6 attended this meeting? | |
| | 108:7   A. That is correct. | |
| | 108:8   Q. Okay.  And looking down on this | |
| | 108:9 page about three-quarters of the way down, | |

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
| --- | --- | --- |
| Page/Line | Source | ID |

108:10 you see where it says, "Mr. Mapes opened"?

108:11   A. Yes, I do.

108:12   Q. It says:  Mr. Mapes opened the

108:13 meeting by making introductions and covering

108:14 the background of previous meetings and

108:15 telephonic conversations between OD and

108:16 McKesson Corp.  Specifically addressed were

108:17 the following:

108:18 And the first bullet says:  A

108:19 meeting between McKesson Corp. and E-Commerce

108:20 Section was held September 1, 2005, at which

108:21 time McKesson Corp. was given a full detailed

108:22 briefing of the OD's Distributors Initiative

108:23 to address the Internet pharmacy problem.

108:24 Do you see that?

108:25   A. Yes, I see that.

109:1   Q. And that September 1 meeting in

109:2 2005 was the one we just were talking about,

109:3 right?

109:4   A. That's correct.

109:5   Q. Okay.  The second-to-last

109:6 bullet point on this page said:  Pharmacies

109:7 of particular concern were located in

109:8 Florida, Texas, and Colorado.

109:9 Do you see that?

109:10   A. Yes, I see that.

**110:20 - 112:22**     **Hilliard, Gary 01-10-2019 (00:01:45)**                    **GH07.71**

110:20 The next bullet point actually

110:21 says:  Specifically addressed concerns with

110:22 United Prescription Services, a current

110:23 customer of McKesson's.

110:24 Do you see that?

110:25   A. Yes, I see that.

111:1   Q. And we do know that was covered

111:2 in the September 1, 2005 meeting, right?

111:3   A. Agreed.

111:4   Q. Their concerns about that

111:5 pharmacy?

111:6   A. Agreed.

111:7   Q. Okay.  It continues:  On

| Page/Line | Source | ID |
|---|---|---|

111:8 October 6, 2005, Mr. Mapes called Mr. Gilbert

111:9 to discuss comments the E-Commerce Section

111:10 had received that McKesson Corp. was not

111:11 taking the Internet pharmacy problem

111:12 seriously.  Mr. Mapes was assured by

111:13 Mr. Gilbert that McKesson Corp. was taking

111:14 the matters seriously and working to change

111:15 their procedures.

111:16 Do you see that?

111:17   A. Yes, I see that.

111:18   Q. Who is Mr. Gilbert?

111:19   A. Outside counsel.

111:20   Q. So he's you guys' lawyer,

111:21 right?

111:22   A. Correct.

111:23   Q. Okay.  And that's on October

111:24 5th.

111:25 And the next entry is on

112:1 October 10.  It says:  On October 10, 2005, a

112:2 DEA investigator from the Tampa District

112:3 Office contacted Bill Mahoney at the McKesson

112:4 Distribution Center in Lakeland, Florida, and

112:5 expressed concerns of hydrocodone sales to

112:6 United Prescription Services.

112:7 Do you see that?

112:8   A. I see that.

112:9   Q. Okay.  Then the next entry

112:10 says:  The E-Commerce Section retrieved ARCOS

112:11 data which revealed that between October 10

112:12 and October 21, 2005, the following alleged

112:13 Internet pharmacies received the identified

112:14 quantities of hydrocodone.

112:15 And then there's one, two,

112:16 three, four, five, six pharmacies listed,

112:17 right?

112:18   A. Yes, that's what's listed here.

112:19   Q. Okay.  And for this 11-day

112:20 period, it's noted in this letter that United

112:21 Prescription Services received 252,100 dosage

112:22 units of hydrocodone from McKesson, right?

| Page/Line | Source | ID |
|---|---|---|
| | **GH07-Hillliard, Gary - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 112:25 - 113:06 | **Hilliard, Gary 01-10-2019 (00:00:12)** | GH07.72 |
| | 112:25   A. That's what's stated on the | |
| | 113:1 document. | |
| | 113:2 QUESTIONS BY MR. BOGLE: | |
| | 113:3   Q. Okay.  And that Universal Rx | |
| | 113:4 received 254,700 dosage units during this | |
| | 113:5 11-day period from McKesson of hydrocodone, | |
| | 113:6 right?  That's what the letter states. | |
| 113:09 - 113:15 | **Hilliard, Gary 01-10-2019 (00:00:11)** | GH07.73 |
| | 113:9   A. That's listed on this letter, | |
| | 113:10 yes. | |
| | 113:11 QUESTIONS BY MR. BOGLE: | |
| | 113:12   Q. Okay.  And that Bi-Wise | |
| | 113:13 Pharmacy received 158,400 dosage units of | |
| | 113:14 hydrocodone during this 11-day period, from | |
| | 113:15 McKesson, right? | |
| 113:19 - 113:24 | **Hilliard, Gary 01-10-2019 (00:00:11)** | GH07.74 |
| | 113:19   Q. That's what the letter states. | |
| | 113:20   A. That's what the letter states. | |
| | 113:21   Q. The letter also states that | |
| | 113:22 Avee Pharmacy received 220,200 dosage units | |
| | 113:23 of hydrocodone from McKesson in this 11-day | |
| | 113:24 period, right? | |
| 114:03 - 114:07 | **Hilliard, Gary 01-10-2019 (00:00:11)** | GH07.75 |
| | 114:3   Q. That's what the letter states. | |
| | 114:4   A. That's what the letter states. | |
| | 114:5   Q. The letter also states that | |
| | 114:6 Medipharm Rx received 500,900 dosage units of | |
| | 114:7 hydrocodone in 11 days from McKesson, right? | |
| 114:10 - 114:14 | **Hilliard, Gary 01-10-2019 (00:00:11)** | GH07.76 |
| | 114:10   A. That's what the letter states. | |
| | 114:11 QUESTIONS BY MR. BOGLE: | |
| | 114:12   Q. And finally, Accumed Pharmacy | |
| | 114:13 received 404,400 dosage units of hydrocodone | |
| | 114:14 from McKesson in 11 days, right? | |
| 114:17 - 115:09 | **Hilliard, Gary 01-10-2019 (00:00:42)** | GH07.77 |
| | 114:17   A. That's what the letter states. | |
| | 114:18 QUESTIONS BY MR. BOGLE: | |
| | 114:19   Q. It continues thereafter and | |
| | 114:20 says:  Mr. Rannazzisi then addressed the | |

| GH07-Hillliard, Gary - Plaintiffs' Submission | |
| --- | --- |

| Page/Line | Source | ID |
| --- | --- | --- |
| | 114:21 representatives of McKesson Corp. and | |
| | 114:22 informed them that it was his concerted | |
| | 114:23 opinion based on the information presented, | |
| | 114:24 the DEA needed to ask for the surrender of | |
| | 114:25 McKesson's Lakeland Distribution Center | |
| | 115:1 registration or DEA would pursue an Order to | |
| | 115:2 Show Cause against the DEA registration of | |
| | 115:3 the McKesson facility in Lakeland, Florida. | |
| | 115:4 Do you see that? | |
| | 115:5   A. Yes, I see that. | |
| | 115:6   Q. So having a DEA registration | |
| | 115:7 surrendered or having an Order to Show Cause | |
| | 115:8 brought against a distribution center, those | |
| | 115:9 are serious enforcement actions, right? | |
| 115:12 - 117:06 | **Hilliard, Gary 01-10-2019 (00:01:39)** | **GH07.78** |
| | 115:12   A. They are serious. | |
| | 115:13 QUESTIONS BY MR. BOGLE: | |
| | 115:14   Q. Okay.  And in fact, the DEA did | |
| | 115:15 file for an Order to Show Cause against | |
| | 115:16 Lakeland after this point in time, right? | |
| | 115:17   A. Yes, they did. | |
| | 115:18   Q. Okay.  Continuing on down in | |
| | 115:19 this letter, I'm skipping that paragraph and | |
| | 115:20 going to the next one that says, "Through the | |
| | 115:21 course of the above." | |
| | 115:22 Do you see that? | |
| | 115:23   A. Yes, I see that. | |
| | 115:24   Q. It says:  Through the course of | |
| | 115:25 the above discussion, McKesson Corp., by | |
| | 116:1 their own admission, was unable to provide a | |
| | 116:2 plausible explanation for the sale of over | |
| | 116:3 2 million dosage units of hydrocodone in a | |
| | 116:4 21-day period to pharmacies previously | |
| | 116:5 identified by DEA to McKesson Corp. | |
| | 116:6 Do you see that? | |
| | 116:7   A. Yes, I see that. | |
| | 116:8   Q. Okay.  And then the last | |
| | 116:9 paragraph on the bottom of this page | |
| | 116:10 references you and says:  After the | |
| | 116:11 conclusion of this meeting, it was learned | |

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

116:12 from Gary Hilliard of McKesson Corp. that one
116:13 of the reasons they were not able to realize
116:14 the full volume of hydrocodone product going
116:15 out to the Florida pharmacies was that their
116:16 reports only included the name brand
116:17 hydrocodone products distributed and was
116:18 not -- and was leaving out the generic
116:19 products.  It was only after realizing that
116:20 the generic were not being reported was
116:21 McKesson Corp. then able to see the large
116:22 quantities that DEA was bringing to
116:23 McKesson's attention.
116:24 Do you see that?
116:25   A. Yes, I see that.
117:1   Q. Okay.  And you recall making
117:2 that statement to somebody at the DEA that
117:3 after the meeting, you recognized that the
117:4 reports you guys ran to track controlled
117:5 substances purchases like this weren't
117:6 picking up the generic products?

| 117:09 - 117:09 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.79** |

117:9   A. That's my recollection.

| 117:19 - 117:23 | **Hilliard, Gary 01-10-2019 (00:00:11)** | **GH07.80** |

117:19   Q. Okay.  So was the report for
117:20 these pharmacies in Florida run any
117:21 differently than the reports for any other
117:22 pharmacies around the country in tracking
117:23 hydrocodone purchases?

| 118:01 - 118:01 | **Hilliard, Gary 01-10-2019 (00:00:01)** | **GH07.81** |

118:1   A. I don't recall.

| 118:03 - 118:04 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.82** |

118:3   Q. You were responsible for the
118:4 reports at that time, right?

| 118:07 - 118:11 | **Hilliard, Gary 01-10-2019 (00:00:17)** | **GH07.83** |

118:7   A. No, I did not generate the
118:8 reports.  Again, the DC manager would have
118:9 these reports and it would be utilized -- Don
118:10 Walker may have looked at them at that point
118:11 in time.  I just don't really know.

| 122:05 - 122:06 | **Hilliard, Gary 01-10-2019 (00:00:04)** | **GH07.84** |

| Page/Line | Source | ID |
|---|---|---|
| | 122:5   Q. I'm asking if you can make that | |
| | 122:6 statement today, not whether you recall then. | |
| 122:09 - 122:10 | **Hilliard, Gary 01-10-2019 (00:00:01)** | **GH07.283** |
| | 122:9   Q. I don't think you're answering | |
| | 122:10 my question. | |
| 122:12 - 122:18 | **Hilliard, Gary 01-10-2019 (00:00:18)** | **GH07.85** |
| | 122:12   A. What I'm answering is, I don't | |
| | 122:13 recall the reports, the detail of the report | |
| | 122:14 or how the report was used.  I recall that | |
| | 122:15 there was an issue with the report that it | |
| | 122:16 didn't contain all the SKU numbers, and | |
| | 122:17 particularly for the generic items.  And when | |
| | 122:18 we identified that, we corrected it. | |
| 122:20 - 122:24 | **Hilliard, Gary 01-10-2019 (00:00:13)** | **GH07.86** |
| | 122:20   Q. Okay.  So can you provide any | |
| | 122:21 specific reassurance that any reports | |
| | 122:22 generated prior to the date when you did this | |
| | 122:23 investigation in early 2006 did not suffer | |
| | 122:24 from the same flaw? | |
| 123:03 - 123:03 | **Hilliard, Gary 01-10-2019 (00:00:01)** | **GH07.87** |
| | 123:3   A. I don't recall. | |
| 123:05 - 123:07 | **Hilliard, Gary 01-10-2019 (00:00:05)** | **GH07.88** |
| | 123:5   Q. Okay.  So -- and if you could | |
| | 123:6 provide such reassurance, you would, right? | |
| | 123:7   A. That's correct. | |
| 129:07 - 129:10 | **Hilliard, Gary 01-10-2019 (00:00:12)** | **GH07.89** |
| | 129:7   Q. Okay.  Well, you do know that | |
| | 129:8 you personally were listed as a potential | |
| | 129:9 witness in this proceeding, right? | |
| | 129:10   A. Yes, I was listed. | |
| 123:22 - 123:24 | **Hilliard, Gary 01-10-2019 (00:00:12)** | **GH07.90** |
| | 123:22   Q. I'm handing you | |
| | 123:23 what I'm marking as Exhibit 6, which is | |
| | 123:24 1.1943, MCKMDL00496306. | |
| 124:03 - 124:09 | **Hilliard, Gary 01-10-2019 (00:00:18)** | **GH07.91** |
| | 124:3   Q. Okay, Mr. Hilliard, just to | |
| | 124:4 generally orient you here, this was produced | |
| | 124:5 to us by McKesson in this litigation and is a | |
| | 124:6 listing of all the pleadings for the Order to | |
| | 124:7 Show Cause proceeding with Lakeland | |

