**Designation Run Report**

# DW03_Donald Walker Plaintiffs' Submission

_____

**Walker, Donald 01-10-2019**

_____

**Plaintiffs Affirmative Designations    02:00:59**

**Defense Counter Designations    00:22:39**

**Plaintiff Counter Counters    00:16:58**

**Defense Completeness Counter Counters  00:06:03**

**Total Time  02:46:39**



| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| 15:10 - 15:21 | **Walker, Donald 01-10-2019 (00:00:16)** | |
| | 15:10   Q. Sir, my name is Eric Kennedy.  You | |
| | 15:11 understand that I represent the plaintiffs in this | |
| | 15:12 case? | |
| | 15:13   A. I do. | |
| | 15:14   Q. And could you please state your full | |
| | 15:15 name for the record. | |
| | 15:16   A. Donald Walker. | |
| | 15:17   Q. And are you currently employed? | |
| | 15:18   A. I am not. | |
| | 15:19   Q. And your prior employer was McKesson; | |
| | 15:20 would that be true? | |
| | 15:21   A. That's correct. | |
| 16:11 - 16:18 | **Walker, Donald 01-10-2019 (00:00:24)** | |
| | 16:11   Q. When did you begin your career with | |
| | 16:12 McKesson? | |
| | 16:13   A. I joined McKesson in 1987. | |
| | 16:14   Q. And when you joined them, what was | |
| | 16:15 your position? | |
| | 16:16   A. My first position with McKesson was | |
| | 16:17 as a Transportation Manager with one of the | |
| | 16:18 subsidary companies that McKesson had. | |
| 16:22 - 17:4 | **Walker, Donald 01-10-2019 (00:00:27)** | |
| | 16:22   Q. And what was the next position that | |
| | 16:23 you held with McKesson? | |
| | 16:24   A. I held the position with the -- what | |
| | 16:25 was then the McKesson Drug Company and | |
| | 17:1 Transportation, and had responsibility for | |
| | 17:2 transportation planning. | |
| | 17:3   Q. And when did you take that position? | |
| | 17:4   A. About 1991. | |
| 17:14 - 17:19 | **Walker, Donald 01-10-2019 (00:00:23)** | |
| | 17:14   Q. What was your next position at | |
| | 17:15 McKesson? | |
| | 17:16   A. I was the Distribution Center Manager | |
| | 17:17 of our Sacramento Distribution Center. | |
| | 17:18   Q. When did you take that position? | |
| | 17:19   A. My best recollection is about 1992. | |
| 17:20 - 18:8 | **Walker, Donald 01-10-2019 (00:00:48)** | |
| | 17:20   Q. And what were your duties and | |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

17:21 responsibilities then, as the manager of a
17:22 distribution center?
17:23  A. I had responsibility for oversight of
17:24 our daily distribution of pharmaceuticals to
17:25 pharmacies served by that distribution center.
18:1  Q. And that position would have involved
18:2 the distribution of opioids; would it not?
18:3  A. As part of our distribution, we did
18:4 distribute controlled substances to pharmacies.
18:5  Q. Did you have any responsibility at
18:6 that point in time with respect to the creation,
18:7 management or implementation of anti-diversion
18:8 regulations and policies at McKesson?

**18:10 - 19:4   Walker, Donald 01-10-2019 (00:01:13)**

18:10 THE WITNESS:  No.  At that time I was
18:11 executing against existing policies the company had
18:12 in place.
18:13 BY MR. KENNEDY:
18:14  Q. What were in place from 1992 to the
18:15 late '90s?  What was the policy in place?
18:16  A. There were -- the policies we had
18:17 were contained in our Operations Manuals that
18:18 specified our responsibilities to comply to
18:19 regulations for handling and distribution of
18:20 controlled substances.
18:21  Q. We know about the existence of
18:22 Standard Operating Procedure 55.  Are you familiar
18:23 with that?
18:24  A. Yes.
18:25  Q. Was that the policy and procedure
19:1 that was in place in the 1990s?
19:2  A. The Section 55 of our Operations
19:3 Manual covered the responsibilities with the handling
19:4 and distribution of controlled substances.

**19:5 - 19:10   Walker, Donald 01-10-2019 (00:00:25)**

19:5  Q. Sir, that wasn't my question.  I was
19:6 asking, was Standard Operating Procedure Section 55,
19:7 was that the policy in place in the 1990s?
19:8  A. My recollection is that Section 55
19:9 was the applicable policy in place during a period in

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

19:10 the 1990s.

19:11 - 20:14   **Walker, Donald 01-10-2019 (00:01:40)**

19:11   Q. How long did you hold the position as

19:12 a Distribution Center Manager?

19:13   A. I recall it was approximately 18

19:14 months.

19:15   Q. So sometime in 1993/'94, you took on

19:16 a new position?

19:17   A. Yes.  In 19 -- in that time frame, I

19:18 don't recall exactly when, I was promoted to a new

19:19 position of Vice President of Distribution Operations

19:20 for their Western Region.

19:21   Q. Western Region would be the western

19:22 part of the United States?

19:23   A. Yes.

19:24   Q. And what were your responsibilities

19:25 as VP of Distribution of the Western Region?

20:1   A. I had responsibility for the

20:2 operations staff in the distribution centers that

20:3 comprised the Western Region.  So the distribution

20:4 center managers that operated those facilities

20:5 reported to me.

20:6   Q. And at that point in time -- how

20:7 long -- how long did you hold that position?

20:8   A. I held that position until about

20:9 1996.

20:10   Q. And in that position, did you have

20:11 responsibility -- other than the following of SOP 55,

20:12 did you have any duties, responsibilities, with the

20:13 creation and the management of anti-diversion

20:14 policies and procedures at McKesson?

20:16 - 20:20   **Walker, Donald 01-10-2019 (00:00:19)**

20:16 THE WITNESS:  In that role I had

20:17 responsibility for the distribution centers and their

20:18 execution of their responsibilities under Section 55

20:19 to the handling and distribution of controlled

20:20 substances.

20:25 - 21:4   **Walker, Donald 01-10-2019 (00:00:13)**

20:25   Q. And what position did you take in

21:1 1996?

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 21:2   A. In 1996 I was promoted to the Senior |  |
|  | 21:3 Vice President of Distribution for McKesson |  |
|  | 21:4 Pharmaceutical. |  |
| 21:10 - 21:14 | **Walker, Donald 01-10-2019 (00:00:19)** | DW03_Donald Walker Plaintiffs' Submission 11 |
|  | 21:10   Q. Is that the position you held until |  |
|  | 21:11 the time of your retirement? |  |
|  | 21:12   A. Yes, with the exception of a period |  |
|  | 21:13 of time from approximately 2000 to 2005 where I was |  |
|  | 21:14 responsible for our Six Sigma organization. |  |
| 21:15 - 21:18 | **Walker, Donald 01-10-2019 (00:00:12)** | DW03_Donald Walker Plaintiffs' Submission 12 |
|  | 21:15   Q. And what is that? |  |
|  | 21:16   A. Six Sigma is a process improvement |  |
|  | 21:17 methodology that we introduced to the company at that |  |
|  | 21:18 time, and I was the senior leader of our Six Sigma. |  |
| 21:22 - 22:9 | **Walker, Donald 01-10-2019 (00:00:38)** | DW03_Donald Walker Plaintiffs' Submission 13 |
|  | 21:22   Q. From '96 to 2000, in this four-year |  |
|  | 21:23 period, what are your responsibilities as a Senior VP |  |
|  | 21:24 of Distribution as it related to the distribution of |  |
|  | 21:25 opioids? |  |
|  | 22:1   A. As the Senior Vice President of |  |
|  | 22:2 Distribution, included in my responsibility was our |  |
|  | 22:3 Regulatory Affairs Group.  It was our overall |  |
|  | 22:4 responsibility to ensure that we were complying with |  |
|  | 22:5 regulations associated with the handling and |  |
|  | 22:6 distribution of controlled substances. |  |
|  | 22:7   Q. And would that be on a national |  |
|  | 22:8 basis? |  |
|  | 22:9   A. Yes. |  |
| 38:5 - 38:7 | **Walker, Donald 01-10-2019 (00:00:10)** | DW03_Donald Walker Plaintiffs' Submission 14 |
|  | 38:5   Q. I want to make sure I get this right, |  |
|  | 38:6 because I think you've told me a number of times -- |  |
|  | 38:7 and this is what you've told me.  Is this accurate, |  |
| 38:8 - 38:9 | **Walker, Donald 01-10-2019 (00:00:08)** | DW03_Donald Walker Plaintiffs' Submission 15 |
|  | 38:8 then?  McKesson's -- McKesson is responsible to |  |
|  | 38:9 comply with the regulations; is that your testimony? |  |
| 38:11 - 38:14 | **Walker, Donald 01-10-2019 (00:00:07)** | DW03_Donald Walker Plaintiffs' Submission 16 |
|  | 38:11 THE WITNESS:  McKesson's responsibility was |  |
|  | 38:12 to comply with the Code of Federal Regulations in |  |
|  | 38:13 which govern the handling and distribution of |  |
|  | 38:14 controlled substances. |  |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |
| 40:5 - 40:9 | **Walker, Donald 01-10-2019 (00:00:14)** | DW03_Donald Walker Plaintiffs' Submission 17 |
| | 40:5 So let's take a look at whether or not | |
| | 40:6 McKesson fulfilled its responsibility -- | |
| | 40:7 all right? -- according to Mr. Walker's view of their | |
| | 40:8 responsibility.  All right? | |
| | 40:9   A. Okay. | |
| 40:15 - 40:21 | **Walker, Donald 01-10-2019 (00:00:33)** | DW03_Donald Walker Plaintiffs' Submission 18 |
| | 40:15   Q. So let's look at McKesson's | |
| | 40:16 fulfilling of its responsibility, then, as you have | |
| | 40:17 described it.  This is Exhibit 688, Bates -00496859 | |
| | 40:18 to -875. | |
| | 40:19 This is a memorandum.  Do you see that up at | |
| | 40:20 the top, it says, "Memorandum"? | |
| | 40:21   A. Yes.  Give me just a minute. | |
| 40:22 - 40:22 | **Walker, Donald 01-10-2019 (00:00:01)** | DW03_Donald Walker Plaintiffs' Submission 19 |
| | 40:22 Yes. | |
| 40:24 - 41:8 | **Walker, Donald 01-10-2019 (00:00:27)** | DW03_Donald Walker Plaintiffs' Submission 20 |
| | 40:24   Q. And this is a Memorandum.  This is a | |
| | 40:25 DEA document; is it not?  Do you see the DEA logo, | |
| | 41:1 U.S. Department of Justice, Drug Enforcement | |
| | 41:2 Administration?  This is a memo from the DEA, from | |
| | 41:3 their documents; true? | |
| | 41:4   A. That's what's on the document, yes. | |
| | 41:5   Q. Well, Mr. Walker, you have seen this | |
| | 41:6 document before; have you not?  This came from your | |
| | 41:7 files. | |
| | 41:8   A. Yes, I have seen this document. | |
| 41:15 - 42:22 | **Walker, Donald 01-10-2019 (00:01:28)** | DW03_Donald Walker Plaintiffs' Submission 21 |
| | 41:15   Q. All right.  So this is a memorandum. | |
| | 41:16 This is a DEA memorandum.  The subject is, "Internet | |
| | 41:17 Presentation with McKesson Corporation on | |
| | 41:18 September 1, 2005"; is that right? | |
| | 41:19   A. That's in the subject title, yes. | |
| | 41:20   Q. And so what they are talking about is | |
| | 41:21 a September 1, 2005, meeting that McKesson had with | |
| | 41:22 the DEA; true?  Is that true? | |
| | 41:23   A. Yes, I think it represents the | |
| | 41:24 meeting we had. | |
| | 41:25   Q. And this is an internal memoranda | |
| | 42:1 that Mr. Mapes, from the DEA, created for Joseph | |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

42:2 Rannazzisi of the DEA; true?  Is that true?
42:3  A. That would appear to be correct.
42:4  Q. And you know who Mr. Rannazzisi of
42:5 the DEA is, do you not?
42:6  A. Yes, I do.
42:7  Q. He held an important position with
42:8 the DEA; did he not?
42:9  A. Mr. Rannazzisi was the head of
42:10 diversion control.
42:11  Q. And that's an important position; is
42:12 it not?
42:13  A. I believe so.
42:14  Q. All right.  Let's read the first
42:15 paragraph.  Again, they are talking about a
42:16 September 1 meeting.  This is a DEA memo.  It says:
42:17 (Reading) On September 1, 2005, a
42:18 meeting was held at the Office of
42:19 Diversion Control conference room.  In
42:20 attendance were Mr. John Gilbert (end
42:21 of reading).

| | 42:22 He's from McKesson; right? | |
| 42:25 - 43:10 | **Walker, Donald 01-10-2019 (00:00:24)** | DW03_Donald Walker Plaintiffs' Submission.32 |

42:25  Q. He's legal counsel at McKesson?
43:1  A. Mr. Gilbert is outside counsel for
43:2 McKesson.
43:3  Q. All right.  A lawyer; right?
43:4  A. Yes, he's a lawyer.
43:5  Q. Ronald Bone, Senior Vice President,
43:6 Distribution Support.  He's from McKesson; correct?
43:7  A. Yes.
43:8  Q. Gary Hilliard, Director of Regulatory
43:9 Affairs was present; right?

| | 43:10  A. Yes. | |
| 44:11 - 44:24 | **Walker, Donald 01-10-2019 (00:00:32)** | DW03_Donald Walker Plaintiffs' Submission.33 |

44:11  Q. That last sentence in the first
44:12 paragraph states:
44:13 (Reading) The purpose of the meeting
44:14 was to address the illegal domestic
44:15 Internet pharmacy problem and their
44:16 source of supply (end of reading).

| Page/Line | Source | ID |
|---|---|---|

44:17 Did I read that right?
44:18   A. Yes.
44:19   Q. And it says, "Illegal"; does it not?
44:20   A. That is what is written.
44:21   Q. And you understand that they said
44:22 they wanted to talk to you about source of supply.
44:23 That's McKesson, because McKesson is a source of
44:24 supply to pharmacies; true?

45:2 - 45:4 — **Walker, Donald 01-10-2019 (00:00:07)**

45:2   Q. That's what they are talking about?
45:3   A. McKesson's role in the pharmaceutical
45:4 supply chain is to supply pharmacies.

45:5 - 45:6 — **Walker, Donald 01-10-2019 (00:00:04)**

45:5   Q. They are a source of supply?  That's
45:6 what they are talking about in this memo; true?

45:8 - 45:10 — **Walker, Donald 01-10-2019 (00:00:06)**

45:8 THE WITNESS:  I'm not sure what their intent
45:9 in writing the "source of supply."  But McKesson does
45:10 supply pharmacies.

45:25 - 46:5 — **Walker, Donald 01-10-2019 (00:00:15)**

45:25   Q. All right.  From your background,
46:1 your experience in dealing with the DEA, this is an
46:2 important meeting?  If the DEA is bringing all these
46:3 folks from McKesson and the DEA is bringing all these
46:4 people to a meeting, and there's lawyers involved,
46:5 can we agree this was an important meeting?

46:6 - 47:15 — **Walker, Donald 01-10-2019 (00:01:41)**

46:6   A. I would acknowledge that DEA had, you
46:7 know, regular meetings with -- with McKesson and
46:8 other distributors.  Their intent in this meeting,
46:9 you know, is it important, you know, again, I'm not
46:10 going to speak for DEA.  It would appear to be.
46:11   Q. Let me ask you, meetings like this
46:12 didn't happen every week with the DEA where lawyers
46:13 are involved, the DEA is bringing all these folks,
46:14 and McKesson is bringing all these folks?  These type
46:15 meetings with the DEA did not happen every week;
46:16 would that be true?
46:17   A. Meetings at DEA headquarters were
46:18 not, you know, frequent.

| Page/Line | Source | ID |
|-----------|--------|-----|

**DW03_Donald Walker Plaintiffs' Submission**

46:19  Q. This didn't even happen every month,
46:20 where this many people from McKesson were brought in
46:21 to meet this many people at DEA headquarters?  It
46:22 didn't even happen once a month; did it?
46:23  A. Not that I recall.
46:24  Q. This is an unusual, important
46:25 meeting; is it not?
47:1  A. It would appear to be.
47:2  Q. Let's go to the next paragraph down.
47:3 Again, this is a -- the DEA memo about September 1,
47:4 2005.  The next paragraph starts with, "Mr. Mapes."
47:5 (Reading) Mr. Mapes opened the meeting
47:6 by presenting to the representatives
47:7 of McKesson Corporation a PowerPoint
47:8 briefing which explained the common
47:9 characteristics of Internet pharmacies
47:10 and why their activities are illegal
47:11 (end of reading).
47:12 So the DEA, at least according to this memo,
47:13 felt that these Internet pharmacies that McKesson was
47:14 supplying, that their activities were illegal; is
47:15 that what that says?

47:18 - 48:12  **Walker, Donald 01-10-2019 (00:00:44)**  DW03_Donald Walker Plaintiffs' Submission_9

47:18  Q. Sir, is that what that says?
47:19  A. I'm reading it.  It says, "the common
47:20 characteristics of Internet pharmacies and why their
47:21 activities are illegal."
47:22  Q. "Illegal," that's the DEA word;
47:23 right?
47:24  A. That's what is written.
47:25  Q. And they told that -- at least
48:1 according to this memo, they told McKesson on
48:2 September 1, 2005, that the activities of the
48:3 Internet pharmacies, in their opinion, were illegal;
48:4 right?  Is that what it says?
48:5  A. Yes.
48:6  Q. Then the next sentence in the
48:7 memoranda states:
48:8 (Reading) Reviewed with the
48:9 representatives of McKesson Corp.,

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

48:10 were (end of reading).

48:11 And then there's some bullet points of what

48:12 were reviewed; true?

| 48:15 - 48:19 | **Walker, Donald 01-10-2019 (00:00:11)** | DW03_Donald Walker Plaintiffs' Submission.20 |

48:15   Q. Do you see the bullet points?

48:16   A. Yes, I do.

48:17   Q. They talked about Supreme Court

48:18 cases, suspension orders with respect to Internet

48:19 pharmacies; right?

| 48:21 - 48:22 | **Walker, Donald 01-10-2019 (00:00:02)** | DW03_Donald Walker Plaintiffs' Submission.21 |

48:21 THE WITNESS:  That's what is written in the

48:22 memo.

| 48:24 - 48:25 | **Walker, Donald 01-10-2019 (00:00:03)** | DW03_Donald Walker Plaintiffs' Submission.22 |

48:24   Q. They talked about the DEA Internet

48:25 policy with McKesson; did they not?

| 49:2 - 49:3 | **Walker, Donald 01-10-2019 (00:00:01)** | DW03_Donald Walker Plaintiffs' Submission.23 |

49:2 THE WITNESS:  Again, that is what is

49:3 written.

| 49:12 - 49:14 | **Walker, Donald 01-10-2019 (00:00:06)** | DW03_Donald Walker Plaintiffs' Submission.24 |

49:12   Q. They talked about suspicious order

49:13 requirements of Title 21.  They talked about that

49:14 with McKesson on this day; true?

| 49:16 - 49:17 | **Walker, Donald 01-10-2019 (00:00:02)** | DW03_Donald Walker Plaintiffs' Submission.25 |

49:16 THE WITNESS:  That is what is written in the

49:17 document.

| 49:19 - 49:22 | **Walker, Donald 01-10-2019 (00:00:09)** | DW03_Donald Walker Plaintiffs' Submission.26 |

49:19   Q. And they talked to McKesson about

49:20 some of the practices and ordering patterns of these

49:21 Internet pharmacies that they thought were engaged in

49:22 illegal activities; true?

| 49:24 - 49:25 | **Walker, Donald 01-10-2019 (00:00:02)** | DW03_Donald Walker Plaintiffs' Submission.27 |

49:24 THE WITNESS:  Again, what is documented here

49:25 is that.

| 50:2 - 50:17 | **Walker, Donald 01-10-2019 (00:00:44)** | DW03_Donald Walker Plaintiffs' Submission.28 |

50:2   Q. All right.  Now, let's look to the

50:3 next paragraph.  This is -- and I'm going to you ask

50:4 you if you can agree how important this next

50:5 paragraph is, though.

50:6 The next paragraph states:

50:7 (Reading) After the presentation,

| DW03_Donald Walker Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

|  | 50:8 Mr. Mapes presented to representatives | |
|  | 50:9 of McKesson Corporation specific | |
|  | 50:10 customers of McKesson Corporation who | |
|  | 50:11 have ordered substantial quantities of | |
|  | 50:12 hydrocodone products.  These specific | |
|  | 50:13 customers of McKesson Corporation were | |
|  | 50:14 (end of reading). | |
|  | 50:15 And then they list United Prescription | |
|  | 50:16 Services and Ninth Avenue Pharmacy; do you see that? | |
|  | 50:17   A. I see that on the document. | |
| 50:24 - 51:7 | **Walker, Donald 01-10-2019 (00:00:32)** | DW03_Donald Walker Plaintiffs' Submission_9 |
|  | 50:24   Q. So you agree with me, this paragraph | |
|  | 50:25 is important because this is documenting the fact | |
|  | 51:1 that on September 1, 2005, the DEA actually pointed | |
|  | 51:2 out to McKesson two of its customers, at least two of | |
|  | 51:3 its customers, that McKesson was selling substantial | |
|  | 51:4 amounts of hydrocodone products to; correct?  That's | |
|  | 51:5 important?  They are actually telling McKesson, | |
|  | 51:6 here's some Internet pharmacies that you're selling a | |
|  | 51:7 lot of hydrocodones to.  That's important; true? | |
| 51:9 - 52:11 | **Walker, Donald 01-10-2019 (00:01:14)** | DW03_Donald Walker Plaintiffs' Submission_9 |
|  | 51:9 THE WITNESS:  In that I wasn't at the | |
|  | 51:10 meeting, all I can infer is that the document states | |
|  | 51:11 that Mr. Mapes presented to representatives of | |
|  | 51:12 McKesson specific customers of who have ordered | |
|  | 51:13 substantial quantities of hydrocodone products. | |
|  | 51:14 BY MR. KENNEDY: | |
|  | 51:15   Q. Let's look to the next paragraph, the | |
|  | 51:16 final paragraph in this first page.  It states: | |
|  | 51:17 (Reading) Mr. Mapes -- he's from the | |
|  | 51:18 DEA -- finalized the presentation by | |
|  | 51:19 advising the representatives of | |
|  | 51:20 McKesson Corporation that they needed | |
|  | 51:21 to thoroughly review the materials | |
|  | 51:22 provided which had been presented to | |
|  | 51:23 them and review in depth the | |
|  | 51:24 purchasing patterns and quantities of | |
|  | 51:25 their customers (end of reading). | |
|  | 52:1 So the DEA is telling McKesson here that | |
|  | 52:2 they have to thoroughly review the materials, and | |

| Page/Line | Source | ID |
|---|---|---|

52:3 they have to review in depth the purchasing patterns
52:4 and quantities of their customers; is that what it
52:5 says?
52:6   A. That's what the document says.
52:7   Q. And it indicates that the
52:8 representatives of McKesson acknowledge understanding
52:9 of the material presented.  Is that the final
52:10 statement?
52:11   A. Yes, that's what's in the document.

**52:15 - 52:17   Walker, Donald 01-10-2019 (00:00:06)**

52:15   Q. And you clearly would have seen this
52:16 document back in 2005, 2006?  We got it out of your
52:17 files; correct?  You saw it back then; right?

**52:19 - 52:21   Walker, Donald 01-10-2019 (00:00:07)**

52:19 THE WITNESS:  I don't recall seeing this
52:20 document, this internal DEA document, prior to the
52:21 review with counsel.

**53:9 - 53:15   Walker, Donald 01-10-2019 (00:00:19)**

53:9   Q. And could we agree that given the
53:10 fact at this meeting, and that they brought everybody
53:11 into headquarters, can we agree that the DEA wanted
53:12 to make sure that McKesson was aware that Internet
53:13 pharmacies were conducting themselves in an illegal
53:14 fashion?  They wanted you folks to know.  Would you
53:15 agree with that?

**53:17 - 53:20   Walker, Donald 01-10-2019 (00:00:13)**

53:17 THE WITNESS:  I would agree that based on
53:18 what is in this document, they are concerned over
53:19 Internet pharmacies.  Again, I wasn't at the meeting,
53:20 so I don't understand the tone.

**54:11 - 54:16   Walker, Donald 01-10-2019 (00:00:16)**

54:11   Q. During the meeting, during this
54:12 meeting, the DEA specifically pointed out that
54:13 McKesson was selling a significant amount of
54:14 hydrocodones to Internet pharmacies; true?  I mean,
54:15 we just read that.  They pointed that out to McKesson
54:16 at this meeting; right?

**54:18 - 54:24   Walker, Donald 01-10-2019 (00:00:12)**

54:18 THE WITNESS:  That's what's represented in
54:19 the document.

| | DW03_Donald Walker Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 54:20 BY MR. KENNEDY: | |
| | 54:21   Q. And this is a meeting that took place | |
| | 54:22 on September 1, 2005; right? | |
| | 54:23   A. That was the date of the meeting, as | |
| | 54:24 I understand it. | |
| 54:25 - 55:2 | **Walker, Donald 01-10-2019 (00:00:15)** | DW03_Donald Walker Plaintiffs' Submission.d |
| | 54:25 MR. KENNEDY:  All right.  Let's go four | |
| | 55:1 months later.  All right.  Four months later.  If we | |
| | 55:2 could look at Exhibit 689, please. | |
| 55:6 - 55:11 | **Walker, Donald 01-10-2019 (00:00:10)** | DW03_Donald Walker Plaintiffs' Submission.d |
| | 55:6   Q. You have got a September 1 meeting, | |
| | 55:7 2005.  I want to talk about four months later.  You | |
| | 55:8 have seen this document; have you not? | |
| | 55:9   A. Yes, I have. | |
| | 55:10   Q. This is from your files. | |
| | 55:11   A. Yes, I have seen this document. | |
| 55:14 - 57:7 | **Walker, Donald 01-10-2019 (00:01:59)** | DW03_Donald Walker Plaintiffs' Submission.d |
| | 55:14   Q. This is another -- this is another | |
| | 55:15 DEA memo; is it not? | |
| | 55:16   A. It would appear to be a DEA memo, | |
| | 55:17 yes. | |
| | 55:18   Q. And the subject of this memo is a | |
| | 55:19 January 3, 2006, meeting with the DEA; true?  True? | |
| | 55:20   A. Yes. | |
| | 55:21   Q. So McKesson is brought into the DEA | |
| | 55:22 on September 1, '05.  And now this is four months | |
| | 55:23 later, January 3, 2006; true? | |
| | 55:24   A. The meeting was held in January of | |
| | 55:25 2006, yes. | |
| | 56:1   Q. Now, this is a DEA memo, again, | |
| | 56:2 written to Mr. Rannazzisi; correct? | |
| | 56:3   A. That's correct. | |
| | 56:4   Q. Let's look to the first paragraph. | |
| | 56:5 They are referencing this meeting, the second meeting | |
| | 56:6 four months after the first.  And they state: | |
| | 56:7 (Reading) On January 3, 2006, a | |
| | 56:8 meeting was held at the Office of | |
| | 56:9 Diversion Control conference room | |
| | 56:10 between representatives of McKesson | |
| | 56:11 Corporation and the Drug Enforcement | |

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

56:12 Administration (end of reading).
56:13 The second paragraph states:
56:14 (Reading) Representing McKesson
56:15 Corporation were Donald G.  Walker" --
56:16 That's you; right?
56:17   A. Yes, it is.
56:18   Q. You're at the second meeting; right?
56:19   A. Yes, I was at this meeting.
56:20   Q. And that point you were Senior Vice
56:21 President of Distribution Operations; correct?
56:22   A. That is correct.
56:23   Q. So you're sitting on top of
56:24 Regulatory Affairs at that point; true?
56:25   A. Yes.
57:1   Q. Bill Mahoney, Distribution Center
57:2 Manager, Lakeland Distribution Center, Florida, was
57:3 there; right?  McKesson employee; true?
57:4   A. Yes.
57:5   Q. Gary Hilliard, Director of Regulatory
57:6 Affairs, was there; right?
57:7   A. Yes.

