**Designation Run Report**

# Walker, Donald - Defendants' Counters 6-23-21 830p

---

**Walker, Donald 01-10-2019**

---

**Defendants' Counters  00:53:11**

---

**Total Time  00:53:11**



| | V315A-Walker, Donald - Defendants' Counters 6-23-21 830p | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 357:10 - 359:01 | **Walker, Donald 01-10-2019 (00:01:52)** | **V315A.1** |

357:10   Q. Good evening, Mr. Walker.

357:11   A. Good evening.

357:12   Q. Mr. Walker, you testified earlier

357:13 today that you joined McKesson in 1987; is that

357:14 correct?

357:15   A. That is correct.

357:16   Q. Before joining McKesson, where did

357:17 you work?

357:18   A. Prior to -- immediately prior to

357:19 working for McKesson, I worked for a grocery

357:20 wholesale distributor, a trucking company.  And then

357:21 prior to that, I spent ten years in law enforcement.

357:22   Q. What roles did you play in law

357:23 enforcement?

357:24   A. I was a city police officer in a city

357:25 in the East Bay of San Francisco.

358:1   Q. Back to your time at McKesson.  Could

358:2 you describe for the jury the various positions you

358:3 held at McKesson beginning in 1987.

358:4   A. 1987 I joined the company with a

358:5 subsidiary company in the transportation group,

358:6 transportation and warehousing.  And that company

358:7 transitioned to the McKesson Drug Company in roughly

358:8 1991.  Was in a staff role for a short period of

358:9 time, a staff role in transportation.

358:10 Then I became the Distribution Center

358:11 Manager in Sacramento, promoted to the Vice President

358:12 of Distribution Operations for the Western Region.

358:13 It was a newly-created position.

358:14 And subsequently, in roughly 1996, I was

358:15 promoted to the Senior Vice President of Distribution

358:16 for McKesson Pharmaceutical.

358:17   Q. And when did you become Senior Vice

358:18 President of Distribution for McKesson

358:19 Pharmaceutical?

358:20   A. It was 1996.  I don't remember

358:21 exactly when in '96.

358:22   Q. And that was also the position you

358:23 held when you retired from McKesson; is that correct?

| | | |
|---|---|---|
| V315A-Walker, Donald - Defendants' Counters 6-23-21 830p | | |

| Page/Line | Source | ID |
|---|---|---|

358:24  A. Yes, it was.

358:25  Q. When did you retire?

359:1  A. June of 2015.

**359:18 - 365:11**   **Walker, Donald 01-10-2019 (00:09:07)**   **V315A.2**

359:18  Q. And briefly, what were your job

359:19 responsibilities as Senior Vice President of

359:20 distribution operations at McKesson?

359:21  A. I was the senior staff operations

359:22 person for McKesson.  I had the overall

359:23 responsibility for the distribution network.

359:24 On my staff I had a support team made up of

359:25 a Transportation Group, an I.T. Support Group, our

360:1 Regulatory Affairs Group was in there, and I had a

360:2 group that was responsible for construction and

360:3 building of our distribution centers.

360:4  Q. You mentioned Regulatory Affairs.

360:5 What kind of regulatory affairs matters were you

360:6 responsible for as Senior Vice President of

360:7 operations -- distribution operations, I should say?

360:8  A. McKesson, and the wholesalers as an

360:9 industry, are highly regulated.  We have

360:10 responsibilities for a number of regulatory

360:11 requirements.  The FAA, the Department of

360:12 Transportation, DOT, OSHA.  We had hazardous material

360:13 requirements.  Certainly we had responsibility for

360:14 compliance with DEA regulations.  And various state

360:15 and local regulations as well.

360:16  Q. What was involved in the handling of

360:17 controlled substances in particular?

360:18  A. Our -- our distribution network in

360:19 handling controlled substances was complex.  The

360:20 requirements under the federal code ensure -- wanted

360:21 to ensure that we had systems in place to prevent

360:22 diversion, primarily around security, as the code

360:23 spelled out.

360:24 And so the inside of our buildings, the

360:25 controlled substances divided into two major areas.

361:1 One, in what we called the narcotics Class 2

361:2 controlled substances were stored in a vault, much

361:3 like a bank vault, and the balance of the controlled

| Page/Line | Source | ID |
|---|:---:|---|

**V315A-Walker, Donald - Defendants' Counters 6-23-21 830p**

361:4 substances were stored in a locked and secured cage.
361:5 There was requirements for alarm.  The physical --
361:6 the physical construction of both the vault and the
361:7 cage were specified under regulation.
361:8 And, in addition, we had reporting
361:9 requirements to the DEA, the ARCOS reporting, which
361:10 was the month-end reporting of all of our sales.  We
361:11 needed to reconcile all of our receipts and all of
361:12 our sales and our inventory, along with the physical
361:13 inventory, to ensure that we could account for each
361:14 and every one of the controlled substances that was
361:15 in our possession that was reportable.
361:16 We had reporting requirements on suspicious
361:17 orders.  Our suspicious order reporting we called at
361:18 the time -- prior to 2008 we gave it a moniker that
361:19 said -- basically a report number called DU45, and we
361:20 provided that suspicious order reporting to the local
361:21 DEA field offices, as required.
361:22   Q. And you described the DU45 report.
361:23 What was the DU45 report exactly?
361:24   A. The DU45 was a report that reviewed
361:25 sales of customers' purchases of controlled
362:1 substances.  And based on an algorithm that had been
362:2 developed many years ago, I'm not sure when,
362:3 identified any sales that might have been of unusual
362:4 size, frequency, or a pattern, to ensure that we were
362:5 complying with that portion of the Federal
362:6 Regulation.
362:7   Q. And over what period did McKesson
362:8 generate the DU45 report for the purpose of reporting
362:9 to DEA?
362:10   A. I'm not certain when we started to
362:11 provide that report.  But during my tenure there,
362:12 we -- at McKesson we provided that report up until
362:13 the 2008 time frame, at which time, as a result of
362:14 our Settlement Agreement with DEA, we ceased
362:15 providing that report to the DEA.
362:16   Q. When you first became Senior Vice
362:17 President of Distribution Operations back in 1996,
362:18 what was McKesson's relationship with the DEA like?

| Page/Line | Source | ID |
|---|---|---|

362:19  A. I think I would best describe that

362:20 relationship as collaborative.  On a regular basis

362:21 our distribution centers could engage local field

362:22 offices on inquiries and questions.

