A.3

**Designation Run Report**

# Knittle, Robert - Merged DA PC DC 7-11-21 1030p

---

**Knittle, Robert 08-27-2020**

---

**Defendants' Affirmatives  00:57:58**

**Defendants' Completeness  00:02:27**

**Plaintiffs' Completeness  00:31:49**

**Total Time  01:32:14**



| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| 8:22 - 9:03 | **Knittle, Robert 08-27-2020 (00:00:16)** | VM31.1 |

8:22   Q. Good morning, Mr. Knittle.  I introduced
8:23 myself a little bit earlier.  My name is Sandy
8:24 Zerrusen, and as I stated earlier, I represent
9:1 AmerisourceBergen Drug Corporation.  Could you
9:2 please state your full name for the record?
9:3   A. Yes, my full name is Robert Clare Knittle.

| 25:20 - 26:06 | **Knittle, Robert 08-27-2020 (00:00:30)** | VM31.2 |

25:20   Q. And where did you go after Pressley Ridge?
25:21   A. After that -- I was there for about 12 or
25:22 13 years, and then I moved on to the Board of
25:23 Medicine in the State of West Virginia as the
25:24 executive director there.
26:1   Q. And when did you start that position?
26:2   A. It was December of 2005.
26:3   Q. And I believe you said earlier you retired
26:4 January 1st of 2017?
26:5   A. Yes.  My last day of work was December
26:6 31st, 2016.

| 26:13 - 27:09 | **Knittle, Robert 08-27-2020 (00:01:16)** | VM31.3 |

26:13   Q. Perfect.  During your time at the Board,
26:14 were you involved in any professional associations?
26:15   A. Yes.
26:16   Q. Okay.  Which ones?
26:17   A. The Federation of State Medical Boards.
26:18   Q. Okay.  Is that FSMB?
26:19   A. Yes, it is.
26:20   Q. Okay.  And what was your involvement with
26:21 FSMB?
26:22   A. Represented the State of West Virginia at
26:23 the -- at a national level.  I was involved in
26:24 several other aspects of the Federation Board.
27:1   Q. Can you describe to me what the Federation
27:2 of State Medical Boards is?
27:3   A. Yes.  It's a organization that helps assist
27:4 state boards of medicine for the United States.
27:5   Q. And how do they help assist them?
27:6   A. They help supply organization information
27:7 that can be shared across states.  They assist in
27:8 the licensing of physicians.  It's

**VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p**

| Page/Line | Source | ID |
|---|---|---|
| | 27:9 more administrative in nature. | |
| 27:10 - 27:24 | **Knittle, Robert 08-27-2020 (00:00:52)** | **VM31.4** |

27:10   Q. Did you find during your tenure at the
27:11 Board that FSMB was helpful for you in your
27:12 position?
27:13   A. Yes, I would -- I would say so.  I think it
27:14 was a two-way street.  I was -- I was involved in a
27:15 number of their projects as well.
27:16   Q. Okay.  Do you remember what projects you
27:17 were involved with them in?
27:18   A. I sat on the medical directors -- state
27:19 medical directors advisory panel to the Federation
27:20 of State Medical Boards.
27:21 And I also sat on their advisory
27:22 council to the United States Medical License
27:23 Examination, USMLE, when they went through their
27:24 changes of their steps.

| | | |
|---|---|---|
| 28:16 - 29:05 | **Knittle, Robert 08-27-2020 (00:00:46)** | **VM31.5** |

28:16   Q. Did any of the changes in the content that
28:17 you were involved in relate to controlled
28:18 substances or prescribing?
28:19   A. Not specifically.  There may have been
28:20 questions in there that dealt with opioids or the
28:21 prescribing of them.  But they were nothing that
28:22 was specifically focused on as part of the
28:23 examination.
28:24   Q. Okay.  You also said that you were on an
29:1 advisory panel.  What was that?
29:2   A. It was a -- basically when issues would
29:3 come up that -- at a national level, they would ask
29:4 from -- for input from different medical directors
29:5 across the country.

| | | |
|---|---|---|
| 29:06 - 29:19 | **Knittle, Robert 08-27-2020 (00:00:57)** | **VM31.6** |

29:6   Q. Did -- were any of the issues that you
29:7 dealt with, did any of them relate to controlled
29:8 substances or prescribing?
29:9   A. I think there was some discussion.  And I
29:10 can't be real specific about it because I can't
29:11 remember.  But -- but there was talk about, you
29:12 know, some type of a template for states to look at

| Page/Line | Source | ID |
|---|---|---|

**VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p**

29:13 in terms of developing policy for training and
29:14 education regarding opiates for physicians.
29:15   Q. Regarding prescribing?  Excuse me.
29:16   A. Well, the whole process of -- like you were
29:17 talking about, you know, someone coming in asking
29:18 for pain management of some nature.  Some were more
29:19 specific than others as to exactly what they want.

| 29:20 - 29:24 | **Knittle, Robert 08-27-2020 (00:00:17)** | **VM31.7** |

29:20   Q. And did you participate in coming up with
29:21 this template?
29:22   A. No, I did not.
29:23   Q. Okay.  All right.  Were you involved with
29:24 any other professional associations while at the

| 30:01 - 30:24 | **Knittle, Robert 08-27-2020 (00:01:16)** | **VM31.8** |

30:1 Board?
30:2   A. There was a group called the Administrators
30:3 In Medicine.
30:4   Q. Okay.
30:5   A. And that is a -- the medical directors --
30:6 or the directors of the medical boards across the
30:7 country, and it was just kind of a subgroup that
30:8 was distinct, at least, from a -- from a nonprofit
30:9 standpoint.
30:10   Q. For the Administrators in Medicine, was
30:11 there anything involving controlled substances,
30:12 education or training?
30:13   A. I think there was always discussion about
30:14 it.  There was nothing that was independently
30:15 developed by that group.
30:16   Q. And what would be discussed about it?
30:17   A. The number -- or I guess the outright
30:18 concern of the number of deaths that were being
30:19 caused by opioids and what the role would be of
30:20 legitimate drugs in the deaths of those people.
30:21   Q. Okay.  And what was discussed about the
30:22 role of the legitimate drugs?
30:23   A. Well, generally, the boards of medicine
30:24 deal with physicians and the licensing and

| 31:01 - 31:04 | **Knittle, Robert 08-27-2020 (00:00:17)** | **VM31.9** |

31:1 disciplining of physicians, so we were looking at

| Page/Line | Source | ID |
|---|---|---|

**VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p**

31:2 things in terms of education for physicians,
31:3 awareness of the -- of the dangers of using
31:4 opioids.

| | | |
|---|---|---|
| 31:10 - 31:15 | **Knittle, Robert 08-27-2020 (00:00:21)** | **VM31.10** |

31:10  Q. Any other professional associations during
31:11 your time at the Board?
31:12  A. I don't believe so.  I sat on the initial
31:13 board for the -- for the general licensing of
31:14 physicians across the state -- or across the
31:15 country.

| | | |
|---|---|---|
| 32:09 - 32:18 | **Knittle, Robert 08-27-2020 (00:00:28)** | **VM31.11** |

32:9  Q. Okay.  A little bit ago, you were talking
32:10 about when you were at the Board, you were
32:11 concerned with the licensing and discipline of
32:12 physicians.  Was that kind of the main purpose of
32:13 the Board of Medicine?
32:14  A. Yeah, the main purpose is to protect the
32:15 public.  And the way that the Board is structured
32:16 legally is for the licensing and disciplining of
32:17 physicians, which would include physician
32:18 assistants as well.

| | | |
|---|---|---|
| 33:16 - 33:24 | **Knittle, Robert 08-27-2020 (00:00:37)** | **VM31.12** |

33:16  Q. Okay.  Can you give me just a rundown of
33:17 what your duties were as executive director at the
33:18 Board?
33:19  A. Basically to carry out the wishes of the --
33:20 of the Board of Medicine, to oversee the staff
33:21 during that implementation, and to maintain a
33:22 physical presence as well as to be available to the
33:23 legislative body and other groups on behalf of the
33:24 Board of Medicine.

| | | |
|---|---|---|
| 37:24 - 38:08 | **Knittle, Robert 08-27-2020 (00:00:32)** | **VM31.13** |

37:24  Q. And how many licensees did the Board
38:1 oversee generally when you were there?
38:2  A. I'm trying to think.  Around 3000.
38:3  Q. And that would include all three
38:4 specialties?
38:5  A. I think there were about 800 P.A.'s and
38:6 there were several hundred - but it was declining -
38:7 of podiatrists.  I think there was around 3000 or

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p |
|---|

| Page/Line | Source | ID |
|---|---|---|

38:8 3200 physicians.

| 39:07 - 40:09 | **Knittle, Robert 08-27-2020 (00:01:17)** | **VM31.14** |

39:7   Q. We were talking about the DEA registration

39:8 or license.  Do you understand why a doctor would

39:9 need a DEA registration or license before

39:10 prescribing a controlled substance?

39:11   A. I believe it's to try to appropriately

39:12 monitor them across the country.

39:13   Q. And a prescription for an opioid that's

39:14 written by a Board licensee must be for a

39:15 legitimate medical purpose.  Correct?

39:16   A. Yes.

39:17   Q. And you agree with me that prescription

39:18 opioids can serve a legitimate medical purpose,

39:19 correct?

39:20   A. They can, yes.

39:21   Q. That patients can benefit from the use of

39:22 opioids being prescribed for a legitimate medical

39:23 purpose, correct?

39:24   A. Yes.

40:1   Q. Okay.  And you agree that it could -- can

40:2 be appropriate for pharmacists to fill a

40:3 prescription for opioids for a patient, correct?

40:4   A. I believe that's their role, yes.

40:5   Q. Yes.  And it's the physician that makes the

40:6 ultimate decision whether or not to prescribe an

40:7 opioid for a legitimate medical purpose to their

40:8 patient, correct?

40:9   A. That's correct.

| 40:10 - 40:24 | **Knittle, Robert 08-27-2020 (00:00:44)** | **VM31.15** |

40:10   Q. And does a prescriber need to consider a

40:11 patient's history prior to prescribing an opioid?

40:12   A. I believe they do.

40:13   Q. How about their diagnosis?

40:14   A. Yes.  That would be, in part, determined by

40:15 the physician.

40:16   Q. Okay.  Anything else that a prescriber

40:17 needs to consider when prescribing an opioid that

40:18 you know of?

40:19   A. No.  Again, not being a physician, I can't

| Page/Line | Source | ID |
|---|---|---|

VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p

40:20 get real specific as to exactly how diagnoses and
40:21 prescribing are specifically determined by a
40:22 physician to a patient.
40:23   Q. Okay.  Should anybody be second-guessing
40:24 the physician's decision to prescribe an opioid?

**41:01 - 41:24     Knittle, Robert 08-27-2020 (00:01:25)     VM31.16**

41:1   A. Some people will go for a second opinion.
41:2   Q. Okay.  Other than a patient going for a
41:3 second opinion, is there anybody that should be
41:4 questioning a physician's decision to prescribe an
41:5 opioid to his or her patient?
41:6   A. I think if someone has concerns over it
41:7 that, you know, that's why the Board of Medicine is
41:8 there, for one aspect.  But there are a number of
41:9 different controls throughout the system for
41:10 different aspects of the system.
41:11 We don't live in a perfect world, and
41:12 you know, some people will take advantage of things
41:13 for financial gain or -- in some respects for
41:14 physicians, for sexual gain.
41:15 But mostly, it's -- from what we've
41:16 seen, it's been monetary.
41:17   Q. And what do you mean that they will take
41:18 advantage for financial gain?  What will they do?
41:19   A. They will overprescribe.
41:20 They will ask for kickbacks, knowing
41:21 that a patient would, you know, sell them, and they
41:22 wanted a portion of it.
41:23 Or to get part of the pills back
41:24 themselves.

