A.4

**Designation Run Report**

# Mapes M DA, PC, PCompleteness, DReply on 07-22-21

---

**Mapes, Michael 07-11-2019**
**Mapes, Michael 07-12-2019**

---

**Defendants' Affirmatives  00:19:38**

**Plaintiffs' Counters  00:13:05**

**Plaintiffs' Completeness  00:21:44**

**Defendants' Reply  00:05:02**

**Total Time  00:59:29**



| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

| Page/Line | Source | ID |
|---|---|---|
| 17:24 - 17:25 | **Mapes, Michael 07-11-2019 (00:00:02)** | vMapes6ALL.1 |
| | 17:24   Q. Good morning, Mr. Mapes. | |
| | 17:25   A. Good morning. | |
| 47:16 - 47:25 | **Mapes, Michael 07-11-2019 (00:00:18)** | vMapes6ALL.2 |
| | 47:16   Q. And so according to this | |
| | 47:17 profile, you worked for DEA for a little more | |
| | 47:18 than 30 years in total, correct? | |
| | 47:19   A. That's correct. | |
| | 47:20   Q. From 1977 to 2007? | |
| | 47:21   A. Yes. | |
| | 47:22   Q. And you held a number of | |
| | 47:23 positions over the course of your tenure at | |
| | 47:24 DEA, correct? | |
| | 47:25   A. Correct. | |
| 48:1 - 48:2 | **Mapes, Michael 07-11-2019 (00:00:05)** | vMapes6ALL.3 |
| | 48:1   Q. Were all of those positions in | |
| | 48:2 the diversion side of DEA? | |
| 48:4 - 48:5 | **Mapes, Michael 07-11-2019 (00:00:02)** | vMapes6ALL.4 |
| | 48:4 THE WITNESS:  They were all | |
| | 48:5 related to the diversion program, yes. | |
| 67:4 - 67:12 | **Mapes, Michael 07-11-2019 (00:00:52)** | vMapes6ALL.5 |
| | 67:4   Q. And who were your clients in | |
| | 67:5 the independent consulting business that you | |
| | 67:6 had after leaving DEA, to the best that you | |
| | 67:7 can recall? | |
| | 67:8   A. AmerisourceBergen, HD Smith, | |
| | 67:9 Meijer Company, M-e-i-j-e-r, Henry Schein, | |
| | 67:10 Physicians Pharmaceutical Corporation. | |
| | 67:11 There's others I just can't | |
| | 67:12 recall this second. | |
| 70:3 - 70:6 | **Mapes, Michael 07-11-2019 (00:00:22)** | vMapes6ALL.6 |
| | 70:3 In 2005, who was the head of | |
| | 70:4 the Office of Diversion Control? | |
| | 70:5   A. I'm not certain.  It could have | |
| | 70:6 been one of a couple of different people. | |
| 70:15 - 70:17 | **Mapes, Michael 07-11-2019 (00:00:04)** | vMapes6ALL.7 |
| | 70:15   Q. Did Joe Rannazzisi take over | |
| | 70:16 that role from Bill Walker? | |
| | 70:17   A. Yes. | |
| 70:21 - 70:25 | **Mapes, Michael 07-11-2019 (00:00:09)** | vMapes6ALL.8 |

| Page/Line | Source | ID |
|---|---|---|

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

70:21   Q. Did you work with Joe
70:22 Rannazzisi in that time period?
70:23   A. I did.
70:24   Q. Did you report to him?
70:25   A. I did.

**79:3 - 79:11**   **Mapes, Michael 07-11-2019 (00:00:29)**   vMapes6ALL.9

79:3   Q. During your time at DEA, you
79:4 became familiar with the regulation regarding
79:5 the identification and reporting of
79:6 suspicious orders?
79:7   A. Yes.
79:8   Q. To your knowledge, has that
79:9 regulation changed since it was issued or
79:10 promulgated?
79:11   A. Not that I'm aware of.

**80:1 - 80:7**   **Mapes, Michael 07-11-2019 (00:00:17)**   vMapes6ALL.10
D640.1.1

80:1   Q. So when we're talking about the
80:2 regulation regarding to the identification
80:3 and reporting of suspicious orders, which
80:4 section of this Exhibit 3 are we talking
80:5 about?
80:6   A. Suspicious orders ends in
80:7 1301.74(b).

**80:8 - 80:16**   **Mapes, Michael 07-11-2019 (00:00:21)**   vMapes6ALL.11

80:8   Q. And 1301.74(b) defines a
80:9 suspicious order to include orders of unusual
80:10 size, orders deviating substantially from a
80:11 normal pattern and orders of unusual
80:12 frequency, right?
80:13   A. Yes.
80:14   Q. Does the regulation explain to
80:15 a registrant how to identify an order of
80:16 unusual size?

**80:18 - 80:22**   **Mapes, Michael 07-11-2019 (00:00:06)**   vMapes6ALL.12

80:18 THE WITNESS:  It does not.
80:19 QUESTIONS BY MS. MCCLURE:
80:20   Q. Does the regulation explain to
80:21 a registrant how to identify an order of
80:22 unusual frequency?

**80:24 - 80:24**   **Mapes, Michael 07-11-2019 (00:00:01)**   vMapes6ALL.13

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

| Page/Line | Source | ID |
|---|---|---|
| | 80:24 THE WITNESS:  It does not. | |
| 81:2 - 81:4 | **Mapes, Michael 07-11-2019 (00:00:08)** | vMapes6ALL.14 |
| | 81:2   Q. Does the regulation explain to | |
| | 81:3 a registrant how to identify an order that | |
| | 81:4 deviates substantially from a normal pattern? | |
| 81:6 - 81:11 | **Mapes, Michael 07-11-2019 (00:00:16)** | vMapes6ALL.15 |
| | 81:6 THE WITNESS:  It does not. | |
| | 81:7 QUESTIONS BY MS. MCCLURE: | |
| | 81:8   Q. Registrants are responsible for | |
| | 81:9 designing their own suspicious order | |
| | 81:10 monitoring systems; is that correct? | clear |
| | 81:11   A. It is. | |
| 81:12 - 82:1 | **Mapes, Michael 07-11-2019 (00:00:35)** | vMapes6ALL.16 |
| | 81:12   Q. Is a registrant to take into | |
| | 81:13 account considerations that are unique to | |
| | 81:14 them in designing such a system, for example, | |
| | 81:15 their customer base? | |
| | 81:16   A. Yes. | |
| | 81:17   Q. So would one registrant | |
| | 81:18 potentially have a different-looking or | |
| | 81:19 different nature of a customer base than | |
| | 81:20 another registrant? | |
| | 81:21   A. Yes. | |
| | 81:22   Q. Is it possible that those | |
| | 81:23 registrants would then have designed | |
| | 81:24 different suspicious order monitoring | |
| | 81:25 systems? | |
| | 82:1   A. It's possible. | |
| 85:5 - 85:8 | **Mapes, Michael 07-11-2019 (00:00:10)** | vMapes6ALL.17 |
| | 85:5 In your experience, DEA affords | |
| | 85:6 registrants the discretion to design a | |
| | 85:7 suspicious order monitoring system that is | |
| | 85:8 effective? | |
| 85:11 - 85:11 | **Mapes, Michael 07-11-2019 (00:00:00)** | vMapes6ALL.18 |
| | 85:11 THE WITNESS:  Yes. | |
| 87:21 - 87:23 | **Mapes, Michael 07-11-2019 (00:00:09)** | vMapes6ALL.19 |
| | 87:21   Q. Do you agree that there -- that | |
| | 87:22 the review of an order to determine whether | |
| | 87:23 it is suspicious or not is a subjective one? | |
| 88:2 - 88:2 | **Mapes, Michael 07-11-2019 (00:00:01)** | vMapes6ALL.20 |

| | vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 88:2 THE WITNESS:  Yes. | |
| 90:25 - 91:10 | **Mapes, Michael 07-11-2019 (00:00:39)** | vMapes6ALL.21 |
| | 90:25   Q. Does the regulation -- I'm | D640.1.1 |
| | 91:1 looking back at Mapes Exhibit 3 -- define the | |
| | 91:2 form or format that a suspicious order report | |
| | 91:3 must take? | |
| | 91:4   A. It does not. | |
| | 91:5   Q. Does it say what information is | |
| | 91:6 supposed to be provided to DEA? | |
| | 91:7   A. No, it doesn't. | |
| | 91:8   Q. Does the regulation in Mapes | |
| | 91:9 Exhibit 3 say anything about whether a | |
| | 91:10 registrant can ship a suspicious order? | |
| 91:12 - 91:12 | **Mapes, Michael 07-11-2019 (00:00:01)** | vMapes6ALL.22 |
| | 91:12 THE WITNESS:  No, it doesn't. | |
| 91:14 - 91:17 | **Mapes, Michael 07-11-2019 (00:00:11)** | vMapes6ALL.23 |
| | 91:14   Q. And this section of the | |
| | 91:15 regulation, 1301.74(b), it has not changed | |
| | 91:16 since 1971? | |
| | 91:17   A. I'm not aware of any changes. | clear |
| 91:18 - 92:12 | **Mapes, Michael 07-11-2019 (00:00:57)** | vMapes6ALL.24 |
| | 91:18   Q. Are you familiar with excessive | |
| | 91:19 purchase reports? | |
| | 91:20   A. Yes. | |
| | 91:21   Q. What are they? | |
| | 91:22   A. Reports that are sent by | |
| | 91:23 wholesalers of purchases of controlled | |
| | 91:24 substances that they, after the fact, think | |
| | 91:25 may be excessive. | |
| | 92:1   Q. Was the submission of excessive | |
| | 92:2 purchase reports, in your experience, | |
| | 92:3 standard practice in the industry? | |
| | 92:4   A. It was. | |
| | 92:5   Q. Was there a particular time | |
| | 92:6 that you believe, in your experience, it was | |
| | 92:7 standard practice in the industry to submit | |
| | 92:8 those? | |
| | 92:9   A. From the time I started with | |
| | 92:10 DEA in 1977 until we had the meetings with | |
| | 92:11 the individual wholesalers, that was the -- | |

