D.1

| City of Huntington v. AmerisouceBergen Drug Corp. et al, 17cv01362 | | |
|---|---|---|
| Witness Name: Darren Cox (Huntington Violent Crime & Drug Taskforce) | | |
| Deposition Date: 7/15/2020 | | |
| White = Defendants' Affirmative Designations (w/ Plaintiffs' Objections and Defendants' Replies) | | |
| Blue = Plaintiffs' Counter-Designations (w/ Defendants' Objections and Plaintiffs' Replies) | | |
| Green = Plaintiffs' Completeness Designations (w/ Defendants' Objections and Plaintiffs' Replies) | | |
| Pink = Defendants' Reply Designations (w/ Plaintiffs' Objections and Defendants' Replies) | | |

| Designations | Objections | Reponses |
|---|---|---|
| **10:03 - 10:12** | | |
| 10:03 Can you please state your name and | | |
| 10:04 address for the record. | | |
| 10:05 A. Yes. My name is Darren Cox. | | |
| 10:06 Q. And where do you live, Special Agent | | |
| 10:07 Cox? | | |
| 10:08 A. Arlington, Virginia. | | |
| 10:09 Q. What is your current job title? | | |
| 10:10 A. Supervisory special agent. | | |
| 10:11 Q. And that's with the FBI, correct? | | |
| 10:12 A. Yes. | | |
| | | |
| **10:21 - 11:06** | | |
| 10:21 Q. Special Agent Cox, you previously | | |
| 10:22 served as coordinator of the Huntington Violent | | |
| 11:01 Crime and Drug Task Force; is that correct? | | |
| 11:02 A. Yes. | | |
| 11:03 Q. When did you begin in that role? | | |
| 11:04 A. I began in that role, I believe | | |
| 11:05 around November of 2012 and concluded around | | |
| 11:06 April of -- or May of 2015. | | |
| | | |
| **28:12 - 28:21** | | |
| 28:12 Q. Before you were subpoenaed to | | |
| 28:13 testify in this case, had you ever heard of | | |
| 28:14 McKesson Corporation? | | |
| 28:15 A. No, I had not. | | |
| 28:16 Q. Had you ever heard of Cardinal | | |
| 28:17 Health? | | |
| 28:18 A. No. | | |
| 28:19 Q. Had you ever heard of | | |
| 28:20 AmerisourceBergen Corporation? | | |
| 28:21 A. No. | | |
| | | |
| **29:22 - 31:20** | | |
| 29:22 Q. Sitting here today, can you identify | | |
| 30:01 anything specific that McKesson Corporation has | | |
| 30:02 done that is unlawful? | | |
| 30:03 A. No. | | |
| 30:04 Q. Can you identify anything specific | | |
| 30:05 that McKesson Corporation has done that is | | |
| 30:06 unreasonable? | | |
| 30:07 A. No. | | |
| 30:08 Q. How about for Cardinal Health? Can | | |
| 30:09 you identify anything specific that Cardinal | | |
| 30:10 Health has done that is unlawful? | | |
| 30:11 A. No. | | |
| 30:12 Q. Can you identify anything specific | | |
| 30:13 that Cardinal Health has done that is | | |
| 30:14 unreasonable? | | |
| 30:15 A. No. | | |
| 30:16 Q. Can you identify anything specific | | |
| 30:17 that AmerisourceBergen has done that is | | |
| 30:18 unlawful? | | |
| 30:19 A. No. | | |
| 30:20 Q. Can you identify anything specific | | |

| Designations | Objections | Reponses |
|---|---|---|
| 30:21 that AmerisourceBergen has done that is<br>30:22 unreasonable?<br>31:01 A. No.<br>31:02 Q. Sitting here today, do you know<br>31:03 anything about any of the systems that the<br>31:04 defendants have in this case in place to<br>31:05 prevent diversion of prescription opioids?<br>31:06 A. I do not.<br>31:07 Q. Special Agent Cox, because you are<br>31:08 not familiar with those systems, you would not<br>31:09 be able to identify any apps attached to those<br>31:10 systems that you consider to be defective,<br>31:11 correct?<br>31:12 A. Correct.<br>31:13 Q. Do you know anything about what<br>31:14 information any of the defendants in this case<br>31:15 reported to the DEA?<br>31:16 A. I do not.<br>31:17 Q. Do you know anything about what<br>31:18 information any of the defendants in this case<br>31:19 reported to the State of West Virginia?<br>31:20 A. I do not. | | |
| **35:10 - 35:19**<br>35:10 Q. Yes, sure.  Do you have an<br>35:11 understanding of whether prescription opioid<br>35:12 medications are medically appropriate for the<br>35:13 treatment of chronic pain?<br>35:14 A. I understand medical doctors make<br>35:15 that determination.  That's the best of my<br>35:16 knowledge.<br>35:17 Q. Based on your experience and<br>35:18 understanding, do you believe medical doctors<br>35:19 are in the best position to make that decision? | **Re: [35:10 to 35:19]**<br>Speculation; Calls<br>for Expert Testimony | **Re: [35:10 to 35:19]**<br>Objections are<br>unfounded. Questions ask for<br>the witness's understanding<br>and do not call for<br>speculation or expert opinion. |
| **36:12 - 36:13**<br>36:12 THE WITNESS:  All right.  Yes.<br>36:13 Doctors make that determination. | **Re: [36:12 to 36:13]**<br>Speculation; Calls<br>for Expert Testimony | **Re: [36:12 to 36:13]**<br>Objections are<br>unfounded. Questions ask for<br>the witness's understanding<br>and do not call for<br>speculation or expert opinion. |
| **39:19 - 39:22**<br>39:19 Q. Do you believe at one point, there<br>39:20 was an opioid epidemic in Cabell County, West<br>39:21 Virginia?<br>39:22 A. Yes. | | |
| **42:14 - 42:17**<br>42:14 Q. What is your understanding of the<br>42:15 biggest drug threat facing Cabell County in<br>42:16 Huntington, West Virginia, when you left the<br>42:17 task force in 2015? | | |
| **43:04 - 43:05**<br>43:04 THE WITNESS:  It was a combination<br>43:05 of prescription drugs and heroin. | | |
| **43:07 - 43:11**<br>43:07 Q. When you left the task force in<br>43:08 2015, was one of those two categories of drugs<br>43:09 that you just mentioned, prescription opioids<br>43:10 and heroin, a larger threat to Cabell County<br>43:11 and the City of Huntington? | | |

| Designations | Objections | Reponses |
|---|---|---|
| | | |
| **43:22 - 44:03** | | |
| 43:22   THE WITNESS:  Yes.  The drug problem<br>44:01   changed over time.  It changed from, I would<br>44:02   say a higher percentage of prescription drugs<br>44:03   to heroin by the time that I had left. | | |
| **44:05 - 44:11** | | |
| 44:05   Q. So by the time you left the task<br>44:06   force in 2015, heroin was a largest threat to<br>44:07   the area?<br>44:08   A. You know, I would say that they were<br>44:09   -- I would say heroin probably was a larger<br>44:10   percentage than prescription drugs at the time<br>44:11   I left. | | |
| **44:18 - 45:09** | | |
| 44:18   Q. Okay.  So then your testimony and<br>44:19   your understanding is that there was a larger<br>44:20   percentage of heroin seizures and cases in 2015<br>44:21   compared to prescription opioid?<br>44:22   A. Again, I want to be specific as far<br>45:01   as the seizures.  You know, there would be<br>45:02   specific statistics of that that would reflect<br>45:03   that.  So -- and again, I think it would be<br>45:04   relative as to the amount -- an amount of<br>45:05   heroin versus an amount of pills are different<br>45:06   amount, different quantities.  A pound of<br>45:07   heroin versus a pound of pills are different<br>45:08   quantities, so I'm not sure I can answer that<br>45:09   question the way it's stated. | | |
| **45:10 - 45:18** | | |
| 45:10   Q. Okay.  That's fair.  Well, you<br>45:11   previously testified that heroin was a larger<br>45:12   percentage at the time you left in 2015, so I<br>45:13   am trying to understand what you mean by that.<br><br>45:14   A. Yes.  I would -- I am basing that on<br>45:15   the number of investigations and the number of,<br><br>45:16   I guess, subjects that we would have worked<br>45:17   that would have been specifically selling<br>45:18   heroin as opposed to prescription drugs. | | |
| **45:19 - 46:12** | | |
| 45:19   Q. Okay.  So that's your understanding<br>45:20   that there was a larger percentage of<br>45:21   investigations and subjects in connection with<br>45:22   heroin compared to prescription drugs in 2015?<br>46:01   A. Yes.<br>46:02   Q. Special Agent Cox, are you familiar<br>46:03   with the phrase "diversion of pharmaceutical<br>46:04   drugs?"<br>46:05   A. Yes.<br>46:06   Q. What does that phrase "diversion"<br>46:07   mean?<br>46:08   A. To me, the way that I am familiar<br>46:09   with it, the diversion is -- would be people<br>46:10   using the -- obtaining a prescription for the<br>46:11   narcotics and then using them for an illegal<br>46:12   manner. | | |
| **47:10 - 48:03** | | |
| 47:10   Q. So is it your understanding then<br>47:11   that diversion of pharmaceutical drugs is | | |

| Designations | Objections | Reponses |
|---|---|---|
| 47:12  always illegal? | | |
| 47:13  A. Yes. | | |
| 47:14  Q. So then the person who diverts a | | |
| 47:15  pharmaceutical drug has committed a crime, | | |
| 47:16  correct? | | |
| 47:17  A. Yes. | | |
| 47:18  Q. Do you have an understanding of | | |
| 47:19  whether the use or possession of a diverted | | |
| 47:20  pharmaceutical drug is a crime? | | |
| 47:21  A. Yes. | | |
| 47:22  Q. Just so there's no confusion, the | | |
| 48:01  use or possession of a diverted pharmaceutical | | |
| 48:02  drug is a crime, correct? | | |
| 48:03  A. Yes. | | |
| | | |
| 49:10 - 52:08 | | |
| 49:10  Q. How does diversion occur, Special | Re: [49:10 to 52:08] | Re: [49:10 to 52:08] |
| 49:11  Agent Cox? | Foundation; Lack of | Objections are |
| 49:12  A. My understanding is an individual | Personal Knowledge | unfounded. Mr. Cox previously |
| 49:13  would go to a physician and receive a | (51:22-52:8) | served as Coordinator of the |
| 49:14  prescription for whatever form of narcotics and | | Huntington Violent Crime & |
| 49:15  then they would take that prescription and sell | | Drug Task Force and testified |
| 49:16  that prescription. | | at length regarding his |
| 49:17  Q. Are you familiar with the term | | experience investigating drug |
| 49:18  "doctor shopping?" | | crimes and diversion. He is |
| 49:19  A. Yes. | | well-positioned to answer |
| 49:20  Q. What does "doctor shopping" mean? | | questions concerning how |
| 49:21  A. Individuals that would go to | | diversion occurs based on his |
| 49:22  different doctors in order to obtain a | | experience in that role. There |
| 50:01  prescription. | | is no basis for a "personal |
| 50:02  Q. Doctor shopping is a form of | | knowledge" objection when the |
| 50:03  diversion, correct? | | witness answers questions |
| 50:04  A. Yes. | | based on his own personal |
| 50:05  Q. Doctor shopping is illegal; is that | | understanding, as Mr. Cox did |
| 50:06  right? | | here. |
| 50:07  A. My understanding is, the result of | | |
| 50:08  what they received from the doctor if they were | | |
| 50:09  going to sell that narcotic, then that would be | | |
| 50:10  illegal.  I don't know if actually going to | | |
| 50:11  multiple doctors is illegal. | | |
| 50:12  Q. Okay.  Fair enough.  What about | | |
| 50:13  theft from a pharmacy.  Is that a form of | | |
| 50:14  diversion? | | |
| 50:15  A. I'm sorry, can you repeat that. | | |
| 50:16  Q. Yes, sure.  Theft from a pharmacy. | | |
| 50:17  Is that a form of diversion? | | |
| 50:18  A. I would assume if they stole | | |
| 50:19  prescription drugs that would be the purpose | | |
| 50:20  for that. | | |
| 50:21  Q. Okay.  What about sharing pills with | | |
| 50:22  someone without a prescription.  Is that a form | | |
| 51:01  of diversion? | | |
| 51:02  A. Yes. | | |
| 51:03  Q. I believe you already testified to | | |
| 51:04  this, but selling pills on the street, that's a | | |
| 51:05  form of diversion as well, correct? | | |
| 51:06  A. Yes. | | |
| 51:07  Q. How about a doctor who knowingly | | |
| 51:08  prescribes prescription opioids without a | | |
| 51:09  legitimate medical purpose.  Is that a form of | | |
| 51:10  diversion? | | |
| 51:11  A. Yes, my understanding. | | |
| 51:12  Q. What about forging a prescription | | |
| 51:13  for opioids.  Is that a form of diversion? | | |
| 51:14  A. Yes. | | |
| 51:15  Q. Can you think of any other ways that | | |

