D.3

| City of Huntington v. AmerisouceBergen Drug Corp. et al, 17cv01362 | | |
|---|---|---|
| Witness Name: | Robert Knittle (WVa Board of Medicine) | |
| Deposition Date: | 8/27/2020 | |
| White = Defendants' Affirmative Designations (w/ Plaintiffs' Objections and Defendants' Replies) | | |
| Blue = Plaintiffs' Completeness Designations (w/ Defendants' Objections and Plaintiffs' Replies) | | |
| Pink = Defendants' Reply Designations (w/ Plaintiffs' Objections and Defendants' Replies) | | |

| Designations | Objections | Reponses |
|---|---|---|
| **8:22 - 9:03** | | |
| 8:22   Q. Good morning, Mr. Knittle.  I introduced | | |
| 8:23   myself a little bit earlier.  My name is Sandy | | |
| 8:24   Zerrusen, and as I stated earlier, I represent | | |
| 9:01   AmerisourceBergen Drug Corporation.  Could you | | |
| 9:02   please state your full name for the record? | | |
| 9:03   A. Yes, my full name is Robert Clare Knittle. | | |
| | | |
| **25:20 - 26:06** | | |
| 25:20   Q. And where did you go after Pressley Ridge? | | |
| 25:21   A. After that -- I was there for about 12 or | | |
| 25:22   13 years, and then I moved on to the Board of | | |
| 25:23   Medicine in the State of West Virginia as the | | |
| 25:24   executive director there. | | |
| 26:01   Q. And when did you start that position? | | |
| 26:02   A. It was December of 2005. | | |
| 26:03   Q. And I believe you said earlier you retired | | |
| 26:04   January 1st of 2017? | | |
| 26:05   A. Yes.  My last day of work was December | | |
| 26:06   31st, 2016. | | |
| | | |
| **26:13 - 27:09** | | |
| 26:13   Q. Perfect.  During your time at the Board, | | |
| 26:14   were you involved in any professional associations? | | |
| | | |
| 26:15   A. Yes. | | |
| 26:16   Q. Okay.  Which ones? | | |
| 26:17   A. The Federation of State Medical Boards. | | |
| 26:18   Q. Okay.  Is that FSMB? | | |
| 26:19   A. Yes, it is. | | |
| 26:20   Q. Okay.  And what was your involvement with | | |
| 26:21   FSMB? | | |
| 26:22   A. Represented the State of West Virginia at | | |
| 26:23   the -- at a national level.  I was involved in | | |
| 26:24   several other aspects of the Federation Board. | | |
| 27:01   Q. Can you describe to me what the Federation | | |
| 27:02   of State Medical Boards is? | | |
| 27:03   A. Yes.  It's a organization that helps assist | | |
| 27:04   state boards of medicine for the United States. | | |
| 27:05   Q. And how do they help assist them? | | |
| 27:06   A. They help supply organization information | | |
| 27:07   that can be shared across states.  They assist in | | |
| 27:08   the licensing of physicians.  It's | | |
| 27:09   more administrative in nature. | | |
| | | |
| **27:10 - 27:24** | | |
| 27:10   Q. Did you find during your tenure at the | Re: [27:10 to 27:24] | Re: [27:10 to 27:24] |
| 27:11   Board that FSMB was helpful for you in your | Relevance. | Relevant to the deponent's |
| 27:12   position? | | background.  Defendants |
| 27:13   A. Yes, I would -- I would say so.  I think it | | designated this additional questioning |
| 27:14   was a two-way street.  I was -- I was involved in a | | in response to Plaintiffs' objection |
| 27:15   number of their projects as well. | | that designations on page 29 |
| 27:16   Q. Okay.  Do you remember what projects you | | required additional foundation. |
| 27:17   were involved with them in? | | |
| 27:18   A. I sat on the medical directors -- state | | |
| 27:19   medical directors advisory panel to the Federation | | |
| 27:20   of State Medical Boards. | | |
| 27:21   And I also sat on their advisory | | |
| 27:22   council to the United States Medical License | | |
| 27:23   Examination, USMLE, when they went through their | | |
| 27:24   changes of their steps. | | |

| Designations | Objections | Reponses |
|---|---|---|
| **28:16 - 29:05** | | |
| 28:16 Q. Did any of the changes in the content that<br>28:17 you were involved in relate to controlled<br>28:18 substances or prescribing?<br>28:19 A. Not specifically.  There may have been<br>28:20 questions in there that dealt with opioids or the<br>28:21 prescribing of them.  But they were nothing that<br>28:22 was specifically focused on as part of the<br>28:23 examination.<br>28:24 Q. Okay.  You also said that you were on an<br>29:01 advisory panel.  What was that?<br>29:02 A. It was a -- basically when issues would<br>29:03 come up that -- at a national level, they would ask<br>29:04 from -- for input from different medical directors<br>29:05 across the country. | **Re: [28:16 to 29:5]**<br>Relevance; Hearsay | **Re: [28:16 to 29:5]**<br>Relevant to the deponent's<br>background.  Defendants designated<br>this additional questioning in<br>response to Plaintiffs' objection<br>that designations on page 29<br>required additional foundation.  The<br>questions do not call for hearsay. |
| **29:06 - 29:19** | | |
| 29:06 Q. Did -- were any of the issues that you<br>29:07 dealt with, did any of them relate to controlled<br>29:08 substances or prescribing?<br>29:09 A. I think there was some discussion.  And I<br>29:10 can't be real specific about it because I can't<br>29:11 remember.  But -- but there was talk about, you<br>29:12 know, some type of a template for states to look at<br>29:13 in terms of developing policy for training and<br>29:14 education regarding opiates for physicians.<br>29:15 Q. Regarding prescribing?  Excuse me.<br>29:16 A. Well, the whole process of -- like you were<br>29:17 talking about, you know, someone coming in asking<br>29:18 for pain management of some nature.  Some were more<br>29:19 specific than others as to exactly what they want. | **Re: [29:06 to 29:19]**<br>Vague; Lack of<br>Foundation; Lack of Personal<br>Knowledge; Hearsay | **Re: [29:06 to 29:19]**<br>The question is not<br>vague, and this form objection<br>is waived for not having been<br>made at the deposition.<br>However, in response to<br>plaintiffs' objection,<br>defendants added reply<br>designations at pages 27 and<br>28 to provide additional<br>context. The question<br>specifically asks about<br>"issues that [the deponent]<br>dealt with," so it does not<br>lack foundation or personal<br>knowledge. The question also<br>does not elicit hearsay,<br>because the deponent's<br>statement that "there were<br>some discussions" is not<br>offered for truth of any<br>statement, but for his<br>understanding of FSMB's focus<br>and activities. |
| **29:20 - 29:24** | | |
| 29:20 Q. And did you participate in coming up with<br>29:21 this template?<br>29:22 A. No, I did not.<br>29:23 Q. Okay.  All right.  Were you involved with<br>29:24 any other professional associations while at the | | |
| **30:01 - 30:24** | | |
| 30:01 Board?<br>30:02 A. There was a group called the Administrators<br>30:03 In Medicine.<br>30:04 Q. Okay.<br>30:05 A. And that is a -- the medical directors --<br>30:06 or the directors of the medical boards across the<br>30:07 country, and it was just kind of a subgroup that<br>30:08 was distinct, at least, from a -- from a nonprofit<br>30:09 standpoint.<br>30:10 Q. For the Administrators in Medicine, was<br>30:11 there anything involving controlled substances,<br>30:12 education or training?<br>30:13 A. I think there was always discussion about<br>30:14 it.  There was nothing that was independently<br>30:15 developed by that group.<br>30:16 Q. And what would be discussed about it?<br>30:17 A. The number -- or I guess the outright<br>30:18 concern of the number of deaths that were being<br>30:19 caused by opioids and what the role would be of<br>30:20 legitimate drugs in the deaths of those people. | | |

| Designations | Objections | Reponses |
|---|---|---|
| 30:21    Q. Okay.  And what was discussed about the<br>30:22    role of the legitimate drugs?<br>30:23    A. Well, generally, the boards of medicine<br>30:24    deal with physicians and the licensing and | | |
| **31:01 - 31:04**<br>31:01    disciplining of physicians, so we were looking at<br>31:02    things in terms of education for physicians,<br>31:03    awareness of the -- of the dangers of using<br>31:04    opioids. | | |
| **31:10 - 31:15**<br>31:10    Q. Any other professional associations during<br>31:11    your time at the Board?<br>31:12    A. I don't believe so.  I sat on the initial<br>31:13    board for the -- for the general licensing of<br>31:14    physicians across the state -- or across the<br>31:15    country. | Re: [31:10 to 31:15]<br>Relevance | Re: [31:10 to 31:15]<br>This question is<br>relevant to establish Mr.<br>Knittle's background and<br>experience. |
| **32:09 - 32:18**<br>32:09    Q. Okay.  A little bit ago, you were talking<br>32:10    about when you were at the Board, you were<br>32:11    concerned with the licensing and discipline of<br>32:12    physicians.  Was that kind of the main purpose of<br>32:13    the Board of Medicine?<br>32:14    A. Yeah, the main purpose is to protect the<br>32:15    public.  And the way that the Board is structured<br>32:16    legally is for the licensing and disciplining of<br>32:17    physicians, which would include physician<br>32:18    assistants as well. | | |
| **33:16 - 33:24**<br>33:16    Q. Okay.  Can you give me just a rundown of<br>33:17    what your duties were as executive director at the<br>33:18    Board?<br>33:19    A. Basically to carry out the wishes of the --<br>33:20    of the Board of Medicine, to oversee the staff<br>33:21    during that implementation, and to maintain a<br>33:22    physical presence as well as to be available to the<br>33:23    legislative body and other groups on behalf of the<br>33:24    Board of Medicine. | | |
| **37:24 - 38:08**<br>37:24    Q. And how many licensees did the Board<br>38:01    oversee generally when you were there?<br>38:02    A. I'm trying to think.  Around 3000.<br>38:03    Q. And that would include all three<br>38:04    specialties?<br>38:05    A. I think there were about 800 P.A.'s and<br>38:06    there were several hundred - but it was declining -<br>38:07    of podiatrists.  I think there was around 3000 or<br>38:08    3200 physicians. | Re: [37:24 to 38:08]<br>Relevance; Vague | Re: [37:24 to 38:08]<br>This question is not<br>vague, and this form objection<br>is waived for not having been<br>made during the deposition.<br>The question is relevant as<br>background on both Mr.<br>Knittle's experience and the<br>role of the WV Board of<br>Medicine, which regulates all<br>doctors in West Virginia,<br>including in Cabell County and<br>Huntington. |
| **39:07 - 40:09**<br>39:07    Q. We were talking about the DEA registration<br>39:08    or license.  Do you understand why a doctor would<br>39:09    need a DEA registration or license before<br>39:10    prescribing a controlled substance?<br>39:11    A. I believe it's to try to appropriately<br>39:12    monitor them across the country.<br>39:13    Q. And a prescription for an opioid that's<br>39:14    written by a Board licensee must be for a<br>39:15    legitimate medical purpose.  Correct?<br>39:16    A. Yes.<br>39:17    Q. And you agree with me that prescription<br>39:18    opioids can serve a legitimate medical purpose, | Re: [39:07 to 40:09]<br>Lack of Foundation;<br>Calls for Expert Opinion; Lack<br>of Personal Knowledge;<br>Speculation; Scope | Re: [39:07 to 40:09]<br>The question does not<br>call for expert opinion or<br>lack foundation. Mr. Knittle<br>was the executive director for<br>the WV Board of Medicine, one<br>of the primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role. The scope objection is |

| Designations | Objections | Reponses |
|---|---|---|

| | | |
|---|---|---|
| 39:19 correct? | | unfounded as this was a fact |
| 39:20 A. They can, yes. | | deposition, and in any case |
| 39:21 Q. That patients can benefit from the use of | | this question focuses on his |
| 39:22 opioids being prescribed for a legitimate medical | | work at the Board of Medicine. |
| 39:23 purpose, correct? | | |
| 39:24 A. Yes. | | |
| 40:01 Q. Okay.  And you agree that it could -- can | | |
| 40:02 be appropriate for pharmacists to fill a | | |
| 40:03 prescription for opioids for a patient, correct? | | |
| 40:04 A. I believe that's their role, yes. | | |
| 40:05 Q. Yes.  And it's the physician that makes the | | |
| 40:06 ultimate decision whether or not to prescribe an | | |
| 40:07 opioid for a legitimate medical purpose to their | | |
| 40:08 patient, correct? | | |
| 40:09 A. That's correct. | | |

| 40:10 - 40:24 | | |
|---|---|---|
| 40:10 Q. And does a prescriber need to consider a | | |
| 40:11 patient's history prior to prescribing an opioid? | | |
| 40:12 A. I believe they do. | | |
| 40:13 Q. How about their diagnosis? | | |
| 40:14 A. Yes.  That would be, in part, determined by | | |
| 40:15 the physician. | | |
| 40:16 Q. Okay.  Anything else that a prescriber | | |
| 40:17 needs to consider when prescribing an opioid that | | |
| 40:18 you know of? | | |
| 40:19 A. No.  Again, not being a physician, I can't | | |
| 40:20 get real specific as to exactly how diagnoses and | | |
| 40:21 prescribing are specifically determined by a | | |
| 40:22 physician to a patient. | | |
| 40:23 Q. Okay.  Should anybody be second-guessing | | |
| 40:24 the physician's decision to prescribe an opioid? | | |

| 41:01 - 41:24 | | |
|---|---|---|
| 41:01 A. Some people will go for a second opinion. | | |
| 41:02 Q. Okay.  Other than a patient going for a | | |
| 41:03 second opinion, is there anybody that should be | | |
| 41:04 questioning a physician's decision to prescribe an | | |
| 41:05 opioid to his or her patient? | | |
| 41:06 A. I think if someone has concerns over it | | |
| 41:07 that, you know, that's why the Board of Medicine is | | |
| 41:08 there, for one aspect.  But there are a number of | | |
| 41:09 different controls throughout the system for | | |
| 41:10 different aspects of the system. | | |
| 41:11 We don't live in a perfect world, and | | |
| 41:12 you know, some people will take advantage of things | | |
| 41:13 for financial gain or -- in some respects for | | |
| 41:14 physicians, for sexual gain. | | |
| 41:15 But mostly, it's -- from what we've | | |
| 41:16 seen, it's been monetary. | | |
| 41:17 Q. And what do you mean that they will take | | |
| 41:18 advantage for financial gain?  What will they do? | | |
| 41:19 A. They will overprescribe. | | |
| 41:20 They will ask for kickbacks, knowing | | |
| 41:21 that a patient would, you know, sell them, and they | | |
| 41:22 wanted a portion of it. | | |
| 41:23 Or to get part of the pills back | | |
| 41:24 themselves. | | |