**GH07-Hillliard, Gary - Plaintiffs' Submission**

| | GH07-Hillliard, Gary - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  |  |
|---|---|---|
| | 124:8 Distribution Center.  Okay? | |
| | 124:9  A. Okay. | |
| 130:18 - 130:22 | **Hilliard, Gary 01-10-2019 (00:00:15)** | **GH07.92** |
| | 130:18  Q. Okay.  And then what follows | |
| | 130:19 is, as McKesson's counsel filed it, the | |
| | 130:20 proposed testimony for each of these | |
| | 130:21 witnesses.  So I want to look at the proposed | |
| | 130:22 testimony for you, which starts on page 6364. | |
| 130:23 - 131:02 | **Hilliard, Gary 01-10-2019 (00:00:05)** | **GH07.93** |
| | 130:23 You see there three-quarters of | |
| | 130:24 the way down the page, it says "Proposed | |
| | 130:25 Testimony of Gary Hilliard." | |
| | 131:1 You see that? | |
| | 131:2  A. I see that. | |
| 133:08 - 133:09 | **Hilliard, Gary 01-10-2019 (00:00:09)** | **GH07.94** |
| | 133:8  Q. All right.  So now let's go to | |
| | 133:9 page 6370 in this document.  It's still part | |
| 133:10 - 133:19 | **Hilliard, Gary 01-10-2019 (00:00:22)** | **GH07.95** |
| | 133:10 of your testimony, proposed testimony. | |
| | 133:11 The last paragraph reads: | |
| | 133:12 Mr. Hilliard will testify that McKesson did | |
| | 133:13 not immediately focus on Florida pharmacies | |
| | 133:14 after the September 1, 2005 meeting because | |
| | 133:15 it appeared from the data provided to | |
| | 133:16 McKesson that Colorado was the immediate | |
| | 133:17 problem. | |
| | 133:18 Do you see that statement? | |
| | 133:19  A. Yes, I see that. | |
| 134:06 - 134:09 | **Hilliard, Gary 01-10-2019 (00:00:10)** | **GH07.96** |
| | 134:6  Q. Okay.  So I'm asking, this | |
| | 134:7 statement here that proposed testimony for | |
| | 134:8 you at this hearing, is that accurate?  Would | |
| | 134:9 you have said that on the stand? | |
| 134:12 - 134:17 | **Hilliard, Gary 01-10-2019 (00:00:17)** | **GH07.97** |
| | 134:12  A. I didn't prepare this or | |
| | 134:13 have -- I don't recall having any | |
| | 134:14 conversations with Mr. Gilbert or my superior | |
| | 134:15 on this, so I don't recall having any | |
| | 134:16 agreement that this is what I would have | |
| | 134:17 stated on the stand. | |

| Page/Line | Source | ID |
|---|---|---|
| | GH07-Hillliard, Gary - Plaintiffs' Submission | |

| Page/Line | Source | ID |
|---|---|---|
| 135:03 - 135:08 | **Hilliard, Gary 01-10-2019 (00:00:11)** | **GH07.98** |
| | 135:3 McKesson did not immediately focus on Florida | |
| | 135:4 pharmacies after the September 1, 2005 | |
| | 135:5 meeting because it appeared from the data | |
| | 135:6 provided to McKesson that Colorado was the | |
| | 135:7 immediate problem?  Is that a true statement | |
| | 135:8 in your mind? | |
| 135:11 - 135:11 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.99** |
| | 135:11   A. I don't recall. | |
| 136:23 - 137:17 | **Hilliard, Gary 01-10-2019 (00:00:36)** | **GH07.100** |
| | 136:23   Q. Let me ask you this:  You can | |
| | 136:24 read the statement now, right? | |
| | 136:25   A. Correct. | |
| | 137:1   Q. And you have read the statement | |
| | 137:2 now, right? | |
| | 137:3   A. Correct. | |
| | 137:4   Q. Do you need more time to read | |
| | 137:5 it now? | |
| | 137:6   A. No. | |
| | 137:7   Q. Okay.  Is there anything about | |
| | 137:8 this sentence that I read to you, which | |
| | 137:9 states:  Mr. Hilliard will testify that | |
| | 137:10 McKesson did not immediately focus on Florida | |
| | 137:11 pharmacies after the September 1, 2005 | |
| | 137:12 meeting because it appeared from the data | |
| | 137:13 provided to McKesson that Colorado was the | |
| | 137:14 immediate problem, that statement, anything | |
| | 137:15 about that statement as you sit here today | |
| | 137:16 that you're willing to stand up and say | |
| | 137:17 that's not true? | |
| 137:20 - 138:03 | **Hilliard, Gary 01-10-2019 (00:00:23)** | **GH07.101** |
| | 137:20   A. I don't recall enough about the | |
| | 137:21 minute details of which steps we took at that | |
| | 137:22 time to comment in depth on this. | |
| | 137:23 QUESTIONS BY MR. BOGLE: | |
| | 137:24   Q. Sir, you say "minute details." | |
| | 137:25 I mean, this is more than 2 million doses of | |
| | 138:1 hydrocodone in 11 days.  Is that a minute | |
| | 138:2 detail to you, whether you'd investigate that | |
| | 138:3 promptly? | |

| | | |
|---|---|---|
| **GH07-Hillliard, Gary - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

138:07 - 138:09     **Hilliard, Gary 01-10-2019 (00:00:03)**     **GH07.102**

138:7   Q. I'm a little confused by that
138:8 statement, sir.  Is that a minute detail to
138:9 you?

138:12 - 138:15     **Hilliard, Gary 01-10-2019 (00:00:13)**     **GH07.103**

138:12   A. So which -- the exact which
138:13 step was taken before the second step, I
138:14 don't have that recollection of what pharmacy
138:15 was looked at prior to another pharmacy.

162:20 - 163:10     **Hilliard, Gary 01-10-2019 (00:00:33)**     **GH07.104**

162:20   Q. All right, Mr. Hilliard, I want
162:21 to shift gears to a different topic here with
162:22 you.  We talked a little bit earlier just
162:23 briefly about the DU45 report.
162:24 Do you recall that discussion
162:25 generally?
163:1   A. Yes.
163:2   Q. Okay.  And also talked a little
163:3 bit about Section 55 generally.
163:4 Do you recall that discussion?
163:5   A. Yes.
163:6   Q. Okay.  So Section 55 was the
163:7 standard operating procedure that was in
163:8 place when you joined McKesson that was meant
163:9 to be the Suspicious Order Monitoring Program
163:10 for the company.  True?

163:13 - 164:01     **Hilliard, Gary 01-10-2019 (00:00:25)**     **GH07.105**

163:13   A. There was a section within
163:14 Section 55 that contained that type of
163:15 information.
163:16 QUESTIONS BY MR. BOGLE:
163:17   Q. Okay.  So it was included
163:18 within Section 55.  True?
163:19   A. Correct.
163:20   Q. Okay.  I think you told me, I
163:21 just want to make sure I understand.  When
163:22 you joined the company in 1997, Section 55,
163:23 and specifically the components with the
163:24 suspicious order monitoring provisions, were
163:25 already in place.  True?

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
|---|---|---|
| | 164:1   A. Correct. | |
| 164:07 - 164:13 | **Hilliard, Gary 01-10-2019 (00:00:18)** | **GH07.284** |
| | 164:7   Q. Okay.  I'll take a look at a | |
| | 164:8 few components of Section 55 here.  So I'm | |
| | 164:9 going to hand you what I'm marking as | |
| | 164:10 Exhibit 9, which is 1.1555.  The Bates number | |
| | 164:11 is MCKMDL00346554. | |
| | 164:12 (McKesson-Hilliard Exhibit 9 | |
| | 164:13 was marked for identification.) | |
| 165:17 - 166:08 | **Hilliard, Gary 01-10-2019 (00:00:38)** | **GH07.106** |
| | 165:17   Q. Okay.  So this section here | |
| | 165:18 talks about the daily version of the DU45 | |
| | 165:19 report.  True? | |
| | 165:20   A. Yes. | |
| | 165:21   Q. Okay.  And if you go down to | |
| | 165:22 the next paragraph, it says:  The same | |
| | 165:23 factors that are used for the Customer Recap | |
| | 165:24 Variance -- and then it gives a description | |
| | 165:25 of the report -- are also used for the Daily | |
| | 166:1 Controlled Substance Suspicious Order Warning | |
| | 166:2 Report. | |
| | 166:3 Then it says:  3X monthly | |
| | 166:4 average for Schedule II and Schedule III | |
| | 166:5 reportables and 8X/monthly averages for | |
| | 166:6 IIIN-V. | |
| | 166:7 Do you see that? | |
| | 166:8   A. Yes, I see that. | |
| 166:09 - 166:17 | **Hilliard, Gary 01-10-2019 (00:00:26)** | **GH07.107** |
| | 166:9   Q. Okay.  So I want to break that | |
| | 166:10 down and make sure it's clear on what that | |
| | 166:11 means.  So both for the DU45 reports run | |
| | 166:12 daily and monthly, an order would appear on | |
| | 166:13 the report for any controlled substance | |
| | 166:14 that's in Schedule II or Schedule III if the | |
| | 166:15 order was three times the average for | |
| | 166:16 customers of McKesson for that product. | |
| | 166:17 True? | |
| 166:20 - 167:11 | **Hilliard, Gary 01-10-2019 (00:00:42)** | **GH07.108** |
| | 166:20   A. It was three times the monthly | |
| | 166:21 average for 12-month sales and it was for | |

| Page/Line | Source | ID |
|---|---|---|

GH07-Hillliard, Gary - Plaintiffs' Submission

166:22 Schedule II and III narcotics.

166:23 QUESTIONS BY MR. BOGLE:

166:24   Q. Okay.  So included within that

166:25 would be opioids, right?

167:1   A. Correct.

167:2   Q. Okay.  So you said a 12-month

167:3 history, so let's talk about how that worked.

167:4 Was it a 12-month same customer history that

167:5 this number would be derived from?

167:6   A. Yes, that's correct.

167:7   Q. Okay.  So, for example, you

167:8 would look at the 12 months for X pharmacy,

167:9 the prior 12 months, and you would do what

167:10 with that data to determine how the three

167:11 times average would be generated?

**167:15 - 167:25**   **Hilliard, Gary 01-10-2019 (00:00:31)**   GH07.109

167:15   Q. Walk me through that process.

167:16   A. The system is taking 12 months'

167:17 worth of sales history based on that item and

167:18 then adds a factor of three times, I'm sorry,

167:19 three times the average, and if the orders

167:20 exceed that threshold then it shows up on the

167:21 report.

167:22   Q. Okay.  And so an average is

167:23 generated from the prior 12 months.  Does

167:24 that roll over every month so it's looking at

167:25 a new 12-month period?

**168:03 - 168:18**   **Hilliard, Gary 01-10-2019 (00:00:33)**   GH07.110

168:3   A. As I recall, it's a rolling

168:4 12-month period.

168:5 QUESTIONS BY MR. BOGLE:

168:6   Q. Right.  So we'll walk through

168:7 this just to make sure it's clear.  So let's

168:8 say, for example, we're in February 2007.

168:9 The prior 12 months' data that would be

168:10 looked at for February 2007 would be the 12

168:11 months prior to that month.  True?

168:12   A. Correct.

168:13   Q. Okay.  So, for example, when

168:14 you go to March 2007, that would then include

| Page/Line | Source | ID |
|---|---|---|
| | 168:15 the February 2007 data and the first month | |
| | 168:16 from the prior 12 months would drop off the | |
| | 168:17 analysis.  True? | |
| | 168:18   A. I believe that to be correct. | |
| 168:19 - 169:04 | **Hilliard, Gary 01-10-2019 (00:00:27)** | GH07.111 |
| | 168:19   Q. Okay.  So if a customer's | |
| | 168:20 orders for a given month did not exceed three | |
| | 168:21 times their prior 12-month average, they | |
| | 168:22 would not appear on the DU45 report.  True? | |
| | 168:23   A. That's correct. | |
| | 168:24   Q. Okay.  Were there any other | |
| | 168:25 calculations that went into the DU45 report | |
| | 169:1 other than the prior 12 months' average and | |
| | 169:2 looking at three times that average, if it | |
| | 169:3 hits that, it gets kicked to the report?  Any | |
| | 169:4 other variables? | |
| 169:07 - 169:07 | **Hilliard, Gary 01-10-2019 (00:00:02)** | GH07.112 |
| | 169:7   A. Not to my knowledge. | |
| 169:08 - 169:13 | **Hilliard, Gary 01-10-2019 (00:00:12)** | GH07.113 |
| | 169:8 QUESTIONS BY MR. BOGLE: | |
| | 169:9   Q. Okay.  All right.  I want to | |
| | 169:10 look at a DU45 report that was produced to | |
| | 169:11 us.  You may want to keep this exhibit kind | |
| | 169:12 of just near you, but I want to look at a | |
| | 169:13 sample DU45 with you. | |
| 169:14 - 169:16 | **Hilliard, Gary 01-10-2019 (00:00:13)** | GH07.114 |
| | 169:14 All right.  I'm going to hand | |
| | 169:15 you what I'm marking as Exhibit 10, which is | |
| | 169:16 1.2100.  Bates number is MCKMDL00660789. | |
| 169:23 - 171:02 | **Hilliard, Gary 01-10-2019 (00:01:16)** | GH07.115 |
| | 169:23 Okay.  And what I've handed | |
| | 169:24 you, Mr. Hilliard, I'll represent to you was | |
| | 169:25 produced to us as part of this litigation as | |
| | 170:1 being a DU45 report from -- I believe it's | |
| | 170:2 the Oklahoma City distribution center.  I | |
| | 170:3 think you can determine that on the second | |
| | 170:4 page of the document, that that's the | |
| | 170:5 distribution center this pertains to.  Let me | |
| | 170:6 know if you disagree with that. | |
| | 170:7   A. Yes.  This does appear to come | |

| | | |
|---|---|---|
| **GH07-Hillliard, Gary - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

170:8 from the Oklahoma City distribution center.
170:9   Q. Okay.  And going back to the
170:10 first page, this is noted to be a monthly
170:11 report that I'm showing you here, right?
170:12   A. That is correct.
170:13   Q. Okay.  And it's dated
170:14 April 3rd, 2007.  That's the date on the
170:15 first page, right?
170:16   A. That's what's stated on the
170:17 first page.
170:18   Q. Okay.  So you obviously have an
170:19 understanding and knowledge of DU45 reports.
170:20 Is what I'm showing you here consistent with
170:21 what a DU45 report would look like, a monthly
170:22 report?
170:23   A. Yes.
170:24   Q. Okay.  Now, these would -- so
170:25 this would be submitted to the DEA on a
171:1 monthly basis, correct?  This version.
171:2   A. That's correct.

**171:06 - 171:10**   **Hilliard, Gary 01-10-2019 (00:00:21)**   **GH07.116**

171:6   Q. And just looking, for example,
171:7 at a few of these pages, I'm looking at the
171:8 second page, which is Bates ending 0790,
171:9 there's three fentanyl orders listed here for
171:10 this customer, right?

**171:13 - 171:16**   **Hilliard, Gary 01-10-2019 (00:00:05)**   **GH07.117**

171:13   A. Fentanyl is listed here, yes.
171:14 QUESTIONS BY MR. BOGLE:
171:15   Q. Okay.  Fentanyl being an opioid
171:16 product, right?