**57:10 - 57:23**   **Walker, Donald 01-10-2019 (00:00:28)**

57:10   Q. And John Gilbert, one of McKesson's
57:11 lawyers was present; true?
57:12   A. That is correct.
57:13   Q. And it says -- next paragraph down it
57:14 outlines now who is there from the DEA.  It says:
57:15 (Reading) Representing Drug
57:16 Enforcement Administration (DEA)
57:17 Office of Diversion Control (OD) were
57:18 Joseph Rannazzisi, Deputy Assistant
57:19 Administrator, Michael R. Mapes,
57:20 Chief, E-Commerce Section (end of
57:21 reading).
57:22 Another DEA person; true?
57:23   A. Yes.

**57:24 - 58:5**   **Walker, Donald 01-10-2019 (00:00:16)**

57:24   Q. Kyle Wright, Chief E-Commerce
57:25 Operations from the DEA was present; right?
58:1   A. Yes.

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

58:2   Q. And then Charles E. Trant, a DEA
58:3 Chief Counsel, a lawyer, was also present; right?
58:4   A. That's what's represented on the
58:5 document, yes.

**58:6 - 59:8**   **Walker, Donald 01-10-2019 (00:01:12)**

58:6   Q. The next paragraph down.  Could you
58:7 read that to us.  Read the next paragraph down.
58:8   A. (Reading) The purpose of this
58:9 meeting -- or the meeting was to
58:10 discuss the delivery of over two
58:11 million dosage units of hydrocodone to
58:12 pharmacies located in Tampa, Florida,
58:13 area alleged to be Internet pharmacies
58:14 (end of reading).
58:15   Q. Hadn't McKesson just met with the DEA
58:16 four months earlier about Internet pharmacies and
58:17 their illegal activity?  Isn't that what we just
58:18 looked at before this document?  Four months earlier
58:19 you had a meeting; correct?
58:20   A. McKesson participated in a meeting in
58:21 September --
58:22   Q. About Internet pharmacy --
58:23   A. -- 2005.
58:24   Q. About Internet pharmacies and illegal
58:25 activity; right?
59:1   A. As was represented in the document,
59:2 yes.
59:3   Q. And what you have just read to us, it
59:4 looks like the DEA is bringing you back four months
59:5 later, because McKesson sold two million dosages of
59:6 hydrocodone to Internet pharmacies after that
59:7 meeting; right?  That's the purpose of this next
59:8 meeting?

**59:11 - 59:16**   **Walker, Donald 01-10-2019 (00:00:19)**

59:11   Q. True?
59:12   A. I don't know that to be accurate.
59:13 What is stated here is the delivery of two million
59:14 dosages of units of hydrocodone to pharmacies in that
59:15 area, which is --
59:16   Q. It says Internet pharmacies --

| | DW03_Donald Walker Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 59:20 - 60:6 | **Walker, Donald 01-10-2019 (00:00:26)** | DW03_Donald Walker Plaintiffs' Submission 26 |
| | 59:20 THE WITNESS:  Internet pharmacies, but it | |
| | 59:21 didn't specify the time frame that they are referring | |
| | 59:22 to. | |
| | 59:23 BY MR. KENNEDY: | |
| | 59:24   Q. Oh, we are going to get to the time | |
| | 59:25 frame.  Because two million doses of hydrocodone, | |
| | 60:1 sir, you know from your 20, 30 years of experience, | |
| | 60:2 that's a lot of hydrocodone drug; is it not?  That's | |
| | 60:3 a lot? | |
| | 60:4   A. Depending on the time frame, Counsel. | |
| | 60:5 And I can't answer whether that's an appropriate | |
| | 60:6 number or an excessive number. | |
| 60:21 - 62:17 | **Walker, Donald 01-10-2019 (00:01:43)** | DW03_Donald Walker Plaintiffs' Submission 26 |
| | 60:21   Q. Okay.  Bullet point No. 1, they are | |
| | 60:22 referencing the first meeting that took place four | |
| | 60:23 months earlier.  And this first bullet point states: | |
| | 60:24 (Reading) A meeting between McKesson | |
| | 60:25 Corp and E-Commerce Section -- that | |
| | 61:1 would be the DEA -- was held | |
| | 61:2 September 1, 2005, at which time | |
| | 61:3 McKesson Corp. was given a full | |
| | 61:4 detailed briefing of the OD | |
| | 61:5 Distributor's initiative to address | |
| | 61:6 the Internet pharmacy problem. | |
| | 61:7 McKesson Corp. was provided a briefing | |
| | 61:8 book covering the briefing and all | |
| | 61:9 supporting documentation (end of | |
| | 61:10 reading). | |
| | 61:11 So they are talking about the meeting that | |
| | 61:12 took place four months earlier about the Internet | |
| | 61:13 pharmacies; correct? | |
| | 61:14   A. I believe that's correct. | |
| | 61:15   Q. The next bullet: | |
| | 61:16 (Reading) Issues to be considered were | |
| | 61:17 frequency of orders, size of orders, | |
| | 61:18 range of product purchases, and | |
| | 61:19 percentage of controlled versus | |
| | 61:20 non-controlled (end of reading). | |
| | 61:21 Did I read that right? | |

| Page/Line | Source | ID |
|---|---|---|
| | DW03_Donald Walker Plaintiffs' Submission | |

61:22   A. Yes.

61:23   Q. And, again, they are talking about

61:24 that meeting on September 1.  The next bullet point:

61:25 (Reading) Current controlled

62:1 substances being abused via the

62:2 Internet were identified as

62:3 hydrocodone, alprazalam and

62:4 Phentermine (end of reading).

62:5 Do you see that?

62:6   A. Yes.

62:7   Q. Look at that last bullet, though.

62:8 Let's focus on that last bullet, because they are

62:9 talking -- they are reflecting back on the meeting

62:10 that took place four months earlier.  And the DEA in

62:11 that last bullet point states:

62:12 (Reading) Specifically addressed

62:13 concerns with United Prescription

62:14 Services, a current customer of

62:15 McKesson's (end of reading).

62:16 Do you see that, sir?

62:17   A. Yes, I see what's written.

**63:2 - 64:18      Walker, Donald 01-10-2019 (00:01:49)**                    DW03_Donald Walker Plaintiffs' Submission 25

63:2   Q. The next bullet point on the next

63:3 page, it next states, "On October 6, 2005" -- that

63:4 would be one month after the September 1 meeting;

63:5 true?

63:6   A. Yes.

63:7   Q. It states:

63:8 (Reading) On October 6, 2005,

63:9 Mr. Mapes" -- and he's from the DEA --

63:10 called Mr. Gilbert (end of reading).

63:11 And he's from McKesson; right?

63:12   A. Mr. Gilbert was our outside counsel.

63:13   Q. So you've got on September 6, one

63:14 month after the DEA meeting.

63:15 (Reading) Mr. Mapes, of the DEA, calls

63:16 McKesson's lawyer to discuss comments

63:17 the E-Commerce Section -- and that's

63:18 the DEA -- to discuss comments the

63:19 E-Commerce Section had received that

| Page/Line | Source | ID |
|---|---|---|

DW03_Donald Walker Plaintiffs' Submission

63:20 McKesson Corp. was not taking the
63:21 Internet pharmacy problem seriously.
63:22 Mr. Mapes, DEA, was assured by
63:23 Mr. Gilbert that McKesson Corp. was
63:24 taking the matters seriously and
63:25 working to change their procedures
64:1 (end of reading).
64:2 Did I read that right?
64:3   A. Yes.
64:4   Q. On October -- next bullet point.
64:5 This is four days later.  So you've had a meeting on
64:6 September 1; they called you a month later saying
64:7 you're not taking it serious; and four days later
64:8 does this bullet point state:
64:9 (Reading) On October 10, 2005, a DEA
64:10 investigator from the Tampa District
64:11 Office contacted Bill Mahoney at the
64:12 McKesson Distribution Center in
64:13 Lakeland, Florida, and expressed
64:14 concerns of hydrocodone sales to
64:15 United Prescription Services (end of
64:16 reading)?
64:17 Did I read that right?
64:18   A. Yes.

**64:25 - 65:3**  **Walker, Donald 01-10-2019 (00:00:09)**

64:25   Q. A month and nine days after being
65:1 warned about United Prescription Services, McKesson
65:2 is getting a call and warning them again; true?  Is
65:3 that what that bullet point says?

**65:5 - 65:6**  **Walker, Donald 01-10-2019 (00:00:01)**

65:5 THE WITNESS:  That's what's in the document.
65:6 BY MR. KENNEDY:

**65:16 - 66:11**  **Walker, Donald 01-10-2019 (00:00:56)**

65:16   Q. So it states:
65:17 (Reading) The E-Commerce Section of
65:18 the DEA retrieved the ARCOS data which
65:19 revealed that between October 10 and
65:20 October 21, 2005, the following
65:21 alleged Internet pharmacies received
65:22 the identified quantities of

| Page/Line | Source | ID |
|-----------|--------|-----|

DW03_Donald Walker Plaintiffs' Submission

65:23 hydrocodone (end of reading).
65:24 Remember, you said you can't tell us whether
65:25 or not two million dosages was a lot, it depends on
66:1 the time frame; right?  Remember you just -- you just
66:2 told us that, and how many people you're selling to
66:3 in the time frame; right?
66:4  A. Yes.
66:5  Q. We're talking about an 11-day period
66:6 here; are we not?  The E-Commerce Section received
66:7 ARCOS data which revealed that between October 10 and
66:8 October 20, 2005, the following alleged Internet
66:9 pharmacies received the identified quantities of
66:10 hydrocodone.  We're talking about 11 days; right?  Is
66:11 that what we're talking about, 11 days?

**66:13 - 67:2**  **Walker, Donald 01-10-2019 (00:00:43)**

66:13 THE WITNESS:  That's what's documented.
66:14 BY MR. KENNEDY:
66:15  Q. It says here, United Prescription
66:16 Services -- after being warned about them, it says
66:17 here, does it not, that McKesson in this 11 days
66:18 distributed them 252,100 units of hydrocodone; is
66:19 that what it says?
66:20  A. That's what it says and is alleged
66:21 here, yes.
66:22  Q. You know that at this point in time,
66:23 the DEA, their statistics in ARCOS, were showing that
66:24 the average monthly, average monthly distribution by
66:25 a distributorship of McKesson was 5,000 units of
67:1 hydrocodone?  Do you remember that?  Remember that
67:2 communication, all during this period?

**67:4 - 67:12**  **Walker, Donald 01-10-2019 (00:00:27)**

67:4 THE WITNESS:  I recall DEA indicating that
67:5 5,000 doses of controlled substances was average.
67:6 BY MR. KENNEDY:
67:7  Q. That's an average monthly dose;
67:8 right?
67:9  A. That's what I recall.
67:10  Q. And, sir, so McKesson sends to United
67:11 Prescription Services in an 11-day period, 50 times,
67:12 50 times the monthly dosage; is that what it says?

| | | |
|---|---|---|
| **DW03_Donald Walker Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

67:14 - 67:23    **Walker, Donald 01-10-2019 (00:00:23)**

67:14 THE WITNESS:  That's what the document says.

67:15 BY MR. KENNEDY:

67:16   Q. So I think you told us a couple

67:17 minutes ago, to tell us whether or not the amount

67:18 that you folks are distributing into a pharmacy, you

67:19 need to know the time frame and the number of

67:20 pharmacies.

67:21 Can we agree that if McKesson send 50 times,

67:22 50 times the monthly dosage in 11 days, that's

67:23 inappropriate?  That's too much?

68:2 - 69:8    **Walker, Donald 01-10-2019 (00:01:55)**

68:2   Q. Would you agree with that?

68:3   A. No, I don't agree specifically,

68:4 because -- not understanding their pharmacies across

68:5 the country, that have a wide variety of business

68:6 models that require substantial quantities of

68:7 controlled substances.  And it also is based on DEA's

68:8 average.

68:9 Our view was that DEA -- how they calculated

68:10 their average, we didn't understand.  So their

68:11 alleged average, whether it's accurate or not, we

68:12 didn't know.

68:13   Q. Let me ask you this.  Forget the

68:14 averages and forget everything else.  You were

68:15 involved in this, sir, for how many years?

68:16   A. Probably 15 years in the role.

68:17   Q. Given your background, experience, as

68:18 we sit here today, sir, can you agree with me that if

68:19 McKesson sent 250,000 units of hydrocodone to a

68:20 single pharmacy in 11 days, sir, that is absolutely,

68:21 positively, an extraordinary amount that should never

68:22 have been shipped?  Could we agree with that?

68:23   A. What I would agree with is that we

68:24 were -- all of these pharmacies were licensed and

68:25 registered pharmacies, registered by the DEA, and we

69:1 were filling prescriptions that were submitted to us,

69:2 you know, based on a licensed pharmacy coming from a

69:3 licensed prescription.

69:4   Q. Sir, McKesson lost its license in six

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 69:5 different distribution centers and was fined | |
|  | 69:6 $13 million for this, and you're sitting here telling | |
|  | 69:7 us that sending 250,000 units of hydrocodone in 11 | |
|  | 69:8 days is appropriate?  Is that what you're telling us? | |
| 69:10 - 69:20 | **Walker, Donald 01-10-2019 (00:00:32)** | DW03_Donald Walker Plaintiffs' Submission.tif |
|  | 69:10 THE WITNESS:  What I can assure you is that | |
|  | 69:11 we were fulfilling orders for pharmacies that were | |
|  | 69:12 licensed and registered by the DEA and were | |
|  | 69:13 submitting to us orders. | |
|  | 69:14 BY MR. KENNEDY: | |
|  | 69:15   Q. The next bullet down, it says during | |
|  | 69:16 an 11-day period you sent Universal Rx 254,700 units | |
|  | 69:17 of hydrocodone.  Is that what it says next? | |
|  | 69:18   A. That's what the document says. | |
|  | 69:19   Q. That would be 50 times the national | |
|  | 69:20 average, would it not, for a full month; true? | |
| 69:23 - 70:3 | **Walker, Donald 01-10-2019 (00:00:13)** | DW03_Donald Walker Plaintiffs' Submission.tif |
|  | 69:23   Q. Is that right? | |
|  | 69:24   A. The -- | |
|  | 69:25   Q. Did I did do the division right?  If | |
|  | 70:1 I put 50 into 250,000, it's about 50 times the | |
|  | 70:2 national average.  Is that -- is my math right?  I | |
|  | 70:3 suppose that's what I'm asking. | |
| 70:5 - 70:20 | **Walker, Donald 01-10-2019 (00:00:44)** | DW03_Donald Walker Plaintiffs' Submission.tif |
|  | 70:5 THE WITNESS:  Again, the document indicates | |
|  | 70:6 that we shipped 250,000 dose units in -- in that time | |
|  | 70:7 frame.  I don't have any independent knowledge of, A, | |
|  | 70:8 whether the quantities alleged is correct because I | |
|  | 70:9 don't have the original information or data; nor, as | |
|  | 70:10 I stated, the average, whether it was correct -- | |
|  | 70:11 BY MR. KENNEDY: | |
|  | 70:12   Q. Well, sir -- | |
|  | 70:13   A. Based on DEA's view. | |
|  | 70:14   Q. -- you don't have any knowledge | |
|  | 70:15 whether these are correct?  You were directly | |
|  | 70:16 involved with this memo from the beginning, and this | |
|  | 70:17 led to negotiations and a settlement, and McKesson | |
|  | 70:18 losing its license to distribute opioids and a | |
|  | 70:19 $13 million fine; did it not?  You were directly | |
|  | 70:20 involved with that; were you not? | |

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

**70:22 - 71:6**   **Walker, Donald 01-10-2019 (00:00:22)**

70:22 THE WITNESS:  I was directly involved in the
70:23 settlement with DEA and the penalties that were
70:24 associated with that.
70:25 ///
71:1 BY MR. KENNEDY:
71:2   Q. And you said you don't know whether
71:3 these numbers are accurate.  Did McKesson ever, ever,
71:4 in fighting its suspension and the $13 million fine,
71:5 did they ever claim that the numbers were inaccurate,
71:6 ever?

**71:9 - 71:19**   **Walker, Donald 01-10-2019 (00:00:36)**

71:9   Q. You were directly involved.  Did they
71:10 ever say, well, we didn't really sell all that, ever?
71:11   A. I don't recall that we have ever had
71:12 the discussion with DEA around those numbers.
71:13   Q. It next states, "Avee Pharmacy."  You
71:14 sold those folks, a single pharmacy, 520,000 units of
71:15 hydrocodone in 11 days.  Is that what it says?
71:16   A. That's what the document says.
71:17   Q. That's a hundred times the 30-day
71:18 national average.  And McKesson did that in 11 days;
71:19 is that -- is that right?  Is my math right?

**71:22 - 72:5**   **Walker, Donald 01-10-2019 (00:00:23)**

71:22   Q. Is that right, sir?
71:23   A. Again, using those numbers, as I
71:24 stated earlier, the average, whether that's correct
71:25 or incorrect.  But if that's what's alleged here,
72:1 then your math is correct.
72:2 BY MR. KENNEDY:
72:3   Q. And then Medipharm Rx, 500,900 in 11
72:4 days.  Again, if my math is correct, that's a hundred
72:5 times the national average in 11 days; right?

**72:7 - 72:13**   **Walker, Donald 01-10-2019 (00:00:18)**

72:7 THE WITNESS:  Again, the way you calculate
72:8 it, using that average and these documented numbers,
72:9 your math would be right.
72:10 BY MR. KENNEDY:
72:11   Q. And then to the Accumed Pharmacy,
72:12 404,400.  And that would be 80 times the national

| Page/Line | Source | ID |
|---|---|---|
| | 72:13 average; would it not? | |
| 72:17 - 72:18 | **Walker, Donald 01-10-2019 (00:00:04)** | DW03_Donald Walker Plaintiffs' Submission.73 |
| | 72:17   A. Again, using your calculations, that | |
| | 72:18 would be 80 times. | |
| 73:5 - 74:3 | **Walker, Donald 01-10-2019 (00:01:13)** | DW03_Donald Walker Plaintiffs' Submission.73 |
| | 73:5   Q. Mr. Walker, we just went through the | |
| | 73:6 DEA's outline of McKesson's sale of two million | |
| | 73:7 hydrocodones to six different pharmacies.  I'm going | |
| | 73:8 to go back for a second.  I'm going to stop there on | |
| | 73:9 this memo and reflect upon what you told us earlier. | |
| | 73:10 This was your statement earlier with respect | |
| | 73:11 to McKesson's responsibility; correct?  Remember | |
| | 73:12 going through that? | |
| | 73:13   A. Yes. | |
| | 73:14   Q. And Mr. Walker said, "McKesson's | |
| | 73:15 responsibility was they were responsible to comply | |
| | 73:16 with the Code of Federal Regulations in the handling | |
| | 73:17 and distribution of controlled substances."  That was | |
| | 73:18 your statement with respect to McKesson's | |
| | 73:19 responsibility; true? | |
| | 73:20   A. Yes, it was. | |
| | 73:21   Q. Hydrocodone is a controlled | |
| | 73:22 substance; right? | |
| | 73:23   A. Yes, it is. | |
| | 73:24   Q. Can we agree that if McKesson -- as | |
| | 73:25 the DEA has outlined here, if McKesson distributed | |
| | 74:1 two million hydrocodones in 11 days to just six | |
| | 74:2 pharmacies, that McKesson did not live up to the | |
| | 74:3 responsibility that you have told us that they had? | |
| 74:6 - 74:15 | **Walker, Donald 01-10-2019 (00:00:30)** | DW03_Donald Walker Plaintiffs' Submission.73 |
| | 74:6   Q. Would you agree? | |
| | 74:7   A. No, I wouldn't agree with that | |
| | 74:8 statement. | |
| | 74:9   Q. So -- just so we're clear here.  On | |
| | 74:10 the record here today, under your oath, it's your | |
| | 74:11 position that the sale of two million hydrocodones in | |
| | 74:12 11 days to six pharmacies is consistent with and | |
| | 74:13 comports with McKesson's responsibility to comply | |
| | 74:14 with Federal Regulations in the handling and | |
| | 74:15 distribution of controlled substances; is that -- | |

**DW03_Donald Walker Plaintiffs' Submission**

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

74:18 - 74:18     **Walker, Donald 01-10-2019 (00:00:01)**

74:18   Q. -- is that your testimony here?

74:21 - 74:22     **Walker, Donald 01-10-2019 (00:00:02)**

74:21   Q. Is that your testimony?  I want to be
74:22 very clear.

74:24 - 75:13     **Walker, Donald 01-10-2019 (00:00:40)**

74:24 THE WITNESS:  I don't agree with your
74:25 original statement.  What I would state is that we
75:1 complied with the regulations regarding the
75:2 distribution.  We reported to DEA.  We sold only to
75:3 licensed pharmacies who had a licensed physician's
75:4 prescriptions.  And we managed the security of our
75:5 controlled substances in compliance with the
75:6 regulations.
75:7 BY MR. KENNEDY:
75:8   Q. That wasn't my question.  But you
75:9 just said you reported to the DEA.  Am I correct that
75:10 not one single one, not one single one of these
75:11 orders that added up to two million hydrocodones in
75:12 11 days, not one single one of them was reported to
75:13 the DEA; isn't that the fact?

75:16 - 75:16     **Walker, Donald 01-10-2019 (00:00:00)**

75:16   Q. That's the fact?

75:18 - 75:19     **Walker, Donald 01-10-2019 (00:00:03)**

75:18 THE WITNESS:  I have no knowledge of that
75:19 either way.

75:20 - 76:1     **Walker, Donald 01-10-2019 (00:00:19)**

75:20 BY MR. KENNEDY:
75:21   Q. Sir, you sat through the meetings,
75:22 the negotiations, the pleadings, and all of the legal
75:23 proceedings with respect to this event; did you not?
75:24   A. No, that's not accurate.  I did not
75:25 sit through all the meetings and negotiations that
76:1 took place between counsels.

76:2 - 76:7     **Walker, Donald 01-10-2019 (00:00:14)**

76:2   Q. Did you sign the agreement with the
76:3 DEA in relation to these violations, these sales of
76:4 hydrocodones?  Did you sign the very settlement
76:5 agreement; sir?
76:6   A. I signed the 2008 memorandum

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 76:7 agreement, yes. | |
| 76:8 - 76:16 | **Walker, Donald 01-10-2019 (00:00:28)** | DW03_Donald Walker Plaintiffs' Submission.00 |
| | 76:8   Q. Let me back up, because I just -- I | |
| | 76:9 just want to be clear about it. | |
| | 76:10 Is it your position, sir -- not in general | |
| | 76:11 terms but with respect to the specifics, is it your | |
| | 76:12 position that the sale of two million hydrocodones in | |
| | 76:13 11 days to six pharmacies comported with, was | |
| | 76:14 consistent with, McKesson's responsibility to comply | |
| | 76:15 with the Code of Federal Regulations in the handling | |
| | 76:16 and distribution of controlled substances? | |
| 76:19 - 76:25 | **Walker, Donald 01-10-2019 (00:00:19)** | DW03_Donald Walker Plaintiffs' Submission.00 |
| | 76:19   Q. If you can answer that specific | |
| | 76:20 question. | |
| | 76:21   A. We specifically complied with the | |
| | 76:22 regulations as associated with the reporting of | |
| | 76:23 suspicious orders and guarding against diversion | |
| | 76:24 through the security and controls that we put in | |
| | 76:25 place to handle controlled substances. | |
| 77:25 - 78:19 | **Walker, Donald 01-10-2019 (00:00:43)** | DW03_Donald Walker Plaintiffs' Submission.00 |
| | 77:25 You were at this meeting; were you not? | |
| | 78:1   A. I was at that meeting. | |
| | 78:2   Q. The memo says, with regard to that | |
| | 78:3 meeting: | |
| | 78:4 (Reading) Mr. Rannazzisi -- he's of | |
| | 78:5 the DEA -- then addressed the | |
| | 78:6 representatives of McKesson and | |
| | 78:7 informed them that it was his | |
| | 78:8 concerted opinion that based upon the | |
| | 78:9 information presented, the DEA needed | |
| | 78:10 to ask for the surrender of McKesson's | |
| | 78:11 Lakeland Distribution Senator -- | |
| | 78:12 Center registration or the DEA would | |
| | 78:13 pursue an Order to Show Cause against | |
| | 78:14 the DEA registrant of the McKesson | |
| | 78:15 facility in Lakeland, Florida (end of | |
| | 78:16 reading). | |
| | 78:17 Is that what you were told at that meeting, | |
| | 78:18 that they wanted McKesson's registration?  Is that | |
| | 78:19 what you were told? | |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

78:21 - 79:10    **Walker, Donald 01-10-2019 (00:00:36)**

78:21 THE WITNESS:  I recall Mr. Rannazzisi in
78:22 that meeting requesting that we surrender our
78:23 Lakeland, Florida, registration.
78:24 BY MR. KENNEDY:
78:25   Q. And that means you're not going to be
79:1 able to sell narcotics to pharmacies:  Right?  If you
79:2 have got to give your registration back, that's what
79:3 that means?
79:4   A. If a registration is suspended or
79:5 revoked, then you're unable to sell controlled
79:6 substances.
79:7   Q. So when you say selling two million
79:8 pills in 11 days is okay, that you're fulfilling your
79:9 responsibility under the regulations, the DEA didn't
79:10 agree with that; did they?