362:23 Conversely, DEA would contact us at a

362:24 headquarters level, our senior management, my

362:25 predecessor.  And my regulatory team could pick up

363:1 the phone and have conversations back and forth with

363:2 the DEA regarding various matters.

363:3  Q. And how, if at all, did McKesson's

363:4 relationship with the DEA change over time?

363:5  A. Well, in the -- it clearly in the

363:6 2005 -- late 2005/2006 time frame, after the new

363:7 administrator was in place, I would say McKesson's

363:8 relationship with DEA became more confrontational.

363:9  Q. And you described earlier to

363:10 Mr. Kennedy that you had a five-year period, I think

363:11 it was, when you ran McKesson's Six Sigma program; is

363:12 that correct?

363:13  A. That's correct.  Roughly, in 2000 to

363:14 2005 I was not the Senior Vice President of

363:15 Operations, Distribution Operations, and did not have

363:16 responsibility for Regulatory during that time frame,

363:17 but was responsible for our Six Sigma process

363:18 improvement.

363:19  Q. So starting with your return to the

363:20 Senior Vice President of Distribution Operations'

363:21 position in 2005, what interactions did you

363:22 personally have with DEA?

363:23  A. The first personal interaction I had

363:24 with DEA was the -- was the January 6, 2000 -- or

363:25 excuse me, January 2006 meeting that we had in

364:1 Washington, D.C., in which we reviewed the Florida

364:2 and the Internet pharmacies and -- with

364:3 Mr. Rannazzisi and other members of his staff.

364:4  Q. Who -- other than the people you just

364:5 mentioned, who attended that January 2006 meeting?

364:6 Maybe starting from McKesson.

364:7  A. My recollection is I attended; Bill

364:8 Mahoney, who was our Distribution Center Manager in

| Page/Line | Source | ID |
|---|---|---|

**V315A-Walker, Donald - Defendants' Counters 6-23-21 830p**

364:9 Florida; John Gilbert, who is our outside counsel;
364:10 and I believe that Gary Hilliard, who was on our
364:11 Regulatory team, also participated in that meeting
364:12 from McKesson.
364:13 From DEA, Mr. Rannazzisi, their outside
364:14 counsel, and one or two other members of his
364:15 Diversion Control staff.
364:16   Q. What message did you take out of the
364:17 January 2006 meeting at DEA headquarters?
364:18   A. I -- the messages that I took out
364:19 were several.  First and foremost, was DEA's concern,
364:20 it was very clear to us, over the Internet pharmacies
364:21 that they identified in Florida.  You know,
364:22 Mr. Rannazzisi unexpectedly asked to have us
364:23 surrender our DEA registration for our Florida
364:24 Distribution Center.
364:25 And in the course of discussions, there were
365:1 a couple of key themes that came out.  One is that we
365:2 had a responsibility to -- which it, quite frankly,
365:3 was the first that we had ever heard from DEA that
365:4 we -- you know, his statement was, why would you ever
365:5 ship an order that you identified as suspicious?  And
365:6 he viewed our DU45 report as inadequate and not
365:7 meeting the -- their needs.
365:8 He -- and, again, this is the first that we
365:9 had had any indication, after many, many years of
365:10 providing it, that there was any concern over our
365:11 DU45, our suspicious order reporting.

**365:23 - 366:10**    **Walker, Donald 01-10-2019 (00:00:53)**    **V315A.3**

365:23   Q. And so in the area of suspicious
365:24 order reporting, what was the message you received
365:25 from DEA at the January 2006 meeting?
366:1   A. I came away from there that -- with a
366:2 very clear view that report only orders that are
366:3 truly suspicious.  That the requirement for -- the
366:4 bar for reporting suspicious orders, because of his
366:5 statement that, you know, we -- a suspicious order, a
366:6 suspicious customer should not receive any controlled
366:7 substances, we went away from there with a very
366:8 serious view around correlating the suspicious orders

| V315A-Walker, Donald - Defendants' Counters 6-23-21 830p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

366:9 with ceasing selling controlled substances to a
366:10 customer.

**366:22 - 368:12**

**Walker, Donald 01-10-2019 (00:02:40)**     **V315A.4**

366:22  Q. And you mentioned that some of these
366:23 messages, it was the first time you had heard these
366:24 things.  And could you describe your reaction to
366:25 these messages that you've explained today.
367:1  A. Well, the first reaction I had was it
367:2 was significantly different than the interaction that
367:3 we had had with DEA in the past.  It was clear that
367:4 there was a different view of the distributors.  And
367:5 from that we really made the determination that we
367:6 needed to go back and follow up and review our
367:7 processes and our -- in order to try to, you know --
367:8 the message was, from the DEA, is that there's an
367:9 issue.  We're trying to solve it.
367:10 Our view was, is we've always collaborated
367:11 with DEA.  So I took what was being said and tried
367:12 to, without specific guidance from them, to establish
367:13 a go-forward modification to our overall monitoring
367:14 program.
367:15  Q. So did you take -- why don't you
367:16 describe any actions that you took following up on
367:17 that January 2006 meeting and the messages that you
367:18 received.
367:19  A. Specifically after the meeting in
367:20 2007, we went back, and we immediately conducted
367:21 additional review and site visits to the pharmacies
367:22 that they had identified to us during the meeting.
367:23 We subsequently ceased selling controlled
367:24 substances to those pharmacies and reported such to
367:25 the DEA.  Even though the -- you know, we learned
368:1 that the DEA didn't make any changes in their DEA
368:2 registration, but we made the choice to cease selling
368:3 controlled substances to them.
368:4 We initiated -- we went back and initiated
368:5 the development of a new program, which evolved into
368:6 what we called the LDMP, which was the Lifestyle Drug
368:7 Monitoring Program.  And primarily named because
368:8 during the meeting the DEA had used the term