**42:01 - 42:24     Knittle, Robert 08-27-2020 (00:01:08)     VM31.17**

42:1   Q. When you say they ask for kickbacks, are
42:2 they asking for kickbacks from the patient
42:3 themselves?
42:4   A. Yes.
42:5   Q. Okay.  Can you explain that a little more
42:6 to me.
42:7   A. No, I think there have been instances where
42:8 someone would, you know, cash -- or fill the
42:9 prescription, sell the medications and give a

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

42:10 portion of the money back to the physician.

42:11   Q. Okay.  And you -- during your tenure at the

42:12 Board, you have seen instances where physicians

42:13 were writing prescriptions for controlled

42:14 substances for sexual favors?

42:15   A. Yes.

42:16   Q. Okay.  You said that there are certain

42:17 controls in the system.  Besides the Board of

42:18 Medicine, what other controls are there in the

42:19 system?

42:20   A. Well, things like the DEA --

42:21   Q. Okay.

42:22   A. -- who monitor how they're distributed and

42:23 who's distributing them.  I think from the Board of

42:24 Pharmacy side and from the national side, I know

**43:01 - 43:24**       **Knittle, Robert 08-27-2020 (00:01:09)**                                   **VM31.18**

43:1 that there are particular controls as to monitoring

43:2 of all sorts of the different types of controlled

43:3 substances or drugs or prescribed drugs.

43:4 But they monitor where they're going,

43:5 how much is going, those sorts of things.

43:6   Q. You said the DEA monitors how they are

43:7 distributed and who distributes them.  Do you know

43:8 who distributes them?

43:9   A. No.

43:10   Q. Okay.  Do you know how they are

43:11 distributed?

43:12   A. Not specifically.  We -- our focus was, you

43:13 know, those sorts of things had always been beyond

43:14 the purview of the Board of Medicine, and even if

43:15 we were curious about something, there's -- there

43:16 were times that we just didn't have access to that

43:17 type of information.

43:18   Q. Were there times that you tried to gain

43:19 access to that type of information?

43:20   A. Not specifically, no.  Unless it was very

43:21 specifically related to a particular case of a

43:22 physician or P.A. --

43:23   Q. Okay.

43:24   A. -- or podiatrist.

| Page/Line | Source | ID |
|---|---|---|

**VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p**

44:01 - 44:08    **Knittle, Robert 08-27-2020 (00:00:37)**     VM31.19

44:1   Q. Did the Board of Medicine while you were
44:2 there work with the DEA?
44:3   A. Yes, on individual cases.
44:4   Q. As you sit here today, can you identify an
44:5 instance where a person overdosed on a controlled
44:6 substance that they were taking as it was
44:7 prescribed to them by their physician?
44:8   A. No.  Not after -- not after years, I can't.

44:09 - 44:21    **Knittle, Robert 08-27-2020 (00:00:32)**     VM31.20

44:9   Q. Is it something that you think has
44:10 happened?
44:11   A. As prescribed?
44:12   Q. Yes.
44:13   A. It's very possible that it did.
44:14   Q. You just, as you sit here today, can't
44:15 think of an instance?
44:16   A. No, it's -- but you know, there have been
44:17 instances of inappropriate prescribing where
44:18 perhaps they prescribed a higher dose than was
44:19 necessary.
44:20 Those would be particularly rare.  But
44:21 I imagine that anything is possible.

44:22 - 45:07    **Knittle, Robert 08-27-2020 (00:00:31)**     VM31.21

44:22   Q. Okay.  Do you know of an instance where a
44:23 drug distributor asked a physician to write a
44:24 prescription for a controlled substance?
45:1   A. Not specifically, no.
45:2   Q. Okay.  When you say, "not specifically," do
45:3 you think there is an instance and you just can't
45:4 remember it, or --
45:5   A. No, I don't think there was anything within
45:6 the Board of Medicine that I can remember a
45:7 specific complaint of that nature.

52:20 - 53:08    **Knittle, Robert 08-27-2020 (00:00:44)**     VM31.22

52:20   Q. So in most or all of the overprescribing
52:21 cases, the Board would get an expert to determine
52:22 whether or not the physician had been
52:23 overprescribing?
52:24   A. Yes.  I think after probable cause is

Defendants' Affirmatives     Defendants' Completeness     Plaintiffs' Completeness

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | |
| --- | --- |

| Page/Line | Source | ID |
| --- | --- | --- |

53:1 found, some physicians will settle the case, will
53:2 go on for, you know, medical education or something
53:3 like that.
53:4 Others will -- are more adamant about
53:5 their own innocence in the matter, and those will
53:6 -- are the ones that we will get, you know, a -- an
53:7 expert for testimony at a hearing, administrative
53:8 hearing.

**53:23 - 54:11**   **Knittle, Robert 08-27-2020 (00:00:31)**   **VM31.23**

53:23   Q. And you talked about the administrative
53:24 hearing.  Who oversees an administrative hearing?
54:1   A. An administrative judge.
54:2   Q. Okay.  And does that administrative judge
54:3 then make a recommendation to the Board?  Or do
54:4 they make a ruling?
54:5   A. Yeah, they make a -- they make a ruling
54:6 that would be taken to the Board for a
54:7 determination, and the Board can either accept it,
54:8 reject it or modify it.
54:9   Q. Okay.  So the Board makes the ultimate
54:10 decision on discipline.
54:11   A. They do.

**57:01 - 57:24**   **Knittle, Robert 08-27-2020 (00:01:22)**   **VM31.24**

57:1 11:14 a.m.  We are on the record.
57:2 BY MS. ZERRUSEN:
57:3   Q. Mr. Knittle, earlier we were talking about
57:4 overprescribing.  And I take it from your testimony
57:5 that there were licensees of the Board that
57:6 overprescribed; is that correct?
57:7   A. Yeah, there have been physicians that have
57:8 been disciplined for inappropriate prescribing.
57:9   Q. And when is the first time that you can
57:10 recall a licensee was disciplined for inappropriate
57:11 or overprescribing?
57:12   A. I don't know the specific instance.  I
57:13 mean, they have been disciplining physicians for
57:14 that for decades prior to me being there.
57:15   Q. Okay.  And was every licensee that the
57:16 Board investigated and found had overprescribed,
57:17 was every one of them disciplined?

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

57:18   A. To some degree.  If there's, you know, an
57:19 abundance of evidence.
57:20   Q. And earlier we talked about diversion.  Is
57:21 overprescribing diversion?
57:22   A. Not necessarily.
57:23   Q. Okay.
57:24   A. It could -- it could lend itself to

**58:01 - 58:21**    **Knittle, Robert 08-27-2020 (00:01:11)**    **VM31.25**

58:1 diversion, but --
58:2   Q. So the overprescribing itself is not
58:3 diversion, it's what the patient then does with
58:4 those pills that they were overprescribed?
58:5   A. That would be determined by the intent of
58:6 the physician.
58:7   Q. Okay.
58:8   A. If they're in collaboration, it could be
58:9 diversion, yes.
58:10   Q. And did -- during your tenure at the Board,
58:11 did that happen where physicians were in
58:12 collaboration with their patient to overprescribe?
58:13   A. I think there have been some instances of
58:14 it, but I can't be specific.
58:15   Q. Okay.  Would those physicians have been
58:16 disciplined?
58:17   A. Yes.
58:18   Q. Would you agree with me that diversion is
58:19 illegal?
58:20   A. Yes.  I believe so.  Either from a
58:21 administrative or criminal standpoint or both.

**59:17 - 59:24**    **Knittle, Robert 08-27-2020 (00:00:29)**    **VM31.26**

59:17   Q. Okay.  Were there any other things that
59:18 licensees of the Board did related to opioids that
59:19 they were disciplined for?
59:20   A. Perhaps their use of them themselves
59:21 personally.
59:22   Q. And would those licensees have been
59:23 disciplined?
59:24   A. They could be disciplined, but they --

**60:01 - 60:24**    **Knittle, Robert 08-27-2020 (00:01:34)**    **VM31.27**

60:1 generally, they were in a point of probably

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

60:2 addiction themselves and it would be specific as to
60:3 whether they were impaired at the time that they
60:4 were practicing as well as whether they were using
60:5 inappropriately.
60:6   Q. Did the Board work with licensees that were
60:7 addicted themselves to get them treatment?
60:8   A. Yes, we did.  In fact, I think one of the
60:9 first things that we were able to pass when I came
60:10 on as the executive director was establishment of a
60:11 physicians health program in West Virginia.
60:12   Q. And what's the physicians health program?
60:13   A. It's the program that works with physicians
60:14 that have alcohol or drug abuse or addiction
60:15 issues, and to some degree, mental illness.
60:16   Q. And why do physicians need a specific
60:17 program for themselves?
60:18   A. I think just because of the seriousness of
60:19 the situation with them that physicians - or
60:20 anybody that's involved with drugs - can do a
60:21 tremendous amount of damage if they're not on top
60:22 of their -- of their game.
60:23   Q. Okay.  And did the Board work with the
60:24 physicians health program?

| 61:01 - 61:08 | **Knittle, Robert 08-27-2020 (00:00:21)** | **VM31.28** |

61:1   A. Yes.
61:2   Q. Okay.  And how did they collaborate?  How
61:3 did the two agencies collaborate?
61:4   A. There's a -- there's an agreement between
61:5 the Board of Medicine and the physicians health
61:6 program as well as specific legislature in
61:7 establishing it, that put together the guidelines
61:8 as to how we worked.

| 61:09 - 61:12 | **Knittle, Robert 08-27-2020 (00:00:12)** | **VM31.29** |

61:9   Q. And what was the agreement between --
61:10 between the two?
61:11   A. It was a -- it was a matter of mutually
61:12 sharing information under proper circumstances.

| 62:04 - 62:08 | **Knittle, Robert 08-27-2020 (00:00:15)** | **VM31.30** |

62:4   Q. Okay.  Was the physicians health program
62:5 successful in treating addiction?

| Page/Line | Source | ID |
|---|---|---|

**VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p**

62:6   A. Yes.  And in fact, the model that we
62:7 established in West Virginia has been emulated
62:8 across the country by a number of different states.

| | | |
|---|---|---|
| 62:09 - 62:10 | **Knittle, Robert 08-27-2020 (00:00:05)** | **VM31.31** |

62:9  Q. So addiction can be treated.
62:10   A. Yes, it can.

| | | |
|---|---|---|
| 63:04 - 63:08 | **Knittle, Robert 08-27-2020 (00:00:14)** | **VM31.32** |

63:4  Q. Okay.  During your tenure at the Board,
63:5 were licensees required to take continuing
63:6 education related to pain management?
63:7   A. They were required to do continuing
63:8 education, yes.

| | | |
|---|---|---|
| 65:17 - 66:09 | **Knittle, Robert 08-27-2020 (00:00:56)** | **VM31.33** |

65:17   Q. Do you recall this requirement for the
65:18 licensees to take two hours of continuing education
65:19 on end-of-life care, including pain management?
65:20   A. Yes, I do.  And the emphasis there was --
65:21 was on the end-of-life care.
65:22   Q. Okay.  And why was the emphasis on
65:23 end-of-life care?
65:24   A. Just in order for people to be able to not
66:1 go through any unnecessary pain in terminal illness
66:2 cases.
66:3   Q. Was this always a requirement, a continuing
66:4 education requirement, while you were at the Board?
66:5   A. Yeah, I believe it was there before I
66:6 started.
66:7   Q. Okay.  Was it there when you -- through
66:8 when you left?
66:9   A. To my recollection, yes.

| | | |
|---|---|---|
| 70:09 - 70:24 | **Knittle, Robert 08-27-2020 (00:00:58)** | **VM31.34** |

70:9   Q. Earlier when we were talking about the
70:10 disciplinary process, I believe you said that there
70:11 were two investigators employed by the Board?
70:12   A. Yeah, for years we only had one.
70:13   Q. Okay.
70:14   A. But with the amount of -- of complaints and
70:15 the complexity of the inappropriate prescribing
70:16 cases that were coming up, then it was necessary to
70:17 hire a second investigator.