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

| Page/Line | Source | ID |
|---|---|---|
| 92:13 - 92:15 | 92:12 the standard practice, to submit those.<br>**Mapes, Michael 07-11-2019 (00:00:05)**<br>92:13   Q. And in your experience, DEA<br>92:14 reviewed those reports as compliant with the<br>92:15 Controlled Substances Act? | vMapes6ALL.25 |
| 92:23 - 92:25 | **Mapes, Michael 07-11-2019 (00:00:07)**<br>92:23 THE WITNESS:  Yeah, I viewed<br>92:24 those as compliant with the regulation<br>92:25 for suspicious orders. | vMapes6ALL.26 |
| 93:2 - 93:25 | **Mapes, Michael 07-11-2019 (00:00:40)**<br>93:2   Q. And in your experience of<br>93:3 conducting audits of distribution centers,<br>93:4 that was one of your roles as a diversion<br>93:5 investigator, right?<br>93:6   A. Yes.<br>93:7   Q. Conducting audits?<br>93:8   A. Yes.<br>93:9   Q. And as a group supervisor, you<br>93:10 would oversee diversion investigators who<br>93:11 were conducting audits?<br>93:12   A. That's correct.<br>93:13   Q. And that would include a review<br>93:14 of their suspicious order monitoring systems?<br>93:15   A. That's correct.<br>93:16   Q. Including the formats that they<br>93:17 were using to submit and how they were<br>93:18 identifying and reporting suspicious orders<br>93:19 to DEA?<br>93:20   A. Correct.<br>93:21   Q. And in the course of your role<br>93:22 as a diversion investigator and a group<br>93:23 supervisor, you accepted these excessive<br>93:24 purchase reports as compliant with the<br>93:25 Controlled Substances Act? | vMapes6ALL.27 |
| 94:3 - 94:3 | **Mapes, Michael 07-11-2019 (00:00:01)**<br>94:3 THE WITNESS:  Yes. | vMapes6ALL.28 |
| 94:22 - 95:2 | **Mapes, Michael 07-11-2019 (00:00:17)**<br>94:22 You don't recall saying to<br>94:23 anyone, a registrant, for example, "You can't<br>94:24 submit these kinds of excessive purchase | vMapes6ALL.29 |

| Page/Line | Source | ID |
|---|---|---|
| | vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21 | |

| Page/Line | Source | ID |
|---|---|---|
| | 94:25 reports and still be compliant with the | |
| | 95:1 Controlled Substances Act" in your role as a | |
| | 95:2 diversion investigator or a group supervisor? | |
| 95:5 - 95:6 | **Mapes, Michael 07-11-2019 (00:00:02)** | vMapes6ALL.30 |
| | 95:5 THE WITNESS: No, I don't | |
| | 95:6 remember saying that. | |
| 95:8 - 95:19 | **Mapes, Michael 07-11-2019 (00:00:26)** | vMapes6ALL.31 |
| | 95:8   Q. And we've been talking about | |
| | 95:9 excessive purchase reports, but sometimes | |
| | 95:10 people -- registrants would call them by | |
| | 95:11 different names. | |
| | 95:12 Do you recall that, or in your | |
| | 95:13 experience were they all called excessive | |
| | 95:14 purchase reports? | |
| | 95:15   A. Generally referred to as | |
| | 95:16 excessive purchase reports. Could be called | |
| | 95:17 suspicious order reports. | |
| | 95:18   Q. And were they generally in a | |
| | 95:19 similar format across the industry? | |
| 95:24 - 96:12 | **Mapes, Michael 07-11-2019 (00:00:25)** | vMapes6ALL.32 |
| | 95:24   Q. Do you understand my question? | |
| | 95:25   A. Yes. | |
| | 96:1 They were in different formats | |
| | 96:2 depending on the company that was sending | |
| | 96:3 them. Some would send computer printouts. | |
| | 96:4 Some would send copies of invoices. So there | |
| | 96:5 are different ways that they were sent. | |
| | 96:6   Q. They generally provided the | |
| | 96:7 same kind of information? | |
| | 96:8   A. Yes. | |
| | 96:9   Q. About purchases and sales that | |
| | 96:10 had already happened? | |
| | 96:11   A. Correct. | |
| | 96:12   Q. And DEA accepted those? | |
| 96:15 - 96:15 | **Mapes, Michael 07-11-2019 (00:00:01)** | vMapes6ALL.33 |
| | 96:15   Q. In your personal experience? | |
| 96:21 - 96:22 | **Mapes, Michael 07-11-2019 (00:00:01)** | vMapes6ALL.34 |
| | 96:21 THE WITNESS: Yes, we accepted | |
| | 96:22 those. | |
| 97:9 - 97:10 | **Mapes, Michael 07-11-2019 (00:00:04)** | vMapes6ALL.35 |

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

| | 97:9   Q. So in your personal experience, | |
| | 97:10 were you the only one who accepted these? | |
| 97:12 - 97:13 | **Mapes, Michael 07-11-2019 (00:00:04)** | vMapes6ALL.36 |
| | 97:12 THE WITNESS:  No other groups | |
| | 97:13 accepted the same type of reports. | |
| 97:25 - 98:4 | **Mapes, Michael 07-11-2019 (00:00:15)** | vMapes6ALL.37 |
| | 97:25   Q. Are you aware of DEA | |
| | 98:1 headquarters approving particular suspicious | |
| | 98:2 order monitoring systems submitted by a | |
| | 98:3 registrant at any time in your experience at | |
| | 98:4 DEA? | |
| 98:7 - 98:22 | **Mapes, Michael 07-11-2019 (00:00:33)** | vMapes6ALL.38 |
| | 98:7 THE WITNESS:  I do recall one | |
| | 98:8 time that I was in headquarters and we | |
| | 98:9 received a letter from a wholesaler | |
| | 98:10 about their suspicious order | |
| | 98:11 monitoring program, and we told them | |
| | 98:12 that it did comply with the | |
| | 98:13 requirements in the regulation. | |
| | 98:14 QUESTIONS BY MS. MCCLURE: | |
| | 98:15   Q. What role were you in when you | |
| | 98:16 received that letter? | |
| | 98:17   A. The deputy chief of liaison and | |
| | 98:18 policy. | |
| | 98:19   Q. And when you say "we" received | |
| | 98:20 that letter, were you personally involved | |
| | 98:21 with the approval of that suspicious order | |
| | 98:22 monitoring system? | |
| 98:24 - 99:13 | **Mapes, Michael 07-11-2019 (00:00:28)** | vMapes6ALL.39 |
| | 98:24 THE WITNESS:  Yes. | |
| | 98:25 | |
| | 99:1 QUESTIONS BY MS. MCCLURE: | |
| | 99:2   Q. Who else is encompassed within | |
| | 99:3 that "we" that you've provided? | |
| | 99:4   A. A staff coordinator that | |
| | 99:5 reviewed the incoming correspondence from the | |
| | 99:6 company, drafted the response to the company | |
| | 99:7 and then sent it to me for approval, or in | |
| | 99:8 this case signature, to send it to the | |
| | 99:9 company. | |

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

99:10  Q. Did you sign that?

99:11  A. Yes.

99:12  Q. And what company was that?

99:13  A. AmerisourceBergen.

129:15 - 130:2  **Mapes, Michael 07-11-2019 (00:00:26)**  vMapes6ALL.40

129:15  Q. Okay.  So Kyle Wright and

129:16 yourself initiated the Distributor

129:17 Initiative?

129:18  A. That's correct.

129:19  Q. Is it sometimes called the

129:20 distributor briefings?

129:21  A. Yes.

129:22  Q. Do you -- okay.

129:23 So those are interchangeable?

129:24  A. They are.

129:25  Q. And what was the reason that

130:1 you and Mr. Wright initiated the distributor

130:2 briefings?

130:8 - 130:10  **Mapes, Michael 07-11-2019 (00:00:06)**  vMapes6ALL.41

130:8 THE WITNESS:  It was started in

130:9 response to the Internet pharmacy

130:10 issue.

130:12 - 131:15  **Mapes, Michael 07-11-2019 (00:01:39)**  vMapes6ALL.42

130:12  Q. What was the Internet pharmacy

130:13 issue?

130:14  A. That was when websites were

130:15 starting to offer their service to patients,

130:16 doctors and pharmacies to put the three

130:17 together so that patients could get a

130:18 prescription filled by a pharmacy after

130:19 completing a questionnaire on a website and

130:20 getting that approved by a doctor for a

130:21 prescription, and a pharmacy getting the

130:22 prescriptions and filling those and sending

130:23 them to the patients.

130:24  Q. So DEA's concern, am I right,

130:25 that there was not a doctor-patient

131:1 relationship in this scenario, the Internet

131:2 pharmacy situation?

131:3  A. That's one of the concerns,

| Page/Line | Source | ID |
|---|---|---|

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

131:4 yes.
131:5   Q. What was the other concern?
131:6 I'm sorry if I missed it.
131:7   A. That the pharmacies were
131:8 filling prescriptions for patients that they
131:9 knew nothing about, for doctors that weren't
131:10 within the geographic area, all for the same
131:11 drug.
131:12   Q. Okay.  And this Internet
131:13 pharmacy issue, as you called it, was
131:14 concerning to DEA?
131:15   A. It was concerning to me, yes.

**131:16 - 131:19**   **Mapes, Michael 07-11-2019 (00:00:11)**   vMapes6ALL.43

131:16   Q. In fact, by 2005, were Internet
131:17 pharmacies overwhelming DEA and exhausting
131:18 its resources as -- in your experience during
131:19 that time period?

**131:24 - 132:1**   **Mapes, Michael 07-11-2019 (00:00:05)**   vMapes6ALL.44

131:24 THE WITNESS:  There were a
131:25 significant number of investigations,
132:1 and the investigations are lengthy.

**132:3 - 132:19**   **Mapes, Michael 07-11-2019 (00:00:50)**   vMapes6ALL.45

132:3   Q. So is that, yes, that the
132:4 resources needing to be devoted to the
132:5 Internet pharmacy issue were becoming a
132:6 problem or a concern?
132:7   A. A concern.
132:8   Q. A concern.
132:9 So you, together with
132:10 Mr. Wright, developed presentations for
132:11 distributors, correct?
132:12   A. That's correct.
132:13   Q. Was it basically the same
132:14 presentation given multiple times, or did the
132:15 presentation itself change?
132:16   A. It was the same basic
132:17 presentation with some unique information
132:18 about sales of each specific wholesaler that
132:19 we were talking with.

**134:1 - 134:2**   **Mapes, Michael 07-11-2019 (00:00:09)**   vMapes6ALL.46

| vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21 |
| --- |

| Page/Line | Source | ID |
| --- | --- | --- |

134:1 And for the record,
134:2 US-DEA-00000147 through 164?

P9112.1

**Mapes, Michael 07-11-2019 (00:00:40)**

vMapes6ALL.47

134:4 - 134:20

134:4   Q. The first page of this
134:5 document that ends in 147, what is this?
134:6   A. This is a memo that I signed to
134:7 William Walker, who was the deputy assistant
134:8 administration in diversion, about a meeting
134:9 that was held on August 10th with Steve Mays
134:10 of the AmerisourceBergen Drug Company.
134:11   Q. And this memo was authored by
134:12 you, right?
134:13 That's your signature?
134:14   A. Yeah, it was actually authored
134:15 by Kyle Wright, and I signed it.
134:16   Q. Okay.  But you signed it after
134:17 reviewing it, I assume?
134:18   A. Yes.
134:19   Q. Right?
134:20   A. Yes.

135:3 - 135:6   **Mapes, Michael 07-11-2019 (00:00:05)**

vMapes6ALL.48

135:3 Is this a complete and accurate
135:4 description of the meeting that you had with
135:5 Steve Mays?
135:6   A. As I remember it, yes.

137:8 - 137:14   **Mapes, Michael 07-11-2019 (00:00:14)**

vMapes6ALL.49

137:8   Q. And from the memo that you
137:9 wrote -- I'm sorry, that Kyle Wright wrote
137:10 and you signed, it looks like you led -- you,
137:11 Michael Mapes, led this distributor briefing
137:12 with AmerisourceBergen, this particular one,
137:13 right?
137:14   A. That's correct.

138:13 - 138:15   **Mapes, Michael 07-11-2019 (00:00:05)**

vMapes6ALL.50

138:13   Q. Do you recall your conversation
138:14 with Steve Mays to set up this meeting?
138:15   A. No.