| Designations | | Objections | Reponses |
|---|---|---|---|
| 51:16 | prescription opioids can be diverted besides | | |
| 51:17 | the ones we have just gone over? | | |
| 51:18 | A. I cannot. | | |
| 51:19 | Q. And all the forms of diversion that | | |
| 51:20 | we just reviewed are illegal, correct? | | |
| 51:21 | A. Yes. | | |
| 51:22 | Q. The licensed distribution of | | |
| 52:01 | controlled substances is not diversion, | | |
| 52:02 | correct? | | |
| 52:03 | A. From my understanding, yes. | | |
| 52:04 | Q. So your understanding then is that a | | |
| 52:05 | distributor like McKesson Corporation is not | | |
| 52:06 | engaged in diversion when it delivers | | |
| 52:07 | medication to a licensed pharmacy? | | |
| 52:08 | A. Yes. | | |
| **57:06 - 57:08** | | | |
| 57:06 | Q. When did you first join the FBI? | | |
| 57:07 | A. I joined the FBI in December of | | |
| 57:08 | 2001. | | |
| **59:12 - 59:22** | | | |
| 59:12 | When you joined in 2001, what was | | |
| 59:13 | your title? | | |
| 59:14 | A. Special agent. | | |
| 59:15 | Q. What were your responsibilities when | | |
| 59:16 | you were a special agent? | | |
| 59:17 | A. Initially, I was assigned to the | | |
| 59:18 | Phoenix Division of the FBI.  My first | | |
| 59:19 | assignment, I was assigned to a white collar | | |
| 59:20 | squad which my responsibilities there were to | | |
| 59:21 | investigate bank fraud -- primarily bank fraud | | |
| 59:22 | investigations, criminal activity. | | |
| **61:20 - 62:04** | | | |
| 61:20 | Q. Okay.  So when did you leave the | | |
| 61:21 | Phoenix office? | | |
| 61:22 | A. I left the Phoenix office in | | |
| 62:01 | December of 2009, I believe. | | |
| 62:02 | Q. Where did you go after that? | | |
| 62:03 | A. I transferred to Charleston, West | | |
| 62:04 | Virginia. | | |
| **62:09 - 62:12** | | | |
| 62:09 | Q. And what kind of work did you do | | |
| 62:10 | when you transferred to the Charleston office? | | |
| 62:11 | A. I was assigned to work | | |
| 62:12 | counterterrorism investigations. | | |
| **63:07 - 64:10** | | | |
| 63:07 | Q. I believe you testified that during | | |
| 63:08 | that time period from 2001 to 2009, you did do | | |
| 63:09 | some narcotics work in the Phoenix Division? | | |
| 63:10 | A. Yes. | | |
| 63:11 | Q. Did you encounter prescription | | |
| 63:12 | opioids during that time? | | |
| 63:13 | A. Not that I can recall, not in a -- | | |
| 63:14 | certainly not in a large volume, as a large a | | |
| 63:15 | volume as after I transferred to West Virginia. | | |
| 63:16 | Q. Okay.  And from 2001 to 2009 in the | | |
| 63:17 | Phoenix office, did you encounter any illegal | | |
| 63:18 | opioids like heroin or fentanyl? | | |
| 63:19 | A. Yes. | | |
| 63:20 | Q. Was heroin a problem at that time? | | |
| 63:21 | A. Not -- yes, it's always a problem | | |
| 63:22 | but it was a relatively small problem and it | | |

| Designations | Objections | Reponses |
|---|---|---|
| 64:01    was a -- I would say a very, very small number<br>64:02    of investigations that we were -- that involved<br>64:03    heroin.<br>64:04    Q. When you say "heroin is always a<br>64:05    problem," what do you mean?<br>64:06    A. Well, any type of illegal drug I<br>64:07    believe was a problem, so if someone is using<br>64:08    any illegal drug, those have negative<br>64:09    consequences so, therefore, as an investigator,<br>64:10    it's problematic when people break the law. | | |
| **64:11 - 64:19**<br>64:11    Q. Understood.  And in your experience<br>64:12    in law enforcement and with the task force, are<br>64:13    most illegal drugs present in some volume at<br>64:14    all times?<br>64:15    A. Yes.<br>64:16    Q. But at certain times, certain<br>64:17    illegal drugs become more popular and more<br>64:18    prevalent; is that right?<br>64:19    A. Yes. | | |
| **64:22 - 65:18**<br>64:22    So you transferred to Charleston in<br>65:01    2009.  You were working on counterterrorism<br>65:02    cases but also doing some narcotics work; is<br>65:03    that correct?<br>65:04    A. Assisting with narcotics work,<br>65:05    again, in a small office, you assist on a<br>65:06    number of investigations.  My primary<br>65:07    responsibilities were terrorism cases.<br>65:08    Q. How long were you in the Charleston<br>65:09    office?<br>65:10    A. In totality, I was assigned to the<br>65:11    -- well, if I could, it is easier probably to<br>65:12    break it down for you.  I was in the Charleston<br>65:13    office for approximately 15 months, and then I<br>65:14    transferred to FBI headquarters as a<br>65:15    supervisory special agent.<br>65:16    Q. And FBI headquarters is in the<br>65:17    Washington, D.C., area?<br>65:18    A. Yes. | | |
| **66:19 - 67:07**<br>66:19    Q. When you moved to FBI headquarters<br>66:20    in Washington in 2011, did you have a focus on<br>66:21    a specific region of the country?<br>66:22    A. I was -- at that point in time, I<br>67:01    was responsible for working in our Weapons of<br>67:02    Mass Destruction Division, and I did have a<br>67:03    specific region of the country related to those<br>67:04    type of investigations.<br>67:05    Q. What was that region?<br>67:06    A. It was the Northeast Region of the<br>67:07    U.S. | | |
| **69:02 - 69:08**<br>69:02    Q. So how did you become involved with<br>69:03    the task force in 2012?<br>69:04    A. After I completed my assignment at<br>69:05    FBI headquarters, I transferred back to the<br>69:06    Charleston and Huntington resident agencies,<br>69:07    and I was assigned to the Huntington Task<br>69:08    Force. | | |

| Designations | Objections | Reponses |
|---|---|---|
| **73:03 - 73:15** | | |
| 73:03    Q. What were your responsibilities as<br>73:04    coordinator of the task force?<br>73:05    A. To oversee the daily operations of<br>73:06    the task force and then also to be involved in<br>73:07    investigations.<br>73:08    Q. When you say you oversaw day-to-day<br>73:09    activities, what does that mean?<br>73:10    A. So on the task force, we had a<br>73:11    number of investigative entities and it was to<br>73:12    ensure that we were working investigations that<br>73:13    were consistent with what the bureau's goals<br>73:14    and objectives were while benefiting the states<br>73:15    and locals. | | |
| **86:08 - 86:20** | | |
| 86:08    Q. It says:  "Since 1992, this<br>86:09    organization has brought a professional and<br>86:10    coordinated effort in combating crime to the<br>86:11    law enforcement community."<br>86:12    Do you see that?<br>86:13    A. Yes.<br>86:14    Q. Does that refresh your recollection<br>86:15    as to when the task force was founded?<br>86:16    A. Sure, yes.<br>86:17    Q. And so you believe the task force<br>86:18    was founded in 1992?<br>86:19    A. I have no reason not to believe<br>86:20    that. | | |
| **87:16 - 87:19** | | |
| 87:16    Q. And let me put it this way:  Would<br>87:17    there be any purpose of founding a violent<br>87:18    crime and drug task force if there wasn't a<br>87:19    drug problem in the city at the time? | **Re: [87:16 to 87:19]**<br>Speculation; Assumes<br>Facts; Calls for a Legal<br>Conclusion | **Re: [87:16 to 87:19]**<br>Objections are unfounded.<br>Question properly<br>asks the witness to assume hypothetical<br>facts and seeks<br>to elicit his personal<br>knowledge based on that<br>hypothetical. |
| **88:02 - 88:02** | | |
| 88:02    A. Not that I am aware of. | **Re: [88:02 to 88:02]**<br>Speculation; Assumes<br>Facts; Calls for a Legal<br>Conclusion | **Re: [88:02 to 88:02]**<br>Objections are unfounded.<br>Question properly<br>asks the witness to assume<br>hypothetical facts and seeks<br>to elicit his personal<br>knowledge based on that<br>hypothetical. |
| **90:14 - 91:02** | | |
| 90:14    What is your understanding of the<br>90:15    purpose of the task force?<br>90:16    A. The task force in Huntington was to<br>90:17    combat violent crime, gang and narcotics drug<br>90:18    trafficking organizations.<br>90:19    Q. When you talk about drug trafficking<br>90:20    organizations, you are talking about criminal<br>90:21    drug trafficking organizations that are selling<br>90:22    either illegal narcotics or illegally diverted<br>91:01    prescription pills?<br>91:02    A. Yes. | | |

| Designations | Objections | Reponses |
|---|---|---|
| **91:11 - 92:07** | | |
| 91:11  Q. Okay.  So when you first joined the<br>91:12  task force in 2012, what illegal drugs were<br>91:13  most prevalent in the City of Huntington?<br>91:14  A. I would say prescription narcotics.<br>91:15  Q. And that would include prescription<br>91:16  opioids?<br>91:17  A. Yes.<br>91:18  Q. Does it include any other<br>91:19  prescription narcotics that are not opioids?<br>91:20  A. Probably, but it was mostly opioids.<br>91:21  Q. When you say that "mostly opioids,"<br>91:22  prescription opioids is the problem, you are<br>92:01  talking about illegally diverted prescription<br>92:02  opioids, correct?<br>92:03  A. Yes.<br>92:04  Q. You are not talking about someone<br>92:05  who receives a prescription from their doctor<br>92:06  and then uses the opioids in accordance with<br>92:07  that prescription, right? | **Re: [91:11 to 92:07]**<br>Argumentative,<br>Speculation | **Re: [91:11 to 92:07]**<br>Objections are unfounded.<br>Questions are<br>clearly not argumentative and<br>do not call for speculation,<br>but rather ask for the<br>witness's personal<br>understanding based on his<br>role as Coordinator of the<br>Huntington Violent Crime &<br>Drug Task Force. |
| **92:09 - 93:09** | | |
| 92:09  THE WITNESS:  Correct.<br>92:10  BY MR. PETKIS:<br>92:11  Q. So in 2012, illegal diverted<br>92:12  prescription opioids was the most prevalent<br>92:13  drug in the City of Huntington.<br>92:14  Has that changed over time?<br>92:15  A. Yes, in my opinion it has.<br>92:16  Q. How so?<br>92:17  A. In the beginning, as I understood<br>92:18  it, my view and opinion based on working it was<br>92:19  that prescription narcotics were the biggest<br>92:20  problem.  They were the biggest issue, and over<br>92:21  a period of time, there were a number of<br>92:22  investigations done that helped -- or made it<br>93:01  harder to obtain illegal narcotics -- illegal<br>93:02  prescriptions and the price of the pills on the<br>93:03  street went up, and as the price and<br>93:04  availability on the street went up or became<br>93:05  harder to get, people switched to heroin.<br>93:06  Q. So at some point after 2012, heroin<br>93:07  became the most prevalent illegal drug in the<br>93:08  City of Huntington?<br>93:09  A. Yes, based on our investigations. | **Re: [92:09 to 93:09]**<br>Speculation | **Re: [92:09 to 93:09]**<br>Objection is unfounded.<br>Question does not<br>call for speculation, but<br>rather asks for the witness's<br>personal understanding based<br>on his role as Coordinator of<br>the Huntington Violent Crime &<br>Drug Task Force. |
| **94:22 - 95:08** | | |
| 94:22  Q. Based on your experience at the task<br>95:01  force, did the City of Huntington have a larger<br>95:02  illegal narcotics problem than other<br>95:03  communities in the area?<br>95:04  A. I think geographically that's<br>95:05  probably correct just because naturally, the<br>95:06  City of Huntington is larger than the City of<br>95:07  Milton or some of the other surrounding towns<br>95:08  in the area. | | |
| **103:09 - 103:13** | | |
| 103:09  Q. Is it your understanding that<br>103:10  criminal drug trafficking organizations brought<br>103:11  illegal narcotics into Huntington from outside<br>103:12  the City of Huntington?<br>103:13  A. Yes. | | |

| Designations | Objections | Reponses |
|---|---|---|
| **103:22 - 104:21** | | |
| 103:22  Q. Okay.  Would Detroit be one of the<br>104:01  sources of illegal narcotics in the City of<br>104:02  Huntington?<br>104:03  A. Yes.<br>104:04  Q. What about Mexico -- Mexican<br>104:05  cartels, would they be a source of the illegal<br>104:06  narcotics brought into the City of Huntington?<br>104:07  A. I believe ultimately they would be<br>104:08  the, you know, probably one of the main<br>104:09  first-line suppliers of it, yes.<br>104:10  Q. Are there any other cities or<br>104:11  regions that you would consider a prominent<br>104:12  source of illegal narcotics in the City of<br>104:13  Huntington?<br>104:14  A. From time to time, there were other<br>104:15  sources, there were other cities, you know,<br>104:16  from time to time, we would have cases that<br>104:17  involved Akron, Ohio, we would have cases<br>104:18  involving Atlanta, Georgia, we would have cases<br>104:19  involving folks from Florida, so it kind of<br>104:20  varied but Detroit would have been probably the<br>104:21  most predominant. | | |
| **105:16 - 106:07** | | |
| 105:16  Q. Are you aware of any time when<br>105:17  either the Huntington Police Department or the<br>105:18  Cabell County Sheriff's Office did not<br>105:19  participate in the task force?<br>105:20  A. I am not aware of any.<br>105:21  Q. Okay.  When one of these agencies<br>105:22  participated in the task force, would they<br>106:01  provide funding to the task force?<br>106:02  A. No, they would not.<br>106:03  Q. The other way around, right?  The<br>106:04  task force would provide funding to the<br>106:05  agencies themselves?<br>106:06  A. The FBI would provide overtime<br>106:07  funding to the agencies. | | |
| **106:08 - 107:03** | | |
| 106:08  Q. Is that the only form of funding,<br>106:09  overtime funding that would be provided to the<br>106:10  agencies?<br>106:11  A. Can you clarify, what do you mean by<br>106:12  "provided to the agencies."  I'm not clear on<br>106:13  that.<br>106:14  Q. Sure.  Did the FBI give any funding<br>106:15  to the agencies besides overtime for task force<br>106:16  officers?<br>106:17  A. No.  The FBI did not.<br>106:18  Q. Did the FBI ever purchase equipment<br>106:19  to be used by the agencies?<br>106:20  A. The FBI would provide equipment that<br>106:21  would be used collectively by the task force.<br>106:22  Q. Would the FBI retain ownership of<br>107:01  that equipment in the event that the task force<br>107:02  ended?<br>107:03  A. While I was there, yes. | | |
| **123:13 - 123:21** | | |
| 123:13  Q. What proportion of the task force<br>123:14  investigations were focused on opioids?<br>123:15  A. I would say a very large percentage<br>123:16  of the Task Force's efforts. | Re: [123:13 to 123:21]<br>Incomplete designation. | Re: [123:13 to 123:21]<br>Plaintiffs agree to designate<br>123:13-124:4. |