| 42:01 - 42:24 | | |
|---|---|---|
| 42:01 Q. When you say they ask for kickbacks, are | | |
| 42:02 they asking for kickbacks from the patient | | |
| 42:03 themselves? | | |
| 42:04 A. Yes. | | |
| 42:05 Q. Okay.  Can you explain that a little more | | |
| 42:06 to me. | | |
| 42:07 A. No, I think there have been instances where | | |
| 42:08 someone would, you know, cash -- or fill the | | |
| 42:09 prescription, sell the medications and give a | | |
| 42:10 portion of the money back to the physician. | | |
| 42:11 Q. Okay.  And you -- during your tenure at the | | |

| Designations | Objections | Reponses |
|---|---|---|
| 42:12 Board, you have seen instances where physicians<br>42:13 were writing prescriptions for controlled<br>42:14 substances for sexual favors?<br>42:15 A. Yes.<br>42:16 Q. Okay. You said that there are certain<br>42:17 controls in the system. Besides the Board of<br>42:18 Medicine, what other controls are there in the<br>42:19 system?<br>42:20 A. Well, things like the DEA --<br>42:21 Q. Okay.<br>42:22 A. -- who monitor how they're distributed and<br>42:23 who's distributing them. I think from the Board of<br>42:24 Pharmacy side and from the national side, I know | | |
| **43:01 - 43:24**<br>43:01 that there are particular controls as to monitoring<br>43:02 of all sorts of the different types of controlled<br>43:03 substances or drugs or prescribed drugs.<br>43:04 But they monitor where they're going,<br>43:05 how much is going, those sorts of things.<br>43:06 Q. You said the DEA monitors how they are<br>43:07 distributed and who distributes them. Do you know<br>43:08 who distributes them?<br>43:09 A. No.<br>43:10 Q. Okay. Do you know how they are<br>43:11 distributed?<br>43:12 A. Not specifically. We -- our focus was, you<br>43:13 know, those sorts of things had always been beyond<br>43:14 the purview of the Board of Medicine, and even if<br>43:15 we were curious about something, there's -- there<br>43:16 were times that we just didn't have access to that<br>43:17 type of information.<br>43:18 Q. Were there times that you tried to gain<br>43:19 access to that type of information?<br>43:20 A. Not specifically, no. Unless it was very<br>43:21 specifically related to a particular case of a<br>43:22 physician or P.A. --<br>43:23 Q. Okay.<br>43:24 A. -- or podiatrist. | | |
| **44:01 - 44:08**<br>44:01 Q. Did the Board of Medicine while you were<br>44:02 there work with the DEA?<br>44:03 A. Yes, on individual cases.<br>44:04 Q. As you sit here today, can you identify an<br>44:05 instance where a person overdosed on a controlled<br>44:06 substance that they were taking as it was<br>44:07 prescribed to them by their physician?<br>44:08 A. No. Not after -- not after years, I can't. | Re: [44:01 to 44:08]<br>Lack of Foundation;<br>Calls for Expert Opinion; Lack<br>of Personal Knowledge;<br>Speculation; Scope | Re: [44:01 to 44:08]<br>The question does not<br>call for expert opinion or<br>lack foundation. Mr. Knittle<br>was the executive director for<br>the WV Board of Medicine, one<br>of the primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role. The scope objection is<br>unfounded as this was a fact<br>deposition, and in any case<br>this question focuses on his<br>work at the Board of Medicine. |
| **44:09 - 44:21**<br>44:09 Q. Is it something that you think has<br>44:10 happened?<br>44:11 A. As prescribed?<br>44:12 Q. Yes.<br>44:13 A. It's very possible that it did.<br>44:14 Q. You just, as you sit here today, can't<br>44:15 think of an instance?<br>44:16 A. No, it's -- but you know, there have been<br>44:17 instances of inappropriate prescribing where<br>44:18 perhaps they prescribed a higher dose than was<br>44:19 necessary. | | |

| Designations | Objections | Reponses |
|---|---|---|
| 44:20    Those would be particularly rare.  But<br>44:21    I imagine that anything is possible. | | |
| **44:22 - 45:07**<br>44:22    Q. Okay.  Do you know of an instance where a<br>44:23    drug distributor asked a physician to write a<br>44:24    prescription for a controlled substance?<br>45:01    A. Not specifically, no.<br>45:02    Q. Okay.  When you say, "not specifically," do<br>45:03    you think there is an instance and you just can't<br>45:04    remember it, or --<br>45:05    A. No, I don't think there was anything within<br>45:06    the Board of Medicine that I can remember a<br>45:07    specific complaint of that nature. | **Re: [44:22 to 45:07]**<br>Relevance; Lack of<br>Foundation; Lack of Personal<br>Knowledge; Scope | **Re: [44:22 to 45:07]**<br>The question does not<br>lack foundation. Mr. Knittle<br>was the executive director for<br>the WV Board of Medicine, one<br>of the primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role. The scope objection is<br>unfounded as this was a fact<br>deposition, and in any case<br>the question focuses on his<br>work with the Board of<br>Medicine. |
| **52:20 - 53:08**<br>52:20    Q. So in most or all of the overprescribing<br>52:21    cases, the Board would get an expert to determine<br>52:22    whether or not the physician had been<br>52:23    overprescribing?<br>52:24    A. Yes.  I think after probable cause is<br>53:01    found, some physicians will settle the case, will<br>53:02    go on for, you know, medical education or something<br>53:03    like that.<br>53:04    Others will -- are more adamant about<br>53:05    their own innocence in the matter, and those will<br>53:06    -- are the ones that we will get, you know, a -- an<br>53:07    expert for testimony at a hearing, administrative<br>53:08    hearing. | **Re: [52:20 to 53:08]**<br>Compound; Relevance;<br>Vague; Lack of Foundation | **Re: [52:20 to 53:08]**<br>The question is not<br>compound or vague. Mr. Knittle<br>was the executive director for<br>the WV Board of Medicine, one<br>of the primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role, as the testimony relates<br>directly to the analysis that<br>the Board believed was<br>necessary to assess the<br>legitimacy of prescribing.<br>Plaintiffs have affirmatively<br>offered testimony about both<br>prescribing patterns and Board<br>of Medicine disciplinary<br>action through their expert<br>Lacey Keller, rendering any<br>relevance objection unfounded. |
| **53:23 - 54:11**<br>53:23    Q. And you talked about the administrative<br>53:24    hearing.  Who oversees an administrative hearing?<br>54:01    A. An administrative judge.<br>54:02    Q. Okay.  And does that administrative judge<br>54:03    then make a recommendation to the Board?  Or do<br>54:04    they make a ruling?<br>54:05    A. Yeah, they make a -- they make a ruling<br>54:06    that would be taken to the Board for a<br>54:07    determination, and the Board can either accept it,<br>54:08    reject it or modify it.<br>54:09    Q. Okay.  So the Board makes the ultimate<br>54:10    decision on discipline.<br>54:11    A. They do. | **Re: [53:23 to 54:11]**<br>Relevance | **Re: [53:23 to 54:11]**<br>The existence of and<br>processes involved in the<br>disciplining of prescribers in<br>West Virginia is relevant,<br>and Plaintiffs have<br>affirmatively placed these<br>facts at issue through their<br>expert witness, Lacey Keller. |

| Designations | Objections | Reponses |
|---|---|---|
| **57:01 - 57:24** | | |
| 57:01    11:14 a.m.  We are on the record. | | |
| 57:02    BY MS. ZERRUSEN: | | |
| 57:03    Q. Mr. Knittle, earlier we were talking about | | |
| 57:04    overprescribing.  And I take it from your testimony | | |
| 57:05    that there were licensees of the Board that | | |
| 57:06    overprescribed; is that correct? | | |
| 57:07    A. Yeah, there have been physicians that have | | |
| 57:08    been disciplined for inappropriate prescribing. | | |
| 57:09    Q. And when is the first time that you can | | |
| 57:10    recall a licensee was disciplined for inappropriate | | |
| 57:11    or overprescribing? | | |
| 57:12    A. I don't know the specific instance.  I | | |
| 57:13    mean, they have been disciplining physicians for | | |
| 57:14    that for decades prior to me being there. | | |
| 57:15    Q. Okay.  And was every licensee that the | | |
| 57:16    Board investigated and found had overprescribed, | | |
| 57:17    was every one of them disciplined? | | |
| 57:18    A. To some degree.  If there's, you know, an | | |
| 57:19    abundance of evidence. | | |
| 57:20    Q. And earlier we talked about diversion.  Is | | |
| 57:21    overprescribing diversion? | | |
| 57:22    A. Not necessarily. | | |
| 57:23    Q. Okay. | | |
| 57:24    A. It could -- it could lend itself to | | |
| **58:01 - 58:21** | | |
| 58:01    diversion, but -- | | |
| 58:02    Q. So the overprescribing itself is not | | |
| 58:03    diversion, it's what the patient then does with | | |
| 58:04    those pills that they were overprescribed? | | |
| 58:05    A. That would be determined by the intent of | | |
| 58:06    the physician. | | |
| 58:07    Q. Okay. | | |
| 58:08    A. If they're in collaboration, it could be | | |
| 58:09    diversion, yes. | | |
| 58:10    Q. And did -- during your tenure at the Board, | | |
| 58:11    did that happen where physicians were in | | |
| 58:12    collaboration with their patient to overprescribe? | | |
| 58:13    A. I think there have been some instances of | | |
| 58:14    it, but I can't be specific. | | |
| 58:15    Q. Okay.  Would those physicians have been | | |
| 58:16    disciplined? | | |
| 58:17    A. Yes. | | |
| 58:18    Q. Would you agree with me that diversion is | | |
| 58:19    illegal? | | |
| 58:20    A. Yes.  I believe so.  Either from an | | |
| 58:21    administrative or criminal standpoint or both. | | |
| **59:17 - 59:24** | | |
| 59:17    Q. Okay.  Were there any other things that | | |
| 59:18    licensees of the Board did related to opioids that | | |
| 59:19    they were disciplined for? | | |
| 59:20    A. Perhaps their use of them themselves | | |
| 59:21    personally. | | |
| 59:22    Q. And would those licensees have been | | |
| 59:23    disciplined? | | |
| 59:24    A. They could be disciplined, but they -- | | |
| **60:01 - 60:24** | | |
| 60:01    generally, they were in a point of probably | | |
| 60:02    addiction themselves and it would be specific as to | | |
| 60:03    whether they were impaired at the time that they | | |
| 60:04    were practicing as well as whether they were using | | |
| 60:05    inappropriately. | | |
| 60:06    Q. Did the Board work with licensees that were | | |
| 60:07    addicted themselves to get them treatment? | | |
| 60:08    A. Yes, we did.  In fact, I think one of the | | |
| 60:09    first things that we were able to pass when I came | | |
| 60:10    on as the executive director was establishment of a | | |
| 60:11    physicians health program in West Virginia. | | |
| 60:12    Q. And what's the physicians health program? | | |

| Designations | Objections | Reponses |
|---|---|---|
| 60:13 A. It's the program that works with physicians<br>60:14 that have alcohol or drug abuse or addiction<br>60:15 issues, and to some degree, mental illness.<br>60:16 Q. And why do physicians need a specific<br>60:17 program for themselves?<br>60:18 A. I think just because of the seriousness of<br>60:19 the situation with them that physicians - or<br>60:20 anybody that's involved with drugs - can do a<br>60:21 tremendous amount of damage if they're not on top<br>60:22 of their -- of their game.<br>60:23 Q. Okay.  And did the Board work with the<br>60:24 physicians health program? | | |
| 61:01 - 61:08<br>61:01 A. Yes.<br>61:02 Q. Okay.  And how did they collaborate?  How<br>61:03 did the two agencies collaborate?<br>61:04 A. There's a -- there's an agreement between<br>61:05 the Board of Medicine and the physicians health<br>61:06 program as well as specific legislature in<br>61:07 establishing it, that put together the guidelines<br>61:08 as to how we worked. | | |
| 61:09 - 61:12<br>61:09 Q. And what was the agreement between --<br>61:10 between the two?<br>61:11 A. It was a -- it was a matter of mutually<br>61:12 sharing information under proper circumstances. | Re:  [61:9 to 61:12]<br>Relevance; Hearsay | Re: [61:9 to 61:12]<br>This is a completeness designation given Plaintiffs' designation of the immediately preceding and immediately following testimony on the same subject, making clear its relevance.  The Board of Medicine's standards for disciplining prescribers is relevant.  The question does not call for hearsay. |
| 62:04 - 62:08<br>62:04 Q. Okay.  Was the physicians health program<br>62:05 successful in treating addiction?<br>62:06 A. Yes.  And in fact, the model that we<br>62:07 established in West Virginia has been emulated<br>62:08 across the country by a number of different states. | | |
| 62:09 - 62:10<br>62:09 Q. So addiction can be treated.<br>62:10 A. Yes, it can. | Re: [62:09 to 62:10]<br>Vague; Lack of<br>Foundation; Calls for Expert Opinion | Re: [62:09 to 62:10]<br>The question does not call for expert opinion or lack foundation. Mr. Knittle was the executive director for the WV Board of Medicine, one of the primary regulators of prescribers in West Virginia, for 12 years. These questions are within the personal knowledge he developed in that role, as he is discussing specific programs that the Board of Medicine participated in to assist with treatment of addiction among licensed prescribers. |