**171:19 - 172:08**   **Hilliard, Gary 01-10-2019 (00:00:39)**   **GH07.118**

171:19   A. Yes, it is.
171:20 QUESTIONS BY MR. BOGLE:
171:21   Q. Okay.  And go to the next page,
171:22 for example, there's an order listed for this
171:23 customer for oxycodone, an oxycodone
171:24 combination product, right?
171:25   A. That's what's stated, yes.
172:1   Q. Okay.  Again, another opioid,

| Page/Line | Source | ID |
|---|---|---|
| | 172:2 right? | |
| | 172:3   A. Yes, that's correct. | |
| | 172:4   Q. Okay.  If you flip over to the | |
| | 172:5 next page, Bates page ending 0792, there are | |
| | 172:6 what I count to be 11 separate orders here | |
| | 172:7 for this customer, again, all for various | |
| | 172:8 opioid products, right? | |
| 172:11 - 173:01 | **Hilliard, Gary 01-10-2019 (00:00:50)** | GH07.119 |
| | 172:11   A. That is what's listed here. | |
| | 172:12 QUESTIONS BY MR. BOGLE: | |
| | 172:13   Q. Okay.  And I'm not going | |
| | 172:14 through every page here, but just one more | |
| | 172:15 just to show you. | |
| | 172:16 Page 0793, for this customer, | |
| | 172:17 there are -- looks like nine different orders | |
| | 172:18 for either hydrocodone or oxycodone listed | |
| | 172:19 here, right? | |
| | 172:20   A. That is what's listed. | |
| | 172:21   Q. Okay.  And so what's listed in | |
| | 172:22 this report, for example, at this time | |
| | 172:23 period, April 2007, would have been orders | |
| | 172:24 that were placed by a customer, filled by | |
| | 172:25 McKesson, and then appeared on this report | |
| | 173:1 thereafter and sent to the DEA, right? | |
| 173:04 - 173:10 | **Hilliard, Gary 01-10-2019 (00:00:07)** | GH07.120 |
| | 173:4   A. That would have been the | |
| | 173:5 process. | |
| | 173:6 QUESTIONS BY MR. BOGLE: | |
| | 173:7   Q. Right.  Because these are all | |
| | 173:8 sales.  This product was provided to the | |
| | 173:9 customers, right?  Everything listed in this | |
| | 173:10 report. | |
| 173:13 - 173:17 | **Hilliard, Gary 01-10-2019 (00:00:08)** | GH07.121 |
| | 173:13   A. That is my recollection. | |
| | 173:14 QUESTIONS BY MR. BOGLE: | |
| | 173:15   Q. Right.  So the DU45 report is | |
| | 173:16 listing sales, not just the order prior to | |
| | 173:17 the sale, right? | |
| 173:20 - 173:21 | **Hilliard, Gary 01-10-2019 (00:00:03)** | GH07.122 |
| | 173:20   A. My recollection is it contains | |

| | GH07-Hillliard, Gary - Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

173:21 the sales.

| 174:24 - 175:04 | **Hilliard, Gary 01-10-2019 (00:00:14)** | **GH07.123** |

174:24   Q. But what the whole
174:25 purpose of this was, you're providing 600 --
175:1 in this instance, 600-plus pages to the DEA
175:2 for this month of suspicious controlled
175:3 substance sales that McKesson had made from
175:4 the prior month, right?

| 175:07 - 175:10 | **Hilliard, Gary 01-10-2019 (00:00:12)** | **GH07.124** |

175:7   A. They were submitted for DEA to
175:8 review.  The report is titled "suspicious"
175:9 but it's orders that need to be reviewed and
175:10 they were supplied to DEA for review.

| 175:12 - 175:18 | **Hilliard, Gary 01-10-2019 (00:00:15)** | **GH07.125** |

175:12   Q. Okay.  So let me make sure I
175:13 understand that.  So when these reports would
175:14 have been submitted to the DEA, it was not
175:15 the intent of the regulatory department for
175:16 the conclusion to be drawn that McKesson
175:17 believed these were suspicious orders.  Is
175:18 that true?

| 175:21 - 176:04 | **Hilliard, Gary 01-10-2019 (00:00:29)** | **GH07.126** |

175:21   A. This was part of the Suspicious
175:22 Order Task Force.  This was the format for
175:23 which industry came to the conclusion to
175:24 provide this information to the DEA and DEA
175:25 was good with it.  There was DEA inspections
176:1 that had occurred in our facilities and there
176:2 was never an issue with that.  So this is the
176:3 format for which the original documentation
176:4 was supplied to DEA.

| 176:08 - 176:16 | **Hilliard, Gary 01-10-2019 (00:00:21)** | **GH07.127** |

176:8   Q. My question was simply that
176:9 during the time that you were with McKesson
176:10 in the regulatory department, was it your
176:11 understanding that the intent was when a DU45
176:12 report like the one we're looking at here was
176:13 supplied to the DEA, was that -- was that
176:14 intended to or not intended to be what
176:15 McKesson deemed to be suspicious orders from

| Page/Line | Source | ID |
|---|---|---|
| | 176:16 the prior month? | |
| 176:20 - 176:22 | **Hilliard, Gary 01-10-2019 (00:00:08)** | **GH07.128** |
| | 176:20   A. Yeah.  Again, it was -- this is | |
| | 176:21 what needed to be reviewed.  This was not | |
| | 176:22 specifically a suspicious order. | |
| 178:20 - 178:25 | **Hilliard, Gary 01-10-2019 (00:00:16)** | **GH07.129** |
| | 178:20   Q. Okay.  And so what's noted in a | |
| | 178:21 report like the one we're looking at here at | |
| | 178:22 Exhibit 10, was any sort of further | |
| | 178:23 investigation done by McKesson to determine | |
| | 178:24 if the orders were truly suspicious versus | |
| | 178:25 just meeting this algorithm? | |
| 179:03 - 179:11 | **Hilliard, Gary 01-10-2019 (00:00:24)** | **GH07.130** |
| | 179:3   A. There was a due diligence | |
| | 179:4 process, so nightly a supervisor would review | |
| | 179:5 the nightly report.  If they identified a | |
| | 179:6 particular order, then it would be reviewed. | |
| | 179:7 The customer would be contacted, ask them if | |
| | 179:8 they, you know, made a mistake in this order, | |
| | 179:9 did they intend to place this order.  So | |
| | 179:10 additional due diligence could be followed | |
| | 179:11 up. | |
| 180:17 - 180:21 | **Hilliard, Gary 01-10-2019 (00:00:11)** | **GH07.131** |
| | 180:17   Q. Would -- during the time the | |
| | 180:18 DU45s were utilized, was there a separate | |
| | 180:19 reporting process for true suspicious orders | |
| | 180:20 that were identified outside of just this | |
| | 180:21 meeting this algorithm in the DU45? | |
| 180:25 - 181:03 | **Hilliard, Gary 01-10-2019 (00:00:10)** | **GH07.132** |
| | 180:25   A. If the DCM -- if something was | |
| | 181:1 identified and DCM felt that there was an | |
| | 181:2 issue with it, then they would contact their | |
| | 181:3 local DEA office. | |
| 181:05 - 181:07 | **Hilliard, Gary 01-10-2019 (00:00:06)** | **GH07.133** |
| | 181:5   Q. Okay. | |
| | 181:6   A. And there was a notification | |
| | 181:7 log that they would fill out. | |
| 182:21 - 183:02 | **Hilliard, Gary 01-10-2019 (00:00:20)** | **GH07.134** |
| | 182:21   Q. Okay.  And again, we're looking | |
| | 182:22 at a report here from 2007.  You're aware | |

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

182:23 that in that same year, in 2007, the DEA made
182:24 clear that the DU45 reports, in their view,
182:25 were not sufficient to satisfy suspicious
183:1 order monitoring and reporting requirements,
183:2 right?

183:06 - 183:16   **Hilliard, Gary 01-10-2019 (00:00:34)**   GH07.135

183:6   A. There were comments -- there
183:7 were times where the DEA would tell us to
183:8 stop faxing the reports.  They were
183:9 frustrated with the frequency and size of the
183:10 reports that would come in and asked us to
183:11 stop clogging up the fax machines, and since
183:12 it was part of the SOP which was based off
183:13 the original Suspicious Order Task Force
183:14 agreement, we would have to try to get
183:15 something in writing or document something in
183:16 order to stop those fax communications.

183:18 - 184:01   **Hilliard, Gary 01-10-2019 (00:00:19)**   GH07.136

183:18   Q. So when you received
183:19 communications from the DEA that these were,
183:20 I guess, basically too large and clogging up
183:21 the fax machines, was there any response from
183:22 anybody at regulatory at McKesson saying,
183:23 "Hey, we can filter this down to something
183:24 smaller to make it easier for you to review,
183:25 do some more due diligence before we dump
184:1 this on you"?

184:04 - 184:09   **Hilliard, Gary 01-10-2019 (00:00:15)**   GH07.137

184:4   A. The nightly review or if
184:5 something came up on the nightly reviews,
184:6 then those would still be faxed if there was
184:7 a concern with an order.  Those would be
184:8 addressed with the DEA and typically a DCM
184:9 would contact DEA to discuss that.

184:11 - 184:18   **Hilliard, Gary 01-10-2019 (00:00:16)**   GH07.138

184:11   Q. Yeah, but I guess what I'm
184:12 asking is different than that.  So do you
184:13 recall at any point in time anyone at the
184:14 regulatory department at McKesson, when they
184:15 received that sort of feedback from DEA,

| Page/Line | Source | ID |
|---|---|---|
| | 184:16 saying, "We can filter this down to what we | |
| | 184:17 truly feel is suspicious rather than just | |
| | 184:18 giving you something based on an algorithm"? | |
| 184:22 - 185:11 | **Hilliard, Gary 01-10-2019 (00:00:34)** | **GH07.139** |
| | 184:22   A. Again, it was filtered down by | |
| | 184:23 providing the notations on the reports that | |
| | 184:24 would be reviewed on the daily reports so | |
| | 184:25 that they weren't getting this large volume; | |
| | 185:1 they were getting, you know, an isolated | |
| | 185:2 customer that needed -- that was identified | |
| | 185:3 that needed further review.  So that reduced | |
| | 185:4 the submissions.  They still did, of course, | |
| | 185:5 get the monthly file at the end of the month. | |
| | 185:6 QUESTIONS BY MR. BOGLE: | |
| | 185:7   Q. Okay.  And so, again, to the | |
| | 185:8 extent that that was done, that the orders | |
| | 185:9 were individually flagged as suspicious | |
| | 185:10 orders during this time frame, that would | |
| | 185:11 have been documented, right? | |
| 185:14 - 185:15 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.140** |
| | 185:14 QUESTIONS BY MR. BOGLE: | |
| | 185:15   Q. That wasn't done verbally. | |
| 185:18 - 185:25 | **Hilliard, Gary 01-10-2019 (00:00:11)** | **GH07.141** |
| | 185:18 QUESTIONS BY MR. BOGLE: | |
| | 185:19   Q. Was it? | |
| | 185:20   A. I don't recall.  It could have | |
| | 185:21 been done both. | |
| | 185:22   Q. Okay.  But there was a | |
| | 185:23 requirement specifically to document anything | |
| | 185:24 that you deem a suspicious order report when | |
| | 185:25 you sent it to the DEA, right? | |
| 186:03 - 186:05 | **Hilliard, Gary 01-10-2019 (00:00:08)** | **GH07.142** |
| | 186:3   A. I don't know what each of them | |
| | 186:4 did after they conducted that report to the | |
| | 186:5 DEA.  I don't know what they kept on file. | |
| 187:17 - 187:20 | **Hilliard, Gary 01-10-2019 (00:00:15)** | **GH07.143** |
| | 187:17   Q. I'm going to hand you what I'm | |
| | 187:18 marking as Exhibit 1.1823, which is | |
| | 187:19 Exhibit 11 to your deposition, and that's | |
| | 187:20 MCKMDL00574906.  And this is titled Summary | |

**GH07-Hillliard, Gary - Plaintiffs' Submission**

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| 187:21 - 187:22 | **Hilliard, Gary 01-10-2019 (00:00:10)** | **GH07.144** |
| | 187:21 of DEA-HDMA Meeting on Suspicious Orders, | |
| | 187:22 Meeting Date:  September 7, 2007. | |
| 188:20 - 188:21 | **Hilliard, Gary 01-10-2019 (00:00:04)** | **GH07.145** |
| | 188:20   Q. Okay.  And if you go to the | |
| | 188:21 second page of this document, the top bullet | |
| 188:22 - 189:15 | **Hilliard, Gary 01-10-2019 (00:00:46)** | **GH07.146** |
| | 188:22 point says:  DEA also does not want to | |
| | 188:23 receive suspicious order reports that merely | |
| | 188:24 reflect volumes that went over a threshold; | |
| | 188:25 they wanted reports that are "true" | |
| | 189:1 suspicious orders.  Similarly, they do not | |
| | 189:2 want to receive what they called "excessive | |
| | 189:3 purchase" reports which had been used in the | |
| | 189:4 past. | |
| | 189:5 Do you see that? | |
| | 189:6   A. I see that. | |
| | 189:7   Q. Okay.  And were you aware of | |
| | 189:8 this discussion that went on with your trade | |
| | 189:9 association and DEA in September 2007? | |
| | 189:10   A. I recall that there was a | |
| | 189:11 meeting. | |
| | 189:12   Q. Okay.  And so this information | |
| | 189:13 I just read to you about the DEA's | |
| | 189:14 expectations, that would have been conveyed | |
| | 189:15 to you and your regulatory team, right? | |
| 189:18 - 189:19 | **Hilliard, Gary 01-10-2019 (00:00:05)** | **GH07.147** |
| | 189:18   A. I don't recall specifically | |
| | 189:19 receiving it, but it is likely that I did. | |
| 189:25 - 190:04 | **Hilliard, Gary 01-10-2019 (00:00:10)** | **GH07.148** |
| | 189:25 And so what they're referencing | |
| | 190:1 there, that they don't want to receive | |
| | 190:2 suspicious order reports that merely reflect | |
| | 190:3 volumes that went over a threshold, that's | |
| | 190:4 what a DU45 report is, right? | |
| 190:08 - 190:12 | **Hilliard, Gary 01-10-2019 (00:00:15)** | **GH07.149** |
| | 190:8   A. It could be considered that, | |
| | 190:9 but I don't know what all the other members | |
| | 190:10 were considering their reports to be referred | |
| | 190:11 to as excessive purchase or what have you as | |

| Page/Line | Source | ID |
|---|---|---|

| | | |
|---|---|---|
| 190:14 - 190:21 | 190:12 well.  So it's a generalization.<br>**Hilliard, Gary 01-10-2019 (00:00:15)**<br>190:14   Q. Yeah.  I guess what I'm -- I'm<br>190:15 not asking you to speak for other<br>190:16 distributors.  I don't think that's within<br>190:17 your purview and I'm not asking you that.<br>190:18 I'm asking you about McKesson.<br>190:19 So the description that I just<br>190:20 read for you from this bullet point would be<br>190:21 consistent with the DU45 report, right? | **GH07.150** |
| 190:25 - 190:25 | **Hilliard, Gary 01-10-2019 (00:00:01)**<br>190:25   A. I'm not sure. | **GH07.151** |
| 191:02 - 191:07 | **Hilliard, Gary 01-10-2019 (00:00:14)**<br>191:2   Q. Okay.  Well, when you received<br>191:3 this information from your trade association<br>191:4 from this meeting with the DEA, did the<br>191:5 regulatory team at McKesson take this to mean<br>191:6 that the DU45 was not good enough to show<br>191:7 suspicious order reporting? | **GH07.152** |
| 191:11 - 191:19 | **Hilliard, Gary 01-10-2019 (00:00:31)**<br>191:11   A. I don't recall exactly what was<br>191:12 discussed with the regulatory department at<br>191:13 that time.  We were in the processes to<br>191:14 develop new programs, LDMP, in 2007, which<br>191:15 was conducted in addition to the DU45.<br>191:16 So the DU45, I don't remember<br>191:17 when it stopped being completely submitted,<br>191:18 but it was still being submitted and then we<br>191:19 were developing additional programs. | **GH07.153** |
| 193:11 - 193:16 | **Hilliard, Gary 01-10-2019 (00:00:14)**<br>193:11   Q. Okay.  So you don't have an<br>193:12 opinion one way or the other whether the<br>193:13 bullet point we read would indicate to you<br>193:14 today that the DU45 like we just looked at is<br>193:15 not going to be sufficient to report<br>193:16 suspicious orders?  Is that your testimony? | **GH07.154** |
| 193:19 - 193:21 | **Hilliard, Gary 01-10-2019 (00:00:07)**<br>193:19   A. We enhanced what we were<br>193:20 providing by developing new programs.  We<br>193:21 continued to supply this in addition. | **GH07.155** |

| Page/Line | Source | ID |
|---|---|---|
| | **GH07-Hillliard, Gary - Plaintiffs' Submission** | |