79:13 - 79:13    **Walker, Donald 01-10-2019 (00:00:01)**

79:13   Q. They want your registration?

79:15 - 79:16    **Walker, Donald 01-10-2019 (00:00:05)**

79:15 THE WITNESS:  The DEA requested we surrender
79:16 our registration during that meeting.

79:17 - 79:19    **Walker, Donald 01-10-2019 (00:00:02)**

79:17 BY MR. KENNEDY:
79:18   Q. And you ended up surrendering your
79:19 registration; didn't you?

79:21 - 79:24    **Walker, Donald 01-10-2019 (00:00:13)**

79:21 THE WITNESS:  Counsel, that's not correct.
79:22 We had a limited suspension of certain controlled
79:23 substances from certain distribution centers, is the
79:24 result of the agreement with DEA.

80:2 - 80:22    **Walker, Donald 01-10-2019 (00:00:44)**

80:2   Q. We will look at that specifically.
80:3 Let's go down to -- after some bullet points, I want
80:4 to go down to the paragraph that starts with
80:5 "Through."
80:6 Do you see this paragraph that starts with
80:7 "Through"?
80:8 (Reading) Through the course of the
80:9 above discussion, McKesson Corp., by
80:10 their own admission, was unable to

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

80:11 provide a plausible explanation for
80:12 the sales of over two million dosage
80:13 units of hydrocodone, in a 21-day
80:14 period, to pharmacies previously
80:15 identified by DEA to McKesson Corp.
80:16 (end of reading).
80:17 Do you see that?
80:18   A. I see what's written there, yes.
80:19   Q. Do you remember that, that all these
80:20 folks at McKesson are sitting there with your
80:21 lawyers, and you can't explain how you did this?  Do
80:22 you remember that?

**80:24 - 81:1**   **Walker, Donald 01-10-2019 (00:00:05)**

80:24 THE WITNESS:  I don't recall any specific
80:25 discussion with the DEA around that.  So the answer
81:1 is --

**81:2 - 81:6**   **Walker, Donald 01-10-2019 (00:00:02)**

81:2 BY MR. KENNEDY:
81:3   Q. Do you remember -- do you remember
81:4 saying --
81:5 MS. HENN:  Counsel, can you make sure to let
81:6 him finish.

**81:8 - 81:20**   **Walker, Donald 01-10-2019 (00:00:33)**

81:8   Q. Do you remember you folks at McKesson
81:9 telling the DEA at this meeting, there's nothing
81:10 wrong with two million pills in 11 days; we fulfilled
81:11 our responsibility under the regulations?  Do you
81:12 remember saying that to them at this meeting?
81:13   A. No, I don't remember saying anything
81:14 like that.
81:15   Q. You said earlier you weren't sure
81:16 whether these numbers, this two million, they were
81:17 accurate.  Any indication on here that you looked at
81:18 the DEA at that meeting and said that two million,
81:19 that two million hydrocodones isn't accurate?  Any
81:20 indication of that, or do you have a memory of that?

**81:22 - 82:19**   **Walker, Donald 01-10-2019 (00:00:57)**

81:22 THE WITNESS:  I don't have a recollection of
81:23 that one way or the other.
81:24 BY MR. KENNEDY:

| Page/Line | Source | ID |
|---|---|---|

DW03_Donald Walker Plaintiffs' Submission

81:25   Q. Let's look at the last paragraph on
82:1 that page.  It states that:
82:2 (Reading) After the conclusion of this
82:3 meeting, it was learned from Gary
82:4 Hilliard of McKesson that one of the
82:5 reasons they were not able to realize
82:6 the full volume of hydrocodone product
82:7 going out to Florida pharmacies was
82:8 that their reports only included the
82:9 name brand hydrocodone products
82:10 distributed and was -- next page --
82:11 and was leaving out the generic
82:12 products.  It was only after realizing
82:13 that the generic were not being
82:14 reported was McKesson Corp. then able
82:15 to see the large quantities that DEA
82:16 was bringing to McKesson's attention
82:17 (end of reading).
82:18 Did I read that right?
82:19   A. Yes.

**82:20 - 82:25     Walker, Donald 01-10-2019 (00:00:27)**

82:20   Q. It doesn't say here that you went
82:21 back and looked and the DEA was wrong; does it?
82:22   A. What is documented here is that
82:23 Mr. Mapes reportedly had a conversation with Gary
82:24 Hilliard.  I'm not directly familiar with that
82:25 conversation.

**83:1 - 83:20      Walker, Donald 01-10-2019 (00:01:12)**

83:1   Q. This is 2006, and McKesson discovers
83:2 at this point that its reports did not include the
83:3 sales of generic hydrocodones; isn't that what it
83:4 indicates?
83:5   A. That's what's documented here.
83:6   Q. And tell the jury what generic
83:7 hydrocodones are.
83:8   A. In all pharmaceuticals or medicines,
83:9 as a brand drug comes to market, it stays brand for a
83:10 period of time, at which time a generic drug can be
83:11 manufactured that has the same pharmacological
83:12 characteristics as the brand medication.  So it's

| Page/Line | Source | ID |
|---|---|---|

83:13 very common in pharmaceutical industry for generics.
83:14 Amoxicillin is probably the best example that
83:15 everybody would know.
83:16   Q. And, sir, the majority of
83:17 hydrocodones that McKesson was selling were generic;
83:18 were they not?
83:19   A. I do not know what quantities were
83:20 brand versus generic at that point in time.

**83:21 - 83:24  Walker, Donald 01-10-2019 (00:00:08)**

83:21   Q. In a general sense, that has always
83:22 been true at McKesson?  You sell more generics than
83:23 you do brand name controlled substances; hasn't that
83:24 always be true?

**84:1 - 84:2   Walker, Donald 01-10-2019 (00:00:02)**

84:1 THE WITNESS:  Again, I don't have any
84:2 specific knowledge one way or the other.

**84:4 - 84:7   Walker, Donald 01-10-2019 (00:00:12)**

84:4   Q. Let me ask you this.  If you weren't
84:5 tracking generic drugs with your reporting and your
84:6 tracking, if you weren't tracking hydrocodone, can we
84:7 agree you weren't tracking oxycodone either; true?

**84:10 - 84:10   Walker, Donald 01-10-2019 (00:00:00)**

84:10   Q. Is that what you discovered?

**84:12 - 84:13   Walker, Donald 01-10-2019 (00:00:03)**

84:12 THE WITNESS:  There -- I had no indication
84:13 that we weren't tracking oxycodone.

**84:14 - 84:19   Walker, Donald 01-10-2019 (00:00:09)**

84:14 BY MR. KENNEDY:
84:15   Q. Are you -- are you representing to
84:16 the jury that you had one system of tracking for
84:17 hydrocodones and a totally different system of
84:18 tracking for oxycodones?  Is that what you're telling
84:19 us, sir?

**84:21 - 85:6   Walker, Donald 01-10-2019 (00:00:30)**

84:21 THE WITNESS:  No, that's not accurate.  Our
84:22 overall system was one and the same.  The inputs into
84:23 that system could have potentially created a void in
84:24 the reporting of hydrocodone and had nothing to do
84:25 with oxycodone.
85:1 BY MR. KENNEDY:

| | DW03_Donald Walker Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  |  |
|---|---|---|
|  | 85:2  Q. Is that what was happening, sir?  You | |
|  | 85:3 were in the middle of this.  Is that what was | |
|  | 85:4 happening, your system wasn't tracking generic | |
|  | 85:5 hydrocodones but, indeed, was tracking generic | |
|  | 85:6 oxycodones?  Is that what was happening? | |
| 85:8 - 85:15 | **Walker, Donald 01-10-2019 (00:00:18)** | |
|  | 85:8 THE WITNESS:  I don't recall specifically. | |
|  | 85:9 I do recall we had an issue with our system at the | |
|  | 85:10 time.  But I don't recall the specifics of that. | |
|  | 85:11 BY MR. KENNEDY: | |
|  | 85:12  Q. Sir, if your system was not tracking | |
|  | 85:13 hydrocodones, generic hydrocodones in '05, then it | |
|  | 85:14 wasn't tracking them in '04 or '03 or '02 or '01; | |
|  | 85:15 true? | |
| 85:18 - 85:18 | **Walker, Donald 01-10-2019 (00:00:01)** | |
|  | 85:18  Q. It never had been? | |
| 85:20 - 86:3 | **Walker, Donald 01-10-2019 (00:00:20)** | |
|  | 85:20 THE WITNESS:  I can't speculate on if this | |
|  | 85:21 was taking place, when it started, and to the extent | |
|  | 85:22 that it took place. | |
|  | 85:23 BY MR. KENNEDY: | |
|  | 85:24  Q. Sir, you were in charge at that | |
|  | 85:25 point.  Didn't you say to Mr. Hilliard and the folks | |
|  | 86:1 working for you, how long has this been going on, | |
|  | 86:2 that we haven't been tracking generic hydrocodones? | |
|  | 86:3 Did you ask? | |
| 86:5 - 86:16 | **Walker, Donald 01-10-2019 (00:00:48)** | |
|  | 86:5 THE WITNESS:  I don't recall having any | |
|  | 86:6 specific request or discussions around this. | |
|  | 86:7 BY MR. KENNEDY: | |
|  | 86:8  Q. Sir, McKesson had the duty since 1970 | |
|  | 86:9 to identify and report suspicious orders of | |
|  | 86:10 controlled substances; did they not? | |
|  | 86:11  A. I don't know specifically when the | |
|  | 86:12 CFR was generated.  It was in the early '70s.  But in | |
|  | 86:13 the time that I was there, we had the responsibility. | |
|  | 86:14  Q. And that included generic | |
|  | 86:15 hydrocodones, did it not, that duty, that | |
|  | 86:16 responsibility? | |
| 86:19 - 86:21 | **Walker, Donald 01-10-2019 (00:00:10)** | |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

86:19 THE WITNESS:  We were responsible to report
86:20 the sales of all pharmaceutical or controlled
86:21 substances that were reportable to the DEA.

**87:15 - 87:16**   **Walker, Donald 01-10-2019 (00:00:06)**

87:15   Q. Including generic hydrocodone; true?
87:16   A. Including generic hydrocodone, yes.

**88:4 - 88:14**   **Walker, Donald 01-10-2019 (00:00:28)**

88:4   Q. Branded versus generic aren't
88:5 different chemically?
88:6   A. Generally, my understanding is that
88:7 they were very close, if not identical, in terms of
88:8 chemical makeup.  But, again, I don't have the level
88:9 of expertise to testify absolutely that they were the
88:10 same.
88:11   Q. Generic hydrocodone, sir, your
88:12 understanding generic hydrocodone was just as likely
88:13 to cause an overdose and death as a named brand
88:14 hydrocodone; true?

**88:16 - 88:18**   **Walker, Donald 01-10-2019 (00:00:10)**

88:16 THE WITNESS:  My understanding is that
88:17 generic hydrocodone, as it's designed for medical
88:18 purposes, it was the same as brand hydrocodone.

**88:19 - 89:3**   **Walker, Donald 01-10-2019 (00:00:37)**

88:19 BY MR. KENNEDY:
88:20   Q. Sir, at this point in time, with
88:21 respect to McKesson's coming to understand in 2006
88:22 that they weren't tracking generic hydrocodones,
88:23 would that have been true nationwide?  You didn't
88:24 have a different system before; did you?  That would
88:25 have been true nationwide?
89:1   A. Our system was a national system.
89:2 So, yes, anything that occurred in Florida would have
89:3 been consistent across the country.

**89:7 - 89:13**   **Walker, Donald 01-10-2019 (00:00:22)**

89:7   Q. West Virginia?
89:8   A. Again, we service all 50 states.
89:9   Q. And you don't know how long this had
89:10 been going on?  Is that your testimony today, you
89:11 don't know how long it was prior to '06, prior to
89:12 '05, that McKesson was not tracking its sales and

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 89:13 distribution of generic hydrocodone; is that true? | |
| 89:16 - 89:18 | **Walker, Donald 01-10-2019 (00:00:10)** | DW03_Donald Walker Plaintiffs' Submission.113 |
| | 89:16 THE WITNESS:  I do not know the time frame, | |
| | 89:17 whether it was a point in time or occurred over a | |
| | 89:18 period of time.  So the answer is, I do not know. | |
| 98:14 - 98:24 | **Walker, Donald 01-10-2019 (00:00:50)** | DW03_Donald Walker Plaintiffs' Submission.114 |
| | 98:14   Q. Sir, we've -- we have been talking | |
| | 98:15 about -- we've been talking about McKesson's sale of | |
| | 98:16 two million hydrocodones in an 11-day period in | |
| | 98:17 October of 2005.  Do you remember all those questions | |
| | 98:18 we had been going through? | |
| | 98:19   A. Yes, I remember the questions. | |
| | 98:20   Q. Isn't it a fact -- isn't it a fact | |
| | 98:21 that in addition to the two million dosages in | |
| | 98:22 October of '05, McKesson did not stop there; they | |
| | 98:23 continued to sell massive amounts of hydrocodones | |
| | 98:24 even after October of '05?  Isn't that true? | |
| 99:2 - 99:5 | **Walker, Donald 01-10-2019 (00:00:09)** | DW03_Donald Walker Plaintiffs' Submission.115 |
| | 99:2   Q. Do you remember that -- | |
| | 99:3   A. I don't -- I don't know what specific | |
| | 99:4 quantities of hydrocodone we sold, you know, after | |
| | 99:5 that period of time. | |
| 99:6 - 99:9 | **Walker, Donald 01-10-2019 (00:00:13)** | DW03_Donald Walker Plaintiffs' Submission.116 |
| | 99:6 (Exhibit No. 693 was marked.) | |
| | 99:7 BY MR. KENNEDY: | |
| | 99:8   Q. Showing you what has been marked as | |
| | 99:8 Exhibit 693.  693, all right, | |
| 99:9 - 99:9 | **Walker, Donald 01-10-2019 (00:00:14)** | DW03_Donald Walker Plaintiffs' Submission.117 |
| | 99:9    which is No. -497154. | |
| 99:10 - 100:5 | **Walker, Donald 01-10-2019 (00:01:03)** | DW03_Donald Walker Plaintiffs' Submission.118 |
| | 99:10 Go to the second page, if you would.  And I | |
| | 99:11 believe this is a document prepared by the DEA and | |
| | 99:12 provided to us by McKesson. | |
| | 99:13 Do you see the chart on page -155?  Do you | |
| | 99:14 see that? | |
| | 99:15   A. Yes. | |
| | 99:16   Q. Now, this is McKesson hydrocodone | |
| | 99:17 sales and distributions from October 1, now, to | |
| | 99:18 January 31, a four-month period.  We've been talking | |
| | 99:19 about just 11 days in October. | |

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

99:20 This is a four-month period; do you see
99:21 that?
99:22   A. Yes.
99:23   Q. This is in Florida, just Florida;
99:24 all right?
99:25 Look at Accumed.  This four-month period,
100:1 1,110,000.  1,110,900, in a four-month period.  Do
100:2 you see that?
100:3   A. I see that.
100:4   Q. Do you understand that's 31 times the
100:5 Florida average?

**100:12 - 100:13**   **Walker, Donald 01-10-2019 (00:00:03)**    DW03_Donald Walker Plaintiffs' Submission (18)

100:12   Q. Do you see that?  Do you agree with
100:13 that?

**100:15 - 100:21**   **Walker, Donald 01-10-2019 (00:00:17)**    DW03_Donald Walker Plaintiffs' Submission (28)

100:15 THE WITNESS:  I wouldn't agree with that or
100:16 disagree.  I don't understand the source of the
100:17 numbers because it's not our information, that I'm
100:18 aware of, and I haven't seen this document before.
100:19 BY MR. KENNEDY:
100:20   Q. This is the DEA's -- these are the
100:21 DEA numbers.

**100:24 - 101:8**   **Walker, Donald 01-10-2019 (00:00:30)**    DW03_Donald Walker Plaintiffs' Submission (37)

100:24   Q. I will ask you to assume that these
100:25 are the DEA numbers, and you provided -- McKesson
101:1 provided to us this document that the DEA created.
101:2 All right?  You can assume that to be true.
101:3 And at least according to the DEA, over the
101:4 four-month period -- after that October event of
101:5 two million, in this four-month period you sold
101:6 Accumed 1,110,900.  Do you have anything in your --
101:7 in your memory or documentation that would dispute
101:8 that number?  Let me ask you that.

**101:11 - 101:18**   **Walker, Donald 01-10-2019 (00:00:27)**    DW03_Donald Walker Plaintiffs' Submission (50)

101:11 THE WITNESS:  I don't have any recollection
101:12 of this document or the numbers, and certainly
101:13 haven't conducted my own review or analysis.  So I
101:14 can't support it or deny it.
101:15 BY MR. KENNEDY:
101:16   Q. During a four-month period, Avee

| Page/Line | Source | ID |
|---|---|---|

**DW03_Donald Walker Plaintiffs' Submission**

101:17 Pharmacy, you sold them 1,754,800.  Do you have
101:18 anything to dispute the DEA's number there?

**101:20 - 102:1**  **Walker, Donald 01-10-2019 (00:00:11)**

101:20 THE WITNESS:  Same response, Counsel.  I
101:21 don't -- I don't have any knowledge one way or the
101:22 other.
101:23 BY MR. KENNEDY:
101:24   Q. You do know that the DEA gets its
101:25 numbers from ARCOS; correct?  The ARCOS database,
102:1 that's where the DEA gets its number; true?

**102:3 - 102:6**  **Walker, Donald 01-10-2019 (00:00:06)**

102:3 THE WITNESS:  I know that ARCOS is one of
102:4 the sources of DEA's data.  But I don't know that
102:5 it's exclusive.
102:6 BY MR. KENNEDY:

**102:7 - 102:13**  **Walker, Donald 01-10-2019 (00:00:15)**

102:7   Q. And tell the jury who provides the
102:8 DEA with the ARCOS data on your sales.  Who provides
102:9 that to them?
102:10   A. We submit on a monthly basis, as
102:11 required by the regulation, the ARCOS data on the
102:12 sales of controlled substances that are required to
102:13 be reported.

**102:14 - 102:20**  **Walker, Donald 01-10-2019 (00:00:17)**

102:14   Q. McKesson gives them the numbers on
102:15 what you're selling them; right?
102:16   A. We provide the ARCOS data to DEA.
102:17   Q. Bi-Wise, you sold them 384,100 in a
102:18 four-month period; right?  And that's about 11 times
102:19 the Florida average.  Do you have anything to
102:20 disagree with those numbers?

**102:23 - 103:5**  **Walker, Donald 01-10-2019 (00:00:28)**

102:23 THE WITNESS:  Again, without understanding
102:24 the source, the background of the numbers, I can't
102:25 support or deny either way.
103:1 BY MR. KENNEDY:
103:2   Q. Medipharm, 1.2 million.  Trelles,
103:3 324,000.  United Prescription, 641,000.  Universal
103:4 Prescriptions, 883,000.  Any way to disagree with
103:5 these numbers, sir?

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

103:9 - 103:17 **Walker, Donald 01-10-2019 (00:00:27)**

103:9   Q. Any way?
103:10   A. I can neither support or refute the
103:11 numbers, Counsel, because I don't understand
103:12 specifically the source.
103:13   Q. Do you recall ever saying to the DEA
103:14 your numbers, based upon ARCOS, that we provided you,
103:15 are wrong?  Do you remember that, during the course
103:16 of events after -- after this date, do you remember
103:17 telling the DEA your numbers are wrong?

103:21 - 103:21 **Walker, Donald 01-10-2019 (00:00:01)**

103:21   Q. Do you remember that, ever?

103:23 - 104:1 **Walker, Donald 01-10-2019 (00:00:08)**

103:23 THE WITNESS:  No, I don't recall ever having
103:24 a conversation with DEA around their numbers or any
103:25 of the data that they shared with us.
104:1 BY MR. KENNEDY:

104:2 - 104:7 **Walker, Donald 01-10-2019 (00:00:23)**

104:2   Q. Sir, based on this table, McKesson --
104:3 McKesson sold seven million hydrocodone pills to
104:4 seven pharmacies in four months.  Do you consider
104:5 that to be consistent with the responsibility that
104:6 you've told us about?  Is that consistent with
104:7 McKesson's responsibility?

104:9 - 104:12 **Walker, Donald 01-10-2019 (00:00:12)**

104:9 THE WITNESS:  We sold to licensed
104:10 pharmacies.  I am aware we wouldn't be able to
104:11 provide any controlled substances to a pharmacy that
104:12 wasn't registered by the DEA.

104:13 - 104:22 **Walker, Donald 01-10-2019 (00:00:28)**

104:13 BY MR. KENNEDY:
104:14   Q. Let me ask you this.  You keep -- you
104:15 keep repeating that over and over, "We sold to
104:16 licensed pharmacies."
104:17 Sir, could we agree that the responsibility
104:18 of McKesson went far beyond just making sure that you
104:19 were selling to a licensed pharmacy?
104:20   A. Our responsibility included
104:21 monitoring, reporting suspicious orders to the DEA,
104:22 and guarding against diversion.

| DW03_Donald Walker Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | | |
| --- | --- | --- |
| 104:23 - 104:25 | **Walker, Donald 01-10-2019 (00:00:08)** | |
| | 104:23  Q. And that was a responsibility that | |
| | 104:24 was far beyond just making sure that you were selling | |
| | 104:25 to a pharmacy with a license; is that true? | |
| 105:2 - 105:5 | **Walker, Donald 01-10-2019 (00:00:07)** | |
| | 105:2 THE WITNESS:  I wouldn't say that that's | |
| | 105:3 accurate.  I think our responsibility was very | |
| | 105:4 specifically spelled out in the regulations, and we | |
| | 105:5 adhered to those. | |
| 105:6 - 105:8 | **Walker, Donald 01-10-2019 (00:00:06)** | |
| | 105:6 BY MR. KENNEDY: | |
| | 105:7  Q. And that included, number one, | |
| | 105:8 identifying orders of unusual size; correct? | |
| 105:10 - 105:16 | **Walker, Donald 01-10-2019 (00:00:14)** | |
| | 105:10 THE WITNESS:  In the suspicious order | |
| | 105:11 regulation, unusual size is called out. | |
| | 105:12 BY MR. KENNEDY: | |
| | 105:13  Q. Right.  And what we're looking at is | |
| | 105:14 seven million units of hydrocodone in four months. | |
| | 105:15 And you had the responsibility to identify orders of | |
| | 105:16 unusual size; did you not? | |
| 105:19 - 106:4 | **Walker, Donald 01-10-2019 (00:00:29)** | |
| | 105:19  Q. Is that true? | |
| | 105:20  A. We -- our suspicious order reporting | |
| | 105:21 needed to provide and identify orders of size, | |
| | 105:22 quantity, and frequency. | |
| | 105:23  Q. Absolutely.  And that's more than | |
| | 105:24 just making sure you're selling to a pharmacy that's | |
| | 105:25 got a license; right?  Correct? | |
| | 106:1  A. And report to the DEA. | |
| | 106:2  Q. Right.  And you know not one single | |
| | 106:3 one of these orders of this seven million was ever | |
| | 106:4 reported to the DEA, not one.  Do you remember that? | |
| 106:7 - 106:7 | **Walker, Donald 01-10-2019 (00:00:00)** | |
| | 106:7  Q. Do you remember that? | |
| 106:9 - 106:15 | **Walker, Donald 01-10-2019 (00:00:12)** | |
| | 106:9 THE WITNESS:  I don't know that to be | |
| | 106:10 accurate either way.  I don't have independent | |
| | 106:11 knowledge of what we did or did not report during | |
| | 106:12 that time frame regarding these pharmacies. | |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

106:13 BY MR. KENNEDY:
106:14   Q. You don't remember that that is the
106:15 reason that you got fined $13 million?

**106:19 - 106:23**   **Walker, Donald 01-10-2019 (00:00:11)**

106:19   Q. You don't remember?
106:20   A. I don't remember or have any
106:21 independent knowledge of whether or not any of these
106:22 pharmacies ever reported to DEA during that time
106:23 frame.

**109:6 - 109:10**   **Walker, Donald 01-10-2019 (00:00:15)**

109:6   Q. And you've told us that you believe,
109:7 as the boss of all of regulatory, that this was
109:8 consistent with your responsibility to carry out the
109:9 law, to regulate, and guard against diversion; is
109:10 that your position?

**109:12 - 109:15**   **Walker, Donald 01-10-2019 (00:00:10)**

109:12 THE WITNESS:  As responsible for Regulatory,
109:13 I feel very confident that we were executing our
109:14 regulatory responsibilities as required under the
109:15 CFR.

**110:2 - 110:5**   **Walker, Donald 01-10-2019 (00:00:14)**

110:2   Q. Sir, isn't that the problem, the very
110:3 fact that you, the boss of Regulatory, think that
110:4 this conduct is okay?  Isn't that the problem with
110:5 McKesson back in '05 and thereafter?

**110:7 - 110:11**   **Walker, Donald 01-10-2019 (00:00:11)**

110:7 THE WITNESS:  Counsel, we were very focused
110:8 on our regulatory responsibilities, and we carried
110:9 out those responsibilities in the very best way that
110:10 we understood them in compliance with the
110:11 regulations.

**110:12 - 110:21**   **Walker, Donald 01-10-2019 (00:00:27)**

110:12 BY MR. KENNEDY:
110:13   Q. Sir, my question is very specific.
110:14 I'm talking about what we have been talking about for
110:15 the last hour.  Isn't the fact that you, the head of
110:16 Regulatory, believes that it was okay for McKesson to
110:17 sell seven million pills to seven pharmacies in a
110:18 four-month period -- isn't the fact that you, the
110:19 head of pharmacy, thinks that that is okay, isn't

| Page/Line | Source | ID |
|---|---|---|

110:20 that the problem, the underlying problem that
110:21 McKesson had?

110:24 - 111:5   **Walker, Donald 01-10-2019 (00:00:18)**

110:24 THE WITNESS:  Counsel, my testimony is that
110:25 I, as the leader of our Regulatory and senior member
111:1 of our company, believe that we were completing our
111:2 regulatory obligations in the very best way that we
111:3 understood them, and adherence to the regulation as
111:4 we understood it and had been operating for many
111:5 years.

111:7 - 111:9   **Walker, Donald 01-10-2019 (00:00:07)**

111:7  Q. And my question to you is very
111:8 specific.  Isn't that the problem that you, a senior
111:9 executive, thought that this was okay?

111:12 - 111:20   **Walker, Donald 01-10-2019 (00:00:18)**

111:12 THE WITNESS:  I can't answer that question,
111:13 Counsel.  I believe very strongly in my prior
111:14 testimony.
111:15 BY MR. KENNEDY:
111:16  Q. And, again, even more, isn't that the
111:17 problem, that you, the executive, the head of
111:18 Regulatory, feel very strongly that seven million
111:19 pills in four months is okay?  Isn't that McKesson's
111:20 problem?