| | V315A-Walker, Donald - Defendants' Counters 6-23-21 830p | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | | |
| --- | --- | --- |
| | 368:9 "lifestyle drugs" to identify four drugs of concern | |
| | 368:10 that they identified as part of the Internet | |
| | 368:11 pharmacy, being the oxycodone, the hydrocodone, | |
| | 368:12 pyrazoline and Phentermine. | |
| 368:13 - 368:21 | **Walker, Donald 01-10-2019 (00:00:40)** | V315A.5 |
| | 368:13 MS. HENN:  I'd like to show you an exhibit. | |
| | 368:14 Let's get this marked as 84. | |
| | 368:15 THE REPORTER:  804. | |
| | 368:16 MS. HENN:  804.  Thank you. | |
| | 368:17 (Exhibit No. 804 was marked.) | |
| | 368:18 BY MS. HENN: | |
| | 368:19  Q. Mr. Walker, the court reporter handed | |
| | 368:20 you an Exhibit No. -- that's been marked 804.  The | |
| | 368:21 Bates number is -571361 through -65. | |
| 369:08 - 371:07 | **Walker, Donald 01-10-2019 (00:02:18)** | V315A.6 |
| | 369:8  Q. What is Exhibit 804? | |
| | 369:9  A. This is a letter from Paul Julian, | |
| | 369:10 our President, one of the senior members of McKesson, | |
| | 369:11 to Mr. Rannazzisi in response to the meeting that we | |
| | 369:12 had with DEA, in which he -- at a high level what he | |
| | 369:13 has done is summarize the actions that we have taken, | |
| | 369:14 how seriously we viewed the meeting, and how | |
| | 369:15 seriously we reviewed -- or viewed our regulatory | |
| | 369:16 obligations, and provided him examples of actions | |
| | 369:17 that we had taken subsequent to the meeting. | |
| | 369:18  Q. And at the time this letter was sent | |
| | 369:19 to Mr. Rannazzisi, did you receive a copy of this | |
| | 369:20 letter? | |
| | 369:21  A. Yes, I did.  I was -- I believe I was | |
| | 369:22 copied on the letter. | |
| | 369:23  Q. On the -- | |
| | 369:24  A. Yes.  Yes, I was. | |
| | 369:25  Q. Okay.  Turning to the second page of | |
| | 370:1 the letter, page 2.  Could you read what McKesson's | |
| | 370:2 Mr. Julian writes to Mr. Rannazzisi in the first | |
| | 370:3 paragraph. | |
| | 370:4 MR. KENNEDY:  Objection. | |
| | 370:5 THE WITNESS:  (Reading) In this regard I | |
| | 370:6 must rebut any impression that | |
| | 370:7 McKesson has not seriously considered | |

| | V315A-Walker, Donald - Defendants' Counters 6-23-21 830p | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

370:8 and responded to the information
370:9 provided by DEA about the
370:10 management -- about the problem of
370:11 "Internet pharmacies."  After the
370:12 September meeting with DEA, senior
370:13 management responsible for all
370:14 McKesson distribution centers were
370:15 provided with the -- with a summary of
370:16 the issues raised by the DEA about
370:17 Internet pharmacies and DEA's view of
370:18 what constitutes an illegal Internet
370:19 pharmacy.  Additionally, discussions
370:20 on the appropriate next steps were
370:21 reviewed and included running regional
370:22 sales reports based on the criteria
370:23 provided by DEA.  At the September
370:24 meeting, DEA identified Colorado
370:25 pharmacies by name.  Upon notification
371:1 that DEA had suspended the
371:2 registration of these pharmacies,
371:3 McKesson immediately terminated the
371:4 authority for these Colorado
371:5 pharmacies to order controlled
371:6 substances from McKesson (end of
371:7 reading).

**371:21 - 371:24**    **Walker, Donald 01-10-2019 (00:00:15)**    **V315A.7**

371:21  Q. Moving down to the paragraph -- the
371:22 third paragraph on this page, starting with, "On
371:23 November 21st, 2005."  Could you read that paragraph
371:24 that Mr. Julian wrote to Mr. Rannazzisi at the DEA.

**372:01 - 373:24**    **Walker, Donald 01-10-2019 (00:02:13)**    **V315A.8**

372:1 THE WITNESS:  (Reading) On November 21st,
372:2 2005, DEA notified McKesson through
372:3 outside counsel that DEA was extremely
372:4 concerned about excessive distribution
372:5 of hydrocodone products to six
372:6 specific pharmacies in the Tampa,
372:7 Florida area.  There's a footnote.
372:8 McKesson immediately imposed a
372:9 limitation on all of these pharmacies