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

|  | 70:18   Q. And do you recall what year that was? | |
|  | 70:19   A. You know, I wish I did, but I don't. | |
|  | 70:20   Q. Why were inappropriate prescribing cases | |
|  | 70:21 complex? | |
|  | 70:22   A. Because I think you eventually have to | |
|  | 70:23 establish that the prescribing itself was | |
|  | 70:24 inappropriate, so you needed to get all the | |
| 71:01 - 71:11 | **Knittle, Robert 08-27-2020 (00:00:38)** | **VM31.35** |
|  | 71:1 records, all of the prescription records, and put | |
|  | 71:2 them together in a meaningful way in order to try | |
|  | 71:3 to make a determination of that. | |
|  | 71:4 So it's a very tedious process in | |
|  | 71:5 order to do it. | |
|  | 71:6   Q. Okay.  I'm assuming - which is probably not | |
|  | 71:7 good to do during a deposition - that based on your | |
|  | 71:8 testimony, the amount of inappropriate prescribing | |
|  | 71:9 cases increased during your -- over your tenure at | |
|  | 71:10 the Board.  Is that correct? | |
|  | 71:11   A. It did. | |
| 74:20 - 74:24 | **Knittle, Robert 08-27-2020 (00:00:29)** | **VM31.36** |
|  | 74:20   Q. Do you recall if -- if the opioid-related | |
|  | 74:21 cases were concentrated in a particular geographic | |
|  | 74:22 area of West Virginia? | |
|  | 74:23   A. They were more southern than they were | |
|  | 74:24 northern.  Huntington, Wayne County, Mingo, down | |
| 75:01 - 75:07 | **Knittle, Robert 08-27-2020 (00:00:21)** | **VM31.37** |
|  | 75:1 towards the Beckley area.  We had a number of cases | |
|  | 75:2 through there, as well as around the Charleston | |
|  | 75:3 area. | |
|  | 75:4 That is not to say that there were not | |
|  | 75:5 cases in the Eastern Panhandle or Morgantown area, | |
|  | 75:6 but there were quite a few in the southern part of | |
|  | 75:7 the state. | |
| 75:08 - 75:12 | **Knittle, Robert 08-27-2020 (00:00:26)** | **VM31.38** |
|  | 75:8   Q. Do you have any idea why? | |
|  | 75:9   A. No.  I don't.  There's a lot of different | |
|  | 75:10 theories that the people cast about as to issues of | |
|  | 75:11 addiction in Appalachia.  But I don't have a | |
|  | 75:12 specific one. | |
| 76:19 - 77:01 | **Knittle, Robert 08-27-2020 (00:00:19)** | **VM31.39** |

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 76:19   Q. Did the investigators have the ability to | |
|  | 76:20 look at the West Virginia Controlled Substances | |
|  | 76:21 Monitoring Program? | |
|  | 76:22   A. I believe that they did. | |
|  | 76:23   Q. Okay.  And if I call it "the CSMP," will | |
|  | 76:24 you understand that it's the West Virginia | |
|  | 77:1 Controlled Substances Monitoring Program? | |
| 77:02 - 77:13 | **Knittle, Robert 08-27-2020 (00:00:43)** | **VM31.40** |
|  | 77:2   A. Yeah.  I don't think that was always in | |
|  | 77:3 existence. | |
|  | 77:4   Q. Okay. | |
|  | 77:5   A. And it came on to -- towards the latter | |
|  | 77:6 part of my tenure with the Board. | |
|  | 77:7   Q. Do you know why the CSMP was implemented? | |
|  | 77:8   A. I think to try to get a better handle on | |
|  | 77:9 what was being distributed and supplied and | |
|  | 77:10 distributed to physicians and patients then. | |
|  | 77:11   Q. Do you know what the -- what information | |
|  | 77:12 the CSMP contains? | |
|  | 77:13   A. I can't specifically recall. | |
| 77:14 - 77:24 | **Knittle, Robert 08-27-2020 (00:00:40)** | **VM31.41** |
|  | 77:14   Q. Okay.  Do you know who maintains the CSMP? | |
|  | 77:15   A. It had been the Board of Pharmacy, if it's | |
|  | 77:16 still there. | |
|  | 77:17   Q. Okay.  Prior to the CSMP, what would the | |
|  | 77:18 investigators look at to try to get information | |
|  | 77:19 regarding dosages and prescribing of physicians? | |
|  | 77:20   A. It would be a subpoena of medical records | |
|  | 77:21 of a physician or particular patients. | |
|  | 77:22   Q. Was the CSMP a helpful tool then once it | |
|  | 77:23 came about? | |
|  | 77:24   A. I believe it was helpful. | |
| 78:19 - 78:22 | **Knittle, Robert 08-27-2020 (00:00:16)** | **VM31.42** |
|  | 78:19   Q. Do you know if prescribers of controlled | |
|  | 78:20 substances were required to register with the CSMP? | |
|  | 78:21   A. I think they were.  I thought that was a | |
|  | 78:22 change in -- in law from the Board of Pharmacy. | |
| 79:01 - 79:24 | **Knittle, Robert 08-27-2020 (00:02:03)** | **VM31.43** |
|  | 79:1   Q. All right.  Can you pull out Tab 14? | |
|  | 79:2 COURT REPORTER:  Sandy, will this be | |

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

79:3 Exhibit 3?
79:4 KNITTLE DEPOSITION EXHIBIT NO. 3
79:5 (WVBOM Quarterly Newsletter, Volume
79:6 14, Issue 1, January-March 2010 was
79:7 marked for identification purposes as
79:8 Knittle Deposition Exhibit No. 3.)
79:9   A. You guys like our newsletters, huh?
79:10   Q. I tried to get other stuff.  This is all I
79:11 got.  All right.  So this is going to be marked as
79:12 Exhibit 3 to your deposition.  It is the West
79:13 Virginia Board of Medicine Quarterly Newsletter,
79:14 Volume 14, Issue 1, January through March 2010.
79:15 And if you look near the bottom of the
79:16 page, it discusses the committee substitute for
79:17 Senate Bill 365 and Senate Bill 514.  You want to
79:18 take a minute and read those two paragraphs?
79:19   A. Okay.
79:20   Q. All right.  So for Senate Bill 365, it says
79:21 that by at least July 1st, 2011, prescribers of
79:22 controlled substances must have access to the CSMP.
79:23 Correct?
79:24   A. Yes.

| 80:17 - 80:21 | **Knittle, Robert 08-27-2020 (00:00:14)** | **VM31.44** |

80:17   Q. So if a physician had -- was checking the
80:18 CSMP, they'd be able to see if their patient had
80:19 been going from doctor to doctor to doctor to try
80:20 to get different controlled substances, right?
80:21   A. Correct.

| 81:04 - 81:11 | **Knittle, Robert 08-27-2020 (00:00:28)** | **VM31.45** |

81:4   Q. Okay.  It also says that Senate Bill 365
81:5 "limits liability of practitioners for good faith
81:6 reliance on the" CSMP database.  Do you know what
81:7 the purpose of limiting the liability of the
81:8 practitioners was?
81:9   A. Well, the first response is it would be to
81:10 curb malpractice cases against them if they were
81:11 prescribing opioids.

| 82:15 - 82:24 | **Knittle, Robert 08-27-2020 (00:00:36)** | **VM31.46** |

82:15   Q. Okay.  If you go -- the Senate Bill 514, it
82:16 says, "controlled substance reporting when a

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

82:17 prescription is filled for a controlled substance
82:18 or a controlled substance is dispensed."
82:19   A. Yes.
82:20   Q. The only information that is then reported
82:21 to the CSMP would be when a controlled substance is
82:22 filled or dispensed by a pharmacy or a doctor that
82:23 dispenses it out of their office?  Is that right?
82:24   A. Yes.

**85:16 - 85:19**   **Knittle, Robert 08-27-2020 (00:00:09)**   **VM31.47**

85:16   Q. And in fact, it would be helpful for
85:17 physicians to check the CSMP prior to writing a
85:18 prescription for an opioid, right?
85:19   A. Yes.

**85:20 - 86:02**   **Knittle, Robert 08-27-2020 (00:00:24)**   **VM31.48**

85:20   Q. And what should the prescriber be looking
85:21 for when they check the CSMP?
85:22   A. Well, apparently -- if it was a physician,
85:23 then you would be looking at a particular patient
85:24 to see if they had been to five different
86:1 physicians over a certain period of time looking
86:2 for a particular type of drug or treatment.

**88:01 - 88:06**   **Knittle, Robert 08-27-2020 (00:00:18)**   **VM31.49**

88:1   Q. Okay.  If a doctor was being investigated
88:2 for inappropriate or overprescribing, would their
88:3 license or their ability to prescribe be put on
88:4 hold in any sort of way during the investigative
88:5 process?
88:6   A. Generally not.

**88:07 - 88:21**   **Knittle, Robert 08-27-2020 (00:00:37)**   **VM31.50**

88:7   Q. Okay.
88:8   A. If it was a case where it was -- it was
88:9 extremely severe, that you had an overdose of --
88:10 deaths of five people because of prescribing,
88:11 sometimes there's a legal means in order to, you
88:12 know, suspend someone on an emergency basis and
88:13 have a quick hearing.
88:14 That was extremely rare --
88:15   Q. Okay.
88:16   A. -- for that -- for that to happen.
88:17   Q. Do you recall --

| | VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

88:18   A. So --
88:19   Q. Sorry.
88:20   A. -- until probable cause is found, people
88:21 are able to practice.

| 88:22 - 89:01 | **Knittle, Robert 08-27-2020 (00:00:12)** | **VM31.51** |

88:22   Q. Do you recall an instance where there were
88:23 deaths of several people that somebody's ability to
88:24 prescribe was almost immediately revoked?
89:1   A. No.

| 89:02 - 89:06 | **Knittle, Robert 08-27-2020 (00:00:12)** | **VM31.52** |

89:2   Q. Okay.  But it is an option for the Board to
89:3 immediately revoke somebody's ability to prescribe
89:4 or practice medicine.
89:5   A. There is that -- there is that aspect in an
89:6 immediate situation.

| 89:12 - 89:22 | **Knittle, Robert 08-27-2020 (00:00:41)** | **VM31.53** |

89:12   Q. What types of discipline could be doled out
89:13 to a physician?  Starting with the harshest penalty
89:14 to the lightest penalty.
89:15   A. Well, you could permanently lose your
89:16 license, would probably be the harshest.  You know,
89:17 probably the least severe would be some type of
89:18 continuing medical education.
89:19 Sometimes community service.  But that
89:20 was rarely used.
89:21   Q. Could somebody's license be suspended?
89:22   A. Yes, that's in the middle.