138:25 - 140:1   **Mapes, Michael 07-11-2019 (00:01:13)**

vMapes6ALL.51

138:25   Q. How would you describe
139:1 Mr. Mays' demeanor during this meeting?

| Defendants' Affirmatives | Plaintiffs' Counters | Plaintiffs' Completeness | Defendants' Reply | |
| --- | --- | --- | --- | --- |

| Page/Line | Source | ID |
|---|---|---|

139:2   A. I really don't recall.

139:3   Q. Okay.  At the end of the memo

139:4 on the top of the document Bates-labeled 148,

139:5 the -- I'm sorry, the third full paragraph,

139:6 it says, "It was agreed that if E-Commerce

139:7 operations were to identify a highly

139:8 suspicious pharmacy to which

139:9 AmerisourceBergen was the wholesaler, that

139:10 OC -- ODCO" --

139:11 That stands for E-Commerce

139:12 operations, right?

139:13   A. Yes.

139:14   Q. -- "would notify

139:15 AmerisourceBergen via e-mail of the

139:16 suspicious activity for AmerisourceBergen to

139:17 review and take the actions the company deems

139:18 appropriate."

139:19 Do you recall that portion of

139:20 the meeting?

139:21   A. No.

139:22   Q. Subsequent to this, do you

139:23 recall reaching out to AmerisourceBergen to

139:24 notify AmerisourceBergen of any suspicious

139:25 activity that DEA wanted AmerisourceBergen to

140:1 review and take appropriate action?

**140:11 - 140:15    Mapes, Michael 07-11-2019 (00:00:08)**          vMapes6ALL.52

140:11 THE WITNESS:  No, I don't

140:12 recall any specific conversations.

140:13 QUESTIONS BY MS. MCCLURE:

140:14   Q. Was Mr. Mays cooperative during

140:15 this meeting, to your recollection?

**140:18 - 140:19    Mapes, Michael 07-11-2019 (00:00:00)**          vMapes6ALL.53

140:18 THE WITNESS:  I just don't

140:19 recall.                                                 clear

**140:21 - 140:25    Mapes, Michael 07-11-2019 (00:00:10)**          vMapes6ALL.54

140:21   Q. Other than what is

140:22 outlined in this memo and the presentation,

140:23 was there anything else discussed with

140:24 Mr. Mays during this briefing?

140:25   A. I don't recall.

P9112.2.2

| vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21 | | |
|---|---|---|
| Page/Line | Source | ID |

| 141:1 - 141:11 | **Mapes, Michael 07-11-2019 (00:00:14)** | vMapes6ALL.55 |

141:1   Q. If there was anything else
141:2 discussed, is it fair to say that your
141:3 practice would have been to put it in a memo
141:4 or in the presentation?
141:5   A. In the memo.
141:6   Q. Okay.  So if there's anything
141:7 else discussed, it would be in the memo
141:8 itself?
141:9   A. Right.
141:10 (Mapes Exhibit 8 marked for
141:11 identification.)

| 141:17 - 142:3 | **Mapes, Michael 07-11-2019 (00:00:41)** | vMapes6ALL.56 |
| | | P12805.1 |

141:17   Q. So this is a similar
141:18 presentation titled "Internet Presentation
141:19 with McKesson Corp" for the memo on page 1 of
141:20 this Mapes 8, right?
141:21   A. Yes, it is.
141:22   Q. And this is a similar document
141:23 to what we just reviewed.
141:24 There's a cover memo followed
141:25 by a somewhat clearer copy of the
142:1 presentation, and that's MCKMDL00496859 to
142:2 875, right?
142:3   A. Yes.

| 142:9 - 142:21 | **Mapes, Michael 07-11-2019 (00:00:32)** | vMapes6ALL.57 |

142:9   Q. And again, for the same
142:10 purpose, Internet pharmacies?
142:11   A. Yes.
142:12   Q. And again, if there had been
142:13 something additional discussed in your
142:14 meeting, you would have included it in the
142:15 cover memo?
142:16   A. Yes.
142:17 (Mapes Exhibit 9 marked for
142:18 identification.)
142:19 QUESTIONS BY MS. MCCLURE:
142:20   Q. And Mapes 9, US-DEA-00000352
142:21 through 366.

P9114.1

| 142:23 - 143:3 | **Mapes, Michael 07-11-2019 (00:00:14)** | vMapes6ALL.58 |

| Page/Line | Source | ID |
|---|---|---|

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

142:23   Q. And that is a similar
142:24 memo followed by the PowerPoint presentation
142:25 that you provided to Cardinal Health on the
143:1 topic of Internet pharmacies on August 22,
143:2 2005?
143:3   A. It is.

**143:4 - 143:17**   **Mapes, Michael 07-11-2019 (00:00:18)**   vMapes6ALL.59

143:4   Q. And again, may not be
143:5 literally identical, but the same basic
143:6 presentation you had given to
143:7 AmerisourceBergen Drug Corporation and
143:8 McKesson, correct?
143:9   A. Yes.
143:10   Q. For the same purpose, Internet
143:11 pharmacy issues?
143:12   A. Yes.
143:13   Q. And again, if there had been
143:14 something additional discussed in your
143:15 meeting, you would have included it in your
143:16 cover memo?
143:17   A. Yes.

**151:7 - 151:9**   **Mapes, Michael 07-11-2019 (00:00:04)**   clear
vMapes6ALL.60

151:7   Q. Does the Controlled Substances
151:8 Act say that registrants should not ship
151:9 suspicious orders?

**151:16 - 151:17**   **Mapes, Michael 07-11-2019 (00:00:02)**   vMapes6ALL.61

151:16 THE WITNESS:  Not specifically,
151:17 no.

**151:19 - 151:22**   **Mapes, Michael 07-11-2019 (00:00:16)**   vMapes6ALL.62

151:19   Q. And if an order is unusual in
151:20 size, frequency or pattern, do you agree that
151:21 that does not necessarily mean that that
151:22 order is going to be diverted?

**152:2 - 152:2**   **Mapes, Michael 07-11-2019 (00:00:01)**   vMapes6ALL.63

152:2 THE WITNESS:  I agree.

**152:19 - 152:24**   **Mapes, Michael 07-11-2019 (00:00:19)**   vMapes6ALL.64

152:19   Q. If an order is not
152:20 suspicious and is therefore filled and
152:21 shipped and later downstream is diverted,
152:22 that fact of that diversion does not now

| Page/Line | Source | ID |
|---|---|---|

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

152:23 render the order suspicious; do you agree
152:24 with that?

**153:4 - 153:4**  **Mapes, Michael 07-11-2019 (00:00:01)**  vMapes6ALL.65

153:4 THE WITNESS:  Yes.

**153:6 - 153:9**  **Mapes, Michael 07-11-2019 (00:00:18)**  vMapes6ALL.66

153:6   Q. Similarly, if an order is
153:7 regarded as suspicious but is shipped, would
153:8 you agree that that order is not necessarily,
153:9 in fact, going to be diverted?

**153:15 - 153:15**  **Mapes, Michael 07-11-2019 (00:00:01)**  vMapes6ALL.67

153:15 THE WITNESS:  Yes.

**163:2 - 163:7**  **Mapes, Michael 07-11-2019 (00:00:23)**  vMapes6ALL.68
P49.1

163:2   Q. After DEA issued what we've
163:3 marked as Mapes 12, which is the order to
163:4 show cause and immediate suspension of
163:5 registration, did the DEA work with
163:6 AmerisourceBergen to evaluate and develop a
163:7 new suspicious order monitoring program?

**163:11 - 163:14**  **Mapes, Michael 07-11-2019 (00:00:09)**  vMapes6ALL.69

163:11 THE WITNESS:  No,
163:12 AmerisourceBergen created a new
163:13 program that we reviewed after they
163:14 created it.                                          clear

**177:19 - 178:4**  **Mapes, Michael 07-11-2019 (00:00:28)**  vMapes6ALL.70

177:19 After you reviewed the new
177:20 changed program that AmerisourceBergen had
177:21 developed, you attended a DEA-sponsored
177:22 pharmaceutical industry conference in
177:23 Houston, Texas, in September of 2007.
177:24 Do you recall that?
177:25   A. Yes, I do.
178:1   Q. And that was a DEA diversion
178:2 control division-sponsored conference,
178:3 correct?
178:4   A. It was.

**178:11 - 178:16**  **Mapes, Michael 07-11-2019 (00:00:17)**  vMapes6ALL.71

178:11   Q. Did you have an understanding
178:12 that Chris Zimmerman was asked to present at
178:13 this conference because you and DEA thought
178:14 that AmerisourceBergen's new system, the

| Page/Line | Source | ID |
|---|---|---|

178:15 changed system, was appropriate and would be
178:16 good to share with others in the industry?

| 178:24 - 179:9 | **Mapes, Michael 07-11-2019 (00:00:26)** | vMapes6ALL.72 |

178:24 THE WITNESS:  Yes, that was my
178:25 understanding of why he was asked to
179:1 be part of that.
179:2 QUESTIONS BY MS. MCCLURE:
179:3   Q. And so I wasn't there, but it
179:4 sounds like you and Mr. Zimmerman were both
179:5 up on stage together presenting ABDC's
179:6 changed program to industry at a DEA
179:7 conference.
179:8 Do I have that correct?
179:9   A. Yes.

| 179:20 - 180:3 | **Mapes, Michael 07-11-2019 (00:00:17)** | vMapes6ALL.73 |

179:20   Q. In the second paragraph under
179:21 Suspicious Orders, it says, "Mr. Zimmerman
179:22 stressed the importance of knowing your
179:23 customer and providing due diligence
179:24 investigation on all new retail and wholesale
179:25 accounts with the exception of retail chain
180:1 pharmacies."
180:2 Do you see that language there?
180:3   A. I do.

| 180:4 - 180:8 | **Mapes, Michael 07-11-2019 (00:00:17)** | vMapes6ALL.74 |

180:4   Q. Can you explain the exception
180:5 for retail chain pharmacies?
180:6   A. No, I didn't discuss that
180:7 particular exception with him, so I don't
180:8 know why he included that.

| 180:20 - 180:25 | **Mapes, Michael 07-11-2019 (00:00:12)** | vMapes6ALL.75 |

180:20   Q. So does this refresh your
180:21 recollection that Chris Zimmerman had a
180:22 PowerPoint that he presented at the
180:23 September 11, 2007 industry conference?
180:24   A. No, I still don't remember the
180:25 presentation details.

| 181:21 - 181:23 | **Mapes, Michael 07-11-2019 (00:00:10)** | vMapes6ALL.76 |

181:21   Q. Do you recall referring to this
181:22 changed program as the new industry standard?