| Designations | Objections | Reponses |
|---|---|---|
| 123:17   Q. What proportion of the task force<br>123:18   investigations were focused on prescription<br>123:19   opioids in your experience?<br>123:20   A. It varied from time to time.  It<br>123:21   would depend what an individual group was | | |
| **123:22 - 124:04**<br>123:22   doing.  I would say that in the beginning, my<br>124:01   time there, it was more driven towards<br>124:02   prescription narcotics.  Towards the end, there<br>124:03   was probably a bigger percentage of heroin that<br>124:04   we investigated. | | |
| **124:05 - 124:12**<br>124:05   Q. You testified earlier that Detroit<br>124:06   was a major source of illicit drugs trafficked<br>124:07   into the Huntington area; is that correct?<br>124:08   A. To our knowledge, yes.<br>124:09   Q. And Detroit was also a major source<br>124:10   of illegally diverted prescription opioids<br>124:11   trafficked into the Huntington area, correct?<br>124:12   A. My understanding is yes. | | |
| **126:06 - 127:16**<br>126:06   Q. During your time on the task force,<br>126:07   are you aware of any situation in which the<br>126:08   task force traced the source of the illegally<br>126:09   diverted prescription opioids back to McKesson<br>126:10   Corporation?<br>126:11   A. No, I'm not.<br>126:12   Q. Same question for Cardinal Health.<br>126:13   Are you aware of any investigation<br>126:14   that traced the source of illegally diverted<br>126:15   prescription opioids back to Cardinal Health?<br>126:16   A. No, I'm not.<br>126:17   Q. And what about AmerisourceBergen?<br>126:18   A. No.<br>126:19   Q. Okay.  I think you mentioned<br>126:20   previously that the task force did arrest some<br>126:21   individuals for diverting pharmaceutical drugs;<br>126:22   is that correct?<br>127:01   A. For distributing prescription<br>127:02   narcotics, yes.<br>127:03   Q. And the assumption would be if they<br>127:04   are illegally distributing prescription<br>127:05   narcotics, then those narcotics were diverted<br>127:06   at some point, correct?<br>127:07   A. Yes.<br>127:08   Q. It could have been diverted either<br>127:09   by the person that you arrested for<br>127:10   distributing them or by some other criminal act<br>127:11   earlier in the chain, right?<br>127:12   A. Yes, that's correct.<br>127:13   Q. Okay.  But it would always be a<br>127:14   criminal act or a criminal drug trafficking<br>127:15   organization that diverted the prescription<br>127:16   opioids, correct? | Re: [126:06 to 127:16]<br>Foundation;<br>Speculation; Lack of Personal<br>Knowledge; Calls for Legal<br>Conclusion; Compound | Re: [126:06 to 127:16]<br>Objections are<br>unfounded. Questions ask for<br>the witness's understanding<br>based on his role as<br>Coordinator of the Huntington<br>Violent Crime & Drug Task<br>Force. Questions do not call<br>for a legal conclusion, but<br>rather ask the witness to<br>identify, as a matter of fact,<br>whether the Task Force ever<br>identified the Defendants as<br>the source of any diverted<br>prescription opioids in the<br>area. Witness confirmed that,<br>based on his understanding,<br>the Task Force had not traced<br>any illegally diverted<br>prescription opioids back to<br>Defendants, demonstrating<br>personal knowledge in response<br>to the question. Form<br>objections waived by lack of<br>contemporaneous objection. |
| **127:20 - 127:21**<br>127:20   THE WITNESS:  It would always be<br>127:21   someone who committed a crime, yes. | Re: [127:20 to 127:21]<br>Foundation;<br>Speculation; Lack of Personal<br>Knowledge; Calls for Legal | Re: [127:20 to 127:21]<br>Objections are<br>unfounded. Questions ask for<br>the witness's understanding |

| Designations | Objections | Reponses |
|---|---|---|
| | Conclusion; Compound | based on his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Questions do not call for a legal conclusion, but rather ask the witness to identify, as a matter of fact, whether the Task Force ever identified the Defendants as the source of any diverted prescription opioids in the area. Witness confirmed that, based on his understanding, the Task Force had not traced any illegally diverted prescription opioids back to Defendants, demonstrating personal knowledge in response to the question. Form objections waived by lack of contemporaneous objection. |
| **128:15 - 128:19**<br>128:15  Q. Based on your experience on the task<br>128:16  force, are you aware of any investigations that<br>128:17  revealed the McKesson Corporation had diverted<br>128:18  any prescription opioids?<br>128:19  A. Not to my knowledge. | **Re: [128:01 to 128:19]**<br>Calls for Legal Conclusion; Compound; Speculation | **Re: [128:15 to 128:19]**<br>Objections are unfounded. Question asks for the witness's understanding based on his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Question does not call for a legal conclusion or speculation, but rather asks the witness to identify, as a matter of fact, whether the Task Force ever identified McKesson as having diverted prescription opioids. |
| **129:01 - 129:03**<br>129:01  Q. Are you aware of any investigations<br>129:02  that revealed that Cardinal Health diverted any<br>129:03  prescription opioids? | **Re: [129:01 to 129:03]**<br>Calls for Legal Conclusion; Compound; Speculation | **Re: [129:01 to 129:03]**<br>Objections are unfounded. Question asks for the witness's understanding based on his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Question does not call for a legal conclusion or speculation, but rather asks the witness to identify, as a matter of fact, whether the Task Force ever identified Cardinal Health as having diverted prescription opioids. |
| **129:09 - 129:09**<br>129:09  THE WITNESS:  Not to my knowledge. | **Re: [129:09 to 129:09]**<br>Calls for Legal Conclusion; Compound; | **Re: [129:09 to 129:09]**<br>Objections are unfounded. Question asks for |

| Designations | Objections | Reponses |
|---|---|---|
| | Speculation | the witness's understanding based on his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Question does not call for a legal conclusion or speculation, but rather asks the witness to identify, as a matter of fact, whether the Task Force ever identified Cardinal Health as having diverted prescription opioids. |

**131:10 - 131:14**

| | | |
|---|---|---|
| 131:10 Q. Based on your experience with the | | |
| 131:11 task force and the investigations that | | |
| 131:12 occurred, what is the most common way that | | |
| 131:13 those individuals would have come into | | |
| 131:14 possession of those illegally diverted pills? | | |

**132:02 - 132:11**

| | | |
|---|---|---|
| 132:02 THE WITNESS:  The individuals would | | |
| 132:03 have come in possession of a larger quantity of | | |
| 132:04 prescription medication and our investigations | | |
| 132:05 would lead us to investigate the source of | | |
| 132:06 supply of the larger amounts. | | |
| 132:07 BY MR. PETKIS: | | |
| 132:08 Q. And was the source of the supply for | | |
| 132:09 the larger amounts of diverted prescription | | |
| 132:10 opioids typically a criminal drug trafficking | | |
| 132:11 organization? | | |

**132:18 - 132:21**

| | | |
|---|---|---|
| 132:18 THE WITNESS:  In some cases, that | | |
| 132:19 would be the case.  In other cases, we would | | |
| 132:20 hear or learn information that they received | | |
| 132:21 the drugs from a pharmacist or from a doctor. | | |

**133:17 - 133:18**

| | | |
|---|---|---|
| 133:17 MR. PETKIS:  I'm going to mark | | |
| 133:18 Exhibit 32. | | |

**133:22 - 135:01**

| | | |
|---|---|---|
| 133:22 Q. Special Agent Cox, have you seen | Re: [133:22 to 135:01] | Re: [133:22 to 135:01] |
| 134:01 this document before? | Foundation; | Objections are |
| 134:02 A. I have -- I may have seen the press | Speculation; Lack of Personal | unfounded. Witness confirmed |
| 134:03 release back in 2014, but I don't recall. | Knowledge; Calls for Legal | that he received the email in |
| 134:04 Q. But it does appear to be an e-mail | Conclusion | question and readily answered |
| 134:05 of a press release.  You are listed on the "to" | | questions concerning its |
| 134:06 line, correct? | | contents, so the proper |
| 134:07 A. Yes, I see that, yes. | | foundation was laid. Questions |
| 134:08 Q. And the title of this particular | | do not call for speculation or |
| 134:09 press release from the U.S. Attorney for the | | legal conclusion, but rather |
| 134:10 Southern District of West Virginia is:  "Heroin | | ask the witness to confirm his |
| 134:11 and Pill Dealer Sentenced in Huntington Federal | | understanding of drug |
| 134:12 Court;" is that correct? | | diversion that occurred during |
| 134:13 A. Yes, that's correct. | | his time as Coordinator of the |
| 134:14 Q. The second sentence of this | | Huntington Violent Crime & |
| 134:15 particular press release reads:  "Chief Judge | | Drug Task Force. |
| 134:16 Robert C. Chambers imposed a sentence of 87 | | |
| 134:17 months for Golson's role in a drug conspiracy | | |
| 134:18 that included transporting heroin and oxycodone | | |
| 134:19 from Detroit, Michigan, for sale in | | |
| 134:20 Huntington;" is that correct? | | |

| Designations | Objections | Reponses |
|---|---|---|
| 134:21   A. Yes.<br>134:22   Q. This is an example of illegal<br>135:01   diversion of prescription opioids, correct? | | |
| **135:06 - 135:06**<br>135:06   THE WITNESS:  Yes. | **Re: [135:06 to 135:06]**<br>Foundation;<br>Speculation; Lack of Personal Knowledge; Calls for Legal Conclusion | **Re: [135:06 to 135:06]**<br>Objections are unfounded. Witness confirmed that he received the email in question and readily answered questions concerning its contents, so the proper foundation was laid. Questions do not call for speculation or legal conclusion, but rather ask the witness to confirm his understanding of drug diversion that occurred during his time as Coordinator of the Huntington Violent Crime & Drug Task Force. |
| **135:08 - 135:20**<br>135:08   Q. In the second paragraph, there is a<br>135:09   reference to the task force and the second to<br>135:10   last sentence reads:  "Golson told agents that<br>135:11   from January of 2010 to April of 2013, he<br>135:12   received regular deliveries of heroin and<br>135:13   oxycodone pills from Detroit that he sold in<br>135:14   Huntington."<br>135:15   Did I read that correctly?<br>135:16   A. Yes.<br>135:17   Q. So is it your understanding that in<br>135:18   this particular situation, the source of the<br>135:19   illegally diverted opioid pills was a criminal<br>135:20   drug trafficking organization in Detroit? | **Re: [135:08 to 135:20]**<br>Foundation;<br>Speculation; Lack of Personal Knowledge; Calls for Legal Conclusion | **Re: [135:08 to 135:20]**<br>Objections are unfounded. Witness confirmed that he received the email in question and readily answered questions concerning its contents, so the proper foundation was laid. Questions do not call for speculation or legal conclusion, but rather ask the witness to confirm his understanding of drug diversion that occurred during his time as Coordinator of the Huntington Violent Crime & Drug Task Force. |
| **135:22 - 136:05**<br>135:22   THE WITNESS:  Yes.<br>136:01   BY MR. PETKIS:<br>136:02   Q. And that particular criminal drug<br>136:03   trafficking organization was also illegally<br>136:04   trafficking heroin into Huntington at the same<br>136:05   exact time; is that right? | **Re: [135:22 to 136:05]**<br>Foundation;<br>Speculation; Lack of Personal Knowledge; Calls for Legal Conclusion | **Re: [135:22 to 136:05]**<br>Objections are unfounded. Witness confirmed that he received the email in question and readily answered questions concerning its contents, so the proper foundation was laid. Questions do not call for speculation or legal conclusion, but rather ask the witness to confirm his understanding of drug diversion that occurred during his time as Coordinator of the Huntington Violent Crime & Drug Task Force. |
| **136:13 - 136:13**<br>136:13   THE WITNESS:  Yes. | **Re: [136:13 to 136:13]**<br>Foundation;<br>Speculation; Lack of Personal Knowledge; Calls for Legal | **Re: [136:13 to 136:13]**<br>Objections are unfounded. Witness confirmed that he received the email in |