| Designations | Objections | Reponses |
|---|---|---|
| 63:04 - 63:08 | | |
| 63:04  Q. Okay.  During your tenure at the Board, | **Re: [63:04 to 63:08]** | **Re: [63:04 to 63:08]** |
| 63:05  were licensees required to take continuing | Vague; Relevance | The question is not |
| 63:06  education related to pain management? | | vague. The knowledge and |
| 63:07  A. They were required to do continuing | | training of physicians in West |
| 63:08  education, yes. | | Virginia is relevant and at |
| | | issue in this case, including |
| | | through Plaintiffs' |
| | | affirmative introduction of |
| | | prescribing records and Board |
| | | of Medicine discipline with |
| | | expert witness Lacey Keller. |
| 65:17 - 66:09 | | |
| 65:17  Q. Do you recall this requirement for the | **Re: [65:17 to 66:09]** | **Re: [65:17 to 66:09]** |
| 65:18  licensees to take two hours of continuing education | Relevance | Please see prior |
| 65:19  on end-of-life care, including pain management? | | response regarding Plaintiffs' |
| 65:20  A. Yes, I do.  And the emphasis there was -- | | relevance objection. |
| 65:21  was on the end-of-life care. | | |
| 65:22  Q. Okay.  And why was the emphasis on | | |
| 65:23  end-of-life care? | | |
| 65:24  A. Just in order for people to be able to not | | |
| 66:01  go through any unnecessary pain in terminal illness | | |
| 66:02  cases. | | |
| 66:03  Q. Was this always a requirement, a continuing | | |
| 66:04  education requirement, while you were at the Board? | | |
| 66:05  A. Yeah, I believe it was there before I | | |
| 66:06  started. | | |
| 66:07  Q. Okay.  Was it there when you -- through | | |
| 66:08  when you left? | | |
| 66:09  A. To my recollection, yes. | | |
| 70:09 - 70:24 | | |
| 70:09  Q. Earlier when we were talking about the | | |
| 70:10  disciplinary process, I believe you said that there | | |
| 70:11  were two investigators employed by the Board? | | |
| 70:12  A. Yeah, for years we only had one. | | |
| 70:13  Q. Okay. | | |
| 70:14  A. But with the amount of -- of complaints and | | |
| 70:15  the complexity of the inappropriate prescribing | | |
| 70:16  cases that were coming up, then it was necessary to | | |
| 70:17  hire a second investigator. | | |
| 70:18  Q. And do you recall what year that was? | | |
| 70:19  A. You know, I wish I did, but I don't. | | |
| 70:20  Q. Why were inappropriate prescribing cases | | |
| 70:21  complex? | | |
| 70:22  A. Because I think you eventually have to | | |
| 70:23  establish that the prescribing itself was | | |
| 70:24  inappropriate, so you needed to get all the | | |
| 71:01 - 71:11 | | |
| 71:01  records, all of the prescription records, and put | | |
| 71:02  them together in a meaningful way in order to try | | |
| 71:03  to make a determination of that. | | |
| 71:04  So it's a very tedious process in | | |
| 71:05  order to do it. | | |
| 71:06  Q. Okay.  I'm assuming - which is probably not | | |
| 71:07  good to do during a deposition - that based on your | | |
| 71:08  testimony, the amount of inappropriate prescribing | | |
| 71:09  cases increased during your -- over your tenure at | | |
| 71:10  the Board.  Is that correct? | | |
| 71:11  A. It did. | | |
| 74:20 - 74:24 | | |
| 74:20  Q. Do you recall if -- if the opioid-related | | |
| 74:21  cases were concentrated in a particular geographic | | |
| 74:22  area of West Virginia? | | |
| 74:23  A. They were more southern than they were | | |
| 74:24  northern.  Huntington, Wayne County, Mingo, down | | |

| Designations | Objections | Reponses |
|---|---|---|
| | | |
| **75:01 - 75:07** | | |
| 75:01   towards the Beckley area.  We had a number of cases | | |
| 75:02   through there, as well as around the Charleston | | |
| 75:03   area. | | |
| 75:04   That is not to say that there were not | | |
| 75:05   cases in the Eastern Panhandle or Morgantown area, | | |
| 75:06   but there were quite a few in the southern part of | | |
| 75:07   the state. | | |
| **75:08 - 75:12** | | |
| 75:08   Q. Do you have any idea why? | **Re: [75:8 to 75:12]** | **Re: [75:8 to 75:12]** |
| 75:09   A. No.  I don't.  There's a lot of different | Improper Opinion; Hearsay; | The question asks for the deponent's |
| 75:10   theories that the people cast about as to issues of | Lack of Foundation; Lack of | own personal understanding, so does |
| 75:11   addiction in Appalachia.  But I don't have a | Personal Knowledge | not lack foundation or personal |
| 75:12   specific one. | | knowledge.  The document does not call |
| | | for hearsay or for any "improper |
| | | opinion."  It asks the deponent if he has |
| | | knowledge of the reasons behind a trend |
| | | in cases that he stated he has personal |
| | | knowledge of. |
| **76:19 - 77:01** | | |
| 76:19   Q. Did the investigators have the ability to | **Re: [76:19 to 77:01]** | **Re: [76:19 to 77:01]** |
| 76:20   look at the West Virginia Controlled Substances | Lack of Foundation; | The question is not |
| 76:21   Monitoring Program? | Lack of Personal Knowledge; | vague and does not lack |
| 76:22   A. I believe that they did. | Speculation; Vague (including | foundation of call for |
| 76:23   Q. Okay.  And if I call it "the CSMP," will | time-frame); Relevance | speculation. Mr. Knittle was |
| 76:24   you understand that it's West Virginia | | the executive director for the |
| 77:01   Controlled Substances Monitoring Program? | | WV Board of Medicine, one of |
| | | the primary regulators of |
| | | prescribers in West Virginia, |
| | | for 12 years. These questions |
| | | are within the personal |
| | | knowledge he developed in that |
| | | role, as they relate |
| | | specifically to the work of |
| | | investigators at the agency he |
| | | ran. |
| **77:02 - 77:13** | | |
| 77:02   A. Yeah.  I don't think that was always in | | |
| 77:03   existence. | | |
| 77:04   Q. Okay. | | |
| 77:05   A. And it came on to -- towards the latter | | |
| 77:06   part of my tenure with the Board. | | |
| 77:07   Q. Do you know why the CSMP was implemented? | | |
| 77:08   A. I think to try to get a better handle on | | |
| 77:09   what was being distributed and supplied and | | |
| 77:10   distributed to physicians and patients then. | | |
| 77:11   Q. Do you know what the -- what information | | |
| 77:12   the CSMP contains? | | |
| 77:13   A. I can't specifically recall. | | |
| **77:14 - 77:24** | | |
| 77:14   Q. Okay.  Do you know who maintains the CSMP? | **Re: [77:14 to 77:24]** | **Re: [77:14 to 77:24]** |
| 77:15   A. It had been the Board of Pharmacy, if it's | Lack of Foundation; | Please see prior |
| 77:16   still there. | Lack of Personal Knowledge; | response. |
| 77:17   Q. Okay.  Prior to the CSMP, what would the | Speculation; Vague (including | |
| 77:18   investigators look at to try to get information | time-frame); Relevance | |
| 77:19   regarding dosages and prescribing of physicians? | | |
| 77:20   A. It would be a subpoena of medical records | | |
| 77:21   of a physician or particular patients. | | |
| 77:22   Q. Was the CSMP a helpful tool then once it | | |
| 77:23   came about? | | |
| 77:24   A. I believe it was helpful. | | |

| Designations | Objections | Reponses |
|---|---|---|
| | | |
| **78:19 - 78:22** | | |
| 78:19 Q. Do you know if prescribers of controlled<br>78:20 substances were required to register with the CSMP?<br>78:21 A. I think they were. I thought that was a<br>78:22 change in -- in law from the Board of Pharmacy. | **Re: [78:19 to 78:22]**<br>Lack of Foundation;<br>Lack of Personal Knowledge;<br>Speculation; Vague (including<br>time-frame); Relevance | **Re: [78:19 to 78:22]**<br>Please see prior<br>response. |
| **79:01 - 79:24** | | |
| 79:01 Q. All right. Can you pull out Tab 14?<br>79:02 COURT REPORTER: Sandy, will this be<br>79:03 Exhibit 3?<br>79:04 KNITTLE DEPOSITION EXHIBIT NO. 3<br>79:05 (WVBOM Quarterly Newsletter, Volume<br>79:06 14, Issue 1, January-March 2010 was<br>79:07 marked for identification purposes as<br>79:08 Knittle Deposition Exhibit No. 3.)<br>79:09 A. You guys like our newsletters, huh?<br>79:10 Q. I tried to get other stuff. This is all I<br>79:11 got. All right. So this is going to be marked as<br>79:12 Exhibit 3 to your deposition. It is the West<br>79:13 Virginia Board of Medicine Quarterly Newsletter,<br>79:14 Volume 14, Issue 1, January through March 2010.<br>79:15 And if you look near the bottom of the<br>79:16 page, it discusses the committee substitute for<br>79:17 Senate Bill 365 and Senate Bill 514. You want to<br>79:18 take a minute and read those two paragraphs?<br>79:19 A. Okay.<br>79:20 Q. All right. So for Senate Bill 365, it says<br>79:21 that by at least July 1st, 2011, prescribers of<br>79:22 controlled substances must have access to the CSMP.<br>79:23 Correct?<br>79:24 A. Yes. | **Re: [79:01 to 79:24]**<br>Improper narrative;<br>Hearsay; Relevance | **Re: [79:01 to 79:24]**<br>These questions lay<br>foundation for the exhibit<br>introduced at page 79. No form<br>objection was made during the<br>deposition and is waived. |
| **80:17 - 80:21** | | |
| 80:17 Q. So if a physician had -- was checking the<br>80:18 CSMP, they'd be able to see if their patient had<br>80:19 been going from doctor to doctor to doctor to try<br>80:20 to get different controlled substances, right?<br>80:21 A. Correct. | **Re: [80:17 to 80:21]**<br>Calls for Expert<br>Opinion; Speculation; Lack of<br>Foundation; Vague (including<br>time-frame) | **Re: [80:17 to 80:21]**<br>The question is not<br>vague and does not lack<br>foundation or call for<br>speculation or expert opinion.<br>No form objection was made<br>during the deposition and is<br>waived. Mr. Knittle was the<br>executive director for the WV<br>Board of Medicine, one of the<br>primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role, as they relate<br>specifically to the State's<br>regulation of prescribers and<br>information sources made<br>available to prescribers. |
| **81:04 - 81:11** | | |
| 81:04 Q. Okay. It also says that Senate Bill 365<br>81:05 "limits liability of practitioners for good faith<br>81:06 reliance on the" CSMP database. Do you know what<br>81:07 the purpose of limiting the liability of the<br>81:08 practitioners was?<br>81:09 A. Well, the first response is it would be to<br>81:10 curb malpractice cases against them if they were<br>81:11 prescribing opioids. | **Re: [81:04 to 81:11]**<br>Hearsay; Lack of<br><br>Foundation; Calls for a Legal<br>Conclusion; Calls for Expert<br>Opinion; Vague | **Re: [81:04 to 81:11]**<br>Please see prior<br><br>response. |

| Designations | Objections | Reponses |
|---|---|---|
| **82:15 - 82:24**<br>82:15  Q. Okay.  If you go -- the Senate Bill 514, it<br>82:16  says, "controlled substance reporting when a<br>82:17  prescription is filled for a controlled substance<br>82:18  or a controlled substance is dispensed."<br>82:19  A. Yes.<br>82:20  Q. The only information that is then reported<br>82:21  to the CSMP would be when a controlled substance is<br>82:22  filled or dispensed by a pharmacy or a doctor that<br>82:23  dispenses it out of their office?  Is that right?<br>82:24  A. Yes. | **Re: [82:15 to 82:24]**<br>Hearsay; Lack of<br>Foundation; Calls for a Legal<br>Conclusion; Calls for Expert<br>Opinion; Vague | **Re: [82:15 to 82:24]**<br>Please see prior<br>response. |
| **85:16 - 85:19**<br>85:16  Q. And in fact, it would be helpful for<br>85:17  physicians to check the CSMP prior to writing a<br>85:18  prescription for an opioid, right?<br>85:19  A. Yes. | **Re: [85:16 to 85:19]**<br>Speculation; Lack of<br>Foundation; Calls for Expert<br>Opinion; Vague (including<br>time-frame) | **Re: [85:16 to 85:19]**<br>Please see prior<br>response. |
| **85:20 - 86:02**<br>85:20  Q. And what should the prescriber be looking<br>85:21  for when they check the CSMP?<br>85:22  A. Well, apparently -- if it was a physician,<br>85:23  then you would be looking at a particular patient<br>85:24  to see if they had been to five different<br>86:01  physicians over a certain period of time looking<br>86:02  for a particular type of drug or treatment. | **Re: [85:20 to 86:02]**<br>Speculation; Lack of<br>Foundation; Calls for Expert<br>Opinion; Vague (including<br>time-frame) | **Re: [85:20 to 86:02]**<br>Please see prior<br>response. |
| **88:01 - 88:06**<br>88:01  Q. Okay.  If a doctor was being investigated<br>88:02  for inappropriate or overprescribing, would their<br>88:03  license or their ability to prescribe be put on<br>88:04  hold in any sort of way during the investigative<br>88:05  process?<br>88:06  A. Generally not. | **Re: [88:01 to 88:06]**<br>Vague; Relevance | **Re: [88:01 to 88:06]**<br>The question is not<br>vague. The disciplinary<br>processes employed by the<br>Board of Medicine are relevant<br>to this case, including<br>through Plaintiffs'<br>affirmative introduction of<br>prescribing records and Board<br>of Medicine discipline with<br>expert witness Lacey Keller. |
| **88:07 - 88:21**<br>88:07  Q. Okay.<br>88:08  A. If it was a case where it was -- it was<br>88:09  extremely severe, that you had an overdose of --<br>88:10  deaths of five people because of prescribing,<br>88:11  sometimes there's a legal means in order to, you<br>88:12  know, suspend someone on an emergency basis and<br>88:13  have a quick hearing.<br>88:14  That was extremely rare --<br>88:15  Q. Okay.<br>88:16  A. -- for that -- for that to happen.<br>88:17  Q. Do you recall --<br>88:18  A. So --<br>88:19  Q. Sorry.<br>88:20  A. -- until probable cause is found, people<br>88:21  are able to practice. | | |
| **88:22 - 89:01**<br>88:22  Q. Do you recall an instance where there were<br>88:23  deaths of several people that somebody's ability to<br>88:24  prescribe was almost immediately revoked?<br>89:01  A. No. | **Re: [88:22 to 89:01]**<br>Relevance | **Re: [88:22 to 89:01]**<br>This is a completeness designation<br>given Plaintiffs' designation of the<br>immediately preceding testimony on the<br>same subject, making clear its relevance.<br>The Board of Medicine's standards for<br>disciplining prescribers is relevant. |