| Page/Line | Source | ID |
|---|---|---|
| 194:01 - 194:08 | **Hilliard, Gary 01-10-2019 (00:00:19)** | **GH07.156** |
| | 194:1 What I'm asking you right now | |
| | 194:2 is about the DU45.  As you sit here reading | |
| | 194:3 this today, having worked as a director of | |
| | 194:4 regulatory affairs for 20 years and just | |
| | 194:5 concluded that practice two years ago, do you | |
| | 194:6 read this as you sit here today as being a | |
| | 194:7 clear indication that the DU45 report was not | |
| | 194:8 sufficient to report suspicious orders? | |
| 194:12 - 194:12 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.157** |
| | 194:12   A. I don't know. | |
| 194:16 - 194:21 | **Hilliard, Gary 01-10-2019 (00:00:15)** | **GH07.158** |
| | 194:16 You've been involved in e-mail | |
| | 194:17 discussions while you were at McKesson where | |
| | 194:18 conclusions by other members of the | |
| | 194:19 regulatory team that you were involved in | |
| | 194:20 were that the DU45 was not a suspicious order | |
| | 194:21 report, right? | |
| 195:20 - 195:21 | **Hilliard, Gary 01-10-2019 (00:00:04)** | **GH07.159** |
| | 195:20   Q. So let's start back at the | |
| | 195:21 first e-mail, page .6.  All right.  So the | |
| 194:25 - 195:05 | **Hilliard, Gary 01-10-2019 (00:00:17)** | **GH07.160** |
| | 194:25   Q. Do you recall those | |
| | 195:1 discussions? | |
| | 195:2   A. I don't recall offhand. | |
| | 195:3   Q. Okay.  I'll hand you what I'm | |
| | 195:4 marking as Exhibit 12, which is 1.1667, and | |
| | 195:5 that's MCKMDL00510747. | |
| 195:22 - 198:23 | **Hilliard, Gary 01-10-2019 (00:03:03)** | **GH07.161** |
| | 195:22 bottom e-mail there is from a Tyra Williams | |
| | 195:23 to a Craig Vanderburg, subject:  Variance and | |
| | 195:24 Suspicious Reports, dated December 16, 2010. | |
| | 195:25 Do you see that? | |
| | 196:1   A. I see that. | |
| | 196:2   Q. And the statement there is: | |
| | 196:3 Craig, please do not forget that these | |
| | 196:4 reports must be sent to the State.  We have | |
| | 196:5 not sent the reports for the last 6 months. | |
| | 196:6 Do you see that reference? | |
| | 196:7   A. I see that. | |

| Page/Line | Source | ID |
|-----------|--------|-----|

196:8   Q. Craig Vanderburg, would he have
196:9 been a distribution center manager at this
196:10 time?
196:11   A. That's my recollection.
196:12   Q. All right.  So let's now flip
196:13 over to page .5.  I'm looking at the e-mail
196:14 at the top there from Tom McDonald,
196:15 December 16, 2010, same title.  Mr. McDonald,
196:16 he was in the regulatory department at that
196:17 time, right?
196:18   A. Yes, he was.
196:19   Q. He was another director of
196:20 regulatory affairs, right?
196:21   A. Yes, he was.
196:22   Q. Okay.  He says there:  I don't
196:23 believe you have identified a suspicious
196:24 order or customer within the last six months,
196:25 have you?  It is still part of our process to
197:1 report all suspicious orders to the DEA and
197:2 to the state board when they are discovered.
197:3 Our current process better identifies
197:4 suspicious orders rather than orders of
197:5 interest.  One man's opinion.
197:6 Do you see that?
197:7   A. Yes, I see that.
197:8   Q. Okay.  And then finally, going
197:9 to the e-mail back on the first page by Dave
197:10 Gustin -- now, Dave Gustin is another
197:11 director of regulatory affairs at the time
197:12 the e-mail is sent, February 4, 2011, right?
197:13   A. That is correct.
197:14   Q. Okay.  And as we talked about a
197:15 minute ago, you're involved in the e-mail
197:16 chain at this point as being copied, right?
197:17   A. That's correct.
197:18   Q. Okay.  Here, in the second
197:19 paragraph, he says:  It is my opinion that
197:20 the previous reports were not the exclusive
197:21 and proper response to this regulation.
197:22 And if you look above, the

| Page/Line | Source | ID |
|---|---|---|
| | 197:23 regulation he's citing to is the one about -- | |
| | 197:24 from the Controlled Substances Act about | |
| | 197:25 reporting suspicious orders, right? | |
| | 198:1   A. That's what's listed, yes. | |
| | 198:2   Q. Okay.  Then he says:  We have | |
| | 198:3 an obligation to report "suspicious orders." | |
| | 198:4 With no clear definition of what constitutes | |
| | 198:5 a suspicious order we must rely on our own | |
| | 198:6 judgment as to what it is.  If we report | |
| | 198:7 anything we believe to be truly suspicious we | |
| | 198:8 will be meeting the spirit and letter of the | |
| | 198:9 regulation.  Simply reporting | |
| | 198:10 larger-than-usual orders does not when there | |
| | 198:11 are so many plausible and routine reasons for | |
| | 198:12 orders to be "larger than normal." | |
| | 198:13 And then he lists some reasons. | |
| | 198:14 I would wait until someone | |
| | 198:15 misses the report before seeking someone out | |
| | 198:16 to give them something that I do not agree | |
| | 198:17 meets their needs or requirements. | |
| | 198:18 Do you see that? | |
| | 198:19   A. Yes, I see that. | |
| | 198:20   Q. And a report that simply | |
| | 198:21 orders -- reports orders that are larger than | |
| | 198:22 usual, that's exactly what the DU45 report | |
| | 198:23 is, right? | |
| 199:01 - 199:03 | **Hilliard, Gary 01-10-2019 (00:00:05)** | **GH07.162** |
| | 199:1   A. They're orders that exceed the | |
| | 199:2 threshold based on the parameters of that | |
| | 199:3 report. | |
| 202:02 - 202:06 | **Hilliard, Gary 01-10-2019 (00:00:16)** | **GH07.163** |
| | 202:2   Q. So do you agree or | |
| | 202:3 disagree that simply reporting | |
| | 202:4 larger-than-usual orders does not meet the | |
| | 202:5 suspicious order reporting requirements of | |
| | 202:6 the Controlled Substances Act? | |
| 202:10 - 202:19 | **Hilliard, Gary 01-10-2019 (00:00:34)** | **GH07.164** |
| | 202:10   A. We were providing information | |
| | 202:11 based on what we believed complied with the | |
| | 202:12 CSA and what came out of the Suspicious Order | |

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

202:13 Task Force, and other additional information
202:14 is provided to the DEA to supplement that,
202:15 such as the notations on the report nightly.
202:16 So there is more that goes
202:17 along with that than just this one report
202:18 that has higher-than-threshold levels of
202:19 transactions listed on it.

205:04 - 205:07     **Hilliard, Gary 01-10-2019 (00:00:10)**     **GH07.165**

205:4   Q. Okay.  So the DU45 by itself,
205:5 would you agree, was not sufficient to
205:6 satisfy the suspicious order reporting
205:7 requirements of the CSA?

205:12 - 205:18     **Hilliard, Gary 01-10-2019 (00:00:17)**     **GH07.166**

205:12   A. We provided the information for
205:13 the DU45 based on the Suspicious Order Task
205:14 Force that we believe complied with the CSA.
205:15 We supplemented that with additional
205:16 information that would give better
205:17 information to the DEA through these reports
205:18 and additional reporting tools.

205:22 - 206:03     **Hilliard, Gary 01-10-2019 (00:00:10)**     **GH07.167**

205:22   Q. Okay.  Let me ask it a
205:23 different way.  You've read the six pages of
205:24 e-mails, correct?
205:25   A. That's correct.
206:1   Q. Okay.  And you know that they
206:2 were specifically talking about the DU45
206:3 report, right?

206:07 - 206:08     **Hilliard, Gary 01-10-2019 (00:00:02)**     **GH07.168**

206:7   Q. It's referenced by name, isn't
206:8 it?

206:11 - 207:01     **Hilliard, Gary 01-10-2019 (00:00:38)**     **GH07.169**

206:11   A. I believe it was stated in the
206:12 e-mail trail.
206:13 QUESTIONS BY MR. BOGLE:
206:14   Q. All right.  So now that you
206:15 have a chance to review the full context of
206:16 this entire e-mail chain, do you agree or
206:17 disagree with Mr. Gustin's following
206:18 statement:  Simply reporting

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

206:19 larger-than-usual orders does not, when there
206:20 are so many plausible and routine reasons for
206:21 orders to be larger than normal -- and "does
206:22 not," he's referring to meeting the spirit
206:23 and letter of the regulation for reporting
206:24 suspicious orders.
206:25 Agree or disagree or no opinion
207:1 on Mr. Gustin's statement there?

| 207:04 - 207:05 | **Hilliard, Gary 01-10-2019 (00:00:04)** | **GH07.170** |

207:4   A. I don't have an opinion on
207:5 his -- on his statement.

| 207:19 - 207:21 | **Hilliard, Gary 01-10-2019 (00:00:04)** | **GH07.171** |

207:19 Do you have a specific
207:20 recollection of disagreeing with his e-mail
207:21 in writing?

| 207:24 - 208:01 | **Hilliard, Gary 01-10-2019 (00:00:07)** | **GH07.172** |

207:24   A. I do not have a recollection of
207:25 reviewing this e-mail or making a response to
208:1 the e-mail.

| 208:16 - 209:02 | **Hilliard, Gary 01-10-2019 (00:00:34)** | **GH07.173** |

208:16   Q. All right, Mr. Hilliard.  Just
208:17 to reorient ourselves here, earlier in the
208:18 deposition, you recall discussing with me the
208:19 DEA's investigation of the Lakeland
208:20 distribution center regarding distribution of
208:21 hydrocodone to seven Florida pharmacies?
208:22   A. That's correct.
208:23   Q. Okay.  And you're aware after
208:24 that investigation, the DEA also began
208:25 investigating some other distribution centers
209:1 within McKesson as to their distribution of
209:2 opioids?

| 209:05 - 209:11 | **Hilliard, Gary 01-10-2019 (00:00:12)** | **GH07.174** |

209:5   A. Yes.  There was additional
209:6 investigations.
209:7 QUESTIONS BY MR. BOGLE:
209:8   Q. Okay.  And ultimately those
209:9 investigations culminated in McKesson
209:10 entering into a settlement agreement with the
209:11 DEA in 2008, right?

| | GH07-Hillliard, Gary - Plaintiffs' Submission | |
|---|---|---|
| Page/Line | Source | ID |

| Page/Line | Source | ID |
|---|---|---|
| 212:23 - 212:25 | **Hilliard, Gary 01-10-2019 (00:00:06)** | GH07.175 |
| | 212:23   Q. Then if you see in | |
| | 212:24 section B, and I wasn't going to read this | |
| | 212:25 whole section but you can look at it here for | |
| 213:01 - 213:10 | **Hilliard, Gary 01-10-2019 (00:00:23)** | GH07.176 |
| | 213:1 yourself, this talks about the conduct that | |
| | 213:2 we actually covered for the seven | |
| | 213:3 pharmacies -- seven Florida pharmacies that | |
| | 213:4 were handled by the Lakeland distribution | |
| | 213:5 center, right? | |
| | 213:6   A. Yes.  It's listed here. | |
| | 213:7   Q. And that's the same conduct we | |
| | 213:8 talked about before, right?  That's what they | |
| | 213:9 discuss here. | |
| | 213:10   A. Yes. | |
| 209:14 - 210:08 | **Hilliard, Gary 01-10-2019 (00:00:45)** | GH07.177 |
| | 209:14   A. There was a settlement | |
| | 209:15 agreement in 2008. | |
| | 209:16 QUESTIONS BY MR. BOGLE: | |
| | 209:17   Q. Okay.  And you're aware that | |
| | 209:18 occurred, right?  That a settlement occurred | |
| | 209:19 in 2008? | |
| | 209:20   A. Yes, I am. | |
| | 209:21   Q. Okay.  And you're aware that | |
| | 209:22 settlement pertained to allegations from the | |
| | 209:23 DEA that McKesson violated the Controlled | |
| | 209:24 Substances Act in distributing opioids from | |
| | 209:25 several of its distribution centers, right? | |
| | 210:1   A. Correct. | |
| | 210:2   Q. Okay.  Have you seen the | |
| | 210:3 settlement agreement itself? | |
| | 210:4   A. I have seen it at one time. | |
| | 210:5   Q. Okay.  All right.  I'm going to | |
| | 210:6 hand you what I'm marking as Exhibit 13, | |
| | 210:7 which is also 1.889, and that's | |
| | 210:8 MCKMDL00337001. | |
| 210:12 - 210:12 | **Hilliard, Gary 01-10-2019 (00:00:03)** | GH07.178 |
| | 210:12   Q. Here you go, sir. | |
| 215:01 - 215:06 | **Hilliard, Gary 01-10-2019 (00:00:19)** | GH07.179 |
| | 215:1   Q. Okay.  And as a result of these | |

| Page/Line | Source | ID |
|---|---|---|
| | 215:2 investigations by DEA in 2005 and 2006, in | |
| | 215:3 addition to entering the settlement | |
| | 215:4 agreement, McKesson modified its Suspicious | |
| | 215:5 Order Monitoring Program to shift to the | |
| | 215:6 Lifestyle Drug Monitoring Program, right? | |
| 210:13 - 210:23 | **Hilliard, Gary 01-10-2019 (00:00:24)** | GH07.180 |
| | 210:13 Okay.  What I've just handed | |
| | 210:14 you, Mr. Hilliard, as Exhibit 13 is titled at | |
| | 210:15 the top Settlement and Release Agreement and | |
| | 210:16 Administrative Memorandum Agreement dated in | |
| | 210:17 the first paragraph May 2nd, 2008. | |
| | 210:18 Do you see that? | |
| | 210:19   A. Yes, I see that. | |
| | 210:20   Q. Okay.  And do you recognize | |
| | 210:21 this to be the settlement agreement we just | |
| | 210:22 referenced from 2008? | |
| | 210:23   A. Yes. | |
| 215:09 - 215:10 | **Hilliard, Gary 01-10-2019 (00:00:09)** | GH07.181 |
| | 215:9   A. The Lifestyle Drug Monitoring | |
| | 215:10 Program was developed in the 2007 time frame. | |
| 215:18 - 215:22 | **Hilliard, Gary 01-10-2019 (00:00:19)** | GH07.182 |
| | 215:18 All right.  So I'm going to | |
| | 215:19 hand you what I'm marking as Exhibit 1.1830, | |
| | 215:20 which is Exhibit 14 to your deposition, and | |
| | 215:21 that is, for those keeping track of these | |
| | 215:22 things, MCKMDL00403340. | |
| 216:02 - 216:03 | **Hilliard, Gary 01-10-2019 (00:00:05)** | GH07.183 |
| | 216:2   Q. There's yours, sir, and there's | |
| | 216:3 yours. | |
| 216:04 - 217:10 | **Hilliard, Gary 01-10-2019 (00:01:05)** | GH07.184 |
| | 216:4 All right.  I've handed you a | |
| | 216:5 PowerPoint deck titled Lifestyle Drugs & | |
| | 216:6 Internet Pharmacies. | |
| | 216:7 Do you see that? | |
| | 216:8   A. I see that. | |
| | 216:9   Q. Okay.  And it's noted to be, in | |
| | 216:10 the slide at the far right there, it says | |
| | 216:11 National Operations Conference 2007. | |
| | 216:12 Do you see that reference? | |
| | 216:13   A. I see that. | |

**GH07-Hillliard, Gary - Plaintiffs' Submission**

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

216:14  Q. Okay.  Have you seen this slide
216:15 deck before?
216:16   A. I have seen it before.
216:17   Q. Okay.  And it's noted to be
216:18 created by Donald Walker, who we've talked
216:19 about a little bit earlier, right?
216:20   A. That's correct.
216:21   Q. Okay.  And if you go here to
216:22 page .3, there's a slide on this PowerPoint
216:23 deck titled Public Health Issues.
216:24 Do you see where I'm at?
216:25   A. I see that.
217:1   Q. Okay.  The first bullet point
217:2 there says:  Abuse of prescription drugs has
217:3 risen 66% since 2000.
217:4 Do you see that reference?
217:5   A. I see it.
217:6   Q. And the third bullet point
217:7 says:  Opioid painkillers kill more than
217:8 cocaine and heroin combined.
217:9 Do you see that as well?
217:10   A. I see that.