111:24 - 112:6   **Walker, Donald 01-10-2019 (00:00:21)**

111:24 THE WITNESS:  Counsel, I -- again, I will
111:25 stand by my testimony.
112:1 BY MR. KENNEDY:
112:2  Q. Sir, what we're looking at here, this
112:3 massive -- this seven million pills in a four-month
112:4 period in Florida, it wasn't just happening in
112:5 Florida, was it?  It was happening across the
112:6 country; was it not?

112:8 - 112:15   **Walker, Donald 01-10-2019 (00:00:17)**

112:8 THE WITNESS:  I don't recall any -- any
112:9 specific issues and don't have knowledge of what was
112:10 occurring in the balance of the country.
112:11 (Exhibit No. 802 was marked.)
112:12 MR. KENNEDY:  Well, sir, let's -- let me
112:13 show you Exhibit 686.

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

112:14 (Exhibit No. 686 was marked.)

112:15 BY MR. KENNEDY:

**112:16 - 112:16**   **Walker, Donald 01-10-2019 (00:00:03)**

112:16   Q. 686 does not have Bates numbers.

**112:17 - 113:17**   **Walker, Donald 01-10-2019 (00:00:59)**

112:17 Sir, you indicate you don't have any knowledge of

112:18 McKesson -- McKesson sending massive amounts around

112:19 the country of hydrocodone -- excuse me,

112:20 hydrocodones.  This is a Settlement Agreement.  Look

112:21 at that first sentence.

112:22 (Reading) This is a Settlement

112:23 Agreement entered into on April 30th,

112:24 2008, between the United States

112:25 Department of Justice, through the

113:1 United States Attorney's Office, for

113:2 the Districts of Maryland, Middle

113:3 Florida, Southern Texas, Colorado,

113:4 Utah, and Eastern California (end of

113:5 reading).

113:6 Do you see that?

113:7   A. I see that.

113:8   Q. And the Settlement Agreement is with

113:9 McKesson Corporation; true?

113:10   A. Yes.

113:11   Q. You signed this document; did you

113:12 not?

113:13   A. Yes, I did.

113:14   Q. And that's why I'm asking, why is it

113:15 that you didn't have any knowledge that this was

113:16 going on across the country?  You signed this

113:17 document; didn't you?

**113:19 - 113:20**   **Walker, Donald 01-10-2019 (00:00:04)**

113:19 THE WITNESS:  I signed this document,

113:20 Counsel.

**122:14 - 122:15**   **Walker, Donald 01-10-2019 (00:00:11)**

122:14 MR. KENNEDY:  687 Exhibit starts with Bates

122:15 -00574724 and ends with -4744.

**122:16 - 123:18**   **Walker, Donald 01-10-2019 (00:01:21)**

122:16   Q. Mr. Walker, have you seen this

122:17 document before?

| Page/Line | Source | ID |
|---|---|---|

DW03_Donald Walker Plaintiffs' Submission

122:18   A. Yes, I have.

122:19   Q. And this would relate to a meeting of

122:20 "Directors of Regulatory"?  Is that what it says?

122:21   A. Yes.

122:22   Q. This would have been in Dallas, March

122:23 5-6, 2008; true?

122:24   A. Yes.

122:25   Q. Do you remember who was present at

123:1 this meeting?

123:2   A. I don't remember specifically all the

123:3 participants.  I know that our newly-hired Director

123:4 of Regulatory Affairs and my Regulatory staff was

123:5 there.  But I don't know who else might have been

123:6 there.

123:7   Q. And the purpose of the meeting was

123:8 what?

123:9   A. As I recall, the purpose of the

123:10 meeting was to review with the Regulatory staff and

123:11 then expanded the overview of the Memorandum of

123:12 Agreement that we were moving forward with.  We

123:13 hadn't signed it yet, but we were very close.  So we

123:14 had the components.

123:15   Q. That was the Memorandum of Agreement

123:16 that we just talked about with the DEA, with the

123:17 Department of Justice?

123:18   A. Yes, the same memorandum.

**124:13 - 124:25**   **Walker, Donald 01-10-2019 (00:00:41)**

DW03_Donald Walker Plaintiffs' Submission_107

124:13   Q. What committees did you sit on?  I

124:14 know that -- we know your title.  But were you a part

124:15 of any management committees at McKesson?  And I'm

124:16 talking about the '08 period.

124:17   A. Yes.  So in that time frame in my

124:18 role, I was part of the -- I will use your term --

124:19 management committee that oversaw -- oversaw the

124:20 pharmaceutical business.

124:21   Q. Okay.  So the management committee

124:22 that oversaw the pharmaceutical business.  And a

124:23 significant part of McKesson's business was the

124:24 pharmaceutical business, I assume?

124:25   A. Yes.

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

125:23 - 127:7   **Walker, Donald 01-10-2019 (00:01:45)**

125:23   Q. All right.  Let's -- let's go back to

125:24 this meeting, then, that was -- that was held in 2008

125:25 with the Directors of Regulatory.

126:1 If you can go to page -- the Bates in the

126:2 bottom of -4733.  Did you run this meeting?

126:3   A. Yes, I did.

126:4   Q. Did you prepare these slide

126:5 presentations?

126:6   A. Looking at it, I don't specifically

126:7 put in the slide presentation.  But it was consistent

126:8 with one that I would do.

126:9   Q. All right.  Well, let's look, then,

126:10 at this page of the 2008 slide presentation.  And

126:11 this is talking about the 2008 Settlement Agreement

126:12 that is reached with the Department of Justice and

126:13 the DEA; correct?

126:14   A. Correct.

126:15   Q. And this is in relation to what we

126:16 have been talking about for the last hour; true?

126:17   A. Yes.

126:18   Q. And does this slide presentation

126:19 state that -- the first -- the first bullet, "Six

126:20 different McKesson facilities involved"; right?

126:21   A. Yes.

126:22   Q. And we went over those six different

126:23 facilities, I think.  Florida, Maryland, Texas, Utah;

126:24 correct?  Those are the ones we went through?

126:25   A. That's correct.

127:1   Q. The next bullet says:

127:2 (Reading) An estimated more than 4,600

127:3 violations, potential fine to exceed

127:4 $46 million (end of reading).

127:5 Is that accurate, 4,600 violations?  This is

127:6 in your PowerPoint or at least one presented at your

127:7 meeting.  Was that accurate?

127:9 - 127:15   **Walker, Donald 01-10-2019 (00:00:21)**

127:9 THE WITNESS:  I don't recall specifically

127:10 whether it is accurate or -- I couldn't testify

127:11 whether it was accurate.

| | | |
|---|---|---|
| **DW03_Donald Walker Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

127:12 What I can say is that we -- I was pulling
127:13 information from the agreement draft, which were the
127:14 DEA's allegations, you know, that led up to the
127:15 agreement.

**127:16 - 127:19    Walker, Donald 01-10-2019 (00:00:08)**

127:16 BY MR. KENNEDY:
127:17   Q. Would you put this in a PowerPoint to
127:18 the Regulatory Department, the new members of the
127:19 Regulatory Department, if it wasn't accurate?

**127:22 - 128:2    Walker, Donald 01-10-2019 (00:00:22)**

127:22   Q. Would you do that?
127:23   A. Again, Counsel, my recollection, my
127:24 best recollection, is that this was based on
127:25 information that was contained in the -- in the draft
128:1 and potentially discussions with DEA or counsel
128:2 through DEA.

**128:3 - 128:7    Walker, Donald 01-10-2019 (00:00:14)**

128:3   Q. My question isn't whether it was part
128:4 of a draft, where it came from.  My question is real
128:5 simple:  Would you put here in this presentation
128:6 "4,600 estimated violations by McKesson" if it was
128:7 not true?

**128:10 - 128:13    Walker, Donald 01-10-2019 (00:00:09)**

128:10 THE WITNESS:  Counsel, as I stated, what I
128:11 would have put in is an accurate representation of
128:12 DEA's allegations.
128:13 BY MR. KENNEDY:

**130:23 - 131:11    Walker, Donald 01-10-2019 (00:00:37)**

130:23 BY MR. KENNEDY:
130:24   Q. Sir, at this point in time, these
130:25 allegations, which are 2004, 2005, 2006, at that
131:1 point in time were the suspicious order monitoring
131:2 policies of McKesson national?
131:3   A. Yes.  It was a single system.  So the
131:4 answer is, yes.
131:5   Q. So the policies and the procedures
131:6 that led at least to what you considered to be the
131:7 allegations of these extraordinary sales, those
131:8 policies and procedures were the same in Maryland,
131:9 Ohio, West Virginia, Utah, Florida; would that be

| Page/Line | Source | ID |
|---|---|---|

131:10 true?

131:11  A. Yes.

**131:12 - 131:17    Walker, Donald 01-10-2019 (00:00:14)**

131:12   Q. And as the person in charge, sitting

131:13 on the top of this, did you make every effort to make

131:14 sure that the implementation of the policies and

131:15 procedures relating to suspicious order monitoring,

131:16 that they were being implemented uniformly across the

131:17 country?

**131:19 - 131:21    Walker, Donald 01-10-2019 (00:00:06)**

131:19 THE WITNESS:  Yes, we had a system in place

131:20 that was reporting regularly to DEA suspicious

131:21 orders.

**131:23 - 132:8    Walker, Donald 01-10-2019 (00:00:30)**

131:23   Q. So the answer would be, yes, you, as

131:24 the boss, made an effort to make sure that your

131:25 policies with respect to suspicious orders were being

132:1 implemented uniformly across the country; true?

132:2   A. Yes.

132:3   Q. You didn't want somebody doing

132:4 something different in California than they were

132:5 doing in Maryland; did you?

132:6   A. The system was one system.  So the

132:7 uniform reporting and report generation was the same

132:8 across the country.

**133:9 - 133:13    Walker, Donald 01-10-2019 (00:00:13)**

133:9   Q. Okay.  But from '08 forward, while

133:10 you were in charge, again, you would have meetings,

133:11 you would have memos, you would have calls in an

133:12 attempt to make sure that your policies were being

133:13 implemented uniformly across the country; true?

**133:16 - 134:1    Walker, Donald 01-10-2019 (00:00:28)**

133:16 THE WITNESS:  So subsequent to the 2008

133:17 agreement with the regulatory team, we had regular

133:18 conference calls, regular discussions to ensure that

133:19 we were executing our regulatory responsibilities

133:20 uniformly across the country; so yes.

133:21 BY MR. KENNEDY:

133:22   Q. You don't want Mr. Oriente in the

133:23 East doing something different from Mr. McDonald in

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

133:24 the West, doing something different than Mr. Gustin

133:25 in the Midwest; true?

134:1   A. Generally that would be accurate.

134:15 - 134:21      **Walker, Donald 01-10-2019 (00:00:19)**

134:15 I'm going to switch gears.  I want to talk

134:16 about the 2008 CSMP, the Controlled Substances

134:17 Monitoring Program.  You remember that program?

134:18   A. Yes.

134:19   Q. That was a program that McKesson

134:20 developed and put into place in 2008; is that true?

134:21   A. Yes, that is correct.

135:22 - 136:2      **Walker, Donald 01-10-2019 (00:00:10)**

135:22   Q. Let me -- let me show you

135:23 Exhibit 672.  And if you keep this exhibit in front

135:24 of you even after this series of questions, because

135:25 we're going to refer back to this quite a bit,

136:1 all right?

136:2   A. That would be fine.

136:5 - 136:19      **Walker, Donald 01-10-2019 (00:00:56)**

136:5   Q. This is the McKesson's 2008

136:6 Controlled Substance Monitoring Program; is it not?

136:7   A. What this document is, is a -- the

136:8 Operations Manual entry and documentation of how to

136:9 execute against the Controlled Substance Monitoring

136:10 Program.  That's probably the best way to describe

136:11 it.

136:12   Q. Was there any document that McKesson

136:13 has that is more comprehensive and detailed with

136:14 respect to your suspicious order monitoring system

136:15 than this document from the period of 2008 to, let's

136:16 say, 2014?  Any document other than this that is more

136:17 comprehensive?

136:18   A. Probably this would be the most

136:19 comprehensive document.

137:14 - 137:19      **Walker, Donald 01-10-2019 (00:00:13)**

137:14   Q. And this program came into place, as

137:15 I said before, in 2008; did it not?

137:16   A. That is correct.

137:17   Q. And it was revised various times, as

137:18 we have seen, up through '13; correct?

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|
| | 137:19   A. Yes. | |
| 138:8 - 138:22 | **Walker, Donald 01-10-2019 (00:00:36)** | |
| | 138:8   Q. And we were talking about this | |
| | 138:9 threshold system.  And do you see where it says, | |
| | 138:10 "Purpose"? | |
| | 138:11   A. Yes. | |
| | 138:12   Q. And the second bullet point down | |
| | 138:13 says, "Set and maintain customer's thresholds for all | |
| | 138:14 controlled substances"; is that right? | |
| | 138:15   A. That is correct. | |
| | 138:16   Q. And then it says, "Make informed | |
| | 138:17 decisions based upon established threshold | |
| | 138:18 information"; correct? | |
| | 138:19   A. Yes. | |
| | 138:20   Q. So the thresholds were an important | |
| | 138:21 part of this monitoring program; true? | |
| | 138:22   A. Yes. | |
| 142:2 - 142:16 | **Walker, Donald 01-10-2019 (00:00:35)** | |
| | 142:2   Q. Now, so each customer of McKesson -- | |
| | 142:3 pursuant to your 2008 monitoring policy, each | |
| | 142:4 customer for each family of a controlled substance | |
| | 142:5 would have an established threshold; true? | |
| | 142:6   A. That's correct. | |
| | 142:7   Q. And that was a monthly threshold; | |
| | 142:8 right? | |
| | 142:9   A. Calculated monthly. | |
| | 142:10   Q. So a particular pharmacy would have a | |
| | 142:11 monthly threshold, for example, for hydrocodones; | |
| | 142:12 right? | |
| | 142:13   A. Yes. | |
| | 142:14   Q. They would have a monthly threshold | |
| | 142:15 for oxycodones; correct? | |
| | 142:16   A. Yes. | |
| 142:17 - 142:24 | **Walker, Donald 01-10-2019 (00:00:24)** | |
| | 142:17   Q. And if they were to exceed that | |
| | 142:18 threshold in any month, that would trigger an | |
| | 142:19 investigation under your monitoring policies; | |
| | 142:20 correct? | |
| | 142:21   A. It would do two things.  One, the | |
| | 142:22 order would be blocked, and then the -- which would | |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

142:23 trigger additional due diligence to determine why the
142:24 threshold was exceeded.

**142:25 - 143:7**     **Walker, Donald 01-10-2019 (00:00:24)**

142:25   Q. And each customer, though, each
143:1 customer could request an increase in their threshold
143:2 for a particular opioid or controlled substance;
143:3 could they not?
143:4   A. The program was designed so that
143:5 customers could request additional controlled
143:6 substances of any -- of the controlled substances
143:7 above their threshold.

**143:8 - 143:25**     **Walker, Donald 01-10-2019 (00:00:48)**

143:8   Q. All right.  And McKesson -- if we
143:9 look at this program and how it's divided up, there
143:10 were basically two different groups of customers.
143:11 One, the big chain pharmacies, the RNAs, the regional
143:12 national accounts; correct?
143:13   A. That's one large customer group.
143:14   Q. And the other major customer group
143:15 that's defined in your monitoring program were the
143:16 ISMCs, or the independent small, medium chains;
143:17 correct?
143:18   A. That was also included.  But that
143:19 wasn't the totality of every registrant that we
143:20 provided controlled substance to.  So the two groups
143:21 that you mentioned in addition to that, would be what
143:22 we called our hospital or MHS group.  So these were
143:23 hospitals, institutions, surgery centers.  And then
143:24 probably the fourth big category was the federal
143:25 government.

**144:22 - 145:1**     **Walker, Donald 01-10-2019 (00:00:14)**

144:22   Q. So if there was a pharmacy on Main
144:23 Street in Cleveland, Ohio, that specific pharmacy
144:24 would contact McKesson and say, "We want to increase
144:25 our threshold"?  That's how it basically worked with
145:1 the independents and the small -- small chains?

**145:3 - 145:4**     **Walker, Donald 01-10-2019 (00:00:03)**

145:3 THE WITNESS:  Basically, that would be the
145:4 process.

**145:6 - 145:24**     **Walker, Donald 01-10-2019 (00:01:08)**

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

145:6   Q. And then that specific pharmacy, say
145:7 the Main Street pharmacy, they would provide
145:8 information and documentation to McKesson to document
145:9 or provide a basis for the increase in the threshold;
145:10 is that how it worked?
145:11   A. Yes, the request --
145:12   Q. And then the Director of Regulatory
145:13 Affairs would evaluate the information and make a
145:14 determination as to whether or not an increase in a
145:15 particular drug threshold was appropriate?  That's
145:16 how it worked?
145:17   A. All threshold increases were reviewed
145:18 by the Director of Regulatory Affairs, or DRAs, and
145:19 they were the sole responsible party to make any
145:20 increases.
145:21   Q. Now, these independent small, medium
145:22 pharmacies were required to submit three months of
145:23 their dispensing data in order to get approval for a
145:24 threshold increase?  That was the policy?

**146:1 - 146:19**  **Walker, Donald 01-10-2019 (00:01:02)**

146:1 THE WITNESS:  I don't believe that that is
146:2 accurate.
146:3 (Exhibit No. 676 was marked.)
146:4 BY MR. KENNEDY:
146:5   Q. Let me show you Exhibit -- you
146:6 were -- you don't think that's accurate, but you
146:7 were -- you were the boss at this point in time in
146:8 '08; correct?
146:9   A. Yes.
146:10   Q. I'm going to show you Exhibit 676.
146:11 And that's Bates -542108 to -110.
146:12 This is an email from Tom McDonald.  Do you
146:13 see that?  The first page.
146:14   A. Yes.
146:15   Q. And who was Tom McDonald in this time
146:16 period of 12 -- or excuse me, 2012?  Who was he?
146:17   A. Tom McDonald was the Director of
146:18 Regulatory Affairs for the Western part of the
146:19 United States.

**146:25 - 148:1**  **Walker, Donald 01-10-2019 (00:00:56)**

| | | |
|---|---|---|
| **DW03_Donald Walker Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

146:25   Q. And he's sending an email to an

147:1 extraordinarily large group of people.  Can you --

147:2 are you able to kind of look through that and say

147:3 this is -- who this group is?

147:4   A. Based on the names here, this is a

147:5 combination of our sales and operations teams in the

147:6 West Region.

147:7   Q. And you're copied on this; right?

147:8 Donald Walker, CC.

147:9   A. Yes, I am.

147:10   Q. So you would have gotten this; right?

147:11   A. Yes.

147:12   Q. Subject, "Ongoing due diligence, new

147:13 questionnaires and dispensing data."  Do you see

147:14 that?

147:15   A. Yes.

147:16   Q. It says high -- importance is high;

147:17 right?

147:18   A. Yes.

147:19   Q. Look to the next page, if you would,

147:20 -109, all the way toward the bottom, the paragraph

147:21 that starts with, "Additionally."

147:22   A. Can I have a moment just to review

147:23 the rest of the document?

147:24   Q. Sure.

147:25   A. I'm not --

148:1 (Witness reviewing document.)

**148:2 - 148:14**   **Walker, Donald 01-10-2019 (00:00:26)**

148:2   A. Okay.

148:3   Q. Look at the paragraph.  This is

148:4 Mr. McDonald.  You're copied on this.  The paragraph

148:5 that starts, "Additionally."

148:6 He states:

148:7 (Reading) Additionally, dispensing

148:8 data is an integral part of

148:9 understanding a customer's business

148:10 for those accounts requiring higher

148:11 thresholds (end of reading).

148:12 Would you agree with that?  Dispensing data

148:13 is an integral part of understanding a customer's

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

148:14 business; do you agree to that?

**148:16 - 148:22**    **Walker, Donald 01-10-2019 (00:00:21)**

148:16 THE WITNESS:  I think it would be more
148:17 accurate to say that at the time, as we evolved the
148:18 program and gained knowledge around the tools that
148:19 were available to us, dispensing data was one of the
148:20 items, and just one of them, that we would use to
148:21 help us make a determination of customer thresholds
148:22 and increase requests or establishment.

**148:24 - 149:2**    **Walker, Donald 01-10-2019 (00:00:07)**

148:24   Q. So you disagree with Mr. McDonald's
148:25 statement, that dispensing data is an integral part
149:1 of understanding a customer's business?  You disagree
149:2 with that?

**149:5 - 149:7**    **Walker, Donald 01-10-2019 (00:00:06)**

149:5 THE WITNESS:  I didn't say I disagreed with
149:6 it.  What I said was it was a piece, and one of the
149:7 pieces of understanding.

**149:9 - 149:14**    **Walker, Donald 01-10-2019 (00:00:24)**

149:9   Q. And tell the jury, dispensing data
149:10 from a pharmacy, what is that?
149:11   A. The data that a pharmacy may or may
149:12 not provide was data around the quantities of a given
149:13 pharmaceutical or medicine that they would dispense.
149:14 So it was a summary document.

**149:24 - 150:4**    **Walker, Donald 01-10-2019 (00:00:12)**

149:24   Q. Let's talk about an independent
149:25 pharmacy on Main Street.  They provide you with
150:1 dispensing data.  It's going to tell McKesson how
150:2 much Oxycontin that they are selling, actually
150:3 dispensing, filling prescriptions and dispensing;
150:4 that's what dispensing data is?

**150:6 - 150:7**    **Walker, Donald 01-10-2019 (00:00:02)**

150:6 THE WITNESS:  Dispensing data should
150:7 represent that, yes.

**150:9 - 150:22**    **Walker, Donald 01-10-2019 (00:00:28)**

150:9   Q. So Mr. McDonald, head of the Western
150:10 Region, in this email he says:
150:11 (Reading) Additionally, dispensing
150:12 data is an integral part of

| | DW03_Donald Walker Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 150:13 understanding a customer's business | |
| | 150:14 for those accounts requiring higher | |
| | 150:15 thresholds.  Bullet 1:  Dispensing | |
| | 150:16 data is not required for all new | |
| | 150:17 accounts.  Bullet 2:  It is required | |
| | 150:18 if the new account is requesting more | |
| | 150:19 than the minimum stated in the | |
| | 150:20 questionnaire (end of reading). | |
| | 150:21 Do you agree with that, it's required for | |
| | 150:22 that? | |
| 150:25 - 151:2 | **Walker, Donald 01-10-2019 (00:00:06)** | DW03_Donald Walker Plaintiffs' Submission 150 |
| | 150:25   Q. So if you have got a threshold higher | |
| | 151:1 than the minimum amount, dispensing data is required; | |
| | 151:2 do you agree with that statement by Mr. McDonald? | |
| 151:4 - 151:10 | **Walker, Donald 01-10-2019 (00:00:22)** | DW03_Donald Walker Plaintiffs' Submission 151 |
| | 151:4 THE WITNESS:  First, I don't recall | |
| | 151:5 specifically, you know, reviewing or remembering any | |
| | 151:6 details of this -- of this memo. | |
| | 151:7 What I would best answer that question, is | |
| | 151:8 that this is what Mr. McDonald was requesting from | |
| | 151:9 his field sales team to support his decision base for | |
| | 151:10 making increases in the Western Region. | |
| 151:22 - 152:4 | **Walker, Donald 01-10-2019 (00:00:11)** | DW03_Donald Walker Plaintiffs' Submission 151 |
| | 151:22   Q. And he states: | |
| | 151:23 (Reading) It is required -- dispensing | |
| | 151:24 data, it is required if the new | |
| | 151:25 account is requesting more than the | |
| | 152:1 minimum stated in the questionnaire | |
| | 152:2 (end of reading). | |
| | 152:3 Did you agree with that statement when you | |
| | 152:4 read it? | |
| 152:6 - 152:9 | **Walker, Donald 01-10-2019 (00:00:07)** | DW03_Donald Walker Plaintiffs' Submission 152 |
| | 152:6 THE WITNESS:  Again, I don't recall | |
| | 152:7 specifically.  What I would say is that I didn't | |
| | 152:8 disagree with his request. | |
| | 152:9 BY MR. KENNEDY: | |
| 152:22 - 153:5 | **Walker, Donald 01-10-2019 (00:00:22)** | DW03_Donald Walker Plaintiffs' Submission 152 |
| | 152:22 BY MR. KENNEDY: | |
| | 152:23   Q. All right.  He next says -- the | |
| | 152:24 bullet next -- and this is the important one for what | |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 152:25 we're going to talk about -- he states: |  |
|  | 153:1 (Reading) It is also required when |  |
|  | 153:2 customer's request increases on |  |
|  | 153:3 elevated thresholds (end of reading). |  |
|  | 153:4 Did you disagree with that statement at the |  |
|  | 153:5 time and email him back and say, no, you're wrong? |  |
| 153:7 - 153:17 | **Walker, Donald 01-10-2019 (00:00:18)** | DW03_Donald Walker Plaintiffs' Submission.197 |
|  | 153:7 THE WITNESS:  Again, not -- not that I |  |
|  | 153:8 recall. |  |
|  | 153:9 BY MR. KENNEDY: |  |
|  | 153:10   Q. The next bullet says: |  |
|  | 153:11 (Reading) The request for dispensing |  |
|  | 153:12 data is standard and should not |  |
|  | 153:13 deviate (end of reading). |  |
|  | 153:14 And he goes down and says, a couple more |  |
|  | 153:15 bullets down says, "The most recent three months of |  |
|  | 153:16 data" -- that's the dispensing data that they are |  |
|  | 153:17 talking about; right? |  |
| 153:20 - 155:3 | **Walker, Donald 01-10-2019 (00:01:14)** | DW03_Donald Walker Plaintiffs' Submission.198 |
|  | 153:20   Q. Do you see that? |  |
|  | 153:21   A. I do.  It would appear that that's |  |
|  | 153:22 what he's requesting. |  |
|  | 153:23   Q. And then he says: |  |
|  | 153:24 (Reading) The data must be by line |  |
|  | 153:25 dispensed (end of reading). |  |
|  | 154:1 Do you see that? |  |
|  | 154:2   A. Yes. |  |
|  | 154:3   Q. He's very specific about what's |  |
|  | 154:4 required with respect to specific dispensing data, is |  |
|  | 154:5 he not? |  |
|  | 154:6   A. He's being very specific. |  |
|  | 154:7   Q. Then he says: |  |
|  | 154:8 (Reading) The data must, it must |  |
|  | 154:9 include product description, date |  |
|  | 154:10 dispensed, quantity in dosage units, |  |
|  | 154:11 method of payment, prescribing doctor, |  |
|  | 154:12 and the doctor's DEA number (end of |  |
|  | 154:13 reading). |  |
|  | 154:14 Do you see that? |  |
|  | 154:15   A. Yes. |  |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 154:16  Q. Do you remember disagreeing with him |  |
|  | 154:17 at that time and sending him back an email, calling |  |
|  | 154:18 him on the phone, having a meeting, saying, you're |  |
|  | 154:19 wrong, that is not what is required?  Do you remember |  |
|  | 154:20 doing that? |  |
|  | 154:21  A. I do not remember any follow-up |  |
|  | 154:22 response to him and disagreeing with him or |  |
|  | 154:23 counseling him to do otherwise. |  |
|  | 154:24  Q. What he's talking about is a good |  |
|  | 154:25 idea; is it?  Is it not a good idea to fulfill your |  |
|  | 155:1 obligations to get the dispensing data if an |  |
|  | 155:2 independent or small pharmacy wants an increase in |  |
|  | 155:3 their threshold? |  |
| 155:6 - 155:11 | **Walker, Donald 01-10-2019 (00:00:29)** | DW03_Donald Walker Plaintiffs' Submission 298 |
|  | 155:6 THE WITNESS:  The view that I would have is |  |
|  | 155:7 at the time that we were working under the CSMP and |  |
|  | 155:8 gaining additional expertise and insight into how we |  |
|  | 155:9 would manage our controlled substance program and our |  |
|  | 155:10 understanding of pharmacies, dispensing data became a |  |
|  | 155:11 tool that we had potentially available to us. |  |
| 157:19 - 158:6 | **Walker, Donald 01-10-2019 (00:00:26)** | DW03_Donald Walker Plaintiffs' Submission 299 |
|  | 157:19  Q. If you get dispensing data from a |  |
|  | 157:20 pharmacy, you're going to be able to see cash |  |
|  | 157:21 payments; are you not, sir? |  |
|  | 157:22  A. Not necessarily. |  |
|  | 157:23  Q. In many instances will you be able to |  |
|  | 157:24 see that, sir? |  |
|  | 157:25  A. If -- if the pharmacist chooses to |  |
|  | 158:1 enter a cash payment in their pharmacy terminal |  |
|  | 158:2 system where this data originates, then, yes, it will |  |
|  | 158:3 show up. |  |
|  | 158:4  Q. All right. |  |
|  | 158:5  A. If he chooses not to do that, it |  |
|  | 158:6 won't show up. |  |
| 158:7 - 158:11 | **Walker, Donald 01-10-2019 (00:00:12)** | DW03_Donald Walker Plaintiffs' Submission 301 |
|  | 158:7  Q. All right.  And so you're getting |  |
|  | 158:8 dispensing data.  And if the pharmacist is putting |  |
|  | 158:9 cash payments in, all right, you're going to be able |  |
|  | 158:10 to see cash payments -- correct? -- from what you |  |
|  | 158:11 just said, if the pharmacist is entering it; true? |  |

| Page/Line | Source | ID |
|---|---|---|
| | **DW03_Donald Walker Plaintiffs' Submission** | |

**158:14 - 158:19**   **Walker, Donald 01-10-2019 (00:00:14)**

158:14   Q. True?
158:15   A. If the pharmacist enters it into the
158:16 pharmacy terminal system, we would see that.
158:17   Q. And a certain percentage of cash
158:18 payments for opioids for narcotics is evidence of
158:19 diversion; is it not?