**V315A-Walker, Donald - Defendants' Counters 6-23-21 830p**

| Page/Line | Source | ID |
|---|---|---|

372:10 and cut the sales of hydrocodone to
372:11 these pharmacies to only 10 percent of
372:12 their prior orders.  McKesson also
372:13 began an investigation of all these
372:14 pharmacies which included requesting
372:15 additional information from the
372:16 pharmacies about their customers and
372:17 steps taken to verify that their --
372:18 that the prescriptions filled are
372:19 legitimate.  McKesson sales managers
372:20 have been visiting the accounts
372:21 inquiring into the nature of their
372:22 business activity (end of reading).
372:23 BY MS. HENN:
372:24   Q. And you mentioned there's a footnote
372:25 in that paragraph.  If you could read that footnote
373:1 to yourself.  My question for you is whether you're
373:2 familiar with what's described in Footnote 1?
373:3   A. Yes.  During -- during this same time
373:4 frame, there was a number of different events that
373:5 were affecting the country.  Hurricane Katrina had
373:6 just gone through, and specifically in Tampa, Florida
373:7 and Northern Florida was -- hurricane Wilma was
373:8 coming through.  It was our normal practice with
373:9 customers where we anticipate, particularly with
373:10 hurricanes, where we anticipate that there was going
373:11 to be a business interruption due to the storm, for
373:12 them to ensure that they ordered in advance and
373:13 stocked their pharmacies so that after the hurricane
373:14 passed, that they could come up back into business as
373:15 quickly as possible, particularly because their --
373:16 the need becomes very great post hurricanes for
373:17 certain medications.
373:18 And there was a concern expressed around the
373:19 quantities to one of the pharmacies, United
373:20 Prescription, where we sold a significant quantity in
373:21 a short amount of time.  But at the same time, right
373:22 after the hurricane passed, and subsequent to that,
373:23 the volume that the pharmacy purchased dropped
373:24 dramatically.

| | | |
|---|---|---|
| | V315A-Walker, Donald - Defendants' Counters 6-23-21 830p | |
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 374:02 - 375:19 | **Walker, Donald 01-10-2019 (00:02:54)** | **V315A.9** |

374:2   Q. Mr. Walker, setting aside this

374:3 letter.  In your testimony a few minutes ago, you

374:4 referred to the Lifestyle Drug Monitoring Program.

374:5 Could you describe the general contours of the

374:6 Lifestyle Drug Monitoring Program.

374:7   A. We -- this was really the beginning

374:8 of our overall control of the monitoring program.  We

374:9 focused on the four lifestyle drugs that had been

374:10 identified in the January meeting.  We established a

374:11 mechanism of thresholds DEA had shared with us in

374:12 the -- in the meetings that we had had, that they

374:13 viewed that the average pharmacy purchases per month

374:14 for a given -- for across the nation for these

374:15 certain drugs is about 5,000 dose units.

374:16 Our own internal data we reviewed, it was --

374:17 the average was closer to 8,000 dose units for our

374:18 customer base.  And we then used the information, the

374:19 data, to establish these thresholds.

374:20 We then ran -- we monitored the sales in

374:21 terms of dose units purchased, which required a

374:22 significant change in -- from a systems standpoint

374:23 because we had to combine all of the individual

374:24 items, unique items, that constitute a given base

374:25 code.  So basically all the brand, generic, all the

375:1 items that were, for example, hydrocodone, had to be

375:2 collated together and multiplied out in terms of the

375:3 base -- the dose units.  A complex process.

375:4 But we -- we then ran reports on a monthly

375:5 basis to ensure that it identified any customers that

375:6 exceeded their threshold.  From that we conducted

375:7 additional follow-up, and to review.  And we also

375:8 instituted our -- the beginning of our questionnaire

375:9 process for new customers and the regulatory review

375:10 process that evolved into CSMP.

375:11   Q. Why did you take these actions

375:12 following the January 2006 meeting with DEA?

375:13   A. It was our -- our intent to be very

375:14 responsive to -- we had long taken guidance from DEA

375:15 and taken it seriously.  So from that meeting, we

| V315A-Walker, Donald - Defendants' Counters 6-23-21 830p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 375:16 determined that we needed to take actions that would | |
|  | 375:17 address the issues that were raised by DEA during | |
|  | 375:18 that meeting.  And that was, you know, a very focused | |
|  | 375:19 part of our effort. | |
| 381:02 - 382:08 | **Walker, Donald 01-10-2019 (00:02:10)** | **V315A.10** |
|  | 381:2 You have described the Lifestyle Drug | |
|  | 381:3 Monitoring Program.  Earlier today Mr. Kennedy asked | |
|  | 381:4 you a lot of questions about the next program that | |
|  | 381:5 McKesson developed.  That was called what? | |
|  | 381:6   A. The Controlled Substance Monitoring | |
|  | 381:7 Program, or CSMP. | |
|  | 381:8  Q. What was the difference between the | |
|  | 381:9 new CSMP program that was put into place and the | |
|  | 381:10 LDMP, or Lifestyle Drug Monitoring Program? | |
|  | 381:11   A. There were a number of things that -- | |
|  | 381:12 that were done at that time.  First, the difference | |
|  | 381:13 specifically in the programs is we continued to use | |
|  | 381:14 the concept of thresholds to monitor specific orders. | |
|  | 381:15 The significant difference was that we created a | |
|  | 381:16 systemic solution to total the dose units purchased | |
|  | 381:17 by a given pharmacy on a given controlled | |
|  | 381:18 substances -- substance.  And if the order that was | |
|  | 381:19 generated at any given time caused the pharmacy to go | |
|  | 381:20 above the threshold, that entire order was blocked. | |
|  | 381:21 The blocking of orders was a piece. | |
|  | 381:22 We had -- we continued to have the | |
|  | 381:23 three-part review.  The difference being is that the | |
|  | 381:24 blocked order triggered a review process, but we | |
|  | 381:25 still maintained a three-tiered escalation process | |
|  | 382:1 and how we would report to the DEA. | |
|  | 382:2 We enhanced the questionnaire and document. | |
|  | 382:3 And it -- outside of specifically the CSMP, but our | |
|  | 382:4 overall regulatory effort, we invested, well, | |
|  | 382:5 significantly in the I.T. effort to solve the CSMP | |
|  | 382:6 I.T. side, but we also expanded our regulatory force, | |
|  | 382:7 adding the four new directors of Regulatory Affairs, | |
|  | 382:8 one assigned to each region. | |
| 383:03 - 384:02 | **Walker, Donald 01-10-2019 (00:01:29)** | **V315A.11** |
|  | 383:3   Q. As this development effort was | |
|  | 383:4 underway to develop a new system of suspicious order | |

| V315A-Walker, Donald - Defendants' Counters 6-23-21 830p | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

383:5 reporting between McKesson's I.T. and the DEA's I.T.