| 93:15 - 94:03 | **Knittle, Robert 08-27-2020 (00:00:41)** | **VM31.54** |

93:15   Q. Do you know what the "epidemic of
93:16 prescription drug fraud" is?
93:17   A. I think that's what we were talking about,
93:18 where people would alter prescriptions or steal
93:19 prescription pads.
93:20   Q. Okay.  Do you know how long this epidemic
93:21 lasted?
93:22   A. No.  But given how quickly the legislative
93:23 acts, it was probably a number of years.
93:24   Q. Are you saying that they -- they don't act
94:1 that quickly?
94:2   A. No, they -- they usually take their time on

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | | |
| --- | --- | --- |
| | 94:3 these things. | |
| 94:04 - 94:07 | **Knittle, Robert 08-27-2020 (00:00:07)** | **VM31.55** |
| | 94:4   Q. Okay. | |
| | 94:5   A. Until it comes to their attention to a | |
| | 94:6 strong enough point where it becomes legislatively | |
| | 94:7 necessary. | |
| 101:24 - 101:24 | **Knittle, Robert 08-27-2020 (00:00:03)** | **VM31.56** |
| | 101:24   Q. Was there a time when the standard of care | |
| 102:01 - 102:24 | **Knittle, Robert 08-27-2020 (00:01:33)** | **VM31.57** |
| | 102:1 was to treat with opioids? | |
| | 102:2   A. I think it was professed by some people to | |
| | 102:3 do that, that narcotics was the thing that you | |
| | 102:4 should start out with first and foremost. | |
| | 102:5 And there were some physicians that | |
| | 102:6 prescribed to that approach.  But it was not | |
| | 102:7 generally very effective and as the addictions rose | |
| | 102:8 and the deaths rose, it was really called into | |
| | 102:9 question. | |
| | 102:10   Q. You said it was professed by people.  Do | |
| | 102:11 you know who professed it? | |
| | 102:12   A. I think some of the pharmaceutical | |
| | 102:13 manufacturers had pushed for it pretty heavily. | |
| | 102:14   Q. Do you know what the Joint Commission on | |
| | 102:15 the Accreditation of Hospitals is? | |
| | 102:16   A. I'm aware of what -- that that entity | |
| | 102:17 exists, yes. | |
| | 102:18   Q. Okay.  Do you know what they do? | |
| | 102:19   A. They accredit hospitals as to appropriate | |
| | 102:20 means of patient care, safety, medical treatment. | |
| | 102:21   Q. Do you remember guidance from the Joint | |
| | 102:22 Commission that pain should be treated as the fifth | |
| | 102:23 vital sign? | |
| | 102:24   A. I don't know if they adopted that or -- | |
| 103:01 - 103:24 | **Knittle, Robert 08-27-2020 (00:01:41)** | **VM31.58** |
| | 103:1 actually, I think it was a pharmacy that started | |
| | 103:2 that, and people were led to believe that that was | |
| | 103:3 truly a medical basis when in fact it wasn't. | |
| | 103:4 It was more of a marketing scheme. | |
| | 103:5   Q. Did pain being seen as the fifth vital sign | |
| | 103:6 change the way that physicians prescribed pain | |

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p |
| --- |

| Page/Line | Source | ID |
| --- | --- | --- |

103:7 medication?

103:8   A. I don't think it ever came up a great deal

103:9 in our complaint process as to whether they fell

103:10 back to that as a line of defense.

103:11   Q. What did come up in the complaint process

103:12 as a line of defense for inappropriate prescribing?

103:13   A. On which case?  There's --

103:14   Q. Was there an excuse or something that

103:15 people used regularly?

103:16   A. You know, some people were -- and there was

103:17 a very select few physicians who adamantly believed

103:18 that narcotics was the first and only treatment.

103:19 But that standard of care caused a

103:20 tremendous amount of addiction and deaths when you

103:21 look back on those particular cases.

103:22 You know, others -- there was a whole

103:23 range of -- of rationale as to why they did what

103:24 they did.

**104:01 - 104:24**   **Knittle, Robert 08-27-2020 (00:01:19)**   **VM31.59**

104:1   Q. You just said, "that standard of care

104:2 caused a tremendous amount of addiction and

104:3 deaths."

104:4   A. Yes.

104:5   Q. What about standard of care caused

104:6 addiction and deaths?

104:7   A. If someone actually believed that the only

104:8 way to deal with any kind of pain was high dosages

104:9 of opioids, then the end result for people is that

104:10 they would become addicted, you know, a vast

104:11 majority of the time, and would abuse the drug,

104:12 seek other ways to get it or get their dosages

104:13 increased by that physician.

104:14 And a number of times, if they mixed

104:15 it with alcohol or whatever, they died.

104:16   Q. And that was a problem with some of the

104:17 Board's licensees, that they -- that was their view

104:18 of the standard of care?

104:19   A. Yes.

104:20   Q. Okay.  How -- how would the Board know

104:21 about physicians that believed this kind of

| | VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

104:22 standard of care?

104:23   A. Their own testimony.

104:24   Q. Okay.  Other than receiving a complaint,

105:01 - 105:04   **Knittle, Robert 08-27-2020 (00:00:12)**   **VM31.60**

105:1 would the Board be able to investigate a doctor

105:2 regarding the standard of care?

105:3   A. No.  The Board doesn't have the capacity to

105:4 initiate their own complaints.

106:02 - 106:14   **Knittle, Robert 08-27-2020 (00:00:43)**   **VM31.61**

106:2   Q. So Mr. Knittle, could you define for me,

106:3 when we've just been talking about standard of

106:4 care, what is your definition of "standard of

106:5 care?"

106:6   A. I think it's an approach by a particular

106:7 physician as to what he feels is the best way to

106:8 manage a medical issue.

106:9   Q. Okay.  And when you say the standard of

106:10 care caused addictions and deaths, what do you mean

106:11 by "standard of care" in that statement?

106:12   A. That some physicians had believed that the

106:13 best way to treat pain was for high and consistent

106:14 amounts of opioids.

107:04 - 108:01   **Knittle, Robert 08-27-2020 (00:01:09)**   **VM31.62**

107:4 Did -- while you were at the Board,

107:5 did you recommend that physicians restrict their

107:6 patient to one pharmacy?

107:7   A. I think that was more from the Board of

107:8 Pharmacy than the Board of Medicine.

107:9   Q. Okay.

107:10   A. It was a way to try to curtail people

107:11 trying to gain prescriptions from different

107:12 pharmacies.  You know, some -- some people would

107:13 get a prescription from one doctor and go to one

107:14 pharmacy and then go to another doctor and then go

107:15 to another pharmacy.

107:16   Q. Okay.  Was that a problem --

107:17   A. Yeah.

107:18   Q. -- in West Virginia?

107:19   A. It was.

107:20   Q. At any time, was this -- kind of go to a

| | VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  |  |
|---|---|---|
| | 107:21 doctor, go to different pharmacies to fill | |
| | 107:22 prescriptions.  At any time did that stop or | |
| | 107:23 lessen?  Was there a time period -- | |
| | 107:24   A. I think with the monitoring program, it | |
| | 108:1 certainly helped.  I think that would be curtailed. | |
| 109:06 - 109:24 | **Knittle, Robert 08-27-2020 (00:00:52)** | **VM31.63** |
| | 109:6   Q. Okay.  At some point, were board -- or | |
| | 109:7 sorry, were licensees of the Board required to | |
| | 109:8 obtain CME credits related to the administration of | |
| | 109:9 naloxone? | |
| | 109:10   A. Naloxone? | |
| | 109:11   Q. Yeah. | |
| | 109:12   A. I think there was. | |
| | 109:13   Q. Okay.  Do you know why the Board would | |
| | 109:14 require licensees to take CME credits related to | |
| | 109:15 naloxone? | |
| | 109:16   A. Just because of the amount of overdoses | |
| | 109:17 that were occurring through the use of prescribed | |
| | 109:18 medications and, later, nonprescribed medications | |
| | 109:19 as well. | |
| | 109:20   Q. So was the CME kind of training on the | |
| | 109:21 administration of naloxone? | |
| | 109:22   A. Yes.  It -- which is a rather simple | |
| | 109:23 procedure -- | |
| | 109:24   Q. Okay. | |
| 110:01 - 110:08 | **Knittle, Robert 08-27-2020 (00:00:19)** | **VM31.64** |
| | 110:1   A. -- for the administration of it.  But they | |
| | 110:2 should be aware of how to do it and that it's | |
| | 110:3 available. | |
| | 110:4   Q. Do you think that it would help reduce | |
| | 110:5 opioid overdoses if physicians were trained in the | |
| | 110:6 administration of naloxone? | |
| | 110:7   A. I think with the -- with the use of | |
| | 110:8 naloxone, it was to prevent deaths. | |
| 110:22 - 111:06 | **Knittle, Robert 08-27-2020 (00:00:30)** | **VM31.65** |
| | 110:22   Q. Was -- during your time at the Board, was | |
| | 110:23 it entirely self-funded? | |
| | 110:24   A. Yes.  We -- it's just basically license | |
| | 111:1 fees.  And that's -- that's it. | |
| | 111:2   Q. And renewal fees? | |

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | 111:3   A. Yes.  But the fines, you know, go to the | |
| | 111:4 general fund.  The Board of Medicine does not gen | |
| | 111:5 -- benefit from the fines that they impose on | |
| | 111:6 people. | |
| 111:09 - 111:15 | **Knittle, Robert 08-27-2020 (00:00:13)** | **VM31.66** |
| | 111:9   Q. So the Board of Medicine -- excuse me -- | |
| | 111:10 does not receive any money from the City of | |
| | 111:11 Huntington, correct? | |
| | 111:12   A. Correct. | |
| | 111:13   Q. And the Board of Medicine does not receive | |
| | 111:14 any money from Cabell County, correct? | |
| | 111:15   A. Correct. | |
| 112:04 - 112:24 | **Knittle, Robert 08-27-2020 (00:01:15)** | **VM31.67** |
| | 112:4   Q. Earlier when we were discussing the paper | |
| | 112:5 that had been republished in the newsletter, it | |
| | 112:6 talked about an opioid epidemic.  Do you believe | |
| | 112:7 that West Virginia had an opioid epidemic? | |
| | 112:8   A. Yes, I do. | |
| | 112:9   Q. Do you know when it began? | |
| | 112:10   A. I think it began probably in the mid '90s. | |
| | 112:11 They used to refer to it as "hillbilly heroin," the | |
| | 112:12 use of oxycodone and OxyContin.  And it just began | |
| | 112:13 -- it just continued to increase since then. | |
| | 112:14   Q. Do you believe West Virginia still has an | |
| | 112:15 opioid epidemic? | |
| | 112:16   A. I couldn't say.  I have not kept track of | |
| | 112:17 the records.  I no longer live in West Virginia, | |
| | 112:18 so, you know, I've had little to no contact with | |
| | 112:19 the Board of Medicine since I left. | |
| | 112:20   Q. Did West Virginia have an opioid epidemic | |
| | 112:21 in 2016 when you were still at the Board? | |
| | 112:22   A. Yes. | |
| | 112:23   Q. Do you believe that Cabell County had an | |
| | 112:24 opioid epidemic? | |
| 113:01 - 113:24 | **Knittle, Robert 08-27-2020 (00:01:32)** | **VM31.68** |
| | 113:1   A. Yes, I do. | |
| | 113:2   Q. Do you know when that began? | |
| | 113:3   A. No.  I think along with other portions of | |
| | 113:4 the state, it just increased and increased.  I know | |
| | 113:5 that Wayne County had some real marked issues years | |

| Page/Line | Source | ID |
|---|---|---|

VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p

113:6 prior to 2016.

113:7   Q. Do you believe that the City of Huntington

113:8 had an opioid epidemic?