| Page/Line | Source | ID |
|---|---|---|

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

| | 181:23   A. No, I don't recall that. | |
| 181:24 - 182:2 | **Mapes, Michael 07-11-2019 (00:00:12)** | vMapes6ALL.77 |
| | 181:24   Q. Do you believe that -- was it | |
| | 181:25 your understanding that it was expected by | |
| | 182:1 DEA, to your understanding, to serve as a new | |
| | 182:2 standard? | |
| 182:9 - 182:18 | **Mapes, Michael 07-11-2019 (00:00:20)** | vMapes6ALL.78 |
| | 182:9 THE WITNESS:  It's my | |
| | 182:10 understanding that the | |
| | 182:11 AmerisourceBergen system was an | |
| | 182:12 example of a system that contained the | |
| | 182:13 type of information that we were | |
| | 182:14 looking for. | |
| | 182:15 QUESTIONS BY MS. MCCLURE: | |
| | 182:16   Q. And was compliant with the | |
| | 182:17 Controlled Substances Act? | |
| | 182:18   A. Yes. | |
| 182:24 - 183:6 | **Mapes, Michael 07-11-2019 (00:00:17)** | vMapes6ALL.79 |
| | | P44539.10 |
| | 182:24   Q. If you turn to page 9 of | |
| | 182:25 whatever this PowerPoint exhibit is -- | |
| | 183:1 MR. BENNETT:  Mapes 17. | |
| | 183:2 MS. MCCLURE:  Thank you.  Yes, | |
| | 183:3 Mapes 17. | |
| | 183:4 QUESTIONS BY MS. MCCLURE: | |
| | 183:5   Q. -- which has little Bates | |
| | 183:6 numbers on it that end in 1786. | |
| 183:7 - 183:22 | **Mapes, Michael 07-11-2019 (00:00:31)** | vMapes6ALL.80 |
| | 183:7 It says, "Historically, | |
| | 183:8 controlled substance" -- I'm looking at the | |
| | 183:9 second and third bullet -- "slash, listed | |
| | 183:10 chemical order monitoring has been based on a | |
| | 183:11 ship and report process." | |
| | 183:12 And the next bullet, "ABC's OMP | |
| | 183:13 process is now based on identify, capture, | |
| | 183:14 investigate and report suspicious orders, all | |
| | 183:15 prior to shipment." | |
| | 183:16 Do you see that language? | |
| | 183:17   A. Yes, I do. | |
| | 183:18   Q. And was it your understanding | |
| | 183:19 that this was one of the new features of the | |

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

183:20 changed program that AmerisourceBergen had
183:21 developed?
183:22  A. Yes.

**183:23 - 183:25**   **Mapes, Michael 07-11-2019 (00:00:05)**   vMapes6ALL.81

183:23  Q. And this was new not just to
183:24 AmerisourceBergen but to the wholesale
183:25 industry?

**184:4 - 184:4**   **Mapes, Michael 07-11-2019 (00:00:01)**   vMapes6ALL.82

184:4  Q. Distributor industry.

**184:11 - 184:12**   **Mapes, Michael 07-11-2019 (00:00:04)**   vMapes6ALL.83

184:11 THE WITNESS:  Yes, this was a     clear
184:12 change for the wholesale industry.

**184:14 - 184:25**   **Mapes, Michael 07-11-2019 (00:00:25)**   vMapes6ALL.84

184:14   Q. Mr. Mapes, after you retired
184:15 from DEA in 2007, you began consulting, as we
184:16 discussed much earlier in today's deposition?
184:17  A. Yes.
184:18   Q. And one of those companies that
184:19 you performed some consulting work for was
184:20 AmerisourceBergen Drug Corporation, correct?
184:21  A. That's correct.
184:22  Q. When did you first start
184:23 consulting for AmerisourceBergen Drug
184:24 Corporation?
184:25  A. In early 2008.

**188:14 - 188:18**   **Mapes, Michael 07-11-2019 (00:00:16)**   vMapes6ALL.85

188:14  Q. Going back to excessive
188:15 purchase reports.
188:16 DEA's acceptance of excessive
188:17 purchase reports changed at some point,
188:18 correct?

**188:25 - 189:14**   **Mapes, Michael 07-11-2019 (00:00:37)**   vMapes6ALL.86

188:25 THE WITNESS:  The nature of the
189:1 reports that I was involved with that
189:2 were accepted did change, yes.
189:3 QUESTIONS BY MS. MCCLURE:
189:4  Q. And what was the change?
189:5  A. It was change from a report
189:6 that was called an excessive purchase report
189:7 after the fact to a report that was of

| Page/Line | Source | ID |
|---|---|---|

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

189:8 specific suspicious orders before they were
189:9 shipped.
189:10   Q. And that's the change that
189:11 we've talked about that AmerisourceBergen had
189:12 in the April, May, June 2007 time period that
189:13 you reviewed, correct?
189:14   A. Yes.

**195:20 - 196:7**   **Mapes, Michael 07-11-2019 (00:00:37)**   vMapes6ALL.87

195:20   Q. Would you expect that if
195:21 a representative of DEA was having a
195:22 conversation with a registrant to answer
195:23 their questions about suspicious order
195:24 monitoring systems, that the DEA employee
195:25 would be honest in their conversations with
196:1 the registrant?
196:2   A. Yeah, I would expect so.
196:3   Q. And would you expect that the
196:4 registrant would be able to rely on the
196:5 information that was provided by the DEA
196:6 employee in those conversations?
196:7   A. Yes.

**197:14 - 198:1**   **Mapes, Michael 07-11-2019 (00:00:39)**   vMapes6ALL.88

197:14 You were aware that the system
197:15 that ABDC was presenting at the conference
197:16 represented a change in how wholesalers were
197:17 conducting suspicious order monitoring and
197:18 reporting; is that correct?
197:19   A. It is.
197:20   Q. Okay.  And when -- but there
197:21 was no change in the regulation, correct?
197:22   A. That's correct.
197:23   Q. So is it fair to say that the
197:24 change was in what DEA -- how DEA was
197:25 expecting wholesalers to comply with the
198:1 regulation?

**198:8 - 198:12**   **Mapes, Michael 07-11-2019 (00:00:12)**   vMapes6ALL.89

198:8 THE WITNESS:  Yes, I did expect
198:9 that wholesalers would report
198:10 suspicious orders differently than
198:11 they had prior to the meetings and

| Page/Line | Source | ID |
|---|---|---|

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

198:12 that conference.

**202:22 - 203:19**　**Mapes, Michael 07-11-2019 (00:01:07)**　vMapes6ALL.90

202:22　Q. Do you recall -- leaving
202:23 aside whether it was at this particular
202:24 meeting, which I understand that you can't
202:25 recall, do you recall ever communicating that
203:1 point that's recited here, that DEA only
203:2 wanted to receive suspicious order reports
203:3 of, quote, true suspicious orders to
203:4 registrants?
203:5　A. I recall discussing that, but I
203:6 don't recall who it was with or when, that
203:7 kind of thing.
203:8　Q. Okay. Fair enough.
203:9 And what does that mean, to say
203:10 that DEA -- well, to your understanding, what
203:11 did that mean when you communicated that DEA
203:12 wanted to receive reports that were true
203:13 suspicious orders, not merely volumes that
203:14 went over a threshold?
203:15　A. That we are looking for reports
203:16 that the wholesalers had reviewed, not just
203:17 with a raw number of drugs that were ordered
203:18 but reviewed it and determined that it was
203:19 suspicious.

**205:2 - 205:11**　**Mapes, Michael 07-11-2019 (00:00:43)**　vMapes6ALL.91

205:2　Q. If someone asserted that
205:3 90 percent of all orders that were shipped
205:4 after September of 2007 should have been
205:5 reported to DEA as suspicious, would that be
205:6 consistent with your expectations as you've
205:7 described them today?
205:8　A. If they said 90 percent of
205:9 orders shipped by wholesalers, no, I wouldn't
205:10 think that was a number that was close to
205:11 those that should be suspicious.

**206:15 - 207:5**　**Mapes, Michael 07-11-2019 (00:01:03)**　vMapes6ALL.92

206:15 At the conclusion of a cyclic
206:16 audit, is it correct that the DEA
206:17 investigator's report would not be provided

| Page/Line | Source | ID |
|---|---|---|

206:18 to the registrant?
206:19   A. Yes, that's correct.
206:20   Q. So is it correct that a
206:21 registrant who went through a cyclic audit
206:22 and had no discrepancies found, the
206:23 registrant would not have a DEA document
206:24 reflecting that fact?  Is that correct?
206:25   A. Unless the registrant requested
207:1 it through FOI or something like that.
207:2   Q. So your understanding that
207:3 registrants could receive audit reports
207:4 through the FOIA process?
207:5   A. Yes.

**212:8 - 212:18**  **Mapes, Michael 07-11-2019 (00:00:35)**  vMapes6ALL.93

D640.1.2

212:8   Q. Section 1301.74(a) requires a
212:9 registrant to then check its customer's DEA
212:10 registration before distributing controlled
212:11 substances to the customer, correct?
212:12   A. It requires they check it at
212:13 some point in time, not necessarily every
212:14 time before they distribute.
212:15   Q. Section 1301.74(a) imposes no
212:16 other requirement on distributors to perform
212:17 due diligence on its customers, does it?
212:18   A. It does not.

clear

**216:4 - 216:9**  **Mapes, Michael 07-11-2019 (00:00:14)**  vMapes6ALL.94

216:4   Q. The objective of this
216:5 additional diligence that you were requesting
216:6 out of distributors was for the distributors
216:7 to be able to identify those rogue Internet
216:8 pharmacy customers of theirs, correct?
216:9   A. Yes.

**216:10 - 216:14**  **Mapes, Michael 07-11-2019 (00:00:11)**  vMapes6ALL.95

216:10   Q. You were not intending the
216:11 additional diligence to require distributors
216:12 to investigate the inner workings of every
216:13 independent pharmacy across America that they
216:14 may service, correct?

**216:20 - 217:1**  **Mapes, Michael 07-11-2019 (00:00:16)**  vMapes6ALL.96

216:20 THE WITNESS:  I was expecting

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

216:21 that over time they would use the same
216:22 procedures for all the pharmacies that
216:23 they were dealing with to be certain
216:24 that there wasn't a problem that they
216:25 wouldn't see without the extra due
217:1 diligence.

217:3 - 217:24   **Mapes, Michael 07-11-2019 (00:00:51)**    vMapes6ALL.97

217:3   Q. And the problem that they were
217:4 to be looking for was whether or not they
217:5 were an Internet pharmacy?
217:6   A. An Internet pharmacy or any
217:7 pharmacy that was selling drugs for other
217:8 than legitimate medical purpose.
217:9   Q. Such as a pill mill, correct?
217:10   A. Yes.
217:11   Q. Now, during the distributor
217:12 briefings, you told distributors that you
217:13 were not concerned with large retail chain
217:14 pharmacies at the time, correct?
217:15   A. No.
217:16   Q. That's not correct?
217:17   A. I don't believe so.
217:18   Q. Do you recall instructing
217:19 distributors at the distributor briefings to
217:20 conduct due diligence on retail chain
217:21 pharmacies?
217:22   A. I don't recall that we made a
217:23 distinction between retail chain pharmacies
217:24 and independent pharmacies.