| Designations | Objections | Reponses |
|---|---|---|
| | Conclusion | question and readily answered questions concerning its contents, so the proper foundation was laid. Questions do not call for speculation or legal conclusion, but rather ask the witness to confirm his understanding of drug diversion that occurred during his time as Coordinator of the Huntington Violent Crime & Drug Task Force. |
| **161:10 - 161:21**<br>161:10  From your experience and based on<br>161:11  your involvement with the task force, has there<br>161:12  ever been a time when the abuse of illegal<br>161:13  drugs was not a problem in the City of<br>161:14  Huntington?<br>161:15  A. Not during my assignment there.<br>161:16  Q. And in your experience and based on<br>161:17  your involvement with the task force, has there<br>161:18  ever been a time when the abuse of illegal<br>161:19  drugs was not a problem in Cabell County?<br>161:20  A. Not during my assignment on the task<br>161:21  force. | **Re: [161:10 to 161:21]**<br>Foundation;<br>Speculation; Misleading; Vague (including as to time-frame);<br>Lack of Personal Knowledge | **Re: [161:10 to 161:21]**<br>Objections are unfounded. Questions ask for witness's personal understanding of drug use and abuse in Cabell/Huntington based on the knowledge and experience he gained as Coordinator of the Huntington Violent Crime & Drug Task Force. Witness answered questions based on his personal understanding. Form objections waived by lack of contemporaneous objection. |
| **162:07 - 162:11**<br>162:07  Q. Is it your understanding, based on<br>162:08  your involvement with the FBI Task Force, that<br>162:09  illegal drug use and abuse had been a<br>162:10  long-standing problem in the City of Huntington<br>162:11  prior to your joining in 2012? | **Re: [162:07 to 162:11]**<br>Foundation;<br>Speculation; Misleading; Vague (including as to time-frame);<br>Lack of Personal Knowledge | **Re: [162:07 to 162:11]**<br>Objections are unfounded. Questions ask for witness's personal understanding of drug use and abuse in Cabell/Huntington based on the knowledge and experience he gained as Coordinator of the Huntington Violent Crime & Drug Task Force. Witness answered questions based on his personal understanding. |
| **162:13 - 162:13**<br>162:13  THE WITNESS:  Yes. | **Re: [162:13 to 162:13]**<br>Foundation;<br>Speculation; Misleading; Vague (including as to time-frame);<br>Lack of Personal Knowledge | **Re: [162:13 to 162:13]**<br>Objections are unfounded. Questions ask for witness's personal understanding of drug use and abuse in Cabell/Huntington based on the knowledge and experience he gained as Coordinator of the Huntington Violent Crime & Drug Task Force. Witness answered questions based on his personal understanding. |
| **162:15 - 163:01**<br>162:15  Q. Same question for Cabell County.  Is<br>162:16  it your understanding that there had been a<br>162:17  long-standing illegal drug problem in Cabell | **Re: [162:15 to 163:01]**<br>Foundation;<br>Speculation; Misleading; Vague | **Re: [162:15 to 163:01]**<br>Objections are unfounded. Questions ask for |

| Designations | Objections | Reponses |
|---|---|---|
| 162:18 County prior to you joining in 2012?<br>162:19 A. Yes.<br>162:20 Q. It's your understanding that illegal<br>162:21 drugs are trafficked into Cabell County and the<br>162:22 City of Huntington by criminal drug trafficking<br>163:01 organizations, correct? | (including as to time-frame);<br>Lack of Personal Knowledge | witness's personal understanding of drug use and abuse and illegal drug distribution in Cabell/Huntington based on the knowledge and experience he gained as Coordinator of the Huntington Violent Crime & Drug Task Force. Witness answered questions based on his personal understanding. Form objections waived by lack of contemporaneous objection. |
| 163:08 - 163:08<br>163:08 A. Yes. | Re: [163:08 to 163:08]<br>Foundation;<br>Speculation; Misleading; Vague (including as to time-frame);<br>Lack of Personal Knowledge | Re: [163:08 to 163:08]<br>Objections are unfounded. Questions ask for witness's personal understanding of drug use and abuse and illegal drug distribution in Cabell/Huntington based on the knowledge and experience he gained as Coordinator of the Huntington Violent Crime & Drug Task Force. Witness answered questions based on his personal understanding. |
| 163:18 - 163:22<br>163:18 Q. And those illegal drugs that are<br>163:19 trafficked into the City of Huntington and<br>163:20 Cabell County are then sold to end users by<br>163:21 criminal drug dealers, correct?<br>163:22 A. Yes. | Re: [163:18 to 163:22]<br>Foundation;<br>Speculation; Misleading; Vague (including as to time-frame);<br>Lack of Personal Knowledge | Re: [163:18 to 163:22]<br>Objections are unfounded. Questions ask for witness's personal understanding of drug use and abuse in Huntington based on the knowledge and experience he gained as Coordinator of the Huntington Violent Crime & Drug Task Force. Witness answered questions based on his personal understanding. Form objections waived by lack of contemporaneous objection. |
| 164:07 - 164:12<br>164:07 Q. Sure.  Based on your understanding<br>164:08 and your experience with the task force, the<br>164:09 licensed pharmaceutical distributors who are<br>164:10 defendants in this case do not distribute any<br>164:11 illegal drugs, correct?<br>164:12 A. Not to my knowledge. | Re: [164:07 to 164:12]<br>Foundation;<br>Speculation; Vague (including as to time-frame); Lack of Personal Knowledge | Re: [164:07 to 164:12]<br>Objections are unfounded. Questions ask for witness's personal understanding of illegal drug distribution in Cabell/Huntington based on the knowledge and experience he gained as Coordinator of the Huntington Violent Crime & Drug Task Force. Witness answered questions based on his personal understanding. Form objections waived by lack of contemporaneous objection. |

| Designations | Objections | Reponses |
|---|---|---|
| **167:08 - 167:11**<br>167:08  Q. Sure.  Would you agree that<br>167:09  defendants are not responsible for any of the<br>167:10  illegal drugs that have been trafficked into<br>167:11  Cabell County? | **Re: [167:08 to 167:11]**<br>Calls for legal<br>conclusion. | **Re: [167:08 to 167:11]**<br>Unfounded objection.  Counsel requested that the witness provide an answer based on his opinion (see 166:7-11).  The witness then provided his opinion, as requested by counsel, based on his experience and knowledge. |
| **167:14 - 167:19**<br>167:14  THE WITNESS:  So my opinion is, you<br>167:15  know, it's a very complex question and it's a<br>167:16  very complex issue and so to say that it's --<br>167:17  they bear no responsibility, at some point in<br>167:18  time, a large volume of narcotics has increased<br>167:19  year after year in our area.  I don't know who | | **Re: [167:14 to 167:19]**<br>Defendants have objected to Plaintiffs' designation of 167:20 to 168:22 on multiple grounds.  To the extent that those objections are overruled Defendants designate this portion for completeness on a conditional basis only. |
| **167:20 - 168:22**<br>167:20  makes them.  I don't know where they come from,<br>167:21  but basic common sense to me as a business<br>167:22  person understands that on a business aspect,<br>168:01  you have an organization that is seeing<br>168:02  astronomical amount of sales increase, whether<br>168:03  that's heroin, whether that's pills, whatever<br>168:04  it is, and what organization it is, and so to<br>168:05  say that nobody bears a responsibility for it,<br>168:06  somebody somewhere bears a responsibility that<br>168:07  at some point in time, whether it's the end<br>168:08  user, whether it's a local level dealer,<br>168:09  whether it's a doctor or a pharmacist or a<br>168:10  maker of narcotics, that it has increased year<br>168:11  after year and at some level in the City of<br>168:12  Huntington, Cabell County, the United States,<br>168:13  we don't have an astronomical increase from<br>168:14  year to year of people experiencing pain, so,<br>168:15  therefore, at some level, not -- far, far,<br>168:16  above my pay grade, but at some level, somebody<br>168:17  bears some responsibility for it and to say<br>168:18  that the first maker of the product bears no<br>168:19  responsibility for it, I can't answer that and<br>168:20  affirm to you whether they do or not, but<br>168:21  that's my stance on it and my understanding of<br>168:22  the problem. | **Re: [167:20 to 168:22]**<br>Incomplete designation.<br>Calls for legal<br>conclusion. | **Re: [167:20 to 168:22]**<br>Unfounded objection.  Counsel requested that the witness provide an answer based on his opinion (see 166:7-11).  The witness then provided his opinion, as requested by counsel, based on his experience and knowledge. |
| **170:07 - 171:03**<br>170:07  Q. Okay.  We talked about this a little<br>170:08  bit previously, but would you agree that the<br>170:09  popularity and availability of illegal drugs<br>170:10  can change over time?<br>170:11  A. Yes.<br>170:12  Q. So for instance, a drug that was<br>170:13  very popular in the '80s might not be so<br>170:14  popular in the '90s, but then might make a<br>170:15  resurgence in the 2000s, right?<br>170:16  A. Yes.<br>170:17  Q. And as the popularity and<br>170:18  availability of a specific illegal drug<br>170:19  changes, the threats posed by that illegal drug<br>170:20  can also change; is that right?<br>170:21  A. Yes.<br>170:22  Q. And so the threats posed by specific<br>171:01  illegal drugs can ebb and flow over time as | | |

| Designations | Objections | Reponses |
|---|---|---|
| 171:02    well, right?<br>171:03    A. Yes. | | |
| **171:06 - 171:10**<br>171:06    What are the factors that determine<br>171:07    whether a specific illegal drug will be popular<br>171:08    or highly accessible at any given moment?<br>171:09    A. I think part of it is the supply,<br>171:10    the cost and the availability. | | |
| **172:07 - 172:10**<br>172:07    Q. Okay.  How does the popularity and<br>172:08    accessibility of a particular illegal drug<br>172:09    relate to the threats posed by that illegal<br>172:10    drug? | | |
| **172:14 - 173:05**<br>172:14    THE WITNESS:  So I would use<br>172:15    marijuana as an example, not my -- not an<br>172:16    official FBI stance but I would use marijuana<br>172:17    for example.<br>172:18    Marijuana is in higher supply now or<br>172:19    appears to be in higher supply now, but people<br>172:20    that smoke marijuana don't necessarily show the<br>172:21    propensity for violence and the death rate and<br>172:22    other violent acts as what other drugs that may<br>173:01    not be as available for.  They may be at<br>173:02    cheaper cost and so there is a variety of drugs<br>173:03    out there that may be a high number but they<br>173:04    may not have the same risk factors just because<br>173:05    it's in a higher number. | | |
| **174:01 - 174:04**<br>174:01    Q. Okay.  So you did testify that price<br>174:02    played a role in the popularity of a specific<br>174:03    illegal drug, right?<br>174:04    A. Yes. | | |
| **175:17 - 175:22**<br>175:17    Q. So in that sense, as price decreases<br>175:18    and supply increases, the threat for a<br>175:19    particular illegal drug will be higher,<br>175:20    correct?<br>175:21    A. The amount of usage would be higher,<br>175:22    yes. | | |
| **176:19 - 176:20**<br>176:19    Q. Criminal actors set the prices for<br>176:20    illegal drugs like heroin, correct? | **Re: [176:19 to 176:20]**<br>Argumentative; Lack<br>of Foundation; Speculation;<br>Vague | **Re: [176:19 to 176:20]**<br>Objections are<br>unfounded. Mr. Cox previously<br>served as Coordinator of the<br>Huntington Violent Crime &<br>Drug Task Force and testified<br>at length regarding his<br>experience investigating drug<br>crimes and diversion. He is<br>well-positioned to answer<br>questions concerning illegal<br>drug distribution and illicit<br>drug markets. Questions are<br>not in any way argumentative. |

| Designations | Objections | Reponses |
|---|---|---|
| **177:01 - 177:02**<br>177:01  THE WITNESS:  Yes, to some degree<br>177:02  it's the seller and the user. | **Re: [177:01 to 177:02]**<br>Argumentative; Lack of Foundation; Speculation; Vague | **Re: [177:01 to 177:02]**<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets. Questions are not in any way argumentative. |
| **177:04 - 177:07**<br>177:04  Q. Okay.  But government-licensed<br>177:05  distributors of legal narcotics do not set the<br>177:06  price in the market for illegal drugs like<br>177:07  heroin, right? | | |
| **177:11 - 177:17**<br>177:11  THE WITNESS:  Not per se.  What I<br>177:12  mean by that is that -- what we saw in the time<br>177:13  that I was on the task force, when prescription<br>177:14  medication becomes harder and harder to obtain,<br><br>177:15  then the price of prescription narcotics goes<br>177:16  up and the cost of heroin then goes down, and<br>177:17  so that is the way I view that. | | |
| **177:19 - 178:07**<br>177:19  Q. Okay.  But the licensed distributor<br>177:20  of legal narcotics doesn't tell a criminal drug<br>177:21  trafficking organization or an individual drug<br>177:22  dealer how much to sell their heroin for,<br>178:01  right?<br>178:02  A. Correct.<br>178:03  Q. The criminal drug trafficking<br>178:04  organization or the individual dealer, they<br>178:05  make the decision how much to sell their heroin<br>178:06  for, right?<br>178:07  A. Yes. | **Re: [177:19 to 178:07]**<br>Argumentative; Lack of Foundation; Speculation; Vague | **Re: [177:19 to 178:07]**<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crime and diversion.  He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets.  Question are not in any way argumentative. Form objections waived by lack of contemporaneous objection. |
| **179:01 - 179:08**<br>179:01  Q. But accessibility and supply play a<br>179:02  role in determining the level of usage of a<br>179:03  particular illegal drug, right?<br>179:04  A. Yes.<br>179:05  Q. And it's criminal drug trafficking<br>179:06  organizations and criminal drug dealers that<br>179:07  determine the availability and supply of | **Re: [179:01 to 179:08]**<br>Argumentative; Misleading; Lack of Foundation; Speculation; Vague | **Re: [179:01 to 179:08]**<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his |

| Designations | Objections | Reponses |
|---|---|---|
| 179:08      illegal drugs in the City of Huntington, right? | | experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets. Questions are not in any way argumentative. Form objections waived by lack of contemporaneous objection. |
| **179:12 - 179:12**<br>179:12      THE WITNESS:  Yes, to some degree. | Re: [179:12 to 179:12]<br>Argumentative;<br>Misleading; Lack of<br>Foundation; Speculation; Vague | Re: [179:12 to 179:12]<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets. Questions are not in any way argumentative. |
| **179:14 - 179:17**<br>179:14      Q. And licensed distributors of illegal<br>179:15      narcotics don't tell criminal drug trafficking<br>179:16      organizations or drug dealers how much of a<br>179:17      particular drug -- illegal drug to sell, right? | Re: [179:14 to 179:17]<br>Argumentative;<br>Misleading; Lack of<br>Foundation; Speculation; Vague | Re: [179:14 to 179:17]<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets. Questions are not in any way argumentative. |
| **179:22 - 179:22**<br>179:22      THE WITNESS:  That's correct. | Re: [179:22 to 179:22]<br>Argumentative;<br>Misleading; Lack of<br>Foundation; Speculation; Vague | Re: [179:22 to 179:22]<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets. Questions are not in any way argumentative. |
| **180:02 - 180:05**<br>180:02      Q. The criminal drug trafficking<br>180:03      organization or drug dealer, they alone make<br>180:04      the decision of how much a particular illegal | Re: [180:02 to 180:05]<br>Argumentative;<br>Misleading; Lack of | Re: [180:02 to 180:05]<br>Objections are unfounded. Mr. Cox previously |