| Designations | Objections | Reponses |
|---|---|---|
| **89:02 - 89:06**<br>89:02  Q. Okay.  But it is an option for the Board to<br>89:03  immediately revoke somebody's ability to prescribe<br>89:04  or practice medicine.<br>89:05  A. There is that -- there is that aspect in an<br>89:06  immediate situation. | **Re: [89:02 to 89:06]**<br>Vague; Relevance | **Re: [89:02 to 89:06]**<br>The question is not vague. The disciplinary processes employed by the Board of Medicine are relevant to this case, including through Plaintiffs' affirmative introduction of prescribing records and Board of Medicine discipline with expert witness Lacey Keller. |
| **89:12 - 89:22**<br>89:12  Q. What types of discipline could be doled out<br>89:13  to a physician?  Starting with the harshest penalty<br>89:14  to the lightest penalty.<br>89:15  A. Well, you could permanently lose your<br>89:16  license, would probably be the harshest.  You know,<br>89:17  probably the least severe would be some type of<br>89:18  continuing medical education.<br>89:19  Sometimes community service.  But that<br>89:20  was rarely used.<br>89:21  Q. Could somebody's license be suspended?<br>89:22  A. Yes, that's in the middle. | **Re: [89:12 to 89:22]**<br>Vague; Relevance | **Re: [89:12 to 89:22]**<br>Please see prior response. |
| **93:15 - 94:03**<br>93:15  Q. Do you know what the "epidemic of<br>93:16  prescription drug fraud" is?<br>93:17  A. I think that's what we were talking about,<br>93:18  where people would alter prescriptions or steal<br>93:19  prescription pads.<br>93:20  Q. Okay.  Do you know how long this epidemic<br>93:21  lasted?<br>93:22  A. No.  But given how quickly the legislative<br>93:23  acts, it was probably a number of years.<br>93:24  Q. Are you saying that they -- they don't act<br>94:01  that quickly?<br>94:02  A. No, they -- they usually take their time on<br>94:03  these things. | **Re: [93:15 to 94:03]**<br>Speculation; Hearsay; Lack of Foundation; Vague; Relevance | **Re: [93:15 to 94:03]**<br>The question is not vague nor does it lack foundation or call for speculation. The question relates to Deposition Exhibit 3, which is a Board of Medicine publication, and the deponent was the Executive Director of the Board of Medicine for twelve years. The question references the newsletter to ask if the deponent understands terms used therein, not for the truth of any statements in the newsletter, and therefore is not calling for hearsay. Issues related to prescription drug fraud are relevant to this case, which deals with the alleged misuse and abuse of prescription opioids. |
| **94:04 - 94:07**<br>94:04  Q. Okay.<br>94:05  A. Until it comes to their attention to a<br>94:06  strong enough point where it becomes legislatively<br>94:07  necessary. | | |
| **101:24 - 101:24**<br>101:24  Q. Was there a time when the standard of care | | |
| **102:01 - 102:24**<br>102:01  was to treat with opioids?<br>102:02  A. I think it was professed by some people to<br>102:03  do that, that narcotics was the thing that you<br>102:04  should start out with first and foremost.<br>102:05  And there were some physicians that<br>102:06  prescribed to that approach.  But it was not<br>102:07  generally very effective and as the addictions rose<br>102:08  and the deaths rose, it was really called into<br>102:09  question. | | |

| Designations | Objections | Reponses |
|---|---|---|
| 102:10 Q. You said it was professed by people.  Do | | |
| 102:11 you know who professed it? | | |
| 102:12 A. I think some of the pharmaceutical | | |
| 102:13 manufacturers had pushed for it pretty heavily. | | |
| 102:14 Q. Do you know what the Joint Commission on | | |
| 102:15 the Accreditation of Hospitals is? | | |
| 102:16 A. I'm aware of what -- that entity | | |
| 102:17 exists, yes. | | |
| 102:18 Q. Okay.  Do you know what they do? | | |
| 102:19 A. They accredit hospitals as to appropriate | | |
| 102:20 means of patient care, safety, medical treatment. | | |
| 102:21 Q. Do you remember guidance from the Joint | | |
| 102:22 Commission that pain should be treated as the fifth | | |
| 102:23 vital sign? | | |
| 102:24 A. I don't know if they adopted that or -- | | |
| | | |
| 103:01 - 103:24 | | |
| 103:01 actually, I think it was a pharmacy that started | | |
| 103:02 that, and people were led to believe that that was | | |
| 103:03 truly a medical basis when in fact it wasn't. | | |
| 103:04 It was more of a marketing scheme. | | |
| 103:05 Q. Did pain being seen as the fifth vital sign | | |
| 103:06 change the way that physicians prescribed pain | | |
| 103:07 medication? | | |
| 103:08 A. I don't think it ever came up a great deal | | |
| 103:09 in our complaint process as to whether they fell | | |
| 103:10 back to that as a line of defense. | | |
| 103:11 Q. What did come up in the complaint process | | |
| 103:12 as a line of defense for inappropriate prescribing? | | |
| 103:13 A. On which case?  There's -- | | |
| 103:14 Q. Was there an excuse or something that | | |
| 103:15 people used regularly? | | |
| 103:16 A. You know, some people were -- and there was | | |
| 103:17 a very select few physicians who adamantly believed | | |
| 103:18 that narcotics was the first and only treatment. | | |
| 103:19 But that standard of care caused a | | |
| 103:20 tremendous amount of addiction and deaths when you | | |
| 103:21 look back on those particular cases. | | |
| 103:22 You know, others -- there was a whole | | |
| 103:23 range of -- of rationale as to why they did what | | |
| 103:24 they did. | | |
| | | |
| 104:01 - 104:24 | | |
| 104:01 Q. You just said, "that standard of care | | |
| 104:02 caused a tremendous amount of addiction and | | |
| 104:03 deaths." | | |
| 104:04 A. Yes. | | |
| 104:05 Q. What about standard of care caused | | |
| 104:06 addiction and deaths? | | |
| 104:07 A. If someone actually believed that the only | | |
| 104:08 way to deal with any kind of pain was high dosages | | |
| 104:09 of opioids, then the end result for people is that | | |
| 104:10 they would become addicted, you know, a vast | | |
| 104:11 majority of the time, and would abuse the drug, | | |
| 104:12 seek other ways to get it or get their dosages | | |
| 104:13 increased by that physician. | | |
| 104:14 And a number of times, if they mixed | | |
| 104:15 it with alcohol or whatever, they died. | | |
| 104:16 Q. And that was a problem with some of the | | |
| 104:17 Board's licensees, that they -- that was their view | | |
| 104:18 of the standard of care? | | |
| 104:19 A. Yes. | | |
| 104:20 Q. Okay.  How -- how would the Board know | | |
| 104:21 about physicians that believed this kind of | | |
| 104:22 standard of care? | | |
| 104:23 A. Their own testimony. | | |
| 104:24 Q. Okay.  Other than receiving a complaint, | | |
| | | |
| 105:01 - 105:04 | | |
| 105:01 would the Board be able to investigate a doctor | | |
| 105:02 regarding the standard of care? | | |

| Designations | Objections | Reponses |
|---|---|---|
| 105:03     A. No. The Board doesn't have the capacity to<br>105:04     initiate their own complaints. | | |
| **106:02 - 106:14** | | |
| 106:02     Q. So Mr. Knittle, could you define for me,<br>106:03     when we've just been talking about standard of<br>106:04     care, what is your definition of "standard of<br>106:05     care?"<br>106:06     A. I think it's an approach by a particular<br>106:07     physician as to what he feels is the best way to<br>106:08     manage a medical issue.<br>106:09     Q. Okay. And when you say the standard of<br>106:10     care caused addictions and deaths, what do you mean<br>106:11     by "standard of care" in that statement?<br>106:12     A. That some physicians had believed that the<br>106:13     best way to treat pain was for high and consistent<br>106:14     amounts of opioids. | **Re: [106:02 to 106:14]**<br>Speculation; Lack of<br>Foundation; Vague; Calls for<br>Expert Opinion | **Re: [106:02 to 106:14]**<br>The question is not<br>vague nor does it lack<br>foundation or call for expert<br>testimony. Mr. Knittle was the<br>executive director for the WV<br>Board of Medicine, one of the<br>primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role, and the question<br>specifically asks for his<br>personal definition of a term<br>("your definition ....."). |
| **107:04 - 108:01** | | |
| 107:04     Did -- while you were at the Board,<br>107:05     did you recommend that physicians restrict their<br>107:06     patient to one pharmacy?<br>107:07     A. I think that was more from the Board of<br>107:08     Pharmacy than the Board of Medicine.<br>107:09     Q. Okay.<br>107:10     A. It was a way to try to curtail people<br>107:11     trying to gain prescriptions from different<br>107:12     pharmacies. You know, some -- some people would<br>107:13     get a prescription from one doctor and go to one<br>107:14     pharmacy and then go to another doctor and then go<br>107:15     to another pharmacy.<br>107:16     Q. Okay. Was that a problem --<br>107:17     A. Yeah.<br>107:18     Q. -- in West Virginia?<br>107:19     A. It was.<br>107:20     Q. At any time, was this -- kind of go to a<br>107:21     doctor, go to different pharmacies to fill<br>107:22     prescriptions. At any time did that stop or<br>107:23     lessen? Was there a time period --<br>107:24     A. I think with the monitoring program, it<br>108:01     certainly helped. I think that would be curtailed. | **Re: [107:04 to 108:01]**<br>Calls for Expert<br>Opinion; Speculation; Lack of<br>Foundation; Vague (including<br>time-frame) | **Re: [107:04 to 108:01]**<br>Please see prior<br>response. In addition, the<br>timeframe is explicit in the<br>question asked ("[W]hile you<br>were at the board ...."). The<br>question asks whether the<br>deponent took a specific<br>action, so could not call for<br>speculation or require expert<br>opinion. |
| **109:06 - 109:24** | | |
| 109:06     Q. Okay. At some point, were board -- or<br>109:07     sorry, were licensees of the Board required to<br>109:08     obtain CME credits related to the administration of<br>109:09     naloxone?<br>109:10     A. Naloxone?<br>109:11     Q. Yeah.<br>109:12     A. I think there was.<br>109:13     Q. Okay. Do you know why the Board would<br>109:14     require licensees to take CME credits related to<br>109:15     naloxone?<br>109:16     A. Just because of the amount of overdoses<br>109:17     that were occurring through the use of prescribed<br>109:18     medications and, later, nonprescribed medications<br>109:19     as well.<br>109:20     Q. So was the CME kind of training on the<br>109:21     administration of naloxone?<br>109:22     A. Yes. It -- which is a rather simple<br>109:23     procedure --<br>109:24     Q. Okay. | | |
| **110:01 - 110:08** | | |
| 110:01     A. -- for the administration of it. But they<br>110:02     should be aware of how to do it and that it's<br>110:03     available. | | |

| Designations | Objections | Reponses |
|---|---|---|
| 110:04 Q. Do you think that it would help reduce<br>110:05 opioid overdoses if physicians were trained in the<br>110:06 administration of naloxone?<br>110:07 A. I think with the -- with the use of<br>110:08 naloxone, it was to prevent deaths. | | |
| 110:22 - 111:06<br>110:22 Q. Was -- during your time at the Board, was<br>110:23 it entirely self-funded?<br>110:24 A. Yes.  We -- it's just basically license<br>111:01 fees.  And that's -- that's it.<br>111:02 Q. And renewal fees?<br>111:03 A. Yes.  But the fines, you know, go to the<br>111:04 general fund.  The Board of Medicine does not gen<br>111:05 -- benefit from the fines that they impose on<br>111:06 people. | Re: [110:22 to 111:06]<br>Relevance | Re: [110:22 to 111:06]<br>The question is<br>relevant to how the Board of<br>Medicine is funded and its<br>potential incentives regarding<br>licensing fees and<br>disciplinary fees. |
| 111:09 - 111:15<br>111:09 Q. So the Board of Medicine -- excuse me --<br>111:10 does not receive any money from the City of<br>111:11 Huntington, correct?<br>111:12 A. Correct.<br>111:13 Q. And the Board of Medicine does not receive<br>111:14 any money from Cabell County, correct?<br>111:15 A. Correct. | Re: [111:09 to 111:15]<br>Relevance | Re: [111:09 to 111:15]<br>Please see prior<br>response. |
| 112:04 - 112:24<br>112:04 Q. Earlier when we were discussing the paper<br>112:05 that had been republished in the newsletter, it<br>112:06 talked about an opioid epidemic.  Do you believe<br>112:07 that West Virginia had an opioid epidemic?<br>112:08 A. Yes, I do.<br>112:09 Q. Do you know when it began?<br>112:10 A. I think it began probably in the mid '90s.<br>112:11 They used to refer to it as "hillbilly heroin," the<br>112:12 use of oxycodone and OxyContin.  And it just began<br>112:13 -- it just continued to increase since then.<br>112:14 Q. Do you believe West Virginia still has an<br>112:15 opioid epidemic?<br>112:16 A. I couldn't say.  I have not kept track of<br>112:17 the records.  I no longer live in West Virginia,<br>112:18 so, you know, I've had little to no contact with<br>112:19 the Board of Medicine since I left.<br>112:20 Q. Did West Virginia have an opioid epidemic<br>112:21 in 2016 when you were still at the Board?<br>112:22 A. Yes.<br>112:23 Q. Do you believe that Cabell County had an<br>112:24 opioid epidemic? | | |
| 113:01 - 113:24<br>113:01 A. Yes, I do.<br>113:02 Q. Do you know when that began?<br>113:03 A. No.  I think along with other portions of<br>113:04 the state, it just increased and increased.  I know<br>113:05 that Wayne County had some real marked issues years<br>113:06 prior to 2016.<br>113:07 Q. Do you believe that the City of Huntington<br>113:08 had an opioid epidemic?<br>113:09 A. I believe their citizens did, yes.<br>113:10 Q. Do you believe that inappropriate<br>113:11 prescribing contributed to the opioid epidemic?<br>113:12 A. I think in part, yes.<br>113:13 Q. Do you believe that doctor shopping<br>113:14 contributed to the opioid epidemic?<br>113:15 A. Yes.<br>113:16 Q. Do you believe that drug cartels<br>113:17 contributed to the opioid epidemic?<br>113:18 A. Define "cartel."<br>113:19 Q. You were talking about the oversea<br>113:20 drug-related --<br>113:21 A. No.  No, I don't think from a criminal<br>113:22 standpoint.  There was not -- I think there's some | | |