**217:18 - 218:20**      **Hilliard, Gary 01-10-2019 (00:00:50)**      GH07.185

217:18   Q. And then if we go to the next
217:19 page, page .4, it says DEA Focus is the title
217:20 of this slide.
217:21 Do you see where I'm at?
217:22   A. I see that.
217:23   Q. Okay.  And it says -- you see
217:24 where it says, "DEA expects"?
217:25   A. I see it.
218:1   Q. Under that it says:  We "know
218:2 our customers."
218:3 Do you see that reference?
218:4   A. I see that.
218:5   Q. The Know Your Customer tag line
218:6 here, are you familiar with what that refers
218:7 to?
218:8   A. I am.
218:9   Q. Okay.  What does it refer to?

| Page/Line | Source | ID |
|---|---|---|
| | 218:10   A. Understanding our customers' | |
| | 218:11 business. | |
| | 218:12   Q. Okay.  The second bullet point | |
| | 218:13 says:  Wholesalers accountable for | |
| | 218:14 controlling quantities shipped. | |
| | 218:15 Do you see that reference? | |
| | 218:16   A. I see that. | |
| | 218:17   Q. And the last bullet point says: | |
| | 218:18 5,000 dose units is "average." | |
| | 218:19 Do you see where that's at? | |
| | 218:20   A. I see that. | |
| 219:07 - 219:11 | **Hilliard, Gary 01-10-2019 (00:00:11)** | GH07.186 |
| | 219:7   Q. Okay.  Do you have any | |
| | 219:8 recollection of the 5,000 number being | |
| | 219:9 discussed around this time frame as an | |
| | 219:10 average for controlled substances purchases | |
| | 219:11 for pharmacies? | |
| 219:14 - 220:01 | **Hilliard, Gary 01-10-2019 (00:00:41)** | GH07.187 |
| | 219:14   A. There was comments of the 5,000 | |
| | 219:15 dosage units for the -- for lifestyle drug | |
| | 219:16 controlled substances.  That's the only | |
| | 219:17 reference that I remember for this quantity. | |
| | 219:18 QUESTIONS BY MR. BOGLE: | |
| | 219:19   Q. Okay.  And those would be -- | |
| | 219:20 let me see if I can find it, one second -- | |
| | 219:21 oxycodone, hydrocodone, phentermine and | |
| | 219:22 alprazolam, right? | |
| | 219:23   A. That sounds correct. | |
| | 219:24   Q. And those are the four drugs | |
| | 219:25 that were included in the LDMP, right? | |
| | 220:1   A. That's correct. | |
| 220:16 - 221:13 | **Hilliard, Gary 01-10-2019 (00:00:46)** | GH07.188 |
| | 220:16   Q. And it says:  Establish | |
| | 220:17 threshold for excessive quantities - 8,000 | |
| | 220:18 dose units. | |
| | 220:19 Do you see that reference? | |
| | 220:20   A. I see the reference. | |
| | 220:21   Q. Okay.  Now, I think we talked | |
| | 220:22 about at the beginning of the deposition that | |
| | 220:23 you were actually the drafter of the LDMP, | |

GH07-Hillliard, Gary - Plaintiffs' Submission

| | | |
|---|---|---|
| **GH07-Hillliard, Gary - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

220:24 right?
220:25   A. I helped to draft it.
221:1   Q. Helped draft it.  Okay.
221:2 Who helped you draft it?
221:3   A. I believe Tracy was involved
221:4 with it as well.
221:5   Q. Jonas?
221:6   A. Yeah, sorry, Tracy Jonas.  But
221:7 I don't recall specifically.
221:8   Q. Okay.  Well, let me ask you
221:9 this:  Since you were involved in the
221:10 drafting of the LDMP, why was 8,000 dose
221:11 units set as the threshold for excessive
221:12 quantities in the LDMP?  How was that number
221:13 chosen?

**221:16 - 221:23   Hilliard, Gary 01-10-2019 (00:00:18)**   **GH07.189**

221:16   A. I don't recall how that number
221:17 came about.  This would have been through
221:18 discussions with Don Walker.
221:19 QUESTIONS BY MR. BOGLE:
221:20   Q. Okay.  Because we just saw a
221:21 minute ago another slide where DEA is noting
221:22 5,000 dosage units to be average.  So why not
221:23 just set it at 5,000?

**222:01 - 222:03   Hilliard, Gary 01-10-2019 (00:00:07)**   **GH07.190**

222:1   A. Again, I don't recall how that
222:2 number came about.  This would have gone
222:3 through a directive with Don Walker.

**222:22 - 223:01   Hilliard, Gary 01-10-2019 (00:00:12)**   **GH07.191**

222:22   Q. And then the additional bullet
222:23 point here says, below that:  Thorough due
222:24 diligence of customers exceeding threshold.
222:25 And that was what was intended
223:1 to happen under that program, right?

**223:04 - 223:04   Hilliard, Gary 01-10-2019 (00:00:02)**   **GH07.192**

223:4   A. That's my recollection.

**224:22 - 225:06   Hilliard, Gary 01-10-2019 (00:00:24)**   **GH07.193**

224:22   Q. Okay.  You were actually
224:23 involved in auditing the Lifestyle Drug
224:24 Monitoring Program in 2007, right?

| Page/Line | Source | ID |
|---|---|---|

|  | GH07-Hillliard, Gary - Plaintiffs' Submission |  |

224:25  A. I don't recall specifically
225:1 what was in the audit at that time, but it's
225:2 possible.
225:3  Q. Okay.  And you recall that
225:4 during that 2007 audit process, there were
225:5 some significant shortcomings found with the
225:6 program, right?

| 225:08 - 225:08 | **Hilliard, Gary 01-10-2019 (00:00:01)** | **GH07.194** |

225:8  A. I don't recall.

| 225:12 - 225:14 | **Hilliard, Gary 01-10-2019 (00:00:13)** | **GH07.195** |

225:12  Q. Okay.  I'm going to hand you
225:13 what I'm marking as Exhibit 15, which is
225:14 1.1887, MCKMDL00591949.

| 225:18 - 226:15 | **Hilliard, Gary 01-10-2019 (00:00:55)** | **GH07.196** |

225:18  Q. You'll see this document is
225:19 titled Lifestyle Drug Program, McKesson U.S.
225:20 Pharma - DEA Licensure Audit.
225:21 Do you see that?
225:22  A. I see that.
225:23  Q. Okay.  And you're noted to be
225:24 the process owner here, right?
225:25  A. Yes, I am listed here.
226:1  Q. What does "process owner" mean?
226:2  A. The person to discuss the
226:3 processes around the LDMP.
226:4  Q. Okay.  And the last revised
226:5 date noted on this document is July 27, 2007.
226:6 Do you see that?
226:7  A. Yes, I do.
226:8  Q. Okay.  In the first line there,
226:9 in Overview, it says:  The Lifestyle Drug
226:10 Program is a response to the DEA's
226:11 requirement to monitor the ordering/sales of
226:12 DEA identified "Lifestyle Drugs" and to "know
226:13 our customer."
226:14 Do you see that reference?
226:15  A. I see it.

| 228:01 - 228:02 | **Hilliard, Gary 01-10-2019 (00:00:04)** | **GH07.197** |

228:1  Q. Okay.  So in the last two
228:2 sentences on this page, it says:  The sales

| | | |
|---|---|---|
| **GH07-Hillliard, Gary - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
|---|---|---|
| 228:03 - 229:15 | **Hilliard, Gary 01-10-2019 (00:01:18)** | GH07.198 |

228:3 quantity is measured by dose rather than
228:4 ordering unit and the current volume
228:5 threshold is 8,000 doses.  The threshold was
228:6 determined by the Regulatory Department.
228:7 Do you see that reference?
228:8   A. I see that.
228:9   Q. Okay.  And the regulatory
228:10 department at that time -- there's actually a
228:11 chart there above -- is you, Don Walker,
228:12 Bruce Russell, right?
228:13   A. That's correct.
228:14   Q. Okay.  And as we turn to the
228:15 next page, it says, on the top there, first
228:16 line:  Because the list of products being
228:17 monitored was determined by Business
228:18 Intelligence, it is possible not all products
228:19 containing one of the generic ingredients
228:20 were included.  It is possible that the
228:21 controlled substances being monitored are
228:22 being underreported.
228:23 Do you see that?
228:24   A. I see that.
228:25   Q. Okay.  Do you recall that
229:1 finding --
229:2   A. I do not.
229:3   Q. -- being made?
229:4   A. I do not.
229:5   Q. Okay.  Was any further
229:6 investigation done as to whether in fact
229:7 there was underreporting under the LDMP?
229:8   A. There may have been, but I
229:9 don't recall it.
229:10   Q. Okay.  That's a significant
229:11 issue, though, right?  If there is
229:12 underreporting occurring, then the thresholds
229:13 wouldn't be -- the determination of when
229:14 somebody met a threshold wouldn't be
229:15 accurate, right?

| 229:18 - 229:22 | **Hilliard, Gary 01-10-2019 (00:00:06)** | GH07.199 |

| | | |
|---|---|---|
| **GH07-Hillliard, Gary - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

229:18   A. We want accurate data, so...

229:19 QUESTIONS BY MR. BOGLE:

229:20   Q. Right.  And if there's

229:21 underreporting occurring, the data wouldn't

229:22 be accurate, right?

**229:25 - 230:03**   **Hilliard, Gary 01-10-2019 (00:00:04)**   GH07.200

229:25   A. Yeah.  It's a possibility.

230:1 QUESTIONS BY MR. BOGLE:

230:2   Q. Right.  And that's why it's

230:3 listed here as a possibility, right?

**230:06 - 230:07**   **Hilliard, Gary 01-10-2019 (00:00:03)**   GH07.201

230:6   A. Yeah.  That's what the auditor

230:7 states.

**230:08 - 231:06**   **Hilliard, Gary 01-10-2019 (00:00:53)**   GH07.202

230:8 QUESTIONS BY MR. BOGLE:

230:9   Q. Okay.  And if you'd go to the

230:10 third paragraph on this page, it says:

230:11 Although McKesson typically directs customers

230:12 to order from only one DC, it's possible for

230:13 a customer to order product from multiple

230:14 DCs.  Since the Daily Dosage Summary Report

230:15 is organized by DC, a customer may be on

230:16 multiple DC reports.  In that case, the Data

230:17 Analyst coordinates with the two DCMs to

230:18 determine which will handle the customer

230:19 review.

230:20 On the other hand, situations

230:21 where a customer is using more than one DC

230:22 and the sales of "Lifestyle Drugs" at either

230:23 DC is not greater than 8,000 doses but the

230:24 total sales is greater than 8,000 doses would

230:25 be missed by the current process.

231:1 Additionally, customers with

231:2 multiple accounts at a single DC with

231:3 aggregate sales exceeding the thresholds are

231:4 being missed by the current process.

231:5 Do you see that?

231:6   A. I see that.

**231:07 - 231:13**   **Hilliard, Gary 01-10-2019 (00:00:17)**   GH07.203

231:7   Q. Do you recall this deficiency

| Page/Line | Source | ID |
|---|---|---|
| | 231:8 being pointed out in this audit? | |
| | 231:9   A. I don't recall.  Customers were | |
| | 231:10 assigned to a specific location usually based | |
| | 231:11 on geographic regions, so it would be unusual | |
| | 231:12 if this occurred.  I don't specifically | |
| | 231:13 recall it. | |
| 231:14 - 231:24 | **Hilliard, Gary 01-10-2019 (00:00:20)** | **GH07.204** |
| | 231:14   Q. Okay.  Do you recall any | |
| | 231:15 investigation being done after this to | |
| | 231:16 determine if there were customers that were | |
| | 231:17 being handled by multiple distribution | |
| | 231:18 centers, to address this concern? | |
| | 231:19   A. Not that -- not that I recall. | |
| | 231:20   Q. What about customers with | |
| | 231:21 multiple accounts at one distribution center, | |
| | 231:22 as is outlined here?  Do you recall that | |
| | 231:23 being investigated after this audit? | |
| | 231:24   A. I don't recall. | |
| 232:04 - 232:10 | **Hilliard, Gary 01-10-2019 (00:00:16)** | **GH07.205** |
| | 232:4   A. circumstance where a customer | |
| | 232:5 is being handled by multiple distribution | |
| | 232:6 centers under the Lifestyle Drug Monitoring | |
| | 232:7 Program, if the report is handled by | |
| | 232:8 distribution center, they could exceed the | |
| | 232:9 8,000 threshold without the company knowing | |
| | 232:10 it, right? | |
| 232:13 - 232:20 | **Hilliard, Gary 01-10-2019 (00:00:21)** | **GH07.206** |
| | 232:13  A. There could be other analytical | |
| | 232:14 tools that were being used in addition to | |
| | 232:15 this.  So, again, I wasn't familiar -- I | |
| | 232:16 don't remember this occurring because | |
| | 232:17 customers were assigned to a geographic | |
| | 232:18 region, assigned to a distribution center. | |
| | 232:19 So I don't specifically | |
| | 232:20 remember this scenario. | |
| 233:10 - 233:18 | **Hilliard, Gary 01-10-2019 (00:00:22)** | **GH07.207** |
| | 233:10   Q. Okay.  Internal audit at | |
| | 233:11 McKesson during this time period, were their | |
| | 233:12 conclusions, from your perspective, generally | |
| | 233:13 accurate? | |

| Page/Line | Source | ID |
|---|---|---|
| | 233:14   A. I have no reason to think<br>233:15 otherwise.  Internal audit a lot of times was<br>233:16 a third party that McKesson would hire.  But<br>233:17 I have no reason to believe there was an<br>233:18 issue with them. | |
| 234:14 - 235:05 | **Hilliard, Gary 01-10-2019 (00:00:34)** | GH07.208 |
| | 234:14   Q. The next paragraph said --<br>234:15 says:  The DCs are burdened by the amount of<br>234:16 information on one report.  Meaning, a<br>234:17 customer that has already been reviewed and<br>234:18 the sales quantity determined to be<br>234:19 legitimate will continue to be included on<br>234:20 the report as long as the volume is above the<br>234:21 threshold.  Also, it is not possible to tell<br>234:22 from the report what stage of review the<br>234:23 customer is in.  If the DCs become<br>234:24 overwhelmed by the LDMP, something will be<br>234:25 missed.<br><br>235:1 Do you see that?<br>235:2   A. I see that.<br>235:3   Q. And certainly, you guys didn't<br>235:4 want anything to be missed under the LDMP,<br>235:5 right? | |
| 235:07 - 235:08 | **Hilliard, Gary 01-10-2019 (00:00:03)** | GH07.209 |
| | 235:7   A. We wanted accurate data and<br>235:8 reporting. | |
| 235:19 - 235:21 | **Hilliard, Gary 01-10-2019 (00:00:08)** | GH07.210 |
| | 235:19   Q. All right.  I'm going to hand<br>235:20 you Exhibit 1.1913, also marked as<br>235:21 Exhibit 16. | |
| 236:01 - 236:09 | **Hilliard, Gary 01-10-2019 (00:00:15)** | GH07.211 |
| | 236:1 Lifestyle Drug Program, McKesson U.S.<br>236:2 Pharma - DEA Licensure Audit of Landover,<br>236:3 Maryland DC.<br>236:4 Do you see that?<br>236:5   A. I see that.<br>236:6   Q. Okay.  The date on this one is<br>236:7 August 17, 2007 is the last revised date.<br>236:8 Do you see that there?<br>236:9   A. I see that. | |