**158:21 - 159:1**   **Walker, Donald 01-10-2019 (00:00:15)**

158:21 THE WITNESS:  The DEA identified cash
158:22 payment percentage as a potential indicator.
158:23 BY MR. KENNEDY:
158:24   Q. All right.  And if you get dispensing
158:25 data, as indicated in this memo, it's going to tell
159:1 you who the prescribing doctors are; is it not?

**159:3 - 159:5**   **Walker, Donald 01-10-2019 (00:00:08)**

159:3 THE WITNESS:  If the data is complete, we
159:4 would see the doctors -- generally see the doctors in
159:5 the dispensing data.

**159:7 - 159:11**   **Walker, Donald 01-10-2019 (00:00:10)**

159:7   Q. And that would allow McKesson to
159:8 determine whether a small group of doctors is
159:9 prescribing a large amount of opioids; correct?  You
159:10 would be able to do that if you had the dispensing
159:11 data; true?

**159:13 - 159:17**   **Walker, Donald 01-10-2019 (00:00:22)**

159:13 THE WITNESS:  I'm not sure I can answer that
159:14 accurately.  Generally, if the physicians are in
159:15 there and the data was complete, not -- our challenge
159:16 was, is the data wasn't always complete.  So I'm
159:17 reluctant to say that that is accurate.

**159:19 - 159:24**   **Walker, Donald 01-10-2019 (00:00:15)**

159:19   Q. If you have accurate prescribing
159:20 data, McKesson would be able to determine whether a
159:21 small group of doctors is ordering a large percentage
159:22 of the opioids from that pharmacy; correct?  You're
159:23 able to do that?
159:24   A. If the data was accurate, yes.

**160:7 - 160:19**   **Walker, Donald 01-10-2019 (00:00:36)**

160:7   Q. And the DEA told you back in 2006
160:8 that's one of the things you should look for, a small

| | DW03_Donald Walker Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

160:9 number of doctors ordering a large percent of the
160:10 opioids from a pharmacy?  That's one of the things
160:11 you should look for?
160:12   A. My recollection of the document, the
160:13 documents state that is one of the areas that they
160:14 outlined.
160:15   Q. And if you had the doctor's name from
160:16 the prescribing -- or the prescribing data, you
160:17 could -- McKesson could research as to whether or not
160:18 this physician was having problems with any medical
160:19 board; couldn't you?

**160:22 - 161:2     Walker, Donald 01-10-2019 (00:00:33)**

160:22   Q. If you had that data?
160:23   A. I believe, Counsel -- I didn't
160:24 specifically make any type of inquiries myself, but
160:25 my understanding was, is that we -- you had the
161:1 ability to identify any doctors if, in fact, there
161:2 was documentation on state medical board sites.

**161:3 - 161:7       Walker, Donald 01-10-2019 (00:00:17)**

161:3   Q. And if you got the dispensing data,
161:4 as Mr. McDonald is saying here in 2012 is required,
161:5 you can now actually see if a pharmacy is purchasing
161:6 opioids from other distributors, other than just
161:7 McKesson; correct?

**161:10 - 161:21    Walker, Donald 01-10-2019 (00:00:33)**

161:10 THE WITNESS:  I don't recall that we had the
161:11 ability or felt we had the ability to determine
161:12 multiple distribution -- distributors supplying a
161:13 pharmacy through dispensing data.
161:14 BY MR. KENNEDY:
161:15   Q. Let me ask you this.  If the
161:16 dispensing data says that a particular pharmacy is
161:17 dispensing, selling 1,000 Oxycontins in a month, and
161:18 your records say you're selling them only 500, then
161:19 you can reasonably conclude that they are getting
161:20 Oxycontins from somebody other than just McKesson;
161:21 right?

**161:24 - 162:7      Walker, Donald 01-10-2019 (00:00:30)**

161:24 THE WITNESS:  Counsel, there are so many
161:25 variables in pharmacy behavior, in terms of inventory

| Page/Line | Source | ID |
|---|---|---|

162:1 management, again, it's very difficult for me to
162:2 answer accurately whether that could take place.
162:3 BY MR. KENNEDY:
162:4   Q. If you have the dispensing data,
162:5 McKesson would be able to determine the percentage of
162:6 controlled substances against total prescriptions?
162:7 They would be able to calculate that, wouldn't they?

**162:10 - 162:16**    **Walker, Donald 01-10-2019 (00:00:19)**

162:10 THE WITNESS:  Counsel, I'm having a
162:11 difficult time answering the question.  I think it's
162:12 an oversimplification of analysis of the value of
162:13 this dispensing data.
162:14 As I stated, it was a very valuable tool to
162:15 us, but it was a single tool.  We had other data
162:16 points that we needed to understand.

**162:17 - 162:24**    **Walker, Donald 01-10-2019 (00:00:21)**

162:17 BY MR. KENNEDY:
162:18   Q. Isn't that exactly one of the things
162:19 that the DEA told McKesson in 2006 you ought to be
162:20 looking to, the percentage of controlled substances
162:21 that a pharmacy was selling against its total
162:22 prescription sales?  Isn't that one of the specific
162:23 items that DEA informed you in 2006 you should be
162:24 looking at?

**163:2 - 163:5**    **Walker, Donald 01-10-2019 (00:00:13)**

163:2   Q. Correct?
163:3   A. My recollection, was that the
163:4 percentage of controlled substance sales were a point
163:5 of indication.

**181:6 - 181:24**    **Walker, Donald 01-10-2019 (00:00:52)**

181:6   Q. All right.  Mr. Walker, we've talked
181:7 a bit about the independents, the small, medium, the
181:8 smaller chains.  I want to switch gears now and talk
181:9 to you about what McKesson called the RNAs, or the
181:10 regional national accounts; all right?
181:11   A. Yes.
181:12   Q. You're familiar with RNA, regional
181:13 national account terminology?
181:14   A. The -- yes, I am.  The correct
181:15 terminology is retail national account.

| DW03_Donald Walker Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

|  | 181:16  Q. I'm sorry.  Those would be the big | |
|  | 181:17 chains? | |
|  | 181:18   A. Big chains. | |
|  | 181:19  Q. The CVS, the Walgreens, the Walmarts, | |
|  | 181:20 the Rite Aids; correct? | |
|  | 181:21   A. That size chain, yes. | |
|  | 181:22  Q. Those are big customers; we agree? | |
|  | 181:23 The big chains were big customers to McKesson? | |
|  | 181:24   A. Yes. | |
| 182:25 - 183:4 | **Walker, Donald 01-10-2019 (00:00:13)** | DW03_Donald Walker Plaintiffs' Submission.217 |
|  | 182:25  Q. Can we agree that McKesson's legal | |
|  | 183:1 duties, responsibilities to monitor and prevent | |
|  | 183:2 diversion applies to the large national chains in the | |
|  | 183:3 same fashion it applies to the independent smaller | |
|  | 183:4 chains? | |
| 183:6 - 183:17 | **Walker, Donald 01-10-2019 (00:00:31)** | DW03_Donald Walker Plaintiffs' Submission.218 |
|  | 183:6 THE WITNESS:  Yes, our -- our overall | |
|  | 183:7 controlled substance and regulatory responsibility | |
|  | 183:8 applied the all the registrants that we provided | |
|  | 183:9 controlled substances to. | |
|  | 183:10 BY MR. KENNEDY: | |
|  | 183:11   Q. And that's always been true?  Going | |
|  | 183:12 back to 1970, 1971, when the Controlled Substance Act | |
|  | 183:13 came into existence and the regulations came into | |
|  | 183:14 existence, that's always been true; your | |
|  | 183:15 responsibility to the large chains was no different | |
|  | 183:16 than your responsibilities related to an independent | |
|  | 183:17 pharmacy? | |
| 183:19 - 184:8 | **Walker, Donald 01-10-2019 (00:00:39)** | DW03_Donald Walker Plaintiffs' Submission.219 |
|  | 183:19 THE WITNESS:  Outside of the direct | |
|  | 183:20 experience that I had and exposure I had with the | |
|  | 183:21 retail national accounts, I can't say what happened | |
|  | 183:22 in the early years.  But certainly during my tenure | |
|  | 183:23 it was the same. | |
|  | 183:24 BY MR. KENNEDY: | |
|  | 183:25  Q. The "Know Your Customer" | |
|  | 184:1 responsibility applied to the large national chains; | |
|  | 184:2 true? | |
|  | 184:3  A. As part of our program, yes, it did. | |
|  | 184:4  Q. The responsibility of McKesson to | |

| | DW03_Donald Walker Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| 184:10 - 184:20 | 184:5 identify suspicious orders, based upon size and 184:6 frequency, unusual pattern, applied to the big 184:7 regional national accounts -- retail national 184:8 accounts -- I'm sorry -- would that be true? **Walker, Donald 01-10-2019 (00:00:31)** 184:10 THE WITNESS:  All the elements of our 184:11 Controlled Substance Monitoring Program would have 184:12 applied to national accounts. 184:13 BY MR. KENNEDY: 184:14   Q. Now, with respect to threshold 184:15 increases.  We talked about threshold increases in 184:16 the smaller chains.  Let's talk about threshold 184:17 increases with respect to the big chains. 184:18 From time to time McKesson would increase 184:19 thresholds for pharmacies that were part of a large 184:20 retail account; correct? | DW03_Donald Walker Plaintiffs' Submission 230 |
| 184:22 - 185:12 | **Walker, Donald 01-10-2019 (00:00:49)** 184:22 THE WITNESS:  Yes, we -- we would increase 184:23 thresholds. 184:24 BY MR. KENNEDY: 184:25   Q. But with respect to the big pharmacy 185:1 chains, when you were going to increase a threshold, 185:2 McKesson would not communicate directly with the 185:3 specific pharmacy that was requesting the increase, 185:4 McKesson, rather, would communicate with the 185:5 corporate headquarters of the big chain; is that 185:6 accurate? 185:7   A. As part of our Controlled Substance 185:8 Monitoring Program, we utilized the retail national 185:9 account chain regulatory teams in the communication 185:10 often.  It varied by -- by account or by customer. 185:11 But we did leverage the regulatory teams at the 185:12 national accounts. | DW03_Donald Walker Plaintiffs' Submission 231 |
| 186:2 - 186:6 | **Walker, Donald 01-10-2019 (00:00:09)** 186:2   Q. All right.  So if you're talking 186:3 about CVS, for example, you would be dealing with 186:4 headquarters in Providence, Rhode Island; that was 186:5 the norm?  Correct? 186:6   A. Yes. | DW03_Donald Walker Plaintiffs' Submission 232 |
| 186:14 - 187:13 | **Walker, Donald 01-10-2019 (00:01:07)** | DW03_Donald Walker Plaintiffs' Submission 233 |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

186:14   Q. That's the concept?  You're dealing
186:15 with headquarters; correct?
186:16   A. Yes.
186:17   Q. Who is Elaine Thomet, if I'm saying
186:18 that right?
186:19   A. I'm sorry.  Can you spell the last
186:20 name.
186:21   Q. T-h-o-m-e-t.
186:22   A. Thomet.
186:23   Q. Thomet.  I am very sorry.  I wasn't
186:24 even close.
186:25 Who is she or who was she in this period of
187:1 '08 to, let's say, '14, 2014?
187:2   A. My recollection is Elaine and her
187:3 responsibilities during that time frame, she worked
187:4 in our retail national account support team.  She was
187:5 a -- as I understood it -- I don't remember her
187:6 title -- was primarily a liaison, you know, from the
187:7 retail national account support team into operations
187:8 and others.
187:9   Q. Okay.  She would liaison into
187:10 regulatory?
187:11   A. On occasion, I believe that's
187:12 correct.
187:13 MR. KENNEDY:  Let's look at Exhibit 677.

**187:17 - 187:25**   **Walker, Donald 01-10-2019 (00:00:09)**

187:17   Q. I want to look at an email, the top
187:18 email on the first page, -72.
187:19   A. I haven't seen this document before.
187:20 Could I just --
187:21   Q. Sure.
187:22   A. -- have a moment to familiarize
187:23 myself?
187:24   Q. Please.
187:25   A. Thank you.

**188:3 - 188:4**   **Walker, Donald 01-10-2019 (00:00:04)**

188:3   Q. If you want to look -- look to page
188:4 -74.  That would be the third page in.

**188:5 - 188:16**   **Walker, Donald 01-10-2019 (00:00:27)**

188:5 And you remember, we've had a discussion

| | | |
|---|---|---|
| **DW03_Donald Walker Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

188:6 about dispensing data and whether or not that was

188:7 required for an increase in a drug threshold for the

188:8 smaller independent accounts.  Do you recall that

188:9 discussion we had?  Correct?

188:10   A. I'm sorry.  Repeat your question.

188:11   Q. We've -- we've had a discussion --

188:12 I've asked you about the requirement for dispensing

188:13 data in -- when increasing the threshold of an

188:14 independent or smaller chain.  You recall that

188:15 discussion?

188:16   A. Yes.

**188:19 - 190:4    Walker, Donald 01-10-2019 (00:01:31)**

188:19   Q. So I want to have that discussion now

188:20 with respect to the regional national accounts.

188:21 If you look to page -74, down at the bottom,

188:22 you will see a November 1, 2012, email, it looks like

188:23 from Perry Anderson, where it says:

188:24 (Reading) Hi, Dan, quick question.

188:25 See Frank's email below regarding CSMP

189:1 threshold adjustments (end of

189:2 reading).

189:3 That's Controlled Substance Monitoring

189:4 Program; right?

189:5   A. Yes.

189:6   Q. And they are asking about threshold

189:7 adjustments.  And he says, "Is it common -- common

189:8 practice in RNA" -- that would be the big chains;

189:9 right?  Right?  RNA?

189:10   A. Yes.

189:11   Q. (Reading) Is it common practice

189:12 in RNA to change thresholds without

189:13 asking for this similar backup, or is

189:14 it more or less done by RNA support

189:15 team behind the scenes for RNA

189:16 accounts (end of reading)?

189:17 Now, go back to -74.  And here seems to be

189:18 the response.  Dan Jeffries responds:

189:19 (Reading) We do -- we adjust at the

189:20 request of the customer, but we don't

189:21 ask for dispense data (end of

| DW03_Donald Walker Plaintiffs' Submission |
|---|

| Page/Line | Source | ID |
|---|---|---|

189:22 reading).
189:23 Do you see that?
189:24   A. Yes.
189:25   Q. He's talking about the regional
190:1 national accounts.  Was that the policy -- and it's
190:2 2012 -- that with respect to increases in the
190:3 thresholds for pharmacies that were a part of the big
190:4 chains, you did not ask for dispensing data?

190:6 - 192:15 **Walker, Donald 01-10-2019 (00:02:51)**

190:6 THE WITNESS:  Generally we did not ask for
190:7 any dispensing data from our retail national account
190:8 pharmacies.
190:9 BY MR. KENNEDY:
190:10   Q. Go to page -72, the first page.  Now,
190:11 this is an email from Elaine Thomet on 11-2-12.  And
190:12 she says:
190:13 (Reading) If it helps, I will add some
190:14 clarification.  What Frank may not
190:15 understand is that with RNA, the big
190:16 accounts, we are able to establish the
190:17 regulatory relationship with their
190:18 headquarters and not at store level
190:19 (end of reading).
190:20 Now, that's what we were talking about.  You
190:21 were addressing the headquarters as opposed to the
190:22 individual stores when it came to the big national
190:23 accounts; true?
190:24   A. We used the headquarters.
190:25   Q. She then says:
191:1 (Reading) After their thresholds have
191:2 been initially set up, based on their
191:3 required usage data or historical
191:4 data, if they were a customer back
191:5 when we implemented the CSMP, then any
191:6 time they exceed their threshold, we
191:7 review it and working with their
191:8 headquarters and our regulatory team,
191:9 determine if the store should be
191:10 allowed an increase.  If the HQs
191:11 agreed, then the presumption is made

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

191:12 that they have done their due

191:13 diligence.  It also means that we are

191:14 not talking to the direct purchaser --

191:15 that's the individual pharmacy -- but,

191:16 rather, a representative from

191:17 headquarters, preferably in Regulatory

191:18 Loss Prevention, Asset Control,

191:19 et cetera (end of reading).

191:20 Do you see that?

191:21   A. Yes.

191:22   Q. And was that basically then the

191:23 practice?  If headquarters said a threshold increase

191:24 is okay, there was at least -- in the words of

191:25 Ms. Thomet, there was a presumption that the

192:1 headquarters of the national chain had done their due

192:2 diligence -- had done their due diligence; is that

192:3 correct?

192:4   A. It is -- it is correct that we

192:5 utilized the retail national chains' headquarters

192:6 regulatory and oversight groups to assist us in

192:7 ensuring that any threshold increases were

192:8 appropriate.

192:9   Q. And you would assume that they did

192:10 their due diligence when saying a threshold increase

192:11 is okay, according to -- at least to Elaine Thomet?

192:12   A. Based -- based on our discussions

192:13 with headquarters and understanding what their

192:14 internal procedures were and how they conducted

192:15 oversight of their pharmacies, yes.

**192:16 - 192:20**  **Walker, Donald 01-10-2019 (00:00:11)**   DW03_Donald Walker Plaintiffs' Submission.226

192:16   Q. No prescribing data was required to

192:17 grant a threshold increase for the pharmacy at a

192:18 large chain; correct?  We just went through that.

192:19 True?

192:20   A. No.

**192:23 - 193:8**  **Walker, Donald 01-10-2019 (00:00:27)**   DW03_Donald Walker Plaintiffs' Submission.226

192:23   Q. And so McKesson, when increasing the

192:24 threshold of a pharmacy at a large chain, had no

192:25 direct knowledge of the physicians who were writing

193:1 the prescriptions at the pharmacies for the large

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 193:2 national accounts; true? | |
| | 193:3   A. That is -- that is correct. | |
| | 193:4   Q. You weren't able to check to see if | |
| | 193:5 any of these physicians had an issue with a medical | |
| | 193:6 board in the large national chains, correct, because | |
| | 193:7 you didn't have their identity?  Couldn't do that; | |
| | 193:8 true? | |
| 193:12 - 193:22 | **Walker, Donald 01-10-2019 (00:00:39)** | DW03_Donald Walker Plaintiffs' Submission.231 |
| | 193:12   Q. Correct? | |
| | 193:13   A. It is probably more accurate to state | |
| | 193:14 that we did not have the detail of their -- of their | |
| | 193:15 prescriptions and the items that would be included in | |
| | 193:16 that prescription data. | |
| | 193:17   Q. All right.  And that would include | |
| | 193:18 the identity of the doctor; correct? | |
| | 193:19   A. Presumably, yes. | |
| | 193:20   Q. It would include the data that would | |
| | 193:21 allow you to accurately run percentages on controlled | |
| | 193:22 purchases versus non-controlled purchases; correct? | |
| 193:24 - 193:24 | **Walker, Donald 01-10-2019 (00:00:01)** | DW03_Donald Walker Plaintiffs' Submission.232 |
| | 193:24 THE WITNESS:  We wouldn't have that ability. | |
| 194:2 - 194:7 | **Walker, Donald 01-10-2019 (00:00:13)** | DW03_Donald Walker Plaintiffs' Submission.233 |
| | 194:2   Q. And you wouldn't have the ability, | |
| | 194:3 with respect to the large chains, to make a | |
| | 194:4 determination as to whether or not they were -- they | |
| | 194:5 were doing business with pain clinics; right?  You | |
| | 194:6 wouldn't be able to -- you wouldn't know that because | |
| | 194:7 you don't know who they are selling to; true? | |
| 194:9 - 194:14 | **Walker, Donald 01-10-2019 (00:00:14)** | DW03_Donald Walker Plaintiffs' Submission.234 |
| | 194:9 THE WITNESS:  We wouldn't -- without the -- | |
| | 194:10 we wouldn't have their prescription data. | |
| | 194:11 BY MR. KENNEDY: | |
| | 194:12   Q. So you wouldn't -- you wouldn't know | |
| | 194:13 whether they were selling to pain clinics, would you, | |
| | 194:14 these large -- these large national accounts? | |
| 194:16 - 195:2 | **Walker, Donald 01-10-2019 (00:00:33)** | DW03_Donald Walker Plaintiffs' Submission.235 |
| | 194:16 THE WITNESS:  We -- we wouldn't know from | |
| | 194:17 the data whether they are were selling to pain | |
| | 194:18 clinics.  I wouldn't state that we wouldn't | |
| | 194:19 necessarily -- we may find out some other -- an other | |

| Page/Line | Source | ID |
|---|---|---|

DW03_Donald Walker Plaintiffs' Submission

194:20 way, but generally the data within the potential
194:21 indicator.
194:22 BY MR. KENNEDY:
194:23   Q. Well, you wouldn't have any
194:24 systematic, regular way to check up on all of the
194:25 different pharmacies at the big retail accounts to
195:1 determine who their customers were and as to whether
195:2 or not they were pain clinics?  That's accurate?

**195:5 - 195:10**   **Walker, Donald 01-10-2019 (00:00:13)**

195:5   Q. Right?
195:6   A. Generally we -- we would not.
195:7   Q. And the DEA had informed McKesson,
195:8 had they not, that a list of pain clinics were a big
195:9 problem in our country?  They had told you that; had
195:10 they not?

**195:13 - 195:15**   **Walker, Donald 01-10-2019 (00:00:15)**

195:13 THE WITNESS:  In a prior meeting and some
195:14 communications, the DEA identified pain clinics.
195:15 MR. KENNEDY:  Let me show you Exhibit 752.

**197:7 - 197:14**   **Walker, Donald 01-10-2019 (00:00:28)**

197:7   Q. And with respect to the big chain
197:8 pharmacies, McKesson was not on any regular basis
197:9 getting the dispensing data that would have told them
197:10 whether or not these big chain pharmacies were
197:11 selling to pain clinics; is that right?
197:12   A. We did not get the dispensing data.
197:13 We relied on the chain's regulatory and loss
197:14 prevention groups to understand their patient base.

**197:15 - 197:22**   **Walker, Donald 01-10-2019 (00:00:25)**

197:15   Q. Without the prescribing data from a
197:16 chain pharmacy, the big chains, the CVSes, the
197:17 Walmarts, you wouldn't have enough detail to identify
197:18 whether or not physicians have been prescribing
197:19 what's been called the trinity of opioids, would you,
197:20 a combination of drugs that indicate diversion?  You
197:21 wouldn't be able to know and understand that; would
197:22 you?