383:6 people, how did McKesson report suspicious orders in

383:7 that interim period?

383:8  A. We -- we continued to submit the DU45

383:9 to local field offices.  And, in addition, as we

383:10 identified customers that we had done the due

383:11 diligence, who had gone through our three-tiered

383:12 review, and we had made a determination that we were

383:13 no longer going to sell controlled substances to

383:14 these customers, we reported those to DEA.

383:15 And the way -- in fact, I did that work.  I

383:16 would contact DEA directly to ensure that they were

383:17 aware of the actions we were taking and ensure that

383:18 they knew that we were reporting those suspicious --

383:19 those orders and customers to them.

383:20  Q. And you mentioned that the DU45s were

383:21 continued -- McKesson continued to send those while

383:22 the new system was in development.  When did McKesson

383:23 cease providing DU45 reports to the DEA?

383:24  A. I think in January of '09, we finally

383:25 reached mutual agreement that we had a system that

384:1 could talk back and forth.  And I think in January of

384:2 2009 is when we ceased providing DU45.

**384:07 - 384:22**  **Walker, Donald 01-10-2019 (00:00:55)**  **V315A.12**

384:7  Q. Mr. Walker, you've been handed

384:8 Defense Exhibit 806, which is Bates

384:9 No. McKesson-WVA-167.

384:10 Do you recognize this document?

384:11  A. Yes, I do.

384:12  Q. What is this?

384:13  A. This is a memo from -- or an email

384:14 memo from me to our field distribution teams and

384:15 distribution centers advising them that -- this is

384:16 dated January 22nd of '09 -- that we would no longer

384:17 be providing the DEA with the end-of-month DU45 or

384:18 the Suspicious Order Report, and that our new

384:19 reporting mechanism was in place and established as

384:20 part of our agreement with DEA, and directed the DCs

384:21 not to submit those reports to the local field

384:22 offices.

| Page/Line | Source | ID |
|---|---|---|

**V315A-Walker, Donald - Defendants' Counters 6-23-21 830p**

| Page/Line | Source | ID |
|---|---|---|
| 385:01 - 385:02 | **Walker, Donald 01-10-2019 (00:00:04)** | **V315A.13** |

385:1   A. It was part of our settlement

385:2 agreement that we agreed to.

| 387:07 - 387:23 | **Walker, Donald 01-10-2019 (00:00:55)** | **V315A.14** |

387:7   Q. Mr. Walker, who at McKesson was

387:8 responsible for setting up the electronic reporting

387:9 system that was put into place after the 2008

387:10 Settlement Agreement with DEA?

387:11   A. Working on my -- on my team, on my

387:12 I.T. group, was a lady named Jenny Melton.  She was

387:13 the project lead and coordinator, and she was the

387:14 direct contact with the DEA contact from the I.T.

387:15 side.

387:16   Q. And at the time Ms. Melton was

387:17 working on this project, were you from time to time

387:18 aware of communications back and forth between

387:19 Ms. Melton and her counterpart at DEA?

387:20   A. At a high level, yes, I was aware.  I

387:21 was aware that there was actually fairly frequent

387:22 conversations back and forth between Jenny and the

387:23 I.T. team at DEA.

| 388:04 - 392:05 | **Walker, Donald 01-10-2019 (00:06:48)** | **V315A.15** |

388:4   Q. So, Mr. Walker, you've been handed a

388:5 document marked Defense Exhibit 808.  The Bates

388:6 number is MCK-WVA-139.  And this is a somewhat

388:7 lengthy chain of emails, but I'll ask you if you

388:8 recognize it?

388:9   A. Yes, I've seen this document before.

388:10   Q. What is the date on which you

388:11 received this email chain?

388:12   A. I received the email chain on

388:13 November 4th of 2008.

388:14   Q. And what is it exactly?

388:15   A. This is a document, and attached is

388:16 an email from DEA to Jenny, some of which was

388:17 specific in terms of the data details of the I.T.

388:18 systems that they were -- really in direct response

388:19 to some questions that Jenny had, I think, to the

388:20 individual was Noel Goretsas, who, if I recall, was

388:21 the I.T. lead for DEA.

| Page/Line | Source | ID |
|---|---|---|

388:22   Q. So you're looking at page 2 of the
388:23 email, from Noel Goretsas, at the DEA, to Jenny
388:24 Melton, at McKesson, your I.T. lead?
388:25   A. Yes.
389:1   Q. What information did DEA, through
389:2 Noel Goretsas, communicate to Jenny Melton in the
389:3 course of this work to set up the electronic system
389:4 about suspicious order reporting?
389:5   A. There were -- there were a couple of
389:6 questions that were answered.  In looking at the page
389:7 -142, it provided the technical view on the
389:8 characters or basically the I.T. format, but also
389:9 stated that a suspicious order should be reported to
389:10 DEA only after your company has completed its due
389:11 diligence and determine that you will not complete
389:12 the sale because it is suspicious.  Stating that
389:13 suspicious orders are not sales or potential sales.
389:14 And there was some other discussion around
389:15 suspicious orders.  And then he noted that, report a
389:16 suspicious order as soon as your company had decided
389:17 that they will not make the sale because it is
389:18 suspicious.
389:19   Q. So was this -- were these -- was this
389:20 guidance that Mr. Goretsas was providing to McKesson
389:21 consistent with what you had heard, even dating back
389:22 to the January 2006 meeting you described with
389:23 Mr. Rannazzisi and the others from the DEA?
389:24   A. Yes, it was -- it was consistent with
389:25 the messaging that I heard in the 2006 meeting.
390:1   Q. And what did this guidance from DEA
390:2 mean, in terms of the suspicious order reporting that
390:3 McKesson would be making to the DEA, if you compare
390:4 the old DU45 system and this new system put in place
390:5 pursuant to this guidance?
390:6   A. First, is that the numbers of
390:7 suspicious orders that we would report would be
390:8 significantly less because the methodology in which
390:9 we were determining whether something was suspicious
390:10 was far more involved.
390:11 We would also, in the course of this, be