113:9   A. I believe their citizens did, yes.

113:10   Q. Do you believe that inappropriate

113:11 prescribing contributed to the opioid epidemic?

113:12   A. I think in part, yes.

113:13   Q. Do you believe that doctor shopping

113:14 contributed to the opioid epidemic?

113:15   A. Yes.

113:16   Q. Do you believe that drug cartels

113:17 contributed to the opioid epidemic?

113:18   A. Define "cartel."

113:19   Q. You were talking about the oversea

113:20 drug-related --

113:21   A. No.  No, I don't think from a criminal

113:22 standpoint.  There was not -- I think there's some

113:23 -- some issue of crime involved with -- with any

113:24 addictive drug.  But I don't think they were the

**114:01 - 114:19**  **Knittle, Robert 08-27-2020 (00:01:07)**  **VM31.69**

114:1 main push for the -- for the epidemic.

114:2   Q. Okay.  What do you think the main push for

114:3 the epidemic was?

114:4   A. I think the amount of addiction that

114:5 occurred through people gaining opioids through

114:6 whatever means they could.

114:7   Q. Including doctors prescribing it to them?

114:8   A. Yes.

114:9   Q. Do you think the Board of Medicine bears

114:10 any responsibility for the opioid epidemic?

114:11   A. No.  I don't think the Board of Medicine

114:12 did.  Our efforts were to try to protect the public

114:13 and to provide education through the public and

114:14 physicians and to discipline those who were

114:15 inappropriately prescribing.

114:16   Q. So you believe that the Board did

114:17 everything that it could have.

114:18   A. I believe so, yeah.  We tried hard.  And

114:19 it's a -- it's a heart-wrenching concern.

**115:21 - 116:04**  **Knittle, Robert 08-27-2020 (00:00:30)**  **VM31.70**

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

115:21 epidemic.  And earlier, we had talked about pain
115:22 being treated as a fifth vital sign.  Do you
115:23 believe that that contributed to the opioid
115:24 epidemic?
116:1   A. I think in a -- in a sense that it gave
116:2 some -- oh, I'm trying to think of the proper word.
116:3 -- basis for physicians to prescribe
116:4 in the manner that some of them did.

**116:05 - 116:14**     **Knittle, Robert 08-27-2020 (00:00:44)**     **VM31.71**

116:5   Q. And do you believe that that manner was
116:6 overprescribing?
116:7   A. Yes.  I think it was initially.
116:8   Q. Okay.  Did the Board of Medicine undertake
116:9 any opioid-related initiatives to help combat the
116:10 opioid epidemic in West Virginia?
116:11   A. I think there was a concern over it and we
116:12 took steps legislatively and through education and
116:13 through discipline -- disciplining physicians and
116:14 P.A.'s, podiatrists.

**121:20 - 122:05**     **Knittle, Robert 08-27-2020 (00:00:36)**     **VM31.72**

121:20   Q. Was the Board ever influenced by any drug
121:21 distributor to create a policy regarding the proper
121:22 use of opioids?
121:23   A. Not that I'm aware of, no.  We had very
121:24 little contact with pharmaceutical -- as far as
122:1 pharmaceutical manufacturers.  They would call us
122:2 now and then, offer us, you know, something that we
122:3 could download to say, "Don't use opioids
122:4 inappropriately" or something like that, but we had
122:5 very little contact with them whatsoever.

**122:18 - 122:21**     **Knittle, Robert 08-27-2020 (00:00:12)**     **VM31.73**

122:18   Q. Okay.  So the drug distributors would not
122:19 have influenced the Board of Medicine to create
122:20 policies related to opioids.
122:21   A. No, I don't believe so.

**123:09 - 124:14**     **Knittle, Robert 08-27-2020 (00:02:38)**     **VM31.74**

123:9   Q. As you sit here today, do you know of an
123:10 instance where a wholesale drug distributor tried
123:11 to approach a physician to influence the Board?
123:12   A. I do not, no.

| Page/Line | Source | ID |
|---|---|---|

**VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p**

123:13   Q. Okay.  All right.  Can you grab Tab 2?
123:14 KNITTLE DEPOSITION EXHIBIT NO. 7
123:15 (Management of Intractable Pain Act
123:16 passed March 14, 1998 was marked for
123:17 identification purposes as Knittle
123:18 Deposition Exhibit No. 7.)
123:19   A. Okay.
123:20   Q. All right.  This will be marked as Exhibit
123:21 7 to your deposition, and it is the Management of
123:22 Intractable Pain which was passed March 14th, 1998.
123:23 Do you see that?
123:24   A. Yes, I do.
124:1   Q. Are you familiar with the Management of
124:2 Intractable Pain Act?
124:3   A. I had been, yes.
124:4   Q. Okay.  You go down to near the bottom.
124:5 It's bold print, Section 30-3A-2, "Limitation on
124:6 disciplinary sanctions or criminal punishment
124:7 related to management of intractable pain."
124:8 If you just want to read that Section
124:9 A-1 and 2.
124:10   A. Okay.
124:11   Q. And so this is saying that the Board of
124:12 Medicine could not discipline any licensees in the
124:13 instances described in Section A-1 and 2.  Correct?
124:14   A. Yes.

| 125:22 - 126:15 | **Knittle, Robert 08-27-2020 (00:01:12)** | **VM31.75** |

125:22   Q. Okay.  All right.  If you want to grab Tab
125:23 3.
125:24 KNITTLE DEPOSITION EXHIBIT NO. 8
126:1 (Joint Policy Statement on Pain
126:2 Management at the End of Life was
126:3 marked for identification purposes as
126:4 Knittle Deposition Exhibit No. 8.)
126:5   A. Okay.
126:6   Q. All right.  This is going to be marked as
126:7 Exhibit 8 to your deposition.  It is the Joint
126:8 Policy Statement on Pain Management at the End of
126:9 Life.  And if you turn to the last page, it says
126:10 that it was approved by the West Virginia Board of

| Page/Line | Source | ID |
|---|---|---|

**VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p**

126:11 Medicine March 12, 2001.

126:12   A. Yes.

126:13   Q. Are you aware of the Joint Policy Statement

126:14 on Pain Management at the End of Life?

126:15   A. Yes, I was aware of it.

**126:16 - 126:24**    **Knittle, Robert 08-27-2020 (00:00:30)**    **VM31.76**

126:16   Q. Okay.  Do you know if the Board of Medicine

126:17 was involved in the drafting of this?

126:18   A. I do not.  I imagine they had -- they

126:19 probably had it placed before them in order to

126:20 approve it, and, you know, they could have -- they

126:21 may have offered suggestions as to language and

126:22 things, but I don't have any -- any recollection of

126:23 that.  It was before I was there.

126:24   Q. Okay.  Do you know what the purpose of the

**126:24 - 128:06**    **Knittle, Robert 08-27-2020 (00:01:36)**    **VM31.77**

126:24   Q. Okay.  Do you know what the purpose of the

127:1 Joint Policy Statement On Pain Management At The

127:2 End of Life was?

127:3   A. I think because -- in order to use opioids

127:4 for the use of intractable pain with terminal

127:5 patients, in order to have a little more dignity in

127:6 death without unnecessary pain and suffering.

127:7   Q. On page 3 --

127:8   A. Okay.

127:9   Q. -- the first paragraph, which is very

127:10 similar to the Position Statement in the Management

127:11 Of Intractable Pain, it says, "Health care

127:12 professionals should not fear disciplinary action

127:13 from the Boards for prescribing, administering, or

127:14 dispensing controlled substances, including opioid

127:15 analgesics, for a legitimate medical purpose and in

127:16 the usual course of professional practice.

127:17 All such prescribing must be

127:18 established with clear documentation of unrelieved

127:19 pain and in compliance with applicable state or

127:20 federal law."

127:21 So again, like we've discussed, you --

127:22 the healthcare professionals should not fear

127:23 disciplinary action for prescribing opioids.

| | | |
|---|---|---|
| | VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | |
| **Page/Line** | **Source** | **ID** |

127:24 Right?
128:1   A. As long as they follow standard of care.
128:2   Q. Yeah.  Because opioids can serve a
128:3 legitimate medical purpose.
128:4   A. They can, yes.  Particularly with end of
128:5 life when there's not an issue of addiction with
128:6 someone who's terminally ill.

**129:05 - 129:09**    **Knittle, Robert 08-27-2020 (00:00:01)**    **VM31.78**

129:5 KNITTLE DEPOSITION EXHIBIT NO. 9
129:6 (Policy for the Use of Controlled
129:7 Substances for the Treatment of Pain
129:8 was marked for identification purposes
129:9 as Knittle Deposition Exhibit No. 9.)

**129:23 - 130:07**    **Knittle, Robert 08-27-2020 (00:00:30)**    **VM31.79**

129:23   Q. So then if you turn to the next page, it
129:24 says that this is "Policy for the Use of Controlled
130:1 Substances for the Treatment of Pain, Effective
130:2 January 10, 2005."
130:3 Do you know if this was a replacement
130:4 to the 1997 Position Statement on the use of
130:5 opioids that we discussed earlier that was Exhibit
130:6 6?
130:7   A. I believe that it was.

**130:16 - 130:24**    **Knittle, Robert 08-27-2020 (00:00:29)**    **VM31.80**

130:16   Q. And was this policy used then to establish
130:17 the standard of care for licensees to follow or
130:18 abide by?
130:19   A. Yes, I think it was -- it was written in
130:20 order to be given some guidelines to go by.
130:21   Q. And by this, the Board was leaving the
130:22 decision to manage pain to the discretion of the
130:23 treating physician.  Correct?
130:24   A. Yes.  Yes.

**131:17 - 132:07**    **Knittle, Robert 08-27-2020 (00:00:55)**    **VM31.81**

131:17   Q. Okay.  And this policy was provided to
131:18 alleviate physician uncertainty and to encourage
131:19 better pain management, correct?
131:20   A. Yes.  And I think, you know, in part too,
131:21 to curb the amount of use inappropriately of
131:22 opioids.

| | | |
|---|---|---|
| | **VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p** | |
| **Page/Line** | **Source** | **ID** |

131:23   Q. And this policy has a paragraph, a last
131:24 paragraph, on page 1 very similar to the paragraphs
132:1 that we've read before about a physician shouldn't
132:2 fear disciplinary action from the Board?
132:3 So while it was the policy of the
132:4 Board in 1997, it continued to be the policy to
132:5 make sure its licensees didn't fear discipline for
132:6 just prescribing opioids, correct?
132:7   A. Correct.

**132:08 - 132:12**   **Knittle, Robert 08-27-2020 (00:00:13)**   **VM31.82**

132:8   Q. Okay.  And if a physician deviated from
132:9 this policy, they wouldn't automatically be
132:10 disciplined.  Correct?
132:11   A. No.  It would depend on the circumstances
132:12 of the patient.

**132:13 - 132:20**   **Knittle, Robert 08-27-2020 (00:00:21)**   **VM31.83**

132:13   Q. Okay.  I know you were only there for a
132:14 couple of weeks.  But was the Board influenced by
132:15 any wholesale drug distributors to create this
132:16 policy?
132:17   A. I'm not aware of any.
132:18   Q. Okay.  Do you know if they were influenced
132:19 by any drug manufacturers to create this policy?
132:20   A. I'm not aware of any.

**132:21 - 133:03**   **Knittle, Robert 08-27-2020 (00:00:22)**   **VM31.84**

132:21   Q. Okay.  How would the Board let its
132:22 licensees know about the changes in the policy?
132:23   A. Oftentimes through the newsletter.
132:24   Q. Okay.
133:1   A. And later on, through the website.  And to
133:2 sharing with other entities that the physicians
133:3 come in contact with.