217:25 - 218:10   **Mapes, Michael 07-11-2019 (00:00:29)**    vMapes6ALL.98

217:25   Q. In asking the distributors to
218:1 conduct this additional diligence, you
218:2 understood that distributors did not have
218:3 access to all of the distribution and sales
218:4 data from each of their pharmacy customers,
218:5 correct?
218:6   A. Yes.
218:7   Q. And you also understood the
218:8 distributors would not be able to identify
218:9 all of the bad actors within the supply chain

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

| Page/Line | Source | ID |
|---|---|---|
| | 218:10 with this additional diligence, correct? | vMapes6ALL.99 |
| 218:13 - 218:15 | **Mapes, Michael 07-11-2019 (00:00:05)** | |
| | 218:13 THE WITNESS:  I didn't expect | |
| | 218:14 that they could immediately identify | |
| | 218:15 everyone, no. | |
| 218:18 - 218:20 | **Mapes, Michael 07-11-2019 (00:00:09)** | vMapes6ALL.100 |
| | 218:18 It wasn't your intention that | |
| | 218:19 distributors became deputized agents to the | |
| | 218:20 DEA, was it? | |
| 218:23 - 218:23 | **Mapes, Michael 07-11-2019 (00:00:01)** | vMapes6ALL.101 |
| | 218:23 THE WITNESS:  No. | |
| 221:4 - 221:12 | **Mapes, Michael 07-11-2019 (00:00:27)** | vMapes6ALL.102 |
| | 221:4   Q. Do you agree that a | |
| | 221:5 distributor's program that identified, | |
| | 221:6 captured or blocked, investigated and | |
| | 221:7 reported suspicious orders prior to shipment | |
| | 221:8 would be in compliance with the Controlled | |
| | 221:9 Substances Act and its regulations? | |
| | 221:10   A. It could be, depending on what | |
| | 221:11 their criteria for identifying suspicious | |
| | 221:12 orders were. | |
| 223:14 - 224:11 | **Mapes, Michael 07-11-2019 (00:00:43)** | vMapes6ALL.103 |
| | 223:14   Q. Would you agree with me that | |
| | 223:15 diversion can occur in many different ways? | |
| | 223:16   A. Yes. | |
| | 223:17   Q. For example, opioids can be | |
| | 223:18 stolen from a delivery truck; that's | |
| | 223:19 diversion, correct? | |
| | 223:20   A. Yes. | |
| | 223:21   Q. Someone could go into their | |
| | 223:22 grandmother's cabinet and take their | |
| | 223:23 grandmother's opioids that she was prescribed | |
| | 223:24 for a legitimate purpose; that would be | |
| | 223:25 diversion? | |
| | 224:1   A. Yes. | |
| | 224:2   Q. Someone could take opioids from | |
| | 224:3 a friend who was prescribed the opioids for | |
| | 224:4 legitimate reasons; that would be diversion, | |
| | 224:5 wouldn't it? | |
| | 224:6   A. Yes. | |

| Page/Line | Source | ID |
|---|---|---|

224:7   Q. Distributors have nothing to do
224:8 with opioids that are diverted when the
224:9 opioids are stolen from friends or family
224:10 members, do they?
224:11   A. No, they don't.

**224:12 - 224:16    Mapes, Michael 07-11-2019 (00:00:12)**    vMapes6ALL.104

224:12   Q. The vast majority of diversion
224:13 occurs once opioids leave the closed system
224:14 of distribution; would you agree with that?
224:15   A. I don't know that to be true or
224:16 not.

**224:21 - 224:24    Mapes, Michael 07-11-2019 (00:00:10)**    vMapes6ALL.105

224:21 You would agree that
224:22 distributors cannot control what happens to
224:23 pills once those pills are delivered to their
224:24 pharmacy customers, correct?

**225:2 - 225:2    Mapes, Michael 07-11-2019 (00:00:01)**    vMapes6ALL.106

225:2 THE WITNESS:  That's correct.

**225:4 - 225:15    Mapes, Michael 07-11-2019 (00:00:23)**    vMapes6ALL.107

225:4   Q. Are you familiar with the term
225:5 "overprescribing"?
225:6   A. Yes.
225:7   Q. What is overprescribing?
225:8   A. It's when a prescriber
225:9 prescribes more controlled substances than
225:10 are necessary or prescribes controlled
225:11 substances to people that it may not be
225:12 necessary for.
225:13   Q. Is overprescribing a form of
225:14 diversion?
225:15   A. Yes.

**225:16 - 225:21    Mapes, Michael 07-11-2019 (00:00:13)**    vMapes6ALL.108

225:16   Q. Overprescribing is a form of
225:17 diversion even if the prescriber is
225:18 well-intentioned and believes there's a
225:19 legitimate medical purpose for prescribing
225:20 the amount and dosage that he or she
225:21 prescribed?

**225:24 - 225:24    Mapes, Michael 07-11-2019 (00:00:01)**    vMapes6ALL.109

225:24 THE WITNESS:  It could be.

| Page/Line | Source | ID |
|---|---|---|
| 226:5 - 226:8 | **Mapes, Michael 07-11-2019 (00:00:08)** | vMapes6ALL.110 |
| | 226:5   Q. You'd agree with me the | |
| | 226:6 distributors have no insight into determining | |
| | 226:7 whether a doctor has overprescribed opioids | |
| | 226:8 to her patient? | |
| 226:12 - 226:12 | **Mapes, Michael 07-11-2019 (00:00:01)** | vMapes6ALL.111 |
| | 226:12 THE WITNESS:  Generally not. | |
| 227:3 - 228:2 | **Mapes, Michael 07-11-2019 (00:01:04)** | vMapes6ALL.112 |
| | 227:3   Q. Earlier today you testified | |
| | 227:4 about meetings that you had with the | |
| | 227:5 plaintiffs' counsel in 2018. | |
| | 227:6 Do you remember that testimony? | |
| | 227:7   A. Yes. | |
| | 227:8   Q. I believe you said you had two | |
| | 227:9 meetings, one in the summer and one in the | |
| | 227:10 fall of 2018, correct? | |
| | 227:11   A. Yes. | |
| | 227:12   Q. Now, did you -- during those | |
| | 227:13 meetings with the plaintiffs' counsel in | |
| | 227:14 2018, did you tell plaintiffs' counsel that | |
| | 227:15 the DEA had approved the distributors' | |
| | 227:16 submission of excessive purchase reports | |
| | 227:17 after orders had been shipped? | |
| | 227:18   A. I believe that was discussed, | |
| | 227:19 yes. | |
| | 227:20   Q. Did you tell plaintiffs' | |
| | 227:21 counsel during those meetings that in your | |
| | 227:22 experience excessive purchase reports | |
| | 227:23 complied with the requirements of the | |
| | 227:24 Controlled Substances Act and its | |
| | 227:25 regulations, at least for your time at DEA | |
| | 228:1 between 1977 and the distributor briefings? | |
| | 228:2   A. Yes. | |
| 228:13 - 229:1 | **Mapes, Michael 07-11-2019 (00:00:40)** | vMapes6ALL.113 |
| | 228:13   Q. During these meetings with the | |
| | 228:14 plaintiffs' counsel in 2018, did you tell | |
| | 228:15 plaintiffs' counsel the distributor briefings | |
| | 228:16 focused on Internet pharmacy issues? | |
| | 228:17   A. Yes. | |
| | 228:18   Q. Did you tell plaintiffs' | |

| | | |
|---|---|---|
| **vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21** | | |
| **Page/Line** | **Source** | **ID** |

228:19 counsel that the additional diligence you
228:20 requested of distributors at these
228:21 distributor briefings was to help identify
228:22 Internet pharmacies?
228:23  A. I don't recall specifically
228:24 that was how it was worded.
228:25  Q. But something similar?
229:1  A. Yes.

**229:17 - 229:21**  **Mapes, Michael 07-11-2019 (00:00:12)**  vMapes6ALL.114

229:17  Q. After your discussions with the
229:18 plaintiffs' counsel, the plaintiffs did not
229:19 contact you to ask you to serve as an expert
229:20 for plaintiffs in this case, correct?
229:21  A. That's correct.

**332:25 - 333:5**  **Mapes, Michael 07-12-2019 (00:00:07)**  vMapes6ALL.115
  P44542.1

332:25 (Mapes Exhibit 20 marked for
333:1 identification.)
333:2 QUESTIONS BY MR. LANIER:
333:3  Q. I'm going to hand you a
333:4 document we're going to mark as Exhibit
333:5 Number 20.

**337:24 - 338:23**  **Mapes, Michael 07-12-2019 (00:01:27)**  vMapes6ALL.116
  MAPES32.37

337:24  Q. Now, in that regard, the first
337:25 stop we're going to make is personal
338:1 background.  And I'm going to keep a sheet of
338:2 your personal background, and we're going to
338:3 mark these documents that I'm showing to the
338:4 jury as an exhibit so that both sides have
338:5 them and we've got the benefit of them as a
338:6 demonstrative exhibit for the jury.
338:7 Your personal background, you
338:8 gave us a lot of it yesterday, but what I'd
338:9 like to do is sort of go in and look at you
338:10 from another angle.
338:11 Are you familiar with the
338:12 concern that has been expressed about a
338:13 revolving door between government and
338:14 industry?
338:15  A. Yes.
338:16  Q. And a revolving door -- you

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

338:17 know, most doors are just a door that's, you
338:18 know, this, with a doorknob.  But a revolving
338:19 door is one of those doors that tends to
338:20 revolve around, such that you've got an
338:21 ability to go in one way and out the other.
338:22 Do you follow me?
338:23   A. Yes.

339:15 - 339:19   **Mapes, Michael 07-12-2019 (00:00:15)**   vMapesALL.117

339:15 The reason the revolving door
339:16 is a concern is because there seems to be a
339:17 pattern of folks working for the DEA who then
339:18 go to work for the very industries they were
339:19 supposed to be overseeing, correct?

339:22 - 339:24   **Mapes, Michael 07-12-2019 (00:00:04)**   vMapesALL.118

339:22 THE WITNESS:  Yes, I went to
339:23 work with the industries after
339:24 retiring from DEA.                                         clear

342:24 - 343:1   **Mapes, Michael 07-12-2019 (00:00:12)**   vMapesALL.119

342:24   Q. But while you retired from the
342:25 DEA, so the jury's clear, you just started
343:1 going to work for industry, didn't you?

343:3 - 343:4   **Mapes, Michael 07-12-2019 (00:00:02)**   vMapesALL.120

343:3 THE WITNESS:  Yes, I did work
343:4 for industry.

349:19 - 349:22   **Mapes, Michael 07-12-2019 (00:00:10)**   vMapesALL.121

349:19   Q. Well, let's put it this way:
349:20 You are someone who was a DEA official who
349:21 went to work for the pharmaceutical industry
349:22 since 2000, aren't you?

349:25 - 350:3   **Mapes, Michael 07-12-2019 (00:00:05)**   vMapesALL.122

349:25 THE WITNESS:  Yes.
350:1 QUESTIONS BY MR. LANIER:
350:2   Q. You did that in 2007 or '8?
350:3   A. 2008.