| Designations | Objections | Reponses |
|---|---|---|
| 180:05   drug to sell, right? | Foundation; Speculation; Vague | served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets. Questions are not in any way argumentative. |
| **180:09 - 180:09**<br>180:09   THE WITNESS:  Yes.  Yes. | **Re: [180:09 to 180:09]**<br>Argumentative; Misleading; Lack of Foundation; Speculation; Vague | **Re: [180:09 to 180:09]**<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets. Questions are not in any way argumentative. |
| **186:01 - 186:05**<br>186:01   Q. Is there anything unique about the<br>186:02   City of Huntington or Cabell County that makes<br>186:03   it particularly susceptible to illegal drug<br>186:04   use?<br>186:05   A. Not to my knowledge. | | |
| **186:06 - 186:08**<br>186:06   Q. Okay.  I'm going to mark two<br>186:07   exhibits at the same time, 46 and 47, if you<br>186:08   want to pull those out. | **Re: [186:06 to 186:08]**<br>Question designated with no answer; Improper narrative | **Re: [186:06 to 186:08]**<br>Question designated for purposes of laying foundation for ensuing questions regarding Exhibit 47, which is a January 27, 2015 report prepared by the Huntington Violent Crime & Drug Task Force. The Task Force contains members of the Huntington Police Department, and this particular report was prepared by Mr. Cox and sent by him to a member of the Huntington Police Department. |
| **187:06 - 187:08**<br>187:06   Q. Who is Greg Moore?<br>187:07   A. Greg Moore was a member of the task<br>187:08   force from Huntington Police Department. | | |
| **188:10 - 188:15**<br>188:10   Q. All right.  Let's look at the next<br>188:11   exhibit.  This is 47.<br>188:12   This document is titled:  "FBI<br>188:13   Huntington Violence Crime Drug Task Force,<br>188:14   Huntington Interdiction Team, OCDETF Funding | **Re: [188:10 to 188:15]**<br>Question designated with no answer; Improper narrative | **Re: [188:10 to 188:15]**<br>Question designated for purposes of laying foundation for ensuing questions regarding Exhibit |

| Designations | Objections | Reponses |
|---|---|---|
| 188:15    Proposal," and it's dated January 27, 2015. | | 47, which is a January 27, 2015 report prepared by the Huntington Violent Crime & Drug Task Force. The Task Force contains members of the Huntington Police Department, and this particular report was prepared by Mr. Cox and sent by him to a member of the Huntington Police Department. |
| **188:22 - 189:05**<br>188:22    Q. What is this document?<br>189:01    A. This is a document that was prepared<br>189:02    by myself with the assistance of some other<br>189:03    folks from the task force in order to get a<br>189:04    fund -- request funding for interdiction<br>189:05    program that we had in Huntington. | Re: [188:22 to 189:05]<br>Relevance; Hearsay | Re: [188:22 to 189:05]<br>Question pertains to Exhibit 47, which is a January 27, 2015 report prepared by the Huntington Violent Crime & Drug Task Force. The Task Force contains members of the Huntington Police Department, and this particular report was prepared by Mr. Cox and sent by him to a member of the Huntington Police Department. Exhibit 47 is relevant in demonstrating the impact of illegal drug distribution on Cabell/Huntington and in particular the presence of illegal drug dealers from Detroit and surrounding areas in Cabell/Huntington. Because Exhibit 47 sets forth the activities of the Huntington Violent Crime & Drug Task Force, it therefore constitutes an admissible public record for which Plaintiffs cannot demonstrate untrustworthiness under FRE 803(8)(A)(i). Exhibit 47 is also admissible as a non-hearsay statement of a party opponent under FRE 801(d)(2)(B). At minimum, Exhibit 47 could be admitted not for its truth, but instead for notice to the Huntington Police Department of illegal drug distribution in Cabell/Huntington as of 2015. |
| **194:17 - 196:05**<br>194:17    Q. Okay.  We are going to skip a<br>194:18    sentence, but the third sentence in this<br>194:19    paragraph states:  "Huntington is the largest<br>194:20    city in the region and located approximately<br>194:21    300 miles south of Detroit, Michigan.  It is<br>194:22    frequently referred to as 'Little Detroit' due<br>195:01    to the large population of former Detroit-based<br>195:02    heroin traffickers."<br>195:03    Did I read that correctly?<br>195:04    A. Yes.<br>195:05    Q. Have you ever heard of Huntington | Re: [194:17 to 196:05]<br>Relevance; Hearsay;<br>Speculation; Improper Opinion | Re: [194:17 to 196:05]<br>Question pertains to Exhibit 47, which is a January 27, 2015 report prepared by the Huntington Violent Crime & Drug Task Force. The Task Force contains members of the Huntington Police Department, and this particular report was prepared by Mr. Cox and sent by him to a member of the |

| Designations | Objections | Reponses |
|---|---|---|
| 195:06 referred to as "Little Detroit?"<br>195:07 A. Yes.<br>195:08 Q. Huntington was given that nickname<br>195:09 due to the large population of heroin<br>195:10 traffickers from Detroit?<br>195:11 A. Yes.<br>195:12 Q. The very next sentence reads:<br>195:13 "Huntington is a destination city known and<br>195:14 utilized by Detroit violent gang members and<br>195:15 narcotic traffickers to establish heroin<br>195:16 distribution points in other parts of the<br>195:17 tri-state region.  The Huntington area is a<br>195:18 well-known regional distribution hub for the<br>195:19 entire tri-state region for illegal drugs,<br>195:20 which has resulted in a deterioration of the<br>195:21 area with increased slum and blighting<br>195:22 conditions."<br>196:01 Did I read that correctly?<br>196:02 A. Yes.<br>196:03 Q. In your experience, is the City of<br>196:04 Huntington a destination city for violent gang<br>196:05 members and narcotics traffickers from Detroit? | | Huntington Police Department. Exhibit 47 is relevant in demonstrating the impact of illegal drug distribution on Cabell/Huntington and in particular the presence of illegal drug dealers from Detroit and surrounding areas in Cabell/Huntington. Because Exhibit 47 sets forth the activities of the Huntington Violent Crime & Drug Task Force, it therefore constitutes an admissible public record for which Plaintiffs cannot demonstrate untrustworthiness under FRE 803(8)(A)(i). Exhibit 47 is also admissible as a non-hearsay statement of a party opponent under FRE 801(d)(2)(B). At minimum, Exhibit 47 could be admitted not for its truth, but instead for notice to the Huntington Police Department of illegal drug distribution in Cabell/Huntington as of 2015. Question does not call for speculation or opinion, but rather asks for Mr. Cox's personal understanding based on his drafting of the document and knowledge as Coordinator of the Huntington Violent Crime & Drug Task Force. |
| 196:07 - 196:07<br>196:07 THE WITNESS:  Yes. | Re: [196:07 to 196:07]<br>Relevance;<br>Speculation; Improper Opinion | Re: [196:07 to 196:07]<br>Question pertains to Exhibit 47, which is a January 27, 2015 report prepared by the Huntington Violent Crime & Drug Task Force. The Task Force contains members of the Huntington Police Department, and this particular report was prepared by Mr. Cox and sent by him to a member of the Huntington Police Department.  Exhibit 47 is relevant in demonstrating the impact of illegal drug distribution on Cabell/Huntington and in particular the presence of illegal drug dealers from Detroit and surrounding areas in Cabell/Huntington. Because Exhibit 47 sets forth the activities of the Huntington Violent Crime & Drug Task Force, it therefore constitutes an admissible public record for which |

| Designations | Objections | Reponses |
|---|---|---|
| | | Plaintiffs cannot demonstrate untrustworthiness under FRE 803(8)(A)(i). Exhibit 47 is also admissible as a non-hearsay statement of a party opponent under FRE 801(d)(2)(B). At minimum, Exhibit 47 could be admitted not for its truth, but instead for notice to the Huntington Police Department of illegal drug distribution in Cabell/Huntington as of 2015.  Question does not call for speculation or opinion, but rather asks for Mr. Cox's personal understanding based on his drafting of the document and knowledge as Coordinator of the Huntington Violent Crime & Drug Task Force. |
| 196:09 - 196:11<br><br>196:09     Q. Why is that the case?<br>196:10     A. There is a demand for illegal drugs<br>196:11     in Huntington. | **Re: [196:09 to 196:11]**<br>Relevance;<br>Speculation; Improper Opinion | **Re: [196:09 to 196:11]**<br>Question pertains to Exhibit 47, which is a January 27, 2015 report prepared by  the Huntington Violent Crime & Drug Task Force. The Task Force contains members of the Huntington Police Department, and this particular report was prepared by Mr. Cox and sent by him to a member of the Huntington Police Department. Exhibit 47 is relevant in demonstrating the impact of illegal drug distribution on Cabell/Huntington and in particular the presence of illegal drug dealers from Detroit and surrounding areas in Cabell/Huntington. Because Exhibit 47 sets forth the activities of the Huntington Violent Crime & Drug Task Force, it therefore constitutes an admissible public record for which<br><br>Plaintiffs cannot demonstrate untrustworthiness under FRE 803(8)(A)(i). Exhibit 47 is also admissible as a non-hearsay statement of a party opponent under FRE 801(d)(2)(B). At minimum, Exhibit 47 could be admitted not for its truth, but instead for notice to the Huntington Police Department of illegal drug distribution in Cabell/Huntington as of 2015.  Question does not call for speculation or opinion, but rather asks for Mr. Cox's personal understanding based on his drafting of the document and knowledge as Coordinator of the Huntington Violent Crime & Drug Task Force. |

| Designations | Objections | Reponses |
|---|---|---|
| 214:18 - 214:21<br>214:18  Based on your experience with the<br>214:19  task force, are you aware of any years in which<br>214:20  marijuana was not being illegally sold and<br>214:21  abused in the City of Huntington? | **Re: [214:18 to 214:21]**<br>Vague; Relevance;<br>Speculation | **Re: [214:18 to 214:21]**<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets in Cabell/Huntington, both of which are relevant to multiple issues in this case. Question does not ask the witness to speculate, but rather asks for his personal understanding based on his role as Coordinator of the Task Force. |
| 215:02 - 215:02<br>215:02  THE WITNESS:  No. | **Re: [215:02 to 215:02]**<br>Vague; Relevance;<br>Speculation | **Re: [215:02 to 215:02]**<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets in Cabell/Huntington, both of which are relevant to multiple issues in this case. Question does not ask the witness to speculate, but rather asks for his personal understanding based on his role as Coordinator of the Task Force. |
| 225:06 - 225:10<br>225:06  Q. Based on your experience with law<br>225:07  enforcement and the task force, are there any<br>225:08  years you are aware of where cocaine and crack<br>225:09  cocaine was not being illegally sold and abused | **Re: [225:06 to 225:10]**<br>Vague; Speculation;<br>Relevance | **Re: [225:06 to 225:10]**<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the |

| Designations | Objections | Reponses |
|---|---|---|
| 225:10    in the City of Huntington? | | Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets in Cabell/Huntington, both of which are relevant to multiple issues in this case. Question does not ask the witness to speculate, but rather asks for his personal understanding based on his role as Coordinator of the Task Force. |
| 225:12 - 225:12 | | |
| 225:12    THE WITNESS:  Not to my knowledge. | Re: [225:12 to 225:12] Vague; Speculation; Relevance | Re: [225:12 to 225:12] Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets in Cabell/Huntington, both of which are relevant to multiple issues in this case. Question does not ask the witness to speculate, but rather asks for his personal understanding based on his role as Coordinator of the Task Force. |
| 227:02 - 227:05 | | |
| 227:02    Q. What about based on your personal 227:03    experience growing up in West Virginia, are you 227:04    aware of heroin use in the State of West 227:05    Virginia prior to 2012? | | |
| 227:07 - 227:11 | | |
| 227:07    THE WITNESS:  You know, heroin was 227:08    something that I rarely heard of growing up in 227:09    West Virginia.  Prior to my law enforcement 227:10    experience, it was -- heroin was not very 227:11    prevalent. | | |
| 229:13 - 229:22 | | |
| 229:13    Q. Based on your experience with the 229:14    task force, are all of these different types of 229:15    heroin listed here, black tar, brown and 229:16    Mexican, illegally sold and abused in the City 229:17    of Huntington and Cabell County? 229:18    A. You know, I am trying to recall if 229:19    we had any black tar heroin.  I think that we 229:20    did, but it would have been very small amounts. 229:21    If we had it during my time, it would be very 229:22    small amounts. | | |