| Designations | Objections | Reponses |
|---|---|---|
| 113:23    -- some issue of crime involved with -- with any<br>113:24    addictive drug.  But I don't think they were the | | |
| **114:01 - 114:19**<br>114:01    main push for the -- for the epidemic.<br>114:02    Q. Okay.  What do you think the main push for<br>114:03    the epidemic was?<br>114:04    A. I think the amount of addiction that<br>114:05    occurred through people gaining opioids through<br>114:06    whatever means they could.<br>114:07    Q. Including doctors prescribing it to them?<br>114:08    A. Yes.<br>114:09    Q. Do you think the Board of Medicine bears<br>114:10    any responsibility for the opioid epidemic?<br>114:11    A. No.  I don't think the Board of Medicine<br>114:12    did.  Our efforts were to try to protect the public<br>114:13    and to provide education through the public and<br>114:14    physicians and to discipline those who were<br>114:15    inappropriately prescribing.<br>114:16    Q. So you believe that the Board did<br>114:17    everything that it could have.<br>114:18    A. I believe so, yeah.  We tried hard.  And<br>114:19    it's a -- it's a heart-wrenching concern. | | |
| **115:21 - 116:04**<br>115:21    epidemic.  And earlier, we had talked about pain<br>115:22    being treated as a fifth vital sign.  Do you<br>115:23    believe that that contributed to the opioid<br>115:24    epidemic?<br>116:01    A. I think in a -- in a sense that it gave<br>116:02    some -- oh, I'm trying to think of the proper word.<br>116:03    -- basis for physicians to prescribe<br>116:04    in the manner that some of them did. | Re: [115:21 to 116:04]<br>Speculation; Calls<br>for Expert Opinion; Lack of<br>Foundation; Vague | Re: [115:21 to 116:04]<br>The question is not<br>vague and expressly solicits<br>Mr. Knittle's personal<br>knowledge ("Do you believe<br>....") so does not lack<br>foundation or call for<br>speculation. Mr. Knittle was<br>the executive director for the<br>WV Board of Medicine, one of<br>the primary regulators of<br>prescribers in West Virginia,<br>for 12 years. This question is<br>within the personal knowledge<br>he developed in that role and<br>do not call for expert<br>testimony. |
| **116:05 - 116:14**<br>116:05    Q. And do you believe that that manner was<br>116:06    overprescribing?<br>116:07    A. Yes.  I think it was initially.<br>116:08    Q. Okay.  Did the Board of Medicine undertake<br>116:09    any opioid-related initiatives to help combat the<br>116:10    opioid epidemic in West Virginia?<br>116:11    A. I think there was a concern over it and we<br>116:12    took steps legislatively and through education and<br>116:13    through discipline -- disciplining physicians and<br>116:14    P.A.'s, podiatrists. | | |
| **121:20 - 122:05**<br>121:20    Q. Was the Board ever influenced by any drug<br>121:21    distributor to create a policy regarding the proper<br>121:22    use of opioids?<br>121:23    A. Not that I'm aware of, no.  We had very<br>121:24    little contact with pharmaceutical -- as far as<br>122:01    pharmaceutical manufacturers.  They would call us<br>122:02    now and then, offer us, you know, something that we<br>122:03    could download to say, "Don't use opioids<br>122:04    inappropriately" or something like that, but we had | Re: [121:20 to 122:05]<br>Lack of Foundation;<br>Speculation; Relevance; Vague | Re: [121:20 to 122:05]<br>The question is not<br>vague and does not call for<br>speculation or lack<br>foundation. Mr. Knittle was<br>the executive director for the<br>WV Board of Medicine, one of<br>the primary regulators of<br>prescribers in West Virginia, |

| Designations | | Objections | Reponses |
|---|---|---|---|
| 122:05 | very little contact with them whatsoever. | | for 12 years. These questions are within the personal knowledge he developed in that role. The question is relevant to the board's operations, and to establish that defendants did not interact with the board regarding any policy related to prescribing. |
| **122:18 - 122:21** | | | |
| 122:18 | Q. Okay.  So the drug distributors would not | **Re: [122:18 to 122:21]** | **Re: [122:18 to 122:21]** |
| 122:19 | have influenced the Board of Medicine to create | Lack of Foundation; | Please see prior |
| 122:20 | policies related to opioids. | Speculation; Relevance; Vague | response. |
| 122:21 | A. No, I don't believe so. | | |
| **123:09 - 124:14** | | | |
| 123:09 | Q. As you sit here today, do you know of an | **Re: [123:09 to 124:14]** | **Re: [123:09 to 124:14]** |
| 123:10 | instance where a wholesale drug distributor tried | Relevance; Hearsay | Please see prior |
| 123:11 | to approach a physician to influence the Board? | | response. The testimony does |
| 123:12 | A. I do not, no. | | not elicit hearsay as it does |
| 123:13 | Q. Okay.  All right.  Can you grab Tab 2? | | not seek for the witness to |
| 123:14 | KNITTLE DEPOSITION EXHIBIT NO. 7 | | adopt the truth of any |
| 123:15 | (Management of Intractable Pain Act | | statements in the exhibit, but |
| 123:16 | passed March 14, 1998 was marked for | | rather uses the exhibit for |
| 123:17 | identification purposes as Knittle | | its notice to prescribers and |
| 123:18 | Deposition Exhibit No. 7.) | | its effect on prescribers' |
| 123:19 | A. Okay. | | actions (through adopting of a |
| 123:20 | Q. All right.  This will be marked as Exhibit | | piece of legislation that |
| 123:21 | 7 to your deposition, and it is the Management of | | regulated prescribing |
| 123:22 | Intractable Pain which was passed March 14th, 1998. | | activity). The standard of |
| 123:23 | Do you see that? | | care, including the State's |
| 123:24 | A. Yes, I do. | | regulation of prescribers are |
| 124:01 | Q. Are you familiar with the Management of | | relevant. |
| 124:02 | Intractable Pain Act? | | |
| 124:03 | A. I had been, yes. | | |
| 124:04 | Q. Okay.  You go down to near the bottom. | | |
| 124:05 | It's bold print, Section 30-3A-2, "Limitation on | | |
| 124:06 | disciplinary sanctions or criminal punishment | | |
| 124:07 | related to management of intractable pain." | | |
| 124:08 | If you just want to read that Section | | |
| 124:09 | A-1 and 2. | | |
| 124:10 | A. Okay. | | |
| 124:11 | Q. And so this is saying that the Board of | | |
| 124:12 | Medicine could not discipline any licensees in the | | |
| 124:13 | instances described in Section A-1 and 2.  Correct? | | |
| 124:14 | A. Yes. | | |
| **125:22 - 126:15** | | | |
| 125:22 | Q. Okay.  All right.  If you want to grab Tab | **Re: [125:22 to 126:15]** | **Re: [125:22 to 126:15]** |
| 125:23 | 3. | Hearsay; Lack of | These questions are |
| 125:24 | KNITTLE DEPOSITION EXHIBIT NO. 8 | Foundation; Speculation; | foundation-laying for the |
| 126:01 | (Joint Policy Statement on Pain | Relevance; Vague (including | exhibit introduced and do not |
| 126:02 | Management at the End of Life was | time-period) | elicit hearsay. The Board of |
| 126:03 | marked for identification purposes as | | Medicine's adoption of a |
| 126:04 | Knittle Deposition Exhibit No. 8.) | | policy statement regarding the |
| 126:05 | A. Okay. | | use of prescription opioids is |
| 126:06 | Q. All right.  This is going to be marked as | | relevant to issues in this |
| 126:07 | Exhibit 8 to your deposition.  It is the Joint | | case, including the standard |
| 126:08 | Policy Statement on Pain Management at the End of | | of care. The time period is |
| 126:09 | Life.  And if you turn to the last page, it says | | made express in the testimony |
| 126:10 | that it was approved by the West Virginia Board of | | (see 126:6-11). |
| 126:11 | Medicine March 12, 2001. | | |
| 126:12 | A. Yes. | | |
| 126:13 | Q. Are you aware of the Joint Policy Statement | | |
| 126:14 | on Pain Management at the End of Life? | | |
| 126:15 | A. Yes, I was aware of it. | | |
| **126:16 - 126:23** | | | |
| 126:16 | Q. Okay.  Do you know if the Board of Medicine | | |
| 126:17 | was involved in the drafting of this? | | |

| Designations | Objections | Reponses |
|---|---|---|
| 126:18 A. I do not.  I imagine they had -- they<br>126:19 probably had it placed before them in order to<br>126:20 approve it, and, you know, they could have -- they<br>126:21 may have offered suggestions as to language and<br>126:22 things, but I don't have any -- any recollection of<br>126:23 that.  It was before I was there. | | |
| 126:24 - 128:06 | | |
| 126:24 Q. Okay.  Do you know what the purpose of the<br>127:01 Joint Policy Statement On Pain Management At The<br>127:02 End of Life was?<br>127:03 A. I think because -- in order to use opioids<br>127:04 for the use of intractable pain with terminal<br>127:05 patients, in order to have a little more dignity in<br>127:06 death without unnecessary pain and suffering.<br>127:07 Q. On page 3 --<br>127:08 A. Okay.<br>127:09 Q. -- the first paragraph, which is very<br>127:10 similar to the Position Statement in the Management<br>127:11 Of Intractable Pain, it says, "Health care<br>127:12 professionals should not fear disciplinary action<br>127:13 from the Boards for prescribing, administering, or<br>127:14 dispensing controlled substances, including opioid<br>127:15 analgesics, for a legitimate medical purpose and in<br>127:16 the usual course of professional practice.<br>127:17 All such prescribing must be<br>127:18 established with clear documentation of unrelieved<br>127:19 pain and in compliance with applicable state or<br>127:20 federal law."<br>127:21 So again, like we've discussed, you --<br>127:22 the healthcare professionals should not fear<br>127:23 disciplinary action for prescribing opioids.<br>127:24 Right?<br>128:01 A. As long as they follow standard of care.<br>128:02 Q. Yeah.  Because opioids can serve a<br>128:03 legitimate medical purpose.<br>128:04 A. They can, yes.  Particularly with end of<br>128:05 life when there's not an issue of addiction with<br>128:06 someone who's terminally ill. | Re: [126:24 to 128:06]<br>Hearsay; Lack of<br>Foundation; Speculation;<br>Relevance | Re: [126:24 to 128:06]<br>These questions do<br>not lack foundation or call<br>for speculation. Mr. Knittle<br>was the executive director for<br>the WV Board of Medicine, one<br>of the primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role. Mr. Knittle earlier<br>testified that he was aware of<br>the exhibit (126:13-15).<br>Regulation of prescribers and<br>the use of prescription<br>opioids is relevant to this<br>case, including to the<br>standard of care. The question<br>does not call for hearsay as<br>it does not use any statement<br>for the truth, but rather for<br>notice of the relevant<br>regulations passed by the<br>State. |
| 129:05 - 129:09 | | |
| 129:05 KNITTLE DEPOSITION EXHIBIT NO. 9<br>129:06 (Policy for the Use of Controlled<br>129:07 Substances for the Treatment of Pain<br>129:08 was marked for identification purposes<br>129:09 as Knittle Deposition Exhibit No. 9.) | Re: [129:05 to 129:09]<br>Same objections as<br>above | Re: [129:05 to 129:09]<br>Please see prior<br>response. |
| 129:23 - 130:07 | | |
| 129:23 Q. So then if you turn to the next page, it<br>129:24 says that this is "Policy for the Use of Controlled<br>130:01 Substances for the Treatment of Pain, Effective<br>130:02 January 10, 2005."<br>130:03 Do you know if this was a replacement<br>130:04 to the 1997 Position Statement on the use of<br>130:05 opioids that we discussed earlier that was Exhibit<br>130:06 6?<br>130:07 A. I believe that it was. | Re: [129:23 to 130:07]<br>Same objections as<br>above | Re: [129:23 to 130:07]<br>Please see prior<br>response. |

| Designations | Objections | Reponses |
|---|---|---|
| **130:16 - 130:24**<br>130:16 Q. And was this policy used then to establish<br>130:17 the standard of care for licensees to follow or<br>130:18 abide by?<br>130:19 A. Yes, I think it was -- it was written in<br>130:20 order to be given some guidelines to go by.<br>130:21 Q. And by this, the Board was leaving the<br>130:22 decision to manage pain to the discretion of the<br>130:23 treating physician.  Correct?<br>130:24 A. Yes.  Yes. | Re: [130:16 to 130:24]<br>Same objections as<br>above | Re: [130:16 to 130:24]<br>Please see prior<br>response. |
| **131:17 - 132:07**<br>131:17 Q. Okay.  And this policy was provided to<br>131:18 alleviate physician uncertainty and to encourage<br>131:19 better pain management, correct?<br>131:20 A. Yes.  And I think, you know, in part too,<br>131:21 to curb the amount of use inappropriately of<br>131:22 opioids.<br>131:23 Q. And this policy has a paragraph, a last<br>131:24 paragraph, on page 1 very similar to the paragraphs<br>132:01 that we've read before about a physician shouldn't<br>132:02 fear disciplinary action from the Board?<br>132:03 So while it was the policy of the<br>132:04 Board in 1997, it continued to be the policy to<br>132:05 make sure its licensees didn't fear discipline for<br>132:06 just prescribing opioids, correct?<br>132:07 A. Correct. | Re: [131:17 to 132:07]<br>Same objections as<br>above | Re: [131:17 to 132:07]<br>Please see prior<br>response. |
| **132:08 - 132:12**<br>132:08 Q. Okay.  And if a physician deviated from<br>132:09 this policy, they wouldn't automatically be<br>132:10 disciplined.  Correct?<br>132:11 A. No.  It would depend on the circumstances<br>132:12 of the patient. | | |
| **132:13 - 132:20**<br>132:13 Q. Okay.  I know you were only there for a<br>132:14 couple of weeks.  But was the Board influenced by<br>132:15 any wholesale drug distributors to create this<br>132:16 policy?<br>132:17 A. I'm not aware of any.<br>132:18 Q. Do you know if they were influenced<br>132:19 by any drug manufacturers to create this policy?<br>132:20 A. I'm not aware of any. | Re: [132:13 to 132:20]<br>Speculation; Lack of<br>Foundation/Personal Knowledge;<br>Relevance | Re: [132:13 to 132:20]<br>The question does not<br>call for speculation or lack<br>foundation. Mr. Knittle was<br>the executive director for the<br>WV Board of Medicine, one of<br>the primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role. The question is relevant<br>to the board's operations, and<br>to establish that defendants<br>did not interact with the<br>board regarding any policy<br>related to prescribing. |
| **132:21 - 133:03**<br>132:21 Q. Okay.  How would the Board let its<br>132:22 licensees know about the changes in the policy?<br>132:23 A. Oftentimes through the newsletter.<br>132:24 Q. Okay.<br>133:01 A. And later on, through the website.  And to<br>133:02 sharing with other entities that the physicians<br>133:03 come in contact with. | Re: [132:21 to 133:03]<br>Vague (including<br>time-frame) | Re: [132:21 to 133:03]<br>The question is not<br>vague, and is asked of a<br>deponent who served as the<br>Board's executive director for<br>twelve years. No form<br>objection was made at the<br>deposition and is waived. |
| **133:17 - 135:21**<br>133:17 KNITTLE DEPOSITION EXHIBIT NO. 10<br>133:18 (WVBOM Quarterly Newsletter, Volume<br>133:19 12, Issue 4, October-December 2008 was<br>133:20 marked for identification purposes as<br>133:21 Knittle Deposition Exhibit No. 10.)<br>133:22 A. Okay. | Re: [133:17 to 135:21]<br>Hearsay; Relevance | Re: [133:17 to 135:21]<br>The document has<br>previously been admitted into<br>evidence, and the questioning<br>does not elicit hearsay as it<br>asks for the deponent's |