GH07-Hillliard, Gary - Plaintiffs' Submission

| Page/Line | Source | ID |
|---|---|---|

**GH07-Hillliard, Gary - Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|
| 236:16 - 237:23 | **Hilliard, Gary 01-10-2019 (00:01:02)** | GH07.212 |

236:16   Q. All right.  Section 1.1 says
236:17 right under that:  The Distribution Center
236:18 Manager for Landover and the local Sales Team
236:19 has met and collaborated on how to handle the
236:20 Lifestyle Drug Monitoring Program.  There
236:21 were two incidents in the past 2-3 years that
236:22 proved it necessary to take more interest in
236:23 reviewing narcotics/controlled substance
236:24 purchases and buying activity for customers.
236:25 During the interview with IA -- which is
237:1 internal audit, right?
237:2   A. That's correct.
237:3   Q. Okay.
237:4 -- the DCM noted that the
237:5 current monitoring program at Landover does
237:6 not include any MHS accounts.
237:7 MHS is the hospital accounts?
237:8   A. That's correct.
237:9   Q. -- or Retail National Accounts.
237:10 Those are the large chain
237:11 pharmacies, right?
237:12   A. Also correct.
237:13   Q. Okay.  The accounts being
237:14 monitored are primarily the Retail
237:15 Independent accounts.
237:16 Those are the smaller
237:17 independent pharmacies, right?
237:18   A. Correct.
237:19   Q. Okay.  So the goal of the
237:20 Lifestyle Drug Monitoring Program was that
237:21 all pharmacies were to be monitored, right?
237:22 It wasn't just for independent pharmacies,
237:23 was it?

| Page/Line | Source | ID |
|---|---|---|
| 238:01 - 238:02 | **Hilliard, Gary 01-10-2019 (00:00:04)** | GH07.213 |

238:1   A. I don't recall what was stated
238:2 in the SOP for that part.

| Page/Line | Source | ID |
|---|---|---|
| 239:10 - 239:13 | **Hilliard, Gary 01-10-2019 (00:00:15)** | GH07.214 |

239:10   Q. Okay.  Well, let's take a look
239:11 at the SOP itself on this issue, then, so we

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  |  |
|---|---|---|
|  | 239:12 can sew that up.  It's 1.1333, Exhibit 17 to |  |
|  | 239:13 your deposition, which is MCKMDL00330211. |  |
| 239:17 - 241:04 | **Hilliard, Gary 01-10-2019 (00:01:26)** | **GH07.215** |
|  | 239:17   Q. Okay.  What I've handed you is | **P-42535.1** |
|  | 239:18 from the McKesson Operations Manual titled | **P-42535.1.1** |
|  | 239:19 Lifestyle Drug Monitoring Program. |  |
|  | 239:20 Do you recognize this document? |  |
|  | 239:21   A. Yes, I do. |  |
|  | 239:22   Q. Okay.  This is the SOP, right, |  |
|  | 239:23 for LDMP? |  |
|  | 239:24   A. Correct. |  |
|  | 239:25   Q. Okay.  I just want to address |  |
|  | 240:1 the issue we were talking about with Landover |  |
|  | 240:2 about whether MHS, which is the hospital |  |
|  | 240:3 accounts, and the retail national accounts, |  |
|  | 240:4 were supposed to be monitored under this |  |
|  | 240:5 program.  So if you take a look at the last |  |
|  | 240:6 paragraph on the first page where it says, |  |
|  | 240:7 "If the account." | **P-42535.1.2** |
|  | 240:8 Do you see that reference? |  |
|  | 240:9   A. I see that. |  |
|  | 240:10   Q. It says:  If the account is a | **P-42535.1.3** |
|  | 240:11 large customer that McKesson expects to |  |
|  | 240:12 purchase in large quantities, for example: |  |
|  | 240:13 Institutional, warehouse accounts, government |  |
|  | 240:14 or mail-order, then you'll generally only |  |
|  | 240:15 have to perform a Level I review.  However, |  |
|  | 240:16 large spikes of any customer, including |  |
|  | 240:17 hospitals, warehouse accounts, or government |  |
|  | 240:18 accounts, must be evaluated. |  |
|  | 240:19 Do you see that? |  |
|  | 240:20   A. I see it. |  |
|  | 240:21   Q. Okay.  So does this indicate to |  |
|  | 240:22 you that it wasn't just the small independent |  |
|  | 240:23 chains that were supposed to be evaluated in |  |
|  | 240:24 this program? |  |
|  | 240:25   A. Yes.  So the expectation is the |  |
|  | 241:1 larger accounts, government accounts, mail |  |
|  | 241:2 orders, they are going to have the large |  |
|  | 241:3 quantities.  But, yes, it does list the |  |

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
| --- | --- | --- |
| 241:05 - 241:11 | 241:4 hospitals and warehouse accounts.<br>**Hilliard, Gary 01-10-2019 (00:00:16)**<br>241:5   Q. Just looking at the LDMP<br>241:6 itself, it does not on its face limit itself<br>241:7 to independent pharmacies, does it?<br>241:8   A. Not that I recall.<br>241:9   Q. And not that you see here<br>241:10 either, right?<br>241:11   A. Right. | **GH07.216** |
| 241:12 - 241:17 | **Hilliard, Gary 01-10-2019 (00:00:17)**<br>241:12   Q. Now, the due diligence required<br>241:13 under the LDMP was supposed to be conducted<br>241:14 by the distribution center as soon as the<br>241:15 customer hits the 8,000 number, right?  Due<br>241:16 diligence was supposed to be instituted<br>241:17 immediately thereafter, right? | **GH07.217**<br>clear |
| 241:19 - 241:25 | **Hilliard, Gary 01-10-2019 (00:00:17)**<br>241:19   A. I believe that's what was<br>241:20 stated.<br>241:21 QUESTIONS BY MR. BOGLE:<br>241:22   Q. Okay.  And I'm going to hand<br>241:23 you next, then, what I'm marking as<br>241:24 Exhibit 18, which is 1.1918, and that's<br>241:25 MCKMDL00591858. | **GH07.218** |
| 242:04 - 242:04 | **Hilliard, Gary 01-10-2019 (00:00:03)**<br>242:4   Q. There you go, sir. | **GH07.219** |
| 242:05 - 242:17 | **Hilliard, Gary 01-10-2019 (00:00:24)**<br>242:5 And this is another Lifestyle<br>242:6 Drug Program, McKesson U.S. Pharma - DEA<br>242:7 Licensure Audit, this time for the Southern<br>242:8 California distribution center.<br>242:9 Do you see that?<br>242:10   A. I see that.<br>242:11   Q. This one's last revised date is<br>242:12 August 23, 2007.<br>242:13 Do you see where that's<br>242:14 referenced?<br>242:15   A. I see that.<br>242:16   Q. Okay.  I want to look at<br>242:17 Section 1.1 again.  And again, that first | **GH07.220** |

| GH07-Hillliard, Gary - Plaintiffs' Submission | |
| --- | --- |

| Page/Line | Source | ID |
| --- | --- | --- |

**242:18 - 244:01**

**Hilliard, Gary 01-10-2019 (00:01:29)**　　　　　　　　GH07.221

242:18 paragraph under 1.1 says:  The Distribution
242:19 Center Manager for So Cal DC and the local
242:20 Sales Team has met and collaborated on how to
242:21 handle the Lifestyle Drug Monitoring Program.
242:22 During the interview with IA -- which again,
242:23 is internal audit, right?
242:24   A. Correct.
242:25   Q. -- the DCM noted that the
243:1 current monitoring program at So Cal does not
243:2 include any MHS accounts or Retail National
243:3 Accounts.  The accounts being monitored are
243:4 primarily the Retail Independent accounts.
243:5 Do you see where that's stated?
243:6   A. I see that.
243:7   Q. And if you can go to page .3.
243:8 I'm on Section 1.4, where it says:  DC's
243:9 Observation of the LDMP.
243:10 Do you see that section?
243:11   A. I see that.
243:12   Q. The second sentence in the
243:13 second paragraph under that says:  Marc
243:14 states that in his opinion, the monitoring
243:15 done by Jan Phillips is done "after the fact"
243:16 and should be initiated sooner from her
243:17 level.
243:18 Do you see that?
243:19   A. I see that.
243:20   Q. And Marc is the distribution
243:21 center manager for that distribution center,
243:22 right?
243:23   A. Correct.
243:24   Q. Okay.  And "the monitoring" is
243:25 talking about the monitoring under the LDMP,
244:1 right?

**244:04 - 244:09**

**Hilliard, Gary 01-10-2019 (00:00:14)**　　　　　　　　GH07.222

244:4   A. That's what's stated here.
244:5 QUESTIONS BY MR. BOGLE:
244:6   Q. And again, the purpose of the
244:7 LDMP was not to do the review after the fact

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

GH07-Hillliard, Gary - Plaintiffs' Submission

| Page/Line | Source | ID |
|---|---|---|
| | 244:8 but to do it as soon as possible once they | |
| | 244:9 hit the 8,000 number, right? | |
| 244:12 - 244:12 | **Hilliard, Gary 01-10-2019 (00:00:01)** | GH07.223 |
| | 244:12   A. That's my recollection. | |
| 244:13 - 244:17 | **Hilliard, Gary 01-10-2019 (00:00:18)** | GH07.224 |
| | 244:13 QUESTIONS BY MR. BOGLE: | |
| | 244:14   Q. All right.  I just want to show | |
| | 244:15 you one more of these audits, which is | |
| | 244:16 Exhibit 1.1917, marked as Exhibit 19 to your | |
| | 244:17 deposition, and that's MCKMDL00591251. | |
| 244:21 - 245:07 | **Hilliard, Gary 01-10-2019 (00:00:25)** | GH07.225 |
| | 244:21   Q. And this is an Audit Report, | |
| | 244:22 DEA Licensure Compliance and LDMP Audit, U.S. | |
| | 244:23 Pharmaceuticals. | |
| | 244:24 Do you see that at the top? | |
| | 244:25   A. I see that. | |
| | 245:1   Q. And this is sent to both | |
| | 245:2 yourself and Bruce Russell, right? | |
| | 245:3   A. That is correct. | |
| | 245:4   Q. Okay.  And it says the date | |
| | 245:5 audit completed here was August 31, 2007. | |
| | 245:6 Do you see that reference? | |
| | 245:7   A. Yes, I see that. | |
| 245:12 - 247:14 | **Hilliard, Gary 01-10-2019 (00:02:09)** | GH07.226 |
| | 245:12   Q. Okay.  Let's go to page .7 of | |
| | 245:13 this document.  Under number 1, under the | |
| | 245:14 Issue/Observation column, you see where it | |
| | 245:15 says Lifestyle Drugs Monitoring Program? | |
| | 245:16   A. Yes, I do. | |
| | 245:17   Q. Okay.  The first bullet point | |
| | 245:18 below that says:  Account reps and/or the | |
| | 245:19 Customer Care groups associated with Retail | |
| | 245:20 National Accounts and Hospital accounts are | |
| | 245:21 unaware of the directive to monitor Lifestyle | |
| | 245:22 Drugs and are not performing this task. | |
| | 245:23 Do you see that? | |
| | 245:24   A. I see that. | |
| | 245:25   Q. Okay.  And there's actually a | |
| | 246:1 Risk column to the right of that for this | |
| | 246:2 specific issue, right? | |

| | | |
|---|---|---|
| | **GH07-Hillliard, Gary - Plaintiffs' Submission** | |
| **Page/Line** | **Source** | **ID** |

246:3   A. Yes, there is.
246:4   Q. Okay.  And under Significance
246:5 for Risk related to this issue, it's noted to
246:6 be moderate, right?
246:7   A. Correct.
246:8   Q. And the actual risk outlined
246:9 is:  Differences in the LDMP execution will
246:10 lead to inefficiencies as it relates to
246:11 compliance with the DEA expectations.
246:12 Do you see that statement?
246:13   A. I see that.
246:14   Q. Do you agree with that
246:15 statement, if there's differences in LDMP
246:16 execution it's going to lead to
246:17 inefficiencies with compliance?
246:18   A. Yes.  That could happen.
246:19   Q. And then I want to look at one
246:20 more thing here on the next page.  The top
246:21 bullet point here under Issues/Observations
246:22 says:  Provide structured training to DC
246:23 personnel or other functions that provide
246:24 input to the DEA process.  Compliance
246:25 regulations are not reinforced or
247:1 periodically revisited for updates relative
247:2 to DEA changes or mandates.
247:3 Do you see that reference?
247:4   A. I see the reference.
247:5   Q. Okay.  And then related to that
247:6 bullet point, there's a risk of:  Lack of
247:7 process oversight could lead to
247:8 noncompliance.
247:9 Do you see that?
247:10   A. I see that.
247:11   Q. Okay.  Do you agree that lack
247:12 of process oversight with any measure in
247:13 regulatory affairs could lead to
247:14 noncompliance?

| | | |
|---|---|---|
| 247:17 - 247:19 | **Hilliard, Gary 01-10-2019 (00:00:08)** | **GH07.227** |

247:17   A. Process oversight should occur
247:18 to ensure compliance with the LDMP program

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 247:19 that was implemented. | |
| 272:07 - 272:10 | **Hilliard, Gary 01-10-2019 (00:00:15)** | **GH07.228** |
| | 272:7   Q. Okay.  I'm handing you what I'm | |
| | 272:8 marking as Exhibit 22 to your deposition, | |
| | 272:9 which is Exhibit 1.1962, and that's | |
| | 272:10 MCKMDL00543610. | |
| 272:14 - 273:03 | **Hilliard, Gary 01-10-2019 (00:00:35)** | **GH07.229** |
| | 272:14   Q. We see here this is a series of | |
| | 272:15 e-mails with an attached flier titled | |
| | 272:16 McKesson Controlled Substances Monitoring | |
| | 272:17 Program, Program Guide for Pharmacies. | |
| | 272:18 Do you see that on the third | |
| | 272:19 page? | |
| | 272:20   A. I see that. | |
| | 272:21   Q. Okay.  And the e-mail that | |
| | 272:22 attaches this, if you go back to the first | |
| | 272:23 page, is from April 17, 2008. | |
| | 272:24 Do you see that? | |
| | 272:25   A. I see that. | |
| | 273:1   Q. This is right around the time | |
| | 273:2 the CSMP was being launched, right? | |
| | 273:3   A. That sounds correct. | |
| 274:06 - 274:12 | **Hilliard, Gary 01-10-2019 (00:00:12)** | **GH07.230** |
| | 274:6   Q. Okay.  And the next-to-last one | |
| | 274:7 says:  Customers will be alerted in advance | |
| | 274:8 of meeting or exceeding their thresholds. | |
| | 274:9 Do you see that reference? | |
| | 274:10   A. Yes, I see that. | |
| | 274:11   Q. Okay.  And that was a process | |
| | 274:12 known as a Threshold Warning Report, right? | |
| 274:15 - 274:22 | **Hilliard, Gary 01-10-2019 (00:00:15)** | **GH07.231** |
| | 274:15   A. That's my recollection. | |
| | 274:16 QUESTIONS BY MR. BOGLE: | |
| | 274:17   Q. Okay.  And basically, the | |
| | 274:18 concept being that once the customer met a | |
| | 274:19 certain percentage of their threshold, they | |
| | 274:20 would be notified that they were approaching | |
| | 274:21 their threshold for a controlled substance, | |
| | 274:22 right? | |
| 274:25 - 274:25 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.232** |