**197:25 - 198:3**   **Walker, Donald 01-10-2019 (00:00:02)**

197:25 THE WITNESS:  The --
198:1 BY MR. KENNEDY:

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 198:2  Q. You wouldn't have that info; would | |
| | 198:3 you? | |
| 198:5 - 198:6 | **Walker, Donald 01-10-2019 (00:00:08)** | DW03_Donald Walker Plaintiffs' Submission.241 |
| | 198:5 THE WITNESS:  We would not have the detail | |
| | 198:6 of prescription by doctor. | |
| 198:15 - 198:18 | **Walker, Donald 01-10-2019 (00:00:07)** | DW03_Donald Walker Plaintiffs' Submission.242 |
| | 198:15   Q. Not just the duty to know the | |
| | 198:16 pharmacy, but you had to know the pharmacy's | |
| | 198:17 customers?  That was part of your obligation with the | |
| | 198:18 DEA; was it not? | |
| 198:21 - 199:11 | **Walker, Donald 01-10-2019 (00:00:47)** | DW03_Donald Walker Plaintiffs' Submission.243 |
| | 198:21 THE WITNESS:  No, our -- our responsibility | |
| | 198:22 was to continue to adhere to the regulations | |
| | 198:23 associated with distribution and handling of | |
| | 198:24 controlled substances. | |
| | 198:25 /// | |
| | 199:1 BY MR. KENNEDY: | |
| | 199:2   Q. Sir, look at the very next page of | |
| | 199:3 your slide -- your slide presentation, -175, the very | |
| | 199:4 next page.  It says, "DEA Registrants" at the top; | |
| | 199:5 right? | |
| | 199:6   A. Yes. | |
| | 199:7   Q. This is your presentation.  Then the | |
| | 199:8 first box on the left, does it state, "Know your | |
| | 199:9 customer and your customer's customer"?  Is that what | |
| | 199:10 your presentation states? | |
| | 199:11   A. Yes, it does. | |
| 199:12 - 199:13 | **Walker, Donald 01-10-2019 (00:00:02)** | DW03_Donald Walker Plaintiffs' Submission.244 |
| | 199:12   Q. And that was your obligation at | |
| | 199:13 McKesson; was it not? | |
| 199:16 - 199:23 | **Walker, Donald 01-10-2019 (00:00:25)** | DW03_Donald Walker Plaintiffs' Submission.245 |
| | 199:16 THE WITNESS:  I would more accurately define | |
| | 199:17 this as our effort to ensure that we were doing | |
| | 199:18 everything that we could to manage the distribution | |
| | 199:19 of controlled substances.  There -- there was not a | |
| | 199:20 regulatory requirement to know our customer, our | |
| | 199:21 customer's customer, but clearly there is an | |
| | 199:22 opportunity for us to do everything we can to support | |
| | 199:23 the DEA in their enforcement actions. | |
| 199:25 - 200:5 | **Walker, Donald 01-10-2019 (00:00:15)** | DW03_Donald Walker Plaintiffs' Submission.246 |

| | | |
|---|---|---|
| **DW03_Donald Walker Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

199:25   Q. Doesn't it say, "DEA Registrants,"
200:1 and then underneath the big arrow it says,
200:2 "Regulatory Burden"?  And your statement to all of
200:3 the Directors in Regulatory Affairs, "Know your
200:4 customer and your customer's customer"; is that your
200:5 slide?

**200:8 - 200:14**   **Walker, Donald 01-10-2019 (00:00:22)**

200:8   Q. Is that your slide?
200:9   A. This is -- this is a slide that I
200:10 created.
200:11   Q. And without prescribing data from the
200:12 16,000 individual pharmacies that were part of the
200:13 big chain pharmacy accounts, there is no way for
200:14 McKesson to know its customer's customer; is there?

**200:17 - 200:19**   **Walker, Donald 01-10-2019 (00:00:09)**

200:17 THE WITNESS:  Without prescribing data from
200:18 the national accounts, we would not have the elements
200:19 of prescription data that we have outlined before.

**201:6 - 201:14**   **Walker, Donald 01-10-2019 (00:00:23)**

201:6 BY MR. KENNEDY:
201:7   Q. And the Directors of Regulatory
201:8 Affairs, and the folks that worked for them, they
201:9 didn't get in their cars on a regular basis and
201:10 physically visit the pharmacies of the big chain
201:11 pharmacies; correct?
201:12   A. Again, I can't say that it never
201:13 occurred.  But generally we did not conduct site
201:14 visits at the chain pharmacies.

**201:25 - 202:2**   **Walker, Donald 01-10-2019 (00:00:07)**

201:25   Q. All right.  But essentially McKesson
202:1 was allowing the big chain pharmacies to monitor
202:2 themselves with respect to threshold increases?

**202:5 - 203:1**   **Walker, Donald 01-10-2019 (00:01:09)**

202:5 THE WITNESS:  We relied on the resources
202:6 that were in the chain pharmacies, with the stated
202:7 responsibility for their regulatory compliance, to
202:8 help us in ensuring that their pharmacies were
202:9 executing appropriately.
202:10 BY MR. KENNEDY:
202:11   Q. Well, let me ask, did McKesson ever

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

202:12 think that -- let's say, for example, did they ever
202:13 think that CVS would report themselves to the DEA?
202:14   A. I'm not sure I understand that
202:15 question.
202:16   Q. Did McKesson ever believe that CVS,
202:17 for example, CVS headquarters, would report one of
202:18 their own pharmacies to the DEA?
202:19   A. I can't answer the question.  I
202:20 don't -- I don't know.
202:21   Q. I mean, did CVS ever sit there and
202:22 say, well, we think that CVS headquarters will
202:23 contact the DEA and tell them we have a pharmacy in
202:24 West Virginia that is violating the law, and we think
202:25 you should close them down?  Do you think that they
203:1 would ever do that?

203:4 - 204:1   **Walker, Donald 01-10-2019 (00:01:08)**    DW03_Donald Walker Plaintiffs' Submission.003

203:4 THE WITNESS:  Again, I can't answer what CVS
203:5 would or would not do with information that they
203:6 received.
203:7 BY MR. KENNEDY:
203:8   Q. Let's talk about Level 1
203:9 investigations.  That's the investigation that would
203:10 take place after -- after an individual pharmacy
203:11 would place an order that exceeded their threshold;
203:12 correct?
203:13   A. Yes.
203:14   Q. And, again, I want to focus on the
203:15 national chains.  So if a -- if a small
203:16 independent -- if a small independent chain ordered
203:17 over their threshold, McKesson would contact that
203:18 individual pharmacy directly; true?  That was the
203:19 policy?
203:20   A. Yes, that's correct.
203:21   Q. But if the -- but if an individual
203:22 pharmacy from a big national chain ordered over their
203:23 opioid threshold, then McKesson would contact the
203:24 national headquarters of the chain; true?
203:25   A. If we were to make the contact, it
204:1 would be with the chain -- the chain headquarters.

211:23 - 211:24   **Walker, Donald 01-10-2019 (00:00:02)**

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  |  |
|---|---|---|
|  | 211:23 MR. KENNEDY:  Let me show you Exhibit 685. | |
|  | 211:24 (Exhibit No. 685 was marked.) | |
| 211:25 - 212:10 | **Walker, Donald 01-10-2019 (00:00:52)** | DW03_Donald Walker Plaintiffs' Submission.251 |
|  | 211:25 MR. KENNEDY:  685 is Bates -498295 to -307. | |
|  | 212:1   Q. Do you remember this document? | |
|  | 212:2   A. Yes, I do. | |
|  | 212:3   Q. And this is a PowerPoint that was put | |
|  | 212:4 together for presentation to the DEA; true? | |
|  | 212:5   A. The date of this document is -- and | |
|  | 212:6 my understanding of this document, based on the date | |
|  | 212:7 here, is that it was a document that we put together | |
|  | 212:8 for a review with various DEA field offices and DEA. | |
|  | 212:9   Q. Did you prepare this? | |
|  | 212:10   A. I prepared the original, yes. | |
| 212:11 - 212:11 | **Walker, Donald 01-10-2019 (00:00:03)** | DW03_Donald Walker Plaintiffs' Submission.252 |
|  | 212:11   Q. Go to page -302, if you would.  See | |
| 212:12 - 213:24 | **Walker, Donald 01-10-2019 (00:01:48)** | DW03_Donald Walker Plaintiffs' Submission.253 |
|  | 212:12 where it says, "Level 1 Review"? | |
|  | 212:13   A. Yes. | |
|  | 212:14   Q. That's what we've been talking about | |
|  | 212:15 with respect to the large chain pharmacies; right? | |
|  | 212:16   A. Yes. | |
|  | 212:17   Q. And in this presentation to the DEA, | |
|  | 212:18 does it state, "Review and Escalation.  Level 1 | |
|  | 212:19 Review, Actions:  Direct contact customer"? | |
|  | 212:20 Well, that's not true with respect to the | |
|  | 212:21 big regional accounts, the big national accounts. | |
|  | 212:22 You contacted headquarters, you didn't contact the | |
|  | 212:23 pharmacy that ordered over the threshold; true? | |
|  | 212:24 True? | |
|  | 212:25   A. That's not accurate. | |
|  | 213:1 Our relationship at a retail national | |
|  | 213:2 account level was specifically and strictly with the | |
|  | 213:3 headquarters, in all matters. | |
|  | 213:4   Q. Exactly.  So the individual pharmacy, | |
|  | 213:5 the individual pharmacy that went over the threshold | |
|  | 213:6 and was subject to a Level 1 Review, they weren't | |
|  | 213:7 contacted; you contacted headquarters, correct? | |
|  | 213:8   A. That is correct. | |
|  | 213:9   Q. And it says, "You will ascertain the | |

| Page/Line | Source | ID |
|---|---|---|

213:10 reason for exceeding the threshold." But as you just
213:11 told us, corporate headquarters wouldn't even
213:12 necessarily get back to you as to why their
213:13 individual pharmacy exceeded the threshold; right?
213:14  A. That could occur, yes.
213:15  Q. It says, "Conduct analysis as
213:16 required." And then at the bottom, "Documentation."
213:17 My question is, when you made this
213:18 presentation to the DEA in 2008, did you tell them
213:19 that with respect to these Level 1 Reviews, this
213:20 isn't going to apply to the big national chains,
213:21 we're going to let them do all of this themselves?
213:22 Did you tell them that the big national chains
213:23 weren't going to be a part of these Level 1 Reviews
213:24 by McKesson?

**214:1 - 214:8**  **Walker, Donald 01-10-2019 (00:00:21)**  DW03_Donald Walker Plaintiffs' Submission.237

214:1 THE WITNESS:  I don't recall specifically if
214:2 we had the conversation with DEA either at a local
214:3 level or at headquarters level of how we were going
214:4 to handle the retail national accounts.
214:5 BY MR. KENNEDY:
214:6  Q. Do you recall telling them, you know,
214:7 we're going to let 16,000 pharmacies really kind of
214:8 monitor themselves?  Did you tell them that?

**214:11 - 214:12**  **Walker, Donald 01-10-2019 (00:00:02)**  DW03_Donald Walker Plaintiffs' Submission.238

214:11 THE WITNESS:  No, we didn't have that
214:12 conversation.

**214:20 - 214:24**  **Walker, Donald 01-10-2019 (00:00:15)**  DW03_Donald Walker Plaintiffs' Submission.239

214:20 And so let me ask you, Rite Aid, was that a
214:21 big national account, one of the big retail RNA
214:22 accounts at McKesson?
214:23  A. Rite Aid was and is a large customer
214:24 of McKesson.

**217:10 - 217:15**  **Walker, Donald 01-10-2019 (00:00:19)**  DW03_Donald Walker Plaintiffs' Submission.240

217:10  Q. Let me ask you this.  Maybe we can
217:11 shortcut things.  Did the big national chains, such
217:12 as CVS and Walmart and Rite Aid, did they represent,
217:13 then, to McKesson that they would review their own
217:14 pharmacies when their own pharmacy exceeded a
217:15 threshold and you notified them?

| Page/Line | Source | ID |
|---|---|---|
| | **DW03_Donald Walker Plaintiffs' Submission** | |

217:18 - 217:19   **Walker, Donald 01-10-2019 (00:00:02)**

217:18   Q. Was that the understanding, the
217:19 representation?

217:21 - 218:2   **Walker, Donald 01-10-2019 (00:00:22)**

217:21 THE WITNESS:  I think it's better said that
217:22 we understood that they would -- had their own
217:23 internal reports and mechanisms to monitor and
217:24 evaluate their own pharmacies' distribution of
217:25 controlled substances, and we relied on their
218:1 resources and their expertise and their data that
218:2 they had and kept internally to manage that.

218:4 - 218:9   **Walker, Donald 01-10-2019 (00:00:12)**

218:4   Q. But, again, you were relying upon
218:5 their representation of their monitoring programs,
218:6 but -- because you didn't hire people to sneak into
218:7 their offices and look at their monitoring programs?
218:8 They provided you with the statements that they were
218:9 monitoring; correct?

218:12 - 218:18   **Walker, Donald 01-10-2019 (00:00:24)**

218:12 THE WITNESS:  Our -- our discussions with
218:13 our national account customers, in each of those they
218:14 would describe to us, and we would have discussions
218:15 around the processes that they used, and we -- again,
218:16 we utilized them heavily to -- as resources that were
218:17 available to help us in managing our overall
218:18 Controlled Substance Monitoring Program.

218:19 - 218:24   **Walker, Donald 01-10-2019 (00:00:23)**

218:19 MR. KENNEDY:  Give me 678.
218:20 (Exhibit No. 678 was marked.)
218:21 BY MR. KENNEDY:
218:22   Q. I am going to show you Exhibit 678,
218:23 which we don't have Bates numbers on.  Let me give
218:24 you this.  It's 445881-4.

218:25 - 219:3   **Walker, Donald 01-10-2019 (00:00:18)**

218:25 If you go down to the bottom, this is an
219:1 email by Elaine Thomet again, July 17, 2014.  I want
219:2 to see if you agree with this.  Do you see the second
219:3 page?

219:4 - 219:5   **Walker, Donald 01-10-2019 (00:00:02)**

219:4   A. Hang on just a moment.  Let me just

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 219:6 - 219:11 | 219:5 take a quick look.<br>**Walker, Donald 01-10-2019 (00:00:14)**<br>219:6 Okay.  Counsel, you directed me to the<br>219:7 second page?<br>219:8   Q. Yes.  Look at the second page, the<br>219:9 big letters.  I mean, you just looked at it.  She<br>219:10 is -- she's talking about setting up informational<br>219:11 phone calls; is she not? | DW03_Donald Walker Plaintiffs' Submission.266 |
| 219:12 - 220:9 | **Walker, Donald 01-10-2019 (00:01:01)**<br>219:12   A. Yes.<br>219:13   Q. And look at "The Call/Web-Ex."  Does<br>219:14 she state that, "Due to the nature of centralized<br>219:15 management within chains" -- and she's talking about<br>219:16 the big accounts, the big national chains; right?<br>219:17   A. Yes.<br>219:18   Q. (Reading) Due to the nature of<br>219:19 centralized management within chains,<br>219:20 RNA -- that's McKesson -- has the<br>219:21 ability to partner with our chain<br>219:22 customers to act somewhat as our proxy<br>219:23 in regards to regulatory oversight of<br>219:24 their stores.  Unlike the ISMC --<br>219:25 that's the smaller ones -- this allows<br>220:1 us to avoid the need to interview and<br>220:2 visit all 16K RNA stores individually<br>220:3 every one to three years, as we are<br>220:4 able to interview the main customer<br>220:5 authorities with regulatory oversight<br>220:6 of their stores (end of reading).<br>220:7 Is that basically what you have been saying<br>220:8 as to -- as to how you addressed chains, the big<br>220:9 national chains? | DW03_Donald Walker Plaintiffs' Submission.269 |
| 220:11 - 220:25 | **Walker, Donald 01-10-2019 (00:00:49)**<br>220:11 THE WITNESS:  We relied on the national<br>220:12 chains' headquarters, because all the national chains<br>220:13 had standard operating procedures and centralized<br>220:14 oversight in their business model.  And our -- our<br>220:15 view was that if you go to one CVS store, you see all<br>220:16 the CVS stores or all the Rite Aid stores because<br>220:17 they had very, very tight controls over how they | DW03_Donald Walker Plaintiffs' Submission.270 |

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

220:18 managed their business.

220:19 BY MR. KENNEDY:

220:20   Q. Well, let me just -- well, first,

220:21 tight controls.  You understand CVS was fined

220:22 $130 million with respect to violations of the

220:23 Controlled Substances Act, $130 million fines, as you

220:24 tell us they had these very, very tight controls?

220:25 You knew that in your position, didn't you?

**221:4 - 221:15**    **Walker, Donald 01-10-2019 (00:00:35)**

221:4   Q. You knew that; did you not?

221:5   A. I was aware CVS had paid some

221:6 penalties.  I don't recall the amount nor do I recall

221:7 the events or the issues.

221:8   Q. And Ms. Thomet, what she says is

221:9 McKesson is giving its proxy to the big national

221:10 chains with respect to regulatory oversight?  Does

221:11 she use the word "proxy"?

221:12   A. That is what is written.

221:13   Q. And proxy means you are giving

221:14 someone else authority to act for you; is that what

221:15 it means?

**221:18 - 221:19**    **Walker, Donald 01-10-2019 (00:00:02)**

221:18 THE WITNESS:  Generally, I would understand

221:19 that.

**221:21 - 223:1**    **Walker, Donald 01-10-2019 (00:01:32)**

221:21   Q. And look where she says now, "The

221:22 Data."  Do you see that, "The Data"?

221:23 And does she state:

221:24 (Reading) We need to ask them to

221:25 provide three months' dispense data

222:1 using the form specifically developed

222:2 for RNA customers, attached.  That

222:3 form can be sent to the customer.  The

222:4 data portion we're looking for them to

222:5 provide is simple:  DEA number, store

222:6 name, total prescription doses

222:7 dispensed by the DEA registrant for a

222:8 three-month period (excluding liquids,

222:9 patches, powders and inhalers and

222:10 non-Rx).  This data, which only they

| | | |
|---|---|---|
| **DW03_Donald Walker Plaintiffs' Submission** | | |

| Page/Line | Source | ID |
|---|---|---|

222:11 can provide, simply gives us a better
222:12 understanding of their pharmacy size
222:13 and is an important part of your
222:14 equations when determining percentage
222:15 controls to total Rx, for example.  If
222:16 we were their sole provider, we could
222:17 potentially rely on our data alone,
222:18 but often that is not the case with
222:19 RNA customers, which is why we need
222:20 them to provide their total dispense
222:21 database (end of reading).
222:22 Do you see that?
222:23   A. I see that written.
222:24   Q. It's 2014, all right, when she is
222:25 saying that.  2014 is the date of this, is it not,
223:1 for this educational webinar?

**223:4 - 223:4**   **Walker, Donald 01-10-2019 (00:00:00)**

223:4   Q. Is that right?

**223:7 - 223:12**   **Walker, Donald 01-10-2019 (00:00:17)**

223:7   Q. 2014?
223:8   A. The document is dated in 2014.
223:9   Q. And that's two years after the
223:10 documents we just looked at saying dispensing data is
223:11 a must, it's required for the independent and small
223:12 chains; right?  This is two years later?

**223:16 - 223:18**   **Walker, Donald 01-10-2019 (00:00:06)**

223:16   Q. Is that right?
223:17   A. This -- this document is two years
223:18 after the documents we reviewed earlier.

**223:19 - 223:21**   **Walker, Donald 01-10-2019 (00:00:10)**

223:19   Q. And it's eight years after the DEA
223:20 told McKesson this is what diversion looks like;
223:21 right?  Eight years?

**223:25 - 223:25**   **Walker, Donald 01-10-2019 (00:00:01)**

223:25   Q. Eight years, sir?

**224:2 - 224:10**   **Walker, Donald 01-10-2019 (00:00:29)**

224:2 THE WITNESS:  I think better -- a better
224:3 characterization there is that it was eight years
224:4 after DEA identified issues with Internet pharmacies.
224:5 They didn't reveal all of this -- these issues.

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

224:6 And, frankly, as we evolved our program and
224:7 gained additional information and additional
224:8 knowledge and ability to utilize data, we expanded
224:9 our enforcement and -- well, not enforcement, but our
224:10 oversight effort in every way that we could.

**224:12 - 224:16    Walker, Donald 01-10-2019 (00:00:19)**

224:12   Q. Sir, the DEA said it in 2006, it was
224:13 required for the smaller chains by '12, and there's
224:14 no requirement, at least according to the documents
224:15 we're looking at, until 2014 with respect to the big
224:16 national accounts; right?

**224:19 - 224:22    Walker, Donald 01-10-2019 (00:00:10)**

224:19 THE WITNESS:  Again, as -- as the program
224:20 evolved and we identified additional information and
224:21 areas that we needed to focus, we modified our
224:22 program and our request for data.

**225:9 - 225:16    Walker, Donald 01-10-2019 (00:00:23)**

225:9   Q. Is that right, sir, eight years to
225:10 develop it?
225:11   A. It is eight years between 2006 and
225:12 2014.  But it is not correct that DEA identified all
225:13 the issues and all the information that we have
225:14 discussed in terms of prescription data.  And during
225:15 that time frame, prescription data resources and
225:16 capabilities increased significantly with technology.

**225:17 - 226:6    Walker, Donald 01-10-2019 (00:00:44)**

225:17   Q. You've said over and over that this
225:18 reliance upon the headquarters of the big national
225:19 chains was based upon the fact that they had their
225:20 own monitoring program, their own Controlled
225:21 Substance Monitoring Program; is that what I have
225:22 heard you say?
225:23   A. More accurately, they had better data
225:24 and regulatory oversight.  We were never made privy
225:25 to the specifics of their programs.  The chains
226:1 considered their data to be very proprietary and, as
226:2 a result, we reviewed it at a high level.
226:3   Q. They never told you -- you relied
226:4 upon the fact that they had their own Controlled
226:5 Substances Monitoring Program, but they didn't give

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

226:9 - 226:13
226:6 you the detail of those programs ever; did they?
**Walker, Donald 01-10-2019 (00:00:12)**
226:9 THE WITNESS:  To my knowledge, we never had
226:10 any detailed specifics from a chain on their -- on
226:11 their programs, due to their proprietary view of
226:12 their data.
226:13 BY MR. KENNEDY:

227:8 - 227:15
**Walker, Donald 01-10-2019 (00:00:26)**
227:8   Q. Did Congress ever tell McKesson -- we
227:9 know what it enacted in 1970, the Controlled
227:10 Substances Act.  But did they ever enact anything
227:11 thereafter that told McKesson, you can give
227:12 pharmacies in the big national accounts your proxy to
227:13 do your due diligence as it relates to Regulatory
227:14 Affairs over controlled substances?  Did Congress
227:15 ever tell McKesson that?

227:17 - 227:24
**Walker, Donald 01-10-2019 (00:00:42)**
227:17 THE WITNESS:  The regulation required that
227:18 we operate a system to identify suspicious orders and
227:19 have systems to prevent the diversion of controlled
227:20 substances.  We utilized the -- and the pharmacies
227:21 and the chains as a registrant had the same
227:22 responsibility.  So we relied upon their
227:23 responsibility and their tools to assist us in
227:24 ensuring that we were complying.

229:6 - 229:8
**Walker, Donald 01-10-2019 (00:00:06)**
229:6   Q. But they would monitor the drugs they
229:7 were distributing, but they weren't monitoring the
229:8 drugs they were buying from you?

229:11 - 229:15
**Walker, Donald 01-10-2019 (00:00:13)**
229:11 THE WITNESS:  Again, we utilized -- because
229:12 they had processes and systems and data in place, we
229:13 utilized strongly their resources to help us in
229:14 overseeing and managing the distribution of
229:15 controlled substances to their pharmacies.

229:17 - 229:25
**Walker, Donald 01-10-2019 (00:00:21)**
229:17   Q. You understand that the
229:18 responsibilities under the law for a pharmacy to
229:19 prevent a diversion is different than the
229:20 responsibilities under the law of a distributor?

| | | |
|---|---|---|
| **DW03_Donald Walker Plaintiffs' Submission** | | |
| **Page/Line** | **Source** | **ID** |

229:21 They are different; correct?
229:22   A. I don't understand specifically the
229:23 regulations associated with pharmacy.  I've never
229:24 reviewed them.  But generally I understand that they
229:25 are different.

230:15 - 230:21   **Walker, Donald 01-10-2019 (00:00:15)**

230:15   Q. And you understand the regulation
230:16 gave a responsibility and a set of responsibilities
230:17 to the two different entities?  Distributors, you've
230:18 got your jobs, and pharmacies, you have your job;
230:19 correct?
230:20   A. I understand the distributor
230:21 responsibilities.

231:10 - 231:11   **Walker, Donald 01-10-2019 (00:00:02)**

231:10 MR. KENNEDY:  Let me show you Exhibit 674,
231:11 if I could.

231:15 - 231:15   **Walker, Donald 01-10-2019 (00:00:06)**

231:15   Q. This is Bates -507218 to -507220.