| Page/Line | Source | ID |
|---|---|---|

390:12 answering their question around ensuring that we were
390:13 providing them with usable information.
390:14 And those were our primary intents, was to
390:15 ensure that our suspicious order reporting was
390:16 complying with what -- what limited information they
390:17 provided us in that January 6 meeting.
390:18  Q. And under the new system McKesson put
390:19 in place pursuant to this guidance from DEA, what was
390:20 the frequency of the reports of suspicious orders?
390:21  A. I don't know that I can answer it in
390:22 terms of a specific frequency, other than there were
390:23 a lot fewer Suspicious Order Reports going -- going
390:24 to DEA.
390:25  Q. Did this make sense to you?
391:1  A. Yes, it did.
391:2  Q. Why?
391:3  A. My view was that we were -- in our
391:4 suspicious order and our Controlled Substance
391:5 Monitoring Program, we were really focused on
391:6 identifying pharmacies that after the due diligence
391:7 we had a high degree of confidence were not
391:8 necessarily complying with their regulatory
391:9 obligations and potentially diverting controlled
391:10 substances.  And we created as a -- as a very high
391:11 standard to report the term suspicious order.  And
391:12 suspicious -- and with that, it just reduced the
391:13 number of customers or pharmacies that we were
391:14 reporting to the DEA.  And very specifically trying
391:15 to provide them with as much information and expedite
391:16 the process in their respective enforcement
391:17 activities.
391:18  Q. And you've described that under the
391:19 new system put in place pursuant to the DEA guidance,
391:20 there would be -- the frequency of suspicious order
391:21 reporting and the number of Suspicious Order Reports
391:22 would be fewer or less.
391:23 Was there any change to the other types of
391:24 reporting that you, McKesson, provided to DEA, that
391:25 you've described today?
392:1  A. No.  I mean, the ARCOS reporting

| Page/Line | Source | ID |
|---|---|---|

**V315A-Walker, Donald - Defendants' Counters 6-23-21 830p**

392:2 requirement remained the same.  We continued to
392:3 report and supply DEA with all of the ARCOS data
392:4 throughout this process.  The ARCOS reporting was
392:5 uninterrupted and not changed.

395:08 - 395:15     **Walker, Donald 01-10-2019 (00:00:33)**     **V315A.16**

395:8 After McKesson's Controlled Substance
395:9 Monitoring Program was in place, did you have further
395:10 interaction with the DEA about the program?
395:11   A. Yes, I did.  In July of 2008, shortly
395:12 after the settlement, we requested a meeting with DEA
395:13 at DEA headquarters so that we could review our
395:14 Controlled Substance Monitoring Program with them in
395:15 some -- in some detail.

396:07 - 400:04     **Walker, Donald 01-10-2019 (00:05:52)**     **V315A.17**

396:7   Q. What is Exhibit 812, if you recognize
396:8 it?
396:9   A. I recognize this.  This is a
396:10 PowerPoint presentation that I created for the
396:11 meeting that we had with DEA in July of 2008.
396:12   Q. Did -- who created this document?
396:13   A. I created the document.
396:14   Q. And what did you use this document
396:15 for?
396:16   A. We made -- and I say "we."  There
396:17 were people from McKesson that met with members of
396:18 the DEA Diversion Team in Washington, D.C. at their
396:19 headquarters, and the intent of this document was to
396:20 review with them in some level of specifics the way
396:21 that we had designed the program, how it was being
396:22 executed, and what we were -- we were going to do
396:23 with our Controlled Substance Monitoring Program.
396:24   Q. Who was present at the July 31st,
396:25 2008, meeting, starting from the DEA this time, if
397:1 you remember?
397:2   A. My recollection was -- well, Kyle
397:3 Wright was there from DEA.  And I believe Maureen
397:4 O'Keefe.  And if I'm not mistaken, I believe I recall
397:5 that Barbara Boockholdt, all of which were members of
397:6 the diversion team.  And there were some other
397:7 members that may have been present, one or two other

| Page/Line | Source | ID |
|---|---|---|

397:8 people.

397:9   Q. And from McKesson?

397:10   A. It was myself and counsel.  I don't

397:11 remember if there were any other McKesson members

397:12 there.

397:13   Q. Could you turn to page 4 of the slide

397:14 presentation.  What were the components of the CSMP

397:15 that you discussed with DEA at the meeting?

397:16   A. Components at a high level was --

397:17 really, the meat of the program was knowing your

397:18 customer, which would include the questionnaire and

397:19 the information that we would gather about the

397:20 customer and their business.

397:21 Establishing thresholds, you know, how we

397:22 would establish thresholds based on customers.

397:23 Again, knowing the customer, the size of the

397:24 pharmacy, the business that they -- they had, whether

397:25 they were supporting an orthopedic clinic or had a

398:1 nursing home oncology, all of the things that can

398:2 drive a variation in prescriptions.

398:3 We were going to monitor our orders against

398:4 the thresholds that we established, you know, for the

398:5 customers, and that we would block any orders that

398:6 exceeded the threshold.  So, again, if the order came

398:7 through, and that quantity ordered exceeded the

398:8 threshold, the order was blocked.