**133:17 - 135:21**   **Knittle, Robert 08-27-2020 (00:02:31)**   **VM31.85**

133:17 KNITTLE DEPOSITION EXHIBIT NO. 10
133:18 (WVBOM Quarterly Newsletter, Volume
133:19 12, Issue 4, October-December 2008 was
133:20 marked for identification purposes as
133:21 Knittle Deposition Exhibit No. 10.)
133:22   A. Okay.
133:23   Q. This will be marked as Exhibit 10 to your

| Page/Line | Source | ID |
|-----------|--------|-----|

133:24 deposition.  It's the West Virginia Board of

134:1 Medicine Quarterly Newsletter, Volume 12, Issue 4,

134:2 October through December of 2008.  Correct?

134:3   A. Yes.

134:4   Q. Okay.  Could you turn to page 6?

134:5   A. Okay.

134:6   Q. All right.  The bottom part of the page

134:7 says, "Responsible Opioid Prescribing:  A

134:8 Physician's Guide; Now Available For Online

134:9 Purchase."

134:10 And it says that "In the Spring of

134:11 2008, the Board of Medicine, in conjunction with

134:12 the Federation of State Medical Boards and the

134:13 Health and Human Services Committee on Substance

134:14 Abuse Treatment," "was able to distribute this book

134:15 to every licensed physician and physician assistant

134:16 in West Virginia."

134:17 And it says it's a "150-page book by

134:18 pain expert Scott Fishman, M.D."  Do you know why

134:19 the Board of Medicine distributed this guide to all

134:20 of its licensees?

134:21   A. I think the amount of addiction and deaths

134:22 due to opioids continued to increase, and the

134:23 Federation of State Medical Boards had worked with

134:24 Scott Fishman, who -- in his work in California,

135:1 and he produced this book and distributed it free

135:2 of charge to people.

135:3   Q. Okay.

135:4   A. In fact, he didn't benefit financially from

135:5 the book at all.

135:6   Q. Did the Board think that the book was a

135:7 good book to guide physicians on how to responsibly

135:8 prescribe opioids?

135:9   A. Yes, it was.

135:10   Q. And the newsletter states that "the

135:11 response to the book has been quite positive."  Do

135:12 you know what that meant?

135:13   A. I think people -- I think physicians found

135:14 it helpful to gain a better understanding of

135:15 opioids, the dangers of them and how to best

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 135:16 prescribe them and what circumstances. |  |
|  | 135:17   Q. Okay.  Was the Board influenced by any |  |
|  | 135:18 wholesale drug distributors to distribute this |  |
|  | 135:19 book? |  |
|  | 135:20   A. No.  It came through the Federation of |  |
|  | 135:21 State Medical Boards. |  |
| 135:22 - 136:01 | **Knittle, Robert 08-27-2020 (00:00:12)** | **VM31.86** |
|  | 135:22   Q. Okay.  Was the Board influenced by any drug |  |
|  | 135:23 manufacturers to distribute this book? |  |
|  | 135:24   A. No.  Again, it was through the medical |  |
|  | 136:1 board, the FSMB. |  |
| 136:02 - 136:23 | **Knittle, Robert 08-27-2020 (00:01:14)** | **VM31.87** |
|  | 136:2   Q. Okay.  Besides the response being quite |  |
|  | 136:3 positive, do you recall any comments or information |  |
|  | 136:4 from any of the licensees regarding the book |  |
|  | 136:5 itself? |  |
|  | 136:6   A. The book?  No, other than that the people |  |
|  | 136:7 that had read it felt that it was beneficial to |  |
|  | 136:8 them.  We actually had -- Scott Fishman presented |  |
|  | 136:9 at the Federation of Medical -- State Medical |  |
|  | 136:10 Boards at one of their national conventions, and |  |
|  | 136:11 one of his biggest concerns was the death rate and |  |
|  | 136:12 the amount of addiction in West Virginia. |  |
|  | 136:13 So we asked him to come and speak to |  |
|  | 136:14 us, and we had Doctor Fishman come to West Virginia |  |
|  | 136:15 and, you know, through the physicians health |  |
|  | 136:16 program and be a speaker for several hundred |  |
|  | 136:17 people, which was very helpful. |  |
|  | 136:18   Q. Do you recall when that was? |  |
|  | 136:19   A. No, I think it was after the book was |  |
|  | 136:20 published. |  |
|  | 136:21   Q. Okay. |  |
|  | 136:22   A. What year was this? |  |
|  | 136:23   Q. It was spring of 2008. |  |
| 137:14 - 137:22 | **Knittle, Robert 08-27-2020 (00:00:18)** | **VM31.88** |
|  | 137:14   Q. Were licensees of the Board invited to |  |
|  | 137:15 attend -- |  |
|  | 137:16   A. Yeah. |  |
|  | 137:17   Q. -- Mr. Fishman's presentation?  Okay. |  |
|  | 137:18   A. They were. |  |

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  |  |
|---|---|---|
|  | 137:19  Q. Did they receive any continuing education |  |
|  | 137:20 credits to attend? |  |
|  | 137:21  A. I believe it was managed through the |  |
|  | 137:22 physicians health program that they did. |  |
| 138:12 - 142:21 | **Knittle, Robert 08-27-2020 (00:06:12)** | **VM31.89** |
|  | 138:12  Q. All right.  Will you pull out Tab 11? |  |
|  | 138:13 KNITTLE DEPOSITION EXHIBIT NO. 11 |  |
|  | 138:14 (Management of Pain Act passed April |  |
|  | 138:15 8, 2009 was marked for identification |  |
|  | 138:16 purposes as Knittle Deposition Exhibit |  |
|  | 138:17 No. 11.) |  |
|  | 138:18  A. Okay. |  |
|  | 138:19  Q. All right.  And this will be marked as |  |
|  | 138:20 Exhibit 11 to your deposition, and this is the |  |
|  | 138:21 Management of Pain Act passed April 8th, 2009.  Do |  |
|  | 138:22 you see that? |  |
|  | 138:23 A. Uh-huh.  Yes, I do. |  |
|  | 138:24  Q. Okay.  And this looks to be kind of an |  |
|  | 139:1 iteration or an update of the legislation we |  |
|  | 139:2 discussed earlier that was Exhibit 7. |  |
|  | 139:3  A. Yes. |  |
|  | 139:4  Q. Are you familiar with the Management of |  |
|  | 139:5 Pain Act? |  |
|  | 139:6  A. Yes.  I think this was an amended version |  |
|  | 139:7 of the previous one. |  |
|  | 139:8  Q. Okay.  Did the Board of Medicine have any |  |
|  | 139:9 involvement in the drafting of the Management of |  |
|  | 139:10 Pain Act? |  |
|  | 139:11  A. I think we probably were cognizant of it as |  |
|  | 139:12 it was being amended and probably had some level of |  |
|  | 139:13 thumbs up or thumbs down on it or modification. |  |
|  | 139:14  Q. But the Board itself wouldn't write the |  |
|  | 139:15 text of it.  It would kind of be presented to the |  |
|  | 139:16 Board to say, "Do you agree with this"? |  |
|  | 139:17  A. Yeah.  I don't think it was initiated by |  |
|  | 139:18 us.  I think it was in -- it was the legislature |  |
|  | 139:19 and -- yeah, legislators who prompted it. |  |
|  | 139:20  Q. Okay.  If you compare it to the 1998 one, |  |
|  | 139:21 the title of it is a little bit different.  The |  |
|  | 139:22 1998 one says "Management of Intractable Pain" and |  |

| Page/Line | Source | ID |
|---|---|---|

139:23 the 2009 version is just "Management of Pain Act."

139:24   A. Uh-huh.

140:1   Q. And if you look at the definition -- do you

140:2 have the 1998 version in front of you too?

140:3   A. No, I don't.

140:4   Q. Could you grab that one?

140:5   A. Okay.  Which tab was it?

140:6   Q. It was Tab 2.

140:7   A. Okay.

140:8   Q. If you look at the definition of

140:9 "Intractable pain" in the 1998 version -- just read

140:10 that over.  It's number (3) in the first -- under

140:11 Article 3A.

140:12   A. Yes, I have it.

140:13   Q. Okay.

140:14   A. So that's intractable pain in the '98

140:15 version?

140:16   Q. And then if you look at the 2009 version,

140:17 there is no definition for intractable pain, but

140:18 there is a definition for "pain."

140:19   A. Yes.

140:20   Q. Okay.  And the definition of "pain" in the

140:21 2009 version is "'Pain' means an unpleasant sensory

140:22 and emotional experience associated with actual or

140:23 potential tissue damage or described in terms of

140:24 such damage."

141:1 If you compare the definitions of

141:2 "intractable pain" versus just "pain," would you

141:3 agree with me that the definition of "pain" is a

141:4 bit broader than the definition of "intractable

141:5 pain"?

141:6   A. Yes, it is.

141:7   Q. Because "intractable pain" definition must

141:8 have a "cause that cannot be removed" and "pain"

141:9 does not have such language in its definition.

141:10   A. Right.

141:11   Q. Okay.  And when you compare the two -- the

141:12 1998 version and the 2009 version, they are

141:13 virtually identical except for the 1998 version

141:14 will use the term "intractable pain" and the 2009

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p |
|---|

| Page/Line | Source | ID |
|---|---|---|

141:15 will use the term "pain."

141:16 Do you agree with me?

141:17   A. I didn't go through letter by letter --

141:18   Q. Okay.

141:19   A. -- but you say that they're exactly

141:20 identical?

141:21   Q. Nearly identical, yes.

141:22   A. All right.

141:23   Q. Okay.  And in fact, the section on the 1998

141:24 version that we reviewed, the 30-3A-2(a)(1) and

142:1 (2) --

142:2   A. Yeah.

142:3   Q. -- is virtually identical.  I think they --

142:4 one says "a physician shall not be subject" and the

142:5 other one "a physician is not subject."  But other

142:6 than that, the definitions of "pain" versus

142:7 "intractable pain" is exactly the same.

142:8   A. Okay.

142:9   Q. So again, it would have been the position

142:10 of the Board of Medicine in 2009 that a physician

142:11 shall not or should not fear disciplinary action

142:12 just for prescribing opioids, correct?

142:13   A. Yeah, for the management of pain.

142:14   Q. And how would the Board of Medicine inform

142:15 its licensees of the change in the legislation?

142:16   A. Through newsletter.  And through

142:17 distribution with the other entities.

142:18   Q. Okay.  Was the Board of Medicine influenced

142:19 by any wholesale drug distributor related to the

142:20 creation of this 2009 legislation?

142:21   A. Not that I'm aware of, no.

| 142:22 - 143:01 | **Knittle, Robert 08-27-2020 (00:00:09)** | **VM31.90** |

142:22   Q. Okay.  Was the Board of Medicine influenced

142:23 by any drug manufacturer related to the 2009

142:24 legislation?

143:1   A. Not that I'm aware of, no.

| 143:02 - 143:23 | **Knittle, Robert 08-27-2020 (00:01:40)** | **VM31.91** |

143:2   Q. Okay.  All right.  Can you grab Tab 15?