350:13 - 350:18   **Mapes, Michael 07-12-2019 (00:00:17)**   vMapesALL.123

350:13   Q. Now, in this
350:14 regard, sir, this idea of a revolving door,
350:15 you being -- working governing industry and
350:16 then all of a sudden you going to work for
350:17 industry, you get paid by industry when they

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

| Page/Line | Source | ID |
|---|---|---|
| 350:21 - 351:1 | 350:18 hire you to do their work, don't you?<br>**Mapes, Michael 07-12-2019 (00:00:11)**<br>350:21 THE WITNESS:  Yes.<br>350:22 QUESTIONS BY MR. LANIER:<br>350:23   Q. So in addition to the money<br>350:24 that you were getting in retirement from the<br>350:25 government, you start making money from<br>351:1 industry, fair? | vMapes6ALL.124 |
| 351:3 - 351:9 | **Mapes, Michael 07-12-2019 (00:00:15)**<br>351:3 THE WITNESS:  Yes.<br>351:4 QUESTIONS BY MR. LANIER:<br>351:5   Q. And the money you've made from<br>351:6 industry, is that based always on an hourly<br>351:7 rate or was it ever on a project or as a<br>351:8 salary?<br>351:9   A. A little of both. | vMapes6ALL.125 |
| 353:9 - 353:11 | **Mapes, Michael 07-12-2019 (00:00:06)**<br>353:9   Q. Because I know you've<br>353:10 been hired by one of the companies in this<br>353:11 case right now, haven't you? | vMapes6ALL.126 |
| 353:14 - 353:18 | **Mapes, Michael 07-12-2019 (00:00:08)**<br>353:14 THE WITNESS:  Yes.<br>353:15 QUESTIONS BY MR. LANIER:<br>353:16   Q. Tell the jury who's hired you,<br>353:17 who you're working for right now, that was<br>353:18 asking you questions yesterday. | vMapes6ALL.127 |
| 353:20 - 353:25 | **Mapes, Michael 07-12-2019 (00:00:08)**<br>353:20 THE WITNESS:  The Williams<br>353:21 Connolly firm.<br>353:22 QUESTIONS BY MR. LANIER:<br>353:23   Q. And who do they represent, to<br>353:24 your knowledge?<br>353:25   A. Cardinal Health. | vMapes6ALL.128 |
| 360:2 - 360:7 | **Mapes, Michael 07-12-2019 (00:00:05)**<br>360:2 (Mapes Exhibit 24 marked for<br>360:3 identification.)<br>360:4 QUESTIONS BY MR. LANIER:<br>360:5   Q. Now, I'll give you Exhibit<br>360:6 Number 24.  This is a copy of your LinkedIn<br>360:7 page. | vMapes6ALL.129<br>P44541.1<br><br><br>clear |

| Page/Line | Source | ID |
|---|---|---|
| 365:4 - 365:6 | **Mapes, Michael 07-12-2019 (00:00:08)** | vMapes6ALL.130 |
| | 365:4  Q. And that's why companies like | |
| | 365:5 AmerisourceBergen put you into their | |
| | 365:6 corporate charts. | |
| 365:13 - 365:19 | **Mapes, Michael 07-12-2019 (00:00:07)** | vMapes6ALL.131 |
| | 365:13 THE WITNESS:  I don't know why | |
| | 365:14 they added me to their chart. | |
| | 365:15 (Mapes Exhibit 25 marked for | P81.1 |
| | 365:16 identification.) | |
| | 365:17 QUESTIONS BY MR. LANIER: | |
| | 365:18  Q. Let me give you a document that | |
| | 365:19 we'll mark as Exhibit Number 25 | |
| 370:8 - 370:13 | **Mapes, Michael 07-12-2019 (00:00:16)** | vMapes6ALL.132 |
| | 370:8  Q. And so here we see for | P81.1.1 |
| | 370:9 AmerisourceBergen in Exhibit 25 associates | |
| | 370:10 assigned to provide resources for the | |
| | 370:11 diversion control program, and it starts up | |
| | 370:12 here with a vice president and an | |
| | 370:13 administrative assistant. | |
| 370:23 - 370:25 | **Mapes, Michael 07-12-2019 (00:00:08)** | vMapes6ALL.133 |
| | 370:23  Q. And if I follow the chart | P81.1.2 |
| | 370:24 right, they've got you basically reporting to | |
| | 370:25 the vice president, don't they? | |
| 371:2 - 371:4 | **Mapes, Michael 07-12-2019 (00:00:07)** | vMapes6ALL.134 |
| | 371:2 THE WITNESS:  I didn't report | |
| | 371:3 to the vice president.  It was mainly | |
| | 371:4 with Steve Mays, the director of CSRA. | |
| 371:9 - 371:12 | **Mapes, Michael 07-12-2019 (00:00:09)** | vMapes6ALL.135 |
| | 371:9  Q. So practically speaking, the | |
| | 371:10 vice president didn't take your cares or | |
| | 371:11 concerns.  You didn't even know technically | |
| | 371:12 you were reporting to him; is that right? | |
| 371:15 - 371:16 | **Mapes, Michael 07-12-2019 (00:00:03)** | vMapes6ALL.136 |
| | 371:15 THE WITNESS:  Practically I | |
| | 371:16 reported to Steve Mays. | |
| 384:16 - 384:22 | **Mapes, Michael 07-12-2019 (00:00:23)** | vMapes6ALL.137 |
| | 384:16 That law that closes this loop, | MAPES32.28 |
| | 384:17 that requires the distributors to only give | |
| | 384:18 to registered and approved pharmacies for | |
| | 384:19 legitimate purposes to stop diversion.  I | |

Defendants' Affirmatives       Plaintiffs' Counters       Plaintiffs' Completeness       Defendants' Reply

| | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

384:20 mean, knowing their customers, knowing the
384:21 pharmacies, that's diversion control 101,
384:22 isn't it?

385:2 - 385:2    **Mapes, Michael 07-12-2019 (00:00:02)**     vMapes6ALL.138

385:2 THE WITNESS:  Yes, it's basic.

386:13 - 386:17    **Mapes, Michael 07-12-2019 (00:00:13)**     vMapes6ALL.139
                                                                                  MAPES32.21

386:13  Q. Let me be more clear.  Some
386:14 people don't understand what I mean.
386:15 This law for the Controlled
386:16 Substances Act, that doesn't apply just to
386:17 Internet pharmacies, does it?

386:19 - 387:3    **Mapes, Michael 07-12-2019 (00:00:27)**     vMapes6ALL.140

386:19 THE WITNESS:  It applies to all
386:20 handlers of controlled substances.
386:21 QUESTIONS BY MR. LANIER:
386:22  Q. Yeah.  There's not a -- where's
386:23 the note I just used?
386:24 Aren't distributors required to
386:25 know their customers, diversion control 101,
387:1 that's not only applicable to Internet
387:2 pharmacies; it applies to all their
387:3 customers, doesn't it?

387:8 - 387:19    **Mapes, Michael 07-12-2019 (00:00:23)**     vMapes6ALL.141

387:8 THE WITNESS:  It applies to all
387:9 registrants, yes.
387:10 QUESTIONS BY MR. LANIER:
387:11  Q. Yeah.  Everybody in the loop,
387:12 right?
387:13  A. Yes.
387:14  Q. And so when the lawyers talked
387:15 to you about these Internet pharmacy
387:16 concerns, let's just make real clear that the
387:17 law that we're talking about is -- the same
387:18 law applies to all pharmacies, whether
387:19 they're Internet or not.

388:3 - 388:3    **Mapes, Michael 07-12-2019 (00:00:00)**     vMapes6ALL.142

388:3 THE WITNESS:  It does.

388:14 - 388:18    **Mapes, Michael 07-12-2019 (00:00:11)**     vMapes6ALL.143

388:14 But in terms of the opioid loop
388:15 and what the distributors have to do, there's

| Page/Line | Source | ID |
|---|---|---|

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

388:16 no special law for distributors that pertains
388:17 to how they treat Internet pharmacies versus
388:18 others, is there?

388:20 - 388:20   **Mapes, Michael 07-12-2019 (00:00:01)**    vMapes6ALL.144

clear

388:20 THE WITNESS:  No.

395:18 - 395:19   **Mapes, Michael 07-12-2019 (00:00:02)**    vMapes6ALL.145

395:18 (Mapes Exhibit 26 marked for
395:19 identification.)

396:1 - 396:3   **Mapes, Michael 07-12-2019 (00:00:06)**    vMapes6ALL.146

P684.1.1

396:1 Do you have Exhibit Number 26
396:2 in front of you?
396:3  A. I do.

397:6 - 398:13   **Mapes, Michael 07-12-2019 (00:01:44)**    vMapes6ALL.147

P684.2.1

397:6  Q. "Steve, at the meeting at DEA,
397:7 I was not sure if your company had sold
397:8 controlled substances to any of the
397:9 pharmacies that were used as examples in the
397:10 presentation.  We checked ARCOS" --
397:11 What is ARCOS?
397:12  A. It's a system that collects
397:13 data from registrants concerning sales of
397:14 Schedule II and III narcotic drugs.
397:15  Q. It is a system you guys have
397:16 that will get all of the information about
397:17 who's selling the drugs and who they're
397:18 selling them to?
397:19  A. Yes.
397:20  Q. All right.  "We checked the
397:21 system that collects info on drug sales,
397:22 ARCOS, and found you made several sales to
397:23 Example Number 2 on page 10 of the printed
397:24 presentation.  It's a Florida pharmacy that's
397:25 now out of business.  Your sales were mostly
398:1 hydrocodone products."
398:2 That's an opiate drug, isn't
398:3 it?
398:4  A. It is.
398:5  Q. So while the lawyer will show
398:6 you and the jury that Mr. Mays informed you
398:7 guys that they didn't want to be associated

| Page/Line | Source | ID |
|---|---|---|

398:8 with this type of illegal activity and they
398:9 reviewed their customers thoroughly, the
398:10 truth of the matter is, y'all went back and
398:11 checked and AmerisourceBergen was, in fact,
398:12 supplying drugs to this illegal, domestic
398:13 Internet pharmacy problem, correct?

**398:20 - 398:20**    **Mapes, Michael 07-12-2019 (00:00:01)**    vMapes6ALL.148

398:20 THE WITNESS:  Yes.

**401:12 - 401:17**    **Mapes, Michael 07-12-2019 (00:00:09)**    vMapes6ALL.149

     P9115.1

401:12 (Mapes Exhibit 27 marked for
401:13 identification.)
401:14 QUESTIONS BY MR. LANIER:
401:15   Q. And then if we want to take it
401:16 a step further, I'll give you a document that
401:17 we'll mark as Exhibit Number 27.

**401:18 - 403:2**    **Mapes, Michael 07-12-2019 (00:01:44)**    vMapes6ALL.150

401:18 And Exhibit Number 27 -- do you
401:19 have it in front of you?
401:20   A. I do.
401:21   Q. -- is one where -- take a
401:22 moment and look at it, but I'll show you the
401:23 part that I'm interested in so it saves
401:24 everybody some time.

     P9115.1.1

401:25 It talks about John Gilbert,
402:1 the legal counsel for McKesson, representing
402:2 McKesson, contacting you and Kyle Wright,
402:3 responding to questions about sales of
402:4 controlled substances by McKesson to six
402:5 Internet pharmacies that were located in the
402:6 Miami field division.

402:7 And then I'm specifically going
402:8 to ask you about this.  You'll see it

     P9115.1.2

402:9 references that they were briefed -- McKesson
402:10 was briefed by the DEA on September 1st of
402:11 2005, and the ARCOS report for the month of
402:12 October revealed that McKesson distribution
402:13 center in Lakeland, Florida, distributed over
402:14 2 million dosage units of hydrocodone --
402:15 Now, that's an opioid, right?
402:16   A. Yes, it is.