| Designations | Objections | Reponses |
|---|---|---|
| **230:01 - 230:07**<br>230:01   Q. Okay.  To the best of your<br>230:02   knowledge, to the extent these different types<br>230:03   of heroin are present in the City of Huntington<br>230:04   or Cabell County, is it your understanding that<br>230:05   they were illegally trafficked by criminal drug<br>230:06   trafficking organizations?<br>230:07   A. Yes. | Re: [230:01 to 230:07]<br>Compound; Relevance | Re: [230:01 to 230:07]<br>Objections are unfounded. The topics of heroin distribution and the role of illegal drug traffickers are relevant to multiple disputed issues in this case. Form objection waived by lack of contemporaneous objection. |
| **231:04 - 231:18**<br>231:04   Q. Has Xanax ever been a threat to the<br>231:05   City of Huntington or Cabell County?<br>231:06   A. Yes.  It's used.  It's an illegal<br>231:07   drug that is used in the City of Huntington<br>231:08   from my understanding.<br>231:09   Q. When you say "it's an illegal drug,"<br>231:10   you mean it's a prescription drug that is<br>231:11   illegally diverted, correct?<br>231:12   A. Yes.<br>231:13   Q. Based on your knowledge and<br>231:14   understanding and participation in the task<br>231:15   force, are there any years in which Xanax was<br>231:16   not being illegally diverted in the City of<br>231:17   Huntington and Cabell County?<br>231:18   A. Not to my knowledge. | Re: [231:04 to 231:18]<br>Vague; Speculation; Relevance | Re: [231:04 to 231:18]<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets in Cabell/Huntington, both of which are relevant to multiple issues in this case. Question does not ask the witness to speculate, but rather asks for his personal understanding based on his role as Coordinator of the Task Force. Form objections waived by lack of contemporaneous objection. |
| **233:10 - 233:12**<br>233:10   Q. Why did the task force track these<br>233:11   three different line items for methamphetamine<br>233:12   only? | Re: [233:10 to 233:12]<br>Relevance; Vague | Re: [233:10 to 233:12]<br>Objections are unfounded. Mr. Cox previously served as Coordinator of the Huntington Violent Crime & Drug Task Force and testified at length regarding his experience investigating drug crimes and diversion. He is well-positioned to answer questions concerning illegal drug distribution and illicit drug markets in Cabell/Huntington, both of which are relevant to multiple issues in this case. Question does not ask the witness to speculate, but rather asks for his personal understanding based on his role as Coordinator of the Task Force. |

| Designations | Objections | Reponses |
|---|---|---|
| **233:14 - 235:04** | | |
| 233:14 THE WITNESS:  My understanding was | **Re: [233:14 to 235:04]** | **Re: [233:14 to 235:04]** |
| 233:15 that methamphetamine use had been more | Relevance; Vague | Objections are |
| 233:16 prevalent at one point in time, and the | | unfounded. Mr. Cox previously |
| 233:17 manufacture and individual labs within the area | | served as Coordinator of the |
| 233:18 had been more prevalent prior to me getting on | | Huntington Violent Crime & |
| 233:19 the task force and that's why these boxes would | | Drug Task Force and testified |
| 233:20 have been there to track that. | | at length regarding his |
| 233:21 BY MR. PETKIS: | | experience investigating drug |
| 233:22 Q. When you say that "there is a point | | crimes and diversion. He is |
| 234:01 in time where it was more prevalent," what are | | well-positioned to answer |
| 234:02 you referring to? | | questions concerning illegal |
| 234:03 A. At some point in time, I would -- | | drug distribution and illicit |
| 234:04 probably before I was on the task force, there | | drug markets in |
| 234:05 was -- it was more prevalent that people would | | Cabell/Huntington, both of |
| 234:06 make methamphetamine.  They would use different | | which are relevant to multiple |
| 234:07 types of methods to make methamphetamine at | | issues in this case. Question |
| 234:08 their house or other places rather than | | does not ask the witness to |
| 234:09 importing it in from outside the state. | | speculate, but rather asks for |
| 234:10 Q. Was there a point in time where | | his personal understanding |
| 234:11 there was a switch and imported methamphetamine | | based on his role as |
| 234:12 became more prevalent than single use or | | Coordinator of the Task Force. |
| 234:13 homemade methamphetamine? | | Form objections waived by lack |
| 234:14 A. Yes. | | of contemporaneous objection. |
| 234:15 Q. And when did that occur? | | |
| 234:16 A. I don't know exactly.  Probably | | |
| 234:17 sometime prior to 2012.  The use of meth -- | | |
| 234:18 methamphetamine imported in was not very high | | |
| 234:19 and the production of it was basically the only | | |
| 234:20 method, almost the only method in the area. | | |
| 234:21 Q. But at some point, the importation | | |
| 234:22 of methamphetamine by criminal drug trafficking | | |
| 235:01 organizations increased; is that right? | | |
| 235:02 A. Yes. | | |
| 235:03 Q. What is your understanding of the | | |
| 235:04 source of that imported methamphetamine? | | |
| **235:06 - 235:07** | | |
| 235:06 THE WITNESS:  It would be coming | **Re: [235:06 to 235:07]** | **Re: [235:06 to 235:07]** |
| 235:07 from Mexico predominantly. | Relevance; Vague | Objections are |
| | | unfounded. Mr. Cox previously |
| | | served as Coordinator of the |
| | | Huntington Violent Crime & |
| | | Drug Task Force and testified |
| | | at length regarding his |
| | | experience investigating drug |
| | | crimes and diversion. He is |
| | | well-positioned to answer |
| | | questions concerning illegal |
| | | drug distribution and illicit |
| | | drug markets in |
| | | Cabell/Huntington, both of |
| | | which are relevant to multiple |
| | | issues in this case. Question |
| | | does not ask the witness to |
| | | speculate, but rather asks for |
| | | his personal understanding |
| | | based on his role as |
| | | Coordinator of the Task Force. |
| **235:09 - 235:16** | | |
| 235:09 Q. When that shift occurred and | | |
| 235:10 imported Mexican methamphetamine became more | | |
| 235:11 common, did the threat posed by methamphetamine | | |

| Designations | Objections | Reponses |
|---|---|---|
| 235:12   in the City of Huntington and Cabell County<br>235:13   increase or decrease?<br>235:14   A. I wasn't on the task force when that<br>235:15   happened, so I don't know the current state of<br>235:16   methamphetamine used in Huntington. | | |
| **236:18 - 236:22**<br>236:18   Q. Are you aware, based on your<br>236:19   experience and participation in the task force,<br>236:20   of any years where methamphetamine was not<br>236:21   being illegally sold and abused in the City of<br>236:22   Huntington? | Re: [236:18 to 236:22]<br>Vague; Speculation;<br>Relevance | Re: [236:18 to 236:22]<br>Objections are<br>unfounded. Mr. Cox previously<br>served as Coordinator of the<br>Huntington Violent Crime &<br>Drug Task Force and testified<br>at length regarding his<br>experience investigating drug<br>crimes and diversion. He is<br>well-positioned to answer<br>questions concerning illegal<br>drug distribution and illicit<br>drug markets in<br>Cabell/Huntington, both of<br>which are relevant to multiple<br>issues in this case. Question<br>does not ask the witness to<br>speculate, but rather asks for<br>his personal understanding<br>based on his role as<br>Coordinator of the Task Force. |
| **237:02 - 237:02**<br>237:02   THE WITNESS:  I'm not. | Re: [237:02 to 237:02]<br>Vague; Speculation;<br>Relevance | Re: [237:02 to 237:02]<br>Objections are<br>unfounded. Mr. Cox previously<br>served as Coordinator of the<br>Huntington Violent Crime &<br>Drug Task Force and testified<br>at length regarding his<br>experience investigating drug<br>crimes and diversion. He is<br>well-positioned to answer<br>questions concerning illegal<br>drug distribution and illicit<br>drug markets in<br>Cabell/Huntington, both of<br>which are relevant to multiple<br>issues in this case. Question<br>does not ask the witness to<br>speculate, but rather asks for<br>his personal understanding<br>based on his role as<br>Coordinator of the Task Force. |
| **242:03 - 243:08**<br>242:03   Q. And you testified that the task<br>242:04   force did have a number of law enforcement<br>242:05   interactions with people who were involved in<br>242:06   illegal diversion of prescription opioids,<br>242:07   correct?<br>242:08   A. Yes.<br>242:09   Q. You also testified that to the best<br>242:10   of the Task Force's ability, it would make an<br>242:11   attempt to trace the source of those illegally<br>242:12   diverted prescription opioids, correct?<br>242:13   A. Yes. | Re: [242:03 to 243:08]<br>Speculation; Lack of<br>Foundation/Personal Knowledge;<br>Compound; Relevance | Re: [242:03 to 243:08]<br>Objections are<br>unfounded. Questions do not<br>ask Mr. Cox to speculate, but<br>rather ask for his personal<br>understanding based on the<br>knowledge and experience he<br>gained in his role as<br>Coordinator of the Huntington<br>Violent Crime & Drug Task<br>Force. Mr. Cox answered the |

| Designations | Objections | Reponses |
|---|---|---|
| 242:14   Q. And I believe you also testified<br>242:15   that in the majority of cases, the source of<br>242:16   the illegally diverted prescription opioids was<br>242:17   criminal drug trafficking organizations from<br>242:18   outside the City of Huntington, right?<br>242:19   A. Yes.<br>242:20   Q. Do you know what proportion of those<br>242:21   illegally diverted prescription opioids<br>242:22   involved in the interactions you are describing<br>243:01   came from a pharmacy within the City of<br>243:02   Huntington?<br>243:03   A. I do not.<br>243:04   Q. Do you know what proportion of those<br>243:05   illegally diverted prescription opioids came<br>243:06   from a doctor in the City of Huntington who was<br>243:07   prescribing without a legitimate medical<br>243:08   purpose? | | questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the diversion of prescription opioids, which is clearly a relevant issue in this case. |
| **243:10 - 243:10**<br>243:10   THE WITNESS:  I do not. | **Re: [243:10 to 243:10]**<br>Speculation; Lack of Foundation/Personal Knowledge; Compound; Relevance | **Re: [243:10 to 243:10]**<br>Objections are unfounded. Questions do not ask Mr. Cox to speculate, but rather ask for his personal understanding based on the knowledge and experience he gained in his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the diversion of prescription opioids, which is clearly a relevant issue in this case. |
| **243:12 - 243:16**<br>243:12   Q. Do you have any knowledge of what<br>243:13   portion of those illegally diverted<br>243:14   prescription opioids were shared between family<br>243:15   members or stolen from a medicine cabinet in<br>243:16   the City of Huntington? | **Re: [243:12 to 243:16]**<br>Speculation; Lack of Foundation/Personal Knowledge; Compound; Relevance | **Re: [243:12 to 243:16]**<br>Objections are unfounded. Questions do not ask Mr. Cox to speculate, but rather ask for his personal understanding based on the knowledge and experience he gained in his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the diversion of prescription opioids, which is clearly a relevant issue in this case. |

| Designations | Objections | Reponses |
|---|---|---|
| **243:18 - 243:18**<br>243:18   THE WITNESS:  I do not. | **Re: [243:18 to 243:18]**<br>Speculation; Lack of Foundation/Personal Knowledge; Compound; Relevance | **Re: [243:18 to 243:18]**<br>Objections are unfounded. Questions do not ask Mr. Cox to speculate, but rather ask for his personal understanding based on the knowledge and experience he gained in his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the diversion of prescription opioids, which is clearly a relevant issue in this case. |
| **245:09 - 245:18**<br>245:09   Q. Based on your law enforcement<br>245:10   experience and participation in the task force,<br>245:11   what kinds of opioids were involved in the<br>245:12   opioid epidemic or opioid crisis in the City of<br>245:13   Huntington?<br>245:14   A. I think initially, it was<br>245:15   prescription drug pills and when I think of the<br>245:16   crisis, I -- that's what I think of.  And then<br>245:17   I think of -- now turn to heroin, but I think<br>245:18   initially, it was prescription narcotics. | | |
| **247:01 - 247:02**<br>247:01   Q. Do you believe that the City of<br>247:02   Huntington is facing an opioid crisis today? | | |
| **247:07 - 247:11**<br>247:07   THE WITNESS:  I don't really have a<br>247:08   basis.  I'm not in Huntington.  I haven't been<br>247:09   there for a while but certainly, what I read in<br>247:10   the newspaper, I would think that they still<br>247:11   do, just -- yes.  The effects of it. | | |
| **247:13 - 247:19**<br>247:13   Q. When you referenced things that<br>247:14   you've read in the newspaper, what are you<br>247:15   referring to?<br>247:16   A. Just about arrests, things that --<br>247:17   about arrests related to drug abuse, drug<br>247:18   investigations, theft, child abuse.  Things<br>247:19   that ultimately have a drug connection to them. | **Re: [247:13 to 247:19]**<br>Hearsay. | **Re: [247:13 to 247:19]**<br>Objections is unfounded.  Counsel asked where witness came to his understanding that there was an opioid crisis in Huntington and the witness properly answered. Hearsay is not applicable as FRE 801(c)(2) is not satisfied, since the information is for notice. |
| **247:20 - 248:02**<br>247:20   Q. I believe you testified previously<br>247:21   that as between prescription opioids and<br>247:22   illegal opioids like heroin and fentanyl, the<br>248:01   illegal opioids are more prevalent at this<br>248:02   time; is that right? | | |

| Designations | Objections | Reponses |
|---|---|---|
| **248:04 - 248:15**<br>248:04    THE WITNESS:  I believe they became<br>248:05    more prevalent after the prescription pills,<br>248:06    yes.<br>248:07    BY MR. PETKIS:<br>248:08    Q. And that was -- that happened during<br>248:09    the time that you were assigned to the task<br>248:10    force, right?<br>248:11    A. Yes.  They started becoming more<br>248:12    prevalent as -- towards the end of my tenure on<br>248:13    the task force.<br>248:14    Q. To the best of your knowledge, has<br>248:15    that trend continued? | | |
| **248:20 - 248:20**<br>248:20    THE WITNESS:  Yes. | | |
| **249:01 - 249:05**<br>249:01    Based on -- based on your law<br>249:02    enforcement experience and participation in the<br>249:03    task force, what portion of the opioid crisis<br>249:04    or opioid epidemic from 2012 to 2015, do you<br>249:05    attribute to prescription opioids? | | |
| **249:11 - 249:18**<br>249:11    THE WITNESS:  I believe that the<br>249:12    prescription medication played a significant<br>249:13    role in the opioid epidemic, and I believe that<br>249:14    after individuals were on prescription<br>249:15    medication, prescription medication became<br>249:16    higher -- started being worked more by law<br>249:17    enforcement, drove the price up and the supply<br>249:18    down, people transitioned to heroin. | | |
| **249:20 - 250:04**<br>249:20    Q. What is the basis for your<br>249:21    understanding that people may have transitioned<br>249:22    from prescription opioid use to heroin use?<br>250:01    A. Conversations with individuals that<br>250:02    we arrested, conversations with individuals<br>250:03    that we talked to within the community and the<br>250:04    drug culture. | Re: [249:20 to 250:04]<br>Hearsay. | Re: [249:20 to 250:04]<br>Objection is unfounded.  Hearsay is not applicable pursuant to FRE 803(3), FRE 803(6), and/or FRE 803(8).  Hearsay is also not applicable as FRE 801(c)(2) is not satisfied, since the information is for notice.  The witness was responding to a question about where the witness came to his understanding. |
| **250:05 - 250:07**<br>250:05    Q. Does the task force, to the best of<br>250:06    your knowledge, keep any data on what drug<br>250:07    someone started with after they're arrested? | | |
| **250:09 - 250:15**<br>250:09    THE WITNESS:  No, not to my<br>250:10    knowledge.<br>250:11    BY MR. PETKIS:<br>250:12    Q. What proportion of the individuals<br>250:13    who you believe abused prescription opioids<br>250:14    prior to using heroin, had a valid prescription<br>250:15    for those prescription opioids? | | |
| **250:17 - 250:17**<br>250:17    THE WITNESS:  I don't know. | | |