| Designations | Objections | Reponses |
|---|---|---|
| 133:23 Q. This will be marked as Exhibit 10 to your<br>133:24 deposition. It's the West Virginia Board of<br>134:01 Medicine Quarterly Newsletter, Volume 12, Issue 4,<br>134:02 October through December of 2008. Correct?<br>134:03 A. Yes.<br>134:04 Q. Okay. Could you turn to page 6?<br>134:05 A. Okay.<br>134:06 Q. All right. The bottom part of the page<br>134:07 says, "Responsible Opioid Prescribing: A<br>134:08 Physician's Guide; Now Available For Online<br>134:09 Purchase."<br>134:10 And it says that "In the Spring of<br>134:11 2008, the Board of Medicine, in conjunction with<br>134:12 the Federation of State Medical Boards and the<br>134:13 Health and Human Services Committee on Substance<br>134:14 Abuse Treatment," "was able to distribute this book<br>134:15 to every licensed physician and physician assistant<br>134:16 in West Virginia."<br>134:17 And it says it's a "150-page book by<br>134:18 pain expert Scott Fishman, M.D." Do you know why<br>134:19 the Board of Medicine distributed this guide to all<br>134:20 of its licensees?<br>134:21 A. I think the amount of addiction and deaths<br>134:22 due to opioids continued to increase, and the<br>134:23 Federation of State Medical Boards had worked with<br>134:24 Scott Fishman, who -- in his work in California,<br>135:01 and he produced this book and distributed it free<br>135:02 of charge to people.<br>135:03 Q. Okay.<br>135:04 A. In fact, he didn't benefit financially from<br>135:05 the book at all.<br>135:06 Q. Did the Board think that the book was a<br>135:07 good book to guide physicians on how to responsibly<br>135:08 prescribe opioids?<br>135:09 A. Yes, it was.<br>135:10 Q. And the newsletter states that "the<br>135:11 response to the book has been quite positive." Do<br>135:12 you know what that meant?<br>135:13 A. I think people -- I think physicians found<br>135:14 it helpful to gain a better understanding of<br>135:15 opioids, the dangers of them and how to best<br>135:16 prescribe them and what circumstances.<br>135:17 Q. Okay. Was the Board influenced by any<br>135:18 wholesale drug distributors to distribute this<br>135:19 book?<br>135:20 A. No. It came through the Federation of<br>135:21 State Medical Boards. | | understanding of why certain<br>actions were taken. The Board<br>of Medicine's guidance to<br>prescribers regarding<br>prescribing opioids is<br>relevant to this case,<br>including to the standard of<br>care. |
| **135:22 - 136:01**<br>135:22 Q. Okay. Was the Board influenced by any drug<br>135:23 manufacturers to distributor this book?<br>135:24 A. No. Again, it was through the medical<br>136:01 board, the FSMB. | | |
| **136:02 - 136:23**<br>136:02 Q. Okay. Besides the response being quite<br>136:03 positive, do you recall any comments or information<br>136:04 from any of the licensees regarding the book<br>136:05 itself?<br>136:06 A. The book? No, other than that the people<br>136:07 that had read it felt that it was beneficial to<br>136:08 them. We actually had -- Scott Fishman presented<br>136:09 at the Federation of Medical -- State Medical<br>136:10 Boards at one of their national conventions, and<br>136:11 one of his biggest concerns was the death rate and<br>136:12 the amount of addiction in West Virginia.<br>136:13 So we asked him to come and speak to<br>136:14 us, and we had Doctor Fishman come to West Virginia<br>136:15 and, you know, through the physicians health<br>136:16 program and be a speaker for several hundred<br>136:17 people, which was very helpful. | Re: [136:02 to 136:23]<br>Same objections as<br>above | Re: [136:02 to 136:23]<br>The document has<br>previously been admitted into<br>evidence, and the questioning<br>does not elicit hearsay as it<br>asks for the deponent's<br>understanding of why certain<br>actions were taken. The Board<br>of Medicine's guidance to<br>prescribers regarding<br>prescribing opioids is<br>relevant to this case,<br>including to the standard of<br>care. |

| Designations | Objections | Reponses |
|---|---|---|
| 136:18   Q. Do you recall when that was?<br>136:19   A. No, I think it was after the book was<br>136:20   published.<br>136:21   Q. Okay.<br>136:22   A. What year was this?<br>136:23   Q. It was spring of 2008. | | |
| **137:14 - 137:22**<br>137:14   Q. Were licensees of the Board invited to<br>137:15   attend --<br>137:16   A. Yeah.<br>137:17   Q. -- Mr. Fishman's presentation?  Okay.<br>137:18   A. They were.<br>137:19   Q. Did they receive any continuing education<br>137:20   credits to attend?<br>137:21   A. I believe it was managed through the<br>137:22   physicians health program that they did. | **Re: [137:14 to 137:22]**<br>Speculation; Lack of<br>Foundation/Personal Knowledge;<br>Relevance | **Re: [137:14 to 137:22]**<br>The question does not<br>call for speculation, nor does<br>it lack foundation or personal<br>knowledge. Mr. Knittle was the<br>Executive Director of the<br>Board of Medicine for twelve<br>years, and is testifying from<br>his personal knowledge in<br>responding to these questions.<br>Questions related to the<br>standard of care and the Board<br>of Medicine's guidance<br>surrounding use of<br>prescription opioids are<br>relevant. |
| **138:12 - 142:21**<br>138:12   Q. All right.  Will you pull out Tab 11?<br>138:13   KNITTLE DEPOSITION EXHIBIT NO. 11<br>138:14   (Management of Pain Act passed April<br>138:15   8, 2009 was marked for identification<br>138:16   purposes as Knittle Deposition Exhibit<br>138:17   No. 11.)<br>138:18   A. Okay.<br>138:19   Q. All right.  And this will be marked as<br>138:20   Exhibit 11 to your deposition, and this is the<br>138:21   Management of Pain Act passed April 8th, 2009.  Do<br>138:22   you see that?<br>138:23   A. Uh-huh.  Yes, I do.<br>138:24   Q. Okay.  And this looks to be kind of an<br>139:01   iteration or an update of the legislation we<br>139:02   discussed earlier that was Exhibit 7.<br>139:03   A. Yes.<br>139:04   Q. Are you familiar with the Management of<br>139:05   Pain Act?<br>139:06   A. Yes.  I think this was an amended version<br>139:07   of the previous one.<br>139:08   Q. Okay.  Did the Board of Medicine have any<br>139:09   involvement in the drafting of the Management of<br>139:10   Pain Act?<br>139:11   A. I think we probably were cognizant of it as<br>139:12   it was being amended and probably had some level of<br>139:13   thumbs up or thumbs down on it or modification.<br>139:14   Q. But the Board itself wouldn't write the<br>139:15   text of it.  It would kind of be presented to the<br>139:16   Board to say, "Do you agree with this"?<br>139:17   A. Yeah.  I don't think it was initiated by<br>139:18   us.  I think it was in -- it was the legislature<br>139:19   and -- yeah, legislators who prompted it.<br>139:20   Q. Okay.  If you compare it to the 1998 one,<br>139:21   the title of it is a little bit different.  The<br>139:22   1998 one says "Management of Intractable Pain" and<br>139:23   the 2009 version is just "Management of Pain Act." | **Re: [138:12 to 142:21]**<br>Improper narrative;<br>Hearsay; Relevance; Lack of<br>Foundation/Personal Knowledge | **Re: [138:12 to 142:21]**<br>The question does not<br>lack foundation or personal<br>knowledge. Mr. Knittle was the<br>Executive Director for the WV<br>Board of Medicine, one of the<br>primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role. Mr. Knittle testified<br>that the Board was "cognizant"<br>of the law (139:11). The<br>question does not call for<br>hearsay as it refers to<br>legislation passed by the<br>State, which provides notice<br>to the regulated parties.<br>Regulation of prescribers is<br>relevant to this case. |

| Designations | Objections | Reponses |
|---|---|---|
| 139:24     A. Uh-huh. | | |
| 140:01     Q. And if you look at the definition -- do you | | |
| 140:02     have the 1998 version in front of you too? | | |
| 140:03     A. No, I don't. | | |
| 140:04     Q. Could you grab that one? | | |
| 140:05     A. Okay.  Which tab was it? | | |
| 140:06     Q. It was Tab 2. | | |
| 140:07     A. Okay. | | |
| 140:08     Q. If you look at the definition of | | |
| 140:09     "Intractable pain" in the 1998 version -- just read | | |
| 140:10     that over.  It's number (3) in the first -- under | | |
| 140:11     Article 3A. | | |
| 140:12     A. Yes, I have it. | | |
| 140:13     Q. Okay. | | |
| 140:14     A. So that's intractable pain in the '98 | | |
| 140:15     version? | | |
| 140:16     Q. And then if you look at the 2009 version, | | |
| 140:17     there is no definition for intractable pain, but | | |
| 140:18     there is a definition for "pain." | | |
| 140:19     A. Yes. | | |
| 140:20     Q. Okay.  And the definition of "pain" in the | | |
| 140:21     2009 version is "'Pain' means an unpleasant sensory | | |
| 140:22     and emotional experience associated with actual or | | |
| 140:23     potential tissue damage or described in terms of | | |
| 140:24     such damage." | | |
| 141:01     If you compare the definitions of | | |
| 141:02     "intractable pain" versus just "pain," would you | | |
| 141:03     agree with me that the definition of "pain" is a | | |
| 141:04     bit broader than the definition of "intractable | | |
| 141:05     pain"? | | |
| 141:06     A. Yes, it is. | | |
| 141:07     Q. Because "intractable pain" definition must | | |
| 141:08     have a "cause that cannot be removed" and "pain" | | |
| 141:09     does not have such language in its definition. | | |
| 141:10     A. Right. | | |
| 141:11     Q. Okay.  And when you compare the two -- the | | |
| 141:12     1998 version and the 2009 version, they are | | |
| 141:13     virtually identical except for the 1998 version | | |
| 141:14     will use the term "intractable pain" and the 2009 | | |
| 141:15     will use the term "pain." | | |
| 141:16     Do you agree with me? | | |
| 141:17     A. I didn't go through letter by letter -- | | |
| 141:18     Q. Okay. | | |
| 141:19     A. -- but you say that they're exactly | | |
| 141:20     identical? | | |
| 141:21     Q. Nearly identical, yes. | | |
| 141:22     A. All right. | | |
| 141:23     Q. Okay.  And in fact, the section on the 1998 | | |
| 141:24     version that we reviewed, the 30-3A-2(a)(1) and | | |
| 142:01     (2) -- | | |
| 142:02     A. Yeah. | | |
| 142:03     Q. -- is virtually identical.  I think they -- | | |
| 142:04     one says "a physician shall not be subject" and the | | |
| 142:05     other one "a physician is not subject."  But other | | |
| 142:06     than that, the definitions of "pain" versus | | |
| 142:07     "intractable pain" is exactly the same. | | |
| 142:08     A. Okay. | | |
| 142:09     Q. So again, it would have been the position | | |
| 142:10     of the Board of Medicine in 2009 that a physician | | |
| 142:11     shall not or should not fear disciplinary action | | |
| 142:12     just for prescribing opioids, correct? | | |
| 142:13     A. Yeah, for the management of pain. | | |
| 142:14     Q. And how would the Board of Medicine inform | | |
| 142:15     its licensees of the change in the legislation? | | |
| 142:16     A. Through newsletter.  And through | | |
| 142:17     distribution with the other entities. | | |
| 142:18     Q. Okay.  Was the Board of Medicine influenced | | |
| 142:19     by any wholesale drug distributor related to the | | |
| 142:20     creation of this 2009 legislation? | | |
| 142:21     A. Not that I'm aware of, no. | | |

| Designations | Objections | Reponses |
|---|---|---|
| | | |
| **142:22 - 143:01** | | |
| 142:22 Q. Okay. Was the Board of Medicine influenced<br>142:23 by any drug manufacturer related to the 2009<br>142:24 legislation?<br>143:01 A. Not that I'm aware of, no. | Re: [142:22 to 143:01]<br>Same objections as<br>above; Also, objection to<br>overlapping designations | Re: [142:22 to 143:01]<br>The question does not<br>lack foundation or personal<br>knowledge. Mr. Knittle was the<br>Executive Director for the WV<br>Board of Medicine, one of the<br>primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role. Mr. Knittle testified<br>that the Board was "cognizant"<br>of the law (139:11). The<br>question does not call for<br>hearsay as it refers to<br>legislation passed by the<br>State, which provides notice<br>to the regulated parties.<br>Regulation of prescribers is<br>relevant to this case.<br>Designation modified to avoid<br>overlap. |
| **143:02 - 143:23** | | |
| 143:02 Q. Okay. All right. Can you grab Tab 15?<br>143:03 KNITTLE DEPOSITION EXHIBIT NO. 12<br>143:04 (Joint Policy Statement on Pain<br>143:05 Management at the End of Life was<br>143:06 marked for identification purposes as<br>143:07 Knittle Deposition Exhibit No. 12.)<br>143:08 A. Did you say 15 or 16?<br>143:09 Q. 15.<br>143:10 A. Okay.<br>143:11 Q. All right. And this will be marked as<br>143:12 Exhibit 12 to your deposition, and it is the Joint<br>143:13 Policy Statement on Pain Management at the End Of<br>143:14 Life, and if you turn to page 4, it says that it<br>143:15 was originally adopted March 12th, 2001 and<br>143:16 re-adopted May 10th, 2001 by the West Virginia<br>143:17 Board of Medicine. Do you see that?<br>143:18 A. Yes, I do.<br>143:19 Q. Okay. So this is -- appears to be exactly<br>143:20 the same Joint Policy Statement on Pain Management<br>143:21 at the End of Life that we discussed earlier that<br>143:22 was Exhibit 8?<br>143:23 A. Yes. | Re: [143:02 to 143:23]<br>Relevance; Hearsay | Re: [143:02 to 143:23]<br>The document and<br>questions are not hearsay as<br>they are relevant to<br>prescriber behavior and are<br>offered for their effect on<br>prescribers, not for the truth<br>of statements therein. |
| **145:06 - 145:09** | | |
| 145:06 Q. Was the Board influenced by any wholesale<br>145:07 drug distributors to relook at all of its policies<br>145:08 during this time?<br>145:09 A. No. | Re: [145:06 to 145:09]<br>Lack of<br>Foundation/Personal Knowledge;<br>Speculation; Relevance | Re: [145:06 to 145:09]<br>This question does<br>not lack foundation or call<br>for speculation. Mr. Knittle<br>was the executive director for<br>the WV Board of Medicine, one<br>of the primary regulators of<br>prescribers in West Virginia,<br>for 12 years. The question is<br>relevant to the board's<br>operations, and to establish<br>that defendants did not<br>interact with the board<br>regarding any policy related<br>to prescribing. |