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 274:25   A. That's also my recollection. | |
| 276:07 - 276:09 | **Hilliard, Gary 01-10-2019 (00:00:06)** | **GH07.233** |
| | 276:7   Q. Okay.  Now, I want to talk to | |
| | 276:8 you a little bit more about the Threshold | |
| | 276:9 Warning Report concept.  The purpose of the | |
| 276:10 - 276:14 | **Hilliard, Gary 01-10-2019 (00:00:13)** | **GH07.234** |
| | 276:10 Threshold Warning Reports was to make sure | |
| | 276:11 that the customer was aware when they were | |
| | 276:12 approaching a threshold so they could ask for | |
| | 276:13 an increase before their supply got cut off, | |
| | 276:14 right? | |
| 276:17 - 276:21 | **Hilliard, Gary 01-10-2019 (00:00:07)** | **GH07.235** |
| | 276:17   A. That's my recollection. | |
| | 276:18 QUESTIONS BY MR. BOGLE: | |
| | 276:19   Q. Okay.  And also to make sure | |
| | 276:20 that, quite frankly, McKesson didn't lose | |
| | 276:21 those sales, right? | |
| 276:24 - 277:01 | **Hilliard, Gary 01-10-2019 (00:00:07)** | **GH07.236** |
| | 276:24   A. No.  It would be so that due | |
| | 276:25 diligence could be conducted to determine if | |
| | 277:1 they needed additional threshold increase. | |
| 277:20 - 277:24 | **Hilliard, Gary 01-10-2019 (00:00:11)** | **GH07.237** |
| | 277:20   Q. Okay.  Do you recall being | |
| | 277:21 involved in any discussions about the need to | |
| | 277:22 set up a Threshold Warning Report for the | |
| | 277:23 very specific purpose of making sure McKesson | |
| | 277:24 didn't lose sales of controlled substances? | |
| 278:02 - 278:02 | **Hilliard, Gary 01-10-2019 (00:00:01)** | **GH07.238** |
| | 278:2   A. No. | |
| 278:05 - 278:10 | **Hilliard, Gary 01-10-2019 (00:00:18)** | **GH07.239** |
| | 278:5   A. No, I do not recall ever having | |
| | 278:6 any conversations of that nature. | |
| | 278:7 QUESTIONS BY MR. BOGLE: | |
| | 278:8   Q. Okay.  I'm going to hand you | |
| | 278:9 what I'm marking as Exhibit 23, which is | |
| | 278:10 1.1804, and that's MCKMDL00543971. | |
| 278:14 - 278:14 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.240** |
| | 278:14   Q. There you go, sir. | |
| 278:15 - 280:19 | **Hilliard, Gary 01-10-2019 (00:02:21)** | **GH07.241** |
| | 278:15 All right.  Let's start at the | |

| Page/Line | Source | ID |
|-----------|--------|-----|

278:16 last page of the document, .3.  There's an

278:17 e-mail at the bottom from you, October 23,

278:18 2006, to a Sharon Mackarness.

278:19 Do you see that?

278:20   A. I see that.

278:21   Q. Okay.  There you say:  McKesson

278:22 will establish a monthly threshold of 10,000

278:23 dosage forms of hydrocodone for all customers

278:24 at each of its facilities.  Customers

278:25 requesting to purchase more than this amount

279:1 will be required to provide additional

279:2 information on its dispensing practices to

279:3 justify amounts above this threshold.  Such

279:4 information will be reviewed by McKesson

279:5 Regulatory Affairs before a customer will be

279:6 authorized to purchase more than 10,000

279:7 dosage forms per month.  McKesson will also

279:8 establish thresholds for other controlled

279:9 substances purchases.

279:10 Do you see that e-mail?

279:11   A. I see that.

279:12   Q. Okay.  So then if you go to

279:13 page .2, I'm looking at the e-mail from

279:14 Sharon Mackarness back to you, October 26,

279:15 2006, at 3:44 p.m.

279:16 Do you see that?

279:17   A. Yes, I see that.

279:18   Q. Okay.  The second paragraph she

279:19 says to you:  JB -- JD brought up a valid

279:20 point in the meeting.  We are in the business

279:21 to sell product.  If we could produce a

279:22 report (you may already have one) that warned

279:23 a customer's approach to the threshold, say

279:24 at 85% of their 10,000 dosages, work could

279:25 begin on justifying an increase in threshold

280:1 prior to any lost sales.

280:2 Do you see that?

280:3   A. I see that.

280:4   Q. Okay.  And do you see your

280:5 response above in the second sentence in your

| Page/Line | Source | ID |
|---|---|---|

GH07-Hillliard, Gary - Plaintiffs' Submission

280:6 next e-mail, and what is that?

280:7   A. "I think JD's idea is good."

280:8   Q. Okay.  And that's the idea

280:9 you're referencing, the one I just read

280:10 about, right?

280:11   A. The one stated in Sharon's

280:12 e-mail, yes.

280:13   Q. Right, okay.  Which talks about

280:14 being in the business to sell product and

280:15 coming up with a threshold warning style

280:16 report that would allow customers to justify

280:17 an increase prior to McKesson losing sales,

280:18 right?

280:19   A. That's what's stated, yes.

**281:11 - 281:19**  **Hilliard, Gary 01-10-2019 (00:00:20)**   **GH07.242**

281:11   Q. All right, Mr. Hilliard.  You

281:12 recall earlier in the deposition we talked

281:13 about the PowerPoint that was presented by

281:14 Mr. Mapes at the September 1, 2005 meeting

281:15 with McKesson?  Do you recall discussing that

281:16 generally?

281:17   A. Yes, I do.

281:18   Q. Okay.  If we can pull that back

281:19 out, which I believe is Exhibit 4, and I want

**281:20 - 281:20**  **Hilliard, Gary 01-10-2019 (00:00:08)**   **GH07.243**

281:20 to go back to page .9.  We talked about this

**281:21 - 282:15**  **Hilliard, Gary 01-10-2019 (00:00:51)**   **GH07.244**

281:21 a little bit before, but that bottom slide

281:22 there titled Suspicious Orders, the last

281:23 bullet point says:  Report suspicious orders

281:24 to DEA when discovered.

281:25 Do you see that?

282:1   A. I see that.

282:2   Q. Okay.  And then on the next

282:3 page we talked about the last slide there,

282:4 the bottom slide there on that page, the

282:5 second bullet point, which says:  Distributor

282:6 must determine which orders are suspicious

282:7 and make a sales decision.

282:8 Do you see that?

| Page/Line | Source | ID |
|---|---|---|
| | 282:9   A. Yes, I see that. | |
| | 282:10   Q. Okay.  So between these two | |
| | 282:11 bullet points, and quite frankly, the rest of | |
| | 282:12 the discussion here, what's being conveyed, | |
| | 282:13 among other things, is that McKesson is | |
| | 282:14 expected to report suspicious orders, not | |
| | 282:15 suspicious sales after the fact, right? | |
| 282:18 - 282:19 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.245** |
| | 282:18   A. The slide states "suspicious | |
| | 282:19 orders." | |
| 282:21 - 282:25 | **Hilliard, Gary 01-10-2019 (00:00:09)** | **GH07.246** |
| | 282:21   Q. Right.  And the second | |
| | 282:22 reference we just read talks about | |
| | 282:23 determining which orders are suspicious and | |
| | 282:24 making a sales decision, right? | |
| | 282:25   A. That's what's stated. | |
| 284:07 - 284:17 | **Hilliard, Gary 01-10-2019 (00:00:26)** | **GH07.247** |
| | 284:7   Q. Okay.  And that was the | |
| | 284:8 presentation from September 1, 2005, right? | |
| | 284:9   A. That's correct. | |
| | 284:10   Q. Okay.  Then if we go back to | |
| | 284:11 Exhibit 3, which is the Rannazzisi letter | |
| | 284:12 from September 27, 2006, you recall | |
| | 284:13 discussing this letter with me earlier today, | |
| | 284:14 right? | |
| | 284:15   A. Yes, I do. | |
| | 284:16   Q. Okay.  If we go to the second | |
| | 284:17 page of the letter, there is a paragraph | |
| 284:18 - 285:19 | **Hilliard, Gary 01-10-2019 (00:00:54)** | **GH07.248** |
| | 284:18 about three-quarters of the way down that | |
| | 284:19 says, "Thus, in addition to." | |
| | 284:20 Do you see that? | |
| | 284:21   A. Yes, I do. | |
| | 284:22   Q. It says:  Thus, in addition to | |
| | 284:23 reporting all suspicious orders, a | |
| | 284:24 distributor has a statutory responsibility to | |
| | 284:25 exercise due diligence to avoid filling | |
| | 285:1 suspicious orders that might be diverted into | |
| | 285:2 other than legitimate medical, scientific, | |
| | 285:3 and industrial channels. | |

| | | |
|---|---|---|
| **GH07-Hillliard, Gary - Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

285:4 Do you see that?

285:5   A. I see that.

285:6   Q. Okay.  And the next paragraph

285:7 down that we read before talks about the

285:8 distributor needing to exercise due care in

285:9 confirming the legitimacy of orders prior to

285:10 filling.

285:11 Do you see that reference in

285:12 the last sentence?

285:13   A. Yes, I see that now.

285:14   Q. Okay.  So, again, this letter

285:15 from September 27, 2006, you would agree with

285:16 me makes clear that the expectation is that

285:17 McKesson will be reporting suspicious orders

285:18 and not filling them if it deems them

285:19 suspicious, right?

| 285:22 - 285:22 | **Hilliard, Gary 01-10-2019 (00:00:01)** | GH07.249 |

285:22   A. That's what's stated on here.

| 286:14 - 287:16 | **Hilliard, Gary 01-10-2019 (00:00:50)** | GH07.250 |

286:14   Q. Okay.  And if you can pull back

286:15 out Exhibit 20.  And this was a document we

286:16 discussed from the 2007 DEA conference.

286:17 Do you recall that?

286:18   A. Yes, I do.

286:19   Q. Okay.  And specifically, the

286:20 e-mail that you -- I want to go back to the

286:21 e-mail you wrote September 11, 2007, which is

286:22 the middle of the first page.

286:23 You with me?

286:24   A. Yes, I am.

286:25   Q. Okay.  We didn't read the

287:1 bottom portion of this e-mail on this page

287:2 where you actually also summarize another

287:3 presentation by Mr. Mapes.

287:4 Do you see where that summary

287:5 begins?

287:6   A. Yes, I do.

287:7   Q. Okay.  First bullet point there

287:8 says:  The requirement is to report

287:9 suspicious orders, not suspicious sales after

| | | |
|---|---|---|
| **GH07-Hillliard, Gary - Plaintiffs' Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

287:10 the fact.

287:11 Right?

287:12   A. That's what's stated, yes.

287:13   Q. Okay.  That's what you wrote,

287:14 right?

287:15   A. Correct, based on his

287:16 presentation.

**287:20 - 288:19**   **Hilliard, Gary 01-10-2019 (00:00:47)**   **GH07.251**

287:20   Q. Okay.  And then going five

287:21 bullet points down from there where it says

287:22 "Registrants"?

287:23   A. I see that.

287:24   Q. Registrants that routinely

287:25 report suspicious orders yet fill these

288:1 orders with reason to believe they are

288:2 destined for the illicit market, and failing

288:3 to maintain effective controls -- and failing

288:4 to maintain effective controls against

288:5 diversion.

288:6 Do you see that?

288:7   A. I see that.

288:8   Q. And again, that's your summary

288:9 of what Mr. Mapes presented that day, right?

288:10   A. That's correct.

288:11   Q. And the last bullet point below

288:12 that says:  Registrant should make informed

288:13 decisions -- and then it's all caps -- BEFORE

288:14 making the sale.

288:15 Do you see that?

288:16   A. I see that.

288:17   Q. And again, that's your summary

288:18 of his presentation that day, right?

288:19   A. That's correct.

**288:20 - 288:22**   **Hilliard, Gary 01-10-2019 (00:00:14)**   **GH07.252**

288:20   Q. All right.  I'm going to hand

288:21 you now what I'm marking as Exhibit 24, which

288:22 is 1.1937, and that's MCKMDL00623568.