231:16 - 233:20   **Walker, Donald 01-10-2019 (00:02:33)**

231:16 This is an email from Michael Oriente, if you look at
231:17 the top.  Who is Michael Oriente?
231:18   A. Michael Oriente was -- was and is the
231:19 Director of Regulatory Affairs for the East Region --
231:20 Northeast Region.
231:21   Q. So a big responsibility.  He's one of
231:22 four/six people; correct?
231:23   A. Yes, at that point in time.
231:24   Q. And at this point in time, he is also
231:25 responsible for managing and monitoring some of the
232:1 large national chains; true?
232:2   A. Yes.
232:3   Q. And this is April of 2011.  And does
232:4 he state, "Dave" -- and he's sending an email to Dave
232:5 Gustin, who is another Regulatory Affairs person;
232:6 right?  He's in the Midwest; right?
232:7   A. Yes.
232:8   Q. He also has some responsibility for
232:9 these big national chains; right?
232:10   A. Yes.
232:11   Q. And does he state, "Dave, can you ask

| Page/Line | Source | ID |
|---|---|---|

DW03_Donald Walker Plaintiffs' Submission

232:12 RNA" -- and that's the regional national account
232:13 portion of McKesson; right?
232:14   A. Yes.
232:15   Q. "Can you ask RNA to provide a contact
232:16 person for each chain?"
232:17 Does it look like he doesn't even know who
232:18 to contact?  He's a Director of Regulatory Affairs,
232:19 he's managing certain big national accounts, and he's
232:20 asking for the contact person at the chain; is he
232:21 not?  Is that what that says?
232:22 "Can you ask RNA" -- a part of McKesson --
232:23 "to provide a contact person for each chain?"  Is
232:24 that how he starts the email?
232:25   A. Yes, it's what's written here.
233:1   Q. And then does he say:
233:2 (Reading) They could add it to our
233:3 DRA, Director of Regulatory Affairs,
233:4 RNA sheet that lists which of us has
233:5 what chain and if any chain has a
233:6 documented Controlled Substance
233:7 Monitoring Program process that they
233:8 could share with us so we could better
233:9 understand what they are doing on
233:10 their side for compliance (end of
233:11 reading).
233:12 Is that what he says?
233:13   A. That's what's written.
233:14   Q. So here's a Director of Regulatory
233:15 Affairs that is monitoring large national chains, and
233:16 number one, he doesn't even know who to contact at
233:17 the national chains; and, number two, he's asking
233:18 whether or not they even have a documented Controlled
233:19 Substance Monitoring Program.  Isn't that what he's
233:20 asking?

| 233:23 - 233:23 | **Walker, Donald 01-10-2019 (00:00:00)** | DW03_Donald Walker Plaintiffs' Submission.206 |
| | 233:23   Q. Right? | |
| 234:2 - 234:4 | **Walker, Donald 01-10-2019 (00:00:04)** | DW03_Donald Walker Plaintiffs' Submission.206 |
| | 234:2   Q. Is that correct, sir? | |
| | 234:3   A. That's what is written here, is that | |
| | 234:4 request. | |

| DW03_Donald Walker Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | | |
| --- | --- | --- |
| 234:9 - 234:12 | **Walker, Donald 01-10-2019 (00:00:05)** | DW03_Donald Walker Plaintiffs' Submission.206 |
| | 234:9   Q. He was in charge of Rite Aid for a | |
| | 234:10 certain portion of time; do you know that? | |
| | 234:11   A. I do recall he had responsibility for | |
| | 234:12 Rite Aid. | |
| 234:22 - 235:2 | **Walker, Donald 01-10-2019 (00:00:15)** | DW03_Donald Walker Plaintiffs' Submission.207 |
| | 234:22   Q. So McKesson is relying upon these | |
| | 234:23 large national chains to do their own monitoring, and | |
| | 234:24 then the person at McKesson who is in charge of | |
| | 234:25 various national chains doesn't even know who to | |
| | 235:1 contact, doesn't even know if they have a documented | |
| | 235:2 monitoring program; right? | |
| 235:5 - 235:5 | **Walker, Donald 01-10-2019 (00:00:01)** | DW03_Donald Walker Plaintiffs' Submission.208 |
| | 235:5   Q. Isn't that what this is saying to us? | |
| 235:7 - 235:21 | **Walker, Donald 01-10-2019 (00:00:40)** | DW03_Donald Walker Plaintiffs' Submission.209 |
| | 235:7 THE WITNESS:  No, I don't think that's | |
| | 235:8 accurate, as I read this. | |
| | 235:9 What I understand it to mean is more of an | |
| | 235:10 update of who the contact people are in the chains. | |
| | 235:11 I mean, people move around in the chain headquarters | |
| | 235:12 constantly.  And he's simply, as I'm reading this, | |
| | 235:13 was trying to determine whether there was other | |
| | 235:14 information that we could use in our ongoing effort | |
| | 235:15 to manage our controlled substance program. | |
| | 235:16 BY MR. KENNEDY: | |
| | 235:17   Q. Well, at this point in time -- maybe | |
| | 235:18 there's been change, maybe people are moving around, | |
| | 235:19 but this man, in charge of CVS and Rite Aid and | |
| | 235:20 Costco and Krogers, he doesn't even know who to call; | |
| | 235:21 right? | |
| 236:4 - 236:5 | **Walker, Donald 01-10-2019 (00:00:01)** | DW03_Donald Walker Plaintiffs' Submission.210 |
| | 236:4   Q. Isn't that what this is saying at | |
| | 236:5 this moment in time? | |
| 236:6 - 236:8 | **Walker, Donald 01-10-2019 (00:00:04)** | DW03_Donald Walker Plaintiffs' Submission.211 |
| | 236:6   A. No, that's not accurate.  I don't | |
| | 236:7 believe that this is that at all.  I think he is | |
| | 236:8 ensuring that he has right information. | |
| 236:10 - 236:14 | **Walker, Donald 01-10-2019 (00:00:09)** | DW03_Donald Walker Plaintiffs' Submission.212 |
| | 236:10   Q. Would you agree with me that he's | |
| | 236:11 asking, hey, do any of these chains actually have a | |

| Page/Line | Source | ID |
|---|---|---|
| | 236:12 documented CSMP, Controlled Substance Monitoring<br>236:13 Program?  Isn't he asking that?  Could somebody tell<br>236:14 me? | |
| 236:18 - 236:21 | **Walker, Donald 01-10-2019 (00:00:07)**<br>236:18  Q. Right?<br>236:19  A. Again, what is written is a request<br>236:20 if they have a documented CSMP process that they<br>236:21 could share. | DW03_Donald Walker Plaintiffs' Submission.283 |
| 249:2 - 249:9 | **Walker, Donald 01-10-2019 (00:00:25)**<br>249:2  Q. All right.  So when we looked back at<br>249:3 that email from Ms. Thomet, where she said that<br>249:4 McKesson was giving its proxy of due diligence to the<br>249:5 big national chains, you gave your proxy to big<br>249:6 national chains -- I just want to be clear, you gave<br>249:7 your proxies to big national chains without knowing<br>249:8 whether or not they had a Suspicious Order Monitoring<br>249:9 Program? | DW03_Donald Walker Plaintiffs' Submission.284 |
| 249:12 - 249:12 | **Walker, Donald 01-10-2019 (00:00:01)**<br>249:12  Q. Is that your testimony, sir? | DW03_Donald Walker Plaintiffs' Submission.285 |
| 249:14 - 250:3 | **Walker, Donald 01-10-2019 (00:00:50)**<br>249:14 THE WITNESS:  What I can't answer is whether<br>249:15 or not we determined at the time that we interacted<br>249:16 with these national chains, at that point in time<br>249:17 whether they had a Suspicious Order Monitoring<br>249:18 Program in place or not.<br>249:19 BY MR. KENNEDY:<br>249:20  Q. You did not determine that?<br>249:21  A. At that point in time I don't believe<br>249:22 so.  Or "I don't know," is my response.  In 2008, we<br>249:23 were just rolling out CSMP, but I don't know whether<br>249:24 we asked every chain that question or not.<br>249:25  Q. In 2009 did you ask the chains --<br>250:1 before you gave them your proxy on due diligence, did<br>250:2 you ask chains in 2009, such as CVS, whether or not<br>250:3 they had a Suspicious Order Monitoring Program? | DW03_Donald Walker Plaintiffs' Submission.286 |
| 250:6 - 250:8 | **Walker, Donald 01-10-2019 (00:00:05)**<br>250:6  Q. In relation to outside orders, not<br>250:7 what they were distributing themselves, but what they<br>250:8 were getting from McKesson? | DW03_Donald Walker Plaintiffs' Submission.287 |
| 250:12 - 251:3 | **Walker, Donald 01-10-2019 (00:00:54)** | DW03_Donald Walker Plaintiffs' Submission.288 |

DW03_Donald Walker Plaintiffs' Submission

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

250:12  Q. Did you ask that in 2009?

250:13  A. I don't know.

250:14  Q. In 2010 did you ask the big chain

250:15 pharmacies, including CVS, whether or not they had a

250:16 Suspicious Order Monitoring Program that covers

250:17 orders that they placed with McKesson?  Did you ask

250:18 them that in 2010?

250:19  A. I don't know.

250:20  Q. In 2011 did you ask the big national

250:21 chains, including CVS, whether or not they had

250:22 Suspicious Order Monitoring Programs in relation to

250:23 opioids that they were purchasing from McKesson?

250:24  A. I do not know.

250:25  Q. And, sir, you were -- you were in

251:1 charge of all the regulatory during this period, were

251:2 you not, 2010, 2011, and 2012?  You were in charge --

251:3  A. Yes.

**251:11 - 251:20     Walker, Donald 01-10-2019 (00:00:22)**

251:11  Q. You do not know whether you even

251:12 asked them whether or not they had a Suspicious Order

251:13 Monitoring Program?  You don't know?

251:14  A. I do not know whether we asked that

251:15 question.

251:16  Q. What about 2013?  In 2013 did you

251:17 ever ask any of the big chains, anybody at McKesson

251:18 ever ask any of the big national chains, including

251:19 CVS, whether or not they had a Suspicious Order

251:20 Monitoring Program?

**251:23 - 251:23     Walker, Donald 01-10-2019 (00:00:01)**

251:23 THE WITNESS:  I do not know.

**302:10 - 302:11     Walker, Donald 01-10-2019 (00:00:04)**

302:10  Q. Was that required of McKesson in

302:11 2007, do not ship until we do our due diligence?

**302:13 - 302:21     Walker, Donald 01-10-2019 (00:00:22)**

302:13 THE WITNESS:  There is no regulatory

302:14 requirement to not ship.  There is a regulatory

302:15 requirement to report.

302:16 BY MR. KENNEDY:

302:17  Q. All right.  And did the DEA tell you

302:18 in 2006 that you are required not to ship until you

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 302:19 do your due diligence on a potentially suspicious | |
| | 302:20 order?  Did they tell you that in '06 in a letter to | |
| | 302:21 McKesson? | |
| 302:25 - 303:6 | **Walker, Donald 01-10-2019 (00:00:30)** | DW03_Donald Walker Plaintiffs' Submission.213 |
| | 302:25   Q. Did they tell you that in '06 in a | |
| | 303:1 letter to McKesson? | |
| | 303:2   A. In 2006 their guidance and direction | |
| | 303:3 was, do not ship.  And the requirement is at the | |
| | 303:4 point that we determine an order to be suspicious. | |
| | 303:5   Q. Does your CSMP that you put in place | |
| | 303:6 in 2008 say, do not ship -- | |
| 303:9 - 303:10 | **Walker, Donald 01-10-2019 (00:00:06)** | DW03_Donald Walker Plaintiffs' Submission.214 |
| | 303:9   Q. -- until we have done our due | |
| | 303:10 diligence?  Does your own CSMP say that in 2008? | |
| 303:12 - 303:15 | **Walker, Donald 01-10-2019 (00:00:13)** | DW03_Donald Walker Plaintiffs' Submission.215 |
| | 303:12 THE WITNESS:  Our CSMP blocks the order.  We | |
| | 303:13 conduct the due diligence.  But at the point we | |
| | 303:14 determine that order to be suspicious, is at the | |
| | 303:15 point where we need to report to the DEA. | |
| 335:19 - 336:10 | **Walker, Donald 01-10-2019 (00:01:09)** | DW03_Donald Walker Plaintiffs' Submission.216 |
| | 335:19   Q. Now, also built right into your | |
| | 335:20 program for the salespeople, you told us -- we've | |
| | 335:21 established this -- that if a pharmacy would order | |
| | 335:22 over their threshold, then there would be a Level 1 | |
| | 335:23 Review or investigation; correct? | |
| | 335:24   A. Yes, as part of the review process, | |
| | 335:25 there would be a Level 1 Review. | |
| | 336:1   Q. And your program had salespeople | |
| | 336:2 doing the Level 1 Review of the pharmacies; correct? | |
| | 336:3   A. Again, we would -- we would utilize | |
| | 336:4 the sales force to help us understand and gain | |
| | 336:5 information as to why the increase or the threshold | |
| | 336:6 was -- was exceeded.  And but at no time was the | |
| | 336:7 sales force authorized to approve a threshold | |
| | 336:8 increase.  The information was reviewed by the DRAs. | |
| | 336:9 They were the sole responsible parties to increase | |
| | 336:10 thresholds. | |
| 336:11 - 336:16 | **Walker, Donald 01-10-2019 (00:00:14)** | DW03_Donald Walker Plaintiffs' Submission.217 |
| | 336:11   Q. I'm not talking about threshold | |
| | 336:12 increases.  I'm talking about Level 1 investigations | |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

336:13 into a potential suspicious order because a customer
336:14 has ordered over their threshold.  You had
336:15 salespeople doing those reviews and investigations;
336:16 did you not, sir?

**336:19 - 337:2**   **Walker, Donald 01-10-2019 (00:00:25)**

336:19 THE WITNESS:  The sales force was used not
336:20 exclusively.  But the sales force was used to help in
336:21 the Level 1 Review.
336:22 BY MR. KENNEDY:
336:23   Q. That was a national practice; was it
336:24 not?  National practice?
336:25   A. I don't have the specifics.  But
337:1 generally I believe it took place across all of our
337:2 regions.

**337:3 - 337:7**   **Walker, Donald 01-10-2019 (00:00:08)**

337:3   Q. And the salespeople didn't want to
337:4 investigate their own customers, because if they
337:5 investigated their customer, the pharmacy may turn
337:6 them in to DEA, then McKesson wasn't going to sell to
337:7 them anymore; right?

**337:11 - 337:11**   **Walker, Donald 01-10-2019 (00:00:01)**

337:11   Q. And the salespeople knew that;

**337:11 - 337:11**   **Walker, Donald 01-10-2019 (00:00:00)**

337:11   Q. right?

**337:16 - 337:24**   **Walker, Donald 01-10-2019 (00:00:16)**

337:16 THE WITNESS:  I wouldn't agree with that
337:17 statement.  The salespeople were very diligent in
337:18 their process and, quite frankly, reported a lot of
337:19 pharmacies to us that they chose not to sign up for
337:20 controlled substances.
337:21 BY MR. KENNEDY:
337:22   Q. You say "they" reported a lot of
337:23 pharmacies to you.  The salespeople did?
337:24   A. Yes.

**339:21 - 339:22**   **Walker, Donald 01-10-2019 (00:00:02)**

339:21 732, please.
339:22 (Exhibit No. 732 was marked.)

**339:23 - 341:3**   **Walker, Donald 01-10-2019 (00:01:20)**

339:23 BY MR. KENNEDY:
339:24   Q. Do you see this email?  This is from

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

339:25 you dated 9-17-13; do you see that?

340:1  A. Yes.

340:2  Q. And the next page says, "Controlled

340:3 Substances Regulatory Org Structure."  Do you see

340:4 that?

340:5  A. Yes.

340:6  Q. This is created by you?

340:7  A. Yes.

340:8  Q. And this is 2013.  And if you go to

340:9 page -500.  Do you see that?  Look at the second

340:10 bullet point.  Do you see that second bullet point?

340:11  A. Yes.

340:12  Q. In 2013 you write:

340:13 (Reading) Prior Controlled Substances

340:14 Monitoring Program process heavily

340:15 dependent on sales and op (end of

340:16 reading).

340:17 Do you see that?

340:18  A. Yes.

340:19  Q. And underneath it do you write,

340:20 "Inconsistent, competency, and conflict of

340:21 objectives"?  Is that what you wrote in 2013, five

340:22 years into the program?

340:23  A. I don't recall specifically creating

340:24 this document, but that's what the document states.

340:25  Q. And in 2013 you, as the boss of all

341:1 of Regulatory, after five years you took sales out of

341:2 the middle of the monitoring program; didn't you,

341:3 sir?

**341:5 - 341:12**   **Walker, Donald 01-10-2019 (00:00:16)**

341:5 THE WITNESS:  Again, I don't recall

341:6 specifically.  But I know that we modified our

341:7 go-forward processes.

341:8 BY MR. KENNEDY:

341:9  Q. And, sir, over and above these

341:10 salespeople that we're talking about, you had -- you

341:11 had marketing people at McKesson; did you not?  We

341:12 have talked about them.

**341:16 - 341:23**   **Walker, Donald 01-10-2019 (00:00:12)**

341:16  Q. There were marketing people at

| Page/Line | Source | ID |
|---|---|---|
| | 341:17 McKesson; were there not? | |
| | 341:18   A. Yes, there was a marketing | |
| | 341:19 department. | |
| | 341:20   Q. And while you were trying to control | |
| | 341:21 the flow of opioids into the communities and the | |
| | 341:22 pharmacy, the marketing people were trying to sell | |
| | 341:23 more opioids; were they not? | |
| 342:1 - 342:3 | **Walker, Donald 01-10-2019 (00:00:03)** | DW03_Donald Walker Plaintiffs' Submission.227 |
| | 342:1 THE WITNESS:  No, that's not accurate. | |
| | 342:2 MR. KENNEDY:  720. | |
| | 342:3 (Exhibit No. 720 was marked.) | |
| 342:4 - 342:7 | **Walker, Donald 01-10-2019 (00:00:09)** | DW03_Donald Walker Plaintiffs' Submission.228 |
| | 342:4 BY MR. KENNEDY: | |
| | 342:5   Q. The first email in time is number one | |
| | 342:6 at the bottom.  That's where it starts in time. | |
| | 342:7 -543462 to -63. | |
| 342:8 - 342:17 | **Walker, Donald 01-10-2019 (00:00:23)** | DW03_Donald Walker Plaintiffs' Submission.229 |
| | 342:8 This is an email from Scott Mooney, and this | |
| | 342:9 is to you, January 16 of 2008, importance high.  It | |
| | 342:10 states: | |
| | 342:11 (Reading) Don, have you seen this one? | |
| | 342:12 Special dating and a buy-in on | |
| | 342:13 oxycodone?  It will probably hit the | |
| | 342:14 limits across the network in the | |
| | 342:15 Volakas report (end of reading). | |
| | 342:16 Is that what he states? | |
| | 342:17   A. Yes. | |
| 342:18 - 342:24 | **Walker, Donald 01-10-2019 (00:00:18)** | DW03_Donald Walker Plaintiffs' Submission.230 |
| | 342:18   Q. And do you respond: | |
| | 342:19 (Reading) Given our challenges with | |
| | 342:20 DEA, I would -- I would like to review | |
| | 342:21 with you how we manage these types of | |
| | 342:22 promos going forward (end of reading)? | |
| | 342:23 So McKesson is running a promotion on | |
| | 342:24 oxycodone; correct? | |
| 343:3 - 343:3 | **Walker, Donald 01-10-2019 (00:00:04)** | DW03_Donald Walker Plaintiffs' Submission.231 |
| | 343:3   Q. Correct?  You call it a promo? | |
| 343:5 - 343:14 | **Walker, Donald 01-10-2019 (00:00:33)** | DW03_Donald Walker Plaintiffs' Submission.232 |
| | 343:5 THE WITNESS:  Just a second, Counsel.  Let | |
| | 343:6 me answer that. | |

**DW03_Donald Walker Plaintiffs' Submission**

| Page/Line | Source | ID |
|---|---|---|

343:7 We were not -- what we were offering -- and
343:8 make sure you understand how the industry works.  We
343:9 were offering to our customers the -- what was being
343:10 offered to us through the manufacturers was dating on
343:11 oxycodone.  We did not promote or push oxycodone, nor
343:12 do we make any adjustments on thresholds to any
343:13 customers on the purchases of oxycodone in any of
343:14 these promotions.

**343:16 - 344:15**   **Walker, Donald 01-10-2019 (00:01:12)**

343:16   Q. Do you call this a promo?  I'm just
343:17 asking, did you use the word "promo"?
343:18   A. I used the word "promo."
343:19   Q. And up top do you send an email to
343:20 Greg Yonko and say:
343:21 (Reading) Easy, big fella.  I know
343:22 it's been standard and your group does
343:23 need to be involved.  That is why I am
343:24 suggesting we talk about it.  DEA
343:25 views the industry as doing anything
344:1 for money and does not understand why
344:2 we would "promote" controlled
344:3 substances.  No immediate changes are
344:4 planned, but we do need to think
344:5 through how we handle promos on
344:6 controls especially lifestyle drugs
344:7 like oxycodone.  Talk with you soon
344:8 (end of reading)?
344:9 Was that your response, sir, in 2008?
344:10   A. That is what is written.
344:11   Q. Now I want to go to two months later.
344:12 Tell the jury what fentanyl is?
344:13   A. Fentanyl is a Schedule 2 narcotic.
344:14   Q. And is it the most powerful,
344:15 dangerous of all the narcotics you sell?

**344:19 - 345:8**   **Walker, Donald 01-10-2019 (00:00:42)**

344:19   Q. Is that true, sir?
344:20   A. I do not know.  I know it's a very
344:21 powerful pain control narcotic.
344:22 MR. KENNEDY:  714.
344:23 (Exhibit No. 714 was marked.)

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

344:24 BY MR. KENNEDY:

344:25   Q. There's an email down at the bottom.

345:1 Kenneth Ball.  And this is two years after you're

345:2 saying we've got to discuss promos.  And he states:

345:3 (Reading) Subject:  Fentanyl checks.

345:4 The promotion ran from 6-22 to 7-31

345:5 and was a free item promotion per the

345:6 terms below (end of reading).

345:7 He's talking in 2010 about a buy one, get

345:8 one free on fentanyl; correct?

**345:11 - 345:11**   **Walker, Donald 01-10-2019 (00:00:01)**

345:11   Q. Is that what he's talking about?

**345:14 - 346:2**   **Walker, Donald 01-10-2019 (00:00:43)**

345:14 THE WITNESS:  I don't -- I'm not sure.  I

345:15 don't understand the promotion that's being referred

345:16 to here.  I can only see what he's written.

345:17 BY MR. KENNEDY:

345:18   Q. Up above it says "free item"; right?

345:19 Free item promotion on fentanyl; correct?  Free item

345:20 promotion; correct, sir?  Is that what it says?

345:21   A. Hang on.  Hang on just a minute,

345:22 Counsel.  I'm trying to catch up with you.

345:23 Okay.  Yes, I see that.

345:24   Q. And up above, in addition to the buy

345:25 one, get one free, you also sent checks out to

346:1 pharmacies if they bought fentanyl pursuant to this

346:2 promotion?

**346:6 - 346:7**   **Walker, Donald 01-10-2019 (00:00:02)**

346:6   Q. Well, look right above.  He's talking

346:7 about checks.

**346:9 - 346:14**   **Walker, Donald 01-10-2019 (00:00:09)**

346:9 THE WITNESS:  I think to clarify what he

346:10 said is -- is rebates, which would be more like off

346:11 invoice, but --

346:12 BY MR. KENNEDY:

346:13   Q. Well, rebate is money; isn't it?  And

346:14 he says "checks"; does he not?

**346:16 - 347:2**   **Walker, Donald 01-10-2019 (00:00:20)**

346:16 THE WITNESS:  I may be missing it, but I

346:17 don't see "checks."  But --

| | DW03_Donald Walker Plaintiffs' Submission | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

346:18 BY MR. KENNEDY:

346:19   Q. "Subject:  Fentanyl Checks."  Do you

346:20 see that?

346:21   A. Okay.  Under the subject, yes.  I

346:22 didn't see that in the body.

346:23   Q. This is two years after you're

346:24 telling the marketing people, we have got to talk

346:25 about promotions; right?  This is now 2010; true?  Is

347:1 that the date of the email?

347:2   A. That's correct.

**347:3 - 347:7**   **Walker, Donald 01-10-2019 (00:00:12)**

347:3   Q. Let's look to 2012, two years later,

347:4 two years after that 7-19.

347:5   A. Again, Counsel, we would not have

347:6 changed any thresholds on any of our customers in

347:7 support of any promotions.

**347:8 - 347:10**   **Walker, Donald 01-10-2019 (00:00:07)**

347:8   Q. Mr. Walker, you got fined

347:9 $150 million in 2018 for changing thresholds; didn't

347:10 you?

**347:14 - 347:17**   **Walker, Donald 01-10-2019 (00:00:14)**

347:14   Q. Is that true?  Did you get fined

347:15 $150 million in 2018, McKesson?

347:16   A. I wasn't with McKesson at the time.

347:17 I understand that McKesson paid $150 million.

**347:20 - 347:22**   **Walker, Donald 01-10-2019 (00:00:06)**

347:20   Q. Let's go to 719.  We're still on

347:21 promotions.  This is two years after the fentanyl

347:22 promotion.  This is now 2012.  And look -- I want to

**347:23 - 347:23**   **Walker, Donald 01-10-2019 (00:00:09)**

347:23 start on page -22.  This is -539021 to -23.  719.

**347:24 - 349:11**   **Walker, Donald 01-10-2019 (00:01:19)**

347:24 And do you see on -22, the subject, "Lower

347:25 Priced Oxycodone has been Released"?  Do you see

348:1 that?

348:2   A. Yes.

348:3   Q. And does it say, "McKesson OneStop

348:4 Generics Campaign has been launched"?  And then it

348:5 states:

348:6 (Reading) Contact customers showing

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 348:7 purchase history of Mallinckrodt | |
| | 348:8 Oxycodone to highlight the | |
| | 348:9 availability of lower-priced oxycodone | |
| | 348:10 items (end of reading). | |
| | 348:11 Did I read that correctly? | |
| | 348:12   A. Yes. | |
| | 348:13   Q. And going to the next page, -21.  And | |
| | 348:14 this is now Mark Odom, with response to this | |
| | 348:15 lower-price oxycodone.  Does he email and say: | |
| | 348:16 (Reading) Are you kidding me!!  We are | |
| | 348:17 auto shipping oxy, exclamation, | |
| | 348:18 exclamation, exclamation (end of | |
| | 348:19 reading)? | |
| | 348:20 Do you see that? | |
| | 348:21   A. I see that. | |
| | 348:22   Q. And then email up above says: | |
| | 348:23 (Reading) What's going on?  Surely we | |
| | 348:24 are not promoting Oxy on special (end | |
| | 348:25 of reading). | |
| | 349:1 Do you see that email? | |
| | 349:2   A. Yes, I do. | |
| | 349:3   Q. And then you state: | |
| | 349:4 (Reading) We agreed to offer the lower | |
| | 349:5 price but are not changing any | |
| | 349:6 thresholds (end of reading). | |
| | 349:7 Is that what you responded? | |
| | 349:8   A. Exactly my response. | |
| | 349:9   Q. Now, this is 2012.  This is four | |
| | 349:10 years after you said to marketing, we have got to | |
| | 349:11 discuss the promotions; right? | |
| 349:14 - 349:14 | **Walker, Donald 01-10-2019 (00:00:01)** | DW03_Donald Walker Plaintiffs' Submission.246 |
| | 349:14 THE WITNESS:  Yes. | |
| 350:6 - 350:6 | **Walker, Donald 01-10-2019 (00:00:02)** | DW03_Donald Walker Plaintiffs' Submission.247 |
| | 350:6   Q. Let's go to the next.  It's 2013. | |
| 350:7 - 350:7 | **Walker, Donald 01-10-2019 (00:00:05)** | DW03_Donald Walker Plaintiffs' Submission.248 |
| | 350:7 This is now a year after the Oxycontin promotion? | |
| 350:10 - 350:10 | **Walker, Donald 01-10-2019 (00:00:01)** | DW03_Donald Walker Plaintiffs' Submission.249 |
| | 350:10 MR. KENNEDY:  721. | |
| 350:11 - 351:13 | **Walker, Donald 01-10-2019 (00:01:23)** | DW03_Donald Walker Plaintiffs' Submission.250 |
| | 350:11   Q. Down below, November 7, 2013, "SMS | |

| Page/Line | Source | ID |
|---|---|---|

DW03_Donald Walker Plaintiffs' Submission

350:12 Analytics Group, Dale Harris."  And the subject is,
350:13 "Campaign Mallinckrodt Hydrocodone has been
350:14 Released!"
350:15 Dale Harris, it states:
350:16 (Reading) McKesson OneStop Generics
350:17 Campaign, hydrocodone has been
350:18 launched.  The campaign will be
350:19 effective from 11-8-13 to 11-15-13.
350:20 Inform ISMC customers with purchase of
350:21 Watson hydrocodone of the savings on
350:22 Mallinckrodt hydrocodone (end of
350:23 reading).
350:24 Do you see that?  And then up above that,
350:25 does Dale Harris send an email from McKesson,
351:1 stating:
351:2 (Reading) Thought you might want to
351:3 see that we're pushing hydrocodone
351:4 with ISMC calls again (end of
351:5 reading)?
351:6 And that is the independent small, medium
351:7 chains; right?  Did I read that right?
351:8   A. The ISM.
351:9   Q. And then up above does Tom Smith --
351:10 who is Tom Smith?
351:11   A. Tom was the head of sales or general
351:12 manager.  General Manager with our Birmingham
351:13 facility.