398:9   A. review and escalation process.  Once the

398:10 blocked order was in place, how we would report

398:11 suspicious orders and any other reports, and offered

398:12 up any other analysis or reports the DEA could

398:13 identify that could help them in their enforcement

398:14 activities.

398:15   Q. And turning to page 6, slide 6 of

398:16 your presentation to the DEA.

398:17 What did you tell the DEA about steps that

398:18 McKesson was going to take with respect to existing

398:19 customers?

398:20   A. We -- there were -- there were

398:21 several points that we covered with DEA, that from an

398:22 existing customer standpoint, we would establish the

| | | |
|---|---|---|
| **Page/Line** | V315A-Walker, Donald - Defendants' Counters 6-23-21 830p | |
| | **Source** | **ID** |

398:23 thresholds.  We would review their 12-month purchase
398:24 history.  We would establish default volumes or
398:25 quantities in each one of the controlled substances.
399:1 We emphasized that unlike the LDMP, that the CSMP
399:2 covered all of the controlled substances that we
399:3 distributed.
399:4 There's a lot of focus around the controls
399:5 that have been abused, but there is a total of -- if
399:6 I recall, somewhere in the area of the mid 80s,
399:7 different control base-codes that we also managed
399:8 under this program.
399:9 So we had to establish, and we explained to
399:10 them we had to establish thresholds for every base
399:11 code for every customer that we had.
399:12 We indicated that we were going to conduct
399:13 site visits to customers, and based on priority.
399:14 They had in the meetings communicated to us that
399:15 their primary concern in pharmacies that had to
399:16 date -- to that date, had displayed the greater
399:17 propensity for illegal -- what they called illegal
399:18 activity, were independent pharmacies.  So we viewed
399:19 that we needed to prioritize the independents first,
399:20 focusing on the lifestyle drugs, and ensuring that we
399:21 understood, you know, where pharmacies had dose
399:22 quantities that were greater than 25,000.
399:23 We were also clear with them at the time
399:24 that we -- how we were going to interact with our
399:25 retail national accounts.  That we would utilize the
400:1 retail national accounts' internal regulatory and
400:2 loss prevention security organizations to assist us
400:3 as a insight into their pharmacy practices and their
400:4 overall control.

**400:23 - 406:20**   **Walker, Donald 01-10-2019 (00:08:51)**                    **V315A.18**

400:23  Q. And turning to page -- slide 9.  What
400:24 did you communicate with DEA during the July 2008
400:25 meeting about the blocking of orders under the CSMP
401:1 program at McKesson?
401:2  A. In the meeting and in discussions
401:3 with them, that we explained very clearly that we
401:4 would block the orders that exceeded threshold.  That

| Page/Line | Source | ID |
|---|---|---|

V315A-Walker, Donald - Defendants' Counters 6-23-21 830p

401:5 it was specific to the base code and specific to the
401:6 registrant.
401:7 And that was a critical piece because many
401:8 customers have in our system multiple customer
401:9 numbers.  And the DEA's -- in prior meetings it had
401:10 expressed some concern of making sure that we
401:11 understood all the sales that went to a customer.
401:12 So we made sure that they understood it was
401:13 specific to their registrant, which is a unique
401:14 number for the DEA, even though there might be
401:15 multiple McKesson customer numbers.
401:16 There was no override.  There was not going
401:17 to be any override capability.  Any changes in the
401:18 threshold would be -- would be required.  And then a
401:19 threshold change process was going to be implemented
401:20 to adjust any thresholds with the documentation.
401:21 And the customer notification, we were very
401:22 clear that we would notify -- that DEA -- the DEA
401:23 that we would alert the customer if they were
401:24 approaching their threshold along with the -- an
401:25 invoice notification so that the customers were aware
402:1 and -- and, again, explained to them the issues that
402:2 we had with ensuring the customers had the ability to
402:3 fulfill their orders for their patients when the
402:4 orders were absolutely critical and necessary for
402:5 fulfilling scripts.
402:6  Q. Turn to slide 13.  What information
402:7 did you provide to DEA during this July 2008 meeting
402:8 about the suspicious order reporting component of the
402:9 CSMP?
402:10  A. We communicated that -- we understood
402:11 that there was still the ongoing work that we were
402:12 prepared to stop, the DU45 reporting to DEA Field
402:13 Offices at the time that they agreed and we agreed --
402:14 and primarily they agreed that the format was
402:15 acceptable to them in terms of the reporting.
402:16 There was -- there certainly was a lot of
402:17 contact with DEA around the format and the -- and the
402:18 process that we were going to go through.  And,
402:19 again, what we were trying to be is -- in this

| Page/Line | Source | ID |
|---|---|---|

**V315A-Walker, Donald - Defendants' Counters 6-23-21 830p**

402:20 meeting, was clear with them that if there was a
402:21 concern or there's other information that we needed
402:22 to have, that they could provide it.
402:23 And, quite frankly, one of the other things
402:24 we asked is to get feedback and create a feedback
402:25 process on orders that were reported.  We -- we
403:1 wanted to understand the effectiveness of our
403:2 reporting and our CSMP to understand whether we were
403:3 providing them the information that they needed to
403:4 manage their enforcement responsibilities for
403:5 pharmacies.
403:6  Q. Did DEA provide that feedback that
403:7 McKesson requested?
403:8  A. No, they did not.
403:9  Q. What was the DEA's reaction to all of
403:10 this information that you provided during the July
403:11 2008 meeting about the new CSMP program you put into
403:12 place?
403:13  A. My -- my recollection of the meeting
403:14 was that the DEA was -- well, first, they -- it is
403:15 not their habit nor did I expect them to provide a
403:16 stamp of approval on it.  But their -- overall the
403:17 types of discussion and the questions were positive.
403:18 There was, you know, a fair amount of body language.
403:19 So my takeaway was, is that they were
403:20 satisfied with the -- with what we had presented to
403:21 them.  And additionally, there wasn't any "you missed
403:22 it."  There was no direction from them that we had
403:23 failed in meeting any of the components of the
403:24 Memorandum of Agreement, nor did they provide any
403:25 specific guidance at all on the -- on the program or
404:1 what we could do differently, better, et cetera.
404:2  Q. Did you have any follow-up meetings
404:3 about the CSMP with the DEA after this July 2008
404:4 meeting, that you recall?
404:5  A. Well, during -- during the meeting
404:6 that we had with DEA, we -- we asked -- and, again,
404:7 the reason we asked is that they were clear around
404:8 wanting to have more centralized control over
404:9 suspicious order reporting.