143:3 KNITTLE DEPOSITION EXHIBIT NO. 12

143:4 (Joint Policy Statement on Pain

| Page/Line | Source | ID |
|---|---|---|

VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p

143:5 Management at the End of Life was
143:6 marked for identification purposes as
143:7 Knittle Deposition Exhibit No. 12.)
143:8   A. Did you say 15 or 16?
143:9   Q. 15.
143:10   A. Okay.
143:11   Q. All right.  And this will be marked as
143:12 Exhibit 12 to your deposition, and it is the Joint
143:13 Policy Statement on Pain Management at the End Of
143:14 Life, and if you turn to page 4, it says that it
143:15 was originally adopted March 12th, 2001 and
143:16 re-adopted May 10th, 2001 by the West Virginia
143:17 Board of Medicine.  Do you see that?
143:18   A. Yes, I do.
143:19   Q. Okay.  So this is -- appears to be exactly
143:20 the same Joint Policy Statement on Pain Management
143:21 at the End of Life that we discussed earlier that
143:22 was Exhibit 8?
143:23   A. Yes.

| 145:06 - 145:09 | **Knittle, Robert 08-27-2020 (00:00:09)** | **VM31.92** |

145:6   Q. Was the Board influenced by any wholesale
145:7 drug distributors to relook at all of its policies
145:8 during this time?
145:9   A. No.

| 145:22 - 147:06 | **Knittle, Robert 08-27-2020 (00:01:33)** | **VM31.93** |

145:22 KNITTLE DEPOSITION EXHIBIT NO. 13
145:23 (Policy for the Use of Controlled
145:24 Substances for Treatment of Pain dated
146:1 May 10, 2010 was marked for
146:2 identification purposes as Knittle
146:3 Deposition Exhibit No. 13.)
146:4   A. Okay.  I have it.
146:5   Q. And this exhibit will be marked as Exhibit
146:6 13 to your deposition and the number on the bottom
146:7 of the first page is WV_BOM00001291.  And if you
146:8 turn to the second page, it says it's the Policy
146:9 for the Use of Controlled Substances for Treatment
146:10 of Pain.
146:11 And similar to the policy that we just
146:12 looked at, if you go to the last page, this is also

| | | |
|---|---|---|
| **VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p** | | |
| **Page/Line** | **Source** | **ID** |

| Page/Line | Source | ID |
|---|---|---|
| | 146:13 re-adopted on May 10th, 2010 by the Board of | |
| | 146:14 Medicine.  And this appears to be identical to the | |
| | 146:15 policy from 2005 that we discussed earlier. | |
| | 146:16 Is this the same situation of the other | |
| | 146:17 one, it was just the Board was looking at | |
| | 146:18 everything it had, and if it agreed with the | |
| | 146:19 language, it re-adopted it; if it needed to change | |
| | 146:20 anything, they would change the language. | |
| | 146:21   A. Yes.  I think if you look at all of our | |
| | 146:22 policies for that time period, over a course of a | |
| | 146:23 couple of meetings, we went through all our | |
| | 146:24 policies. | |
| | 147:1   Q. Okay.  So it would have been the position | |
| | 147:2 of the Board in -- that its Policy for the Use of | |
| | 147:3 Controlled Substances for the Treatment of Pain did | |
| | 147:4 not need to change at all from January of 2005 to | |
| | 147:5 May of 2010. | |
| | 147:6   A. Right. | |
| 148:23 - 149:06 | **Knittle, Robert 08-27-2020 (00:00:19)** | VM31.94 |
| | 148:23 Did the Board of medicine ever | |
| | 148:24 promulgate rules for the licensure of pain | |
| | 149:1 management clinics? | |
| | 149:2   A. I believe they did, yes. | |
| | 149:3   Q. Okay.  Do you know what they were? | |
| | 149:4   A. No.  I know that we had to monitor them and | |
| | 149:5 that there were certain stipulations that they had | |
| | 149:6 to abide by. | |
| 153:20 - 154:04 | **Knittle, Robert 08-27-2020 (00:00:22)** | VM31.95 |
| | 153:20   Q. What did the Board do to designate a person | |
| | 153:21 to access the CSMP database? | |
| | 153:22   A. I recommended to the Board that our | |
| | 153:23 investigator be the lead person for -- to access | |
| | 153:24 it. | |
| | 154:1   Q. And did the Board accept that | |
| | 154:2 recommendation? | |
| | 154:3   A. I believe they did, yes.  I did not have | |
| | 154:4 access to it. | |
| 158:24 - 159:05 | **Knittle, Robert 08-27-2020 (00:00:01)** | VM31.96 |
| | 158:24 KNITTLE DEPOSITION EXHIBIT NO. 15 | |
| | 159:1 (Model Policy on the Use of Opioid | |

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  |  |  |
|---|---|---|
|  | 159:2 Analgesics in the Treatment of Chronic | |
|  | 159:3 Pain was marked for identification | |
|  | 159:4 purposes as Knittle Deposition Exhibit | |
|  | 159:5 No. 15.) | |
| 159:09 - 159:19 | **Knittle, Robert 08-27-2020 (00:00:29)** | **VM31.97** |
|  | 159:9   Q. All right.  And this will be marked as | |
|  | 159:10 Exhibit 15 to your deposition.  Do you recognize | |
|  | 159:11 this document? | |
|  | 159:12   A. I do. | |
|  | 159:13   Q. Okay.  And what is it? | |
|  | 159:14   A. It's the policy for the use of opioid | |
|  | 159:15 analgesics for the treatment of chronic pain that | |
|  | 159:16 was put out by the Federation of State Medical | |
|  | 159:17 Boards. | |
|  | 159:18   Q. And it's dated July 2013? | |
|  | 159:19   A. It is. | |
| 162:09 - 162:12 | **Knittle, Robert 08-27-2020 (00:00:12)** | **VM31.98** |
|  | 162:9   Q. Do you know if FSMB was influenced in any | |
|  | 162:10 way by any wholesale drug distributors to create | |
|  | 162:11 the 2013 model policy? | |
|  | 162:12   A. No, I do not. | |
| 162:18 - 163:09 | **Knittle, Robert 08-27-2020 (00:00:29)** | **VM31.99** |
|  | 162:18 KNITTLE DEPOSITION EXHIBIT NO. 16 | |
|  | 162:19 (WVBOM Policy on the Use of Opioid | |
|  | 162:20 Analgesics in the Treatment of Chronic | |
|  | 162:21 Pain was marked for identification | |
|  | 162:22 purposes as Knittle Deposition Exhibit | |
|  | 162:23 No. 16.) | |
|  | 162:24   A. Okay. | |
|  | 163:1   Q. All right.  So this says these are the | |
|  | 163:2 Board of Medicine's Policy on the Use of Opioid | |
|  | 163:3 Analgesics in the Treatment of Chronic Pain and | |
|  | 163:4 dated July 2013.  And it says they are adopted from | |
|  | 163:5 the model policy guidelines of the Federation of | |
|  | 163:6 State Medical Boards. | |
|  | 163:7 Would those be the July -- the July | |
|  | 163:8 policy that we just talked about? | |
|  | 163:9   A. Yes. | |
| 163:15 - 163:20 | **Knittle, Robert 08-27-2020 (00:00:24)** | **VM31.100** |
|  | 163:15   Q. Do you know if the Board made any changes | |

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

163:16 to the FSMB model policy?

163:17   A. I don't believe that they did.  I know that

163:18 they reviewed it carefully, it being a new policy

163:19 with a lot more information in it, but I don't

163:20 think they made any policy -- any changes in it.

**164:03 - 164:13**     **Knittle, Robert 08-27-2020 (00:00:41)**     **VM31.101**

164:3   Q. What was the purpose of the Board adopting

164:4 the Policy on the Use of Opioid Analgesics in the

164:5 Treatment of Chronic Pain?

164:6   A. I think it was to have a -- just a common

164:7 understanding across the nation as to how -- how

164:8 you should use opioid analgesics for the treatment

164:9 of chronic pain.  We wanted to try to get it as

164:10 uniform as possible from state to state in terms of

164:11 language and expectation of physicians.

164:12 You know, moving from, you know, West

164:13 Virginia to Texas to South Dakota to California.

**164:18 - 165:05**     **Knittle, Robert 08-27-2020 (00:00:32)**     **VM31.102**

164:18   Q. All right.  The second, I guess, full

164:19 paragraph - even though it's only a sentence - says

164:20 "The CSA does not limit the amount of drug

164:21 prescribed, the duration for which it is

164:22 prescribed, or the period for which a prescription

164:23 is valid (although some states do impose such

164:24 limits)."

165:1 Do you know if West Virginia imposes

165:2 limits?

165:3   A. No, we did not.  We didn't cap anything.

165:4 I'm trying to think of a state that did, and I

165:5 can't recall one.

**166:04 - 166:19**     **Knittle, Robert 08-27-2020 (00:00:52)**     **VM31.103**

166:4   Q. And during your tenure at the Board, did

166:5 the Board have licensees that illegally prescribed

166:6 opioids?

166:7   A. Yeah, there were a number of them that

166:8 ended up being criminally prosecuted.

166:9   Q. Okay.  And what was their criminal intent?

166:10   A. I believe that their intent was -- was

166:11 financial in nature.

166:12   Q. Okay.  Do you know of any board licensees

| Page/Line | Source | ID |
|---|---|---|

**VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p**

166:13 that illegally prescribed in Cabell County?
166:14   A. I believe that there were.  I can't give
166:15 you their names.  And there were some that
166:16 prescribed in Cabell County and other counties,
166:17 surrounding counties, as well.
166:18 But there were some that -- that were
166:19 criminal in their -- in their actions.

| 167:14 - 167:21 | **Knittle, Robert 08-27-2020 (00:00:21)** | **VM31.104** |

167:14   Q. Okay.  Was the Board of Medicine influenced
167:15 in any way by any wholesale drug distributors to
167:16 adopt the policy on the use of opioid analgesics in
167:17 the treatment of chronic pain?
167:18   A. No.
167:19   Q. Was the Board influenced by any
167:20 manufacturers?
167:21   A. Not that I'm aware of.

| 168:10 - 168:24 | **Knittle, Robert 08-27-2020 (00:00:49)** | **VM31.105** |

168:10   Q. All right.  This will be marked as Exhibit
168:11 17 to your deposition.  And it is the West Virginia
168:12 Board of Medicine Quarterly Newsletter, Volume 17,
168:13 Issue 3, July through September of 2013.  Correct?
168:14   A. Yes, it is.
168:15   Q. Okay.  On page 2, it says, "Update On Board
168:16 Policies."  So is this kind of like how we talked
168:17 about for many of the other policies, that the
168:18 Board would put information in the newsletter about
168:19 changes in policies?
168:20   A. Yes.
168:21   Q. And so this one is talking about the Policy
168:22 on the Use of Opioid Analgesics in the Treatment of
168:23 Chronic Pain.  And that would be Exhibit 16 that we
168:24 just discussed.  Right?

| 169:01 - 169:24 | **Knittle, Robert 08-27-2020 (00:01:26)** | **VM31.106** |

169:1   A. Yes.
169:2   Q. Okay.  And the second full paragraph, the
169:3 first sentence, says, "The Board continues
169:4 overtreatment and the continued use of ineffective
169:5 treatments to be the most common and problematic
169:6 iterations of the inappropriate treatment of pain."
169:7 What is "overtreatment"?

| | VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

169:8   A. "Overtreatment" would be overprescribing,
169:9 prescribing multiple medications.
169:10   Q. And what is the "continued use of
169:11 ineffective treatments"?
169:12   A. To continue a treatment regimen that is
169:13 ineffective.
169:14   Q. What options would a prescriber have if
169:15 opioid therapy was ineffective?
169:16   A. I think there's a number of them.  I
169:17 couldn't tell you, again, not being a physician.  I
169:18 know that there are some good pain management
169:19 specialists out there who have developed pain
169:20 management without the use of opioids and have had
169:21 good success with it.
169:22 So I think they had to begin to look
169:23 at other options.
169:24   Q. Why were these the most common and

170:01 - 170:13     **Knittle, Robert 08-27-2020 (00:00:47)**     **VM31.107**

170:1 problematic iterations of the inappropriate
170:2 treatment of pain in 2013?
170:3   A. I think probably we were looking at the
170:4 complaints and things we had that people were
170:5 overprescribing; people continued to provide
170:6 opiates at higher dosages although there was no
170:7 indication that there was any effectiveness
170:8 whatsoever.
170:9 And more information was coming out
170:10 that opioids often do not control pain very well.
170:11   Q. Where was that information coming from?
170:12   A. I believe it was coming from medical
170:13 associations, medical journals across the nation.