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

| Page/Line | Source | ID |
|---|---|---|

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

402:17   Q. -- to six suspected illicit
402:18 Internet pharmacies.  They even filed
402:19 suspicious order reports involving these same
402:20 pharmacies but still distributed them.
402:21 Do you see that?
402:22   A. I do.
402:23   Q. Does that help refresh your
402:24 recollection of whether or not McKesson was
402:25 participating in this problem of Internet
403:1 pharmacies as well, illegal Internet
403:2 pharmacies?

**403:5 - 403:5**  **Mapes, Michael 07-12-2019 (00:00:01)**   vMapes6ALL.151
403:5 THE WITNESS:  It does.

**403:7 - 403:8**  **Mapes, Michael 07-12-2019 (00:00:03)**   vMapes6ALL.152
403:7   Q. And in fact, were they
403:8 participating in the problem?  Is that true?

**403:11 - 403:11**  **Mapes, Michael 07-12-2019 (00:00:01)**   vMapes6ALL.153
403:11 THE WITNESS:  Yes.

**407:19 - 407:20**  **Mapes, Michael 07-12-2019 (00:00:01)**   vMapes6ALL.205
407:19 (Mapes Exhibit 28 marked for
407:20 identification.)

**408:19 - 409:20**  **Mapes, Michael 07-12-2019 (00:01:02)**   vMapes6ALL.154
P23733.1
408:19 (Mapes Exhibit 29 marked for
408:20 identification.)
408:21 QUESTIONS BY MR. LANIER:
408:22   Q. I'll hand it to you -- a copy
408:23 of it to you marked as Exhibit Number 29.
408:24 It's long.  I don't need you to -- you're
408:25 welcome to go through the whole thing, but I
409:1 want to direct your attention specifically to
P23733.1.1
409:2 the background section.  Just right there at
409:3 the start.
409:4 August 4, 2006, you were still
409:5 at the DEA at that time, weren't you?
409:6   A. I was.
409:7   Q. By its deputy administrator,
409:8 Joseph T. Rannazzisi, issued an order to show
409:9 cause to McKesson with respect to its
409:10 Lakeland distribution center in Lakeland,
409:11 Florida.

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

409:12 Do you see that?

409:13   A. I do.

409:14   Q. Order number 1 alleged, among

409:15 other things, that "McKesson failed to

409:16 maintain effective controls at the Lakeland

409:17 facility against diversion of particular

409:18 controlled substances."

409:19 Do you see that as well?

409:20   A. I do.

**409:23 - 410:4    Mapes, Michael 07-12-2019 (00:00:20)**     vMapes6ALL.155

P23733.1.2

409:23   Q. And then it says that,

409:24 "Whereas, on November 1, 2007, Mr. Rannazzisi

409:25 issued a second order to show cause to

410:1 McKesson with respect to its Landover

410:2 distribution in Maryland for failing to

410:3 maintain effective controls."

410:4 Did you see that as well?

**410:7 - 410:7    Mapes, Michael 07-12-2019 (00:00:01)**     vMapes6ALL.156

410:7 THE WITNESS:  Yes, I see that.

**410:9 - 410:11    Mapes, Michael 07-12-2019 (00:00:09)**     vMapes6ALL.157

410:9   Q. Now, when defendants fail to

410:10 maintain effective control, is that a good

410:11 thing or a bad thing?

**410:13 - 410:13    Mapes, Michael 07-12-2019 (00:00:01)**     vMapes6ALL.158

410:13 THE WITNESS:  It's a bad thing.

**410:15 - 410:17    Mapes, Michael 07-12-2019 (00:00:04)**     vMapes6ALL.159

410:15   Q. Why?

410:16   A. Because that may allow drugs to     clear

410:17 be diverted.

**411:8 - 411:16    Mapes, Michael 07-12-2019 (00:00:24)**     vMapes6ALL.160

MAPES32.30

411:8 The questions that I've asked

411:9 you about Internet pharmacies, as far as

411:10 Cardinal Health is concerned, you also met

411:11 with them, right?

411:12   A. With counsel for Cardinal

411:13 Health, yes.

411:14   Q. And we have the notes from that

411:15 as Exhibit Number 9 that we looked at

411:16 yesterday, correct?

**411:18 - 411:19    Mapes, Michael 07-12-2019 (00:00:01)**     vMapes6ALL.161

| | vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 411:18 THE WITNESS: Yes, that is<br>411:19 correct. | |
| 411:21 - 411:22 | **Mapes, Michael 07-12-2019 (00:00:05)** | vMapes6ALL.162 |
| | 411:21 Q. And Cardinal Health never<br>411:22 confessed to having problems? | MAPES32.31 |
| 411:25 - 411:25 | **Mapes, Michael 07-12-2019 (00:00:00)** | vMapes6ALL.163 |
| | 411:25 Q. Did they? | |
| 412:3 - 412:3 | **Mapes, Michael 07-12-2019 (00:00:01)** | vMapes6ALL.164 |
| | 412:3 THE WITNESS: They did not. | |
| 412:5 - 412:8 | **Mapes, Michael 07-12-2019 (00:00:10)** | vMapes6ALL.165 |
| | 412:5 Q. And yet you know Cardinal<br>412:6 Health was also trafficking in the pills to<br>412:7 the Internet pharmacies that were illegal or<br>412:8 illicit, right? | |
| 412:11 - 412:12 | **Mapes, Michael 07-12-2019 (00:00:03)** | vMapes6ALL.166 |
| | 412:11 THE WITNESS: They were selling<br>412:12 pills to pharmacies, yes. | |
| 412:14 - 412:15 | **Mapes, Michael 07-12-2019 (00:00:04)** | vMapes6ALL.167 |
| | 412:14 Q. Failing to maintain effective<br>412:15 controls against diversion, true? | |
| 412:20 - 412:22 | **Mapes, Michael 07-12-2019 (00:00:01)** | vMapes6ALL.168 |
| | 412:20 THE WITNESS: Yes.<br>412:21 (Mapes Exhibit 30 marked for<br>412:22 identification.) | |
| 415:12 - 415:14 | **Mapes, Michael 07-12-2019 (00:00:10)** | vMapes6ALL.169 |
| | 415:12 Q. 1301.74, that's part of what<br>415:13 was asked you about yesterday, correct?<br>415:14 A. That's correct. | P19418B.27 |
| 416:25 - 417:2 | **Mapes, Michael 07-12-2019 (00:00:08)** | vMapes6ALL.170 |
| | 416:25 Q. And this is the same law that<br>417:1 requires them to report suspicious orders to<br>417:2 the DEA when discovered, fair? | |
| 417:5 - 417:5 | **Mapes, Michael 07-12-2019 (00:00:00)** | vMapes6ALL.171 |
| | 417:5 THE WITNESS: It is. | |
| 417:7 - 417:9 | **Mapes, Michael 07-12-2019 (00:00:08)** | vMapes6ALL.172 |
| | 417:7 Q. So this is the company's<br>417:8 requirement to design and operate the system.<br>417:9 It's not the DEA's job -- | |
| 417:12 - 418:4 | **Mapes, Michael 07-12-2019 (00:00:39)** | vMapes6ALL.173 |
| | 417:12 Q. -- right? | |

| Page/Line | Source | ID |
|---|---|---|

**vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21**

417:13   A. That's correct.

P19418B.28

417:14   Q. And then on suspicious orders,
417:15 report -- the next slide, "Reporting a
417:16 suspicious order to the DEA does not" --
417:17 And you put that in all caps
417:18 for your presentation, didn't you?
417:19   A. Yes.
417:20   Q. -- "does not relieve the
417:21 distributor of the responsibility to maintain
417:22 effective controls."
417:23 You can't just report the
417:24 suspicious order; you still have to maintain
417:25 effective controls, don't you?
418:1   A. Yes.
418:2   Q. Because it's the distributor's
418:3 decision whether or not they're going to ship
418:4 those suspicious drugs or not, isn't it?

418:6 - 418:6   **Mapes, Michael 07-12-2019 (00:00:00)**   vMapes6ALL.174

418:6 THE WITNESS:  Yes.

418:8 - 418:13   **Mapes, Michael 07-12-2019 (00:00:18)**   vMapes6ALL.175

P19418B.13

418:8   Q. And that's your next slide.
418:9 You said, "The DEA cannot tell a distributor
418:10 if an order is legitimate or not.  The
418:11 distributor must determine which orders are
418:12 suspicious and then make a sales decision."
418:13 Correct?

418:16 - 418:16   **Mapes, Michael 07-12-2019 (00:00:01)**   vMapes6ALL.176

418:16 THE WITNESS:  Correct.

420:15 - 420:21   **Mapes, Michael 07-12-2019 (00:00:20)**   vMapes6ALL.177

420:15   Q. So you've got a
420:16 company that's got to make a sales decision,
420:17 knowing if they ship and sell the product
420:18 they make their money, most likely.  And yet
420:19 it's their decision, it's not the DEA's, in
420:20 the normal course of events, absent some
420:21 order, right?

420:25 - 420:25   **Mapes, Michael 07-12-2019 (00:00:01)**   vMapes6ALL.178

420:25 THE WITNESS:  Yes.

421:2 - 421:9   **Mapes, Michael 07-12-2019 (00:00:23)**   vMapes6ALL.179

P19418B.24

421:2   Q. And so in your summary sheet,

| | vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21 | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 421:3 which is right toward the end, you had to | |
| | 421:4 tell them that any "distributor selling | |
| | 421:5 controlled substances that are being | |
| | 421:6 dispensed outside the course of professional | |
| | 421:7 practice must stop immediately." | |
| | 421:8 You had to tell them that, | |
| | 421:9 right? | |
| 421:12 - 421:13 | **Mapes, Michael 07-12-2019 (00:00:01)** | vMapes6ALL.180 |
| | 421:12 THE WITNESS:  We did tell them | clear |
| | 421:13 that, yes. | |
| 429:4 - 429:22 | **Mapes, Michael 07-12-2019 (00:00:52)** | vMapes6ALL.181 |
| | 429:4   Q. I mean, you told these | |
| | 429:5 companies that under the old Harrison | |
| | 429:6 Narcotic Act -- you know what that is, right? | |
| | 429:7   A. Yes. | |
| | 429:8   Q. That's what preceded the | |
| | 429:9 Controlled Substances Act? | |
| | 429:10   A. Correct. | |
| | 429:11   Q. And you would talk to these | |
| | 429:12 companies about this US Supreme Court | |
| | 429:13 explaining the need to hold suspicious | |
| | 429:14 shipments, didn't you? | |
| | 429:15   A. In those meetings, yes. | |
| | 429:16   Q. And the case you were citing | |
| | 429:17 from the US Supreme Court -- I looked at your | |
| | 429:18 meeting notes -- 1943, Direct Sales versus | |
| | 429:19 United States, correct? | |
| | 429:20   A. Yes. | |
| | 429:21   Q. So you knew since 1943 about | |
| | 429:22 the need to hold suspicious orders -- | |
| 429:25 - 429:25 | **Mapes, Michael 07-12-2019 (00:00:01)** | vMapes6ALL.182 |
| | 429:25   Q. -- didn't you? | |
| 430:2 - 430:16 | **Mapes, Michael 07-12-2019 (00:00:37)** | vMapes6ALL.183 |
| | 430:2 THE WITNESS:  I don't recall | |
| | 430:3 the details of that case and what it | |
| | 430:4 refers to, but it was a case from... | |
| | 430:5 QUESTIONS BY MR. LANIER: | |
| | 430:6   Q. From 1943, Direct Sales versus | |
| | 430:7 the United States, where the petitioner was a | |
| | 430:8 registered drug manufacturer and wholesaler, | |

| | | |
|---|---|---|
| | **vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21** | |
| **Page/Line** | **Source** | **ID** |