| Designations | Objections | Reponses |
|---|---|---|
| **251:22 - 252:09** | | |
| 251:22   Q. But you don't know how many of those<br>252:01   people who transitioned had an actual valid<br>252:02   prescription for prescription opioids, right?<br>252:03   A. I do not.<br>252:04   Q. And you don't know how many of those<br>252:05   people who may have transitioned from<br>252:06   prescription opioids to illegal opioids like<br>252:07   heroin were using illegally diverted<br>252:08   prescription opioids?<br>252:09   A. I do not. | | |
| **252:18 - 255:10** | | |
| 252:18   Q. Have you ever interviewed anyone who<br>252:19   started with another illegal drug and then<br>252:20   began using heroin?<br>252:21   A. Yes.<br>252:22   Q. So you referenced some interviews<br>253:01   that you had with people who began with<br>253:02   prescription opioids and transitioned to<br>253:03   heroin.<br>253:04   Do you remember that?<br>253:05   A. Yes.<br>253:06   Q. How many times has that occurred?<br>253:07   A. I can't put a number on it.  More<br>253:08   than once.<br>253:09   Q. Do you recall any of the specific<br>253:10   interviews where someone mentioned that they<br>253:11   began with prescription opioids and then<br>253:12   transitioned to heroin?<br>253:13   A. I don't.  It would be a -- during<br>253:14   the course of our investigations and<br>253:15   interviews, we talked to a lot of people and we<br>253:16   would ask, I would frequently ask, how did you<br>253:17   get on this, what happened, what kind of --<br>253:18   what your story is, and so I have talked to a<br>253:19   number of people that used pills and<br>253:20   transitioned from pills to heroin.<br>253:21   Q. Sitting here today, you can't<br>253:22   remember any specific stories along those<br>254:01   lines?<br>254:02   MR. PENDELL:  Objection.<br>254:03   THE WITNESS:  What are you wanting<br>254:04   as far as a story, like, specifically.<br>254:05   BY MR. PETKIS:<br>254:06   Q. Well, you are referencing a number<br>254:07   of interviews that you had with people who<br>254:08   transitioned from heroin -- I'm sorry, from<br>254:09   prescription opioids to heroin, right?<br>254:10   A. Yes.<br>254:11   Q. Are you thinking of anyone in<br>254:12   particular?  Do you have any specific<br>254:13   recollection of those conversations?<br>254:14   A. I do.  I remember one.  I don't know<br>254:15   their names but I do remember one couple that<br>254:16   we interviewed in Huntington who -- and when I<br>254:17   say "interviewed," we talked to them during a<br>254:18   -- during an interdiction or arrest type of<br>254:19   activity, talked to them about how they got on<br>254:20   heroin.<br>254:21   And I remember husband and wife and<br>254:22   they said that initially, heroin was, like,<br>255:01   scared the daylights out of them.  That they<br>255:02   never thought in a million years that they<br>255:03   would use heroin because they had to stick a | Re: [252:18 to 255:10]<br>**Def Obj** Hearsay. | Re: [252:18 to 255:10]<br>Objection is unfounded.  Hearsay<br>is not applicable pursuant to FRE<br>803(3), FRE 803(6), and/or FRE<br>803(8).  Hearsay is also not<br>applicable as FRE 801(c)(2) is not<br>satisfied, since the information is<br>for notice.  The witness was<br>responding to a question about<br>where the witness came to his<br>understanding.  Furthermore, the<br>witness was asked specifically to<br>recite conversations the witness<br>recalled during Task Force<br>interviews and investigations.<br>The witness provided the context<br>that the conversation was during<br>an interdiction and part of the<br>ongoing investigation. |

| Designations | Objections | Reponses |
|---|---|---|
| 255:04  needle in their arm, but the addiction of the<br>255:05  pills was something that drove them to do it,<br>255:06  and the supply of pills, the cost of pills,<br>255:07  that heroin was much cheaper and that<br>255:08  eventually, they decided that they could<br>255:09  apparently get around the use of a needle and<br>255:10  they transitioned to heroin. | | |
| **255:11 - 255:15**<br>255:11  Q. This particular story you are<br>255:12  referencing, did you ask those people whether<br>255:13  or not they had a valid prescription for<br>255:14  prescription opioids or whether they were using<br>255:15  illegally diverted prescription opioids? | | |
| **255:17 - 255:22**<br>255:17  THE WITNESS:  No, I did not.<br>255:18  BY MR. PETKIS:<br>255:19  Q. Do you have an understanding of<br>255:20  whether they had a valid prescription or<br>255:21  whether or not they were using illegally<br>255:22  diverted prescription opioids? | | |
| **256:02 - 256:09**<br>256:02  THE WITNESS:  No, I do not.<br>256:03  BY MR. PETKIS:<br>256:04  Q. Can you recall any interviews where<br>256:05  you did ask that question of whether someone<br>256:06  had a valid prescription or whether or not they<br>256:07  were using illegally diverted prescription<br>256:08  opioids?<br>256:09  A. No, I can't. | | |
| **258:02 - 258:06**<br>258:02  Q. So is it fair to say then that the<br>258:03  vast majority, if not all of the people the<br>258:04  task force arrested with prescription opioids<br>258:05  had possession of illegally diverted<br>258:06  prescription opioids? | | |
| **258:08 - 258:12**<br>258:08  THE WITNESS:  Yes.<br>258:09  BY MR. PETKIS:<br>258:10  Q. So those people would have received<br>258:11  their prescription opioid pills from a criminal<br>258:12  drug dealer, right? | | |
| **258:14 - 259:08**<br>258:14  THE WITNESS:  The majority, yes.<br>258:15  There were cases that we would have where<br>258:16  individuals would have a legitimate<br>258:17  prescription and then they would sell those and<br>258:18  if we were buying pills off of them that they<br>258:19  had a legitimate prescription for, we would<br>258:20  arrest that person even though they had a<br>258:21  legitimate prescription for that but those<br>258:22  cases were less frequent.<br>259:01  BY MR. PETKIS:<br>259:02  Q. And you would arrest those people<br>259:03  because selling prescription opioids, even if<br>259:04  you have a valid prescription is criminal,<br>259:05  correct?<br>259:06  A. Yes.<br>259:07  Q. It's a form of diversion?<br>259:08  A. Yes. | | |

| Designations | Objections | Reponses |
|---|---|---|
| **293:12 - 293:15**<br><br>293:12  Q. In your experience with the task<br>293:13  force, did the task force interact at all with<br>293:14  the West Virginia Board of Medicine as part of<br>293:15  its diversion investigations? | **Re: [293:12 to 293:15]**<br>Relevance; Lack of<br>Foundation/Personal Knowledge;<br>Speculation | **Re: [293:12 to 293:15]**<br>Objections are<br>unfounded. Questions do not<br>ask Mr. Cox to speculate, but<br>rather ask for his personal<br>understanding based on the<br>knowledge and experience he<br>gained in his role as<br>Coordinator of the Huntington<br>Violent Crime & Drug Task<br>Force. Mr. Cox answered the<br>questions based on his own<br>knowledge and experience,<br>demonstrating proper<br>foundation and personal<br>knowledge. Questions pertain<br>to the Task Force's<br>investigation of prescription<br>opioid diversion, which is<br>clearly a relevant issue in<br>this case. |
| **293:21 - 294:01**<br><br>293:21  THE WITNESS:  I can't say that we<br>293:22  never interacted with them, but that was -- we<br>294:01  rarely, if at all, interacted with them. | **Re: [293:21 to 294:01]**<br>Relevance; Lack of<br>Foundation/Personal Knowledge;<br>Speculation | **Re: [293:21 to 294:01]**<br>Objections are<br>unfounded. Questions do not<br>ask Mr. Cox to speculate, but<br>rather ask for his personal<br>understanding based on the<br>knowledge and experience he<br>gained in his role as<br>Coordinator of the Huntington<br>Violent Crime & Drug Task<br>Force. Mr. Cox answered the<br>questions based on his own<br>knowledge and experience,<br>demonstrating proper<br>foundation and personal<br>knowledge. Questions pertain<br>to the Task Force's<br>investigation of prescription<br>opioid diversion, which is<br>clearly a relevant issue in<br>this case. |
| **294:03 - 294:11**<br><br>294:03  Q. Okay.  So sitting here today, you<br>294:04  can't specifically recall any instances where<br>294:05  the task force interacted with the West<br>294:06  Virginia Board of Medicine on a diversion<br>294:07  investigation?<br>294:08  A. Not in our investigations.<br>294:09  Q. Okay.  Did the task force interact<br>294:10  at all with the West Virginia Board of Pharmacy | **Re: [294:03 to 294:11]**<br>Relevance; Lack of<br>Foundation/Personal Knowledge;<br>Speculation | **Re: [294:03 to 294:11]**<br>Objections are<br>unfounded. Questions do not<br>ask Mr. Cox to speculate, but<br>rather ask for his personal<br>understanding based on the<br>knowledge and experience he<br>gained in his role as |

| Designations | Objections | Reponses |
|---|---|---|
| 294:11     on any diversion investigation? | | Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the Task Force's investigation of prescription opioid diversion, which is clearly a relevant issue in this case. |
| **294:16 - 294:16**<br>294:16     THE WITNESS: Generally, no. | **Re: [294:16 to 294:16]**<br>Relevance; Lack of Foundation/Personal Knowledge; Speculation | **Re: [294:16 to 294:16]**<br>Objections are unfounded. Questions do not ask Mr. Cox to speculate, but rather ask for his personal understanding based on the knowledge and experience he gained in his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the Task Force's investigation of prescription opioid diversion, which is clearly a relevant issue in this case. |
| **294:18 - 294:21**<br>294:18     Q. And sitting here today, you can't<br>294:19     remember any specific investigations where the<br>294:20     task force worked with the West Virginia Board<br>294:21     of Pharmacy on diversion investigations? | **Re: [294:18 to 294:21]**<br>Relevance; Lack of Foundation/Personal Knowledge; Speculation | **Re: [294:18 to 294:21]**<br>Objections are unfounded. Questions do not ask Mr. Cox to speculate, but rather ask for his personal understanding based on the knowledge and experience he gained in his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the Task Force's investigation of prescription opioid diversion, which is clearly a relevant issue in this case. |

| Designations | Objections | Reponses |
|---|---|---|
| 295:02 - 295:02<br><br>295:02     THE WITNESS:  No. | **Re: [295:02 to 295:02]**<br>Relevance; Lack of Foundation/Personal Knowledge; Speculation | **Re: [295:02 to 295:02]**<br>Objections are unfounded. Questions do not ask Mr. Cox to speculate, but rather ask for his personal understanding based on the knowledge and experience he gained in his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the Task Force's investigation of prescription opioid diversion, which is clearly a relevant issue in this case. |
| 297:22 - 298:02<br><br>297:22     Q. For instance, the task force would<br>298:01     not investigate a doctor who was writing<br>298:02     legitimate prescriptions, correct? | **Re: [297:22 to 298:02]**<br>Relevance; Lack of Foundation/Personal Knowledge; Speculation | **Re: [297:22 to 298:02]**<br>Objections are unfounded. Questions do not ask Mr. Cox to speculate, but rather ask for his personal understanding based on the knowledge and experience he gained in his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the Task Force's investigation of prescription opioid diversion, which is clearly a relevant issue in this case. |

| Designations | Objections | Reponses |
|---|---|---|
| **298:04 - 298:05**<br><br>298:04　THE WITNESS:  Correct.  That was not<br>298:05　within our investigative additive. | **Re: [298:04 to 298:05]**<br>Relevance; Lack of<br>Foundation/Personal Knowledge;<br>Speculation | **Re: [298:04 to 298:05]**<br>Objections are<br>unfounded. Questions do not<br>ask Mr. Cox to speculate, but<br>rather ask for his personal<br>understanding based on the<br>knowledge and experience he<br>gained in his role as<br>Coordinator of the Huntington<br>Violent Crime & Drug Task<br>Force. Mr. Cox answered the<br>questions based on his own<br>knowledge and experience,<br>demonstrating proper<br>foundation and personal<br>knowledge. Questions pertain<br>to the Task Force's<br>investigation of prescription<br>opioid diversion, which is<br>clearly a relevant issue in<br>this case. |
| **298:07 - 298:14**<br><br>298:07　Q. Based on your experience with the<br>298:08　task force, are you familiar with something<br>298:09　called an ARCOS database?<br>298:10　A. I am not.<br>298:11　Q. Based on your experience with the<br>298:12　task force, you are not aware of any situation<br>298:13　where the task force made use of the ARCOS<br>298:14　database as part of a diversion investigation? | **Re: [298:07 to 298:14]**<br>Relevance; Lack of<br>Foundation/Personal Knowledge;<br>Speculation | **Re: [298:07 to 298:14]**<br>Objections are<br>unfounded. Questions do not<br>ask Mr. Cox to speculate, but<br>rather ask for his personal<br>understanding based on the<br>knowledge and experience he<br>gained in his role as<br>Coordinator of the Huntington<br>Violent Crime & Drug Task<br>Force. Mr. Cox answered the<br>questions based on his own<br>knowledge and experience,<br>demonstrating proper<br>foundation and personal<br>knowledge. Questions pertain<br>to the Task Force's<br>investigation of prescription<br>opioid diversion, which is<br>clearly a relevant issue in<br>this case. |