| Designations | Objections | Reponses |
|---|---|---|
| **145:22 - 147:06** | | |
| 145:22 KNITTLE DEPOSITION EXHIBIT NO. 13<br>145:23 (Policy for the Use of Controlled<br>145:24 Substances for Treatment of Pain dated<br>146:01 May 10, 2010 was marked for<br>146:02 identification purposes as Knittle<br>146:03 Deposition Exhibit No. 13.)<br>146:04 A. Okay. I have it.<br>146:05 Q. And this exhibit will be marked as Exhibit<br>146:06 13 to your deposition and the number on the bottom<br>146:07 of the first page is WV_BOM00001291. And if you<br>146:08 turn to the second page, it says it's the Policy<br>146:09 for the Use of Controlled Substances for Treatment<br>146:10 of Pain.<br>146:11 And similar to the policy that we just<br>146:12 looked at, if you go to the last page, this is also<br>146:13 re-adopted on May 10th, 2010 by the Board of<br>146:14 Medicine. And this appears to be identical to the<br>146:15 policy from 2005 that we discussed earlier.<br>146:16 Is this the same situation of the other<br>146:17 one, it was just the Board was looking at<br>146:18 everything it had, and if it agreed with the<br>146:19 language, it re-adopted it; if it needed to change<br>146:20 anything, they would change the language.<br>146:21 A. Yes. I think if you look at all of our<br>146:22 policies for that time period, over a course of a<br>146:23 couple of meetings, we went through all our<br>146:24 policies.<br>147:01 Q. Okay. So it would have been the position<br>147:02 of the Board in -- that its Policy for the Use of<br>147:03 Controlled Substances for the Treatment of Pain did<br>147:04 not need to change at all from January of 2005 to<br>147:05 May of 2010.<br>147:06 A. Right. | **Re: [145:22 to 147:06]**<br>Compound; Improper<br>Narrative; Relevance;<br>Speculation; Lack of<br>Foundation | **Re: [145:22 to 147:06]**<br>The questioning is<br>not compound and constitutes<br>preliminary questions laying a<br>foundation for a document just<br>introduced. The document is<br>not used for the truth of its<br>contents, and the deponent has<br>personal knowledge and the<br>ability to testify about the<br>document, as it was a Board of<br>Medicine policy adopted during<br>his tenure as Executive<br>Director of the board. |
| **148:23 - 149:06** | | |
| 148:23 Did the Board of medicine ever<br>148:24 promulgate rules for the licensure of pain<br>149:01 management clinics?<br>149:02 A. I believe they did, yes.<br>149:03 Q. Okay. Do you know what they were?<br>149:04 A. No. I know that we had to monitor them and<br>149:05 that there were certain stipulations that they had<br>149:06 to abide by. | **Re: [148:23 to 149:06]**<br>Relevance; Lack of<br>Foundation/Personal Knowledge;<br>Scope | **Re: [148:23 to 149:06]**<br>The question does not<br>lack foundation or personal<br>knowledge. Mr. Knittle was the<br>Executive Director for the WV<br>Board of Medicine, one of the<br>primary regulators of<br>prescribers in West Virginia,<br>for 12 years. These questions<br>are within the personal<br>knowledge he developed in that<br>role. The scope objection is<br>unfounded as this was a fact<br>deposition, and in any case<br>the questions relate to the<br>deponent's personal knowledge<br>as Executive Director of the<br>Board of Medicine. |
| **153:20 - 154:04** | | |
| 153:20 Q. What did the Board do to designate a person<br>153:21 to access the CSMP database?<br>153:22 A. I recommended to the Board that our<br>153:23 investigator be the lead person for -- to access<br>153:24 it.<br>154:01 Q. And did the Board accept that<br>154:02 recommendation?<br>154:03 A. I believe they did, yes. I did not have<br>154:04 access to it. | **Re: [153:20 to 154:04]**<br>Speculation; Lack of<br>Foundation/Personal Knowledge;<br>Relevance | **Re: [153:20 to 154:04]**<br>Please see prior<br>response. |

| Designations | Objections | Reponses |
|---|---|---|
| **158:24 - 159:05** | | |
| 158:24      KNITTLE DEPOSITION EXHIBIT NO. 15<br>159:01      (Model Policy on the Use of Opioid<br>159:02      Analgesics in the Treatment of Chronic<br>159:03      Pain was marked for identification<br>159:04      purposes as Knittle Deposition Exhibit<br>159:05      No. 15.) | **Re: [158:24 to 159:05]**<br>Hearsay; Relevance | **Re: [158:24 to 159:05]**<br>The document has previously been admitted into evidence, and the questioning does not elicit hearsay as it asks for the deponents' understanding of what the policy is, it does not offer the contents of the policy for truth. Guidance to prescribers regarding prescribing opioids is relevant to this case, including to the standard of care. |
| **159:09 - 159:19** | | |
| 159:09      Q. All right. And this will be marked as<br>159:10      Exhibit 15 to your deposition. Do you recognize<br>159:11      this document?<br>159:12      A. I do.<br>159:13      Q. Okay. And what is it?<br>159:14      A. It's the policy for the use of opioid<br>159:15      analgesics for the treatment of chronic pain that<br>159:16      was put out by the Federation of State Medical<br>159:17      Boards.<br>159:18      Q. And it's dated July 2013?<br>159:19      A. It is. | **Re: [159:09 to 159:19]**<br>Hearsay; Relevance | **Re: [159:09 to 159:19]**<br>Please see prior response. |
| **162:09 - 162:12** | | |
| 162:09      Q. Do you know if FSMB was influenced in any<br>162:10      way by any wholesale drug distributors to create<br>162:11      the 2013 model policy?<br>162:12      A. No, I do not. | **Re: [162:09 to 162:12]**<br>Lack of Foundation;<br>Speculation; Relevance; Vague | **Re: [162:09 to 162:12]**<br>This question is not vague and does not lack foundation or call for speculation. Mr. Knittle was the executive director for the WV Board of Medicine, one of the primary regulators of prescribers in West Virginia, for 12 years. The question is relevant to the board's operations, and to establish that defendants did not interact with the board regarding any policy related to prescribing. |
| **162:18 - 163:09** | | |
| 162:18      KNITTLE DEPOSITION EXHIBIT NO. 16<br>162:19      (WVBOM Policy on the Use of Opioid<br>162:20      Analgesics in the Treatment of Chronic<br>162:21      Pain was marked for identification<br>162:22      purposes as Knittle Deposition Exhibit<br>162:23      No. 16.)<br>162:24      A. Okay.<br>163:01      Q. All right. So this says these are the<br>163:02      Board of Medicine's Policy on the Use of Opioid<br>163:03      Analgesics in the Treatment of Chronic Pain and<br>163:04      dated July 2013. And it says they are adopted from<br>163:05      the model policy guidelines of the Federation of<br>163:06      State Medical Boards.<br>163:07      Would those be the July -- the July<br>163:08      policy that we just talked about?<br>163:09      A. Yes. | **Re: [162:18 to 163:09]**<br>Compound; Hearsay; | **Re: [162:18 to 163:09]**<br>The document has previously been admitted into evidence, and the questioning does not elicit hearsay as it asks for the deponents' understanding of what the policy is, and therefore it does not offer the contents of the policy for truth. Guidance to prescribers regarding prescribing opioids is relevant to this case, including to the standard of care. |
| **163:15 - 163:20** | | |
| 163:15      Q. Do you know if the Board made any changes<br>163:16      to the FSMB model policy?<br>163:17      A. I don't believe that they did. I know that<br>163:18      they reviewed it carefully, it being a new policy<br>163:19      with a lot more information in it, but I don't | **Re: [163:15 to 163:20]**<br>Lack of<br>Foundation/Personal Knowledge;<br>Speculation; Relevance | **Re: [163:15 to 163:20]**<br>This question does not lack foundation or call for speculation. Mr. Knittle was the executive director for |

| Designations | Objections | Reponses |
|---|---|---|
| 163:20     think they made any policy -- any changes in it. | | the WV Board of Medicine, one of the primary regulators of prescribers in West Virginia, for 12 years. The question is relevant to the board's operations and policies impacting the standard of care. |
| **164:03 - 164:13** <br> 164:03   Q. What was the purpose of the Board adopting <br> 164:04   the Policy on the Use of Opioid Analgesics in the <br> 164:05   Treatment of Chronic Pain? <br> 164:06   A. I think it was to have a -- just a common <br> 164:07   understanding across the nation as to how -- how <br> 164:08   you should use opioid analgesics for the treatment <br> 164:09   of chronic pain. We wanted to try to get it as <br> 164:10   uniform as possible from state to state in terms of <br> 164:11   language and expectation of physicians. <br> 164:12   You know, moving from, you know, West <br> 164:13   Virginia to Texas to South Dakota to California. | Re: [164:03 to 164:13] <br> Same objections as above | Re: [164:03 to 164:13] <br> Please see prior response. |
| **164:18 - 165:05** <br> 164:18   Q. All right. The second, I guess, full <br> 164:19   paragraph - even though it's only a sentence - says <br> 164:20   "The CSA does not limit the amount of drug <br> 164:21   prescribed, the duration for which it is <br> 164:22   prescribed, or the period for which a prescription <br> 164:23   is valid (although some states do impose such <br> 164:24   limits)." <br> 165:01   Do you know if West Virginia imposes <br> 165:02   limits? <br> 165:03   A. No, we did not. We didn't cap anything. <br> 165:04   I'm trying to think of a state that did, and I <br> 165:05   can't recall one. | Re: [164:18 to 165:05] <br> Same objections as above | Re: [164:18 to 165:05] <br> Please see prior response. |
| **166:04 - 166:19** <br> 166:04   Q. And during your tenure at the Board, did <br> 166:05   the Board have licensees that illegally prescribed <br> 166:06   opioids? <br> 166:07   A. Yeah, there were a number of them that <br> 166:08   ended up being criminally prosecuted. <br> 166:09   Q. Okay. And what was their criminal intent? <br> 166:10   A. I believe that their intent was -- was <br> 166:11   financial in nature. <br> 166:12   Q. Okay. Do you know of any board licensees <br> 166:13   that illegally prescribed in Cabell County? <br> 166:14   A. I believe that there were. I can't give <br> 166:15   you their names. And there were some that <br> 166:16   prescribed in Cabell County and other counties, <br> 166:17   surrounding counties, as well. <br> 166:18   But there were some that -- that were <br> 166:19   criminal in their -- in their actions. | | |
| **167:14 - 167:21** <br> 167:14   Q. Okay. Was the Board of Medicine influenced <br> 167:15   in any way by any wholesale drug distributors to <br> 167:16   adopt the policy on the use of opioid analgesics in <br> 167:17   the treatment of chronic pain? <br> 167:18   A. No. <br> 167:19   Q. Was the Board influenced by any <br> 167:20   manufacturers? <br> 167:21   A. Not that I'm aware of. | | |

| Designations | Objections | Reponses |
|---|---|---|
| **168:10 - 168:24**<br>168:10 Q. All right.  This will be marked as Exhibit<br>168:11 17 to your deposition.  And it is the West Virginia<br>168:12 Board of Medicine Quarterly Newsletter, Volume 17,<br>168:13 Issue 3, July through September of 2013.  Correct?<br>168:14 A. Yes, it is.<br>168:15 Q. Okay.  On page 2, it says, "Update On Board<br>168:16 Policies."  So is this kind of like how we talked<br>168:17 about for many of the other policies, that the<br>168:18 Board would put information in the newsletter about<br>168:19 changes in policies?<br>168:20 A. Yes.<br>168:21 Q. And so this one is talking about the Policy<br>168:22 on the Use of Opioid Analgesics in the Treatment of<br>168:23 Chronic Pain.  And that would be Exhibit 16 that we<br>168:24 just discussed.  Right? | | |
| **169:01 - 169:24**<br>169:01 A. Yes.<br>169:02 Q. Okay.  And the second full paragraph, the<br>169:03 first sentence, says, "The Board continues<br>169:04 overtreatment and the continued use of ineffective<br>169:05 treatments to be the most common and problematic<br>169:06 iterations of the inappropriate treatment of pain."<br>169:07 What is "overtreatment"?<br>169:08 A. "Overtreatment" would be overprescribing,<br>169:09 prescribing multiple medications.<br>169:10 Q. And what is the "continued use of<br>169:11 ineffective treatments"?<br>169:12 A. To continue a treatment regimen that is<br>169:13 ineffective.<br>169:14 Q. What options would a prescriber have if<br>169:15 opioid therapy was ineffective?<br>169:16 A. I think there's a number of them.  I<br>169:17 couldn't tell you, again, not being a physician.  I<br>169:18 know that there are some good pain management<br>169:19 specialists out there who have developed pain<br>169:20 management without the use of opioids and have had<br>169:21 good success with it.<br>169:22 So I think they had to begin to look<br>169:23 at other options.<br>169:24 Q. Why were these the most common and | | |
| **170:01 - 170:13**<br>170:01 problematic iterations of the inappropriate<br>170:02 treatment of pain in 2013?<br>170:03 A. I think probably we were looking at the<br>170:04 complaints and things we had that people were<br>170:05 overprescribing; people continued to provide<br>170:06 opiates at higher dosages although there was no<br>170:07 indication that there was any effectiveness<br>170:08 whatsoever.<br>170:09 And more information was coming out<br>170:10 that opioids often do not control pain very well.<br>170:11 Q. Where was that information coming from?<br>170:12 A. I believe it was coming from medical<br>170:13 associations, medical journals across the nation. | | |
| **178:07 - 180:01**<br>178:07 KNITTLE DEPOSITION EXHIBIT NO. 21<br>178:08 (WV Legislature 2016 Regular Session<br>178:09 Enrolled Senate Bill 627 was marked<br>178:10 for identification purposes as Knittle<br>178:11 Deposition Exhibit No. 21.)<br>178:12 A. Okay.<br>178:13 Q. All right.  This may look familiar, but<br>178:14 this will be marked as Exhibit 21 to your<br>178:15 deposition.  And if -- the front says it's passed<br>178:16 March 10th, 2016, and if you turn to the next page,<br>178:17 it's the Management of Intractable Pain Act.<br>178:18 A. Yes. | **Re: [178:07 to 180:01]**<br>Hearsay; Compound;<br>Lack of Foundation/Personal<br>Knowledge; Speculation;<br>Relevance | **Re: [178:07 to 180:01]**<br>This question does<br>not lack foundation or call<br>for speculation. Mr. Knittle<br>was the executive director for<br>the WV Board of Medicine, one<br>of the primary regulators of<br>prescribers in West Virginia,<br>for 12 years. The question is<br>relevant to the board's<br>operations and policies<br>impacting the standard of |