**289:07 - 290:06**   **Hilliard, Gary 01-10-2019 (00:00:55)**   **GH07.253**

289:7 So the bottom e-mail on the

289:8 first page is one from Jenny Melton,

| Page/Line | Source | ID |
|---|---|---|
| | 289:9 August 26, 2008, again, sent to that | |
| | 289:10 regulatory e-mail group, right? | |
| | 289:11   A. Yes, it is. | |
| | 289:12   Q. That I think we agreed earlier | |
| | 289:13 you're a part of.  True? | |
| | 289:14   A. That's correct. | |
| | 289:15   Q. Okay.  What was Jenny Melton's | |
| | 289:16 role with the company at this point? | |
| | 289:17   A. Project manager. | |
| | 289:18   Q. Okay.  She worked in regulatory | |
| | 289:19 affairs? | |
| | 289:20   A. She routinely worked with | |
| | 289:21 regulatory affairs on projects. | |
| | 289:22   Q. Okay.  The subject of her | |
| | 289:23 e-mail there on August 26, 2008, is:  CSMP | |
| | 289:24 Suspicious Transaction Reporting to the DEA. | |
| | 289:25 Do you see that? | |
| | 290:1   A. I see that. | |
| | 290:2   Q. And she lists there, carrying | |
| | 290:3 over to the next page, six different subjects | |
| | 290:4 under that heading. | |
| | 290:5 Do you see that? | |
| | 290:6   A. I see that. | |
| 290:07 - 292:16 | **Hilliard, Gary 01-10-2019 (00:02:18)** | GH07.254 |
| | 290:7   Q. Going to number 5 which is on | |
| | 290:8 the second page here, she says:  The | |
| | 290:9 suspicious designation will not be | |
| | 290:10 systematically determined.  Don or the DRAs | |
| | 290:11 will determine whether a transaction is | |
| | 290:12 deemed to be suspicious and the DRA will log | |
| | 290:13 into BI and flag the transaction as a | |
| | 290:14 suspicious transaction. | |
| | 290:15 Do you see that? | |
| | 290:16   A. I see that. | |
| | 290:17   Q. Okay.  You respond to her | |
| | 290:18 e-mail on the same day, August 27, 2008.  Do | |
| | 290:19 you see where you respond right above that? | |
| | 290:20   A. I see that. | |
| | 290:21   Q. Okay.  You say:  Question.  I | |
| | 290:22 thought the requirement was raw data sales. | |

| Page/Line | Source | ID |
|---|---|---|

290:23 As you have outlined, wouldn't this be
290:24 customer "orders" and not McKesson sales?  If
290:25 a transaction/order is suspicious, we are not
291:1 to fulfill the order, thus nothing to
291:2 transmit.
291:3 Do you see that?
291:4   A. I see that.
291:5   Q. Okay.  Then Tracy Jonas
291:6 responds above and says:  I agree, Gary.  I
291:7 was under the impression that this was merely
291:8 a "data dump" in a format that the DEA could
291:9 utilize.
291:10 Do you see that there?
291:11   A. I see that.
291:12   Q. Okay.  Then Sheila Pacheco
291:13 responds and says, on the same day:  The DEA
291:14 is asking for two different things on one
291:15 file.  You're correct about the "data dump"
291:16 as you call it.  Subsequently though, they
291:17 are also asking for us to flag suspicious
291:18 orders.  Those will be determined by you and
291:19 there should be very few.  You will need to
291:20 work together to identify what you might
291:21 define as suspicious.
291:22 Do you see that?
291:23   A. I see that.
291:24   Q. Okay.  And then you respond
291:25 again in the top e-mail, same day, and you
292:1 say:  That certainly complicates the
292:2 transaction reporting.  This would mean, 1,
292:3 regulatory reviews every controlled substance
292:4 order daily (filled or not); or, 2, the
292:5 system is programmed to notify regulatory for
292:6 orders meeting a "suspicious" criteria.
292:7 (define suspicious; some form of DU45); or,
292:8 3 -- and you list three question marks there,
292:9 right?
292:10   A. Yes.
292:11   Q. And you say:  I agree there
292:12 will be very few, but I expect the DEA will

| Page/Line | Source | ID |
|---|---|---|
| | 292:13 want to know how (SOP) we are evaluating the | |
| | 292:14 data. | |
| | 292:15 Do you see that? | |
| | 292:16  A. I see that. | |
| 292:17 - 292:22 | **Hilliard, Gary 01-10-2019 (00:00:16)** | GH07.255 |
| | 292:17  Q. So in this e-mail chain, you -- | |
| | 292:18 initially, in your August 27, 2008 first | |
| | 292:19 response there, were operating under the | |
| | 292:20 understanding that the DEA wanted suspicious | |
| | 292:21 sales, not orders, right?  That's what you | |
| | 292:22 say. | |
| 292:25 - 293:16 | **Hilliard, Gary 01-10-2019 (00:00:37)** | GH07.256 |
| | 292:25  A. I say it:  As you have | |
| | 293:1 outlined, wouldn't this be customer "orders" | |
| | 293:2 and not McKesson sales. | |
| | 293:3 QUESTIONS BY MR. BOGLE: | |
| | 293:4  Q. Right.  Then you say:  If a | |
| | 293:5 transaction/order is suspicious, we are not | |
| | 293:6 to fulfill the order, thus nothing to | |
| | 293:7 transmit. | |
| | 293:8 Right? | |
| | 293:9  A. That's what's stated, yes. | |
| | 293:10  Q. But as we just looked at in the | |
| | 293:11 prior three documents, starting in | |
| | 293:12 September 2005 all the way up to your last | |
| | 293:13 e-mail in September 2007, three different | |
| | 293:14 occasions where it's documented that the DEA | |
| | 293:15 wants reports of suspicious orders, not | |
| | 293:16 suspicious sales.  Right? | |
| 293:19 - 293:19 | **Hilliard, Gary 01-10-2019 (00:00:01)** | GH07.257 |
| | 293:19  A. They stated the orders. | |
| 293:21 - 294:04 | **Hilliard, Gary 01-10-2019 (00:00:37)** | GH07.258 |
| | 293:21  Q. Right.  Not sales. | |
| | 293:22  A. And this is discussions for | |
| | 293:23 creating the CSMP program in CSMP, so this is | |
| | 293:24 development discussions to get to what | |
| | 293:25 eventually becomes the CSMP program. | |
| | 294:1 There was some collaboration or | |
| | 294:2 agreement that took place whereas we were | |
| | 294:3 sending information directly to DEA based on, | |

GH07-Hillliard, Gary - Plaintiffs' Submission

## GH07-Hillliard, Gary - Plaintiffs' Submission

| Page/Line | Source | ID |
|---|---|---|

**294:4 I think, the agreement from 2008.**

294:05 - 294:18 **Hilliard, Gary 01-10-2019 (00:00:32)**   GH07.259

294:5   Q. But if you go down to your
294:6 e-mail, your first e-mail response towards
294:7 the bottom of the first page, you
294:8 specifically say:  If a transaction/order is
294:9 suspicious, we're not to fulfill the order,
294:10 thus nothing to transmit.
294:11 Right?
294:12   A. That was the discussion point.
294:13   Q. Right.  But that's exactly the
294:14 opposite of what Mr. Mapes told you
294:15 September 11, 2007, when he's saying
294:16 specifically to report suspicious orders.  To
294:17 stop the order, to block the order, and
294:18 report it, right?

296:04 - 296:08 **Hilliard, Gary 01-10-2019 (00:00:09)**   GH07.260

296:4 QUESTIONS BY MR. BOGLE:
296:5   Q. But when you go back to the top
296:6 e-mail that you wrote, you're actually
296:7 discussing the potential options of how you
296:8 might report a suspicious order, right?

296:12 - 296:12 **Hilliard, Gary 01-10-2019 (00:00:01)**   GH07.261

296:12   Q. How you would even do that.

294:21 - 294:23 **Hilliard, Gary 01-10-2019 (00:00:04)**   GH07.262

294:21   Q. You're saying here in the same
294:22 vein there would be nothing to transmit if
294:23 that happened.

296:15 - 297:02 **Hilliard, Gary 01-10-2019 (00:00:31)**   GH07.263

296:15   A. Again, this is bouncing ideas
296:16 off of each other, coming up with development
296:17 on how these reports would work.
296:18 QUESTIONS BY MR. BOGLE:
296:19   Q. I guess my question is simply
296:20 that we've looked at three documents from
296:21 September 2005 to September 2007 where
296:22 members of the DEA are expressing that
296:23 suspicious orders need to be blocked and
296:24 reported when they are blocked.
296:25 How could it be possible that

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 297:06 - 297:16 | 297:1 three years later you guys still don't know<br>297:2 how to do that?<br>**Hilliard, Gary 01-10-2019 (00:00:24)**<br>297:6   A. The process was difficult.  The<br>297:7 process took time.  It took time to<br>297:8 implement, it took time for development.<br>297:9 Again, this is just one piece<br>297:10 of that project review and trying to get to a<br>297:11 better program.<br>297:12 QUESTIONS BY MR. BOGLE:<br>297:13   Q. Was it so complicated that it<br>297:14 took more than three years to develop how to<br>297:15 report a suspicious order if it's been<br>297:16 blocked? | GH07.264 |
| 295:01 - 295:15 | **Hilliard, Gary 01-10-2019 (00:00:34)**<br>295:1   A. This was developmental<br>295:2 discussions in regards to what -- what and<br>295:3 how things would populate on reports and<br>295:4 transmits, and I honestly don't recall the<br>295:5 specifics or the outcome of this other than<br>295:6 what we were discussing in this<br>295:7 communication.<br>295:8 QUESTIONS BY MR. BOGLE:<br>295:9   Q. Okay.  But three -- more than<br>295:10 three years after this first presentation<br>295:11 from Mr. Mapes in September 2005, you guys<br>295:12 are now in August 2008 and you're still not<br>295:13 clear on how to report suspicious orders that<br>295:14 you didn't fill?  That's what this indicates,<br>295:15 right? | GH07.265 |
| 295:19 - 296:03 | **Hilliard, Gary 01-10-2019 (00:00:29)**<br>295:19   A. I don't recall what all<br>295:20 additional conversations are outside of this<br>295:21 one e-mail communication.  But again, this<br>295:22 was our work that we were trying to work<br>295:23 towards obtaining a better program, which was<br>295:24 a CSMP program.<br>295:25 So this was just an element of<br>296:1 that development and discussions on how to<br>296:2 get there, and, again, I don't know what else | GH07.266 |

| Page/Line | Source | ID |
|---|---|---|
| | 296:3 was communicated. | |
| 298:11 - 298:20 | **Hilliard, Gary 01-10-2019 (00:00:21)** | **GH07.267** |
| | 298:11   A. It took us until the | |
| | 298:12 implementation of the CSMP in order to get | |
| | 298:13 our systems to where they could appropriately | |
| | 298:14 conduct the blocking. | |
| | 298:15 QUESTIONS BY MR. BOGLE: | |
| | 298:16   Q. And the reporting, it appears | |
| | 298:17 like, too, right?  Because you're saying if | P-42680.1.1 |
| | 298:18 they block it, you thought in August 27, 2008 | |
| | 298:19 there would be nothing to transmit, no report | |
| | 298:20 to make if you blocked it. | |
| 298:24 - 298:25 | **Hilliard, Gary 01-10-2019 (00:00:01)** | **GH07.268** |
| | 298:24   Q. Isn't that what you're saying | |
| | 298:25 here? | |
| 299:02 - 299:12 | **Hilliard, Gary 01-10-2019 (00:00:20)** | **GH07.269** |
| | 299:2   A. I don't recall the context of | |
| | 299:3 this document. | |
| | 299:4 QUESTIONS BY MR. BOGLE: | |
| | 299:5   Q. Okay.  Well, I'm looking at | |
| | 299:6 your own statement.  I'm not asking you to | |
| | 299:7 interpret anybody else's.  You say, on | |
| | 299:8 August 27, 2008, at 5:51 a.m.:  If a | |
| | 299:9 transaction/order is suspicious, we're not to | |
| | 299:10 fulfill the order, thus nothing to transmit. | |
| | 299:11 That's exactly what you said, | |
| | 299:12 right? | |
| 297:20 - 298:06 | **Hilliard, Gary 01-10-2019 (00:00:29)** | **GH07.270** |
| | 297:20   A. Again, it took time for the | |
| | 297:21 development.  We were working towards doing | |
| | 297:22 the blocking of the transactions and this was | |
| | 297:23 just part of that development process. | |
| | 297:24 QUESTIONS BY MR. BOGLE: | |
| | 297:25   Q. Okay.  But, again, we looked at | |
| | 298:1 three documents; Exhibit 4, Exhibit 3, and | |
| | 298:2 Exhibit 20, all where the DEA is saying make | |
| | 298:3 a sales decision, block a sale, report | |
| | 298:4 suspicious orders when they're blocked.  Yet | |
| | 298:5 we're looking now in August 2008 and you guys | |
| | 298:6 still don't know how to do that, right? | |

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| 299:17 - 299:24 | **Hilliard, Gary 01-10-2019 (00:00:17)** | GH07.271 |

299:17   Q. Did I read any of that
299:18 incorrectly?
299:19   A. This was the discussion in 2008
299:20 10 years ago.  I don't recall what all the
299:21 other discussions that were going on.  This
299:22 was us working on the development process.
299:23   Q. My question was simply did I
299:24 read any portion of that sentence wrong?

| 300:02 - 300:02 | **Hilliard, Gary 01-10-2019 (00:00:01)** | GH07.272 |

300:2   A. You read the e-mail.

| 342:13 - 342:18 | **Hilliard, Gary 01-10-2019 (00:00:13)** | GH07.273 |
| | | clear |

342:13   Q. Okay.  And you mentioned that
342:14 McKesson would not know whether its customers
342:15 were getting controlled substances from other
342:16 distributors.
342:17 Do you recall that?
342:18   A. Yes, I do.

| 343:20 - 343:24 | **Hilliard, Gary 01-10-2019 (00:00:08)** | GH07.274 |

343:20   Q. Okay.  But you're not aware of
343:21 any specific prohibition for McKesson asking
343:22 its customers whether it's purchasing opioids
343:23 from other distributors, do you?
343:24   A. I don't know.

| 344:03 - 344:07 | **Hilliard, Gary 01-10-2019 (00:00:14)** | GH07.275 |

344:3   Q. You said that in 2006, there
344:4 were some new things coming from the DEA, new
344:5 directives, one you listed as blocking
344:6 orders.  Do you recall mentioning that, that
344:7 was a new directive in the 2006 time frame?

| 344:10 - 344:10 | **Hilliard, Gary 01-10-2019 (00:00:01)** | GH07.276 |

344:10   A. Yes, I do.

| 345:03 - 345:08 | **Hilliard, Gary 01-10-2019 (00:00:12)** | GH07.277 |

345:3 Do you
345:4 have a specific opinion that McKesson, in
345:5 attempting to be a good corporate citizen,
345:6 would be doing a bad thing in blocking orders
345:7 it deemed suspicious for opioids prior to
345:8 2006?

| 345:11 - 345:11 | **Hilliard, Gary 01-10-2019 (00:00:02)** | GH07.278 |

| GH07-Hillliard, Gary - Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

|  | 345:11   A. I don't know. |  |
| 349:11 - 349:15 | **Hilliard, Gary 01-10-2019 (00:00:08)** | **GH07.279** |
|  | 349:11   Q. You mentioned, again, that your |  |
|  | 349:12 understanding is the DU45 was developed from |  |
|  | 349:13 some DEA task force meeting. |  |
|  | 349:14 Do you recall talking about |  |
|  | 349:15 that? |  |
| 349:19 - 349:25 | **Hilliard, Gary 01-10-2019 (00:00:09)** | **GH07.280** |
|  | 349:19   Q. I'm just trying to orient you |  |
|  | 349:20 to the prior question.  Do you recall talking |  |
|  | 349:21 about that with your counsel? |  |
|  | 349:22   A. Yes. |  |
|  | 349:23   Q. Okay.  And again, you weren't |  |
|  | 349:24 present for any such task force meeting, |  |
|  | 349:25 right? |  |
| 350:03 - 350:04 | **Hilliard, Gary 01-10-2019 (00:00:02)** | **GH07.281** |
|  | 350:3   A. Correct, I was not at the task |  |
|  | 350:4 force. |  |
| 350:06 - 350:08 | **Hilliard, Gary 01-10-2019 (00:00:04)** | **GH07.285** |
|  | 350:6   Q. So you have no firsthand |  |
|  | 350:7 knowledge about what actually happened at |  |
|  | 350:8 that task force meeting, do you? |  |
| 350:11 - 350:14 | **Hilliard, Gary 01-10-2019 (00:00:15)** | **GH07.286** |
|  | 350:11   A. I read the documents that came |  |
|  | 350:12 out of that.  The Section 55 information and |  |
|  | 350:13 reports that were created for the processes |  |
|  | 350:14 that McKesson had were based on that output. |  |
| 350:16 - 350:18 | **Hilliard, Gary 01-10-2019 (00:00:04)** | **GH07.282** |
|  | 350:16   Q. Do you have any documents that |  |
|  | 350:17 came out of that meeting? |  |
|  | 350:18   A. I do not currently. |  |

Plaintiffs Affirmative Designations = 01:21:19
Plaintiffs Counters = 00:01:13
Defense Counter Designations = 00:00:19
Defense Completeness Counters = 00:18:05
**Total Time = 01:40:55**

**Documents Shown**

| Page/Line | Source | ID |
|-----------|--------|-----|

GH07-Hillliard, Gary - Plaintiffs' Submission

P-42535
P-42680