**351:14 - 351:18    Walker, Donald 01-10-2019 (00:00:12)**                  DW03_Donald Walker Plaintiffs' Submission 251

351:14   Q. And does he say, "This is silly"?
351:15   A. That's what's written.
351:16   Q. Sir, this is 2013 when he says, "This
351:17 is silly"; correct?
351:18   A. That's what's written.

**351:19 - 352:13    Walker, Donald 01-10-2019 (00:01:01)**                  DW03_Donald Walker Plaintiffs' Submission 252

351:19   Q. It's more than silly in 2013, isn't
351:20 it?  Running a promotion pushing hydrocodone on
351:21 pharmacies, it's more than silly; isn't it?  Could we
351:22 agree that that --
351:23   A. No, I don't agree because it's a
351:24 mischaracterization of what -- of the promo -- or as

| Page/Line | Source | ID |
|---|---|---|

**DW03_Donald Walker Plaintiffs' Submission**

351:25 you call it, a promo.
352:1 These were opportunities for pharmacies to
352:2 obtain product at a reduced price.  It didn't change
352:3 the threshold.  It was simply to provide them an
352:4 opportunity to provide legitimate medications to
352:5 customers at a lower price.
352:6   Q. At this point in time, when he says
352:7 "This is silly," what -- strike that for a second.
352:8 You described this as a legitimate way to
352:9 get more hydrocodone to pharmacies.  Tom Smith --
352:10   A. No.
352:11   Q. -- doesn't agree this is a legitimate
352:12 way to get more hydrocodone.  He says it's silly;
352:13 right?

352:15 - 352:22   **Walker, Donald 01-10-2019 (00:00:20)**
352:15 THE WITNESS:  Counsel, you asked me two
352:16 questions.
352:17 The first question, no, this was not an
352:18 opportunity to get more hydrocodone to pharmacies.
352:19 This was an opportunity for pharmacies to purchase
352:20 the hydrocodone that they required, and we monitored,
352:21 at a price that was reduced to give them an
352:22 opportunity from a business standpoint.

352:24 - 353:9   **Walker, Donald 01-10-2019 (00:00:25)**
352:24   Q. Well, you've got one McKesson
352:25 employee who says, you're pushing hydrocodone.  You
353:1 have another one saying, silly.  Do you disagree with
353:2 them?
353:3   A. I see what his -- what is written.  I
353:4 don't agree with "pushing" hydrocodone.
353:5   Q. Do you know how many people
353:6 hydrocodone was killing a year at the time of this --
353:7 of this promotion in 2013?  Do you know that?
353:8   A. No, I don't have any specific
353:9 information on that.

353:15 - 353:18   **Walker, Donald 01-10-2019 (00:00:09)**
353:15 And since 2013, five years ago, you said you want to
353:16 talk to the marketing people about promotions; right?
353:17 You said that five years ago, I want to talk to them
353:18 about promotions; remember?

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

353:21 - 354:4   **Walker, Donald 01-10-2019 (00:00:29)**

353:21 THE WITNESS:  In my prior email we reviewed,
353:22 I indicated to Mr. Yanko that we would have a
353:23 conversation around promotional incentives with
353:24 certain controlled substances.  I did.
353:25 We clarified very clearly at that time that
354:1 we were not going to make any regulatory adjustments
354:2 regarding thresholds.  And our customers could take
354:3 advantage of the pricing but could not change their
354:4 threshold as a result of promotion.

365:12 - 365:22   **Walker, Donald 01-10-2019 (00:00:42)**

365:12  Q. You mentioned that Mr. Rannazzisi, or
365:13 DEA, expressed that the DU45 report was inadequate.
365:14 What -- what was the issue that DEA raised with the
365:15 DU45 report?
365:16  A. I think it was -- as I -- as I
365:17 interpreted the discussion, it was really a matter of
365:18 just the volume -- he used the term "excessive order
365:19 report," and that the volume of data was -- was not
365:20 usable, you know, to DEA.  And it was just -- didn't
365:21 view it as a valuable report to -- you know that they
365:22 could use to follow up on.

366:11 - 366:21   **Walker, Donald 01-10-2019 (00:00:36)**

366:11  Q. So you've described a message that
366:12 once deemed suspicious, an order should not be
366:13 shipped.  And you've described a message that, I
366:14 think you said, a customer should not receive any
366:15 order of controlled substances if an order placed is
366:16 deemed suspicious?
366:17  A. No.  If we -- if we deem that
366:18 customer to have a suspicious pattern of orders or a
366:19 business model that was suspicious, then we should
366:20 cease selling controlled substances to them
366:21 altogether.

368:13 - 368:21   **Walker, Donald 01-10-2019 (00:00:37)**

368:13 MS. HENN:  I'd like to show you an exhibit.
368:14 Let's get this marked as 84.
368:15 THE REPORTER:  804.
368:16 MS. HENN:  804.  Thank you.
368:17 (Exhibit No. 804 was marked.)

| DW03_Donald Walker Plaintiffs' Submission | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | 368:18 BY MS. HENN: | |
| | 368:19 Q. Mr. Walker, the court reporter handed | |
| | 368:20 you an Exhibit No. -- that's been marked 804. The | |
| | 368:21 Bates number is -571361 through -65. | |
| 406:21 - 407:3 | **Walker, Donald 01-10-2019 (00:00:29)** | DW03_Donald Walker Plaintiffs' Submission.259 |
| | 406:21 Q. Mr. Walker, from 2008, when the CSMP | |
| | 406:22 was put into place, to 2012, do you know how many | |
| | 406:23 Suspicious Order Reports about customers were | |
| | 406:24 reported to the DEA by McKesson? | |
| | 406:25 A. My recollection is that we were | |
| | 407:1 somewhere in the area of 35 to 40 different | |
| | 407:2 pharmacies that we reported and generated suspicious | |
| | 407:3 order reporting to DEA. | |
| 407:4 - 407:15 | **Walker, Donald 01-10-2019 (00:00:41)** | DW03_Donald Walker Plaintiffs' Submission.260 |
| | 407:4 Q. Did you do any analysis to total that | |
| | 407:5 number? | |
| | 407:6 A. We did -- we did tally up the -- and | |
| | 407:7 provide a report. | |
| | 407:8 And the report only reflected, you know, | |
| | 407:9 what we report at the DEA. What is not and was not | |
| | 407:10 reported, because it was not a requirement to report | |
| | 407:11 or tallied, was the number of pharmacies that we | |
| | 407:12 elected not to do business with during our initial | |
| | 407:13 due diligence of a potential new customer. And that | |
| | 407:14 number of pharmacies was significantly higher than | |
| | 407:15 the 40 that we reported to the DEA. | |
| 411:25 - 412:3 | **Walker, Donald 01-10-2019 (00:00:09)** | DW03_Donald Walker Plaintiffs' Submission.266 |
| | 411:25 Q. All right. And you -- actually, I | |
| | 412:1 think you read a footnote on page -1362 of the letter | |
| | 412:2 written to the DEA. Do you remember reading that | |
| | 412:3 footnote? | |
| 412:6 - 413:7 | **Walker, Donald 01-10-2019 (00:01:39)** | DW03_Donald Walker Plaintiffs' Submission.267 |
| | 412:6 Q. Sir, do you remember reading that | |
| | 412:7 footnote? | |
| | 412:8 A. Counselor, I remember describing the | |
| | 412:9 content of the footnote. I don't remember that -- I | |
| | 412:10 don't recall that I read it specifically. I just | |
| | 412:11 want to be clear. | |
| | 412:12 Q. All right. This -- this footnote | |
| | 412:13 basically outlines an explanation from McKesson as to | |

| Page/Line | Source | ID |
|---|---|---|

**DW03_Donald Walker Plaintiffs' Submission**

412:14 why it filled an order of 99,000 doses to United
412:15 Prescription Services on October 21, 2005; is that
412:16 what that footnote talks about?
412:17   A. Yes, that's what's written there.
412:18   Q. And McKesson's excuse and explanation
412:19 to the DEA was that there was a hurricane, Hurricane
412:20 Wilma, and that's why we sent 99,000 doses to United
412:21 Prescription; right?  Is that what that says?
412:22   A. That's what is noted, yes.
412:23   Q. And my question is, if this is
412:24 McKesson's explanation to the DEA with respect to
412:25 99,000 dosages, what was McKesson's explanation for
413:1 the other seven million dosages that the DEA was
413:2 unhappy about?  The other seven million, what was
413:3 their explanation on those?
413:4   A. I don't recall that there was any --
413:5 any specific response that McKesson provided
413:6 regarding any other dosages or shipments that the DEA
413:7 covered.

**414:6 - 414:9**    **Walker, Donald 01-10-2019 (00:00:12)**    DW03_Donald Walker Plaintiffs' Submission.283

414:6   Q. My question is, you sent the DEA a
414:7 letter explaining that it was a hurricane that caused
414:8 you to send 99,000.  What was McKesson's explanation
414:9 to the DEA about the other seven million?

**414:11 - 414:15**    **Walker, Donald 01-10-2019 (00:00:25)**    DW03_Donald Walker Plaintiffs' Submission.284

414:11 THE WITNESS:  Counsel, I don't believe that
414:12 we made any specific response on any other quantity
414:13 allegations.  I do note that the letter from
414:14 Mr. Julian to Mr. Rannazzisi was in October of --
414:15 where's the letter just real quick?

**414:17 - 414:25**    **Walker, Donald 01-10-2019 (00:00:31)**    DW03_Donald Walker Plaintiffs' Submission.284

414:17 THE WITNESS:  Was in January of '06.  So
414:18 what I'm not -- don't recall is what information we
414:19 had at hand in terms of the number of doses that the
414:20 DEA was alleging at that time.
414:21 BY MR. KENNEDY:
414:22   Q. Well, my question is, why did you --
414:23 why did you show us an explanation for 99,000, when,
414:24 in fact, the alleged conduct involved over seven
414:25 million dosages?

| Page/Line | Source | ID |
|---|---|---|

**DW03_Donald Walker Plaintiffs' Submission**

415:4 - 415:16 **Walker, Donald 01-10-2019 (00:00:37)**

415:4 THE WITNESS:  It's really two different --
415:5 in my view, it's two different pieces of information.
415:6 The letter is in direct response to items
415:7 that were outlined as -- as we understood them in the
415:8 January '06 meeting.  The settlement and the
415:9 allegations in the settlement, to my recollection,
415:10 not all of those were shared with us during the
415:11 course of the meeting that we had with
415:12 Mr. Rannazzisi.
415:13 So the best way I can answer the question is
415:14 this is a direct response to Mr. Rannazzisi around
415:15 the issues that he personally raised in that January
415:16 '06 meeting.

415:18 - 415:21 **Walker, Donald 01-10-2019 (00:00:10)**

415:18   Q. All right.  We're sitting here today,
415:19 now it's way, way later.  Tell me the explanation
415:20 that was provided for the other seven million
415:21 dosages, other than 99,000?  What was provided?

415:23 - 418:11 **Walker, Donald 01-10-2019 (00:03:08)**

415:23 THE WITNESS:  Counsel, I do not believe --
415:24 as I stated, I don't believe that we had any other
415:25 specific response to DEA.
416:1 BY MR. KENNEDY:
416:2   Q. Between 2000 and 2005, you said you
416:3 were out of Regulatory for that period of time, and
416:4 what was your job?
416:5   A. I was -- I can't remember my specific
416:6 title, but I was the Senior Vice President overseeing
416:7 Six Sigma.
416:8   Q. And what did that involve?  Did that
416:9 involve regulation of controlled substances?
416:10   A. Not at all.
416:11   Q. Not at all.
416:12 How many meetings with the DEA did you go to
416:13 between 2000 and 2005?
416:14   A. None.
416:15   Q. How many DEA seminars did you go to
416:16 between 2000 and 2005?
416:17   A. None that I remember.

| Page/Line | Source | ID |
|---|---|---|

416:18   Q. How many regulatory meetings did you
416:19 go to at McKesson between 2000 and 2005 with respect
416:20 to controlled substances?
416:21   A. I don't recall going to any.
416:22   Q. So when you said that in January of
416:23 '06 this was the first time that Mr. Rannazzisi of
416:24 the DEA made certain representations to you with
416:25 respect to the responsibilities, you had not been
417:1 involved with Regulatory for five years; is that
417:2 correct?
417:3   A. I had not been directly involved with
417:4 Regulatory during that time frame.
417:5   Q. Now, there was a lot of time spent in
417:6 your questioning about a meeting that you had with
417:7 the DEA in July of 2008.  Do you remember all those
417:8 questions about a meeting with the DEA and the
417:9 presentations that you made to the DEA and McKesson
417:10 made to the DEA with respect to its 2008 Controlled
417:11 Substances Monitoring Program?  Do you recall all
417:12 those questions?
417:13   A. Yes.
417:14   Q. And I think you went through great
417:15 details.  We told the DEA we're going to do this.  We
417:16 told them the monitoring program would include this.
417:17 And this was all about the program that you were
417:18 going to implement in 2008; correct?
417:19   A. Yes, it was about the program that we
417:20 were implementing.
417:21   Q. And I wrote it down.  I think you
417:22 said that by their body language, you thought that
417:23 the DEA was satisfied with the monitoring program
417:24 that you were going to implement in 2008; correct?
417:25 Do you remember saying that?
418:1   A. I believe that was my testimony.
418:2   Q. Well, let me -- let me ask you:  Your
418:3 monitoring program, the McKesson monitoring program
418:4 that you outlined for the DEA at that meeting in
418:5 2008, could we agree that that monitoring program
418:6 isn't going to be of any use unless you follow it;
418:7 right?

| Page/Line | Source | ID |
|---|---|---|

**DW03_Donald Walker Plaintiffs' Submission**

418:8   A. I would agree that it was certainly
418:9 our intent and our commitment that we would execute
418:10 our Controlled Substance Monitoring Program and
418:11 explained that to DEA.

418:12 - 419:3   **Walker, Donald 01-10-2019 (00:01:01)**

418:12   Q.   And can we agree, just
418:13 because you write a monitoring program on paper, put
418:14 it into a heading of, this is our Controlled
418:15 Substances Monitoring Program and show it to the DEA,
418:16 just because it's on the paper doesn't mean it's
418:17 going to be effective or work unless you follow it;
418:18 right?  You've got to follow it?
418:19   A. The monitoring program that we
418:20 presented, we applied and we followed.
418:21   Q. Sir, would you answer my question,
418:22 please.  The monitoring program you put on paper is
418:23 of no effect, it's no good to anybody unless you
418:24 follow it; is that true?
418:25   A. I wouldn't agree with that statement.
419:1 Clearly, the monitoring program that we put in place,
419:2 we executed against and continued to provide the
419:3 regulatory recite of controlled substances.

419:13 - 420:3   **Walker, Donald 01-10-2019 (00:00:53)**

419:13   Q. Mr. Walker, we were talking about the
419:14 representations that you made to the DEA with respect
419:15 to the monitoring program that you were going to put
419:16 into place in 2008.  And I asked you, if you -- could
419:17 you agree that putting a monitoring program on paper
419:18 and representing to the DEA at your meeting with the
419:19 DEA back in 2008 -- representing to them everything
419:20 that you were going to do in this written monitoring
419:21 program, can we agree that that does no one any good,
419:22 it doesn't work unless you actually follow your
419:23 program?  Agreed?
419:24   A. What I think my response -- what I
419:25 can agree to is that we put the program in place, and
420:1 we executed that program, as described, and with the
420:2 intent and certainly the execution to ensure that we
420:3 were meeting our regulatory requirements.

420:11 - 420:13   **Walker, Donald 01-10-2019 (00:00:06)**

| Page/Line | Source | ID |
|---|---|---|

**DW03_Donald Walker Plaintiffs' Submission**

420:11   Q. Let's look at how diligent you were
420:12 in executing, then.  Let's look at Exhibit 730, if we
420:13 could.

**420:21 - 421:9**   **Walker, Donald 01-10-2019 (00:00:43)**

420:21   Q. Pursuant to your agreement and your
420:22 communication to the DEA and your monitoring program,
420:23 there should be Level 1 Reviews when a pharmacy
420:24 orders over their threshold; correct?  Is that
420:25 correct, sir?
421:1   A. There -- in orders that went over the
421:2 threshold, a Level 1 Review was -- was called out.
421:3   Q. That's what should be done under the
421:4 program; right?
421:5   A. That's correct.
421:6   Q. And you represented that to the DEA
421:7 at your meeting in 2008?  If somebody omits, meaning
421:8 they order over the threshold, there will be a
421:9 Level 1 Review; correct?

**421:11 - 421:20**   **Walker, Donald 01-10-2019 (00:00:28)**

421:11 THE WITNESS:  What I represented to the DEA
421:12 and reviewed with them is that as a -- if somebody
421:13 exceeded a threshold, we would conduct a Level 1
421:14 Review.
421:15 BY MR. KENNEDY:
421:16   Q. Exhibit 730 is an audit done by
421:17 McKesson in March of 2011.  Is that what it says on
421:18 the cover page, March of 2011 Audit Report?
421:19   A. Yes.
421:20   Q. If you go to page -498069.  Do you

**421:21 - 422:11**   **Walker, Donald 01-10-2019 (00:00:41)**

421:21 see that?  "Level 1 Forms," do you see that title?
421:22 Level 1 Forms.
421:23   A. Yes.
421:24   Q. Delran, what is that?  Is that one of
421:25 your distribution centers?
422:1   A. Delran, New Jersey was one of our
422:2 distribution centers.
422:3   Q. Under that it says:
422:4 (Reading) Omit Reports were not being
422:5 signed by DC management as required by

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

422:6 policy.  In addition, the required
422:7 Level 1 forms were not completed for
422:8 20 of 56 omits in July 2010, and all
422:9 54 omits for the month of November
422:10 2010 (end of reading).
422:11 Did I read that right?

422:12 - 422:14   **Walker, Donald 01-10-2019 (00:00:02)**   DW03_Donald Walker Plaintiffs' Submission.269

422:12   A. Yes.
422:13   Q. This policy is no good unless you
422:14 follow it.

422:18 - 422:25   **Walker, Donald 01-10-2019 (00:00:28)**   DW03_Donald Walker Plaintiffs' Submission.269

422:18   Q. Is that agreeable?
422:19   A. I don't agree with that statement.
422:20 What I would agree with is that we had, as
422:21 part of our control substance, any threshold that
422:22 generated a Level 1 Review needed to take place.  My
422:23 interpretation of and review of this document is that
422:24 we failed to complete the paperwork associated with
422:25 that.

423:1 - 424:21   **Walker, Donald 01-10-2019 (00:01:50)**   DW03_Donald Walker Plaintiffs' Submission.269

423:1   Q. Now, New Castle.  This is another
423:2 distribution center; right?
423:3   A. Yes.
423:4   Q. Under that one it says:
423:5 (Reading) The Omit Reports were not
423:6 being signed by DC management as
423:7 required by policy.  In addition, the
423:8 required Level 1 forms were not
423:9 completed for 21 of 31 -- 30 omits in
423:10 July 2010, and 20 of 27 omits in
423:11 November 2010 (end of reading).
423:12 Did I read that right?
423:13   A. Yes, you read it correctly.
423:14   Q. Washington Court House, is that
423:15 another distribution center?
423:16   A. Yes, it is.
423:17   Q. Does that say:
423:18 (Reading) the required Level 1 forms
423:19 were not completed for all 19 omits in
423:20 July 2010, and all 11 omits in

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

423:21 November (end of reading)?
423:22 Is that what that says about that
423:23 distribution center?
423:24  A. Yes.
423:25  Q. Conroe, on the next page.  That's
424:1 another distribution center; is it not?
424:2  A. Yes, it is.
424:3  Q. Does that state:
424:4 (Reading) The Omit Reports were not
424:5 signed and dated by management as
424:6 required by policy.  In addition,
424:7 Level 1 forms were not completed for
424:8 July and November 2010 omits.  CSMP
424:9 Excursion contract forms were used in
424:10 place of Level 1 forms, although 22 of
424:11 35 omits in July and 17 out of 35
424:12 omits in November didn't have any
424:13 completed documentation (end of
424:14 reading).
424:15 Did I read that right?
424:16  A. Yes, you read that correctly.
424:17  Q. And let me ask you, when you had your
424:18 meeting with the DEA in 2008 to outline your
424:19 Controlled Substance Monitoring Program for them, did
424:20 you tell them that you would have sales reps doing
424:21 the Level 1 investigations?  Did you tell them that?

**424:23 - 425:7**    **Walker, Donald 01-10-2019 (00:00:25)**    DW03_Donald Walker Plaintiffs' Submission.266

424:23 THE WITNESS:  I don't recall that we
424:24 specified who would conduct the Level 1 Reviews.
424:25 ///
425:1 BY MR. KENNEDY:
425:2  Q. You told them, did you not -- you
425:3 described to them that you would have a system
425:4 whereby pharmacies could request an increase in their
425:5 threshold.  Did you tell that to the DEA, that that
425:6 would be part of your program, pharmacies could
425:7 request increases in their threshold?

**425:12 - 425:17**    **Walker, Donald 01-10-2019 (00:00:20)**    DW03_Donald Walker Plaintiffs' Submission.270

425:12  Q. And in your PowerPoint you
425:13 specifically represented, did you not, that if you

| Page/Line | Source | ID |
|---|---|---|

425:14 were going to increase the threshold, it would

425:15 require documentation?

425:16   A. Let me make sure I understand what

425:17 page you're referring to there.

**425:25 - 426:15**   **Walker, Donald 01-10-2019 (00:00:51)**

425:25   Q. Slide No. 7 you created.

426:1 Did you tell the DEA if you were going to

426:2 adjust the threshold, it would require documentation?

426:3   A. That's what I covered with the DEA in

426:4 that meeting.

426:5   Q. Did you tell them that you would be

426:6 giving threshold -- giving threshold increases for

426:7 reasons such as Thanksgiving?  Did you tell them

426:8 that?

426:9   A. We didn't have any discussion in that

426:10 meeting around reasons for increases.

426:11   Q. Did you tell them in that meeting

426:12 that you would be increasing thresholds 30 stores at

426:13 a time for chain pharmacies?  Did you tell them that?

426:14   A. Again, we had no discussion on the

426:15 reasons that we would be increasing thresholds.

**426:21 - 426:25**   **Walker, Donald 01-10-2019 (00:00:12)**

426:21   Q. Did you tell them, that in the system

426:22 that you would be implementing, that customers would

426:23 be told that they could expect a decision on a

426:24 threshold increase within one day?  Did you tell them

426:25 that?

**427:3 - 427:11**   **Walker, Donald 01-10-2019 (00:00:23)**

427:3 THE WITNESS:  Again, I don't recall any

427:4 discussion around the specifics of how we would grant

427:5 increases in thresholds.

427:6 BY MR. KENNEDY:

427:7   Q. Did you tell them that this system

427:8 would be such that McKesson would tell pharmacies

427:9 that if they requested an increase, that they could

427:10 presume that that threshold increase was granted and

427:11 approved unless they heard otherwise?

**427:13 - 427:15**   **Walker, Donald 01-10-2019 (00:00:03)**

427:13 BY MR. KENNEDY:

427:14   Q. Did you tell the DEA that that's the

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 427:15 kind of system that you would implement? | |
| 427:17 - 427:18 | **Walker, Donald 01-10-2019 (00:00:05)** | |
| | 427:17 THE WITNESS:  Counsel, we had no discussion | |
| | 427:18 around our methodology of threshold increases. | |
| 428:5 - 428:7 | **Walker, Donald 01-10-2019 (00:00:06)** | |
| | 428:5   Q. And, sir, you went all through this | |
| | 428:6 discussion with the DEA about how you were going to | |
| | 428:7 report suspicious orders to them; did you not? | |
| 428:9 - 428:19 | **Walker, Donald 01-10-2019 (00:00:28)** | |
| | 428:9 THE WITNESS:  We -- we covered with them the | |
| | 428:10 process and how we would -- and when we would report | |
| | 428:11 suspicious orders based on our three-tiered review | |
| | 428:12 process. | |
| | 428:13 BY MR. KENNEDY: | |
| | 428:14   Q. But, again, if you don't follow your | |
| | 428:15 own policies that you put in writing, they don't do | |
| | 428:16 anybody any good, do they, unless you follow them; | |
| | 428:17 right? | |
| | 428:18   A. We followed our policies as we | |
| | 428:19 outlined. | |
| 432:20 - 433:4 | **Walker, Donald 01-10-2019 (00:00:40)** | |
| | 432:20   Q. And, sir, you've told us that | |
| | 432:21 McKesson diligently, aggressively applied the 2008 | |
| | 432:22 Controlled Substances Monitoring Program; is that | |
| | 432:23 what you've told us? | |
| | 432:24   A. Yes, that was my testimony. | |
| | 432:25   Q. Sir, didn't McKesson get fined | |
| | 433:1 $150 million by the DEA because of their failures | |
| | 433:2 with respect to the 2008 program, leading all the way | |
| | 433:3 up from 2008 and '09, '10, '11, '12, '13, '14, '15, | |
| | 433:4 '16, and '17?  $150 million. | |
| 433:7 - 433:7 | **Walker, Donald 01-10-2019 (00:00:01)** | |
| | 433:7   Q. Do you recall that, sir? | |
| 433:10 - 433:15 | **Walker, Donald 01-10-2019 (00:00:17)** | |
| | 433:10 THE WITNESS:  All that I'm aware of is | |
| | 433:11 that -- and because it was public information, is | |
| | 433:12 that McKesson paid $150 million.  I don't understand | |
| | 433:13 any of the details of the settlement, of the | |
| | 433:14 documentation, because all of it occurred after I | |
| | 433:15 left the company. | |

| DW03_Donald Walker Plaintiffs' Submission | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

435:15 - 435:21     **Walker, Donald 01-10-2019 (00:00:21)**

         435:15   Q. Well, so what I'm -- can you explain
         435:16   to me how you can come in here and tell us that
         435:17   McKesson was diligent and aggressive in following and
         435:18   implementing its 2008 agreement, and you haven't read
         435:19   the settlement covering that same period of time with
         435:20   respect to the implementation of that program? How
         435:21   can you -- how can you not have read this?

435:23 - 435:25     **Walker, Donald 01-10-2019 (00:00:05)**

         435:23   THE WITNESS: Counsel, I wasn't with the
         435:24   company when -- to my knowledge, when this document
         435:25   was -- was generated.

Plaintiffs Affirmative Designations   = 02:00:59
Defense Counter Designations   = 00:22:39
Plaintiff Counter Counters   = 00:16:58
Defense Completeness Counter Counters = 00:06:03
**Total Time = 02:46:39**