| Page/Line | Source | ID |
|-----------|--------|-----|

**V315A-Walker, Donald - Defendants' Counters 6-23-21 830p**

404:10 But what we wanted to do was we wanted to go
404:11 to local field offices and share with the local field
404:12 offices what we were doing with our Controlled
404:13 Substances Monitoring Program.  We did that.  We took
404:14 an offshoot of this document and provided that to the
404:15 DRAs so that they could, in fact, have meetings with
404:16 the local field offices if the field office wanted to
404:17 do that.  We reached out to them.
404:18 We made a number of presentations to local
404:19 field offices by way of the DRAs.  I'm not sure
404:20 exactly how many.  But we did do that.  And,
404:21 actually, the document that I reviewed with
404:22 Mr. Kennedy earlier, I think is actually a copy of
404:23 the document we shared with the local field offices.
404:24   Q. And did you get any feedback from
404:25 those local field offices that reached you about the
405:1 2008 -- or about the CSMP that McKesson put in place
405:2 in 2008?
405:3   A. I didn't get any specific feedback
405:4 from the field office personally.  The DRAs reported
405:5 a generally positive response, again, not unlike like
405:6 what we experienced in Washington, D.C.
405:7   Q. You've described your meeting at the
405:8 headquarters and then the DRAs' meetings that
405:9 occurred at local field offices.  What, if any, other
405:10 interactions did McKesson have on an ongoing basis
405:11 with DEA and its distribution centers?
405:12   A. Well, throughout this process, there
405:13 is what I would call a lot of business as usual
405:14 interactions that McKesson distribution centers had
405:15 with the local field offices.  Inquires around DEA
405:16 registrations of pharmacies, you know, around
405:17 expiration dates.  Those are always a problem with
405:18 the DEA.
405:19 If there was a report -- there needed to be
405:20 a report of a theft or a loss, you know, questions
405:21 around -- and procedural things, in particular around
405:22 the paperwork, the ARCOS reporting.  And the
405:23 paperwork required with that sometimes can be
405:24 confusing.  So there's an ongoing relationship, just

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

405:25 an interactive relationship.
406:1 Additionally, the DEA continued to conduct
406:2 their cyclical audit.  A cyclical audit is where the
406:3 DEA comes in unannounced and inspects the
406:4 distribution center in a number of different areas,
406:5 primarily around the recordkeeping, the security of
406:6 the controlled substances, the handling, reviewing
406:7 the associates that are authorized to handle
406:8 controlled substances.  All of that is part of the
406:9 normal cyclical audit.
406:10   Q. And what would happen if DEA found an
406:11 issue during one of those cyclical audits?
406:12   A. Excuse me.  There was an Audit Report
406:13 that was generated out of each one of the audits.  If
406:14 there were actions that needed to be taken by
406:15 McKesson to correct anything that they identified in
406:16 the audit, virtually all the time that I can recall,
406:17 those were fairly minor issues.  They were more what
406:18 I would call procedural.
406:19 We made the procedural adjustments and
406:20 reported back to DEA the changes that we made.

**408:24 - 410:13**   **Walker, Donald 01-10-2019 (00:02:41)**   **V315A.19**

408:24   Q. Mr. Walker, you were asked by
408:25 Mr. Kennedy about -- I think you referred to them as
409:1 RNA chains, retail national accounts, like Rite Aid
409:2 and CVS.  Could you describe how McKesson performed
409:3 due diligence on orders by chain pharmacies.
409:4   A. McKesson, as we had clearly indicated
409:5 in our program, was going to utilize the regulatory
409:6 and loss control -- loss control security -- they all
409:7 had different names for them -- teams at the various
409:8 chains.
409:9 In our interaction -- in our business
409:10 interactions with the retail national accounts, they
409:11 all had very strong centralized control of their
409:12 pharmacies and their inventories, and we wanted to
409:13 leverage the resources to -- they had to help us with
409:14 understanding, know your customer.
409:15 And, again, our view was if you understood
409:16 how one retail national account pharmacy operated in

| Page/Line | Source | ID |
|---|---|---|

409:17 a given chain, they all fundamentally operated the
409:18 same way because of the heavy centralized control
409:19 that they had.
409:20   Q. Mr. Walker, how would you
409:21 characterize McKesson's efforts to comply with its
409:22 regulatory responsibilities?
409:23   A. I would -- I would -- I would say
409:24 that it is a core competency and something that
409:25 individuals, particularly in our operations group,
410:1 get at the very beginning of their career.  You know,
410:2 both our hourly associates, but especially our
410:3 management teams.  So because we're so regulated,
410:4 compliance is a key component of what we do.  And
410:5 performance is based on that.  There's -- if there's
410:6 issues that are there, it can affect the individual's
410:7 performance reviews.
410:8 So from a cultural standpoint, we strive
410:9 to -- you know, strive to be -- or strive to be, and
410:10 I believe continue to strive to be, a very compliant
410:11 organization and accept that responsibility readily.
410:12 MS. HENN:  Thank you very much, Mr. Walker.
410:13 I have no further questions.

Defendants' Counters = 00:53:11
**Total Time = 00:53:11**