178:07 - 180:01     **Knittle, Robert 08-27-2020 (00:02:30)**     **VM31.108**

178:7 KNITTLE DEPOSITION EXHIBIT NO. 21
178:8 (WV Legislature 2016 Regular Session
178:9 Enrolled Senate Bill 627 was marked
178:10 for identification purposes as Knittle
178:11 Deposition Exhibit No. 21.)
178:12   A. Okay.
178:13   Q. All right.  This may look familiar, but
178:14 this will be marked as Exhibit 21 to your

| Page/Line | Source | ID |
|---|---|---|

VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p

178:15 deposition.  And if -- the front says it's passed
178:16 March 10th, 2016, and if you turn to the next page,
178:17 it's the Management of Intractable Pain Act.
178:18   A. Yes.
178:19   Q. So we have previously discussed two prior
178:20 versions of this, the 1998 and the 2009 versions,
178:21 correct?
178:22   A. Yes.
178:23   Q. Was the Board involved in the drafting of
178:24 this 2016 version?
179:1   A. I believe we were, but I don't recall the
179:2 circumstances of it.  There was a -- there was a
179:3 reason why it was -- it was moot -- or it was -- or
179:4 amended.
179:5   Q. Okay.  And if you look on the second page,
179:6 the top paragraph, says, "An Act to amend and
179:7 reenact Section 30-3A-2 of the Code of West
179:8 Virginia, 1931, as amended; and to amend and
179:9 reenact Section 55-7-23 of said code, all relating
179:10 to permitting physicians to decline prescribing
179:11 controlled substance in certain circumstances;
179:12 limiting disciplinary action by a licensing board
179:13 on a health care provider with prescriptive
179:14 authority for declining to prescribe, or declining
179:15 to continue to prescribe, any controlled substance
179:16 in certain circumstances and providing that a
179:17 health care provider with prescriptive authority is
179:18 not liable to a patient or third party for
179:19 declining to prescribe, or declining to continue to
179:20 prescribe, any controlled substance in certain
179:21 circumstances."
179:22 So the amendment seems to be trying to
179:23 address the issue where a physician was declining
179:24 to prescribe a controlled substance.
180:1   A. Yes.

181:23 - 182:05   **Knittle, Robert 08-27-2020 (00:00:19)**   VM31.109

181:23   Q. And prior to this amendment, if the Board
181:24 had received a complaint regarding a physician not
182:1 prescribing opioids, would the Board have
182:2 disciplined that physician?

| Page/Line | Source | ID |
|---|---|---|

VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p

182:3   A. I think we would looked -- would have
182:4 looked into the complaint to see if there was any
182:5 merit.

**191:17 - 193:20**   **Knittle, Robert 08-27-2020 (00:02:42)**   **VM31.110**

191:17   Q. And how did the Board try to identify the
191:18 prescribers who were contributing to the alarming
191:19 and sad situation?

191:20   A. Through complaints.  We can't go fishing --
191:21 you can't go into the CSMP and start looking and
191:22 saying, "Oh, okay, who's the biggest prescribers
191:23 here?"  That's, you know, grossly illegal, and it
191:24 was not the purpose of the CSMP, and there was a
192:1 lot of caution against that kind of activity where
192:2 they could -- that information could be used
192:3 detrimentally towards people.
192:4 So, you know, we function by
192:5 complaints, the complaint process, and we really
192:6 can't -- are not authorized to do anything unless
192:7 there's a complaint.

192:8   Q. And why would just going into the CSMP - if
192:9 you had the ability - to say, "Who's the biggest
192:10 prescriber," why wouldn't that do anything for you?
192:11 I mean, would you have wanted to be able to do
192:12 that?

192:13   A. No.  No.  And it would not be for -- for
192:14 the Board of Medicine.  It would be for law
192:15 enforcement.  That -- you know, if they have a --
192:16 someone under suspicion, they can't pull up that
192:17 information and then say, "Oh, okay, well, so-and-
192:18 so's -- you know, look at this, you know, he has
192:19 two different doctors prescribing to him, let's --
192:20 let's monitor him and then pick it up."
192:21 You know, which is illegal.  So -- or
192:22 people using it to get information against
192:23 somebody.  You know, there was an instance of --
192:24 that I had heard of where someone had found
193:1 information on their ex-wife.  So, you know, that's
193:2 a -- you can -- you can use it -- you can use it in
193:3 a lot of criminal ways, and there was a great deal
193:4 of effort to make sure that that didn't happen.

| | VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

193:5   Q. And just going in and getting information
193:6 on the biggest prescriber wouldn't tell you
193:7 anything.  The biggest prescriber could be working
193:8 in hospice where it's end-of-life care and of
193:9 course they're the biggest prescriber --
193:10  A. Right.
193:11  Q. -- that type of situation.
193:12  A. Right.
193:13  Q. The numbers --
193:14  A. That was just a -- that was just a, you
193:15 know, a possibility, throw it out in the air.
193:16  Q. Yeah.
193:17  A. But you know, you're exactly right.
193:18  Q. Yeah.  The numbers alone don't tell you
193:19 anything.
193:20  A. Right.

**193:21 - 194:22**   **Knittle, Robert 08-27-2020 (00:01:52)**   **VM31.111**

193:21  Q. Okay.  Can you pull out Tab 36?
193:22 KNITTLE DEPOSITION EXHIBIT NO. 42
193:23 (WVBOM June 2016 Newsletter was marked
193:24 for identification purposes as Knittle
194:1 Deposition Exhibit No. 24.)
194:2  A. Okay.
194:3  Q. Perfect.  This will be marked as Exhibit 24
194:4 to your deposition.  And this is the June 2016 West
194:5 Virginia Board of Medicine newsletter, correct?
194:6  A. Yes.
194:7  Q. And if you turn to page 6.
194:8  A. Okay.
194:9  Q. The title is "Reducing Risk:
194:10 Opioid-Prescribing Guideline Developed by CDC."
194:11 And the first full paragraph states, "Since 2006,
194:12 West Virginia has been the epicenter for
194:13 prescription drug overdose deaths in the nation.
194:14 This primarily has been fueled by the liberal
194:15 prescription of opioids over the past decade,
194:16 unfortunately compounded by overdose deaths from
194:17 heroin and illicitly-produced fentanyl."
194:18 So in -- in at least 2016, it was the
194:19 Board's belief that the opioid epidemic was

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

194:20 primarily fueled by doctors liberally prescribing
194:21 opioids, correct?
194:22  A. Yes.

196:07 - 196:24    **Knittle, Robert 08-27-2020 (00:01:14)**    VM31.112

196:7  Q. For -- I'm sorry.  For all of the
196:8 guidelines that we've discussed, including the
196:9 adoption of the 2013 FSMB guidelines, the Board
196:10 would have relied on the judgment of the medical
196:11 professionals on the Board as to whether to accept
196:12 or adopt those guidelines, correct?
196:13  A. Yes.
196:14  Q. Okay.  And when the Board adopted the FSMB
196:15 2013 guidelines, did they make that decision
196:16 independent from the FSMB, or did the FSMB request
196:17 that the Board adopt the guidelines?
196:18  A. No, it was -- it was their own independent
196:19 decision.  You know, the guidelines were put out by
196:20 the FSMB, but there was no coercion on anyone's
196:21 part to adopt or adopt portions of it or however.
196:22 With 50 different states, you know, there's -- it
196:23 was made available to everyone to use it as they
196:24 saw fit.

201:04 - 202:16    **Knittle, Robert 08-27-2020 (00:01:35)**    VM31.113

201:4  Q. As you discussed earlier, one of the
201:5 Board of Medicine's functions is to license
201:6 doctors and other medical professionals,
201:7 correct?
201:8  A. That's correct.  Allopathic
201:9 physicians.
201:10  Q. How often do doctors have to be
201:11 relicensed by the Board?
201:12  A. Every two years.
201:13  Q. And what is the purpose of licensing
201:14 doctors?
201:15  A. In order to ascertain that they are
201:16 still practicing with a proper degree of
201:17 knowledge and professionalism.
201:18  Q. So the Board's license is an
201:19 endorsement of the doctor's credentials?
201:20  A. Yes.

| | VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

201:21   Q. And the Board's license is an
201:22 endorsement of the doctor's ability to
201:23 continue to make medical judgments?
201:24   A. Yes.
202:1   Q. And part of the reason that the Board
202:2 of Medicine licenses doctors is to protect the
202:3 public; is that right?
202:4   A. That's correct.
202:5   Q. So the public can have confidence that
202:6 a licensed doctor is legitimate?
202:7   A. Yes.
202:8   Q. And licenses ensure that only doctors
202:9 can prescribe controlled substances?
202:10   A. I think physicians, yes.
202:11   Q. And if the Board of Medicine knew that
202:12 a doctor was engaged in diversion of
202:13 controlled substances, they have the authority
202:14 to pull the doctor's license through the
202:15 disciplinary procedures we talked about?
202:16   A. Through the disciplinary process, yes.

**202:17 - 202:24**   **Knittle, Robert 08-27-2020 (00:00:20)**   **VM31.114**

202:17   Q. And the Board of Medicine also has the
202:18 authority to decide not to relicense a doctor?
202:19   A. It would have to have a basis for
202:20 doing so.
202:21   Q. If the Board of Medicine knew that a
202:22 doctor was engaged in diversion of controlled
202:23 substances, would they have the authority to
202:24 decide not to re-license a doctor?

**203:01 - 203:04**   **Knittle, Robert 08-27-2020 (00:00:10)**   **VM31.115**

203:1   A. It would have to be proven through the
203:2 complaint process for that to occur.  We
203:3 couldn't just randomly say, "Well, we don't
203:4 think we're gonna give you your license back."

**203:05 - 204:01**   **Knittle, Robert 08-27-2020 (00:01:20)**   **VM31.116**

203:5   Q. So if a doctor/licensee went through
203:6 the disciplinary process and was found to have
203:7 engaged in diversion of controlled substances,
203:8 the Board of Medicine would have the authority
203:9 to decide not to relicense a doctor at that

| VM31-Knittle, Robert - Merged DA PC DC 7-11-21 1030p | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

203:10 point.
203:11   A. It would be a revocation of his
203:12 license with the -- with the possibility that
203:13 he would not be able to renew again.
203:14   Q. What is the -- what information does
203:15 the Board of Medicine look at when it decides
203:16 whether or not to license a doctor?
203:17   A. We would look at -- there's a series
203:18 of questions that the physician must answer -
203:19 I think there's 12 or 15 of them - that has to
203:20 do with their mental fitness, their physical
203:21 fitness, any issues with possible addictions
203:22 themselves, any court issues or legal issues
203:23 that may affect their practice.
203:24 And there's a -- there's a list
204:1 of those on the page for the renewal section.

Defendants' Affirmatives = 00:57:58
Defendants' Completeness = 00:02:27
Plaintiffs' Completeness = 00:31:49
**Total Time = 01:32:14**