430:9 and they were selling to Dr. Tate in such
430:10 quantities and so frequently that it must
430:11 have known he couldn't dispense the amounts
430:12 lawfully, and so he was distributing them
430:13 illegally.  And they were continuing to ship
430:14 to him even after they should have known
430:15 this, and that's what they got nailed for.
430:16 That's the case, isn't it?

| | | |
|---|---|---|
| 430:19 - 430:19 | **Mapes, Michael 07-12-2019 (00:00:00)** | vMapes6ALL.184 |

430:19 THE WITNESS:  Yes.

| | | |
|---|---|---|
| 430:21 - 430:25 | **Mapes, Michael 07-12-2019 (00:00:07)** | vMapes6ALL.185 |

430:21   Q. And you included that case in
430:22 what you gave the companies?
430:23   A. Yes, we did.
430:24   Q. And that was an opioid case,
430:25 wasn't it?

| | | |
|---|---|---|
| 431:2 - 431:8 | **Mapes, Michael 07-12-2019 (00:00:15)** | vMapes6ALL.186 |

431:2 THE WITNESS:  It was.
431:3 QUESTIONS BY MR. LANIER:
431:4   Q. So this idea that, ah, geez, we
431:5 couldn't know, I mean, you gave them a case
431:6 that said since 1943 the US Supreme Court
431:7 said that you should be holding these things,
431:8 right?

| | | |
|---|---|---|
| 431:11 - 431:12 | **Mapes, Michael 07-12-2019 (00:00:03)** | vMapes6ALL.187 |

431:11 THE WITNESS:  Yes, the Supreme
431:12 Court said that you should have known.

| | | |
|---|---|---|
| 433:21 - 434:1 | **Mapes, Michael 07-12-2019 (00:00:15)** | vMapes6ALL.188 |
| | | MAPES32.27 |

433:21   Q. So when a company sees a
433:22 suspicious order, the company's got to make
433:23 this decision:  Do we sell it and make our
433:24 money, or do we hold it and investigate it?
433:25 That's the company's decision,
434:1 right?

| | | |
|---|---|---|
| 434:3 - 434:3 | **Mapes, Michael 07-12-2019 (00:00:00)** | vMapes6ALL.189 |

434:3 THE WITNESS:  It is.

| | | |
|---|---|---|
| 435:16 - 436:16 | **Mapes, Michael 07-12-2019 (00:01:09)** | vMapes6ALL.190 |

435:16   Q. "All registrants are required
435:17 to maintain effective control against
435:18 diversion."  I'm going to put your answers in

| | | |
|---|---|---|
| **vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21** | | |
| **Page/Line** | **Source** | **ID** |

435:19 blue.

435:20 Do you agree or disagree?

435:21   A. Agree.

435:22   Q. And so this is blue for

435:23 Mr. Mapes.

435:24 "The registrant is required to

435:25 report a suspicious order to the DEA."

436:1 Do you agree?

436:2   A. Yes.

436:3   Q. "The registrant is required to

436:4 maintain a system to detect suspicious

436:5 orders."

436:6 Do you agree with that part?

436:7   A. Yes.

436:8   Q. And "It's a business decision,

436:9 but they must identify suspicious orders."

436:10 Do you agree?

436:11   A. Yes.

436:12   Q. And "They should not ship

436:13 suspicious orders without full due diligence

436:14 that resolves their suspicions."

436:15 Do you agree?

436:16   A. I agree.

**443:17 - 444:1**   **Mapes, Michael 07-12-2019 (00:00:28)**   vMapes6ALL.191

MAPES32.24

443:17   Q. Now, "if the companies

443:18 are asserting a roadblock," I asked

443:19 Mr. Rannazzisi in his deposition, "that the

443:20 DEA was part of the problem, that you didn't

443:21 do your job right or that Joe Ran didn't do

443:22 his job right or the others," Joe Ran

443:23 disagreed and said the DEA tried to stop

443:24 diversion and to clean up the supply chain.

443:25 Do you think that the DEA was

444:1 the problem?

**444:11 - 444:13**   **Mapes, Michael 07-12-2019 (00:00:05)**   vMapes6ALL.192

444:11 THE WITNESS:  I believe the DEA

444:12 worked within the resources they had

444:13 to address the problem.

**456:19 - 456:23**   **Mapes, Michael 07-12-2019 (00:00:04)**   vMapes6ALL.193

P82.1

456:19 (Mapes Exhibit 31 marked for

| Defendants' Affirmatives | Plaintiffs' Counters | Plaintiffs' Completeness | Defendants' Reply | |
|---|---|---|---|---|

| Page/Line | Source | ID |
|---|---|---|

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

456:20 identification.)
456:21 QUESTIONS BY MR. LANIER:
456:22  Q. Well, let me give it to you.
456:23 We'll mark it as Exhibit Number 31.

**467:8 - 467:19**   **Mapes, Michael 07-12-2019 (00:00:24)**   clear   vMapes6ALL.194

467:8  Q. And did the DEA ever tell the
467:9 companies, "Oh, go ahead, just ship those
467:10 suspicious orders.  It's following the law
467:11 when you ship a suspicious order.  You don't
467:12 need to do due diligence.  You don't need to
467:13 check into it.  You don't -- yeah, it's
467:14 excessive, yeah, it's suspicious, yeah, it's
467:15 probably going to be diverted, but just ship
467:16 it anyway and make the money"?
467:17 Did y'all ever tell them to do
467:18 that?
467:19  A. I never did.

**468:11 - 468:14**   **Mapes, Michael 07-12-2019 (00:00:08)**   vMapes6ALL.195

468:11  Q. It's the company's decision
468:12 whether or not they want to ship a suspicious
468:13 order or hold it, isn't it?
468:14  A. It is.

**510:22 - 511:3**   **Mapes, Michael 07-12-2019 (00:00:25)**   vMapes6ALL.196   P44542.1

510:22  Q. And Mr. Lanier showed you a
510:23 privilege log marked as Exhibit 20 and asked
510:24 you about the fact that several entries here
510:25 indicated that you were involved in these.
511:1 Do you recall looking at this
511:2 document, Exhibit Number 20?
511:3  A. Yes.

**512:6 - 512:12**   **Mapes, Michael 07-12-2019 (00:00:12)**   vMapes6ALL.197

512:6  Q. He didn't tell you that,
512:7 in fact, every single one of the documents on
512:8 this list that we're looking at here, which
512:9 comprises two pages, had, in fact, been
512:10 produced by AmerisourceBergen.  He didn't
512:11 tell you that, right?
512:12  A. That's correct.

**512:14 - 512:17**   **Mapes, Michael 07-12-2019 (00:00:14)**   clear   vMapes6ALL.198

512:14 Mr. Mapes, does DEA have ethics

| Page/Line | Source | ID |
|---|---|---|

512:15 rules in place about post-DEA employment for
512:16 DEA employees like yourself who leave or
512:17 retire?

**512:23 - 513:3** | **Mapes, Michael 07-12-2019 (00:00:09)** | vMapes6ALL.199

512:23 THE WITNESS:  Yes, there are.
512:24 QUESTIONS BY MS. MCCLURE:
512:25   Q. And you followed those
513:1 post-employment ethics rules?
513:2   A. Yes.
513:3   Q. Thank you.

**514:12 - 514:18** | **Mapes, Michael 07-12-2019 (00:00:16)** | vMapes6ALL.200

514:12   Q. And do you think that there's
514:13 anything wrong that you've done in consulting
514:14 for various industry participants to help
514:15 them be compliant with the Controlled
514:16 Substances Act and DEA policies and
514:17 procedures in your post-DEA work?
514:18   A. No.

**518:7 - 519:3** | **Mapes, Michael 07-12-2019 (00:00:57)** | vMapes6ALL.201

518:7   Q. And so you testified in a
518:8 lawsuit in West Virginia in 2016, correct?
518:9   A. Yes.
518:10   Q. And in that you testified that
518:11 the shift from ship and then report to
518:12 instead halt and investigate was a gradual
518:13 change, right?
518:14   A. Yes, it was.
518:15   Q. And that the regulations did
518:16 not change, but the DEA's interpretation of
518:17 them did, right?
518:18   A. Yes.
518:19   Q. And that companies were
518:20 responding to DEA's changed interpretation
518:21 and then coming up with programs to handle
518:22 that new different expectation, right?
518:23   A. That's correct.
518:24   Q. And there was not a date
518:25 certain by which companies were expected or
519:1 anticipated to implement the changes to DEA's
519:2 new interpretation of 1301.74(b)?

| Page/Line | Source | ID |
|---|---|---|
| | | |

vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21

| Page/Line | Source | ID |
|---|---|---|

519:3   A. That's correct.

520:14 - 520:20    **Mapes, Michael 07-12-2019 (00:00:13)**          vMapes6ALL.202

520:14   Q. And so that was -- the
520:15 submission of excessive purchase reports was
520:16 considered, in your experience at DEA, to be
520:17 in compliance with the Controlled Substances
520:18 Act for the period of time that those reports
520:19 were accepted, correct?
520:20   A. Yes.

520:22 - 521:9    **Mapes, Michael 07-12-2019 (00:00:26)**          vMapes6ALL.203

520:22 And in addition, I just asked
520:23 you a question as to whether they were in
520:24 compliance with the Controlled Substances
520:25 Act.
521:1 They were also then in
521:2 compliance -- I just asked you a question
521:3 that stated that they were in compliance --
521:4 the acceptance of the excessive purchase
521:5 reports is being compliant -- was compliant
521:6 with the Controlled Substances Act.
521:7 They were also compliant with
521:8 the regulations that underscored and
521:9 implemented that act, correct?

521:15 - 521:18    **Mapes, Michael 07-12-2019 (00:00:08)**          vMapes6ALL.204

521:15 THE WITNESS:  Personally we
521:16 accepted them, the excessive purchase
521:17 reports, as compliant for the
521:18 suspicious order monitoring, yes.

---

Defendants' Affirmatives = 00:19:38
Plaintiffs' Counters = 00:13:05
Plaintiffs' Completeness = 00:21:44
Defendants' Reply = 00:05:02
**Total Time = 00:59:29**

**Documents Shown**
D640
MAPES32
P12805

| Page/Line | Source | ID |
|---|:---:|---|
| | **vMapes6ALL-Mapes M DA, PC, PCompleteness, DReply on 07-22-21** | |
| P19418B | | |
| P23733 | | |
| P44539 | | |
| P44541 | | |
| P44542 | | |
| P49 | | |
| P684 | | |
| P81 | | |
| P82 | | |
| P9112 | | |
| P9114 | | |
| P9115 | | |