| Designations | Objections | Reponses |
|---|---|---|
| **298:19 - 298:19**<br>298:19    THE WITNESS:  I'm not. | **Re: [298:19 to 298:19]**<br>Relevance; Lack of Foundation/Personal Knowledge; Speculation | **Re: [298:19 to 298:19]**<br>Objections are unfounded. Questions do not ask Mr. Cox to speculate, but rather ask for his personal understanding based on the knowledge and experience he gained in his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the Task Force's investigation of prescription opioid diversion, which is clearly a relevant issue in this case. |
| **298:21 - 299:08**<br>298:21    Q. Based on your experience with the<br>298:22    task force, are you familiar with the West<br>299:01    Virginia Board of Pharmacy controlled substance<br>299:02    monitoring program, also sometimes called CSAP?<br>299:03    A. No.<br>299:04    Q. Based on that answer, I'm going to<br>299:05    assume based on your involvement with the task<br>299:06    force, you are not aware of the task force ever<br>299:07    using CSAP as part of a diversion<br>299:08    investigation? | **Re: [298:21 to 299:08]**<br>Relevance; Lack of Foundation/Personal Knowledge; Speculation | **Re: [298:21 to 299:08]**<br>Objections are unfounded. Questions do not ask Mr. Cox to speculate, but rather ask for his personal understanding based on the knowledge and experience he gained in his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the Task Force's investigation of prescription opioid diversion, which is clearly a relevant issue in this case. |

| Designations | Objections | Reponses |
|---|---|---|
| **299:10 - 299:13**<br>299:10  THE WITNESS:  The FBI did not run<br>299:11  diversion investigations on doctors or<br>299:12  pharmacies.  That was done by someone else<br>299:13  outside the task force. | **Re: [299:10 to 299:13]**<br>Relevance; Lack of<br>Foundation/Personal Knowledge;<br>Speculation | **Re: [299:10 to 299:13]**<br>Objections are<br>unfounded. Questions do not<br>ask Mr. Cox to speculate, but<br>rather ask for his personal<br>understanding based on the<br>knowledge and experience he<br>gained in his role as<br>Coordinator of the Huntington<br>Violent Crime & Drug Task<br>Force. Mr. Cox answered the<br>questions based on his own<br>knowledge and experience,<br>demonstrating proper<br>foundation and personal<br>knowledge. Questions pertain<br>to the Task Force's<br>investigation of prescription<br>opioid diversion, which is<br>clearly a relevant issue in<br>this case. |
| **299:15 - 299:16**<br>299:15  Q. Who outside the task force would be<br>299:16  responsible for those investigations? | | |
| **299:21 - 299:22**<br>299:21  THE WITNESS:  Other members of the<br>299:22  FBI in Huntington or Charleston. | | |
| **300:08 - 300:15**<br>300:08  Q. Are you familiar with the term<br>300:09  "Suspicious Order Report?"<br>300:10  A. I am not.<br>300:11  Q. Are you aware, based on your<br>300:12  involvement with the task force, of the task<br>300:13  force ever having used a Suspicious Order<br>300:14  Report in connection with a diversion<br>300:15  investigation? | **Re: [300:08 to 300:15]**<br>Relevance; Lack of<br>Foundation/Personal Knowledge;<br>Speculation | **Re: [300:08 to 300:15]**<br>Objections are<br>unfounded. Questions do not<br>ask Mr. Cox to speculate, but<br>rather ask for his personal<br>understanding based on the<br>knowledge and experience he<br>gained in his role as<br>Coordinator of the Huntington<br>Violent Crime & Drug Task<br>Force. Mr. Cox answered the<br>questions based on his own<br>knowledge and experience,<br>demonstrating proper<br>foundation and personal<br>knowledge. Questions pertain<br>to the Task Force's<br>investigation of prescription<br>opioid diversion, which is<br>clearly a relevant issue in<br>this case. |

| Designations | Objections | Reponses |
|---|---|---|
| **300:20 - 300:20**<br>300:20    THE WITNESS:  I am not. | **Re: [300:20 to 300:20]**<br>Relevance; Lack of Foundation/Personal Knowledge; Speculation | **Re: [300:20 to 300:20]**<br>Objections are unfounded. Questions do not ask Mr. Cox to speculate, but rather ask for his personal understanding based on the knowledge and experience he gained in his role as Coordinator of the Huntington Violent Crime & Drug Task Force. Mr. Cox answered the questions based on his own knowledge and experience, demonstrating proper foundation and personal knowledge. Questions pertain to the Task Force's investigation of prescription opioid diversion, which is clearly a relevant issue in this case. |
| **311:09 - 311:21**<br>311:09    MR. PETKIS:  I'm going to mark<br>311:10    Exhibit 56.<br>311:11    (Deposition Exhibit 56 was marked<br>311:12    for identification.)<br>311:13    BY MR. PETKIS:<br>311:14    Q. Let me know once you have had a<br>311:15    chance to review that.<br>311:16    A. Okay.<br>311:17    Q. This exhibit is a combined e-mail<br>311:18    attachment.<br>311:19    Do you see yourself copied on the<br>311:20    first e-mail there dated January 19, 2016?<br>311:21    A. I do. | **Re: [311:09 to 311:21]**<br>Hearsay | **Re: [311:09 to 311:21]**<br>Question designated for purposes of laying foundation for ensuing questions regarding Exhibit 56. Exhibit 56 is a combined email thread and attachment containing a report prepared by the DEA concerning illegal heroin distribution and prescription opioid diversion in Huntington, West Virginia. The email thread contains members of the Huntington Police Department. The DEA report contained in Exhibit 56 constitutes an admissible public record for which Plaintiffs cannot demonstrate untrustworthiness under FRE 803(8)(A)(i). At minimum, Exhibit 56 could be admitted not for its truth, but instead for notice to the Huntington Police Department of illegal drug distribution in Cabell/Huntington as of 2015. |
| **313:17 - 314:01**<br>313:17    The very first paragraph begins:<br>313:18    "Huntington, West Virginia, to a lesser extent,<br>313:19    Charleston, West Virginia, are major<br>313:20    destinations for traffickers transporting<br>313:21    controlled pharmaceutical drugs (CPDs) and<br>313:22    heroin from Detroit, Michigan." | **Re: [313:17 to 314:01]**<br>Incomplete designation; Hearsay; No Answer/Responsiveness; Lack of Foundation; Assumes Facts | **Re: [313:17 to 314:01]**<br>Designation corrected to 313:17-314:1. Question pertains to Exhibit 56, which is a combined email thread and attachment containing a report |

| Designations | Objections | Reponses |
|---|---|---|
| 314:01    Do you see that? | | prepared by the DEA concerning illegal heroin distribution and prescription opioid diversion in Huntington, West Virginia. The email thread contains members of the Huntington Police Department. The DEA report contained in Exhibit 56 constitutes an admissible public record for which Plaintiffs cannot demonstrate untrustworthiness under FRE 803(8)(A)(i). At minimum, Exhibit 56 could be admitted not for its truth, but instead for notice to the Huntington Police Department of illegal drug distribution in Cabell/Huntington as of 2015. |
| **314:02 - 314:02** | | |
| 314:02    A. Yes. | | |
| **314:14 - 316:04** | | |
| 314:14    Q. The very next sentence here reads: | | |
| 314:15    "Although the movement of CPDs from Detroit to | | |
| 314:16    West Virginia has been stable, for the past | | |
| 314:17    several years, the volume of heroin trafficking | | |
| 314:18    is increasing as heroin abuse expands in West | | |
| 314:19    Virginia." | | |
| 314:20    Did I read that correctly? | | |
| 314:21    A. Yes. | | |
| 314:22    Q. Is that consistent with your | | |
| 315:01    understanding of the volume of prescription | | |
| 315:02    drug trafficking compared to heroin trafficking | | |
| 315:03    around the time you left the task force in | | |
| 315:04    2015? | | |
| 315:05    A. No. I would -- in my opinion, no. | | |
| 315:06    Q. And why not? | | |
| 315:07    A. I believe the prescription | | |
| 315:08    medication decreased and heroin increased. | | |
| 315:09    Q. Okay.  Understood.  So where it says | | |
| 315:10    here that:  "The movement of CPDs from Detroit | | |
| 315:11    to West Virginia has been stable," you disagree | | |
| 315:12    because you believe it actually decreased, | | |
| 315:13    correct? | | |
| 315:14    A. Yes. | | |
| 315:15    Q. The next paragraph begins:  "As | | |
| 315:16    heroin abuse and trafficking in West Virginia | | |
| 315:17    have increased, Detroit traffickers have | | |
| 315:18    swiftly exploited their CPD trafficking | | |
| 315:19    connections and methods to sell heroin in | | |
| 315:20    Huntington and Charleston and by extension, | | |
| 315:21    rural West Virginia." | | |
| 315:22    Did I read that correctly? | | |
| 316:01    A. Yes. | | |
| 316:02    Q. Do you agree with that assessment | | |
| 316:03    based on your work with the task force at the | | |
| 316:04    time you left in 2015? | | |
| **316:07 - 316:07** | | |
| 316:07    THE WITNESS:  Yes. | | |

| Designations | Objections | Reponses |
|---|---|---|
| **316:09 - 316:12**<br>316:09   Q. So it's your understanding then that<br>316:10   criminals who had been trafficking prescription<br>316:11   drugs began to traffic heroin from Detroit to<br>316:12   West Virginia instead? | | |
| **316:16 - 316:16**<br>316:16   THE WITNESS:  Yes. | | |
| **316:18 - 316:21**<br>316:18   Q. Those criminals essentially then<br>316:19   made the choice to focus more on distributing<br>316:20   heroin compared to pharmaceutical drugs; is<br>316:21   that correct? | **Re: [316:18 to 316:21]**<br>Speculation; Assumes<br>Facts; Lack of Foundation;<br>Improper Opinion; Relevance | **Re: [316:18 to 316:21]**<br>Objections are<br>unfounded. Mr. Cox previously<br>served as Coordinator of the<br>Huntington Violent Crime &<br>Drug Task Force and testified<br>at length regarding his<br>experience investigating drug<br>crimes and diversion. He is<br>well-positioned to answer<br>questions concerning illegal<br>drug distribution and illicit<br>drug markets. |
| **317:03 - 317:03**<br>317:03   THE WITNESS:  Yes. | **Re: [317:03 to 317:03]**<br>Speculation; Assumes<br>Facts; Lack of Foundation;<br>Improper Opinion; Relevance | **Re: [317:03 to 317:03]**<br>Objections are<br>unfounded. Mr. Cox previously<br>served as Coordinator of the<br>Huntington Violent Crime &<br>Drug Task Force and testified<br>at length regarding his<br>experience investigating drug<br>crimes and diversion. He is<br>well-positioned to answer<br>questions concerning illegal<br>drug distribution and illicit<br>drug markets. |
| **317:05 - 317:14**<br>317:05   Q. The very next sentence reads:  "This<br>317:06   trend is expected to increase supply, drive<br>317:07   down prices and contribute to an uptick in<br>317:08   trafficking-related violence in West Virginia."<br>317:09   Did I read that correctly?<br>317:10   A. Yes.<br>317:11   Q. Is that statement consistent with<br>317:12   your understanding at the time you left the<br>317:13   task force in 2015?<br>317:14   A. Yes. | | |
| **321:13 - 321:22**<br>321:13   Q. Based on your law enforcement<br>321:14   experience and your work with the task force,<br>321:15   is it your understanding that part of what<br>321:16   makes illegal drugs so dangerous is that they<br>321:17   can be laced with other drugs?<br>321:18   A. Yes.<br>321:19   Q. And the end user of those illegal<br>321:20   drugs might not know that the drugs are laced<br>321:21   with something else, correct?<br>321:22   A. Correct. | | |

| Designations | Objections | Reponses |
|---|---|---|
| 339:02 - 340:03 | | |
| 339:02   Q. So, Special Agent Cox, you recall<br>339:03   earlier I asked you some questions about the<br>339:04   techniques and methods that the task force used<br>339:05   as part of its diversion investigations.<br>339:06   Do you remember that?<br>339:07   A. Yes.<br>339:08   Q. Based on your experience with the<br>339:09   task force, did the task force make use of<br>339:10   either physical or electronic surveillance as<br>339:11   part of its diversion investigations?<br>339:12   A. Yes.<br>339:13   Q. Did the task force make use of<br>339:14   confidential informants as part of its<br>339:15   diversion investigations?<br>339:16   A. Yes.<br>339:17   Q. Did the task force make use of<br>339:18   cooperating defendants as part of its diversion<br>339:19   investigations?<br>339:20   A. Yes.<br>339:21   Q. And did the task force make use of<br>339:22   wiretaps as part of its diversion<br>340:01   investigations?<br>340:02   A. During my time, we did not, but we<br>340:03   have the capabilities. | **Re: [339:02 to 340:03]**<br>Relevance | **Re: [339:02 to 340:03]**<br>Objection is<br>unfounded. Questions pertain<br>to the Task Force's<br>investigation of prescription<br>opioid diversion, which is<br>clearly a relevant issue in<br>this case. |