| Designations | Objections | Responses |
|---|---|---|
| 178:19 Q. So we have previously discussed two prior<br>178:20 versions of this, the 1998 and the 2009 versions,<br>178:21 correct?<br>178:22 A. Yes.<br>178:23 Q. Was the Board involved in the drafting of<br>178:24 this 2016 version?<br>179:01 A. I believe we were, but I don't recall the<br>179:02 circumstances of it.  There was a -- there was a<br>179:03 reason why it was -- it was moot -- or it was -- or<br>179:04 amended.<br>179:05 Q. Okay.  And if you look on the second page,<br>179:06 the top paragraph, says, "An Act to amend and<br>179:07 reenact Section 30-3A-2 of the Code of West<br>179:08 Virginia, 1931, as amended; and to amend and<br>179:09 reenact Section 55-7-23 of said code, all relating<br>179:10 to permitting physicians to decline prescribing<br>179:11 controlled substance in certain circumstances;<br>179:12 limiting disciplinary action by a licensing board<br>179:13 on a health care provider with prescriptive<br>179:14 authority for declining to prescribe, or declining<br>179:15 to continue to prescribe, any controlled substance<br>179:16 in certain circumstances and providing that a<br>179:17 health care provider with prescriptive authority is<br>179:18 not liable to a patient or third party for<br>179:19 declining to prescribe, or declining to continue to<br>179:20 prescribe, any controlled substance in certain<br>179:21 circumstances."<br>179:22 So the amendment seems to be trying to<br>179:23 address the issue where a physician was declining<br>179:24 to prescribe a controlled substance.<br>180:01 A. Yes. | | care. The questioning does not<br>elicit hearsay as it asks for<br>the deponents' understanding<br>of what the policy is, it does<br>not offer the contents of the<br>policy for truth. Guidance to<br>prescribers regarding<br>prescribing opioids is<br>relevant to this case,<br>including to the standard of<br>care. |
| 181:23 - 182:05<br>181:23 Q. And prior to this amendment, if the Board<br>181:24 had received a complaint regarding a physician not<br>182:01 prescribing opioids, would the Board have<br>182:02 disciplined that physician?<br>182:03 A. I think we would looked -- would have<br>182:04 looked into the complaint to see if there was any<br>182:05 merit. | Re: [181:23 to 182:05]<br>Lack of<br>Foundation/Personal Knowledge;<br>Speculation; Relevance | Re: [181:23 to 182:05]<br>This question does<br>not lack foundation or call<br>for speculation. Mr. Knittle<br>was the executive director for<br>the WV Board of Medicine, one<br>of the primary regulators of<br>prescribers in West Virginia,<br>for 12 years. The question is<br>relevant to the board's<br>operations and policies<br>regarding prescriber<br>discipline. |
| 191:17 - 193:20<br>191:17 Q. And how did the Board try to identify the<br>191:18 prescribers who were contributing to the alarming<br>191:19 and sad situation?<br>191:20 A. Through complaints.  We can't go fishing --<br>191:21 you can't go into the CSMP and start looking and<br>191:22 saying, "Oh, okay, who's the biggest prescribers<br>191:23 here?"  That's, you know, grossly illegal, and it<br>191:24 was not the purpose of the CSMP, and there was a<br>192:01 lot of caution against that kind of activity where<br>192:02 they could -- that information could be used<br>192:03 detrimentally towards people.<br>192:04 So, you know, we function by<br>192:05 complaints, the complaint process, and we really<br>192:06 can't -- are not authorized to do anything unless<br>192:07 there's a complaint.<br>192:08 Q. And why would just going into the CSMP - if<br>192:09 you had the ability - to say, "Who's the biggest<br>192:10 prescriber," why wouldn't that do anything for you?<br>192:11 I mean, would you have wanted to be able to do<br>192:12 that?<br>192:13 A. No.  No.  And it would not be for -- for<br>192:14 the Board of Medicine.  It would be for law<br>192:15 enforcement.  That -- you know, if they have a -- | Re: [191:17 to 193:20]<br>Vague; Relevance | Re: [191:17 to 193:20]<br>The question is not<br>vague and is relevant to the<br>Board of Medicine's policies<br>regarding investigating<br>prescriber behavior. |

| Designations | Objections | Reponses |
|---|---|---|
| 192:16 someone under suspicion, they can't pull up that<br>192:17 information and then say, "Oh, okay, well, so-and-<br>192:18 so's -- you know, look at this, you know, he has<br>192:19 two different doctors prescribing to him, let's --<br>192:20 let's monitor him and then pick it up."<br>192:21 You know, which is illegal.  So -- or<br>192:22 people using it to get information against<br>192:23 somebody.  You know, there was an instance of --<br>192:24 that I had heard of where someone had found<br>193:01 information on their ex-wife.  So, you know, that's<br>193:02 a -- you can -- you can use it -- you can use it in<br>193:03 a lot of criminal ways, and there was a great deal<br>193:04 of effort to make sure that that didn't happen.<br>193:05 Q. And just going in and getting information<br>193:06 on the biggest prescriber wouldn't tell you<br>193:07 anything.  The biggest prescriber could be working<br>193:08 in hospice where it's end-of-life care and of<br>193:09 course they're the biggest prescriber --<br>193:10 A. Right.<br>193:11 Q. -- that type of situation.<br>193:12 A. Right.<br>193:13 Q. The numbers --<br>193:14 A. That was just a -- that was just a, you<br>193:15 know, a possibility, throw it out in the air.<br>193:16 Q. Yeah.<br>193:17 A. But you know, you're exactly right.<br>193:18 Q. Yeah.  The numbers alone don't tell you<br>193:19 anything.<br>193:20 A. Right. | | |
| **193:21 - 194:22**<br>193:21 Q. Okay.  Can you pull out Tab 36?<br>193:22 KNITTLE DEPOSITION EXHIBIT NO. 42<br>193:23 (WVBOM June 2016 Newsletter was marked<br>193:24 for identification purposes as Knittle<br>194:01 Deposition Exhibit No. 24.)<br>194:02 A. Okay.<br>194:03 Q. Perfect.  This will be marked as Exhibit 24<br>194:04 to your deposition.  And this the June 2016 West<br>194:05 Virginia Board of Medicine newsletter, correct?<br>194:06 A. Yes.<br>194:07 Q. And if you turn to page 6.<br>194:08 A. Okay.<br>194:09 Q. The title is "Reducing Risk:<br>194:10 Opioid-Prescribing Guideline Developed by CDC."<br>194:11 And the first full paragraph states, "Since 2006,<br>194:12 West Virginia has been the epicenter for<br>194:13 prescription drug overdose deaths in the nation.<br>194:14 This primarily has been fueled by the liberal<br>194:15 prescription of opioids over the past decade,<br>194:16 unfortunately compounded by overdose deaths from<br>194:17 heroin and illicitly-produced fentanyl."<br>194:18 So in -- in at least 2016, it was the<br>194:19 Board's belief that the opioid epidemic was<br>194:20 primarily fueled by doctors liberally prescribing<br>194:21 opioids, correct?<br>194:22 A. Yes. | Re: [193:21 to 194:22]<br>Compound; Hearsay;<br>Relevance | Re: [193:21 to 194:22]<br>The questioning is<br>not compound and constitutes<br>preliminary questions laying a<br>foundation for a document just<br>introduced. The document is<br>not used for the truth of its<br>contents, but for the Board of<br>Medicine's belief (see<br>194:18-21). The Board's<br>understanding of the causes of<br>opioid misuse and abuse is<br>relevant, including to<br>standard of care. |
| **196:07 - 196:24**<br>196:07 Q. For -- I'm sorry.  For all of the<br>196:08 guidelines that we've discussed, including the<br>196:09 adoption of the 2013 FSMB guidelines, the Board<br>196:10 would have relied on the judgment of the medical<br>196:11 professionals on the Board as to whether to accept<br>196:12 or adopt those guidelines, correct?<br>196:13 A. Yes.<br>196:14 Q. Okay.  And when the Board adopted the FSMB<br>196:15 2013 guidelines, did they make that decision<br>196:16 independent from the FSMB, or did the FSMB request<br>196:17 that the Board adopt the guidelines?<br>196:18 A. No, it was -- it was their own independent | Re: [196:07 to 196:24]<br>Relevance | Re: [196:07 to 196:24]<br>The Board of<br>Medicine's policies and<br>actions in relation to<br>providing guidance to<br>prescribers, including sources<br>of potential influence for<br>that guidance, is relevant to<br>the standard of care. Issues<br>of prescribing and Board of<br>Medicine regulation thereof<br>have been affirmatively |

| Designations | Objections | Reponses |
|---|---|---|
| 196:19 decision.  You know, the guidelines were put out by<br>196:20 the FSMB, but there was no coercion on anyone's<br>196:21 part to adopt or adopt portions of it or however.<br>196:22 With 50 different states, you know, there's -- it<br>196:23 was made available to everyone to use it as they<br>196:24 saw fit. | | introduced into this case through plaintiffs' expert, Lacey Keller. |
| **201:04 - 202:16**<br>201:04 Q. As you discussed earlier, one of the<br>201:05 Board of Medicine's functions is to license<br>201:06 doctors and other medical professionals,<br>201:07 correct?<br>201:08 A. That's correct.  Allopathic<br>201:09 physicians.<br>201:10 Q. How often do doctors have to be<br>201:11 relicensed by the Board?<br>201:12 A. Every two years.<br>201:13 Q. And what is the purpose of licensing<br>201:14 doctors?<br>201:15 A. In order to ascertain that they are<br>201:16 still practicing with a proper degree of<br>201:17 knowledge and professionalism.<br>201:18 Q. So the Board's license is an<br>201:19 endorsement of the doctor's credentials?<br>201:20 A. Yes.<br>201:21 Q. And the Board's license is an<br>201:22 endorsement of the doctor's ability to<br>201:23 continue to make medical judgments?<br>201:24 A. Yes.<br>202:01 Q. And part of the reason that the Board<br>202:02 of Medicine licenses doctors is to protect the<br>202:03 public; is that right?<br>202:04 A. That's correct.<br>202:05 Q. So the public can have confidence that<br>202:06 a licensed doctor is legitimate?<br>202:07 A. Yes.<br>202:08 Q. And licenses ensure that only doctors<br>202:09 can prescribe controlled substances?<br>202:10 A. I think physicians, yes.<br>202:11 Q. And if the Board of Medicine knew that<br>202:12 a doctor was engaged in diversion of<br>202:13 controlled substances, they have the authority<br>202:14 to pull the doctor's license through the<br>202:15 disciplinary procedures we talked about?<br>202:16 A. Through the disciplinary process, yes. | Re: [201:04 to 202:16]<br>Vague (including time-period) Relevance; Speculation (202:5-7) | Re: [201:04 to 202:16]<br>The questioning is not vague and does not call for speculation. Mr. Knittle was the executive director for the WV Board of Medicine, one of the primary regulators of prescribers in West Virginia, for 12 years. The question is relevant to the board's operations and why and how the board licenses prescribers. |
| **202:17 - 202:24**<br>202:17 Q. And the Board of Medicine also has the<br>202:18 authority to decide not to relicense a doctor?<br>202:19 A. It would have to have a basis for<br>202:20 doing so.<br>202:21 Q. If the Board of Medicine knew that a<br>202:22 doctor was engaged in diversion of controlled<br>202:23 substances, would they have the authority to<br>202:24 decide not to re-license a doctor? | | |
| **203:01 - 203:04**<br>203:01 A. It would have to be proven through the<br>203:02 complaint process for that to occur.  We<br>203:03 couldn't just randomly say, "Well, we don't<br>203:04 think we're gonna give you your license back." | | |

| Designations | Objections | Reponses |
|---|---|---|
| 203:05 - 204:01 | | |
| 203:05    Q. So if a doctor/licensee went through | **Re: [203:05 to 204:01]** | **Re: [203:05 to 204:01]** |
| 203:06    the disciplinary process and was found to have | Relevance; | The questioning is |
| 203:07    engaged in diversion of controlled substances, | Speculation; Vague (including | not vague and does not call |
| 203:08    the Board of Medicine would have the authority | time-period) | for speculation. Mr. Knittle |
| 203:09    to decide not to relicense a doctor at that | | was the executive director for |
| 203:10    point. | | the WV Board of Medicine, one |
| 203:11    A. It would be a revocation of his | | of the primary regulators of |
| 203:12    license with the -- with the possibility that | | prescribers in West Virginia, |
| 203:13    he would not be able to renew again. | | for 12 years. The question is |
| 203:14    Q. What is the -- what information does | | relevant to the board's |
| 203:15    the Board of Medicine look at when it decides | | operations and why and how the |
| 203:16    whether or not to license a doctor? | | board licenses prescribers. |
| 203:17    A. We would look at -- there's a series | | |
| 203:18    of questions that the physician must answer - | | |
| 203:19    I think there's 12 or 15 of them - that has to | | |
| 203:20    do with their mental fitness, their physical | | |
| 203:21    fitness, any issues with possible addictions | | |
| 203:22    themselves, any court issues or legal issues | | |
| 203:23    that may affect their practice. | | |
| 203:24    And there's a -- there's a list | | |
| 204:01    of those on the page for the renewal section. | | |